Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                    :

                               :     Chapter 11

6    ENERGY FUTURE HOLDINGS     :

     CORP., et al.,      :    :    Case No. 14-10979(CSS)

7                               :

              Debtors.      :    (Jointly Administered)

8    _____:

9

10

11

12                              United States Bankruptcy Court

13                              824 North Market Street

14                              Wilmington, Delaware

15                              November 19, 2015

16                              10:04 a.m. - 3:05 p.m.

17

18

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:   LESLIE MURIN

1    HEARING re: Confirmation Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   AKIN GUMP STRAUSS HAUER & FELD LLP

4         Attorney to Ad Hoc Committee of EFIH Unsecured

5         Noteholders and EFIH Second Lien DIP Commitment

6

7   BY:  SCOTT L. ALBERINO

8

9   ASHBY & GEDDES PA

10        Attorneys for WSFS Second Lien Trustee

11

12  BY:  GREGORY TAYLOR

13

14  BROWN RUDNICK LLP

15        Attorneys for WSFS Second Lien Trustee

16

17  BY:  JEFFREY L. JONAS

18        JONATHAN D. MARSHALL

19

20  CHADBOURNE & PARKE LLP

21        Attorneys for NextEra Energy Resources LLC

22

23  BY:  DAVID M LEMAY

24

25

1    COLE SCHOTZ MEISEL FORMAN & LEONARD P.A

2        Attorney for DTC Company as Indenture Trustee

3

4    BY:  THERESE SCHEUER

5

6    CRAVATH, SWAINE & MOORE LLP

7        Attorney for EFIH Special Conflicts

8

9    BY:  PHILLIP A. GELSTON

10

11   FOLEY & LARDNER LLP

12       Attorney for UMB Bank, NA as Indenture Trustee

13

14   BY:  HAROLD L. KAPLAN

15

16   FOX ROTHSCHILD LLP

17       Attorney for Counsel to Ad Hoc Group of

18       TCEH Unsecured Noteholders

19

20   BY:  L. JOHN BIRD

21

22   GELLERT SCALI BUSENKELL & BROWN

23       Attorneys for EFIH Special Conflicts

24

25   BY:  RONALD S. GELLERT

1    HOGAN MCDANIEL

2         Attorneys for Contrarian Capital Management

3

4    BY:  GARVAN F. MCDANIEL

5

6    JENNER & BLOCK LLP

7         Co-Counsel to Energy Future Intermediate Holding

8         Company LLC

9

10   BY:  RICHARD LEVIN

11        VINCENT E. LAZAR

12

13   KASOWITZ BENSON TORRES & FRIEDMAN LLP

14        Attorney to Ad Hoc Group of EFH Legacy Noteholder

15

16   BY:  DANIEL A. FLIMAN

17

18   KAYE SCHOLER

19        Attorney for York Capital

20

21   BY:  SCOTT D. TALMADGE

22

23

24

25

1   KLEHR HARRISON HARVEY BRANZBURG LLP

2        Counsel to UMB Bank N.A. Indenture Trustee

3

4   BY:  RAYMOND H. LEMISCH

5

6   KRAMER LEVIN NAFTALIS & FRANKEL LLP

7        Attorneys for Second Lien Indenture Trustee

8

9   BY:  GREGORY A. HOROWITZ

10

11  LANDIS RATH & COBB

12        Attorneys for NextEra Energy Resources LLC

13

14  BY:  MATTHEW MCGUIRE

15

16  MCELROY, DEUTSCH, MULVANEY, & CARPENTER, LLP

17        Co-Counsel to the TCEH Debtors

18

19  BY:  DAVID H. PRIMACK

20

21  MONTGOMERY MCCRACKEN WALKER AND RHOADS

22        Co-Counsel to the EFH Creditors' Committee

23

24  BY:  SIDNEY LIEBESMAN

25

```
 1   MORRIS JAMES LLP

 2        Attorney for Law Debenture of New York, Indenture

 3        Trustee

 4

 5   BY:  STEPHEN M. MILLER

 6

 7   MORRISON & FOERSTER LLP

 8        Co-Counsel to the TCEH Creditors' Committee

 9

10   BY:  TODD M. GOREN

11        CHARLES L. KERR

12        BRETT H. MILLER

13

14   MUNGER, TOLLES & OLSON LLP

15        Co-Counsel to the TCEH Debtors

16

17   BY:  JOHN W. SPIEGEL

18

19   MUNGER, TOLLS & OLSON LLP

20        Attorneys for Hugh Sawyer TCEH Dmitry

21

22   BY:  BRADLEY R. SCHNEIDER

23

24

25
```

```
1    NIXON PEABODY LLP
2         Attorneys for AST as EFH Indenture Trustee
3
4    BY:  MORGAN C. NIGHAN
5         RICHARD C. PEDONE
6
7    O'KELLY, ERNST & BIELLI LLP
8         Co-Counsel to Energy Future Holdings Corp.
9
10   BY:  DAVID M. KLAUDER
11
12   O'MELVENY & MYERS LLP
13        Attorneys for Apollo, Brookfield, Angelo Gordon
14
15   BY:  ANDREW D. SORKIN
16
17   PACHULSKI STANG ZIEL & JONES
18        Attorney for Second Lien Indenture Trustee
19
20   BY:  COLIN R. ROBINSON
21
22
23
24
25
```

1   PATTERSON BELKNAP

2        Attorney for Law Debenture of New York, Indenture

3        Trustee

4

5   BY:  DANIEL A. LOWENTHAL

6

7   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

8        Counsel to Ad Hoc Committee Of TCEH First Lien

9        Creditors

10

11  BY:  JACOB A. ADLERSTEIN

12       BRIAN S. HERMANN

13

14  POLSINELLI

15       Attorney for T Committee

16

17  BY:  JARRETT K. VINE

18

19  POLSINELLI PC

20       Co-Counsel to the TCEH Creditors' Committee

21

22  BY:  CHRISTOPHER A. WARD

23

24

25

1  POTTER ANDERSON & CORROON LLP

2      Attorneys for Deutsche Bank, Agent to DIP Financing

3

4  BY:  JEREMY W. RYAN

5

6  PROSKAUER ROSE LLP

7      Attorneys for EFH Corp. Disinterested Directors

8

9  BY:  MICHAEL A. FIRESTEIN

10     MARK K. THOMAS

11

12 REED SMITH

13     Attorney for Bank of New York Mellon Trust

14

15 BY:  SARAH K. KAM

16

17 SEWARD & KISSEL

18     Wilmington Trust as Successor of First Lien

19     Administrative Agent and Collateral Agent

20

21 BY:  MARK D. KOTWICK

22

23

24

25

1  SEWARD & KISSEL LLP

2      Attorney to Wilmington Trust NA-First Lien Agent

3

4  BY:  ARLENE R. ALVES

5

6  SHEARMAN & STERLING LLP

7      Counsel to Deutsche Bank, agent to DIP Financing

8

9  BY:  NED S. SCHODEK

10

11  STEVENS & LEE PC

12      Co-Counsel to Energy Future Intermediate Holding

13      Company LLC

14

15  BY:  JOSEPH H. HUSTON, JR.

16

17  U.S. DEPARTMENT OF JUSTICE

18      U.S. Trustee

19

20  BY:  RICHARD L. SCHEPACARTER

21

22  VENABLE LLP

23      Attorney for PIMCO

24

25  BY:  JAMIE L. EDMONSON

1   WACHTELL, LIPTON, ROSEN & KATZ

2       Attorneys for Equity Sponsors

3

4   BY:  EMIL A. KLEINHAUS

5

6   WHITE & CASE LLP

7       Attorney to Ad Hoc Committee of EFIH Unsecured

8       Noteholders and EFIH Second Lien DIP Commitment

9

10  BY:  THOMAS LAURIA

11       J. CHRISTOPHER SHORE

12

13  WILMER CUTLER PICKERING HALE & DORR LLP

14       Attorneys for Marathon Asset Management

15

16  BY:  PHILIP D. ANKER

17

18  YOUNG CONAWAY STARGATT & TAYLOR, LLP

19       Counsel to Ad Hoc Group of TCEH Unsecured Noteholders

20

21  BY:  PAULINE K. MORGAN

22

23

24

25

1    MORGAN LEWIS

2         Attorneys for PIMCO

3

4    BY:  CHRISTOPHER L. CARTER

5

6    VENABLE

7         Attorneys for PIMCO

8

9    BY:  CAROL W. LEVY

10

11   APPEARING TELEPHONICALLY:

12   ABID QURESHI

13   ROBERT K. MALONE

14   MARK F. HEBBEIN

15   MATTHEW M. ROOSE

16   BENJHAMIN D. FEDER

17   APARNA YENAMANDRA

18   CHRISTOPHER HAHM

19   MARK A. FINK

20   MARY D. CLULLO

21   ASHLEY F. BARTRAM

22   BRIAN P. GUINEY

23   ANDREA B. SCHWARTZ

24   NII-AMAR AMAMOO

25   PEG A. BRICKLEY

1   EMILY A BUSSIGEL

2   MARIA CHUTCHIAN

3   MARK A. CODY

4   KENT COLLIER

5   LOUIS A. CURCIO

6   ADAM M. DENHOFF

7   STACEY DORE

8   BARRY FELDER

9   MARK FLANNAGAN

10   MEGGIE GILSTRAP

11   RICHARD GITLIN

12   XIAOYU GU

13   THOMAS HALS

14   MARK W. HANCOCK

15   ANGELA K. HERRING

16   NATASHA HWANGPO

17   ANNA KALENCHITS

18   MATTHEW W. KINSKEY

19   SETH KLEINMAN

20   CHARLES KOSTER

21   STUART KOVENSKY

22   PHILIP G. LAROCHE

23   BRIAN P. MORGAN

24   HAL F. MORRIS

25   TINA MOSS

```
 1   LARS A PETERSON

 2   BRIAN PFEFFER

 3   MEREDITH PFISTER

 4   MEREDITH QUICK

 5   ELIZABETH RASSKAZOVA

 6   ERICA RICHARDS

 7   MARC B. ROITMAN

 8   JASON SATSKY

 9   FREDRIC SOSNICK

10   RICHARD A. STEIGLITZ

11   MARK TAUB

12   AMER TIWANA

13   BRIAN TONG

14   CARL TULLSON

15   MICHAEL TURKEL

16   MATTHEW UNDERWOOD

17   KEVIN M. VAN DAM

18   BRADY C. WILLIAMSON

19   JULIA M. WINTERS

20   DANIELE ZAZOVE

21   DAVID ZYLBERBERG

22

23

24

25
```

1                    P R O C E E D I N G S

2            CLERK:  All rise.

3            THE COURT:  Please be seated.  Good morning.

4            MR. SHORE:  Good morning, Your Honor.

5            THE COURT:  Mr. Shore, I believe he wants to be

6    heard.

7            MR. SHORE:  Good morning, Your Honor, Chris Shore

8    from White & Case on behalf of the ad hoc group of TCEH

9    unsecured notes.

10           I'd like to make an oral motion to strike a

11   pleading that was filed yesterday.  On the docket yesterday

12   was a statement submitted by NextEra in connection with

13   confirmation.  It -- to the extent it is an objection to

14   confirmation, it is untimely under Your Honor's scheduling

15   order, objections were due October 23rd.

16           To the extent it is a witness statement, it is

17   untimely under the order of all witnesses needed to be

18   disclosed, and put up for deposition.  Obviously, we would

19   have many questions to ask, with respect to the hearsay

20   statements that are in that pleading.

21           The -- NextEra is not a participating party under

22   the order, but that doesn't really solve the problem.

23   They've been on notice that their bid was going to be used

24   in connection with these proceedings.  They had an

25   opportunity to file a notice of intent, quite frankly, all

1   the way up through the end of the confirmation hearing.  Any

2   party in interest in case can appear and be heard.

3            So they had an opportunity, to the extent they

4   thought something needed to be corrected in the testimony of

5   Mr. Keglevic or Ms. Doré or anybody else to file a notice of

6   intent and cross the witness and try to elicit the facts

7   that they say should have been elicited as part of the

8   confirmation trial.

9            Although they are not a participating party under

10  the order, they are, as I said, a party in interest in the

11  case.  They have most recently filed a joinder to the

12  objection to the PIK settlement motion, where they disclosed

13  they held, I believe $45 million in PIK notes.  So they

14  clearly have had the economic wherewithal to come in and

15  play according to the rules under the order.

16           To allow the statement to exist on the record, we

17  believe, as prejudicial, not only to the debtors, but all

18  parties, who had participated in these cases and gone

19  through the burdens of disclosing what their case was going

20  to be, both in advance of the trial, to allow people to

21  respond to it, but also expose themselves to discovery.

22           In addition, though we don't need to address it

23  today, we do not believe that the pleading was filed at all

24  to correct the record.  We believe there may have been other

25  reasons why they were going to do that.  So we've asked the

1    Court to strike the pleading as a violation of the Court's

2    scheduling order in connection with confirmation, and asked

3    the Court to reserve all parties rights with respect to

4    appropriate remedies, if they need to be taken at a later

5    time.

6              THE COURT:  Thank you, Mr. Shore.  Does anyone

7    wish to be heard?  Mr. Lemay?

8              MR. LEMAY:  Your Honor, David Lemay from

9    Chadbourne & Parke for NextEra Energy.

10             Might I first ask, Your Honor, if it would be okay

11   to ask if there's anyone else who's going to speak on the

12   other side of this issue before I launch in?

13             THE COURT:  Sure. No one else stood up, but does

14   anyone wish to be heard in connection with this, other than

15   Mr. Lemay?  All right, I hear or see none.

16             MR. LEMAY:  Thank you, Your Honor.  So, Your

17   Honor, we filed, as everyone knows yesterday, a three page

18   eight or nine paragraph statement that was engendered by the

19   fact that three witnesses, Mr. Keglevic, Ms. Doré and Ms.

20   Williamson had spoken a lot about NextEra.  Counsel had

21   spoken a lot about NextEra in its speeches and we thought

22   the time had come to let the Court and parties know what

23   NextEra truly thought firsthand.

24             The paper does not seek to solicit anyone to do

25   anything.  It concludes by saying if the debtors wish to re-

1    engage, we're here.  So I don't think there's any question

2    of solicitation.

3            It's very brief.  I don't believe it's actually,

4    in reality, consumed very much of anyone's time.  And it

5    fully sets forth NextEra's thinking, which I think can only

6    be a benefit.

7            I don't know if Your Honor is inclined to hear all

8    applications to strike or not strike, but this seems, to me,

9    to be quite a tempest in a teapot, and I'm happy to answer

10   any questions that the Court has.

11           THE COURT:  I have no questions.

12           MR. LEMAY:  Thank you, Your Honor.

13           THE COURT:  I'm going to grant the motion and

14   strike the pleading.  The docket is not a place for

15   statements.  It's not a position place.  It's a place for

16   motions seeking Court relief.  It's a place for objections

17   to relief being sought.  It's a place for filing matters

18   that are contemplated under the rules.

19           These types of statements, to the extent would --

20   they would be appropriate -- could've been made in open

21   Court, could've been filed as an objection.  All those

22   witnesses could've been cross examined.  So I just don't

23   think it's an appropriate thing for the docket.  I'm going

24   to grant the motion, strike the pleading and reserve all

25   parties' rights.

1          MR. LEMAY:  Very well.  Thank you, Your Honor.

2          THE COURT:  You're welcome.  Mr. Shore, would you

3     submit an order, please?

4          MR. SHORE:  I will, Your Honor.

5          THE COURT:  And we will have the image removed

6     from CMEC.  Ms. Werkheiser, would you make a note to let the

7     clerk's office know?  Thank you.  Mr. McKane?  Good morning.

8          MR. MCKANE:  Your Honor, Mark McKane of Kirkland

9     and Ellis on behalf of the debtor's on a much more mundane

10    matter.

11         At the close of Friday's proceeding the debtor's

12    committed to submit a revised written direct of Mr. Eric

13    Mendelsohn and consistent with your Court's ruling as it

14    relates to, I believe, the admissibility of a few lines of

15    that testimony, we have provided Your Honor and Your Honor's

16    staff with D-DIR-Mendelsohn-R, which reflects Your Honor's

17    ruling and has been confirmed, to my understanding, by all

18    of the objectors as consistent with Your Honor's order.

19         THE COURT:  All right, very good.  Thank you.  I

20    have received that.  Let's admit that into evidence.

21         MR. MCKANE:  Please, Your Honor.

22         THE COURT:  All right, any objection?  All right,

23    submitted into evidence.  That's D-DRI-Mendelsohn-R.

24         MR. MCKANE:  Thank you, Your Honor.

25         THE COURT:  You're welcome.

1          MR. MCKANE:  And Your Honor, I believe Mr. Spiegel

2     of Munger, Tolles is now going to handle the next witness.

3          THE COURT:  Yeah, I -- just before we get to that,

4     Mr. Anker and Mr. Horowitz, if you could put on the record

5     that you don't need to further examine Ms. Doré, I'd

6     appreciate that.

7          MR. ANKER:  Mr. McKane suggested that we should

8     change the order of that.

9          THE COURT:  Okay.

10          MR. MCKANE:  So that he could say, "Me too."

11          MR. ANKER:  So I could say, "Me too."

12          THE COURT:  Well, the first liens get to go first.

13          MR. ANKER:  We are first.  I do recall that.  Your

14     Honor, Philip Anker, Wilmer, Cutler, Pickering, Hale and

15     Dorr for Delaware Trust Company as indentured trustee for

16     the first liens.

17          We have reached an agreement memorialized in very

18     specific language to modify the plan to address the issues

19     we raised in our objection, regarding impairment.  And in

20     light of that, and I understand that language has been

21     agreed to, indeed, their emails with both debtors' counsel

22     and counsel for the plan sponsors, Mr. Shore and Mr. Lauria.

23          In light of that, we do not believe we need to

24     examine Ms. Doré and we're happy to release her so she can

25     do, hopefully, more productive things.  We obviously reserve

1    our rights as to the confirmation order itself, as I think

2    to all objecting parties.  But other than that, we do not

3    have any need to examine Ms. Doré.

4              THE COURT:  Very good.  Mr. Horowitz?

5              MR. HOROWITZ:  Thank you, Your Honor.  Gregory

6    Horowitz from Kramer, Levin, Naftalis & Frankel on behalf of

7    the EFIH second lien indentured trustee.  The agreement that

8    Mr. Anker just described includes language covering the

9    second lien, the EFIH second lien notes as well.  And on the

10   basis of the agreement, to include that language in the

11   plan, and also reserving our rights with regard to the

12   confirmation order, we, too, agree that we have no need to

13   cross examine Ms. Doré.

14             THE COURT:  All right, thank you very much.

15             MR. HOROWITZ:  Thank you, Your Honor.

16             THE COURT:  All right, that'll close Ms. Doré's

17   testimony for the record.  And now, we'll -- Mr. Sawyer, I

18   believe.

19             MR. SPIEGEL:  Thank you, Your Honor.  Good

20   morning, John Spiegel, Munger, Tolles & Olson representing

21   TCEH and EFCH, acting at the direction of the disinterested

22   manager, Hugh Sawyer.  The debtor's call our next witness,

23   Your Honor, Hugh Sawyer.

24             THE COURT:  Very good.  Mr. Sawyer, if you'd

25   please take the stand and remain standing for your

1   affirmation?

2           CLERK:  Please raise your right hand.  Do you

3   affirm your word that you will tell the truth, the whole

4   truth and nothing but the truth to the best of your

5   knowledge and ability?

6           MR. SAWYER:  I will.

7           CLERK:  Please state and spell your name for the

8   record.

9           MR. SAWYER:  Hugh.  H-U-G-H and one initial E.

10  Last name Sawyer. S-A-W-Y-E-R.

11          CLERK:  Thank you.

12          MR. SAWYER:  Thank you.

13          THE COURT:  Thank you.  Please be seated, Mr.

14  Sawyer.

15                      DIRECT EXAMINATION

16  BY MR. SPIEGEL:

17  Q    Good morning, Mr. Sawyer.

18  A    Good morning.

19  Q    What is your role with the debtors in these cases?

20  A    I am the disinterested manager for ECFH and TCEH.

21  Q    Do you sit on the boards of any of the other debtors in

22  these cases?

23  A    I do not.

24  Q    What's your understanding of your role as director at

25  TCEH and EFCH?

1    A    I owe a sole fiduciary duty to ECH and TCEH.

2    Q    Could you give the Court a brief summary of your

3    professional background, please?

4    A    Over the last 35 years, I've served as a CEO or a

5    President of eight companies, some public companies, some

6    privately equity sponsored.  And I've also served on 13

7    boards over the last 35 years.

8    Q    Could you give us a few examples of companies, where

9    you served as the CEO?

10   A    As a CEO or President, most recently, Euramax Holdings,

11   Wells Fargo Armored Service Corporation, the National Linen

12   Service.

13   Q    And what types of businesses were these companies in?

14   A    Wells Fargo Armored Service was an armored car carrier

15   that served the federal reserve system of the United States

16   and certain retail plants.

17         We essentially transported cash. We also were the

18   largest third party servicer of ATM equipment in the US.

19   The National Linen Service was North America's largest

20   industry laundry.  We provided bed sheets and pillowcases to

21   hotels and hospitals and tabletops and linens to fine

22   dining.  Euramax Holdings is a building materials company.

23   In simple terms, they bend metal and paint it, a major

24   supplier to Home Depot and Lowes with global operations.

25   Q    And how about some examples of companies where you've

1    served as a member of the board of directors?

2    A     Spiegel Corporation, Edison Mission Energy, Neff

3    Equipment Rental.

4    Q     And what is your current business affiliation?

5    A     I am a Managing Director at Huron Business Advisory,

6    Huron Consulting Group.

7    Q     And what are your responsibilities in that capacity?

8    A     I have a responsibility for operational improvement

9    assignments at Huron Business Advisory.

10   Q     Have you had experience with any companies that have

11   gone through and leveraged buyout transaction?

12   A     Yes.

13   Q     What companies is that?

14   A     BorgWarner Corporation.

15   Q     And have you had experience with other companies

16   involved in mergers and acquisitions transactions?

17   A     Yes.

18   Q     About how many, if you can estimate?

19   A     Over 35 years, either as a CEO or board member, and

20   well over 100.

21   Q     Did there come a time in your role as disinterested

22   manager at TCEH and EFCH -- and I'll just use the

23   abbreviation -- TCEH collectively, if that's okay with you--

24   A     Sure.

25   Q     In that role, did there come a time when you retained

1    independent advisors to assist you?

2    A    Yes.

3    Q    When was that?

4    A    After the November 3rd ruling from the Court.

5    Q    What year was that?  November 3 of what year?

6    A    In 2014.

7    Q    So November of 2014?

8    A    Yes.

9    Q    And what did you do in connection with retaining

10   independent advisors?

11   A    I interviewed, personally, nine law firms during that

12   process.

13   Q    And who did you select to be your legal advisor?

14   A    I selected Munger, Tolles & Olson.

15   Q    How did you come to consider Munger, Tolles on your

16   list of firms to be considered?

17   A    I had been adversarial to Munger, Tolles in the Edison

18   Mission Energy bankruptcy.

19   Q    In what way were you adversarial with Munger, Tolles?

20   A    I was a disinterested director at Edison Mission Energy

21   and Munger, Tolles represented the parent company, EIX.

22   Q    Were there claims asserted by Edison Mission Energy

23   against its parent company, represented by Munger, Tolles?

24   A    Yes.

25   Q    And how did you come to select your financial advisor,

1  your independent financial advisor?

2  A    I interviewed a handful of firms.  I knew of Brad

3  Robbins reputationally and felt very strongly that he would

4  be a good advisor at Greenhill.

5  Q    Approximately when did you retain Munger, Tolles and

6  Greenhill as your legal and financial, your independent,

7  legal, and financial advisors?

8  A    Subsequent to the Court's ruling on November the 3rd,

9  which emphasized that I should act vigorously in my role,

10  around that mid-November.

11  Q    Let's turn to Exhibit 156, DX 156.  It should be in

12  your binder, and we'll put it up on the screen for you.  And

13  as we're doing that, what was the first thing you asked your

14  legal advisors to do, once you retained them?

15  A    I asked -- directed Munger, Tolles to review the

16  resolutions that established the role and authority of the

17  disinterested management.

18  Q    And did they do that?

19  A    They did.

20  Q    And what was the outcome of that review, without

21  reviewing any substantive legal advice that you received?

22  A    The resolutions were modified to confirm the role in

23  authority of the disinterested manager on the T-side and the

24  other estates.

25  Q    But looking at the first page of DX 156, do you

1    recognize this document?

2    A    I do.

3    Q    What is it?

4    A    It's the board agenda from the December 9th meeting of

5    the T-side.

6    Q    Did you attend that meeting?

7    A    I did.

8    Q    Who else was there?

9    A    John Young, who was Chair, Arcilia Acosta, who's a

10   member of the board, Paul Keglevic, Scott Levovitz, Michael

11   McDougall, Jason Ridloff.

12   Q    So the TCEH EFCH Board was in attendance?

13   A    Exactly.

14   Q    Telephone or in-person?

15   A    It was telephonic.

16   Q    Okay.  Let's turn to the second page of DX 156.  And

17   can you take, (indiscernible) please, the first paragraph of

18   text under the heading "Board of Managers Resolutions?"

19   This paragraph says, "The following recitals and resolutions

20   supplement the Board of Managers Resolutions dated as of

21   November 7, 2014."  What were the November 7th resolutions?

22   A    Soon after the November 3rd ruling from the Court, the

23   T-side board established an initial set of resolutions

24   defining the role and the authority of the disinterested

25   managers.

1    Q    Well--

2    A    These are the resolutions I asked Munger, Tolles to

3    review.

4    Q    Well, let's go to the third whereas clause on this

5    page, please.  And if we could highlight the several lines

6    above the definition of conflict matters in parentheses and

7    quotes, so beginning, "Any matter pertaining to the Chapter

8    11 case," all the way down to, "conflict matters," please?

9    So did you have an understanding of what a conflict matter

10   was in your role as disinterested manager?

11   A    Yes.

12   Q    And what was that?

13   A    When a decision point was reached that might be

14   contrary to the economic interests of another debtor in the

15   case.

16   Q    Let's go down to the resolution at the bottom of the

17   page -- of this page, too.  What's your understanding of the

18   significance of this resolution?

19   A    This delegated authority to both investigate and

20   determine whether a matter constituted a conflict matter.

21   Q    And what was the effect of a determination on your part

22   that a matter was a conflict matter?

23   A    The effect was that I had the authority and the

24   exercise in my business judgment, and after a consultation

25   with the advisors to determine in my sole authority, if a

1    conflict matter existed.

2    Q    Let's go to the resolution above that one, the second

3    from the bottom.  What was the significance of this

4    resolution, as you understood it?

5    A    This resolution establishes that after a conflict

6    matter had been investigated and identified, not only the

7    authority to review it, but to act on it, as the

8    disinterested manager.

9    Q    And go to Page 3 of 156, please, and look at the fourth

10   resolution from the top.  This resolution defines authorized

11   persons as officers, employees, advisors and agents of TCEH.

12   What did you understand this resolution to provide with

13   respect to these authorized persons of TCEH?

14   A    Well, it first defines who the authorized persons are,

15   the officers, employees, advisors and agents.  And then, it

16   stipulates that those authorized persons are to provide to

17   the disinterested manager or to the disinterested managers'

18   advisors, any information we may request.

19   Q    And what else did this resolution provide, with respect

20   to authorized persons?

21   A    That they are to cooperate with me in all

22   circumstances.

23   Q    The next resolution below this one, please?  It'll be

24   the fifth one down.  What's the significance of this

25   resolution, as you understood it?

1    A    This essentially establishes that I have a right to

2    direct the authorized persons to act at the direction of the

3    disinterested manager.

4    Q    And then, there's a proviso in the last two lines.  Can

5    we highlight that, please?  And what was the significance of

6    this proviso language in this resolution?

7    A    Well, not only did I have the authority to direct the

8    authorized persons to act in the instances of conflict

9    matters, but it goes on to say that I had the right to

10   implement the decisions on my own.

11   Q    Was this significant to you?

12   A    It was very significant.

13   Q    Why?

14   A    In 35 years as a CEO or board member, I've never seen

15   this type of authority granted to a board member.

16   Q    And what was it about this type of authority that was

17   significant to you?

18   A    The right to act.

19   Q    On your own?

20   A    On my own.

21   Q    Did you get any resistance or pushback or opposition

22   from TCEH board members about the delegation shown in this

23   resolution?

24   A    No, I did not.

25   Q    Let's go to the next to last resolution on this page.

1   This is the last one we'll be covering.  What was the

2   significance of this resolution?

3   A    This essentially defines the privileged nature of the

4   work undertaken by the disinterested manager or his advisors

5   and that board and other authorized persons who will not

6   have access to our work product, our information.

7   Q    We looked, a minute ago, at the definition of conflict

8   matters in this resolution.  Did you in fact determine

9   matters to be conflict matters, during your tenure as

10  disinterested manager?

11  A    Yes.

12  Q    And when did you first do that?

13  A    Very early in the process.

14  Q    Very early in what process?

15  A    In the investigative process that I undertook in

16  consultation with the advisors.

17  Q    And when did that begin?

18  A    Almost immediately after Munger, Tolles and Greenhill

19  were retained.

20  Q    So that's November of 2014?

21  A    Yes, November of 2014.

22  Q    And describe for us some of the conflict matters that

23  you determined early on in this process, beginning in

24  November of 2014.

25  A    Well, some of the conflict matters would include the

1   intercompany claims, certain task matters, certain claims

2   against the sponsors, as they relate to the intercompany

3   claims.  The bid process for Encore, as it relates to

4   conflict matters and the plan of reorganization itself, as

5   it relates to conflict matters.

6   Q    Did you keep the TCEH board informed of matters that

7   you had designated as conflict matters?

8   A    I certainly did.

9   Q    And did you cause your advisors to inform your TCEH

10  creditor constituents of matters that you had identified as

11  conflict matters?

12  A    I directed Munger, Tolles to do that, yes.

13  Q    Let's now focus on one of the conflict matters you've

14  described, intercompany claims.  So when did you begin the

15  process of considering or reviewing intercompany claims as a

16  conflict matter?

17  A    After I had retained Munger, Tolles and Greenhill, I

18  asked them to initiate an investigative process and focused

19  the initial stages of that investigative process on the

20  intercompany claims.

21  Q    And from what period of time did this investigative

22  process go on for Munger, Tolles and Greenhill under your

23  direction, beginning in November of 2014?

24  A    Substantially, from November through late February.

25  Q    Of 2015?

1   A    Yes.

2   Q    And what was it, in general terms, that Munger, Tolles

3   and Greenhill were doing under your direction during this

4   period of time from November to February?

5   A    They were investigating the legacy database.  They were

6   communicating on a consistent basis with the T-side

7   constituents.  They were talking to the officers and

8   employees and interviewing those officers and employees of

9   the -- of EFH and the T-side.  Essentially, uncovering every

10   rock that might relate to the intercompany claims.

11   Q    Did you get a presentation at some point from Greenhill

12   and Munger, Tolles about the diligence activities they

13   undertook in investigating intercompany claims?

14   A    Yes.

15   Q    We have DX 12, Page 177, please.  You recognize the

16   document, the first page of which is DX 177

17   A    I do.

18   Q    What is it?

19   A    It's a presentation made by Munger, Tolles and

20   Greenhill, reporting out on the results of their

21   investigative process.

22   Q    Let's go to the next page, please, 178.  The -- were

23   these the topics covered in the presentation?

24   A    They are.

25   Q    And none of them was diligence, is that right?

1    A    Yes.

2    Q    First topic.

3    A    Yes.

4    Q    Let's go to 185, please.  And can we highlight the

5    first bullet?  And the first, the bullet above that, the

6    first bullet above that, thank you.  And so, this is a

7    diligence presentation describing meetings with the debtors'

8    advisors by MTO.  What was the purpose of that diligence?

9    A    Obviously, a great deal of work had already been done

10   by Kirkland and Evercore, the other advisors to the debtor.

11   I directed Munger, Tolles to go meet with the debtors'

12   advisors to see what we could learn about the facts and

13   documents related to the intercompany claims.

14   Q    Let's go to Pages 186 and 87, if you could put those

15   two up -- side by side, please, Mr. Mendosa?  Thank you.

16   And then, if you would highlight the first bolded bullet?

17   What was the purpose of MTO's meetings with TCEH creditor

18   constituents and other constituents, as listed here?

19   A    Well, as I said, I took the emphasis on acting

20   vigorously very seriously, and I directed Munger, Tolles to

21   meet regularly with the T-side estate constituents to

22   ascertain their view of the potential intercompany claims

23   that may exist in these cases.

24   Q    Next Page 188, please?  And what did you have in mind

25   by instructing Munger, Tolles to review prior work, as part

1    of their diligence?

2    A    The company, the debtor had a legacy database that I

3    recall had about 900,000 pages of documents.  And I asked

4    Munger, Tolles to review the database that included a large

5    amount of information that might ultimately be relevant to

6    the intercompany claims.

7    Q    Now as part of this presentation, did Greenhill give

8    you a summary of their diligence on intercompany claims?

9    A    They did.

10   Q    Can we go to Page 191, please?  And does this slide

11   summarize the diligence activities of Greenhill under your

12   direction?

13   A    It does starting in mid-November.

14   Q    And did Greenhill also give you a timeline listing the

15   dates of their various diligence meetings and telephone

16   calls?

17   A    They did.  I asked that they provide a report out as to

18   their activity.

19   Q    May we have 192 and 93?  You can put them side by side.

20   Now, I won't ask you to read the entries in this, Mr.

21   Sawyer, but is this the timeline of Greenhill's diligence

22   meetings that they provided to you in that April 1st

23   presentation?

24   A    It is.  And as you can see, along with the direction I

25   gave to Munger, Tolles, Greenhill was very active during

1    this period.

2    Q    Now, what was your role during this time period of

3    November to February when all these diligence activities

4    were being undertaken by Greenhill and Munger, Tolles?

5    A    My role was to maximize the value of the T-side estates

6    and to direct the investigative process.

7    Q    And what activity were you involved in in directing the

8    investigative process?

9    A    Virtually daily updates with Munger, Tolles and

10   Greenhill, typically seven days a week.

11   Q    And was there a regularly scheduled call for these

12   updates?

13   A    There certainly was.

14   Q    When was that?

15   A    In a.m. Eastern.

16   Q    And were there occasions when for one reason or another

17   you didn't have the daily call?

18   A    Sure.  We would reschedule as we needed to...

19   Q    Did it include holidays and weekends, these daily

20   calls?

21   A    I'm afraid it did.

22   Q    And give us a rough estimate during this time period,

23   mid-November to the end of February, how frequently -- what

24   percentage of days did you actually have these daily

25   updates?

1    A    I would estimate over 90-95 percent of those days.

2    Q    Did there come a time when you concluded that the

3    investigation was far enough along to begin discussions with

4    the advisors of the disinterested directors and managers on

5    the E-side?

6    A    Yes.

7    Q    About when was that?

8    A    Roughly, mid-February.

9    Q    I'm going to take you through a chronology.  Can we

10   have DX3 Page 158, please?  A chronology that's listed in

11   the disclosure statement for the fifth amended plan.  I'm

12   going to ask you about some of the dates in this chronology.

13   And let's start with the first bullet in the chronology,

14   which refers to a meeting between MTO and Proskauer, advisor

15   to EFH, to discuss potential claims and defenses on February

16   19, 2015.  Can you give us the background of the days

17   leading up to this February 19 meeting?

18   A    I can.

19   Q    Please do.

20   A    I actually remember this day vividly because I was in

21   New York on the 17th and 18th, specifically on the 17th to

22   attend the swearing in of Judge Jim Gary.

23   Q    Did you meet with Munger, Tolles and Greenhill on the

24   17th?

25   A    Yes.

1    Q    And how about on the 18th?

2    A    Yes.

3    Q    And just describe for us generally what you were doing

4    in these meetings with Munger, Tolles and Greenhill on the

5    17th and the 18th in New York.

6    A    I was consulting with the advisors, reviewing the

7    results of their investigation.  It was a highly engaged

8    detail review.  We also reviewed certain tax matters.

9    Q    Did you do anything else prior to this February 19th

10    meeting in connection with launching discussions or

11    negotiations with the E-side?

12    A    Yes.

13    Q    What was that?

14    A    I head learned that the chairman, Don Evans, was in New

15    York and I called him and had breakfast with him.

16    Q    What was Mr. Evans' role with respect to the

17    intercompany claims negotiation process?

18    A    He was the disinterested director at EFH.

19    Q    And which day was this that you had breakfast with him?

20    A    It would've been on the 18th.

21    Q    Did you set the breakfast up or did he contact you to

22    set it up?

23    A    I called Don.

24    Q    And what was it that you discussed at the breakfast

25    meeting in substance?

1    A    I told Don that I thought our investigative process was

2    well underway and that I expected that we would engage soon

3    in good faith negotiations.  I expressed to the chairman

4    that I thought there was some possibility that the

5    discussions could become somewhat adversarial.  But that our

6    objective should be to reach a fair and reasonable

7    conclusion.

8    Q    Let's go to February 25 in the chronology, which is the

9    fourth bullet down.  It refers to you participating in a

10   meeting of the TCEH EFCH boards of managers on intercompany

11   claims. Did you participate in that meeting?

12   A    I did.

13   Q    Where was it?

14   A    It was in Dallas at the EFH headquarters.

15   Q    Were you there in person?

16   A    I was.

17   Q    Who else was there?

18   A    You were there, Mr. Spiegel, and Mr. Walker from

19   Munger, Tolles.

20   Q    And who was there from the TCEH board?

21   A    As I recall, the entire board was there.

22   Q    And what happened at this meeting?

23   A    I directed Munger, Tolles to make a presentation to the

24   T-side board.  I felt it was my duty to do so, to establish

25   the proper record with my own board, and to give them

1    insight into the preliminary results of our investigative

2    process.

3    Q    How long was the presentation?

4    A    As I recall, it was over an hour.

5    Q    And who gave it?

6    A    You did, Mr. Spiegel, along with your colleague, Mr.

7    Walters.

8    Q    Now, was this just Tom and me talking or was there

9    interaction and questions from the board?

10   A    It was a robust discussion with the board.

11   Q    What do you mean by robust discussion?

12   A    They were highly engaged.

13   Q    Following the meeting on the 25th, let's go to the

14   March 5th bullet just below the February 25th.  This refers

15   to a meeting with MTO and Greenhill and the EFH conflicts

16   advisors to discuss potential claims and defenses, and that

17   MTO provided Proskauer with a written presentation detailing

18   potential claims. Did you review and approve a presentation

19   by MTO to Proskauer that was given on March 5th?

20   A    I did.

21   Q    And did you discuss their presentation?  Did you go

22   over it slide by slide with your advisors?

23   A    I certainly did.

24   Q    Turn to DX12 Page 20, and I'm going to ask you to

25   actually look in your binder, if you would, Mr. Sawyer, just

1    so we can identify the document for the record.  So, take

2    Page 20 through 63, and if you would just kind of thumb

3    through that and let us know if that's the presentation that

4    you authorized be given by MTO to Proskauer on March 5.

5    A    I'm sorry, Mr. Spiegel, where is it in the binder?

6    Q    So, look under the tab that says DX12.

7    A    Okay, thank you.

8    Q    Once you get there, go to Page 20 and then there's

9    about 40 pages or so to get you to 62.

10   A    Okay.  Yes, this is the presentation that I authorized.

11   Q    Now, let's go to Page 21 and you don't need your binder

12   for this -- you can look at it on the screen if that's more

13   convenient.  Page 21?

14   A    Yes.

15   Q    You see nine topics here or claims that are listed in

16   the presentation?

17   A    I do.

18   Q    I'd like to go through each of those nine with you and

19   ask you very briefly just to give us the gist of your

20   understanding of what those claims are -- not from a legal

21   perspective, obviously, but from your perspective as an

22   experienced business executive.  So let's take Topic 1,

23   Claim 1, the intercompany tax claim.  Go to Page 23, please.

24   What's the gist of this claim?

25   A    This relates to the tax allocation agreement between

1    EFH and the subsidiaries.  It's a payable from EFH to TCEH.

2    It's part of the bankruptcy schedules.  It's in the SEC

3    filings; it's in the company's internal financial

4    statements.

5    Q    Let's go to the second claim, Page 32, preferential tax

6    claim.

7    A    Yes.

8    Q    What's the gist of this claim?

9    A    TCEH paid in excess of 84 million to the parent in

10   order to clean up some historical issues with the IRS.  And

11   this occurred within a year of bankruptcy.

12   Q    Page 34, third claim, intercompany notes.  What's the

13   gist of this claim?

14   A    This is a circumstance where the parent was using the

15   T-side as a bank to borrow money at below market rates, at a

16   time when TCEH was insolvent.

17   Q    And Page 41?  This is Claim 4, EFH holdings of TCEH

18   debt.  Is this a claim by TCEH against EFH or EFH against

19   TCEH?

20   A    It was potentially a claim by EFH against TCEH.  We

21   thought they might attempt to claim their sell-off rights.

22   I directed Munger, Tolles to be proactive in setting out the

23   legal defenses.

24   Q    Claim 5, amended extend, Page 45.  What's the gist of

25   this claim?

1    A    This is essentially a decision that was reached to kick

2    the can on the debt incurred -- potentially 2 billion and

3    fees, at a time where TCEH was balance sheet insolvent and

4    the shale revolution was clearly already underway.

5    Q    Claim 6, Page 48, sponsor fees and shared services --

6    actually, 49, and we can go to 49 for sponsor fees.  What's

7    the gist of the sponsor fee claim?

8    A    Well, in 2010, EFH began allocating 100 percent of the

9    sponsor fees to TCEH.  I felt that was an over-allocation.

10   Q    And Page 50, shared services.  What's the gist of this

11   claim?

12   A    As to the shared services, before 2014, none of those

13   costs were allocated to EFIH.

14   Q    Claim 7, the LBO claims. What's the gist of this claim?

15   A    When the LBO occurred, TCH took on the debt and

16   eventually moved a $21 billion dividend back to EFH.  I

17   viewed this as a nuclear option.

18   Q    Let me ask you why was it a nuclear option?

19   A    Because it's a $21 billion claim.

20   Q    Now, it's been suggested that you've put zero value on

21   this claim or viewed it -- didn't give it any weight.  Is

22   that true?

23   A    No.

24   Q    Why not?

25   A    When we made our initial proposal, I didn't think it

1    would be constructed to ask for 21 billion.  But in the

2    negotiations that took place between the disinterested

3    directors in Dallas I was very clear in my communication to

4    Miss Williamson and Mr. Evans that should we not reach

5    agreement, that I would direct Munger, Tolles to pursue this

6    claim.  And I was very clear on that point.

7    Q    Let's go to the eighth set of claims, Page 58.  Claims

8    against EFIH, and we'll go to 59.  Why were you discussing -

9    - why were you asking Munger, Tolles to present claims

10   against EFIH in this presentation to EFH?

11   A    EFIH was the sub of EFH, so any claims paid by EFIH

12   were potentially dilutive at the EFH level.

13   Q    And last topic, Page 60, step up basis claim.  Was this

14   a legal claim?

15   A    No, it was not a legal claim.

16   Q    What was it?

17   A    At the time I did the investigation, I felt that a

18   taxable transaction at the T-side had great value,

19   potentially in the avoidance of, roughly, 700 million in

20   taxes on the T-side.  And by consenting to a tax-free fence

21   spend, I thought we should be paid for the consent.

22   Q    Was this basis step up claim a centerpiece of your

23   negotiations with the E-side directors?

24   A    No, it was not.

25   Q    Why not?

1   A    Because I understand at the time I concluded the

2   investigation that this has a high degree of variability

3   depending on the value of the company and the NOLs and,

4   furthermore, it could be quite some time before we know that

5   actual map here.  So I didn't emphasize this claim in the

6   negotiations.

7   Q    Let me roll forward for a moment to the present time.

8   Has there been some variability and change in the relevant

9   values here of the TCH tax basis?

10   A    Yes.

11   Q    And what's that change?

12   A    The value of TCEH today is, rough math, roughly

13   equivalent to the NOL.  So, as I had anticipated, those

14   numbers changed over time.

15   Q    And what's the result of that in terms of the impact on

16   the T-side of a taxable versus nontaxable transaction?

17   A    Well, you know, I still think our consent to a tax-free

18   spend has great value.  After consulting with the tax

19   attorneys, my understanding --

20   Q    I just want to caution you not to reveal any advice

21   received from counsel.

22   A    Yeah, thank you.  But my understanding is that a tax-

23   free spend at Oncor -- excuse me, the Oncor REIT cannot be

24   effectuated without a tax-free spend over on the T-side.  So

25   by agreeing to a tax-free spend, we should be paid for that

1    agreement.

2    Q    And when will we actually know the value of any

3    possible step up in basis to the T-side?

4    A    You're not going to know that number until the company

5    emerges.

6    Q    So, following the presentation that MTO gave to

7    Proskauer, did Proskauer give one back?

8    A    They did.

9    Q    Let's go to March 11 in the chronology.  This entry

10   says that Proskauer provided MTO with a written

11   presentation.  Did you review that presentation when it was

12   provided to MTO?

13   A    I did.

14   Q    Would you go to DX1264?  And I'll ask you again to take

15   out your -- look in your binder to identify the

16   presentation, if you would.  Look at 64 through 128.  And

17   let me just ask you is this the presentation that you

18   reviewed from Proskauer as given to MTO?

19   A    Yes.

20   Q    And following -- did you discuss that with your

21   advisors, this Proskauer presentation?

22   A    Sure, yes.

23   Q    And without revealing any legal advice, after that

24   review were you left with a view that there were substantial

25   claims that the T-side had against the E-side?

1    A    Yes.

2    Q    Let's move ahead to March 16, the next bullet in the

3    chronology.  This refers to a written presentation that MTO

4    provided Cravath on behalf of EFIH.  Did you review that

5    presentation and authorize it to be given to Cravath?

6    A    Yes.

7    Q    Next board on March 16.  This refers to something

8    identified as the initial TCEH demand.  If you'll highlight

9    the bottom there.  I'd like to ask you a few questions about

10   this initial TCEH demand delivered on March 16.  Did you, in

11   fact, direct MTO to make this demand on EFH?

12   A    I did.

13   Q    Let's take each of the elements here.  The first one --

14   if you'll highlight that for us -- is an allowed unsecured

15   claim for TCH of 1.2 billion against EFH, including 200

16   million against EFIH.  See that?

17   A    Yes.

18   Q    The second is all of EFH's NOLs at emergence.

19   A    Yes.

20   Q    And the third has several elements to it.  Let's talk

21   about each one of those.  The first is 100 percent of all

22   excess consideration received by EFH.  What was the excess

23   consideration that you were asking for 100 percent of here?

24   Can you circle that, please?

25   A    In simple terms, I wanted all their money after they

1   paid off their creditors.

2   Q    Okay.  And let's go to the 10 million distribution to

3   EFH equity holders.  Now, the equity holders here are the

4   sponsors, is that right?

5   A    Yes.

6   Q    KKR, Goldman, TPG?

7   A    Yes.

8   Q    Why were you demanding a $10 million distribution to

9   EFH equity holders as part of the initial demand?

10  A    It related to an arcane tax matter that would enable a

11  tax-free spend.

12  Q    And then the last element here directors and officers

13  of the Debtors and the equity holders would receive full

14  releases.  Circle releases there.  Why were you asking for

15  full releases for the D's and O's of the Debtors and for the

16  sponsors in this demand to EFH?

17  A    I was attempting to maximize the recovery to the T-side

18  estates?  These D's and O's and the sponsors were all

19  indemnified by EFH and should that indemnification be

20  invoked it would dilute the recovery to my estates.

21  Q    Did EFH respond to this initial demand?

22  A    They did.

23  Q    Let's go to the next bullet.  March 18.  And we'll need

24  to carry over to the next page.  If you'll pull those two

25  together, Mr. Mendoza.  Okay, this refers to an initial EFH

1    counter.  You can highlight that.  And let's take their

2    response to your elements one by one.  So, you ask for 1.2

3    billion.  They came back at -- can we take the first little

4    "I" there -- they came back at 100 million.

5    A     Yes.

6    Q     Then on the NOLs they agreed.

7    A     Correct.

8    Q     And on excess consideration, what did they counter

9    with?

10   A     Some hypothetical waterfall that would be negotiated at

11   some point in the process.

12   Q     So, not 100 percent?

13   A     Not 100 percent.

14   Q     Some kind of sharing?

15   A     Some type of sharing based on a waterfall to be

16   negotiated.

17   Q     And how about the 10 million for the sponsors?

18   A     Yes.

19   Q     Yes, what?

20   A     We agreed to that.

21   Q     And how about the releases?

22   A     They agreed to the releases.

23   Q     Now, in the course of the negotiations over the

24   resolution that a company claims, which we'll be talking

25   about, did you negotiate and discuss with the E-side

1    disinterested directors the releases we've talked about here

2    for the sponsors and the Debtor's D's and O's?

3    A    I did not.

4    Q    Was there a reason why you didn't?

5    A    Not a conflict matter.

6    Q    But you understood that they were onboard with the idea

7    that any intercompany claim settlement would include full

8    releases?

9    A    Yes.  And I was glad they were onboard because I didn't

10   want to dilute my estates.

11   Q    Well, what was your reaction to this counteroffer?  1.2

12   billion versus 100 million?  That's a little bit of a gap,

13   right?

14   A    Yes.

15   Q    What was your reaction?

16   A    I didn't think it was a good faith attempt.  I thought

17   it was horribly inadequate and I was insulted.

18   Q    Why were you insulted?

19   A    Because I didn't think it gave credit to the merits of

20   our claims or the values of our claims.

21   Q    What did you do about this inadequate and insulting

22   counter?

23   A    I directed Munger, Tolles to revert to Proskauer and to

24   share my sentiments about their initial counter.  I also

25   directed Munger, Tolles that under no circumstance was

1    Munger, Tolles to counter off this $100 million number.

2    Q    Let's go to the next bullet in the chronology.  The top

3    of Page 159, first full bullet.  So, this refers to various

4    calls, conferences, and discussions between the 18th and the

5    23rd.  Was any progress made from the time of the counter

6    from EFH on the 18th until March 23rd as a result of all

7    this activity?

8    A    No.  This illustrates the back and forth between the

9    advisors to the E-side and the T-side but it was

10   unproductive.

11   Q    What did you do about the fact that there'd been no

12   progress made in these four or five days of back and forth

13   between the advisors?

14   A    I told Munger, Tolles to hold their ground.  I also

15   told Munger, Tolles that I wasn't going to go to Dallas.  I

16   didn't see any reason to go.

17   Q    What was this thing that was being planned in Dallas?

18   A    Over the back and forth between the advisors and the

19   disinterested directors we decided at some point to get

20   together in Dallas and scheduling got set for the week of

21   March 23rd to get together in Dallas and begin the

22   negotiations.

23   Q    So there was a plan to meet for in-person negotiations

24   in Dallas the week of March 23?

25   A    Yes.

1   Q    And you're saying you told Munger, Tolles to deliver

2   the message you weren't going?

3   A    I told Munger, Tolles to call Proskauer and tell them

4   that I was insulted by their offer, I didn't think it was a

5   good faith attempt, and I had no intention of going to

6   Dallas.

7   Q    Did you tell anybody else that you weren't going to

8   Dallas?

9   A    Yes.

10  Q    Who was that?

11  A    I called Don Evans.

12  Q    When did you call Don Evans?

13  A    As I recall, it was the morning of the 23rd.

14  Q    Where were you when you called him?

15  A    I was in San Francisco at a conference.

16  Q    And did you speak -- did you reach him on the phone

17  when you called him?

18  A    I did.  I called him on his mobile.

19  Q    Well, what did you tell him?

20  A    I told him what I thought of his offer.  I told him I

21  didn't think it was a good faith attempt.  I told him I

22  thought it was insulting and that I couldn't see any reason

23  to come to Dallas.

24  Q    And how did he respond to that?

25  A    He was taken aback, surprised.  We continued to talk.

1    Eventually reached a conclusion that secured a commitment

2    that he would engage in good faith negotiations and I

3    ultimately determined to make the trip.

4    Q    So, based on that conversation, you ended up going to

5    Dallas after all?

6    A    I did.  I felt that Don and I had a constructive

7    conversation and that we understood -- I understood where he

8    was and he understood where I was, and I decided to make the

9    trip to Dallas.

10   Q    Well, when did you get to Dallas?

11   A    The night of the 23rd.

12   Q    Let's go to the fourth bullet, March 24 and March 26.

13   So, you got to Dallas on the 23rd.  Did you have extensive

14   in-person negotiations the 24th, 25th, and 26th in Dallas?

15   A    I did.  At the EFH headquarters.

16   Q    Set the scene for us a little bit, will you?  Who was

17   there?  Where were you situated?  Where were the

18   negotiations conducted?

19   A    It was a little bit like a teamster negotiation.

20   Everybody had their own conference room, they were in the

21   room with their own advisors, separated by some distance.

22   The meetings took place sometimes with advisors, sometimes

23   without advisors.

24   Q    And where did you meet when you were meeting without

25   the advisors?

1   A    In Chairman Evans' office.

2   Q    And just describe for us your general recollection of

3   what transpired the first day of these negotiations.

4   A    I think on the first day, on the 24th, I would describe

5   that as an interchange of positions where Ms. Williamson and

6   Mr. Evans staked out the ground on the merits of their

7   claims and advocated quite vigorously for their position as

8   to their view of the claims. And I did the same.  It was a

9   discussion back and forth as to merits and values.

10  Q    Let's turn our attention for just a minute on EFIH as

11  opposed to EFH.  Can we go back to the second and third

12  bullets?  Bring this up together -- the 19th and the 20th.

13  Now, had you directed MTO to make a demand on EFIH the way

14  you directed them to make a demand on EFH?

15  A    I did.

16  Q    And that was for $200 million?

17  A    Yes.

18  Q    And did you review a written response from Cravath

19  regarding their position on those claims?

20  A    Yes.

21  Q    And let's go to the 25th, the first bullet on the 25th.

22  So, on the 25th, that's the second day of the negotiations -

23  - Cravath says no to the demand.  Is that right?

24  A    That's right.  They said no.

25  Q    And then the chronology says the TCH debtors continued

1   negotiating with EFH, the equity owner of EFIH, over an

2   allowed claim against EFIH.  Now, why were you negotiating

3   with EFH for an allowed claim against EFIH?

4   A    Well, EFIH is the sub, any payments by EFIH would be

5   dilutive to my recovery of EFH so I focused my attention to

6   the litigation claims at EFH.

7   Q    Okay, back to EFH now.  Did there coma a time when you

8   made a further proposal to EFH?

9   A    Yes.

10  Q    Can we take the next March 25th bullet, please, Mr.

11  Mendoza?  So, what did you put on the table?  Now, this is

12  the second day of the negotiations, right?  What did you put

13  on the table for EFH?

14  A    I felt that the discussions back and forth on the 24th

15  had been constructive and so I determined on the morning of

16  the 25th to deliver a further counterproposal setting the

17  allowed unsecured claim at 710 million and defining the

18  excess consideration.  Met privately with Don and Billy to

19  deliver the counter.

20  Q    So you dropped to 710 from 1.2 billion and you agreed

21  to a type of sharing with them?

22  A    Yes.

23  Q    Now, did they counter this offer of yours?

24  A    Yes.

25  Q    Can we go to the next bullet, please?  So, they come

1   back to you moving from 100 to 675, is that right?

2   A    Yes, correct.

3   Q    And how about the sharing of excess consideration?  How

4   did they respond to that?

5   A    A 50/50 split capping at 800.

6   Q    Now, did you respond to this offer?

7   A    I did.  I didn't think it was enough money and I didn't

8   think the excess consideration was right.

9   Q    Next bullet, please.  So, you moved just to 705 and

10  agreed to a different sharing arrangement?

11  A    Set the excess consideration at 925, yes.

12  Q    Did you deliver a message along with this further

13  proposal on the 25th?

14  A    I did.  I did do that.

15  Q    What message did you deliver?

16  A    This interchange occurred very late in the day on the

17  25th and I directed Tom Walper of Munger, Tolles to call the

18  CRO, Stacy Dori and to instruct Stacy to tell Mr. Evans that

19  this was my last and final offer.

20  Q    And did you deliver that message to anybody else?

21  A    Yes.

22  Q    Who else?

23  A    I determined later that evening that I didn't need the

24  lawyers to carry the water for me, so I called Mr. Evans

25  directly on his mobile phone.

1    Q     And what did you tell him?

2    A     I told him that he had received a counter from me that

3    evening and that he should consider that counter to be my

4    last and final offer.

5    Q     And how did he respond to your telling him that?

6    A     He was agitated, dismayed, angry, saw it as a threat.

7    Q     And can you tell us anything else about the substance

8    of that phone call?

9    A     You could hear in the tone of his voice and the

10   surprise in his voice he felt that -- Mr. Evans felt that I

11   was drawing a line in the sand by delivering a best and

12   final at this stage of the process.

13   Q     So, what happened the next day, the 26th of March

14   following the delivery of your best and final offer?

15   A     That morning we began again very early in Mr. Evans'

16   office , Mr. Evans, Ms. Williamson and I had what is best

17   described as a very heated conversation about the approach I

18   take to the negotiations and the offer that I'd made.  They

19   expressed their anger in very clear terms.

20   Q     And following that discussion, did they respond further

21   to your best and final?

22   A     They eventually responded, taking their prior offer to

23   700 million on the unsecured claim and setting the sharing

24   at 800 million.

25   Q     Did you accept this response from them?

1    A    No.

2    Q    How did you respond?

3    A    I was still concerned about this excess consideration.

4    I didn't think it was quite enough.  So, after considering

5    the negotiations that had been underway, I delivered a best

6    and final and last.  Then I instructed Munger, Tolles to

7    clean it up and I got on a plane to go to Atlanta because I

8    had an earnings call that I was leading the next morning.

9    Q    Did you eventually reach an agreement with the EFH

10   disinterested directors that day?

11   A    I did.

12   Q    How did that come about?

13   A    When I landed the evening of the 26th at Hartsfield

14   Airport, I first called Billie Williamson and asked her to

15   confirm that we had an agreement in principle, which she

16   confirmed.  And then I called Chairman Evans on his mobile,

17   had a brief and abrupt phone call where he confirmed that we

18   had an agreement in principle.

19   Q    And what is the extra bit that you got as an

20   improvement over the offer they made to you that we have

21   here on the screen, at 700 million and 800 million cap?

22   A    Another 5 million and excess consideration.

23   Q    We have the last bullet and carryover to Page 160.  Put

24   that together with the top of 160, okay.  So, the first

25   sentence of this entry says, "On March 26th, the directors

1   and managers reached an agreement in principle with respect

2   to the disinterested directors' settlement." Is that the

3   agreement in principle that you've described to us reached

4   in the phone calls from Hartfield Airport?

5   A    Yes.

6   Q    And it's described in the joint statement incorporated

7   in the plan of reorganization -- we'll get to that in just a

8   minute.  But I want to go to the entry here for April 1st

9   down in the carryover page, indicating that you approved the

10  disinterested directors' settlement on April 1st.  Do you

11  see that?

12  A    I do.

13  Q    Did you receive a presentation from Munger, Tolles and

14  Greenhill in connection with your consideration of the

15  disinterested directors' settlement on April 1st?

16  A    Yes, I did.

17  Q    Can we look at DX12177?  I'm going to ask you to look

18  in your book one more time, if you would.  And just look

19  through -- the presentation begins on 177, and let us know

20  if that's the presentation that you were given in connection

21  with the approval of the settlement on April 1st.

22  A    Yes, this is the presentation.

23  Q    Now, let's go to the terms of the settlement as

24  described in the joint statement.  Can we have DX12 Page 17

25  and 18?  Put those up side by side?  This is titled, Joint

1   Statement of Summary of Settlement of Intercompany Claims as

2   filed on April 14 of this year.  Did you approve this joint

3   statement?

4   A    I did.

5   Q    And let's look at the bullet points contained on Pages

6   17 and 18 of DX12.  Does this accurately summarize the terms

7   of the disinterested directors' settlement as you approved

8   it on April 1st?

9   A    This does, yes.

10  Q    And can we switch to the next set of bullets?  Now,

11  there's nothing in these bullets that refers to releases of

12  the sponsors or directors and officers.  Am I reading that

13  correctly?

14  A    Yes.

15  Q    Why was there no -- why wasn't that included in the

16  disinterested directors' settlement given that the two sides

17  had exchanged that as a term in their negotiations?

18  A    It wasn't a designated conflict matter.  I didn't have

19  the authority to approve those releases.

20  Q    Who actually had the authority?

21  A    A special committee of the T-side board.

22  Q    Were you a member of that special committee?

23  A    Yes.

24  Q    And did the special committee approve releases for the

25  sponsors, and directors, and officers?

Page 62

1    A    Yes.

2    Q    Did you participate in the meeting where that occurred?

3    A    Yes.

4    Q    And when was that, roughly?

5    A    Roughly, soon thereafter in mid-April.

6    Q    Of 2015?

7    A    Yes, thank you.

8    Q    Okay.  Now, I want to fast forward, if I can, from

9    April of 2015 to August of 2015.  And we've got five months

10   there.  Did you remain involved in an active way in your

11   role as disinterested manager on the T-side in that five-

12   month period, April to August 2015?

13   A    Yes.  Given the prospect that virtually anything in

14   this case could become a conflict matter, I stayed very

15   involved.

16   Q    And describe for us in general terms what activities

17   you were involved in during that time period.  You concluded

18   the disinterested directors' settlement.  What were you

19   doing in that five-month period?

20   A    We were considering the value-maximizing alternatives

21   to exit bankruptcy, and I remained in constant communication

22   and in consultation with my advisors during that entire

23   period.

24   Q    Can we have DX74R?  And if you can pull up for us, Mr.

25   Mendoza, the top half of that document, first page of the

1    document?  That top half, please.  Do you recognize this

2    document, 74R?

3    A    Yes.

4    Q    It's dated August 9, 2015?

5    A    Yes.

6    Q    And what is it?

7    A    It's the minutes of a meeting of the disinterested

8    manager of EFCH and DCEH.

9    Q    And did you -- it's referencing a presentation prepared

10   by MTO and Greenhill in the second paragraph of this

11   document?

12   A    Yes.

13   Q    Did you get the presentations described there?

14   A    I did.

15   Q    I'm going to ask you to look one more time in your

16   book.  DX74R, Page 5-18, and then 19-44.  I'll ask you to

17   take a look and tell us whether those are the presentations

18   you received from Greenhill and Munger, Tolles in August of

19   2015.

20   A    Yes, this is the presentation.

21   Q    And did you discuss those presentations with Munger,

22   Tolles and Greenhill when they were given to you?

23   A    I did.

24   Q    Following those presentations, did you reach a decision

25   as to whether to approve the settlement agreement -- and I'm

1    referring now to the settlement agreement that's before the

2    Court, not the disinterested directors' settlement -- the

3    settlement agreement and third amended plan of

4    reorganization?

5    A    I did.

6    Q    And what was your conclusion in that regard?

7    A    I concluded that the settlement agreement created a

8    pathway to a value-maximizing event, settled the ongoing

9    litigation issues among the T-side space.  Had -- clearly

10   had the support of my constituents.  Provided an alternative

11   should the Oncor merger not go through.

12   Q    And turning to Page 4, middle of the page of 74R, the

13   first resolution.  Does that reflect your approval of the

14   settlement agreement and the third amended plan?

15   A    Yes.

16   Q    Back to Page 3 of 74R, the first whereas clause.

17   There's an enumeration here of seven listed conflicts

18   matters.

19   A    Yes.

20   Q    Is that an accurate list of conflicts matters as

21   determined by you from the period November 2014 through

22   August of 2015?

23   A    Yes.

24   Q    And were some of those determined by you to be conflict

25   matters early in the process and some later on?

1    A    Yes.

2            MR. SPIEGEL:  Subject to moving exhibits, Your

3    Honor, and Mr. Sawyer's written direct testimony

4    declaration, I have no further questions.

5            THE COURT:  Okay, thank you.  Who is going to want

6    to cross-examine Mr. Sawyer?  Mr. Glueckstein?

7            MR. GLUECKSTEIN:  Your Honor, I will, as well as a

8    few questions from Mr. Sheppard.

9            THE COURT:  Okay.  Anyone else?  Yes?

10            MS. KAM: On behalf of EFCH 2037 notes trustee, the

11    Bank of New York.

12            THE COURT:  Okay, the Bank of New York for the

13    EFCH 2037 notes.  Yes?

14            MAN:  Your Honor, the United States on behalf of

15    the Environmental Protection Agency.

16            THE COURT:  Okay, so the United States on behalf

17    of the EPA.  All right, we'll start with Mr. Glueckstein, I

18    think makes the most sense, if that's okay.  We're going to

19    take a very short recess before we do that.  As I had

20    mentioned earlier, I think, we're going to have to break at

21    12:15 so we'll see where that lays out.  Hopefully, we can -

22    - maybe if necessary, it might make sense to break a little

23    earlier if we're between crosses, but we'll sort of have to

24    see how it plays out.  Mr. Sawyer, please during the break

25    you may not discuss the substance of your testimony with any

1   person.  Thank you, sir.  We're in recess.

2        (Recess)

3             CLERK:  All rise.

4             THE COURT:  Please be seated.

5             MR. GLUECKSTEIN:  Thank you, Your Honor.

6                     CROSS-EXAMINATION

7   BY MR. GLUECKSTEIN:

8   A    Good morning, Mr. Sawyer.  My name is Brian Glueckstein

9   with Sullivan & Cromwell on behalf of the EFH creditors

10  committee.

11  Q    Mr. Sawyer, do you still have the binder that your

12  counsel gave you in front of you, if you could.

13  A    Yes.

14  Q    Thank you.  The first tab of your binder is the written

15  direct testimony that you provided in advance of testifying

16  before the Court today, correct?

17  A    Yes.

18  Q    And the information contained therein is based on your

19  knowledge of the facts contained therein, correct?

20  A    Yes.

21  Q    And Mr. Sawyer, in Paragraph 14 of your written direct,

22  which appears on Page 6.  You testified that the

23  relationship with the debtor as a subset, almost very

24  significant issue in these cases could give rise to

25  adversity between the TCEH debtors and the other debtors.

1    Do you see that, sir?

2    A    Yes.

3    Q    And so it's your view that virtually every issue in the

4    case was a potential conflict matter that you considered,

5    correct?

6    A    Yes, it could give rise to adversity.

7    Q    And did you testify this morning with your counsel, the

8    boards of TCEH, and EFCH passed resolutions delegating to

9    you authority late in 2014 with respect to conflict matters,

10   correct?

11   A    Yes.

12   Q    And for those matters that you formally designated

13   pursuant to those resolutions, such as the inter-company

14   claims, you handled all aspect of that matter including the

15   negotiations with respect to that matter, correct?

16   A    Yes.

17   Q    Okay.  And negotiation of the terms of the plan of

18   reorganization were not designated as a conflict matter

19   pursuant to those resolutions, correct?

20   A    No, except as it relates to conflict matters associated

21   with the plan of reorganization.

22   Q    Okay.  And were there any matters with respect to the

23   plan of reorganization for which you, as disinterested

24   manager, led the negotiations yourself, as opposed to the

25   debtor's joint advisors?

1  A     No.

2  Q     And you had no -- you were not directly involved in the

3  negotiation of the plan of reorganization itself that's

4  currently before the Court for confirmation, correct?

5  A     No.

6  Q     You provided your approval of the plan of

7  reorganization and the settlement agreement on August 9th,

8  the same day the plan and the settlement agreement were

9  subsequently approved by the full boards of TCEH and EFCH,

10  correct?

11  A     Yes.

12  Q     And similarly, you were not a party to the negotiations

13  of the settlement agreement itself that's before the Court,

14  which incorporates a modified version of the disinterested

15  directors settlement, correct?

16              THE COURT:  Mr. Shore.

17              MR. SHORE:  Just objection to relevance in light

18  of the committee's objection.  The committee's objection is

19  with respect to the process of the debtors for which they --

20  who -- for which creditors they represent.  These are all

21  questions going to the TCEH process.  They don't have a

22  pending objection that the TCEH decision with respect to

23  entering into the settlement or the plan is or is not part.

24              MR. GLUECKSTEIN:  Your Honor, this goes to the

25  disinterested directors process that's as squarely at issue

1    and Mr. Sawyer's view of the world.  I'm almost done with

2    this line of questioning as it is.

3              THE COURT:  All right.  I'll allow it.

4    Q    Mr. Sawyer, the plan and the settlement agreement that

5    you approved were recommended and presented to you by the

6    debtor's co-chief restructuring officers, correct?

7    A    Yes.

8    Q    Mr. Sawyer, the TCEH has no ownership interest in Oncor

9    itself, correct?

10   A    That's right.

11   Q    And Oncor is not an asset of the TCEH estate, correct?

12   A    That's right.

13   Q    Oncor is an asset of EFH and EFIH, correct?

14   A    Yes.

15   Q    And it's your understanding, Mr. Sawyer, that any sale

16   of Oncor would have been subject to approval of the TCEH

17   board of directors, correct?

18   A    Yes.

19   Q    And you understood that approval from the TCEH board

20   would be necessary in order to proceed with the sale of

21   Oncor, correct?

22             MR. SHORE:  Objection.  This is still -- we're

23   talking TCEH process at this point.

24             THE COURT:  What's the relevance, Mr. Glueckstein?

25             MR. GLUECKSTEIN:  The relevance goes to the fact

1    as to whether TCEH understood that they had an approval

2    right over the sale process.

3              THE COURT:  So why is that relevant?

4              MR. GLUECKSTEIN:  It's squarely at issue to the

5    question of the corporate governance and the process that

6    the debtors collectively ran with respect to the disposition

7    of this asset.

8              THE COURT:  All right.  I'll allow it.

9    Q    Mr. Sawyer, I think you just answered my question.  You

10   understood that approval from the TCEH board would be

11   necessary in order to proceed with the sale of Oncor,

12   correct?

13   A    Yes.

14   Q    Mr. Sawyer, you understood that during the

15   disinterested directors negotiation that you had with the

16   other directors, that the disinterested directors at EFH

17   were seeking the consent of TCEH for a tax-free

18   reorganization, correct?

19   A    Could you please repeat that question?

20   Q    Did you have an understanding during the course of your

21   negotiations with the disinterested directors at EFH that

22   those disinterested directors were seeking the consent of

23   TCEH for a tax-free reorganization.

24   A    No.

25   Q    That topic was not discussed during the course of your

1    negotiations.

2    A    Not that I recall.

3    Q    With respect to the inter-company claims.  You

4    concluded, and Mr. Shore, that the TCEH debtors should

5    receive compensation for the various claims they had against

6    the E-side debtors, correct?

7    A    Yes.

8    Q    And that conclusion was based on your assessment, from

9    the perspective of the T-side, on the merits of those inter-

10   company claims, correct?

11   A    Yes.

12   Q    Okay.  Now you talked about it a bit in your testimony

13   this morning, but you did include in your demands to EFH

14   compensation on behalf of what's been referred to as the

15   basis step up, correct?

16   A    Yes.

17   Q    And that was, as you set forth in Paragraph 28 of your

18   written declaration, because you understood at that time

19   that a taxable separation could generate substantial value

20   for the TCEH debtors from the tax basis step up, correct?

21   A    Yes, at that time.

22   Q    And you're aware that the value of TCEH and

23   subsidiaries have been decreasing over the course of 2015,

24   correct?

25   A    Yes.

1   Q    And as you testified this morning, your testimony is

2   that the value is currently roughly equivalent to the NOLs,

3   correct?

4   A    Yes.

5   Q    And so, at the current valuation as received here

6   today, the TCEH first lien creditors are not foregoing any

7   basis step up by agreeing to a tax-free reorganization,

8   correct?

9   A    Yes, as we sit here today.

10  Q    And is it your testimony that notwithstanding that,

11  that a taxable separation could create risk and uncertainty

12  for EFH, correct?

13  A    Yes.

14  Q    And that's because ultimately the valuation will be

15  determined at the time of the transaction when it closes at

16  some point in the future, correct?

17  A    Yes.

18  Q    Now, Mr. Sawyer, you testified in Paragraph 28 of your

19  written direct testimony, which appears on Page 11, that you

20  also understand the taxable separation of the TCEH debtors

21  would effectively prevent EFH from converting to a REIT,

22  correct?

23  A    Yes.

24  Q    And facilitation of a REIT was not a reason discussed

25  for a tax-free separation in negotiation with the

1   disinterested directors of EFH back in March, was it?

2   A    I don't recall if we specifically discussed that topic

3   during the negotiations.

4   Q    You don't have any recollection of actually discussing

5   that topic, do you?

6   A    I don't.

7   Q    In the settlement agreement that's before the Court for

8   approval does not guarantee EFH a tax-free plan if an

9   alternative plan is necessary, correct?

10  A    That's right.

11  Q    You testified, Mr. Sawyer, you authorized into the

12  disinterested directors settlement during a meeting you had

13  with your advisors on April 1st of this year, correct?

14  A    Yes.

15  Q    And when you announced the disinterested directors

16  settlement, there was opposition to the terms of that

17  settlement from the T-side creditors, correct?

18  A    Yes.

19  Q    Mr. Sawyer, you're testimony is that agreement is that

20  the disinterested directors settlement would be incorporated

21  into the plan of reorganization that was filed subsequent to

22  agreement to those terms in April of 2015, correct?

23  A    No.  I recognize that not all elements might be

24  incorporated, but that some would be.

25  Q    Okay.  If you could turn to page -- to Exhibit 12 in

1    the binder that your counsel handed you earlier, and if you

2    could look at that copy back the joint statement that you

3    discussed with your counsel this morning, which appears in

4    the numbers that have been added at Exhibit 12 at Page 17 on

5    the bottom.  Are you there, sir?

6    A    Yes.

7    Q    Okay.  And okay, on the -- and you testified this

8    morning that the joint statement accurately reflected the

9    terms of the agreement that you reached with the other

10   disinterested directors, correct?

11   A    Yes.

12   Q    Okay.  And in the second paragraph of the joint

13   statement, it's there that the settlement is subject to

14   bankruptcy court approval, and goes on to say, as part of a

15   joint plan of reorganization for EFH, EFIH, TCEH, and their

16   subsidiaries.  Do you see that, sir?

17   A    Yes.

18   Q    So it was your understanding that the terms of the

19   settlement that you agreed to would be incorporated in the

20   plan that was filed with the Court in April of 2015,

21   correct?

22   A    Yes.

23   Q    And that plan of reorganization that was filed in April

24   of 2015 provided for a tax-free spinoff of TCEH, correct?

25   A    Yes.

1    Q    And you agreed to that plan, including the tax-free

2    spinoff of TCEH because you had received consideration to do

3    so as part of the disinterested directors settlement,

4    correct?

5    A    Yes, and, of course, consideration for the litigation

6    claims.

7    Q    And Mr. Sawyer, the terms now of the disinterested

8    directors settlement as modified are contained in the

9    settlement agreement that's before the Court for approval,

10   correct?

11   A    Yes.

12   Q    And those terms now exist in that settlement agreement

13   and not in a specific plan of reorganization, correct?

14   A    Yes.

15   Q    And if approved by this Court, the terms of the

16   settlement agreement are permanent, irrespective of what

17   comes next in the bankruptcy, correct?

18   A    Yes.

19   Q    And you testify in your written direct testimony at

20   Paragraph 69, you note that if a better alternative

21   materializes, the debtors have the right to exercise a

22   fiduciary right; do you recall that testimony?

23   A    Yes.

24   Q    Okay.  And if the settlement agreement is approved by

25   the Court, the debtors no longer have a fiduciary out with

1    respect to the terms of the settlement, correct?

2    A    Yes, that's my understanding.

3    Q    Okay.  So your testimony with respect to the fiduciary

4    out is with respect to the plan of reorganization only,

5    correct?

6    A    I'm not a lawyer, but I believe that is correct, yes.

7    Q    Okay.  Now you testified, Mr. Sawyer, in Paragraph 42

8    of your indirect -- and I think you touched on this this

9    morning in your testimony -- that you made it clear that if

10   EFH -- if the disinterested directors at EFH had not settled

11   the inter-company claims on reasonable terms, you would have

12   authorized TCEH to pursue litigation with respect to the LBO

13   claims that EFH had, correct?

14   A    Yes.

15   Q    And you appreciated, however, that EFH had potential

16   defenses to those LBO claims.

17   A    Yes.  They -- complex, legal matters, strong defenses.

18   Q    And you testified in your deposition that you believe

19   there's actually a high litigation bar to overcome with

20   respect to those claims, correct?

21   A    Yes.

22   Q    And you did not attribute any par value to the LBO

23   claims in communicating your settlement demands to EFH,

24   correct?

25   A    Yes, that's correct.  As a starting point in the

1    negotiation, I didn't think it would be productive to ask

2    for the $21 billion.

3    Q    Now Mr. Sawyer, your position with respect to each of

4    the inter-company claims is that the TCEH's inter-company

5    claims against EFH have value, correct?

6    A    Yes.

7    Q    And you testified at Paragraph 66 of your written

8    direct that the claims against officers and directors that

9    would exist arise from the inter-debtor claims that are the

10   subject of the settlement, correct?

11   A    Yes.

12   Q    And so, Mr. Sawyer, if you're correct, would you agree

13   if you're correct about your litigation position with

14   respect to the merits of the TCEH inter-debtor claims, that

15   there are related claims against the officers and directors

16   that also would have merit.

17           MR. SHORE:  Objection.  The question is unclear.

18   Q    Let me restate.  I'm happy to restate the question.

19   Mr. Sawyer, if you're correct with respect to your

20   litigation position with respect to the merits of the claims

21   against EFH, you would agree that there are related claims

22   against the directors and officers that could be prosecuted

23   as well, correct?

24           MR. SHORE:  Objection.  First to form, which

25   officers and directors; second as to foundation, this

1    witness has no personal knowledge of the underlying facts

2    related to claims; and third, this is a 9019.  The party on

3    the other side is objecting to the evaluation of the claims

4    to the third party to the settlement.  I've never seen it

5    before in a 9019, and I don't think it's relevant to the

6    objection that the committee has on file.

7              MR. GLUECKSTEIN: Your Honor, I do think it is

8    relevant, and is point of issue, even the testimony here, of

9    the point that there are, in fact, claims that exist that

10   the T-side is releasing related to these claims should those

11   claims have merit.

12             THE COURT:  And so why do you care if the T-side

13   is releasing anything?

14             MR. GLUECKSTEIN:  Well, we do care, Your Honor,

15   and in that consideration for all of this is being provided

16   by EFH.  That's not an issue for this witness.  But the fact

17   of whether or not he's releasing claims with merit.

18             THE COURT:  I understand your complaint about the

19   settlement, but doesn't that really go to what the EFH

20   directors have done, and not what the TCEH directors have

21   done?

22             MR. GLUECKSTEIN:  The question -- it does, but the

23   question here is simply to -- whether Mr. Sawyer has an

24   understanding of whether or not there are claims with merit

25   that were being released with the D&Os.  It's simple -- the

1   only question is before.

2          THE COURT:  Okay, I'll allow it.  You can answer

3   it to the extent you understand it.

4   A    I believe you're asking a question that I'm not

5   qualified to answer.  I'm not a lawyer.  In the course of my

6   investigation, I considered the claims against the sponsors

7   related to the amended and extend and the LBO transaction,

8   all the D&Os, I considered their claims related to the

9   inter-company notes and the amend and extend.  That was

10  where my investigation focused.

11  Q    And did your investigation related to that include also

12  claims against directors and officers?

13  A    As it related to the inter-company claims, certainly.

14  Q    Now, Mr. Sawyer, you testified that, in your view, and

15  you testified to this in Paragraph 35 of your written

16  direct, that you view the insider releases as an essential

17  element of the claims because litigation would expose EFH to

18  indemnification costs and damages.  Do you recall that

19  testimony?

20  A    Yes.

21  Q    Mr. Sawyer, are you aware that there's potentially

22  applicable D&O insurance that would cover some of those

23  potential liabilities, correct?

24  A    Yes, I'm aware the D&O policy exists.  I don't -- I'm

25  not a D&O expert and don't know if it can be invoked.

1   Q    Okay.  Absent the settlement agreement, creditors --

2   did you understand that creditors could pursue claims

3   against directors and officers and potentially obtain

4   recoveries from those D&O insurance assets?

5   A    Yes, absent the settlement agreement.

6   Q    And do you have an understanding, Mr. Sawyer, that any

7   uninsured indemnification claims against the debtors would

8   be general unsecured claims in this bankruptcy?

9   A    Again, a legal question.  But I think hypothetically,

10  yes, that's probably right.

11  Q    Mr. Sawyer, you testified at Paragraph 54 of your

12  direct testimony that disarmament -- what's referred to as

13  disarmament -- is a great value to the debtors and enables a

14  value maximizing event.  Do you recall that testimony?

15  A    I do.

16  Q    Okay.  And the value maximizing event is the plan of

17  reorganization that's before the Court for confirmation,

18  correct?

19  A    Yes.

20  Q    And you believe that the settlement agreement is an

21  important part of that plan, correct?

22  A    I do.

23  Q    And the settlement agreement, from your perspective,

24  facilitates that plan of reorganization, correct?

25  A    Yes.

1    Q    Now you testified in Paragraph 67 of your direct that

2    the plan was the "best and only path available to pay E-side

3    creditors in full."  Do you recall that testimony, sir?

4    A    I do.

5    Q    Okay.  As we sit here today, there's uncertainty as to

6    whether that plan will close and the EFH creditors will be

7    paid in full, correct?

8    A    Yes.

9    Q    And you agree, Mr. Sawyer, that the debtors have no

10   enforcement remedies in the purchase contract itself with

11   respect to this plan, correct?

12   A    Yes.

13   Q    In fact, you testified in Paragraph 69 that

14   notwithstanding the absence of remedies, you're not aware of

15   any reason to doubt that the plan sponsors intend to close

16   the transaction.  Do you recall that testimony?

17   A    I do.

18   Q    Okay.  You would agree, Mr. Sawyer, that the purchasers

19   will ultimately make a decision at the time of closing as to

20   whether it's in their financial interest to close, correct?

21   A    Yes, among other interests.

22   Q    But if it's -- if it was uneconomical for them to

23   close, they -- you don't believe they would close the

24   transaction, correct?

25   A    I can't speculate whether they would or wouldn't.

1   Q    Then you do believe that they would make a decision at

2   the time of closing as to what's in their financial

3   interest.

4   A    Sure, yes.

5          MR. GLUECKSTEIN:  Thank you.  That's all the

6   questions I have, Your Honor.

7          THE COURT:  Thank you.  Mr. Sheppard.

8          MR. SHEPPARD:  Thank you, Your Honor.  Your Honor,

9   I also handed up a much skinnier binder this time.

10          THE COURT:  Very good.

11          MR. SHEPPARD:  Mr. Sawyer, you also have a copy of

12   that.

13          MR. SAWYER:  Yes.

14          THE COURT:  You may proceed.

15          MR. SHEPPARD:  Thank you, Your Honor.

16   Q    Mr. Sawyer, you testified that, on direct examination

17   regarding this rather exhaustive process, that you went

18   through with your counsel to evaluate these various inter-

19   company claims, correct?

20   A    Yes, with counsel and Munger, Tolles.

21   Q    Okay.  And I believe in your written direct you wrote

22   that it was important to you that you faithfully discharge

23   those duties as a disinterested director, right?

24   A    Yes.

25   Q    And you certainly took it very seriously.

1    A    Yes.

2    Q    And that your counsel conducted, over about a five-

3    month period, right, an exhaustive review of what was in the

4    legacy database, what was in the data room, all the

5    documents, correct?

6    A    Yes, counsel and Munger, Tolles.

7    Q    And the purpose of that review was to determine whether

8    or not the T-side had any claims against the E-side and

9    against the sponsors; isn't that right?

10   A    Yes.

11   Q    Okay.  All right, so let me, if we can, turn to DX-12,

12   which is the exhibit that your counsel was working from.  In

13   my binder, I included only just the presentation I want to

14   ask you about.

15   A    Sure.

16   Q    Do you recall your counsel asking you about a

17   presentation that Munger, Tolles gave to Proskauer on March

18   5th, remember that?

19   A    I do.

20   Q    Okay.  And I believe you testified that in connection

21   with that presentation, you had reviewed it with your

22   counsel before it was made to Proskauer, right?

23   A    Yes.

24   Q    And that you approved everything that was in there;

25   isn't that correct?

1   A    Yes.

2   Q    And that you believe that what you were saying in that

3   presentation or what your lawyers were telling to Proskauer

4   was accurate; isn't that right?

5   A    Yes.

6   Q    Okay.  So can we turn then to slide 26, which is the

7   slide that relates to the amend and extend transactions; do

8   you see that?

9   A    I do.

10  Q    Okay.  And this was one of the claims that you believed

11  that the T-side had against EFH; isn't that correct?

12  A    Yes.

13  Q    Okay.  And it also says here that you believe that it

14  was a claim that the T-side had against the sponsors; isn't

15  that true?

16  A    Yes.

17  Q    And if the value of that claim at par, I believe you

18  testified, was about $2 billion, right?

19  A    No.  I felt the litigation value of this claim was

20  about $2 billion.  The initial proposal we presented was $8

21  million.

22  Q    Okay.  But you thought there could possibly result in a

23  recovery of about $2 billion; is that right?

24  A    Yes, yes, that's right.

25  Q    Can we then turn to slide 30, please?  Okay, and this

1    was also a slide that was shown to you by your counsel; do

2    you recall that?

3    A    Yes.

4    Q    And here we're talking about the -- your position with

5    regard to the allocation of the sponsor fees; isn't that

6    right?

7    A    Yes.

8    Q    Okay.  And at the bottom of that second bullet, do you

9    see that, the management agreement is potentially avoidable;

10   do you see that?

11   A    Yes.

12   Q    Okay.  And that's the management agreement between the

13   sponsors and EFH, correct?

14   A    Yes.

15   Q    That required the payment of the management fees?

16   A    Yes.

17   Q    Okay.  And then lastly, let's turn to slide 33, please.

18   And, again, this is another slide that I believe your

19   counsel showed you regarding the LBO claims.  And in

20   response to that, I believe you called it the nuclear

21   option, right?

22   A    I did.

23   Q    And that the potential value of this was $21 billion,

24   right?

25   A    Yes.

1    Q    Okay.  And on that first page, again, it says these are

2    claims against EFH and/or the sponsors; isn't that correct?

3    A    Yes.

4    Q    Okay.  So these were claims that the T-side potentially

5    had against the sponsors, right?

6    A    Yes, that's right.

7    Q    For which you were agreeing to release as part of this

8    plan of reorganization; is that correct?

9    A    Yes.

10            THE COURT:  Agreeing -- I'm going to back you up

11   for a minute.  You just said agreeing to release, in

12   connection with this plan of reorganization, which claim?

13            MR. SHEPPARD:  Okay.  The plan that's before the

14   Court, Your Honor.  And I can be more specific.

15            THE COURT:  Did you understand that was the

16   question, Mr. Sawyer?

17            MR. SHEPPARD:  Your Honor, let me restate it if

18   it's unclear.  With regard to the settlement agreement

19   that's before the Court, Your Honor.

20   A    Thank you.  Yes.

21   Q    Okay.

22   A    Thank you.

23   Q    All right, now -- okay, we can take that down.  Now,

24   you testified, I think also in your written direct and again

25   here this morning, that you viewed your role as this

1    disinterested manager as unique, right?

2    A    Yes.

3    Q    And that you were really the only person on the TCEH or

4    EFCH boards that was not somehow conflicted by some other

5    obligation to either EFH or the sponsors; isn't that right?

6    A    Yes.

7    Q    Okay.  And that's why you were chosen to be the person

8    to review this disinterested directors settlement, correct?

9    A    Yes.

10   Q    However, when it came time to approve the releases of

11   the sponsors, Mr. Sawyer, it was, in fact, the special

12   committee of the board of TCEH, correct?

13   A    That's right.

14   Q    Okay.  People that -- persons like Mr. Costa who had an

15   obligation to EFH, correct?

16   A    Yes.

17   Q    Okay.  Mr. Keglevic, who was an officer of all the

18   entities, correct?

19   A    Yes.

20   Q    And whose compensation ultimately was determined by the

21   EFH board, correct?

22   A    Yes.

23   Q    The board dominated by the sponsors?

24   A    Uncomfortable with the characterization of majority.

25   Q    How about majority?

1      MR. SPIEGEL:  May the witness be allowed to finish

2  his answer, Your Honor?

3      THE COURT:  Yes, please.

4  Q    I'm sorry.  I thought you were finished.

5  A    I'm uncomfortable with the characterization of

6  dominated.

7  Q    Okay.

8  A    But yes, there are a number of sponsor directors on the

9  EFH board.

10  Q    And they're a majority of the board, correct?

11  A    In numbers, yes.

12  Q    Okay.  And Mr. Young, also an officer similarly?

13  A    Yes.

14      THE COURT:  Similarly what?

15  Q    Whose compensation is determined by the EFH board,

16  correct?

17  A    Yes.

18  Q    And that was the special committee that approved the

19  releases of the sponsors in the settlement agreement before

20  the Court today.

21  A    Yes.

22  Q    I have nothing further, Your Honor.

23      THE COURT:  All right.  Thank you.  2037 notes?

24  Not going to hold you to it, but just try to get an idea of

25  how long you think --

1          MS. KAM:  Five to 10 minutes.

2     Q    Good morning, Mr. Sawyer.  My name is Sarah Kam and I'm

3     from Reed Smith on behalf of the Bank of New York Mellon

4     Trust Company in its capacity as the 2037 notes trustee for

5     EFCH.  Now you're the disinterested manager of EFCH and

6     TCEH, which together are referred to as the TCEH debtors; is

7     this correct?

8     A    Yes.

9     Q    What are your duties as a disinterested manager of

10    EFCH?

11    A    I have a duty of loyalty and a duty of care to EFCH.

12    Q    And are these the same duties that you have as a

13    disinterested manager of TCEH?

14    A    Yes.

15    Q    As a disinterested manager of EFCH and TCEH, you

16    investigated claims on behalf of the TCEH debtors against

17    the E-side debtors; is this correct?

18    A    Yes.

19    Q    And you ultimately concluded that the TCEH debtors hold

20    various claims against the E-side debtors for which the TCEH

21    debtors should receive compensation; is this correct?

22    A    Yes.

23    Q    And you described some of these various claims in your

24    declaration; is this correct?

25    A    Yes.

1    Q    And these claims include claims of EFCH; is this

2    correct?

3    A    Yes.

4    Q    On behalf of the TCEH debtors, you entered into

5    discussions with various parties to settle the claims of the

6    TCEH debtors; is this correct?

7    A    Yes.

8    Q    At the same time you were prepared to authorize the

9    TCEH disinterested advisors to commence litigation on behalf

10   of the TCEH debtors if the E-side debtors refused to

11   adequately compensation the TCEH debtors for their claims;

12   is this correct?

13   A    Yes.

14   Q    Did you separately analyze the claims of EFCH alone?

15   A    During the -- yes, during the course of the

16   investigation work, we considered -- I considered some of

17   those claims, yes.

18   Q    And what conclusions did you reach with respect to the

19   EFCH claims alone?

20   A    That they did not have merit.

21   Q    Did you separately analyze the claims of TCEH alone?

22   A    Yes.

23   Q    In Paragraph 43 of your declaration, you state that you

24   did not attempt to agree on a specific settlement value for

25   each individual claim; is this correct?

1    A    Yes.

2    Q    And why did you not attempt to agree on a specific

3    settlement value for each individual claim?

4    A    The negotiations between the disinterested directors

5    were so intense and so difficult as to the merits of the

6    claims that I included to aggregate the value, knowing that

7    we would never agree as to the merits of the individual

8    claims or the values of the individual claims.

9    Q    In Paragraph 16 of your declaration, you state that you

10   ultimately concluded that the claims of the TCEH debtors

11   against the E-side debtors in the aggregate were more

12   valuable than the claims of the E-side debtors against the

13   TCEH debtors; is this correct?

14   A    Yes.

15   Q    You did not make a determination that only TCEH holds

16   litigation claims; is that correct?

17   A    Could you repeat your question?  I'm sorry.

18   Q    Sure.  You did not make a determination that only TCEH

19   holds litigation claims; is that correct?

20   A    That's right.

21   Q    So you did not make a determination that EFCH does not

22   hold any litigation claims; is that correct?

23   A    That's right.

24   Q    Even though you were negotiating on behalf of the TCEH

25   debtors, you only demanded that TCEH receive an allowed

1    claim against EFH; is that correct?

2    A    Yes.

3    Q    You did not demand that EFCH also receive an allowed

4    claim against EFH; is this correct?

5    A    Yes.

6    Q    You eventually entered into the DD settlement, which

7    resolved the claims of the TCEH debtors; is this correct?

8    A    Yes.

9    Q    And under the DD settlement, TCEH would have an allowed

10   claim of $700 million against EFH; is this correct?

11   A    Yes.

12   Q    And on the other hand, under the DD settlement, EFCH

13   would not have an allowed claim against any of the E-side

14   debtors; is this correct?

15   A    Yes.

16   Q    The claims being settled belong to the TCEH debtors,

17   right?

18   A    Yes.

19   Q    And the claims being settle include all of the claims

20   of EFCH; is this correct?

21   A    Yes.

22   Q    So EFCH has assets in the form of litigation claims,

23   right?

24   A    Potentially, yes.

25   Q    Okay.  Thank you.  We have nothing further, except that

1    we have four exhibits that we want to move into evidence,

2    which are just the indentures and proofs of claim relating

3    to the EFCH 2037 notes claims.

4          THE COURT:  And have you discussed that with the

5    other side yet?

6          MS. KAM:  We did discuss it with Kirkland, and we

7    submitted copies of the exhibits, and also a declaration

8    regarding authenticity, but I haven't heard back from them.

9          THE COURT:  Can Mr. McKane, is this…

10         MR. MCKANE:  Your Honor, we'll be available to

11   address the issue, if we have any objections, after the

12   lunch break.

13         THE COURT:  All right.  We'll hold that in

14   abeyance pending the lunch break, and I'll make a ruling at

15   that time.

16         MS. KAM:  Thank you.

17         THE COURT:  You're welcome.  Let's see, is the

18   United States in the house?  All right.  I don't want to

19   hold you to it, I'm just sensitive to the time, Frank, for

20   lunch, so I was just wondering if you could let me know how

21   long you think you'll think you'll be.

22         MS. GRACE:  Good afternoon, Your Honor.  Anna

23   Grace with the United States Department of Justice here on

24   behalf of the Environmental Protection Agency.  Thank you,

25   Your Honor.  Your Honor, I do want to report that the

1    parties are close to a settlement -- EPA and the debtors are

2    close to a settlement.  With that in mind, Your Honor, we

3    would like to reserve our opportunity to cross the witness

4    until after lunch.

5              THE COURT:  Okay, that's fine.

6              MS. GRACE.  Thank you very much.

7              THE COURT:  Very good.  Mr. McKane?

8              MR. MCKANE:  Your Honor, the debtors absolutely

9    have no issue with that.  And, in fact, we just report that

10   there's been material progress made during the course of

11   this morning.

12             THE COURT:  Okay.

13             MR. MCKANE:  And so, we're hopeful.

14             THE COURT:  All right.  Then I think there was no

15   other cross.  So we'll hold the cross of the EPA to after

16   lunch, if necessary, and we'll take the break now since we

17   can't do redirect till we're finished cross.  And we'll

18   reconvene at 1:30.  As I said earlier, I have a meeting so

19   we can't do it any earlier than that.

20             And Mr. Sawyer, again, during the break, you may

21   not discuss the substance of your testimony with any person.

22   So we're in recess until 1:30.  Thank you.

23        (Recess)

24             THE COURT:  Please be seated.  I'm sorry, I

25   apologize for the delay.

1            MR. HUSNICK:  Good afternoon, Your Honor.  Chad

2    Husnick, from Kirkland & Ellis, on behalf of the Debtors.

3            Your Honor, just briefly to mention on the record,

4    that the Debtors have reached agreement in principle with

5    the Environmental Protection Agency that will resolve the

6    confirmation objection, as well as their claims.  We will be

7    documenting that settlement agreement.  It will require

8    notice and comment under their applicable regulations.  But

9    subject to all that, I believe that eliminates the need for

10   further cross of Mr. Sawyer.

11           THE COURT:  Okay.  Does The United States wish to

12   be heard?

13           MS. GRACE:  No, thank you, Your Honor.

14           The COURT:  Okay.  Very good.  That was

15   outstanding.

16           MR. HUSNICK:  That's all I --

17           THE COURT:  All right, very good.

18           MR. HUSNICK:  That's all I have, Your Honor.

19           THE COURT:  All right, excellent.

20           MR. HUSNICK:  Thank you.

21           THE COURT:  So do we have re-direct for Mr.

22   Sawyer?  Yes?

23           MR. SPIEGEL:  I do, Your Honor, yes.

24           THE COURT:  Okay, very good.  Mr. Sawyer, can you

25   retake the stand, please?  You may proceed.

 1          MR. SPIEGEL:  Thank you, Your Honor.

 2                    RE-DIRECT EXAMINATION

 3     BY MR. SPIEGEL:

 4     Q    Good afternoon, Mr. Sawyer.

 5     A    Good afternoon.

 6     Q    Handful of questions for you on redirect.  Referring

 7     you to questions on cross-examination about the T-side

 8     board's approval of any sale of Oncor.  What is the basis

 9     for your understanding that you were required to approve any

10     sale of Oncor?

11     A    My understanding, Mr. Spiegel, was that the Court had

12     directed me to approve the sale of Oncor.

13     Q    And when was that court direction entered?

14     A    As I recall, the November 3rd ruling.

15     Q    November 3rd, 2014?

16     A    Yes.

17     Q    And did that apply to your approval of bidding

18     procedures?

19     A    Yes.  As I recall, it did.

20     Q    And to the selection of a stalking horse bidder?

21     A    Yes, exactly.

22     Q    And to the selection of a winning bidder?

23     A    Yes.

24     Q    You were asked some questions about the claims that

25     were presented to EFH in the Munger, Tolles presentation

1  dated March 5.  Let's go to Page 45 of DX 12.  Remember

2  counsel asked you about whether a claim was presented

3  against the sponsors, in connection with the amend and

4  extend transaction.  You have that testimony in mind?

5  A    Yes.

6  Q    Was that a claim by TCEH against the sponsors, or a

7  claim by EFH against the sponsors?

8  A    As I recall, it was a claim by TCEH against the EFH,

9  and the sponsors.

10 Q    Did you ever investigate, at any time, any claims by

11 EFH against the sponsors?

12 A    No.

13 Q    We are Page 52 of DX 12.  That you were shown this

14 slide relating to LBO claims presented by Munger, Tolles to

15 EFH.  You recall that, on cross?

16 A    Yes.

17 Q    And the claim described here against the sponsors, in

18 connection with the LDO, was that a claim by TCEH, or a

19 claim by EFH?

20 A    As I recall, Mr. Spiegel, it was a claim by TCEH.  TCEH

21 incurred the debt, transferred the cash to EFH through a

22 dividend.

23 Q    And in connection with the LBO, did you ever

24 investigate in any way, at any time, any claim by EFH

25 against the sponsors?

1    A    I did not.

2    Q    Let's talk about the compensation of Messrs.  Young and

3    Keglevic.  Recall you were asked some questions about their

4    compensation being set by the board?

5    A    Yes.

6    Q    Have you ever attended a meeting of the compensation

7    committee of the board of EFH?

8    A    Yes.

9    Q    You're not a member of the compensation committee.

10   A    I am not.

11   Q    Are you an observer there?

12   A    Periodically, yes.

13   Q    And does the compensation committee set the

14   compensation for Messrs.  Young and Keglevic?

15   A    Yes.

16   Q    As opposed to the full board?

17   A    My understanding is yes.

18   Q    And on the compensation committee, as you recall, who

19   were the members of the compensation committee?

20   A    The chairman of the board led those compensation

21   discussions.  I don't recall siting here today who the other

22   members are.

23   Q    So it was Don Evans?

24   A    Yes.

25   Q    And refreshing your recollection, Arcilia Acosta, was

1    she on the compensation committee?

2    A    Yes, thank you, yes.

3    Q    And was there a sponsor director on the committee?

4    A    I believe there was, I just don't recall who it was.

5    Q    Ken Pontarelli.

6    A    That sounds right, yep.

7    Q    So three members of the sponsor -- sponsor -- three

8    members of the compensation committee, is that right?

9    A    Chaired by Chairman Evans.

10   Q    Three members, only one was the sponsor director.

11   A    Correct.

12   Q    Can you look at Paragraph 71 of your direct testimony?

13   We have that on the screen, Mr. Mendoza?  While we're doing

14   that, you were asked some questions about possible claims by

15   EFCH, do you recall that?

16   A    Yes.

17   Q    We'll get your declaration up there in a minute.  Take

18   a look at Paragraph 71.  Is this your direct testimony, as

19   it relates to your assessment of claims that EFCH might

20   have?

21   A    Yes.

22   Q    Now, you say here that you don't believe that EFCH has

23   any litigation claims of value for unsecured creditors of

24   EFCH?

25   A    Yes.

```
1    Q    Was that based upon your investigation and discussions

2    with your legal and financial advisors?

3    A    Yes.

4    Q    And do you know of any way for EFCH to monetize any

5    litigation claims that it might have?

6    A    I do not.

7    Q    Nothing further.  Thank you, Mr. Sawyer.

8              THE COURT:  Any further questions?  All right, I

9    hear none.  Thank you, Mr. Sawyer.

10             MR. SAWYER:  Thank you, Your Honor.

11             THE COURT:  You may step down.  All right, I think

12   next is Mr. Cremens?

13             MR. MCKANE:  Yes, Your Honor, the Debtors call

14   Charles Cremens to the stand.

15             THE COURT:  All right.  Good afternoon, Mr.

16   Cremens.  If would please take the stand, but remain

17   standing for your affirmation.  Step on up.

18             CLERK:  Please raise your right hand.  Do you

19   affirm you're willing to tell the truth, the whole truth,

20   and nothing but the truth, to the best of your knowledge and

21   ability?

22             MR. CREMENS:  I do.

23             CLERK:  Please state and spell your name for the

24   record?

25             MR. CREMENS:  Charles H.  Cremens.  C-R-E-M-E-N-S.
```

1          THE COURT:  You may be seated, sir.  If you could

2    make sure you're close to the mic, that'd be great.  And you

3    need -- Mr. Levin, hello.

4          MR. LEVIN:  Good afternoon, Your Honor.  Richard

5    Levin, Jenner & Block LLP for EFIH.  If I may approach the

6    witness with a binder?

7          THE COURT:  Yes, please.  And if someone would

8    take away the binders that are left over from Mr. Sawyer,

9    that would be -- thank you, Mr. Levin.  You can just put

10   them right over there, excellent.  Thank you.  Do you have a

11   sec?  Could we get a binder for Ms. Werkheiser, please?

12   Okay, you may proceed.

13                    DIRECT EXAMINATION

14   BY MR. LEVIN:

15   Q    Mr. Cremens, you've already stated your name for the

16   record.  What is your role in this Chapter 11 case and with

17   the Debtors?

18   A    I am the EFIH disinterested director.

19   Q    Are you on any other boards at EFIH or its affiliates?

20   A    No.

21   Q    Would you briefly describe your professional

22   background, please?

23   A    Over the last 30 years, I have been involved in

24   restructurings, public, private companies.  Worked as chief

25   restructuring officer (indiscernible) management, and most

1    recently I've been involved in a number of board positions

2    of companies that are going through restructurings, formal

3    or otherwise.

4    Q    You have a binder in front of you.  The first tab in

5    that binder is entitled "Direct Testimony of Charles H.

6    Cremens."  You have that?

7    A    I do.

8    Q    And you see the tabs in that binder labeled "Settlement

9    Agreement" and "Fifth Amended Plan of Reorganization"

10   A    Tabs in the -- yes, I do.

11   Q    I want you to remember that, because we're going to be

12   talking about those items this afternoon.  And have you read

13   and reviewed your declaration that is in the first tab?

14   A    I have.

15   Q    In the form you see it in the binder, is the

16   declaration your written testimony?

17   A    It is.

18   Q    Would you turn to the last page of that, please?  Is

19   that your signature on it?

20   A    It is my signature.

21   Q    And are the statements that you've made in the

22   declaration, unless otherwise stated, based on your own

23   personal knowledge?

24   A    They are.

25   Q    And are they true and correct to the best of your

1    personal knowledge and belief?

2    A    Yes, they are.

3           MR. LEVIN:  Your Honor, I'm going to hold off

4    moving that into evidence until the end, when I have some

5    other exhibits that'll go with it, but I just wanted to lay

6    the foundation for it now.

7           THE COURT:  Great.

8    Q    I want to turn now, Mr. Cremens, to the question of

9    conflict matters.  You're familiar that the EFIH board

10   adopted a resolution giving you authority with respect to

11   conflict matters?

12   A    That is correct.

13   Q    And did you designated all matters that you dealt with

14   during the case as conflict matters?

15   A    No, absolutely not.

16   Q    And why were only some matters formally designated as

17   conflict matters?

18   A    Those were matters that had specific adverse conflicts

19   that existed between or among the debtors.

20   Q    And did you apply EFH-focused decision-making, with

21   respect to those conflict matters?

22   A    EFIH focus, absolutely.  EFIH was my responsibility, as

23   a disinterested director, and it was my sole focus to try to

24   maximize value for EFIH.

25   Q    Did you apply that same direction and focus with

```
 1   respect to non-conflict matters?
 2   A    Yes, the process was very similar, and in fact, after
 3   the November designation of dealing with adverse actions
 4   that could be considered conflict, that were set up by the
 5   Court, requested by the Court, structurally, I went and
 6   hired counsel and advisors, and followed a process that was
 7   very similar, no matter what the issue was.  And if
 8   something was determined to be a conflict, specific
 9   conflict, where adverse issues among the Debtors was
10   determined, then we certainly dealt with that very
11   specifically to reach conclusion.
12   Q    I want to turn now to the settlement agreement that I
13   referenced in the binder a moment ago.  Are you familiar
14   with that document?
15   A    I am.
16   Q    What is your understanding of the subject matter areas
17   that that settlement agreement covers?
18   A    Subject matter at a high level covered?  Because I'm
19   sure the Court has heard a lot of detail.  But in a high
20   level, we have inter-Debtor settlements, we have a creditor
21   settlement between the Ts, and we have releases for the
22   director, officer, and sponsors.
23   Q    Now, focusing just on EFIH, which is a party to that
24   settlement agreement, what is your understanding, in general
25   terms, of what EFIH gets under the settlement agreement?
```

1    A    EFIH gets releases from the other debtors, and the

2    opportunity with the overall settlement being confirmed and

3    approved by the Court, hopefully global peace.

4    Q    And what is your understanding, again in general terms,

5    of what EFIH gives up in order to get those benefits, under

6    the settlement agreement?

7    A    EFIH also provides its side of the mutual releases to

8    the other debtors, and so any claims that EFIH might have

9    had against those debtors we have obviously released as part

10   of the settlement.  And we specifically have also given up,

11   well, claims that would go to EFH.

12   Q    Give me an example of one of those claims.

13   A    I got ahead of myself there, but there was 1.3 billion,

14   which represents two-thirds of the overall legacy notes.  So

15   we released that claim as part of the settlement agreement.

16   Q    Were there litigation claims by EFIH against EFH that

17   were released, as part of the settlement?

18   A    Yes.  EFIH released claims against EFH, and we also

19   released our litigation claims against TCEH.

20   Q    Now, before you voted on the settlement agreement, what

21   did you consider, in your capacity as a disinterested

22   manager of EFIH, in evaluating the claims by and against

23   EFIH?

24   A    Well, we had an investigation done by the disinterested

25   director advisors of EFIH, and it was a rather thorough

1    investigations of the claims, and the merits of the claims

2    specifically.  But as it relates to consideration of EFIH,

3    and making the decisions of releasing the claims, we looked

4    at what the benefit would be of pursuing the claims.

5            It was within the context, at that time, that we

6    felt that EFIH had a probable certainty of getting paid 100

7    cents on recovery of allowed claims at the EFIH level.  So

8    within that context, we realized that pursuing claims

9    against EFH, the parent, would just be a circular situation,

10   if in fact, we won on any claims against EFH.  If, in fact,

11   it turned out that EFIH were not solvent, did not have a

12   full opportunity to recover for its stakeholders, then we

13   would be pursuing against whatever assets were at the EFH

14   level.

15           EFH had cash, effectively, for us to pursue.  And

16   the cash was being depleted relatively quickly, because of

17   the litigation, and other expenses associated with the case

18   at the time.  And so the opportunity was to create a

19   settlement that would minimize the legal risks, and from our

20   end, from our standpoint, the ability to expedite, to get to

21   confirmation and payment in 100 percent to our creditors.

22   So, as it relates to TCEH, TCEH was insolvent by billions of

23   dollars.  And we looked at those claims both on the merits,

24   and what would be the befit of pursuing those claims.  And

25   it would be little benefit of opportunity for value.

1   Q    So before you voted on approving the settlement, did

2   you feel at the time that you were adequately informed of

3   the risks and benefits to enable you to make a sound

4   decision about that?

5   A    Absolutely.

6   Q    And did you vote to approve the settlement?

7   A    I did.

8   Q    Why?

9   A    Again, global peace.  I think it gets us to an

10  opportunity of resolution, in terms of, in particular, in

11  conjunction with the plan, and the PSA to move forward, and

12  hopefully get the hundred percent recovery for EFIH

13  stakeholders.

14  Q    Well at the time the settlement agreement was entered

15  into, you had already supported what is referred to as the

16  DD Settlement, or the Disinterested Director Settlement,

17  you're familiar with that?

18  A    Yes.

19  Q    And in that settlement, you had a fiduciary out,

20  correct?

21  A    Correct.

22  Q    Did you understand that you approved the settlement

23  agreement, and if this Court approved it, you would lose the

24  fiduciary out under the DD Settlement at the time?

25  A    Yes.

```
1    Q    And you were okay with that?

2    A    I was okay with it, because the tradeoff was that there

3    were significant benefits, as I just spoke about, that

4    accrued to the overall opportunity of the plan, the global

5    peace of the settlement, moving ahead with the terms of the

6    PSA as well, in terms of alternative transaction, and so

7    forth.

8    Q    And from EFIH's perspective, do you believe that the

9    Court's approval of the settlement agreement is in EFIH's

10   best interest?

11   A    Absolutely.

12   Q    Okay.  I want to turn to the Plan of Reorganization.

13   You're familiar with that document as well?

14   A    I am.

15   Q    And we're talking about the Fifth Amended Plan of

16   Reorganization, right?

17   A    Yes.

18   Q    Okay.  What do you see as the benefits of the plan to

19   EFIH?

20   A    Again, the plan is set up to deliver a hundred percent

21   recovery on allowed claims.  It's actually based upon recent

22   settlements.  It will deliver even in the aggregate, more

23   than a hundred percent in allowed claims to the EFIH

24   stakeholders.  And it lays out the opportunity to, in the

25   downside, to the extent that the merger does not occur as
```

1    anticipated in the plan, we have an opportunity to quickly

2    move to an alternative transaction.

3    Q    And what does it provide for EFIH's shareholder?

4    A    EFIH's shareholder gets a hundred percent recovery for

5    its allowed claims, and it release (indiscernible) settled.

6    Q    And what do you see as the risks associated with the

7    plan?

8    A    The risks associated with the plan are those primarily

9    associated with the merger, which are condition, they're

10   precedent to the purchase, which are regulatory risks, risks

11   with the IRS, and capital market risks.

12   Q    In coming to your decision on whether to approve the

13   plan, how did you weigh the benefits and the risks of the

14   plan?

15   A    This was the highest and best opportunity that had been

16   presented and provided us with, not only -- as I said, 100

17   percent recovery, but also the opportunity to have what is

18   known as disarmament to provide us with the elements of

19   being able to move quickly towards an alternative

20   transaction if this plan as laid out is not consummated.

21   Q    In coming to your decision on whether to approve the

22   plan, did you consider the absence of any enforcement

23   mechanism with respect to the merger agreement?

24   A    Yes, we talked about liquidated damages, but we

25   considered that the disarmament is of much greater value.

1    One thing I think that it was the opportunity of having this

2    purchaser, which is unique. This is not a third party

3    purchaser. It was the Creditors that had been the most

4    disruptive in the planning, in the case to that point, and

5    the opportunity to create a settlement agreement that

6    eliminated that disruption, even for successful plans, was

7    significant, and of great value to EFIH.

8    Q    With respect to EFIH's interest, do you believe that

9    the plan represented the best plan put forward?

10   A    The best plan put forward in terms of alternative

11   plans, is that the question?

12   Q    Yes.

13   A    Absolutely.

14   Q    And did you vote to approve the fifth amended plan?

15   A    I did.

16   Q    Do you support the Court's approval of the settlement

17   agreement and the confirmation of the plan currently before

18   the Court?

19   A    Absolutely.

20   Q    Your Honor, I have no further questions.

21        THE COURT:  Thank you. Cross? Mr. Glueckstein?

22              CROSS-EXAMINATION

23   BY MR. GLUECKSTEIN:

24   Q    Good afternoon, Mr. Cremens.

25   A    Good afternoon, Mr. Glueckstein.

1    Q    Nice to see you.  For the record, Brian Glueckstein of

2    Sullivan & Cromwell on behalf of the E-side Creditors'

3    Committee.  Mr. Cremens, one of the claims you were just

4    discussing, as referenced in your written, direct testimony,

5    is EFH's holdings of the $1.3 billion of EFH legacy notes.

6    You're familiar with that, correct?

7    A    I am.

8    Q    Mr. Cremens, that claim is only economically relevant

9    to EFIH if there was otherwise insufficient value at Oncor

10   to satisfy allowed claims at EFIH, correct?

11   A    Correct.

12   Q    and if there was a shortfall, the claim is still only

13   relevant to the extent of each available dollar necessary to

14   satisfy those EFIH claims in full, correct?

15   A    Say that again for me?

16   Q    So if in fact there is a shortfall in the value of

17   Oncor in the downside case, the $1.3 billion dollar note

18   claim is still only relevant to the extent of each available

19   dollar and EFH and each available dollar that's necessary to

20   make up that shortfall to pay off EFH claims, correct?

21   A    I'm getting confused about your question.

22   Q    Okay, let me try it differently.  To the extent that

23   there is a shortfall at EFIH, you would only be able to

24   collect, or it would only make sense to collect on the claim

25   in order to make up the amount of that shortfall to pay

1   those claims at EFIH, correct?

2   A    I think you're taking it out of context, so that isn't

3   the way I'd look at it.  When -- are you talking about the

4   settlement?

5   Q    I'm talking about--

6   A    Are you talking about the claim out of context?  What

7   are you talking about?

8   Q    Yeah, I'm talking about just the existence of that

9   claim, right?  The $1.3 billion dollar claim against EFH.  I

10  think as you testified, you can only collect on that claim

11  to the amount of available assets at EFH, correct?

12  A    Correct.

13  Q    Okay, and to the extent that you would collect on that

14  claim, you would need to collect on that claim on a dollar-

15  for-dollar basis, for which you have a shortfall, to pay

16  claims at EFIH, correct?

17  A    Again, I -- I'm misunderstanding where you're going

18  with that question because I've already stated that the --

19  to the extent that we evaluated this within the context of a

20  settlement agreement.  There were a lot of aspects to the

21  settlement agreement.

22  Q    I- -- sorry, go ahead.  I'm just talking in the absence

23  of a settlement agreement, do you have the claim existing at

24  EFH, correct?

25  A    Okay.

1   Q    If you didn't have a settlement and you were seeking to

2   collect on your claim, on the $1.3 billion dollar legacy

3   note claim, you would only need to collect on that claim to

4   the amount of any deficiency in your other assets at EFIH to

5   pay claims, correct?

6   A    Well, if -- yeah, if you're saying if there was an

7   opportunity to collect a billion three for EFIH --

8   Q    Mm hmm?

9   A    -- we'd go and collect a billion three for EFIH.

10  Q    Okay, and if you only had a $5 million dollars

11  shortfall in order to pay claims, what would happen to the

12  remaining amount of -- of --

13  A    As I said earlier, that would be a circular issue and

14  go to the parent.

15  Q    Okay, so that would end up back at EFIH so you

16  effectively --

17  A     EF --

18  Q    -- at EFH, correct?

19  A    Correct.

20  Q    Okay. And in agreeing to compromise in connection with

21  this settlement, EFH's $1.3 billion dollar note claim, you

22  had a reasonable expectation at the time that allowed claims

23  at EFIH were going to be paid in full, correct?

24  A    Yes.

25  Q    Okay. And you in fact presumed at the time that you

1    agreed to the settlement back in March that EFIH claims

2    would in fact be paid in full, correct?

3    A    It was April I think, and in terms of at that -- at

4    that time, we absolutely had indications that we would be

5    paid in full.

6    Q    Okay, and Mr. Cremens, you understand that there were

7    claims asserted for post-petition interest and make whole

8    premiums by holders of claims at EFIH, correct?

9    A    Yes.

10   Q    Yes.  And is it your understanding that those claims

11   totaled approximately in aggregate at the EFIH level about

12   $1.5 billion dollars or so?

13   A    A little bit less, yes.

14   Q    And the Debtors, EFIH specifically, contested the

15   allowance of those claims before this Court, correct?

16   A    EFIH did contest it, successfully.

17   Q    Okay, and successfully, and the Court has now

18   disallowed those make whole and post-petition interest

19   claims that had been asserted at the time you were

20   negotiating the settlement back in April, correct?

21   A    Yes.

22   Q    Okay, so the likelihood that EFIH is -- that EFIH's

23   claim with respect to the EFIH legacy notes being

24   economically relevant is less now, by $1.5 billion dollars

25   than it was back in April when you agreed to the settlement,

1    correct?

2    A    I don't think so, and that -- at the time that -- if

3    you're asking -- if you're trying to link that the

4    prospective allowed claim was including the $1.3 or 4

5    billion dollars of make whole and post-petition interest,

6    that wasn't the way we were looking at it.

7    Q    At the time you -- at the time you agreed to waive the

8    $1.3 billion dollar claim, there was a possibility that

9    those post-petition interests and make whole claims would be

10   allowed, correct?

11   A    Possibility.

12   Q    All right, and at least with respect to this Court,

13   this Court has now said that those claims were in fact

14   disallowed, correct?

15   A    That is correct.

16           THE COURT:  Wait a minute.  I -- are you talking

17   about post-petition interests at EFIH for the secured

18   lenders?

19           MR. LEVIN:  I'm talking about post-petition

20   interest and the make whole --

21           THE COURT:  Are you talking about the PIK

22   noteholders?

23           MR. LEVIN:  We're talking about the PIK

24   noteholders, yes.

25           THE COURT:  Okay, all right.

1   Q    Mr. Cremens, as you sit here today, you have no reason

2   to believe that the value of Oncor is such that EFIH claims

3   would not be paid in full, even if an alternative plan would

4   be necessary, correct?

5   A    That's our hope.

6   Q    I have no further questions, thank you.

7            THE COURT:  Thank you.

8            MR. MCKANE:  No questions, Your Honor.

9            THE COURT:  Okay, thank you, Mr. Sheppard.  Any

10  redirect?

11           MR. LEVIN:  No, Your Honor, I'd just like to move

12  in the declaration and the exhibits at this point.

13           THE COURT:  Okay.  Mr. Cremens, thank you, you may

14  step down.

15           MR. CREMENS:  Thank you, Your Honor.

16           THE COURT:  All right, any objection to the

17  admission of Mr. Cremens' declaration?  All right, I hear

18  none, it's submitted.

19           MR. LEVIN:  And Your Honor, there are five

20  exhibits also that I'd like to move in that are referenced

21  in the declaration.

22           THE COURT:  Okay.

23           MR. LEVIN:  Those are DX 043, DX 044 -- I'll give

24  them time to catch up.

25           THE COURT:  Yeah, that's fine.

 1              MR. LEVIN:  Okay, DX 045, DX 155, and DX 170.

 2   That's it.

 3              THE COURT:  Okay, those all look like minutes.

 4              MR. SHEPPARD:  No objection, Your Honor.

 5              THE COURT:  All right, they're admitted without

 6   objection.  Thank you, Mr. Levin.

 7              MR. LEVIN:  Thank you, Your Honor.

 8              THE COURT:  Mr. McKane.

 9              MR. MCKANE:  Your Honor, we have a number of

10   exhibits and written directs we'd like to move into evidence

11   at this time.

12              THE COURT:  Okay.

13              MR. MCKANE:  Specifically, Mr. Sawyer's written

14   direct, I have heard, I believe was not moved into evidence

15   at the start of his live examination and we'd like to do

16   that at this time.

17              THE COURT:  Any objection?

18              MR. GLUECKSTEIN:  No objections.

19              THE COURT:  It's admitted without objection.

20              MR. MCKANE:  All right, there were three Debtor's

21   exhibits that were used with his written direct that we'd

22   like to move into evidence as well.  I believe there are no

23   objections to these, and those are DX 73, 156 and 195.

24              MR. GLUECKSTEIN:  No objection.

25              THE COURT:  They're admitted.

1            MR. MCKANE:  And may I approach and provide a

2    copy?

3            THE COURT:  Yes.

4            MR. MCKANE:  Okay, Your Honor, with that --

5            THE COURT:  Can we -- can we back up to the EFCH

6    2037 bonds?

7            MR. MCKANE:  Your Honor, that's exactly where I

8    was going.

9            THE COURT:  Okay.

10           MR. MCKANE:  Is Ms. Kam still here?  Your Honor,

11   there is a declaration that Ms. Kam is going to file that

12   will provide the authenticity of certain documents.  The

13   Debtors have reviewed it and have no objection to its being

14   filed.

15           THE COURT:  Okay.

16           MS. KAM:  We were asked to circulate it to the --

17   the email service list and we did do that, but if you want

18   it filed, we can file it also.

19           MR. MCKANE:  No, actually, let me be more precise.

20   We will serve it on the objectors like we have done

21   everything in this case, and then file a notice that it has

22   been served, just like we do with other written directs or

23   affidavits and to the extent that anyone not under the

24   protective order wants access to it, we will provide it.

25           THE COURT:  Okay, and --

1          MR. MCKANE:  I apologize for the ambiguity.

2          THE COURT:  -- ultimately, if you want it into

3    evidence, you'll move it into evidence.

4          MR. MCKANE:  And we will move it into evidence on

5    Monday if need be, yes.

6          THE COURT:  Okay.  All right.

7          MR. MCKANE:  And as of -- to -- it relates to two

8    of her exhibits, BNY 71 and BNY 72.  These are both proofs

9    of claims, and the Debtor does not object to their

10   admissibility to the extent that they're offered solely for

11   the fact that they were filed and not for the truth of the

12   matter therein or the legal arguments contained therein.

13         THE COURT:  Okay.

14         MS. KAM:  And we agreed to that.

15         THE COURT:  Okay, great.  Can we list your

16   documents for the record then, that are going into evidence?

17         MS. KAM:  So, for the record, the proofs of claim

18   are BNY 71 and BNY 72, and the indentures are BNY 43 and BNY

19   44.

20         THE COURT:  Okay, that's fine.

21         MS. KAM:  I have copies of them, if you'd like.

22         THE COURT:  Yeah, we'll need some for the record,

23   so.  Why don't you -- do you have two sets?

24         MS. KAM:  I do.

25         THE COURT:  Two sets would be great.  Just give

1    them to Ms. Werkheiser, we'll take care of it.  Actually,

2    give me one, I'll keep it up here.  There we go, thank you.

3    Excellent.  And just so the record's clear, those documents

4    are admitted subject to the limitation on -- as put on the

5    record by Mr. McKane.

6              MR. MCKANE:  Thank you, Your Honor.  Your Honor,

7    at this time, we would like to move into evidence the

8    written direct of Mr. Michael McDougal.

9              THE COURT:  All right, any objection?

10             MR. GLUECKSTEIN:  No, no objection.

11             THE COURT:  Your Honor, may I approach?

12             THE COURT:  Yes.  Thank you.  All right, the

13   direct is admitted without objection.

14             MR. MCKANE:  Your Honor, at this time, the Debtors

15   would like to move into evidence the written direct of Mr.

16   David Ying.

17             THE COURT:  Any objection?

18             MR. GLUECKSTEIN:  No objection, Your Honor.

19             THE COURT:  Thank you.

20             MR. MCKANE:  May I approach?

21             THE COURT:  Yes.

22             MR. MCKANE:  Your Honor, I can represent to the

23   Court that the ESCH 2037 notes do not want to cross Mr.

24   Ying.

25             THE COURT:  Okay, thank you.

1           MR. MCKANE:  Okay, Your Honor, there are a series

2     of documents that the Debtors would like to move in at this

3     time.  We believe none of them are objected to.

4     Specifically, these are documents that were referenced in

5     the written direct of Mr. McDougal, that was just moved into

6     evidence.  Those are DX 717, 718, 764 to 766, 768, 772 to

7     775, 777, 779, 784, 788, 792.

8           MR. SHEPPARD:  No objection, Your Honor.

9           THE COURT:  All right, they are admitted.

10           MR. MCKANE:  Your Honor, I have a list.

11           THE COURT:  Thank you, you may approach.  They are

12     admitted.

13           MR. MCKANE:  Your Honor, we have a healthy list of

14     remaining exhibits that the Debtors would like to move into

15     evidence.  You guys ready?

16           MR. GLUECKSTEIN:  I'm ready, we're ready.

17           MR. MCKANE:  All right, Your Honor.  DX 20, 24,

18     36,41, 61, 62, 64, 65, 67, 72, 77 to 79, 81 to 83, 86, 90,

19     95, 98, 99, 120, 125, 126, 130, 133, 134, 136, 138, 140,

20     143, 144 -- excuse me -- 146, 147, 154, 158, 179. 180 to

21     182, 185 to 187, 190, 192, 197 to 199, 205, 213, 214, 216,

22     219, 220, 239 to 244, 246, 248, 269, 273, 304, 328, 330,

23     331, 335, 342, 346, 353, 361, 366, 367, 373 to 375, 390,

24     395, excuse me, 395, 396, 399, 401, 442, 443, 646, 655, 664,

25     678, 695, 789, 902, 919 to 927, and 978 to 993.

1                THE COURT:  I have a note here that I think it was

2      -- was it -- this the previous group or this group?

3                CLERK:  (Indiscernible)

4                THE COURT:  Okay, you have 178 written down but I

5      think you said 179.  So if we could clarify for the record.

6                MR. GLUECKSTEIN:  Yeah, we have that.

7                MR. MCKANE:  Your Honor, I think --

8                THE COURT:  Mr. Glueckstein's caught it too, so.

9                MR. MCKANE:  Your Honor is correct, I cannot read.

10               THE COURT:  All right, so just so the record's

11     clear, it's not 178, it's -- oh, it is 178 that's admitted,

12     not 179.

13               MR. MCKANE:  That's correct.

14               THE COURT:  Okay.

15               MR. MCKANE:  All right.

16               THE COURT:  Any objection?

17               MR. GLUECKSTEIN:  No objection.

18               THE COURT:  All right, they're admitted.

19               MR. MCKANE:  All right, they're -- and we thank

20     the Court and staff for monitoring us.  There's also three

21     documents that are on the PUCT docket that we would like the

22     Court to take judicial notice of that are also --  have a

23     Debtor exhibit numbers.  We're only offering these for the

24     fact that they have been filed and by whom they've been

25     filed and not for the truth of the matters concerted therein

1    or the legal arguments contained therein.

2            THE COURT:  Okay.

3            MR. MCKANE:  All right, and they are what will be

4    DX 994, Memoranda of PUCT Commissioner Ken Anderson, filed

5    on the PUCT docket, Number 42750 dated August 20th of 2015.

6    Debtor's Exhibit 995, Memoranda of PUCT Commissioner Ken

7    Anderson, filed on the PUCT docket, Number 42750 on

8    September 23rd, 2015.  And DX 996, the September 29th, 2015

9    joint-report and application for regulatory approvals,

10   pursuant to PURPA Sections 14.101, 37.154 and 39.262, and

11   the exhibits contained therein.

12           MR. GLUECKSTEIN:  Your Honor, we have no objection

13   for the limited purpose that Mr. McKane outlined, only that

14   they were filed and by whom and not for the contents.

15           THE COURT:  All right.  I'll take judicial notice

16   of them for that reason.

17           MR. MCKANE:  Thank you, Your Honor.  We will

18   provide file stamped copies with those DX number on Monday -

19   -

20           THE COURT:  All right.

21           MR. MCKANE:  -- but I can approach with the list.

22           THE COURT:  Yes.

23           MR. GLUECKSTEIN:  Your Honor, for the record,

24   Brian Glueckstein, Sullivan & Cromwell.  Just to clean up on

25   the exhibit with respect to these witnesses and the evidence

1    currently, I just first wanted to address, there was an open

2    issue.  We had moved shortened exhibits into evidence last

3    week, it might have even been the end of the first week of

4    trial that the Debtors reserved on, and we left that open,

5    and I wanted to close that out.

6            And so, this list has been provided to Your Honor,

7    but just so that it's clear, we've now confirmed there are

8    no objections, and I think as previously offered into

9    evidence, we now asked formally be moved the following

10   exhibits: EUCC 267, and these are all EUCC, 269, 272, 273,

11   329, 443, 447, 466, 471, 474, 475, 479, 503, 527 and 634,

12   and those are the exhibits that we had previously put on the

13   record that were currently open.

14           THE COURT:  Any objection to their admission?

15           MR. MCGAAN:  No, Your Honor.

16           THE COURT:  And they're admitted.

17           MR. GLUECKSTEIN:  Okay, and then we had some other

18   exhibits that related to the testimony over the past few

19   days that we wanted to put into evidence and that we have

20   discussed and --

21           THE COURT:  Mr. Glueckstein, I'm going to

22   interrupt you.  I think you may have missed one. 270?  I

23   don't think you --

24           MR. GLUECKSTEIN:  270, let me --

25           MR. MCGAAN:  Mr. McKane is hoping he missed one.

1          THE COURT:  It was on the list you provided.

2          MR. GLUECKSTEIN:  It's not on my list right now so

3     let me confirm whether -- because there were some --

4          THE COURT:  Okay.

5          MR. GLUECKSTEIN:  Let me confirm that and

6     (indiscernible) the rest of the issues, I'll circle back,

7     Your Honor.

8          THE COURT:  Okay.  Very good.

9          MR. GLUECKSTEIN:  On the new exhibits, there are

10    all exhibits that have been disclosed and I believe -- I

11    understand there are no objections.  Just first, Your Honor,

12    with respect to the following four exhibits, EUCC 260, 348,

13    349 and 356, these are documents that are on this Court's

14    docket that we ask can be part of the record of the trial,

15    only admitted for the purpose, as we did with some other

16    documents, for the fact that they were filed and not for the

17    truth of the matter asserted or the legal arguments

18    contained therein.

19          THE COURT:  Okay.  I'm sorry, any objection?

20          MR. MCGAAN:  No, for that purpose, no objection.

21          THE COURT:  Thank you.

22          MR. GLUECKSTEIN:  And then other exhibits, for

23    which I understand there would be no objection, we'd move in

24    as follows: DX 679, and then EUCC 31, EUCC 125, 128, 149,

25    150, 165, 167, 172, 177, 191, 192, 214, 253, 257, 265, 268,

1    271, 274, 334, 536 and 641.

2            MR. MCGANN:  No objection, Your Honor.

3            THE COURT:  Thank you.  They're admitted.

4            MR. GLUECKSTEIN:  I'm looking over here on that

5    list.  All right, we'll leave that one open, Your Honor.  We

6    are not ask to -- I believe it was 270 on our earlier list.

7    I have an updated list for the Court and --

8            THE COURT:  Okay, please approach.

9            MR. GLUECKSTEIN:  -- if that one needs to moved,

10   we'll do that, certainly, next week.

11           THE COURT:  All right.  Did we ever deal with 408?

12           MR. SHEPPARD:  I can address that right now, Your

13   Honor.

14           THE COURT:  Okay.  Thank you, Mr. Glueckstein.

15           MR. GLUECKSTEIN:  Thank you.

16           THE COURT:  Mr. Sheppard.

17           MR. SHEPPARD:  Okay.  For the record, Your Honor,

18   Mark Sheppard, conflicts counsel for the Committee.  With

19   regard to the Court's question about 408, the Debtors and

20   conflicts counsel, we've engaged in a number of meeting

21   confers -- we've narrowed our list down to three specific

22   documents that we're still trying to work out to the extent

23   that we can't get those issues resolved, we're prepared to

24   argue those on Monday.

25           THE COURT:  Okay.

1          MR. SHEPPARD:  Okay?  And Your Honor, we too have

2    a pretty healthy list, if I can approach?

3          THE COURT:  Yes, please.  Oh my, yes you do.

4    Thank you.

5          MAN: (Indiscernible).

6          THE COURT:  All right.

7          MR. SHEPPARD:  And again, Your Honor, it's my

8    understanding that these exhibits are not objected to.  DX

9    695, DX 970, the rest of these, Your Honor, are EUCC

10   exhibits.  268, 282, 283, 284, 286, 287, 375, 389, 391, 395,

11   397, 398, 417, 420, 429, 436, 437, 445, 472, 480, 485, 496,

12   498, 500, 522, 525, 528, 529, 546, 550, 552, 553, 555, 579,

13   581, '81, '82 and '83 and '84, 617, 618, 620, 624, 625, 626,

14   630, 678, 688, 760, 767, 768, 770, 771 through 779, 780,

15   781, 783, 784, 785, 786, 788 and 791.

16         THE COURT:  Thank you.  Any objection?

17         MR. SHEPPARD:   Your Honor, thank you, Debtor's

18   counsel reminded me, I appreciate that.  With regard to

19   Exhibits 397, 417, 498 and 525, Your Honor, these are being

20   admitted, though not for the truth of the matter but simply

21   for the effect upon the here and notice to the sponsors.

22         THE COURT:  All right.  Subject to that

23   limitation, they're admitted without objection.

24         MR. GLUECKSTEIN:  Your Honor, sorry, Brian

25   Glueckstein, if I just close off so I think then we'll be

1    set on this, on Your Honor's question on Exhibit EUCC 270,

2    that exhibit has already been admitted previously --

3              THE COURT:  Okay.

4              MR. GLUECKSTEIN:  -- on November 4th in connection

5    with other testimony.  I believe it was moved in by the

6    Debtors, so that's why it's not here now, but it's already

7    in evidence, so we don't -- not an open issue.

8              THE COURT:  Okay, thank you.  Any further

9    evidentiary issues?  All right, I hear none.

10             MR. MCKANE:  No, Your Honor, and with that, the

11   Debtors close their case in chief, and given where we are in

12   these proceedings, we don't believe -- at least I think the

13   Debtors and I believe Committee also agrees that we do not

14   need tomorrow with -- but obviously we'd start again on

15   Monday.

16             THE COURT:  All right.  We do have one open issue

17   that we'll put off until Monday, I believe?  I think this is

18   right but correct me if I'm wrong.  We -- the PIK

19   noteholders and the fidelity settlements are still open.

20   We're going to move those to Monday?

21             MR. MCKANE:  That is our request, Your Honor, to

22   continue the process of ongoing discussions.

23             THE COURT:  Okay, that's fine.

24             MR. GLUECKSTEIN:  Your Honor, Brian Glueckstein.

25   Just that is fine with the Committee.  We have an agreement

1    with the plan supporters that in connection with the

2    Committee's case in chief that we will have the ability as

3    necessary to call Mr. McDougal and Mr. Ying and examine them

4    on all subjects, including the subjects of their written

5    direct.

6           MR. MCKANE:  Your Honor, we agree that as part of

7    their case in chief, they could -- they could call both of

8    those witnesses, that's correct.

9           THE COURT:  All right, and we won't have an

10   argument about scope.

11          MR. MCKANE:  That's right, Your Honor.

12          THE COURT:  Very good.  Mr. Pedone?

13          MR. PEDONE:  And similarly, with regard to

14   witnesses identified by the EFH indentured Trustee, our

15   right to call them is still open and preserved.

16          THE COURT:  Okay.

17          MR. PEDONE:  Thank you.

18          THE COURT:  Very good.  Mr. Pedone, how are we

19   going to address your evidence?  Are we going to do that on

20   Monday?

21          MR. PEDONE:  We are, Your Honor.  We believe that

22   we, by stipulation and complete agreement and a declaration

23   on authenticity, so --

24          THE COURT:  Okay.

25          MR. PEDONE:  Monday morning, we'll be ready.

1           THE COURT:  Very good.  Thank you.

2           MR. PEDONE:  Thank you.

3           THE COURT:  Does anyone else wish to be heard on

4    anything?

5           MR. MCKANE:  Your Honor, and just to be clear as

6    to the Debtor to just to -- and the plan sponsors, to the

7    extent that anyone else has any evidence that they want to

8    put forward, other than the indentured Trustee and the

9    Committee, that they should do so now.

10          THE COURT:  Does any other party wish to submit

11   any evidence other than the EFH Committee and the EFH

12   indentured Trustee, who will submit their evidence next

13   week?  This is your opportunity and last opportunity to be

14   heard.  Okay, I hear none and see none, so the only evidence

15   left open will be those of the Committee and the indentured

16   Trustee.

17          MR. MCKANE:  Thank you, Your Honor.

18          THE COURT:  Very good.  Would -- do we need

19   another organizational meeting, status conference after we

20   recess for the day?  I don't think so?

21          MR. MCKANE:  I think we're good, Your Honor.

22          THE COURT:  Okay.  Okay, very good.  All right,

23   well, thank you very much.  We're going to adjourn for the

24   day and recess the trial until Monday at 10:00 AM and we

25   will convene for our normal pre-trial meeting at 9:30 on

1    Monday morning, and as I have no other matters scheduled

2    between now and then, you can leave the various boxes, et

3    cetera, around.  They'll be here waiting for you bright and

4    early Monday morning, right?

5              Thank you very much, we're adjourned until Monday.

6              MR. MCKANE:  Thank you, Your Honor.

7              MR. GLUECKSTEIN:  Thank you, Your Honor.

8

9                        *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2015.11.20 17:41:50 -05'00'

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 20, 2015