**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline:  May 16, 2016 at 4:00 p.m.**<br>**Hearing Date:  May 23, 2016 at 10:00 a.m.** |
| | **Re: D.I No. 8358** |

**OBJECTION OF CONTRARIAN CAPITAL MANAGEMENT, LLC TO DEBTORS'**
**DISCLOSURE STATEMENT AND CONFIRMATION SCHEDULING MOTION**

Contrarian Capital Management, LLC (as advisors, or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority or voting authority, "Contrarian"), by its undersigned counsel, files this objection (the "Objection") to the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols in Connection with the Confirmation of Debtors' Joint Plan of Reorganization and the Approval of Debtors' Disclosure Statement* (the "Scheduling Motion") [D.I. 8358].[1]  In support of the Objection, Contrarian respectfully states as follows:

**PRELIMINARY STATEMENT**

The Debtors entered Chapter 11 with a fast-track plan of reorganization that severely prejudiced stakeholders.  Contrarian – and other creditor constituencies – proved that the substance of that plan and process to confirm it proposed by the Debtors were fatally flawed. Consequently, the Debtors went back to the drawing board following comments from the Court.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Scheduling Motion, or in the New Plan (as defined herein).

Now that their Confirmed Plan has failed, the Debtors seek to launch another fast-track plan without any meaningful justification and with no chance at confirmation due to its fundamental valuation flaws. The Court should reject the proposed schedule to allow creditors sufficient time to consider all available alternatives and further should reject the Debtors' plan to allocate estate assets worth at least $1 billion from their 100% legal owner to an affiliate with no legal rights to them.

There are no emergent circumstances requiring such haste. To the contrary, now more than ever, E-Side creditors must be afforded the opportunity to work with their Debtors to formulate a plan that maximizes value, not the plan that will merely cross the finish line first. The Debtors' exclusivity period has expired, and they are clearly using an expedited schedule as a Trojan horse to ensure their continued control over restructuring alternatives. This is patently improper.

The E-Side plan treatment is almost entirely undefined because no real restructuring transaction has been negotiated. While the Debtors seek an equitization of $5.4 billion of E-Side debt, there has been no negotiation of the terms of the equitization, nor have there been any takers. The E-Side Debtors may be market-tested to third-party bidders, but the process for doing so has not been clearly defined. Moreover, given the fact that the Debtors' proposed schedule seeks to begin the confirmation hearing on August 15, 2016, the Debtors are setting up the process to fail because a fair and robust auction process will take many months.

Many significant matters must be considered and addressed in a new E-Side plan that may have profound effects on the T-Side. For example, because the Debtors' aborted Confirmed Plan provided for payment substantially in full to all E-Side creditors, many inter-estate issues that were then irrelevant may now take center stage if E-Side creditors (particularly at EFH

Corp.) are forced to take a discount. Indeed, under the Confirmed Plan, the T-Side Debtors were slated to use tax attributes (namely NOLs) that belong to EFH Corp. (the only recognized entity for federal tax purposes in the group) to achieve a step-up in tax basis for the benefit of T-Side creditors. Now, while the structure and recoveries of most E-Side creditors are "TBD" under the current plan, reorganized TCEH would still receive a step-up in tax basis, thereby enhancing T-Side recoveries by $1 billion through the use of the EFH estate's property (NOLs). EFH creditors have not consented to the transfer of their property to the T-Side. What makes this forced transfer even more astonishing is that it equates to a "double dip" for the benefit of T-Side creditors. In December 2015, TCEH settled all rights it had to any of EFH's NOLs under a pre-existing tax sharing arrangement in return for a $700 million claim, recoveries on which will go directly to the T-Side First Lien Creditors. Notwithstanding that agreement, the Debtors now propose to hand over the same NOLs, which should be used directly to benefit EFH creditors, for the benefit of the same T-Side First Lien Creditors.

There is no need to set any schedule given the uncertainty and opacity of the Debtors' plan. Instead, the E-Side Debtors and their creditors should negotiate a plan with due deliberation, *and then set a schedule*. Contrarian looks forward to working constructively with the E-Side Debtors and the other E-Side constituents to pursue all restructuring alternatives. Accordingly, for the reasons set forth herein, the Court should deny the Motion.

## **RELEVANT BACKGROUND**

1.     On April 29, 2014 (the "Petition Date"), each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors continue to

operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### A.    The Plan Support Agreement.

2.    With the support of the majority of the TCEH Debtors' secured and unsecured creditors, on August 10, 2015, the Debtors filed a motion (the "PSA Motion"), seeking an order approving and authorizing the Debtors to enter into and perform under the Plan Support Agreement attached as Exhibit 1 to Exhibit A to the PSA Motion (the "PSA") [D.I. 5248-2].  On September 18, 2015, the Court approved the TCEH Debtors' entry into the PSA.  [D.I. 6097].

### B.    The Confirmed Plan.

3.    On December 1, 2015, the Debtors filed the *Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 7187] (the "Confirmed Plan").  Under the Confirmed Plan, the EFH Legacy Notes were unimpaired and entitled to receive cash payment equal to principal plus accrued interest at the federal judgment rate.[2]

4.    On December 7, 2015, the Court entered an amended order confirming the Confirmed Plan [D.I. 7244], which was amended on December 9, 2015 (as amended, the "Confirmation Order") [D.I. 7285], and also entered an order (the "Settlement Order") [D.I. 7243], approving the settlement of certain litigation claims (the "Settlement Agreement").[3]

### C.    The New Plan.

---

[2]    Confirmed Plan Art. III.B.

[3]    Among other things, the Settlement Agreement compromised and settled the inter-Debtor claims, several other claims and causes of actions of various creditors of the Debtors, claims and causes of action against holders of interests in EFH Corp. and certain related entities and claims and causes of action against each of the Debtors' current and former directors, managers and officers, and other related entities.

5.      As referenced in the Scheduling Motion, the Debtors abandoned the Confirmed Plan on May 1, 2016 when the TCEH First Lien Creditors issued a Plan Support Termination Notice pursuant to the PSA.

6.      That same day, the Debtors filed the *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code,* [D.I. 8355], which the Debtors amended on May 10, 2016 [D.I. 8421] (as amended, the "New Plan").

7.      The New Plan embodies a separate plan of reorganization for each of the Debtors.[4]  In addition, the New Plan contemplates the possibility of separate confirmation dates and effective dates for the EFH Plan and the TCEH Plan.

8.      As to the E-Side Debtors, the New Plan sets forth vague and uncertain treatment of key constituencies.  As to the EFH Legacy Notes, it provides for a recovery of cash or the right to invest cash with a recovery "TBD."[5]

### OBJECTION

**The Proposed Expedited Confirmation Process Impairs The Chances Of Maximizing Value For The E-Side Debtors' Estates**

9.      A bankruptcy court, as does any court, has the inherent power to "control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  This also includes the inherent power to stay proceedings on its own docket.  *Id.*

10.      The Court should deny the Scheduling Motion under the circumstances presented here.  *First*, the Debtors are exploiting the proposed expedited schedule to make an end-run around the termination of exclusivity.  The proposed schedule creates *de facto* exclusivity by

---

[4]      New Plan at 4.
[5]      *Disclosure Statement for the Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, dated May 10, 2016 at 15 (the "Disclosure Statement") [D.I. 8423]; New Plan Art. III.B.4(c); Art.I.A.96.

proposing a schedule that forecloses other plans as a practical matter.  By pressing for a tight process for a plan that is merely a placeholder, the Debtors are essentially asking for more time to maintain control over the plan process.  Indeed, getting a head start in a race to confirmation is the only way the Debtors can retain control over the plan process, control that they relinquished when exclusivity expired.  Of course, once exclusivity expires it cannot, and should not, be resurrected.  *See* COLLIER ON BANKRUPTCY ¶ 1121.06[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("There can be no extension [of exclusivity] after the period has expired.").

11.     *Second*, the New Plan is merely a placeholder as it relates to E-Side Debtors generally, and EFH creditors in particular.  The Debtors have not yet run a process to raise capital to fund plan distributions and thus cannot determine how E-Side creditors will be treated.  That is why the New Plan does not specify or even attempt to estimate what the EFIH Second Lien Notes, the EFIH PIK Notes or the EFH Legacy Notes will receive (beyond saying they might get cash or equity at an undetermined valuation).[6]  Thus, the New Plan is no plan at all.

12.     The Debtors defend their proposed schedule by asserting that "[a]s for the E-Side Debtors, the potential remaining issues *may be limited* to (a) valuation issues on the E Side of the Debtors' capital structure, (b) allocation of equity in a reorganized EFH and (c) whether the New Plan satisfies the Bankruptcy Code's requirements for a plan of reorganization," which they characterize as a "narrow scope of remaining issues."[7]  What the Debtors characterize as "narrow" issues are really gaping holes in fundamental plan terms without which parties like Contrarian cannot assess the merits of the New Plan.  And, it would be highly prejudicial and wasteful to require parties, like Contrarian, to litigate against the unknown.

---

[6]     Disclosure Statement at 15, 18.
[7]     Scheduling Motion ¶¶ 7, 8 (emphasis added).

13.    *Third*, there are significant tax issues infecting the New Plan that render it non-confirmable.  The New Plan provides that reorganized TCEH will be reorganized via a tax-free spin.[8]  As part of this transaction, reorganized TCEH will receive a step-up in tax basis with respect to T-Side assets using net operating losses ("NOLs") owned by EFH.[9]  The Debtors value this step-up in tax basis at approximately $1 billion.[10]  However, the Settlement Agreement releases and otherwise discharges all inter-Debtors claims arising under or related to, among other things, the Tax Sharing Agreements,[11] precluding the T-Side Debtors from asserting a claim to the NOLs.  Moreover, the EFH Settlement expressly provides an acknowledgement that the Consenting TCEH First Lien Creditors reserve all rights to pursue an "Alternative Restructuring" that may include a taxable deconsolidation of the TCEH Debtors.[12]  As such, there are alternative tax structures that could otherwise enable EFH (and the E-Side creditors) to actually benefit from the use of its own NOLs.  For example, EFH could employ an analogous strategy to the "busted section 351" contribution and tax free spin transaction contemplated in the New Plan to effectuate a step up in tax basis with respect to  EFIH/Oncor assets.  The Debtors' projections for Oncor indicate taxable income generation through the projection period that could be mitigated with additional depreciation deductions afforded by a step-up in tax basis.  As previously disclosed in the Debtors' *Omnibus Tax Memorandum*, dated October 1,

---

[8]    Disclosure Statement at 8-9.

[9]    *Id*. at 8-9.

[10]    *Id*. at 9.

[11]    *See* Settlement Agreement § 2.1(c) ("[U]pon the occurrence of the Settlement Effective Date, all Non-EFH Debtor Intercompany Claims, and all Non-EFIH Intercompany Claims, and all Non-TCEH Debtor Intercompany Claims arising from the beginning of the world through the Settlement Effective Date, … as well as all claims and Causes of Action … relating to or arising from disputes with respect to … the Tax Sharing Agreements, … shall be voluntarily and knowingly, unconditionally, absolutely and forever waived, remised, released, settled, acquitted, satisfied, and discharged."

[12]    *Order Approving Settlement Among Debtors, EFH Committee, EFH Notes Trustee, and Certain Other Parties* [D.I. 7143-1] § 6(d) ("For the avoidance of doubt, the Parties acknowledge that an Alternative Restructuring for the TCEH Debtors may include a taxable deconsolidation, and nothing herein or in any related stipulation, settlement agreement or support agreement shall limit, impair, hinder or prejudice the rights of the Consenting TCEH First Lien Creditors to pursue, or the Debtors' or the EFH Committee's rights to oppose … confirmation and consummation of an Alternative Restructuring that includes a taxable deconsolidation of the TCEH Debtors.").

2014 [D.I. 2296], EFIH's net basis in Oncor Holdings is approximately negative $1.7 billion. Other strategies also exist that could accomplish similar effects or could otherwise facilitate the realization by EFH of the value of its tax attributes.  Under the New Plan, EFH would receive *no consideration* for the use of its own NOLs, and, notably, all inter-estate claims and disputes between the E-side and T-side were previously settled, which forecloses any right that TCEH once had to tax sharing payments related to use of these NOLs.  EFH's NOLs should not be used by TCEH without the consent of EFH and its creditors.  This fact pattern represents an egregious overreach by the TCEH First Lien Creditors, who are having their cake and eating it too by benefiting from the intercompany claim, and at the same time seeking to realize additional value through the use of the EFH estate's property.

14.    *Fourth*, even by the Debtors' own justifications in the Scheduling Motion, the New Plan need not proceed now.  The PSA obligates the PSA parties to support a schedule for any alternative plan with specified T-Side treatment that provides for a confirmation hearing of reasonable length concluding on or before 90 days after filing an alternative plan.[13]  Thus, the Debtors have a 90-day runway to pursue an alternative plan.  However, no such obligation exists for most E-Side creditors.

15.    *Fifth*, the Scheduling Motion reveals that the New Plan (or at least the plan terms) has been vetted by major T-Side creditor groups and purportedly has their support.[14]  By contrast, there is no such consensus among the E-Side creditors or their estates.  Indeed, the Debtors fail to mention any E-Side creditor that has signed on to the New Plan or even agreed to the proposed treatment.

---

[13]    PSA § 10(j).
[14]    Scheduling Motion ¶¶ 5-6.

16.    Building E-Side consensus may not be an easy task.  As the Court is keenly aware, given the stakes here, the complexity of the Debtors' corporate structure and the outstanding unsettled issues, and the contentious nature of the cases to date, analyzing and resolving these issues could take several months.  Contrarian hopes that the E-Side creditors will all work in good faith and with deliberate speed to reach a consensual resolution.

## CONCLUSION

17.    For the reasons set forth above, the Court should deny the Scheduling Motion as to the E-Side Debtors, and defer confirmation of the E-Side Debtors' plan to allow the Debtors to solidify the proposed treatment they are offering and to allow other parties time to assess and potentially counter with competing plans.  Absent that path, the Debtors will end up imposing a *de facto* exclusivity for a placeholder plan that delivers nothing but confusion.

18.    If the Court is inclined, nonetheless, to impose some schedule now with respect to the New Plan on the E-Side Debtors, Contrarian submits that the schedule must be modified in significant ways to protect Contrarian's interests.  Primarily, Contrarian must be afforded the opportunity to take appropriate discovery without regard to the prior discovery conducted by others.  The New Plan is fundamentally different from the Confirmed Plan – and raises more questions than it answers.  While Contrarian can appreciate the time and resources expended in connection with the legacy claims, ad hoc discovery requests, the prior confirmation proceedings, and the related discovery in connection therewith, Contrarian as well as other E-Side creditors stood on the sidelines of these processes given the treatment of their claims under the Confirmed Plan.  However, because the treatment of the majority of the claims against the E-Side Debtors are drastically different from those under the Confirmed Plan, it would be prejudicial to the E-Side Debtors' claimants to limit the scope and timing of any discovery in

connection with the New Plan.  As such, Contrarian respectfully objects to entry of the proposed

scheduling order as it relates to limiting the amount, time or scope of discovery insofar as it

relates to the E-Side Debtors' estates and/or claims.  As required by the applicable federal and

local rules, Contrarian will meet with the Debtors and their creditor constituents to propose a

consensual path forward.

***

WHEREFORE, for the reasons set forth in this Objection, Contrarian requests that the

Scheduling Motion be denied or otherwise modified as set forth herein and that the Court grant

to Contrarian such other and further relief as is just and proper.

Dated: May 16, 2016
       Wilmington, Delaware

HOGAN♦MCDANIEL

By: /s/ *Garvan F. McDaniel*
Garvan F. McDaniel, Esq.
1311 Delaware Avenue
Wilmington, Delaware 19806
Telephone:  (302) 656-7540
Facsimile:  (302) 656-7599
Email:  gfmcdaniel@dkhogan.com

– and –

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP

David S. Rosner, Esq.
Andrew K. Glenn, Esq.
Daniel A. Fliman, Esq.
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800
Email: DRosner@kasowitz.com
        AGlenn@kasowitz.com
        DFliman@kasowitz.com
*Counsel to Contrarian Capital Management, LLC*