1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                   :    Chapter 11

6    ENERGY FUTURE HOLDINGS CORP., :

     et al.,                       :    Case No. 14-10979 (CSS)

7                                  :

             Debtors.              :    (Joint Administration

8    _____:    Requested)

9

10

11                               United States Bankruptcy Court

12                               824 North Market Street

13                               Wilmington, Delaware

14                               May 23, 2016

15                               10:05 a.m. – 12:38 p.m.

16

17

18

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:  LESLIE MURIN

Page 2

1   HEARING re Motion of Energy Future Holdings Corp., et al.,

2   for Entry of an Order (A) setting a Supplemental Bar Date

3   for Ninety Subsequently Identified Parties, (B) Approving

4   Notice Thereof, and (C) Establishing Related Procedures

5   [D.I. 8150; filed April 6, 2016]

6

7   HEARING re Motion of Energy Future Holdings Corp., et al.,

8   for Entry of an Order Scheduling Certain Hearing Dates and

9   Deadlines and Establishing Certain Protocols in Connection

10  with the Confirmation of Debtors' Joint Plan of

11  Reorganization and the Approval of Debtors' Disclosure

12  Statement [D.I. 8358; filed May 1, 2016]

13

14

15

16

17

18

19

20

21

22

23

24  Transcribed by:  Sonya Ledanski Hyde

25

1  A P P E A R A N C E S :

2

3  SULLIVAN & CROMWELL LLP

4      Attorney for the EFH Committee

5

6  BY:  ANDREW G. DIETDERICH

7      BRIAN GLUECKSTEIN

8

9  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

10      Attorney for Contrarian Capital Management

11

12  BY:  ANDREW GLENN

13

14  RICHARDS, LAYTON & FINGER, P.A.

15      Attorney for EFH

16

17  BY:  ANDREW M. DEAN

18      DANIEL J. DEFRANCESCHI

19      JASON M. MADRON

20

21  WILMER CUTLER PICKERING HALE & DORR

22      Attorney for Delaware Trust, 1st Lien Trustee

23

24  BY:  PHILIP ANKER

25

```
1   SHEARMAN & STERLING LLP
2         Attorney for Deutsche Bank New York
3
4   BY:  STEVEN SCHWARTZ
5
6   POTTER ANDERSON & CORROON LLP
7         Attorney for Deutsche Bank New York
8
9   BY:  R. STEPHEN MCNEILL
10
11  PROSKAUER ROSE LLP
12        Attorney for EFH Disinterested Directors
13
14  BY:  MARK K. THOMAS
15        PETER J. YOUNG
16
17  MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP
18        Attorney for EFH Committee
19
20  BY:  NATALIE D. RAMSEY
21
22  BIELLI & KLAUDER. LLC
23        Attorney for EFH Disinterested Creditors
24
25  BY:  DAVID M. KLAUDER
```

1   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

2        Attorney for TCEH Debtor, DD

3

4   BY:  DAVID P. PRIMACK

5

6   MORRIS JAMES LLP

7        Attorney for Law Debenture Trust Company of New York,

8        in its capacity as Indenture Trustee

9

10  BY:  STEPHEN M. MILLER

11

12  PATTERSON BELKNAP WEBB & TYLER LLP

13        Attorney for Law Debenture Trust Company of New York,

14        in its capacity as Indenture Trustee

15

16  BY:  DANIEL A. LOWENTHAL

17

18  COLE SCHOTZ P.C.

19        DTW, EFIH First Lien Trustee

20

21  BY:  NORMAN PERNICK

22

23

24

25

1   LANDIS RATH & COBB LLP

2        Attorney for NextEra Energy Resources, LLC

3

4   BY:  ADAM LANDIS

5

6   CHADBOURNE & PARKE LLP

7        Attorney for NextEra Energy Resources, LLC

8

9   BY:  HOWARD SEIFE

10

11  CROSS & SIMON

12       Attorney for American Stock Transfer & Trust Company

13

14  BY:  CHRISTOPHER P. SIMON

15

16  YOUNG CONAWAY STARGATT & TAYLOR, LLP

17       Attorney for Ad Hoc Committee of TCEH First Lien

18       Creditors

19

20  BY:  JOEL A. WAITE

21       RYAN A. BARTLEY

22

23

24

25

1    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2         Attorney for Ad Hoc Committee of TCEH First Lien

3         Creditors

4

5    BY:  ALAN W. KORNBERG

6         JACOB A. ADLERSTEIN

7         KEVIN O'NEIL

8

9    KRAMER LEVIN NAFTALIS & FRANKLIN LLP

10        Attorney for EFIH Second Lien Indenture Trustee

11

12   BY:  JOSHUA K. BRODY

13

14   PACHULSKI STANG ZIEHL & JOHNES LLP

15        Attorney for EFIH Second Lien Indenture Trustee

16

17   BY:  COLIN R. ROBINSON

18

19   HOGAN MCDANIEL

20        Attorney for Contrarian Capital Management, LLC,

21        Fenicle & Fahy

22

23   BY:  GARVAN F. MCDANIEL

24        DANIEL K. HOGAN

25

1   DRINKER BIDDLE & REATH LLP

2        Attorney for Citibank, DIP Agent

3

4   BY:  HOWARD A. COHEN

5

6   WHITE & CASE LLP

7        Attorney for Ad Hoc Group of TCEH Unsecured Noteholders

8

9   BY:  J. CHRISTOPHER SHORE

10

11  VENABLE, LLP

12       Attorney for Pacific Investment Management Co. LLC

13

14  BY:  JEFFREY S. SABIN

15       JAMIE L. EDMONSON

16

17  BLANK ROME

18       Attorney for Wilmington Trust, N.A. as First Lien

19       Administrative Agent and Collateral Agent

20

21  BY:  MICHAEL D. DEBAECKE

22

23

24

25

1    SEWARD KISSEL

2          Attorney for Wilmington Trust, N.A. as First Lien

3          Administrative Agent and Collateral Agent

4

5    BY:  ARLENE ALVES

6

7    REED SMITH LLP

8          Attorney for The Bank of New York Mellon Trust Company,

9          N.A., as Indenture Trustee

10

11    BY:  KURT F. GWYNNE

12

13    FOX ROTHSCHILD LLP

14          Attorney for Ad Hoc Group of TCEH Unsecured Noteholders

15

16    BY:  JEFFREY SCHLERF

17

18    NIXON PEABODY LLP

19          Attorney for American Stock Transfer & Trust Company

20          LLC as Indenture Trustee

21

22    BY:  RICHARD C. PEDONE

23          MORGAN C. NIGHAN

24

25

1   KIRKLAND & ELLIS LLP

2        Attorney for the Debtors

3

4   BY:  MARC KIESELSTEIN

5        CHAD J. HUSNICK

6        MARK E. MCKANE

7

8   UNITED STATES DEPARTMENT OF JUSTICE

9        Attorney for the U.S. Trustee

10

11  BY:  RICHARD L. SCHEPACARTER

12

13

14  KLEHR HARRISON HARVEY BRANZBURG LLP

15        Attorney for UMB Bank, N.A.

16

17  BY:  RAYMOND H. LEMISCH

18

19  FOLEY & LARDNER LP

20        Attorney for UMB Bank, N.A.

21

22  BY:  HAROLD L. KAPLAN

23

24

25

1    AKIN GUMP STRAUSS HAUER & FELD LLP

2          Attorney for UMB Bank, N.A.

3

4    BY:  SCOTT ALBERINO

5

6    ALSO PRESENT TELEPHONICALLY:

7

8    EPHRAIM DIAMOND

9    ALYSA AIN

10   JOSHUA H. APFEL

11   ASHLEY F. BARTRAM

12   WARD BENSON

13   PEG A. BRICKLEY

14   PHILIP E. BROWN

15   STEPHEN BURNZIAN

16   EMILY A. BUSSIGEL

17   MICHAEL CARTER

18   MARK A. CODY

19   ALEXANDER DEFELICE

20   STACEY DORÉ

21   DAVID DUNN

22   CATHERINE EISENHUT

23   BENJAMIN D. FEDER

24   BRADLEY FEINGERTS

25   JEFFREY R. FINE

1   MARK A. FINK

2   MICHAEL FIRESTEIN

3   MARK FLANNAGAN

4   PATRICK FLEURY

5   JULIA FROST-DAVIES

6   PHILIP A. GELSTON

7   RICHARD GITLIN

8   SETH GOLDMAN

9   ERICA GOODSTEIN

10  XIAOYU GU

11  JENNIFER GUERARD

12  BRIAN GUINEY

13  CHRISTOPHER HAHM

14  THOMAS HALS

15  BEAU HARBOUR

16  WARREN HASKEL

17  MARK F. HEBBELN

18  MARK HICKSON

19  JOSEPH H. HUSTON, JR.

20  NATASHA HWANGPO

21  VERONICA IP

22  JEFFREY L. JONAS

23  ANNA KALENCHITS

24  MATTHEW KIMBLE

25  STUART KOVENSKY

1   AMY KYLE

2   VINCENT LAZAR

3   MICHAEL LEE

4   RICHARD LEVIN

5   KEVIN M. LIPPMAN

6   CATHERINE LOTEMPIO

7   CHIANSAN MA

8   ROBERT K. MALONE

9   JONATHAN D. MARSHALL

10  CHRIS MCBAY

11  JOEL. MILLAR

12  BRETT H. MILLER

13  BRIAN P. MORGAN

14  HAL F. MORRIS

15  TINA MOSS

16  JOANNA S. NEWDECK

17  RACHEL R. OBALDO

18  KEVIN O'NEILL

19  MEREDITH PFISTER

20  JON PRUCHANSKY

21  ELIZABETH RASSKAZOVA

22  JEFF ROSENBAUM

23  ERIK SCHNEIDER

24  NED S. SCHODEK

25  NOAH M. SCHOTTENSTEIN

1   CHARLES SIEVING

2   NATE STREICHER

3   MARSHA SUKACH

4   MARK TAUB

5   ANGELO THALASSINOS

6   ANDREW M. THAU

7   AMER TIWANA

8   CARL TULLSON

9   MICHAEL TURKEL

10  MATTHEW UNDERWOOD

11  TAMARA VAN HEEL

12  BARDY C. WILLIAMSON

13  JULIA M. WINTERS

14  APARNA YENAMANDRA

15  JOSEPH ZALEWSKI

16  STEVEN ZUCCHET

17  JEREMY HOLLEMBEAK

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           CLERK:  All rise.

3           THE COURT:  Please be seated.  Good morning.

4           MR. KIESELSTEIN:  Good morning, Your Honor.  Mark

5    Kieselstein, Edward Sassower, Mark McKane and Chad Husnick,

6    Kirkland & Ellis, on behalf of the Debtors.  Here we are

7    again, Your Honor.  Your Honor, before Mr. McKane addresses

8    a scheduling motion and the remaining objections, we thought

9    it appropriate to give the Court a brief update at a high

10   level on what's transpired over the last several weeks.

11           Your Honor, obviously, the fact that the confirmed

12   plan could not go effective was an unwelcomed development to

13   everyone, but it was also an outcome that had been carefully

14   provided for.  Thus, it bears repeating, Your Honor, that

15   the issues remaining in these cases pale in comparison to

16   what was open and raging, prior to last December.

17           The settlement agreements and the many key

18   resolutions of disputed claims that were contained therein

19   remains fully intact, including the $700 million claim of

20   TCEH against EFH.  Your Honor, since the beginning of the

21   month, there's been a great deal of activity.  Let me start

22   with the T-side, because things are more straightforward

23   there.

24           Your Honor, the Court will recall that the core

25   elements of a backup plan, if the hunt T unsecured plan

1    failed to launch were largely pre-ordained in the plan

2    support agreement and related documents.  And thus, the new

3    plan provides, as it was required to do, that the TCEH

4    person in the group will receive all of the equity of

5    reorganized TCEH, and the junior creditors will share $550

6    million, carved out from the collateral of the T firsts.

7            The T firsts have the ability to direct the votes

8    of the TCEH junior creditors sharing that $550, pursuant to

9    the drag provisions of the PSA.  Aside from the PCRB issues,

10   Your Honor, the only real question is whether TCEH will

11   reorganize on a tax free or a taxable basis.  The plan

12   provides for a tax free spin.

13           And Mr. McKane will address the issues that relate

14   to the need for a tax matters agreement and how issues

15   related to a TMA can be accommodated within the proposed T-

16   side schedule.  Now, Your Honor, notwithstanding the

17   relatively settled state of the T-side plan, we have been in

18   near constant dialogue with the TCEH first, given their

19   wholly understandable desire for an expeditious T-side

20   emergence and a corresponding desire not to get caught up in

21   a protracted E-side process.  Our discussions with them have

22   centered almost entirely on those points.

23           On the E-side, Your Honor, there are undoubtedly

24   more moving parts.  Over the past few weeks, the Debtor and

25   the Debtors and its advisors, including the disinterested

1   director/advisors have met with representatives, sometimes

2   with principles, sometimes not, of the EFIH seconds, the

3   EFIH PIKs, and Fidelity the largest bond-holder at EFH.

4           The company and its advisors have been in dialogue

5   with each of these stakeholders regarding a standalone

6   equitization plan, with varying amounts of new money

7   commitments.  It is our understanding that each of those

8   groups and stakeholders is currently working on developing a

9   term sheet proposal that they hope to deliver to the company

10  in the next few weeks.

11          We look forward to that and are working diligently

12  with those parties to provide any additional needed

13  information.  At the same time, Your Honor, we are in

14  ongoing discussions with potential strategic buyers

15  regarding a potential transaction for the Encore assets.

16          We also know that at least one strategic party has

17  had rather extensive discussions with E-side creditors, and

18  it is possible, though by no means certain, that the

19  standalone restructuring discussions and the third party

20  discussions may ultimately converge.

21          To be very clear, the company welcomes and is

22  strongly supportive of all these important initiatives and

23  believes that an active and parallel pursuit of both the

24  internal and external restructurings will yield the best

25  result.  And as the Court may be aware, we filed last night,

1    Your Honor, probably very late, a revised E-side schedule,

2    to allow significant, but not unlimited additional time for

3    these various discussions to ripen into a clearly defined

4    path on the E-side.

5              Mr. McKane will address the constructed

6    discussions that that revised schedule has yielded.  Your

7    Honor, the Debtor's singular focus is to shepherd a process

8    that is orderly, efficient and value maximizing at each of

9    the estates.

10             The corollary, of course, is that a process that

11   is disorderly and inefficient will not be value maximizing.

12   And we recognize that exclusivity has expired, but we think

13   that makes it all the more important that a organized,

14   inclusive process remain in place.

15             Your Honor, on that front, there have been a

16   rumblings that a particular strategic party, one that has

17   purchased a claim in these proceedings, may be intending to

18   file a competing plan in the near term.  What we believe

19   such a unilateral action would fall firmly on the disorderly

20   and inefficient-side of the spectrum, and we hope that

21   doesn't transpire.

22             Finally, Your Honor, in the event there is a

23   shortfall at any of the E-side estates, and we sincerely

24   hope there isn't, we aim to have had a process that leaves

25   no room for serious dispute that we have fully, fairly and

1    irrationally tested what the market will bear for the E-side

2    assets.  And it is our expectation that such a market driven

3    process would render a protracted valuation contest with

4    dueling experts, and the like, a truly unnecessary indeed

5    and academic exercise. Unless Your Honor has questions, I'll

6    turn it over to Mr. McKane.

7              THE COURT:  No questions.

8              MR. KIESELSTEIN:  Thank you, Your Honor.

9              MR. MCKANE:  Good morning, Your Honor.  For the

10   record, it's Mark McKane of Kirkland & Ellis on behalf of

11   the Debtors.  Your Honor, I have a demonstrative that I'd

12   like to use to aid the Court in the discussion today.  May I

13   approach?

14             THE COURT:  Yes.  Thanks.

15             MR. MCKANE:  And Your Honor, I have hard copies

16   here for anyone who'd like them, as well as black lines of

17   the proposed -- the revised proposed scheduling order that

18   we filed last night.  That's Docket Entry number 8501.  And

19   we have copies for anyone who needs them as well.  No, I

20   brought 15.

21             Your Honor, we, the Debtors have made significant

22   progress we E-side creditor constituencies since the filing

23   of the motion.  Docket Entry 8501 of revised scheduling

24   order provides for a significant movement in the proposed

25   schedule.  And specifically, the Debtors have agreed to move

1   back the E-side disclosure statement hearing to a proposed

2   date of July 21st, to allow for significantly more time for

3   the development of a potential alternative plan.

4           And the Debtors have committed to filing a revised

5   plan by no later than July 8th, to enable creditor

6   constituencies to evaluate the plan in advance of any

7   disclosure statement hearing.  Specifically relating to

8   concerns about additional discovery requests that may arise

9   out of that new plan, as opposed to the plan that's

10  currently on file, the Debtors have also proposed to allow

11  for supplemental discovery requests for material changes in

12  the plan by July 13th.

13          I'll go into all this in greater detail over the

14  course of the presentation, but those are key dates that

15  will enable the E-side to have the entire length of the

16  process necessary to develop an alternative plan, if they

17  can.

18          Overall, this provides additional E-side fact and

19  expert discovery periods that are far more than we believe

20  are necessary under the rules or under this process.  And

21  that ultimately will culminate in a proposed start of an E-

22  side confirmation hearing by September 26th, and that's our

23  proposed date.

24          And with that, we believe that we have the support

25  of the EFH second lien ad hoc group.  They were -- are here

1    today, and will speak for themselves.  And beyond the EFIH

2    second liens, we have worked very constructively with the

3    PIKs, as well as Fidelity.  We've had discussions with them

4    about this proposed schedule of this structure and approach.

5            And while there may be additional language that we

6    may need to work out with the PIKs or with Fidelity to get

7    them to 100 percent support, this proposed order.  We

8    believe that in terms of timing, approach and structure, the

9    proposed order that we filed last night, Docket Entry 8501,

10   will generally have the support of both the PIKs and

11   Fidelity at those times.

12           So Your Honor, this proposed schedule

13   significantly pairs back the concerns that have been raised

14   by E-side Creditors.  And we believe that the Debtor's

15   progress since filing the motion really underscores the

16   importance and the need for a schedule.  And it shows how

17   Creditors react and engage when confronted with deadlines.

18           Turning to the T-side, Your Honor, there's

19   virtually no objection from the T-side schedule at this

20   time.  This unquestionably qualifies as an alternative

21   restructuring.  Under the plan support agreement, the T

22   firsts, the -- as we are constantly reminded, the largest

23   Creditor in the case, especially on the T-side, they support

24   the schedule.

25           And the only one Creditor group, the PCRB's, with

1    881 million of the 7.56 billion in unsecured debt opposes

2    the schedule.  We'll address their objections specifically,

3    but the proposed order that we filed really has relatively

4    few changes to the schedule that was filed originally with

5    the motion.  And we believe that starting with that

6    expedited schedule ending with a proposed August 17th

7    confirmation hearing for the T-side, it absolutely is

8    consistent with the few remaining issues in that case.

9            So ultimately, Your Honor, when you look at where

10   we are now with the proposed order that, that's before you

11   and the remaining objections, the -- those -- that

12   underbrush of objections falls into four categories and we

13   believe should be overruled.

14           The first category is ultimately that there's not

15   enough time for discovery, that we have not -- that there's

16   an inability either on the T-side or the E-side to fully vet

17   what we're proposing in our proposed schedule.  And then,

18   that's why I provided you the demonstrative today.

19           We have to price all this in context.  We've come

20   before you with schedules at least four times in this case.

21   On July of last year, with Docket Number 4916, we came

22   forward with the proposed confirmation schedule that had a

23   discovery period from the end of docket number requests,

24   through the end of the experts of 143 days.

25           That was when we were proposing to have a runway

1    up to a July 20th, 2016 schedule, and we -- the contested

2    issues that we anticipated at that time were significant.

3    We had the DD settlement in place, but we had E-side and T-

4    side valuation issues.  We had all of the legacy liability

5    issues, at least as it related to the TCH first lien

6    creditors, in addition to challenging the DD settlement.

7           We had inter-company tax claims.  We had the plan

8    releases at issue, as well as un-manifested asbestos issues

9    that were identified, and the treatment of the PCRBs.  All

10   of that was going to be handled in a discovery period of 143

11   days, and that is what the Court approved.

12          When we came back to you, after reaching the

13   global settlement, and the plan support agreement, and asked

14   for a shorter schedule, we had nailed the issues

15   considerably, all right?  This Court approved an order that

16   allowed for a discovery window of 83 days.  We had the full

17   comprehensive legacy liability settlement, including the DD

18   settlement that had been baked in, but we still had E-side

19   impairment issues, feasibility issues, the scope of the plan

20   releases, as well as un-manifested asbestos issues and the

21   PCRB's treatment.

22          We had all of those issues, and yet, we were able

23   to do it all in 83 days.  Now, we're coming before you and

24   proposing a T-side schedule that is not materially different

25   from that for a proposed confirmation order of August 17th,

1     when there are really only two buckets of issues that we've

2     identified, the treatment of the PCRB's, the same issue that

3     we addressed previously, and the tax matters agreement.

4             And we can get into it, you know, what are the

5     issues in the tax matters agreement, but they're not novel.

6     They're not new.  But that is an issue that remains for

7     August 17th.

8             We have one objective to that schedule and that's

9     the PCRBs.  As it relates to the E-side schedule, we've

10    proposed, you know, with the order that was filed last

11    night, 104 days for discovery for facts and expert

12    discovery, leading to that September 26th confirmation date

13    that I proposed, with ultimately two sets of issues that we

14    believe are material that have been identified.

15            This is a valuation case.  And ultimately, there

16    will be unmasked -- unmanifested asbestos issues that will

17    be raised.  Those are no different than what we've litigated

18    before, but that's it.  That's what we're looking at.  And

19    we're giving 104 days of runway to let that happen.

20            So when placed in context, what we're proposing

21    for a schedule here for both the T-side and E-side is

22    absolutely consistent with your prior orders and undeniably

23    reasonable.  Now when we've -- and that's what we mean when

24    we say that the issues have been truncated enormously.

25            As it relates to the E-side valuation, Your Honor,

1    the creditors, and they're very capable professionals, are

2    very familiar with the Encore business after two years.

3    Encore, as a regulated utility, has very predictable

4    results, with relatively low volatility.  And we are going

5    forward with the process.  We're already moving forward with

6    the collection process.

7              As it relates to a very specific issue that we've

8    addressed with the PIKs and the second liens and Fidelity,

9    let me be precise, because there's a question about what we

10   should be serving discovery on now, versus what could be a

11   material change later.

12             Material (indiscernible) valuation, clearly a

13   material issue now.  The business plan, not going to change

14   between now and a month from now.  The debt capacity issues

15   on the E-side, not going to change between now and a month

16   from now.  All of that discovery should be served now.

17   Let's move that process forward now, because none of that

18   will change.

19             To the extent that we filed a new, revised plan,

20   say July 6th.  And while this plan contemplates a new money

21   investment that has the specifics of the new money

22   investment.  We certainly understand if E-side creditors

23   wanted to file supplemental discovery as it relates to the

24   specifics of that new money investment that had not been

25   previously articulated.

1           That would fall in the supplemental discovery

2    category.  We used the word material changes, and we

3    recognize that that -- there could be some debate on that,

4    which is why we have a -- we were proposing to have a status

5    conference with Your Honor within two days of filing a

6    proposed plan, so that we can assess where we are at that

7    time.

8           And to the extent that there are issues that we

9    have not been able to work out with Creditors at that time,

10   as it relates to what would be the appropriate scope of

11   material changes, that would be an appropriate forum to

12   address those issues.

13          Your Honor, turning to some of the other issues

14   that would be an E-side issue, the un-manifested asbestos

15   claims, this is really just a replay of the earlier

16   confirmation issues.  And then, Your Honor, as it relates to

17   the PCRB (indiscernible), there's already been substantial

18   discovery from prior confirmation proceedings on exactly

19   that issue.

20          For the T-side, regarding the tax matters

21   agreement, we recognize that treatments of the NOLs in that

22   plan would be a potential issue, that the potential step up

23   in tax basis could be potentially an issue.  And the

24   relative compensation, to the extent, if any, between the E-

25   side and the T-side, as it relates to two -- for a to be

1    negotiated tax matters agreement might be an issue, but

2    there is nothing new or different about those issues that we

3    haven't been wrestling with for two years, and that's why we

4    believe on the T-side that we can address those issues and

5    be done with the time period we have. That's what those 68

6    days are for.

7              And Your Honor, as you've previously noted, and

8    when we've asked for schedules, the burden falls on us.  It

9    falls on the Debtors.  We're the ones who have to deliver on

10   schedules like this.  We're the ones who receive the bulk of

11   the requests, if not all of them.  And that's what we're

12   proposing to take on and that's what we're prepared here to

13   do.

14             We've delivered in the past and we'll deliver here

15   as well.  And if not, the Creditors have the ability to come

16   forward and address issues with Your Honor.  A for cause

17   standard is absolutely consistent with your prior orders,

18   and ultimately, you know, boils down to if there is a

19   legitimate issue, they have the opportunity to raise it at

20   that time in terms of the scope of our responses or our

21   timing.

22             Your Honor, the issue that we take most -- the

23   issue that we reject the most is the argument that there

24   should be no schedule now, so that E-side creditors can

25   continue to evaluate alternatives.  We believe we've turned

1    the tide by providing additional time with many of the B-

2    side creditors on this issue.

3            We are now providing for significantly more time

4    to allow them to evaluate their proposals and try to put

5    together competing bids.  But Your Honor, we've done that to

6    avoid the downside of having those scheduled.  And what that

7    means, because history in this case has shown that without a

8    schedule, things don't move.

9            Without a schedule, these Creditors will continue

10   to do what they do, which is wait for changed circumstances.

11   A schedule here will force action and will force decisions

12   to happen, and that's why we asked for a schedule to be

13   entered today.

14           Your Honor, the third issue that we've heard in

15   the objections that we believe we've totally addressed is

16   that the plan is so ambiguous we can't start now.  Now none

17   of the E-side proposed schedules that we're putting forward

18   are new, right?  We've discussed them in the past.  Sale to

19   a strategic, you know, an equitization plan or a conversion

20   to a REIT.

21           These proposals build on years of work, and as

22   you've heard in the past, mountains of existing discovery.

23   The poor materials that we've talked about, the underlying

24   valuation materials, the business plan, the debt capacity of

25   the company, none of that changes.  That's why we need to

1    move forward now with those requests, and then to the extent

2    that the plan gets refined, while we provided for the

3    supplemental relief.  And the supplemental ability to serve

4    discovery.

5            Finally, out of the fourth category of arguments

6    that we've seen is our premature arguments that the plan is

7    either un-confirmable or will fail.  And we recognize, Your

8    Honor, the time honored bankruptcy tradition of Creditors

9    previewing their confirmation arguments at a disclosure

10   statement hearing or the scheduling order.

11           But now is not the time or place, and we see them

12   as preview arguments for what they are, nothing more,

13   nothing less.  Now turning to some of the specific

14   objections that remain, as it relates to the Bank of New

15   York, Your Honor, we've addressed this T-side solicitation

16   issue.  It's, if anything, there was, you know, maybe an

17   inadequately worded footnote in our original motion.

18           We've addressed that to make clear, you know, how

19   much solicitation time exists.  The disclosure statement

20   hearing on the T-side would be June 15th.  We discussed

21   solicitation on or before the 27th of June.  The objection

22   deadline to the T-side would be August 3rd, which is 38 days

23   from the last day to start solicitation.

24           And the confirmation hearing would start August

25   17th.  That's 52 days from the start of solicitation.  There

1    is no solicitation issue that, you know, with regards to the

2    proposed order we put in front of you.  As it relates to

3    timing, there could -- you know, the concern that somehow

4    we're going to jam the PCRBs and timing, the practice of the

5    Debtors in this case has been to do rolling productions as

6    they are available, rather than waiting for the last day and

7    producing a mountain of material.

8            We do that because that's how you hold the

9    schedule.  It's our schedule.  We want to keep this

10   schedule.  And to keep that schedule, we need to produce

11   materials on a rolling basis to move the case forward.

12   We've -- so we've addressed that issue.  That is a nonissue

13   in these cases.

14           And then, finally, to the extent that the schedule

15   somehow robs the Bank of New York of a fair opportunity to

16   conduct discovery, the Bank of New York's already served

17   discovery and requests.  There have been some creditors have

18   -- that have taken us up on serving requests, even in

19   advance of the order to do so.

20           We reviewed those requests.  We'll work with them

21   on them, but we see absolutely no basis to re-litigate the

22   global settlement agreement, which is a final non-appealable

23   order.  We understand that they may have objections as it

24   relates to this plan, but we are previewing for you now, we

25   do not believe there is any basis to revisit a final non-

1    appealable order.

2              As it relates to the Fenicle and Fahy objections,

3    Your Honor, we've (indiscernible) the asbestos related

4    objections are frankly misplaced and stem from a misreading

5    of the plan.  Nothing has changed regarding the treatment of

6    asbestos claims.  They remain in Class A3 and they will be

7    reinstated.  Therefore, the need for additional discovery on

8    these issues is minimal, at best, to nonexistent.

9              And as it relates to the supplemental bar date,

10   that's a motion that's going to be considered later today

11   and has no bearing on the E-side confirmation schedule at

12   all.  Your Honor, there is an objection launched by a series

13   of folks that they shouldn't have to coordinate with the E-

14   side Unsecured Creditors Committee.

15             We've met and conferred with many of the E-side

16   unsecured creditors, including their indentured trustees.

17   The Debtors' concern has always been, we didn't want to get

18   six sets of requests from unsecured creditors.  We wanted

19   them coordinated in some capacity.

20             They understand that.  They don't need to work

21   with the E -- official committee to do that.  If they do it

22   amongst themselves, if they agree to work together and

23   service one set of requests, fine.  We have no issue with

24   that.  We will re-work the order to have it reflect that

25   it'll be -- the proposed order to be one set of requests, if

1   that's acceptable to Your Honor.

2            But from our perspective, whether we get one

3   coordinated set of requests, that's facilitated through the

4   committed or facilitated through the ad hoc groups, it

5   doesn't matter to us.  We just want one set of requests.

6            And finally, Your Honor, as it relates to the next

7   NextEra's objections, ultimately, they amount to basically

8   pot shots to whether the plan on file is confirmable or not.

9   We see nothing in there that adds anything to the other

10  objections that were already raised.

11           We believe we've addressed all of them as it

12  relates to whether a schedule is needed at this time and how

13  best to manage things going forward.  And therefore, we have

14  nothing more to address with regards to NextEra, because we

15  think they've added nothing.

16           Your Honor, I'm happy to answer any questions the

17  Court has.  I've reserved some time to respond to those

18  Creditors who may have specific issues that have not been

19  addressed yet.  But for everything I've raised today, as

20  well as on papers, the Debtors asked that you submitted a --

21  you enter a proposed -- an order substantially similar to

22  the proposed order we filed last night.

23           THE COURT:  Okay.

24           MR. MCKANE:  Thank you, Your Honor.  Mr. Kornberg?

25           MR. KORNBERG:  Good morning, Your Honor.  Alan

1   Kornberg, with Jake Adlerstein, at Paul, Weiss, Rifkind,

2   Wharton & Garrison for the TCEH First Lien Ad Hoc Committee.

3   Your Honor, I know I don't have to remind you of how large

4   our claims are or how much value we've lost during these

5   very long cases, but there is a little history that I want

6   to remind the Court of.

7           And that is, what we have -- some of the actions

8   we have taken as first lien creditors to try to speed up

9   these cases rather than slow them down.  Pre-petition, we

10  engaged in good faith negotiations to arrive at a pre-

11  arranged plan.  Unfortunately, that was not to be.

12          Post-petition, we participated in a successful

13  mediation, which resolved virtually all of the T-side inter-

14  creditor issues.  We supported the efforts to get the REIT

15  plan to the finish line.  We agreed to a plan based upon a

16  tax-free spin transaction, provided certain conditions were

17  met.

18          In that regard, as Mr. McKane noted, we

19  successfully negotiated a tax matters agreement with the

20  Debtors and with the Encore purchasers.  And we negotiated

21  and signed the PSA and settlement agreement that were

22  intended to pay the way for the Debtor's emergence,

23  regardless of whether the REIT plan happened or not.

24          But we've also done a lot of work behind the

25  scenes about which the Court is probably not familiar, to

1    prepare TCEH for emergence as soon as possible.  We have

2    digital -- diligently and effectively pursued all of the

3    regulatory approvals that are necessary for emergents.

4    We've worked with the Debtors on separation and transition

5    issues.  We've continued to work cooperatively with the

6    Debtors on tax matters.

7           We're in the very final stages of arranging exit

8    financing needed for the company to emerge.  And we've

9    focused intensely on the issues and challenges that TCEH

10   faces, post-reorganization in a changing energy environment.

11          All things, including TCEH's Chapter 11 case, must

12   eventually end, and we strongly support the proposed

13   scheduling order, because it will facilitate the beginning

14   of the end of these very long cases.  With the durable

15   settlement agreement and PSA in place, there is no reason

16   not to march forward with T-side confirmation of an agreed

17   upon restructuring.

18          As Mr. McKane said, that's exactly what the

19   Debtor's new plan is.  It's the alternative restructuring

20   envisioned by the PSA.  We anticipated that this might be

21   the outcome, and we bargained for it.  Indeed, under the

22   PSA, parties agreed that confirmation of an alternative

23   restructuring plan would take place within 90 days of the

24   filing of that plan.  And that's what the proposed

25   scheduling order is an attempt to do.

1          We feel so strongly about the agreed upon

2    timeline, that with exclusivity having long ago expired,

3    we've prepared and we're ready to file a TCH standalone

4    plan.  But once again, Your Honor, we have done the right

5    thing in this case.  We've negotiated the scheduling order

6    with the Debtors.

7          It permits all the Debtors to go forward with

8    confirmation, but protects the T-side against delay because

9    of unresolved issues on the E-side.  With the scheduling

10   order in place, we can put our plan to the side and avoid a

11   competing plan process.

12         None of the objections should stand in the way of

13   this very sensible approach.  The only objections, as we've

14   heard, that relate to the T-side are one, that the PCRB

15   holders don't like the plan, and two, that there needs to be

16   a tax matters agreement in place if TCEH is to emerge by

17   means of a tax free spin transaction.

18         These issues can and should be dealt with at

19   confirmation.  They should not delay it.  First, whether the

20   plan could be confirmed over the objection of the PCRB

21   holders is not a new issue.  Your Honor heard a lot about it

22   in confirmation on the REIT plan and lots of discovery was

23   taken and everybody had a very full day in court on those

24   issues.

25         But in any event, it's a classic confirmation

1   issue, and the time to hear that issue is when the plan is

2   actually before the Court for confirmation.  It should not

3   delay the Court hearing the plan.

4          With respect to the taxa matters agreement, well,

5   we've proven we can do that.  We've already successfully

6   negotiated a tax matters agreement, as I mentioned, in

7   connection with the REIT plan to facilitate the tax-free

8   spin.  We negotiated that with the Debtors.  We negotiated

9   that with the Encore purchasers.  I'm sure Your Honor is

10  aware that they are very zealously protected the interests

11  of their clients, but we were able to succeed in getting a

12  tax matters agreement done.

13         It's the same issues this time, and we're very

14  confident that we will succeed again.  In fact, we have been

15  in constant conversation with the Debtor's tax advisors, and

16  we've even begun to discuss the tax matters agreement with

17  certain of the E-side creditor groups.

18         And Your Honor, if we're not successful, there's

19  always the option of emerging by means of a taxable

20  transaction, and we've got some indication that some of the

21  E-side creditors would actually prefer that.

22         So Your Honor, the TCEH first lien creditors have

23  worked cooperatively and good faith throughout these cases

24  to help ensure a fair outcome.  We've done everything

25  possible to position the T-side Debtors for emergence as

1    soon as possible.  All of the significant T-side issues have

2    been resolved.

3          Those which remain are not new.  They can be

4    fairly addressed and resolved during the course of the

5    confirmation schedule envisioned by the scheduling order.

6    Indeed, we agree with the Debtors that to the extent there

7    are open issues, the best way to resolve them is by

8    approving a reasonably tight timeline, rather than

9    permitting delay.

10          The constructive efforts by the T-side creditors

11    should not be rewarded by holding a T-side emergent hostage

12    to the E-side's lack of progress.  Permitting that would

13    significantly prejudice the TCEH first lien debt holders in

14    their efforts to salvage the value of their collateral by

15    taking actions that can not be accomplished, while TCEH

16    remains in Chapter 11.  So we urge the Court to approve the

17    scheduling order so that the T-side can finally see some

18    light at the end of this very long tunnel.  Thank you, Your

19    Honor.

20          MR. GOREN: Thank you, Your Honor.  Todd Goren,

21    Morrison & Foerster on behalf of the TCH Official Committee.

22    The Committee as obviously very disappointed that the PSA

23    was terminated.  You know, we had worked very hard to get to

24    where we got, but you know, that outside forces don't always

25    cooperate.

1          We were particularly so, at the timing of the

2     termination, there had been some hope might have been that

3     the plan could've been salvaged with a little time and

4     effort, but the parties had a right to terminate it when

5     they did, and they exercised that right.

6          We have an obligation to support the new plan, so

7     we're here today to support the new plan and to support the

8     schedule for the new plan.  From the Committee's

9     perspective, and after speaking with counsel for the Ad Hoc

10    Group, that White and Case, who was asked not to appear

11    today, the most critical thing for unsecured creditors is

12    speed.

13         Our recovery is fixed, so we are looking to get

14    creditors their recovery as quickly as possible.  So at this

15    point, I believe our interests align completely with the

16    first lien creditors and with the TCH debtors to get TCH out

17    of bankruptcy as quickly as possible.

18         As noted by the debtors and Mr. Kornberg, the

19    issues on the T-side are very discreet.  You have the PCRB's

20    and the tax issues.  As they've both noted, those are both

21    confirmation issues, so the proposed schedule is more than

22    adequate to resolve those issues.

23         One particular issue, which we might want to come

24    back to Your Honor on is potentially reappointing the

25    mediator who helped to resolve the PCRB issues last time.

1    There seems to be some appetite to negotiate, so to the

2    extent we believe that there's a deal to be had, we believe

3    it's in everyone's best interests to try and resolve that

4    issue ahead of confirmation and not turn that into a giant

5    sideshow.

6              Finally, Your Honor, as you may recall, we are

7    also -- the EFH corporate services is also within our

8    charge, which is technically on the E-side, but they are

9    part of our -- we represent creditors of the EFH corporate

10   services as well.

11             In the last version of the plan filed by the

12   Debtors, EFH corporate services was lumped in with the other

13   EFH creditors.  We've spoken with Kirkland about that.  We

14   understand that was an error and it will be fixed in a

15   revised version of the plan.  That seems to be reflected in

16   the scheduling order, which has EFH corporate services going

17   forward with the rest of the TCH Debtors.  But until we see

18   those revisions, we reserve our rights.

19             So Your Honor, in conclusion, we support entry of

20   the schedule.  We believe it will help expedite the exit of

21   the TCH Debtors out of bankruptcy and allow the company to

22   continue on with its business.

23             THE COURT:  Okay.

24             MR. GOREN:  Thank you, Your Honor.  Mr. Brody?

25             MR. BRODY:  Good morning, Your Honor.  Josh Brody

1    from Kramer & Levin on behalf of Computershare as the EFIH

2    second lien venture trustee.  As Mr. McKane mentioned, we

3    have withdrawn our objection to the scheduling motion.

4         I thought though it made sense for me to stand up

5    just for a minute to give Your Honor a little bit of context

6    as to how we're thinking about things.  A lot of the

7    comments Mr. McKane made about the order itself related to

8    the dates and discovery.  And obviously, that was a concern

9    for us, because there were questions about how you serve

10   discovery on a plan that you don't know what it is.

11        But in some respects, our objection really relates

12   more to that second point is, what's the plan going to be?

13   And we've felt -- seeing the Debtor's plan, we could -- were

14   concerned when it got filed that it said, "We don't know

15   what this is.  We don't know how they possibly think they

16   can force secured creditors to take equity."

17        We recognize they're trying to pick -- may

18   (indiscernible) a number of different paths, so they can

19   rush towards confirmation.  And we appreciate the need for

20   speed.  That said, until the number of issues, substantive

21   issues, not discovery get resolved, it just didn't seem to

22   us they could make any -- made any sense to move forward.

23        And as we laid out some of the issues in our

24   objection that need to get addressed, this tax matters issue

25   is something that we see as potentially being very

1    important.  And you know, obviously standing here today, I

2    don't know where that's going to come out.  The T-side plan

3    is okay to move forward, and we may need to object at some

4    point to the tax matters agreement, depending on where that

5    goes.

6              But (indiscernible) falls under the number of

7    things that I think are going to need to be addressed as a

8    substantive matter in order for the Debtors to move forward

9    with a plan on the E-side.  There are other issues relating

10   to that as well, and you know, again, mentioned our pleading

11   as the intercreditor litigation that's currently pending.

12             And we're -- from where we sit, until some of

13   these issues are resolved, we just don't see how an E-side

14   plan moves forward.  We think that an equitization of the

15   second lien is certainly a possibility.  And that may be

16   where this ends up.

17             But where we sit right now, we don't -- we're not

18   sure how that's going to move forward.  And so, we objected

19   because we wanted the plan to get -- the dates to get moved

20   out because we didn't think the Debtors really had a plan to

21   move forward on.

22             So now that they've made the changes, we,

23   obviously we've resolved our objection.  But I guess I would

24   note that a big part of that resolution is the reservation

25   of rights to come back to Your Honor at some point.  If we

1    think that as we get closer to the next day, I guess towards

2    the middle of July, that we think there's still not -- the

3    Debtors are not in a position to move forward on the plan.

4              We may ask Your Honor to kick things further for

5    the same reason that we had originally asked for today.  But

6    as things stand now, with the changes to the order, we've

7    resolved our objection.

8              THE COURT:  Okay, thank you.

9              MR. BRODY:  Thank you.

10             THE COURT:  Sorry Mr. Qureshi, before you speak,

11   is there -- (indiscernible) for you, Mr. Brody, I'm actually

12   going to ask Mr. Kornberg and Mr. McKane.  I didn't see

13   anything in the T-side schedule that set any kind of

14   deadline in connection with the tax matters agreement.

15   What's your proposal there?  Am I going to be hit with a

16   brand new, nobody's seen it, TMA on August 17th or what?

17   How's this going to work?

18             MR. MCKANE:  Your Honor, Mark McKane, Kirkland &

19   Ellis for the Debtors.  We fully anticipate that we'll have

20   a tax matters agreement fully fleshed out in advance of the

21   disclosure statement hearing on the T-side, which, if memory

22   serves, is mid-June.

23             THE COURT:  I think it's June 15.

24             MR. MCKANE:  June 15, yes.  So that is our current

25   working -- yeah.  It may not be -- to be precise, it may not

1   be definitive documentation, but a -- at least a term sheet

2   laying out all material terms.

3          THE COURT:  Can we build that into the schedule?

4          MR. MCKANE:  We absolutely can.  I've been asked

5   to highlight that there is a term sheet to the tax matters

6   agreement that is currently attached to the plan.  And so,

7   there's at least a starting point for Creditors to evaluate.

8   And, but we'll still bake in that date to scheduling.

9          THE COURT:  Okay.  I have not (indiscernible) the

10  plan.  I must admit.

11         MR. QURESHI: Good morning, Your Honor.  For the

12  record, Abid Qureshi, Akin, Gump, Strauss, Hauer & Feld on

13  behalf of the EFIH PIK Notes Trustee.  Very briefly, Your

14  Honor, I certainly agree with Mr. McKane's characterization

15  that since the filing of our objection to what was

16  originally filed by the Debtors, we have had a productive

17  dialogue, I think.

18         But for a few, what I would characterize as minor

19  tweaks to some of the language in the order, we are okay

20  with the proposed schedule.  We are fully supportive of the

21  idea of moving ahead as quickly as we reasonably can.  Just

22  wanted to highlight for Your Honor two potential things out

23  there that I think could cause the schedule to come off the

24  tracks a little bit.

25         One is, in the event that on the T-side, there is

1    a switch to a taxable transaction, that will raise a number

2    of issues on the E-side that I think will give rise both to

3    a need for discovery the E-side Creditors would want to

4    take, with respect to the T-side plan.  And then, the second

5    thing, Your Honor is, in the event that we end up with

6    competing plans on the E-side, I think there are two in both

7    of those circumstances, what we would likely need is a

8    status conference so that everybody understands the new

9    world and the new discovery issues that that may give rise

10   to.  But for the moment, Your Honor, we are okay, as I've

11   said, with a few tweaks to the existing schedule.

12           THE COURT:  Thank you.

13           MR. QURESHI:  Thank you.

14           THE COURT:  And actually, I was going to save this

15   for later, but I think it's a good time to talk about it,

16   and that is this concept of alternative plans.  Of course,

17   exclusivity is expired and everybody has a right to -- every

18   party in interest has a right to file their own proposed

19   plan of reorganization.

20           But just to be clear, we can file as many plans as

21   you want.  No plan is moving forward without a schedule like

22   this.  So don't file a plan and notice a disclosure

23   statement for the next omnibus, because it's just not going

24   to happen, okay?  We're going to be organized.

25           I'm not saying you can't file your plan.  I'm not

1    saying you can't file a scheduling motion.  I'm not saying I

2    won't hear it, but we're going to have an organized process

3    no matter what plan we're prosecuting.

4              MR. KAPLAN:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. KAPLAN:  Gary Kaplan from Fried Frank on

7    behalf of Fidelity.  Your Honor, I'm not going to reiterate

8    a lot of the points.  We sort of are in the same place that

9    Mr. Brody was in, based on our objection when we started,

10   which was, the Debtors really didn't have a plan and we

11   thought we were trying to put sort of some schedule around,

12   without the actual substance of what it is that we're

13   dealing with.

14              But based on the conversations that have gone on

15   over the last several days, we can live with the Debtor's

16   schedule as will be tweaked, you know, through some of the

17   negotiation, including coordinating amongst ourselves as

18   opposed to having to react to the E-side (indiscernible),

19   and some of the other schedules.

20              But there are a couple of points, and Mr. Qureshi

21   highlighted one.  And I want to make sure that none of us

22   end up running into an issue here, which is, the T-side

23   schedule is in a very tight schedule that, as Mr. McKane

24   said, is really all predicated on a tax free spin, because

25   in a tax free spin, the issues are now, we need to get to a

1     resolution with the E-side on a tax matters agreement.  Any

2     compensation for use of tax attributes, et cetera, that

3     those issues are -- we know what they are and those can, you

4     know, move along with a confirmation schedule and we can

5     fight about it and hopefully get to an agreement on that.

6               In a taxable world, the entire landscape changes.

7     And I know a lot of this is old history and all of us tried

8     to put it out of our minds, but in a taxable world, there's

9     potential massive tax that is triggered by the

10    deconsolidation of TCEH from EFH, which is currently the

11    taxpayer.

12              It raises issues as to whether EFH, as the one who

13    files the returns, would check the box, and in effect, make

14    TCEH, which is right now a pass through entity not

15    recognized by the IRS into the taxpayer.  There's that risk,

16    which TCH undoubtedly would fight EFH's ability to do so.

17    Even if they didn't do that, they would be claims by EFH or

18    alleged claims by EFH down, because if they're -- literally

19    billions of dollars of tax, now do at EFH, EFH has an

20    agreement with TCEH to -- that allocates the taxes.

21              There would be disputes between EFH and TCH over

22    what is their claim?  Is it just an unsecured claim?  Is it

23    an admin claim, et cetera?  And so, you know, when we talked

24    about the schedule, for example, about solicitation, it's

25    very different if you now potentially have a multi-billion

1    dollar claim by the EFH against TCEH, and potentially even

2    the IRS may come and say they have direct claims against

3    TCEH.

4            So all of it, we are fine.  We're, right now,

5    (indiscernible) Creditors of the T-side estate.  They want

6    to move on their schedule.  Nobody wants to hold them

7    hostage, can shrink the groups in this court room as we move

8    through the E-side.  So that's all fine.  They can move

9    forward on the tax-free spin.

10           But I just want -- none of us, I think, expect

11   that we need to serve discovery this week of TCH and EFH and

12   everybody else that pre-supposes that they're actually doing

13   a taxable transaction.  And so, I just want to make sure

14   that the same way that the Debtors, when they filed their

15   more detailed plan on the E-side, that Mr. McKane suggested

16   we'd have a status conference to discuss what the issues

17   are, to the extent that the T-side elects that they're now

18   going to go taxable, which raises all of these different

19   issues that I just want to be sure that we're not all

20   precluded and they don't say, "Oh, no, no, no, you should've

21   raised that all early on. That should've been done by June

22   15th.  You should've had all of these issues not only

23   vetted, but you know, discovery should've been done with

24   them, and all of it and it's too late."

25           So I do want to make sure that those rights are

1    preserved again, not only for us, but for all the E-side

2    creditors, frankly, the E-side disinterested directors,

3    which would be the key parties and all on that.  And

4    otherwise, Your Honor, as you know, as Mr. Brody said, and I

5    think Akin Gump said as well, as long as we're making

6    progress, the schedule works, we may come back if

7    unfortunately we don't have a plan that is heading to

8    confirmation.  All these dates may need to be adjusted.  But

9    for now, we don't have an objection.  Thank you.

10            THE COURT:  Mr. McKane, where are we on IRS

11   approval of the tax free spin?

12            MR. MCKANE:  Your Honor, why I'm not directly a

13   party to those conversations -- those discussions with the

14   IRS are moving forward.  We have a deadline that we've

15   committed to, to having approval by the IRS by, I believe no

16   later than July 30th.  And we fully intend to meet that

17   deadline.

18            THE COURT:  Okay.  So if the IRS and you can not

19   resolve that issue, what's the plan with regard to the T-

20   side plan?  You've switched to a taxable transaction and

21   then --

22            MR. MCKANE:  How does that work?

23            THE COURT:  -- how would the schedule accommodate?

24   When does that light switch get switched?  It sounds like

25   the end of July?

1           MR. MCKANE:  Yeah.

2           THE COURT:  And how do we accommodate that between

3    July 31st and August 17th, assuming the worst happens?

4           MR. MCKANE:  Right.  So, assuming the worst, and -

5    -

6           THE COURT:  And by worst, I mean the IRS isn't on

7    board.

8           MR. MCKANE:  Understood, Your Honor.  Let me

9    confer with Mr. Kieselstein for a moment?

10          Your Honor, a couple things.  One, we expect to

11   have clarity well before July 30th.  We will not wait once

12   we know one way or another, and we will report that out.

13   And, frankly, consistent with what Mr. Kaplan had suggested

14   when we discussed that before -- we discussed that earlier

15   today -- we believe the appropriate next step would then be

16   to have a scheduling conference to the extent that we

17   received very disappointing news from the IRS.  But we are

18   continuing to work with the IRS in a very constructive

19   manner and we will hopefully report back well before July

20   30th.

21          THE COURT:  All right.  Mr. Kornberg?

22          MR. KORNBERG:  Your Honor, let me just add, I want

23   to be very clear, the plan has and has always had a toggle

24   feature so that if we do not get the required rulings, there

25   will be a toggle to a taxable transaction.  We raised this

1    issue, I think, with Your Honor in a status conference not

2    too long ago.

3            We disagree very much with the characterizations

4    Mr. Kaplan is making.  This is not the beginning of this

5    case where a taxable transaction would have created massive

6    potential tax liabilities in a deconsolidation.  As we've

7    talked about before, given the increasing NOLs and the

8    decreasing values on the T-side, it's a completely different

9    environment.

10            I think with respect to discovery on these issues,

11   they should proceed because we do not control the IRS, just

12   the way we do not -- we do not control the Texas PUC.  And

13   so, to the extent that people think they need discovery on

14   these issues, we would urge that that go forward on this

15   schedule so that we don't come back at the end of July and

16   say, oh my God, we have to start over.

17            Because this plan does have a toggle feature, it's

18   critically important, and we have to all recognize that

19   while we're very hopeful that we will get the IRS rulings,

20   no one in this room can guarantee that.

21            THE COURT:  So, assuming you don't get the rulings

22   that you want, or at least that the Debtors want, you would

23   still push for an August 17th confirmation hearing?

24            MR. KORNBERG:  Absolutely, Your Honor.  And again,

25   the discussion about massive tax claims existing, we think

1    is very outdated information.

2           THE COURT:  Yeah, but no one's had an opportunity

3    to take discovery on that issue.  And even your position on

4    valuation isn't necessarily what the IRS's position on

5    valuation would be.

6           MR. KORNBERG:  That's true, Your Honor.  But we

7    don't even think it's a close call at this point. But again,

8    to the extent that people need discovery, that should take

9    place because, again, we don't hope that that's the outcome

10   here, but we have to acknowledge that it's a possibility.

11          MR. MCKANE:  And Your Honor, Mark McKane from

12   Kirkland.  With regards to issues about size of claim and

13   tax basis, like we discussed on the E-side as it relates to

14   debt capacity for the E-side, that information is

15   discoverable now.  Right?  We may not need it, right, put it

16   on the side, but we can provide that -- we should receive

17   requests on that and we can provide it.

18          THE COURT:  Mr. Qureshi?

19          MR. QURESHI:  Your Honor, again Abid Qureshi on

20   behalf of the EFIH PIK note Trustee.

21          Mr. Kornberg has raised an issue that I think

22   we're going to need some clarity on from the Debtor.  If

23   there is a toggle to a taxable transaction, it absolutely in

24   our view does raise all sorts of issues with respect to

25   valuation, with respect to the underlying tax issues and

1    claims and the like.  If Mr. Kornberg's suggestion --

2              THE COURT:  What is the -- I mean if I'm -- unless

3    I'm missing the boat here, it raises a T-side valuation

4    issue, doesn't it?

5              MR. QURESHI:  It raises an issue with respect to

6    claims that the E-side may in that scenario have into the T-

7    side estate, Your Honor.  And so, as I understand what Mr.

8    Kornberg is proposing, he is saying well, the toggle is in

9    the plan today.  Everybody knows that there is a possibility

10   that the T-side will have to toggle to a taxable

11   transaction, and so we should just serve those discovery

12   requests today.

13             So, you know, again, from our perspective, if the

14   Debtors are prepared to make that production and to produce

15   all of those documents now, not knowing whether there will

16   be an issue that we are going to have to grapple with and

17   whether we're going to have to deal with those valuation

18   issues or not, that's certainly a scenario that we might be

19   able to live with.

20             We just want to ensure that on the E-side, in the

21   event that there is that toggle, that we are not prejudiced

22   from having access to information and being able to raise

23   whatever issues are appropriate in the circumstances.

24             We're not trying to slow it down.  We just want to

25   ensure that whatever process they're going to follow,

1    whether it's produce that information now or have a status

2    conference and then build in additional time and produce it

3    later.

4         But what I don't see as a possibility, Your Honor,

5    is that by July 28th or around there, we learn for the first

6    time that it is going to toggle to a taxable transaction, we

7    haven't had the discovery, and we proceed to confirmation on

8    August 17th.

9         MR. MCKANE:  And Your Honor, Mark McKane for the

10   Debtors.  I think I can bring this full circle to where we

11   started the conversation.  If there is a toggle to a taxable

12   transaction, we believe the appropriate next step is a

13   status conference with Your Honor at that time so that we

14   can address then as opposed to now what implications that

15   may or may not have.

16        THE COURT:  Well, but I mean -- but what Mr.

17   Kornberg is saying, which I don't blame him -- but he's

18   saying his position's going to be full speed ahead --

19        MR. MCKANE:  Right.

20        THE COURT:  -- taxable transaction.  So if you

21   want to take the $10 million worth of discovery about taxing

22   and he'll do it because he's not paying for it, do it now as

23   opposed to waiting until we actually know whether it's an

24   issue or not, that seems wasteful as I sit here today.

25        MR. MCKANE:  Yeah, you know, setting aside

1   everything's expensive in this case, Your Honor.  Ten

2   million might be a little high.  But he is paying for it,

3   right?  So, if he's saying get it -- you know, go for it now

4   and you can set it aside, ultimately, it is his clients who

5   are paying for it.

6          We still think the appropriate next step, you

7   know, once you get the kind of basic materials on what would

8   be the size of those type of claims based on tax basis and

9   NOLs.

10         Again, issues that have been permeated through

11  this case for two years and for which there has already been

12  significant discovery.  We believe that the appropriate next

13  step is a status conference to evaluate, you know, what is

14  appropriate going forward in terms of those issues.  And so

15  it is kind of an issue for another day in terms of how it

16  affects the schedule, and we can go forward at that time.

17         THE COURT:  Well, do you agree with Mr. Kornberg?

18  Should they take the discovery now?

19         MR. MCKANE:  I believe they should at least ask or

20  request for the tax basis and have an understanding of what

21  the issues are, at a minimum.  This is not -- this is not

22  like 50 depositions and a wave of documents.  It's a pretty

23  confined universe.

24         THE COURT:  Okay.

25         MR. MCKANE:  And frankly, we're building on work

1    that's already been done and that's already out there.

2              THE COURT:  Okay.

3              MR. KORNBERG:  Your Honor, let me just add, we

4    really do want the discovery to take place now.  We don't

5    think it's $10 million, and we'd rather pay for the

6    discovery than pay for more delay here.

7              THE COURT:  All right.  Mr. Kaplan?  Hang on, Mr.

8    Pedone, I'm...

9              MR. KAPLAN:  Your Honor, just to -- Gary Kaplan

10   from Fried Frank again.

11             Just one point.  There's a difference between

12   serving and discovery.  We could come up with very broad

13   requests to ask for facts on all the different taxes on

14   valuation.  We could do that.  But the schedule isn't just

15   about when do you serve discovery.

16             Based on their schedule on the T-side, we're going

17   to be doing depositions in June, which may be well before we

18   even know what the IRS is doing.  So we're going to be

19   completing fact discovery on a taxable transaction before we

20   know.  And we're not going -- I'm not going to go into any

21   details about discussions with the IRS, but there are

22   different curveballs that come up all the time in these

23   conversations, which can change dramatically.

24             When Mr. Kornberg says my facts are old, they're

25   old one day, the next day they're not old anymore, and then

1    they change constantly.  And there are things that could

2    potentially have major swings on the tax claims.  And it

3    goes again, solicitation -- they're not going to -- they

4    don't plan on soliciting E-side creditors for claims for

5    taxes.  That's not how their plan is structured and they are

6    going to have a disclosure statement in mid-June on a tax-

7    free deal.

8              So, I don't understand how they can say we can

9    easily toggle to a taxable transaction.  They'll have done

10   discovery and no problem, were off to the races and done.

11   It just doesn't work because you're going to have massive

12   claims.  Let's say we're right and they're administrative.

13   Maybe there are no claims.  That would be fantastic all

14   around, great for EFH and then we wouldn't care.

15             But if there are large claims and we assert their

16   administrative claims, it's going to fundamentally change

17   their plan, or they're going to have to reserve for them.

18   So, I don't think that it's realistically possible to say we

19   can set today this schedule and assume it works for both a

20   tax-free and a taxable transaction.  Thank you.

21             THE COURT:  All right.

22             MR. PEDONE:  Your Honor, Richard Pedone on behalf

23   of American Stock Transfer & Trust Company, Indenture

24   Trustee at the EFH level for all of the corporate-issued

25   bonds.

1            So, to put it in perspective, we're talking about

2    a disclosure statement hearing one month from now, a bit

3    less, with regard to -- if Mr. Kornberg is correct -- what

4    would happen, and we'll have full detail on that disclosure

5    statement concerning what would happen in a taxable

6    transaction, because approximately 15 days after the

7    disclosure statement or more, a month and a half, we'll hear

8    from the IRS.  That's going to be quite an odd disclosure

9    statement hearing process.

10            So, our request was that the order that enters

11   today have maximum flexibility.  Mr. McKane said that he

12   wanted the order -- the order would be amendable for cause.

13   We think there are going to be a lot of instances for cause

14   in the coming two months if this proceeds on the expedited

15   basis.

16            Our request was that it actually be a slower

17   process.  We would ask that the Court permit parties to come

18   back on a lower standard to seek additional discovery,

19   because to nail down the deadline today seems to me to be

20   quite impossible.  Thank you.

21            THE COURT:  You're welcome.

22            MR. GLENN:  Good morning, Your Honor, Andrew

23   Glenn, Kasowitz Benson Torres & Friedman, on behalf of

24   Contrarian Capital Management.

25            Your Honor, we are standing on our objection today

1    and I think the recent colloquy demonstrates why.

2    Obviously, in a case of this complexity, having a schedule

3    usually is better than not having a schedule.  Having a

4    process is usually better than not having a process.  But

5    nothing has been disclosed today that demonstrates, on the

6    E-side in particular and potentially also on the T-side,

7    that there really is a plan.

8             When we started the case, we had a convertible DIP

9    that was going to be converted into the reorganized equity

10   of the company.  We pointed out all kinds of flaws with the

11   process that led up to that.  Your Honor sent them back to

12   the drawing board.  We had independent committees set up.

13   We had a series of discussions on the E-side to expand a

14   number of months.

15            My concern is we are setting the schedule for

16   really discovery and litigation when the fundamental

17   business transaction has not been established.  There is no

18   process in the schedules, as far as I know, for the

19   equitization proposals to be put forward.  There is no

20   schedule right now for third-party debtors to submit their

21   proposals and have that considered for getting protections

22   and an auction.  And I don't blame the debtors for that.  I

23   don't.  They're clearly under pressure under their RSA to

24   keep what they have intact.

25            But the point here is we shouldn't have a

1    schedule, we shouldn't have a process just for the sake of

2    it.  I think what you've heard today is everyone's okay with

3    the schedule, unless every single person.  So why are we

4    having the schedule when the likelihood of "unless" is very

5    high?

6              There's no reason why people can't start discovery

7    right now.  But we know the tax issues are going to have a

8    huge impact on both sides of the ledger here.  So why are we

9    planning for different scenarios when we don't know what the

10   reality is going to be?  Are we doing discovery on valuation

11   when an auction process is going to be hugely demonstrative

12   of what value is?

13             So, my clients, who reside at EFH, have no further

14   meaningful representation from the creditors' committee.

15             THE COURT:  Auction -- auction process for what

16   entity?  For Oncor?

17             MR. GLENN:  Yes.

18             THE COURT:  We did that.

19             MR. GLENN:  We did.  And it ended.

20             THE COURT:  Yeah.

21             MR. GLENN:  And now there are third-parties, I

22   understand, that have come forward who want to bid again.

23   And if we were in a world that was 30 days or 60 days or 90

24   days after the last process, you know, maybe we could do

25   that on an expedited basis.  But we're well off of that.

1           So, I don't want to repeat what everyone's --

2           THE COURT:  So the parties who walked away from

3     the transaction, I should shut everything down and let them

4     rethink whether or not they should have taken that billion

5     dollars off the table last year or not?

6           MR. GLENN:  Maybe.  But our concern is not having

7     a process for the sake of having a process.  Let's have a

8     process that's set up to maximize value.  And one further

9     point on the tax issue.

10          The tax issue, depending on whether we checked the

11    box, depending on whether it was a tax-free spend or not,

12    that's obviously very relevant.  But our position is that

13    EFH owns the NOLs for this corporate group and should be

14    compensated for those.

15          And the T-side transaction should not be

16    structured to foreclose us from using no NOLs on the EFH

17    side.  And our concern is that this is a race.  That on the

18    T-side, if they exit before year end this year, they don't

19    get to use the NOLs and we won't, even though we want to

20    potentially do this equitization plan that can mimic the

21    busted 351 transaction that they have on the T-side.

22          So, I foresee litigation.  I foresee what we had

23    during the DIP discovery, Your Honor, where I was taking the

24    deposition of David Ying.  We were getting discovery on a

25    day-to-day basis with the next proposal from next door, the

1    next proposal from other bidders.  And it's a toxic

2    environment, I believe, to conduct discovery in a world

3    where the business negotiations are still ongoing.

4          So, we would ask Your Honor, number one, to reject

5    this schedule as is and have the parties come back after

6    some period of time, rethinking the entire process, both

7    discovery and the business side, where to set up some kind

8    of a status conference in 30 days or less, to come back and

9    take stock of where we are, so Your Honor knows about where

10   the business is, and parties like my client, who are smaller

11   players, are not jammed based on artificial deadlines that

12   other stakeholders used against them because they're in the

13   pull position with the Debtor and they want their

14   transaction done quickly.  Thank you.

15         THE COURT:  Mr. Dietderich?

16         MR. DIETDERICH:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MR. DIETDERICH:  Andy Dietderich and Brian

19   Glueckstein, Sullivan & Cromwell for the E-side committee.

20         Your Honor, we'll be brief.  The committee

21   believes a reasonable schedule is important to bring an end

22   to these cases finally.  The situation is complicated still

23   by a link between the two sides by tax, which has not been

24   eliminated by the settlement.

25         From the committee's perspective, a key part of

1      that global settlement was the committee's settlement.  And

2      Your Honor may remember a trial last year.  That settlement

3      is incorporated -- looks like it's incorporated in the plan

4      that we reviewed.  Our main job is to make sure that

5      settlement is incorporated in the final plan, and we reserve

6      rights to make sure it is at the end of the day.

7             But with respect to scheduling, we are nolo

8      contendere today.  We have no position.  Thanks.

9             THE COURT:  Okay.  Thank you.

10            MR. SEIFE:  Good morning, Your Honor.  Howard

11     Seife from Chadbourne & Parke for NextEra Energy.  We filed

12     an objection, Your Honor, to the scheduling motion.  We had

13     two primary concerns, which I'm pleased that the Debtors

14     have addressed.  One, we thought the E-side schedule should

15     be separated from the T-side schedule.  And we also thought

16     the proposed schedule was too aggressive and too tight to

17     accommodate the parties on the E-side.  So, those objections

18     -- those provisions have been addressed.

19            We also raised what I think a variety of people

20     have raised, was the ambiguity of the plan that was filed

21     for the E-side.  However, we've taken some comfort from Mr.

22     Kieselstein's comments at the outset of this hearing that

23     the Debtors are prepared to engage with third parties and

24     potential financing parties for a transaction on the E-side.

25     We think that's the fastest route to getting a confirmable

1    plan for the E-side, one that would identify a party that

2    has the capability of conducting a transaction, a

3    transaction that'll get regulatory approval.

4              So, based on those comments, we're prepared today

5    to withdraw our objection, as our issues have been resolved.

6              THE COURT:  Thank you.

7              MR. PEDONE:  Your Honor, may I briefly respond to

8    one question you had for Mr. Glenn regarding --

9              THE COURT:  Yes.

10             MR. PEDONE:  So, Your Honor, the value, as we

11   outlined in our objection, of Oncor is an issue and there

12   may be a need for a marketing process.  We heard from the

13   committee on the T-side today that they believe that with

14   some additional time, they might have been able to hold the

15   REIT together, but there were termination events that

16   occurred.

17             Many of the parties that might be the natural

18   parties to come forward here to propose another re-

19   transaction or a transaction to modify the existing re-

20   transaction to generate enough value to get up to EFH, are

21   parties bound by plan support agreements and who can't

22   proceed. So this is a situation where we need to work out

23   exactly who can push hard for the Debtors to maximize the

24   value of Oncor, push the Debtors, who may or may not have an

25   interest for running another process, to run a process if

1    it's appropriate.

2            We don't have the details today on who's expressed

3    interest and what the process might be.  And that would be

4    one of the examples that we may actually be back before you

5    saying the schedule needs to be modified so a process could

6    be run.  And I'd ask that the court hold out hope for

7    optimism that that occurs because there is no indication

8    that the current plan that's being proposed or processed is

9    going to pay EFH creditors 100 cents as might be possible.

10   Thank you.

11            THE COURT:  Mr. Gwynne?

12            MR. GWYNNE:  Good morning, Your Honor.  Kurt

13   Gwynne from Reed Smith on behalf of Bank of New York Mellon

14   and Bank of New York Mellon Trust Company as Indentured

15   Trustees.

16            With respect to the PCRBs, Your Honor, they're

17   both too big to be treated fairly under the plan, meaning

18   they're too big to get the same distribution as all the

19   other unsecured creditors.  Yet, whenever we raise an

20   objection to the process or procedure, we're too small or

21   too insignificant to matter.

22            IF the PCRB agrees we're that insignificant, Your

23   Honor, then I think it wouldn't be much for the parties to

24   provide for equal treatment to them.  But we're not here for

25   that today and we're not asking Your Honor to decide that

1    here today, notwithstanding some suggestions to the

2    contrary.

3              A few other things we're not here on today.

4    First, Your Honor, is the solicitation issue.  The initial

5    schedule was deficient with respect to solicitation on the

6    plan.  The Debtors have fixed that.  We're not asking Your

7    Honor to extend any of the deadlines -- I'm sorry -- the

8    outside deadline of the schedule either.  And it's important

9    also to note that with respect to the prior schedule that we

10   had, we worked within that schedule.

11             We're not seeking to delay the T-side confirmation

12   hearing.  We're not seeking to extend the process as

13   submitted in the most recent version of the scheduling

14   order, but we do have some issues with it.

15             First of all, Your Honor, it does more than just

16   schedule discovery and deadlines. It purports to preclude

17   discovery.  In Paragraph 18 of the revised proposed order,

18   the Debtors seek to prohibit parties from submitting

19   discovery relating to topics that were settled, where Your

20   Honor entered the settlement order, and also to the extent

21   that any party has previously requested a document before.

22             With respect to the first matter, Your Honor, the

23   topics of the settlement, I do want to explain the

24   importance of the issue to the PCRBs.  But I first want to

25   state, we don't seek to re-litigate the settlement motion.

1    We don't seek to challenge the settlement order.  What we

2    seek to take discovery on is the settlement that was

3    reached, and in particular there were claims that were held

4    by TCEH and there were claims that were held by the TCEH

5    subsidiaries.

6         We want to know, in the settlement that was

7    reached, what amount of the settlement -- like the

8    deficiency claim distributions that are going to the TCEH

9    creditors and the subsidiary creditors -- what portion of

10   that consideration is allocated to the claims that were held

11   by TCEH and what portion of that consideration was allocated

12   to the claims held by the subsidiaries?  That's not asking

13   the Debtor what they valued the claims to be.

14        We're not asking them why they reached the

15   settlement in the magnitude that they reached.  But what

16   we're is when you settled all these claims, that some were

17   held by TCEH and some were held by the subsidiaries, what

18   were the respective amounts that you settled the claims for?

19   And that's critical in this case because all the claims

20   against the TCEH first-lien lenders were settled.  All the

21   TCEH Debtor's claims were settled.

22        But the PCRBs are entirely shut out of sharing in

23   that distribution that's going to be made on the TCEH first-

24   lien deficiency.  That was the consideration for settling

25   those claims.  So what we need to be able to take discovery

1    on, Your Honor, is what portion of that consideration should

2    be allocated to TCEH versus its subsidiaries.

3            With respect to the issue also about duplicative

4    discovery, Your Honor, the Debtor's, as you know, when they

5    originally filed the motion, I saw the retroactive date.

6    This is technically a different contested matter.

7            The Debtors don't say anywhere in the documents

8    that they intend to comply with the duty to supplement on

9    prior discovery.  There also are new facts.  Once again

10   there was a document that treated the PCRBs equally, and

11   then once again the plan that was filed was inconsistent

12   with that.

13           So we are entitled to take discovery.  There are

14   both new facts as well as the continuing duty to supplement.

15   But what I don't want is to get all the same documents that

16   we already received.  We're happy to reach an agreement with

17   the Debtor that those documents are considered to be

18   produced here and that they can be used in this case with

19   respect to this confirmation hearing.

20           We're not desirous of the Debtor having to produce

21   documents that it's already produced, and were not desirous

22   of having to review documents that we've already reviewed

23   the first time.

24           With respect to the schedule itself, there are a

25   couple instances where I believe there's unfair allocation

1    of time.  The Debtors say that there, you know, was

2    virtually no controversy remaining on the T-side.  That is

3    very discrete issues, discrete discovery.

4              Yet when you break down the allocation of the time

5    for them to respond to discovery and then for you to then

6    have to review documents and file a motion to compel, I

7    think it's unfair.

8              The Debtors would require that written discovery

9    be served by the 25th.  We already served discovery, by the

10   way, on the 2nd, Your Honor.  But they then would have 28

11   days after that deadline to respond to the production, so

12   until June 22nd.

13             However, they really have over 50 days to respond

14   to the discovery that we served because we served it on the

15   2nd of May.  The deadline, however, to file a motion to

16   compel is only seven days after the production.  So the

17   document production ends on June 22nd.  You only have 7 days

18   to review all the documents and file a motion to compel.

19             We think a fairer allocation would be to move the

20   Debtor's response deadline up.  Now, this is a case where

21   one size probably doesn't fit all.  Sounds like with respect

22   to the E-side that there are some complicated issues.

23             Our issue, as the Debtor's say, is relatively

24   discrete, which is the more reason why they don't need 50-

25   some days to produce documents and then give us only seven

1    days to file a motion to compel with respect to any

2    deficiencies.

3              And then a second issue with respect to the

4    schedule is in Paragraph 6(y) on Page 7 of the redline.  The

5    Debtor's propose that deposition counter-designations be due

6    on August 8th, and then objections to those counter-

7    designations would have to be filed on August 9th under

8    Paragraph 6(B)(b) on Page 8.  We think that there is time

9    prior to the confirmation hearing to move that date back,

10   even if it was only to August 11th, to give the parties a

11   little more reasonable time period to respond to counter-

12   designations.

13             Lastly, Your Honor, the Debtors provide in their

14   motion that all major T-side creditor groups have agreed to

15   the plan, that there's virtually no controversy that should

16   remain.  But nevertheless, they want to require Bank of New

17   York Mellon to coordinate its discovery requests with the

18   creditors' committee.

19             Now the TCHE creditors' committee is a party to

20   the plan support agreement.  It is therefore in that context

21   our opposing party, that the justification in the Debtor's

22   motion in Paragraph 35 is that it won't be party litigation.

23   Parties with similar positions can be ordered to coordinate

24   their discovery. We don't have a similar position with the

25   TCEH creditor's committee.  They support the plan; we oppose

1     it.

2           We don't have a similar position with respect to

3     folks taking discovery regarding the tax sharing matters.

4     Our issues are different and we should be able to serve our

5     own discovery.  It doesn't make sense to have to have the

6     committee comment on or revise or otherwise engage in

7     strategy discussions with the committee about discovery that

8     we're going to take when the committee is on the other side

9     of us.

10          Those are the issues, Your Honor, that we would

11    hope the Court would address before approving the schedule

12    as submitted.

13          THE COURT:  Thank you.

14          MR. GWYNNE:  Thank you.

15          THE COURT:  Can we take -- Mr. Hogan, before you

16    go forward, if we could just take a short recess.

17          MR. HOGAN:  Sure.

18          (Recess)

19          THE COURT:  Please be seated.  Take your time.

20    Mr. Hogan.

21          MR. HOGAN:  Good morning, Your Honor.  Daniel

22    Hogan, Hogan McDaniel, on behalf of Fenicle and Fahy.  Your

23    Honor, I'll be very brief.  I don't intend to repeat.  Just

24    two discreet issues relative to the proposed Order.

25    Likewise, we're on the E side and we're concerned about the

1   coordination with the committee, the provision for the

2   coordination and discovery, where they've already resolved

3   their issues with the Debtors and we haven't, so that's a

4   repeat of what you just heard.

5              And then a discreet issue with regard to the

6   30(b)(6) issue in Paragraph 17, about how the Debtors want

7   to limit it to, I believe, 10 fact witnesses.  And for the

8   purposes of limitation, each witness produced, in response

9   to 30(b)(6), shall be treated as a separate deponent.  We

10  just don't want that to be gained in such a way that those

11  30(b)(6)'s get used up before we have a chance to get our

12  issues resolved.  To that end, we've already filed a notice

13  of intent to participate in discovery.  We've also already

14  served discovery requests on the Debtor.  So we're trying to

15  stay ahead of that curve, Your Honor.  Thank you.

16             THE COURT:  Thank you.  Anyone else?  Mr. McKane?

17             MR. MCKANE:  Thank you, Your Honor.  I, too, will

18  be brief as really only in EFH can you have a hearing last

19  two hours when most people say I generally agree with the

20  Debtors.

21             With regards to a couple of issues that have been

22  raised.  By the way, the picks and Fidelity and others on

23  the E-side creditors have asked to have until this Friday to

24  serve requests in the T-side case.  I think the schedule has

25  a current conflict, it says Wednesday.  I had not addressed

1    that issue previously.  We're happy to give them until

2    Friday.  But, again, our end, as it relates to the

3    coordination with the official committees, we are happy to

4    release the official committees from that coordination

5    obligation.

6              But in lieu of that, we ask for the creditors to

7    coordinate amongst themselves.  So to the extent that the E-

8    side unsecured creditors are going to be serving requests

9    this week in the T-side case, all we ask is that, consistent

10   with the representation that they would coordinate on the E-

11   side, that they do it on the T-side.

12             I think they're amenable to that, but I just

13   wanted to flag that for Your Honor.  The Debtors are fine

14   with releasing the official committees from the burden of

15   coordinating if the unsecured creditors are going to do it

16   amongst themselves.

17             THE COURT:  I just want to make sure I had the

18   scorecard right.  So with regard to the E-side schedule, the

19   only outstanding objections are that of American Stock

20   Transfer and Contrarian to the actual schedule.  Is that

21   correct?

22             MR. MCKANE:  Your Honor, I believe that's true as

23   it relates to the schedule.  I think you just heard counsel

24   for Fenicle and Fahy raise a concern about some of the

25   ancillary aspects of the schedule, and they are E-side

1    creditors.  But as to the dates, that's it.  They're the

2    only ones asking to move it out.  And as it relates to AST's

3    concerns that for cause is too high a standard, I don't know

4    of a standard and I don't think we can have a no cause

5    standard.

6            THE COURT:  You could have a standard my kids

7    like, which is because I asked for it standard because I

8    want it.  No, I hear you.

9            MR. MCKANE:  And, Your Honor, with that and given

10   where we are with the breakout consensus, we think

11   everything else is resolvable.  The 30(b)(6) concern Fenicle

12   and Fahy raised, for example, Your Honor, that's the same

13   language we had in earlier Orders that you've entered.  We

14   will not gain the system there.  As it relates to the issue

15   raised by Mr. Gwynne about coordination, he's already sent

16   his document request, we're already evaluating.  When we

17   confer with him, we still are struggling with the collateral

18   tack on a final non-appealable Order, but we will address

19   it.  Frankly, some of these uses raising about allocation of

20   a claim, not only is that an attack on an appealable Order,

21   he took that discovery.  I mean, we'll work with him to make

22   clear that he can import that.

23           THE COURT:  I mean, it doesn't seem to me at all

24   efficient to repeat discovery that's already occurred.  Of

25   course, Mr. Gwynne raises a valid point, that you have -- if

1   you're going to do that, you'll have a duty to supplement.

2   So if there's supplemental information that needs to be

3   produced, you have to do that.  But also, you know, this

4   comes up a couple of different places, which is, you know, I

5   agree with you that the settlement is a final non-appealable

6   Order.  Nobody appealed from it.

7            So if there are exceptions to that that Mr.

8   Gwynne's trying to fit into, so be it.  It seems to me it

9   would be pretty narrow, but I, frankly, didn't follow it

10  either.  So work with him if you can; if you can't agree,

11  get me on the phone, explain it to me again using simple

12  words.  I'll do my best to make a decision.

13           MR. MCKANE:  Thank you, Your Honor.  That's all we

14  were going to ask, and we'll continue to work with the

15  parties to refine whatever language is necessary so that we

16  can submit a final proposed Order to Your Honor, hopefully,

17  later today.

18           THE COURT:  All right.  Well, I have nits to the

19  Order so we can go through those in a little bit.  But I

20  really view it as, obviously, two sides, and the Order now

21  bifurcates those sides a little more clearly, the T-side and

22  the E-side, of course, of the capital structure.

23           With regard to the T-side plan, I am happy to

24  approve the approved schedule.  Again, I have some comments,

25  but the schedule itself is fine.  There are issues -- they

1    are the PCRB issues, obviously, and the tax issues.  And the

2    tax issues may be significant; we'll have to see how things

3    continue to develop.

4         I am happy to approve the schedule as it exists,

5    really with the idea that this is a tax-free spin.  If the

6    data changes and it looks like it's going to be a taxable

7    transaction, I agree that as soon as we know that, some sort

8    of notice or information needs to be communicated to the

9    parties and we should have a status conference very shortly

10   thereafter, which we may need to rework the schedule.  I

11   don't know.  I'm not making an advance decision there.

12        But if we've got a significant shift to a taxable

13   transaction, and we've been talking about this now for over

14   two years, it's been an issue from day one and a big issue.

15   It's what made reorganizing these companies complicated --

16   one of the many things that's made reorganizing these

17   companies complicated from day one.  So you can't just sort

18   of say, hey, it's okay, it's not a big deal, we're switching

19   to a taxable transaction, don't worry about anything you've

20   been hearing about over the last two years.  Unless there's

21   some facts to back that up, and it sounds like there may be,

22   but that's a factual issue that might require some

23   discovery.

24        So even if the parties start now, which they're

25   going to have to start now, it's possible that the facts

1    will change in such a way that even given that, it may

2    require some change to the schedule if it turns out this is

3    going to be a taxable transaction.

4           So I'll approve the schedule now.  I'll allow that

5    discovery to start now.  However, in the event that it looks

6    like it's going to have to be a taxable transaction, I think

7    we're going to need to have a schedule.  And I will

8    reconsider at that time whether the schedule that's in place

9    now needs to be stretched out or not.  We'll figure that out

10   as we go along.

11          The change to the TMA being sort of filed, I

12   guess, in a slightly more detailed form or term sheet prior

13   to the disclosure statement hearing, I think is necessary as

14   well because even if we're in a tax-free world, the TMA

15   matters.  So there may be litigation over the TMA at

16   confirmation, and I think it's appropriate that people have

17   an idea of what they're shooting at sufficiently ahead of

18   time to be prepared.  I don't want to be hit with a TMA on

19   August 1st that's brand new to everybody in town and expect

20   them to be ready to have a contested confirmation hearing on

21   that on August 17th.

22          So the timing of the T-side is, in my mind, not a

23   problem.  I think it's sufficient.  It is actually a little

24   longer than contemplated by the RSA -- PSA, excuse me.  I

25   don't want to get my acronyms wrong.  The RSA is long gone

1     and we're in the funeral provisions of the PSA,

2     unfortunately, but we'll do the best we can under the

3     situation.

4            So let me just address, before I turn to the E-

5     side schedule, my issues that remain that affect the T-side.

6     The first is the coordination and request for discovery

7     through the committees; if not through the committees,

8     through some sort of ad hoc agreement of all the creditors.

9     Going to ruin your day, Mr. McKane, but I'm not going to

10    require that.  I think that, first of all, especially on the

11    T-side, we've narrowed the number -- well, maybe not as much

12    as we wanted to with how this has developed, but we've

13    narrowed the number of people that are going to have

14    discovery.  Even on the E-side, I think that the number of

15    creditors participating isn't necessarily as daunting as it

16    was before.

17           And given that the T-side committee now supports

18    confirmation, the E-side committee is sort of limited its

19    role under the E-side settlement to some very specific

20    provisions.  I think it's not fair or appropriate to require

21    people to work through them, and I think trying to get them

22    to reach some sort of ad hoc agreement before they serve

23    things on the Debtor is too complicated and unlikely to

24    result in agreement, so you're just going to have to deal

25    with the discovery responses as they come in.  So I'll

1    strike Paragraph 11 -- I think it's now Paragraph 11 of the

2    proposed schedule.

3            The other issue I have here is this very creative

4    attempt in what's Paragraph 9 now to say that if, for

5    whatever reason, the Debtors stumble on their path towards

6    confirming a T-side plan, that the ad hoc committee of first

7    lien Debtors can step into the shoes of the Debtors as if

8    they had filed their plan on May 1st for benefit of votes on

9    whatever their plan is, subject to same deadlines in the

10   Debtor's plan.  I just think that's inappropriate.  I don't

11   see how you can do that.

12           You can't deem a plan filed before it was actually

13   filed, especially with regard to having an approved

14   disclosure statement and then deem votes under one

15   disclosure statement under one plan to be deemed to be made

16   in connection with another plan, I simply don't believe is

17   appropriate.  So that may mean that if the Debtors stumble

18   on their path towards the T-side plan and the T-side

19   actually files their plan as a plan, as opposed to an

20   exhibit to a filing, and wants to go forward with that plan,

21   I'm not saying that can't happen, but it just won't work to

22   have it kind of scoop up what's left of the Debtor's plan

23   and move forward as if nothing has changed.

24           So it would require, you know, starting a new

25   schedule with regard to that plan where the issues, again,

1    would probably be extremely narrow and could proceed at a

2    decent clip, but I don't think that it's going to work as

3    it's set up.  So I would strike everything after actually

4    the redline deletion you have in Paragraph 9 now.  So

5    starting, if (a), the disclosure statement is not approved

6    as to the TCEH Debtors, et cetera, et cetera, to the end of

7    that paragraph would need to be stricken.

8              Those are my sole comments and rulings in

9    connection with the T-side scheduling orders, so I will

10   approve, as modified, the request.

11             With regard to Mr. Gwynne's comments.  As I said,

12   well, first of all, you know, I think you can give -- little

13   surprised these kind of issues are still out there, but I

14   know everybody's had a lot to do.  But I think the 11th, as

15   opposed to the 9th, to respond is not going to be a problem,

16   I assume.

17             MR. MCKANE:  No, Your Honor.

18             THE COURT:  Okay.  And we've talked about the

19   30(b)(6) issues.  I think that the amount of time to file a

20   motion to compel, seven days, I think that's sufficient.

21   Look, we're on a fast track to get to get this plan

22   confirmed, but we've been there before.  The issues have

23   been narrowed.  This is more time than the Bankruptcy Rules

24   contemplate, significantly more time than the Bankruptcy

25   Rules contemplate.  And if there's one thing bankruptcy

1    litigators know how to do, it's expedite a discovery.

2          So I know it's hard, it's expensive, it takes a

3    lot of effort, time, and money, but it's important that this

4    case move forward.  I think I can't stress enough how much I

5    agree with the Debtor's position that it is time to move the

6    T-side plan forward.  I have no regrets, and I don't think

7    the Debtors should have any regrets about the attempt to get

8    the plan that was confirmed in December confirmed and done.

9    I have no regrets about approving that confirmation.

10          I went in with my eyes open that it might not be

11    feasible.  Several people told me -- thank you, by the way,

12    for no "I told you so's" from any of the objectors.  There

13    were several people who said it wasn't feasible; it turns

14    out it wasn't.  But I have no regrets about that and it's

15    time to, you know, pick ourselves up and move forward.  This

16    case has been pending now for over two years, especially in

17    connection with the operating business, as opposed to the

18    holding company, that the T-side, I think it's time to move

19    the case forward.

20          There's a PSA in place that has a pathway for an

21    expedited solution to the T-side cases, and we're going to

22    go down that road.  Just like I did with the plan in

23    December, I'm going to hold people to the schedule.  Now

24    that's not saying that I'm not open to moving that.  And

25    I've already identified one issue, which is whether we're at

1    a tax-free spin or not.

2            There may be issues that arise.  I think cause is

3    an appropriate standard.  If you can show me why something

4    doesn't work, we'll fix it.  If you don't convince me that

5    it's a problem, we won't.  So I'm not sure how else to do

6    that.  It's certainly not putting too onerous a burden on

7    somebody who has a problem with the schedule I'm approving

8    to come in and make a showing as to why it's not working.

9    And if it's not working, we'll fix it.  And if it means more

10   time, it'll take more time, but I am committed to enforcing

11   what I'm going to approve today.

12           MR. MCKANE:  Thank you, Your Honor.  Just in terms

13   of locking down the dates, with regards to the request for a

14   disclosure statement hearing on June 15th, could we set a

15   time for that?

16           THE COURT:  Yes, as soon as I can -- sorry.  Just

17   so we're all clear, I'm not done.  We're just dealing with

18   the T-side stuff at this point, but I still have things to

19   say about the E-side.  Sorry, I'm just trying to -- yeah,

20   can we do the 16th?

21           MR. MCKANE:  Yes, Your Honor.

22           THE COURT:  At 10:00 AM?  I'll give you the

23   balance of the day.

24           MR. MCKANE:  Absolutely.  And then, Your Honor, in

25   that same vein, we had proposed an initial pre-hearing

1    conference, pretrial conference on July 20th.  Does that

2    date work for you?

3              THE COURT:  July 20th?

4              MR. MCKANE:  Sorry, July 20th.

5              THE COURT:  2-0.

6              MR. MCKANE:  2-0, I believe it's a Wednesday.

7              THE COURT:  I think so, hang on.  Yes.

8              MR. MCKANE:  And what time works for Your Honor?

9              THE COURT:  We'll do 10:00 AM.

10             MR. MCKANE:  Okay.  And then finally, Your Honor,

11   we had proposed for a final pretrial conference Monday, the

12   15th, and starting trial on Wednesday, the 17th.  Do those

13   dates work for you?  That's August.

14             THE COURT:  Yup.  I'm just checking here.  So you

15   want to start confirmation Wednesday, the 17th, and have a

16   final pretrial the 15th?

17             MR. MCKANE:  Yes, Your Honor.

18             THE COURT:  That's fine.  For that, shall we say

19   12:30?

20             MR. MCKANE:  12:30 for the pretrial?

21             THE COURT:  Yup.  So how many days for

22   confirmation should I set aside?

23             MR. MCKANE:  Your Honor, what we proposed, I

24   believe, is at the initial pretrial, we'll have a better

25   sense of the issues, and we'd propose a duration at that

1    point in time.  I think it's probably, hopefully, that

2    thought would be it's far enough out that your schedule

3    won't be completely logged; but at the same time, we'll have

4    a better idea of how many hours we might need.  Consistent

5    with our prior practice, we'd be proposing a block.

6              THE COURT:  Okay.  I'll block out some time just

7    to make sure it doesn't fill up.  But right now, it's wide

8    open.  That won't last, of course, but I'll block off some

9    time.

10             MR. MCKANE:  Thank you, Your Honor.

11             THE COURT:  So I'll block off, just so we know,

12   I'll definitely block off the week of the 17th, the 18th,

13   the 19th, and then the entire week of the 22nd, and then

14   we'll -- so we know those dates are on my schedule.  We'll

15   finalize it, or at least try to finalize it, on the pretrial

16   on July 20th.  Is that what we decided?

17             MR. MCKANE:  That's correct, Your Honor.

18             THE COURT:  Okay.  Mr. Kornberg has something he

19   wants to say.

20             MR. KORNBERG:  Your Honor, we understand your

21   ruling with respect to Paragraph 9.  But I think the two

22   last sentences of Paragraph 9 should remain in, even in

23   light of that ruling.

24             THE COURT:  Starting for purposes of Section 2.1?

25             MR. KORNBERG:  Correct, which goes to control over

1    the intercompany claim.  And then obviously the second

2    sentence is a reservation of rights.

3              THE COURT:  Okay, let me look at it.  Oh, yes, I'm

4    sorry.  Yeah, both those sentences can stay in.

5              MR. KORNBERG:  Thank you, Your Honor.

6              THE COURT:  Mr. Gwynne, did I miss something?

7              MR. GWYNNE:  Kurt Gwynne again, Your Honor, on

8    behalf of Bank of New York Mellon.  With respect to

9    Paragraph 18, there's language in there that precludes

10   discovery, quote, "on any topic that was resolved and

11   settled in connection with the settlement order," closed

12   quote.  I just want to make sure that Your Honor understands

13   what my issue was with that because it sounds like I didn't

14   do a very good job of explaining it.

15             THE COURT:  Okay, let me just -- give me a second.

16   I want to --

17             MR. GWYNNE:  Sure.

18             THE COURT:  Where does it say that?

19             MR. GWYNNE:  Paragraph 18 on Page 19 is where it

20   is.  I'm looking at the redline that was filed last night.

21   It's the overlap of prior discovery paragraph.

22             THE COURT:  Right.

23             MR. GWYNNE:  Nor shall participating parties seek

24   discovery on any topic that was resolved and settled.

25             THE COURT:  Okay.

1              MR. GWYNNE:  Your Honor, here's the issue.

2    Assuming up to Debtors, Debtor A and Debtor B, and they both

3    have -- well, you have Debtor A and Debtor B have different

4    creditor groups, okay?  And then assume that Debtors C and D

5    have claims against A and B, and those claims of C and D are

6    settled for $3.00.  So they had claims against those

7    entities, both Debtors C and D had claims against Debtors A

8    and B, the claims were settled for $3.00.  But there's no

9    indication of whether Debtor C's claims were settled.  I'm

10   doing a horrible job again.  Let me start over, Your Honor.

11             We don't challenge the settlement, and the

12   consideration for that settlement is the payment on the

13   first lien deficiency claim, and that's going to go to all

14   creditors on TCEH, except for the PCRBs.  But we're not

15   challenging the settlement.  We're not saying the Debtors

16   should have gotten more.  All we're saying is that the

17   consideration itself, now that there is a settlement and

18   Your Honor has approved it and it hasn't been appealed, that

19   we should not be precluded from sharing in the settlement.

20             The settlement that Your Honor approved doesn't

21   allocate the proceeds of the settlement.  It's the plan

22   support agreement and the plan that do that.  And our issue,

23   therefore, is not with the settlement itself.  But it's with

24   being precluded from sharing in the distribution on account

25   of the deficiency claim because that doesn't go to first

1      lien lenders, it goes to all the TCEH creditors, except us.

2                THE COURT:  Okay.

3                MR. GWYNNE:  So the discovery that we want to take

4      is we're saying, look, we're a TCEH creditor just like all

5      these other people and they get to share and we don't; why

6      is that?  And we were told there are two reasons, one of

7      which is because we didn't have claims against the TCEH

8      subsidiaries.  But we know that Mr. Kornberg's client had

9      those assets fully encumbered, so that can't be a basis to

10     treat us differently because there's no value there for the

11     other unsecured creditors.  The second basis that we're told

12     for treating us differently is that the TCEH subs actually

13     had some of the claims against Mr. Kornberg's client that

14     were settled.  In other words, they weren't all TCEH claims

15     that were settled, some were TCEH sub-claims.

16               And what we want to take discovery on is the

17     allocation of the settlement consideration among the TCEH

18     and the TCEH subsidiaries.  So we don't challenge the

19     settlement; we just challenge the fact that everyone else

20     can participate in the proceeds, but not us, and the bases

21     for that.  And if one of the bases for that is that some of

22     the claims that were settled were own by the TCEH subs, then

23     we just want to know, well, how much of the consideration --

24     when you settled, Debtor, how much of that consideration did

25     you believe was going to the TCEH sub-claims, how much did

1    you believe of that consideration was from TCEH.

2              THE COURT:  Okay, I understand.

3              MR. GWYNNE:  That's the issue, not challenging the

4    settlement itself.

5              THE COURT:  Mr. McKane?

6              MR. GWYNNE:  And this language, I think, would

7    preclude that discovery.

8              MR. MCKANE:  First of all, Your Honor, this

9    language is essentially an extension of language Your Honor

10   has had, which has been the message was always, if you took

11   discovery before, it's available to you now.  You can use

12   that now, but don't serve discovery on prior periods or

13   things that we've already litigated.  That's the purpose

14   really of Paragraph 18.

15             We will work with Mr. Gwynne to make clear the

16   discovery that you took specifically on the allocation issue

17   we just tried to articulate to you, he already asked those

18   questions of the DDs, right?  He can use those deposition

19   transcripts at trial, you know, to the extent he's going to.

20   Now I think the discovery that will be coming to you down

21   the road, but I'm going to try to resolve it if I can.  But

22   now's the time, the Order's not really the place to address

23   that issue.

24             Let me just be clear as I understand it.  The 550

25   is settlement for lien avoidance actions.  You remember the

1    official committee and the unsecureds brought more actions

2    against Mr. Kornberg's clients?  The 550 is in lieu of the

3    settlement of that.  Where are those liens?  Those liens are

4    where the assets are.  The assets are not at TCH.  The

5    debt's at TCEH, the assets are at subs below TCEH.  Mr.

6    Gwynne, for better or worse, is up at TCH with everybody

7    else.  That creates the disparity that he has a problem

8    with.  We'll deal with the discovery and if we have to,

9    we'll brief it for you, but that's the underlying basis for

10   all of this.

11                THE COURT:  All right.  Well, I think we can -- I

12   think I'm comfortable preserving Mr. Gwynne's ability to ask

13   for this, and certainly your ability to object.  So there's

14   certainly nothing, I'm not pre-judging today the issue.

15                MR. MCKANE:  Understood.  Thank you, Your Honor.

16                THE COURT:  Oh, and then the limitation on

17   depositions.

18                MR. MCKANE:  The 10?

19                THE COURT:  Yeah, the 10.  The problem with this

20   is that my question for you is, is this supposed to be 10

21   for T-side, 10 for E-side, or is this supposed to be 10 for

22   everybody?

23                MR. MCKANE:  No, this was -- this limitation,

24   again, on the depositions, this is a legacy of when we had a

25   joint plan and a joint hearing.  It would be 10 and 10.

1           THE COURT:  Okay, because it doesn't say that.

2           MR. MCKANE:  We'll specify that, Your Honor.

3     We'll make that clearer because we were trying to -- we'll

4     clarify.

5           THE COURT:  Okay.  Anybody with anything else on

6     the T-side?  Okay.  That turns us to the E-side schedule.

7     You know, coming into the hearing today, I was very

8     sympathetic to this argument that the plan on the T-side is

9     not sufficiently gelled, it's not sufficiently detailed

10    enough that it would be appropriate to schedule -- to put a

11    schedule in place.

12          We simply don't know, we don't know if there's

13    going to be new money infusion by existing E-side creditors

14    -- that's still in flux.  We don't know if there's going to

15    be a sale-type transaction with NextEra or some other type

16    of utility.  We don't know if somebody can resurrect the

17    restructure, if it's even doable with the Treasury

18    regulation changes, I don't know.  And it's still, of

19    course, any kind of restructure would still face the

20    uncertainties that doomed the previous restructures, so I

21    don't know if that's resurrectable or not, so there's a lot

22    of unknowns.

23          And while I appreciate that the Debtors have, in

24    effect, filed a toggle plan, to use that now-dirty word,

25    that preserves that optionality.  I was very concerned that

1    there just wasn't enough detail to move forward, and I

2    wasn't inclined to issue an Order today setting up an E-side

3    schedule.  I had some significant concerns.

4          I still am wary of setting up an E-side schedule,

5    but I think it is significant -- highly significant -- that

6    the Debtors have the support, at least as to a schedule with

7    certain and significant reservations, but have the support

8    of the EFIH second lien trustee, Computershare, the PIK

9    notes trustee, and Fidelity, that are not objecting to the

10   schedule, entry of a schedule today, and are willing to go

11   forward.  They obviously have their own issues.

12         It's significant that the next -- they have this

13   objection to that was resolved.  I really don't think that

14   the Fenicle and Fahy objections go to as much setting up a

15   schedule at all for the E-side, as opposed to reserving

16   their rights to participate fully in discovery, which, of

17   course, they have.  The E-side official committee has taken

18   no position.  So we're really left with two significant and

19   important objecting creditors, American Stock Transfer and

20   Contrarian, and they raise some issues that give the Court

21   pause.

22         However, given the weight of creditor support in

23   setting up a plan process for the E-side, I am going to

24   overrule those objections and set up the plan process that's

25   been proposed.

1              Having said that, this schedule is not going to

2       have -- I'm going to enforce it, but it does not have near

3       the momentum that the T-side schedule has.  It much more

4       likely if significant events develop, it will have to

5       rethink the schedule.  Also, if things don't develop, we may

6       have to reset the schedule.  If we are moving down this

7       schedule and there's still not any meat on what the options

8       are, and there's no meat and there's no meat and there's no

9       meat, you know, at some point, we either have to know what's

10      going to happen or we're going to have to stop and reset.

11             So I will set it today.  It will continue to be

12      enforced today.  However, it's going to need to develop

13      further with more detail in order to stay on the schedule.

14      Or if there are significant issues that derail it for other

15      purposes, I'll consider those at this time.  So it's a soft

16      schedule, I guess, is the way to put it, but it's a schedule

17      nonetheless.  I think that how old the case is, how much

18      money has been spent, how the issues really haven't changed

19      -- they've narrowed, I think is appropriate -- and, you

20      know, the fact that schedules move parties.  And things have

21      had to happen as this case has developed and, again, I don't

22      have any regrets about how it's happened.  We had to have

23      that legacy discovery.  It cost a gajillion dollars -- and

24      I'm not going to spell that for the record -- the court

25      reporter will have to figure out how to spell gajillion.

1          It's cost a lot of money; it took a lot of time,

2     but it had to happen.  If it shaped how the case developed,

3     the case has developed appropriately.  We have the inter-

4     company settlement agreement that was struck and had been

5     approved.  Things have continued to narrow, and I think it's

6     appropriate to continue to keep people on sort of pace to

7     get these cases confirmed.

8          We don't quite have the urgency of reorganizing an

9     existing business, like we do with the T-side, when we're

10    reorganizing the E-side, which is more of a holding company

11    structure obviously.  And Oncor has stated their operations

12    aren't directly affected by what happens in this court

13    because of the ring fencing.  But I think that nonetheless,

14    we should go forward with the schedule as outlined.

15         So that leaves open some dates, right, that need

16    to be filled in?  When's the disclosures?

17         MR. MCKANE:  Your Honor, we had proposed that

18    there be a disclosure statement hearing on Thursday, July

19    21st for the E-side.  Just wonder if that works for Your

20    Honor?

21         THE COURT:  Yes.

22         MR. MCKANE:  Okay.  10:00 AM, Your Honor?

23         THE COURT:  Yes.

24         MR. MCKANE:  Then we had proposed Friday,

25    September 9th as the date for an initial pretrial

1   conference?

2            THE COURT:  Okay.

3            MR. MCKANE:  At 10:00 AM?

4            THE COURT:  Yup.

5            MR. MCKANE:  Very good.  And then for a final

6   pretrial conference, we had proposed Friday, the 23rd, with

7   trial to start the following Monday, the 26th, if that

8   worked for you.

9            THE COURT:  Yes.

10           MR. MCKANE:  And we'll set both start times as

11  10:00 AM?

12           THE COURT:  Yes.

13           MR. MCKANE:  Thank you, Your Honor.  And I will

14  set aside -- all right, no wait, 23rd won't work, right?  I

15  think we've got a religious holiday there.  Maybe not.  No,

16  we're okay, the 23rd's okay.

17           MR. MCKANE:  Your Honor, we've already scrubbed

18  that.

19           THE COURT:  Yeah, it's okay.  I have little

20  symbols and I just got confused.  All right, so confirmation

21  the 26th.  I will pencil in that whole week.  Now we do have

22  a problem the next week, right?  October 3rd is Rosh

23  Hashanah.

24           MR. MCKANE:  We do.

25           THE COURT:  I'm not going to pencil anything else

1    in until -- well, I better.  I'm just going to schedule that

2    week for now.  We'll have the -- the scheduling gets a

3    little more complicated as we move into October.  I have

4    some time already where I might be out of the office and we

5    have the religious holidays to deal with, as well as the

6    non-religious holidays.  We have Columbus Day to deal with,

7    so we'll pin that down with more specificity at, I guess, at

8    the pretrial in early September.

9                MR. MCKANE:  And, Your Honor, if there are events

10    along the way, obviously, we can address that as well.

11                THE COURT:  Yup.

12                MR. MCKANE:  Thank you, Your Honor.

13                THE COURT:  All right.  So you'll mark it up and

14    send it over to under COC.

15                MR. MCKANE:  Yes, sir.

16                THE COURT:  Okay.  Anyone else on scheduling?

17    Yes, Mr. Hogan?

18                MR. HOGAN:  Your Honor, I just want to be clear

19    that that coordination issue that you mentioned on the T-

20    side is going to be taken out of the E-side relative as

21    well.

22                THE COURT:  Yes, it is.

23                MR. HOGAN:  Thank you.

24                THE COURT:  Yes, it is.  Sorry, Mr. McKane.  Okay,

25    I now have to pivot or toggle to Mr. Husnick and an issue

1    with the supplemental bar date, most of which most of you

2    probably don't care.  So we're going to take a recess to

3    allow the Courtroom to clear.  If you are going to stick

4    around, please be respectful of the fact that there's a

5    contested matter going forward.  So 10 minutes, Mr. Husnick,

6    and then we'll go forward.

7              MR. HUSNICK:  Thank you, Your Honor.

8              (Recess)

9              CLERK:  All rise.

10             THE COURT:  Please be seated.  Okay, Mr. Husnick.

11             MR. HUSNICK:  Good afternoon, Judge Sontchi.  Chad

12   Husnick from Kirkland & Ellis appearing on behalf of the

13   Debtors.  Your Honor, the second item on the agenda today is

14   the Debtor's motion to establish a supplemental bar date and

15   procedures for setting further supplemental bar dates.  I

16   don't know whether to be sad or what not but I clearly don't

17   have the respect that Mr. McKane and Mr. Kieselstein do, but

18   hopefully, we can be very brief on this.

19             Your Honor, we filed this motion because the

20   company identified 90 additional parties that they had

21   inadvertently omitted from their schedules.  These were all

22   co-defendants in pending asbestos litigation.  These are not

23   the asbestos Plaintiffs themselves, but instead are the co-

24   defendants.  With respect to these types of claims, it is

25   arguable, at least, perhaps conclusory that these are known

1    Creditors and are therefore entitled to actual notice.  So

2    while we ran an incredibly comprehensive constructive notice

3    program for parties who are in pending litigation, you will

4    note they have not actively filed a cross-claim, it's

5    possible that they could argue that they're known Creditors.

6    So that's the purpose of establishing the supplemental bar

7    date.

8              We followed very closely -- you may remember, in

9    setting the original bar date, there was a provision that

10   said if you've amended your schedules, you'd serve the

11   amended schedules on the parties and then there are 30 days.

12   Perhaps that would have been the shorter and more

13   appropriate way to do this, but we wanted to at least

14   affirmatively file notice so that everybody knew what we

15   were doing vis-à-vis the supplemental bar date.

16             Your Honor, we would expect this to be relatively

17   straightforward but as with all bar date issues in this case

18   it is contested.  The objectors are arguing that the

19   supplemental bard date should be be denied because they are

20   not--we are not simultaneously extending the unmanifested

21   claims bar date. I would start by saying there's no standing

22   for parties who filed a proof of claim to ask to have the

23   deadline that they've already met further extended for other

24   parties who didn't meet the deadline.  So that's what we

25   have here, when they're asking for a subsequent or a

1    simultaneous extension.  What they're really after is just

2    re-litigating the due process arguments that the Court has

3    already heard and rejected four times in the case, and I'm

4    sure we'll hear again in connection with confirmation of the

5    plan the second time around.

6            Your Honor, those points are -- were well-briefed.

7    It's the law of the case that we can satisfy due process at

8    least on the prospective basis, and we have satisfied the

9    due process by running that lengthy plan.  So we're really

10   only focused on these claims, and what I'm saying here is

11   the unmanifested claims like Mr. Hogan's clients, are

12   unknown Creditors.  They have now filed a proof of claim, so

13   we have them, and they're getting service of the papers as

14   we filed them.  The Creditors that we've identified for the

15   supplemental bar date are arguably known Creditors, so

16   there's a very big difference between the two categories.

17   One, arguably, the bar date is completely irrelevant to them

18   because they could take the position that they were a known

19   Creditor and therefore needed to obtain actual notice.  So

20   we're resolving that problem.  We're not affecting in any

21   way the asbestos bar date or the asbestos claimants

22   themselves.  It's frankly irrelevant whether or not these 90

23   potentially known Creditors actually received constructive

24   notice, so that's why we're doing this.  Unless Your Honor

25   has any questions, that's all I have to offer on this.

1          THE COURT:  All right, thank you, Mr. Husnick.

2     Mr. Hogan?

3          MR. HOGAN:  Thank you, Your Honor.  Let me start

4     by telling you what you're not going to hear.  You're not

5     going to hear the due process argument.  We understand that,

6     okay?  But let's talk about the motion itself.  This motion

7     was filed in a quiet period of this case, early April.  The

8     plan -- the confirmed plan hadn't yet been derailed.  The

9     motion for 90 subsequently identified parties is clear in

10    that the notice lists all 71 Debtors.  That's interesting,

11    even though we've been told that the asbestos liabilities

12    lay on the E-side.  What the motion doesn't do is the motion

13    doesn't tell us who the 90 subsequently identified parties

14    are.  No idea.  In response to that, in accordance with the

15    Delaware way, I reached out informally to Debtors' counsel

16    to find out who they were.  I received an email outlining

17    six cases that related to these 90 subsequently identified

18    parties, and laid out for me whether they were included in

19    schedules or not included in schedules.

20          We drilled down on that, Your Honor, to get a

21    sense of what it was that these claims were.  As it turns,

22    there were six asbestos-related matters.  Asbestos was never

23    mentioned anywhere in the original motion to identi -- for

24    these subsequently identified parties, again, we don't know

25    who they are, and five of the cases were cases that were

Page 99

1    included in the Debtors' schedules and statements.  In only

2    one instance, they were inadvertently left off the schedules

3    and the statements.  We accept that, Your Honor.  Things

4    happen.  Without identifying who the 90 were, the Debtors

5    informed me that they were co-defendants in litigation

6    matters, which were in their schedules, with the exception

7    of the one claim that wasn't in their schedules, and in that

8    claim, there are 25 co-defendants.  And so, we can surmise,

9    predicated on the representations given to us by Debtor, who

10   25 of the 90 claimants are.  We reviewed the other five to

11   get a sense of what those claims were, and what the status

12   of those claims were, and we had to drill down not just in

13   the Bankruptcy docket, but had to go to State Court docket

14   to get a sense of what these things were.

15           The first case is a George Cordress vs. Energy New

16   Orleans and other parties.  That case lists 55 co-

17   defendants.  The second case, Cleon Edwards, this being the

18   case that wasn't included the schedules, listed 25 co-

19   defendants, so we can surmise who those 25 are.  Jimmy

20   (indiscernible) vs. AVB Inc., et al., 44 defendants.  Craig

21   Phillips vs. 84 Lumber, et al., 33 defendants.  Maybe

22   literal, 69 co-defendants.  And then finally, Wilma May

23   Shepherd vs. 4520 Corp, et al., 98 co-defendants.  So in

24   short, Your Honor, we found, from our review of these six

25   litigation matters, that there are approximately 300 co-

1    defendants in these six cases, averaging approximately 50

2    per case.  With the exception of the 25 defendants that we

3    were able to identify by virtue of the one claim that wasn't

4    scheduled, we have no way to discern who the 90 co-

5    defendants are.

6              Now, you're sitting there and you're wondering,

7    why do I care?  It's a fair question.  In this case, the

8    Debtors have told us from the get-go that I think there were

9    341 or 391 asbestos claims that they scheduled when this

10   case was filed.  We now know, from other litigation in the

11   District Court, that there were over 32,000 asbestos cases--

12   claims that have been filed in this case, manifested and

13   unmanifested.  We think that the purpose of this motion is

14   something in the nature of a Trojan horse, Your Honor.  We

15   need to know who the 90 co-defendants are, we'd like to know

16   with specificity.  Their claims agent isn't here to testify

17   to tell us who they are, of these 300.  We don't know if

18   these 90 co-defendants are going to look to assert claims

19   not just in the six matters that they listed and told us,

20   these are the co-defendants, but whether these 90 co-

21   defendants are also going to assert claims for contribution

22   and indemnity predicated on the 32,000 unmanifest -- or

23   32,000 claims that have been asserted in this case.

24             And so, we're trying to understand, Your Honor,

25   who these people are, who these co-defendants are, with

1    particularity, and whether these claims -- because it's not

2    90 claims, it's not 90 subsequently identified claims, it's

3    90 subsequently identified parties, and each of those

4    parties could have numerous claims, a contribution and an

5    indemnity in each of those cases.  And so, those are the

6    reasons that we have objected to this.  We need to

7    understand how these claims affect the claims of the

8    asbestos claimants.  The one case that the Debtor cited as a

9    basis for this is this A321 Systems case, the Delaware -- a

10   bankruptcy case.

11          And I looked at that case, Your Honor.  In that

12   case, the predicate for this subsequent bar date was, they

13   had noted, the Debtors, that certain parties did not receive

14   the bar date notice.  We don't have that here, Your Honor.

15   We have -- we have -- using the Debtor's very language, may

16   not have received the notice.

17          We're entitled to know -- five of the six were

18   scheduled.  Notices and suggestions of bankruptcies were

19   filed in five of the six, and most importantly, Your Honor,

20   and this is curious, of the six cases that they listed,

21   voluntary dismissals have been filed as to the Debtor,

22   whichever Debtor it might be, and in one case, EECI, and the

23   other case, EFCH, voluntary dismissed a notice of non-suit,

24   and voluntary dismissed notice of non-suit.  So in two of

25   the four cases, it appears that the Debtor is not even --

1    doesn't even have a claim on it -- against them, predicated

2    on those cases.

3            So, that's the basis of our objection, Your Honor.

4    We're just trying to drill down and understand what it is

5    the Debtor is trying to do by articulating a motion that

6    says they have 90 identified parties but then they're

7    unwilling to tell us with specificity who those 90 are.  We

8    would like to send for an evidentiary hearing so that we can

9    -- we can cross-examine the notice agent and find out

10   exactly who these parties are.  Thank you.

11           THE COURT:  Thank you, Mr. Hogan.

12           MR. HUSNICK:  Your Honor, it sounds to me like --

13   I'll follow up with the client on 300 versus 90, but

14   frankly, we absolutely do not need an evidentiary hearing to

15   establish a bar date.  The entire purpose of running a bar

16   date process is if a party wants to file a claim, then

17   parties know who that party is -- other parties in the case

18   know who that claimant is, what their asserted claim is, and

19   if they don't file a proof of claim, then their identify is

20   completely irrelevant.

21           All that said, I don't really have a visceral

22   reaction to giving a list of the claimants to -- to my

23   knowledge, I'm not sure it was ever requested, but if it

24   was, we can give a list of the names of the co-defendants.

25   It's public record who they are.  We've identified what the

1    cases are, so he's clearly been able to go to the record and

2    look, and we'll identify the last one.  So I think this is -

3    - this identity of the claimants is a red herring that

4    they're trying to drum up, knowing exactly what the

5    substance of the claims is.  That's what we do a bar date

6    for.

7              As to all 71 Debtors, I rarely file a bar date

8    motion that doesn't include all of the Debtors, lest I'm not

9    getting the full benefit of setting a bar date for all of

10   the Debtors.  So, the fact that the vast majority of the

11   asbestos claims in this case have been at the select three

12   or four Debtors that we talked about on the E-side of the

13   confirmation hearing is completely irrelevant to setting a

14   bar date and making sure that we encompass all the Debtors.

15   So with that, Your Honor, I request that the order be

16   entered.

17             MR. HOGAN:  Your Honor, we're most concerned about

18   the ability of these 90 subsequent -- subsequently

19   identified parties to assert claims outside of the six that

20   were identified by the Debtors.  If we could limit it to

21   those six, then we understand, but without any clarity as to

22   what's intended and whether these parties will now have the

23   ability to assert what effectively is an asbestos claim for

24   contribution, and other claims that have already been filed

25   outside of the six that they've identified as where they

1    found the subsequently identified parties.

2              THE COURT:  Yeah.

3              MR. HOGAN:  Okay?  Thank you.

4              THE COURT:  You're welcome.  Well, I'm going to

5    overrule the objection and grant the motion.  I think this

6    is a routine motion.  Indeed, you know, setting of a bar

7    date, provided that certain notice requirements are met with

8    regard to how far out the notice goes out, et cetera,

9    doesn't even require a hearing, let alone an evidentiary

10   hearing.  So I don't think it's necessary or appropriate to

11   require an evidentiary hearing.

12             I am going to require that the Debtors provide Mr.

13   Hogan with a complete list of the 90 parties that'll be

14   receiving notice of the supplemental bar date.  I don't

15   think he's entitled to -- well, he may not be entitled to

16   that, but he's certainly not entitled to anything more in

17   connection with the supplemental bar date, and to the extent

18   that there were issues raised in the objection about

19   extending the time for the unmanifested bar date that's

20   already been set by the Court, just so the record's clear, I

21   reject those arguments.

22             I've rejected them previously.  Those rulings are

23   law of the case and I won't revisit them here.  But the

24   objection as articulated in Court today is overruled for the

25   reasons I just set forth.  So, if you have an order, Mr.

1    Husnick, I'll sign it.

2            MR. HUSNICK:  I do, Your Honor.  May I approach?

3            THE COURT:  Yes, you may, and then if you get Mr.

4    Hogan that list, I'd appreciate it.

5            MR. HUSNICK:  I'm sorry, Your Honor, I didn't hear

6    what your --

7            THE COURT:  Oh, if you'll get -- I'm sorry, if

8    you'll get Mr. Hogan that list, I'd appreciate it.

9            MR. HUSNICK:  Oh, yes.  Yes, sir, I will.

10           THE COURT:  I've signed the order.

11           MR. HUSNICK:  Thank you, Your Honor.  That's all

12   the Debtors have for today.

13           THE COURT:  Very good, we're adjourned.

14

15                        * * * * *

16

17

18

19

20

21

22

23

24

25

Page 106

1                              **I N D E X**

2

3                              RULINGS

4    DESCRIPTION                              PAGE        LINE

5

6    American Stock Transfer and              104         18

7    Contrarian Objections Overruled

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6      Sonya
                          Digitally signed by Sonya Ledanski
                          Hyde
                          DN: cn=Sonya Ledanski Hyde, o, ou,
       Ledanski Hyde      email=digital1@veritext.com, c=US
7                         Date: 2016.05.24 15:14:24 -04'00'

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  May 24, 2016