**Exhibit A**



**Deloitte & Touche LLP**
JPMorgan Chase Tower
2200 Ross Avenue, Suite 1600
Dallas, TX 75201-6778
USA

Tel: +1 214 840 7000
www.deloitte.com

April 5, 2016

Ms. Billie Williamson
Chairperson of the Audit Committee
The Audit Committee of Energy Future Holdings Corp.
Energy Plaza
1601 Bryan Street
Dallas, TX 75201

Mr. Paul Keglevic
Executive Vice President and Chief Financial Officer
Energy Future Holdings Corp.
Energy Plaza
1601 Bryan Street
Dallas, TX 75201

Dear Ms. Williamson and Mr. Keglevic:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as the independent registered public accounting firm for each of the following companies; Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and Energy Future Competitive Holdings Company LLC,(collectively, "EFH") and Texas Competitive Electric Holdings Company LLC ("Subsidiary"), as listed on Appendix A (collectively "EFH and Subsidiaries", the "Company" or "you" or "your"). Mr. Tom Kilkenny will be responsible for the services that we perform for the Company hereunder.

In addition to the audit and review services we are engaged to provide under this engagement letter, we would also be pleased to assist the Company on issues as they arise throughout the year. Hence, we hope that you will call Mr. Kilkenny whenever you believe D&T can be of assistance. This assistance will require approval by Energy Future Holdings Corp.'s audit committee (the "Audit Committee") in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

Member of
**Deloitte Touche Tohmatsu**

**Audit of EFH and Subsidiaries' Financial Statements and the Effectiveness of EFH and Subsidiaries' Internal Control over Financial Reporting**

Our engagement is to perform an integrated audit in accordance with the standards of the Public Company Accounting Oversight Board (PCAOB) (United States) (the "PCAOB Standards"). The objectives of an integrated audit conducted in accordance with the PCAOB Standards are the expression of opinions on (1) the fairness of the presentation of EFH and Subsidiaries' financial statements for the year ending December 31, 2016, in conformity with accounting principles generally accepted in the United States of America ("generally accepted accounting principles"), in all material respects and (2) the effectiveness of EFH and Subsidiaries' internal control over financial reporting as of December 31, 2016, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Framework").

Appendix B contains a description of an integrated audit in accordance with the PCAOB Standards.

Our ability to express any opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our reports. If, for any reason, we are unable to complete any of our audits or are unable to form or have not formed any opinion, we may decline to express any opinion or decline to issue any report as a result of this engagement. If we are unable to complete any of our audits or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Audit Committee and EFH and Subsidiaries' management.

In connection with the Subsidiary's anticipated initial filing with the Securities and Exchange Commission ("SEC") of a registration statement on Form S-1 on or about April 15, 2016 to register for resale the shares of Subsidiary common stock and rights to receive payments under a tax receivable agreement, and any related amendments thereto (the "Registration Statement"), the Subsidiary's management has informed us that the Subsidiary intends to include the audited financial statements of Subsidiary as of December 31, 2015 and 2014, and for each of the three years in the period ended December 31, 2015 (collectively, the "Subsidiary financial statements"), and D&T's report thereon, in the Registration Statement. In connection therewith, the Subsidiary is engaging us to perform procedures that would enable us to reissue our report on the financial statements for inclusion in the Registration Statement.

Our willingness to reissue our report, and the wording thereof, should we issue such report, will be dependent on the facts and circumstances existing at the date we complete the procedures. If we are unable to complete the procedures, we will not be in a position to reissue our report. If we conclude that we will not be able to reissue our report, or if our report requires modification, the reasons for this will be discussed with the Subsidiary's Board of Managers (the "Board of Managers") and the Subsidiary's management. Accordingly, this engagement should not be construed as constituting our agreement to be associated with the offering of securities referred to above or the Registration Statement. Additionally, if we are unwilling to reissue our report related to December 31, 2015 and 2014, we may be unwilling to issue a report under the PCAOB standards for the year ending December 31, 2016 and an amendment to this engagement letter may be necessary.

**Reviews of Interim Financial Information**

We will also perform a review of EFH's condensed interim financial information (the "interim financial information") in accordance with the PCAOB Standards ("interim review") for each of the quarters in the year ending December 31, 2016, prepared for submission to the Securities and Exchange Commission (SEC). The objective of an interim review is to provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles. The objective of an interim review is also to provide us with a basis for determining whether we are aware of any material modifications that, in our judgment, should be made to management's disclosures about changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect EFH's internal control over financial reporting for management's certifications to be accurate and to comply with the requirements of Section 302 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations.

Appendix B also contains a description of an interim review in accordance with the PCAOB Standards.

If we become aware of material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles, or if we become aware of deficiencies in internal control over financial reporting so significant that they would preclude management's preparation of interim financial information in conformity with generally accepted accounting principles, we may be precluded from completing any of our reviews. If, for any reason, we are unable to complete any of our interim reviews, the reasons for this will be discussed with the Audit Committee and EFH's management.

**Management's Responsibilities**

Appendix D describes management's responsibilities.

**Audit Committee's Responsibility and Auditor Communications**

As the independent registered public accounting firm of EFH and Subsidiaries we acknowledge that the Audit Committee is directly responsible for the appointment, compensation, and oversight of our work, and accordingly, except as otherwise specifically noted, we will report directly to the Audit Committee for EFH and Subsidiaries. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

Under the PCAOB Standards, SEC Rule 2-07 of Regulation S-X we are required to communicate with the Audit Committee about various matters in connection with our audits and interim reviews. Appendix E describes such communications.

**Fees**

We anticipate our fee to be approximately $6,000,000, which includes a base audit fee of $4,190,000 and fees related to additional procedures expected to be performed with respect to the audit and review services due to the continuation of the chapter 11 cases.  These services may include additional audit procedures as well as "Out of Scope" services such as accounting and financial reporting research and consultation services related to the restructuring and emergence transactions and related financing activities customarily provided by the independent auditor as may be required in large and complex chapter 11 cases like the Company's cases that were not specifically contemplated in the base audit fee.

D&T will charge the "base audit" hourly rates set forth below for the additional audit procedures required by the bankruptcy, and the Out of Scope Services will be billed at the "consultation" hourly rates set forth in this table.

| Personnel Classification | Applicable Hourly Rates (base audit) | Applicable Hourly Rates (consultation) |
| --- | --- | --- |
| Partner/Principal/Director | $ 365 | $ 720 |
| Senior Manager | $ 290 | $ 620 |
| Manager | $ 265 | $ 540 |
| Senior Staff | $ 215 | $ 425 |
| Staff | $ 175 | $ 350 |

In addition, engagement-related expenses, including travel, report production, delivery services, and other expenses incurred in providing the services, will be included in the total amount billed.

The fees for this engagement are dependent upon the timing and form of the Company's emergence from bankruptcy expected to occur in mid-2016.  The fee is representative of all reporting entities listed in Appendix A, and due to the uncertainty of the timing of emergence from bankruptcy and the form of the transaction, does not contemplate changes in scope which may be required.  Future changes in scope that may result in an adjustment to the fee include: (1) a reduction in fees related to the removal of certain SEC Registrants (quarterly review and annual audits), (2) reduction in fees related to entity simplification, and (3) increases in fees due to the addition of financial reporting under the AICPA standards for newly created entities under the Company's plan of reorganization (AssetCo LLC and PrefCo).

The fees for this engagement would ordinarily be billed according to an agreed upon schedule.  However, while the Company is operating under the purview of the Bankruptcy Court, the timing of billings will be subject to the fee application process of the Court.  Bankruptcy related audit procedures and Out of Scope services described above will be billed as incurred.

Our estimated fees are based on certain assumptions, including (1) the continued financial statement filing requirements of all entities included within this engagement letter, (2) timely and accurate completion of the requested entity participation schedules and additional supporting information (3) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (4) the effectiveness of internal control over financial reporting throughout the period under audit, (5) a minimal level of audit adjustments (recorded or unrecorded), and (6) no changes to the timing or extent of our work plans.  We will notify you promptly of any circumstances we encounter that could significantly affect our estimates and discuss with you any additional fees, or fee reductions which could become necessary as a result of bankruptcy emergence transactions, as necessary.

Notwithstanding anything herein to the contrary, EFH will compensate D&T for invoices submitted in connection with this agreement (a) only after D&T's engagement by EFH has been approved by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to section 327(a) of the Bankruptcy Code and (b) in accordance with any order entered by the Bankruptcy Court governing the compensation or reimbursement of fees of parties employed pursuant to section 327(a) of the Bankruptcy Code.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Company intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with the SEC or other regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Company agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Company also agrees that its management will notify us and obtain our approval prior to including any of our reports on an electronic site; provided, however that such notification and approval shall not be required to the extent that D&T has previously approved the inclusion or incorporation by reference of its reports in a document, in the public domain, that is subsequently or contemporaneously posted on the Company's corporate electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Company. Any request by the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

## Requests for Production of Documents or Information

The Company acknowledges its obligations under the waiver agreement relating to D&T's cooperation with the PCAOB and the SEC under Sections 102 and 106 of the Sarbanes-Oxley Act of 2002.

**Other Services**

If the PCAOB, during their annual inspection process of D&T, selects D&T's audit of EFH and subsidiaries' financial statements for the year ended December 31, 2016, we agree to use commercially reasonable efforts to notify you, within 5 days of Mr. Kilkenny receiving notification of such inspection.

* * * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Company or the Audit Committee request, and should D&T agree to provide, services (including audit services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through G attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

Energy Future Holdings Corp. confirms that it has the power and authority to execute this agreement on behalf of, and to bind, Energy Future Competitive Holding Company LLC, Energy Future Intermediate Holdings Corp. and Texas Competitive Electric Holdings Company LLC.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Acknowledged and agreed to on behalf of
the Audit Committee of Energy Future Holdings Corp.:

By: _Billie M. Williamson_

Title: _AUDIT COMMITTEE CHAIRMAN_

Date: _4/6/16_

Accepted and agreed to by Energy Future Holdings Corp.

on behalf of itself, Energy Future Competitive Holdings Company LLC, Energy Future Intermediate
Holding Company LLC. and Texas Competitive Electric Holdings Company LLC:

By: _____

Title: _EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER_
      _AND CO-CHIEF RESTRUCTURING OFFICER_

Date: _4/11/16_

cc: Board of Managers of Energy Future Competitive Holdings Company LLC, Energy Future
    Intermediate Holding Company LLC, and Texas Competitive Electric Holdings Company LLC

7

**APPENDIX A**

**DESCRIPTION OF REPORTING ENTITIES**

This Appendix A is part of the engagement letter dated April 5, 2016 between Deloitte & Touche LLP and Energy Future Holdings Corp. and acknowledged and agreed to by the Audit Committee of Energy Future Holdings Corp.

This engagement letter applies to the following reporting requirements of Energy Future Holdings Corp. and its subsidiaries:

| REPORTS | EXPECTED COMPLETION DATE |
|---|---|
| Annual Reports on Form 10-K: | February  2017 |
| • Energy Future Holdings Corp. (a) | |
| • Energy Future Competitive Holdings Company LLC (a) | |
| • Energy Future Intermediate Holding Company LLC (a) | |
| • Texas Competitive Electric Holdings Company LLC (b) | |
| Quarterly Reports on Form 10-Q: | May 2016, August |
| • Energy Future Holdings Corp. (a) | 2016, November |
| • Energy Future Competitive Holdings Company LLC (a) | 2016 |
| • Energy Future Intermediate Holding Company LLC (a) | |
| Annual Reports on Internal Control over Financial Reporting: | February  2017 |
| • Energy Future Holdings Corp. (a) | |
| • Energy Future Competitive Holdings Company LLC (a) | |
| • Energy Future Intermediate Holding Company LLC (a) | |
| • Texas Competitive Electric Holdings Company LLC (b) | |

(a) Integrated audit and reviews of interim information performed under the PCAOB Standards, described in Appendix B.

(b) Integrated audit performed under the PCAOB Standards, described in Appendix B, expected to be performed in connection with the Company's Registration Statement and subsequent amendments thereto.

**DESCRIPTION OF AN INTEGRATED AUDIT AND INTERIM REVIEW IN ACCORDANCE WITH THE PCAOB STANDARDS**

This Appendix B is part of the engagement letter dated April 5, 2016 between Deloitte & Touche LLP and Energy Future Holdings Corp. and acknowledged and agreed to by the Audit Committee of Energy Future Holdings Corp.

## Components of an Integrated Audit

An integrated audit includes the following:

- Examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements

- Inquiring directly of the Audit Committee regarding (1) its views about fraud risks in EFH and Subsidiaries, (2) whether it has knowledge of any actual, suspected, or alleged fraud affecting EFH and Subsidiaries, and (3) whether it is aware of tips or complaints regarding EFH and Subsidiaries' financial reporting (including those received through any internal whistleblower program, if such program exists) and, if so, its responses to such tips and complaints

- Assessing the accounting principles used and significant estimates made by management

- Evaluating the overall financial statement presentation

- Examining, on a test basis, evidence supporting the design and operating effectiveness of EFH and Subsidiaries' internal control over financial reporting

- Evaluating the effectiveness of EFH and Subsidiaries' internal control over financial reporting

An integrated audit does not include the performance of any procedures with respect to EFH and Subsidiaries' financial information in an interactive data format using eXtensible Business Reporting Language (XBRL). Any procedures that EFH requests D&T to perform related to any such XBRL interactive data would be described in a separate engagement letter.

## Reasonable Assurance

The PCAOB Standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about (1) whether the financial statements are free of material misstatement, whether caused by error or fraud, and (2) whether effective internal control over financial reporting was maintained in all material respects. However, because of the characteristics of fraud, a properly planned and performed audit may not detect a material misstatement or material weakness. Accordingly, there is some risk that a material misstatement of the financial statements or a material weakness in internal control over financial reporting would remain undetected. Also, an integrated audit is not designed to detect error or fraud that is immaterial to the financial statements or deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness.

## Inherent Limitations of Internal Control over Financial Reporting

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may occur and not be detected. Also, projections of any evaluation of the internal control over financial reporting to future periods are subject to the risk that the internal control may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

## Interim Reviews

An interim review is substantially less in scope than an audit in accordance with the PCAOB Standards, the objective of which is to express an opinion on the financial statements taken as a whole. Accordingly, an interim review will not result in the expression of an opinion concerning the fairness of the presentation of the interim financial information in conformity with generally accepted accounting principles and cannot be relied on to reveal all significant matters that would be disclosed in an audit.

An interim review consists principally of applying analytical procedures to pertinent financial data and making inquiries of, and evaluating responses from, certain management personnel of EFH who have responsibility for financial and accounting matters. An interim review also includes obtaining sufficient knowledge of EFH's business and its internal control as they relate to the preparation of both annual and interim financial information to (1) identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence, and (2) select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles. An interim review is not designed to provide assurance on internal control or to identify control deficiencies.

An interim review does not include the performance of any procedures with respect to interim financial information in an interactive data format using XBRL.

An interim review also includes procedures, principally observation and inquiries, relating to management's disclosures about changes in internal control over financial reporting to provide us with a basis for communicating whether we are aware of any modifications that, in our judgment, should be made to such disclosures for management's certifications to be accurate and to comply with the requirements of Section 302 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations. These procedures are substantially less in scope than an audit of internal control over financial reporting in accordance with the PCAOB Standards. Accordingly, an interim review cannot be relied on to reveal all significant matters that would be disclosed in an audit of internal control over financial reporting, and we will not express an opinion on the effectiveness of internal control over financial reporting.

**APPENDIX C**

**MANAGEMENT'S RESPONSIBILITIES**

This Appendix C is part of the engagement letter dated April 5, 2016 between Deloitte & Touche LLP and Energy Future Holdings Corp. and acknowledged and agreed to by the Audit Committee of Energy Future Holdings Corp.

**Financial Statements and the Effectiveness of Internal Control over Financial Reporting – EFH and Subsidiaries**

EFH and Subsidiaries' management is responsible for the preparation, fair presentation, and overall accuracy of EFH and Subsidiaries' financial statements and interim financial information, including disclosures, in conformity with generally accepted accounting principles. The assessment of the effectiveness of internal control over financial reporting to comply with Section 404 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations is also the responsibility of EFH and Subsidiaries' management. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Establishing and maintaining effective internal control over financial reporting and informing D&T of all deficiencies in the design or operation of internal control over financial reporting identified as part of management's evaluation, including separately disclosing to D&T all such deficiencies that management believes to be significant deficiencies or material weaknesses in internal control over financial reporting

- Informing D&T of significant changes in the design or operation of EFH and Subsidiaries' internal control over financial reporting that occurred during each fiscal quarter or subsequent to the date being reported on

- Identifying and ensuring that EFH and Subsidiaries comply with the laws and regulations applicable to their activities and informing us of any known or possible material violations of such laws or regulations

- Adjusting the financial statements to correct material misstatements relating to accounts or disclosures, and affirming to D&T in the representation letter that the effects of any uncorrected misstatements aggregated by us are immaterial, both individually and in the aggregate, to the financial statements taken as a whole

- Providing D&T with (1) access to all information of which management and, where appropriate, the Audit Committee are aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management and, where appropriate, the Audit Committee for the purpose of our audit, and (3) unrestricted access to personnel within EFH and Subsidiaries from whom we determine it necessary to obtain evidence

To the extent that D&T will use the Company's internal auditors to perform audit procedures under our direction, supervision, and review ("direct assistance"), management and the Audit Committee acknowledge and agree that (1) the internal auditors that will provide direct assistance to us will be allowed to follow our instructions, and (2) the Company will not intervene in the work performed by such internal auditors for us.

## Management's Representations

We will make specific inquiries of the Company's management about the representations embodied in the financial statements and management's assessment of the effectiveness of EFH and Subsidiaries' internal control over financial reporting. In addition, we will request that management provide us with the written representations that EFH and Subsidiaries are required to provide to their independent registered public accounting firm under the PCAOB Standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinions. We will also request a similar representation letter as part of our interim reviews.

## Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any services to be provided by D&T to the Company.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, CXO conferences, or Deloitte Energy Conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates.  In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Company or its affiliates and the related fees (if any) would be subject to the mutual agreement of the Company or its affiliates, as applicable, and D&T and may be described in a separate written agreement. The Company hereby confirms that any use or receipt by the Company or its affiliates of these programs and subscriptions is approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Kilkenny.

In connection with the foregoing, the Company agrees to furnish to D&T and keep D&T updated with respect to (1) a corporate tree that identifies the legal names of the Company's affiliates, including affiliates as defined in SEC Rule 2-01(f)(4) of Regulation S-X (e.g., parents, subsidiaries, investors, or investees), together with the ownership relationship among such entities, and (2) any equity or debt securities of the Company and its affiliates (including, without limitation, tax-advantaged debt of such entities that is issued through governmental authorities) that are available to individual investors (whether through stock, bond, commodity, futures or similar markets in or outside of the United States, or equity, debt, or any other securities offerings), together with related securities identification information (e.g., ticker symbols or CUSIP®, ISIN®, or Sedol® numbers). The Company acknowledges and consents that (a) the information referred to in clause (1) above may be shared by D&T for use within the member firms of Deloitte Touche Tohmatsu Limited and their respective affiliates, and with other professional accounting and auditing organizations for compliance purposes within their organizations and (b) the information referred to in clause (2) above may be treated by D&T as being in the public domain.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Kilkenny and approved by the Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or in a comparable position at a significant subsidiary of the Company; (2) on the Company's board of directors; (3) as a member of the Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding five paragraphs, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

**APPENDIX D**

## COMMUNICATIONS WITH THE AUDIT COMMITTEE

This Appendix D is part of the engagement letter dated April 5, 2016 between Deloitte & Touche LLP and Energy Future Holdings Corp. and acknowledged and agreed to by the Audit Committee of Energy Future Holdings Corp.

### Independence Communications

We have the responsibility to comply with the rules and standards of the PCAOB and the securities laws and regulations administered by the SEC regarding auditor independence. To demonstrate compliance with those requirements and in accordance with PCAOB Ethics and Independence Rule 3526, *Communication with Audit Committees Concerning Independence* ("Rule 3526"), we will describe to the Audit Committee, in writing, all relationships between D&T and EFH, its affiliates, or persons in "financial reporting oversight roles" (as defined in SEC Rule 2-01 of Regulation S-X) at EFH and Subsidiaries, that may reasonably be thought to bear on our independence and affirm to the Audit Committee in such communication whether we are independent of EFH and Subsidiaries within the meaning of the rules and standards of the PCAOB and the securities laws and regulations administered by the SEC. We also will discuss our independence with the Audit Committee in accordance with Rule 3526. For purposes of this paragraph, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

### Other Communications Arising from the Audit or Interim Reviews

#### *Fraud and Illegal Acts*

We will report directly to the Audit Committee any fraud of which we become aware that involves senior management, and any fraud (whether caused by senior management or other employees) of which we become aware that causes a material misstatement of the financial statements. We will report to senior management any fraud perpetrated by lower level employees of which we become aware that does not cause a material misstatement of the financial statements; however, we will not report such matters directly to the Audit Committee, unless otherwise directed by the Audit Committee.

We will inform the appropriate level of management of EFH and Subsidiaries and determine that the Audit Committee is adequately informed with respect to illegal acts that have been detected or have otherwise come to our attention during the course of our audit, unless the illegal acts are clearly inconsequential.

#### *Internal Control Matters – Audits of EFH and Subsidiaries*

We will communicate in writing to management and the Audit Committee all material weaknesses (as defined in the PCAOB Standards) identified during the audits. We will also communicate in writing to the Audit Committee all significant deficiencies (as defined in the PCAOB Standards) identified during the audits of EFH and Subsidiaries. If we conclude that the oversight of EFH and Subsidiaries' external financial reporting and internal control over financial reporting by the Audit Committee is ineffective, we will also communicate that conclusion in writing to the EFH Board of Directors.

In addition, we will communicate to management in writing all deficiencies in internal control over financial reporting (i.e., those deficiencies in internal control over financial reporting that are of a lesser

magnitude than material weaknesses) identified during the audit and inform the Audit Committee when such communication has been made. When making this communication, we will not repeat information about deficiencies that has been included in previously issued written communications, whether those communications were made by us, internal auditors, or others within EFH and Subsidiaries.

### Other Matters of EFH and Subsidiaries

We will communicate matters required by PCAOB Auditing Standard No. 16, *Communications with Audit Committees*, and SEC Rule 2-07 of Regulation S-X prior to EFH and Subsidiaries filing any of our reports or consents with the SEC.

In addition, at the request of the Audit Committee, we will provide the Audit Committee with a report in connection with the New York Stock Exchange Corporate Governance Listing Standards.

### Interim Reviews of EFH and Subsidiaries

With the concurrence of the Audit Committee, we will not issue a written review report upon completion of our interim reviews; however, we will communicate to EFH's management and, if appropriate, the Audit Committee matters that cause us to believe that (1) material modifications should be made to the interim financial information for it to conform with generally accepted accounting principles, (2) modifications to management's disclosures about changes in internal control over financial reporting are necessary for management's certifications to be accurate and to comply with the requirements of Section 302 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations, or (3) EFH filed the Form 10-Q before the completion of our review. When conducting our interim reviews, we will also determine whether any other matters required by regulations or the PCAOB Standards as they relate to interim financial information have been identified. If such matters have been identified, we will communicate them to the Audit Committee prior to the filing of interim financial information with the SEC.

**APPENDIX E**

## GENERAL BUSINESS TERMS

This Appendix E is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated April 5, 2016 between Deloitte & Touche LLP and Energy Future Holdings Corp. and acknowledged and agreed to by the Audit Committee of Energy Future Holdings Corp.

1.  **Independent Contractor.** D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Company, the Audit Committee, or the Board of Managers.

2.  **Survival.** The agreements and undertakings of the Company and the Audit Committee contained in the engagement letter will survive the completion or termination of this engagement.

3.  **Assignment and Subcontracting**. Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Company and the Audit Committee hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  **Severability.** If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  **Force Majeure.** No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  **Confidentiality.** To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Company ("Confidential Information"), D&T shall not disclose such Confidential Information to any third party without the Company's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Company and the Audit Committee hereby consent to D&T disclosing such Confidential Information (1) as may be required by law or regulation, or to respond to governmental inquiries, provided that D&T will, to the extent permitted by applicable law or regulation, notify the Company of such a disclosure so the Company may seek a protective order or other appropriate remedy and/or waive D&T's compliance with the non-disclosure provisions of this paragraph, and further provided that if, in the absence of such a protective order or other remedy or receipt of such a waiver by the Company, D&T is compelled to disclose such Confidential Information, D&T will only disclose that portion of such Confidential Information that is required to be disclosed, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such Confidential Information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a

16

source that D&T believes is not prohibited from disclosing such Confidential Information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph.

7.    **<u>Dispute Resolution</u>.** Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix F and made a part hereof.

**APPENDIX F**

## DISPUTE RESOLUTION PROVISION

This Appendix F is part of the engagement letter dated April 5, 2016 between Deloitte & Touche LLP and Energy Future Holdings Corp. and acknowledged and agreed to by the Audit Committee of Energy Future Holdings Corp.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

<u>Mediation:</u> All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

<u>Arbitration Procedures:</u> If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in Dallas, Texas. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").
The arbitration shall be conducted before a panel of three arbitrators. Each of the Company and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules, and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of Texas (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be permitted in connection with the arbitration to the extent authorized by the arbitrators in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

<u>Costs:</u> Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

**BUSINESS ASSOCIATE APPENDIX**

This Appendix G is part of the engagement letter dated April 5, 2015 between Deloitte & Touche LLP and Energy Future Holdings Corp. and acknowledged and agreed to by the Audit Committee of Energy Future Holdings Corp.

If and to the extent, and so long as, required by HIPAA or HITECH (each as defined below), and not otherwise, D&T and the Company hereby agree to the following in connection with D&T's performance of services under the engagement letter to which this Business Associate Appendix is attached (such engagement letter, the "Engagement Letter," together with this Business Associate Appendix and all other attachments, appendices, and exhibits to the Engagement Letter, this "Agreement").

(A) Unless otherwise specified in this Business Associate Appendix, all capitalized terms used in this Business Associate Appendix shall have the meanings established for purposes of HIPAA or HITECH, as applicable. Specific statutory or regulatory citations used in this Business Associate Appendix shall mean such citations as amended and in effect from time to time.

1. "Compliance Date" shall mean, with respect to any applicable provision in this Business Associate Appendix, the later of the date by which compliance with such provision is required under HITECH and the effective date of this Agreement.
2. "Electronic Protected Health Information" shall mean Protected Health Information that is transmitted or maintained in electronic media.
3. "HIPAA" shall mean the Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320d through 1320d-8, as amended from time to time, and all associated existing and future implementing regulations, when effective and as amended from time to time.
4. "HITECH" shall mean Subtitle D of the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009, 42 U.S.C. §§ 17921-17954, as amended from time to time, and all associated existing and future implementing regulations, when effective and as amended from time to time.
5. "Protected Health Information" shall mean the term as defined in 45 C.F.R. § 160.103, and is limited to the Protected Health Information received from, or received or created on behalf of, the Company by D&T pursuant to performance of the Services.
6. "Privacy Rule" shall mean the federal privacy regulations issued pursuant to HIPAA, as amended from time to time, codified at 45 C.F.R. Part 164 (Subparts A and E).
7. "Security Rule" shall mean the federal security regulations issued pursuant to HIPAA, as amended from time to time, codified at 45 C.F.R. Part 164 (Subparts A and C).
8. "Services" shall have the meaning set forth in the attached engagement letter, and, if not therein defined, shall mean the services described in the Engagement Letter to be performed by D&T for the Company.
9. "Unsecured Protected Health Information" shall mean Protected Health Information that is not rendered unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the Secretary in the regulations or guidance issued pursuant to 42 U.S.C. § 17932(h)(2).

(B) With regard to D&T's use and disclosure of Protected Health Information:

1. D&T may use and disclose Protected Health Information as reasonably required or contemplated in connection with the performance of the Services, excluding the use or further disclosure of Protected Health Information in a manner that would violate the requirements of the Privacy Rule, if done by the Company. Notwithstanding the foregoing, D&T may use and disclose Protected Health Information for the proper management and administration of D&T as provided in 45 C.F.R. § 164.504(e)(4).

2. D&T will not use or further disclose Protected Health Information other than as permitted or required by this Business Associate Appendix, and in compliance with each applicable requirement of 45 C.F.R. § 164.504(e), or as otherwise Required by Law.

3. D&T will implement and use appropriate administrative, physical, and technical safeguards to (i) prevent use or disclosure of Protected Health Information other than as permitted or required by this Business Associate Appendix; (ii) reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic Protected Health Information that D&T creates, receives, maintains, or transmits on behalf of the Company; and (iii) comply with the Security Rule with respect to Electronic Protected Health Information.

4. D&T will, without unreasonable delay, report to the Company (i) any use or disclosure of Protected Health Information not provided for by this Business Associate Appendix of which it becomes aware in accordance with 45 C.F.R. § 164.504(e)(2)(ii)(C); and/or (ii) any Security Incident affecting Electronic Protected Health Information of which D&T becomes aware in accordance with 45 C.F.R. § 164.314(a)(2)(C).

5. D&T will, without unreasonable delay, and in any event no later than sixty (60) calendar days after Discovery, notify the Company of any Breach of Unsecured Protected Health Information. The notification shall include, to the extent possible (and subsequently as the information becomes available), the identification of all individuals whose Unsecured Protected Health Information is reasonably believed by D&T to have been Breached along with any other available information that is required to be included in the notification to the Individual, the Secretary, and/or the media, all in accordance with the data breach notification requirements set forth in 42 U.S.C. § 17932 and 45 C.F.R. Parts 160 and 164 (Subparts A, D, and E).

6. D&T will ensure that any subcontractors or agents to whom D&T provides Protected Health Information agree in writing to the same restrictions and conditions that apply to D&T with respect to such Protected Health Information. To the extent that D&T provides Electronic Protected Health Information to a subcontractor or agent, it will require the subcontractor or agent to implement reasonable and appropriate safeguards to protect the Electronic Protected Health Information consistent with the requirements of this Business Associate Appendix.

7. D&T will, to the extent that Protected Health Information in D&T's possession constitutes a Designated Record Set, make available such Protected Health Information to the Company to permit the Company to respond to a request by an Individual in accordance with 45 C.F.R. § 164.524.

8. In the event that D&T, in connection with the Services, uses or maintains an Electronic Health Record of Protected Health Information of or about an Individual, D&T will provide an electronic copy of such Protected Health Information to the Company to permit the Company to respond to a request by an Individual in accordance with 42 U.S.C. § 17935(e).

9. D&T will, to the extent that Protected Health Information in D&T's possession constitutes a Designated Record Set, make available to the Company such Protected Health Information for amendment and incorporate any amendments to such information as directed by the Company, all in accordance with 45 C.F.R. § 164.526.

10. D&T will document and make available to the Company the information required to provide an accounting of disclosures of Protected Health Information, in accordance with 45 C.F.R. § 164.528.

11. In the event that D&T, in connection with the Services, uses or maintains an Electronic Health Record of Protected Health Information of or about an Individual, D&T will make available to the Company the information required to provide an accounting of disclosures of such Protected Health Information in accordance with the requirements for accounting of disclosures made through an Electronic Health Record in 42 U.S.C. § 17935(c).

12. D&T will make its internal practices, books, and records relating to the use and disclosure of Protected Health Information available to the Secretary for purposes of determining the Company's and D&T's compliance with the Privacy Rule.

13. D&T will limit any request, use or disclosure by D&T of Protected Health Information, to the extent practicable, to the Limited Data Set of such Protected Health Information (as defined in 45 C.F.R. § 164.514(e)(2)), or, if the request, use or disclosure by D&T of Protected Health Information, not in a Limited Data Set, is necessary for D&T's performance of the Services, D&T will limit the amount of such Protected Health Information requested, used or disclosed by D&T to the minimum necessary to accomplish the intended purpose of such request, use or disclosure, respectively; provided, however, that the requirements set forth above in this subsection (13) shall be superseded and replaced by the requirements of the "minimum necessary" regulations or guidance to be issued by the Secretary (pursuant to 42 U.S.C. § 17935(b)(1)(B)) on and after its Compliance Date.

(C) In addition to any other obligation set forth in this Agreement, including this Business Associate Appendix, the Company agrees that it will: (1) not make any disclosure of Protected Health Information to D&T if such disclosure would violate HIPAA, HITECH, or any applicable federal or state law or regulation; (2) not request D&T to use or make any disclosure of Protected Health Information in any manner that would not be permissible under HIPAA, HITECH, or any applicable federal or state law or regulation if such use or disclosure were done by the Company; and (3) limit any disclosure of Protected Health Information to D&T, to the extent practicable, to the Limited Data Set of such Protected Health Information, or, if the disclosure of Protected Health Information that is not in a Limited Data Set is necessary for D&T's performance of the Services, to limit the disclosure of such Protected Health Information to the minimum necessary to accomplish the intended purpose of such disclosure, provided, however, that the requirements set forth above in this subsection (3) shall be superseded and replaced by the requirements of the "minimum necessary" regulations or guidance to be issued by the Secretary (pursuant to 42 U.S.C. § 17935(b)(1)(B)) on and after its Compliance Date.

(D) If either the Company or D&T knows of either a violation of a material term of this Business Associate Appendix by the other party or a pattern of activity or practice of the other party that constitutes a material breach or violation of this Business Associate Appendix, the non-breaching party will provide written notice of the breach or violation to the other party that specifies the nature of the breach or violation. In the event that the breaching party does not cure the breach or end the violation on or before thirty (30) days after receipt of the written notice, the non-breaching party may, if feasible, terminate this Agreement.

(E) D&T will, at termination of this Agreement, if feasible, return or destroy all Protected Health Information that D&T still maintains in any form and retain no copies of Protected Health Information or, if such return or destruction is not feasible (such as in the event that the retention of Protected Health Information is required for archival purposes to evidence the Services), D&T may retain such Protected Health Information and shall thereupon extend the protections of this Business Associate Appendix to such Protected Health Information and limit further uses and disclosures to those purposes that make the return or destruction of such Protected Health Information infeasible.

(F) Any other provision of this Agreement that is directly contradictory to one or more terms of this Business Associate Appendix shall be superseded by the terms of this Business Associate Appendix to the extent and only to the extent of the contradiction and only for the purpose of the Company's and D&T's compliance with HIPAA and HITECH. The terms of this Business Associate Appendix, to the extent they are unclear, shall be construed to allow for compliance by the Company and D&T with HIPAA and HITECH.

(G) Nothing contained in this Business Associate Appendix is intended to confer upon any person (other than the parties hereto) any rights, benefits, or remedies of any kind or character whatsoever, whether in contract, statute, tort (such as negligence), or otherwise, and no person shall be deemed a third-party beneficiary under or by reason of this Business Associate Appendix.

(H) Nothing contained in this Business Associate Appendix shall be interpreted to mean that D&T will create or transmit Protected Health Information on behalf of the Company. Furthermore, D&T shall not carry out any of the Company's obligations under the Privacy Rule.