# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS | ) | Case No. 14-10979 (CSS) |
| CORP., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| DELAWARE TRUST COMPANY, as | ) | |
| Indenture Trustee and Collateral Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No: 14-50410(CSS) |
| | ) | |
| COMPUTERSHARE TRUST COMPANY, | ) | |
| N.A. and COMPUTERSHARE TRUST | ) | |
| COMPANY OF CANADA, as Indenture | ) | |
| Trustee and Paying Agent, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OPINION**[1]

Dated: June 3, 2016

Sontchi, J. _____


---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## INTRODUCTION[2]

Before the Court is a motion to dismiss (the "Motion to Dismiss") filed by the Second Lien Trustee in an action commenced by the First Lien Trustee.  In the underlying action, the First Lien Trustee is seeking, pursuant to the terms of the intercreditor Collateral Trust Agreement, to recover the amount of the Applicable Premium[3] from the Second Lien Noteholders who received a partial paydown of their Second Lien Notes by the Debtors.

As is wont to occur in cases of this size, matters have continued to develop.  While the Motion to Dismiss was being briefed, this Court determined, in a separate adversary proceeding, that the First Lien Noteholders could only recover the Applicable Premium under the First Lien Indenture if there was an Optional Redemption of the First Lien Notes.  The Court further determined that the First Lien Notes were automatically accelerated by the Debtors' bankruptcy and the First Lien Indenture did not provide for payment of the Applicable Premium following a bankruptcy acceleration of the First Lien Notes.  Thereafter (and after the Motion to Dismiss in this adversary proceeding was fully briefed), the Court denied the First Lien Trustee relief from the automatic stay to decelerate the First Lien Notes; as a result, the Applicable Premium never became due under the First Lien Indenture.

---

[2] Capitalized terms used herein have the meaning ascribed to them *infra*.

[3] The term "Applicable Premium" used herein shall have the meaning ascribed to it in *Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 527 B.R. 178, 182 (Bankr. D. Del. 2015), *aff'd*, No. CV 15-620 RGA, 2016 WL 627343 (D. Del. Feb. 16, 2016).

Thus, under the current landscape between the parties to this adversary,[4] the Court is left to determine whether the First Lien Trustee can recover the amount of the Applicable Premium from the Second Lien Noteholders when such amount is not due as against the EFIH Debtors.  As set forth below, the Court finds that such amounts are not recoverable from the Second Lien Notes because such amounts are not due *vis-à-vis* the EFIH Debtors.  As such, the Court will grant the Motion to Dismiss.

## JURISDICTION

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be so in the context of this adversary proceeding.  This is a core proceeding pursuant to 11 U.S.C. § 157(b).

## BACKGROUND

### A.  General Background Related to Bankruptcy Case

On April 29, 2014, Energy Future Holdings Corp. ("EFH") and its affiliates (collectively, the "Debtors"), including Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. ("EFIH" and "EFIH Finance" respectively, and, together, the "EFIH Debtors"), filed voluntary petitions with the United States Bankruptcy Court for

---

[4]  The Court requested supplemental briefing from the parties in this adversary to address these factual developments.  *See* Del. Bankr. Adv. 14-50410, D.I. 59, 62, 63, 65, and 66.  Hereinafter, all references to the docket in this adversary will be referred to as "Adv. D.I. _" and references to the docket in the main bankruptcy cases (Del. Bankr. 14-10979) will be referred to as "D.I. _."

the District of Delaware under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

**B.  The Parties**

The plaintiff, Delaware Trust Company (the "First Lien Trustee" or the "Plaintiff"), commenced this action as (i) indenture trustee for the (a) 10% notes ("10% First Lien Notes") issued by the EFIH Debtors under the Indenture dated as of August 17, 2010 (together with all supplements, amendments, and exhibits, the "10% Notes First Lien Indenture") between EFIH, EFIH Finance, and the First Lien Trustee, and (b) 6.875% notes ("6.875% First Lien Notes," and collectively with the 10% First Lien Notes, the "First Lien Notes," held by "First Lien Noteholders") issued by the EFIH Debtors under the Indenture dated as of August 14, 2012 between EFIH, EFIH Finance, and the First Lien Trustee (together with all supplements, amendments, and exhibits, the "6.875% Notes First Lien Indenture," and together with the 10% Notes First Lien Indenture, the "First Lien Indentures"), and (ii) as Collateral Trustee under the Collateral Trust Agreement dated as of November 16, 2009 (including joinders thereto, the "Collateral Trust Agreement"), in each capacity as successor to The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon").

The defendants are Computershare Trust Company, N.A. ("Computershare N.A.") and Computershare Trust Company of Canada ("Computershare Canada" and collectively with Computershare N.A., the "Second Lien Trustee" or "Defendants") as successor indenture trustee and paying agent to BNY Mellon for the notes ("Second Lien

Notes") issued under the Indenture dated as of April 25, 2011 (together with all supplements, amendments and exhibits, the "Second Lien Indenture," held by, the "Second Lien Noteholders").

## C. Procedural History of Adversary Action[5]

The First Lien Trustee commenced the above-captioned adversary action on June 20, 2014. Subsequently, on March 31, 2015, the First Lien Trustee filed its Second Amended Complaint[6] (the "Complaint") seeking declaratory judgment that the Second Lien Trustee must turn over future distributions it receives from the EFIH Debtors in these bankruptcy cases until the First Lien Trustee receives payment in full of not less than approximately $488 million of obligations that the First Lien Trustee asserts are owed to the First Lien Noteholders (the "First Lien Obligations"). Thereafter, Defendants filed the Motion to Dismiss.[7] The Motion to Dismiss has been fully briefed and is ripe for the Court's consideration.

## D. Factual Background Related to Adversary Action

### i. Corporate Structure

The parent debtor among the entities in these Chapter 11 Cases is Energy Future Holdings Corp. ("EFH"). At all relevant times, EFIH has owned, and does own, 100% of the equity interests in Oncor Electric Delivery Holdings Company LLC ("Oncor

---

[5] As the Court is reviewing a motion to dismiss, the facts set forth herein are from the Complaint and for the purposes of this opinion, the facts as set forth in the Complaint have been accepted as "true." *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir.2009).

[6] Adv. D.I. 47.

[7] Adv. D.I. 48.

Holdings"), which, in turn, owns approximately 80% of the equity interests in Oncor Electric Delivery Company LLC, the operator of the largest electric utility company in Texas. EFIH's equity interest in Oncor Holdings is its largest asset.

### ii.    Secured Debt

EFH undertook what it called a "Liability Management Program" starting in 2009. EFIH and EFIH Finance entered into an Indenture dated as of November 16, 2009 (the "Reference Indenture") under which they issued certain Senior Secured Notes due 2019, secured by a first priority lien on EFIH's equity interest in Oncor Holdings.

### iii.    Collateral Trust Agreement

EFH and EFIH contemplated that they might issue additional first lien and second lien notes, so, at the same time it entered into the Reference Indenture, EFIH also entered into the Collateral Trust Agreement on November 16, 2009, for the benefit of all future indenture trustees and holders of notes that had the benefit of a first lien on the equity in Oncor Holdings.

Thereafter, as part of the Liability Management Program, EFIH issued under new indentures the approximately $4 billion of First Lien Notes and $2.2 billion of Second Lien Notes, which principal amounts remained outstanding as of the Petition Date. EFIH used these notes for exchange offers, among other things. These notes were secured by EFIH's equity interest in Oncor Holdings.

The Collateral Trust Agreement governs the rights and obligations of the indenture trustees for those notes. Although EFIH is no longer a guarantor of any notes

issued under the Reference Indenture, the Collateral Trust Agreement continues to incorporate certain definitions from the Reference Indenture.

The Collateral Trust Agreement provides that "Parity Lien Obligations" include all other "Obligations" in respect of the First Lien Notes, and "Obligations" is defined to include any prepayment premium "payable under the documentation governing . . . [the First Lien Notes]."[8]

Section 2.4(c) of the Collateral Trust Agreement contains two separate and independent prohibitions on the Second Lien Trustee retaining the Partial Paydown (as discussed below) or receiving future distributions from specified funds (together, the "Second Lien Payment Restrictions").

One of the Second Lien Payment Restrictions is generally applicable at any time, whether before or after commencement of the Chapter 11 Cases (the "General Second Lien Payment Restriction"); the other prohibition applies only after the commencement of a bankruptcy or certain default and remedy actions (the "Insolvency Second Lien Payment Restriction").  Both of these Second Lien Payment Restrictions were in effect in March 2015 at which time the Court authorized a partial payment of the Second Lien Notes (the "Partial Paydown").  Each recipient of payments, including the Second Lien Trustee, is required to hold any such funds received in trust for the First Lien Noteholders and remit those amounts to the First Lien Trustee upon demand until all obligations under the First Lien Indenture are discharged in full in cash.

---

[8] Collateral Trust Agreement, §1.1 "Obligations." *See also* Complaint at ¶ 5.

The Collateral Trust Agreement (which predates the First Lien Indenture and Second Lien Indenture) refers to the obligations owed under the First Lien Notes and the First Lien Trustee as "Parity Lien Obligations" and the "Parity Lien Representative," respectively.  It refers to the obligations owed under the Second Lien Notes and the Second Lien Trustee as "Junior Lien Obligations" and the "Junior Lien Representative," respectively.

The General Second Lien Payment Restriction addresses "proceeds resulting from" the defined term "Sale of Collateral," and provides in relevant part:

> At any time prior to the Discharge of Parity Lien Obligations, no payment shall be made to . . . any Junior Lien Representative or any holder of Junior Lien Obligations with respect to Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations) (i) from the proceeds resulting from a Sale of Collateral . . . [9]

Separately, the Insolvency Second Lien Payment Restriction addresses any "proceeds" of "Collateral," and provides:

> At any time prior to the Discharge of Parity Lien Obligations and after (1) the commencement of any Insolvency or Liquidation Proceeding in respect of EFIH . . . no payment of money (or the equivalent of money) shall be made from the proceeds of Collateral by EFIH to . . . and Junior Lien Representative or any holder of Junior Lien Obligations with respect to Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations).[10]

---

[9]  Collateral Trust Agreement, § 2.4(c)(i).

[10]  Collateral Trust Agreement, § 2.4(c).

The First Lien Trustee asserts that *even if* the First Lien Trustee is prevented from collecting the Applicable Premium from the EFIH Debtors by operation of the Bankruptcy Code, such amounts remain Parity Lien Obligations under the Collateral Trust Agreement with respect to the Second Lien Trustee, and the Second Lien Trustee must turn over any funds it receives to the First Lien Trustee until the amount of the Applicable Premium is paid in full.

### iv.    DIP Financing and the First Lien Prepayment Decisions

On June 6, 2014, the Court approved debtor-in-possession financing ("DIP Financing"), which approved the repayment of the principal balance of and accrued interest on the First Lien Notes; but the order approving the DIP Financing specified that "the rights of all parties are preserved with respect to the EFIH First Lien Makewhole Claims."[11]  The DIP Financing sought a determination that the First Lien Noteholders, certain of which did not agree with the treatment set forth in the DIP Motion, were not entitled to any prepayment premium or related claims.  In accordance with the DIP Financing Order, on June 19, 2014, the EFIH Debtors repaid all First Lien Noteholders their full principal and accrued interest (other than disputed amounts of interest and any prepayment premium).  The non-settling First Lien Noteholders retained their rights to litigate the prepayment premium payment issues (the "First Lien Applicable Premium Litigation").

---

[11] D.I. 859, ¶ 12.

Thereafter, on September 12, 2014, the Court bifurcated the First Lien Applicable

Premium Litigation into two phases:

> Phase One of the litigation in which the Court will determine:
> (1) whether EFIH is "liable under applicable non-bankruptcy
> law for . . . a Redemption Claim," including the "make-
> whole" or other "damages . . . under any 'no-call' covenant,
> 'right to de-accelerate,' " or applicable law; and (2) "whether
> the Debtors intentionally defaulted in order to avoid paying
> an alleged make-whole premium or other damages." The
> Court ruled that, except with respect to the Trustee's claim
> that EFIH intentionally defaulted to evade payment of the
> make-whole, "the Court will assume solely for the purposes
> of Phase One that the EFIH Debtors are solvent and able to
> pay all allowed claims of their creditors in full." If the Court
> finds EFIH liable for a Redemption Claim, and if EFIH
> contests that it is, in fact, solvent, Phase Two will determine
> "(a) whether the EFIH Debtors are insolvent, and, if so,
> whether that insolvency gives rise to any defenses arising
> under the Bankruptcy Code in favor of the EFIH Debtors that
> bar or limit the amount of the Redemption Claim, and (b) the
> dollar amount of . . . any allowed Redemption Claim."[12]

Thereafter, on March 26, 2015, in Phase One, the Court held:

> Under section 6.02, "in the case of an Event of Default arising
> under clause (6) or (7) of Section 6.01(a) hereof, all
> outstanding Notes shall be due and payable immediately
> without further action or notice." Here, EFIH's filing for
> bankruptcy was an Event of Default arising under clause (6)
> of Section 6.01(a). Thus, the Notes were automatically
> accelerated on the Petition Date and became due and payable
> immediately without further action or notice of the Trustee or
> any Noteholder.
>
> There is no reference in Section 6.02 to the payment of the
> "Applicable Premium" upon an automatic acceleration, nor is
> section 3.07 incorporated into section 6.02. The parties

---

[12] *Delaware Trust Company v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 533 B.R. 106, 109 (Bankr. D. Del. 2015), *aff'd*, No. CV 15-620 RGA, 2016 WL 627343 (D. Del. Feb. 16, 2016); *see also* Del. Bankr. Adv. Pro. 14-50363, D.I. 128.

> included the concept of an Applicable Premium in only one instance (an optional redemption under section 3.07). It is not mentioned in section 6.02 or anywhere else in the Indenture.
>
> Under New York law, an indenture must contain express language requiring payment of a prepayment premium upon acceleration; otherwise, it is not owed.[13]

The Court continued that when the EFIH Debtors filed for bankruptcy, the First Lien Notes automatically accelerated and became due and payable immediately, and repayment after acceleration was not considered voluntary.[14] The Court further held that the First Lien Trustee had the right to rescind the automatic acceleration of the First Lien Notes, but such right was not absolute and was barred by the automatic stay.[15]

Subsequently, the Court considered whether the automatic stay should be lifted to allow the First Lien Trustee to decelerate the First Lien Notes. After a trial, on July 8, 2015, the Court held that:

    i.    Notwithstanding that the EFIH Debtors are presumed solvent for Phase One, based upon the totality of the circumstances, cause does not exist to lift the automatic stay to allow the Trustee to waive the default and decelerate the Notes.

    ii.    Great prejudice to either the EFIH Debtors' estate or the EFIH Debtors, in the form of the loss of hundreds of millions of dollars, will result from a lifting of the automatic stay.

    iii.    The hardship to the Noteholders by maintenance of the automatic stay is, at most, equal to the hardship to the EFIH Debtors from lifting the automatic stay and

---

[13] *In re Energy Future Holdings Corp.*, 527 B.R. at 191-92 (paragraph numbers, footnotes and citations omitted).

[14] *Id.* at 195 (citations omitted).

[15] *Id.* at 196-199.

therefore does not considerably outweigh the hardship to the EFIH Debtors.

iv.    The Court has previously held that, under the Indenture, the "Trustee ... had the right to waive [EFIH's bankruptcy] default and decelerate the Notes," and that "[w]ere the Court ... to lift the automatic stay ... to allow the Trustee's rescission notice to take effect then the automatic default would be waived, the Notes would no longer be immediately due and the refinancing would require payment of the Applicable Premium."    Thus, the Trustee has demonstrated a likelihood of success on the merits.[16]

Weighing these factors and rulings, the Court denied relief from the automatic stay.[17]

Thus, the First Lien Trustee was unable to rescind the automatic acceleration of the First

Lien Notes.  As a result, the Court held that the Applicable Premium was not due by the

EFIH Debtors.[18]

### v.    *Partial Paydown of the Second Lien Notes*

On March 10, 2015, the Court entered the *Order (A) Authorizing Partial Repayment of EFIH Second Lien Notes; (B) Approving EFIH DIP Consent; and (C) Authorizing Consent Fee*[19] (the "Partial Paydown Order") which approved a Partial Paydown of the Second Lien Notes.  The Partial Paydown Order preserved the First Lien Trustee's right to seek

---

[16] *In re Energy Future Holdings Corp.*, 533 B.R. at 110-11 (citations omitted).

[17]  *Id.* at 125-126 ("As the debtor's estate and its stakeholders would be greatly prejudiced by lifting the automatic stay and the harm to the creditor cannot substantially outweigh the harm to the debtor's estate, under the totality of the circumstances, relief from the automatic stay is almost certainly unavailable, regardless of the creditor's likelihood of success on the merits.").

[18] As the Court held the EFIH Debtors were not liable for the Redemption Claim (as defined in Del. Bankr. Adv. Pro. 14-50363, D.I.128), Phase Two of the litigation was moot.  On July 8, 2015, the Court entered a final order disposing of the litigation.  Del. Bankr. Adv. Pro. 14-50363, D.I. 305.

[19]  D.I. 3855.

turnover of the Partial Paydown as well as any future payments to the Second Lien Notes.

More specifically, the Partial Paydown Order provided in relevant part:

> At the election of the EFIH First Lien Trustee, any and all consideration (other than the Partial Repayment) paid after entry of this order by any EFIH Debtor to the EFIH Second Lien Trustee, any EFIH Second Lien Noteholder, the Paying Agent under the Collateral Trust Agreement, or any other entity for the benefit of EFIH Second Line Noteholders, on account of, or in connection with, the EFIH Second Lien Notes (collectively, the "Future Repayment Claims"), including, for the avoidance of doubt, distributions or other forms of consideration under any plan of reorganization (collectively, the "Future Distributions") but only up to the amount of the Partial Repayment, shall be subject to the claims asserted in the Intercreditor Adversary Proceeding as though such Future Distributions were the same, in kind, nature, and all other legally relevant characteristics, as the Partial Repayment (including without limitation, the source of funds used to make the Partial Repayment).

> All arguments and rights of the Collateral Trustee, Parity Lien Representative (as defined in the Collateral Trust Agreement) and holders of Parity Lien Obligations (as defined in the Collateral Trust Agreement) that would have applied to the Partial Repayment shall apply to all Future Distributions, until all claims of the EFIH First Lien Trustee or Collateral Trustee in the Intercreditor Adversary Proceeding are determined by Court order.  To the extent the EFIH First Lien Trustee shows in the Intercreditor Adversary Proceeding that it would have prevailed on any potential claims under the Collateral Trust Agreement with respect to the Partial Repayment but for the EFIH First Lien Trustee's agreement set forth in this Order to consent to the Partial Repayment, as reflected in a Court order or ruling in effect in such Intercreditor Adversary Proceeding, then the EFIH First Lien Trustee shall be entitled to relief under the Collateral Trust Agreement through turnover to the Collateral Trustee of Future Distributions in an amount agreed to or set by the Court, not to exceed the Partial Repayment; provided, however, any such turnover or right to payment shall be in the same form and nature of such Future Distributions

(including in a pro rata amount to the extent the Future Distributions are in multiple forms of consideration).[20]

### vi.  *Current Dispute*

As a result of the rulings set forth above and the Partial Paydown of the Second Lien Notes, the Court is left with two fundamental issues in the litigation: (i) is the Applicable Premium an obligation rendered unenforceable by operation of the Bankruptcy Code or is it a contingent obligation that failed to mature by operation of the Bankruptcy Code; and (ii) if the Applicable Premium obligation never matured *vis-à-vis* the Debtors, does that forestall the First Lien Trustee's claim against the Second Lien Noteholders?

## DISCUSSION

### A.    Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'"[21]  At this stage in the proceeding, it is not the question of "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[22] Since the *Twombly* and *Iqbal* decisions, "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading."[23]  This new standard

---

[20] Partial Paydown Order, ¶¶ 11-12.  *See also Order with Respect to Partial Repayment Order*, ¶¶ A-B.  Adv. D.I. 46.

[21] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).

[22] *Scheuer v. Rhodes*, 416 U.S. 232, 236, abrogated on other grounds by, *Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *see also Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 134 (Bankr. D. Del. 2005).

[23] *Fowler*, 578 F.3d at 210.

requires "a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[24]  It is insufficient to provide "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ."[25]  Under the heightened standard, a complaint "must contain either direct or indirect allegations respecting all the material elements necessary to sustain recovery under some *viable* legal theory."[26]  The Court, in order to determine whether a claim meets this requirement, must "draw on its judicial experience and common sense."[27]  In *Fowler*, the Third Circuit articulated a two-part analysis to be applied in evaluating a complaint.[28]  First, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[29]  Second, the court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"[30]

## B.    Contract Interpretation

Under New York law, which governs the Collateral Trust Agreement,[31] the Court need not look "outside the four corners" of a complete document to determine what the parties intended.[32]  Here, neither party has alleged that the Collateral Trust Agreement is

---

[24]  *Id.*

[25]  *Iqbal*, 129 S. Ct. at 1949 (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).

[26]  *Twombly*, 550 U.S. at 562.

[27]  *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 34 (Bankr. D. Del. 2011).

[28]  *Fowler*, 578 F.3d at 210-11.

[29]  *Id.*

[30]  *Id.* at 211.

[31]  Collateral Trust Agreement, § 7.15.

[32]  *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990).

an incomplete document, so it is not necessary to resort to extrinsic evidence to interpret it. A contract is not ambiguous merely because the parties offer different constructions of the same term.[33]

If the Court reaches the conclusion that the Collateral Trust Agreement is unambiguous, the Court then relies on long-recognized canons of interpretation to determine its meaning. First, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing."[34] Second, should there be an inconsistency between a specific and general provision of a contract, the specific controls.[35] Third, "[a] reading of the contract should not render any portion meaningless."[36]

Neither party before the Court argued that the Collateral Trust Agreement is ambiguous or has raised a genuine dispute of a material fact or expressed a need for more discovery. The questions before the Court are purely legal in nature.[37]

---

[33] *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).

[34] *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) (internal quotation marks and citation omitted).

[35] *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *Waldman v. New Phone Dimensions, Inc.*, 487 N.Y.S.2d 29, 31 (N.Y. App. Div. 1985).

[36] *See Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210, 1213 (N.Y. 2007) (quotation marks and citations omitted); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms.").

[37] *Niagara Frontier Transit Metro Sys., Inc. v. Cnty. of Erie*, 212 A.D.2d 1027 (1995) ("Where the contract is unambiguous on its face, it should be construed as a matter of law and summary judgment is appropriate.")); *Green Mach. Corp. v. Zurich Am. Ins. Grp.*, No. CIV. A. 99-3048, 2001 WL 1003217, at *6 (E.D. Pa. Aug. 24, 2001) ("Whether a contract provision is ambiguous is a question of law for the court."), *aff'd sub nom. Green Mach. Corp. v. Zurich-Am. Ins. Grp.*, 313 F.3d 837 (3d Cir. 2002).

**C.    The Collateral Trust Agreement Does Not Provide for Turnover of the Amount of the Applicable Premium because it is Not Payable under the First Lien Indenture.**

  **i.    The First Lien Trustee's Claim for Payment of the Applicable Premium Is Not Contingent.**

Although conflated in the briefing, the Court did not find that the Applicable Premium was not owed by the EFIH Debtors *solely* because of the automatic stay – the Court found that the automatic stay prevented rescission of the automatic acceleration of the First Lien Notes.[38]    However, the First Lien Trustee's claim for the Applicable Premium was contingent *only* until the Court decided the relief from stay issue.[39]    The Third Circuit has instructed that the court's focus "should not be on when the claim accrues . . . but whether a claim exists."[40]    As discussed above, this Court held that the automatic stay would not be lifted in order for the First Lien Notes to be decelerated.[41] As such, the First Lien Notes were, in fact, accelerated and under the terms of the First Lien Indenture, an Applicable Premium is **not** due.    Thus, here, the First Lien Trustee's claim for the Applicable Premium does not exist as against the EFIH Debtors.    As a result, the *only* way for the First Lien Trustee to assert a claim for the Applicable Premium is under terms the Collateral Trust Agreement as against the Second Lien Noteholders *even when* it is not a claim against the EFIH Debtors.

---

[38] *Energy Future Holdings Corp.*, 527 B.R. at 198-99.

[39] *In re RNI Wind Down Corp.*, 369 B.R. 174, 182 (Bankr. D. Del. 2007) ("A claim is contingent where it has not yet accrued and is dependent upon some future event that may never happen." (citations, modifications, and quotation marks omitted).

[40] *In re Rodriguez*, 629 F.3d 136, 142 (3d Cir. 2010) (*citing Jeld-Wen, Inc. v. Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 121 (3d Cir. 2010)).

[41] *Energy Future Holdings Corp.*, 527 B.R. at 183-84.

*ii.*    ***The Applicable Premium is not an "Obligation[]"***

a.  **Contractual Language**

The Collateral Trust Agreement requires the Second Lien Trustee to turn over the proceeds of collateral only to the extent that such amount is an "Obligation[]." "Obligations" are defined in the Collateral Trust Agreement as:

> ***"Obligations"*** means any principal, interest (including all interest accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate including any applicable post-default rate, specified in the Secured Debt Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceedings), premium, penalties, fees, indemnifications, reimbursements, damages and other liabilities and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing the Indebtedness.[42]

The Second Lien Trustee argues that an obligation that is not actually payable under the First Lien Indenture (such as is the case because of the acceleration of the First Lien Notes) does not fall within the definition of "Obligations" and therefore cannot be sought by the First Lien Trustee.  The First Lien Trustee responds that the Collateral Trust Agreement

---

[42]   Collateral Trust Agreement, § 1.1 "Obligations."   The Collateral Trust Agreement also defines "Indebtedness" as:

> ***"Indebtedness"*** means, with respect to any Person, without duplication:
>
> > (1) Any indebtedness (including principal and premium) of such Person, whether or not contingent:
> >
> > > (a) in respect to borrowed money;
> > >
> > > (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof); . . .

Collateral Trust Agreement, § 1.1 "Indebtedness."

contemplates turnover for amounts that are "not . . . allowed or allowable" as against the

EFIH Debtors in bankruptcy because such amounts are "payable under the

documentation."

## 1.  Not Allowed or Allowable

Here, the Collateral Trust Agreement definition of "Obligations" contains the

phrase "interest (including all interest accrued thereon after the commencement of any

Insolvency or Liquidation Proceeds . . . even if such interest is not enforceable, allowable

or allowed as a claim in such proceeding)."[43]  However, such parenthetical language is

not included in the other obligations set forth in the definition.  This is indicative of the

parties' intent – the parties knew how to include such language and chose not to do so in

relation to the other enumerated obligations set forth in the Collateral Trust Agreement.[44]

The Court "court must be careful not to alter the terms of the agreement.  The parties

having agreed upon their own terms and conditions, the courts cannot change them and

must not permit them to be violated or disregarded."[45]  Thus, the Court will not read into

the "Obligations" provision that any premium would be owed from the Second Lien

---

[43]  Collateral Trust Agreement, § 1.1 "Obligations."

[44]  *Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 662 (2d Cir. 1994) ("Where one interpretation is broader than another, courts should not apply the broader interpretation absent a clear manifestation of intent. Rather, where contracts are negotiated by counsel for sophisticated commercial parties, courts should interpret ambiguous language to realize the reasonable expectations of the ordinary businessperson." (citations omitted)); *William P. Pahl Equip. Corp. v. Kassis*, 588 N.Y.S.2d 8, 13 (1992) ("Most significantly, the memorandum of agreement for the sale of the business contained a cross-default provision which made a default by any party under the contract of sale for the subject premises a corresponding default thereunder as well. That the contract of sale did not contain a similar provision seems to us persuasive that the parties, sophisticated businessmen represented by counsel throughout the negotiation, drafting and execution of the agreements, never intended that one be included." (citations omitted)).

[45]  *Two Locks, Inc. v. Kellogg Sales Co.*, 68 F. Supp. 3d 317, 328 (E.D.N.Y. 2014), *appeal withdrawn* (Mar. 2, 2015) (citations and internal quotation marks omitted).

Notes to the First Lien Notes regardless of whether it is allowed or is allowable in an Insolvency Proceeding.

## 2. "Payable Under the Documentation"

The First Lien Trustee argues that if these transactions occurred outside of the Bankruptcy Court then the Applicable Premium would be due, thus it is owed "under the documentation" and should be paid by the Second Lien Notes. In other words, the First Lien Trustee asserts that the section 362 of the Bankruptcy Code (and not the terms of the parties' contract as governed by state law) has "rendered unenforceable" the premium against the debtor. The First Lien Trustee asserts that because the Applicable Premium is "unenforceable" as against the EFIH Debtors *only* by operation of the Bankruptcy Code, the Second Lien Trustee must turn over collateral proceeds to the First Lien Trustee. The First Lien Trustee states that, under the Collateral Trust Agreement, the Second Lien Trustee is required to turn over such proceeds to satisfy any obligation that would be "payable under the documentation," and not just "payable" by the EFIH Debtors.

The Second Lien Trustee responds that this Court has ruled that the First Lien Notes have been accelerated, that the automatic stay bars the First Lien Trustee from taking action to decelerate those notes, and that cause does not exist to lift the stay to permit deceleration. The Second Lien Trustee asserts that either the First Lien Notes have been decelerated or they have not. The Second Lien Trustee continues that the First Lien Trustee is essentially arguing that under the Bankruptcy Code's automatic stay

provisions, the Court has the power to leave the stay in place as to the debtor while at the same time "deeming" the stayed action to have occurred for the purpose of adjudicating a third party's rights.

The Court agrees with the Second Lien Trustee.  The First Lien Notes automatically accelerated upon the bankruptcy filing.  In order for the First Lien Notes to decelerate the First Lien Notes needed to obtain relief from the automatic stay, which they did not receive.  To deem the First Lien Notes decelerated as to the Second Lien Noteholders, even though they have not been decelerated as to the Debtors, would be a fiction. Deceleration is contingent on an order of this Court lifting the automatic stay, this contingency makes the Applicable Premium *not* payable under the First Lien Indenture and, therefore, *not* an "Obligation[]" under the Collateral Trust Agreement.

### b.  Purpose of Turnover Provisions

The First Lien Trustee asserts that the purpose of the turnover provisions that have force when there is an "Insolvency Proceeding" or when there is a "Sale of Collateral" is to have an "insurance policy" when the Second Lien Trustee might collect proceeds even though the First Lien Trustee was not receiving payment from the EFIH Debtors. Although, in general, that may be the purpose of turnover provisions, such requirement is not stated in the Collateral Trust Agreement.  The Collateral Trust Agreement does not contain language that the Applicable Premium would be an obligation "even if not enforceable, allowable or allowed as a claim."  Here, the Collateral Trust Agreement states that the Applicable Premium would be due if payable under the First Lien

Indenture – and this Court found that the First Lien Trustee was unable to decelerate the First Lien Notes, thus, the Applicable Premium was not "payable under the documents."

Essentially, the First Lien Trustee asserts that *any* amount provided for in the First Lien Indenture would be an obligation payable under the documentation. The Court disagrees. If that was the case then why was the additional language added related to "interest?" The parties were capable of drafting such language, yet chose to limit such language to the interest obligation.[46]

### c. *In re Onco Investment Co.*

Both parties rely on *MW Post Portfolio Fund Ltd. v. Norwest Bank Minn., Nat'l Ass'n (In re Onco Inv. Co.)* (hereinafter "*Onco*").[47] In *Onco*, the senior creditor's claim against the debtor had been cured and reinstated to its pre-default state in *Onco*'s plan, such that the claim was unimpaired.[48] The senior creditor, even though the notes underlying the claim were reinstated and cured, argued that this treatment under the *Onco* plan would be $11 million less than the amount to which they were entitled.[49] Thus, the senior creditor in *Onco* argued that its reinstated claim could still give rise to a turnover obligation for a prepayment premium as against the junior creditor.[50] The *Onco* intercreditor agreement

---

[46] *In re Energy Future Holdings Corp.*, 527 B.R. at 192 ("The Indenture here was negotiated at arm's length between sophisticated parties who were represented by counsel. The Court is unwilling to read into agreements between sophisticated parties provisions that are not there." (citations, quotation marks, and internal modifications omitted)).

[47] 316 B.R. 163 (Bankr. D. Del. 2004).

[48] *Id.* at 164.

[49] *Id.* at 165.

[50] *Id.* at 165-66.

provided for various enumerated categories "payable under the documentation governing such indebtedness."[51]   The *Onco* Court concluded that the senior creditor could not recover such amounts from the junior creditors, because the debtor had cured the default and given the secured creditor everything to which it was entitled under the documentation.[52]

The Second Lien Trustee sites *Onco* for the holding that if the amount is not owed "under the documentation" but for the operation of the Bankruptcy Code (in that case §1124(2)), then it is not owed by the junior creditors.

The First Lien Trustee attempts to distinguish *Onco* on the fact that, in *Onco*, the notes had been cured and reinstated, allowing the senior noteholders to obtain their negotiated interest obligation over time versus the case *sub judice* where the First Lien Notes were refinanced, leaving the First Lien Noteholders without (i) interest-over-time (which would make the premium unnecessary) or (ii) the Applicable Premium.

Although the Court appreciates this distinction raised by the First Lien Trustee, in the case *sub judice*, the First Lien Noteholders are also receiving everything they are entitled to under the First Lien Indenture.   As this Court previously held, the First Lien Indenture does not provide for the Applicable Premium following a bankruptcy acceleration.   The First Lien Indenture did not contain the requisite express language requiring the Applicable Premium upon acceleration, as a result, it is not owed.[53]

---

[51]  *Id.* at 166.

[52]  *Id.* at 166-67.

[53]  *In re Energy Future Holdings Corp.*, 527 B.R. at 192.

Furthermore, the Collateral Trust Agreement does not provide for payment of the Applicable Premium from the Second Lien Noteholders if it is not payable under the First Lien Indenture. [54]

### iii.    Conclusion

Thus, the Court finds that the Applicable Premium is not "payable under the documentation governing the Indebtedness" and is, thus, not an "Obligation[]" for which the First Lien Trustee can seek turnover from the Second Lien Noteholders.

## CONCLUSION

For the reasons set forth above, the Court will grant the Second Lien Trustee's Motion to Dismiss and will dismiss the Complaint. The Court finds that the Collateral Trust Agreement does not provide for payment of the amount of the Applicable Premium from the Second Lien Noteholders as such obligation is not owed by the EFIH Debtors.

An order will be issued.

---

[54] The First Lien Trustee also points to *In re Romero*, 411 B.R. 56 (Bankr. D. Mass 2009), wherein the court distinguished *Onco* which rolled-back the relationship between the senior creditors to a pre-default status and *Romero* wherein the confirmed plan provided for a partial payment of the notes. *Id.* at 61. The *Romero* court held that the creditors' claims were impaired pursuant to the confirmed plan, which did alter the contractual rights of the creditor. In *Romero*, the dispute was between a creditor and a debtor, not an intercreditor dispute. *Id.* at 57. Furthermore, in *Romero*, the court found that there was no evidence that the notes were accelerated which would trigger the prepayment premium. *Id.* at 60. In the case *sub judice*, the Court found that the First Lien Notes were automatically accelerated and the Applicable Premium was not due under the terms of the First Lien Indenture, thus, any comparison to *Romero* is not persuasive.