**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date: June 27, 2016 at 10:00 a.m.** |
|  | ) | **Objection Deadline: June 20, 2016 at 4:00 p.m.** |

**MOTION OF TEXAS COMPETITIVE ELECTRIC
HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR
AFFILIATES FOR ENTRY OF ORDERS (I) (A) AUTHORIZING
THE TCEH DEBTORS TO (X) ENTER INTO THE POSTPETITION
FINANCING COMMITMENT LETTER AND THE FEE LETTER, (Y) PAY
ASSOCIATED FEES AND EXPENSES, AND (B) GRANTING RELATED RELIEF
AND (II) (A) APPROVING POSTPETITION FINANCING FOR TEXAS COMPETITIVE
ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR
AFFILIATES, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (C) AUTHORIZING REFINANCING OF
SECURED POST-PETITION DEBT AND (D) MODIFYING THE AUTOMATIC STAY**

Texas Competitive Electric Holdings Company LLC (the "<u>Borrower</u>" or "<u>TCEH</u>"),

Energy Future Competitive Holdings Company LLC (the "<u>Parent Guarantor</u>" or "<u>EFCH</u>"), and

each of the Subsidiary Debtors (as defined in the Commitment Letter (as defined herein)

(collectively, the "<u>Subsidiary Guarantors</u>," and together with the Parent Guarantor,

the "<u>Guarantors</u>"), each as a debtor and debtor-in-possession (collectively, the "<u>TCEH Debtors</u>,"

and together with the other above-captioned Debtors and Debtors-in-possession, the "<u>Debtors</u>"),

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

file this motion (the "Motion")[2] for entry of (a) an order (the "Approval Order"), substantially in

the form attached hereto as **Exhibit A**, (i) authorizing the TCEH Debtors to (x) enter into the

postpetition financing commitment letter, substantially in the form annexed as **Exhibit 1** to

**Exhibit A** (including exhibits and attachments thereto, collectively the "Commitment Letter")

with Deutsche Bank AG New York Branch ("DBNY") and Deutsche Bank Securities Inc.

("DBSI" and, together with DBNY, "DB"), Barclays Bank PLC, Citigroup Global Markets Inc.

(or its affiliates), Credit Suisse AG (acting through such of its affiliates and branches it deems

appropriate) and Credit Suisse Securities (USA) LLC (acting through such of its affiliates and

branches it deems appropriate), Royal Bank of Canada and RBC Capital Markets,[3] UBS AG,

Stamford Branch and UBS Securities LLC, and Natixis, New York Branch (collectively,

the "Commitment Parties") and the fee letter (the "Fee Letter" and, together with the

Commitment Letter, the "Financing Papers")[4] with the Commitment Parties, and (y) pay

associated fees and expenses, and (ii) granting related relief; and (b) an order (the "DIP Order"

and, together with the Approval Order, the "Orders"), substantially in the form attached hereto as

**Exhibit B**, (i) authorizing the TCEH Debtors, in their sole discretion and subject to the

occurrence of the Closing Date (as defined in the DIP Roll Credit Agreement (as defined

herein)), to enter into the DIP Roll Facilities (as defined herein) on the terms set forth in the

---

[2]   Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to such terms
      in the Financing Papers or the Orders as applicable. To the extent there exists any inconsistency between this
      Motion and the provisions of the Financing Papers or the Orders, the provisions of the applicable Financing
      Papers or the Orders, as applicable, shall control.

[3]   RBC Capital Markets is a brand name for the capital markets activities of Royal Bank of Canada and its
      affiliates.

[4]   Contemporaneously herewith, the Debtors have filed the *Debtors' Motion Authorizing Texas Competitive
      Electric Holdings Company LLC and Certain of its Debtor Affiliates to File Under Seal the Certain Fee Letter
      Related to Proposed Financing* (the "Seal Motion"), whereby the Debtors have requested authority to cause the
      Fee Letter to be filed under seal or redacted from the public version of this Motion filed on the docket
      maintained in these chapter 11 cases pursuant to the relief requested therein.

2

Commitment Letter, the Fee Letter, and the DIP Roll Facilities Credit Agreement (the "DIP Roll Credit Agreement")[5] (ii) granting liens and providing superpriority administrative expense claims, (iii) authorizing refinancing of secured post-petition debt, and (iv) modifying the automatic stay, in each case on the terms set forth in the DIP Order.  In support thereof, the TCEH Debtors submit the *Declaration of Chuck McMullan in Support of the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Orders (I) (A) Authorizing the TCEH Debtors to (X) Enter into the Postpetition Financing Commitment Letter and the Fee Letter (Y) Pay Associated Fees and Expenses, and (B) Granting Related Relief and (II) (A) Approving Postpetition Financing For Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing Refinancing of Secured Post-Petition Debt and (D) Modifying the Automatic Stay* (the "McMullan Declaration"), a copy of which is attached hereto as **Exhibit C**, and respectfully submit as follows.

### Jurisdiction and Venue

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the TCEH Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection

---

[5]    The Debtors will file a form of the DIP Roll Credit Agreement in advance of the hearing, no later than June 17, 2016.

with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rules 2002, 4001, and 9014.

## Preliminary Statement

4.      The TCEH Debtors' current DIP loans under the Existing DIP Credit Agreement (as defined in **Exhibit A** to the Commitment Letter) will mature on November 7, 2016.  The Debtors anticipate that they may require debtor-in-possession financing beyond that date, in addition to requiring exit financing upon emergence. To fulfill that need, the TCEH Debtors seek authorization to enter into the Financing Papers and the financing contemplated therein (the "Financing"), which, upon Court approval, will permit the TCEH Debtors to elect, at their discretion and in accordance with the terms of the Financing Papers, to enter into either (a)  exit financing in connection with the Debtors' emergence from chapter 11 or (b) replacement debtor-in-possession financing that will convert into exit financing upon their emergence from chapter 11.   The Financing provides two principal benefits—optionality and certainty.   The TCEH Debtors retain optionality to enter into a favorable transaction structure based on the direction and timing of the TCEH Debtors' chapter 11 cases (the "Cases"), and certainty by locking in exit financing well in advance of confirmation and/or approval of a Plan and

4

emergence from the Cases, substantially enhancing the TCEH Debtors' prospects for a successful emergence from chapter 11.

5.    Following a lengthy, competitive process, the TCEH Debtors obtained commitments from several large financial institutions for fully underwritten financing. Pursuant to the Commitment Letter, the TCEH Debtors may elect to fund either of two options:

- **Senior Facilities.** Pursuant to and subject to the terms and conditions set forth in the Financing Papers and in connection with confirmation and/or approval of a Plan, the TCEH Debtors may elect to receive: (a) a senior secured first lien revolving credit facility in an aggregate principal amount of $750,000,000, the "Senior Revolving Credit Facility"), (b) a senior secured first lien term loan facility in an aggregate principal amount of $2,850,000,000, the "Senior Term Loan B Facility"), and (c) a senior secured first lien term loan facility in an aggregate principal amount of $650,000,000 (the "Senior Term Loan C Facility," and together with the Senior Term Loan B Facility, the "Senior Term Loan Facilities," and together with the Senior Revolving Credit Facility, the "Senior Facilities"), in each case described in **Exhibit B** to the Commitment Letter; or

- **DIP Roll Facilities.** Pursuant to and subject to the terms and conditions set forth in the Financing Papers, the TCEH Debtors may elect to receive: a senior secured superpriority debtor-in-possession and exit credit agreement consisting of (a) a superpriority senior secured first lien revolving credit facility in an aggregate principal amount of $750,000,000 (the "DIP Roll Revolving Credit Facility"), (b) a superpriority senior secured first lien term loan facility in an aggregate principal amount of $2,850,000,000 (the "DIP Roll Term Loan B Facility"), and (c) a superpriority senior secured first lien term loan facility in an aggregate principal amount of $650,000,000 (the "DIP Roll Term Loan C Facility," and together with the DIP Roll Term Loan B Facility, the "DIP Roll Term Loan Facilities," and together with the DIP Roll Revolving Credit Facility, the "DIP Roll Facilities" and, together with the Senior Facilities, the "Facilities") described in **Exhibit C** to the Commitment Letter. The DIP Roll Facilities will convert to the Senior Facilities on the Conversion Date (as defined in **Exhibit C** to the Commitment Letter).

6.    The TCEH Debtors seek to use the amounts provided by the Financing primarily to fund the following: outstanding obligations under the Existing DIP Credit Agreement; fees, premiums, and expenses incurred in connection with the foregoing and transactions related thereto (such fees and expenses, the "Transaction Costs"); fees, expenses, and costs relating to

the emergence from the Cases; consummation of a Plan (as defined in the Commitment Letter) relating to the TCEH Debtors; working capital and general corporate purposes; and backstop or replacement of existing letters of credit.

7.    The authorization of entry into the Financing Papers, with their favorable terms, and all transactions contemplated thereby, including entry into either the Senior Facilities or the DIP Roll Facilities, will substantially enhance the Debtors' ability to consummate the Plan. Importantly, unless and until the Debtors enter into the DIP Roll Credit Agreement (such date, the "DIP Closing Date"), the Existing DIP Agreement and Existing DIP Order will remain in full force and effect.  On the DIP Closing Date, the DIP Order would become effective, and the Existing DIP Agreement and Existing DIP Order would be null and void in all respects. Therefore, the Debtors respectfully request that the Court enter (i) the Approval Order authorizing the Debtors to enter into the Commitment Letter and the Fee Letter and granting related relief and (ii) the DIP Order authorizing the Debtors to enter into the DIP Roll Facilities and granting related relief.

## Relief Requested

8.    By this Motion, the TCEH Debtors seek entry of the Orders, which, among other things, provides the TCEH Debtors:

   (a) ***Commitment Letter and Fee Letter***:  authorization to (a) enter into the Financing Papers; and (b) incur and pay associated fees, costs, and expenses in relation with the Financing Papers;

   (b) ***DIP Roll Facilities***: (i) authorization to enter into the DIP Roll Facilities at the Debtors' sole discretion and on the terms set forth in the Financing Papers, (ii) grant of liens and providing superpriority administrative expense claims, and (iii) authorization of secured post-petition debt;

6

(c) ***Automatic Stay***:  vacation and modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Financing Papers and the Financing; and

(d) ***Immediate Effectiveness***:  waiver of any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Order.

## Concise Statement Pursuant to Bankruptcy Rule 4001(c)[6]

9.        In accordance with Bankruptcy Rules 4001(c) and (d), the following summarizes the significant terms of the Financing, the DIP Order, and the Approval Order:

| Material Terms | Summary of Material Terms | | Provision |
|---|---|---|---|
| ***Facility Parties***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Borrower: | **Under the Senior Facilities**: A new domestic entity resulting from transactions in connection with the consummation of the Plan that succeeds to the business and operations of TCEH. | Commitment Letter at <u>Exhibit B</u> and <u>Exhibit C</u> |
| | | **Under the DIP Roll Facilities**: Initially, the Company. After the Conversion Date, same as Senior Facilities. | |
| | Guarantors: | The immediate parent company of the Borrower ("<u>Holdings</u>"), the Preferred Stock Entity (if applicable and as defined in the Plan) and its restricted subsidiaries, and each existing and subsequently acquired or organized direct or indirect wholly-owned U.S. organized restricted subsidiary of the Borrower (in each case other than Excluded Subsidiaries as provided in the Commitment Letter). | |
| | Lenders: | **Under the Senior Facilities**: The Commitment Parties, and other mutually and reasonably satisfactory banks, financial institutions, and other institutional lenders and investors (the "<u>Senior Lenders</u>"). | |
| | | **Under the DIP Roll Facilities**: The Commitment Parties and other mutually and reasonably satisfactory banks, financial institutions, and other institutional lenders and investors (together with the Initial DIP Roll Lender, the "<u>DIP Roll</u> | |

---

[6]    This concise statement is qualified in its entirety by the Financing Papers and the Orders. To the extent there exists any inconsistency between this concise statement and the provisions of the Financing Papers or the Orders, the provisions of the Financing Papers or the Orders, as applicable, shall control.

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | Lenders"). | |
| | Term Letters of Credit and Revolving Letters of Credit Issuers: **Under the Senior Facilities**: Senior Administrative Agent and any other agreed Senior Lenders. | |
| | **Under the DIP Roll Facilities**: DIP Roll Administrative Agent and any other agreed DIP Roll Lenders. | |
| | Administrative Agent: **Under the Senior Facilities**: DBNY (together with its permitted successors and assigns, the "Senior Administrative Agent"). | |
| | **Under the DIP Roll Facilities**: DBNY (together with its permitted successors and assigns, the "DIP Roll Administrative Agent"). | |
| ***Senior Facilities and DIP Roll Facilities*** *Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | Total Loan Commitment: $4,250,000,000 aggregate principal amount under the Senior Facilities or under the DIP Roll Facilities.<br><br>• **Senior Term Loan B Facility**: $2,850,000,000 aggregate principal amount.<br><br>• **Senior Term Loan C Facility**: $650,000,000 aggregate principal amount, which shall be available to support the issuance of cash collateralized letters of credit (the "Term Letters of Credit").<br><br>• **Senior Revolving Credit Facility**: $750,000,000 aggregate principal amount<br><br>    o Not less than $500,000,000 of the Senior Revolving Credit Facility shall be available for issuance of standby and trade letters of credit (the "Revolving Letters of Credit" and together with the Term Letters of Credit the "Letters of Credit").<br><br>    o Not less than $250,000,000 of the Senior Revolving Credit Facility shall be available for swingline loans made by the Senior Administrative Agent.<br><br>• **DIP Roll Term Loan B Facility**: Same as Senior Term Loan B Facility.<br><br>• **DIP Roll Term Loan C Facility**: Same as Senior Term Loan C Facility.<br><br>• **DIP Roll Revolving Credit Facility**: Same as Senior Revolving Credit Facility. | Commitment Letter at Exhibit B and Exhibit C |

8

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| *Interest Rate and Margins*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | • **Senior Term Loan B Facility**: At the option of Borrower, Adjusted LIBOR+5.00% or ABR+4.00%; *provided* that, interest rate spreads will be subject to one 25 basis point reduction.<br><br>• **Senior Term Loan C Facility**: Same as Term Loan B Facility.<br><br>• **Senior Revolving Credit Facility**: At the option of Borrower, Adjusted LIBOR+4.00% or ABR+3.00%.<br><br>• **DIP Roll Term Loan B Facility**: Same as Senior Term Loan B Facility.<br><br>• **DIP Roll Term Loan C Facility**: Same as Senior Term Loan C Facility.<br><br>• **DIP Roll Revolving Credit Facility**: Same as Senior Revolving Credit Facility. | Commitment Letter at <u>Annex I</u> to <u>Exhibit B</u> and <u>Annex I</u> to <u>Exhibit C</u> |
| *Fees*<br><br>*Fed R. Bankr. P. 4001(c)(1)(B)* | • **Underwriting and Other Fees**: As set forth in the Fee Letter.<br><br>• **Professional Fees and Expenses**: Reimbursement of Lead Arrangers and Initial Lenders of reasonable fees and expenses of one primary counsel, one regulatory counsel and one local counsel in each relevant jurisdiction incurred in connection with the preparation of the Financing Papers and Facilities Documentation.<br><br>• **Senior Term Letter of Credit Fees**: The Borrower shall pay to the relevant Issuing Bank, for its own account, (a) a fronting fee of 0.125% on the aggregate face amount of outstanding Term Letters of Credit under the Senior Term Loan C Facility, payable in arrears at the end of each quarter after the Closing Date and upon termination of the Senior Term Loan C Facility and (b) such Issuing Bank's customary and reasonable issuance and administration fees.<br><br>• **Senior Revolving Letter of Credit Fees**: A *per annum* fee equal to the applicable spread over Adjusted LIBOR under the Senior Revolving Credit Facility in effect from time to time will accrue on the aggregate face amount of outstanding Revolving Letters of Credit under the Senior Revolving Credit Facility, payable in arrears on the tenth business day after the end of each quarter after the Closing Date and upon termination of the Senior Revolving Credit Facility. Such fees shall be distributed to the Revolving Lenders (other than to Defaulting Senior Lenders) *pro rata* in accordance with their commitments under the Senior Revolving Credit Facility. In addition, the Borrower shall pay to the relevant Issuing Bank, for its own account, (a) a fronting fee of 0.125% on the aggregate face amount of outstanding Revolving Letters of Credit under the Senior Revolving Credit Facility, payable in arrears on the tenth business day after the end of each quarter | Commitment Letter at <u>Annex I</u> to <u>Exhibit B</u> and <u>Annex I</u> to <u>Exhibit C</u>; DIP Order at ¶ 24; Approval Order at ¶ 6 |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | after the Closing Date and upon termination of the Senior Revolving Credit Facility and (b) such Issuing Bank's customary and reasonable issuance and administration fees.<br><br>• **Senior Commitment Fees**: The Borrower shall pay to the Revolving Lenders (other than Defaulting Senior Lenders) a commitment fee of 0.50% *per annum* on the undrawn portion (for this purpose, disregarding Swingline Loans as a utilization of the Senior Revolving Credit Facility) of the commitments in respect of the Senior Revolving Credit Facility (subject to one stepdown to 0.375% following delivery of financial statements for the first full fiscal quarter of the Borrower completed after the Closing Date, based on meeting Consolidated First Lien Net Leverage Ratio to be mutually agreed upon between the Borrower and the Senior Administrative Agent). All commitment fees shall be payable quarterly in arrears after the Closing Date and upon the termination of the commitments.<br><br>• **DIP Roll Term Letter of Credit Fees**: Same as Senior Term Loan B Facility.<br><br>• **DIP Roll Revolving Letter of Credit Facility**: Same as Senior Revolving Credit Facility.<br><br>• **DIP Roll Commitment Fees**: Same as Senior Commitment Fees. | |
| *Maturity and Amortization*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | • **Senior Term Loan B Facility**: Matures on the day that is 7 years after the Closing Date and will amortize in equal quarterly installments in an aggregate annual amount equal to 1% of its original principal amount (subject to reduction in connection with debt prepayments and debt buy backs), commencing the first full fiscal quarter after the Closing Date, with the balance payable on the final maturity date.<br><br>• **Senior Term Loan C Facility**: Matures on the day that is 7 years after the Closing Date and will not amortize.<br><br>• **Senior Revolving Credit Facility**: Terminates on the day that is 5 years after the Closing Date.<br><br>• **DIP Roll Term Loan B Facility**: Matures on October 31, 2017 and shall not amortize; *provided* that after the Conversion Date, the DIP Roll Term Loan B Facility will mature on the day that is 7 years after the Closing Date and will amortize in the same manner as the Senior Term Loan B Facility.<br><br>• **DIP Roll Term Loan C Facility**: Matures on October 31, 2017 and shall not amortize; *provided* that after the Conversion Date, the DIP Roll Term Loan C Facility will mature on the day that is 7 years after the Closing Date and will not amortize.<br><br>• **DIP Roll Revolving Credit Facility**: Matures on October 31, | Commitment Letter at Exhibit B and Exhibit C |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | 2017; *provided* that after the Conversion Date, the DIP Roll Revolving Credit Facility will terminate on the day that is 5 years after the Closing Date. | |
| ***Purpose/Use of Proceeds***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | • **Senior Term B Loans**:  (a) To pay Transaction Costs, (b) to fund the Closing Refinancing, (c) to fund distributions required in connection with the consummation of the Plan, (d) for working capital and general corporate purposes, and (e) to pay fees, expenses and costs relating to the consummation of the Plan and funding the transactions contemplated by the Plan and for other purposes to be mutually agreed.<br><br>• **Senior Term C Loans**: To cash fund in an amount not to exceed $650 million, one or more interest-bearing cash collateral accounts and invested in cash or cash equivalents. (each, a "<u>Cash Collateral Account</u>").<br><br>    • Amounts on deposit in any such Cash Collateral Account at a Funded LC Issuing Bank will secure (i) the Borrower's obligations in respect of Term Letters of Credit issued by such Funded LC Issuing Bank on a first priority basis, (ii) the Borrower's obligations in respect of the Term Letters of Credit issued by all other Funded LC Issuing Banks on a second-priority basis, and (iii) the other obligations of the Borrower and the Guarantors under the Senior Facilities on a third-priority basis for the secured parties under the definitive documentation for the Senior Facilities. The Borrower shall cause the balance of each Cash Collateral Account for the benefit of a Funded LC Issuing Bank at all times to at least equal the sum of the face amounts of all undrawn Term Letters of Credit issued by such Funded LC Issuing Bank plus all unpaid reimbursement obligations with respect thereto plus any unused commitments in respect of Term Letters of Credit issued by such Funded LC Issuing Bank (if any) (such amount for any Funded LC Issuing Bank, an "<u>Individual Senior Funded LC Exposure Amount</u>").<br><br>• **Senior Revolving Credit Facility**: (a) On the Closing Date to fund (i) a portion of the Transaction Costs, and (ii) any OID or upfront fees required to be funded in connection with the terms and provisions of the Fee Letter, (b) on and after the Closing Date, to backstop or replace existing letters of credit or to cash collateralize outstanding letters of credit other than Term Letters of Credit, (c) on or after the Closing Date, for working capital, capital expenditures and general corporate purposes (including acquisitions, investments, restricted payments and other transactions not prohibited by the Senior Facilities Documentation), and (d) to fund the transactions contemplated by the Plan and for other purposes to be mutually agreed; provided that, on the Closing Date, borrowings of Revolving Loans to fund uses described in clause (c) shall not exceed a cap | Commitment Letter at <u>Exhibit B</u> and <u>Exhibit C</u>; DIP Order at ¶¶ G, 4, 15 |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | to be mutually agreed. | |
| | • **DIP Roll Term B Loans**: (a) To pay Transaction Costs, (b) to fund the Closing Refinancing, (c) to fund distributions in connection with the consummation of the Plan, (d) for working capital and general corporate purposes, and (e) to pay fees, expenses and costs relating to the consummation of the Plan and funding the transactions contemplated by the Plan (and the funding of operations prior to the consummation of the Plan) and for other purposes to be mutually agreed. | |
| | • **DIP Roll Term C Loans**: To cash fund in an amount not to exceed $650 million, one or more Cash Collateral Accounts. | |
| | • **DIP Roll Revolving Credit Facility**: (a) On the Closing Date to fund (i) a portion of the Transaction Costs, and (ii) any OID or upfront fees required to be funded in connection with the terms and provisions of the Fee Letter, (b) on and after the Closing Date, to cash collateralize or backstop or replace outstanding letters of credit, (c) on or after the Closing Date, for working capital, capital expenditures and general corporate purposes (including acquisitions, investments, restricted payments and other transactions not prohibited by the DIP Roll Facilities Documentation), and (d) to fund the transactions contemplated by the Plan (and the funding of operations prior to the emergence from the Case until the consummation of the Plan) and for other purposes to be mutually agreed. | |
| *Events of Default*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Senior Facilities and DIP Roll Facilities include usual and customary events of default for financings of their type, including, without limitation: <br><br>• Non-payment of principal, interest and fees, breaches of representations and warranties, defaults under negative covenants and certain affirmative covenants, cross-event of default and cross-acceleration to debt in excess of a materiality threshold to be mutually agreed; bankruptcy and insolvency defaults; final monetary judgment defaults (same dollar threshold as cross default to material indebtedness) to the extent not covered by indemnities or insurance above a materiality threshold to be mutually agreed; customary ERISA events; and invalidity of material guarantees or loan documents or impairment of security of a material portion of the collateral; or a Change of Control; *provided, that*, with respect to the DIP Roll Facilities (i) prior to the Conversion Date, the Events of Default will be substantially similar to the Existing DIP Credit Agreement (including those related to the Case and shall not include bankruptcy and insolvency defaults until after the Conversion Date) and (ii) any provisions in respect of the Case or a plan of reorganization (or orders approving any such plan of reorganization) shall be amended to conform to the terms set | Commitment Letter at <u>Exhibit B</u> and <u>Exhibit C</u>; DIP Order at ¶ 21 |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | forth in the Commitment Letter. | |
| ***Priority and Security of Financing Liens***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | • **Senior Facilities**: All obligations related to the Financing shall, subject to the Carve Out, the RCT Lien and the Reclamation Obligations, be secured by substantially all of the present and after acquired assets of each of the Senior Loan Parties and a perfected pledge by Holdings of all of the capital stock of the Borrower (excluding the Excluded Assets as defined in the Commitment Letter) (the "Security").<br><br>• **DIP Roll Facilities**: Same as Senior Facilities, *provided* that prior to the Conversion Date, the Security will benefit from the claim and priority status as set forth in the Existing DIP Credit Agreement and will otherwise be substantially similar to the Existing DIP Credit Agreement. | Commitment Letter at <u>Exhibit B</u> and <u>Exhibit C</u>; DIP Order at ¶ 7 |
| ***Carve Out***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The "Carve Out" shall have the meaning set forth in the DIP Order. | DIP Order at ¶ 27 |
| ***RCT Lien and Reclamation Obligations***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | • Security and priority of obligations related to the Facilities will be subject to a first priority lien in favor of the Railroad Commission of Texas to provide credit support to secure reclamation obligations with the Railroad Commission of Texas from time to time (the "RCT Lien"), until such time as the Borrower has obtained applicable regulatory approvals to "self-bond" such obligations on an unsecured basis, provided that to the extent unsecured self-bonding is subsequently unavailable or prohibited, the RCT Lien shall automatically be permitted (all such obligations, including credit support required to be provided to the Railroad Commission of Texas, collectively, "Reclamation Obligations"). | Commitment Letter at <u>Exhibit B</u> and <u>Exhibit C</u>; DIP Order at ¶ 28 |
| ***Covenants***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Usual and customary covenants for similar financings, including the following financial covenant:<br><br>• **Senior Revolving Credit Facility**: A financial covenant with respect to the Senior Revolving Credit Facility as follows: for any fiscal quarter if as of the last day of such fiscal quarter the Testing Threshold (as defined in the Commitment Letter) is met, the ratio of (i) funded debt outstanding (including drawings under letters of credit to the extent unreimbursed and not cash collateralized) under the Senior Facilities plus all other funded debt outstanding that is secured by a lien on the Collateral that is *pari passu* with the lien securing the Senior Facilities and capitalized lease obligations and purchase money debt of the Borrower and its restricted subsidiaries (net of (x) unrestricted cash and cash equivalents of the Borrower and its restricted subsidiaries and (y) the amount of funds on deposit in the Cash | Commitment Letter at <u>Exhibit B</u> and <u>Exhibit C</u> |

13

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | Collateral Accounts) to (ii) consolidated EBITDA for the most recent four fiscal quarter period for which financial statements are available shall not exceed 4.25 to 1.00.<br><br>• **DIP Roll Revolving Credit Facility**: A financial covenant with respect to the DIP Roll Revolving Credit Facility as follows: for any fiscal quarter if as of the last day of such fiscal quarter the Testing Threshold (as defined in the Commitment Letter) is met, the ratio of (i) the loans outstanding under the DIP Roll Facilities and any other funded debt secured by a superpriority lien on the collateral to (ii) consolidated EBITDA for the most recent four fiscal quarter period for which financial statements are available shall not exceed 4.25 to 1.00. After the Conversion Date, the Financial Covenant with respect to the DIP Roll Revolving Credit Facility will match the financing covenant for the Senior Revolving Credit Facility. | |
| *Conditions to Borrowing*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Usual and customary conditions precedent to extensions of credit for financings of this type. | Commitment Letter at <u>Exhibit D</u> and <u>Exhibit E</u> |
| *Waivers and Consents*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv, v), (vii-x)* | ***Indemnification***:  Indemnification of the Commitment Parties, their affiliates (as defined in the Commitment Letter), permitted successors and assigns and their respective officers, directors, employees, members, agents, advisors, representatives and controlling persons involved in the Transactions (each, an "<u>Indemnified Person</u>").<br><br>***Release of Claims and Causes of Action***:   Release of the Indemnified Parties from any and all claims arising out of, in connection with, or relating to the Financing, or the transactions contemplated thereunder. | Commitment Letter at <u>Exhibit B</u>; Approval Order at ¶ 8 |
| *Professional Retention* | White & Case LLP will represent DBNY, as Senior Administrative Agent or DIP Roll Administrative Agent, as applicable, and the Commitment Parties, as joint lead arrangers; *provided that* such retention in no way alters White & Case's obligations under the Settlement Agreement or Plan Support Agreement. | Approval Order at ¶ 7 |

## <u>Provisions to be Highlighted Pursuant to Local Bankruptcy Rule 4001-2(a)(i)</u>

10.    Local Bankruptcy Rule 4001-2(a)(i) requires a debtor to:  (a) recite whether the proposed form of the financing order contains certain provisions of the type enumerated therein; (b) identify the location of such provisions in the proposed financing order; and (c) justify the

14

inclusion of such provisions in the proposed financing order (the "Highlighted Provisions").  *See*

Del. Bankr. L.R. 4001-2(a)(i).  The TCEH Debtors submit that one provision of the Financing

requires highlighting under Local Bankruptcy Rule 4001-2(a)(i), specifically with respect to

Local Bankruptcy Rule 4001-2(a)(i)(G), the priming of secured liens, and that such provision is

justified and necessary in the context and circumstances of the Cases.

11.    The Financing grants the DIP Agent, for the benefit of itself, its sub-agents, the

DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management

Banks, a valid, binding, continuing, enforceable, fully-perfected and non-avoidable first priority

senior priming security interest in and lien upon all prepetition and postpetition property of the

TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that is subject to

valid, perfected, and non-avoidable Prepetition First Priority Liens[7] and Prepetition Second

Priority Liens presently held by any of the Prepetition Secured Creditors (as defined in the Final

Cash Collateral Order), excluding the Deposit L/C Loan Collateral Account to the extent of the

Deposit L/C Obligations (each, as defined in the First Lien Credit Agreement (as defined in the

Final Cash Collateral Order)), pursuant to section 364(d)(1) of the Bankruptcy Code.  *See* DIP

Order, at ¶¶ F(ii), 7.

12.    Local Rule 4001-2(a)(i)(G) requires explicit disclosure of provisions that prime

any secured liens without that lienholder's consent.  *See Del. Bankr. L.R.* 4001-2(a)(i)(G).  Here,

the Financing contemplates priming of the Prepetition First Priority Liens and the Prepetition

Second Priority Liens of the Prepetition Secured Creditors in the Prepetition Collateral (as

---

[7]    Capitalized terms used but not otherwise defined in this section shall have the meanings set forth in the *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [D.I. 855] (the "Final Cash Collateral Order").

defined in the Final Cash Collateral Order) under section 364(d) of the Bankruptcy Code.  As described herein, the TCEH Debtors and their advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the TCEH Debtors require.  The TCEH Debtors are not able to obtain financing on equal or better terms from the Commitment Parties other than financing secured by first priority priming liens.  The priming liens to be granted pursuant to the Financing are consistent with the terms of the Existing DIP Credit Agreement and Final Cash Collateral Order. Significantly, subject to the terms and conditions of the DIP Roll Credit Agreement and the DIP Order, the TCEH First Lien Ad Hoc Committee, the members of which hold a majority of claims under the First Lien Credit Agreement and the First Lien Notes Indenture, has consented to such priming liens.  Moreover, any DIP Superpriority Claims granted pursuant to the Financing shall remain subject and subordinate to any DIP Superpriority Claims arising under the Existing DIP Order until such DIP Superpriority Claims have been irrevocably paid in full.  The TCEH Debtors submit that no further provisions of the Orders require highlighting under Local Bankruptcy Rule 4001-2(a)(i).

**Background**

13.     On April 29, 2014 (the "Petition Date"), each of the TCEH Debtors filed a voluntary petition with the Court under the Bankruptcy Code.  The TCEH Debtors are operating their businesses and managing their properties as TCEH Debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered a final order for joint administration of these chapter 11 cases [D.I. 849].  The Court has not appointed a trustee.  The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors of Energy Future Competitive Holdings Company LLC ("EFCH"), Texas Competitive Electric Holdings Company LLC ("TCEH"), the direct and

16

indirect Debtor subsidiaries of EFCH and TCEH, and EFH Corporate Services Company (the "TCEH Creditors' Committee") on May 13, 2014 [D.I. 420], and an official committee of unsecured creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC ("EFIH"), EFIH Finance, Inc., and EECI, Inc. (the "EFH Creditors' Committee") on October 27, 2014 [D.I. 2570]. Further information regarding the TCEH Debtors' business operations and capital structure is set forth in the declaration of Paul Keglevic in support of the TCEH Debtors' first day motions [D.I. 98].

### The TCEH Debtors' Need to Obtain the Financing

14.     The TCEH Debtors have approximately $1,040,000,000 drawn under the current DIP revolving credit facility and $1,425,000,000 outstanding under the Existing DIP Credit Agreement, which facilities mature on November 7, 2016. The Financing contemplates financing that provides: (i) committed exit financing for the TCEH Debtors; and (ii) the flexibility to incur financing prior to exit in order to refinance the DIP loan under the Existing DIP Credit Agreement. This ensures the Debtors have sufficient liquidity runway to fund the bankruptcy process past the maturity of the existing DIP facility and until October 31, 2017.

15.     Upon entry of the Orders, the Financing will provide the TCEH Debtors with access to up to $4,250,000,000 of loans, consisting of:  (a) $750,000,000 under the Senior Revolving Credit Facility or DIP Roll Revolving Credit Facility; (b) $2,850,000,000 under the Senior Term Loan B Facility or DIP Roll Term Loan B Facility; and (c) $650,000,000 under the Senior Term Loan C Facility or the DIP Roll Term Loan C Facility.

16.     The approval of the TCEH Debtors' Financing, with its favorable terms, will substantially enhance the TCEH Debtors' ability to confirm and/or approve the Plan, achieve a smooth transition out of chapter 11, and instill confidence in their customers, employees,

17

creditors, and other parties in interest.  Therefore, the TCEH Debtors have a substantial need to access the Financing during their Cases and after emergence.

<u>**The TCEH Debtors' Efforts to Obtain Exit Financing**</u>

17.    The TCEH Debtors were uniquely positioned to negotiate the Financing with favorable terms given that the TCEH Debtors have had continuous dialogue regarding potential financing with various banks since October 2015.  In October 2015, the TCEH Debtors held in-person meetings with seven banks in New York and received financing proposals from all seven banks. The proposals consisted of the Senior Facilities and/or DIP Roll Facilities. In November 2015, the TCEH Debtors met with a subset of these banks to further refine the financing proposals. Prospective lenders understand that the Debtors are a sizable company with a leveraged balance sheet that will be restructured in the Cases and thus continued to maintain open dialogue through periodic calls, meetings, and presentations in the subsequent months. In February 2016, the TCEH Debtors followed-up on the initial financing discussions with additional in-person meetings in New York with prospective lenders.

18.    The TCEH Debtors utilized feedback from prior discussions with banks to structure the request-for-proposal process. The TCEH Debtors' decision to proceed with the Financing comes after a dedicated and diligent search for the best financing alternatives and after obtaining guidance and preliminary proposals regarding structure from the various banks.  In early April 2016, the TCEH Debtors and Evercore Group LLC ("<u>Evercore</u>") initiated a request for financing proposals (the "<u>RFP</u>").  The TCEH Debtors utilized feedback from prior discussions with prospective lenders to structure the RFP process. The TCEH Debtors and Evercore canvassed the market to find parties interested in providing the Financing.  During the initial stage of the RFP process, the TCEH Debtors approached seven large financial institutions

18

that are actively involved in the DIP and syndicated finance markets. The TCEH Debtors and

their advisors provided these financial institutions with a draft fee letter, draft commitment letter,

a summary grid of select terms, and financial projections of TCEH.  The TCEH Debtors offered

each of these financial institutions the opportunity to conduct due diligence and submit written

responses to the RFP and other materials related to the Financing.

19.      All seven financial institutions submitted initial proposals in response to the

TCEH Debtors' RFP in grid format. The TCEH Debtors, Kirkland & Ellis LLP, and Evercore

conducted multiple rounds of negotiations with six of the seven banks before proceeding to the

documentation stage. In early May 2016, three additional financial institutions signed

non-disclosure agreements and joined the financing process.  The TCEH Debtors continued

actively negotiating with nine of the ten prospective financing parties for over three weeks to

obtain the most favorable terms on the Financing.  The TCEH Debtors negotiated commitment

documents with nine to ten banks, understanding that the TCEH Debtors would require a

broadly-syndicated facility to achieve a DIP to exit facility of this size.

20.      On May 31, 2016, the TCEH Debtors received signed commitment letters from

seven lenders who are participating in the Financing.  Collectively, these institutions were able to

provide the TCEH Debtors with up to $4,250,000,000 in commitments to provide the Financing.

21.      The Financing is the best source of financing for the TCEH Debtors, providing

the liquidity needed to continue operating their businesses in the ordinary course and satisfy

restructuring-related costs as well as refinance the existing facility under the Existing DIP Credit

Agreement, and facilitate the TCEH Debtors' emergence from bankruptcy.  The Financing was

negotiated at arm's length, in a competitive process, on terms that are reasonable to all parties.

The Financing will ensure the TCEH Debtors' access to sufficient liquidity that will provide the foundation for maximizing value for all stakeholders.

### The Aggregate Fees Associated with the DIP Facility

22.    The aggregate fees payable in connection with the Financing are equal to approximately 2.25 percent (or $95.625 million) of the total Financing commitment of $4.25 billion.

### Basis for Relief

I.    **The TCEH Debtors Should Be Authorized to Obtain Replacement Postpetition Financing Through the Commitment Letter and the Facilities.**

   A.    **Entry into the Commitment Letter and Facilities is an Exercise of the TCEH Debtors' Sound and Reasonable Business Judgment.**

23.    The Court should authorize the TCEH Debtors, as an exercise of the TCEH Debtors' sound business judgment, to enter into the Financing and obtain access to the Senior Facilities or DIP Roll Facilities as contemplated by the Commitment Letter.

24.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  *See*, *e.g.*, *Trans World Airlines, Inc. v. Travellers Int'l AG* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649,

at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

25.     Furthermore, courts in this jurisdiction and others have similarly approved debtors' entry into commitment letters and the incurrence of obligations in connection with exit financings on the basis of such debtors' reasonable business judgment.  *See, e.g.*, *In re GSE Envtl., Inc.*, No. 14-11126 (MFW) (Bankr. D. Del. July 11, 2014) (approving entry into and payment of fees under commitment letter); *In re Overseas Shipholding Grp., Inc.*, No. 12-20000 (PJW) (Bankr. D. Del. May 27, 2014); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Nov. 6, 2012); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Oct. 12, 2011); *In re Muzak Holdings LLC*, No. 09-10422 (KJC) (Bankr. D. Del. Dec. 21, 2009).

26.     Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts

should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

27.    The TCEH Debtors' proposed entry into the Financing is an exercise of their sound business judgment that warrants approval by the Court.  During these Cases, the TCEH Debtors and their advisors have analyzed the TCEH Debtors' financing needs and determined that the TCEH Debtors require continuous access to financing to support their operational and restructuring activities.  Accordingly, the TCEH Debtors negotiated the Financing with the Commitment Parties in good faith, at arm's length, and with the assistance of their advisors, to obtain the required replacement postpetition financing on terms most favorable to the TCEH Debtors.  Based on the advice of counsel and other professionals, and the TCEH Debtors' own analysis, the TCEH Debtors have determined in their sound business judgment that the Facilities as set forth in the Commitment Letter provide a greater amount of replacement DIP financing on more favorable terms than any other reasonably available alternative.  The TCEH Debtors' advisors canvassed the market to find interested parties to participate in the debtor-in-possession financing and have assisted the TCEH Debtors in negotiations to obtain the best terms available to ensure that the Facilities contemplated by the Commitment Letter were fully subscribed.

28.    Entry into the Financing will allow the TCEH Debtors to lock in exit financing, and at their election, replacement DIP financing well in advance of consummation of the Plan, thus enhancing the Debtors' reorganization prospects. Accordingly, entry into the Financing is an exercise of the TCEH Debtors' sound business judgment.

**B.    The TCEH Debtors Should Be Authorized to Obtain Replacement Postpetition Financing on a Senior Secured and Superpriority Basis.**

29.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (a)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (b)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (c)  secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

30.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also, L.A. Dodgers*, 457 B.R. at 313 (citing *Ames Dep't Store*, 115 B.R. at 37 (noting the court "may not approve any credit transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)").  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to

23

extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

31.    The TCEH Debtors' and Evercore's discussions with various potential sources of replacement DIP financing revealed that replacement DIP financing on a junior or unsecured basis was not available to the TCEH Debtors.  The TCEH Debtors' significant secured debt obligations and lack of unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a senior secured and superpriority basis.  The Court should therefore authorize the TCEH Debtors to provide the Commitment Parties with a lien, subject to exclusions as provided in the Commitment Letter, on substantially all of the present and after acquired assets of each of the Borrower and Guarantors (together, the "Loan Parties") and a perfected pledge by Holdings of all of the capital stock of the Borrower, including (a) a perfected pledge of all the capital stock of each direct, wholly owned material restricted subsidiary held by the Loan Parties (which pledge, in the case of any CFC Holding Company or foreign subsidiary of a U.S. entity shall be limited to 65% of the voting

24

capital stock (and 100% of the non-voting capital stock) of such CFC Holding Company or CFC) and (b) a perfected security interest in substantially all other tangible and intangible assets of the Loan Parties (including but not limited to accounts receivable, inventory, equipment, general intangibles, investment property, owned real property (with all required mortgages being permitted to be delivered on a post-closing basis), intellectual property and the proceeds of the foregoing).

C.    **The TCEH Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.**

32.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

33.    When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtors' assets. Courts consider a number of factors, including, without limitation:

> (a) whether alternative financing is available on any other basis (i.e., whether any better offers, bids, or timely proposals are before the court);
>
> (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;
>
> (c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

25

> (d) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 364.04[1] (16th ed.). The DIP Documents satisfy each of these factors.

34. **First**, as described above, the TCEH Debtors and their advisors canvassed the market and were not able to obtain financing on equal or better terms from the Commitment Parties other than financing secured by first priority priming liens.

35. **Second**, the TCEH Debtors need the funds to be provided under the Financing to preserve the value of their estates for the benefit of all stakeholders. Specifically, the TCEH Debtors need the funds under the Financing to consummate the Plan and maintain operations beyond the maturity of the current DIP loan under the Existing DIP Credit Agreement.

36. **Third**, the TCEH Debtors and their advisors determined that the Commitment Parties offered the best option for obtaining the postpetition financing the TCEH Debtors require, including, upon entry of the Orders, access to up to $4,250,000,000 in funding, which the TCEH Debtors and their advisors have independently determined is sufficient and necessary to allow the TCEH Debtors to fund the consummation of the Plan.

37. **Fourth**, the TCEH Debtors conducted arm's-length negotiations with the Commitment Parties regarding the terms of the Facility, and those agreements reflect the most favorable terms on which the Commitment Parties (or any other lender) were willing to offer

26

financing.  Thus, the entry into the Financing is an exercise of sound and reasonable business judgment in the best interests of the TCEH Debtors' estate and its creditors.  Accordingly, the TCEH Debtors satisfy the requirements to obtain postpetition financing secured by a first priority priming lien and the Court should authorize the TCEH Debtors to enter into the Financing Papers and obtain access to the Financing.

## II.    The Payment of Fees is Appropriate.

38.    The TCEH Debtors have agreed, subject to Court approval, to pay certain fees to the Commitment Parties in exchange for their providing the Financing.  The fees the TCEH Debtors have agreed to pay to the Commitment Parties, together with the other provisions of the Financing Papers, represent the most favorable terms to the TCEH Debtors on which the Commitment Parties would agree to make the Financing available.  The TCEH Debtors considered such fees when determining in their sound business judgment that the Financing Papers constituted the best terms on which the TCEH Debtors would obtain the postpetition financing necessary to continue their operations and prosecute their chapter 11 cases, and paying these fees in order to obtain the Financing is in the best interests of the TCEH Debtors' estates, creditors, and other parties in interest.

39.    Courts routinely authorize TCEH Debtors to pay fees of the kind that the TCEH Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the TCEH Debtors' estates.  *See, e.g.*, *In re LSP Energy Ltd. P'ship*, No. 12-10460 (Bankr. D. Del Feb. 27, 2012) (approving 1.25-percent commitment fee); *In re Friendly Ice Cream Corp.*, No. 11-13167 (Bankr. D. Del. Nov. 2, 2011) (approving certain letter of credit fees including a 2-percent issuance fee); *In re Sea Launch Co., L.L.C.*, No. 09-12153 (Bankr. D. Del. May 12, 2010) (approving 3.75-percent DIP break-up fee); *In re Cooper-Standard Holdings Inc.*,

27

No. 09-12743 (Bankr. D. Del. Sept. 2, 2009) (approving 2.5-percent upfront fee and 2.5-percent exit fee); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. June 15, 2009) (approving 3-percent exit fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5-percent exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Jan. 30, 2008) (approving a 2.5-percent fee related to refinancing and extending a postpetition financing facility); *see also In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3-percent letter of credit fee); *In re InSight Health Servs. Holdings Corp.*, No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5-percent DIP closing fee); *In re Neff Corp.*, No. 10-12610 (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1-percent DIP and exit facility fee); *In re Reader's Digest Ass'n*, No. 09-23529 (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3-percent exit fee); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5-percent upfront fee and a 1-percent exit/conversion fee); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75-percent exit fee); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Feb. 9, 2009) (approving an upfront 3-percent facility fee).  Accordingly, the Court should authorize the TCEH Debtors to pay the fees provided under the Financing Papers in connection with entering into those agreements.

40.    The terms of the Financing Papers, including the key provisions described above, constitute the most favorable terms on which the TCEH Debtors could obtain needed replacement postpetition financing.

### III.    The Scope of the RCT Reclamation Support Carve Out is Appropriate.

41.    The Commitment Letter subjects the security interests of the Commitment Parties to the RCT Lien (the "<u>RCT Reclamation Support Carve Out</u>").  The TCEH Debtors are obligated

to secure their reclamation obligations to the RCT.  The TCEH Debtors, after consultation with the Commitment Parties, the Prepetition First Lien Agent, and their respective advisors, believe that securing the RCT reclamation obligations with the RCT Lien is preferable to other alternatives, including a letter of credit, because the TCEH Debtors will be able to avoid significant fees associated with such alternatives.  Accordingly, the TCEH Debtors believe the scope of the RCT Reclamation Support Carve Out is appropriate.

## IV.    The Commitment Parties Should Be Deemed Good Faith Lenders under Section 364(e) of the Bankruptcy Code.

42.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

43.    As set forth in the McMullan Declaration, the Facilities were negotiated in good faith and at arm's length among the TCEH Debtors and the Commitment Parties, and all of the Financing obligations will be extended by the Commitment Letters in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party in connection with the Financing other than as described in this Motion, the Commitment Letter, and the Fee Letter.  Moreover, the Financing has been extended in express reliance upon the

29

protections afforded by section 364(e) of the Bankruptcy Code and the Commitment Parties should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise. *See* 11 U.S.C. § 364(e).  Accordingly, the Court should find that the Commitment Parties are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## V.    Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances.

44.    The Facilities and the proposed Orders, as applicable, contemplate that the automatic stay imposed under section 362(a) of the Bankruptcy Code shall be vacated or modified, on the terms set forth therein to the extent necessary to effectuate all of the terms and provisions contained therein, including, without limitation, to:  (a) permit the TCEH Debtors to grant the DIP liens and the Superpriority Claims; (b) permit the TCEH Debtors to perform such acts as the Commitment Parties each may request in its sole discretion to assure the perfection and priority of the DIP Liens; (c) permit the TCEH Debtors to incur all liabilities and obligations to the Commitment Parties under the Commitment Letter and the Orders; and (d) authorize the TCEH Debtors to make payments, and the Commitment Parties to retain and apply payments made, in accordance with the terms of the Orders.  Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and, in the TCEH Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under the Commitment Letter and proposed Order.

30

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

45.     To implement the foregoing successfully, the TCEH Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **Notice**

46.     The TCEH Debtors shall provide notice of this Motion on the date hereof via U.S. first class mail to:  (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) counsel to the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in

31

its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the TCEH Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002, and (z) White & Case LLP, as counsel to the Commitment Parties.  The TCEH Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

47.    No prior request for the relief sought in this Motion has been made to this or any other court.

32

WHEREFORE, the TCEH Debtors respectfully request that the Court enter the Orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**.

Dated:  June 6, 2016
      Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:       (302) 651-7700
Facsimile:       (302) 651-7701
Email:           collins@rlf.com
                 defranceschi@rlf.com
                 madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile:       (212) 446-4900
Email:           edward.sassower@kirkland.com
                 stephen.hessler@kirkland.com
                 brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:           james.sprayregen@kirkland.com
                 marc.kieselstein@kirkland.com
                 chad.husnick@kirkland.com
                 steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession

33