1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                      :

                                 :    Chapter 11

6    ENERGY FUTURE HOLDINGS       :

     CORP., et al.,              :    Case No. 14-10979(CSS)

7                                 :

              Debtors.           :    (Jointly Administered)

8    _____ :

9

10

11

12                              United States Bankruptcy Court

13                              824 North Market Street

14                              Wilmington, Delaware

15

16

17                              June 16, 2016

18                              10:06 AM

19

20   B E F O R E :

21   HON CHRISTOPHER S. SONTCHI

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECR OPERATOR:  LESLIE MURIN

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order (A) Approving the Disclosure

3    Statement, (B) Establishing the Voting Record Date, Voting

4    Deadline, and Other Dates, (C) Approving Procedures for

5    Soliciting, Receiving, and Tabulating Votes on the Plan and

6    for Filing Objections to the Plan, and(D) Approving the

7    Manner and Forms of Notice and Other Related Documents [D.I.

8    8357; filed May 1, 2016]

9

10   HEARING re Second Amended Disclosure Statement for the

11   Second Amended Joint Plan of Reorganization of Energy Future

12   Holdings Corp., et al., Pursuant to Chapter 11 of the

13   Bankruptcy Code as it Applies to the TCEH Debtors and EFH

14   Shared Services Debtors [D.I. 8689; filed June 10, 2016]

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3         Attorney for the Debtors

4

5    BY:  CHAD HUSNICK, ESQ.

6         MARK MCKANE, ESQ.

7         MARC KIESELSTEIN, ESQ.

8

9    RICHARDS, LAYTON & FINGER

10        Attorneys for the Debtors

11

12   BY:  DAN DEFRANCESCHI, ESQ.

13        JASON MADRON, ESQ.

14

15   BAYARD

16        Attorney for Delaware Trust Co. as Indenture

17        Trustee

18

19   BY:  NEIL GLASSMAN, ESQ.

20

21   POTTER ANDERSON CARROON LLP

22        Attorney for Deutsche Bank New York

23

24   BY:  R. STEPHEN MCNEILL, ESQ.

25

Page 4

1    VENABLE, LLP

2         Attorneys for Pimco

3

4    BY:  JEFFREY S. SABIN, ESQ.

5         JAMIE EDMONSON, ESQ.

6

7    WHITE & CASE

8         Attorney for TCEH Ad Hoc Group

9

10   BY:  J. CHRISTOPHER SHORE, ESQ.

11

12   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

13        Attorneys for the Ad Hoc Committee of TCEH First Lien

14        Creditors

15

16   BY:  ALAN W. KORNBERG, ESQ.

17        JACOB A. ADLERSTEIN, ESQ.

18        KELLIE CAIRNS, ESQ.

19

20   YOUNG CONAWAY STARGATT & TAYLOR, LLP

21        Attorney for the Ad Hoc Committee of TCEH First Lien

22        Creditors

23

24   BY:  PAULINE MORGAN, ESQ.

25

1   PACHULSKI STANG ZIEHL & JONES

2        Attorney for EFIH Second Lien Indenture Trustee

3

4   BY:  COLIN R. ROBINSON, ESQ.

5

6   KRAMER LEVIN NAFTALIS & FRANKEL

7        Attorney for Second Lien Indenture Trustee

8

9   BY:  JOSHUA BRODY, ESQ.

10

11  SULLIVAN & CROMWELL

12       Attorney for E Side Committee

13

14  BY:  BRIAN GLUECKSTEIN, ESQ.

15

16  NIXON PEABODY

17       Attorney for AST as EFH Indenture Trustee

18

19  BY:  RICHARD PEDONE, ESQ.

20

21  FOX ROTHSCHILD

22       Attorney for the Ad Hoc TCEH Noteholders

23

24  BY:  JEFFREY M. SCHLERF, ESQ.

25

1   MCELROY DEUTSCH MULVANEY & CARPENTER LLP

2        Attorney for TCEH

3

4   BY:  DAVID A. PRIMACK, ESQ.

5

6   SHERMAN & STERLING LLP

7        Attorney for Deutsche

8

9   BY:  STEVE SCHWARTZ, ESQ.

10

11   MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

12        Attorney for E Side Committee

13

14   BY:  MARK A. FINK, ESQ.

15

16   MOFO

17        Attorney for TCEH Committee

18

19   BY:  TODD GOREN, ESQ.

20

21   MORRIS JAMES

22        Attorney for Law Debenture

23

24   BY:  STEPHEN MILLER, ESQ.

25

Page 7

1    FOLEY & LARDNER

2         Attorney for UMB, as Trustee

3

4    BY:  HAROLD KAPLAN, ESQ

5

6    MUNGER, TOLLES & OLSON

7         Attorney for TCEH Debtors

8

9    BY:  BRADLEY SCHNEIDER, ESQ.

10

11   BLANK ROME

12        Attorney for Wilmington Trustee

13

14   BY:  MICHAEL D. DEBAECKE, ESQ.

15

16   SEWARD KISSEL

17        Attorney for Administrative Agent and Collateral

18        Agent

19

20   BY:  ARLENE ALVES, ESQ.

21

22   KLEHR HARRISON HARVEY BRANZBURG LLP

23        Attorney for UMB Bank, Indenture Trustee

24

25   BY:  RAYMOND H. LEMISCH, ESQ.

1  AKIN GUMP STRAUSS HAUER & FELD

2      Attorney for UMB Bank, Indenture Trustee

3

4  BY:  SCOTT ALBERINO, ESQ.

5

6  PATTERSON BELKNAP

7      Attorney for Law Debenture Trust Company

8

9  BY:  BRIAN P. GUINEY, ESQ.

10

11  PROSKAUER ROSE

12      Attorney for EFH Corp.

13

14  BY:  PETER YOUNG, ESQ.

15

16  STEVENS & LEE P.C.

17      Attorney for EFIH Special Conflicts

18

19  BY:  JOSEPH H. HUSTON, JR., ESQ.

20

21

22

23

24

25

1            P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.  Good morning.

4            MR. HUSNICK:  Good morning, Your Honor.  Chad

5    Husnick with Kirkland & Ellis on behalf of the debtors.  I'm

6    here with my colleagues, Marc Kieselstein and Mark McKane.

7            Your Honor, we're here today on the debtors'

8    motion to approve the disclosure statement for the TCEH

9    debtors, but before I turn to the disclosure statement I'd

10   like to provide the Court with a brief update on the

11   debtors' efforts to bring these cases to a conclusion since

12   we were last here.

13           THE COURT:  Okay.

14           MR. HUSNICK:  Your Honor, I'll begin with the

15   T side.

16           As we discussed at the scheduling hearing, the

17   TCEH debtors are on a faster track to emergence given the

18   narrower set of issues.  Consistent with this reality the

19   debtors have continued to take significant steps over the

20   last few weeks to prepare for emergence from Chapter 11.

21           In particular, and for example, on June 6th the

22   debtors filed a motion seeking approval of a $4.25 billion

23   exit financing commitment.

24           Your Honor, we spent the better part of six to

25   eight weeks negotiating with a full panoply of lenders to

1    try and identify the highest and best offer for that

2    financing, and then ultimately negotiated the fully

3    committed commitment letter that we put on file.

4            That proposed exit financing facility has the

5    flexibility to either refinance the existing DIP in advance

6    of an emergence should there need additional time, or and

7    then it would have a roll feature into the exit facility, or

8    it can just be used as exit financing that would be put in

9    place upon emergence of the T side debtors.

10           The debtors will present that motion at the

11   June 27th omnibus hearing.

12           At the same time the debtors negotiated with the

13   TCEH first liens to extend what was a 60-day runoff period

14   of the use of cash collateral.

15           Your Honor may remember that on May 1st the

16   debtors received notice of a plan support termination event,

17   that triggered the 60-day run off period under the cash

18   collateral order as drafted.  We've negotiated for a

19   consensual extension of that order through September of

20   2016.

21           We will be filed a stipulation to that effect in

22   the near future.

23           On the regulatory --

24           THE COURT:  How much did that cost you?

25           MR. HUSNICK:  No fee -- or no fee --

1          THE COURT:  Okay.

2          MR. HUSNICK:  -- for the extension.

3          THE COURT:  Thank you.

4          MR. HUSNICK:  Although there is adequate

5     protection.

6          THE COURT:  Okay.

7          MR. HUSNICK:  On the regulatory front on the

8     T side, Your Honor, I'm happy to report that on May 7th the

9     TCEH debtors did receive approval from the Nuclear

10    Regulatory Commission on the change of control application

11    on the T side.  So that's an important step ultimately, it

12    was a condition to consummation of any type of plan on the

13    T side.

14          Let me turn to tax, everybody's favorite topic in

15    this case.

16          The company continues to work on implementing the

17    TCEH tax-free spin transaction, and that includes working to

18    finalize the private letter ruling from the IRS as well as

19    negotiating the tax matters agreement.

20          On the private letter ruling in particular the

21    company has been in an active dialogue with the IRS

22    regarding the necessary rulings.  We remain optimistic that

23    the company will obtain the necessary rulings to facilitate

24    the tax-free spin, and as such at this time the company

25    continues to believe that the tax-free spin transaction is

1    the preferred outcome for both the company as well as all of

2    their respective stakeholders, including creditors of the

3    TCEH debtors and creditors of the EFH and EFIH debtors.

4          The debtors have at the same time been engaged in

5    negotiations regarding the tax matters agreement, and we

6    filed the current draft of that agreement on Monday of this

7    week, consistent with the obligations under the scheduling

8    order.

9          The tax matters agreement addresses a host of

10   issues regarding the tax affects of the tax-free spin

11   transaction.

12         In the agreement that we filed on Monday it

13   reflects a great deal of consensus between the TCEH first

14   lien creditors, who are the putative equity holders for

15   reorganized TCEH, and the EFH debtors.  The agreement does

16   supersede the prior term sheet that we filed in connection

17   with -- when we originally filed the disclosure statement.

18   So it supersedes that, and the agreement will be attached to

19   the disclosure statement that we're seeking to have approved

20   today.

21         The company will continue to work with all parties

22   in interest over the coming weeks to answer questions

23   regarding the tax matters agreement, as well as to resolve

24   any of the open objections or issues identified, and they

25   are quite few at least in its current draft.

1            The tax matters agreement would be approved as

2    part of confirmation of the plan for the TCEH debtors, and

3    we would be seeking the ruling in the confirmation order

4    that the tax matters agreement is binding upon both the EFH

5    and EFIH debtors as well as the TCEH debtors.  And I'll

6    address that a little bit more in detail in the disclosure

7    statement context how we intend to accomplish that.

8            Turning to the taxable deconsolidation, which has

9    received some focus of late.

10           As we discussed at the scheduling hearing the

11   joint plan in its current formulation contemplates that the

12   TCEH debtors can emerge from Chapter 11 in a taxable

13   transaction in the event that the tax-free spin conditions

14   are not satisfied.  Those conditions include, as I said,

15   obtaining the private letter ruling as well as the tax

16   matters agreement.

17           Since filing the plan the debtors have continued

18   to discuss potential for a taxable transaction with

19   stakeholders on both sides of the enterprise.

20           And as discussed in the amended disclosure

21   statement and the reply that we filed last Thursday, the

22   company recently received feedback from the IRS regarding

23   their views on the treatment of the cancellation of

24   indebtedness income in a taxable deconsolidation

25   transaction.

1          In particular, the IRS informed the company, and

2     the Treasury Department recently made statements in

3     connection with certain newly issued regulations, that they

4     generally believe that debt of disregarded entities will

5     generally be regarded as "non-recourse" for certain tax

6     purposes.

7          As we discussed in the revised disclosure

8     statement, if the position of the IRS and the Treasury

9     Department remains unchanged, a taxable deconsolidation of

10    TCEH from EFH could once again trigger a large cash tax

11    obligation at EFH.

12         The company and its stakeholders are still

13    considering these recent developments and exploring

14    alternative transaction structures for a taxable

15    deconsolidation.

16         Indeed the EFH debtors made clear in the tax

17    matters agreement that we filed on Monday that the tax

18    matters agreement on file with have no effect and all rights

19    are reserved if the company is unable to satisfy the tax-

20    free conditions -- spin off conditions and the IRS is

21    unwilling to provide a favorable ruling on these recent

22    indications we received from them.

23         So it's important to note however -- and this is a

24    very important part for those listening -- that this

25    development does not negatively affect the company's ability

1    to implement a tax-free spin transaction.

2         The company has informed the IRS that if the IRS

3    cannot issue the favorable Cody (ph) ruling the company will

4    seek additional rulings regarding the treatment of the

5    cancellation of the TCEH debt to provide comfort that the

6    tax-free spin remains tax free.

7         Parties have reserved their rights with respect to

8    the ability to consummate the tax-free spin off with the

9    basis step up transaction if these additional rulings are

10   not obtained.  The debtors are still discussing those issues

11   with the stakeholders.

12        But I must emphasize that this development that I

13   just disclosed about a taxable transaction does not

14   negatively affect the ability to implement the tax-free

15   transaction.

16        THE COURT:  Have you had any indication from the

17   IRS on their position on the tax-free spin?

18        MR. HUSNICK:  What I can report is that the

19   indications are positive and have been consistent and the

20   discussions are ongoing.  We do remain confident that we

21   will get the rulings necessary to implement a tax-free spin.

22        THE COURT:  And do you have any time frame that

23   you can share?

24        MR. HUSNICK:  Yeah.  We built into the schedule,

25   Your Honor, July 28th as a pivot point by which we expected

1    to have the necessary rulings.  I believe we are still

2    gunning for that date, and I think that there's a status

3    conference scheduled on that date at which point we would

4    report to Your Honor where we're at, and I think it's a

5    natural inflection point in the schedule.

6              THE COURT:  July 28th?

7              MR. HUSNICK:  Correct.  I had the right date?

8    Yes.

9              THE COURT:  Status conference with me?

10             MR. HUSNICK:  Yes.  I think it was going to be

11   telephonic.  No?  In person?

12             Okay.  I'm sorry, Your Honor, it wasn't a specific

13   -- it's two days after if we toggle we have to have a status

14   conference.

15             THE COURT:  All right.  I'm on vacation that week.

16             MR. HUSNICK:  Okay.

17             THE COURT:  And I'm on an airplane that day, so

18   that's definitely not working.

19             MR. HUSNICK:  Okay.

20             THE COURT:  I'm available the prior week, and I'll

21   certainly fit you in the prior week, or I could do,

22   reluctantly, but it's an important issue, obviously I could

23   do very early that week, so maybe the 25th or the 26th.  But

24   the 28th will not work.

25             MR. HUSNICK:  Your Honor, why don't we tentatively

1    pencil something in for the -- the week before.  If we know

2    something sooner, which there's a possibility that we will,

3    we will update the Court in advance of that.

4            THE COURT:  But we have the E side disclosure

5    statement for the 21st, so can we use that date?

6            MR. HUSNICK:  Yeah.  Let's treat that as a status

7    update, and hopefully we have clarity on that date.

8            THE COURT:  All right.  Okay.

9            MR. HUSNICK:  Thank you, Your Honor.

10           THE COURT:  You're welcome.

11           MR. HUSNICK:  Let me turn to the E side quickly.

12           The debtors are also working diligently to reach a

13    consensual path to emergence on the E side of the house.  In

14    particular the company is engaged in ongoing discussions

15    with creditors of EFH and EFIH as well as potential

16    strategic purchasers of the economic interests in Oncor.

17           We are mindful of the Court's observations

18    regarding the need to provide additional clarity for the

19    treatment and the direction of the E side cases in order to

20    maintain the schedule that has been set forth, and we are

21    optimistic that we will be able to reach some level of

22    consensus around the path forward well in advance of the

23    July 21st disclosure statement hearing.  So we will keep the

24    Court posted and likely be filing supplemental documents in

25    advance of that date.

1           Your Honor, unless you had any questions that

2    concludes my introductory remarks and I would turn into the

3    disclosure statement.

4           THE COURT:  I have no questions.

5           MR. HUSNICK:  Thank you.

6           Your Honor, the debtors filed on May 4th shortly

7    after the termination of the plan support termination event,

8    a revised plan -- new plan and disclosure statement.  We

9    also filed at the same time a motion to schedule the

10   hearings, as well as a disclosure statement and solicitation

11   procedures approval motion.

12          As you know at the confirmation -- or at the

13   scheduling order hearing we bifurcated the confirmation

14   schedules into a T side confirmation schedule and an E side

15   confirmation schedule.

16          Consistent with that we filed Thursday of last

17   week a revised joint plan of reorganization and a separate

18   disclosure statement for the TCEH debtors.

19          The significant disclosure in the disclosure

20   statement, it is largely not surprisingly based on the prior

21   draft of the disclosure statement brought current for

22   developments, including confirmation of the original plan,

23   updated disclosures regarding the tax effects of the tax-

24   free spin transaction, as well as the additional disclosures

25   that I mentioned this morning.  We have a detailed

1     disclosure regarding the proposed plan treatment for

2     creditors of TCEH, and we also explain that the disclosure

3     statement and the votes being solicited are only related to

4     the TCEH debtors and not the EFH debtors.  That will be

5     subject to a separate disclosure statement.

6              We have a very lengthy description of the risk

7     factors associated with this particular transaction,

8     including the intricate tax issues that I've already

9     mentioned.

10              Your Honor, we told you at the scheduling hearing

11    that the issues were narrow on the T side and that we

12    expected this to move quite quickly, and the proof is in the

13    pudding, Your Honor.

14              In a case that has been filled with nattering

15    nabobs of negativity, including myself, we only have two --

16              THE COURT:  Mr. Kieselstein write that or --

17         (Laughter)

18              MR. HUSNICK:  I was fed some language this

19    morning, but not from Mr. Kieselstein.

20         (Laughter)

21              MR. HUSNICK:  We only have two objections.  And,

22    Your Honor, consistent with the normal course in disclosure

23    statement hearings, we endeavored to resolve those

24    objections as much as we possibly could.

25              We did resolve with Bank of New York Mellon, which

1    was reflected in the objection chart we filed --

2            THE COURT:  Uh-huh.

3            MR. HUSNICK:  -- a couple days ago, that issue,

4    Your Honor, has heard much about, we ultimately settled it

5    in the first confirmation hearing.  Hopefully we can settle

6    it again in this confirmation hearing.  We are working on

7    that, but suffice to say it is a confirmation issue but

8    there's disclosure that can be and was included.

9            The EFH indenture trustee now stands alone in its

10   objection to the disclosure statement.  And I won't spent

11   too much time on this other than to say it's not a voting

12   constituency, it's an incredibly sophisticated constituency

13   with sophisticated counsel, and they really have no standing

14   or place -- even if they had legal standing have no place

15   objecting to a disclosure statement in this case.

16           And as I walk through the issues that they're

17   raising I will explain at each turn why they don't need

18   additional disclosure on this.  It appears to be a ploy for

19   more time, and I'm not sure what more time does in this

20   case.

21           The first objection is one versus two plans.  The

22   debtors thought long and hard about whether we should split

23   the plans into two or whether we should keep a joint plan.

24   And I can confess, we had an active debate within Kirkland,

25   with our clients, and I was on one side and others were on

1    other sides.  Ultimately we determined that it was probably

2    the most logical to keep them in a joint plan with two

3    disclosure statements and separate confirmation hearings.

4    This is because there are still significant ties between

5    these two estates that must be carefully addressed whether

6    they're one plan or two.

7            We recognize that there will need to be

8    negotiations, for example, with the E side and the T side

9    stakeholders regarding language that reserves the rights on

10   particular provisions and how they affect.  That's a natural

11   reality.  If we had two plans we'd be negotiating two sets

12   of language because one constituency be confirmed that the

13   subsequent plan affects their rights.

14           So we're going to have to cross that bridge and we

15   will cross that bridge whether there's one or two plans.

16           But we believe consistency is important and

17   changes can be accomplished, to the extent necessary,

18   through the confirmation orders as is done in many cases.

19           I conclude on this topic by saying it is not

20   contrary to the assertions unprecedented to do thing in this

21   way.  I personally worked on a very complicated case in the

22   Southern District of New York, General Grill (ph)

23   Properties, where there were more than 100 different

24   separate private loans with different borrowers and

25   different collateral, and we ultimately used a single joint

1    plan and we accomplished it through exhibits and different

2    confirmation orders to bring categories of debtors out of

3    Chapter 11 on different schedules.  But it was important

4    that the overall plan structure, so we weren't fighting

5    multiple times over the same issues in the same case, that

6    we had a joint plan.

7            Your Honor, I turn to the second issue that was

8    raised both informally and formally in terms of objections,

9    and that is the ability of the EFH debtors to be bound to

10   the ancillary agreements like the tax matters agreement and

11   the separation agreement without a separate motion.

12           In my mind, Your Honor, as I read the Bankruptcy

13   Code, there's absolutely no question that that which can be

14   accomplished through a motion in a contested proceeding can

15   be accomplished through confirmation of a plan through a

16   confirmation process, but the question is, is the

17   confirmation process binding on the EFH debtors?

18           And I would submit that while the EFH debtors are

19   not seeking confirmation of their own plan on this first

20   track, the EFH debtors remain co-proponents of the joint

21   plan and will be supporting confirmation of the TCEH

22   debtor's plan.

23           As co-proponents the debtors can and do support,

24   at this point in time, the inclusion of provisions in the

25   confirmation order that will authorize them to enter into

1   and perform under the ancillary documents described in the

2   plan and disclosure statement, including the tax matters

3   agreement.  That is why there is such an intense focus by

4   the disinterested directors for the EFH debtors, the

5   disinterested directors for the EFIH debtors on negotiating

6   the terms of the tax matters agreement, and I can assure you

7   that their counsel, Proskauer and Cravath, have been on the

8   front lines for this negotiation and they're here today if

9   they want to make a statement.

10          Creditors of EFH and EFIH will of course have an

11  opportunity to raise any objections that they have to the

12  tax matters agreement and other ancillary documents in

13  connection with the confirmation hearing.  And the EFH and

14  EFIH debtors will have a burden of demonstrating that entry

15  into such agreements is a reasonable exercise of their

16  business judgment.

17          Indeed stakeholders have already served discovery

18  around these exact issues in connection with the

19  confirmation process, and we are in the process of

20  responding to those and scheduling depositions.

21          At the request of the EFIH PIC indenture trustee

22  the debtors have also included in the revised version I have

23  here this morning some additional disclosure regarding the

24  burden of proof at the confirmation trial as it relates to

25  the EFH and EFIH debtors, and on this point in particular

1    about business judgment needing to be demonstrated not only

2    from the TCEH side of the house but also from the EFH/EFIH

3    side of the house as it relates to provisions that would

4    bind those debtors.

5              EFH Corporate Services and EFH Properties is the

6    last issue that was raised in the indenture trustee's

7    objection to the disclosure statement.

8              The EFH indenture trustee sought additional

9    disclosure regarding the assets and liabilities that are

10   being transferred from the E side of the house to the T side

11   house in connection with the consummation of the TCEH tax-

12   free spin.  To put a fine point on it, EFH Corporate

13   Services and the EFH Properties are being transferred to the

14   TCEH debtors.

15             Those two entities, just so Your Honor knows what

16   we're talking about, EFH Corporate Services is a debtor

17   entity, it is an entity that houses many of the employees

18   who provide support to the TCEH debtors as well as the EFH

19   debtors, but post spin there will no longer be any need to

20   support -- let me just hedge on that a bit.  There may be

21   some need for transition services that will be documented in

22   any kind of spin agreement, but there generally will not be

23   an ongoing need for EFH Corporate Services to provide

24   services to the E side.

25             The same goes with EFH Properties.  EFH Properties

1    is in effect a flow through vehicle that houses the leases

2    for the various headquarters' properties.  It's actually

3    very complicated and subdivided between floors, floors

4    allocable cable to Luminant, floors allocable to TXU Energy,

5    floors allocable to I believe Oncor in some instance, and

6    then subleted back.  It's a mess, but suffice to say it's

7    all housed in EFH Properties.  That is a non-debtor entity.

8    Your Honor heard a little bit about it in connection with

9    the first confirmation hearing because it had some of the

10   environmental overlap with the EPA.

11            Suffice to say, as part of the negotiations on the

12   transaction services and separation agreement those entities

13   are -- have been and will be moved down to the TCEH debtors

14   where they have the most significant connections.  And this

15   is consistent with the reality we've lived in this case from

16   the very beginning even when the U.S. Trustee appointed the

17   committee, they appointed the TCEH committee to represent

18   the interests of the EFH Corporate Services entities.

19            Some would say, well there was no EFH committee at

20   that time, but the U.S. Trustee revisited that issue and

21   they appointed an EFH committee and the TCEH committee said,

22   well do we still have to represent that entity?  And the

23   decision was made not to reconstitute the committees largely

24   recognizing, in my opinion, the alignment between those two

25   debtors.

1           That's all besides the point.  The EFH indenture

2     trustee says whatever you said in the disclosure statement

3     it's not enough.  They want us to actually carry our burden

4     of confirmation on this particular issue in the disclosure

5     statement, and I submit, Your Honor, that's not the

6     standard.  We've disclosed what's happening, we've disclosed

7     how the entities are moving, and we've disclosed now some

8     additional identify about the assets and liabilities of

9     these entities.  Suffice to say, these entities are cost

10    centers, they're not profit centers, and they will have no

11    value without the TCEH debtors.

12           We will be prepared to present evidence at the

13    confirmation hearing, and certainly the EFH indenture

14    trustee and all other parties are free to seek discovery in

15    connection with confirmation around these particular issues.

16    We will carry our burden, that is our obligation, and that

17    is what we will do.

18           With that, Your Honor, unless you have any other

19    questions I believe I've addressed all the objections raised

20    in the papers.

21           THE COURT:  Thank you.  Is there any supporting

22    party that would wish to be heard?

23           Mr. Kornberg.

24           MR. KORNBERG:  Good morning, Your Honor.  Alan

25    Kornberg from Paul, Weiss, Rifkind, Wharton & Garrison on

1    behalf of the ad hoc committee of TCEH first lien creditors.

2         Your Honor, you've heard from Mr. Husnick the

3    significant progress that's been made and the very hard work

4    by everyone involved to position the T side debtors for

5    emergence, and we very much hope that there will be no

6    roadblocks imposed today to confirmation of the T side plan.

7         Whatever the E side creditors' objections may be

8    to the T side plan or the ancillary agreements that

9    Mr. Husnick described, today's hearing concerns whether the

10   proposed disclosure statement is adequate for the creditors

11   who have to vote on the T side plan to cast those votes.

12   It's not a confirmation hearing, it's about adequacy of

13   disclosure.

14        The folks that are going to be voting on the T

15   side plan do not include the creditors of EFH or EFHI.  They

16   will have standing to be heard on a number of issues at

17   confirmation, but this disclosure statement is not for them,

18   it's for the T side creditors.

19        And I don't think there can be serious debate that

20   the disclosure statement before the Court with the additions

21   that Mr. Husnick described is adequate.  I don't think there

22   can be any serious question that the creditors that are

23   getting ballots for the T side plan have enough information

24   with which to cast those ballots.

25        So, Your Honor, we would just urge you to keep the

1    focus on the adequacy of disclosure, there will be a full

2    and fair opportunity to challenge the plan by people that

3    will want to do so at confirmation, but that's really not

4    the purpose of today's hearing.  And so we would ask that

5    you approve the disclosure statement.

6              THE COURT:  Okay.  Thank you.

7              MR. KORNBERG:  Thank you.

8              MR. GOREN:  Thank you, Your Honor.  Todd Goren,

9    Morrison & Foerster on behalf of the TCEH committee.

10             We worked closely with the debtors on some

11   revisions to the disclosure statement to address both the

12   PCRB objection and as to the percentage distributions

13   available to unsecured creditors under the plan, as well as

14   on revisions to the plan addressing EFH Corporate Services.

15             The committee strongly supports approval of the

16   disclosure statement at this time.  Keeping the train moving

17   on the TCEH side is critical to creditors.  We think most of

18   the issues on our side are very well established and taken

19   care of.  There are limited issues, but we believe those are

20   confirmation issues that can be heard at confirmation.

21             THE COURT:  Okay.

22             MR. GOREN:  So we support approval of the

23   disclosure statement.

24             THE COURT:  Thank you.

25             MR. GOREN:  Thank you.

1           THE COURT:  Mr. Shore?

2           MR. SHORE:  Chris Shore from White & Case on

3   behalf of the ad hoc group of TCEH noteholders.

4           We support approval of the disclosure statement.

5           THE COURT:  Thank you, Mr. Shore.

6           All right.  I'll hear from Mr. Pedone.

7           MR. PEDONE:  Your Honor, do you have a -- Richard

8   Pedone with Nixon Peabody for American Stock Transfer as

9   indenture trustee of EFH Corp.

10          Your Honor, do you have a copy of the proposed

11  additions, the redline?

12          THE COURT:  No.

13          MR. PEDONE:  May I approach?

14          THE COURT:  Yes.  Thank you.  Do you have a --

15  Mr. Husnick, do you have a copy for Ms. Werkheiser (ph), if

16  you don't mind?  Thank you.

17          MR. PEDONE:  I'd actually like to start first the

18  EFH indenture trustee opposes an entry of an order approving

19  the disclosure statement at this time.  We think that it's

20  premature in light of a variety of tax issues, as well as

21  other issues that need to be worked out.  And I think that

22  the issue is brilliantly highlighted by the language that's

23  added at the bottom of page 3 where both the EFH debtors,

24  the EFIH debtors, and holders of claims in interest are all

25  entitled to conduct discovery with regard to the various

1    agreements that are part of the plan.

2            So here we have a joint proponent of a plan.  One

3    plan that feels that it is necessary to have language put in

4    reserving their right to take discovery against themselves.

5            This is incredibly unusual to have one plan go

6    forward with two disclosure statements and two confirmation

7    orders.

8            At the time we had the scheduling hearing I don't

9    think there were many on our side, if anyone, who believed

10   that we were going to have a single plan with two

11   confirmation orders.  We fully expected that there would be

12   a T side plan much like the T side first lien had drafted

13   and prepared and filed, that would move forward, and then

14   the E side could represent its own interests, agreements

15   could be worked out, but we wouldn't have a situation where

16   we were running down the tracks together and then here

17   brilliantly highlighted together but perhaps litigating

18   against each other.

19           And let's look at our schedule.  All discovery --

20   fact discovery ends on the 30th.  All written discovery

21   deadlines have already gone by.  We're in a very unusual

22   tight, compressed situation.

23           Your Honor, before I go into further details

24   concerning the procedural quagmire we're in and how unfair

25   and wrong and inappropriate I believe it is let's step back

1    to the substance and the new developments that Mr. Husnick

2    explained.

3            If we turn to page 16 -- 192 of the disclosure

4    statement, that's the redline that was filed, and I believe

5    it's 156 of the clean version of the disclosure statement,

6    we have two disclosures that are made.  And here I think

7    it's appropriate to use your term from the scheduling

8    hearing where this fast proceeding was set where you said if

9    we're not in a tax-free world things may proceed

10   differently.

11           This is not a T side plan that says it dies if

12   this becomes a taxable transaction, this is a joint plan

13   that proceeds and nobody knows where it goes if it becomes a

14   taxable transaction.  So this is potentially a taxable plan

15   that is on the table, and if you get to the tax matters

16   agreement and you look at the footnote that was put in, the

17   parties, the E side and the T side and the lenders say, we

18   don't know what's going to happen and we don't have

19   agreement if in fact this all becomes taxable.

20           And that gets to the crux of it, what agreements,

21   what is this plan that exists?

22           Let me take another sidestep with regard to

23   standing.  My client is the EFH indenture trustee, the

24   majority of the issuances that we are trustee for are just

25   at EFH Corp., but the LBO notes for which we are a trustee

1    also had guarantees both on the E side and the T side.  So

2    unquestionably we have standing to be here today objecting

3    to the disclosure statement, seeking a fulsome disclosure

4    statement even if we don't vote on those guarantees because

5    they're deemed to be rejected.  We're a party in interest

6    with standing in connection with any disclosure statement on

7    the T side plan and certainly a joint plan.

8           Your Honor, on page 192 of the redline the debtors

9    highlight that the EFH group could have a cash tax liability

10   in excess of $4 billion.  So if the IRS situation goes in

11   the direction that none of us want it to go this plan could

12   be moving forward towards a $4 billion tax liability.

13          And as they explain, maybe the IRS's statements

14   are tentative and we all hope that, but a new regulation did

15   come out between the last time we were here and today that

16   goes hand in hand with the tentative indications on that

17   issue of what would happen in a taxable transaction.  So the

18   question of could we go with a taxable transaction that has

19   no tax effect seems to be an enormous question mark.

20          And what the disclosure statement doesn't provide

21   is the implication -- details and the implications of how

22   various parties at EFH, how even TCEH will deal with that

23   described potential 44 billion tax liability, and that's a

24   disclosure defect.

25          So if you carry out their new disclosures and you

1    say what are the implications of those, what else should be

2    explained, a lot should be explained in how you would deal

3    with that $4 billion tax issue.

4           And they've repeatedly in our discussions said

5    give us what your want for disclosures.  Well, you know, in

6    the compressed time frame that we've had since June 9th and

7    June 10th when we got the disclosure statement and then the

8    tax matters agreement you can't come up with a solution for

9    this.  This cries out for more time, and we don't believe

10   that it should proceed.

11          Your Honor, there are other portions of the

12   debtors' disclosure statement that provide considerable more

13   detail on the tax issue and in the event that we had a

14   taxable transaction.  I could point the Court to them, but I

15   don't think we need to at this time unless you want me to.

16          But suffice it to say unquestionably this plan

17   that is before you is not solely a tax-free plan as was

18   advertised when the tight procedures were scheduled.  It is

19   potentially a taxable plan, and there have been new issues

20   that have come up since we were here before and set the

21   compress time frame that highlight that it could result in a

22   $4 billion tax.

23          And our goal is not to derail the process or slow

24   the T side's exit from the bankruptcy case, it's get to a

25   fair resolution that avoids that tax liability.  And that

1    could be done.

2              THE COURT:  It hasn't been done in two years, so

3    why do you think an extra couple weeks is going to make a

4    difference?

5              MR. PEDONE:  Your Honor, I would think that we may

6    learn significant clarity at the end of July, as Mr. Husnick

7    explained, and I think proceeding with a railroad freight

8    train where discovery ends in a week and a half from now

9    when we don't know what's going to happen at the end of July

10   it doesn't make sense.  And then if we look at the -- back

11   to their new disclosures they identify four agreements that

12   need to be negotiated.

13             So we have the tax matters agreement.  We don't

14   have a term sheet where the two sides have said this is what

15   we agree on.  If you look at footnote 2 they say on the big

16   issue of what happens in a taxable scenario we don't know

17   what we're going to do and we're all reserving our rights.

18   There's no agreement.

19             We have a separation agreement between these

20   estates that would provide great detail on exactly how a

21   separation will work.

22             And then we have a transaction services agreement

23   because there is an acknowledgment of the back and forth and

24   the role that the -- what I call the Corporate Services

25   debtors play.

1              Those agreements, which are the meat of how these

2      companies will be separated, should not be provided two

3      weeks before the confirmation hearing after experts reports

4      and after the close of discovery.

5              If you want a plan for separating two companies,

6      if you want it to be a joint plan, which we don't think it

7      should be, but give us the agreements that show us the real

8      plan, don't run a confirmation process with litigation and

9      then pop the agreements on us 14 days before the

10     confirmation hearing after all discovery is closed and say

11     here is actually what we've worked out for a separation.

12             You can't look at this plan and say without those

13     agreements we understand what's going to happen and how this

14     break-up will occur, and that is fundamentally unfair to be

15     proceeding in this manner without those agreements.

16             And then to get to where we're at procedurally.

17     Okay, yes, a debtor can file a plan and build in what could

18     be an emotion into the plan, but if that's the case then

19     give us the E side disclosure statement where if this is the

20     motion for the E side to enter into the yet to be drafted

21     agreements, where's the disclosure statement for the E side?

22     There should at the very least here be a separate motion by

23     the E side, ample discovery by the E side for approval of

24     these agreements.  It's a $4 billion issue on how the going

25     to be worked out and what the break up with occur.

1              And if we listen to the debtors they knew months

2      ago that this could be coming at us, they could have been

3      preparing the agreements, they could have worked out the

4      separation.  Maybe they have them and they're just holding

5      them back from us at this point.  But there are material

6      issues that we don't have that do not allow us to test what

7      is going to happen to the E side in connection with this

8      plan.

9          (Pause)

10             MR. PEDONE:  So, Your Honor, what do we propose,

11     because there does need to be a solution here.

12             These parties, and perhaps the IRS, need to be put

13     through a process that leads to a solution.  A plan without

14     the agreement, a confirmation schedule without the

15     agreements is not going to give the parties time to force

16     the resolution that a plan process could do.

17             THE COURT:  Well isn't this something that can be

18     dealt with at the confirmation hearing in that let's assume

19     a worse case scenario where in late July we find out from

20     the IRS that a tax-free spin is not available and we find

21     that they continue to take the position with regard to

22     disregarded entities in a taxable transaction?

23             If we get to confirmation and that's our situation

24     can't the Court consider at that time whether it's prudent

25     to go forward with confirmation or whether that needs to be

1    kicked to a later date to allow for fuller development on

2    the record in the event that's the world we live in?

3              But as I sit here today there's no question that

4    while there's a reservation of optionality and flexibility

5    that the plan on the table is one that's based on a tax-free

6    spin.  So why do I have to stop it now?

7              MR. PEDONE:  So, Your Honor, that's not the case

8    though.  If you look at this plan there's optionality of a

9    $4 billion tax.

10             THE COURT:  I understand.

11             MR. PEDONE:  And so you can't say the plan that's

12   on the table is based on a tax-free spin.

13             THE COURT:  Well I can only stop this, okay, if

14   it's appropriate, I can always extend the time, and since

15   we're in a situation where everyone -- I understand they've

16   reserved optionality and flexibility, but I think the

17   reality is, and this is what I heard from Mr. Husnick that

18   the debtors remain optimistic, that they intend to go

19   forward with a tax-free spin, that they've gotten some

20   indication that that might work.

21             Now, I'm reluctant, given what happened in the

22   past to rely too much on optimism about approval of

23   transactions after I approve them by other parties, but you

24   know, the reality is while they've reserved this optionality

25   if matters change I can stop, if appropriate, at that time

1    and say let's go back, we're not ready to go forward, maybe

2    more discovery is needed and maybe a fuller record needs to

3    be developed.

4           But if I stop everything now I'm delaying a

5    transaction that if things go right for these debtors and we

6    do get IRS approval on a tax-free spin would be consistent

7    with the plan support agreement that I've already approved

8    and would allow for a confirmation of this plan, assuming

9    all other elements are met, that's totally consistent with

10   what's in the disclosure statement.

11          So isn't it premature for me to pull the plug as

12   opposed to premature to go forward at all?

13          MR. PEDONE:  So, Your Honor, I would suggest pull

14   the plug and come back with one plan articulated.

15          But the other obvious -- if I may -- the other

16   obvious solution is approve only a disclosure statement that

17   provides for a tax-free spin, don't force us to be

18   litigating against the crazy unknowns of $4 billion in

19   potential liability and who would have that.  And if the

20   debtors find a way to pivot back to a taxable transaction

21   due to some new ruling from the IRS, some optimism of the

22   regulation won't be applied, some agreement with the IRS,

23   well then that would be a non-material modification that

24   would allow the transaction to go forward without tax and

25   you could push that on us if we were standing here opposing

1    us.  But to run a dual track process of tax disaster and

2    optimism doesn't make sense.

3            If we want to run the optimism and no harm track

4    for a plan okay, but there's no need to run a plan process

5    and leave open the window that the T side first liens have

6    the ability to inflict tremendous harm on everyone, that is

7    unnecessary and inappropriate, and the odds of it possibly

8    happening have now by highlighted, and we don't think that

9    process should go forward.

10           So if the Court is inclined to go forward I'd say

11   the taxable aspects that could inflict harm should be

12   removed from the plan, and for the reasons I always outlined

13   I think that any plan should actually just be a T side plan

14   where they have to then go through an E side process.

15           If the E side concludes it wants to enter into a

16   contract get us appropriate notice of time of the rationale

17   for entering into that contract, a motion with the reasons

18   for entering into that contract, don't drop it on us.

19           And I'll touch on discovery.  We served our

20   discovery very quickly.  The debtors stood here three weeks

21   ago at the scheduling and said we're ready to roll.  We've

22   gotten a couple thousands pages of documents, we've asked

23   for how much is the universe.  They didn't open up the

24   floodgates of discovery and get it to us on the front end.

25   This is an adversarial process that is being run and there

1    are portions of it that are significantly unfair, and I

2    think it would be much better if the Court is inclined to go

3    forward to eliminate the parts that are taxable.  That's

4    all.

5              Thank you.

6              THE COURT:  Thank you, Mr. Pedone.

7              Mr. Husnick, what about this -- oh, I'm sorry, did

8    any other objectors or parties reserving rights wish to be

9    heard?  Okay.  I hear no one.

10             Let's take the latter point first.  What about

11   this point that this preservation of optionality in

12   connection with the taxable transaction isn't sufficiently

13   developed to go forward?

14             MR. HUSNICK:  I believe the answer is absolutely.

15   We've been standing here, Your Honor, trying to do tax-free

16   for -- well in my -- it's been four years for me, two years

17   for Your Honor.  To say that we haven't thought about what

18   happens in a taxable transaction would be incorrect.

19             We built in very consciously the pivot in

20   negotiations with the T firsts, a natural pivot point, we

21   addressed this issue at the scheduling hearing.  It's a

22   little bit like Ground Hog Day, because we had this exact

23   discussion with the EFIH second liens about the potential

24   tax effects.  We inserted a toggle at page 7 in paragraph S

25   of the scheduling order that basically says if we decide to

1    toggle we must have a status conference within two business

2    days.  That's what I was referring to earlier.  So we will

3    have an opportunity to do that.  To say that it's not

4    developed though is incorrect.

5            I think it's very developed on the T side what

6    would happen if it went taxable.  I think what the E side is

7    struggling with, and just putting my E side only hat on for

8    a minute, is what to do about what happens if the T side

9    does the T side transaction.

10           And frankly, these are all -- you must get through

11   the threshold issue of the E side can block the T side's

12   tax-free spin, and I'm not going to take a position on that

13   because I'm on both sides of that issue.  The DD's have

14   fully voiced their opinion, and frankly in response just to

15   the concern about discovery, the disinterested directors

16   served discovery on each other by the original deadline,

17   this is not a new concept.  In fact they did the same in the

18   last confirmation process where we were all heading in the

19   same direction.  They both served discovery on each other

20   and the debtors are responding to that discovery, we'll

21   provide the disinterested directors with all the documents

22   requested.

23           So frankly, I just -- coming right back to your

24   question, I do think it's well enough developed.  There are

25   ancillary documents of course that are being worked on that

1    work out the definitive documents.  It's not unheard of to

2    have definitive documents filed in a plan supplement two

3    weeks before the confirmation hearing.  We will endeavor to

4    do it as -- even sooner if we can like we did with the tax

5    matters agreement where we filed it very recently.

6             Suffice to say, this is not a novel issue, and

7    frankly ,I think we are ready to go, and I completely agree

8    with Your Honor's appraisal of the situation.

9             We could today pump the breaks, set it off for two

10   weeks, we may or may not have additional clarity in two

11   weeks, that will be helpful, I expect we will, but I'm not

12   certain that even at that point we're going to be at a pivot

13   point where we say, okay, one of the options comes off the

14   table, and frankly all we've done is lost two weeks in a

15   process that needs to occur.

16            At the end of the day people need to do their

17   discovery around both the taxable and the tax-free, and it

18   may or may not have to get litigated at confirmation, and we

19   will make that -- we have it built into the schedule a

20   natural pivot point.

21            THE COURT:  Okay.  Can you -- oh, Mr. Kornberg,

22   sorry.

23            MR. KORNBERG:  Yeah, Your Honor, very briefly.

24            I really think Mr. Pedone's arguments today are to

25   revisit the scheduling order, and we dealt with the issue

1    about what happens if there has to be a pivot to a taxable

2    transaction, and Your Honor very wisely when we were last

3    here said, if you're going that direction you better come

4    back and have a status conference within two days after the

5    decision is made to pivot.

6           So that's really the issue that Mr. Pedone is

7    focused on and the scheduling order addresses it and Your

8    Honor further clarified it by saying we should come back no

9    later than the 21st.

10          The idea that we should stop the process because

11   the E side hasn't seen a separation agreement or a

12   transaction services agreement is really hard to take

13   seriously in the context of this case where there's so much

14   at stake.

15          There's going to be nothing incredibly revealing

16   around a transaction services agreement.  As everyone knows

17   TCEH is an operating company, it needs the services that are

18   provided by EFH Services, and EFH will need some as well,

19   and I don't think that is a reason to stop the wheels of

20   progress here because that agreement hasn't been fully

21   negotiated.

22          The tax matters agreement I acknowledge it's not

23   completed, but we went far beyond just filing the material

24   terms of it, we actually filed an agreement.  There's

25   certainly enough information there for people to conduct

1    discovery.

2             So let's not revisit the scheduling order.  If we

3    have to pivot to a taxable agreement we're going to be

4    before the Court, everyone will be heard, and we can figure

5    out the appropriate next steps so that no one is prejudiced.

6             THE COURT:  Thank you, Mr. Kornberg.

7             All right.  Mr. Pedone, would you like to follow

8    up with anything?

9             MR. PEDONE:  Briefly on the issue with regard to

10   the Corporate Services.

11            We will address -- we don't agree with what's

12   explained in the disclosure statement concerning value, but

13   we'll deal with that in the discovery process.

14            THE COURT:  All right.

15            MR. PEDONE:  As it was highlighted the T side

16   needs that entity owned by EFH, and we'll address it later.

17            hank you.

18            THE COURT:  All right.  Well I am going to

19   overrule the remaining objection to the disclosure

20   statement.  After I rule on this, Mr. Husnick, if you could

21   run me through the incremental blackline I'd appreciate it.

22   But I do believe that this objection is at heart a couple

23   things.

24            One, I think it is an attempt to revisit the

25   scheduling order.  Not for illegitimate reasons, there are

1    some valid points to be made in connection with what do we

2    do in a pivot situation where the debtors decide to go

3    forward with a taxable transaction, and it may be -- not

4    will be -- may be appropriate to adjust the schedule in the

5    event that occurs.  But we've already built in, as I said, a

6    -- and as Mr. Kornberg pointed out again, Mr. Husnick

7    pointed out -- it's already built into the schedule that the

8    Court's already approved.

9           I don't think it is necessary nor appropriate to

10   stop the progress that's been made in the transaction that

11   although not the only transaction formally on the table,

12   it's clearly the preferred transaction and the transaction

13   frankly with the momentum which is the tax-free spin.  And

14   nothing that the IRS has done in the last few weeks that

15   affect -- have effect with regard to disregarded entities,

16   et cetera, affect the ongoing efforts to get a tax-free spin

17   approved.

18          In the event that the debtors' optimism proves to

19   be correct and they get the ruling that they want and desire

20   this matter can certainly go forward and the issues are

21   significantly narrowed for a plan.

22          And what we're doing today is dealing with a

23   disclosure statement and whether it contains adequate

24   information, and there's no question in my mind that it

25   contains more than adequate information in that scenario.

1           I think it contains adequate information based on

2    what we know at this time in connection with any scenario,

3    but I certainly reserve the right and all parties' rights

4    are reserved to revisit that issue if -- or if not

5    specifically the disclosure statement issue, the issue about

6    whether it's appropriate to go forward on the time frame

7    that we've set in the event the pivot occurs.

8           So I don't -- I do think it's a question trying to

9    revisit the order, the pivot is already built in, all rights

10   are reserved to argue whether we should or shouldn't go

11   forward.  I see no reason to stop and delay.  Further delay

12   in this case is costing this estate millions of dollars.

13          It's been over two years, people have been working

14   extremely hard to try to get to a transaction that would

15   reorganize these estates, and I'm not going to stop this bus

16   to allow more negotiation to occur.  There's been more than

17   enough negotiation, there's been more than enough time, and

18   if the parties are stuck with a tight time frame that is

19   what it is.  It is somewhat the result of the inability of

20   people to reach a consensus.  If a consensus had been

21   reached we wouldn't be in this situation.

22          But we don't have an E side, T side consensus.  I

23   doubt we'll ever get one, and the Court is going to have to

24   make decisions, which I will make at an appropriate time,

25   that's what I'm paid to do.  I'm not going stop the T side

1    plan because the E side can't get their act together.  Not

2    going happen.

3            And if we're in a taxable transaction I'm not sure

4    that stops a T side plan as long as the ability to fairly

5    litigate issues that might arise from a taxable transaction

6    are preserved.

7            At the end of the day if we're in a taxable

8    transaction we are, and if we have to litigate we will, and

9    whoever is stuck with that liability will be stuck with that

10   liability, and if that affects an E side plan or that

11   affects a T side plan so be it.

12           But just the fact that a couple billion dollars,

13   not insignificant, might end up on the E side isn't in and

14   of itself going to stop the T side plan.  This company has

15   to be separated.

16           The parties have never been -- well that's not

17   true -- the parties were able to reach consensus on a

18   separation, if you will, under the original plan, but the

19   parties, you know, Project Olympus died a long time ago, and

20   the reality is these companies have to be split, and if it

21   ends up the IRS gets a couple billion dollars we're going to

22   work through it, but we're going to confirm plans here, and

23   this case isn't going to last for five years, it's going to

24   last for two and a half, and we're already well on our way

25   to that.

1            So it'll be what it'll be.  Everyone's' rights to

2      revisit the reschedule are preserved in the event we have to

3      pivot to a taxable transaction.  The disclosures are more

4      than adequate, I believe, to satisfy the legal standard

5      certainly if one considers what's really appropriate, which

6      is people who actually get to vote as opposed to parties who

7      aren't even subject to the confirmation order that's on

8      plan.

9            Everyone's rights are reserved at confirmation,

10     there's no reason to stop this schedule that has been put in

11     place, there's sufficient time, and plenty of money and

12     effort will be spent this summer on it and that's

13     appropriate.

14            So I'm going to overrule that objection.

15            But before I approve the disclosure statement if

16     you could run through the incremental blackline I'd

17     appreciate it.

18            MR. KUSNICK:  Your Honor, may I approach with a

19     redline and the order?

20            THE COURT:  Yes.

21        (Pause)

22            MR. KUSNICK:  Your Honor, I'll start with the

23     disclosure statement redline, which I believe you have.  And

24     just to be clear, we have not yet put this on file.  We

25     would propose to file it after the hearing and submit it

1     under certification of counsel with the order.

2            Your Honor, just I'll highlight the material

3     changes in here starting on page 2.  This is the piece of

4     additional disclosure that we negotiated and inserted at the

5     request of the EFIH PIC indenture trustee that highlights

6     the reservation of rights and the burden of proof in

7     connection with the EFH and EFIH debtors seeking entry --

8     permission to enter into the documents under the plan -- the

9     ancillary documents that we've talked so much about.

10            Your Honor, moving ahead then on page 10 of the

11     blackline, footnote 13, just adding in a clarification of

12     how the various numbers that are used and thrown around in

13     the disclosures are calculated.  We need to make --

14     necessarily need to make assumptions about certain issues in

15     order to get to a result, so this is just clarifying what

16     assumption was used.

17            On page 11 the first bullet, these are additional

18     disclosures, and you're going to see this language reflected

19     a couple of times, and it was mentioned in my opening.  But

20     given the IRS's position on the Cody recourse issue that I

21     discussed, we are seeking -- the debtors are seeking an

22     additional ruling in connection with the tax-free spin off

23     transaction that would provide additional comfort regarding

24     the tax-free spin off transaction, and this is an additional

25     disclosure regarding that particular ruling.

1           The second bullet on this page is additional

2    disclosure about the affect of the tax matters agreement.

3    Again, in my opening statement I mentioned that the tax

4    matters agreement, to the extent that the conditions to a

5    tax-flee spin are not satisfied and the IRS is unwilling to

6    change its position on the Cody ruling -- or let me

7    rephrase, I'm not sure they've taken a final position.

8           If the IRS is unwilling to issue a favorable Cody

9    ruling then the tax matters agreement is not effective and

10   all rights are reserved in connection with a taxable

11   transaction.

12          The bottom bullet about mutual releases is simply

13   additional disclosure about the effect and the nature of the

14   releases that are contained later on in the disclosure

15   statement as well as set forth in the plan.

16           You'll see some changes on page -- I'll caulk

17   page 13 up to just cleaning up things and ancillary

18   language.

19          On page 15 and 17 in the treatment box there's

20   some new language subject to timely submission of a tax --

21   it's a TRA information form.

22          One of the ancillary documents that is only

23   relevant on the TCEH side, it's a document that the TCEH

24   debtors would enter into with -- in effect with themselves

25   and potentially the new equity holders.  I'm looking at my

1    tax colleagues to make sure I don't say anything dumb.  But

2    yes, it would be amongst the TCEH new equity holders and the

3    TCEH box itself.  It provides for certain treatment of the

4    recoveries that they received under the plan.  It's really

5    only relevant to them.  But we do need certain information

6    from them in order for it to work, so that's what this is

7    all built in to address.

8            That takes us through -- or up to page 109.

9    Again, this is where I was talking about the TRA rights

10   information form.  It's set forth here.  And then again on

11   108.

12           On page 131, footnote number 6 is just a

13   clarification that in the TCEH plan these releases are only

14   binding upon the TCEH debtors on the TCEH effective date.

15           On page 132 in the release section this is clean

16   up.  There are ongoing negotiations about certain issues in

17   the releases and this language should not have appeared in

18   here.

19           Page 154 just clarifying in the disclosure

20   statement as I reported that the Nuclear Regulatory

21   Commission has approved the change in control application.

22           On page 157 at the bottom of paragraph 9 we're

23   adding in just cross-references and repeating the earlier

24   language about the current state of play with the IRS.

25           If you didn't get it the first two times you'll

1    get it again on 158, and you'll get it again on 182.

2              So suffice to say, you're going to understand what

3    the tax results are.

4              That -- unless Your Honor has any questions about

5    the disclosure statement that's where we are on that draft.

6              THE COURT:  Okay.  Mr. Pedone?

7              MR. HUSNICK:  So the redline of the order, Your

8    Honor, we did put on the docket.  The changes are almost

9    exclusively to deal with the fact that the TCEH debtors are

10   confirming their plan at the same time as EFH Corporate

11   Services, which is actually referred to in the defined terms

12   as EFH shared services debtors.  There's a handful of

13   debtors that are related to EFH Corporate Services.  We

14   speak generally about Corporate Services, but there are a

15   couple of other entities that are involved in that that

16   don't have significant assets.

17             So, Your Honor, throughout this we added some

18   additional disclosure on this point.

19             That takes me -- I'm just trying to identify

20   whether there are any other issues in here.

21             On page 9 this is the language that I mentioned

22   again in the disclosure statement.  We repeated verbatim

23   here at the request of the EFIH PIC indenture trustee about

24   the burdens and the limitations of findings related to the

25   EFH debtors and the EFIH debtors.

1            Again, this language was previewed with most of

2    the constituents last night, and we filed it I believe this

3    morning on the docket.

4            I think that is the only other substantive changes

5    beyond adding EFH Corporate Services.

6            So unless Your Honor has any objection we'd be

7    happy to put this on file after the hearing through the

8    certification of counsel.

9            THE COURT:  All right.  Mr. Pedone?

10           You know, and I apologize before you speak.  I did

11   not address your argument with regard to the fact that we're

12   going forward with one plan with two different confirmation

13   orders and two different disclosure statements.

14           I'm not troubled by that.  I think as discussed

15   there is precedent.  At the end of the day the confirmation

16   order is really going to control and going to control

17   specifically, you know, what debtors are being confirmed,

18   what debtors aren't going to be confirmed.

19           Obviously the plan will have to reflect what

20   effects might happen with regard to non-confirmed debtors,

21   but we have to plans all the time that bind third parties,

22   and in this case those third parties might be non-confirmed

23   debtors.

24           So I'm not bothered by how the debtors have chosen

25   to proceed in the exercise of their business judgment.  I

1    may have chosen how to do it differently.  I was under --

2    like you I frankly thought we would have two plans, but the

3    debtors have chosen in the exercise of their business

4    judgment to go forward with one plan, and I don't think it

5    creates a significant enough problem to hold up the

6    disclosure statement and going -- and make the plan

7    unconfirmable so that we can't go forward with the

8    disclosure statement and solicitation.

9            So just so the record is clear I wanted to address

10    that point and I'll overrule that objection.  And now, I

11    will let you be heard.

12            MR. PEDONE:  I'm feeling completely overruled,

13    Your Honor.

14            I do have one ask on a procedural issue and in

15    particular in light of your comments there.

16            We have a situation where the plan is about to

17    become a deemed motion of the E side creditors concerning

18    agreements that aren't yet filed and we're going to receive

19    them 14 days ahead.  I'd ask that the 14-day deadline be

20    moved up to 3 weeks ahead of time, and that there be an

21    actual motion put on the docket, because I don't believe

22    that confirmation of the plan for the T side debtors will

23    actually be something that can give you authority to approve

24    agreements of the E side debtors.

25            We need a motion where those debt authors that are

1    separate and distinct will come to the Court and for

2    authority and procedurally we would be properly teed up to

3    challenge that authority.

4           So that's two requests.  An addition of weeks time

5    with the agreements, and an actual motion that we can object

6    to and get a determination on it, and I assume it will be at

7    the confirmation hearing.

8           THE COURT:  Right.  So on the latter point I don't

9    see why there would be any problem with filing a motion.

10   I'm not going to allow it to trigger a whole nother round of

11   discovery, discovery is already in place.  So if we're

12   talking about a procedural nicety about having a formal

13   motion created to contest a matter that's fine, but I'm not

14   going to open up discovery.  Discovery has already been

15   established.

16          MR. PEDONE:  I completely understand if I want

17   anymore discovery I have to come in and seek a change in the

18   procedures and establish cause.

19          THE COURT:  All right.

20          MR. PEDONE:  And so the motion would not open up

21   additional discovery, but it would give us the docket entry

22   where we're addressing the authority of the EFH and the

23   business judgment of the EFH directors to enter into this

24   agreement, and we want on order on that that's appealable.

25          THE COURT:  All right.

1          MR. PEDONE:  We haven't even seen the agreements,

2     and so I'm looking to preserve our rights.

3          Thank you.

4          THE COURT:  I understand.  You have a problem with

5     filing --

6          MR. HUSNICK:  Your Honor, if I may --

7          THE COURT:  -- the motion, right?

8          MR. HUSNICK:  Yeah.  If I may address that issue,

9     because I know what's going on underneath here.

10         Let me start by saying one -- or an additional

11    week the debtors are more than happy to give an additional

12    week to get drafts of these ancillary documents.  So that's

13    fine and we will do so.

14         But on the motion in particular I do feel we

15    addressed this in argument, but I -- the point is what's

16    really going on here is they want to have two separate

17    orders so that they don't have to appeal the confirmation

18    order when they appeal.  Because they feel, and we agree, it

19    is much more difficult to appeal successfully from a

20    confirmation order.

21         Frankly, the argument on appeal is going to be the

22    same whether you're appealing from the confirmation order or

23    you're appealing from a separate order.  The argument is

24    going to be whether the debtor --

25         THE COURT:  Well even if we have two separate

1   motions we can have one order.  There's no reason the

2   confirmation order can't approve more than one motion to

3   confirm --

4          MR. HUSNICK:  That's true.  That's true.  And then

5   -- well what I would come back to then, is then it's just --

6   I hate to say this -- but I mean it's kind of a waste of

7   estate resources to file a motion when we all know what

8   we're asking to do.  It's really semantics for us to put a

9   motion on file, but that is -- we would fight not to have

10  them separated.

11          I can't emphasize enough, the tax matters

12  agreement is so fundamental to the tax-free spin transaction

13  that if one were to appeal the tax matters agreement order

14  and strike it it would necessarily knock -- and I'm going to

15  borrow the language from -- but it would knock the props out

16  from underneath the plan.  It just doesn't work on its own.

17          So I -- to the extent that a motion sets -- I

18  actually completely disagree with the reading of the law as

19  a co-proponent of a plan and as Your Honor said when you

20  were ruling --

21          THE COURT:  All right.

22          MR. HUSNICK:  -- you combine third parties.

23          THE COURT:  Okay.  I'm not going to require -- no,

24  I'm not going to require filling the separate motion.  It'll

25  be what it'll be.

1           MR. PEDONE:  Your Honor, Mr. Husnick exactly gets

2    to the point that the confirmation order of the T side plan

3    will not be an order.  If it's a confirmation order of a T

4    side plan it will not be an order binding the E side --

5           THE COURT:  That's not true.

6           MR. PEDONE:  -- unless we have a motion.

7           THE COURT:  That's not true.

8           MR. PEDONE:  Okay, Your Honor.

9           THE COURT:  We bind people all the time.  We bind

10   people all the time to provisions in a plan and provisions

11   in a confirmation order that where they don't -- and there's

12   no reason as a formal matter you need to have a motion by a

13   non-debtor -- or excuse me -- by a co-debtor that's not

14   being part of the confirmed plan that binds that debtor.

15          MR. PEDONE:  Your Honor, I respectfully disagree,

16   because we -- the E side --

17          THE COURT:  Well then you have a --

18          MR. PEDONE:  -- debtors did not sign the

19   disclosure statement.

20          THE COURT:  Then you have an issue for appeal --

21          MR. PEDONE:  Thank you.

22          THE COURT:  -- of the confirmation order and you

23   can take it up with the district court.

24          MR. PEDONE:  Thank you.

25          MR. HUSNICK:  Thank you, Your Honor.

1          Unless you have anything further that's all we

2    have for today.

3          THE COURT:  All right.  So I'll await an order

4    under certification.

5          MR. HUSNICK:  We will submit it under

6    certification very soon.

7          THE COURT:  Okay.  Very good.

8          Anyone else have any matters before the Court

9    today?

10          Per the hearing I find that the disclosure

11    statement has adequate information, I'm otherwise -- will

12    approve the solicitation procedures, et cetera, all the

13    objections have either been resolved or overruled, and when

14    I receive an order under certification of counsel I will

15    sign and approve that order and get it docketed.

16          MR. HUSNICK:  Thank you, Your Honor.

17          THE COURT:  You're welcome.  We're adjourned.

18        (Whereupon these proceedings were concluded at 11:18

19    AM)

20                    * * * * *

21

22

23

24

25

Page 60

1                         I N D E X

2

3                          RULINGS

4                                                      PAGE

5    Motion of Energy Future Holdings Corp., et al., for

6    Entry of an Order (A) Approving the Disclosure

7    Statement, (B) Establishing the Voting Record Date,

8    Voting Deadline, and Other Dates, (C) Approving

9    Procedures for Soliciting, Receiving, and Tabulating

10   Votes on the Plan and for Filing Objections to the

11   Plan, and(D) Approving the Manner and Forms of Notice

12   and Other Related Documents [D.I. 8357; filed May 1,

13   2016]                                              59

14

15   Second Amended Disclosure Statement for the Second

16   Amended Joint Plan of Reorganization of Energy

17   Future Holdings Corp., et al., Pursuant to Chapter

18   11 of the Bankruptcy Code as it Applies to the TCEH

19   Debtors and EFH Shared Services Debtors [D.I. 8689;

20   filed June 10, 2016]                               59

21

22

23

24

25

Page 61

1                    C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5    Dawn South

6    _____

7    Dawn South

8    AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12    Date:  June 17, 2016

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501