## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 8668, 8754, 8762, 8817** |

### AMENDED ORDER (A) APPROVING
### POSTPETITION FINANCING FOR TEXAS
### COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
### AND CERTAIN OF ITS DEBTOR AFFILIATES, (B) GRANTING
### LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
### EXPENSE CLAIMS, (C) AUTHORIZING REFINANCING OF SECURED
### POST-PETITION DEBT AND (D) MODIFYING THE AUTOMATIC STAY

Upon the motion (the "<u>Motion</u>") of Texas Competitive Electric Holdings Company LLC (the "<u>Borrower</u>" or "<u>TCEH</u>"), Energy Future Competitive Holdings Company LLC (the "<u>Parent Guarantor</u>"), and each of the Subsidiary Guarantors (as defined in the DIP Credit Agreement (as defined herein)) (the Subsidiary Guarantors, together with the Parent Guarantor, the "<u>Guarantors</u>"), each as a debtor and debtor-in-possession (collectively, the "<u>TCEH Debtors</u>") in the above-captioned chapter 11 cases of the TCEH Debtors (collectively, the "<u>Cases</u>"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), seeking entry of an order (this "Order"), inter alia:

(i)        authorizing the Borrower and the Parent Guarantor to enter into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), between the Borrower, the Parent Guarantor, the financial institutions from time to time party thereto as lenders (the "DIP Lenders"), the financial institutions from time to time party thereto as letter of credit issuers (the "DIP L/C Issuers"), Deutsche Bank AG New York Branch , as administrative agent and collateral agent (in such capacities, the "DIP Agent"),[2] and the other agents and entities from time to time party thereto, substantially in the form of Exhibit A annexed hereto, to obtain secured postpetition financing (the "Financing") on a superpriority basis, consisting of (a) a revolving credit facility (the "Revolving Credit Facility") in an aggregate principal amount of up to $750,000,000; (b) a term "B" credit facility (the "Term Loan B Facility") in an aggregate principal amount of up to $2,850,000,000; and (c) a term "C" credit facility (the "Term Loan C Facility" and, collectively with the Revolving Credit Facility and the Term Loan B Facility, the "DIP Facility") in an aggregate principal amount of up to $650,000,000.

(ii)       authorizing the Parent Guarantor and each of the Subsidiary Guarantors to enter into that certain Guarantee, substantially in the form of Exhibit B annexed to the DIP Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Guarantee");

---

[2]    As used herein, the term "DIP Agent" refers to Deutsche Bank AG New York Branch, as administrative agent under the DIP Credit Agreement, Deutsche Bank AG New York Branch, as collateral agent under the DIP Credit Agreement, or both, as the context requires.  All references in this Order to the DIP Agent with respect to the Secured Hedge Banks or the Secured Cash Management Banks (each, as defined herein) shall mean Deutsche Bank AG New York Branch, in its capacity as collateral agent. Deutsche Bank AG New York Branch, in its capacity as administrative agent, has no duties or obligations to the Secured Hedge Banks or the Secured Cash Management Banks.

(iii)    authorizing each of the TCEH Debtors to execute and deliver the DIP Credit Agreement, the DIP Guarantee, the Fee Letter (as defined in the DIP Credit Agreement), and the other related Credit Documents (as defined in the DIP Credit Agreement) (collectively, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iv)    granting the DIP Facility and all obligations owing thereunder and under the DIP Documents, the Secured Commodity Hedging Agreements, the Secured Hedging Agreements, and the Secured Cash Management Agreements (each, as defined in the DIP Credit Agreement) to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks (collectively, and including all "Obligations" as described in the DIP Credit Agreement, including, without limitation, (A) obligations (the "Secured Hedge Obligations") owing under or in connection with the Secured Commodity Hedging Agreements or the Secured Hedging Agreements with the TCEH Debtors and (B) obligations (the "Secured Cash Management Obligations") owing under or in connection with the Secured Cash Management Agreements with the TCEH Debtors, the "DIP Obligations") allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (as defined herein);

(v)    granting to the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, Hedge Banks (as defined in the DIP Credit Agreement) that are parties to Secured Commodity Hedging Agreements or Secured Hedging Agreements (the "Secured Hedge Banks") with the TCEH Debtors,[3] and Cash Management Banks (as

---

[3]    For the avoidance of doubt, the TCEH Debtors are only authorized to pledge collateral for the benefit of Secured Hedge Banks pursuant to the terms of the *Interim Order Authorizing the Debtors To (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* [D.I. 315] or the *Final Order Authorizing the Debtors To (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor*

defined in the DIP Credit Agreement) that are parties to Secured Cash Management Agreements (the "Secured Cash Management Banks") with the TCEH Debtors, automatically perfected security interests in and liens upon all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, which security interests and liens shall be subject to the priorities set forth herein;

       (vi)    authorizing and directing the TCEH Debtors to irrevocably repay in full, with the proceeds of the DIP Facility, all loans and other obligations (other than any indemnities that are intended to survive repayment of the obligations under the Existing DIP Credit Agreement) under that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of May 5, 2014 (as amended, restated, supplemented, or otherwise modified from time to time, the "Existing DIP Credit Agreement" and, together with the mortgages and all other documentation executed in connection therewith, the "Existing DIP Facility Documents") by and among the Borrower, the Parent Guarantor, the financial institutions from time to time party thereto as lenders (the "Existing DIP Lenders"), the financial institutions from time to time party thereto as letter of credit issuers (the "Existing DIP L/C Issuers"), Citibank, N.A., as administrative agent and collateral agent (in such capacities, the "Existing DIP Agent"),[4] and the other agents and entities from time to time party thereto (such repayment in full, the "Refinancing");

---

*Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements, as applicable.*

[4]   As used herein, the term "Existing DIP Agent" refers to Citibank, N.A., as administrative agent under the Existing DIP Credit Agreement, Citibank, N.A., as collateral agent under the Existing DIP Credit Agreement, or both, as the context requires. All references in this Order to the Existing DIP Agent with respect to the Secured Hedge Banks or the Secured Cash Management Banks (each, as defined in the Existing DIP Order) shall mean Citibank, N.A., in its capacity as collateral agent. Citibank, N.A., in its capacity as administrative agent, has no duties or obligations to the Secured Hedge Banks or the Secured Cash Management Banks.

(vii)    authorizing, upon the occurrence of the Conversion Date (as defined in the DIP Credit Agreement), the TCEH Debtors to convert the DIP Facility into a post-emergence exit financing facility (the "Exit Facility");

(viii)    authorizing and directing the TCEH Debtors to pay the principal, interest, fees, expenses, and other amounts payable and/or reimbursable under the DIP Documents, including, without limitation, the Fee Letter, as such amounts become due, including, without limitation, letter of credit fees (including issuance and other related charges), commitment fees, closing fees, arrangement fees, incentive fees, and administrative agent's fees, all to the extent provided in, and in accordance with the terms of, the DIP Documents; and

(ix)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Order and to permit the exercise of remedies hereunder and thereunder.

The Court having considered the Motion, the *Declaration of Chuck McMullan in Support of the (I) Motion for Entry of an Order (A) Authorizing the TCEH Debtors to (I) Enter into the Exit Financing Commitment Letter and the Fee Letter, (II) Pay Associated Fees and Expenses, and (B) Granting Related Relief and (II) Motion for Entry of an Order (A) Approving Postpetition Financing for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Liens and Providing Superpriority Expense Claims, (C) Authorizing Refinancing of Secured Post-Petition Debt and (D) Modifying the Automatic Stay* (the "McMullan Declaration"), the DIP Documents, and the evidence submitted or adduced and the arguments of counsel made at the hearing held on June 27, 2016 (the "Hearing"); and notice of the Hearing having been provided in accordance with rules 4001(b), (c), and (d), and 9014 of

the Bankruptcy Rules; and all objections, if any, to the entry of this Order having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the TCEH Debtors and their estates, creditors, and other parties in interest, and is essential for the continued operation of the TCEH Debtors' businesses; and after due deliberation and consideration and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE HEARING BY THE TCEH DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[5]

A.    Petition Date.  On April 29, 2014 (the "Petition Date"), each of the TCEH Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court") commencing these Cases.  On May 1, 2014, the Court entered an order approving the joint administration of these Cases.

B.    Debtors-in-Possession.  The TCEH Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.    Jurisdiction and Venue.  The Court has jurisdiction over this matter, these proceedings, and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the TCEH Debtors confirm their consent pursuant to rule

---

[5]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

9013-1(f) of the Local Bankruptcy Rules to the entry of an Order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue for the Cases and proceedings on the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.  Committee Formation.  On May 13, 2014, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code [D.I. 420] (the "Creditors' Committee").

E.  Existing DIP Order.  On June 6, 2014, the Court entered the *Final Order (A) Approving Postpetition Financing for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, and (C) Modifying the Automatic Stay* [D.I. 856] (the "Existing DIP Order").

F.  Findings Regarding Postpetition Financing.

(i)  Request for Postpetition Financing.  The TCEH Debtors seek authority to obtain the DIP Facility on the terms described herein and in the DIP Documents to administer their Cases, fund the Refinancing and fund their operations pursuant to this Order.

(ii)  Priming of Liens of Prepetition Secured Creditors.  The priming of the Prepetition First Priority Liens[6] and the Prepetition Second Priority Liens of the Prepetition Secured Creditors in the Prepetition Collateral (each, as defined in the Final Cash Collateral Order) under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility and as

---

[6]  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [D.I. 855] (the "Final Cash Collateral Order").

further described below, will enable the TCEH Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of the estates and their creditors.

       (iii)    <u>Need for Postpetition Financing</u>.  The TCEH Debtors require the proceeds of this Financing to continue operations and to administer and preserve the value of their estates. The ability of the TCEH Debtors to finance their operations, maintain business relationships with their vendors, suppliers, and customers, pay their employees, and otherwise finance their operations to date has required the availability of working capital from the Existing DIP Facility Documents.  The continued access to sufficient working capital and liquidity through the Refinancing, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the ongoing preservation and enhancement of the TCEH Debtors' estates.

       (iv)    <u>No Credit Available on More Favorable Terms</u>.  Given their current financial condition, financing arrangements, and capital structure, the TCEH Debtors have been unable to obtain financing from sources other than the DIP Lenders and the DIP L/C Issuers on terms more favorable than the DIP Facility.  The TCEH Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The TCEH Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the TCEH Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the TCEH Debtors and their estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management

Banks, (x) perfected security interests in and liens on (each, as provided herein) the TCEH Debtors' existing and after-acquired assets as set forth in this Order, (y) superpriority claims as set forth in this Order, and (z) the other protections set forth in this Order.

G.    Use of Proceeds of the DIP Facility.  As a condition to entry into the DIP Credit Agreement and the extension of credit under the DIP Facility, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers require, and the TCEH Debtors agree, that:

(i)    proceeds of the Revolving Credit Facility may be utilized (a) on the Closing Date to fund (i) a portion of the Transaction Costs, and (ii) any OID or upfront fees required to be funded in connection with the "market flex" provisions of the Fee Letter, (b) on and after the Closing Date, to cash collateralize or backstop or replace outstanding letters of credit, (c) on or after the Closing Date, for working capital, capital expenditures and general corporate purposes (including acquisitions, investments, restricted payments and other transactions not prohibited by the DIP Documents, (d) subject to the satisfaction of the conditions precedent to the Conversion Date, to fund the transactions contemplated by the Plan, and (e) to fund operations prior to the emergence from the Cases until the consummation of the Plan, and for other purposes to be mutually agreed;

(ii)    proceeds of the Term Loan B Facility may be used together with cash on hand of the Borrower and its subsidiaries, (a) to pay Transaction Costs (as defined in the Commitment Letter), (b) to fund the Closing Refinancing (as defined in the Commitment Letter), (c) subject to satisfaction of the conditions precedent to the Conversion Date, to fund distributions required in connection with the consummation of the Plan, (d) for working capital and general corporate purposes, and (e) to pay fees, expenses and costs relating to the consummation of the Plan and funding the transactions contemplated by the Plan (and the

funding of operations prior to the consummation of the Plan) and for other purposes to be mutually agreed; and

(iii)    proceeds of the Term Loan C Facility may be used, on or after the Closing Date, to cash fund (together with cash on hand and other available sources of cash), in an amount not to exceed $650,000,000, one or more Cash Collateral Accounts (as defined in the Commitment Letter).

H.    Section 506(c).  In light of the DIP Agent's, the DIP Lenders', and the DIP L/C Issuers' agreement to subordinate their liens and superpriority claims to the Carve Out and the RCT Reclamation Support Carve Out (each as defined herein), the DIP Agent, the DIP Lenders, and the DIP L/C Issuers are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

I.    Good Faith of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers.

(i)    Willingness To Provide Financing.  The DIP Lenders have indicated a willingness to provide financing to the TCEH Debtors subject to (a) entry of this Order, (b) approval of the terms and conditions of the DIP Facility and the DIP Documents, and (c) entry of findings by the Court that such financing is essential to the TCEH Debtors' estates, that the DIP Agent, the DIP Lenders, and the DIP L/C Issuers are extending credit to the TCEH Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's, the DIP Lenders', and the DIP L/C Issuers' claims, superpriority claims, security interests and liens, and other protections granted pursuant to this Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent

reversal, modification, vacatur, amendment, reargument, or reconsideration of this Order or any other order.

(ii)      Business Judgment and Good Faith Pursuant to Section 364(e). The terms and conditions of the DIP Facility and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the TCEH Debtors under the circumstances, reflect the TCEH Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility was negotiated in good faith and at arm's length among the TCEH Debtors, the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers (as defined in the DIP Credit Agreement). Credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Order.

J.      Good Cause. The relief requested in the Motion is necessary, essential, and appropriate, and is in the best interests of, and will benefit, the TCEH Debtors and their estates, creditors, and other parties in interest, as its implementation will, inter alia, provide the TCEH Debtors with the necessary incremental liquidity to (a) minimize the disruption to the TCEH Debtors' business and ongoing operations, (b) preserve and maximize the value of the TCEH Debtors' estates for the benefit of all of the TCEH Debtors' creditors and other parties in interest and (c) confirm a plan of reorganization and exit from chapter 11.

K.      Notice. In accordance with rules 2002, 4001(c) and (d), and 9014 of the Bankruptcy Rules, and the Local Bankruptcy Rules, notice of the Hearing and the relief

requested in the Motion has been provided by the TCEH Debtors, via first class mail to: (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) counsel to the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its

capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the TCEH Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002, and (z) White & Case LLP, as counsel to the Commitment Parties. The parties have made reasonable efforts to afford the best notice possible under the circumstances to permit the relief set forth in this Order, and no other or further notice is or shall be required.

L.    Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    <u>Motion Approved</u>.  The Motion is granted as set for the herein, subject to the terms and conditions set forth in this Order. **The provisions of this Order shall be effective immediately upon (and in no event before) the Closing Date.  On the Closing Date, subject**

to the satisfaction of paragraph 15 herein, the Existing DIP Order shall be null and void and of no further force or effect.

2.    <u>Objections Overruled</u>.  All objections to the Motion, to the extent not withdrawn or resolved, are hereby overruled.  This Order shall be immediately effective and enforceable upon its entry.

**<u>DIP Facility Authorization</u>**

3.    <u>Authorization of the Financing and DIP Documents</u>.  The DIP Documents are hereby approved.  The TCEH Debtors are expressly and immediately authorized and empowered to execute and deliver (to the extent not previously executed or delivered) the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Order and the DIP Documents, and to deliver all instruments and documents which may be required or necessary for the performance by the TCEH Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in, and provided for by, this Order and the DIP Documents.  The TCEH Debtors are hereby authorized and directed to pay, in accordance with this Order, the principal, interest, fees, expenses, reimbursement obligations with respect to Letters of Credit, and other amounts payable or reimbursable by the TCEH Debtors described in the DIP Documents and all other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, including, without limitation, letter of credit fees (including issuance and other related charges), commitment fees, closing fees, arrangement fees, incentive fees, and administrative agent's fees, whether or not the transactions contemplated hereby are consummated, as provided for in the DIP Credit Agreement and the DIP Documents.  All collections and proceeds, whether ordinary course or otherwise, will be deposited and applied as required by this Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the TCEH Debtors,

enforceable against each of the TCEH Debtors and their estates in accordance with their terms. No obligation, payment, transfer, or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

4.     <u>Authorization to Borrow</u>.  The TCEH Debtors are hereby authorized to draw upon the DIP Facility in accordance with the DIP Documents.

5.     <u>Use of DIP Facility Proceeds</u>.  Upon entry of this Order, in accordance with paragraph 15 hereof and the DIP Documents, on the Closing Date, the TCEH Debtors are authorized to draw upon the DIP Facility and use advances of credit under the DIP Facility only for the purposes specifically set forth in, and subject to the terms and conditions of, this Order and the DIP Documents.

6.     <u>DIP Obligations</u>.  The DIP Documents and this Order shall constitute and evidence the validity and binding effect of the TCEH Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the TCEH Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in the Cases, any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>"). On the DIP Termination Date, (a) the DIP Obligations shall be due and payable, without notice or demand, to the extent provided for in the DIP Credit Agreement, and (b) unless all the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations (as defined in the DIP Credit Agreement)) have been indefeasibly paid in full, in cash, all Commitments (as defined in the DIP Credit Agreement)

have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), the use of the DIP Collateral, including Cash Collateral, shall automatically cease.

7.    DIP Liens.    To secure the DIP Obligations, effective immediately upon the occurrence of the Closing Date (as defined in the DIP Credit Agreement), pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, is hereby granted the following continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests and liens (all property identified in clauses (a), (b), and (c) below being collectively referred to as the "DIP Collateral"), subject only to the payment of the Carve Out and the RCT Reclamation Support Carve Out (all such liens and security interests granted to the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, pursuant to this Order and the DIP Documents, the "DIP Liens").

(a)    First Lien on Cash Balances and Unencumbered Property.    Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected and non-avoidable first priority senior security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Closing Date, is not subject to valid, perfected, and non-avoidable liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, the RCT L/C Collateral Account and the General L/C Collateral

Account (each, as defined in the DIP Credit Agreement), cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, postpetition intercompany claims of the TCEH Debtors), deposit accounts, investment property, supporting obligations, minerals, oil, gas, and as-extracted collateral, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), royalty interests, chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, capital stock and stock equivalents of subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "Unencumbered Property").    Notwithstanding the prior sentence, Unencumbered Property shall in any event exclude (a) the TCEH Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code (other than causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions") or any proceeds or property recovered pursuant to any successful Avoidance Actions, whether by judgment, settlement, or otherwise (the "Avoidance Proceeds") and (b) the TCEH Debtors' commercial tort claims (the "Commercial Tort Claims"), but shall include any proceeds or property recovered pursuant to any successful Commercial Tort Claim, whether by judgment, settlement, or otherwise (the "Commercial Tort Proceeds"); provided, however, that notwithstanding anything to the contrary in this paragraph 7, the DIP Superpriority Claims in respect of the DIP Obligations may be satisfied from any assets of the TCEH Debtors' estates, including any Avoidance Proceeds, subject to the Carve Out and the RCT Reclamation Support

Carve Out; provided further, however, that to the extent a security interest or lien is granted in or on Avoidance Actions or Avoidance Proceeds, the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, shall be granted, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien on the Avoidance Actions or Avoidance Proceeds, as applicable.

      (b)    <u>Priming of Liens of Prepetition Secured Creditors</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected and non-avoidable first priority senior priming security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable Prepetition First Priority Liens and Prepetition Second Priority Liens presently held by any of the Prepetition Secured Creditors (as defined in the Final Cash Collateral Order), excluding the Deposit L/C Loan Collateral Account to the extent of the Deposit L/C Obligations (each, as defined in the First Lien Credit Agreement (as defined in the Final Cash Collateral Order)).  Such security interests and liens shall be senior in all respects to the Prepetition First Priority Liens and Prepetition Second Priority Liens in such property of any of the Prepetition Secured Creditors arising from current and future liens of any of the Prepetition Secured Creditors (including, without limitation, Adequate Protection Liens (as defined in the Final Cash Collateral Order)), but shall not be senior to any valid, perfected, and non-avoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date, including the liens securing the Tex-La Indebtedness (as defined in the DIP Credit Agreement), or to any valid, perfected, and non-avoidable interests in such property arising out of liens to which the liens of

any of the Prepetition Secured Creditors become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "Permitted Prior Liens"). Notwithstanding anything to the contrary in this Order or any rights granted or action taken pursuant hereto or pursuant to the agreements and transactions approved hereby, any and all rights and priorities of the First Lien Lenders (as defined in the Final Cash Collateral Order) holding Deposit L/C Loans (as defined in the First Lien Credit Agreement) (the "Deposit L/C Lenders") in or to the Deposit L/C Loan Collateral Account (as defined in the First Lien Credit Agreement) or any cash therein or proceeds thereof (including amounts corresponding to undrawn Deposit Letters of Credit, and to drawn Deposit Letters of Credit if and to the extent any such amounts are returned to the TCEH Debtors), whether held by the TCEH Debtors or in which the TCEH Debtors otherwise have an interest as of the Petition Date or thereafter (the "Deposit L/C Loan Collateral"), shall be preserved, including, without limitation, any and all priorities among the First Lien Lenders or as between the Deposit L/C Lenders and the other First Lien Lenders, and any and all rights, claims, and liens granted or provided by or through this Order to the First Lien Lenders, to the extent applicable to any Deposit L/C Loan Collateral, shall have the same priorities, if any, among the First Lien Lenders, and as between the Deposit L/C Lenders and the other First Lien Lenders, as existed in the Deposit L/C Loan Collateral as of the Petition Date. For the avoidance of doubt, the preceding sentence delineates the rights and priorities among the First Lien Lenders and as between the Deposit L/C Lenders and the other First Lien Lenders only, and in no way affects the DIP Agent, the DIP Lenders, or the DIP L/C Issuers or their rights and priorities with respect to the First Lien Lenders, the Deposit L/C Lenders, or the Deposit L/C Loan Collateral.

(c)    <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected and non-avoidable security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors (other than the property described in clause (a), (b), or (d) or the final sentence of this paragraph 7, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date, or to any valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Adequate Protection Liens), which security interests and liens in favor of the DIP Agent are junior to such valid, perfected, and non-avoidable liens.

(d)    <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be junior or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the TCEH Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other domestic or foreign governmental unit (including any regulatory body), commission, board, or court for any liability of the TCEH Debtors.

Notwithstanding anything to the contrary in the DIP Documents or this Order, for the purposes of this Order, in no event shall the Unencumbered Property include, or the DIP Liens granted under this Order attach to, any of (a) Excluded Collateral (as defined in the DIP Credit Agreement), (b) Avoidance Actions or Avoidance Proceeds, and (c) Commercial Tort Claims (other than Commercial Tort Proceeds).

8. <u>DIP Lien Priority</u>. The DIP Liens are valid, binding, continuing, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be junior only to Permitted Prior Liens, the Carve Out, and the RCT Reclamation Support Carve Out. Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior to the Prepetition First Priority Liens and the Prepetition Second Priority Liens of the Prepetition Secured Creditors in the Prepetition Collateral and the Adequate Protection Liens. For purposes of this Order, it shall be an Event of Default if, other than as set forth herein or to the extent permitted by the DIP Documents, the DIP Liens shall be made junior to, or <u>pari passu</u> with, any lien or security interest heretofore or hereinafter granted (i) in the Cases or any Successor Cases, (ii) upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or (iii) upon the dismissal of any of the Cases or Successor Cases. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be <u>pari passu</u> with or senior to the DIP Liens.

9. <u>DIP Superpriority Claims</u>.

(a)    Effective immediately upon the occurrence of the Closing Date, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations: (i) except as set forth herein, with priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against the TCEH Debtors or their estates in any of the Cases and any Successor Cases, existing on the Petition Date or thereafter arising, of any kind or nature whatsoever, including, without limitation,

administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from, and have recourse to, all prepetition and postpetition property of the TCEH Debtors and all proceeds or products thereof; and (ii) which shall at all times be senior to the rights of the TCEH Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law. Notwithstanding the foregoing, the DIP Superpriority Claims shall be subject only to the payment of the Carve Out and the RCT Reclamation Support Carve Out, to the extent specifically provided for herein; provided, however, that the DIP Superpriority Claims granted hereunder shall remain subject and subordinate to any DIP Superpriority Claims arising under the Existing DIP Order until such DIP Superpriority Claims have been irrevocably paid in full.

(b)    Notwithstanding anything to the contrary in the DIP Documents or this Order, for the purposes of this Order, in no event shall the DIP Obligations be secured by a lien or mortgage on Excluded Collateral, Avoidance Actions, Avoidance Proceeds, or Commercial Tort Claims (other than Commercial Tort Proceeds).

10.    No Obligation to Extend Credit.  The DIP Agent, the DIP Lenders, and the DIP L/C Issuers shall have no obligation to make any loan or advance, or to issue any Letter of Credit, under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit or the issuance of such Letter of Credit under the DIP Documents and this Order have been satisfied in full or waived in accordance with the terms of the DIP Documents.

**Provisions Common to DIP Financing**

11.    Amendments to the DIP Documents.  The TCEH Debtors are hereby authorized

to implement, in accordance with the terms of the DIP Documents: (a) any nonmaterial modifications or amendments (including, without limitation, any change to the number or composition of the DIP Lenders or the DIP L/C Issuers) of the DIP Documents without further approval of the Court, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees paid in connection therewith) so long as such authorizations, amendments, waivers, consents or modifications do not shorten the maturity of the extensions of credit thereunder, increase the aggregate commitments of the DIP Lenders or the rate of interest payable thereunder or increase existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee), provided, however, that notice of any nonmaterial modification or amendment of the DIP Documents shall be provided to counsel to the Creditors' Committee and counsel to the TCEH First Lien Ad Hoc Committee contemporaneously with the execution of such nonmaterial modification or amendment; and (b) any other modifications or amendments to the DIP Documents without further approval of the Court, provided, however, that notice of any material modification or amendment to the DIP Documents shall be provided to counsel to the Creditors' Committee, the TCEH First Lien Ad Hoc Committee, and the U.S. Trustee, each of whom shall have seven (7) business days from the date of such notice within which to object, in writing, to such material modification or amendment. If the Creditors' Committee or the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of the Court. The foregoing shall be without prejudice to the TCEH Debtors' right to seek approval from the Court of any material modification or amendment on an expedited basis. Pursuant to this Order, the Creditors' Committee hereby (a)

consents to any request by the TCEH Debtors to seek approval from the Court of any material modification or amendment on an expedited basis and (b) reserves its right to object to any such modification or amendment.    The TCEH Debtors are hereby authorized to implement, in accordance with the terms of the DIP Documents, any amendment required to implement this Order; provided, however, that five (5) business days' notice of any fees in connection therewith shall be given to the U.S. Trustee and on a professionals' eyes only basis to counsel to the Creditors' Committee, and counsel to the TCEH First Lien Ad Hoc Committee.    Pursuant to this Order, the U.S. Trustee, the Creditors' Committee, the Ad Hoc Group of TCEH Unsecured Noteholders, and the TCEH First Lien Ad Hoc Committee hereby (a) consent to any request by the TCEH Debtors to seek approval from the Court of any such fees on an expedited basis and (b) reserve their right to object to any such fees.    Notwithstanding any other provision hereof, without further approval of this Court or notice to any party, amendments to the DIP Documents may be made as contemplated by Section 13.1 of the DIP Credit Agreement and/or in the Fee Letter permitting modifications to the DIP Credit Agreement necessary or advisable to ensure successful syndication, including, without limitation, increasing the interest rate, commitment fee or fees to market.

12.    <u>Budget and Annual Forecast Reporting</u>.    The Borrower will provide the DIP Agent and the Creditors' Committee with a statement of cash sources and uses of all free cash flow for the next full three (3) calendar months of the TCEH Debtors (on a consolidated basis) following the date of entry of the Order, broken down by month (the "<u>Budget</u>"), including the anticipated uses of the DIP Facility for such period, and after such three (3) calendar month period, at the end of each fiscal quarter (or, at the election of the Borrower, at the end of each calendar month or such other earlier period as may be agreed), an updated Budget for the

subsequent three (3)-calendar month period.  The Borrower will also provide the DIP Agent (for the benefit of the DIP Lenders) and the Creditors' Committee, on a monthly basis, with a variance report for each calendar month (delivered no later than the end of the subsequent calendar month), (a) showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, including explanations for all material variances and (b) certified as to its reasonableness when made by an Authorized Officer (as defined in the DIP Credit Agreement) of the Borrower.  No later than December 1, 2016 for the business plan and operating budget covering 2017, the Borrower will provide the DIP Agent (for the benefit of the DIP Lenders) and the Creditors' Committee with TCEH's approved annual business plan and projected operating budget through the DIP Facility's stated maturity date (the "Annual Operating Forecast"), (x) which shall be broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, and a line item for total available liquidity for the period of such Annual Operating Forecast and (y) which shall set forth the anticipated uses of the DIP Facility for such period, certified as to its reasonableness when made by an Authorized Officer of the Borrower.  Both the Budget and the Annual Operating Forecast shall provide, among other things, for the payment of the fees and expenses relating to the DIP Facility, ordinary course administrative expenses, bankruptcy-related expenses and working capital, expected issuances and renewals of Letters of Credit, and other general corporate needs; provided, however, that the Allowed Professional Fees (as defined herein) will be due and payable, and will be paid by the TCEH Debtors, whether or not consistent with the items or amounts set forth in the Budget, or the Annual Operating Forecast; and provided, further, that under no circumstance will the

Budget, or the Annual Operating Forecast be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the TCEH Debtors.

13.    <u>Modification of the Automatic Stay</u>.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including, without limitation, to (a) permit the TCEH Debtors to grant the DIP Liens and the DIP Superpriority Claims, (b) permit the TCEH Debtors to perform such acts as the DIP Agent, the DIP Lenders, and the DIP L/C Issuers each may request in its sole discretion to assure the perfection and priority of the liens granted herein, (c) permit the TCEH Debtors to incur all liabilities and obligations to the DIP Agent, the DIP Lenders, and the DIP L/C Issuers under the DIP Documents, the DIP Facility, and this Order, and (d) authorize the TCEH Debtors to make payments, and the DIP Agent, the DIP Lenders, and the DIP L/C Issuers to retain and apply payments made, in accordance with the terms of this Order.

14.    <u>Perfection of DIP Liens</u>.    This Order shall be sufficient and conclusive evidence of the granting, attachment, validity, perfection, and priority of all liens granted herein, including the DIP Liens, without the necessity of filing or recording any financing statement, patent filing, trademark filing, copyright filing, fixture filing, mortgage, notice of lien, or other instrument or document, which may otherwise be required under the law or regulation of any jurisdiction, or the taking possession of, or control over, assets, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, securities account control agreement, or other similar agreement) to grant, attach, validate, or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, and/or secured parties pursuant to the DIP Documents to the priorities granted herein.

Notwithstanding the foregoing, the DIP Agent is authorized, but not required, to file, as it in its sole discretion deems necessary, such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The TCEH Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent all such financing statements, mortgages, notices, and other documents and information as the DIP Agent may reasonably request.  The DIP Agent, in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of lien, or similar instrument.  In furtherance of the foregoing and without further approval of the Court, each Debtor is (a) authorized to do and perform all acts to make, execute, and deliver all instruments and documents and provide all information and (b) authorized and directed to pay all fees that may be reasonably required or necessary for the TCEH Debtors' performance hereunder.

15.    <u>Payments to Existing DIP Agent and Existing DIP Lenders</u>.

(a)    On the Closing Date, the TCEH Debtors are hereby authorized and directed to (i) use the proceeds of borrowings under the DIP Facility (in accordance with the terms of the DIP Credit Agreement) to irrevocably repay in full all obligations (other than any indemnities that are intended to survive repayment of the obligations under the Existing DIP Credit Agreement) then due and payable to the Existing DIP Agent and the Existing DIP Lenders

under the Existing DIP Facility Documents and the Existing DIP Order, (ii) cancel, replace, backstop or "cash collateralize" all outstanding letters of credit issued pursuant to the Existing DIP Credit Agreement in accordance with the provisions thereof and (iii) pay or secure all hedging obligations of the TCEH Debtors permitted under the Existing DIP Credit Agreement, in each case under collateral arrangements reasonably satisfactory to the respective obligee of such obligations, whereupon all liens, mortgages and security interests granted to the Existing DIP Agent and the Existing DIP Lenders under the Existing DIP Order and the Existing DIP Facility Documents shall be deemed released and of no further force or effect.

(b)     Subsequent to the Closing Date, (i) the TCEH Debtors shall promptly pay and/or reimburse the Existing DIP Agent and/or Existing DIP Lenders for any and all reasonable fees, costs, expenses, losses and damages incurred thereafter to the extent that the Existing DIP Credit Agreement or any other Existing DIP Facility Document entitled them to such payment, indemnity or reimbursement after termination of such Existing DIP Facility Document (subject to all parties' reservation of rights to contest whether the Existing DIP Agent or Existing DIP Lender is entitled to such payment, indemnity or reimbursement by the TCEH Debtors) and (y) such amounts shall, until paid in full in cash, constitute superpriority administrative expense claims under section 507(b) of the Bankruptcy Code, senior in all respects to the Superpriority Claims granted in paragraph 9(a) above.

16.     Proceeds of Subsequent Financing.   If the TCEH Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in the Cases or any Successor Cases, shall obtain credit or incur debt pursuant to section 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to such time as the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash

Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), including subsequent to the confirmation of any plan with respect to any or all of the TCEH Debtors and the TCEH Debtors' estates, and such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit or debt shall be used to indefeasibly repay in full, in cash, the DIP Obligations.

17.    <u>Maintenance of DIP Collateral</u>.  Until such time as all DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), the TCEH Debtors shall (a) maintain and insure the DIP Collateral in amounts, for the risks, and by the entities as required under the DIP Documents and (b) maintain the cash management system in effect as of the Petition Date consistent with the Cash Management Order (as defined in the DIP Credit Agreement), as modified by any order that may be entered by the Court, or as otherwise required by the DIP Documents.

18.    <u>Disposition of DIP Collateral; Rights of DIP Agent, DIP Lenders, and DIP L/C Issuers</u>.  The TCEH Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than as permitted in both the DIP Documents and, to the extent required under the Bankruptcy Code, by order of the Court (and no consent shall be implied by this Order or from any action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, or an order of the Court); provided that the TCEH Debtors may

release liens on the DIP Collateral solely to the extent permitted by the DIP Documents.

19.    Protection of DIP Lenders' Rights

(a)    So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding Commitments (as defined in the DIP Credit Agreement) under the DIP Credit Agreement, the Prepetition Secured Creditors shall: (i) have no right to and shall take no action to foreclose upon the liens granted thereto pursuant to the Prepetition Secured Facilities, any other Prepetition First Lien Document or any other documents or instruments related to, referenced in, or executed in connection with any such agreements or this Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral (the "Enforcement Remedies") while the DIP Lenders are pursuing such Enforcement Remedies; provided, however, that in the event the DIP Lenders do not pursue or are not continuing to pursue the Enforcement Remedies, the Prepetition Secured Creditors shall be permitted to pursue any such Enforcement Remedies subject to the terms of the Final Cash Collateral Order; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (ii), the DIP Agent or the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Order or as the Prepetition Secured Creditors may reasonably determine to be required by applicable law to continue the perfection of such liens or security interests.  Notwithstanding anything herein to the contrary, nothing in this Order shall prohibit or limit the Prepetition Secured Creditors from terminating the TCEH Debtors' use of Cash Collateral pursuant to the terms and conditions of the Final Cash Collateral Order and all such rights are fully reserved.

(b)     To the extent any Prepetition Secured Creditor has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, then such Prepetition Secured Creditor shall be deemed to maintain such possession or exercise such control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders and the First Lien Collateral Agent (as defined in the Final Cash Collateral Order) for the Prepetition Secured Creditors shall use its commercially reasonable efforts to comply with the reasonable instructions of the DIP Agent with respect to the exercise of such control and the DIP Agent agrees, and shall be deemed, without incurring any liability or duty to any party, to maintain possession or control of any Prepetition Collateral in its possession or control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the Prepetition Secured Creditors with respect to bank accounts.

(c)     Except as set forth in this Order, no rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Loan Parties' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the TCEH Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the TCEH Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

(d)     The DIP Agent, the DIP Lenders and the DIP L/C Issuers are hereby granted a non-exclusive worldwide license or right to use, to the maximum extent permitted by applicable law and to the extent of their interest therein, exercisable without payment of royalty or other compensation, any of the DIP Collateral consisting of intellectual property in connection

with the liquidation, collection, disposition or other realization upon the DIP Collateral pursuant to any enforcement action by the DIP Agent and the DIP Lenders.

20.    _DIP Termination Date_.    On the DIP Termination Date, (a) the DIP Obligations shall be immediately due and payable, to the extent provided for in the DIP Credit Agreement, and all Commitments shall terminate and (b) unless the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), all authority to use the DIP Collateral, including Cash Collateral, shall cease.    For purposes of this Order, the "_DIP Termination Date_" shall mean the Maturity Date as defined in the DIP Credit Agreement.

21.    _Events of Default_.    An "Event of Default" under the DIP Documents shall constitute an Event of Default under this Order, unless waived in writing in accordance with Section 13.1 of the DIP Credit Agreement.    Notwithstanding anything to the contrary contained herein or in the DIP Documents, any Event of Default under this Order or the DIP Documents, other than any Event of Default which cannot be waived without the written consent of each DIP Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act, or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action, or omitting to take any action) or have ceased to exist and the Borrower is in compliance with the DIP Documents.

22.    _Rights and Remedies Upon Event of Default_.    Upon the occurrence and during the continuance of an Event of Default and following the giving of five (5) business days' notice to

the TCEH Debtors, counsel to the Creditors' Committee, and counsel to the TCEH First Lien Ad Hoc Committee (the "Remedies Notice Period"), the DIP Agent, on behalf of the DIP Lenders and the DIP L/C Issuers, may exercise all rights and remedies provided for in the DIP Documents, may declare (a) the termination, reduction, or restriction of any further Commitment to the extent any such Commitment remains, (b) all DIP Obligations under the DIP Documents to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the TCEH Debtors, and (c) subject to the provisions of the DIP Documents, the termination of the DIP Documents as to any future liability or obligation of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers, including without limitation any obligations with respect to the Exit Facility, but without affecting any of the DIP Liens or the DIP Obligations, and may withdraw consent to the TCEH Debtors' continued use of Cash Collateral.  Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder.  During the Remedies Notice Period, the TCEH Debtors may continue to use the DIP Collateral, including Cash Collateral, in the ordinary course of business, consistent with past practices and the most recently delivered Budget, but may not enter into any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales, or transactions with non-Debtor affiliates) that are not in the ordinary course of business; provided that, during the Remedies Notice Period, the TCEH Debtors may use DIP Collateral, including Cash Collateral, to (y) seek use of Cash Collateral on a non-consensual basis and/or (z) seek a determination that an Event of Default has not occurred and/or is not continuing.  Unless the Court orders otherwise during the Remedies Notice Period, at the end of the Remedies Notice Period, (a) the TCEH

Debtors shall no longer have the right to use or seek to use the DIP Collateral, including Cash Collateral, (b) the automatic stay pursuant to section 362 of the Bankruptcy Code, as to all of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers, shall be automatically terminated without further notice to, or order of, the Court, and (c) the DIP Agent, on behalf of itself, the DIP Lenders, and the DIP L/C Issuers, shall be permitted to exercise all rights against the DIP Collateral in accordance with the DIP Documents and this Order, and shall be permitted to satisfy the DIP Obligations, without further order or application or motion to the Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, and the TCEH Debtors waive their right to, and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent, on behalf of the DIP Lenders and the DIP L/C Issuers, set forth in this Order or the DIP Documents.

23.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order.  Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter modified, amended, or vacated by a subsequent order of the Court or any other court, each of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  To the fullest extent permitted under section 364(e) of the Bankruptcy Code, any liens or claims granted to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint

Lead Arrangers hereunder arising prior to the effective date of any such modification, amendment, or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

24.    <u>DIP and Other Expenses</u>.  All fees paid and payable, and costs and/or expenses reimbursed or reimbursable, as set forth in the DIP Documents, by the TCEH Debtors to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers are hereby approved; <u>provided</u>, <u>however</u>, that fees and expenses of the professionals advising the DIP Agent shall be subject to review by the TCEH Debtors, the U.S. Trustee, and counsel to the Creditors' Committee in accordance with the procedures set forth in this paragraph 24.  The TCEH Debtors are hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the DIP Documents, without the necessity of any further application with the Court for approval or payment of such fees, costs, or expenses.  The TCEH Debtors are authorized and directed to reimburse within ten (10) calendar days of written demand (together with reasonably detailed supporting documentation) the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication, and administration of the DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the DIP Facility, and any exercise of remedies in respect thereof (including reasonable documented out-of-pocket prepetition and postpetition fees, charges, and disbursements of legal counsel, financial advisors, and third-party appraisers and consultants advising the DIP Agent incurred in connection with the DIP Agent's participation in the Cases, limited in the case of legal counsel to one primary counsel (and (a) local counsel in applicable foreign and local jurisdictions, but

limited to one local counsel in each such jurisdiction, (b) regulatory counsel, and (c) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)).  Payment of all such fees and expenses shall not be subject to allowance by the Court; provided, however, that the TCEH Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the DIP Credit Agreement and the DIP Documents to counsel to the Creditors' Committee and the U.S. Trustee, and the Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten (10) calendar days after receipt thereof.  In the event that within ten (10) calendar days from receipt of such invoices the TCEH Debtors, the U.S. Trustee, or counsel to the Creditors' Committee raises an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to an order of the Court.  Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers under the DIP Documents, whether incurred prior to or after the Petition Date, shall be deemed fully earned, indefeasibly paid, irrevocable, and non-avoidable pursuant to, and in accordance with, the terms of the DIP Documents and, irrespective of any subsequent order approving or denying the Financing or any other financing pursuant to section 364 of the Bankruptcy Code, fully entitled to all protections of section 364(e) of the Bankruptcy Code; provided, however, that nothing contained in this sentence shall impair the rights of the TCEH Debtors, the U.S. Trustee, or

counsel to the Creditors' Committee with respect to the fees and expenses of the professionals advising the DIP Agent in accordance with the procedures set forth in this paragraph 24. All unpaid fees, costs, and expenses payable under the DIP Documents to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers shall be included and constitute part of the DIP Obligations and be secured by the DIP Liens.

25.    Proofs of Claim. The DIP Agent, the DIP Lenders, and the DIP L/C Issuers will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to the DIP Agent, the DIP Lenders, or the DIP L/C Issuers.

26.    Rights of Access and Information. Without limiting the rights of access and information afforded the DIP Agent, the DIP Lenders, and the DIP L/C Issuers under the DIP Documents, the TCEH Debtors shall be, and hereby are, required to afford representatives, agents, and/or employees of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Creditors' Committee reasonable access to the TCEH Debtors' premises and its books and records in accordance with the DIP Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the TCEH Debtors shall authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent and the Creditors' Committee all such information as may be reasonably requested from the TCEH Debtors with respect to the business, results of operations, and financial condition of the TCEH Debtors.

27.    <u>Carve Out</u>.

(a)    <u>Carve Out</u>.  As used in this Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the TCEH Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the TCEH Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation

of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

    (b)   <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the TCEH Debtors with a copy to counsel to the Creditors' Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the TCEH Debtors for Revolving Credit Loans under the Revolving Credit Commitment (each, as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding Revolving Credit Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Revolving Credit Loans) and (ii) also constitute a demand to the TCEH Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The TCEH Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the TCEH Debtors for Revolving Credit Loans under the Revolving Credit Commitment (on a pro rata basis based on the then outstanding Revolving Credit Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Revolving Credit Loans).  The TCEH Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any

and all other claims.  On the first business day after the DIP Agent gives such notice to such Revolver Credit Lenders (as defined in the DIP Credit Agreement), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the TCEH Debtors to satisfy any or all of the conditions precedent for Revolving Credit Loans under the Revolving Credit Facility, any termination of the Revolving Credit Commitments following an Event of Default, or the occurrence of the Maturity Date, each Revolver Credit Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such Revolver Credit Lender's pro rata share with respect to such borrowing in accordance with the Revolving Credit Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders and the DIP L/C Issuers, unless the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), in which case any such excess shall be paid to the Prepetition First Lien Creditors in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve

Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders and the DIP L/C Issuers, unless the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), in which case any such excess shall be paid to the Prepetition First Lien Creditors in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Documents or this Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 27, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 27, prior to making any payments to the DIP Agent or the Prepetition First Lien Creditors, as applicable. Notwithstanding anything to the contrary in the DIP Documents or this Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition First Lien Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the TCEH Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this Order, (i) disbursements by the TCEH Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in

full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Annual Operating Forecast, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the TCEH Debtors. For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Final Cash Collateral Order, the DIP Facility, or in any Prepetition Secured Facilities (as defined in the Final Cash Collateral Order), the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim (as defined in the Final Cash Collateral Order), and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(c)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>. The DIP Agent, DIP Lenders, and the DIP L/C Issuers shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the TCEH Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)    <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Order, the DIP Documents, the Bankruptcy Code, and applicable law.

28.    <u>RCT Reclamation Support Carve Out</u>. All amounts up to $975,000,000 required to be paid by the TCEH Debtors to the Railroad Commission of Texas (the "<u>RCT</u>") pursuant to amounts due and owing in respect of reclamation obligations incurred by the RCT and for which any of the TCEH Debtors may be liable under Applicable Law (as defined in the DIP Credit Agreement) will constitute the "RCT Reclamation Support Carve Out," and such RCT Reclamation Support Carve Out will be senior to the DIP Obligations and to any other obligations or liabilities of the TCEH Debtors (other than, and subject in any event to, the Carve Out). Notwithstanding any provision of the DIP Documents or this Order to the contrary, for the sake of clarity, with respect to the RCT Reclamation Support Carve Out in favor of the RCT for financial assurance for Debtor Luminant Mining Company LLC's reclamation obligations, the RCT shall be entitled to up to the first $975,000,000 in proceeds of DIP Collateral to satisfy valid claims against the RCT Reclamation Support Carve Out, in the event such DIP Collateral is liquidated, before payment of claims of all other secured or unsecured creditors or other parties in interest, other than the amounts subject to the professional fee carve out (which amounts are defined as the "Carve Out" in paragraph 27 of this Order).

29.    <u>Limitations on the DIP Facility, the DIP Collateral, and the Carve Out</u>. Notwithstanding anything herein to the contrary, except as provided in this paragraph and in

paragraph 22 with respect to the ability of the TCEH Debtors to use DIP Collateral, including Cash Collateral, solely during the Remedies Notice Period, to seek use of Cash Collateral on a non-consensual basis and/or to challenge whether an Event of Default has occurred and/or is continuing, the TCEH Debtors shall not assert or prosecute, and no portion of the proceeds of the DIP Facility, the DIP Collateral, including Cash Collateral, or the Carve Out, and no disbursements set forth in the Budget, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person in connection with (a) incurring Indebtedness (as defined in the DIP Credit Agreement) except to the extent permitted under the DIP Credit Agreement; (b) preventing, hindering, or delaying any of the DIP Agent's, the DIP Lenders', the DIP L/C Issuers', the Existing DIP Agent's, the Existing DIP Lenders', the Prepetition First Lien Agents', or the Prepetition First Lien Creditors' (in the case of each of the foregoing, in their respective capacities as such) enforcement or realization upon, or exercise of rights in respect of, any of the DIP Collateral once an Event of Default has occurred and after the Remedies Notice Period; (c) objecting, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the DIP Obligations (as defined in the Existing DIP Order), the DIP Liens (as defined in the Existing DIP Order), the Prepetition First Lien Obligations, the Prepetition First Priority Liens, or the Prepetition Collateral (including Cash Collateral), or any other rights or interest of any of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, the Existing DIP Agent, the Existing DIP Lenders, the Prepetition First Lien Agents, or the Prepetition First Lien Creditors (in the case of each of the foregoing, in their respective capacities as such); (d) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any

actions under chapter 5 of the Bankruptcy Code, against any of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, the Existing DIP Agent, the Existing DIP Lenders, the Prepetition First Lien Agents, the Prepetition First Lien Creditors, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees (in the case of each of the foregoing, in their respective capacities as such); or (e) (i) asserting, joining, commencing, supporting, investigating, or prosecuting any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of the Released Parties (as defined herein and/or in the Existing DIP Order) arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Existing DIP Credit Agreement, the Existing DIP Facility Documents or the transactions contemplated hereunder or thereunder or (ii) asserting, joining, commencing, supporting, or prosecuting any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or materially adverse to the interests of the Prepetition First Lien Creditors arising out of, in connection with, or relating to the Prepetition First Lien Documents or the financing transactions contemplated thereunder, and in the case of (e)(i) and (e)(ii) of this paragraph 29, including, without limitation, (i) any action arising under the Bankruptcy Code with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Facility, the DIP Obligations (as defined in the Existing DIP Order), the DIP Liens (as defined in the Existing DIP Order), the Existing DIP Facility Documents, the Prepetition First Lien Obligations, the Prepetition First Priority Liens, or the Prepetition First Lien Documents, as applicable; (ii) any so-called "lender liability" claims

and causes of action with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Facility, the DIP Obligations (as defined in the Existing DIP Order), the DIP Liens (as defined in the Existing DIP Order), the Existing DIP Facility Documents, the Prepetition First Lien Obligations, the Prepetition First Priority Liens, or the Prepetition First Lien Documents, as applicable; (iii) any action with respect to the validity and extent of the DIP Obligations, the DIP Obligations (as defined in the Existing DIP Order), the DIP Superpriority Claims, or the Prepetition First Lien Obligations or the validity, extent, perfection, and priority of the DIP Liens, the DIP Liens (as defined in the Existing DIP Order) or the Prepetition First Priority Liens; (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the DIP Liens, the DIP Liens (as defined in the Existing DIP Order), the DIP Superpriority Claims, or the Prepetition First Priority Liens in whole or in part; (v) appeal or otherwise challenge this Order, the DIP Documents, the Existing DIP Order, the Existing DIP Facility Documents or any of the transactions contemplated herein or therein, provided that nothing herein shall limit the Creditors' Committee's rights to be compensated for any objection to this Order, and any allowed fees and expenses of the Creditors' Committee's professionals with respect thereto may be paid using any of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out; and/or (vi) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Existing DIP Agent or the Existing DIP Lenders in respect of their liens and security interests in

the DIP Collateral or any of their rights, powers, or benefits hereunder or in the DIP Documents or the Existing DIP Documents anywhere in the world.

30.   Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, or the Creditors' Committee to object to the allowance and payment of such fees and expenses.

31.   Release.  The TCEH Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in the Cases or Successor Cases) and any party acting by, through, or under the TCEH Debtors or their estates, forever and irrevocably (a) release, discharge, waive, and acquit the current or future DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Joint Lead Arrangers, each of their respective participants and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, and in each case solely in their capacities as such, the "Released Parties"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, or the transactions contemplated hereunder or

thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the DIP Obligations, DIP Liens, or DIP Facility, as applicable, (ii) any and all claims and causes of action arising under the Bankruptcy Code, with respect to or relating to the DIP Obligations, DIP Liens, or DIP Facility, as applicable, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the DIP Obligations and the DIP Liens; provided, however, that this release shall have no impact on any claims or causes of action the Creditors' Committee may bring (y) pursuant to the Challenge (as defined in the Final Cash Collateral Order) rights granted under the Final Cash Collateral Order and this Order or (z) for the prepetition conduct of any party not related to the DIP Facility or otherwise, in each case, subject to the terms and conditions of the Final Cash Collateral Order and this Order.

32.     No Third Party Rights.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

33.     Section 506(c) Claims.  No costs or expenses of administration of the Cases or any future proceeding that may result therefrom, which have been or may be incurred in the Cases at any time, shall be charged against the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, or any of their respective claims or the DIP Collateral, pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, as applicable, and no such consent shall be implied from

any other action, inaction, or acquiescence by the DIP Agent, any DIP Lender, and any DIP L/C Issuer.

34.    <u>Payments Free and Clear</u>. Subject only to the Carve-Out, any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders pursuant to the provisions of this Order or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of any TCEH Debtor.

35.    <u>No Marshaling/Application of Proceeds</u>.  The DIP Agent, the DIP Lenders, and the DIP L/C Issuers shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds shall be received and applied pursuant to the terms of the DIP Documents notwithstanding any other agreement or provision to the contrary.

36.    <u>Insurance</u>. To the extent that any of the Prepetition Secured Agents is listed as loss payee under the TCEH Debtors' insurance policies, the DIP Agent is also deemed to be the loss payee under such insurance policies and shall act in that capacity and distribute, subject to the Carve Out, any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and second, to the payment of the Prepetition Secured Obligations.

37.    <u>Payments Held in Trust</u>. Except as expressly permitted in this Final Order or the DIP Documents and except for adequate protection payments pursuant to orders of the court in effect as of the date hereof (including, for the avoidance of doubt all payments under section 5 of

the Final Cash Collateral Order), in the event that any person or entity receives any payment on account of a security interest in DIP Collateral (whether in the form of DIP Collateral or any proceeds of DIP Collateral or any other payment with respect thereto from any other source) prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Final Order.  For the avoidance of doubt, any payments made by the TCEH Debtors in accordance with the DIP Documents, including the Budget, and this Order, shall not be affected by this paragraph 37.

38.    <u>Credit Bidding</u>.  The DIP Agent shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

39.    <u>Joint and Several Liability</u>.  Nothing in this Order shall be construed to constitute a substantive consolidation of any of the TCEH Debtors' estates, it being understood, however, that the TCEH Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

40.    <u>Discharge Waiver</u>.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of

section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) on or before the effective date of a confirmed plan of reorganization or liquidation.  It shall be an Event of Default if any of the TCEH Debtors that own any of the Principal Properties propose or support any plan of reorganization or liquidation for such TCEH Debtors other than (i) the Existing Plan, (ii) an Alternative Acceptable Plan, or (iii) any plan of reorganization or liquidation that provides that the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) shall be indefeasibly paid in full, in cash, all Commitments shall be terminated, and all Letters of Credit shall be cancelled (or all such Letters of Credit shall be fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) on or prior to the earlier to occur of the effective date of any such plan of reorganization or liquidation or sale and the DIP Termination Date.

41.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Agent's, the DIP Lenders', the DIP L/C Issuers', or the Creditors' Committee's right to seek any other or supplemental relief in respect of the TCEH Debtors; (b) any of the rights of the DIP Agent, any of the DIP Lenders, any of the DIP L/C Issuers, or the Creditors' Committee under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers,

or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, or the Creditors' Committee.

42.    <u>No Waiver by Failure To Seek Relief</u>.  The delay or failure of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, or the Creditors' Committee to seek relief or otherwise exercise their rights and remedies under this Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Creditors' Committee, or any party in interest, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

43.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, any statutory or nonstatutory committees appointed or formed in the Cases (including the Creditors' Committee), and the TCEH Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed for the estate of any of the TCEH Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the TCEH Debtors and their respective successors and assigns; <u>provided</u>, <u>however</u>, that the DIP Agent, the DIP Lenders, and the DIP L/C Issuers shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the TCEH Debtors.  In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and

when permitted pursuant to this Order or the DIP Documents, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers (a) shall not be deemed to be in control of the operations of any of the TCEH Debtors or to be acting as a "controlling person," "responsible person," "insider" or "owner or operator" with respect to the operation or management of any of the TCEH Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act (as amended), or any similar Federal or state statute) and (b) shall not owe any fiduciary duty to any of the TCEH Debtors, their creditors, or their estates, and shall not constitute or be deemed to constitute a joint venture or partnership with any of the TCEH Debtors.

44.    <u>No Modification of this Order</u>.  Unless and until the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), an Event of Default shall occur if the TCEH Debtors seek or consent to, directly or indirectly, or if there is entered:  (a) except as permitted herein or in the DIP Documents, without the prior written consent of the DIP Agent, (i) any modification or amendment to this Order that is in the aggregate adverse to the rights and interests of the DIP Lenders, (ii) any stay or vacatur of this Order, (iii) a priority claim for any administrative expense or unsecured claim against the TCEH Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in section 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy

Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superpriority Claims other than the Carve Out and the RCT Reclamation Support Carve Out, or (iv) any Lien on any of the DIP Collateral with priority equal or superior to the DIP Liens; (b) except as permitted herein or in the DIP Documents, without the prior written consent of the DIP Agent, an order (other than the Final Cash Collateral Order) allowing use of the DIP Collateral, including Cash Collateral; (c) an order converting or dismissing any of the Cases of a TCEH Debtor that directly owns any of the Principal Properties (as defined in the Commitment Letter); (d) an order appointing a chapter 11 trustee with respect to the TCEH Debtors and substantially all of their respective properties; or (e) an order appointing an examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) with respect to the TCEH Debtors and substantially all of their respective properties; provided, however, that notwithstanding anything to the contrary herein, the TCEH Debtors may seek to use Cash Collateral on a non-consensual basis pursuant to an order in form and substance acceptable to the Left Lead Arrangers (as defined in the DIP Credit Agreement). No such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent.

45.    Survival.  The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization or liquidation in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which the Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Order, including the claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks pursuant to this Order and/or the DIP Documents,

notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Order until, in respect of the DIP Facility, all the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations), pursuant to the DIP Documents and this Order, have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

46.    <u>Conversion Date</u>.  Upon the satisfaction or waiver of the conditions to effectiveness set forth in the Exit Facility Agreement (as defined in the DIP Credit Agreement), the DIP Facility shall convert to the Exit Facility on the terms set forth in the Exit Facility Agreement without further notice to or order or other approval of the Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any person or entity (including the boards of directors of the TCEH Debtors or the Reorganized TCEH Debtors), except as otherwise required by the DIP Credit Agreement.  Solely for purposes of this paragraph 46, the DIP Documents in effect after the occurrence of the Conversion Date are referred to as the "<u>Exit Facility Documents</u>."  Upon the satisfaction or waiver of the conditions to effectiveness set forth in the Exit Facility Agreement, the TCEH Debtors and Reorganized TCEH Debtors shall be authorized and directed, in each case to the extent necessary, appropriate or desirable, to (1) enter into any notes, documents or agreements in connection with the Exit Facility , including, without limitation, any documents required in

connection with the creation, perfection or continuation of the liens securing the Exit Facility, (2) grant such liens and security interests as necessary to provide security for the Exit Facility in accordance with the Exit Facility Agreement and the Exit Facility Documents, (3) continue to perform all of their obligations under the Exit Facility Agreement and the other Exit Facility Documents, and (4) take all such other actions as any Authorized Officer (as defined in the Exit Facility Agreement) of the Reorganized TCEH Debtors may determine are necessary, appropriate or desirable in connection with the consummation of the transactions contemplated by the Exit Facility.

47.    <u>Railcar Lease Representation</u>.  Nothing herein primes or otherwise affects the rights and interests of TXU 2007-1 Railcar Leasing LLC (as the assignee of its affiliate High Ridge Leasing, LLC) under that certain Lease dated as of September 7, 2007, by and among TXU 2007-1 Railcar Leasing LLC (as assignee of its affiliate High Ridge Leasing, LLC) and Debtor Texas Competitive Electric Holdings Company LLC, relating to 996 Aluminum Rapid Discharge IV Coal Cars (the "<u>Railcar Lease</u>").  All rights of parties in interest with respect to the Railcar Lease are preserved.

48.    <u>DeCordova and Permian Basin Representation</u>.  Nothing herein primes, limits, or otherwise affects the rights and interests of either The Bank of New York Mellon Trust Company, N.A. (in its capacity as successor in interest to American National Bank and Trust Company of Chicago as indenture trustee (the "<u>7.48% Indenture Trustee</u>")), or its successors in interest (including CSC Trust Company of Delaware, in its capacity as proposed successor indenture trustee), for the 7.48% Secured Facility Bonds, 1995 Series due January 1, 2017 (the "<u>7.48% Secured Facility Bonds</u>"), or of the holders of the 7.48% Secured Facility Bonds, under (a) that certain Trust Indenture, Security Agreement, and Mortgage, dated as of December 1,

1989, among TCEH (as successor in interest to Texas Utilities Electric Company), U.S. Bank National Association (as successor in interest to The Connecticut National Bank), as Owner Trustee, and the Indenture Trustee, as amended and supplemented by the Trust Indenture, Security Agreement and Mortgage Supplement No. 1, dated as of October 25, 1995 (collectively, the "7.48% Indenture"); and (b) the Operative Documents (as defined in the 7.48% Indenture) or any other document relating to the DeCordova Facility and the Permian Basin Facility (each as defined in the 7.48% Indenture). All rights of all parties in interest with respect to the 7.48% Secured Facility Bonds, the Operative Documents and the DeCordova and Permian Basin Facilities are hereby fully preserved.

49. No Impact on Certain Contracts/Transactions. No rights of any entity under section 555, 556, 559, 560, or 561 of the Bankruptcy Code shall be affected by the entry of this Order as to any contract or transaction of the kind listed in such sections of the Bankruptcy Code.

50. Alcoa Inc. Representation. Nothing herein shall interfere with, affect, or otherwise impair Alcoa Inc.'s setoff or recoupment rights, if any, in its capacity as counterparty under certain contracts and other agreements with any of the Debtors, against any applicable Debtor entity.

51. Order Governs. In the event of any inconsistency between the provisions of this Order and any provision contained in the DIP Documents, the Existing DIP Facility Documents or the Existing DIP Order, the provisions of this Order shall govern.

52.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Order according to its terms.

Wilmington, Delaware
Dated:  _June 28_, 2016

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE