closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"**Tax Order**" shall mean that certain Order Authorizing the Debtors To Pay Certain Prepetition Taxes and Fees [D.I. 799].

"**Tax Sharing Agreements**" shall mean (i) the Federal and State Income Tax Allocation Agreement among the Members of the Energy Future Holdings Corp. Consolidated Group, dated May 15, 2012 by and among Energy Future Holdings Corp. and the other parties thereto, (ii) the Amended and Restated Tax Sharing Agreement, dated November 5, 2008, among Energy Future Holdings Corp., Oncor Electric Delivery Holdings Company LLC, Oncor Electric Delivery Company LLC, Texas Transmission Investment LLC and Oncor Management Investment LLC and (iii) any other tax sharing agreement, each as amended, supplemented or otherwise modified from time to time in a manner that is not, in the Borrower's reasonable judgment, adverse, taken as a whole, to the Lenders in any material respect.

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"**TCEH**" shall have the meaning provided in the preamble to this Agreement.

"**TCEH Debtors**" shall have the meaning set forth in the Recitals hereto.

"**Term L/C Cash Coverage Requirement**" shall have the meaning provided in Section 3.9.

"**Term L/C Loan**" shall have the meaning provided in Section 2.1(d).

"**Term L/C Loan Collateral Account**" shall mean one or more cash collateral accounts or securities accounts, including the Deutsche Bank Term L/C Loan Collateral Account and the Existing Term L/C Loan Collateral Account established pursuant to, and subject to the terms of, Section 3.9 for the purpose of cash collateralizing the Term L/C Obligations in respect of Term Letters of Credit.

"**Term L/C Loan Collateral Account Balance**" shall mean, at any time, with respect to any Term L/C Loan Collateral Account, the aggregate amount on deposit in such Term L/C Loan Collateral Account. References herein and in the other Credit Documents to the Term L/C Loan Collateral Account Balance shall be deemed to refer to the Term L/C Loan Collateral Account Balance in respect of the applicable Term L/C Loan Collateral Account or to the Term L/C Loan Collateral Account Balance in respect of all Term L/C Loan Collateral Accounts, as the context may require.

"**Term L/C Loan Commitment**" shall mean, on the date hereof, the amount set forth opposite Lender's name on Schedule 1.1(a) as such Lender's "Term L/C Loan Commitment", in each case as the same may be changed from time to time pursuant to the terms hereof.

"**Term L/C Loan Facility**" shall mean the facility providing for the Term L/C Loans.

"**Term L/C Loan Lender**" shall mean each Lender holding a Term L/C Loan.

58

"**Term L/C Loan Maturity Date**" shall mean the Maturity Date.

"**Term L/C Obligations**" shall mean, as at any date of determination, the aggregate Stated Amount of all outstanding Term Letters of Credit plus the aggregate principal amount of all Unpaid Drawings under all Term Letters of Credit. For all purposes of this Agreement, if on any date of determination a Term Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Term Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**Term L/C Permitted Investments**" shall mean:

(a) any Permitted Investments described in clauses (a) through (g) of the definition thereof; and

(b) such other securities as agreed to by the Borrower and the applicable Term Letter of Credit Issuer from time to time.

"**Term L/C Termination Date**" shall mean the Maturity Date.

"**Term Letter of Credit**" shall mean each letter of credit issued pursuant to Section 3.1(b) (including Existing Letters of Credit deemed issued as Term Letters of Credit pursuant to Section 3.10).

"**Term Letter of Credit Commitment**" shall mean $650,000,000, as the same may be reduced from time to time pursuant to Section 2.5(a) or Section 5.2(c).

"**Term Letter of Credit Issuer**"[9] shall mean (a) Deutsche Bank AG New York Branch, any of its Affiliates or any replacement or successor pursuant to Section 3.6, (b) each issuer of an Existing Letter of Credit denoted as a "Term Letter of Credit" on Schedule 1.1(c), and (c) at any time such Person who shall become a Term Letter of Credit Issuer pursuant to Section 3.6 (it being understood that if any such Person ceases to be a Lender hereunder, such Person will remain a Term Letter of Credit Issuer with respect to any Term Letters of Credit issued by such Person that remained outstanding as of the date such Person ceased to be a Lender). Any Term Letter of Credit Issuer may, in its discretion, arrange for one or more Term Letters of Credit to be issued by Affiliates of such Term Letter of Credit Issuer reasonably acceptable to the Borrower, and in each such case the term "Term Letter of Credit Issuer" shall include any such Affiliate or Lender with respect to Term Letters of Credit issued by such Affiliate or Lender. References herein and in the other Credit Documents to the Term Letter of Credit Issuer shall be deemed to refer to the Term Letter of Credit Issuer in respect of the applicable Term Letter of Credit or to all Term Letter of Credit Issuers, as the context requires.

"**Term Letters of Credit Outstanding**" shall mean, at any time, with respect to any Term Letter of Credit Issuer, the sum of, without duplication, (a) the aggregate Stated Amount of all outstanding Term Letters of Credit issued by such Term Letter of Credit Issuer and (b) the aggregate principal amount of all Unpaid Drawings in respect of all such Term Letters of Credit. References herein and in the other Credit Documents to the Term Letters of Credit Outstanding shall be deemed to refer to the Term Letters of Credit Outstanding in respect of all Term Letters of Credit issued by the applicable

---

[9] NTD: Issuance of Term Letters of Credit by up to three of the Joint Lead Arrangers (consistent with the issuance of Revolving Letters of Credit) under consideration.

Americas 91311338

Term Letter of Credit Issuer or to the Term Letters of Credit Outstanding in respect of all Term Letters of Credit, as the context requires.

"**Term Letter of Credit Reimbursement Obligations**" shall mean the obligations of the Credit Parties to reimburse and repay Unpaid Drawings on any Term Letter of Credit pursuant to the terms and conditions set forth in Section 3.4 of this Agreement.

"**Term Loan Commitment**" shall mean, on the date hereof, the amount set forth opposite such Lender's name on Schedule 1.1(a) as such Lender's "Term Loan Commitment", in each case as the same may be changed from time to time pursuant to the terms hereof.

"**Term Loan Facility**" shall mean the facility providing for the Term Loans.

"**Term Loan Lender**" shall mean each Lender holding a Term Loan.

"**Term Loans**" shall have the meaning provided in Section 2.1(a). Unless the context shall otherwise require, the term "Term Loans" shall include any Incremental Term Loans.

"**Test Period**" shall mean, for any determination under this Agreement, the four consecutive fiscal quarters of the Borrower then last ended and for which Section 9.1 Financials have been or were required to have been delivered.

"**Tex-La Indebtedness**" shall mean the obligations owing by Parent Guarantor in respect of obligations between Parent Guarantor (or its legal predecessors in interest) and the Tex-La Electric Cooperative of Texas, Inc., in aggregate principal amount of approximately $[•] as of the Closing Date, which obligations are secured by a Lien on a 2.17% undivided interest in "Comanche Peak Unit 1" and "Comanche Peak Unit 2" (each as defined in the definition of "Baseload Generation Assets").

"**Total Credit Exposure**" shall mean, at any date, the sum, without duplication, of (a) the Total Revolving Credit Commitment (if any) at such date or, if the Total Revolving Credit Commitment shall have terminated on or prior to such date, the aggregate Revolving Credit Exposure of all Revolving Credit Lenders at such date, (b) the Available Total Term L/C Loan Commitment (if any) at such date, (c) the aggregate outstanding principal amount of all Term L/C Loans (if any) at such date, (d) the aggregate outstanding principal amount of all Term Loans (if any) at such date, and (e) the Available Total Term Loan Commitment (if any) at such date.

"**Total Revolving Credit Commitment**" shall mean the sum of the Revolving Credit Commitments of all the Lenders.

"**Total Term L/C Loan Commitment**" shall mean the sum of the Term L/C Loan Commitments of all the Lenders.

"**Total Term Loan Commitment**" shall mean the sum of the Term Loan Commitments of all the Lenders.

"**Transaction Expenses**" shall mean any fees, costs, liabilities or expenses incurred or paid by the Ultimate Parent, Parent Guarantor or any of their respective Subsidiaries in connection with the Transactions, this Agreement and the other Credit Documents and the transactions contemplated hereby and thereby including in respect of the commitments, negotiation, syndication, documentation and closing (and post-closing actions in connection with the Collateral) of the Credit Facilities.

"**Transactions**" shall mean, collectively, the transactions contemplated by this Agreement to occur on or around the Closing Date (including the entering into and funding hereunder, the preparation and filings in the Cases, the preparation and documentation of the other transactions set forth in the Commitment Letter), the payment of fees, costs, liabilities and expenses in connection with each of the foregoing, and the consummation of any other transaction connected with the foregoing.

"**Transferee**" shall have the meaning provided in Section 13.6(e).

"**Transition Charges**" shall have the meaning provided in in Section 39.302(7) of the Texas Utilities Code.

"**Transition Property**" shall have the meaning provided in Section 39.302(8) of the Texas Utilities Code.

"**Trust Indenture Act**" shall have the meaning provided in Section 12.11.

"**Type**" shall mean, (a) as to any Term Loan, its nature as an ABR Loan or a LIBOR Loan, (b) as to any Term L/C Loan, its nature as an ABR Loan or a LIBOR Loan, and (c) as to any Revolving Credit Loan, its nature as an ABR Loan or a LIBOR Loan.

"**UCC**" shall mean the Uniform Commercial Code of the State of New York or the State of Texas, as applicable, or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**Ultimate Parent**" shall mean Energy Future Holdings Corp., a Texas corporation.

"**Unfunded Current Liability**" of any Benefit Plan shall mean the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 ("**SFAS 87**")) under the Benefit Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the fair market value of the assets allocable thereto.

"**Unit**" shall mean an individual power plant generation system comprised of all necessary physically connected generators, reactors, boilers, combustion turbines and other prime movers operated together to independently generate electricity.

"**Unpaid Drawing**" shall have the meaning provided in Section 3.4(a).

"**Unrestricted Cash**" shall mean, without duplication, (a) all cash and cash equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by Section 10.2(l) and Liens permitted by Sections 10.2(a), (j) and (bb) and clauses (i) and (ii) of Section 10.2(o)) included in the cash and cash equivalents accounts listed on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries as at such date and (b) all margin deposits related to commodity positions listed as assets on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries; provided that Unrestricted Cash shall not include any amounts on deposit in or credited to any Term L/C Loan Collateral Account.

"**Unrestricted Subsidiary**" shall mean (a) the Subsidiaries set forth on Schedule 1.1(d) hereto; (b) any Subsidiary of the Borrower that is formed or acquired after the Closing Date; provided that at such time (or promptly thereafter) the Borrower designates such Subsidiary an Unrestricted Subsidiary in a written notice to the Administrative Agent, (c) any Restricted Subsidiary subsequently designated as

61

an Unrestricted Subsidiary by the Borrower in a written notice to the Administrative Agent; _provided_ that in the case of (b) and (c), (x) such designation shall be deemed to be an Investment (or reduction in an outstanding Investment, in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary) on the date of such designation in an amount equal to the net book value of the investment therein and such designation shall be permitted only to the extent permitted under Section 10.5 on the date of such designation and (y) no Event of Default would result from such designation after giving Pro Forma Effect thereto and (d) each Subsidiary of an Unrestricted Subsidiary.   The Borrower may, by written notice to the Administrative Agent, re-designate any Unrestricted Subsidiary as a Restricted Subsidiary, and thereafter, such Subsidiary shall no longer constitute an Unrestricted Subsidiary, but only if (x) to the extent such Subsidiary has outstanding Indebtedness on the date of such designation, immediately after giving effect to such designation, the Borrower shall be in compliance, on a Pro Forma Basis, after giving effect to the incurrence of such Indebtedness, with the covenant set forth in Section 10.9 (to the extent such covenant is then required to be tested) and (y) no Event of Default would result from such re-designation.   On or promptly after the date of its formation, acquisition, designation or re-designation, as applicable, each Unrestricted Subsidiary (other than an Unrestricted Subsidiary that is a Foreign Subsidiary) shall have entered into a tax sharing agreement containing terms that, in the reasonable judgment of the Administrative Agent, provide for an appropriate allocation of tax liabilities and benefits; _provided_ that the tax sharing agreements described in clauses (i) and (ii) of the definition of "Tax Sharing Agreements" as in effect on the date hereof shall be deemed to satisfy such standard.

"**U.S. Lender**" shall have the meaning provided in Section 5.4(h).

"**Voting Stock**" shall mean, with respect to any Person, such Person's Stock or Stock Equivalents having the right to vote for the election of directors or other governing body of such Person under ordinary circumstances.

"**Wages Order**" shall mean the "Final Order Authorizing Energy Future Holdings Corp., et al., To (A) (i) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (ii) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (iii) Continue Employee Compensation and Retiree Benefit Programs and (B) Modifying the Automatic Stay" as in effect from time to time.

"**Wholly Owned**" shall mean, with respect to the ownership by a Person of a Subsidiary, that all of the Stock of such Subsidiary (other than directors' qualifying shares or nominee or other similar shares required pursuant to Applicable Law) are owned by such Person or another Wholly Owned Subsidiary of such Person.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**Yield**" shall mean, with respect to any Commitments and/or Loans, on any date of determination, the yield to maturity, in each case, based on the interest rate applicable to such Commitments and/or Loans on such date and giving effect to interest rate floors and any original issue discount or upfront fees (amortized over four years), but excluding any structuring, underwriting, ticking, arrangement, commitment and other similar fees not payable to all Lenders generally providing such Commitments and/or Loans).

1.2    Other Interpretive Provisions.  With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

62

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)     The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c)     Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d)     The term "including" is by way of example and not limitation.

(e)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)     The words "asset" and "property" shall be construed to have the same meaning and effect and refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(g)     All references to "knowledge" or "awareness" of any Credit Party or a Restricted Subsidiary thereof means the actual knowledge of an Authorized Officer of a Credit Party or such Restricted Subsidiary.

(h)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(i)     Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(j)     For purposes of determining compliance with any one of Sections 10.1, 10.2, 10.3, 10.4, 10.5, 10.6, 10.7 and 1.1(a), in the event that any Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, dividend, affiliate transaction, contractual obligation or prepayment of Indebtedness meets the criteria of more than one of the categories of transactions permitted pursuant to any clause of such Section, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower (and the Borrower shall be entitled to redesignate use of any such clauses from time to time) in its sole discretion at such time; provided that all Indebtedness outstanding under the Credit Documents will be deemed at all times to have been incurred in reliance only on the exception in clause (a) of Section 10.1.

1.3     Accounting Terms.

(a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP.

(b)     Notwithstanding anything to the contrary herein, for purposes of determining compliance with any test or covenant contained in this Agreement with respect to any period during

which any Specified Transaction occurs (and, for purposes of the definition of "Unrestricted Subsidiary" only, thereafter and on or prior to the date of determination), the Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio shall be calculated with respect to such period and such Specified Transaction on a Pro Forma Basis.

        1.4     Rounding.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate amount by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

        1.5     References to Agreements, Laws, Etc. Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document; and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

        1.6     Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

        1.7     Timing of Payment of Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

        1.8     Currency Equivalents Generally.  For purposes of determining compliance under Sections 10.4, 10.5 and 10.6 with respect to any amount denominated in any currency other than Dollars (other than with respect to (a) any amount derived from the financial statements of the Borrower and the Subsidiaries of the Borrower or (b) any Indebtedness denominated in a currency other than Dollars), such amount shall be deemed to equal the Dollar equivalent thereof based on the average Exchange Rate for such other currency for the most recent twelve-month period immediately prior to the date of determination determined in a manner consistent with that used in calculating Consolidated EBITDA for the related period.  For purposes of determining compliance with Sections 10.1, 10.2 and 10.5, with respect to any amount of Indebtedness in a currency other than Dollars, compliance will be determined at the time of incurrence or advancing thereof using the Dollar equivalent thereof at the Exchange Rate in effect at the time of such incurrence or advancement.

        1.9     Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Credit Loan") or by Type (e.g., a "LIBOR Loan") or by Class and Type (e.g., a "LIBOR Revolving Credit Loan").  Borrowings also may be classified and referred to by Class (e.g., a "Revolving Credit Borrowing") or by Type (e.g., a "LIBOR Borrowing") or by Class and Type (e.g., a "LIBOR Revolving Credit Borrowing").

        1.10    Hedging Agreements.  For the avoidance of doubt, it is understood that the following Hedging Agreements and/or Commodity Hedging Agreements shall not be deemed to be speculative or entered into for speculative purposes for any purpose of this Agreement and all other Credit Documents:  (a) any Commodity Hedging Agreement intended, at inception or execution, to hedge or

64

manage any of the risks related to existing and/or forecasted power generation or load of the Borrower or the Restricted Subsidiaries (whether owned or contracted), (b) any Hedging Agreement intended, at inception or execution, (i) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of the Borrower or the Restricted Subsidiaries, (ii) for foreign exchange or currency exchange management, (iii) to manage commodity portfolio exposure associated with changes in interest rates or (iv) to hedge any exposure that the Borrower or the Restricted Subsidiaries may have to counterparties under other Hedging Agreements such that the combination of such Hedging Agreements is not speculative taken as a whole and (c) any Hedging Agreement and/or Commodity Hedging Agreement, as applicable, entered into by the Borrower or any Restricted Subsidiary (in each case, entered into in the ordinary course of business or consistent with past practice) that was intended, at inception or execution, to unwind or offset any Hedging Agreement and/or Commodity Hedging Agreement, as applicable, described in clauses (a) and (b) of this Section 1.10.

SECTION 2.    Amount and Terms of Credit.

2.1    Commitments.

(a)    Subject to and upon the terms and conditions set forth in this Agreement, each Lender having a Term Loan Commitment, severally, but not jointly, agrees to make a loan (each a "**Term Loan**" and, collectively, the "**Term Loans**") in Dollars to the Borrower on the Closing Date, which Term Loans shall equal the amount requested by the Borrower, not to exceed (i) for any such Lender, the Available Term Loan Commitment of such Lender, and (ii) in the aggregate, the Available Total Term Loan Commitment. The Term Loans may, at the option of the Borrower, be incurred, maintained as, and/or converted into, ABR Loans or LIBOR Loans in accordance with Section 2.6; provided that all such Term Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Term Loans of the same Type. The Term Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

(b)    Subject to and upon the terms and conditions set forth in this Agreement, each Lender having a Term L/C Loan Commitment, severally, but not jointly, agrees to make a loan (each a "**Term L/C Loan**" and, collectively, the "**Term L/C Loans**") in Dollars to the Borrower on the Closing Date, which Term L/C Loans shall equal the amount requested by the Borrower, not to exceed (i) for any such Lender, the Available Term L/C Loan Commitment of such Lender, and (ii) in the aggregate, the Available Total Term L/C Loan Commitment. The Term L/C Loans may, at the option of the Borrower, be incurred, maintained as, and/or converted into, ABR Loans or LIBOR Loans in accordance with Section 2.6; provided that all such Term L/C Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Term L/C Loans of the same Type. The Term L/C Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

(c)    Subject to and upon the terms and conditions herein set forth, each Lender having a Revolving Credit Commitment severally, but not jointly, agrees to make a loan or loans (each a "**Revolving Credit Loan**" and, collectively, the "**Revolving Credit Loans**") in Dollars to the Borrower. Such Revolving Credit Loans (A) shall be made at any time and from time to time on and after the Closing Date and prior to Revolving Credit Termination Date, (B) may, at the option of the Borrower, be incurred and maintained as, and/or converted into, ABR Loans or LIBOR Loans; provided that all Revolving Credit Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Revolving Credit Loans of the same Type, (C) may be repaid and reborrowed in accordance with the provisions hereof, (D) shall not, for any Lender

at any time with respect to any Class of Revolving Credit Loan, after giving effect thereto and to the application of the proceeds thereof, result in such Lender's Revolving Credit Exposure with respect to such Class at such time exceeding such Lender's Revolving Credit Commitment with respect to such Class at such time and (E) shall not, after giving effect thereto and to the application of the proceeds thereof, result at any time in the aggregate amount of the Lenders' Revolving Credit Exposures at such time exceeding the Total Revolving Credit Commitment then in effect.

(d)    Each Lender may at its option make any LIBOR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that (A) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (B) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in material increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous in any material respect to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.10 shall apply).

(e)    [Reserved].

2.2    Minimum Amount of Each Borrowing; Maximum Number of Borrowings.  The aggregate principal amount of each Borrowing of Loans shall be in a minimum amount of at least the Minimum Borrowing Amount for such Type of Loan and in a multiple of $1,000,000 in excess thereof (except borrowings to reimburse Unpaid Drawings under Revolving Letters of Credit).  More than one Borrowing may be incurred on any date; provided that at no time shall there be outstanding more than (i) twenty, in the case of Revolving Credit Loans, (ii) ten, in the case of Term Loans, and (iii) five, in the case of Term L/C Loans, Borrowings of LIBOR Loans under this Agreement.  For the avoidance of doubt, unless otherwise determined by the Borrower, all Loans of the same Class subject to the same Interest Period and drawn on the same date will constitute one Borrowing.

2.3    Notice of Borrowing; Determination of Class of Loans.

(a)    When the Borrower desires to incur Term Loans or Term L/C Loans, the Borrower shall deliver to the Administrative Agent at the Administrative Agent's Office a Notice of Borrowing (or telephonic notice promptly confirmed by delivery of a Notice of Borrowing) (i) prior to 1:00 p.m. at least three Business Days' prior to the date of the proposed Borrowing of Term Loans or Term L/C Loans if all or any of such Loans are to be initially LIBOR Loans (or, in the case of Borrowings on the Closing Date, prior to 10:00 a.m. on the date of the proposed Borrowing) and (ii) prior to 10:00 a.m. on the date of the proposed Borrowing of Term Loans or Term L/C Loans if all or any of such Loans are to be ABR Loans.  Each Notice of Borrowing shall specify (i) the aggregate principal amount of Loans to be made, (ii) the date of the Borrowing, (iii) whether such Loans shall consist of Term Loans or Term L/C Loans (or a combination thereof) and (iv) whether such Loans shall consist of ABR Loans and/or LIBOR Loans and, if the Loans are to include LIBOR Loans, the Interest Period to be initially applicable thereto.  The Administrative Agent shall promptly give each applicable Lender written notice (or telephonic notice promptly confirmed in writing) of the proposed Borrowing of Loans, of such Lender's proportionate share thereof and of the other matters covered by the related Notice of Borrowing.

(b)    [Reserved].

(c)    [Reserved].

(d)       Whenever the Borrower desires to incur Revolving Credit Loans, (other than borrowings to reimburse Unpaid Drawings under Revolving Letters of Credit), the Borrower shall give the Administrative Agent at the Administrative Agent's Office, (i) prior to 1:00 p.m. at least three Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of each Borrowing of Revolving Credit Loans if all or any of such Revolving Credit Loans are to be initially LIBOR Loans (or, in the case of Borrowings on the Closing Date, prior to 10:00 a.m. on the date of the proposed Borrowing) and (ii) prior to 2:00 p.m. on the date of the proposed Borrowing of each Borrowing of Revolving Credit Loans if all or any of such Revolving Credit Loans are to be ABR Loans. Each such Notice of Borrowing shall specify (i) the aggregate principal amount of the Revolving Credit Loans to be made pursuant to such Borrowing, (ii) the date of the Borrowing (which shall be a Business Day) and (iii) whether the Borrowing shall consist of ABR Loans and/or LIBOR Loans and, if LIBOR Loans, the Interest Period to be initially applicable thereto. The Administrative Agent shall promptly give each Revolving Credit Lender written notice (or telephonic notice promptly confirmed in writing) of each proposed Borrowing of Revolving Credit Loans, of such Lender's Revolving Credit Commitment Percentage thereof and of the other matters covered by the related Notice of Borrowing.

(e)       [Reserved].

(f)       [Reserved].

(g)       Borrowings of Revolving Credit Loans to reimburse Unpaid Drawings under Revolving Letters of Credit shall be made upon the notice specified in Section 3.4(a).

(h)       Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower.

2.4       Disbursement of Funds.

(a)       No later than 3:30 p.m. on the date specified in each Notice of Borrowing, (including Borrowings of Revolving Credit Loans to reimburse Unpaid Drawings under Revolving Letters of Credit), each Lender will make available its *pro rata* portion, if any, of each Borrowing requested to be made on such date in the manner provided below.

(b)       Each Lender shall make available all amounts required under any Borrowing for its applicable Commitments in immediately available funds to the Administrative Agent at the Administrative Agent's Office in Dollars, and the Administrative Agent will (except in the case of Borrowings of Revolving Credit Loans to reimburse Unpaid Drawings under Revolving Letters of Credit) make available to the Borrower, by depositing to an account designated by the Borrower to the Administrative Agent the aggregate of the amounts so made available in Dollars. Unless the Administrative Agent shall have been notified by any Lender prior to the date of any such Borrowing that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent has made available such amount to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor the Administrative Agent shall promptly

Americas 91311338

notify the Borrower in writing and the Borrower shall immediately pay such corresponding amount to the Administrative Agent in Dollars. The Administrative Agent shall also be entitled to recover from such Lender or the Borrower interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent, at a rate *per annum* equal to (i) if paid by such Lender, the Overnight Rate or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with Section 2.8, for the Loans of the applicable Class.

(c)    Nothing in this Section 2.4 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

2.5    Repayment of Loans; Evidence of Debt.

(a)    The Borrower shall repay to the Administrative Agent, for the benefit of the applicable Lenders, on the Maturity Date, (i) the then outstanding Term Loans and Term L/C Loans and (ii) the then outstanding Revolving Credit Loans. Upon the repayment of the then outstanding Term L/C Loans on the Maturity Date, the Term Letter of Credit Commitment shall be reduced by an amount equal to the portion of such repayment constituting principal as provided in Section 4.3(d) and the Borrower shall be permitted to withdraw an amount up to the amount of such prepayment from the Term L/C Loan Collateral Accounts to complete such repayment as, and to the extent, provided in Section 4.3(d).

(b)    [Reserved].

(c)    In the event any Incremental Term Loans are made, such Incremental Term Loans, as applicable, shall be repaid in amounts and on dates as agreed between the Borrower and the relevant Lenders of such Incremental Term Loans, subject to the requirements set forth in Section 2.14.

(d)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office of such Lender from time to time, including the amounts of principal and interest payable and paid to such lending office of such Lender from time to time under this Agreement.

(e)    The Administrative Agent shall maintain the Register pursuant to Section 13.6(b), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder, whether such Loan is a Term Loan, a Term L/C Loan, an Incremental Term Loan, a Revolving Credit Loan or a New Revolving Credit Loan, as applicable, the Type of each Loan made and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(f)    The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (d) and (e) of this Section 2.5 shall, to the extent permitted by Applicable Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the

obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.6     Conversions and Continuations.

(a)     Subject to the penultimate sentence of this clause (a), (x) the Borrower shall have the option on any Business Day to convert all or a portion equal to no less than the Minimum Borrowing Amount of the outstanding principal amount of Term Loans, Term L/C Loans or Revolving Credit Loans of one Type into a Borrowing or Borrowings of another Type and (y) the Borrower shall have the option on any Business Day to continue the outstanding principal amount of any LIBOR Loans as LIBOR Loans for an additional Interest Period; provided that (i) no partial conversion of LIBOR Loans shall reduce the outstanding principal amount of LIBOR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount, (ii) ABR Loans may not be converted into LIBOR Loans if a Payment Default or Event of Default is in existence on the date of the conversion and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such conversion, (iii) LIBOR Loans may not be continued as LIBOR Loans for an additional Interest Period if a Default or Event of Default is in existence on the date of the proposed continuation and the Required Lenders have determined in its or their sole discretion not to permit such continuation and (iv) Borrowings resulting from conversions pursuant to this Section 2.6 shall be limited in number as provided in Section 2.2. Each such conversion or continuation shall be effected by the Borrower by giving the Administrative Agent at the Administrative Agent's Office prior to 1:00 p.m. at least (i) three Business Days', in the case of a continuation of, or conversion to, LIBOR Loans or (ii) one Business Day's in the case of a conversion into ABR Loans, prior written notice (or telephonic notice promptly confirmed in writing) (each, a **"Notice of Conversion or Continuation"**) specifying the Loans to be so converted or continued, the Type of Loans to be converted into or continued and, if such Loans are to be converted into, or continued as, LIBOR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration).   The Administrative Agent shall give each applicable Lender notice as promptly as practicable of any such proposed conversion or continuation affecting any of its Loans.

(b)     If any Payment Default or Event of Default is in existence at the time of any proposed continuation of any LIBOR Loans and the Required Lenders have determined in their sole discretion not to permit such continuation, such LIBOR Loans shall be automatically converted on the last day of the current Interest Period into ABR Loans.  If upon the expiration of any Interest Period in respect of LIBOR Loans, the Borrower has failed to elect a new Interest Period to be applicable thereto as provided in clause (a) above, the Borrower shall be deemed to have elected to convert such Borrowing of LIBOR Loans into a Borrowing of ABR Loans, effective as of the expiration date of such current Interest Period.

(c)     Notwithstanding anything to the contrary herein, the Borrower may deliver a Notice of Conversion or Continuation pursuant to which the Borrower elects to irrevocably continue the outstanding principal amount of any Term Loans or Term L/C Loans subject to an interest rate Hedging Agreement as LIBOR Loans for each Interest Period until the expiration of the term of such applicable Hedging Agreement.

2.7     Pro Rata Borrowings.  Subject to Section 2.1(d), each Borrowing of Revolving Credit Loans under this Agreement shall be made by the Lenders *pro rata* on the basis of their then applicable Revolving Credit Commitments without regard to the Class of Revolving Credit Commitments held by such Lender.  It is understood that (a) no Lender shall be responsible for any default by any other Lender in its obligation to make Loans hereunder and that each Lender severally but not jointly shall be

69

obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to fulfill its commitments hereunder and (b) failure by a Lender to perform any of its obligations under any of the Credit Documents shall not release any Person from performance of its obligation under any Credit Document.

2.8    Interest.

(a)    The unpaid principal amount of each ABR Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable ABR Margin plus the ABR, in each case, in effect from time to time.

(b)    The unpaid principal amount of each LIBOR Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable LIBOR Margin plus the relevant LIBOR Rate, in each case in effect from time to time.

(c)    [Reserved].

(d)    If all or a portion of (i) the principal amount of any Loan or (ii) any interest payable thereon or any other amount hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), and an Event of Default shall exist as a result of such failure to pay, then upon the giving of written notice by the Administrative Agent to the Borrower, such overdue amount (other than any such amount owed to a Defaulting Lender) shall bear interest at a rate *per annum* (the "**Default Rate**") that is (x) in the case of overdue principal, the rate that would otherwise be applicable thereto plus 2% or (y) in the case of any overdue interest or other amounts due hereunder, to the extent permitted by Applicable Law, the rate described in Section 2.8(a) plus 2% from the date of such written notice to the date on which such amount is paid in full (after as well as before judgment).

(e)    Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; provided that any Loan that is repaid on the same date on which it is made shall bear interest for one day. Except as provided below, interest shall be payable (i) in respect of each ABR Loan, monthly in arrears on the third Business Day of each calendar month, (ii) in respect of each LIBOR Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three-month intervals after the first day of such Interest Period and (iii) in respect of each Loan, (A) on any prepayment; provided that interest on ABR Loans shall only become due pursuant to this subclause (A) if the aggregate principal amount of the ABR Loans then outstanding is repaid in full, (B) at maturity (whether by acceleration or otherwise) and (C) after such maturity, on demand.

(f)    All computations of interest hereunder shall be made in accordance with Section 5.5.

(g)    The Administrative Agent, upon determining the interest rate for any Borrowing of LIBOR Loans, shall promptly notify the Borrower and the relevant Lenders thereof. Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.

2.9    Interest Periods. At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of LIBOR Loans in accordance with Section 2.6(a), the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of the Interest

70

Period applicable to such Borrowing, which Interest Period shall, at the option of the Borrower, be a one week (solely (x) with respect to LIBOR Revolving Credit Loans and (y) with the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld)) or a one, two, three or six or (if available to all relevant Lenders participating in the relevant Credit Facility) a twelve month period or a period of less than one month; provided that, notwithstanding the foregoing, the initial Interest Period beginning on the Closing Date may be for a period of less than one month if agreed upon by the Borrower and the Administrative Agent.

Notwithstanding anything to the contrary contained above:

(a)     the initial Interest Period for any Borrowing of LIBOR Loans shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b)     if any Interest Period relating to a Borrowing of LIBOR Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)     if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that if any Interest Period in respect of a LIBOR Loan would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(d)     the Borrower shall not be entitled to elect any Interest Period in respect of any LIBOR Loan if such Interest Period would extend beyond the applicable Maturity Date of such Loan.

2.10     Increased Costs, Illegality, Etc.

(a)     In the event that (x) in the case of clause (i) below, the Administrative Agent or (y) in the case of clauses (ii) and (iii) below, the Required Lenders shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto):

(i)     on any date for determining the LIBOR Rate for any Interest Period that (x) deposits in the principal amounts and currencies of the Loans comprising such LIBOR Borrowing, are not generally available in the relevant market or (y) by reason of any changes arising on or after the Closing Date affecting the interbank LIBOR market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR Rate; or

(ii)     at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any LIBOR Loans (other than any increase or reduction attributable to (i) Taxes indemnifiable under Section 5.4, (ii) net income taxes and franchise and excise taxes (imposed in lieu of net income taxes) imposed on any Agent or Lender or (iii) Taxes included under clauses (c) through (e) of the definition of "Excluded Taxes") because of (x) any change since the Closing Date in any Applicable Law (or in the interpretation or administration thereof and including the introduction of any new Applicable Law), such as, for example, without limitation, a change in official reserve requirements, and/or

71

(y) other circumstances affecting the interbank LIBOR market or the position of such Lender in such market; or

(iii)    at any time, that the making or continuance of any LIBOR Loan has become unlawful as a result of compliance by such Lender in good faith with any Applicable Law (or would conflict with any such Applicable Law not having the force of law even though the failure to comply therewith would not be unlawful), or has become impracticable as a result of a contingency occurring after the Closing Date that materially and adversely affects the interbank LIBOR market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall within a reasonable time thereafter give notice (if by telephone, confirmed in writing) to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders).  Thereafter (x) in the case of clause (i) above, LIBOR Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing or Notice of Conversion or Continuation given by the Borrower with respect to LIBOR Loans, that have not yet been incurred shall be deemed rescinded by the Borrower, as applicable, (y) in the case of clause (ii) above, the Borrower shall pay to such Lender, promptly after receipt of written demand therefor such additional amounts (in the form of an increased rate of or a different method of calculating, interest or otherwise, as such Lender in its reasonable discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) and (z) in the case of subclause (iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by Applicable Law.

(b)    At any time that any LIBOR Loan is affected by the circumstances described in Section 2.10(a)(ii) or (iii), the Borrower may (and in the case of a LIBOR Loan affected pursuant to Section 2.10(a)(iii) shall) either (x) if the affected LIBOR Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to Section 2.10(a)(ii) or (iii) or (y) if the affected LIBOR Loan is then outstanding, upon at least three Business Days' notice to the Administrative Agent require the affected Lender to convert each such LIBOR Loan into an ABR Loan; provided that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.10(b).

(c)    If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's or its Affiliate's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent or its Affiliate could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy), then from time to time, promptly after demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lenders such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such

Americas 91311338

compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any Applicable Law as in effect on the Closing Date. Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.13, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon receipt of such notice.

Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.10 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

2.11    Compensation. If (i) any payment of principal of any LIBOR Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such LIBOR Loan as a result of a payment or conversion pursuant to Section 2.5, 2.6, 2.10, 5.1, 5.2 or 13.7, as a result of acceleration of the maturity of the Loans pursuant to Section 11 or for any other reason, (ii) any Borrowing of LIBOR Loans is not made as a result of a withdrawn Notice of Borrowing, (iii) any ABR Loan is not converted into a LIBOR Loan as a result of a withdrawn Notice of Conversion or Continuation, (iv) any LIBOR Loan is not continued as a LIBOR Loan, as the case may be, as a result of a withdrawn Notice of Conversion or Continuation or (v) any prepayment of principal of any LIBOR Loan is not made as a result of a withdrawn notice of prepayment pursuant to Section 5.1 or 5.2, the Borrower shall, after receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such LIBOR Loan.

Notwithstanding the foregoing or anything contained in the Existing DIP Credit Agreement to the contrary, (i) no Lender shall demand compensation pursuant to this Section 2.11 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities, and (ii) no Lender that is also a Lender (as defined in the Existing DIP Credit Agreement) under the Existing DIP Credit Agreement shall demand compensation of the type described in Section 2.11 of the Existing DIP Credit Agreement in connection with or as a result of the transactions contemplated by the Closing Refinancing.

2.12    Change of Lending Office. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii), 2.10(a)(iii), 2.10(b), 3.5 or 5.4 with respect to such Lender, it will, if requested by the Borrower use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section. Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 2.10, 3.5 or 5.4.

2.13    Notice of Certain Costs. Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.10, 2.11, 3.5 or 5.4 is given by any Lender more

than 180 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.10, 2.11, 3.5 or 5.4, as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower.

2.14    Incremental Facilities.

(a)    The Borrower may, at any time or from time to time after the Closing Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request (i) one or more additional tranches of term loans (the "**Incremental Term Loans**") or (ii) one or more increases in the amount of the Revolving Credit Commitments (each such increase, an "**Incremental Revolving Commitment Increase**") and together with the Incremental Term Loans, the "**Incremental Facilities**"), provided that both at the time of any such request and after giving effect to the effectiveness of any Incremental Amendment referred to below, no Default or Event of Default shall exist or would exist after giving effect thereto (or, in the case of an Incremental Facility the proceeds of which will be used to finance a Permitted Acquisition or other Investment or repayment of Indebtedness that requires an irrevocable prepayment or redemption notice, only to the extent required by the providers of such Incremental Facility (provided that at a minimum there shall be a no payment or bankruptcy event of default condition)) and at the time that any such Incremental Term Loan or Incremental Revolving Commitment Increase is made or effected (and after giving effect thereto), the conditions in Section 7.1 shall be satisfied.

(b)    Each tranche of Incremental Term Loans and each Incremental Revolving Commitment Increase shall be in the aggregate principal amount that is not less than $25,000,000 (provided that such amount may be less than $25,000,000 if such amount represents all remaining availability under the limit set forth in the next sentence).

(c)    The aggregate principal amount of all Incremental Facilities shall not exceed $750,000,000.

(d)    The Incremental Term Loans (i) shall rank pari passu in right of payment and of security with the Revolving Credit Loans, all Term Loans and all Term L/C Loans, (ii) shall not mature earlier than the Latest Maturity Date, (iii) shall have interest rates, interest margins, rate floors, fees, funding discounts, premiums and amortization schedules determined by the Borrower and the lenders thereof and (iv) may have terms and conditions different from those of the other Term Loans; provided that, except with respect to the differences set forth in clauses (ii) and (iii) above, any differences must be reasonably acceptable to the Administrative Agent; provided, further that the Yield on any tranche of Incremental Term Loans incurred within twelve (12) months of the Closing Date does not exceed the Yield on the initial Term Loans or the Term L/C Loans by more than 50 basis points per annum, unless the interest rate on the initial Term Loans and the Term L/C Loans, as applicable, is increased on or prior to the date of the incurrence of such Incremental Term Loans in order to comply with this proviso.

(e)    [Reserved].

(f)    [Reserved].

(g)    Each notice from the Borrower pursuant to this Section 2.14 shall set forth the requested amount and proposed terms of the relevant Incremental Facility. Incremental Term Loans may be made, and Incremental Revolving Commitment Increases may be provided, by any existing Lender (it being understood that no existing Lender will have an obligation to make a portion of any Incremental

Americas 91311338

Facility); provided that the Administrative Agent shall have consented (not to be unreasonably withheld) to such Lender's or Additional Lender's making such Incremental Term Loans or providing such Incremental Revolving Commitment Increases if such consent would be required under Section 13.6(b) for an assignment of Loans or Commitments, as applicable, to such Lender or Additional Lender.

(h)    Commitments in respect of Incremental Term Loans and Incremental Revolving Commitment Increases shall become Commitments (or in the case of an Incremental Revolving Commitment Increase to be provided by an existing Lender with a Revolving Credit Commitment, an increase in such Lender's applicable Revolving Credit Commitment) under this Agreement pursuant to an amendment (an "**Incremental Amendment**") to this Agreement (which shall be substantially in the form of Exhibit K to this Agreement) and, as appropriate, the other Credit Documents, executed by the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and the Administrative Agent (notwithstanding any provision to the contrary in Section 13.1 of this Agreement).  The Incremental Amendment may, subject to Section (b) and (f)) as the case may be, without the consent of any other Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section (notwithstanding any provision to the contrary in Section 13.1 of this Agreement). The effectiveness of any Incremental Amendment shall be subject to the satisfaction on the date thereof of the conditions in Section 2.14(a) and such other conditions as the parties thereto shall agree.  The Borrower may use the proceeds of the Incremental Term Loans and Incremental Revolving Commitment Increases for any purpose not prohibited by this Agreement.

(i)    (i) Unless it so agrees, the Borrower shall not be obligated to offer any existing Lender the opportunity to provide any Incremental Facility. Upon each increase in the Revolving Credit Commitments, each Lender with a Revolving Credit Commitment immediately prior to such increase will automatically and without further act be deemed to have assigned to each Lender providing a portion of the Incremental Revolving Commitment Increase (each an "**Incremental Revolving Commitment Increase Lender**") in respect of such increase, and each such Incremental Revolving Commitment Increase Lender will automatically and without further act be deemed to have assumed, a portion of such Lender's participations hereunder in outstanding Revolving Letters of Credit such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding participations hereunder in Revolving Letters of Credit held by each Lender with a Revolving Credit Commitment (including each such Incremental Revolving Commitment Increase Lender) will equal the percentage of the aggregate Revolving Credit Commitments of all Lenders represented by such Lender's Revolving Credit Commitment. If, on the date of any increase in the Revolving Credit Commitments pursuant to an Incremental Revolving Commitment Increase, there are any Revolving Credit Loans outstanding, such Revolving Credit Loans shall on or prior to the effectiveness of such Incremental Revolving Commitment Increase be prepaid from the proceeds of additional Revolving Credit Loans made hereunder (reflecting such increase in Revolving Credit Commitments), which prepayment shall be accompanied by accrued interest on the Revolving Credit Loans being prepaid and any costs incurred by any Lender in accordance with Section 2.11.  The Administrative Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(ii)    At the option of the Borrower and the Lenders providing such Incremental Revolving Commitment Increases, any Incremental Revolving Commitment Increases may be in the form of one or more separate classes of revolving credit commitments (the "**New Revolving Credit Commitments**") which shall constitute a separate Class of Commitments from the Revolving Credit Commitments and/or any other New Revolving Credit Commitments (each

such separate Class of New Revolving Credit Commitments, a "**New Revolving Credit Series**" and each Loan thereunder, a "**New Revolving Credit Loan**") and the related Loans shall constitute a separate Class of Loans from the Revolving Credit Loans, and/or any other New Revolving Credit Loans (it being understood that New Revolving Credit Commitments of a single New Revolving Credit Series may be established on more than one date); provided that:

(A)     each tranche of New Revolving Credit Commitments shall be in an aggregate principal amount of not less than $25,000,000 (provided that such amount may be less than $25,000,000 if such amount represents all remaining availability under the limit set forth in Section 2.14**Error! Reference source not found.** above);

(B)     the terms of such New Revolving Credit Commitments, except for (w) the tenor of the New Revolving Credit Commitments (which shall have a scheduled expiration date no earlier than the Maturity Date), (x) the size of any letter of credit subfacilities under such New Revolving Credit Commitments, (y) the applicable interest rates, interest margins, rate floors, premiums, funding discounts and fees payable with respect to such New Revolving Credit Commitments and (z) the borrowing, repayment and termination of Commitment procedures (in each case which shall be as specified in the applicable Incremental Amendment), shall be similar to the terms of the Revolving Credit Commitments (unless otherwise consented to by the Administrative Agent); provided that the Yield on the New Revolving Credit Commitments does not exceed the Yield on the initial Revolving Credit Commitments by more than 50 basis points, unless the interest rate on the initial Revolving Credit Commitments is increased on or prior to the date of the incurrence of such New Revolving Credit Commitments in order to comply with this proviso; and

(C)     in connection with the establishment of any New Revolving Credit Commitments that will include letter of credit subfacilities, any amendment to this Agreement pursuant to this Section 2.14(i)(ii) may include provisions relating to letters of credit issued thereunder, which issuances shall be on terms similar (except for the overall size of such subfacilities and the identity of the letter of credit issuer, and borrowing, repayment and termination of commitment procedures, in each case which shall be specified in the applicable Incremental Amendment) to the terms relating to Letters of Credit with respect to the Revolving Credit Commitments or otherwise reasonably acceptable to the Administrative Agent and any applicable letter of credit issuer thereunder.

2.15     [Reserved].

2.16     Defaulting Lenders.

Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then for so long as such Lender is a Defaulting Lender:

(a)     fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 4.1(a).

(b)     if any Revolving Letter of Credit Exposure exists at the time a Lender becomes a Defaulting Lender, then (i) all or any part of such Revolving Letter of Credit Exposure of such Defaulting Lender will, subject to the limitation in the first proviso below, automatically be reallocated (effective on the day such Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders pro rata in

76

accordance with their respective Revolving Credit Commitment Percentage; provided that (A) each Non-Defaulting Lender's Revolving Letter of Credit Exposure may not in any event exceed the Revolving Credit Commitment of such Non-Defaulting Lender as in effect at the time of such reallocation and (B) neither such reallocation nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim the Borrower, the Administrative Agent, the Revolving Letter of Credit Issuers or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender, (ii) to the extent that all or any portion of the Defaulting Lender's Revolving Letter of Credit Exposure cannot, or can only partially, be so reallocated to Non-Defaulting Lenders, whether by reason of the first proviso in Section 2.16(b)(i) above or otherwise, the Borrower shall within two Business Days following written notice by the Administrative Agent Cash Collateralize such Defaulting Lender's Revolving Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (i) above), in accordance with the procedures set forth in Section 3.8 for so long as such Revolving Letter of Credit Exposure is outstanding, (iii) if the Borrower Cash Collateralizes any portion of such Defaulting Lender's Revolving Letter of Credit Exposure pursuant to the requirements of this Section 2.160, the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 4.1(c) with respect to such Defaulting Lender's Letter of Credit Exposure during the period such Defaulting Lender's Revolving Letter of Credit Exposure is Cash Collateralized, (iv) if the Revolving Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to the requirements of this Section 2.160, then the fees payable to the Lenders pursuant to Section 4.1(c) shall be adjusted in accordance with such Non-Defaulting Lenders' Revolving Credit Commitment Percentages and the Borrower shall not be required to pay any fees to the Defaulting Lender pursuant to Section 4.1(c) with respect to such Defaulting Lender's Revolving Letter of Credit Exposure during the period that such Defaulting Lender's Revolving Letter of Credit Exposure is reallocated, or (v) if any Defaulting Lender's Revolving Letter of Credit Exposure is neither Cash Collateralized nor reallocated pursuant to the requirements of this Section 2.160, then, without prejudice to any rights or remedies of the applicable Revolving Letter of Credit Issuer or any Lender hereunder, all fees payable under Section 4.1(c) with respect to such Defaulting Lender's Revolving Letter of Credit Exposure shall be payable to the applicable Revolving Letter of Credit Issuer until such Revolving Letter of Credit Exposure is Cash Collateralized and/or reallocated;

(c)    no Revolving Letter of Credit Issuer will be required to issue any new Revolving Letter of Credit or to amend any outstanding Revolving Letter of Credit to increase the face amount thereof or extend the expiry date thereof, unless the applicable Revolving Letter of Credit Issuer is reasonably satisfied that any exposure that would result from the exposure to such Defaulting Lender is eliminated or fully covered by the Revolving Credit Commitments of the Non-Defaulting Lenders or by Cash Collateralization or a combination thereof in accordance with the requirements of Section 2.160 above or otherwise in a manner reasonably satisfactory to the applicable Revolving Letter of Credit Issuer and the Borrower; and

(d)    if the Borrower, the Administrative Agent and the Revolving Letter of Credit Issuers agree in writing in their discretion that a Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender and any applicable Cash Collateral shall be promptly returned to the Borrower and any Revolving Letter of Credit Exposure of such Lender reallocated pursuant to the requirements of Section 2.16(b) shall be reallocated back to such Lender; provided that, except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

2.17    Conversion to Exit Facility Agreement.  Upon the satisfaction or waiver of the conditions precedent to effectiveness set forth in Section [6.1] of the Exit Facility Agreement, automatically and without any further consent or action required by the Administrative Agent, the Collateral Agent, the Joint Lead Arrangers or any Lender, (i) the entity assuming the operations and assets of the Borrower as reorganized TCEH, and each Guarantor that is not a TCEH Debtor and each entity assuming the operations and assets of each Guarantor that is a TCEH Debtor as a reorganized TCEH Debtor, to the extent such Person is required under the Exit Facility Agreement to continue to be a guarantor thereunder, shall assume all obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) each Loan hereunder shall be continued as a Loan under the Exit Facility Agreement, (iii) each Lender hereunder shall be a Lender under the Exit Facility Agreement and (iv) this Agreement shall terminate and be superseded and replaced in its entirety by, and deemed amended and restated in its entirety in the form of, the Exit Facility Agreement (with such changes and insertions reasonably satisfactory to the Administrative Agent and the Borrower thereto incorporated as necessary to make such technical changes necessary to effectuate the intent of this Section 2.17), and each of the Commitments hereunder shall automatically be Commitments under the Exit Facility Agreement. Notwithstanding the foregoing, all obligations of the Borrower and the Guarantors to the Agents, the Joint Lead Arrangers, the Letter of Credit Issuers and the Lenders under this Agreement and any other Credit Document (except the Exit Facility Agreement) which are expressly stated in this Agreement or such other Credit Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect. Each of the Credit Parties, the Administrative Agent, the Collateral Agent, the Lenders and the Letter of Credit Issuers shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.17 and as are required to complete the Schedules to the Exit Facility Agreement as contemplated by Section [ ] thereof; provided, however, that any such action by the Administrative Agent, the Collateral Agent, any of the Lenders or the Letter of Credit Issuers shall not be a condition precedent to the effectiveness of the provisions of this Section 2.17.

SECTION 3.    Letters of Credit.

3.1    Issuance of Letters of Credit.

(a)    Revolving Letters of Credit.  (i) Subject to and upon the terms and conditions herein set forth, at any time and from time to time on and after the Closing Date and prior to the Revolving L/C Maturity Date, each Revolving Letter of Credit Issuer agrees, in reliance upon the agreements of the Revolving Credit Lenders set forth in this Section 3.1, to issue upon the request of the Borrower and for the direct or indirect benefit of the Borrower and its Subsidiaries and for the direct or indirect benefit of the Ultimate Parent and its other Subsidiaries, so long as the aggregate Stated Amount of all Letters of Credit issued for the Ultimate Parent and its other Subsidiaries' benefit (excluding Letters of Credit issued to support the obligations of the Ultimate Parent or its other Subsidiaries which obligations were entered into primarily to benefit the business of Borrower and its Subsidiaries) does not exceed $50,000,000, a letter of credit or letters of credit (each, the "**Revolving Letters of Credit**" and each, a "**Revolving Letter of Credit**") in such form and with such Issuer Documents as may be approved by such Revolving Letter of Credit Issuer in its reasonable discretion; provided that the Borrower shall be a co-applicant, and jointly and severally liable with respect to each Revolving Letter of Credit issued for the account of such Subsidiary and the Ultimate Parent and its other Subsidiaries; provided further that Revolving Letters of Credit issued for the direct or indirect benefit of the Ultimate Parent and its other Subsidiaries other than the Borrower and the Restricted Subsidiaries shall be subject to Section 10.5 and Section 10.12 hereof. Notwithstanding anything to the contrary contained herein, none of Barclays Bank PLC, Credit Suisse Securities (USA) LLC, UBS AG, Stamford Branch or any Affiliate thereof that is a

78

Revolving Letter of Credit Issuer shall be required to issue trade or commercial Revolving Letters of Credit under this Agreement.

(ii)    Notwithstanding the foregoing, (A) no Revolving Letter of Credit shall be issued the Stated Amount of which, when added to the Revolving Letters of Credit Outstanding in respect of all Revolving Letters of Credit at such time, would exceed the Revolving Letter of Credit Commitment then in effect; (B) no Revolving Letter of Credit shall be issued the Stated Amount of which, when added to the Revolving Letters of Credit Outstanding with respect to all Revolving Letters of Credit, would cause the aggregate amount of the Revolving Credit Exposures at such time to exceed the Total Revolving Credit Commitment then in effect; (C) no Revolving Letter of Credit (other than an Existing Letter of Credit) shall be issued (or deemed issued) by any Revolving Letter of Credit Issuer the Stated Amount of which, when added to the Revolving Letters of Credit Outstanding with respect to such Revolving Letter of Credit Issuer, would exceed the Specified Revolving Letter of Credit Commitment of such Revolving Letter of Credit Issuer then in effect, (D) each Revolving Letter of Credit shall have an expiration date occurring no later than the earlier of (x) one year after the date of issuance thereof, unless otherwise agreed upon by the Administrative Agent and the Revolving Letter of Credit Issuer, or as provided under Section 3.2(b) and (y) the Revolving L/C Maturity Date; (E) each Revolving Letter of Credit shall be denominated in Dollars; (F) no Revolving Letter of Credit shall be issued if it would be illegal under any Applicable Law for the beneficiary of the Revolving Letter of Credit to have a Revolving Letter of Credit issued in its favor; and (G) no Revolving Letter of Credit shall be issued after the relevant Revolving Letter of Credit Issuer has received a written notice from the Borrower or the Administrative Agent or the Required Lenders stating that a Default or an Event of Default has occurred and is continuing until such time as such Revolving Letter of Credit Issuer shall have received a written notice (x) of rescission of such notice from the party or parties originally delivering such notice, (y) of the waiver of such Default or Event of Default in accordance with the provisions of Section 13.1 or (z) that such Default or Event of Default is no longer continuing.

(iii)    From and after the Closing Date, the Borrower shall use commercially reasonable efforts to (x) select the Revolving Letter of Credit Issuer with the lowest percentage utilization of its Specified Revolving Letter of Credit Commitment as of the date of any Letter of Credit Request to issue a new Revolving Letter of Credit; provided that (I) the Borrower shall not be required as a result of this clause (x) to request two separate Revolving Letters of Credit for a single beneficiary if the Stated Amount of any required Letter of Credit for such beneficiary exceeds the unused portion of the Specified Revolving Letter of Credit Commitment of such Revolving Letter of Credit Issuer but may instead select a Revolving Letter of Credit Issuer with the next lowest percentage utilization that does not result in such occurrence, (II) if two or more Revolving Letter of Credit Issuers otherwise required to be selected pursuant to this clause (x) have the same such percentage utilization, the applicable Revolving Letter of Credit Issuer shall be selected sequentially in the order in which the names of financial institutions appear in the definition of "Revolving letter of Credit Issuer" and (III) with respect to the issuance of trade or commercial Revolving Letters of Credit, if the Revolving Letter of Credit Issuer otherwise required to be selected pursuant to this clause (x) is excused from issuing trade or commercial Revolving Letters of Credit pursuant to the last sentence of Section 3.1(a)(i), the Borrower may select the Revolving Letter of Credit Issuer with the next lowest percentage utilization that is not subject to such restriction and (y) cause each Revolving Letter of Credit constituting an Existing Letter of Credit to be replaced upon expiry thereof with a new Revolving Letter of Credit requested to be issued by a Revolving Letter of Credit Issuer in accordance with the terms of this clause (iii); provided that the Borrower may, in any given case, request the issuance of a

79

Revolving Letter of Credit without regard to the requirements set forth above in this clause (iii) from (A) any Revolving Letter of Credit Issuer with the consent of such Revolving Letter of Credit Issuer and (B) any Revolving Letter of Credit Issuer with a Specified Revolving Letter of Credit Commitment equal to 100% of the Revolving Letter of Credit Commitment.

(b)    Term Letters of Credit.  (i) Subject to and upon the terms and conditions herein set forth, at any time and from time to time on and after the Closing Date and prior to the Term L/C Termination Date, each Term Letter of Credit Issuer agrees to issue upon the request of the Borrower and for the direct and indirect benefit of the Borrower and its Subsidiaries and for the direct or indirect benefit of the Ultimate Parent and its other Subsidiaries, so long as the aggregate Stated Amount of all Letters of Credit issued for the Ultimate Parent and its other Subsidiaries' benefit (excluding Letters of Credit issued to support the obligations of the Ultimate Parent or its other Subsidiaries which obligations were entered into primarily to benefit the business of Borrower and its Subsidiaries) does not exceed $50,000,000, a letter of credit or letters of credit (the "**Term Letters of Credit**" and each, a "**Term Letter of Credit**") in such form and with such Issuer Documents as may be approved by such Term Letter of Credit Issuer in its reasonable discretion; provided that the Borrower shall be a co-applicant, and jointly and severally liable with respect to each Term Letter of Credit issued for the account of such Subsidiary and the Ultimate Parent and its other Subsidiaries; provided further that Term Letters of Credit issued for the direct or indirect benefit of the Ultimate Parent and its other Subsidiaries other than the Borrower and the Restricted Subsidiaries shall be subject to Sections 10.5(b), (g), (i) and/or (v) and Section 10.12 hereof.

(ii)    Notwithstanding the foregoing, (A) no Term Letter of Credit shall be issued, the Stated Amount of which, when added to the Term Letters of Credit Outstanding in respect of all Term Letters of Credit at such time, would exceed the lesser of (x) the Term Letter of Credit Commitment then in effect and (y) the Term L/C Loan Collateral Account Balance, (B) no Deutsche Bank Term Letter of Credit shall be issued the Stated Amount of which, when added to the Term Letters of Credit Outstanding in respect of all other Existing Term Letters of Credit and Deutsche Bank Term Letters of Credit at such time, would exceed the aggregate amount on deposit in the Existing Term L/C Loan Collateral Accounts and the Deutsche Bank Term L/C Loan Collateral Account, (C) each Term Letter of Credit shall have an expiration date occurring no later than the earlier of (x) one year after the date of issuance thereof, unless otherwise agreed upon by the Administrative Agent and the Term Letter of Credit Issuer or as provided under Section 3.2(b) and (y) the Term L/C Termination Date, (D) each Term Letter of Credit shall be denominated in Dollars, (E) no Term Letter of Credit shall be issued if it would be illegal under any Applicable Law for the beneficiary of the Term Letter of Credit to have a Term Letter of Credit issued in its favor, and (F) no Term Letter of Credit shall be issued after the Term Letter of Credit Issuer has received a written notice from the Borrower, the Administrative Agent or the Required Lenders stating that a Default or an Event of Default has occurred and is continuing until such time as the Term Letter of Credit Issuer shall have received a written notice (x) of rescission of such notice from the party or parties originally delivering such notice, (y) of the waiver of such Default or Event of Default in accordance with the provisions of Section 13.1 or (z) that such Default or Event of Default is no longer continuing.

3.2    Letter of Credit Requests.

(a)    Whenever the Borrower desires that a Letter of Credit be issued, the Borrower shall give the Administrative Agent and the applicable Letter of Credit Issuer a Letter of Credit Request by no later than 1:00 p.m. at least two (or such lesser number as may be agreed upon by the Administrative Agent and such Letter of Credit Issuer) Business Days prior to the proposed date of issuance. Each notice shall be executed by the Borrower, shall specify whether such Letter of Credit is to

80

be a Revolving Letter of Credit or Term Letter of Credit and shall be in the form of <u>Exhibit G</u>, or such other form (including by electronic or fax transmission) as agreed between the Borrower, the Administrative Agent and the applicable Letter of Credit Issuer (each, a "**Letter of Credit Request**").

(b)    If the Borrower so requests in any applicable Letter of Credit Request, any Letter of Credit Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "**Auto-Extension Letter of Credit**"); <u>provided</u> that any such Auto-Extension Letter of Credit must permit the Letter of Credit Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "**Non-Extension Notice Date**") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued.  Unless otherwise directed by a Letter of Credit Issuer, the Borrower shall not be required to make a specific request to such Letter of Credit Issuer for any such extension.  Once an Auto-Extension Letter of Credit has been issued, the Borrower and, in the case of Revolving Letters of Credit, the Revolving Credit Lenders, and in the case of Term Letters of Credit, the Lenders shall be deemed to have authorized (but may not require) such Letter of Credit Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than, in the case of any Revolving Letter of Credit, the Revolving L/C Maturity Date, and in the case of any Term Letter of Credit, the Term L/C Termination Date; <u>provided</u>, <u>however</u>, that such Letter of Credit Issuer shall not permit any such extension if (A) such Letter of Credit Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of <u>clause (ii)</u> of either <u>Sections 3.1(a)</u> or <u>(b)</u>, as applicable, or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Extension Notice Date from the Administrative Agent or the Borrower that one or more of the applicable conditions specified in <u>Section 7</u> are not then satisfied (or waived), and in each such case directing such Letter of Credit Issuer not to permit such extension.

(c)    Each Letter of Credit Issuer shall, at least once each month, provide the Administrative Agent a list of all Letters of Credit (including any Existing Letter of Credit) issued by it that are outstanding at such time and specifying whether such Letters of Credit are Revolving Letters of Credit or Term Letters of Credit; <u>provided</u> that upon written request from the Administrative Agent, such Letter of Credit Issuer shall thereafter notify the Administrative Agent in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such Letter of Credit Issuer and specifying whether such Letters of Credit are Revolving Letters of Credit or Term Letters of Credit.

(d)    The making of each Letter of Credit Request shall be deemed to be a representation and warranty by the Borrower that the Letter of Credit may be issued in accordance with, and will not violate the requirements of, <u>Section 3.1(a)(ii)</u> or <u>Section 3.1(b)(ii)</u>, as applicable.

3.3    <u>Revolving Letter of Credit Participations</u>.

(a)    Immediately upon the issuance by the Revolving Letter of Credit Issuer of any Revolving Letter of Credit (and on the Closing Date in respect of Existing Letters of Credit denoted as "Revolving Letters of Credit" on <u>Schedule 1.1(c)</u>), the Revolving Letter of Credit Issuer shall be deemed to have sold and transferred to each Revolving Credit Lender (each such Revolving Credit Lender, in its capacity under this <u>Section 3.3</u>, a "**Revolving L/C Participant**"), and each such Revolving L/C Participant shall be deemed irrevocably and unconditionally to have purchased and received from the Revolving Letter of Credit Issuer, without recourse or warranty, an undivided interest and participation, in each Revolving Letter of Credit, each substitute therefor, each drawing made thereunder and the obligations of the Borrower under this Agreement with respect thereto (each, a "**Revolving L/C**

Americas 91311338

**Participation**") pro rata based on such Revolving L/C Participant's Revolving Credit Commitment Percentage (determined without regard to the Class of Revolving Credit Commitments held by such Lender), and any security therefor or guaranty pertaining thereto.

(b)     In determining whether to pay under any Revolving Letter of Credit, the Revolving Letter of Credit Issuer shall have no obligation relative to the Revolving L/C Participants other than to confirm that (i) any documents required to be delivered under such Revolving Letter of Credit have been delivered, (ii) the Revolving Letter of Credit Issuer has examined the documents with reasonable care and (iii) the documents appear to comply on their face with the requirements of such Revolving Letter of Credit.  Any action taken or omitted to be taken by the Revolving Letter of Credit Issuer under or in connection with any Revolving Letter of Credit issued by it, if taken or omitted in the absence of gross negligence, bad faith, willful misconduct or a material breach by the Revolving Letter of Credit Issuer of any Credit Document, shall not create for the Revolving Letter of Credit Issuer any resulting liability.

(c)     Whenever the Revolving Letter of Credit Issuer receives a payment in respect of an unpaid reimbursement obligation as to which the Administrative Agent has received for the account of the Revolving Letter of Credit Issuer any payments from the Revolving L/C Participants, the Revolving Letter of Credit Issuer shall pay to the Administrative Agent and the Administrative Agent shall promptly pay to each Revolving L/C Participant that has paid its Revolving Credit Commitment Percentage (determined without regard to the Class of Revolving Credit Commitments held by such Lender) of such reimbursement obligation, in Dollars and in immediately available funds, an amount equal to such Revolving L/C Participant's share (based upon the proportionate aggregate amount originally funded by such Revolving L/C Participant to the aggregate amount funded by all Revolving L/C Participants) of the principal amount so paid in respect of such reimbursement obligation and interest thereon accruing after the purchase of the respective Revolving L/C Participations at the Overnight Rate.  For the avoidance of doubt, all distributions under this Section 3.3(c) shall be made to each Lender with a Revolving Credit Commitment pro rata based on each such Lender's Revolving Credit Commitment Percentage without regard to the Class of Revolving Credit Commitments held by such Lender.

(d)     The obligations of the Revolving L/C Participants to make payments to the Administrative Agent for the account of the Revolving Letter of Credit Issuer with respect to Revolving Letters of Credit shall be irrevocable and not subject to counterclaim, set-off or other defense or any other qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including under any of the following circumstances:

(i)     any lack of validity or enforceability of this Agreement or any of the other Credit Documents;

(ii)     the existence of any claim, set-off, defense or other right that the Borrower may have at any time against a beneficiary named in a Revolving Letter of Credit, any transferee of any Revolving Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, the Revolving Letter of Credit Issuer, any Lender or other Person, whether in connection with this Agreement, any Revolving Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between the Borrower and the beneficiary named in any such Revolving Letter of Credit);

(iii)     any draft, certificate or any other document presented under any Revolving Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

      (iv)    the surrender or impairment of any security for the performance or observance of any of the terms of any of the Credit Documents; or

      (v)    the occurrence of any Default or Event of Default;

provided, however, that no Revolving L/C Participant shall be obligated to pay to the Administrative Agent for the account of the Revolving Letter of Credit Issuer its Revolving Credit Commitment Percentage of any unreimbursed amount arising from any wrongful payment made by the Revolving Letter of Credit Issuer under a Revolving Letter of Credit as a result of acts or omissions constituting gross negligence or willful misconduct by the Revolving Letter of Credit Issuer.

      3.4    Agreement to Repay Letter of Credit Drawings.

      (a)    The Borrower hereby agrees to reimburse the applicable Letter of Credit Issuer, by making payment in Dollars to the Administrative Agent in immediately available funds, for any payment or disbursement made by such Letter of Credit Issuer under any Letter of Credit (each such amount so paid until reimbursed, an "**Unpaid Drawing**") (i) within one Business Day of the date of such payment or disbursement, if such Letter of Credit Issuer provides written notice to the Borrower of such payment or disbursement prior to 10:00 a.m. (New York City time) on such next succeeding Business Day or (ii) if such notice is received after such time, on the first Business Day following the date of receipt of such notice (such required date for reimbursement under clause (i) or (ii), as applicable, the "**Reimbursement Date**"), with interest on the amount so paid or disbursed by such Letter of Credit Issuer, from and including the date of such payment or disbursement to but excluding the Reimbursement Date, at the per annum rate for each day equal to the Overnight Rate; provided that, notwithstanding anything contained in this Agreement to the contrary, (i) in the case of any Unpaid Drawings under any Revolving Letter of Credit, (A) unless the Borrower shall have notified the Administrative Agent and the relevant Letter of Credit Issuer prior to 10:00 a.m. on the Reimbursement Date that the Borrower intends to reimburse the relevant Letter of Credit Issuer for the amount of such drawing with funds other than the proceeds of Revolving Credit Loans, the Borrower shall be deemed to have given a Notice of Borrowing requesting that, with respect to Revolving Letters of Credit, the Lenders with Revolving Credit Commitments make Revolving Credit Loans (which shall be ABR Loans) on the Reimbursement Date in the amount of such Unpaid Drawing and (B) the Administrative Agent shall promptly notify each Revolving Credit Lender of such drawing and the amount of its Revolving Credit Loan to be made in respect thereof (without regard to the Minimum Borrowing Amount), and each Revolving L/C Participant shall be irrevocably obligated to make a Revolving Credit Loan to the Borrower in the manner deemed to have been requested in the amount of its Revolving Credit Commitment Percentage (determined without regard to the Class of Revolving Credit Commitments held by such Lender) of the applicable Unpaid Drawing by 2:00 p.m. on such Reimbursement Date by making the amount of such Revolving Credit Loan available to the Administrative Agent and the Administrative Agent shall use the proceeds of such Revolving Credit Loans solely for purpose of reimbursing the relevant Letter of Credit Issuer for the related Unpaid Drawing or (ii), in the case of any Unpaid Drawing under any Term Letter of Credit, unless the Borrower shall have notified the Administrative Agent and the relevant Letter of Credit Issuer prior to 10:00 a.m. on the Reimbursement Date that the Borrower intends to reimburse the relevant Letter of Credit Issuer for the amount of such drawing with its own funds, the Collateral Agent shall promptly cause the amounts on deposit in the Term L/C Loan Collateral Accounts to be applied to repay in full the amount of such Unpaid Drawing, provided that after giving effect to such application, the Term Letters of Credit Outstanding with respect to Term Letters of Credit issued by any Term Letter of Credit Issuer at such time would not exceed the Term L/C Loan Collateral Account Balance of the Term L/C Loan Collateral Account established for such Term Letter of Credit Issuer. For the avoidance of doubt, all Borrowings of Revolving Credit Loans under this Section (a) shall be made by each Lender with a

Revolving Credit Commitment pro rata based on each such Lender's Revolving Credit Commitment Percentage (determined without regard to Class of Revolving Credit Commitments held by such Lender).

In the event that the Borrower fails to Cash Collateralize any Revolving Letter of Credit that is outstanding on the Revolving L/C Maturity Date, the full amount of the Revolving Letters of Credit Outstanding in respect of such Revolving Letter of Credit shall be deemed to be an Unpaid Drawing subject to the provisions of this Section 3.4 except that the Revolving Letter of Credit Issuer shall hold the proceeds received from the Lenders as contemplated above as cash collateral for such Revolving Letter of Credit to reimburse any Drawing under such Revolving Letter of Credit and shall use such proceeds first, to reimburse itself for any Drawing made in respect of such Revolving Letter of Credit following the Revolving L/C Maturity Date, second, to the extent such Revolving Letter of Credit expires or is returned undrawn while any such cash collateral remains, to the repayment of obligations in respect of any Revolving Credit Loans that have not been paid at such time and third, to the Borrower or as otherwise directed by a court of competent jurisdiction.

(b)    The obligations of the Borrower under this Section 3.4 to reimburse the Letter of Credit Issuers with respect to Unpaid Drawings (including, in each case, interest thereon) shall be absolute and unconditional under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that the Borrower or any other Person may have or have had against any Letter of Credit Issuer, the Administrative Agent or any Lender (including in its capacity as a Revolving L/C Participant), including any defense based upon the failure of any drawing under a Letter of Credit (each a "**Drawing**") to conform to the terms of the Letter of Credit or any non-application or misapplication by the beneficiary of the proceeds of such Drawing; provided that the Borrower shall not be obligated to reimburse any Letter of Credit Issuer for any wrongful payment made by such Letter of Credit Issuer under the Letter of Credit issued by it as a result of acts or omissions constituting gross negligence, bad faith, willful misconduct or a material breach by such Letter of Credit Issuer of any Credit Document.

3.5    Increased Costs.  If after the Closing Date, the adoption of any Applicable Law, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or actual compliance by a Letter of Credit Issuer or any Revolving L/C Participant with any request or directive made or adopted after the Closing Date (whether or not having the force of law), by any such authority, central bank or comparable agency shall either (a) impose, modify or make applicable any reserve, deposit, capital adequacy, liquidity or similar requirement against letters of credit issued by any Letter of Credit Issuer, or any Revolving L/C Participant's Revolving L/C Participation therein, or (b) impose on any Letter of Credit Issuer or any Revolving L/C Participant any other conditions or liabilities affecting its obligations under this Agreement in respect of Letters of Credit or Revolving L/C Participations therein or any Letter of Credit or such Revolving L/C Participant's Revolving L/C Participation therein, and the result of any of the foregoing is to increase the cost to such Letter of Credit Issuer or such Revolving L/C Participant of issuing, maintaining or participating in any Letter of Credit, or to reduce the amount of any sum received or receivable by such Letter of Credit Issuer or such Revolving L/C Participant hereunder (other than any such increase or reduction attributable to (i) Taxes indemnifiable under Section 5.4 or, (ii) net income taxes and franchise and excise taxes (imposed in lieu of net income taxes) imposed on any Letter of Credit Issuer or such Revolving L/C Participant or (iii) Taxes included under clauses (c) through (e) of the definition of "Excluded Taxes") in respect of Letters of Credit or Revolving L/C Participations therein, then, promptly after receipt of written demand to the Borrower by such Letter of Credit Issuer or such Revolving L/C Participant, as the case may be (a copy of which notice shall be sent by such Letter of Credit Issuer or such Revolving L/C Participant to the Administrative Agent), the Borrower shall pay to such Letter of Credit Issuer or such Revolving L/C Participant such additional amount or amounts as will compensate such Letter of Credit Issuer or such

84

Revolving L/C Participant for such increased cost or reduction, it being understood and agreed, however, that any Letter of Credit Issuer or a Revolving L/C Participant shall not be entitled to such compensation as a result of such Person's compliance with, or pursuant to any request or directive to comply with, any such Applicable Law as in effect on the Closing Date.  A certificate submitted to the Borrower by the relevant Letter of Credit Issuer or a Revolving L/C Participant, as the case may be (a copy of which certificate shall be sent by such Letter of Credit Issuer or such Revolving L/C Participant to the Administrative Agent), setting forth in reasonable detail the basis for the determination of such additional amount or amounts necessary to compensate such Letter of Credit Issuer or such Revolving L/C Participant as aforesaid shall be conclusive and binding on the Borrower absent clearly demonstrable error.  Notwithstanding the foregoing, no Letter of Credit Issuer or Revolving L/C Participant shall demand compensation pursuant to this Section 3.5 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

3.6    New or Successor Letter of Credit Issuer.

(a)    Subject to the appointment and acceptance of a successor Letter of Credit Issuer as provided in this paragraph (with the consent of the Borrower, not to be unreasonably withheld or delayed), any Letter of Credit Issuer may resign as a Letter of Credit Issuer upon 30 days' prior written notice to the Administrative Agent, the Lenders and the Borrower.  The Borrower may add Revolving Letter of Credit Issuers and/or Term Letter of Credit Issuers at any time upon notice to the Administrative Agent.  If a Letter of Credit Issuer shall resign or be replaced, or if the Borrower shall decide to add a new Letter of Credit Issuer under this Agreement, then the Borrower may appoint from among the Lenders a successor issuer of Letters of Credit under the applicable Credit Facility or a new Letter of Credit Issuer under the applicable Credit Facility, as the case may be, or, with the consent of the Administrative Agent (such consent not to be unreasonably withheld, denied, conditioned or delayed), another successor or new issuer of Letters of Credit under the applicable Credit Facility, whereupon such successor issuer shall succeed to the rights, powers and duties of the replaced or resigning Letter of Credit Issuer under this Agreement and the other Credit Documents, or such new issuer of Letters of Credit shall be granted the rights, powers and duties of a Revolving Letter of Credit Issuer or Term Letter of Credit Issuer, as applicable, hereunder, and the term "Revolving Letter of Credit Issuer" or "Term Letter of Credit Issuer", as applicable, shall mean such successor or include such new issuer of Letters of Credit under the applicable Credit Facility effective upon such appointment.  At the time such resignation or replacement shall become effective, the Borrower shall pay to the resigning or replaced Letter of Credit Issuer all accrued and unpaid fees owing to such Letter of Credit Issuer pursuant to Section 4.1(d).  The acceptance of any appointment as a Letter of Credit Issuer hereunder whether as a successor issuer or new issuer of Letters of Credit in accordance with this Agreement, shall be evidenced by an agreement entered into by such new or successor issuer of Letters of Credit, in a form satisfactory to the Borrower and the Administrative Agent and, from and after the effective date of such agreement, such new or successor issuer of Letters of Credit shall become a "Revolving Letter of Credit Issuer" or "Term Letter of Credit Issuer", as applicable, hereunder.  After the resignation or replacement of a Letter of Credit Issuer hereunder, the resigning or replaced Letter of Credit Issuer shall remain a party hereto and shall continue to have all the rights and obligations of a Letter of Credit Issuer under this Agreement and the other Credit Documents with respect to Letters of Credit issued by it prior to such resignation or replacement, but shall not be required to issue additional Letters of Credit.  In connection with any resignation or replacement pursuant to this clause (a) (but, in case of any such resignation, only to the extent that a successor issuer of Letters of Credit shall have been appointed), either (i) the Borrower, the resigning or replaced Letter of Credit Issuer and the successor issuer of Letters of Credit shall arrange to have any outstanding Letters of Credit issued by the resigning or replaced Letter of Credit Issuer replaced with Letters of Credit issued by the successor issuer of Letters of Credit or (ii) in the case of Revolving Letters

85

of Credit, the Borrower shall cause the successor issuer of Revolving Letters of Credit, if such successor issuer is reasonably satisfactory to the replaced or resigning Revolving Letter of Credit Issuer, to issue "back-stop" Revolving Letters of Credit naming the resigning or replaced Revolving Letter of Credit Issuer as beneficiary for each outstanding Revolving Letter of Credit issued by the resigning or replaced Revolving Letter of Credit Issuer, which new Revolving Letters of Credit shall have a face amount equal to the Revolving Letters of Credit being back-stopped and the sole requirement for drawing on such new Revolving Letters of Credit shall be a drawing on the corresponding back-stopped Revolving Letters of Credit. After any resigning or replaced Letter of Credit Issuer's resignation or replacement as Letter of Credit Issuer, the provisions of this Agreement relating to a Letter of Credit Issuer shall inure to its benefit as to any actions taken or omitted to be taken by it (A) while it was a Letter of Credit Issuer under this Agreement or (B) at any time with respect to Letters of Credit issued by such Letter of Credit Issuer.

(b)    To the extent that there are, at the time of any resignation or replacement as set forth in clause (a) above, any outstanding Letters of Credit, nothing herein shall be deemed to impact or impair any rights and obligations of any of the parties hereto with respect to such outstanding Letters of Credit (including, without limitation, any obligations related to the payment of Fees or the reimbursement or funding of amounts drawn), except that the Borrower, the resigning or replaced Letter of Credit Issuer and the successor issuer of Letters of Credit shall have the obligations regarding outstanding Letters of Credit described in clause (a) above.

3.7    Role of Letter of Credit Issuer. Each Lender and the Borrower agree that, in paying any Drawing under a Letter of Credit, the relevant Letter of Credit Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the Letter of Credit Issuers, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Letter of Credit Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Required Lenders; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the Letter of Credit Issuers, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Letter of Credit Issuer shall be liable or responsible for any of the matters described in Section 3.3(d); provided that anything in such Section to the contrary notwithstanding, the Borrower may have a claim against a Letter of Credit Issuer, and such Letter of Credit Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by such Letter of Credit Issuer's gross negligence, bad faith, willful misconduct or a material breach by such Letter of Credit Issuer of any Credit Document or such Letter of Credit Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, each Letter of Credit Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no Letter of Credit Issuer shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

86

3.8     Cash Collateral.

(a)     Upon the written request of the Required Revolving Credit Lenders if, as of the Revolving L/C Maturity Date, there are any Revolving Letters of Credit Outstanding, the Borrower shall immediately Cash Collateralize the then Revolving Letters of Credit Outstanding.

(b)     If any Event of Default shall occur and be continuing, the Required Revolving Credit Lenders may require that the Revolving L/C Obligations be Cash Collateralized.

(c)     For purposes of this Agreement, "**Cash Collateralize**" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Revolving Letter of Credit Issuers, as collateral for the Revolving L/C Obligations, cash or deposit account balances ("**Cash Collateral**") in an amount equal to 100% of the amount of the Revolving Letters of Credit Outstanding, required to be Cash Collateralized pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent, the Borrower and the Revolving Letter of Credit Issuers (which documents are hereby consented to by the Revolving Credit Lenders). Derivatives of such terms have corresponding meanings. The Borrower hereby grants to the Administrative Agent, for the benefit of the Revolving Letter of Credit Issuers, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the documentation in form and substance reasonably satisfactory to the Administrative Agent, the Revolving Letter of Credit Issuers (which documents are hereby consented to by the Revolving Credit Lenders). Such cash collateral shall be maintained in blocked, interest bearing deposit accounts established by and in the name of the Administrative Agent (with the interest accruing for the benefit of the Borrower).

3.9     Term L/C Loan Collateral Accounts. On the Closing Date, the Borrower has established a Term L/C Loan Collateral Account for the benefit of each Term Letter of Credit Issuer on the Closing Date (including the Deutsche Bank Term L/C Loan Collateral Account and the Existing Term L/C Loan Collateral Account) for the purpose of cash collateralizing the Borrower's obligations (including Term L/C Obligations) to such Term Letter of Credit Issuer in respect of the Term Letters of Credit issued or to be issued by such Term Letter of Credit Issuer. On the Closing Date, the proceeds of the Term L/C Loans, together with other funds (if any) provided by the Borrower, shall be deposited into the applicable Term L/C Loan Collateral Accounts such that the Term L/C Loan Collateral Account Balance of the Term L/C Loan Collateral Account established for the benefit of each Term Letter of Credit Issuer shall equal at least the Term Letters of Credit Outstanding of such Term Letter of Credit Issuer. After the Closing Date, the Borrower may establish additional Term L/C Loan Collateral Accounts for the benefit of any additional Term Letter of Credit Issuer for the purpose of cash collateralizing the Borrower's obligations to such Term Letter of Credit Issuer in respect of the Term Letters of Credit issued or to be issued by such Term letter of Credit Issuer, and may transfer all or any portion of the funds in any Term L/C Loan Collateral Account to any other Term L/C Loan Collateral Account (including between the Deutsche Bank Term L/C Loan Collateral Account and the Existing Term L/C Loan Collateral Account), subject to the satisfaction (or waiver) of the conditions set forth in this Section 3.9; provided that each Term Letter of Credit Issuer may require that the Depositary Bank for the Term L/C Loan Collateral Account corresponding to its Term L/C Obligations is such Term Letter of Credit Issuer or an Affiliate thereof. The Borrower agrees that at all times, and shall immediately cause additional funds to be deposited and held in the Term L/C Loan Collateral Accounts from time to time in order that (A) the Term L/C Loan Collateral Account Balance for all Term L/C Loan Collateral Accounts shall at least equal the Term Letters of Credit Outstanding with respect to all Term Letters of Credit and (B) the Term L/C Loan Collateral Account Balance of each Term L/C Loan Collateral Account established for the benefit of a Term Letter of Credit Issuer shall equal at least the Term Letters of Credit Outstanding of such Term Letter of Credit Issuer (the "**Term L/C Cash Coverage Requirement**"). The

87

Borrower hereby grants to the Collateral Agent, for the benefit of all Term Letter of Credit Issuers, a security interest in the Term L/C Loan Collateral Accounts and all cash and balances therein and all proceeds of the foregoing, as security for the Term L/C Obligations (including the Term Letter of Credit Reimbursement Obligations) (and, in addition, grants a security interest therein, for the benefit of the Secured Parties as collateral security for the Obligations; provided that (x) amounts on deposit in the Existing Term L/C Loan Collateral Account shall be applied, first, to repay the Term L/C Obligations in respect of Existing Term Letters of Credit, second, to repay the Term L/C Obligations in respect of all other Term Letters of Credit and, then, to repay any other Obligations, (y) amounts on deposit in the Deutsche Bank Term L/C Loan Collateral Account shall be applied, first, to repay the Term L/C Obligations in respect of Deutsche Bank Term Letters of Credit, second, to repay the Term L/C Obligations in respect of all other Term Letters of Credit and, then, to repay all other Obligations and (z) amounts on deposit in any other Term L/C Loan Collateral Account shall be applied, first, to repay the corresponding Term L/C Obligations (including Term Letter of Credit Reimbursement Obligations) owing to the applicable Term Letter of Credit Issuer, second, to repay the Term L/C Obligations in respect of all other Term Letters of Credit and, then, to repay all other Obligations). Except as expressly provided herein or in any other Credit Document, no Person shall have the right to make any withdrawal from any Term L/C Loan Collateral Account or to exercise any right or power with respect thereto; provided that at any time the Borrower shall fail to reimburse any Term Letter of Credit Issuer for any Unpaid Drawing in accordance with Section 3.4(a), the Borrower hereby absolutely, unconditionally and irrevocably agrees that the Collateral Agent shall be entitled to instruct the applicable depositary bank (each, a "**Depositary Bank**") of the applicable Term L/C Loan Collateral Account to withdraw therefrom and pay to the Administrative Agent for the account of such Term Letter of Credit Issuer amounts equal to such Unpaid Drawings. Amounts in any Term L/C Loan Collateral Account shall be invested by the applicable Depositary Bank in Term LC Permitted Investments in the manner instructed by the Borrower (and agreed to by such Depositary Bank) (and returns shall accrue for the benefit of the Borrower); provided, however, that the applicable Depositary Bank shall determine such investments in Term LC Permitted Investments during the existence of any Event of Default as long as made in Term LC Permitted Investments, it being understood and agreed that neither the Borrower nor the applicable Depositary Bank nor any other Person may direct the investment of funds in any Term L/C Loan Collateral Account in any assets other than Term LC Permitted Investments. The Borrower shall bear the risk if loss of principal with respect to any investment in any Term L/C Loan Collateral Account. So long as no Event of Default shall have occurred and be continuing and subject to the satisfaction of the Term L/C Cash Coverage Requirement after giving effect to any such release, upon at least three Business Days' prior written notice to the Collateral Agent and the Administrative Agent, the Borrower may, at any time and from time to time, request release of and payment to the Borrower of (and the Collateral Agent hereby agrees to instruct the applicable Depositary Bank to release and pay to the Borrower) any amounts on deposit in the Term L/C Loan Collateral Accounts (as reduced by the aggregate amounts, if any, withdrawn by the Term Letter of Credit Issuers and not subsequently deposited by the Borrower) in excess of the Term Letter of Credit Commitment at such time (provided that the Collateral Agent shall have received prior confirmation of the amount of such excess from the Administrative Agent). In addition, the Collateral Agent hereby agrees to instruct the Depositary Bank to release and pay to the Borrower amounts (if any) remaining on deposit in the Term L/C Loan Collateral Accounts after the termination or cancellation of all Term Letters of Credit, the termination of the Term Letter of Credit Commitment and the repayment in full of all outstanding Term L/C Loans and Term L/C Obligations.

3.10    Existing Letters of Credit.  Subject to the terms and conditions hereof, (a) each Existing Letter of Credit that is outstanding on the Closing Date, listed on Schedule 1.1(c) and denoted thereon as a "Term Letter of Credit" shall, effective as of the Closing Date and without any further action by the Borrower, be continued (and deemed issued) as a Term Letter of Credit hereunder and from and after the Closing Date shall be deemed a Term Letter of Credit for all purposes hereof and shall be subject

88

to and governed by the terms and conditions hereof and (b) each Existing Letter of Credit that is outstanding on the Closing Date, listed on Schedule 1.1(c) and denoted thereon as a "Revolving Letter of Credit" shall, effective as of the Closing Date and without any further action by the Borrower, be continued (and deemed issued) as a Revolving Letter of Credit hereunder and from and after the Closing Date shall be deemed a Revolving Letter of Credit for all purposes hereof and shall be subject to and governed by the terms and conditions hereof.

3.11    <u>Applicability of ISP and UCP</u>.  Unless otherwise expressly agreed by the relevant Letter of Credit Issuer and the Borrower when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each Commercial Letter of Credit, and in each case to the extent not inconsistent with the above referred rules, the laws of the State of New York shall apply to each Letter of Credit.

3.12    <u>Conflict with Issuer Documents</u>.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control and any security granted pursuant to any Issuer Document shall be void.

3.13    <u>Letters of Credit Issued for Others</u>.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, the Ultimate Parent or any Subsidiary of the Ultimate Parent or the Borrower, the Borrower shall be obligated to reimburse the relevant Letter of Credit Issuer hereunder for any and all drawings under such Letter of Credit.  The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of the Ultimate Parent or any Subsidiary of the Ultimate Parent or the Borrower inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of the Ultimate Parent or any Subsidiary of the Ultimate Parent or the Borrower.

SECTION 4.    Fees; Reduction of Commitments.

4.1    <u>Fees</u>.

(a)    The Borrower agrees to pay to the Administrative Agent in Dollars, for the account of each Revolving Credit Lender (in each case *pro rata* according to the respective Revolving Credit Commitments of all such Lenders), a commitment fee (the "**Revolving Credit Commitment Fee**") for each day from the Closing Date to, but excluding, the Revolving Credit Termination Date.  The Revolving Credit Commitment Fee shall be earned, due and payable by the Borrower (x) quarterly in arrears on the tenth Business Day following the end of each March, June, September and December (for the three-month period (or portion thereof) ended on such day for which no payment has been received) and (y) on the Revolving Credit Termination Date (for the period ended on such date for which no payment has been received pursuant to <u>clause (x)</u> above), and shall be computed for each day during such period at a rate *per annum* equal to the applicable Revolving Credit Commitment Fee Rate in effect on such day on the applicable portion of the Available Revolving Commitment in effect on such day.

(b)    In the event that, on or prior to the six month anniversary of the Closing Date, the Borrower (x) makes any prepayment or repayment of initial Term Loans or initial Term L/C Loans in connection with any Repricing Transaction or (y) effects any amendment of this Agreement resulting in a Repricing Transaction, the Borrower shall pay to the Administrative Agent, for the ratable account of each of the applicable Lenders holding initial Term Loans or initial Term L/C Loans, as applicable, (I) a prepayment premium of 1.00% of the principal amount of the initial Term Loans and initial Term L/C Loans being prepaid or repaid in connection with such Repricing Transaction and (II) in the case of clause

89

(y), an amount equal to 1.00% of the aggregate amount of the applicable initial Term Loans and initial Term L/C Loans of non-consenting Lenders outstanding immediately prior to such amendment that are subject to an effective pricing reduction pursuant to such amendment.

(c)     The Borrower agrees to pay to the Administrative Agent in Dollars for the account of each Revolving Credit Lender *pro rata* on the basis of their respective Revolving Letter of Credit Exposure, a fee in respect of each Revolving Letter of Credit (the "**Revolving Letter of Credit Fee**"), for the period from the date of issuance of such Revolving Letter of Credit to the termination or expiration date of such Revolving Letter of Credit computed at the *per annum* rate for each day equal to the product of (x) the Applicable LIBOR Margin for Revolving Credit Loans and (y) the average daily Stated Amount of such Revolving Letter of Credit.  The Revolving Letter of Credit Fee shall be due and payable (x) quarterly in arrears on the tenth Business Day following the end of each March, June, September and December and (y) on the Revolving Credit Termination Date (for the period ended on such date for which no payment has been received pursuant to clause (x) above). If there is any change in the Applicable LIBOR Margin during any quarter, the daily maximum amount of each Revolving Letter of Credit shall be computed and multiplied by the Applicable LIBOR Margin separately for each period during such quarter that such Applicable LIBOR Margin was in effect.

(d)     [Reserved].

(e)     The Borrower agrees to pay to each Letter of Credit Issuer a fee in respect of each Letter of Credit issued by it (the "**Fronting Fee**"), for the period from the date of issuance of such Letter of Credit to the termination date of such Letter of Credit, computed at the rate for each day equal to 0.125% *per annum* on the average daily Stated Amount of such Letter of Credit (or at such other rate per annum as agreed in writing between the Borrower and such Letter of Credit Issuer).  Such Fronting Fees shall be earned, due and payable by the Borrower (x) quarterly in arrears on the tenth Business Day following the end of each March, June, September and December and (y) (1) in the case of Revolving Letters of Credit, on the later of (A) the Revolving Credit Termination Date and (B) the day on which the Revolving Letters of Credit Outstanding shall have been reduced to zero and (2) in the case of Term Letters of Credit, the Term L/C Loan Maturity Date or, if earlier, the date upon which the Term Letter of Credit Commitment terminates and the Term Letter of Credit Outstanding shall have been reduced to zero.

(f)     The Borrower agrees to pay directly to the Letter of Credit Issuer upon each issuance of, drawing under, and/or amendment of, a Letter of Credit issued by it such amount as the Letter of Credit Issuer and the Borrower shall have agreed upon for issuances of, drawings under or amendments of, letters of credit issued by it.

(g)     [Reserved].

(h)     The Borrower agrees to pay directly to the Administrative Agent for its own account the administrative agent fees as set forth in the Fee Letter.

(i)     Notwithstanding the foregoing, the Borrower shall not be obligated to pay any amounts to any Defaulting Lender pursuant to this Section 4.1 (subject to Section 2.16).

4.2     Voluntary Reduction of Revolving Credit Commitments, Revolving Letter of Credit Commitments and Term Letter of Credit Commitments.

(a)     Upon at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent at the Administrative Agent's Office (which

90

notice the Administrative Agent shall promptly transmit to each of the Revolving Credit Lenders), the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the Revolving Credit Commitments in whole or in part; provided that (a) any such termination or reduction of Revolving Credit Commitments of any Class shall apply proportionately and permanently to reduce the Revolving Credit Commitments of each of the Revolving Credit Lenders of such Class, except that, notwithstanding the foregoing, the Borrower may allocate any termination or reduction of Revolving Credit Commitments in its sole discretion among the Classes of Revolving Credit Commitments as the Borrower may specify, (b) any partial reduction pursuant to this Section 4.2 shall be in the amount of at least the Minimum Borrowing Amount and (c) after giving effect to such termination or reduction and to any prepayments of the Revolving Credit Loans or cancellation or Cash Collateralization of Revolving Letters of Credit made on the date thereof in accordance with this Agreement (including pursuant to Section 5.2(b)), the aggregate amount of the Revolving Credit Lenders' Revolving Credit Exposures shall not exceed the Total Revolving Credit Commitment; provided, further, that if any notice delivered pursuant to this clause (a) indicates that such commitment is to be terminated or reduced in connection with a new financing that would result in the termination or reduction in full of the Revolving Credit Commitments, such notice of termination or reduction may be revoked if such new financing is not consummated.

(b)    [Reserved].

(c)    Upon at least one Business Day's prior revocable written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent and the Revolving Letter of Credit Issuers (which notice the Administrative Agent shall promptly transmit to each of the Revolving Credit Lenders), the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the Revolving Letter of Credit Commitment in whole or in part; provided that, after giving effect to such termination or reduction, (i) the Revolving Letters of Credit Outstanding with respect to all Revolving Letters of Credit, after giving effect to Cash Collateralization of Revolving Letters of Credit, shall not exceed the Revolving Letter of Credit Commitment and (ii) the Revolving Letters of Credit Outstanding (other than with respect to Existing Letters of Credit) with respect to each Revolving Letter of Credit Issuer shall not exceed the Specified Revolving Letter of Credit Commitment of such Revolving Letter of Credit Issuer.

(d)    Upon at least one Business Day's prior revocable written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent and the Term Letter of Credit Issuers (which notice the Administrative Agent shall promptly transmit to each of the Term L/C Loan Lenders), the Borrower shall have the right, without premium or penalty (except as provided in Section 4.1(b)), on any day, permanently to terminate or reduce the Term Letter of Credit Commitment in whole or in part; provided that, immediately upon any such termination or reduction, the Borrower shall prepay the Term L/C Loans in an aggregate principal amount equal to the aggregate amount of the Term Letter of Credit Commitment so terminated or reduced in accordance with the requirements of Sections 5.1 and 5.2(d).

4.3    Mandatory Termination or Reduction of Commitments.  (a) The Total Revolving Credit Commitment (and the Revolving Credit Commitment of each Lender with such a Commitment), the Term Letter of Credit Commitment shall terminate at 5:00 p.m. on the Maturity Date.

(b)    The Total Term Loan Commitment (and the Term Loan Commitment of each Lender with such a Commitment) shall terminate on the Closing Date (immediately after giving effect to the incurrence of Term Loans on such date pursuant to Section 2.1(a)).

91

(c)    The Total Term L/C Loan Commitment (and the Term L/C Loan Commitment of each Lender with such a Commitment) shall terminate on the Closing Date (immediately after giving effect to the incurrence of Term L/C Loans on such date pursuant to Section 2.1(b)).

(d)    The Term Letter of Credit Commitment shall be reduced by the amount of any prepayment or repayment of principal of Term L/C Loans pursuant to Section 2.5(a), 5.1 or 5.2 and the Borrower shall be permitted to withdraw an amount up to the amount of such prepayment or repayment from the Term L/C Collateral Accounts to complete such prepayment or repayment; provided that after giving effect to such withdrawal, the Term L/C Cash Coverage Requirement shall be satisfied.

SECTION 5.    Payments.

5.1    Voluntary Prepayments.  The Borrower shall have the right to prepay Term Loans, Term L/C Loans, Revolving Credit Loans, without premium or penalty, in whole or in part, from time to time on the following terms and conditions: (a) the Borrower shall give the Administrative Agent at the Administrative Agent's Office written notice (or telephonic notice promptly confirmed in writing) of its intent to make such prepayment, the amount of such prepayment and, in the case of LIBOR Loans, the specific Borrowing(s) pursuant to which made, which notice shall be given by the Borrower no later than, in the case of Term Loans, Term L/C Loans, and Revolving Credit Loans, 1:00 p.m. (x) one Business Day prior to (in the case of ABR Loans) or (y) three Business Days prior to (in the case of LIBOR Loans), (b) each partial prepayment of any Borrowing of Term Loans, Term L/C Loans or Revolving Credit Loans shall be in a multiple of $1,000,000 and in an aggregate principal amount of at least $5,000,000; provided that no partial prepayment of LIBOR Loans made pursuant to a single Borrowing shall reduce the outstanding LIBOR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount for LIBOR Loans and (c) any prepayment of LIBOR Loans pursuant to this Section 5.1 on any day other than the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of Section 2.11; provided that (i) any voluntary prepayment of initial Term Loans or initial Term L/C Loans pursuant to this Section 5.1 in connection with a Repricing Transaction within six months after the Closing Date shall be accompanied by the payment of any applicable prepayment premium to the extent required by Section 4.1(b) and (ii) if any notice delivered pursuant to this clause (a) indicates that such prepayment is to be funded in connection with a new financing that would result in the repayment in full of all Obligations, and the termination of all Commitments, under a given Credit Facility, such notice of prepayment may be revoked if such new financing is not consummated.  Each prepayment in respect of any tranche of Term Loans or Term L/C Loans pursuant to this Section 5.1 shall be applied to the Class or Classes of Term Loans or Term L/C Loans in such manner as the Borrower may determine.  All prepayments under this Section 5.1 shall also be subject to the provisions of Section 5.2(c) or (e), as applicable.  At the Borrower's election in connection with any prepayment pursuant to this Section 5.1, such prepayment shall not be applied to any Loan of a Defaulting Lender.

5.2    Mandatory Prepayments.

(a)    Loan Prepayments.  On each occasion that a Prepayment Event occurs, the Borrower shall, within three Business Days after the occurrence of such Prepayment Event (or, in the case of Deferred Net Cash Proceeds, within three Business Days after the Deferred Net Cash Proceeds Payment Date), prepay (subject to Section 11.19 when applicable), in accordance with clauses (c) and (d) below, Loans in a principal amount equal to 100% of the Net Cash Proceeds from such Prepayment Event.

92

(b) <u>Repayment of Revolving Credit Loans</u>. Subject to <u>Section 11.19</u> when applicable, if on any date the aggregate amount of the Lenders' Revolving Credit Exposures for any reason exceeds 100% of the Total Revolving Credit Commitment then in effect, the Borrower shall, forthwith repay within two (2) Business Days of such date the principal amount of the Revolving Credit Loans in an amount necessary to eliminate such deficiency. If, after giving effect to the prepayment of all outstanding Revolving Credit Loans, the aggregate amount of the Lenders' Revolving Credit Exposure exceeds the Total Revolving Credit Commitment then in effect, the Borrower shall Cash Collateralize the Revolving L/C Obligations to the extent of such excess.

(c) <u>Application to Repayments</u>. Subject to <u>Section 11.19</u> when applicable, each prepayment of Loans required by <u>Section (a)</u> shall be allocated (i) first, to the Term Loans and any Incremental Term Loans (ratably (or, with respect to Incremental Term Loans, on a less than ratable basis, if agreed to by the lenders under the applicable Incremental Term Loan Facility) based on then remaining principal amounts of the respective Class of Loans then outstanding) until paid in full, (ii) second, to the Term L/C Loans then outstanding until paid in full and (iii) thereafter, to the Revolving Credit Facility (without any permanent reduction in commitments thereof). Prepayments within any Class of Loans must be applied *pro rata* to the Lenders with Loans of such Class, based upon the outstanding principal amounts owing within such Class of Loans.

(d) <u>Application to Term Loans and Term L/C Loans</u>. With respect to each prepayment of Term Loans, Term L/C Loans and Incremental Term Loans elected to be made by the Borrower pursuant to <u>Section 5.1</u> or required by <u>Section 5.2(a)</u>, subject to <u>Section 11.19</u> when applicable, the Borrower may designate the Types of Loans that are to be prepaid and the specific Borrowing(s) pursuant to which made; <u>provided</u> that the Borrower pays any amounts, if any, required to be paid pursuant to <u>Section 2.11</u> with respect to prepayments of LIBOR Loans made on any date other than the last day of the applicable Interest Period. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under <u>Section 2.11</u>. Upon any prepayment of Term L/C Loans, the Term Letter of Credit Commitment shall be reduced by an amount equal to such prepayment as provided in <u>Section 4.3(d)</u> and the Borrower shall be permitted to withdraw an amount up to the amount of such prepayment from the Term L/C Loan Collateral Accounts to complete such repayment as, and to the extent, provided in <u>Section 4.3(d)</u>.

(e) <u>Application to Revolving Credit Loans</u>. With respect to each prepayment of Revolving Credit Loans elected to be made by the Borrower pursuant to <u>Section 5.1</u> or required by <u>Section (a)</u> or <u>(b)</u>, the Borrower may designate (i) the Types of Loans that are to be prepaid and the specific Borrowing(s) pursuant to which made and (ii) the Revolving Credit Loans to be prepaid; <u>provided</u> that (x) each prepayment of any Loans made pursuant to a Borrowing shall be applied *pro rata* among such Loans; and (y) notwithstanding the provisions of the preceding clause (x), no prepayment made pursuant to <u>Section 5.1</u> or <u>5.2</u> of Revolving Credit Loans shall be applied to the Revolving Credit Loans of any Defaulting Lender. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under <u>Section 2.11</u>.

(f) <u>LIBOR Interest Periods</u>. In lieu of making any payment pursuant to this <u>Section 5.2</u> in respect of any LIBOR Loan other than on the last day of the Interest Period therefor so long as no Event of Default shall have occurred and be continuing, the Borrower at its option may deposit with the Administrative Agent an amount equal to the amount of the LIBOR Loan to be prepaid and such LIBOR Loan shall be repaid on the last day of the Interest Period therefor in the required amount. Such

93

deposit shall be held by the Administrative Agent in a corporate time deposit account established on terms reasonably satisfactory to the Administrative Agent, earning interest at the then customary rate for accounts of such type. Such deposit shall constitute cash collateral for the LIBOR Loans to be so prepaid; provided that the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this Section 5.2.

(g)     Minimum Amount. No prepayment shall be required pursuant to Section (a) (i) in the case of any Prepayment Event yielding Net Cash Proceeds of less than $5,000,000 in the aggregate and (ii) unless and until the amount at any time of Net Cash Proceeds from Prepayment Events required to be applied at or prior to such time pursuant to such Section and not yet applied at or prior to such time to prepay Term Loans or Term L/C Loans pursuant to such Section exceeds (x) $25,000,000 for a single Prepayment Event or (y) $100,000,000 in the aggregate for all Prepayment Events (other than those that are either under the threshold specified in subclause (i) or over the threshold specified in subclause (ii)(x)) in any one fiscal year, at which time all such Net Cash Proceeds referred to in this subclause (ii) with respect to such fiscal year shall be applied as a prepayment in accordance with this Section 5.2.

(h)     [Reserved].

(i)     Foreign Net Cash Proceeds. Notwithstanding any other provisions of this Section 5.2, (i) to the extent that any or all of the Net Cash Proceeds from a Recovery Prepayment Event (a "**Foreign Recovery Event**") of, or any Disposition by, a Restricted Foreign Subsidiary giving rise to an Asset Sale Prepayment Event (a "**Foreign Asset Sale**") are prohibited or delayed by applicable local law from being repatriated to the United States, such portion of the Net Cash Proceeds so affected will not be required to be applied to repay Term Loans or Term L/C Loans at the times provided in this Section 5.2 but may be retained by the applicable Restricted Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to cause the applicable Restricted Foreign Subsidiary to promptly take all actions required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Cash Proceeds will be promptly (and in any event not later than two Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans or Term L/C Loans as required pursuant to this Section 5.2 and (ii) to the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Cash Proceeds of any Foreign Recovery Event on any Foreign Asset Sale would have a material adverse tax consequence with respect to such Net Cash Proceeds, the Net Cash Proceeds so affected may be retained by the applicable Restricted Foreign Subsidiary; provided that, in the case of this clause (ii), on or before the date on which any Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to Section (a), (x) the Borrower applies an amount equal to such Net Cash Proceeds to such reinvestments or prepayments as if such Net Cash Proceeds had been received by the Borrower rather than such Restricted Foreign Subsidiary, less the amount of additional taxes that would have been payable or reserved against if such Net Cash Proceeds had been repatriated (or, if less, the Net Cash Proceeds that would be calculated if received by such Foreign Subsidiary) or (y) such Net Cash Proceeds are applied to the repayment of Indebtedness of a Restricted Foreign Subsidiary.

5.3     Method and Place of Payment.

(a)     Except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrower without set-off, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Lenders entitled thereto, the Letter of Credit Issuer

94

entitled thereto, as the case may be, not later than 2:00 p.m., in each case, on the date when due and shall be made in immediately available funds at the Administrative Agent's Office or at such other office as the Administrative Agent shall specify for such purpose by notice to the Borrower, it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make a payment from the funds in the Borrower's account at the Administrative Agent's Office shall constitute the making of such payment to the extent of such funds held in such account. All repayments or prepayments of any Loans (whether of principal, interest or otherwise) hereunder and all other payments under each Credit Document shall be made in Dollars. The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 2:00 p.m. or, otherwise, on the next Business Day) like funds relating to the payment of principal or interest or fees ratably to the Lenders entitled thereto.

(b)    Any payments under this Agreement that are made later than 2:00 p.m. shall be deemed to have been made on the next succeeding Business Day. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

5.4    Net Payments.

(a)    Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Credit Document shall be made free and clear of, and without deduction or withholding for or on account of, any Indemnified Taxes; provided that if the Borrower or any Guarantor or the Administrative Agent shall be required by Applicable Law to deduct or withhold any Indemnified Taxes from such payments, then (i) the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after making all such required deductions and withholdings (including such deductions or withholdings applicable to additional sums payable under this Section 5.4) the Administrative Agent, the Collateral Agent or any Lender (which term shall include each Letter of Credit Issuer for purposes of Section 5.4 and for the purposes of the definition of Excluded Taxes), as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Borrower or such Guarantor or the Administrative Agent shall make such deductions or withholdings and (iii) the Borrower or such Guarantor or the Administrative Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with Applicable Law. Whenever any Indemnified Taxes are payable by the Borrower or such Guarantor, as promptly as possible thereafter, the Borrower or Guarantor shall send to the Administrative Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an original official receipt (or other evidence acceptable to such Lender, acting reasonably) received by the Borrower or such Guarantor showing payment thereof.

(b)    The Borrower shall timely pay and shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender with regard to any Other Taxes (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority).

(c)    The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within fifteen Business Days after written demand therefor, for the full amount of any Indemnified Taxes imposed on the Administrative Agent, the Collateral Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Credit Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 5.4) and any reasonable out-

95

of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth reasonable detail as to the amount of such payment or liability delivered to the Borrower by a Lender, the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)     Any Non-U.S. Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or under any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Credit Document shall, to the extent it is legally able to do so, deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. A Lender's obligation under the prior sentence shall apply only if the Borrower or the Administrative Agent has made a request for such documentation. In addition, any Lender, if requested by the Borrower or the Administrative Agent shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e)     Each Non-U.S. Lender with respect to any Loan made to the Borrower shall, to the extent it is legally entitled to do so:

(i)     deliver to the Borrower and the Administrative Agent, prior to the date on which the first payment to the Non-U.S. Lender is due hereunder, two copies of (x) in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service Form W-8BEN or W-8BEN-E (together with a certificate substantially in the form of Exhibit L representing that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, any interest payment received by such Non-U.S. Lender under this Agreement or any other Credit Document is not effectively connected with the conduct of a trade or business in the United States and is not a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Code)), (y) Internal Revenue Service Form W-8BEN, W-8BEN-E or Form W-8ECI, in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax on payments by the Borrower under this Agreement or (z) if a Non-U.S. Lender does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Lender under any of the Credit Documents (for example, in the case of a typical participation or where Non-U.S. Lender is a pass through entity) Internal Revenue Service Form W-8IMY and all necessary attachments (including the forms described in clauses (x) and (y) above, as required); and

(ii)     deliver to the Borrower and the Administrative Agent two further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower.

If in any such case any Change in Law has occurred prior to the date on which any such delivery would otherwise be required that renders any such form inapplicable or would prevent such Non-U.S. Lender

96

from duly completing and delivering any such form with respect to it, such Non-U.S. Lender shall promptly so advise the Borrower and the Administrative Agent.

(f)    If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it had received and retained a refund of an Indemnified Tax (including an Other Tax) for which a payment has been made by the Borrower pursuant to this Agreement, which refund in the good faith judgment of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, is attributable to such payment made by the Borrower, then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower for such amount (net of all out-of-pocket expenses of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender, Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion exercised in good faith to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any taxes imposed on the refund) than it would have been in if the payment had not been required; <u>provided</u> that the Borrower, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower (<u>plus</u> any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority.  A Lender, the Administrative Agent or the Collateral Agent shall claim any refund that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such a claim. Neither the Lender, the Administrative Agent nor the Collateral Agent shall be obliged to disclose any information regarding its tax affairs or computations to any Credit Party in connection with this <u>clause (f)</u> or any other provision of this <u>Section 5.4</u>.

(g)    If the Borrower determines that a reasonable basis exists for contesting a Tax, each Lender or Agent, as the case may be, shall use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request in challenging such Tax.  Subject to the provisions of <u>Section 2.12</u>, each Lender and Agent agrees to use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request to minimize any amount payable by the Borrower or any Guarantor pursuant to this <u>Section 5.4</u>.  The Borrower shall indemnify and hold each Lender and Agent harmless against any out-of-pocket expenses incurred by such Person in connection with any request made by the Borrower pursuant to this <u>Section (g)</u>.  Nothing in this <u>Section (g)</u> shall obligate any Lender or Agent to take any action that such Person, in its sole judgment, determines may result in a material detriment to such Person.

(h)    Each Lender with respect to any Loan made to the Borrower that is a United States person under Section 7701(a)(30) of the Code and each Agent (each, a "**U.S. Lender**") shall deliver to the Borrower and the Administrative Agent two United States Internal Revenue Service Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Lender or Agent is exempt from United States backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete, (iii) after the occurrence of a change in such Agent's or Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(i)    If a payment made to any Lender would be subject to U.S. federal withholding Tax imposed under FATCA if such Lender were to fail to comply with the applicable reporting

97

requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such other documentation reasonably requested by the Administrative Agent and the Borrower as may be necessary for the Administrative Agent and the Borrower to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this subsection (i), "FATCA" shall include any amendments after the date of this Agreement.

(j)     The agreements in this <u>Section 5.4</u> shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

5.5     <u>Computations of Interest and Fees.</u>

(a)     Except as provided in the next succeeding sentence, interest on LIBOR Loans, and ABR Loans shall be calculated on the basis of a 360-day year for the actual days elapsed. Interest on ABR Loans in respect of which the rate of interest is calculated on the basis of the Administrative Agent's prime rate and interest on overdue interest shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.

(b)     Fees and the average daily Stated Amount of Letters of Credit shall be calculated on the basis of a 360-day year for the actual days elapsed.

5.6     <u>Limit on Rate of Interest.</u>

(a)     <u>No Payment Shall Exceed Lawful Rate</u>.  Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect of the Obligations in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

(b)     <u>Payment at Highest Lawful Rate</u>.  If the Borrower is not obliged to make a payment that it would otherwise be required to make, as a result of <u>Section (a)</u>, the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

(c)     <u>Adjustment if Any Payment Exceeds Lawful Rate</u>.  If any provision of this Agreement or any of the other Credit Documents would obligate the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate that would be prohibited by any Applicable Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under <u>Section 2.8</u>.

(d)     <u>Spreading</u>.  In determining whether the interest hereunder is in excess of the amount or rate permitted under or consistent with any Applicable Law, the total amount of interest shall be spread throughout the entire term of this Agreement until its payment in full.

(e)     Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the

98

maximum permitted by any Applicable Law, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

SECTION 6.    Conditions Precedent to Initial Credit Events.

The agreement of each Lender to make any Loan requested to be made by it on the Closing Date, and the obligation of any Letter of Credit Issuer to issue (or continue or be deemed to have issued) Letters of Credit on the Closing Date, is subject to the satisfaction (or waiver by the Joint Lead Arrangers) of the conditions precedent set forth in this Section 6, except as otherwise agreed by the Borrower and the Joint Lead Arrangers.

6.1    Credit Documents.  The Administrative Agent shall have received:

(a)    this Agreement, executed and delivered by a duly authorized officer of Parent Guarantor and the Borrower;

(b)    the Guarantee, executed and delivered by a duly authorized officer of each Guarantor as of the Closing Date; and

(c)    the Security Agreement, executed and delivered by a duly authorized officer of each Credit Party as of the Closing Date.

6.2    Collateral.

(a)    Solely with respect to any Guarantor that is not a TCEH Debtor, the Borrower shall have used commercially reasonable efforts (without undue burden or expense) to execute and deliver all documents and instruments required to perfect the Collateral Agent's security interest in, and Lien on, the Collateral; provided that, notwithstanding the foregoing, the Collateral Agent shall have received (i) UCC-1 financing statements in proper form for filing and (ii) the delivery of stock or other equity certificates of such Guarantor and any Material Subsidiary thereof that is a Domestic Subsidiary (other than Excluded Stock and Stock Equivalents) (to the extent such certificates exist and such stock or other equity certificates have been received by the Borrower).

(b)    The Deutsche Bank Term L/C Loan Collateral Account shall have been established with arrangements (including arrangements relating to perfection by "control") reasonably satisfactory to the Administrative Agent.

6.3    Legal Opinions.  The Administrative Agent shall have received the executed legal opinions (which legal opinion will address customary matters for a debtor-in-possession financing) of (a) Kirkland & Ellis LLP, special New York counsel to Parent Guarantor and the Borrower, and (b) Gibson, Dunn & Crutcher LLP, special Texas counsel to Parent Guarantor and the Borrower, in each case, in form and substance reasonably acceptable to the Administrative Agent.  Parent Guarantor, the Borrower, the other Credit Parties and the Administrative Agent hereby instruct such counsel to deliver such legal opinions.

6.4    Notice of Borrowing.  Prior to the making of Term Loans, Term L/C Loans and Revolving Credit Loans on the Closing Date, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 2.3.

Americas 91311338

6.5    <u>Closing Refinancing</u>.  The Closing Refinancing shall have been made or consummated prior to, or shall be made or consummated substantially concurrently with, the initial Borrowing under this Agreement.

6.6    <u>Closing Certificates</u>.  The Administrative Agent shall have received a certificate of the Credit Parties, dated the Closing Date, substantially in the form of <u>Exhibit H</u>, with appropriate insertions, executed by an Authorized Officer of each Credit Party, and attaching the documents referred to in <u>Section 6.7</u>.

6.7    <u>Authorization of Proceedings of Each Credit Party</u>.  The Administrative Agent shall have received (a) a copy of the resolutions of the board of directors, other managers or general partner of each Credit Party (or a duly authorized committee thereof) authorizing (i) the execution, delivery and performance of the Credit Documents (and any agreements relating thereto) to which it is a party and (ii) in the case of the Borrower, the extensions of credit contemplated hereunder, (b) true and complete copies of the Organizational Documents of each Credit Party as of the Closing Date and (c) good standing certificates (to the extent such concept exists in the relevant jurisdiction of organization) of the Borrower and the Guarantors.

6.8    <u>Fees</u>.  All fees required to be paid on the Closing Date pursuant to the Fee Letter and reasonable and documented out-of-pocket expenses required to be paid on the Closing Date pursuant to the Commitment Letter, in the case of expenses, to the extent invoiced at least three (3) Business Days prior to the Closing Date, shall have been paid, or shall be paid substantially concurrently with, the initial Borrowings hereunder (which amounts may be offset against the proceeds of the initial Borrowings hereunder).

6.9    <u>Representations and Warranties</u>.  All Specified Representations shall be true and correct in all material respects on the Closing Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, it shall be true and correct in all material respects as of such earlier date).

6.10    <u>DIP Order</u>.  The DIP Order, in form and substance satisfactory to the Requisite Joint Lead Arrangers (it being agreed and understood that the form of DIP Order attached to the Commitment Letter as Exhibit G thereof is satisfactory to the Requisite Joint Lead Arrangers) shall have been entered by the Bankruptcy Court and shall remain in full force and effect and shall be final and not subject to any stay.  The DIP Order shall not have been waived, amended, supplemented or otherwise modified in any respect that in the aggregate is adverse to the rights and interests of the Joint Lead Arrangers (taken as a whole) in their capacities as committed lenders under the Commitment Letter unless consented to in writing thereby by the Requisite Joint Lead Arrangers and the DIP Order shall not have been reversed or vacated.  The TCEH Debtors shall be in compliance in all material respects with the DIP Order.

6.11    <u>Company Material Adverse Change</u>.  No Company Material Adverse Change shall have occurred since May 31, 2016.

6.12    <u>No Chapter 7</u>.  The Case with respect to the Borrower shall not have been converted to a proceeding under chapter 7 of the Bankruptcy Code.

6.13    <u>Pro Forma Financial Statements</u>.  The Joint Lead Arrangers shall have received an unaudited *pro forma* consolidated balance sheet and related unaudited *pro forma* consolidated statement of income of the Borrower and its Subsidiaries as of and for the twelve-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 45 days (or 90 days if

100

such four-fiscal quarter period is the end of the Borrower's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred on such date (in the case of such *pro forma* balance sheet) or on the first day of such period (in the case of such *pro forma* statement of income), as applicable (which need not be prepared in compliance with Regulations S-X of the Securities Act of 1933, as amended, or include adjustments for purchase accounting (including adjustments of the type contemplated by Financial Accounting Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R)).

6.14    <u>Patriot Act</u>.  The Administrative Agent shall have received (at least 3 Business Days prior to the Closing Date) all documentation and other information about the Borrower and each Guarantor as has been reasonably requested in writing at least 10 Business Days prior to the Closing Date by the Administrative Agent or the Joint Lead Arrangers that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act.

6.15    <u>Historical Financial Statements</u>.  The Joint Lead Arrangers shall have received copies of (i) the audited consolidated balance sheet and the related audited consolidated statements of income, cash flows and shareholders' equity of the Borrower and its Subsidiaries as of and for the fiscal years ended December 31, 2013, December 31, 2014 and December 31, 2015 and (ii) the unaudited consolidated balance sheet and the related consolidated statements of income and cash flows of the Borrower and its Subsidiaries as of and for each subsequent fiscal quarter (other than the fourth fiscal quarter of the Borrower's fiscal year) ended at least 45 days before the Closing Date; <u>provided</u> that the Borrower's public filing with the Securities and Exchange Commission of any required audited financial statements on Form 10-K or required unaudited financial statements on Form 10-Q, in each case, will satisfy the requirements under clauses (i) or (ii) as applicable, of this <u>Section 6.15</u>.

For purposes of determining compliance with the conditions specified in this <u>Section</u> **Error! Bookmark not defined.** on the Closing Date, each Agent and each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to such Agent or Lender unless the Borrower shall have received notice from such Agent or Lender (or from the Administrative Agent on behalf of such Lender) prior to the proposed Closing Date specifying its objection thereto, but excluding for the avoidance of doubt any subsequent changes or modifications to such documents or matters made after release of such party's signature page.

SECTION 7.    <u>Conditions Precedent to All Credit Events After the Closing Date</u>.  The agreement of each Lender to make any Loan requested to be made by it on any date after the Closing Date, and the obligation of any Letter of Credit Issuer to issue Letters of Credit on any date after the Closing Date, is subject to the satisfaction of the conditions precedent set forth in the following <u>Sections 7.1</u> and <u>7.2</u>:

7.1    <u>No Default; Representations and Warranties</u>.  At the time of each Credit Event and also after giving effect thereto (a) no Default or Event of Default shall have occurred and be continuing and (b) all representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date).

7.2    Notice of Borrowing.

(a)    Prior to the making of each Revolving Credit Loan (other than any Revolving Credit Loan made pursuant to Section 3.4(a)), the Administrative Agent shall have received a Notice of Borrowing (whether in writing or by telephone) meeting the requirements of Section 2.3.

(b)    Prior to the issuance of each Revolving Letter of Credit, the Administrative Agent and the Revolving Letter of Credit Issuer shall have received a Letter of Credit Request meeting the requirements of Section 3.2(a).

(c)    Prior to the issuance of each Term Letter of Credit, the Administrative Agent and the Term Letter of Credit Issuer shall have received a Letter of Credit Request meeting the requirements of Section 3.2(b).

The acceptance of the benefits of each Credit Event after the Closing Date shall constitute a representation and warranty by each Credit Party to each of the Lenders that all the applicable conditions specified in Section 7 above have been satisfied or waived as of that time.

SECTION 8.    Representations, Warranties and Agreements.

In order to induce the Lenders and the Letter of Credit Issuers to enter into this Agreement, to make the Loans and issue or participate in Letters of Credit as provided for herein, each of Parent Guarantor and the Borrower makes (on the Closing Date (limited solely to the Specified Representations) and on each other date as required or otherwise set forth in this Agreement) the following representations and warranties to, and agreements with, the Lenders and the Letter of Credit Issuers, all of which shall survive the execution and delivery of this Agreement, the making of the Loans and the issuance of the Letters of Credit:

8.1    Corporate Status; Compliance with Laws.    Each of Parent Guarantor, the Borrower and each Material Subsidiary of the Borrower that is a Restricted Subsidiary (a) is a duly organized and validly existing corporation or other entity in good standing (as applicable) under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its material property and assets and to transact the business in which it is engaged, (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect and (c) is in compliance with all Applicable Laws, except to the extent that the failure to be in compliance could not reasonably be expected to result in a Material Adverse Effect.

8.2    Corporate Power and Authority. Subject to the entry of the DIP Order and the terms thereof, each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party.  Each Credit Party has duly executed and delivered each Credit Document to which it is a party and, subject to the entry of the DIP Order and the terms thereof, each such Credit Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

102

8.3     No Violation.  Subject to the entry of the DIP Order and the terms thereof, neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party nor the compliance with the terms and provisions thereof will (a) contravene in any material respect any provision of any material Applicable Law (including material Environmental Laws), (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of Parent Guarantor, the Borrower or any Restricted Subsidiary (other than Liens created under the Credit Documents, Permitted Liens or Liens securing any of the Prepetition Debt) pursuant to the terms of any material indenture, loan agreement, lease agreement, mortgage, deed of trust or other material agreement or instrument to which Parent Guarantor, the Borrower or any Restricted Subsidiary is a party or by which it or any of its property or assets is bound, in each case to the extent any such agreement was entered into after the Petition Date (any such term, covenant, condition or provision, a "**Contractual Requirement**") other than any such breach, default or Lien that could not reasonably be expected to result in a Material Adverse Effect, or (c) violate any provision of the Organizational Documents of Parent Guarantor, the Borrower or any Restricted Subsidiary.

8.4     Litigation.  Other than the Cases, except as set forth on Schedule 8.4, there are no actions, suits or proceedings (including Environmental Claims) pending or, to the knowledge of the Borrower, threatened with respect to Parent Guarantor, the Borrower or any of the Restricted Subsidiaries that could reasonably be expected to result in a Material Adverse Effect.

8.5     Margin Regulations.  Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the Board.

8.6     Governmental Approvals.  Subject to the entry of the DIP Order and the terms thereof, the execution, delivery and performance of the Credit Documents does not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (i) such as have been obtained or made and are in full force and effect, (ii) filings and recordings in respect of the Liens created pursuant to the Security Documents and (iii) such consents, approvals, registrations, filings or actions the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

8.7     Investment Company Act.  None of the Credit Parties is an "investment company" within the meaning of, and subject to registration under, the Investment Company Act of 1940, as amended.

8.8     True and Complete Disclosure.  None of the written factual information and written data (taken as a whole) heretofore or contemporaneously furnished by or on behalf of Parent Guarantor, the Borrower, any of the Subsidiaries of the Borrower or any of their respective authorized representatives to the Administrative Agent, any Joint Lead Arranger and/or any Lender on or before the Closing Date (including all such information and data contained in the Credit Documents) for purposes of or in connection with this Agreement or any transaction contemplated herein contained any untrue statement of any material fact or omitted to state any material fact necessary to make such information and data (taken as a whole) not materially misleading at such time in light of the circumstances under which such information or data was furnished, it being understood and agreed that for purposes of this Section 8.8, such factual information and data shall not include projections or estimates (including financial estimates, forecasts and other forward-looking information) and information of a general economic or general industry nature.

8.9     Financial Condition; Projections.

103

(a)     The financial statements described in Section 6.15 present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated subsidiaries as of such date and for such period in accordance with GAAP consistently applied (except to the extent provided in the notes thereto).

(b)     The projections, forward-looking statements, estimates and pro forma financial information contained in the Information Memorandum are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agents, Joint Lead Arrangers and the Lenders that such projections, forward-looking statements, estimates and pro forma financial information are not to be viewed as facts and are subject to material contingencies and assumptions, many of which are beyond the control of the Credit Parties, and that actual results during the period or periods covered by any such projections, forward-looking statements, estimates and pro forma financial information may differ materially from the projected results.

8.10    Tax Matters.   Except where the failure of which could not be reasonably expected to have a Material Adverse Effect, (a) each of Parent Guarantor, the Borrower and each of the Restricted Subsidiaries has filed all federal income Tax returns and all other Tax returns, domestic and foreign, required to be filed by it and has paid all material Taxes payable by it that have become due (whether or not shown on such Tax return), other than those (i) not yet delinquent or (ii) contested in good faith as to which adequate reserves have been provided to the extent required by law and in accordance with GAAP, (b) each of Parent Guarantor, the Borrower and each of the Restricted Subsidiaries has provided adequate reserves in accordance with GAAP for the payment of, all federal, state, provincial and foreign Taxes not yet due and payable and (c) each of Parent Guarantor, the Borrower and each of the Restricted Subsidiaries has satisfied all of its Tax withholding obligations.

8.11    Compliance with ERISA.

(a)     Each Employee Benefit Plan is in compliance with ERISA, the Code and any Applicable Law; no Reportable Event has occurred (or is reasonably likely to occur) with respect to any Benefit Plan; no Multiemployer Plan is insolvent or in reorganization (or is reasonably likely to be insolvent or in reorganization), and no written notice of any such insolvency or reorganization has been given to the Borrower or any ERISA Affiliate; no Benefit Plan has an accumulated or waived funding deficiency (or is reasonably likely to have such a deficiency); on and after the effectiveness of the Pension Act, each Benefit Plan has satisfied the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Benefit Plan, and there has been no determination that any such Benefit Plan is, or is expected to be, in "at risk" status (within the meaning of Section 4010(d)(2) of ERISA); none of the Borrower or any ERISA Affiliate has incurred (or is reasonably likely to incur) any liability to or on account of a Benefit Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code; no proceedings have been instituted (or are reasonably likely to be instituted) to terminate or to reorganize any Benefit Plan or to appoint a trustee to administer any Benefit Plan, and no written notice of any such proceedings has been given to the Borrower or any ERISA Affiliate; and no Lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists (or is reasonably likely to exist) nor has the Borrower or any ERISA Affiliate been notified in writing that such a Lien will be imposed on the assets of the Ultimate Parent, Parent Guarantor, the Borrower or any ERISA Affiliate on account of any Benefit Plan, except to the extent that a breach of any of the representations, warranties or agreements in this Section 8.11(a) would not result, individually or in the aggregate, in an amount of liability that would be reasonably likely to have a Material Adverse Effect.  No Benefit Plan has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 8.11(a), be reasonably likely to have a Material Adverse Effect.  With respect to Benefit Plans

that are Multiemployer Plans, the representations and warranties in this Section 8.11(a), other than any made with respect to (i) liability under Section 4201 or 4204 of ERISA or (ii) liability for termination or reorganization of such Multiemployer Plans under ERISA, are made to the best knowledge of the Borrower.

(b)    All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and Applicable Law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to have a Material Adverse Effect. All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except to the extent any such events would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.12    Subsidiaries.  Schedule 8.12 lists each Subsidiary of Parent Guarantor (and the direct and indirect ownership interest of Parent Guarantor therein), in each case existing on the Closing Date. Each Material Subsidiary as of the Closing Date has been so designated on Schedule 8.12.

8.13    Intellectual Property.  Each of Parent Guarantor, the Borrower and the Restricted Subsidiaries has good and marketable title to, or a valid license or right to use, all patents, trademarks, servicemarks, trade names, copyrights and all applications therefor and licenses thereof, and all other intellectual property rights, free and clear of all Liens (other than Liens permitted by Section 10.2), that are necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such title, license or rights could not reasonably be expected to have a Material Adverse Effect.

8.14    Environmental Laws.  Except as could not reasonably be expected to have a Material Adverse Effect: (a) Parent Guarantor, the Borrower and the Restricted Subsidiaries and all Real Estate are in compliance with all Environmental Laws; (b) Parent Guarantor, the Borrower and the Restricted Subsidiaries have, and have timely applied for renewal of, all permits under Environmental Law to construct and operate their facilities as currently constructed; (c) except as set forth on Schedule 8.4, neither Parent Guarantor, the Borrower nor any Restricted Subsidiary is subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim or any other liability under any Environmental Law including any such Environmental Claim or, to the knowledge of the Borrower, any other liability under Environmental Law related to, or resulting from the business or operations of any predecessor in interest of any of them; (d) neither Parent Guarantor, the Borrower nor any Restricted Subsidiary is conducting or financing or is required to conduct or finance, any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; (e) to the knowledge of the Borrower, no Hazardous Materials have been released into the environment at, on or under any Real Estate currently owned or leased by Parent Guarantor, the Borrower or any Restricted Subsidiary and (f) neither Parent Guarantor, the Borrower nor any Restricted Subsidiary has treated, stored, transported, released or disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or, to the knowledge of the Borrower, formerly owned or leased Real Estate or facility.

8.15    Properties.  Except as set forth on Schedule 8.15, Parent Guarantor, the Borrower and the Restricted Subsidiaries have good title to or valid leasehold or easement interests or other license or use rights in all properties that are necessary for the operation of their respective businesses as currently conducted, free and clear of all Liens (other than any Liens permitted by this Agreement) and except where the failure to have such good title, leasehold or easement interests or other license or use rights could not reasonably be expected to have a Material Adverse Effect.

Americas 91311338

8.16    DIP Order. The DIP Order is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid, binding, continuing, enforceable, non-avoidable, and automatically perfected security interests in, and Liens on, the Collateral of the TCEH Debtors and the proceeds and products thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents.

8.17    Status of Obligations; Perfection and Priority of Security Interests. (i)    The Obligations of the TCEH Debtors are, subject only to the Carve Out, the RCT Reclamation Support Carve Out and the DIP Order:

(a)    upon entry of the DIP Order, allowed administrative expense claims in the Cases, having priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against each of the Borrower, Parent Guarantor and each other Guarantor or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and effective upon entry of, the DIP Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(1) of the Bankruptcy Code;

(b)    after the entry of, and pursuant to the terms of, the DIP Order, secured by a valid and perfected Lien with the priority provided in Section 14.1(a) on all of the Collateral of the TCEH Debtors, subject only to the Carve Out and the RCT Reclamation Support Carve Out; and

(c)    notwithstanding the provisions of section 362 of the Bankruptcy Code and subject to the applicable provisions of the DIP Order, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations in cash and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of the Credit Documents and the DIP Order.

(ii)    With respect to each Credit Party (other than a TCEH Debtor), the Security Documents (other than the DIP Order) taken as a whole are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable first priority security interest (subject to Liens permitted hereunder) in the Collateral described therein and proceeds thereof, in each case, to the extent required under the Security Documents, the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  In the case of (i) the Stock described in the Security Agreement that is in the form of securities represented by stock certificates or otherwise constituting certificated securities within the meaning of Section 8-102(a)(15) of the New York UCC or the corresponding code or statute of any other applicable jurisdiction ("**Certificated Securities**"), when certificates representing such Stock are delivered to the Collateral Agent along with instruments of transfer in blank or endorsed to the Collateral Agent, and (ii) all other Collateral constituting personal property described in the Security Agreement, when financing statements and other required filings, agreements and actions in appropriate form are executed and delivered, performed or filed in the appropriate offices, as the case may be, the Collateral Agent, for the benefit of the Secured Parties, shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Credit Parties (other than a TCEH Debtors) in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document and the proceeds thereof (to the extent such Liens may be perfected by possession of the Certificated Securities by the Collateral Agent or such filings, agreements or other actions or perfection is otherwise required by

106

the terms of any Credit Document), in each case, to the extent required under the Security Documents, as security for the Obligations, in each case prior and superior in right to any other Person (except, in the case of Liens permitted hereunder).

       8.18   <u>Insurance</u>.  The properties of Parent Guarantor, the Borrower and the Restricted Subsidiaries are insured pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower, as applicable) are financially sound and responsible, in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business.

       8.19   <u>Labor Matters</u>.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Parent Guarantor, the Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrower, threatened in writing; and (b) hours worked by and payment made to employees of Parent Guarantor, the Borrower and each Restricted Subsidiary have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters.

       8.20   <u>Sanctioned Persons; Anti-Corruption Laws; Patriot Act</u>.  None of Parent Guarantor, the Borrower or any of its Subsidiaries or any of their respective directors or officers is subject to any economic embargoes or similar sanctions administered or enforced by the U.S. Department of State or the U.S. Department of Treasury (including the Office of Foreign Assets Control) or any other applicable sanctions authority (collectively, "**Sanctions**", and the associated laws, rules, regulations and orders, collectively, "**Sanctions Laws**").  Each of Parent Guarantor, the Borrower and its Subsidiaries and their respective directors and officers is in compliance, in all material respects, with (i) all Sanctions Laws, (ii) the United States Foreign Corrupt Practices Act of 1977, as amended, and any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, "**Anti-Corruption Laws**") and (iii) the Patriot Act and any other applicable terrorism and money laundering laws, rules, regulations and orders.  No part of the proceeds of the Loans or Letters of Credit will be used, directly or indirectly, (A) for the purpose of financing any activities or business of or with any Person or in any country or territory that at such time is the subject of any Sanctions or (B) for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation in any material respect of any Anti-Corruption Law.

       SECTION 9.   <u>Affirmative Covenants</u>.

       The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until all Commitments and all Letters of Credit have terminated (unless such Letters of Credit have been collateralized on terms and conditions reasonably satisfactory to the applicable Letter of Credit Issuer following the termination of the Revolving Credit Commitments or the Term Letter of Credit Commitment (and the repayment of the Term L/C Loans), as the case may be) and the Loans and Unpaid Drawings, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Secured Commodity Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations), are paid in full:

Americas 91311338