9.1    Information Covenants.  The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)    Annual Financial Statements.  As soon as available and in any event on or before the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 90 days after the end of each such fiscal year), the consolidated balance sheet of (x) the Borrower and its consolidated Subsidiaries and (y) if different, the Borrower and the Restricted Subsidiaries (provided, however, that the Borrower shall be under no obligation to deliver the consolidated financial statements described in sub-clause (y) if the Consolidated Total Assets and the Consolidated EBITDA of the Borrower and its consolidated Subsidiaries (which Consolidated Total Assets and Consolidated EBITDA shall be calculated in accordance with the definitions of such terms, but determined based on the financial information of the Borrower and its consolidated Subsidiaries, and not the financial information of the Borrower and its Restricted Subsidiaries) do not differ from the Consolidated Total Assets and the Consolidated EBITDA, respectively, of the Borrower and its Restricted Subsidiaries by more than 2.5%), in each case as at the end of such fiscal year, and the related consolidated statements of operations and cash flows for such fiscal year, setting forth comparative consolidated figures for the preceding fiscal years (or, unless the consolidated financial statements described in sub-clause (y) are not required to be delivered pursuant to the immediately preceding proviso, in lieu of such audited financial statements of the Borrower and the Restricted Subsidiaries, a detailed reconciliation, reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and its consolidated Subsidiaries, on the other hand), all in reasonable detail and prepared in accordance with GAAP, and, in each case, (i) except with respect to any such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be qualified as to the scope of audit, (ii) certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its consolidated Subsidiaries (or the Borrower and the Restricted Subsidiaries, as the case may be) in accordance with GAAP and (iii) accompanied by a Narrative Report with regard thereto.

(b)    Quarterly Financial Statements.  As soon as available and in any event on or before the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) with respect to each of the first three quarterly accounting periods in each fiscal year of the Borrower (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 45 days after the end of each such quarterly accounting period), the consolidated balance sheets of (x) the Borrower and its consolidated Subsidiaries and (y) if different, the Borrower and the Restricted Subsidiaries (provided, however, that the Borrower shall be under no obligation to deliver the consolidated financial statements described in sub-clause (y) if the Consolidated Total Assets and the Consolidated EBITDA of the Borrower and its consolidated Subsidiaries (which Consolidated Total Assets and Consolidated EBITDA shall be calculated in accordance with the definitions of such terms, but determined based on the financial information of the Borrower and its consolidated Subsidiaries, and not the financial information of the Borrower and its Restricted Subsidiaries) do not differ from the Consolidated Total Assets and the Consolidated EBITDA, respectively, of the Borrower and its Restricted Subsidiaries by more than 2.5%), in each case as at the end of such quarterly period and the related consolidated statements of operations for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and the related consolidated statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such

108

consolidated balance sheet, for the last day of the prior fiscal year (or, unless the consolidated financial statements described in sub-clause (y) are not required to be delivered pursuant to the immediately preceding proviso, in lieu of such unaudited financial statements of the Borrower and the Restricted Subsidiaries, a detailed reconciliation reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and its consolidated Subsidiaries, on the other hand), all of which shall be (i) certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its consolidated Subsidiaries (or the Borrower and the Restricted Subsidiaries, as the case may be) in accordance with GAAP, subject to changes resulting from audit, normal year-end audit adjustments and absence of footnotes and (ii) accompanied by a Narrative Report with respect thereto.

(c)    Officer's Certificate.  At the time of the delivery of the financial statements provided for in Section (a) and (b), a certificate of an Authorized Officer of the Borrower to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall set forth (i) the calculations required to establish whether the Borrower and its Restricted Subsidiaries were in compliance with the provisions of Section 10.9 as at the end of such fiscal year or period (solely to the extent such covenant is required to be tested at the end of such fiscal year or period), as the case may be (including calculations in reasonable detail of any amount added back to Consolidated EBITDA pursuant to clause (a)(xii), clause (a)(xiii) and any amount excluded from Consolidated Net Income pursuant to clause k of the definition thereof) and (ii) a specification of any change in the identity of the Restricted Subsidiaries and Unrestricted Subsidiaries as at the end of such fiscal year or period, as the case may be, from the Restricted Subsidiaries and Unrestricted Subsidiaries, respectively, provided to the Lenders on the Closing Date of the most recent fiscal year or period, as the case may be.  At the time of the delivery of the financial statements provided for in Section (a), a certificate of an Authorized Officer of the Borrower setting forth (A) in reasonable detail the Applicable Amount and the Applicable Equity Amount as at the end of the fiscal year to which such financial statements relate and (B) the information required pursuant to Section 2 of the Perfection Certificate or confirming that there has been no change in such information since the Closing Date or the date of the most recent certificate delivered pursuant to this clause (c)(B), as the case may be.

(d)    Annual Operating Forecast. No later than December 1, 2016 for the business plan and operating budget covering 2017, and no later than December 1, 2017 for the business plan and operating budget covering 2018), the approved annual business plan and projected operating budget (the "**Annual Operating Forecast**"), on an annual basis, through the Maturity Date, broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, a line item for total available liquidity for the period of such Annual Operating Forecast, and which shall set forth the anticipated uses of the Credit Facilities for such period, certified as to its reasonableness when made by an Authorized Officer of the Borrower in the form of Exhibit C.

(e)    Notice of Default; Litigation.  Promptly after an Authorized Officer of the Borrower or any Restricted Subsidiary obtains knowledge thereof, notice of (i) the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto and (ii) any litigation, regulatory or governmental proceeding pending against the Borrower or any Restricted Subsidiary that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect.

(f)    Environmental Matters.  Promptly after obtaining knowledge of any one or more of the following environmental matters, unless such environmental matters known to the Borrower and

the Restricted Subsidiaries would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect, notice of:

(i)     any pending or threatened in writing Environmental Claim against any Credit Party or any Real Estate or any Credit Party or any predecessor in interest of the Borrower or any Restricted Subsidiary or any other Person for which any Credit Party is alleged to be liable by contract or operation of law;

(ii)     any condition or occurrence on any Real Estate that (x) could reasonably be expected to result in noncompliance by any Credit Party with any applicable Environmental Law or (y) could reasonably be anticipated to form the basis of any Environmental Claim against any Credit Party or any Real Estate;

(iii)     any condition or occurrence on any Real Estate or any circumstance that could reasonably be anticipated to cause such Real Estate to be subject to any restrictions on the ownership, occupancy, use or transferability of such Real Estate under any Environmental Law that would be inconsistent with the present use or operation of such Real Estate; and

(iv)     the conduct of any investigation, or any removal, remedial or other corrective action in response to the actual or alleged presence, release or threatened release into the environment of any Hazardous Material on, at, under or from any Real Estate.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence, removal or remedial or other corrective action and the response thereto.  The term "**Real Estate**" shall mean any interest in land, buildings and improvements owned, leased or otherwise held by any Credit Party, but excluding all operating fixtures and equipment.

(g)     Other Information.  Promptly upon filing thereof, copies of any filings (including on Form 10-K, 10-Q or 8-K) or registration statements with, and reports to, the SEC or any analogous Governmental Authority in any relevant jurisdiction by Parent Guarantor, the Borrower or any Restricted Subsidiary (other than amendments to any registration statement (to the extent such registration statement, in the form it becomes effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statements on Form S-8) and copies of all financial statements, proxy statements, notices and reports that Parent Guarantor, the Borrower or any Restricted Subsidiary shall send to the holders of any publicly issued debt of Parent Guarantor, the Borrower and/or any Restricted Subsidiary in their capacity as such holders (in each case to the extent not theretofore delivered to the Administrative Agent pursuant to this Agreement) and, with reasonable promptness, such other information (financial or otherwise) as the Administrative Agent on its own behalf or on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time; provided that, notwithstanding anything to the contrary in this Section 9.1(g), none of the Parent Guarantor, the Borrower or any of its Restricted Subsidiaries will be required under this Section 9.1(g) to provide any such other information to the extent that the provision thereof would violate any attorney-client privilege (as reasonably determined by counsel to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality (not created in contemplation thereof) binding on the Credit Parties or their respective affiliates or constitutes attorney work product (as reasonably determined by counsel to the Credit Parties).

(h)     [Reserved].

(i)     Budget and Variance Report.  (i) Commencing with the end of the first full fiscal quarter ended after the entry of the DIP Order (or, at the election of the Borrower, at the end of each

110

calendar month or such earlier period as may be agreed), the Borrower shall promptly provide an updated Budget for the subsequent 3-month period to the Administrative Agent.

(ii)    With respect to each calendar month, no later than the end of the subsequent calendar month in each case with respect to Parent Guarantor and its Restricted Subsidiaries, a variance report showing a statement of actual cash sources and uses of all free cash flow for the immediately such preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, including narrative explanations as to any material variances and certified as to its reasonableness when made by an Authorized Officer of the Borrower.

(j)    _Monthly Reporting_.  As soon as available, but in any event not later than twenty five days after the end of each calendar month, a report detailing (i) any material Dispositions consummated by any Credit Party (or the entry into any binding contracts for a material Disposition by any Credit Party), (ii) material developments in connection with any cost savings programs by any Credit Party and (iii) such other matters as the Administrative Agent may reasonably request; _provided_ that, notwithstanding anything to the contrary in this clause (iii) (but without limitation of any other requirement set forth in this Section 9.1), none of the Parent Guarantor, the Borrower or any of its Restricted Subsidiaries will be required under this clause (iii) to provide any information to the extent that the provision thereof would violate any attorney-client privilege (as reasonably determined by counsel to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality (not created in contemplation thereof) binding on the Credit Parties or their respective affiliates or constitutes attorney work product (as reasonably determined by counsel to the Credit Parties).

Notwithstanding the foregoing, the obligations in clauses (g), (h) and (i) of this Section 9.1 may be satisfied with respect to financial information of the Borrower and the Restricted Subsidiaries by furnishing (A) the applicable financial statements of Parent Guarantor, the Ultimate Parent or any direct or indirect parent of the Ultimate Parent or (B) the Borrower's (or Parent Guarantor's, the Ultimate Parent's or any direct or indirect parent thereof), as applicable, Form 10-K or 10-Q, as applicable, filed with the SEC; _provided_ that, with respect to each of subclauses (A) and (B) of this paragraph, to the extent such information relates to Parent Guarantor, the Ultimate Parent or a parent of the Ultimate Parent, such information is accompanied by consolidating or other information that explains in reasonable detail the differences between the information relating to Parent Guarantor, the Ultimate Parent or such parent, on the one hand, and the information relating to the Borrower and the Restricted Subsidiaries on a standalone basis, on the other hand.  Documents required to be delivered pursuant to clauses (g), (h) and (i) of this Section 9.1 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website as notified to the Administrative Agent; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

9.2    _Books, Records and Inspections_.  The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent or the Required Lenders (as accompanied by the Administrative Agent) to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the books and records of the Borrower and any such Restricted Subsidiary

and discuss the affairs, finances and accounts (including, without limitation, strategic planning, cash and liquidity management and operational and restructuring activities) of the Borrower and of any such Restricted Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or Required Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); provided that, excluding any such visits and inspections during the continuation of an Event of Default (a) only the Administrative Agent, whether on its own or in conjunction with the Required Lenders, may exercise rights of the Administrative Agent and the Lenders under this Section 9.2, (b) the Administrative Agent shall not exercise such rights more than two times in any calendar year and (c) only one such visit shall be at the Borrower's expense; provided further that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) or any representative of any Lender may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Required Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 9.2, neither the Borrower nor any Restricted Subsidiary will be required under this Section 9.2 to disclose or permit the inspection or discussion of any document, information or other matter to the extent that such action would violate any attorney-client privilege (as reasonably determined by counsel to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality (not created in contemplation thereof) binding on the Credit Parties or their respective affiliates or constituting attorney work product (as reasonably determined by counsel to the Credit Parties).

       9.3     Maintenance of Insurance. The Borrower will, and will cause each Material Subsidiary that is a Restricted Subsidiary to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower, as applicable) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business; and will furnish to the Administrative Agent, upon written reasonable request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried. With respect to each Mortgaged Property, obtain flood insurance in such total amount as the Administrative Agent may from time to time require, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

       9.4     Payment of Taxes. The Borrower will pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims in respect of any Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a material Lien upon any properties of the Borrower or any Restricted Subsidiary of the Borrower; provided that neither the Borrower nor any such Restricted Subsidiary shall be required to pay any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings if it has maintained adequate reserves (in the good faith judgment of management of the Borrower) with respect thereto in accordance with GAAP or the failure to

pay could not reasonably be expected to result in a Material Adverse Effect or to the extent the enforcement thereof is subject to a stay pursuant to an order of the Bankruptcy Court.

9.5    Consolidated Corporate Franchises. The Borrower will do, and will cause each Material Subsidiary that is a Restricted Subsidiary to do, or cause to be done, all things necessary to preserve and keep in full force and effect its existence, corporate rights and authority, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect; provided, however, that the Borrower and the Restricted Subsidiaries may consummate any transaction permitted under Section 10.2, 10.3, 10.4 or 10.5.

9.6    Compliance with Statutes, Regulations, Etc. The Borrower will, and will cause each Restricted Subsidiary to, comply with all Applicable Laws applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

9.7    ERISA.

(a)    Promptly after the Borrower or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following events that, individually or in the aggregate (including in the aggregate such events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would be reasonably likely to have a Material Adverse Effect, the Borrower will deliver to the Administrative Agent a certificate of an Authorized Officer or any other senior officer of the Borrower setting forth details as to such occurrence and the action, if any, that the Borrower or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by the Borrower, such ERISA Affiliate, the PBGC, a Benefit Plan participant (other than notices relating to an individual participant's benefits) or the Benefit Plan administrator with respect thereto: that a Reportable Event has occurred; that an accumulated funding deficiency has been incurred or an application is to be made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412 of the Code with respect to a Benefit Plan; that a Benefit Plan having an Unfunded Current Liability has been or is to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA (including the giving of written notice thereof); that a Benefit Plan has an Unfunded Current Liability that has or will result in a lien under ERISA or the Code; that proceedings will be or have been instituted to terminate a Benefit Plan having an Unfunded Current Liability (including the giving of written notice thereof); that a proceeding has been instituted against the Borrower or an ERISA Affiliate pursuant to Section 515 of ERISA to collect a delinquent contribution to a Benefit Plan; that the PBGC has notified the Borrower or any ERISA Affiliate of its intention to appoint a trustee to administer any Benefit Plan; that the Borrower or any ERISA Affiliate has failed to make a required installment or other payment pursuant to Section 412 of the Code with respect to a Benefit Plan; or that the Borrower or any ERISA Affiliate has incurred or will incur (or has been notified in writing that it will incur) any liability (including any contingent or secondary liability) to or on account of a Benefit Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code.

(b)    Promptly following any request therefor, on and after the effectiveness of the Pension Act, the Borrower will deliver to the Administrative Agent copies of (i) any documents described in Section 101(k) of ERISA that the Borrower and any of the Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that the Borrower and any of the Restricted Subsidiaries or any ERISA Affiliate may

113

request with respect to any Multiemployer Plan; provided that if the Borrower, any of such Restricted Subsidiaries or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower, the applicable Restricted Subsidiary(ies) or the ERISA Affiliate(s) shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

(c)    Upon the reasonable request of the Administrative Agent, the Borrower shall deliver to the Administrative Agent copies of:  (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by the Borrower or any ERISA Affiliate with the Internal Revenue Service with respect to each Benefit Plan, (ii) the most recent actuarial valuation report for each Benefit Plan, (iii) all notices received by the Borrower or any ERISA Affiliate from a Multiemployer Plan sponsor or any governmental agency and (iv) such other documents or governmental reports or filings relating to any Employee Benefit Plan as the Administrative Agent shall reasonably request.

9.8    Maintenance of Properties.  The Borrower will, and will cause the Restricted Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition (ordinary wear and tear, casualty and condemnation excepted), except to the extent that the failure to do so could reasonably be expected to have a Material Adverse Effect.

9.9    Transactions with Affiliates.    The Borrower will conduct, and cause the Restricted Subsidiaries to conduct, all transactions with any of its Affiliates (other than transactions between or among (i) the Borrower and the Restricted Subsidiaries and (ii) the Borrower, the Restricted Subsidiaries and to the extent in the ordinary course or consistent with past practice the Ultimate Parent and any of its other Subsidiaries, including the Oncor Subsidiaries and Investments permitted by Section 10.5(ff); provided that such Investments permitted by Section 10.05(ff) must be in a Subsidiary of the Borrower) on terms that are, taken as a whole, substantially as favorable to the Borrower or such Restricted Subsidiary as it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate; provided that, subject to the Cash Management Order, the Tax Order, the Wages Order and any other orders of the Bankruptcy Court, the foregoing restrictions shall not apply to:

(a)    [Reserved],

(b)    transactions permitted by Sections 10.5(c) (other than clause (iii) thereof), (k), (l), (m), (p), (z), and (bb) and Section 10.6,

(c)    the Transactions and the payment of the Transaction Expenses,

(d)    the issuance of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) to the management of the Borrower (or any direct or indirect parent thereof) or any Subsidiary of the Borrower in connection with the Transactions or pursuant to arrangements described in clause (f) of this Section 9.9,

(e)    loans, advances and other transactions between or among the Borrower, any Subsidiary of the Borrower or any joint venture (regardless of the form of legal entity) in which the Borrower or any Subsidiary of the Borrower has invested (and which Subsidiary or joint venture would not be an Affiliate of the Borrower but for the Borrower's or such Subsidiary's Subsidiary ownership of Stock or Stock Equivalents in such joint venture or Subsidiary) to the extent permitted under Section 10,

(f)    payments, advances or loans (or cancellation of loans), employment and severance arrangements and health and benefit plans or agreements between the Ultimate Parent, Parent

114

Guarantor, the Borrower and the other Subsidiaries of the Ultimate Parent and their respective officers, employees or consultants (including management and employee benefit plans or agreements, stock option plans and other compensatory arrangements) in the ordinary course of business,

(g)     payments by the Borrower (and any direct or indirect parent thereof), and the Subsidiaries of the Ultimate Parent pursuant to the Tax Sharing Agreements among the Borrower (and any such parent) and the Subsidiaries of the Borrower to the extent attributable to the ownership or operation of the Borrower and the Subsidiaries of the Ultimate Parent,

(h)     the payment of customary fees and reasonable out of pocket costs to, and indemnities provided on behalf of, directors, managers, consultants, officers and employees of the Borrower (or, to the extent attributable to the ownership of the Borrower by such parent, any direct or indirect parent thereof) and the Subsidiaries of the Borrower in the ordinary course of business,

(i)     the payment of indemnities and reasonable out-of-pocket expenses incurred by the Sponsors and their Affiliates in connection with services provided to the Borrower (or any direct or indirect parent thereof), or any of the Subsidiaries of the Borrower,

(j)     the issuance of Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) to Ultimate Parent, any Permitted Holder or to any director, officer, employee or consultant,

(k)     sales of Receivables Facility Assets in connection with any Permitted Receivables Financing,

(l)     the performance of any and all obligations (including payment obligations) pursuant to the Shared Services Agreement and other ordinary course transactions under the intercompany cash management systems with Specified Affiliates and subleases of property from any Specified Affiliate to the Borrower or any of the Restricted Subsidiaries, or as disclosed in any Budget approved by the Administrative Agent and the Joint Lead Arrangers, and

(m)     transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 9.9 or any amendment thereto to the extent such an amendment (together with any other amendment or supplemental agreements) is not adverse, taken as a whole, to the Lenders in any material respect.

9.10     End of Fiscal Years; Fiscal Quarters.  The Borrower will, for financial reporting purposes, cause (a) each of its, and the Restricted Subsidiaries' fiscal years to end on December 31 of each year (each, a "**Fiscal Year**") and (b) each of its, and the Restricted Subsidiaries', fiscal quarters to end on dates consistent with such fiscal year-end; provided, however, that the Borrower may, upon written notice to the Administrative Agent change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Administrative Agent, in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

9.11     Additional Guarantors and Grantors.  Subject to any applicable limitations set forth in the Guarantee and the Security Documents, the Borrower will cause each direct or indirect Domestic Subsidiary of the Borrower (excluding any Excluded Subsidiary) formed or otherwise purchased or acquired after the Closing Date and each other Domestic Subsidiary of the Borrower that ceases to constitute an Excluded Subsidiary to, within 30 days from the date of such formation, acquisition or cessation, as applicable (or such longer period as the Administrative Agent may agree in its

115

reasonable discretion), (i) become a Guarantor under the Guarantee and a grantor under the Security Agreement pursuant to (A) the DIP Order or (B) if reasonably requested by the Administrative Agent, a supplement to each of the Guarantee and the Security Agreement and (ii) if reasonably requested by the Administrative Agent, execute a joinder to the Intercompany Subordinated Note.

9.12    Pledge of Additional Stock and Evidence of Indebtedness.

(a)    Subject to any applicable limitations set forth in the Security Documents, the Borrower will promptly notify the Administrative Agent in writing of any Stock or Stock Equivalents issued or otherwise purchased or acquired after the Closing Date and of any Indebtedness in excess of $10,000,000 that is owing to the Borrower or any Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.11) incurred (individually or in a series of related transactions) after the Closing Date and, in each case, if reasonably requested by the Administrative Agent, will pledge, and, if applicable, will cause each other Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.11), to pledge to the Collateral Agent for the benefit of the Secured Parties (in each case, excluding Excluded Collateral), (i) all such Stock and Stock Equivalents (other than any Excluded Stock and Stock Equivalents), pursuant to a Pledge Agreement or supplement thereto, and (ii) all evidences of such Indebtedness, pursuant to a Pledge Agreement or supplement thereto.

(b)    The Borrower agrees that, at the reasonable request of the Administrative Agent, all Indebtedness of the Borrower and the Restricted Subsidiaries of the Borrower and that is owing to the Borrower or to any Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.11) shall be evidenced by the Intercompany Subordinated Note.

9.13    [Reserved].

9.14    Further Assurances.

(a)    Subject to the applicable limitations set forth in this Agreement and in the Security Documents, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, and other documents) that may be required under any Applicable Law, or that the Collateral Agent or the Required Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of Parent Guarantor, the Borrower and the other Guarantors; provided, however, that notwithstanding anything to the contrary contained in this Agreement or in any other Credit Document, but without limiting the grant of a Lien on and security interest in the Collateral pursuant to the DIP Order and the Security Documents, the TCEH Debtors will not be obligated to enter into any Mortgage, authorize any fixture filing, enter into any agreement providing "control" as defined in Section 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction) or to undertake any registration in respect of assets subject to a certificate of title.

(b)    [Reserved].

(c)    [Reserved].

(d)    [Reserved].

Americas 91311338

(e)     Notwithstanding anything herein to the contrary, if the Collateral Agent determines (taking into account the existence and effect of the DIP Order) in its reasonable judgment (confirmed in writing to the Borrower and the Administrative Agent) that the cost or other consequences (including adverse tax and accounting consequences) of creating or perfecting any Lien on any property is excessive in relation to the benefits afforded to the Secured Party thereby, then such property may be excluded from the Collateral for all purposes of the Credit Documents.

9.15     Bankruptcy Matters.

(a)     The Borrower shall maintain a cash management system in accordance with the Cash Management Order and the DIP Order.

(b)     The Borrower will deliver to the Administrative Agent, and in the case of clause (ii) of this subsection, to its legal counsel, no later than three (3) Business Days in advance of filing with the Bankruptcy Court, (i) all proposed material orders and pleadings related to the Credit Facilities after the Closing Date and (ii) any Plan filed after the Closing Date (or any other disclosure statements related to any such Plan); provided that the Borrower shall not be required to deliver any such documents provided by the Official Committee of Unsecured Creditors to the extent that any such document is filed under seal and/or subject to reasonable confidentiality and other restrictions prohibiting disclosure to the Administrative Agent, the Lenders and their counsel).

9.16     Ratings.   The Borrower shall use commercially reasonable efforts to obtain ratings (but not any specified rating) for the initial Credit Facilities and each Incremental Facility from each of Moody's and S&P as soon as reasonably practicable after the Closing Date or the date of incurrence of such Incremental Facility, as applicable.

9.17     Use of Proceeds.   Parent Guarantor and the Borrower shall not, and shall not permit any other Credit Party or any other Restricted Subsidiary to:

(a)     use the proceeds of the Credit Facilities or any Letters of Credit issued hereunder for purposes other than those permitted under this Agreement and contained in the DIP Order; and

(b)     use the proceeds of the Credit Facilities or any Letters of Credit issued hereunder for purposes that would violate the provisions of Regulation T, U or X of the Board.

SECTION 10.   Negative Covenants.

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until all Commitments and all Letters of Credit have terminated (unless such Letters of Credit have been collateralized on terms and conditions reasonably satisfactory to the applicable Letter of Credit Issuer following the termination of the Revolving Credit Commitments or the Term Letter of Credit Commitment (and the repayment of the Term L/C Loans), as the case may be) and the Loans and Unpaid Drawings, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Secured Commodity Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreement or Contingent Obligations) are paid in full:

10.1     Limitation on Indebtedness.   The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness.

Notwithstanding the foregoing, the limitations set forth in the immediately preceding paragraph shall not apply to any of the following items:

117

(a)     Indebtedness arising under the Credit Documents (including any Indebtedness incurred pursuant to Section 2.14);

(b)     subject to compliance with Section 10.5, Indebtedness of the Borrower or any Restricted Subsidiary owed to the Borrower or any Restricted Subsidiary; provided that all such Indebtedness of any Credit Party owed to any Person that is not a Credit Party shall be (x) evidenced by the Intercompany Subordinated Note or (y) otherwise be subject to subordination terms substantially identical to the subordination terms set forth in the Intercompany Subordinated Note or otherwise reasonably acceptable to the Administrative Agent;

(c)     Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of construction and restoration activities and in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims);

(d)     subject to compliance with Section 10.5, Guarantee Obligations incurred by (i) Restricted Subsidiaries in respect of Indebtedness of the Borrower or any other Restricted Subsidiary that is permitted to be incurred under this Agreement (except that a Restricted Subsidiary that is not a Credit Party may not, by virtue of this Section (d) guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 10.1) and (ii) the Borrower in respect of Indebtedness of Restricted Subsidiaries that is permitted to be incurred under this Agreement; provided that (A) if the Indebtedness being guaranteed under this Section (d) is subordinated to the Obligations, such Guarantee Obligations shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness, (B) [reserved] and (C) the aggregate amount of Guarantee Obligations incurred by Restricted Subsidiaries that are not Subsidiary Guarantors under this clause (d), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section (j) and Section (o), shall not exceed $200,000,000 at any time outstanding;

(e)     Guarantee Obligations (i) incurred in the ordinary course of business (including in respect of construction or restoration activities) in respect of obligations of (or to) suppliers, customers, franchisees, lessors and licensees or (ii) otherwise constituting Investments permitted by Sections 10.5(d), 10.5(g), 10.5(i), 10.5(q), 10.5(t), 10.5(v) and 10.5(ff); provided that such Investments permitted by Section 10.5(ff) must be in a Subsidiary of the Borrower;

(f)     (i) Indebtedness (including Indebtedness arising under Capital Leases) incurred to finance the purchase price, cost of design, acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of fixed or capital assets or otherwise in respect of Capital Expenditures, so long as such Indebtedness, except in the case of Environmental CapEx or Necessary CapEx, is incurred within 270 days of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of such fixed or capital assets or incurrence of such Capital Expenditure, (ii) Indebtedness arising under Capital Leases entered into in connection with Permitted Sale Leasebacks and (iii) Indebtedness arising under Capital Leases, other than Capital Leases in effect on the Closing Date and Capital Leases entered into pursuant to subclauses (i) and (ii) above; provided, that the aggregate amount of Indebtedness incurred pursuant to this clause (iii) at any time outstanding shall not exceed $400,000,000 and (iv) any modification, replacement, refinancing, refunding, renewal or extension of any Indebtedness specified in subclause (i), (ii) or (iii) above; provided that, except to the extent otherwise expressly permitted hereunder, the principal amount thereof does not exceed the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing,

118

refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension;

(g)     Indebtedness outstanding on the Closing Date listed on Schedule 10.1 and the Prepetition Debt and any modification, replacement, refinancing, refunding, renewal or extension thereof; provided that except to the extent otherwise expressly permitted hereunder, in the case of any such modification, replacement, refinancing, refunding, renewal or extension, (i) the principal amount thereof (including any unused commitments) does not exceed the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension, (ii) the direct and contingent obligors with respect to such Indebtedness are not changed, (iii) no portion of such Indebtedness matures prior to the Stated Maturity of such Indebtedness as in effect as of the Closing Date, and (iv) if the Indebtedness being refinanced, or any guarantee thereof, constituted subordinated Indebtedness, then such replacement or refinancing Indebtedness, or such guarantee, respectively, shall be subordinated to the Obligations to substantially the same extent (it being understood that an Incremental Amendment may provide, without the consent of any other Lender required, for restrictions similar and in addition to those set forth in this Section 10.1(g)(iv) on modification, replacement, refinancing, refunding, renewal or extension of Indebtedness which matures on or after the Maturity Date but on or before the final maturity date for the Incremental Term Loans in such Incremental Amendment);

(h)     Indebtedness in respect of Hedging Agreements; provided that (i) other than in the case of Commodity Hedging Agreements, such Hedging Agreements are not entered into for speculative purposes (as determined by the Borrower in its reasonable discretion acting in good faith) and (ii) any speculative Commodity Hedging Agreements must be entered into in the ordinary course of business and shall be consistent with past practice;

(i)     [reserved];

(j)     (i) Indebtedness of a Person or Indebtedness attaching to assets of a Person that, in either case, becomes a Restricted Subsidiary (or is a Restricted Subsidiary that survives a merger with such Person or any of its Subsidiaries) or Indebtedness attaching to assets that are acquired by the Borrower or any Restricted Subsidiary, in each case after the Closing Date as the result of a Permitted Acquisition; provided that

(x)     such Indebtedness existed at the time such Person became a Restricted Subsidiary or at the time such assets were acquired and, in each case, was not created in anticipation thereof,

(y)     such Indebtedness is not guaranteed in any respect by the Borrower or any Restricted Subsidiary (other than by any such Person that so becomes a Restricted Subsidiary or is the survivor of a merger with such Person or any of its Subsidiaries), and

(z)     (A) the Stock and Stock Equivalents of such Person are pledged to the Collateral Agent to the extent required under Section 9.12 and (B) such Person executes a supplement to each of the Guarantee and the Security Documents (or alternative guarantee and security arrangements in relation to the Obligations reasonably acceptable to the Collateral Agent); provided, further, that the requirements of this subclause (C) shall not apply to any Indebtedness of the type that could have been incurred under Section 10.1(f);

119

(ii)     any modification, replacement, refinancing, refunding, renewal or extension of any Indebtedness specified in subclause (j)(i) above; provided that, except to the extent otherwise expressly permitted hereunder, (x) the principal amount of any such Indebtedness does not exceed the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension, (y) the direct and contingent obligors with respect to such Indebtedness are not changed and (z) if the Indebtedness being refinanced, or any guarantee thereof, constituted subordinated Indebtedness, then such replacement or refinancing Indebtedness, or such guarantee, respectively, shall be subordinated to the Obligations to substantially the same extent; and

(iii)     provided further that the aggregate amount of Indebtedness incurred under this Section (j) (A) shall not exceed $200,000,000 at any time outstanding and (B) by Restricted Subsidiaries that are not Subsidiary Guarantors, when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Sections (d) and (o), shall not exceed $200,000,000 at any time outstanding;

(k)     [reserved].

(l)     Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, in each case provided in the ordinary course of business (including in respect of construction or restoration activities) or consistent with past practice or in respect of coal mine reclamation, including those incurred to secure health, safety and environmental obligations in the ordinary course of business (including in respect of construction or restoration activities) or consistent with past practice;

(m)     (i) Indebtedness incurred in connection with any Permitted Sale Leaseback and (ii) any modification, replacement, refinancing, refunding, renewal or extension of any Indebtedness specified in subclause (l)(i) above; provided that, except to the extent otherwise permitted hereunder, (x) the principal amount of any such Indebtedness is not increased above the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension and (y) the direct and contingent obligors with respect to such Indebtedness are not changed;

(n)     additional Indebtedness; provided that the aggregate amount of Indebtedness incurred and remaining outstanding pursuant to this Section (o) shall not at any time exceed $250,000,000; provided, that the aggregate amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors under this Section (o), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section (d) and (j), shall not exceed $200,000,000 at any time outstanding;

(o)     Indebtedness in respect of the RCT Reclamation Support Carve Out;

(p)     Cash Management Obligations and other Indebtedness in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business;

120

(q)    (i) Indebtedness incurred in the ordinary course of business in respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, including turbines, transformers and similar equipment and (ii) Indebtedness in respect of intercompany obligations of the Borrower or any Restricted Subsidiary with the Borrower or any Restricted Subsidiary of the Borrower in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(r)    Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case entered into in connection with Permitted Acquisitions, other Investments and the Disposition of any business, assets or Stock or Stock Equivalents permitted hereunder;

(s)    Indebtedness of the Borrower or any Restricted Subsidiary consisting of (i) obligations to pay insurance premiums or (ii) take or pay obligations contained in supply agreements, in each case arising in the ordinary course of business (including in respect of construction or restoration activities);

(t)    Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Borrower (or, to the extent such work is done for the Borrower or its Subsidiaries, any direct or indirect parent thereof) and the Restricted Subsidiaries incurred in the ordinary course of business;

(u)    Indebtedness consisting of promissory notes issued by any Credit Party to current or former officers, managers, consultants, directors and employees (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) to finance the purchase or redemption of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) permitted by Section 10.6(b);

(v)    Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions and Permitted Acquisitions or any other Investment permitted hereunder;

(w)    Indebtedness in respect of Permitted Receivables Financings;

(x)    Indebtedness of the Borrower or any Restricted Subsidiary to the Ultimate Parent or any of its other Subsidiaries in the aggregate amount at any time outstanding not in excess of $25,000,000;

(y)    [Reserved]; and

(z)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (x) above.

For purposes of determining compliance with this Section 10.1, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described clauses (a) through (y) above, the Borrower shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Indebtedness (or any portion thereof) and will only be required to include the amount and type of such Indebtedness in one or more of the above paragraph or clauses; provided that all

121

Indebtedness outstanding under the Credit Documents will be deemed at all times to have been incurred in reliance only on the exception in clause (a) of Section 10.1.

        10.2    Limitation on Liens.  The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of the Borrower or such Restricted Subsidiary, whether now owned or hereafter acquired, except:

        (a)    Liens arising under (i) the Credit Documents and/or created pursuant to the DIP Order, in each case securing the Obligations;

        (b)    Liens on the Collateral securing obligations under Secured Cash Management Agreements, Secured Hedging Agreements and Secured Commodity Hedging Agreements; provided that (i) such obligations shall be secured by the Liens granted in favor of the Collateral Agent in the manner set forth in, and be otherwise subject to (and in compliance with), this Agreement and governed by the applicable Security Documents and (ii) such agreements were not entered into for speculative purposes (as determined by the Borrower at the time such agreement was entered into in its reasonable discretion acting in good faith) and, in the case of any Secured Commodity Hedging Agreement or any Secured Hedging Agreement of the type described in clause (c) of the definition of "Hedging Agreement", entered into in order to hedge against or manage fluctuations in the price or availability of any Covered Commodity);

        (c)    Permitted Liens;

        (d)    Liens securing Indebtedness permitted pursuant to Section 10.1(f); provided that (x) except with respect to any Indebtedness incurred in connection with Environmental CapEx or Necessary CapEx, such Liens attach concurrently with or within two hundred and seventy (270) days after completion of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement (as applicable) of the property subject to such Liens and (y) such Liens attach at all times only to the assets so financed except (1) for accessions to the property financed with the proceeds of such Indebtedness and the proceeds and the products thereof and (2) that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

        (e)    Liens existing on the Closing Date; provided that any Lien securing Indebtedness or other obligations in excess of (x) $20,000,000 individually or (y) $100,000,000 in the aggregate (when taken together with all other Liens securing obligations outstanding in reliance on this clause (e) that are not set forth on Schedule 10.2) shall only be permitted to the extent such Lien is listed on Schedule 10.2;

        (f)    the modification, replacement, extension or renewal of any Lien permitted by clauses (a) through (e) and clause (g) of this Section 10.2 upon or in the same assets theretofore subject to such Lien (or upon or in after-acquired property that is affixed or incorporated into the property covered by such Lien or any proceeds or products thereof) or the modification, refunding, refinancing, replacement, extension or renewal (without increase in the amount or change in any direct or contingent obligor except to the extent otherwise permitted hereunder) of the Indebtedness or other obligations secured thereby (including any unused commitments), to the extent such modification, refunding, refinancing, replacement, extension or renewal is permitted by Section 10.1;

        (g)    Liens existing on the assets of any Person that becomes a Restricted Subsidiary (or is a Restricted Subsidiary that survives a merger with such Person or any of its Subsidiaries) pursuant to a Permitted Acquisition or other permitted Investment, or existing on assets acquired after the Closing

Date, to the extent the Liens on such assets secure Indebtedness permitted by <u>Section 10.1(j)</u>; <u>provided</u> that such Liens (i) are not created or incurred in connection with, or in contemplation of, such Person becoming such a Restricted Subsidiary or such assets being acquired and (ii) attach at all times only to the same assets to which such Liens attached (and after-acquired property that is affixed or incorporated into the property covered by such Lien), and secure only the same Indebtedness or obligations that such Liens secured, immediately prior to such Permitted Acquisition and any modification, replacement, refinancing, refunding, renewal or extension thereof permitted by <u>Section 10.1(j)</u>;

(h)     Liens in respect of the RCT Reclamation Support Carve Out;

(i)     Liens securing Indebtedness or other obligations (i) of the Borrower or any Restricted Subsidiary in favor of a Credit Party and (ii) of any other Restricted Subsidiary that is not a Credit Party in favor of any other Restricted Subsidiary that is not a Credit Party;

(j)     Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off);

(k)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to <u>Section 10.5</u> to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction permitted under <u>Section 10.4</u>, in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(l)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business (including in respect of construction or restoration activities) permitted by this Agreement;

(m)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under <u>Section 10.5</u>;

(n)     any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Borrower or any Restricted Subsidiary;

(o)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(p)     Liens solely on any cash earnest money deposits made by the Borrower or any Restricted Subsidiary in connection with any letter of intent or purchase agreement permitted hereunder;

(q)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(r)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances

123

issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods in the ordinary course of business or consistent with past practice;

(s)     [reserved];

(t)     [reserved];

(u)     Liens in respect of Permitted Sale Leasebacks;

(v)     Liens on Receivables Facility Assets in respect of any Permitted Receivables Financing;

(w)     rights reserved to or vested in others to take or receive any part of, or royalties related to, the power, gas, oil, coal, lignite or other minerals or timber generated, developed, manufactured or produced by, or grown on, or acquired with, any property of the Borrower and the Restricted Subsidiaries and Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the obligations to pay all or a part of the expenses of exploration, drilling, mining or development of such property only out of such production or proceeds;

(x)     Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, drilling contracts, injection or repressuring agreements, cycling agreements, construction agreements, shared facilities agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, exploration and development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the exploration, development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of the Borrower and the Restricted Subsidiaries; provided that such agreements are entered into in the ordinary course of business (including in respect of construction or restoration activities);

(y)     any restrictions on any Stock or Stock Equivalents or other joint venture interests of the Borrower or any Restricted Subsidiary providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such Stock or Stock Equivalents or interest of such Person, if a security interest or other Lien is created on such Stock or Stock Equivalents or interest as a result thereof and other similar Liens;

(z)     Rights of first refusal and purchase options in favor of Aluminum Company of America ("**Alcoa**") to purchase Sandow Unit **Error! Bookmark not defined.** and/or the real property related thereto, as described in (i) Sandow Unit **Error! Bookmark not defined.** Agreement dated August 13, 1976, as amended, between Alcoa and Texas Power & Light Company ("**TPL**") and in (ii) Deeds dated March 14, 1978 and July 21, 1980, as amended, executed by Alcoa conveying to TPL the Sandow Unit **Error! Bookmark not defined.** real property;

(aa)     Lien and other exceptions to title, in either case on or in respect of any facilities of the Borrower or any Restricted Subsidiary, arising as a result of any shared facility agreement entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of

124

  
the relevant property in the operation of business the Borrower and the Restricted Subsidiaries, taken as a whole;

(bb)    Liens on cash and Permitted Investments (i) deposited by the Borrower or any Restricted Subsidiary in margin accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by the Borrower or any Restricted Subsidiary with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to:  (A) any contracts and transactions for the purchase, sale, exchange of, or the option (whether physical or financial) to purchase, sell or exchange (1) natural gas, (2) electricity, (3) coal, (4) petroleum-based liquids, (5) oil, (6) nuclear fuel (including enrichment and conversion), (7) emissions or other environmental credits, (8) waste byproducts, (9) weather, (10) power and other generation capacity, (11) heat rate, (12) congestion, (13) renewal energy credit or (14) any other energy-related commodity or services or derivative (including ancillary services and related risk (such as location basis) or weather related risk); (B) any contracts or transactions for the purchase, processing, transmission, transportation, distribution, sale, lease, hedge or storage of, or any other services related to any commodity or service identified in subparts (1) - (14) above, including any capacity agreement; (C) any financial derivative agreement (including but not limited to swaps, options or swaptions) related to any commodity identified in subparts (1) - (14) above, or to any interest rate or currency rate management activities; (D) any agreement for membership or participation in an organization that facilitates or permits the entering into or clearing of any Netting Agreement, any insurance or self-insurance arrangements or any agreement described in this Section 10.2(bb); (E) any agreement combining part or all of a Netting Agreement or part or all of any of the agreements described in this Section 10.2(bb); (F) any document relating to any agreement described in this Section 10.2(bb) that is filed with a Governmental Authority and any related service agreements; or (G) any commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (such agreements described in clauses (A) through (G) of this Section 10.2(bb) being collectively, "**Permitted Contracts**"), Netting Agreements, Hedging Agreements and letters of credit supporting Permitted Contracts, Netting Agreements and Hedging Agreements; and

(cc)    additional Liens, so long as the aggregate amount of obligations secured thereby at any time outstanding does not exceed $200,000,000; provided that (i) any Liens on the Collateral shall (at the Borrower's election) rank *pari passu* or junior (but not senior) to the Liens on the Collateral securing the Obligations and (ii) such Liens on the Collateral shall be subject to appropriate intercreditor arrangements (including enforcement rights) in a manner reasonably satisfactory to the Administrative Agent and the Borrower.

10.3    Limitation on Fundamental Changes.  Except as permitted by Section 10.4 or 10.5, the Borrower will not, and will not permit the Restricted Subsidiaries to, consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise consummate the disposition of, all or substantially all its business units, assets or other properties, except that:

(a)    so long as both before and after giving effect to such transaction, no Payment Default or Event of Default has occurred and is continuing or would result therefrom, any Subsidiary of the Borrower or any other Person may be merged, amalgamated or consolidated with or into the Borrower; provided that the Borrower shall be the continuing or surviving company;

125

(b)     so long as no Payment Default or Event of Default has occurred and is continuing, or would result therefrom, any Subsidiary of the Borrower or any other Person (in each case, other than the Borrower) may be merged, amalgamated or consolidated with or into any one or more Subsidiaries of the Borrower; provided that (i) in the case of any merger, amalgamation or consolidation involving one or more Restricted Subsidiaries, (A) a Restricted Subsidiary shall be the continuing or surviving Person or (B) the Borrower shall cause the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Restricted Subsidiary) to become a Restricted Subsidiary, (ii) in the case of any merger, amalgamation or consolidation involving one or more Guarantors, a Guarantor shall be the continuing or surviving Person or the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Guarantor) shall execute a supplement to the Guarantee and the relevant Security Documents and a joinder to the Intercompany Subordinated Note, each in form and substance reasonably satisfactory to the Administrative Agent in order to become a Guarantor and pledgor, mortgagor and grantor, as applicable, thereunder for the benefit of the Secured Parties and to acknowledge and agree to the terms of the Intercompany Subordinated Note and (iii) the Borrower shall have delivered to the Administrative Agent an officers' certificate stating that such merger, amalgamation or consolidation and any such supplements to the Guarantee and any Security Document preserve the enforceability of the Guarantee and the perfection and priority of the Liens under the applicable Security Documents;

(c)     [reserved];

(d)     any Restricted Subsidiary that is not a Credit Party may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other Restricted Subsidiary;

(e)     the Borrower or any Subsidiary of the Borrower may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to any Credit Party; provided that the consideration for any such disposition by any Person other than a Guarantor shall not exceed the fair value of such assets;

(f)     any Restricted Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Restricted Subsidiary is a Credit Party, any assets or business of such Restricted Subsidiary not otherwise disposed of or transferred in accordance with Section 10.4 or 10.5, or in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Credit Party after giving effect to such liquidation or dissolution; and

(g)     to the extent that no Payment Default or Event of Default has occurred and is continuing or would result from the consummation of such Disposition, the Borrower and the Restricted Subsidiaries may consummate a merger, dissolution, liquidation, consolidation or disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 10.4.

10.4    Limitation on Sale of Assets.  The Borrower will not, and will not permit the Restricted Subsidiaries to, (i) convey, sell, lease, assign, transfer or otherwise consummate the disposition of any of its property, business or assets (including receivables and leasehold interests), whether now owned or hereafter acquired or (ii) consummate the sale to any Person (other than to the Borrower or a Subsidiary Guarantor) any shares owned by it of the Borrower's or any Restricted Subsidiary's Stock and Stock Equivalents (each of the foregoing a "**Disposition**"), except that:

126

(a)      the Borrower and the Restricted Subsidiaries may sell, transfer or otherwise dispose of (i) obsolete, worn-out, scrap, used, or surplus or mothballed equipment (including any such equipment that has been refurbished in contemplation of such disposition), vehicles and other assets to the extent such assets are not necessary for the operation of the Borrower's and the Restricted Subsidiaries' business, (ii) inventory or goods (or other assets) held for sale in the ordinary course of business, (iii) cash and Permitted Investments and (iv) assets for the purposes of charitable contributions or similar gifts to the extent such assets are not material to the ability of the Borrower and the Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b)      the Borrower and the Restricted Subsidiaries may make Dispositions of assets, excluding any Disposition of accounts receivable except in connection with the Disposition of any business to which such accounts receivable relate, for fair value; provided that (i) to the extent required, the Net Cash Proceeds thereof to the Borrower and the Restricted Subsidiaries are promptly applied to the prepayment of Term Loans or Term L/C Loans as provided for in Section 5.2(a), (ii) after giving effect to any such Disposition, no Event of Default shall have occurred and be continuing, (iii) the aggregate consideration for all Dispositions made in reliance on this Section (b), when aggregated with the amount of Permitted Sale Leaseback transactions consummated pursuant to Section (g), shall not exceed at any time 5% of Consolidated Total Assets (determined at the time of each Disposition) for all such transactions consummated after the Closing Date, (iv) with respect to any Disposition pursuant to this clause (b) for a purchase price in excess of $50,000,000, the Person making such Disposition shall receive not less than 75% of such consideration in the form of cash or Permitted Investments; provided that for the purposes of this subclause (iv) and Section (g) the following shall be deemed to be cash ("**Deemed Cash**"):  (A) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms (1) subordinated to the payment in cash of the Obligations or (2) not secured by the assets that are the subject of such Disposition, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by the Person making such Disposition from the purchaser that are converted by such Person into cash (to the extent of the cash received) within 180 days following the closing of the applicable Disposition, (C) any Designated Non-Cash Consideration received by the Person making such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this Section (b) that is at that time outstanding, not in excess of 1.5% of Consolidated Total Assets at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, and (v) any non-cash proceeds received in the form of Real Estate, Indebtedness or Stock and Stock Equivalents are pledged to the Collateral Agent to the extent required under Section 9.12 or 9.14;

(c)      (i) the Borrower and the Restricted Subsidiaries may make Dispositions to the Borrower or any other Credit Party and (ii) any Restricted Subsidiary that is not a Credit Party may make Dispositions to the Borrower or any other Subsidiary of the Borrower; provided that with respect to any such Dispositions, such sale, transfer or disposition shall be for fair value;

(d)      the Borrower and any Restricted Subsidiary may effect any transaction permitted by Section 10.2, 10.3, 10.5 or 10.6;

(e)      the Borrower and any Restricted Subsidiary may lease, sublease, license (only on a non-exclusive basis with respect to any intellectual property) or sublicense (only on a non-exclusive

basis with respect to any intellectual property) real, personal or intellectual property in the ordinary course of business;

(f)     Dispositions of property (including like-kind exchanges) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are applied to the purchase price of such replacement property, in each case under Section 1031 of the Code or otherwise;

(g)     Dispositions pursuant to Permitted Sale Leaseback transactions in an aggregate amount pursuant to this Section (g), when aggregated with the amount of Dispositions made pursuant to Section (b), not to exceed the limitations set forth in Section (b).

(h)     Dispositions of (i) Investments in joint ventures (regardless of the form of legal entity) to the extent required by, or made pursuant to, customary buy/sell arrangements or put/call arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements or (ii) to joint ventures in connection with the dissolution or termination of a joint venture to the extent required pursuant to joint venture and similar arrangements;

(i)     Dispositions of Receivables Facility Assets in connection with any Permitted Receivables Financing; provided that to the extent that any new Participating Receivables Grantor is added to any Permitted Receivables Financing after the Closing Date, the Net Cash Proceeds of any Dispositions of Receivables Facility Assets by such new Participating Receivables Grantor must be promptly applied to the prepayment of Loans as provided for in Section 5.2(a) without giving effect to any reinvestment rights under the definition of "Net Cash Proceeds"; provided, further, that no Net Cash Proceeds shall be required to be used to prepay the Loans pursuant to Section 5.2(a) to the extent that any new Participating Receivables Grantor replaces (by merger or otherwise) any existing Participating Receivables Grantor and at the time of such replacement, the volume of Receivables Facility Assets sold into any Permitted Receivables Financing does not increase as a result of such replacement;

(j)     Dispositions listed on Schedule 10.4;

(k)     transfers of property subject to a Recovery Event or in connection with any condemnation proceeding upon receipt of the Net Cash Proceeds of such Recovery Event or condemnation proceeding;

(l)     Dispositions of accounts receivable in connection with the collection or compromise thereof;

(m)     the Borrower and the Restricted Subsidiaries may make Dispositions (excluding any Disposition of accounts receivable except in connection with the Disposition of any business to which such accounts receivable relate), for fair value to the extent that (i) the aggregate consideration for all such Dispositions consummated after the Closing Date, when combined with all Dispositions made pursuant to Section (b), does not exceed 7.5% of Consolidated Total Assets (determined at the time of each Disposition), (ii) the Net Cash Proceeds of any such Disposition are promptly applied to the prepayment of Loans as provided in Section 5.2(a) without giving effect to any reinvestment rights under the definition of "Net Cash Proceeds"; provided that, in the case of a Disposition of a Baseload Asset pursuant to this Section (m), the Borrower shall be permitted to reinvest the Net Cash Proceeds received in such Disposition in other Baseload Assets within the reinvestment periods set forth in the definition of "Net Cash Proceeds", (iii) after giving effect to any such Disposition, no Event of Default shall have occurred and be continuing, (iv) with respect to any Disposition pursuant to this Section (m) for a purchase price in excess of $50,000,000, the Person making such Disposition shall, subject to the

128

parenthetical below, receive not less than 75% of such consideration in the form of cash or Permitted Investments (or, to the extent that less than 75% of such consideration is in the form of cash or Permitted Investments, the Borrower shall apply the amount of such difference to the prepayment of Loans as provided in clause (ii) above); provided that for the purposes of this subclause (iv), Deemed Cash shall be deemed to be cash and (v) any non-cash proceeds received in the form of Real Estate, Indebtedness or Stock and Stock Equivalents are pledged to the Collateral Agent to the extent required under Section 9.12 or 9.14;

(n)    [reserved];

(o)    Dispositions of power, capacity, heat rate, renewable energy credits, waste by-products, energy, electricity, coal and lignite, oil and other petroleum-based liquids, emissions and other environmental credits, ancillary services, fuel (including all forms of nuclear fuel and natural gas) and other related assets or products of services, including assets related to trading activities or the sale of inventory or contracts related to any of the foregoing, in each case in the ordinary course of business;

(p)    the execution of (or amendment to), settlement of or unwinding of any Hedging Agreement;

(q)    any Disposition of mineral rights, other than mineral rights in respect of coal or lignite;

(r)    any Disposition of any real property that is (i) primarily used or intended to be used for mining which has either been reclaimed, or has not been used for mining in a manner which requires reclamation, and in either case has been determined by the Borrower not to be necessary for use for mining, (ii) used as buffer land, but no longer serves such purpose, or its use is restricted such that it will continue to be buffer land, or (iii) was acquired in connection with power generation facilities, but has been determined by the Borrower to no longer be commercially suitable for such purpose;

(s)    any Disposition of any assets required by any Governmental Authority;

(t)    any Disposition of assets in connection with salvage activities;

(u)    any Disposition of assets pursuant to any First Day Orders, the DIP Order or the order governing de minimis asset dispositions, in each case to the extent approved by the Joint Lead Arrangers;

(v)    Dispositions of any asset between or among the Borrower and/or any Restricted Subsidiary as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (t) above; provided that after giving effect to any such Disposition, to the extent the assets subject to such Dispositions constituted Collateral, such assets shall remain subject to, or be rejoined to, the Lien of the Security Documents;

(w)    the surrender or waiver of contractual rights and settlement or waiver of contractual or litigation claims; and

(x)    Dispositions of any assets (including Stock and Stock Equivalents) acquired in connection with any Permitted Acquisition or other Investment not prohibited hereunder, which assets are not used or useful to the core or principal business of the Borrower and its Restricted Subsidiaries.

Americas 91311338

10.5    Limitation on Investments.  The Borrower will not, and will not permit the Restricted Subsidiaries, to make any Investment except, subject to the Cash Management Order, the Tax Order, the Wages Order and any other orders of the Bankruptcy Court:

(a)    extensions of trade credit, asset purchases (including purchases of inventory, fuel (including all forms of nuclear fuel), supplies, materials and equipment) and the licensing or contribution of intellectual property pursuant to joint marketing arrangements or development agreements with other Persons, in each case in the ordinary course of business (including in respect of construction or restoration activities);

(b)    Investments that were Permitted Investments when such Investments were made;

(c)    loans and advances to officers, directors, employees and consultants of the Borrower (or any direct or indirect parent thereof) or any Subsidiary of the Borrower (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances), (ii) in connection with such Person's purchase of Stock or Stock Equivalents of the Ultimate Parent (or any direct or indirect parent thereof; provided that, to the extent such loans and advances are made in cash, the amount of such loans and advances used to acquire such Stock or Stock Equivalents shall be contributed to the Borrower in cash) and (iii) for purposes not described in the foregoing subclauses (i) and (ii); provided that the aggregate principal amount outstanding pursuant to subclause (iii) shall not exceed $25,000,000 at any one time outstanding;

(d)    Investments (i) existing on, or made pursuant to legally binding written commitments in existence on, the Closing Date as set forth on Schedule 10.5 and any modifications, extensions, renewals or reinvestments thereof and (ii) existing on the Closing Date of the Borrower or any Restricted Subsidiary in the Borrower or any Subsidiary of the Borrower and any modification, extension, renewal or reinvestment thereof, only to the extent that the amount of any Investment made pursuant to this clause (d) does not at any time exceed the amount of such Investment set forth on Schedule 10.5;

(e)    Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business or upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(f)    Investments to the extent that payment for such Investments is made with (i) Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) or (ii) the proceeds from the issuance of Stock or Stock Equivalents (other than Disqualified Stock, any Cure Amount or other proceeds which increase the Applicable Equity Amount) of the Borrower (or any direct or indirect parent thereof);

(g)    Investments (i) (A) by the Borrower or any Restricted Subsidiary in any Credit Party, (B) between or among Restricted Subsidiaries that are not Credit Parties, and (C) consisting of intercompany Investments incurred in the ordinary course of business in connection with the cash management operations (including with respect to intercompany self-insurance arrangements) among the Borrower and the Restricted Subsidiaries (provided that any such intercompany Investment in connection with cash management arrangements by a Credit Party in a Subsidiary of the Borrower that is not a Credit Party is in the form of an intercompany loan or advance and the Borrower or such Restricted Subsidiary complies with Section 9.12 to the extent applicable, and subject in each case to the Cash Management Orders); (ii) by Credit Parties in any Restricted Subsidiary that is not a Credit Party, to the extent that the aggregate amount of all Investments made on or after the Closing Date pursuant to this subclause (ii), when valued at the fair market value (determined by the Borrower acting in good faith) of each such

130

Investment at the time each such Investment was made, is not in excess of, when combined with, and without duplication, the aggregate amount of Investments made pursuant to the proviso to <u>Section (h)</u> an amount equal to the sum of (w) $200,000,000 <u>plus</u> (x) the Applicable Equity Amount at such time <u>plus</u> (y) if no Event of Default has occurred and is continuing at the time the Investment is first made, the Applicable Amount at such time <u>plus</u> (z) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment (which amount referred to in this <u>subclause (z)</u> shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made) (subject in each case to the Cash Management Order); and (iii) by Credit Parties in any Restricted Subsidiary that is not a Credit Party so long as such Investment is part of a series of simultaneous Investments by Restricted Subsidiaries in other Restricted Subsidiaries that result in the proceeds of the initial Investment being invested in one or more Credit Parties;

(h)     Investments constituting Permitted Acquisitions; <u>provided</u> that the aggregate amount of any such Investment, as valued at the fair market value (determined by the Borrower acting in good faith) of such Investment at the time each such Investment is made, made by the Borrower or any Subsidiary Guarantor in any Restricted Subsidiary that, after giving effect to such Investment, shall not be a Guarantor, shall not cause the aggregate amount of all such Investments made pursuant to this <u>clause (h)</u> (as so valued at the time each such investment is made) to exceed, when combined with, and without duplication of, the aggregate amount of Investments made pursuant to clause (ii) of <u>Section (g)</u>, an amount equal to the sum of (i) $200,000,000 <u>plus</u> (ii) the Applicable Equity Amount at such time <u>plus</u> (iii) if no Event of Default has occurred and is continuing at the time such Investment is first made, the Applicable Amount at such time <u>plus</u> (iv) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment (which amount referred to in this <u>clause (iv)</u> shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made);

(i)     Investments (including but not limited to (i) Minority Investments and Investments in Unrestricted Subsidiaries, (ii) Investments in joint ventures (regardless of the form of legal entity) or similar Persons that do not constitute Restricted Subsidiaries and (iii) Investments in Subsidiaries that are not Credit Parties), in each case valued at the fair market value (determined the Borrower acting in good faith) of such Investment at the time each such Investment is made, in an aggregate amount pursuant to this <u>clause (i)</u> that, at the time each such Investment is made, would not exceed the sum of (w) $500,000,000 <u>plus</u> (x) the Applicable Equity Amount at such time <u>plus</u> (y) if no Event of Default has occurred and is continuing at the time such Investment is first made, the Applicable Amount at such time <u>plus</u> (z) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment (which amount referred to in this <u>subclause (z)</u> shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made);

(j)     Investments constituting non-cash proceeds of Dispositions of assets to the extent permitted by <u>Section 10.4</u>;

(k)     Investments made to repurchase or retire Stock or Stock Equivalents of the Borrower or any direct or indirect parent thereof owned by any employee or any stock ownership plan or key employee stock ownership plan of the Borrower (or any direct or indirect parent thereof) in an

aggregate amount, when combined with distributions made pursuant to <u>Section 10.6(b)</u>, not to exceed the limitations set forth in such Section;

(l)  Investments consisting of dividends or other payments permitted under <u>Section 10.6;</u>

(m)  loans and advances to any direct or indirect parent of the Borrower in lieu of, and not in excess of the amount of, dividends or other payments to the extent permitted to be made to such parent in accordance with <u>Section 10.6</u>; <u>provided</u> that the aggregate amount of such loans and advances shall reduce the ability of the Borrower and the Restricted Subsidiaries to make dividends under the applicable clauses of <u>Section 10.6</u> by such amount;

(n)  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(o)  Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(p)  advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(q)  Guarantee Obligations of the Borrower or any Restricted Subsidiary of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(r)  Investments held by a Person acquired (including by way of merger, amalgamation or consolidation) after the Closing Date otherwise in accordance with this <u>Section 10.5</u> to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(s)  Investments in Hedging Agreements permitted by <u>Section 10.1</u>;

(t)  Investments arising out of, or in connection with, any Permitted Receivables Financing;

(u)  Investments consisting of deposits of cash and Permitted Investments as collateral support permitted under <u>Section 10.2</u>;

(v)  other Investments, which, when aggregated with (i) all aggregate principal amounts paid pursuant to <u>Section 10.7(ii)</u> from the Closing Date and (ii) all loans and advances made to any direct or indirect parent of the Borrower pursuant to <u>Section (m)</u> in lieu of dividends permitted by <u>Section 10.6(c)</u> and (iii) all dividends paid pursuant to <u>Section 10.6(c)</u>, shall not exceed an amount equal to (w) $500,000,000 <u>plus</u> (x) the Applicable Equity Amount at the time such Investments are made <u>plus</u> (y) if no Event of Default has occurred and is continuing at the time such Investment is first made, the Applicable Amount at such time <u>plus</u> (z) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such

132

Investment (which amount referred to in this <u>subclause (z)</u> shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made);

(w)    to the extent constituting Investments, transactions pursuant to the Shared Services Agreement, transactions pursuant to the Tax Sharing Agreements permitted under Section 10.6(d)(i) or transactions disclosed in any Budget approved by Administrative Agent and the Joint Lead Arrangers;

(x)    Investments consisting of purchases and acquisitions of assets and services in the ordinary course of business (including in respect of construction or restoration activities);

(y)    Investments in the ordinary course of business consisting of Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practice;

(z)    to the extent constituting Investments, any payments made or obligations acquired pursuant to the Wages Order;

(aa)    Investments consisting of Indebtedness permitted by Section 10.1 (but only to the extent such Indebtedness was permitted without reference to Section 10.5) or fundamental changes permitted by Section 10.3;

(bb)    Investments relating to pension trusts;

(cc)    Investments by Credit Parties in any Restricted Subsidiary that is not a Credit Party so long as such Investment is part of a series of simultaneous Investments by the Borrower and the Restricted Subsidiaries in other Restricted Subsidiaries that result in the proceeds of the intercompany Investment being invested in one or more Credit Parties;

(dd)    Investments relating to nuclear decommission trusts and nuclear insurance and self-insurance organizations or arrangements;

(ee)    Investments in the form of, or pursuant to, operating agreements, working interests, royalty interests, mineral leases, processing agreements, farm-out agreements, contracts for the sale, transportation or exchange of oil and natural gas or other fuel or commodities, unitization agreements, pooling agreements, area of mutual interest agreements, production sharing agreements or other similar or customary agreements, transactions, properties, interests or arrangements, and Investments and expenditures in connection therewith or pursuant thereto, in each case, made or entered into in the ordinary course of business; and

(ff)    Investments in (A) wind or other renewable energy projects, (B) any nuclear power or energy joint venture, or (C) assets comprising (or a Person owning) an electric generating facility or unit, in an aggregate amount not to exceed $500,000,000 at any time outstanding.

Notwithstanding anything to the contrary contained in this Agreement, the Borrower and the Restricted Subsidiaries may not rely on clause (g), (h), (i) or (j) of this Section 10.5 to directly or indirectly make an Investment of all or any portion of one or more Baseload Generation Assets.

10.6    <u>Limitation on Dividends</u>.  The Borrower will not declare or pay any dividends (other than dividends payable solely in its Stock or Stock Equivalents (other than Disqualified Stock)) or return any capital to its stockholders or make any other distribution, payment or delivery of property or

133

cash to its stockholders as such, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for consideration, any shares of any class of its Stock or Stock Equivalents or the Stock or Stock Equivalents of any direct or indirect parent now or hereafter outstanding, or set aside any funds for any of the foregoing purposes, or permit any Restricted Subsidiary to purchase or otherwise acquire for consideration (other than in connection with an Investment permitted by Section 10.5) any Stock or Stock Equivalents of the Borrower now or hereafter outstanding (all of the foregoing, "dividends"), provided, subject to the Cash Management Order, the Tax Order and the Wages Order:

      (a)    the Borrower may (or may pay dividends to permit any direct or indirect parent thereof to) redeem in whole or in part any of its Stock or Stock Equivalents for another class of its (or such parent's) Stock or Stock Equivalents or with proceeds from substantially concurrent equity contributions or issuances of new Stock or Stock Equivalents; provided that (i) such new Stock or Stock Equivalents contain terms and provisions at least as advantageous to the Lenders, taken as a whole, in all respects material to their interests as those contained in the Stock or Stock Equivalents redeemed thereby and (ii) the cash proceeds from any such contribution or issuance have not otherwise been applied pursuant to the Applicable Equity Amount;

      (b)    so long as no Payment Default or Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may (or may pay dividends to permit any direct or indirect parent thereof to) redeem, acquire, retire or repurchase shares of its (or such parent's) Stock or Stock Equivalents held by any present or former officer, manager, consultant, director or employee (or their respective Affiliates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any direct or indirect parent thereof) and any Subsidiaries, so long as such repurchase is pursuant to, and in accordance with the terms of, any stock option or stock appreciation rights plan, any management, director and/or employee benefit, stock ownership or option plan, stock subscription plan or agreement, employment termination agreement or any employment agreements or stockholders' or shareholders' agreement; provided, however, that the aggregate amount of payments made under this Section (b) do not exceed in any calendar year $25,000,000 (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $50,000,000 in any calendar year); provided, further, that such amount in any calendar year may be increased by an amount not to exceed:

      (i)    the cash proceeds from the sale of Stock (other than Disqualified Stock) of the Borrower and, to the extent contributed to the Borrower, Stock of any of the Borrower's direct or indirect parent companies, in each case to present or former officers, managers, consultants, directors or employees (or their respective Affiliates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any of its direct or indirect parent companies) or any Subsidiary of the Borrower that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Stock have not otherwise been applied pursuant to the Applicable Equity Amount; plus

      (ii)    the cash proceeds of key man life insurance policies received the Borrower or any Restricted Subsidiary after the Closing Date; less

      (iii)    the amount of any dividends or distributions previously made with the cash proceeds described in clauses (i) and (ii) above;

and provided, further, that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from present or former officers, managers, consultants, directors or employees (or their

134

respective Affiliates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any of its direct or indirect parent companies), or any Subsidiary of the Borrower in connection with a repurchase of Stock or Stock Equivalents of the Borrower or any of its direct or indirect parent companies will not be deemed to constitute a dividend for purposes of this covenant or any other provision of this Agreement;

(c)     so long as no Payment Default or Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may pay dividends on its Stock or Stock Equivalents; provided that the amount of all such dividends paid from the Closing Date pursuant to this clause (c), when aggregated with (A) all loans and advances made to any direct or indirect parent of the Borrower pursuant to Section 10.5(m) in lieu of dividends permitted by this clause (c) and (B) all Investments made pursuant to Section 10.5(v), shall not exceed an amount equal to (x) $0 plus (y) the Applicable Equity Amount at the time such dividends are paid;

(d)     the Borrower may make dividends, distributions or loans to any direct or indirect parent company of the Borrower in amount required for any such direct or indirect parent to pay, in each case without duplication:

(i)     foreign, federal, state and local income taxes, to the extent such income taxes are attributable to the income of the Borrower and its Subsidiaries; provided that the amount of such payments in any fiscal year does not exceed the amount that the Ultimate Parent and its Subsidiaries are required to pay in respect of foreign, federal, state and local income taxes attributable to the income of the Borrower and its Subsidiaries for such fiscal year;

(ii)     (A) such parents' and their respective Subsidiaries' (other than the Oncor Subsidiaries) general operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business and to the extent such costs and expenses are attributable to the ownership or operation of the Borrower and its Subsidiaries, (B) any reasonable and customary indemnification claims made by directors or officers of the Borrower (or any parent thereof and such parent's Subsidiaries (other than the Oncor Subsidiaries) to the extent such claims are attributable to the ownership or operation of the Borrower and its Subsidiaries) or any Restricted Subsidiary or (C) fees and expenses otherwise due and payable by the Borrower (or any parent thereof and such parent's Subsidiaries (other than the Oncor Subsidiaries) to the extent such fees and expenses are attributable to the ownership or operation of the Borrower and its Subsidiaries) or any Restricted Subsidiary and not prohibited to be paid by the Borrower and its Restricted Subsidiaries hereunder;

(iii)     franchise and excise taxes and other fees, taxes and expenses required to maintain the corporate existence of any direct or indirect parent of the Borrower;

(iv)     to any direct or indirect parent of the Borrower to finance any Investment permitted to be made by the Borrower or any Restricted Subsidiary pursuant to Section 10.5; provided that (A) such dividend shall be made substantially concurrently with the closing of such Investment, (B) such parent shall, immediately following the closing thereof, cause (1) all property acquired (whether assets, Stock or Stock Equivalents) to be contributed to the Borrower or such Restricted Subsidiary or (2) the merger (to the extent permitted in Section 10.5) of the Person formed or acquired into the Borrower or any Restricted Subsidiary, (C) the Borrower shall comply with Section 9.11 and Section 9.12 to the extent applicable and (D) the aggregate amount

135

of such dividends shall reduce the ability of the Borrower and the Restricted Subsidiary to make Investments under the applicable clauses of <u>Section 10.5</u> by such amount;

      (v)     customary costs, fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering or acquisition or disposition transaction payable by the Borrower or the Restricted Subsidiaries; and

      (vi)    customary salary, bonus and other benefits payable to officers, employees or consultants of any direct or indirect parent company (and such parent's Subsidiaries (other than the Oncor Subsidiaries)) of the Borrower to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and its Subsidiaries;

      (e)    to the extent (if any) constituting dividends, transactions pursuant to the Shared Services Agreement or described in any Budget approved by the Administrative Agent and the Joint Lead Arrangers;

      (f)    to the extent constituting dividends, the Borrower may enter into and consummate transactions expressly permitted by any provision of <u>Section 10.3</u>;

      (g)    the Borrower may repurchase Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) deemed to occur upon exercise of stock options or warrants if such Stock or Stock Equivalents represents a portion of the exercise price of such options or warrants, and the Borrower may pay dividends to any direct or indirect parent thereof as and when necessary to enable such parent to effect such repurchases;

      (h)    the Borrower may (i) pay cash in lieu of fractional shares in connection with any dividend, split or combination thereof or any Permitted Acquisition and (ii) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

      (i)    the Borrower may pay any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

      (j)    [reserved];

      (k)    the Borrower may pay dividends in an amount equal to withholding or similar Taxes payable or expected to be payable by any present or former employee, director, manager or consultant (or their respective Affiliates, estates or immediate family members) and any repurchases of Stock or Stock Equivalents in consideration of such payments including deemed repurchases in connection with the exercise of stock options;

      (l)    [reserved];

      (m)    the Borrower may make payments described in <u>Sections 9.9(a)</u>, <u>9.9(c)</u>, <u>9.9(f)</u>, <u>9.9(g)</u>, <u>9.9(h)</u>, <u>9.9(i)</u>, <u>9.9(k)</u>, <u>9.9(l)</u> and <u>10.5(z)</u>;

      (n)    the Borrower may pay dividends or make distributions in connection with the Transactions, including payments in respect of the Ultimate Parent's and its Subsidiaries' long term incentive plan or in respect of tax gross-ups and other deferred compensation;

(o)     [reserved];

(p)     the Borrower may make distributions or payments of Receivables Fees;

(q)     [reserved];

(r)     [reserved];

(s)     the Borrower may make distributions of, or Investments in, Receivables Facility Assets for purposes of inclusion in any Permitted Receivables Financing, in each case made in the ordinary course of business or consistent with past practices;

(t)     the Borrower may make distributions, loans or other advances to Parent Guarantor, in an amount not to exceed $125,000,000 in the aggregate for all such distributions, loans or other advances made from the Closing Date solely to the extent that the proceeds of such distributions, loans or other advances are used by Parent Guarantor to satisfy payment obligations (including, without limitation, payment of principal, interest and any make-whole, prepayment or similar fees) owed by Parent Guarantor under (i) the Tex-La Indebtedness and (ii) the CT Lease Indebtedness; provided that no such distribution, loan or other advance shall be permitted pursuant to this clause (ii) unless (x) the Borrower or the Restricted Subsidiary, as applicable, that is the lessee under the applicable CT Lease retains its leasehold interest in respect of such CT Lease or (y) the assets subject to such CT Lease are contributed to the Borrower or a Restricted Subsidiary; and

(u)     the Borrower may make loans to, or permit letters of credit (including Letters of Credit) to be issued on behalf of, any of its direct or indirect parent companies or such parents' Subsidiaries for working capital purposes or the cost of maintaining the headquarters building at Energy Plaza, in each case so long as made in the ordinary course of business and consistent with past practices and in an amount not to exceed $50,000,000.

Notwithstanding anything to the contrary contained in Section 10 (including Section 10.5 and this Section 10.6), the Borrower will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on or in respect of the Borrower's Stock or Stock Equivalents or purchase or otherwise acquire for cash any Stock or Stock Equivalents of the Borrower or any direct or indirect parent of the Borrower, for the purpose of paying any cash dividend or making any cash distribution to, or acquiring any Stock or Stock Equivalents of the Borrower or any direct or indirect parent of the Borrower for cash from the Permitted Holders, or guarantee any Indebtedness of any Affiliate of the Borrower for the purpose of paying such dividend, making such distribution or so acquiring such Stock or Stock Equivalents to or from the Permitted Holders, in each case by means of utilization of the cumulative dividend and investment credit provided by the use of the Applicable Amount or the exceptions provided by Sections 10.5(i), (m) and (v), and Section 10.7(ii), unless at the time and after giving effect to such payment, no Event of Default has occurred and is continuing.

10.7     Limitation on Prepaying Indebtedness.  Except as permitted by the terms and conditions set forth in the Plan, the Final Cash Collateral Order, the First Day Orders, the DIP Order or as specifically permitted hereunder, Borrower shall not, and shall not permit the Restricted Subsidiaries to, make any payment or transfer with respect to any Indebtedness incurred or arising prior to the filing of the Cases, whether by way of "adequate protection" under the Bankruptcy Code or otherwise (in each case, other than any (i) to the extent permitted under the Hedging and Trading Order, payments under any financial or physical trading transaction, including commodities transactions and any payments under any Hedging Agreements, and (ii) payments in an aggregate amount not to exceed the sum of (A) $200,000,000 and (B) the Applicable Amount).

137

10.8    <u>Limitations on Sale Leasebacks</u>.  The Borrower will not, and will not permit the Restricted Subsidiaries to, enter into or effect any Sale Leasebacks after the Closing Date, other than Permitted Sale Leasebacks.

10.9    <u>Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio</u>.  If on the last day of any Test Period (commencing with the Test Period ending [•][10]) the sum of (i) the aggregate principal amount of all Revolving Credit Loans then outstanding plus (ii) the aggregate Stated Amount of all then outstanding Revolving Letters of Credit plus the aggregate amount of Unpaid Drawings with respect to all then outstanding Revolving Letters of Credit, but in each case, excluding (a) cash collateralized or backstopped Revolving Letters of Credit and (b) up to $100,000,000 of undrawn Revolving Letters of Credit, exceeds 30% of the Total Revolving Credit Commitment then in effect (after including any New Revolving Credit Commitments then in effect), the Borrower will not permit the Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio for any such Test Period to be greater than 4.25 to 1.00; it being understood and agreed that such financial covenant shall only be in effect during such period.

10.10    <u>Changes in Business</u>.  The Borrower and the Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by the Borrower and the Restricted Subsidiaries, taken as a whole, on the Closing Date and other business activities which are extensions thereof or otherwise incidental, corollary, synergistic, reasonably related or ancillary to any of the foregoing except as required by the Bankruptcy Code or pursuant to the DIP Order.

10.11    <u>Bankruptcy Provisions.</u>

(a)    Parent Guarantor and the Borrower shall not, and shall not permit any other Credit Party or any other Restricted Subsidiary to create or permit to exist any other Superpriority Claim (other than the Carve Out, the RCT Reclamation Support Carve Out or the Obligations) or any "claim" (as such word is defined in the Bankruptcy Code) that is pari passu with or senior to the claims of the Secured Parties or any Lien that is pari passu with or senior to the liens of the Secured Parties in any of the Cases except (A) with the prior written consent of the Administrative Agent or (B) to the extent such Lien constitutes a Lien not prohibited by this Agreement securing Indebtedness or obligations not prohibited by this Agreement.

(b)    Parent Guarantor and the Borrower shall not, and shall not permit any other Credit Party or any other Restricted Subsidiary to, at any time, seek or affirmatively consent to any reversal, modification, amendment, stay, vacation or termination of any First Day Order, if such reversal, modification, amendment, stay or vacation would have a materially adverse effect on the rights of the Secured Parties under this Agreement.

10.12    <u>Affiliate Value Transfers</u>.  The Borrower will not, and will not permit the Restricted Subsidiaries to, make any Affiliate Value Transfers in an aggregate amount in excess of $50,000,000 for all such Affiliate Value Transfers outstanding at any one time.

SECTION 11.    <u>Events of Default.</u>

Upon the occurrence of any of the following specified events (each an "**Event of Default**"):

---

[10] <u>NTD</u>: To insert last day of first full fiscal quarter after the Closing Date.

138

11.1 <u>Payments</u>. The Borrower shall (a) default in the payment when due of any principal of the Loans or any Unpaid Drawings or (b) default, and such default shall continue for five or more days, in the payment when due of any interest on the Loans or any Fees or any other amounts owing hereunder or under any other Credit Document; or

11.2 <u>Representations, Etc.</u> Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

11.3 <u>Covenants</u>. Any Credit Party shall:

(a) default in the due performance or observance by it of any term, covenant or agreement contained in <u>Section 9.1(e)</u>, <u>Section 9.5</u> (solely with respect to the Borrower), <u>Section 9.15</u> or <u>Section 10</u>; <u>provided</u> that an Event of Default under <u>Section 10.9</u> shall not constitute an Event of Default for purposes of any Term Loan or Term L/C Loan, or result in the availability of any remedies for the Term Loan Lenders or Term L/C Loan Lender, unless and until the Required Revolving Credit Lenders have actually declared all Revolving Credit Loans and all related Obligations to be immediately due and payable in accordance with this Agreement and such declaration has not been rescinded on or before the date the Required Term Loan Lenders or the Required Term L/C Loan Lenders declare an Event of Default with respect to <u>Section 10.9</u>; or

(b) default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in <u>Section 11.1</u> or <u>11.2</u> or clause (a) of this <u>Section 11.3</u>) contained in this Agreement or any other Credit Document and such default shall continue unremedied for a period of at least 30 days after receipt of written notice by the Borrower from the Administrative Agent or the Required Lenders; or

11.4 <u>Default Under Other Agreements</u>. (a) The Borrower or any Restricted Subsidiary shall (i) default in any payment with respect to any Indebtedness incurred after the Petition Date (other than any Indebtedness described in <u>Section 11.1</u>, Hedging Obligations or Indebtedness under any Permitted Receivables Financing) in excess of $150,000,000 in the aggregate for the Borrower and such Restricted Subsidiaries, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than any agreement or condition relating to, or provided in any instrument or agreement, under which such Hedging Obligations or such Permitted Receivables Financing was created), in each case, after giving effect to any applicable period of grace, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or (b) without limiting the provisions of clause (a) above, any such Indebtedness shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment (other than any Hedging Obligations or Indebtedness under any Permitted Receivables Financing) or as a mandatory prepayment, prior to the stated maturity thereof; <u>provided</u> that this clause (b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; <u>provided further</u> that this <u>Section 11.4</u> shall not apply to (i) any Indebtedness if the sole remedy of the holder thereof following

139

such event or condition is to elect to convert such Indebtedness into Stock or Stock Equivalents (other than Disqualified Stock) and cash in lieu of fractional shares or (ii) any such default that is remedied by or waived (including in the form of amendment) by the requisite holders of the applicable item of Indebtedness in either case, prior to acceleration of all the Loans pursuant to this Section 11; or

11.5     [Reserved].

11.6     ERISA. (a) Any Benefit Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code; any Benefit Plan is or shall have been terminated or is the subject of termination proceedings under ERISA (including the giving of written notice thereof); an event shall have occurred or a condition shall exist in either case entitling the PBGC to terminate any Benefit Plan or to appoint a trustee to administer any Benefit Plan (including the giving of written notice thereof); any Benefit Plan shall have an accumulated funding deficiency (whether or not waived); the Borrower or any ERISA Affiliate has incurred or is likely to incur a liability to or on account of a Benefit Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code (including the giving of written notice thereof); (b) there could result from any event or events set forth in clause (a) of this Section 11.6 the imposition of a Lien, the granting of a security interest, or a liability, or the reasonable likelihood of incurring a Lien, security interest or liability; and (c) such Lien, security interest or liability will or would be reasonably likely to have a Material Adverse Effect; or

11.7     Credit Documents. Any Credit Document or any material provision thereof shall cease to be in full force and effect (other than pursuant to the terms hereof or thereof); or

11.8     [Reserved].

11.9     [Reserved].

11.10     [Reserved].

11.11     Judgments.  Any single judgment in excess of $150,000,000 as to any post-petition obligation, or any judgments that are in the aggregate in excess of $250,000,000 as to any one or more post-petition obligations, shall be rendered against the TCEH Debtors or any other Credit Party and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants, in each case, to the extent not paid or covered by insurance provided by a carrier not disputing coverage or another creditworthy indemnitor) or there shall be rendered against the TCEH Debtors or any other Credit Party a non-monetary judgment with respect to a post-petition event that causes or is reasonably expected to cause a Material Adverse Effect, in each case to the extent such judgments shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 consecutive days; provided, however, that this Section 11.11 shall not apply to any judgments as to any pre-petition obligation; or

11.12     Hedging Agreements.  The Borrower or any of the Restricted Subsidiaries shall default (and have knowledge of such default) in any required payment obligation that is not being contested in good faith and by appropriate proceedings by the Borrower or any Restricted Subsidiary under any one or more Hedging Agreements entered into after the Petition Date and involving liabilities in the aggregate in excess of $150,000,000 and payable by the Borrower and the Restricted Subsidiaries, after giving effect to any grace periods, dispute resolution provisions or similar provisions contained in such Hedging Agreements; and such default shall not have been cured within 60 days after the date on

140

which the date on which the counterparty under such Hedging Agreement is permitted to cause the obligation to become due and payable; or

11.13    Change of Control.  A Change of Control shall occur; or

11.14    [Reserved].

11.15    Matters Related to the Cases.

(i)      Any of the cases with respect to any TCEH Debtor that directly owns any of the Principal Properties shall be converted to a case under chapter 7 of the Bankruptcy Code or dismissed; or

(ii)      a trustee, receiver, interim receiver, or manager shall be appointed with respect to the TCEH Debtors and substantially all of their respective properties, or a responsible officer or an examiner with enlarged powers shall be appointed with respect to the TCEH Debtors and substantially all of their respective properties (having powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code); or

(iii)      any other Superpriority Claim (other than the Carve Out, the RCT Reclamation Support Carve Out or the Obligations) or any "claim" (as such word is defined in the Bankruptcy Code) that is pari passu with or senior to the claims of the Secured Parties or any Lien that is pari passu with or senior to the Liens of the Secured Parties shall be granted in any of the Cases except (A) with the prior written consent of the Administrative Agent or (B) to the extent such Lien constitutes a Lien not prohibited by this Agreement securing Indebtedness or obligations not prohibited by this Agreement; or

(iv)      the Bankruptcy Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Collateral; or

(v)      any TCEH Debtor makes any material payments relating to prepetition obligations (including any "adequate protection" payments), other than in accordance with any of the First Day Orders, the Final Cash Collateral Order, the DIP Order, the Budget, Section 10.7 or as otherwise agreed to by the Administrative Agent; or

(vi)      the use of cash collateral by the TCEH Debtors shall be terminated and the TCEH Debtors shall not have obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to the Joint Lead Arrangers; or

(vii)      the Credit Parties or any of their Subsidiaries, or any person claiming by or through the Credit Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or Lenders, in each case, relating to the Credit Facilities; or

(viii)      (i) Any TCEH Debtor shall file a motion or pleading or commence a proceeding that could reasonably be expected to result in an impairment of the Administrative Agent's or any of the Lenders' material rights or interests in their capacities as such under the Credit Facilities and such motion, pleading or proceeding shall not be withdrawn or dismissed within three (3) Business Days after a request to such TCEH Debtor by the Administrative Agent or the Required

Americas 91311338

Lenders to withdraw or dismiss such motion, pleading or proceeding or (ii) a final, non-appealable judgment by a court with respect to a motion, pleading or proceeding brought by another party that results in such an impairment; provided, however, that this subclause (viii) will not apply to the termination of use of cash collateral (which shall be exclusively governed by subclause (vi) above); or

      (ix)     the Bankruptcy Court shall enter a final non-appealable order that is adverse in any material respect to the interests (taken as a whole) of the Administrative Agent or the Lenders or their respective material rights and remedies in their capacity as such under the Credit Facilities in any of the Cases; provided, however, that this subclause (viii) will not apply to the termination of use of cash collateral (which shall be governed exclusively by subclause (vi) above); or

      (x)     any TCEH Debtor shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other person's motion as to any matter set forth in <u>Section 11.11</u>, this <u>Section 11.15</u> (other than this subclause (x)), <u>Section 11.16</u>, <u>Section 11.17(i)</u> and <u>(ii)</u>, or <u>Section 11.18</u>; or

      (xi)     any TCEH Debtor shall file any motion or pleading seeking approval by the Bankruptcy Court of any alternative debtor-in-possession financing facility that is senior or *pari passu* in right of payment or security with respect to the Obligations and is not permitted under this Agreement or that does not provide for the Obligations to be paid in full in cash (other than Contingent Obligations); or

      (xii)     the occurrence of any "Event of Default" specified in the DIP Order.

      11.16   <u>Automatic Stay</u>.  The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the TCEH Debtors that have an aggregate value in excess of $150,000,000; or

      11.17   <u>Status of Orders</u>.  (i) An order shall be entered reversing, supplementing, staying for a period of five (5) Business Days or more, vacating or otherwise amending, supplementing or modifying the DIP Order in a manner that is, in the aggregate, adverse to the interests of the Lenders (taken as a whole), or the Borrower or any Guarantor shall apply for authority to do so, without the prior written consent of the Administrative Agent or the Required Lenders, (ii) the DIP Order shall cease to be in full force and effect; or (iii) the TCEH Debtors shall fail to comply in all material respects with any material provision of the DIP Order in any material respect after the entry thereof; or

      11.18   <u>Confirmation of Plan</u>.  A plan of reorganization under Chapter 11 of the Bankruptcy Code shall be confirmed for any of the TCEH Debtors that owns any of the Principal Properties that does not either (i) provide for termination of the Commitments hereunder and the indefeasible payment in full in cash of the Obligations (other than Contingent Obligations) on the effective date of such plan or (ii) constitute the Existing Plan or an Alternative Acceptable Plan;

      then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, subject in each case to the terms and conditions of the DIP Order, the Administrative Agent may and, upon the written request of the Required Lenders, shall, by five calendar days' written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower, except as otherwise specifically provided for in this Agreement: (i) declare the Commitments terminated, whereupon the

142

Commitments, if any, of each Lender and each Letter of Credit Issuer shall forthwith terminate immediately and any Fees theretofore accrued shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal of and any accrued interest and Fees in respect of any or all Loans and any or all Obligations owing hereunder and under any other Credit Document to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and/or (iii) terminate any Letter of Credit that may be terminated in accordance with its terms.

11.19   Application of Proceeds.   Subject only to the Carve Out and the RCT Reclamation Support Carve Out, during the existence of an Event of Default any Net Cash Proceeds received by the Collateral Agent, any distribution made in respect of any Collateral in any bankruptcy or insolvency proceeding of any Credit Party, all proceeds of any sale, collection or other liquidation of any Collateral, including all insurance proceeds received in respect thereof, and all proceeds of any such distribution, and any proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Collateral Agent pursuant to this Agreement and/or any other Credit Document, promptly as follows:

(a)        with respect to any Collateral other than the Term L/C Loan Collateral Accounts:

(i)        First, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent, Collateral Agent and their agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent and Collateral Agent in connection therewith and all amounts for which the Administrative Agent and Collateral Agent is entitled to indemnification pursuant to the provisions of any Credit Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(ii)       Second, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(iii)      Third, without duplication of amounts applied pursuant to clauses (i) and (ii) above, to the indefeasible payment in full in cash, pro rata, of interest and other amounts constituting Obligations (other than principal, reimbursement obligations in respect of Letters of Credit and obligations to cash collateralize Letters of Credit) and any fees, premiums and scheduled periodic payments due under Secured Hedging Agreement, Secured Commodity Hedging Agreements and Secured Cash Management Agreements to the extent constituting Obligations and any interest accrued thereon (excluding any breakage, termination or other payments thereunder), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(iv)      Fourth, to the payment in full in cash, pro rata, of principal amount of the Obligations (including reimbursement obligations in respect of Letters of Credit and obligations to cash collateralize Letters of Credit) and any premium thereon and any breakage, termination or other payments under Secured Hedging Agreement, Secured Commodity Hedging Agreements or

143

Secured Cash Management Agreements to the extent constituting Obligations and any interest accrued thereon; and

(v)    Fifth, the balance, if any, to the person lawfully entitled thereto (including the applicable Credit Party or its successors or assigns) or as a court of competent jurisdiction may direct.

(b)    with respect to any Term L/C Loan Collateral Account:

(i)    First, on a pro rata basis, to the payment of all amounts due to the relevant Term Letter of Credit Issuer under any of the Credit Documents, excluding amounts payable in connection with any Term Letter of Credit Reimbursement Obligation;

(ii)    Second, on a pro rata basis, to the payment of all amounts due to the relevant Term Letter of Credit Issuer in an amount equal to 100% of all Term Letter of Credit Reimbursement Obligations;

(iii)    Third, on a pro rata basis, to any Secured Party which has theretofore advanced or paid any fees to the relevant Term Letter of Credit Issuer, other than any amounts covered by priority Second, an amount equal to the amount thereof so advanced or paid by such Secured Party and for which such Secured Party has not been previously reimbursed;

(iv)    Fourth, on a pro rata basis, to the payment of all other relevant Term L/C Obligations; and

(v)    Last, the balance, if any, after all of the relevant Term L/C Obligations have been indefeasibly paid in full in cash, as set forth above in Section (a).

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a), (b) and (c) of this Section 11.19, the Credit Parties shall remain liable, jointly and severally, for any deficiency.

Notwithstanding anything to the contrary contained herein, any Event of Default under this Agreement or similarly defined term under any other Credit Document, other than any Event of Default which cannot be waived without the written consent of each Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist and the Borrower is in compliance with this Agreement and/or such other Credit Document.

11.20    Right to Cure.

(a)    Notwithstanding anything to the contrary contained in Section 11.3(a), in the event that the Borrower fails to comply with the requirement of the covenant set forth in Section 10.9, until the expiration of the fifteenth Business Day after the date on which Section 9.1 Financials with respect to the Test Period in which the covenant set forth in such Section is being measured are required to be delivered pursuant to Section 9.1 (the "**Cure Period**"), the Parent Guarantor or any other Person shall have the right to make a direct or indirect equity investment (other than in the form of Disqualified Stock) in the Borrower in cash (the "**Cure Right**"), and upon receipt by the Borrower of the net cash proceeds pursuant to the exercise of the Cure Right (including through the capital contribution of any such net cash proceeds to the Borrower, the "**Cure Amount**"), the covenant set forth in such Section shall

144

be recalculated, giving effect to the pro forma increase to Consolidated EBITDA for such Test Period in an amount equal to such Cure Amount; provided that (i) such pro forma adjustment to Consolidated EBITDA shall be given solely for the purpose of calculating the covenant set forth in such Section with respect to any Test Period that includes the fiscal quarter for which such Cure Right was exercised and not for any other purpose under any Credit Document, (ii) there shall be no pro forma reduction in Indebtedness with the proceeds of any Cure Right for determining compliance with Section 10.9 for the fiscal quarter in respect of which such Cure Right is exercised (either directly through prepayment or indirectly as a result of the netting of Unrestricted Cash) and (iii) no other adjustment under any other financial definition shall be made as a result of the exercise of any Cure Right (including no netting of cash constituting any Cure Amount in the definition of Consolidated Superpriority Secured Net Debt (either directly or indirectly through the definition of Unrestricted Cash)).

(b)      If, after the exercise of the Cure Right and the recalculations pursuant to clause (a) above, the Borrower shall then be in compliance with the requirements of the covenant set forth in Section 10.9 during such Test Period (including for the purposes of Section 7), the Borrower shall be deemed to have satisfied the requirements of such covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable Default or Event of Default under Section 11.3 that had occurred shall be deemed cured for purposes of this Agreement; provided that (i) in each Test Period there shall be at least two fiscal quarters for which no Cure Right is exercised, (ii) no more than five Cure Rights may be exercised during the term of the Revolving Credit Facility, and (iii) with respect to any exercise of the Cure Right, the Cure Amount shall be no greater than the amount required to cause the Borrower to be in compliance with the covenant set forth in Section 10.9.  Neither the Administrative Agent nor any Lender shall exercise the right to accelerate the Loans or terminate the Commitments and none of the Administrative Agent, any Lender or any other Secured Party shall exercise any right to foreclose on or take possession of the Collateral or exercise any other remedy prior to the expiration of the Cure Period solely on the basis of an Event of Default having occurred and being continuing with respect to a failure to comply with the requirement of the covenant set forth in Section 10.9 (it being understood that no Revolving Credit Lender or Revolving Letter of Credit Issuer shall be required to fund Revolving Credit Loans or extend new credit in respect of Revolving Letters of Credit during any such Cure Period).

SECTION 12.   The Agents.

12.1   Appointment.

(a)      Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Credit Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.   The provisions of this Section 12 (other than Sections 12.9 and 12.13 with respect to the Borrower) are solely for the benefit of the Agents and the Lenders, and the Borrower shall not have any rights as a third party beneficiary of such provision.   Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein or in any other Credit Document, any fiduciary relationship with any Lender or any agency or trust obligations with respect to any Credit Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against such Agent.

145

(b)    The Administrative Agent, each Lender, each Hedge Bank with respect to any Secured Commodity Hedging Agreement and the Letter of Credit Issuers hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Administrative Agent, each Lender and each Letter of Credit Issuer irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein or in any other Credit Document, any fiduciary relationship with any of the Administrative Agent, the Lenders or the Letter of Credit Issuers or any agency or trust obligations with respect to any Credit Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Collateral Agent.

(c)    Each of the Co-Syndication Agents, the Joint Lead Arrangers (except as expressly set forth herein) and the Co-Documentation Agents, each in its capacity as such, shall not have any obligations, duties or responsibilities under this Agreement but shall be entitled to all benefits of this Section 12.

12.2    Delegation of Duties.  The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Credit Documents by or through agents, sub-agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any agents, sub-agents or attorneys-in-fact selected by it in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

12.3    Exculpatory Provisions.

(a)    No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Credit Document (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein) or (ii) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of Parent Guarantor, the Borrower, any other Guarantor, any other Credit Party or any officer thereof contained in this Agreement or any other Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Credit Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Security Documents, or for any failure of Parent Guarantor, the Borrower, any other Guarantor or any other Credit Party to perform its obligations hereunder or thereunder.  No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof.  The Collateral Agent shall not be under any obligation to the Administrative Agent, any Lender or any Letter of Credit Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party.

146

(b)    Each Lender confirms to the Administrative Agent, each other Lender and each of their respective Related Parties that it (i) possesses (individually or through its Related Parties) such knowledge and experience in financial and business matters that it is capable, without reliance on the Administrative Agent, any other Lender or any of their respective Related Parties, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Agreement, (y) making Loans and other extensions of credit hereunder and under the other Credit Documents and (z) in taking or not taking actions hereunder and thereunder, (ii) is financially able to bear such risks and (iii) has determined that entering into this Agreement and making Loans and other extensions of credit hereunder and under the other Credit Documents is suitable and appropriate for it.

(c)    Each Lender acknowledges that (i) it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Credit Documents, (ii) that it has, independently and without reliance upon the Administrative Agent, any other Lender or any of their respective Related Parties, made its own appraisal and investigation of all risks associated with, and its own credit analysis and decision to enter into, this Agreement based on such documents and information, as it has deemed appropriate and (iii) it will, independently and without reliance upon the Administrative Agent, any other Lender or any of their respective Related Parties, continue to be solely responsible for making its own appraisal and investigation of all risks arising under or in connection with, and its own credit analysis and decision to take or not take action under, this Agreement and the other Credit Documents based on such documents and information as it shall from time to time deem appropriate, which may include, in each case:

(i)    the financial condition, status and capitalization of the Borrower and each other Credit Party;

(ii)    the legality, validity, effectiveness, adequacy or enforceability of this Agreement and each other Credit Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document;

(iii)    determining compliance or non-compliance with any condition hereunder to the making of a Loan or the issuance of a Letter of Credit and the form and substance of all evidence delivered in connection with establishing the satisfaction of each such condition; and

(iv)    the adequacy, accuracy and/or completeness of any information delivered by the Administrative Agent, any other Lender or by any of their respective Related Parties under or in connection with this Agreement or any other Credit Document, the transactions contemplated hereby and thereby or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document.

12.4    <u>Reliance by Agents</u>.  The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex, electronic mail, or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to Parent Guarantor and/or the Borrower), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent.  The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or

147

concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; provided that no Agent shall be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Credit Document or Applicable Law. For purposes of determining compliance with the conditions specified in Section 6 and Section 7 on the Closing Date, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

      12.5    Notice of Default. Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or Collateral Agent, as applicable, has received notice from a Lender, Parent Guarantor or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders, the Administrative Agent and the Collateral Agent. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as is within its authority to take under this Agreement and otherwise as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval of the Required Lenders or each of the Lenders, as applicable.

      12.6    Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders. Each Lender expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or Collateral Agent hereinafter taken, including any review of the affairs of Parent Guarantor, the Borrower, any other Guarantor or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or Collateral Agent to any Lender or the Letter of Credit Issuer. Each Lender and the Letter of Credit Issuer represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of Parent Guarantor, the Borrower, each other Guarantor and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of Parent Guarantor, the Borrower, each other Guarantor and each other Credit Party. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business,

Americas 91311338

assets, operations, properties, financial condition, prospects or creditworthiness of Parent Guarantor, the Borrower, any other Guarantor or any other Credit Party that may come into the possession of the Administrative Agent or Collateral Agent any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

      12.7    <u>Indemnification</u>.  The Lenders agree to indemnify each Agent, each in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Total Credit Exposure in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Total Credit Exposure in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against such Agent, including all fees, disbursements and other charges of counsel to the extent required to be reimbursed by the Credit Parties pursuant to <u>Section 13.5</u>, in any way relating to or arising out of the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing (SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON); provided that no Lender shall be liable to any Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; provided, further, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this <u>Section 12.7</u>.  In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur, be imposed upon, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing (including at any time following the payment of the Loans), this <u>Section 12.7</u> applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse such Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's *pro rata* portion thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment,

149

suit, cost, expense or disbursement resulting from such Agent's gross negligence or willful misconduct (as determined by a final judgment of court of competent jurisdiction). Each such indemnified person agrees to refund and return any and all amounts paid by the Borrower or any other Credit Party to such indemnified person to the extent such person is not entitled to such payment pursuant to the terms hereof. The agreements in this Section 12.7 shall survive the payment of the Loans and all other amounts payable hereunder.

12.8    <u>Agents in its Individual Capacities</u>.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with Parent Guarantor, the Borrower, any other Guarantor, and any other Credit Party as though such Agent were not an Agent hereunder and under the other Credit Documents.  With respect to the Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

12.9    <u>Successor Agents</u>.  Each of the Administrative Agent and Collateral Agent may resign at any time by notifying the other Agent, the Lenders, the Letter of Credit Issuers and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the Letter of Credit Issuers, appoint a successor Agent meeting the qualifications set forth above (including receipt of the Borrower's consent); <u>provided</u> that if such Agent shall notify the Borrower and the Lenders that no qualifying person (including as a result of the absence of consent of the Borrower) has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (x) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Secured Parties under any of the Credit Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (y) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender and the Letter of Credit Issuer directly, until such time as the Required Lenders with (except after the occurrence and during the continuation of a Default or Event of Default) the consent of the Borrower (not to be unreasonably withheld) appoint successor Agents as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower (following the effectiveness of such appointment) to such Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Section 12 (including Section 12.7) and Section 13.5 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

150

(a)      Without limitation to Section 3.6(a) and the rights of the Borrower specified therein, any resignation by Deutsche Bank AG New York Branch as Administrative Agent pursuant to this Section 12.9 shall also constitute its resignation as a Letter of Credit Issuer.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Letter of Credit Issuer, (b) the retiring Letter of Credit Issuer shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents, and (c) the successor Letter of Credit Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Letter of Credit Issuer to effectively assume the obligations of the retiring Letter of Credit Issuer with respect to such Letters of Credit.

12.10    Withholding Tax.    To the extent required by any Applicable Law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax.  If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent or of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower (solely to the extent required by this Agreement) and without limiting the obligation of the Borrower to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

12.11    Trust Indenture Act.  In the event that Deutsche Bank AG New York Branch or any of its Affiliates shall be or become an indenture trustee under the Trust Indenture Act of 1939 (as amended, the "**Trust Indenture Act**") in respect of any securities issued or guaranteed by any Credit Party, and agree that any payment or property received in satisfaction of or in respect of any Obligation of such Credit Party hereunder or under any other Credit Document by or on behalf of Deutsche Bank AG New York Branch in its capacity as the Administrative Agent or the Collateral Agent for the benefit of any Lender or Secured Party under any Credit Document (other than Deutsche Bank AG New York Branch or an Affiliate of Deutsche Bank AG New York Branch) and which is applied in accordance with the Credit Documents shall be deemed to be exempt from the requirements of Section 311 of the Trust Indenture Act pursuant to Section 311(b)(3) of the Trust Indenture Act.

12.12    [Reserved].

12.13    Security Documents and Guarantee. (a) Agents under Security Documents and Guarantee.  Each Secured Party hereby further authorizes the Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Collateral and the Security Documents.  Subject to Section 13.1, without further written consent or authorization from any Secured Party, the Administrative Agent or Collateral Agent, as applicable, may execute any documents or instruments necessary to in connection with a sale or disposition of assets permitted by this Agreement, (i) release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets, or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 13.1) have otherwise consented or (ii) release any Guarantor from the Guarantee, or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 13.1) have otherwise consented.  The Administrative Agent or the Collateral Agent, as the case may be, will, at

151

the Borrower's expense, execute and deliver to the applicable Credit Party or to file or register in any office such documents as such Credit Party may reasonably request to (x) subordinate its Lien on any property granted to or held by the Administrative Agent or the Collateral Agent, as the case may be, under any Credit Document to the holder of any Lien on such property that is permitted to rank senior to the Liens securing the Obligations pursuant to Section 10.11 or (y) provide that its Lien on any property granted to or held by the Administrative Agent or the Collateral Agent, as the case may be, under any Credit Document will rank senior to or *pari passu* with the Liens granted to the holder of any Lien on such property that is permitted to rank senior to or *pari passu* with, as applicable, the Obligations pursuant to Section 10.2(cc); provided that the Administrative Agent or the Collateral Agent, as the case may be, may require as a condition thereto that such holder (or its agent or other representative) enter into intercreditor arrangements reasonably acceptable to the Administrative Agent.

   (b) <u>Right to Realize on Collateral and Enforce Guarantee</u>.  Anything contained in any of the Credit Documents to the contrary notwithstanding, Parent Guarantor, the Borrower, the Agents and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Lenders in accordance with the terms hereof and all powers, rights and remedies under the Security Documents and Guarantee may be exercised solely by the Collateral Agent, on behalf of the Secured Parties, and (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent or any Secured Party may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

   SECTION 13. <u>Miscellaneous</u>.

   13.1 <u>Amendments, Waivers and Releases</u>.  Neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 13.1.  The Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent and/or the Collateral Agent may, from time to time, (a) enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or of the Credit Parties hereunder or thereunder or (b) waive in writing, on such terms and conditions as the Required Lenders or the Administrative Agent and/or Collateral Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; provided, however, that each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance and for the specific purpose for which given; and provided, further, that no such waiver and no such amendment, supplement or modification shall:

     (i) forgive or reduce any portion of any Loan or extend the final scheduled maturity date of any Loan or reduce the stated rate (it being understood that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest or principal at the Default Rate or amend Section 2.8(d)), or forgive any portion, or extend the date

152

for the payment, of any interest or Fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates, or the applicability of the "most favorable nation" clause in respect of any Incremental Facility), or extend the final expiration date of any Lender's Commitment or extend the final expiration date of any Revolving Letter of Credit beyond the Revolving L/C Maturity Date or extend the final expiration date of any Term Letter of Credit beyond the Term L/C Termination Date, , or increase the aggregate amount of the Commitments of any Lender, or amend or modify any provisions of Section 5.3(a) (with respect to the ratable allocation of any payments only) and 13.8(a) and 13.19 or make any Loan, interest, Fee or other amount payable in any currency other than expressly provided herein, in each case without the written consent of each Lender directly and adversely affected thereby, or

(ii)    amend, modify or waive any provision of this Section 13.1 or reduce the percentages specified in the definition of the term "Required Lenders", "Required Revolving Credit Lenders", "Required Term Loan Lenders" or "Required Term L/C Loan Lenders" consent to the assignment or transfer by Parent Guarantor or the Borrower of their respective rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to Section 10.3 or on the Conversion Date as contemplated by Section 2.17) or alter the order of application set forth in Section 5.2(c)(i), in each case without the written consent of each Lender directly and adversely affected thereby, or

(iii)    amend, modify or waive any provision of Section 12 without the written consent of the then-current Administrative Agent and Collateral Agent or any other former or current Agent to whom Section 12 then applies in a manner that directly and adversely affects such Person, or

(iv)    amend, modify or waive any provision of Section 3 (or amend, modify or waive any defined term as used in such Section 3, or any underlying definition thereto as used in Section 3, in each case in a manner directly adverse to any Letter of Credit Issuer in its capacity as such) without the written consent of the applicable Letter of Credit Issuer in its capacity as such, or

(v)    amend, waive or otherwise modify any term or provision of Section 10.9 or 11.3 (solely as it relates to Section 10.9), or the definition of "Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio" (or any of its component definitions (as used in such Section but not as used in other Sections of this Agreement)), without the written consent of the Required Revolving Credit Lenders (it being understood and agreed that the consent of no other Lender shall be required to amend, waive or modify any such terms or provision), or

(vi)    release all or substantially all of the Guarantors under the Guarantee (except as expressly permitted by the Guarantee or this Agreement) or release all or substantially all of the Collateral under the Security Documents (except as expressly permitted by the Security Documents or this Agreement), in either case without the prior written consent of each Lender, or

(vii)    adversely affect the rights or duties of, or reduce any Fees or other amounts payable to, any Agent under this Agreement or any other Credit Document without the prior written consent of such Agent, or

(viii)    [reserved], or

(ix)    waive the provisions of the proviso of Section 2.14(d) with respect to Term Loans or Term L/C Loans without the written consent of the Non-Defaulting Lenders having or holding a majority of the aggregate outstanding principal amount of the Term Loans (excluding

153

Term Loans held by Defaulting Lenders) or Term L/C Loans (excluding Term L/C Loans held by Defaulting Lenders), as applicable, at such date, or

        (x)    waive the provisions of the proviso of <u>Section 2.14(i)(ii)</u> without the written consent of the Required Revolving Credit Lenders (but not including in such calculation any New Revolving Credit Commitments).

        Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon Parent Guarantor, the Borrower, the applicable Credit Parties, such Lenders, the Administrative Agent and all future holders of the affected Loans.

        In the case of any waiver, Parent Guarantor, the Borrower, the applicable Credit Parties, the Lenders, the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing, it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  In connection with the foregoing provisions, the Administrative Agent may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.

        Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, modification, supplement, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender (it being understood that any Commitments, Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders, except as expressly provided for by this Agreement).

        Notwithstanding the foregoing, in addition to any credit extensions and related Incremental Amendment(s) effectuated without the consent of Lenders in accordance with <u>Section 2.14</u>, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent, Parent Guarantor and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Loans and Commitments and the accrued interest and Fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and other definitions related to such new Loans and Commitments.

        In addition, notwithstanding the foregoing, (i) the Administrative Agent, the Collateral Agent and the relevant Credit Parties may amend, supplement or modify the Security Documents to make such ministerial changes as may be required to effect the provisions of <u>Section 10.2(a)</u> without the consent of any Lender so long as such amendments do not adversely affect the Lenders and (ii) the Administrative Agent, the Collateral Agent and the relevant Credit Parties may amend, supplement or modify this Agreement or any of the Security Documents and any other document delivered in connection therewith at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities, omissions, mistakes or defects, (iii) to cause any such Security Document or other document to be consistent with this Agreement and the other Credit Documents, (iv) add syndication or documentation agents and make customary changes and references related thereto or

154

(v) extend the time periods pursuant to which the Credit Parties are required to grant Guarantees or security interests with respect to Collateral or to extend the time periods for perfection.

Notwithstanding the foregoing, Exhibit E to this Agreement may be amended, restated, waived or otherwise modified with the prior written consent of the Required Lenders, the Administrative Agent and the Borrower; provided that to the extent such amendment, restatement, waiver or other modification would require the consent of any affected "Lender", all "Lenders" or any other Person (or requisite class of Persons) under the terms of Exhibit E as in effect on the Closing Date, the prior written consent of the corresponding affected Lender, all Lenders or such corresponding Person (or requisite Class of Persons) under this Agreement shall be required; provided, further, that the Lenders hereby authorize the Administrative Agent to enter into any amendments to this Agreement and the other Credit Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to give effect to the transaction contemplated by Section 2.17 and such other technical or immaterial amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection therewith.

The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Credit Parties on any Collateral shall be automatically released (i) in full, upon the Obligations (except for Hedging Obligations in respect of any Secured Hedging Agreement and/or any Secured Commodity Hedging Agreement, Cash Management Obligations in respect of Secured Cash Management Agreements and Contingent Obligations) having been paid in full, in cash, all Commitments having been terminated, and all Letters of Credit having been cancelled (or all such Letters of Credit having been fully cash collateralized or otherwise back-stopped, in each case to the reasonable satisfaction of the applicable Letter of Credit Issuers), (ii) upon the sale or other disposition of such Collateral (including as part of or in connection with any other sale or other disposition permitted hereunder) to any Person other than another Credit Party, to the extent such sale or other disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Credit Party, upon termination (in accordance with the terms of this Agreement) or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with this Section 13.1), (v) to the extent the property constituting such Collateral is owned by any Subsidiary Guarantor, upon the release of such Subsidiary Guarantor from its obligations under the Guarantee (in accordance with the following sentence), (vi) as required to effect any sale or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Credit Documents and (vii) to the extent the property constituting such Collateral becomes Excluded Collateral. Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents. Additionally, the Lenders hereby irrevocably agree that the Subsidiary Guarantors shall be released from the Guarantee upon consummation of any transaction resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary. The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Subsidiary Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender.

13.2    Notices.    Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing

155

(including by facsimile or other electronic transmission). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)     if to Parent Guarantor, the Borrower, the Administrative Agent, the Collateral Agent, any Revolving Letter of Credit Issuer or any Term Letter of Credit Issuer, to the address, facsimile number, electronic mail address or telephone number specified for such Person on <u>Schedule 13.2</u> or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to Parent Guarantor, the Borrower, the Administrative Agent, the Collateral Agent, any Revolving Letter of Credit Issuer, any Term Letter of Credit Issuer.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail, when delivered; <u>provided</u> that notices and other communications to the Administrative Agent or the Lenders pursuant to <u>Sections 2.3</u>, <u>2.6</u>, <u>2.9</u>, <u>4.2</u> and <u>5.1</u> shall not be effective until received.

13.3     <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

13.4     <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder, in the other Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

13.5     <u>Payment of Expenses; Indemnification</u>.  The Borrower agrees (a) to pay or reimburse the Agents, the Joint Lead Arrangers, the Letter of Credit Issuers and the Lenders for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, negotiation, preparation and execution and delivery of, and any amendment, supplement or modification to, this Agreement and the other Credit Documents and any other documents prepared in connection herewith or therewith, the syndication of the Credit Facilities, the consummation and administration of the transactions contemplated hereby and thereby, any Event of Default or the enforcement or preservation of any rights under this Agreement, the other Credit Documents and any such other documents, including the reasonable and documented out-of-pocket fees, disbursements and other charges of Advisors (limited, in the case of Advisors, as set forth in the definition thereof); (b) to pay, indemnify, and hold harmless each Agent, each Joint Lead Arranger, each Letter of Credit Issuer and each Lender from, any and all recording and filing fees and (c) to pay, indemnify, and hold harmless each

156

Agent, each Joint Lead Arranger, each Letter of Credit Issuer and their respective Affiliates, directors, officers, partners, employees and agents from and against any and all other liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented out-of-pocket fees, disbursements and other charges of Advisors, related to the Transactions (including the Cases) or, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Credit Documents and any such other documents, including, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law (other than by such indemnified Person or any of its Related Parties (other than trustees and advisors)) or to any actual or alleged presence, release or threatened release into the environment of Hazardous Materials attributable to the operations of Parent Guarantor, the Borrower, any of the Borrower's Subsidiaries or any of the Real Estate (all the foregoing in this clause (c), collectively, the "indemnified liabilities") (SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON); provided that neither the Borrower nor any other Credit Party shall have any obligation hereunder to any Agent, any Letter of Credit Issuer or any Lender or any of their respective Related Parties with respect to indemnified liabilities to the extent they result from (A) the gross negligence, bad faith or willful misconduct of such indemnified Person or any of its Related Parties, as determined by a final non-appealable judgment of a court of competent jurisdiction, (B) a material breach of the obligations of such indemnified Person or any of its Related Parties under the Credit Documents, as determined by a final non-appealable judgment of a court of competent jurisdiction, (C) disputes not involving an act or omission of Parent Guarantor, the Borrower or any other Credit Party and that is brought by an indemnified Person against any other indemnified Person, other than any claims against any indemnified Person in its capacity or in fulfilling its role as an Agent or Joint Lead Arranger or any similar role under the Credit Facilities, (D) such indemnified Person's capacity as a financial advisor of the Parent Guarantor, Borrower or its Subsidiaries in connection with the Transactions, (E) such indemnified Person's capacity as a co-investor in any potential acquisition of the Parent Guarantor, Borrower or its Subsidiaries or (F) any settlement effected without the Borrower's prior written consent, but if settled with Borrower's prior written consent (not to be unreasonably withheld, delayed, conditioned or denied) or if there is a final non-appealable judgment against an indemnified Person in any such proceeding, the Borrower will indemnify and hold harmless such indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this section.  The agreements in this Section 13.5 shall survive repayment of the Loans and all other amounts payable hereunder.

All amounts payable under this Section 13.5 shall be paid within thirty days of receipt by the Borrower of an invoice relating thereto setting forth such expense in reasonable detail; provided, that the TCEH Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the Credit Documents to counsel to the Ad Hoc TCEH Committee and the United States Trustee, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within thirty days after receipt thereof.  In the event that within thirty days from receipt of such invoices, the Credit Parties, the United States Trustee or counsel to the Ad Hoc TCEH Committee raise an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Bankruptcy Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court.

Americas 91311338

No Credit Party nor any indemnified Person shall have any liability for any special, punitive, indirect or consequential damages resulting from this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (except, in the case of the Borrower's obligation hereunder to indemnify and hold harmless the indemnified Persons, to the extent any indemnified Persons is found liable for special, punitive, indirect or consequential damages to a third party).  No indemnified Persons shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent that such damages have resulted from the willful misconduct, bad faith or gross negligence of any indemnified Person or any of its Related Parties (as determined by a final non-appealable judgment of a court of competent jurisdiction).  This <u>Section 13.5</u> shall not apply to Taxes.

13.6    <u>Successors and Assigns; Participations and Assignments.</u>

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of a Letter of Credit Issuer that issues any Letter of Credit), except that (i) except as expressly permitted by <u>Section 10.3</u> and as provided in the Exit Facility Agreement on the Conversion Date, neither Parent Guarantor nor the Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by Parent Guarantor or the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this <u>Section 13.6</u>.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of a Letter of Credit Issuer that issues any Letter of Credit), Participants (to the extent provided in <u>clause (c)</u> of this <u>Section 13.6</u>), to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent, the Letter of Credit Issuers and the Lenders and each other Person entitled to indemnification under <u>Section 13.5</u> and, to the extent expressly contemplated by <u>Section 13.20</u>, the Oncor Subsidiaries) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in <u>clause (b)(ii)</u> below, any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans (including participations in Revolving L/C Obligations) at the time owing to it) with the prior written consent (such consent not be unreasonably withheld or delayed; it being understood that, without limitation, the Borrower shall have the right to withhold or delay its consent to any assignment if in order for such assignment to comply with Applicable Law, the Borrower would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority) of:

(A)    the Borrower (which consent shall not be unreasonably withheld or delayed); <u>provided</u> that no consent of the Borrower shall be required for an assignment (1) to a Lender (other than in respect of an assignment of a Revolving Credit Commitment and Revolving Credit Loans), an Affiliate of a Lender (other than in respect of an assignment of a Revolving Credit Commitment and Revolving Credit Loans (except to an Affiliate of such Revolving Credit Lender having a combined capital and surplus of not less than the greater of (x) $100,000,000 and (y) an amount equal to twice the amount of Revolving Credit Commitments to be held by such assignee after giving effect to such assignment, in which case no such Borrower consent shall be required) or an Approved

158

Fund (other than in respect of an assignment of a Revolving Credit Commitment and Revolving Credit Loans) or (2) if Specified Default has occurred and is continuing with respect to the Borrower, to any other assignee; and

(B)    the Administrative Agent (which consent shall not be unreasonably withheld or delayed), and in the case of Revolving Credit Commitments or Revolving Credit Loans and each Revolving Letter of Credit Issuer; provided that no consent of the Administrative Agent shall be required for any assignment of any Term Loan or Term L/C Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

Notwithstanding the foregoing or any other term or condition herein to the contrary, no such assignment shall be made to (x) a natural person or (y) a Disqualified Institution.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except (i) in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, (ii) an assignment to a Federal Reserve Bank or (iii) in connection with the initial syndication of the Commitments or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent), shall not be less than, in the case of Loans and Commitments, $1,000,000 and increments of $1,000,000 in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld or delayed); provided that no such consent of the Borrower shall be required if a Specified Default has occurred and is continuing with respect to Parent Guarantor or the Borrower; provided, further, that contemporaneous assignments to a single assignee made by Affiliates of Lenders and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; provided that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans;

(C)    The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee in the amount of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; and

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in a form approved by the Administrative Agent (the "**Administrative Questionnaire**").

(iii)    Subject to acceptance and recording thereof pursuant to clause (b)(iv) of this Section 13.6, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement,

Americas 91311338

and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 3.5, 5.4 and 13.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 13.6.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans and any payment made by any Letter of Credit Issuer under any Letter of Credit owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). Further, each Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Collateral Agent, the Letter of Credit Issuers and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Parent Guarantor, the Borrower, the Collateral Agent, the Letter of Credit Issuers and any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section shall be construed so that the Loans and Letters of Credit are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(v)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in clause (b) of this Section 13.6 (unless waived) and any written consent to such assignment required by clause (b) of this Section 13.6, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.

(c)    (i)    Any Lender may, without the consent of Parent Guarantor, the Borrower, the Administrative Agent or any Letter of Credit Issuer, sell participations to one or more banks or other entities that are not Disqualified Institutions (each, a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) Parent Guarantor, the Borrower, the Administrative Agent, the Letter of Credit Issuers and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any consent, amendment, modification, supplement or waiver described in clause (i) or (vii) of the second proviso of the first paragraph of Section 13.1 that affects such Participant. Subject to clause (c)(ii) of this Section 13.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 5.4 to the same extent as if it were a Lender, and provided that such Participant agrees to be subject to the requirements of

160

those Sections as though it were a Lender and had acquired its interest by assignment pursuant to <u>clause (b)</u> of this <u>Section 13.6</u>  To the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of <u>Section 13.8(b)</u> as though it were a Lender; <u>provided</u> such Participant agrees to be subject to <u>Section 13.8(a)</u> as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under <u>Section 2.10</u>, <u>2.11</u>, or <u>5.4</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (which consent shall not be unreasonably withheld or delayed).

(iii)    Each Lender that sells a participation shall, acting for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts of each participant's interest in the Loans (or other rights or obligations) held by it (the "**Participant Register**").  The entries in the Participant Register shall be conclusive, and such lender shall treat each Person whose name is recorded in the Participant Register as the owner of such Loan or other obligation hereunder as the owner thereof for all purposes of this Agreement notwithstanding any notice to the contrary.  No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  This Section shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)    Any Lender may, without the consent of Parent Guarantor, the Borrower, the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this <u>Section 13.6</u> shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  In order to facilitate such pledge or assignment or for any other reason, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time after any Borrower has made its initial borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a promissory note, substantially in the form of <u>Exhibit J-1</u>, <u>J-2</u>, or <u>J-3</u>, evidencing the Revolving Credit Loans, Term Loans and Term L/C Loans, respectively, owing to such Lender.

(e)    Subject to this <u>Section 13.16</u>, the Borrower authorizes each Lender to disclose to any Participant, secured creditor of such Lender or assignee (each, a "**Transferee**"), any prospective Transferee and any prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Loans made hereunder any and all financial information in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates in connection with such Lender's credit evaluation of the Borrower and its Affiliates prior to becoming a party to this Agreement.

Americas 91311338

(f)    The words "execution," "signed," "signature," and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(g)    SPV Lender.  Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (a "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it shall not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 13.6, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.  This Section (g) may not be amended without the written consent of the SPV.  Notwithstanding anything to the contrary in this Agreement, (x) no SPV shall be entitled to any greater rights under Sections 2.10, 2.11, and 5.4 than its Granting Lender would have been entitled to absent the use of such SPV and (y) each SPV agrees to be subject to the requirements of Sections 2.10, 2.11, and 5.4 as though it were a Lender and has acquired its interest by assignment pursuant to clause (b) of this Section 13.6.

13.7    Replacements of Lenders under Certain Circumstances.

(a)    The Borrower shall be permitted to replace, or prepay the Loans and terminate the Commitments on a non pro rata basis of, any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.10, 3.5 or 5.4, (b) is affected in the manner described in Section 2.10(a)(iii) and as a result thereof any of the actions described in such Section is required to be taken or (c) becomes a Defaulting Lender, with a replacement bank or other financial institution; provided that (i) such replacement does not conflict with any Applicable Law, (ii) no Specified Default shall have occurred and be continuing at the time of such replacement, (iii) the Borrower shall repay (or the replacement bank or institution shall purchase, at par) all Loans and other amounts (other than any disputed amounts), pursuant to Section 2.10, 2.11, 3.5 or 5.4, as the case may be) owing to such replaced Lender prior to the date of replacement, (iv) the replacement bank or institution, if not already a Lender, and the terms and

162

conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent, (v) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein) and (vi) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

(b)     If any Lender (such Lender, a "**Non-Consenting Lender**") has failed to consent to a proposed amendment, modification, supplement, waiver, discharge or termination that pursuant to the terms of Section 13.1 requires the consent of all of the Lenders or all Lenders directly and adversely affected and with respect to which the Required Lenders shall have granted their consent, the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Loans and its Commitments hereunder to one or more assignees reasonably acceptable to the Administrative Agent or to prepay the Loans and terminate the Commitments of such Non-Consenting Lender on a non pro rata basis; provided that:  (a) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment, and (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.   In connection with any such assignment, the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 13.6.

13.8     Adjustments; Set-off.  Subject in each case to the Orders:

(a)     If any Lender (a "**Benefited Lender**") shall at any time receive any payment of all or part of its Loans, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans, or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Loan, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by Applicable Law, each Lender shall have the right, without prior notice to Parent Guarantor, the Borrower, any such notice being expressly waived by Parent Guarantor, the Borrower to the extent permitted by Applicable Law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final, but not withholding or payroll accounts, employee benefits accounts, de minimis accounts or other accounts used exclusively for taxes or fiduciary or trust purposes), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

Americas 91311338

13.9    <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

13.10    <u>Severability</u>.    Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.11    <u>INTEGRATION</u>.    THIS WRITTEN AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT OF PARENT GUARANTOR, THE BORROWER, THE COLLATERAL AGENT, THE ADMINISTRATIVE AGENT, THE LETTER OF CREDIT ISSUERS AND THE LENDERS WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND (1) THERE ARE NO PROMISES, UNDERTAKINGS, REPRESENTATIONS OR WARRANTIES BY PARENT GUARANTOR, THE BORROWER, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT, THE LETTER OF CREDIT ISSUERS OR ANY LENDER RELATIVE TO SUBJECT MATTER HEREOF NOT EXPRESSLY SET FORTH OR REFERRED TO HEREIN OR IN THE OTHER CREDIT DOCUMENTS, (2) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES AND (3) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES; PROVIDED THAT THE SYNDICATION PROVISIONS AND THE BORROWER'S AND PARENT GUARANTOR'S CONFIDENTIALITY OBLIGATIONS IN THE COMMITMENT LETTER SHALL REMAIN IN FULL FORCE AND EFFECT. IT IS SPECIFICALLY AGREED THAT THE PROVISION OF THE CREDIT FACILITIES HEREUNDER BY THE LENDERS SUPERSEDES AND IS IN SATISFACTION OF THE OBLIGATIONS OF THE AGENTS (AS DEFINED IN THE COMMITMENT LETTER) TO PROVIDE THE COMMITMENTS SET FORTH IN THE COMMITMENT LETTER.

13.12    <u>GOVERNING LAW</u>.    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

13.13    <u>Submission to Jurisdiction; Waivers</u>.    Each party hereto irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Bankruptcy Court, and to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in

164

any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on Schedule 13.2 at such other address of which the Administrative Agent shall have been notified pursuant to Section 13.2;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction;

(e)    subject to the last paragraph of Section 13.5, waives, to the maximum extent not prohibited by Applicable Law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 13.13 any special, exemplary, punitive or consequential damages; and

(f)    agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

13.14    Acknowledgments.    Each of Parent Guarantor and the Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b)    (i) the credit facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document) are an arm's-length commercial transaction between Parent Guarantor and the Borrower, on the one hand, and the Administrative Agent, the Letter of Credit Issuer, the Lenders and the other Agents on the other hand, and Parent Guarantor, the Borrower and the other Credit Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Administrative Agent and the other Agents, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of Parent Guarantor, the Borrower, any other Credit Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) neither the Administrative Agent nor any other Agent has assumed or will assume an advisory, agency or fiduciary responsibility in favor of Parent Guarantor, the Borrower or any other Credit Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Credit Document (irrespective of whether the Administrative Agent or any other Agent has advised or is currently advising Parent Guarantor, the Borrower, the other Credit Parties or their respective Affiliates on other matters) and neither the Administrative Agent or other Agent has any obligation to Parent Guarantor, the Borrower, the other Credit Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; (iv) the Administrative Agent, each other Agent and each Affiliate of the foregoing may be engaged in a broad range of transactions that involve interests that differ from those of Parent Guarantor, the Borrower and their respective Affiliates, and neither the Administrative Agent nor any other Agent has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) neither the Administrative Agent nor any other Agent has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions

165

contemplated hereby (including any amendment, waiver or other modification hereof or of any other Credit Document) and Parent Guarantor and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Parent Guarantor and the Borrower agree not to claim that the Administrative Agent or any other Agent has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to Parent Guarantor, the Borrower or any other Affiliates, in connection with the transactions contemplated hereby or the process leading hereto.

(c)     no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among Parent Guarantor and the Borrower, on the one hand, and any Lender, on the other hand.

13.15   <u>WAIVERS OF JURY TRIAL</u>. PARENT GUARANTOR, THE BORROWER, EACH AGENT AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE (TO THE EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

13.16   <u>Confidentiality</u>. The Administrative Agent, each Letter of Credit Issuer, each other Agent and each Lender shall hold all non-public information furnished by or on behalf of Parent Guarantor, the Borrower or any Subsidiary of the Borrower in connection with the Transactions or such Lender's evaluation of whether to become a Lender hereunder or obtained by such Lender, the Administrative Agent, Letter of Credit Issuer or such other Agent pursuant to the requirements of this Agreement or in connection with any amendment, supplement, modification or waiver or proposed amendment, supplement, modification or waiver hereto or the other Credit Documents ("**Confidential Information**"), confidential, <u>provided</u> that such Lender, Administrative Agent, Agent or Letter of Credit Issuer may make disclosure (a) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by Applicable Law, regulation or compulsory legal process (in which case such Lender, the Administrative Agent, Letter of Credit Issuer or such other Agent shall use commercially reasonable efforts to inform the Borrower promptly thereof to the extent lawfully permitted to do so (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority)), (b) to such Lender's or the Administrative Agent's or such Letter of Credit Issuer's or such other Agent's attorneys, professional advisors, independent auditors, trustees or Affiliates involved in the Transactions (other than Excluded Affiliates) on a "need to know" basis and who are made aware of and agree to comply with the provisions of this <u>Section 13.16</u>, in each case on a confidential basis (with such Lender, the Administrative Agent, Letter of Credit Issuer or such other Agent responsible for such persons' compliance with this <u>Section 13.16</u>), (c) to any bona fide investor or prospective bona investor in a Securitization that agrees its access to information regarding the Credit Parties, the Loans and the Credit Documents is solely for purposes of evaluating an investment in a Securitization and who agrees to treat such information as confidential in accordance with this <u>Section 13.16</u>, (d) on a confidential basis to any bona fide prospective Lender, prospective participant or swap counterparty (in each case, other than a Disqualified Institution or a Person who the Borrower has affirmatively denied assignment thereto in accordance with <u>Section 13.6</u>), (e) to the extent requested by any bank regulatory authority having jurisdiction over a Lender or its Affiliates (including in any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), (f) to a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in connection with the administration, servicing and reporting on the assets serving as collateral for a Securitization and who agrees to treat such information as confidential, (g) to a nationally recognized ratings agency that requires access to information regarding the Credit Parties, the Loans and Credit Documents in connection with

166

ratings issued with respect to a Securitization and (h) as consented to by the Borrower in writing. Each Lender, the Administrative Agent, each other Letter of Credit Issuer and each other Agent agrees that it will not provide to prospective Transferees or to any pledgee referred to in Section 13.6 or to prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Loans made hereunder any of the Confidential Information unless such Person is advised of and agrees to be bound by the provisions of this Section 13.16 or confidentiality provisions at least as restrictive as those set forth in this Section 13.16.

13.17    Direct Website Communications.

(a)    Parent Guarantor and the Borrower may, at their option, provide to the Administrative Agent any information, documents and other materials that they are obligated to furnish to the Administrative Agent pursuant to the Credit Documents, including, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (A) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or Interest Period relating thereto), (B) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under this Agreement or (D) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit thereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at marcus.tarkington@db.com, nick.salemme@db.com and Ls2.docs-ny@db.com; provided that:  (i) upon written request by the Administrative Agent, Parent Guarantor or the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) Parent Guarantor or the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.  Nothing in this Section 13.17 shall prejudice the right of Parent Guarantor, the Borrower, the Administrative Agent, any other Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

(b)    The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Credit Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Credit Documents.  Each Lender agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

(c)    Parent Guarantor and the Borrower further agree that the Agents may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "**Platform**"), so long as the access to such Platform is limited (i) to the Agents, the Letter of Credit Issuers, the Lenders or any bona fide potential Transferee and (ii) remains subject the confidentiality requirements set forth in Section 13.16.

167

(d)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. In no event shall any Agent or their Related Parties (collectively, the "**Agent Parties**" and each an "**Agent Party**") have any liability to Parent Guarantor, the Borrower, any Lender, any Letter of Credit Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of Parent Guarantor', the Borrower's or any Agent's transmission of Communications through the internet, except to the extent the liability of any Agent Party resulted from such Agent Party's (or any of its Related Parties' (other than trustees or advisors)) gross negligence, bad faith or willful misconduct or material breach of the Credit Documents (as determined in a final non-appealable judgment of a court of competent jurisdiction).

(e)      The Borrower and each Lender acknowledge that certain of the Lenders may be "public-side" Lenders (Lenders that do not wish to receive material non-public information with respect to Parent Guarantor, the Borrower, the Subsidiaries of the Borrower or their securities) and, if documents or notices required to be delivered pursuant to the Credit Documents or otherwise are being distributed through the Platform, any document or notice that Parent Guarantor or the Borrower has indicated contains only publicly available information with respect to Parent Guarantor, the Borrower and the Subsidiaries of the Borrower and their securities may be posted on that portion of the Platform designated for such public-side Lenders. If Parent Guarantor or the Borrower has not indicated whether a document or notice delivered contains only publicly available information, the Administrative Agent shall post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material nonpublic information with respect to Parent Guarantor, the Borrower, the Subsidiaries of the Borrower and their securities. Notwithstanding the foregoing, Parent Guarantor and the Borrower shall use commercially reasonable efforts to indicate whether any document or notice contains only publicly available information.

13.18      <u>USA PATRIOT Act</u>. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act.

13.19      <u>Payments Set Aside</u>. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, <u>plus</u> interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

168

13.20    <u>Separateness.</u>

The Secured Parties hereby acknowledge (i) the legal separateness of Parent Guarantor, the Borrower and the Subsidiaries of the Borrower from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Credit Facility and the noteholders under the Oncor Notes and under the transition bonds have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from Parent Guarantor, the Borrower and the Subsidiaries of the Borrower, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of Parent Guarantor, the Borrower and the Subsidiaries of the Borrower, (iv) that the Obligations are obligations and liabilities of the Borrower and the other Credit Parties only, and are not the obligations or liabilities of any of the Oncor Subsidiaries, (v) that the Secured Parties shall look solely to the Borrower and the Guarantors and such Persons' assets, and not to any assets, or to the pledge of any assets, owned by any of the Oncor Subsidiaries, for the repayment of any amounts payable pursuant to this Agreement and for satisfaction of any other Obligations and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Secured Parties for any amounts payable, or any other Obligation, under the Credit Documents.

The Secured Parties hereby acknowledge and agree that the Secured Parties shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver, or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any of the Oncor Subsidiaries, or against any of the Oncor Subsidiaries' assets. The Secured Parties further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the foregoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity.

13.21    <u>Keepwell.</u>    Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations under this Guarantee in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this <u>Section 13.21</u>, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). Each Qualified ECP Guarantor intends that this <u>Section 13.21</u> constitute, and this <u>Section 13.21</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

13.22    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions.</u>
Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

169

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

SECTION 14.    Security; Secured Commodity Hedging Agreements.

14.1    Security.

(a)    Collateral; Grant of Lien and Security Interest.

(i)    Pursuant to the DIP Order and in accordance with the terms thereof (and subject to the terms and conditions set forth therein), as security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration, or otherwise) of the Obligations, the Borrower hereby assigns, pledges, and grants to the Collateral Agent, for the benefit of the Secured Parties (subject, in each case, only to the Carve Out and the RCT Reclamation Support Carve Out):

(A)    a valid, binding, continuing, enforceable, fully-perfected and non-avoidable first priority senior security interest in and Lien upon, pursuant to section 364(c)(2) of the Bankruptcy Code, all prepetition and postpetition property of the TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Closing Date, was not subject to valid, perfected, and non-avoidable Liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, the Term L/C Loan Collateral Accounts, cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, post-petition intercompany claims of the TCEH Debtors), deposit accounts, investment property, supporting obligations, minerals, oil, gas, and as-extracted collateral, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), royalty interests, chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, Stock and Stock Equivalents of Subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "**Unencumbered Property**"); provided that the Unencumbered Property shall exclude (a) the TCEH Debtors' Avoidance Actions, or any proceeds or property recovered pursuant to any successful Avoidance Actions, whether by judgment, settlement or otherwise (the "**Avoidance Proceeds**") and (b) the TCEH Debtors' commercial tort claims (the "**Commercial Tort Claims**"), but shall include any proceeds or property recovered pursuant to any successful Commercial Tort Claim whether by judgment, settlement, or otherwise (the "**Commercial Tort Proceeds**"); provided, however, that (i) the DIP Superpriority Claims (as defined in the DIP Order) in respect of the Obligations may be satisfied from any assets of the TCEH Debtors' estates, including any Avoidance Proceeds, subject only to the Carve Out and the RCT Reclamation Support Carve Out and (ii) to the extent a security interest or lien is granted in or on Avoidance Actions or

170

Avoidance Proceeds, the Collateral Agent, for the benefit of itself, its sub-agents, the Lenders, the Letter of Credit Issuers, the Hedge Banks, and the Cash Management Banks, shall be granted, pursuant to Section 364(d)(1) of the Bankruptcy Code , a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien on the Avoidance Actions or Avoidance Proceeds, as applicable;

(B)    a valid, binding, continuing, enforceable, fully-perfected and non-avoidable first priority senior priming security interest in and Lien upon, pursuant to section 364(d)(1) of the Bankruptcy Code, all prepetition and postpetition property of the TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable Liens currently held by any of the Prepetition Secured Creditors (as defined in the Final Cash Collateral Order), excluding the "Deposit L/C Loan Collateral Account" to the extent of the "Deposit L/C Obligations" (each as defined in the Prepetition Credit Agreement); provided that such security interests and Liens shall be senior in all respects to the interests in such property of any of the Prepetition Secured Creditors arising from current and future Liens of any of the Prepetition Secured Creditors (including, without limitation, Adequate Protection Liens) (as defined in the Final Cash Collateral Order), but shall not be senior to any valid, perfected, and non-avoidable interests of other parties arising out of Liens, if any, on such property existing immediately prior to the Petition Date, including the Liens securing the Tex-La Indebtedness, or to any valid, perfected, and non-avoidable interests in such property arising out of Liens to which the Liens of any of the Prepetition Secured Creditors become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; and

(C)    a valid, binding, continuing, enforceable, fully-perfected and non-avoidable junior security interest in and Lien upon, pursuant to section 364(c)(3) of the Bankruptcy Code, all prepetition and postpetition property of the TCEH Debtors (other than the property described in clauses (A) and (B) of this Section (i), as to which the Liens and security interests in favor of the Collateral Agent, for the benefit of the Secured Parties, will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that were subject to valid, perfected, and non-avoidable Liens in existence immediately prior to the Petition Date, or to any valid and non-avoidable Liens in existence immediately prior to the Petition Date that are or were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Adequate Protection Liens (as defined in the Final Cash Collateral Order));

provided, that notwithstanding anything to the contrary in this Section 14.1(a)(i), the Collateral shall exclude (A) Excluded Collateral, (B) Avoidance Actions or Avoidance Proceeds, and (C) Commercial Tort Claims (other than Commercial Tort Proceeds), subject to the last proviso in Section 14.1(a)(i)(A).

(ii)    The security interests and Liens in favor of the Collateral Agent in the Collateral of the TCEH Debtors shall be effective immediately upon the entry of the DIP Order and the occurrence of the Closing Date and subject, only in the event of the occurrence and during the continuance of an Event of Default, to the Carve Out, the RCT Reclamation Support Carve Out and the terms and conditions set forth in the DIP Order. Such Liens and security interests and their priority shall remain in effect until the Obligations (except for Hedging Obligations in respect of any Secured Hedging Agreement and/or any Secured Commodity Hedging Agreement, Cash Management Obligations in respect of Secured Cash Management Agreements and Contingent Obligations) have been paid in full, in cash, all Commitments have been terminated,

171

and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable Letter of Credit Issuers).

(iii)     Subject only to the prior payment of the Carve Out and the RCT Reclamation Support Carve Out, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases (as defined in the DIP Order) or in any other proceedings related thereto, and no priority claims, are or will be senior to, or pari passu with, any claim of any Secured Party or the Collateral Agent against any Credit Party.

(b)     <u>Administrative Priority</u>.  The TCEH Debtors agree that their Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed superpriority administrative expense claims in the Cases or any Successor Cases, ranking on a parity with each other and having priority over all administrative expense claims, diminution claims, unsecured claims, and all other claims against the TCEH Debtors or their estates in any of the Cases and any Successor Cases, existing on the Petition Date or thereafter, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and upon entry of, the DIP Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, subject only to the Carve Out and the RCT Reclamation Support Carve Out, to the extent specifically provided for in the DIP Order.

(c)     <u>Grants, Rights and Remedies</u>.  The Liens and security interests granted pursuant to <u>Section (a)(i)</u> hereof and the administrative priority granted pursuant to <u>Section (b)</u> hereof may be independently granted by the Credit Documents and by other Credit Documents hereafter entered into. This Agreement, the DIP Order, and such other Credit Documents supplement each other, and the grants, priorities, rights, and remedies of the Agents and the Secured Parties hereunder and thereunder are cumulative.

(d)     <u>No Filings Required</u>.  The Liens and security interests referred to in this <u>Section 14</u> shall be deemed valid and perfected by entry of the DIP Order and entry of the DIP Order shall have occurred on or before any Loan is made.  The Collateral Agent shall not be required to file or record any financing statements, patent filings, trademark filings, mortgages, notices of Lien, or other instrument or document in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Liens and security interests granted by or pursuant to this Agreement, the DIP Order or any other Credit Document.

(e)     <u>Survival</u>.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Collateral Agent and the Secured Parties pursuant to this Agreement, the DIP Order, and the other Credit Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered, or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the TCEH Debtors (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Cases, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     except to the extent of the Carve Out or the RCT Reclamation Support Carve Out, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases, or in any other proceedings related thereto, and

172

no priority claims, are or will be superior to or pari passu with any claim of the Collateral Agent and the Secured Parties against the TCEH Debtors;

(ii)    subject only to the Carve Out and the RCT Reclamation Support Carve Out and subject to the terms of the DIP Order, the Liens in favor of the Collateral Agent and the Secured Parties set forth in Section (a)(i) hereof shall constitute valid and perfected first priority Liens and security interests, and shall be superior to all other Liens and security interests, existing as of the Petition Date or thereafter arising, in favor of any other creditor or any other Person whatsoever (subject to Permitted Liens); and

(iii)    the Liens in favor of the Collateral Agent and the Secured Parties set forth herein and in the other Credit Documents shall continue to be valid and perfected without the necessity that the Collateral Agent files financing statements or mortgages, takes possession or control of any Collateral, or otherwise perfects its Lien under applicable non-bankruptcy law.

14.2    <u>Secured Commodity Hedging Agreements.</u>

(a)    Subject to the limitations set forth in this Agreement, the Borrower and each Secured Party acknowledges and agrees that the Collateral may secure additional obligations of the Borrower and the other Credit Parties in respect of Secured Commodity Hedging Agreements, subject to compliance with this Section 14.2. Upon (x) execution and delivery to the Collateral Agent of an Accession Agreement and (y) compliance with the procedures set forth in Section 8.16 of the Security Agreement, such Person shall become a "Hedge Bank" under clause (i) of the definition thereof and a "Secured Party" hereunder and under the other Credit Documents, and the Credit Parties' obligations to such Person shall become "Obligations" hereunder and under the Credit Documents and "Secured Obligations" under the Security Agreement; provided that, for the avoidance of doubt, no such Person in such capacity shall have any consent or voting rights under this Agreement or any of the Credit Documents. Each Credit Party and each Secured Party agrees that this Agreement and the applicable Security Documents may be amended by the Credit Parties and the Collateral Agent without the consent of any Secured Party to the extent necessary or desirable to cause the Liens granted thereby to be in favor of such Persons (to the extent Liens in favor of such Persons are permitted by the terms of this Agreement).

(b)    Notwithstanding the foregoing, nothing in this Agreement will be construed to allow any Credit Party to incur additional Indebtedness or grant additional Liens unless in each case permitted by the terms of this Agreement.

14.3    <u>Permitted Property Interests.</u>    Upon the written request of any Credit Party following such Credit Party's execution of an easement, right-of-way or other real or personal property interest that (i) constitutes in whole or in part a Permitted Lien pursuant to clause (f) of the definition of Permitted Liens in the Agreement (a Permitted Lien pursuant to such clause (f), a "Permitted Property Interest"), and (ii) in the commercially reasonable determination of such Credit Party is required in the ordinary course of business, the Collateral Agent will promptly subordinate any Liens and any Superpriority Claim held by it for the benefit of any Secured Party, to the rights of third parties with respect to such Permitted Property Interest.

173

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first written above.

ENERGY FUTURE COMPETITIVE HOLDINGS
COMPANY LLC,
as Parent Guarantor

By: _____
    Name:
    Title:

TEXAS COMPETITIVE ELECTRIC HOLDINGS
COMPANY LLC,
as the Borrower

By: _____
    Name:
    Title:

DEUTSCHE BANK AG NEW YORK BRANCH,
as Administrative Agent and Collateral Agent,
Revolving Letter of Credit Issuer and Term Letter of
Credit Issuer

By: _____
    Name:
    Title:

By: _____
    Name:
    Title: