Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                   :    Chapter 11

6    ENERGY FUTURE HOLDINGS CORP., :

     et al.,                       :    Case No. 14-10979 (CSS)

7                                  :

             Debtors.              :    (Jointly Administered)

8    _____:

9

10

11

12                                 United States Bankruptcy Court

13                                 824 North Market Street

14                                 Wilmington, Delaware

15                                 July 20, 2016

16                                 10:26 a.m. - 11:33 a.m.

17

18

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:  LESLIE MURIN

1    HEARING re Second Amended Joint Plan of Reorganization of

2    Energy Future Holdings Corp., et al., Pursuant to Chapter 11

3    of the Bankruptcy Code [D.I. 8745; filed June 16, 2016]

4

5    HEARING re Contrarian Capital Management, LLC's Motion to

6    Compel Mediation of Disputes Concerning Certain Plan

7    Confirmation Issues [D.I. 8890; filed July 11, 2016]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   VENABLE LLP

4        Attorney for Pimco

5

6   BY:  JEFFREY SABIN

7

8   MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP

9        Attorney for E-Side Committee

10

11  BY:  BRIAN GLUECKSTEIN

12

13  GITLIN & CO., LLC

14       Attorney for the EFH Fee Committee

15

16  BY:  RICHARD GITLIN

17

18  PACHULSKI STANG ZIEHL & JONES

19       Attorney for the Second Lien Indenture Trustee

20

21  BY: LAURA DAVIS JONES

22

23

24

25

Page 4

1   KRAMER LEVIN NAFTALIS & FRANKEL LLP

2        Attorney for the Second Lien Indenture Trustee

3

4   BY:  JENNIFER R. SHARRET

5

6   HOGAN MCDANIEL

7        Attorney for Fenncle & Fehy

8

9   BY:  DANIEL K. HOGAN

10

11  CROSS & SIMON

12       Attorney for Fidelity Management & Research

13

14  BY:  DAVID HOLMES

15       CHRISTOPHER SIMOR

16

17  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

18       Attorney for Fidelity Management & Research

19

20  BY:  GARY KAPLAN

21       MATTHEW ROOSE

22

23

24

25

1    SEWARD & KISSEL

2         Attorney for Wilmington Trust as TCEH First Lien Agent

3

4    BY:  ARLENE ALVES

5    HOGAN MCDANIEL

6         Attorney for Contrarium Capital

7

8    BY:  GARVAN MCDANIEL

9

10   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

11        Attorney for Contrarium Capital

12

13   BY:  DAVID ROSNER

14        NII-AMAR AMAMOO

15

16   MORRIS JAMES LLP

17        Attorney for Law Debenture Trust Company of New York,

18        in its capacity as Indenture Trustee

19

20   BY:  STEPHEN MILLER

21

22

23

24

25

1   PATTERSON BELKNAP WEBB & TYLER LLP

2       Attorney for Law Debenture Trust Company of New York,

3       in its capacity as Indenture Trustee

4

5   BY:  BRIAN GUINEY

6

7   NIXON PEABODY LLP

8       Attorney for American Stock Transfer as EFH Trustee

9

10  BY:  RICH PEDONE

11      GEORGE SHELLY

12

13  MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

14      Attorney for the TCEH Debtors

15

16  BY:  DAVID PRIMACK

17

18  MUNGER, TOLLES & OLSON LLP

19      Attorney for the TCEH Debtors

20

21  BY:  TOM WALPER

22

23

24

25

1   DRINKER BIDDLE & REATH LLP

2        Attorney for Citibank DIP Agent

3

4   BY:  HOWARD A. COHEN

5

6   UNITED STATES DEPARTMENT OF JUSTICE

7        Attorney for the U.S. Trustee

8

9   BY:  RICHARD L. SCHEPACARTER

10  KLEHR HARRISON HARVEY BRANZBURG LLP

11       Attorney for UMB Bank, N.A. as Indenture Trustee

12

13  BY:  RAYMOND H. LEMISCH

14

15  AKIN GUMP STRAUSS HAUER & FELD LLP

16       Attorney for UMB Bank, N.A. as Indenture Trustee

17

18  BY:  ABID QURESHI

19       CHRISTOPHER CARTY

20

21  YOUNG CONAWAY STARGATT & TAYLOR, LLP

22       Attorney for Ad Hoc Committee of TCEH First Lien

23       Creditors

24

25  PAULINE K. MORGAN

1    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2         Attorney for Ad Hoc Committee of TCEH First Lien

3         Creditors

4

5    BY:  ALAN W. KORNBERG

6         MOSES SILVERMAN

7         JACOB ALDERSTEIN

8         ADAM BERNSTEIN

9

10   PROSKAUER ROSE LLP

11        Attorney for EFH Disinterested Directors

12

13   BY:  PETER J. YOUNG

14        MARK THOMAS

15

16   BIELLI & KLAUDER. LLC

17        Attorney for EFH Disinterested Creditors

18

19   BY:  DAVID M. KLAUDER

20

21   FOX ROTHSCHILD LLP

22        Attorney for Ad Hoc Group of TCEH Unsecured Noteholders

23

24   BY:  JEFFREY M. SCHLERF

25

```
1    KIRKLAND & ELLIS

2         Attorneys for the Debtor

3

4    BY:  MARK MCKANE

5         SARA ZABLOTNEY

6

7    RICHARDS, LAYTON & FINGER, P.A.

8         Attorney for the Debtors

9

10   BY:  DAN DEFRANCESCHI

11        JASON MADROM

12

13   WHITE & CASE LLP

14        Attorney for the Ad Hoc TCEH Unsecured Notes Wilmington

15        Trust

16

17   BY:  J. CHRISTOPHER SHORE

18

19   STEVENS & LEE PC

20        Attorney for EFIH

21

22   BY:  JOSEPH H. HUSTON, JR.

23

24

25
```

1    ALSO PRESENT TELEPHONICALLY:

2

3    SCOTT L. ALBERINO

4    ASHLEY F. BARTRAM

5    WARD BENSON

6    JOSH W. BRANT

7    PEG A. BRICKLEY

8    PHILIP E. BROWN

9    STEPHEN BUMAZIAN

10   KELLIE CAIRNS

11   MARK A. CODY

12   DANIEL B. DENNY

13   STACEY DORÉ

14   PHILIP G. EISENBERG

15   CATHERINE EISENHUT

16   BENJAMIN D. FEDER

17   BRADLEY FEINGERTS

18   BARRY FELDER

19   MICHAEL FIRESTEIN

20   MARK FLANNAGAN

21   PATRICK FLEURY

22   JOSEPH A. FLORCZAK

23   SETH GOLDMAN

24   ERICA GOODSTEIN

25   ISLEY M. GOSTIN

1    CHRISTOPHER HAHM

2    BEAU HARBOUR

3    MARK F. HEBBELN

4    NATASHA HWANGPO

5    HAROLD KAPLAN

6    MATTHEW KIMBLE

7    MICHAEL LEE

8    CATHERINE LOTEMPIO

9    CHRIS MCBAY

10    HAL F. MORRIS

11    TINA MOSS

12    KEVIN O'NEILL

13    MEREDITH PFISTER

14    JON PRUCHANSKY

15    LARY A. RAPPAPORT

16    ELIZABETH RASSKAZOVA

17    JEFF ROSENBAUM

18    ROBIN RUSSELL

19    ERIK SCHNEIDER

20    NOAH M. SCHOTTENSTEIN

21    MARSHA SUKACH

22    FOTEINI TELONI

23    ANGELO THALASSINOS

24    ANDREW M. THAU

25    AMER TIWANA

1    MATTHEW UNDERWOOD

2    TAMARA VAN HEEL

3    APARNA YENAMANDRA

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       P R O C E E D I N G S

2              THE COURT:  Please be seated.  Mr. McKane, good

3    morning.

4              MR. MCKANE:  Good morning, Your Honor.  Mark

5    McKane of Kirkland & Ellis on behalf of the Debtors.

6              We're here today I believe on three issues.  One

7    is the initial pre-trial conference for the TCEH

8    confirmation hearing.

9              Second, we're here to give a status update with

10   regards to our efforts to secure a private letter ruling

11   from the Internal Revenue Service.  And third, we're here on

12   a motion by Contrarian for mediation.  If it's acceptable to

13   the Court, we'll start with the initial pretrial conference,

14   and then take them in that order?

15             THE COURT:  Yes, that's fine.  Just give me a

16   second here.

17             MR. MCKANE:  Thank you, Your Honor.

18             THE COURT:  So --

19             MR. MCKANE:  I'm a little discombobulated here.

20             THE COURT:  Apologize.

21             MR. MCKANE:  I've got papers everywhere.

22             THE COURT:  Now I'm okay, all right.

23             MR. MCKANE:  Your Honor, I'm pleased to report

24   that we've had a fairly successful pre-trial process, in

25   which we are working towards a confirmation hearing on

1    August 17th.  It doesn't mean there aren't issues to -- that

2    are disputed to be tried.  And I think primarily, those

3    would fall really in -- into the Debtor's obligations,

4    obviously, to satisfy the standards under 1129.

5              But more specifically, there is an issue regarding

6    the fact that the proposed plan of reorganization

7    contemplates the consumption of certain tax attributes of

8    the EFH group, and whether the EFH core parent should be

9    compensated for the consumption of those NOLs that would

10   yield a step up in basis to the reorganized TCEH entity.

11   That's issue number one.

12             The second issue relates to whether there should

13   be consideration provided to EFH Corp. for the transfer of

14   two entities.  One is a Debtor, one is not.  The Debtor's

15   EFH Corporate Services, as Your Honor knows from the -- from

16   these cases, that provide basically the back office function

17   for the Debtors.

18             It's largely more of a T-side effort than

19   servicing the holding companies.  But that's that transfer.

20   The third issue relates to the transfer of a non-Debtor EFH

21   Properties.  EFH Properties is not the owner of the

22   headquarters building at Energy Plaza in Dallas, it is the

23   lessee of that building, as a result of a sale lease backed

24   transaction back in 2003.  Those are the core issues that

25   have been the focus of discovery.

1          THE COURT:  So it's owned by a -- not an

2     affiliate?

3          MR. MCKANE:  Correct, Your Honor.  There is a

4     third party bank.  There was a sale lease backed transaction

5     back in 2003.  EFH Properties, ultimately became the lessee.

6     And there are sub-lessee -- sub-leasing obligations

7     primarily to Luminant, but also corporate services as well,

8     as well as some Oncor.  So EFH, the Debtors, none of the

9     Debtors and none of the affiliated companies actually own

10    the headquarters.

11         THE COURT:  Okay.

12         MR. MCKANE:  It's owned by the bank.

13         THE COURT:  How is the NOL issue impacted, if at

14    all, by the tax-free spin issue?

15         MR. MCKANE:  To be more precise about the rulings

16    that we're going to get from the IRS?

17         THE COURT:  Yes.

18         MR. MCKANE:  Okay.  Based on what we understand

19    the rulings to be, will be, we anticipate that the Debtors

20    will be able to go forward with the tax-free spin on the T-

21    side.  A component of that transaction, which is consistent

22    with what we had in 2015, is what we -- the tax

23    professionals refer to as a Busted 351.

24         That Busted 351 is the means by which we put

25    certain assets into an entity and then trigger a tax gain

1    through the selling of preferred stock, yes, yielding a step

2    up in basis that can be neutralized from a cash tax

3    perspective by the consumption of tax attributes.  That's

4    how we give a step up to the T-side.

5              THE COURT:  Right.

6              MR. MCKANE:  Based on what we expect the rulings

7    to be, the transaction on the T-side will ultimately consume

8    NOLs, you know, post-emergence, you know, when EFH goes to

9    file taxes.  And there--anticipate there may be NOLs

10   remaining for EFH, you know, for -- and to the extent that

11   it goes forward, when it goes forward with its plan of

12   reorganization.  And those E -- some of those NOLs may

13   actually be able to be utilized post-emergence by EFH.

14             THE COURT:  Okay.

15             MR. MCKANE:  Okay?  So it's with those kind of

16   core issues that the parties have focused their discovery.

17   We acknowledge objections aren't due yet, so there may be a

18   linked issue that no one's taken discovery on, but frankly,

19   we find that unlikely.

20             In our pre-trial efforts, we had a productive meet

21   and confer session last week.  And really, I think we're

22   building on the successful procedures that you implemented

23   from last year.  And so, based on that, we have consensus

24   from all participating parties in the confirmation hearing

25   to use of a chess clock to manage the time, to the use of

1    written directs, like we did last year, to the same types of

2    procedures for the use of exhibits and demonstratives, and,

3    and even for working together on closing statements or

4    whatever the Court wants in terms of post-trial work, and as

5    well as deposition designations.

6            So there's agreement there.  Where there's --

7    where we haven't got to agreement yet, but we expect there

8    will be agreement is frankly on the trial time.  I think

9    everyone acknowledges last year, we used 55 hours.  We

10   proposed 55 hours.  We did not use 55 hours.

11           I think it's based on that experience and the

12   issues that were presented there, as well as the procedures

13   that are being used, that the Debtors propose 20 hours.

14           People didn't say no, but they wanted to further

15   evaluate the issue to fully assess whether 20 hours was too

16   limited.  I think we'll get there.

17           So I expect by the time we're back for the pre-

18   trial conference on the 15th, we'll have agreement on those

19   issues.  And frankly, before we have to file the submission

20   of the pre-trial order on the 8th, I'm hopeful that, you

21   know, maybe with some of your guidance today, we'll be able

22   to get to a resolution of how much trial time we need.  And

23   then, there's -- and frankly, I think probably a less --

24           THE COURT:  Well, we have -- I mean, as you know,

25   we have eight full trial dates booked.

1          MR. MCKANE:  Yeah.

2          THE COURT:  Okay.

3          MR. MCKANE:  I will tell you, based on the issues

4    that have surfaced to date, I do not believe that we need

5    all eight trial dates.

6          THE COURT:  I won't give any away.

7          MR. MCKANE:  Thank you, Your Honor.

8          THE COURT:  Hope for the best, expect the worst.

9          MR. MCKANE:  Exactly.  So it's with that that we

10   were moving forward.  We also, as I reported yesterday in

11   correspondence with Your Honor, we are proposing some modest

12   revisions to the scheduling order, and let me just explain

13   why.

14          At the disclosure statement hearing, one of the

15   issues that the EFH indentured trustee highlighted was the

16   fact that there were certain ancillary agreements that are

17   not yet finalized, that have to be filed by date and time.

18   And based on guidance from Your Honor, we agreed that we

19   would file those -- a handful of agreements by no later than

20   July 27th.

21          We are on track to do that.  Those agreements are

22   specifically agreements that would impact the issues that

23   we're going to be trying.  It's the tax matters agreement,

24   which is -- to a lay person, really a risk allocation

25   exercise about tax issues going forward, as well as a

1    separation agreement, which really governs the transfer of

2    properties and corporate services, among other things.

3            So we are moving forward with finalizing those

4    agreements.  There are a handful of outstanding issues that

5    we are negotiating with the TCEH first liens, who are as the

6    owners of reorganized TCEH, who is the counterparty to those

7    agreements, is the primary counterparty with whom we're

8    negotiating.

9            And we expect to reach a resolution of those

10   issues.  And so, we have, from a governance standpoint, a

11   board meeting scheduled for this Friday.  We have a board

12   meeting in person scheduled for next Wednesday.  And we

13   expect to be filing those agreements on time.

14           As we filed those agreements, not surprisingly,

15   the EFH indentured trustee and the other participating

16   parties have said that they want to take certain discovery

17   about the final terms.  Again, based on some of your

18   guidance, at the disclosure statement hearing, we recognize

19   that that would be appropriate.

20           And we've referred to this colloquially as phase

21   two.  And so, we are moving forward with some limited

22   discovery during the first week of August.  You know, once

23   we've filed the agreements, to enable modest amounts of fact

24   discovery to be resolved at that point in time.

25           And in addition, next week, we will be -- next

1    Monday, the 25th is when rebuttal of the expert reports are

2    due.  And then, we'll be completing the expert discovery at

3    that time as well.  So it's really, more -- not that effort

4    work, but the fact work that's leading to us basically

5    acknowledging that it would be appropriate to allow

6    objectors to have some time after we complete that phase two

7    discovery before they file their objections, and that's

8    what's driving the suggestion that we move the objection

9    date from the 3rd to the 8th of August, with a modest --

10   with a compression of the Debtor's reply.

11          But with the request that we file the reply on the

12   morning of the 15th.  And so, that's what's driving those

13   proposed revisions to the scheduling order.  I believe we've

14   circulated a proposed revised scheduling order to address

15   that.  We've gotten some comments, I think frankly, we can

16   work through the revisions as necessary this afternoon and

17   file it by COC this evening, but I think that's the status

18   of where we are in the scheduling order.

19          And then, finally, we are working constructively

20   with the EFH indenture trustee to resolve certain

21   outstanding fact disputes, discovery dispute issues as it

22   relates to the amount of information they need to evaluate

23   the corporate services and properties issues.

24          That's an ongoing effort and I think based on

25   where we are, I don't believe there's any issue that's right

1   and presentable for you at this time.  But I wanted to give

2   you a heads up that there's -- we're working through those

3   issues and it may surface later on.

4          THE COURT:  All right.  So when it comes to pre-

5   trial, you are -- what I hear is you're not asking me to do

6   anything other than sign whatever you send over under COC?

7          MR. MCKANE:  Absolutely.  Today is really more of

8   an update.  I think it's consistent with our initial pre-

9   trial conference last week to send the -- these procedures

10  are generally acceptable to you.  We'll continue down this

11  path and we'll submit a formal pre-trial order on August 8th

12  for consideration on the 15th.

13         THE COURT:  Okay.  Does anyone wish to be heard on

14  pre-trial issues?  Mr. Pedone?

15         MR. PEDONE:  Your Honor, Richard Pedone on behalf

16  of the EFH indenture trustee.  We do have ongoing disputes

17  concerning discovery regarding the properties entity and

18  regarding corporate services.  They're being worked through

19  professionally and we're all working hard to find a creative

20  way, keep the case on track time wise and the Debtors are

21  assisting in that effort.

22         There was a deadline in the initial pre-trial

23  order for motions to compel.  Ahead of that, we sent the

24  Debtors a long letter, and then we've been exchanging lists

25  and working through it.  I just want to be certain that if

1    it does boil up over the next week, which I don't expect it

2    would, that the Court is not wishing to hear about the issue

3    in more detail today.  I truly believe we're going to work

4    through it in a solid manner.

5              THE COURT:  I'd only -- if people are working

6    through it, I don't need a preview or to hear about it, if

7    ultimately, an issue arises that there's a decision, I can

8    deal with that when it comes.  I am out of the office

9    Tuesday -- Monday and Tuesday next week.  I am in the office

10   Wednesday.  I am generally not happy to, but willing to hear

11   you Monday, Tuesday or Wednesday next week.  If the issue

12   needs to be decided after that, I'm -- I think as you know,

13   I'm out of the country for two weeks, so --

14             MR. PEDONE:  Okay.  I understand.  I --

15             THE COURT:  There's always a duty judge available,

16   but in a case like this, I think it would be very difficult

17   for somebody to come in cold and make an intelligent

18   decision.  So if you can't reach an agreement and you think

19   you need court intervention, you really kind of have until

20   next Wednesday, and then you're sort of out of luck, I

21   think.

22             MR. PEDONE:  Okay.  I think it's unlikely we'll

23   need Court intervention, and we're working through it.

24   Thank you.

25             THE COURT:  All right.  Very good.  Thank you, Mr.

1   Pedone.  Anyone else on T-side confirmation pre-trial

2   issues?  Okay, I don't hear anyone.  Now can I have the long

3   awaited, carefully worded tax update?

4            MR. MCKANE:  Yeah, emphasis on carefully worded,

5   Your Honor.  I am authorized to report the following with

6   regards to the PLR.  We've had several positive

7   conversations with the IRS over the past few weeks regarding

8   the ruling, and are optimistic that we will receive the

9   rulings by the July 28th deadline.

10           We expect to receive a draft of the facts and

11  representations required of EFH from the IRS today.  And in

12  fact, may have already received it during the -- this

13  hearing.  There is a follow-up call scheduled with the IRS

14  to discuss the exact wording of the rules to -- the rulings

15  to be given on Friday.

16           And my understanding is, that is standard protocol

17  for the service in terms of how they proceed before they

18  give you a ruling that they will not provide you a written

19  draft, but they will orally discuss the exact wording of

20  what the ruling will be.  And that is very promising news.

21  So that's scheduled for Friday.

22           The IRS has indicated that it will likely issue

23  positive rulings covering the subject matter of the

24  fundamental rulings required by the plan.  And while the IRS

25  remains adverse on the CODI ruling, they have indicated that

Page 24

1    they're a likely positive on the alternative rulings

2    requested to confirm that any gain triggered as a result of

3    this adverse position does not create a current tax

4    liability from -- for EFH from the spin-off.

5              THE COURT:  Can you refresh my recollection.  What

6    do you mean by CODI ruling?

7              MR. MCKANE:  Right, sorry.  So the CODI ruling or

8    the cancellation of debt income ruling --

9              THE COURT:  Debt, okay.

10             MR. MCKANE:  -- is one where we had made a request

11   so as to confirm essentially such that the -- it's non-

12   recourse debt on the T-side.  That was the request so as to

13   not have CODI triggered.

14             The IRS, through its preliminary adverse

15   indication, as well as a regulatory change or a reg change,

16   has indicated that based on the fact that the debt was at an

17   LLC, that they were not inclined to give us the non-recourse

18   ruling that we wanted.  That could ultimately have triggered

19   a situation where we would have had gain.

20             We have proposed some alternative rulings to

21   enable us to structure the transaction so as to not trigger

22   that gain.  And it is those alternative rulings that

23   essentially was a follow-up based on the input that we

24   received from the service in May that the IRS has indicated

25   they are amenable to providing in the alternative.

1            And so, from a layman's perspective, a non-tax

2    lawyer's perspective, we will have the rulings from the IRS

3    necessary to move forward with the transaction.

4            THE COURT:  Okay.  Are you dealing with the

5    decision makers at the -- yeah, if anybody -- if he says

6    anything wrong, the tax lawyers need to jump up and --

7            MR. MCKANE:  Yeah, Ms. Zablotney would be happy to

8    take the podium.

9            THE COURT:  All right.  Are -- okay.

10           MR. MCKANE:  Thank you.

11           MS. ZABLOTNEY:  Yeah, no problem.  Sarah Zablotney

12   from Kirkland & Ellis.

13           THE COURT:  I can't hear you.  I'm sorry.

14           MS. ZABLOTNEY:  Sarah Zablotney from Kirkland &

15   Ellis tax counsel to EFH.

16           THE COURT:  All right, do you want to elaborate on

17   what Mr. McKane said?

18           MS. ZABLOTNEY:  Yeah, sure.  So we are dealing

19   with decision makers at the IRS.  Ms. Kelly, who is our

20   ruling -- who is handling our ruling -- has taken it --

21   taken the rulings to Bob Wellen, who's head of Corporate.

22   And he has looked at them and we have heard from her that he

23   is the person who is positive.

24           THE COURT:  Okay.  So the only reason I ask, of

25   course, is there could be a delay --

```
1              MS. ZABLOTNEY:  Correct.

2              THE COURT:  -- involved, if you have to take it up

3      the -- a decision chain.  So you feel you're dealing with

4      the people who will be in a position --

5              MS. ZABLOTNEY:  We do.

6              THE COURT:  -- to give you the ruling by the date

7      that you've talked about?

8              MS. ZABLOTNEY:  We do feel that, Your Honor.

9              THE COURT:  Okay.  All right.  Okay.  I think I

10     understand.  All right.  Anything you can do to avoid me

11     having to make a tax ruling is to the benefit of all.  I

12     won't tell you what I got in corporate tax in law school,

13     but it was not one of my better grades.

14             Would anyone like to make any comment or be heard

15     in connection with the report on the tax ruling or tax

16     situation with the IRS?  Okay, everybody's quiet.  I don't

17     have any further questions.  Let me hear on the motion to

18     compel mediation.

19             MR. ROSNER:  Good morning, Your Honor.  David

20     Rosner from Kasowitz Benson Torres & Friedman.  I'm here

21     with my colleague Nii-Amar Amamoo.  I'm here for Contrarian

22     Capital Management.  Contrarian, so Your Honor's aware, is

23     the holder of certain of the legacy bonds that are issued by

24     EFH.

25             THE COURT:  EFH, right.
```

1           MR. ROSNER:  The top box.  And in several series

2    of those notes.  Now as Your Honor is aware, and I think Mr.

3    McKane just identified the three issues.  There are certain

4    contested issues that we believe are susceptible to

5    settlement, that hinder confirmation of the T-plan, at this

6    point.

7           And specifically, they relate to the use by and

8    transfer to TCEH of certain property of EFH's estate,

9    without compensation, which is how we view it.  And what

10   we're talking about is $8.2 billion in NOLs that translate

11   to a $1 billion step-up in basis for the assets at the TCEH

12   side.

13          And I think extremely valuable asset of the EFH

14   estate that is being transferred, in our view, without

15   consideration.  And then, also, as Mr. McKane pointed out,

16   the equity in the reorganized EFH shared services Debtors

17   are being transferred to TCEH under the plan without any

18   compensation to the E-side.

19          So there's been no agreement on any compensation

20   on the transfer of those valuable assets, and none has been

21   accomplished to date.  There have been settlement proposals,

22   Your Honor.  There's been settlement proposals that have

23   been offered from Contrarian Capital, as well as Fidelity.,

24   and you'll hear from Fidelity today, that have, at this

25   point, been unresponded to.

1           And I think that's important for today's hearing

2      on this motion, because one of the things you'll hear from

3      the objectors is, "We're so far apart that there's no point

4      in mediating."  We actually don't know that at this point,

5      because there hasn't been a specific response to the

6      settlement offers other than that, and they won't be the

7      first party compelled to mediation that has said, "We don't

8      think we're going to be able to settle."

9           That is usually the reason that there is a

10     mediation, because people think that, but then they're able

11     to reach a resolution.

12          So we simply say, Contrarian simply states that

13     mandatory mediation, regarding compensation for those asset

14     transfers, will greatly narrow the contested issues for

15     confirmation and take those eight trial dates that you have

16     and vastly reduce them.

17          As Your Honor is well aware, the local rules

18     provide for compelled mediation, if Your Honor so desires,

19     as well as the Bankruptcy Code.  And we've submitted that we

20     would submit almost immediately three proposed mediators to

21     Your Honor, if that's how you wanted to do it.

22          You would appoint the mediator.  The mediator

23     would control the time, place and manner.  Again, these are

24     narrowly focused issues, important, critically important

25     issues, but narrowly focused.  And we think that the

1    mediator will be able to control the time, place, manner,

2    whether it be by telephone, whether it be in-person, report

3    to the Court.  And of course, everything said and provided

4    would be subject to a settlement privilege.

5              Absolutely critical, Your Honor.  We are not

6    asking to move the August 17th confirmation date, and

7    beginning of the confirmation trial in any respect.  We

8    propose that this be done on a dual track.  We're a month

9    away from confirmation.

10             I think as Your Honor is aware, you can compel

11   mediation to occur during confirmation, as well as before.

12   And it can work without changing the schedule.  I think

13   actually, the local rules require that the schedule -- the

14   scheduling order maintain -- remain enforced.

15             And we do not seek to dislodge it, notwithstanding

16   the protestations to the contrary, that all we're seeking to

17   do is delay confirmation, not the case.  We -- what we're

18   seeking to do is reach consensual resolution with an

19   independent and neutral mediator.

20             And mediation is preferred, I think, in -- as any

21   type of alternative dispute resolution.  And if we can

22   narrow, at least take two of the three main issues of

23   confirmation off the table over the next couple of weeks.

24             And it doesn't involve a lot of people, I don't

25   think in the room.  And even if it did involve some of the

1    people, and you only have a few parties that have actually

2    even opined on this or given, given their view on this

3    today.

4            And if there were other parties that needed to

5    join, it's easy to get done.  And it's not that many people.

6    So we seek to streamline the resolution of these central

7    issues and confirmation.  And we want to minimize the

8    administrative burden of litigating them.

9            So as you'll hear today, our request for mediation

10   has been specifically joined by our indentured trustee, as

11   well as by Fidelity, which was one of the authors of one of

12   the settlement term sheets that were offered to the other

13   side.

14           And I think just the concept that settlement

15   offers were made to the other side, written settlement

16   offers, indicates a strong desire on one side, at least, to

17   settle issues that are necessary to be settled and resolved

18   at confirmation.

19           There's been opposition.  There's opposition by

20   two -- there's opposition by the Debtors and there's

21   opposition by the TCEH First Lien Ad Hoc Committee, who

22   you'll hear from.

23           Now the TCEH Committee, as we see it, largely

24   argues the merits of their position under what they think

25   should happen, whether they think that tax attributes should

1    be taken from one estate, transferred to another estate

2    without compensation, whether companies should be taken from

3    one estate, transferred to another, without compensation.

4            They argue the merits of those.  I don't -- I

5    think this is largely a procedural motion.  What we're

6    trying is to set the table to bring their views and our

7    views together in a room.

8            I think it won't be lost on the Court, it's not

9    lost on any of the parties in the room, that the transfer of

10   over $8 billion of NOLs, and the step-up in basis of a

11   billion dollars in value to the TCEH side is valuable and is

12   something to talk about, and that the parties can actually

13   talk about it.

14           It can't be said that there's no value

15   attributable to that.  They will make their arguments that

16   maybe they don't have to pay for it.  We will make our

17   arguments that it can -- that they need to pay for it.  And

18   it's an economic issue that can be resolved.  It could be

19   resolved with a neutral.

20           They also, with the shared services, I think

21   largely argue the merits of the proceeding -- the merits of

22   the underlying issues.  And again, that's -- that should be

23   saved for the mediation itself.  But they talk about delay.

24   I've addressed it.  We're not seeking to delay.  And they

25   say that they don't want to mediate.

1           I think they do.  They would want to settle and

2      resolve certain issues.  They may not want to give up as

3      much to do it as we'd want them to do it.  But I think just

4      the protestation that they don't want to mediate should not

5      be a reason to not compel mediation, because I think if you

6      compel mediation, they'll sit in the room, they'll listen.

7      Mr. Kornberg will listen to me.  I will listen to Mr.

8      Kornberg.  And we will see if we can reach a resolution.

9      The neutral will listen to both of us.

10          They say that it's wasteful.  There's no way that

11     it is wasteful to put lawyers in a room that are otherwise

12     going to be contesting these issues at the cost of millions

13     of dollars in a litigation and seeing if they can actually

14     resolve the issues.

15          Mediation works.  It's worked before.  It

16     typically works.  And if you take the same lawyers and put

17     them in a room, you are not wasting resources, you're

18     additive to the process.

19          Now the Debtors also have objected, and you'll

20     hear from, I assume Mr. McKane in a little bit about his

21     objection to compel mediation.  They say, quote, "It's

22     highly unlikely to resolve on the eve of trial," closed

23     quote.  He concedes, and he said earlier today that these

24     are -- we're seeking to mediate two of the three main

25     issues.

1           And I would submit, Your Honor, the eve of trial

2     is -- with a neutral mediator is exactly when things get

3     resolved.  And whether you want to call four to five weeks

4     away from confirmation the eve of trial or whether you want

5     to say, "We're sufficiently ahead of trial to get things

6     mediated," that is when people actually sit down and hammer

7     it out.  And we can get it done with a neutral mediator.

8           Again, they make the same argument that the

9     parties are far apart.  We're not sure about that.  And if

10    we are far apart, it can be resolved in a room.  They also

11    claim that this is an untimely request, and that it's

12    inappropriate.  And I would submit to Your Honor that a

13    mediation, particularly of the compelling -- of the two of

14    the three issues remaining for confirmation, is always

15    appropriate, that mediation -- and this is the precise

16    circumstance -- that mediation is designed to solve plan

17    related issues prior to the conduct of the confirmation

18    hearing.

19          I would simply say that it's also timely because

20    it's before confirmation, a month before confirmation, I

21    think as Your Honor recognized, it could be at confirmation,

22    but it doesn't delay confirmation.  And that's the only

23    issue that really goes to timeliness.  That's all I have,

24    Your Honor, to start off with.  We would ask for Your Honor

25    to enter an order of compelled mediation, and we're ready to

1    start that mediation this afternoon.

2            THE COURT:  All right, thank you.

3            MR. ROSNER:  Thank you, Your Honor.

4            THE COURT:  Does anyone wish to be heard in

5    connection with requiring mediation?  Mr. Kaplan?

6            MR. KAPLAN:  Thank you, Your Honor.  Gary Kaplan

7    from Fried Frank on behalf of Fidelity.  Fidelity joins in

8    the motion and I'm obviously not going to reiterate the

9    points that Mr. Rosner made.  But I just want to add a few

10   things.

11            One is, in terms of the issues at hand, while

12   they're still in discovery, that needs to go on to put on --

13   to put together a trial, the parties are aware of all of the

14   factual bases to have the discussions.  Now it's not like

15   this is a -- some dispute where we need to continue to

16   develop a record for the parties to sit down today and have

17   a discussion about it.

18            We all know the value -- people can dispute

19   amongst themselves and have different perspectives on the

20   value of the NOLs and the value of the basis of step-up.

21   But everybody knows what the universe of the assets are that

22   we're talking about and what the values of those assets are.

23            So mediation could start immediately.  It's not as

24   if we would need to wait for discovery to conclude in order

25   to do it.  I think you're going to hear from Mr. Kornberg

1    that, well, what's really happening is parties are looking

2    to re-litigate the disinterested director settlement that

3    settled a number of the inter-Debtor issues.

4              And that -- and just to address that head-on,

5    that's not what's happening here.  That settlement was

6    addressed at a time when there was a plan on file that was

7    going to be paying EFH Creditors in full.  And that

8    settlement did not deal with issues such as what happened,

9    is their compensation necessary for these assets being

10   transferred, because it was irrelevant.

11             You have 100 percent plan, so there was no reason

12   for compensation, because it would just recycle itself.  So

13   nobody is seeking to re-litigate an issue.  That order is

14   fine.  It wasn't appealed, or if it was appealed, the

15   appeals are done, so that's not what's at -- that's not

16   what's at issue here.

17             This is simply an economic issue of EFH looking

18   and saying there are -- there's value being transferred to

19   the T-side.  The T-side's getting benefit and there should

20   be compensation for that.  We're not seeking to delay, as

21   Mr. Rosner said, you're not seeking to delay confirmation.

22             We've be very happy for this courtroom to be a lot

23   emptier by the time we get to an E-side confirmation

24   hearing.  The T-side should get out of Chapter 11 as soon as

25   it can.  We just need to address these inter-state issues.

1          As Mr. Rosner said, the parties are -- the parties

2    at issue are fairly small here.  This isn't a huge issue of

3    20 different parties.  This is a fairly discreet group of

4    people who need to get in a room and figure out whether

5    these issues can be resolved, or not.

6          And then, the final point and the reason why I

7    think you're seeing the EFH Creditors, you're pushing the

8    mediation so strongly is, we don't yet know what the

9    ultimate outcome is going to be for EFH, but there are

10   scenarios where the primary recovery for EFH or a portion of

11   the recovery may just be the cash that's left at EFH.

12         And so, when we have a confirmation hearing, if it

13   turns out to be a wasteful eight-day confirmation hearing,

14   where we settle the issues on day five or day seven, and

15   we've wasted another $20, $30, $40, $50 million, a lot of

16   that money is going to be, frankly, coming directly out of

17   the recovery for EFH Creditors.

18         And so what you're seeing by this motion is the

19   EFH creditors saying we don't want to waste more money.

20         If we can get these issues resolved, we can cut

21   the burn, at least on the TCEH confirmation, focus just on

22   the EFH confirmation and exit and not waste a lot of money,

23   because while it may be great that on day 3 or 4 of the

24   confirmation hearing we ultimately settle these issues, we

25   will have potentially reduced our recovery significantly

1   because we will have burnt 10's of millions of dollars on

2   unnecessary litigation.

3           So, unless Your Honor has any questions, I don't

4   have --

5           THE COURT:  No, I do not.  Thank you, Mr. Kaplan.

6           MR. KAPLAN:  Thank you, Your Honor.

7           THE COURT:  Mr. Pedone?

8           MR. PEDONE:  Your Honor, Richard Pedone on behalf

9   of EFH Indenture Trustee.  As Mr. Kaplan noted and Mr.

10  Rosner noted, we're not looking to slow down the process.

11  Mediation can occur simultaneously.

12          There are three buckets of issues to be

13  determined. They are the NOLs, and it's worth emphasizing,

14  the use of the NOLs by the T-side in a second-round plan was

15  not determined in the settlement agreement.

16          It's an issue that opened.  It's a question of

17  whether there is a tax sharing agreement that currently

18  covers it.  It's a tax issue and then a -- I think the word

19  that Mr. McKane used best sums it up.

20          Should the T side be allowed to consume an EFH

21  property and asset?  And that's an issue.  And should there

22  be consideration?  And the parties could get in a room and

23  look at the cost and benefit and cut through it.

24          And the other two issues to be determined, what is

25  the value of corporate services?  Should there be

1   consideration for it?  And what is the value of the non-

2   debtor properties, which has a payable to EFH Corp of over

3   $100 million noted on the books and records and the

4   schedules of EFH Corp.

5        Those are factual issues that this Court does not

6   need to be delving into that the parties could get to a

7   resolution on, even if it simply a mediation that says the

8   dollar amount to be put on them is X, and the Court can

9   determine the law that's applicable.

10        And for those reasons, we think the process would

11   be much more efficient if mediation were ordered.  Thank

12   you.

13        THE COURT:  Thank you, Mr. Pedone.  Anyone else?

14   Mr. Glueckstein --

15        MR. GLUECKSTEIN:  Yeah.

16        THE COURT:  -- would you like to be heard?

17        MR. GLUECKSTEIN:  Your Honor, for the record,

18   Brian Glueckstein, Sullivan & Cromwell, on behalf of the EFH

19   Creditors' Committee.

20        I rise, Your Honor, only to make the point that

21   the Committee has not filed a position on this particular

22   motion.  As Your Honor is aware, the Committee's role in the

23   litigation is somewhat limited as a result of the settlement

24   agreement that the Committee has currently in place.

25        But make no mistake, the Committee remains active.

```
1    The Committee remains in touch with creditors, and certainly

2    beyond the E-side creditors who have moved today.  If a

3    mediation were to go forward, there are other creditors,

4    both of EFH and EFIH potentially who would be impacted by

5    the result.

6            And so I rise, Your Honor, only to make the

7    request that if Your Honor is to order mediation today, that

8    that be expanded to at least include the Committee and any

9    other significant creditors who have a desire to participate

10   in the mediation process, as it seems that it would be most

11   beneficial for an outcome to be -- completely resolve the

12   remaining issues for confirmation, as opposed to piecemeal

13   with particular creditors.  Thank you.

14           THE COURT:  Thank you, Mr. Glueckstein.  Mr.

15   McKane?

16           MR. MCKANE:  Thank you, Your Honor, and for the

17   record, Mark McKane of Kirkland & Ellis on behalf of the

18   Debtors.

19           Your Honor, before I step into the mediation

20   issues, I actually owe Mr. Gwynne an apology, because when I

21   was identifying --

22           THE COURT:  Well, I was going to ask --

23           MR. MCKANE:  When I was identifying all of these -

24   -

25           THE COURT:  I owe him an apology too because it
```

1    was on my mind to ask about the PCRBs.  I apologize as well.

2             MR. MCKANE:  Right.  So even though we're on the

3    T-side of confirmation and these are all E-side creditors,

4    we actually do have one T-side issue remaining and to date -

5    - it's the PCRB issue is back on the table and we've been

6    working very constructively with Mr. Gwynne on that and I

7    think whatever needs to be presented to you be done in a

8    very discreet manner.

9             THE COURT:  Okay.

10            MR. MCKANE:  Turning to mediation, while the

11   Debtors recognize there's a strong trend to mediate

12   restructuring disputes, there's nothing wrong with the

13   classic approach of parties negotiating and resolving

14   disputes while litigating in parallel.  You try to resolve

15   the issue, and if you can't, the Court rules.  We work in

16   parallel all the time and that's what we've done in other

17   proceedings.

18            We've had successful mediation in this case and

19   we've had mediations that have been left successful.  And

20   frankly, it's the Debtor's view that given the distance

21   between where the parties are on these -- on these issues,

22   it's hard to see how a mediation at this time would be

23   successful.

24            And let me just briefly touch on a view of the

25   issues and really kind of emphasize some points.  We

1    believe, frankly, that the issues are not that difficult.

2    They are very straightforward.

3            With regard to the NOLs, I do have to pause

4    because I have been educated by my tax professionals over

5    the last couple years.  And there is no transfer of tax

6    attributes.  That's just -- that's a -- that legally does

7    not happen.  There is a proposed transaction at TCEH.  It

8    triggers whatever income it triggers.  Here, it'll trigger

9    income at the Busted 351 level.

10           When the tax bill comes due, the taxpayer, EFH

11   Corp, has to satisfy those obligations.  It has tax

12   attributes.  There is law on how those tax attributes are

13   consumed.  The existing year, oldest, running back up the

14   chain.  There's no transfer moving around.

15           That happens as a matter of law, right?  That

16   doesn't happen.  So it's really about the structure of the

17   T-side transaction.  That's what folks are objecting to.

18           And the cold, hard restructuring reality is after

19   two years, the Debtors cannot force the TCEH first liens to

20   pursue a tax-free restructuring.  And after two years in

21   bankruptcy, the first liens can pursue a taxable

22   transaction.

23           And based on the anticipated rulings that we will

24   be receiving from the IRS, with those rulings, if the TCEH

25   first liens pursued a taxable transaction, we are back into

1    the world of the stranded tax on the E-side, a multi-billion

2    dollar stranded tax on the E-side.  That is tax Armageddon;

3    that is a disaster for their recoveries.  It also consumes

4    every NOL the EFH side has.  The EFH Corp has no NOLs, you

5    know, post-emergence in that scenario.

6         And so the proposal -- a plan that's, you know, on

7    file, incentivizes the TCEH first liens to go forward tax

8    free by providing the step up in basis.  So when asked, is

9    there consideration being provided, it is the -- it is

10   foregoing in massive liability for the EFH creditors.

11        Right now, there is no viable scenario in which

12   the EFH keeps all of their tax attributes through this

13   discussion.  That is going to be the reality that will be

14   presented in August.  And, frankly, from a negotiating

15   standpoint, the T first -- the T creditors will never pay

16   hundreds and millions of dollars for the use of those NOLs.

17   That would never happen.

18        I think the consideration issues are equally

19   straightforward on corporate services.  Corporate services

20   provides the back office functions, as I mentioned.  And

21   frankly, the vast majority of their work, you know -- in

22   recent years, in their restructuring years, over 90 percent

23   of their work has been for the T-side.

24        And if EFH Corporate Services stayed on the E-

25   side, there'd be significant liabilities for any of that.

1    EFH Corporate Services is not -- it would never be a 100

2    percent payout case.  There would be liabilities there.

3            And the TCEH debtors have agreed to take the

4    equity of corporate services, both the assets and those

5    liabilities.  And by taking the equity, you are foregoing

6    significant liabilities that would arise if EFH corporate

7    services was left at the parent, right?  That is where we

8    are.  Those are kind of the core issues.

9            And what is not said in their papers, but is

10   undeniably the elephant in the room, is that there's an

11   allowed $700 million claim that EFH -- that the TCEH first

12   liens control.  That's the result of the final non-

13   appealable settlement order.  And the NOL and the

14   contribution issues are efforts to create leverage to

15   negotiate against the first liens to subordinate all or part

16   of that claim.  That is the end goal here.

17           It's not surprising that with that environment

18   between the creditors on both sides of the house that the

19   Debtors have actively pursued a consensual resolution of

20   these issues.

21           On June 1st and 2nd, Proskauer, as counsel for

22   EFH, under the direction of the disinterested directors,

23   Donald Nevins and Billie Williamson, brought the creditors

24   together in a room, multiple efforts to try to resolve those

25   issues and as put forward.  I tell you that not because I'm

1    trying to probe into the settlement negotiations.  But I

2    raise that because we're not blind to the needs to try to

3    resolve these issues.

4            And these issues, to the extent that the creditors

5    are saying are new or resurfaced in the new plan were in the

6    -- were in the prior plan, but since filing the '16 plan in

7    May, we have tried to bring these issues to resolution.  And

8    the fact that there was no movement thereafter is as strong

9    a secondary indication as we can identify for you without

10   telling you the contents of the settlement offers, to give

11   you some sense of the distance between the parties.

12           So it's because of that distance that we struggle

13   with, you know, how this could possibly get done in a

14   constructive manner.  No one would be happier than the

15   Debtors to get to August 17th and have a largely, if not 100

16   percent, consensual confirmation hearing.

17           We understand their position that there's, you

18   know, no chances of a delay here.  We would want that as

19   almost (indiscernible).  We believe that we must get the T-

20   side debtors out and that the August 17th hearing, in our

21   view, is invalid, and therefore, whatever we do here has to

22   move in parallel.

23           I would add that I know they discuss these claims

24   do not rise, but as I understand their joinder, I really do

25   believe that to the extent that there are issues -- their

1    issues are E-side issues, they are E-side creditors.  And

2    when we file an E-side plan, they will have their day in

3    court and we will try to resolve issues to the extent we can

4    with them.  But this is not their day.

5            So to the extent you are considering those issues,

6    I just wanted to emphasize that where Ms. Fenicle and Mr.

7    Fahy are, they are purely E-side creditors, and therefore,

8    to the extent their interests are parallel with the movants,

9    so be it.  But to the extent they're trying go into asbestos

10   issues on the T-side, I don't believe they're appropriate

11   parties for that.

12           So, finally, with regard to the likelihood of

13   success, based on the history of these cases, the common

14   thread to when we've had successful mediations has been

15   whether there was -- the parties were, frankly -- let me say

16   it another way.  The common thread was the relative

17   difference between the party's positions at the start of the

18   mediation process.

19           This is largely an economic issue, right?  And

20   sometimes that's what you'd say, well, by definition that

21   should be more mediatable than a legal issue.  But if the

22   distance between the parties on those economic issues is

23   vast, it's still very difficult to see a path forward where

24   we'd have a likely resolution and not just a consumption of

25   additional state resources.  And given where we understand

1    the E-side creditors are and the T firsts are, they're not

2    in the same zip Code.  They're not even in the same country.

3           And it's for those reasons that we, you know,

4    oppose mediation at this time.  We'll continue our efforts

5    through the disinterested directors and others to try to

6    broker a resolution, but we just have concerns about the

7    likelihood of success of mediation at this time.

8           THE COURT:  Okay.  Thank you, Mr. McKane.  Mr.

9    Kornberg?

10          MR. KORNBERG:  Good morning, Your Honor.  Alan

11   Kornberg from Paul Weiss Rifkind Wharton & Garrison for the

12   TCEH first lien debtholders.

13          Your Honor, we think there is too little to

14   mediate and we think it's too late to ask for it.  You've

15   heard already issues are very narrow.  They relate to the

16   future of EFH Corporate Services, which is a non-profit-

17   making back office operation, and I'm glad Mr. McKane

18   clarified the NOL issue.

19          There is no transfer of NOLs.  TCEH isn't taking

20   NOLs away from EFH.  It's a question of whether or not EFH

21   is wise in using some of its NOLs to accommodate the tax-

22   free spin, which, as Your Honor is well aware, would avoid

23   the consequences of a taxable transaction that would yield

24   billions of dollars of potential tax liabilities.

25          Your Honor, those issues are not new.  They've

1    been known to the parties certainly since as early as the

2    filing of the first iteration of the new plan on May 1.  And

3    our view is that Contrarian and other E-side creditors

4    genuinely believe that mediation would be a productive

5    route.

6           They should have raised that in connection with

7    the scheduling order, to which they objected on May 16, and

8    we're now two months later.

9           Your Honor, we are not anti-mediation, but not

10   every dispute should be mediated.  We know how to

11   participate in mediation and we enthusiastically did so in

12   the past in this case.

13          Indeed, we wouldn't be on the verge of a T-side

14   confirmation hearing but for the success we had in mediation

15   with Mr. Borowitz.

16          But here, there are two discrete issues.  There

17   isn't a lot of -- a law that has to be debated, which was

18   certainly at the core of the mediation we had on the T-side

19   with Mr. Borowitz check, how the parties of the legal risks

20   and issues.  Here, it's a question of economics.  And if we

21   can't resolve those issues, we have every confidence, Your

22   Honor, that you will do so.

23          We don't believe there can be a fruitful mediation

24   effort when neither that Debtors nor the TCEH first lien

25   creditors believe it will be useful.  And frankly, we don't

1      need to mediate.  If it makes sense to settle the objections

2      raised by Contrarian and others, we can do so.  If the

3      question of dollars and cents.

4              We are very, very concerned, despite what has been

5      said today, that mediation will delay and not advance

6      confirmation.  As Your Honor, I know, is tired of hearing me

7      say, our biggest fear is that there will be more delay in

8      terms of the T-side emergence from Chapter 11 because of

9      dysfunction on the E-side.  And, Your Honor, that also

10     informs our view on mediation.

11             It is not like the E-side creditors have come into

12     Court and said we are all united; we have a path out of

13     Chapter 11, but we need some tinkering with the T-side plan.

14     There are significant E-side creditors that you haven't even

15     heard from today, and I have no reason to believe that they

16     will not continue to object to the T-side confirmation.

17             So notion that we should commence a mediation at

18     this late date at the request of several E-side creditors

19     when we working full steam ahead towards confirmation and

20     emergence, is very much a cause for concern.  It makes us

21     even more concerned to know -- and I think you've seen this

22     today, Your Honor -- that despite what they say, the movants

23     do want to revisit the settlement that was struck between

24     the estate under the aegis of the disinterested directors.

25             While they say that that settlement's durable, you

1    also heard how it was arrived at a time when they -- the E-

2    side creditors thought they were being paid in full.  And we

3    have no interest in revisiting that settlement.  That was

4    approved by the Court in December and it did not depend on

5    the recoveries --

6              THE COURT:  Well that's not true, is it?  Because

7    the settlement was reached by the disinterested directors in

8    February of 2015 and approved by the Court in May, or I

9    guess finally authorized in May of 2015.  And the brokered

10   pay in full plan was mediated in June and July of 2015.  So,

11   am I missing the timeline?

12             MR. MCKANE:  No, Your Honor.  The timeline's very

13   close.  The disinterested directors put forward their

14   settlement in a plan that we filed in April that at that

15   point in time did not have payment in full, right?  It had

16   the three-way --

17             THE COURT:  Toggle.

18             MR. MCKANE:  -- toggle on the E-side.  And that --

19   so it was then -- now reconstituted on the wrong way, but

20   again, baked into the larger global settlement agreement

21   that was filed as part of the plan in August, so that DD

22   settlement became part of the global settlement that was

23   approved by Your Honor on December 9th.

24             THE COURT:  But the DD settlement was before the

25   deal that led to the unimpaired plan on the E-side?

1          MR. MCKANE:  That is correct.

2          THE COURT:  Sorry to interrupt, Mr. Kornberg.

3          MR. KORNBERG:  Oh, no, Your Honor.  I mean that's

4   exactly right, and it is a durable settlement.  And the idea

5   that it becomes not durable because the E-side recoveries

6   may not be what people expected should not be the burden

7   that we on the T-side bear.  So that also affects our lack

8   of enthusiasm for mediation.

9          Your Honor, we believe mediation at this point

10  would be an unproductive diversion of resources and we'd

11  rather see those resources directed at an efficient and

12  dispositive TCEH confirmation hearing.

13         THE COURT:  Okay.  Thank you.  Anything further?

14         MR. ROSNER:  Just two or three --

15         THE COURT:  Two or three points?

16         MR. ROSNER:  When we use the term "transfer" or we

17  use the term "consumption" of the NOLs, there is no doubt

18  that there is use of the estate property, there's use of the

19  NOLs by the T-side that are the E-side NOLs, in order to

20  generate a stepped-up basis of $1 billion.

21         Now, had the E-side gone first, it would have

22  utilized its own NOLs.  It's agreed not to do so, but it's

23  not being compensated for it.  And this is about

24  compensation for use of estate assets.  And again, I did say

25  at the outset, people argued in their papers the merits of

1    underlying position.

2            It is no surprise to me that the other side has a

3    different view on whether they should compensate and how

4    much they should compensate.  But that's what the mediation

5    would actually lead to.  What it would actually do is have

6    people state what their positions are and then get to the

7    economics and get to a deal.

8            The fact that we didn't raise mediation at the

9    scheduling order, I will tell you, Your Honor, was frankly

10   just the view that there would be actual settlement

11   negotiations that could drive this.  And when I hear the

12   other party say, well, we can settle this, we can settle

13   this ourselves, we have unresponded-to settlement term

14   sheets.  That's an indication that's the best evidence that

15   they -- that the parties won't independently settle it, and

16   a neutral where they're compelled to sit in a mediation,

17   there will be responses because the mediator will require

18   responses and the parties will then be able to engage in

19   good faith negotiations.

20           So I would argue, Your Honor, that compelled

21   mediation is not only a good path to lead to resolution, it

22   is the best path under the circumstances that have been

23   presented here by all of the parties, not just those moving

24   for mediation.

25           That's all I have, Your Honor, unless you have any

1    questions.

2              THE COURT:  No.  Thank you.  Mr. Pedone?

3              MR. PEDONE:  Your Honor, we are not looking to

4    revisit the settlement.  If Properties pays, this is an

5    entity being given to the E-side -- T-side for no

6    consideration.

7    If it pays on the $150 million payable to EFH, which was not

8    released in the settlement, that money goes up and

9    distributions will be made on the $700 million claim.  The

10   $700 million claim will not be re-litigated, but clearly the

11   distribution on 150 coming up being split, materially moves

12   what could happen to the creditors at EFH, including on that

13   claim, if we don't get to value flowing up from Oncor.

14             Similarly, if there's 10, 20, $50 million of value

15   in corporate services and we prove that at trial, and that

16   comes up, that contributes value.  And the NOLs are

17   unquestionably being consumed.  And the question of who

18   could consume NOLs in connection with a future plan, NOLs

19   that the decision to use them rests with EFH, was completely

20   not addressed in any prior settlement; so that is an open

21   issue.  It's an issue that's going to come before you in

22   connection with what the tax matters agreement looks like in

23   the business judgment of the EFH directors.  And so that's

24   an issue not addressed in the settlement.

25             This is not about revisiting the settlement

1    agreement, it's about how the issues that weren't addressed

2    in the settlement are addressed now, in the unforeseen

3    circumstances that you have.  And of course, understanding

4    the fact that the settlement agreement came into place, it's

5    helpful to know why weren't these issues addressed, because

6    they were irrelevant when you were paying E-side creditors a

7    hundred cents.  So it's in the context of the settlement

8    what we do with these three buckets of assets that the

9    parties need to focus on.  And court time will be consumed

10   at trial, if the parties don't reach a resolution.

11          And for those reasons, we hope the Court will

12   order mediation.  Thank you.

13          THE COURT:  All right.  Thank you, Mr. Pedone.

14          Yes, Mr. McKane?

15          MR. MCKANE:  Your Honor, if I could, the rulings -

16   - the PLR rulings have kind of implicated, you know, whether

17   the alternative world, like if we go taxable you get to --

18   back to the world of the stranded tax and so I've asked my

19   partner, Ms. Zablotney, to kind of explain that, because I

20   think, as I've been told from our tax professionals, I've

21   got it 95 percent, right?  But they'd like to clarify.

22          THE COURT:  All right. Thank you.

23          Mrs. Zablotney?

24          MS. ZABLOTNEY:  Your Honor, the way we had

25   originally thought that the IRS was going to rule is that it

1    would rule that the TCEH debt was recourse debt, and

2    therefore the cancellation of the TCEH debt would give rise

3    to cancellation of indebtedness income that would be

4    excluded from income; and that was a good result, and that's

5    what we thought we were getting.

6            But, as Mr. McKane explained, instead the IRS has

7    come back, tentatively adverse to that position, and they

8    are taking the position that the TCEH debt is nonrecourse,

9    for tax purposes.  And therefore, the income, as a result of

10   the cancellation of the TCEH debt, would just give rise to

11   gain in an enormous amount.  Now we're solving that problem

12   through our alternative rulings, but that's only in the

13   context of the spinoff.  And so we can get that results in

14   the context of the spinoff.

15           The difference is, that if it's cancellation of

16   indebtedness income, all of the inner wells go poof, as a

17   result of the emergence from bankruptcy.  The tax rules

18   require a debtor to reduce its tax attributes, including

19   NOLs, by the amount of cancellation of indebtedness income.

20   The sole reason why there's anything left, potentially, is

21   as a result of the IRS's tentatively adverse position on the

22   Cody issue.

23           And so as Mr. McKane said, we don't have an

24   alternative that doesn't leave a large stranded tax.  Our

25   alternative is a taxable spinoff -- or is a tax-free

1     spinoff, otherwise we have a taxable transaction that

2     strands a large tax.

3              So where we are now is that the tax-free spinoff,

4     which potentially does allow some NOLs to survive, is our

5     best alternative, but it's not necessarily what everybody

6     was thinking.

7              THE COURT:  Okay.  Thank you.  That's helpful.

8              Mr. Pedone?

9              MR. PEDONE:  I only want to address one point.

10    Built into that explanation was that there are no other

11    alternatives, and we don't necessarily agree with that, that

12    there are no other alternatives.  And if we get to trial on

13    the NOL issues, we would actually be addressing that issue.

14             THE COURT:  Okay.  Thank you.

15             MR. PEDONE:  Thank you.

16             THE COURT:  Okay.  I am not going to require

17    mediation at this time, although I am certainly reserving

18    the right, sua sponte, or at further request, to compel

19    mediation.

20             And I think -- let me say a few things, and then

21    I'll say more about the actual ruling.

22             So, some of the arguments.  One of the arguments

23    against mediation is the fear of delay.  There is certainly

24    a possibility that sending people into a lengthy mediation

25    could potentially arise a situation where for that mediation

1    to continue to be productive, it would require a delay in

2    the ultimate confirmation hearing and decision by the Court.

3    And sometimes that certainly happens, when parties are in

4    active settlement negotiations, with or without a mediator,

5    they will say, Judge, can we move the hearing in order to

6    allow those discussions to continue.  Judge, we've had the

7    hearing, can you delay decision to allow those discussions

8    to continue.  Sometimes discussions go better before the

9    Court has made an indication of how it's going to proceed,

10   and sometimes negotiations can't go anywhere until you have

11   some idea of how the Court's going to proceed, and sometimes

12   it's a mix.

13        So it is possible that were I to start a mediation

14   or require mediation, and the mediation was being

15   constructive, that there might be an indication that it

16   would be -- make sense to delay things starting in order to

17   allow the mediation to run its course.

18        I cannot see that being the situation here, and I

19   would say that in no way, even were I to compel mediation,

20   would this Court delay the start of the confirmation trial

21   on August 17th.  We will start the confirmation trial on

22   August 17th.  That's when it's going to start, and I'm not

23   moving that date unless every single person in this room

24   comes in and asks me to do it.  If there's one holdout,

25   Debtor or otherwise, we're going to start.  This case needs

1    to move forward, and this case will move forward.

2              So -- but having said that, I don't believe that

3    were I to compel mediation there would be any reason that it

4    would require a delay or cause a delay in the start of the

5    confirmation trial, again, unless everyone came in and said

6    that was how they wanted to proceed.  I don't view that as

7    remotely possible, and it would have implications with the

8    PSA, among other things.

9              But you've got a month between now and August

10   17th, and that is plenty of time to appoint a mediator and

11   have constructive mediation discussions, without delaying

12   the August 17th trial.  So I don't take delay as a reason

13   not to compel mediation.

14             Also, I don't view the fact that somebody didn't

15   ask for mediation two months ago and somehow waives the

16   right to ask for mediation now.  It's -- this case continues

17   to be fluid, the facts continue to develop and as I've heard

18   today, there were at least some -- have been some non-

19   mediated settlement discussions amongst the parties that

20   ultimately haven't borne, at least as of we sit here they'd,

21   fruition.

22             I don't think waiting to ask a Court to compel

23   mediation, while facts and law continue to develop, and

24   private negotiations are ongoing, should be held against a

25   party that ultimately wants to ask the Court to mediate a

1    dispute.  So I don't view that as a reason not to order

2    mediation.

3              Also, the fact that parties are far apart, in and

4    of itself I don't believe is a reason not to compel

5    mediation, or that mediation couldn't be successful.  Often

6    parties are very far apart when they go to mediation, and

7    mediations are successful in bringing them together, or at

8    least narrowing the issues that significantly advance the

9    ball as to what ultimately a Court is going to be asked to

10   decide or not decide, to reach a final resolution.  So I

11   don't view that, in and of itself, to be a reason not to

12   mediate.

13             And sort of the last thing which is I just don't

14   want to mediate, that really gets you nowhere.  And the

15   Court will order it when appropriate, even if parties don't

16   want to do it.

17             Now, having said all that, ultimately any

18   settlement negotiation, or mediated or otherwise, can only

19   be successful if the parties that are negotiating have a

20   economic reason to settle.  In other words, there's a

21   perception of risk that is such that settlement is preferred

22   to not going -- settlement is preferred to actually putting

23   it in front of the judge, and having a potentially adverse

24   ruling.

25             As I read the state of play today, based on what's

1    been said in court, I don't believe that the Debtors and the

2    T-side ad hoc committee the first lien lenders really have

3    an economic incentive, as we sit here today, to settle, or

4    to mediate.  I don't believe that a risk has been

5    articulated or developed such that they would really be in a

6    position to want to proceed in settlement negotiations.

7             What's going to be required is a further

8    development of the record.  And also I think, in this

9    instance, and this happened in connection with the

10   confirmation hearing in 2015, as the record is developed in

11   court, the parties will be able to get a feel for how it's

12   going, and whether there's an economic reason to settle and

13   the Court will get a reason -- will get a feeling as to how

14   it's going, and whether to bring the parties in and

15   encourage mediation.

16            Now that is very difficult, because it often

17   requires splitting up the parties to two masters,

18   confirmation and mediation.  And there's a huge amount of

19   time pressure involved, and it's very difficult to make

20   process.  But, for example, the Court, in 2015 at the

21   confirmation trial, strongly encouraged the parties to

22   mediate, the make whole dispute, in the context of an

23   unimpaired plan.  And that was a difficult mediation, but a

24   successful mediation.  And the Court urged the parties to do

25   so based on how the case was developing.  So we really

1    didn't -- I didn't really know or have a feel for whether it

2    was appropriate until I heard more about what was going on

3    and what the pressure points were and then I could encourage

4    the parties to negotiate.

5            I think in this instance, it's going to take the

6    actual filing of objections, it's going to take perhaps the

7    actual start of trial for the parties or the Court to get an

8    idea as to whether there are truly pressure points that

9    would be constructive to require negotiations.

10           Having said all that, I certainly encourage the

11   parties to continue to consider settlement and to actively

12   work towards settlement.  Mediation is not required to reach

13   a settlement.

14           When I'm wearing my curmudgeon hat, I often

15   grumble, when I'm asked, yet again, to appoint a mediator.

16   You know, 20 years ago we used to settle cases, and nobody

17   went to mediation.  What's going on today?  So I won't be a

18   curmudgeon from the bench, but, you know, you can certainly

19   settle cases without a mediator.  These are incredibly

20   sophisticated parties involved here, very gifted, highly

21   skilled, highly experienced lawyers on all sides and they

22   are capable of having settlement negotiations, without

23   requiring a mediator.

24           Now, there may come a time, and it may be two days

25   into confirmation, where I call everybody into the mediation

1    room, or the what we call the mediation room, off the

2    hallway here, and say, you need to get together with a

3    mediator and try to resolve this dispute in here.  Let me

4    tell you why I think it's a good idea that both parties are

5    at risk and you should really think about making a

6    settlement.  I'm not in that position today.  And I don't

7    think it's a fault of anyone that I'm not in a position to

8    today.  This continues to be a fluid situation, with the IRS

9    tax issues, for example and the tax-free spin.  Continues --

10   discovery continues to be taken, including on the issues

11   that parties want to mediate, and the factual record is

12   being developed and the legal positions are being developed,

13   and will ultimately result in, I'm sure, objections to the

14   plan; but they're not due until August 8th.  So more needs

15   to happen in order for the Court to believe that requiring

16   mediation would be successful.

17           So it really goes to whether there's an sufficient

18   risk assessment on the Debtor and the T-side parties to put

19   them in a position where settlement negotiations would be

20   constructive; that's how I feel -- or that's how I read it,

21   based on what I've heard in court.

22           So certainly as things develop, you know, we might

23   come to mid-August and it might make sense to appoint a

24   mediator, judicial or otherwise, to try to bridge issues.

25   It may be too late to do that; I don't know.  But I think

1    this is a case where appointing a mediator wouldn't be

2    helpful until the facts, and law, and legal positions, and

3    confirmation objections, and discovery further develop a

4    basis to bring the parties together, and to provide an

5    incentive for settlement.

6              So I'm going to deny the request without prejudice

7    and overrule the -- or sustain the objections.

8              And the parties can certainly come back to court.

9    I don't think a formal motion would be required.  You could

10   -- if circumstances change and you want to send the Court a

11   letter and set up a conference call, we could probably

12   proceed in that way.  And the Court, may on its own, sua

13   sponte, decide that mediation might be an appropriate way.

14   But as I sit here today, with the facts in front of me

15   today, I don't think it'll be constructive.

16             And the Court will enter an order denying the

17   motion without prejudice.  I'll draft something up.

18             MR. MCKANE:  Thank you, Your Honor

19             THE COURT:  All right. Anything else for today?

20   All right.  Very good.

21             When will we next see each other?  I guess August

22   15th?

23             MR. MCKANE:  Yes, Your Honor.

24             THE COURT:  Okay.  Very good.  Thank you.

25   We're adjourned.

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6      Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o=Veritext,
ou, email=digital@veritext.com, c=US
Date: 2016.07.20 20:16:34 -04'00'

7

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  July 20, 2016