**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF
CONFIRMATION OF THE THIRD AMENDED JOINT PLAN OF REORGANIZATION
AS IT APPLIES TO THE TCEH DEBTORS AND EFH SHARED SERVICES DEBTORS**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## Table of Contents

PRELIMINARY STATEMENT ....................................................................................2

BACKGROUND ........................................................................................................6

I.      THE ORIGINAL PLAN..................................................................................6

II.     KEY TAX CONSIDERATIONS. ....................................................................9

        A.      Tax Drives Evaluation of Restructuring Possibilities.......................11

        B.      Overview of Net Operating Losses. ..................................................13

        C.      The Private Letter Ruling Gives Confidence that the Spin-Off Can
                Proceed and Creates Potential for EFH Debtors to Utilize NOLs
                Available After Consummation of Spin-Off.......................................14

        D.      Overview of the Spin-Off and Basis Step-Up. ..................................16

        E.      The Spin-Off and Basis Step-Up is the Product of Extensive
                Negotiations With the Ad Hoc Committee of TCEH First Lien
                Creditors. ...........................................................................................17

        F.      A Taxable Separation Destroys Value for Virtually All Debtor
                Constituencies....................................................................................20

        G.      The Objecting Parties' Tax Objections Mischaracterize the Facts and
                the Law in a Short-Sighted Attempt to Force the Debtors to
                Renegotiate a Comprehensive TCEH Restructuring. .......................21

III.    CONFIRMATION SOLICITATION AND NOTIFICATION PROCESS................22

        A.      Unimpaired and Deemed to Accept...................................................22

        B.      Fully Impaired and Deemed to Reject. ..............................................23

        C.      Subject to Reinstatement or Discharge and Deemed to Accept or
                Reject..................................................................................................24

IV.     VOTING RESULTS. .....................................................................................24

V.      RESOLVED OBJECTIONS...........................................................................25

VI.     MODIFICATIONS TO THE PLAN.................................................................25

ARGUMENT ...................................................................................................................27

I.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services
        Debtors Satisfies Each Requirement for Confirmation. ...............................27

        A.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services
                Debtors Fully Complies with the Applicable Provisions of the
                Bankruptcy Code (Section 1129(a)(1)). ...............................................27

                1.      The Plan as it Relates to the TCEH Debtors and EFH Shared
                        Services Debtors Satisfies the Classification Requirements of
                        Section 1122 of the Bankruptcy Code. ....................................28

                2.      The Plan as it Relates to the TCEH Debtors and EFH Shared
                        Services Debtors Satisfies the Seven Mandatory Plan
                        Requirements of Sections 1123(a) of the Bankruptcy Code ...............29

        B.      The Debtors Have Complied Fully with the Applicable Provisions of
                the Bankruptcy Code (Section 1129(a)(2)). ..........................................35

        C.      The Debtors Proposed the Plan as it Relates to the TCEH Debtors and
                the EFH Shared Services Debtors in Good Faith and Not by Any
                Means Forbidden by Law (Section 1129(a)(3)). ...................................36

        D.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services
                Debtors Provides for Bankruptcy Court Approval of Certain
                Administrative Payments (Section 1129(a)(4)) .....................................38

        E.      The Debtors Have Complied with the Bankruptcy Code's Governance
                Disclosure Requirement As it Relates to the TCEH Debtors and EFH
                Shared Services Debtors (Section 1129(a)(5)). ....................................40

        F.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services
                Debtors Does Not Provide for Any Rate Changes Requiring
                Governmental Approval (Section 1129(a)(6)). .....................................42

        G.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services
                Debtors Is in the Best Interests of Holders of Claims and Interests
                (Section 1129(a)(7)). ............................................................................43

        H.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services
                Debtors Satisfies the Voting Requirements (Section 1129(a)(8)) ...................44

        I.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services
                Debtors Complies With Statutorily Mandated Treatment of
                Administrative and Priority Tax Claims (Section 1129(a)(9)) ......................45

J.      At Least One Impaired Class of Claims has Accepted the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors, Excluding the Acceptances of Insiders (Section 1129(a)(10)). .........................46

K.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Is Feasible (Section 1129(a)(11)). ..........................................................46

      1.      Key Regulatory Approvals Have Already Been Obtained...................47

      2.      Reorganized TCEH Will Be Financially-Sound....................................48

L.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). ..............................................................................................49

M.     The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Complies with Section 1129(a)(13) of the Bankruptcy Code.............50

N.      Sections 1129(a)(14) Through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors................................................................................50

O.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Satisfies the Cramdown Requirements (Section 1129(b)). ................51

      1.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Is Fair and Equitable with Respect to the Rejecting Classes. ....................................................................................51

      2.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Does Not Unfairly Discriminate Against the Deemed Rejecting Classes. ....................................................................52

P.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Complies with the Other Provisions of Section 1129 of the Bankruptcy Code: (Section 1129(c)-(e))............................................................53

II.     The Discretionary Contents of the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Are Appropriate. ....................................................54

A.      The Releases in the Plan Related to the TCEH Debtors and EFH Shared Services Debtors Are Appropriate. ........................................................55

B.      The Third-Party Releases in the Plan as They Relate to the TCEH Debtors and EFH Shared Services Debtors are Appropriate..........................57

C.      The Plan's Exculpation Provisions Are Appropriate as They Relate to the EFH Shared Services Debtors and TCEH Debtors....................................59

> **D.** The Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained in the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors. ...................................................62

**III.** The Court Should Overrule the Objections to the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors. .....................................................62

> **A.** The Objecting Parties Have Invented Optionality That Does Not Exist in an Effort to Cherry-Pick Certain Provisions in a Complex Transaction. ...................................................62

> **B.** The Objecting Parties Overestimate the Value of the Basis Step-Up and Ignore Significant Concessions from the TCEH First Lien Creditors. ...................................................65

> **C.** The Potential Ability to "Spread the Pain" of a Taxable Separation Does Not Change the Analysis Comparing the Spin-Off to the Taxable Separation. ...................................................67

> **D.** The "EFH 363 Transactions" are not "Transfers" And, in the Alternative, are Transfers in the Best Interests of All of the Estates. .............68

>> **1.** The EFH Group's Use of the EFH Group's NOLs to Offset Taxable Gain by the EFH Group Does Not Constitute a "Transfer." ...................................................68

> **E.** There is No "Equity Value" in EFH Properties or EFH Corporate Services for EFH Corp. to transfer to Reorganized TCEH. ...........................72

>> **1.** EFH Properties Company. ...................................................72

>> **2.** EFH Corporate Services Company. ...................................................76

> **F.** EFH Corp. Approved the "EFH 363 Transactions" in a Sound Exercise of Business Judgment, and No Heightened Scrutiny Applies. .........79

> **G.** No EFH or EFIH Directors or Officers Are Being Released or Exculpated Pursuant to the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors. ...................................................83

> **H.** The Feasibility Objection is Irrelevant and the Plan Otherwise Satisfies the Best Interests Test as to Creditors of EFH Corporate Services. ...................................................84

> **I.** The Procedural Objections Should Be Overruled. ...........................................86

> **J.** Classification and Treatment of the EFCH 2037 Notes in Class C6 is Appropriate. ...................................................91

iv

**K.      The Debtors Will Work to Consensually Resolve Assumption and Cure Objections, Which Should Not Stand in the Way of Plan Confirmation.** ....................................................................................................**92**

**CONCLUSION** ...........................................................................................................**93**

## Table of Authorities

**Page(s)**

**Cases**

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) ........................................................................................... 38, 43, 51, 91

*Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*,
554 U.S. 33 (2008) ...................................................................................................... 86

*In re 203 N. LaSalle St. Ltd. P'ship*,
190 B.R. 567 (Bankr. N.D. Ill. 1995) ............................................................................ 52

*In re 300 Washington St. LLC*,
528 B.R. 534 (Bankr. E.D.N.Y. 2015) .......................................................................... 54

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ..................................................................... 43, 91

*In re Adelphia Commc'ns Corp.*,
No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) .................................................. 47

*In re Ahead Commc'ns Sys., Inc.*,
395 B.R. 512 (D. Conn. 2008) ...................................................................................... 33

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ...................................................................... 35, 41

*In re Ambanc La Mesa Ltd. P'ship*,
115 F.3d 650 (9th Cir. 1997) ......................................................................................... 53

*In re AMR Corp.*,
No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) ................................................. 47

*In re Armstrong World Indus.*,
432 F.3d 507 (3d Cir. 2005) .......................................................................................... 31

*In re Armstrong World Indus., Inc.*,
348 B.R. 136 (D. Del. 2006) .......................................................................................... 91

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006) .......................................................................................... 27

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ....................................................................... 53

*In re B.D. Int'l Disc. Corp.*,
701 F.2d 1071 (2d Cir. 1983) ........................................................................................ 37

*In re Blitz U.S.A., Inc.*,
2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014)..............................................................56

*In re Bob Richards*,
473 F.2d 262 (9th Cir. 1973).............................................................................................70

*In re Bonded Mailings, Inc.*,
20 B.R. 781 (Bankr. E.D.N.Y. 1982)..................................................................................37

*In re Bowles*,
48 B.R. 502 (Bankr. E.D. Va. 1985)..................................................................................52

*In re Brice Rd. Devs., L.L.C.*,
392 B.R. 274 (B.A.P. 6th Cir. 2008)..................................................................................46

*In re Broadstripe, LLC*,
444 B.R. 51 (Bankr. D. Del. 2010).....................................................................................83

*In re Burns & Roe Enters., Inc.*,
No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ........................................26

*In re Cajun Elec. Power Coop., Inc.*,
150 F.3d 503 (5th Cir. 1998).............................................................................................39

*In re Capmark Fin. Grp. Inc.*,
438 B.R. 471 (Bankr. D. Del. 2010)...................................................................................87

*In re Century Glove, Inc.*,
1993 WL 239489 (D. Del. Feb. 10, 1993)..........................................................................43

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................................35, 41, 56

*In re Citadel Broad. Corp.*,
No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010).....................................................47

*In re CNC Payroll, Inc.*,
491 B.R. 454 (Bankr. S.D. Tex. 2013)...............................................................................83

*In re Coastal Broad. Sys., Inc.*,
570 F. App'x 188 (3d Cir. 2014)........................................................................................28

*In re Conex Holdings, LLC*,
518 B.R. 792 (Bankr. D. Del. 2014)...................................................................................70

*In re Congoleum Corp.*,
No. 09-4371, 2010 WL 1850182 (D.N.J. May 7, 2010) ...................................................39

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000)..............................................................................................57

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004)........................................................................ 28

*In re Couture Hotel Corp.*,
    536 B.R. 712 (Bankr. N.D. Tex. 2015) .................................................................... 91

*In re DBSD N. Am.*,
    No. 09-13061 (REG) (Bankr. S.D.N.Y. July 5, 2011) ........................................... 47

*In re Decora Indus., Inc.*,
    No. 00-4459 (JJF), 2002 WL 32332749 (D. Del. May 20, 2002) .......................... 87

*In re Distributed Energy Sys. Corp.*,
    No. 08-11101(KG), 2009 WL 1458175 (Bankr. D. Del. May 18, 2009) ............... 32

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992) .................................................................................... 61

*In re e2 Commc'ns, Inc.*,
    320 B.R. 849 (Bankr. N.D. Tex. 2004) .................................................................... 83

*In re Edison Mission Energy*,
    No. 12-49219 (JPC) (Bankr. N.D. Ill. Mar. 11, 2014) ........................................... 47

*In re Electroglas, Inc.*,
    No. 09-12416 (PJW), 2009 WL 8189056 (Bankr. D. Del. July 9, 2009) ............... 32

*In re Enron Corp.*,
    326 B.R. 497 (S.D.N.Y. 2005) ................................................................................ 61

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003)............................................................... 28, 51, 57

*In re Franscella Enters., Inc.*,
    360 B.R. 435 (Bankr. E.D. Pa. 2007) ...................................................................... 85

*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................. 52

*In re Gen. Growth Props., Inc.*,
    No. 09-11977 (Bankr. S.D.N.Y. May 20, 2010) ..................................................... 90

*In re Gen. Motors Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009) .................................................................... 87

*In re Genco Shipping & Trading Ltd.*,
    509 B.R. 455 (Bankr. S.D.N.Y. 2014) .................................................................... 38

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001)........................................................................ 27

*In re Global Crossings, Ltd.*,
  No. 02-40188 (REG) (Bankr. S.D.N.Y. Dec. 26, 2002).........................................................47

*In re Global Safety Textiles Holdings LLC*,
  No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) ...........................26

*In re Greate Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) ........................................................................................85

*In re Greystone III Joint Venture*,
  995 F.2d 1274 (5th Cir. 1991) ................................................................................................91

*In re Hawaiian Telecom Commcn's, Inc.*,
  No. 08-02005 (Bankr. D. Haw. Dec. 30, 2009).....................................................................47

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013)...........................................................................38, 47, 48

*In re Innkeepers USA Trust*,
  442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...................................................................................83

*In re Iridium Operating LLC*,
  478 F.3d 452 (2d Cir. 2007) ...................................................................................................87

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986),
  *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987)........................................................................................53

*In re Journal Register Co.*,
  407 B.R. 520 (Bankr. S.D.N.Y. 2009) ...................................................................................39

*In re Kaiser Aluminum Corp.*,
  No. 02-10429(JKF), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006), *aff'd*, 343 B.R.
  88 (D. Del. 2006)....................................................................................................................28

*In re Key3Media Grp., Inc.*,
  336 B.R. 87 (Bankr. D. Del. 2005).........................................................................................57

*In re Lapworth*,
  No. 97-34259DWS, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 3, 1998) ...............................36

*In re Laramie Assocs., Ltd.*,
  1996 WL 549984 (Bankr. E.D. Pa. June 20, 1996)...............................................................44

*In re LCI Holding Co.*,
  No. 12-13319 (Bankr. D. Del. 2013).......................................................................................64

*In re Lightsquared Inc.*,
  No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015)........................................................47

*In re Madison Hotel Assocs.*,
  749 F.2d 410 (7th Cir. 1984)..................................................................................................37

*In re Majestic Star Casino, LLC*,
  No. 09-14136 (KG) (Bankr. D. Del. Mar 10, 2011) ........................................................... 47

*In re Martin*,
  91 F.3d 389 (3d Cir. 1996) ........................................................... 37

*In re Marvel Entm't Gr'p, Inc.*,
  273 B.R. 58 (D. Del. 2002) ........................................................... 69

*In re Marvel Entm't Grp. Inc.*,
  222 B.R. 243 (D. Del. 1998) ........................................................... 87

*In re Master Mortg. Inv. Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994) ........................................................... 56

*In re Maxcom Telecommunicaciones, S.A.B. de C.V.*,
  No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013) ........................................................... 47

*In re Mirant Corp.*,
  No. 03-46590DML11, 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007) ................................... 28

*In re Montgomery Ward Holding Corp.*,
  242 B.R. 147 (D. Del. 1999) ........................................................... 80

*In re MSR Resort Golf Course LLC, et al.*,
  No. 11-10372 (Bankr. S.D.N.Y. 2013) ........................................................... 64

*In re Opus East, LLC*,
  528 B.R. 30 (Bankr. D. Del. 2015) ........................................................... 69

*In re PPI Enters., Inc.*,
  324 F.3d 197 (3d Cir. 2003) ........................................................... 44, 45

*In re Premier Int'l Holdings, Inc.*,
  No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ........................................ 60

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) ........................................................... 36, 60, 61

*In re Rath Packing Co.*,
  55 B.R. 528 (Bankr. N.D. Iowa 1985) ........................................................... 54

*In re Sorenson Commc'ns, Inc.*,
  No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) ........................................................... 47

*In re Sound Radio, Inc.*,
  93 B.R. 849 (Bankr. D.N.J. 1988) ........................................................... 37

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010) ........................................................... 58

*In re Spansion, Inc.*,
   No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. Apr. 16, 2010) .......................................... 60

*In re T-H New Orleans Ltd. P'ship*,
   116 F.3d 790 (5th Cir. 1997) ................................................................................................ 46

*In re Trenton Ridge Investors, LLC*,
   461 B.R. 440 (Bankr. S.D. Ohio 2011) ................................................................................ 46

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011),
   *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011) .................................................... 48

*In re Tribune Co.*,
   476 B.R. 843 (Bankr. D. Del. 2012)...................................................................................... 28

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ........................................................................................*passim*

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3d Cir. 2013) ................................................................................................. 30

*In re W.R. Grace & Co.*,
   729 F.3d 332 (3d Cir. 2013) ................................................................................................. 46

*In re Wash. Mut., Inc.*,
   461 B.R. 200 (Bankr. D. Del. 2011)...................................................................................... 46

*In re Wash. Mut., Inc.*,
   No. 08-12229 (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012)......................... 28

*In re Washington Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011)................................................................. 55, 56, 57, 59

*In re World Health Alts., Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006)...................................................................................... 32

*In re WorldCom, Inc.*,
   No. 02-135333(AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003)...................... 36

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999)........................................................................................ 83

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993) ................................................................................................. 28

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988) ................................................................................................. 53

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984) ............................................................................................................. 37

*United States v. Reorganized CF & I Fabricators of Utah, Inc.*,
   518 U.S. 213 (1996) .................................................................................................... 43

*VFB LLC v. Campbell Soup Co.*,
   482 F.3d 624 (3d Cir. 2007) ........................................................................................ 72

*Zentek GBV Fund IV v. Vesper*,
   19 F. App'x 238 (6th Cir. 2001) .................................................................................. 91

**Statutes**

11 U.S.C. 1129(a)(11) ........................................................................................................ 85

11 U.S.C. 1141 ................................................................................................................... 89

11 U.S.C. § 101(51D)(B) ................................................................................................... 54

11 U.S.C. § 363(b)(1) ........................................................................................................ 80

11 U.S.C. § 548(a)(1)(B) ................................................................................................... 72

11 U.S.C. § 1114(e) ........................................................................................................... 50

11 U.S.C. § 1122(a) ...................................................................................................... 28, 91

11 U.S.C. § 1123(a)(1)-(3) ................................................................................................ 30

11 U.S.C. § 1123(a)(4) ....................................................................................................... 30

11 U.S.C. § 1123(a)(5) ....................................................................................................... 32

11 U.S.C. § 1123(a)(6) ....................................................................................................... 33

11 U.S.C. § 1123(a)(7) ....................................................................................................... 34

11 U.S.C. § 1123(b)(1)-(6) ................................................................................................ 54

11 U.S.C. § 1124 ................................................................................................................ 44

11 U.S.C. § 1125(b) ........................................................................................................... 36

11 U.S.C. § 1126(c) ........................................................................................................... 44

11 U.S.C. § 1126(f) ............................................................................................................ 44

11 U.S.C. § 1126(g) ........................................................................................................... 44

11 U.S.C. § 1127(a) ........................................................................................................... 25

11 U.S.C. § 1127(d) ........................................................................................................... 25

11 U.S.C. § 1129(a)(1) ....................................................................................................... 27

11 U.S.C. § 1129(a)(3)................................................................................................................36, 50

11 U.S.C. § 1129(a)(4)................................................................................................................39, 40

11 U.S.C. § 1129(a)(5)(A)(i).............................................................................................................41

11 U.S.C. § 1129(a)(5)(A)(ii)............................................................................................................41

11 U.S.C. § 1129(a)(5)(B).................................................................................................................41

11 U.S.C. § 1129(a)(6)......................................................................................................................43

11 U.S.C. § 1129(a)(7)......................................................................................................................43

11 U.S.C. § 1129(a)(8)......................................................................................................................44

11 U.S.C. § 1129(a)(9)......................................................................................................................45

11 U.S.C. § 1129(a)(10)....................................................................................................................46

11 U.S.C. § 1129(a)(12)....................................................................................................................49

11 U.S.C. § 1129(a)(13)....................................................................................................................50

11 U.S.C. § 1129(a)(14)....................................................................................................................50

11 U.S.C. § 1129(a)(15)....................................................................................................................50

11 U.S.C. § 1129(a)(16)....................................................................................................................51

11 U.S.C. § 1129(b).........................................................................................................................44

11 U.S.C. § 1129(b)(1)......................................................................................................................51

11 U.S.C. § 1129(b)(2)......................................................................................................................91

11 U.S.C. § 1129(b)(2)(B)(ii)......................................................................................................51, 91

11 U.S.C. § 1129(b)(2)(C)(ii)............................................................................................................51

11 U.S.C. § 1129(c).........................................................................................................................54

11 U.S.C. § 1129(e).........................................................................................................................54

28 U.S.C. § 1930.............................................................................................................................49

Tex. Bus. & Com. Code § 24.006(a) .............................................................................................75

**Regulations**

Treas. Reg. § 1.1502-6 ...................................................................................................................70

**Other Authorities**

5 *Collier on Bankruptcy* , ¶ 1129.02[11] at 1129-36.11 (15th ed. rev. 1989)............................................. 85

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N.
      5936, 6368 ........................................................................................................................ 27, 36

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N.
      5787, 5912 ................................................................................................................... 27, 33, 36

The above-captioned debtors and debtors in possession (the "Debtors") file this memorandum of law (this "Brief") in support of confirmation of the *Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al.*, Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9199] (as modified, amended, or supplemented from time to time, the "Plan") as it relates to Texas Competitive Electric Holdings Company LLC ("TCEH" and, together with its direct parent company, Energy Future Competitive Holdings Company LLC ("EFCH") and certain of TCEH's direct and indirect subsidiaries, the "TCEH Debtors") and certain subsidiaries of EFH Corp. (collectively, and as defined in the Plan, the "EFH Shared Services Debtors").[2]  In support of confirmation of the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors, and in response to the objections thereto (the "Objections" and the parties raising the Objections, the "Objectors"),[3] the Debtors respectfully state as

---

[2]   Capitalized terms used but not defined in this memorandum have the meanings ascribed to them in the Plan.

[3]   Excluding the Assumption Objectors (defined herein), the following parties filed objections:  (a) AppLabs Technologies Pvt Ltd. [D.I. 9170] ("AppLabs"); (b) Sommerville County, Sommerville County Water Improvement District, Glen Rose ISD, Sommervelle Hospital District, Nolan County, Wes Texas Groundwater, Nolan County Hospital District, Sweetwater ISD, City of Sweetwater, Blackwell ISD [D.I. 9177] (the "Taxing Units"); (c) the United States Trustee [D.I. 9203] (the "U.S. Trustee"); (d) Shirley Fenicle, individually and as successor-in-interest to the Estate of George Fenicle, William Fahy, and John. H. Jones [D.I. 9209] (together, the "Fenicle & Fahy"); (e) Bank of New York Mellon Trust Company, as the indenture trustee for the EFCH 2037 Notes [D.I. 9210] (the "EFCH 2037 Notes Trustee"); and (f) American Stock Transfer & Trust Company, LLC, as successor trustee to The Bank of New York Mellon Trust Company, N.A. under the indentures for certain notes issued by EFH Corp. [D.I. 9224] (the "EFH Indenture Trustee" and collectively, the "Objectors").

Contrarian Capital Management, LLC and certain funds and accounts advised or sub-advised by Fidelity Management & Research Company or its affiliates joined the EFH Indenture Trustee objection [D.I. 9224, 9226].

The following parties filed reservations of rights: (a) TXU 2007-1 Railcar Leasing LLC [D.I. 9206] ("TXU Railcar Leasing"); (b) NextEra Energy, Inc. and NextEra Energy Capital Holdings, Inc. [D.I. 9212] (together, "NextEra"); (c) the indenture trustee for the EFIH unsecured notes [D.I. 9214] ("EFIH PIK Trustee"); (d) Union Pacific Railroad Company [D.I. 9242] ("UPRR").

As set forth in the status chart filed substantially contemporaneously herewith, the Debtors have resolved the objections of AppLabs, the Taxing Units, the U.S. Trustee, and that portion of the EFCH 2037 Notes Trustee's objection related to the PCRB Claims, in addition to resolving a number of the objections raised by the Assumption Objectors.

1

follows.[4]

**PRELIMINARY STATEMENT**

1.      The Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors should be confirmed.  It is the product of four years of evaluating possible TCEH transaction structures, including, among others, a tax-free spin-off of TCEH, a tax-efficient spin-off of TCEH, and a taxable separation of TCEH from EFH Corp.  Four years of meetings with and among *all* of the Debtors' boards of directors and managers, analyzing the effect of the TCEH Debtors' restructuring on the rest of the Debtors' estates and evaluating how best to maximize the value of all of the Debtors' estates.  Three years of negotiations with all of the Debtors' constituencies, including every significant constituency at the TCEH Debtors, including, among others, the TCEH First Lien Creditors, the TCEH Second Lien Creditors, the TCEH Unsecured Creditors, and the TCEH Committee.  Three years of applications and submissions to various regulatory agencies, as a result of which the TCEH Debtors' received the long-awaited Private Letter Ruling as well as key approvals from, among others, the Federal Energy Regulatory Commission, the FCC, and the Nuclear Regulatory Commission necessary to consummate the TCEH Debtors' proposed restructuring.

2.      What is the product of these efforts?  ***First***, the TCEH First Lien Creditors have agreed to forgo pursuit of a Taxable Separation—an outcome that would unambiguously destroy value for virtually all of the Debtors' constituencies.  ***Second***, the TCEH junior creditors have agreed to lay down their arms under the Settlement Agreement and the Original Plan Support

---

[4]    The exhibits referenced herein are included as exhibits to the *Declaration of Michael P. Esser, Esq. in Support of the Debtors' Memorandum of Law in Support of Confirmation of the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the TCEH Debtors and EFH Shared Services Debtors*, filed substantially contemporaneously herewith.

Agreement in exchange for the treatment embodied in the Required Alternative Restructuring Terms. ***Third***, as reflected in the Voting Report filed substantially contemporaneously herewith, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors reflects the overwhelming consent of every class entitled to vote on the Plan as it relates to such Debtors, who stand ready and willing to eliminate ***nearly $20 billion in liabilities***, allowing the Reorganized TCEH Debtors and Reorganized EFH Shared Services Debtors to focus on Job One: safely powering Texas and caring for their broad base of customers.

3.　　　The Debtors' boards of directors and managers made the decision to pursue the Spin-Off on the terms described in the Plan and herein after careful consideration of all available alternatives, and the effect of each alternative on each of the Debtors' estates. The evidence will show that this process mirrored the pristine process the Court applauded at the November 2015 confirmation hearing.　The Debtors' boards met half a dozen times (in addition to numerous individual consultations) in the four months since the Original Plan was rendered null and void. This included multiple meetings for the specific purpose of evaluating the very transactions that are at the heart of the EFH Indenture Trustee's and Fenicle & Fahy's objections:　the Tax Matters Agreement, the Corporate Services Contribution, and the Properties Contribution (as defined below).　With the benefit of the board materials and discussions, the EFH Corp. board of directors approved, via board resolution, entry into the Tax Matters Agreement, Separation Agreement (which effectuates the Corporate Services Contribution and the Properties Contribution), and the Interim Transition Services Agreement, and the TCEH board of managers approved, via board resolution, the filing of such documents.

4.　　　And yet, for some, this is not enough.　Instead of acknowledging the landmark, and value-maximizing, transaction that has widespread support across the TCEH creditor

constituencies and avoids catastrophic tax consequences for virtually *all* of the Debtors' constituencies (and the robust governance process that evaluated and ultimately approved the transaction), the EFH Indenture Trustee and Fenicle & Fahy instead spend fifty pages of briefing arguing in favor of imagined alternatives that are based on a single premise—the Plan, as it relates to the TCEH Debtors and EFH Shared Services Debtors, improperly "transfers" assets of the "E-Side" for the benefit of the "T-Side."  This premise is false.

5.      As an initial matter, EFH is not "transferring" the EFH Group's NOLs to Reorganized TCEH.  Instead, the EFH Group is consuming its own NOLs to shelter its own taxable gain for its own benefit.  Case law in this circuit makes clear that application of NOLs in this fashion does not constitute a transfer.  Even if the consumption of NOLs constitutes a "transfer" of assets, it is a transfer in exchange for the TCEH First Lien Creditors' agreement to refrain from pursuing a Taxable Separation in a post-exclusivity world and accept the post-effective date burdens of the Spin-Off.

6.      EFH Corp.'s contribution of the equity in EFH Corporate Services and EFH Properties to Reorganized TCEH is likewise not a transfer of EFH value to Reorganized TCEH without consideration.  First and foremost, EFH does not have equity value in either EFH Corporate Services or EFH Properties.  The equity in EFH Corporate Services has no independent value separate from its relationship to the TCEH Debtors.  Indeed, the Objectors preferred transaction—EFH Corp.'s retention of the equity in EFH Corporate Services—is ultimately detrimental to *both* the "E-Side" and the "T-Side."  In the absence of EFH Corp.'s contribution of the equity in EFH Corporate Services to Reorganized TCEH, EFH Corporate Services would be faced with the choice to either retain hundreds of employees, unnecessarily, or sever a significant number of employees, potentially incurring significant severance and WARN

Act liabilities, among other potential liabilities. At the same time, Reorganized TCEH would have to unnecessarily hire new employees to perform the services formally provided by EFH Corporate Services. In short, both "sides of the house" would incur unnecessary costs that are easily avoided by transferring the equity in EFH Corporate Services to Reorganized TCEH. Similarly, EFH Properties is currently marginally cash-flow positive and is projected to be cash-flow neutral from 2018-2022. Without Reorganized TCEH as a tenant in Energy Plaza, EFH Properties is projected to become cash-flow negative.

7.      Even if EFH's contribution of the equity in EFH Corporate Services and EFH Properties to Reorganized TCEH is a transfer of value, the evidence will show that the contribution of those entities is a key part of the Spin-Off that benefits all of the Debtors, including EFH Corp. For example, those entities must be contributed to Reorganized TCEH as a condition to consummation of the proposed sale of the indirect economic interests in Oncor. Moreover, in exchange for transferring the equity of EFH Properties (which has no value) to Reorganized TCEH, EFH Corp. will receive cash on hand at EFH Properties (approximately $14 million).

8.      At bottom, the Objectors seek to cherry-pick provisions from a complex, heavily negotiated, and value-maximizing transaction. This is simply not possible. For all the complexities of the TCEH Debtors' restructuring efforts, the Spin-Off is the product of one very fundamental truth: in the absence of the Basis Step-Up and the utilization of the NOLs that make the Basis Step-Up possible, the TCEH First Lien Creditors will pursue a Taxable Separation, a result that would swiftly lead to administrative insolvency at one or more Debtors. There is no mechanism to force the TCEH First Lien Creditors to accept the Spin-Off without the Basis Step-Up. The EFH Indenture Trustee sets up a slate of "alternative" Spin-Off provisions the

EFH Debtors allegedly could have negotiated, both across the estates and with the TCEH creditor constituencies.  These so-called alternatives have no basis in reality; rather, they are figments of the EFH Indenture Trustee's imagination that cannot be used as a basis for rejecting confirmation of the Plan as it relates to the TCEH Debtors and the EFH Shared Services Debtors.

9.  This Plan—unlike the imaginary plan supported by the objecting parties—is real, viable, and actionable.  *This* Plan has overwhelming support from stakeholders across the Debtors' capital structure.  *This* Plan already has many of the regulatory approvals necessary to consummate the Spin-Off.  *This* Plan avoids a "Tax Armageddon" and maximizes value for all of the Debtors' estates.  For these reasons, as will be set forth in greater detail below and in the record at trial, the Court should overrule the remaining Objections and confirm the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.

## BACKGROUND

### I.    THE ORIGINAL PLAN.

10.  The Plan is the product of a negotiation and transaction development process that began in mid-2012.  The Debtors and their stakeholders have focused their restructuring discussions on three key issues:  (a) executing a Spin-Off in a manner that minimizes adverse tax consequences; (b) the increasing value of EFH Corp's economic interest in Oncor Electric Delivery Company LLC ("Oncor"); and (c) a fair, comprehensive, and binding resolution of inter-Debtor and intra-"T-side" legacy and other related claims.

11.  In August 2015, after an expansive third-party marketing process, the Debtors, Hunt Consolidated, Inc., and certain co-investors (collectively, the "Hunt Consortium"), together with virtually every significant TCEH stakeholder, entered into a plan support agreement (the "Original PSA").  The Original PSA contemplated a merger sponsored by the Hunt Consortium and members of the TCEH Unsecured Ad Hoc Group (the "Hunt Merger"), pursuant to which

EFIH's interest in Oncor would be converted to a real estate investment trust (a "REIT"), subject to the receipt of certain key regulatory rulings from, among others, the PUCT and the IRS. Importantly, the Original PSA also included the Alternative Restructuring Terms (as defined in the Original PSA) in the event the Debtors had to pursue an alternative restructuring other than that contemplated by the Hunt Merger.    Colloquially referred to as "disarmament," the Alternative Restructuring Terms ensured that in the event the Debtors were not able to consummate the Hunt Merger, the Debtors would nevertheless be able to expeditiously pivot to, and confirm, an alternative plan of reorganization at least with respect to the TCEH Debtors.

12.    The Court approved the Debtors' entry into the Original PSA on September 18, 2015, and confirmed the plan of reorganization implementing the transactions contemplated by the Hunt Merger on December 9, 2015 [D.I. 6097, 7285] (the "Original Plan").

13.    In parallel with the Original Plan, the Debtors obtained Court approval of an unprecedented settlement agreement that resolved billions of dollars in potential litigation related to three broad categories of prepetition claims:  (a) inter-Debtor Claims; (b) claims against the TCEH First Lien Creditors; and (c) claims against the Sponsors and against the Debtors' directors and officers (the "Settlement Agreement") [D.I. 7243].[5]

14.    Post-confirmation, the Debtors worked to effectuate the transactions contemplated by the Original Plan, including the Hunt Merger.    Under the Original PSA, the parties' obligations to support the Original Plan could terminate under certain circumstances on April 30, 2016 (the "Plan Support Outside Date") if all required regulatory approvals from the PUCT had not been obtained by such date.  It became apparent, however, by March 2016 that the regulatory

---

[5]    Additional details regarding the expansive scope of prepetition claims settled and released by the Settlement Agreement is set forth in the *Motion of Energy Future Holdings Corp.* et al., *to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement* [D.I. 5249].

conditions necessary to consummate the Hunt Merger may not all be obtained on the timeline set forth in the Original PSA.

15.     As a result, and cognizant that the expiration of their statutory periods of exclusivity had expired, leaving them vulnerable to competing plans of reorganization, the Debtors and their advisors re-engaged with the TCEH First Lien Creditors in earnest.  These discussions were driven by two primary considerations.  *First*, in the absence of the Private Letter Ruling providing the requisite comfort regarding the TCEH Debtors' ability to consummate the Spin-Off, the TCEH First Lien Creditors would need to preserve the optionality of a Taxable Separation.  *Second*, the TCEH First Lien Creditors would not exercise their right to pursue a Taxable Separation *if* they received the Basis Step-Up and *if* the TCEH Debtors emerged from chapter 11 on an expedited timeline.

16.     On March 24, 2016, the PUCT entered an order regarding the Oncor change of control application submitted by the Hunt Consortium and Oncor (the "PUCT Order").  The PUCT Order did not include all of the approvals required to consummate the Hunt Merger, including with respect to the terms of the initial lease between Oncor AssetCo and OEDC (requiring a separate proceeding for such approval).[6]

17.     Because the PUCT Order did not include all of the approvals required for consummation of the Original Plan and the Hunt Merger, the Plan Support Outside Date was not automatically extended.  On April 30, 2016, the investor parties that are party to the Original PSA indicated that they would not elect to extend the Plan Support Outside Date.  As a result, the TCEH First Lien Creditors delivered a Plan Support Termination Notice (as defined in the Original PSA) to the Debtors and the Required Investor Parties (as defined in the Original PSA),

---

[6]     *See, e.g.*, Ex. 2, DX344 Mar. 24, 2016 PUCT Order ¶ 191-92.

which caused the Original Plan to become null and void. Shortly thereafter, the EFH Debtors and EFIH Debtors terminated the agreement governing the Hunt Merger.

18.     Importantly, while the delivery of the Plan Support Termination Notice terminated the parties' obligations to support the Original Plan, it did not terminate the Original PSA (including the Alternative Restructuring Terms) or invalidate the Settlement Agreement. Collectively, the Original PSA effectively avoids the need to renegotiate the terms of a TCEH restructuring with TCEH junior creditors (through disarmament) and as reflected by the relatively few Objections in front of the Court today, while the Settlement Agreement provides a permanent resolution of virtually all inter-Debtor Claims.[7]   Armed with the stability and consensus provided by the Alternative Restructuring Terms and the Settlement Agreement, the Debtors immediately filed the Plan on May 1, 2016, together with a motion seeking to establish a Plan confirmation timeline.   Consistent with the negotiations with the TCEH First Lien Creditors, the Plan included the ability to "toggle" to a Taxable Separation, and the Plan confirmation timeline contemplated an aggressive schedule to emergence.

19.     To that end, the Debtors obtained entry of a scheduling order on May 24, 2016 (as amended, modified, or supplemented from time to time, the "Scheduling Order") that bifurcated the confirmation process for the TCEH Debtors and EFH Shared Services Debtors on hand and the EFH Debtors and EFIH Debtors on the other hand.

## II.     KEY TAX CONSIDERATIONS.

20.     Over the last four years, the Debtors have left no stone unturned and no avenue unexplored in considering *viable* restructuring alternatives.  With respect to the TCEH Debtors in

---

[7]     *See* Amended and Restated Settlement Agreement ("[T]he Parties have resolved to enter into this Settlement Agreement . . ., which upon entry of the Settlement Order, shall remain binding on all Parties regardless of whether the Plan is confirmed or consummated.")  [D.I. 7243-1 at 6].

particular, the Debtors explored the possibility of, among other transactions, a taxable separation through a plan of reorganization, a taxable separation through a transaction under section 363 of the Bankruptcy Code, a tax-free spin-off of TCEH, and a tax-efficient (but not wholly tax-free) spin-off of TCEH.  The Debtors and their advisors, and, starting in the fall of 2014, the Debtors' disinterested directors and their advisors, evaluated each of these transaction structures at length.[8]

21.     It will come as no surprise to any party that has followed or participated in the Debtors' restructuring efforts that the potential for a significant, administrative tax liability (capable of rendering one or more of the Debtors' estates administratively insolvent) was one of the primary considerations in evaluating each potential transaction structure.[9]  Indeed, while the relative balance of these considerations has shifted over time, a chronological analysis of the Debtors' decision making process unequivocally shows that *the bottom line has always remained the same, i.e., that a taxable separation of TCEH would have been a nonstarter for most of the Debtors' constituencies*.  Even as early as 2012, it was apparent that a taxable separation would create a catastrophic tax liability for the Debtors.  In 2015 and early 2016, when a REIT reorganization of EFH was either specifically contemplated or at least being considered for EFH, a taxable separation of TCEH would have potentially foreclosed that possibility.  For a period of time in 2016, in light of apparent declines in TCEH's value, a taxable separation seemed possible, though the Debtors preferred to avoid it because it would foreclose

---

[8]     *See* Ex. 1, 8/2/16 P. Keglevic Dep. Tr. at 298:11-23.

[9]     *See* Ex. 3, 7/7/16 C. Howard Dep. Tr. at 22:21-23:4 ("Generally, the case . . . has created difficult separation issues from a tax perspective because separation of either side leads to a potentially large stranded tax, as it's been called in this case.  So the challenge has been to develop an agreed path that does not leave a large stranded tax at the EFH level.").

the "E-Side" Debtors' ability to pursue a REIT after the "T-Side" separation and because a taxable separation potentially had valuation and other tax-related risks.

22.     Ultimately, in May 2016, the IRS delivered an unexpected message to the Debtors:  the IRS announced that it had tentatively concluded that it would treat TCEH's debt as "non-recourse" debt for federal income tax purposes.  In July 2016, the IRS informed the Debtors that this conclusion was their final conclusion.  The primary consequence of that conclusion was that a taxable separation of TCEH could give rise to approximately $27 billion of taxable gain, regardless of the valuation of TCEH's assets.[10]  After accounting for NOLs, that taxable gain could lead to a total federal tax liability of approximately $6.5 billion.[11]  Risk of a $6.5 billion cash tax liability dwarfed the Debtors' earlier concerns regarding the tax consequences of triggering a taxable separation of the TCEH Debtors from EFH Corp., and the brief period where a taxable separation did not appear to be catastrophic for the Debtors came to a swift and immediate end.  In short, from at least 2012 to today, it has been abundantly clear that a taxable separation of TCEH could result in a "Tax Armageddon."

### A.     Tax Drives Evaluation of Restructuring Possibilities.

23.     As described in the TCEH Disclosure Statement, the Debtors proactively eliminated large, contingent tax liabilities over the last four years, but have not been able to eliminate the potentially adverse tax consequences associated with a taxable sale of the TCEH Debtors' assets.

24.     As a result, tax continued to be a key driver of restructuring negotiations. Over time, four particular considerations have become increasingly significant.  *First*, the Ad Hoc

---

[10]   *See* Ex. 4, 6/27/16 P. Keglevic Dep. Tr. at 93:3-12.

[11]   *See* Ex. 4, 6/27/16 P. Keglevic Dep. Tr. at 92:16-24; Ex. 5, 8/4/16 B. Williamson Dep. Tr. at 82:10-12; Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365791].

Committee of TCEH First Lien Creditors was prepared to seek a taxable separation of the TCEH

Debtors from EFH Corp., with or without the support of the Debtors (a risk that only increased

once the Debtors reached the statutory limit of their exclusivity periods on December 29, 2015).

At the same time, the TCEH First Lien Creditors made it abundantly clear to the Debtors (and to

the Court and all parties in interest through statements on the record) that their willingness to

support a tax-free or tax-efficient restructuring of the TCEH Debtors would be conditioned on

receiving the maximum possible step-up in tax basis of TCEH's assets.[12]  ***Second***, the support of

the TCEH First Lien Creditors would be critical to the TCEH Debtors' ability to expeditiously

exit from chapter 11 (given their ability to, among other things, potentially credit bid for TCEH's

assets, and leverage their position in connection with the TCEH Debtors' access to, and use of,

the TCEH DIP Facility and TCEH Cash Collateral Order, and given the difficulty of "cramming

down" a massively undersecured creditor with blanket liens on substantially all of the TCEH

Debtors' assets).[13]   ***Third***, a taxable separation of the TCEH Debtors could (a) create a

significant tax liability (a liability that has significantly grown in light of the IRS's position that

the debt of TCEH is non-recourse debt for tax purposes) and (b) likely lead to a taxable

separation of the EFIH Debtors (given that no creditors and no potential investors would be

willing to take the equity in Reorganized EFH in light of the large and fundamentally

"unsatisfiable" tax liability), which could give rise to an additional multi-billion cash tax

liability.  ***Fourth***, as the EFH Indenture Trustee itself acknowledged, there are significant ties

---

[12]   Ex. 4, 6/27/16 P. Keglevic Dep. Tr. at 103:24-104:6 ("Q.  Who has conveyed to you that doing the busted 351 is a prerequisite to getting the T-side's consent? A.  The T-side. Q.  Who?  A.  Jeff Strong, T-side advisors, Paul Weiss.").

[13]   *Id.* at 105:8-19 ("Q. When [the TCEH First Lien Creditors] communicated to you . . . that doing the busted 351 is a prerequisite to their consent, had there been any discussions of what they would do if you didn't agree to do the busted 351?  A.  Yes, a 363 sale or a foreclosure of their assets, whatever it took to get them out of bankruptcy and get control of their assets in the fastest possible way, and if that is the case, they're not concerned with the tax treatment.").

between the EFH Debtors' estates and the TCEH Debtors' estates—as a result, restructuring decisions made on regarding a "T-Side" restructuring could materially affect the "E-Side" and vice versa.

25.     Each of these considerations is described in greater detail below.  In light of these considerations, the Debtors are pursuing the Spin-Off with the Basis Step-Up—the same transaction the Debtors sought and obtained Court approval of nine months ago in connection with the hearing to consider the Original Plan.  Let there be no doubt:  a robust analysis of the competing tax considerations underlying the Debtors' multi-party restructuring negotiations will unambiguously show that the Spin-Off is the only alternative that maximizes the value of *all* of the Debtors' estates.

## B.     Overview of Net Operating Losses.

26.     Under general tax rules, if a corporation (or an entity taxed as a corporation) is in an overall taxable loss position for a tax year (after accounting for all items of income and loss and deductions), then the corporation has a net operating loss, or "NOL," for that year.  A consolidated tax group has a consolidated NOL, or "CNOL," that reflects the combined operating results of each corporation in the group.  For these purposes, the results of any entity that is a so-called "disregarded entity" for tax purposes, such as TCEH and EFIH, are included in its parent entity's results as if the entity were a division of the parent.  Most of the material legal entities in the EFH consolidated tax group (other than EFH Corp.) (collectively, the "<u>EFH Group</u>") are disregarded entities, with certain relatively unimportant exceptions.

27.     Subject to various assumptions regarding, among other things, operating performance, asset values, and certain planned transactions, the Debtors estimate that the EFH Group will have approximately $8.3 billion of available losses, including current year losses and NOL carryforwards, assuming a December 31, 2016 emergence date for all of the Debtors (prior

to taking into account any gain arising from the Preferred Stock Sale described below and in the Plan).[14]

28.     Of these projected NOLs, the vast majority is attributable to interest deductions and operational results generated by TCEH and its subsidiaries.  For example, for the 2014-2016 period, the TCEH Debtors are projected to generate approximately $7.2 billion in NOLs.  In contrast, the "E-Side" (including both EFH and EFIH) is projected to have generated only approximately $700 million in NOLs in the same period.[15]

**C.      The Private Letter Ruling Gives Confidence that the Spin-Off Can Proceed and Creates Potential for EFH Debtors to Utilize NOLs Available After Consummation of Spin-Off.**

29.     On June 10, 2014, EFH submitted a request for a private letter ruling to the IRS, seeking various rulings related to the federal income tax treatment of the TCEH Debtors' proposed reorganization (the "PLR Request").  The main purpose of the PLR Request was to obtain assurance from the IRS that the TCEH separation from EFH could qualify as a tax-free transaction under Sections 368, 355, and 356 of the Internal Revenue Code.  The PLR Request did not have any assurances of success (and, indeed, it was not until over two years later, on July 28, 2016, that the Debtors received the requested private letter ruling (the "PLR")).

30.     The PLR contains many novel rulings in a very complex and uncertain area of the law.  The Debtors believe the rulings they obtained in the PLR are sufficient to satisfy the requirements of the Plan and give the Debtors and all stakeholders comfort that the Spin-Off can proceed without triggering a multi-billion dollar stranded tax liability.  Most importantly, the

---

[14]   For simplicity, the remainder of this discussion (along with, for example, disclosures in the Debtors' disclosure statement related to NOLs) will refer to the combined current year losses and NOL carryforwards collectively as "NOLs."

[15]   *See*, Ex.7, DX713 NOL at Emergence 7-5-16 Summary Excel [EFH06374960].  The remaining approximately $400 million of NOLs were generated in periods before 2014.  *See id.*

PLR confirms that the separation of TCEH pursuant to the Spin-Off does not give rise to the multi-billion cash tax liability that could arise in a Taxable Separation (so long as the Spin-Off otherwise satisfies the applicable provisions of the Internal Revenue Code and is consummated consistent with the PLR).

31.     Somewhat ironically, the IRS's position that the TCEH debt is "non-recourse" for tax purposes appears to permit the EFH Group NOLs to *survive* the Spin-Off.  Specifically, the PLR provides that the so-called "bankruptcy exclusion" under section 108(a) of the Internal Revenue Code does *not* apply to the cancellation of TCEH's debt.  Because the "bankruptcy exclusion" does not apply—and the taxable gain from the cancellation of TCEH's debt is shielded instead by other provisions of the Internal Revenue Code—the attribute reduction rules of section 108 of the Internal Revenue Code, which would otherwise eliminate the EFH Group's NOLs as a result of the cancellation of TCEH's debt, also do not appear to apply.

32.     Thus, in a chapter 11 case full of twists and turns, the IRS's position in the PLR, first communicated in May 2016, altered the parties' expectations in a number of ways.  To the extent the EFH Group's NOLs are not utilized in connection with the Preferred Stock Sale (or subject to reduction in connection with a restructuring of the EFH Debtors and EFIH Debtors), they appear to survive for the benefit of Reorganized EFH (or its acquirer or successor).[16]  By contrast, if the Taxable Separation were to occur, all of the EFH Group's NOLs would potentially be utilized, and a multi-billion tax liability would potentially be created, because the amount of taxable gain would greatly exceed all of the EFH Group's NOLs.

---

[16]   These NOLs may be subject to some limitations under Section 382 of the Internal Revenue Code.

D.      Overview of the Spin-Off and Basis Step-Up.[17]

33.      The Plan, as it relates to the TCEH Debtors and EFH Shared Services Debtors, contemplates a tax-free spin-off of TCEH to Holders of TCEH First Lien Claims (as defined in the Plan, the "Spin-Off") that will be structured to obtain a significant, and carefully controlled, step-up in tax basis in certain of TCEH's assets.  In connection with the Spin-Off, TCEH will contribute the assets and liabilities of the Comanche Peak nuclear plant and TCEH's retail electricity business to a subsidiary of Reorganized TCEH (referred to as the "Preferred Stock Entity"), which will, in turn, issue common stock and preferred stock in exchange for such assets.  Reorganized TCEH will immediately sell such preferred stock to third parties pursuant to a prearranged agreement (such sale, the "Preferred Stock Sale").[18]

34.      The Preferred Stock Sale will cause EFH to recognize taxable gain with respect to the transfer of Comanche Peak and the retail electricity business, leading to approximately $5.86 billion of taxable gain and a corresponding increase in the depreciable and amortizable tax basis of the assets.  Such taxable gain will be offset by NOL carryforwards and current-year deductions of the EFH Group.  Notably, the amount of NOLs projected to be used in connection with the Preferred Stock Sale is expected to be *less* than the amount of total NOLs that are attributable to TCEH Debtors (as described above).

35.      It is no simple task to modify the assets to be included in the Basis Step-Up Transaction in order to preserve more NOLs for use by the EFH Debtors and EFIH Debtors.

---

[17]   The Plan also contemplates a potential Taxable Separation to the extent that certain conditions to the Spin-Off are not satisfied.  The Debtors are not seeking confirmation of the taxable portions of the Plan at this time.  All rights are reserved with respect to the foregoing issues.  *See Notice of Filing of Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9199].

[18]   As described in greater detail in the Howard Declaration, the Preferred Stock Sale will occur before the Reorganized TCEH Conversion and, for tax purposes, the Preferred Stock Entity's preferred stock will be treated as owned and sold by EFH, rather than Reorganized TCEH.

Contrary to the EFH Indenture Trustee's position, one cannot merely "adjust" the amount of taxable gain to reach a desired level of NOL preservation. For the transfer of assets in the Preferred Stock Sale to result in a tax basis step-up, such assets must have "built in gain," *i.e.*, they must have value in excess of tax basis. The only TCEH assets with substantial built in gains are the TCEH Debtors' retail electricity business and the Comanche Peak plant.[19] Additionally, certain parties have asserted that the amount of NOLs that are utilized in the Preferred Stock Sale could be lowered by including certain "built in loss" assets. However, including those additional assets in the Preferred Stock Sale would be inconsistent with the facts presented to the IRS in connection with obtaining the Private Letter Ruling, could risk causing the Spin-Off to be taxable, and would result in a basis step-down with respect to those assets. The TCEH First Lien Creditors would also be unlikely to agree to such a basis step-down.

> **E.    The Spin-Off and Basis Step-Up is the Product of Extensive Negotiations With the Ad Hoc Committee of TCEH First Lien Creditors.**

36.    The Debtors' negotiations with the TCEH First Lien Creditors date back to 2012. As the value of the TCEH assets has declined, and it has become clear that a tax-free transaction coupled with a basis step-up transaction would provide the maximum possible step-up in tax basis to TCEH, the TCEH First Lien Creditors have not been shy about keeping the option of a taxable separation on the negotiating table. Following expiration of the Debtors' exclusivity period, this possibility became much more likely. Indeed, under the Original PSA, the TCEH First Lien Creditors preserved their ability to pursue a taxable transaction in the Alternative Restructuring Terms, as evidenced by the draft standalone plan of reorganization the TCEH First

---

[19]   TCEH's historic natural gas plants also have a small amount of built in gain. After consulting with the TCEH First Lien Creditors, however, those plants were not included in the Preferred Stock Sale for other tax reasons related to the qualification of the Spin-Off.

Lien Creditors filed on May 19, 2016 as an exhibit to their pleading in support of establishing a Plan confirmation schedule on May 24, 2016 [D.I. 8480].

37.      Throughout the three years of negotiations between the Debtors and the TCEH First Lien Creditors, the TCEH First Lien Creditors have steadfastly rejected any argument that they should compensate EFH Corp. for the Basis Step-Up.  The TCEH First Lien Creditors believe that a taxable separation of TCEH would result in a basis step-up for TCEH and TCEH would not be liable for any tax resulting from the separation.  In effect, this was the default transaction for the "T-side," and the TCEH First Lien Creditors had no reason to accept any outcome that was less beneficial to them.  This position was particularly motivated by the fact that a spin-off would impose significant additional risks and limitations on Reorganized TCEH. Specifically, the Tax Matters Agreement will prohibit Reorganized TCEH from (a) engaging in certain types of M&A activity (specifically, it cannot be acquired in a taxable transaction) or selling all of its assets; (b) instituting certain types of stock repurchase programs, including the repurchase of more than 20% of outstanding stock; and (c) shutting down assets under certain circumstances.  In the event of a so-called "dividend recapitalization," which are a key tool used by companies to adjust their capital structures, the dividend would be more likely to be taxable to Reorganized TCEH's shareholders.[20]  Moreover, the Tax Matters Agreement allocates certain material risks to Reorganized TCEH that Reorganized TCEH would arguably not be liable for in a Taxable Separation, including (a) various "ordinary-course" tax liabilities and (b) most risks relating to any tax liability that results if the EFH Group's NOLs were insufficient to shelter the

---

[20]   This is because the "earnings and profits" of the EFH Group will be allocated between Reorganized TCEH and EFH in the Spin-Off, with the significant majority, or all, of such earnings and profits being allocated to Reorganized TCEH.  Dividends are taxable to shareholders to the extent of a company's earnings and profits. By contrast, in a Taxable Separation, none of these historic earnings and profits—or earnings and profits associated with the restructuring—would be allocated to Reorganized TCEH.

gain associated with the Preferred Stock Sale. Perhaps mostly importantly, Reorganized TCEH will have "consolidated group" or "-6" liability with respect to any tax liability that arises in 2016, including as a result of a failure of the Spin-Off to be tax-free.[21]

38.     In the tax-free spin-off of TCEH with the Preferred Stock Sale, Reorganized TCEH will receive a basis step-up of approximately $5.86 billion.[22] Evercore, the Debtors' investment banking advisors estimated the present value of this Basis Step-Up at approximately $1.1 billion (relying in part on previous projections prepared by the Debtors).[23] By comparison, in a Taxable Separation, even though a multi-billion tax liability would be generated, Reorganized TCEH would receive a Basis Step-Up of only approximately $3.7 billion, with a net present value of approximately $670 million.[24] Thus, the Preferred Stock Sale and its concomitant Basis Step-Up provides a strong incentive for the TCEH First Lien Creditors to agree to forgo pursuit of the Taxable Separation and accept the operational limitations required to pursue the Spin-Off and the additional tax liability risk associated with the Spin-Off. But, contrary to the EFH Indenture Trustee's arguments, the TCEH First Lien Creditors are not receiving a free $1.1 billion benefit from forgoing a Taxable Separation; they are receiving a $430 million net benefit, and paying a price for it.

---

[21]  In a Taxable Separation, Reorganized TCEH would not have this consolidated group tax liability under any circumstance. Although the Tax Matters Agreement allocates indemnification obligations with respect to consolidated group liability to EFH Corp and EFIH (or their reorganized successors) under certain circumstances, under applicable Treasury Regulations, Reorganized TCEH may remain obligated to the IRS for these obligations in the event EFH Corp. or EFIH have insufficient assets to pay the liability, and Reorganized TCEH also has liability to EFH Corp. and EFIH under the Tax Matters Agreement under certain circumstances.

[22]  Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365791]; Ex. 4, 6/27/16 P. Keglevic Dep. Tr. at 114:11-24.

[23]  *See* Ex. 8, 7/29/16 D. Ying Dep. Tr. at 27:19-28:4. This valuation was based on comparing the use of TCEH depreciation and amortization deductions with and without the Preferred Stock Sale and applying a discount rate to the anticipated tax savings. Additionally, this valuation was done prior to the removal of TCEH's historic natural gas plants from the assets being transferred in the Preferred Stock Sale, and prior to certain updated valuations of Comanche Peak and the retail electricity business provided by Duff & Phelps.

[24]  *See* Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365791].

39.    Collectively, these considerations dictated that, in order to (i) obtain the support of the TCEH First Lien Creditors, (ii) avoid a "Tax Armageddon" in the form of the material cash tax liability generated in a taxable transaction, and (iii) avoid a protracted and litigious confirmation process, the TCEH Debtors would have to obtain the maximum possible step-up in tax basis, as quickly as possible.

### F.    A Taxable Separation Destroys Value for Virtually All Debtor Constituencies.

40.    There has never been any doubt that a Taxable Separation of the TCEH Debtors from EFH Corp. may create a significant tax liability at EFH Corp. (and, potentially, TCEH or one or more of its subsidiaries if EFH Corp. is able to, and elects to, "check the box" and make one or more TCEH subsidiaries members of the EFH consolidated group (i.e., revoke such subsidiaries' status as disregarded entities)).  Equally, there is no doubt that a separation of the TCEH Debtors from EFH Corp. would have immediate ramifications for the EFH Debtors and EFIH Debtors. Because of the risk of a significant tax burden at EFH Corp. generated by a Taxable Separation of the TCEH Debtors from EFH Corp., no creditors or investors would be willing to accept equity in Reorganized EFH.  As a result, the restructuring efforts of the EFH Debtors and EFIH Debtors would be paralyzed by a Taxable Separation of the TCEH Debtors from EFH Corp.  Indeed, it is almost inevitable that a Taxable Separation of the TCEH Debtors would lead to a Taxable Separation of the EFIH Debtors from EFH Corp.—adding billions of dollars in additional tax liability at EFH Corp. and rendering it administratively insolvent. Moreover, all of the EFH Group's NOLs would be utilized (because any taxable gain would far exceed the EFH Group NOLs) and EFH Corp. and any other entity taxed as a corporation in the EFH Group would be jointly and severally liable for the tax liability.  This is exactly why none

of the formal bidders for EFH has asked for a Taxable Separation or otherwise disputed that a tax free separation of TCEH with a Basis Step-Up is the best path forward for EFH.

41.    Let there be no doubt.  A Taxable Separation of the TCEH Debtors from EFH Corp. would be destructive to value across all of the Debtors' estates and ultimately benefits no party.

### G.    The Objecting Parties' Tax Objections Mischaracterize the Facts and the Law in a Short-Sighted Attempt to Force the Debtors to Renegotiate a Comprehensive TCEH Restructuring.

42.    As will be set forth in greater detail below, the tax objections filed by Fenicle & Fahy and the EFH Indenture Trustee are wrong on both the facts and the law. Factually, these parties ignore the four years' worth of evidence from  (a) the TCEH First Lien Creditors, regarding their willingness to pursue a Taxable Separation (with or without the support of the Debtors) in the absence of significant concessions regarding a Basis Step-Up and (b) the Debtors' boards of directors and managers regarding their evaluation of all potentially value-maximizing transactions, as well as the TCEH's board's evaluation of what alternative is most likely to maximize the value of the TCEH estate.

43.    Legally, these parties ignore (a) the jurisprudence on "stranded taxes," which include three recent cases in which debtors have consummated transactions that stranded a significant tax liability; (b) jurisprudence regarding the permissibility of use of NOLs; and (c) the significant risks associated with each of the EFH Indenture Trustee's arguments for "spreading the pain" of a Taxable Separation to TCEH or Reorganized TCEH (setting aside the fact that none of the EFH Indenture Trustee's arguments would prevent that pain from being jointly and severally visited upon EFH).

44.    In short, the EFH Indenture Trustee and Fenicle & Fahy are demanding that the Debtors cherry pick the most favorable "E-Side" terms of the Spin-Off while haphazardly

ignoring the fact that each step of, and each term relating to, the Spin-Off is the product of extensive negotiations between the Debtors and their constituencies, as well as among the Debtors' estates. The Debtors worked tirelessly over the last four years to negotiate a TCEH restructuring resolution that balances the vastly differing desires of their constituencies and potentially devastating tax consequences for all parties. That resolution is the Spin-Off and Basis Step-Up. Anything short of the Spin-off and Basis Step-Up has a significant risk of resulting in a Taxable Separation that would likely render EFH administratively insolvent.

## III.    CONFIRMATION SOLICITATION AND NOTIFICATION PROCESS.

45.    On June 17, 2016, the Court entered the order approving the TCEH Disclosure Statement and establishing procedures for solicitation of votes on the Plan (the "TCEH Disclosure Statement Order").[25]    As required by section 1126 of the Bankruptcy Code, the TCEH Debtors and EFH Shared Services Debtors solicited votes from the Holders of Claims or Interests in Impaired Classes receiving a recovery under the Plan, with all other Classes deemed to accept or reject the Plan as applicable.

### A.    Unimpaired and Deemed to Accept.

46.    Holders of Claims in the following Classes are Unimpaired and therefore were deemed to accept the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors. While the TCEH Debtors and EFH Shared Services Debtors did not solicit votes from Holders of Claims in such Classes, the TCEH Debtors and EFH Shared Services Debtors mailed them a

---

[25] *See Order (A) Approving the Disclosure Statement for the TCEH Debtors, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates as it Relates to all Debtors, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes as it Relates to all Debtors on the Plan and for Filing Objections to the Plan as it Relates to the TCEH Debtors, and (D) Approving the Manner and Forms of Notice and Other Related Documents as it relates to the TCEH Debtors* [D.I. 8761].

notice regarding the TCEH Confirmation Hearing as required under the TCEH Disclosure Statement Order.[26]

| Class | Claims and Interests | Status |
|---|---|---|
| Class C1 | Other Secured Claims Against the TCEH Debtors | Unimpaired |
| Class C2 | Other Priority Claims Against the TCEH Debtors | Unimpaired |
| Class D1 | Other Secured Claims Against the EFH Shared Services Debtors | Unimpaired |
| Class D2 | Other Priority Claims Against the EFH Shared Services Debtors | Unimpaired |
| Class D3 | General Unsecured Claims Against the EFH Shared Services Debtors | Unimpaired |

**B.      Fully Impaired and Deemed to Reject.**

47.      Holders of Claims or Interests in the following Classes did not receive any recovery under the Plan and therefore were deemed to reject the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors. While the TCEH Debtors and EFH Shared Services Debtors did not solicit votes from these stakeholders, the TCEH Debtors and EFH Shared Services Debtors mailed them a notice regarding the TCEH Confirmation Hearing as required under the TCEH Disclosure Statement Order.[27]

| Class | Claims and Interests | Status |
|---|---|---|
| Class C6 | General Unsecured Claims Against EFCH | Impaired |
| Class C8 | Non-TCEH Debtor Intercompany Claims | Impaired |
| Class C10 | Interests in TCEH and EFCH | Impaired |
| Class D5 | Non-EFH Shared Services Debtor Intercompany Claims | Impaired |

---

[26]   *See id.* ¶ 12; *Affidavit of Service of Solicitation Materials* [D.I. 9189].

[27]   *Order (A) Approving the Disclosure Statement for the TCEH Debtors, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates as it Relates to all Debtors, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes as it Relates to all Debtors on the Plan and for Filing Objections to the Plan as it Relates to the TCEH Debtors, and (D) Approving the Manner and Forms of Notice and Other Related Documents as it relates to the TCEH Debtors* [D.I. 8761]

### C.    Subject to Reinstatement or Discharge and Deemed to Accept or Reject.

48.    With respect to inter-Debtor Claims and Interests between TCEH Debtors and EFH Shared Services Debtors in the same "debt silo" (for example, Claims between one TCEH Debtor and another TCEH Debtor), the TCEH Debtors and EFH Shared Services Debtors retained the ability to either reinstate or cancel and release such Claims on the TCEH Effective Date to facilitate ordinary operations or the maintenance of existing organizational structures. The TCEH Debtors or EFH Shared Services Debtors holding these Claims and Interests are deemed to have accepted or rejected the Plan. The TCEH Debtors and EFH Shared Services Debtors were not required to solicit votes from the Debtors holding these Claims and Interests or serve such Debtors with any other type of notice in connection with solicitation.[28]

| Class | Claims and Interests | Status |
|-------|----------------------|--------|
| Class C7 | TCEH Debtor Intercompany Claims | Unimpaired/ Impaired |
| Class C9 | Interests in TCEH Debtors Other Than TCEH and EFCH | Unimpaired/ Impaired |
| Class D4 | EFH Shared Services Intercompany Claims | Unimpaired/ Impaired |
| Class D6 | Interests in the EFH Shared Services Debtors | Unimpaired/ Impaired |

## IV.    VOTING RESULTS.

49.    The TCEH Debtors and EFH Shared Services Debtors filed the TCEH Voting Report substantially contemporaneously herewith. All of the impaired Classes of Claims and Interests entitled to vote—Classes C3, C4, and C5—voted to accept the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors, exclusive of any acceptance by insiders.[29] Thus, there is an impaired consenting class of non-insider claims at each Debtor with a class of

---

[28]    *Id.*

[29]    *See* TCEH Voting Report.

impaired Claims.  Accordingly, the Plan as it relates to the TCEH Debtors and the EFH Shared Services Debtors satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code.

50.    The following table summarizes the TCEH Voting Report (with ranges reflecting variance by individual Debtor, as set forth in greater detail in the TCEH Voting Report):

| Class | Claims and Interests | Percent of Number Accepting | Percent of Amount Accepting | Result |
|---|---|---|---|---|
| Class C3 | TCEH First Lien Secured Claims | Approximately 97% | Approximately 99% | Accept |
| Class C4 | TCEH Unsecured Debt Claims | Approximately 82% | Approximately 92% | Accept |
| Class C5 | General Unsecured Claims Against the TCEH Debtors Other Than EFCH | Approximately 90% | Approximately 99% | Accept |

## V.    RESOLVED OBJECTIONS.

51.    As of the date hereof, the Debtors have finally resolved six Objections and believe they will be positioned to resolve another two objections, pending execution of final documentation and/or agreement of the parties.  As of the date hereof, four Objections remain outstanding.

## VI.    MODIFICATIONS TO THE PLAN.

52.    The TCEH Debtors and EFH Shared Services Debtors intend to file a revised Plan to effectuate resolutions of objections and implement language clarifications.

53.    The Bankruptcy Code provides that a plan proponent may modify a plan "at any time" before confirmation.[30] It further provides that all stakeholders that previously have accepted a plan should also be deemed to have accepted such plan as modified.[31] Courts

---

[30]    11 U.S.C. § 1127(a).

[31]    *Id.* § 1127(d).

routinely allow plan proponents to make nonmaterial changes to a plan without requiring the proponent to resolicit votes for the plan.[32]

54.    Most significantly, the revised Plan resolves the objection of the PCRB Trustee with respect to the PCRB Claims by including the PCRB Claims as TCEH Deficiency Recipient Claims.  This has the effect of permitting Holders of Allowed PCRB Claims to share in distributions of the TCEH Cash Payment that would have otherwise been distributed to, or for the benefit of, Holders of Allowed TCEH First Lien Deficiency Claims, to the extent necessary to cause such Holders to receive a distribution equal to 54% of the distributions such Holders would have received if the Allowed TCEH First Lien Deficiency Claims had been waived for the benefit of all Holders of Allowed TCEH Unsecured Debt Claims and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH (the "PCRB Settlement").[33]

55.    The modifications to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors agreed to so far by the TCEH Debtors and EFH Shared Services Debtors either do not materially and adversely affect the recoveries of the Holders of Claims against and Interests in the TCEH Debtors and the EFH Shared Services Debtors or, to the extent such modifications materially and adversely affect such Holders, these affected Holders have accepted the modifications in writing.  Accordingly, the TCEH Debtors and EFH Shared Services Debtors are not required to resolicit acceptances from Holders of Claims and Interests in voting classes,

---

[32]    *See, e.g., In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (holding that nonmaterial modifications to a plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming a plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[33]    On August 10, 2016, Ms. Nikki McClendon filed an informal (and untimely) objection to confirmation of the Plan as it relates to the TCEH Shared Services Debtors (the "Informal PCRB Objection").  Ms. McClendon purports to be a holder of PCRB Claims.  The Informal PCRB Objection should be overruled in light of the PCRB Settlement.

and their prior acceptances should be deemed votes to accept the modified Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.

## ARGUMENT

**I.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Satisfies Each Requirement for Confirmation.**

56.      To confirm the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[34]  For the reasons stated herein and in light of the evidentiary support to be offered at the TCEH Confirmation Hearing, the Debtors respectfully request that the Court find that the Debtors have satisfied their burden and confirm the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.

**A.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Fully Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

57.      Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[35]  The principal aim of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[36]  Accordingly, the determination of whether the Plan as it relates to the TCEH Debtors and the EFH Shared Services Debtors complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122

---

[34]  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 & n.15 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

[35]  11 U.S.C. § 1129(a)(1).

[36]  *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368; *see also Genesis Health*, 266 B.R. at 599 ("The legislative history reflects that the applicable provisions of chapter 11 includes sections such as section 1122 and 1123, governing classification and contents of plan." (internal quotation marks and alterations omitted)).

and 1123 of the Bankruptcy Code.

> 1.    **The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

58.    Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[37]  Because claims only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining to classify claims together.[38]  Likewise, the Third Circuit has recognized that plan proponents may place similar claims into *different* classes so long as there is a reasonable basis to do so[39]—for example, where members of a class have different legal rights.[40]

59.    Here, each of the Claims or Interests in a particular Class with Claims against, or Interests in, the EFH Shared Services Debtors or TCEH Debtors is substantially similar to the other Claims or Interests in such Class, and there is a reasonable basis for the separate

---

[37]   11 U.S.C. § 1122(a).

[38]   *See In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012) (recognizing that plan proponents have "discretion" in classifying claims under a plan of reorganization); *In re W.R. Grace & Co.*, 475 B.R. 34, 109-10 (D. Del. 2012) ("Plan proponents and bankruptcy courts have considerably broad discretion in deciding how to classify claims.").

[39]   *In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014) ("[A] corollary to that rule is that the 'grouping of similar claims in different classes' is permitted so long as the classification is 'reasonable.'") (quoting *In re Jersey Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987)); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (stating that "each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (stating that similar claims may be placed in separate classes so long as such classification is reasonable).

[40]   *See, e.g.*, *In re Wash. Mut., Inc.*, No. 08-12229 (MFW), 2012 WL 1563880, at *12 (Bankr. D. Del. Feb. 24, 2012) (permitting separate classification of notes issued by same issuer where each debenture had "slightly different legal rights"); *In re Kaiser Aluminum Corp.*, No. 02-10429(JKF), 2006 WL 616243, at *5-6 (Bankr. D. Del. Feb. 6, 2006) (permitting classification scheme after consideration of creditors' legal rights), *aff'd*, 343 B.R. 88 (D. Del. 2006); *In re Exide Techs.*, 303 B.R. 48, 79-80 (Bankr. D. Del. 2003) (stating that there may be a basis for separately classifying creditors of the same priority level); *see also In re Mirant Corp.*, No. 03-46590DML11, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007) (permitting separate classification because holders of claims had different legal interests in the debtor's estate).

classification of Claims in such Classes.  In general, the Plan's classification scheme follows the Debtors' capital structure.  The Plan first classifies Claims and Interests into four subcategories: subcategory A for the EFH Debtors, subcategory B for the EFIH Debtors, subcategory C for the TCEH Debtors, and subcategory D for the EFH Shared Services Debtors.  Subcategories A, B, and C reflect the Debtors' three primary "debt silos" while subcategory D, the EFH Shared Services Debtors, reflects Debtor entities that either primarily function to provide services to the TCEH Debtors (and, potentially, Reorganized TCEH) or whose creditor base is sufficiently small, such that the emergence of such Entities is not dependent on the consummation of an "E-Side" transaction.  From there, Claims are generally categorized by priority, by Secured versus Unsecured status, by type, or based on unique factors associated with particular series of debt.[41]  Because the Plan classifies Claims and Interests based upon their different rights and attributes, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfies section 1122 of the Bankruptcy Code.

2.      **The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Satisfies the Seven Mandatory Plan Requirements of Sections 1123(a) of the Bankruptcy Code.**

60.      The seven applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing the plan.  The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors satisfies each of these requirements.

61.      ***Specification of Classes, Impairment, and Treatment.***      The first three requirements of section 1123(a) are that the plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise

---

[41]   Third Amended Joint Plan, Art. III.A.

nature of their treatment under the Plan.[42]  The Plan as it relates to the TCEH Debtors and EFH

Shared Services Debtors, in particular Article III, satisfies these three requirements by setting

forth these specifications in detail and no party has asserted otherwise.[43]

62.    ***Equal Treatment.***  The fourth requirement of section 1123(a) is that the plan must

"provide the same treatment for each claim or interest of a particular class."[44]  Courts in

Delaware construe this provision to require "only approximate equality," not "precise

equality."[45]  Importantly, in analyzing equal treatment, courts examine whether particular class

members "give up the same degree of consideration for their distribution under the plan."[46]

63.    Here, the Plan as it relates to the TCEH Debtors and EFH Shared Services

Debtors satisfies these requirements.  In general, the Plan provides for identical treatment within

each Class.  The Allowed TCEH First Lien Secured Claims (Class C3) will receive their *pro rata*

share of the Reorganized TCEH Common Stock (subject to certain dilutions), the TCEH

Debtors' Cash on hand, net Cash proceeds from the issuance of the New Reorganized TCEH

Debt (or, at the election of the TCEH Supporting First Lien Creditors, all or a portion of such

New Reorganized TCEH Debt), and any proceeds of the TCEH Settlement Claim. The TCEH

Unsecured Debt Claims (Class C4)—which include the TCEH First Lien Deficiency Claim, the

TCEH Second Lien Note Claims, the TCEH Unsecured Note Claims, and the PCRB Claims—

will all receive their *pro rata* share of the TCEH Cash Payment, subject to the limited waiver of

the TCEH First Lien Deficiency Claim set forth in Article IV.B.11 of the Plan and noted below.

---

[42]   11 U.S.C. § 1123(a)(1)-(3).

[43]   Third Amended Joint Plan, Art. III.B1.

[44]   11 U.S.C. § 1123(a)(4).

[45]   *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (quoting *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)).

[46]   *W.R. Grace & Co.*, 475 B.R. at 121.

The General Unsecured Claims Against the TCEH Debtors Other Than EFCH (Class C5) will also receive their *pro rata* share of the TCEH Cash Payment.

64.     As a critical component of the settlement of litigation to avoid the liens securing the TCEH First Lien Secured Claims, the Plan provides that the Holders of TCEH First Lien Secured Claims, will waive their recovery under the TCEH First Lien Deficiency Claim for the benefit of holders of TCEH Unsecured Debt Claims which, in light of the PCRB Settlement, now include *all* Holders of TCEH Unsecured Debt Claims.

65.     In the absence of the waiver of the TCEH First Lien Deficiency Claim, Holders of TCEH First Lien Claims would receive the vast majority of the TCEH Cash Payment, to the detriment of the other Holders of Allowed Class C4 and Class C5 Claims.   In addition, the waiver of the TCEH First Lien Deficiency Claim, as a critical component of the Settlement Agreement, has the support of both the TCEH Supporting First Lien Creditors (who are waiving their recovery on account of the TCEH First Lien Deficiency Claim), the PCRB Trustee (in resolution of the PCRB Trustee's Objection), the TCEH Unsecured Ad Hoc Group (whose constituencies are the beneficiaries of such waiver), and the TCEH Creditors' Committee (who is a fiduciary of all "T-side" creditor constituencies).   This settlement is a reasonable means of ensuring that Holders of these subsidiary guarantees do not give up disproportionate consideration under the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.   In addition, courts in the Third Circuit have recognized the permissibility of secured creditors providing a portion of their recovery to junior creditors in certain circumstances, including as part of a larger restructuring transaction.[47]

---

[47]   *See In re Armstrong World Indus.*, 432 F.3d 507, 514 (3d Cir. 2005) (denying confirmation where the plan of reorganization contemplated unsecured creditors providing a portion of their recovery to former equity holders but noting that distributions from secured creditors are tantamount to permissible carve-outs from lien

66.     ***Adequate Means for Implementation.***  Fifth, a plan must provide adequate means for its implementation.[48]   The Plan, together with the documents and forms of agreement included in the TCEH Plan Supplement, provides a detailed blueprint for the transactions that underlie the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.

67.     Article IV of the Plan, in particular, sets forth the means for implementation of the critical going-concern transaction underlying the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors:  the Spin-Off.  It also describes the means for cancelation of existing securities and implementation of the key capital markets transactions underlying the Plan, including the issuance of the New Reorganized TCEH Debt and the Reorganized TCEH Common Stock.  In addition to these core transactions, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors sets forth the other critical mechanics for emergence, like the dissolution of certain subsidiaries, the establishment and termination of certain agreements, and the settlement of intercompany accounts.

68.     The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents or forms of agreements included in the TCEH Plan Supplement.  This includes, for example, the New Organizational Documents governing Reorganized TCEH and its reorganized subsidiaries (including the Reorganized EFH Shared Services Debtors) (e.g., a certificate of incorporation, new bylaws, and a form LLC

---

proceeds); *In re Electroglas, Inc.*, No. 09-12416 (PJW), 2009 WL 8189056 (Bankr. D. Del. July 9, 2009) (permitting a stalking horse bidder to contribute a portion of its bid to certain creditors not receiving payment in full under the Plan); *In re Distributed Energy Sys. Corp.*, No. 08-11101(KG), 2009 WL 1458175 (Bankr. D. Del. May 18, 2009) (same); *In re World Health Alts., Inc.*, 344 B.R. 291, 297 (Bankr. D. Del. 2006) (finding that secured creditors may share their recovery with unsecured creditors post-*Armstrong*).

[48]   11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include:  retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancelation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.  *Id.*

agreement for the subsidiaries), a term sheet for the Preferred Stock offering, the Tax Matters Agreement, the Interim Transition Services Agreement, the Separation Agreement, and the final forms of agreement executed in connection with the TCEH DIP facility approved in June 2016, and which closed on August 4, 2016.[49]  Thus, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfies section 1123(a)(5) and no party has asserted otherwise.

69.    ***Non-Voting Stock.***  The sixth requirement of section 1123(a) is that a plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.[50]  As one court explained, this subsection "prevents the issuance of a class of stock without the *possibility* of exercising *any* vote."[51]  Its legislative history indicates that it is primarily meant to protect the interests of a debtor's prepetition creditors and stockholders receiving equity under the plan.[52]

70.    Here, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors provides that the New Organizational Documents of Reorganized TCEH will prohibit

---

[49]    On June 6, 2016, the TCEH Debtors filed a motion (the "Financing Motion") seeking Bankruptcy Court approval to enter into a commitment letter for up to $4.25 billion in financing in the form of either: (i) exit financing to be funded on the TCEH Effective Date (the "Senior Revolving Credit Facilities") or (ii) replacement debtor-in-possession financing that converts into exit financing on the TCEH Effective Date [D.I. 8668] (the "DIP Roll Facilities"). The Financing Motion was approved by the Bankruptcy Court in June 2016. On August 4, 2016 (the "Closing Date"), TCEH entered into the DIP Roll Facilities, which provide for up to $4.25 billion in financing consisting of (i) a $750 million senior secured, super-priority revolving credit facility (the "Revolving Credit Facility"), (ii) a $650 million senior secured, super-priority funded term loan letter of credit facility (the "Term Loan Credit Facility") and (iii) a $2.85 billion senior secured, super-priority term loan (the "Term Loan B Facility").

[50]    *See* 11 U.S.C. § 1123(a)(6).

[51]    *In re Ahead Commc'ns Sys., Inc.*, 395 B.R. 512, 518 (D. Conn. 2008) (emphases added).

[52]    S. Rep. No. 95-989, at 10 (1978) ("As public investors are likely to be junior or subordinated creditors or stockholders, it is essential for them to have legislative assurance that their interests will be protected.").

the issuance of non-voting stock.[53]   Additionally, as a critical component of the required tax treatment of the Spin-Off and the related basis step-up transaction, TCEH or one of its subsidiaries will form a new business entity that will issue contingent-voting preferred stock to third-party investors for approximately $50 million in cash.  The terms of the preferred stock will provide voting rights in the event of certain sustained dividend arrearages.  Thus, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors complies with the requirements of section 1123(a)(6) and no party has asserted otherwise.

71.    ***Selection of Officers and Directors.***  Finally, section 1123(a)(7) requires that the plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[54]  The Plan provides that, on the TCEH Effective Date, the terms of the existing boards of the TCEH Debtors will expire and the initial boards of directors, including the New Boards, and the officers of each of the Reorganized TCEH Debtors and Reorganized EFH Shared Services Debtors will be selected in accordance with the New Organizational Documents.[55]

72.    In the TCEH Plan Supplement filed on August 3, 2016 (as amended on August 5, 2016),[56] the TCEH Debtors filed additional disclosures regarding the New Organization

---

[53]  *See Amended Plan Supplement as it Relates to the TCEH Debtors and EFH Shared Services Debtors for the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9188].

[54]  11 U.S.C. § 1123(a)(7).

[55]  Third Amended Joint Plan, Art. IV.L.

[56]  *See Plan Supplement as it Relates to the TCEH Debtors and EFH Shared Services Debtors for the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9188]; *see also Amended Plan Supplement as it Relates to the TCEH Debtors and EFH Shared Services Debtors for the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9258].

Documents.  Specifically, with respect to Reorganized TCEH, the TCEH Debtors disclosed that the initial Reorganized TCEH Board will consist of seven members, all of whom were tentatively named in the TCEH Plan Supplement.[57]  The TCEH Debtors and EFH Shared Services Debtors anticipate that current directors and officers will serve after the TCEH Confirmation Date until the TCEH Effective Date.[58]  Reorganized TCEH will be managed in accordance with the Reorganized TCEH Certificate of Incorporation, Reorganized TCEH Bylaws, and the LLC Agreements governing the Reorganized TCEH Subsidiaries (which will also govern the Reorganized EFH Shared Services Debtors), drafts of which were filed with the TCEH Plan Supplement.[59]  Therefore, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfies the requirements of section 1123(a)(1)–(7) of the Bankruptcy Code and no party has asserted otherwise.

### B.    The Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

73.    Section 1129(a)(2) requires that the plan *proponents* comply with applicable provisions of the Bankruptcy Code.  Case law and legislative history indicate that this section principally reflects the disclosure and solicitation requirements of section 1125 of the

---

[57]  *Plan Supplement as it Relates to the TCEH Debtors and EFH Shared Services Debtors for the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9188 at Ex. G].

[58]  *Id; In re Charter Commc'ns*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the known directors."); *In re Am. Solar King Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

[59]  *Plan Supplement as it Relates to the TCEH Debtors and EFH Shared Services Debtors for the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9188 at Ex. A(i), Ex. A(ii), and Ex. A(iii)].

Bankruptcy Code,[60] which prohibits the solicitation of plan votes without a court-approved disclosure statement.[61]

74.     Here, the Debtors, as Plan proponents, have satisfied section 1125 of the Bankruptcy Code with respect to the TCEH Debtors and EFH Shared Services Debtors.  The Court approved the TCEH Disclosure Statement as containing adequate information, and the TCEH Debtors and the EFH Shared Services Debtors solicited and tabulated votes on the Plan in accordance with the solicitation procedures approved by the Court.  The Debtors also timely mailed the notices to non-voting creditors as described in the solicitation procedures.[62] Accordingly, the Debtors have satisfied the requirements of section 1125 of the Bankruptcy Code and therefore have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code with respect to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors and no party has asserted otherwise.

C.     **The Debtors Proposed the Plan as it Relates to the TCEH Debtors and the EFH Shared Services Debtors in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

75.     The Bankruptcy Code requires that the proponent of a plan of reorganization propose the plan "in good faith and not by any means forbidden by law."[63]  In assessing the good faith standard, courts consider whether the plan:   (1) fosters a result consistent with the

---

[60]     *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re WorldCom, Inc.*, No. 02-135333(AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) ("The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code."); *In re Lapworth*, No. 97-34259DWS, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 3, 1998) ("The legislative history of [section] 1129(a)(2) specifically identifies compliance with the disclosure requirements of [section] 1125 as a requirement of [section] 1129(a)(2)."); S. Rep. No. 95-989, at 126; H.R. Rep. No. 95-595 at 412.

[61]     11 U.S.C. § 1125(b).

[62]     *See Affidavit of Service of Solicitation Materials* [D.I. 9189].

[63]     11 U.S.C. § 1129(a)(3).

objectives of the Bankruptcy Code; (2) has been proposed with honesty, good intentions, and a basis for expecting that the reorganization can be effectuated; and (3) exhibits a fundamental fairness in dealing with creditors.[64]

76.    Courts look to the reorganization plan itself to determine whether the plan seeks relief consistent with the Bankruptcy Code.[65]    To that end, the fundamental purpose of chapter 11 is to enable a company in financial distress to restructure its balance sheet, reorganize its business operations, and avoid the adverse economic effects associated with disposing of assets at their liquidation value.[66]  Minimizing litigation through compromise is likewise favored in bankruptcy.[67]

77.    Here, the Plan as it relates to the TCEH Debtors and the EFH Shared Services Debtors will shed over $20 billion of debt.  It also preserves a settlement of billions of dollars of alleged prepetition claims arising out of various historical transactions and the extensively negotiated landmark Disinterested Director Settlement.  Effectuating these unprecedented and value maximizing transactions and settlements is the good-faith purpose of the Plan.

78.    In designing those transactions, the Debtors have left no stone unturned, and, indeed, have considered numerous alternatives, including a consolidated transaction structure, a taxable deconsolidation, a partially taxable spin-off, and everything in between.  The end result

---

[64]    *W.R. Grace & Co.*, 475 B.R. at 87-88.

[65]    *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *see also In re Sound Radio, Inc.*, 93 B.R. 849, 854 (Bankr. D.N.J. 1988).

[66]    *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *see also In re B.D. Int'l Disc. Corp.*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start"); *In re Bonded Mailings, Inc.*, 20 B.R. 781, 785 (Bankr. E.D.N.Y. 1982) (holding Bankruptcy Code's policy of equitable distribution amongst creditors should not be thwarted by actions of a single creditor).

[67]    *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." (internal quotation marks and alterations omitted)).

comes after years of negotiations between the TCEH Debtors and their highly-organized TCEH stakeholders, dating back to early 2013.  The Debtors have thoroughly analyzed the resulting Restructuring Transactions and believe that the Plan, as it relates to the TCEH Debtors and the EFH Shared Services Debtors, will be consummated.

79.     In addition, the receipt of the Private Letter Ruling, which provided the key rulings necessary for the Spin-Off to qualify for tax-free treatment, only cements the TCEH Debtors' belief that the proposed Restructuring Transactions related to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors is in the best interests of the Debtors' estates. Finally, and perhaps most significantly, the Plan as it relates to the TCEH Debtors, has the support of nearly all of the key "T-side" creditors.  This level of consensus amongst impaired creditors in the context of one of the largest and most complex restructurings in history is *prima facie* evidence of good faith.[68]  Accordingly, the Debtors respectfully submit that the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfies section 1129(a)(3) of the Bankruptcy Code.[69]

> **D.     The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Provides for Bankruptcy Court Approval of Certain Administrative Payments (Section 1129(a)(4)).**

80.     The Bankruptcy Code requires that professional fees and expenses related to the case and paid under the plan be approved by the court as reasonable or subject to approval of the

---

[68]  *See, e.g.*, *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435 (1999) ("[T]he two recognized policies underlying Chapter 11 [are] preserving going concerns and maximizing property available to satisfy creditors . . . ."); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 468 (Bankr. S.D.N.Y. 2014) ("[A] key goal of a bankruptcy in a mega Chapter 11 such as this is for creditors to negotiate to reach a consensus. . . ."); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 294-95 (Bankr. D. Del. 2013) (noting "a clear legislative policy encouraging negotiations among creditors and stakeholders in Chapter 11 cases").

[69]  The EFH Indenture Trustee argues that the TCEH Debtors and the EFH Shared Services Debtors should not be entitled to the "good faith" findings under section 363(m) of the Bankruptcy Code.  If the Bankruptcy Court finds that such Debtors have satisfied their obligations under 1129(a)(3) of the Bankruptcy Code, then such Debtors, by extension, should be entitled to the "good faith" findings under section 363(m) of the Bankruptcy Code.

court as reasonable.[70]  Whether a payment is reasonable is a case-by-case inquiry that turns on who makes the payment, who receives it, and the effect of such payments on the estate.[71]  As one court explained, as to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[72]

81.    A significant portion of these fees and expenses are already authorized by the Court to be paid under the TCEH DIP Facility and the Cash Collateral Order, which are subject to pre-existing review procedures.[73]  All of the fees and expenses payable under the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors must be reasonable and documented, and, to the extent they are not, the TCEH Debtors will file an objection to such fees and expenses with the Court.

82.    Additionally, the Plan effectuates the TCEH Cash Payment approved in the Settlement Agreement Order.  As described in the TCEH Disclosure Statement, the TCEH Cash Payment consists of $550 million, subject to certain reductions that are applicable to all Allowed Class C4 and Class C5 Claims (the "Shared Reductions") and certain reductions that are only applicable to certain Holders of Allowed Class C4 Claims (in each case, as set forth in the Settlement Agreement) (the "Allocated Reductions").  The Allocated Reductions consist of

---

[70]   11 U.S.C. § 1129(a)(4).

[71]   *In re Cajun Elec. Power Coop., Inc.*, 150 F.3d 503, 517 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."); *see also In re Congoleum Corp.*, No. 09-4371, 2010 WL 1850182, at *5 (D.N.J. May 7, 2010) (quoting same); *In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) ("The determination whether a payment is reasonable under § 1129(a)(4) requires an analysis of the issue of reasonableness based on the facts and circumstances of the payments.").

[72]   *Cajun Elec.*, 150 F.3d at 517.

[73]   *See* Cash Collateral Order ¶ 5(c); TCEH DIP Order ¶ 24; EFIH First Lien DIP Order ¶ 27.

professional fees covered by the "charging lien" under the applicable "T-Side" Indenture Trustee's "charging lien."  As of the date hereof, the vast majority of fees payable to "T-Side" professionals are subject to such "charging liens."  Charging lien fees will not affect the TCEH Debtors' estates (or, for the avoidance of doubt, any creditor constituencies not expressly contractually bound to the indentures).

83.    As a result, after accounting for (a) "charging lien" fees (authorized under the Settlement Agreement Order) and (b) fees already authorized under, and subject to review under, the TCEH DIP Facility and TCEH Cash Collateral Order, including pursuant to the most recent extension of use of cash collateral,[74] there are no incremental fees payable by Reorganized TCEH under the Plan.  Under the circumstances, given the significant level of consensus among creditors of the TCEH Debtors, the Court should approve the provisions of the Plan that provide for payment of fees and expenses under the Plan as reasonable and find that the Plan (as it relates to the TCEH Debtors and EFH Shared Services Debtors) satisfies section 1129(a)(4) of the Bankruptcy Code.  Importantly, no party has asserted that the Plan does not satisfy section 1129(a)(4) of the Bankruptcy Code as it relates to the TCEH Debtors and EFH Shared Services Debtors.[75]

> **E.    The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement As it Relates to the TCEH Debtors and EFH Shared Services Debtors (Section 1129(a)(5)).**

84.    The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor

---

[74]  *See Stipulation and Consent Order Amending Certain Terms of the Final Cash Collateral Order* [D.I. 8796].

[75]  The U.S. Trustee raised issues in the U.S. Trustee Objection with respect to the payment of the EFH and EFIH Indenture Trustee fees.  The Debtors are not seeking approval of such fees pursuant to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.

to the debtor under the plan.[76]  It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[77]  Lastly, it requires that the plan proponent have disclosed the identity of insiders to be retained by the reorganized debtor and the nature of their compensation.[78]  In construing section 1129(a)(5), courts have long made clear that, to the extent the debtor is unable to identify these individuals by name at the time of confirmation, the debtor nonetheless satisfies this requirement so long as directors will be appointed consistent with the company's organizational documents and applicable state and federal law.[79]

85.     As described in detail in Section I.A.(ii) above, the Debtors have supplied all available information with respect to the identity of the directors and officers to serve on the Reorganized TCEH Board in the TCEH Plan Supplement filed on August 3, 2016 (as amended on August 5, 2016).  The current directors and officers will serve on the Reorganized TCEH Board following entry of the Confirmation Order until the TCEH Effective Date.  Additionally, the TCEH Debtors have identified all of the seven directors of the Reorganized TCEH Board.

86.     Under the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors, the TCEH Debtors will adopt, enter into, assume, and/or assign the New Employee Agreements/Arrangements and the Employee Arrangements on the TCEH Effective Date, as

---

[76]   11 U.S.C. § 1129(a)(5)(A)(i).

[77]   *Id.* § 1129(a)(5)(A)(ii).

[78]   *Id.* § 1129(a)(5)(B).

[79]   *Charter Commc'ns*, 419 B.R. at 260 n.30 ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors."); *Am. Solar King*, 90 B.R. at 815  ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

well as adopt the Reorganized Debtor Management Incentive Plan.[80]    In the TCEH Plan Supplement filed on August 3, 2016, the TCEH Debtors filed a term sheet reflecting the material terms of the Reorganized Debtor Management Incentive Plan.  The Reorganized TCEH Debtors will be authorized pursuant to the TCEH Confirmation Order to implement the Reorganized Debtor Management Incentive Plan and the Reorganized TCEH Board will establish the terms of the Reorganized Debtor Management Incentive Plan.  Additionally, the TCEH Debtors filed employee letter agreements for members of their executive leadership team.[81]    Consistent with the provisions of the Plan, the Original PSA requires the TCEH Debtors (and, in certain instances, EFH Corporate Services) to assume the Employment Agreements and assign the Employment Agreements to Reorganized TCEH, and requires Reorganized TCEH to enter into New Employee Agreements/Arrangements with a limited number of individuals who may be considered insiders.[82]    Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) with respect to the TCEH Debtors and EFH Shared Services Debtors and no party has asserted otherwise.

> F.    **The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Does Not Provide for Any Rate Changes Requiring Governmental Approval (Section 1129(a)(6)).**

87.    The Bankruptcy Code requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such

---

[80]   Third Amended Joint Plan, Art. IV.J.

[81]   *Amended Plan Supplement as it Relates to the TCEH Debtors and EFH Shared Services Debtors for the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [D.I.9188 at  Ex. F, Ex. F(i), and Ex. F(ii)].

[82]   Original PSA ¶ 10(l).

approval."[83]   The Plan as it relates to the TCEH Debtors is expressly conditioned on a number of regulatory approvals, but does not, however, provide for any rate changes that require the approval of these regulatory agencies.   Thus, this provision of the Bankruptcy Code is inapplicable to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors and no party has asserted otherwise.

### G.    The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Is in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).

88.    The best interests of creditors test requires that, "[w]ith respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation.[84]   Where the plan provides for less than full recoveries on claims, a debtor generally satisfies the test by comparing recoveries in a hypothetical liquidation with the estimated recoveries under the plan of reorganization.[85]

89.    Here, the TCEH Disclosure Statement includes a customary liquidation analysis.[86] The liquidation analysis demonstrates that each Class of Claims against the TCEH Debtors and EFH Shared Services Debtors will receive more under the Plan than it would in a hypothetical liquidation.   Thus, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfies the best interests of creditors test.

---

[83]   11 U.S.C. § 1129(a)(6).

[84]   *Id.* § 1129(a)(7).

[85]   *See 203 N. LaSalle St. P'ship*, 526 U.S. at 442 n.13; *see also United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation"); *In re Century Glove, Inc.*, Civ. A Nos. 90-400-SLR & 90-401-SLR, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993).

[86]   *Third Amended Disclosure Statement for the Second Amended Joint Plan of Reorganization of Energy Future Holdings Corp.*   [D.I. 8747 at Ex. F.].

### H. The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Satisfies the Voting Requirements (Section 1129(a)(8)).

90. The Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.[87] If not, the plan must satisfy the requirements with respect to the claims or interests in a rejecting class.[88]

91. The TCEH Debtors and EFH Shared Services Debtors expect that the Plan will satisfy these requirements with respect to every Class of Claims and Interests because all Classes either will have voted to accept the Plan, are conclusively presumed to have accepted the Plan, or will receive treatment consistent with the Bankruptcy Code's cramdown requirements.

92. All Classes entitled to vote on the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors have voted to accept the Plan.

93. A claim is unimpaired if the plan either "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest" or cures defaults and reinstates the maturity of the claim.[89] As an alternative to reinstatement, repayment in full in cash of the allowed amount of such claims results in unimpairment.[90] The

---

[87] 11 U.S.C. § 1129(a)(8). A class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than half in number of the claims in that class actually vote to accept the plan. *Id.* § 1126(c). A class that is not impaired under a plan, and the creditors in that class, are conclusively presumed to have accepted the plan. *Id.* § 1126(f). A class is deemed to have rejected a plan if the plan provides that the holders of claims or interests in that class do not receive or retain any property under the plan on account of such claims or interests. *Id.* § 1126(g).

[88] *Id.* § 1129(b).

[89] *Id.* § 1124.

[90] *In re PPI Enters., Inc.*, 324 F.3d 197, 205-07 (3d Cir. 2003) (overruling argument that Congress intended to eliminate unimpairment by cash repayment); *see also In re Laramie Assocs., Ltd.*, 1996 WL 549984, at *6 (Bankr. E.D. Pa. June 20, 1996) ("Class 1 Claims are not impaired.  Each holder of a Class 1 Claim shall be paid in Cash the full amount of its Allowed Claim . . . .").

Third Circuit has held that, if the Bankruptcy Code partially disallows or caps a claim, the claim is nonetheless unimpaired so long as the allowed amount is repaid in full in cash.[91]

94.     Here, the Plan provides for repayment in full in Cash of several Classes of Claims against the TCEH Debtors and the EFH Shared Services Debtors—Classes C1, C2, D1, and D3. The exception is the option under the Plan to reinstate Claims in Classes C1, C7, C9, D4, and D6.  If the TCEH Debtors reinstate the Claims in Classes C1, C7, C9, D4, or D6, this would involve reinstatement under section 1124(2) of the Bankruptcy Code or a close analog leaving such Claims unaltered under section 1124(1).   This, of course, is the statutory definition of unimpairment, and thus Claims subject to this treatment are Unimpaired.   Therefore, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfies the requirements of section 1129(a)(8) of the Bankruptcy Code with respect to these Classes and no party has asserted otherwise.

**I.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).**

95.     The Bankruptcy Code generally requires that claims entitled to administrative priority must be repaid in full in cash or receive certain other specified treatment.[92]  Here, the Plan generally provides that Allowed Administrative Claims will be repaid in full in cash or receive other treatment rendering them Unimpaired.   Therefore, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors complies with section 1129(a)(9) of the Bankruptcy Code and no party has asserted otherwise.

---

[91]  *Id.* at 204 ("[A] creditor's claim outside of bankruptcy is not the relevant barometer for impairment; we must examine whether the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights."); *see also W.R. Grace*, 475 B.R. at 161 (confirming that the *PPI Enterprises* holding also applies to section 502(b)(2)'s prohibition on allowance of unmatured interest on unsecured debt).

[92]  11 U.S.C. § 1129(a)(9).

**J.      At Least One Impaired Class of Claims has Accepted the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors, Excluding the Acceptances of Insiders (Section 1129(a)(10)).**

96.      The Bankruptcy Code requires that, "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."[93]  Here, all three impaired Classes of Claims entitled to vote on the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors have voted to accept the Plan.  Therefore, the Plan as it relates to the EFH Shared Services Debtors and TCEH Debtors satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code and no party has asserted otherwise.

**K.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Is Feasible (Section 1129(a)(11)).**

97.      Feasibility refers to the Bankruptcy Code's requirement that plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . ., unless such liquidation or reorganization is proposed in the plan."[94]  Under this standard, it is well-established that the success of the plan need only be "reasonably likely," not "guaranteed."[95]  Indeed, "a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility."[96]

---

[93]  *Id.* § 1129(a)(10).

[94]  *Id.* § 1129(a)(11).

[95]  *In re W.R. Grace & Co.*, 729 F.3d 332, 348 (3d Cir. 2013); *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) ("All the bankruptcy court must find is that the plan offer 'a reasonable probability of success.'" (quoting *In re Landing Assoc., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993))).

[96]  *In re Brice Rd. Devs., L.L.C.*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008) (internal quotation marks omitted); *see also In re Wash. Mut., Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (quoting "low threshold of proof" standard); *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 479 (Bankr. S.D. Ohio 2011) (same).

### 1.    Key Regulatory Approvals Have Already Been Obtained.

98.    The fact that a plan depends on regulatory and tax approvals does not change the statutory feasibility standard.  It is not clear that the requirements of section 1129(a)(11) apply to conditions precedent to the consummation of a Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors as opposed to the ability of the reorganized debtor to satisfy its obligations under the plan after consummation of the plan.  Nevertheless, to the extent pre-consummation requirements are to be considered in connection with the feasibility analysis, "[i]t is not at all unusual for consummation of a Chapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities, and courts have not typically held up confirmation of a plan to wait for issuance of such approvals."[97]  Numerous courts have approved chapter 11 plans that are conditioned on regulatory approvals, including state public utility commission approvals, FCC approvals, and FERC approvals.[98]  In the regulatory context, Delaware bankruptcy courts emphasize that the likelihood of success need only be

---

[97]    *Indianapolis Downs,* 486 B.R. at 298.

[98]    *See, e.g.*, *In re Lightsquared Inc.*, Case No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) [D.I. 2276] (Federal Communications Commission); *In re Sorenson Commc'ns, Inc.*, Case No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) [D.I. 180] (Federal Communications Commission); *In re Edison Mission Energy*, Case No. 12-49219 (JPC) (Bankr. N.D. Ill. Mar. 11, 2014) [D.I. 2206] (Federal Energy Regulatory Commission); *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) [D.I. 10367] (Federal Aviation Administration and Department of Transportation); *In re DBSD N. Am.,* Case No. 09-13061 (REG) (Bankr. S.D.N.Y. July 5, 2011) [D.I. 1159] (Federal Communications Commission); *In re Majestic Star Casino, LLC*, Case No. 09-14136 (KG) (Bankr. D. Del. Mar 10, 2011) [D.I. 1059] (State gaming regulators); *In re Citadel Broad. Corp.*, Case No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010) [D.I. 369] (Federal Communications Commission); *In re Hawaiian Telecom Commc'n's, Inc.*, Case No. 08-02005 (Bankr. D. Haw. Dec. 30, 2009) [D.I. 1570] (Hawaii Public Utilities Commission and the Federal Communications Commission); *In re Maxcom Telecommunicaciones, S.A.B. de C.V.*, Case No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013) [D.I. 148] (the Mexican Government under Mexican telecommunications law); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) (Federal Trade Commission); *In re Global Crossings, Ltd.*, Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Dec. 26, 2002) [D.I. 2586] (Federal Communications Commission).

"reasonable" to show feasibility and have found plans feasible despite significant post-confirmation regulatory conditions.[99]

99.     Here, the occurrence of the TCEH Effective Date is expressly conditioned on the TCEH Debtors receiving all authorizations, consents, and regulatory approvals, including, most significantly, from the IRS, FERC and the Railroad Commission of Texas (the "RCT").[100]  These regulatory processes are characteristic of the TCEH Debtors' retail and generation businesses, and would be necessary in one form or another under virtually any plan of reorganization.  ***Key approvals have already been obtained from the NRC and IRS***.  In addition, in connection with Luminant Mining's land reclamation performance obligations, Luminant is required to obtain approval of a replacement reclamation performance bond from the RCT as a condition to the TCEH Effective Date.   Luminant received a similar approval in connection with the TCEH DIP Order and is confident that it will be able to achieve approval of the replacement bond.

### 2.     Reorganized TCEH Will Be Financially-Sound.

100.     When assessing the feasibility of a reorganized company as a going concern, courts may assess various factors with respect to the commercial viability of the new entity, including capital structure, earning capacity, economic conditions, and management strength—although earning capacity is generally the most important metric.[101]

---

[99]  *See Indianapolis Downs*, 486 B.R. at 299; *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

[100]  Additionally, the importance of the tax structure to Consummation of the Plan is discussed in greater detail in the Background section.

[101]  *W.R. Grace.*, 475 B.R. at 115  ("The bankruptcy court can consider a wide array of factors in determining a plan's feasibility, including assessment of the debtor's capital structure, the earning power of the business, economic conditions, and the ability of the corporation's management.  Most importantly, the debtor must provide the bankruptcy court with an estimate of its future earning capacity."  (citation omitted)); *see also Indianapolis Downs*, 486 B.R. at 298 (listing similar factors).

101.    The Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors is feasible.  The net debt of Reorganized TCEH at emergence will be no greater than 2.5x projected 2017 adjusted EBITDA.  The Reorganized TCEH Debtors' projections further demonstrate that the TCEH Debtors will be able to continue as a going concern and satisfy all of their obligations under the Plan.[102]   Moreover, after emerging with an incredibly streamlined balance sheet, Reorganized TCEH expects to maintain its strong operational performance as compared to peer companies.  Despite sustained declines in wholesale electricity prices following the Debtors' 2007 LBO, when benchmarked to its competitors, TCEH has maintained top-tier operational performance.  The TCEH Debtors have every expectation that this performance will persist.

102.    Accordingly, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfy the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

L.    **The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

103.    The Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[103]  The Plan includes an express provision requiring payment of all fees under 28 U.S.C. § 1930.[104]  The Plan, therefore, as it applies to the TCEH Debtors and EFH Shared Services Debtors, complies with section 1129(a)(12) of the Bankruptcy Code and no party has asserted otherwise.

---

[102] *See Third Amended Disclosure Statement for the Second Amended Joint Plan of Reorganization of Energy Future Holdings Corp.* [D.I. 8747 at Ex. D].

[103]  11 U.S.C. § 1129(a)(12).

[104]  Third Amended Joint Plan, Art. XII.C.

**M.    The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Complies with Section 1129(a)(13) of the Bankruptcy Code.**

104.    The Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[105]  Retiree benefits is defined under section 1114(a) of the Bankruptcy Code as medical benefits.[106]  Article IV.P of the Plan provides that on and after the TCEH Effective Date, the payment of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue in accordance with applicable law.  Accordingly, the Plan as it applies to the TCEH Debtors and EFH Shared Services Debtors satisfies section 1129(a)(3) of the Bankruptcy Code and no party has asserted otherwise.

**N.    Sections 1129(a)(14) Through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors.**

105.    A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.  Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors because the TCEH Debtors are not subject to any domestic support obligations.[107]  Section 1129(a)(15) is inapplicable because no TCEH Debtor is an "individual" as defined in the Bankruptcy Code.[108]  Section 1129(a)(16) is inapplicable because

---

[105]  11 U.S.C. § 1129(a)(13).

[106]  Section 1114(a) defines "retiree benefits" as: " . . . payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(e) (emphasis added).

[107]  *See* 11 U.S.C. § 1129(a)(14).

[108]  *See id.* § 1129(a)(15).

the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust (and no party has asserted otherwise).[109]

> **O.    The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Satisfies the Cramdown Requirements (Section 1129(b)).**

106.    If an impaired class has not voted to accept the plan, the plan must be "fair and equitable" and not "discriminate unfairly" with respect to that class.[110]  The Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfies both of these cramdown requirements with respect to the Impaired Classes that have been deemed to reject the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors (and no party has asserted otherwise).

> **1.    The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Is Fair and Equitable with Respect to the Rejecting Classes.**

107.    The Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors complies with the absolute priority rule with respect to all deemed rejecting Classes. Specifically, the "fair and equitable" requirement mandates that a junior class of claims cannot receive a distribution under the plan unless senior classes (a) are rendered unimpaired or (b) give their consent.[111]  This requirement is known as the "absolute priority rule."  The corollary of the absolute priority rule is that senior classes cannot receive more than a 100% recovery for their claims or interests.[112]

---

[109]  *See id.* § 1129(a)(16).

[110]  *See id.*  § 1129(b)(1).

[111]  *See id.* § 1129(b)(2)(B)(ii), (C)(ii); *see also 203 N. LaSalle St. P'ship*, 526 U.S. at 441.

[112]  *See Exide Techs.*, 303 B.R. at 61.

108.    ***Class C6: EFCH General Unsecured Claims.***    The Class consisting of General Unsecured Claims against EFCH (Class C6) is Impaired and deemed to reject.  The more junior class, consisting of Interests in TCEH and EFCH (Class C10), will receive no recovery under the Plan, and the more senior Classes will receive no more than a 100% recovery.  Thus, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfies the absolute priority rule with respect to Class C6.

109.    ***Inter-Silo Claims and Interests.***    The remaining Impaired Classes that are deemed to reject the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors consist entirely of Claims between and among the TCEH Debtors and the EFH Shared Services Debtors (Classes C8 and D5) and Interests held in TCEH and EFCH in (Class C10).  These are the junior-most Classes and the more senior Classes will receive no more than a 100% recovery.  Thus, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfies the absolute priority rule with respect to deemed rejecting Classes.

**2.      The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Does Not Unfairly Discriminate Against the Deemed Rejecting Classes.**

110.    The Plan as it relates to the EFH Shared Services Debtors and the TCEH Debtors does not unfairly discriminate against the deemed rejecting Classes.  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[113]  Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.[114]  At a minimum, however, the unfair discrimination standard prevents

---

[113] *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established").

[114] *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis …"); *see also In re Freymiller Trucking, Inc.*, 190 B.R.

creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[115]  The unfair discrimination requirement, which involves a comparison of classes, is distinct from the equal treatment requirement of section 1123(a)(4), which involves a comparison of the treatment of claims within a particular class.

111.    ***Class C6: EFCH General Unsecured Claims.***  The Class consisting of general unsecured Claims against EFCH (Class C6) will receive no recovery under the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.  This is the only Class of Claims against EFCH that does not consist of Secured, Administrative, or Priority Claims, and the Interests in TCEH and EFCH (Class C10) will likewise receive no recovery.  Thus, there is no unfair discrimination against Class C6.

112.    ***Other Classes.***  Otherwise, the rejecting classes consist entirely of inter-Debtor Claims and Interests.  Moreover, the treatment of each such Class is largely consensual:  the Holder of each applicable Claim or Interest in such Classes is either a TCEH Debtor or an EFH Shared Services Debtor.  Thus, the Plan as it relates to the EFH Shared Services Debtors and the TCEH Debtors does not unfairly discriminate against Classes that are subject to the cramdown requirements of section 1129(b).

> **P.**    **The Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Complies with the Other Provisions of Section 1129 of the Bankruptcy Code: (Section 1129(c)-(e)).**

113.    The Plan as it relates to the TCEH Debtors and the EFH Shared Services Debtors satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c),

---

913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[115]    *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

prohibiting confirmation of multiple plans, is not implicated because there is only one proposed plan of reorganization.[116]

114.    The Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors also complies with section 1129(d) because the primary purpose of the Plan is not to avoid taxes or securities laws.  The primary purpose of the Plan as it relates to the TCEH Debtors and the EFH Shared Services Debtors is to restructure the TCEH Debtors' balance sheets by shedding tens of billions of dollars of funded debt through the execution of certain tax-efficient structures made possible by the Internal Revenue Code and the Private Letter Ruling.[117]

115.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case."[118]  Thus, the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors satisfies the Bankruptcy Code's mandatory confirmation requirements.

## II.    The Discretionary Contents of the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors Are Appropriate.

116.    The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any appropriate provision not inconsistent with the applicable provisions of this title."[119]

---

[116]  11 U.S.C. § 1129(c).

[117]  *See, e.g.*, *In re 300 Washington St. LLC*, 528 B.R. 534, 554 (Bankr. E.D.N.Y. 2015) ("A debtor may still benefit from avoidance of tax liabilities through its plan, provided that this is not the plan's primary purpose."); *In re Rath Packing Co.*, 55 B.R. 528, 536 (Bankr. N.D. Iowa 1985) ("[T]he Court holds 'the principal purpose' should be strictly construed and essentially means 'most important.'").

[118]  11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,566,050[] (excluding debt owed to 1 or more affiliates or insiders)."  *Id.* § 101(51D)(B).

[119]  *Id.* § 1123(b)(1)-(6).

117.    **Most importantly, no party objects to the Releases and Exculpation provisions as they relate to the Prepetition Sponsors or the directors and officers of the TCEH Debtors and EFH Shared Services Debtors**.

118.    For the reasons discussed below (including consideration of the overwhelmingly consensual nature of the proposed Releases and Exculpation provisions as they relate to the TCEH Debtors and EFH Shared Services Debtors), the Court should give effect to the Plan Releases and the other discretionary provisions of the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.

### A.    The Releases in the Plan Related to the TCEH Debtors and EFH Shared Services Debtors Are Appropriate.

119.    Courts in Delaware and elsewhere generally analyze five factors when determining whether a debtor's release of non-debtors is appropriate, commonly known as the *Zenith* or *Master Mortgage* factors.  The analysis includes an inquiry into whether there is: "(1) an identity of interest between the debtor and the non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan."[120]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[121]

---

[120] *In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) and *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)).

[121] *Id.* (citing *Master Mortg.*, 168 B.R. at 935).

120.    Here, the Court may rely entirely on its findings in connection with the Settlement Agreement releases.  All of the alleged legacy litigation claims arose prepetition, in connection with the Debtors' 2007 LBO, as well as its predecessor and successor transactions, including various Liability Management Program transactions.  The temporal scope of the postpetition claims that are covered by the releases—up to the TCEH Effective Date rather than up to the earlier Settlement Agreement effective date—is therefore immaterial.

121.    An analysis of the *Master Mortgage* factors demonstrates that the releases of the Prepetition Sponsors and the Debtors' directors and officers should be approved.

- ***First***, an identity of interest exists between the TCEH Debtors and the Prepetition Sponsors as well as the TCEH Debtors and the TCEH Debtors' directors and officers because the TCEH Debtors are required to indemnify each of the Sponsors and the directors and officers for any liability they incur as a result of any claims brought against the Prepetition Sponsors.[122]

- ***Second***, the Prepetition Sponsors and directors and officers have made substantial contributions to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.   The Prepetition Sponsors consented to the allowance of the $700 million TCEH Settlement Claim, which primes their equity interests, and they transferred their residual equity interests to the TCEH unsecured creditors in the event of any topping bid.[123]  The Prepetition Sponsors have also waived their clams for unpaid management fees and expenses (totaling approximately $69 million). Beyond all this, the Prepetition Sponsors and the directors and officers have also made significant non-monetary contributions to this restructuring,

---

[122] *See id.* at 347 (holding that an identity of interest existed between the directors/officers and the debtors where the debtors had to indemnify directors/officers for claims asserted against them); *Charter Commc'ns*, 419 B.R. at 259 (holding that "[t]he indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest"); *Master Mortg.*, 168 B.R. at 935 (noting that the identity of interest is "usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor").

[123] Even if the excess value at EFH Corp. is not ultimately realized, forgoing the *right* to this potential recovery was critical to enabling the global settlement that is integral to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.  *See In re Blitz U.S.A., Inc.*, 2014 WL 2582976, at *4 (Bankr. D. Del. Jan. 30, 2014) (holding that consideration provided by Wal-Mart constitutes a substantial contribution where part of the consideration included agreement to relinquish valuable insurance rights).

including their participation in *129* board and committee meetings in 2015 and 2016.[124]

- **Third**, the releases are essential to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors because they allow the TCEH Debtors to move forward with the restructuring without tackling lengthy and complex litigation against the Debtors' directors and officers.[125]

- **Fourth**, the Plan Releases have substantial support of the creditors entitled to vote on the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors. Indeed, the Supporting Parties were the only creditors to identify any potential claims against the Prepetition Sponsors, directors, or officers.

    B.    **The Third-Party Releases in the Plan as They Relate to the TCEH Debtors and EFH Shared Services Debtors are Appropriate.**

122.    The Third Circuit has identified the factors necessary to approve nonconsensual third-party releases.   Specifically, the Third Circuit has explained that the "hallmarks" of permissible nonconsensual third-party releases would be "fairness, necessity to the reorganization, and specific factual findings to support these conclusions."[126]   In so holding, the Third Circuit recognized that there was a split in the Circuits regarding the permissibility of nonconsensual third-party releases and that given such a divide, the Third Circuit would review nonconsensual third-party releases on a case-by-case basis.[127]   Delaware Courts that have subsequently ruled on this issue have looked at, among other things, whether (a) the releasee has provided critical contribution to the debtor's plan and (b) whether the release is fair to the

---

[124] *See In re Exide Techs.*, 303 B.R. 48, 74 n.37 (Bankr. D. Del. 2003) (declining to hold that "the price of a release of officers, directors and others must always involve the contribution of tangible 'assets' or that efforts alone of officers and directors are never sufficient to warrant such a release.").

[125] *See In re Key3Media Grp., Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005); *see Washington Mut.,* 442 B.R. at 348 (holding the releases were reasonable because in light "of the complex and interrelated claims that the Debtors, JPMC and the FDIC have to virtually every asset in the Debtors' estates, it is hard to imagine what plan the Debtors could propose without the resolution of those claims first").

[126] *In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000).

[127] *Id.* at 212.

nonconsenting creditors (i.e., whether the nonconsenting creditor was compensated for their contributions).[128]  Further, interested parties have received sufficient notice of the releases.[129]

123.    Here, the factors identified by the Third Circuit counsel in favor of the nonconsensual third-party releases in the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.  The non-consenting parties releasing claims consist only of the limited number of impaired creditors of the TCEH Debtors that voted to reject or were deemed to reject the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.  As to fairness, the TCEH Debtors and EFH Shared Services Debtors are not aware of any alleged claims held by these third parties that are related to the TCEH Debtors and EFH Shared Services Debtors or these chapter 11 cases, and thus these releases impose little to no costs on these parties.

124.    On the other hand, these releases are part and parcel of the Original Plan Support Agreement, which is one of the cornerstones of the TCEH Debtors and EFH Shared Services Debtors' restructuring efforts.  The releases contemplated under the Original PSA were a critical component in incentivizing the Supporting Parties (as defined therein) to support the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors, and, ultimately, obtaining the support of nearly all significant "T-side" creditors, including those constituencies that remain substantially Impaired under the Plan.    Indeed, in the absence of such releases, the TCEH Debtors and EFH Shared Services Debtors very well could have found themselves mired in

---

[128]  *See In re Spansion, Inc.*, 426 B.R. 114, 145 (Bankr. D. Del. 2010) (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001) (describing the factual conclusions that may support nonconsensual third-party releases).

[129]  In both the Plan and TCEH Disclosure Statement, the releases (as well as the injunction enforcing the releases) were conspicuously set off in **bold** font.  Moreover, in soliciting votes on the Plan, the TCEH Debtors and EFH Shared Services Debtors sent ballots to all impaired stakeholders unambiguously providing in **bold** or all capital letters that stakeholders could vote for or against the Plan or abstain from voting and opt out of the third-party releases contained in the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.

legacy litigation for the foreseeable future, a process that would delay emergence and likely generate significant costs.

125.    Most significantly, and as discussed in greater detail below, the EFH Indenture Trustee's *sole objection regarding the proposed Releases is based on a factual inaccuracy*.  The EFH Indenture Trustee objected to the extent the proposed Releases, as they relate to the TCEH Debtors and EFH Shared Services Debtors, purport to release the EFH Debtors, EFIH Debtors, Reorganized EFH Debtors, and Reorganized EFIH Debtors.  The Plan (in Article VIII.C. and VIII.D) clearly states that Debtor and Third-Party Releases for the EFH Debtors, EFIH Debtors, Reorganized EFH Debtors, and Reorganized EFIH Debtors are effective as of the *EFH* Effective Date, not the *TCEH* Effective Date.  Thus, the Debtors are not asking the Court to approve such releases at the TCEH Confirmation Hearing.  Setting aside the EFH Indenture Trustee's misinformed objection, no other party objects to the proposed Releases as they relate to the TCEH Debtors and EFH Shared Services Debtors.

### C.    The Plan's Exculpation Provisions Are Appropriate as They Relate to the EFH Shared Services Debtors and TCEH Debtors.

126.    Exculpation provisions that apply only to estate fiduciaries, and are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[130]   Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing

---

[130]  *See Washington Mut.*, 442 B.R. at 350-51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

party against an "Exculpated Party" for acts arising out of the TCEH Debtors and EFH Shared

Services Debtors' restructuring.[131]

127.    Here, the Plan's definition of Exculpated Parties includes the following estate

fiduciaries:

> (a) the Debtors and Reorganized Debtors; (b) the Committees; and (c) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.[132]

128.    The Exculpated Parties have participated in good faith in formulating and

negotiating the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors, and

they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors

or other unsatisfied parties.   Indeed, the exculpation provision and the liability standard it sets

represents a conclusion of law that flows logically from certain findings of fact that the Court

must reach in confirming the Plan as it relates to the TCEH Debtors and EFH Shared Services

Debtors.

129.    *First*, as discussed above, the Court must find, under section 1129(a)(2), that the

TCEH Debtors and EFH Shared Services Debtors have complied with the applicable provisions

of the Bankruptcy Code.   Additionally, the Court must find, under section 1129(a)(3), that the

---

[131] *See PWS Holding*, 228 F.3d at 245 (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion, Inc.*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. Apr. 16, 2010) (same).

[132] Third Amended Joint Plan, Art. I.A.208.

plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the TCEH Debtors and EFH Shared Services Debtors and, by extension, to the TCEH Debtors and EFH Shared Services Debtors' officers, directors, employees, and professionals. Further, these findings imply that the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors was negotiated at arm's length and in good faith.  Here, as discussed above, the TCEH Debtors and EFH Shared Services Debtors and their officers, directors, and professionals actively negotiated with holders of claims and interests across the Debtors' capital structure throughout these chapter 11 cases.  Accordingly, the Court's findings of good faith vis-à-vis the Debtors' chapter 11 cases should also extend to the Exculpated Parties.

130.    *Second*, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors that has paved the way for a successful reorganization of such Debtors, and likely would not have been so inclined to participate in the plan process without the promise of exculpation.  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.[133]  In addition, it is well established that the liability of statutory committees and their professionals under section 1103 of the Bankruptcy Code is limited to acts of gross negligence and willful misconduct, making their inclusion as Exculpated Parties entirely appropriate.[134]

131.    The TCEH Debtors and EFH Shared Services Debtors therefore request that the Court approve the Plan's exculpation provisions with respect to such Debtors and adopt the

---

[133] *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[134] *See PWS Holding*, 228 F.3d at 246-47 (holding that the appropriate standard of liability under section 1103 is "willful misconduct or *ultra vires* acts," and approving an exculpation of the creditors committee and its professionals subject only to liability for willful misconduct or gross negligence).

appropriate standard of liability for the Exculpated Parties with respect to such Debtors' chapter 11 cases.

### D. The Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained in the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors.

132.    The Plan's injunction provision as it relates to the TCEH Debtors and EFH Shared Services Debtors simply provides the enforcement mechanism for the releases and exculpation provisions of the Plan.  This injunction generally provides that all entities are permanently enjoined from prosecuting or otherwise pursuing claims released or exculpated under the Plan.[135]  The Plan's release and exculpation provisions as they relate to the TCEH Debtors and EFH Shared Services Debtors would be substantially weakened without the injunction provision.  Moreover, the injunction provided in the Plan is consistent with other injunctions approved in this District.

## III. The Court Should Overrule the Objections to the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors.

### A. The Objecting Parties Have Invented Optionality That Does Not Exist in an Effort to Cherry-Pick Certain Provisions in a Complex Transaction.

133.    The EFH Indenture Trustee has created a universe of "alternative" options that it alleges the TCEH Debtors failed to assess.  This universe exists only in the EFH Indenture Trustee's overactive imagination.  It has been said many times and it bears repeating:  over the course of *four years*, the Debtors have exhaustively considered every possible alternative for restructuring the TCEH Debtors.  This has been an immense undertaking, involving extensive discussions among the Debtors and their creditor constituencies and among the Debtor estates

---

[135]  The Plan's injunction provision applies to the discharge of claims against and interests in the TCEH Debtors and EFH Shared Services Debtors.  *See* Third Amended Joint Plan, Art. VIII.F.

themselves. As discussed below, the terms of the Spin-Off were reviewed and discussed at length by the Debtors' boards of directors and managers. In addition, over the course of several years of discussions, the TCEH First Lien Creditors have made it clear that they will pursue a Taxable Separation in the absence of the Basis Step-Up. They fought for, and obtained, the contractual right to pursue the Taxable Separation (and "drag" the TCEH junior creditors' Plan vote) in the Court-approved Plan Support Agreement. Consequently, the TCEH First Lien Creditors' support is pivotal in confirming a value-maximizing Plan with respect to the TCEH Debtors. Borrowing a page from the EFH Indenture Trustee's book of metaphors, the TCEH First Lien Creditors have made it clear that their threat of a Taxable Separation is not a "bluff." Lest there be any doubt regarding their willingness to pursue a Taxable Separation, they filed a standalone, Taxable Separation plan of reorganization as an exhibit to their pleading regarding the May 2016 scheduling order less than three weeks after the Debtors' terminated the Original Merger Agreement.[136]

134.    In addition, while it would be difficult for a plan of reorganization that generates a significant administrative tax liability to be confirmed, it is not impossible. Indeed, the Debtors are aware of at least three cases—*Inner City Media*, *LCI Holdings*, and *MSR*—in which a chapter 11 debtor completed a transaction either through a plan or through a section 363 sale that resulted in a large tax that the taxpayer could not satisfy in full (i.e., a "stranded tax" scenario). In *Inner City Media*, the debtors sought to transfer their assets through a transaction that resulted

---

[136] *Supplemental Response of the TCEH First Line Ad Hoc Committee to the Motion of Energy Future Holding Corp., et al., for Entry of an Order Scheduling Certain Hearing Dates and Deadline and Establishing Certain Protocols in Connection with the Confirmation of Debtors' Joint Plan of Reorganization and Approval of Debtors' Disclosure Statement and Notice of Filing Forms of TCEH-Only Plan and Disclosure Statement* [D.I. 8480].

in a significant tax liability.[137]  The bankruptcy court overruled the IRS's objections and allowed the sale to go forward, noting that there was no alternative transaction available.[138]  The resulting sale order contained standard "free and clear" provisions that shielded the acquirers of the assets from "successor liability" claims by the IRS.[139]  Similarly in *LCI Holding Company*, the bankruptcy court entered an order approving the sale of substantially all of the debtor's assets, notwithstanding the fact that the proposed sale generated a significant tax liability that the debtors would be unable to pay.[140]  Finally, in *MSR*, the debtors attempted to consummate a tax-free transaction for nearly two years before pivoting to a taxable transaction.[141]  The bankruptcy court approved the taxable transaction, stranding approximately $200 million at a non-debtor parent company that ultimately liquidated pursuant to a subsequent plan of liquidation.[142]

135.    The EFH Indenture Trustee attempts to distinguish these cases by asserting that they relied on the fact that there was no alternative in those cases.  But that's precisely the point.  There was no alternative *because the debtors' creditors would not permit alternative structures to proceed*.  The stranded tax liabilities in each of these cases likely could have been avoided by equitizing creditors.  Creditors likely refused, because (a) equitizing would have forced them to forgo tax basis and (b) equitizing claims is riskier than simply receiving clean title to assets.  And the Spin-Off imposes more restrictions, limitations, and risks than "vanilla" equitizations.  To be sure, it is not the case that the TCEH First Lien Creditors would face no risk on this issue.  But so would the Debtors, and the risk faced by the Debtors is the risk of catastrophe.

---

[137]  *Inner City Media*, No. 11-13967 (Bankr. S.D.N.Y. 2012).

[138]  *Id.*, Docket No. 345.

[139]  *Id.*

[140]  *In re LCI Holding Co.*, No. 12-13319 [Docket No. 617] (Bankr. D. Del. 2013).

[141]  *In re MSR Resort Golf Course LLC, et al.*, No. 11-10372 (Bankr. S.D.N.Y. 2013).

[142]  *Id.*, Docket No. 2071.

136.    Ultimately, the Debtors urge the Court to see the EFH Indenture Trustee's and Fenicle & Fahy's objections for what they are—an attempt to retrade portions of a comprehensive and complex restructuring transaction.  With respect to the Spin-Off, each of its terms, including the use of the EFH Group's NOLs to offset the EFH Group's taxable gain and achieve the Basis Step-Up, are critical terms in a carefully choreographed and heavily negotiated transaction.    The removal or material adjustment of even one term will collapse the entire transaction and, with it, years of efforts to avoid incurring a significant tax liability.  With respect to the EFH Properties Contribution and the EFH Corporate Services Contribution, potential E-Side acquirers have already spoken: they do not want the burden of these entities, whose primarily value is driven by their relationship with TCEH (and Reorganized TCEH).

> ## B.    The Objecting Parties Overestimate the Value of the Basis Step-Up and Ignore Significant Concessions from the TCEH First Lien Creditors.

137.    The EFH Indenture Trustee asserts that the TCEH First Lien Creditors should be forced to accept, at most, the amount of basis step-up they would receive in a Taxable Separation, rather than the greater basis step-up provided by the Plan.  As previously stated, the basis step-up that will occur in the Spin-Off is currently expected to be approximately $5.86 billion.[143]  Evercore has estimated that the value of this step-up in basis is approximately $1.1 billion on a net present value basis.[144]  By comparison, in a Taxable Separation, even though a multi-billion tax liability would be generated, Reorganized TCEH would receive a Basis Step-Up

---

[143]    Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365791]; Ex. 4, 6/27/16 P. Keglevic Dep. Tr. at 114:11-24.  Based on the latest asset-by-asset evaluation conducted by Duff  & Phelps, compared to asset-by-asset tax basis.

[144]    *See* Ex. 8, 7/29/16 D. Ying Dep. Tr. at 27:19-28:4.  This valuation was based on comparing the use of TCEH depreciation and amortization deductions with and without the Preferred Stock Sale and applying a discount rate to the anticipated tax savings. Additionally, this valuation was done prior to the removal of TCEH's historic natural gas plants from the assets being transferred in the Preferred Stock Sale, and prior to certain updated valuations of Comanche Peak and the retail electricity business provided by Duff & Phelps.

of approximately \$3.7 billion[145]  (based on the midpoint of Evercore's valuation range of ███

billion to ███ billion, excluding the value of the Basis Step-Up).  In other words, at mid-point

valuations, the Basis Step-Up in the Plan results in approximately \$2.2 billion of additional tax

basis compared to a Taxable Separation.  Assuming that incremental basis would be depreciated

over 15 years, and applying a discount rate of 8.2% (the midpoint discount rate used by Evercore

in valuing the step-up in the Spin-Off), the Plan results in approximately \$430 million of

additional net present value for Reorganized TCEH.[146]

138.    The value inuring to the benefit of the TCEH First Lien Creditors in the form of

the Basis Step-Up comes at a price.  Most significantly, the TCEH First Lien Creditors are

forgoing the Taxable Separation, a path they have been incentivized to pursue since the very

beginning of these chapter 11 cases.  Additionally, to preserve the tax-free nature of the Spin-

Off, the Tax Matters Agreement will impose material limitations on Reorganized TCEH for two

years after the Spin-Off, including:   (a) prohibiting certain kinds of M&A transactions

(specifically, it cannot be acquired in a taxable transaction) or a sale of all of its assets; (b)

banning certain types of stock repurchase programs, including the repurchase of more than 20%

of outstanding stock; and (c) limitations on shutting down assets under certain circumstances.  In

the event of a so-called "dividend recapitalizations," which are a key tool used by companies to

adjust their capital structures, the dividend would be more likely to be taxable to Reorganized

TCEH's shareholders.[147]  Moreover, under the Tax Matters Agreement, payment obligations for

---

[145] *See* Ex 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365791].  Based on Evercore's
midpoint valuation for TCEH of approximately ███████, after accounting for approximately \$6.5 billion
of tax basis.

[146] A significant portion of this value is monetized through payments under the Tax Receivable Agreement.

[147] This is because the "earnings and profits" of the EFH Group will be allocated between Reorganized TCEH and
EFH in the Spin-Off, with the significant majority, or all, of such earnings and profits being allocated to
Reorganized TCEH.  Dividends are taxable to shareholders to the extent of a company's earnings and profits.

certain tax liabilities that would have been left behind in a Taxable Separation are allocated to Reorganized TCEH.  And, perhaps most importantly, Reorganized TCEH may be exposed to "consolidated group" joint and several liability with respect to any tax liabilities resulting from the reorganization of TCEH, including as a result of a failure of the Spin-Off to be tax-free.[148]

139.    It is certainly the case that the Basis Step-Up is a strong incentive for the TCEH First Lien Creditors to agree to forgo pursuit of the Taxable Separation.  But for the reasons discussed above, it is *not* the case that the TCEH First Lien Creditors are receiving a $1.1 billion benefit; the incremental benefit of approximately $430 million is a more appropriate measure. That benefit comes with significant costs.  And, ultimately, that benefit is the cost that EFH, in a sound exercise of its business judgment, has accepted in exchange for avoiding even the *possibility* that the TCEH First Lien Creditors pursue a catastrophic Taxable Separation in a protracted, costly, and litigious process.

**C.    The Potential Ability to "Spread the Pain" of a Taxable Separation Does Not Change the Analysis Comparing the Spin-Off to the Taxable Separation**.

140.    The EFH Indenture Trustee attempts to argue that the Debtors have ignored or minimized possible ways to "spread the pain" of a Taxable Separation to TCEH or Reorganized TCEH.  Nothing could be further from the truth, since "spread the pain" is simply a euphemism for "mutually assured destruction."  The record on this issue is crystal-clear from years of negotiations, board deliberations, and the fact that the Debtors themselves identified many such

---

By contrast, in a Taxable Separation, none of these historic earnings and profits—or earnings and profits associated with the restructuring—would be allocated to Reorganized TCEH.

[148]   In a Taxable Separation, Reorganized TCEH would not have this consolidated group tax liability under any circumstance.  Although the Tax Matters Agreement allocates indemnification obligations with respect to consolidated group liability to EFH Corp and EFIH (or their reorganized successors) under certain circumstances, under applicable Treasury Regulations, Reorganized TCEH may remain obligated to the IRS for these obligations in the event EFH Corp. or EFIH have insufficient assets to pay the liability, and Reorganized TCEH also has liability to EFH Corp. and EFIH under the Tax Matters Agreement under certain circumstances.

arguments in the Omnibus Tax Memorandum.[149]   The Debtors, but apparently not the EFH Indenture Trustee, understand that "spreading the pain" does not result in a better outcome for EFH:  indeed, the tax liability for a Taxable Separation of TCEH could exceed $6 billion, and would likely be accompanied by an additional multi-billion tax liability from a follow-on taxable sale of Oncor.[150]   Mutually assured destruction, or, put differently, catastrophe for all, is not a helpful outcome.

141.    Moreover, there are serious questions about whether any of the "pain spreading" mechanisms work.   "Checking the box" has a significant risk of "locking in" a negative tax outcome in these cases that cannot be avoided by the Spin-Off; the TCEH disinterested manager disputes EFH's authority to "check the box," and the TCEH First Lien Creditors have secured claims that would prime even administrative tax claims that the IRS could assert against TCEH. Any potential state law claims against TCEH, and any effort to pursue Reorganized TCEH for tax liabilities, whether under the Internal Revenue Code's successor assessment power or under state law, is subject to significant risk.   And, as discussed above, stranded tax cases have been approved before, over the vigorous objection of the Department of Justice.

> **D.      The "EFH 363 Transactions" are not "Transfers" And, in the Alternative, are Transfers in the Best Interests of All of the Estates.**
>
> **1.      The EFH Group's Use of the EFH Group's NOLs to Offset Taxable Gain by the EFH Group Does Not Constitute a "Transfer."**

142.    The EFH Indenture Trustee and Fenicle & Fahy repeatedly assert that EFH's NOLs are being "transferred" to TCEH to obtain a step-up for Reorganized TCEH.   That is

---

[149]  *See, e.g.*, Ex. 9, DX321 Oct. 29, 2016 Joint Boards Restructuring Update [EFH06125893]; Ex. 10, DX329 Apr. 24, 2014 Presentation to Joint Boards [EFH2D00067163 at EFH2D00067164]; Ex. 11, DX303 Nov. 21, 2014 Joint Board Materials [EFH06002419 at EFH06002442-43]; *Omnibus Tax Memorandum*, dated October 1, 2014 [DI 2296].

[150]  Ex. 5, 8/4/16 B. Williamson Dep. Tr. at 87:16-21, 88:13-18; Ex. 12, 8/4/16 H. Sawyer Dep. Tr. at 47:16-24.

simply not the case.  ***First***, those NOLs are primarily generated by TCEH's business operations and the interest deductions arising from the TCEH First Lien Debt.[151]  ***Second***, no "transfer" is taking place.  The use of the EFH Group's NOLs to offset taxable gain within the EFH Group does not constitute a transfer under principles of logic or law.[152]  In *Marvel*, a bankruptcy corporate subsidiary brought an adverse proceeding against its former parent arguing, among other things, that the parent's use of the NOLs in the consolidated tax group that contained the parent and the subsidiary constituted a fraudulent transfer.[153]  In rejecting this argument, the District Court emphasized that (a) the parent filed consolidated federal income tax returns and, in doing so, was required to apply the group's consolidated NOLs, (b) as a result of the consolidated filing, the NOLs were computed and applied to the group entity on a consolidated basis (stating that ". . . [the parent] did not have discretion as to whether to "take" the NOLs from its group members; rather the manner in which NOLs were consolidated and applied was statutorily mandated").[154]  As a result, the District Court found that in the context of a consolidated tax filing group, the hypothetical standalone NOLs attributable to any individual members of the group were a legal fiction and thus, could not be actually transferred by virtue of their application to the consolidated group's income.[155]

143.    It is true that TCEH does not have a separate existence for income tax purposes, and this court has generally held that a disregarded entity does not have a separate entitlement to

---

[151]  Ex. 7, DX713 NOL at Emergence 7-5-16 Summary Excel [EFH06374960]; Ex. 12, 8/4/16 H. Sawyer Dep. Tr. at 78:3-5.

[152]  *See In re Marvel Entm't Gr'p, Inc.*, 273 B.R. 58 (D. Del. 2002).

[153]  *Id.* at 62-63.

[154]  *Id.* at 84-85.

[155]  *Id.  See also In re Opus East, LLC*, 528 B.R. 30 (Bankr. D. Del. 2015) (noting that a claim that certain trusts were able to realize a tax benefit from the debtor's liquidation was "simply the result of the tax laws").

the NOLs it has generated in the absence of a tax sharing agreement.[156]  But, that cuts both ways: if, in the absence of a tax sharing agreement, a disregarded subsidiary (e.g., TCEH) has no entitlement to NOLs it generated, surely a disregarded entity's parent (e.g., EFH) has no arguable claim against its disregarded subsidiary (e.g., TCEH) when the disregarded entity (e.g., TCEH) transfers its assets in a way that gives rise to taxable income that are offset by NOLs.  That argument is even stronger where those NOLs are attributable to the disregarded entity's own activities.[157]

144.    The EFH Indenture Trustee attempts to argue that the use of the EFH Group's NOLs constitutes an improper sheltering of Reorganized TCEH's potential joint and several tax liability.  In other words, because Reorganized TCEH may have joint and several liability for any tax liability resulting from the Preferred Stock Sale (i.e., what has been referred to as the "-6 Liability" resulting from the Spin-Off making TCEH a part of the consolidated group for a moment in time), Reorganized TCEH is receiving a "free pass" on a potential contribution claim.[158]  It is certainly true that the Spin-Off transactions render Reorganized TCEH jointly and severally liable with EFH for any tax liability arising in 2016.[159]  But the fact that the EFH Indenture Trustee is relying on this to *support* its argument boggles the mind: from the perspective of the TCEH First Lien Creditors, this is one of these most severe drawbacks to the Spin-Off.  In a Taxable Separation, the entity that would acquire TCEH's assets would *not* be

---

[156]  *See, e.g.*, *In re Conex Holdings, LLC*, 518 B.R. 792 (Bankr. D. Del. 2014).

[157]  *Cf. In re Bob Richards*, 473 F.2d 262 (9th Cir. 1973) (holding that in the absence of a tax sharing agreement, a subsidiary is equitably entitled to a refund where refund was attributable to subsidiary's operations).

[158]  *See EFH Indenture Trustee and Contrarian Capital Management, LLCs Objection to Confirmation of Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp.* [D.I. 9224 ¶¶ 29-31].

[159]  *See* Treas. Reg. § 1.1502-6.  The IRS expressly held that this was the case in the PLR.  The Debtors attempted to obtain a ruling that this was *not* the case, and the TCEH First Lien Creditors vigorously argued to the IRS that the IRS should not issue this ruling.

jointly and severally liable with EFH under these tax rules.  Thus, the EFH Indenture Trustee bizarrely attempts to point to one of the Spin-Off's primary detriments (from the perspective of the TCEH First Lien Creditors) in an effort to compel TCEH to forego value.  This argument wholly ignores the undeniable and simple fact that the Spin-Off avoids a multi-billion tax liability, for which Reorganized TCEH would *not* be jointly liable under the consolidated return rules, in which *all* of the EFH Group's NOLs would be consumed.

145.   The same can be said of EFH's agreement to pay half of whatever alternative minimum tax ("AMT") liability is generated by the Preferred Stock Sale.  Assuming a December 31, 2016 emergence for all Debtors, and assuming none of the Debtors' current-year deductions are ultimately disallowed, the Debtors anticipate total AMT liability of approximately $14-20 million, half of which would be paid by EFH.[160]  To be sure, this was part of a comprehensive, global deal that, as discussed above, avoids a multi-billion cash tax liability.[161]  Moreover, it was heavily negotiated by the successive potential acquirers of EFH, so the reasonableness of this resolution has been "market tested."[162]  The EFH Indenture Trustee's second-guessing of the Debtors' business judgment must be rejected.

---

[160]   *See* Ex. 13, DX057 July 22, 2016 Joint Boards Restructuring, Tax, and M&A Update Presentation [EFH06365720 at EFH06365727].

[161]   *See* Ex. 5, 8/4/16 B. Williamson Dep. Tr. at 105:22-106:4 ("We were looking for a global settlement where all of the estates would agree and move forward on the plan that we had. So, the forbearance and not getting 4 to 6 billion dollars worth of tax that would use all of the cash associated with the EFH side, was huge for us."); Ex. 12, 8/4/16 H. Sawyer Dep. Tr. at 55:2-8 ("As I think I have already stated, the consideration is the utilization of the NOLs to effectuate a tax-free spin on the T-side, which is part of the overall value-maximizing global transaction for both E and T, avoiding a stranded tax, which would be catastrophic for the E-side.").

[162]   *See* Ex. 5, 8/4/16 B. Williamson Dep. Tr. at 118:20-119:4 ("Q: And so, . . . do you have any examples that come to mind of the issues that were of concern to the potential bidders?  A: There was an issue about who would pay AMT."); Ex. 13, DX057 July 22, 2016 Joint Boards Restructuring, Tax, and M&A Update [EFH06365720 at EFH06365727].

**E.      There is No "Equity Value" in EFH Properties or EFH Corporate Services for EFH Corp. to transfer to Reorganized TCEH.**

**1.      EFH Properties Company.**

146.    The Plan contemplates that (a) EFH Corp. will contribute the equity interests in EFH Properties Company (a non-Debtor) ("<u>EFH Properties</u>"), to Reorganized TCEH, (b) all intercompany claims held by the Debtors against EFH Properties will be released (including an approximate $158 million payable from EFH Properties to EFH Corp. (the "<u>EFH Corp. Receivable</u>") (collectively, (a) and (b) the "<u>EFH Properties Contribution</u>"), and (c) the cash held by EFH Properties immediately prior to such contribution (approximately $14 million) will be distributed or otherwise transferred to EFH Corp. or a subsidiary or other affiliate designated by EFH Corp.   These contemplated transactions are being effectuated through the Separation Agreement and the Plan.

147.    Understanding the role EFH Properties plays in the TCEH Debtors' operations is critical to understanding the purpose of the EFH Properties Contribution—quite simply, the equity in EFH Properties does not have independent value separate and apart from the relationship EFH Properties has to the TCEH Debtors' operations. As a result, the EFH Properties Contribution cannot be a fraudulent transfer; there can be no fraudulent transfer with a contribution that has no value to the contributing party.[163]

148.    The Debtors do not own the Company's headquarters building, Energy Plaza, in downtown Dallas, Texas.   Rather, EFH Properties, a direct subsidiary of EFH Corp., leases the

---

[163] A "constructively fraudulent" transfer is a transfer for which the debtor received less than reasonably equivalent value, and the debtor was either (a) insolvent at the time of or became insolvent as a result of the transfer; (b) had unreasonably small capital for its business; or (c) intended to incur, or believed it would incur, debts beyond its ability to pay as they matured.  11 U.S.C. § 548(a)(1)(B).  "Reasonably equivalent value" is a fact-intensive inquiry and is commonly assessed by comparing the value of the property transferred (at the time of the transfer) to the value of the property received by the debtor in the transaction.  *See, e.g., VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007).

entire Energy Plaza building pursuant to a Lease Agreement dated as of February 14, 2002 (as amended, the "Lease") and in turn subleases a portion of the space to EFH Corporate Services, the Federal Deposit Insurance Corporation (the "FDIC"), and Oncor Electric Delivery Company LLC ("Oncor"), with Luminant Generation Company LLC ("Luminant") being a sub-subtenant of Oncor.[164]  Base rent on the Lease has been pre-paid in full, but EFH Properties is liable for certain supplemental rent as well as the costs to operate Energy Plaza, which include maintenance, janitorial, utilities, security, and property tax expenses, all of which are payable by EFH Properties and none of which are payable by the owner-lessor under the Lease.

149.    Oncor does not actually occupy any of its subleased space.  Instead, Oncor sub-subleases its subleased space to Luminant at a significant loss—approximately $1.1 million every year.  Oncor's sublease expires in March 2017 and the Debtors do not anticipate a renewal. In addition, due to its contracting workforce, the FDIC has expressed preliminary interest in renewing only 13 to 14 of the 21 floors under its sublease, which expires in November 2017.[165] As a result of these factors, even assuming continued sublease rent from EFH Corporate Services, *EFH Properties is projected to be cash flow neutral between 2018 and the expiration of the Lease in 2022*.[166]

150.    If the equity in EFH Properties is not contributed to Reorganized TCEH, there is little incentive for Reorganized TCEH—and thus EFH Corporate Services or Luminant—to continue renting Energy Plaza from EFH Properties.  If Reorganized TCEH terminates EFH Corporate Services' sublease, which is a month-to-month tenancy, the Debtors project losses of

---

[164]  Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365783]; Ex. 13, DX057 July 22, 2016 Joint Boards Restructuring, Tax, and M&A Update Presentation [EFH06365720 at EFH06365737].

[165]  Ex. 14, 8/1/16 K. Moldovan Dep. Tr. at 52:17-53:11.

[166]  Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365784].

at least $13.5 million to EFH Properties over the life of the lease through 2022.[167] On the other hand, based on the Debtors' prior efforts to assess alternative office space, the Debtors project that Reorganized TCEH would likely incur $16 million in moving costs to relocate to new space.[168]

151.    Contributing the equity in EFH Properties to Reorganized TCEH avoids these losses.  In addition, if the equity in EFH Properties is contributed to Reorganized TCEH as contemplated under the Plan, EFH Corp. will receive approximately $14 million in Cash (a significant amount in light of EFH Properties' current negative book equity position), and Reorganized TCEH will receive the benefits of its tenancy in Energy Plaza.

152.    The EFH Indenture Trustee and Fenicle & Fahy—without filing a standing motion and complaint, without submitting any valuation of EFH Properties, and without even mentioning the approximately $14 million in Cash that is being transferred to EFH Corp., or the avoidance of the losses that would occur were Reorganized TCEH to vacate Energy Plaza— argues in two paragraphs of a forty-seven page brief that the contribution of EFH Corp.'s equity in EFH Properties to Reorganized TCEH constitutes a fraudulent transfer.  This argument is meritless.

153.    *First*, and most fundamentally, absent the EFH Properties Contribution, EFH Properties has a negative book value and is projected to be cash neutral through the life of the Lease in 2022, even before taking into account the lost rental income were Reorganized TCEH to

---

[167]  *Id.* at EFH06365786]; Ex. 4, 6/27/16 P. Keglevic Dep. Tr. at 82:22-84-17.

[168]  Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365787].

vacate Energy Plaza.[169]    Thus, EFH Properties is not slated to have any equity value.    A contribution of EFH Properties equity cannot, therefore, be said to be a transfer of any value.

154.    **Second**, as the evidence will show at trial, EFH Corp. does not project having sufficient cash-flow to to service the EFH Corp. Receivable.[170] Indeed, EFH Properties has *never* served the EFH Corp. Receivable.    Additionally, the TCEH First Lien Creditors have made it abundantly clear that their willingness to take the equity in EFH Properties will dissipate swiftly if they are forced to service the EFH Corp. Receivable.[171]    Thus, there is no consideration available for any party in the form of a recovery on the EFH Corp. Receivable.[172]

155.    **Third**, to the extent the EFH Properties Equity Contribution even constitutes a "transfer," neither the EFH Indenture Trustee nor Fenicle & Fahy can establish the elements of fraudulent transfer.    As a threshold matter, EFH Corp. will receive approximately $14 million in Cash and avoid potentially escalating losses associated with EFH Properties upon effectiveness of the Plan, in exchange for contributing equity that has no value.    Thus, to the extent the contribution of EFH Properties' equity constitutes a transfer of value, EFH Corp. is receiving value in exchange for its contribution.[173]    Additionally, the EFH Indenture Trustee has not valued EFH Properties—it has submitted no expert report or other valuation.    As a result, the EFH Indenture Trustee cannot meet its burden to establish that the EFH Properties Equity Contribution lacks the exchange of reasonably equivalent value.[174]

---

[169]  Ex. 15, DX356 Apr. 30, 2016 EFH Properties Balance Sheet [EFH06360659].

[170]  Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365788]; Ex. 1, 8/2/16 P. Keglevic Dep. Tr. at 288:6-11; 290:6-291:2.

[171]  Ex. 5, 8/4/16 B. Williamson Dep. Tr. at 179:18-185:22; Ex. 1, 8/2/16 P. Keglevic Dep. Tr. at 239:2-22.

[172]  Ex. 5, 8/4/16 B. Williamson Dep. Tr. at 176:2-13; 179:18-185:22.

[173]  Ex. 1, 8/2/16 P. Keglevic Dep. Tr. at 276:2-279:4; 280:14-282:14.

[174]  *See* Tex. Bus. & Com. Code § 24.006(a).

## 2.    EFH Corporate Services Company.

156.    The Plan contemplates contributing EFH Corp.'s equity interests in EFH Corporate Services Company ("EFH Corporate Services") to Reorganized TCEH (the "EFH Corporate Services Contribution").    The proposed Contribution is effectuated through the Separation Agreement, the Transition Services Agreement, and the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.

157.    EFH Corporate Services is a wholly owned subsidiary of EFH Corp. that provides a host of business services to TCEH entities (i.e., Luminant and TXU Energy), EFH Corp., EFIH, and Oncor, through separate Shared Services Agreements or operating procedures (collectively, the "Shared Services").[175]    EFH Corporate Services has approximately 420 employees.[176]

158.    All Shared Services are billed at cost and without markup.[177]    As a result, EFH Corporate Services operates as a *zero-profit, cost-center*.    EFH Corporate Services has minimal cash on hand, which is maintained only for daily operations.[178]    The services provided by EFH Corporate Services overwhelming support T-Side entities.    Currently, "E-Side" service billings

---

[175]  Ex. 16, DX651 Apr. 1, 2014 Amended and Restated Shared Services Agreement between EFH Corporate Services Co. and TCEH [EFH04269629]; Ex. 17, DX661 Apr. 1, 2014 Shared Services Agreement between EFH Corporate Services Co. and EFIH [EFH04801624].

[176]  Ex. 18, July 25, 2016 Rebuttal Report of John Stuart at 2 ("Stuart Rebuttal Report"); Ex. 4, 6/27/16 P. Keglevic Dep. Tr. at 32:21-23.

[177]  Ex. 16, DX651 Apr. 1, 2014 Amended and Restated Shared Services Agreement between EFH Corporate Services Co. and TCEH [EFH04269629 at EFH04269632, EFH04269636]; Ex. 17, DX661 Apr. 1, 2014 Shared Services Agreement between EFH Corporate Services Co. and EFIH [EFH04801624 at EFH04801627, EFH04801631]; *see also* Ex. 13, DX057 July 22, 2016 Joint Boards Restructuring, Tax, and M&A Update Presentation [EFH06365720 at EFH06365731].

[178]  Ex. 13, DX057 July 22, 2016 Joint Boards Restructuring, Tax, and M&A Update Presentation [EFH06365720 at EFH06365731].

only comprise approximately 5% of EFH Corporate Services' total service billings.[179]   TCEH

has also pre-paid for certain of EFH Corporate Services' assets, including IT hardware and

software, and the Shared Services Agreement provides TCEH with an ongoing right to use these

assets.[180]   ***Thus, the value, if any, of EFH Corporate Services arises from its relationship to the***

***TCEH Debtors' operations***.

159.    If EFH Corporate Services is not contributed to Reorganized TCEH, it may not

continue to provide services to TCEH, and could be forced to sever the overwhelming majority

of its employees.[181]   As a result, EFH Corporate Services could incur significant costs and

liabilities, including severance obligations, WARN Act obligations, and third-party contract

termination costs.[182]   By contributing the equity in EFH Corporate Services to Reorganized

TCEH, EFH Corp. avoids these potential costs.[183]

160.    Like the EFH Properties Equity Contribution, the EFH Corporate Services

Contribution is not a transfer of real equity value.  EFH Corporate Services has no independent,

stand-alone value to EFH Corp.  What little theoretical net book value EFH Corporate Services

may have will be quickly absorbed by potentially significant severance and WARN obligations

and contract termination costs (including potential rejection damages associated with rejecting

previously assumed contracts).[184]   Some of these obligations may be reduced or eliminated if the

---

[179]   Ex. 18, July 25, 2016 Rebuttal Report of John Stuart at 2, 3, 6; Ex. 19, DX368 2016 6+6 projection allocation 072216 Excel [EFH06365711].

[180]   Ex. 16, DX651 Apr. 1, 2014 Amended and Restated Shared Services Agreement between EFH Corporate Services Co. and TCEH [EFH02921638 at EFH04269684].

[181]   Ex. 13, DX057 July 22, 2016 Joint Boards Restructuring, Tax, and M&A Update Presentation [EFH06365720 at EFH06365732]; Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365770-72].

[182]   Ex. 18, July 25, 2016 Rebuttal Report of John Stuart at 15-16; Ex. 20, DX471 May 2015 Severance Calculator for Business Services Excel [EFH06009585].

[183]   Ex. 4, 6/27/16 P. Keglevic Dep. Tr. at 44:12-22.

[184]   *Id*. at 59:12-60:7.

equity owners of Reorganized TCEH agreed to make offers of employment to the employees of EFH Corporate Services prior to EFH Corporate Services severing such employees.[185]  There is no guarantee this will happen and, indeed the TCEH First Lien Creditors have little incentive to agree to such a resolution if they are deprived of the right to utilize the employee base at EFH Corporate Services at Reorganized TCEH.

161.    In the absence of the EFH Corporate Services Contribution, EFH Corporate Services will limit its services to the bare minimum required to serve the EFH Debtors and the EFIH Debtors.  This would likely require EFH Corporate Services to reduce its presence in Energy Plaza, thereby reducing the rental income otherwise payable to EFH Properties.[186]  It bears repeating at this juncture that the sum of the Plan transactions are greater than their parts: unraveling one carefully negotiated provision (like the EFH Corporate Services Contribution) has the effect of adversely effecting a completely separate provision (i.e., the EFH Properties Contribution).[187]

162.    At the same time, the Interim Transition Services Agreement filed with the Plan Support Agreement provides that EFH Corporate Services will provide the services under the Shared Services Agreements for an interim period, further reducing any potential "harm" EFH experiences from contributing the equity in EFH Corporate Services to Reorganized TCEH.[188]

163.    In short, the EFH Corporate Services Contribution benefits both the "T-Side" and the "E-Side."  It preserves any value EFH Corporate Services has by maintaining its tie to the

---

[185]  Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365773].

[186]  *Id*. at EFH06365774.

[187]  Ex. 1, 8/2/16 P. Keglevic Dep. Tr. 245:13-246:16.

[188]  Transition Services Agreement [D.I. 9100-2]; Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365776].

TCEH Debtors, while at the same time eliminating any potential costs EFH Corporate Services would otherwise have to incur if it were to lose its relationship to Reorganized TCEH and its subsidiaries.  For this reason, the objections by the EFH Indenture Trustee and Fenicle & Fahy regarding the EFH Corporate Services Contribution are short-sighted and overestimate the equity value of EFH Corporate Services without its relationship to Reorganized TCEH.

164.    With respect to both the EFH Properties Contribution and the EFH Corporate Services Contribution, the clearest evidence that these proposed transactions benefit the EFH estate as well is the simple fact that no potential owner of Reorganized EFH wants to own these entities.  In with various parties in connection with a sale of EFH's indirect economic interest in Oncor, the question has arisen time and time again regarding who bears the burden of Reorganized EFH Corporate Services and EFH Properties.  The answer has always been the same: no potential owner of Reorganized EFH wants to bear the burden of EFH Corporate Services and EFH Properties.  To this end, the Merger Agreement EFH and EFIH executed with NextEra on July 29th requires EFH to eliminate Corporate Services and Properties from its capital structure as a condition to closing the Merger.

### F.    EFH Corp. Approved the "EFH 363 Transactions" in a Sound Exercise of Business Judgment, and No Heightened Scrutiny Applies.

165.    EFH Corp.'s decision to enter into the minimum transactions necessary to effectuate the separation of the T-side was a sound exercise of business judgment made on an informed basis after a robust corporate governance process.[189]  Contrary to the EFH Indenture

---

[189]  Ex. 13, DX057 July 22, 2016 Joint Boards Restructuring, Tax, and M&A Update Presentation [EFH06365720]; Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761-5926]; Ex. 21, DX049 July 27, 2016 Minutes of the Joint Meeting [EFH06365754]; Ex. 22, DX058 July 22. 2016 Minutes of the Joint Meeting [EFH06365751]; Ex. 23, DX134 Aug. 9, 2016 Approval of Amended Plan and Merger Documents Transaction Presentation [EFH06002898].

Trustee's assertions, the EFH Corp. disinterested directors were both unconflicted and fully-informed in approving these transactions.

166.    The Court can approve these transactions as a sound exercise of EFH Corp.'s business judgment.  Upon court approval, a debtor "may use, sell, or lease . . . property of the estate" outside the ordinary course of business.[190]   In the Third Circuit, courts authorize transactions outside the ordinary course of business when the transaction has a "sound business purpose."[191]   As discussed above, each of the EFH Corp. transactions is supported by a sound business purpose.   The contribution of EFH Corporate Services, a zero-profit entity, to Reorganized TCEH under the Separation Agreement and the Transition Services Agreement is a fundamental separation-mechanics transaction that is both sensible and inevitable under the circumstances.  The same is true of the contribution of EFH Properties, an entity with no value independent of the TCEH Debtors' operations.  And, again, the Tax Matters Agreement does not "transfer" NOLs to Reorganized TCEH.  Rather, it is a mutually-beneficial tax agreement that avoids a situation where a multi-billion dollar tax liability would be generated.

167.    These transactions were vigorously negotiated between EFH Corp., with input from its independent advisors, and the Ad Hoc Committee of TCEH First Lien Creditors, the future owners of Reorganized TCEH, in consultation with their advisors.   Importantly, the transactions were also negotiated with extensive input from the likely potential bidders for EFH Corp., including NextEra, who generally agreed with the finalized terms of the transactions.

168.    These decisions were made on a fully-informed basis.  Notwithstanding the EFH Indenture Trustee's vague assertions to the contrary, EFH Corp. disinterested directors and

---

[190]  11 U.S.C. § 363(b)(1).

[191]  *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999).

advisors did in fact "reevaluate" the situation after the Original Plan terminated—over the course of a half dozen board meetings and numerous individual consultations with advisors, including extensive discussions of the current tax implications of the Debtors' restructurings.  At bottom, the EFH Indenture Trustee premises its argument on an assertion that somehow the IRS's private letter ruling was a game-changing "fourth ace" for the E-side.  But the May 2016 IRS statements, which indicated that the IRS would treat TCEH's debt in a manner that would give rise to a $6.5 billion cash tax liability in a Taxable Separation, dwarfed the previous concerns of a "Tax Armageddon."  Moreover, the insistence of the Ad Hoc Committee of TCEH First Lien Creditors that it was prepared to seek a taxable transaction with or without the support of the Debtors only increased after the termination of the Original Plan, a threat that was all the more real after termination of the Debtors' exclusivity.

169.    Perhaps the clearest indication of this reality is that NextEra and other E-side bidders generally supported the terms of these separation transactions.  Unlike the EFH Indenture Trustee, these are actual economic participants that plan to own EFH Corp. on a go-forward basis and were directly involved in the negotiations and diligence around these issues.[192]  In sum, it is the EFH Indenture Trustee that is deeply uninformed about the facts and considerations of these complex separation issues.

170.    Moreover, the governance process through which EFH Corp. approved these transactions was robust.  After termination of the Original Plan, the EFH Corp. disinterested directors attended six board meetings that covered alternative restructuring issues, separation issues, or the Plan.  Throughout this time, they also conferred with their independent legal and

---

[192] *See* Merger Agreement [D.I.9190-2 Ex. 1 to Ex. A at 10, 96] (requiring that the TCEH spinoff have occurred, including the contribution of EFH Properties and EFH Corporate Services).

financial advisors, including extensive reviews of the terms of the transactions in preparation for the meeting to consideration their approval. Ultimately, on July 27, 2016, EFH Corp. disinterested directors held a separate meeting with the conflicts matters advisors and approved, to the extent they were conflicts matters, entry into the forgoing EFH Corp. transactions. Thereafter, on the same day, the full board of EFH Corp., including the disinterested directors, approved the transaction.

171.    Contrary to the EFH Indenture Trustee's assertions, nothing about this process warrants application of anything other than the standard business judgment test. First and foremost, it is a fundamental tenet of Delaware corporate law that the "entire fairness" standard applies when an insider is on both sides of a proposed transaction. Here, no director was on both sides of the EFH 363 Transactions. These provisions were negotiated as between the Debtors and Paul Weiss, not the Debtors and the TCEH disinterested manager.

172.    Perhaps recognizing this undeniable negotiating history, the EFH Indenture Trustee instead relies on two novel and illogical arguments in favor of applying the "entire fairness" standard. *First*, the EFH Indenture Trustee argues that the EFH Corp. disinterested directors have an interest in the transaction because the IRS could hypothetically assert liability against them for a stranded tax. This potential liability would only arise if there were a tax liability at EFH Corp. that wiped out the recovery of the EFH Indenture Trustee's constituents. If anything, this risk of personal liability, however attenuated, aligns the directors' interests with those of the corporation. Moreover, directors of corporations are always subject to potential assertions of personal liability for their decision-making. If the EFH Indenture Trustee's conflicts theory were true, every decision by a corporate director would be "interested" insofar as the opposite decision could potentially result in a personal lawsuit.

173. **Second**, the EFH Indenture Trustee argues that the release and exculpation provisions for the benefit of the EFH disinterested directors constitutes a "conflict." The fact that the disinterested directors may receive releases, employment agreements, or severance, in connection with the Plan or otherwise, does not come close to creating a conflict. Director and officer release and compensation provisions are commonly found in nearly every chapter 11 plan and are entirely unrelated to the transactions at issue. Again, the EFH Indenture Trustee's theory proves too much and would render virtually every chapter 11 plan approval an "interested" transaction.

174. Unsurprisingly, the EFH Indenture Trustee is unable to cite a single case that has applied the entire fairness standard, let alone found a breach of fiduciary duty, based on director and officer releases, compensation provisions, or potential personal liability. The cases the EFH Indenture Trustee cites either involved egregious instances of self-dealing, transactions with controlling shareholders, or creditors controlling hiring and firing decisions.[193] The EFH Indenture Trustee's reckless and unsubstantiated breach of fiduciary duty allegations and heightened scrutiny arguments should therefore be overruled.

### G.    No EFH or EFIH Directors or Officers Are Being Released or Exculpated Pursuant to the Plan as it Relates to the TCEH Debtors and EFH Shared Services Debtors.

175. Article VIII.C and Article VIII.D. of the Plan clarifies that Debtor releases and third-party releases with respect to the EFH Debtors, the EFIH Debtors, the Reorganized EFH

---

[193] *See, e.g., In re CNC Payroll, Inc.*, 491 B.R. 454, 463 (Bankr. S.D. Tex. 2013) (involving a Chapter 7 trustee using anti-competitive practices to cause his own law firm to be retained as counsel); *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (involving transaction between 100% owner and debtor); *In re Broadstripe, LLC*, 444 B.R. 51, 81 (Bankr. D. Del. 2010) (involving major creditor exercising control over debtors through hiring and firing decisions and retention of affiliated consultants and agents); *In re e2 Commc'ns, Inc.*, 320 B.R. 849 (Bankr. N.D. Tex. 2004) (involving numerous personal loans and transfers between the debtor and its founder, president, and director); *In re Zenith Elects. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) (involving controlling shareholder acquiring the entire company under the plan).

Debtors, and the Reorganized EFIH Debtors will be provided on the *EFH* Effective Date, not the

*TCEH* Effective Date.[194]    Similarly, the draft TCEH Confirmation Order filed substantially

contemporaneously herewith states that the Exculpated Parties that relate to the EFH Debtors,

EFIH Debtors, the Reorganized EFH Debtors, and the Reorganized EFIH Debtors will receive

the exculpation set forth in Article VIII.E. of the Plan as of the *EFH* Effective Date instead of the

*TCEH* Effective Date.,

> **H.     The Feasibility Objection is Irrelevant and the Plan Otherwise
> Satisfies the Best Interests Test as to Creditors of EFH Corporate
> Services.**

176.    The EFH Indenture Trustee and Fenicle & Fahy raise two objections under

section 1129 of the Bankruptcy Code.  ***First***, both parties erroneously argue that the Plan as it

relates to the TCEH Debtors does not satisfy the feasibility standard under section 1129 of the

Bankruptcy Code.  ***Second***, the EFH Indenture Trustee argues that the Plan fails the "best

interests" test because the Debtors have not provided a standalone liquidation analysis for EFH

Corporate Services. Each of these arguments should be overruled.

177.    The EFH Indenture Trustee's argument regarding feasibility fails on two grounds.

***First***, if the Bankruptcy Court enters the TCEH Confirmation Order, thereby confirming the Plan

as it relates to the TCEH Debtors and EFH Shared Services Debtors and binding the estates' to

the Tax Matters Agreement, then the Bankruptcy Court has approved the Debtors' pursuit of the

Spin-Off *including application of the EFH Group's NOLs*.  That is, if the Plan as it relates to the

TCEH Debtors and EFH Shared Services Debtors, then by extension, the EFH Indenture

---

[194] *See* Third Amended Joint Plan, Article VIII.C. ("For the avoidance of doubt. . .(ii) the EFH Debtors, Reorganized EFH Debtors, EFIH Debtors, and Reorganized EFIH Debtors shall provide the release set forth in this Article VIII.C. as of the EFH Effective Date. . ."); *see also* Article VIII.D., Plan ("For the avoidance of doubt. . .(ii) the Releasing parties shall provide the release set forth in this Article VIII.D. for all Claims and Causes of Action that relate to the EFH Debtors, Reorganized EFH Debtors, EFIH Debtors, or Reorganized EFIH Debtors as of the EFH Effective Date").

Trustee's feasibility argument regarding the use of NOLs is eliminated.  Conversely, if the Bankruptcy Court rejects the use of the EFH Group's NOLs in connection with the Preferred Stock Sale, then the Spin-Off transaction collapses and feasibility becomes one of many concerns.

178.    **Second**, section 1129(a)(11) states that a plan of reorganization may only be confirmed if "confirmation of the plan is not likely ***to be followed by*** liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[195] In short, "feasibility involves the question of the ***emergence of the reorganized debtor*** in a solvent condition with reasonable prospects of financial stability and success."[196]  In determining whether a plan is feasible, courts in this circuit generally look at several factors, including most significantly (a) the post-emergence capital structure, (b) the earnings potential of the reorganized entity, (c) the market conditions governing the reorganized entity's operations, and (d) the capabilities of the post-emergence management team.[197]

179.    In other words, the feasibility standard is designed to ensure that the reorganized structure will not liquidate following its emergence from chapter 11. The EFH Indenture Trustee's and Fenicle & Fahy's objections are, from this perspective, misguided and irrelevant. They illogically argue that the necessary use of the EFH Group NOLs as part of the larger Spin-Off transaction *of the TCEH Debtors* somehow makes *Reorganized TCEH* vulnerable to a post-emergence liquidation. There is, quite simply, no connection between the two, and the factors

---

[195]  11 U.S.C. 1129(a)(11) (emphasis added).

[196]  5 *Collier on Bankruptcy* , ¶ 1129.02[11] at 1129-36.11 (15th ed. rev. 1989) (emphasis added).

[197]  *See In re Franscella Enters., Inc.,* 360 B.R. 435, 452 (Bankr. E.D. Pa. 2007); *In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 226 (Bankr. D.N.J. 2000).

that the Court will examine to assess feasibility with respect to Reorganized TCEH are in no way tied to the transactions necessary to reorganize the TCEH Debtors.

180.    With respect to the "best interests," objection, EFH Corporate Services is a "C-corp." There is no doubt that in the event of a hypothetical 7 chapter liquidation, EFH Corporate Services, as a tax-paying corporation, would be joint and severally liable for the resulting, significant tax liability.[198]

## I.    The Procedural Objections Should Be Overruled.

181.    The EFH Indenture Trustee (and, to a more limited extent, Fenicle & Fahy) argue that the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors cannot be confirmed because (a) the application of the EFH Group's NOLs to offset the taxable gain associated with the Spin-Off Transactions and the transfer of equity in EFH Corporate Services and EFH Properties (as the EFH Indenture Trustee calls them, the "EFH 363 Transactions") constitute a *sub rosa* plan for EFH Corp., (b) insufficient notice was provided by the Debtors regarding such transactions, and (c) the Debtors are improperly seeking entry of multiple confirmation orders with respect to a single Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors. Each of these should be dismissed.

182.    *First*, the argument that the so-called "EFH 363 Transactions" constitute a *sub rosa* Plan for EFH Corp. are as misguided as they are a gross misstatement of the jurisprudence governing *sub rosa* plans. *Sub rosa* transactions are those that disenfranchise creditors by circumventing the protections provided by the plan confirmation process and other sections of the Bankruptcy Code (e.g., disclosure requirements, voting, the best interests of creditors test,

---

[198] *See Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 59 (2008) (stating that the "central purpose of Chapter 11 is to facilitate reorganizations, rather than liquidations" and that chapter 7 liquidations generally constitute sales of substantially all of a debtors' assets).

and the absolute priority rule).[199]   Moreover, a settlement constitutes a *sub rosa* plan when the settlement has the effect of dictating the terms of a prospective chapter 11 plan. To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote.[200]

183.    Here, the EFH 363 Transactions were described in detail in the TCEH Disclosure Statement.  Parties have had an opportunity to object to the EFH 363 Transactions (following access to the full notice period required under the Bankruptcy Code and as evidenced by the EFH Indenture Trustee's objection).

184.    Rather bizarrely, the only adverse consequence the EFH Indenture Trustee points to as a result of this alleged "sub rosa" plan for EFH Corp. is that it will "impede the possibility of a creditor bid for EFH Corp.'s equity in Oncor because virtually all of the NOLs that would bolster such a bid will be consumed by Reorganized TCEH."  EFH Indenture Trustee Objection, ¶ 83.

185.    Not only does the Private Letter Ruling *preserve* those NOLs not used in the Spin-Off, the alternative to the Spin-Off would consume *all* of the EFH Group's NOLs.  In

---

[199]   *See, e.g.*, *In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002) (The focus of 'sub rosa' plan analysis is oriented toward those situations in which a debtor proposes to sell 'all,' or 'substantially all' of its assets without the benefit of a confirmed plan or a court-approved disclosure statement."); *In re Gen. Motors Corp.*, 407 B.R. 463, 495 (Bankr. S.D.N.Y. 2009) ("A proposed [transaction] may be objectionable, for example, when aspects of the transaction dictate the terms of the ensuing plan or constrain parties in exercising their confirmation rights, such as by placing restrictions on creditors' rights to vote on a plan."(citations omitted)); *see also In re Iridium Operating LLC*, 478 F.3d 452, 461 (2d Cir. 2007) ("[T]he reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of Chapter 11 for confirmation of a reorganization plan.'") (quoting *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983)).

[200]   *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010) (citations omitted) (holding proposed settlement between Chapter 11 debtors and secured lenders was not an impermissible *sub rosa* plan and did not dispose of all claims against jointly administered Chapter 11 estates or restrict creditors' right to vote where lenders relinquished interest in collateral that more than fully secured their claims and waived any claims against the estate in exchange for agreed upon recovery); *see also In re Marvel Entm't Grp. Inc.*, 222 B.R. 243, 251 (D. Del. 1998) (holding that a proposed settlement was not a de facto or *sub rosa* plan of reorganization where settlement did not bypass confirmation process but, instead, was contingent upon subsequent confirmation and consummation of proposed plan after sufficient notice and opportunity to object).

addition, the execution of the Merger Agreement, as well as ongoing discussions the Debtors are having with existing (and significant) EFIH constituencies regarding a potentially consensual path forward with respect to a restructuring of the EFH Debtors and EFIH Debtors, is evidence in and of itself that the Spin-Off transaction structure is the best alternative available for generating support for an "E-Side" transaction.   Indeed, the Merger Agreement the Debtors executed on July 28, 2016 with NextEra expressly contemplates execution of the Spin-Off as a condition precedent to consummation of the Merger Agreement.

186.    With respect to EFH Corporate Services, the Plan cannot be a *sub rosa* Plan for EFH Corporate Services—it is an actual Plan for EFH Corporate Services.   EFH Corporate Services is seeking to confirm the Plan as to itself at the August 17, 2016 confirmation hearing. With respect to EFH Properties, the EFH Properties Contribution is the equivalent of a settlement between EFH Corp. and Reorganized TCEH.   EFH Properties is already projected to be, at best, cash flow neutral starting in 2018.[201]   The absence of Reorganized TCEH's presence in Energy Plaza almost certainly renders EFH Properties cash flow negative.[202]   In exchange for preserving what little value EFH Properties has, by (a) contributing the equity in EFH Properties (to the only entity that can extract any value from EFH Properties) and (b) releasing the EFH Corp. Receivable, EFH Corp. is retaining the Cash at EFH Properties (subject to certain adjustments).   This settlement does not meet the standards of a *sub rosa* plan.   Not only does it not deprive creditors of any right to vote (since EFH Properties is not a Debtor), it also does not seek to dispose of any material assets of the EFH Debtors' estates.

---

[201]   Ex. 6, DX048 July 27, 2016 Joint Board Materials [EFH06365761 at EFH06365784].

[202]   *Id.* at EFH06365785.

187.    *Second*, the EFH Indenture Trustee's "notice" objection elevates form over substance. The EFH 363 Transactions were described at length in the TCEH Disclosure Statement, which was approved at a hearing held by the Bankruptcy Court after sufficient notice. Indeed, at the hearing to approve the TCEH Disclosure Statement, the Court addressed the very same objection.[203]    Additionally, and perhaps most fundamentally, *all* of the Debtors are co-proponents of the Plan.  This means, as a matter of law, all of the Debtors are ultimately bound to the Plan.[204]

188.    *Third*, the Bankruptcy Court has already ruled that a joint plan with two confirmation orders is a permissible exercise of the Debtors' business judgment and supported by precedent.[205]  The TCEH Disclosure Statement and the Scheduling Order are abundantly clear on the staggered confirmation process and one would certainly expect a party as sophisticated as the EFH Indenture Trustee to understand the bifurcated process. Moreover, the distinction from *General Growth Properties* ("GGP") is inapposite. Without converting this Brief into a tutorial on GGP for the benefit of the EFH Indenture Trustee, the "ten properties" the EFH Indenture Trustee highlights were merely one small part of a larger, staggered confirmation process.  The GGP debtors confirmed a single joint plan of reorganization for 262 project-level subsidiaries restructuring 108 separate loans totaling approximately $15 billion in secured indebtedness across 144 properties.  Beginning on December 15, 2009, and continuing through May 20, 2010, the GGP debtors confirmed the same plan for their 262 project-level subsidiary debtors over the

---

[203]  *See* Ex. 24, 6/16/16 Hr'g Tr. at 58:9-14 (". . .and there's no reason as a formal matter you need to have a motion by a non-debtor -- or, excuse me -- by a co-debtor that's not being part of the confirmed plan that binds the debtor").

[204]  *See, generally*, 11 U.S.C. 1141 (holding that the provisions of a confirmed plan are binding upon the debtor).

[205]  *See* Ex. 24, 6/16/16 Hr'g Tr. at 53:10-54:8 ("I did not address your argument with regard to the fact that we're going forward with one plan with two different confirmation orders and two different disclosure statements. I'm not troubled by that. I think as discussed, there is precedent.").

course of nine separate confirmation hearings and pursuant to nine separate confirmation orders.[206]    The EFH Indenture Trustee's attempt to distinguish this precedent is misplaced.  While the debtors for certain of the loans were moved from the December 15 hearing to the December 23 hearing because they were unable to complete their consent and balloting process in time for the December 15 hearing, there were still another *seven groups of debtors* that had not yet completed their negotiations for which the debtors confirmed the same plan pursuant to separate confirmation orders.

189.    Ultimately, as the Bankruptcy Court itself noted, the confirmation orders will control what each Debtor is bound by, regardless of whether those binding provisions are set forth in one or two orders.  In addition, the Scheduling Order entered on May 24, 2016 [Docket No. 8514] (which, again, was entered after full notice and opportunity for objection was provided) contemplated separate confirmation tracks for the "T-Side" and "E-Side" on a single, joint Plan.

---

[206] *See In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 20, 2010) (D.I. 5225) (Findings of Fact, Conclusions of Law, and Order Confirming the Ninth Group of Plan Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. Apr. 29, 2010) (D.I. 5100) (Findings of Fact, Conclusions of Law, and Order Confirming the Eighth Group of Plan Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. Mar. 26, 2010) (D.I. 4807) (Findings of Fact, Conclusions of Law, and Order Confirming the Seventh Group of Plan Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. Mar. 19, 2010) (D.I. 4725) (Findings of Fact, Conclusions of Law, and Order Confirming the Sixth Group of Plan Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. Mar. 4, 2010) (D.I. 4579) (Findings of Fact, Conclusions of Law, and Order Confirming the Fifth Group of Plan Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. Feb. 16, 2010) (D.I. 4394) (Findings of Fact, Conclusions of Law, and Order Confirming the Fourth Group of Plan Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. Jan. 20, 2010) (D.I. 4239) (Findings of Fact, Conclusions of Law, and Order Confirming the Third Group of Plan Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. Dec. 23, 2009) (D.I. 4025) (Findings of Fact, Conclusions of Law, and Order Confirming the Second Group of Plan Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. Dec. 15, 2009) (D.I. 3915) (Findings of Fact, Conclusions of Law, and Order Confirming the Plan Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code).

### J.    Classification and Treatment of the EFCH 2037 Notes in Class C6 is Appropriate.

190.    The EFCH Notes Trustee's argument that the EFCH Notes Claims must be classified with the rest of the T-side funded debt claims ignores the fact that the EFCH Notes Claims have different legal entitlements than the rest of the T-side funded debt.

191.    Claims may only be classified together under section 1122 of the Bankruptcy Code if they are "substantially similar."[207]   Claims with different priorities are by definition not substantially similar.[208]

192.    Here, the EFCH unsecured claims are structurally subordinate to TCEH unsecured claims.  EFCH is the parent company of TCEH, and EFCH's only material asset is its equity interests in TCEH.[209]   As an equity holder in TCEH, EFCH is only entitled under the absolute priority rule to recover from the assets of TCEH after all TCEH claims are paid in full.[210]   Here, multiple Classes of Claims against the TCEH Debtors are Impaired (i.e., not receiving payment in full of their Claims).  Accordingly, the Court should therefore overrule the EFCH Notes Trustee's Objection.

---

[207] 11 U.S.C § 1122(a); *see also Zentek GBV Fund IV v. Vesper*, 19 F. App'x 238, 248 (6th Cir. 2001) (section 1122 "clearly dictates that only substantially similar claims may be placed together"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 160 (D. Del. 2006) (holding that the plan satisfied section 1122(a) because it placed substantially similar claims in the same class and places claims and equity interests in different classes).

[208] *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir. 1991), *on reh'g*, (Feb. 27, 1992) ("[S]ubstantially similar claims [are] those which share common priority and rights against the debtor's estate."); *In re Couture Hotel Corp.*, 536 B.R. 712, 734 (Bankr. N.D. Tex. 2015) (holding that claims with different priorities in the collateral are not similarly situated and are therefore properly classified separately). Indeed, classifying claims with different priorities is mandated by the absolute priority rule. *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 (1999) (describing the absolute priority rule); *see also* 11 U.S.C. § 1129(b)(2).

[209] *See In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 191 (Bankr. S.D.N.Y. 2007) (explaining equitable subordination).

[210] *See* 11 U.S.C. § 1129(b)(2)(B)(ii).

**K.      The Debtors Will Work to Consensually Resolve Assumption and Cure Objections, Which Should Not Stand in the Way of Plan Confirmation.**

193.     The Debtors received various objections and reservations of rights regarding the assumption of certain executory contracts and proposed cure amounts set forth in Exhibit C to the Plan Supplement (the "Assumption Objections," and such parties, the "Assumption Objectors").[211]    While the Debtors believe that the various assumptions and cure amounts listed in Exhibit C to the Plan Supplement are generally accurate, the Debtors are working and will continue to work with the Assumption Objectors to determine accurate cure amounts, identify assumed contracts, and otherwise consensually resolve the Assumption Objections.   For the avoidance of doubt, the Debtors intend to continue to pay postpetition amounts due under its contracts in the ordinary course of business.   Unless otherwise agreed, the Debtors will include language in the TCEH Confirmation Order that they will not seek to assume, cure, or otherwise treat any contract pursuant to the TCEH Confirmation Order that is the subject of an outstanding Assumption Objection at the time of entry of the TCEH Confirmation Order.   Any party with an outstanding Assumption Objection will have an opportunity to be heard at TCEH Confirmation Hearing, or another hearing that is convenient to the Court.   Unless otherwise agreed, the Debtors will not assume any contract that is the subject of an Assumption Objection until the Assumption Objection has been consensually resolved or the Court has made a determination on the Assumption Objection.   Therefore, the Assumption Objections should in no way prevent the Court from confirming the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors.

---

[211] The Assumption Objectors are:  (a) Pooled Equipment Inventory Co. [D.I. 9195] ("PEICo"), (b) Oracle America, Inc. [D.I. 9213] ("Oracle"), (c) Boral Material Technologies, LLC [D.I. 9234] ("BMT"), (d) Accenture LLP [D.I. 9238] ("Accenture"); (e) Union Pacific Railroad Company [D.I. 9242] ("UPRR"); (f) SAP Industries, Inc. [D.I. 9243] ("SAP")

## <u>CONCLUSION</u>

194.    For the reasons set forth herein, the Debtors respectfully request that the Court confirm the Plan as it relates to TCEH Debtors and EFH Shared Services Debtors and enter the Confirmation Order.

[*Remainder of page intentionally left blank.*]

Dated: August 15, 2016
Wilmington, Delaware

*/s/ Jason M. Madron*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:        (302) 651-7700
Facsimile:         (302) 651-7701
Email:              collins@rlf.com
                       defranceschi@rlf.com
                       madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:        (212) 446-4800
Facsimile:         (212) 446-4900
Email:              edward.sassower@kirkland.com
                       stephen.hessler@kirkland.com
                       brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:         (312) 862-2200
Email:              james.sprayregen@kirkland.com
                       marc.kieselstein@kirkland.com
                       chad.husnick@kirkland.com
                       steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession