IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.*,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 14-10979 (CSS)<br>)<br>) (Jointly Administered)<br>)<br>) Re: Docket Nos. 9199, 9209, 9224, 9226<br>) & 9299 |

**JOINDER OF THE AD HOC COMMITTEE OF TCEH
FIRST LIEN CREDITORS TO DEBTORS' MEMORANDUM
OF LAW IN SUPPORT OF CONFIRMATION OF THE THIRD
AMENDED JOINT PLAN OF REORGANIZATION AS IT APPLIES
TO THE TCEH DEBTORS AND EFH SHARED SERVICES DEBTORS**

The ad hoc committee of certain unaffiliated holders of first lien senior secured claims against the TCEH Debtors (the "**Ad Hoc Committee of TCEH First Lien Creditors**"),[2] by and through its undersigned counsel, hereby joins (the "**Joinder**") in the *Debtors' Memorandum of Law in Support of Confirmation of the Third Amended Joint Plan of Reorganization as it Applies to the TCEH Debtors and EFH Shared Services Debtors* [D.I. 9299] (the "**Reply**"), and respectfully states as follows:

**JOINDER**

1. After nearly three years of hard-fought negotiations and, at times, hotly contested litigation, the TCEH Debtors seek confirmation of a standalone T-Side plan that is

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] The members of the Ad Hoc Committee of TCEH First Lien Creditors hold or manage, in the aggregate, approximately $16.39 billion of first lien secured claims against Texas Competitive Electric Holdings Company LLC and certain of its subsidiaries (collectively, the "**TCEH Debtors**"). *See Seventh Supplemental Verified Statement of the Ad Hoc Committee of TCEH First Lien Creditors Pursuant to Bankruptcy Rule 2019* [D.I. 8573].

overwhelmingly supported by their largest stakeholders and avoids triggering massive potential tax claims at EFH.[3]  This is the value-maximizing outcome that all parties in these cases have strived for years to achieve.  Nevertheless, in what has become a common theme in these cases, a small handful of EFH creditors, including the EFH Notes Trustee,[4] Contrarian Capital Management, LLC, certain funds and accounts advised or sub-advised by Fidelity Management & Research Company or its affiliates and certain holders of asbestos-related claims against the EFH Debtors (collectively, the "**E-Side Objectors**"),[5] persist in seeking to delay the T-Side's emergence in a last ditch effort to extract hold-up value.  After years of negotiations and litigation in which nearly every possible restructuring alternative has been considered and analyzed, and during which time the TCEH Debtors' operating entities have suffered billions of dollars of value erosion, the time for gamesmanship has long passed.

2.  The E-Side Objectors' complaints epitomize the adage that no good deed goes unpunished.  In agreeing to support the Plan and pursue the tax-free Spin-Off (as opposed to a taxable separation), the TCEH first lien creditors are facilitating the only viable restructuring transaction that will avoid EFH's incurrence of a multi-billion tax liability.  Notwithstanding the

---

[3] (*Decl. of Jane Sullivan on Behalf of Epiq Bankruptcy Solutions, LLC, Regarding Voting and Tabulation of Ballots Cast on the Second Amended Joint Plan of Reorganization of Energy Future Holdings Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the TCEH Debtors and EFH Shared Services Debtors* [D.I. 9296].)

[4] Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Reply and the *Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9199] (the "**Plan**"), as applicable.

[5] (*See EFH Indenture Trustee and Contrarian Capital Management, LLC's Objection to Confirmation of Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al*., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9244]; *Joinder of Certain Funds and Accounts Advised or Sub-Advised By Fidelity Management & Research Co. or its Affiliates to EFH Indenture Trustee and Contrarian Capital Management, LLC's Objection to Confirmation of Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al*., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9226]; *see also Obj. of Shirley Fenicle, William Fahy, and John H. Jones to Second Amended Joint Plan of Reorganization of Energy Future Holding Corp. et al, Pursuant to Chapter 11 of the Bankruptcy Code, Dated June 26, 2016* [D.I. 9209].)

E-Side Objectors' strident protestations to the contrary, after nearly three years in chapter 11, the record on this issue is abundantly clear: there is no feasible alternative. And yet, the E-Side Objectors unabashedly (and astonishingly) demand more.

        3.      As described in greater detail below and in the Reply, their arguments fall far short and should be rejected by the Court. As a preliminary matter, the three limited aspects of the Plan that the E-Side Objectors attack are each, standing on their own, reasonable and appropriate, in the best interests of all of the Debtors' estates, and should be approved. But more importantly, these provisions cannot be considered in isolation. The Plan, together with the various transaction agreements that must be executed in connection therewith, including the Tax Matters Agreement and Separation Agreement, reflect a comprehensive, integrated transaction that is the product of extensive, good faith and arms'-length negotiations across a myriad of interrelated issues and competing constituencies. Each provision of the Plan and the related transaction agreements was expressly relied upon by the Ad Hoc Committee of TCEH First Lien Creditors in agreeing to support the Plan. No creditor, and certainly not the E-Side Objectors, can unilaterally excise those elements of the Plan that they perceive as less advantageous to their estate, while retaining the significant benefits associated with the agreement of the T-Side Debtors and their creditors to pursue a tax-free spin. Modifying or amending any one of these terms or provisions at this juncture would destroy the delicate consensus reached among the parties and place the viability of the entire Plan in jeopardy, to the detriment of ***all*** of the Debtors, including, most notably, the E-Side.[6]

---

[6] (Hugh Sawyer Dep. Tr. 55:2-8, Aug. 4, 2016 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (emphasis added).)

4. Accordingly, and for the reasons discussed below, the Court should reject this piecemeal attack on a handful of the numerous integrated and interconnected compromises embedded in the Plan; the objections should be overruled and the Plan should be confirmed.

I. **EFH's Use Of The NOLs To Shelter Income Generated Under The Plan Is Proper In All Respects.**

5. The E-Side Objectors obfuscate the Debtors' tax structure and wrongly allege that EFH's NOLs are being transferred or used by Reorganized TCEH, without fair value, to effectuate the "busted 351" Basis Step-Up.[7] As an initial matter, the equities on this issue tilt strongly against the E-Side Objectors. As even the EFH Notes Trustee implicitly acknowledges, TCEH and its subsidiaries generated at least ▇▇▇▇ NOLs at issue.[8] Thus, even after approximately $5.5-6.0 billion[9] of the NOLs are used to effectuate the "busted 351" Basis Step-Up, EFH will receive an incredible windfall under the Plan by retaining approximately ▇▇▇ of NOLs following consummation of the Plan.[10] This is approximately ▇▇▇ *more* NOLs than were generated by the E-Side and approximately ▇▇▇ *more* NOLs than it would be left with following a taxable separation (▇▇▇▇▇).[11] Viewed in this light, the EFH Notes Trustee's complaints that

---

[7] (*See, e.g.*, EFH Notes Trustee Obj. ¶¶ 26-28.)

[8] (*See id.* ¶ 22 ("Here, only EFH Corp., for federal income tax purposes, possesses the legal interests in, and the right to control, the disposition and use of the EFH Group's tax attributes, including the NOLs, *regardless of how and when the NOLs were generated*.") (emphasis added); *see also* EFH Corp. & Subs., Cumulative Net Operating Loss, Emergence Date - December 31, 2016 (EFH06374960).)

[9] (*See* Third Amended Disclosure Statement for the Second Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al. Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the TCEH Debtors and EFH Shared Services Debtors [D.I. 8747] (the "**TCEH Disclosure Statement**") at 181-82.)

[10] (Carla A. Howard Dep. Tr. 88:2-10, July 7, 2016.)

[11] (*See id.* at 88:19-89:15.)

4

EFH's NOLs are being transferred or used by Reorganized TCEH without fair value ring especially hollow.

6. Further, as the E-Side Objectors acknowledge, TCEH and substantially all of its subsidiaries are "disregarded entities" and, therefore, do not exist for federal income tax purposes. As a result, any income or resulting tax liabilities incurred in connection with the "busted 351" (or any other transaction involving TCEH's assets) is, by definition, ***EFH's***—not TCEH's—legal obligation.[12] And thus, EFH is using EFH's NOLs to shield EFH's income. This is hardly controversial, does not represent a transfer without fair value and should end the Court's inquiry.[13]

7. The EFH Notes Trustee desperately attempts to escape this conclusion by postulating that TCEH could instead separate from EFH without implementing the Basis Step-Up, thereby reducing the amount of EFH income generated pursuant to the Plan.[14] While this is theoretically true, it is also irrelevant. The members of the Ad Hoc Committee of TCEH First

---

[12] (*See Omnibus Tax Memorandum* [D.I. 2296] at 6-7.)

[13] This argument applies with equal force with respect to the fairly *de minimis* amount of alternative minimum tax liabilities that are expected to arise upon consummation of the Plan. EFH, as the taxpayer for the consolidated group, is liable for these amounts, irrespective of the source of the related income generation. Reorganized TCEH is not liable for these amounts, but has agreed, as one of a number of integrated settlements and compromises embodied in the Tax Matters Agreement, to cover 50% of these costs. If anything, this is a windfall for EFH, which would otherwise be liable for the full amount.

[14] (EFH Notes Trustee Obj. ¶ 37.)

Lien Creditors would not have supported a tax-free spin without the Basis Step-Up.[15] Indeed, if the Debtors had pursued confirmation of a plan that contemplated a tax-free spin-off but did not contain the Basis Step-Up, the members of the Ad Hoc Committee of TCEH First Lien Creditors (whose vote is required to confirm any plan of reorganization for the TCEH Debtors) would have instead sought to effectuate a taxable separation, which also would have resulted in a basis step-up for Reorganized TCEH, but without the additional risks and complications for Reorganized TCEH associated with the Spin-Off transaction.[16] And, despite the EFH Notes Trustee hypothesizing that "the Plan Support Agreement and the Settlement Agreement left room for a wide range of restructuring options the Debtors have failed to consider,"[17] none of the E-Side Objectors have, after nearly three years in chapter 11, put forward a single viable alternative restructuring that has garnered the support of any of the Debtors' key stakeholders, including,

---

[15] (*See, e.g.*, *Response of the Ad Hoc Committee of TCEH First Lien Creditors to the Motion of Energy Future Holdings Corp., et al., for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereto Pursuant to Section 1121 of the Bankruptcy Code* [D.I. 1966] (stating, nearly two years ago, the that Ad Hoc Committee of TCEH First Lien Creditors' "continuing support of the Debtors' reorganization efforts is dependent, in significant part, on . . . the allocation for the benefit of TCEH first lien creditors of additional value likely to become available through the restructuring and recapitalization of EFH and EFIH in the form of a tax-free spin or other structure in respect of which the TCEH first lien creditors are called upon to make valuable concessions."); *see also Limited Objection of the Ad Hoc Committee of TCEH First Lien Creditors to the Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling and Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 2395]; *Response of the Ad Hoc Committee of TCEH First Lien Creditors to the Second Motion of Energy Future Holdings Corp., et al., for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereto Pursuant to Section 1121 of the Bankruptcy Code* [D.I. 3439]).

[16] Such risks and complications include, among other things, Reorganized TCEH potentially being exposed to joint and several liability for any tax resulting from the "busted 351" transaction and accepting certain restrictions on Reorganized TCEH's ability to operate the T-Side's business pursuant to certain covenants in the Tax Matters Agreement. (*See* Tax Matters Agreement § 6.01(b).)

[17] (EFH Notes Trustee Obj. ¶ 40.)

most significantly, the TCEH first lien creditors.[18]  This is because no such alternative exists. EFH's decision to use the NOLs to shield its taxable income and thereby facilitate the only actionable transaction that has both overwhelming creditor support and locks in the benefit of a TCEH tax-free spin is unquestionably appropriate and proper in all respects.

8.     Accordingly, EFH's use of NOLs, the vast majority of which were generated by TCEH, to shield EFH's *own* taxable income under the only value-maximizing restructuring and actionable restructuring alternative that ensures a tax-free spin of TCEH, is appropriate and should be approved.

## II.    The Transfer of EFH Corporate Services and EFH Properties Under the Plan Should Be Approved.

9.     As an initial matter, as described above, the transfers of EFH Corporate Services and EFH Properties are part of a comprehensive, integrated transaction and, therefore, justified on the basis of the numerous benefits the E-Side is receiving as a result of the first lien creditors' agreement to support the tax-free Spin-Off (instead of a taxable transaction). Notwithstanding the interrelatedness of the transactions contemplated under the Plan, even viewed in isolation, the E-Side Objectors' arguments regarding such transfers miss the mark by a wide margin.  For example, what is not evident from their objections, but is abundantly clear from the factual record, is that EFH has no interest in (and would not benefit by) retaining these two entities, which are pure pass-through cost centers closely associated with the TCEH Debtors' operations.  Without support from TCEH, these entities would generate substantial losses and

---

[18]   Indeed, as set forth in the TCEH Disclosure Statement, the TCEH first lien creditors are dramatically undersecured.  (*See* TCEH Disclosure Statement at 15.)  Accordingly, no plan could be confirmed without their support.  *See* H.R. Rep. No. 95–595, 95th Cong., 2d Sess. (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6475 ("[a]bandonment of the collateral to the creditor would clearly satisfy indubitable equivalence, as would a lien on similar collateral. . . . Unsecured notes as to the secured claim ***or equity securities of the debtor would not be the indubitable equivalent***.") (emphasis added); *see also In re TM Monroe Manor Assoc. Ltd.*, 140 B.R. 298, 301 (Bankr. N.D. Ga. 1991) (denying confirmation of a chapter 11 plan in which the debtor proposed to convert a substantial portion of a secured creditor's claim into limited partnership interests in the reorganized debtor).

their equity would be worthless.[19]  Likewise, each entity carries significant liabilities that EFH would never agree to retain.[20]  These facts lay bare the E-Side Objectors' true objective in pressing this objection:  a quest for hold-up value.

10. Specifically, with respect to EFH Corporate Services,[21] a review of the alternatives available to EFH—retaining the entity or selling it to a third party—plainly reveals that the transfer contemplated under the Plan is a reasonable exercise of EFH's business judgment, and the value-maximizing transaction for all of the Debtors (including EFH).  The first alternative—retaining EFH Corporate Services—is indisputably not in EFH's best interests.  Historically, the TCEH Debtors have funded a substantial majority of EFH Corporate Services' operations.[22]  In fact, the Debtors project that nearly ▆▆▆▆▆▆ percent of EFH Corporate Services' operations will be utilized, and paid for by, the TCEH Debtors.[23]  This is consistent with the conclusions of the EFH Notes Trustee's own expert, who acknowledged that ▆▆▆▆

---

[19] (*See* July 27, 2016 Board Presentation (EFH06365761 at EFH063655771-79 (discussing EFH Corporate Services) and EFH06365784-86 (discussing EFH Properties)).

[20] (*See* July 27, 2016 Board Presentation (EFH06365761 at EFH06365772-73 (discussing EFH Corporate Services)) and EFH06365784-86 (projecting ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆)).

[21] The Ad Hoc Committee of TCEH First Lien Creditors incorporates by reference the Debtors' arguments in the Reply as to the appropriateness of the transfer of EFH Properties.

[22] (*See generally* Paul Keglevic Dep. Tr. 39:4-21, June 27, 2016 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.)

[23] (*See* Rebuttal Report of John Stuart, dated July 25, 2016 at 16 (the "**Stuart Report**").)

███████████████████████████████████████████████.[24]  Retaining EFH Corporate Services would require EFH to fund substantial overhead costs, including the salaries and benefits of some ███ employees, which far exceeds EFH's legitimate needs.  In these circumstances, a liquidation of EFH Corporate Services would be inevitable, which would potentially prejudice the hundreds of employees and suppliers that rely on EFH Corporate Services, and would likely trigger significant wind-down costs ██████████████████ ████████████████████████████████████████.[25]  Moreover, not only would EFH's equity interest in EFH Corporate Services be rendered valueless in such a scenario, but there is a risk that certain of these wind-down liabilities could be asserted against EFH itself, further depleting EFH creditor recoveries.[26]

11.     The second alternative—selling to a third party—is similarly not viable, for the simple reason that EFH Corporate Services was built to service only the T-Side Debtors.[27]  There is no third-party market for an entity like EFH Corporate Services, which has no external customers, no third-party revenue and is not operated as a profit center.[28]

---

[24] (*See* Jack F. Williams Dep. Tr. 138:22-139:3, July 28, 2016 ██████████████████ █████████████████████████████████) ("**Williams Dep. Tr.**").)

[25] (*See* Stuart Report at 18.)

[26] (*See* Billie Williamson Dep. Tr. 148:16-149:25, Aug. 4, 2016 (██████████████ ████████████████; Paul Keglevic Dep. Tr. 247:7-249:7, Aug. 2, 2016 (same).

[27] (Expert Report of Professor Jack F. Williams at 29 ████████████████████████ ███████████████████████████████████████████████████████████████████); Williams Dep. Tr. 129:13-19 (████████████████████████████████████████████ ███████████████████████████████)

[28] (*See* Williams Dep. Tr. 154:19-22 ██████████████████████████████████████ █████████████████████████.)

12. The E-Side Objectors have failed to articulate a viable restructuring alternative in which EFH receives any value on account of its equity interest in these entities. Moreover, to the limited extent the E-Side intends to utilize EFH Corporate Services following consummation of the Plan, the TCEH Debtors have agreed to provide those services, *at cost*, to the E-Side for a reasonable transitional period under the Transition Services Agreement.[29] Because the E-Side is not prejudiced by the transfer of EFH Corporate Services and EFH Properties, and indeed will be relieved of significant potential liabilities associated with these entities, the transfers do not constitute fraudulent conveyances, are in the best interests of each of the Debtors' estates and should be approved.

## RESERVATION OF RIGHTS

13. The Ad Hoc Committee of TCEH First Lien Creditors reserves the right to (a) amend or supplement this Joinder and otherwise take any additional or further action with respect to the Plan or the matters addressed therein, and (b) be heard before this Court with respect to the Plan.

---

[29] (*See* Transition Services Agreement [D.I. 9100].)

WHEREFORE, the Ad Hoc Committee of TCEH First Lien Creditors respectfully requests that this Court overrule the objections to Confirmation of the Plan and grant such other relief as it deems just and proper.

Dated: August 15, 2016
    Wilmington, Delaware

/s/ Ryan M. Bartley
**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Pauline K. Morgan (Bar No. 3650)
Ryan M. Bartley (Bar No. 4985)
Andrew L. Magaziner (Bar No. 5426)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Alan W. Kornberg (admitted *pro hac vice*)
Moses Silverman (admitted *pro hac vice*)
Brian S. Hermann (admitted *pro hac vice*)
Jacob A. Adlerstein (admitted *pro hac vice*)
Adam Bernstein (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to the Ad Hoc Committee of TCEH First Lien Creditors*