# **EXHIBIT 1**

1

2         UNITED STATES BANKRUPTCY COURT

3          FOR THE DISTRICT OF DELAWARE

4   -------------------------------------x

5   In Re:

6   Energy Future Holdings Corporation,

7   et al.,

8                         Debtors.

9

10  Chapter 11

11  Case No. 14-10979

12  Jointly Administered

13  -------------------------------------x

14

15

16          DEPOSITION OF PAUL KEGLEVIC

17              New York, New York

18                August 2, 2016

19

20

21

22

23

24  Reported by: BONNIE PRUSZYNSKI, RMR,

25  Job No: 110917

```
 1                   P. Keglevic
 2    entire report, so, I was -- I am not aware
 3    what it -- I know it included some stuff on
 4    Corporate Services, but I wasn't sure what
 5    else it included.
 6        Q.    You don't have a memory of it
 7    including anything else, do you?
 8              MR. MCKANE:  Objection, form.
 9              Go ahead.
10        A.    Actually, I thought he covered
11    Properties in there, but maybe he didn't.
12    Like I said, I just flipped it very quickly.
13        Q.    The transfer of Corporate Services
14    is not related to whether or not the T-side
15    might toggle to a taxable transaction, is it?
16        A.    Well, I would say the transfer --
17    the separation agreement and the transfer of
18    Properties and Corporate Services was part
19    and parcel to the entire T-side deal.  You
20    know, that was the only deal we have reached
21    with the T-side and the only deal we have
22    filed with the court.
23              So, you know, starting to pick and
24    choose which pieces, you know, we could take
25    out and still get the same conclusion or not
```

1              P. Keglevic
2    would be something I wouldn't be prepared to
3    do, because we did not have that negotiation
4    with the T firsts, but we knew, you know,
5    actually, ironically, for the benefit of the
6    E-side, we had to get rid of those two
7    entities or we couldn't find a purchaser for
8    the E-side, because no buyer was interested
9    in taking on a corporate service department
10   or taking on the responsibilities of landlord
11   under the EFH lease.
12            So, we spent 18 months convincing
13   the T-side to take this as part and parcel of
14   the deal.
15       Q.    Are you aware of any obligations of
16   EFH Corporate Services that EFH Corp. is also
17   liable for?
18            MR. MCKANE:   Objection, form,
19       wildly overbroad.
20            MR. PEDONE:   If you could just
21       limit your objection to the word
22       "objection," as the rules call for, I
23       would appreciate it.  No commentary on
24       the wildness of any comment.  Just
25       "objection" is what you are entitled to

```
 1                    P. Keglevic
 2       A.    No.  I think they understood the
 3  rationale that was presented to them, and the
 4  history that -- much similar to what I went
 5  through with you on Corporate Services, and
 6  accepted that rationale as the support for
 7  the separation agreement, or that portion of
 8  the separation agreement, and did not direct
 9  any additional work to be done.
10       Q.    What was the rationale for not
11  seeking consideration beyond the cash for EFH
12  Properties first presented to the board of
13  EFH Corp.?
14       A.    Well, we went through the
15  background of EFH Properties probably before
16  we filed, in 2014, because we never filed EFH
17  Properties as a debtor, so the board -- going
18  through that rationale, and we explained the
19  operations, and we explained at that point
20  the likelihood that that entity would need to
21  be transferred.
22              Ultimately, that got facilitated
23  into the April 2015 plan and then updated for
24  the Hunt transaction in -- later in '15.
25       Q.    Do you know whether or not
```

1                  P. Keglevic
2   Proskauer or any other advisor for the
3   disinterested directors ever examined the
4   valuation of EFH Properties?
5       A.    Well, I indicated that I don't
6   think we did a, quote/unquote, valuation, but
7   they certainly saw the projections that we
8   did that supported the rationale for transfer
9   that were the cash flows, the balance sheet
10  items, what the cash flows would look like if
11  the deal wasn't done, et cetera.  All that
12  information was shared with all the
13  disinterested directors and was part of the
14  negotiation with the TCEH firsts before we
15  filed in May 2015 -- I'm sorry, I always get
16  that wrong.  April 2015.
17      Q.    Do you know for certain that
18  information concerning EFH Properties was
19  shared with Proskauer?
20      A.    Yes.
21      Q.    How do you know that?
22      A.    Just based on some discussion I had
23  with some of their team, that they were
24  familiar with it, and working with our team
25  to go through the information.

1                  P. Keglevic
2      Q.    Who did you have that discussion
3  with?
4      A.    I don't recall.  Well, who did I
5  specifically?  Probably with Mark Thomas.
6      Q.    Do you recall when that discussion
7  took place?
8      A.    Before May 2015.
9      Q.    Are you aware of any discussion by
10 the board of EFH Corp. after confirmation of
11 the prior plan on the topic of seeking to
12 obtain consideration in exchange for the
13 transfer of EFH Properties?
14     A.    Well, as I indicated, we are giving
15 consideration.  The net $14 million.
16     Q.    And I am wondering were there
17 discussions on that topic.  My question
18 relates to, are you aware of any discussions?
19     A.    Beyond that amount?
20     Q.    No.  I'm actually looking to learn
21 about the discussion, not the amount that is
22 in the documents.
23     A.    Well, we discussed at both of the
24 July meetings -- you know, we updated all the
25 prior discussions we had had earlier in '15

1                P. Keglevic
2    and reminded them all of the rationale in
3    '16, before we signed the latest round of
4    agreements and got their approval.
5         Q.   So, would it be fair to say that
6    the first time that you are aware of any
7    discussion with the disinterested directors
8    concerning the appropriate amount of value to
9    be obtained for EFH Corporate Services,
10   between the date of the last plan being
11   confirmed and today's date, occurred on
12   July 22nd?
13            MR. MCKANE:  Objection to form.
14        A.   Yes.  Until the Hunt plan blew up,
15   it didn't matter, because we were committed,
16   and they had agreed to the prior plan, and
17   until we were ready to file another plan,
18   there was no basis to have the discussion,
19   but we basically did update the discussion
20   that we had that led to the April 2015,
21   December 2015 agreements, and brought it down
22   through July, before the new round of
23   agreements was signed.
24        Q.   But the issue -- between the time
25   that the Hunt deal blew up and the filing of

1                    P. Keglevic
2    the current plan on file, the issue of the
3    amount of consideration that should be
4    obtained for Corporate Services was not
5    revisited, was it?
6         A.    No, because there were no change in
7    facts, or we would have brought something to
8    them.
9         Q.    And at either of the July 22nd or
10   the July 27th board meeting, did any of the
11   disinterested directors for EFH Corp. ask any
12   questions about the value of EFH Properties
13   or its assets?
14        A.    Yes.   There was some dialogue.   As
15   I remember, I jumped into the conversation.
16   I don't recall who started it, but people
17   were asking about the -- we have a real
18   estate expert on our board, and he was asking
19   about the -- if his understanding of the
20   rental community was correct, and I think
21   somebody also said -- you know, asked the
22   question of why is somebody questioning this
23   at this point.  So, we went through the
24   rationale for them.  I did.
25        Q.    Who is the real estate expert on

1                      P. Keglevic
2    the board?
3         A.    Tom Ferguson.
4         Q.    What did he say about his
5    understanding of the -- make sure I use your
6    term correctly -- his understanding of the
7    rental community?  And what did you mean by
8    "rental community"?
9         A.    Can I rephrase?
10        Q.    Yes.
11        A.    The rental market.  Tom is probably
12   part of the community.  That's where I got
13   confused.
14              But we indicated that it was a very
15   difficult rental environment.  We had looked
16   to move and what the opportunities were for
17   TCEH to move, because that's where all the
18   employees were other than Corporate Services,
19   and there are two buildings within three or
20   four blocks of our building that are both
21   50 percent unoccupied.  So in fact, those
22   were the two only candidates where we could
23   look to move.
24              If we did that, that would have
25   left our building 50 percent unoccupied, and

```
 1                    P. Keglevic
 2    it is just a very, very difficult market in
 3    downtown Dallas, and yet downtown Dallas,
 4    because of that, is the cheapest rent.  It is
 5    substantially higher outside of Dallas.
 6              So, we just kind of went through
 7    that, and I think the question might have
 8    come up about how many floors are currently
 9    unoccupied at Energy Plaza, which is about
10    four, and so we just had a little quick
11    discussion of that, and I think Tom indicated
12    that yep, it's a tough market, and I
13    wouldn't -- I'm not expecting it to change
14    quickly.
15         Q.   So, are all but four floors being
16    currently utilized at Energy Plaza?
17         A.   Yes.
18         Q.   And did -- it was Mr. Ferguson?  Is
19    that --
20         A.   Um-hum.  Yes.
21         Q.   What did Mr. Ferguson say about
22    the -- if anything, about the per-square-foot
23    value of space at Energy Plaza?
24         A.   We did not talk about the
25    per-square-foot value, but -- with
```

1                 P. Keglevic

2    credit and ultimately EFH reimbursing TCEH

3    and then setting up an intercompany

4    receivable payable from EFH Corp. and EFH

5    Properties.

6         Q.    And prior to July 22, 2016, was

7    there ever any discussion at the board of

8    directors of EFH Corp. with regard to whether

9    or not that amount would be collected?

10        A.    Yes.  It should be their assumption

11   that that amount will not be collected.

12        Q.    So my question is about the

13   discussions at the board.  Are you aware of

14   any discussions ever at the board of EFH

15   Corp. prior to July 22, 2016, concerning the

16   collection of that amount?

17        A.    Well, they know the agreement that

18   they signed in April 2015 provided for no

19   collection of that amount.  So we had

20   discussion prior to that.  We had a

21   discussion going back to 2009, when we had to

22   fund that amount, you know, and that it was a

23   $115 million transaction.

24              So, I think the board has heard

25   about this amount, and knows that the

1                    P. Keglevic

2    agreements, we explained the financial

3    circumstances surrounding EFH Properties and

4    EFH Corporate Services, the rationale for the

5    agreements that we asked them to sign.

6         Q.    Do you recall anyone raising any

7    questions or engaging in discussion -- strike

8    that.

9               Do you recall anyone raising any

10   questions regarding your presentation,

11   specifically about the $158 million amount,

12   which I assume may have been a slightly

13   different amount at that time?

14        A.    It was slightly different, because

15   interest accrues, but it was still a

16   substantial item, and I know I explained

17   what -- how it came to be, and why we chose

18   the rationale we did for not paying it, which

19   was primarily because that that amount, if

20   EFH Properties stays with EFH Corp., based on

21   the cash flows that Properties has, there is

22   no economic ability to repay that amount.

23              You know, so the assumption that

24   that was going to get paid in the alternative

25   construct is not a valid assumption, in my

Page 291

1                     P. Keglevic
2    opinion.
3        Q.    Did anyone raise any questions in
4    response to your presentation?
5        A.    None specifically on that item that
6    I can recall.
7        Q.    Okay.  After that presentation --
8    which would have been prior to April 2015;
9    correct?  Has there been any discussion prior
10   to June 22nd -- July 22nd, 2016, at the EFH
11   Corp. board level concerning the collection
12   of that amount?
13       A.    No, but to be fair, there is no
14   reason for a discussion, because we were
15   bound to that agreement through the Hunts
16   deal blowing up.  So really the only time
17   that it would have been relevant had the
18   facts changed would have been sometime in the
19   first quarter of 2016.
20             Fundamentally, the facts didn't
21   change, so we didn't bring it to the board,
22   and, you know, to answer your question
23   specifically, I'm not aware that the board
24   asked any questions about it from the time
25   the Hunt deal blew up until the July

```
 1                    P. Keglevic
 2    with T, that if they went taxably they would
 3    not get.
 4         Q.    Would it be fair to say you
 5    approached the analysis in connection with
 6    your advice to the board of the EFH Corp.
 7    from the perspective of EFH Corp. had a
 8    binary choice, go taxable or give the T-side
 9    what they were asking for; correct?
10                MR. MCKANE:   Objection to form.
11         A.    I think we and my tax advisors laid
12    out a lot of different interpretations, and
13    we have yet to see anybody put forth a plan
14    that would not result in the total
15    consummation of NOLs other than the deal we
16    are talking about.
17                So, I wouldn't say it's binary, but
18    we did look at a lot of different outcomes,
19    and a lot of different suggestions have been
20    made in this case, and none of them have
21    passed what we believe is a fair result for
22    both parties, other than the transaction we
23    put forth in our plan.
24         Q.    What's your understanding of what a
25    fair result is for reorganized TCEH in
```