# **EXHIBIT 2**

PUC DOCKET NO. 45188

| | | |
|---|---|---|
| **JOINT REPORT AND APPLICATION** | § | |
| **OF ONCOR ELECTRIC DELIVERY** | § | **PUBLIC UTILITY COMMISSION** |
| **COMPANY LLC, OVATION** | § | |
| **ACQUISITION I, LLC, OVATION** | § | **OF TEXAS** |
| **ACQUISITION II, LLC, AND SHARY** | § | |
| **HOLDINGS, LLC FOR REGULATORY** | § | |
| **APPROVALS PURSUANT TO PURA** | § | |
| **§§ 14.101, 37.154, 39.262(l)-(m), AND** | § | |
| **39.915** | § | |

## ORDER

This Order addresses the joint report and application filed by Oncor Electric Delivery Company, LLC, Ovation Acquisition I, LLC, Ovation Acquisition II, LLC, and Shary Holdings, LLC (collectively, applicants) for Commission approval of a transaction that would transfer control of Oncor Electric Delivery Company, LLC and would restructure Oncor under Public Utility Regulatory Act (PURA) §§ 14.101, 39.262(m), and 39.915(b).[1] Based on the evidence and testimony presented during hearing, the Commission finds that the transaction described in the application is in the public interest under PURA §§ 14.101, 39.262(l)-(m), and 39.915, but only if all the conditions described in this Order are met. Further, unless the proposed transaction has closed and the Commission has established initial rates and tariffs as provided in this Order, the authority granted by this Order to complete the proposed transaction expires on November 30, 2016.

It is appropriate to identify early in this Order how the restructured utility will be referenced in this Order. Oncor Electric Delivery Company, LLC, as it exists today and until the transaction closes and the contemplated restructuring occurs, will be referenced in this Order as Oncor Electric Delivery Company or Oncor. As a result of the proposed restructuring, Oncor will be split into two companies. Oncor AssetCo will own the transmission and distribution facilities and will be referenced as Oncor AssetCo. The restructured Oncor Electric Delivery Company will contain substantially all Oncor's management and employees and the remainder of Oncor's assets as

---

[1] Public Utility Regulatory Act, Tex. Util. Code Ann. §§ 14.101, 39.262(m), and 39.915(b) (West 2007 & Supp. 2014) (PURA).

**EXHIBIT**

**A**

00000001

described in the application, and will provide electric delivery services to customers. It will be referenced in this Order as the restructured Oncor Electric Delivery Company or OEDC.

In addition to the public interest finding, as further discussed below, the Commission will issue two new certificates of convenience and necessity through this Order. Oncor AssetCo's certificate will authorize it to own, construct, and lease distribution facilities in the area currently certificated to Oncor, to provide street lighting service within the area currently certificated to Oncor, and to own, construct, and lease the transmission facilities certificated to Oncor. OEDC's certificate will authorize it to operate and construct the leased distribution facilities and perform any other function that a distribution utility would perform within the area currently certificated to Oncor, except for providing street lighting or any functions Oncor AssetCo is authorized to perform. In addition, OEDC's certificate will authorize it to operate and construct the leased transmission facilities and perform any other function that a transmission utility would perform, except for any function Oncor AssetCo is authorized to perform. The authority granted in these two certificates encompasses all of the authority now found in the four certificates held by Oncor.

## I.   Discussion

On September 29, 2015, the applicants jointly filed an application for Commission approval of a transaction that would transfer control of Oncor and would restructure Oncor. The applicants requested that the Commission approve the transaction under PURA §§ 14.101, 39.262(m), and 39.915(b) and make four specific findings. The first requested finding is that the transaction is in the public interest. The second requested finding is that OEDC can provide adequate service and that the allocation of Oncor's certificates of convenience and necessity to OEDC is appropriate. The third finding is that the allocation of Oncor's tariffs to OEDC should be approved. And the fourth finding is that any commitments remaining from Docket No. 34077 are no longer in effect.[2] The application contained a number of proposed regulatory commitments, outlined in the direct testimony of Ralph Goodlet.[3]

After the initial application, Ovation Acquisition I, LLC, Ovation Acquisition II, LLC, and Shary Holdings, LLC (collectively, the purchasers) filed the supplemental direct testimony of D. Greg Wilks and Mary Korby on October 9, 2015, which addressed certain concerns raised by

---

[2] Application at 5 (Sep. 29, 2015).
[3] Direct Testimony of Ralph Goodlet, Purchasers Ex. 17 at Exhibit RGG-2.

Commissioner Anderson in a memorandum dated September 24, 2015.[4]  In addition, in response to the list of issues to be addressed set forth in the preliminary order, the purchasers filed the supplemental direct testimony of Ralph Goodlet on October 29, 2015.  This Order will refer to the application filed on September 29 and the supplemental direct testimony filed by the purchasers as the application.

Commission Staff, the Steering Committee of Cities Served by Oncor (Cities), the International Brotherhood of Electric Workers (IBEW) Local 69, the Office of Public Utility Counsel (OPUC), the Texas Industrial Energy Consumers (TIEC), the Texas Energy Association for Marketers (TEAM), the Alliance of Oncor Cities, Tex-La Electric Cooperative of Texas, the Alliance for Retail Markets, CMC Steel Texas, Gerdau Long Steel North America, Gexa Energy LP, Nucor Steel–Texas, the St. Lawrence Cotton Growers' Association, Rayburn Country Electric Cooperative, Inc., Farmers Electric Cooperative, Inc., and the NRG Companies (NRG Texas Power LLC, Reliant Energy Retail Services, LLC, and NRG Power Marketing LLC) were granted intervention in this docket.  The Commission held a hearing on the merits on January 11-14, 2016.  The Commission considered this docket at the open meetings on February 11, March 3, March 21, and March 24, 2016.

### A.    The Proposed Transaction

On August 9, 2015, Ovation Acquisition I, Ovation Acquisition II, Energy Future Holdings Corporation (EFH), and Energy Future Intermediate Holding Company, LLC (EFIH) entered into a merger agreement and plan of merger by which Ovation Acquisition I would acquire EFH's indirect, 80.03% ownership interest in Oncor.[5]  As proposed in the application, and described in the testimony of W. Kirk Baker, after the acquisition, Oncor would ultimately be separated into two companies. One company, Oncor AssetCo, a Delaware limited liability company, would hold legal title to substantially all of Oncor's current transmission and distribution assets, and the other company, OEDC, a Texas limited liability company, would operate the assets and hold Oncor's certificates of convenience and necessity and other personal property.[6]  Oncor Electric Transition Bond Company LLC, a subsidiary of Oncor, will continue to meet its obligations to bondholders

---

[4] *Matters Pertaining to or Arising Out of the Chapter 11 Bankruptcy of Energy Future Holdings,* Project No. 42750, Memorandum of Commissioner Kenneth W. Anderson, Jr. (Sept. 24, 2015).

[5] Application at 2.

[6] Application at 3.

and with respect to all applicable laws, rules, orders, and contracts.[7]   As proposed in the application, OEDC would have the responsibility to fulfill those obligations.[8]   OEDC will be wholly owned by the Hunt family.[9]   Specifically, Shary Holdings, as managing member, will control OEDC.  SU Investment Partners, L.P. will be the other member of OEDC.  Both Shary Holdings and SU Investment Partners are wholly owned by the Hunt family.  Organizational charts filed with the application are attached as Attachment A.

At the conclusion of these proposed transactions, Ovation Acquisition I would be an indirect owner of Oncor AssetCo, and would qualify to be taxed as a real-estate investment trust (REIT) under Internal Revenue Code §§ 856-860.[10]   According to the application, before the closing of the transactions, Ovation Acquisition I would be converted into a Delaware corporation, and would elect to be taxed as a REIT commencing with the taxable year ending December 31, 2016.[11]

These transactions are a portion of a greater plan for Oncor's current, indirect parent company, EFH, to emerge from chapter 11 bankruptcy.  The transactions at issue in this docket are a portion of the fifth amended joint plan to reorganize EFH and some of its affiliates that was filed in bankruptcy court on September 21, 2015.[12]   On December 7, 2015, the bankruptcy court for the district of Delaware issued an order confirming the sixth amended joint plan of reorganization filed by EFH.[13]   Commission approval of the proposed transaction at issue in this docket is a prerequisite to completion of this plan.[14]

## B.   Commitments and Conditions to the Transaction

Because the transaction subjects Oncor's ratepayers to significant risks, the Commission finds that conditions in addition to the purchasers' commitments must be imposed to find that the

---

[7] Direct Testimony of D. Greg Wilks, Purchasers Ex. 6 at 4, footnote 1.

[8] *Id.*

[9] There are some number of companies owned by, controlled by, or affiliated with the Hunt family that were not always clearly identified in the application.  In this Order, *Hunt* refers to any affiliate or controlling person of Hunt Consolidated Inc., or any of its affiliates.  *Id.* at 6:24-7:1.

[10] *Id.*; 26 U.S.C.A. §§ 856-860 (West 2011 and Supp. 2014).

[11] *Id.* at footnote 5; *see also*, Direct Testimony of W. Kirk Baker, Purchasers Ex. 1 at 20:1-3.

[12] Application at 4.

[13] Rebuttal Testimony of the Honorable Leif M. Clark, Purchasers Ex. 5 at 2:1-2, Rebuttal Ex. R-LMC-1., *In re Energy Future Holdings Corp., et al,* No 14-10979 (CSS), Order Confirming the Sixth Amended Joint Plan of Reorganization of Energy Future Holdings, Corp. *et al.,* Pursuant to Chapter 11 of the Bankruptcy Code (Bankr. D. Del.) (Dec. 7, 2015).

[14] Purchasers Ex. 1 at 18:5-6.

transaction, subject to the legal conclusions discussed below, is in the public interest under PURA §§ 14.101, 39.262(l)-(m), and 39.915. The purchasers made various commitments in their application and revised these commitments on several occasions. The final version of the purchasers' proposed regulatory commitments was filed on February 19, 2016 in the purchasers' response to commissioners' questions. The Commission finds that it may enforce the purchasers' commitments.[15]

In addition, after reviewing the record evidence and evaluating the terms of the transaction, Commissioner Anderson outlined conditions in his memorandum filed on March 1, 2016. Commissioner Anderson noted that the conditions would be in addition to the commitments proposed by purchasers, and that to the extent that any conditions in the memorandum differ or conflict with those advanced by purchasers, the conditions in the memorandum would control. The Commission at its March 3, 2016 open meeting made minor modifications to the language of the conditions in Commissioner Anderson's memorandum. The purchasers' commitments and the Commission's conditions are set forth in findings of fact 212 through 292.

### C. Transaction Financing and Legacy Buyout Debt

In the application, the purchasers estimated that, at the closing of the transaction, $4.8 to $5.5 billion of debt will remain with Ovation Acquisition I or its post-closing subsidiary, a reorganized EFIH.[16] While this debt is being raised as part of the capitalization of Ovation Acquisition I, as a practical matter, this debt constitutes a refinancing of the debt incurred by EFH and EFIH either to finance the original 2007 buyout of TXU Corporation or subsequently to restructure or refinance portions of the original acquisition debt. In this Order, any reference to *legacy buyout debt* means the existing EFH or EFIH debt obligations described in this paragraph and any debt or other financial obligation subsequently incurred by Ovation Acquisition I or a reorganized EFIH. Legacy buyout debt does not include debt obligations of Oncor that exist within the ring fence established in the final order in Docket No. 34077.[17]

The transaction is being financed by a consortium of investors, including Hunt, certain unsecured and other creditors of Texas Competitive Electric Holdings Company LLC (TCEH),

---

[15] PURA §§ 39.262(o), 39.915(d).

[16] Direct Testimony of W. Kirk Baker, Purchasers Ex. 1 at 7:2.

[17] *Joint Report and Application of Oncor Electric Delivery Company and Texas Energy Future Holdings Limited Partnership Pursuant to PURA § 14.101,* Order on Rehearing (Apr. 24, 2008).

and other investors, including various funds affiliated with Anchorage Capital Group, LLC, Arrowgrass Capital Partners (US), Avenue Capital Group, Balyasny Asset Management L.P., BHR Capital LLC, BlackRock Financial Management, Inc., Centerbridge Credit Advisors, L.L.C., Cyrus Capital Partners, Deutsche Bank Securities Inc., GSO Capital Partners LP, Taconic Capital Advisors L.P., Hunt Power Holdings, LLC, Pecos Partners, L.P., and Flourish Investment Corporation.[18] The investor consortium intends to raise or contribute approximately $12.6 billion of new debt and equity to fund the transaction.[19] The purchasers intend to reduce the amount of debt at the EFIH level to approximately $3.5 billion by closing or within 12 months after closing through additional equity funding,[20] although the purchasers have not proposed any binding commitments to do so.

On December 17, 2015, Fidelity Management and Research Company executed an equity commitment letter in which Fidelity committed an additional $500 million in equity to Ovation Acquisition I.[21] Based on this commitment, the purchasers estimate that the total debt at closing will be $4.3 to $5 billion, depending on the amount of equity subscribed for in a planned rights offering.[22]

In the application, the purchasers noted that Ovation Acquisition I was seeking to acquire the 19.75% interest in Oncor currently owned by Texas Transmission Investment, LLC.[23] Texas Transmission Investment, LLC is indirectly owned by OMERS Administration Corporation acting through its infrastructure investment entity, Borealis Infrastructure Management Inc. (49.5%), the Government of Singapore Investment Corporation, acting through GIC Special Investments Pte Ltd (49.5%), and Hunt Strategic Utility Investment, LLC (1%).[24] On September 4, 2015, EFH delivered notice to Texas Transmission advising it that EFH intended to exercise its drag-along rights.[25] On October 19, 2015, EFH filed an adversary complaint against Texas Transmission

---

[18] Purchasers Ex. 1 at 14:7-13, Exhibit WKB-2.
[19] *Id.* at 6:16-17.
[20] *Id.* at 7:2-3.
[21] Rebuttal Testimony of W. Kirk Baker, Purchasers Ex. 3 at 6:12-15.14-17.
[22] *Id.* at 6:18-23.
[23] Direct Testimony of W. Kirk Baker, Purchasers Ex. 1 at 23:1-2.
[24] *Id.* at 6, footnote 3.
[25] *Id.* at 23:6-8.

Investment in the Delaware Bankruptcy Court, and on December 4, 2015, Ovation Acquisition I was permitted to join the lawsuit as an intervenor.[26]

In the adversary proceeding, EFH seeks an order of specific performance directing Texas Transmission to sell its minority interest in Oncor to Ovation Acquisition I on the terms, conditions, and price set forth in the required sale notice delivered by EFH to Texas Transmission on September 4, 2015, and take all actions required of it to implement the initial public offering conversion plan, as described in the investor rights agreement.[27]  The bankruptcy court has set the matter for trial to begin on March 21, 2016.[28]

The merger agreement addresses the possibility that the drag-along litigation will not be completed by the time of closing.[29]  If the Texas Transmission Investment interest is not acquired by Ovation Acquisition I, the other transactions will proceed as planned but the size of the rights offering, the backstop investors' commitments, and commitments under the equity commitment letter will be reduced proportionately.

### D.  Federal Income-Tax Expense

As discussed in the application, the transaction at issue in this docket is intended to allow Ovation Acquisition I, the indirect owner of Oncor AssetCo, to qualify as a REIT under Internal Revenue Code §§ 856-860.[30]  In order to qualify for taxation as a REIT under the Internal Revenue Code, section 856(c)(2) provides that at least 75% of a REIT's gross income each year must be derived from certain real-estate investment activities, including rents from real property, and section 856(c)(3) provides that at least 95% of a REIT's gross income each year must be derived from certain real-estate investment activities, including rents from real property, and some other forms of passive income, such as interest and dividends.[31]  The transaction contemplates the creation of Oncor AssetCo to hold legal title to substantially all of Oncor's current transmission and distribution assets, so that payments received from OEDC, as the lessee and operator of the assets, will constitute rents from real property under the meaning of the Internal Revenue Code.

---

[26] Rebuttal Testimony of W. Kirk Baker, Purchasers Ex. 3 at 8:23-25.

[27] *Id.* at 9:3-8.  *See* Investor Rights Agreement, Commission Staff Ex. 4, Oncor Response to Staff RFI 1-2, Attachment 1 at 20.

[28] *Id.* at 9:14.

[29] Rebuttal Testimony of W. Kirk Baker, Purchasers Ex. 3 at 10:11-17.

[30] Application at 3, *citing* 26 U.S.C.A. §§ 856-860 (West 2011 and Supp. 2014).

[31] Purchasers Ex. 1 at 25:19-25; 26 U.S.C.A. § 856(c)(2)-(3).

A REIT is also required to distribute at least 90% of its taxable income to its stockholders on an annual basis.[32]  According to the purchasers, "federal income tax law provides that if the applicable rules are met, the distributions [Ovation Acquisition I] makes to its shareholders will qualify as deductions to reduce the amount of its taxable income."[33]  Ovation Acquisition I's general operating policy will be to distribute 100% of its taxable income to stockholders.[34]  A REIT must pay taxes at the rate applicable to the business entity on the amount of taxable income not distributed to shareholders.[35]  Oncor AssetCo will be either a partnership or a disregarded entity under federal tax law.[36]  All income recognized by Oncor AssetCo will be included in the income computation of its ultimate owners, Ovation Acquisition I and Ovation Acquisition II, or allocated between Ovation Acquisition I, Ovation Acquisition II, and Texas Transmission Investment, depending on the results of the drag-along litigation.  As proposed, Oncor AssetCo will not itself be liable for federal income tax.

While not addressed in the initial application, in the purchasers' rebuttal testimony, the purchasers requested that the Commission provide the purchasers with an additional finding.  The purchasers requested that the Commission rule that "Oncor AssetCo and OEDC will be entitled to an income tax allowance in setting their combined rates, based upon a standalone calculation of tax at the corporate tax rate."[37]  In the purchasers' initial post-hearing briefs, purchasers requested that the Commission make the following two findings:

1.  The Commission will treat utilities organized in a manner that permits or facilitates ownership of such entity by a REIT in the same manner as all other investor-owned utilities for purposes of the utility qualifying for the standard 35% income-tax allowance.

2.  The Commission has discretion to determine the methodology and amount of such income tax allowance, consistent with the Commission's policy as set forth in the Order on Rehearing in Docket No. 35717. [38]

In response to the commissioners' discussion at the February 11, 2016 open meeting, the purchasers stated in a filing that they could accept the following finding:

---

[32] Direct Testimony of Tony M. Edwards, Purchasers Ex. 11 at 3:4-6.
[33] Purchasers Ex. 3 at 29:18-20.
[34] OPUC Ex. 32, Purchasers Response to Staff RFI 10-3.
[35] Purchasers Ex. 11 at 7:20-21.
[36] Purchasers Ex. 3 at 30:14-16.
[37] Id. at 28:12-15.
[38] Purchasers' Brief at 38.

Following consummation of the [t]ransaction, the Commission will set rates for Oncor, based on the combined books and records of Oncor AssetCo and OEDC, in the same manner as it does for all other investor-owned utilities with regard to the standard federal income tax allowance included in a utility's cost of service, subject to the limitations set forth in PURA."[39]

The Commission declines to make the finding requested by the purchasers. Instead, the Commission notes that in setting rates, the Commission has considerable discretion to determine the appropriate method and amount of income-tax allowance.[40] The Commission will use its discretion under PURA to determine the appropriate income-tax allowance and ratemaking treatment of any tax benefits realized by a utility with a REIT in its ownership structure. The use of a REIT in the ownership structure of a utility, including the appropriate tax expense to be used in setting rates, is an issue of first impression for this Commission. The Commission intends to conduct a rulemaking to address the appropriate tax expense to use in setting rates for utilities under PURA.

Subject to the results of the rulemaking on federal income-tax expense, if Ovation Acquisition I elects to be taxed as a REIT and exposes ratepayers to the risks associated with this structure, any reduction in their federal income-tax expense resulting from the use of the REIT structure may be reflected in rates such that the savings are shared with ratepayers. The amount of tax savings shall be an issue to be addressed in the next rate proceeding of Oncor AssetCo and OEDC. The Commission's public interest determination on this transaction is based, in part, on this possible sharing of the tax savings with ratepayers.

### E.  Legal Issues

Prior to the hearing on the merits, at the January 7, 2016 open meeting, Commissioner Anderson requested that the parties address the following two legal issues in briefing:

1. Does PURA allow the Commission to treat two separate companies as one utility for ratemaking and regulatory purposes? Where in PURA is such authority?

2. Does the lease proposed by the applicants between the asset company and the operating company constitute a tariff that is subject to Commission approval in a subsequent proceeding? How could this Commission review be accomplished?

---

[39] Purchasers' Response to Commissioners' Questions at 2 (Feb. 19, 2016).
[40] *Pub. Util. Comm'n v. GTE Sw. Inc.*, 901 S.W.2d 401, 409-411 (Tex. 1995).

## 1. Consolidated Ratemaking

The purchasers have proposed in the application that Oncor AssetCo and OEDC be treated on a consolidated basis for ratemaking purposes, with the books and records of each company being combined to set rates for utility customers.[41]   Under the proposed structure, OEDC is to receive the Commission-authorized return from customers, while Oncor AssetCo will actually hold title to a majority of the invested capital giving rise to that return.

PURA, however, gives the Commission the authority to establish rates on an individual utility basis:

> In establishing *an electric utility's* rates, the regulatory authority shall establish *the utility's* overall revenues at an amount that will permit *the utility* a reasonable opportunity to earn a reasonable return on *the utility's* invested capital used and useful in providing service to the public in excess of *the utility's* reasonable and necessary operating expenses.[42]

Oncor AssetCo and OEDC will be separate electric utilities, and each will have its separate invested capital and will incur its separate expenses.  The amount of reasonable return for each company may also differ to reflect the differences between the two companies and their ownership. In order to satisfy the ratemaking requirements in PURA, the Commission must evaluate each utility on an individual basis to ensure that each utility has a sufficient revenue requirement that affords it an opportunity to earn a reasonable return on that utility's invested capital used and useful in providing service, over its reasonable and necessary operating expenses.[43]   The Commission cannot determine a rate for service based on a fictitious set of books and records that combines assets and expenses of two separate utilities.

In addition, under the circumstances presented in this case, treating OEDC and Oncor AssetCo as one utility for ratemaking purposes would violate the affiliate transaction requirements under PURA § 36.058.  Purchasers have accepted the condition that OEDC and Oncor AssetCo will be considered affiliates for purposes of PURA.[44]   Capital costs and expenses paid between affiliates are not allowed in rates unless the Commission finds that such payments are fair to the utility, are no more than would be charged to a non-affiliate, and are consistent with the market

---

[41] Supplemental Direct Testimony of Ralph Goodlet, Jr., Purchasers Ex. 16 at 6:7-24.
[42] PURA § 36.051 (emphasis added).
[43] PURA §§ 36.051 (revenue requirement), 36.052 (rate of return), 36.053 (invested capital), 36.054 (construction work in progress), 36.056 (depreciation), 36.057 (net income), 36.064 (self-insurance), and 36.065 (pensions).
[44] Purchasers' Response to Commissioners' Questions, Attachment A at 11 of 29 (Feb. 19, 2016).

value of the service.[45]  Accordingly, the consolidated rate-setting approach proposed by the purchasers would not allow the Commission to evaluate any inter-company transactions for compliance with the affiliate standards.  Holding one rate proceeding, but separately analyzing each utility's invested capital and rates will allow the Commission to ensure that the affiliate transaction requirements under PURA § 36.058 are met.

However, PURA does state that the Commission "shall ensure that each rate an electric utility or *two or more electric utilities jointly make* . . . is just and reasonable."[46]  The Commission need not determine the exact scope of this language; it is enough to say that this provision does not authorize the use of the combined assets of two utilities to set rates.  This language does, however, allow the Commission to conduct a single proceeding to evaluate the separate books and records of Oncor AssetCo and OEDC to compute separate rates: a rate for the customers of OEDC, a rate Oncor AssetCo will charge for street lighting service, and a rate that Oncor AssetCo will charge OEDC.  The Commission notes that Oncor AssetCo's rate, the lease payment, will be a significant expense item for OEDC and that if this rate were to change, then OEDC would need a concomitant rate change to match its revenue requirement with this expense.  Accordingly, the Commission will in this Order require that Oncor AssetCo notify OEDC of any potential rate filing with sufficient lead time and with sufficient detail to allow OEDC to prepare a rate-filing package that can be filed concurrently with Oncor AssetCo's filing.  Recognizing that OEDC may have increases in its non-lease expenses, OEDC may initiate a rate proceeding on its own, without participation by Oncor AssetCo, subject to any conditions on the recovery of expenses as set forth in this Order.

## 2. Oncor AssetCo and OEDC Lease

The second legal issue on which the Commission requested briefing concerned whether the lease between Oncor AssetCo and OEDC was a tariff subject to Commission approval.  All parties to this proceeding agree, including the applicants,[47] and the Commission concurs, that both Oncor AssetCo and OEDC will be electric utilities under PURA as Oncor AssetCo will own and OEDC will operate transmission and distribution facilities in Texas.[48]  A utility must file a tariff

---

[45] PURA § 36.058.
[46] PURA § 36.003(a) (emphasis added).
[47] Direct Testimony of Ralph Goodlet, Purchasers Ex. 16 at 4:8-13.
[48] *See* PURA § 31.002(6).

showing each rate that is in effect for a utility service offered by the utility.[49] *Service* is broadly defined as "any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties under this title to . . . other public utilities. . . ."[50] The Commission concludes that Oncor AssetCo will be providing a utility service by leasing its transmission and distribution facilities to OEDC for the provision of electric service. OEDC will be providing a utility service by delivering electricity to customers.

Rate is also broadly defined as charges by an electric utility for utility service and includes a rule, practice, or contract that affects such charge that must be approved by a regulatory authority.[51] The Commission concludes that leases for the transmission and distribution assets are rates. As a result, Oncor AssetCo must file a tariff with the Commission showing the charge (*i.e.*, lease payment) and any rule or practice that affects that charge, for the utility service it provides to OEDC.[52] The leases will be tariffs, and the Commission must approve the leases as a tariff and determine that the rates to be charged to OEDC under the lease are just and reasonable.

Before Oncor AssetCo can provide service to OEDC, it will need an approved tariff.[53] The initial lease will require a proceeding so that parties will have the opportunity to review the lease payment and the Commission will have the opportunity to approve the lease as a tariff. The initial rates and tariffs of Oncor AssetCo be must established in a separate proceeding before the closing of the transaction can occur.

### 3.  Oncor AssetCo and OEDC CCNs

The application proposed that the Commission approve the allocation of Oncor's certificates of convenience and necessity (CCNs) to OEDC under PURA § 37.154.[54] The application did not intend for Oncor AssetCo to have a CCN.[55] The Commission concludes, however, that both Oncor AssetCo and OEDC are required to have CCNs. An "electric utility or other person may not directly or indirectly provide service to the public under a franchise or permit unless the utility or other person first obtains from the Commission a certificate that states the

---

[49] PURA § 32.101.
[50] PURA § 11.003(19).
[51] PURA § 31.002(15).
[52] PURA § 32.101.
[53] PURA § 36.004
[54] Application at 3.
[55] Purchasers Ex. 16 at 18:10-15.

000000012

public convenience and necessity requires or will require the installation, operation, or extension of that service."[56]  As was previously stated, Oncor AssetCo will be indirectly providing service to the public via the lease of its transmission and distribution assets; therefore, Oncor AssetCo is required to have a CCN to lease its assets to OEDC for the provision of electric service.  In addition, Oncor AssetCo will also require a CCN because it is providing street lighting service.  OEDC will also need a CCN, as it will, in general, be providing transmission, distribution, and metering service to the public.

Oncor currently has four CCNs that were transferred to it from TXU Electric Company as part of the business separation and transition to customer choice in 2001.[57]  These four certificates were originally issued to Dallas Power and Light Company (CCN No. 30043), Southwestern Electric Service Company (CCN No. 30152), Texas Electric Service Company (CCN No. 30158), and Texas Power and Light Company (CCN No. 30160).  These four certificates, as amended from time to time, contain the total authority granted by the Commission to Oncor to provide distribution and transmission service.  To facilitate the granting of separate areas of authority to Oncor AssetCo and OEDC, the Commission concludes that after the restructuring of Oncor, this authority should reside in two certificates.  For administrative convenience, the certificates will be assigned new numbers.  In addition, Oncor's service area does not qualify for a multiple certification exception because it was not dually certified before February 1, 1999,[58] so only one utility may obtain a CCN for the provision of a particular type of service in the Oncor service area.  OEDC's CCN will exclude the street lighting service, to avoid any issues as to dual certification of Oncor's service area.

The Commission finds that the application and the proposed transaction support the cancellation of Oncor's four current CCNs, numbers 30158, 30160, 30043, and 30152, and the granting of two new CCNs to Oncor AssetCo and to OEDC, and are in the public interest, subject to the conditions and commitments set forth in this Order.

Oncor AssetCo's certificate will authorize it to own, construct, and lease to OEDC distribution facilities in the area currently certificated to Oncor, to provide street lighting service

---

[56] PURA § 37.051.

[57] *Application of TXU Electric Company for Approval of Amended Business Separation Plan*, Docket No. 24789, Order at 7, ordering paragraph 3 (Nov. 9, 2001).

[58] PURA § 37.060(h).

within the area currently certificated to Oncor, and to own, construct, and lease to OEDC the transmission facilities certificated to Oncor. OEDC's certificate will authorize it to operate the leased distribution facilities and perform any other function that a distribution utility would perform within the area currently certificated to Oncor, except for providing street lighting or any other distribution-related function Oncor AssetCo is authorized to perform. In addition, OEDC's certificate will authorize it to operate the leased transmission facilities and perform any other function that a transmission utility would perform, except for the transmission-related functions Oncor AssetCo is authorized to perform. OEDC is also authorized to construct new facilities or reconstruct existing facilities. The authority granted in these two certificates encompasses all of the authority now found in the four certificates held by Oncor.

### F.    Public Interest Determination

The Commission concludes that, if all the conditions specified in this Order are met, the proposed transaction offers benefits to ratepayers. First, the proposed transaction provides an opportunity to end the bankruptcy proceeding faced by Oncor's majority parent company, EFH, in a relatively expeditious manner.[59] Second, the transaction will allow a well-regarded Texas company to acquire operational control of Oncor and the future OEDC. Third, as set forth in the application, the transaction will reduce the amount of debt held above Oncor from the approximately $9.6 billion that exists today to between $4.3 billion to $5 billion at closing; and subsequent to the restructuring, the purchasers intend to reduce this debt above Oncor AssetCo to $3.5 billion in 12 months.[60] Fourth, based upon the record evidence and the commitments, the transaction will not adversely affect the health or safety of Oncor's customers or employees. Fifth, the transaction will not result in the transfer of jobs of citizens of this state to workers domiciled out of this state. Sixth, based upon the record evidence and the commitments made by the applicants, the transaction will not result in a decline in service. Seventh, the possible combination of Oncor AssetCo and OEDC with Sharyland Distribution & Transmission Services, LP, and Sharyland Utilities, LP is a benefit of this transaction. Finally, the transaction provides a benefit in that it would separate Oncor from its generation and retail electric provider affiliates for the first time since the vertically integrated utilities within the Electric Reliability Council of Texas (ERCOT) region were unbundled at the beginning of the last decade. As former Commission

---

[59] Purchasers Ex. 16 at 15:18-21.
[60] Purchasers Ex. 3 at 31:21-24.

Chairman Pat Wood pointed out, this was a goal long-sought by our Commission since restructuring the electric market.[61]

Intervenors throughout this proceeding have identified various risks of the transaction, including liquidity constraints for OEDC,[62] inadequate flexibility for OEDC under the terms of the lease,[63] the possibility of credit downgrades for Oncor AssetCo,[64] the possibility that the REIT's requirement to distribute at least 90% of its taxable income will leave little retained earnings for capital investment and will require Ovation Acquisition I to continuously access the capital markets,[65] and risks of improper transactions between Hunt controlled entities.[66]

While the legacy buyout debt and the REIT structure impose some unique risks, the conditions set forth in this Order provide a balanced approach to mitigate these and other risks and compensate ratepayers for the remaining risks. In addition, the possibility of tax savings resulting from the REIT structure to be shared with ratepayers is a potential benefit of the transaction, and the Commission's public interest determination is based, in part, on this possible sharing of the tax savings with ratepayers. Accordingly, when presented with benefits of the transaction, including the possible sharing of the tax savings resulting from the REIT structure with ratepayers, subject to all the conditions and commitments described in this Order, the Commission finds that the transaction is in the public interest. If the proposed transaction does not close before November 30, 2016, the authority granted in this Order to purchase and restructure Oncor expires and has no further effect. The Commission notes that the finding that the transaction is in the public interest, subject to the conditions and commitments, does not in any way waive or limit the Commission's right to make any rate-related determinations, including the appropriate amount of federal income-tax expense, if any, in subsequent rate cases.

### G.   Rate Proceeding

To change rates, a utility must file a notice of intent with each regulatory authority having original jurisdiction over those rates; no notice of intent was filed in this docket.[67] In addition,

---

[61] Tr. at 629: 23-630:8 (Wood) (Jan. 12, 2016).
[62] Direct Testimony of Robert S. Shapard, Oncor Ex. 1 at 17:16-25.
[63] Id. at 17:26-18:24.
[64] Id. at 18:24-23.
[65] Confidential Direct Testimony of Bruce H. Fairchild, Gexa Ex. 1a at 9:4-10 (HSPM).
[66] Direct Testimony of Craig R. Roach, Commission Staff Ex. 2A at 16:18-17:6.
[67] PURA § 36.102.

PURA, Commission rules, and the Commission's rate-filing packages require certain information and tariffs in specified forms.[68] These elements are missing in this docket; consequently, the Commission concludes that this docket is not a rate proceeding in which rates and tariffs may be approved. This conclusion comports with the Commission's decision on the tax sharing issue discussed above: that issue cannot be determined here but must be determined in a future rate case. In accordance with these conclusions, the applicants must make a filing to establish the initial rates of Oncor AssetCo in a time frame that will allow the Commission to approve the initial rates before the proposed restructuring occurs. The Commission concludes, however, that the initial rates and tariffs of Oncor AssetCo must be established before the restructuring of Oncor.

The Commission adopts the following findings of fact and conclusions of law:

## II.    Findings of Fact

### *Procedural History*

1.    On September 29, 2015 Oncor Electric Delivery Company LLC, Ovation Acquisition I, LLC, Ovation Acquisition II, LLC, and Shary Holdings, LLC (collectively, applicants) jointly filed an application for Commission approval of a transaction that would transfer control of Oncor and would restructure Oncor under PURA §§ 14.101, 39.262(m), and 39.915(b). The applicants also requested that the Commission approve the transfer of Oncor's certificates of convenience and necessity.

2.    On September 29, 2015, the Commission issued an order requesting each interested party to file a list of issues to be addressed by the Commission in this docket.

3.    On October 1, 2015, matters relating to the conduct of discovery in the docket were referred to the State Office of Administrative Hearings (SOAH) for handling.

4.    On October 5, 2015, Commission Staff filed a recommendation on notice.

5.    On October 6, 2015, the Commission issued Order No. 2, requiring the applicants to revise notice.

6.    On October 7, 2015, the Commission issued Order No. 3, approving the amended form of notice, and directing applicants to provide notice.

---

[68] *See generally*, PURA ch. 36, 16 Tex. Admin Code subchapter J of chapter 25.

7.  On October 8, 2015, a prehearing conference was held, in which the following parties entered an appearance: applicants, the Steering Committee of Cities Served by Oncor (Cities), the Office of Public Utility Counsel (OPUC), the Texas Industrial Energy Consumers (TIEC), the Alliance of Oncor Cities, the Texas Energy Association for Marketers (TEAM), State Agencies, and Commission Staff.  Also at the prehearing conference, the motions to intervene of Cities, OPUC, TIEC, and the Alliance of Oncor Cities were granted.

8.  On October 9, 2015, Ovation Acquisition I, Ovation Acquisition II, and Shary Holdings (collectively, the purchasers) filed the supplemental direct testimony of Mary R. Korby and D. Greg Wilks.

9.  On October 12, 2015, Commission Staff filed a recommendation on the sufficiency of the application.

10. On October 14, 2015, Chairman Nelson and Commissioner Anderson filed memorandums regarding the issues to be addressed in this docket.

11. On October 15, 2015, the Commission issued a preliminary order identifying issues to be addressed.

12. On October 15, 2015, the Commission ALJ issued Order No. 4, memorializing the prehearing conference and adopting a procedural schedule.

13. On October 19, 2015, the purchasers filed a narrative statement concerning the contingency plans related to the plan to acquire the minority interest in Oncor held by Texas Transmission Investment, LLC.  The purchasers also filed a narrative explanation and projections of the lease payments proposed to be charged to OEDC.

14. On October 23, 2015, the Commission issued Order No. 5, which granted the motions to intervene of Tex-La Electric Cooperatives of Texas, Inc., the Texas Association for Marketers, the Alliance for Retail Markets, and the International Brotherhood of Electric Workers (IBEW) Local 69.

15. On October 26, 2015, the purchasers filed the supplemental direct testimony of Ralph Goodlet, Jr.

16.    A technical conference on the proposed lease between Oncor AssetCo and OEDC was held on October 28, 2015.

17.    On November 9, 2015, SOAH issued Discovery Order No. 1, ruling on Oncor's objections to TIEC's first request for information, in which the SOAH ALJ found that Oncor's privilege log met the requirements of 16 Texas Administrative Code (TAC) § 22.144(d)(2). The ALJ also reviewed *in camera* 24 documents that Oncor claimed were protected by attorney-client privilege, the work-product privilege, or the allied litigant privilege. Based on the review, the ALJ found that the documents were privileged, and TIEC's motion to compel production was denied.

18.    On November 19, 2015, the Commission ALJ issued Order No. 6, granting the motions to intervene of CMC Steel Texas, Gexa Energy, LP, Gerdau Long Steel North America, Nucor Steel—Texas, the St. Lawrence Cotton Growers Association, Rayburn County Electric Cooperative, Inc., Farmers Electric Cooperative Inc., and the NRG Companies (NRG Texas Power, LLC, Reliant Energy Retail Services, LLC, and NRG Power Marketing, LLC).

19.    On November 10, 2015, TIEC filed a motion to compel production or an *in camera* inspection of documents claimed privileged in the purchasers' supplemental privilege log responsive to TIEC's first request for information.

20.    On November 10, 2015, Gexa Energy filed their fourth request for information and request for production to applicants.

21.    On November 18, 2015, the applicants, Commission Staff, the Alliance for Retail Markets, the Alliance of Oncor Cities, Farmers Electric Cooperative, Gexa Energy, the NRG Companies, OPUC, Rayburn County Electric Cooperative, the St. Lawrence Cotton Growers Association, TEAM, TIEC, CMC Steel, Gerdau Steel, IBEW Local 69, Nucor Steel, and the Tex-La Electric Cooperatives filed an agreed motion to modify the procedural schedule adopted in Order No. 4.

22.    On November 20, 2015, Oncor filed an affidavit attesting to the provision of notice.

23.    On November 20, 2015, the purchasers filed an emergency request for enforcement of the protective order against Gexa Energy.

24.    On November 20, 2015, the purchasers filed a request for non-disclosure of certain highly sensitive protected materials to Gexa Energy.

25.    On November 23, 2015, SOAH issued Discovery Order No. 2 granting in part TIEC's motions to compel production or *in camera* inspection of documents claimed privileged.

26.    On November 23, 2015, the SOAH ALJ responded to the purchasers' emergency request for enforcement of the protective order against Gexa Energy and the purchasers request for non-disclosure of certain highly sensitive protected materials to Gexa Energy. The SOAH ALJ determined these matters to be outside the jurisdiction of SOAH and transmitted the highly sensitive protected materials to the Commission ALJ.

27.    On November 23, 2015, the Commission ALJ issued Order No. 7 granting in part and denying in part the joint parties' proposed schedule and discovery deadlines.

28.    On November 23, 2015, Gexa Energy filed a motion to compel responses to its fourth set of requests for information and production to applicants and to compel disclosure of discovery.

29.    On November 23, 2015, TIEC filed a motion to compel responses to TIEC's third set of requests for information to the purchasers.

30.    On November 23, 2015, the Commission ALJ issued Order No. 8 enforcing the protective order and denying Joseph Balzano, Director of Finance for the Treasury Department with NextEra Energy, the parent company of Gexa Energy, access to highly sensitive protected material.

31.    On November 24, 2015, the applicants filed a motion for reconsideration of Order No. 7.

32.    On November 24, 2015, the purchasers filed a revised *in camera* review submission regarding the purchasers' supplement to its request for non-disclosure of certain highly sensitive protective materials to Gexa Energy.

33.    On November 25, 2015, the Commission ALJ issued Order No. 9 addressing the applicants' motion for reconsideration of Order No. 7 by extending the deadline for purchasers' rebuttal testimony.

34.    On November 25, 2015, TIEC filed a motion to compel production or an *in camera* inspection of documents claimed privileged in the purchasers' second supplemental privilege log responsive to TIEC's first request for information.

35.    On November 25, Gexa Energy filed a response to the purchasers' emergency request for enforcement of the protective order and request for non-disclosure of certain highly sensitive protective materials to Gexa Energy.  Gexa Energy asked the Commission to reject all relief sought by the purchasers in its emergency request for enforcement and request for non-disclosure as being unnecessary and frustrating to Gexa Energy's right to participate in this proceeding and prepare its case, compel disclosure of all highly sensitive protective materials documents produced to other certifying parties in this docket, extend the discovery deadline to allow Gexa Energy three working days to review previously undisclosed highly sensitive protective materials and conduct additional discovery, if necessary, and issue an expedited decision on this matter.

36.    On December 2, 2015, SOAH issued Discovery Order No. 3 denying Gexa Energy's request for production and sustaining applicants' objections to the request for production.

37.    On December 2, 2015, the Commission ALJ issued Order No. 10, affirming the decision to enforce of the protective order, denying the purchasers' motion for non-disclosure of highly sensitive protective material, and denying Gexa Energy's request for additional time to conduct discovery.

38.    On December 2, 2015, Cities Served by Oncor filed a motion to compel responses to Cities' eighth request for information to Oncor.

39.    On December 3, 2015, the purchasers filed a letter describing the resolution of TIEC's November 25, 2015 motion to compel.

40.    On December 7, 2015, Cities Served by Oncor filed the direct testimonies of Lane Kollen, Richard A. Baudino, and Scott Norwood.

41.    On December 7, 2015, the Office of Public Utility Counsel filed the direct testimonies of Carol Szerszen and June M. Dively.

42.    On December 7, 2015, TIEC filed the direct testimonies of Douglas W. Sesler,[69] Michael P. Gorman, and Charles S. Griffey.

43.    On December 7, 2015, Tex-La Electric Cooperative of Texas and St. Lawrence Cotton Growers' Association filed statements of position.

44.    On December 7, 2015, Gexa Energy filed the direct testimonies of Bruce H. Fairchild and Steven M. Fetter.

45.    On December 8, 2015, Rayburn Country Electric Cooperative and Farmers Electric Cooperative filed their joint statement of position.

46.    On December 9, 2015, Commission Staff filed the direct testimonies of Craig R. Roach, Darryl Tietjen, and Constance McDaniel Wyman.

47.    On December 9, 2015, SOAH issued Discovery Order No. 4 denying Cities' motion to compel responses to Cities' eighth request for information to Oncor.

48.    On December 10, 2015, Commission Staff filed an errata to the direct testimony of Constance McDaniel Wyman.

49.    On December 11, 2015, the purchasers objected to and moved to strike portions of the direct testimony and work papers of June M. Dively, filed on behalf of OPUC and portions of the direct testimony of Charles S. Griffey, filed on behalf of TIEC.

50.    On December 17, 2015, the purchasers filed a motion to compel and reply to Gexa Energy's objections regarding the purchasers' first set of requests for information.

51.    On December 17, 2015, the Commission ALJ issued Order No. 11 granting in part and denying in part the purchasers' motion to strike portions of the direct testimony and work papers of June M. Dively, filed on behalf of OPUC and portions of the direct testimony of Charles S. Griffey, filed on behalf of TIEC.

52.    On December 18, 2015, the Official Committee of TCEH Unsecured Creditors filed a motion to intervene.

---

[69] Mr. Sesler's direct testimony was presented on behalf of TIEC and Cities.

53.   On December 21, 2015, the applicants filed the rebuttal testimonies of Leif M. Clark, Greg Wilks, James A. Greer, Michael J. Vilbert, W. Kirk Baker, Ellen Blumenthal, Steven L. Schwarz, Ralph G. Goodlet, and Robert S. Shapard.

54.   On December 21, 2015, the Commission ALJ issued Order No. 12 establishing procedures, guidelines, and deadlines for the prehearing conference and hearing on the merits.

55.   On December 22, 2015, the purchasers withdrew their December 17 motion to compel after resolving all disputes with Gexa Energy regarding the purchasers' first set of requests for information.

56.   On December 23, 2015, Commission Staff, OPUC, Cities, the Alliance of Oncor Cities, TIEC, and Gexa Energy filed a joint objection and motion to strike portions of the rebuttal testimonies of Greg Wilks, Michael Vilbert, W. Kirk Baker, and Ralph G. Goodlet.

57.   On December 23, 2015, the purchasers filed the Honorable Leif M. Clark's executed affidavit to his rebuttal testimony and exhibits.

58.   On December 30, 2015, OPUC filed revised direct testimony and working papers of June M. Dively.

59.   On December 30, 2015, TIEC filed a motion for issuance of commissions and subpoenas for oral depositions.

60.   On December 30, 2015, the Commission ALJ issued Order No. 13 denying the Official Committee of TCEH Unsecured Creditors' motion to intervene because the Committee failed to adequately demonstrate that it had good cause for not seeking intervention by the October 31, 2015 deadline.

61.   On December 31, 2015, the Commission ALJ issued Order No. 14 granting in part and denying in part Commission Staff, OPUC, Cities, the Alliance of Oncor Cities, TIEC, and Gexa Energy joint motion to strike portions of the purchasers' rebuttal testimony.

62.   On January 4, 2016, statements of position were filed by Gerdau Long Steel North America, CMC Steel, and Nucor Steel–Texas, Commission Staff, TEAM, Alliance of Oncor Cities, and IBEW Local 69.

63.    On January 4, 2016, the purchasers appealed Order No. 14 for striking portions of the purchasers' rebuttal testimony and requested expedited consideration of the appeal.

64.    On January 5, 2016, OPUC filed its statement of position.

65.    On January 5, 2016, the Commission issued commissions requiring the depositions of Ellen Blumenthal, Greg Wilks, Kirk Baker, and Ralph Goodlet.

66.    On January 6, 2016, OPUC filed an errata to the revised direct testimony and work papers of June M. Dively.

67.    On January 6, 2016, the purchasers filed a motion to quash and motion for protective order seeking protection from the January 5, 2016 commissions requiring depositions of the purchasers' witnesses.

68.    On January 6, 2016, the purchasers filed an errata to rebuttal exhibit R-RGG-1 to the rebuttal testimony of Ralph Goodlet filed on December 21, 2015.

69.    On January 7, 2016, the purchasers filed the conformed rebuttal testimony and exhibits of Michael Vilbert and Greg Wilks.

70.    On January 7, 2016, the purchasers filed an errata to rebuttal exhibit R-DGW-3 to the rebuttal testimony of Greg Wilks filed on December 21, 2015.

71.    At its January 7, 2016 open meeting, the Commission granted the purchasers' appeal of Order No. 14 and overturned the ALJ's ruling striking portions of the rebuttal testimony of Greg Wilks and Michael Vilbert, as their testimony regarding the liquidity analysis was adequately addressed in their direct testimony.

72.    On January 11, 2016, the Cities filed an errata to the direct testimony of Scott Norwood.

73.    On January 12, 2016, Commission Staff filed an errata to the direct testimony of Craig R. Roach.

74.    The hearing on the merits convened before the Commission on January 11, 2016 and concluded on January 14, 2016.

75.    On January 21, 2016, the purchasers filed their revised proposed regulatory commitments addressing several issues raised during the hearing on the merits and clarifying the intent of certain regulatory commitments.

76.     On January 28, 2016, initial post-hearing briefs were filed by the St. Lawrence Cotton
        Growers Association, Nucor Steel–Texas, TEAM, OPUC, the Alliance of Oncor Cities,
        Gexa Energy, purchasers, Cities, Oncor, TIEC, and Commission Staff.

77.     On February 3, 2016, reply briefs were filed by the St. Lawrence Cotton Growers
        Association, OPUC, Oncor, Cities, the purchasers, Gexa Energy, TIEC, and Commission
        Staff.

78.     On February 19, 2016, the purchasers filed responses to questions raised by the
        Commissioners at the February 11, 2016 open meeting.

79.     On February 24, 2016, Cities, TIEC, OPUC, and the Alliance of Oncor Cities filed a
        response to the purchasers' response to Commissioners' questions.

80.     On February 25, 2016, Commission Staff filed a response to the purchasers' proposals.

81.     On February 29, 2016, the purchasers filed a reply to the filings by the joint parties and
        Commission Staff.

82.     On March 1, 2016, Commission Staff filed a response to the purchasers' February 29, 2016
        filing.

83.     On March 1, 2016, Commissioner Anderson filed a memo addressing the costs and risks
        of the transaction and describing additional conditions the applicants must accept in order
        for him to find that the transaction meets PURA's public interest standard.

*Notice*

84.     Notice of the transaction at issue in this docket was provided by first class mail to the
        following: (a) all municipalities in Oncor's service area; (b) all entities listed in the
        Commission's transmission matrix in Docket No. 43881, *Commission Staff's Application
        to Set 2015 Wholesale Transmission Service Charges for the Electric Reliability Council
        of Texas*; (c) all electric cooperatives and municipally-owned utilities with dually certified
        areas with Oncor; (d) all retail electric providers currently certificated by the Commission;
        and (e) all authorized representatives for parties in Docket No. 38929, *Application of Oncor
        Electric Delivery Company for Authority to Change Rates*. Further notice of this docket
        was provided by publication of an approved notice in local newspapers of general

circulation in Oncor's service territory once a week for two consecutive weeks in accordance with 16 TAC § 22.55.

### *Description of the Transaction in the Application*

85.    As detailed in findings of fact 86 through 144, the purchasers' witness W. Kirk Baker described the proposed transaction.

86.    Under the merger agreement between Ovation Acquisition I, Ovation Acquisition II, EFH and EFIH, Ovation Acquisition I will acquire EFH and its 80.03 percent indirect ownership interest in Oncor and plans to acquire the minority interest in Oncor.

87.    Ovation Acquisition I expects to purchase the 19.97 percent portion of the minority interest in Oncor held by Texas Transmission Investment (19.75 percent) and Oncor Management Investment LLC (0.22 percent) either through private negotiations or, with respect to Texas Transmission Investment's interest, pursuant to drag-along provisions contained in the investor rights agreement, dated as of November 5, 2008, among Oncor and certain of its direct and indirect equity holders, including EFH and Texas Transmission Investment.

88.    If the minority interest has been acquired at the first closing (discussed below), Ovation Acquisition I will contribute the minority interest to reorganized EFIH in exchange for reorganized EFIH interests. Reorganized EFIH will, in turn, contribute the minority interest to Oncor Electric Delivery Holdings Company LLC, a wholly owned subsidiary of EFIH and the direct holder of the 80.03 percent interest in Oncor.

89.    Oncor will be reorganized in accordance with a joint-survivor merger under chapter 10 of the Texas Business Organization Code and certain related transactions.

90.    This reorganization will allow Ovation Acquisition I to qualify as a REIT under the Internal Revenue Code as a means of accessing capital markets for purposes of financing capital investment in transmission and distribution assets.

91.    Ovation Acquisition I will be organized as a Delaware corporation, which will be a REIT-eligible structure upon consummation of the transaction and will elect to be taxed as a REIT commencing with the taxable year ending December 31, 2016.

92.    Oncor currently operates within a family of EFH-owned companies encumbered with approximately $42.3 billion in debt.

93.    In April 2014, the debt forced EFH, EFIH, and other subsidiaries of EFH (collectively, the debtors) to file voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code[70] in the United States Bankruptcy Court for the District of Delaware.

94.    On August 10, 2015, the debtors filed the third amended joint plan of reorganization of Energy Future Holdings Corp., et al., under chapter 11 of the Bankruptcy Code. This plan was superseded on September 21, 2015 by the fifth amended joint plan of reorganization of Energy Future Holdings Corp., *et al.*

95.    The fifth amended plan provides for certain restructuring transactions, including (a) the spin-off of TCEH to its first lien creditors, which will result in the separation of the competitive generation company and retail electric operations from the regulated transmission and distribution business of EFH and (b) the transactions contemplated by the merger agreement, including the Oncor acquisition and Oncor restructuring.

96.    The transaction will separate Oncor from its bankrupt competitive affiliates and restructure it into two companies: Oncor AssetCo, which will own substantially all of the transmission and distribution assets and OEDC, which will operate those assets to provide transmission and distribution service to customers.

97.    OEDC will be wholly owned by Hunt family members and controlled and directed by Hunter L. Hunt.

98.    Oncor Electric Transition Bond Company LLC, a subsidiary of Oncor, will continue to exist as a subsidiary of OEDC and will meet its obligations to bondholders and with respect to all applicable laws, rules, orders, and contracts. As proposed in the application, OEDC would have the responsibility to fulfill those obligations.

99.    Certain personal property of Oncor, including its CCNs and franchises, and certain other assets and liabilities will be allocated by operation of law to and become property of OEDC, and related employees will be transferred to OEDC, in consideration of an initial cash payment and certain deferred payments from OEDC to Oncor in an aggregate amount equal to the fair market value of such personal property (net of any liabilities assumed).

---

[70] 11 U.S.C.A. § 102 (West 2004 and Supp. 2014).

100.  The real property and remaining personal property (and related liabilities) of Oncor will be held by Oncor AssetCo, and such property will be leased to OEDC.

101.  Oncor AssetCo and OEDC will enter into leases that will vest full operational authority of the transmission and distribution system with OEDC.

102.  Pursuant to the lease agreements, OEDC will have sole responsibility and authority to operate and maintain the Oncor AssetCo transmission and distribution system.

103.  An independent appraiser will establish a valuation for the CCNs and other related assets allocated to OEDC using customary valuation metrics on a going-concern basis.  The consideration will consist of a cash payment of up to $150 million and if the appraised value exceeds $150 million, deferred payments over a period of up to 10 years reflecting the balance of the fair market value established by the independent appraisal.

104.  The current Oncor management and current employees will continue to operate and maintain the Oncor transmission and distribution system.  They will become employees of OEDC.

105.  OEDC will be responsible for regulatory compliance, managing quality of service, handling customer and community relations matters, accounting for operations and maintenance costs, planning capital expenditures, and complying with all environmental, safety, and other laws applicable to operating the transmission and distribution assets.

106.  Neither Oncor AssetCo nor its parent companies will have any employees, with limited exceptions.

107.  Hunt Utility Services, LLC will enter into a management agreement with Ovation Acquisition I, reorganized EFIH, and Oncor AssetCo to provide certain services required in order for such entities to operate within a REIT Structure.

108.  Hunt Utility Services will provide these companies with a management team, including a chief executive officer and chief financial officer, along with appropriate support personnel, to provide management services.

109. Subject to the oversight and control of the Ovation Acquisition I and Oncor AssetCo boards of directors, Hunt Utility Services will be responsible for the companies' day-to-day business activities.

110. The transaction is primarily being financed through a combination of debt and equity. Debt financing will consist of a $4.8 billion to $5.5 billion permanent debt financing facility as well as a $250 million interim facility.

111. The $250 million interim facility will be retired one day after closing, and the $5.5 billion term loan will include an express recognition that Oncor will not be liable for the debt, nor will Oncor be restricted in its conduct by the loan. Exhibit B to the $5,500 million Debt Commitment Letter titled "Summary of Principal Terms" provides: "For the avoidance of doubt, Oncor Electric Delivery Holdings Company LLC and its subsidiaries (the "Oncor Entities") (a) will not be Guarantors under the Term Loan Facility and (b) will not be directly or indirectly restricted (or be "restricted subsidiaries") in the conduct of their respective businesses by the Term Loan Facility Documentation (whether by application of mandatory repayments, representations and warranties, affirmative covenants, events of default or otherwise) (other than through customary covenants restricting transaction with affiliates, intercompany investments and intercompany loans)."

112. The debt commitment lenders have agreed to provide up to $5.5 billion of senior secured term loans and $250 million of senior secured bridge loans in connection with the consummation of the transaction.

113. Participants in the rights offering and the members of the investor group will purchase shares in Ovation Acquisition I and Ovation Acquisition II for an aggregate consideration of $7.1 billion.

114. The investor group consists of funds affiliated with Anchorage Capital Group, L.L.C.; Arrowgrass Capital Partners (US), LP; Avenue Capital Group; Balyasny Asset Management L.P.; BHR Capital LLC; BlackRock Financial Management, Inc.; Centerbridge Credit Advisors, L.L.C.; Cyrus Capital Partners; Deutsche Bank; Flourish Investment Corporation; GSO Capital Partners LP; Hunt Power Holdings, L.L.C.; Pecos Partners, L.P.; and Taconic Capital Advisors L.P. Pecos Partners, L.P. is an investment

vehicle that is being used by the Teacher Retirement System of Texas for its investment in Ovation Acquisition I.

115.   In addition, up to an additional $700 million in equity may be provided by TCEH's first lien creditors in accordance with a portion of the rights offering.

116.   Ovation Acquisition I is currently a Delaware limited liability company whose sole member is Hunt Transmission Services L.L.C., a Hunt affiliate.

117.   At closing, Ovation Acquisition I will be converted into a Delaware corporation and will offer holders of certain secured and unsecured claims against TCEH the opportunity to purchase shares in Ovation Acquisition I with an aggregate worth of approximately $5.8 billion in a rights offering.

118.   EFIH will be converted from a Delaware limited liability company into a Delaware limited partnership. Following the merger, Ovation Acquisition I will be the general partner of reorganized EFIH.

119.   Ovation Acquisition II, a wholly-owned Hunt subsidiary, will make a $250 million investment in exchange for an approximately 3.3% ownership interest in reorganized EFIH.

120.   Reorganized EFIH will use the $250 million received from Ovation Acquisition II to repay the interim financing facility in full.

121.   Ovation Acquisition I will conduct the rights offering described in finding of fact 117. Participants will receive rights to purchase shares of Ovation Acquisition I for consideration totaling up to $5.8 billion and will elect whether or not to exercise such rights.

122.   A total of $5.1 billion of the rights offering will be backstopped by the backstop investors, meaning certain members of the investor group, as set forth in exhibit WKB-2 to the direct testimony of W. Kirk Baker, guarantees it will purchase any unsold rights, up to $5.1 billion.

123.   All amounts paid by rights holders in connection with the rights offering will be held in escrow until the first closing.

124.  In addition, the investor group has agreed, pursuant to a commitment letter, to purchase approximately $1.75 billion worth of additional shares in Ovation Acquisition I and $250 million of equity in Ovation Acquisition II.

125.  Ovation has entered into a debt financing commitment letter with a group of arrangers and lenders led by Morgan Stanley Senior Funding, Inc., and including JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Inc., MUFG Union Bank, N.A., Wells Fargo Bank, National Association and Wells Fargo Securities, LLC.

126.  Oncor's competitive generation and electric retail affiliates, consisting of TCEH and its subsidiaries, will be separated from EFH in a tax-free spin-off transaction.

127.  TCEH will form a new subsidiary to effect a tax-free spin-off of the subsidiaries of TCEH from EFH.

128.  On the closing date, pursuant to a separation agreement to be entered into between TCEH, reorganized TCEH, and EFH and certain of its subsidiaries, TCEH will transfer the TCEH assets to reorganized TCEH in exchange for 100 percent of the newly-issued equity interests of reorganized TCEH and the cash proceeds from the issuance of new reorganized TCEH debt, as well as the assumption by reorganized TCEH of the TCEH liabilities.

129.  Reorganized EFH will issue 100 percent of its shares of common stock (after giving effect to the cancellation of its previously outstanding shares as provided by the fifth amended plan), having a value of approximately $151.1 million, to TCEH's unsecured creditors.

130.  Reorganized TCEH will then transfer certain of its assets to a newly formed Delaware entity, New Holdco, in exchange for 100 percent of New Holdco's equity.

131.  Reorganized TCEH will sell preferred stock of New Holdco to third parties in exchange for cash consideration and distribute the cash consideration to TCEH.

132.  Reorganized TCEH will then convert into a Delaware corporation.

133.  Reorganized EFH will merge with and into Ovation Acquisition I, with Ovation Acquisition I being the surviving company.

134. Before the conversion of reorganized TCEH to a Delaware corporation, EFH will contribute certain other assets, liabilities, and equity interests related to the TCEH debtors' operations to reorganized TCEH. As a result, most of the employees of EFH Corporate Services and its subsidiaries will become the employees of reorganized TCEH or one or more of its subsidiaries.

135. On June 10, 2014, EFH filed a request for a private letter ruling with the Internal Revenue Service that asks the Internal Revenue Service to address several issues relating to the qualification of the proposed spin-off as a *reorganization* within the meaning of Sections 368(a)(1)(G), 355, and 356 of the Internal Revenue Code and certain other matters.

136. This request for a private letter ruling was updated on September 3, 2015 to reflect certain changes contemplated by the merger agreement and the fifth amended plan. The issuance of a satisfactory private letter ruling is a condition to closing under the merger agreement.

137. Ovation entered into a letter agreement with Oncor and Oncor Holdings, in which Oncor and Oncor Holdings have agreed to cooperate with Ovation Acquisition I in connection with regulatory filings required to consummate the transaction, the rights offering, and the debt financing.

138. Oncor and Oncor Holdings have also agreed to operate their respective businesses in the ordinary course before closing and in accordance with Oncor's long range business plan.

139. The closing under the merger agreement is subject to a number of conditions, including approval of the application by the Commission.

140. If approval is obtained (and the other closing conditions have been satisfied or waived), the merger agreement contemplates the consummation of a series of transactions at two closings.

141. Almost all of the major steps in the transaction will occur before or on the date of the first closing under the merger agreement, with a few steps scheduled to occur at a second closing to be held one business day after the first closing.

142. The second closing will consist of a $250 million investment of Ovation Acquisition II, a wholly-owned Hunt subsidiary, in exchange for an approximately 3.3% ownership interest

in reorganized EFIH. Reorganized EFIH will use the $250 million received from Ovation Acquisition II to repay the interim financing facility in full.

143. In addition to the Commission's approval, the applicants must also obtain approval from the Federal Energy Regulatory Commission pursuant to Section 203 of the Federal Power Act; Federal Communications Commission approval for the transfer of radio licenses and point-to-point private microwave licenses held by EFH and its subsidiaries; termination or expiration of the waiting periods applicable to the transaction under the Hart-Scott-Rodino Antitrust Improvements Act of 1974; and Nuclear Regulatory Commission approval related to Luminant Generation Company LLC's change of control under section 184 of the Atomic Energy Act. In addition, a private letter from the Internal Revenue Service regarding certain aspects of the TCEH tax-free spin-off transaction and Ovation I's satisfaction of certain requirements for it to be treated as a REIT must be obtained before consummation of the transaction.

144. On December 4, 2015, the Federal Energy Regulatory Commission issued an order granting authorization under Section 203 of the Federal Power Act.

### *EFH Bankruptcy and EFIH Debt*

145. On April 29, 2014, EFH, and numerous direct and indirect subsidiaries of EFH, including EFIH, which indirectly owns about 80% of Oncor, filed a chapter 11 bankruptcy case in the United States Bankruptcy Court for the District of Delaware.[71]

146. At the time it filed for bankruptcy, EFH and EFIH had debt of over $9.6 billion, excluding debt attributable to its competitive entities.

147. Approximately $1.929 billion of debt was held at EFH.

148. Approximately $7.709 billion of debt was held at EFIH.

149. A majority of the debt held by EFIH was incurred in a series of transactions after the 2007 Commission-approved buyout of TXU Corporation to refinance portions of such indebtedness.[72]

---

[71] *In re Energy Future Holdings Corp., et al,* No 14-10979 (CSS) (Bankr. D. Del.) (petition filed Apr. 29, 2014).
[72] *Joint Report and Application of Oncor Electric Delivery Company and Texas Energy Future Holdings Limited Partnership Pursuant to PURA § 14.101,* Docket No. 34077, Order on Rehearing (Apr. 24, 2008).

150.  The proposed transaction contemplates reducing debt at the EFIH level (legacy buyout debt) to between $4.8 billion and $5.5 billion at closing.

151.  The legacy buyout debt was not incurred to provide capital assets used and useful in Oncor's business.

152.  The purchasers intend to reduce the amount of debt at the EFIH level to $3.5 billion by closing or within 12 months after closing, through additional equity funding.

153.  On December 17, 2015, affiliates of Fidelity Management and Research Company executed an equity commitment letter in which Fidelity is committing an additional $500 million in equity to Ovation Acquisition I.

154.  After receiving this commitment, the purchasers estimate that total debt at closing at Ovation Acquisition I and EFIH will be $4.3 to $5 billion.

155.  The purchasers estimate that 100% of Oncor is valued at, approximately, $17.6 billion, assuming a March 31, 2016 closing date.  This valuation is based upon the amount of payments made to creditors of EFH and subsidiaries for EFIH's interest in Oncor Holdings, assumes success on current challenges to make whole and post-petition interest claims, and does not include payments for the bridging of equity commitments or structuring fees.  This valuation has not been evaluated or approved by the Commission, and the Commission expresses no opinion as to the validity or appropriateness of this valuation.

### *Federal Income-Tax Expense*

156.  In order to qualify for taxation as a REIT under the Internal Revenue Code, section 856(c)(2) provides that at least 75% of a REIT's gross income each year must be derived from certain real-estate investment activities, including rents from real property, and section 856(c)(3) provides that at least 95% of a REIT's gross income each year must be derived from certain real-estate investment activities, including rents from real property, and some other forms of passive income, such as interest and dividends.

157.  The transaction contemplates the creation of Oncor AssetCo to hold legal title to substantially all of Oncor's current transmission and distribution assets, so that payments received from OEDC, as the lessee and operator of the assets, will constitute rents from real property under the Internal Revenue Code.

158.   Oncor AssetCo will be either a partnership or a disregarded entity under federal tax law.

159.   All income recognized by Oncor AssetCo will be included in the taxable income computation of its ultimate owners, Ovation Acquisition I and Ovation Acquisition II, or allocated between Ovation Acquisition I, Ovation Acquisition II, and Texas Transmission Investment, depending on the results of the drag-along litigation.

160.   Oncor AssetCo will not itself be liable for federal income tax.

161.   A REIT is required to distribute at least 90% of its taxable income to its shareholders on an annual basis to maintain qualification as a REIT.

162.   Ovation Acquisition I's general operating policy will be to distribute 100% of its taxable income to stockholders.[73]

163.   Federal income tax law provides that if applicable rules are met, the distributions a REIT such as Ovation Acquisition I makes to its stockholders will qualify as deductions to reduce the amount of the REIT's taxable income.

164.   A REIT must pay taxes on its taxable income, which includes income not distributed to stockholders.

165.   In setting rates, the Commission has considerable discretion to determine the appropriate method to calculate a federal income-tax expense and the amount of such income-tax expense.

166.   It is appropriate for the Commission to use its discretion under PURA to determine the appropriate tax expense and the ratemaking treatment of any tax benefits resulting from a REIT in a utility's ownership structure.

167.   The use of a REIT in the ownership structure of a utility, including the appropriate federal-income-tax expense in setting rates, is an issue of first impression for the Commission.

168.   The Commission intends to conduct a rulemaking in a comprehensive manner to examine the appropriate federal-income-tax expense to use in setting rates for utilities under PURA.

---

[73] OPUC Ex. 32 Purchasers Response to Staff RFI 10-3.

169. Subject to the upcoming rulemaking on federal income-tax expenses, if Ovation Acquisition I elects to be taxed as a REIT and expose ratepayers to the risks associated with this structure, any reduction in its federal income-tax expense resulting from the use of the REIT structure may be reflected in rates such that the savings are shared by the ratepayers. The amount of tax savings shall be an issue to be addressed in the next rate proceeding of Oncor AssetCo and OEDC.

## *Ratemaking Treatment of Oncor AssetCo and OEDC*

170. The application proposed that rates be set on a combined basis for both OEDC and Oncor AssetCo, using the audited books and records of both companies to prepare a combined rate filing.

171. PURA § 36.051 requires that when establishing rates for an electric utility the Commission must establish a revenue requirement that will give "*the utility* a reasonable opportunity to earn a reasonable return on *the utility's* invested capital used and useful . . . in excess of the utility's reasonable and necessary operating expense."

172. Oncor AssetCo and OEDC will be separate electric utilities, each owning and operating distinct facilities.

173. PURA § 36.051 requires that a utility's rate be based on the invested capital of that utility to ensure that each utility has an opportunity to earn a reasonable return on that utility's invested capital used and useful in providing service.

174. PURA § 36.052 requires that in setting a utility's rate of return certain characteristics of that utility be considered.

175. PURA § 36.053 requires a utility's rates be based on the property used by or useful to that utility in providing service and that the original cost of such property be determined when the property was dedicated to public use by that utility or a previous owner.

176. PURA § 36.054 allows a utility's rates, in certain circumstances, to include construction work in progress at the cost recorded on that utility's books.

177. PURA § 36.056 requires the Commission to establish proper and adequate rates and methods of depreciation, amortization, or depletion for an electric utility.

178.   PURA § 36.057 defines a utility's net income as that utility's total revenue less reasonable and necessary expenses as determined by the Commission.

179.   PURA § 36.064 allows a utility to self-insure and allows the Commission to include in that utility's rates the cost of the utility's reserve account.

180.   No provision in subchapter B of chapter 36 of PURA allows consideration of the attributes of any utility other than the utility for which rates are being set.

181.   Under PURA § 36.058, capital costs and expenses paid between affiliates are not allowed in rates unless the Commission finds that such payments are fair to the utility, and no more than would be charged to a non-affiliate, and consistent with the market value of the service.

182.   Because Oncor AssetCo and OEDC will be considered affiliates, as addressed in finding of fact 232, the consolidated rate-setting approach proposed by the purchasers would not allow the Commission to evaluate any inter-company transaction.

183.   The Commission can evaluate the separate books and records of Oncor AssetCo and OEDC in a single proceeding.

184.   In a single proceeding, the Commission can approve a rate for the customers of OEDC and also approve a rate for the sole customer of Oncor AssetCo, OEDC.

185.   New methods may be required to properly determine transmission cost recovery factors, distribution cost recovery factors, and energy efficiency cost recovery factors for Oncor AssetCo and OEDC.

### *Oncor AssetCo and OEDC Leases are Tariffs*

186.   The application states that Oncor AssetCo and OEDC will both be electric utilities under PURA § 31.002(6).

187.   PURA § 11.003(19) broadly defines "service" as "any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties under this title to. . . other public utilities. . . ."

188.   By providing the "service" of supplying electric facilities to OEDC via the lease, Oncor AssetCo will be charging rent to OEDC, which is a rate under the broad definition of "rate"

in PURA § 32.002(15) defined as "a compensation, tariff, charge, fare, toll, rental, or classification. . . that must be approved by a regulatory authority."

189.    PURA § 32.101 requires that a utility file a tariff showing each rate that is in effect for a utility service offered by the utility.

190.    As an electric utility, Oncor AssetCo must file a tariff with the Commission showing the rate (*i.e.*, lease payment) in effect for the utility service it provides to OEDC.

191.    It is appropriate and necessary that the initial rates and tariffs of Oncor AssetCo be established before closing.

192.    Before charging rates under the lease, the Commission must approve the rate Oncor AssetCo is to charge OEDC, and the resulting lease must be filed as a tariff with the Commission.

### *Oncor AssetCo and OEDC CCNs*

193.    The application proposed that OEDC would be allocated Oncor's CCNs under PURA § 37.154 as part of the Oncor AssetCo and OEDC joint survivor merger.

194.    The evidence presented shows that OEDC will provide adequate service, as required by PURA § 37.154.

195.    The application proposed that Oncor AssetCo would hold the rights under the CCNs necessary to own the transmission and distribution assets and conduct the street lighting and transmission engineering and construction management business.

196.    PURA § 37.051 provides that an "electric utility or other person may not directly or indirectly provide service to the public under a franchise or permit unless the utility or other person first obtains from the Commission a certificate that states the public convenience and necessity requires or will require the installation, operation, or extension of that service."

197.    Oncor currently has four CCNs that were transferred to it from TXU Electric Company as part of the business separation and transition to customer choice in 2001.

198.    These four certificates were originally issued to Dallas Power and Light Company (CCN No. 30043), Southwestern Electric Service Company (CCN No. 30152), Texas Electric

Service Company (CCN No. 30158), and Texas Power and Light Company (CCN No. 30160).

199. These four certificates, as amended from time to time, contain the total authority granted by the Commission to Oncor to provide distribution and electric service.

200. To facilitate the granting of separate areas of authority to Oncor AssetCo and OEDC, the Commission concludes that after the restructuring of Oncor, this authority should reside in two certificates.

201. For administrative convenience, the certificates will be assigned new numbers, CCN numbers 30198 and 30199.

202. Oncor AssetCo is indirectly providing service to the public via the lease of its transmission and distribution assets.

203. Oncor AssetCo will be providing street lighting service to the public.

204. OEDC will operate and construct the leased transmission facilities and perform other functions that a transmission utility would perform, except for any transmission-related functions Oncor AssetCo is authorized to perform.

205. OEDC will operate and construct the leased distribution facilities and perform other functions that a distribution utility would perform, except for any distribution-related functions that Oncor AssetCo is authorized to perform. OEDC will also construct new facilities and reconstruct existing facilities.

206. Oncor's service area does not qualify for a multiple-certification exception because it was not dually certificated before February 1, 1999, and so only one utility may obtain a CCN for the Oncor service area.

*Purchasers' Commitments and Conditions of the Transaction*

207. The purchasers' regulatory commitments are reflected in their filing made on February 19, 2016.

208. On March 1, 2016, Commissioner Anderson filed a memorandum discussing the conditions to be imposed on the transaction in order for him to find that the transaction met the public interest standard of PURA §§ 14.101, 39.262, and 39.915.

209. Commissioner Anderson's memorandum noted that to the extent the conditions in the memorandum differed from those proposed by the purchasers, the conditions in the memorandum would control.

210. At the March 3, 2016 open meeting, the Commissioners discussed the conditions in Commissioner Anderson's memorandum, and agreed that the conditions outlined in Commissioner Anderson's memorandum, as modified in the discussion at the open meeting, should be imposed on the transaction to find the transaction in the public interest.

211. The transaction will be in the public interest, only if the following conditions set forth in findings of fact 212 through 292 below are imposed on the transaction.

212. The aggregate combined indebtedness of Ovation Acquisition I and its subsidiaries (excluding only Oncor Holdings and Oncor AssetCo) shall not exceed the combined total debt that exists immediately following the second closing as described in finding of fact 142. Notwithstanding the foregoing, all combined indebtedness at Ovation Acquisition I and its subsidiaries (excluding only Oncor Holdings and Oncor AssetCo) will never exceed the lesser of $5.5 billion or the amount of combined debt at closing without the prior approval of the Commission.

213. Ovation Acquisition I will seek to reduce the outstanding indebtedness at Ovation Acquisition I and reorganized EFIH to no more than $3.5 billion within one year after closing of the transaction. Nine months after the closing of the transaction, purchasers shall file a report with the Commission describing their progress in achieving the reduction in their outstanding indebtedness to $3.5 billion along with a plan to retire all of the legacy buyout debt. For each year that a material amount of debt, as determined by the Commission, exists at Ovation Acquisition I or reorganized EFIH, purchasers will file an annual report describing the aggregate debt levels, including a progress report on the reduction of the legacy buyout debt. Such report will be filed at the same time the annual earnings report under 16 TAC § 25.73 is filed for Oncor AssetCo and OEDC. Failure to reduce the debt to $3.5 billion within 12 months of the closing may be taken into consideration by the Commission when determining an appropriate return on equity for Oncor AssetCo and OEDC.

214. Both Oncor AssetCo and Oncor Holdings must have a board of directors composed of at least seven persons. A majority of Oncor AssetCo's board members and Oncor Holdings board members must qualify as "independent" in all material respects in accordance with the rules and regulations of the New York Stock Exchange (which are set forth in section 303A of the New York Stock Exchange Listed Company Manual) from reorganized EFIH or Ovation Acquisition I. The directors of Oncor AssetCo and Oncor Holdings must not include any members of the board of Ovation Acquisition I.

215. As long as any material amount of debt, as determined by the Commission, exists at reorganized EFIH or Ovation Acquisition I or any other intervening entity above Oncor AssetCo or Oncor Holdings, a majority of the board of directors of Oncor AssetCo and Oncor Holdings must be composed of disinterested directors. A disinterested director must be (a) independent as defined by the New York Stock Exchange, (b) have no current or previous material relationships with Oncor AssetCo, EFIH, Ovation Acquisition I or their respective affiliates within the previous ten years, and (c) have no material relationships with the Hunt affiliates, OEDC, or their respective affiliates.

216. At all times, a disinterested director of Oncor AssetCo may only be removed during the director's term by a majority of the remaining directors, which affirmative vote must include a majority of the remaining disinterested directors.

217. Oncor Holdings and Oncor AssetCo must have staggered board terms such that no more than one-third of each entity's board of directors may be replaced in any single year.

218. Neither Oncor AssetCo nor Oncor Holdings will take or permit any of the following actions unless board approval, including the approval of a majority of such entity's disinterested directors, is obtained (a) causing either Oncor AssetCo or Oncor Holdings to seek or consent to any bankruptcy, liquidation, receivership, or similar proceeding, (b) dissolving or liquidating Oncor AssetCo or Oncor Holdings without permission from the Commission, (c) merging or consolidating Oncor AssetCo or Oncor Holdings with Ovation Acquisition I or its affiliates, (d) causing Oncor AssetCo or Oncor Holdings to sell or transfer all or substantially all of its assets, (e) amending the dividend policy or paying dividends that are contrary to the dividend policy, except that in no event will distributions be made if such distributions would cause a violation of the debt-to-equity ratio

commitment described in finding of fact 235, (f) causing Oncor AssetCo or Oncor Holdings to enter into any material agreement or transaction with Ovation Acquisition I, EFIH, or any of their subsidiaries, with any significant stockholder of Ovation Acquisition I, or with the direct and indirect owners of OEDC, except as contemplated in finding of fact 280, and (g) causing Oncor AssetCo or Oncor Holdings to incur indebtedness other than through facilities approved by the disinterested directors or refinancings of their existing indebtedness.

219.    In addition to the conditions discussed above, with respect to each company, and as long as any material amount of debt exists (as may be determined by the Commission) at reorganized EFIH or Ovation Acquisition I or any other intervening entity above Oncor AssetCo or Oncor Holdings, the concurrence of a majority of the disinterested directors shall be required for Oncor AssetCo or Oncor Holdings to (a) declare any dividend or make any other distribution and in so doing shall act to ensure that sufficient capital is available to fund Oncor AssetCo's and OEDC's operations; (b) merge, acquire, or be sold to any third party; (c) file for bankruptcy, or otherwise avail itself of any federal or state law relating to insolvency; and (d) enter into any other transaction or series of transactions exceeding ten million dollars that are out of the ordinary course of business.

220.    The Oncor AssetCo limited liability company agreement will provide that, to the fullest extent permitted by applicable law, the disinterested directors shall consider only the best interests of Oncor AssetCo, including its direct creditors, in acting or otherwise voting on any action set forth in subsections (a) through (d) of finding of fact 218. In performing such actions, the disinterested directors must take into account (a) Oncor AssetCo's status as a regulated utility, (b) the need of both Oncor AssetCo and OEDC to fulfill their regulatory obligations, (c) the regulatory and contractual obligations of Oncor AssetCo described herein to provide sufficient liquidity to OEDC. Otherwise, in exercising rights and performing their duties under the Oncor AssetCo limited liability company agreement, the disinterested directors will have fiduciary duties of loyalty and care identical to those of a director of a business corporation organized under the General Corporation Law of the state of Delaware.

221.    Oncor AssetCo's dividends and distributions will be reduced or suspended if either (a) the combined leverage of OEDC, Oncor AssetCo, and Oncor Holdings exceeds the maximum regulatory debt-to-equity ratio established by the Commission in its most recent rate case or (b) if a majority of the independent or disinterested directors decide that it is in the best interest of Oncor AssetCo to retain such amounts to meet expected future requirements, taking into account contribution commitments from Oncor AssetCo's parent companies.

222.    Oncor AssetCo and Oncor Holdings will not incur, guarantee, or pledge assets in respect of any existing or incremental new debt related to the transaction other than under credit facilities solely to provide loans and other liquidity in OEDC or to acquire assets or to construct facilities used and useful in providing service to its or OEDC's customers.

223.    Oncor Holdings will be maintained between EFIH and Oncor AssetCo.

224.    Oncor AssetCo and Oncor Holdings will not transfer material assets or facilities to Ovation Acquisition I, EFIH or any of their subsidiaries, or any significant shareholder of Ovation Acquisition I, or to the direct and indirect owners of OEDC, other than transfers on an arm's-length basis consistent with the Commission's affiliate standards applicable to Oncor AssetCo and OEDC, regardless of whether such affiliate standards would apply to such a transaction.

225.    Oncor AssetCo and Oncor Holdings will maintain an arm's-length relationship with Ovation Acquisition I, EFIH, or any of their subsidiaries, and any significant shareholder of Ovation Acquisition I or other affiliates of Oncor AssetCo and OEDC (other than with Oncor AssetCo or Oncor Holdings) consistent with the Commission's affiliate standards applicable to Oncor AssetCo and OEDC.

226.    Oncor AssetCo must maintain an investment grade rating.  During any time Oncor AssetCo's entity rating is not maintained as investment grade by at least two of Standard & Poor's, Moody's, or Fitch credit rating agencies, Oncor AssetCo shall not make any distributions, dividends, or other upstream payments to reorganized EFIH, Ovation Acquisition I or to any of their respective subsidiaries without the prior approval of the Commission.  If, at any time from the date of closing the merger through December 31, 2020, Oncor AssetCo's entity rating is not maintained as investment grade by Standard &

Poor's, Moody's, or Fitch credit ratings agencies, Oncor AssetCo and OEDC shall not use the lower credit rating as a justification for a higher regulatory rate of return.

227.    Oncor AssetCo's and OEDC's financial statements will be audited by one of the big-four accounting firms.  Oncor AssetCo, Oncor Holdings, and OEDC will maintain accurate, appropriate, and detailed books, financial records, and accounts, including checking and other bank accounts, and custodial and other securities safekeeping accounts that are separate and distinct from those of any other entity.  Oncor AssetCo, Oncor Holdings, and OEDC will provide the Commission full access to its books and records.

228.    Oncor AssetCo and Oncor Holdings will not commingle any facilities, assets, funds, or liabilities with the facilities, assets, funds or liabilities of Ovation Acquisition I, EFIH or any of their subsidiaries, or any significant stockholder of Ovation Acquisition I or the OEDC owners.

229.    Oncor AssetCo and Oncor Holdings will not enter into any debt transactions with Ovation Acquisition I or EFIH or any of their subsidiaries (other than with Oncor Asset Co or Oncor Holdings), any significant stockholder of Ovation Acquisition I, or the OEDC owners following consummation of the transaction.

230.    Oncor AssetCo will not share any credit facility with any unregulated affiliate or any regulated affiliate other than OEDC or its subsidiaries and Oncor Holdings.  Neither Oncor AssetCo nor Oncor Holdings will pledge any of its assets for Ovation Acquisition I, EFIH or any of their subsidiaries, or any significant stockholder of Ovation Acquisition I or any other affiliate other than for itself, OEDC, and OEDC's subsidiaries.  In addition, Oncor AssetCo will not incur or assume any liability for, or guarantee any debt of the foregoing entities, other than OEDC and its subsidiaries.

231.    Oncor AssetCo will not pledge any of its assets for Ovation Acquisition I, EFIH or any of their subsidiaries, or any significant stockholder of Ovation Acquisition I or for any other regulated affiliate other than OEDC or its subsidiaries and Oncor AssetCo or Oncor Holdings.

232.    Oncor AssetCo, Oncor Holdings, OEDC, Shary Holdings, LLC, Ovation Acquisition I, LLC, Ovation Acquisition II, LLC, EFIH, and Hunt Utility Services are affiliates under

PURA and subject to PURA provisions and Commission rules governing affiliate transactions. The foregoing list shall not be deemed exclusive of other entities related to Hunt Consolidated, Inc.

233. The Commission will determine Oncor AssetCo's and OEDC's return on equity based on a comparison group of investment-grade-rated utilities regardless of the actual debt ratings of Oncor AssetCo and OEDC.

234. Except as otherwise provided in this order, Oncor AssetCo and Oncor Holdings must be independent and operate with other entities on an arm's-length basis to prevent each entity from incurring an obligation of related parties or claims by outside claimants. Protections must include: (a) non-consolidation opinions for each of Oncor AssetCo and Oncor Holdings to prevent consolidation into related parties during a bankruptcy or liquidation proceeding, and (b) a commitment by Oncor AssetCo, OEDC, and Oncor Holdings to not provide any guarantees, act as a co-borrower, pledge any assets or otherwise obligate themselves on behalf of other affiliates, except Oncor AssetCo and Oncor Holdings.

235. Oncor AssetCo and OEDC must maintain a combined debt-to-equity ratio established by the Commission in rate proceedings. The calculation of the ratio shall not include goodwill.

236. None of the fees and expenses or any incremental borrowing costs of OEDC related to any extension of credit from Oncor AssetCo will be borne by OEDC's customers.

237. Oncor AssetCo's and OEDC's debt will be limited so that the debt-to-equity ratio for the entities on a combined basis excluding inter-company transactions is at or below the regulatory debt-to-equity ratio established from time to time by the Commission for ratemaking purposes.

238. For a period of five years, OEDC's system average interruption duration Index (SAIDI) and system average interruption frequency index (SAIFI) benchmarks should be calculated based on the performance standards applicable to Oncor for years 2011, 2013, and 2014. OEDC's SAIDI benchmark should be 96.30667 and its SAIFI benchmark should be 0.94000.

239. All debt instruments issued by Ovation Acquisition I, reorganized EFIH, or any of their subsidiaries, including without limitation all purchase agreements, trust indentures, notes, and security and pledge agreements, will contain an express acknowledgment in which the debt holders and their respective successors and assigns acknowledge that neither Oncor AssetCo nor Oncor Holdings will be liable for any principal, interest, premium, penalty, or other costs arising out of or relating to such debt. This does not apply to debt incurred by Oncor AssetCo. The acknowledgement must state that such debt holders may not exercise any right to foreclose on any equity of reorganized EFIH or Ovation Acquisition I or otherwise attempt to control Oncor Holdings or Oncor AssetCo, whether by directing the voting of such equity or otherwise exercising any control over any such entities without first obtaining approval for the change of control from the Commission.

240. Oncor AssetCo and Oncor Holdings will each provide advance notice of its corporate separateness from Oncor Holdings, OEDC, reorganized EFIH, and Ovation Acquisition I to lenders on all new debt and will obtain an acknowledgement of the separateness and non-petition covenants in all new debt instruments, including any debt instruments used in connection with financing the transaction.

241. OEDC shall provide advance notice of its corporate separateness from Oncor Holdings, Oncor AssetCo, Reorganized EFIH, and OV1 to lenders (other than Oncor AssetCo) on all new debt and will obtain an acknowledgement of the separateness and non-petition covenants in all new debt instruments, including any debt instruments used in connection with financing the transaction.

242. Under the leases between Oncor AssetCo and OEDC, if OEDC identifies a *footprint project* in its *capex budget* (as those terms were defined in the leases provided in the direct testimony of D. Greg Wilks) then OEDC must have the sole discretion to decide what capital budget is required to meet the obligation to fund the footprint project.

243. Oncor AssetCo's obligation to fund capital projects will remain in effect if OEDC is unable to meet lease obligations. OEDC's rental payment obligations shall not impair OEDC's financial stability or obligations under PURA.

244. Neither Oncor AssetCo nor OEDC will own, operate, or construct capital assets outside of ERCOT without the prior approval of the Commission. Oncor Holdings will not own,

operate or construct, or hold any interest in any entity that owns, operates, or constructs any capital assets outside of ERCOT without the prior approval of the Commission.

245.    Oncor AssetCo and OEDC will maintain headquarters and management in Dallas County, Texas or any of the counties adjacent thereto.

246.    The organizational documents of Ovation Acquisition I, Oncor AssetCo, reorganized EFIH, Oncor Holdings, and OEDC and any modifications to those documents must be consistent with any order approving the transaction.

247.    The purchasers commit that ratepayers of both Oncor and Sharyland will be held harmless for any costs related to or caused by the transaction, including any incremental costs that may or will be incurred as the result of the transaction or the transaction's structure after the transaction is consummated. Such costs will not be included in rate base, cost of capital, or operating expenses in future ratemaking proceedings. OEDC and Oncor AssetCo commit that their wholesale and retail transmission and distribution rates will not be any greater than their rates would have been absent restructuring. This commitment also applies to OEDC's and Oncor AssetCo's cost of capital.

248.    The purchasers commit that ratepayers will be held harmless for any incremental Texas margin tax because of the restructuring of Oncor into two separate utilities. Such costs shall not be included in rate base, cost of capital, or operating expenses in future ratemaking proceedings.

249.    The purchasers commit that ratepayers will be held harmless for any incremental costs related to the Oncor AssetCo and OEDC separate lines of credit and for the costs of an OEDC contingency reserve. Such costs shall not be included in rate base, cost of capital or operating expenses in future ratemaking proceedings.

250.    The purchasers commit that ratepayers will be held harmless for any costs related to the terms of the transfer of the CCNs and other assets by Oncor AssetCo to OEDC by removing all effects of the book gain and tax gains from the revenue requirement, including any effects of a stepped-up basis on OEDC's books and the effects of the accumulated deferred income taxes (ADIT) that was eliminated on Oncor AssetCo's books. Such costs shall not be included in rate base, cost of capital, or operating expenses in future ratemaking

proceedings. Further, the lost ADIT will be included as a subtraction from rate base in future ratemaking proceedings.

251.   The purchasers commit that ratepayers will be held harmless for any incremental costs related to the separate ownership and management of Oncor AssetCo and OEDC, including, but not limited to, the costs of Hunt Utility Services reflected in any agreements between Oncor AssetCo, Oncor Holdings, and OEDC. Such costs shall not be included in rate base, cost of capital, or operating expenses in future ratemaking proceedings. In addition, Oncor AssetCo and OEDC shall bear the burden of proof to show that no costs incurred because of the transaction will be included in the revenue requirement recovered through rates.

252.   The purchasers commit that ratepayers will be held harmless for any costs of goodwill. Such costs will not be included in rate base, cost of capital, or operating expenses in future ratemaking proceedings.

253.   Ratepayers will be held harmless for any fees or expenses or incremental borrowing costs associated with the transaction.

254.   Until the transaction closes, the applicants agree to request approval from the Commission of any modifications or additions to the approved commitments in this case by other regulatory bodies.

255.   The applicants agree to request approval from the Commission of any modification to the transaction resulting from the private letter ruling obtained from the Internal Revenue Service regarding REIT treatment. In addition, applicants must notify the Commission if the Internal Revenue Service declines to issue a private letter ruling, or issues an unfavorable private letter ruling.

256.   Subject to the Commission's authority under PURA and Commission rules, the terms of all leases after the initial lease may not exceed four years to provide more flexibility in adjusting the amount of rent payments than would be available in longer leases and minimize liquidity risks related to timing issues.

257. Subject to the Commission's authority under PURA and Commission rules, any lease with a term of three years or longer will have a variable rent component so long as the inclusion of such a component is consistent with maintaining REIT status for Ovation Acquisition I.

258. Rental payments between OEDC and Oncor AssetCo must be omitted from the determination of cash working capital in future rate cases.

259. Oncor AssetCo and OEDC must fund a study as soon as practicable in consultation with Commission Staff to determine any additional net benefits to ratepayers or operational synergies that may be derived from the relationship that will exist between the sister companies or the possible future combination of Oncor AssetCo and OEDC with Sharyland Distribution & Transmission Services, LP, and Sharyland Utilities, LP.

260. A conflicts committee of Ovation Acquisition I—composed solely of directors who are independent under New York Stock Exchange rules—will review and advise the board on specific matters that the board believes may involve a conflict of interest, including approving any transactions in which Hunt has a controlling interest.

261. Flourish Investment Corporation has committed that neither it nor any affiliate will seek to nominate or have a representative serve as a director of the Ovation Acquisition I board of directors.

262. OEDC will assign a non-economic interest in OEDC to a disinterested independent party whose affirmative consent, taking into account the continuing viability and operation of Oncor AssetCo and OEDC, will be required before the filing of a petition by OEDC to commence any voluntary bankruptcy, liquidation, receivership, or any person on its behalf.

263. OEDC will not be permitted to make any cash distributions to its equity holders at any time unless the total amount of liquidity for OEDC is at or above $500 million, including OEDC's working capital cash fund, an OEDC line of credit, and a line of credit from Oncor AssetCo.

264. OEDC will maintain an arm's-length relationship with the owners of OEDC, Ovation Acquisition I, EFIH or any of their subsidiaries, and any significant stockholder of Ovation Acquisition I, and their collective affiliates consistent with PURA's and the Commission's affiliate standards applicable to Oncor AssetCo and OEDC.

265.    OEDC will not transfer material assets or facilities to OEDC's owners or Ovation Acquisition I, EFIH or any of their subsidiaries, or any significant stockholder of Ovation Acquisition I (other than Oncor AssetCo or Oncor Holdings) other than transfers on an arm's-length basis consistent with PURA's and the Commission's affiliate standards applicable to Oncor AssetCo and OEDC, regardless of whether such affiliate standards would apply to a particular transaction.

266.    Except for loans that OEDC's owners may make to OEDC, OEDC will not enter into any inter-company debt transactions with OEDC's owners following consummation of the transaction. OEDC will not share any credit facility with any unregulated or regulated affiliate other than Oncor AssetCo or its subsidiaries.

267.    OEDC will not pledge any of its assets for OEDC's owners or Ovation Acquisition I, EFIH or any of their subsidiaries, or any significant stockholder of Ovation Acquisition I, other than for Oncor AssetCo or its subsidiaries.

268.    The leases between Oncor AssetCo and OEDC will include restrictive covenants that restrict OEDC from incurring debt, effecting asset sales, creating or incurring liens, engaging in certain business activities and undergoing change of control transactions, without consent from Oncor AssetCo.

269.    The applicants agreed that parties are free to argue in subsequent proceedings that savings, if any, that may have occurred from the Oncor restructuring should be shared with ratepayers.

270.    OEDC and Oncor AssetCo will not request rate recovery of formation or other costs associated with the Oncor restructuring.

271.    OEDC and Oncor AssetCo will not seek future cost recovery of any issuance costs related to an initial public offering or private placement by a REIT affiliated with either of them.

272.    Oncor AssetCo will not incur indebtedness, provide guarantees, or pledge assets in a manner that will harm the quality of service or increase the rates paid by OEDC's customers.

273.    The applicants agreed to comply with Oncor's previous rate settlements.

274.    OEDC will not surrender, resign, transfer, assign, or otherwise cease to be the operator of the electrical transmission and distribution system owned by Oncor AssetCo without prior Commission approval.

275.    Oncor AssetCo is required to fund all improvements to the electrical system that are required by the Commission, ERCOT, or the Texas Reliability Entity, or that are reasonably necessary to satisfy OEDC's obligations as a regulated utility.

276.    If at any time Oncor AssetCo fails to meet its obligation to fund improvements, OEDC is obligated to fund such improvements and Oncor AssetCo shall not restrict, impair or delay OEDC's ability to do so.

277.    Oncor AssetCo will not sell, acquire, lease, or transfer assets, merge or consolidate with another utility, or transfer a controlling interest in or operational control of Oncor AssetCo without prior Commission approval.

278.    Oncor AssetCo and OEDC will file a general base rate case by July 1, 2017, unless before that date a general base rate-case has been initiated by Commission Staff or some other party.

279.    Oncor AssetCo and OEDC will have the burden of proof in all general rate proceedings to show that they have complied with the commitment set forth in finding of fact 247, including submitting evidence that ratepayers have been held harmless from any duplicative costs attributable to the REIT structure.

280.    OEDC will maintain facilities providing liquidity in an amount of no less than $500 million, including OEDC's working capital fund, an OEDC line of credit, and a line of credit from Oncor AssetCo, until such time as the Commission approves a different amount. Oncor AssetCo will provide OEDC with a credit facility that, when combined with other sources of OEDC liquidity, equals no less than $500 million.

281.    Terms and conditions of the credit facility that Oncor AssetCo provides to OEDC, including the interest rate, will be no less favorable to OEDC than Oncor AssetCo's third party line of credit.

282.   If OEDC's liquidity falls below $150 million for a period of at least 15 days, Oncor
       AssetCo and OEDC will file with the Commission within 15 days after such period a report
       setting forth a plan for restoring liquidity to $500 million.

283.   Oncor AssetCo will backstop OEDC's pension obligations as set forth in the Pension
       Backstop Agreement attached as rebuttal exhibit R-DGW-3 to the rebuttal testimony of D.
       Greg Wilks.

284.   If OEDC fails to satisfy the reliability commitment set forth in finding of fact 238 for two
       consecutive years and OEDC's operations and maintenance spending has declined below
       the operations and maintenance spending during the previous two years, then OEDC must
       file within 90 days thereafter the following: (a) to the extent not previously filed, the current
       leases, lease supplements, and renewals for leases expiring in the current year, (b) an
       explanation of the impact, or lack thereof, of the leases and rental payments on the decline
       in SAIDI/SAIFI levels set forth in the reliability commitment, (c) an explanation of why
       the operations and maintenance spending has declined, and (d) a description of Oncor
       AssetCo's and OEDC's plan to address the issue causing the filing.

285.   Oncor AssetCo and OEDC will continue participating in discussions with Commission
       Staff and customers with respect to implementing improvements to their interconnection
       process.

286.   During a period of two years after the closing, if closing occurs before June 30, 2016, or
       until December 31 following the first anniversary of the closing date, if the closing occurs
       after June 30, 2016, (a) current Oncor employees will be provided no less favorable salaries
       or wage rates, and substantially similar incentive compensation opportunities and
       employee benefits, as compared to those currently provided to the Oncor employees, and
       (b) OEDC will not implement any material involuntary workforce reductions of Oncor
       employees, other than employees that hold the office of senior vice president or greater
       with Oncor or Oncor Holdings.

287.   The employment, severance, retention, termination, and change in control arrangements of
       Oncor, Oncor Holdings, and their respective subsidiaries will be assumed and honored in
       accordance with their terms, in accordance with Section 8 of the Oncor Letter Agreement
       dated August 28, 2015, filed as exhibit WKB-4 to the direct testimony of W. Kirk Baker.

288.   With respect to any Oncor employee whose terms and conditions of employment are covered by a collective bargaining agreement, the terms and conditions of such employment will continue to be governed by the terms of the applicable collective bargaining agreement, as may be modified from time to time.

289.   It is acknowledged that, with respect to any employee that holds the office of senior vice president or greater, a "change in control" within the meaning of each applicable change in control agreement will occur as a result of the consummation of the transaction, and that any termination in connection with the transaction will constitute a "termination without cause."

290.   For Oncor employees who become participants in any employee benefit plan of Ovation Acquisition I, its subsidiaries, Hunt Utility Services, or OEDC in connection with the transaction, the prior service of those employees to an Oncor entity will generally be taken into account, for purposes of eligibility and vesting thereunder, in the same manner in which Oncor currently credits service.

291.   Applicants will make at least the amount of capital expenditures as set forth in Oncor's current long range plan for five years following the date of closing, subject to the following adjustments to the extent reported to the Commission in OEDC's quarterly earnings monitor report: OEDC may reduce capital spending due to conditions not under OEDC's control, including, without limitations, siting delays, cancellations of projects by third parties, or weaker than expected economic conditions.

292.   The applicants will file periodic reports with the Commission regarding compliance with these commitments. Unless otherwise stated in this Order, such reports will be filed at the same time the annual earnings report under 16 Texas Administrative Code § 25.73 is filed for Oncor AssetCo and OEDC.

## *Evaluation of the Transaction*

293.   The proposed transaction provides an opportunity to end the bankruptcy proceeding faced by Oncor's majority parent company, EFH, in a relatively expeditious manner.

294.   The transaction will allow a Texas company to acquire operational control of Oncor.

295.  As proposed, the transaction will reduce the amount of debt held above Oncor from the $9.6 billion that exists today to between $4.3 billion to $5 billion at closing.

296.  The purchasers intend to reduce the debt above Oncor AssetCo to $3.5 billion in 12 months.

297.  The transaction provides a benefit in that it would separate Oncor from its generation and retail electric provider affiliates for the first time since the vertically integrated utilities within the ERCOT region were unbundled at the beginning of the last decade.

298.  The possible combination of Oncor AssetCo and OEDC with Sharyland Distribution & Transmission Services, LP, and Sharyland Utilities, LP is a benefit of this transaction.

299.  The possibility of tax savings resulting from the REIT structure to be shared with ratepayers is a potential benefit of the transaction, and the Commission's public interest determination is based in part on this possible sharing of the tax savings with ratepayers.

300.  Risks of the transaction include liquidity constraints for OEDC, inadequate flexibility for OEDC under the terms of the lease, the possibility of credit downgrades for Oncor AssetCo, the possibility that the REIT's requirement to distribute at least 90% of its taxable income will leave little retained earnings for capital investment and will require Ovation Acquisition I to continuously access the capital markets, and risks of improper transactions between Hunt controlled entities.

301.  Based upon the record evidence and the commitments, the transaction will not adversely affect the health or safety of Oncor's customers or employees.

302.  The merger will not result in the transfer of jobs of citizens of this state to workers domiciled out of this state.

303.  Based upon the record evidence and the commitments and conditions on the transaction, the transaction will not result in a decline in service.

304.  The transaction, if all the conditions and commitments described in this Order are met, is in the public interest.

305.  It is appropriate and necessary that the initial rates and tariffs of Oncor AssetCo be established before closing.

### III.  Conclusions of Law

1.  Oncor AssetCo will be an electric utility as defined by PURA § 31.002(6), a transmission and distribution utility as defined in PURA § 31.002(19), and a public utility as defined in PURA § 11.004.

2.  OEDC will be an electric utility as defined by PURA § 31.002(6), a transmission and distribution utility as defined in PURA § 31.002(19), and a public utility as defined in PURA § 11.004.

3.  The Commission has jurisdiction over the parties and the subject matter of this docket under PURA §§ 14.101, 39.262(o), and 39.915.

4.  Notice of the merger at issue in this proceeding and the events in this docket was provided as required by 16 TAC § 22.55.

5.  The Commission may enforce any representation or commitment made by the applicants under PURA §§ 39.262(o) and 39.915(d).

6.  The Commission cannot treat Oncor AssetCo and OEDC on a consolidated basis for ratemaking purposes, with the books and records of each company being combined to set rates for utility customers under subchapter B of Chapter 36 of PURA.

7.  PURA § 36.003(a) allows the Commission to conduct a single proceeding to evaluate the separate books and records of Oncor AssetCo and OEDC to compute two separate rates: a rate for the customers of OEDC and a rate that Oncor AssetCo will charge OEDC.

8.  The Commission may require OEDC to come in for a base-rate case any time Oncor AssetCo comes in for a base-rate case.

9.  The Commission may not approve rates or tariffs in this case as it was not noticed as a rate proceeding.

10.  Oncor AssetCo is providing utility service by supplying electric facilities to OEDC via the lease under PURA § 11.003(19).

11.  Oncor AssetCo will be charging rent to OEDC, which is a rate under PURA § 32.002(15).

12.     PURA § 32.101 requires that, before commencing service, Oncor AssetCo must file a tariff with the Commission showing the rate (*i.e.*, lease payment) and terms of service in effect for the utility service it provides to OEDC.

13.     After the Oncor restructuring, OEDC must continue to provide service to the public under the terms of Oncor's current tariffs until a new tariff is approved.

14.     PURA § 37.051 requires OEDC to have a CCN to provide service to the public, as described in the application.

15.     The evidence presented shows that OEDC can provide adequate service, as required by PURA § 37.154.

16.     PURA § 37.051 requires Oncor AssetCo to have a CCN to provide indirect service to the public via the lease of its transmission and distribution assets, as described in the application.

17.     PURA § 37.051 requires Oncor AssetCo to have a CCN to provide street lighting service, as described in the application.

18.     The evidence presented shows that Oncor AssetCo can provide adequate service, as required by PURA § 37.154.

19.     Because OEDC's CCN will exclude the street lighting service, there will be no dual certification of Oncor's service area under PURA § 36.060(h).

20.     The Commission has the authority to enforce the commitments set forth in this Order against both Oncor AssetCo and OEDC, including any obligation on the part of Oncor AssetCo and OEDC to fund improvements that are reasonably necessary to maintain the safety or reliability of the Oncor electrical system. To the extent that either OEDC and Oncor AssetCo fail to comply with a Commission order, the Commission can take necessary actions to remedy such noncompliance, including seeking a court order requiring compliance with this Order under PURA § 15.021, filing a court action for contempt for failure to comply with this Order under PURA § 15.022, or imposing administrative penalties under PURA § 15.023.

21.    This transaction is in the public interest under PURA §§ 14.101, 39.262(l)-(m), and 39.915, only if all conditions and commitments described in this Order are met.

## IV.  Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders:

1.    The Commission approves the purchase of Oncor Electric Delivery Company LLC, by Ovation Acquisition I, LLC, Ovation Acquisition II, LLC, and Shary Holdings, LLC, approves the proposed restructuring of Oncor Electric Delivery Company, and finds that the purchase and restructuring of Oncor Electric Delivery Company is in the public interest under §§ 14.101, 39.262(l)-(m), and 39.915, subject to the conditions set forth in this Order.

2.    Unless the Commission has expressly ruled on or discussed a particular regulatory treatment of the proposed transaction, the Commission does not in this Order approve (a) any proposed regulatory treatment, (b) the applicability of any provision of PURA or Commission rules, or (c) the proper application of any applicable provision of PURA or Commission rules.

3.    The amount of tax savings shall be an issue to be addressed by Commission Staff and intervenors in the next rate proceeding of Oncor AssetCo and OEDC.

4.    Both Oncor AssetCo and OEDC shall each record in a separate account in its regulatory books the amount of federal-income-tax-expense revenue collected through rates.  The treatment of these accounts shall be addressed in a future rate proceeding, including the rate proceeding required by ordering paragraph 5.

5.    The purchasers shall file by April 6, 2016 a notice of intent to set the initial rates and tariffs of Oncor AssetCo.  Ordering paragraph 15 does not apply to this filing.

6.    If the Commission has not set the initial rates of Oncor AssetCo as final rates, before August 5, 2016, the authority granted by this Order to purchase and restructure Oncor expires and has not further effect.

7.    If the proposed transaction does not close before November 30, 2016, the authority granted in this Order to purchase and restructure Oncor expires and has no further effect.

8.      Applicants shall comply with the commitments and conditions that are reflected in the Order, as set forth in findings of fact 212-292 in this Order. Applicants shall make annual reports to the Commission regarding its compliance with these commitments and conditions.

9.      Effective the date that Oncor is restructured, Oncor's four current CCNs, numbered 30158, 30160, 30043, and 30152, are cancelled.

10.     Effective the date that Oncor is restructured, CCN number 30198 is granted to Oncor AssetCo, and the certificate will authorize Oncor AssetCo to own, construct, and lease distribution facilities in the area currently certificated to Oncor, to provide street lighting service within the area currently certificated to Oncor, and to own, construct, and lease the transmission facilities certificated to Oncor.

11.     Effective the date that Oncor is restructured, CCN number 30199 is granted to OEDC and will authorize OEDC to operate and construct the leased distribution facilities and perform any other function that a distribution utility would perform within the area currently certificated to Oncor, except for providing street lighting or any other distribution-related function Oncor AssetCo is specifically authorized to perform under its certificate. OEDC's certificate will authorize it to operate and construct the leased transmission facilities and perform any other function that a transmission utility would perform, except for the transmission-related functions Oncor AssetCo is specifically authorized to perform under its certificate. OEDC's certificate also authorizes OEDC to construct new facilities or reconstruct existing facilities.

12.     The entirety of the authority granted through Oncor's four CCNs is transferred to the two new CCNs, as authorized in ordering paragraphs 10 and 11.

13.     Oncor AssetCo and OEDC shall file a base-rate case by July 1, 2017, unless before that date a base-rate case has been initiated by Commission Staff or some other party.

14.     Oncor AssetCo must notify OEDC of any potential rate filing with sufficient lead time and with sufficient detail to allow OEDC to prepare a rate-filing package that can be filed concurrently with Oncor AssetCo's filing.

15.     OEDC must file a base-rate proceeding each time that Oncor AssetCo files a base-rate proceeding to ensure that OEDC's rates provide revenues to match Oncor AssetCo's rates.

16.     OEDC may file a base-rate proceeding without Oncor AssetCo to reflect changes in its costs of service unrelated to the lease payments.

17.     Oncor shall continue to charge customers the same rates until it is restructured.

18.     After Oncor is restructured, OEDC shall continue to charge the rates found in Oncor's current tariff until new tariffs are approved.

19.     The applicants shall notify the Commission within 24 hours of the completion, failure, or waiver of any condition precedent, including all other necessary approvals, to the closing of the transaction.

20.     The purchasers shall notify the Commission within 24 hours of any withdrawal or change in committed investors.

21.     All motions or requests for entry of specific findings of fact and conclusions of law, and other requests for general or specific relief not expressly granted, are denied.

Signed at Austin, Texas the $24th$ day of March 2016.

PUBLIC UTILITY COMMISSION OF TEXAS

_____

KENNETH W. ANDERSON, JR., COMMISSIONER

_____

BRANDY MARTY MARQUEZ, COMMISSIONER

Chairman Nelson joins the majority's decision approving the application and finding that the proposed transaction is in the public interest. However, for the reasons outlined in her March 17, 2016 memo in this docket, Chairman Nelson respectfully dissents from the majority's decision regarding the timing and treatment of the income tax expense.

_____

DONNA L. NELSON, CHAIRMAN

W2013
q:\cadm\orders\final\45000\45188fo.docx

Attachment A



### AFTER



