# **EXHIBIT 5**

1

2         UNITED STATES BANKRUPTCY COURT

3          FOR THE DISTRICT OF DELAWARE

4   ---------------------------------------x

5   In Re:

6   Energy Future Holdings Corporation,

7   et al.,

8                             Debtors.

9

10  Chapter 11

11  Case No. 14-10979

12  Jointly Administered

13  ---------------------------------------x

14

15

16        DEPOSITION OF BILLIE WILLIAMSON

17              New York, New York

18               August 4, 2016

19

20

21

22  Reported by:

23  BONNIE PRUSZYNSKI, RMR,

24  JOB NO.  110918

25

1           B. Williamson
2    specifically.
3        Q.    Have you ever seen a similar
4    analysis done in connection with the facts as
5    they exist today?
6        A.    Of taxable versus nontaxable?
7        Q.    Yes.
8        A.    Yes, I have.
9        Q.    And what does that show?
10       A.    That if we allowed a taxable
11   separation of TCEH, that EFH would have 4 to
12   6 billion dollars worth of taxes.
13       Q.    And what would the present value of
14   the benefit to reorganized TCEH be if you had
15   a taxable separation today?
16       A.    I have no idea.  I'm more concerned
17   with the fact that we would have 4 to
18   6 billion dollars worth of tax at the EFH
19   level, which would consume all of the assets.
20   There would be nothing to pay to the EFH
21   creditors.
22       Q.    So, it would be fair to say that in
23   connection with the negotiation and filing of
24   the current plan, you have not compared the
25   benefit that reorganized TCEH would receive

1                    B. Williamson

2  before or that sort of thing.  It matters

3  what it is today.

4       Q.    Sure.  Okay.  So today --

5       A.    Um-hum.

6       Q.    -- after the private letter

7  ruling --

8       A.    Um-hum.

9       Q.    -- what would the benefit --

10 present value of the benefit step-up be to

11 reorganized TCEH of a taxable transaction?

12      A.    I think it's -- I mean, it's

13 probably in line with these same kinds of

14 calculations, but that is not relevant.  What

15 is relevant is, for my constituents, at the

16 EFH level, I am not going to sign up for 4 to

17 6 billion dollars of taxes that wipe out all

18 of the cash for my creditors and leave a

19 stranded tax, unless there is absolutely no

20 other way to get this company out of

21 bankruptcy.

22      Q.    And have you reviewed Mr. Ying's

23 expert report?

24      A.    His detailed report, no.

25      Q.    Are you aware of the fact that he

1              B. Williamson
2  indicates that the present value of the
3  step-up that reorganized TCEH will receive
4  will be in excess of a billion dollars?
5      A.    Yes.
6      Q.    Can you offer any more specifics on
7  the value of the step-up that reorganized
8  TCEH would receive in a taxable transaction?
9          MR. FIRESTEIN:  Objection to form.
10     Q.    Today after the private letter
11 ruling?
12     A.    I'm going to say it the fifth time.
13 I'm not going to recommend that we enter into
14 a transaction that is taxable that leaves 4
15 to 6 billion dollars worth of tax at the EFH
16 level and wipes out all of the cash that is
17 associated with my creditors and leaves
18 stranded tax to the U.S. Government.
19         MR. PEDONE:  Would you read the
20    question, please.
21         (Record read.)
22     A.    I have nothing further to answer
23 that question.
24     Q.    Do you have any recollection of
25 seeing any documents in the last month that

1          B. Williamson

2  in connection with the Plan of

3  Reorganization?

4      A.   They agreed not to file a plan and

5  have not yet filed a plan that asked for that

6  taxable transaction.

7      Q.   So, therefore, would it be fair to

8  say that their forbearance from filing a plan

9  was the primary consideration asked for and

10 obtained by EFH for use of the NOLs?

11          MR. FIRESTEIN:  Objection to the

12     form.  Calls for a legal conclusion.

13          MR. PEDONE:  That's fair.  Let me

14     try to rephrase it.

15     Q.   What consideration did EFH Corp.

16 receive for agreeing to a plan that allows

17 the T firsts/reorganized TCEH to receive the

18 benefit of the NOLs?

19     A.   So, I just want to rephrase

20 something that I have said.

21     Q.   Sure.

22     A.   We were looking for a global

23 settlement where all of the estates would

24 agree and move forward on the plan that we

25 had.  So, the forbearance and not getting

1              B. Williamson
2  4 to 6 billion dollars worth of tax that
3  would use all of the cash associated with the
4  EFH side, was huge for us.  So if they had
5  pursued a taxable transaction, based on the
6  private letter ruling, we would have had a
7  significant tax liability at EFH, and so we
8  wanted to move forward with the tax-free
9  solution.
10     Q.    How did you go about evaluating the
11 odds that the T firsts could have succeeded
12 in getting court approval of a taxable
13 transaction?
14          MR. FIRESTEIN:  Objection to form.
15     Q.    Withdrawn.
16          Did you -- did you do anything to
17 evaluate the odds that the T firsts could
18 succeed in obtaining court approval of a
19 taxable transaction?
20          MR. FIRESTEIN:  Same objection.
21          MR. PEDONE:  What is the objection
22    to that question?
23          MR. FIRESTEIN:  I'm objecting --
24    the odds?
25          MR. PEDONE: Yes.  Okay.  That's

1                B. Williamson

2    the E-side were incorporated into the

3    ancillary agreements; correct?

4        A.    I would rather say that they were

5    taken into consideration.

6        Q.    Were there any requests for changes

7    to the ancillary agreements made by potential

8    bidders on the E-side that were not

9    incorporated into the agreements?

10       A.    The potential bidders were not

11   always in the same -- they didn't all have

12   the same views on every item.  So, it would

13   be difficult to incorporate all of their

14   comments.

15       Q.    Can you give me some examples?

16       A.    They are outlined in one of the

17   presentations.  I'm sorry, I don't want to

18   try to explain them without that in front of

19   me.

20       Q.    And so, from your memory, do you

21   have any examples that come to mind of the

22   issues that were of concern to the potential

23   bidders?

24       A.    There was an issue about who would

25   pay AMT.  There was an issue about the issue

1                    B. Williamson
2     that we talked about later, if you break it,
3     you pay for it.  Those are the ones that I
4     recall.
5         Q.    Are you aware of any additional
6     changes that could be made to the ancillary
7     agreements that would make it more likely
8     that any bidder on the E-side would pay a
9     higher amount?
10            MR. FIRESTEIN:  Calls for
11       speculation.
12            MR. McKANE:  Objection to the form.
13        A.    I don't understand the question, so
14    I am sorry.
15        Q.    I will rephrase it.
16            It's -- the ancillary agreements
17    could have an impact on the E-side sale
18    process; correct?
19        A.    They might, but I don't think it
20    would be significant.
21        Q.    It would be significant if the you
22    break it, you pay provision was not kept as
23    it is, wouldn't it?
24            MR. McKANE:  Objection to form.
25        A.    Kept as it is.  I don't know how to

1                    B. Williamson
2        Q.    Have you quantified the benefit, if
3    any, that reorganized TCEH will receive by
4    taking EFH Properties?
5        A.    The benefit?
6        Q.    Yes.
7        A.    Well, actually they didn't really
8    want to take it.  They -- nobody really
9    wanted to take Properties, and so it was part
10   of the negotiation and one of the things that
11   was put in that overall discussion and
12   overall compromise to have them take
13   Properties.
14              MR. PEDONE:  Let's take a
15         five-minute break for me to organize the
16         exhibits, and it will all go faster.
17              THE WITNESS:  You bet, no problem.
18              (Recess taken from 4:04 to
19         4:15 p.m.)
20              MR. PEDONE:  This is Keglevic 21.
21       Q.    I have handed you an e-mail from
22   Mr. Keglevic, and it references, "We have
23   promised first liens 5.8 billion of NOLs."
24              Do you know what he was referring
25   to?

1          B. Williamson

2     Q.    In connection with the prior plan,
3  the one that has been terminated, are you
4  aware of whether or not there were
5  discussions regarding reorganized TCEH or
6  Properties paying the note due balance that
7  is indicated on here for funds due from
8  Properties to EFH?
9     A.    Which number are you referring to?
10    Q.    Let me find it.  It's on the
11 second -- hang on one second.
12          It's the $158 million liability on
13 the second page, which ends in Bates range
14 660.
15    A.    Okay.  So state your question
16 again, now that I know what you are looking
17 at.
18    Q.    In connection with the prior plan,
19 meaning the one that was terminated, are you
20 aware of whether or not there were
21 discussions regarding whether reorganized
22 TCEH or EFH Properties would pay that
23 158.55 million amount?
24    A.    Yes.
25    Q.    And what was your understanding?

1                    B. Williamson
2       A.    That they said they wouldn't take
3  it if they had to pay it.
4       Q.    And was that issue revisited in
5  connection with the current plan?
6       A.    Yes.
7       Q.    When was it revisited?
8       A.    I don't know the specific date.
9       Q.    How do you know it was revisited?
10      A.    It's -- my attorney told me about
11 it.
12      Q.    Did your -- so what do you mean
13 by -- strike the question.  Revisited.
14            I am trying to actually break down,
15 were there communications with the T firsts
16 with regard to whether or not they would
17 agree to pay that amount?
18      A.    They have said they would not.
19      Q.    Do you know how that was
20 communicated?
21      A.    No.
22      Q.    How do you know that that's what
23 they said?
24      A.    It was told to me by one of our
25 attorneys.

1                  B. Williamson
2       Q.    Okay.  And in connection with any
3  negotiations or discussions regarding the
4  amended plan, did anyone on behalf of EFH
5  Corp. ask the T firsts or reorganized TCEH to
6  pay that amount?
7       A.    No.
8       Q.    Why not?
9       A.    It's not a real amount.
10      Q.    Why isn't it a real amount?
11      A.    Okay.  Did you major in accounting?
12      Q.    No.
13            MR. FIRESTEIN:  Uh-oh.
14      A.    Okay.  Let's see.  Basically --
15  shall we go through the whole history?  Is
16  that how we want to do that, or how do you --
17      Q.    I'm familiar with what prior
18  witness' said, and I believe you read some of
19  their transcript, so if you want to -- nobody
20  has quite said it's not a real amount or
21  anything characterizing it that way, so I
22  want to know what you meant by that.
23      A     Okay.  That is a fair question.
24            It's an intercompany amount, and it
25  is an amount that went on the financial

1                    B. Williamson
2      statements at the time that the letter of
3      credit was drawn on to support -- you know,
4      this is -- the Energy Plaza is part of a sale
5      leaseback transaction, so, I want to make it
6      clear that we don't own the building anymore.
7      We don't really have debt on the building
8      anymore.  We have a lease that is considered
9      a leveraged lease on the building.
10              So, part of -- when Zurich bought
11     the building, the debt -- the noteholder
12     wanted a guarantee from an investment-grade
13     entity, so they started out with EFH, and
14     then when EFH went to less than investment
15     grade, it went to TCEH.  And when TCEH went
16     to less than investment grade, it went to a
17     letter of credit.  Okay?  So --
18          Q.    If I could interrupt for a second.
19     That letter of credit was supported by TCEH;
20     correct?
21          A.    It was, yes.
22              And then as things continued to get
23     more and more challenged from a financial
24     standpoint, they drew on the letter of credit
25     so that cash was paid at that point in time.

 1                    B. Williamson
 2    It was about 115 or 120 million dollars at
 3    the time.  So the difference between 115 and
 4    the 158 in here is interest between EFH and
 5    EFH Properties, okay?
 6              So that is an intercompany.  It's
 7    not -- in my mind, it's not an external
 8    interest rate or anything like that.  So, a
 9    portion of this is intercompany interest.
10              And so, then TCEH said, hey, we
11    have paid this, and EFH said, okay, we will
12    pay you back.  So, in one of the settlement
13    times, EFH paid TCEH back.
14         Q.    Real money flowed between them?
15         A.    Sure did, cash.  Green stuff.
16              So, then EFH put this into
17    Properties.  So, again, it's an intercompany
18    liability.  EFH Properties does not have, has
19    never had the wherewithal to pay that back.
20    So they don't generate enough cash flow to
21    make that liability.  And at the end of the
22    lease, we won't own a building.  We won't
23    have a lease.  We won't have anything.
24              So, the issue with the liability
25    that is there is, there are alternatives

1                  B. Williamson
2    under accounting.  You can put it on there as
3    an intercompany liability, or you could have
4    put it on there as an intercompany
5    investment.  But it is not a liability that
6    anyone ever thought would be paid, or there
7    is no wherewithal in the projections that it
8    can ever pay that.
9         Q.   So, tell me why you don't believe
10   anybody thought it ever would be paid.
11        A.   Because it's an intercompany
12   transaction.  It's part of how you keep books
13   and records, and except when you are in
14   bankruptcy, you know, all that stuff sort of
15   gets eliminated in consolidation.
16             So, in bankruptcy there are
17   different issues or provisions or whatever
18   that deal with that, but it's an accounting
19   entry.  I don't -- it's not a real note.
20   It's not something that this entity can ever
21   pay back.
22        Q.   Were bondholders at EFH Corp. told
23   that?
24        A.   I -- that predates me, way predates
25   me.  I don't have any idea.  I'm sorry.

1                     B. Williamson
2        Q.    Do you know how this was reported
3   on EFH Corp.'s schedules and statements of
4   affairs in the case?
5        A.    Well, first off, this entity was
6   not filed in bankruptcy.
7        Q.    EFH Corp. schedules money due to it
8   on its schedules; correct?
9        A.    Yes, and I don't know, I did not
10  review the SOFAs.
11       Q.    When did you first learn that this
12  is not a real obligation, to use your term?
13            MR. McKANE:  Objection.
14       A.    I didn't characterize it that way.
15  What I am trying to explain to you is, it was
16  put on there as an intercompany liability
17  back to EFH.  But in looking at the
18  projections of what this entity has generated
19  and what it will generate in the future, it
20  is not going to throw off enough cash flow to
21  pay a liability of that size.  I want to make
22  sure that is clear.
23       Q.    It could have if perhaps the real
24  estate market were different in Dallas;
25  correct?