## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| | § Case No. 14-10979 (CSS) |
| ENERGY FUTURE HOLDINGS CORP., et al., | § (Jointly Administered) |
| | § |
| Debtors. | § **Objection Deadline: 9/6/16 at 4:00 p.m.** |
| | § **Hearing Date: 9/26/16 at 10:00 a.m.** |

## MOTION OF BLUEBONNET ELECTRIC COOPERATIVE, INC. FOR (I) ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM, OR (II) ALTERNATIVELY, FOR LEAVE TO FILE LATE PROOF OF CLAIM

Bluebonnet Electric Cooperative, Inc. ("*Bluebonnet*" or the "*Cooperative*") files this motion (the "*Motion*"), seeking allowance and payment of an administrative expense claim pursuant to sections 503(b)(1) and 105(a) of Title 11 of the United States Code (the "*Bankruptcy Code*") or, alternatively, for leave to file a late proof of claim. In support of this Motion, Bluebonnet would respectfully show the following:

### I. JURISDICTION

1.     The Court has jurisdiction over the Debtors' chapter 11 cases (the "*Bankruptcy Cases*") and this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. § 1408. Matters concerning administration of the estates and the allowance and disallowance of claims are core proceedings pursuant to 28 U.S.C. § 157(b)(2). The statutory predicate for the relief sought herein is section 503(b)(1) of the Bankruptcy Code. Pursuant to Local Rule 9013-1(h), Bluebonnet consents to the entry of final orders by this Court if it is determined that the Court, absent consent of the parties, cannot enter final orders consistent with Article III of the United States Constitution.

## II. BACKGROUND

2.     The Debtors commenced these chapter 11 cases (the "*Cases*") by filing voluntary petitions under chapter 11 of the Bankruptcy Code on April 29, 2014 (the "*Petition Date*"). While this Court has confirmed the *Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 7187] (the "*Prior Plan*"), the Prior Plan is now null and void.  Thus, the Court has scheduled a hearing on August 17, 2016, to consider confirmation of the Debtors' *Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9199] (as may be subsequently amended, supplemented or modified, the "*New Plan*").

3.     On August 18, 2014, this Court issued the General Bar Date Order [Doc. No. 1866], establishing the General Bar Date as October 27, 2014 (the "*General Bar Date*").

4.     Bluebonnet is a Texas non-profit retail electric cooperative as defined by Public Utility Regulatory Act ("*PURA*") § 11.003(9), providing retail electric service under CCN No. 30011, issued by the Public Utility Commission of Texas (the "*PUC*" or "*Commission*"), to which reference is made and incorporated in this Motion as if copied here verbatim.

5.     Certain of the Debtors and their corporate affiliates and subsidiaries are power generators as defined by the PURA, including but not limited to Luminant Generation Company LLC ("*Luminant Generation*"), and Sandow Power Company.  Both of these entities are power generation companies as defined by PURA § 31.002(10).

6.     The Debtors or their affiliates or subsidiaries are also owners and/or operators of a mine known as the Three Oaks Mine in Lee and Bastrop Counties, Texas (the "*Three Oaks Mine*" or "*Mine*"), including various facilities located in this area that consume electricity

2

provided by Luminant Generation and Sandow Power Company. The Mine area falls within a Commission-approved singly-certificated service territory of Bluebonnet.

7.    Neither Luminant Generation or Sandow Power Company are electric utilities as defined by PURA, and therefore, they cannot hold a Certificate of Convenience and Necessity ("*CCN*").

8.    Only a retail electric utility can hold a CCN for the provision of retail electric service and a CCN is a necessary prerequisite for the lawful provision of retail electric service. Nevertheless, prior to and following the Petition Date, at least one of the Debtors' affiliates (Luminant Generation) had been providing, and continues to provide, retail electric service to the various mining facilities owned and operated by another affiliate of the Debtors (Luminant Mining Company LLC), and which facilities are located within Bluebonnet's certificated service area. This conduct violates certain provisions of PURA, including without limitation, PURA Sections 31.002(10), 31.002(6), and 39.105(b). Moreover, in a prior dispute involving the same conduct of the Debtors, the PUC ruled that the conduct violated provisions of PURA and, thus, were subject to statutory penalties and fines under Texas utilities laws and actual damages. *See Complaint of Rusk County Electric Cooperative, Inc. Against TXU Electric Delivery Company and TXU Power,* PUC Docket No. 30037, Order on Rehearing (May 19, 2010).[1]

---

[1] The Commission's Final Order in *Rusk County* (Docket No. 30037 ) in 2010 contained, among others, the following findings of fact and conclusions of law: (i) "Luminant Generation and Luminant ET Services are not electric utilities and, therefore, cannot hold a CCN." *Id.*, Finding of Fact (FOF) 29; (ii) "Luminant Generation and Luminant Mining are separate legal entities." *Id.*, FOF 35; (iii) The electricity provided by Luminant Generation to Luminant Mining constitutes a retail sale of that electricity. *Id.*, FOF 43; (iv) Luminant Generation's provision of electricity to Luminant Mining is not self-service. *Id.*, FOF 44; (v) Luminant Generation is a power generation company as defined by PURA § 31.002(10). *Id.*, Conclusion of Law (COL) 4; (vi) Luminant Generation is in violation of PURA § 31.002(10) when it provides electricity to Luminant Mining. *Id.*, COL 11; (vii) Luminant Generation's provision of electricity to Luminant Mining is not self-service as defined by PURA § 31.002(6)(J)(i). *Id.*, COL 12; (viii) PURA §39.105(b) prohibits Luminant Generation from providing electric service to Luminant Mining. Id., COL 16; and (ix) Luminant Generation is acting as an electric utility and is in violation of PURA § 39.105(a) because it does not have a CCN. *Id.*, COL 17. Since, at least the entry of that order in 2010 (if not sooner), Luminant Generation and Sandow Power Company were on notice and aware that its electric power

9.     Thus, as of the Petition Date, and likely since at least since 2010, if not sooner, the Debtors knew or should have known that this conduct violated provisions of PURA. Bluebonnet, on the other hand, was unaware of the Debtors' past or current violations of PURA prior to the General Bar Date established in these Bankruptcy Cases, because the conduct of Debtors made it difficult to recognize that the Debtors' Mining operations were being conducted in Bluebonnet's service area. Specifically, transmission lines and connections to the facilities in the Mine area had been constructed and maintained in such a manner that made it difficult for Bluebonnet to discover their presence within Bluebonnet's singly certificated area until after the General Bar Date. Only with specific information, which Bluebonnet did not obtain until after the General Bar Date, did Bluebonnet discover the Debtors' PURA violations.

10.     On February 5, 2015, Bluebonnet gave the Debtors notice of these violations and demanded that the Debtors immediately cease and desist from continuing such violations. Initially upon receiving such demands, the Debtors denied any wrongdoing and declined to cease these violations of PURA. More than a year later, through certain filings with the PUC, the Debtors seemingly acknowledged these past and present violations.[2] Notwithstanding these admitted violations of PURA, the Debtors have refused to rectify their actions or compensate Bluebonnet for past violations, leaving Bluebonnet with no choice but to file this Motion.

---

activities in Bluebonnet's singly certificated service area were violations of PURA and the Commission's order in Docket No. 30037.

[2] Initially, in April, 2016, the Debtors merely acknowledged their own PURA violations. In June, 2016, however, the Debtors amended those PUC pleadings to allege (for the first time) that Alcoa, the prior owner of the Mine, was responsible for the Mine development and construction plans. *See* PUC Docket No. 45868, *Amended Request for Declaratory Order of Luminant Mining Company LLC Regarding the Provision of Electric Delivery Service to the Three Oaks Mine*, filed June 8, 2016. In those amended filings with the PUC, the Debtors allege (for the first time) that "Bluebonnet was completely aware of Alcoa's Mine development and construction plans," that "Bluebonnet never indicated to Alcoa that it should, could, or would provide permanent electrical service to the Mine," and that "Bluebonnet amicably worked with Alcoa on relocating its facilities to accommodate the construction of the Mine and in providing temporary construction power for the creation of the Mine." Bluebonnet has conducted its own due diligence of these allegations, and has found no evidence to support them to date. On the contrary, Bluebonnet would show that it never authorized or permitted Alcoa (or any other owner or operator of the Mine) to provide electric service to the Mine with electricity from its own facilities, nor did Alcoa (or its successors) obtain permission from the PUC. Bluebonnet reserves all rights to dispute any similar allegations made in this Court.

Moreover, despite the Debtors' knowledge that their pre- and post-petition conduct violated provisions of PURA and, thus, would give rise to damages in favor of Bluebonnet, the Debtors did not list any such claims for their known PURA violations in their Schedules of Assets and Liabilities.[3]

11.    By Bluebonnet's calculations, during the years prior to the commencement of these Bankruptcy Cases, the Debtors' facilities located in Bluebonnet's certificated service area utilized approximately $1,123,800 of power per year.[4] Had the Debtors complied with PURA by acquiring power from Bluebonnet to service the facilities located in the that area, the Debtors would have paid Bluebonnet over $10.3 million since taking over operations of the Mine in 2007, and at least $2,622,200 since the Petition Date.[5]

### III. RELIEF REQUESTED

12.    By this Motion, Bluebonnet seeks allowance of an administrative expense claim (the "*Administrative Expense Claim*") for all damages caused to Bluebonnet.    Based on Bluebonnet's calculations, such Administrative Expense Claim may exceed $10.3 million.[6] As

---

[3] Debtor Luminant Mining did schedule Bluebonnet as holding a general unsecured, non-priority claim in the amount of $239.15 [Doc. No. 1280], and Bluebonnet filed a proof of claim [Claim No. 4252] in the amount of $407.74 against Luminant Mining, relating to retail residential and commercial electric service provided to the Debtors' locations in Rockdale, Texas; Lexington, Texas; and Elgin, Texas. These consuming facilities of Luminant Mining were: a barn and house; bridge lights; and a house and shop. Moreover, such facilities appear to be unrelated to core mining or dragline operations.    The Debtors filed a notice on November 18, 2015 [Doc. No. 7044], indicating that Bluebonnet's $407.74 claim was all or substantially satisfied in the ordinary course of business, or by check on July 8, 2014.

[4] This annual amount has been calculated utilizing information provided by Luminant Mining regarding the estimated electrical load of all facilities in the Mine area, charged at Bluebonnet's Key Rate tariff, an approved rate under Bluebonnet's tariff for such service. Bluebonnet reserves the right to calculate its damages based on a higher rate to which the Debtors' load may be eligible, as approved by the PUC.

[5] These figures are calculated based on Bluebonnet's approved Key Rate tariff of $93,650 per month. Because the Debtors' admitted violations are continuing, and have been since 2007, including 28 months since the Petition Date, Bluebonnet's damages continue to accrue under applicable non-bankruptcy law.    As such, Bluebonnet asks this Court to allow Bluebonnet's claim for such additional amounts as are justified by the circumstances and applicable law, until the Debtors cease their admitted violations of applicable non-bankruptcy law.

[6] The Debtors began providing retail electric service to the facilities in the Mine area for approximately nine years, since 2007, and have known, since at least 2010, that their electric delivery practices violated PURA. Based on Bluebonnet's calculation of $1,123,800 of power usage per year, its damages could range from $6.7 million to over

set forth below, this entire amount may be allowed as a post-petition administrative claim, due to the Debtors' continuous violations of PURA and the circumstances surrounding their operations, which prevented Bluebonnet from discovering these PURA violations.    The Debtors have known since at least 2010, if not since the beginning of the Debtors' Mine operations, that their practices violate state utilities laws and damage retail electric utilities like Bluebonnet.

13.    In addition to the allowance of the Administrative Expense Claim under section 503(b)(1) of the Bankruptcy Code, Bluebonnet also seeks an order of the Court requiring payment of the Administrative Expense Claim immediately, or no later than upon occurrence of the Effective Date of the Plan.

14.    In the alternative, to the extent the Administrative Expense Claim is limited or disallowed, in part, Bluebonnet hereby seeks leave to file a late proof of claim to assert a general, unsecured non-priority claim for any portion of its claim that is not allowed as an administrative expense claim by this Court.

## IV.  ARGUMENT AND AUTHORITY

**The Administrative Expense Claim Should be Allowed for the Entire Amount.**

15.    Under section 503(b)(1)(A) of the Bankruptcy Code, the Court may allow as administrative expenses, the actual, necessary costs and expenses of preserving the estate.  A claim is entitled to priority treatment under § 503(b)(1)(A) if the applicant proves that "the debt [arises] from a transaction with the debtor-in-possession . . . [and] the consideration supporting the claimant's right to payment [is] beneficial to the debtor-in-possession in the operation of the business." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181

---

$10 million, depending on the amount of time the Court finds the Debtors to have been violating PURA, to Bluebonnet's detriment.

F.3d 527, 532-33 (3d Cir. 1999) (quoting *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950, 954 (1st Cir. 1976) (alterations in original)).

16.    Where a debtor engages in post-petition misconduct, courts have allowed the damages as priority administrative claims against the estate. *See In re Hayes Lemmerz Int'l, Inc.,* 340 B.R. 461, 480 (Bankr. D. Del. 2006) ("Damages arising from a post-petition tort committed by a debtor are entitled to administrative expense status.") (citing *Reading Co. v. Brown,* 391 U.S. 471, 485, 88 S. Ct. 1759, 20 L. Ed. 2d 751 (1968)). In *Hayes Lemmerz,* even though the debtor had a pre-petition lease contract with GECC for equipment, Judge Walrath held that GECC was entitled to an allowed administrative expense claim for damages arising from the debtors' post-petition misconduct, such as cannibalizing some of the machines to keep from having to buy new parts or machines.

17.    Here, the Debtors' PURA violations were concealed from Bluebonnet, and the Debtors failed to schedule a claim for their PURA violations or provide Bluebonnet with actual notice of these bankruptcy cases.[7] Only *after* the General Bar Date did Bluebonnet discover that the Debtors had been providing electric service to the Mine in violation of PURA. Under the circumstances, and based on the Debtors' continuing conduct, which was concealed from Bluebonnet, the entire Administrative Expense Claim should be allowed. As discussed above, the manner in which the transmission lines and connections to facilities within the Mine area were constructed and maintained rendered it difficult for Bluebonnet to determine that the Debtors were violating provisions of PURA.

---

[7] As noted above, the only claim scheduled by any of the Debtors was an undisputed claim in the amount of $239.15 due from Luminant Mining, which was unrelated to the illegal practices at the Mine and surrounding facilities. Given the Debtors' history of PURA violations, the Debtors, at a minimum, should have scheduled the claims arising from their PURA violations as contingent, unliquidated and/or disputed. Instead, the Debtors chose not to list any claims at all.

18.    As Judge Walrath held in *Hayes Lemmerz*, while certain continuing conduct may violate a pre-petition contract, there can also be a "'distinct post-petition injury' arising independently" of the pre-petition contract, giving rise to a separate post-petition damage claim.[8] The conduct here, given the lengths to which the PURA violations were concealed from Bluebonnet, as well as the prejudice to Bluebonnet, justify the allowance of an Administrative Expense Claim for the entire amount of Bluebonnet's damages.

19.    The Debtors unquestionably benefited from Luminant Generation and Sandow Power Company's provision of power to the facilities located in the Mine area. However, the Debtors paid nothing to Bluebonnet to obtain this benefit. Had the Debtors complied with PURA and the Commission order by obtaining electric service from Bluebonnet, Debtors would have paid Bluebonnet at least $10.3 million since taking over the Mine operations in 2007, and at least $2.6 million since the Petition Date.[9] Because Bluebonnet was ready, willing and able to provide such service, and because the Debtors have violated the letter and intent of PURA by providing their own power by or through an affiliate, they are liable to Bluebonnet under PURA. The liability arising from such violations constitutes an allowable administrative expense claim. *See Reading Co. v. Brown*, 391 U.S. 471, 485, 88 S. Ct. 1759, 20 L. Ed. 2d 751 (1968) (concluding that "damages resulting from the negligence of a receiver acting within the scope of his authority as receiver give rise to 'actual and necessary costs'" of the estate).

---

[8] *See In re Hemmerz Int'l, Inc.,* 340 B.R. at 479.
[9] Bluebonnet reserves the right to present evidence demonstrating all such damages at trial on this Motion, which may exceed the amounts set forth above.

**In the Alternative, Bluebonnet Should Be Allowed to File a Late Proof of Claim.**

20.     To the extent this Court determines that only the post-petition portion of the Administrative Expense Claim can be allowed under section 503(b) of the Bankruptcy Code,[10] Bluebonnet hereby seeks leave to file a late proof of claim for the remaining, disallowed portions of the Administrative Expense Claim, to be treated in these Bankruptcy Cases as a general unsecured non-priority claim.  The circumstances in this matter demonstrate cause to grant such relief, particularly given that the Debtors' continuing PURA violations remained concealed from Bluebonnet to its detriment until well after the General Bar Date.

21.     As a threshold matter, the General Bar Date Order is not applicable to Bluebonnet because the Debtors failed to give adequate notice to Bluebonnet as a "known creditor."  The notice provisions of the Federal Rules of Bankruptcy Procedure strike a balance between claimants' due process rights and "one of the principal purposes of bankruptcy law, to secure within a limited period the prompt and effectual administration and settlement of the debtor's estate." *Chemetron Corp. v. Jones,* 72 F.3d 341, 346 (3d Cir. 1995) ("*Chemetron I*"); *see also In re Nortel Networks, Inc.,* 531 B.R. 53, 62-63 (Bankr. D. Del. 2015). A creditor who does not receive proper notice of the claims bar date is not bound thereby.  *In re Nortel Networks, Inc.,* 531 B.R. at 62 (citing *City of New York v. New York, N.H. & H.R. Co.,* 344 U.S. 293, 296, 73 S. Ct. 299, 97 L. Ed. 333 (1953)).

22.     For purposes of notice, bankruptcy law differentiates between "known" and "unknown" creditors. *Chemetron I,* 72 F.3d at 346. "Known creditors" are entitled to actual notice of the applicable claims bar date. *Id.* Notice by publication is generally sufficient for

---

[10] *Cf. In re Marcal Paper Mills, Inc.,* 650 F.3d 311, 315-18 (3d Cir. 2011) (allowing an administrative expense claim only "to the extent that a portion of the benefits correlate to the employees' post-petition service, [because] the benefit is akin to direct compensation provided in exchange for post-petition services, which undisputedly qualifies as an administrative expense").

"unknown creditors." *Id.* "The law regarding whether a creditor is known or unknown is well settled and discussed at length by the United States Court of Appeals for the Third Circuit in *Chemetron I.*" *See In re Nortel Networks,* 531 B.R. at 63 (discussing *Chemetron I*):

> A known creditor is one whose identity is either known or reasonably ascertainable by the debtor. An unknown creditor is one whose interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor].

*Id.* at 346-47 (internal quotation marks omitted; quoting *Chemetron I*, 72 F.3d at 346); *see also Mullane v. Central Hanover Bank & Trust, Co.,* 339 U.S. 306, 317, 70 S. Ct. 652, 94 L. Ed. 865 (1950).

> A creditor's identity is "reasonably ascertainable" if that creditor can be identified through reasonably diligent efforts. . . . Reasonable diligence does not require impracticable and extended searches . . . in the name of due process. . . . A debtor does not have a duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it. . . . The requisite search instead focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required. . .

*Chemetron I,* 72 F.3d at 346-47 (internal quotation marks and citations omitted).

23.     Here, Bluebonnet was a "known creditor" because the Debtors knew or should have known that they were violating provisions of PURA by providing electric service to facilities within Bluebonnet's singly-certificated territory.    With reasonable diligence— particularly given the PUC's 2010 ruling in the Rusk County matter[11]—the Debtors would have known or should have discovered that the Mine was within Bluebonnet's singly-certificated territory and that, as such, Bluebonnet held a claim for damages arising from the Debtors' past and present violations of PURA.    Notwithstanding the Debtors' known violations, they did not

---

[11] *See Complaint of Rusk County Electric Cooperative, Inc. Against TXU Electric Delivery Company and TXU Power,* PUC Docket No. 30037, Order on Rehearing (May 19, 2010).

give Bluebonnet actual notice of the Bankruptcy Cases and the General Bar Date Order in such a manner that would have allowed Bluebonnet to file a claim for damages arising from PURA violations.

24.    Even if notice had been proper under the standards outlined above, the circumstances justify granting leave to allow Bluebonnet to file a late claim, because Bluebonnet can demonstrate excusable neglect.  Just as the Court held in *In re Grand Union Co.,* 204 B.R. 864 (Bankr. D. Del. 1997), even if the Debtors had mailed a notice of the General Bar Date to Bluebonnet, Bluebonnet would not have understood the importance of that notice.  At the time the General Bar Date Order was entered in August of 2014, Bluebonnet was unaware of any claim it held against Luminant Mining and its affiliate Debtors as it concerns the illegal electric service being provided to the mining activities in Bluebonnet's service area. The Debtors were not members of Bluebonnet for these mining activities, and it was only *after* the October 2014 General Bar Date that Bluebonnet discovered the Debtors' violations of PURA.

25.    "Bankruptcy Rule 9006(b)(1) empowers a bankruptcy court to permit a creditor to file a late claim if the movant's failure to comply with an earlier deadline 'was the result of excusable neglect.'" *Chemetron I,* 72 F.3d at 349. Whether neglect is "excusable" is an essentially equitable determination. *See id.* (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993)). Relevant circumstances, emphasized by the Supreme Court in *Pioneer*, include: "[1] the danger of prejudice to the debtor, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Pioneer,* 507 U.S. at 395; *see also In re O'Brien Environmental Energy, Inc.*, 188 F.3d 116, 126 (3d Cir. 1999).

26.    In this case, the initial reason for Bluebonnet's delay is the Debtors' failure to follow state law and apprise and request electric service from Bluebonnet. Because allegations of PURA violations are serious, Bluebonnet proceeded carefully, but expeditiously, upon learning of the Debtors' conduct, as Bluebonnet wanted to verify such violations before making any potentially inaccurate allegations.    As soon as Bluebonnet confirmed such violations, they notified the Debtors in February, 2015.  The reason for such additional 18 month delay in filing this Motion is that the Debtors engaged in settlement negotiations with Bluebonnet to completely resolve this matter (while recently working with Alcoa to obtain relevant information concerning the Mine operations),[12] and Bluebonnet was hopeful that such discussions would alleviate the need for legal proceedings. Only in recent filings with the PUC, in mid- to late-April of 2016, did the Debtors finally and formally admit to their own PURA violations.     Yet, despite such admissions, the Debtors have not ceased their unlawful conduct. The delay described above is reasonable under the circumstances.

27.    Also, Bluebonnet believed that its delay while attempting to negotiate in good faith was reasonable.  Under applicable Texas law, the statute of limitations did not begin to run until Bluebonnet discovered, or should have discovered, the Debtors' PURA violations.[13] Moreover, such delay has caused no prejudice to the Debtors or their estates, nor will the Debtors' estates be harmed by the proposed late-filed claim.  The Debtors are still working to confirm a new chapter 11 plan of reorganization, and the New Plan has yet to be confirmed or go effective.  And, depending on how much the Court allows as an administrative expense under

---

[12] As the Court will recall, the Debtors' relationship with Alcoa is complicated.  *See, e.g., Motion of Energy Future Holdings Corp., et al., for Entry of an Order Approving the Assumption of All Executory Contracts by and Among Luminant Generation Company LLC, Luminant Mining Company LLC, Sandow Power Company LLC, Texas Competitive Electric Holdings Company, LLC, and Alcoa Inc.* [D.I. 5789] [as amended at D.I. 7549, and approved at D.I. 7713].

[13] *See, e.g., KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 750 (Tex. 1999).

section 503(b) of the Bankruptcy Code, the potential late-filed claim may be in the range of $6.7-10.3 million—significant to Bluebonnet, but not terribly significant to the Debtors or their bankruptcy estates when compared to the billions of dollars in debt being addressed under the Debtors' plan. Accordingly, under the circumstances, Bluebonnet can show that cause exists to grant leave to file late claims to the extent this Court does not allow the Administrative Expense Claim in its entirety.

## V. PRAYER

WHEREFORE, Bluebonnet respectfully requests that the Court enter an order: (i) allowing the Administrative Expense Claim under section 503(b)(1) of the Bankruptcy Code in an amount consistent with this Motion, plus any additional amounts as may be assessed by the PUC; (ii) as an alternative, if the Administrative Expense Claim is denied, in part or in its entirety, granting Bluebonnet leave to file a late general unsecured, non-priority proof of claim for any disallowed portions of the Administrative Expense Claim; (iii) ordering the Debtors to pay such Administrative Expense Claim on or before the Effective Date of the Plan; and (iv) granting such other and further relief as may be just and proper.

Dated: August 16, 2016

MANION GAYNOR & MANNING LLP

By: _____
    Marc J. Phillips (Del. Bar No. 4445)
    1007 North Orange Street, 10th Floor,
    Wilmington, DE  19801
    Telephone:  (302) 504-6803
    Facsimile:  (302) 657-2104
    Email: MPhillips@mgmlaw.com

    and

DYKEMA COX SMITH

    Jeffrey R. Fine (TX Bar No. 07008410)
    Alison R. Ashmore (TX Bar No. 24059400)
    Aaron M. Kaufman (TX Bar No. 24060067)
    1717 Main Street, Suite 4200
    Dallas, Texas  75201
    Telephone:  (214) 462-6400
    Facsimile:  (214) 462-6401
    Email:  jfine@dykema.com
         aashmore@dykema.com
         akaufman@dykema.com

    and

HOLLAND & KNIGHT LLP

    Mark Davis (TX Bar No. 05525050)
    1005 Congress Avenue, Suite 950
    Austin, TX. 78701
    Telephone:  (512) 472-1081
    Facsimile:  (512) 472-7473
    Email:  Mark.Davis@hklaw.com

*Counsel for Bluebonnet Electric Cooperative, Inc.*