1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                        :

                                  :    Chapter 11

6   ENERGY FUTURE HOLDINGS        :

    CORP., et al.,                :    Case No. 14-10979(CSS)

7                                 :

              Debtors.            :    (Jointly Administered)

8   _____ :

9

10

11

12

13                              United States Bankruptcy Court

14                              824 North Market Street

15                              Wilmington, Delaware

16

17                              August 17, 2016

18                              10:04 AM - 5:22 PM

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

1    Notice of Filing Third Amended Joint Plan of Reorganization

2    of Energy Future Holdings Corp., et al., Pursuant to Chapter

3    11 of the Bankruptcy Code [D.I. 9199; filed August 5th,

4    2016] (as may be further modified, amended, or supplemented,

5    the "Plan")

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach & Dawn South

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3         Attorney for the Debtors

4

5    BY:  BARACK ECHOLS, ESQ.

6         CHAD HUSNICK, ESQ.

7         MARK MCKANE, ESQ.

8

9    RICHARDS, LAYTON & FINGER

10        Attorneys for the Debtors

11

12   BY:  DANIEL J. DEFRANCESCHI, ESQ.

13

14   POTTER ANDERSON CARROON LLP

15        Attorney for Deutsche Bank New York

16

17   BY:  R. STEPHEN MCNEILL, ESQ.

18

19   VENABLE, LLP

20        Attorneys for Pimco

21

22   BY:  JEFFREY S. SABIN, ESQ.

23        JAMIE EDMONSON, ESQ.

24

25

1    WHITE & CASE

2         Attorney for TCEH Ad Hoc Group

3

4    BY:  J. CHRISTOPHER SHORE, ESQ.

5

6    FOX ROTHSCHILD

7         Attorney for the Ad Hoc TCEH Noteholders

8

9    BY:  JEFFREY M. SCHLERF, ESQ.

10

11   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

12        Attorneys for the Ad Hoc Committee of TCEH First Lien

13        Creditors

14

15   BY:  ALAN W. KORNBERG, ESQ.

16        JACOB A. ADLERSTEIN, ESQ.

17        KELLIE CAIRNS, ESQ.

18        MOSES SILVERMAN, ESQ.

19

20   YOUNG CONAWAY STARGATT & TAYLOR, LLP

21        Attorney for the Ad Hoc Committee of TCEH First Lien

22        Creditors

23

24   BY:  PAULINE K. MORGAN, ESQ.

25

1   PACHULSKI STANG ZIEHL & JONES

2        Attorney for EFIH Second Lien Noteholder

3

4   BY:  LAURA DAVIS JONES, ESQ.

5

6   SULLIVAN & CROMWELL

7        Attorney for E-Side Committee

8

9   BY:  BRIAN GLUECKSTEIN, ESQ.

10

11  NIXON PEABODY

12        Attorney for AST as EFH Indenture Trustee

13

14  BY:  GEORGE SKELLY, ESQ.

15        RICHARD PEDONE, ESQ.

16        ERIK SCHNEIDER, ESQ.

17        MORGAN NIGHAN, ESQ.

18

19  MCELROY DEUTSCH MULVANEY & CARPENTER LLP

20        Attorney for TCEH Debtors - Conflict counsel

21

22  BY:  DAVID A. PRIMACK, ESQ.

23

24

25

1    MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

2         Attorney for E-Side Committee

3

4    BY:  MARK A. FINK, ESQ.

5

6    MORRIS JAMES

7         Attorney for Law Debenture

8

9    BY:  STEPHEN MILLER, ESQ.

10

11   MUNGER, TOLLES & OLSON

12        Attorney for TCEH Debtors - Conflict Counsel

13

14   BY:  TOM WALPER, ESQ.

15

16   SEWARD KISSEL, LLP

17        Attorney for Wilmington Trust as TCEH First Lien

18        Agent

19

20   BY:  ARLENE ALVES, ESQ.

21        MARK KOTWICK, ESQ.

22

23

24

25

1   KLEHR HARRISON HARVEY BRANZBURG LLP

2        Attorney for UMB Bank, Indenture Trustee

3

4   BY:  RAYMOND H. LEMISCH, ESQ.

5

6   AKIN GUMP STRAUSS HAUER & FELD

7        Attorney for UMB Bank, Indenture Trustee

8

9   BY:  CHRISTOPHER CARTY, ESQ.

10

11  PATTERSON BELKNAP

12       Attorney for Law Debenture Trust Company

13

14  BY:  DANIEL LOVENTHAL, ESQ.

15

16  PROSKAUER ROSE

17       Attorney for EFH Corp.

18

19  BY:  PETER YOUNG, ESQ.

20       MARK THOMAS, ESQ.

21       MICHAEL FIRESTEIN, ESQ.

22

23

24

25

1  REED SMITH, LLP

2        Attorneys for EFCH 2037 Notes Trustee

3

4  BY:  SARAK KAM, ESQ.

5

6  MORRISON & FOERSTER, LLP

7        Attorneys for TCEH Committee

8

9  BY:  BRETT MILLER, ESQ.

10        ERICA RICHARDS, ESQ.

11

12  CROSS & SIMON, LLP

13        Attorneys for EFH Indenture Trustee

14

15  BY:  CHRISTOPHER SIMON, ESQ.

16        KEVIN MANN, ESQ.

17

18  HOGAN MCDANIEL

19        Attorneys for Fenicle, Fehy & Jones

20

21  BY:  DANIEL K. HOGAN, ESQ.

22        GARVAN MCDANIEL, ESQ.

23

24

25

1  DRINKER, BIDDLE & REATH, LLP
2       Attorneys for Citibank, DIP Agent
3
4  BY:  HOWARD A. COHEN, ESQ.
5
6  BIELLI & KLAUDER
7       Attorneys for EFH Corp.
8
9  BY:  DAVID KLAUDER, ESQ.
10
11 ASHBY & GEDDES
12      Attorneys for WSFS
13
14 BY:  RICARDO PALACIO, ESQ.
15
16 BROWN RUDNICK
17      Attorneys for WSFS
18
19 BY:  JONATHAN MARSHALL, ESQ.
20
21 KASOWITZ BENSON TORRES & FRIEDMAN, LLP
22      Attorneys for Fenicle, Fehy & Jones
23
24 BY:  ANDREW GLENN, ESQ.
25

1    FRIED FRANK

2         Attorneys for Fidelity

3

4    BY:  GARY KAPLAN, ESQ.

5         ALICIA AIN, ESQ.

6         MATT ROOSE, ESQ.

7

8    UNITED STATES DEPARTMENT OF JUSTICE

9         Attorneys for U.S. Trustee

10

11   BY:  RICHARD L. SCHEPACARTER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.

4              Good morning.

5              MR. MCKANE:  Good morning, Your Honor.  Mark

6    McKane of Kirkland & Ellis on behalf of the debtors.  We are

7    here to start the confirmation hearing for the TCEH debtors

8    and what we refer to as the shared services debtors.

9              But before we get to opening statements, Your

10   Honor, we would like to raise one issue regarding some

11   filings that were made last night.

12             Your Honor, between seven and eight o'clock last

13   night the EFH Indenture Trustee filed two filings.  They are

14   two pretrial briefs totaling approximately 35 to 39 pages.

15   Upon receipt of those briefs the debtors had concerns.  We

16   specifically checked the scheduling order to make sure we

17   didn't misconstrue it.  Whether you characterize these as

18   pretrial briefs or sur-replies there's nothing in the

19   schedule that provides for these.  And we started to

20   evaluate whether we needed to file a motion to strike those

21   filings.

22             But then we read them.  And, Your Honor, when we

23   read them it's fair to say that there's no there there.

24   There's nothing new there.  It is just a re-articulation of

25   the arguments that were made in the objection.

1          And so stepping back and recognizing, you know,

2    what the value is, we are not going to move to strike the

3    pleadings.  All we ask is to the extent that there is going

4    to be briefing on the law or an opportunity in written

5    submissions to apply the facts to the law that both sides

6    get that opportunity and that these filings be considered as

7    all or part of that opportunity.

8          Thank you, Your Honor.

9          THE COURT:  Thank you.

10          Mr. Pedone.

11          MR. PEDONE:  Your Honor, I appreciate Mr. McKane's

12    comments and purposely kept argument out of those briefs and

13    reply.  They're additional expansion on statements of law of

14    issues raised in the objection.  It's nothing new, just

15    additional law we thought would aid the Court.

16          Thank you.

17          THE COURT:  All right.  Well, you know, we have a

18    pretrial order because we need a pretrial order in this

19    complicated case, and there are a lot of moving parts.

20    Given when they were filed, you know, frankly, I haven't

21    read them.  I was only aware of one of them.  I wasn't aware

22    that two had been filed.

23          So I think it's a sort of a non-issue, I suppose,

24    for present purposes.  And if I get around at some point to

25    have enough time to look at them I may do so at that time.

1    But it sounds like there isn't an issue to deal with

2    specifically.

3              So -- and, certainly, if we have further briefing

4    in connection with confirmation it will be organized and it

5    will give every party an opportunity, a full and fair

6    opportunity to participate in that briefing.

7              MR. MCKANE:  Thank you, Your Honor.

8              THE COURT:  You're welcome.

9              Mr. Husnick.

10             MR. HUSNICK:  Good morning, Your Honor.  Chad

11   Husnick with Kirkland & Ellis appearing on behalf of the

12   debtors.

13             Your Honor, I'll deliver the debtors' opening

14   statement this morning.  And if I may, I'll publish a

15   presentation, then I'll walk us through the opening

16   statement.

17             THE COURT:  Okay.  Oh, wait.

18             MR. HUSNICK:  I skipped.  There we go.

19             THE COURT:  Give me a second.

20             MR. HUSNICK:  If Your Honor would like a hard copy

21   I can walk him --

22             THE COURT:  No.  It's --

23        (Pause)

24             THE COURT:  I'm fine.

25             MR. HUSNICK:  Thank you, Your Honor.

1          Your Honor, all debtors are here today seeking

2     confirmation of the plan of reorganization as to the TCEH

3     debtors and the EFH shared services debtors.  Importantly,

4     Your Honor, what we're not seeking confirmation of today is

5     a plan as to the EFH debtors and the EFIH debtors.  And

6     we're also not seeking confirmation of any provisions in the

7     plan that relate to a taxable transaction.

8          And we filed the confirmation order late last

9     night that I'm sure folks are still digesting.  But we made

10    very clear in the confirmation order that any provision in

11    the plan related to a taxable transaction is not operative

12    and not being confirmed.  That is simply a reservation,

13    should the plan not go effective as is, we would need to

14    come back to Your Honor and have a new confirmation process

15    as it relates to any taxable transaction.

16         Your Honor, what -- but while we're not seeking

17    confirmation of the plan as to the EFH and EFIH debtors,

18    there are, of course, certain provisions in the plan that we

19    seek to have binding on the EFH and EFIH debtors as the co-

20    proponents of the plan.  That includes, of course, entry

21    into and performance under the tax matters agreement, the

22    separation agreement, and the interim transition services

23    agreement.  And you're going to hear a lot about that in the

24    witness testimony and the justification for the actions that

25    we're seeking authority to take.

1            Your Honor, this case has been filled with

2    metaphors and metaphors often put up by my colleague, Mr.

3    Kieselstein (ph).  Mr. Shore as well.  He went from lobster

4    and potato chips and airplanes to gestation periods for

5    large land mammals.

6            Your Honor, no matter which metaphor we choose to

7    apply to this case, after more than four years of

8    restructuring efforts, three years of negotiations with key

9    stakeholders and two years of Chapter 11 the time has come

10   for the TCEH debtors to confirm a plan and actually emerge

11   from Chapter 11.

12            But why is this the right deal?  The evidence is

13   going to show from all of the witnesses that this is the

14   best available alternative.  But it's not only the best

15   available alternative, it's the only alternative.  This

16   alternative avoids the tax Armageddon and I probably owe

17   five cents to Mr. McKane every time I say that word, but

18   you're going to hear it a lot in the trial.  I believe he

19   has a copyright on it.

20       (Laughter)

21            MR. HUSNICK:  It also brings finality and closure

22   to the T-Side and confirmation of this plan and the evidence

23   will show that it best positions the EFH and EFIH debtors

24   for what would be either a stand-alone reorganization or a

25   sale transaction to a third party such as NextEra as

1   contemplated right now.

2          Your Honor, my opening statement I plan to set the

3   stage for what will happen over the next five days ending on

4   Tuesday.  I would like to think of myself as still young,

5   but I am optimistic as well.  I'm going to cover development

6   of the plan and how we got to where we are today.  I'm going

7   to cover a summary of that plan and the evidentiary support

8   that we are going to put in forth of -- put in favor of

9   satisfaction of the 1129 requirements.  And then I'm going

10  to address very briefly the objections and the evidence that

11  we intend to put forward to rebut those objections.

12          How did we get here, Your Honor?  Any discussion

13  in this case, and you're going to hear from the witnesses,

14  must necessarily begin with taxes.  The focal point since

15  the beginning of these Chapter 11 cases has, in fact, been

16  taxes.  And the consistent referring that you've heard from

17  witnesses that have taken the stand and you'll continue to

18  hear is that the desire to avoid tax Armageddon, the desire

19  to avoid straddling the EFH, EFIH debtors and perhaps the

20  TCEH debtors with a massive stranded tax.

21          To do that the debtors explored all available

22  alternatives and you're going to hear significant testimony

23  from Ms. Williamson, Ms. Dore, Mr. Keglevic that they

24  explored all alternatives and they walked the boards through

25  all alternatives.

1              As one of the attorneys that's been working on

2     this matter since June of 2012, that's over four years, I

3     can assure you that the company and its board have

4     considered all available alternatives.  They considered a

5     consolidated Olympus transaction that we heard a lot about

6     in the first RSA.  When consolidated Olympus didn't generate

7     consensus across the capital structure they switched to a

8     deconsolidated transaction.  But as Your Honor knows there's

9     massive complexity associated with a deconsolidated

10    transaction, and that's where the deconsolidated tax comes

11    in, the separation tax that we'll talk about and you'll hear

12    about in the testimony.

13              To deal with that we address -- we analyzed tax

14    free transactions, tax efficient transactions and taxable

15    transactions.  Ultimately, you're going to hear from the

16    witnesses that after all of that evaluation they determined,

17    not surprisingly, that the tax free spin was the best

18    available maximizing alternative.  And we filed a 50 page

19    omnibus tax memo in October of 2014 highlighting exactly why

20    that is, the tax complexities associated with the separation

21    tax.

22              Indeed, in a moment of apparent weakness Mr. Shore

23    even said that was one of the few things the debtors got

24    right in these Chapter 11 cases, taxes.  No party could

25    seriously disagree that the tax free spin is the best

1    alternative.  And the witnesses are going to provide that

2    testimony as well.

3           Your Honor, you'll hear from the witnesses that we

4    negotiated with parties to achieve that tax free goal having

5    concluded that the tax free spin is the best alternative.

6    The witnesses will testify that the negotiation with the T-

7    First when we first approached them about the tax free spin

8    was contentious and there was significant give and take.

9           The E-Side for its benefit wanted to avoid the

10   tax, of course, but also best position the E-Side debtors

11   for a stand-alone transaction or a sale transaction.

12          On the T-Side, the TCEH first lien creditors, the

13   punitive owners of the reorganized TCEH entity, strove to

14   try if they were going to forgo the taxable setup the

15   witnesses will testify that they made clear they needed to

16   be compensated for the foregone step up and basis.  But they

17   also had another goal and that was speed.  They didn't get

18   speed so far, but that's still an important goal to them and

19   that is something that they were very focused on from the

20   outset.

21          The final consideration that both sides were

22   interested in was resolution of the intercompany disputes.

23   And as Your Honor is aware, the last confirmation hearing we

24   sought approval of a transaction that resolved everything, a

25   global settlement transaction, a tax free spin transaction,

1    and a busted 351 component to compensate the TCEH first

2    liens.

3           Your Honor is aware the global settlement resolved

4    all of the intercompany litigation, all of the litigation

5    between the TCEH first liens and the unsecured creditors,

6    all of the litigation related to the existing equity

7    sponsors.  I cannot underestimate the importance of that

8    transaction.  And you'll hear from the witnesses that this

9    transaction of the settlement agreement significantly

10   narrowed the issues that we needed to deal with as part of

11   an alternative plan.  It avoided years of litigation and

12   most importantly it was all weather.  It did not go away

13   when Plan A terminated.  As a result, I can stand here today

14   and say that we have significant consensus on the T-Side.

15          The transactional element of the first plan, of

16   course, included the busted 351 transaction and the spinoff.

17   And you're going to hear evidence that the busted 351 was a

18   trade for the -- to avoid the opt -- the taxable transaction

19   as well as any operational limitations.  And I'll talk about

20   those operational limitations and what you're going to hear

21   from Mr. Keglevic in a bit.

22          You're also going to hear evidence that the TCEH

23   first liens have consistently made clear they will not

24   consent to a tax free transaction without the busted 351.

25   And if there were any doubt whether they would consent or

1    not, the T-First filed their brief on Monday and made clear

2    in the written product that they would not consent.

3            Your Honor ultimately confirmed that plan in

4    December after a month-long confirmation hearing and the

5    debtors set off to try and get approval of that plan from

6    the regulatory agencies.

7            As Your Honor remembers, the PUCT, the Public

8    Utility of Commission, needed to approve the E-Side

9    transaction.  And the PUCT did, in fact, approve that

10   transaction, but not all of it.  There was a portion of the

11   transaction that was not approved in advance of the April

12   30th deadline and, ultimately, the TCEH first liens informed

13   the debtors on May 1st, 2016 that they would be sending a

14   plan support termination notice.

15           The delivery of the plan support termination

16   notice of course, Your Honor, would render that plan, the

17   original confirmed plan, null and void and send the debtors

18   on a mission to confirm an alternative plan.

19           Your Honor, that turns me to the development of

20   the alternative plan considerations.

21           Your Honor, the debtors negotiated in the first

22   plan for a backup mechanism.  You may remember that it was a

23   significant provision in that we used to call it a toggle

24   and we tried -- we got rid of toggle and we came in with the

25   backup plan mechanism.  And we fought hard to get that

1    knowing that there was risk that the first transaction

2    wouldn't close.

3              And we used that backup plan mechanism beginning

4    in early 2013.  You're going to hear that the evidence will

5    show -- you're going to hear from Ms. Williamson, Ms. Dore

6    and Mr. Keglevic that in the early part of 2016 the debtors

7    began discussing with their boards and key stakeholders

8    backup plans.  Ms. William was -- Ms. Williamson will

9    testify as a member of the EFH board and as one of the two

10   disinterested directors at EFH that the EFH board was

11   regularly updated about the status of consummation of the

12   old plan by the debtors' management, the co-CROs, Kirkland

13   and Evercore.

14             She will also testify that she attended formal

15   meetings of the EFH board and consulted early and often with

16   her disinterested director advisors, Proskauer & Sullick

17   (ph).  And you'll hear a lot about that from Ms. Williamson.

18             Ms. Dore and Mr. Keglevic, for his part, will talk

19   about initiating preliminary discussions on or about

20   February of 2016 with key stakeholders.  They will testify

21   that they held those discussions in an effort to try and

22   piece together a potential alternative restructuring

23   transaction.

24             And Ms. Dore and Mr. Keglevic will testify that

25   that process intensified and accelerated as it became

1    clearer in early 2016 that the old plan may not compensate

2    -- consummate.

3              Ms. Dore and Mr. Keglevic will testify that the

4    board was critically aware of one very important fact,

5    exclusivity had expired.  There was nothing stopping the

6    filing of competing plans and there was nothing stopping the

7    TCEH first lien lenders from filing a taxable plan.  The

8    plan that Mr. Keglevic will testify would have resulted, if

9    confirmed, in tax Armageddon.

10             And that taxable threat, Mr. Keglevic will

11   testify, was not a bluff.  Your Honor, they filed -- the

12   TCEH first liens filed with their motion -- or with their

13   brief in support of the scheduling motion the actual plan.

14   They had it ready to go.

15             Against that backdrop, Your Honor, the debtors at

16   the behest of Mr. Keglevic and Ms. -- or led by Mr. Keglevic

17   and Ms. Dore took off to negotiate an alternative plan.  The

18   first principles of the alternative plan are quite simple

19   and you're going to hear a lot about them from the

20   witnesses.

21             The first principal number one was a tax free

22   spin.  Not surprising.  Mr. Keglevic, Ms. Dore and Ms.

23   Williamson will testify that the debtors, including EFH

24   Corp., continued to believe that the tax free spin remained

25   preferable to a taxable transaction and in the best interest

1    of all of the debtors.  Why is that?  Well, the evidence

2    will show that the boards were very much aware and respected

3    the potential tax Armageddon.  There was no exclusivity as

4    I've already mentioned, and the T-Firsts were consistently

5    banging at the door filing the taxable transaction.

6          But it became even more clear.  The hypothetical

7    risk of tax Armageddon became reality in May of 2016.

8    You're going to hear Mr. Keglevic and Ms. Howard testify

9    about the CODI ruling, the tentative ruling that we learned

10   about in May of 2016.

11         The CODI ruling made clear that a taxable

12   transaction would not just result in or have the risk of

13   resulting in stranding the tax.  It was a reality.  The CODI

14   ruling made clear that $26 billion of gain would come due if

15   there was a taxable separation.  That would wipe out all of

16   EFH Group's NOLs and leave behind a $6.5 billion stranded

17   tax.

18         In comparison, Mr. Keglevic will testify that the

19   board analyzed the tax free spin under the PLR that avoids

20   that tax and preserves approximately $1.2 billion of NOLs

21   for reorganized EFH.  That's the alternative, $380 million

22   of savings Mr. Keglevic will testify.

23         That's core principle number one.

24         Core principle number two you will hear about from

25   Mr. Keglevic is preserving the alternative restructuring

1    terms.  That's paying the $550 million (indiscernible) prize

2    from the TCEH first to the TCEH unsecured creditors.  This

3    one is easy.  Without that we have World War III on our

4    hands again and that was not in anyone's best interests.  So

5    that was a core principle of the alternative plan.

6            The third principle you're going to hear about

7    from Mr. Keglevic is cleaning up EFH and EFIH.  Here Mr.

8    Keglevic will testify that the goal was to position EFH and

9    EFIH for emergence from Chapter 11, either as a stand-alone

10   or as -- through a third party sale.  And that involved,

11   among other things, contributing the equity in EFH Corporate

12   Services and EFH Properties as well as the assets and

13   liabilities of those entities to reorganized TCEH.  Cleaning

14   it up.

15           Mr. Keglevic will testify and the Court can take

16   judicial notice that the proposed contribution of these

17   entities has been a part of every single plan filed in these

18   cases from the very first plan to the confirmed plan to the

19   plan that I present to you today.  This is not by mistake.

20   It reflects the sound business judgment of EFH Corp that

21   there's no material value for EFH Properties and EFH

22   Corporate Services to the E-Side debtors or to a purchaser

23   of the E-Side debtors.

24           Indeed, Mr. Keglevic will testify that the

25   potential E-Side acquirers, creditors and third parties

1    alike have consistently viewed EFH Properties and EFH

2    Corporate Services as a hindrance.  The evidence will show,

3    for example, that EFH Properties is slightly cash flow

4    positive at best and cash flow negative in certain

5    circumstances.

6              And similarly, the evidence will show that EFH

7    Corporate Services is a cost center.  It's not a profit

8    center.  It does not charge a markup for its services.

9              Ms. Dore and Mr. Keglevic will explain to the

10   Court that it was not easy to convince the TCEH first lien

11   creditors to take EFH Properties as part of the

12   comprehensive transaction that we know -- we discussed today

13   and we've put forward to the Court.  Those discussions took

14   many, many months with the TCEH first lien creditors.

15             Mr. Keglevic will finally testify that the

16   rationale that existed when we filed the original plan

17   didn't change and it was important to an alternative plan

18   that we clean up EFH and EFIH for a potential restructuring.

19   So that is why it is the third core principle.

20             On April 25th, Your Honor, the debtors circulated

21   a term sheet to all of their key stakeholders that embedded

22   these three core principles.  And we negotiated with the

23   TCEH first lien lenders and the key stakeholders on the E-

24   Side in an attempt to try and develop consensus around this

25   proposal.

1          Ultimately, we did reach agreement with the TCEH

2     first lien creditors and the boards' approved and authorized

3     the filing of the modified plan that embedded the core

4     principles should the debtors receive the termination notice

5     from the first lien lenders.

6          Your Honor, let me turn to the -- a description of

7     the new plan.  Shortly after May 1st when we received the

8     termination notice the debtors did, in fact, file the new

9     plan and we've modified twice.  I -- or maybe three times.

10    I think we modified it most recently last night.  I'll talk

11    quickly about what was embedded in there, a couple of

12    settlements.

13         But ultimately the new PRR -- POR or plan is very

14    similar to the original and confirmed plan as it relates to

15    the TCEH debtors.  In particular, you're going to see and

16    hear from the witnesses that one of the big changes is

17    creation of Class D.  Well, Class D is simply the creditors

18    and interest holders of the EFH Corporate Services debtors

19    -- shared services debtors.

20         In the old plan where we were confirming all of

21    the debtors at the same time it made sense -- they didn't

22    have to be separately classified.  They could just be

23    treated as E-Side debtors and lumped in where they all were

24    getting unimpaired.

25         In the new plan we needed to bring those EFH

1    shared services debtors out with the T-Side in order to make

2    the transaction work as I've discussed.

3           And you're going to hear that what we did is we

4    separately classified them.  We inserted them into the plan.

5    We rendered the general unsecured creditors of those

6    entities unimpaired.  And that's largely because there are

7    at -- there are some cash at that entity and we are going to

8    unimpair those claims.

9           The second major difference that you'll hear

10   about, Your Honor, is of course incorporation of the

11   alternative required plan terms.  And, again, that was

12   simple, required under the global settlement agreement which

13   was all weather.

14          Your Honor, there was one open dispute you may

15   remember from the prior confirmation trial with the PCRB

16   Indenture Trustee.  That's Mr. Gwyn's (ph) client.  And that

17   issue was still open when we filed the alternative plan

18   because the alternative plan still had the waiver of the

19   TCEH first lien deficiency claim for the benefit of the

20   unsecured bond holders, the general unsecured claims, the

21   TCEH second lien claims, but not the PCRB claimants.

22          A lot of arguments about why that is.  It's not

23   relative for today.  Suffice to say the parties have

24   resolved that objection.  You did not see a filed objection

25   from the PCRB trustee.  They've accepted a percentage of

1    what they would have received had they participated in full,

2    and it's 54 percent of what they would have received had

3    they participated in full in the waiver.

4           Your Honor, the other first principles that I

5    mentioned -- sorry.  I'm skipping around here.

6           The other first principles that I mentioned were

7    also achieved in the plan that we filed.  The tax matters

8    agreement reflects the taxable -- tax free spin in the

9    busted 351 transaction and a fair allocation of the risk of

10   tax going forward.  The transition services agreement --

11   interim transition services agreement provides the

12   transition services -- the five percent of services you'll

13   hear about that Corporate Services supplies to the EFH and

14   EFIH debtors -- will continue to be supplied by the

15   reorganized TCEH to the EFH and EFIH debtors during the gap

16   period after the effective date of the TCEH plan and before

17   the effective date of an EFH plan.

18          And the third document is the separation

19   agreement.  That document facilitates an orderly separation

20   of the E-Side from the T-Side and the contribution of EFH

21   Corporate Services and EFH Properties to reorganized TCEH.

22          Your Honor, the evidence is going to show that

23   this plan is consummation ready.  All regulatory approvals

24   save for the Railroad Commission of Texas bonding

25   application have already been received.  That includes the

1    IRS private letter ruling that we've heard a lot about

2    received in July.  The Nuclear Regulatory Commission

3    approval to transfer the Comanche Peak operating license was

4    received in May of 2016.  The application for the Railroad

5    bonding -- the Railroad bond is actually pending and we

6    expect we will receive approval of that.

7              Your Honor, on Slide 10 I set forth the results of

8    what you'll hear from the Sullivan declaration.  Ms. Jane

9    Sullivan from Epiq Systems is the debtors' noticing claims

10   and balloting agent.  Ms. Sullivan, in her declaration, set

11   forth the voting results.  And as you can see from these

12   numbers the plan was overwhelmingly accepted by all of the

13   voting classes.

14             I would just take one moment to highlight Class C-

15   4.  That's the lowest of the numbers that you see.  The

16   explanation for that is the PCRB creditors who we've now

17   settled with.  They do not change their vote unless they

18   want to change their vote, but suffice to say I would count

19   them in the yes bucket at this point.

20             Your Honor, we set forth in our brief all of the

21   1129 factors, and I'm not going to walk through each of

22   those today.  You're welcome.

23        (Laughter)

24             MR. HUSNICK:  I've included the slide that sets

25   forth where you'll find the witness support for each of the

1    1129 factors.  Suffice to say the debtors believe they will

2    carry their burden.  And we can skip the next few slides up

3    to 17.

4            Thank you.

5            But I do want to take a moment to talk about EFH

6    and EFIH debtors.  As I said at the very outset, we're not

7    seeking the confirmation -- to confirm the plan as to those

8    debtors.  But they are co-proponents of the plan.  And they

9    seek to perform certain obligations under the plan as any

10   other co-proponent would do.  They are in a bit of a unique

11   situation insofar as they are also Chapter 11 debtors in

12   these jointly administered proceedings.

13           But despite the consistent referring from the EFH

14   Indenture Trustee, the debtors believe, and we'll do this in

15   closing argument, that the Court has jurisdiction and

16   statutory authority to authorize the EFH and EFIH debtors to

17   take actions under this plan.

18           And the evidence will show under the Section 363

19   standard that entry into these agreements is consistent with

20   the best interest of all of the debtors' estates and will

21   maximize value.

22           Your Honor, I want to turn to the objections.  The

23   objections that remain are an objection from the -- I'm

24   going to call them the EFH objectors colloquially; that is,

25   EFH Indenture Trustee, Fenicle and Fehy, Contrarian and

1    Fidelity.

2            You see an objection up there from the EFCH 2037

3    notes.  Just a quick update on that.  I understand that the

4    EFCH 2037 notes Indenture Trustee is actually actively

5    considering a proposal and I'm hoping that before the end of

6    today that we'll be able to announce we have resolution of

7    that issue as well.

8            But the premise of the EFH creditors' objections

9    is that the transfers to EFH or the contributions to EFH of

10   EFH Corporate Services and EFH Properties and the

11   consumption of NOLs is a transfer without value.

12           Your Honor, they focused on those three

13   components, the consumption of the NOLs in connection with

14   the spinoff, the tax free spinoff, and the busted 351

15   transaction and the two contributions.  They argue that

16   these transfers are allegedly transferring value away from

17   EFH to reorganized TCEH.  And they argue that that should

18   command the EFH board to re-trade the deal.

19           But the evidence is going to show that the

20   premise, the premise that E -- or that EFH is transferring

21   value to TCEH is flawed.  It's flawed for two reasons.  The

22   evidence is first going to show that it's not a contribution

23   for -- of value.  They don't have any value.  And the NOLs

24   is not a contribution at all.

25           And, second, the evidence is going to show that

1    even if they are a transfer of value, when you put it in the

2    context of the global transaction that we're seeking

3    approval of today, the balance weighs overwhelmingly in

4    favor of approval.  It satisfies the best interest of

5    creditors.

6              Your Honor, the failed premise when you hear all

7    of the evidence will doom the confirmation objections.

8              I want to spend a few moments on each of the

9    different components just to emphasize why we feel and where

10   the evidence is going to come from.

11             Your Honor, consumption of NOLs.  I don't want to

12   spend too much time on this because it's a legal argument,

13   but we briefed it in a brief and there's clear case law in

14   this district on -- in the Marvel (ph) case that the

15   consumption of NOLs by a parent corporation for the NOL --

16   the group's NOLs is not a transfer to the subsidiary.

17   That's simply not the law.

18             But even if it is a transfer, the evidence is

19   going to show that it's part of the overall transaction

20   that's necessary to avoid the tax Armageddon.  And we're

21   going to put on evidence from Mr. Keglevic that the taxable

22   alternative, as I said at the outset, is $26 billion of gain

23   and $6.5 billion of tax.

24             There's an argument that the EFH objectors make

25   about joint and several liability, and how the TCEH box

1    should somehow share in the joint and several liability.

2    And it's a convoluted argument where they say, well, there

3    are certain steps taken and we're going to -- I'm going to

4    get into the evidence in a second.  But they say there are

5    certain steps taken in the tax free spin that makes

6    reorganized TCEH jointly and severally liable and,

7    therefore, it should be jointly and severally liable for

8    everything and they should compensate.  That's the argument.

9            But the evidence is going to show that the only

10   time TCEH ever becomes part of the consolidated group is in

11   the tax free spinoff.  That's the dash six liability you're

12   going to hear about from Mr. Keglevic and Ms. Howard.

13           And the testimony is going to show that there is

14   no dash six liability without the TCEH first lien consent

15   and without a tax free spin.  And the TCEH first liens are

16   never going to consent to a tax free spin and take these

17   steps to become jointly and severally liable if they're

18   going to suddenly put themselves on the hook for a $26

19   billion tax.  They're going to go taxable.  They've told us

20   that.  They've put that on the record.

21           The same logic applies, Your Honor, for the

22   alternative minimum tax and you'll hear testimony on that as

23   well.  At the end of the day any notion that the reorganized

24   TCEH must compensate EFH to avoid joint and several

25   liability or the alternative minimum tax is just plain

1    wrong.

2            Mr. Keglevic is also going to testify that the EFH

3    objectors misunderstand the gives and takes as you balance

4    whether the consumption of the NOLs, if it is, in fact, a

5    transfer, is worth it.

6            On one hand they overestimate, Mr. Keglevic will

7    testify, the incremental step up in the basis.  You're going

8    to hear from the EFH Indenture Trustee, or at least what was

9    said in the brief, is it's $1.1 billion.  But that's not the

10   incremental value.  The incremental value is $430 million.

11   Mr. Keglevic will testify that's the present value of the

12   step up -- of the incremental value of the step up and the

13   basis.

14           Mr. Keglevic will also testify that that

15   incremental value being provided, that's set off a little

16   bit by the fact that there's $1.2 billion of NOLs preserved

17   for reorganized EFH.  And Mr. Keglevic is going to testify

18   that the value of that is about $380 million.  Ultimately,

19   Mr. Keglevic will then go to the fact and believe that the

20   EFH objectors underestimate, so they overestimate how much

21   the T-Side is getting, but they underestimate how much the

22   T-Side is giving up.

23           Mr. Keglevic will testify that it's not a free

24   ride.  And in particular, in addition to the foregone --

25   foregoing the taxable separation Mr. Keglevic is going to

1    testify that there were a number of other very important

2    concessions by agreeing to a tax free spin.  Most

3    importantly, the two-year moratorium on taxable M&A

4    transactions, an increased risk associated with dividend

5    recapitalizations, institution of clear stock repurchase --

6    I'm sorry -- institution of certain stock repurchase

7    programs, and exposure to consolidated group liability --

8    this was the dash six liability -- should at the end of the

9    day this transaction ever be taxed -- challenged as taxable,

10   notwithstanding the private letter ruling.  Those are huge

11   concessions.

12           Turning to EFH Corporate Services and Properties,

13   each of these face a similar argument.  You're going to hear

14   about Corporate Services a great deal.  Ms. Keglevic -- or

15   Mr. Keglevic and Ms. Dore will testify that Corporate

16   services employees approximately 400 employees and provides

17   shared services to all of the debtors.  It provides human

18   resources, information technology, and payroll services.

19           But what you're going to hear from Mr. Keglevic is

20   that it's a cost center, not a profit center, and that it

21   does not charge a markup.  And what you're not going to

22   hear, Your Honor, is testimony regarding discounted cash

23   flows and financial projections for EFH Corporate Services

24   because they simply don't exist.  There's no value there.

25           You're also going to hear from Mr. Keglevic that

1    Corporate Services provides 95 percent of its services to

2    the TCEH box.  Only five percent of those services are

3    provided to the EFH creditor or to the EFH box.  And that's

4    why Mr. Keglevic will testify that the EFH creditors and

5    potential purchasers or EFH have very little use for

6    Corporate Services.

7            Under the plan as we know that's being contributed

8    to reorganized TCEH.  But the evidence is going to show that

9    that's not a transfer of value because there's no equity

10   value.  And we'll get that evidence from Mr. Stuart (ph),

11   Mr. John Stuart from Alvarez & Marsal.  And why does it have

12   no equity value?  As I said from Mr. Keglevic that it's not

13   a profit center and there's no benefit to the E-Side.

14           The evidence is going to show that even if it is a

15   transfer of value, though, all of the debtors gain by doing

16   this transaction.  EFH Corporate Services, if Corporate

17   Services were not contributed, you're going to hear from Mr.

18   Keglevic that it could incur significant WARN Act and

19   severance obligations.  It could incur incentive

20   compensation that is accrued and remains unpaid under the

21   various bonus programs that the Court has approved.

22           And you're going to hear that there is contracts

23   that would need to be rejected because EFH Corporate

24   Services continues to -- it does not provide services to

25   TCEH any longer.  Those -- some of those contracts were

1    assumed earlier in the case, so those are administrative

2    claims and TCEH has a right to use under the shared services

3    agreement.   So Mr. Keglevic will talk about the effect on

4    EFH Corporate Services of having this right to use provision

5    in the shared services agreement.

6         Ultimately, you're going to hear Mr. Keglevic

7    conclude that EFH Corporate Services would be forced to

8    liquidate and incur the concomitant liquidation costs.  EFH

9    doesn't gain anything from keeping Corporate Services.

10   There is no equity value.  It will have 400 more employees

11   than it needs, but it won't have any value.

12        TCEH will incur costs associated with developing

13   or rehiring the new employee base.  If it is contributed

14   you'll hear evidence from Mr. Keglevic that you'll avoid all

15   of the costs at Corporate Services associated with

16   liquidating the entity.   EFH will suffer no loss and indeed

17   it will get a benefit.  Mr. Keglevic will testify to the

18   benefit of the interim transition services agreement between

19   TC -- reorganized TCEH and the EFH and EFIH debtors.  At the

20   end of the day the overwhelming balance favors the

21   contribution.

22        With respect to Properties it's a very similar

23   result.  Here you're going to hear from Mr. Mullivan and Mr.

24   Keglevic regarding EFH Properties.  It's a non-debtor

25   entity.  It's a wholly owned subsidiary of EFH.  It's a

1    lessee on the Energy Plaza lease.  That's the lease where

2    the debtors' corporate headquarters is located.

3              EFH Properties is, in turn, a lessor to various

4    sub-lessees, including Encore, which leases it back to

5    Luminant.  Luminant is one of the two business units; FDIC;

6    and Corporate Services itself.   EFH Properties is

7    responsible, however, for the maintenance under the lease.

8    And you'll hear from Mr. Mullivan and Mr. Keglevic about

9    what the implications of that are.  But suffice to say EFH

10   Properties is cash flow neutral at best, slightly -- maybe

11   slightly cash flow positive, but as time rolls on it becomes

12   cash flow neutral.  And if separated from TCEH you'll hear

13   from Mr. Keglevic it's likely that it would go cash flow

14   negative.

15             The plan, Your Honor, as you know contemplates

16   contribution of EFH Properties to reorganized TCEH, the

17   release of the intercompany payable between EFH Corp and EFH

18   Properties.  But it also contemplates leaving behind the

19   excess cash at EFH Properties for the EFH estate.  And

20   you'll hear from Mr. Keglevic that that's approximately $14

21   million.  That's an estimate.

22             You're going to hear from Mr. Stuart that based on

23   the testimony of Mr. Mullivan that he believes there's no

24   equity value in EFH Properties and that the payable --

25   you're going to hear from Mr. Mullivan that the payable, the

1    100 and -- I forget the number -- 158 million, I believe,

2    payable will be uncollectable if TCEH is separated from EFH

3    Properties.  That's because, in Mr. Mullivan's view, there

4    would be no reason for TCEH to stay in the Energy Plaza

5    building.  They would be searching for a new location.

6         You'll hear from Mr. Mullivan a lot about the cash

7    flows, but at the end of the day the conclusion will be that

8    there is no transfer of any value occurring as a result of

9    this contribution.  And even if there was, I go back to my

10   original second reason for the flawed premise.  The debtors

11   all stand to gain.  EFH stands to gain by giving the $14

12   million of cash and it stands to gain -- it at least will

13   not be losing because in the separation scenario where they

14   don't take TCEH -- or EFH Properties, there will of course

15   not be payment on that intercompany payable at all.

16        Your Honor, you're also going to hear -- and I'm

17   getting close.  You're going to hear about the market

18   perception of Corporate Services and EFH Properties.  As I

19   mentioned earlier, the evidence will show that the debtors

20   have discussed what to do with Corporate Services and EFH

21   Properties with the creditors and various potential

22   purchasers.  And the answer has always been the same.  No

23   party is interested in being an owner of Corporate Services

24   and Properties.  And if they are going to be an owner, they

25   want a price reduction.

1            The case in point, the NextEra merger agreement

2    requires as a condition that those two entities be

3    contributed.  And if they're not contributed, they're not on

4    the list of retained entities underneath EFH, so then they

5    have to be liquidated.  So the option is either liquidate

6    them or contribute them, but we don't want them.

7            The one thing you're not going to hear in the

8    testimony, you won't hear a single witness testify that the

9    E-Side creditors want Properties or Corporate Services.

10   They just want holdup value.

11           Your Honor, the EFH Corp board knows and

12   understands the give and tax of the tax free spin and the

13   busted 351 transaction.  And before I cede the podium I want

14   to address the corporate governance assertions and the

15   process that ultimately yielded approval of the key

16   transactions in this plan.

17           The EFH creditors argue that the board should get

18   a better deal; that it should re-trade the deal on the

19   table; that it should start over.  But the evidence is going

20   to show that this is the best available deal.  It's the only

21   available deal.

22           The evidence will show also -- you know,

23   recognizing the simple truth that there are no alternatives,

24   the EFH objectors argue on the law that there is -- you

25   should apply entire fairness or you should apply heightened

Page 41

1    scrutiny.

2             But the evidence is going to show that neither of

3    those two tests is relevant.  Before you get to those two

4    tests you've got to make an evidentiary showing and

5    assertion that the directors are on both sides or that the

6    debtors didn't fulfill their duty of care.  You're not going

7    to hear that the directors were on both sides of the

8    transaction.  On one side you have EFH.  On the other side

9    you had the punitive owners of reorganized TCEH.

10            You're not going to hear that there was a conflict

11   between the interests of EFH and EFIH and the interests of

12   its directors and officers.  At one point they assert that

13   because the directors and officers could allegedly be liable

14   for an income tax that, therefore, it should be entire

15   fairness.  I -- it doesn't make any sense to me, but suffice

16   to say it seems to me that the interests are aligned and

17   there can't possibly be a conflict if the interests are

18   aligned.

19            On the D&O releases, Your Honor, this is a tried

20   and true area of the law.  It comes up in almost every

21   single case.  It doesn't create a conflict.  If aligned

22   interest and D&O releases created an entire fairness and

23   heightened scrutiny standard, we would be applying that in

24   every single Chapter 11 case on every single issue.

25            The evidence is also going to show to rebut the

1    assertion that there was not due care; that there were at

2    least six meetings, and that the boards consulted with their

3    advisors on many occasions.

4              In particular, you're going to hear from Ms.

5    Williamson, that she consulted with the DDAs, the

6    disinterested director advisors about the alternative plan

7    and that she re-evaluated.  You're going to hear, I think,

8    from Ms. Dore that she re -- that the board re-evaluated the

9    tax separation in light of the CODI ruling.  That's the $26

10   billion stranded tax ruling as a result of the expiration of

11   exclusivity.  And each and every time they concluded that

12   this is the best deal.

13             So there's no need to apply entire fairness and

14   there's no need to apply heightened scrutiny.

15             The other objections, Your Honor, there's a

16   handful of them, I'll reserve for closing argument.

17             And in conclusion I just want to wrap up and say

18   -- before I do that, the board understands that you cannot

19   cherry-pick favorable provisions in a tax free spinoff.  The

20   tax free spinoff and the busted 351 rise and fall together.

21   The evidence is going to show that the objectors rely on a

22   false premise that EFH is giving away the farm to the

23   reorganized TCEH debtors and that that give away should be

24   the basis for a re-trade of this transaction.

25             But the evidence is going to show that a re-trade

1    is not an option.  There's no counterparty willing to say

2    yes.  It's not feasible.  The T-Firsts are simply unwilling

3    to consent to the step up or to the spinoff without the step

4    up, without the speed of getting out today.  It's not

5    surprising.  The T-Firsts have lost more value in this case

6    than any other stakeholder including the existing sponsors.

7            The evidence is going to show that spreading the

8    pain, as the EFH objectors argue should be done, doesn't

9    solve the issue.  The ability to check the box as uncertain

10   and checking the box still results in a stranded tax.  It

11   just so happens that it makes it more difficult for the T-

12   Firsts to potentially get their assets.

13           Spread the pain, Your Honor, is a euphemism.  It's

14   a euphemism for mutually assured destruction for the

15   unsecured creditors in these cases.  That's the result the

16   debtors tried to avoid from the very first moment I was

17   retained in June of 2012.  That's the moment we tried to

18   avoid here today.  That's the moment that we negotiated for.

19   That's the event.

20           The reason to confirm the plan here today, Your

21   Honor, is it is the best and only available alternative.

22   And we respectfully request at the end of the hearing after

23   you've heard all of the evidence that it will overwhelmingly

24   show that confirmation is appropriate.

25           Thank you.

1           THE COURT:  Thank you, Mr. Husnick.

2           MR. THOMAS:  Good morning, Your Honor.

3           THE COURT:  Good morning.

4           MR. THOMAS:  Mark Thomas from Proskauer Rose,

5    counsel to Energy Future Holdings Corporation acting on

6    behalf of and at the direction of the EFH disinterested

7    directors, Mr. Donald Evans and Ms. Billie Williamson.

8           Your Honor, I will be very concise.  The

9    objections by the EFH creditors raise many contentions,

10   allegations and speculative theories.  The evidence will

11   prove all of those contentions, allocations and speculative

12   theories wrong.  There's no basis in the objections for the

13   tax leveled against the EFH disinterested directors.

14          The evidence will show that the current plan and

15   that the three ancillary agreements that implement the

16   current plan are not conflict matters.  They're not insider

17   transactions.  They're not affiliated transactions.  These

18   are documents and agreements that were negotiated between

19   EFH Corp on the one side and reorganized TCEH who will be

20   owned by the T-First creditors represented by Paul Weiss on

21   the other side.

22          The allegation that the full board of EFH and the

23   disinterested directors were not fully informed will be

24   squarely rebutted by the evidence.  There is ample evidence

25   of numerous meetings of the full board of EFH as well as

1    meetings of the disinterested directors that considered all

2    options and all alternatives since the termination of the

3    December 2015 confirmed plan.

4           And, Your Honor, for the record we filed a reply,

5    Docket Number 9297, to the objections.

6           Your Honor, the allegation that the EFH board and

7    the disinterested directors did not consider alternatives

8    will be overwhelmingly rebutted by the evidence.

9           Moreover, there is no evidence that any EFH

10   creditor provided any alternative to EFH, any alternative

11   for use of NOLs, any alternative for monetization of NOLs,

12   any alternative for the sale, reorganization or liquidation

13   of EFH Corporate Services, any alternative for the sale,

14   liquidation or reorganization of EFH Properties.  No such

15   alternative has been presented.

16          The evidence will show, however, Your Honor, that

17   EFH Corp did present an alternative plan to the EFH

18   creditors that called for a potential equitization of EFH

19   and that plan was met with complete and utter silence.

20          Your Honor, the allegation that there is some

21   hypothetical plan out there that can utilize EFH NOLs and

22   retain Corporate Services and Propco there will be no

23   evidence in support of any such hypothetical plan.

24          Your Honor, finally, there's an implied allegation

25   that the current plan and the ancillary agreements that

1    implement that plan are not in the best interest of the EFH

2    estate.  The allegation will be rebutted by the evidence.

3    The evidence will clearly show that the current plan and the

4    ancillary agreements, even with the contribution of Propco,

5    even with the contribution of Corporate Services, even with

6    the consumption of NOLs are very much in the best interest

7    of the EFH estate.

8              Due to this current plan EFH retains its cash.

9    EFH also minimizes tax claims or tax damages and retains tax

10   attributes.  And, finally, EFH is able to continue a robust

11   marketing and sale process of its indirect interest in

12   Encore.

13             Your Honor, I think some of the best evidence of

14   why this -- these transactions and ancillary agreements are

15   in the best interest of the EFH estate is the simple fact

16   that the proposed stalking horse bidder, NextEra, has

17   reviewed and approved each and every one of these ancillary

18   agreements, each of which call for the contribution of

19   Propco and Corporate Services, and the consumption of NOLs.

20             Your Honor, there are no better alternatives.

21             And finally one point on this tax Armageddon

22   concept.  From the EFH estate point of view we hold

23   unencumbered cash.  We would like to distribute that cash or

24   publicly traded stock to our creditors.  Spreading the pain

25   or causing Armageddon with other potential debtors does not

1    protect the EFH unencumbered cash from being fully taken by

2    the Internal Revenue Service in partial satisfaction of a $6

3    billion tax claim.  So spreading the pain and trying to

4    bring on tax Armageddon does not do any benefit to the EFH

5    estate.

6              Your Honor, in sum, the objections should be

7    overruled.  EFH assured destruction is not the solution to

8    this case.

9              Thank you.

10             THE COURT:  Thank you, Mr. Thomas.

11             Mr. Kornberg.

12             MR. KORNBERG:  Good morning, Your Honor.  Alan

13   Kornberg of Paul, Weiss, Rifkin, Wharton & Garrison,

14   together with Moses Silverman and Jake Adlerstein for the ad

15   hoc committee of TCEH first lien creditors.

16             Your Honor, as Mr. Husnick has explained and I

17   know Your Honor knows very well, it's been a very long road

18   to get to this hearing.  Many would say too long.  And no

19   one can question the resolve it took on all sides to make

20   the hard decisions and to negotiate the complex interrelated

21   transactions that are at the heart of this plan.

22             As we all know in this case everyone's job was

23   made significantly more difficult because of the shifting

24   tax and regulatory environment to which these debtors are

25   subject.

1           So now we're about to arrive at the best and only

2    available resolution for these estates and their creditors,

3    and we very much hope that we will not be diverted or

4    delayed, particularly at the urging of a handful of E-Side

5    creditors who are pursuing a very parochial agenda.

6           Perhaps the best evidence of confirmability of the

7    plan as to the T-Side is what you will not hear.  There are

8    almost no T-Side objections.  Indeed, the one outstanding

9    one we're hopeful will be resolved during the course of the

10   day.  As you've seen there are very few votes against the

11   plan, all of which proves the wisdom of the previously

12   agreed upon disarmament and the previously approved

13   settlement agreement.

14          We, as the debtors, believe that there cannot be

15   any question that the applicable requirements of Section

16   1129 have been met.  But. in addition, taking a broader

17   view, the plan provides for a fair and appropriate

18   resolution of these epic cases.  This is particularly true

19   when you consider the dynamics facing the parties and the

20   Court for the past two years.

21          When Project Olympus failed, it became very clear

22   that separating the T-Side and the E-Side was the only path

23   forward.  As we all know, there are essentially two ways to

24   achieve that goal:  The tax free spinoff of TCEH or a

25   taxable sale of TCEH.

1          The second taxable alternative has substantial

2    benefits for our clients.  In the face of massive losses,

3    TCEH could at least enjoy a stepped up basis and its assets.

4    But it also has substantial disadvantages for EFH.  Tax

5    Armageddon as Mr. McKane likes to say, billions of dollars

6    of cash taxes that EFH cannot pay, the so-called stranded

7    taxes.

8          The tax free alternative is therefore much more

9    attractive to the E-Side, but it would deprive the T-Side

10   debtors of a stepped up basis.  As you've heard, it would

11   limit certain post-reorganization strategic alternatives.

12   It would impose certain risks on the T-Side which it

13   otherwise would not face, particularly if the spin were

14   later determined to be taxable.

15          The record is very clear, and you will hear more

16   evidence about this, that the T-Side creditors will resolve

17   to pursue a taxable transaction.  And I think Your Honor

18   knows that very well from the prior proceedings in this

19   case.  Anyone that doesn't think that that is true hasn't

20   been paying attention.  As has been mentioned, if you just

21   look at the attachment to the supplemental response that we

22   filed to the debtors' scheduling motion in May there was a

23   plan attached and it provided for a taxable alternative.

24   And, Your Honor, I can assure you that was not prepared

25   overnight.  It was months and months of effort and

```
 1    discussion and analysis.

 2              It's equally clear that just as we were determined

 3    to pursue a taxable transaction if need be, that it was a

 4    principal goal of these debtors to avoid a stranded tax

 5    situation.  In our view, the plan resolves this fundamental

 6    tension in an eloquent and equitable way which is fully

 7    consistent with the letter and the spirit of Chapter 11;

 8    that is, a highly engineered series of integrated

 9    transactions that maximize values for all concerned in the

10    unique and unprecedented circumstances of these cases.

11              At their heart, these inter-dependent transactions

12    provide the following:

13              A tax free spinoff of the TCEH debtors;

14              A so-called busted 351 transaction which through a

15    preferred stock sale delivers to the T-Side creditors their

16    long-sought objective of a stepped up basis;

17              A critically important and intensely negotiated

18    tax matters agreement, the covenants of which, together with

19    the private letter ruling finally obtained, are the best

20    means of ensuring that the plan will receive the tax free

21    treatment intended by all the parties.

22              The plan therefore accomplishes the most vitally

23    important value maximizing goals of the competing interest

24    at stake; however, the complex tax driven solutions that

25    yield that result should not be tampered with.  Doing so
```

212-267-6868                    www.veritext.com                    516-608-2400

1    would knock the props out from the fundamental bargain which

2    took so long to strike.

3              Fairly viewed the objections really are just

4    musings about what negotiations over hypothetical

5    alternative plans might have yielded.  Such what ifs are too

6    little and too late to stand in the way of confirmation of

7    this plan.

8              With respect to the NOLs the objectors have it

9    wrong.  The EFH consolidated tax group is using a portion of

10   its consolidated NOLs to shield gains arising principally

11   out of the busted 351 transaction, which involves a transfer

12   of assets that are owned by EFH for tax purposes.  EFH is

13   not, as argued by the objectors, transferring its NOLs to

14   anyone, including TCEH.

15             Given that EFH is achieving one of its principal

16   goals, avoiding tax Armageddon, by using its NOLs in such a

17   fashion one cannot seriously question the reasonableness of

18   EFH's decision to do so.

19             The avoidance of massive stranded taxes is an

20   enormous value to EFH and its creditors and certainly not as

21   described by the EFH indenture trustee in one of the briefs

22   it filed last night, subjective, ephemeral, or emotion.  It

23   is real, it is quantifiable.

24             Nor is it as an equitable matter unfair for EFH to

25   use its NOLs to facilitate the tax-free spin of TCEH given

1    that TCEH actually generated the losses that created such

2    tax attributes in the first place, and TCEH generated enough

3    losses so that there will still be significant NOL carry

4    forwards left over for EFH if it can use them in the post-

5    emergence tax periods, a result that would not be possible

6    in a taxable transaction.

7              The objectors in our view have devoted more time

8    and effort to challenging the transfer of the -- to the

9    T-Side of EFH Corporate Services and EFH Properties than

10   those entities are most likely worth.  Neither are profit

11   making enterprises, both are operated principally for the

12   benefit of TCEH, both have significant liabilities

13   associated with them that EFH would have to satisfy if it

14   retained them, and because of such liabilities the T-Side

15   creditors, as you will hear, had to be persuaded to allow

16   reorganized TCEH to take these entities over.

17             Moreover, as you will hear ,the prospective buyers

18   of Oncor, don't want these entities either.

19             Under all these circumstances relocating

20   Corporation Services and EFH Properties to the T-Side is

21   fair and appropriate, in any event it is part of a carefully

22   calibrated, integrated series of transactions that are at

23   the heart of the plan and which should not be disturbed.

24             We believe that there is little doubt that this

25   plan should be confirmed.  It took a long time and a lot of

1    very hard work by all involved to solve the very difficult

2    and novel issues facing TCEH.

3              The series of integrated transactions and

4    agreements at the heart of this plan balance the competing

5    interests of the various estates and their creditors in a

6    fair and appropriate way and in a manner fully consistent

7    with the provisions and goals of the Bankruptcy Code.

8              The outcome provided by the plan-based

9    transactions is in the best interests of all the debtors,

10   not just the T-Side, and the objectors will not be able to

11   prove otherwise.

12             Accordingly, we ask that the plan be confirmed and

13   the objections overruled.

14             Thank you, Your Honor.

15             THE COURT:  Thank you, Mr. Kornberg.

16             Mr. Miller?

17             MR. MILLER:  Thank you, Your Honor.  Brett Miller,

18   Morrison & Foerster on behalf of the T-Side creditors'

19   committee.  Very briefly.

20             We agree with everything the debtors, the

21   disinterested directors, and Mr. Kornberg have said.  We've

22   worked closely with all those parties regarding a T-Side

23   plan.  It is -- you have before you the best and only

24   available resolution of these cases.

25             The objections have no merit and should be

1    overruled, and the T-Side committee strongly believes that

2    we should end this hearing with a confirmed T-Side plan and

3    move forward.

4            Thank you.

5            THE COURT:  Thank you.

6            Anyone else on the proponent side?

7            All right.  We're going to take a recess and then

8    I'll hear opening argument from the objectors.

9        (Recessed at 11:08 a.m.; reconvened at 11:21 p.m.)

10           THE COURT:  All right.  Everybody is having too

11   much fun.  Please be seated.

12           Mr. Pedone?

13           MR. PEDONE:  Good morning, Your Honor.

14           THE COURT:  Good morning.

15           MR. PEDONE:  Richard B. Pedone on behalf of

16   American Stock Transfer, the EFH indenture trustee.

17           Your Honor, before I begin there was a lot of

18   references to what will be hearsay in the opening

19   statements.  They're not evidence, so I won't go any further

20   than to say that the statements concerning what the T-Firsts

21   do that come in through counsel are not evidence.

22           Your Honor, this Court is being asked to determine

23   in connection with confirmation and the 363 transactions two

24   things.  Are the transactions permissible under Section 363?

25   And may the plan be confirmed under 1129?  It's really two

1    separate baskets of findings even though they were put

2    together in one plan and disclosure statement.

3              The broad issues involve the process determined

4    that we are challenging and was the consideration

5    sufficient?

6              Our arguments with regard to the process have two

7    parts.  What should be analyzed, and then how do you value

8    the consideration and what negotiations took place?

9              Whether the transactions were properly approved

10   and pass muster under the appropriate standard of review

11   will depend on the facts as you determine them at trial.

12   You will see multiple decision points with votes and at each

13   varying degrees of conflict existed.  Then Your Honor

14   there's the issue of the consideration or lack thereof.

15             Well this analysis is part of a 363 review we're

16   challenging the underlying proposed transactions and the

17   legality of them.  We believe that these are a fraudulent

18   transfer.  There's no monetary consideration going to EFH

19   Corp. for the use of its NOLs nor the other assets.

20             Furthermore, Your Honor, the challenge doesn't

21   just relate to transfers and property moving from one to the

22   other, the Texas statute that's applicable provides that a

23   fraudulent transfer can take place through the incurrence of

24   an obligation.

25             When through various witnesses the parties dig

1    into what has actually happened here you will see at more

2    than one point in time EFH Corp. is incurring an obligation

3    for the benefit of reorganized TCEH and for a period of time

4    its affiliate corporations on the T-Side.

5              Your Honor, the analysis is under Section 369 --

6    excuse me -- under Section 363, 1129, and applicable Texas

7    law.  This is not a 9019 settlement, Your Honor.

8              The appropriate frame of reference for the Court's

9    analysis of this transaction obviously stems from Section

10   363, but in reality this is exactly the same frame of

11   reference as the Court would take if it were evaluating a

12   prepetition set of transactions for a company that appeared

13   before you in bankruptcy.  Was the standard that's taking

14   place properly authorized and did the consideration that

15   will be passed forth in connection with that spin violate

16   any law?  Was there a prepetition fraudulent transfer?  You

17   look at this exactly the same way.  And as you hear the

18   evidence I'd ask that the Court consider that perspective

19   and keep it in mind as it evaluates whether or not it will

20   bless these transactions.

21             Your Honor, we're here today after much prior

22   litigation.  Mr. Husnick explained that the original

23   settlement was supposed to be an all weather settlement for

24   the T-Side, but we had global peace on certain issues.  But

25   today you're going to hear that within a few weeks of

1    leaving this courtroom right after the holidays the debtors

2    began their contingency planning.  What you will not hear is

3    that they brought E-Side creditors into that process

4    immediately.  Nor will you hear that EFH Corp. shaped its

5    planning and developed a new strategy based upon the changed

6    facts.

7              EFH received a booby prize in connection with the

8    last transaction that it would get the benefit of when it

9    did not receive the par distribution and creditors

10   unimpaired.  That booby prize is use of the NOLs in

11   connection with the control of its NOLs going forward.

12             Your Honor, there are four undisputed facts.  The

13   NOLs, Corporate Services, and EFH Properties are all

14   property of EFH Corp.  The NOLs do not belong to a group.

15   In many of the directs the reference is made the groups

16   NOLs.  That statement is not founded in applicable law.

17             Well you may hear equitable arguments that the

18   NOLs should be used for the benefit of the T-Side.  That

19   issue was cleaned up with the settlement agreement.

20             The NOLs undisputedly belong to EFH Corp.  They

21   belong to the taxpayer.

22             The second undisputed fact is that the PSA is

23   silent on the disposition or use of EFH Corp. property in

24   any alternative restructuring.

25             The third fact is that in the December settlement

1    all TCEH claims to the use of EFH NOLs were released.  We

2    cleaned that issue up.

3            The prior plan -- the fourth fact.  The prior plan

4    is terminated, and thus any agreements that the parties may

5    have made with regard to what would happen to NOLs,

6    Corporate Services, or Properties in connection with that

7    plan no longer govern here.

8            Now, you will hear testimony about them and I

9    believe you need to think about what that prior plan did as

10   you make your rulings, because our position is that the

11   prior plan and everything that was done before was carried

12   forward as if it was preordained to occur in connection with

13   every resolution in the future and that the issues were not

14   appropriately revisited.

15           Your Honor, in light of these facts on May 1, 2016

16   or an earlier date in the contingency planning -- and May 1

17   is the date the termination notice was delivered of the old

18   plan -- the slate was clean to let -- the slate was clean

19   with regard to EFH's right to demand contribution or

20   consideration for any use of the NOLs, for any use of

21   Corporate Services, and for Properties.  And you'll hear

22   testimony that those assets, while they may be a little bit

23   difficult to measure and the facts may be disproportionately

24   intense given the value in issue here, the process and the

25   failure to make use of those entities and frankly the

1    leverage that EFH Corp. has with regard to those entities

2    and the failure to extract the modest tens of millions

3    perhaps hundreds of millions of value that should have been

4    extracted is important.  It wasn't -- the analysis to use

5    those entities was not revisited until very late when you

6    get to late July board meetings.

7             Your Honor, you'll see that there was no careful

8    evaluation of what the new playing field was after the

9    decision became to move forward with Plan B and begin

10   planning for it.

11            Your Honor, as the Court thinks about what it is

12   being asked to do and to approve would ask that it be

13   mindful of the unusual procedural posture that we are in.

14   This is unprecedented in a case of this scale with the

15   situation that we have to have two debtors with different

16   confirmation schedules on one plan.  We are to believe, to

17   use the term of one of the parties in their opening they

18   referred to them as intertwined.  They are intensely

19   intertwined.

20            Your Honor, we did not start this litigation with

21   a motion under 363 nor do we have one today.  We've stated

22   our objections to the process.  Your Honor, the process of a

23   motion and the process of these issues or these issues being

24   addressed in a separate EFH plan or the EFH plan being

25   occurred at the same time provide procedural protections for

1    creditors on the E-Side, and those are missing here.

2           Your Honor, we didn't start this request for

3    relief under 363 with a statement of the issues as would be

4    required under the local rules regarding consideration going

5    back and forth, regarding interestedness.  We didn't begin

6    the discovery process and you don't have the benefit of

7    those statements put into writing by the debtors.

8           More importantly, this is not a motion for

9    approval of a 9019 compromise where you would be given

10   evidence of balancing of the considerations if the

11   transaction was challenged.

12          Your Honor, turning to the 363 transactions as we

13   refer to them to make sure that we're clear on what those

14   involve.

15          The first and most significant is the consumption

16   of approximately 5.8 billion of EFH Corp.'s NOLs, and these

17   are being consumed to provide TCEH Corp. with a basis accept

18   up valued at more than a billion dollars.

19          Your Honor, the second EFH transaction involves

20   EFH Corp. being required to pay 10- to 20 million in

21   alternative minimum tax.  The EFH Corp. is taking on an

22   obligation to pay a significant tax, and then it may receive

23   reimbursement under the tax matters agreement for some of

24   that.  But it is being -- seeking authority to pay the tax

25   in connection with the transactions that provide benefit to

1    the other parties.

2              Finally, Your Honor, the transfer of equity in

3    Corporate Properties, this is an entity where the base rent

4    is effectively prepaid through 2022.  And then there's the

5    forgiveness of the $158 million obligation from Properties

6    to EFH Corp., as well as an additional payable that you'll

7    hear evidence of that will be forgiven under the plan.  And

8    then there's the transfer of EFH Corporate Services.

9              Your Honor, at the November 2014 hearing in

10   request for approval of the Oncor bidding procedures you

11   laid out what you believed was the standard for approval of

12   a 363 transaction.  We believe the standard applies here and

13   that you're required to actually look at the consideration

14   that's going back and forth in connection with the

15   transaction.

16             Your Honor, you made a point in that November 3rd

17   ruling that the committee had not yet been put in place on

18   the E-Side, and you made a point about important creditor

19   involvement in decisions to improve 363 transactions.  That

20   creditor involvement, that E-Side creditor involvement was

21   missing here as the debtors worked through -- the EFH Corp.

22   worked through its decision to go forward with the

23   transactions.  Many of the creditors were -- or at least the

24   largest creditor was locked up under a plan support

25   agreement and was perhaps reached out to but not deeply

1   consulted with, and out of the debtors' preordained decision

2   of which way this should go they went forward and proposed

3   the plan and their exigency was the fact that exclusivity

4   was up and they were afraid of someone else's plan.

5          We don't believe that that was an adequate excuse

6   for full consultation.  Sending out a term sheet six days

7   before the plan will be filed is not allowing a period for

8   negotiation over significant issues.

9          Your Honor, before turning to what happened here

10  in connection with corporate governance, the decision, the

11  measurement of value it's worth reflecting on the intense

12  process that took place in connection with the prior

13  settlement.  There you had the retention of the

14  disinterested director advisors.  When you approved the

15  settlement the last time you had before you a hundred plus

16  page motion detailing intense negotiations.  Meetings took

17  place, disinterested directors sat in meetings.  People sat

18  in meetings and represented their estates.  You had

19  extensive creditor involvement.  You had an enormous legacy

20  process.  You had a disinterested director proposal being

21  floated after a CRO proposal was floated, and just intense,

22  intense negotiations as should occur when a matter involves

23  more than a billion dollars.

24         Here, Your Honor, that evidence of those intense

25  negotiations simply will not exist.  Here the evidence will

1    show that the officers and directors of EFH Corp. treated

2    the consumption of EFH Corp.'s NOLs for the benefit of TCEH

3    as a foregone conclusion.  The framework was preordained.

4    The parties' assumptions about operative facts were cast in

5    stone never to be revisited.

6            There's no careful analysis of the leverage that

7    EFH Corp. would have against the T-Firsts in future

8    litigation or in connection with negotiating this plan.

9            There was no development of a negotiating plan nor

10   a review of the analysis and alternatives.

11           Most importantly, we do not expect that there will

12   be evidence that anyone on behalf of EFH Corp. not once

13   reached out and demanded cash on behalf of EFH Corp. for the

14   use of its NOLs.

15           Your Honor, the reply of the disinterested

16   directors is remarkably light on the facts, but entirely in

17   line with what was revealed in discovery.

18           I submit that a prudent person, and that is the

19   ultimate standard that you'll need to get to, Your Honor, a

20   prudent person would have demanded cash.  There would have

21   been a stated demand for cash in exchange for the use of the

22   NOLs.  It does not appear that that spirited negotiation

23   took place.

24           Well the evidence will show that according to

25   Billy Williamson Proskauer was on every call.  They danced

1    around the margins.  We don't have documents showing a

2    negotiation, we don't have documents showing an exchange of

3    proposals.  There's no memory in any witness's mind that

4    they were able to recall in their depositions about a heated

5    negotiation over the consideration EFH Corp. should receive

6    at any point in 2016.  None of that occurred.  The plan cast

7    in stone was to capitulate to provide the T-First lien

8    lenders with a maximum step up.

9            Your Honor, furthermore, not once after the start

10   of what I call the contingency planning period of the early

11   January 2016 until some point in mid-April of this year when

12   the plan was crystallized and prepared to be filed on May 1,

13   not once during that contingency planning period was the

14   value of Corporate Services, Properties, or most importantly

15   the NOLs analyzed in connection with an effort to negotiate.

16           There were prior recollections of what the value

17   would be, there were prior recollections of what the

18   negotiating leverage could be, there was certainly endless

19   analysis of the situation and the danger, the fear of tax

20   Armageddon, which you heard extensively about, but the facts

21   were not analyzed.

22           Your Honor, Mr. Sawyer in his deposition he was

23   asked:

24           "As there a time since April 2015 when any board

25      to your knowledge revisited the question of whether the

1          NOLs should be used by the T-Side and for what

2          consideration?

3                And his response:

4                "You know, again the use of the NOLs has been

5          contemplated since the filing of the original plan.  To

6          my knowledge and belief it was not revisited."

7                Your Honor, in no other meetings do we have

8     evidence that they actually sat down and said is there

9     another way to negotiate this than beginning with the

10    premise of giving the T-First the NOLs?

11               Your Honor, Mr. Sawyer had similar responses when

12    asked about the use of Corporate Services and Properties.

13    The issues, according to Mr. Sawyer, were not revisited.

14               Your Honor, you've heard and we had believed

15    before getting here today that the debtors entire case will

16    rest on the assertion that avoiding the harm of tax

17    Armageddon amounts to adequate consideration.  We do not

18    believe that that is the case under Texas law.

19               Tax Armageddon has never been just around the

20    corner.  Numerous hurdles would need to be cleared before

21    any taxable transaction could be approved.

22               Further, Your Honor, the debtors neglected to

23    analyze that their negotiating adversary actually receives

24    more in a step up in the busted 351 than it would receive in

25    any foreclosure on its assets.  This is an incredibly

1    changed fact that I'll come to in more detail in a minute.

2    We do not believe that the fear of tax Armageddon was well

3    founded.

4              Your Honor, it's worth stopping for a minutes and

5    looking at some of the hurdles that would need to be

6    overcome before we get to tax Armageddon.

7              First, a taxable plan would have to be filed.  I

8    refer to that as the tax suicide plan.  It would have to be

9    confirmed and then consummated.  In the meantime we would

10   need to get the disinterested directors to agree not to

11   fight that plan or to roll over on it or Your Honor would

12   have to confirm it.

13             Your Honor, there'd be extensive plan litigation,

14   we would have extensive IRS involvement, and the assertion

15   of success or liability claims.

16             Your Honor, you'd have competing plans from the

17   E-Side almost most assuredly, you'd have the box checking

18   option and litigation perhaps over when and where and how

19   the box should be checked to spread the liability.

20             Your Honor, you'd have requisite lender consents

21   that would be required to be obtained before the lenders

22   could actually decide to effect their tax suicide option.

23   There won't be evidence that the lenders would actually all

24   be able to consent.

25             Your Honor, ahead of the hearing two days ago when

1    the tax matters agreement was put before the Court or we

2    were told that the final tax matters agreement would appear

3    three weeks late the process was someone comes rushing into

4    the courtroom right before the hearing and says, we have the

5    final sign off.

6            The lenders on the other side have not shown and

7    there will be no evidence that they agree and act in a

8    concerted manner.  That evidence will be missing.

9            Your Honor, you'd certainly have assertions of DNO

10   liability for breaches of fiduciary duty that would be

11   dealing before the day of reckoning if tax Armageddon came.

12   You'd have potential liability for the various directors and

13   officers and perhaps some allegations of personal liability

14   for the tax.  But what the Court can clearly take notice of

15   is it would be delay, delay, delay before we got to tax

16   Armageddon.  And for us, Your Honor, that establishes that

17   there was a window for negotiation here that was not

18   utilized.

19           Your Honor, this slide is telling.  The facts have

20   changed in this case as NOLs and EFH Corp. have increased,

21   as EFH Corp. obtained clean title to its NOLs as

22   unfortunately the value on the T-Side changed the benefit

23   that the T-Firsts would receive from causing tax Armageddon

24   has decreased to the point where the undisputed testimony

25   is, according to Mr. Keglevic, the undisputed testimony is

1    the T-Firsts are financially better off, they're better off

2    in a tax-free spin than they are in a taxable transaction.

3              This stark fact there's no evidence it was

4    considered or discussed at a single board meeting that we

5    have seen.  This analysis should have driven the EFH Corp.

6    directors to negotiate with a vengeance for consideration

7    for what they were giving away.

8              Your Honor, there'll be no evidence that there was

9    a discussion of the probability of tax Armageddon occurring.

10   The idea that the T-First lien lenders faced with a middle

11   ground, middle ground being take the PLR, pay something for

12   the NOLs that provide them with the benefit shown by their

13   slide, and then we have a successful plan here.  The idea

14   that they would run from that middle ground just makes no

15   sense, and I'd submit you need evidence that they actually

16   would cause these problems and they actually would act

17   before you can base a ruling on the EFH Corp. directors

18   having acted rationally in response to that fear.  And you

19   won't have that evidence.  The T-Firsts aren't on anyone's

20   witness list.

21             Your Honor, a prudent person would have identified

22   what might occur before the taxable event could occur.

23   You'd evaluate the steps.  So you'd say before I get to a

24   taxable event I, as a prudent person, deciding what to do, I

25   need to think about all the things that will occur.  I refer

1    to those as the hurdles.  And then you need to weigh the

2    probability that the bad event will occur.  And then, and

3    most importantly, if you're preparing yourself properly for

4    a negotiation you say if I negotiate and it goes bad for me

5    when can I turn off course and change direction?  And giving

6    that the EFH Corp. directors held the keys to a tax-free

7    spin in their hand and those keys were of undisputed

8    monetary values of the T-Firsts because they receive more in

9    a tax-free spin, and clearly the EFH Corp. directors hold

10   the keys to the speed in this transaction, given that we

11   believe that the failure to negotiate, the failure to figure

12   out a strategic plan for when you can get off the off ramp

13   during your negotiations that was not correct, that's not

14   what a prudent person should have done in this situation.

15           Your Honor, briefly I'd like to touch on the

16   alternatives that were in fact available.

17           Mr. Keglevic and the debtors take a binary

18   approach.  They argue that there were two alternatives.

19   Taxable transaction and Armageddon or complete capitulation

20   and give the T-Firsts all of the NOLs.  Their alternatives,

21   there's a range of them.

22           Stepping back for one second, Your Honor, this

23   transaction has two steps as detailed in Mr. Keglevic's

24   declaration.

25           First you have a tax-free spin that will take

1    place.  That could occur with or without a basic step up.

2    There is no obligation that a spin -- that the busted 351

3    transaction take place.

4         Now would it be a waste of resources and NOLs not

5    to find a compromise and to not find some way to permit the

6    T-Firsts to make use of the step up NOLs?  Certainly.  But

7    as a legal matter this Court needs to note that there was an

8    alternative number one, which was a spin without the step

9    up.

10        And in connection with this, Your Honor, it's

11   worth noting the point that the T-Firsts do not have a lien

12   on EFH Corp.'s NOLs, so they have no right other than --

13   they have no right to the NOLs.  They can make threats of

14   causing bad events so that perhaps people consider that

15   giving them the NOLs made sense, which is apparently what

16   happened here, but there's no right, they have no lien, they

17   didn't -- they weren't entitled to that.  What they're

18   entitled to is to take their assets after a process.

19        Your Honor, Option B is for reorganized TCEH to

20   pay for the NOLs that it's using.  You're not going hear

21   that that was discussed and pursued.

22        Your Honor, Option C would be for there to be the

23   transaction currently contemplated but with fewer assets put

24   into the step up bucket and a lower number of NOLs granted.

25   EFH Corp. is not committed to use its NOLs, as I've

1     explained, nor under the PLR are they committed to provide

2     as much of a step up.  There's a wide range of negotiations

3     that -- and options that were available as the parties

4     negotiated the transaction.  None of those were visited.

5              Finally, Your Honor, Option D is to wait and see

6     what happens on the E-Side.  We do not know yet and you will

7     not have evidence that a creditor side plan will emerge on

8     the E-Side in connection with bidding.  I have no evidence

9     to offer that it's under way or it's actually going happen,

10    but we're still weeks and weeks away from the final deadline

11    for a competing bidder in connection with the Oncor sale

12    process, and what the Court needs to take note of and what

13    the directors may not have fully considered is that that

14    possibility still existed and it hasn't been facilitated.

15    And that is an option, to wait and see if the NOLs are

16    needed on the E-Side or would add more value.

17             Your Honor, I don't have a perfect explanation for

18    the disinterested directors and nor EFH Corp.'s failure to

19    engage in the negotiations.  I think there was a belief that

20    there was a deal momentum and that the old transaction

21    should continue to govern, it's what witnesses say, they

22    didn't revisit it.  Perhaps it's the fact that it appears

23    that all 400 and some odd employees at EFH Corp. really at

24    Corporate Services are destined to go work for the T-Side in

25    the future.  We can't quite nail down why these issues

1    weren't revisited, but we don't have to.

2         For that trial what you need to do is say were

3    there alternatives and did anybody on behalf of EFH Corp.

4    make the most of attempting to use those alternatives in a

5    negotiation for the benefit of EFH Corp.?  And you're not

6    going see that that occurred.

7         Your Honor, this is the timeline of the events.

8    You get the prior plan that is terminated.  And as will be

9    shown at trial there were limited or no negotiations over

10   attempting to obtain consideration for EFH Corp.

11        Your Honor, there's no evidence of a development

12   of an EFH Corp. strategy to attempt to extract value for its

13   NOLs, and there's no or just limited perfunctory evidence of

14   involvement of EFH creditors.  Those facts will make it very

15   difficult for this Court to enter a 363 finding that the

16   transactions can be approved.

17        Your Honor, in summary this Court must take note

18   of the fact that legal and economic alternatives existed.

19   You do not need to determine why they were not considered to

20   send everyone out to negotiate a better alternative.  This

21   isn't about delaying this plan forever, it's about finding

22   the appropriate amount of consideration that should be paid,

23   and then this plan largely could be confirmed.  You just

24   need to make a ruling that the consideration -- the

25   alternatives weren't properly considered or the

1    consideration is not appropriate.

2            Your Honor, Mr. Sawyer used a term that I borrow

3    more than once when he described that it was always in the

4    plumbing of the deal for reorganized TCEH to receive the

5    maximum step up.  The issues just weren't revisited.

6            Your Honor, courts in bankruptcy do not approve

7    363 transactions where there's no evidence of negotiation

8    nor about full evaluation of the consideration.  I can't

9    find a case where that occurred, I don't believe that you're

10   going see that there was active negotiation during the

11   period in question.

12           Your Honor, as you hear the evidence I would ask

13   that you focus on what was the consideration that EFH Corp.

14   was receiving, who was making the decisions about that

15   consideration, who was negotiating, who wasn't negotiating,

16   and at the end of the day you'll be asked to determine

17   whether or not on the facts and the varying degrees of

18   interestedness, the various degrees of care that were

19   exercised, what the appropriate standard is.

20           As we've outlined in the brief that we filed last

21   night we believe that it is at a minimum heightened scrutiny

22   and it may be entire fairness and that you will actually

23   have to weigh the consideration and weigh these factors.

24   Under 363 and the facts of this case you will not be able to

25   be deferential to the directors.

Page 74

1          Thank you.

2          THE COURT:  Thank you, Mr. Pedone.

3          Anyone else?

4          MR. PEDONE:  I believe Ms. Kam.

5          MS. KAM:  I'm Sarah Kam of Reed Smith and I'm here

6    today on behalf of the Bank of New York Mellon Trust Company

7    in its capacity as the EFCH 2037 notes trustee.

8          As others have already mentioned we're currently

9    working to resolve our objection and hope to have a

10   resolution soon.

11         And also on behalf the Bank of New York Mellon in

12   its capacity as the PCRB trustee we would just like to state

13   for the record that yesterday we received written

14   authorization to withdraw the August 15th letter filed by

15   PCRB holder Nickie McKlendon (ph) at docket number 9282 and

16   therefore we withdraw that letter.

17         THE COURT:  Thank you.

18         MS. KAM:  Thank you.

19         THE COURT:  Mr. Hogan?

20         MR. HOGAN:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22         MR. HOGAN:  I believe it's just before noon there.

23   Thank you.  Daniel Hogan, Hogan McDaniel on behalf of

24   Fenicle -- Shirley Fenicle, David William Fehy, and John

25   Jones.  Your Honor, I'll be brief.

1          The objecting parties, the Fenicle, Fehy are

2    obviously asbestos objectors.  Shirley Fenicle is a

3    successor in interest to the estate of George Fenicle, her

4    husband who was a mesothelioma victim and was exposed to

5    asbestos brought home by her -- and she was exposed to

6    asbestos brought home by her husband on her clothes -- on

7    his clothing.

8          Mr. Fehy is a mesothelioma claimant as well.  Mr.

9    -- Ms. Fenicle and Mr. Fehy have filed claims in this case

10   as the Court is aware.

11         Mr. Jones was exposed to the debtors' asbestos

12   while working for the Hartford nuclear plant in Washington

13   State.  Mr. Jones was diagnosed with metastatic malignant

14   mesothelioma on December 14th, 2015, the bar date.

15   Mr. Jones did not file a proof of claim.

16         We readily acknowledge, Your Honor, that these

17   asbestos objectors are E-Side claimants, of course the way

18   the plan is structured currently Mr. Jones arguably doesn't

19   have a claim insofar as his claim arose after the bar date.

20         We also note that the asbestos objectors attempted

21   to engage in discovery during the T-Side plan confirmation

22   process but were repeatedly told that the discovery on the

23   T-Side would be limited to the issues related to the

24   confirmation of the T-Side plan and that the debtors would

25   object to any questioning that we undertook that was not

1   relevant to that subject.

2           We therefore reserve our rights to object to the

3   presentation at this confirmation hearing to the extent that

4   the debtors offer any evidence or testimony relating to the

5   E-Side confirmation process.

6           I'll get to our objections.

7           The TCEH debtors, as the Court knows, are a subset

8   of the 71 debtors in these cases, and these cases have not

9   been substantively consolidated.

10          Section 541 of the Bankruptcy Code provides that

11  the property of the estate is comprised of "the legal and

12  equitable interests of the debtor and the property at the

13  commencement of the case."

14          As the Third Circuit has instructed a federal

15  court sitting in bankruptcy has jurisdiction over the

16  debtor's estate, the court's subject matter jurisdiction

17  does not extend to property that is not property of the

18  debtor's estate.  The debtor's plan cannot use property

19  belonging to a subsidiary or other affiliate.  A debtor may

20  not use Section 541 to divest another property to which that

21  pertains to rightful title.  Similarly property of a

22  subsidiary or other affiliate of the debtor is not part of

23  the debtor's estate and is not within the court's

24  jurisdiction.

25          The NOLs in the EFH group equity interests in the

1    shared service debtors are property of the EFH group as you

2    just heard.  TCEH is classified as a disregarded entity for

3    United States federal income tax purposes.

4            Any (indiscernible) loss of other tax attributable

5    in respect to such losses, including NOLs, of a disregarded

6    entity are not considered income loss or attributes of its

7    owner through a U.S. federal tax income purposes.

8            Thus the NOLs are property of the EFH Corp.

9    regardless of whether a portion of the NOLs arose due to

10   losses incurred by TCEH or other EFH Corp. disregarded

11   subsidiaries.

12           TCEH does not have a contractual right to utilize

13   EFH Corp.'s NOLs to provide reorganized TCEH with a step up

14   tax basis as provided in the new plan.

15           Under the settlement agreement TCEH released any

16   and all claims it had against EFH group under the tax

17   sharing agreement, including any right to payments in

18   respect of EFH group's -- EFH Corp.'s use of NOLs in

19   exchange for a settlement of the $700 million.

20           Under the new plan TCEH debtors would

21   substantially use up the valuable asset of EFH Corp. without

22   providing any consideration to the EFH debtors.

23           Thus the Court may not assert jurisdiction over

24   that property in these cases and the new plan cannot be

25   confirmed because it would purport to dispose of property

1    that is not a part of the TCEH debtors' estate.

2            Secondly, Your Honor, 1129(a)(2) and 1129(a)(3)

3    the plan must comply with all applicable provisions of the

4    code and it may not be proposed by a means forbidden by law.

5            In order to confirm a plan the Court must find

6    that the plan satisfies the requirements of 11 U.S.C. 1129.

7    The code imposes an independent duty on the Court to

8    determine whether the plan satisfies each element of 1129.

9            Moreover, Your Honor, the new plan only seeks to

10   divest the EFH group of property which is not rightfully

11   theirs causing the EFH group to transfer assets to TCEH

12   without compensation, which would be a fraudulent transfer

13   in violation of their fiduciary duties to the EFH group

14   creditors.

15           Feasibility, Your Honor.  The TCEH debtors bear

16   the burden of proving the feasibility of the new plan under

17   11 U.S.C. 1129(a)(11).  Here the TCEH debtors have not

18   satisfied that burden and will no be able to satisfy the

19   burden.  They have made no attempt to demonstrate that the

20   plan would be feasible without the use of these EFH group

21   assets, thus the new plan cannot be confirmed.

22           Finally, Your Honor, just a very limited

23   reservation of rights.

24           I'd like to acknowledge and thank Court for its

25   ruling on the debtors' motion in limine to preclude Fenicle

1   and Fehy from making due process arguments in their

2   objections to the TCEH plan.  We don't plan to make those

3   arguments, Your Honor, and in fact did not include those in

4   our objection to the TCEH plan confirmation process.

5          Fenicle, Fehy, and Jones have not asserted those,

6   and the Court is aware the asbestos objectors objected to

7   the previous plan which was approved by the Court on the

8   grounds that the discharge of unmanifested asbestos claims

9   would violate due process.

10         We will make the objections to the E-Side plan and

11  we will deal with those issues on that confirmation process

12  has that comes down the pike.

13         As we've stated in our response to the motion in

14  limine, we do reserve the right to raise the issue and any

15  other due process arguments if such arguments are relevant

16  or responsive to other arguments or evidence introduced at

17  this TCEH confirmation hearing.

18         As I said, the asbestos objectors will play a

19  limited role in this confirmation process, Your Honor, we're

20  really just here to watch and learn and listen, but we do

21  reserve the right to object if it becomes germane.

22         Thank you.

23         THE COURT:  You're welcome.

24         Anyone else?

25         Okay.  All right.  We're ahead of schedule.  I

1    think though Mr. Keglevic will take say an hour and a half

2    you think for direct?

3             UNIDENTIFIED SPEAKER:  On direct I suspect he'll

4    be more than an hour.

5             THE COURT:  I'd rather not interrupt that, so

6    we'll take somewhat of an early lunch today.  We'll take the

7    lunch break down, we'll reconvene at approximately 1 p.m.,

8    and we'll take Mr. Keglevic at that time.  All right?

9             Thank you very much.

10        (Recessed at 11:59; reconvened at 1:11 p.m.)

11             THE CLERK:  All rise.

12             THE COURT:  Please be seated.

13             Please remain standing for your affirmation, Mr.

14   Keglevic.  You're an old hand at this.  He knows his way to

15   the witness stand.

16        (Laughter)

17                  PAUL KEGLEVIC, WITNESS, SWORN

18             THE CLERK:  Please state and spell your name for

19   the record.

20             THE WITNESS:  Paul Keglevic, K-E-G-L-E-V-I-C.

21             THE CLERK:  Thank you.

22             MR. MCKANE:  Your Honor, first of all for the

23   record Mark McKane of Kirkland & Ellis on behalf of the

24   debtors.  To assist in Mr. Keglevic's examination we have

25   prepared the Paul Keglevic witness binder.  May I approach?

1              THE COURT:  Yes, please.

2         (Pause)

3              THE COURT:  Volume VI.

4         (Laughter)

5              THE COURT:  Very good.

6              MR. MCKANE:  Your Honor, you'll see on the cover

7    page it says, Volume I.  This is I of I.

8              THE COURT:  Okay.

9              MR. MCKANE:  So hopefully that will be good news.

10                  DIRECT EXAMINATION

11   BY MR. MCKANE:

12   Q    Mr. Keglevic, can you please state your employment

13   positions with the debtors for the Court again?

14   A    Yes.  I'm the executive vice-president and CFO of all

15   the debtors, and I have various director roles at different

16   debtors that I won't go through in detail.

17   Q    And, sir, specifically with regards to EFH Corporate

18   Services, do you hold a position?

19   A    Yes.  I am the president of EFH Corporate Services and

20   I am their loan director.

21   Q    And, sir, what about EFH Properties, do you hold a

22   position there?

23   A    Yes.  My -- I think my position there is still EVP, CFO

24   and I am a director.

25   Q    And, sir, did you prepare a declaration, a written

1    declaration of testimony today?

2    A    I did.

3    Q    And, sir, if you could look in your witness binder and

4    under the tab DDIRKEGLEVIC --

5    A    Got it.

6    Q    -- sir, can you confirm that this is your declaration?

7    A    Yes, it is.

8    Q    And, sir, to -- is the information contained therein

9    the  -- true and correct to the best of your knowledge?

10   A    Yes, it is.

11   Q    All right.  I will hold off on moving that into

12   evidence until the -- at the end of your examination.

13       Let's start, Mr. Keglevic, by talking about how we got

14   to this plan.  Starting with the confirmation of the Hunt

15   plan in December can you describe the debtors' efforts

16   generally to effectuate that plan?  What were you doing?

17   A    Sure.  To effectuate the Hunt plan we needed various

18   levels of regulatory approvals, the most important of which

19   was the PUCT approval to the E-Side.  And so we cooperated

20   with Encore on that and in the background most of the other

21   regulatory approvals related to the T-Side, but we also

22   moved those forward such as the Firk (ph) and the NRC, et

23   cetera.

24   Q    And, sir, in parallel with those efforts did you also

25   begin contingency planning?

1    A    Not initially because, of course, we -- it was in

2    everybody's best interest to get the Hunt plan confirmed and

3    approved.  But during the PUCT hearings it became clear that

4    there were going to be some -- you know, potentially some

5    issues that would cause that plan not to be executed.  And

6    at that point, which I believe was probably in January,

7    early February, we began seriously looking at contingency

8    planning.

9    Q    And was the EFH board of directors kept informed with

10   regards to the potential contingency planning that the

11   debtors' restructuring team were undertaking?

12   A    Yes.  We -- for a long time we've had calls with our

13   board every two weeks.  So we reviewed not only PUCT

14   hearings and how the Hunt case was progressing, but also as

15   we segwayed into contingency planning that became part of

16   the standing agenda.

17   Q    And is it part of your practice to participate and lead

18   in many of those discussions?

19   A    Yes.  I certainly participate in virtually all of them

20   and in many cases I lead or at least participate.

21   Q    And before we go further about the board process, could

22   you describe for the Court generally with regards to

23   restructuring matters your efforts working with Ms. Dore to

24   identify and develop for the board restructuring updates?

25   A    Yeah.  Ms. Dore and I and our advisors, Evercore and

1    Kirkland, typically put our heads together to come up with

2    an outline, run it by the disinterested director advisors,

3    get agreement, direct our advisors to draft something.  The

4    draft was circulated among the disinterested director

5    advisors, Ms. Dore and myself and our advisors for comments,

6    and then we sent out the board materials.

7    Q    All right.  And, sir, do you seek board approval for

8    significant transactions as it relates to the restructuring?

9    A    Yes, we do.

10   Q    All right.  Sir, could you turn in your binder to DX-

11   103?

12   A    Yes.

13   Q    And could you describe for the Court what DX-103 is?

14   A    It's -- it was a restructuring update.  This one was

15   given live with our board.  And it basically went through

16   the status of all the regulatory approvals and then started

17   to outline the contingencies for an alternative plan.  And I

18   think that's -- and notably also went through fair -- four

19   different tax considerations.  I think we looked at two non-

20   taxable plans and two potential taxable plans and evaluated

21   the pros and cons of each of those four tax plans.

22   Q    All right.  And, sir, just maybe using the page ending

23   16 on the Bates in the bottom right-hand corner, the table

24   of contents as a guide, and looking at the bottom, the

25   second half of the agenda there, contingency planning Plan

1    B.

2    A    Yes.

3    Q    All right.  Can you just describe for the Court what

4    was the kind of status of the debtors' efforts to evaluate a

5    potential Plan B as of the date of this board meeting,

6    February 25th, 2016?

7    A    Sure.  In short form, if that -- if the deal with the

8    Hunts did not go through, we were looking at various

9    alternatives that we could go through that would be the

10   underpinnings or the fundamental concepts of the plan.  As

11   you know from probably before we filed and since we filed

12   having a tax free transaction has been one of the basic

13   tenants.  We reviewed, you know, afresh as to whether that

14   should still be one of the tenants because if you'll note

15   before then we started looking at changes in market values

16   of the TCEH assets and recognized that the, you know, TCEH

17   asset value had been, you know, declining.  So we did our

18   best to evaluate the pros and cons of all of those four tax

19   initiatives.

20   Q    So why -- if you could just highlight for the Court,

21   why were you evaluating both tax free and taxable

22   transactions as of that time?

23   A    Well, as much as I would have loved to have taxable

24   have gone away by then, it still remains.  And it remains to

25   this day, as you've heard, as certainly as -- at a minimum a

1    threat.  And, you know, in fact, even backed up by a plan

2    that was filed by the T-First as Mr. Kornberg mentioned.

3            So we -- and given the significance of the T-First

4    position in the case and the need to get their cooperation,

5    if we're going to do something other than taxable we needed

6    to keep that as a, you know, option on the table and make

7    sure we understood what the pros and cons were, as I said.

8    Q    And (indiscernible) by February of 2016 had the debtors

9    statutory exclusivity period lapsed?

10   A    Yes.

11   Q    Was that a factor in your discussions?

12   A    Yes.  Certainly, you know, once your exclusivity

13   periods lapses you have no "control" of the case unless you

14   continue to work with the parties and do something that is

15   cooperative and keeps them from filing.  And we've always

16   had that as a risk in this case and we wanted to make sure

17   we understood that it was still a risk that needed

18   attention.  Once we determined that it was, we knew we

19   needed to embark upon something that would be acceptable to

20   the T-First or take the significant risk.  I -- apparently

21   we're calling it Armageddon.  But mutual destruction is

22   another word for Armageddon or a description of that

23   Armageddon on -- you know, if we incurred that tax.

24   Q    And, sir, were you doing this evaluation and

25   contingency planning in a bubble or were you engaging with

1    creditors as well?

2    A     No.  We had -- at the date of this presentation we had

3    already met with both E-Side and T-Side creditors, if I

4    remember correctly mid-February.  In fact, the DDAs

5    participated in these meetings and I know we met with at

6    least the second liens at EFIH, the PICs at EFIH and the

7    TCEH first.  I think the EFH, the Fidelity contingent,

8    because they were tied up with the Hunt deal they did not

9    feel it was appropriate to attend.  And, in fact, some of

10   the PIC sponsors or PIC holders that were also tied up in

11   the deal did not attend, but others that were not did and

12   their advisors did.

13   Q    And did this evaluation or contingency planning at some

14   point crystallize into a term sheet?

15   A     Yes.  Before we filed our plan in May, I think it was

16   May 2016, we had sent out a term sheet to all parties.  But,

17   frankly, the term sheet was anti-climatic because at the

18   February meetings we had with creditors and with all of our

19   disinterested directors, everybody seemed to continue to be

20   aware of the negative consequences of a taxable deal at that

21   point and was not interested in going down that road.

22          So we got no objections to that part of the plan,

23   which was incorporated into the Hunt plan.  We got no

24   objections to the transfer, in fact, of Corporate Services

25   or Properties when we had those meetings.  The only question

1    at that point was going to be was it going to be a self-

2    equitization of the E-Side; did we want to start with a plan

3    there and have a toggle to sell it to a strategic; and were

4    they willing to put together a plan to set a value that then

5    strategics could shoot at.  So the vast majority of the

6    discussion was not on those items.  Everybody was in

7    agreement on the items associated with the other tenants,

8    the transfers and the tax free.

9             But, you know, it was really how now that Hunts

10   were going to take out the DIP and the second lien, you

11   know, debt to pay everybody at par, what was the best way to

12   get recovery for the E-Side.  That was really the

13   fundamental, the majority of the discussion.

14   Q    All right.

15             MR. PEDONE:  Move to strike --

16             THE COURT:  Basis?

17             MR. PEDONE:  -- with regard to the comments made

18   by E-Side creditors in attendance at the meeting.  It's his

19   summarization of hearsay with regard to what E-Side

20   creditors said at this meeting and in their reaching of a

21   consensus.  That's --

22             THE COURT:  Overruled.

23             MR. PEDONE:  -- hearsay.

24             THE COURT:  Overruled.

25   BY MR. MCKANE:

1    Q    All right.  Recognizing that there was a general

2    consensus as to the term sheet as it relates to the tenants,

3    if you could just identify the term sheet.  I believe it's

4    Exhibit 688 in your binder.

5    A    Yes.  That looks like the term sheet.

6    Q    Thank you, Mr. Keglevic.

7         And, sir, if could confirm looking at Bates number

8    ending 147 of that exhibit, specifically the top two box,

9    sir, can you confirm for me that that -- that second box,

10   the TCEH restructuring transactions, that's the spin with

11   the busted 351; is that right?

12   A    Yes, which was the same description that was

13   incorporated into the Hunt plan, basically.

14   Q    All right.  And, sir, was the tax matters agreement

15   contemplated at this time as well?

16   A    Yes.  There was always a tax matters agreement that had

17   to be entered into to make sure that if -- you know, the tax

18   free spins come with it, various conditions and prohibitions

19   against certain activities, and each party was going -- in

20   fact, in the Hunt deal we had one.  In any deal it's

21   typically a market condition in any M&A that both parties

22   will agree not to do something that will, in fact, cause the

23   tax to be triggered accidentally or through their actions.

24   Q    And what about the other ancillary agreements, were

25   they contemplated at this time as well?

1   A    Yes.  Similarly, they were part of every plan that we

2   have filed, including the Hunt plan that was confirmed and

3   this plan.

4   Q    All right.  And, sir, at some point in time did you

5   receive a ruling from the Public Utility Commission of

6   Texas?

7   A    Yes, we did.  We received a ruling that effectively

8   approved the change of control, but left some significant

9   points open.  One was the treatment of the tax advantages of

10  the REIT and one point that they had ruled on is that the

11  lease between two entities that were part of the REIT would

12  be considered tariffs and would have to have a hearing to

13  determine the fairness of the tariff between the parties.  I

14  think those were the two primary economic concerns that led

15  the deal to, you know, have substantial uncertainty and

16  caused ultimately the TCEH first to file the notice of

17  suspension, or I can't remember what it was called

18  officially.

19  Q    Well, sir, if you could turn -- you mentioned the

20  notice, a notice of termination --

21  A    Notice of Termination.

22  Q    -- plan support termination.  If you could turn to DX-

23  682.

24  A    Yes.  That's the notice of termination that I was

25  referencing.

1  Q    And, sir, what impact did this notice of termination

2  have that was sent from Kevin O'Neil at Paul Weiss?

3  A    Well, it ultimately meant that we had to file an

4  alternative plan or, you know, determine an alternative

5  course to file for the restructuring.  And the plan we filed

6  had to follow the alternative restructuring terms that were

7  in the settlement or it would have blown up the settlement.

8  But it really caused us to -- you know, to take a different

9  course, file a different plan which is why we started the

10  alternative planning in February that I previously

11  discussed.

12  Q    And were the debtors in a position to respond to this

13  contingency?

14  A    Yes, because it was pretty clear in the Texas PUCT

15  hearings that this thing was not headed in the right

16  direction.  We had gotten feedback both from the Hunts and

17  from some of the unsecured that they were concerned that if

18  they could not change these conditions that they would

19  accept the notice of termination and, therefore, we, you

20  know, spent that time probably from early February until we

21  filed the plan in May to determine that we had an

22  appropriate follow up plan that met the alternative

23  conditions.

24  Q    And, sir, did -- as you present -- did you and the

25  other members of the restructuring team present to the board

```
1    of directors in advance of filing a plan of reorganization

2    your proposed plan?

3    A    Yes.  The proposed plan was gone through at a board

4    meeting and was approved by the board.

5    Q    And was the process for the review and preparation of

6    those board materials the same as you described previously?

7    A    Yes.

8    Q    All right.  And if you could turn to DX-95 in your

9    binder.

10   A    I'm sorry, Mr. McKane.

11   Q    I'm sorry.  DX-95.

12   A    Got it.

13   Q    Sir, do you recognize it?

14   A    Yes.  This was the board deck that we used to obtain

15   the approvals of the plan that we filed shortly thereafter.

16   This was the April 29th meeting that I think we filed on May

17   1st.

18   Q    All right.  And, sir, if you could turn to page --

19   Bates ending 771.  Also, in the middle of the bottom it's

20   page 7 of 35.

21   A    Yes.

22   Q    Sir, can you describe to the Court what the status of

23   events was with regards to your communications with

24   creditors as of April 29th?

25   A    Well, we had the preliminary meetings in February that
```

1    I talked about in person with the creditors and our DDAs.   I

2    know there were various other discussions that took place

3    that were not necessarily in a meeting setting, but -- and I

4    think -- I believe the DDAs also had -- they represented to

5    me that they also had some communication with the creditor

6    groups.

7    Q    And so the term sheet that you developed on April 25th,

8    did that go out to creditors as well?

9    A    It did.

10   Q    Okay.  And by this point in time with the termination

11   notice had you had some interaction with Fidelity?

12   A    I don't think Fidelity was at the first meeting, but my

13   recollection was that, yes, we had -- either -- I don't know

14   if it was with Fidelity directly meaning the company or it

15   was their advisors, but I believe we did.

16   Q    And --

17   A    That's my recollection.

18   Q    Thank you.

19          And, sir, if you could just turn the page --

20   A    Yes.

21   Q    -- to 772.  The alternative plan of reorganization as

22   described on that page for the board, did that meet the core

23   principles that Mr. Husnick referenced in his opening

24   statement?

25   A    Yes.

```
 1   Q    All right.  And did the board ultimately approve the

 2   filing of an alternative plan?

 3   A    They did.

 4   Q    And did all the boards approve that filing?

 5   A    Yes.  All the boards did and it -- including the

 6   disinterested directors.

 7   Q    All right.  And, sir, why was there a toggle in that

 8   plan as best as you can articulate it?

 9   A    Once again, because the TCEH first liens threatened to

10   file their own taxable plan unless we included the toggle, I

11   think as Mr. Husnick said, you know, throughout the case

12   there's, you know, the TCEH firsts, to avoid a taxable

13   route, always wanted an incentive.  We were able to give

14   them a partial step up or some type of step up and also the

15   promise of speed and those were the incentives that, you

16   know, kept them off the playing field as a proponent of a

17   taxable plan.

18              MR. PEDONE:  Move to strike.

19              THE COURT:  Overruled.

20   BY MR. MCKANE:

21   Q    And, sir, you mentioned that the TCEH first liens had

22   threatened to file a plan and they did file a plan.  If you

23   could turn to DX-758.

24   A    Yes.

25   Q    And in particular if you can look to the attachment to
```

1    the supplemental response, which I believe has the caption,

2    form a plan of reorganization.  Do you recognize that, sir?

3    A    I'm sorry.  Can you give me the Bates --

4    Q    Yeah.  Let me --

5    A    -- number or something?

6    Q    If you look at the top of the page it starts 1 of 158

7    and I'm looking at page 9 of 158.

8    A    Okay.  Yes.  I'm on the page.

9    Q    Sir, to the best of your knowledge is this the plan of

10   reorganization that Paul Weiss and Young Conaway filed on

11   behalf of the TCEH first liens in draft form in May of this

12   year?

13   A    Yes.  That's my understanding.

14   Q    All right.  Sir, at one point the debtors proposed

15   bifurcated proceedings, having two confirmation hearings.

16   Are you familiar with that?

17   A    I was.

18   Q    And are you familiar --

19   A    I am.

20   Q    Were you part of the board's discussion regarding the

21   decision to bifurcate the proceedings?

22   A    Yes.  Once again, as part of, you know, the incentives

23   that the T-Side wanted not to pursue a taxable plan, they

24   wanted speed and they were concerned about getting tied up

25   with E-Side since the E-Side did not have a fully baked plan

1    of their own to offer and we did not have a bigger or a plan

2    sponsor yet at that point in time.  So they wanted this

3    bifurcated schedule since the issues on T were largely

4    resolved and that effectively we needed, you know, the

5    various ancillary agreements, a tax matter -- including a

6    tax matters agreement and a PLR, and that the T-Side was

7    ready to go and they didn't see any need for a hold up.

8           Interestingly, the E-Side also wanted more time to

9    evaluate, you know, their plan and their opportunity.  So

10   they seemed to also be okay with the bifurcation.  They

11   were, in fact, asking for more time and I think we ended up

12   virtually having a consensus.

13   Q   And just to be -- to confirm something I think I heard.

14   E-Side creditors specifically asked you to delay their

15   confirmation proceeding so they could get their act

16   together?

17          MR. PEDONE:  Objection.

18          THE WITNESS:  That's what they -- sorry.

19          THE COURT:  Overruled.  And let me just -- it's

20   not hearsay, okay, because it's not being offered for the

21   truth of the matter about whether or not they actually

22   offered this, et cetera.  This goes to Mr. Keglevic's

23   perception of what the status was and it goes to his

24   decision-making ability.

25          Now whether or not it's true or not isn't the

1    issue.  It's what he believed to be the case.  So it's not

2    hearsay.  Overruled.

3            MR. PEDONE:  Your Honor, may I address --

4            THE COURT:  Yeah.

5            MR. PEDONE:  We've had discussions with the debtor

6    about the limits of admissibility about estate arguments,

7    positions, statements of other parties, and whether or not

8    it could be limited to non-hearsay purposes and the truth.

9    And we weren't able to resolve those issues with regard to

10   the direct.

11           So I don't actually no yet and I don't believe the

12   Court does the purpose for which this is being offered.

13           MR. MCKANE:  Let me absolutely clear about this.

14   Statements are exact -- what is told to Mr. Keglevic across

15   the negotiating table go to his state of mind and his

16   understanding as to what the positions are that are then

17   articulated to the board.

18           That is admissible.  It's admissible because it's

19   viewed by the rules of evidence as not hearsay or subject to

20   a hearsay exception.

21           Our position is very clear.  There's in evidence

22   and there's not in evidence.  And if you can satisfy an

23   exception to the hearsay rule like state of mind, it's in

24   evidence.  We're not arguing that it is the truth.  It --

25   you know, but we're saying this was the decision-making of

1    the debtors and, therefore, it should be admissible, period,

2    because it satisfies a hearsay exception.

3                THE COURT:  And you articulated it better than I

4    did, but that's --

5         (Laughter)

6                THE COURT:  -- I think that's what I was saying.

7    But --

8                MR. MCKANE:  Thank you, Your Honor.

9                THE COURT:  Mr. Pedone.  Yeah.

10               MR. PEDONE:  Your Honor, we're also dealing with

11   double, triple, perhaps quadruple hearsay.  Mr. Keglevic was

12   asked about certain of these discussions in his deposition

13   and stated, I never sat in the room and had a negotiation

14   with them for (indiscernible).

15               THE COURT:  It doesn't matter.

16               MR. PEDONE:  We need a foundation, Your Honor.

17               THE COURT:  It doesn't matter.

18               MR. PEDONE:  Thank you.

19               THE COURT:  Overruled.

20               MR. PEDONE:  Thank you.

21   BY MR. MCKANE:

22   Q    Okay.  Mr. Keglevic, I think we're up through the point

23   of the filing of the plan.  Okay.  I want to pause for a

24   second in the chronology and then turn to some tax

25   considerations, which I know you love.

1              Can you just set the table for the Court about the

2      process for filing a private letter ruling and why you did

3      it?

4      A    Yes.  It goes back to foundationally that we thought a

5      negative outcome for all the estates would be a taxable

6      deal.  So we designed a transaction that we thought would

7      meet the criteria for non-taxable, but it was creative and I

8      think all of the parties before entering into a tax matter

9      agreement needed the support and wanted the support not only

10     of lawyers who give an opinion that it's more likely than

11     not or a should transaction, but from the IRS that this

12     transaction would meet those objectives.  So that's why we

13     went to the IRS and asked them effectively to affirm that

14     our interpretation as it relates to this transaction would

15     not result in tax.  And, in fact, we got that affirmation in

16     the tax letter ruling we received at the end of July.

17     Q    All right.  And, sir, this process from filing the

18     request two years ago through up to July who was leading

19     that effort on behalf of the debtors?

20     A    The tax department reports to me, so I looked to Ms.

21     Howard who is going to be a witness in this case to lead our

22     efforts.  But we had substantial assistance from our

23     advisors, from the disinterested director advisors and

24     several of the creditors also participated in the process so

25     that they knew exactly what was going on.  And I think we

1    did our best report out as changes in the process developed

2    or as we had different communications.

3              In fact, I know as drafts of information went to

4    the IRS those drafts were shared with the parties of

5    interest as were results of conversations and, in fact, many

6    were invited, I think most were invited to be on the phone

7    calls or the -- in meetings or the meetings in person that

8    we had with the IRS.

9    Q    All right.  Mr. Keglevic, if you could just turn to DX-

10   343 in your binder and let me know when you're there, sir.

11   A    Yes.

12   Q    Sir, after just familiarizing yourself with the

13   document, obviously, which is dated July 28th from the IRS,

14   can you confirm to the best of your knowledge that this is

15   the private letter ruling?

16   A    This is the private letter ruling that we received.

17   Q    Thank you.

18              Can you just give your understanding of the sub --

19   sorry.  Let me say it again.  Recognizing that Ms. Howard

20   will testify later this week and give a more technical

21   discussion, can you give your understanding of the sub-

22   rulings contained in the private letter ruling?

23   A    Yeah.  The -- in my mind the important elements of the

24   private letter ruling were first and foremost that the

25   transaction we proposed would create no tax.  So that

1    included the tax free spin with the busted 351 and the basis

2    step up of about the $5.8 billion, that that would be non-

3    taxable.  So that was terrific.  The -- there was -- some

4    other elements of this were slightly different than where we

5    thought we were with the IRS over the two years.

6            One element was that the -- we thought that the --

7    there would be a code section that would not cause the

8    cancelation of debt income to be taxable at EFH.  And

9    obviously there is a substantial amount, 33, $34 billion of

10   debt income on the T-Side that would enter into the game

11   calculation.  The IRS took an alternative position and, in

12   fact, said, no, that that amount would be triggered unless

13   the company took the path of the tax free spin with the

14   busted 351.

15           Said another way, that tax -- and I think we've

16   calculated it in one of my exhibits to come of about six and

17   a half billion dollars would be the outcome if the company

18   sought a tax -- if the T-Side sought a taxable exit from the

19   corporation.

20   Q    All right.  And, sir, are you familiar, whether you

21   need to cite the code section or not, the tax code section

22   or not, with a bankruptcy stop that it would sometimes

23   prevent NOLs from flowing through post-reorganization?

24   A    Yeah.  It was really -- and I wasn't quite finished,

25   but thank you --

1    Q    Oh.

2    A    -- for getting to the second part of my answer.  So

3    that was item number 2.  Item number 3 was that that same

4    ruling, kind of the flip side of the ruling that there would

5    be a significant tax due in a taxable transaction was that

6    the NOLs which we thought -- that no NOLs would survive

7    regardless of the transaction we took.  The IRS took an

8    alternative position.

9          So, in fact, while there was a big negative

10   associated with this ruling that a taxable transaction would

11   cause more tax that we had hoped or anticipated, there would

12   be some benefit to the E-Side of the tax free transaction

13   meaning NOLs would survive.  And, in fact, I think we have

14   an exhibit on that to show that amount.

15         So those were the three primary elements of the

16   ruling that came out that I think are going to be part of

17   the discussion we're having today.

18   Q    All right.  And as we -- before we get to the walk

19   through of the financial impact of the ruling, can you

20   explain to the Court before July 28th when the IRS gave the

21   debtors preliminary guidance that they were going to be

22   potentially adverse to some of the rulings that we have

23   requested?

24   A    Yes.  So to refresh the Court's memory we -- and I

25   think it's in Mr. Pedone's exhibit demonstrative that he

1    showed.  Originally, we -- and based on discussions with the

2    IRS we thought the tax calculation in a taxable T exit would

3    be the fair value of T minus the tax basis that they have,

4    which was about six and a half billion dollars.

5           So simplistically if the fair value of T was

6    sixteen and half billion at six and a half billion of tax

7    basis, there would be a $10 billion taxable gain obviously

8    times 35 percent that would cause the tax to be incurred.

9           As the value of T declined over time which has

10   happened as a result of lower gas prices and -- primarily

11   lower gas prices, that value has gone down.  So it got to

12   the point that based on that preliminary calculation if T

13   was only worth -- and in Mr. Ying's latest valuation was --

14   and I'll just use rough numbers -- but he said 10.2, I

15   think.  So let's use ten and a half.  We have six and a half

16   of tax basis.  There's only a four billion dollar gain.  EFH

17   is expected to have $8 billion of NOL.  So even if T went

18   taxably, we had enough NOLs to cover it and all of a sudden

19   Armageddon would not have been Armageddon.

20          And, in fact, while the E-Side never got to the

21   point where they -- we -- you know, we said we're okay with

22   a taxable exit because there were still some issues if they

23   did a taxable exit, which came out in our February board

24   meeting, that it would affect REIT optionality.  And even

25   though the REIT didn't work for the Hunts, there were still

1    others in Texas pursuing it.  And that was viewed as some

2    value as having the potential to do a REIT in the future

3    because if we went taxably they would leave behind all the

4    E&P profits at E and that made REIT non-economic.  So that

5    was a negative.

6           And then the second thing was, well, what if gas

7    prices go up and that valuation changes and all of a sudden

8    we don't have enough NOLs to cover that position, E would be

9    taking that risk.

10           So for those two reasons we weren't yet on board

11    with potentially supporting a T-Side deal, but that was our

12    mindset.  And then basically in May, the end of May, the IRS

13    basically said, you know, we're going -- we're close to

14    issuing you the ruling.  This is our final determination.

15    They told us this over the phone; that the CODI, you know,

16    the cancelation of debt income would go into the gain

17    calculation so it was no longer the fair value minus the tax

18    basis.  It started with the total amount of debt that was

19    canceled, the $34 billion and, in fact, my demonstrative

20    shows you where they are today.

21           So effectively it put Armageddon back on the

22    table.

23           But the flipside of putting Armageddon back on the

24    table was that that exception that we thought would cause

25    the NOLs to go into the black hole in bankruptcy now would

1    not go away and that E would be the beneficiary of any NOLs

2    not used by the 351 transaction, which we've estimated to be

3    about $370 million, which, Your Honor, I apologize for using

4    the numbers, but they're in the demonstratives that I think

5    we're going to go through here in a minute.

6              So net net, you know, there was a -- as long as we

7    went non-taxable and did the trans -- the busted 351, no tax

8    would be due other than the AMT tax which is about $14

9    million.  So T got what they wanted and they got a partial

10   tax basis step up.  So that part of the transaction went

11   according to what we thought the IRS was going to tell us.

12             But instead of having the declining value

13   potentially providing an escape hatch for T in a taxable

14   deal that E could support, that escape hatch was closed.

15   But the flip side of that is while we thought all the NOLs

16   would have gone away, so originally E was giving sleeves off

17   their vest to get any tax basis to T because they couldn't

18   have used them anyway, now E was interested in how many NOLs

19   would survive because it could have potential value to the

20   E-Side of the business, whether it was creditor-owned or

21   whether we sold it.

22   Q    All right.

23   A    So I apologize, but that's the reality of where we were

24   and where we ended up.

25   Q    So I may need to unpack that a little bit.

1    A    I was afraid you might.

2    Q    So as of the time of the filing of the plan you're --

3    am I correct that you're -- the debtors' expectation was

4    that there would be no NOLs falling through on the E-Side

5    because based on the private letter ruling request that had

6    been made the expectation would be these things would go

7    into a -- they would fall into sort of a black hole and they

8    were not going to be used.

9    A    That's correct.  The -- so in -- back then if our

10   estimate was $8 billion of NOLs, even though we were only

11   going to use 5.8 with the 351 busted transaction, the other,

12   you know, $2.2 billion would just be eliminated by virtue of

13   code section under the IRS.

14   Q    All right.  And step two is at the time you filed the

15   plan in May, based on your understanding of the expected

16   value of TCEH, the anticipated enterprise value would have

17   been such that the gain would have been such that we had

18   more than enough NOLs to offset that gain?

19   A    Had we gone taxably, you know, if T made their threat

20   come to fruition and went taxably, there was a potential

21   that E-Side could have supported it because they had more

22   than enough NOLs.  Any NOLs they didn't use would have gone

23   away anyway, and all they were giving up was the risk

24   associated with estimating what the fair value of T would be

25   upon exit, and they were giving up the optionality of ever

1   doing a REIT in the future.

2           And obviously after having a -- kind of a bad

3   hearing with the PUCT on the REIT, that wasn't viewed as

4   having substantial value.  So, you know, I think there was

5   some level of comfort that we could go either direction, the

6   toggle or the transaction we proposed and, you know, be able

7   to manage through it.

8   Q    And --

9           THE COURT:  Wait.  I'm sorry.  What was the time

10  frame again of this sort of initial communication from the

11  IRS, May?

12          THE WITNESS:  The end of May.

13          THE COURT:  The end of May --

14          THE WITNESS:  So it was --

15          THE COURT:  -- 2016.

16          THE WITNESS:  -- about 30 days literally after we

17  filed our plan.  We might have had a phone call shortly

18  before the end of May, but that was my recollection.

19          MR. MCKANE:  All right.

20  BY MR. MCKANE:

21  Q    And so even with the -- that taxable may be able to be

22  sheltered, we went -- you went tax free and why was that --

23  you mentioned a couple of things about the REIT, and was

24  speed a factor in why you went tax free as well?

25  A    Yes.  It was three things.  It was the "estimation

1    risk"; that if gas prices spiked, and they have been known

2    to do that in our industry and values spiked, that there

3    could be a liability beyond our NOLs.  That's always been a

4    concern that the E-Side had.

5              Secondly, it was REIT optionality.

6              And third was because we had gotten all parties

7    through this, you know, process with the tax free deal and

8    we were confident we were going to get it from the IRS.  We

9    thought it would be the fastest, most, you know, consensus

10   based way of exiting, you know, bankruptcy and have all

11   parties agree because E didn't seem to be interested because

12   there would be no NOLs that would survive under any

13   scenario.  T was happy with the tax basis write up.

14             But we -- to be clear our E-Side disinterested

15   director and our board did not come to that conclusion.  We

16   were still concerned about those three risks associated with

17   just saying to T, go ahead, go taxably.  So we --

18   Q    Okay.

19   A    -- we continued to keep it on the rails for a non-

20   taxable transaction.

21   Q    All right.  And then late May we get this indication.

22   It's preliminary, but an indication from the IRS that they

23   may be going adverse on a couple of the rulings and the

24   world changes.

25   A    Yeah.  And let me be clear about their preliminary

1    ruling.  They called us and told us that.  We immediately

2    demanded or -- well, you don't ever --

3    Q    Requested.

4    A    -- demand of the IRS.  You ask.  That they have a

5    meeting with us.

6        (Laughter)

7    A    Several of the creditor groups and our advisors went.

8    We asked the IRS to reconsider.  I think we even sent a memo

9    further outlining the reasons why we thought that ruling was

10   not the appropriate ruling.  And then at the subsequent

11   meeting it was very clear that while they were polite and

12   listened to our arguments they said, we've taken this all

13   the way up the flagpole and we believe this is our final

14   position.

15   Q    Okay.

16   A    So, you know, if it wasn't the end of May, very shortly

17   thereafter.  And I'm only commenting because you said

18   preliminary.  We very quickly went from preliminary to final

19   without a lot of space.

20   Q    All right.  But there was --

21   A    But had not got it in writing until July 29th.

22   Q    Okay.  All right.  Between the time you get the it's

23   final, but it's not in writing, through July 28th when we

24   get it in writing, did you do an assessment as to -- you've

25   described some of the material impacts of how these rulings

1    changed.  Did you assess your restructuring options at that

2    time?

3    A    Yes.  You know, I was frankly extremely pleased with

4    the outcome, even though it wasn't what we were asking for,

5    because, you know, my tax advisors told me we could never

6    get to -- you know, they weren't expected to get to the

7    place they got to.  So, number one, why was I happy, because

8    we were on a -- we had filed a plan that said tax free and

9    tax free worked.  So, number one, I knew that the busted 351

10   transaction worked and we had it in writing so we didn't

11   have to change paths.

12              Secondly, if we went to a toggle, even though I

13   wasn't hoping for this outcome, the toggle now, the taxable

14   deal was kind of back to the future and created a huge tax

15   that would assure mutual destruction, and this is the

16   Armageddon scenario.  So in my mind it made all parties

17   aligned around the fact that tax free was once again the

18   only way to go.

19              And then the third thing was to the E -- you know,

20   E-Side creditors, hey, you just got, you know, net present

21   value of $370 million dropped in your laps that you weren't

22   counting on from the IRS, which ironically, and we didn't

23   structure it this way, was almost identical to the

24   incremental amount of benefit that the T-Side was going to

25   get as part of the busted 351 transaction.

1          So it became very solomonistic (sic) in terms of

2     the outcome that if we went this way both parties had an

3     incentive to pursue the tax free, you know, deal and get,

4     you know, the taxable one off the table because both parties

5     absolutely had no positives associated, you know, with the

6     taxable one and especially if you're, you know, concerned

7     about speed in the case.

8          So that's, you know, kind of was my -- the mindset

9     that we had and, in fact, you know, that was the basis upon

10    which we continued to pursue the path we did.

11    Q    All right.  Sir, before you even filed the plan you

12    mentioned some interactions you had with creditors including

13    the T-Firsts.  After getting the preliminary and then final,

14    but not in writing, responses from the IRS did you have

15    further interactions with the T-First creditors?

16    A    Yes.  The -- at the end of May when we got this ruling,

17    obviously, you know, I was pretty sure that somebody in the

18    case from the E-Side was going to raise their hand and say,

19    now that these NOLs have value, I want more of them.  And so

20    I -- you know, I called the T-Firsts, my contact person who

21    is Jeff Strong at Apollo --

22    Q    And, sir, can you explain to the Court who Mr. Strong

23    is, not just at Apollo, but his role that he played for the

24    ad hoc group of TCEH first lien lenders?

25    A    Yes.  I think they have a -- a ten-person committee and

1    then a, you know, an executive committee of that ten-person

2    which is four or five.  He's one of the four or five.  He --

3    he ultimately will be a board member on the reorganized

4    TCEH.

5        So, you know, I have found him -- he's been involved in

6    the case a long a time.  I found him to be very attune to

7    what his committee thinks about and decides and so I had a

8    conversation with him saying, you know; hey, the world's

9    changed.  You know, because I wanted to make -- you know,

10   see what his appetite was for reconsidering the busted 351

11   and the amount of the step-up.

12   Q    And what did he tell you?

13   A    I probably can't use the exact words in court.

14        MR. PEDONE:  Objection.  Objection.

15        (Laughter)

16        MR. MCKANE:  Well, I'll rephrase.

17        THE COURT:  Yeah.

18        MR. MCKANE:  All right.

19   BY MR. MCKANE:

20   Q    Can you convey to the Court your take away from your

21   discussion with Mr. -- Mr. Strong about the willingness of

22   the TCEH first lien creditors to pay consideration to the

23   EFH creditors for use of the NOLs in a busted 351?

24   A    Well -- well, in all -- all fairness, it wasn't

25   particularly paying consideration but taking less of the

1    NOLs and leaving more behind, which is another way of

2    shifting consideration between the two parties because, at

3    this point, you have a pie.  The only question is how you

4    cut it between the two parties.

5         Like I said, the -- the net economic result, in my

6    opinion, because very close between the two parties so I

7    thought it was equitable.  But I did ask that question and

8    it was -- I guess the nicest way to say that was a non-

9    starter and that, you know the E has no basis of asking

10   that.

11        He's heard rumblings that they were going to -- that

12   they're prepared to go taxably and they needed the

13   consideration they were getting under the busted 351 because

14   they were also taking on substantial risks that they

15   wouldn't have to take in a taxable deal.  And they were done

16   discussing it.

17        So that was the conversation.  It wasn't very long.

18             MR. PEDONE:  Move to strike, Your Honor.  Hearsay

19   from a witness who could have been subpoenaed to testify

20   here but was not but on a witness list intentionally.

21             MR. MCKANE:  Your Honor, the same hearsay

22   exception for state of mind and his understanding of

23   what's --

24             THE COURT:  Yeah.  I think there were a couple

25   quotes there that, you know, really sort of pushed the

1    envelope; state of mind versus actual out-of-court

2    statement.

3            But I think, generally speaking, it's consistent

4    with my prior ruling.  So I'll allow it and overrule the

5    objection.

6            MR. MCKANE:  Okay.  So I -- let's move on.

7    BY MR. MCKANE:

8    Q    You mentioned that you've analyzed the economic impact

9    of -- of the rulings.  If you could turn to the

10   demonstrative number one.  It's the first tab of your

11   binder.

12   A    Yes.

13   Q    Mr. Keglevic, did you have this demonstrative prepared

14   on the financial impact of the cancellation of that ruling

15   to aid you in your testimony today?

16   A    I did.

17   Q    All right.  So could you walk the Court through what

18   this demonstrative shows?

19   A    Yes.  So the -- the top line is the historical tax

20   basis of the TCEH assets.  So those are the -- primarily

21   the, you know, the power plants that we own and the -- the

22   amount that's available for depreciation deduction in the

23   future.

24       The second line item is really the one that changed

25   with the IRS ruling and that is that they considered any

1    cancellation of debt income, commonly referred to as CODI,

2    C-O-D-I, to be included as a taxable gain.  So that is the

3    calculation, the amount based on face value.

4         The net of those two because the tax basis is a

5    deduction, the CODI is income, is the gross income.

6    Obviously, that gross income is -- would show up on the

7    income tax return of EFH.  The EFH has the 8.3 -- that's the

8    estimated NOLs that'll exist at that time.  They'll offset

9    any income resulting in a net taxable income of eighteen

10   four forty-one to which a thirty-five percent tax rate would

11   apply, resulting in the roughly six and half billion dollars

12   of tax.

13   Q    So -- so, in other words, if there were a taxable

14   separation of T -- of TCEH, the tax impact to EFH of that

15   separation, is $6.45 billion?

16   A    Yes.  That would be our best estimate of the amount

17   due.

18   Q    And, sir, who would be primarily liable for those tax

19   obligations?

20   A    Well, there's only one taxpayer and -- and that is EFH.

21   So, initially, it would show up on the EFH tax return.

22        I -- I understand that there's debate and potential

23   litigation about how that may be getting shared but I think,

24   technically speaking, it's EFH's liability.

25   Q    Now -- and, sir, did you -- did you also analyze the --

1    the -- the incremental benefits of the tax-free spin and the

2    busted 351 that is part of this plan?

3    A    Yes.  We -- we -- you know, as I mentioned, over time,

4    and I think Mr. Pedone's demonstrative shows this, that the

5    TCEH fair value had been declining.

6         So, interestingly, under this busted 351 transaction,

7    because you get to pick and choose the assets, and, in fact,

8    there's two assets, TXU Energy and Comanche Peak, that we

9    own, that they're fair value exceeds their tax basis.

10        And those two assets in total are -- you know, trigger

11   a 5.8 -- in fact, it's the step-up in preferred stock sale,

12   this $5.8 billion.

13   Q    And, sir, let's -- well, let me ask you, if you could

14   -- let's turn to demonstrative number two and we can walk

15   through the analysis --

16   A    Oh, I'm sorry.

17   Q    -- of this.  No.

18   A    That's what I was going off of.

19   Q    That's -- that's all level sighted.

20        And demonstrative number two says value of tax basis,

21   step-up.  And, sir, is this the calculating of the

22   incremental value of the spin-off step-up versus a taxable

23   step-up?

24   A    Yeah.  And I think it's much easier to explain it with

25   numbers.

1         There -- there's two alternatives here.  One

2    alternative is to do a taxable transaction.  That is the

3    fifth item showed there that they would have gotten in a

4    taxable -- traditional taxable transaction, a $4 billion

5    step-up, 3-9-6-7 is the exact number.

6         And then what we did is compare that amount to the

7    amount that they would get as a result of the built in gain

8    associated with Comanche Peak and TXU Energy, which is the

9    five billion, eight, six, zero.  The net of those two

10   numbers is that the T-Side is going to enjoy a incremental

11   step-up of about 2.163 multiplying it times the effective

12   tax rate, you get a $768 million nominal value.  That value

13   will be realized to TCEH to the extent they have income over

14   a 15-year period which is the depreciable lives of the

15   assets.

16        And so we applied a discount rate consistent with how

17   Mr. Ying calculated it in his valuation to get to the

18   incremental benefit of $434 million.

19        Now, I point out that the total benefit of the 5.860,

20   which has been used in this case before, is reflected on

21   line two.  That's the one billion, one, two, two.  It's the

22   same calculation if you just took the 5860 times the tax

23   rate times NPV, that's the total basis step-up.

24        But, what we're showing here is they had an alternative

25   to that transaction that would have given them, you know,

1    obviously, a huge portion of it, more, you know, two-thirds

2    of the benefit if they go in taxable that -- but there is an

3    incremental benefit that we are aware that they got as a

4    result of this transaction.

5    Q    Okay.  So why give an incremental benefit to the TCEH

6    first lien creditors above and beyond the step-up and basis

7    that they could get under a taxable transaction?

8    A    Once again, because the alternative of a taxable

9    transaction was a very bad outcome for the estate primarily

10   EFH and we had to recognize that TCEH, to get this

11   incremental benefit, took on risks that they wouldn't take

12   if they went taxably.

13   Q    Okay.

14   A    So not all of it is just for nice guys and the threat

15   of being, you know, of -- of the taxable deal.  It's you

16   can't just look at the value and not consider that there's

17   value net of risks that you're taking to achieve the value

18   and those risks were fairly substantial.

19   Q    Well, if -- if you can, could you articular, for the

20   Court, what risks or concessions that reorganized TCEH is --

21   is making in this tax-free spin with the busted 351?

22   A    Sure.  The -- probably the biggest one applies to what

23   we've been talking about, is who has liability if this thing

24   went taxable.

25        So to do this non-tax -- tax-free spin, busted 351

1    transaction, for a moment in time, TCEH has to become a

2    corporation, meaning under a -6 regulation, and don't ask me

3    what the front part of the -6 is; Ms. Howard will know the

4    exact term; that they are effectively joint and severally

5    liable for taxes in that year that the transaction take

6    place.

7        So if, by chance, down the road, somebody comes back

8    and says; oops.  You know, the IRS changes its mind and

9    private letter didn't apply, you owe that six and a half

10   billion dollars in tax, now TCEH would be joint and

11   severally liable with EFH for that tax.  That's number one.

12       Number two, they are taking -- you know, they're

13   agreeing to pay 50 percent of the AMT.  In a taxable deal,

14   there is no AMT and they wouldn't have to pay that 50

15   percent.  They effectively just agree to split it with EFH.

16       They are taking responsibility for non-income taxes,

17   such as Texas gross margin tax.  They could have exited, you

18   know, the system and not, you know, paid for their share of

19   Texas gross margin taxes.  They've agreed to do that.

20       They are limited in their ability to do a taxable sale

21   in -- for two years of their assets to any third party.

22   They are limited to stock repurchase programs which cast

23   them at 20 percent and they are also, because they are

24   taking E&P with them which, by the way, gives optionality to

25   the E-Side of the reap down the road which everybody seems

1    to ignore.  But I still think is worth something.

2         They cannot do what is commonly referred to as dividend

3    recap without having those dividends that would be sent to

4    their shareholders have tax consequences that otherwise they

5    could finance debt and avoid tax consequences.

6         So when you -- you put the -- and, by the way, I should

7    not that TCEH, as we went and raised the debt for TCEH, they

8    raised about three and half billion dollars, they are very

9    -- have very low leverage and if they don't find something

10   interesting to buy, one of the common ways that you fix a

11   leverage or have what they call a lazy balance sheet is to

12   increase the leverage by, you know, stock repurchases or

13   dividend recaps giving the money directly to your

14   shareholders.

15        They're coming out of it two times without leverage

16   when the rest of the space is six times.  So, you know,

17   doing, you know, not having the dividend recap and the stock

18   repurchases above a certain amount, especially where their

19   leverage is coming out, is, you know, more than a little bit

20   of a concession that they gave up.

21        So I think when look at the four thirty-four, do they

22   think they're getting $434 million free and clear?  I think

23   they're looking at that they've got substantial risk that

24   goes with the four thirty-four which reduces that number

25   which, in my mind, is why they're not that afraid of pulling

1   the trigger on the taxable one because this benefit isn't as

2   rich as it otherwise appears.

3   Q    Yeah.  And, just to be clear, all those concessions,

4   all those obligations that they're taking on, that you

5   articulated, you know, from the dividend recapitalizations,

6   the -6 liability to the M&A transactions, that's only in a

7   tax-free option, right?

8   A    Right.  Those are all incremental risks.  So they are

9   getting an incremental benefit but taking on incremental

10  risks which is very different, in my opinion, then what the

11  E-Side is getting in terms of incremental benefit.  They're

12  getting incremental benefit of these NOLs that we didn't

13  think would survive.  But they're reducing risk not taking

14  on more risk as part of doing this transaction.

15  Q    So before we get to the incremental benefit that the E-

16  Side is getting, what do you mean by that?  That the ES --

17  the E-Side is being able to slough off risk while the T-Side

18  is taking on risk?

19  A    Well, the E-Side has the primary risk as we've

20  discussed as being the taxpayer of a taxable deal.

21       Now they have a, you know, because T is converting to

22  a, you know, a -6 corporation, they are joint and severally

23  liable for that tax which gives the IRS somebody else to

24  collect it if it ever gets incurred which, you know, at six

25  and a half billion dollars, is -- is a substantial give up.

1    So that's the primary one.

2        And then I went through the fact that they're, you

3    know, the -- the AMT wouldn't get triggered, some of the

4    gross margin taxes wouldn't get paid so that, you know, the

5    E-Side, by doing this deal, is getting incremental risk or

6    incremental benefit, you know, the -- and we'll go through

7    that in a minute, and I think shedding risk whereas the T-

8    Side's getting incremental benefit and taking on risk.

9    Q    And is part of that shedding of risk and our risk

10   allocation between the T-Side and the E-Side reflected in

11   the tax matters agreement?

12   A    Yes.  In -- in fact, it's -- well, it -- it -- it --

13   part of it -- it's between the plan and the tax matters

14   agreement.  It's all in there.  Some of it comes out as a

15   result of doing the -- the tax-free deal and some of it is

16   outlined in the tax matters agreement in terms of who has

17   what risk.

18       But in -- yeah.  I think you have to look at both of

19   them in their totality if I'm not mistaken.

20   Q    Uh-huh.  And -- and sir, recognizing now that there are

21   some benefits that the EFH side is getting by shedding risk,

22   do they also -- they're also getting a monetary benefit

23   through the (indiscernible)?

24   A    Yes.  The -- the -- the good news -- I'm -- I'm sorry.

25           MR. PEDONE:  The leading question concerning the

Page 123

1    E-Side's benefit.

2              MR. MCKANE:  I'll rephrase.  I'll rephrase.

3              THE COURT:  Yeah.

4              MR. MCKANE:  I apologize, Your Honor.

5    BY MR. MCKANE:

6    Q    You mentioned that there's certain NOLs that may be

7    available to the E-Side.  Did you evaluate those -- the --

8    the value of those NOLs?

9    A    Yes, I did.

10   Q    Okay.

11   A    And, as I suggested, you know, we -- when we filed the

12   plan, we didn't think there'd be any NOLs available to the

13   E-Side.  As a result of the end of May ruling from the IRS,

14   there -- there are NOLs that survive that could potentially

15   have benefit to the E-Side depending on how, you know, the

16   E-Side restructuring finally occurs.

17   Q    All right.  And, sir, did you prepare a demonstrative

18   today to aid you in your testimony in articulating how much

19   of -- NOLs will survive on the E-side?

20   A    I did.

21   Q    And is that demonstrative number three?

22   A    It is.

23   Q    All right.  Would you go to that demonstrative, please?

24   A    Yes.

25   Q    All right.  So starting with the projected NOLs,

1    assuming all debtors emerge as of the end of this year, can

2    you walk me through -- walk the Court through and -- what

3    this demonstrative shows?

4    A    Sure.  This basically shows that based on the IRS

5    ruling that incorporated into the private letter ruling that

6    we received, that we start with our estimate of $8.3 billion

7    of NOLs; 5.8 is used by TCEH as part of the busted 351

8    transaction, as part of the tax-free spin, which means the

9    remaining NOLs stay at EFH and the only offset against those

10   is because of this CODI ruling.

11        CODI not only affects the T-Side, it affects the E-Side

12   and you can see that that's our best estimate of what the E-

13   Side CODI would be.  So, after that amount, there would be

14   surviving NOLs of about a billion two.  We apply the same

15   tax rate and then an NPV factor to kind of put it on equal

16   footing with when we did the calculation of TCEH.

17   Q    And, sir, I apologize, but is -- am I correct that the

18   effective tax rate should be 35.49 percent?

19   A    Yes, it should be.

20   Q    I apologize for that.

21        Did that alter the calculation of -- of the NPV

22   (indiscernible) as being approximately $380 million?

23   A    It is very minimal impact but it should have been the

24   same as the other schedule.

25   Q    All right.  And --

1   A     And-- and I should point out on this schedule in case,

2   you know, to be as transparent as I can, the NPV factor is

3   different than the T-Side which would make sense because

4   it's a regulated business.  But it also recognizes that

5   these NOLs can be used to offset income that comes up from

6   ONCOR --

7   Q     Uh-huh.

8   A     -- and, you know, that income is not subject to a 15-

9   year straight line depreciable live as the T-Side is.  So

10  effectively there's less of a hit on the NPV on the E-Side

11  because those NOLs can be used as soon as ONCOR creates

12  income.  And, based on our forecast, I think we think in the

13  first five years that the ONCOR income will shield all the

14  NOLs or allow the benefits of the NOLs to be realized.

15  Q     All right.  So -- so said another way, sir, the NPV of

16  the -- of the gross amount is higher on the E-Side because

17  the ability to use them is projected to be faster than on

18  the T-Side?

19  A     Yeah.  It's better to have NOLs than it is to have

20  something that gets depreciated over 15 years if you think

21  you're going to have income faster than straight line over

22  15 years.

23  Q     All right.  Thank -- thank you, Mr. Keglevic.

24        Sir, before we move on to the ancillary agreements, I

25  have just a few questions that, you know, based on arguments

1    that you've heard.

2         Sir, were you -- you were here for the opening

3    statements, right?

4    A    I was.

5    Q    All right.  And, sir, do you recall Mr. Pedone putting

6    up a list of alternative restructuring approaches that --

7    that could have been evaluated or undertaken?  Did you see

8    that list of four?

9    A    I did.

10   Q    All right.  Sir, I believe the first one on the list,

11   and I'm not trying to put words in his mouth, was can you do

12   a tax-free spin without a busted 351?

13        So in other words, just do the spin.  Don't -- don't

14   provide the -- the step-up in basis.  Go tax-free with no

15   consumption of NOLs.

16        Did -- did you evaluate whether that was a viable

17   alternative?

18   A    Well, and I think Mr. Pedone asked me this in

19   deposition, and, you know, so let me just say this.

20   Technically, you can do a tax-free spin under IRS

21   Regulations that doesn't have a busted 351 transaction.

22        The problem when you get into practically, not

23   technically, is you'd have to have T-Side consent which

24   means they're taking on the risks that I articulated and not

25   getting any incremental benefit associated with doing that.

1    So it was a non-starter from their standpoint.  They would,

2    you know, they'd get no basis step-up and take on risks

3    under that approach versus going taxably where they get two-

4    thirds of the basis step-up and don't take on any of the

5    risks.

6        I -- I don't think that takes much decision from the T-

7    Side in terms of which path they would take.

8    Q    All right.  Sir, did you also see Mr. Pedone's second

9    proposal which is you do a spin, a tax-free spin, and

10   there's a step-up in basis but it's just not as big as a

11   step-up in basis so you reduce the consumption of the NOLs?

12   Did -- is -- was that a viable alternative for you?

13   A    Well, once again, technically, so -- so what this gets,

14   you know, down to in the simplest form, how are you going

15   split the pie?  The pie is the $8.3 billion and how are you

16   going to split it?  And you could have split it differently.

17       The way we split it, it gave incremental benefits to

18   both sides of, as I calculated it, close to the same amount,

19   four thirty versus three eighty-seven.  And then we also

20   took into consideration that the T-Side took on risk where

21   the E-Side shedded risk.

22       So, yeah, you could have made the busted 351 be a lower

23   number.  Once again, it has the same fundamental problems

24   that I mentioned in the first answer that you'd have to get,

25   you know, T-Side agreement to do that and I -- I think, you

1    know, I -- my understanding is the -- the E-Side has tried

2    to get some kind of concessions from the T-Side.  It was met

3    with the same response that I got.  It's a non-starter.

4    Q    And, sir, was that your assessment of getting

5    compensation instead of reduced NOLs?  Is that basically two

6    sides of the same coin?

7    A    It -- yes.  I, you know, I think you always would

8    rather have cash than NOLs but you should get, you know,

9    cash counts day one and there's a NPV about NOLs.

10        But it -- it -- it's still getting an economic

11   concession from the other side that has a viable alternative

12   that they can pursue which is a taxable deal that gives, you

13   know, in certain incentive with less risk.

14        So, you know, I -- to -- to say that, in my opinion,

15   the T-Side was not willing to engage anybody in those

16   discussions and I think it's been proven by, you know, the

17   -- the disinterested director advisors, my discussions and I

18   think the E-Side creditors themselves have attempted it, is

19   my understanding.  Somebody said down at the Court.

20             MR. PEDONE:  Move to strike.  There's no

21   foundation that a taxable alternative is, in fact, viable at

22   this point in time.

23             THE COURT:  Overruled.

24   BY MR. MCKANE:

25   Q    All right.  And, sir, with regard to the fourth

1    alternative that Mr. Pedone provided.  It was a little

2    different.  And his -- his proposal was the T-Side should

3    wait until the E-Side sale process is over and then evaluate

4    what to do with the -- with the NOLs.

5        Did you evaluate, as -- as the co-CRO, the impact of

6    moving forward on the T-Side on the E-Side's sales process?

7    And, if so, how did you -- how did you evaluate it?

8    A    I'm -- I'm sorry.  That was king of a long question but

9    I -- I got a little lost in the middle of --

10   Q    Let me try it again.  Sorry.  I apologize. That's --

11   all right.

12       You understood the proposal which was the T-Side should

13   hold off on moving forward with the plan --

14   A    Yes.

15   Q    -- of -- of confirmation.  And they should wait until

16   the E-Side is sold.

17   A    Yes.

18   Q    Go -- go forward with E-Side first, wait on T.

19   A    Yes.

20   Q    Did you evaluate going forward E-Side first, wait on T?

21   A    Well, I -- I don't know if it's -- you know, that we

22   did a full blown evaluation but I -- I guess here's our

23   mindset as to why we went the way we did.

24       It's -- it's been very, very difficult in this case to

25   get an E-Side creditor proposal to support a plan.

1    Secondly, I think we all would agree that our job is to

2    try to monetize any NOLs that are left with a buy of the E-

3    Side.  So I don't know how I can agree to sell a company

4    when I don't know what I'm selling.  In other words, meaning

5    I don't know how many NOLs would be available to the buyer

6    if they acquired the E-Side.  So that didn't make sense to

7    me.

8        So, it's kind of those two things.  You know, I -- I

9    thought our path to success, you know, very, I guess this is

10   beyond the scope of today, but I'm -- I'm pleased where we

11   got to with NextEra.  I think there's some, you know,

12   opportunities maybe, you know, until the Judge approves the

13   break fee to even do better and I think, you know, we should

14   pursue the path we're on.  I think it's the -- it's the path

15   with the most success to the most -- most parties for those

16   two reasons that, you know, delay, I don't think is really

17   going to provide substantial benefit to either party.

18   Q    Okay.  With regards to bidders, and I'm not -- this is

19   not -- I'm not turning this into an E-Side sales process.

20   But once you got the indication from the IRS, even before

21   July, and you knew that there was a potential that these

22   NOLs could flow through, did you raise that with E-Side

23   bidders to see, you know -- you know, if they would address

24   the NOLs, you know, whether there's potential value there?

25   A    Yeah.  I absolutely -- we, you know, we were looking

1    for any reasons we could to get that bid as high as it

2    possibly could be.  And, you know, I -- I think NextEra's

3    the only public bidder.  But different bidders had different

4    points of view about NOLs and -- but we absolutely believe

5    that it was, you know, an attribute that certainly could

6    have value in the right circumstances to a buyer or, in the

7    event of a self-equitization plan, which hasn't been

8    proposed but if -- if there was one to the owners, if it was

9    going to be the E creditors.

10   Q    And --

11              MR. PEDONE:  Your Honor, I'd like to move that

12   there be no testimony regarding what bidders said so that we

13   can avoid a discussion of that.  I don't know -- I mean, I

14   (indiscernible) or not.

15              MR. MCKANE:  I'll address to NextEra as the

16   stalking horse bid and keep it at that for now.

17              THE COURT:  Okay.

18              MR. MCKANE:  If that's -- if that's all right.

19   That's my only follow-up question.  I don't -- so I don't

20   think this alters the examination at all.

21              THE COURT:  Okay.

22   BY MR. MCKANE:

23   Q    But we've talked about NextEra being the stalking horse

24   bidder that you -- there's a merger agreement on file, sir.

25   If you could turn to DX-3 and just confirm for me that is

1    the merger agreement.

2    A    Yes.  I believe it is.

3    Q    All right.  And, sir, what position did NextEra take,

4    in the merger agreement, about whether there needs to be

5    NOLs available as part of this transaction?

6    A    It is not --

7              MR. PEDONE:  Objection.  To the extent that the

8    question is to elicit statements as to what they said beyond

9    what's written in the document which is unnecessarily

10   duplicative.  But I -- I have no objection to him reciting

11   what's in the document.  I'd object to the extent --

12             MR. MCKANE:  I'm -- I'm asking for his

13   understanding of the -- of the merger agreement.

14             THE COURT:  Okay.  All right.

15             THE WITNESS:  I don't believe the document has any

16   condition with respect to the existence or the survival of

17   any NOLs.

18   BY MR. MCKANE:

19   Q    All right.  Thank you, sir.

20        Post -- in the new world, right?  The post IRS ruling,

21   well, even before July, did you, as the co-CRO, and the rest

22   of the restructuring team, present to the board -- the

23   boards of EFH, the impacts and the overall evaluation of the

24   approach that you're moving forward in this plan?

25   A    Yes.  We had -- well, when we got the word from the

1     IRS, I specifically remember one phone call where I walked

2     through -- you know, just the way I just did at this

3     hearing, that there was good news and bad news.

4         The bad news was that taxable now looked like it would

5     be very difficult to accomplish without significant cost but

6     NOLs would survive and there would be a benefit to the E-

7     Side that we weren't counting on.

8     Q    And, sir, in July, was there a board -- a presentation

9     made to the board regarding the -- the analysis of the

10    busted 351 and the step-up in basis?

11    A    Yes.

12    Q    All right.

13        Sir, if you could turn to DX-48.

14    A    Yes.

15    Q    And, sir, could you just confirm that DX-48 is a

16    presentation made to the joint boards of directors on

17    restructuring tax and M&A issues as of July 27th of this

18    year?

19    A    Yes.  There were other discussions but this one we held

20    in person.

21    Q    All right.  And, sir, could you just confirm that the

22    tax discussion starts at page -- internal page 30 of 166?

23    A    Yes.

24    Q    All right.  And, sir, if you could turn to the last

25    page of that deck, 38 of 166.

1    A     I'm there.

2    Q     All right.  Can you describe, for the Court, the

3    recommendation of you, as the CRO, the management team and

4    professionals, including the DDAs, with regards to the tax

5    attribute issues we've been discussion today?

6    A     Certainly.  I mean, I think, you know, that the -- the

7    key points are that, one, from a process standpoint, the

8    disinterested directors have thoroughly evaluated the issues

9    and were in agreement that the plan, given the IRS ruling,

10   would, in fact, avoid the multi-billion dollar stranded

11   costs to be phage corp. and would preserve, at that point,

12   we said it was approximately one billion, it's slightly

13   higher, and that involves for reorganized EFH and that, you

14   know, given the scales of what we thought the justice was

15   here in terms of benefit to EFH and the avoidance of the tax

16   Armageddon, we recommended continuing forward with the

17   approach that we had filed in early May.

18   Q     All right.  Thank you, Mr. Keglevic.

19             MR. MCKANE:  Your Honor, at this time, we're about

20   to transition to another topic.

21             I probably have 20 minutes if that's all right to

22   continue?

23             THE COURT:  Yes.  That's fine.

24             MR. MCKANE:  Thank you, Your Honor.

25   BY MR. MCKANE:

1   Q    Let's transition to the contribution by EFH Corp. of

2   EFH properties and EFH corporate services.

3        Mr. Keglevic, can you describe, for the Court, whether

4   it's always been part of the plan that these properties --

5   the properties and corp. services would be conveyed to the

6   T-Side?

7   A    Yes.  As -- I -- I can't remember a time when that

8   wasn't part of the plan and, I'll tell you, the genesis was

9   very simple once we got past Olympus and we're now looking

10  at potentially self-equitization or sale to a strategic of

11  the E-Side, everybody who was interested, the E-Side

12  creditors as well as any bidders, wanted as simple as

13  possible to just clear title to the 80 percent ownership in

14  ONCOR.

15       They didn't want anything else associated with the

16  asset.  That was the only asset that they saw value in and

17  -- so we had to deal with, you know, various things;

18  asbestos; the EFH, you know, corporate services which is a

19  cost center; EFH properties which is a -- the owner of the

20  leasehold interest in a relatively old building downtown

21  that's our corporate headquarters, and various other sundry

22  things that were at EFH.

23       So we, early on this case, tried to, you know, clean

24  the decks and make EFH a -- you know, they didn't want to

25  take on the debt either, I should mention in all fairness to

1   EFH, right.  Just to give them as clean a title as they

2   could get and, given the specific natures of who's occupying

3   the building and who corporate services is delivering the

4   services to, our analysis indicated that the cleanest way

5   would be -- and the best way for EFH would be to give it to

6   TCEH which, by the way, they weren't willing to take for a

7   long period of time.

8        And it was really, you know, driven by an EFH analysis.

9   We thought the best thing for EFH was to get rid of those

10  assets and, in fact, in the merger agreement with the Hunts,

11  the stalking horse agreement with NextEra, they either ship

12  it, you know, to TCEH or they liquidate it.

13       And, you know, these things are truly orphans in the

14  corporate system that, you know, nobody wanted but we had to

15  find a solution and get rid of them, which included

16  potential liquidation.

17            MR. PEDONE:  Move to strike the concerning TCEH's

18  willingness to take the assets.

19            THE COURT:  Overruled.

20  BY MR. MCKANE:

21  Q   Mr. Keglevic, in your business judgment, did -- were

22  you -- is moving these assets to the T-Side of the estate,

23  in some form or fashion, part of an effort to maximize value

24  for the E-Side?

25  A   Absolutely.

1    Q    Okay.  You -- you mentioned this is not a new idea.

2    Sir, if you could turn to DX-45.

3    A    I'm there.

4    Q    All right.  And that's your -- for the record, sir, do

5    you recognize DX-45 filed on April 14th of 2015 as the

6    original joint plan of reorganization of EFH?

7    A    I was going to say I think this is our very first plan

8    of reorganization.  Yes.

9    Q    And, sir, if you could turn to page nine in the middle.

10   No, I -- yeah.

11   A    Nine on the bottom?

12   Q    Nine on the bottom.  I -- nine on the top, excuse --

13   excuse me.  Nine on the top.  Nine of eighty-two.

14        Definition 49.

15        Put that on the screen please.

16   A    Yes, the contribution definition?

17   Q    Yes.  Sir, what do you -- can you explain, to the

18   Court, what is reflected in the contribution definition?

19   A    Yes, that -- that we were -- that the plan contemplated

20   contributing the equity, and I think purist assets or equity

21   of corporate services to TCEH.

22   Q    All right.  And, sir, if you could turn to DX-25, which

23   is around the front end of the binder.

24   A    Yes.  This looks like the -- the plan that was approved

25   by the Court --

1    Q    Yes.

2    A    -- the Hunt plan as we refer to it.

3    Q    The confirmed plan, yes, sir.

4         And if you could turn to -- on page 11 of 115.  And if

5    we could put that on the screen.

6         And, sir, you see that same definition, number 56 of

7    contribution.

8    A    It's -- it's the same except that it also embodies EFH

9    properties at this time.

10   Q    All right.  So the confirmed plan contemplated the

11   transfer of equity of both corporate services and EFH

12   properties?

13   A    Yes.  The original plan in '15, we were still

14   evaluating properties because properties was not a debtor to

15   the case and we were understanding our ability to file them

16   and potentially received some monies back from the lessor of

17   the property.

18        We decided that that was not a likely outcome and,

19   therefore, decided that the only way to get rid of it,

20   economically, was the same way we dealt with corporate

21   services.

22   Q    All right.  And that -- and that determination was made

23   before the -- the -- for the plan that was -- that became

24   the confirmed plan; is that correct?

25   A    Yes.  Somewhere in between the original plan and then I

1    don't recall the date exactly.

2    Q    Yeah.  And, sir, if you could just -- working still

3    with that definition of contribution, for a moment, do you

4    see three lines from the bottom, the parenthetical that

5    says; but not including any cash on hand of the EFH

6    properties?

7    A    Yes.

8    Q    And what do you understand that reference to be, sir?

9    A    Well, it was simply -- as we were looking at what to do

10   with these orphans and splitting up the, you know, assets or

11   reorganizing equity.  We were going to transfer -- we left

12   the cash with properties with EFH and, since corporate

13   services cash was primarily used as working capital that was

14   funded by TCEH, which was the -- is, you know, 95 percent

15   user of those services that we thought it was equitable to

16   have it go to the person who funded and that would need it

17   for ongoing working capital associated with that business

18   going forward.

19   Q    All right.  Sir, you made a reference regarding your

20   impression as to the TCEH first lien creditors willingness

21   to take these entities.

22   A    Yes.

23   Q    What is -- what is the basis of that impression?

24        MR. PEDONE:  Objection to the extent it calls for

25   statement that constitute hearsay.

1            THE COURT:  He ask for his impression.  Overruled.

2            MR. PEDONE:  I'm sorry, Your Honor.  He asked for

3    the basis of the impression.

4            MR. MCKANE:  Do you want me to reformulate the

5    question, Your Honor?

6            THE COURT:  Yeah, please.

7    BY MR. MCKANE:

8    Q    All right.  Sir, why do you have the impression that

9    the TCEH first lien creditors were not interested in the

10   near -- you know, in taking these assets, at least

11   initially.

12           MR. PEDONE:  Objection to the extent it leads to a

13   (indiscernible) issue.

14           THE COURT:  Overruled.  He can certainly explain

15   to me why he thinks what he thinks.

16           THE WITNESS:  I -- I won't make a long speech.

17   It's just simply that we -- it took us a year to get

18   conclusion on this matter or more.

19   BY MR. MCKANE:

20   Q    Thank you, Mr. Keglevic.

21        Sir, you understand that EFH creditors, including the

22   indentured trustee had taken the position that EFH Corp.

23   should be compensated for the transfers of the -- of these

24   equity positions.

25        Do you agree with that position?

```
 1   A    No, I don't.

 2   Q    Why not, sir?

 3   A    EFH is a cost center that was designed and does 95

 4   percent of its work for TCEH and, as -- as such, has no

 5   inherent value to EFH or, you know, to -- the value to TCEH

 6   is TCEH would have a little disruption cost if he had to

 7   replace the corporate service center.

 8       They do have the right to use up all the assets in the

 9   processes and procedures so it would be about, you know,

10   replacing the people.  But, you know, similarly, EFH had --

11   you know, only consumes five percent of the services that

12   the 420 people provide and they have no use for that payroll

13   and would have to deal with contract termination, severance,

14   Warren Act, et cetera.

15       So it was -- it -- you know, and interestingly, nobody

16   has said they'll -- you know, E-Side has never said they'll

17   take it.  They just want more for it.

18   Q    You know, with regard to this -- the -- your-- your

19   position that the -- no one has said the E-Side would take

20   it, has NextEra taken a position with regards to whether

21   there can be employees as of the closing date of the merger

22   agreement?

23   A    Yeah.  They took the exact same position the Hunts did.

24   The --

25   Q    Uh-huh.
```

1   A     -- they -- neither wanted employees and neither of them

2   wanted those two entities.  Those entities had to be

3   transferred and/or liquidated period.

4   Q     Let me direct you back to DX-3, the merger agreement.

5   And, sir, if I could direct your attention to page 104 of

6   429 at the top, 104.

7         And, sir, do you see the section (i) on employees on

8   page 104 of 429?

9   A     I do.

10  Q     You know, what is your understanding of this provision

11  in the NextEra merger agreement with regards to its impact

12  on EFH corporate services?

13  A     That NextEra wants no employees or any potential

14  liabilities associated with any employees at the date the

15  take ownership.

16  Q     Yeah.  And, sir, is that -- that's a closing condition

17  for the -- for the transaction to close?

18  A     It is.

19  Q     Did the board of directors evaluate this transfer or

20  this contribution of corporate services and properties in

21  connection with this plan?

22  A     Well, not only this plan but, because it was part of

23  prior plans that the board approved, going back to April

24  15th and I would tell you we had discussions prior to that.

25  But, yes, as part of every plan that's been filed and

1   approved and then fundamentally before we signed the

2   ancillary agreements that NextEra was a counter-party to,

3   which is basically the separation agreement, the tax matters

4   agreement and the transition service agreement, which is

5   basically that when corporate services goes to TCEH, they

6   won't leave the E-Side in the lurch and will provide, you

7   know, any services the E-Side needs until E-Side chooses not

8   to, you know, need them anymore.

9   Q    And, sir, as the co-CRO, did you direct that there be

10  board presentations made in advance of a vote on the

11  ancillary agreement to update the board with -- as it

12  relates to specifically the contribution of EFH of corporate

13  services and properties?

14  A    Yes.  We dusted off all the old rationale, updated it

15  and presented it again before those agreements were signed

16  in late July.

17  Q    And, sir, if you could turn back to the DX-48 again.

18       Actually, I apologize.  Let's go to 57 first.

19  A    I'm there.

20  Q    All right.  And, sir, do you recognize DX-57 as a

21  restructuring tax and M&A update that was provided on July

22  22nd of this year?

23  A    I -- I do.  This was a phone call board meeting where

24  we reviewed, you know, previewed everything associated with

25  the agreements and where we were in the restructuring,

1   including where we were with NextEra, I believe.

2   Q    And, sir, did you -- in addition to having that

3   telephonic board meeting, did you also have an in-person

4   board meeting the following week in advance of the approvals

5   of the ancillary agreements?

6   A    We did.

7   Q    And, sir, is that -- the presentation associated with

8   that board meeting DX-48?  The one we looked at earlier.

9   A    Yes.

10  Q    And, sir, you -- you referenced in your testimony

11  certain analyses that were presented to the board of

12  directors regarding the evaluation of the transfer or

13  contribution of corporate services and properties.  Is this

14  the presentation you were referring to?

15  A    Yes.  It's all in one or both of these.

16  Q    All right.  So let's focus on properties for a second.

17       You mentioned earlier that properties holds leasehold

18  interest in EFH Plaza.  How long is that lease until it

19  expires?

20  A    I believe it's 2022.  So about five and a half years.

21  Q    And -- and, sir, how was that lease secured?  Is there

22  a letter of credit?

23  A    There was a letter of credit that secured it.  But

24  when, I think it was in 2009, interestingly, when the bank

25  that issued the letter of credit got downgraded, we had to

1   post a letter of credit.  We had to post cash in lieu of the

2   letter of credit.  So, actually, this was a leveraged lease

3   so, effectively, the debt that the -- that the owner of the

4   building had, had to be first supported by a letter of

5   credit and ultimately supported by cash.

6   Q    And so that cash is already out in an escrow account --

7   away -- not -- not an asset of the debtors?

8   A    No.  That's -- and that was what we were trying to

9   analyze if we get our hands on that on behalf of the E

10  estate if we filed properties for bankruptcy.  That was the

11  last issue as to whether we had an opportunity to get that

12  asset back.

13  Q    And what was the ultimate conclusion that -- that the

14  debtors reached about the ability of EFH to get back any

15  portion of that drawn LC?

16  A    It -- I'm not worried about attorney-client privilege?

17           MR. PEDONE:  Objection.

18           THE COURT:  All I want is the conclusion, sir.

19           THE WITNESS:  We couldn't get it back.

20           MR. PEDONE:  Objection.  We inquired into the

21  conclusion in discovery.  We were precluded from getting the

22  answers to the conclusions in discovery.  And so to ask the

23  witness the answer we couldn't take discovery into is

24  completely incorrect.

25           MR. MCKANE:  Your Honor, the -- Mr. Pedone's

1    position is demonstrably untrue.  The position as it relates

2    to could they get the money back was articulated in the

3    witness' -- it's also in the documents that were produced

4    and made available and used them at depositions.

5              I can show you the page in the July 27th board

6    meeting where we articulated the non-privileged reasons why

7    we couldn't get the money back.

8              THE COURT:  All right.  Can you answer the

9    question apart from any privileged communications?  If you

10   can't, you can't.

11             THE WITNESS:  I -- well, I -- we -- we -- that

12   conclusion was based on advice of counsel.

13             MR. MCKANE:  All right.

14             THE COURT:  All right.

15             MR. MCKANE:  Well, I'll move on.

16             THE COURT:  Okay.  Fine.

17   BY MR. MCKANE:

18   Q    All right.  So when the LC was drawn, can you walk --

19   there's -- there's been a reference to a receivable that is

20   owed from properties to corp.

21   A    Right.

22   Q    Can you explain, to the Court, how the drawing of the

23   LC led to the creation of this receivable?

24   A    Well, to -- to get to the net bottom line --

25   Q    Yes.

```
 1   A    -- ultimately EFH provided the cash that properties
 2   needed to post with the landlord.
 3        There was an interim step because it was a -- EFH
 4   didn't have letters of credit so it was a TCEH letter of
 5   credit that was posted and TCEH cash that was taken and then
 6   ultimately EFH stepped into TCEH's shoes and it became EFH
 7   cash that was -- that is still on the books as a liability
 8   from properties to EFH Corp.
 9   Q    All right.  And -- and, sir, when this contribution
10   occurs a property from EFH to reorganized TCEH, what happens
11   to that receivable?
12   A    I'm sorry.  Can you say that again?
13   Q    What happens to the receivable?  Will it be cancelled
14   as part of the transfer of the equity?
15   A    Yes.  It -- it -- as part of the deal to get TCEH to
16   take it, that had -- that liability effectively gets
17   extinguished and is never paid by TCEH.
18   Q    All right.  And, sir, in evaluating whether to make the
19   contribution of properties to TCEH, did you evaluate their
20   -- its projected cash flows?
21   A    Yes.
22   Q    And what did you conclude?
23   A    Well, that the projected cash flows would be break even
24   when the FDIC moves out of some of the space that we lease
25   to them, sublease to them, starting in 2018 through the term
```

1    of the lease.

2         And given that downtown Dallas has a lot of unoccupied

3    space, at least two similar buildings that are 50 percent

4    occupied, our broker says that the chance of getting

5    somebody for a five-year tenant that's going to take the

6    kind of space that the FDIC is moving out of is unlikely.

7         So it -- it -- cash flow looked like, at best, it was

8    break even.

9    Q    Let me ask you --

10         MR. PEDONE:  Objection to strike the comments with

11   regard to the broker.  That's not of the areas of subject

12   that are -- subject to objection with regard to redirects as

13   well, Your Honor.

14         MR. MCKANE:  Let me ask it another way, Your

15   Honor.

16   BY MR. MCKANE:

17   Q    Things -- things that what he actually said, what is

18   your understanding.

19         First of all, did you engage Jones Lang LaSalle.

20         THE COURT:  Look.  Mr. Pedone, he's a business

21   person, okay?  He understands what he's doing based on

22   information given to him.  He can have opinions and have

23   facts and have states of mind that, like everyone else in

24   this room, is based on all the information he receives.

25         That is different from somebody saying as proof of

1    the matter asserted what somebody said.

2              So it's not hearsay for him to say what the broker

3    told him in the context of his basis for how he put together

4    the cash flows.

5              MR. PEDONE:  And, Your Honor, if we could have a

6    agreement or a stipulation on the record that when a comment

7    such as what the broker says about market value in Texas

8    that comes in in the middle of a statement is limited to his

9    state of mind as opposed to the truth then I'm in -- in

10   agreement and I understand.

11             But the -- the facts keep coming in and they're

12   facts that are material.  Not so much with the broker but,

13   in particular, with the T-Side comments, Your Honor.

14             And I'm not sure how I should be sorting that out

15   in --

16             THE COURT:  Uh-huh.

17             MR. PEDONE:  -- a way that allows the continued

18   efficiency of the trial because Mr. McKane does not lay the

19   foundation as you just articulated before every question.

20             MR. MCKANE:  Your -- Your Honor, let me -- let me

21   be -- this goes back to my earlier comment.  There is this

22   no middle ground of like partly in evidence for a partial

23   reason.  It's in evidence for the person that it goes to his

24   mental impressions and how he formulated it.

25             The entire testimony here is about what

1   Mr. Keglevic understood as he charted the path forward in --

2   in these restructuring negotiations and moving this case

3   forward.

4           THE COURT:  All right.  Well, let me do it this

5   way.  Mr. Keglevic, it would be helpful if you would focus

6   -- if you would focus on, you know, telling us your state of

7   mind.  You can say, based on information I received.  But

8   when you start to say things like, my broker told me, I

9   couldn't rent this out, we start to get into a bit of a gray

10  area.

11          So it's -- it's six one, half dozen of the other a

12  little bit because I can see them wanting to -- I can see

13  the question then being; all right, I believed we couldn't

14  rent the space.  And then the next question is; well, why?

15          THE WITNESS:  Right.

16          THE COURT:  Mainly because my broker told me I --

17  I couldn't so --

18          THE WITNESS:  But --

19          THE COURT:  -- I -- we -- I think we're -- we're

20  counting angels on the head of a pin here a little bit

21  but --

22          THE WITNESS:  I'll do my best.

23          MR. MCKANE:  And -- well -- and, Your Honor, I

24  think it's important for the -- to lay some foundation as to

25  the exercise that the debtors went, in terms of evaluating

1   whether -- what space was available in Dallas, and so I --

2   there's another witness who will be addressing this in

3   greater detail tomorrow.

4   BY MR. MCKANE:

5   Q    But, Mr. Keglevic, if you could -- did the -- did the

6   debtors engage Jones Lang LaSalle to evaluate the Dallas

7   market during the period of bankruptcy?

8   A    We did and we've -- we've continuously used various

9   brokers.  I mean, I -- I guess my state of mind is this.  I

10  know there's four floors today that are unoccupied.

11       The guy who put together the cash flows, who runs our

12  property group, who hires brokers, you know, gave us his

13  best estimate of what occupancy looked like and I have no

14  reason to believe, based on questions I've asked to him,

15  that he made the inappropriate assumptions.

16  Q    And -- to be even more precise, the projections that

17  were prepared by the person who runs properties for you, is

18  that the best understanding you have of what the projected

19  cash flows will -- of properties will be on a go forward

20  basis?

21  A    Yes.  That's the one that indicates they'll be, you

22  know, break even cash flows from '18 through '22.

23  Q    And, to be precise, that assumption, that -- does the

24  projected cash neutral assumption include TCEH and corporate

25  services remaining in the building, you know, for -- for

1   that period?

2   A    Yes, which is a substantial assumption that gets the

3   cash flow break even.  If you make an alternative assumption

4   that TCEH would no longer have an incentive to stay there,

5   the cash flows turn negative immediately.

6   Q    And did you prepare a demonstrative to aid your

7   testimony to show the impact of the cash flows if TCEH moves

8   out?

9   A    Yes.

10  Q    And is that demonstrative number 4?

11  A    It is.

12  Q    And, sir, could you walk the Court through what the

13  projected cash flows if TCEH moves out looks like for the

14  remainder of the lease?

15  A    Well, it -- it -- yes.  Basically, if you just go to

16  the bottom line, you'll see that it -- it starts at about a

17  million negative but rises to about four negative through

18  the end of the lease or about seventeen in total.

19       And -- and one of the interesting things about this

20  lease that I think everybody is aware of is the lessee,

21  which is EFH Properties, is responsible for operating

22  expense and for capital expenditures on the building.

23       So those are very difficult to vary.  So they're kind

24  -- and, you know, you can almost call those fixed expenses

25  to if you drop tenants or lose rent, it typically goes right

1    to the bottom line.

2    Q    Okay.  And, sir, did -- as an officer of EFH

3    Properties, did you evaluate the risk that Properties may

4    lose tenants on a go forward basis between now and the end

5    of the lease?

6    A    I -- I think our forecast represent -- this forecast

7    represents our best guess as to what that happens.  But,

8    obviously, as being a landlord which, you know, is not the

9    core business of -- of the E-Side or the core business of

10   the T-Side, you take on certain risks associated with that,

11   you know, the operating expenses or capital expenditures or

12   tenants leaving.  You know, alternatively, you could get

13   tenants that move in that you didn't anticipate.

14        But we think this is a fair, you know, presentation and

15   as balanced as we could make it with the information we had

16   available.

17   Q    And, so if TCEH moves out, as I understand it, this

18   cash flow projection says that the hit to properties is

19   approximately $18 million; is that right?

20   A    That's right.

21   Q    All right.  Did -- as part of your efforts to -- you

22   know, during the course of the restructuring, did you

23   evaluate what the costs are of moving of EFH -- sorry, of

24   Energy Plaza, and moving somewhere else?

25   A    Yes.  It's in my direct.  I think we -- it's about $16

1    million or something if they moved out.  So, you know, the

2    -- the fundamental, you know, business logic we used is if

3    properties stayed with, you know, EFH, it'd cost them 17

4    million.  And if TCEH moved, it'd cost them 16 million.

5         So it's better to -- for both parties if they just

6    transfer it.  In this situation, EFH gets the cash that it

7    might not otherwise get if it had to be liquidated because,

8    once again, it's a condition of the merger that NextEra

9    wouldn't buy it if this is around.

10        So, you know, we thought overall it was the best deal

11   for both sides.

12   Q    And the amount of cash that's projected to be on hand

13   that EFH will receive?

14   A    I think it's about $14 million.

15   Q    Thanks.

16        Let's turn briefly to corporate services.

17   A    Okay.

18   Q    Can you just briefly give an overview to -- for the

19   Court of what are the services that EFH corporate services

20   provides?

21   A    Yes.  In the -- in the simplest fashion, if you just

22   think of a back office of any corporation that has finance,

23   HR, legal, public affairs and information technology.

24        And then the subsections of all of those including, you

25   know, controllership and tax and internal audit and risk

1    management and those kinds of things.  So it's basically the

2    traditional services that aren't lying, customer facing or

3    operational services that a corporation needs to be a SEC

4    registrant and they have outstanding debt and, you know,

5    manage its businesses.

6    Q    And approximately how many employees are at corporate

7    services?

8    A    Just over 400.

9    Q    And, sir, does EFH corporate services make a profit?

10   A    No.  It's a cost center.

11   Q    How -- how does it bill out?  Does it -- does it have

12   some transfer cost pricing with its affiliates?

13   A    No.  We -- we -- it -- it -- the actual cost incurred

14   by corporate services are allocated to 95 percent to TXU

15   Energy and Luminant.  The other five percent goes to EFIH

16   and EFH.

17        Of course, the reason for that discrepancy is EFIH and

18   EFH -- EFIH has no employees.  EFIH has, I think, two or

19   three and while there's some legal requirements that those

20   entities and some, you know, ancillary, you know, treasury

21   services and some financial statements.  Obviously,

22   corporate services in the design of it and the products its

23   produced was designed to satisfy -- while TCEH and Luminant

24   and TXU Energy.

25   Q    And is it (indiscernible) cost?

1    A     Those are the costs.

2    Q     And, sir, does it have working capital?

3    A     It -- it does.  We kind of force about $20 million to

4    sit at corporate services, obviously, because we have

5    various vendors and, you know, payrolls that, you know, we

6    don't get reimbursed from our business units exactly when we

7    get our bills.  So we just kind of have 20 million bucks on

8    hand which is the sweet spot number that we think, you know,

9    that it needs, that effectively operates as working capital

10   just to make sure we can get the bills paid.

11   Q     And, sir, did -- can you walk the Court through the

12   analysis that you did about whether the impact of -- if

13   corporate services stays on the E-side of the house as

14   opposed to being contributed over to the T-Side of the

15   house?

16   A     Yeah.  I -- you know, it never made sense to me that it

17   stays on the E-Side of the house.

18   Q     Why not?

19   A     When -- because only five percent of its services were

20   directed to E and it's 95 percent to the TCEH businesses.

21         So if it stayed at E, it would need T as their

22   remaining customer and I don't -- and as a cost-based

23   services contract, I don't know what value that has at E if

24   that were to occur and why that made any sense.

25              So when we looked at it, you start with that 95/5.

1    We looked at the fact that I think, you know, the -- the

2    only real value there is the cash that was funded by the 95

3    percent user of the service and, in fact, others would argue

4    there were liabilities that even reduced the adjusted book

5    value below the amount of the cash there.

6              And that's, you know, why, you know, TCEH was --

7    TCEH has basically, you know, one of the reasons why it took

8    a long time to take it is because 400 people -- and, you

9    know, they have publicly, when we did the debt road show,

10   you know, said that they think there's some people they can

11   cut.  And they didn't want to take on the people and the

12   liabilities associated with them.

13        But, at the end of the day, they also recognized there

14   could be some disruption costs.  So they agreed.

15   Q    All right.  And, sir, you mentioned that there's some

16   cost avoidance from transferring it to T, in other words,

17   that there'd be costs that EFH corporate services might

18   incur if it stayed on the E-Side that might -- I believe

19   your testimony was it would reduce the cash on hand.

20        What are some of those costs that -- that you believe

21   are being avoided through the contribution of corporate

22   services to the T-Side?

23   A    Well, there -- there the costs that NextEra wants to

24   avoid, too.  You know, primarily anything associated with

25   severance or employee, you know, costs, Warren costs, things

1    of that nature because, obviously, if you have a 400-person

2    workforce that you don't need, you're going to trigger some

3    downsizing, substantial downsizing.

4    Q    And, sir, is it -- is it your assessment that EFH

5    corporate services would likely liquidate if it didn't

6    transfer over?

7    A    Yeah.  I -- if I was -- you know, which I might be, if

8    I was the CFO of E, I would immediately do that because the

9    cost -- the monthly operating costs are substantial.

10   Q    Is there any hit or impact to the E-Side from the

11   transfer from the services they receive?

12   A    No.  In fact, the concern as we tried to balance the

13   interest was, you know, while there be some disruption for

14   the T-Side to recreate its services to satisfy its needs,

15   the E-Side services that it needs are not as substantial but

16   still they would have had to find people to do that work

17   and, you know, there -- we thought the most economical way

18   for E to continue until it's ultimately sold or acquired by

19   the creditors was to continue to let T do the work for them

20   at cost for, you know, the period that they needed it.

21   Q    And is that agreement the interim transition services

22   agreement?

23   A    It is.

24   Q    And, sir, you previously had mentioned the board

25   presentations in July 22nd and July 27th before the

1    ancillary agreements.  Did those presentations also address

2    your analysis of whether to contribute corporate services?

3    A    Yes, they did.  As well as the transition service

4    agreement.  So they're really three agreements I believe,

5    the separation agreement, which is the transfer or

6    contribution of corporate services and properties,

7    transition service that said T would undertake the

8    obligation to provide those services at cost going forward

9    and then the tax matters agreement, which ultimately was

10   signed on to not only by E but by NextEra.

11   Q    And at the end of the July 27th board meeting, did you,

12   as part of the restructuring team, the co-CRO, make a

13   recommendation to the boards as to whether to enter into the

14   ancillary agreements?

15   A    I did.  We reviewed all the rationale and, I think,

16   largely the demonstratives that we've gone over with the

17   board on those two dates, July 22nd and July 29th and that

18   was my recommendation and it was accepted by the

19   disinterested directors as well as the other directors.

20   Q    And, sir, is -- is it your business judgment that --

21   that the plan put forward is in the best interests of -- of

22   all the estates?

23   A    Yes, to the best of my knowledge and ability, that was

24   the best deal I could have brokered between the estates.

25              MR. MCKANE:  All right.  Your Honor, at this time,

1    we -- it may be appropriate, if we could, to take a break,

2    allow maybe Mr. Pedone to re-evaluate some of his

3    evidentiary objections because, in terms of the narrative of

4    the examination, this is where I would stop.

5            But if I need to lay specific foundation or

6    address certain hearsay objections, I may have to go forward

7    a little bit more.  But I -- I think it might be appropriate

8    to allow Mr. Pedone ten minutes to reassess.

9            THE COURT:  All right.  That's fine.  We'll take a

10   ten-minute recess.

11           Mr. Keglevic, you may not discuss your testimony

12   with any person during the break.

13           THE WITNESS:  Yes, sir.

14       (Recessed at 2:52 p.m.; reconvened at 3:12 p.m.)

15           THE CLERK:  All rise.

16           THE COURT:  Please be seated.

17           MR. MCKANE:  Your Honor, I am pleased to report I

18   think we've made some progress, and I'll just break it down

19   into three buckets.

20           We will have an issue as it relates to board

21   presentations, and I will present the argument after I just

22   lay some additional foundation with this witness as it

23   relates to two board presentations we haven't covered yet.

24   So that's bucket number 1.

25           Bucket number 2 is his written direct.  And with

1    regards to the written direct there are passages that

2    Mr. Pedone takes issue on with the hearsay argument that

3    he's been articulating this afternoon.  So that's bucket

4    number 2.  I believe he wants to be heard on that.

5            Bucket number 3 are certain Excel files that

6    because we provided Excel files in native format, because if

7    you lock them down they're not as manipulable and easy to

8    interpret, they have asked us to provide through a proffer

9    or some form of declaration just that they're business

10   records.  So we'll lay it out, you know, we'll tick the

11   elements of a business record and submit that to Your Honor,

12   and with that we'll be able to get those Excel files into

13   evidence.

14           We would ask Your Honor's guidance as to whether

15   the declarant would need to be in the room for us to do

16   that.  My understanding is that Mr. Pedone has no interest

17   in examining the individual, he just wants us to kind of

18   check the box.

19           MR. PEDONE:  Your Honor, I'd be satisfied with

20   Mr. McKane making a proffer that they are in fact business

21   records based upon his knowledge.  I certainly do not need

22   the declarant.

23           THE COURT:  Okay.

24           MR. MCKANE:  And I'll make that representation

25   then as an officer of the court if that's acceptable to Your

Page 162

1    Honor.

2              THE COURT:  That's fine with me.

3              MR. MCKANE:  All right.  So I will do that, but

4    before we engage in the evidentiary arguments Mr. Keglevic I

5    do have to ask you about two board presentations.

6    BY MR. MCKANE:

7    Q    And sir, if you could turn to Exhibit 134.  One-three-

8    four.

9    A    Okay.

10   Q    All right.  Sir, do you recognize the document labeled

11   DX-134 with the cover, "Approval of amended plan and merger

12   transaction documents," dated August 9th, 2015?

13   A    Yes.

14   Q    Sir, is this a presentation that was given to the joint

15   boards of EFH on August 9th of 2015 regarding what became

16   the confirmed plan of reorganization?

17   A    I believe it is.

18   Q    All right.  Thank you, sir.

19              And sir, if you could turn to DX-321.  You there,

20   sir?

21   A    Yes.

22   Q    And sir, do you recognize Exhibit DX-321 as a

23   restructuring update that was presented to the joint boards

24   of EFH on October 29th of 2004?

25   A    I do.

1    Q    And so to the best of your recollection did you

2    participate in the development of this board deck and the

3    presentation of it?

4    A    Yes, I did.

5    Q    And is that true for the other board deck as well that

6    you participated in the development of and the presentation

7    of the August 9th board deck?  That's 134.

8    A    Yes, I did.

9    Q    Thank you, sir.

10           MR. MCKANE:  Your Honor, with that I have no

11   further questions for this witness on direct.  I would so it

12   may be appropriate we would like to move into evidence

13   certain materials and to do that I think we have to have an

14   argument.

15           THE COURT:  Okay.  Let's do that then.

16           MR. MCKANE:  All right.

17           Your Honor, I'll tell you right now the documents

18   that are in dispute are board presentations, the two board

19   presentations that we addressed that's Exhibit 134,

20   Exhibit 321, which is the one from October of 2014, and then

21   the exhibits that were used in the written direct and in the

22   line of presentations, Exhibits 48 and 57.  These are the

23   presentations in July that were made, you know, with regards

24   to the ancillary agreement as well as the presentations in

25   February about the evaluation of alternatives, and then in

1    late April in advance of filing of the board presentation.

2                Your Honor, these are absolutely admissible

3    business records of the board.  Developed by the company and

4    their advisors presented to the board.

5                And I cannot say how offensive it is for this

6    debtor to be accused of violating their duty of care.  Their

7    entire opening was about how we violated our duty of care by

8    not keeping this board informed, by not telling them what

9    was going on.

10                These are the presentations that reflect the

11   information that was presented to the EFH board, to the TCEH

12   board, to the EFIH board as they evaluated and exercised

13   their business judgment.  Under Delaware way and Texas law

14   there is no doubt that these are business records and they

15   are unequivocally admissible.  They go to the core of the

16   debtors' defense to this challenge of the exercise of their

17   duty of care.

18                THE COURT:  Okay.  Mr. Pedone?

19                MR. PEDONE:  Your Honor, to be specific Richard

20   Pedone for American Stock Transfer, EFH indenture trustee.

21                I believe that we're arguing over the exception

22   continued Rule 8036, records of regularly conducted

23   activity.

24                The core of that rule is when you take something

25   such as a minute, and we have no objections to the minutes

1    of the meetings which were kept in the regular course coming

2    in.

3              Attached to the minutes, we've heard from the

4    witness, are board decks that were prepared ahead of time by

5    the meetings.  Other witnesses have testified that they

6    participated in connection with preparation of these

7    materials.  Counsel participated in preparation with the

8    board decks.

9              These are not records of what occurred at the

10   meeting, they're presentations.

11             Excuse me for one second.

12             And it's worth looking at what some of these

13   contain.

14             If we were to turn to DX-48, page 11 of 66 we see

15   that there's a discussion of what was contained in

16   Mr. Stewart's expert report.  We're getting statements

17   concerning Mr. Stewart's expert report coming in through

18   something that is supposedly a business record.

19             If you turn further down you see further

20   statements concerning Mr. Stewart's report.

21             In other parts of the presentation we see on page

22   35 of 166 statements concerning what the T-Firsts might do.

23             We see statements at the top of that page

24   concerning what the T-First lenders have in fact done.

25             This is ripe with hearsay and multiple layers of

1    hearsay, and if we simply follow through the foundation laid

2    out for when something needs to be in a business record it's

3    not here.  The witness's statements were they were not

4    prepared at the time.

5              Your Honor, it is their burden to establish it's a

6    business record, they could have proffered testimony as to

7    what part was created at what time, but they haven't.  There

8    are multiple layers in hearsay.

9              Further, Your Honor, many of these board decks

10   that they're seeking to introduce have extensive redactions

11   making the full comprehension of what this declarant, which

12   declarant it was you can't actually tell, said.

13             Finally, none of the declarants, to the extent

14   there are legal conclusions contained in here, clearly won't

15   be available for cross-examination.

16             And, Your Honor, that's the summary of my

17   objection.  Thank you.

18             And again, it's the four decks, and I might add at

19   certain points in some of the board decks there may be build

20   ups of financial information which is based upon business

21   records.  For example, some of the Excel spreadsheets may be

22   summarized.  We have no problems if those particular pieces

23   which are based on documents that we've had available to us

24   come in.  For example, if it's a summary of TCEH's financial

25   performance over time we can work around those issues.  It's

1    the clear out-of-court declarations that we have the issues

2    with.

3              Thank you.

4              MR. MCKANE:  Your Honor, just to be absolutely

5    clear, presentations that are developed on the days leading

6    up to a board meeting and then presented to the board so

7    they can understand the status of what's going on in the

8    case so they can then come to a conclusion and form their

9    business judgment to vote on the ancillary agreements,

10   that's what he's talking about in July.  He's talking about

11   the information that was presented.

12             He can say it's wrong.  He can cross-examine

13   Mr. Keglevic, you know, any of the people at the board

14   meeting, and if they -- you know, maybe we gave them the

15   wrong information, but this is a factual matter is what was

16   presented and it was developed leading up to the board

17   meeting absolutely so it could be presented at the board

18   meeting.

19             And then the minutes reflect what was said at the

20   board meeting.  Right?

21             The notion that this is not a business record is

22   inconceivable to me.

23             THE COURT:  Uh-huh.  I agree with the debtors, I'm

24   ready to rule.

25             MR. PEDONE:  Yeah.  May I make one more comment.

1          Your Honor, I have no problem with these coming in

2     for actually the record of what was presented, it's the

3     truth -- coming in for the truth of the statements contained

4     with them, which includes litigation argument as well.  It's

5     those statements of truth contained within the document, not

6     that there was a presentation of the document at the

7     meeting.

8          MR. MCKANE:  Your Honor, the reason why they come

9     in is this was said.

10         THE COURT:  Yeah.

11         MR. MCKANE:  Not whether it's true or not.  This

12    is what was said.

13         THE COURT:  Yeah, I think -- I mean I think maybe

14    you don't disagree.  I think it is certainly a business

15    record, and to the extent that it is prepared in connection

16    with the debtors' business presentation, review, and

17    discussion at the board meeting.

18         These kind of decks are routinely admitted into

19    evidence if they -- it says -- you know, if the board looked

20    at this, considered it in making its decision I think it's

21    relevant.  Whether any specific statement in there about

22    what the ad hoc committee first lien lenders may have said

23    or didn't say was true or not true I don't think is the

24    point of why you're putting them in.  You're putting them in

25    for purposes of showing that your board exercised its duty

1    of care.  It was given these presentations, it reviewed

2    these presentations in making its decision.

3            So what I'm hearing I think is that there's no

4    disagreement.

5            MR. MCKANE:  I think that's right at this point.

6            MR. PEDONE:  No, Your Honor, the business records

7    section allows the business record to come in for the truth

8    of what is asserted in the record.

9            THE COURT:  All right.

10           MR. PEDONE:  If this is being presented for a non-

11   hearsay purpose then we could get to an agreement on its

12   introduction.  But to the extent it is being offered for the

13   truth as a business record it does not qualify and there was

14   no agreement.  We continue our objection.

15           THE COURT:  All right.  Objection is overruled.

16           MR. PEDONE:  Thank you.

17           THE COURT:  I think it's a business record.

18           MR. MCKANE:  Thank you, Your Honor.

19           And with that I'm just going to make a statement

20   that they've been asked for a representation by counsel as

21   it relates to four Excel files that we're about to move into

22   evidence.  Those are DX-383, 384, 386, and 586.

23           And, Your Honor, I can represent that they were

24   made at or near the time by or from information transmitted

25   by a person at EFH with knowledge, that they were kept in

1    the ordinary course of regularly conducted activities of the

2    debtors, and that they were made suggest to regular practice

3    of the debtors.

4              THE COURT:  Okay.  Thank you.

5              MR. PEDONE:  Thank you.

6              MR. MCKANE:  All right.  Your Honor, with that I

7    would move for the admission of the following exhibits and

8    then we can address Mr. Keglevic's declaration.

9              THE COURT:  Okay.

10             MR. MCKANE:  And I do have a green sheet, Your

11   Honor.  I have a -- consistent with prior practice we have a

12   sheet of --

13             THE COURT:  Oh, excellent.

14             MR. MCKANE:  -- exhibits to track.

15             THE COURT:  Thank you.

16             MR. MCKANE:  Your Honor, with that I believe that

17   all of the following exhibits are not disputed.  DX-1C,

18   DX-2, 3, 6, 19, 22, 23, 24, 26, 27, 31, 35, 44, 47, 48, 49,

19   57, 58, 95, 97, 123, 134, 321, 332, 343, 344, 368, 385, 464,

20   471, 586, 651, 661, 682 to 688, and 758.  Those are all DX.

21   And they are all in the written direct, Your Honor.

22             MR. PEDONE:  Your Honor, I'm not certain which of

23   those contain board decks, and I would need a minute to

24   check.  We would continue our objection on the board deck

25   coming in, and I'm assuming the Court's decision would be

1    exactly the same.

2              Do we need to formalize that or can we agree that

3    our objection, to the extent that there are any board decks,

4    continues to apply and it's been overruled?

5              THE COURT:  You can have the standing objection to

6    that, yeah.

7              MR. PEDONE:  Thank you.

8              THE COURT:  And it is overruled.

9              MR. MCKANE:  Your Honor, with regards to live

10   direct there are just five --

11             THE COURT:  So -- okay, I'm sorry.

12             MR. MCKANE:  I'm sorry.

13             THE COURT:  I was just going say, so do you need

14   time to review the list and we can deal with whether I admit

15   them or not at a later time or can I admit them now?

16             MR. MCKANE:  I can actually cut through this.

17             The only PowerPoint presentations that were

18   objected to were the ones that you just overruled.  It was

19   those four, and so I don't think that that's an issue for

20   right now.

21             THE COURT:  All right.  So they're admitted.

22             MR. PEDONE:  Thank you.

23        (Debtors' Exhibit Nos. DX-1C, 2, 3, 6, 19, 22, 23, 24,

24   26, 27, 31, 35, 44, 47, 48, 49, 57, 58, 95, 97, 123, 134,

25   321, 332, 343, 344, 368, 385, 464, 471, 586, 651, 661, 682-

Page 172

1    688, and 758 were admitted)

2         MR. MCKANE:  Your Honor, with the live direct

3    there are five exhibits.  DX-25, DX-45, DX-103, DX-383, and

4    DX-384.  And, Your Honor, we are not going to move into the

5    evidence the demonstratives.

6         THE COURT:  All right.  Any objection to the

7    admission of those five documents?

8         MR. PEDONE:  can I have one minute, Your Honor?

9         THE COURT:  Yes.

10   (Pause)

11        MR. PEDONE:  Your Honor, we're going to need a

12   minute.  At least one of those was a presentation that

13   contained another board deck, 103.  So we just need to

14   check.  Our objection as to 103 it's a board deck and I

15   understand that that objection has been overruled.

16        THE COURT:  Yes.

17        MR. PEDONE:  Okay.

18        THE COURT:  All right.  They're admitted.

19   (Debtors' Exhibit Nos. DX-25, 45, 103, 383, and 384

20   were admitted)

21        MR. MCKANE:  Your Honor, as it relates to exhibits

22   I have a tracking sheet that I'd like to offer the Court and

23   its staff.

24        THE COURT:  Sure.  Great.

25        MR. MCKANE:  Your Honor, the -- before I pass the

1    witness this leaves the written direct and there are

2    passages in the written direct that I have not been able to

3    resolve the discovery -- the evidentiary disputes with

4    Mr. Pedone.

5             I have, as I understand it, there were -- there

6    was a narrowing of the issues, you may not believe that when

7    you see the highlight, but I have a highlighted version of

8    Mr. Keglevic's written direct or declaration to guide the

9    discussion.  May I approach?

10            THE COURT:  Yes.  Thank you.

11            MR. MCKANE:  And, Your Honor, as I understand it

12   the basis is again hearsay for all of the highlighted

13   passages in some form or fashion.  Either positions that the

14   TCEH first liens took, information that was provided by

15   Jones Lang LaSalle as the broker to the company, and you

16   know, the impressions that Mr. Keglevic had based on that

17   information provided.

18            Our position is plain.  This is not hearsay.  That

19   happened, whether it's true or not doesn't matter.  That's

20   why it's not hearsay.  It's a fact that went into his

21   impression that he formulated as he guided the company

22   through the restructuring.

23            Therefore we ask for the declaration to be

24   admitted in whole.

25            THE COURT:  Okay.

1         (Pause)

2               MR. PEDONE:  Your Honor, the best illustration of

3    the problem with the hearsay contained with the declaration

4    is paragraph 24.  Here we have statements concerning a

5    participating party in the litigation that has chosen not to

6    appear, the debtors have chosen not to select him as a

7    witness in an out-of-court statement concerning their

8    statements, and it's being offered for the truth of what is

9    asserted.  This statement is not necessary.

10              You've had statements in evidence concerning

11   Mr. Keglevic's state of mind, which is the only thing that

12   could be relevant.  We don't actually believe it's relevant,

13   but it's the only thing I think it's matter for.

14              Your Honor, the hearsay rule exists so that

15   parties bring witnesses who are available in to testify.

16              We heard the only evidence that we've heard was

17   that Mr. Keglevic himself spoke with an individual that we

18   believe works in New York, could be here to testify, but

19   wasn't put on a witness list, wasn't deposed by the debtors

20   because they're unavailable, and we have conclusive summary

21   statements.

22              We also have a situation where Mr. Keglevic at his

23   deposition described limited if not in-person communications

24   with the T-First concerning  some of these issues and the

25   witness is not here.

1          I believe that some of these statements are in

2    fact based upon discussions with counsel or discussions with

3    other advisors and constitute double layers of hearsay, and

4    so the foundation for any statements as to what the T-First

5    lien lenders stated they would do it simply has not been

6    laid by the debtors and the hearsay shouldn't be admitted.

7          Your Honor, we could get deep into the purpose of

8    the hearsay rule, but the treatises actual discuss that when

9    a witness is available and a statement is offered and it's

10   in hearsay form there are actually grounds to draw

11   presumption against a statement that's being offered in its

12   hearsay form because the witness is in fact available and

13   parties have chosen not to bring them into the courtroom.

14          So with that, Your Honor, we'd continue with our

15   objection with regard to all statements concerning the T-

16   First lenders contained within his declaration as well as

17   statements of other board members when those board members

18   will be here testifying.

19          Thank you.

20          THE COURT:  Okay.

21          MR. MCKANE:  Your Honor, is there anything you

22   would like me to respond to?

23          THE COURT:  It's up to you.

24          MR. MCKANE:  Yeah, all I would say is the

25   positions taken in the negotiations with Mr. Keglevic forms

1   his understanding.  He reported them here today, he reported

2   them in his declaration.  He is available to examination.

3   True or not all of that is known between the person that

4   conveyed that information and their maker.  What he knows is

5   in his head based on what was said, the statement is a fact.

6   Whether it's for the truth of the matter of assertion this

7   is not hearsay.

8           THE COURT:  Okay.  There's a lot of highlighting

9   here so what I'm going do with that is next time we take a

10  break I'll have a look at it and see -- and make a decision

11  at that time about whether to admit the statements or not.

12          MR. PEDONE:  Thank you.

13          THE COURT:  Okay.  Now --

14          MR. MCKANE:  Your Honor, with that I'd pass the

15  witness.

16          THE COURT:  Okay.  Is there any party in support

17  of the plan that wishes to cross-examine the witness?  All

18  right.  I hear none.

19          Mr. Pedone?

20          MR. PEDONE:  Your Honor, I could benefit from a

21  very short brief just to get organized --

22          THE COURT:  That's fine.

23          MR. PEDONE:  -- it'll be more efficient.

24          THE COURT:  Yeah, let us know when you're ready.

25          MR. PEDONE:  Five minutes.

Page 177

1            THE COURT:  Okay.  We're in recess.

2            MR. PEDONE:  Thank you.

3       (Recessed at 3:34 p.m.; reconvened at 3:40 p.m.)

4            THE CLERK:  All rise.

5            THE COURT:  Please be seated.  Okay.

6                     CROSS-EXAMINATION

7   BY MR. PEDONE:

8   Q    Mr. Keglevic, Richard Pedone for American Stock

9   Transfer, the EFH indenture trustee.

10            MR. PEDONE:  Your Honor, I believe that you have

11   been provided with a copy of our exhibit binder No. 5, which

12   is what I'll be referring to along with the debtors'

13   exhibits.  And one has been provided to the witness.

14            THE COURT:  Just five?

15            MR. PEDONE:  Just five for now.  We may go back,

16   but I don't think so.

17            THE COURT:  Okay.

18   BY MR. PEDONE:

19   Q    Mr. Keglevic, how many in-person meetings did you have

20   with the T-Firsts since January of this year, if any?

21   A    January of this year?

22   Q    Yes.

23   A    I don't recall.

24   Q    Do you recall any?

25   A    I don't recall.

```
 1   Q    And how many telephone conversations in which you

 2   negotiated with the T-Firsts did you personally participate

 3   in?

 4   A    I don't keep that kind of record.

 5   Q    Do you have any recollection?  You testified about one

 6   conversation with Mr. Strong, correct?

 7   A    Yes, and I don't know that I would call that a

 8   negotiation.

 9   Q    Okay.  Can you recall any other conversations with him

10   since January 1 of this year?

11   A    Yes.

12   Q    Approximately how many can you recall?

13   A    No.

14   Q    Would it be fair to say that the majority of any

15   negotiations that took place between the debtors and the

16   first lien lenders took place through counsel and other

17   advisors?

18   A    I don't know what negotiation you're referring to.

19   Document negotiation or conceptual negotiation, economic

20   negotiation?

21   Q    So negotiations over what the structure of the plan of

22   reorganization would look like if the plan that was

23   confirmed last year failed.  Those are the negotiations I'm

24   referring to.

25            Would it be fair to say that the majority of those
```

1    negotiations over what the structure of an alternative

2    restructuring would look like took place between advisors --

3    A      Well in the --

4    Q      -- as opposed to you in person -- as opposed to with

5    you?

6    A      In the alternative restructuring -- I mean in the Hunt

7    plan there were specific things that had to be included in

8    an alternative restructuring that had to exist or it would

9    have undone, you know, or would have effectively put the

10   settlement agreement at risk.  So a lot of those were, you

11   know, hard wired because of that provision.  And I'm trying

12   to think of the number of negotiations of the alternative

13   plan.  I think a lot of the alternative plan on the T-Side

14   was very similar to the Hunt plan so it did not require a

15   lot of negotiation per se.  And our conclusion was that the

16   Hunt plan had many of the features that remained appropriate

17   at the time that it was determined that it was no longer

18   valid, which wasn't until May.

19          So the January time frame doesn't make much sense

20   to me, because until we had a -- you know, we really didn't

21   meet with them I think my testimony was until February to

22   begin potential discussion of alternatives, and that was a

23   face-to-face meeting that I had with them that I testified

24   to earlier.  And at that meeting we talked about the

25   desirability of keeping the alternative terms of the

1    restructuring in place, and those were the major, you know,

2    points at that time that I remember.

3    Q    Was anyone at that meeting representing strictly EFH

4    Corp. such as Proskauer?

5    A    Yes.

6    Q    Who was there?

7    A    I'm trying to remember if the only, but Mark was there.

8         THE COURT:  Mark Thomas?  Mr. Thomas?

9         THE WITNESS:  Yes.

10   BY MR. PEDONE:

11   Q    And at that meeting did anyone make a request that the

12   T-Firsts pay cash consideration for use of EFH Corp.'s NOLs?

13   A    Oh, at that pointed in time the NOLs had no value to

14   EFH.  We just testified that until May, until the arrows

15   changed its position that that was sleeves off vest for EFH,

16   that there was no benefit to EFH of retaining NOLs because

17   they would all go through the black hole.

18        So it would -- I don't understand why -- you know,

19   nobody from any side had ever brought up, including E

20   creditors, that concept.  The concept that we were relying

21   upon until the end of May was that the best interest of E

22   was not to have a taxable transaction and giving up

23   something that E had no economic benefit to E the NOLs was

24   the right way to proceed, and we gave all that testimony

25   associated with the old plan that was confirmed and it

1    remained the same until the end of May.

2    Q    One of the transactions contemplated in the plan would

3    be that an alternative minimum tax would be triggered that

4    needs to be paid by EFH Corp. in -- for 2016, correct?

5    A    Yes.

6    Q    The TMA filed on Tuesday night provides that

7    reorganized TCEH will only reimburse EFH Corp. for half of

8    that minimum tax, correct?

9    A    Correct.

10   Q    EFH Corp. will be required to pay between 10- and

11   $20 million in cash because EFH Corp. will not be able to

12   satisfy that AMT liability using NOLs, correct?

13   A    Yes, but I don't think it's 10- to 20-, I think the

14   total is 20- of which if it was 20- half would be TCEH so it

15   would be 10-.

16   Q    EFH --

17   A    It'd be 7- to 10-.

18   Q    EFH Corp. will make the payment and then it will seek

19   reimbursement from EF -- from reorganized TCEH under the tax

20   sharing agreement, correct?

21   A    Correct.  And we don't see that as being any

22   significant counterparty risk to EFH, so I don't think it's

23   relevant.  Economically it's 50/50 from 7- to 10- is the EFH

24   burden and the same burden on TCEH.

25   Q    And in connection with the transactions contemplated in

1    the plan neither reorganized TCEH nor any T-Side debtor will

2    be paying any cash to EFH Corp., correct?

3    A    I'm sorry, would you restate?

4    Q    Sure.  In connection with the transactions that are

5    contemplated in the plan neither reorganized TCEH nor any

6    T-Side debtor will be paying any cash to EFH Corp., correct?

7    A    Well you just went through an analysis that told me

8    that EFH was going to pay the AMT and get reimbursed by

9    TCEH, that would be a payment from TCEH to EFH.

10   Q    Other than that payment is there any cash consideration

11   flowing from the T-Side to EFH Corp.

12   A    No, the T-Side is generally speaking reducing potential

13   obligations or actual obligations of E but not paying them

14   cash.  So, for example, in the transfer of EFH Corporate

15   Services there's some administrative claims, TCEH is taking

16   the burden of those.  To the extent there's any severance

17   cost associated with employees they're taking the burdens of

18   those.  There's some EFH severance -- EFH Corp. severance

19   that TCEH is taking the burden of.

20            So there's different, you know, costs that are

21   being picked up by EFH, but I'm not aware of any straight

22   cash consideration from TCEH to EFH for the reasons I've

23   stated.

24            THE COURT:  I'm sorry, you said costs being picked

25   up by EFH, you meant TCEH, right?

1       THE COURT:  I did, Your Honor, if I misspoke.

2  BY MR. PEDONE:

3  Q    And no provision has been made for EFH Corp. to be

4  reimbursed for the fees and expenses that its estate is

5  incurring in connection with the tax-free spin, correct?

6  A    That's correct.

7  Q    Have you seen any document evidencing that any such

8  request for the reimbursement of fees and expenses was ever

9  made?

10  A    No.  Once again the tax-free spin, which was

11  incorporated in the prior plan and this plan, it was viewed

12  as being substantial risk mitigation for the benefit of E,

13  and that was the primary consideration.

14  Q    You and Mr. A are officers of all of the debtors,

15  correct?

16  A    I'm sorry, the other name?

17  Q    You and Mr. A --

18  A    Oh, okay.

19  Q    -- are officers of all of the debtors, correct?

20  A    Yes.

21  Q    And you understand that you owe duties to each of

22  debtors, correct?

23  A    Yes.

24  Q    And you also owe duties to the creditors of each of the

25  debtors, correct?

1   A    I like to think that I owe duties to the estate, not

2   the individual creditors within the estate.

3   Q    You've dealt with many issue ins these cases where

4   there are conflicts among the debtors, correct?

5   A    Yes.

6   Q    You proposed a CRO settlement to get the creditors to

7   reach a consensus, correct?

8   A    Yes.

9   Q    But ultimately it was the disinterested directors and

10  then the creditors who participated in the give and take as

11  detailed at the last hearing to arrive at the settlement

12  agreement approved by the Court, correct?

13  A    To the extent there's any conflict matters I don't

14  vote.  It's a disinterested director decision and it's up to

15  them, correct.  I give input.

16  Q    But in connection with reaching the last settlement it

17  was actually -- the settlement approved last fall it was

18  actually the disinterested directors who participated in

19  negotiations or their advisors participated in negotiations,

20  correct?

21  A    Yes, I was asked into some of the sessions to give some

22  input, but ultimately it was their negotiation.

23  Q    And as you stated in your declaration that you filed in

24  connection with this hearing the amount of NOLs, if any, to

25  be used in connection with the current plan or any future

1   plan is not specified in the December -- strike that.

2          Sitting here today you'd agree that the amount of

3   NOLs, if any, to be used in connection with the current plan

4   or any future plan in these cases is not specified in the

5   December settlement agreement is it?

6   A    No.

7   Q    And you'd also agree that the plan support agreement

8   does not require EFH to allow its NOLs to be used to

9   facilitate a step up for reorganized TCEH wouldn't you?

10  A    It's not technically required, but it's required if we

11  want to get the T-Side to agree, in my opinion.

12  Q    Was that your understanding when you became -- when you

13  first began contingency planning in January this year or is

14  it an understanding that you came to at a later date?

15  A    I don't know that -- well I know we were putting in a

16  new plan and it wasn't an alternative term that had to be in

17  the plan, but I also know that what my belief was in terms

18  of what the expectation of the T-Firsts were and the

19  benefits to the E of doing that to do the 5.8.

20  Q    Okay.  So let's go back.  So specifically you have an

21  understanding today that the settlement agreement did not

22  commit to any particular use of the NOLs, correct?

23  A    Yes.

24  Q    And the PSA did not commit to any particular use of the

25  NOLs, correct?

1    A    Yes.

2    Q    That's your understanding today.  And my question is,

3    when you began the contingency planning in January of 2016

4    did you have the same understanding or did you come to that

5    understanding at a later date?

6    A    I don't recall what my understanding was when I began

7    negotiations exactly, but I think I've always known that

8    that was technically possible but not substantively possible

9    given the parties' positions that they stated in the

10    discussions around the February meeting when we started

11    talking about alternative positions.

12            And I would also add that that wasn't a meaningful

13    distinction in my mind since the E-Side had never suggested

14    that any amount of NOLs being used by T was problematic for

15    them or beneficial to them given the IRS expected black hole

16    ruling.  So that was not top of mind I think for anybody in

17    the negotiations at that point.

18            MR. PEDONE:  We move to strike the last part, it

19    was non-responsive to the question.

20            THE COURT:  Overruled.

21    BY MR. PEDONE:

22    Q    At the trial in connection with the debtors' efforts to

23    obtain approval of the plan and the settlement you describe

24    some of the benefits of the settlement agreement for the

25    debtors and in particular you described how disarmament was

1   the cornerstone, correct?

2   A    I'm sorry, what hearing are you referencing or what --

3   Q    Sure.  The hearing to obtain approval of the settlement

4   agreement last fall you spoke in your declaration to the

5   effect that disarmament was a cornerstone of the

6   arrangement, correct?

7   A    Correct.

8   Q    And you also described how the assurance of a fresh

9   start free of litigation was worth far more to the debtors

10  than any break fee, correct?

11  A    Correct.

12  Q    And the settlement obtained that disarmament, correct?

13  A    Correct.

14  Q    At least with regard to certain parties because we're

15  still here today.

16          And you'd agree that there's nothing in the

17  settlement agreement that would have precluded EFH Corp. or

18  its disinterested directors or any executive acting for EFH

19  Corp. from seeking monetary consideration for EFH Corp.'s

20  NOLs, correct?

21  A    The --

22  Q    Settlement agreement.

23  A    There was no technical barrier to doing it.  I think I

24  answered why our judgment was that it wasn't appropriate to

25  do.

1    Q    And you're saying the answer would apply for the PSA,

2    there was no technical barrier in the PSA that prevented EFH

3    Corp. from reaching out and seeking monetary consideration

4    for use of its NOLs, correct?

5    A    Once again, I don't understand the point since it was

6    never raised by EFH creditors, NOLs had no value at that

7    point in time to EFH, there was never a proposal put forth

8    by the creditors, never a suggestion when we met with them

9    to do that.

10            But yes, so at that point in time that was not

11    something that we were focused upon.  We were focused on

12    still avoiding taxable transaction to the benefit of the

13    E-Side.

14    Q    You're aware that Mr. Sawyer on behalf of TCEH and the

15    negotiations over the settlement demanded that TCEH receive

16    the benefit of all of EFH Corp.'s NOLs, correct?

17    A    Yes.

18    Q    And you're aware that instead the settlement provided

19    that in exchange for consideration received, including a

20    $700 million claim against EFH Corp, TCEH released its claim

21    to the use of EFH Corp.'s NOLs up through the settlement

22    effective date, correct?

23            MR. MCKANE:  Objection, Your Honor.  I think that

24    calls for a legal conclusion.  Asking this witness to -- he

25    can only give his business understanding, to the extent he

1    has one.  But asking for an interpretation of the release of

2    the claims in the settlement agreement is a legal

3    conclusion.

4              MR. PEDONE:  I'll withdraw the question and move

5    on, Your Honor.

6         (Pause)

7    BY MR. PEDONE:

8    Q    The board approved the plan to be filed on May 1 on

9    approximately April 28th, 29th period, correct?

10   A    Yes.  The current plan?

11   Q    Yes.

12   A    Yes.

13   Q    And at that point it provided for two alternative paths

14   as you've described today.  A potential taxable transaction

15   and then the transaction that you're proceeding with today

16   which is the step up busted 351, correct?

17   A    Correct.

18   Q    The term sheet for the tax matters agreement that was

19   attached to that plan, it's DX-24 in the debtors' -- let me

20   make sure I get the right binder.

21              The original term sheet that was filed in

22   connection with the plan -- you don't need to look for a

23   document -- did not provide for any consideration to flow to

24   EFH Corp. for use of its NOLs did it?

25   A    No.  Yes, it did not.  Sorry.

1    Q    It's okay.

2              And in fact by that date other than the

3    negotiations over risk allocation, which you've testified

4    about, the deal with the T-Firsts had been struck hadn't it?

5    A    Well on May when we filed the plan, for the reasons I

6    stated, that you know, the IRS regulations were

7    substantially different that when we found out at the end of

8    May, there was no basis to change the interpretation or the

9    structure of the deal that we had previously cut when we

10   went through the Hunt transaction.  Those NOLs had no value

11   to EFH, it was sleeves off the vest, it mitigated the

12   potential of a taxable deal, and it was something that was

13   provided, an incentive along with speed to the TCEH firsts.

14   So yes, for all those reasons we struck the deal at that

15   point for those reasons.

16   Q    At what point did you actually strike the deal?  Wasn't

17   it really presumed from the beginning in January of 2016

18   that for no consideration other than what you've testified

19   about and what's currently explained in the deal that

20   reorganized TCEH would receive the step up?

21   A    I'm struggling with understanding why that deal that E

22   agreed to with the Hunts would have had any reason as to

23   renegotiate it when there was fundamentally no fact change

24   with the IRS or with the considerations of the party.

25              It was the logic, the same agreement, and it was

1    when we met with the E-Side there was no objection to

2    proceeding with that plan in that fashion, and the T-Side

3    demanded that we proceed with that plan in that fashion, or

4    they would go taxable.

5              So, you know, so effectively it was a very short

6    negotiation with agreement by everybody when we met in

7    February, and then we reviewed the basis for that with our

8    board in February, and I don't think there were substantial

9    negotiations or changes before we filed because we had that

10   level of consensus and understanding of the issues based on

11   the previous experience.

12   Q    You testified earlier today that the largest creditor,

13   Fidelity, felt that they could not participate in those

14   negotiations, didn't you?

15   A     That was their basis but it had -- it didn't stop them

16   once the notice of termination was filed and it hasn't

17   stopped -- I mean, they could have called since and they

18   still have not posted me on any issues associated with the

19   plan.  We filed two amendments to that plan.  We weren't

20   forestalled from considering a creditor's point of view and

21   that was their -- they could have had their advisors call

22   us.  There were many opportunities for them to call us but

23   --

24   Q    They could have had their indentured trustee voice

25   objections or they could have watched as their indentured

1   trustee voiced their objections which is what actually

2   happened, correct?

3   A    I -- I'm not sure what they -- whether you speak for

4   them or not.

5   Q    Okay.  But let's go back.  (Indiscernible) I'm taking

6   from your testimony the die was cast and the deal was

7   struck, that it would go forward without consideration being

8   paid for the use of the NOLs as early as January of this

9   year, correct?

10  A    No.  We didn't meet with the creditors until -- I

11  testified until mid-February when the proceedings started to

12  go bad.  So we were not working actively on an alternative

13  plan.  You keep going back to January.  It wasn't January

14  and then we didn't seriously consider going forward with

15  that until we presented it to our board and got all the

16  disinterested directors on -- in -- and their advisors on

17  board which I think was the end of February based on the

18  decks we've been through today.  So, you know, maybe the die

19  was cast somewhere, you know, in March or, you know,

20  whatever but for all the same reasons with all the same

21  logic that this Court confirmed the plan, all those facts

22  remained exactly the same and there was no basis for the die

23  not to be cast but we reevaluated substantially those

24  element -- you know, the elements of the plan before we dove

25  into it and that certainly took place in February and later.

1   Q    In connection with the current plan, the step-up that

2   reorganized TCEH will receive is approximately 5.8 billion

3   as outlined in your direct, correct?

4   A    Correct.

5   Q    And in his deposition, Mr. Ying, I'll represent, has

6   estimated that the net present value of the step-up will

7   between roughly a billion and a billion-one and change.  Is

8   that your understanding as well?

9   A    Yes, the total, not the incremental.

10  Q    That's right, the total value of the step-up so

11  rephrase the question.  The total benefit that reorganized

12  TCEH receives to its valuation increased in its valuation as

13  a result of the step-up is more than a billion dollars,

14  correct?

15  A    Yes, if they follow the tax-free approach, that's the

16  value.

17  Q    While we're on the subject of basis, the tax basis of

18  EFI's interest in Oncor, EFIH's interest in Oncor, is

19  approximately a negative 1.8 billion, correct?

20  A    That's correct.

21  Q    Without going into the details of what any potential

22  purchaser at Oncor -- of Oncor stated and without

23  identifying any of them, I'd like to ask you isn't it true

24  that some purchasers have inquired into the quality and the

25  quantity of the NOLs that will be available at EFH if the T-

1    Side closing takes place?

2    A    Yeah, I -- I'm struggling with how I answer that

3    without talking about what different bidders -- your entry

4    was don't tell me about what you've heard from the bidders

5    but what have they said.  At least that's what I heard.

6    Q    Let's try you -- now -- and I'll try to rephrase it so

7    it's a yes or no question.  The potential bidders on the E-

8    Side for the debtors' interest in Oncor have made inquiries

9    into both the quality and the quantity of the NOLs that will

10   be available at EFH if the T-Side plan closes?

11                MR. MCKANE:  Your Honor, all I ask is -- I

12   recognize that there were some lines drawn on the direct.

13   If we're going to go down this road which I'm going down, I

14   just have the same ability on redirect to explore the area.

15                MR. PEDONE:  That's one question.

16                THE COURT:  If he opens the door --

17                MR. PEDONE:  Yup.

18                MR. MCKANE:  Very good, Your Honor.  Thank you.

19                THE COURT:  -- and if I determine he's opened the

20   door, you will have an opportunity to explore it and I'll --

21                MR. MCKANE:  Thank you, Your Honor.

22                THE COURT:  -- figure that out.

23                THE WITNESS:  Yeah, certainly, potential

24   interested parties did due diligence around the EFH NOLs and

25   the transaction that we were proposing in this case.

1   BY MR. PEDONE:

2   Q    When I deposed you on June 27th and conducted your

3   deposition, the private letter ruling had not been yet come

4   out, correct?

5   A    Correct.

6   Q    And you had not yet received oral indication from the

7   IRS on what direction they would like to go on any of the

8   issues, correct -- they were likely to go on any of the

9   issues, correct?

10  A    No.

11  Q    Okay.  At that point in June when we spoke, did you

12  know where the IRS was going to come out on the CODI issue?

13  A    Yes.

14  Q    And did you --

15  A    Well, obviously, my -- we anticipate -- our best

16  information was that they were going to come out the way

17  they did in the letter.  I -- you know, it wasn't certain

18  until you got the letter but given that we went -- heard

19  from them, had a face-to-face meeting and they said they'd

20  taken it up the flagpole and that's where they thought they

21  would end up, at that point in June when we talked, I think

22  I knew that's where it was going to come out.  That was my

23  best guess as to where it was going to come out.

24  Q    And how about the part of the ruling that you described

25  as being -- I won't get your words exactly right but, in

1    effect, pleasantly surprised with that the inverse,

2    essentially, was -- it was an advantage that EFH Corp. could

3    retain more of its NOLs -- I'll rephrase the question

4    because that was pretty mangled.

5    A    No, no, I --

6    Q    So my question is by the -- for the record as well,

7    I'll get it straight.  When you were deposed at the end of

8    June, did you know that the IRS was likely to rule that EFH

9    Corp. would be able to retain more of its NOLs?

10   A    It -- it's hard for me to put a date on it but I

11   believe I did at that date.

12   Q    Okay.  And do you recall in your deposition that you

13   did an approximate calculation of the net present value of

14   the NOLs that EFH would retain as being approximately 175

15   million under the current plan?

16   A    Yes, I specifically remember doing that and the

17   difference between that and the number of my -- that I

18   presented today, if I can presume where this is going, is I

19   applied the same NPV factor for E-Side that the T-Side would

20   have, not realizing that the NOLs could be used quicker on

21   the E-Side if, in fact, Oncor income, you know, was

22   available.  So I think I explained that when I went through

23   my deposition but at that time, I was just using the same

24   NPVs so it was the same number, 1.2 billion times 35

25   percent.  I used an NPV factor of roughly half which turns

1   out to be right for TCEH but not right for EFH.  So that

2   part of the information was still evolving at that point.

3   Q    So the change from your testimony at your deposition

4   which, admittedly, was the back of the envelope on -- back

5   of the envelope number on the fly.  I'm not trying to hang

6   you up on it.  The change in the number was not based upon

7   the IRS ruling, it was based upon your revisiting the

8   calculations and other inputs?

9   A    It was simply the NPV factor that I applied.  I think I

10  had the NOLs right, the tax rate right and just the NPV

11  factor wrong.

12  Q    But, unquestionably then, by the end of June, based

13  upon your testimony, the debtors had a good sense of where

14  the IRS was going to come out, correct?

15  A    Yes.  Well, we always had a sense that they were going

16  to approve the transaction, the tax re-spin with the 351,

17  the two curve balls, as I mentioned, and they relay to each

18  other was the CODI and then the survival of the NOLs but at

19  that point, we had had communication that that would be

20  where they came out and we fully expected to see it in

21  writing which we did.

22  Q    And at the end of June, you knew that the NOLs that EFH

23  was to retain were worth at least $175 million?

24  A    Yes.  Well, we -- put it this way, we knew what the

25  nominal value was which hasn't changed which is the 1.2

1   billion times 35 percent.  We knew that was the nominal

2   value.  The only thing I mucked up was the NPV.

3   Q    And you would agree that, all things being equal, if

4   EFH was able to retain more of its NOLs, that would provide

5   it with more flexibility in negotiations with interested

6   parties or, potentially, its own creditors for a stand-alone

7   plan, correct?

8   A    Potentially.  I -- you know, once again, speculating as

9   to what bidders will provide value for, I was surprised in

10  the merger agreement with NextEra that they did not make

11  that a closing condition.  If I put value in the $1.2

12  billion of NOLs that would survive, I would have,

13  effectively, said if there's less than that, I want to

14  adjust my purchase price.  They did not and I think that's

15  because they had a unique perspective associated with the

16  NOLs that some of the NOLs we expect to be there might not

17  be there, that the IRS might disallow them.

18  Q    Sure, but let's be clear.  The E-Side has more

19  flexibility if it has more NOLs, correct?

20  A    Generally speaking, I would rather have more NOLs than

21  less NOLs, yes.

22          MR. PEDONE:  And just one second, Your Honor.

23          THE COURT:  Of course, that's apart from how you

24  get them.

25          THE WITNESS:  I think I'd messed that up in a

1    prior testimony so I'm going to try not to go over that

2    ground again.

3    BY MR. PEDONE:

4    Q    Mr. Keglevic, if you could turn to Binder 5, Debtor's

5    Exhibit 353?

6           MR. PEDONE:  Your Honor, may I confer with Mr.

7    McKane for one second?

8           THE COURT:  Uh-huh.

9        (Counsel conferred)

10   BY MR. PEDONE:

11   Q    You sent this email to Laurel Cohen at Evercore on

12   May 11th, 2016, didn't you?

13   A    Yes.

14   Q    And in the first sentence, you refer to a promise that

15   was made to the T-first specifying and you say we have

16   promised the first liens only 5.8 billion of NOLs and there

17   is substantial cushion pull-back with EFH, correct?

18   A    Yeah, that's what it says.  That's what was in -- I

19   mean, we filed a plan by this point so probably, better

20   stated, would have been our plan only provides for up to 5.8

21   billion.  It wasn't a -- I mean, the plan was filed by that

22   date and reflected 5.8.

23   Q    Uh-huh.  You got my next question.  Was the agreement

24   ultimately -- was the -- is the agreement you're referring

25   to, the plan, was that the memorialization of it?

1   A    Yes.

2   Q    To whom was the promise that you're referring to

3   actually made?

4   A    There is no promise.  It was the plan that we filed

5   that, you know, got their support and to not file a taxable

6   stand-alone plan.  So, sorry, I'm not a lawyer but I don't

7   think it's a binding promise.  It was what we agreed to with

8   them to -- in our plan and that's what's reflected.  And, by

9   the way, the -- Laurie Colbin and Hiltz (ph) are the -- were

10  the people trying to at that -- you know, they're -- they

11  were the key people marketing the Oncor asset to the outside

12  and one of the bidders was concerned that there'd be some

13  liability to the E-Side if T got 5.8 billion of NOLs and the

14  NOLs turned out to be a lower number.  We effectively fixed

15  that risk and, by the way, it's an important risk that the

16  T-Side said if the NOLs aren't there, the 5.8, they'll pay

17  the incremental tax.  So at that point, it was twofold.

18  One, we were trying to get somebody to pay us for what was

19  left over but, at a minimum in this email, we were trying

20  not to get somebody to suggest there was a risk in acquiring

21  E and reduce their purchase price.  So that was why this is

22  important.  That's the context.

23          MR. PEDONE:  Move to strike.

24          THE COURT:  Overruled.

25  BY MR. PEDONE:

1   Q    And just so I'm clear on the timing, the promise or the

2   agreement was memorialized on the very same day as the

3   termination notice was received, correct?

4   A    I --

5   Q    The plan was filed May 1?

6   A    Yes.

7   Q    And the termination notice was delivered May 1?

8   A    So, yeah, we probably had agreement with the T-Side --

9   with -- you know, maybe a few days ahead of that but,

10  generally speaking, that was -- they were very close

11  together.

12  Q    And, sitting here today, can you recall a discussion

13  with E-Side creditors that took place between April 1 and

14  the board vote to approve the May 1 plan, E-Side creditors?

15  A    When we met with them in February, that was the game

16  plan going in and I don't remember having any further

17  discussions with them or any disagreements, any

18  communication with them.  We -- I thought I had tacit

19  approval from them to do an -- a -- to pursue after our

20  February meeting and some -- to pursue a busted 351 tax re-

21  step.

22  Q    Tacit approval from who?

23  A    The E-creditors that I met with.

24  Q    Which ones were those?

25  A    All of them, the ones that I met with earlier that I'd

1   referred to earlier, the second lien, the PICs and the -- I

2   -- well, like I said, I'm not sure if we met with Fidelity

3   advisors or not during that time but those for sure we met

4   with separately as we did with the T-first at that same time

5   --

6   Q    And you --

7   A    -- and all those parties agreed with the approach going

8   forward.

9   Q    You certainly don't -- aren't testifying that Fidelity

10  agreed with the approach going forward at that time, are

11  you?

12  A    No, I certainly did not have any indication that

13  Fidelity wouldn't agree to it since the facts and the

14  background was the same that they had supported in the Hunt

15  deal.  So I don't know why I would have assumed they would

16  have a problem with it when the facts were exactly the same.

17  I -- that -- I just don't understand the logic.

18  Q    The creditors' committee was not consulted with in

19  February concerning the alternative plan, were they, on the

20  E-Side?

21  A    I didn't meet with them but I don't know the activities

22  of all the other -- I don't know if the disinterested

23  director on the E-Side, Mr. Thomas, met with them or -- they

24  could have.  My advisors could have informed them -- I know

25  we sent the term sheet to everybody.

1   Q    The term sheet was sent about six days before the plan

2   was actually filed, correct?

3   A    Correct, and we heard nothing back from any of the

4   creditors, any disagreement with anything in the term sheet.

5   Q    You don't personally know whether phone calls were

6   returned during that period considering the term sheet, do

7   you?

8   A    I don't know if they were made, let alone returned.  So

9   --

10  Q    If you could turn to Debtors' Exhibit 103 in the

11  debtors' exhibit binder?

12  A    Okay.

13          MR. PEDONE:  We don't need the slide.

14          UNIDENTIFIED SPEAKER:  Hmm?

15          MR. PEDONE:  We don't need the slide.

16      (Counsel conferred)

17  BY MR. PEDONE:

18  Q    If you could turn to page 28 of the slide deck?

19  A    Is this the analysis of Alternative 1, tax free?

20  Q    It is.

21  A    Then I'm there.

22  Q    And in this analysis -- and it begins with

23  Consideration No. 1 being maximization of the step-up,

24  correct?

25  A    Yes.

```
1    Q    And then as the analysis goes through other

2    alternatives, Question No. 1 is always how do we maximize

3    the step-up, correct?

4    A    There's no -- they're not numbered.  They're just

5    considerations.  The top one is maximized step-up.

6    Q    Okay.  And nowhere in any of these slides is the issue

7    of maximizing the recovery ADFH Corp. discussed, is it?

8    A    Mr. Pedone, we had the E-Side sign onto the plan that

9    had the exact same maximization of tax free.  We had no

10   indication from the IRS that there would be any value to E.

11   We had indication -- no indication from the creditors that

12   they disagreed with this logic.  We had T demanding it and I

13   can't imagine that somebody would be so prescient to

14   understand in this period that on May 30th, the IRS was

15   going to throw us a curve ball and it became a relevant

16   thing for the board to consider.  We keep going over this

17   ground but I'm going to keep giving you that long answer

18   that I'm sure you don't want but I don't understand the

19   foundation of the question as to how any reasonable person

20   at that point in time from the E -- any E creditor would

21   disagree with this approach when it was sleeves off their

22   vest.  So why -- what's the basis of asking for compensation

23   when no facts change and nothing was different than the Hunt

24   plan that they signed onto?

25   Q    I appreciate that you do not think that a distribution
```

1    of PAR versus an unknown distribution is a change.  That's

2    clearly your opinion, there was no change, correct?

3    A     When I said there's no change, no change in the

4    underlying tax facts that any NOLs that would be left over

5    for the E-Side would have zero value so it wouldn't change

6    their ability to recover more than whatever they got.

7    Q     But it's not --

8    A     So, certainly, I understand -- I -- but at that time,

9    we didn't know what the value was of E's recover because the

10   E-Side would never provide us with a plan.  So we didn't

11   have any basis of understanding whether they'd get PAR or

12   anything else.  We did have this understanding, that they

13   agreed to a plan where they gave up NOLs because it was

14   sleeves off their vest and this is continuing the same

15   thing.  We also had an understanding that T-first would go

16   taxably if we didn't provide them an incentive.  So we

17   continued that approach until we got to May and then we

18   evaluated at that -- that we have to change approach.  We

19   revisited the topic but at this point in time, I can

20   shortcut all of this.  Did anybody ask for cash, I would go

21   for what reason.  We -- the T -- the Hunt deal was still in

22   place.  When we were looking at alternatives, we weren't

23   sure what the recovery was going to be for the E-Side and

24   the tax hadn't changed and the focus of all the questions is

25   around the tax that you're asking me and I don't understand

1    why, rationally, we would have assumed that when we went

2    from the Hunt deal to this deal, an alternative deal without

3    a change in the IRS that T would have accepted any outreach

4    from E about consideration for NOLs that had no value to

5    them.  So no, we did not.

6    Q    And in this presentation, you do not lay out for the

7    board the possibility that they could seek consideration for

8    the NOLs because, essentially, title to the NOLs had been

9    cleaned up in the settlement agreement, did you?

10             MR. MCKANE:  Objection, form.

11             THE WITNESS:  I don't --

12             MR. MCKANE:  Objection, form.

13             MR. PEDONE:  I'll rephrase the question.

14    BY MR. PEDONE:

15    Q    You previously testified that the settlement agreement

16    made it clear that EFH Corp.'s obligations to use the NOLs

17    for any particular purpose -- strike that.  You previously

18    testified that it was your understanding at some point that

19    EFH -- at some point -- you couldn't recall when you came to

20    the understanding -- that the NOLs were not preordained for

21    any particular use in the settlement agreement, correct?

22    A    Correct.  So we could --

23    Q    And this board presentation does not contain any

24    explanation of that fact to the board, does it?

25    A    The board presentation basically suggests we give the

1   maximum amount to T to keep them from filing a taxable plan

2   because those have worse alternatives.  It does not suggest

3   compensation for E because, as was explained to the board in

4   the past, E could not retain any NOLs and, therefore, they

5   had no value and we've not been -- in the prior plan been

6   able to get any compensation for -- from T to E for

7   something that had no value to E.

8   Q    But by the point of your deposition, you knew that the

9   NOLs had at least 187 million in value to EFH, the small

10  piece that would be retained, correct?

11  A    Sure, because the IRS had changed its position so I

12  didn't know -- I expected that to be the outcome of the

13  private letter ruling.

14  Q    If you could turn to the demonstrative exhibits which I

15  believe you have copies of or I'll pass out?

16          MR. PEDONE:  Your Honor, may I approach the

17  witness?

18          THE COURT:  Yes.  Is this -- oh.

19      (Counsel conferred)

20  BY MR. PEDONE:

21  Q    In connection with that same board presentation in

22  February, you did not advise the board that the incentives

23  for the T-firsts to attempt a taxable transaction were

24  changing, did you?

25  A    Yes.

Page 208

1    Q    What did you --

2    A    Page 22.

3    Q    What did you tell them?

4    A    Well, we told them that the value, the implied -- we

5    show the implied TEV and compare it that their benefit under

6    a taxable approach is on page 22 or Bates No. 3737 versus

7    the deal that they were getting under busted 351.  We

8    specifically showed them that in this presentation.

9    Q    And did you have discussion at that board meeting about

10   the change in dynamic as that would affect the negotiations?

11   A    We absolutely said there's a change in dynamic and that

12   the E-Side now if the IRS continued with this set of rulings

13   -- this is pre-CODI -- could potentially accept a taxable

14   deal and not oppose it because there was enough NOLs to

15   cover it and I think I made that point earlier in the -- my

16   direct.

17   Q    But there was no discussion about using that changed

18   fact or attempt to obtain consideration for EFH Corp., was

19   there, because there was no discussion about attempting to

20   obtain more consideration for EFH Corp.?

21   A    For the reasons I stated, no, there's been no change

22   facts in the underlying tax logic that supported the

23   previously-confirmed plan or at this date.  The only thing

24   that changes, potentially, the E-board might be able to

25   support a taxable deal.  If T could go taxably, I -- you

1    know, and get primarily the same benefit, why would -- you

2    know, why wouldn't they just pursue it and then we said

3    well, the mini Armageddon would be if we had to fight a

4    taxable deal and both sides incurred a lot of costs that

5    would be bad for both of the estates.  So are they going to

6    get a little extra basis right up here than they would get

7    in a taxable deal?  Great, that's incentive but as part of

8    that incentive, they're taking out a lot of risks -- we've

9    gone through that -- and it cost E zero to give them this

10   basis write-up.  So E got the benefit of mitigating any

11   potential risks, optionality of the REET and didn't give any

12   consideration that had economic value at this point in time

13   up.  So that's why there was no consideration of going to T

14   and asking for, you know, remuneration or consideration.

15   Q    What was the term you described to explain the

16   difference that the T-first would receive in valuation of

17   the basis step-up?  So we had the billion plus that Mr. Ying

18   discussed and then you were using a 400 million and change

19   number.  You had a term that you like to use in your

20   testimony for that difference.

21   A    Incremental?

22   Q    Incremental difference.

23   A    Yes.

24   Q    That incremental difference of excess to four -- in

25   excess of $400 million could move the recovery at EFH Corp.

1   by 200 percent, couldn't it?

2   A    Well, I don't know what recovery you're assuming at EFH

3   Corp.  In our plan?

4   Q    We don't know the -- what the recovery will be in the

5   current plan, do we?

6   A    No, but it --

7   Q    But if we were to just have a distribution of cash, as

8   Mr. Thomas indicated he's seeking to protect, an extra $400

9   million will move the needle a lot and that is a benefit

10  being conferred on the T-Side, at least 400 to a billion?

11  A    There -- well, it's not a billion.  The incremental

12  benefit is 430 and the incremental benefit comes with

13  additional risks which I enumerated that I won't go through

14  again including the risk that they're joint and severally

15  liable for a potential $6-1/2 billion tax.  So I would not

16  say that they view all that incremental value as being

17  something they would pay cash for.  I would also say that

18  it's difficult to make a negotiation when you're asking

19  somebody for cash for something that they know costs you

20  nothing and, in fact, the consideration the E-Side was

21  getting is a reduction in risk of going taxable.  So, you

22  know, E-Side got a partner joint and several if the tax re-

23  spin goes bad.  They take taxable Armageddon off the table.

24  Yes, the did not get a -- and they get NOLs that they

25  wouldn't get if they -- if T files tax relief.  So they are

1    getting incremental benefit of $370 million and risk

2    reduction.  I view that as being a good deal for E and

3    nobody -- I don't think E will support, you know, a taxable

4    plan.  You just want the same pie to be split differently

5    and we're saying there's incremental benefit net of risk to

6    T and there's incremental benefit, effectively, with less

7    risk to E and when we looked at it, we viewed our business

8    judgment to be that was the best deal for both estates.

9    Q    And in connection with that board meeting in February,

10   you didn't evaluate the likelihood based upon the facts at

11   that time that TCEH first lien creditors could succeed in

12   obtaining confirmation of a taxable plan, did you?

13   A    No, we had previously --

14   Q    And you made your decision without evaluating that?

15   A    That's unfair.  We had previously looked at the issues

16   associated with taxable separations that led up to the Hunt

17   plan confirmation.  I think in prior board decks, those are

18   the same consideration -- that wasn't a new list you

19   presented today and we've had that similar list but,

20   importantly, the page that I'm referring you to, at that

21   point, we're showing a taxable deal might not be Armageddon

22   because it would have lower tax and there's NOLs to cover

23   it.  So in that -- given the environment we're in -- and

24   you've got me to the February DEC when the board looked it

25   -- there was no reason to look at all the negatives of a tax

1    because E very well may have supported a tax-free deal

2    because it could clearly cover the cost.  It -- you know,

3    here in this page, it's indicating that the -- it might be a

4    $2-1/2 billion gain and they were going to have $8 billion

5    of NOLs.  So, you know, they never got there but their

6    mindset was totally different saying that that threat of

7    taxable was not what it was.  That totally changed in the

8    end of May and that was what I'm trying to communicate.

9    Q    And in February, one of the reasons, I believe, that

10   the debtors are articulating that the T-firsts were not

11   pushed harder in negotiations or more cash -- or cash for

12   the step-up was not pushed was a fear that the T-firsts

13   would file a taxable plan, correct?

14   A    Yes, and that would have negative consequences,

15   potentially, to the E-Side.  It could limit optionality

16   which, by the way, we were still pursuing with the E-Side to

17   get -- at that point in time with the PUCT.  That would have

18   killed it if we went there.  That would have been a -- that

19   could have -- affect your full PAR recovery had we agreed to

20   go that way plus they took all the volatility risk

21   associated with -- if things change and, as your charts

22   indicate, the value of TCEH has been all over the map here.

23   If it goes the other direction, T would take that liability

24   and that was a bad -- those things, as we indicate on page

25   -- you had me there, you know, the tax consideration pages

1    still left us to not be willing to support a taxable deal

2    from T.  They would have been delighted if we made that

3    phone call.  Thinking of the E-Side risks, we decided not to

4    pursue it at that point in time but we're recognizing that

5    it might not be the Armageddon we were previously worried

6    about but there's still reasons not to do it.

7    Q    The plan filed by the T-first on May 19 did not seek

8    approval of any 363 transactions, did it?

9    A    I'm sorry, can you repeat --

10   Q    The T-first filed a plan on May 19th, correct?

11   A    Yes.

12   Q    And in connection with that plan, they did not seek

13   approval -- it didn't lay out a mechanism to obtain the

14   actions that were needed for EFH Corp. to act, did it?

15   A    I don't know, it -- I did not -- since we were not

16   pursuing that plan but in my mind, it was a valid plan that

17   would have had to go to the Court and then further be

18   developed on the specific action but it had things in there

19   like that they needed TMA if it was a taxable deal and it

20   outlined in some decent detail what the taxable plan would

21   look like but I'm not an expert whether it was fully

22   complete and, ultimately, the Court would have had to decide

23   what else needed to be litigated or included in that plan

24   but it certainly indicated to us that they were -- they had

25   thought about it and they were ready to go.  So I think it

1    was a substantive plan.

2         (Pause)

3    Q    Mr. Ying has worked as a central advisor for the

4    debtors throughout these cases, correct?

5    A    He is the debtors' financial advisor.

6    Q    And he has a very good understanding of the entire

7    picture and the negotiating dynamics at play, correct?

8    A    I don't know if he under -- he's not in all of the

9    negotiations but he certainly is the financial advisor.  He

10   knows what a financial advisor needs to know.

11   Q    And he knows enough that you believe -- the debtors

12   believe he'll be able to provide a valuation of reorganized

13   TCEH so he has to be under --

14   A    Yes, we relied upon his valuation, correct.

15   Q    And at his deposition, I asked Mr. Ying whether he had

16   an opinion -- whether or not he had an opinion as to whether

17   or not reorganized TCEH could offer it without the assets

18   and employees that would be transferred over to it and I was

19   referring to at -- those at Corporate Services and he

20   responded "Well, I know there were several hundred people

21   employed at Corporate Services.  I know that substantially

22   all of them worked and are the brains that constitute what

23   TCEH's operations.  So I believe TCEH wants and needs

24   Corporate Services and the assumption and the belief has

25   always been that the right home for substantially most of

1   the -- those people is at TCEH."  Is Mr. Ying's

2   understanding of what TCEH wants, reorganized TCEH will want

3   and need with regard to Corporate Services wrong?

4   A    Oh, I think it's incomplete.  It wasn't ever a question

5   of whether TCEH needed the functions.  They need the

6   functions.  The question was what the alternatives were to

7   create the functions or transfer the functions and what were

8   the risks and rewards associated with doing that versus an

9   alternative approach.  Just like E's were -- it -- you just

10  can't look at it in a vacuum.  I would never -- I would tell

11  you that E doesn't need corporate service and T does.  I

12  would agree with Mr. Ying in that simplistically but there's

13  way more to the analysis than that.

14  Q    And there's nothing in any board DEC that you're aware

15  of that describes EFH Corp. using TCEH's need as negotiating

16  leverage, is there?

17  A    I'm sorry, could you repeat?

18  Q    Sure.  You agree that there is some need for TCEH for

19  the assets and people that are in Corporate Services and my

20  review indicates that there's not a single board DEC where

21  the use of that need is developed into a plan to obtain

22  value for EFH Corp.  There's no negotiating plan to attempt

23  to have reorganized TCEH pay for that asset that they need,

24  is there?  Is it in a board DEC and we've missed it or it

25  just wasn't analyzed?

1   A    We analyzed it and that element of the plan is the same

2   as the one that all the creditors agreed to previously.

3   When we analyzed it, we talked to the -- you know, this was

4   a classic lose-lose negotiation and it would be that if you

5   threaten -- either T pays me money or what.  They create

6   their own functions.  They have the right to use the assets,

7   the procedures, the records so they just have to hire people

8   to do those functions.  Obviously, that is going to be

9   somewhat disruptive and have some costs.  Alternatively, if

10  E keeps it, they've just lost the 95 percent customers so

11  they have to effectively liquidate Corporate Services and

12  deal with severance and all the things associated with it.

13  So we, of course, brought out that it was a classic lose-

14  lose for both parties and at the end of the day, given the

15  analysis we went through, we thought it was in -- and, by

16  the way, a transition service agreement that also got, you

17  know, E services, you know, for what they needed so they

18  didn't have disruption costs that T was worried about.  When

19  we put all that together, given that this is a cost setter

20  and there's not value in cost setters, we thought this was

21  the appropriate balancing of interests and, ultimately, the

22  disinterested directors signed onto it but, yes, we talked

23  about all of that.

24  Q    And I think you've just summarized it very well.  You

25  -- throughout all of these evaluations, your goal and your

1    role as a fiduciary for all the estates was to obtain a

2    balancing of the interests, not to advocate for the best

3    outcome of any particular debtor, correct?

4    A    That certainly was the role I tried to play.  I had

5    advocates on my board that it was their role to then

6    determine whether it was a fair deal and to the extent that

7    people disagreed that it was a fair deal, they would need to

8    negotiate and that would have been a conflict matter.  I

9    think we treated all this, even though they weren't conflict

10   matters, because all sides saw the brilliance of my logic --

11   I'm under oath, they at least accepted my logic and -- but

12   we treated it as if it was one and got their concurrence and

13   agreement on those pieces but that -- that's fair.  I accept

14   the fact that I tried to come up with something that would

15   work for both party and benefit both estates since I'm an

16   officer at more than one.

17   Q    And EFH Corp., I believe that Mr. Young, if I'm

18   correct, is the only employee?

19   A    Chairman Evans, I think, is a executive chairman and

20   then there might be a secretary --

21   Q    Okay.

22   A    -- but, yes, it's a very small core team with those two

23   being far and away the vast majority of the expense.

24   Q    So neither Mr. Evans, the secretary that you're

25   referring to nor Mr. Young were personally involved in

1   negotiations with the T-firsts in connection with the second

2   plan, with -- during this calendar year, were they?

3   A    You'd have to ask them.  I'm not aware of what --

4   whether they had any negotiations as part of that.

5   Q    But you're not aware of any?

6   A    I am not aware of any.

7   Q    Any connection with the negotiations that took place

8   during this calendar year, to the extent there were any, Ms.

9   Evans did not roll up her sleeves and actually participate

10  in the direct negotiations with the T-first that you're

11  aware of, did she?

12  A    You mean Ms. Williamson?

13  Q    I'm saying -- excuse me, Ms. Williamson.

14  A    I -- I'm not aware of what Ms. Williamson did.  I am

15  aware -- the only thing I'm aware of is we presented the

16  logic and she had her advisors go through that, ask

17  questions, do their due diligence.  They made a

18  recommendation to her and she ultimately accepted it and

19  then she was in the -- you know, she indicated her support

20  for it among the board meeting when in the end of July we

21  went through all this rationale for the agreement but

22  whether her or her advisors had any direct dialog or

23  discussion as advocates, I don't know.

24  Q    And aside from any role that Proskauer may -- the

25  evidence may show that Proskauer played or didn't play,

1    you're not aware of any other advocates, direct advocates,

2    in the negotiations for EFH Corp., are you, that were not

3    doing what you were doing which is attempting to balance of

4    all estates?

5    A    Well, I think by the questions that came out of the

6    Proskauer group, I certainly think that they were acting

7    under -- as an advocate on behalf of Ms. Williamson or they

8    wouldn't have came at us with all the questions and analysis

9    that they required.  Their bill probably supports the amount

10   of time they put in as an advocacy role.

11   Q    If you could turn to the debtors' demonstrative No. 3?

12   A    I'm there.

13   Q    And if you could turn to the reference at the top of

14   the page to EFH Group NOLs, in fact, all of the NOLs are

15   owned by and controlled by EFH Corp. as the taxpayer.

16   They're not group property, correct?

17   A    Well, I don't want to make a legal determination but

18   there's only one taxpayer so there's -- yeah, EFH is the

19   only taxpayer so the only one that IRS recognized as having

20   NOLs.

21   Q    And if you could turn to the demonstrative No. 4?  When

22   you spoke in terms of the cost of approximately 16 million

23   -- and I've seen other numbers so there may be other

24   evidence of higher numbers later but you spoke in terms of

25   the cost of moving TCEH being approximately $16 million,

1    correct?

2    A     Yes.

3    Q     And that is a cost of -- I may have just mis-raised

4    your testimony but you were referring to the cost of

5    actually moving, not a total savings that would take place,

6    correct, as a result of a move or a total --

7    A     That was the cost of moving whether --

8    Q     I mangled that but go ahead.

9    A     I understood so we -- we're both in trouble.  That was

10   their cost of physically moving.  We did not assume, as you

11   can imagine, different deals where you move into different

12   space.  Some landlords put money toward tenant improvements

13   and offsetting move cost but that's just the gross, based on

14   our experience, cost of leaving Energy Plaza as tenants

15   which since they're month-to-month and -- they have the

16   right to do that.

17   Q     And since the base rent is prepaid, there's a benefit

18   to remaining in terms of the rent?

19   A     No, that -- they're taking an entity that without that

20   base rent is cash flow negative.  So their base rent that

21   they pay plus that -- the negative cash flow from EFH

22   Property Company gets us to a break-even.  So they

23   effectively -- you know, if you eliminate their income and

24   the expenses that EFH has, it's a zero cash flow entity.

25   They're not -- you know, they're effectively -- have a --

1    you know, whatever the number is, what these numbers

2    indicate, $4 million a year negative, they're taking that

3    and then with their rent, they bring it down to break even.

4    Q    So let's step away from the balance sheet itself.

5    They're -- the base -- you would agree with me that the base

6    rent has been prepaid on the building which is approximately

7    a million square feet?

8    A    Yes, and it's still running cash flow negative because

9    operating expenses aren't covered by rent.

10   Q    And we have an uncertainty.  You said it was cash flow

11   negative and it -- cash flow neutral and then may go

12   negative is what your testimony initially was today, right?

13   A    Well, the -- at the risk of trying to explain what I

14   was trying to say, if -- under the construct that we have,

15   if the EFH Properties goes to TCEH, TCEH will have an entity

16   which includes their rent that is cash flow neutral.  It's

17   like $4,000 a year so, effectively, the operating losses

18   that are on this page which would be what EFH Properties

19   would look like if E owned it would be offset if T owned it

20   by the T rent.  If T moves out of the building, E is stuck

21   with the losses.  So that's why when we evaluated it, we

22   said so E, if they keep it, has a $17 million negative now

23   if there's a four or $5 million rent deposit that they might

24   get back in 2022 which brought it down to 13, 14 million

25   negative and if TCEH moved, they have a $16 million

1    negative.  So, once again, by transferring it, I eliminated

2    the E negative and I gave T something that was break-even

3    cash flow that they were neutral to but they avoided a $16

4    million cost and E avoided the $14 million cost and that was

5    based on our best estimates of what this building would be

6    based on rent and market.

7    Q    If you could turn to Debtors' Exhibit 48?

8              THE COURT:  Which binder?

9              MR. PEDONE:  I -- I'm sorry, the debtors' binder

10   that they supplied today and, Your Honor, just briefly on

11   timing, I think I probably have another ten minutes of

12   questions and then I'd like to take a five-minute break and

13   probably wrap up within five minutes and --

14             THE COURT:  Okay.

15             MR. PEDONE:  -- that timing works.

16             THE WITNESS:  I'm there, Mr. Pedone.

17   BY MR. PEDONE:

18   Q    To be clear, the board debt that is attached was

19   prepared ahead of the board meeting on July 27th, 2016,

20   correct?

21   A    That's correct.

22   Q    And portions of it were drafted by counsel, correct?

23   A    Yes, I think the majority was drafted by counsel at the

24   direction of Ms. Dore and myself but, obviously, to the

25   extent there are numbers and facts, my team, my finance

Page 223

1    team, primarily supplied those to them but I think they had

2    the pen for the PowerPoint.

3    Q    And if you could turn in the same binder to Debtors'

4    Exhibit 57?

5    A    I'm there.

6    Q    Actually, I'll move on.

7            MR. PEDONE:  Actually, Your Honor, this would be a

8    good time to take a break, and I think I'll be able to wrap

9    up within five minutes.

10           THE COURT:  All right.  Take a short recess.

11        (Recessed at 4:49 p.m.; reconvened at 5:03 p.m.)

12           THE COURT:  Please be seated.

13           All right.  Yes, sir.

14           MR. PEDONE:  Your Honor, I'll pass the witness,

15   I'm complete.  Thank you.

16           THE COURT:  Okay, thank you.

17           MR. GLENN:  For the record, Your Honor, Andrew

18   Glenn, Kasowitz Benson Torres & Friedman, on behalf of

19   Contrarian Capital Management.  I don't have very long, I

20   should be very quick.

21                        CROSS-EXAMINATION

22   BY MR. GLENN:

23   Q    Mr. Keglevic, I believe you testified in response to

24   Mr. Pedone's questioning that EFH is the owner of the NOLs

25   for this corporate group, correct?

```
1    A    I trouble -- I struggle with the term "owner," but as

2    the taxpayer they are the only group that the IRS would

3    recognize as having NOLs.

4    Q    Fair enough.  And that was the case going into the

5    bankruptcy proceedings that we're here about today, correct?

6    A    Correct.

7    Q    And the global settlement agreement that you testified

8    earlier did not transfer ownership of the NOLs, correct?

9    A    Correct.

10   Q    So you testified earlier about one meeting that you've

11   had with what you've called e-creditors about an alternative

12   restructuring.  I believe that was in February of this year,

13   correct?

14   A    Correct.

15   Q    And the creditors you've identified are, and correct me

16   if I'm wrong, the PICs and the second liens, correct?

17   A    Correct.

18   Q    And those are creditors of EFIH, not EFH, correct?

19   A    Correct.

20   Q    And to date you're unable to testify as to any meetings

21   you've had with creditors of EFH as opposed to other E-Side

22   creditors about the disposition of the NOLs, correct?

23   A    Correct.  I believe EFH was invited to the meeting,

24   chose not to attend.  And I certainly took any phone calls,

25   but I did not reach out or have any personal meetings.  I'm
```

1   not aware of anybody -- somebody else may have.

2   Q    I wasn't and my clients were not invited to this

3   meeting.  Do you have a different understanding?

4   A    I didn't do the invitations.  My understanding was

5   Fidelity was invited.

6   Q    Fair enough.  But as you sit here today you can

7   identify no meetings that you've had or that EFH has had

8   with its creditors to decide or to determine what EFH

9   creditors want to do with the NOLs, correct?

10  A    Correct.  I just had the body of knowledge from the

11  prior plan and input from the creditors you mentioned.

12  Q    Thank you.  Now, you testified earlier in response to

13  Mr. Pedone's questioning that you relied on the E-Side's

14  creditors' participation in the Hunt plan as evidence of

15  their support for the treatment of the NOLs that you are

16  advocating in the T-Side plan today, correct?

17  A    Yes, that and I think, you know, we had a PSA early on

18  in the case which had a similar tax-free.  So it wasn't just

19  that plan, we had support from EFH creditors on a tax-free

20  deal every plan we submitted.

21  Q    Okay.  And -- but in particular, just so the record is

22  clear, you relied on their support of the Hunt transaction

23  as evidence of their support, the E-Side creditors' support

24  of a tax structure of the deal now before the Court,

25  correct?

1    A    As one of the pieces of evidence and prior agreements

2    that they entered into, yes.

3    Q    And you also testified -- again, correct me if I'm

4    wrong -- that in your view, because of that and because no

5    facts have changed, that that's one factor that you believe

6    would be appropriate to go forward with the NOL treatment in

7    the plan today, correct?

8    A    Well, I said there -- in the February time frame no tax

9    facts had changed, which encompasses NOL, so that was the

10   basis.  Clearly, in the end of May facts changed and NOLs

11   then at least had -- you know, there were going to be some

12   NOLs that went to EFH, which was a good thing.  There was no

13   doubt in my mind that EFH would have liked to have got more

14   NOLs at that point in time.  But I think as we evaluated

15   once again the balancing of interests between the two

16   parties, we thought they were both -- that incrementally EFH

17   was better off than TCEH because they shed risk, got an

18   incremental benefit.  TCEH got an incremental benefit, but

19   took extra risks to get it.

20   Q    Okay.  I understand that's your view --

21   A    That's my view.

22   Q    -- Mr. Keglevic, but what I'm trying to focus in on is

23   the E-Side creditors and what they did or didn't do in

24   relation to NOLs.  So again going back to your testimony

25   earlier today about the facts not changing between the last

1    Hunt deal and the deal today, I want to focus on that.

2            In the Hunt deal the NOLs, I believe you testified

3    were not of concern to the E-Side creditors and their

4    support of the tax agreement as part of that, correct?

5    A    That was my understanding, correct.

6    Q    Fair enough.  And what was the plan treatment for EFH

7    creditors in the Hunt transaction?

8    A    They were going to get paid at par.

9    Q    Okay.  So the treatment of the NOLs didn't affect the

10   EFH creditors' recovery in the Hunt plan, correct?

11   A    Under the prior IRS interpretation all of those NOLs

12   would have gone away, so it would never have affected their

13   recovery in any situation.

14   Q    Okay.  But you, sir, testified that your belief was

15   that because the EFH creditors supported the tax agreement

16   of the Hunt that somehow we can all assume that that would

17   be support of a different plan --

18   A    That was not --

19   Q    -- correct?

20   A    -- that's not the completeness of my testimony.

21   Q    Okay.

22   A    I said with respect to the NOLs no facts changed and

23   therefore until May 30th, regardless of if they kept all the

24   NOLs, it wouldn't have affected their recovery; they were

25   ambivalent to it from a recovery standpoint.  I'm not at all

1    suggesting that I'm not aware that they were getting par.

2    So when May came about and now potentially splitting the pie

3    differently could have increased their recovery, I

4    understood EFH's position, and in fact I reached out to Mr.

5    Strong and asked him what his position would be with respect

6    to change.

7    Q    Okay.  But just so again the record is clear, whereas

8    in the Hunt deal EFH creditors were agnostic to the

9    treatment of the NOLs, what is the current contemplation of

10   EFH creditor recoveries if the T-Side plan is approved and

11   the NextEra bid goes forward -- EFH?

12   A    They would not get par.

13   Q    Okay.  Isn't it significantly less than par?

14   A    It is depending on -- it depends on how -- yes, they

15   would get under the old deal, because they wouldn't have to

16   split with the TCEH, they would get a little bit more than

17   their cash balances.  Rough numbers, a couple hundred and

18   fifty million dollars that they'd have to split with the T-

19   Side.

20   Q    Okay.  So you would agree with me that the different

21   treatment of EFH creditors is a principal reason why EFH

22   creditors would want to obtain some value for the use of

23   their asset in the T-Side plan, correct?

24   A    Yeah, we certainly understood that and that's why I

25   reached out to the T-Side once the IRS made it clear.  My

1    only point of distinction here is we kept talking about

2    February, March, April, May, it didn't matter until May 30th

3    happened; May 30th happened.  I'm fully aware of why the E-

4    Side would want more, that's why we reevaluated it, that's

5    why we reached out to T.  But at the end of the day when we

6    looked at fundamentally the economics associated with

7    getting the deal you get, because the only way to get the

8    incremental $370 million benefit is to support this deal; if

9    you don't support that deal, you get no NOLs.

10   Q    Okay.  Now, you said you reached out to T after the IRS

11   ruling came down in the May time frame --

12   A    Yes.

13   Q    -- correct?  Okay.  So just so again the record is

14   clear, to whom did you reach out on the T-Side?

15   A    Jeff Strong at Apollo.

16   Q    Okay.  And that was the conversation I believe you

17   testified with Mr. McKane in which Mr. Strong said that he

18   -- in words and substance, he wouldn't give anything,

19   correct?

20   A    Correct.

21   Q    Okay.  But after that conversation and just so we're

22   clear, you never went back to the EFH creditors to ask what

23   they wanted to do, correct?

24   A    Well, no EFH -- for the record, no EFH creditor called

25   me from the date we filed the plan, still has not contacted

1    me or reached out, and certainly they have got ahold of me

2    in the past when they were unhappy or had a point of view.

3    But I did not specifically reach out primarily because I

4    thought it was clear what they would like to do:  they would

5    like to get more value than they got under the plan we

6    filed.  And we pursued that alternative and came to a

7    balanced approach that thought that by EFH trying to get

8    more -- by the way, my understanding and I think it was your

9    clients testified or you may have testified that you reached

10   out to TCEH and tried to do the same thing and got the same

11   answer.  So it was clear to us what your end game was.  We

12   just think at the end of the day that we're not going to get

13   the consent of T to that end game and we think that the IRS

14   ruling resulted in incremental economic benefit to E and,

15   for the reasons I stated, it's a fair deal for the E-Side.

16   Q    Okay.  So just so we're clear, you reached out to Mr.

17   Strong, he indicated to you in words or in substance that he

18   was not going to provide any value, but after that and in

19   response to that neither you nor anybody else representing

20   EFH attempted to throw down the gauntlet and say unless you

21   provide something for this we're not going to go forward?

22   You never tried to use whatever leverage you had to try to

23   get more on behalf of EFH creditors, correct?

24   A    Well, we evaluated that response and looked at the

25   sharing between the parties.  We thought there was little

Page 231

1   chance of getting to a deal and so therefore decided to go

2   forward with it, but after revisiting our position.

3   Q     Yes or no, sir, did you or did you not try to do that?

4   A     We concluded that we would not be successful in

5   reaching out to T, so we did not do that.

6   Q     Thank you very much.

7          MR. GLENN:  Nothing further.

8          THE COURT:  Mr. Hogan?

9          MR. HOGAN:  Just a few, Your Honor.

10                     CROSS-EXAMINATION

11  BY MR. HOGAN:

12  Q     Good afternoon, Mr. Keglevic.

13  A     Good afternoon.

14  Q     Dan Hogan on behalf of Fenick Fehy & Jones.  A couple

15  quick questions.

16          Again, the testimony relative to this reach-out to

17  the E-Side creditors in February of 2016, did those include

18  any of the asbestos creditors?

19  A     They were not in the meeting that I spoke to.

20  Q     And in terms of the treatment of those creditors,

21  nothing has changed in terms of the time between that

22  meeting and the change come May 1st when the new plan was

23  filed?

24  A     Well, the new plan always assumed that the asbestos

25  creditors would be paid, you know, that that obligation

1    would carry forward to the E estate.  Ultimately, it is

2    carried forward through the merger agreement, that in fact

3    NextEra has put aside $250 million to make sure there's

4    enough money to pay the creditors.  So I think consistently

5    with the plans that we have filed we have always made sure

6    that the asbestos creditors would be taken care of, either

7    that obligation would be adopted by E or passed along in

8    this case to NextEra, which the merger agreement suggests

9    that's the approach.

10   Q    I don't want to go too far down the rabbit hole on the

11   E-Side issues relative to the asbestos, but at the same time

12   since you bring it up, you mentioned this $250 million; how

13   was that number arrived at, if you know?

14   A    Negotiated --

15            MR. MCKANE:  Objection, Your Honor.

16            THE COURT:  Sustained.  We're not getting into

17   that.

18            MR. HOGAN:  Okay.  He brought it up, Your Honor,

19   I'm just trying to --

20            THE COURT:  He was answering --

21            MR. HOGAN:  -- make sure I understand.

22            THE COURT:  -- he was answering your question.  He

23   didn't bring it up, he was responding to a question asked.

24            MR. HOGAN:  I never mentioned anything about the

25   amount of an escrow or anything --

```
 1              THE COURT:  You asked about the treatment of

 2      asbestos creditors, he answered.

 3              MR. HOGAN:  No more questions.  Thank you.

 4              THE COURT:  Thank you.

 5              Anything else?  All right, how much redirect do

 6      you think you have?

 7              MR. MCKANE:  Yeah --

 8              THE WITNESS:  None.

 9          (Laughter)

10              MR. MCKANE:  If I say two questions --

11              THE COURT:  I think the client has spoken.

12              MR. MCKANE:  No, I understand, and he does call

13      the shots.

14          (Laughter)

15              THE COURT:  Here's the thing, if you're going to

16      take over half an hour --

17              MR. MCKANE:  No, not at all --

18              THE COURT:  Oh, all right.

19              MR. MCKANE:  -- absolutely not.

20              THE COURT:  We were going to wait until tomorrow,

21      but if you can do it in less than that we'll continue.

22              MR. MCKANE:  Oh, absolutely.

23              THE COURT:  Oh.

24              MR. MCKANE:  Just two questions -- or two areas.

25          (Laughter)
```

1                     REDIRECT EXAMINATION

2     BY MR. MCKANE:

3     Q    Mr. Keglevic, in response to questions from Mr. Pedone

4     you made a number of references to a black hole, the NOL is

5     going into a black hole; just to be absolutely clear for the

6     record, what do you mean by that?

7     A    Typically in bankruptcy, under IRS regulations that is

8     part of the restructuring that you don't have to pay for

9     CODI and all -- but use all the NOLs you have and they all

10    expire, they don't survive.  That's not the ruling we got.

11    Q    And was that your operative understanding from, using

12    the date that Mr. Pedone likes to use, January of this year

13    up through the end of May?

14    A    Yeah, I think it would be fair to say that throughout

15    this case up until May 30th that was everybody's

16    understanding as the likely outcome and in fact based on

17    information the IRS had preliminary given us that was their

18    position, but it shows you the fault of -- or the risk

19    associated with being in a private letter ruling process for

20    a long period of time:  we got a different group of people

21    that took a different interpretation of their regulations.

22    Q    And shifting topics, Mr. Glenn asked you a series of

23    questions about, you know, what would have happened if you

24    had used your leverage and essentially gone pencils down or

25    terminated a tax-free plan?  You know, as the CRO of the

1   debtors, based on your interactions with the TCEH first

2   liens, what would have happened in that scenario?

3   A    I think --

4           MR. GLENN:  Objection.  That calls for

5   speculation, what would have happened had he done something;

6   there's no foundation for that.

7           THE COURT:  Overruled, I think there is.

8           THE WITNESS:  Our concern was they would have

9   filed their taxable plan and we would have gone -- started

10  to go down the road of Armageddon or mini-Armageddon at

11  least, incurred a lot of cost, a lot of delay and maybe

12  ultimately the bad tax answer.

13  BY MR. MCKANE:

14  Q    And going down the path of mini-Armageddon, is there an

15  end date on the NextEra merger agreement?

16  A    Yes, it's -- if I recall, it's 240 days from the date

17  we signed the agreement that they can walk if it's not

18  consummated.

19          MR. MCKANE:  No further questions, Your Honor.

20          THE COURT:  All right.  Thank you, Mr. Keglevic.

21          MR. PEDONE:  Your Honor, may I ask one follow-up

22  question in response to a question Mr. Glenn asked --

23          THE COURT:  Yes.

24          MR. PEDONE:  -- very briefly?  Thank you.

25                       RECROSS-EXAMINATION

1   BY MR. PEDONE:

2   Q    You made a comment to Mr. Glenn about we concluded that

3   we would not be successful in connection with discussions,

4   revisiting discussions with the T-Firsts.  Who is the "we"

5   you're referring to?

6   A    Well, I think ultimately the board decided to go

7   forward as planned and not change approach.  So the board

8   concurred, but I had, you know, various levels of discussion

9   with the disinterested director/advisors, primarily I'd say

10  on the E-Side Mr. Thomas, who didn't see that there would be

11  a great opportunity to improve his client's position given

12  the circumstances as we laid out to the board.

13  Q    So specific --

14  A    So he was at least part of the "we."  I don't want to

15  speak for Ms. Dore, but I would guess she would testify that

16  she supported the approach as well, and then ultimately the

17  entire board supported it.

18  Q    Do you recall a meeting at which this decision was made

19  between you and Ms. Dore?

20  A    No, we didn't have any specific meeting that I recall,

21  but ultimately at the end of the day, when we got the -- we

22  presented to the board the facts associated with the new IRS

23  interpretation and our conclusion that we should stay the

24  path and not change.  So --

25  Q    Do you recall a meeting with the disinterested

1    directors where making this decision not to proceed was

2    considered at this time?

3    A    I don't know that it was a meeting.  I do recall having

4    a conversa -- I know Mr. Thomas asked about the T-Side

5    position and did due diligence around surviving EF -- you

6    know, so it was part of all of that.  Certainly he was aware

7    of my point of view on the T discussion.

8    Q    And you referred to a May 30th date in response to Mr.

9    McKane's question.  Is there a specific event that occurred

10   on May 30th or is that an approximate reference?

11   A    Yes, thank you.  It's probably more of an approximate

12   reference, but I think it's very close to that.  This is

13   when we, you know, got the IRS phone call that said that we

14   think we've come to the conclusion that CODI applies and

15   black hole does not.

16   Q    Thank you.

17           MR. PEDONE:  No further questions.  Thank you,

18   Your Honor.

19           THE COURT:  Mr. McKane, anything?

20           MR. MCKANE:  No.  I'd like to release the witness,

21   please.

22           THE COURT:  Okay, very good.  Thank you, Mr.

23   Keglevic.

24           THE WITNESS:  Thank you, Your Honor.

25           MR. MCKANE:  Your Honor, given the lateness of the

1   hour, we'd ask to start tomorrow with Mr. Muldavon (ph).

2           THE COURT:  Okay.

3           MR. MCKANE:  We've had -- I'll confer with Mr.

4   Pedone with regards to his time estimate.  He has given me

5   earlier time estimates that based on the written direct he

6   thought we'd be able to move Mr. Muldavon on fairly quick.

7   We are at this point in time going to try to possibly put on

8   three witnesses tomorrow:  Mr. Muldavon, Ms. Howard and then

9   Mr. Ying.  If we get to two, we understand that.  And then

10  if we don't get to Mr. Ying he'll be very disappointed

11  because he rode down -- took the train unnecessarily, but we

12  will then proceed with Ms. Williamson.

13          THE COURT:  So Muldavon, Howard, Ying.  And if you

14  don't get to Mr. Ying on Friday, it will be Ms. Williamson?

15          MR. MCKANE:  That's correct.

16          THE COURT:  Okay.

17          MR. PEDONE:  Just to be clear, Ms. Williamson will

18  not testify tomorrow under any circumstances?

19          MR. MCKANE:  Well, the hope is that we fill the

20  time with Mr. Ying, because the thought is that Mr. -- you

21  could get Mr. Ying up and off the stand because the vast

22  majority of his testimony is uncontroverted.

23          THE COURT:  Okay, all right.  I know which directs

24  to read tonight.  Very good.  Anything else before we

25  recess?

Page 239

1              All right.  So I'll -- court will start at 10:00,

2     I'll see you in chambers at 9:30.

3          (A chorus of thank you)

4          (Whereupon, these proceedings were concluded at 5:22

5     PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 240

```
 1                   I N D E X

 2

 3    WITNESSES              EXAM BY                    PAGE

 4    Paul Keglevic          Mr. McKane                  81

 5                           Mr. Pedone                 177

 6                           Mr. Glenn                  223

 7                           Mr. Hogan                  231

 8                           Mr. McKane                 234

 9                           Mr. Pedone                 236

10

11                   E X H I B I T S

12    PARTY       NO                                 EVID.

13    Debtors'    DX-1C                                171

14                DX-2                                 171

15                DX-3                                 171

16                DX-6                                 171

17                DX-19                                171

18                DX-22-24                             171

19                DX-25                                172

20                DX-26-27                             171

21                DX-31                                171

22                DX-35                                171

23                DX-44                                171

24                DX-45                                172

25                DX-47-49                             171
```

Page 241

| | | |
|---|---|---|
| 1 | DX-57-58 | 171 |
| 2 | DX-95 | 171 |
| 3 | DX-97 | 171 |
| 4 | DX-103 | 172 |
| 5 | DX-123 | 171 |
| 6 | DX-134 | 171 |
| 7 | DX-321 | 171 |
| 8 | DX-332 | 171 |
| 9 | DX-383-384 | 172 |
| 10 | DX-343-344 | 171 |
| 11 | DX-368 | 171 |
| 12 | DX-385 | 171 |
| 13 | DX-464 | 171 |
| 14 | DX-471 | 171 |
| 15 | DX-586 | 171 |
| 16 | DX-651 | 171 |
| 17 | DX-661 | 171 |
| 18 | DX-682-688 | 171 |
| 19 | DX-758 | 171 |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 242

1                    C E R T I F I C A T I O N

2

3    We, Sherri L. Breach, Penny A. Skaw, Dawn South, Linda S.

4    Foley, and Tracey Williams, certify that the foregoing

5    transcript is a true and accurate record of the proceedings.

Sherri Breach    Digitally signed by Sherri Breach
                 DN: cn=Sherri Breach, o=Veritext, ou,
                 email=digital@veritext.com, c=US
6    _____    Date: 2016.08.18 11:07:39 -04'00'

7    Sherri L. Breach

8    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

Pamela A. Skaw    Digitally signed by Pamela A. Skaw
                  DN: cn=Pamela A. Skaw, o=Veritext, ou,
                  email=digital@veritext.com, c=US
9    _____    Date: 2016.08.18 11:08:18 -04'00'

10   Pamela A. Skaw

Dawn South    Digitally signed by Dawn South
              DN: cn=Dawn South, o=Veritext, ou,
              email=digital@veritext.com, c=US
11   _____    Date: 2016.08.18 11:09:14 -04'00'

12   Dawn South

13   AAERT Certified Electronic Transcriber CET**D-408

Linda S. Foley    Digitally signed by Linda S. Foley
                  DN: cn=Linda S. Foley, o=Veritext, ou,
                  email=digital@veritext.com, c=US
14   _____    Date: 2016.08.18 11:10:09 -04'00'

15   Linda S. Foley

16   Approved Electronic Transcriber

Tracey Williams    Digitally signed by Tracey Williams
                   DN: cn=Tracey Williams, o=Veritext, ou,
                   email=digital@veritext.com, c=US
17   _____    Date: 2016.08.18 11:10:57 -04'00'

18   Tracey Williams

19   AAERT Certified Electronic Transcriber CET**152

20   Date:  August 17, 2016

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501