Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                          :

                                    :    Chapter 11

6   ENERGY FUTURE HOLDINGS          :

    CORP., et al.,                  :    Case No. 14-10979(CSS)

7                                   :

            Debtors.                :    (Jointly Administered)

8   _____ :

9

10

11

12

13                              United States Bankruptcy Court

14                              824 North Market Street

15                              Wilmington, Delaware

16

17                              August 18, 2016

18                              10:07 AM - 4:39 PM

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

1    Notice of Filing Third Amended Joint Plan of Reorganization

2    of Energy Future Holdings Corp., et al., Pursuant to Chapter

3    11 of the Bankruptcy Code [D.I. 9199; filed August 5th,

4    2016] (as may be further modified, amended, or supplemented,

5    the "Plan")

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach & Dawn South

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3        Attorney for the Debtors

4

5   BY:  BARACK ECHOLS, ESQ.

6        CHAD HUSNICK, ESQ.

7        MARK MCKANE, ESQ.

8        MICHAEL ESSER, ESQ.

9

10   RICHARDS, LAYTON & FINGER

11        Attorneys for the Debtors

12

13   BY:  DANIEL J. DEFRANCESCHI, ESQ.

14

15   POTTER ANDERSON CARROON LLP

16        Attorney for Deutsche Bank New York

17

18   BY:  R. STEPHEN MCNEILL, ESQ.

19

20   VENABLE, LLP

21        Attorneys for Pimco

22

23   BY:  JEFFREY S. SABIN, ESQ.

24        JAMIE EDMONSON, ESQ.

25

1    WHITE & CASE

2         Attorney for TCEH Ad Hoc Group

3

4    BY:  J. CHRISTOPHER SHORE, ESQ.

5

6    FOX ROTHSCHILD

7         Attorney for the Ad Hoc TCEH Noteholders

8

9    BY:  JEFFREY M. SCHLERF, ESQ.

10

11   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

12        Attorneys for the Ad Hoc Committee of TCEH First Lien

13        Creditors

14

15   BY:  ALAN W. KORNBERG, ESQ.

16        JACOB A. ADLERSTEIN, ESQ.

17        KELLIE CAIRNS, ESQ.

18        MOSES SILVERMAN, ESQ.

19

20   YOUNG CONAWAY STARGATT & TAYLOR, LLP

21        Attorney for the Ad Hoc Committee of TCEH First Lien

22        Creditors

23

24   BY:  PAULINE K. MORGAN, ESQ.

25

1   PACHULSKI STANG ZIEHL & JONES

2       Attorney for EFIH Second Lien Noteholder

3

4   BY:  LAURA DAVIS JONES, ESQ.

5

6   SULLIVAN & CROMWELL

7       Attorney for E-Side Committee

8

9   BY:  BRIAN GLUECKSTEIN, ESQ.

10

11  NIXON PEABODY

12      Attorney for AST as EFH Indenture Trustee

13

14  BY:  GEORGE SKELLY, ESQ.

15       RICHARD PEDONE, ESQ.

16       ERIK SCHNEIDER, ESQ.

17       MORGAN NIGHAN, ESQ.

18

19  MCELROY DEUTSCH MULVANEY & CARPENTER LLP

20      Attorney for TCEH Debtors - Conflict counsel

21

22  BY:  DAVID A. PRIMACK, ESQ.

23

24

25

1   MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

2        Attorney for E-Side Committee

3

4   BY:  MARK A. FINK, ESQ.

5

6   MORRIS JAMES

7        Attorney for Law Debenture

8

9   BY:  STEPHEN MILLER, ESQ.

10

11  MUNGER, TOLLES & OLSON

12        Attorney for TCEH Debtors - Conflict Counsel

13

14  BY:  TOM WALPER, ESQ.

15

16  SEWARD KISSEL, LLP

17        Attorney for Wilmington Trust as TCEH First Lien

18        Agent

19

20  BY:  ARLENE ALVES, ESQ.

21        MARK KOTWICK, ESQ.

22

23

24

25

1   KLEHR HARRISON HARVEY BRANZBURG LLP

2        Attorney for UMB Bank, Indenture Trustee

3

4   BY:  RAYMOND H. LEMISCH, ESQ.

5

6   AKIN GUMP STRAUSS HAUER & FELD

7        Attorney for UMB Bank, Indenture Trustee

8

9   BY:  CHRISTOPHER CARTY, ESQ.

10

11   PATTERSON BELKNAP

12        Attorney for Law Debenture Trust Company

13

14   BY:  DANIEL LOVENTHAL, ESQ.

15

16   PROSKAUER ROSE

17        Attorney for EFH Corp.

18

19   BY:  PETER YOUNG, ESQ.

20        MARK THOMAS, ESQ.

21        MICHAEL FIRESTEIN, ESQ.

22

23

24

25

Page 8

1   REED SMITH, LLP

2        Attorneys for EFCH 2037 Notes Trustee

3

4   BY:  SARAK KAM, ESQ.

5

6   MORRISON & FOERSTER, LLP

7        Attorneys for TCEH Committee

8

9   BY:  BRETT MILLER, ESQ.

10       ERICA RICHARDS, ESQ.

11

12  CROSS & SIMON, LLP

13       Attorneys for EFH Indenture Trustee

14

15  BY:  CHRISTOPHER SIMON, ESQ.

16       KEVIN MANN, ESQ.

17

18  HOGAN MCDANIEL

19       Attorneys for Fenicle, Fehy & Jones

20

21  BY:  DANIEL K. HOGAN, ESQ.

22       GARVAN MCDANIEL, ESQ.

23

24

25

1   DRINKER, BIDDLE & REATH, LLP

2        Attorneys for Citibank, DIP Agent

3

4   BY:  HOWARD A. COHEN, ESQ.

5

6   BIELLI & KLAUDER

7        Attorneys for EFH Corp.

8

9   BY:  DAVID KLAUDER, ESQ.

10

11   ASHBY & GEDDES

12        Attorneys for WSFS

13

14   BY:  RICARDO PALACIO, ESQ.

15

16   BROWN RUDNICK

17        Attorneys for WSFS

18

19   BY:  JONATHAN MARSHALL, ESQ.

20

21   KASOWITZ BENSON TORRES & FRIEDMAN, LLP

22        Attorneys for Fenicle, Fehy & Jones

23

24   BY:  ANDREW GLENN, ESQ.

25

1    FRIED FRANK

2         Attorneys for Fidelity

3

4    BY:  GARY KAPLAN, ESQ.

5         ALICIA AIN, ESQ.

6         MATT ROOSE, ESQ.

7

8    UNITED STATES DEPARTMENT OF JUSTICE

9         Attorneys for U.S. Trustee

10

11    BY:  RICHARD L. SCHEPACARTER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           THE CLERK:  All rise.

3           THE COURT:  Please be seated.

4           All right, go ahead, Mr. McKane.  Good morning.

5           MR. MCKANE:  Good morning, Your Honor, Mark McKane

6    of Kirkland & Ellis on behalf of the debtors, with two just

7    preliminary issues before we return to the witnesses.

8           First, we have an announcement with regards to a

9    resolution.  The 2037 notes have been able -- we have been

10   able to reach a resolution of their treatment and we will be

11   incorporating that I believe into the order.  So we would

12   put it both in the confirmation order and in an amended

13   version of the plan that will be forthcoming.

14          At this time we would just like to thank all of

15   the parties involved in working out this issue, including

16   the TCEH first liens, the TCEH ad hoc unsecured group, as

17   well as obviously the counsel for the holders of the 2037

18   notes of Reed Smith; very constructive and we're very

19   grateful that we were able to work this through.

20          There's also a confidentiality issue, Your Honor,

21   that we'd like to raise.  There are -- today we'll be

22   addressing certain tax issues, including submissions that

23   had been made to the IRS that contain confidential

24   information and that were treated confidential by the IRS.

25   As a result, we have worked with the other parties in the

1    case to develop slightly redacted versions of the

2    submissions.  The submissions, the exhibit numbers that

3    contain this confidential information are both the final

4    private letter ruling that was entered, as well as two

5    submissions to the IRS as well, they are Exhibit Nos. 343,

6    360 and 363.  343 is already in evidence, 360 and 363 are

7    not in evidence yet, but will be going in today I believe.

8             And so what we have worked with the other parties

9    to do is to provide redacted versions of this that protect

10   the confidential information.  My understanding is there are

11   no objections to having just the redacted forms be admitted

12   into evidence and we'd provide revised versions of the

13   proposed exhibits to Your Honor and Your Honor's staff.

14   We've already provided them to opposing counsel for

15   admission when they go in.

16             THE COURT:  Okay.  So we're going to need to swap

17   out 363 --

18             MR. MCKANE:  Yes, sir.

19             THE COURT:  -- to have what's in evidence be the

20   redacted version?

21             MR. MCKANE:  That's correct, Your Honor, if that's

22   acceptable to the Court.  It's acceptable -- it's -- I

23   understand there's no objection from the parties.

24             THE COURT:  All right, very good.  That's fine.

25             MR. MCKANE:  Thank you, Your Honor.

1          (Pause)

2               MR. MCKANE:  Your Honor, also with regards to the

3     submissions to the IRS there are going to be a series of

4     them that are going to be moved into evidence by I believe

5     the EFH indenture trustee.  The debtor has no objection to

6     what they're moving in; they are what they purport to be.

7     So there's no need to lay a foundation with Ms. Howard and

8     that will help I think shorten her examination.

9               THE COURT:  Okay.

10              MR. MCKANE:  With that, Your Honor, I'll cede the

11    podium to my partner Mr. Michael Esser.

12              THE COURT:  Okay.

13              MR. ESSER:  Good morning, Your Honor.

14              THE COURT:  Good morning.

15              MR. ESSER:  Mike Esser, Kirkland & Ellis, for the

16    debtors.  At this time, Your Honor, we are prepared to call

17    Kristopher Moldovan.

18              THE COURT:  Okay.

19              MR. ESSER:  And we do call Mr. Kristopher Moldovan

20    to the stand.

21              THE COURT:  Mr. Moldovan, if you'd just take the

22    stand and remain standing, please, for your affirmation.

23              THE CLERK:  Please raise your right hand.

24               KRISTOPHER MOLDOVAN, WITNESS, AFFIRMED

25              THE CLERK:  Please state and spell your name for

1    the record.

2                  THE WITNESS:  Kristopher Moldovan,

3    K-R-I-S-T-O-P-H-E-R  M-O-L-D-O-V-A-N.

4                  THE CLERK:  Thank you.

5                  THE COURT:  Thank you, sir.

6                  THE WITNESS:  Good morning.

7                  THE COURT:  Good morning.  If you could just slide

8    up to the microphone?  Thank you.

9                       DIRECT EXAMINATION

10   BY MR. ESSER:

11   Q    Good morning.

12   A    Good morning.

13   Q    Sir, could you please state your name for the record?

14   A    Kristopher Moldovan.

15   Q    Mr. Moldovan, do you hold a position with the debtors?

16   A    I do.  I'm the assistant treasurer of every debtor

17   other than Energy Future Holdings Corp.

18   Q    Do you also hold a position with any non-debtor

19   affiliates of the debtors?

20   A    I do.  I'm the assistant treasurer of EFH Properties

21   Company and Basic Resources, Inc., among other non-debtors.

22   Q    How long have you held your current positions?

23   A    Since April of 2010.

24   Q    Have you held any other positions with the company

25   prior to your current position?

1  A    Yes.  I was senior counsel in the legal department from

2  October 2006 through April 2010.

3  Q    And have you testified in these cases before?

4  A    I have.  I testified in the first lien make-whole

5  trial.

6  Q    Well, welcome back.

7  A    Thank you.

8  Q    Mr. Moldovan, did you prepare a declaration in

9  anticipation of your testimony here today?

10  A    I did.

11  Q    Have you prepared a revised declaration after

12  submitting your original declaration?

13  A    I have.

14        MR. ESSER:  Your Honor, if I may approach?  I've

15  got witness binders for both you and your staff.

16        THE COURT:  Thank you.

17     (Pause)

18        THE COURT:  Thanks.

19  BY MR. ESSER:

20  Q    Mr. Moldovan, could you please turn to the tab labeled

21  Moldovan Declaration?

22  A    I'm there.

23  Q    Is this your revised declaration?

24  A    It is.

25  Q    How does this revised declaration differ from your

1    original declaration submitted?

2    A    When I signed the original declaration to the best of

3    my information and belief, I did not believe that EFH

4    Properties had ever made a payment to reduce a receivable it

5    had with EFH Corp.  After I signed and this declaration was

6    submitted, upon preparing for my examination today I learned

7    that there was one payment made in August 2009.

8    Q    Have there been any payments since that original

9    payment?

10   A    No.

11   Q    And is that change reflected on page 7 of your revised

12   declaration?

13   A    There's a deletion of the sentence that said "No

14   payment has ever been made," that's correct.

15   Q    Now, is all other information contained in this

16   document true and accurate to the best of your knowledge?

17   A    Yes.

18          MR. ESSER:  Your Honor, we had received some

19   evidentiary objections to Mr. Moldovan's declarations --

20   declaration, but I believe we have resolved them with the

21   following caveat.  The EFH indenture trustee objected to

22   paragraphs 21, 23 and 28 as hearsay, but we have resolved

23   that objection with the following statement:  "We've agreed

24   to admit them for their effect on the listener as statements

25   informing the debtors' decision-making process."

1           So, Your Honor, with that proviso, we move Mr.

2    Moldovan's revised written declaration into evidence.

3           THE COURT:  Any objection?

4           MR. PEDONE:  No, Your Honor.

5           THE COURT:  It's admitted.

6       (Debtors' Exhibit Moldovan Declaration admitted)

7    BY MR. ESSER:

8    Q    Mr. Moldovan, where does EFH Properties sit in the

9    company's corporate organizational structure?

10   A    EFH Properties is a wholly owned subsidiary of Energy

11   Future Holdings Corp.

12   Q    Does EFH Properties itself have any subsidiaries?

13   A    It does.  Basic Resources, Inc. is a wholly owned

14   subsidiary of EFH Properties Company.

15   Q    What is the principal function of Basic Resources,

16   Inc.?

17   A    Basic Resources, Inc. holds what remains of the active

18   patents that the company has and has a few patent

19   applications as well.

20   Q    Does the company ascribe any value to these patents?

21   A    No, it does not.

22   Q    Why not?

23   A    The patent application -- the patents that it's had,

24   there's been no value ascribed either from the accounting or

25   the business groups and in fact, because the costs of

1    renewal exceeds the value company believes, over time we've

2    been letting the patents expire when the renewals come.  And

3    that is our plan going forward with the remaining active

4    patents is as they come, the plan is to let them expire

5    rather than pay to renew them.

6    Q    What is the principal function of EFH Properties

7    Company itself?

8    A    It's the lessee of record for the entire Energy Plaza

9    Building, which is the headquarters of Energy Future

10   Holdings Corp. and its competitive subsidiaries.

11   Q    Sir, did you help prepare a demonstrative to aid your

12   testimony today?

13   A    I did.

14   Q    Could you turn to Tab Moldovan 1 in your binder?

15        (Pause)

16   Q    Is this that demonstrative?

17   A    It is.

18   Q    Sir, when was the Energy Plaza lease first executed?

19   A    February 14th, 2002.

20   Q    Can you please describe the transaction that led to the

21   execution of the lease?

22   A    Sure.  That was executed in connection with a sales

23   leaseback.  At the time, EFH Properties was known as TXU

24   Properties.  It owned the building; it sold the building to

25   an affiliate of Zurich Structured Finance.  Zurich

1    Structured Finance financed it in a leveraged -- there was a

2    leveraged lease, they financed it with the pro --

3    principally with the proceeds of debt that was issued to

4    certain insurance companies, including Prudential Insurance

5    Corporation.  And then the affiliate of Zurich Structured

6    Finance who bought the building leased it back to TXU

7    Properties and again leased the entire building to them.

8    Q    Can you please describe the rent obligations under the

9    lease?

10   A    Yeah, the lease requires both basic rent -- basic rent

11   is fixed, semi-annual rent -- those rent amounts are equal

12   to the principal and interest payments on the debt.  The

13   lease agreement also requires supplemental rent, which is

14   variable rent and is paid almost daily.

15   Q    At the time of execution, did the lease require a

16   guaranty of these rental payments?

17   A    It did.  At the time of execution TXU Corp., which is

18   now EFH Corp., provided a guaranty of all obligations of EFH

19   Properties Company, including its payment obligations.

20   Q    Were any other guaranties given after that?

21   A    Yes.  In May, 2002 TXU Europe, which was a wholly owned

22   subsidiary of EFH Corp., filed for administration in England

23   and Wales.  As a wholly owned subsidiary of the guarantor,

24   that filing resulted in a lease event of default.  In

25   connection with that the company sought to get a waiver from

1    the counterparties, the lessor and the noteholders, for that

2    lease event of default.  In order to obtain that waiver, the

3    counterparties required an additional guaranty be provided

4    from an investment grade-rated company.  That guaranty at

5    the time was provided by TXU Energy Company, which is now

6    known as TCEH.  It was investment grade-rated at the time

7    and it provided a second guaranty of all obligations of the

8    lease.

9    Q    What happened to the guaranties after that?

10   A    In February of 2007, the LBO was announced and all the

11   debt related to the LBO was announced and the rating

12   agencies downgraded, subsequently downgraded TCEH to below

13   investment grade.  The terms of that guaranty required that

14   either a third guaranty be provided from another investment

15   grade-rated corporation or a qualified letter of credit as

16   defined in the lease documentation be provided as security,

17   or else there would be a lease event of default.

18   Q    What did the parties do?

19   A    Well, first the parties analyzed whether we could find

20   an investment grade-rated corporation to provide a guaranty;

21   the company could not find one to do that.  The company

22   looked at the documents and determined that the provisions

23   related to qualified letter of credit were not sufficient

24   for providing a letter of credit the size that was going to

25   be required.  It was not well thought out when it was

1    drafted in 2002.

2           So the company sought to negotiate amendments to

3    the documents and worked with the counterparties for several

4    months, and ultimately amended all of the lease

5    documentation and provided a letter of credit from TCEH to

6    the counterparties to secure its obligations.  And at the

7    time that it provided the letter of credit we were able to

8    obtain the release of the guaranties from EFH Corp. and

9    TCEH.

10   Q    What happened to the letter of credit after 2007?

11   A    Yeah, the letter of credit was issued by JP Morgan, who

12   at the time met the criteria of an acceptable bank.  An

13   acceptable bank required certain ratings of the bank that

14   was issuing the letter of credit.  As we got into 2008 and

15   2009, JP Morgan resigned as a letter of credit issuer under

16   TCEH's credit facility.  The -- after that resignation and

17   as the letter of credit was about to come up for renewal, JP

18   Morgan sent the notice of nonrenewal.  When that was sent,

19   that allowed the company a certain period of time to provide

20   a replacement letter of credit from an acceptable bank and

21   the company sought to do that.  Unfortunately, the company

22   did not have any letter of credit issuers available to it

23   that met the definition.

24           And then it sought -- and so because it could not

25   give a letter of credit from an acceptable bank it sought to

1    amend the documents again with the counterparties so that

2    they would accept the letter of credit from Citibank, who

3    just barely missed those qualifications.  And after a

4    proposal was made, the counterparties considered it and

5    informed the company that they would not be accepting the

6    letter of credit from Citibank.

7    Q    What happened next?

8    A    As soon as the period ran where the company had the

9    right to provide a letter of credit, once that ran, very

10   shortly thereafter the beneficiary of the letter of credit

11   drew on the full amount of the letter of credit, which was

12   approximately $115 million.

13   Q    Have you prepared a demonstrative exhibit to aid your

14   explanation of this transaction?

15   A    I have.

16   Q    Could you please turn to D-DEM Moldovan 2 in your

17   binder.

18   A    Okay.

19   Q    Could you please walk the Court through how the company

20   accounted for this letter of credit draw?

21   A    Sure.  There was a reduction of restricted cash at TCEH

22   that came out of a TCEH restricted cash account and then

23   there was a payable put on the books and records, a payable

24   and receivable, a payable from EFH Corp. to TCEH for that

25   approximately $115 million.  There was a corresponding

1   payable and receivable put on the books of EFH Properties

2   and EFH Corp.; it was a payable from Properties to Corp. of

3   the same amount, approximately $115 million.  And then EFH

4   Properties had an increase in its prepaid rent.

5   Q    At that time were these intercompany payables and

6   receivables memorialized in any formal loan agreements or

7   notes?

8   A    No, they were just put on the accounting books as an

9   intercompany payable/receivable.

10  Q    What happened to the payable between EFH Corp. and

11  TCEH?

12  A    Yeah, later in 2009 that payable was incorporated into

13  an SG&A note that was outstanding from EFH Corp. to TCEH.

14  At the time the interest rates were the same and so the

15  amount was incorporated into that note.  And then subsequent

16  to that, over time that SG&A note was repaid in full,

17  including the amount that was incorporated from this

18  payable.

19  Q    Have there been any payments on the payable between EFH

20  Properties and EFH Corp?

21  A    Yeah, as I said earlier, there was one payment in

22  August 2009, but there have been none since then.

23  Q    Does the company currently forecast to make any

24  payments on account of it?

25  A    No.

1    Q     What is the approximate balance of that payable today?

2    A     It's approximately $158 million.

3    Q     Thank you.

4          How did EFH Properties' rent obligations change

5    after the draw on the TCEH letter of credit?

6    A     The amount of the TCEH letter of credit was equal to

7    the undiscounted base rent payments from that period through

8    the end of the lease, plus $5 million.  Those amounts were

9    put into accounts at the servicer of the debt and the base

10   rent payments, which are made semi-annual again in the

11   amounts of the debt payments, are now drawn from those

12   accounts and made with money drawn from those accounts.  And

13   EFH Properties therefore no longer makes any base rent

14   payments unless -- it still does have an obligation if for

15   some reason the servicer wouldn't withdraw, it still would

16   have an obligation to make the base rent payments, but

17   otherwise it has effectively prepaid the base rent payments

18   through the end of the term.

19   Q     EFH Properties control those escrow accounts?

20   A     No.  In fact the -- one of the documents signed when we

21   amended the documents in 2007 EFH Properties specifically

22   disclaims any interest at all in those accounts.

23   Q     I'd like to shift gears a bit.  What is the primary

24   source of EFH Properties' cash flow?

25   A     Rent from subtenants offset by the expenses to run and

1   maintain the building.

2   Q    Have you prepared a demonstrative on this issue?

3   A    I have.

4   Q    Could you turn to Moldovan 3 in your binder?

5   A    Okay.

6   Q    Please walk the Court through EFH Properties' primary

7   subtenants?

8   A    Yeah, the primary subtenants are EFH Corporate

9   Services, the Federal Deposit Insurance Corporation, and

10  Oncor Electric Delivery Company.

11  Q    Does Oncor sublease its space?

12  A    It does.  Oncor does not occupy any space in Energy

13  Plaza anymore; it has sub-subleased its space to Luminant.

14  Q    I don't see TXU Energy listed as a subtenant here; why

15  is that?

16  A    TXU -- at the time of the LBO, TXU Energy moved to a

17  building outside of downtown Dallas at a suburban campus and

18  it inhabits that building plus another customer operations

19  facility.

20  Q    About how long of a drive is that from Energy Plaza?

21  A    Oh, depending on the time of day, it's probably 20 to

22  30 minutes.

23  Q    Would you please walk the Court through when each

24  sublease expires?

25  A    Yeah.  The Corporate Services sublease has already

1   expired, it expired in 2004; it's now on a month-to-month

2   arrangement.  The FDIC sublease expires in November 2017,

3   and the Oncor sublease expires in March 2017, and then of

4   course the Luminant sub-sublease expires at the same time as

5   the Oncor sublease in March of 2017.

6   Q    How about the EFH Properties master lease?

7   A    It expires in February 2022.

8   Q    So there are five and a half years left?

9   A    Approximately.

10  Q    What are EFH Properties' expenses other than base rent?

11  A    Again, it's got supplemental rent.  Supplemental rent

12  is all-inclusive of both operating and maintaining a Class A

13  building in downtown Dallas, as well as it has the

14  supplemental rent covers, the expenses -- the annual and

15  period expenses of the counterparties to the lease,

16  including the servicer, the indenture trustee, the

17  owner/lessor, the noteholders, their counsel.

18  Q    Could you please give the Court some example of the

19  cost to operate the building?

20  A    Yeah.  The operating expenses include janitorial,

21  security, property -- we have an outside property manager,

22  we have an internal facilities group, it includes utilities.

23  I think those are the -- property taxes -- those are the

24  primary.

25  Q    Does EFH Properties receive any reimbursement at all

1    from the owner/lessor for these costs?

2    A    No and, again, in fact all the costs that the

3    owner/lessor and the other counterparties have EFH

4    Properties actually reimburses them, not the opposite.

5    Q    Are any floors currently vacant at Energy Plaza?

6    A    Yes, four floors are entirely vacant and several other

7    floors have partial vacancy.

8    Q    How does the remaining duration of the lease impact

9    your ability to sublease the space?

10   A    Well, there's only five and a half years until the

11   duration of the lease and to attract significant subtenants

12   that's a very short time.  The time it takes to fix the

13   space for their specifications and for them to move, they'd

14   probably actually have less than five years; that's actually

15   very expensive.  So our experience is it's been very

16   difficult to lease given the short duration of the remaining

17   tenure of the lease.

18   Q    Have the debtors spent any efforts to assess moving to

19   alternative office space?

20   A    We have.  Before the LBO, in 2006 and 2007 we sought to

21   move the headquarters and in fact signed a lease at a

22   building in -- another building in the downtown Dallas area

23   to move our headquarters.  That -- we never did end up

24   moving to that location, but had that lease in place

25   throughout the term until we were able to terminate.  And

1   then again in 2014 and 2015, we engaged Jones Ling LaSalle

2   to find alternative space and toured and went through a

3   significant process to locate an alternative space.

4   Q    Has EFH Properties ever approached the current

5   owner/lessor in an attempt to restructure the lease

6   documents?

7   A    We did.  In 2014, late 2014, given the fact that being

8   a landlord is not a core business of either the E-side or

9   the T-side, we approached the current owner of the building.

10  We offered to convert the lease that EFH Properties had from

11  a lease of the entire building that was responsible for

12  everything in the building, so just a more typical landlord-

13  tenant relationship.  We would transfer the obligations and

14  the upside of the building back to the owner where we

15  thought it was more appropriate, especially given the fact

16  that we are not -- EFH Properties is not able to sublease

17  beyond 2022, whereas the owner of the building has an

18  interest in keeping tenant beyond that date, it will own the

19  building after the lease of the entire building expires.

20  And we would assign them all the subleases, that they were

21  getting all the sublease rent.  We would enter into a lease

22  with them and then again they would then control the ability

23  to sublease the vacant space and to negotiate with the FDIC

24  beyond the 2022 expiration date that we have on our lease.

25          MR. PEDONE:  Objection.  Move to strike the

1    statements with regard to the ability to sublease beyond the

2    expiration date; it calls for a legal conclusion.

3              THE COURT:  No, I think -- I don't think it

4    requires a legal conclusion.  I think he can answer that

5    based on his experience, so overruled.

6    BY MR. ESSER:

7    Q    I just want to understand this:  the company proposed

8    that the landlord take on the costs of running the building?

9    A    That's correct.

10   Q    And in turn the landlord would receive all rents going

11   forward?

12   A    That's correct.

13   Q    How did the landlord respond to this proposal?

14   A    Well, we sent them a term sheet.  There was an initial

15   cursory response.  We responded to that term sheet, we

16   didn't get a response for some period of time, and then they

17   came back and declined to engage in any future discussions

18   and informed us that they wanted to maintain the status quo.

19   Q    Are you familiar with the EFH Properties' financial

20   forecast about which Mr. Keglevic testified yesterday?

21   A    I am.

22   Q    Does that forecast include assumptions about whether or

23   not the FDIC will renew all floors currently under lease

24   when its lease expires in 2017?

25   A    It does include an assumption and assumes that they

1    will not renew all of the floors that they're currently

2    subleasing.

3    Q    Why does it include that assumption?

4    A    FDIC has sent us a request for proposal for 13 to 14

5    floors; they currently occupy 21 floors.

6    Q    Does that forecast include assumptions about whether or

7    not Oncor will renew its sublease when it expires in March

8    of 2017?

9    A    It does include an assumption and it assumes that Oncor

10   will not renew any portion of its sublease.

11   Q    Why is that assumption in that forecast?

12   A    Well, Oncor doesn't occupy any of the space, it sub-

13   subleases to Luminant.  That sub-sublease, that arrangement

14   that Oncor has entered into has done so at a loss of

15   approximately $1.1 million a year.  So there's no reason to

16   believe that they would continue to extend that loss.

17   Q    So Oncor pays more in sublease rent than it receives

18   from its sub-sublease to Luminant?

19   A    Yeah, it pays more to EFH Properties than it receives

20   from Luminant by approximately $1.1 million per year.

21   Q    If EFH Properties loses these subtenants, will there be

22   any large reductions in expenses at Energy Plaza?

23   A    No.  There will be slight reductions for utilities and

24   janitorial, but all the other costs including the outside

25   property management, the inside facilities department, the

1    property taxes, the capital expenditures, those all remain

2    the same.  So it will be very -- there will be a very small

3    reduction.

4    Q    What are some examples of the overhead costs or capital

5    expenditures that EFH Properties would still have to pay?

6    A    Yeah, EFH Properties, again, is responsible for

7    maintaining the building as a Class A building.  So it's got

8    to maintain the roof -- there's multiple roofs on the

9    building given its structure, there's a separate parking

10   garage that it has to maintain and repair, there's a number

11   of elevators, escalators, there's the HVAC system, cooling

12   towers, chillers; there's the sidewalks, there's a plaza in

13   front, there's -- you know, it has to upkeep the building,

14   again, as a Class A building in Dallas.

15   Q    Shifting gears a little bit.  Are you aware that the

16   plan contemplates that EFH Corp. will contribute its equity

17   interests in EFH Properties to reorganize TCEH?

18   A    I am.

19   Q    What is your understanding of what EFH Corp. is

20   conveying and what EFH Corp. is receiving through this

21   transaction?

22   A    Well, again, EFH Corp. is going to transfer the equity

23   interests to reorganize TCEH, but immediately prior to the

24   transfer all cash that is at EFH Properties, which is

25   anticipated to be approximately $14 million, will be

1   distributed or otherwise transferred to EFH Corp. or one of

2   the E-side entities designated by EFH Corp. and some

3   intercompany payables from EFH Properties to EFH Corp. will

4   be cancelled before that transfer.

5   Q    Have you assisted with the preparation of any board

6   presentations on this subject?

7   A    I have.

8   Q    Can you please turn to Tab DX-57 in your witness

9   binder?

10      (Pause)

11  Q    Do you recognize this document?

12  A    I do.

13  Q    What is this document?

14  A    This is the presentation that was prepared in advance

15  of the board meeting and presented at the board meeting on

16  July 22nd, 2016.

17  Q    Did you provide and put on this presentation?

18  A    I did.

19  Q    Could you please turn to page 10 of the presentation?

20  A    Okay, I'm there.

21  Q    Did you provide input on this portion of the

22  presentation?

23  A    I did.

24  Q    When did you provide your comments?

25  A    In advance of the meeting, my last set of comments were

1    submitted right before this presentation was sent to the

2    board, which would have been the day before the board

3    meeting.

4    Q    Can you please turn to Tab DX-48 in your witness

5    binder?

6         (Pause)

7    A    I'm there.

8    Q    What is this document?

9    A    This is a presentation that was prepared for a board

10   meeting that occurred on July 27th, 2016.

11   Q    Did you provide input on this presentation?

12   A    I did.

13   Q    Can you please turn to page 21?

14   A    I'm there.

15   Q    Did you provide input on this part of the presentation?

16   A    I did.

17   Q    Did you provide multiple rounds of edits?

18   A    I did.

19   Q    When did you provide your final comments?

20   A    Again, my final comments were provided very shortly

21   before the materials were sent to the board, which would

22   have been the day before the board meeting.

23   Q    In advance of a July 27, 2016 board meeting, did you

24   meet with any of the disinterested directors of EFH

25   regarding EFH Properties?

1    A     I did; I met with Billie Williamson.

2    Q     Who requested that meeting?

3    A     Billie Williamson.

4    Q     When was that meeting held?

5    A     It was held on the morning of the 27th.

6    Q     About how long did it last?

7    A     Approximately an hour.

8    Q     What was the purpose of the meeting?

9    A     It was Ms. Williamson asked me to go over the history

10   of the Energy Plaza lease and the transactions.

11   Q     Were her advisers present?

12   A     They were present by phone, yes.

13   Q     Anyone else?

14   A     Yes.  Ms. Doray was at that meeting, Mr. McKane, and I

15   believe other Kirkland lawyers were on the phone.

16   Q     Did Ms. Williamson ask you questions?

17   A     She did.

18   Q     And what details did you provide to her?

19   A     I provided her a history of the lease transactions,

20   including the letter of credit draw and the origination of

21   the payables and receivables on the books, and answered the

22   questions that she had.

23          MR. ESSER:  Your Honor, at this time, unless I

24   need to lay any additional foundation for exhibits, I have

25   no further questions for Mr. Moldovan.  I believe we have a

1    relatively uncontested set of exhibits to move in at this

2    time.

3              THE COURT:  All right.

4              MR. ESSER:  Your Honor, I've --

5              MR. PEDONE:  Your Honor --

6              THE COURT:  Mr. Pedone?

7              MR. PEDONE:  -- could we just briefly --

8              THE COURT:  Sure.

9              MR. PEDONE:  -- go off the record --

10             THE COURT:  Yes, of course.

11             MR. PEDONE:  -- and see if we can make this go a

12   little more quickly.

13        (Pause)

14             MR. ESSER:  Okay, my understanding is it will in

15   fact be uncontested.

16             THE COURT:  Okay.

17             MR. ESSER:  Okay.  Your Honor, as to DX-356, this

18   is an EFH Properties balance sheet, which I will move into

19   the record subject to the following attorney representation,

20   if you would like.

21             THE COURT:  Okay.

22             MR. ESSER:  Okay.  Your Honor, DX-356 is an EFH

23   Properties assets and liabilities balance sheet pulled from

24   the company's general ledger from Alvarez & Marcel as of

25   April 30, 2016.

1              Your Honor, as you know, Alvarez & Marcel has been

2    advising the company since before the petition date, has

3    been embedded with the company's accounting and planning

4    group, and is often the company's arms and legs when it

5    comes to summarizing voluminous company records such as the

6    general ledger.

7              Your Honor, this document was created by a member

8    of Alvarez & Marcel at the direction of a member of the

9    company's planning group.  This exhibit was made at or near

10   the time of creation by someone with knowledge from

11   information kept in the course of a regularly conducted

12   activity of the company and was made subject to a current

13   practice of the company.

14             With this representation, I believe we have

15   resolved the objection and move DX-356 into evidence.

16             THE COURT:  All right.  Any objection?

17             MR. PEDONE:  No objection, Your Honor.

18             THE COURT:  It's admitted.

19        (Debtors' Exhibit No. DX-356 was admitted)

20             MR. ESSER:  Your Honor, DX-519, DX-572, and DX-577

21   are Excel spreadsheets that I will move in with a similar

22   proffer -- excuse me, or attorney representation.

23             THE COURT:  Okay.

24             MR. ESSER:  Okay.

25             THE COURT:  They're admitted.

1          (Debtors' Exhibit Nos. DX-519, DX-572, and DX-577 were

2     admitted)

3               MR. ESSER:  Okay, thank you.

4               MR. PEDONE:  Your Honor, we need the

5     representation as to the business records foundation.

6               THE COURT:  He --

7               MR. ESSER:  I'm happy to make it again.

8               THE COURT:  Okay.

9               MR. PEDONE:  I believe it's different because

10    Alvarez is not involved with that one.

11              THE COURT:  Oh, I see.

12              MR. PEDONE:  Yes.

13              THE COURT:  Okay, very good.  Thank you.  I

14    apologize.

15              MR. ESSER:  Yes, this one is a little bit

16    narrower.  So these exhibits are company records, they were

17    made from information transmitted by someone with knowledge

18    from information kept in the course of a regularly conducted

19    activity of the company and made subject to a current

20    practice of the company.

21              With this attorney representation, we move these

22    exhibits into the record.

23              MR. PEDONE:  No objection, Your Honor.

24              THE COURT:  All right, they're admitted this time

25    for real.

1      (Laughter)

2      (Debtors' Exhibit Nos. DX-519, DX-572, and DX-577 were

3   admitted)

4           MR. ESSER:  Thank you, Your Honor.

5           The remaining exhibits will be moved in, I will

6   read the list in, no proffers will be made.

7           THE COURT:  Okay.

8           MR. ESSER:  Your Honor, at this time we move in

9   DX-382, DX-457, DX-491, DX-493, DX-494, DX-508, DX-512, DX-

10  514, DX-515, DX-528, DX-530, DX-574, DX-575, DX-576, DX-578,

11  DX-579, DX-580, DX-581 -- that's 581 -- DX-582, and DX-583.

12          THE COURT:  Okay, any objection?

13          MR. PEDONE:  No, Your Honor.

14          THE COURT:  They're admitted.

15      (Debtors' Exhibit Nos. DX-382, DX-457, DX-491, DX-493,

16  DX-494, DX-508, DX-512, DX-514, DX-515, DX-528, DX-530, DX-

17  574, DX-575, DX-576, DX-578, DX-579, DX-580, DX-581, DX-582,

18  and DX-583 were admitted)

19          MR. PEDONE:  Thank you, Your Honor.  That's all I

20  have.

21          THE COURT:  All right, very good.

22          Mr. Pedone?

23                    CROSS-EXAMINATION

24  BY MR. PEDONE:

25  Q   Good morning, Mr. Moldovan.  I'm Richard Pedone,

1    counsel for American Stock Transfer Indenture Trustee for

2    the EFH bonds.

3    A    Good morning.

4    Q    Mr. Moldovan, the building that we've been discussing

5    is located in Dallas, Texas, correct?

6    A    That's correct.

7    Q    And it's approximately a million square feet of space,

8    correct?

9    A    Approximately, yes.

10   Q    How many floors?

11   A    Forty -- approximately 47, 46 or 47.

12   Q    And a few of those floors are devoted to engineering

13   space and are not potentially available for sublease,

14   correct?

15   A    That's correct.

16   Q    And as you discussed with Mr. Esser, the FDIC is a

17   subtenant, correct?

18   A    That's correct.

19   Q    And there are ongoing discussions and it appears likely

20   at this time that the FDIC will renew its sublease for 13 or

21   14 floors of the building, correct?

22   A    Well, they will -- their renewal right is for the

23   entire space, so they have requested a proposal for a

24   restructured lease for 13 to 14 floors.

25   Q    So I misspoke.  In effect, it will be effectively a new

1   lease for 13 or 14 floors, correct?

2   A    A restructured -- yeah, I would call it again a

3   restructured lease for 13 or 14 floors, yes.

4   Q    And the fact that they will be taking that additional

5   space is built into the cash-flow projections that have been

6   admitted into the Court for EFH Properties, correct?

7   A    When you say taking that additional space --

8   Q    Sorry, let me rephrase the question.  The fact that

9   they will be restructuring the lease and remaining in 13 or

10  14 floors is built into the cash-flow projections that have

11  been admitted into Court?

12  A    Yes.

13  Q    In addition to the $158 million note that you testified

14  about, EFH Properties also owes a payable to EFH Corp. of

15  approximately 70 to 85 million, doesn't it?

16  A    Yeah.

17          THE COURT:  I'm sorry, I didn't hear you.

18          THE WITNESS:  I believe it's 70 -- approximately

19  $74 million.

20  BY MR. PEDONE:

21  Q    Okay.  And you're not aware of any defenses that EFH

22  Properties has to payment on that obligation, are you?

23          MR. ESSER:  Objection.  It calls for a legal

24  conclusion, Your Honor.

25          THE COURT:  Are you a lawyer?

1          THE WITNESS:  Not -- I am --

2          MR. ESSER:  Retired, Your Honor.

3          THE WITNESS:  I'm a non-practicing attorney.

4          THE COURT:  Me too.

5      (Laughter)

6          THE COURT:  Overruled.  He can answer the

7   question.

8          THE WITNESS:  It's in the subject to compromise on

9   the books and records; I don't know whether that constitutes

10  a defense to payment.

11         MR. PEDONE:  Your Honor, excuse me for just one

12  second.

13     (Pause)

14  BY MR. PEDONE:

15  Q    Have you reviewed EFH Corp.'s schedules and financial

16  statements of affairs filed with the Bankruptcy Court?

17  A    I did some time ago, yes.

18  Q    And what's the basis of your testimony just now that

19  you believe that that payable is -- what were your words?

20  A    Subject to compromise.

21  Q    Why do you believe it's subject to compromise?

22  A    That's how it's currently reflected on the records that

23  I've reviewed.

24  Q    What records were those?

25  A    That was the balance sheet that was prepared by

1    Alvarez & Marcel and a trial balance given to me by the

2    accounting group.

3    Q    And do you have an understanding of what it means for

4    something to be subject to compromise on the records that

5    you reviewed?

6    A    They're very high-level.

7    Q    You're not aware of any real defenses to payment of

8    that obligation, are you?

9    A    No, not as I sit here.

10   Q    In your direct testimony -- back up actually.

11        (Pause)

12   Q    At your deposition do you recall that we discussed the

13   costs that reorganized TCEH would incur if it decided to

14   move the Corporate Services operations out of the building?

15   A    Yes, I do.

16   Q    And you provided an estimate -- and granted, the

17   estimate was looking back, not looking forward to

18   reorganized TCEH, but it was looking back to what it would

19   cost to move the people who comprise Corporate Services,

20   correct?

21   A    I believe it was an estimate to move people at

22   Corporate Services and Luminant to specific -- the specific

23   buildings that TXU Energy occupies.

24   Q    Okay.  And the hard costs of moving that you estimated

25   were between 16 and $25 million of hard moving costs,

1    correct?

2    A    My recollection is it was 16 to 24, but --

3    Q    I'm fine with 25.  24, I won't hand you your deposition

4    for that.

5    A    Okay.

6    Q    That estimate did not take any account of the

7    disruption cost to the business productivity, any of the

8    other typical disruptions that go with moving, did it?  It

9    was hard, fixed costs of undertaking the move.

10   A    That's my understanding.

11   Q    And you would agree that the time period to plan for

12   and undertake such a move would be at least six months to a

13   year -- would be six months to a year, correct?

14   A    I don't -- I don't believe that that's accurate.  We

15   have already -- the space is there that we're talking about,

16   those costs were to move to existing space that we're aware

17   of and our facilities group has -- already understands the

18   space.  And so I think the timing that it would take to plan

19   for that move would be shorter.

20        (Pause)

21   Q    Do you have a recollection of what you told me in your

22   deposition about the time for planning or would you like to

23   review a copy of your deposition?

24   A    I do not.

25             MR. PEDONE:  Your Honor, may I approach the

1    witness with a copy of his deposition?

2            THE COURT:  Yes.

3        (Pause)

4    BY MR. PEDONE:

5    Q    Mr. Moldovan, turning to the bottom of page 72 in your

6    deposition, do you recall that I asked you, "What would be

7    the timing required to achieve such a move?"  And you should

8    take a minute and read the bottom of page 70 above it, and

9    you can read through 71 to make sure you're familiar with

10   it.

11       (Pause)

12   A    Yes, I've --

13   Q    And in your deposition, isn't it true that you made a

14   reference to the analysis that the facilities group had

15   undertaken?

16   A    Yes.

17   Q    And then in describing that analysis you stated to me

18   that your recollection was -- you didn't know specifically,

19   but your recollection was that it would take six months to a

20   year?

21   A    Well, yes.  I think --

22   Q    Thank you.

23           THE COURT:  You can explain on redirect if --

24           THE WITNESS:  Okay.

25           THE COURT:  -- your counsel wants to explore that.

1    BY MR. PEDONE:

2    Q    Mr. Moldovan, in your direct testimony you indicated

3    that there might be limitations on obtaining subtenants

4    because the lease expired in 2022, correct?

5    A    That's correct.

6    Q    But in fact the lease contains a renewal option,

7    doesn't it?

8    A    It does, but it also prohibits -- there's a provision

9    in the lease that prohibits EFH Properties from entering

10   into a sublease beyond 2022.

11   Q    Certainly, but it would be entirely possible to locate

12   a tenant for the building and then assign certain renewal

13   option rights or rights under the lease, so that if you

14   found a tenant who was interested in the building there are

15   structures that could be analyzed, aren't there?

16   A    I think that's a hypothetical.  Right now EFH

17   Properties can offer a sublease into 2022, there's no

18   assurance that we could give anybody that they could stay in

19   the building beyond that time.

20   Q    Are any efforts currently undertaken to examine

21   structures to maximize the value of sub-tenancies and lease

22   restructuring opportunities going forward or is that

23   something not being looked at?

24   A    No, we have engaged outside brokers, one of the

25   premiere brokers in Dallas, Jones Ling & LaSalle, to assist

1    us in maximizing revenue at least through 2022.  I'm not

2    aware of any efforts to go beyond 2022 at this point.

3    Q    You've made a reference in the direct testimony to a

4    payment that had been made in 2009 on the intercompany

5    payable; how much was paid?

6    A    Approximately $5.7 million.

7    Q    And turning to the board deck, which is DX-48, if you

8    would, please?

9         (Pause)

10   A    Okay.

11   Q    Mr. Esser asked you a series of questions about your

12   participation in the drafting and preparation of this board

13   deck, correct?

14   A    He did.

15   Q    And he made a reference to exchanging drafts back and

16   forth, or you did in your testimony, I'm not sure who, but

17   that topic was discussed, correct?

18   A    He asked me if I had provided comments and I said that

19   I did.

20   Q    Who did you provide the comments to?

21   A    To Kirkland & Ellis.

22   Q    And then did Kirkland & Ellis at any point communicate

23   with you concerning the substance of your comments ahead of

24   the final draft being prepared?

25   A    I'm sorry, can you repeat that question?

1    Q    Sure.  Did you have an ongoing discussion at all with

2    Kirkland & Ellis about the substance of what would be

3    incorporated into this board deck?

4    A    I just provided written comments, I don't recall any

5    substantive conversations.

6    Q    Okay.  And do you know the comments between you and

7    Kirkland & Ellis go back and forth once or was there a

8    dialogue in writing?

9    A    On July 27th, I submitted multiple rounds of comments,

10   written comments, and then when I got drafts back confirmed

11   that my comments were addressed.

12   Q    Okay.  And then with regard to the July 22nd board

13   deck, what was the process -- what was your interaction with

14   Kirkland & Ellis in connection with the preparation of your

15   comments on that deck?

16   A    Again, I provided written comments to Kirkland & Ellis.

17   Q    So you first provided comments on what they delivered

18   to you, they were the initial author?

19   A    I believe they had the -- they had the pen on the

20   document, yes.  It was sent to me by somebody at Kirkland &

21   Ellis and I provided comments on that and subsequent drafts.

22   Q    Now, you described a discussion with Ms. Williamson

23   that took place on, was it July 27th?

24   A    That is correct.

25   Q    And had you had any other substantive discussions with

1    Ms. Williamson about EFH Properties prior to July 27th?

2    A    No, I had not.

3    Q    Had you had any substantive discussions with Mr. Evans

4    about EFH Properties prior to July 27th?

5    A    No, I had not.

6    Q    Had you had any substantive discussions with anyone at

7    Proskauer concerning EFH Properties prior to July 27th?

8    A    That I don't know.  We had substantive discussions

9    about properties when we did due diligence with the EF --

10   with the TCEH first lien lenders and I am not aware of

11   whether Proskauer was at or attending those meetings.

12   Q    So sitting here today you have no recollection of

13   specific discussions with Proskauer concerning EFH -- any

14   attorney at Proskauer concerning EFH Properties, do you?

15   A    No, I don't have any specific recollection.

16   Q    And when you provided your comments on both of the

17   board decks, you were aware that you were likely to be

18   deposed in this case, weren't you?

19   A    I don't recall when I was aware that I was going to be

20   deposed.

21        (Pause)

22   Q    You're aware you were designated as a designee of the

23   company to testify on certain specific topics related to EFH

24   Properties in connection with your deposition, aren't you?

25   A    I'm aware that I was designated, I just don't know when

1    I became aware of it.

2    Q    That's fine.  It's more that I wanted to make sure that

3    we were in agreement that you knew you were this

4    representative of the company speaking on certain topics --

5    A    That's correct.

6    Q    -- when you testified on August 1st.

7    A    That's correct.

8         MR. PEDONE:  Your Honor, if I could take one

9    minute and then I believe I'm wrapped up.

10        THE COURT:  Okay.

11        (Pause)

12   BY MR. PEDONE:

13   Q    You're aware that the plan of reorganization for these

14   debtors that is at issue today was filed initially on May 1?

15   A    The initial filing, yes.

16   Q    Yes.  And then the plan that went out with the

17   disclosure statement was filed in mid-June, you're aware of

18   that?

19   A    Approximately that time, yes.

20   Q    Yeah.  And in connection with the preparation of the

21   plan, did you have any discussions with anyone about EFH

22   Properties?  Strike the question, let me rephrase it.

23        Did you have any discussions with Ms. Williamson

24   or Mr. Evans with regard to the content of the plan and its

25   treatment of EFH Properties?

1    A    No.  As I stated before, I had not had a conversation

2    with them before my conversation with Ms. Williamson on July

3    27th.

4    Q    Thank you.

5         MR. PEDONE:  Thank you, Your Honor.  No further

6    questions.

7         THE COURT:  Thank you.

8         MR. ESSER:  Very brief redirect, Your Honor?

9         THE COURT:  Yes.  Yep, you're up.

10                   REDIRECT EXAMINATION

11   Q    Mr. Moldovan, you were handed a copy of your deposition

12   transcript and asked a question about how long it may take

13   for the company to move out of the space, and it sounded

14   like you wanted to explain that answer a little bit more;

15   would you like to do so?

16   A    Yeah.  The company has looked at several alternatives,

17   I think the alternative for -- where it was 16 to $25

18   million, that cost is specific to moving to current space

19   that is leased by TXU Energy, it's also looking at other

20   potential moves to other buildings.  And whether I

21   misunderstood the question, my understanding is it would

22   take six to 12 months for a building that has yet to be

23   identified and that we're not familiar with, and that it's

24   my understanding today would be shorter for those buildings

25   because we are familiar with them and have analyzed them

1    over time.

2    Q    Thank you.

3            MR. ESSER:  No further questions, Your Honor.

4            THE COURT:  Thank you, sir.  You may step down.

5            MR. MCKANE:  Your Honor, the debtors call Ms.

6    Carla Howard to the stand.

7            THE COURT:  All right.  We'll take a short recess

8    and then we'll hear Ms. Howard.

9            MR. MCKANE:  Thank you, Your Honor.

10        (Recessed at 11:04 a.m.)

11        (Reconvened; audio technical difficulties until 11:17

12   a.m.)

13                DIRECT EXAMINATION (Continued)

14   BY MR. MCKANE:

15   Q    -- Number 4, D-DIR Howard.

16   A    Yes.

17   Q    And do you recognize it?

18   A    I do.

19   Q    Is the information contained in this document true and

20   correct to the best of your knowledge?

21   A    Yes.

22   Q    And is it made in support of the plan of reorganization

23   that's pending before the Court?

24   A    Yes.

25   Q    All right.

1           MR. MCKANE:  Your Honor, I'm going to move this

2   into evidence at the end of the examination because I will

3   lay -- there's only one objection, and I'll lay some

4   additional foundation that I think will resolve that.

5           THE COURT:  Okay.

6           MR. MCKANE:  All right.

7   BY MR. MCKANE:

8   Q    Ms. Howard, can you briefly describe for the Court your

9   involvement in the EFH restructuring efforts?

10  A    I've been responsible for the debtors' efforts on tax

11  matters in the restructuring case and there's been a lot of

12  them.

13  Q    And did you also have specific interactions with

14  regards to the Internal Revenue Service?

15  A    Yes.  So I've been responsible for all of our interface

16  with the IRS, both on tax claims as well as on the private

17  letter ruling.

18  Q    And are -- do you also interact with creditor

19  constituencies as -- you know, with regards to the tax

20  matters?

21  A    Absolutely.  We have an active group of advisors in the

22  case on behalf of all the creditors and their tax advisors

23  have been interfacing with us, diligently in negotiating for

24  a long period of time.

25  Q    And are your familiar with the -- the disinterested

1    directors and their advisors?

2    A    Very familiar.

3    Q    And how do you interact with the -- the disinterested

4    directors and their advisors on tax matters?

5    A    Well, the disinterested directors, particularly with

6    respect to preparing for, participating in board meetings

7    that have tax issues associated with restructuring; when the

8    disinterested director advisor came on, like December of

9    2014, we worked to get them up to speed on the tax issues so

10   -- and since that time participating actively in advance of

11   board meetings and negotiations.

12   Q    And does each of the disinterested directors have their

13   own tax counsel in -- as part of t hose advisory teams?

14   A    Absolutely.

15   Q    You mentioned you're point person with regards to

16   interaction with the IRS.  Are -- can you briefly describe

17   what a private letter ruling is?

18   A    It's a very private -- sorry.

19        The private letter ruling process is actually --

20   Q    I'm sorry.  Is that a tax joke?

21   A    It is --

22        (Laughter)

23   A    You know, we're the funniest people there are.

24        (Laughter)

25   A    The private letter ruling process is -- is designed for

1    taxpayers to go in and resolve issues of law, application to

2    specific facts in a technically private process and receive

3    written guidance that is issued specifically only to the

4    taxpayer.

5    Q    And -- and how long is this private letter ruling

6    process been ongoing?

7    A    So this particular private letter ruling process

8    associated with this restructuring's gone on since April of

9    2014.

10   Q    Yeah.

11        And -- and you -- you mentioned that it's supposed to

12   be private.  Is the process that was underwent with regards

13   to involvement of others with regards to this private letter

14   ruling process unique in your experience?

15   A    There's so many things that are unique about this

16   private letter ruling and the process is also very unique.

17   Because of the significant tax issues in the case and the

18   adversity of creditor interests, really every creditor,

19   advisor and disinterested director advisor has a tax point

20   person in the case and they have been integral with the

21   company, myself and our company representatives on all of

22   the submissions, discussions, negotiations with the IRS

23   throughout the process.

24   Q    Okay.

25        When you meet with the IRS, as part of this -- well,

1    let me ask -- have you met with the IRS as part of this

2    process?

3    A    Yes.

4    Q    And can you describe how this group interacts as it

5    relates to your meetings with the IRS?

6    A    Sure.  Typically, it's only the taxpayer and the

7    taxpayer's representative.  But, again, in this case,

8    because of tax issues are significant and the IRS process is

9    designed to all be conducted in writing, with certain

10   exceptions for meetings, the core group of tax advisors for

11   the disinterested directors, some of the creditors and

12   debtors would all have at least one representative at our

13   in-person meetings, on scheduled phone calls, that kind of

14   thing.

15   Q    All right.

16        And then after your meetings with the IRS, are there

17   any steps taken to inform the larger creditor body?

18   A    Certainly to inform the large creditor advisor parties.

19   So, you know, each disinterested -- in order to not

20   overpower the IRS and outnumber in every way and there's

21   limits to what kind of rooms and things are available,

22   typically, each group only sends one person to the in-person

23   meetings.

24        But we would have pre-meetings and post-meetings so

25   that we could get everyone on the calls that were included

1    in the tax advisor group.

2    Q    And -- and with regards to everyone, can you give the

3    Court some sense of which E-Side creditors had tax counsel

4    involved in the process for the development of the private

5    letter ruling?

6    A    Sure.  So it -- it moves in some during the case

7    because under different plans and different tax issues

8    sometimes, you know, what's hot is a little different and

9    that influences that makeup.

10       But, generally, for EFH, we've had Proskauer's

11   involvement --

12   Q    Uh-huh.

13   A    -- for Fidelity.  We've had Fried Frank on the EFIH

14   side, Akin Gump's been involved.

15       We've also had Cravath and then, of course, in the T-

16   Side we have others.

17   Q    Okay.

18       And what -- what about with regards to EFH creditor

19   groups?  Did they also participate or receive the

20   information immediately after your meetings with the IRS?

21   A    Sure.  Like Akin Gump would, you know, on -- on behalf

22   of EFIH and Fried Frank, certainly.

23   Q    All right.  Very good.  I apologize for that.

24       Your interactions with the creditor groups, did it go

25   beyond just the private letter ruling to cover other tax

1    issues in the case, like the TMA?

2    A    Oh, absolutely.

3    Q    Yeah.  And just to be clear, the -- the TMA --

4    A    TMA is tax matters agreement.

5    Q    Thank you.

6    A    Okay.

7    Q    What about your interactions with the board as it

8    relates to tax matters?  Can you describe, for the Court,

9    your involvement there?

10   A    So in -- in -- in my role as a participant in debtors'

11   management, obviously, I'm not, you know, part of the board

12   constitution.  But on the restructuring tax issues that go

13   before the board, which have been a pretty high volume in

14   this case, I will participate in preparing materials and in

15   the discussions and answer questions.

16        And it's been fairly common throughout this case as

17   we've gotten to be such -- so familiar with each other on

18   tax issues that I'll answer individual questions of

19   directors on tax issues.

20   Q    And -- and the answering individual questions of

21   directors on tax issues, does that also include questions

22   that the disinterested directors have?

23   A    Yes.

24   Q    And could you --

25   A    So for every estate.

1    Q    For every estate.

2         Can you describe, for the Court, the types of one off

3    meetings you -- you would have with -- with various

4    directors as it relates to tax issues?

5    A    I'm sure you don't want to go through a chronology of

6    the whole case.  But a recent example would be as we were

7    leading up to the July -- late July board meetings, we were

8    also having regular quarter-end board meetings at that time.

9         And Billy Williamson reached out to have a meeting to

10   discuss a number of elements in the materials for the

11   restructuring meeting.  That would include tax matter

12   agreement issues, things about the busted 351 as it's

13   called, status of the private letter ruling, debt

14   characterization ruling, those types of things are things

15   that we covered.

16   Q    And -- and just to -- to the -- to your best

17   recollection that -- that meeting occurred when?

18   A    So it was either Tuesday or Wednesday -- whatever day

19   the joint board meeting was because it turned out to be a

20   marathon day and we also had audit committee that day and --

21   so that -- it -- it was -- it was on that day, Tuesday or

22   Wednesday of that week.

23   Q    And -- and you -- that week being the last week of

24   July?

25   A    Yes.

1    Q     All right.

2          You -- you know, you mentioned earlier in your

3    testimony that there's so many unique things about the

4    private letter ruling including the process.

5          Can you explain, for the Court, did -- at -- at a high

6    level, what's unique about the ruling itself?

7    A     So it's -- it's unusual to -- it's -- it's unusual to

8    get a broad comprehensive ruling on so many novel

9    applications of what you'd think of as regular corporate --

10   corporate structuring but in the context of bankruptcy and

11   especially got into all the debt characterization issues.

12         So very complex Internal Revenue Code provisions and a

13   high volume of them applying to a fairly broad range of

14   facts.  So it's novel in that respect.

15         And it's also novel because it's after the no rulings

16   policy was issued where the government, to conserve

17   resources, really can't just give you a blanket ruling and

18   say; 368 applies and it's a -- you know, it's a great tax-

19   free deal.

20         They really have to get granular and -- and get to what

21   is the significant issue that needs to be ruled on.  And so

22   it was -- it was -- it was -- it was very interactive and it

23   took a significant amount of work to get a large number of

24   rulings.

25   Q     All right.

1        We'll -- we'll -- we're going to cover the private

2    letter ruling itself in detail in a few minutes.

3        But let's -- let's start with the basics.

4    A    Okay.

5    Q    Yeah.  Specifically, the amount of and the origin of

6    the -- of the tax attributes in this case.

7        Can you start with just explaining what a consolidated

8    tax group is?

9    A    It's just a group of affiliated corporations that

10   elects to file a single tax return.

11   Q    And -- and what does it mean to be a disregarded entity

12   for tax purposes?

13   A    A disregarded entity is -- for federal income tax

14   purposes, is just a legal entity that isn't treated

15   separately as its own taxpayer.  But really just it's

16   parents, like a division.

17   Q    And -- and which EFH entitles are disregarded?  And I

18   don't need all of them.  Just an example or two.

19   A    Yeah.  So most of the significant legal entities, like

20   EFIH and TCEH, are disregarded entities.  There are some

21   exceptions in corp. services and properties are both

22   regarded corporations.

23   Q    Those are C-corps?

24   A    Uh-huh.

25   Q    And can you explain to -- what a NOL or a net operating

1    loss is under the general tax rules?

2    A    Sure.  I mean, the easy -- if you end up with a lot

3    more deductions and losses then you have income, then you

4    have a net operating loss.

5    Q    And -- and just how -- how do -- how did EFH use its

6    NOLs?

7    A    Well, anytime you have taxable income and you have

8    existing NOLs, then you can just apply those dollar-for-

9    dollar to offset your liability.

10   Q    Are there limits on how and when net operating losses

11   can be consumed?

12   A    The general rule is you can carry them back two years

13   and carry them forward for 20.

14   Q    And -- and how are net operating losses treated for a

15   consolidated tax group?

16   A    So consolidated net operating losses are available to

17   offset any income or gain within the entire consolidated

18   return.

19   Q    And are there -- can -- is there an example recently in

20   which EFH actually used NOLs to offset gain?

21   A    Sure.  2015, we're about to file the 2015 tax return

22   and for that year EFH, as a holding company parent, actually

23   has a significant amount of taxable income and there are

24   consolidated net operating losses generated on the TCEH side

25   of the business that will be used in order to prevent the

1    payment of any cash tax liability to the IRS when we file

2    that return.

3    Q    All right.

4         And have the debtors done an estimation of how many net

5    operating losses the EFH group would likely have upon

6    emergence?

7    A    Yes.

8    Q    And what is that total projected amount of NOLs?

9    A    The projected amount is 8.3 billion.

10   Q    And what is the -- what's the estimation date for

11   emergence that -- that's used to do that calculation?

12   A    There's a number of assumptions, obviously, since it's

13   a forecast.  But the date is assuming there's a 12/31/2016

14   emergence.

15   Q    All right.

16        And did you prepare a demonstrative to aid in your

17   testimony today regarding the projected NOLs --

18   A    Yes.

19   Q    -- and how they were calculated?

20        All right.

21        If you could just turn to the first tab in your binder.

22        Is demonstrative one entitled: EFH Consolidated Tax

23   Group Projected NOLs in Emergence, that demonstrative?

24   A    Yes.

25   Q    All right.

1          Can you walk the Court what -- through what this chart

2     is and what it shows?  Just at a high level.

3     A     Sure.  The 8.3 billion that we just talked about is at

4     the bottom of the column that says consolidated.

5     Q     Uh-huh.

6     A     And really line-by-line on the left is just showing how

7     much for the 2014 tax year on a consolidated basis than 1.7

8     billion.

9          You can see the two right hand columns are then

10    designed to just show how that breaks out between business

11    operations.  So for 2014, that first line item, if you have

12    consolidated NOL of 1.7 billion, you can see that a little

13    over 71 percent of that was generated from tax activities on

14    the TCEH side of the business and the balance, the 28.5

15    percent is really generated at the EFH level.

16    Q     All right.

17         And can you walk us through the -- the 2015 line as

18    well?

19    A     Yes.  So the 2015 line actually shows the example that

20    we just talked about because that's a year whereby you can

21    see at the end of the TCEH column that they've generated 1.1

22    billion, 148.7 percent of the total consolidated NOL.

23         But EFH, in that year, will be utilizing some of that

24    NOL so that there's no cash taxes paid to the IRS and, at

25    the end of the day then, the consolidated NOL remaining on

Page 64

1    the 2015 return will be the 748.

2    Q    All right.

3         And looking at the -- the 2016 line, the third line

4    down, it's significantly greater than the first two years of

5    the restructuring.  Can you explain to the Court why that

6    is?

7    A    Sure.  There's -- since 2016 hasn't completed yet and

8    the tax return for that wouldn't be due until nine months

9    later, you know, there's several assumptions in there.

10        But, generally, the biggest items contributing to the

11   -- sort of the pop up of NOL is really associated with

12   whatever year emergence happens.  There are deductions that

13   are just sort of suspended right now and when emergence

14   happens and debt is cancelled or otherwise terminated, those

15   deductions become viable and they'll be claimed on that tax

16   return.

17   Q    All right.

18        And so what does this chart basically tell us about the

19   allocation of the origins of the NOLs, at least for the

20   years 2014 through 2016?

21   A    The vast majority are generated by the TCEH business.

22   Q    All right.

23        And there's a line item below that of total adjusted

24   carry forward from '13.

25   A    Right.

1   Q    You know, can you explain the -- the amounts there and

2   -- and where they came from?

3   A    So, as we described, you can, you know, carry forward

4   NOLs for 20 years and the balance for the group at the end

5   of 2013 is the 465 million that's represented there.

6        Generally, since all of those tax returns have now been

7   audited by the IRS and all of that final resolution is

8   happening in the claims process, we haven't broken that out

9   between the silos.

10  Q    All right.

11       Has this information, this type of information about

12  the amount of estimated NOLs and the origin of the NOLs been

13  shared with creditors?

14  A    Yes.  Very few days go by that we don't get asked for a

15  refresh or a -- additional details.  So we've been sharing

16  information on estimated NOLs.  I mean, they've been

17  growing, right, as we've been in the case a long time.

18       But -- so we've been providing that to all creditor

19  groups and advisors as well as disinterested directors for

20  some time.

21  Q    Yeah.

22       And -- and what about bidders on the E-Side?

23  A    Oh, yes.

24  Q    Okay.

25       Let's turn back to the private letter ruling, okay?

1    A    Okay.

2    Q    Could you turn to Debtors' Exhibit 343R in your binder?

3         Let me know when you're there.

4    A    I'm there.

5    Q    All right.

6         Do you recognize 343R?

7    A    Yes.

8    Q    And what is it?

9    A    So this is the final private letter ruling that was

10   issued by the IRS for us on July 28th.

11   Q    All right.

12        And is it fair to say you directed the debtors' efforts

13   to obtain this private letter ruling?

14   A    It certainly wasn't an individual effort.  But I was

15   responsible for ensuring that we went through the process

16   and that we obtained this result.

17   Q    All right.

18   A    And we did.

19        (Laughter)

20   Q    And, just -- just for background, the purpose of a

21   private letter ruling, I think you've covered, but, if you

22   don't mind, just explaining briefly why -- why do you want a

23   private letter ruling?

24   A    It's the primary way to get certainty with respect to

25   the application of complicated tax law to specific facts and

1    have the maximum certainty in advance of doing a transaction

2    of what the outcome will be.

3    Q    Does the private letter ruling contain sub-rulings and

4    can you explain how that works?

5    A    We'll call the sub-rulings.

6         So, definitely, yes.  And the -- the point there is

7    that because there's not these blanket rulings of broad, you

8    know, okay, the whole thing's tax-free.  There's sub-rulings

9    that go to the -- the content of what is really the

10   significant issue in the application of existing tax law to

11   these specific facts.

12        So there's a number of sub-rulings.

13   Q    Okay.

14        And did the debtors, as part of its private letter

15   ruling, request -- seek guidance from the IRS with respect

16   to the tax treatment on the cancellation of TCEH's debt?

17   A    Yes.

18   Q    All right.

19        And if I refer to that as the debt characterization

20   ruling, would you -- you know what I'm talking about?

21   A    Sure.

22   Q    All right.

23        What guidance did the debtors request as it relates to

24   the debt characterization?

25   A    We asked the IRS to -- we asked the IRS to conclude

1   that the cancellation of TCEH debt, which is substantial,

2   would be treated under Section 108(a) of the Code, very

3   commonly known as the bankruptcy exclusion.

4       And that's what we asked.

5   Q    And when did you start to receive initial indications

6   from the IRS about this ruling?

7   A    May -- so -- so during May -- after we filed the

8   current plan, we advised the reviewers on the private letter

9   ruling that the plan had been filed, that it contemplated a

10  tax-free spin-off but it also had a taxable separation

11  option and that was going to be, you know, filed in the

12  Court and published in an AK and so we advised them of that.

13      It was shortly after that that we learned that they had

14  concerns about the debt characterization ruling.

15  Q    And -- and what was the issue as best -- as best you

16  explain to the Court?

17  A    So throughout the two years that this ruling's been

18  pending and for many years leading up to that, the type of

19  TCEH debt that we were requesting the ruling on is really

20  recourse debt and the IRS is -- was taken a position that

21  since TCEH is a disregarded entity, that it was going to be

22  non-recourse.  And that was not going to allow 108 to apply.

23  Q    And when you received this initial indication from the

24  IRS, how did the -- the debtors and their advisors respond?

25  A    Loud.  We -- you know -- you know, we -- we first

1    wanted the opportunity to point out that there was a long

2    history of why it should apply and why we should get that

3    ruling.

4         And so we embarked on the process of having written

5    submissions and requesting conferences and -- so that's how

6    we proceeded.

7    Q    All right.

8         Are you familiar with -- is -- is the phrase

9    tentatively adverse a term of art in the -- in the tax

10   world?

11   A    Yeah.  It's not a good thing to hear.  But it is a term

12   of art and --

13   Q    And can you explain to the Court what that is?

14   A    Yes.  So in -- when the IRS has a ruling that you've

15   requested and they've done a preliminary review and, based

16   on what they've read and studies so far, they've come to a

17   conclusion that they're not going to give you the ruling

18   that you've requested.

19        Then they advise you that they are tentatively adverse

20   on the issue.

21   Q    Okay.

22   A    So that's -- that's actually what happened on the debt

23   characterization ruling.  Probably by the end of May, we --

24   we knew that they were tentatively adverse.

25   Q    And the what steps did the debtors take once they

1    learned -- and, by the way, when you learned that -- when

2    you received that information, how'd you communicate it to -

3    -- to the board, disinterested directors and -- and the

4    creditors?

5    A    Yeah.  It's a -- it's a big thing.  And it affects

6    everyone and so first word travels really fast in this case

7    because, like I said, we have a lot of tax advisors

8    participating in every event.

9         So when we had a scheduled call to discuss the debt

10   characterization ruling, disinterested director advisor and

11   creditor advisors, as well as the company and its

12   representatives, would have participated in that call and,

13   you know, so there's already a group that real time is

14   learning that information and sharing it with their own

15   constituencies.

16        But we also then communicate that out to every creditor

17   group advisor in the case.

18   Q    Okay.

19        And that was done with -- with regards to the

20   indication from the IRS that they were tentatively adverse?

21   A    Absolutely.

22   Q    Okay.

23   A    I -- I mean, we advised co-CROs like instantly.

24   Q    All right.

25        And what steps did the debtors take once the IRS gave

1   you the tentatively adverse ruling -- indication?

2   A    We still fought on.  I mean, we -- we were sure that we

3   -- we were -- we were -- we were convinced that we would

4   prevail and we told them we wanted to continue to seek the

5   ruling and we asked for our conference of right which is

6   what you do when they're tentatively adverse and you want to

7   sit down and talk to them about it.

8   Q    All right.

9        And you can describe, for the Court, the conference of

10  right and who participated in the conference of right?

11  A    So I'm going to -- I'm going to say a little generic

12  just -- I don't want to like identify all the government

13  personnel.  But, I mean, generally, it was our core group so

14  the disinterested director advisors each had one

15  representative there and our primary credit constituencies

16  with issue in that as well as myself and our company

17  counsel.

18  Q    Yeah.

19       And you mentioned previously that there'd sometimes be

20  pre-meetings and post-meetings in advance of -- of

21  conferences with the IRS.  Did you have that procedure here?

22  A    We did.  That -- I think -- I think for that one we

23  actually -- Proskauer's offices are -- turns out are right

24  by -- in D.C. are right by the treasury building so we had

25  out pre and post meeting there as I recall.

Page 72

1        I know we had our post-meeting there.

2   Q    Yeah.

3        And in the post-meeting, were the E-Side creditors' tax

4   counsel part of that larger group?

5   A    I can't remember if everyone was there in person but we

6   always open a dial in for everyone and we, of course, send

7   -- and -- and that day everybody was standing by that wasn't

8   participating in person.  So we definitely communicated with

9   everyone.

10  Q    Okay.

11       And what was your take away after the conference of

12  right with regards to the IRS's position on the cancellation

13  of debt ruling?

14  A    Well, I, personally, was pretty convinced that we were

15  not going to get the debt characterization ruling but we had

16  already in this time period teed up alternative rulings

17  which -- which I believed were going to be critical to a

18  favorable resolution in the event they were -- were -- were

19  adverse.

20       But that -- everyone in the group didn't have exactly

21  the same feel and we did make additional submissions after

22  that with the intention of -- of -- of trying to still get

23  the debt characterization ruling.

24  Q    All right.

25       You mentioned the alternative rulings.  Can you explain

```
 1    to the Court what those were?
 2    A     So early on when the IRS notified us that they were --
 3    way before they notified us they were tentatively adverse,
 4    when they described that the plan on file with the taxable
 5    separation raised some concerns given new cases that they
 6    had worked on on 108.
 7          And, you know, we started exploring with them whether
 8    there were alternative rulings that if they -- if they -- if
 9    they came out that 108 did not apply, the tax-free spinoff
10    could still proceed without any recognition of gain.
11          And so the alternative rulings are all designed to
12    mitigate and eliminate the negative effect of the debt
13    characterization ruling if it is adverse in the context of
14    doing a tax-free spinoff.
15    Q     All right.
16          And did you work with the IRS in -- in -- in -- with
17    regards to any questions they had with regards to these
18    alternative rulings?
19    A     Absolutely.
20    Q     All right.
21          And did you have that same weigh-in from the
22    disinterested directors and the creditors with regards to
23    the alternative rulings?
24    A     Oh, yes.  Active -- active discussion, active debate.
25    Q     And, ultimately, what's reflected in the
```

Page 74

1    (indiscernible)?

2    A     So the debt characterization ruling went against us and

3    so 108 does not apply when TCEH debt is cancelled in the

4    IRS's private letter ruling.  But we obtained all three

5    alternative rulings and those three rulings together

6    basically confirm that even though the debt cancellation is

7    a taxable event, no gain will be recognized when that event

8    occurs.

9    Q     All right.

10        And, based on the private letter ruling, what would be

11   just the general impact of a taxable separation of TCEH, you

12   know, with regards to cancellation of debt and existence of

13   NOLs as opposed to the tax-free spin with the busted 351

14   that's pending in front of the Court?

15   A     So it's unfavorable.  You don't get the same protection

16   if you do a taxable separation that you do -- that you get

17   if you do a spinoff and, in fact, many of the things that we

18   described earlier in the case, when we filed the omnibus tax

19   memo about stranded tax, in effect, you -- you get that type

20   of result if you do a taxable separation.

21   Q     So we're back to the world of a stranded tax?

22   A     Yes.

23   Q     Okay.

24        Ultimately, were the rulings that the debtors received

25   in the private letter ruling in July 28th a surprise? I --

1    I --

2    A     No.  The -- and the process is, you know, there

3    whittling issues as they go along and so there -- there are,

4    you know, approximately 15 rulings in -- in this ruling.

5         And we had dialog.  We would respond to questions.  We

6    submitted our two-part which is, you know, our facts and

7    refs.  We got their draft back.  We had calls to discuss

8    what the actual language of the specific rulings would be

9    with all of our core group and, you know, gave comments at

10   the time.

11        So by the time we actually had the ruling in hand, we

12   were fairly confident about what every single ruling would

13   be.

14   Q    And had -- were you -- did you have opportunity to

15   communicate kind of your sense of how this was breaking with

16   the creditors and the disinterested directors and their

17   advisors?

18   A     Oh, yes.  And, I mean, everybody was asking on a daily

19   basis so I was constantly giving the over and under on, you

20   know, is it coming July 28th?  Is it coming one hour early?

21   What exactly is going to be in there?

22        So we -- we -- we were in constant dialog with everyone

23   in the case.

24   Q    All right.

25        Does the private letter ruling provide all the comfort

1    that the debtors need to move forward with the tax-free

2    spin?

3    A    Okay, well, tax people are never comfortable.  But the

4    -- the -- the plan, you know, it -- the rulings are -- the

5    -- the fundamental rulings that we described in the plan and

6    in the disclosure statement are really the consensus of what

7    it takes to get the right kind of certainty for a

8    transaction like this.

9        And we obtained all of the rulings that we needed in

10   that space which are also supplemented with the fundamental

11   opinions.  But we did get the rulings that are required and

12   in time.

13   Q    Uh-huh.  Okay.

14       If -- if we go forward with the tax-free spin and later

15   on there's a determination that it does not qualify for tax-

16   free treatment or -- what happens there?  How -- how -- how

17   do the debtors address that situation?

18   A    Well, if you -- if you don't take the steps that are

19   required to do the tax-free spinoff, whether it's

20   intentional or unintentional, then it's effectively a

21   taxable transaction and all the consequences of a taxable

22   transaction exist.

23   Q    Yeah.

24       And -- and with that -- we use the term like a busted

25   spin or a failed spin, you understand what I'm referring to?

1   A    I do.

2   Q    All right.

3        In -- did the debtors separately from the private

4   letter process go through a -- a tax matters agreements

5   process to address the risks associated with issues like a

6   busted spin?

7   A    Sure.  So it's -- it's -- it's -- if you -- if you

8   separate a consolidated group into two owners, then you

9   enter into a tax matters agreement to address how taxes are

10  going to be handled leading up to that separation and in

11  post-separation.

12       And one of the critical areas of that in the

13  negotiation process is how you're going to share risk if

14  things go wrong.

15  Q    Okay.

16       We'll come to that in a -- in a minute.

17       The transaction at issue.  There's this reference to a

18  preferred stock sale or a busted 351, are those synonymous?

19  A    Yes.

20  Q    Okay.

21       Can you explain to the Court what that is?

22  A    So the busted 351 transaction is really a subset of the

23  overall tax-free spinoff where certain assets, in this case

24  Comanche Peak and the retail business, TXU Energy for

25  change, are contributed to a separate legal entity.  Legal

1    entity issues preferred stock and common stock, and

2    distributes the common to -- and preferred to reorganized

3    TCEH.

4         At that point, the preferred stock is sold to unrelated

5    parties, completely outside the group.  And that effectively

6    busts the 351.  And it makes that transfer of assets with

7    respect to those assets taxable.

8         So ever though you have an overall tax-free spinoff,

9    the busted 351 component is its own little taxable world.

10   Q    Okay.

11        In that own little taxable world, why is Comanche Peak

12   and -- why were Comanche Peak and the retail business

13   identified as the assets to be transferred into that world?

14   A    So over -- with a valuation over time, you know, to --

15   to -- to -- to effectively use a busted 351, you need assets

16   that have built in gain and so TXU Energy and Comanche Peak

17   are really the primary assets in the group that -- that have

18   built in gain.

19   Q    Okay.

20        Are you aware that some of the EFH creditors have taken

21   the position that you should mix -- have a different mix of

22   assets that should go into the taxable world of the busted

23   351?

24   A    Yes.  I've heard that.

25   Q    And -- and -- and what's you sense?  Would that work,

1    you know, from your perspective?

2    A    Well, if you -- if you add assets to the mix that are

3    built in loss assets, you're going to, you know, water down

4    the amount of basis step-up that you get from the busted

5    351.

6         But, more negatively than that, you're actually writing

7    down the value and the basis of those built in loss assets

8    so that going forward you'll get less depreciation.  So even

9    if you invested in environmental equipment for a plant,

10   you'd go ahead and write it down today and not take those

11   depreciation deductions.

12             MR. MCKANE:  May I approach?

13             THE COURT:  Yes.

14             THE WITNESS:  Thank you.

15   BY MR. MCKANE:

16   Q    Let's transition away from the busted 351 for a minute.

17        Are you familiar with the debtors' assessments of ways

18   to, for lack of a better term, spread liability or -- with

19   regards to the potential for a stranded tax?

20   A    I'm not sure the debtors have tried to spread

21   liability.  But I am certainly familiar with the concept of

22   spreading liability for a stranded tax.

23   Q    All right.

24        Let's -- let's -- let's just start with the basics.

25        If there were a taxable transaction that occurred, the

1    taxable separation of T, what would happen to creditor

2    recoveries at EFH Corp.?

3    A    Well, from a tax perspective, if EFH disposes of its

4    assets, the T-Side in a taxable manner, it's going to report

5    the tax liability and be responsible for paying taxes on

6    that in the first instance and if that's many billions of

7    dollars, then I think the creditor recoveries, at the EFH

8    level, would be significantly reduced or eliminated.

9    Q    And -- and, just to be clear, based on the rulings that

10   you received from the IRS, if TCEH were to go taxable, would

11   it be billions of dollars of cash tax liability that EFH

12   Corp. would face?

13   A    Yes.

14   Q    All right.

15        And you mentioned that you're -- you're aware that

16   creditors have taken, you know, a position that -- that --

17   that if that were to happen, there should be an effort to

18   spread the -- the liability as it relates to that -- to that

19   stranded tax.

20        What's your sense as to the ability to do that and --

21   and its benefits and detriments?

22   A    I don't think that it's really that easy and we did

23   brief the Court on a lot of those issues when we filed the

24   omnibus tax memorandum for that reason.

25        And so that's still that most of those -- most of those

1     techniques have a lot of uncertainty associated with them.

2     Q     All right.

3           And you -- you'd mentioned the tax -- the omnibus tax

4     memorandum.

5           One of the -- the techniques or approaches discussed in

6     there is been what's referred to as checking the box.

7     A     Yes.

8     Q     You -- are your familiar with checking the box?

9     A     Yes.

10    Q     Can you explain to the Court what that is and how it

11    could work?

12    A     Well, in this case, specifically, the idea is that EFH

13    would check the box to treat TCEH or its subsidiaries or all

14    of them as regarded corporations and thereby expose them to

15    joint and several liability along with EFH.

16    Q     And -- and what are some ramifications of -- of

17    checking the box?

18    A     The consequences of what you choose for a legal

19    entity's tax status are very far-reaching.  In this

20    particular instance, there's quite a bit of concern about

21    creating a multi-billion dollar deferred inter-company gain

22    or excess loss account by taking that kind of an action.

23    Q     And, Ms.  Howard, what happens if there's a creation of

24    this multi-billion dollar deferred inter-company gains and

25    excess loss accounts?

1    A     So DIGs and ELAs (ph), as they're known, as really a

2    bad thing because once they exist with respect to the stock,

3    it's -- it's -- it -- it significantly increases the tax

4    cost of disposing of that.

5    Q     All right.

6          And -- and -- and what are some of the risks associated

7    with checking the box?  Oh, let me say that again.

8          Would the risks associated with checking the box be

9    mitigated if there was a tax-free spin?

10   A     Oh, no.  The -- the private letter -- the private

11   letter ruling is completely about the tax-free spinoff.

12         If you check the box and create ELAs or DIGs within the

13   group, there's no protection there against tax liability

14   from -- from triggering those doing a tax-free spinoff.

15   Q     All right.

16         And are you familiar with another argument that you --

17   that the creditors have raised that -- I believe it's

18   referenced in the -- in the omnibus tax memorandum, about

19   convincing the IRS to change its administrative position

20   regarding the liability of disregarded entities?

21   A     Kind of did a version of that just now in the debt

22   characterization ruling and I wasn't that successful.

23         So, I mean, the - the -- the IRS can always change

24   their administrative position.  You -- you know, I can't

25   take bets on whether they would or would not.

1    Q    Yeah.

2         And if -- if TCEH were liable for a stranded tax

3    liability, could the TCEH first lien lenders do something

4    else with their assets in an attempt to avoid that

5    liability?

6    A    Well, I don't -- you know, if they -- once they had

7    joint and several liability, they might have that.  But the

8    tax could still be stranded because, I mean, that wouldn't

9    necessarily preclude them from foreclosing on their assets,

10   for example.

11        I mean, they could still get their assets.  You'd just

12   have a stranded tax.

13   Q    And if they foreclosed on their assets, there's a

14   possibility that the tax would stay with the entity and the

15   assets would go?

16   A    Yes.

17   Q    All right.

18        Based on all the work you've done in the case, are you

19   familiar with the Department of Justice's position with

20   regards to the potential for a taxable separation?

21   A    I'm familiar with -- yes.

22   Q    And what is their position?

23   A    They -- in -- they made an appearance in the case, at

24   one point, to notify the Court that they would oppose a

25   taxable separation if it was proposed in a plan.

1    Q    Okay.

2         And are you familiar with earlier efforts by the IRS

3    and the Department of Justice to -- to block a stranded tax?

4    A    I don't have a lot of direct experience with that but I

5    -- I am aware of cases where the Department of Justice has

6    challenged whether or not a bankruptcy confirmation can

7    leave a stranded tax and I think in all three of those

8    instances, the Department of Justice wasn't successful.

9    Q    All right.

10        Let's turn to the tax matters agreement for a second.

11   A    Okay.

12   Q    First, let's -- if you could turn to the -- at the --

13   nearly the end of your binder, DX-766.  And let me know when

14   you're there.

15   A    I'm there.

16   Q    And, Ms. Howard, do you -- do you recognize DX-766,

17   which is a document that was filed on the Court's docket on

18   the 16th of this month?

19   A    Yes.

20   Q    What is it?

21   A    So this is the currently filed tax matters agreement as

22   negotiated in the case.

23   Q    All right.

24        And is it your understanding this is the final?

25   A    Yes.

1   Q     All right.

2         Could you just explain, to the Court, just what the

3   purpose of a tax matters agreement is?

4   A     The tax matters agreement deals with a number of, you

5   know, our tax return filing and audit responsibilities.  But

6   it also, primarily, in this case, addresses the allocation

7   of risk associated with later tax events, including a tax

8   transaction failure, like a failed spinoff.

9   Q     Okay.

10        And could you describe for the Court some of the

11  parties involved in reviewing, assessing, negotiating the

12  tax matters agreement?

13  A     So, you know, the -- certainly the tax matters

14  agreement on file has been actively negotiated.  The debtors

15  and debtors' counsel have participated in those

16  negotiations.  Disinterested director advisors have

17  participated in those.  E-Side bidders and their counsel

18  have participated in those and the TCEH first liens and

19  their advisors.

20  Q     And why -- why have -- why have the TCEH first lien

21  advisors and the bidders been involved?

22  A     Because, generally, you're, you know, addressing who's

23  responsible for what tax liability down the road when the

24  group's separated and -- so it's, you know, designed to

25  decide, in advance, when something goes wrong, who's

1    responsible for paying the tax, if there's a tax due.

2    Q    And -- and what is your understanding of those terms of

3    whether this tax matters agreement is acceptable, both to

4    the TCEH first lien lenders and NextEra?

5    A    At long last, this one is acceptable to both of those

6    parties, as I understand it today.

7    Q    All right.

8         So let's look backwards a little bit in time.  Can --

9    can you turn to DX-13 in the -- in the front of your binder?

10        All right.  So let's go back in time.

11   A    Okay.

12   Q    All right.

13        Do you recognize DX-13?

14   A    Yes.

15   Q    What is it?

16   A    So this was an earlier version of the tax matters

17   agreement, back in June, and this actually did incorporate

18   changes and comprises that the first liens had made but

19   really only up to a point in time and it was really mostly

20   negotiated with the disinterested director advisors.

21   Q    Okay.

22        And can you give the Court a sense of some of the open

23   issues as of June of this year that remained open for the

24   tax matters agreement?

25   A    We were generally -- even by the time we got to this

1   version, a lot of the responsibilities had been divided.

2   But the mostly contested section was 2.05, primarily (d),

3   2.05D, and that -- the -- that language has changed between

4   this version and what we looked at a minute ago.

5   Q    And 2.05 is part of the -- the discussion about the

6   allocation of taxes and the allocation --

7   A    Allocation or separation related taxes, yes.

8   Q    Okay.

9        And, if your -- if you could turn to the document right

10  in front of it in the binder, DX-6.

11  A    Okay.

12  Q    Do you recognize DX-6?

13  A    Yes.

14  Q    Which was filed on -- filed with the Court on July 28th

15  of this year?

16  A    Okay.  Yes.

17  Q    What is it?

18  A    It's also a version of the tax matters agreement.

19  Q    And was this the form of the tax matters agreement that

20  was approved by the joint boards of EFH and the

21  disinterested directors on July 27th?

22  A    Yes.

23  Q    And could you just explain for the Court the

24  circumstances that led to the filing of this form of the tax

25  matters agreement?

1    A    Well, again, it's really 2.05D that was at issue and --

2    so, at that point in time, the disinterested directors and

3    the first lien -- TCEH first liens could not agree on the

4    language there.

5         So there's brackets around the language in (d).

6    Q    Uh-huh.

7    A    And then there's the footnote that basically describes

8    what the TCEH first lien position is.

9    Q    All right.

10        And -- and, at this point in time, in July 27th, this

11   was the only open issue?  The only material open issue?

12   A    Yes.

13   Q    All right.

14        And was there a step between the reaching of the -- of

15   this agreement, which is supported by the boards and the

16   DDS, and the final agreement as well?

17        Is there another intermediate step?

18   A    So I think we -- I think -- I think we would have filed

19   another version in conjunction with the NextEra merger

20   agreement and that -- that -- that tax matters agreement

21   removed the brackets and the footnote but that was not

22   agreed to by the TCEH first liens at the time.

23   Q    All right.

24        And if you could turn to DX-3 at the front -- you know,

25   one -- one step earlier in your binder.

1    A    Okay.

2    Q    And you see this is a -- this is an excerpt from a

3    larger submission that's 429 pages long.

4         If you could turn two pages in to page 275 of 429.  Are

5    you with me?

6    A    No.  I did something wrong.

7    Q    So you look at the top of the pages.

8    A    No.  Tell me what --

9    Q    2-7-5 of 4-2-9.

10   A    What exhibit am I on first?  Sorry.

11   Q    Sorry.  We're on DX-3.

12   A    Okay.  Approval order?

13   Q    Yes.

14   A    Okay.

15   Q    And now I'm going to have you go a couple page in.

16   Great.

17   A    Okay.

18   Q    And if you look at the top of the page, there's --

19   upper right hand corner, it's pages of 4-2-9.

20   A    Oh, yes.

21   Q    And then I'm asking you to go page 2-7-5 of 4-2-9.

22   A    All right.  I'm there.  Sorry.

23   Q    Nope.  No -- I -- it's my fault.

24        You mentioned that there was a tax matters agreement

25   that was agreed to with NextEra.

```
 1    A     Yes.

 2    Q     Is this that tax matters agreement?

 3    A     That -- yes.

 4    Q     All right.

 5    A     Sorry.  I'm all good.

 6    Q     And then this open issue, 2.05D, can you explain to the

 7    Court how -- what was the resolution of 2.05D as reflected

 8    on page 17 otherwise known as 294 of 429, of this version of

 9    the tax matters agreement, the one that was acceptable to

10    NextEra at that time?

11    A     So the language in 2.05D in this version that was filed

12    with the NextEra merger agreement allocates responsibility

13    to TCEH and holders of reorganized TCEH stock for various

14    actions that they might take that would create busted

15    spinoff.

16    Q     All right.

17          And, ultimately, it was resolved.  This -- this

18    allocation responsibility was -- was resolved?

19    A     That's right.

20    Q     And that's what's reflected in the -- in the final TMA

21    that was filed earlier this week?

22    A     Yes.

23    Q     All right.

24          And can you explain to the Court what's the resolution?

25    Just at a high level.
```

1    A    The -- and everyone calls it the you break it, you pay

2    provision.  And so it just basically attributes fault to

3    whichever side creates the break and that's the party that's

4    responsible for the tax.

5    Q    And when people talk about the break, they talk about

6    that busted spin or failed spin you referred to earlier?

7    A    Yes.

8    Q    All right.

9         This TMA, it also addresses allocations of

10   responsibility and risk with regards to other tax issues

11   beyond just the failure of -- of the busted 51 -- 351,

12   right?

13   A    Sure.

14   Q    Can -- can you explain to the Court some of the risks

15   and restrictions that the TCEH first lien creditors are

16   agreeing to by agreeing to go forward with the tax-free

17   spin.

18   A    So some of that's part of the tax matters agreement

19   that's the -- and some of it's part of the rulings.  So

20   probably one of the biggest -- biggest allocations of risk

21   that the TCEH first liens take on by pursuing the tax-free

22   spinoff under the ruling, as it was issued, is that there's

23   a sub-ruling that provides that reorganized TCEH is in the

24   consolidated group for a moment in time and that means that

25   reorganized TCEH has joint and several liability for tax

1    that, you know, might be generated if that is not ultimately

2    a tax-free spinoff.

3    Q     And are you familiar with the phrase, -6 liability?

4    A     Right.

5    Q     All right.

6          Is this the --

7    A     That --

8    Q     Is --

9    A     -- that would -6 liability and -- and -- and even

10   though that's allocated to the TCEH first liens in the tax

11   matters agreement, it's probably more -- it's -- it's more

12   significant commercially if you have that -6 liability in a

13   private letter ruling because then you're jointly and

14   severally liable to the IRS.

15         And, under a tax matters agreement, while it's

16   contractual, it's really between the parties as opposed to

17   your liability to the government.

18   Q     Yeah.

19   A     So that's one of the -- one of the big items that the

20   TCEH first liens take on by doing the tax-free spin.

21   Q     Are there others?

22   A     Yes.

23   Q     Is -- do they take on responsibility for taxes other

24   than federal income taxes?

25   A     Yes.  I mean, there's gross margin tax and other taxes

1   associated with TCEH historic activities that -- that they

2   take on as a result of the tax matters agreement.

3   Q    Is there AMT that is triggered with regards to the tax-

4   free spin?

5   A    Sure.  The busted 351 is expected to generate AMT tax

6   since there won't be sufficient current year NOLs.  So

7   that's like 14 to 20 million.

8        And the tax matters agreement that was finally agreed

9   to is -- allocates that AMT liability 50/50 between E and T.

10  Q    All right.

11       And you -- you used an estimate of $14 to $20 million

12  for that AMT.  You know, what are some of the general

13  assumptions on which that's based?

14  A    So, you know, that's -- that -- it really depends on

15  how much current year NOL you have and how much carry

16  forward you're using.

17       So that's assuming that there's emergence in -- before

18  12/31 of 2016.  That's a primary driver.

19  Q    Yeah.

20  A    And it is -- it also assumes that, you know, you've

21  built up that many NOLs and you've been in that long so,

22  obviously, that could be different.

23  Q    And is the 14 to 20 million the debtors best estimate

24  at this time?

25  A    It is.

1    Q    And so the split would be $7 to $10 million each?

2    A    Yes.

3    Q    All right.

4         Are there certain mergers and acquisition restriction

5    that the debtors -- sorry, that TCEH first lien creditors

6    are taking on with regards to the tax-free spin?

7    A    Yeah.  The private letter ruling and the tax matters

8    agreement have really, because of law, a two-year limitation

9    on some of the things that you can do.

10        So there's some taxable limine (ph).  You have some

11   limits on your stock repurchases.

12   Q    Are there other financing or transactional restrictions

13   that are imposed on the TCEH first lien lenders or

14   restrictions or limitations on their ability to do

15   refinancings?

16   A    Well, I mean, certainly -- certainly, you can continue

17   to do things like dividend recapitalizations.  But, in the

18   facts of this case, there's a high likelihood that, with the

19   large earnings and profits that we expect allocated, that

20   those will be taxable versus tax-free.

21        So that's different then you would normally expect.

22   Q    And so it's more likely that -- that -- that a

23   transaction like a dividend recapitalization would be

24   taxable; is that a -- is that right?

25   A    That's right.  That's right.

1   Q    All right.

2        And what about audit risk associated with the busted

3   351 or the preferred stock sale?

4   A    So that -- that's one of the things that the tax

5   matters agreement, you know, makes clear that, for example,

6   you know, when you're doing the busted 351, you think you're

7   going to have a certain number of NOLs to make sure you

8   don't have any liability.

9        If it turns out you don't have all those NOLs or those

10  are disallowed for some reason, well, that liability is on

11  reorganized T and, similarly, if, you know, we were

12  fortunate and commodity prices went way high and the values

13  of those assets were way higher, then, you know, they bear

14  the risk that there's not enough NOLs to -- to cover that.

15  Q    All right.

16            MR. MCKANE:  Your Honor, I'd -- I'd like to

17  address maybe with -- take just two seconds to confer with

18  opposing counsel.  I believe I've resolve their evidentiary

19  issues.

20            THE COURT:  Okay.

21       (Counsel confer)

22            MR. MCKANE:  Your Honor, I have no further

23  questions at this time for Ms. Howard and I'd like to be

24  able to move in the evidence at this time, her written

25  direct.

1            THE COURT:  Any objection?

2            UNIDENTIFIED SPEAKER:  No objection.

3            THE COURT:  It's admitted.

4       (Debtors' Exhibit No. D-DIR Howard was admitted)

5       (Pause)

6            MR. MCKANE:  Your Honor, I recognize what time it

7    is.  Maybe it'd be -- if it's appropriate to break for lunch

8    at this time, then we can do some moving in of exhibits and

9    then proceed forward with cross.

10           THE COURT:  That's fine.  Okay.  Very good.

11           All right.  And we need a little extra time today

12   so Mr. Pedone can prepare for later this afternoon.

13           So twelve twenty, one twenty -- that's shoot for

14   one thirty-five to one forty to reconvene.

15           Ms. Howard, during our break, you may not discuss

16   the substance of your testimony with any person because

17   you're still under cross-examination.

18           THE WITNESS:  Okay.

19           THE COURT:  Very good.  Thank you.  We're in

20   recess until one thirty-five.

21           MR. MCKANE:  Thank you, Judge Sontchi.

22       (Recessed at 12:18 p.m.; reconvened at 1:53 p.m.)

23           THE CLERK:  All rise.

24           THE COURT:  Please be seated.

25           All right, sorry for the delay, we're having some

1   technical difficulties, and unfortunately it sounds like we

2   had a problem -- I'm making a mess up here -- unfortunately

3   we had a problem with the record, so we need to back up a

4   little bit, reswear in Ms. Howard, and I think you have some

5   direct to do.

6               MR. MCKANE:  Uh-huh.

7               THE COURT:  Sorry about that.

8               THE CLERK:  Please raise your right hand.

9                 CARLA HOWARD, WITNESS, SWORN

10              THE CLERK:  Please state and spell your name for

11  the record.

12              THE WITNESS:  Carla Howard.  C-A-R-L-A,

13  H-O-W-A-R-D.

14              THE CLERK:  Thank you.

15              THE COURT:  Thank you.  You can be seated,

16  Ms. Howard.  Sorry, Mr. McKane.

17              MR. MCKANE:  Not a problem, Your Honor.  Happy to

18  help in any way.

19                     DIRECT EXAMINATION

20  BY MR. MCKANE:

21  Q    Ms. Howard, will you please state your position at the

22  debtors?

23  A    Senior vice president and general tax counsel.

24  Q    And how long have you been employed by EFH?

25              THE COURT:  I'm sorry, hang on.  What's wrong?

1           MR. PEDONE:  Your Honor, we didn't know about

2     what's occurring here.

3           MR. MCKANE:  Oh, sorry.

4           MR. PEDONE:  So could I confer with --

5           THE COURT:  The only problem was that we had a --

6     the only problem was there was a mix up with -- on our end

7     from recording.  So the affirmation and the first few lines

8     of testimony were not recorded.

9           MR. PEDONE:  Okay.

10          THE COURT:  So they need to be done again.

11          MR. PEDONE:  We didn't know what you were doing,

12    the whole with the -- thank you.

13       (Laughter)

14          THE COURT:  I wouldn't be smiling, that's for

15    sure.

16       (Laughter)

17          MR. PEDONE:  Thank you.

18          THE COURT:  I think Ms. Howard might walk out if

19    she had to -- like enough, two years, I'm out of here.

20       (Laughter)

21          THE COURT:  All right.  So start over, Mr. McKane.

22    Sorry for the miscommunication.

23          MR. MCKANE:  And it's my fault, Your Honor, I

24    apologize.  I did not relay the message.

25    BY MR. MCKANE:

1    Q    I'm sorry, Ms. Howard, you said how long you worked for

2    the debtors and its predecessors?

3    A    I joined the company in 2004.

4    Q    And can you briefly state and describe positions you

5    held from 2004 to the present?

6    A    I started in the tax group at TRQ, now EFH, responsible

7    for tax planning and tax controversy, and I was promoted to

8    VP tax general tax counsel in 2008, and senior vice

9    president in 2011.

10   Q    And can you briefly describe your responsibilities as

11   the senior vice president and general tax counsel for EFH?

12   A    I'm responsible for taxes for EFH and all of its

13   subsidiaries.

14   Q    And are you a direct report to Mr. Keglevic?

15   A    Yes.

16   Q    All right.  And did you prepare a declaration in

17   anticipation of your testimony today?

18   A    I did.

19   Q    And can I direct your attention to what has been

20   previously marked as D-DIR Howard, it's the fourth tab of

21   your binder?

22   A    Okay.

23            THE COURT:  Okay.  I think we had everything else.

24            MR. MCKANE:  Excellent.

25            THE COURT:  All right.

1          MR. MCKANE:  Your Honor, with that we have -- we'd

2    like to move into evidence Ms. Howard's written direct,

3    which I believe there is no objection to.

4          THE COURT:  Any objection?

5          MR. PEDONE:  No objection.

6          THE COURT:  Okay.  It's admitted.

7     (Debtors' Exhibit No. D-DIR Howard was admitted)

8          MR. MCKANE:  And, Your Honor, just for practice we

9    have what we refer to as a green sheet for additional

10   exhibits that we'd like to move into evidence.  It is our

11   understanding that there are no objections to any of these

12   exhibits.

13         THE COURT:  Okay.

14         MR. MCKANE:  For the written direct Exhibits DX-4,

15   DX-46, and DX-713, and then for the live direct DX-13, 448,

16   451, 765, and 766.  And the other exhibits that are on this

17   list have already been moved in with Mr. Keglevic.

18         THE COURT:  Okay.  Thank you.

19         MR. MCKANE:  May I approach and provide a copy?

20         THE COURT:  Yes.  Thank you.

21     (Debtors' Exhibit Nos. DX-4, DX-13, DX-46, DX-448, DX-

22   451, DX-713, and DX-765-766 were admitted)

23         MR. MCKANE:  With that, Your Honor, we'd pass the

24   witness.

25         THE COURT:  Okay.  Very good.

Page 101

1          (Pause)

2              THE COURT:  Yes, please.

3                     CROSS-EXAMINATION

4    BY MR. SKELLY:

5    Q    Good afternoon, Ms. Howard.  I'm George Skelly here for

6    American Stock Transfer on behalf of EFH indenture trustee.

7              You would agree with me wouldn't you from a tax

8    perspective that a tax-free reorganization can be

9    accomplished without a taxable component?

10   A    Correct.

11   Q    Okay.  And so, for example, isn't it true that about

12   the time of the filing of the omnibus tax brief a number of

13   alternatives were considered in connection with that of --

14   for ways of avoiding a stranded tax at the EFH level and

15   those -- some of them included a number of options that were

16   tax free without a busted 351?

17   A    I'm sorry, that was a really long question.

18   Q    Okay.

19   A    I might have to have you repeat it.

20   Q    Happy to.

21             So at about the time of filing the omnibus tax

22   brief there were laid out the boundaries for generally

23   avoiding a stranded tax at the EFH level and that included a

24   number of options that were tax free without a busted 351;

25   is that correct?

```
 1    A     I don't remember all of the things that we outlined in

 2    the omnibus tax memo, but I think generally we would have

 3    covered many of those alternatives.

 4    Q     Okay.  And the IRS's private letter ruling does not

 5    limit what assets can be used to seek a step up; is that

 6    right?

 7    A     The final private letter ruling doesn't specify which

 8    assets.  We did provide a lot of submissions in advance of

 9    those, but the final private letter ruling doesn't specify

10    which assets.

11    Q     Okay.  And it doesn't specify a particular quantum of

12    assets that have to be used for a busted 351 would it?

13    A     That's correct.

14    Q     Okay.  So isn't it correct that a step up of a smaller

15    size could be obtained by using less assets?

16    A     You can generally accomplish a different size smaller.

17    Q     Okay.  For example, rather than transferring Comanche

18    Peak, nuclear fuel that goes with it and the TXU to result

19    in an estimated step up of 5.8 billion, it would be possible

20    to transfer just Comanche Peak, including the fuel

21    presumably; is that right?

22

23    A     Generally you can transfer less assets.

24    Q     And that would result in a lower step up?

25    A     That's correct.
```

1    Q    All right.  Now you mentioned in your testimony earlier

2    that if assets were transferred into what I'll call Prefco

3    (ph), do you understand what I'm referring to there?

4    A    Sure.

5    Q    Okay.  If assets were transferred into Prefco as part

6    of this step up transaction that had a built in loss, if

7    those were added into the mix, that that could reduce the

8    ability of the company to take depreciation going forward on

9    those assets, right?

10   A    Generally that's correct.

11   Q    And you viewed that as a negative consequence?

12   A    From a tax perspective having less depreciation

13   deductions is a negative.

14   Q    But with respect to the possible alternative that I

15   just mentioned, which is to put fewer assets into the bucket

16   in the first place, that would not be an adverse

17   consequence, it wouldn't have that adverse consequence,

18   correct?

19   A    It would not have that adverse consequence, that's

20   correct.

21   Q    Would you agree that if a transaction was consummated

22   in EFH group, assuming other technical requirements are met,

23   if there are NOLs left over at that time that generally you

24   can claim them on the returns and offset any tax liability?

25   A    If I understand the question when EFH files returns and

1    there's NOLs available they can use them on that return to

2    offset income on that return, that would be correct.

3    Q    Okay.  And if a lower amount of assets were put into

4    the Prefco -- were transferred to Prefco to obtain the step

5    up, if a lower amount were transferred there that would

6    leave a greater amount of NOLs that EFH could use under such

7    circumstances; is that right?

8    A    Yes.  If you triggered less gain you wouldn't use as

9    many NOLs to offset the gain you triggered.

10   Q    Now thinking back over this year I'd like to ask if you

11   recall having any discussions personally with creditors

12   about the possibility of a tax-free spin without a busted

13   351?

14   A    So I don't have an extensive amount of discussions with

15   creditors, I have more discussions with creditor advisors,

16   but I don't recall specific conversations during 2016 of

17   tax-free spin off without the preferred stock sale or busted

18   351.

19           The plan the debtors had on file at the beginning

20   of the year and the plan that was put on subsequent to it

21   both had those elements, and so in my responsibility for

22   taxes I would have been working to execute on those

23   transactions.

24   Q    Right.  So that's not an option that was under

25   discussion at any time during 2016 that you recall?

1   A    I can't say it wasn't an option under discussion, but

2   it wasn't part of the responsibilities that I was executing

3   on, and I don't have personal knowledge of that.

4   Q    Okay.  So you have no knowledge that such a thing was

5   discussed as a serious option in 2016?

6   A    I don't have any knowledge.

7   Q    All right.  To your knowledge has anyone in

8   negotiations in 2016 ever asked the T-Firsts to pay specific

9   consideration for the use of NOLs?

10  A    Again, those are probably broader negotiations that are

11  being conducted, you know, outside my responsibility, but I

12  did not have discussions like that with tax advisors in the

13  case working on the transactions that were contemplated by

14  the plans that it had either been approved or that went on

15  file.

16  Q    So you have no specific knowledge of any such request

17  in 2016?

18  A    And remind me of the request again that you're

19  referring to?

20  Q    That the T-Firsts be asked to pay specific

21  consideration for the NOLs.

22  A    No, I don't recall that personally.

23  Q    Did you have any discussion in 2016 with the EFH

24  disinterested directors regarding developing a strategy to

25  obtain a payment or other specific consideration for TCEH's

1    use of the NOLs?

2    A    Well developing the strategy of the company more

3    broadly is not my actual responsibility.  I certainly had

4    discussions with the disinterested director advisors during

5    2016 about NOLs, about uses of them, and about the mechanics

6    of a busted 351.

7    Q    I understand, and I appreciate that.  Thank you.

8              But what I'm asking about is discussions in which

9    there was a strategy discussed to seek a payment or other

10   specific consideration for the use of those NOLs.

11   A    I don't recall discussions specifically about payment

12   of NOLs.  I mean again, I -- more of the discussions were

13   around what alternatives could be pursued that would

14   maximize value at different estates, and all of the estates,

15   and so in conjunction with that, you know, how tax

16   attributes might be used is more the kinds of things that I

17   would have been involved in.

18   Q    And I understand and I'm just trying to get the

19   parameters of what you may know because you have been

20   involved in a lot of these discussions and I understand

21   you're not primarily responsible for negotiations and that

22   sort of thing, but you don't have any knowledge that whether

23   such a strategy to seek to obtain a payment for the use of

24   the NOLs was being developed at any point in 2016?

25   A    The reason I'm having trouble answering you on that is

1    that the development of strategies of all alternatives and

2    how the case kept changing and even between May and July

3    when the kind of ground rules kept changing on tax there

4    were a lot of strategies being discussed, and so, you know,

5    it wouldn't necessarily tie to a specific, you know, one

6    form of consideration in exchange for one other thing.

7               I think more of the discussions were around bigger

8    alternatives.  How could you execute transactions that would

9    keep other alternatives available.  For example, if there

10   was an E-Side purchaser that wanted to do a REIT, you know,

11   what things could you do to keep the maximum optionality.

12   And I don't remember a specific one for one trade on NOLs

13   that you've asked about.

14   Q    Okay.  Thank you.

15              You've heard mentioned in this matter the term tax

16   Armageddon, right?

17   A    Yes.

18   Q    Do you have any assessment of the odds that a tax

19   Armageddon could occur in these cases?

20   A    My assessment around what things can happen is it's

21   clearly a lot of creditors have rights to do things in

22   bankruptcy, which is not my specific expertise of every

23   option that a creditor might have, but it is my assessment

24   that should a creditor pursue a taxable separation it's been

25   a huge concern of mine that the EFH estate would be the

1    party filing a tax return to report a multi-billion dollar

2    liability that might not have the resource -- likely

3    wouldn't have the resources for.

4           So I think it really is more in the context of

5    knowing that creditors have a wide variety of rights and

6    that that opportunity is there, what kind of an impact would

7    that have on EFH as a taxpayer.

8    Q    But with respect to the odds that such a thing could be

9    carried out and implemented did you have an assessment?

10          MR. MCKANE:  Objection, Your Honor.  Calls for her

11   legal opinion, and she's tax counsel of EFH.  She has not

12   been authorized by the debtors to disclose -- to waive the

13   privilege and the question seems privileged in nature.

14   (Indiscernible).

15          THE COURT:  Well I'm not sure it contains -- I'm

16   not sure he's asking for privileged communication.

17          MR. MCKANE:  Well it calls for a legal opinion,

18   and so for her to answer it she's going to render her --

19   divulge her opinion.

20          THE COURT:  Well I think he's asking, I mean

21   correct me if I'm wrong, I think you're asking, you know,

22   does she have an opinion, which she may or may not have on

23   the odds --

24          MR. SKELLY:  Correct.

25          THE COURT:  -- that the T-Firsts would pull the

1    trigger on a taxable spin.

2              MR. SKELLY:  And whether --

3              THE COURT:  And I think she said that's not --

4    well she hasn't answered that specific question.

5              MR. MCKANE:  Well and I guess maybe I'm one

6    question too early (indiscernible).  It's a yes or no does

7    she have an opinion.  Your Honor, then I think the next

8    question is (indiscernible) and it goes to her legal opinion

9    or her legal advise to the company that's our concern.

10             THE COURT:  Oh, I see.

11             MR. MCKANE:  If she can answer the question

12   another way (indiscernible).

13             THE COURT:  Okay.  Well let's see if we can do the

14   preliminary question.

15             MR. SKELLY:  Okay.

16   BY MR. SKELLY:

17   Q    Again, without divulging the substance of any

18   communication that you had with lawyers or with strictly

19   divulging to us a strictly legal conclusion that you may

20   have come to, but more from a practical standpoint

21   understanding all the obstacles that may or may not be in

22   the way of pulling a trigger or ultimately implementing such

23   a taxable transaction, from a practical and business

24   standpoint do you have an assessment of the odds that a tax

25   Armageddon would occur and could occur in these cases?

```
 1    A     I don't have an opinion assessing the probability of

 2    that.

 3    Q     Okay.  If we could turn to paragraph 27 of your

 4    declaration, which I think is, if I remember correctly, the

 5    fourth tab in the binder that was put before you this

 6    morning.

 7    A     Yes.  I'm there.

 8    Q     Okay.  And if you go to the last sentence, which is on

 9    page 16 of the declaration.  Do you see -- this is in the

10    paragraph 27 itself at the top of the page, "Accordingly,

11    while I believe it is uncertain that a taxable separation

12    would occur if the TCEH creditors attempted to pursue such a

13    transaction ..." do you see that language?

14    A     Yes.

15    Q     So do you believe that it is uncertain that that would

16    occur?

17    A     Yes.

18    Q     Now, I think you've told us that you have not made an

19    assessment of the odds of that happening, if I understand

20    your testimony just a moment ago.

21    A     Correct.

22    Q     Setting aside numerical odds, did you have a view about

23    the degree of uncertainty where you're referring to the

24    uncertainty here?  Is it very uncertain, is it -- you know,

25    any other views as to the degree of uncertainty?
```

1    A    I don't have an opinion on the degree of uncertainty.

2    I stated that while I believe it's uncertain that a taxable

3    separation would occur, if attempted, and so it's uncertain.

4    Q    Okay.  So you would agree with me that a lot of things

5    would have to happen before a taxable separation could be

6    effectuated, correct?

7    A    In a bankruptcy case a lot of things have to happen

8    before anything can occur.

9         (Laughter)

10   Q    Thank you.

11        So, for example, if it were part of a stand-alone

12   taxable plan the plan would have to be confirmed and

13   consummated, right?

14   A    I understand that to be true.

15   Q    And as a practical matter disinterested directors would

16   have to agree; is that right?

17   A    I think --

18        THE COURT:  Agree on what?

19        THE WITNESS:  -- whether or not conflicts --

20   whether it's a conflicts issue would determine whether or

21   not disinterested directors would, but --

22        THE COURT:  Yeah, I didn't understand the

23   question.

24        MR. SKELLY:  Okay.

25        THE COURT:  Agree on what?  I'm sorry.

1    BY MR. SKELLY:

2    Q    Directors generally would have to agree and the

3    disinterested directors would have to agree to go forward

4    with or have that plan approved, right?

5    A    We're probably outside my space, because what the

6    disinterested directors have as a responsibility in

7    governance decisions on legal matters is broader than what

8    I'm --

9    Q    Okay.

10    A    -- responsible for.

11    Q    There would likely be litigation relating to such a

12    plan, right?

13    A    Based on my experience with plans that have been on

14    file there's litigation with respect to every plan on file.

15    Q    There would be the potential for the Department of

16    Justice to get involved and make certain claims and

17    potentially try the block the transaction; is that right?

18    A    So I think on my direct I referred to the fact that

19    earlier in the case the Department of Justice did go on the

20    record to voice their reservation of rights, something to

21    that effect, in the event a taxable separation was pursued

22    in this case.

23    Q    Okay.  So for all these and perhaps other reasons you

24    conclude that this possibility of a taxable separation

25    actually occurring is something that you felt was uncertain?

1    A    Correct.

2    Q    Okay.  Did you tell the EFH disinterested directors, in

3    your many interactions with them, that you believed it was

4    uncertain that the taxable separation could be done?

5    A    So I've had a lot of interactions in the case with the

6    disinterested directors and I have certainly shared and in

7    response to their questions what things are involved in

8    pursuing a taxable separation and many of the things that we

9    talked about in the omnibus tax brief.  So I have discussed

10   those topics with them.

11   Q    Do you recall saying to them that in your view the

12   possibility of a taxable separation occurring is uncertain?

13   A    I can't recall saying in so many words to a specific

14   disinterested director that it was uncertain, but I think

15   the materials that we presented and the discussions that

16   I've had with them the conclusions would clearly be drawn

17   that I think it's uncertain.

18   Q    Did the EFH disinterested directors, to your knowledge,

19   do anything to evaluate the degree of uncertainty of that

20   eventually -- eventuality?

21   A    I don't feel -- I don't know everything that the

22   disinterested directors and their advisors have done.  I

23   know that the disinterested director advisors have asked for

24   extensive diligence and discussion so that they could

25   evaluate many of those types of issues in connection with

1      their representation, but I haven't been privy to all of

2      those discussions necessarily.

3      Q    And I'm only asking with respect to what actually know.

4      A    Right.

5      Q    So I'm not asking you to speculate beyond your direct

6      experience here.

7              So you essentially don't know whether the EFH

8      disinterested directors evaluated the degree of uncertainty

9      of that potential type of transaction?

10     A    I do specifically recall discussions with one of the

11     EFH disinterested directors around the various taxable

12     separation consequences and some of the other elements like

13     that.  So I have a recollection of a discussion on that

14     subject.

15     Q    That'd be with respect to the consequences of the

16     taxable separation, right, not -- that's correct?

17     A    I think that's correct.  Yeah, that'd be fair.

18     Q    Okay.  And that -- I'm distinguishing the subject of

19     the consequences of a potential taxable separation from

20     likelihood or uncertainty that it might occur.

21     A    I appreciate the distinction in your question, I just

22     think when someone is exploring what's uncertain and what

23     are the boundaries of that it's crossing over between

24     whether or not that's a likely thing to occur or not.  So

25     that's what my hesitation is.

1   Q    Okay.  I appreciate that.

2          So then the consequences of a taxable separation

3   occurring is something that you think would be a factor in

4   evaluating the likelihood of it occurring?

5   A    I think it would go hand in hand, and I certainly know

6   that the discussions on that subject when you understand the

7   consequences it's been a little bit sobering so I think

8   they've gone hand in hand in some instances.

9   Q    And in your view being aware of the consequences is

10  that something that makes it less likely that someone would

11  actually pull the trigger and make it happen?

12  A    There's lots of opinions, I don't know which way -- I

13  think different people would treat that different.

14  Q    I'm like to call your attention to the last sentence of

15  your declaration in which you state a conclusion that:

16          "In addition based on my interactions with the

17          disinterested directors and their advisors the

18          disinterested directors have thoroughly evaluated these

19          issues since their engagement."

20          And I just want to get a little bit of clarity on

21  what issues you're referring to there first.  And for

22  starters I'm looking for essentially what I'll characterize

23  as grammatical clarity, because we have a couple of

24  references to issues in this last paragraph and I find it

25  potentially ambiguous.

1           So if you take a look here at the first sentence

2    there's a reference to "Debtors' management team and

3    professionals have addressed certain of these issues

4    periodically with the boards," and that may refer to one

5    thing I'll ask you in a moment to clarify.  "And has

6    certainly apprised the boards of," and therein there's a

7    list of several things here.

8           So one thing that's listed here that have

9    certainly apprised the boards of is one, the most recent

10   developments with respect to the PLR; is that right?

11   A    Yes.

12   Q    And then another is -- and I take it the -- a

13   continuation -- the most recent developments with respect to

14   the IRS's position on the debt characterization rule.  That

15   would be another item or issue, correct?  Yes?  I'm sorry,

16   see you nodding yes.

17   A    Yeah -- well, I'm actually looking down and -- at it

18   too.  Yes, and could be an extension or clarification of

19   most recent developments with respect to the PLR and the

20   IRS's position on the debt characterization ruling which is

21   part of that.

22   Q    Yes.  Thank you.  And then another of what might be --

23   you might be referring to as the issues here is the

24   alternative rulings; is that correct?

25   A    Correct.

1   Q    And then a fourth in my counting, the effect of those

2   rulings on EFH REET LLs and what I want to know first is

3   when you are saying that they -- based on your interactions,

4   the disinterested thoroughly evaluated these issues, is it

5   those latter four issues that you're referring to here?

6   A    Not the way I've produced it in my direct.  I actually

7   was referencing in this board process in recommendations

8   section the issues that are covered in my direct which are,

9   you know, some of these items but really broader --

10  Q    Okay.

11  A    -- and so I was really referring to more broadly the

12  issues of tax in connection with the restructuring plan

13  that's on file and at issue in this case and then

14  highlighting this and we most certainly apprise the boards

15  of the recent developments with respect to the PLR and the

16  IRS's position on the debt characterization ruling, the

17  related alternative rulings and what effect those rulings

18  would have on NOLs.  So that's sort of a smaller set of

19  issues.

20  Q    Okay.  I think I understand better.  So if we could go

21  to Paragraph 9 of your declaration and so I want to call

22  particular attention to these actually on the top of page 7

23  but you can read for context the entirety or however much is

24  helpful to you of Paragraph 9.  There's a reference there

25  ultimately to -- and I was reading from the bottom of 6

1    going over to the top of 9, "Accordingly, the value of the

2    step-up in the tax-free spinoff could be approximately 430

3    million higher than the value of the step-up that the TCEH

4    first lien creditors would receive in a taxable separation."

5    A    Okay.

6    Q    See that?

7    A    Uh-huh.

8    Q    Now, I didn't hear you testify live today to the $430

9    million number; is that correct?

10   A    That's correct.  I think a lot of this was covered

11   yesterday in Mr. Keglevic's so we didn't repeat it today.

12   Q    So what I wanted to know was whether that $430 million

13   number, that particular incremental analysis, is something

14   that you discussed specifically with the EFH disinterested

15   directors and, therefore, intended that that be included in

16   your last -- the records in your last sentence.

17   A    So I don't -- thinking of the time line of their

18   creation of this chart, demonstrative, in connection with

19   preparation --

20   Q    Yes.

21   A    -- I don't recall discussing that with the

22   disinterested directors.

23   Q    Okay.  And was that figure, a $430 million figure,

24   something that, to your knowledge, was part of a board

25   presentation?

```
1    A    Not exactly in this format.  I don't believe so.

2    Q    Okay.  In Paragraph 19 of your declaration -- and I'm

3    mostly interested in what's on page 11 then just before the

4    chart there -- you are discussing, if I understand

5    correctly, an amount of NOLs that you say here could survive

6    under the current plan and you state thus, if the tax-free

7    spinoff is consummated, approximately 1.2 billion of the EFH

8    group's NOLs could survive and the net present value of

9    those NOLs could be worth approximately 380 million.  Again,

10   is that 380 million net present value calculation something

11   that was part of a board presentation, to your recollection?

12   A    Not this format coming down to that 380 million.  I

13   don't recall that in a board presentation.

14   Q    All right.  And was that figure, that calculation,

15   something that you discussed with EFH disinterested

16   directors?

17   A    No, again, coming down to the 380 million so the items

18   above it, the survival of NOLs, the raw amount of those

19   which is actually over 2 billion and then, you know, having

20   1.2 billion survive, I can specifically remember discussions

21   on that but then, carrying it forward to give it sort of a

22   current day talk about it in court kind of demonstrative, I

23   don't think we've brought it down to the 380 million in a

24   board presentation that I was part of.

25   Q    Okay.  I'd like to turn back to the stuff -- subject of
```

1    the -- your awareness of Department of Justice involvement

2    and you touch on this in Paragraph 27 --

3    A    Uh-huh.

4    Q    -- of your declaration and you state that you are aware

5    that the Department of Justice has stated on the record its

6    intention to vigorously oppose a taxable separation and

7    would pursue these and other remedies to avoid a so-called

8    stranded tax, correct?

9    A    Yes.

10   Q    All right.  And then you go on and mention that you're

11   aware of some situations in other cases where the Department

12   of Justice has unsuccessfully attempted to prevent a

13   stranded tax, right?

14   A    Right.

15   Q    And I believe you testified today that you're referring

16   to three cases that you're aware of on the -- or about three

17   cases.

18   A    I did say that.

19   Q    And so your conclusion with respect to the -- your

20   uncertainty as to whether the Department of Justice would

21   act as it stated it would is based on those three cases; is

22   that correct?

23   A    My basis for what the Department of Justice would do in

24   this case is based on their statement on the record in this

25   case --

1   Q     Yes.

2   A     -- and not related to those other cases.  In

3   determining whether or not they'd be successful in that, I

4   am aware that those other three cases exist and they make,

5   you know, challenges like that in those cases but I was

6   really referring to them appearing on the record here and

7   saying they would vigorously oppose that.

8   Q     Okay.  But you're not aware of any separate

9   representations or statements by the IRS or the Department

10  of Justice indicating anything to the contrary of what you

11  just said?

12  A     What they said on the record --

13  Q     Right.

14  A     -- which is they would contest it.

15  Q     Okay.

16  A     No, in fact, the other statements that they have made

17  to us in connection with the PLR when it's come up or in

18  connection with our large case audits have all been

19  consistent with that would be their intention.

20  Q     Okay.  You would agree that different creditor groups

21  in these matters had potentially adverse interests regarding

22  how to resolve tax-related issues such as how the NOLs

23  should be used?

24  A     Yes.

25  Q     And would you agree that you act and advise on behalf

1    of all the estates?

2    A    Like most of debtors' management, it's my

3    responsibility to evaluate and manage all the affairs of all

4    the estates that I'm responsible for.

5    Q    Okay.  So you view your role, similar to Mr.

6    Keglevic's, as balancing the interests of all of the estates

7    to the extent that you're involved in decision making and

8    advising regarding tax matters?

9    A    We certainly take the interests of every estate

10   seriously and try to act responsibly on behalf of all of

11   them, yes.

12   Q    You mentioned this morning that some creditors provided

13   comments on the tax matters agreement, creditors are better

14   advisors?

15   A    Correct.

16   Q    Okay.  Did EFH creditors provide comments on any tax

17   matters agreement?

18   A    EFH disinterested director advisors.  I don't recall

19   any separate EFH creditor advisors specifically.

20   Q    So, for instance, to your knowledge, the EFH indenture

21   trustee who we represent was not invited to provide comments

22   on the tax matters agreement, right?

23   A    So I'll pause on the not invited.  I would say that

24   everything that the debtors do in the case we file and we

25   provide notice to everyone and so the tax matters agreement

1    has been negotiated in the required part of the plan

2    confirmation for an extended period of time and I think that

3    when parties have weighed in with comments, we have dealt

4    with those or incorporated them or, you know, in -- included

5    them.  So I don't know what kind of an invitation exactly we

6    would send out so I -- I mean, I think we invited -- I don't

7    know, it doesn't feel like -- I -- I'm having trouble with

8    the word invited, as you can see.  I -- we file all of the

9    documents that are relevant and the various estates in this

10   case are all represented by a significant number of advisors

11   and then they weigh in with comments on behalf of their

12   estates.

13   Q    Now, when you say that you talked with creditors and

14   various advisors and some creditors commented on the tax

15   matter agreement, that didn't include the -- strike that

16   question.  I'll move on to another question.

17          MR. SKELLY:  I move to --

18       (Counsel conferred)

19   BY MR. SKELLY:

20   Q    I'd ask you to take a look if you would, please, at the

21   demonstrative that is the first tab in your book from this

22   morning.

23   A    Okay.

24   Q    DEM Howard 1.

25   A    I'm there.

1   Q    Okay.  At the top, it says EFH Consolidated Tax Group

2   Project NOLs at Emergence.  You see that?

3   A    Yes.

4   Q    In fact, the NOLs are EFH Corp. NOLs, aren't they?

5   A    As the title suggests, this represents all of the NOLs

6   reflected on the consolidated tax returns that had been

7   filed or as anticipated to be filed.  So NOLs are claimed

8   initially on a tax return and the tax return is the EFH

9   consolidated tax group return.  That's where those NOLs are

10  claimed.  So the 2014 NOLs, it's on the EFH consolidated

11  return that you would see the 1.767 going in of NOL.

12  Q    But do I understand correctly it is EFH that's the

13  taxpayer; is that correct?

14  A    The tax return actually says EFH and its consolidated

15  subsidiaries because it's elected to file as a consolidated

16  group.

17  Q    But you don't mean to imply by this heading that the T-

18  Side has any legal right to those NOLs, do you?

19  A    It's simply the label that the tax return that claims

20  the NOLs is filed with the IRS as.  So it's just the same as

21  the tax return.  That's the label that's on the slide.

22  Q    This morning you mentioned that you have had

23  conversations with Ms. Williamson regarding certain tax-

24  related matters, right?

25  A    That's correct.

1    Q    And you referred to a conversation that took place on

2    either the Tuesday or Wednesday, the day of the joint board

3    meeting which occurred on July 27th.

4    A    Okay.

5    Q    Is that correct?  And I think that you mentioned that

6    some topics that were discussed were something to do with

7    the tax matters agreement, I presume, the busted 351 and the

8    debt characterization ruling.  Were those topics that you

9    discussed with her?

10   A    Yes.

11   Q    Okay.  Can you tell me what do you recall about that

12   conversation?  Who said what to whom?

13   A    Well, the background on that conversation is that the

14   sites the joint board meeting that occurred that day, those

15   also are a quarter close so it was our quarter board

16   meetings that we -- and I'm a regular participant in the

17   audit committee of the boards which is where the financial

18   matters of the company are overseen by the audit committee

19   of the board.  Ms. Williamson is the chair of the audit

20   committee so every month -- I mean, every quarter close, we

21   would have -- she would have -- request meetings with a

22   number of people that would be presenting in those audit

23   committee meetings.  So, certainly, we would have discussed

24   just that day's audit committee meeting except that that

25   afternoon, we were scheduled to have a call with the IRS to

```
1    read us many of the rulings that we were going to obtain in

2    the case and the deadline for the private letter ruling was

3    the next day --

4    Q    Sure.

5    A    -- and we were also trying to answer questions from the

6    joint board meeting that morning.  So Ms. Williams had --

7    Ms. Williamson had requested that sometime during that day,

8    we get an our alone so that she could ask questions on a

9    variety of materials that she had read in preparation for

10   board meetings and so those three topics that you mentioned

11   are ones that she specifically enumerated to me that she

12   wanted to talk about and that we did discuss.

13   Q    Okay.  And can you summarize what you did discuss with

14   respect to the tax matters agreement?

15   A    The general discussion was around the fact that the

16   ancillary agreements had been in front of -- ancillary

17   agreements, the transition services agreement, the

18   separation agreement, the tax matters agreement had all been

19   in front of the boards a number of times on interim board

20   meetings and, generally, we had charts that tried to show

21   what open positions there were on those.  So it was really

22   an update on what had progressed or not progressed on the

23   tax matters agreement at that point in time.

24   Q    Okay.  And what about with respect to the busted 351?

25   A    The discussion there was around her wanting a deeper
```

1    understanding of the tax law that actually provides that and

2    how the IRS goes about evaluating that and what I expected

3    them to provide in the private letter ruling which I was

4    expecting to get in the next 48 hours.

5    Q    I understand.  And how about with respect to a debt

6    characterization ruling?

7    A    There the discussion was around what the significance

8    of it was and what kind of NOL balances would remain which

9    had not been anticipated at the EFH estate before.

10   Q    And what did you say to her and what did she say to you

11   with respect to that issue, to the best that you can recall?

12   A    I described that when 108 doesn't apply, then you don't

13   have any attribute reductions so any NOLs that remained

14   after the busted 351 transaction would generally continue to

15   be available at EFH.

16   Q    All right.  What other discussions do you recall having

17   with Ms. Williamson regarding these or other issues apart

18   from -- specific discussions you recall apart from that

19   July 27th?

20   A    There's a pretty high volume of conversations.  Ms.

21   Williamson is not shy about asking for information and she's

22   a fairly voracious reader of materials that are sent her

23   way.  So it's extremely common for her to call me -- not

24   just me, many but she definitely is accustomed to contacting

25   me to ask questions and set up time to discuss specific tax

1    issues in connection with the restructuring case as well as

2    ongoing audit committee matters.

3    Q    Okay.

4            MR. SKELLY:  I'm just going to pause for a moment

5    here and consult with --

6        (Counsel conferred)

7            MR. SKELLY:  We have no further questions.

8            THE COURT:  Okay.

9            MR. SKELLY:  Thank you.  Thank you, Ms. Howard.

10           THE COURT:  Centurion?

11                       CROSS-EXAMINATION

12   BY MR. GLENN:

13   Q    Good afternoon.

14   A    Good afternoon.

15   Q    For the record, Andrew Glenn, Kasowitz, Benson, Torres

16   and Friedman on behalf of Centurion.  Ms. Howard, if you

17   could turn, please, to the tax memorandum which I believe is

18   DX-46 in your binder.

19   A    All right.  I'm there.

20   Q    Let me ask you some foundational questions before we

21   delve into this.  You were asked by Mr. McKane about the

22   potential consequences in relation to the stranded tax

23   issue.  You recall that?

24   A    Yes.

25   Q    And one of the available tools to, I believe, as you

1    stated it, mitigate the stranded tax liability as

2    implementing the check the box alternative, correct?

3    A    I don't know if it mitigates it as much as it spreads

4    the liability but check the box is one of the things we

5    talked about in connection with the stranded tax.

6    Q    Oh, okay.  And by checking the box, the effect of that

7    is that the entities whose box are checked become jointly

8    and severally liable for the entire tax, correct?

9    A    That's one of the consequences, yes.

10   Q    Okay.  So if you could turn, please, to Paragraph -- or

11   page 20 of the Exhibit 46, the omnibus tax memo, and, again,

12   for background, this memorandum was prepared in 2014,

13   correct?

14   A    Really?  That long ago?  Yes.

15   Q    October 1st --

16   A    Yes, actually, I see it, yes.  Okay.

17   Q    -- 2014.

18   A    All right.  I'm so sorry.  Yes, it was.

19   Q    Sure.  Okay.  And the discussion about the implications

20   of checking the box is on page 20 and 21, correct?

21   A    Uh-huh.

22   Q    Okay.  And you conclude at the end of the section

23   carrying over to 21, the last sentence of the last

24   paragraph, quote, "As a result, the debtors believe that a

25   check the box election would be an adverse outcome for all

1    parties."  Do you see that?

2    A    Yes.

3    Q    I'd like to focus on the potential adverse outcome to

4    TCEH in particular for a moment.  Okay?

5    A    Okay.

6    Q    Okay?  And just so the record's clear, is -- am I

7    correct that when you check the box, you can do it for any

8    of the consolidated entities or all of the consolidated

9    entities, correct?

10   A    It's entity by entity so you can make a selection.

11   Q    Okay.  So the EFH could make the determination to check

12   the box for TCEH and its subsidiaries and leave the other E-

13   Side entities as disregarded entities, correct?

14   A    Generally, that's correct.

15   Q    Okay.  So were you in court yesterday when Mr. Keglevic

16   testified?

17   A    No.

18   Q    Okay.  Do you understand that there are analyses

19   indicating that the TCEH first lien creditors are getting a

20   one plus billion dollar benefit by using the NOLs if the

21   Court confirms the plan?

22   A    So the number that you're using is -- I understand that

23   the busted 351 has a step-up in basis which is valuable and

24   we've had work done to assess that around a billion.

25   Q    Okay.  So I believe Mr. Keglevic testified as to that

1    yesterday and so we'll move forward.  So the stranded tax,

2    if the box were checked as against TCEH, how much would TCEH

3    be liable for if there's a taxable transaction?

4    A    So joint and several liability simply means that you

5    can get all of the tax against any one of the jointly-liable

6    or you can get it from a bunch.  You can go after all of

7    them for it.  Only one recovery but you can get it in

8    varying amounts.  So they would be jointly and severally

9    liable with any other parties responsible up to the full

10   amount of the tax.

11   Q    Fair enough but let's assume for a moment that the IRS

12   only enforced that against TCEH just to see the economic

13   impact.  Would TCEH be liable for the entire thing if the

14   box were checked?

15   A    Joint and several liability means that the IRS can go

16   against any one party and obtain their satisfaction.

17   Q    Okay.  So the stranded tax, the maximum amount is five

18   billion, six billion?  Can you just clarify that for the

19   record for a moment?

20   A    So there isn't actually a stranded tax right now so the

21   amount of it is not computed anywhere.  Okay?  So at

22   different times in the case, different numbers are being

23   used but in the context of where we are right now with the

24   debt characterization number that's been given, generally,

25   what we were trying to refer to and be grounded on is the

1   cancellation of the 33 billion of TCEH debt.  It's what

2   would give rise to a large tax and so if it's 33 billion and

3   you subtract the basis you have which is 6-1/2 billion and

4   you use all the inner wells you have which is, hopefully, .3

5   billion, you still have a big residual times 35 percent and

6   so whatever that is, you know, six -- so at the time of this

7   memo, there was different computations being evaluated for

8   stranded tax but whatever that tax liability is, it can be

9   fully recovered as a collections matters from any one party.

10  Q    Do you -- are you able to estimate that number as you

11  sit here today?

12  A    If we're talking specifically about the transaction

13  whereby TCEH's debt is cancelled, there's not an EFH

14  transaction yet, then it's roughly 6-1/2 billion of tax.

15  Q    Okay.  So if $6-1/2 billion is the outside maximum

16  liability for TCEH and the lenders are getting a $1 billion

17  benefit from the plan if the Court confirms it, you're

18  looking at a $7 billion swing in value between the worst

19  case scenario for the stranded tax for the T-Side and the

20  use of the NOLs if the plan is confirmed, correct?

21  A    I mean, I don't think about the lenders point of view

22  very often but, I mean, if you want to mix it in there, that

23  way I -- following your math.

24  Q    Math is correct, correct?

25  A    Yes.

1            MR. GLENN:  Nothing further.

2            THE COURT:  Redirect?

3                       REDIRECT EXAMINATION

4    BY MR. MCKANE:

5    Q    Ms. Howard, you're almost done, promise.  Let's go

6    maybe in a little reverse chronological order in terms of

7    some of the questions.  Mr. Glenn, his last question, was

8    talking about the maximum outside liability and the question

9    before that he posed was about the stranded tax but you in

10   your answer, I believe, started to explain that if the T-

11   Side went with the Cody ruling, that would trigger $33

12   billion in tax, right?

13   A    Right.

14   Q    What happens if the T-Side goes and the E-Side says I'm

15   not sticking around, I want to go too?  What happens then?

16   A    Well, then the tax liability is much larger because the

17   taxable separation on both sides is a much bigger number.

18   the 6-1/2 billion, I was limiting that to the T-Side

19   transaction only.

20   Q    And based on the Cody ruling, do you have any sense of

21   how much additional liability would be triggered if the E-

22   Side tried to go taxable as well?

23   A    Oh my God, these are such big numbers.  So, you know,

24   it's double that.  It's very big.

25   Q    All right.  Let's -- if you don't mind, if we go back

1    to your written directive for a second -- sorry, that is

2    Tab 4 of your binder --

3    A    Uh-huh.

4    Q    -- Mr. Skelly asked you the series of questions

5    regarding page 7, the chart on page 7?

6    A    Yes?

7    Q    And I believe in response, you were -- you were asked,

8    basically, was this information presented in exactly this

9    way to the board -- the boards and your answer was I believe

10   not exactly in this format.  Can you explain to the Court

11   how this information about the incremental value, the total

12   value of the step-up and the potential for an incremental

13   value, how was that conveyed to the board, to the best of

14   your recollection?

15   A    So, as I recall, you know, everything that presents the

16   fair market value of TCEH, what the net present value of the

17   step-up in the pervert stock sale, the 1.1 we talked about,

18   certainly, the amount of TCEH assets.  So the step-up of the

19   3.6 billion and comparison to a regular step-up in a taxable

20   transaction, I just think the only part that we -- I don't

21   recall seeing in a board presentation was when we converted

22   that to a net present value of the incremental tax savings

23   between, you know, the taxable step-up and the specific

24   busted 351 step-up but all the components of it before that

25   I believe we presented to the board and to the disinterested

1    director advisors.

2    Q    All right.  So other than reducing it down to an MPV,

3    you believe everything else was presented to the board?

4    A    Yes.

5    Q    All right.  And, Ms. Howard, if you don't mind turning

6    to page 11 of your written direct?  And I believe Mr. Skelly

7    in his questioning asked you about this chart as well and I

8    believe you gave a similar answer with regard to the -- this

9    information wasn't presented in this exact format to the

10   board.  Could you explain to the Court what information was

11   presented to the board?

12   A    Again, starting at the top, we would -- we -- we've

13   presented the projected NOL assuming at 12/31/16 of 8.3 and

14   we have then our disclosure statement.  The taxable gain in

15   the preferred stock sale of 5.8 which relieves NOLs of the

16   2.4 billion -- and I -- after that, I can't -- I'm not

17   certain if we've shown them projections of the E-Side

18   cancellation of debt calculation but I know everything up to

19   that point we would have presented to the board.

20   Q    All right.  So you -- to the best of your recollection,

21   you conveyed to the board the gross number of NOLs that

22   would be available to the E-Side to -- and then did you also

23   identify that there -- some would be reduced by the Cody on

24   the E-Side?

25   A    We definitely communicated and, really, the month of

1    May, June and July when the debt characterization ruling was

2    out there, that's when we were constantly saying the effect

3    of no 108 is there's going to be NOLs surviving and there's,

4    you know, about 2.4 of those based on everything we know and

5    some of that will get used up and the E-Side Cody, that

6    depends on what kind of transaction there is on the E-Side

7    as to what recoveries are there so, you know, we're

8    speculating a little bit there but -- so we definitely

9    communicated all of that information that there'd be well

10   over a billion dollars of NOLs.

11   Q    And do you -- to your knowledge, was the board also

12   informed that this information about the availability of

13   NOLs was communicated to creditors and bidders as well?

14   A    Oh, yes, in the update on transaction status, you know,

15   we would have covered all the kinds of diligence things that

16   bidders were doing in the case and that certainly include

17   evaluating NOLs.

18   Q    All right.  I want to change subjects again to another

19   topic that Mr. Skelly covered.  Mr. Skelly asked you about

20   the ability in the Prefco or the busted 3 -- the taxable

21   land of the busted 351.  If you could put asset -- they not

22   only had a stepped up -- oh, strike that.  Do you recall the

23   discussion about questions that could go -- the assets that

24   could go into that busted 351 zone?

25   A    Yes.

1    Q    All right.  And I believe Mr. Skelly asked you some

2    questions about those that had a built-in gain, right?

3    A    Right.

4    Q    And those were Comanche Peak and the retail business,

5    right?

6    A    Correct.

7    Q    And Mr. Skelly also asked you some questions about

8    could you put in assets that had a negative basis, right, to

9    offset some of that positive basis.  Do you recall that?

10            MR. SKELLY:  I'm objecting here.

11            THE COURT:  I don't think he got there.

12            MR. MCKANE:  Yeah, I believe he talked a built-in

13    lost assets.  That was referred to, Mr. --

14            THE COURT:  Okay.

15            THE WITNESS:  I --

16            THE COURT:  Do you recall that?

17            THE WITNESS:  So let -- so my recollection is that

18    I discussed built-in lost assets and he clarified his

19    question of instead of doing that scenario where you put in

20    built-in lost assets, could you simply not put in as many

21    built-in gain assets and I answered that question.

22    BY MR. MCKANE:

23    Q    All right.  Then let's build on that.

24    A    Okay.  All right.

25    Q    Of those two assets, right, based on your understanding

1    of their current values, if you just put Comanche Peak in

2    the busted 351, do you meet or exceed the level of NOLs

3    available if the T-Side wasn't taxable?  Let me say it

4    another way.  All right.  If the TCEH first lien lenders go

5    taxable, do they get a step-up in basis?

6    A     Yes.

7    Q     And do you have a general understanding of the size of

8    that step-up in basis?

9    A     Yes.

10   Q     If the debtors are trying to induce the TCEH first lien

11   lenders to go tax free, right, they're putting these assets

12   into a busted 351, correct?

13   A     Right.

14   Q     Based on your understanding of the value of Comanche

15   Peak, if they put just Comanche Peak into the busted 351, is

16   the amount of the step-up equal to the step-up that's

17   available through the tax (indiscernible)?

18   A     No, it'd be insufficient to do that.

19   Q     And I believe both Mr. Skelly and Mr. Glenn asked you

20   questions about, you know, what would happen if they went

21   taxable and I believe Mr. Glenn, in particular, was posing

22   you a hypothetical about if the TCEH lenders went for it in

23   a taxable transaction and then created all this stranded tax

24   and you're checking the box.  With regard to checking the

25   box, that creates liability at the entity level or at the

1    asset level?

2    A    At the entity level.

3    Q    All right.  If EFH checked the box at the entity level,

4    to your knowledge, did that have any impact on the ability

5    of the TCH first lien lenders to foreclose on their assets?

6    A    To my knowledge, that wouldn't limit them from

7    foreclosing on their assets.

8    Q    All right.  And one final area, Mr. Skelly asked you

9    about page 16 of your written direct and he put up the last

10   sentence of a paragraph.

11           MR. MCKANE:  Can we put that on the screen,

12   please?

13   BY MR. MCKANE:

14   Q    Are you there?

15   A    Yes.

16   Q    All right.  My understanding is Mr. Skelly had asked

17   you about the introductory clause.  While I believe it's

18   uncertain that a taxable separation would occur if the TCEH

19   creditors attempted to pursue such a transaction but he did

20   ask you about this -- the rest of the sentence, right, where

21   you state I believe that inducing the TCEH creditors not to

22   produce such a transaction is in the best interest of each

23   of the debtor's estates.  Do you see that?

24   A    Right, that's really the guts of the sentence.

25   Q    Why?

1  A    Because at the end of the day, on behalf of EFH and

2  filing a tax return that would reflect the taxable

3  separation and the large stranded tax that would be

4  catastrophic for that estate, can't force the TCEH first

5  liens necessarily to do a tax-free spinoff but if you could

6  get them to do a tax-free spinoff, it would be beneficial to

7  EFH, EFIH and TCEH.

8  Q    And, specifically, that's what you mean by each of the

9  debtor's estates?

10  A    Yes.

11          MR. MCKANE:  No further questions, Your Honor.

12          THE COURT:  Thank you.  You may step down.

13          MR. MCKANE:  Your Honor, the debtors are prepared

14  to call their next witness and I'll give the podium to my

15  partner, Mr. Barack Echols.

16          THE COURT:  Okay.  And that's -- remind me, who

17  are we --

18          MR. MCKANE:  Unless you wanted to (indiscernible)

19  break at this time.

20          THE COURT:  We will.  I'm just trying to remember

21  who the next witness is.

22          MR. ECHOLS:  It's Mr. Ying, Your Honor.

23          THE COURT:  Mr. Ying?  Okay.  Take five minutes.

24      (Recessed at 3:03 p.m.; resumed at 3:15 p.m.)

25          THE CLERK:  All rise.

```
                                                    Page 141
 1              THE COURT:  Please be seated.

 2              All right.

 3              MR. ECHOLS:  Good afternoon, Your Honor.

 4              THE COURT:  Good afternoon.

 5              MR. ECHOLS:  Allow me to introduce myself.  I

 6   haven't had the pleasure of appearing before you.  My name

 7   is Barack Echols.  I'm with the Chicago office of Kirkland &

 8   Ellis and I'm here on behalf of the debtors.

 9              THE COURT:  Okay.

10              MR. ECHOLS:  We would like to call David Ying.

11              THE COURT:  All right.  Mr. Ying is ready to go,

12   so as soon as we wake up over there we'll be --

13              THE CLERK:  I'm sorry.

14         (Laughter)

15              THE CLERK:  Please raise your right hand.

16                     DAVID YING, WITNESS, SWORN

17              THE CLERK:  Please state and spell your name for

18   the record.

19              THE WITNESS:  David Ying, D-A-V-I-D Y-I-N-G.

20              THE CLERK:  Thank you.

21              THE COURT:  Thank you.

22              Please be seated, Mr. Ying.

23              THE WITNESS:  Thank you, Your Honor.

24              MR. ECHOLS:  May I proceed?

25              THE COURT:  Yes.
```

1                      DIRECT EXAMINATION

2    BY MR. ECHOLS:

3    Q     Mr. Ying, where do you work?

4    A     I work at Evercore.

5    Q     And what's the current position that you hold there?

6    A     I am a senior managing director at Evercore and I run

7    the firm's restructuring and debt advisory business.

8    Q     How long have you worked at Evercore?

9    A     Twelve years.

10   Q     And prior to and including Evercore how many years have

11   you worked generally as a restructuring advisor?

12   A     Well, I got my MBA in 1978 and I've been engaged in the

13   restructuring advisory business since 1985.

14   Q     Would you describe just briefly and generally the types

15   of things that you've done as a restructuring advisor?

16   A     I've advised companies both big and small in

17   bankruptcies, in 363 sales.  I've advised companies in and

18   out of court.  Out of course we do exchange offers, M&A,

19   financings, debt renegotiations, exchange offers.

20   Q     Sir, were you and Evercore retained to serve as

21   financial advisors for the debtors in this case?

22   A     Yes.

23   Q     When was that?

24   A     In the summer of 2012.

25   Q     And what were you and Evercore retained to do?

1    A    It was a very broad assignment.  But, essentially, it

2    was to evaluate the company's financial condition, its

3    financial prospects, to look at all of its various debt

4    obligations and to assist the company and its outside legal

5    advisors in trying to devise a way to restructure the

6    company and preserve as much enterprise value as possible.

7    Q    Were you the lead Evercore professional in that

8    retention?

9    A    From a restructuring perspective, yes, but I also have

10   many partners involved particularly on the M&A side.

11   Q    Now, Mr. Ying, I know you weren't here yesterday, but

12   while Mr. Keglevic was on the stand Mr. Pedone mentioned

13   your name.  He didn't say anything bad.

14        (Laughter)

15   Q    But he asked --

16   A    Thank you.

17   Q    -- Mr. Keglevic if based on your position as a

18   financial advisor you were familiar with the nature of the

19   plan that's being proposed here.  Mr. Keglevic said you

20   were; is that accurate?  You are familiar with the nature of

21   the plan that's being proposed here?

22   A    Yes.

23   Q    And there was a discussion that there had been a number

24   of plans prior to this one.  There was a reference to

25   Project Olympus and the Hunt plan and in the current plan.

1    Have you been involved working with the debtors throughout

2    all of those plans?

3    A    Yes.

4    Q    Okay.  As part of your role as the advisor to the

5    debtors, a financial advisor to the debtors, have you dealt

6    with creditors or creditors' representatives or any of the

7    E-Side or T-Side creditors?

8    A    Yes, I have.

9    Q    And have you dealt with both T-Side and E-Side

10   creditors?

11   A    I believe I've interacted with every creditor group

12   both on the E-Side and the T-Side.

13   Q    Have those dealings continued to the most recent period

14   where this plan has been pending in the last five months or

15   so?

16   A    Yes.

17   Q    Let me ask you first on the T-Side have you talked to

18   first who are of the -- on the T-First side?

19   A    Yes, I have.

20   Q    And neither -- could you identify for the Court,

21   please, who are some of the people that you've dealt with on

22   the T-Firsts?

23   A    Well, I have had conversations with Paul Weiss, for

24   example, which is the legal advisor to the T-Firsts.  I've

25   had discussions with several of the T-First lenders

1    themselves who I guess are on that ad hoc committee,

2    including Apollo and Brookfield and Angelo Gordon.

3    Q    And how about Oak Tree, any discussions with them?

4    A    Yes.  Oak Tree as well.

5    Q    Okay.  During the course of the discussions you've had

6    with the T-Firsts, and I'll focus on this most recent

7    period, did you come to any understanding of their position

8    with respect to whether they would pursue a taxable

9    transaction or agree to the tax free spinoff that's proposed

10   here?

11             MR. PEDONE:  Your Honor, objection, both on

12   relevance and to the extent that it calls for hearsay.  The

13   hearsay would be obvious statements of a party out of court

14   declarant for the truth of the matter asserted.  And going

15   to relevance, Mr. Ying is not a decision-maker for the

16   company.  So any state of mind that he might have is

17   completely irrelevant to the proceedings.

18             THE COURT:  Mr. Echols?

19             MR. ECHOLS:  Your Honor, it's certainly not

20   hearsay.  And I can establish that he actually had these

21   conversations with real people.  He was the financial

22   advisor of the debtors.  Mr. Pedone put on the record

23   yesterday that, of course, as the financial advisor he was

24   familiar and is familiar with this plan.  And as far as the

25   relevance, the whole past two days has been what

1    communications have the debtors had with various creditor

2    constituencies, and Mr. Ying is right in the middle of that.

3              THE COURT:  All right.  Well, I'll allow it in the

4    context of relevance, but let us avoid -- you know, Mr. Yong

5    can talk about who he talked to.  He can talk about

6    generally what they talked about as to a topic, but let's

7    avoid getting into issues about, you know, what their

8    positions have been.  I don't think that's where you're

9    headed, but if it is I would need to know why his, as I

10   think Mr. Pedone raised, unlike Mr. Keglevic who is the CFO

11   why the state of mind of Mr. Ying would be relevant.

12             MR. ECHOLS:  I was intending to, with the Court's

13   permission, to ask what his understanding of the positions

14   was based on his direct interactions with those

15   representatives of the creditors as the financial advisor to

16   the company who would advise --

17             THE COURT:  Right.

18             MR. ECHOLS:  -- Mr. Keglevic and others.

19             THE COURT:  All right.  Well -- all right.  Well,

20   lay the foundation and then we'll see when you get to that

21   question.

22             MR. ECHOLS:  Very good.

23   BY MR. ECHOLS:

24   Q    Now, Mr. Ying, were you directly involved in

25   negotiations with representatives of the T-First creditors?

1    A    Yes.

2    Q    You spoke with particular individuals who worked for or

3    represented those entities on the T-First side?

4    A    Yes.  I've had conversations with people at Apollo and

5    Brookfield and Oak Tree and Angelo.

6    Q    In the course of those discussions was they -- did they

7    make you aware of the positions they were taking in the

8    negotiations with the debtors concerning whether they would

9    agree to a tax free spinoff or go taxable?

10            MR. PEDONE:  Objection, Your Honor.

11            MR. ECHOLS:  It's a --

12            MR. PEDONE:  Making aware of the positions would

13   be acceptable, did they make him aware of the positions.

14   But then there was a either/or which would provide testimony

15   with regarding to alternative positions out of court

16   declarants elected.  And those declarants could be brought

17   here as witnesses, but there's been a purposeful decision

18   not to bring the declarant here for cross-examination.

19            THE COURT:  All right.  Well, I didn't find

20   anything offensive in the question that was asked.  We

21   haven't gotten to the sort of money question yet.  So I'll

22   overrule the objection.

23            MR. ECHOLS:  Okay.

24   BY MR. ECHOLS:

25   Q    And as far as just a yes or no did they -- I'll break

1    it down.  Did they make you aware of their position with

2    respect to whether they would pursue a taxable transaction?

3    A    Yes.

4    Q    Did they make you aware of their position as to whether

5    they would agree to a tax free spinoff?

6    A    Yes.

7    Q    Did you yourself personally communicate to the debtors

8    what you understood the positions to be of the T-First

9    creditors?

10   A    Yes.

11   Q    What did you tell them you believed those positions to

12   be?

13            MR. PEDONE:  Objection, Your Honor.  It's a way of

14   bringing in the statements.  There's only one source of that

15   understanding.  That's the out of court declarant who is not

16   available for cross-examination.

17            THE COURT:  All right.  Overruled. I think he can

18   tell me what his understanding of their position is for what

19   it's worth.

20            MR. ECHOLS:  Please proceed, sir.

21            THE WITNESS:  Could you restate the question?

22            MR. ECHOLS:  Sure.  Sure.

23   BY MR. ECHOLS:

24   Q    What did you tell the debtors?  You know, as the

25   financial advisor to the debtors what did you tell the

1    debtors about your belief or --

2    A    Well --

3    Q    -- your understanding of the T-First creditors'

4    position?

5    A    What I told --

6             MR. PEDONE:  Objection.

7             THE WITNESS:  -- the debtors and in particular Mr.

8    Keglevic --

9             THE COURT:  Overruled.  Go ahead.

10            MR. ECHOLS:  What -- I'm sorry.

11            THE WITNESS:  Excuse me.

12            THE COURT:  Well, you made him ask the question

13   again so then he had to object, so now I've got to overrule

14   the objection and now you can answer.  So don't ask him to

15   say the question again.

16        (Laughter)

17            THE WITNESS:  I'll try to remember, Your Honor.

18   Thank you.

19            MR. ECHOLS:  Do I have to ask it again or --

20            THE COURT:  No.  Please don't.

21        (Laughter)

22            THE WITNESS:  What I told Mr. Keglevic is that the

23   T-First lenders were -- and this is now in the time frame of

24   March/April when then T-Uns and the Hunt Group have now

25   disclosed that they can no longer execute on their purchase

1    of EFH and convert it to a REIT.

2            What the T-First communicated was that they want

3    to separate from --

4            THE COURT:  See, you're -- all right.  Go ahead.

5    Go ahead.

6            THE WITNESS:  Well, they said they wanted to

7    separate from the company; that they don't want any delay;

8    that they would be very happy separating in a taxable

9    fashion; and they just don't want a delay.  And they were

10   very skeptical of our ability to come up with a new

11   replacement deal for the Hunt T-unsecured proposal to

12   restructure the E-Side and have both T and E restructure and

13   exit bankruptcy at the same time.

14           MR. PEDONE:  Move to strike, Your Honor.

15           THE COURT:  I'm going to sustain that.

16   BY MR. ECHOLS:

17   Q    Could you, without telling specifically what

18   individuals on a T -- the T-First creditor said to you,

19   could you tell us please what you advised Mr. Keglevic as to

20   whether you believed there was a risk of a taxable

21   transaction being pursued?

22   A    Yeah.  I told Mr. Keglevic I thought that the T-Uns

23   were -- or T-First liens were very serious in their

24   position; that since we no longer had exclusivity they

25   actually had some real leverage on the company; and that our

1    negotiating posture vis-à-vis them was very much one of what

2    can we do to keep them engaged with a tax free proposal

3    because that was a much better for the E-Side, and that

4    anything we could do to accommodate their willingness to

5    pursue a tax free deal would be very difficult.

6            But if we could do it, we should consider all

7    means of doing so including sticking with the existing

8    proposal that was embedded in the Hunt plan with regard to a

9    tax free spin of T, the section -- plus the 351 step up

10   which is obviously the basis of the current plan in question

11   today.

12   Q   Okay.  I'm going to move off the T-Side and then to the

13   E-Side.  Have you, yourself, personally, Mr. Ying, had any

14   communications with representatives of E-Side creditors

15   within the last five months?

16   A   Yes.

17   Q   Okay.  And have any of those communications been with

18   Fidelity?

19   A   Yes, they have.

20   Q   Okay.  When's the most recent time you had any

21   communications with any representative of Fidelity?

22   A   Within the last 30 days.

23   Q   Would you tell me please, sir, in any of the

24   conversations that you had with Fidelity in these last 30

25   days or prior, did they ever raise with you a complaint

1    about this plan and the intention for EFH to consume NOLs in

2    connection with the tax free spinoff?

3    A    No.

4    Q    Did they ever ask you to go back to the company and ask

5    them to negotiate a different deal that would involved a

6    consumption of fewer NOLs?

7    A    No.

8    Q    How many times did they tell you that Fidelity was

9    against that element of this current plan?

10            MR. PEDONE:  Objection.  There's no foundation.

11            THE COURT:  Overruled.

12            THE WITNESS:  They never mentioned that.

13   BY MR. ECHOLS:

14   Q    Moving aside from the NOLs -- now you were talking to

15   them as your position -- in your position as a financial

16   advisor to the debtors; is that correct?

17   A    That is correct.

18   Q    As a financial advisor to the debtors were you open to

19   considering alternative plans?

20   A    Yes.

21   Q    At any time did Fidelity or any E-Side creditor provide

22   you with an alternative T-Side plan?

23   A    No.

24   Q    But you would have been open to receiving one had one

25   been provided?

1    A    Yes.

2    Q    At any time were you told -- you know, strike that.  We

3    move on there.

4            MR. ECHOLS:  Judge, as has been the practice we've

5    prepared a witness binder.  If I might approach and --

6            THE COURT:  Yes.

7            MR. ECHOLS:  -- give that to you.  Mine are much

8    thinner than (indiscernible)

9            THE COURT:  Thank you.

10   BY MR. ECHOLS:

11   Q    If I could please, sir, direct you in the binder that's

12   been provided to the very last tab.  There's a tab marked as

13   D-DIR Ying.  Oh, actually for you the -- maybe the second to

14   last --

15   A    The second to last tab.

16   Q    Yeah.

17   A    Yes, I have it.

18   Q    Okay.  Do you recognize the documents there behind the

19   D-DIR Ying tab?

20   A    Yes.

21   Q    What is it, please?

22   A    It's a declaration in support of the confirmation

23   hearing today.

24   Q    And is the information contained in that declaration

25   true and accurate to the best of your knowledge?

1    A    Yes.

2            MR. ECHOLS:  Your Honor, there have been no

3    objections raised to us with respect to the written direct

4    of Mr. Ying and all of the material cited in there as far as

5    exhibits that are previously admitted into evidence.  So at

6    this point we would move it into evidence.

7            THE COURT:  Any objection?

8            MR. PEDONE:  No objection --

9            THE COURT:  All right.

10            MR. PEDONE:  -- of Mr. Ying's declaration.

11            THE COURT:  It's admitted.

12        (Debtors' Exhibit D-DIR Ying was admitted)

13    BY MR. ECHOLS:

14    Q    I would like to turn now specifically, Mr. Ying, to

15    questions of valuation.  Were you asked to perform a

16    valuation here by the debtors?

17    A    Yes.

18    Q    And what were you asked to value?

19    A    I was asked to value TCEH as a stand-alone entity as

20    well as the value of the incremental tax benefits that would

21    accrue to the TCEH company pursuant to a proposed busted 351

22    election.

23    Q    And, sir, this is a silly question.  Have you ever

24    testified as an expert before with respect to valuation

25    issues?

1    A    Yes.

2    Q    Now did you perform a valuation here?

3    A    Yes, I did.

4    Q    And did you reach a valuation conclusion with respect

5    to reorganized TCEH and with respect to the busted 351?

6    A    Yes.

7    Q    You prepared a number of demonstratives to aid your

8    testimony; is that correct?

9    A    Yes.

10   Q    If I could direct you and Your Honor to the first tab I

11   believe, D-DIR Ying 1.  And is this one of the

12   demonstratives that you prepared?

13   A    Yes.

14   Q    Rather than going from top to bottom, you know, let me

15   start the other way.  Could you first please just give the

16   Court your bottom line opinion with respect to what the

17   value of reorganized TCEH will be upon emergence?

18   A    The bottom line of the chart is actually a valuation of

19   the both TCEH and the tax basis step up. and the midpoint of

20   the range is 11.3 billion with a high of 12.1 and a low of

21   10.5 billion.

22   Q    What methodology, sir, did you use to reach this

23   valuation opinion?

24   A    So this is a composite valuation.  We valued, again,

25   TCEH on a going concern basis referencing both trading

1    multiples, primarily total enterprise value to EBITDA

2    multiples for comparable companies and applying those

3    multiples to the projects for TCEH.  And we also looked at a

4    discounted cash flow analysis for TCEH taking a five-year

5    projection, discounting it at a WAC, applying a terminal

6    valuation to that DCF and coming up with a net present value

7    and then equally weighting both methodologies in addition to

8    the --

9    Q    That's --

10   A    -- enterprise value of TCEH we separately valued the

11   future cash flows or tax shields afforded by the stepped up

12   basis from the busted 351 transaction.

13   Q    I'm going to ask you to go through those one at a time

14   briefly to explain how you came to your conclusions.  And

15   let's start with the discounted cash flow or the DCF.  If

16   you would turn, please, to the next tab, demonstrative

17   number 2.

18          Now if I could -- are you there, sir?

19   A    Yes.

20   Q    If I could refer you to the bottom there's a portion

21   that says cash flow.  Do you see that?

22   A    Yes.

23   Q    Could you describe, what does this have to do with your

24   DCF analysis?

25   A    So this range of valuations which is from 11 to 12.4

1    with a midpoint of 11.7 represents the net present value of

2    the cash flows, and at the end of five years the calculation

3    of terminal value while discounted to the present at a

4    weighted average cost of capital.

5    Q    And what did you use as the financial projections for

6    the basis of this analysis?

7    A    We used the company's 2016 long-range plan or they

8    refer to it as an LRP.  And it's basically a plan they put

9    together at the end of 2015.  It gives us in this case six

10   years of projected cash flows.

11            MR. ECHOLS:  And just for the record, Your Honor,

12   the long-range plan was admitted, I understand, this morning

13   with Mr. Moldovan.  It's DX-382.

14   BY MR. ECHOLS:

15   Q    And then how did you -- and I think you may have

16   explained part of this already.  How did you then determine

17   the reorganized enterprise value range, you know, once you

18   had these financial results?

19   A    Again, with respect to DCF?

20   Q    Yes.

21   A    With respect to DCF we took the free -- unleveraged

22   free cash flow implied by the company's financial

23   projections over the next five years.  We calculated a

24   weighted average cost of capital looking at betas for

25   comparable independent power producers in the market,

1    appropriately adding to it various factors such as the risk

2    free rate, the equity risk premium, applying the betas from

3    the comps, and then levering up that or combining that

4    equity cost of capital with the debt cost of capital at the

5    emergence debt to equity ratio for the company to calculate

6    a WAC.

7              And then lastly we calculated terminal value.  The

8    terminal value actually is based on, again, using our

9    comparable company EBIDTA multiples and applying it to an

10   estimate of future EBIDTA at the end of the projection

11   period.  That particular EBIDTA estimate was based on input

12   from another consultant to the company, Phil Singer at

13   Energy Partners.  The reason we asked them to work with the

14   company to prepare a long run EBIDTA estimate at the end of

15   the projection period is that the company is subject to a

16   variety of environmental regulations.  Many of those

17   regulations had been proposed and it's not clear if and when

18   those restrictions may be put in place.

19             But we wanted FEP and the company to go through a

20   very detailed analysis of what the impact of those

21   environmental regulations might be because they may have a

22   material impact on the future earnings of each of the assets

23   of the company's feeder generation assets.  Some of the

24   impacts could be very significant, so significant that some

25   of these assets may be put out of commission because of the

1    environmental costs.  So we wanted them to help us come up

2    with a long range estimate of future earnings at the end of

3    the projection period.

4            So based on their input we came up with an

5    estimated EBIDTA, applied a multiple to it, and also a

6    discounted terminal value to the present at the WAC.  And

7    the composite of all that flows into the DCF calculation.

8    Q    And what, sir, was the conclusion as far as the range

9    determined by your DCF calculation?

10   A    Again, it's on the page at the bottom, midpoint of 11.7

11   billion.

12   Q    The section above the trading multiples, now that's

13   part of the separate methodology used in comparable

14   companies; is that correct?

15   A    That's correct.

16   Q    All right.  I would like to look at that in just a

17   little bit more specificity.  If you would turn, please, to

18   demonstrative 3 in your binder.

19   A    Yes.

20   Q    Now if you could just setting the table here please,

21   sir, what generally and briefly is involved in the

22   comparable company or the peer group company analysis?

23   A    Sure.  It's a couple of steps.  The first is to

24   identify a peer group of companies that are as comparable to

25   the business at TCEH as possible.  So we look for public

1    independent power producers, companies with a fairly pure

2    independent power producer business.  They're not in the

3    regulated business.  Some of them had retail which TCEH

4    obviously has, some of them don't.  But these are the three

5    companies that are the most closely -- viewed as closely

6    similar to the TCEH business.

7            Once we identified the companies, again, our

8    purpose is to calculate their trading value based on current

9    market statistics as reflected by the total enterprise value

10   EBIDTA ratio.  So the first step in the calculation is to

11   calculate the total enterprise value for each of the three

12   comparables.  Total enterprise value is equity value plus

13   debt at face less cash on the books, but there are always

14   some adjustments one has to make to get a pure number.

15           For example, if they have large tax attributes

16   NOLs that are disclosed and analysts talk about the value of

17   those NOLs, we back that out because tax attributes can vary

18   from company to company based on their corporate history and

19   aren't particularly germane to how the market is valuing the

20   earnings power of the business going forward.

21           Another adjustment we might make is if they have a

22   large hedged book of energy hedges.  Again, that can be a

23   management decision which is independent from the earnings

24   power of the business.  And correspondingly when we look at

25   the EBIDTA forecast for these companies we extract from the

1    EBIDTA the value of the hedges as they flow through their

2    future earnings and, therefore, we focus on their open

3    EBIDTA projections.

4           And you can see we've calculated the TEVs.  We've

5    calculated forward EBIDTAs and then we calculate the ratio,

6    and you can see them for projected years '17, '18 and '19 --

7    actually, excuse me, '16, '17, and '18.  Pardon me.

8    Q    And could you explain why you -- what companies you

9    picked and why you chose those specific companies?

10   A    Again, I said earlier, but I'll say it again, these

11   companies are the most comparable to TCEH.  They are all in

12   the independent power industry.

13   Q    I just don't know if we actually said their names.

14   A    Oh, I'm -- I apologize.  The names of the companies are

15   NRG, Dynegy and Calpine.

16   Q    Thank you.

17          And so you said that once you had done this

18   analysis you came up with a series of multiples; is that

19   correct?

20   A    That is correct.

21   Q    And now it doesn't appear that we've got the

22   application of the multiples to the debtors here for value.

23   Is that back on demonstrative 2?

24   A    Yes.  That's correct.

25   Q    Could you please direct the Court to what your analysis

1    of the comparable companies, how that applied to the

2    valuation of the EFH debtors here?

3    A    Sure.  So the comparable company analysis results in a

4    range of multiples on one-year, two-year and three-year

5    forward EBIDTAs.  You can see those ranges on the left side

6    of the page at the top.  So, for example, the forward

7    multiple for 2017 on 27 EBIDTA is seven and a half to eight

8    and a half and so on.  And so we applied those multiples to

9    the forecasted EBIDTAs for TCEH and you see the three ranges

10   or the three green bars.  We take the average of those

11   three, a simple average, equal weighting, and that simple

12   weighting is our comparable company trading valuation for

13   TCEH.

14   Q    And you're referring there, sir, to the middle portion

15   of demonstrative 2 where you've got the green midpoints for

16   2017 estimated 8.9 billion, then 8.454 billion for 2018 and

17   then 8.686 billion for 2019; is that correct?

18   A    Yes.  That's correct.

19   Q    Let's change to the value of the busted 31 tax basis

20   step up.  That's something else that you analyzed; is that

21   correct?

22   A    That is correct.

23   Q    And you have a demonstrative that you have prepared to

24   explain how you did that analysis.  If we turn to

25   demonstrative 4, please.

1    A    Yes.

2    Q    All right.  Would you please just walk the Court

3    through how you calculated the value of the tax basis step

4    up from the busted 351?

5    A    Sure.  The inputs for this schedule came from the

6    company and their tax advisors and, also, another consulting

7    firm, Duff & Phelps, who helped them with some of the

8    valuations for the specific assets.

9         But essentially what you can see on the page is

10   that this calculation is based on the presumption that the

11   transfer of assets to Preferred Co would include TXUE or TXU

12   Energy, Luminant which is their nuclear power plant, and

13   some of their gas fired turban plants which are quite small,

14   which have post the preparation of this schedule those

15   assets are no longer going to be included in the busted 351

16   transaction.

17   Q    Does that affect the -- does that affect your opinion

18   at all with respect to the value?

19   A    No.  You can see the third line there, the numbers are

20   quite small so it has a very modest impact.

21        So what you see here is the future depreciation

22   schedules based on the fair -- new fair market value for the

23   assets to be transferred obviously spread out over a period

24   of time.  And then the fourth line down you can see we're

25   subtracting the historical depreciation, tax depreciation

1    schedule for these very same assets.  The difference

2    obviously results in the incremental or stepped up

3    depreciation.

4            The line which refers to Section 328 adjustments,

5    it's a adjustment that the tax folks gave us that reflects

6    some very detailed issues with respect to the -- how the tax

7    code work that says that we couldn't fully utilize the tax

8    shield immediately; that we had to defer the rate of its

9    use.

10   Q    I think that's 382; is that correct?

11   A    That -- excuse me.  Pardon me.  I misread it.  Section

12   382, that's correct.

13   Q    Sure.

14   A    So the next line on the page shows what the net

15   depreciation which is the stepped up amount.  We then

16   applied the marginal corporate and state tax rate which the

17   company gave us.  And the net result is the cash tax benefit

18   or it's the cash benefit from the stepped up depreciation.

19           We then in the lower left-hand corner of the page

20   took those future cash flows, applied the company's equity

21   costs of capital because we think that's the right discount

22   rate to use.  This is, in fact, the number just before you

23   get to net income.  So we think equity cost of capital is

24   the  right risk adjusted rate of turn to use for this kind

25   of calculation.  And you can see that based on that discount

1    rate the midpoint of our range of estimates for the value of

2    the stepped depreciation is a billion-one-twenty-two.

3    Q    Okay.  If we can simplify and conclude this part of

4    your analysis, can we flip back to demonstrative number 1,

5    please.  Now if you just walk down the lines, then, if you

6    would to please explain to the Court the elements that led

7    you to reach to the conclusion of $11.3 billion valuation.

8    A    Sure.  So the trading multiples, you can see the range

9    of values.  We equally weight that with the range of values

10   for the DCF or cash flow valuation methodology.  So you can

11   see that our valuation just for the TCEH business itself

12   runs from a range of 9.4 to 10.9 billion with a midpoint of

13   10.2 billion.

14           In addition to that, we valued the net present

15   value of the tax basis step up.  Again, you can see the

16   range of 10.088 to 1.157.  We combined the two values, the

17   going concern value and the tax basis step up.  You can see

18   the range.  And then last you see the midpoint of the

19   consolidated valuation of 11.3 billion.

20   Q    Okay.  Thank you.  We can take that down.

21           I'm going to change topics here now, sir.  In

22   connection with the debtors' request for confirmation of

23   this plan were you also asked to provide a feasibility

24   analysis?

25   A    Yes.

1   Q    And what was the feasibility analysis you were asked to

2   provide?

3   A    We were asked to look at the emergence capital

4   structure and to evaluate whether we thought that the

5   company could reasonably meet its debts as they come due

6   based on the company's projections.

7   Q    What was your general conclusion in that regard?

8   A    The general conclusion is that the emergence capital

9   structure as proposed is feasible.

10  Q    And, again, you've got a couple of demonstratives we'll

11  go through quickly.  If we could put up demonstrative 5,

12  please.

13          Now could you explain to the Court, please, sir,

14  what did you do as far as analyzing cash flow and liquidity

15  for the reorganized TCEH?

16  A    Sure.  So on this page we laid out over time based on

17  the company's projections and superimposed upon that the

18  emergence capital structure both unlevered and levered free

19  cash flow of the business.  And you can see it's quite

20  positive throughout the projection period.  And at the

21  bottom of the page we looked at two liquidity measures.  One

22  is just absolute dollars of liquidity.  The red line is the

23  cash balance.  The blue line is the additional balance that

24  one gets from the undrawn revolver.  And then lastly we

25  measured liquidity at any given point in time just as a

1    percentage of the amount of the debt outstanding.

2            And you can see in all cases it's an ever

3    improving picture and the company's quite healthy on these

4    metrics.

5    Q    And did you also analyze some credit metrics?

6    A    Yes, we did.

7    Q    If we looked at demonstrative number 6, please, could

8    you please explain to the Court what you analyzed with

9    respect to the credit metrics for reorganized TCEH?

10   A    Sure.  So these are some very typical credit ratios

11   that the markets and we would look at.  So on the top of the

12   page we looked at both gross leverage and net leverage over

13   time as a percentage or as a ratio of EBIDTA.  And you can

14   see that gross leverage declines pretty rapidly.  And then

15   once the company actually, pursuant the projections pays off

16   substantially all of its debt, the ratio is pretty flat.

17           And then on a net leverage basis which compares

18   debt minus cash to EBIDTA actually you can see that cash

19   exceeds debt once you get to the year 2020 because you pay

20   off all the debt.

21           And on the bottom side -- path of the page we

22   looked at the ratios of EBIDTA to income and then EBIDTA

23   minus Cap X to income and you can see in both cases it shows

24   a very rosy picture of credit health going forward.

25           THE COURT:  You said income, but the term says

1    interest.

2           THE WITNESS:  I'm sorry.  My -- I apologize.  It

3    was it EBIDTA to interest and EBIDTA minus Cap X to

4    interest.

5    BY MR. ECHOLS:

6    Q    And based on both or all of these analyses, is your

7    conclusion that reorganized TCEH upon emergence will have a

8    relatively healthy balance sheet?

9    A    Yes.  It will have a very healthy balance sheet.

10   Q    And would you describe it as a favorable credit

11   position?

12   A    A very favorable.

13   Q    As a financial advisor, you know, based on your

14   understanding having, you know, worked on this in your

15   analysis would you say that reorganized TCEH would be in a

16   sufficiently healthy financial position to enter into M&A

17   transactions?

18   A    Yes.  Very much so.

19   Q    How about engaging in stock repurchase programs, is

20   that something that based on the financial status of

21   reorganized TCEH, would they be able to engage in those?

22   A    They certainly could engage in a very aggressive stock

23   buyback program purely from a financial standpoint.  Yes.

24   Q    What about dividend recapitalizations, would that be

25   something that was an opportunity that reorganized TCEH

1    could take advantage of?

2    A    Yes.  Again, based on these credit metrics the company

3    would have a large ability to incur additional debt to clear

4    a large dividend payment to its shareholders.

5    Q    Is that something that's commonly done in the industry?

6    A    It is quite commonly done across corporate America

7    these days.

8    Q    Based on your understanding of what TCEH will look like

9    from a financial perspective upon emergence, do you have any

10   opinion with respect to whether the restrictions that are

11   placed on the T-Side in this proposed plan, are those real

12   restrictions?

13   A    If you're referring to the tax matters agreement which

14   the T-Side and the E-Side have to enter into one another to

15   ensure that the tax free spin remains a tax free spin,

16   there's some very significant impediments on TCEH's

17   financial behavior going forward including restricting the

18   amount of stock buybacks it can incur and restricting their

19   ability to consider doing a dividend recap.

20   Q    And, similarly, M&A transactions, are there limitations

21   with respect to that as well?

22   A    Yes.  There definitely are restrictions on the types of

23   M&A transactions that TCEH can undertake.

24   Q    Thank you.

25        MR. ECHOLS:  I have no further questions, Your

1     Honor.  I would pass the witness.

2              THE COURT:  Okay.

3          (Pause)

4                     CROSS-EXAMINATION

5     BY MR. PEDONE:

6     Q    Good afternoon, Mr. Ying.  I'm Richard Pedone --

7     A    Good afternoon.

8     Q    -- of Nixon Peabody representing American Stock

9     Transfers, Indenture Trustee.

10             You would agree with Mr. Keglevic's statement

11    yesterday to the effect that relative to its peers TCEH will

12    not have significant leverage when it emerges, correct?

13    A    Yes.

14    Q    And what would you say the additional borrowing

15    capacity of the entity as its now scheduled to emerge if the

16    plan is confirmed would be?

17    A    Well, it depends on the purpose of the use of proceeds.

18    Q    What would the range be for different uses?

19    A    Well, if the desire of the company is to borrow money

20    to pay a dividend, I would say that they could certainly add

21    at least another turn of leverage meaning one times EBIDTA

22    to their capital structure.

23    Q    Which would be how much in dollars?

24    A    A little over a billion dollars.

25    Q    Okay.  So in all events it has significant additional

1    borrowing capacity?

2    A    Yes.

3    Q    And if the company were permitted to do some extent of

4    a buyback that would be one of the more restrictive

5    instances in which you could borrow, correct?

6    A    I don't understand what --

7    Q    In other words, the --

8    A    -- you mean by restrictive.

9    Q    So, in other words, the ability to borrow for that

10   purpose would be a purpose that resulted in a lower amount

11   of borrowing capacity than other purposes might have as

12   opposed to borrowing for an M&A transaction where they would

13   also be receiving perhaps assets or other purposes that

14   would drive the EBIDTA.  This is -- borrowing for a stock

15   buyback as a purpose is not accretive to the income of the

16   company.  So you would expect a lower --

17   A    I agree with that.

18   Q    -- borrowing amount.  So that's a fair minimum floor

19   for its borrowing capacity, a billion dollars?

20   A    Yes.

21   Q    And, in addition, the company is scheduled to have how

22   much in unrestricted cash on its balance sheet when it

23   emerges?

24   A    I believe the number is about a half a billion.

25   Q    Okay.  So in all events if the Court were -- and,

1  actually, it would help if you would turn to your

2  demonstrative number 4, please.  If you could turn to

3  demonstrative 4 for -- that you prepared or that is -- was

4  prepared for you.

5  A    I have it.  Thank you.

6  Q    In all events if the Court were to order that TCEH pay

7  the present value of the step up and basis to EFH Corp for

8  use of the NOLs, we're talking about a company that has the

9  ability between the cash on its balance sheet and its

10  borrowing capacity to make that payment and still emerge

11  from bankruptcy, correct?

12  A    I believe that's correct.  Yes.

13  Q    And, in fact, if that were the case in light of the

14  fact that TCEH holds a $700 million claim against EFH Corp,

15  it would be even easier because some of the cash paid for

16  the use of the NOLs would flow up, but then come back in

17  distribution, correct?

18  A    If that's how the waterfall works, sure, that would

19  happen.  Yeah.

20  Q    If that's how it would end up working.

21      (Pause)

22  Q    At any board meeting that you attended this year, and

23  you've attended many during this calendar year for EFH Corp

24  and its affiliates?

25  A    Yes, I have.

1  Q    Out of the board meetings that have taken place do you

2  know how many you've missed, if any?

3  A    I -- only less than the fingers on my one hand.

4  Q    So you've been at most of the board meetings this year?

5  A    A majority, yes.

6  Q    A majority.  And at any board meeting that you

7  attended, was there any discussion about the development of

8  a strategy by EFH Corp or the employment of a strategy by

9  EFH Corp to extract a monetary consideration for the use of

10  its NOLs?

11  A    I don't believe that that specific question was ever

12  discussed by the board.

13       (Pause)

14            MR. PEDONE:  No further questions.

15            THE COURT:  Thank you.

16            Redirect.  Oh, I'm sorry.  I'm sorry.

17            MR. GLENN:  Very briefly.

18            THE COURT:  I apologize.

19            MR. GLENN:  No problem.

20                     CROSS-EXAMINATION

21  BY MR. GLENN:

22  Q    Mr. Ying, Andrew Glenn from Kasowitz Benson on behalf

23  of Contrarian.  You testified on your direct concerning some

24  conversations you had with Fidelity and cited one as

25  recently as within the last 30 days, correct?

1    A    Yes.

2    Q    Okay.  And you were asked whether Fidelity had raised

3    the issue of the treatment of NOLs in the context of that

4    conversation, correct?

5    A    Yes.

6    Q    Okay.  You don't mean to tell the Court today that

7    because Fidelity didn't raise that issue to you that

8    Fidelity doesn't care about it, do you?

9    A    They haven't raised it with me and that's the answer to

10   the question that was posed.

11   Q    Fair enough.  And you've never been designated as the

12   person to negotiate with the T-Side with respect to the

13   treatment of the NOLs, are you?

14   A    I'm part of a big team of people at the company and

15   with legal and financial advisors and we talk to the first

16   lien constituency all the time at TCEH.

17   Q    Okay.  But no one has ever told you in words or in

18   substance, Mr. Ying, please negotiate with the T-Side about

19   consideration that you might be able to get for use of the

20   NOLs.  That's never happened, right?

21   A    I've never been designated the NOL negotiator, no.

22   Q    And, in fact, you're conflicted from doing so because

23   you're both the financial advisor on the T-Side and the

24   financial side on the E-Side, correct?

25   A    I'm the financial advisor to all the estates.

Page 175

1    Q    Thank you very much.

2            THE COURT:  Mr. Hogan.

3            MR. PEDONE:  Can I confer with Mr. Hogan for one

4    second, Your Honor?

5            THE COURT:  Uh-huh.

6        (Pause)

7                    CROSS-EXAMINATION

8    BY MR. HOGAN:

9    Q    Good afternoon, Mr. Ying.  Is it Dr. or Mr.?

10   A    No.  Just David Ying.

11       (Laughter)

12   Q    Can you tell me if there was a designated negotiator

13   for -- on the NOL issue on the EFH or on the TCEH side of

14   the ledger?

15   A    No.  No one has that title within either EFH or the

16   advisors to the company.

17   Q    Thank you.

18            With regard to the feasibility analysis that you

19   undertook, and specifically with regard to your

20   demonstrative number 6, a very simple question, and that is,

21   is did you undertake the feasibility analysis that did not

22   utilize the NOLs on the TCH side -- TCEH side, excuse me?

23   A    I have to refresh my memory by going back to the raw

24   data just to look at what tax position we used.  If you

25   could give me --

```
1    Q    And can you direct me to -- so I know what it is that

2    you're looking at to make that determination?

3    A    Actually, I'm going to go back to my expert report --

4    Q    Okay.

5    A    If that's okay?

6    Q    That's fine.

7    A    Because I have to look at the cash flows specifically.

8         (Pause)

9    A    So these cash flows assume that the company is

10   benefiting from the step up, but that 90 percent of the tax

11   shield from the step up is being paid out of the company

12   pursuant to a tax receivable agreement.

13        So the cash flows that you see here actually have

14   -- show the company is not itself benefiting from 90 percent

15   of the tax -- the step up in tax basis.  It's being paid out

16   as a separate cash flow stream, and pursuant to the T-Side

17   plan there's a separate TRA instrument that will be given to

18   the T-First creditors as part of the plan of reorganization.

19   Q    Wow.  That's complicated.

20   A    Sorry.

21   Q    No.  You're good.  You're fine.  I'm just trying to

22   understand.  So if I can boil it down to my level as it

23   were, the answer to your (sic) question is, is that there's

24   some portion of those NOLs that were utilized or -- strike

25   that.
```

1          The analysis for feasibility that you did

2    contained some portion of the utilization of those NOLs and

3    there's not a separate analysis that was done that didn't

4    utilize any aspect of the utilization of those NOLs?

5    A    I'll say it again and I'll try to -- by saying it again

6    I'll try to answer your question.

7    Q    Thank you.

8    A    The 90 percent of the value of the tax step up is going

9    to be incorporated in a separate security that the company

10   is going to issue called a TRA, a tax --

11   Q    Yes.

12   A    -- receivable agreement.  So 90 percent of the value to

13   step up in these feasibility projections are being paid out

14   in a separate instrument as if it were a debt obligation.

15   So the feasibility numbers you see here show the company not

16   benefiting from 90 percent of that tax step up.

17   Q    And then in turn benefiting from ten percent in other

18   words?

19   A    Only ten percent.  Yes.

20   Q    But there is a benefit?

21   A    Only ten percent of it.  Yes.

22   Q    And that benefit is to the TCEH estates?

23   A    That's correct.

24   Q    And is there a corresponding benefit to the E-Side

25   estates?

1    A    Well, pursuant to the plan of reorganization the E-Side

2    has the ability to realize value in its reorganization value

3    without any taxable transactions.  So indirectly, yes, there

4    is a benefit to the E-Side.

5    Q    Thank you.

6              MR. HOGAN:  No further questions.

7              THE COURT:  Thank you, Mr. Hogan.

8              MR. PEDONE:  Yes.

9              THE COURT:  Who are you --

10             MR. PEDONE:  Oh, I can wait.

11             THE COURT:  Well, wait.  No.  You already crossed.

12   What --

13        (Laughter)

14             MR. PEDONE:  I had a follow up on a new subject

15   that was touched on, Your Honor.  I'll wait until after --

16             THE COURT:  Well, no.  I'm not going to give you -

17   - the cross that was raised by one of your colleagues?

18             MR. PEDONE:  They're not my colleagues, Your

19   Honor.  They are all parties --

20             THE COURT:  We're all colleagues.

21             MR. PEDONE:  -- in the case.

22        (Laughter)

23             MR. PEDONE:  Your Honor, we are all --

24             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

25             THE COURT:  -- by your allies.

1           MR. PEDONE:  The statement wasn't necessarily an

2    allied statement, Your Honor.

3           THE COURT:  All right.  Well, go ahead and ask the

4    questions.  I generally go direct, cross, redirect and don't

5    like to go beyond that.  So if you have more cross, ask.

6    I'll let you have a second shot at it.

7           MR. PEDONE:  Thank you.

8                         CROSS-EXAMINATION

9    BY MR. PEDONE:

10   Q    The benefit that you referred to in the questions you

11   were just discussing for EFH Corp, have you provide -- have

12   you performed any monetary calculation of the value of that

13   benefit?

14   A    We have not.

15   Q    Okay.  Thank you.

16           THE COURT:  All right.  Redirect.

17           MR. ECHOLS:  Thank you, Your Honor.

18                      REDIRECT EXAMINATION

19   BY MR. ECHOLS:

20   Q    First off, Mr. Ying, there was a question posed to you

21   about whether there had been discussion of any monetary

22   consideration being provided to the E-Side for the NOLs.  Do

23   you recall that?

24   A    Yes.

25   Q    Now just to be clear, before the IRS private letter

1    ruling was received, what, if any, value was there of the

2    NOLs to the E-Side, to EFH?

3    A    Well, for -- the PLR, private letter ruling, I think

4    was filed when we -- when the company filed for bankruptcy.

5    So it's already been two years ago.  And through that

6    process I think our -- the companies and the tax advisors'

7    understanding of the implications of a restructuring on the

8    T-Side and a separation, either taxably or tax free, has

9    changed multiple times.

10             But I think up until the spring the view was that

11   there was no benefit to the E-Side from any of the NOLs that

12   resided within the consolidated estate, either in a taxable

13   or a tax free separation with T-Side.  The revelation about

14   their being an ability for E to have the benefit of NOLs

15   only happened in the last two months.

16   Q    And is it correct, as Mr. Keglevic was explaining

17   yesterday, that in a tax free transaction the understanding

18   was that the NOLs would disappear into the black hole, and

19   then in a taxable they would all be consumed; is that

20   accurate?

21   A    Yes.  Up until May that was the common belief.

22   Q    Now Mr. Pedone, when he was up, changing to a separate

23   topic, asked you about a couple of different alternatives if

24   the NOLs were not included in the proposed transaction and

25   what the result would be.  But just to be clear, has anyone

1    on the E side ever proposed to you or anyone at the debtors,

2    to the best of your knowledge, any alternative plan here?

3    A    No.  And we certainly said to the E-Side, if you have

4    any better ideas, please tell us.  It's only been two years.

5    Q    And we heard both today and I think yesterday in court

6    and testimony, you know, Mr. Keglevic described this as a

7    package deal or as an integrated plan.  Does that make any

8    sense to you?

9    A    Yes.  It very much does.  It is an integrated plan.

10   Q    And could you explain to the Court what that means?

11   A    Well, I guess we're all burdened by history because

12   we've all been here for two years.  But last year when we

13   agreed to the plan proposed by the Hunts and the T-

14   unsecured, the T-Firsts agreed to go along with that plan

15   and agreed to pay 550 million to the T-Uns in return for a

16   partial step up of an amount roughly equal to the one we're

17   now discussing.

18            Now at that time the value of the T business was

19   about twice what it is today, 15 billion roughly versus say

20   10 billion today, actually not twice, but it was in the high

21   teens.  Pardon me.  The debt plans were certainly trading

22   like at 65 cents and today they're only trading at 32 cents.

23            So the challenge in getting the T-Side to agree to

24   that deal was that a taxable separation was actually worth

25   more to them because the market value of T was much higher

1   versus the cost basis which hasn't changed.  That step up in

2   a full taxable deconsolidation was more valuable to the T-

3   Side than the partial step up.

4          So we had to ask them, please agree to do this so

5   that the E-Side could have the benefit of a tax free

6   transaction and that not have a budget stranded tax.

7   Fortunately, they said yes.  The T-Uns then said, we can't

8   close the deal.  We no longer have exclusivity.  The T-

9   Firsts say, hey, I'm sick and tired of this deal.  I want to

10  go home and take my assets.  I'm a first lien creditor.  I'm

11  proposing a plan.  Our position was, please don't do that.

12  Please stick with the old deal.  Please don't trigger a tax

13  at EFH and wipe out all the creditors there.

14          And this as an integrated plan we said, look, we

15  had no leverage or negotiating position to say, oh, by the

16  way, just because the value of your asset now has been cut

17  substantially and the value of a taxable separation is now

18  worth less than what we promised you originally, do you want

19  to re-trade, do you want our original promise.  We were in a

20  position where it was very difficult to say, oh, by the way,

21  because you lost half your value now you can have less by

22  cooperating with us.

23          That's what I meant by integrated plan and the

24  negotiating leverage we had in dealing with the T-Firsts.

25  Q    And as the financial advisor to the --

1          MR. PEDONE:  Your Honor, move to strike his

2     statements with regard to what the T-Firsts said.

3          THE COURT:  Overruled.

4          MR. ECHOLS:  I'm sorry.

5     BY MR. ECHOLS:

6     Q    And I'm sorry.  As the lead financial advisor to the

7     debtors throughout the course of these cases are you

8     advising the debtors that the current plan that's proposed

9     and on the table is in the best interests of all the

10    estates?

11    A    Yes, we are.

12    Q    Okay.

13         MR. ECHOLS:  I have no further questions, Your

14    Honor.

15         MR. PEDONE:  Your Honor, redirect (sic) on the

16    last statements concerning the discussions with the T-Firsts

17    and the leveraging.

18         THE COURT:  All right.

19         MR. PEDONE:  A completely new topic. Thank you.

20                 RECROSS-EXAMINATION

21    BY MR. PEDONE:

22    Q    Mr. Ying, you described a lack of leverage with regard

23    to the T-Firsts, correct?

24    A    Yes, I did.

25    Q    Okay.  And in -- at what time period was the analysis

1    undertaken, if it was undertaken, that there was a lack of

2    leverage against the T-Firsts in these discussions?

3    A    As soon as we felt that the T-Uns and the Hunts were

4    not going to be able to execute on their merger and

5    reconversion of the E-Side, which was in March/April of this

6    year.

7    Q    Okay.  And in connection with those early analyses of

8    whether or not leverage existed did you participate in any

9    meetings where the impact of the prior settlement agreement

10   was discussed?

11   A    I don't understand your question about --

12   Q    Sure.

13   A    -- the impact of the prior settlement agreement.

14   Q    Sure.  The prior settlement agreement, it's your

15   understanding -- well, you understand today that the prior

16   settlement agreement does not restrict EFH Corp's use of its

17   NOLs, correct?

18            MR. ECHOLS:  Your Honor, this is beyond the scope

19   of the redirect here.

20            THE COURT:  Yeah.  You're getting quite far

21   afield.  How is this relevant or how is this within the

22   scope of what was discussed?

23            MR. PEDONE:  It's directly applicable to what the

24   leverage that they had is, Your Honor.  The settlement

25   agreement freed the EFH --

1           THE COURT:  All right.  I understand.

2           MR. PEDONE:  -- Corp debtors --

3           THE COURT:  Okay.  I understand.

4           MR. PEDONE:  I'm a little articulated getting at

5      it, but I'll try to tighten it up.

6           THE COURT:  I understand now.  You may proceed.

7           MR. PEDONE:  Thank you.

8      BY MR. PEDONE:

9      Q    Mr. Ying, you understand that the prior settlement

10     agreement does not restrict EFH Corp to a particular use of

11     its NOLs, correct?

12     A    Yes.  I agree with that.

13     Q    And when the discussions first began in March/April

14     that you've been referring to or analysis first began, were

15     there any discussions about making use of that new leverage

16     or that freedom to do what EFH Corp wished with its NOLs

17     that was provided by the settlement agreement?

18     A    Well, there was certainly thought about should we start

19     fresh with a blank piece of paper and start all over again

20     with the T-Firsts.

21     Q    Let's come back.  Were there discussions at that time

22     in March/April about the benefit optionality that the

23     settlement agreement provided to EFH Corp?

24     A    I'm trying to answer your question by indirectly saying

25     that you certainly could try to start the negotiation with

1    the T-First with a blank piece of paper.

2    Q    Uh-huh.

3    A    But the strong feeling was is that if we start with a

4    blank piece of paper, their piece of paper will be we're

5    going to deconsolidate taxably.  We're going to get out of

6    here as quickly as possible.  You guys figure it out and

7    pick up the pieces of what's left at EFH.  We did not want

8    that.

9    Q    Okay.  So my questions are were there discussions about

10   that optionality that the settlement agreement provided to

11   EFH Corp that you were aware of?  Do you have any knowledge

12   of whether any such discussions about the optionality took

13   place?  Just your knowledge of the discussions is all I'm

14   looking for.

15   A    No.

16   Q    So you -- the follow on would be that you're not aware

17   of any discussions taking place about EFH Corp making use of

18   any leverage that that optionality provided by the

19   settlement agreement might afford EFH Corp?

20   A    No, because --

21   Q    Just your awareness.

22   A    Yes.  My awareness is, no, because we don't think that

23   that was really optionality because it was optionality with

24   no leverage.

25   Q    And your --

1    A    We had no negotiating chips to start fresh with the

2    TCEH Firsts because starting fresh with them would imply a

3    taxable reconsolidation --

4    Q    So I'm --

5    A    -- which we did not want because we thought that was a

6    negative for all the estates.

7    Q    I appreciate your understanding, your opinions as being

8    what you might want to discuss.  But my question is your

9    personal knowledge as someone who sat in on board meetings

10   and participated in the re -- participated in a variety of

11   discussions.  You do not have any knowledge about any

12   discussions taking place at all about EFH Corp making use of

13   leverage that could be afforded by that optionality, do you?

14   A    I don't.

15   Q    Thank you.

16           THE COURT:  Mr. Echols, anything further?

17           MR. ECHOLS:  Your Honor, I have no questions.

18           THE COURT:  All right.  Thank you, Mr. Ying.

19           All right.  Do we have time for one more?

20           MR. MCKANE:  We think we do, Your Honor.  If

21   you're willing -- is the cutoff at 5:30ish or 5:30?

22           THE COURT:  Yeah.

23           MR. MCKANE:  Okay.  We believe we can address

24   another witness if that's alright.

25           THE COURT:  Okay.  And who are we going to call?

1              MR. MCKANE:  It's going to be Mr. Todd Filsinger

2     of Filsinger Energy Partners.

3              THE COURT:  All right.  Any objection, Mr. Pedone?

4     Any objection to --

5              MR. PEDONE:  No.  With proceeding?  No.

6              THE COURT:  Yeah.  Okay.  We're going to take just

7     a few minutes and then we'll have Mr. Filsinger on the

8     stand.

9              MR. MCKANE:  Thank you, Your Honor.

10         (Recessed at 4:16 p.m.; reconvened at 4:25 p.m.)

11             MR. GANTER:  Your Honor, John Ganter of Kirkland &

12    Ellis on behalf of the debtors.  And the debtors would call

13    Todd Filsinger.

14             THE COURT:  All right.  Mr. Filsinger if you'd

15    just take the stand there and remain standing.

16             THE CLERK:  Please raise your right hand.

17              TODD WILLIAM FILSINGER, WITNESS, SWORN

18             THE CLERK:  Please state and spell your name for

19    the record.

20             THE WITNESS:  Todd William Filsinger.

21             THE CLERK:  And spell it.

22             THE WITNESS:  T-O-D-D, W-I-L-L-I-A-M,

23    F-I-L-S-I-N-G-E-R.

24             THE CLERK:  Thank you.

25                        DIRECT EXAMINATION

```
 1    BY MR. GANTER:

 2    Q    Mr. Filsinger, could you please introduce yourself.

 3    A    Yes, I'm Todd Filsinger from Filsinger Energy Partners.

 4    Q    And what does Filsinger Energy Partners do?

 5    A    Filsinger Energy Partners is an energy advisory firm.

 6    We provide due diligence, financial analysis, and management

 7    services in the electric sector.

 8    Q    And what is your title?

 9    A    I am the senior managing director.

10    Q    And, Mr. Filsinger, by whom are you retained in this

11    matter?

12    A    We were retained by counsel to EFH.

13    Q    And --

14    A    And TCEH.

15    Q    And when did that occur?

16    A    It happened in -- originally in 2012.

17    Q    Mr. Filsinger, did you prepare a declaration in

18    anticipation of your testimony here today?

19    A    Yes, I did.

20    Q    I'd direct you to tab 1 in your binder and you'll see

21    that it's a document labeled D-DIR Filsinger.  Do you

22    recognize this?

23    A    Yes, I do.

24    Q    And is the information contained in there accurate to

25    the best of your knowledge?
```

1    A    Yes, it is.

2    Q    And you made this declaration in support of the plan of

3    reorganization?

4    A    Yes, I did.

5             MR. GANTER:  Your Honor, it's our understanding

6    that there have been no objections to Mr. Filsinger's

7    written direct testimony, and the exhibits cited therein

8    have already been entered into evidence, so we'd move

9    Mr. Filsinger's declaration -- or written direct into

10   evidence at this time.

11            THE COURT:  Any objection?

12            MR. PEDONE:  No objection, Your Honor.

13            THE COURT:  It's admitted.

14       Debtors' Exhibit No. D-DIR Filsinger was admitted)

15   BY MR. GANTER:

16   Q    Mr. Filsinger, before we get to your opinions and work

17   on this case could you please tell us about your educational

18   background?

19   A    Yes, I am a mechanical engineer.  I got a mechanical

20   engineering degree from Colorado State University and an MBA

21   with an emphasis in financial from CU Colorado.

22   Q    And how long have you been at FEP?

23   A    I've been at FEP for approximately six years.

24   Q    And can you provide the Court with a short summary of

25   your professional experience before you founded FEP in 2010?

1    A    Yes.  I've been in the energy sector for approximately

2    30 years.  I started off with a company called Ardiviewbec

3    (ph), which does due diligence around the power and power

4    stations.  From there I went to a company called Hegularbye

5    (ph) and did their market price practice as well as their

6    evaluation practice.  That firm was eventually purchased by

7    a company out of the UK called PA Consulting Group.  I ran

8    their energy group for about ten years or so before I

9    started Filsinger Energy Partners.

10   Q    And can you please tell us a little bit about your team

11   at Filsinger Energy Partners?

12   A    Yes, we have accumulated a team of experts across the

13   sector, including the lead risk manager from Calpine, used

14   to be the chief risk officer of Calpine Corporation.  We

15   have the lead of the due diligence from SAIC of Ardiviewbec

16   who led their engineering practice who leads all of our

17   engineering.  And we have one of the asset manger from

18   Dynegy as a -- we also brought on to lead our market price

19   forecasting practice Gene Agress (ph) who is from Ventex

20   (ph), one of the leading software providers of our

21   generation analysis.

22   Q    Can you please describe your experience working with

23   companies like EFH, Luminant, and TXU Energy?

24   A    Yes.  We work with a lot of different power companies

25   on a multitude of issues looking at, for example, coal

1    companies, looking at the value of the coal, the cost,

2    operational efficiencies, things on that order.  From tower

3    stations we look at value of the stations as well as the

4    market price that supports that.  Efficiencies around that,

5    the operations, due diligence around transactions.  We work

6    for the regulated entities around regulatory issues.  I

7    think I mentioned last time to the Court we worked on Senate

8    Bill 7 in Texas that did some of the regulatory stuff that

9    brought the market to the competitive situation it's in

10   today.  And we've also worked on a tremendous number of

11   restructurings.

12   Q    Now focusing now on your work with the debtors.  You

13   indicated earlier that FEP was retained in 2012, right?

14   A    That is correct.

15   Q    Since being retained in 2012 have you had any

16   involvement with the debtors' long-term -- long-range

17   planning process?

18   A    Yes.  Since being retained by the debtors we have

19   worked with them on their long-range plan or LRP since that

20   time.  So from 2012 through today.

21   Q    Can you please give us a high level overview of what

22   that plan process involves?

23   A    Yes.  So when the company does its long-range plan it

24   starts -- it does really a ground up process.  So they start

25   around mid-year where they meet -- the two business units in

1    particular -- or I guess the business services Luminant and

2    TXU, those business units meet, discuss the assumptions, all

3    the issues, the market, all the issues, cost, everything

4    that builds their plan from the ground up.  We were in --

5    we've attended those meetings, worked with them on those

6    assumptions back and forth.

7           From there they put together the plan and then

8    it's tested among the management group and adjustments made

9    until everyone is happy with it and then it goes up to the

10   senior management team.

11   Q   And you touched on it briefly there, but describe a

12   little bit about what Filsinger Energy Partners does in

13   connection with the long-range planning process.

14   A   As part of the long-range planning process we were --

15   we have been involved -- intimately involved in the process

16   in looking at the assumptions, testing the assumptions,

17   pressure testing the assumptions, and providing input to

18   those different assumptions and meetings.

19           We've also as part of that though we've -- you

20   know, as we look at the Cap X and the O&&M and all those

21   things that go into the LRP we visited virtually all the

22   facilities, the gas plants, the coal plants, the nuke

23   plants, and the lignite mines as well as the TXU operations

24   in Sierra in looking at and assessing the level of cost, the

25   condition of the assets, and the O&M and the different

1    aspects of that as we evaluated the LRPs.

2    Q    Mr. Filsinger, in connection with the confirmation of a

3    plan what did the debtors ask you to provide an opinion on?

4    A    Yes, several things.  One is the -- looking at the

5    long-range plans, the validity thereof for the 2015 LRP and

6    then the update that was done roughly in January 1st of

7    2016, which I will refer to as the zero plus 12 update to

8    that plan.

9         In addition -- so we looked at that plan and the

10   planning process to make an opinion as to whether that

11   represented the likely outcome for the company in the years

12   forward for that plan.

13   Q    Are you -- the EBITDA projections?

14   A    Yes, the -- well it's the EBITDA and the Cap X

15   projections.

16         In addition to that we were asked, as Mr. Ying

17   mentioned, to look at a terminal value at the end of that

18   for EBITDA, so a terminal EBITDA value, and then also to

19   look at the environmental rules that -- the proposed rules

20   and what that potential impact could be on the portfolio

21   with respect to the terminal value.

22   Q    And --

23   A    The terminal EBITAA, excuse me.

24   Q    Excuse me.  In deriving the terminal year EBITDA did

25   you look at -- do that for both of the forecasts that you

1    mentioned, the 2015 LRP and the zero plus 12 2016 forecast?

2    A    Yes, we did that for both the LRP and the update zero

3    plus 12.

4    Q    In providing -- in connection with providing your

5    opinion did you prepare an expert report on this?

6    A    Yes, we did.

7    Q    So let's now walk through your opinions briefly, and

8    we're going to start with the validation of the company's

9    long-range fore cost for reorganized TCEH.

10          On that point can you describe the work that you

11   did to validate the reasonableness of the debtor' long-term

12   financial performance projections?

13   A    Yes.  So again, we were involved in the entire process,

14   so we had input on the assumptions, the models, and the

15   like, and so when there were issues we brought them up

16   during the process.  So we were involved in that level of

17   the process.

18          We also tested different assumptions looking at

19   how those impacted to make sure that it made sense as to

20   what types of assumptions were underlying the plan.

21          And again in addition to that we met with

22   management on many occasions, met with staff, and then like

23   I say, myself and our engineers visited the different

24   facilities, spoke with the O&M managers, the plant managers,

25   and also looked at the condition of the assets, the level of

1    O&M, and you know, visiting the mines, looking at the

2    different seams, how that would affect future cost, and

3    things on that order.

4              MR. GANTER:  Could you please display the graphics

5    from pages 5 and 6 of the written direct that was just

6    entered into evidence?

7    BY MR. MCKANE:

8    Q    Mr. Filsinger, what did you conclude with regard to the

9    long-term projections in that 2015 LRP?

10   A    Well once thing that I failed to mention is the other

11   thing we did is we independently ran the numbers using the

12   same price curving through our proprietary models also to --

13   as a further test of how that impacted the different units

14   -- power plants as well as TXU.  And you can see here when

15   you look at the graphics for both the LRP, which is the

16   upper one, and the 2016 zero plus 12, they are both within

17   the realm of reasonableness from the modeling perspective.

18   I believe there's about a .1 percent variance between FEP

19   and the company in 2015 LRP and .4 percent in the lower.

20             Our conclusion based on this as well as all the

21   due diligence we did around the process and the numbers was

22   that this gave a good representation of what the company

23   could expect for performance in the time frame shown from an

24   EBITDA and Cap X perspective.

25   Q    Turning now to your work (indiscernible) terminal year

1    EBITAA projection for these forecasts, first describe what

2    you did to determine those terminal year projections?

3    A    When we looked at -- so we built on the analysis shown

4    in this graphic.  We have a -- you know, modeled the

5    different units, modeled TXU, and built that model out for a

6    period of time, because the company only -- as Mr. Ying

7    mentioned, only models for a certain period of time.  So we

8    took that and carried it out further using our proprietary

9    models.  And in doing so we then NPBed that back to get a

10   reasonable long-term -- in 2015 LRP the 2022 terminal value

11   -- terminal EBITDA, and the 2023 for the 2016 zero plus 12.

12   Q    And what did you conclude with regard to the terminal

13   year EBITDA for the 2012 LRP?

14   A    As shown in the first graphic we had a terminal value

15   of 1.628 billion in 2000 -- I think from the 2015 LRP,

16   that's for 2022.  And for 2023 in the 2016 zero plus 12

17   forecast 1.920 billion.  Excuse me.

18            MR. GANTER:  Your Honor, no further questions for

19   Mr. Filsinger at this time.  I will, as has been our

20   practice, so I don't forget hand up the green sheet, it just

21   represents the written direct that was just entered into

22   evidence.

23            THE COURT:  All right.  That's okay.  I'll just

24   lose it.

25            All right.  Mr. Pedone, any questions?

1            MR. PEDONE:  Your Honor, no questions.

2            THE COURT:  All right.  Mr. Glenn, Mr. Hogan?

3            MR. GLENN:  No, Your Honor.

4            MR. HOGAN:  No, Your Honor.

5            THE COURT:  Okay.  Thank you, sir, you may step

6    down.

7            THE WITNESS:  Thank you, Your Honor.

8            THE COURT:  You're welcome.

9            MR. MCKANE:  Your Honor, at this time we have

10   another witness that we could put on, but I think it may be

11   more appropriate for tomorrow morning, because based on what

12   I just experienced we may be able to do this through --

13   without having to put the witness on the stand and

14   recollects that's Ms. Jane Sullivan, the valid expert.

15            MR. PEDONE:  I believe we will be able to.  We

16   have one document to come in and if we're going to get to a

17   resolution then Ms. Sullivan can come in without being here

18   live through her declaration.

19            THE COURT:  All right.  Let's wait until tomorrow

20   then.

21            MR. MCKANE:  All right.

22            THE COURT:  All right.  Very good.

23            MR. MCKANE:  Your Honor, with that tomorrow we

24   will address the voting through Ms. Sullivan or through --

25   as needed and then Ms. Williamson and then one additional

1    person, it's Mr. David Herr (ph) of Duff & Phelps who will

2    attest to the evaluation of certain plants that were done.

3    It's a building block to the liquidation analysis.

4            THE COURT:  Okay.  Very good.  Anything else

5    before we adjourn for the evening?

6            All right.  Thank you very much, we're adjourned.

7    We'll reconvene quarter to 10:00, and I'll see counsel in

8    chambers at 9:30.

9            MR. MCKANE:  Thank you, Your Honor.

10       (Whereupon, these proceedings were concluded at 4:39

11   PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 200

```
 1                    I N D E X

 2

 3   WITNESSES              EXAM BY                    PAGE

 4   Kristopher Moldovan    Mr. Esser                    14

 5                          Mr. Pedone                   38

 6                          Mr. Esser                    50

 7   Carla Howard           Mr. McKane                   51

 8                          Mr. Skelly                  101

 9                          Mr. Glenn                   128

10                          Mr. McKane                  133

11   David Ying             Mr. Echols                  142

12                          Mr. Pedone                  170

13                          Mr. Glenn                   173

14                          Mr. Hogan                   175

15                          Mr. Pedone                  179

16                          Mr. Echols                  179

17                          Mr. Pedone                  183

18   Todd William Filsinger   Mr. Ganter                188

19

20                    E X H I B I T S

21   PARTY          NO.                               EVID.

22   Debtors'       Moldovan Declaration                17

23                  DX-356                               36

24                  DX-519, DX-572, DX-577               37

25                  DX-382, DX-457, DX-491, DX-493,
```

Page 201

1                           EXHIBITS

2    PARTY           NO.                                  EVID.

3    Debtors'        DX-494, DX-508, DX-512, DX-514,

4                    DX-515, DX-528, DX-530, DX-574,

5                    DX-575, DX-576, DX-578, DX-579,

6                    DX-580, DX-581, DX-582, and DX-583    38

7                    D-DIR Howard                          96

8                    DX-4, DX-13, DX-46, DX-448, DX-451,

9                    DX-713, DX-765-766                    100

10                   D-DIR Ying                            154

11                   D-DIR Filsinger                       190

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    We, Sherri L. Breach, Penny A. Skaw, Dawn South, Linda S.

4    Foley, and Tracey Williams, certify that the foregoing

5    transcript is a true and accurate record of the proceedings.

6    Sherri Breach    Digitally signed by Sherri Breach
     DN: cn=Sherri Breach, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2016.08.19 12:24:54 -04'00'

7    Sherri L. Breach

8    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

9    Pamela A. Skaw    Digitally signed by Pamela A. Skaw
     DN: cn=Pamela A. Skaw, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2016.08.19 12:25:24 -04'00'

10   Pamela A. Skaw

11   Dawn South    Digitally signed by Dawn South
     DN: cn=Dawn South, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2016.08.19 12:29:20 -04'00'

12   Dawn South

13   AAERT Certified Electronic Transcriber CET**D-408

14   Dawn South    Digitally signed by Dawn South
     DN: cn=Dawn South, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2016.08.19 12:32:35 -04'00'

15   Linda S. Foley

16   Approved Electronic Transcriber

17   Tracey Williams    Digitally signed by Tracey Williams
     DN: cn=Tracey Williams, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2016.08.19 12:35:31 -04'00'

18   Tracey Williams

19   AAERT Certified Electronic Transcriber CET**152

20   Date:  August 18, 2016

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501