Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                        :

                                  :    Chapter 11

6   ENERGY FUTURE HOLDINGS        :

    CORP., et al.,                :    Case No. 14-10979(CSS)

7                                 :

              Debtors.            :    (Jointly Administered)

8   _____ :

9

10

11

12                               United States Bankruptcy Court

13                               824 North Market Street

14                               Wilmington, Delaware

15

16

17                               August 19, 2016

18                               10:17 AM

19

20   B E F O R E :

21   HON CHRISTOPHER S. SONTCHI

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECR OPERATOR:   BRANDON MCCARTHY

1    Notice of Filing Third Amended Joint Plan of Reorganization

2    of Energy Future Holdings Corp., et al., Pursuant to Chapter

3    11 of the Bankruptcy Code [D.I. 9199; filed August 5th,

4    2016] (as may be further modified, amended, or supplemented,

5    the "Plan")

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Sherri L. Breach, Pamela Skaw &

25                     Tracy Williams

1  A P P E A R A N C E S :

2  KIRKLAND & ELLIS

3       Attorney for the Debtors

4

5  BY:  BARACK ECHOLS, ESQ.

6       CHAD HUSNICK, ESQ.

7       MARK MCKANE, ESQ.

8       BRYAN STEPHANY, ESQ.

9       MICHAEL ESSER, ESQ.

10

11  POTTER ANDERSON CARROON LLP

12       Attorney for Deutsche Bank New York

13

14  BY:  R. STEPHEN MCNEILL, ESQ.

15

16  VENABLE, LLP

17       Attorneys for Pimco

18

19  BY:  JEFFREY S. SABIN, ESQ.

20       JAMIE EDMONSON, ESQ.

21

22  PACHULSKI STANG ZIEHL & JONES

23       Attorney for EFIH Second Lien Noteholder

24

25  BY:  LAURA DAVIS JONES, ESQ.

1   FOX ROTHSCHILD

2        Attorney for the Ad Hoc TCEH Noteholders

3

4   BY:  JEFFREY M. SCHLERF, ESQ.

5        ERIN SMITH, ESQ.

6

7   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

8        Attorneys for the Ad Hoc Committee of TCEH First Lien

9        Creditors

10

11  BY:  JACOB A. ADLERSTEIN, ESQ.

12       ADAM BERNSTEIN, ESQ.

13       MICHAEL TURKEL, ESQ.

14       COLIN KELLY, ESQ.

15

16  YOUNG CONAWAY STARGATT & TAYLOR, LLP

17       Attorney for the Ad Hoc Committee of TCEH First Lien

18       Creditors

19

20  BY:  PAULINE K. MORGAN, ESQ.

21

22  SULLIVAN & CROMWELL

23       Attorney for E-Side Committee

24

25  BY:  BRIAN GLUECKSTEIN, ESQ.

1   NIXON PEABODY

2        Attorney for AST as EFH Indenture Trustee

3

4   BY:  GEORGE SKELLY, ESQ.

5        RICHARD PEDONE, ESQ.

6        ERIK SCHNEIDER, ESQ.

7        MORGAN NIGHAN, ESQ.

8

9   MCELROY DEUTSCH MULVANEY & CARPENTER LLP

10        Attorney for TCEH Debtors - Conflict counsel

11

12   BY:  DAVID A. PRIMACK, ESQ.

13

14   MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

15        Attorney for E-Side Committee

16

17   BY:  MARK A. FINK, ESQ.

18

19   MORRIS JAMES

20        Attorney for Law Debenture

21

22   BY:  STEPHEN MILLER, ESQ.

23

24

25

1    MUNGER, TOLLES & OLSON

2         Attorney for TCEH Debtors - Conflict Counsel

3

4    BY:  TOM WALPER, ESQ.

5

6    SEWARD KISSEL, LLP

7         Attorney for Wilmington Trust as TCEH First Lien

8         Agent

9

10   BY:  ARLENE ALVES, ESQ.

11        MARK KOTWICK, ESQ.

12

13   KLEHR HARRISON HARVEY BRANZBURG LLP

14        Attorney for UMB Bank, Indenture Trustee

15

16   BY:  SEAN BRENNECKE, ESQ.

17

18   AKIN GUMP STRAUSS HAUER & FELD

19        Attorney for UMB Bank, Indenture Trustee

20

21   BY:  CHRISTOPHER CARTY, ESQ.

22        ABID QUERESHI, ESQ.

23

24

25

1   PROSKAUER ROSE

2        Attorney for EFH Corp.

3

4   BY:  PETER YOUNG, ESQ.

5        MARK THOMAS, ESQ.

6        MICHAEL FIRESTEIN, ESQ.

7

8   MORRISON & FOERSTER, LLP

9        Attorneys for TCEH Committee

10

11  BY:  TODD GOREN, ESQ.

12       ERICA RICHARDS, ESQ.

13

14  CROSS & SIMON, LLP

15       Attorneys for EFH Indenture Trustee

16

17  BY:  CHRISTOPHER SIMON, ESQ.

18

19  HOGAN MCDANIEL

20       Attorneys for Fenicle, Fehy & Jones

21

22  BY:  GARVAN MCDANIEL, ESQ.

23       DANIEL HOGAN, ESQ.

24

25

Page 8

1    BIELLI & KLAUDER

2        Attorneys for EFH Corp.

3

4    BY:  DAVID KLAUDER, ESQ.

5

6    KASOWITZ BENSON TORRES & FRIEDMAN, LLP

7        Attorneys for Fenicle, Fehy & Jones

8

9    BY:  ANDREW GLENN, ESQ.

10

11   SHEARMAN & STERLING

12       Attorneys for Deutsche Bank New York

13

14   BY:  NAME ILLEGIBLE ON SIGN IN

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.

4              Good morning.

5              MR. FIRESTEIN:  Good morning, Your Honor.  I'm

6    Michael Firestein of Proskauer and I represent EFH Corp.

7    acting on behalf of and at the direction of EFH's

8    disinterested directors, Billie Williamson and Donald Evans.

9              Before we call Ms. Williamson to the stand we

10   thought it would be prudent and efficient to address the

11   Court and advise of a resolution of a number -- in fact, all

12   of the objections that were presented with respect to her

13   written direct.  And if I could just sort of recite what the

14   resolution is and then we can proceed.

15             THE COURT:  Okay.

16             MR. FIRESTEIN:  Thank you.

17             So the indenture trustee raised a few buckets of

18   objections, the first of which was with respect to a number

19   of hearsay objections, and those are all going to be handled

20   in the fashion that the matters asserted are not asserted

21   for the truth, but for Ms. Williamson's state of mind and

22   decision-making process the information that she had.  And

23   that is going to be the resolution of those hearsay

24   objections.

25             Secondly, with respect to Ms. Williamson's use of

1    the term, business judgment, we have slightly modified the

2    declaration and I believe there is a dash-R declaration

3    that's in the binder that we've provided to Your Honor.

4    Those words have been modestly changed to express her view

5    in my opinion and business belief.

6              And thirdly there are a couple of other objections

7    with respect to paragraphs 15 and 36 to Ms. Williamson's

8    declarations -- declaration which have been withdrawn.

9              In addition to that there were -- there are two

10   exhibits to Ms. Williamson's declaration, DX-59 and --

11             THE COURT:  I'm sorry.  The entirety of those

12   paragraphs are withdrawn?

13             MR. FIRESTEIN:  No.  No, not the paragraphs, the

14   objections have been --

15             THE COURT:  Oh, the objections --

16             MR. FIRESTEIN:  -- withdrawn --

17             THE COURT:  -- are withdrawn.

18             MR. FIRESTEIN:  -- to paragraphs 15 and 36.  And

19   actually let me digress for one second, Your Honor.

20             I believe what's going to happen is the indenture

21   trustee would like to provide ultimately a courtesy copy

22   with the highlighted portions of the written declaration to

23   which the objections were asserted so that Your Honor can

24   see exactly what the language was for which the objections

25   have either been withdrawn or resolved.

1           THE COURT:  Okay.

2           MR. FIRESTEIN:  And lastly there are two board

3     decks that were identified as DX-59 and 61.  One of them is

4     the June 24th, 2016 board deck and the other one is the June

5     10th, 2016 board deck.  The resolution of that, Your Honor,

6     is when the Court makes its ruling with respect to what

7     other -- whatever other issues are going to be addressed

8     concerning the board decks in connection with Mr. Keglevic's

9     testimony, that ruling will be applicable to those two board

10    decks as well.

11          THE COURT:  Okay.

12          Mr. Pedone.

13          MR. PEDONE:  Your Honor, just to clarify for the

14    record, we asserted that there was hearsay that should not

15    be admitted in paragraphs or should be admitted for limited

16    purposes in paragraphs 3, 20, 31, 32, 34, 41, 45, 46, 50,

17    51, 56, and 59 so that the statements in those paragraphs of

18    an out of court declarant are subject to the limited

19    admission that was just discussed and so that the Court can

20    actually handle this in an efficient manner.  We will

21    highlight the language that was objected to in objections

22    that you did not see and you'll know -- be able to read it

23    and know what it was.

24          THE COURT:  All right.

25          MR. PEDONE:  Thank you.

1          THE COURT:  You're welcome.

2          Yes.

3          MR. FIRESTEIN:  Can I proceed?

4          THE COURT:  Anything further before we go to the

5    witness?

6          MR. PEDONE:  No, Your Honor.

7          THE COURT:  Okay.  Yes.  You may proceed.

8          MR. FIRESTEIN:  The debtors call Ms. Billie

9    Williamson, Your Honor.

10          THE COURT:  All right.

11          Ms. Williamson, if you would take the stand and

12    remain standing for your affirmation please.

13          MS. WILLIAMSON:  Yes.

14          THE CLERK:  Raise your right hand.

15    BILLIE WILLIAMSON, WITNESS, SWORN

16          THE CLERK:  Please state your full name and spell

17    your last name for the record.

18          THE WITNESS:  Billie Ida Williamson,

19    W-I-L-L-I-A-M-S-O-N.

20          THE CLERK:  You may be seated.

21          THE COURT:  Thank you.

22          Make yourself as uncomfortable as possible --

23        (Laughter)

24          THE COURT:  -- and try to be close to the

25    microphone.  That would be very helpful.

1          THE WITNESS:  Yes.

2          THE COURT:  Thank you.

3          THE WITNESS:  Okay.

4          MR. FIRESTEIN:  May I proceed, Your Honor?

5          THE COURT:  Yes, you may.

6          MR. FIRESTEIN:  Thank you very much.

7          For the record Michael Firestein of --

8   representing EFH Corp acting on behalf of and at the

9   direction of EFH's disinterested directors Billie Williamson

10   and Donald Evans.

11          In connection with Ms. Williamson's direct

12   examination, Your Honor, I believe we handed out in advance

13   a small witness binder and the Court also should have her

14   revised written declaration and you should have those

15   already; is that right?

16          THE COURT:  Yes.

17          MR. FIRESTEIN:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19   BY MR. FIRESTEIN:

20   Q    Good morning, Ms. Williamson.

21   A    Good morning.

22   Q    Could you please introduce yourself to the Court again

23   and who you are?

24   A    My name is Billie Williamson and I serve as a director

25   of Energy Future Holdings Corporation and I'm also a

1    disinterested director for the EFH estate.

2    Q    And could you briefly describe for the Court your

3    professional background?

4    A    Yes, sir.  I am a certified public accountant in the

5    State of Texas.  I spent 33 years with Ernst & Young as an

6    assurance partner, also as a corporate finance type partner

7    in the mergers and acquisitions area.  In addition, I was

8    CFO of a company in Dallas called AMX Corporation and I was

9    senior vice-president of finance at Marriot International.

10             I retired from Ernst & Young in 2011 and

11   subsequent to that time I've served on the boards of

12   companies who have stock-traded on the New York Stock

13   Exchange with the exception of EFH which had public debt.

14   Q    And what other boards do you serve on besides EFH?

15   A    Currently I serve on CSRA Inc. which is a defense

16   contractor in Washington, D.C.; Janus Capital Group which is

17   an asset manager; PENTA or PIC which is an industrial

18   manufacturing company; and I previously served on the board

19   of Annie's, Inc., an organic food company and on Excellis,

20   Inc., another defense contractor.

21   Q    And, Ms. Williamson, when did you join the board of

22   EFH?

23   A    In about March of 2013.  It was subsequent to the

24   filing of the 2012 10-K.

25   Q    And what committees do you serve on at EFH?

1   A    I'm the chair of the audit committee of EFH and I also

2   am one of the members of the disinterested directors for

3   EFH.

4   Q    Do you have an understanding as to why you were

5   selected as an EFH disinterested director?

6   A    Yes.  I do not serve on the board of any of the other

7   debtors in the case, and I'm also considered independent.

8   Q    And to your knowledge what are the disinterested

9   directors of EFH responsible for?

10  A    We were charged by the board of EFH to look at each

11  transaction or complicated matter to determine whether it

12  was a conflict matter.  A conflict matter was defined as

13  something involving two debtors, two or more debtors in the

14  case.  And then once we determined something was a conflict

15  matter, we were to deliberate that and reach a conclusion

16  and then report that to the board.

17  Q    Now before we get too far into this, in front of you --

18  it's not actually in the binder.  I think it's on top of the

19  binder --

20  A    Ye.

21  Q    -- is a document that is entitled at the top, D-Dir

22  Williamson_R.  DO you see that document that's entitled,

23  declaration of Billie Ida Williamson in support of

24  confirmation of the joint plan of reorganization, and it

25  goes on and it says it applies to the TCEH debtors and the

1    EFH shared services debtors?

2    A    Yes.

3    Q    Can you tell the Court what that is, please?

4    A    That's my personal declaration that I submitted to the

5    Court ahead of this testimony.

6    Q    And did you review and revise your declaration?

7    A    I did.

8    Q    And does the declaration contain your truthful and

9    accurate testimony?

10   A    It does.

11   Q    And if you would turn to the last page, please?  The

12   last page has what we would refer to as an S/ for your

13   signature.  Did you authorize that the S/ for your signature

14   be placed on that document?

15   A    I did.

16   Q    Okay.

17            MR. FIRESTEIN:  Your Honor, as per custom in this

18   matter I'm happy to wait until the end of the examination to

19   admit the direct exam.

20            THE COURT:  It's up to you.

21            MR. FIRESTEIN:  Thank you.  Well, in that case if

22   it's up to me how about we, subject to the rulings and

23   resolutions that we had I'll move her direct testimony in

24   writing into evidence.

25            THE COURT:  Any objection?

1           MR. PEDONE:  No objection subject to --

2           THE COURT:  It's admitted.

3           MR. PEDONE:  -- the resolutions.  Thank you.

4           MR. FIRESTEIN:  Thank you, Your Honor.

5      (Debtors' Exhibit D-Dir Williamson_R was admitted)

6  BY MR. FIRESTEIN:

7  Q    Ms. Williamson, besides you are there any other EFH

8  disinterested directors?

9  A    Yes.  Chairman Donald Evans.

10  Q    And do you share responsibility equally with Mr. Evans?

11  A    I do.

12  Q    And as a disinterested director of EFH what do you

13  believe your duty to be?

14  A    My duty is to maximize the value for the EFH estate and

15  we've been focused on doing that through preservation of

16  cash, minimization of tax risk, and by conducting a very

17  rigorous and robust process to get the highest price

18  possible for Encore.

19  Q    And why did you and Mr. Evans review and consider

20  matters that were not determined by you to be conflict

21  matters?

22  A    Well, we felt it was a part of our strong governance

23  process.  We also wanted to do it in an abundance of caution

24  so that if at some point in the future someone came back and

25  was able to prove that something was a conflict matter, then

1    we would have already gone through the process we -- and,

2    therefore, wouldn't have slowed down the case.

3            Also, I think it was important for the board to

4    hear from Chairman Evans and myself on some of these

5    significant issues.

6    Q    After you became an EFH disinterested director what

7    processes did you use to carry out your responsibilities?

8    A    Well, the first thing we did was hire a law firm that

9    just represented the disinterested directors.  Then we also

10   proceeded to hire a financial advisor firm.  And then each

11   time that something would come up that was a major

12   transaction or significant in the case we would assess

13   whether we thought it was a conflict matter.

14           If it was a conflict matter or if we were going to

15   follow our process then we would read all the materials.  We

16   would do our own due diligence.  We would meet with our

17   attorneys.  We would meet with the financial advisor if that

18   was appropriate.  Chairman Evans and I would deliberate the

19   matters, and then we would reach a conclusion and in formal

20   minutes -- if we made a decision those would be in formal

21   minutes.  We did have some informal meetings.

22   Q    Moving to matters that are specifically pertinent to

23   the plan before the Court today, are you familiar with the

24   term ancillary agreements in the context of that plan?

25   A    Yes.

1   Q    Can you identify the ancillary agreements that you're

2   aware of that were applicable to your work?

3   A    There's the separation agreement.  There is the tax

4   matters agreement, and there is the initial transition

5   services agreement.

6   Q    And since approximately early of 2016 can you estimate

7   how many formal or informal meetings or update calls you had

8   with your disinterested director advisors regarding the

9   ancillary agreements in the plan?

10  A    Upwards of ten meetings.

11  Q    And separate and apart from meetings with your

12  disinterested director advisors can you estimate how many

13  full EFH board meetings were devoted to the plan, the

14  ancillary agreements, restructuring updates or alternatives

15  in 2016?

16  A    I think it was around a dozen meetings and it should be

17  noted that the representatives from the disinterested

18  director advisors, the law firms, were always on those

19  calls.

20  Q    Okay.  And could you explain to the Court please why

21  the disinterested directors of EFH reviewed the ancillary

22  agreements?

23  A    Again, as I talked about, we felt like these were

24  significant.  They helped effectuate the plan.  And so

25  because of that we did not feel that they were conflict

1    matters because the counterparty is reorganized TCEH, but we

2    wanted to follow our governance process.  We wanted to make

3    sure that we had done everything that was appropriate.

4         So Chairman Evans and I went ahead and reviewed

5    those documents, discussed them with counsel, did our due

6    diligence out of an abundance of caution and as they might

7    relate to conflict matters.

8    Q    And when you say reorganized TCEH who are you referring

9    to?

10   A    Reorganized TCEH are the creditors, the first lien

11   creditors on the TCEH side.

12   Q    And for -- just for clarification did you have an

13   understanding as to who their counsel was in this matter?

14   A    Yes.  Paul Weiss.

15   Q    Okay.  Now what processes did you undertake to evaluate

16   the ancillary agreements as a disinterested director?

17   A    Okay.  Well, first I read all of the agreements and

18   then, secondly, I discussed them with my attorney,

19   Proskauer, but we also discussed them in -- on several

20   occasions within the joint board meetings so I listened to

21   counsel from Kirkland & Ellis as well as the disinterested

22   director counsel.  Then I spoke with different individuals

23   at the company.  I spoke with Mr. Molodovan.  I spoke with

24   Ms. Howard, and I also spoke with some of the financial

25   accounting people at EFH jut to ensure that I understood all

1    of the matters.

2    Q     Please explain to the Court what your reasoning was for

3    having your conversation with Mr. Molodovan?

4    A     Well, I wanted to -- we had talked about because the

5    EFH Properties and EFH Corporate Services in 2015 we had

6    reviewed that because it was in Plan A, that we would be

7    transferring the equity of those two entities to reorganized

8    TCEH.  So we had reviewed it at that time.  Then we began to

9    review it again in 2016 as we were moving into Plan B.  And

10   I just wanted to confirm some of my understanding with Mr.

11   Molodovan.  These were important issues.  We were hopefully

12   getting down to the end of this and I wanted to ensure that

13   I understood the matter.

14   Q     And why did you speak with Ms. Howard?

15   A     Well, that wasn't the first time I had spoken with Ms.

16   Howard.  We -- Ms. Howard and I had had a long relationship

17   because of her reporting to the audit committee.  She

18   reported at every joint board meeting along with

19   representatives from the external law firms and that sort of

20   thing.  So we had heard a lot from Ms. Howard throughout the

21   pendency of the bankruptcy and certainly before we even

22   filed bankruptcy.  So I was very clear about a lot of the

23   things that she spoke about.

24          But, again, I wanted to just confirm a couple of

25   quick things with her, so I spoke with her on I think it was

```
 1    July 27th.  And that was the day before the private letter

 2    ruling came out, but I wanted to understand what she thought

 3    would be in the private letter ruling.  I know she had -- I

 4    knew she had talked with the IRS and she knew some of the

 5    things that would be occurring.  I wanted to make sure I

 6    understand exact -- understood exactly how a busted 351

 7    would be executed.

 8              And then I also wanted to understand which NOLs

 9    would be available, you know, at the end of this for EFH to

10    cover things like CODI or operating matters.

11    Q    Did you consider the approval of the ancillary

12    agreements in your mind a full EFH board decision as opposed

13    to a disinterested director decision?

14    A    Clearly it was a full board decision because the

15    counterparty on each one of those agreements is reorganized

16    TCEH.  They are not a debtor and so, therefore, it is not a

17    conflict matter and not something that the disinterested

18    directors had to rule on.

19    Q    I would like to move to the transition services

20    agreements for a moment.  What is your understanding of what

21    the transitions services agreement is?

22    A    The transition services agreement enables EFH and EFIH

23    to have access to Corporate Services at the same price as

24    before.  Corporate services is a shared service function

25    that all of the entities within the EFH family use.  The
```

1   services are provided at cost, so there's no profit

2   motivation there.

3          But once the T-Side emerges from bankruptcy, then

4   the E-Side is going to still have a transition period until

5   we can get the E-Side out.  And we needed to have access to

6   the accounting people, the tax people, the lawyers, the IT,

7   all those different things.  So it was important for us to

8   be able to have access to the individuals that had been

9   handling that as opposed to going out and hiring new people.

10  Q    As part of your decision-making process did you have an

11  understanding as to what NextEra's position was with respect

12  to the transition services agreement?

13  A    Yes.  They reviewed the agreements during the bidding

14  process as did the other bidder, and they were able to

15  comment on those and they were comfortable with the

16  agreements.

17  Q    Was that important to you in connection with your

18  decision-making process?

19  A    Clearly it was because it's -- you know, again, as I

20  stated earlier we were trying to maximize what we -- the

21  value that we could get out of Encore.  And so I didn't

22  want, you know, things like a transition services agreement

23  or those kind of things to be a point of conflict or

24  anything like that.

25  Q    So moving along to the separation agreement for a

1    moment, what is your understanding of the separation

2    agreement?

3    A    The separation agreement effectuates the transfer of

4    EFH Properties and EFH Corporate Services to reorganized

5    TCEH.  IT also transfers a couple of employment agreements

6    and some employee benefit type plans.

7    Q    When you say transfer are -- is it your understanding

8    that there's going to be a contribution of the equity of

9    those enterprises to --

10   A    Absolutely.  We're going to contribute the equity of

11   EFH Properties and EFH Corporate Services to reorganized

12   TCEH.

13   Q    And if you could explain to the Court, please, why the

14   separation agreement and its contribution or the effect of

15   contribution of EFH Corporate Services to reorganized TCEH

16   is important to EFH?

17   A    Well, first off, when we talk about EFH Corporate

18   Services 95 percent of the effort in EFH Corporate Services

19   is being expended for TCEH.  So they're the largest user.

20   And, you know, I think it's important that -- that

21   reorganized TCEH wouldn't have to go out and hire 400 people

22   to be able to do all of their accounting, their tax work,

23   their HR, all the different business functions.

24           The other thing that was particularly important to

25   me is I felt like we were being able to move potential

1    liabilities to reorganized TCEH because had we, EFH, kept

2    EFH Corporate Services we would have been at risk for

3    severing all those people because at some point in time --

4    like I said, we only need about ten people, but there's 420

5    people in that organization.  Reorganized TCEH would not be

6    required to use Corporate Services.

7             And so I felt like we were transferring the

8    potential liabilities for severance which was calculated

9    around $38 million.  There are the WARN provisions which

10   were about $10 million, plus we would have had to have gone

11   through the process of terminating contracts, any leases,

12   any things like IT contracts and that sort of thing.  So

13   that could be very costly.  It could be very time-consuming

14   and that type of thing.

15   Q    Did you consider the contribution of the equity to

16   reorganized TCEH of EFH Corporate Services to be a benefit

17   to EFH?

18   A    Absolutely.  It would have saved a lot of our cash

19   which, again, I'm trying to preserve cash so that we can get

20   as much to our creditors as we can.

21   Q    As part of your decision-making process did you have a

22   belief as to what NextEra's view was with respect to the

23   transfer of corporate services?

24   A    Absolutely.  They -- it's in the merger agreement that

25   we have to contribute the equity of EFH Corporate Services

1    and EFH Properties to reorganized TCEH before they'll close

2    the transaction.

3    Q    In your decision-making process was the view of NextEra

4    important to you?

5    A    Surely.

6    Q    Okay.  And in this context were you aware or are you

7    aware of an EFH creditor or reasonable alternative for how

8    to handle EFH Corporate Services?

9    A    Nothing has been proposed that I'm aware of.

10   Q    Staying with the separation agreement for a moment, can

11   you just explain, please, why the effect of contribution of

12   EFH Properties to reorganized TCEH is important to EFH?

13   A    Yes.  EFH Properties really doesn't have very many

14   assets.  All it has is the prepaid lease on Energy Plaza

15   which is the building in which are offices operate.

16          However -- and the way that that is set up is

17   there are -- that -- the prepaid lease is for the base rent.

18   Then there are additional pieces of rent that have to be

19   paid, plus we are responsible for all of the expenses of

20   operating that building plus any capital expenditures that

21   have to be made to keep the building in great shape.

22          And so we have some subleases, but those subleases

23   are about to run out.  So, for example, we have a sublease

24   with Encore that is then sub-subleased to Luminent.  That

25   expires in March of 2017.  We have a sublease with the FDIC.

1    They have 21 floors in the building.  That expires in

2    November of 2017 and they have clearly indicated that they

3    want to significantly reduce their space in the building if

4    they renew that lease.  And then finally the EFH Corporate

5    Services lease is on a month to month, so they can move out

6    any time that they would like.

7            So currently while EFH Properties is generating a

8    little bit of cash right now, we get to keep the cash that

9    they've generated thus far.  So it's about $14 million after

10   you take out the EPA liability.

11           And then going forward starting in 2018 at best

12   EFH Properties is going to be a zero cash flow.  So the cash

13   coming in will just barely offset the expenses that we have.

14   And there is a huge risk that it could go actually negative,

15   especially if some of the tenants move out.

16   Q    In your mind, Ms. Williamson, was there any real value

17   to retaining EFH Properties?

18   A    No.

19   Q    Okay.  As part of your decision-making process did you

20   have a belief as to what NextEra's view was with respect to

21   the transfer of, we'll call it Prop Co?

22   A    As I just mentioned it is in the merger agreement with

23   NextEra that EFH Properties and EFH Corporate Services, the

24   equity of those companies has to be transferred to TCEH --

25   reorganized TCEH before we can close the transaction with

1    NextEra.

2    Q    And was that important to you?

3    A    Clearly it was.

4    Q    As you sit here are you aware of any reasonable

5    alternative from an EFH creditor with respect to how to

6    handle EFH Properties?

7    A    No, I am not.

8    Q    Now are you familiar with a payable in the amount of

9    approximately $158 million that is resident on the books of

10   Prop Co in favor of EFH Corp?

11   A    I am.

12   Q    Why in your mind -- and I'm always loath to ask an

13   accountant these questions.  But why in your mind is giving

14   up the equity in EFH Prop Co in exchange for the cash that

15   you referenced better for EFH than trying to collect on that

16   $158 million claim?

17   A    Because as I just mentioned EFH Prop Co doesn't

18   generate cash and they have no asset that they can go and

19   sell because at the end of the lease that's it.  We won't

20   own the building or anything like that.  So there's no way

21   that EFH Properties can pay that $158 million liability.

22   Q    All right.  I want to move on to the tax matters

23   agreement for the moment.  What is your understanding of the

24   tax matters agreement?

25   A    The tax matters agreement allocates the risk between

1    the parties associated with tax and the tax free spin.

2    Q    And can you give an example for the Court of a

3    provision that you understand was part of that allocation of

4    risk pursuant to the tax matters agreement?

5    A    Well, the most famous section of the provision --

6    Q    Most famous, I'm sure --

7    A    Yeah.

8    Q    I'm sure the document likes that, but go ahead.

9    A    If you break it you have to fix it.  And so what that

10   means is, for example, if reorganized TCEH did something

11   that caused the tax free spin to be busted -- and I know

12   that's poor English -- then EF -- I mean, reorganized TCEH

13   would have to bear the tax consequences of that.

14   Q    In your decision-making process did you have a belief

15   as to whether NextEra was amenable to the tax matters

16   agreement in the form that you approved?

17   A    Yes.  The tax matters agreement is attached as an

18   exhibit to the merger agreement with NextEra.  And the one

19   that was attached had this provision, if you break it you

20   take it provision in it at the time, you know, that the

21   merger agreement was signed.

22   Q    And do you have a belief with respect to the position

23   that's been taken by the T-First lien creditors with respect

24   to the tax matters agreement today?

25   A    Yes.

1    Q    And what's that?

2    A    Well, we've resolved the conflict over if you break it

3    you take it, and so that wording has now been modified to

4    address the concern that both our board, that Chairman Evans

5    and I had as disinterested directors and as -- that was also

6    a concern for NextEra.  That has been resolved now.  So it's

7    my understanding that the T-First creditors and our side are

8    in agreement now.

9    Q    In your decision-making process with respect to the tax

10   matters agreement did you have a belief as to whether it

11   restricted the ability in some way for the T-First lien

12   creditors to undertake any actions after the close of the

13   transaction?

14   A    Yes.  That's what's important about the tax matters

15   agreement is it does restrict reorganized TCEH from doing

16   certain things.  For example, entering into certain merger

17   and acquisition transactions, repurchasing more than 20

18   percent of their stock and, you know, doing something like a

19   dividend recapitalization or those sort of things.  So it

20   does restrict what they can do for a period of time.

21   Q    I want to shift for a moment to your understanding and

22   response to some of the objections to the current plan that

23   have been raised by some of the creditors.  Do you agree

24   with certain objectors that you've allowed reorganized TCEH

25   to utilize EFH's net operating losses or NOLs without

1    consideration?

2    A     No.

3    Q     Why not?

4    A     Well, first off we can all look at value in a variety

5    of different ways.  But I think it's very valuable to us as

6    we look at the overall transaction.  One we're getting a tax

7    free spin and that has been important to us from the very

8    beginning before we ever even filed bankruptcy.  We knew

9    that the T-First creditors wanted a taxable transaction so

10   they could get a step up in basis.  We wanted a tax free

11   transaction because of the concern over stranded tax.

12            And so because of that we've gotten our tax free

13   spin, that's very important, but they've also done other

14   things like take EFH Properties and EFH Corporate Services

15   and they bear the risk of the liabilities associated with

16   those companies.  And I just feel that we still have some

17   NOLs left at EFH that will cover any taxable income that we

18   might have from CODI and any operating results and that type

19   of thing.

20            So overall I believe that we got reasonable value

21   for that and it allows us to exit bankruptcy in a more time

22   effective way.

23   Q     As part of your decision-making process did you have a

24   belief as to whether NextEra was amenable to the utilization

25   of a tax free spin and the consumption of EFH NOLs?

1            MR. PEDONE:  Objection to the extent the response

2    leads to what NextEra said.

3            THE CLERK:  Well --

4            THE COURT:  Yeah.  I want to talk about that for a

5    second because this has come up several times.  And, again,

6    we're not asking and the point of the question isn't what

7    did NextEra say -- was it NextEra?

8            MR. FIRESTEIN:  Yeah.

9            THE COURT:  Okay.  What did NextEra say or what

10   did the T-First lien lenders say.  It's what is the belief

11   or state of mind based on what was said as to the belief

12   about whether they're serious or what their position might

13   be.

14           Also, I haven't said this, but I have been

15   thinking about it for several days.  In my mind what's

16   really going on here is you're asking the business person

17   for a fact opinion, what is your opinion based on facts, and

18   that is something that certainly can be offered under the

19   rules and opinion testimony can be based on hearsay.

20           So for those reasons the objection is overruled.

21           MR. FIRESTEIN:  Okay.

22           THE WITNESS:  Could you restate your question,

23   please?

24           MR. PEDONE:  Your Honor, may I make one comment on

25   the scope of the hearsay coming in?

1          THE COURT:  Yes.

2          MR. PEDONE:  So a portion of our argument is that

3    a different standard may need to apply in these cases, and

4    that if we establish the burden for that to happen or the

5    Court finds that should happen on the 363 heightened

6    scrutiny the Court will actually need to evaluate some of

7    the underlying facts in order to reach an affirmative

8    conclusion for the debtors.

9          So I'm comfortable with your ruling for those

10   limited purposes, but can -- need to continue to assert and

11   in instances object to the evidence for other purposes.

12          THE COURT:  Oh, you can do whatever you need to do

13   to --

14          MR. PEDONE:  Thank you, Your Honor.

15          THE COURT:  preserve your record and your

16   arguments.  I'm certainly not being critical of you raising

17   those issues.

18          MR. PEDONE:  Thank you.

19          THE COURT:  You're welcome.

20          MR. FIRESTEIN:  May I restate the question, Your

21   Honor?

22          THE COURT:  Yes, you may.

23          MR. FIRESTEIN:  Thank you.

24   BY MR. FIRESTEIN:

25   Q    Ms. Williamson, in your decision-making process did you

1   have a belief in your mind as to what NextEra's position was

2   concerning the usability of a tax free spin and the

3   consumption of EFH's net operating losses as a consequence

4   of that?

5   A    Yes.  My understanding was that while NextEra knew

6   there were some NOLs out there they also had a question

7   about whether they could really use those NOLs or how much

8   of those NOLs they could use or over what time period they

9   could use those NOLs.  So that was not really a piece of how

10  they valued the offer that they made to the company.

11  Q    Why was that important to you in connection with your

12  decision to approve of the transaction pursuant to which

13  EFH's NOLs would be consumed?

14  A    Well, certainly, if they weren't placing any value on

15  it I wanted to get value in the other place.  And getting

16  value was really critical to me in terms of getting that tax

17  free spin.  And the tax free spin allows us not to leave

18  stranded tax of maybe up to $6 billion sitting at the EFH

19  level.  And if we had done that all the cash that we had

20  tried to preserve for our creditors would have been paid to

21  the IRS.

22  Q    Okay.  There's been some reference in papers that have

23  been filed with the Court by the indenture trustee about the

24  potential of personal liability perhaps with respect to a

25  stranded tax.  Was your decision to approve the tax free

1   spin influenced in any way by the potential risk that you

2   may face with respect to personal liability?

3   A     Absolutely not.  When you take on the responsibility of

4   being a member of a board of directors of a corporation it

5   is your primary duty to do the best thing for that

6   corporation.  It is not your duty to do anything as it

7   relates to personally.  So I had no concern about that.

8   Q     Shifting away from the NOLs for a moment and focusing

9   on Corporate Services and Prop Co together for efficiency

10   sake, did you agree with certain objectors that EFH was

11   contributing the equity of Corporate Services and Prop Co

12   for no consideration?

13   A     No.

14   Q     Could you explain to the Court why not, please?

15   A     Yes.  First off, we're getting $14 million out of Prop

16   Co so that's $14 million we didn't have before.  And then

17   the other thing that was very important to me, when I think

18   about value, value is not just cash, but it's if someone

19   takes a liability that I might have or if I get something in

20   return that's valuable to me.

21         So when I think about transferring EFH Prop Co and

22   EFH Corporate Services I feel that we are transferring

23   potential liabilities that could be very substantial that

24   could eat into the cash that I have been able to preserve or

25   that we've been able to preserve at the EFH level.  And I

1    think it's in the best interest for them to take that, for

2    them to have to deal with the issues like managing the

3    building and those kinds of things.  And so that was very

4    important to me.

5    Q    I want to move to a slightly higher altitude to wrap up

6    my direct examination.  Could you just explain to the Court,

7    please, why you believe that the plan that's before the

8    Court is in the best interest of EFH, your box?

9    A    Well, at EFH I've done -- Chairman Evans and I have

10   worked very hard to maximize the value that we could have

11   there.  It's been difficult with all of the different

12   parties in this case, but I believe that we have maximized

13   the value there, and that's important to me.

14          But the other thing that I will also mention is

15   that as a member of the EFH overall board I think that we

16   have done our best to get to a plan that envelopes a global

17   plan that has a lot of compromise in it and meets, you know,

18   the needs of all of the creditors so that we can get out of

19   bankruptcy in a timely fashion.  We've been in this for a

20   long time. It's important to get these companies out and

21   allow them to begin to grow again and to operate

22   effectively.

23          MR. FIRESTEIN:  Your Honor, that concludes my

24   direct examination.  Before I pass the witness to Mr.

25   Pedone, we have agreed she -- with respect to the documents

1    that have -- that are referenced in Ms. Williamson's revised

2    written declaration that are not otherwise admitted into

3    evidence.  I'm happy to identify those numbers now or we can

4    wait until the conclusion.

5              THE COURT:  Let's do it now.

6         (Pause)

7              MR. FIRESTEIN:  May I approach?

8              THE COURT:  Yes.

9              MR. FIRESTEIN:  Your Honor, at this time I'm going

10   to do it in two groups.  We'll move for the admission of DX-

11   1b, 50, 51, 64, 69, 74, 75, 82, 93, 94, 96 and 316.  The

12   other two exhibits are 59 and 61 which are the two board

13   decks that we referenced at the outset or prior to Ms.

14   Williamson beginning to testify.

15             We would move those in as well, but we'll

16   obviously submit to whatever the ruling of the Court is with

17   respect to the usability of those documents when the Court

18   rules on the other board decks that are the subject of some

19   controversy.

20             THE COURT:  Okay.

21             MR. PEDONE:  Your Honor, just to state for the

22   record we object to board decks 59 and 61 being moved into

23   evidence on the grounds that they're hearsay.

24             THE COURT:  Okay.

25             MR. PEDONE:  Thank you.

1          THE COURT:  All right.  I am going to overrule

2    that objection, admit the documents subject, of course, to

3    this document, these 59 and 61 being subject to the motion

4    for reconsideration that's already before the Court that

5    will be briefed and decided next week.

6          MR. PEDONE:  Thank you for including them.  Thank

7    you.

8          THE COURT:  You're welcome.

9       (Debtors' Exhibit Nos. DX-1b, 50, 51, 59, 61, 64, 69,

10   74, 75, 82, 93, 94, 96, & 316 were admitted)

11         MR. FIRESTEIN:  With that, Your Honor, I'll pass

12   the witness.

13         THE COURT:  All right.  We'll take --

14         MR. PEDONE:  Your Honor --

15         THE COURT:  Yes.

16         MR. PEDONE:  Yes.  I was going to ask if we could

17   take five minutes.

18         THE COURT:  Very good.  Yes.  We'll take a five,

19   ten-minute recess and then we'll turn to --

20         MR. PEDONE:  Thank you.

21         THE COURT:  -- cross of Ms. Williamson.

22         You may not discuss the substance of your

23   testimony with any person during the break.

24         THE WITNESS:  Yes, sir.  Thank you.

25      (Recessed at 10:56 a.m.; reconvened at 11:10 a.m.)

```
 1            THE CLERK:  All rise.

 2            THE COURT:  Please be seated.

 3            Sorry for the delay there.  It's -- other matters

 4   are still percolating through the Court's inbox so I had to

 5   look at some things.

 6            All right.  Mr. Pedone.

 7                    CROSS-EXAMINATION

 8   BY MR. PEDONE:

 9   Q    Good morning, Ms. Williamson.

10   A    Good morning.

11   Q    I'm Richard Pedone, counsel for American Stock

12   Transfer, as you know the indenture trustee at EFH Corp.

13            Ms. Williamson, what is your understanding of the

14   role that a director plays under Texas corporate law, your

15   business understanding, not a legal conclusion?

16   A    Well, I am to study matters that come before a board.

17   I'm to give my best counsel to management.  I am to oversee

18   management and make sure that we have the right management

19   in place, and I am to follow proper governance within -- as

20   outlined.

21   Q    So you would agree with me that a director's job

22   entails oversight and guidance, but you're not responsible

23   for the operation.  You provide guidance and oversight, and

24   as you described to management, correct?

25   A    I believe that there is a distinction between
```

1    management and the board as it relates to operations.  And

2    it is management's job to operate the business and it is the

3    board's job to oversee that.  However, were there a

4    situation where management wasn't operating it properly,

5    there are certainly cases where a board member has stepped

6    in to function in one of those officer roles or that type of

7    thing.

8    Q    And in that case there has been no vote taken or

9    corporate action by which any director at EFH Corp, yourself

10   or Mr. Evans or anyone else has been provided with a

11   management title or responsibility; is that correct?

12   A    Well, I have not.  Chairman Evans is an executive

13   chairman and an employee of the company.

14   Q    Yes.  If you want to explain more, go ahead.  I --

15   A    I don't want --

16   Q    -- didn't mean --

17   A    -- to explain more. I don't want to answer your

18   question with a blank yes, though, because it's not correct

19   --

20   Q    That is completely fair --

21   A    -- for me to --

22   Q    -- and in a way it was not a perfect question because I

23   aware that Chairman Evans is one of a small handful of

24   employees at EFH Corp who have executive functions.

25   A    Yes.

1    Q    And the other employees with executive functions at EFH

2    Corp I believe is Mr. Young?

3    A    Correct.

4    Q    Is there anyone else with an executive function at EFH

5    Corp?

6    A    That's on the EFH board?

7    Q    And let me -- let me actually back up and ask the

8    questions in pieces because I know --

9    A    Okay.

10   Q    -- that there are many individuals, including the co-

11   restructuring officers, who have positions at EFH Corp.

12           I'm trying to make sure that we're on a common

13   understanding of the executives or management people who are

14   exclusively employed by EFH Corp, and my understanding is

15   that would be Mr. Evans and Mr. Young, Chairman Evans and

16   Mr. Young.  Is there someone else?

17   A    Are you making a distinction between EFH Corporate

18   Services and EFH Corporation?

19   Q    I am.  And my questions are limited to EFH Corporation.

20   So --

21   A    Okay.  At EFH Corporation the executives that are

22   employees of that company are Chairman Donald Evans and John

23   Young, the CEO of the company.

24       (Pause)

25   Q    And in connection with restructuring matters did either

Page 42

```
 1    Mr. Young or Mr. Evans, Chairman Evans, play a hands on role

 2    in any way implementing the negotiations related to the

 3    restructuring or were they serving in a board advisory role

 4    as you've defined the role of a board member?

 5              MR. FIRESTEIN:  I'm just going to object as vague,

 6    Your Honor.  I'm not sure I understand the question, but --

 7              THE COURT:  Overruled.  You can answer if you can.

 8              THE WITNESS:  I'm sorry.  I don't understand your

 9    question exactly.  Are you ask --

10         (Laughter)

11              MR. PEDONE:  Sure.

12              THE WITNESS:  Are you asking if they talked with

13    creditors or are you asking -- I don't understand.

14              MR. PEDONE:  Sure.

15    BY MR. PEDONE:

16    Q    Were there negotiations related to the filing of the

17    second amended plan that your -- the plan in May that you're

18    aware of?

19    A    I'm sorry.

20    Q    I'm backing up.  I'm breaking it down and backing up.

21    So --

22    A    Okay.

23    Q    -- the plan, a plan was filed in May.

24    A    Yes, it was.

25    Q    Did Ms. -- Chairman Evans play any role in negotiating
```

1   with creditors this calendar year in connection with that

2   plan that you're aware of?

3   A    Did he physically go and speak with someone?  Is that

4   what you're asking me?

5   Q    That's a good first question and then I'll ask you if

6   he spoke with someone on the tele -- a creditor on the

7   telephone that you know of.

8   A    I don't believe that he went and met with anyone.

9   Q    And are you aware of whether or not Mr. Evans

10  communicated directly with creditors and negotiated with

11  them in connection with the second amended -- in connection

12  with the May plan during this calendar year?

13  A    I am not aware.

14  Q    And you're not aware of Mr. Young undertaking either of

15  those two actions during this calendar year, are you?

16  A    I want to make sure my answer to the last question was

17  correct.  I'm not aware whether Mr. Evans did or did not

18  have those conversations.  That's what I'm answering.

19  Q    Yes.

20  A    Okay.  And I am not aware of whether John Young did or

21  did not have conversations or meet with individuals.

22  Q    And are you aware of whether or not any negotiations

23  this calendar year took place between the debtors and the T-

24  First lien lenders regarding the plan of reorganization that

25  was filed around May 1?

1    A     Any negotiations?

2    Q     Yes.

3    A     Certainly we had multiple negotiations.

4    Q     Okay.  Do you recall that at your deposition I asked

5    that question and your response was, "I wouldn't call it

6    negotiations, but there were discussions that I believe

7    occurred."  And let me provide you with your deposition

8    before you respond.

9              THE COURT:  Yeah.  Let's not paraphrase.  Show her

10   -- if you want to impeach her, show her.

11             MR. PEDONE:  Yes.

12             May I approach, Your Honor?

13             THE COURT:  Yes.

14       (Pause)

15             MR. FIRESTEIN:  Could I have a cite, Your Honor?

16             MR. PEDONE:  Yes.  It's page 34.  And I have

17   copies if anyone needs one.

18             MR. FIRESTEIN:  A pin cite, Your Honor, a line

19   number.

20             THE COURT:  I'm sure he's getting there.

21             MR. PEDONE:  Yeah.  Line 6 was where the question

22   was asked and the question and answer dialogue follows

23   through.  Line 19 is where the answer is provided.

24             THE COURT:  Could you read that into the record,

25   please?

1          THE WITNESS:  Me?

2          THE COURT:  No.  Mr. Pedone.

3          MR. PEDONE:  Yes.

4     BY MR. PEDONE:

5     Q    So, Ms. Williamson, following along the exact question

6     asked was:

7               "Are you aware of whether or not any negotiations

8               took place between the debtors and the T-First

9               lien lenders regarding the plan of reorganization

10              that was filed around May 1?"

11              And your answer was:

12              "I wouldn't call it negotiations, but there were

13              discussions that I believe occurred."

14              Is that correct?

15    A    I read the -- I understand the question and I

16    interpreted that differently because debtors doesn't specify

17    the debtors there and T-First lenders.  So I apologize if I

18    answered your question incorrectly at the deposition.

19    Q    Do you believe that you answered the question

20    incorrectly at the deposition?

21    A    I would like you to state which debtors you're

22    referring to and which T-First lien lenders that you are

23    referring to and I will try to answer it to the very best of

24    my knowledge.

25    Q    So more broadly, and this is what my question meant at

1    the deposition.  It was a question regarding all debtors.

2    Were there negotiations regarding the plan?

3    A    Absolutely.  I'm sorry, then.  If that's what you meant

4    I did not answer it correctly.

5    Q    Okay.  And then I asked you what knowledge of those

6    discussions, which is how you described them, this is the

7    next question, line 14 I said, "What knowledge do you have

8    of those discussions?"  And your answer was, "You mean what

9    was said and that sort of thing," and I responded, "Yes,"

10   and then you responded, "I was not in any of those

11   meetings," correct?

12   A    I was not in any negotiations that involved any of the

13   debtors or any of the T-First lien lenders.

14   Q    Okay.  And at EFH Corporation who was charged with

15   leading the negotiations for EFH Corp, that box?

16   A    Our -- Chairman Evans and I directed our attorneys at

17   Proskauer to be present at all of those negotiations and to

18   give input and to discuss matters at those negotiations and

19   meetings.

20   Q    So now Proskauer was present, correct?

21   A    Yes.

22   Q    Okay.  Do you know whether or not Proskauer negotiated

23   on behalf of EFH Corporation at those meetings?

24   A    Have you met Mark Thomas?

25        (Laughter)

1   A    Yes.  He gave input and he participated in the

2   discussions.

3   Q    I -- see, this is very important and I realize your

4   distinction now.  You're changing what you said at your

5   deposition.  You want to now characterize it --

6         MR. FIRESTEIN:  I'm going to object to his

7   statement, Your Honor.  It misstates --

8         THE COURT:  Don't characterize --

9         MR. PEDONE:  -- the evidence.

10        THE COURT:  Don't characterize whether she's

11  changed her testimony or not.  Put it in the record and I'll

12  make that determination.

13  BY MR. PEDONE:

14  Q    So I want to know not just whether or not Mr. Thomas

15  participated in discussions, but were there negotiations?

16  A    Yes.  He participated in negotiations.

17  Q    And he was doing that on behalf of whom?

18  A    He was doing that on behalf of EFH and the

19  disinterested directors because that's his job.

20  Q    And you mean on behalf of EFH Corporation, the holding

21  company of which you are a disinterested director, correct?

22  A    Yes.

23  Q    Not on behalf of the EFH group or any other entities,

24  that single one entity at which my client serves as

25  indenture trustee, correct?

1    A     If we're parsing words I want to make sure that, you

2    know, he may have done things as it related to perhaps

3    subsidiaries or that sort of thing.  But, in general, I will

4    confirm to you that he was dealing on behalf of EFH

5    Corporation.

6    Q     And by what authority was Mr. Thomas empowered to

7    negotiate on behalf of EFH Corporation?

8    A     Okay.  In November the board of EFH Corporation

9    designated Chairman Donald Evans and myself as the

10   disinterested directors, and they gave us full authority to

11   hire counsel and to deal with matters of -- conflict matters

12   and that type of thing.  That was also the engagement of

13   Proskauer and our financial advisor was approved by the

14   Court.

15            And so Mr. -- the people -- the lawyers from

16   Proskauer were acting on authority from Chairman Evans and

17   myself in terms of their participation in those discussions.

18   Q     Okay.  But -- and now their participation, again, your

19   belief is they were negotiating on behalf of EFH Corp.; is

20   that correct?

21   A     Proskauer, yes.

22   Q     Negotiated on behalf of EFH Corp.  Okay.

23   A     EFH Corp has an overall counsel, though, which is

24   Kirkland & Ellis, and they were negotiating also for the

25   overall corporation.

```
 1   Q    And in connection with the negotiation or discussions

 2   concerning the plan that was filed on May 1 what were the

 3   conflict matters, if any?

 4   A    We did not have conflict matters at that point.

 5   Q    So your position is that in connection with any

 6   negotiations or discussions during the calendar year 2016,

 7   beginning on January 1 through the filing of the plan on May

 8   1 there was no need and nothing was designated as a conflict

 9   matter?

10   A    We did not designate any of the matters from -- I'm

11   sorry, the dates again, please?

12   Q    Sure.  This calendar year, May 1 --

13   A    Okay.

14   Q    -- through the filing of the plan on -- I'm sorry.

15   January 1, 2016 through the filing of the plan on May 1.

16   A    There -- we had not designated any items as conflict

17   matters, but in that time period we had dealt with certain

18   matters as it relates to conflict matters.

19   Q    What do you mean by that?

20   A    Okay.  As I explained during my direct testimony we

21   followed the same governance process of going through

22   various major matters that we thought were important.  We

23   would first assess whether it was a conflict matter, and

24   even if it wasn't determined to be a conflict matter, then

25   we would do our due diligence.  We would consult with
```

1    Proskauer.  We would work with our financial advisors, and

2    we would reach a conclusion.  Our deliberations then were

3    reported to the board.

4    Q    Okay.  And now of all the decisions that were made

5    between January 1, 2016 and the May 1 filing of the plan, in

6    your mind which of them were dealt with as conflict matters?

7              Now I realize you didn't designate them as

8    conflict matters, but I understand your testimony to be that

9    certain things were treated as if they were, and I'm trying

10   to determine which decisions during that time period you

11   believe you and Mr. Evans treated as conflict matters.

12   A    Well, we --

13             MR. FIRESTEIN:  That's -- objection, Your Honor.

14   That misstates the evidence.  She said specifically she

15   didn't treat them as conflict matters.  She said out of an

16   abundance of caution in case somebody later were to

17   determine them as same, the governance process would have

18   been used.

19             THE COURT:  I think -- I don't draw a distinction

20   between what was asked and what you -- your clarification.

21   Overruled.

22             You can answer.

23             MR. PEDONE:  You can answer.

24             THE WITNESS:  Okay.  Sorry.

25             THE COURT:  That's okay.

1          THE WITNESS:  Would you restate the question then,

2    again, please?

3          MR. PEDONE:  Certainly.  And I probably won't get

4    it exactly right, but we'll try.

5          THE WITNESS:  Okay.

6    BY MR. PEDONE:

7    Q    So between January 1, 2016 and May 1, 2016 it's my

8    understanding from your testimony that certain things,

9    decisions were dealt with or matters were dealt with as if

10   they were conflict matters even though they had not been

11   designated matters.

12          And I want to get a very firm sense of the uniform

13   -- the universe of things and decisions that you and

14   Chairman Evans believe that you dealt with as conflict

15   matters.  And, of course, it's just your belief, not

16   Chairman Evans' belief.

17   A    Certainly.  So first off let me correct one thing I

18   said.  We did deal with the -- on a equitization plan we

19   have to determine what piece of equity goes with each level

20   within the plan.  So that was considered to be a conflict

21   matter, determining, you know, in the plan who was going to

22   get what equity and how that equity was going to be split.

23          In addition to that, we did look at the various

24   alternatives and the attributes of the plan and that type of

25   thing, and we reviewed the plan with our counsel as it

1    relates to conflict matters --

2    Q    Okay.

3    A    -- so the plan that was filed May 1st.

4    Q    Okay.  So the plan that was filed May 1st you reviewed

5    with regard to matters that were conflict matters.  Were all

6    parts of the plan filed on May 1 treated as conflict

7    matters?  And then I --

8              THE COURT:  One question at a time.

9              MR. PEDONE:  We'll start with that.  One question

10   at a time.  Sorry.

11             THE WITNESS:  The process was applied to reviewing

12   the entire plan at that point in time.

13   BY MR. PEDONE:

14   Q    So in your mind what is the process for the review of

15   the entire plan?  Was the entire -- the approval of the

16   entire plan treated as a conflict matter or not?  That's the

17   question.  Was the approval of the entire plan treated as a

18   conflict matter or not?

19   A    As I explained to you, the levels of -- and maybe I'm

20   just not understanding from a legal standpoint.  But what we

21   did do is we talked through -- the conflict is where people

22   -- a conflict matter is where two of the counterparties are

23   debtors, or I mean the parties on either side of a

24   transaction are debtors in this estate.

25             So when we do an equitization plan we have to go

1    through and assign who would get the equity in an

2    equitization plan.  That we determined to be a conflict

3    matter.

4            And then we reviewed the plan in total through the

5    same process.  We consulted with our attorneys.  We went

6    through a lot of financial analysis with SOLIC and we went

7    through all of those processes.  We negotiated and talked

8    with Mr. Crimmins (ph).  We went through a variety of

9    different things to get to a point where we were comfortable

10   putting in the plan about the equitization and approving the

11   plan that was to be filed.

12   Q    Okay.  So now I'm very clear that you treated the

13   equitization aspects, I believe, of the E-Side of the plan

14   that was filed on May 1 as a conflict matter; am I correct

15   in understanding your testimony?

16   A    Yes.

17   Q    Okay, because you perceived that as an involving

18   competition or conflicting interest between what estates?

19   A    No.  What I said was that the parties were different

20   debtors.  So the -- you know, EFIH was a different debtor

21   than EFH.  Okay.  So that is why it was a conflict matter.

22   Q    And -- okay.  And so did Proskauer handle negotiations

23   with regard to the terms of that plan that was filed?  Let

24   me ask the question again and make sure I get it correct.

25           Did Proskauer handle the negotiations with regard

1    to the terms of the equitization portions of that plan to

2    the extent there were any negotiations?

3    A    Well, there were negotiations, but Chairman Evans and I

4    met with Chuck Crimmins and Proskauer was involved in the

5    negotiations associated with the equitizations.

6    Q    Okay.  So in connection with the plan filed on May 1

7    you and Chairman Evans met with Mr. Crimmins and that was --

8    that meeting was at a negotiation or discussions?  What were

9    the characteristics of that meeting?

10   A    Both.  It was a negotiation and a discussion.

11   Q    And what was at issue in that meeting?

12   A    What level of stock ownership in the reorganized EFH

13   would go to EFH and which level would go to EFIH.

14   Q    And do you remember the disparity in --

15              THE COURT:  What -- what's the relevance of the E-

16   Side equitization plan that's not in front of the Court?

17              MR. PEDONE:  I'm -- Your Honor, it's the process

18   that the disinterested directors utilized, when they were

19   utilized and for what matters.

20              THE COURT:  And we need to get into the --

21              MR. PEDONE:  I'll move on, Your --

22              THE COURT:  -- back and forth on the bid and ask

23   on the equitization?

24              MR. PEDONE:  Your Honor, it's actually my question

25   would be was there a back and forth on the bid and ask.  The

1    amounts don't matter.

2    BY MR. PEDONE:

3    Q    So just was there a back and forth in the discussion?

4    A    Yes.

5    Q    I'll move on.  Now aside from the equitization on the

6    E-Side that we've just discussed, was anything else in

7    connection with the plan filed on May 1 treated as a

8    conflict matter?

9    A    I don't recall, but we can go to this pile of minutes

10   here if you want to and go through them.  I don't recall

11   another item, but that doesn't mean there wasn't one.  I

12   just don't recall it today.

13   Q    Certainly.  That's fine, and we don't need to go

14   through the minutes now.

15        (Pause)

16   Q    Were you present during any phone conversations where

17   Proskauer negotiated with the T-Firsts on behalf of EFH

18   Corp?

19   A    No.

20   Q    Were you present -- and you were not present in any

21   meetings where such negotiations took place, were you?

22   A    No.

23   Q    Okay.  So without relying -- without disclosing what

24   counsel said, are you able to testify about those -- you're

25   not able to testify about those negotiations with firsthand

1    knowledge, correct?

2         Strike that question.  That was horrible.

3         Aside from what counsel told you do you have

4    knowledge about what occurred in any such negotiations?

5    A    Well, I have knowledge through what Proskauer told me.

6    I also have knowledge through what our co-restructuring

7    officers told me, and I also have knowledge through what

8    Kirkland & Ellis reported to us.

9    Q    Okay.  And you recall in your deposition I was not

10   permitted to inquire into what Proskauer told you, correct?

11   A    Yes.

12   Q    And I was not permitted to inquire into what Kirkland &

13   Ellis told you, correct?

14   A    Yes.

15   Q    Could you describe the process utilized in the past six

16   months -- well, I should back up.  Just describe generally

17   the process utilized since Proskauer's retention for how

18   things were -- became to be designated by you and Chairman

19   Evans as conflict matters?

20   A    Okay.  So Proskauer was engaged in either November or

21   December of 2014.  And so if there was a matter that we felt

22   we should address, whether it was a conflict matter or not,

23   we would -- Chairman Evans and I would call a meeting with

24   our attorneys at Proskauer.  And then if a financial -- if

25   our financial advisor was necessary we would ask SOLIC to be

1    on the call or in the meeting.  And we would bring the

2    matter forward.  We would talk about the matter.  We would

3    look at who the parties to the matter were, and we would

4    make an assessment, taking into consideration both what

5    Chairman Evans and I thought as well as the advice of our

6    counsel and our financial advisor to reach a conclusion.

7    Q    Okay.  And typically was the process initiated, the

8    raising the question of whether or not something was a

9    conflict matter initiated by you and Chairman Evans or was

10   it initiated by someone else?

11   A    Well, it was up to -- the board had designated that

12   Chairman Evans and I should determine what were conflict

13   matters.  And so -- you know, it came up in different ways.

14   Sometimes Chairman Evans and I would bring it up.  Sometimes

15   Proskauer would contact us.  Sometimes Kirkland would ask

16   that we would go and look at things.  I mean, there was not

17   a -- it was a robust process that had been set up to do

18   that.  And we had it for the other debtors, also.

19   Q    Okay.  Now in connection with the plan that was filed

20   on May 1 -- actually, back up.  The plan that was filed on

21   May 1, to use a shorthand that several people have used in

22   discussions, provides for NOLs of EFH Corp to be consumed in

23   a tax free spin, correct?

24   A    Some of the NOLs.  Yes.

25   Q    Some of the NOLs.  In the process -- was any part of

1    the process regarding whether or not those NOLs would be

2    used for such a plan -- and just limiting your answer to

3    2016.  Was any part of the process, making the decision

4    whether those NOLs would be used designated as a conflict

5    matter?

6    A    It was not designated as a conflict matter.

7    Q    And was any part of the decision with regard to whether

8    or not the equity of EFH Corporate Services would be

9    transferred in connection with the plan designated as a

10   conflict matter?

11   A    No.

12   Q    And nor was any part of the decision about whether or

13   not -- and, again, limiting to 2016 -- any part of the

14   decision with regard to whether or not EFH Properties'

15   equity, EFH Corp's equity in EFH Properties would be

16   transferred, that decision was not designated a conflict

17   matter, was it?

18   A    No, because the counterparty on the other side was not

19   a debtor.

20   Q    Okay.  Now let's back up from the perhaps -- let's back

21   up from the definition -- conflict matters, as we've been

22   discussing it, it's a term that you understand as

23   specifically defined by a board resolution of EFH Corp.,

24   correct?

25   A    Yes.

1    Q    So let's back away from the definition and those board

2    resolutions and it's commonly used in this case.  Do you

3    have an understanding of whether or not different rules for

4    the designation of conflicts apply under Texas law?

5              MR. FIRESTEIN:  Objection, Your Honor.  Calls for

6    a legal conclusion.  I realize it's foundational, but the

7    path, it seems obvious.

8              THE COURT:  Well, to the extent you understand in

9    your capacity as a director of many corporations as opposed

10   to a legal matter.  If you can answer the question you can

11   do that.

12             THE WITNESS:  Thank you.  I am not a lawyer, so I

13   don't know.  I believe that conflicts are defined in a

14   variety of different ways in different pieces of the law.

15   What I do know is that the board of inner -- EFH Corporation

16   asks us to treat as a conflict and as a conflict matter

17   those matters where the two or more counterparties were all

18   debtors of the overall bankruptcy.

19             So I don't know how conflict is defined in the

20   State of Texas regulations.  I would be happy to read it if

21   you would like.  But I don't know that.

22             MR. PEDONE:  I would not burden you by asking you

23   to read it today

24             THE WITNESS:  Thank you.  There was a reason I

25   didn't become a lawyer.

1       (Laughter)

2    BY MR. PEDONE:

3    Q    But I will ask you in connection with any decision that

4    you made as a board member this year did you obtain any

5    legal advice regarding whether or not a different set of

6    conflict rules might apply to the decisions that you were

7    being asked to make as a board member of EFH Corp?  And I'll

8    say in your response please do not disclose the advice that

9    you received.

10   A    Well, I think one of the things that's really important

11   is that in the major decisions that we made just exactly for

12   this purposes or this purpose Chairman Evans and I, even

13   though it wasn't a conflict matter as specified by our board

14   direction, we reviewed and followed the same process as if

15   it was a conflict matter so that we could report our

16   assessment to the board.  Each time that we did that we did

17   have advice of counsel.  We had advice of Kirkland.  We had

18   -- in the joint board meetings which we all learned and

19   used.  We had advice of our own counsel which was Proskauer.

20   We had advice of SOLIC, our financial advisors.

21           So, yes, I believe that I was advised properly as

22   to what were conflicts and what things we should be dealing

23   with.  And I believe that I used the resources that were

24   available to me to be able to address those.

25   Q    Okay.  So let's back up again to my question.  And,

1    again, in response I do not want to know what legal advice

2    you received.  My question is -- I'm going to phrase it as a

3    yes or no question.

4            Between January 1, 2016 and May 1, 2016 did you,

5    as a member of the board of directors of EFH Corp., obtain

6    any legal advice regarding the designation of conflicts and

7    how conflicts should be dealt with under Texas law?

8    A    Yes.

9    Q    Who provided that advice?

10   A    Proskauer.

11   Q    And was that advice provided -- I'll move on.

12        (Pause)

13   Q    Did you obtain any legal advice during that same time

14   period with regard to whether or not any decision that you

15   needed to make as a board member of EFH concerning the use

16   of the NOLs in connection with the plan would be considered

17   a matter of conflict between the corporations, between the

18   debtors, under Texas State law?

19           MR. FIRESTEIN:  Your Honor, I just want to object

20   on the grounds this is getting dangerously close to what

21   might infringe upon attorney/client privilege issues.  When

22   you're talking about generic subjects I certainly understand

23   that.  But as you get down to the precise nature of a

24   subject matter that's -- for which legal advice was

25   obtained, that -- if not gets close to, if it doesn't step

1    over that line.  I just want to make sure that I'm not in a

2    position on having waived the position as it relates to the

3    attorney/client privilege.

4            THE COURT:  Okay.  Your objection is noted and

5    certainly no waiver will be construed based on the answer.

6            Can you answer the question?

7            THE WITNESS:  If he'll restate it for me, please.

8            MR. PEDONE:  Sure.

9    BY MR. PEDONE:

10   Q    In connection with any decision that the board of EFH

11   Corp made with regard to the use of NOLs in connection with

12   a plan of reorganization for the T-Side debtors, the plan

13   before us, did you obtain as a board member or individually

14   any legal advice with regard to whether or not conflicts

15   between the debtors existed under State law?

16   A    I believe I did.

17   Q    At the time -- well, I'll back up.

18       (Pause)

19   Q    When did you first make a decision to allow a plan to

20   proceed that would -- in 2016 when did you first make a

21   decision to allow a plan to proceed that would make use of

22   EFH Corp's NOLs?

23   A    We began talking about that in January of 2016 and we

24   talked about it all throughout the time up until we filed

25   the plan on May 1st.

1    Q    Okay.  So I want to separate talking about things from

2    decisions.  When did you first make a decision to allow such

3    a plan to proceed?

4    A    Our final decision on allowing the plan to proceed was

5    at the end of April.

6    Q    Okay.  And my question was when did you first make a

7    decision to allow such a plan to proceed?

8    A    Well, I'm not sure I understand the question in the way

9    you're asking it, nor can I give you a specific date.  What

10   I will tell you, though, is that in January we began to look

11   at what alternatives we might have if Plan A was not

12   successful.  We looked at a variety of different options at

13   that time that involved the NOLs and we began to discuss

14   that over that period of time.

15          So I -- you know, it was very important to us to

16   get a tax free spin so that we would not have the large tax

17   at the EFH level.  And -- so I can't give you the first time

18   I made a decision, but the formal and final decision about

19   the use of the NOLs was done when we filed the plan.

20   Q    Aside from that final decision did you make any

21   decisions with regard to whether or not a plan should be

22   filed that would provide for the use of EFH Corp's NOLs?

23   A    I don't understand the question.  I'm sorry.  I can't

24   answer it in the way it's phrased to me because I -- what

25   I'm telling you is we started back in January.  We looked at

1    every different alternative.  We looked at taxable plans.

2    We looked at tax free plans with some NOLs.  We looked at

3    tax free plans with no NOLs.  We looked at a variety of

4    different options.  And we discussed those all throughout

5    January, February, March, and April.  In April we made the

6    decision of how we were going to file the plan.

7            So making a decision I carefully considered it.  I

8    listened to all the discussions.  It was carefully vetted.

9    But my decision was made when we voted on the plan.

10   Q    In connection with the plan who was the negotiating

11   team for EFH Corp if it was anyone aside from Proskauer?

12   A    Well, I believe that the co-CRO's in this case are

13   responsible for negotiating on behalf of all of the estates

14   so they were involved.  I believe that Kirkland has a

15   similar responsibility.  And then Proskauer is specifically

16   designated with looking at EFH.

17   Q    But Proskauer only has a role to play if a conflict

18   matter has been designated, correct?

19   A    No.  I don't interpret it that way and that's now how

20   we've run our governance process.  Proskauer is the attorney

21   for the disinterested directors.  There's an attorney for

22   the TCEH disinterested director, and there is an attorney or

23   two firms for EFIH.  And so the process that we outlined had

24   them engaged in all of the meetings, not just in 2016, but

25   in 2015.  They've been integral to the process, and so I

1    don't see it in the way that you just said it.

2    Q    Okay.  Do you have a recollection of what's contained

3    in Proskauer's November 19th, 2014 engagement letter that

4    defines the scope of their work?

5    A    I'm sorry, Mr. Pedone.  I have not re-reviewed that in

6    the last two years.

7    Q    It's kind of an unfair question, but --

8    A    Yeah.

9    Q    -- there's a rule that I -- before I can hand a

10    document to you I --

11    A    Okay.  Great.

12    Q    -- have to make sure it would help your memory.

13    A    Okay.

14         MR. PEDONE:  So, Your Honor, may I approach the

15    witness?

16         THE COURT:  Yes.

17    (Pause)

18         THE WITNESS:  All right.

19    BY MR. PEDONE:

20    Q    Ms. Williamson, do you know whether or not the scope

21    of the engagement defined in paragraph one of this letter

22    was ever expanded?

23         MR. FIRESTEIN:  Your Honor, without the order --

24    this is an exhibit to an order.  So it's hard to put the

25    pieces together without having the order that's in front of

1    it.

2              THE COURT:  Okay.

3              MR. PEDONE:  We'll start with the pending question

4    and then we'll move to the order.

5              THE COURT:  All right.  I forget the question so

6    why don't you ask again?

7         (Laughter)

8              MR. PEDONE:  Certainly.

9              THE COURT:  Sorry.

10             THE WITNESS:  It's okay.

11   BY MR. PEDONE:

12   Q    Do you know whether or not the scope of the engagement

13   defined in paragraph one of this letter was ever expanded?

14   A    I don't believe there's been an amendment to this

15   engagement letter.

16   Q    Okay.  And you would agree with me, wouldn't you, that

17   the scope defined in paragraph one is limited to conflict

18   matters -- well, I'll actually read the sentence and you can

19   tell me if you agree with me:

20             "The firm's engagement shall be limited to

21             rendering professional services to EFH Corp's

22             disinterested directors, Donald L. Evans and

23             Billie I. Williamson, in connection with conflict

24             matters as defined in and pursuant to the

25             authority delegated to the disinterested directors

1            pursuant to the board of resolutions -- pursuant

2            to the resolutions of the EFH Corp board of

3            directors attached hereto as Exhibit 2, the

4            resolutions."

5            And then it goes on for some further description.

6  A    Yes.  So your question is?

7  Q    Was the scope ever expanded beyond what is contained in

8  that paragraph?

9  A     No.  But I interpret that paragraph as permitting

10 Chairman Evans and myself to use Proskauer because it's

11 rendering professional services to Chairman Evans and myself

12 as a disinterested director.  And it relates, while it

13 specifies conflict matters, all of the items has to be

14 determined as to whether they were a conflict matter and it

15 doesn't say that here, or if we're going to apply the

16 process as it -- as if it were a conflict matter.  And

17 that's how we interpreted it and that's how we engaged and

18 worked with Proskauer.

19 Q    No.  And getting your understanding of what it meant is

20 very important.  But with regard to Proskauer's duty and

21 authority to engage in negotiations on behalf of EFH Corp, I

22 do not see that this provides them with the responsibility

23 to actually negotiate for EFH --

24            THE COURT:  With all due respect, Mr. Pedone, I

25 don't particularly care how you see it.  That's for your

1    brief, not for evidence.

2         (Pause)

3    BY MR. PEDONE:

4    Q    Ms. Williamson, what knowledge do you have, if any,

5    with regard to whether or not Proskauer ever asked the TCEH

6    First-lien lenders to play measurable consideration for use

7    of EFH Corp's NOL?

8    A    I know that they did that.

9    Q    What did they ask?

10   A    They asked them that very thing.  Now -- and part of it

11   had to do with -- you know, prior to May we were dealing

12   with the assumption that the bankruptcy exclusion would

13   pertain so that the NOLs would go away at the end of the

14   bankruptcy.

15        Now in May, late May, we were informed through

16   discussions with the IRS that the IRS was going to rule

17   adverse on that, which meant that the NOLs would

18   theoretically not disappear at the end of that.  So we found

19   that out at the end of May, and on June 1st Proskauer spoke

20   with rep -- the attorney at Paul -- an attorney at Paul

21   Weiss related to whether they felt like TCEH should pay

22   something for those NOLs with the change in the view

23   associated with the IRS.

24   Q    And that was on June 1, the first request that you're

25   aware of, for payment of measurable consideration for the

1    NOLs was made?

2    A    Well, that's when an additional request was made for

3    that.  Yes.

4    Q    What specific knowledge do you have of any requests

5    that were made prior to June 1 for the payment of

6    measureable consideration?  And this is request by

7    Proskauer.

8    A    Okay.  Well, first off I think we have to go back and

9    define what value is.  So value can be cash.  Value can be

10   agreeing to do something that is important to a debtor.

11   Value can be taking a liability that I don't want to have.

12   So there's a variety of things that can be done with value

13   or value can be interpreted in a variety of ways.

14            So one --

15   Q    And I take it you think --

16   A    -- of the things that --

17   Q    I used the word measurable consideration.  You can go

18   on about value, but I used the word --

19            THE COURT:  Please don't, Mr. Pedone.

20            MR. PEDONE:  I'm sorry.

21            THE COURT:  Please.

22            MR. PEDONE:  Go ahead, Ms. Williamson.

23            THE COURT:  We have a pretty standard rule not to

24   interrupt witnesses.

25            MR. PEDONE:  Please.  I'm sorry.

1    BY MR. PEDONE:

2    Q    So in the circumstances we had been asking for a tax

3    free spin from before we filed bankruptcy.  And so to get

4    that tax free spin that was important to us we had to do

5    something to compensate for that because the T-First

6    creditors wanted a taxable spin so they could have the step

7    up in basis.

8              So we had been discussing the important value that

9    we got and the value was getting a tax free spin that did

10   not put $6 billion worth of tax stranded at the EFH level.

11   So that discussion had been going on for a very long period

12   of time.

13             But I know for sure on June 1st Proskauer went

14   back to the Paul Weiss organization and asked since the NOLs

15   were not going to be able to survive at the emergence

16   whether they would compensate for that in some way.

17   Q    Okay.  And my question was you are not aware of any

18   instance prior to June 1 when Proskauer asks the T-Firsts to

19   pay additional -- to pay measureable considerations?  And

20   I'm thinking monetary, but it could be an asset that comes

21   back, something measurable and quantifiable.

22   A    It was --

23   Q    You're not aware of any instance prior to June 1 when

24   it was -- by Proskauer when there was an ask for payment of

25   measurable consideration, are you?

1   A     Yes.  As I just stated, I believe that it's measurable

2   to determine what the impact of what a taxable spin would

3   be.  And that taxable transaction, I believe the calculation

4   was about $6 billion, and so to not have $6 billion or the

5   risk of $6 billion in tax I consider that to be measurable

6   compensation.

7            In addition, in both Plan A and Plan B the

8   reorganized TCEH was taking the equity in EFH Corporate

9   Services and EFH Properties which took liabilities,

10  potential significant liabilities away that we could

11  measure.  We made a measurement of the severance

12  liabilities.  We made a measurement of the WARN liabilities,

13  and we estimated some of the liabilities associated with the

14  right of use and with canceling contracts.

15           So I believe that we have had discussions all

16  along about measurable compensation for the T-First

17  creditors to agree to a tax free spin.

18  Q     Okay.  So going back to my question, which was when

19  prior to May 1 -- prior to June 1 are you aware of Proskauer

20  making an ask for measurable consideration, so it's actions

21  by Proskauer, and then tied to measurable consideration?  So

22  what actions of Proskauer prior to June 1 asking for

23  consideration are you aware of, if any?

24  A     We engaged Proskauer in either November or December --

25  oh, wait.  It's right here on this letter so I can be

1   specific for you.  In November -- we engaged Proskauer in

2   November of 2014.  From that time forward they were involved

3   in substantially all of the negotiations and the meetings

4   and the discussions associated with Plan A as well as with

5   Plan B.

6              So while I can't give you specific dates and

7   times, they were involved in all of those discussions and

8   were very actively engaged in negotiating on behalf of EFH.

9   Q    So sitting here today you do not have a memory of

10  Proskauer making a specific ask for measurable consideration

11  during 2016 other than what you've described on June 1?

12             MR. FIRESTEIN:  Your Honor, I realize that --

13             THE COURT:  It --

14             MR. FIRESTEIN:  It's asked and answered.  She's

15  given the best testimony.

16             THE COURT:  She's answered this question at least

17  three times.  You and Ms. Williamson disagree about what

18  measurable consideration is.  In her mind she's answered

19  that question.  So you're just going to have to agree to

20  disagree.

21             MR. PEDONE:  My question actually goes to the

22  dates of Proskauer's asks so that I can understand --

23             THE COURT:  No.  But she said --

24             MR. PEDONE:  -- if negotiations took place.

25             THE COURT:  But she answered that question and

1    said she couldn't specify a date, but it's been part of

2    conversation since November of 2014.  So sustained.

3         (Pause)

4    BY MR. PEDONE:

5    Q    Ms. Williamson, you do not take notes during board

6    meetings, do you?

7    A    I don't.

8    Q    You do believe that the minutes of the board meetings

9    of all of these debtors are accurate, correct, as to the

10   best of your belief?

11   A    Yes.

12   Q    Do you have a copy of your declaration handy?

13   A    Yes, sir.

14   Q    In paragraph 15 you state, "The settlement agreement as

15   approved by the Court did not include any specific language

16   pertaining to the use or handling of EFH Corp's NOLs,"

17   correct?

18   A    Yes.

19   Q    When contingency -- let me back up.

20         When did you first become aware -- when did you

21   first become involved in contingency planning in case the

22   confirmed plan was not consummated?

23   A    Well, we had discussions about alternate plans when

24   Plan A was actually under discussion.  And there was a lot

25   of discussion about whether we wanted to just file Plan A

1    that had the Hunt transaction or if we wanted to outline

2    what the alternative would be if that did not work.  The

3    decision was made not to put any alternatives in there, but

4    there were certain things that had to be included in an

5    alternative restructuring.

6                So I quite honestly think we've been talking about

7    all the alternatives since before we filed for bankruptcy.

8    Q    But at some case -- at some point following

9    confirmation of the prior plan a contingency planning

10   process was undertaken and board meetings began to occur

11   with regard to those contingencies.  And my understanding

12   that was approximately in February of 2016.

13   A    Actually, it was January.

14   Q    January.

15   A    But, yes --

16   Q    Okay.

17   A    -- you're close.

18   Q    Sure.  So January.  And so by January of 2016 you were

19   involved in a contingency planning process of sorts in case

20   the prior plan did not go effective?

21   A    The entire board was.  Yes.

22   Q    Yes.  And as you began that process in January of 2016

23   did you have the same understanding with regard to the

24   operation of the settlement agreement that you described in

25   paragraph 15 of your declaration?

1    A    Yes.

2    Q    Okay.  And at that time were you aware -- let me back

3    up.

4              Sitting here today do you know whether or not

5    TCEH's claims under the tax sharing agreement that was in

6    effect pre-petition have been released?

7              MR. FIRESTEIN:  I'm sorry.  I just didn't

8    understand what the time was.

9              MR. PEDONE:  Sure.

10   BY MR. PEDONE:

11   Q    So there was a -- back up.

12             There was a tax sharing agreement between EFH Corp

13   and its affiliates including the T-Side debtors, correct?

14   You're aware of that?

15   A    I'm sorry.  State it again, please.

16   Q    When these cases commenced there was a tax sharing

17   agreement --

18   A    Yes.

19   Q    -- in place between the T-Side debtors and EFH Corp --

20   A    Yes.

21   Q    -- correct?  And it's my understanding -- well, I want

22   to know if the time that the contingency planning began in

23   January, did you have an understanding of whether or not any

24   T-Side claims under that tax sharing agreement had been

25   released?

1    A    I don't know the answer to your question right now.  I

2    know that we dealt with the various tax claims.  We looked

3    at a variety of things.  What I -- I just -- I'm sorry.  I

4    don't have a good answer for you on that.

5    Q    Okay.  In connection with any contingency planning that

6    you participated in in January or February 2016, do you have

7    any recollection of the discussion -- of a discussion

8    occurring with regard to whether or not the T-Side would

9    have claims against EFH Corp under our tax sharing

10   agreement?

11   A    The tax sharing agreement really just provided for the

12   way that we would allocate taxes as we operated as a

13   consolidated company.  So that's different than what -- in

14   my mind I believe that's different than what happens in a

15   bankruptcy situation because there are different entities

16   and corporations.  So I was more focused on what would

17   happen in a bankruptcy related to that.

18        (Pause)

19   Q    Do you recall participating in negotiations with Mr.

20   Sawyer over the use of EFH Corp's NOLs in connection with

21   the prior plan?

22   A    We definitely had negotiations with Mr. Sawyer and they

23   were hotly contested negotiations.  And one of the items

24   that we looked at in there related to the difference between

25   a tax free spin and a taxable transaction.

1    Q    And in connection with those negotiations, and to be

2    fair it wasn't -- these weren't just negotiations related to

3    the prior plan, but they were negotiations relating to what

4    we've referred to as the DD settlement which ultimately

5    became the settlement agreement approved by the Court.  So I

6    didn't mean to ask it too narrowly.

7              But last year you had hotly negotiated -- heated

8    negotiations with Mr. Sawyer with regard to the use of EFH

9    Corp's tax attributes, didn't you?

10   A    Actually, we took into consideration and discussed --

11   there were specific claims that were identified and those

12   are listed on -- at Exhibit A that you and I have talked

13   about before.  And some of those were tax related.  And then

14   there was also a consideration that we were talking about

15   because TCEH first wanted a taxable transaction and we, EFH,

16   wanted a tax free transaction.  There was a difference in

17   the value of those two, and so that was something we

18   considered in those negotiations.

19   Q    And do you have a recollection that at some point in

20   those negotiations Mr. Sawyer articulated that all of the

21   NOLs should be made available to EF -- to the T-Side, TCEH?

22   A    Made available in what way?

23   Q    For use in connection with any plan that they chose or

24   otherwise?

25   A    Well, first off EFH can't transfer its tax attributes

1    to anybody.  But secondly the discussions were more around

2    how we might reach some settlement that took into

3    consideration the difference between a tax free spin to the

4    T-First creditors and a taxable transaction that they would

5    like.

6    Q    And in addition to the settlement agreement that we've

7    referenced, and when I use the term settlement agreement you

8    know I'm referring to the agreement that was approved in

9    December by the Court that contained a variety of releases

10   and settling intercompany claims.  You understand what I

11   mean by that term?

12   A    I understand what the settlement agreement is.  Yes.

13   Q    Okay.  Around that time there was also approved a plan

14   support agreement and you're --

15   A    Yes, there was.

16   Q    -- aware of that?  Neither that plan support agreement

17   nor that settlement agreement placed any limitations on what

18   EFH Corp could utilize their NOLs for in connection with an

19   alternative restructuring, did they?

20   A    No.

21   Q    And when contingency be -- planning began in January

22   did you participate in any meetings with your advisors at

23   which the subject was how to develop leverage to exert

24   against the T-First lenders to extract value for EFH Corp?

25   A    Yes.

1    Q    And in that meeting was the subject of making use of

2    the releases of claims -- let me back up.

3          In that meeting -- actually, why don't you tell

4    me, did a plan for making use of EFH Corp's leverage come

5    out of that meeting or those meetings?

6    A    Could you define what you mean by a plan?

7    Q    Sure.  So I asked whether or not you've met with

8    advisors about developing a plan to exert leverage against

9    the T-First lenders and you said, yes, a meeting took place

10   at which that was discussed.  And so did a plan come out of

11   those discussions?

12   A    If I could describe it slightly different than that.

13   Q    Please.

14   A    Again, we focused on a variety of things starting in

15   January.  We focused on a taxable transaction.  We talk --

16   focused on a tax free transaction with no NOLs.  We focused

17   on a tax free transaction with some NOLs.  We looked at a

18   variety of different things.  But it's important to take

19   into consideration that at that time in January and February

20   and March and April there was no way that EFH itself could

21   use all of its NOLs, and those NOLs would go away if the

22   bankruptcy exception applied.

23          And so, therefore, it wasn't -- we felt like if we

24   could get the tax free spin by giving up some of those NOLs

25   plus some of the other things that we wanted in the overall

1    settlement, such as moving EFH Properties and EFH Corporate

2    Services to reorganized TCEH, that that would be a good

3    plan.

4    Q    But no plan was developed and written down on a piece

5    of paper for how to exert leverage on the T-Firsts, was it?

6    A    You know, I can't tell you what other people wrote

7    down.  I did not write down on a piece of paper a plan, but

8    I feel that our co-restructuring officers as well as the

9    attorneys from the different estates all had in their minds

10   the things that they were going to try to do to get to an

11   appropriate settlement for the parties.

12   Q    So let's back up.  You -- you've described a meeting at

13   which the topic of exerting leverage against the T-Firsts

14   came up.  Who was present at this meeting?

15   A    Mr. Pedone, these topics came up each time we discussed

16   and as I mentioned there have been a lot of meetings and

17   it's been discussed in our restructuring update for our

18   board each time as to, you know, what type of plan we should

19   go forward with, should it be taxable or should it be tax

20   free, what are the other things that we need to get or give,

21   and that type of thing.

22           So it's not one meeting.  It's not one thing.

23   It's a whole body of knowledge that our board dealt with,

24   our co-CROs dealt with and our external advisors dealt with.

25   Q    Okay.  But you have a memory of a particular meeting at

1    which a plan for exerting leverage was discussed, correct?

2    A    I'm sorry.  I don't know how to answer it any better

3    for you.  This was discussed in several board meetings about

4    what we were going to do and how we were going to value

5    that, what we were going to get in return and that type of

6    thing.  I don't know any other way to respond to your

7    question.

8    Q    So do you have a memory of the first meeting at which

9    such topics were discussed of creating a plan to exert

10   leverage on the T-Firsts?  And if it's just a general --

11   your memory is only a general memory that such meetings

12   occurred and you have no specific memory of a particular

13   meeting, that's okay.  I'm just trying to identify if you

14   have specific memories of a meeting of the -- such a plan

15   being discussed.

16             MR. FIRESTEIN:  Asked and answered, Your Honor.

17             THE COURT:  I agree.  She's answered this question

18   several times.

19   BY MR. PEDONE:

20   Q    Ms. Williamson, you never saw a plan for exerting

21   leverage against the T-Firsts reduced to writing, did you?

22             THE COURT:  Can I ask --

23             MR. FIRESTEIN:  I --

24             THE COURT:  Can I ask what -- do you mean plan of

25   reorganization or do you mean plan in the broader sense of

1   strategy?

2          MR. PEDONE:  Yes.  Thank you, Your Honor.

3   BY MR. PEDONE:

4   Q    And I'm speaking, when I refer to plan of a plan of

5   strategy for EFH Corp to extract the most value,

6   compensation, exert leverage to recover the most money

7   against -- in connection with a plan of reorganization.  But

8   I'm talking about the strategy plan.  I'm not aware of any

9   strategy plan being developed.  And so I'm asking what your

10  memory on whether such a plan was developed for EFH Corp?

11         MR. FIRESTEIN:  Your Honor, his knowledge or

12  perception is irrelevant and this question was specifically

13  asked.  In fact, Ms. Williamson responded by asking for

14  clarification as to what plan meant, and then they had an

15  exchange with respect to this exact issue.

16         THE COURT:  Yeah.  I think this has been asked and

17  answered as well.

18  BY MR. PEDONE:

19  Q    You've never seen such a plan reduced to writing, have

20  you?

21         MR. FIRESTEIN:  Same objection, Your Honor.

22         THE COURT:  You can answer.

23         THE WITNESS:  I have not seen a plan in writing.

24  That does not mean there was not a plan.  I have not seen a

25  plan in writing.

1          MR. PEDONE:  I understand.

2          THE COURT:  Would now be an appropriate time to

3     take our lunch break?

4          MR. PEDONE:  That would be fine with me, Your

5     Honor.

6          THE COURT:  All right.  Very good.  We're going to

7     take lunch.  We'll reconvene at 1:25.

8          Ms. Williamson, during our lunch break you may not

9     discuss the substance of your testimony.

10         Thank you.

11         THE WITNESS:  Thank you.

12         MR. FIRESTEIN:  Thanks, Your Honor.

13         MR. PEDONE:  Thank you, Your Honor.

14     (Recessed at 12:19 p.m.; reconvened at 1:28 p.m.)

15         THE CLERK:  All rise.

16         THE COURT:  Please be seated.

17         Yes?

18         MR. STEPHANY:  Your Honor, Brian Stephany of

19     Kirkland and Ellis on behalf of the debtors.

20         Before we resume Mr. Pedone's examination of

21     Ms. Williamson, we have two pieces of evidence we'd like to

22     move in barring objection from counsel.

23         We understand that it's the declaration of

24     Ms. Jane Sullivan of Epic Bankruptcy Solutions.  She leads

25     their balloting team.  The Declaration describes the

Page 84

1    solicitation and voting process for the plan of

2    reorganization.

3              THE COURT:  Uh-huh.

4              MR. STEPHANY:  And also DX-767, both of those are

5    in the binder that we had placed up there and that schedule

6    details the voted first lien ballots at the request of the

7    counsel for the EFH indentured trustee.

8              I understand that there's no objections or

9    questions for Ms. Sullivan and we would respectfully ask --

10   she's here -- in -- in Court here today if Your Honor has

11   any questions but, barring that, we would move D-DIR

12   Sullivan and DX-767 into evidence.

13             THE COURT:  Any objection?

14             MR. PEDONE:  No objection, Your Honor.

15             THE COURT:  All right.  They're admitted.  Thank

16   you.

17        (Debtors' Exhibit No. D-DIR Sullivan and DX-767 were

18   admitted)

19             MR. STEPHANY:  Thank you.

20             THE COURT:  Thank you, ma'am.  You're excused.

21        (Pause)

22                  CROSS-EXAMINATION (Continued)

23   BY MR. PEDONE:

24   Q    Ms. Williamson, after Proskauer reached out to the T-

25   First on July 1 to request additional consideration, do you

1  know whether or not they reached out again to request

2  consideration on any other date?

3         MR. FIRESTEIN:  I think counsel misspoke.  I think

4  he meant June 1, not July 1.

5         MR. PEDONE:  I do mean June 1, Your Honor.

6         THE WITNESS:  Could you ask me the question again?

7         MR. PEDONE:  Certainly.

8  BY MR. PEDONE:

9  Q    After Proskauer reached out on June 1 to request

10  additional consideration on behalf of EFH Corp., do you know

11  whether or not they reached out again at any point?

12  A    I -- I know that Proskauer had further discussions with

13  Mr. Kornberg at Paul, Weiss.  But I don't know the specific

14  dates.

15  Q    Ms. Williamson, if you could turn to -- the binder in

16  front of you has date tabs and then behind the date tabs,

17  we've assembled board minutes --

18  A    Uh-huh.

19  Q    -- presentations and -- and other material that we

20  believe related to board events on that date and each of

21  those items is labeled with the debtors' exhibit number.

22  A    Yes, sir.

23  Q    So if you could turn to DX-106, please, which is under

24  the February 25th tab.

25         MR. PEDONE:  We don't need to bring it up.

```
 1   BY MR. PEDONE:

 2   A    Yes, sir.

 3   Q    This is a board meeting -- minutes for a board meeting

 4   of --

 5   A    Yes.

 6   Q    -- of the joint companies --

 7   A    Yes.

 8   Q    -- on February 25, 2016, correct?

 9   A    Yes.

10   Q    At that meeting, there was no discussion that took

11   place about EFH Corp. seeking out additional consideration

12   for the use of its NOLs; was there?

13   A    Well, that would have come under the restructuring

14   update and that's redacted.

15   Q    Do you have a specific memory of whether or not that

16   subject was discussed at that meeting?

17   A    Well, as we were talking before our break, each time

18   that we would have a restructuring update, we would talk

19   about different matters in the case.

20        And -- so, you know, those topics came up and were

21   visited throughout as we talked about January, February,

22   March and April.

23   Q    Okay.  So do you have a specific memory of whether or

24   not the subject of EFH seeking additional consideration for

25   the use of its NOLs was discussed at the February 25th board
```

1    meeting?

2    A    I -- I know that we had an overall discussion of the

3    tax-free spin and -- and that type of thing.

4         I don't recall exactly whether that particular point

5    was talked about in that manner.

6    Q    Okay.

7         And that board meeting minutes do not contain any

8    reference to anyone negotiation additional consideration on

9    behalf of EFH Corp.; do they?

10              MR. FIRESTEIN:  Objection, Your Honor.  The

11   document says what it says.  I -- I don't -- I'm not sure --

12              THE COURT:  Well, he can ask -- to the extent that

13   you know, ma'am.

14              THE WITNESS:  I don't -- what I don't know is when

15   it's redacted whether I'm supposed to comment on it or not.

16              THE COURT:  You're not.

17              THE WITNESS:  Okay.  Thank you.  Sorry.  I can't

18   comment.

19         (Pause)

20   BY MR. PEDONE:

21   Q    Ms. Williamson, if you could turn to DX-103.

22   A    Yes.

23   Q    And this is a debtors' exhibit and, for the record,

24   with regard to evidentiary issues, I -- I will not be moving

25   in but will be using it for our discussion.

1           What is this document?

2       A    This is a document that is -- was provided to the joint

3       boards that is our -- our restructuring update that was

4       discussed on February 25th, 2016.

5       Q    And do you recall whether or not the subjects on page

6       three, and they're a little bit faint in the bottom right of

7       the slides; do you recall whether the subjects on this page

8       three were, in fact, discussed at the board meeting?

9           (Pause)

10              THE COURT:  Can you reference by Bates number,

11      please?

12              MR. PEDONE:  Certainly, Your Honor.

13              So it's the Bates page ending in 7-1-8.

14      BY MR. PEDONE:

15      A    Okay.  Sorry.

16          Yes.  This was discussed.

17          (Pause)

18              MR. PEDONE:  Your Honor, I need just one minute to

19      review the document.  Sorry.

20          (Pause)

21      BY MR. PEDONE:

22      Q    Ms. Williamson, if you would turn to the Bates page

23      ending in 7-3-4, which is slide 19.

24      A    Yes.

25      Q    In the middle of that page, it states that the

1    consensual stand-alone plan would be negotiated among the

2    disinterested directors in consultation with the DDAs.

3    A    Yes.

4    Q    Do you know why it was that the negotiation of the plan

5    -- why it was that this deck refers to the disinterested

6    directors negotiating the plan with the DDAs?

7    A    The way that I interpret that is it's related to the --

8    when I was talking earlier about the equitization plan and

9    those items being discussed among the disinterested --

10   disinterested directors.

11   Q    And there's a reference to a plan term sheet; do you

12   know whether or not that was, in fact, prepared?

13   A    Yes.  There was a plan term sheet prepared.

14   Q    When was it prepared?

15   A    I don't know the specific date.

16   Q    Do you have any memory of it being prepared prior to

17   April 1, 2016?

18   A    Yes.  I believe it was prepared prior to that time.

19   Q    Are you aware of whether or not it was circulated to

20   creditors prior to that time, other than the T-Firsts?

21   A    I'm sorry.  I don't know the answer to that.

22   Q    Okay.

23        (Pause)

24   Q    And you're aware that it -- under the -- the facts as

25   they currently exist, if the T-Firsts were to conduct a

1   foreclosure sale of their assets, they would end of

2   receiving less of a valuable step-up than they will under a

3   tax-free spin, correct?

4   A    Well, I think there are a lot of issues with

5   foreclosing on the assets of TCEH.

6        For example, on a nuclear power plant that is

7   significantly regulated and any change in control has to be

8   approved by the -- the Nuclear Regulatory Commission.  So we

9   did not go through the process of how you would foreclose on

10  all of those assets because I -- I don't think that's -- I

11  think that's a very complex matter that would be very

12  difficult to do.

13  Q    Okay.

14       If -- so let's outside of a foreclosure, if -- if the

15  T-Firsts were to obtain approval of a plan of reorganization

16  that triggered a taxable transaction today or -- it wouldn't

17  be a transaction but --

18  A    Taxable spin.

19  Q    -- triggered the tax -- taxable spin, the dollar value

20  of their step-up would be hundreds of millions of dollars

21  less than the value -- the present value of the step-up

22  they're receiving in the current plan, correct?

23  A    It -- it would be less.  Yes.  As of today.

24  Q    Yes.  And what was the situation with regard to that

25  comparison in February of 2016?

1   A    Well, while the comparison was made, as we talked about

2   earlier, they were working under the assumption that the

3   bankruptcy exception would apply.

4        And what that mean is EFH could use their NOLs up to

5   the time of emergence and then, at that point in time

6   though, those NOLs would go away.  And you cannot transfer

7   the attributes, the tax attributes, to another entity.

8        So, you know, at that time, the NOLs were not worth a

9   huge amount because EFH wasn't going to be able to use those

10  before bankruptcy -- I mean, before emergence from

11  bankruptcy.

12       So, while there was discussion associated with that,

13  and we did have calculations of what the step-up would be if

14  there was a taxable transaction and a step-up if -- if there

15  was a tax-free spin.  We did see those calculations.  Yes.

16  Q    Okay.

17       And -- and, at that time -- so you were aware that in

18  -- in February, on the few dollar value of the step-up, the

19  T-Firsts were better off with a consensual tax-free spin as

20  opposed to triggering a taxable transaction in February?

21  A    Well, not exactly because there are restrictions that

22  TCEH has if they're in a tax-free spin.

23       So, for example, there are risks associated with that

24  and then -- then there are also restrictions on what they

25  can do in a tax-free spin.

1          For example, there's restrictions on M&A activity.

2     There's restrictions on buying back stock and that type of

3     thing.

4          So it was not without risk to them and -- and

5     restrictions to them even though the dollar amount might

6     have been greater for a tax-free step-up.

7     Q    And you would agree that the dollar amount would -- of

8     the -- the net present value of the dollar amount of the

9     step-up in February would have been greater under a tax-free

10    spin through such as the plan is being filed as opposed to a

11    taxable transaction, setting aside all of the other benefits

12    to them or avoidance of risks for them that you just

13    mentioned?

14    A    Well, we had -- there were various calculations at

15    different times.  And, quite honestly, I -- I can't put the

16    date quite -- but there was a time where we looked at the

17    taxable transaction versus the tax-free and, you know, the

18    -- the -- there were ways that the taxable transaction might

19    have provided.

20         Clearly, when we began the case, the taxable

21    transaction would have given them a higher step-up and --

22    and they -- in the value of their assets.

23         So there's been a -- over time, there's been a lot of

24    -- we've looked at the different ways of --

25              THE COURT:  Hang on.  Brandon, we just lost her.

1    Lost her mic.

2        (Pause)

3            THE COURT:  Did you hit --

4            THE WITNESS:  That's me.  That's me.  That's me.

5            THE COURT:  Okay.

6            THE WITNESS:  I did it.  I'm sorry.

7        (Laughter)

8            THE WITNESS:  Sorry.

9            THE COURT:  Hit that little button.

10           THE WITNESS:  There's too much stuff up here.

11           THE COURT:  Yeah.  It's -- it's -- it's --

12           THE WITNESS:  Yeah.  The little button up here.

13   Sorry.  I'll watch that better.

14           THE COURT:  I'm trying -- and I'm hoping to get --

15   not that it matters to you, but I'm hoping to get a much --

16   a revised witness box that actually has room for binders.

17       (Laughter)

18           THE COURT:  So --

19           THE WITNESS:  Well --

20       (Laughter)

21           THE COURT:  -- when we're here for the fifth

22   plan --

23       (Laughter)

24           THE WITNESS:  I -- I hope not, Judge.

25           THE COURT:  Boy, there's a groan, huh?

1           THE WITNESS:  Thank you.  It's not that I don't

2      enjoy seeing you but I sure hope we're not in that

3      (indiscernible).

4           (Laughter)

5           THE WITNESS:  I'm sorry.  I've lost track of the

6      question now.

7           THE COURT:  We could play it back if you want,

8      Mr. Pedone.

9           MR. PEDONE:  No.  I -- I can actually reframe it

10     so hopefully we get to the answer more quickly.

11     BY MR. PEDONE:

12     Q    So, as you sat and listened to the discussion in

13     February, 2016, you were not aware of any analysis based

14     upon the facts as they existed in February, 2016 that led

15     you to believe that the T-Firsts would receive more in a

16     dollar amount of a step-up in a taxable transaction then

17     they would receive in a tax-free spin?

18     A    There was a point in time, and I don't recall when it

19     was, where there was a -- a discussion about whether the

20     taxable transaction might not provide the -- the same kind

21     of stranded tax.

22          I don't recall when that was.  But we have looked at

23     all of those different things over a time period.

24          But, as we sit here today, the -- and -- and when we

25     were looking at it in April, the tax-free spin provides a

1    higher step-up for the T-First creditors than a taxable plan

2    does.

3    Q    Thank you.

4         And at this board meeting, if -- if you turn to the

5    pages beginning on Bates number 7-4-3, ending with 7-4-3,

6    excuse me, slide 28.

7    A    Uh-huh.

8    Q    There's a review of the alternatives.

9    A    Yes.

10   Q    And it may actually start -- yes.  That's the correct

11   page.

12        The review of the alternatives and -- and one

13   alternative discussed first is a goal of maximizing the

14   step-up for the T-Firsts, correct?

15   A    Well, there are different things that are listed here

16   as to items that should be considered and so maximizing a

17   step-up is one of the items that is listed.

18   Q    Yep.

19        And nowhere here in this board presentation is

20   maximizing the cash available for distribution of the EFH

21   Corp. actually discussed.

22   A    Well, actually, you know, when you're sitting here --

23   when we were sitting here in February, as I've stated to

24   you, these NOLs were not valuable to EFH at that point in

25   time because we couldn't use them.

1        I think one of the people in the cases described it as

2    sleeves off of a vest.  And so the -- the whole point is

3    while we were considering different alternatives and that

4    sort of thing, when we're assuming that the NOLs are going

5    to go away, at emergence -- at emergence from bankruptcy,

6    you know, these were not hugely valuable.

7        But that isn't to say -- I mean, we didn't put on every

8    slide maximizing the cash at different areas.  That was

9    something that was important to Chairman Evans and myself.

10   As I stated from the beginning, that we wanted to maximize

11   the cash.  We wanted to minimize the tax risk and we wanted

12   to get a great value for ONCOR.

13       And so, you know, here it's not listed on this

14   particular slide but that doesn't mean that it wasn't

15   something that was considered.

16   Q    Do you have a specific recollection of it being

17   discussed at that board meeting?

18   A    We always talked about making sure that we retained as

19   much cash and, at every board meeting, not every joint board

20   meeting, but at every board meeting of EFH, there was an

21   analysis done of what cash might be available at exit from

22   bankruptcy.

23   Q    Okay.

24       And so it -- in -- in my mind, I'm not speaking

25   necessarily about maintaining existing cash.  I'm curious

1    about was there a discussion about ways of obtaining

2    additional cash.

3    A    Okay.  This goes --

4    Q    Just if there's -- (indiscernible) --

5    A    -- goes back to the discussion we had about what value

6    is.

7    Q    Yes.

8    A    And where you get value.  But to ask people to pay for

9    something that they knew wasn't valuable to us is difficult.

10        Now one of the things that -- is important is for us to

11   get the tax-free spin so that we did not strand $6 billion

12   worth of tax up at the EFH level is particularly that

13   valuable for me.

14        Also getting them to take EFH corporate services and

15   EFH properties and the potential liabilities associated with

16   those (indiscernible) retained cash at EFH.

17   Q    I'm -- how is retention of corporate services in any

18   way capable of impacting cash at EFH Corp.?

19   A    Well --

20   Q    Other than -- go ahead --

21   A    Go ahead.

22   Q    -- I'd like to finish the question but --

23   A    Yes.  I'm sorry.  I shouldn't have interrupted.

24   Q    No. No.

25   A    It's my fault.

1    Q    It was -- I was slow.

2         So -- so I understand that if there's a distribution to

3    equity because it turns out it's valuable cash would go to

4    EFH Corp.  So I don't mean to exclude that possibility.

5         But I have an understanding that EFH corporate services

6    is the stand-alone corporation and EFH Corp., the entity

7    that you're a disinterested director of, is not liable for

8    the debts of EFH corporate services.

9         So I'm -- I'm not sure how actions with regard to

10   corporate services could impact defensive cash at EFH Corp.

11        So you could please explain, for me, how you think that

12   could happen?

13   A    Certainly.  I'm sorry.  I'm not a lawyer so I'm not

14   going to do it in -- in legal terms.  But I am going to do

15   it in the terms as a business person.

16        First off, there is a signed agreement for shared

17   services between EFH Corporation and EFH corporate services.

18   And in that -- and in that agreement, we talk about the

19   facts that the services from EFH corporate services are

20   going to be provided at cost and they're -- and the cost of

21   those services are going to be allocated to the people that

22   use those services based on the amount, you know, the

23   activities that are done and that sort of thing.

24        So, in my mind, if you EFH corporate services and EFH

25   corporate services has 420 people and they're going to have

1     to separate those people, there is a potential for all of

2     that separation liability.

3          And while that might be able to be allocated around all

4     the different companies and everything, certainly, EFH would

5     take its allocation and if TCEH were gone and had already

6     set up its own, you know, set of accounting people and that

7     sort of thing, that liability would be left and would be

8     allocated to the people who are using the services and that

9     would be EFH.

10    Q    And, surely, it's a legal conclusion with regard to

11    whether or not EFH Corp. would be responsible for any of

12    those liabilities?

13              MR. FIRESTEIN:  Objection, Your Honor.

14              THE COURT:  You -- you asked the question,

15    Mr. Pedone.  You can't --

16              MR. PEDONE:  I did.

17              THE COURT:  -- you can't complain about her making

18    a legal conclusion.  Maybe I misunderstood your question.

19              MR. PEDONE:  No, no. I'm not moving to strike the

20    response --

21              THE COURT:  Oh.

22              MR. PEDONE:  -- but I'm just asking the witness

23    that you would agree that there's some legal analysis of the

24    document that's required to actually get to the conclusion

25    that -- that you've just stated.

1          THE WITNESS:  Pretty much everything in this case

2    require legal analysis of the documents.  But, yes, sir, I

3    would agree with that.

4    BY MR. PEDONE:

5    Q    And -- and -- and has anybody presented you with that

6    legal analysis?

7    A    A detailed legal analysis of that, we have had a

8    discussion.  I've discussed it with my attorneys.  I have

9    heard the discussion at the joint board meetings that

10   Kirkland has addressed.

11        So, yes.  I believe I have.

12   Q    And -- and you believe -- do you believe that a

13   conclusion was reached that EFH Corp. would be liable for

14   those costs?

15          MR. FIRESTEIN:  Objection, Your Honor.  That asks

16   for advice from lawyers.

17          THE COURT:  Yeah.

18          MR. FIRESTEIN:  She's given her business sense

19   but --

20          THE COURT:  I agree.  Overruled.

21          MR. PEDONE:  I'll move on, Your Honor.

22          THE COURT:  Overruled or sustained, excuse me.

23        (Pause)

24   BY MR. PEDONE:

25   Q    Ms. Williamson, if you could turn to the April 28th

1   tab.

2   A     Yes, sir.

3   Q     And Exhibit DX-097.

4   A     Yes, sir.

5   Q     These are the minutes of the meeting of the

6   disinterested directors of EFH Corp., correct?

7   A     Yes.

8   Q     Do you have any recollection of whether or not the

9   disinterested directors of EFH Corp. held any formal minuted

10  meetings between February 25th, 2016 and April 28th of 2016?

11  A     I -- I don't think that there were any formal minuted

12  meetings.  We had numerous conversations with Proskauer.

13  Q     Okay.

14        (Pause)

15  Q     And do you know whether or not between February 25th,

16  2016 and April 28th, 2016 there were any joint EFH Corp.

17  board meetings that you recall?

18        And -- and I believe we've assembled the binder to

19  reflect the chronology.  But it's entirely possible, given

20  the discovery in this case, that we missed something so just

21  if you could think about the time period and -- and -- and

22  work from your memory.

23  A     Okay.  So looking at the chronology that you have in

24  the front, it does not appear that there were minutes during

25  that time period.

1  Q    And based upon your memory, do you recall formal board

2  meetings taking place during that period?

3  A    Not if they're not listed here.  There have been so

4  many meetings though --

5  Q    Sure.

6  A    -- over the -- I -- I don't recall exactly.

7  Q    Okay.

8      And when we get the April 28th time period, this is

9  just a few days before the plan of reorganization will be

10 filed, correct?

11 A    Yes.

12 Q    On May 1.

13     You're not aware of any board minutes or formal

14 corporate documents of board meetings that detail any

15 negotiations by Proskauer or anyone else taking place

16 between February 25th and April 28th; are you?

17 A    There were numerous conversations and, I guess,

18 negotiations going on throughout that time.  We were working

19 to try, you know, we had to work behind the scenes because

20 until the termination notice was presented, we had specific

21 requirements that we had to adhere to related to any

22 planning for alternate restructuring plans.

23     And that was specified in the plan support agreement.

24 That was done at the end of 2015.  So while we could have

25 discussions, they had to be non-public.  They had to be

1     carefully done and we couldn't do anything that would

2     disrupt the process in front of the PUCT.

3     Q    And, aside from what you've just explained, do you have

4     recollection of there being any minuted board meetings where

5     Proskauer's efforts, if any, to negotiate on behalf of EFH

6     Corp. are recorded?

7              MR. FIRESTEIN:  Objection, Your Honor.  Asked and

8     answered.  You just did.

9              THE COURT:  You can answer.

10             THE WITNESS:  First off, I would like to exception

11    with your comment about "if any".  I -- I think that my

12    testimony has been that I am well aware that Proskauer did

13    participate in negotiations and has represented EFH and the

14    disinterested director this -- directors in that.

15             Now, that being said, everything in between, I

16    think in our minutes you notice that at every joint board

17    meeting, Chairman Evans calls on all of the counsels for the

18    disinterested directors, one at a time, and allows them to

19    speak and to update the joint boards on their activities.

20             And, so while everything they is, perhaps, not

21    listed in the minutes, I believe that Proskauer has done a

22    -- a good job of being present on every board call and on

23    voicing updates on those board calls.

24    BY MR. PEDONE:

25    Q    Okay.

1        And -- and I mean to cause offense.  I'm just trying --

2    A    No, no.  I --

3    Q    -- to find the recorded instances of Proskauer's

4    efforts being record.  That was really what it related to.

5    Not --

6    A    No.  I --

7    Q    -- to contradict your testimony of what they did or may

8    not --

9    A    And I --

10   Q    -- have done.

11   A    -- I just want to make sure that we're all on the same

12   page.

13   Q    And looking through the restructuring update --

14   A    Yes.

15   Q    -- that is attached as DX ninety -- I'm sorry.  It's

16   actually attached to the minute -- it's attached to the

17   agenda.

18   A    I'm sorry.

19            MR. FIRESTEIN:  Well, what -- what exhibit --

20            THE WITNESS:  Held me out.

21            MR. PEDONE:  Yeah.  Let me back up.

22            Yep, certainly.

23   BY MR. PEDONE:

24   Q    So, to clear the record up, the minutes of the meeting,

25   the joint meeting, are DX-96.

1    A    Okay.

2    Q    And then the agenda, with the restructuring update

3    attached are DC-0-9-5.

4    A    Yes, sir.

5    Q    So, turning to DX-0-9-5, the restructuring update

6    presented --

7    A    Wait a minute.  I don't have a --

8    Q    Uh-huh.

9    A    Are you asking to look at --

10            MR. FIRESTEIN:  It's a different tab.

11            THE WITNESS:  -- DC-0-9-2?

12            MR. PEDONE:  0-9-5, Ms. Williamson.

13            THE COURT:  Okay.  So he's on -- he's the

14    April 29, not the April 22, at this point.

15            THE WITNESS:  Excuse me.

16            THE COURT:  He --

17            THE WITNESS:  I'm sorry.

18            THE COURT:  -- skipped ahead.

19            MR. PEDONE:  Thank you.

20            THE WITNESS:  April 29, sorry.

21        (Pause)

22            THE WITNESS:  I'm sorry.  Okay.  I got it now.

23    Sorry.

24            THE COURT:  So we're looking at 95?

25            THE WITNESS:  Yes, sir.

```
 1              MR. PEDONE:  We are.

 2              THE COURT:  Okay.

 3  BY MR. PEDONE:

 4  Q    So turning to the April 29th meeting.

 5  A    Yes.

 6  Q    There's a restructuring update attached to the agenda.

 7  A    Yes.

 8  Q    And then right behind that in your binder are minutes

 9  of a joint meeting.

10  A    Yes.

11       (Pause)

12  Q    Neither of these records contain any reference to

13  Proskauer seeking additional consideration from the TCEH

14  first lien lenders; do they, for EFH Corp.?

15  A    There is nothing specifically stated here but Proskauer

16  was on the call and did, as we talked about, gave an update

17  of their activities and the things that they had been doing

18  on behalf of EFH.

19       (Pause)

20  A    Oh, and if you look on page -- it's Bates number 7-7-1,

21  it does say the debtors have had preliminary discussions

22  with the advisors to the TCEH first lien creditors, EFH PIC

23  noteholders and Fidelity and Fidelity is one of the EFH

24  creditors.

25  Q    Sure.
```

1        And -- and, I was -- I appreciate that but I was just

2    looking for any reference to efforts that Proskauer

3    undertook.

4        (Pause)

5    Q    And, Ms. Williamson, flipping ahead chronologically

6    until we get to the May 10th meeting.

7    A    Yes.

8            THE COURT:  Hang on a second.  May 10.

9        (Pause)

10           THE COURT:  Okay.

11   BY MR. PEDONE:

12   Q    So, if you turn to DX-75.

13   A    Yes.

14   Q    On -- you did not attend this meeting; is that correct?

15   A    That's correct.

16   Q    And in the period between April 29th and May 10th,

17   you're not aware of any efforts, specific efforts, on behalf

18   of Proskauer during that narrow period, to seek additional

19   consideration for EFH Corp.; are you, from the T-Firsts.

20   A    Well, again, I know that Proskauer was engaged in all

21   of the discussions that took place.

22       So, if there were any discussions that had taken place,

23   or negotiations, they were represented on that -- on those

24   calls and were working on our behalf.

25       (Pause)

1    Q    And if you could turn further ahead to DX-64, and this

2    is on -- the date for you --

3    A    Yes, I have it.

4    Q    -- May 20th.

5    A    Uh-huh.  I have it.

6              UNIDENTIFIED SPEAKER:  Sixty-three.

7    BY MR. PEDONE:

8    Q    DX-64 on May 20th.

9    A    Uh-huh.

10        (Pause)

11   Q    In connection with this meeting --

12   A    Uh-huh.

13   Q    -- was there any discussion of Proskauer seeking

14   additional consideration for EFH Corp.?

15   A    Again, Proskauer was given the opportunity to update

16   the entire joint boards at the end of the meeting and they

17   did make that update.

18   Q    And their update, to the extent it included a

19   description of any efforts, which you can't recall, would be

20   reflected in the minutes?

21             UNIDENTIFIED SPEAKER: (Indiscernible).

22             MR. PEDONE:  I'll let you know if want

23   (indiscernible).

24             UNIDENTIFIED SPEAKER:  Yes.

25             THE WITNESS:  Would -- would you like to ask your

1    question again, please.

2            MR. PEDONE:  I would since I lost track of it.

3            THE WITNESS:  Okay.

4        (Laughter)

5        (Pause)

6    BY MR. PEDONE:

7    Q    Actually, I'll move on.

8    A    Okay.

9    Q    Ms. Williamson, skipping ahead to July 27th.

10   A    Yes, sir.

11   Q    Tab DX-51.

12   A    Yes.

13   Q    This is what I believe is the next separate meeting of

14   the disinterested directors of EFH Corp.

15   A    That's the minuted one.

16   Q    And -- and this is the meeting at which the ancillary

17   agreements were discussed, correct?

18   A    Yes.  Uh-huh.

19   Q    There's no discussions in -- in these minutes about

20   efforts that Proskauer undertook to negotiate for additional

21   consideration for EFH Corp.; is there?

22   A    No.  There's not.

23        But, as we talked about, that was done back on June the

24   1st when they spoke to Mr. Kornberg at Paul, Weiss and then

25   they had meetings on June the 2nd with some of the EFH

Page 110

1    creditors.  And they spoke with them, also.

2        We were kept apprised of those discussions and, while

3    they're not in the minutes, we were kept updated on that.

4        (Pause)

5    Q    Ms. Williamson, between the date that the last plan was

6    confirmed and February, 2016, did you perform any analysis

7    or review any analysis of the likelihood that the T-Firsts

8    could successfully cause a taxable transaction to occur if

9    you did not consent?

10   A    We have a meeting on January -- in January of 2016 and,

11   at that meeting, there was a discussion about taxable

12   transactions.

13   Q    And my question is, specifically, you -- you did not

14   view any analysis of the likelihood that the T-Firsts could

15   succeed in forcing a taxable transaction during that period;

16   did you?

17   A    Well, that was discussed at the meeting and there were

18   representatives from Kirkland who addressed that topic.

19       And then in informal meetings with Proskauer, I asked

20   that question.

21   Q    And in -- in arriving at your business decision to

22   proceed with discussions and towards the development of a

23   plan, did you have a conclusion in mind with regard to what

24   the probability of -- of success the T-Firsts would have if

25   they to force a -- an involuntary taxable transaction?

1   A    Well, I know we've -- we've talked about probabilities

2   before and, so, from the very beginning, before we ever

3   filed bankruptcy, the T-Firsts were very strong on the fact

4   that they wanted a taxable transaction.

5        I felt like that was something that they could do.

6   They had threatened it.  I'm sure they've got very capable

7   lawyers on their side also who were advising them.

8        So I did feel that there was a very high risk of a tax

9   -- taxable transaction and, because of that, you know, we

10  had been focused on having a tax-free transaction from the

11  very beginning.

12  Q    And -- and so in the February time period, how did you

13  evaluate that risk compared to how you may have evaluated it

14  in connection with the last plan?

15  A    I felt like there was a very high risk that they could

16  attempt to move to a taxable plan.

17       We lost exclusivity in December of 2015 which meant

18  that TCEH or any creditor, in this case, could file their

19  own plan at that point in time.  And they had threatened to

20  file a plan, a stand-alone plan, that incorporated a taxable

21  transaction.

22       (Pause)

23  Q    In mid-July, ahead of the board meeting, at which the

24  ancillary agreements were approved --

25  A    Uh-huh.

1    Q    -- at some point in that time period, you received --

2    the companies received an indication that the IRS was

3    favorable on many of the provisions that had been requested

4    in the private letter ruling, correct?

5    A    Well, we had been updated as we went along as we had

6    conversations with the IRS, as we responded to questions

7    that they provided and that sort of thing.

8         If there was anything significant that would have been

9    brought up on each restructuring update.

10        So, at the end of May, we learned that the IRS was not

11   going to be favorable on the -- the bankruptcy exception

12   piece.

13        But, then, as we moved into July, we were having

14   discussions -- I -- you know, we continued to have

15   discussions.  We provided information and answers to

16   questions.

17        And there was a discussion that we were very hopeful

18   and optimistic that we would get many of the things that we

19   had asked for in the private letter ruling other than the

20   bankruptcy exception item.

21   Q    And that occurred ahead of the July 27th board meeting

22   where the ancillary -- or end of July board meeting where

23   the ancillary agreements were approved, correct?

24   A    We didn't have anything in -- in particular but there

25   was an optimism to -- but, to be real honest, while Kirkland

1    and Ms. Howard were optimistic, we did actually have a

2    conversation with Proskauer where they weren't quite as

3    positive.

4             MR. FIRESTEIN:  Well, Your -- Your Honor, I would

5    just caution the witness not to disclose what advice was

6    that she received from counsel.

7             THE COURT:  Yes.  Let's strike that last sentence.

8             MR. FIRESTEIN:  Thank you.

9             MR. FIRESTEIN:  Thank you.

10            THE WITNESS:  I'm sorry.

11   BY MR. PEDONE:

12   Q    And in connection with that optimism, and certainly by

13   the time that the private letter ruling issued, you came to

14   understand that NOLs could, in fact, have significantly more

15   value to EFH Corp. than when you performed your initially

16   assessment of the situation in January, correct?

17   A    Yes.

18   Q    And, subsequent to the point at which you learned that

19   the NOLs could be more valuable, do you know whether or not

20   Proskauer went to the T-Firsts and sought additional

21   consideration?

22            MR. FIRESTEIN:  Your Honor, this asked and

23   answered.  She's discussed this ad nauseam with respect to

24   the end of May and then having the conversations with the

25   T-Firsts.

1          THE COURT:  Right.  I think this has been covered

2     but --

3          MR. PEDONE:  I don't believe we --

4          THE COURT:  -- if you want to be more specific.

5          MR. PEDONE:  It's the very specific time period

6     after they received the private letter ruling.

7          THE COURT:  Right.

8          MR. PEDONE:  Through the present.  During this

9     time period, what did Proskauer do, is the --

10          THE COURT:  I think she testified previously that

11     on June 1, they made a call to Mr. Kornberg and that there

12     was a meeting with somebody or some people, between

13     Proskauer and some creditors on June 2nd and that, I think

14     she testified she didn't recall any further, specific

15     meetings or discussions.

16          But maybe that's the question so, other than June

17     1 and June 2, do you recall any specific instances where

18     Proskauer took actions in connection with the NOLs and

19     increasing consideration?

20          THE WITNESS:  Yes.  They -- they had further

21     discussions with the E-Side creditors that were bringing

22     forth some settlement proposals.

23          And those settlement proposals were provided to

24     Mr. Kornberg and one of those from Fidelity, I believe, was

25     rejected.  And then the one from Contrarian was not

1    responded to until just recently.

2    BY MR. PEDONE:

3    Q    Okay.  But after you received the favorable ruling from

4    the IRS, did you, specifically, instruct Proskauer to go

5    seek more consideration?

6    A    We -- I think it's really important for you to

7    understand that we had the indication in May that the IRS

8    was -- was going to rule adverse to the situation on the

9    bankruptcy exception.

10        That is when we learned that the NOLs might be more

11   valuable and that is when we instructed Proskauer to go back

12   and that is when they did go back.

13        There was no sense in going back again after we just

14   got the formal private letter ruling who -- that said

15   exactly what we expected to say and ask again because we had

16   been turned down in our previous discussions and

17   negotiations with the T-First creditors.

18   Q    You've just testified that you had a degree of

19   pessimism -- I'll -- I'll -- it wasn't your word but you --

20   you described the company's representatives and Kirkland as

21   having optimism that the ruling would issue, as requested.

22        But you've indicated that your advisors or you and your

23   advisors weren't quite as optimistic.

24              MR. FIRESTEIN:  You -- You --

25              THE COURT:  You --

1          MR. PEDONE:  I don't want to use -- I'm trying --

2          MR. FIRESTEIN:  Your Honor --

3          THE COURT:  You're already --

4          MR. FIRESTEIN:  -- I'm -- I'm going to interject.

5     This is --

6          THE COURT:  Yeah.  This is -- you're -- you're --

7          MR. PEDONE:  Let me -- let me ask the question

8     another way.  Sorry.

9          THE COURT:  All right.

10         MR. PEDONE:  Strike the question.

11         MR. FIRESTEIN:  I move to strike the comments,

12    Your Honor --

13         THE COURT:  Yes.  The --

14         MR. FIRESTEIN:  -- that he's making.

15         THE COURT:  -- question --

16         MR. PEDONE:  And the comments.

17         THE COURT:  -- is stricken.

18         Please do not engage in a question that references

19    what Proskauer's feelings or thoughts were that were

20    communicated to Ms. Williamson, pessimistic or otherwise.

21       (Pause)

22    BY MR. PEDONE:

23    Q    In mid-July, 2016 --

24    A    Uh-huh.

25    Q    -- did you have a view of the likelihood that the

1    private letter ruling would issue as requested?

2    A    We had an indication that the private letter ruling

3    would come down as approving the tax-free spin.

4    Q    And when the private letter ruling, in fact, issued --

5    strike the question.

6            MR. PEDONE:  Your Honor, if I could have just one

7    minute.  I think I'm almost done.

8            THE COURT:  Okay.

9        (Pause)

10            MR. PEDONE:  Your Honor, I have no further

11    questions.

12            THE COURT:  Thank you, Mr. Pedone.

13            Mr. Glenn, I assume you have some questions.

14            MR. GLENN:  I do.  Thank you.

15            THE COURT:  All right.  We're going to take a

16    short recess before you commence.

17            MR. GLENN:  Yes.

18            THE COURT:  Just a few minutes.

19            MR. GLENN:  Thank you.

20        (Recessed at 2:16 p.m. and reconvened at 2:24 p.m.)

21    THE COURT:  Please be seated.

22            Mr. Glenn, you may proceed.

23            MR. GLENN:  Thank you.  For the record, Andrew

24    Glenn, Kasowitz Benson Torres & Friedman, on behalf of

25    Contrarian Capital Management.

1                           CROSS-EXAMINATION

2    BY MR. GLENN:

3    Q    Just a few questions, Ms. Williamson, and we'll have

4    you on your way.

5              You testified in response to your counsel's

6    questioning about whether or not some of the negotiations

7    involved what you have described as conflict matters; do you

8    recall those general questions?

9    A    Yes.

10   Q    Okay.  And one of the reasons why you did not deem

11   certain of the tax negotiations as conflict matters is

12   because reorganized TCEH was on the other side, correct?

13   A    Yes.

14   Q    Okay.  Does reorganized TCEH exist now?

15   A    I believe it exists when they emerge from bankruptcy.

16   Q    So there's no reorganized TCEH that now exists, am I

17   correct?

18   A    Well, I think that it is structured as part of the plan

19   of bankruptcy and at emergence when those agreements are

20   entered into there is an ad hoc committee of the creditors

21   of TCEH and that is who we're referring to as reorganized

22   TCEH.

23   Q    Okay.  So you negotiated in your view with the

24   creditors of TCEH -- and we're talking about the first liens

25   now, correct?

1    A    Yes, sir.

2    Q    Okay.  So because in your view you were negotiating

3    with the TCEH creditors that did not rise to a conflicts

4    matter, correct?

5    A    As I've stated, it specifically specified that conflict

6    matters are inter-debtor matters and so that would be

7    matters that are between the estates that are in bankruptcy.

8    Q    Fair enough.  But what these transactions were

9    contemplated to do was to effectuate the global plan of

10   reorganization on the T-side, correct?

11   A    Yes.

12   Q    Okay.  No T-side confirmation, no reorganized TCEH,

13   correct?

14   A    You know, I'm not a lawyer and I don't know the answer

15   to that question, but I do know that the ad hoc committee

16   and the TCEH first lien creditors are still there --

17   Q    Okay.

18   A    -- they're not going to go away.

19   Q    Fair enough.  And you do understand that the board of

20   directors and the officers of TCEH also needed to consent to

21   these transactions for them to occur, correct?

22   A    Yes.

23   Q    Okay.  And I take it you also understood that the TCEH

24   creditors wanted to use these NOLs since practically day one

25   of this case, correct?

1    A    No, sir.  I believe that they wanted a taxable spin,

2    that's what we discussed before we ever went into

3    bankruptcy, and they were very harsh on having a taxable

4    transaction.

5    Q    Okay.  The last bankrupt -- I'm sorry, the last plan of

6    reorganization you do understand was a tax-free spin,

7    correct?

8    A    Yes, sir.

9    Q    Okay.  And the T-side creditors demanded to use the

10   NOLs as part of that tax-free spin transaction, correct?

11   A    In plan A?

12   Q    Yes.

13   A    Okay.  In plan A, we were working under the assumption

14   that the bankruptcy exclusion did not apply.  So what that

15   meant is we weren't giving up something that was hugely

16   valuable at that point in time because we weren't going to

17   be able to use those NOLs anyway.

18   Q    I'm asking you a different question, ma'am.  Pardon me.

19   I'm asking you if as part of that last bankruptcy plan the

20   T-side creditors demanded to use the NOLs as part of that

21   transaction, yes or no?

22   A    I don't know the answer to your --

23        THE COURT:  You do not need to answer any question

24   yes or no, you feel -- you do not need to answer questions

25   yes or no even if Counsel says that.  Answer the question as

1    you feel fit --

2             THE WITNESS:  Thank you, sir.

3             THE COURT:  -- as you see fit.

4             THE WITNESS:  The way that I would answer that

5    question is I don't recognize the words "demanded."  I don't

6    believe they demanded.  I believe that they wanted some

7    consideration for being able to do a tax-free spin.  That

8    could have been done in a variety of different ways, but in

9    this case we chose to use the NOLs in plan A.

10   BY MR. GLENN:

11   Q    Okay, so maybe we can come to some agreement on the

12   verbiage here.  Is it fair to say, if they didn't demand it,

13   they at least asked for it?  They asked to be able to use

14   the NOLs as part of plan A?

15   A    They certainly asked for consideration and one form of

16   that consideration was NOLs.

17   Q    Thank you very much.  Now, in the context of plan A,

18   how much were the unsecured creditors of EFH recovering on a

19   percentage basis?

20   A    A hundred percent --

21   Q    Okay.

22   A    -- at par, let me just say at par.

23   Q    Fair enough.  Now, rolling forward, plan B arose out of

24   the demise of plan A.  I think we've talked about that

25   extensively, right?

1    A    We haven't, but I'm aware that the plan has --

2    Q    Okay.

3    A    -- gone away.

4    Q    Okay, fair enough.  And I believe you testified

5    earlier, correct me if I'm wrong, you and the other

6    directors of EFH agreed to the T-side plan around May of

7    2016, correct?

8    A    What T-side plan are you referring to?

9    Q    The one that's now before the Court.

10   A    Well, that's not a T-side plan.  We have a plan for the

11   entire of Energy Future Holdings on file.  So it's the whole

12   plan, not a T-side plan.

13   Q    Okay, but we're here today and just I'll represent to

14   you that we're here only to consider confirmation to get the

15   T-side out of bankruptcy; do you understand that?

16   A    Yes.  And we were granted the provision to do that, to

17   let T-side come out and then work to get to the E-side to

18   come out, but it is one bankruptcy, it is not two

19   bankruptcies.

20   Q    Okay.  So when you agreed to the plan that's now before

21   the Court, what was the projected recovery for EFH

22   creditors?

23   A    It's not a hundred percent on plan B.

24   Q    Okay.  So can you tell me what it is?

25   A    I don't know the exact percent right now.

1    Q     Do you know if it's more than 50 cents on the dollar?

2    A     No, it's less than that, I believe.

3    Q     Okay.  Is it more than 25 cents on the dollar?

4               THE COURT:  Relevance?

5               MR. GLENN:  Well, we're getting to why this is

6    important to the EFH creditors.

7    BY MR. GLENN:

8    Q     So you understood, whatever the numbers are, that the

9    recoveries for EFH creditors went down between the time plan

10   A was on the table and the time plan B was on the table,

11   correct?

12   A     Yes.  There have been a lot of different economic

13   situations that have occurred.  And so if you look at the

14   economic situation of what things are valued today versus

15   what they might have been valued at two years ago or a year

16   ago or a year and a half ago, there's lots of things that

17   have changed in that time period.

18   Q     Okay.  So you were asked questions on both direct and

19   cross about the private letter ruling that made in your view

20   or understanding the NOLs potentially available to EFH; is

21   that correct?

22   A     Yes.

23   Q     Okay.  And if I recall your testimony -- and I know you

24   went over this, I don't mean to repeat it -- you asked after

25   that occurred your counsel Proskauer to ask the T-side

1    creditors whether they would provide some consideration for

2    using the NOLs, correct?

3    A    Yes.

4    Q    Okay.  Can you tell me exactly what you instructed them

5    to do?

6    A    I asked them to go back and to talk with the TCEH first

7    creditors' representative and explain that we had -- we

8    weren't going to be able to, you know, pay everyone out at a

9    hundred percent and with the NOLs that they were getting,

10   what consideration would they give us for that.

11   Q    Okay.  So you asked Proskauer to ask the T-side first

12   whether they would agree to give something for the NOLs; is

13   that a fair statement?

14   A    Yes.

15   Q    Okay.  Now, you understood at the time that request was

16   given that you as a fiduciary had the right to terminate

17   your support of the plan that's now before the Court,

18   correct?

19   A    I did.

20   Q    You have what's called a fiduciary out, right?

21   A    Yes, sir, I do.

22   Q    Okay.  And you understand that the people who are the

23   major creditors of the T-side firsts are substantial hedge

24   funds and private equity funds like Apollo, Oaktree and

25   Brookfield, correct?

```
 1    A     Yes.

 2    Q     These are tough institutions, right?

 3    A     Yes.

 4    Q     Okay.  So in dealing with these tough institutions, you

 5    never instructed your counsel to tell the first liens and

 6    their representatives that you would withhold your approval

 7    of the T-side plan if they failed to provide any additional

 8    cash consideration to the EFH estate, correct --

 9    A     Well, that would be --

10    Q     -- you never did that?

11    A     -- that would be like shooting a gun with no bullets in

12    it, because basically where we are at this point in time is

13    we could say, yeah, we'll withhold, and they could say,

14    okay, we'll go file a taxable plan because we have that

15    right to do that.  And they would go file a taxable plan and

16    then we'd all have a great big argument about who was going

17    to pay those stranded taxes since our NOLs would not come

18    anywhere close to covering the CODI that was going to be

19    generated in a taxable transaction.  And because we had

20    actually asked and worked with the E-side creditors to try

21    to get them to come forward with any kind of plan or

22    proposal that would be more effective in working with the T-

23    side and they were not able to do that; in fact, they never

24    did.

25    Q     Okay.
```

1          MR. GLENN:  I move to strike that question -- that

2     answer as nonresponsive to my question, which I will repeat

3     again.

4     BY MR. GLENN:

5     Q    Did you --

6          THE COURT:  Actually, first of all, you wait for a

7     ruling before you roll in to what you just asked for --

8          MR. GLENN:  I'm sorry --

9          THE COURT:  -- all right?

10         MR. GLENN:  -- I'm sorry.

11         THE COURT:  Second of all, overruled.  She

12    answered the question I think exactly on point.  So no need

13    to ask it again, it's been answered.

14         MR. GLENN:  Okay.

15    BY MR. GLENN:

16    Q    So did you ever speak to constituents directly of EFH

17    to determine how they wanted to proceed with the

18    negotiations with the T-side firsts?

19    A    You know, I talked with constituents last year and I

20    talked with two of the constituents, I talked with Fidelity

21    and I also talked with Mr. Rosenbaum.  And so I did spend

22    time and that was not a particularly effective exercise.

23    And so in this circumstance I felt like the best way for us

24    to go back at this was to ask our advisers to go back and to

25    negotiate both with the T firsts and to seek out the ideas

1    of the E-side creditors, our E creditors as to what they

2    wanted done.  They reported to us, they did what we asked,

3    they reported on the discussions.  And in fact I know that

4    they spoke with Contrarian, with Fidelity and with Mr.

5    Pedone.

6    Q    Okay.  And is it fair to say that all of those

7    constituents opposed a transaction in which EFH provided the

8    T-side with use of its NOLs without additional consideration

9    that had been included in the T-side plan?

10   A    Well, I don't believe that's the case, because if they

11   had really felt that way they would have come forward with a

12   plan that they proposed or a settlement offer that they

13   proposed that was realistic.

14   Q    Okay.  So are you able to identify any communication

15   now for this Court where an E-side creditor, EFH creditor in

16   particular, indicated to you in words or in substance that

17   it did not mind the treatment of the NOLs being provided to

18   the T firsts without any additional consideration?

19   A    Well, again, unless you're going to come forward with

20   your proposal to do that, I have to make some assumptions.

21   So we had some assumptions.  The other thing that we did

22   have was the fact that NextEra was on the other side and was

23   looking at this, and I do know that NextEra considered the

24   NOLs and they did not factor that into their pricing for

25   Oncor, because they feel like there is some risk as to when

1    or if those NOLs could be used.  So I also had a third party

2    indication that we were on the right path.

3    Q    Okay, I'm talking about EFH creditors.  Are you able to

4    identify any EFH creditor that supports transferring these

5    NOLs to the T-side other than the T-side holders of the

6    intercompany claim?

7    A    Actually, one of the EFH creditor is the TCEH first

8    liens and they're approving that transaction.

9    Q    Thank you.  And you're aware that Fidelity, Contrarian

10   and the Trustee are all opposing the plan which provides

11   this, these NOLs to the T-side without additional

12   consideration, are you aware of that?

13   A    Yes, sir.  I think that's why we're here today.

14   Q    Okay.  So as you sit here today, other than the T-side

15   creditors, you can't identify one economic stakeholder of

16   EFH that supports what you want to do with these NOLs, can

17   you?

18   A    I haven't gone through the whole voting thing that the

19   lady brought in today, so I don't know that in particular.

20   I understand that Contrarian, the U.S. Trustee and Fidelity

21   -- but, you know, it's interesting because Fidelity is

22   getting fully paid on their other debt in the structure, so

23   they haven't been quite as vocal as perhaps you and Mr.

24   Pedone have been.

25   Q    Okay, but you understand as a disinterested director

1    that we're relying on you as the only disinterested director

2    of EFH representing our interests to protect us, do you

3    understand that?

4    A    First --

5              MR. FIRESTEIN:  Objection, Your Honor, it calls

6    for a legal conclusion.

7              THE COURT:  Overruled.  You can answer.

8              THE WITNESS:  Okay.  First, Chairman Evans and I

9    are both disinterested directors --

10             MR. GLENN:  Fair enough.

11             THE WITNESS:  -- that are working for EFH.  And,

12   you know, secondly, I feel that we have done the absolute

13   best with the situation that we have to do as best as we can

14   for the unsecured creditors of EFH, and your debt is

15   unsecured and unfortunately, as sophisticated investors, you

16   knew there was a risk associated with that.

17             MR. GLENN:  Okay.  Thank you very much, ma'am.

18             THE WITNESS:  Yes, sir.

19             THE COURT:  Mr. Hogan?

20             MR. HOGAN:  Thank you, Your Honor.

21                        CROSS-EXAMINATION

22   BY MR. HOGAN:

23   Q    Good afternoon.

24   A    How are you?

25   Q    Good, thank you.  Just a few questions.  I represent a

1    series of asbestos claimants --

2    A    Yes, sir.

3    Q    -- on the E-side --

4    A    Yes, sir.

5    Q    -- just so you have clarity.  In your declaration, one

6    of the things you said was that the current plan is in the

7    best interest of the EFH Corp. estate and its stakeholders.

8    And if you could, for the Court and for my benefit, define

9    for me who those stakeholders are.

10   A    Well, there's a lot of stakeholders when you think

11   about a company.  There's the customers of our company,

12   there are the vendors that provide us with the materials to

13   be able to provide services, there are the communities in

14   which we operate, et cetera.  We have employees too and

15   they're stakeholders.

16   Q    And so in your position as a disinterested director, I

17   guess you're telling me that your concerns were their

18   concerns and not just the concerns of the corporation?

19   A    No.  What I'm telling you, as I stated in the

20   beginning, is that I have a fiduciary duty as a member of

21   the board of directors to execute and make decisions in the

22   best interests of Energy Future Corporation -- Energy Future

23   Holdings Corporation, and as a disinterested director it is

24   my responsibility for -- to consider and to maximize the

25   value at the EFH estate.

1  Q    Okay.  I guess I'll just be more concise and that way

2  we won't have to --

3  A    Right.

4  Q    -- dance around the issue.  The question I really have

5  is, there are subsidiaries to EFH Corp. on the E-side, you

6  understand that?

7  A    Yes, sir.

8  Q    Obviously.  And are those entities also stakeholders as

9  you use the term in your declaration?

10  A    Well, why don't you give me the specific subsidiary

11  that you want me to address I'll see if I can do that.

12  Q    Okay, that's fine.  Actually, it's four, and within the

13  context of the litigation on the E-side they've been

14  referred to as the asbestos debtors, okay?  I'll use that

15  characterization, but I'll give you the four entities

16  specifically.  It's EEC Holdings, Inc.; LSGT SACROC, Inc.;

17  EECI; and LSGT Gas Company, Inc.

18  A    Yes.  And is your question whether you think -- whether

19  the asbestos liabilities are going to be paid?

20  Q    No.

21  A    Okay.

22  Q    I might get to that, but --

23  A    Okay.

24  Q    -- my question --

25       (Laughter)

1   A   My understanding, just so I can help you out there --

2   Q   Please.

3   A   -- my understanding is that the asbestos liabilities

4   are being assumed by NextEra in the merger agreement.

5   Q   Okay.  And again, we may get to that --

6   A   Okay.

7   Q   -- but my question was more discrete than that, it was

8   as it relates to your characterization of being involved and

9   concerned with the stakeholders of EFH Corp., are those four

10  entities stakeholders of EFH Corp.?

11  A   I suppose I would consider them that, yes.

12  Q   Okay.  And so then within the context of your duties as

13  a disinterested director and the need to handle conflict

14  matters, how do you reconcile the need to be responsible, as

15  you say, solely from EFH Corp.'s perspective when at the

16  same time you have a duty to be responsible for the

17  stakeholders who are in fact subsidiaries of that same

18  entity?

19  A   Well, I think you're mischaracterizing my testimony.

20  So may I try again, please?

21  Q   Please.

22  A   Okay.

23  Q   I'm not trying to -- I'm just trying to understand.

24  A   Yes, okay.  What I'm telling you is I'm on the board of

25  directors of Energy Future Holdings Corporation; that

1    includes all of the subsidiaries of the company whether

2    they're TCEH or EFIH are all of those subsidiaries, I sit on

3    that board.  And that board makes judgments and decisions

4    about the things that are important to the board and the

5    matters that are in front of it.

6              In addition to that, I have a role as a

7    disinterested director whereby I work on the EFH estate and

8    I try to maximize the value to the EFH estate, and I have

9    done that, in my view, to the best of my ability.  So I'm

10   not sure I understand the conflict that you're asking me

11   about.  That's why we set up the disinterested directors.

12   So if there was something on the T-side or something on the

13   E-side or something at EFH where these two people were

14   arguing about it and then there was a decision to be made or

15   a transaction that had to be entered into, we would have

16   determined if it was one debtor over here and one debtor

17   over here and they were conflicting over something, that

18   would be a conflict matter, and we would take that conflict

19   matter up based on the advice of our counsel and we would

20   render an opinion or our recommendation to the board.

21   Q    Are you done?

22   A    Yes, sir.

23   Q    Thank you.  I just didn't want to interrupt.

24             So as I understand it, there's either 70 or 71

25   estates in this case; do you understand that?

1    A     I know there's a lot of them, yes.

2    Q     And were you engaged in the determination as to which

3    entities of EFH were in fact going to file for Chapter 11?

4              MR. FIRESTEIN:  Objection, Your Honor.  What's the

5    relevance of this?

6              MR. HOGAN:  Well, it relates back to this issue

7    and about this conflict, Your Honor, about as between these

8    entities, the stakeholders, and I'm just trying to

9    understand.  She did testify that Prop Co., which didn't

10   file, she was involved in determining whether or not that

11   entity in fact had been -- whether it was going to be filing

12   Chapter 11 or not.  So I'm just trying to -- I'm trying to

13   use that to understand this distinction.  She's testifying

14   about three different estates, I understand there to be 70

15   or 71 estates, and I'm trying to understand.

16             MR. MCKANE:  Your Honor, may I be heard?

17             THE COURT:  Yes.

18             MR. MCKANE:  This is the confirmation hearing as

19   it relates to the T-side debtors and the shared services

20   debtors; the debtors to whom Mr. Hogan is referring are not

21   up for confirmation today.  Any issue as that relates to

22   conflict between EFH Corp. and those debtors are not at

23   issue today in any way.  That's why I don't think this line

24   of questioning is appropriate for the T-side confirmation

25   hearing and he can reserve it for the E-side.

1          MR. HOGAN:  Your Honor, let me be clear.  I'm not

2    asking -- the witness brought up the asbestos issue

3    specifically.  I'm not asking -- I'm not trying to get down

4    into those asbestos issues, that's not what this is about;

5    I'm just trying to understand.  She's made a declaration

6    that says that she has an interest in the stakeholders, and

7    then she went on to testify that the stakeholders in fact

8    include the 70 sub -- or the subsidiaries of the underlying

9    EFH entity -- let me finish, please -- and so the fact that

10   she made that testimony, I'm just trying to understand that

11   within the context of this conflicts matter issue and I

12   should be able to explore that.

13          MR. MCKANE:  It's direct -- he's eliciting these

14   questions about the stakeholders and about specifically

15   these subsidiaries, which are his subsidiaries, the asbestos

16   subsidiaries where the only thing we're dealing with are the

17   asbestos liabilities, none of that is relevant today.  If he

18   wants to explore potential conflicts issues as it relates to

19   those debtors that are being -- having their confirmation

20   hearing today, that would be appropriate.  There's -- he

21   could absolutely explore conflicts issues as it relates to

22   those debtors; this is a sideshow.

23          MR. HOGAN:  Your Honor?

24          THE COURT:  Yes.  I'll allow it --

25          MR. HOGAN:  Thank you.

```
 1              THE COURT:  -- but let's move as quickly as

 2      possible through it.

 3              MR. HOGAN:  Yes, sir.

 4      BY MR. HOGAN:

 5      Q    So do you understand the question?

 6      A    Well, may I clarify one thing?  I didn't list all those

 7      subsidiaries when I listed stakeholders.  I listed our

 8      employees, I listed our customers, I listed our vendors, and

 9      those -- and the communities in which we operate.

10      Q    Okay.  And so you're telling me that in fact the

11      stakeholders do not include the subsidiaries?

12      A    You know, I'm going to -- I would have to discuss this

13      with my counsel, because I know that there are a lot of

14      entities that were filed, there was a discussion at board

15      meetings about which ones to file and which ones not to

16      file, but I am not current on all that today.

17      Q    Okay.  Let's move on from that issue then --

18      A    Thank you.

19      Q    -- if we could.  Were you present over the last two

20      days in the courtroom for the testimony of the other

21      witnesses that have testified on behalf of the debtors?

22      A    I have not been in the courtroom, no, sir.

23      Q    Until today?

24      A    That is correct.

25      Q    I just wanted to understand that.  Thank you, I
```

1   appreciate that.  You did make testimony over the course of

2   this morning and this afternoon about the time line from

3   when you started as a disinterested director up until I

4   believe late July when the ancillary agreements were

5   ultimately approved by the board.  And in the context of

6   that, I believe you testified about Oncor and about how

7   Oncor entered stage right at one point and in fact made an

8   offer to purchase -- or, I'm sorry, NextEra made an offer to

9   purchase Oncor when they entered stage right; do you recall

10  that testimony, when NextEra came in and made an offer

11  potentially to buy Oncor?

12  A    I don't recall what you're getting at, I'm sorry.

13  Q    Did you testify in fact that NextEra has come forward

14  and made an offer to buy an interest in Oncor, which EFH has

15  an indirect interest in?

16  A    I don't know that I testified to that, but that is

17  true.

18  Q    Okay.  You're also on the audit committee; is that

19  correct?

20  A    Yes, sir.

21  Q    And your declaration talks about your role on the audit

22  committee.  Could you just quickly explain to me what it is

23  that the audit committee does?

24  A    Certainly.  An audit committee of a company is

25  responsible for the consolidated financial statements that

1    are issues, it's responsible for the systems of internal

2    control, it's responsible for making sure that there's an

3    internal audit department that is testing controls and

4    helping management ensure that transactions are being

5    properly recorded.  It also deals with other matters that

6    are often given to an audit committee such as things that

7    are specified in generally accepted accounting principles.

8    So that's in general some of the things that an audit

9    committee does.

10   Q    Thank you.  And in earlier testimony, I think you

11   stated that one of the responsibilities primarily was the

12   review of the consolidated financial records, correct?

13   A    Yes, that's right.

14   Q    And who if not the audit committee would be responsible

15   for the maintenance of the non-consolidated financial

16   records of each of the subsidiaries debtors?

17           MR. FIRESTEIN:  Objection, Your Honor, relevance.

18           THE COURT:  Relevance?

19           MR. HOGAN:  Well, she's testified as to what the

20   audit committee does and doesn't do and we're just trying to

21   figure out if I can offer a question as to how the

22   consolidated financials are arrived at, it would probably

23   illuminate the Court as to why the question is relevant.

24           MR. FIRESTEIN:  When she testifies about -- I'm

25   sorry, Your Honor.

1          THE COURT:  No, I -- the fact that she's on the

2     audit committee was raised in the context of her resume that

3     had nothing to do with anything that was offered on direct.

4     So I'm not going to allow it.

5          MR. HOGAN:  That's fine, Your Honor.  It's your

6     courtroom, I understand.  It is in her declaration which was

7     offered and that's where this --

8          THE COURT:  Yeah, that she's on --

9          MR. HOGAN:  -- is derived from.

10          THE COURT:  Yeah, that she's on the audit

11     committee.  It's also in her declaration that she was a

12     member of several boards of directors, but I'm not going to

13     let you investigate or cross-examine her about what she did

14     at those boards of directors.

15          MR. HOGAN:  Nor would I want to, Your Honor.

16     Thank you.

17          (Pause)

18     BY MR. HOGAN:

19     Q    You testified on direct examination regarding the

20     conflicts matter and specifically the equitization plan; do

21     you recall that testimony?

22     A    Yes, sir.

23     Q    And I believe you testified that you looked at the

24     equitization plan as it relates to each level?

25     A    Yes.

1    Q    What do you mean by each level?  I just wanted to

2    understand that.

3    A    I'm sorry, by each -- it would be each debtor.  So the

4    equitization plan provides for equity at the EFH level and

5    then it provides for equity at the EFIH level, who is

6    another debtor in this case.

7    Q    You'll recall a few minutes ago that I mentioned those

8    four asbestos debtors; did you likewise do a review of the

9    equitization plan as it relates to each of those four

10   debtors?

11               MR. FIRESTEIN:  Objection, Your Honor, relevance.

12               THE COURT:  Relevance?

13               MR. HOGAN:  She testified that she did a review of

14   the equitization plan as it relates to each of the debtors

15   at most levels and I'm just asking her if she did it for

16   those four asbestos -- I'm not going to go any further than

17   that, I just need to know if she did it for them.

18               THE COURT:  I'm going to sustain the objection.

19   She testified about the whole plan, but the question isn't

20   whether something is tangentially relevant to something she

21   said in answer to a question; the question is whether it's

22   relevant to the issues before the Court.  Nothing about that

23   is before this Court, so it's not relevant.

24               MR. HOGAN:  Okay, thank you.

25               THE COURT:  You're welcome.

```
 1   BY MR. HOGAN:

 2   Q    Let's turn to the NOLs.

 3   A    Yes, sir.

 4   Q    I believe you testified that it wasn't until February

 5   of this year that it became apparent to the disinterested

 6   directors that there was going to be value to EFH relative

 7   to those NOLs; do you recall that testimony?

 8   A    That is not correct.

 9   Q    Okay.  Can you correct me then?  When did you realize

10   that there was value in the NOLs to EFH?

11   A    From the very beginning of the case we knew that the

12   NOLs were a point that could be important and part of the

13   consideration for different things that were being done in

14   the case.  The situation changed in late May when we got an

15   indication from the IRS that the bankruptcy exemption was

16   not going to be -- was not something that the IRS was in

17   favor of.  And so therefore what that meant was that we

18   wouldn't get the exemption for the CODI, but that also meant

19   then that the NOLs might survive emergence.

20   Q    Moving now to the creation of the NOLs.  There's been a

21   lot of discussion today about the NOLs and how they would be

22   used, but was there ever an analysis done as to at which

23   entities or subsidiaries of EFH the NOLs were actually

24   created or where they derived from?

25   A    Yes, there was.
```

1    Q    And when was that done?

2    A    I don't remember the specific date, but about $7.2

3    billion of the NOLs are coming from the TCEH side.

4    Q    Okay.  And you would agree with me, and I know you

5    weren't here for the testimony, but earlier in this trial I

6    believe there was testimony that showed that it changed over

7    time; would you agree with that?

8    A    Well, it changed over time because the NOLs got larger

9    over time as we continued to incur legal fees and as we

10   continued to incur operating deficits in our operations.

11   And as this case has gone longer, the NOLs go up.

12   Q    I understand that, but -- so there was an analysis done

13   and it was an ongoing analysis because in fact they changed

14   over time?

15   A    Yes.

16   Q    Thank you.  And so it's your testimony that a lion's

17   share of those NOLs were created you said on the T-side; is

18   that correct?

19   A    Yes, sir.

20           MR. HOGAN:  I'm almost done, Your Honor.

21           THE COURT:  Okay.

22        (Pause)

23           MR. HOGAN:  Ms. Williamson, thank you for your

24   time.

25           THE WITNESS:  Yes, sir.

```
 1              MR. HOGAN:  Safe trip home.

 2              Thank you, Your Honor.

 3              THE COURT:  You're welcome, Mr. Hogan.

 4              Any redirect?

 5              MR. FIRESTEIN:  No, Your Honor.

 6              THE COURT:  Okay.  Thank you, Ms. Williamson.

 7              THE WITNESS:  Thank you very much.

 8              THE COURT:  All right, we'll take a break and then

 9    we have Mr. -- who's next?  I forget, I'm sorry.

10              MR. MCKANE:  I apologize, Your Honor.  We have

11    one --

12              THE COURT:  The gentleman from Duff & Phelps?

13              MR. MCKANE:  -- we just have one -- yeah, one

14    witness left, Mr. Herr from Duff & Phelps.

15              THE COURT:  Okay.

16              MR. PEDONE:  Your Honor, may I just confer with

17    Mr. McKane?

18              THE COURT:  Yes.

19              MR. PEDONE:  Thank you.

20              MR. THOMAS:  Your Honor, if I may -- excuse

21    ourselves from the courtroom?

22              THE COURT:  Yes, sir.

23              MR. THOMAS:  Thank you.

24              UNIDENTIFIED SPEAKER:  Well, are we in recess,

25    Your Honor, or are we --
```

1           THE COURT:  Not yet.

2       (Pause)

3           MR. MCKANE:  Your Honor, we may be able to obviate

4    the need for live testimony from Mr. Herr --

5           THE COURT:  All right.

6           MR. MCKANE:  -- so if maybe we could have a five-

7    minute break?

8           THE COURT:  Yes, we'll take a recess.  Thank you

9    very much.

10          MR. MCKANE:  Thank you, Your Honor.

11      (Recessed at 2:58 p.m.; reconvened at 3:12 p.m.)

12          THE COURT:  Please be seated.

13          Yes?

14          MR. STEPHANY:  Your Honor, once again for the

15   record, Brian Stephany from Kirkland & Ellis on behalf of

16   the debtors.

17          Your Honor, the debtors had intended to call as

18   their next witness Mr. David Herr of Duff & Phelps.  During

19   the break, counsel for the EFH indenture trustee informed us

20   that based on certain testimony elicited during Ms.

21   Williamson's examination that they did not have any further

22   need to question Mr. Herr.  As a result, no one has objected

23   to Mr. Herr's written direct, his declaration, and the

24   debtors would -- Mr. Herr is here in the courtroom today if

25   Your Honor has any questions, but barring that the debtors

1    would respectfully move D-DIR Herr into evidence.

2              THE COURT:  Any objection?

3              MR. PEDONE:  No objections.

4              THE COURT:  It's admitted.

5         (Debtors' Exhibit No. D-DIR Herr admitted)

6              THE COURT:  I have no questions.  Thank you.

7              MR. STEPHANY:  Thank you, Your Honor.

8              THE COURT:  That's it for the day?

9              MR. MCKANE:  Your Honor, that's it for the day,

10   and thank you for your time.

11             THE COURT:  You're welcome.

12             MR. MCKANE:  Oh, I'm sorry, that's not true.

13        (Laughter)

14             THE COURT:  Wow.  Oh, wow.

15             MR. MCKANE:  There's a train to catch, so we're

16   going to have to go really fast.

17             THE COURT:  All right.  Well, we'll make it quick.

18             MS. NIGHAN:  I'll be quick.  Good afternoon, Your

19   Honor, Morgan Nighan from Nixon Peabody on behalf of the EFH

20   indenture trustee, and we'd like to move into evidence a

21   series of exhibits.  It's my understanding that there's no

22   objection, so I'll be quick; your clerk has a list.

23             And for the record we're moving into evidence DX-

24   41, 51, 52, 54, 60, 62, 64, 66, 67, 69, 70, 74, 75, 81, 82,

25   88, 89, 91, 93, 94, 96, 98, 102, 105, 106, 113, 114, 119,

1      121, 141, and 754.

2               THE COURT:  Any objection?

3               MR. MCKANE:  No objection, Your Honor.

4               THE COURT:  They're admitted.

5      (Debtors' Exhibit Nos. DX-41, DX-51, DX-52, DX-54, DX-60,

6      DX-62, DX-64, DX-66, DX-67, DX-69, DX-70, DX-74, DX-75, DX-

7      81, DX-82, DX-88, DX-89, DX-91, DX-93, DX-94, DX-96, DX-98,

8      DX-102, DX-105, DX-106, DX-113, DX-114, DX-119, DX-121, DX-

9      141, and DX-754 admitted)

10              MS. NIGHAN:  Thank you.

11              THE COURT:  You're welcome.

12              MR. MCKANE:  And, Your Honor, we have nothing

13     further for today.

14              THE COURT:  We're in recess.  However, we need to

15     start a half hour later than normal on Monday, because I

16     have a conflict early in the morning.  So we will start at

17     10:00 -- why do I have us starting at -- we weren't going to

18     start at 9:00, were we?

19              MR. MCKANE:  I don't believe so, Your Honor.

20              THE COURT:  I'm showing -- okay, I'm sorry.  I'm

21     showing a weird thing on my calendar here.  Anyway, so we

22     will start at 10:30 and we'll have our pre-chambers meeting

23     at 10:00 on Monday.

24              MR. MCKANE:  Very good.

25              THE COURT:  All right?  I hope everyone has a

1    pleasant weekend.  We're adjourned until Monday.

2         (A chorus of thank you)

3         (Whereupon, these proceedings were concluded at 3:14

4    PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3    WITNESSES                EXAM BY                      PAGE

4    Billie Williamson        Mr. Firestein                13

5                             Mr. Pedone                   39

6                             Mr. Glenn                   118

7                             Mr. Hogan                   129

8

9

10

11

12

13

14                       E X H I B I T S

15    NO.                                          PAGE

16    D-Dir Williamson                              17

17    DX-1b, 50, 51, 59, 61, 64,

18    69, 74, 75, 82, 93, 94, 96,

19    & 316                                         38

20

21    DX-41, 51, 52, 54, 60, 62, 64, 66, 67,        146

22    69, 70, 74, 75, 81, 82, 88, 89, 91, 93,

23    94, 96, 98, 102, 105, 106, 113, 114, 119,

24    121, 141, 754

25

Page 149

1                    C E R T I F I C A T I O N

2

3           We, Sherri L. Breach, Pamela Skaw and Tracey Williams

4      certify that the foregoing transcript is a true and accurate

5      record of the proceedings.

6      Sherri Breach    Digitally signed by Sherri Breach
                         DN: cn=Sherri Breach, o=Veritext, ou,
                         email=digital@veritext.com, c=US
7      _____ Date: 2016.08.22 09:10:43 -04'00'

8      Sherri L. Breach

9      AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10     Sherri Breach    Digitally signed by Sherri Breach
                         DN: cn=Sherri Breach, o=Veritext, ou,
                         email=digital@veritext.com, c=US
11     _____ Date: 2016.08.22 09:11:14 -04'00'

12     Pamela A. Skaw

13     Tracey Williams  Digitally signed by Tracey Williams
                         DN: cn=Tracey Williams, o=Veritext,
                         ou, email=digital@veritext.com, c=US
                         Date: 2016.08.22 09:13:10 -04'00'

14     _____

       Tracey Williams

15

       AAERT Certified Electronic Transcriber CET**152

16

17

18     Date:  August 20, 2016

19

20

21     Veritext Legal Solutions

22     330 Old Country Road

23     Suite 300

24     Mineola, NY 11501

25