Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                    :    Chapter 11

6    ENERGY FUTURE HOLDINGS         :

     CORP., et al.,                 :    Case No. 14-10979(CSS)

7                                   :

           Debtors.                 :    (Jointly Administered)

8    _____ :

9

10

11

12

13                              United States Bankruptcy Court

14                              824 North Market Street

15                              Wilmington, Delaware

16

17                              August 22, 2016

18                              10:36 AM – 4:26 PM

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCEHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECR OPERATOR:  DANA MOORE

1    Notice of Filing Third Amended Joint Plan of Reorganization

2    of Energy Future Holdings Corp., et al., Pursuant to Chapter

3    11 of the Bankruptcy Code [D.I. 9199; filed August 5th,

4    2016] (as may be further modified, amended, or supplemented,

5    the "Plan")

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Tracey Williams, Debra McCostlin, Dawn

25    South, Pamela A. Skaw, Jamie Gallagher

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3         Attorney for the Debtors

4

5    BY:  BARACK ECHOLS, ESQ.

6         BRYAN STEPHANY, ESQ.

7         MARK MCKANE, ESQ.

8         MARC KIESELSTEIN, ESQUIRE

9         MICHAEL ESSER, ESQ.

10        JUSTIN SOWA, ESQ.

11

12   RICHARDS, LAYTON & FINGER

13        Attorneys for the Debtors

14

15   BY:  DANIEL J. DEFRANCESCHI, ESQ.

16        JASON MADRON, ESQ.

17

18   POTTER ANDERSON CARROON LLP

19        Attorney for Deutsche Bank New York

20

21   BY:  R. STEPHEN MCNEILL, ESQ.

22

23

24

25

1   VENABLE, LLP

2        Attorneys for Pimco

3

4   BY:  JEFFREY S. SABIN, ESQ.

5        JAMIE EDMONSON, ESQ.

6

7   WHITE & CASE

8        Attorney for TCEH Ad Hoc Group

9

10  BY:  J. CHRISTOPHER SHORE, ESQ.

11

12  FOX ROTHSCHILD

13       Attorney for the Ad Hoc TCEH Noteholders

14

15  BY:  JEFFREY M. SCHLERF, ESQ.

16

17  PAUL, WEISS, RIFKIND, WHARTON & GARRISON

18       Attorneys for the Ad Hoc Committee of TCEH First Lien

19       Creditors

20

21  BY:  ALAN W. KORNBERG, ESQ.

22       JACOB A. ADLERSTEIN, ESQ.

23       KELLIE CAIRNS, ESQ.

24       MOSES SILVERMAN, ESQ.

25       ROBERT KILLIP, ESQ.

1    YOUNG CONAWAY STARGATT & TAYLOR, LLP

2         Attorney for the Ad Hoc Committee of TCEH First Lien

3         Creditors

4

5    BY:  PAULINE K. MORGAN, ESQ.

6

7    PACHULSKI STANG ZIEHL & JONES

8         Attorney for EFIH Second Lien Noteholder

9

10   BY:  LAURA DAVIS JONES, ESQ.

11

12   SULLIVAN & CROMWELL

13        Attorney for E-Side Committee

14

15   BY:  BRIAN GLUECKSTEIN, ESQ.

16

17   NIXON PEABODY

18        Attorney for AST as EFH Indenture Trustee

19

20   BY:  GEORGE SKELLY, ESQ.

21        RICHARD PEDONE, ESQ.

22        ERIK SCHNEIDER, ESQ.

23        MORGAN NIGHAN, ESQ.

24

25

1    MCELROY DEUTSCH MULVANEY & CARPENTER LLP

2         Attorney for TCEH Debtors - Conflict counsel

3

4    BY:  DAVID A. PRIMACK, ESQ.

5

6    MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

7         Attorney for E-Side Committee

8

9    BY:  MARK A. FINK, ESQ.

10

11   MORRIS JAMES

12        Attorney for Law Debenture

13

14   BY:  STEPHEN MILLER, ESQ.

15

16   MUNGER, TOLLES & OLSON

17        Attorney for TCEH Debtors - Conflict Counsel

18

19   BY:  TOM WALPER, ESQ.

20

21

22

23

24

25

1   SEWARD KISSEL, LLP

2        Attorney for Wilmington Trust as TCEH First Lien

3        Agent

4

5   BY:  ARLENE ALVES, ESQ.

6        MARK KOTWICK, ESQ.

7

8   KLEHR HARRISON HARVEY BRANZBURG LLP

9        Attorney for UMB Bank, Indenture Trustee

10

11  BY:  RAYMOND H. LEMISCH, ESQ.

12

13  AKIN GUMP STRAUSS HAUER & FELD

14        Attorney for UMB Bank, Indenture Trustee

15

16  BY:  CHRISTOPHER CARTY, ESQ.

17

18  PATTERSON BELKNAP

19        Attorney for Law Debenture Trust Company

20

21  BY:  DANIEL LOVENTHAL, ESQ.

22

23

24

25

1    PROSKAUER ROSE

2         Attorney for EFH Corp.

3

4    BY:  PETER YOUNG, ESQ.

5         MARK THOMAS, ESQ.

6         MICHAEL FIRESTEIN, ESQ.

7

8    REED SMITH, LLP

9         Attorneys for EFCH 2037 Notes Trustee

10

11   BY:  SARAK KAM, ESQ.

12

13   MORRISON & FOERSTER, LLP

14        Attorneys for TCEH Committee

15

16   BY:  BRETT MILLER, ESQ.

17        ERICA RICHARDS, ESQ.

18

19   CROSS & SIMON, LLP

20        Attorneys for EFH Indenture Trustee

21

22   BY:  CHRISTOPHER SIMON, ESQ.

23        KEVIN MANN, ESQ.

24

25

Page 9

1  HOGAN MCDANIEL

2       Attorneys for Fenicle, Fehy & Jones

3

4  BY:  DANIEL K. HOGAN, ESQ.

5       GARVAN MCDANIEL, ESQ.

6

7  DRINKER, BIDDLE & REATH, LLP

8       Attorneys for Citibank, DIP Agent

9

10  BY:  HOWARD A. COHEN, ESQ.

11

12  BIELLI & KLAUDER

13       Attorneys for EFH Corp.

14

15  BY:  DAVID KLAUDER, ESQ.

16

17  ASHBY & GEDDES

18       Attorneys for WSFS

19

20  BY:  RICARDO PALACIO, ESQ.

21

22  BROWN RUDNICK

23       Attorneys for WSFS

24

25  BY:  JONATHAN MARSHALL, ESQ.

1   KASOWITZ BENSON TORRES & FRIEDMAN, LLP

2         Attorneys for Fenicle, Fehy & Jones

3

4   BY:   ANDREW GLENN, ESQ.

5         NII-AMAR AMAMOO, ESQ.

6

7   FRIED FRANK

8         Attorneys for Fidelity

9

10  BY:   GARY KAPLAN, ESQ.

11        ALICIA AIN, ESQ.

12        MATT ROOSE, ESQ.

13

14  UNITED STATES DEPARTMENT OF JUSTICE

15        Attorneys for U.S. Trustee

16

17  BY:   RICHARD L. SCHEPACARTER, ESQ.

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  All rise.

 3              THE COURT:  Please be seated.  Good morning,

 4      everybody.

 5          (A chorus of good morning)

 6              THE COURT:  Yes, sir?

 7              MR. FIRESTEIN:  Good morning, Your Honor, Michael

 8      Firestein of Proskauer on behalf of EFH, on behalf of and

 9      acting at the direction of the disinterested directors

10      Billie Williamson and Donald Evans.  Just a couple of very

11      quick process points before the evidence continues this

12      morning.

13              In connection with Mr. Pedone's examination of Ms.

14      Williamson on Friday, he asked Ms. Williamson whether she

15      attended a May 10th, 2016 board of directors meeting.  She

16      answered from the stand that she had not when she was

17      presented with a copy of the minutes and when she left the

18      stand, upon review of the direct -- the written direct that

19      was submitted, she inadvertently included in the litany of

20      board meetings that she had thought that she had attended

21      the May 10th, 2016 meeting.

22              We have prepared a revised version of Ms.

23      Williamson's written direct which is exactly the same as it

24      was presented to Your Honor, including the strike-through

25      changes that had been made in connection with certain
```

Page 12

1    objections that Mr. Pedone had made to her earlier

2    declaration, the difference being only that in this version

3    called R-2 we've struck out the language in which she

4    referenced the May 10th, 2016 meeting, which I think for the

5    record is at paragraph 29(b).

6           I've discussed this matter with Mr. Pedone; he has

7    no objection to our substituting R-2 for Ms. Williamson's

8    existing declaration.  I have provided a copy for the Court

9    as well as to your clerk.  And we would move as a substitute

10   exhibit written direct for Ms. Williamson of version D-DIR

11   Williamson R-2 for inclusion in the Court's record.

12          THE COURT:  Any objection?

13          MR. PEDONE:  No objection, Your Honor, but we will

14   -- this is Richard Pedone for American Stock Transfer -- but

15   we will be providing a highlighted copy showing the

16   statements that we have both agreed are only admitted for

17   limited purposes, the hearsay statements, for the Court's

18   convenience.

19          THE COURT:  Okay.

20          MR. FIRESTEIN:  That would have been the second

21   process point, Mr. Pedone has identified it and we will make

22   sure that the correct version of whatever he is intending to

23   submit gets provided to the Court prior to close.

24          THE COURT:  All right, very good.

25          MR. FIRESTEIN:  Thank you very much, Your Honor.

1             MR. PEDONE:  Thank you, Your Honor.

2             THE COURT:  It's admitted.

3         (Debtors' Exhibit D-DIR Williamson R-2 admitted)

4             MR. MCKANE:  Good morning, Your Honor, Mark McKane

5    of Kirkland & Ellis on behalf of the debtors.  We also have

6    a motion to seal a document that's in evidence and a

7    redaction issue as well, and I'd ask that my colleague Mr.

8    Justin Sowa handle that matter.

9             THE COURT:  Thank you.

10             MR. SOWA:  Good morning, Your Honor, it's Justin

11   Sowa, Kirkland & Ellis, on behalf of the debtors.

12             So we have two small redaction issues and one

13   sealing issue.  The redaction issues are in relation to two

14   exhibits containing communications with the IRS.  The

15   exhibit numbers are DX-699 and DX-705.  These exhibits

16   haven't been moved into evidence yet, but they are on the

17   list of exhibits the debtors intend to use this week.

18             As we've done with some prior instances of these

19   IRS communications, we've applied some very narrow

20   redactions to portions of the exhibits that contain material

21   non-public, information that's not germane to the

22   proceedings today.  We've shared these redactions with all

23   the parties in advance, have not heard any objections and

24   believe them to be noncontroversial.

25             I've brought three copies of replacement exhibits,

1    which are stamped DX-699 underscore R and DX-705 underscore

2    R, for the Court's exhibit binders.

3              THE COURT:  Okay, thank you.

4              Any objection?

5              MS. NIGHAN:  No objection, Your Honor.

6              THE COURT:  Thank you.  You can hand them to Ms.

7    Werkheiser.

8         (Pause)

9              MR. SOWA:  Thank you, Your Honor.  We do have one

10   exhibit that we are unable to resolve the confidentiality

11   issues through redactions.  This is Debtors' Exhibit DX-586.

12   This was previously admitted during Mr. Keglevic's direct

13   examination.  This exhibit is a spreadsheet containing the

14   names and compensation information for all of the 400-plus

15   employees of EFH Corporate Services, and the debtors believe

16   that public disclosure of this document would cause

17   competitive harm to the debtors and so we ask that Your

18   Honor seal this document in the record.

19              We understand that the EFH Indenture Trustee has

20   no objection to our motion to seal.  We've disclosed our

21   intent to make this motion to the other parties and have

22   heard no other objections either.  So if that remains the

23   case, at this time I would move the Court to seal Debtors'

24   Exhibit DX-586 for the purposes of the record.

25              THE COURT:  Any objection?

1          MS. NIGHAN:  No objection.

2          THE COURT:  All right, it's sealed.

3          MR. SOWA:  Thank you, Your Honor.  For the ease of

4    the Court's recordkeeping, we have prepared a blue sheet,

5    which is a list of all of the sealed items on the record,

6    which are just Debtors' Exhibit DX-586.

7          THE COURT:  All right, please approach.

8      (Pause)

9          THE COURT:  I thought we had a sealed document

10   earlier; it was just redacted?

11         MR. SOWA:  Yes.

12         MR. FIRESTEIN:  That was redacted, Your Honor.

13         THE COURT:  Okay.

14         MR. SOWA:  Yes.  The redacted exhibits for the

15   record are not under seal, the redacted versions are the

16   exhibit and no longer contain material nonpublic

17   information.

18         THE COURT:  Very good.  Thank you.

19         MR. SOWA:  Thank you, Your Honor.

20         MR. STEPHANY:  Good morning, Your Honor --

21         THE COURT:  Good morning.

22         MR. STEPHANY:  -- Bryan Stephany, Kirkland &

23   Ellis, on behalf of the debtors.

24         Your Honor, before we call our next witness, who

25   will be Mr. John Stuart, Mr. Stuart has submitted two expert

1     opinions in this case:  one in connection with his

2     liquidation analysis and the second is a rebuttal to the

3     opinions offered by the EFH Indenture Trustee's expert

4     concerning the value of EFH Corporate Services.  We've

5     conferred with counsel for the EFH Indenture Trustee and

6     subject to the Court's approval we intend to present both

7     opinions that Mr. Stuart offers in our direct examination,

8     to avoid the need to recall him following Mr. -- or

9     Professor Williams' testimony.

10              And so, with the Court's permission, we're ready

11    to proceed.

12              THE COURT:  Okay, that's fine.  Call your witness

13    to the stand.

14              MR. STEPHANY:  The debtors would call Mr. John

15    Stuart to the stand.

16              THE COURT:  All right.  Mr. Stuart, if you'd take

17    the stand and remain standing.

18              THE CLERK:  Please raise your right hand.

19                   JOHN STUART, WITNESS, AFFIRMED

20              THE CLERK:  Please state and spell your name for

21    the record.

22              THE WITNESS:  John Stuart, J-O-H-N S-T-U-A-R-T.

23              THE COURT:  Please be seated, Mr. Stuart.  And if

24    you could make sure you're close to the microphone, that

25    would be helpful.

1              THE WITNESS:  Will do.

2              MR. STEPHANY:  And, Your Honor, as is standard

3     practice, we prepared witness binders and a green sheet; if

4     I may approach?

5              THE COURT:  Yep.

6         (Pause)

7              THE COURT:  Thank you.

8                          DIRECT EXAMINATION

9     BY MR. STEPHANY:

10    Q    Good morning --

11    A    Good morning.

12    Q    -- Mr. Stuart.  Where do you work?

13    A    I work for Alvarez & Marsal.

14    Q    And what is your title?

15    A    Managing Director.

16    Q    What is Alvarez & Marsal's role in these cases?

17    A    We've performed a number of work streams for the

18    debtors over the last two and a half to three years.  We've

19    assisted the debtors in preparing the companies for

20    bankruptcy, first-day pleadings, et cetera.  We've assisted

21    the debtors in the evaluation of executory contracts,

22    preparation of strategy around vendor management programs;

23    assisted the debtors in supporting certain plan of

24    reorganizations and disclosure statement initiatives such as

25    the liquidation analysis.  We've performed a number of ad

1    hoc analyses for the debtors over the course of that period

2    of time.

3    Q    And were you asked to provide an expert opinion or

4    opinions in connection with these confirmation proceedings?

5    A    I was.

6    Q    And did you prepare any expert reports?

7    A    I did.

8    Q    And can you tell us what the subject matter generally

9    was for those expert reports?

10   A    I prepared an expert report in connection with the

11   liquidation analysis of the T-side entities, as well as EFH

12   Corporate Services.  I also prepared an expert rebuttal

13   report in connection with the expert report of Professor

14   Jack Williams' assertions of value on EFH Corporate

15   Services.

16   Q    Did you also prepare a declaration in anticipation of

17   your testimony here today?

18   A    I did.

19   Q    And does that contain a summary of your expert opinions

20   on the hypothetical Chapter 7 liquidation and the response

21   to Professor Williams' opinions on value of EFH Corporate

22   Services?

23   A    It does.

24   Q    If you would turn in your binder there to the tab

25   that's labeled D-DIR Stuart.

1   A    Okay, I'm there.

2   Q    And do you recognize that?

3   A    I do.

4   Q    And can you tell us what that is?

5   A    That's my declaration in support of these confirmation

6   proceedings.

7   Q    And is the information contained in that declaration

8   true and accurate to the best of your knowledge?

9   A    It is.

10  Q    And did you make that declaration in support of the

11  plan of reorganization?

12  A    I did.

13           MR. STEPHANY:  Your Honor, at this time the

14  debtors would move D-DIR Stuart into evidence.  We've

15  conferred with counsel for the EFH Indenture Trustee and I

16  believe our objections have been resolved.

17           MR. PEDONE:  That's right.

18           THE COURT:  All right, it's admitted.

19      (Debtors' Exhibit D-DIR Stuart admitted)

20  BY MR. STEPHANY:

21  Q    Mr. Stuart, before we talk about the opinions and your

22  work in this case, could you just tell us a little bit about

23  your educational background?

24  A    I have a Bachelor's degree from the University of

25  Oklahoma; I have an MBA from Rice University.

1    Q    And could you also provide a short overview of your

2    professional experience?

3    A    Sure.  I've been with Alvarez & Marsal since

4    approximately 2008.  Prior to Alvarez & Marsal, I was a

5    manager -- or I was the portfolio manager at Highland

6    Capital Management in their distressed private equity group.

7    I began my career working in the restructuring practices of

8    both Arthur Andersen and PricewaterhouseCoopers.

9    Q    And can you describe your experience in performing

10   liquidation analyses?

11   A    I've performed a number of liquidation analyses over

12   the course of my career.  As a younger professional I

13   assisted in the preparation of liquidation analysis and more

14   recently, as I've been a part of Alvarez & Marsal, I've

15   submitted declarations in support of various plan of

16   confirmations and in support of my liquidation analyses.

17   Q    And how long have you been working with the debtors and

18   their affiliates?

19   A    I believe since early 2013.

20   Q    And during that time have you had the opportunity to

21   perform any liquidation analyses?

22   A    We've performed a number of refreshes of the

23   liquidation analysis in this case prior to these

24   confirmation proceedings; we also prepared a liquidation

25   analysis and associated expert report for the liquidation

1    analysis for the confirmation proceedings last fall.

2    Q    And are you aware of whether that analysis was

3    submitted to the Court?

4    A    I'm aware it was.

5    Q    Focusing now on the liquidation analysis you performed

6    in connection with these confirmation proceedings, do you

7    have an understanding, first of all, as to why you were

8    asked to perform a liquidation analysis?

9    A    I do.  My understanding of the rational for the

10   liquidation analysis is to support Section 1129(a)(7) of the

11   Bankruptcy Code, otherwise known as the best-interest test,

12   to satisfy the fact that the plan recoveries exceed

13   hypothetical recoveries under a Chapter 7 liquidation.

14   Q    And what debtors did you analyze in your current

15   liquidation analysis?

16   A    I analyzed all of the T-side debtors, as well as EFH

17   Corporate Services.

18   Q    And are the assumptions and methodology that you used

19   in conducting the liquidation analysis, are they described

20   in detail in your declaration?

21   A    They are.

22   Q    Without going into that level of detail, can you

23   provide just a brief overview of your methodology?

24   A    Sure.  The methodology assumes a hypothetical

25   liquidation of 12/31/2016; it's based on a legal-entity-by-

1    legal-entity rollup of all of the T-side debtors, as well as

2    EFH Corporate Services.  It assumes that the 12/31/2015

3    balance sheet is a proxy for value.  We also used certain

4    alternative values in certain cases where the balance sheet

5    was not a good proxy for value under a liquidation.

6         We also assumed that the liquidation would occur

7    over a six-month period of time followed by a 12-month

8    estate wind-down period.

9    Q    Just stepping back for a second.  The TCEH debtors when

10   you refer to that, approximately how many entities is that,

11   do you know?

12   A    I believe it's approximately 40 separate legal

13   entities.

14   Q    And in discussing your methodology you mentioned the

15   use of balance sheet unless you felt that that was not a

16   good proxy and in which case you would use an alternative

17   value; can you give us an example of what that might be?

18   A    Sure, a couple of examples:  cash, for instance.  Since

19   we relied upon a starting point of the 12/31/2015 balance

20   sheet, we didn't feel like that was a good proxy for where

21   cash might be at the hypothetical liquidation date at the

22   end of 2016, so we relied upon cash forecasts for that.

23        Other examples of alternative values:  we relied

24   upon certain values from Duff & Phelps in connection with

25   the Generation Plant values, as well as the intangible value

1    of TXU Retail.

2    Q    And is it common in your experience to rely on

3    liquidation values for assets such as that, rely on the

4    opinions of others more familiar with the specific

5    industries?

6    A    Very customary.

7    Q    Did your analysis consider a possible deconsolidation

8    tax?

9    A    It did.

10   Q    And why is that?

11   A    In consultation with the tax professionals at the

12   debtors, as well as the tax professionals at K&E, it was

13   determined that a piecemeal liquidation of the assets under

14   a Chapter 7 with a trustee appointed would trigger the

15   deconsolidation tax.  So that was the overarching assumption

16   that we assumed.

17   Q    And how was that deconsolidation tax reflected in your

18   analysis?

19   A    We assumed two tax scenarios with respect to the

20   deconsolidation tax in the analysis.  The first scenario

21   assumed that that deconsolidation tax would only hit at the

22   regarded entities and only those entities would be jointly

23   and severally liable for that tax.  The other scenario we

24   assumed was a check-the-box scenario where that tax

25   liability was pushed to all entities, not just including

1    regarded entities.

2    Q    And focusing for a moment just on EFH Corporate

3    Services, can you explain or describe the impact that those

4    two scenarios had on your liquidation analysis for EFH

5    Corporate Services?

6    A    The assumption didn't change with respect to EFH

7    Corporate Services.  Corporate Services is a regarded

8    entity, so the tax hit at that entity under either scenario.

9    Q    Turning to the results of your liquidation analysis,

10   does your declaration include a summary of the overall

11   results with respect to the TCEH debtors?

12   A    It does.

13   Q    And is that the figure that's attached as Figure A to

14   your declaration?

15   A    I believe it is.

16   Q    And then we've talked about your liquidation analysis

17   for EFH Corporate Services; does your declaration include a

18   summary of the results of that analysis as well?

19   A    It does.

20   Q    And is that Figure B?

21   A    It is.

22            MR. STEPHANY:  Permission to publish Figure B,

23   Your Honor?

24            THE COURT:  Of course.

25   BY MR. STEPHANY:

1    Q    Mr. Stuart, is this the -- what's commonly referred to

2    as the waterfall or liquidation analysis for Corporate --

3    EFH Corporate Services?

4    A    Yes, it is.

5    Q    And can you walk us through this at a high level; what

6    are the component parts?

7    A    Sure.  This would be an example of the type of

8    liquidation analysis that we performed obviously for

9    Corporate Services, as well as all approximately 40 of the

10   debtor entities at the T-side.  At the top of the page you

11   see an estimate of the distribution value of the assets

12   under a liquidation, the bottom half of the page is how that

13   distribution of assets is ascribed in recovery terms to each

14   one of the creditors of that entity.

15   Q    And who created this -- the waterfall analysis

16   reflected here?

17   A    I did.

18   Q    And where did the inputs come from?

19   A    Again, the inputs, if you see at the top of the page,

20   about three columns in, you start -- we started with the

21   12/31/2015 balance sheet.  We made certain adjustments for

22   value to get to a liquidation balance.  That -- so the

23   answer to your question is the inputs ultimate began with

24   the 12/31/2015 consolidating balance sheet by legal entity.

25   Q    And does -- is the methodology that you utilized in

1    developing the liquidation analysis for EFH Corporate

2    Services, is that similar to the methodology that you used

3    in doing your liquidation analysis for the other TCEH debtor

4    entities?

5    A    Very similar.

6    Q    Specifically with respect to the liquidation analysis

7    for Corporate Services, how were liquidation costs handled?

8    A    With respect to Corporate Services, we assumed in that

9    particular entity professional fees and Chapter 7 trustee

10   fees only.  With respect to the Corporate Services entity at

11   large, we did assume that there were retention costs for

12   Corporate Services, but given the function of Corporate

13   Services was to perform administrative functions on behalf

14   of all of the business units, but primarily the T-side,

15   those retention costs were pushed down to the T entities and

16   allocated ratably to those entities in accordance with their

17   distributable liquidation value.

18          We also assumed that there were -- we qualified

19   that there might be severance and WARN Act claims, as part

20   of the liquidation at whole we did not ascribe or quantify

21   value to those claims.

22          MR. STEPHANY:  We can take that down now.

23   BY MR. STEPHANY:

24   Q    Stepping back to the overall liquidation analysis for

25   all the TCEH debtors, did you reach any conclusions based on

1    your analysis?

2    A    Yes, I did.

3    Q    And can you tell us what those are?

4    A    The conclusion was that the plan recoveries provide

5    value that exceeds the value that would exist under this

6    hypothetical Chapter 7 liquidation.

7    Q    Thank you.  I'd like to shift gears now and talk about

8    your rebuttal opinion.  Can you briefly describe the subject

9    again of your rebuttal opinion?

10   A    The rebuttal opinion is primarily to provide a response

11   to the work performed by Professor Jack Williams in

12   connection with his assertions of value related to EFH

13   Corporate Services.

14   Q    And your opinions and conclusions that you reached in

15   connection with that opinion, those are also reflected in

16   your declaration D-DIR Stuart?

17   A    Yes, they are.

18   Q    Can you briefly describe the work that you performed in

19   connection with developing your rebuttal opinions?

20   A    Sure.  We -- in the case of the EFH Corporate Services

21   work, we began with a 4/30 balance sheet, same beginning

22   balance sheet date that Mr. Williams used.  We investigated

23   certain asset liability accounts; we caucused with members

24   of the accounting team.  Ultimately I performed my own

25   adjusted net book value and, in addition to that, I valued

1   other contingent liabilities and other factors that may

2   contribute to the value discussion.

3   Q    I'd like to talk about each one of those in turn, but

4   before we do, just stepping back generally, did you develop

5   any understanding of the function or functions that EFH

6   Corporate Services performs?

7   A    I am aware of the functions that they perform.

8   Q    And what are those?

9   A    They perform a host of administrative functions on

10  behalf of all of the business units, the T-side, the E-side,

11  Oncor.  Examples of those administrative functions would be

12  human resources, accounting, tax, legal, et cetera.

13  Q    Are you aware of how many employees EFH Corporate

14  Services has?

15  A    I believe EFH Corporate Services has approximately 400

16  to 420 employees.

17  Q    And what if any understanding did you develop regarding

18  how the services provided by EFH Corporate Services are

19  billed?

20  A    My understanding is that the consumption of services

21  and the reimbursement of services and the allocation of

22  services are all in accordance with the shared services

23  agreement historically.

24  Q    And are those billed at a particular rate?

25  A    They're billed at cost.

1    Q    Did you develop an understanding as to how the services

2    are allocated across the entities that they serve?

3    A    I'm aware of work that was done more recently to

4    estimate the allocation of those services for 2016 are based

5    on actualized services through June of this year, as well as

6    projection of those consumption of services through the

7    balance of the year.

8    Q    And what is that understanding based on?

9    A    It's based on work ultimately performed by the

10   company's financial planning group, an analysis of which I

11   reviewed to determine the most recent allocation split.

12   Q    And is that information summarized in the chart that

13   appears on page 17 of your declaration, D-DIR Stuart?

14        (Pause)

15   A    Yes, it is.

16             MR. STEPHANY:  Permission to publish, Your Honor?

17             THE COURT:  Yes.

18   BY MR. STEPHANY:

19   Q    Mr. Stuart, what does this chart show?

20   A    This is a very summary view of the analysis that I was

21   just speaking about.  It's based on actualized service bill

22   through June of this year, as well as an estimate of the

23   remaining service bill allocation through the end of the

24   year.  It shows that approximately 95 percent of that

25   consumption of services goes to the T-side entities with the

1    balance of five percent going to the E-side entities and

2    Oncor.

3    Q    And are you aware that Professor Williams also looked

4    at service bill allocations?

5    A    I'm aware.

6    Q    Are there any differences in his review of service bill

7    allocations compared with yours?

8    A    I think a major difference is that he relies upon a

9    historical view of the allocation whereas I am relying upon

10   the most recent allocation of the consumption of services.

11   Q    And why is that, why did you choose to look at the most

12   recent allocation?

13   A    Well, I think there are reasons over the course of time

14   for why the distribution of those services might be

15   different.  I think that I simply relied upon the current

16   view of where those costs returned.

17   Q    Turning to the methodology that you used in connection

18   with your analysis of the value of EFH Corporate Services;

19   can you briefly describe that methodology?

20   A    I think simply we again started with the 4/30/2016

21   balance sheet.  We made certain adjustments for assets and

22   liabilities that we did not think would contribute to value,

23   ultimately arriving at an adjusted net book value.

24   Q    Let's focus first on the adjusted balance sheet

25   valuation.  Can you briefly explain how you went about

1    performing that valuation?

2    A    Again, I think it's ultimately a -- it begins with a

3    4/30 balance sheet.  We made certain adjustments, you know,

4    going from left to right --

5    Q    I notice --

6    A    -- where --

7    Q    I apologize for interrupting.  I notice that you're

8    looking at a page in your witness binder; which page is

9    that?

10   A    Figure C.

11   Q    Figure C in your declaration?

12   A    Yes.

13            MR. STEPHANY:  Permission to publish, Your Honor?

14            THE COURT:  yes.

15   BY MR. STEPHANY:

16   Q    And can you briefly explain and walk us through what

17   this Figure C depicts?

18   A    So this is the adjusted net book value that I was just

19   discussing.  If you look at the blue column with numbers on

20   the left-most portion of the table, that's the 4/30 balance

21   sheet.  Moving from left to right, the adjustment columns

22   are removing certain assets and liabilities that we did not

23   believe would contribute to value in arriving at ultimately

24   the adjusted net book value, which is the far-right column.

25   Q    And what was your -- what was the result of your

1    adjusted balance sheet valuation?

2    A    The result was 15.2 million.

3    Q    Okay.  And are you aware that Professor Williams

4    performed a similar exercise?

5    A    I am.

6    Q    And do you have a view as to the methodology that

7    Professor Williams employed?

8    A    Yeah, I believe we used substantially similar

9    methodologies.

10   Q    And likewise do you have a view as to the result of his

11   analysis?

12   A    They're very close to the results of my analysis,

13   within $3 million.  I think his number is a little bit less,

14   a little bit under $13 million.

15   Q    Now, in addition to --

16        MR. STEPHANY:  -- we can take the balance sheet

17   down, thank you.

18   BY MR. STEPHANY:

19   Q    In addition to the adjusted balance sheet, you

20   mentioned that you also considered other factors?

21   A    I did.

22   Q    Can you tell us what they are?

23   A    We also valuated certain contingent liabilities related

24   to employer-related claims that could potentially be

25   triggered if Corporate Services failed to be transferred and

1    ultimately had to wind down that legal entity, examples

2    would be severance, WARN Act claims, other liquidation

3    costs.

4    Q    And can you explain why you thought that was important

5    to include those contingent liabilities in your analysis?

6    A    Yeah, I think that simply drawing a circle around the

7    value of Corporate Services and concluding that that

8    represents the value I think is incomplete.  I think in

9    order to look into the seller alternatives here, which I

10   think are limited, I think if you look at the statement of

11   what the merger agreement says with respect to employees at

12   Corporate Services, I think it's -- it's clear to me at

13   least that the buyers of Oncor don't want any employees of

14   the Corporate Services.  I think if you look as to the

15   proprietary nature of these assets and the fact that they

16   are unique to the T-side entities and the other business

17   units, I believe that a failure to transfer these assets as

18   contemplated in this plan will almost certainly lead to a

19   wind-down of this business, bringing to bear these other

20   contingent liabilities that we've highlighted.

21   Q    Focusing on the contingent liabilities, did you prepare

22   a demonstrative to aid in your testimony concerning those

23   contingent liabilities?

24   A    Yes, I did.

25   Q    And is that in your witness binder at Tab D-DEM Stuart

1    1?

2    A    Yes, it is.

3           MR. STEPHANY:  Permission to publish, Your Honor?

4           THE COURT:  Yes.

5    BY MR. STEPHANY:

6    Q    Mr. Stuart, can you tell us what this demonstrative

7    depicts?

8    A    This demonstrative depicts on the left-hand column the

9    15.2 million adjusted net book value that I arrived at for

10   EFH Corporate Services.  Also included in that column is a

11   comparison of the 12.88 million that Professor Williams

12   arrived at, again using a very substantially similar

13   approach.

14          The right-hand column is a stack of contingent

15   liabilities that may be relevant to the determination of

16   value, including severance, WARN Act and liquidation costs.

17   Q    I'd like to focus on severance for a moment.  What was

18   your basis for including severance in the stack of

19   contingent liabilities here?

20   A    Again, I think the basis here is that absent a transfer

21   of these -- this entity, I don't believe this entity as it's

22   currently constituted has a home anywhere else.  I don't

23   believe that there would be a third-party buyer of these

24   assets, in which case I think that this entity would be

25   forced to wind down its operations, thereby creating

1     significant severance liabilities.

2     Q    And how did you arrive at the 38 million number?

3     A    I worked with members of the company's human resources

4     department to arrive at that number for employees that are

5     currently at EFH Corporate Services.

6     Q    Turning briefly to the WARN Act, the compensation and

7     benefits, what was the basis for including that amount in

8     the stack of contingent liabilities?

9     A    Same as the severance, it's essentially contingent

10    liabilities that could be created to the extent that this

11    entity were forced to wind itself down.

12    Q    And again, how did you arrive at that 10.4 million

13    figure?

14    A    Again, working alongside members of the human resources

15    group.

16    Q    And liquidation costs at the top of that stack, can you

17    explain your basis for including that and how you came to

18    that number?

19    A    This is an amount that came straight from my

20    liquidation analysis of EFH Corporate Services.

21    Q    And are there any contingent liabilities that you're

22    aware of that are not reflected in the stack shown on D-DEM

23    Stuart 1?

24    A    There was another category of potential contingent

25    liabilities in the form of contract rejection claims.  EFH

```
1    Corporate Services has assigned a number of executory

2    contracts throughout this case and you know, to the extent

3    that it was forced to wind down its operations and

4    ultimately reject those executory contracts, it could give

5    rise to contract damage claims.  We did not (indiscernible)

6    those claims, I only point that out as a -- and qualify it

7    as potentially additional contingent liabilities.

8    Q    And briefly I just want to touch on your conclusions in

9    connection with the work you did and your opinions

10   concerning the value of EFH Corporate Services; can you

11   please explain those?

12   A    I think the conclusions are that the adjusted net book

13   value that we utilized again is substantially similar to the

14   work done by Professor Jack Williams.  I think that's simply

15   a start to the evaluation of value in this particular case.

16   I think certainly this Court has heard a number of other

17   witnesses as it relates to the benefits of the tax structure

18   of this deal.  I think that, you know, with respect to the

19   merger agreement filed by NextEra, I think it's certainly

20   clear that the, you know, buyers of NextEra do not want

21   these employees, does not want Corporate Services, and I

22   think that -- I think it's important to understand seller

23   alternatives here, which I think that absent transfer of

24   these assets are few and far between, I don't think there

25   would be a third-party buyer that would buy these
```

1    proprietary assets.  And I think that there's a cost

2    avoidance issue that you must, that I think a failure to

3    transfer could give rise to significant employee contingent

4    claims.

5    Q    Thank you.

6              MR. STEPHANY:  At this time we pass the witness.

7              THE COURT:  All right.

8              MR. STEPHANY:  I'm sorry, Your Honor, I apologize.

9    If we could, we've got a few exhibits that are cited in Mr.

10   Stuart's written direct that have not yet been moved into --

11   or admitted into evidence, if I could do that at this time,

12   Your Honor?

13             THE COURT:  Yes.

14             MR. STEPHANY:  I understand that there are no

15   objections with respect to these exhibits?

16             MS. NIGHAN:  That's right.

17             THE COURT:  Thank you.

18             MR. STEPHANY:  So with that the debtors would

19   respectfully move into evidence DX-12, DX-16, DX-17, DX-355,

20   DX-378, DX-551, DX-588, DX-760, 761, 762, 763, and 764.

21             THE COURT:  They're admitted.

22        (Debtors' Exhibit Nos. DX-12, DX-16, DX-17, DX-355, DX-

23   378, DX-551, DX-588, DX-760, DX-761, DX-762, DX-763, DX-764

24   received)

25             MR. STEPHANY:  Thank you.

1                          CROSS-EXAMINATION

2       BY MR. SKELLY:

3       Q    Good morning, Mr. Stuart.

4       A    Good morning.

5       Q    I'm George Skelly, I'm here on behalf of American Stock

6       Transfer, the EFH Indenture Trustee, and I have a few

7       questions for you.

8                  Have you ever previously performed an expert

9       valuation of a business on a going-concern basis rather than

10      a liquidation valuation?

11      A    I historically performed liquidation analyses almost

12      exclusively, although the methodology that I relied upon

13      with the adjusted net book value is certainly very

14      substantially similar to the methodology that I utilized for

15      the liquidation analysis.

16      Q    So it just so happens that all of your experience is

17      with respect to liquidation analyses and not a going-concern

18      valuation; is that correct?

19      A    That would be correct.

20      Q    Okay.  So in paragraph 49 of your declaration where you

21      note you have "significant experience developing liquidation

22      analyses, including liquidation analyses admitted into

23      evidence without objection in connection with the prior

24      confirmation proceedings in these cases."  Then you go on

25      and you say, "leveraging my experience with liquidation

1   analyses, my analysis regarding EFH Corporate Services

2   includes an adjusted balance sheet valuation."

3           When you say leveraging your experience with

4   liquidation analyses, what you mean by that essentially is

5   that you don't have direct experience doing the going-

6   concern-type valuation; is that correct?

7   A    I don't believe that's what I'm saying here.

8   Q    In any event, valuing a business that's going to

9   continue in operation is a valid and common valuation task,

10  right?

11  A    Sure.

12  Q    Have you ever seen a case in which a valuation analysis

13  was done on a going-concern basis and a court approved

14  subtracting out costs associated with liquidating a company

15  to arrive at the going-concern value?

16  A    I'm not sure I've seen a specific example.  I think

17  that the seller's alternatives to this proposed separation

18  are an important consideration to this particular valuation,

19  that's what I'm trying to point out in my particular

20  rebuttal materials.

21  Q    Be that as it may, there are accepted valuation

22  methodologies; isn't that correct?

23  A    There are certainly methodologies that are used more

24  often than not.

25  Q    And some of them apply with respect to certain premises

1    of valuation and others apply with respect to other premises

2    of valuation, correct?

3    A    I think that's a fair statement.

4    Q    So for example, there are two distinct valuation

5    premises that may be under consideration:  a going-concern

6    premise and a liquidation premise, right?

7    A    Certainly a going-concern and liquidation are two

8    premises.

9    Q    And there's no basis in the literature to support

10   mixing and matching the different premises when doing a

11   particular valuation; is that correct?

12   A    I don't believe I've mixed and matched.  I think in

13   fact your own expert relies upon a definition of an adjusted

14   net book value that considers contingent liabilities, which

15   is exactly what I've done here.

16   Q    You're familiar with David Ying's valuation of TCEH in

17   this case?

18   A    I'm generally familiar, but by no means an expert on

19   the work he did.

20   Q    Okay.  Did you review it?

21   A    A long time ago, yes.

22   Q    Now, are you aware that that's a valuation that was

23   done on a going-concern basis?

24   A    Yes, I'm aware of that.

25   Q    Mr. Ying did not subtract out the costs that TCEH might

1    incur if it were hypothetically to liquidate reorganized

2    TCEH, did he, to your knowledge?

3    A    He did not.

4    Q    In your view it's fair to say, I take it, that when

5    doing a valuation of an asset or a business it's important

6    to be aware of the facts and circumstances surrounding the

7    transaction, right?

8    A    Absolutely.

9    Q    For example, if you're considering the choice of

10   valuation methodology, if you're trying to decide whether

11   it's appropriate to do a fair market valuation approach or

12   method, you need to be aware of whether there even was a

13   market for the asset, that sort of thing, right?

14   A    Those sort of things should certainly be considered.

15   Q    Now, in your rebuttal report --

16          MR. SKELLY:  -- which I'd like to put up, if I

17   may --

18   BY MR. SKELLY:

19   Q    -- the last page, you have a conclusion that "the

20   Williams report also fails to consider the transaction

21   holistically, effectively ignoring benefit that E-side

22   creditors will realize as a result of avoiding a significant

23   stranded tax liability."  Do you recall that?

24   A    I recall that, yes.

25   Q    And so you've essentially criticized Professor Williams

1    because he does a valuation, but fails to consider the

2    transaction holistically, right?

3    A    That's the comment here.

4    Q    Okay.  Now, what I want to understand is when you

5    criticize Professor Williams' report for failing to use a

6    holistic report, do you mean anything more than that -- what

7    we just discussed, that it's important to be mindful of the

8    facts and circumstances surrounding a transaction when you

9    choose the valuation standard, and the approach and the

10   method?

11   A    I'm not sure I would limit it to that.  I'm simply

12   saying that under this current structure it doesn't give

13   rise to a tax liability measured in the billions of dollars

14   and I think that's a good deal for the entire estate.

15   Q    Your opinions generally about whether something is a

16   good deal for the entire estate or not are not a recognized

17   factor for consideration in deciding whether to use one

18   valuation methodology or another; is that right?

19   A    I'm not sure that that's the case.  I think Corporate

20   Services is one component of a much more complicated

21   transaction.  I -- at least my own opinion is that a failure

22   to not consider the tax liability would be incomplete.

23   Q    So is it your view that Professor Williams, what he

24   should have done is perform his valuation, come to a number,

25   the adjusted -- you know, the -- I have it here, the

1    adjusted balance sheet valuation to determine the equity

2    value using standard methodologies and then reduce whatever

3    that equity value was by some amount to take account for the

4    fact that some potential large tax liability, some

5    contingent liability was avoided?

6    A    No, I'm not saying that.  I think that the tax

7    liabilities is an important consideration here.  I would

8    probably go so far as to say that I think, you know,

9    including the seller alternatives and potentially the

10   employee contingent liabilities are relevant to the calculus

11   here.  This last bullet is a general understanding of the

12   tax benefits of this deal and the benefits to all of the

13   estates, and nothing more, nothing less.

14   Q    So are you suggesting that Professor Williams ought to

15   have reduced the equity value figure that he came to by some

16   number to account for those concerns?

17   A    I think a failure to look at EFH Corporate Services

18   alternatives absent a separation is incomplete.  I don't

19   think there are any other buyers of EFH Corporate Services;

20   I don't think that the buyers of Oncor want these entities.

21   So considering what would happen of a failure of the

22   transfer and potentially giving rise to the wind-down of

23   this entity is a relevant factor.

24   Q    But would you insist that a person doing a valuation of

25   an asset or a business who comes to an equity value then

1    subtract an amount from that equity value that he's arrived

2    at to account for such concerns, as you apparently have?

3    A    I think if the facts and circumstances were similar to

4    the ones that we face here then, yes, I think that you would

5    have to consider those factors.

6    Q    Okay.  And so that is essentially what I'll refer to as

7    a two-step analysis; first you come to a valuation using the

8    standard methodologies and approaches and then you find that

9    there were alternative transactions that might have had

10   adverse consequences, and you subtract from your equity

11   valuation some amount in light of those alternative

12   transactions that are being avoided.  Are you aware of

13   anything in the academic writing on valuation that supports

14   that kind of a two-step analysis?

15   A    Not off the top of my head.  I'm simply pointing out

16   that the valuation under net book value is incomplete in

17   light of the facts and circumstances that we are faced with

18   in this case and the fact that, absent a transfer to TCEH of

19   EFH Corporate Services, I think that there are serious

20   concerns that EFH Corporate Services would find itself in a

21   wind-down.

22   Q    Are you aware of any case law or professional standards

23   that support that sort of a two-step analysis?

24   A    I'm not aware of an example of this particular

25   situation that we're faced with in this particular case.

1   Q    And you don't cite any in your direct testimony, right?

2   A    I don't.

3   Q    Or in any of your reports, right?

4   A    I don't believe I do.

5   Q    Another way perhaps to refer to this analysis might be

6   the holistic approach; would you accept that?

7   A    I think about holistic, the word holistic is in the

8   affirmative sense in this particular case:  the benefits of

9   the tax structure, the benefits of facilitating the deal

10  with NextEra insomuch as they don't want this entity and

11  have explicitly stated that.  I think that that is the

12  holistic consideration here.  I think the contingent

13  liabilities and the wind-down costs of a failure to transfer

14  as a slightly different response to that.

15  Q    So you're aware that there a number of accepted

16  standards of valuation in the industry, including for

17  example fair market value, right?

18  A    Sure.  Do you want to talk about fair market value?

19  Q    Costs or asset approach?

20  A    Sure.

21  Q    The market approach, the income approach, you've heard

22  these terms?

23  A    Yes.

24  Q    Have you ever heard of anyone valuing a business using

25  a holistic approach?

Page 46

1    A    I think it happens all the time in the real world.

2    Q    But there's no accepted standard, the holistic

3    valuation approach in the literature, whether academic or

4    professional, that you can point to to support such a

5    distinct approach, right?

6    A    I have not committed all the different approaches to

7    memory.  I don't think that that fails to create a situation

8    here that absent a separation Corporate Services finds

9    itself in a situation where nobody would be willing to buy

10   this entity and it would otherwise be forced to wind down

11   its operations.

12   Q    Well, are you familiar with the AIRA, the Association

13   of Insolvency and Restructuring Advisers?

14   A    I am.

15   Q    And are you familiar that they have issued standards

16   for distressed business valuation?

17   A    That was the document that I just quoted a few minutes

18   ago when I suggested that the adjusted net book value

19   definition in that document contains a provision for

20   contingent liabilities.

21   Q    Okay.  Is there anything in those standards that

22   supports doing a, quote-unquote, "holistic valuation

23   methodology"?

24   A    I have not committed that document to memory.

25   Q    Let's turn for a moment to tax.  Now, I understand

1   you're not holding yourself out as a tax expert, correct?

2   A    Far from it.

3   Q    Now, you did note in your rebuttal report again that

4   "the Williams report fails to consider the transaction

5   holistically, effectively ignoring benefit that E-side

6   creditors will realize as a result of avoiding a significant

7   stranded tax liability."  But you're not opining, since

8   you're not a tax expert, anything about the amount of the

9   potential stranded tax liability, correct?

10  A    We came up with an estimate in our expert liquidation

11  report that was based on the gain that would otherwise get

12  triggered under both the E-side and the T-side were a

13  hypothetical liquidation that would contribute to a

14  hypothetical deconsolidation tax.  My understanding based on

15  some of the more recent rulings is that amount could

16  potentially have been conservative.

17  Q    So did you offer an opinion in your written opinions

18  here as to what the amount of the potential stranded tax

19  liability would be?

20  A    Again, not in the rebuttal, but in the liquidation

21  expert report I did.

22  Q    Did you offer an opinion with respect to the

23  probability that there would be a potential stranded tax

24  liability?

25  A    I did not put any statements with respect to

1    probability.

2    Q    You would agree, wouldn't you, that there are a number

3    of things that would need to occur under the circumstances

4    here to result in a taxable transaction ultimately going

5    forward as part of a plan?

6    A    This probably gets a little outside my wheelhouse.

7    Q    Okay.  Well, in taking a look at the probability of

8    something occurring, you would want to know what obstacles

9    there were that would have to be overcome before that event

10   would occur, wouldn't you?

11   A    That seems to be logical.

12   Q    Okay.  And in essence you're suggesting that the

13   potential stranded tax liability is an avoided contingent

14   liability that should somehow be figured into a valuation

15   calculation for Corporate Services, right?

16   A    No, I don't believe that's my testimony.  I believe

17   that it's certainly an important consideration of this plan

18   overall.  I think with respect to drawing a circle around

19   Corporate Services, I think that is more of the adjusted net

20   book value that we seem to both agree on would be very

21   close, but the consideration of the contingent liabilities

22   that would trigger if there was a failure to transfer that

23   entity.

24   Q    Again, sticking to the tax issues for a moment, you

25   aren't telling us as a matter of your expert opinion that

1    the various things that might have to happen prior to a

2    taxable transaction actually taking place, for example T-

3    side having to file a plan, there would be objections, the

4    plan would have to be confirmed, the Department of Justice

5    is likely to object and intervene, those sorts of things,

6    you're not opining on the likelihood of all of those things

7    occurring or not, right?

8    A    I don't believe I've said anything in any of my reports

9    with respect to the steps.

10   Q    Well, if you don't have an opinion to offer regarding

11   how probable such an outcome might be, taking into account

12   the probability of the various steps that need to precede

13   it, then how can you properly conclude that Mr. Williams'

14   report did something incorrect by, as you say, effectively

15   ignoring the benefit the E-side creditors will realize, et

16   cetera?

17   A    Again, I think this bullet simply states that the tax

18   structure as contemplated and in this deal holistically no

19   differently than the comments that getting rid of Corporate

20   Services would appear to facilitate the buyers of Oncor,

21   it's a consideration.  Ultimately it's not my consideration,

22   it's Your Honor's consideration as to how this inputs

23   holistically into the overall transaction.

24   Q    I'd like you to consider for a moment how a valuation

25   of the T-side on a going-concern basis might be affected or

1    not by possibly avoiding an alternative taxable situation

2    that I'm going to refer to in a moment as Tax Armageddon 2.

3    Before we get there let me ask, are you familiar with

4    Internal Revenue Service Regulation Section 1.1502-6?

5    A    I am not.

6    Q    Okay.

7    A    I will say that I -- you know, I said in my (audio

8    paused) heard from people that are much more qualified to

9    speak to it than I am.

10   Q    Are you familiar with the idea that under certain

11   circumstances there may be joint and several liability

12   imposed on reorganized TCEH for taxes of the EFH Group?

13   A    I don't know if this is the provision of the IRS code

14   or not.  I certainly included such a scenario in my

15   liquidation analysis when I was previously discussing the

16   check-the-box scenario.

17   Q    Okay.  And even apart from check-the-box, are you aware

18   that one of the rulings that was received in the context of

19   the private letter ruling results in the possibility that

20   TCEH will be treated -- that is reorganized TCEH will be

21   treated as a member of the EFH Group and therefore jointly

22   and severally liable for the taxes of the EFH Group?

23   A    I'm not aware one way or the other.

24   Q    Okay.  Well, can you just assume with me for a moment

25   that that's the case.  And just in general you would agree

1   with me, wouldn't you, that there's some possibility or some

2   risk that the tax-free spin deal that is presented in the

3   current plan could get broken, it could wind up taxable,

4   correct?

5   A    I've heard testimony over the last few days discussing

6   it, but I don't have a basis one way or the other.

7   Q    Okay.  And if it were to wind up broken, that is the

8   tax-free spin that's under contemplation now in the current

9   plan, that would wind up imposing an enormous tax, many

10  billions of dollars, correct?

11  A    Yes, I've heard that it's certainly in the billions of

12  dollars.

13  Q    Okay.  And I'm going to refer to that tax Armageddon 2

14  just to distinguish it from other scenarios that people have

15  raised and referred to as tax Armageddon generally.  Do you

16  know whether reorganized TCEH could as a matter of tax law

17  be liable under Section 1.1502-6 for that tax Armageddon 2?

18  A    I think as I stated, I have never seen that section of

19  the IRS code before, so I don't know one way or the other.

20  Q    Have you heard of dash 6 liability?

21  A    No.

22  Q    Okay.  So for the purpose of this hypothetical please

23  assume that it is the case that under the recent private

24  letter ruling and this regulation that TCEH, reorganized

25  TCEH could wind up liable for the tax jointly and severally

1    in the event of a tax Armageddon 2, okay?  Do you

2    understand; you're with me so far?

3    A    I will continue to play along, but I --

4    Q    Thank you.

5    A    -- want to continue to state that I am not a tax expert

6    and --

7    Q    Okay.  Under those assumptions, let's assume that

8    somebody was doing a valuation of the T-side as a going

9    concern, okay?

10   A    Okay.

11   Q    Would it be improper in doing a T-side valuation as a

12   going concern to ignore the possibility of such a tax

13   Armageddon 2 that could result from the tax-free spin

14   structure ultimately being broken?

15   A    Can you repeat the question?

16   Q    Would it be proper in doing a T-side valuation as a

17   going concern to ignore the possibility of a tax Armageddon

18   2 that could result from the current plan's tax-free spin

19   structure being broken?

20   A    I did not perform a valuation, a going-concern

21   valuation for the T-side, I'm not sure what would be proper

22   or not under that particular scenario.

23   Q    Okay.  So if Mr. Ying's analysis of the T-side

24   valuation did not include some kind of an offset or

25   consideration of the possible contingent liability for such

1    a tax Armageddon, would you criticize that valuation as

2    incorrect?

3    A    Again, I'm not that familiar with Mr. Ying's valuation;

4    I don't know if it did or did not take into account certain

5    tax considerations or not.  Again, it was several weeks ago

6    when I read that valuation.

7    Q    Okay, but you're willing to criticize Mr. Williams'

8    report as effectively ignoring essentially the potential for

9    a significant stranded tax liability --

10              MR. STEPHANY:  Objection, Your Honor.

11   BY MR. SKELLY:

12   Q    -- would you extend the same criticism to Mr. Ying's

13   report?

14   A    Again, I am not that familiar with Mr. Ying's report; I

15   don't know if he did or did not consider issues of tax.

16   Q    Okay.  Now, I understand -- well, let me ask, you're

17   not an attorney, are you?

18   A    I am not.

19   Q    Okay.  And you don't claim to be an expert in

20   employment law?

21   A    I do not make that claim.

22   Q    Okay.  The vast majority of Corporate Services

23   employees don't have employment contracts; is that right?

24   A    Yes, that's my understanding.

25   Q    And only a handful of top executives employed by

1    Corporate Services have employment contracts?

2    A    Yes, that's my understanding.

3    Q    So do you have the expertise to opine on whether

4    there's a legal obligation in the event Corporate Services

5    let the rank-and-file employees go to pay them severance?

6    A    I believe I referenced an order that was signed by Your

7    Honor just a few weeks ago in connection with a motion to

8    approve severance, which would include Corporate Services

9    employees, including the rank and file.

10   Q    I'm not sure that answered my question as to whether

11   you can opine about whether there's a legal obligation to

12   pay the rank-and-file employees severance if they're let go?

13           MR. STEPHANY:  Objection, Your Honor, the question

14   as to whether or not there is a legal obligation I believe

15   is one for the Court, not for this witness.

16           THE COURT:  Well, yes, but I think the question is

17   valid.  The question is whether he's in a position to make a

18   legal conclusion as to liability.  It's a fairly narrow

19   question, I suppose.

20           MR. SKELLY:  Thank you, Your Honor.

21           THE WITNESS:  I am aware of the existence of a

22   severance program that would cover employees of Corporate

23   Services.  So to the extent that that binds Corporate

24   Services to a contractual obligation, to the extent that it

25   were to let go its rank-and-file employees.

1    BY MR. SKELLY:

2    Q    But you don't know and don't have the expertise to

3    opine about whether or not that policy is one that is in

4    fact legally binding?

5    A    I have no basis as to whether or not it's legally

6    binding.

7    Q    If Corporate Services is transferred to reorganized

8    TCEH and continued to be operated, as the plan contemplates,

9    there would be no severance obligation, right?

10   A    That's correct.

11   Q    In valuing the equity of Corporate Services on a going-

12   concern basis then, you shouldn't subtract out the

13   severance, right?

14   A    I think about an evaluation of the seller's

15   alternatives to the extent that EFH Corporate Services is

16   not separated is an important consideration here, because

17   there are no other buyers that I would be aware of that

18   would buy this proprietary organization, that buyers of

19   NextEra have stated in the merger agreement that they don't

20   want this entity, the concerns I raised in my rebuttal

21   suggest that that may give rise to a wind-down of the

22   Corporate Services, in which case the contingent liabilities

23   for employees would be a relevant consideration.

24   Q    But in valuing the equity of Corporate Services on a

25   going-concern basis in doing that valuation, that exercise,

1    you shouldn't subtract out the severance, right?

2    A    I disagree.  I think an evaluation of the seller's

3    alternatives is an important consideration of value.  There

4    are no other alternatives here that I'm aware of.

5    Q    I'd like to go to your demonstrative bar chart, which I

6    think is in your witness book.

7         (Pause)

8    Q    And this is D-DEM Stuart 1.  Do I understand correctly

9    that the right-hand bar is intended to depict contingent

10   liabilities?

11   A    That's correct.

12   Q    And that bar shows the contingent liabilities

13   essentially at 100 percent?

14   A    They're reflected at a hundred percent of the amounts

15   that I sized for this, that's correct.

16   Q    If you were to value a contingent liability when doing

17   a going-concern valuation, wouldn't you evaluate the

18   likelihood that those liabilities would be incurred in the

19   context of that going concern?

20   A    I'm not taking the left-hand column and subtracting the

21   right-hand column here, I'm simply taking the left-hand

22   column and comparing it against the gross liabilities that

23   could get created; I'm not creating any math between the

24   two.

25   Q    Oh, that's interesting, because I thought that you were

1    taking the position that it is important to reduce the

2    equity valuation that you might otherwise come up with by

3    amounts that where there were costs avoided in not doing a

4    different transaction?

5    A    I'm suggesting it should be taken into consideration,

6    once arriving at the net book value considering the seller

7    alternatives and the contingent liabilities that could get

8    created if there was a failure to transfer this entity.

9    Q    But you're not doing any math between the two?  You're

10   not suggesting that you ought to subtract?

11   A    I'm not suggesting you should subtract the full amount,

12   I'm not suggesting you should subtract a 15-percent amount.

13   I'm suggesting that there should be an awareness of the

14   fullness of the contingent liabilities that could get

15   created.

16   Q    If a company had contingent liabilities that were

17   foreseeable in a going-concern situation, looking forward to

18   the company operating as a continuing business, nonetheless

19   had some contingent liabilities and you were doing a

20   valuation of that company on a going-concern basis, wouldn't

21   you evaluate the likelihood of incurring those contingent

22   liabilities, isn't that part of a proper valuation

23   methodology?

24   A    I think in consideration of the gross liquidation, or

25   I'm sorry, the gross costs here is a relevant consideration.

1    Again, I'm not subtracting one from the other.  I'm simply

2    pointing out on E-side of the cost avoidance discussion.

3    Q    Shouldn't in the context of a going-concern valuation,

4    shouldn't costs -- contingent liabilities that are not going

5    to be incurred on the premise of a going concern, shouldn't

6    they be given a zero percent -- you know, shouldn't they be

7    considered at zero percent, not 100 percent?

8    A    I think there are several examples that we would run

9    into all the time where a company may have contingent

10   liabilities and it's not relevant to the discussion.  I

11   think examples of those companies would be examples of

12   companies that have alternatives.  This company has no

13   alternatives.  The buyers of (indiscernible) don't want it.

14   There's no third party that I'm aware of that would likely

15   pay anything for it.  Therefore, I think the relevance of

16   these contingent liabilities are important to the

17   discussion.

18   Q    Mr. Stuart, I'd like you to assume with me a

19   hypothetical.  Assume that I own a boat and my boat is

20   valued at $100,000 and assume I'm insolvent.  Now, assume

21   with me that I go to sell the boat which, by the way, there

22   are lots of costs involved; costs of terminating my yacht

23   club contract, the severance that I may need to pay to my

24   vast crew, and those costs, let's assume, would cost me

25   $70,000 in liquidation costs.  Okay.  Are you with me so

1    far?

2    A    I'm with you so far.

3    Q    Thank you.  Now, I come to you to get a valuation of my

4    boat.  Now, under your holistic theory, you would subtract

5    out the 70,000 liquidation costs that I avoid by selling the

6    boat.  Do I understand that correctly?

7    A    I'm following you so far.

8    Q    And that's correct?

9    A    I think maybe I'd take a little bit different approach.

10   If I were the buyer of your boat and I knew the costs that

11   you may have to incur on the alternative, I'd be willing to

12   consider that as part of what I think value consideration

13   should be.

14   Q    So if I, the insolvent boat owner, sell my $100,000

15   boat for 30,000, having subtracted out the 70,000

16   liquidation costs that I avoided, you would consider that to

17   be economically equivalent value for the boat; is that

18   right?

19   A    The example that I'm pointing out here is if you have

20   no other buyer except a single buyer for that boat and the

21   alternative is liquidating that boat, those liquidation

22   costs may be relevant to the discussion.

23   Q    Okay.  And setting aside the no other buyer, et cetera,

24   am I correct that you're saying a holistic approach would

25   require that you subtract out the liquidation costs of

1    70,000 and then if I sell my boat for 30,000 you would

2    consider that to be a sale for economically equivalent

3    value?

4    A    If you set aside the no other buyer issue then I don't

5    think the premise is relevant to what I'm trying to point

6    out here.

7    Q    So I want to come back once again to your statement at

8    the end of your rebuttal report about holistic --

9    considering a holistic valuation and ignoring benefit that

10   creditors will realize as a result of avoiding a significant

11   stranded tax liability.  Let's say that Professor Williams

12   had been valuing a going concern that had a billion dollars

13   in cash and no liabilities and he came to a fair value

14   conclusion that it had a worth of one billion.  Are you with

15   me so far?

16   A    Yes.

17   Q    Okay.  If that asset was being transferred to the T-

18   Side here for zero dollars as part of a tax-free transaction

19   and bankruptcy plan, would you say that the valuation of one

20   billion dollars was flawed unless it went on and

21   holistically reduced the one billion dollar value to zero

22   because of avoidance of the stranded tax liability?

23   A    I think that premise -- I think it would depend on the

24   hypothetical value of the benefits of avoiding the stranded

25   tax.  I think if -- in that example if a failure to transfer

1    gave rise to $2 billion of contingent liabilities, I think

2    that would also be a relevant consideration.

3    Q    How about three billion?

4    A    Even better.

5              MR. SKELLY:  I have no further questions.

6              THE COURT:  Redirect?

7              MR. STEPHANY:  Briefly, Your Honor.

8                          REDIRECT EXAMINATION

9    BY MR. STEPHANY:

10   Q    For the record, Bryan Stephany, Kirkland & Ellis, on

11   behalf of the debtors.

12   A    Uh-huh.

13   Q    Mr. Stuart, you were asked some questions about your

14   methodology in connection with the opinions you've offered

15   on the value of Corporate Services.  Specifically you were

16   asked about whether your analysis was a two-step or a single

17   step analysis.  How do you view your analysis?

18   A    Again, I think my testimony has been that the adjusted

19   net book value approach that I arrived at I think has

20   substantial similarities to Professor Williams' approach.  I

21   think it's important to not stop there for me and simply

22   draw a circle around that net book value number.

23        I think it's important to consider other factors, some

24   of which I've pointed out as holistic benefits of this deal,

25   tax structure and tax -- avoiding tax liabilities as being

1    one of them.  I think facilitating in the next

2    (indiscernible) is an important aspect, but I also think

3    that the cost avoidance of a failure to transfer Corporate

4    Services is a relevant consideration here.

5    Q    You were asked some questions about the literature and

6    there was reference made to a document that's cited in

7    Professor Williams' written direct via Association of

8    Insolvency and Restructuring Advisors' Standards for

9    Distressed Business Evaluation, ARA evaluation standards.

10   Do you recall that?

11   A    I do.

12   Q    And have you ever reviewed that document before?

13   A    Again, (indiscernible).  I haven't memorized it in

14   detail but I do recall specifically the passage on adjusted

15   net book value and its conclusion of the concept of

16   contingent liabilities.

17            MR. STEPHANY:  Permission to publish, Your Honor?

18            THE COURT:  Yes.

19            MR. STEPHANY:  I think we're at page 68.

20   BY MR. STEPHANY:

21   Q    Is the passage that you were referring to, Mr. Stuart?

22   A    Yes, that's the passage.

23   Q    And this definition of adjusted book value method, that

24   includes contingent liabilities?

25   A    That's correct.

1    Q    And the costs that you considered in developing your

2    opinion; the severance, the (indiscernible), liquidation

3    costs, other potential costs, are those all contingent

4    liabilities?

5    A    They are.

6    Q    Thank you.

7              THE COURT:  Okay.  Thank you.  You may step down.

8              All right.  Shall we take a very short recess and

9    then turn to Ms. Dore?

10             MR. MCKANE:  Very good, Your Honor.

11             THE COURT:  All right.  Very good.

12   (Recessed at 11:54 p.m.; reconvened at 12:04 p.m.)

13             THE COURT:  Please be seated.

14             MR. MCKANE:  Good afternoon, Your Honor.  Mark

15   McKane of Kirkland & Ellis on behalf of the debtors.  The

16   debtors call Ms. Stacey Dory to the stand.

17             THE COURT:  She knows her way.

18                   STACEY DORE, WITNESS, SWORN

19             THE WITNESS:  I do and it's Stacey, S-T-A-C-E-Y,

20   Dore, D-O-R-E.

21                   DIRECT EXAMINATION

22   BY MR. MCKANE:

23   Q    Good afternoon, Ms. Dore.

24   A    Good afternoon.

25   Q    Can you please state your current position at the

1    debtors for the Court?

2    A    I am the executive vice-president and co-chief

3    restructuring officer and general counsel for all of the

4    primary debtors, EFH, EFCH, TCEH, and EFIH.

5    Q    And just at a high level, what are your

6    responsibilities as the co-CRO?

7    A    I am responsible, along with co-crew, Paul Keglevic,

8    for formulating the plan of reorganization for the debtors

9    as well as communications with all of the various groups of

10   creditors and their advisors, keeping the Board informed in

11   general, running the restructuring in addition to my normal

12   duties as the general counsel.

13   Q    And how do you and Mr. Keglevic, your co-crew, divide

14   those duties?

15   A    Well, we sort of -- they naturally fall into a division

16   of labor based on our areas of expertise and so Mr. Keglevic

17   tends to have primary responsibility for the financial

18   aspects of the restructuring and I tend to have primary

19   responsibility for legal, regulatory, and governance issues.

20   But having said that, we overlap quite a lot and keep each

21   other informed on all aspects of the restructuring and we

22   work together on everything.

23   Q    And did you prepare a declaration in anticipation of

24   your testimony today in support of the plan of

25   reorganization?

1    A    I did.

2    Q    And if you could turn to Tab 3 of your binder.  Do you

3    recognize this document, your amended declaration?

4    A    Yes, I do.

5    Q    And is the information contained herein true and

6    accurate to the best of your knowledge?

7    A    It is.

8    Q    And was this document, this amended declaration

9    prepared in support of the plan of reorganization?

10   A    Yes.

11   Q    All right.

12            MR. MCKANE:  Your Honor, I am not going to move it

13   in at this time as I am hoping to through the course of the

14   live direct examination provide some additional foundation

15   that may obviate some of Mr. Pedone's objections.

16            THE COURT:  Okay.

17   BY MR. MCKANE:

18   Q    Ms. Dore, I'd like to focus at least initially on just

19   the Board governance efforts that you have as your general

20   counsel and co-CRO.  What is your role with respect to the

21   debtors' governance at the Board level?

22   A    Well, the corporate secretary's office reports to me.

23   Our corporate secretary reports to me and so as the general

24   counsel of the company I am primarily responsible for

25   assisting in formulating the Government's process and

1    ensuring that our Board remains informed about material

2    matters.  I set agendas for the Board meetings in

3    consultation with the rest of management.  I direct the

4    preparation of materials.  I review all of the minutes.

5    Pretty much everything associated with our Board process

6    falls within my purview.

7    Q    And so it's fair to say that you manage the debtors'

8    governance process for the entire life of the restructuring?

9    A    Yes.

10   Q    And just briefly to level set, when were the

11   disinterested directors appointed by the debtors?

12   A    Well, the specific disinterested directors that serve

13   on our various boards were elected at different times so

14   Billy Williamson joined the Board in, I believe, February or

15   March of 2013.  Hugh Sawyer joined the Board in the fall of

16   2013.  I think it was October.  And Chuck Crimmons at the

17   EFIH Board joined in early 2014.  They started those -- Don

18   Evans is also a disinterested director at EFH and he's been

19   on the Board since 2008.

20       But the four disinterested directors started meeting as

21   disinterested directors at their respective estates in early

22   2014, right around the time that Mr. Crimmons joined the

23   Board of EFIH.  Prior to that time the groups of what we

24   call non-sponsored directors, which included some directors

25   that had overlapping directorates, also met on a periodic

1   basis starting in 2012 or 2013.

2   Q    And when were the disinterested director advisors, also

3   known as the DDAs, appointed?

4   A    Around November of 2014 we formalized what had been an

5   informal process of having the disinterested directors meet

6   alone without the other directors present.  We formalized

7   that process by having the Boards vote past resolutions that

8   formally recognized each of the individuals that I just

9   described as disinterested directors and authorized them to

10   not only identify and resolve and handle conflict matters

11   but to hire independent counsel and financial advisors.  So

12   that happened I think around November of 2014 and shortly

13   thereafter they had engaged their independent advisors.

14   Q    And at a high level, can you describe how the debtors

15   incorporated the disinterested directors and their advisors

16   into the governance process?

17   A    Well, as I mentioned, this disinterested directors

18   themselves were already fully a part of the governance

19   process and in fact had their own separate meetings prior to

20   November of 2014.  So what we did really when the advisors

21   were appointed is we spent a lot of time in November and

22   December and on an ongoing basis doing -- allowing those

23   advisors to do their own diligence work.  They spent a lot

24   of time on their own with company personnel getting up to

25   speed on the facts of the case basically and the facts of

1    the business.  And then right away we began including all of

2    the DDAs in our regularly scheduled joint Board meetings.

3    Q    And approximately how frequently are these regularly

4    scheduled joint Board meetings?

5    A    Very frequent.  We, for a time, up until confirmation

6    of the plan last year, we were meeting weekly.  After

7    confirmation of Plan A, we gave the Board a couple weeks off

8    in December and then in January of 2016 we reinstituted

9    regularly scheduled joint Board meetings and set them for

10   every other week.

11   Q    All right.  And Ms. Dore, I just want to kind of pause

12   for a minute and discuss the process for having a Board

13   meeting and your role in that.  As a co-CRO and as the

14   general counsel, do you have responsibility for helping to

15   set the Board agenda?

16   A    Yes.

17   Q    And who's responsible for deciding what materials are

18   presented to the Board?

19   A    Well, it depends on the topic.  If it's a non-

20   restructuring top then obviously business people in the

21   business will decide what materials to present in connection

22   with the CEO.  On restructuring topics though, Paul and I

23   essentially decide what materials need to be presented to

24   the Board at each Board meeting.

25   Q    And how are Board materials that relate to the

1    restructuring prepared as a general matter?

2    A    Well, often I will -- because our meetings are so

3    frequent, this happens, you know, seems like on a weekly

4    basis, but often I will send out an email to kick start the

5    discussion with a tentative outline of the topics that I

6    think we need to cover with the Board.  Paul and others will

7    weigh in.  We come up with a final outline and then

8    typically Kirkland & Ellis will prepare the first draft and

9    send it to us for our review although there are times when I

10   personally have prepared the first draft or other people in

11   the company or people on Paul's team or Evercorp.  It

12   depends on what the topic is.

13   Q    And when are board materials related to the

14   restructuring prepared in relation to the Board meeting?

15   A    Not far enough in advance according to our board

16   members who would like to have them even earlier.  But we

17   are, you know, constantly on this rolling board schedule so

18   we typically prepare the Board materials within, you know,

19   three or four days of the Board meeting and we strive very

20   hard to get them out the day before.  Sometimes they are the

21   morning of.

22   Q    And do you review and provide editorial comments and

23   edits to the presentations before they are finalized for the

24   Board?

25   A    Yes.

1    Q    And ultimately who has the final say with regards to

2    what's in the board materials?

3    A    I do.

4    Q    And apologize for even asking this question, but has

5    the restructuring efforts been a significant part of the

6    debtors' regularly conducted business activities over the

7    last four years?

8    A    Yes.

9    Q    And in preparing these materials, is that a regular

10   part of the debtors' governance process?

11   A    Absolutely.

12        UNIDENTIFIED SPEAKER:  Objection.  It's a vague

13   question.

14        THE COURT:  I disagree.  Overruled.

15   BY MR. MCKANE:

16   Q    And how are the board materials shared with the Board?

17   A    We post them to an app called Board Vantage.  It's a

18   portal for board materials.

19   Q    And why provide materials in advance?

20   A    Well, the board members -- we have very diligent board

21   members who spend a lot of time reading materials and they

22   want to have them as far enough in advance as possible so

23   that they can not only read them but formulate questions and

24   sometimes I'll even get calls if -- the downside of getting

25   them out too early is sometimes I'll get calls before the

1    board meeting saying, you know, I think maybe you need to

2    revise this in the board deck because they have their own

3    views about these things.  So they're very active

4    participants in the process.

5    Q    And are you in the board meetings?  Do you participate

6    in the board meetings to the extent possible?

7    A    Yes.

8    Q    And how are the board materials used in those meetings?

9    A    We typically -- depending again on the topic, someone

10   will walk through the board deck essentially as a

11   presentation in the board meeting.  Sometimes that's me.

12   Sometimes it's Paul.  Sometimes it's Kirkland.  Most often

13   it's a combination of all of us.

14       We split it up and we walk them through the deck and

15   they pause to ask questions and then at the end of the

16   meeting, if it's something we're taking a vote on, we'll

17   make a recommendation, take a vote.  But often it's just for

18   informational purposes and we just allow the discussion to

19   proceed.

20   Q    And where are the board materials, the presentations,

21   and agendas maintained?

22   A    Well, they're all on Board Vantage which is maintained

23   by the corporate secretary's office.

24   Q    And I believe you may have said this but to whom does

25   the corporate secretary report?

1   A    To me.

2   Q    And were the board materials, the presentations, and

3   agendas produced in the case?

4   A    Yes, I directed Kirkland to produce in response to

5   discovery requests with active versions of those materials.

6   Q    And beyond just the board presentations, can you

7   briefly describe the various ways in which the debtors

8   update the boards on a regular basis about the restructuring

9   efforts?

10  A    We have -- well, as I said, we have meetings at least

11  every other week, sometimes more often than that depending

12  on what's going on.  We have quarterly in-person board

13  meetings and so we see them at least on a quarterly basis in

14  person.  There are numerous one-off informal calls.  Board

15  members call me.  They call Paul.  They sometimes call our

16  CEO.  And I talk to, you know, many of them on an almost

17  weekly basis with questions and discussions.

18       They are also kept informed -- the disinterested

19  directors are kept informed by their own advisors.  I have

20  discussions with their advisors.  There's a robust amount of

21  dialogue and communication that goes on to keep them up to

22  speed.

23  Q    And what information, if any, do board members receive

24  regarding negotiations with creditors and bidders of the

25  infrastructure?  Is that folded into these information

1   sessions?

2   A    Yes, and we will often report on that formally in board

3   materials.  Sometimes we just voice it over.  We don't

4   always put everything in writing that we say in a board

5   meeting.  And then, again, when board members call with

6   questions often it's to ask about how are the negotiations

7   going, who have you talked to to get information that way.

8   Q    And can you briefly describe how you personally have

9   kept the disinterested directors and their advisors involved

10   in the debtors' governance process?

11   A    Well, again, I speak to the disinterested directors on

12   a fairly frequent basis, especially Billy Williamson and Don

13   Evans increasingly, you know, in the last year or so as --

14   well, the last several months when Plan A started to become

15   in jeopardy.  Obviously those directors were particularly

16   focused on conserving cash at the EFH estate and so I've

17   spoken to them in particular on an increasingly frequent

18   basis.  I also speak to the DDAs from time to time and

19   monitor how they're doing, ask if we can provide

20   information.  They keep me up to speed.  And then I also

21   communicate with Kirkland about the DDA process because they

22   are always communicating with them, as well.

23   Q    And we'll get to this in greater detail a little bit

24   later but you mentioned that Ms. Williamson and Mr. Evans

25   were particularly focused earlier this year about conserving

1    cash.  Why is that?

2    A    Well, as I think everyone recalls, in Plan A all of the

3    E-side creditors were being paid in full.  When Plan A

4    started to fall apart, we had a concern, as we had always

5    had, that if we were not able to sell EFH's interest in

6    Oncore for a high enough price that the EFH creditors could

7    be impaired.  And so it was always very important to the EFH

8    Board as a whole, not just to Chairman Evans and

9    Ms. Williamson but to the Board as a whole, to conserve cash

10   at EFH in order to have as much distributable value for

11   those creditors as possible and to that end Paul reports

12   regularly to the Board on the cash forecast and we keep very

13   close tabs on that cash.

14       We're always updating projections for the uses of that

15   cash which a big use of that cash today is unfortunately for

16   professional fees and so we're constantly having to update

17   those projections.

18   Q    All right.  Let's transition just for a moment to cover

19   conflicts matters, okay.  Can you briefly describe the

20   process that the debtors have in place for the evaluation of

21   potential conflict matters between the estates?

22   A    Yes.  Well, as I mentioned in November of 2014, we put

23   into place a formal resolution which all of the Boards

24   passed authorizing the disinterested directors to identify,

25   investigate, and determine what are conflicts.  So that is

1  solely within their purview.  No one else on the Board nor

2  any member of management has the ability to determine what

3  is a conflict as a final matter.  We can suggest that we

4  might think something is a conflict but that is not within

5  our decision-making authority.  It's solely within the

6  authority of the disinterested directors.

7  Q    All right.  And the governance process that you

8  outlined, was that governance process followed as it relates

9  to all the restructuring activities in 2016?

10  A    Yes.  Because we got the plan confirmed in this Court

11  last year and we felt like the governance process we had

12  used helped us to get the plan confirmed and the Court was

13  supportive of it, we continued that same process going

14  forward to make sure that we would be able to address any

15  arguments that the decision-making was the result of

16  conflicted directors or management.

17  Q    And how did the disinterested directors weigh in at

18  board meetings as to whether something was or was not a

19  conflict?

20  A    At the end of every board meeting we have an item on

21  the agenda for a disinterested director update and the

22  advisors to the disinterested directors as well as the

23  directors themselves will inform the Board if they have

24  determined something is a conflict and if they have, how

25  they have chosen to resolve it.  And they will also, even if

1    they're not informing us about a particular conflict, they

2    will always give us an update as to what their processes

3    are.  They will often tell us if they have met with the

4    disinterested directors in advance of a joint board meeting

5    and if the directors have made any decision in that

6    disinterested director session which we don't attend.  They

7    will report on that at the joint board meetings.

8    Q    All right.  Let's transition to some of the tax issues

9    in the case.  First of all, at the level standing, the plan

10   that's on file, when was that plan filed?

11   A    May 1st.

12   Q    All right.  And when did the debtors' board approve the

13   plan that was filed May 1st?

14   A    April 30th.

15   Q    All right.  And did you prepare a demonstrative aid to

16   assist with you tomorrow today to cover the timeline of

17   chronological events and tax issues associated with that

18   plan?

19   A    Yes.

20   Q    All right.  And is that the first tab of your binder?

21   A    Yes.

22   Q    All right.

23           MR. MCKANE:  And if we could publish that, please.

24   BY MR. MCKANE:

25   Q    Now, Ms. Dore, if the -- there's a lot going on in this

1    slide so maybe we could just start with -- can you give an

2    overview of what the purpose is of the timeline and then I

3    can follow up with some questions about the taxes.

4    A    Sure.  So we were trying to show here the process that

5    was specifically devoted to developing and ultimately

6    sitting here today trying to confirm the alternative plan.

7    And so at the top there we have a timeline of particular

8    events that were important in that process.  Those are

9    represented with the taller green lines with diamonds at the

10   top.

11       And then we represented the formal joint board meetings

12   in the purple and gold lollipops which is what I call them.

13   But we decided to add a little splash of color to the many

14   green slides in this case and the LSU colors worked well

15   last year so I brought them back.  Go Tigers.  So we

16   represented the formal joint board meetings there with those

17   purple and gold indications.

18       And that at the bottom of the slide we attempted to

19   show the change in the facts as we understood them to be as

20   it related to taxable versus tax free and how we understood

21   those tax consequences prior to late May and then after late

22   May.  Because as the Court has heard a lot about, there was

23   a significant development there that changed our

24   understanding of the various tax consequences in the case.

25   Q    So let's tease that out.  So at the time of the filing

1   in May, you know, what was the debtors' general

2   understanding of what the tax consequences would be if the

3   Court approved a tax-free transaction and if we approved a

4   taxable transaction?

5   A     So at the time of the filing of the plan, as the left-

6   Side at the bottom shows, we understood and our tax advisor

7   understood that there would be no taxable gain on the

8   cancellation of TCEH's debt.  Therefore, the only tax that

9   would be triggered in a taxable separation would be based on

10  the difference between the basis step up -- I'm sorry --

11  based on the difference between the tax basis of TCEH and

12  its value.  And what that amount was we believed could be

13  potentially covered by the amount of NOLs that EFH had.

14        So therefore, for the first time in the case there was

15  a period of time there where we thought that a taxable

16  transaction might not leave a huge stranded tax at EFH.

17  However, we were still interested in avoiding a taxable

18  transaction for a few reasons.  One was at that point in

19  time we were still doing whatever we could to preserve the

20  possibility for EFH of converting to a Reed.  We were being

21  told by many creditors and by some of the parties that were

22  involved in the Hunt plan that they wanted to keep trying

23  for that plan.  That they might be able to reconfigure it in

24  a way to still have EFH become a Reed and our standing was

25  that a taxable transaction might jeopardize the potential

1       for EFH to become a Reed.  So for that reason, even though

2       we thought at that time there might be a big stranded tax,

3       we still were not -- we were still trying to avoid the

4       taxable scenario.

5               In addition to that, as it has been the case

6       throughout since going back all the way to 2012 and 2013, we

7       also wanted to avoid the taxable scenario because we

8       believed that it would be a big expense to all of the

9       estates to fight about the taxable transaction in court.

10      Q    All right.  And Ms. Dore, before I ask you to kind of

11      cover your understanding of what the results would be in a

12      tax-free scenario, I have to apologize.  I believe there's a

13      typo on the left-hand side of the chart as it relates to tax

14      free.  Do you see where it says NOLs not consumed in a tax-

15      free spin-off?  In a tax-free spin-off, what is your

16      understanding back then in May as to whether the NOLs would

17      survive on the E-side?  Would they be stopped on the E-side

18      or would they flow through?

19      A    We did not think at that time that whatever NOLs

20      weren't used for the tax-free spin-off would not benefit

21      EFH.

22      Q    All right.  So (indiscernible), your understanding is

23      the NOLs that were not consumed in a tax-free spin-off would

24      not survive?

25      A    Right.

1   Q    I apologize.

2   A    Just what it says.  Does it not say that?

3           THE COURT:  I think it says it.

4           THE WITNESS:  Yeah.

5   BY MR. MCKANE:

6   Q    All right.  Good.  Just wanted to make sure we're on

7   the same page.  I hate typos.

8   A    Okay.  Because I reviewed this this morning and I

9   thought it was right.  I think it's right.

10  Q    All right.  So with that understanding, let's go back

11  in time and walk through the governance from -- sorry.

12  A    Well, I just want to finish for completeness.  I didn't

13  talk about the right-Side.

14  Q    Okay.

15  A    So --

16  Q    Well, let me ask you a question about the side-Side

17  then.  After May 30th, what was the debtors' understanding

18  regarding the tax consequences of a proposed plan if they

19  went taxable versus tax free?

20  A    Yes.  So by late May we had learned from the IRS that

21  they were tentatively adverse on the Cody ruling and that --

22  you know, I'm not a tax lawyer but the gist of that was that

23  there was going to, once again, be a taxable gain that could

24  not be covered fully by EFH's NOLs and we learned that as a

25  result of that ruling if there were NOLs that were not

1    consumed in the tax-free spin-off, they could potentially

2    survive the restructuring and be available to EFH.

3    Q    Thank you, Ms. Dore.  All right.  With that general

4    baseline of understanding regarding the taxes, let's go back

5    in time and cover the governance, the Board governance

6    leading up to the filing of the plan reorganization, okay.

7    After confirming the sixth amended joint plan in December of

8    '15, what was the debtors' strategy on how to proceed with

9    reorganization?

10   A    Well, first of all, we devoted our -- as many efforts

11   as we could to getting Plan A to succeed at the PEC and we

12   spent a lot of time trying to support that process as well

13   as pursuing execution of the entire Plan A.  So we had

14   weekly calls with White & Case and with Hunt's counsel to

15   work on execution of that deal which involved, by the way,

16   negotiation of a lot of the same kinds of agreements that

17   we've ended up with today like the separation agreement, the

18   tax matters agreement.  Those are not new to Plan B.

19   They're slightly different because they were different

20   negotiating parties by this time, but all of that had to be

21   done in connection with Plan A as well and those were being

22   fully negotiated over the course of December, January,

23   February, March.

24        But at the same time, we knew from the way the

25   proceedings were going and some of the questions that were

1    being raised that there was a possibility that Plan A would

2    not close.  There were also market conditions at the time

3    that our advisors told us were potentially causing the deal

4    not to be as economic for the investors and so as a result

5    of all of that, we thought it was prudent and we had

6    specifically negotiated for the right to work on a Plan B

7    alternative in parallel and so we thought it was prudent to

8    kick that off in January.  There were a lot of board members

9    and others who, you know, really didn't want to even think

10   about having to have a Plan B but of course it became

11   necessary and so it was good that we started planning for

12   thought process as early as January 8th when we had our

13   first board meeting of the year.

14   Q    And were the disinterested directors of the three

15   primary estates involved in that parallel Plan B work

16   stream?

17   A    Yes, they were.  They were -- well, the directors were

18   involved as were all the members of the Board and then their

19   advisors were heavily involved starting, you know, as early

20   as January in trying to understand what the alternatives

21   were going to be.

22   Q    And based on your own interactions, what steps did the

23   disinterested directors and their advisors take to consider

24   the possible contingency scenarios?

25   A    The DDAs during the course of I would say January all

```
1    the way through really up until today but certainly through

2    June and July engaged in a very robust diligence process of

3    their own.  They sent diligence requests to the company.  I

4    facilitated meetings for the DDAs to talk to people at the

5    company about, again referencing what I was talking about

6    earlier, things like the cash forecast, how much cash was

7    going to be available at EFH and EFIH, what were the

8    professional fee expenditures that were projected to come

9    out of that cash.  What were various waterfall analyses for

10   the E-side creditors?  What could we do to think about a

11   marketing process or a new bidding process for EFH and not

12   the least of which in that process was a lot of diligence

13   around the tax issues and trying to make sure that they

14   understand fully all of the consequences of where we were on

15   tax.

16   Q    All right.  And how would the debtors' boards including

17   the disinterested directors kept informed of the potential

18   of these alternative instructions?

19   A    Through all these purple and gold lollipops.  So we had

20   meetings frequently in addition to, you know, as I said,

21   informal conversations with particular board members or, you

22   know, email updates, that sort of thing.

23   Q    And at what point in time did the debtors begin

24   discussions about Plan B alternatives with creditors?

25   A    So -- well, first of all, let me say we were very
```

1    sensitive in the January and February time frames and you

2    see a lot of references to this in the board decks.  We were

3    very concerned about -- even though we had the right to do

4    it under Plan A, we were very concerned about working

5    publicly, so to speak, on Plan B because we did not want --

6    there had been a lot of leaks in his case and the we did not

7    want the PEC or anyone else to know that we were thinking

8    about an alternative because we were fully committed to Plan

9    A closing and very much wanted it to close.

10        So we did not immediately contact, you know, the

11   various creditor groups.  We started first with internal

12   analysis in January of what the possible Plan B alternatives

13   could be but pretty quickly after that we did -- I believe

14   it was February 17th we had a meeting in New York with the

15   EFI second liens and the EFIH PICs and the TCEH first liens.

16   Separate -- they were in separate meetings but it was

17   throughout a day, it was a day's worth of meetings, where we

18   started to talk to them about we think it's really prudent

19   to start planning for a Plan B process.  We're fully

20   committed to Plan A but we don't want to be starting from

21   scratch on April 30th if Plan A doesn't consummate.

22        And we invited Fidelity as well to participate in those

23   meetings, however, Fidelity was an investor in Plan A and

24   declined to participate because understandably they were

25   committed to Plan A.  I think they had agreements among the

1    investors not to, you know, discuss alternatives and that

2    sort of thing.  So we unfortunately didn't have Fidelity in

3    those meetings although we invited them but all the other

4    major creditor groups we met with on February 17th in New

5    York to kick off that process.

6    Q    And when did the EFH Boards next receive a formal

7    update on the contingency planning after that February 17th

8    meeting?

9    A    On February 25th we had a board meeting that gave an

10   extensive update on our internal analysis, on what we were

11   hearing from creditors, as well as on the status of Plan A.

12   Q    And were you involved in the preparation of the

13   presentation to the Board on February 25th?

14   A    Yes, I was.  In fact, I did the first draft of that

15   board deck.

16   Q    All right.  And at a high level, what information was

17   presented to the Boards with respect to contingency planning

18   at that February 25th board meeting?

19   A    We presented at that meeting a number of tax

20   alternatives and we tried to put the Boards kind of in the

21   shoes of each estate and talk about from that estate's

22   perspective what would be the goals of a Plan B

23   reorganization and whether the various alternatives would

24   meet those goals.

25   Q    Well, if I could ask that you turn to one of the last

1   exhibits in your binder, DX103.  And Ms. Dore, do you

2   recognize DX103?

3   A    I do.

4   Q    Is this the presentation that was given to the joint

5   boards of EFH on February 25th?

6   A    Yes.

7   Q    Ms. Dore, are you aware of an assertion made by certain

8   EFH creditors that the Boards were not informed about the

9   potential value of the step up in bases with regards to a

10  busted 351 and the relationship of the value in the busted

11  351 approach as opposed to a taxable approach?

12  A    Yes.

13  Q    Can you turn to Slide 22 of 103?

14  A    Yes, I'm already there.

15  Q    All right.

16        MR. MCKANE:  And if we could publish that, please.

17  BY MR. MCKANE:

18  Q    Ms. Dore, what is this slide, Slide 22 on the value of

19  tax basis?  What does this present and tell the Board.

20  A    We were informing the Board that in the taxable

21  scenario TCEH would benefit from a step up in bases that had

22  a present value of close to half a billion dollars and that

23  in the tax-free scenario the partial step up would result in

24  a tax benefit of close to a billion dollars.

25  Q    All right.  And when you refer to this tax-free

1    separation, this would be the potential for like a busted

2    351 structure that was discussed?

3    A     Yes.  It was the tax-free separation with the busted

4    351.

5    Q     All right.  You mentioned that in the presentation to

6    the Board discussed trying to put the board members in the

7    perspective of the three estates; is that right?

8    A     Yes.

9    Q     If you could turn to Slide 28, please.

10              MR. MCKANE:  And if you would put that on the

11   screen.

12   BY MR. MCKANE:

13   Q     Can you walk the Court through what you were trying to

14   and explain to the Boards in Slide 28?

15   A     Yes.  So we were trying to encapsulate in one place the

16   various considerations from the perspective of each estate

17   that might be important to them, to that estate, in

18   evaluating restructuring alternatives, a Plan B alternative.

19   And so for example, for TCEH you see the only place we have

20   any text for TCEH is in the first consideration.  Does it

21   maximize step up?  And in the last one, is there a cash tax

22   liability?  Because in our view, from TCEH's perspective and

23   the first liens perspective, they wanted to maximize a step

24   up in bases and they also, of course, everybody wants to

25   avoid a tax cash liability.  But the other three

1    considerations here, minimizing E&P, permitting conversion

2    to a Reed and having a NOL cushion were not really concerns

3    of the TCEH estate.  Those were concerns of the E-side.  So

4    we were simply attempting in this chart to reflect what we

5    thought were the various motivations of the different

6    estates and their stakeholders.

7    Q    And specifically these are the various tax

8    considerations for each of the debtors' estates and

9    creditors; is that right?

10   A    Yes.

11   Q    All right.  And you mentioned Slide 28, does this same

12   type of analysis apply to multiple scenarios?

13   A    Yes.  We carried it through the different scenarios.

14   Alternative 1 being basically the Plan A which was the tax-

15   free spin-off with the busted 351 and conversion to a Reed

16   and, again, we believed at this time that -- we called it

17   actually Plan A Prime because we believed at this time that

18   there was still a possibility of salvaging Plan A

19   potentially with a slightly different makeup in investors

20   who were willing to abide by the PEC conditions and so we

21   were still looking at that alternative and then we were also

22   looking at of course taxable deconsolidation of TCEH,

23   taxable deconsolidation of both EFIH and TCEH, and then

24   Alternative 4 which is where we ended up today which is the

25   TCEH tax-free spin-off with a busted 351 and EFH remaining a

1    C Corp.

2    Q    All right

3           MR. MCKANE:  And if we could possibly put Slide 31

4    on the screen, I'll turn to 4.

5    BY MR. MCKANE:

6    Q    If I understood your testimony, this Alternative 4

7    ultimately is where we ended and this is the plan that's

8    pending before the Court?

9    A    Yes, this is the plan pending before the Court.

10   Q    And what involvement did the disinterested directors

11   and the disinterested director's advisors have?  I'm sorry.

12   You need to clarify something?

13   A    Let me correct one thing I said.  This is the -- the

14   structure reflects the plan pending before the Court but as

15   you see here, this just confirms what I was talking about

16   earlier.  On Slide 31, if you look at the NOL cushion line,

17   it talks about from an EFH perspective, yes, there's going

18   to be cushion of NOLs for the busted 351 but any NOLs not

19   used in the busted 351 at this time we believed were going

20   to be eliminated through the reduction as a result of Cody.

21   So that reflects the fact that we didn't think any leftover

22   NOLs would be available for EFH however a cushion was still

23   important to us to make sure that if we were wrong about the

24   valuation of TCEH and the IRS had a different view after the

25   fact that there were still NOLs left at EFH to cover the

1   total tax that resulted from the busted 351 even if we had a

2   difference of opinion about valuation.

3   Q    All right.  And what steps did the debtors take after

4   this February 25th presentation to move forward with getting

5   a Plan B, whatever alternative it was going to be, ready in

6   advance of April 30th?

7   A    So we spent a lot of March really with the DDAs and

8   they were doing a ton of work on their own around coming up

9   with alternative plan structures, talking to their creditor

10  constituencies and they would report back to us.  And so

11  basically we were having some conversations with creditor

12  advisors.  We didn't have any other formal meetings with

13  creditors in March because we were trying to come up with a

14  term sheet that we would circulate and if the DDAs agreed to

15  it, we would circulate to the creditors to sort of kick

16  start those Plan B discussions.  But we were inviting

17  frequently.  We were inviting the E-side creditors to please

18  submit proposals of their own if they had proposals to make.

19  And again, the difficulty was in particular with Fidelity

20  that they were committed in Plan A and they really weren't

21  going to engage heavily with us until Plan A had fallen

22  apart.

23  Q    All right.  And you mentioned in your answer due

24  diligence by the disinterested directors and advisors in

25  this March time period.  What personal involvement did you

1   have with their diligence efforts?

2   A    So they would frequently -- particularly Proskauer who

3   was again very focused on the effects of the EFH creditors

4   of Plan A not being consummated.  But all of the DDAs would

5   direct diligence requests through me and I would facilitate

6   often setting up the meeting.  Sometimes I would actually

7   participate in the meeting.  Sometimes I wouldn't.  But they

8   did a lot of diligence with us on those issues.  They also

9   would -- we would have conference calls.  For example, I

10  remember a conference call with Proskauer in which they

11  presented to us that they had gone back and looked at the

12  settlement agreement and they did not believe that the NOLs

13  -- that it was dictated that the NOLs go to any particular

14  place in Plan B and therefore they were going to ask the

15  first liens to compensate EFH for the NOLs.  And --

16  Q    Go ahead.

17  A    And so they reported to us that they -- that Mark

18  Thomas had spoken to Alan Kornberg, that his request for

19  compensation had been rejected and so they were coming to us

20  to say that they were trying to come up with alternative tax

21  structures that would potentially provide a lower step up in

22  basis to the T-Side which would preserve more value for the

23  E-side and ultimately those attempts to have those

24  discussions between Proskauer and Paul Weiss were rebuffed

25  by the first liens, as well.

1          UNIDENTIFIED SPEAKER:  Your Honor, move to strike

2     (indiscernible).

3          THE COURT:  And what's your basis for motion to

4     strike?  I'm sorry.

5          UNIDENTIFIED SPEAKER:  Hearsay.

6          MR. MCKANE:  Your Honor, Ms. Dore is providing,

7     you know, her takeaway, her opinion, her lay opinion under

8     702 based on her understanding of the situation which as a

9     lay witness is based on her percipient observations

10    including the communications from Proskauer.  So that's a

11    one leveled answer and it also goes to -- that statement is

12    -- you know, it can come in for a hearsay objection for the

13    truth of the matter asserted.  In addition, it can come in

14    for the fact that the statement was made, whether true or

15    not, because that statement then helped form her inner

16    analysis and her exercise of her business judgment.

17         UNIDENTIFIED SPEAKER:  Your Honor, it can't come

18    in at all for the truth of the matter asserted unless

19    there's a right to cross-examine the declarant who literally

20    is in court but of course for a variety of reasons hasn't

21    been brought as a witness.  And then with regard to what may

22    have formed her state of mind, if she were the decision-

23    maker that might be relevant but she's in fact just an

24    advisor to the decision-maker and actually not technically

25    an advisor on what matters which we believe is

1    (indiscernible).

2            THE COURT:  All right.  I'm going to overrule the

3    objection.  I believe that -- I agree with most of

4    Mr. McKane's position.  First, I don't believe it's hearsay

5    because she's offering her opinion as to what the state of

6    negotiations were at the time she was engaged in these

7    activities.  In addition, it certainly goes to her state of

8    mind as an advisor to the Board and since the EFH indentured

9    trustee at least at one point had implicated the duty of

10   care as part of its objection to the plan, what the advisor

11   was telling the Board is clearly relevant and the state of

12   mind in coming up with that advice is clearly relevant.  So

13   for those reasons I'll overrule the objection and Proskauer

14   will not be subject to cross-examination.

15   BY MR. MCKANE:

16   Q    So Ms. Dore, in your answer you touched on a number of

17   issues and reports you received from Proskauer.  I'm going

18   to take them in chunks.  All right.  Specifically, can you

19   describe for you what was reported to you by Proskauer of

20   the work they were doing in evaluating plan alternatives

21   that consumed (indiscernible)?

22            MR. SOWA:  Objection.

23            THE COURT:  Overruled.

24            THE WITNESS:  Yes, Mark Thomas and I during that

25   period in March and April spoke frequently.  Mark Thomas

1    with Proskauer as he was -- he and his tax advisors were

2    attempting to evaluate potential tax alternatives to the one

3    that we had on the table and so he -- obviously his tax

4    lawyer, I think his name is Stu, would speak to K&E's tax

5    lawyers, would speak to Carla Howard at the company, would

6    speak to Paul Keglevic and they -- you know, to make sure

7    that the assumptions, for example, that Proskauer was using

8    synched up with the company's assumptions.  And he reported

9    to me that they had come up with an alternative that would

10   provide a lower step up in basis for TCEH and potentially,

11   you know, create more value for the E-side and that he was

12   going to and did speak to Paul Weiss about that sort of

13   under the theory that we're in a new world.  We're in Plan

14   B.  You're not -- you, the first liens, are not entitled to

15   the NOLs by law or by settlement agreement and therefore we

16   think you should take a lower step up in bases and, you

17   know, share some of the pain, so to speak, of Plan B and the

18   first lien said no.

19            THE COURT:  What was the time frame?

20            THE WITNESS:  This was in the March/April time

21   frame.  I recall specifically a conference call on April 7th

22   with Proskauer in which the results of that were reported

23   but the work had been going on sometime prior to that.

24   BY MR. MCKANE:

25   Q    Thank you.  And just to clarify the record, Mr. Thomas'

1    tax partner at Proskauer, is that Stuart Rosell?

2    A    Yes.

3    Q    And did your discussions with Mr. Thomas about

4    alternatives also include potential compensation for the

5    NOLs?

6              UNIDENTIFIED SPEAKER:  Objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  Yes, prior to even -- I think part

9    of what spurred Proskauer on to analyzing potential

10   alternative tax transactions with a lower step up is that

11   the TCEH persons had already rejected any notion that they

12   would pay for the NOLs and of course they had one that

13   throughout the case but they had reaffirmed that to

14   Mr. Thomas.  I believe at some point during this time period

15   certain EFH creditors also made a demand on the TCEH first

16   liens for compensation.  They had rejected that and so

17   Proskauer was attempting to come up with something other

18   than just straight cash compensation as a way to reach a

19   compromise and that's what caused them to think of the

20   alternative for a lower step up in basis for T.

21             UNIDENTIFIED SPEAKER:  Move to strike.  It was

22   nonresponsive and brought in a whole additional couple

23   layers of hearsay.

24             THE COURT:  Overruled.

25             MR. MCKANE:  All right.  If we could go back to

1    the timeline, the Dore demonstrative.

2    BY MR. MCKANE:

3    Q    All right.  Ms. Dore, you mentioned -- I just want to

4    kind of (indiscernible) the discussion with regard to your

5    timeline, as well.  While all this due diligence is going on

6    and these efforts are going on with the disinterested

7    directors and advisors, can you kind of overlay what's going

8    on with the (indiscernible) process in March and early

9    April?

10   A    So there were a number of hearings that had taken place

11   in Austin at PEC, all of which I attended starting I think

12   in December and then some in January, February, March, all

13   of which culminated in the PEC issuing an order on March

14   24th that in fact did approve the transaction but placed a

15   number of conditions on it which the investor group

16   ultimately informed us had made the deal uneconomic for

17   them.  In addition to that, something we didn't really

18   anticipate occurred which was in the March 24th order the

19   PEC said it was not going to approve the lease which is

20   basically the essence of the (indiscernible) transaction as

21   a lease between what's called Opco and Prop Co and they were

22   not going to approve the lease as a tariff until the August

23   hearing.  That caused the TCEH first liens after analyzing

24   the order to conclude that the order did not meet the

25   requirements of the PSA which required all necessary PEC

1    approvals to be obtained to consummate the transaction by

2    April 30th.  So the TCEH first liens sent a letter reflected

3    on the timeline on April 7th to the TCEH unsecureds that

4    said you have not met the requirements of the PSA, the order

5    doesn't meet the requirements of the PSA and therefore

6    unless you pay for your extension, which they had negotiated

7    the right to do, the plan is going to terminated, the PSA is

8    going to terminate on April 30th.  We were -- I personally

9    was involved in a lot of discussions during that time period

10   about ways perhaps that we could get the PUC to fix that

11   issue or address that issue perhaps by accelerating, for

12   example, the least of the tariff proceeding.  You know,

13   there were a lot of discussions going on about to avoid that

14   April 30th termination but ultimately we weren't able to get

15   there and the first liens sent their plan support

16   termination notice on April 30th.

17   Q    All right.  Ms. Dore, in your answer you referenced an

18   April 7th letter that the TCEH first liens sent the ad hoc

19   unsecured group of TCEH creditors.  How do you know about

20   that letter?

21   A    Because it was sent to me.

22   Q    And how did the debtors proceed in light of these

23   developments, the PUC T ruling and then deliberate the

24   letter by the first liens?

25   A    So we were already in the process of preparing the plan

1    term sheet that I mentioned earlier and of course these

2    events just caused us to want to accelerate that process.

3    We had told the Board as far back as February that our goal

4    in the event that Plan A didn't consummate was to have a

5    plan ready to file on April 30th because we knew that

6    exclusivity had expired, that anyone could come in and file

7    a plan and we very much wanted to avoid a scenario of

8    competing plans and so we were working on a term sheet at

9    that time.  We ultimately ended up circulating that term

10   sheet to creditors and talking in particular to the TCEH

11   first liens during that April time period about what their

12   plans were.  They made it very clear that if we did not file

13   a plan on April 30th that was to their satisfaction, they

14   were going to file a competing plan and that plan was -- in

15   fact what they suggested was they were going to file a

16   taxable plan that only had a toggle to a tax-free scenario

17   if in their words "the E-side got their act together".

18            UNIDENTIFIED SPEAKER:  Move to strike.

19            THE COURT:  Overruled.

20   BY MR. MCKANE:

21   Q    All right.  Ms. Dore, when did the debtors circulate

22   the proposed Plan B term sheet?

23   A    I think we circulated on April -- oh, it's right here -

24   - April 25th because we had notified the Board about it the

25   day before and then we circulated it to the creditors on

1    April 25th.  We had a call with the PICs on April 27th to

2    get their feedback on the term sheet and the PICs informed

3    us that they understood that we needed to file a plan to

4    avoid the TCEH first liens filing their own plan.  They

5    didn't have any comments on the T-Side aspects of the plan

6    as it related to the tax-free spin and the busted 351, but

7    they very much wanted us not to include valuation

8    information for the E-side in the plan that we filed because

9    they did not want to prejudice the sales process and we took

10   that into account and decided to take the valuation

11   information out for the E-side when we filed the plan.

12   Q    All right.  And prior to removing some of that E-side

13   sales process -- sorry.  Prior to removing that E-side sales

14   information from the proposed plan, had the disinterested

15   directors and their advisors been working with regards to

16   the equity splits of that (indiscernible)?

17   A    Yes.  They had -- if I recall correctly, the

18   disinterest directors had declared the equitization splits a

19   conflict back in July or August of 2015 because, if you

20   recall, at that time we were also discussing the possibility

21   of a standalone equitization plan on the E-side.  So

22   essentially they just revived those discussions in April of

23   2016 so that when we filed the plan we once again had -- we

24   tried to build in as much optionality for the E-side as

25   possible.  And so we had a standalone equitization

1    possibility.  We had a possible third party investment or

2    sale option.  And then I forget now.

3    Q    You also reserved Reed option.

4            THE COURT:  You had a Reed option.

5            THE WITNESS:  We had the Reed option.  That's

6    right.  We were protecting the Reed option.

7    BY MR. MCKANE:

8    Q    All right.  So given your understanding of the tax

9    consequences, why were you worried about the T-Side

10   proposing a taxable transaction at that time?

11   A    Well, for one thing, we were worried about the Reed

12   optionality and we did not want to do anything that --

13   especially in public jeopardize the Reed option because the

14   IRS, recall, was still considering the PLR as it related to

15   the Reed transaction and we did not want to do anything that

16   suggested that we were going to go taxable and there would

17   be no Reed.  We also, as I mentioned before, we were always

18   focused for the last four years on, if possible, avoiding a

19   taxable transaction because we knew that it was going to

20   lead to long protracted expensive litigation among the

21   estates and with the IRS.  So we knew that at the end of the

22   day it might not be possible to avoid a taxable transaction

23   forever but we were going to do everything we could to try

24   to avoid that scenario for all of these dates.

25   Q    All right.  Let's talk about the potential costs

1    associated with a litigation related to a taxable

2    transaction for a minute, okay.  Right now what is the

3    debtors' best estimate of when the E-side would potentially

4    emerge in a tax-free scenario?  What's the target date you

5    all are using?

6    A    Well, the target date we're using in our tax

7    projections just because we don't -- we haven't -- the PUC

8    application hasn't been filed yet for the new plan and that

9    will start the new six month clock.  But right now we're

10   projecting a 331 emergence for the E-side.

11   Q    And for your task projections --

12   A    I'm sorry.  March 31st of 2017.

13   Q    Yes.  Just to be clear, March 31 of '17.

14   A    Yes.

15   Q    All right.  And what is the projected distributable

16   cash that you're using in your cash projections for EFH Corp

17   as of that date?

18   A    We are projecting that EFH will have approximately $250

19   million of distributable cash at that point in time.

20   Q    Yeah.  And you've mentioned that it would be a

21   protracted litigation.  Are you aware of Mr. Prodony's

22   assertion even in the opening statement that the courts

23   could take notice that there would be, quote, "delay, delay,

24   delay" before we got the tax on again?

25   A    Yes.

1    Q    Do you think that delay, delay, delay is in the best

2    interest of EFH creditors?

3    A    No.  In fact, as I mentioned, we -- it is a -- there's

4    a constant cash burn at all of the estates really, but at

5    EFH where we've been so vigilant to try to protect what is a

6    dwindling amount of cash there, we were very concerned in a

7    taxable scenario that there would be long litigation with

8    additional costs to the estate.  And sitting here today, for

9    every month past March 31st that goes by for the EFH estate,

10   it's cash is reduced by approximately $10 million.  And that

11   may not sound like a lot in the context of this case, but

12   $10 million on a $250 million distributable value for every

13   month that goes by could really impact the amount of cash

14   that's available to distribute to EFH creditors.

15   Q    So if the --

16   A    And by the way, that $10 million is without taking into

17   account additional litigation expense associated with

18   litigating a taxable plan.  That's just the cash burn today.

19   Q    That's just using the historical (indiscernible) of

20   these cases for the EFH estate alone?

21   A    Correct.

22   Q    All right.  And so if the litigation associated with

23   going taxable were to take a year and such that the

24   emergence of the EFH estate was delayed by a year, how much

25   cash would the EFH estate lose?

1   A      Upwards of $120 million.

2   Q      And so that would be just slightly more than half of

3   the -- would be less than slightly half -- excuse me.

4   A      Around half of it would be left.

5   Q      That's what I was trying to say.

6              MR. MCKANE:  Your Honor, I am very conscious of

7   what time it is and I know the representation I made about

8   Ms. Dore's examination, vis-à-vis Mr. Keglevic's

9   examination, and my sense is it's going to be a little more

10  Keglevic-like than I expected.  So it would be okay to -- we

11  would support taking -- I'm at a break so it may work best

12  to take a break at this time.

13             THE COURT:  All right.  We'll take lunch.  That's

14  fine.  We'll reconvene at 2:00.

15             Ms. Dore, during the break you may not discuss the

16  substance of your testimony with any person.

17             THE WITNESS:  Yes, sir.

18             THE COURT:  Thank you very much.

19             We're in recess until 2:00.

20        (Recessed at 1:01 p.m.; reconvened at 2:06 p.m.)

21             THE CLERK:  All rise.

22             THE COURT:  Please be seated.

23             MR. MCKANE:  Okay.

24                  DIRECT EXAMINATION (Resumed)

25   BY MR. MCKANE:

```
 1    Q    Ms. Dore, you mentioned that the plan was filed on

 2    May 1st and I'd like to briefly cover the governance process

 3    and the days leading up to the May 1 filing of the plan,

 4    okay?

 5    A    Okay.

 6    Q    All right.  Referring back to the demonstrative that's

 7    tab 1 of your binder, and if you'd put that back up on the

 8    screen.  All right.  After the Plan B term sheet was

 9    circulated on April 25th was there a meeting of the joint

10    boards of EFH?

11    A    Yes.

12    Q    And when was that?

13    A    On April 29th.

14    Q    All right.  And, Ms, Dore, if you could maybe move your

15    mic closer?

16    A    Oh, sorry.  April 29th.

17    Q    All right.  And did the DDAs, the disinterested

18    director advisors, participate in the April 29th meeting?

19    A    Yes.

20    Q    All right.  And did the -- any of the disinterested

21    director advisors give an update regarding their

22    understanding of the TCEH first lien positions and strategy

23    as it relates to the potential termination of Plan A?

24    A    Yes.

25              MR. PEDONE:  Objection.  To the extent the answer
```

1    ends up bringing in hearsay concerning what was provided in

2    the update.

3              THE COURT:  Overruled.

4              MR. MCKANE:  And, Your Honor, this is -- I'm

5    referencing minutes that are already in evidence.

6    BY MR. MCKANE:

7    Q    If I could have you direct your attention to DX-96 in

8    your binder.  It's the second to last tab.

9    A    Okay.

10   Q    Ms. Dore, you were at this meeting, right?

11   A    Yes.

12   Q    All right.  And if I can direct your attention to the

13   bottom of page 2 and the top of page 3.

14             MR. MCKANE:  Put that up on the screen.

15   BY MR. MCKANE:

16   Q    Do you recall Mr. Walper of the Munger firm providing a

17   report regarding the TCEH first lien positioning?

18   A    I do.

19   Q    And what did he report?

20   A    He reported that as they had been saying to us for

21   several weeks they were going to send a plan support

22   termination notice at 12:01 a.m. on May 1st, they were --

23   they had a plan of reorganization ready to file that was a

24   taxable alternative, although they had agreed that if we

25   filed an alternative plan consistent with the terms that we

1    had negotiated with them, both in the PSA and also during

2    that month of April, that they would forbear essentially

3    from filing their own plan.

4    Q    And just to be precise for the record, the they you're

5    referring to are the TCEH first lien creditors?

6    A    Yes.

7    Q    And did the boards also meet the following day?

8    A    Yes.

9    Q    Is it unusual to have back-to-back board meetings?

10   A    Yes.

11   Q    Why did you have back-to-back board meetings?

12   A    When we met on April 29th we were discussing the

13   alternative plan that we had drafted and educating the board

14   about that.  We were also discussing the question of whether

15   we would terminate the merger agreement at the same time or

16   right after the TCEH firm liens terminated the PSA.  And we

17   would normally give the board that opportunity on the 29th

18   to digest what we were saying and perhaps come back to them,

19   you know, within a few days and ask for a vote.

20         But what had occurred at this point in time was

21   the following week, on I think May 4th, was our normal in-

22   person quarterly board meetings, they were already on the

23   schedule, so I asked Kirkland to ask Paul, Weiss if they

24   would please give us until Wednesday or Thursday of the next

25   week to get our final board vote on the plan and file it, I

1    didn't think the three or four days difference would be that

2    harmful and it would give our board a little bit more time.

3    And they asked them and Paul, Weiss said absolutely not.  If

4    you don't file a plan on May 1st we're going to file our own

5    plan.

6    Q    And so the first liens were unwilling to forbear even

7    for four days?

8    A    Correct.

9    Q    And so what was discussed on April 30th?  Or what day

10   of the week is April 30th?

11   A    I think it's a Sunday.

12   Q    All right.

13            MR. PEDONE:  Objection.

14            MR. MCKANE:  On the day of the week?

15            MR. PEDONE:  No, on what was discussed.

16            THE COURT:  Overruled.

17   BY MR. MCKANE:

18   Q    All right.  What was discussed?

19   A    On April 30th?

20   Q    Yes, please.

21   A    On April 30th we made our final recommendation after

22   having had the meeting the day before to discuss the details

23   of the plan and the DDAs had had a chance by Sunday to meet

24   separately with their advisors.

25            So we came back together on Sunday the 30th, made

1    our recommendation to the board that they approve the plan

2    for filing and also authorize us to terminate the merger

3    agreement as soon as we received the plan support notice.

4            And it bears mentioning that we made all of that

5    conditioned on receiving the plan support notice from the

6    TCEH first lien.  If they had chosen, for example, to wait a

7    few days then we would have waited a few days, but we felt

8    like it was important as soon as we received that notice

9    from them to be able to file our own plan, because we knew

10   the first liens had prepared their own plan and we didn't

11   know if there were other creditor constituencies that

12   perhaps were working on plans, and we wanted to be the first

13   one to file a plan.  We thought that was important to

14   maintain control of the case.

15           So the board approved the filing of those plans

16   and merger agreement termination notice, and at some time

17   that -- early the morning of May 1st we filed the plan.

18   Q    All right.  If you could -- in your binder let me

19   direct your attention to DX-94.  Are you there?

20   A    Yes.

21   Q    Ms. Dore, are these the minutes of the joint meeting on

22   April 30th, including the resolutions to file the May 1

23   plan?

24   A    Yes.

25   Q    And did the disinterested directors and their advisors

1    participate in this meeting?

2    A    They did.

3    Q    And did they weigh in on the plan of reorganization

4    before the vote?

5    A    Yes, they did.

6    Q    And what was the -- what was reported regarding the

7    disinterested directors' position, including especially the

8    EFH disinterested directors?

9    A    Yes.  So Proskauer reported that they had met with the

10   disinterested directors of EFH Corp. and they had approved

11   the filing of Plan B after numerous conference calls with

12   various parties and discussions of Plan B, and they had

13   approved it insofar as it related to conflict matters.

14   Q    All right.  Ms. Dore, did any -- you previously

15   mentioned before filing the plan there were negotiations and

16   meetings with creditors, right?

17   A    Yes.

18   Q    Did though meetings stop after you filed a plan?

19   A    No, in fact we scheduled -- promptly upon filing a plan

20   we reached out to all of the creditor constituencies again

21   and we scheduled a round of meetings and scheduled those for

22   May 10th in New York.

23   Q    And which creditor constituencies met with the debtors

24   on May 10th?

25   A    We met with the advisors to the PICs, EFIH PICs, and we

1    met with actually principals and advisors from the EFIH

2    second liens and principals and advisors from Fidelity, and

3    we met with the TCEH first liens again.

4    Q    All right.  And what was the debtors' approach to the

5    negotiations with the creditors and principals for the EFH

6    and EFIH creditor constituencies on May 10th?

7    A    We described again to them the events that had led up

8    to the filing of the plan, we had described the plan to

9    them.  Of course they had the plan, it had been filed and

10   that had reviewed it.  But we talked about what was

11   contained in the plan.

12            And the primary focus of the -- those discussions

13   with the E-Side creditors was on basically filling in the

14   blank on the E-Side, what -- how were we going to come to a

15   resolution on how the E-Side was going to be resolved, and

16   we practically begged the E-Side creditors to, you know,

17   submit a proposal, several of them said that they thought

18   they might have proposals to take out -- to basically

19   purchase the company with new money.  We said they needed to

20   come forward with those quickly, because by that time we had

21   already gotten a proposal from NextEra, they had asked us

22   not to engage heavily with NextEra just yet because they

23   wanted to have time do see if they could come up with

24   something on their own.  We obliged that request for a short

25   period of time.  And essentially the discussions revolved

1    around what's going to happen to the E-Side.

2    Q    All right.  And those discussions are included with

3    principals from Fidelity?

4    A    Yes.

5    Q    Was there any discussion about the consumption of NOLs

6    or the busted 351 at this meeting by -- issued raised by the

7    EFH creditors?

8    A    No, none of the EFH creditors or EFIH creditors ever

9    suggested that we should be doing anything different with

10   the T-Side than the plan -- the tax-free spin with the

11   busted 351, they never asked us to demand compensation.

12            As I mentioned, I think that separately Fidelity

13   actually had -- Fidelity and a group of EFH creditors had

14   demanded compensation and the TCEH first liens had not

15   accepted that.

16            But they certainly didn't make that demand on us,

17   they didn't ask us to go back and ask for a lower step up.

18   The focus was on what was going to happen to the E-Side.

19            The only thing that was really mentioned with

20   respect -- in the Fidelity meeting with respect to the

21   T-Side was a desire on Fidelity's part for TCEH to agree to

22   subordinate some portion of its $700 million claim at EFH.

23   Q    And so what -- and in the Fidelity meeting what was the

24   proposal that Fidelity offered to incentivize the TCEH first

25   lien creditors to subordinate a part of their $700 million

```
 1   claim?

 2           MR. PEDONE:  Objection.  It's hearsay.

 3           THE COURT:  Overruled.

 4           THE WITNESS:  Fidelity simply said that the only

 5   way they could agree to allow the T-Side to go fast was if

 6   the T-Side agreed to subordinate part of the claim.

 7   BY MR. MCKANE:

 8   Q    All right.  And so they offered speed?

 9   A    Yes.

10   Q    And consensus?

11   A    Yes.

12   Q    You mentioned proposals that were floated around, that

13   might be forthcoming from EFH creditors.  Did you ever

14   receive a proposal from the EFH creditors?

15   A    We never received a plan proposal from EFH creditors.

16   At some point I think in June there was a proposal from

17   Fidelity about the terms on which it could support a bid

18   from NextEra and withdraw its objections to the T-Side, but

19   it wasn't a plan proposal, it simply had to do with what

20   percentage recovery they wanted in order to do that.

21   Q    All right.  And did you ever receive any type of demand

22   letter, you know, to the EFH board, you know, raising issues

23   about the consumption of the NOLs or suggesting they should

24   be a lower amount of NOLs consumed as part of the T-Side

25   plan?
```

1    A    No, we never heard -- we never received a letter, I

2    never received a phone call, I'm not aware of anyone in the

3    company ever receiving a phone call or a letter regarding

4    consumption of the NOLs and compensation for those or

5    regarding the amount of the step up in basis that was being

6    provided in the busted 351.

7    Q    All right.  Let's transition to kind of the initial

8    indications from the IRS about the prior letter going, okay?

9              In May of 2016 what indications were the debtors

10   receiving from the Internal Revenue Service regarding their

11   position with relation to the debt characterization ruling

12   or the Cody (ph) ruling?

13   A    Some time in May of 2016 we got a preliminary

14   indication from the IRS that they were going to be

15   tentatively adverse on what I call the Cody ruling.  I think

16   it's been called the debt characterization ruling.  Which,

17   you know, at a high level to me as a non-tax lawyer to

18   submit that the transaction -- the taxable transaction was

19   now going to include the cancellation of TCEH's debt as

20   income to EFH.

21   Q    Okay.  And how did that information affect the debtors'

22   approach to the proposed -- the plan on file?

23   A    Well we considered it and we reevaluated what it meant

24   for all sides, and at the end of the day we concluded that

25   it made it even more important that we keep the TCEH first

1   liens on board with the tax-free spin to avoid the taxable

2   scenario.  Because whereas prior to that feedback in May we

3   thought that if the worse case happened and the TCEH first

4   liens filed a taxable plan and actually consummated a

5   taxable plan EFH potentially had enough NOLs to cover the

6   tax.  After that feedback in May we were very concerned

7   about -- even more concerned about the filing of the taxable

8   plan.

9   Q    All right.  Well did the debtors view the IRS position

10  as final in May?

11  A    No.

12  Q    All right.  But did you avoid the -- did you advise the

13  board regarding the IRS position?

14  A    Yes.  We had a joint board meeting on June 10th, and we

15  informed the board that we had received that preliminary

16  feedback from the IRS, we informed them that we had what's

17  called a conference of right with the IRS and that numerous

18  creditors as well as the DDAs had been very clear that they

19  wanted to take advance of that conference of right and try

20  to dissuade the IRS from that position.

21  Q    All right.  Let me direct your attention to DX-61 in

22  your binder.

23  A    Okay.

24  Q    Do you recognize it?

25  A    Yes.

1    Q    Is the DX-61 the restructuring update that was

2    presented to the joint boards of EFH on June 10th of 2016?

3    A    Yes.

4    Q    All right.  Let me direct your attention to slides 6

5    and 7.

6           MR. MCKANE:  Put those on the screen as well.

7    BY MR. MCKANE:

8    Q    All right.  In slide 6 -- are you with me, Ms. Dore?

9    A    Yes.

10   Q    What were you trying to convey to the boards in the

11   TCEH tax update regarding the IRS ruling?

12   A    We were trying to convey the importance of this

13   feedback and what it could mean for EFH in particular that

14   the taxable separation could now once again led to a multi-

15   billion dollar tax liability.

16   Q    All right.  And were the -- you mentioned the DDAs were

17   involved in the process and in fact wanted to go to the

18   conference of right.

19   A    Yes.

20   Q    What level of involvement did the DDAs have from your

21   direct observations in the private letter ruling process?

22   A    They were very involved.  I think they attended most of

23   the conference calls with the IRS, they attended, you know,

24   all of the calls where our tax advisors would keep the

25   creditor advisors up to speed.  They basically followed

1    along side Kirkland and our tax group the whole way.

2    Q    And you mentioned the IRS conference of rights in -- I

3    believe that was in mid-June; is that right?

4    A    Yes.

5    Q    Now did the debtors' understanding of the IRS position

6    change after the conference of right?

7    A    The debtors did not.  I think you heard Ms. Howard

8    testify that different people came out of that meeting with

9    different opinions, but our -- the debtors' view was that it

10   just further confirmed that the IRS would in fact be adverse

11   on that issue, and they were when the PLR came out.

12   Q    Uh-huh.  And, Ms. Dore, what impact did the IRS

13   position on the Cody ruling have on the debtors' negotiating

14   position with the first liens?

15   A    Well we had already negotiated, essentially we had

16   proposed a plan with the tax-free transaction and the busted

17   351, and we were by that time moving forward with a schedule

18   to confirm that plan.  And it certainly -- the impact of

19   this tax ruling meant that we had even less leverage to

20   convince the first liens to stick with that plan, and so it

21   became even more important to us that we adhere to the

22   schedule and get this plan confirmed, because we continued

23   to believe that it was the best plan for all estates, but in

24   this instance even more so at this point for EFH.

25   Q    All right.  And did the debtors update the joint boards

1    after the conference of right?

2    A    Yes.  We had a board meeting on June 24th.

3    Q    All right.  Now, Ms. Dore, I believe you just testified

4    that you had -- you reevaluated the positions after the

5    conference of right?

6    A    Yes.  We -- well all through this period we were

7    looking at what this really meant for the parties, and in

8    some ways although the feedback we got from the IRS on the

9    Cody ruling was not what we had hoped for, in some ways it

10   sort of funneled the parties' options, you know, into the

11   plan that we were actually trying to confirm.  In other

12   words, it just further confirmed that the path we were

13   pursuing was the right one for EFH because the alternative

14   was the tax Armageddon that we've heard so much about.

15   Q    Okay.  And did you provide -- or excuse me -- did you

16   present to the joint boards the debtors' reevaluation and

17   reassessment of the plan in July of this year?

18   A    Yes.  I mean starting in, you know, June 24th we

19   reported on the conference of right, and then in July we had

20   a series of meetings where we again reaffirmed that we had

21   gone through the tax analysis, what the various interest of

22   the parties were, and that we believed -- we continued to

23   believe, as did the DDAs, that we were on the right path.

24   In fact the silver lining, so to speak, in the adverse

25   ruling from the ISR on the Cody ruling was that now it

1    turned out we thought the EFH estate would get to keep some

2    of the NOLs and have them survive restructuring, which we

3    thought was a positive that we did not expect to be able to

4    deliver.

5    Q    All right.  And, Ms. Dore, are you familiar with the

6    term ancillary agreements?

7    A    Yes.

8    Q    What are the ancillary agreements?

9    A    The ancillary agreements are the agreements essentially

10   that effectuate -- help to effectuate the plan, and they're

11   some of the same ones I mentioned that we had had to

12   negotiate in Plan A, these were the ones that we negotiated

13   for Plan B, and they include the tax matters agreement, the

14   separation agreement, and the interim transition services

15   agreement.

16   Q    And what role did you play with respect to the

17   ancillary agreements?

18   A    I was heavily involved in the negotiation of the

19   separation agreement and the interim TSA.  I negotiated

20   those with NextEra and of course with the DDAs help and

21   input.  And then on the TMA of course I was responsible for

22   making sure it got done, but I was not directly negotiating

23   that agreement, that was really primarily between the tax

24   advisors.

25   Q    All right.  And did you prepare a demonstrative to aid

1    your testimony today regarding with whom the debtors were

2    negotiating these ancillary agreements?

3    A    Yes.

4    Q    And that demonstrative number 2, tab 2 of your binder.

5    A    Yes.

6    Q    All right.  And can you walk --

7              MR. MCKANE:  I need to publish that, please.

8    BY MR. MCKANE:

9    Q    And can you walk the Court through what you're trying

10   to convey as it relates to the negotiating parties and

11   purpose of the ancillary agreements?

12   A    Yes.  This chart is pretty straightforward, but we're

13   just showing here, for example, the tax matters agreement

14   the bolded parties are the actual parties to the agreement

15   who will sign on the effective date of the T-Side plan, so

16   that agreement will be between EFH and the new TCEH.  But

17   we're showing here that, for example, for EFH there were

18   multiple parties involved in negotiating on behalf of that

19   estate, including NextEra, EFH and EFIH, itself, and then

20   the DDAs for those estates.

21   Q    And just for the record NEE is the stock ticker symbol

22   for NextEra?

23   A    Yes, correct.

24   Q    Why is --

25   A    And then --

1    Q    Sorry.

2    A    I'm sorry.

3    Q    Why is EFIH, you know, involved in the tax matters

4    agreement?

5    A    Well EFIH has -- ultimately EFIH and its DDAs approved

6    -- did not -- I think the way we worded it in the resolution

7    is they did not object to the tax matters agreement.  They

8    didn't, you know, affirmative approve it because it's not

9    between them and anyone.  But EFIH certainly has an interest

10    in its parent avoiding the taxable scenario and avoiding

11    risk even associated with the tax-free scenario, because as

12    I think you've heard some in this court if EFH ended up with

13    a stranded tax of some sort it would make it more likely

14    that EFIH would attempt to deconsolidate as well and that

15    would of course engender lots of disputes and litigation on

16    the EFIH side.

17    Q    All right.  And, Ms. Dore, are you aware that certainly

18    EFH creditors contend that the negotiations and governance

19    process regarding the ancillary agreements was flawed?

20    A    Was flawed?

21    Q    Flawed, yes.

22    A    I am aware, yes.

23    Q    And do you agree with that assertion?

24    A    I could not disagree more.

25    Q    Why not?

1    A    I think if you look at the demonstrative one that we

2    showed --

3              MR. MCKANE:  Put that up, please.

4              THE WITNESS:  -- and you look at all the testimony

5    in this case we constantly reevaluated, met with our board,

6    talked to creditors, we had so much process around this that

7    it was, you know, hard that -- a week didn't go by where we

8    weren't having discussions about Plan B, starting all the

9    way back in January.  And if this is not enough process and,

10   you know, information and due care then it's hard for me to

11   imagine what would be, because we -- the directors took all

12   of these facts into account and applied their best business

13   judgment relying on their advisors to reach their decision.

14   Of course a different decision is always possible, that's

15   what -- that's why directors are, you know, in a very tough

16   position any time they're on a board because there's always

17   multiple alternatives.

18              They had to pick one and they picked one based on

19   weeks and weeks and weeks and hours upon hours of

20   negotiation and diligence and information that they thought

21   was in their best -- in the best interest of all of the

22   estates, and I agree.

23              MR. PEDONE:  Move to strike with regard to the

24   thought process of the disinterested directors.

25              THE COURT:  Overruled.

1    BY MR. MCKANE:

2    Q    All right.  Ms. Dore, can you specifically address the

3    assertion -- let me rephrase.

4         Were the ancillary agreements treated as conflicts

5    matters by the disinterested directors to your knowledge?

6    A    No, they were not -- well they were not declared as

7    conflict matters because the agreements are with reorganized

8    TCEH, so they're not inter-debtor agreements and the first

9    liens were negotiating on behalf of reorganized TCEH, so

10   essentially it was the DDAs negotiating against the first

11   liens, not the DDAs negotiating against each other.  But

12   they were -- the process they went through was identical to

13   the one that they would have gone through for a conflict

14   matter.  And we did that again because we wanted to make

15   sure that the process was as unassailable as we could make

16   it.

17   Q    And how did they report out to the full board their

18   conclusions with regards to the merits of the agreement and

19   whether it was a conflicts matter?

20   A    Again, I think they reported -- I don't remember -- I

21   think it was at the July 27th meeting, but they probably

22   reported at the July 22nd meeting as well -- but they

23   reported their final result at the July 27th meeting that

24   they had met with their disinterested directors separately

25   and had approved the ancillary agreements.

1   Q    All right.  Let's briefly go through those final board

2   meetings in July leading up to the ancillary agreements

3   approval, okay?  You mentioned a July 22nd board meeting.

4   What was the purpose of that meeting?

5   A    The purpose of that meeting was as we got closer to

6   one, trying to finalize the deal with NextEra, but two,

7   making sure that we had met the deadline, we had a July 27th

8   deadline for filing the final ancillary agreements and we

9   knew we would be bringing those up in front of the board the

10  following week for approval.

11          So on July 22nd we -- as I mentioned earlier, we

12  tried when we could to lay the groundwork in advance of a

13  vote and not just do it all in one meeting, because we felt

14  like that was not giving the board sufficient time to digest

15  the information -- so on July 22nd we were basically

16  educating the board, laying the groundwork for approval of

17  the ancillary agreements and then seeking their approval the

18  following week.

19  Q    And did you have direct input and approval of the

20  substance of the July 22nd board presentation?

21  A    Yes.

22  Q    All right.  And was there a separate presentation on

23  July 27th regarding certain issues relating to the plan?

24  A    Yes.

25  Q    All right.  And did you have direct input and approval

1    over that presentation?

2    A    Yes, it was a long week that week.  A lot of meetings.

3    Q    What information did the board receive on July 27th

4    regarding the ancillary agreements?  Just at a high level.

5    A    Again we just -- we walked them through some of the

6    same information we had provided the week before about what

7    the ancillary agreements were designed to do, we told them

8    who had been negotiating them and who had signed off,

9    because by this time on July 27th NextEra had signed off on

10   the separation agreement and the interim transition services

11   agreement so we felt like -- in addition to the DDAs and the

12   DCOs, and we felt like that was sort of independent

13   verification that these were consistent with EFH's interest

14   because NextEra was standing in the shoes of someone who was

15   going to own EFH and they were very motivated to make sure

16   that the separation agreement did not saddle EFH with

17   liabilities, that NextEra would have to assume, and that

18   EFH, through the interim TSA, would receive the services it

19   needed to continue its business during the -- what we call

20   the gap period between T-Side emergence and E-Side

21   emergence.

22   Q    All right.

23   A    So we just informed the board about who had been

24   negotiating, the fact that those two agreements were fully

25   negotiated, what the open issues were still on the TMA, I

1   think we also might have given an update on the PLR process

2   in that meeting, and we ultimately recommended approval of

3   the ancillary agreements.

4   Q    All right.  Let me direct your attention to DX-49 in

5   your binder, which are the minutes of the July 27th board

6   meeting.

7   A    Okay.

8   Q    And let me direct your attention to page 3, the first

9   paragraph.

10          MR. MCKANE:  And if you could put that on the

11   screen, please.

12   BY MR. MCKANE:

13   Q    Ms. Dore, what do you recall regarding the statements

14   made by the disinterested directors themselves and their

15   advisors regarding their views on the ancillary agreements

16   in advance of the votes on July 27th?

17   A    Well it states it pretty succinctly here, they --

18   Chairman Evans explained that he and Ms. Williamson had met

19   with their DDAs regarding the ancillary agreements many

20   time, they had reviewed materials regarding those

21   agreements, and they had approved them prior to this meeting

22   insofar as they related to conflicts matters.  And with one

23   caveat that they would only approve the tax matters

24   agreement if it contained the you break it you own it

25   provision for the T-Side.

1    Q    Okay.  And what information was provided to the board

2    regarding the contributions of equity that EFH Corp. was

3    going to make with regards to Properties and Corporate

4    Services?

5    A    Well both in the July 22nd and the July 27th meetings

6    we provided an extensive amount of background to support why

7    we were recommending that the plan contain the transfer of

8    equity in those entities, and we also were informing the

9    board that the transfer of equity in those entities was

10   being objected to, because by this time we knew about

11   Mr. Pedone's objections and we wanted to make sure that the

12   board understood what the objection was and what our

13   response was so that they could take that into account

14   before they approved the agreements that effected those

15   transfers.

16   Q    I'm sorry.  Sorry, Ms. Dore, go ahead, please.

17   A    I had finished my answer.

18   Q    Oh, perfect.  Let me direct your attention to DX-48.

19   A    48?

20   Q    48, the one that -- the document preceding the one you

21   were -- the minutes.

22   A    Okay.

23   Q    All right.  Ms. Dore, is this the agenda and

24   presentation that was made at the July 27th board meeting?

25   A    Yes.

Page 127

1    Q    And let me direct your attention to page 16, slide 16

2    of that deck, and if you're looking at the pages in the

3    middle it's 18 of 166.

4              MR. MCKANE:  And if you could put that up on is

5    screen.

6              THE WITNESS:  Okay.

7    BY MR. MCKANE:

8    Q    What was the take away that the management and the

9    advisors presented to the joint boards regarding the risks

10   if EFH Corporate Services' equity was not contributed to

11   reorganize TCEH?

12   A    The take away was that if EFH retained Corporate

13   Services it would potentially -- Corporate Services would

14   potentially incur obligations to third parties and to

15   employees and therefore it would have no equity value left

16   for EFH.

17   Q    Now -- and was this the first time that the boards are

18   reviewing the risks and benefits of a contribution of

19   Corporate Services to the T-Side of the house?

20   A    No.  We had discussed the transfer of Corporate

21   Services all the way back to prefiling, in fact if you look

22   back at the infamous RSA there is a plan term sheet attached

23   to it that contains the transfer of Corporate Services to

24   TCEH.

25              We did a lot of work in the case to convince the

1    first liens to take that entity, they did not want to take

2    it for a long time, and then even after we convinced them to

3    take it they weren't sure they wanted the equity of it, they

4    potentially just wanted the assets, and we spend many, many

5    hours and presentations to the first liens convincing them

6    that they should take that entity because it most closely

7    served the T-Side.

8           And then -- so back all the way to 2014 --

9    2013/2014 we had been discussing that with the board, and of

10   course every time we filed a new plan it was part of the

11   plan.  And so implicit in the approval of each iteration of

12   the plan was the approval of transferring the equity in

13   those entities to TCEH.

14   Q    And, Ms. Dore, what's your best recollection as to

15   whether the issue of the transfer of Corporate Services was

16   discussed in 2016 before the May plan?

17   A    So I don't have a -- and I looked back at all the

18   minutes and the board decks -- and I don't have a specific

19   date recollection of discussing the transfer of Corporate

20   Services prior to this June -- July 22nd meeting, but I know

21   that it came up somewhere along the way.  And the reason I

22   know that is because our board members are always very

23   concerned about what is going to happen to the employees of

24   the company when the companies split up, and so they would

25   ask us from time to time along the way, well so is Corporate

1    Services still -- you know, are our employees still going to

2    go with the T-Side, and they wanted to make sure that that

3    was occurring so that our employees were not left stranded.

4    Q    All right.  And, Ms. Dore, in this meeting on July 27th

5    was there a discussion with the board about the consumption

6    of NOL that is was embedded in the plan?

7    A    I'm sorry, which meeting?

8    Q    The July 27th meeting.  I'm going back to July 27th.

9    A    Yes, there was.

10   Q    Okay.  And I believe you have Exhibit 48 in front of

11   you.  If you could turn to slide 33.

12   A    Yes.

13   Q    Are you there?

14   A    Yes.

15           THE COURT:  Excuse me.

16   BY MR. MCKANE:

17   Q    And starting at the top of the page, Ms. Dore, what was

18   the board informed about the TCEH first liens negotiating

19   position on the issue of paying EFH for the consumption of

20   NOLs?

21   A    That they had rejected every attempt to extract

22   compensation from the NOLs.

23   Q    All right.  And if you go to the bottom of the page,

24   what was the board told regarding the position of E-Side

25   stakeholders regarding whether there should be some limits

1    placed on the size of the step up or an alternative to

2    reduce the step up in basis?

3             MR. PEDONE:  Objection, Your Honor.  Hearsay to

4    the extend that the witness is not the declarant.

5             THE COURT:  Overruled.

6             THE WITNESS:  We informed the board that the

7    T-First liens had rejected every attempt to either lower the

8    step up in basis or make a cash payment for the NOLs,

9    including, as I've testified earlier, Proskauer's attempts

10   and Fidelity's attempts to make those demands on the TCEH

11   first liens, and that we believed in our judgment that they

12   were serious about filing a taxable plan if we continued to

13   insist on changing the deal.

14             And the TCEH first liens in this case, their

15   default position has always been to file a taxable plan

16   since before we ever filed the case, and the debtors have

17   devoted a significant amount of effort to -- and we've been

18   successful -- to convincing them not to go that route.

19   Q    And in this presentation in July what were the boards

20   informed about regarding potential consequences if the TCEH

21   first lien creditors decided to pursue a taxable separation?

22             MR. PEDONE:  Objection, Your Honor.  Again,

23   hearsay if the witness is not the declarant.  I believe this

24   is actually legal advice concerning the consequences.

25             MR. MCKANE:  Well, Your Honor, I'm simply asking,

1    whether true or not, whether it was presented to the board

2    and what was -- and then Ms. Dore is going to testify on a

3    lay opinion basis what her assessment was based on the

4    hearsay that was provided, the positions taken by those

5    first lien creditors.

6              THE COURT:  Overruled.

7              THE WITNESS:  We informed the board, as we had

8    many, many times in the past, that in a taxable scenario EFH

9    as the taxpayer would be liable for the stranded tax, and we

10   also always acknowledged that there were arguments for

11   holding TCEH liable for that tax as well, but the

12   uncertainty of the success of those arguments and the huge

13   impact to EFH, if those arguments were unsuccessful,

14   continued to cause us to think that the tax-free alternative

15   was the best alternative for all of the estates.

16   BY MR. MCKANE:

17   Q    All right.  And if you could turn to slide 36 on the

18   right of the presentation.  38 of 166 in the middle.

19   A    Okay.

20   Q    And what was the board informed about regarding the

21   disinterested directors' position on the potential

22   consumption of tax attributes in the plan?

23             MR. PEDONE:  Objection.

24             THE COURT:  Overruled.

25             THE WITNESS:  We advised the board and the

1    disinterested directors advisors advised the board directly

2    that they had continued to evaluate those issues throughout

3    2016 and before and that they had reaffirmed their support

4    for the overall structure of this plan, which was the tax-

5    free spin with the busted 351, with again the icing on the

6    cake now being that potentially EFH would have about a

7    billion dollars of NOLs left for its own use.

8    BY MR. MCKANE:

9    Q    All right.  And what actions did the board take at the

10   end of the July 27th meeting?

11   A    The board voted to approve the ancillary agreements and

12   we filed later that night.

13   Q    All right.  Do you -- are you familiar with the issue

14   -- the open issue at that time regarding you break it you

15   own it?

16   A    Yes.

17   Q    What is that issue?

18   A    So that was an issue where both NextEra and the EFH

19   disinterested directors, as well as the EFH board, had

20   insisted that the TCEH first liens take responsibility for

21   any taxes that might result after the tax-free spin if those

22   taxes resulted from conduct of reorganized TCEH or its

23   shareholders.  And the TCEH first liens position had been

24   not to say we're not going to be responsible, but they

25   wanted a specific list of these are the actions we could

1    take that would make us liable.  The EFH side was saying,

2    no, we're not going to list that out for you because if we

3    miss something then we're left holding the bag, we just want

4    you to agree in general that if your actions cause it you're

5    responsible.

6           And as of July 27th the TCEH first liens had not

7    signed off on the more general language, so we agreed to

8    file the plan with that language in brackets and to note

9    that both that the EFH side wouldn't agree to the tax

10   matters without it and that the first liens had not yet

11   signed off on it.

12   Q    And how is that issue and the TMA as a whole ultimately

13   resolved?

14   A    Well so the very next night we were completing the

15   negotiations on the NextEra deal and NextEra had agreed to

16   the language as it was filed with the Court on the night of

17   July 27th.  So we called up the first liens again and said,

18   we really need you to get on board with this TMA because

19   we're announcing a deal tomorrow with NextEra and it's going

20   to have this TMA attached to it.

21          They could not come to agreement and sign off on

22   it, so we told them we're filing the one with the merger

23   agreement that we filed with the Court Wednesday night.  We

24   did that.  We announced the merger agreement on Friday the

25   29th, yes, and then on August 3rd we filed the merger

1   agreement with that TMA attached.  And we continued to urge

2   the TCEH first liens to sign off on the tax matters

3   agreement as we had now filed it two or three times with the

4   Court.

5           And ultimately on the day that -- the before the

6   -- the day of or the day before this trial started they

7   signed off with a few tweaks, but in essence they agreed to

8   the concept that both NextEra and EFH were asking for.

9   Q    All right.  You mentioned the debtors filed a merger

10  agreement with NextEra on August 3rd.  And if you could turn

11  to DX-3, please.  And if you turn six pages in looking at

12  the top where it says 6 of 429.  Are you with me?

13  A    Six, okay.  The very first page of the merger

14  agreement?

15  Q    Yeah.  I just want to verify --

16  A    Yes.

17  Q    -- this is the merger agreement.

18  A    Yes, it is.

19  Q    All right.  All right.  And you're familiar with it?

20  A    Yes, I am.

21  Q    Intimately?

22  A    Yes.

23  Q    All right.  Let me direct your attention to page 101 of

24  429.

25  A    I should have brought my reading glasses.

1   Q    Well maybe (indiscernible) is willing to help you.

2   A    No, no, no, no, it's fine.  I'm fine.  101 you said?

3   Q    Yes.

4   A    Okay.

5   Q    In the condition section, what are the conditions

6   required with respect to the TCEH separation?  And maybe we

7   could call sub-D out.

8   A    Yeah.  So Section 7.1(d) of the NextEra merger

9   agreement requires that the reorganized TCEH spin off shall

10  have occurred in all material respects in accordance with

11  the plan of reorganization and the private letter ruling.

12  The plan of reorganization here is defined as the one that's

13  currently on file and defined elsewhere in the agreement,

14  and this is a closing condition.

15  Q    And what is your understanding as to whether the plan

16  of reorganization as defined herein includes the busted 351?

17  A    It does.  It includes the tax-free spin with the busted

18  351 and that is the transaction that is required to have

19  already occurred by the time of the NextEra closing.

20  Q    And did NextEra, in your interactions with them, ever

21  propose anything other than a tax-free spin on the T-Side?

22           MR. PEDONE:  Objection, hearsay.

23           THE COURT:  To her knowledge.  To the extent of

24  her knowledge.  Overruled.

25  BY MR. MCKANE:

1    Q    To the extent you know based on your interactions.

2    A    No, they never proposed anything other than what we

3    have proposed to the T-Side, and in fact we attempted to

4    convince them that the additional billion dollars of NOLs

5    when the news came in from the IRS about the Cody ruling and

6    we concluded that that would make a billion dollars

7    available to EFH we attempted to convince them that should

8    raise their price, and I don't -- they didn't really assign

9    any additional value to that.

10   Q    All right.  Does the final NextEra merger agreement

11   address the transfer of Corporate Services as well?

12   A    Yes, it does.

13   Q    All right.  Let me direct your attention to page 104.

14   So three pages further back in the document, and in

15   particular sub-I regarding employees.

16   A    Yes.

17   Q    All right.

18   A    Yeah.  So it was very important in the NextEra

19   negotiations -- important to NextEra that when they acquire

20   EFH, so on the closing date of the transaction, that EFH

21   have no employees or at least that at a minimum any employee

22   liabilities are taken care of on the day of the closing such

23   that when NextEra owns the company they're not responsible

24   for employees or obligations to employees.  And that meant

25   that throughout the agreement it references the fact that

1    the separation agreement, which is attached to the merger

2    agreement, must be executed in connection with closing.  And

3    so the company, EFH, has an obligation to deliver an

4    executed separation agreement that effects the transfer of

5    EFH Properties and EFH Corporate Services to NextEra in

6    order for NextEra to close.

7    Q    All right.  And (indiscernible) transaction briefly to

8    the 1129 factors.  Are you familiar with the requirements of

9    Section 1129 of the Bankruptcy Code?

10   A    Yes, generally.

11   Q    And do you have an understanding as to whether the plan

12   as it relates to the TCEH debtors and the shared service in

13   debtors satisfies all of the 1129 factors?

14   A    Yes, I believe that it does.

15   Q    All right.

16           MR. MCKANE:  We have no further questions at this

17   time for Ms. Dore.

18           THE COURT:  All right.  Let's see.  Mr. Pedone,

19   yes.

20           MR. PEDONE:  Your Honor, can we take a very short

21   recess?

22           THE COURT:  Yeah.  I was going to -- I'm having a

23   moment.  My brain isn't working.  I just wanted to know if

24   there were any other questions before we turned it over to

25   Mr. Pedone no cross.

1           MR. MCKANE:  Well, Your Honor, maybe at the end of

2   the break we can move in some exhibits and maybe Mr. Pedone

3   can evaluate -- or reevaluate his objections to her written

4   directs.

5           THE COURT:  Okay.

6           MR. MCKANE:  Testimony (indiscernible).

7           THE COURT:  Let's do that.  All right.  So we'll

8   take a short recess.  Ms. Dore, you can't talk to anybody.

9           THE WITNESS:  Yes, sir.

10      (recessed at 2:50 p.m.; reconvened at 3:08 p.m.)

11          THE CLERK:  All rise.

12          THE COURT:  Please be seated.  Sorry.  Okay.

13          MR. MCKANE:  Your Honor, was able to work with the

14   Nixon Peadoby team and they were able to step back from

15   their foundational objections after hearing a lot of direct,

16   but the others remain.

17          What the debtors have prepared, and the Nixon

18   Peabody team have reviewed, is we have highlighted the

19   disputes and identified what was the evidentiary issue.  We

20   provided copies for your staff.  If I could approach and

21   provide them up to you.

22          THE COURT:  Okay.  Thank you.

23          MR. MCKANE:  And I have provided I believe copies

24   to the objectors as well.

25          Your Honor, the first objection that remains

1    outstanding it relates to paragraph 7 on page 7.

2              THE COURT:  Okay.

3              MR. MCKANE:  The sentence that starts, "I am aware

4    of DDAs similar engagement discussions with creditors."

5              And, Your Honor, we believe that the hearsay

6    objection here is unfounded, and based on Ms. Dore's

7    testimony she has specifically laid down the foundational

8    basis for this based on her direct interactions with the

9    DDAs in this time period.  And so we'd ask that the

10   objection be overruled.

11             MR. PEDONE:  Your Honor, the response established

12   that the foundation is based upon what the DDAs or their

13   advisors out of court's declarants told the witness.

14             If these are statements that are not being offered

15   for the truth but from her state of mind then they're

16   actually not hearsay and they would be able to come in.  But

17   to the extent that these are being offered for the truth of

18   what the DDAs did or said that they did then that is classic

19   hearsay and I'd again request that the DDAs advisors

20   (indiscernible) statements be available for cross-

21   examination.

22             MR. MCKANE:  Your Honor, what I want to highlight

23   is -- for Mr. Pedone, is there's something about a DDA

24   statement in there.  This is a direct observation of the

25   witness that she conveyed based on her observations and

1     interactions with the DDAs after the February 25th board

2     meeting.  You'll recall from her testimony they said that

3     they went in -- essentially went into the --

4               THE COURT:  Yeah.

5               MR. MCKANE:  -- lab in March and were evaluating

6     the process -- you know, alternatives, and she was a part of

7     that and observed it.  So there's no hearsay angle to

8     paragraph 7 on page 7.

9               THE COURT:  Yeah, I agree.  This isn't hearsay.

10    Objection is overruled.

11              MR. MCKANE:  Okay.  Your Honor, paragraph 8,

12    specifically the highlighted language, makes -- again

13    Mr. Pedone objects on hearsay.  I believe in part -- or

14    based on the reference to the April 7th, 2016 letter that

15    was sent to the TCEH unsecured noteholders.

16              Your Honor, the testimony was that Ms. Dore

17    specifically received that letter and that letter has

18    already been admitted as part of DX-97.  And so we ask that

19    the hearsay objection be overruled.

20              MR. PEDONE:  Your Honor, with regard to the second

21    part, the TCEH first lien creditors indicated thereafter,

22    that would be classic hearsay.

23              MR. MCKANE:  And, Your Honor, I believe for the

24    reasons we stated when this same objection was raised during

25    the live testimony that this is admissible hearsay based on

1    her lay opinion under 701 and it's not hearsay to the extent

2    that the fact or the statement was made whether truthful or

3    not and formed her judgment that she later conveyed to the

4    board of directors.

5            THE COURT:  I agree with Mr. McKane's position.

6    Objection is overruled.

7            MR. PEDONE:  Your Honor, if I could ask for

8    clarification.  Is that based upon this being lay opinion?

9            THE COURT:  Both.

10           MR. PEDONE:  Thank you.

11           MR. MCKANE:  All right.  Your Honor, the next

12   objection is on paragraph 12, and on paragraph 12 it's a

13   statement by Ms. Dore that the first liens were unwilling to

14   budge on the issue and maintain that they were fully

15   prepared to move forward on May 1st with the stand-alone

16   plan.  That's based on her participation in a board meeting

17   that is admitted into evidence -- the minutes of that

18   meeting are admitted into evidence as DX-94, and that

19   information for the same reasons that I provided earlier,

20   the same foundation, it's the lay opinion plus it's the non-

21   hearsay, both -- for both reasons that statement is

22   admissible.

23           THE COURT:  I agree.  Objection is overruled.

24           MR. PEDONE:  Thank you.

25           MR. MCKANE:  And, Your Honor, it's the same issue

1    as it relates to paragraph 13, and we assert the same

2    arguments.

3              THE COURT:  Yeah.  Overruled.

4              MR. MCKANE:  Your Honor, paragraph 17, which is at

5    the top of page 12, this is an assertion of foundation

6    that's been withdrawn.  I apologize.  Thank you.

7              The bottom though on paragraph 18 the statement by

8    Munger, Tolles, counsel for the disinterested directors

9    regarding the information provided in the board meeting,

10   that is reflected in an admitted minutes, DX-96, and for

11   that basis alone we believe this is admissible as well.

12   She's simply reporting what she observed in a board meeting

13   based on a reporting from Munger, Tolles.  Our position on

14   the hearsay objection remains the same.

15             MR. PEDONE:  Your Honor, we agree that the minutes

16   as they come in as business records of what was taken --

17   took place at the minutes.  The witness's statements and

18   expansion upon what happens to be contained in an otherwise

19   admissible document should not come in.  That is hearsay.

20             THE COURT:  Overruled.

21             MR. MCKANE:  Your Honor, regarding paragraph 19,

22   this is also a statement made in a board meeting.  The

23   highlighted language says, "Prior to the joint boards

24   approval of the resolutions debtor counsel and for the joint

25   boards of the TCEH first lien position regarding their

1    termination notice at midnight."  That is expressly

2    referenced in DX-94, which has been admitted into evidence

3    as a business record and not subject to hearsay.  And for

4    the same reasons we've already articulated regarding

5    Ms. Dore as offering her testimony as non-hearsay purpose we

6    believe this statement is admissible as well.

7              THE COURT:  Yeah. I mean, again, I'm going to

8    overrule the objection.  This is the same sort of issue.

9    It's not really whether it was true; whether or not they

10   believed it or not.

11             It's -- it's the impression that it's created.

12   It's what's being reported.  It's the statement that an

13   argument occurred.  A position was taken.

14             Only they know in their heads what they would do

15   when it ultimately came down to a negotiation.  And that's

16   not what's being offered for -- as the truth here.

17             MR. PEDONE:  Your Honor, then it would be a

18   statement that is not hearsay and it's not offered for the

19   truth.

20             Again, to the extent that I believe counsel's

21   offering these for the truth, then they are hearsay --

22             THE COURT:  We're --

23             MR. PEDONE:  -- and we continue our objection.

24             Thank you.

25             THE COURT:  No.  There -- it's -- we're splitting

1    hairs then because what -- it's being offered to prove that

2    that was -- it's being offered to establish the state of

3    mind and what occurred.

4            My point is whether or not ultimately they would

5    follow through with that threat or not.  That's not what

6    it's being offered for.

7            MR. PEDONE:  Your Honor, based upon every

8    discussion that we have had with counsel in meet and confer

9    with these issues, we have been unequivocally told, and in

10   their brief filed this morning, we have been unequivocally

11   told that they are offering these statements for the truth

12   of the matters asserted and we continue our objection --

13           THE COURT:  All right.

14           MR. PEDONE:  -- that they're offering for truth.

15           THE COURT:  Well, I -- to the extent they are,

16   then, based on what I've said numerous times, the objection

17   is overruled.

18           MR. MCKANE:  All right.

19           MR. PEDONE:  Thank you.

20           MR. MCKANE:  Your Honor, that was the last of the

21   hearsay objections.

22           There is one final objection category and it's --

23   it relates to Ms. Dore's statement page 15.  And, again,

24   it's picked up later.

25           They object to her use of the phrase "exercise of

1    business judgment" and so, on page 17 --

2              THE COURT:  Yeah.  We've -- we've dealt with this

3    before.  It's -- it's difficult because it's a term of legal

4    art and, ultimately, I -- you know, whether there's been a

5    reasonable exercise of business judgment, as a legal

6    matter --

7              MR. MCKANE:  Okay.

8              THE COURT:  -- is one thing.  But to say that a

9    business person exercised judgment, and that's what they

10   did, I mean, I think it has both a legal meaning and a lay

11   meaning or a business person meaning.

12             And, certainly, ultimately, I decide whether it's

13   a reasonable exercise of business judgment or not.

14             But I think that any business person, Mr. Keglevic

15   got into this a little bit, too, and I think you tweaked the

16   wording a little bit, if I remember correctly, earlier in

17   the -- in the trial.

18             But I don't think that's necessary.  It -- it --

19   it's what they believe.  It's not going to be determinative

20   of what the Court's ultimate legal ruling is.

21             MR. PEDONE:  Your Honor, we were sensitive because

22   it was coming from a lawyer --

23             THE COURT:  Uh-huh.

24             MR. PEDONE:  -- who they claim expertise on the

25   subject.  But we believe the better course is to have been

1    the language as we did with Mr. Williamson.  But I

2    understand your position.

3                 THE COURT:  Yeah.

4                 MR. MCKANE:  All right.  Your Honor, two other

5    Dore evidentiary -- excuse me.  I apologize.

6                 The first relates to the demonstrative and I'll --

7    I'll put it on the screen so you can see what the issue is.

8                 It's -- it's -- can we put Dore one on the screen,

9    please?

10        (Pause)

11                THE COURT:  You having a --

12                MR. MCKANE:  Might be a technical issue.  We can

13   go to the hard copy if --

14                THE COURT:  Yeah.

15                MR. MCKANE:  It's the first tab of your binder.

16                THE COURT:  Oh, there it is.

17                MR. MCKANE:  There we go.

18                THE COURT:  Yes.

19                MR. MCKANE:  Your Honor, you will -- if you look

20   at the right side, maybe not.

21                THE COURT:  I have it.

22                MR. MCKANE:  Okay.  So, with regards to the -- the

23   timeline, there is a LSU, lollipop or PIN, on the right hand

24   side on July 28th.  And that's a reference to the fact there

25   was a joint board meeting on that date.

1           Now that joint board meeting related to E-Side

2    issues, not T-Side issues and I've made that representation

3    to Mr. Pedone and I have actually provided him an

4    opportunity to review the draft minutes even though they

5    haven't been reviewed and approved by the board of directors

6    which satisfied him that this was not a T-Side confirmation

7    hearing.

8           He has asked that we amend the demonstrative.

9    And, if he wants me to pull the PIN, I will.  We'll submit a

10   revised declaration tonight or tomorrow morning.

11          THE COURT:  I don't think that's necessary.  The

12   demonstrative's not even evidence so --

13          MR. PEDONE:  I'm -- Your Honor, I'm happy with the

14   record reflecting that there was no meeting relevant to

15   these proceedings that took place on that date.

16          THE COURT:  Okay.

17          MR. PEDONE:  Thank you, Your Honor.

18          THE COURT:  All right.

19          MR. MCKANE:  Your Honor, with regard, we do have a

20   few undisputed exhibits that we want to move in and there's

21   just two of them and it's DX-30 and DX-345.  I'd like to

22   more those in at this time.

23          THE COURT:  Any objection?

24          UNIDENTIFIED SPEAKER:  No objection.

25          MR. PEDONE:  No, Your Honor.

1          THE COURT:  It's admitted.

2      (Debtors' Exhibit Nos. DX-30 & 345 were admitted)

3          MR. MCKANE:  All right.  Your Honor, there are

4  three board decks that were used in the -- in Ms. Dore's

5  declaration that are subject to your ruling on board

6  presentations.

7          I would just note, for the record, that we would

8  move them in, subject to the clarification and

9  reconsideration.  That's DX-92, DX-118 and DX-120.

10         THE COURT:  Okay.

11         MR. PEDONE:  Subject to our objection.

12         THE COURT:  Very good.  They're admitted subject

13  to the objection and maybe now would be a good time to rule

14  on that.

15     (Debtors' Exhibit Nos. DX-92, 118 & 120 were admitted)

16         MR. MCKANE:  Yeah, absolutely.

17         THE COURT:  If that's okay.

18         So, in connection with the two things the Court

19  has under advisement, if you will, first the subjections to

20  Mr. Keglevic's declaration, I did go through the identified

21  passages and let's see, the first on page six, I don't know

22  if everybody's got it handy.  You want to pull it out and

23  give everybody a second?

24     (Pause)

25         THE COURT:  Okay?  You ready, Mr. McKane?

1          MR. MCKANE:  Yes, sir.

2          THE COURT:  Okay.

3          So the -- the sentence is, explain below EFH

4    Corp.'s decision to transfer EFH corporate services and EFH

5    Properties Company to reorganize TCEH is a reasonable

6    exercise of the debtors' business judgment.

7          For the reasons just expressed in connection with

8    Ms. Dore's testimony, the Court finds that this is not

9    evidence of the legal conclusion.  Use of the word business

10   judgment here and reasonable exercise of the debtors'

11   business judgment isn't a legal conclusion; that'll be up to

12   the Court.  But is a business person's belief as to the

13   issue and, as such, I will overrule the objection.

14          Page eight, paragraph eighteen, last sentence.

15   For the reasons I've stated numerous times on the record so

16   far, I find that that's not hearsay and the objection is

17   overruled.

18          With regard to the end of paragraph 20 and the

19   entirety of paragraph 21 on page 10 -- let's see.  Again, I

20   think what Mr. Keglevic is testifying here is his

21   understanding.  But, in any event, I don't believe it's

22   hearsay so objection's overruled.

23          Same in connection with paragraph 24, 25 and 26,

24   objection overruled.

25          As well as paragraph 31, 32, 33 and 34, objection

Page 150

1    overruled.

2              Paragraph 38 is simply a statement as to

3    Mr. Keglevic's belief.  It's not hearsay.  Overruled.

4              And same with paragraph 30, not hearsay.  So

5    objection overruled.

6              Same with paragraphs 28 and 50 and 53.  Objection

7    overruled.

8              I've also reviewed the motion for clarification or

9    reconsideration in connection with the board decks and

10   reviewed both the motion and the response that was filed

11   earlier today and I deny the motion.  I endorse the debtors'

12   view.

13             First of all, I'm sorry that the record was

14   unclear.  I meant to rule that -- you know, I didn't think

15   there was an actual dispute.  But, to the extent there was a

16   dispute, I was finding that they were business records and

17   were admissible.  So apologize for an unclear record and the

18   Court's ruling continues to be that there are business

19   records.

20             I don't believe that I'm incorrect on that and

21   it's not a manifest error law that would require

22   reconsideration to (indiscernible) presentations are

23   business records and they are admissible.  So I'll deny that

24   motion.

25             MR. PEDONE:  Thank you, Your Honor.

1          THE COURT:  You're welcome.

2          MR. MCKANE:  Thank you, Your Honor.  And I -- I

3    believe what the debtors have done, just to make clear, we

4    -- we have compiled a list of all the board presentations

5    that are subject to the objection and so maybe we'll have --

6    I'll work with Mr. Pedone, make sure the list is accurate,

7    and make sure we've edited it correctly and then submit it

8    to chambers to make absolutely clear what is in the record.

9          THE COURT:  Very good.

10          MR. MCKANE:  Thank you, Your Honor.

11          With that, we pass the witness.

12          THE COURT:  Very good.  Mr. Pedone.

13      (Pause)

14                    CROSS-EXAMINATION

15    BY MR. PEDONE:

16    Q    Good afternoon, Ms. Dore.

17    A    Good --

18    Q    Richard Pedone, counsel for American Stock Transfer,

19    the indentured trustee.

20    A    Good afternoon.

21    Q    When you were deposed on August 18th, you agreed that

22    the settlement agreement did not bind EFH Corp. to use its

23    NOLs for any particular purpose, including to provide the

24    step-up with TCEH.

25          Do you agree with that?

1    A    I agree.

2    Q    Did you have that understanding in February, 2016 or

3    did you have a different understanding at that time?

4    A    I think I had the same understanding.  I know we

5    discussed when it looked like plan A was going to not

6    consummate, we went back and -- I personally went back and

7    looked at the settlement agreement and discussed with both

8    Kirkland and Proskauer what the arguments were for and

9    against that position.

10        And I don't remember exactly when we all made sure we

11   were in sync but, ultimately, we concluded that the

12   settlement agreement doesn't dictate use of the NOLs in any

13   particular manner.

14   Q    Had that conclusion been reached for all parties

15   involved by April of 2016?

16   A    Yes.

17   Q    And you're also aware that the PSA does not require EFH

18   Corp. to use its NOLs for a particular -- any particular

19   purpose; aren't you?

20   A    Correct.

21   Q    By PSA I mean the plan support agreement that the

22   debtors signed on to and the Court approved last Fall

23   A    That's correct.

24   Q    Now at your -- at your deposition on August 18th, you

25   were unsure as to whether or not the tax sharing agreement,

1    another agreement, or any other agreements, at all might

2    restrict EFH Corp.'s use of its NOLs; weren't you?

3    A    What -- I -- I don't remember exactly what I said but I

4    think I was asked about the tax sharing agreement and I

5    wasn't sure if post-settlement agreement, the tax sharing

6    agreement is still in effect and I'm not sure if that could

7    give rise to arguments by either side that -- that they're

8    entitled to NOLs after the date of the settlement agreement

9    under the tax sharing agreement.

10        I'm just not sure about that.  We haven't analyzed that

11   issue.

12   Q    Okay.

13        And if, at any point, I ask you a question about your

14   deposition and you'd like a copy, I'm happy to bring one up.

15             MR. MCKANE:  And, Your Honor, just to clarify the

16   record, I believe Mr. Pedone accidentally misspoke and said

17   the deposition occurred on the 18th.  It actually occurred

18   on the 16th.

19             THE COURT:  Okay.

20             MR. PEDONE:  Thank you.

21             THE COURT:  What month?  August?

22             MR. PEDONE:  August.  About a week ago.

23             THE COURT:  Okay.

24   BY MR. PEDONE:

25   Q    In your declaration filed this weekend, you indicated

1    that the disinterested directors approached the governance

2    process related to alternative restructuring options as if

3    it was a conflict matter.  Is that correct?

4    A    Yes.

5    Q    And turning specifically to the disinterested

6    directions -- directors' actions in April of 2016, when they

7    authorized the filing of the plan, was it the case that they

8    treated matters as if they were conflict matters at that

9    time with regard to the content of a plan?

10   A    Yes.  Well, there was one matter that they treated --

11   that they declared a conflict matter which was the equity

12   splits.

13        But everything else they -- you know, it's hard to

14   parse in a plan that's, I don't know, 300, 400 pages to --

15   whether each particular element of the plan might or might

16   not be a conflict matter.

17        So the disinterested directors treated the plan as --

18   itself, as if it were a conflict matter and went through the

19   same process that they would have gone through -- they just

20   didn't formally declare anything a conflict other than the

21   equity splits.

22   Q    And you'd agree that under a corporate governance

23   structure legally in place, the disinterested directors were

24   delegated authority to themselves act only on matters that

25   were declared conflict matters, correct?

1    A    Well, they were certainly delegated authority to decide

2    what was a conflict matter and then to act on that.

3         I'm not sure that the reverse is true that they were

4    somehow restricted or prevented from acting on other

5    matters.

6    Q    By what authority would the disinterested directors

7    alone, as opposed to the full board, have authority to act

8    for EFH Corp. if -- if it wasn't delegated to them?

9    A    Well, the full board did act.  So the point is we -- we

10   -- it was belt and suspenders.  You know, they -- they

11   declared conflicts where there were conflicts, like the

12   equity splits.

13        They treated other matters as if there were conflicts

14   so that they had gone through their same full process and

15   then we brought it to a full board with their recommendation

16   and approval and the full board voted on it.

17        So there was no -- no manner in which each of those

18   matters wasn't authorized.

19   Q    Okay.

20        During the period from February until the end of April,

21   before the plan was approved, was there any delegation of

22   authority to the disinterested directors to negotiate the

23   terms of the plan other than with regard to the equity

24   splint on the E-Side?

25   A    There was no formal delegation of authority between

1    February and April.

2    Q    Okay.

3         In a situation where there's no delegation of authority

4    or declaration of a conflict matter, the normal corporate

5    governance structure for EFH Corp. leaves Mr. Young,

6    yourself and Mr. Keglevic as the actual actors for EFH

7    Corp., correct?

8    A    Well, we're members of management and so we're

9    certainly authorized to act on behalf of management -- on

10   behalf of the entities but so are the individual directors.

11   Q    You believe the directors are authorized to act as

12   opposed to make decisions?

13   A    Well, they're authorized to make decisions.  I mean, if

14   they wanted to call up a creditor and talk to him, I suppose

15   there's nothing that prevents them from doing that.

16        But that's not what normal board members do.

17        (Pause)

18   Q    And as far as you're aware, no formal board action has

19   ever been taken to designate any matters related to EFH

20   Corp.'s use of its NOLs in connection with the plan filed on

21   May 1 as a conflict matter, correct?

22   A    That is correct because the -- at that point in time,

23   the tax matters agreement that was being contemplated that

24   would address those issues and the risks was being

25   negotiated with the TCEH first liens.

1   Q    And you, personally, never developed a strategy to

2   force the T-Firsts to pay cash consideration for their use

3   of the NOLs; did you?

4   A    I did not personally develop a strategy to do that.

5   No, I didn't.

6   Q    And did you -- you do not have any records -- strike

7   that.

8        And the impact of such a strategy, if it had been

9   successful, would have been to take funds from one group of

10  creditors, the T-Firsts, for the benefit of another group of

11  creditors in the debtors' capital structure, correct?

12  A    Well, you're posing the hypothetical as if that request

13  was never made and I think I testified it was made numerous

14  times by Proskauer, by Fidelity. I think Mr. Keglevic

15  testified he asked.

16       So, just because I personally didn't develop that

17  strategy, doesn't mean that those requests were not made.

18  Those requests and demands were made.  They were refused.

19       And EFH was left with the decision of whether to stick

20  with the busted 351 and the tax-free spin with the TCEH

21  first lien support or call the first lien's bluff and end up

22  in lots of litigation over the taxable plan.  And it chose

23  the former.

24  Q    My question actually is about your understanding and

25  did you have an understanding that the impact of such a

```
1    strategy, to demand cash from the T-Firsts, would result in

2    taking cash from one group creditors for the benefit of

3    another group of creditors of a different debtor?

4         Just did you have that understanding?

5    A    Well, I think -- I think that, if what you're asking is

6    if the TCEH first liens had agreed to pay cash for use of

7    the NOLs, would that, ultimately, have benefited EFH

8    creditors, the answer is, yes.

9         But the money would have been exchanged, I presume,

10   between the estates not directly from principals to EFH

11   creditors.

12   Q    So you would agree with me that it was a conflict

13   between the estates?

14   A    No.  I don't agree with you because Proskauer asked, on

15   behalf of EFH, for compensation and was rejected and

16   determined with their disinterested directors, and,

17   ultimately, the full board determined that it was in the

18   best interest of EFH to provide -- to use its own NOLs to

19   cover the impacts of a busted 351 transaction because that

20   was the best plan for EFH.

21        So there was an alignment between EFH and TCEH at that

22   point.

23   Q    Why was there an alignment?

24   A    Because EFH had determined that it was in the best

25   interest of the EFH estate and for the benefit of its
```

1    creditors to not choose a taxable path that would result in

2    a depletion of resources from the EFH estate.

3         But, instead, to use its own NOLs to cover the result

4    of a busted 351 and keep the TCEH first liens on board with

5    the plan.

6    Q    But that was not a gift.  There's been testimony that

7    the debtors received -- they were receiving a benefit and my

8    question goes to, correct, the debtors' believed that they

9    were receiving --

10   A    Yeah.

11   Q    -- a benefit from this transaction in the plan?

12   A    Correct.

13   Q    And -- and -- and so the measure of benefit, you would

14   agree, would be greater for EFH Corp. if it had received

15   cash or were receiving cash as well in connection with

16   allowing its NOLs to be used, correct?

17   A    If that were an alternative that was possible, then I

18   suppose EFH would be better off receiving -- with the exact

19   structure today but additional cash going to EFH --

20   Q    Yes.

21   A    -- yes.  But that wasn't an alternative that was

22   possible.

23   Q    And that cash would have come from the estate of TCEH

24   or the TCEH first lien creditors.  There's no other source

25   of that cash, correct?

1    A    I -- I don't know.  I mean, I -- it's hard for me to

2    answer that hypothetical because it never was something that

3    the TCEH first liens did or would have agreed to.

4    Q    And it's not something you'd considered?

5    A    Did -- what -- what did I consider?

6    Q    What the source of cash would be if EFH Corp. asked for

7    additional cash, did you consider that?

8    A    I never considered what the source of cash would

9    because all of the demands for cash were rejected by all

10   parties, including EFH creditors.

11   Q    Ms. Dore -- Ms. Dore, in connection with the

12   alternative restructuring you recommended to -- you

13   recommended that EFH Corp.'s NOLs be consumed in connection

14   with the plan that was filed on May 1 to provide the TCEH

15   first lien lenders with a step-up that is now valued at more

16   than a billion dollars, correct?

17   A    Yes.

18   Q    And would you agree that in connection with making that

19   recommendation, and all of the others related to the use of

20   the NOLs, you were acting as a fiduciary for all of the

21   estates?

22   A    Yes.

23   Q    Were you like Mr. Keglevic -- and did you hear his

24   testimony?

25   A    You know, I didn't actually hear all of it.  I was in

1   route --

2   Q     Uh-huh.

3   A     -- to Wilmington.

4   Q     Sure.

5          MR. PEDONE:  Put a piece of it on the screen.

6       (Pause)

7          MR. PEDONE:  It make take one second since it

8   overlaps pages.

9       (Pause)

10  BY MR. PEDONE:

11  Q    Mr. Keglevic testified that, in essence, he was seeking

12  to balance the interest of all estates.

13       Was that what you also were doing?

14  A    I would -- I would not say it exactly that way.  You

15  know, I don't know what was in Mr. Keglevic's mind but I --

16  I don't consider that we -- I was attempting to balance the

17  interests.

18       We were very careful, as I think we mentioned in one of

19  the board decks, we showed an example of this, that we tried

20  to put in front of the various boards the perspective of

21  each estate, solely from that estate's perspective.

22       And, of course, the DDAs were there to consider only

23  that estate's perspective and we worked with them to make

24  sure we understood that, for example, our understanding of

25  what would be EFH's perspective was the same as what the

1    disinterested directors would think it would be.

2        And, then, what we tried to do was figure out whether

3    there was a plan that served everyone's interests and,

4    luckily, in this case, there was.

5        There could certainly be scenarios in which there

6    wasn't.  But, here, there was a plan that served all

7    estate's interests.

8    Q    So it would be fair to say that you weren't trying to

9    favor the interests of one estate over the other when you

10   made your recommendations?

11   A    Absolutely not.

12   Q    Okay.

13       And by no means in discussions with the T-Firsts that

14   may have taken place, that you may have participated in,

15   were you being a zealous advocate for the estate of EFH

16   Corp. to the detriment of TCEH; were you?

17   A    Well, we have disinterested directors and their

18   advisors whose job it is to be zealous advocates for each of

19   their estates.

20       It was my goal, again, to try to make sure that each of

21   the boards had identified to it what was in the sole

22   interest of that estate and then whether there were

23   alternatives that could achieve the interest of that estate,

24   that could be agreed to by the other estates, because if

25   it's not agreed to, then it doesn't really achieve the goal.

1    Q    So you would agree that you, personally, were not being

2    a zealous advocate for the interests of EFH Corp.?

3    A    At times, I could be because, you know, the TCEH first

4    liens are -- are represented by Paul, Weiss and so that

5    reorganized estate has, in effect, their own counsel as

6    well.

7         And so there were certainly times when I could make

8    arguments that, you know, EFH should get this or should get

9    that.  But, ultimately, it wasn't my decision.  It was only

10   my decision what to recommend to the boards.

11   Q    Okay.

12        Was it before or after the May 1 plan termination that

13   the debtors elected to re-approach NextEra to start

14   discussions over the E-Side plan?

15   A    I'm sorry.  Say that again.

16   Q    Sure.

17        Was it before or after the May 1 plan termination date,

18   for the old plan, that the debtors approached NextEra to

19   reengage in negotiations over an E-Side plan?

20   A    We didn't approach NextEra.  They approached us.

21   Q    And that occurred after May 1?

22   A    No.  I think they reached out to us in late April and

23   said; we want to send you a new proposal and we'd like --

24   basically said; we want you to invite us to do that.

25        We said; we are committed to plan A.  We're not going

1    to invite you to do something or not do something.  If you

2    would like to submit a proposal, you can feel free to do so

3    and, if you send it to our board, we'll show it to them.

4        And, ultimately, they submitted a proposal and, I think

5    it was after May 1st, if I recall correctly, but -- but they

6    had reached out to us before that date.

7    Q    And approaching them prior to May 1, approaching

8    NextEra prior to May 1, would have been difficult given the

9    terms of the PSA, correct?

10   A    I -- I'm not sure I agree with that.  We had the right

11   to negotiate alternatives.  We just chose to be -- to remain

12   committed to plan A until it was formally terminated.

13       And, in fact, I think I testified earlier, even after

14   NextEra submitted a proposal, there were certain E-Side

15   creditors that asked us not to engage, in earnest, with

16   NextEra right away because they wanted to have more time to

17   formulate their own alternative.

18       And we accommodated that for a short period of time

19   until no alternative was forthcoming and then we felt like

20   we needed to engage.

21   Q    So it would be fair to say that when the board of EFH

22   Corp. approved the plan of reorganization that was filed on

23   May 1, NextEra had not been consulted with regard to whether

24   or not they believed that consumption of all of the NOLs on

25   the T-Side was in their best -- was in the best interests?

1          Let me rephrase that question.

2     A    Okay.

3     Q    When EFH Corp. first reengaged with -- in discussions

4     with NextEra, the EFH board had already approved a plan

5     providing for the T-Sides use of the full 5.8 billion of

6     NOLs, correct?

7     A    Yes.

8     Q    And certainly NextEra was not given a veto right or an

9     opportunity to comment on the decision of the debtors to

10    file the May 1 plan, correct?

11    A    They were not given a -- given an opportunity to

12    comment on the May 1 plan.  But they were certainly given an

13    opportunity to comment on many iterations of the plan after

14    that and they commented heavily.

15    Q    In fact, NextEra filed an objection to the scheduling

16    order in connection with the May 1 plan, correct?

17    A    They did.

18    Q    So you would agree that NextEra was aware when

19    discussions began with (indiscernible) that the NOLs had

20    already been, to use Mr. Keglevic's words in an email,

21    promised to reorganized TCEH by virtue of the language of

22    the plan?

23    A    Well, I take issue with you inserting Mr. Keglevic's

24    words into that question because I -- those are not my

25    words.  I'm not sure exactly what you're referring to.

1       But what NextEra was aware of is that we had filed a

2   plan on May 1st that had the exact same construct that it

3   had had in plan A, which was a tax-free spin with a busted

4   351.

5       And, when they sent their proposal to us, just a few

6   days later, it, in fact, incorporated, in their proposal,

7   that the tax-free reorganization of TCEH, with the busted

8   351, be part of the plan for which they would be a plan

9   sponsor.

10  Q   Ms. Dore, aside from the disinterested director

11  meetings on April 28 and 29, debtors -- which are referenced

12  by Debtors' Exhibit 97 and 51 in the binder in front you,

13  aware -- are you aware of any other formal disinterested

14  director meetings for EFH Corp.?

15  A   I'm sorry.  What are you referring to?

16  Q   Sure.

17      In our binder, it would be DX-97 and DX-51.  So 51 and

18  97.

19  A   Okay.

20      Well, I hadn't seen these minutes before but I don't

21  attend the meetings of the disinterested directors.  So I'm

22  not always aware of all of the formal meetings.

23      I am aware of constant discussions because I will talk

24  to the directors, who often say; I just got off the phone

25  with Proskauer, or I'll talk to Proskauer who'll say; I just

1    got off the phone with Ms. Williamson and Mr. Evans.

2        So I know they have a lot of discussions.  I don't know

3    their schedule of formal meetings.

4    Q    You've been in the courtroom for much of the trial,

5    correct?

6    A    Yes, most of it.

7    Q    And you've heard -- did you hear testimony from

8    Mr. Keglevic and Ms. Howard about their understanding that

9    the NOLs at EFH were perceived to have little or no value to

10   EFH Corp. prior to May, when the alternative rulings were

11   first brought up?

12   A    I did hear that testimony.

13   Q    And do you agree with that?

14   A    Well, I -- we had a understanding that E -- that the

15   NOLs not consumed in the tax-free spin would disappear, go

16   into the black hole, so to speak prior to mid-May.

17       But I think I pointed out, and I think Ms. Howard and

18   Mr. Keglevic probably pointed as well, that there was some

19   benefit to having a NOL cushion at EFH even before mid-May,

20   just in case we got the tax calculation wrong, we had enough

21   to cover the tax.

22       But there wasn't a thought that it could be beneficial

23   in a future transaction for EFH or after emergence.

24   Q    And, certainly, there was no thought, prior to this

25   date in May when it became clear that the IRS was going to

1   rule a certain way, that the NOLs on the E-Side would have

2   cash value, correct?

3   A    I'm not sure they have cash value.  But --

4   Q    Your --

5   A    -- certainly, we didn't think that prior to mid-May.

6   Q    Have you reviewed those portions of Mr. Keglevic's

7   declaration where he indicates that they may have a net

8   present value of $370 million?  The retained NOLs.

9   A    Yes.

10  Q    And did you hear --

11  A    But I -- I think when you say cash value, I guess I was

12  thinking you were saying you could go out and sell them for

13  cash.

14      I think what he's saying is it might have benefit for

15  EFH to be able to cover taxes up to $370 million on a net

16  present value basis.

17      So I don't know that they have cash value but maybe I'm

18  misinterpreting what he said.

19  Q    Are -- you're aware that he discusses, in his

20  declaration, that they have value and his declaration,

21  obviously, addresses the issue better than I can right now

22  so --

23  A    Yes.

24      (Pause)

25  Q    After the private letter ruling was issued on July

1    28th, approximately three weeks ago, you were never

2    physically in a room to witness Proskauer ask for cash or

3    other consideration for the use of the NOLs; were you?

4    A    No.

5    Q    And after the private letter ruling was issued, you

6    never saw or witnessed Mr. Williamson -- Ms. Williamson or

7    Chairman Evans threaten to exercise a fiduciary out if the

8    EF -- if EFH Corp. were not compensated in cash or other

9    monetary consideration for the use of the NOLs; did you?

10   A    No.  But I don't know why the -- why you're using the

11   date of the PLR as -- as an important date there because we

12   knew, going all the way back to mid-May, we had a pretty

13   good indication of what the PLR would say.

14        So there was nothing magical other than the fact that

15   we got it in writing.  There was nothing surprising about

16   the content of the PLR on July 28.

17        So I don't know why that would have changed anyone's

18   negotiating posture.

19   Q    And after the PLR was issued, you never watched anyone

20   ask NextEra, or any other bidder, how valuable the NOLs

21   would be to them if the plan filed on May 1 could be

22   changed; did you?

23   A    No. But, again, we had asked NextEra, and other

24   bidders, when we found out in mid-May that the NOLs could be

25   available for EFH's use, to add value to their bid for it

1    and they did not.

2          In other words, we knew that before the PLR was issued

3    so there would be no reason to ask them again after July

4    28th.

5    Q    EFH has a negative basis of approximately $1.8 billion

6    in ONCOR, correct?

7    A    I will take your word for it.  I don't have that number

8    committed to memory.

9          (Pause)

10   Q    Were you aware that EFH has a negative basis in ONCOR?

11   A    Yes.

12   Q    And it was sizeable, more than a billion dollars.  You

13   are cognizant of a scale?

14   A    I'm sure that at some point I was.  I'm just not

15   remembering sitting here today what the number is.

16         But I -- I take your word for it.

17         (Pause)

18   Q    And are you aware of the fact that a variety of

19   transactions that could occur on the E-Side, including those

20   by a purchaser after any closing, might trigger a gain

21   related to that negative basis, what's referred to as a

22   built-in gain?

23   A    I'm aware that on both sides of the structure there

24   could be transactions that trigger taxes, if that's what

25   you're asking.

1   Q    And there's a variety of events, including the

2   forgiveness of debt, that could trigger a gain; are you

3   aware of that?

4   A    Well -- well, we project that EFH, now that we know it

5   gets to use some of the NOLs, has enough NOLs to cover the

6   CODI at EFH when EFH emerges.

7   Q    And -- and will the -- do you have an understanding of

8   the dollar amount of NOLs that would be utilized to cover

9   the CODI in connection with the purchase that's

10  contemplated?

11  A    No.  I don't.  And I think Ms. Howard testified that

12  that number moves quite a bit based on projections about the

13  emergence date.  I just know that the tax and finance folks

14  have told us and told the board that EFH should have enough

15  NOLs to cover the CODI and have some left over, if the

16  assumptions being used today hold true.

17  Q    And you understand that if the gains are triggered by

18  -- do you understand that if the gains are triggered by

19  certain events, then the NOLs can be released to offset the

20  gain?  Is that a concept that you're familiar with?

21  A    I think they're just applied on the tax return.  Is

22  that what you're referring to?

23  Q    The -- you -- you would agree that use of NOLs in

24  limited.  You have an understanding of that so --

25  A    Yes.

1    Q    -- $5 billion in NOLs on the E-Side certainly couldn't

2    be utilized in the first year following a transaction.

3         And -- and there are certain rules that govern when

4    NOLs can be used.  You heard -- do you have an understanding

5    of those rules?

6    A    Not in detail.

7    Q    Generally, do you have an understanding of those rules?

8    A    All I know about the NOLs is they can be used to offset

9    gain and there are -- limit -- time limitations going back

10   and going forward on when you can use them.

11        I think there are very complex rules around what kinds

12   of transactions can take advantage of NOLs and what can't

13   that I'm not familiar with.

14   Q    Would you agree that, generally, the -- the -- it's

15   projected that after utilizing NOLs to cover the CODI, there

16   will be approximately -- it's -- there's projected to be

17   approximately a billion dollars in additional NOLs available

18   at EFH?

19   A    Is that what Mr. Keglevic testified to?

20   Q    I'm using very rough numbers.  But the -- his

21   declaration --

22   A    If that's consistent with --

23   Q    -- does --

24   A    -- his testimony or Ms. Howard's testimony, then, yes.

25   I agree.  They -- I think they provided testimony on those

```
1    points and I didn't.

2    Q    And those -- but you have the idea -- you have an

3    understanding of the concept that a large portion of the

4    NOLs will be consumed with the transaction on account of

5    CODI.

6    A    With the T-Side transaction.

7    Q    With the E-Side transaction.  So let's back up.

8    A    I don't know if it's -- I don't know if it's a large

9    portion.  I thought it was a small portion.

10   Q    By small portion, what do you understand?

11   A    I really don't know the number specifically.  If you

12   wanted to --

13            THE COURT:  Let's stop the guessing game.  If you

14   want to show her something, show her something.

15            MR. PEDONE:  Yeah, let's move on, Your Honor.

16   BY MR. PEDONE:

17   Q    When the plan was filed in May of this year, was the

18   expectation that any NOLs would be consumed if TCEH was spun

19   off first, correct?

20   A    Was the expectation that some of the NOLs would be

21   consumed?  Yes.

22   Q    That the vast majority of them.  When the plan was

23   filed on May 1, there was no expectation that NOLs would be

24   left over after the T-Side spinoff for EFH Corp.?

25   A    Well, no, I think the expectation was there would be,
```

1    as I mentioned earlier, an NOL cushion that could cover

2    higher than the 5.8, that could cover tax from the busted

3    351, but the expectation was that to the extent the NOLs

4    fully covered the busted 351 even with that cushion and

5    there were NOLs leftover, they would be of no use to EFH

6    because they would go into the black hole is the language

7    the tax lawyers used, in a galaxy far, far away.

8    Q    You would agree that Ms. Howard was correct when she

9    testified that it was legally possible for fewer assets to

10   be used in connection with the busted 351 and that that

11   could result in a lower step up in retention of more NOLs,

12   separate and apart from the fact that the T-Side would need

13   to agree?  It's technically possible to do a transaction

14   that way.

15   A    Yes.

16   Q    And under the current understanding that the company

17   has obtained -- the debtors have obtained in May at some

18   point from the IRS, if fewer assets were used or deposited

19   into Prop Co in connected with the spin, there would be more

20   NOLs available for EFH Corp.?

21   A    Yes.

22   Q    Did you personally review any documents analyzing the

23   value of the NOLs that might be available for EFH Corp.

24   under different scenarios if different assets were deposited

25   into Prof Co?

```
 1   A    I don't know that I reviewed analysis of the value to

 2   EFH of that, but I know that we -- I participated in

 3   meetings, this would have been prior to May 1st, again, when

 4   the understanding was that EFH could not make use of NOLs

 5   post-emergence.  I certainly participated in meetings where

 6   we discussed what assets to put into Prof Co in order to

 7   achieve the step up in basis and the different mix of assets

 8   that could go into there and some of the considerations that

 9   prevented assets from going into there.

10   Q    Are you the individual at the company primarily

11   responsible for negotiation with NextEra?

12   A    It was a team of people.  I mean, Tony Horton from

13   Paul's team was the primary business interface.  And Andy

14   Wright and I on my team were the legal interface.

15   Q    And are you aware of whether or not you or anyone on

16   your team conveyed to NextEra that if the NOLs were valuable

17   to them, it would be possible to delay the T-Side plan and

18   engage in discussions over what they would be willing to pay

19   for the NOLs?

20   A    I think I testified that Paul and his team, Tony, I

21   believe specifically, discussed with NextEra the

22   availability of the NOLs after we learned of the Cody ruling

23   in May and they were not interested in assigning value.  So

24   there would have been no reason to have further discussions

25   with them about delay.
```

1    Q    So you're not aware of anybody offering to NextEra that

2    the T-Side plan could be delayed?

3    A    No, and they didn't ask us to once they had withdrawn

4    their objection to the schedule in Court.

5    Q    When did the debtors communicate to NextEra the effect

6    of what the final PLR ruling would be that EFH would be able

7    to retain its NOLs?  So I understand there's a public

8    document or an official document, the private letter ruling

9    that comes out, and there's some point in May, and I haven't

10   nailed down the exact date that the debtors learned that

11   their NOLs would have value.  Do you know that date

12   specifically?

13   A    Well, I think that -- I don't know the date

14   specifically.  I know that the tax lawyers started to get

15   some indications of that sometime in May, I don't know when.

16   I believe that I was advised, you know, more specifically

17   about the impact of it towards the end of May.  And then we

18   informed the board of it on June 10th.  We had the

19   conference of right on June 15th.  And we talked to the

20   board again on June 24th about the conference of right.  So

21   I think the discussions with NextEra would have certainly

22   been after June 24th and obviously before July 28th when we

23   finalized the agreement, or the early morning of July 29th.

24   Q    So would it be fair to say that the earliest date that

25   NextEra would have known that the IRS was favorable to the

1    interpretation of the NOLs having value would be June 24th?

2    A    You know, actually, now that I say that, I don't want

3    to speculate about that because I wasn't -- that would have

4    been Paul's team discussing that and they very well could

5    have mentioned it to them.  We were in almost daily

6    negotiating sessions with NextEra during period of June and

7    July.  They were in our offices.  We were in New York.  We

8    were on constant diligence calls.  And so it's very possible

9    that someone mentioned it to them even before we had advised

10   the board of the conference of right schedule on June 24th.

11   I'm just not sure.  I just know sometime between say June

12   1st and July 29th it would have been mentioned probably

13   multiple times.

14   Q    You're aware that upon an ownership change, such as the

15   contemplated purchase of EFH Corp. by NextEra, EFH Corp.

16   will retain its NOLs, but there will be limitations placed

17   on their use, which are limitations triggered by the

18   ownership change.  Is that concept familiar to you?

19   A    Not really.

20   Q    Do you have an understanding of the potential value to

21   purchasers other than NextEra of NOLs that might survive?

22   A    I only know that I've heard you say, and other

23   creditors who are objecting say that there are certain

24   structures that could make better use of the NOLs for EFH

25   than NextEra, but no one ever proposed a plan along those

1    lines.  So -- and we didn't have reason to do a detailed

2    evaluation of that since the only proposal we've had since

3    plan A fell apart for EFH's reorganization is from third

4    party bidders, none of whom requested, or demanded, or even

5    asked about retaining additional NOLs.  So I can't really

6    speculate about what some hypothetical structures that no

7    one has proposed.

8    Q    So my question is separate and apart from structures

9    where creditors might -- existing creditors might be the

10   purchaser and therefore avoid a change of ownership.  That's

11   one structure where the NOLs could have value and that's not

12   what my question relates to.  Under the current transaction

13   with NextEra, a certain number of NOLs will be available for

14   NextEra to make use of or EFH Corp. to make use -- actually,

15   it would be NextEra given the merger -- to make use of in

16   the future.  Do you have that understanding?

17   A    Yes.

18   Q    And there are limitations in the IRS code on the timing

19   of when NextEra can make use of those.  Are you aware of

20   that concept?

21   A    I know Ms. Howard testified as to timing

22   considerations.

23   Q    Do you have knowledge that there's a formula based upon

24   the value of the enterprise and interest rates that then

25   leads to a calculation to determine how many NOLs can be

1    used per year?

2    A    No, I have no knowledge of that.

3    Q    So it would be fair to say that in your negotiations

4    with potential purchasers, which include parties we won't

5    identify other than NextEra, you have not been aware of the

6    dollar value to those parties of the NOLs that would be

7    retained?

8    A    What I know about that is that the discussions with

9    alternative bidders to NextEra included the facts around the

10   availability of the NOLs and at the end of the day, the

11   offer from NextEra, as we sit here today, was the highest

12   and best offer available.  So whatever impact the discussion

13   of the NOLs had on other bidders, it wasn't enough to cause

14   their bid to be higher than NextEra's.

15   Q    Okay.  I understand that's your understanding, but my

16   question related to your knowledge of the value of the NOLs

17   for use in future years.  That's not something that you had

18   in your mind such calculations as you participate in the

19   negotiations, is it?

20   A    Well, I was negotiating with NextEra.  It didn't assign

21   any value.  And I was not directly participating.  We had

22   sort of the, you know, blue team/red team, and I was not

23   participating in the negotiations with the other bidders.

24   But I am aware, based on conversations with the board, and

25   conversations with Paul, and Tony that the other bidders

1   were informed of the same facts around the NOLs, and

2   ultimately, it did not factor into their bid in a way that

3   made their bid superior to NextEra's bid.  Not yet, at

4   least.

5   Q    But you don't really have personal knowledge of the

6   other bidders' calculations of the value of the NOLs that

7   would be retained in how they apportion that in connection

8   with their bids, do you?

9            MR. MCKANE:  Objection, Your Honor.  I mean, first

10  of all, this line of questioning is absolutely inconsistent

11  not only with her testimony, but she's already said what her

12  limits are in terms of what the finance team did versus what

13  she did.  But as to that specific question, how could anyone

14  on our side of the ledger have visibility into the

15  calculations that led into the bid when the bid comes across

16  the (indiscernible)?  It's an impossible question to answer.

17           MR. PEDONE:  I agree, which is why I asked the

18  follow up.

19           THE COURT:  Which is?  The follow up is?

20           MR. PEDONE:  Which was did you have -- you didn't

21  have knowledge of the other -- the bidders' calculations

22  concerning the value of the NOLs.

23           THE COURT:  Okay.

24           MR. PEDONE:  Her testimony was that --

25           THE COURT:  Did you have that knowledge?

1            THE WITNESS:  I do not have that knowledge.

2    BY MR. PEDONE:

3    Q    And are you aware that NOLs can be carried forward for

4    20 years?

5    A    I think I recall Ms. Howard saying that.  There's a 2

6    years and a 20 years and I don't remember now which went

7    with what.  But if you represent that's what she said then I

8    believe it because she knows what she's talking about.

9            MR. PEDONE:  May I confer with Mr. McKane for one

10   second?

11           THE COURT:  Uh-huh.

12      (Pause)

13           MR. PEDONE:  Your Honor, there had been an open

14   question with regard to whether or not certain employment

15   agreements would be objected to by the debtors, which would

16   lead into a line of questions.  Mr. McKane has agreed that

17   they'll be admitted later, so I don't need to -- I'm not

18   going to go forward with those questions now.

19           THE COURT:  Okay.

20   BY MR. PEDONE:

21   Q    Ms. Dore, you're aware that in connection with

22   scheduling in these matters that T-Side first lien lenders

23   filed a statement and attached a form plan of reorganization

24   to it, aren't you?

25   A    Yes.

1  Q    Would you agree that with their statement that the TCEH

2  only plan is in almost all respects substantially identical

3  to the debtor's new plan as it relates to the TCEH debtors?

4  A    I didn't do a side by side comparison, but I know the

5  overall structure was similar.  That's why they ended up

6  agreeing not to file their plan and to vote in favor of our

7  plan.  I think they may have had some more onerous

8  conditions on the E-Side around the tax re-spend then we

9  did, if I recall correctly.  I know that they originally --

10  and I don't know what their filed plan said.  They

11  originally said they were going to flip the toggle and file

12  a plan that had taxable -- with a tax-free toggle only if

13  the E-Side creditors could "get their act together."  I

14  don't know that by the time they filed it, that's the way

15  they had it structured.

16  Q    And, of course, their statements concerning that in

17  May, do you know if their statements concerning potentially

18  flipping the toggle were before or after the indications

19  that were received from the IRS that the NOLs would have

20  value?

21  A    They were before.

22  Q    And you would agree that the -- unless the toggle was

23  exercised, the T-Side plan attached to their statement was

24  not a recipe for tax Armageddon, was it?

25  A    Which toggle are you talking -- I'm sorry, I got

```
 1    confused --

 2    Q    Sure.

 3    A    -- because I said --

 4    Q    That's okay.

 5    A    -- they were going to flip the toggle and I'm not sure

 6    if they did in their plan or not.

 7    Q    I thought you meant the toggle in their own plan.  So

 8    they filed the plan with the provisions to spin off the T-

 9    Side and those were substantially similar to the plan that

10    the debtors had filed, correct?

11    A    Can we look at that document?  Do you mind?  Because I

12    just don't remember if they changed their position between

13    April 15th --

14    Q    Yes.

15    A    -- call it, and May 15th.  Which document is it?

16    Q    Let me -- give me one second.

17    A    Is it 7-DX-758?

18    Q    Yes.  But what we do not need to do is take too long

19    for you to spend a lot of time reading because I can move on

20    rather than spend a lot of time, but --

21    A    Well, I just --

22    Q    -- feel free to refresh your memory to get your

23    testimony correct.

24    A    Luckily, by this time, when they filed the plan, the

25    only thing that was important to me was that they had filed
```

1    a plan showing they were ready to do so if we hadn't.  But I

2    didn't study their plan because we already had our plan on

3    file.  So --

4    Q    Okay.  I'm -- we can move on with your --

5    A    Okay.

6    Q    -- statements.  Do you have an understanding of the

7    benefit that the T first lien lenders new equity owners of

8    TCEH, assuming the plan is confirmed, will receive from the

9    tax receivable agreement?

10   A    Only at the highest level.  I'm not -- I was not

11   involved in negotiating the tax receivable agreement.

12   Again, that was largely done between tax lawyers.  So my

13   very, very high level of understanding is that the tax

14   receivable agreement essentially monetizes the value of the

15   step up in basis over time with payments to holders of tax

16   receivable rights, essentially, which would be the equity

17   holders.  That's about the limit of my knowledge of that.

18   Q    Ms. Dore, earlier this morning you testified that

19   Proskauer had reached out to the T first on behalf of the

20   disinterested directors in an attempt to negotiate some

21   additional consideration for reorganized TCEH's use of the

22   NOLs around March or April of this year, correct?

23   A    Yes.  I think they were doing it on behalf of

24   disinterested directors but on -- as a larger matter on

25   behalf of the EFH estate.  I mean, they do represent EFH,

1    they're just directed by the disinterested directors.  They

2    are lawyers for EFH.

3            MR. PEDONE:  Your Honor, may I approach the

4    witness?

5            THE COURT:  Uh-huh.

6    BY MR. PEDONE:

7    Q    I'm going to hand you a copy of your deposition.

8    A    Which one is --

9    Q    So it's page 182 of your most recent deposition.

10   A    Okay.  182, you said?

11   Q    182.  It actually begins at the bottom of 181.

12           THE COURT:  At this point, we're up to volume 8 of

13   8, (indiscernible).

14           MR. PEDONE:  It's worse.  We foolishly started

15   over, so citing is difficult.

16           THE WITNESS:  Okay.

17   BY MR. PEDONE:

18   Q    And I asked you and has -- and Ms. Nighan asked you,

19   she bet that I would make that mistake --

20   A    Yeah, I thought you were going to have her cross me.

21   Q    And she asked has there been any discussion or

22   consideration to your knowledge by any of the disinterested

23   directors of having reorganized TCEH pay some amount of

24   consideration to EFH Corp. in exchange for the use of the

25   NOLs.  And would you read your answer?

1   A    I'm so sorry.  I lost you again on -- tell me the page

2   number.

3   Q    It's okay, no.

4   A    I just want to make sure I'm --

5   Q    That's fine.  So I read the question that begins on

6   page 181, line 25.

7   A    Okay.

8   Q    And then your answer --

9   A    Okay.

10  Q    -- begins on 182, line 6.

11          MR. MCKANE:  Objection, Your Honor.  This is not

12  proper impeachment.  Those are not inconsistent statements.

13  I mean, you can refresh recollection with -- you can do it

14  with a deposition, you can do it (indiscernible).  But

15  impeachment requires you to identify a prior inconsistent

16  statement, read the question and answer, and that's it.

17  This is not inconsistent.

18          THE COURT:  I'll allow the question to -- answer

19  to be read.

20          THE WITNESS:  My answer was, "I don't participate

21  in the disinterested director meetings, so I can't say what

22  they might have discussed with their counsel."

23  BY MR. PEDONE:

24  Q    And then down towards the bottom when I said, "I'm not

25  asking that, but do you have any knowledge that they

1   discussed or considered that issue."  And your response was,

2   at the bottom of the page, line 20.

3   A    I said, "Well, your question is open-ended as to time,

4   so I know for example -- I know that, for example, part of

5   the settlement discussions you know long ago, they would

6   have had that discussion about whether TCEH should be

7   compensating for use of the NOLs and TCEH's position always

8   was you should be compensating us.  So they were always

9   taking the opposite position on that, including the

10  disinterested directors for each estate."

11  Q    And at that point when you were deposed, you didn't

12  know if there had been any discussion or consideration by

13  the disinterested directors of having a possible agreement

14  to a lesser amount of NOLs consumed, thereby leaving some

15  greater amount of NOLs available at EFH, did you?

16  A    Well, I knew that their advisors -- I knew about my

17  conversations with their advisors as to what their advisors

18  had told me.  What I didn't know was what had been discussed

19  between the disinterested directors and their advisors.  I

20  mean, I could speculate that if their advisors were telling

21  me that, surely they were telling their directors that, but

22  I wasn't going to speculate in my deposition because I don't

23  participate in those meetings.  So I said I don't know what

24  took place in those meetings and I was never asked a

25  question of, well, did the advisors ever tell you that they

1    had asked Paul Weiss for both compensation and lower step

2    up.  That's what I had knowledge of.

3              MR. PEDONE:  Thank you.  Your Honor, if I could

4    take one minute and then I believe I'm complete.

5              THE COURT:  Okay.

6              MR. PEDONE:  Your Honor, I have no further

7    questions.

8              THE COURT:  Thank you.

9              MR. PEDONE:  Thank you.

10             THE COURT:  Mr. McKane?

11             MR. MCKANE:  No redirect, Your Honor.

12             THE COURT:  All right.  Thank you, Ms. Dore.

13             THE WITNESS:  Thank you, Your Honor.

14             MR. MCKANE:  Your Honor, the (indiscernible) team

15   has informed that I may not have actually formally moved

16   Ms. Dore's declaration into evidence.

17             THE COURT:  I don't think you have.

18             MR. MCKANE:  I'd like to do that at this time.

19             THE COURT:  The objections have been overruled, so

20   any further ones not identified?

21             MR. PEDONE:  No, Your Honor.

22             THE COURT:  All right.

23             MR. PEDONE:  Just making sure they're there.

24   Thank you.

25             THE COURT:  It's admitted.

1       (Debtors' Exhibit No. D-DIR Dore was admitted)

2              MR. MCKANE:  And, Your Honor, we have shared with

3    the objectors those board presentation which we understood

4    were subject to their objection which have been overruled on

5    the motion for clarification (indiscernible)

6    reconsideration.  And just for the record, we'd like to

7    provide that summary.

8              THE COURT:  Okay.

9              MR. MCKANE:  Your Honor, at this point in time,

10   there are a number of exhibits that I understand based on

11   your ruling are no -- there are no objections to that I

12   would like to read into the evidence -- read into the record

13   and move these all into evidence as a group.

14             THE COURT:  Okay.

15             MR. MCKANE:  All right.  And I have green sheets

16   for that as well.  And, Your Honor, I apologize.  Mr. Pedone

17   has asked me to clarify that these exhibits are -- do

18   contain -- do cover, sorry, this list does cover exhibits

19   that had objections to them that you have overruled --

20             THE COURT:  Okay.

21             MR. MCKANE:  -- as opposed to having them

22   withdrawn.

23             THE COURT:  All right.

24             MR. MCKANE:  All right.  May I approach?

25             THE COURT:  Yes.  You're not going to read all of

Page 190

1    this, are you?

2              MR. MCKANE:  And, Your Honor, this list of

3    exhibits we're about to move into evidence has been shared

4    prior to now with all of the objectors.  This is the most

5    difficult part of the proceeding for me.  So I apologize if

6    I miss one.

7              THE COURT:  You've messed this up before.

8              MR. MCKANE:  I have (indiscernible) here, Your

9    Honor.  The debtors at this time --

10             THE COURT:  You can't blame Mr. Husnick, he's not

11   here.  We'll blame Mr. Kieselstein.

12             MR. MCKANE:  There we go.  All right.  At this

13   time, the debtors move into evidence DX-5, 7, 8, 10, 11, 14,

14   15, 20, 21, 28, 29, 32, 33, 34, 36, 37, 38, 39, 40, 42, 43,

15   55, 56, 65, 76, 90, 132, 133, 135, 136, 138, 140, 143, 146,

16   292, 293, 296, 297, 299, 300, 301, 302, 311, 312, 314, 315,

17   317, 318, 319, 320, 346, 348, 350, 351, 354, 357, 358, 359,

18   360R, 361, 362, 363R, 364, 366, 369, 370, 371, 372, 374,

19   375, 455, 462, 564, 565, 566, 591, 592, 593, 594, 595, 596,

20   597, 598, 599, and 600.  601, 602, 603, 604, 605, 606, 607,

21   608, 609, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619,

22   620, 621, 622, 625, 626, 627, 630, 635, 644, 652, 678, 679,

23   690, 691, 692, 693, 694, 695, 696, 697, 698, 699R, 700, 701,

24   702, 703, 704, 705R, 708, 709, 710.

25             THE COURT:  And all objections in connection with

1    those have obviously either -- have been overruled, so

2    they're otherwise admissible?

3              UNIDENTIFIED SPEAKER:  Yes.  No objection, Your

4    Honor.

5              THE COURT:  Okay, they're admitted.

6         (Debtors' Exhibit Nos. 5, 7-8, 10-11, 14-15, 20-21, 28-

7    29, 32-34, 36-40, 42-43, 55-56, 65, 76, 90, 132-133, 135-

8    136, 138, 140, 143, 146, 292-293, 296-297, 299-302, 311-312,

9    314-315, 317-320, 346, 348, 350-351, 354, 357-359, 360R-

10   363R, 364, 366, 369-372, 374-375, 455, 462, 564-566, 591-

11   622, 625-627, 630, 635, 644, 652, 678-679, 690-699R, 700-

12   705R, 708-710 were admitted)

13             MR. MCKANE:  That's it.

14             THE COURT:  Page 2?

15             MR. MCKANE:  On page 2, Your Honor, I believe

16   these are a series of board presentations which were

17   previously not moved into evidence which they had objections

18   which have been overruled.  And just for an abundance of

19   caution, I'd like to move them in as well, if they haven't

20   already been moved in.

21             THE COURT:  Okay.

22             MR. MCKANE:  DX-53, 63, 71, 72, 73, 87, 139, 142,

23   145, 191, 291, 294, 295, 303, 313, 329, and 342.

24             MR. PEDONE:  I think these objections have been

25   addressed, Your Honor.

1          THE COURT:  Okay.  They're admitted.

2      (Debtors' Exhibit Nos. 53, 63, 71-73, 87, 139, 142,

3   145, 191, 291, 294-295, 303, 313, 329, 342 were admitted)

4          MR. MCKANE:  Your Honor, at this time the debtors

5   rest their case in chief.

6          THE COURT:  Okay.  Excellent.  All right.  We have

7   an hour-ish.  Do we want to start Mr. -- Dr. -- Professor

8   Sullivan, I'll get it right.

9          MR. PEDONE:  Our preference would be to start him

10  tomorrow and not ruin his evening if that's okay with the

11  Court.

12          THE COURT:  That's fine with me.  Is that all

13  right, Mr. McKane?

14          MR. MCKANE:  Your Honor, we are well ahead of

15  schedule and I believe it would be helpful if Mr. Pedone

16  just confirms he -- the only rebuttal witness that as of

17  this time he's going to call, which is now at the end of our

18  case, is Mr. Sawyer.  And if that's the case, we can take

19  care of both witnesses, I believe, tomorrow morning.

20          THE COURT:  All right.

21          MR. PEDONE:  There's no other rebuttal witnesses.

22          THE COURT:  All right.  Very good.  All right,

23  excellent.  So we'll recess until tomorrow.  We'll reconvene

24  at 10 o'clock as normal and we'll have our 9:30 chambers

25  meeting as normal.  And at this point, I don't think there's

1    anything sitting on my plate.  You're going to have a

2    discussion as we discussed this morning --

3              MR. MCKANE:  Yes, Your Honor.

4              THE COURT:  -- about briefing and issues,

5    etcetera, and we'll be able to hopefully have a further

6    discussion about that in chambers tomorrow morning.

7              MR. MCKANE:  Very good, Your Honor.

8              MR. PEDONE:  Yes.

9              THE COURT:  And we'll make a final decision.

10             MR. PEDONE:  Yes.

11             THE COURT:  Okay.

12             MR. PEDONE:  Thank you, Your Honor.

13             THE COURT:  All right.  Very good.  See you

14   tomorrow.  We're adjourned.

15             MR. MCKANE:  Thank you, Your Honor.

16        (Whereupon these proceedings were concluded at 4:26 PM)

17

18

19

20

21

22                         I N D E X

23

24   WITNESSES              EXAM BY                    PAGE

25   John Stuart            Mr. Stephany                17

| | | |
|---|---|---|
| 1 | Mr. Skelly | 38 |
| 2 | Mr. Stephany | 61 |
| 3 | Stacey Dore    Mr. McKane | 63 |
| 4 | Mr. Pedone | 151 |
| 5 | | |

6                    E X H I B I T S

| | | |
|---|---|---|
| 7 | PARTY       NO. | EVID. |
| 8 | Debtors'     D-DIR Williamson R-2 | 13 |
| 9 | D-DIR Stuart | 19 |
| 10 | D-DIR Dore | 191 |
| 11 | | |
| 12 | DX-5 | 191 |
| 13 | DX-7-8 | 191 |
| 14 | DX-10-11 | 191 |
| 15 | DX-12 | 37 |
| 16 | DX-14-15 | 191 |
| 17 | DX-16 | 37 |
| 18 | DX-17 | 37 |
| 19 | DX-20-21 | 191 |
| 20 | DX-28-29 | 191 |
| 21 | DX-30 | 148 |
| 22 | DX-32-34 | 191 |
| 23 | DX-36-40 | 191 |
| 24 | DX-42-43 | 191 |
| 25 | DX-53 | 192 |

Page 195

| | | |
|---|---|---|
| 1 | DX-55-56 | 191 |
| 2 | DX-63 | 192 |
| 3 | DX-65 | 191 |
| 4 | DX-71-73 | 192 |
| 5 | DX-76 | 191 |
| 6 | DX-87 | 192 |
| 7 | DX-90 | 191 |
| 8 | DX-92 | 148 |
| 9 | DX-118 | 148 |
| 10 | DX-120 | 148 |
| 11 | DX-132-133 | 191 |
| 12 | DX-135-136 | 191 |
| 13 | DX-138 | 191 |
| 14 | DX-139 | 192 |
| 15 | DX-140 | 191 |
| 16 | DX-142 | 192 |
| 17 | DX-143 | 191 |
| 18 | DX-145 | 192 |
| 19 | DX-146 | 191 |
| 20 | DX-191 | 192 |
| 21 | DX-291 | 192 |
| 22 | DX-292-293 | 191 |
| 23 | DX-294-295 | 192 |
| 24 | DX-296-297 | 191 |
| 25 | DX-299-302 | 191 |

Page 196

| | | |
|---|---|---|
| 1 | DX-303 | 192 |
| 2 | DX-311-312 | 191 |
| 3 | DX-313 | 192 |
| 4 | DX-314-315 | 191 |
| 5 | DX-317-320 | 191 |
| 6 | DX-329 | 192 |
| 7 | DX-342 | 192 |
| 8 | DX-345 | 191 |
| 9 | DX-346 | 191 |
| 10 | DX-348 | 191 |
| 11 | DX-350-351 | 191 |
| 12 | DX-354 | 191 |
| 13 | DX-355 | 37 |
| 14 | DX-357-359 | 191 |
| 15 | DX-360R | 191 |
| 16 | DX-361-362 | 191 |
| 17 | DX-363R | 191 |
| 18 | DX-364 | 191 |
| 19 | DX-366 | 191 |
| 20 | DX-369-372 | 191 |
| 21 | DX-374-375 | 191 |
| 22 | DX-378 | 37 |
| 23 | DX-455 | 191 |
| 24 | DX-462 | 191 |
| 25 | DX-551 | 37 |

Page 197

| 1 | DX-588 | 37 |
| 2 | DX-564-566 | 191 |
| 3 | DX-591-622 | 191 |
| 4 | DX-625-627 | 191 |
| 5 | DX-630 | 191 |
| 6 | DX-635 | 191 |
| 7 | DX-644 | 191 |
| 8 | DX-652 | 191 |
| 9 | DX-678-679 | 191 |
| 10 | DX-690-698 | 191 |
| 11 | DX-699R | 191 |
| 12 | DX-700-704 | 191 |
| 13 | DX-705R | 191 |
| 14 | DX-708-710 | 191 |
| 15 | DX-760 | 37 |
| 16 | DX-761 | 37 |
| 17 | DX-762 | 37 |
| 18 | DX-763 | 37 |
| 19 | DX-764 | 37 |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 198

1            C E R T I F I C A T I O N

2

3    We, Tracey Williams, Debra McCostlin, Dawn South, Pamela A.

4    Skaw, and Jamie Gallagher, certify that the foregoing

5    transcript is a true and accurate record of the proceedings.

6    Tracey Williams _____
     Digitally signed by Tracey Williams
     DN: cn=Tracey Williams, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2016.08.23 13:20:07 -04'00'

7    Tracey Williams

8    AAERT Certified Electronic Transcriber CET**152

9    Debra McCostlin _____
     Digitally signed by Debra McCostlin
     DN: cn=Debra McCostlin, o=Veritext, ou,
     email=digital1@veritext.com, c=US
     Date: 2016.08.23 13:20:42 -04'00'

10   Debra McCostlin

11   Dawn South _____
     Digitally signed by Dawn South
     DN: cn=Dawn South, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2016.08.23 13:21:11 -04'00'

12   Dawn South

13   AAERT Certified Electronic Transcriber CET**D-408

14   Pamela A. Skaw _____
     Digitally signed by Pamela A. Skaw
     DN: cn=Pamela A. Skaw, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2016.08.23 13:21:48 -04'00'

15   Pamela A. Skaw

16   Jamie Gallagher _____
     Digitally signed by Jamie Gallagher
     DN: cn=Jamie Gallagher, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2016.08.23 13:22:26 -04'00'

17   Jamie Gallagher

18

19   Date:  August 23, 2016

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501