## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.,*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 14-10979 (CSS)<br><br>Jointly Administered<br><br>Re: D.I. 9199 |

**POST-TRIAL BRIEF OF EFH INDENTURE TRUSTEE IN SUPPORT OF OBJECTION TO CONFIRMATION OF THIRD AMENDED JOINT PLAN OF REORGANIZATION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**NIXON PEABODY LLP**
Amanda D. Darwin
Richard C. Pedone
George J. Skelly
100 Summer Street
Boston, Massachusetts 02110
Telephone: (617) 345-1000
Facsimile: (617) 345-1300
adarwin@nixonpeabody.com
rpedone@nixonpeabody.com
gskelly@nixonpeabody.com

-and-

Christopher J. Fong
437 Madison Avenue
New York, NY 10022
Telephone: 212-940-3724
Facsimile: 855-900-8613
cfong@nixonpeabody.com

**CROSS & SIMON, LLC**
Christopher P. Simon (Del. Bar No. 3697)
105 North Market Street, Suite 901
Wilmington, Delaware 19801
Telephone: (302) 777-4200
Facsimile: (302) 777-4224
csimon@crosslaw.com

*Co- Counsel to American Stock Transfer & Trust Company, LLC, as Indenture Trustee*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................I

I. NATURE AND STAGE OF PROCEEDINGS......................................................... 1

II. SUMMARY OF ARGUMENT ............................................................................. 1

III. ARGUMENT ...................................................................................................... 2

      A.     EFH Corp. Is Providing Substantial Value But Is Not Receiving Reasonably Equivalent Value in Exchange for its NOLs........................................................... 2

           i)      Overview................................................................................................ 2

           ii)     Texas Fraudulent Transfer Law .................................................. 4

           iii)    It is Uncontroverted That EFH Corp. is Transferring Enormous Value to and Conferring Benefit on TCEH .................................................. 5

           iv)    The NOLs Proposed to be Consumed in the Busted 351 Will Result in Loss to EFH Corp. Creditors ................................................ 5

           v)     EFH Corp. Is Not Receiving Reasonably Equivalent Value ..................... 7

      B.     Following a Change of Control, NOLs Retained by EFH Corp. Will Have Value That Can Be Reasonably Calculated From the Evidence........................... 10

           i)      Law Applicable to Retention and Future Use of NOLs........................... 10

           ii)     Retained NOLs Will be Valuable to EFH Corp........................................ 13

      C.     The TCEH Debtors are Not Entitled To A Good Faith Finding........................... 17

IV. CONCLUSION................................................................................................... 18

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*Giuliano v. FDIC (In re Downey Fin. Corp.),*
499 B.R. 439 (Bankr. D. Del. 2013) ...................................................................17

*High River LP v. TWA, Inc. (In re TWA, Inc.),*
2002 U.S. Dist. LEXIS 5951 (D. Del. Mar. 26, 2002) ..........................................19

*Hinsley v. Boudloche (In re Hinsley),*
201 F.3d 638 (5th Cir. 2000) ...........................................................................4, 5

*In re Abbotts Dairies,*
788 F.2d 143 (3d Cir. 1986).................................................................................20

*In re Alaska Fur Gallery, Inc.,*
2011 Bankr. LEXIS 5787 (Bankr. AL, April 29, 2011) .....................................1, 2

*In re Centennial Textiles,*
227 B.R. 606 (Bankr. S.D.N.Y. 1998) ..................................................................1

*In re Contex Holdings, LLC*
518 B.R. 792 (Bankr. D. Del. 2014) ..................................................................4,7

*In re Metropolitan Cosmetic Reconstructive Surgery P.A.,*
125 B.R. 556 (Bankr. D. Minn. 1991), argued .....................................................1

*In re Prudential Lines, Inc.,*
107 B.R. 832 (Bankr. S.D.N.Y. 1989), *aff'd* 119 B.R. 430 (S.D.N.Y. 1990), aff'd 928
F. 2d 565 (2d Cir. 1991).........................................................................................7

*In re Wash. Mut., Inc.,*
442 B.R. 314 (Bankr. D. Del. 2011) .....................................................................1

*McLane Foodservice, Inc. v. Wolverine Pizza, LLC,*
2005 U.S. Dist. LEXIS 12110 (N.D. Tex. June 21, 2005) ......................................4

*Osherow v. Nelson Hensley & Consol. Fund Mgmt, L.L.C. (In re Pace),*
456 B.R. 253 (Bankr. W.D. Tex. 2011)..................................................................9

**OTHER CASES**

*Bowman v. El Paso CGP Co., L.L.C.,*
431 S.W.3d 781 (Tex. App. Houston 14th Dist. 2014) ..........................................5

**FEDERAL STATUTES**

11 U.S.C. § 363(m) ..................................................................................................19, 20

11 U.S.C. § 1129(a)(3) .................................................................................................1,2

IRC § 108 ..............................................................................................................6, 11, 12

IRC § 959(b) ...............................................................................................................1, 2

IRC § 108(a) ..............................................................................................................10, 12

IRC § 108(b) ................................................................................................................6, 11

IRC § 361 .......................................................................................................................12

IRC § 382 ................................................................................................................. *passim*

IRC § 1001 .....................................................................................................................12

**OTHER STATUTES**

TEX. BUS. & COM. CODE § 24.004(d) .............................................................................4

TEX. BUS. & COM. CODE § 24.006(a) .............................................................................4

**REGULATIONS**

Dept. of Treasury, Internal Revenue Service, 26 CFR Part 1 [TD 9771] ......................11

Revenue Ruling 2016-11 ................................................................................................16

Treasury Regulations §§ 1.382-12 ................................................................................15

**OTHER AUTHORITIES**

7 COLLIER ON BANKRUPTCY ¶ 1108.02 (15th ed. 2015) ................................................2

Barr, 780-4th T.M., *Net Operating Losses and Other Tax Attributes — Sections 381, 382, 383, 384, and 269* ............................................................................................ *passim*

Oxford Dictionary ...........................................................................................................3

# I.
# NATURE AND STAGE OF PROCEEDINGS

The EFH Indenture Trustee by its undersigned counsel, hereby submits this post-trial brief in further support of its Objection to the Current Plan.[2]  The Objection, the *Pretrial Brief of EFH Indenture Trustee Regarding Applicable Fraudulent Transfer Law* [D.I. 9316] (the "Fraudulent Transfer Brief") and the *Pretrial Brief of EFH Indenture Trustee Regarding Standard of Review Applicable to Approval of EFH 363 Transactions and Related Corporate Governance Matters* [D.I. 9315] (the "Corporate Governance Brief," together with the Fraudulent Transfer Brief, the "Pretrial Briefs") are incorporated herein by reference.

# II.
# SUMMARY OF ARGUMENT

1.    As explained in the Objection and the Pretrial Briefs, the Debtors bear the "burden of proving that the Plan complies with all of the requirements of the Bankruptcy Code for confirmation." *In re Wash. Mut., Inc.,* 442 B.R. 314, 328 (Bankr. D. Del. 2011).  EFH Corp. also bears the burden of establishing that the EFH 363 Transactions are proper.  Neither the Current Plan nor the EFH 363 Transactions can be approved under section 1129(a)(3) if the transactions constitute fraudulent transfers.[3]  Moreover, 28 U.S.C. § 959(b) requires that the

---

[2]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the *EFH Indenture Trustee and Contrarian Capital Management, LLC's Objection to Confirmation of Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9224] (the "Objection").

[3]    At closing arguments, Debtors' counsel, citing *In re Centennial Textiles,* 227 B.R. 606  (Bankr. S.D.N.Y. 1998) and *In re Metropolitan Cosmetic Reconstructive Surgery P.A.,* 125 B.R. 556 (Bankr. D. Minn. 1991), argued that state fraudulent transfer law has no application here. **Both of those opinions dealt with chapter 11 cases which were converted to chapter 7 and the chapter 7 trustee sought to avoid post-petition/pre-conversion payments**. *Centennial* dealt with a cause of action brought under state fraudulent conveyance law, made applicable through section 544(b), to avoid postpetition transfers.  The court held that section 544(b), and hence state law, applies solely to prepetition transfers. *Centennial Textiles,* 227 B.R. 606. *Metropolitan* contained a similar analysis.  Here, the EFH Indenture Trustee is not seeking to avoid a post-petition transaction.  Rather, EFH Indenture argues that the EFH 363 Transactions violate section 1129 and the Current Plan cannot be approved because the Current Plan, *if approved*, effectuates a fraudulent transfer under Texas law.  Nothing in the Bankruptcy Code permits a debtor to violate state law.

Debtors operate their property "according to the requirements of the valid laws of the State in which such property is situated," which would include state fraudulent transfer laws.[4]

2.      As explained herein and in the Objection and Fraudulent Transfer Brief, the proposed transactions are, in fact, constructive fraudulent transfers under Texas law and cannot be approved.[5]  While the majority of this brief focuses on the proposed consumption of EFH Corp.'s NOLs, the same principles discussed herein apply equally to the proposed transfer of EFH Corporate Services and EFH Properties.

### III.
### ARGUMENT

**A.    EFH Corp. Is Providing Substantial Value But Is Not Receiving Reasonably Equivalent Value in Exchange for its NOLs**

   i)      **Overview**

3.      To determine if a party receives reasonably equivalent value in a transaction the Court must assess what each party to the transaction "gives" and "gets."  The plan proponents

---

As the court in *In re Alaska Fur Gallery, Inc.*, 2011 Bankr. LEXIS 5787 (Bankr. AL, April 29, 2011) stated: "State law precludes this transfer, and there is nothing in § 1123 which would permit [the debtor plan proponent] to circumvent this.  Accordingly, the debtor's fourth amended plan violates § 1129(a)(3).").  *Id.* at * 25.

[4]    While 28 U.S.C. § 959(b) is often cited in cases involving compliance with environmental law, the mandate of the statute is clear:  Debtors cannot violate state laws, which include prohibitions against fraudulent transfers of property.

> [I]t is clear that a business must be operated in accordance with federal nonbankruptcy laws as well. Thus, for example, a landlord that files a chapter 11 petition and continues to operate an apartment building as debtor in possession is not relieved of the obligation to comply with local housing code regulations, state rent control laws or local zoning ordinances. A debtor that operates a retail store is not excused from complying with consumer protection laws, nor from complying with state laws governing close-out sales. Filing does not relieve a debtor of its obligation to comply with securities law reporting requirements, including the responsibilities imposed by the Sarbanes-Oxley Act of 2002.

7 COLLIER ON BANKRUPTCY ¶ 1108.02 (15th ed. 2015).

[5]    The elements of a fraudulent transfer under Texas law are detailed in the Fraudulent Transfer Brief.  This brief solely addresses whether reasonably equivalent value was provided to EFH Corp.

have posited that EFH Corp. will receive reasonably equivalent value in the form of the avoidance of tax liability upon the occurrence of Tax Armageddon and other benefits that are not measurable.  Over five days of testimony, the Debtors' witnesses emphasized that the benefit to EFH Corp. from permitting Reorganized TCEH to consume its NOLs is the avoidance of so-called "Tax Armageddon."[6]

4.    That testimony, however, misses a key point.  As Mr. Sawyer explained in his testimony on August 23, 2016, TCEH is receiving the ***very same*** benefits as EFH Corp.– the avoidance of tax liability in connection with any potential Tax Armageddon:[7]

> Ms. Nighan: So you would agree that a benefit of the plan is that TCEH avoids the risk of a tax Armageddon occurring?
>
> Mr. Sawyer: I think a benefit of the plan as is before the Court is that both the T-Side estates and the E-Side estates avoid the catastrophic tax risk of a stranded tax that EFH, where EFH would be jointly liable for that tax, along with the T- Side.[8]

Mr. Sawyer makes clear that any benefit derived from the avoidance of Tax Armageddon inures equally to the benefit of both estates.  As a result, there is no net transfer to EFH Corp. that might constitute a transfer of reasonably equivalent value.  Moreover, for the other reasons discussed below, avoidance of such a hypothetical contingency does not qualify as sufficiently "concrete" under Texas fraudulent transfer law.

---

[6]    Hr'g Tr. 210:20-23 (Aug. 17, 2016) (Keglevic, P.) ("[T]he consideration the E-Side was getting is a reduction in risk of going taxable. So, you know, E-Side got a partner joint and several if the tax re-spin goes bad. They take taxable Armageddon off the table."); Hr'g Tr. 117:11-14 (Aug. 22, 2016) (Dore, S.) ("In other words, it just further confirmed that the path we were pursuing was the right one for EFH because the alternative was the tax Armageddon that we've heard so much about.").

[7]    The Oxford Dictionary defines "Armageddon" as a "dramatic and catastrophic conflict, typically seen as likely to destroy the world or the human race."  OXFORD DICTIONARY, *available at* http://www.oxforddictionaries.com/us/definition/american_english/armageddon?q=Armageddon. In the Armageddon described by the Debtors, EFH Corp. and TCEH will face the same consequences and the avoidance of mutual destruction is a mutual benefit.

[8]    Hr'g Tr. 104:23 – 105:4 (Aug. 23, 2016) (Sawyer, H.).

3

ii)    **Texas Fraudulent Transfer Law**

5.    Texas Uniform Fraudulent Transfer Act ("TUFTA") provides that:

> (a)  A transfer made or **obligation incurred** by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation **without receiving a reasonably equivalent value in exchange for the transfer or obligation** and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

TEX. BUS. & COM. CODE § 24.006(a) (emphasis added); *see* Fraudulent Transfer Brief, at 3-13. "The burden is on the party seeking to uphold the transfer to show valid consideration." *McLane Foodservice, Inc. v. Wolverine Pizza, LLC*, 2005 U.S. Dist. LEXIS 12110, *5-6 (N.D. Tex. June 21, 2005).[9]

6.    TUFTA defines "reasonably equivalent value" as "without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." *See* TEX. BUS. & COM. CODE § 24.004(d).  "The value of consideration given for a transfer alleged to be in fraud of creditors is determined from the standpoint of creditors."  *Hinsley v. Boudloche (In re Hinsley)*, 201 F.3d 638, 644 (5th Cir. 2000).  "Intangible, non-economic benefits . . . do not constitute reasonably equivalent value." *Id.* at 643.

7.    In examining whether reasonably equivalent value was received from the creditors' viewpoint, "the proper focus is on the **net** effect of the transfers on the debtor's estate,

---

[9]    Debtors' counsel asserts that, among other things, the elements of TEX. BUS. & COM. CODE § 24.006(a) are not met because Reorganized TCEH's use of EFH Corp.'s NOLs is not a "transfer."  *In re Marvel Entertainment Group*, 273 B.R. 58 (D. Del. 2002) is distinguishable because the plaintiff in that case was a reorganized debtor and the defendant was not in bankruptcy and all entites were corporations and members of a consolidated tax group.  Here, TCEH is a limited liabity company and a disregarded entity, which has no rights to NOLs.  *See In re Contex Holdings, LLC*, 518 B.R. 792 (Bankr. D. Del. 2014) . In addition, as evidenced by the transaction steps in the Debtors' submmission to the IRS and in the T-Disclosure Statement, EFH Corp. surely incurs an "obligation" in connection with the Busted 351.

4

the funds available to the unsecured creditors." *See id.* at 644 (emphasis added). The "emphasis is not on whether value was received contemporaneously with the transfer, but on the net effect on the debtor's estate." *See Bowman v. El Paso CGP Co., L.L.C.*, 431 S.W.3d 781, 788 (Tex. App. Houston 14th Dist. 2014).

### iii) It is Uncontroverted That EFH Corp. is Transferring Enormous Value to and Conferring Benefit on TCEH

8.     If the contemplated transactions are approved, EFH Corp. will provide TCEH with a concrete and measurable benefit in the form of the Step-Up in basis with an "estimated present value of approximately **$1.1 billion** . . . resulting from the Busted 351 Election."[10] The benefit conferred on the TCEH estate cannot be disputed. Nor can it be disputed that the TCEH First Lien Creditors will immediately begin monetizing that value through the Tax Receivables Agreement. [D.I. 9188-15].[11]

### iv) The NOLs Proposed to be Consumed in the Busted 351 Will Result in Loss to EFH Corp. Creditors

9.     From the viewpoint of EFH Corp.'s creditors, the proposed consumption of EFH Corp.'s NOLs in the Busted 351 transaction will result in a net loss. At trial, various witnesses noted that, contrary to their expectations when the plan was filed on May 1, 2016, EFH Corp.'s NOLs not utilized as part of the proposed Busted 351 will not vanish in the "black hole."[12]

---

[10]    *Declaration of David Ying In Support of Confirmation of the Third Amended Joint Plan of Reorganization*, at ¶ 16 (emphasis added).

[11]    Hr'g Tr. 177:8-16 (Aug. 18, 2016) (Ying, D.).

[12]    *See e.g.,* Hr'g Tr. 167:14-16 )(Aug. 22, 2016) (Dore, S.) (" Well, I -- we had a understanding that E -- that the NOLs not consumed in the tax-free spin would disappear, go into the black hole, so to speak prior to mid-May."); Hr'g Tr. 180:14-18 (Aug. 17, 2016) ("We just testified that until May, until the arrows changed its position that was sleeves off vest for EFH, that there was no benefit to EFH of retaining NOLs because they would all go through the black hole.") (Keglevic, P.).

The term "black hole" is a term of art used by bankruptcy tax experts to explain what happens to cancellation of debt income ("CODI") after all tax attributes (such as NOLs) are consumed by such CODI. However, at the confirmation hearing, the term was mistakenly used to describe how tax attributes such as

10.     At trial, Mr. Keglevic testified that as a result of the Tax-Free Spin-Off:

> $2.5 billion of NOLs should survive immediately after the Busted
> 351 transaction. Based on the value of NextEra's bid, those NOLs
> will be subject to approximately $1.3 billion of further reduction
> on account of CODI related to the E-side restructuring.[13]

In his declaration, Mr. Keglevic estimated that the $1.2 billion of NOLs currently expected to be preserved for EFH Corp. will have a "net present value" of "approximately **$380 million**."[14]  The table below, taken from Mr. Keglevic's declaration, illustrates his analysis:[15]

Figure 2: E-Side CODI and NOL Valuation

|  | (in millions) |
|---|---|
| Projected NOL assuming all Debtors Emerge 12/31/16 | 8,328 |
| *Less* : Taxable Gain in Preferred Stock Sale | (5,860) |
| *NOLs Remaining After Spin-Off* | 2,468 |
| *Less* : Projected E-Side CODI[1] | (1259.00) |
| *Surviving NOLs* | 1,209.00 |
| Tax Rate | 35.43% |
| *Potential Tax Savings* | 428.3487 |
| NPV factor, 6% Discount Rate[2] | 89.12% |
| ***NPV of NOLs*** | 381.7511 |

[1] Based on EVR analysis of distributable value of current NEE bid.
[2] Assumes (a) no 382 limits because of NUBIG/Notice 2003-65;
   (b) LRP allocated taxable income from Oncor starting in 2017.

Plainly, to the extent more NOLs become available to EFH Corp., the $381 million figure increases.  Indeed, the value to EFH Corp. of an additional $5.8 billion of NOLs is the net present value of the NOLs tax effected. Those NOLs can be used more quickly by EFH Corp.

---

NOLs are consumed by CODI.  *See* 26 U.S.C §108 ("Income from Discharge of Indebtedness"); § 108(b) ("Reduction of Tax Attributes"). Further explanations of CODI, tax attributes and black hole CODI is contained herein.

[13]     *Declaration of Paul Keglevic in Support of Confirmation of the Third Amended Plan of Reorganization* ("Keglevic Dec."), at 14 n. 26.  Mr. Keglevic assumed $1.259B of CODI to be recognized via the future E-Side transaction.  As previously discussed, the remaining E-Side NOLs must be reduced by the CODI pursuant to section 108(b).  *Id.* at 14 Fig .2.

[14]     Keglevic Dec., at ¶ 30 (emphasis added).

[15]     At his testimony on August 17, Mr. Keglevic testified that the applicable tax rate should be 35.49%, not 35.43% as stated in his declaration.  Hr'g Tr. 124:17-24.  This change in tax rate would have minimal impact on the analysis.  *Id.*

6

than Reorganized TCEH, so the net present value is higher.[16]  Accordingly, It is clear that the

value foregone by EFH Corp. creditors is greater than the approximately $1.2 billion value that

Mr. Ying arrived at for the benefit of Reorganized TCEH.

### v)    EFH Corp. Is Not Receiving Reasonably Equivalent Value

#### (a)    *EFH Corp.'s Retention of its Own NOLs Does Not Constitute Reasonably Equivalent Value*

11.    Implementation of the Current Plan will consume $5.86 billion of EFH Corp.'s

NOLs allowing EFH Corp to retain approximately $2.5 billion of its NOLs.[17]  The benefit of

retaining what you already own cannot constitute receipt of reasonably equivalent value.[18]  As

noted, the Court must focus on "the net effect on the debtor's estate" to determine if reasonably

equivalent value is being received by the transferor.  Since the $2.5 billion in NOLs was always

EFH Corp.'s property, evidence that EFH Corp. can retain those NOLs does not equate to EFH

Corp. *receiving* reasonably equivalent value.

#### (b)    *Avoidance of Hypothetical "Tax Armageddon" Results in Equal Benefit to EFH Corp. and TCEH and thus is Not a Transfer of Any Value from TCEH to EFH Corp.*

12.    The main consideration that the plan proponents assert EFH Corp. will receive in

the contemplated transactions is avoidance of Tax Armageddon.  However, this is emphatically

not a transfer of any value from TCEH to EFH Corp.  Instead, it is merely a consequence both

---

[16]    Hr'g Tr. 125:15-22 (Aug. 17, 2016) ("Q: All right. So -- so said another way, sir, the NPV of the -- of the gross amount is higher on the E-Side because the ability to use them is projected to be faster than on the T-Side? A: Yeah. It's better to have NOLs than it is to have something that gets depreciated over 15 years if you think you're going to have income faster than straight line over 15 years.").

[17]    Keglevic Dec., at ¶ 7.

[18]    There is no dispute that the NOLs are property of EFH Corp.'s estate.  *See e.g., In re Prudential Lines, Inc.*, 107 B.R. 832 (Bankr. S.D.N.Y. 1989), *aff'd* 119 B.R. 430 (S.D.N.Y. 1990), aff'd 928 F. 2d 565 (2d Cir. 1991).  At the August 17, 2016 hearing, Mr. Keglevic stated that "EFH is the only taxpayer so the only one that IRS recognized as having NOLs."  Hr'g Tr. 219:18-20 (Aug. 17, 2016).  TCEH, as a disregarded entity under applicable federal tax law, has no right to or ownership interest in the NOLs under tax law.  *See e.g., In re Contex Holdings, LLC* 518 B.R. 792 (Bankr. D. Del. 2014) (CSS).

7

parties enjoy identically as a result of choosing and agreeing to implement a "tax free" plan.  As
discussed above, and as Mr. Sawyer frankly testified in the dramatic final testimony presented
trial:

> [the] benefit of the plan as is before the Court is that both the T-
> Side estates and the E-Side estates avoid the catastrophic tax risk
> of a stranded tax that EFH, where EFH would be jointly liable for
> that tax, along with the T- Side.[19]

To the extent this consequence can even be analogized to a conveyance, it was bi-directional and
mutual, with no net-value coming from one source and moving to the other.

**(c)** ***Avoidance of "Tax Armageddon" Is a Hypothetical Contingency
That is Insufficiently Concrete Under Texas Law***

13.    Even if the Court were to determine that the mutual benefits to EFH Corp. and
TCEH of avoidance of Tax Armageddon should not be netted out, the Court cannot decide that
the avoidance of a hypothetical and theoretical risk is the required "concrete" consideration that
constitutes reasonably equivalent value under Texas law.

14.    Avoidance of a hypothetical and amorphous event is not concrete consideration.
Courts in Texas have held that "[a] payment made solely for the benefit of a third party, such as a
payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the
debtor."  *Osherow v. Nelson Hensley & Consol. Fund Mgmt, L.L.C. (In re Pace),* 456 B.R. 253,
271 (Bankr. W.D. Tex. 2011) (finding that debtor did not receive reasonably equivalent value).
"Courts have recognized that reasonably equivalent value may be found in transfers involving
third parties if the debtor received some indirect benefit from the transfer. But such benefits must
be 'fairly concrete.'"  *Id.*; *see also* Jack F. Williams, ARTICLE: REVISITING THE PROPER LIMITS OF
FRAUDULENT TRANSFER LAW, 8 Bank. Dev. J. 55, 66 (1991)(stating that benefits "satisfy the
reasonably equivalent value requirement if the value is definite and not illusory.").

---

[19]    Hr'g Tr.104:23 – 105:4 (Aug. 23, 2016) (Sawyer, H.).

15.     Here, the "benefit" of avoiding the tax liabilities in connection with Tax
Armageddon is hypothetical and theoretical.  We have not located any cases under Texas law
holding that a third-party's forbearance from inflicting a ***hypothetical*** and ***theoretical*** harm on a
transferor constitutes reasonably equivalent value.  Moreover, at trial, no witness offered
testimony on the ***likelihood*** that Tax Armageddon would ever occur.[20]  Indeed, Ms. Howard was
asked: "from a practical standpoint understanding all the obstacles that may or may not be in the
way of pulling a trigger or ultimately implementing such a taxable transaction, from a practical
and business standpoint do you have an assessment of the odds that a tax Armageddon would
occur and could occur in these cases?"[21]  Ms. Howard, the Debtors' in-house tax lawyer,
responded: "I don't have an opinion assessing the probability of that."[22]

16.     The Debtors also purposefully elected to not offer any evidence of probabilities
that Tax Armageddon would occur.  Notably, the Debtors strategically elected not to call any
TCEH First Lien Creditor to testify about the likelihood that it would seek to cause Tax
Armageddon instead of paying for use of the NOLs.  Furthermore, Ms. Williamson testified it
would extremely difficult for the TCEH First Lien Creditors to foreclose on their collateral,
especially the nuclear power plants.[23]

---

[20]     To be sure, Ms. Williamson testified that she believed that the TCEH First Lien Creditors would <u>file</u> a
taxable plan under certain circumstances.  Hr'g Tr. 125: 11-24 (Aug. 19, 2016).  But there remains many
steps and much uncertainty between the filing of a taxable plan or a plan with a toggle and "Armageddon,"
including, for example, confirmation of the plan over the objection of the Department of Justice and the
EFH Indenture Trustee.

[21]     Hr'g Tr. 109:20-25 (Aug. 18, 2016).

[22]     *Id.* at 110:1-2.

[23]     Hr'g Tr. 90:4-12 (Aug. 19, 2016) (Williamson, B.) ("Well, I think there are a lot of issues with foreclosing
on the assets of TCEH. For example, on a nuclear power plant that is significantly regulated and any
change in control has to be approved by the -- the Nuclear Regulatory Commission. So we did not go
through the process of how you would foreclose on all of those assets because I -- I don't think that's -- I
think that's a very complex matter that would be very difficult to do.").

9

17.     Further, even if the TCEH First Lien Creditors filed a plan proposing a taxable transaction, there would be significant hurdles to the confirmation and implementation of that plan as outlined in slides 25 and 26 of the EFH Indenture Trustee's closing presentation.

18.     In summary, the record is devoid of any evidence of the likelihood that Tax Armageddon would occur and the alleged benefit of avoidance to EFH Corp. is not measurable. Thus, EFH Corp. would not receive reasonably equivalent value if Reorganized TCEH was permitted to consume its NOLs.

**B.     Following a Change of Control, NOLs Retained by EFH Corp. Will Have Value That Can Be Reasonably Calculated From the Evidence**

### i)     Law Applicable to Retention and Future Use of NOLs

19.     The EFH Indenture Trustee is not contesting the Debtors' assertion that up to some point in May 2016 the Debtors believed that all of EFH Corp.'s NOLs would be consumed by the CODI generated in the transaction contemplated by the plan filed on May 1, 2016.[24]  The paper record admitted during the confirmation hearing contains extensive details of the processes that the Debtors undertook to obtain numerous rulings from the IRS.

20.     The Debtors, along with their advisors, have been corresponding with the IRS regarding a proposed tax free reorganization since April 30, 2014.[25]   There were at least fifteen

---

[24]     On May 5, 2016, the Debtors requested that the IRS treat gain realized in the tax-free transaction be Cancellation of Debt Income ("CODI") pursuant to the "CODI Ruling." (DX358).  "CODI" is generally calculated as the difference between the outstanding debt and consideration paid in satisfaction of that debt. This income is excluded from taxable income for taxpayers in bankruptcy (among other circumstances), under IRC §108(a).  In exchange for this tax benefit, taxpayers must reduce their tax attributes by the amount of CODI excluded from income.  See IRC §108(b).  Before the "tentatively adverse" position of the IRS, the Debtors assumed that the CODI would exceed EFH's tax attributes by a significant amount, thereby rendering them unavailable for use beyond the year of plan confirmation.  At the trial, CODI has been referred to as "Black Hole CODI".  Black Hole CODI is actually a term of art used by bankruptcy tax experts to describe the CODI that is leftover after the reduction of all tax attributes.

[25]     See April 30, 2014 letter from Thompson & Knight to Frances Kelly at the IRS (DX691).

items of correspondence with the IRS through the date of the confirmation of the prior plan and no doubt numerous meetings and phone calls.  *See* Schedule 1.

21.     On May 5, 2016, the Debtors requested (among other things) that a portion of the gain realized in the tax-free transaction be classified as CODI (the "CODI Ruling").[26]  On June 1, 2016, the Debtors had calls with the IRS wherein the IRS told the Debtors that they were "tentatively adverse" with respect to the CODI Ruling.[27]

22.     On June 9, 2016 the IRS issued regulations that supported the IRS's tentative position.[28]  The result of this position by the IRS was potentially disastrous to all Debtors because it would mean that the entire amount of the TCEH debt would be considered nonrecourse debt, and the Debtors could not avail themselves of the benefits of IRC section 108 which only applies to CODI from income.  This would cause a really big gain (approximately $20 billion) leading to a really big tax bill.

23.     On June 10, 2016 the Debtors wrote to the IRS to request the so-called "alternative rulings" to salvage the situation.  They requested that the IRS rule that the income recognized on the transaction be recognized as income for tax purposes,[29] but excluded from income under IRC section 361, instead of under section 108.[30]  Exclusion of the gain from income under IRC section 361 is better than under section 108 because it does not require the

---

[26]     May 5, 2016 letter from KPMG to Frances Kelly at the IRS at the IRS (DX358).

[27]     June 10, 2016 letter from KPMG to the IRS, "EFH appreciates the Service's explanation of its tentative position during telephone calls on June 1, 2016" (DX361).

[28]     Dept. of Treasury, Internal Revenue Service, 26 CFR Part 1 [TD 9771].

[29]     IRC § 1001.

[30]     DX362.

reduction of income tax attributes — (you save the NOLs!)  As a result, the EFH Corp. NOLs could survive the transaction.[31]

24.     There were at least five more items of correspondence with the IRS after the June 10, 2016 letter wherein the Debtors further supported their positions.[32]  In addition, there were numerous phone calls and meetings with the IRS, including a Conference of Right on June 15, 2016.

25.     These exchanges with the IRS, and certainly the calls with the IRS, were highly confidential, and according to Ms. Dore were not disclosed to potential bidders.[33]  Accordingly, NextEra and other potential bidders had no reason to believe that the retained EFH Corp. NOLs, if any, could potentially have value to them as a purchaser.  In addition, by filing the Plan on May 1, 2016, and making emails available in discovery indicating that $5.8 billion of NOLs had been "promised" to the TCEH First Lien Creditors, and in seeking an expedited confirmation hearing, no rational bidder could have believed that there was a window to negotiate for more NOLs.[34]  Nor would they have believed the NOLs had value.  In fact, the only evidence of disclosure of the potential value of the NOLs is made on June 16, 2016 in the T-Disclosure Statement.

26.     The IRS issued its favorable rulings on July 28, 2016.[35]

---

[31]     Hr'g Tr. 105: 12-21 (Aug. 17, 2016) (Keglevic, P.) ("now E was interested in how many NOLs would survive because it could have potential value to the E-Side of the business, whether it was creditor-owned or whether we sold it.").

[32]     DX 361, DX363, DX364, DX690, DX708, DX710.

[33]     Hr'g Tr. 169:19-170:1; 176:5-177:13 (Aug. 22, 2016)  (Dore, S.).

[34]     Hr'g Tr. 199:11-18 (Aug. 17, 2016)(Keglevic, P.).

[35]     DX343.

ii)      **Retained NOLs Will be Valuable to EFH Corp**.

27.      At the beginning of the case, NOLs were not a matter of intense focus, primarily because there were relatively low in amount, $2.3 billion, and were assumed to be "overwhelmed."[36]  While value and NOL projections fluctuated during the administration of the case, it wasn't until late-May, 2016, that it was clear that retained NOLs would have value.

28.      Reorganized TCEH will consume $5.86 billion of NOLs as a result of the proposed Busted 351 portion of the spin-off.  This dollar amount is a negotiated part of the deal, one that was promised to the TCEH creditors.[37]  It is not required as an operation of tax or any other law.  Putting fewer assets into the Busted 351 portion of the spin-off is legally possible and it will consume fewer NOLs.[38]

29.      As noted, all NOLs retained by EFH, whether they are the $2.5 billion in the current plan,[39] or the entire $8.3 billion,[40] are only subject to limitations on use, they do not get consumed.[41]  The Private Letter Ruling makes it clear, as a matter of law, that NOLs not used in the spin and Busted 351 will survive.[42]

30.      In any situation where there is an Ownership Change, as may be deemed to occur with the Oncor Merger, NOLs are subject to a limitation on use, referred to as the ("Annual

---

[36]      DX046 at p.9 ("The Debtors expect the EFH Group to have available consolidated net operating loss (NOL) carryforwards of approximately 2.3 billion upon emergence.  As discussed below, although these tax attributes should be accounted for in assessing the tax consequences of a taxable reorganization of the Debtors, the effect of any offsets attributable to those attributes will likely be overwhelmed by the amount of gain generated on a taxable sale of TCEH and/or EFIH (or their assets).").

[37]      Hr'g Tr. 199:11-18 (Aug. 17, 2016)(Keglevic, P.).

[38]      Hr'g Tr. 103:14-20 (Aug. 18, 2016) (Howard, C.).

[39]      Keglevic Dec., at 15 Fig. 2.

[40]      Keglevic Dec., at 15 Fig. 2.

[41]      IRC § 382.

[42]      Rulings 2 and 12 in Private Letter Ruling (DX343); June 10, 2016 Letter to IRS (DX362).

Limitation" or the "382 Limitation"). This provision is intended to reduce or mitigate the benefits derived by profitable companies buying loss companies to use the loss companies' accumulated NOLs to offset taxable income. Section 382 is the principal IRS weapon against "trafficking in loss carryovers."[43] Section 382 also commonly referred to as the provision to "prevent the trading of NOLs". The Annual Limitation is a <u>simple calculation</u> – it is the product of the value of the enterprise immediately before the transaction times the federal long term tax exempt interest rate.

> The §382 Limitation is expressed in monetary terms and is the product of multiplying:
>
> - the loss corporation's value (at the time of the ownership change); times
> - a published rate of return (called the long-term tax-exempt rate).[44]

31.    The law and guidance issued by the IRS regarding IRC section 382 is extremely complex, and beyond the scope of a brief of the allowed length. Therefore we have applied broad principles for purpose of illustration.[45]

---

[43]    Barr, 780-4th T.M., *Net Operating Losses and Other Tax Attributes — Sections 381, 382, 383, 384, and 269 [Introduction].*

[44]    Barr, 780-4th T.M., *Net Operating Losses and Other Tax Attributes — Sections 381, 382, 383, 384, and 269 [Paragraph A].*

[45]    "The general rule of §382 is found in §382(a): A "new loss corporation" cannot deduct "pre-change losses" in an amount greater than "the Section 382 Limitation." This general rule contains five of the six basic elements: There must have been an ownership change 360 in the stock of the loss corporation. If so, then NOLs and other losses (which are collectively called pre-change losses) are only deductible against the §382 Limitation. There is one more basic element in §382: continuity of business. Like its predecessor, §382(c) requires a form of continuity of business. If this business continuity requirement is not satisfied, the NOL carryover privilege is severely limited. The general rule has spawned a vast array of conditions, exceptions, definitions, and references. To assure no escape from this maze of rules, Congress included anti-avoidance provisions in §382. The statute gives the IRS broad regulations authority." Barr, 780-4th T.M., *Net Operating Losses and Other Tax Attributes — Sections 381, 382, 383, 384, and 269 [Paragraph A].*

14

32.    The majority of the NOLs generated by EFH Corp. have been generated in the past three to four years, so they will be able to be carried forward for at least 17 years.[46]

33.    The Annual Limitation is increased by any NUBIG recognized, and reduced by any recognized net unrealized built in losses ("NUBIL"), which is described further herein.

34.    In this case, assuming a value of $18.5 billion, and an interest rate of 2.22% (May 2016)[47] EFH Corp., post NextEra-EFH merger, could use $300 million to $400 per year to offset taxable income.[48]

35.    In this case, EFIH has a "negative basis" in its ownership interest in Oncor.[49] This "negative basis" is a form of NUBIG, which if recognized for tax purposes can trigger additional NOLs for immediate use.

> Section 382 deals extensively with built-in gains and losses. Generally, a built-in gain or loss is a gain or loss or item of income or expense that accrues economically before and ownership change but is recognized after the ownership change. Without special rules, the loss corporation could circumvent the §382 rules by postponing or accelerating recognition transactions.[50]

---

[46]    Hr'g Tr. 63:3-65:9 (Aug. 18, 2016) (Howard, C.).

[47]    Revenue Ruling 2016-11.

[48]    While the NOLs can absolutely offset Oncor income, more facts are needed, and a complicated analysis of the certain regulations must be conducted to determine the exact annual limitation. In any case the new regulations will result in a slightly lower annual limitation than currently allowed and thus will not impact the high end of this range. *See* Treasury Regulations § 1.382-12.

[49]    Omnibus Tax Memorandum 10/1/2014 (DX046) at 8 ("EFH's estimated basis in its assets (*i.e.,* its 80.03% interest in the Oncor partnership) is approximately $6 billion on a gross basis, but is effectively a *negative* $1.7 billion on a net basis").

[50]    Barr, 780-4th T.M., *Net Operating Losses and Other Tax Attributes — Sections 381, 382, 383, 384, and 269 [at Section H]*.

15

36.     If some transaction, deliberate or otherwise, required the recognition of the $1.8 billion of NUBIG at Oncor, it would release at least $1.86 billion of NOLs to offset that gain.[51]

37.     Mr. Keglevic took the NUBIG at EFIH into consideration in his Figure 2. Although we were not provided details in his calculation, we were able to "back into" the assumption that EFH will recover all of the retained NOLs of $1.2 billion before the end of year three.

38.     This Court has previously ruled that it does not need expert testimony to interpret tax law.  *See Giuliano v. FDIC (In re Downey Fin. Corp.)*, 499 B.R. 439, 463 (Bankr. D. Del. 2013).  Here, the key principal is not complicated and was in fact well explained by both Mr. Keglevic and Ms. Howard.  The $1.2 billion in retained NOLs will be worth $382 million.[52]  As a matter of law, in light of the fact that NOLs can be retained for 20 years, and those at issue accrued fairly recently,[53] it is clear from the evidence that additional retained NOLs at EFH will be of immense value to EFH Corp., and any purchaser.[54]

---

[51]     Examples of such transactions include certain debt forgiveness events, a check-the-box election, and a transaction with a third party.

[52]     Keglevic Dec., at 15 Fig. 2; *Declaration of Carla A. Howard In Support of Confirmation of the Third Amended Plan of Reorganization*, at ¶ 19.

[53]     Hr'g Tr. 63:3-65:9 (Aug. 18, 2016).

[54]     Barr, 780-4th T.M., *Net Operating Losses and Other Tax Attributes — Sections 381, 382, 383, 384, and 269* [Portfolio Description] ("Net Operating Loss and other tax attribute carryovers have come to be considered a form of corporate asset.  To protect that asset and to seek to reduce exposure to limitations on that asset, a number of widely-held corporations attempt to discourage future stock acquisitions that might trigger the limitations of §382 or §383.  Those protections have developed in the form of Tax Attribute Protection (TAP) Plans or Charter Amendments.  Both types of protections are products of the traditional anti-takeover plans that have come to be known as "Poison Pill Plans.").

"With recent stock market volatility and sharp drops in stock market prices coupled with the continuing low interest rate environment, management and boards of directors of companies with significant net operating loss carryforwards (NOLs) may want to consider taking steps to preserve these valuable tax assets."  *NOL Poison Pill – A Timely Prescription*, Kirkland M&A Update, October 13, 2015.

4834-4054-6103.14

39.     It is also a well-established fact that NOLs and other tax attributes have value under Generally Accepted Accounting Principles ("GAAP").  Entities required to follow GAAP must analyze income tax attributes, including NOLs, to determine whether a deferred tax asset should be booked to the financial statements.[55]

40.     In summary, where this evidence of the value of the retained NOLs is in the record, and there is no evidence of the probability that Tax Armageddon will occur, the Court must find that the transactions contemplated under the Current Plan will be constructively fraudulent transfers.  EFH Corp. does not "get" reasonably equivalent value for what it "gives."

## C.    The TCEH Debtors are Not Entitled To A Good Faith Finding

41.     In the proposed *Order Confirming the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the TCEH Debtors and EFH Shared Services Debtors* [D.I. 9323] (the "Proposed Confirmation Order"), the Debtors propose various findings that the Debtors (including the TCEH Debtors) and the TCEH First Lien Creditors acted in good faith and the Current Plan was the result of "good faith, arms' length negotiations".[56]  To the extent

---

[55]     ASC 740.

[56]     *See* Proposed Confirmation Order, at ¶ 51 ("The Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors is the product of good faith, arm's-length negotiations by and among the Debtors, the Debtors' disinterested directors and managers, the Original Plan Sponsors, the TCEH Committee, the TCEH First Lien Ad Hoc Committee, the TCEH Second Lien Consortium, the TCEH Unsecured Ad Hoc Group, the Debtors' prepetition equity sponsors, and certain of the Debtors' other stakeholders."); ¶ 68 ("The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders. The Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors accomplishes this goal . . . . Therefore, the Plan as it relates to the TCEH Debtors and the EFH Shared Services Debtors has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code."); ¶ 70 ("All documents and agreements necessary to implement the Plan as it relates to the TCEH Debtors and the EFH Shared Services Debtors, including those contained or summarized in the Plan Supplement, including the Tax Matters Agreement, the Separation Agreement, the Transition Services Agreement, the Spin-Off Tax Receivable Agreement, and the TRA Information Form, and all other relevant and necessary documents have been negotiated in good faith and at arm's length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.").

the Court confirms the Current Plan, the Court should not make any finding that provides the TCEH Debtors, Reorganized TCEH or the TCEH First Lien Lenders with the protections afforded under section 363(m).[57]

42.     Relief under section 363(m) can only be granted if the Court finds that the transaction was "at arm's length, negotiated in good faith and for fair value." *High River LP v. TWA, Inc. (In re TWA, Inc.),* 2002 U.S. Dist. LEXIS 5951, *5 (D. Del. Mar. 26, 2002); *see also In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986) (defining good faith purchaser as "one who purchases in 'good faith' and for 'value.'"). Here, there is no admissible evidence in the record of the required arms' length negotiations. Further, as described above, EFH Corp. is not receiving fair value for its NOLs. The TCEH Debtors and the TCEH First Lien Creditors are not entitled the protections of section 363(m).

## IV.
## <u>CONCLUSION</u>

43.     Based on the foregoing and for reasons explained in the Objection and the Pretrial Briefs, the EFH Indenture Trustee respectfully requests that the Court (i) not grant approval under section 363 of the Bankruptcy Code to the EFH 363 Transactions; (ii) deny confirmation of the Current Plan; and (iii) grant such other and further relief as is just and proper.

Dated: Wilmington, DE
August 24, 2016

**CROSS & SIMON, LLC**

By: <u>/s/*Christopher P. Simon*</u>
Christopher P. Simon (Del. Bar No. 3697)
105 North Market Street, Suite 901
Wilmington, Delaware 19801
Telephone: (302) 777-4200

---

[57]     *See* 11 U.S.C. § 363(m) ("The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.")

18

Facsimile: (302) 777-4224
csimon@crosslaw.com

- and –

NIXON PEABODY LLP
Amanda D. Darwin
Richard C. Pedone
George J. Skelly
100 Summer Street
Boston, Massachusetts 02110
Telephone: (617) 345-1000
Facsimile: (617) 345-1300
adarwin@nixonpeabody.com
rpedone@nixonpeabody.com
gskelly@nixonpeabody.com

-and-

Christopher J. Fong
437 Madison Avenue
New York, NY 10022
Telephone: 212-940-3724
Facsimile: 855-900-8613
cfong@nixonpeabody.com

*Co- Counsel to American Stock Transfer & Trust Company, LLC, as Indenture Trustee*

19

**SCHEDULE 1**

| DX # | Date | Debtors' Description |
|------|------|----------------------|
| DX 691 | 4/30/2014 | Letter to Frances Kelly re Presubmission Conference |
| DX 692 | 6/10/2014 | Letter to Frances Kelly re Ruling Request Submission |
| DX 693 | 6/20/2014 | Letter to Frances Kelly re No Rule Policy |
| DX 694 | 11/10/2014 | Letter re Information Request No. 1 |
| DX 374 | 3/25/2015 | Letter from David Wheat to Gene Raineri - (IRS) |
| DX 695 | 3/25/2015 | Letter to Frances Kelly re Memo on Busted 351 Transaction |
| DX 696 | 5/7/2015 | Letter to Frances Kelly re Busted 351 Transaction |
| DX 371 | 5/25/2015 | Letter from David Wheat to Gene Raineri - (IRS) |
| DX 697 | 6/15/2015 | Letter to Frances Kelly re Response to Questions on E&P Allocation |
| DX 698 | 8/7/2015 | Letter to Frances Kelly re Response to Request for Updated Section 355(d) Analysis |
| DX 370 | 9/3/2015 | Letter from David Wheat to Frances Kelly - (IRS) |
| DX 699 | 9/3/2015 | Letter to Frances Kelly re Supplemental Submission |
| DX 369 | 10/20/2015 | Letter from David Wheat to Frances Kelly - (IRS) |
| DX 700 | 10/20/2015 | Letter to Frances Kelly re Information Request No. 3 |
| DX 701 | 10/28/2015 | Letter to Frances Kelly re Information Request No. 4 |
| DX 702 | 12/4/2015 | Letter to Frances Kelly re REIT Asset Submission |
| DX 703 | 1/5/2016 | Letter to Frances Kelly re Fidelity Settlement, COBE and NEWCO Assets |
| DX 704 | 3/4/2016 | Letter to Frances Kelly re Distressed Company Exception |
| DX 372 | 3/14/2016 | Letter from David Wheat to Frances Kelly re Rulings |
| DX 705 | 3/14/2016 | Letter to Frances Kelly re Rulings |
| DX 358 | 5/5/2016 | Letter to Frances Kelly re Supplemental Representations and Requested Rulings |
| DX 359 | 5/13/2016 | Letter to Frances Kelly re CODI Ruling |
| DX 360 | 5/26/2016 | Letter to Frances Kelly re Supplemental Information Requests |
| DX 361 | 6/10/2016 | Letter to Frances Kelly re CODI Ruling |
| DX 362 | 6/10/2016 | Letter to Frances Kelly re CODI Ruling and Related Issues |
| DX 363 | 6/21/2016 | Letter to Frances Kelly Re Information Requests |
| DX 364 | 6/29/2016 | Letter to Frances Kelly re Follow up to Conference of Right on 6/15/2016 |
| DX 690 | 6/29/2016 | EFH - IRS - CODI Submission |
| DX 708 | 7/11/2016 | Email from David Wheat to Frances Kelly re EFH Change in Structure |
| DX 710 | 7/12/2016 | Response to IRS Supplemental Questions - July 10 |
| DX 343 | 7/28/2016 | IRS Private Letter Ruling, dated July 28, 2016 |
| DX 357 | | EFH - IRS - Submission re 6/10/2014 Letter |

4834-4054-6103.14