**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No.  14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' POST-TRIAL MEMORANDUM IN SUPPORT OF
CONFIRMATION OF THE THIRD AMENDED JOINT PLAN OF REORGANIZATION
AS IT APPLIES TO THE TCEH DEBTORS AND EFH SHARED SERVICES DEBTORS**

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ............................................................................................................................2

I.    THE DEBTORS' REASONABLE EXERCISE OF THEIR BUSINESS
      JUDGMENT SUPPORTS CONFIRMATION OF THE PLAN AND
      APPROVAL OF THE TRANSACTIONS UNDER THE PLAN. ....................................2

      A.    The Debtors Satisfy the Business Judgment Standard.............................................2

      B.    In the Alternative, the Debtors Satisfy the Heightened Scrutiny and Entire
            Fairness Standards. ..............................................................................................6

II.   THE EFH GROUP'S USE OF THE EFH GROUP'S NOLS AND THE EQUITY
      CONTRIBUTIONS DO NOT CONSTITUTE FRAUDULENT TRANSFERS. ...............7

      A.    State Fraudulent Transfer Law Does Not Apply. ...................................................7

      B.    The Plan and Ancillary Agreements are One Integrated Transaction. ....................8

      C.    The Plan Provides Reasonably Equivalent Value for the Use of the EFH
            Group's NOLs and the EFH Corporate Services and EFH Properties
            Equity Contributions...........................................................................................9

III.  THE DEBTORS' HAVE THOROUGHLY EVALUATED THE RISKS AND
      COSTS ASSOCIATED WITH A TAXABLE PLAN......................................................12

      A.    EFH Does Not Necessarily Have Uncontested Ownership of its NOLs
            Under Applicable Legal Authority or Equitable Principles...................................13

      B.    Prior to the IRS's Unexpected Policy Shift In May, No One Believed the
            Residual NOLs Had Value If Not Used In the Preferred Stock Sale....................14

      C.    The EFH Objectors Overstate the Incremental Value of the Preferred
            Stock Sale and Dramatically Understates the Drawbacks of a Spin-Off to
            the TCEH First Lien Lenders...............................................................................16

      D.    A Taxable Separation Is a Real Risk. .................................................................18

      E.    Spreading the Pain is No Solution. .....................................................................19

      F.    Even Taking Discounting Into Account, A Fight Over a Taxable
            Separation is "Mini Armageddon."......................................................................20

CONCLUSION......................................................................................................................20

## Table of Authorities

**Page(s)**

**Cases**

*Eisenberg v. Bank of N.Y. (In re Sattler's, Inc.)*,
    73 B.R. 780 (Bankr. S.D.N.Y. 1987) ................................................................. 8

*H-M Wexford LLC v. Encorp, Inc.*,
    823 A.2d 129 (Del. Ch. 2003) ......................................................................... 5

*In re Alaska Fur Gallery, Inc.*,
    2011 Bankr. LEXIS 5787 (Bankr. Alaska Apr. 29, 2011) ................................. 11

*In re Bob Richards*
    473 F.2d 262 (9th Cir. 1973) ......................................................................... 14

*In re Centennial Textiles, Inc.*,
    227 B.R. 606 (Bankr. S.D.N.Y. 1998) .......................................................... 7, 8

*In re Conex Holdings, LLC*,
    518 B.R. 792 (Bankr. D. Del. 2014) ............................................................. 13

*In re Cottonwood Corners Phase V, LLC*,
    No. 11-11-12663, 2012 WL 566426 (Bankr. D. N.M. Feb. 17, 2012) ............... 19

*In re Fed. Mogul Glob., Inc.*,
    293 B.R. 124 (D. Del. 2003) ........................................................................... 2

*In re Future Energy Corp.*,
    83 B.R. 470 (Bankr. S.D. Ohio 1988) ........................................................... 19

*In re Hechinger Inv. Co.*,
    327 B.R. 537 (D. Del. 2005) ........................................................................ 8, 9

*In re Hinsley*,
    201 F.3d 638 (5th Cir. 2000) ........................................................................... 9

*In re ICL Holding Co., Inc.*,
    802 F.3d 547 (3d Cir. 2015) ........................................................................... 2

*In re ICL Holding Co.*,
    No. 12-13319 (Bankr. D. Del. 2013) ............................................................. 18

*In re Marvel Entm't Gr'p, Inc.*,
    273 B.R. 58 (D. Del. 2002) .......................................................................... 13

*In re Metro. Cosmetic Reconst. Surgery P.A.*,
    125 B.R. 556 (Bankr. D. Minn. 1991) .......................................................... 7, 8

*In re MSR Resort Golf Course LLC, et al.*,
   No. 11-10372 (Bankr. S.D.N.Y. 2013)........................................................... 18

*In re NewStarcom Holdings, Inc.*,
   547 B.R. 106 (Bankr. D. Del. 2016) (Sontchi, J.) ............................................. 5

*In re Pace*,
   456 B.R. 253 (Bankr. W.D. Tex. 2011) ............................................................ 9

*In re Trial Guaranty, Inc.*,
   Mem. Op. June 27, 2016 (D. Del) ................................................................... 13

*In re Ultimate Escapes Holdings, LLC*,
   551 B.R. 749 (D. Del. 2016) ........................................................................... 3

*Inner City Media*,
   No. 11-13967 (Bankr. S.D.N.Y. 2012)........................................................... 18

*Matter of TM Monroe Manor Assocs., Ltd.*,
   140 B.R. 298 (Bankr. N.D. Ga. 1991) ............................................................ 19

*Peltz v. Hatten*,
   279 B.R. 710 (D. Del. 2002) ............................................................................ 9

*Prudential Lines, Inc.*,
   928 F.2d 565 (2d Cir. 1991) ........................................................................... 13

*Smith v. Am. Founders Fin. Corp.*,
   365 B.R. 647 (S.D. Tex. 2007) ......................................................................... 9

*United States v. Tabor Court Realty Corp.*,
   803 F.2d 1288 (3d Cir. 1986) ........................................................................... 8

**Statutes**

11 U.S.C. § 544(b) ................................................................................................ 7, 8

11 U.S.C. § 1123(a)(5)(B) ...................................................................................... 11

The above-captioned debtors and debtors in possession (the "Debtors") file this post-trial memorandum (this "Post-Trial Brief") in support of confirmation of the Plan[2] as it relates to the TCEH Debtors and the EFH Shared Services Debtors and approval of the transactions contemplated under the Plan.

## PRELIMINARY STATEMENT

1.     While the Court has held five days of trial, heard testimony from 12 witnesses, admitted 293 exhibits, read 11 declarations totaling 263 pages, as well as hundreds of pages of legal analysis, this case is actually very simple.  The Plan is the best—indeed only—available restructuring transaction for the TCEH Debtors that maximizes value for all of the Debtors' estates.  The alternative taxable separation leads to Tax Armageddon—*i.e.*, the consumption of all NOLs, all cash on hand, and stranding a $6.5 billion administrative priority tax claim at EFH Corp. The EFH Indenture Trustee and other objectors (collectively, the "EFH Objectors") have put forward no viable alternative.  Instead, their case is reduced to second-guessing the extraordinary efforts of the Debtors' Boards of Directors, management, and advisors.

2.     The only thing the EFH Objectors proved at trial was that they had no affirmative case of their own.  Instead, the EFH Objectors tried to obfuscate the truth.  First, without any supporting evidence, the EFH Objectors urged the Court to apply a "heightened scrutiny" or "entire fairness" standard.[3]  Second, the EFH Objectors made every attempt to keep out of the record any evidence that demonstrated the extensive efforts of the Debtors' Boards of Directors, management team, and advisors to assess alternative plan options and maximize value for these estates.

---

[2]    Capitalized terms used but not defined in this memorandum have the meanings ascribed to them in the Plan.

[3]    *Pretrial Brief of EFH Indenture Trustee Regarding Standard of Review Applicable to Approval of EFH 363 Transactions and Related Corporate Governance Matters* [D.I. 9315] at 4.

3.      Now, after overwhelming evidence has refuted those allegations, the EFH

Objectors want to debate aspects of tax and fraudulent transfer law in post-trial briefing.  This

last ditch effort—with no evidentiary support—to challenge the Debtors' assessment of the

likelihood of a $6.5 billion stranded tax at EFH Corp. ignores that the Debtors' Boards of

Directors assessed both the risk of the tax itself and the millions of dollars of costs the estates

would incur just in the pursuit of a taxable plan.  Ultimately, the Debtors determined after

independent investigation and thorough assessment of the gives and the gets, the Plan

represented the best available restructuring alternative for the TCEH Debtors.

4.      Because a 20-page post-trial brief cannot do justice to the comprehensive trial

record and the Debtors' briefs in support of confirmation, the Debtors incorporate by reference

their evidence and argument, and provide here targeted responses to the EFH Objectors'

requested post-trial briefing topics.

## ARGUMENT

**I.      THE DEBTORS' REASONABLE EXERCISE OF THEIR BUSINESS JUDGMENT SUPPORTS CONFIRMATION OF THE PLAN AND APPROVAL OF THE TRANSACTIONS UNDER THE PLAN.**

### A.      The Debtors Satisfy the Business Judgment Standard.

5.      The Court has held it will approve a section 363 transaction "if the debtors have

satisfied the business judgment standard under 363(b)(1), *i.e.*, is the proposed action supported

by a sound business reason and based on a sound exercise of business judgment?"[4]  To make this

determination, the Court "reviews the debtors' business judgment to determine independently

whether the judgment is a reasonable one."[5]

---

[4]    11/3/14 Hr'g Tr. 16:21-25.

[5]    *Id.* at 17: 5-7; *In re ICL Holding Co., Inc.*, 802 F.3d 547, 551 (3d Cir.  2015) (bankruptcy courts use the "sound business purpose test" "to decide whether to approve a § 363 sale" (internal quotation marks omitted)); *In re Fed. Mogul Glob., Inc.*, 293 B.R.  124, 126 (D.  Del.  2003) ("a court should approve a debtor's use of assets

6.      Courts apply "heightened scrutiny" or "entire fairness" standards *only* where there are strong indicia of decision makers on both sides of a transaction.  *In re Ultimate Escapes Holdings, LLC*, 551 B.R. 749, 761 (D. Del. 2016) (heightened scrutiny applies where board faced "potential conflicts of interest"; entire fairness applies where board "confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority").  The evidence at trial proves that the Debtors' directors were disinterested, and there is no reason to deviate from the Court's well-articulated business judgment standard.

7.      The evidence shows that the Debtors' management, Disinterested Directors, and advisors negotiated the Plan at arm's length with creditors, including the TCEH First Lien Lenders:

- Mr. Keglevic testified that members of the TCEH First Lien Lenders were "prepared to go taxably and they needed the consideration they were getting under the busted 351 because they were also taking on substantial risks that they wouldn't have to take in a taxable deal.  And they were done discussing it."[6]

- Ms. Williamson testified that she and Chairman Evans "directed our attorneys at Proskauer to be present at all of those negotiations [with the TCEH First Liens about the new plan] and to give input and to discuss matters at those negotiations and meetings."[7]

- Mr. Ying testified that the Debtors' negotiating position vis-à-vis the TCEH First Liens "was very much one of what can we do to keep them engaged with a tax free proposal because that was [] much better for the E-Side."[8]

- And Ms. Doré testified "[the TCEH First Liens] made it very clear that if we did not file a plan on April 30th that was to their satisfaction, they were going to file a competing . .

---

outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction.").

[6]    Keglevic 8/17/16 Hr'g Tr. at 113:7-17; *see also id.* at 94:11-17 ("throughout the case . . . , the TCEH First Lien Lenders, to avoid a taxable route, always wanted an incentive"); *id.* at 118:5-12 ("we had to recognize that TCEH, to get this incremental benefit, took on risks that they wouldn't take if they went taxably.").

[7]    Williamson 8/19/16 Hr'g Tr. at 46:16-19; *id.* at 70:13-15 ("But I know for sure on June 1st Proskauer went back to the Paul Weiss organization and asked since the NOLs were [now] going to be able to survive at the emergence whether they would compensate for that in some way.").

[8]    Ying 8/18/16 Hr'g Tr. at 150:22-151:5 ("I told Mr. Keglevic I thought that . . . T-First liens were very serious in their position; that since we no longer had exclusivity they actually had some real leverage on the company").

. taxable plan that only had a toggle to a tax-free scenario if in their words 'the E-side got their act together.'"[9]

There is no doubt that the counterparty on the other side of the negotiating table was not an interested director of the Debtors, but rather the TCEH First Lien Lenders.

8.    In approving the Confirmed Plan, this Court recognized the Debtors' Disinterested Director process as gold-plated.[10]  While the EFH Objectors complain that the Disinterested Directors never formally designated as "conflict matters" the negotiations with the TCEH First Lien Lenders regarding the use of NOLs, or the contribution of EFH Corp.'s equity in EFH Properties and EFH Corporate Services to Reorganized TCEH, the EFH Disinterested Directors employed the same rigorous process that they employed when handling conflicts matters related to the Confirmed Plan—independently meeting with counsel, independently holding Disinterested Director board meetings, and directing independent counsel to negotiate on behalf of the EFH Corp. estate,[11] ultimately evaluating all aspects of the Plan "in an abundance of caution" as if they were conflicts matters,[12] and approving the filings of the Ancillary Agreements "insofar as they related to conflicts matters."[13]

---

[9]    Doré 8/22/16 Hr'g Tr. at 98:8-16.

[10]    *See* 12/3/15 Hr'g Tr. at 19:10-19.

[11]    Williamson 8/19/16 Hr'g Tr. at 49:20-50:3 ("[W]e followed the same governance process" as the process for conflict matters. "We would first assess whether it was a conflict matter, and even if it wasn't determined to be a conflict matter, then we would do our due diligence. We would consult with Proskauer. We would work with our financial advisors, and we would reach a conclusion. Our deliberations then were reported to the board.").

[12]    Williamson 8/19/16 Hr'g Tr. at 17:19-18:5 ("Q And why did you and Mr. Evans review and consider matters that were not determined to by you to be conflict matters? A. Well, we felt it was a part of our strong governance process. We also wanted to do it in an abundance of caution so that if at some point in the future someone came back and was able to prove that something was a conflict matter, then we would have already gone through the process we—and, therefore, wouldn't have slowed down the case."); *see also* D-DIR Doré_R ¶ 17 ("Throughout the alternative restructuring considerations, the Disinterested Directors approached the governance processes *as if* they were dealing with conflict matters, even if they did not ultimately conclude that an issue was a conflict matter.").

[13]    DX049 July 27, 2016 Minutes of Meeting of Joint Boards [EFH06365754 at EFH06365756].

9.       Accordingly, even if the approvals of the Ancillary Agreements were conflict matters, the Debtors' Disinterested Directors' governance process ensured that the Debtors' directors satisfied their fiduciary duty of loyalty.  *In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 118 (Bankr. D. Del. 2016) (Sontchi, J.) ("The requirement to act in good faith is a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." (internal quotation marks omitted)).  Likewise, the inclusion of director releases and a director's shared interest in avoiding Tax Armageddon does not trigger heightened scrutiny or entire fairness.  *See H-M Wexford LLC v. Encorp, Inc.*, 823 A.2d 129, 149-50 (Del. Ch. 2003) (holding negotiated releases for directors and officers in settlement agreement does not make the settlement an "interest party transaction" because such releases are more or less "universal").

10.      The EFH Objectors also argue that "entire fairness" analysis is required due to the lack of E-Side creditor involvement in the negotiation of a plan of reorganization.[14]  Not only is this an incorrect statement of law, but the evidence showed that the Debtors negotiated with T-Side stakeholders and kept E-Side creditors informed and solicited their input about the alternative restructuring.[15]

11.      The Plan and all available alternatives were extensively evaluated by the Debtors' Boards, and independently by the Disinterested Directors and their independent advisors.  Ms. Williamson described her process for reviewing and approving the Ancillary Agreements:

> Well, first I read all of the agreements and then, secondly, I discussed them with
> my attorney, Proskauer, but we also discussed them in -- on several occasions
> within the joint board meetings so I listened to counsel from Kirkland & Ellis as

---

[14] *Pretrial Brief of EFH Indenture Trustee Regarding Standard of Review Applicable to Approval of EFH 363 Transactions and Related Corporate Governance Matters*, [D.I. 9315] at 6-7.

[15] Ms. Doré testified that on "February 17th we had a meeting in New York with the EFI[H] second liens and the EFIH [PIKs] and the TC[E]H first liens. [T]hey were in separate meetings but it was throughout a day, it was a day's worth of meetings, where we started to talk to them about we think it's really prudent to start planning for a Plan B process." Doré 8/22/16 Hr'g Tr. at 84:14-19; *see also id.* at 84:22-85:5; *id.* at 98:20-99-10; Williamson 8/19/16 Hr'g Tr. at 126:16-127:5.

well as the disinterested director counsel.  Then I spoke with different individuals at the company.  I spoke with Mr. Molodovan.  I spoke with Ms. Howard, and I also spoke with some of the financial accounting people at EFH [just] to ensure that I understood all of the matters.[16]

As Ms. Doré testified, the Board gave at least 14 restructuring updates since January 2016.[17] This included ten Joint Board meetings with restructuring updates before learning that the IRS was tentatively adverse on the Debt Characterization Ruling, and four more meetings before authorizing entry into the Ancillary Agreements.[18]  As the Court heard from Ms. Doré, Mr. Keglevic, and Ms. Williamson, the Debtors have exhaustively evaluated alternative plan options since the Confirmed Plan.[19]  This process thoroughly satisfies the Debtors' duties of care and loyalty, and the Plan is therefore proposed in good faith as a result of the Debtors' sound exercise of business judgment.

### B. In the Alternative, the Debtors Satisfy the Heightened Scrutiny and Entire Fairness Standards.

12.    Moreover, while the record supports application of the business judgment standard, the transactions contemplated by the Plan satisfy both heightened scrutiny and entire fairness.  As the EFH Objectors admit in their pre-trial brief, the highest standard of review, "entire fairness," requires examination of fair dealing and fair price "***examined together as a whole***."[20]  The evidence overwhelmingly supports a finding of fair dealing—the Debtors

---

[16]   Williamson 8/19/16 Hr'g Tr. at 20:15-22:10.

[17]   Doré 8/22/16 Hr'g Tr. at 77:11-17 (D-DEM Doré 1), 68:3-10.

[18]   *See* Doré 8/22/16 Hr'g Tr. at 114:6-115:15, 116:25-118:4, 123:1-21, 123:22-132:12.

[19]   Doré 8/22/16 Hr'g Tr. at 85:16-24 ("We presented at that meeting a number of tax alternatives and we tried to put the Boards kind of in the shoes of each estate and talk about from that estate's perspective what would be the goals of a Plan B reorganization and whether the various alternatives would meet those goals."); *id.* at 85:25-90:2; *id.* at 90:7-10); Keglevic 8/17/16 Hr'g Tr. at 236:6-24; Williamson 8/19/16 Hr'g Tr. at 49:20-50:3.

[20]   *Pretrial Brief of EFH Indenture Trustee Regarding Standard of Review Applicable to Approval of EFH 363 Transactions and Related Corporate Governance Matters* [D.I. 9315] at 4.

extensively negotiated the Plan's terms at arm's length.  In addition, the record establishes that EFH Corp. is getting more than a fair price in exchange for what it is giving up.

## II.   THE EFH GROUP'S USE OF THE EFH GROUP'S NOLS AND THE EQUITY CONTRIBUTIONS DO NOT CONSTITUTE FRAUDULENT TRANSFERS.

13.   The EFH Indenture Trustee divorces its analysis of the EFH Group's use of the EFH Group's NOLs and EFH Corp.'s contribution of its equity interest in EFH Corporate Services and EFH Properties from its challenges to the balance of the Plan in an attempt to characterize these transactions as constructive fraudulent transfers lacking reasonably equivalent value.   This analysis is flawed.   Fraudulent transfer claims cannot be brought to challenge postpetition transfers that satisfy section 363(b) of the Bankruptcy Code.   Nevertheless, the "gives and gets" relevant to a transfer pursuant to section 363 are analogous to reasonably equivalent value analysis under fraudulent transfer law.   Therefore, even if the EFH Objectors could bring a fraudulent transfer challenge to the transactions contemplated by the Plan—which they cannot—there is ample evidence to support a finding of reasonably equivalent value.   The "gives and gets" of the overall Plan make clear that there is reasonably equivalent value for any transfers of EFH/EFIH estate assets.

### A.   State Fraudulent Transfer Law Does Not Apply.

14.   Bankruptcy courts may consider state law fraudulent transfer claims under 11 U.S.C. § 544(b), which provides that "the trustee may avoid any transfer of an interest of the debtor . . . that is voidable under applicable law." "Section 544(b), and hence, state law, applies **solely** to prepetition transfers." *In re Centennial Textiles, Inc.*, 227 B.R. 606, 610 (Bankr. S.D.N.Y. 1998) (emphasis added).   For postpetition transfers, "[w]hat constitutes an unauthorized transfer of estate property is . . . determined by federal law under the Code." *In re*

*Metro. Cosmetic Reconst. Surgery P.A.*, 125 B.R. 556, 557 (Bankr. D. Minn. 1991).[21]

Consequently, numerous courts have declined to permit fraudulent transfer actions for

postpetition transfers.

### B.    The Plan and Ancillary Agreements are One Integrated Transaction.

15.    When a series of transactions are "part of one integrated transaction," courts may

look "beyond the exchange of funds" and "collapse" the individual transactions for purposes of

fraudulent transfer analysis. *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302

(3d Cir. 1986).   To make this determination, courts consider (1) whether all of the parties

involved had knowledge of the multiple transactions; (2) whether each transaction would have

occurred on its own; and (3) whether each transaction was dependent or conditioned on other

transactions. *In re Hechinger Inv. Co.*, 327 B.R. 537, 546-47 (D. Del. 2005).

16.    The Ancillary Agreements were all agreed to for inclusion in the Plan Supplement

on July 27, 2016 (with an updated TMA filed August 16, 2016), are binding on the same parties

(EFH and EFIH, on the one hand, and Reorganized TCEH and related entities, on the other

hand), and the Plan Proponents request that each be approved together with the Plan.[22]   All

parties involved had knowledge of each of the transactions contemplated by these agreements.

*See In re Hechinger*, 327 B.R. at 546-47 (collapsing a multi-step transaction where, among other

things, "[t]he Director Defendants, the Bank Defendants and [an individual Defendant] all knew

---

[21]    *In re Centennial*, 227 B.R. at 610 (denying trustee's fraudulent transfer claims because "[t]he only improper transfers proved at trial occurred postpetition"); *In re Metro. Cosmetic Reconst. Surgery P.A.*, 125 B.R. at 557 ("Minnesota fraudulent conveyance law has no application to postpetition transfers of estate property. Section 544(b), which provides for the avoidance of a transfer that is avoidable under state law, applies only to the prepetition transfer of an interest in property of a debtor. It does not apply to the postpetition transfer of an interest in property of an estate."); *Eisenberg v. Bank of N.Y.   (In re Sattler's, Inc.)*, 73 B.R. 780, 790-91 (Bankr. S.D.N.Y. 1987) (dismissing postpetition state law fraudulent transfer claims under 11 U.S.C. § 544(b)).

[22]    DX006 July 27, 2016 Plan Supplement [D.I. 9100]; DX766 Aug. 16, 2016 Revised Tax Matters Agreement, [D.I. 9305-1]; DX001C Aug. 16, 2016 Plan [D.I. 9321-1].

about the multiple steps of the transaction").    Additionally, the Plan and the Ancillary Agreements are interdependent.    Without the Plan, there is no need for the Ancillary Agreements.  And without the Ancillary Agreements, the Plan could not be confirmed.  *See id.* ("Each step of the Transaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent . . . .").  Because the Plan and Ancillary Agreements are integrated, the Court should evaluate these transactions holistically in considering whether reasonably equivalent value was obtained.

> **C.    The Plan Provides Reasonably Equivalent Value for the Use of the EFH Group's NOLs and the EFH Corporate Services and EFH Properties Equity Contributions.**

17.    Under both Texas and Delaware fraudulent transfer law, the entire transaction must be evaluated when assessing whether reasonably equivalent value is exchanged.[23]    As a result, Courts evaluate all that a transferor gives and all that a transferor gets in assessing reasonably equivalent value.[24]  Here, the Plan contemplates a tax-free spin-off and corresponding utilization of the EFH Group's NOLs to avoid (a) the costs associated with pursuing a taxable plan and (b) a potential $6.5 billion stranded tax at EFH Corp.[25]    As Ms. Doré testified, the Debtors project that EFH Corp. will have approximately $250 million of distributable cash at the

---

[23]    *See, e.g.*, *Smith v. Am. Founders Fin. Corp.*, 365 B.R. 647, 666 (S.D. Tex. 2007) (holding that a court should "examine *all aspects* of the transaction" in assessing reasonable equivalent value (emphasis added)); *Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002) (in analyzing "'reasonably equivalent value,' the court should examine the 'totality of the circumstances'").

[24]    *In re Pace*, 456 B.R. 253, 270 (Bankr. W.D. Tex. 2011) ("Courts examine all the circumstances surrounding a transaction, looking to whether there is a reasonable and fair proportion between what the debtor surrendered and what the debtor received in return. . . .   [T]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors." (internal quotation marks omitted)); *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000) ("The proper focus is on the *net effect* of the transfers on the debtor's estate . . . ." (emphasis added)); *Smith*, 365 B.R. at 666 (stating that the court should "carefully measure the value of all benefits *and* burdens to the debtor, direct or indirect" (emphasis added)).

[25]    Howard 8/18/16 Hr'g Tr. at 131:17-132:14.

projected E-Side emergence date of March 31, 2017, and "for every month past March 31st that goes by for the EFH estate . . . cash is reduced by approximately $10 million."[26]

18.     Thus, even going down the taxable route would destroy value at EFH Corp. as restructuring fees mount.  And this is just the litigation alone.  Ms. Doré also testified that the risk of a $6.5 billion stranded tax increased when the TCEH First Lien Lenders Debtors learned of the Debt Characterization Ruling.[27]  Were this taxable transaction to come to pass, Mr. Keglevic testified, it would be "Armageddon."[28] The avoidance of these contingent liabilities provides ample consideration for the use of NOLs contemplated under the Plan.

19.     The EFH Objectors argued in closing arguments that the risks of Tax Armageddon to the EFH Objectors and the TCEH First Lien Lenders must be netted for purposes of reasonably equivalent value analysis.   Respectfully, the EFH Objectors fundamentally misunderstand the how the contingent liability created by Tax Armageddon would impact the unsecured claims at EFH Corp. held by the EFH Objectors differently and far more harshly than the secured claims at TCEH held by the TCEH First Lien Lenders.  The potential liabilities are not close in magnitude.  EFH Corp. is the tax payer and primarily liable for the stranded tax in Tax Armageddon.  All cash at EFH Corp. would be exhausted, while the TCEH First Lien Lenders' secured claims (and the $550 million payable to TCEH unsecured creditors as a carve out) would still prime the joint and several tax claims created even were EFH Corp. able to check

---

[26]  Doré 8/22/16 Hr'g Tr. at 101:6-103:5 (noting that if a taxable plan delayed EFH emergence for another year, EFH would lose half of its distributable cash, even "without taking into account additional litigation expense associated with litigating a taxable plan").

[27]  Doré 8/22/16 Hr'g Tr. at 116:12-24 ("the impact of this tax ruling meant that we had even less leverage to convince the first liens to stick with that plan, and so it became even more important to us that we adhere to the schedule and get this plan confirmed, because we continued to believe that it was the best plan for all estates, but in this instance even more so at this point for EFH."); *see also* DX758 May 19, 2016 Supplemental Response of TCEH First Liens to Scheduling Motion [D.I. 8480].

[28]  Keglevic 8/17/16 Hr'g Tr. at 104:15-22.

the box.  As a result, by avoiding Tax Armageddon, the EFH Objectors are getting far more than the TCEH First Lien lenders.  The liabilities do not net.

20.    EFH Corp.'s contribution of its equity interests in EFH Corporate Services and EFH Properties are part of a larger Separation Agreement—let alone Plan—that provides for multiple forms of consideration to EFH Corp.[29]  The EFH Objectors acknowledge that in evaluating whether reasonably equivalent value is exchanged, the primary consideration is whether the transferor's net worth is preserved.[30]  By contributing its equity in EFH Corporate Services and EFH Properties, EFH Corp. is shedding downside risks and liabilities associated with these entities.[31]  The avoidance of EFH Corp.'s contingent liabilities associated with EFH Corporate Services and EFH Properties, as well as the transfer of $14 million of cash on hand at EFH Properties, provide ample consideration for EFH Corp.'s contribution of equity to Reorganized TCEH.  In fact, as Mr. Keglevic testified and the NextEra merger agreement makes clear, EFH Corp.'s ownership interest in Oncor becomes more marketable upon shedding EFH

---

[29]  DX004 Separation Agreement [D.I. 9188-17]. In its pretrial brief, the Indenture Trustee also relies on *In re Alaska Fur Gallery, Inc.*, 2011 Bankr. LEXIS 5787 (Bankr. Alaska Apr. 29, 2011), for the proposition that the transfer of a non-debtor's assets is impermissible under 11 U.S.C. § 1123(a)(5)(B). [D.I. 9316 at 13].  Initially, it is unclear how such a proposition, if true, would apply here. The Plan provides that debtor EFH Corp. will transfer its equity interest in non-debtor EFH Properties to Reorganized TCEH. No assets of non-debtor EFH Properties are separately transferred. Further, the court in *Alaska Fur* addressed the transfer of a non-debtor's assets to the debtor without any consideration. *See* 2011 Bankr. LEXIS 5787 at *24 ("[Debtor] will pay noting for the [non-debtor's] property."). Here, in contrast, the avoidance of EFH Properties' contingent liabilities and the transfer of $14 million in cash on hand at EFH Properties, provides EFH Corp. with equivalent value.

[30]  *Pre-Trial Brief of EFH Indenture Trustee Regarding Applicable Fraudulent Transfer Law* [D.I. 9316] at 10.

[31]  As to EFH Corporate Services, EFH Corp. could be saddled with potential severance costs exceeding $38 million dollars, potential WARN Act liabilities, rejection damages for the majority of contracts to which it is a party and no longer needs post-separation, and potential liquidation costs. *See* Stuart 8/22/16 Hr'g Tr. at 34:6-35:5; D-DIR Stuart ¶¶ 73-77; Williamson 8/19/16 Hr'g Tr. at 25:7-12. As to EFH Properties, Mr. Keglevic testified that the entity will likely be cash flow neutral for the balance of the lease—which ends in 2022—and cash flow negative if Reorganized TCEH moves out. *See* Keglevic 8/17/16 Hr'g Tr. at 151:23-152:18; *id.* at 153:17-20. Moreover, Mr. Moldovan testified that EFH Properties has not made a payment on its $158 million payable to EFH Corp. since 2009 and does not forecast to do so. *See* Moldovan 8/18/16 Hr'g Tr. at 16:5-10. EFH Properties likewise has no ability—other than cash on hand and diminishing cash flows—to pay a $74 million EFH Money Pool payable. *See* D-DIR Keglevic at 22, Fig. 4 (EFH Properties Projected Cash Flow); Moldovan 8/18/16 Hr'g Tr. at 40:13-41:10. The Court also heard about EFH Properties' fixed costs to run Energy Plaza, which do not materially decrease even if tenants move out. Keglevic 8/17/16 Hr'g Tr. at 152:19-153:1; Moldovan 8/18/16 Hr'g Tr. at 30:21-31:3.

Corporate Services and EFH Properties.[32] These equity contributions therefore preserve and enhance the transferor's net worth, and do not lack reasonably equivalent value.

## III.    THE DEBTORS' HAVE THOROUGHLY EVALUATED THE RISKS AND COSTS ASSOCIATED WITH A TAXABLE PLAN.

21.    As the Court knows, and as the evidence establishes, tax considerations have driven the Debtors' restructuring from the beginning.   The IRS's CODI ruling—which the Debtors learned about in late May—means that *all* of the Debtors faced two choices in approving the tax-free spin-off with the Preferred Stock Sale component.   They could *either* (a) approve a transaction that had the support of the TCEH First Lien Lenders and the Debtors' disinterested directors that utilizes approximately $5.86 billion of NOLs, potentially allows a significant number of NOLs to survive (contrary to earlier expectations) for the benefit of EFH creditors, and avoids "Tax Armageddon"; or (b) "throw down the gauntlet,"[33] insist on additional compensation for the use of NOLs in the Preferred Stock Sale, fight a confirmation battle against the TCEH First Lien Lenders, and risk a catastrophic Taxable Separation that could generate at least $6.5 billion of tax liability, wipe out all of the EFH Group's NOLs, and render EFH administratively insolvent.[34]

22.    The Debtors thoroughly analyzed these alternatives.   They considered, among other things, the fact that exclusivity had expired, the TCEH First Lien Lenders were prepared to file a taxable plan, and the Debtors were unable to force the TCEH First Lien Lenders to accept a tax-free spin transaction.   And, at the end of the day, the answer was easy—no responsible

---

[32]   Keglevic 8/17/16 Hr'g Tr. at 135:1-22 ("everybody who was interested, the E-Side creditors as well as any bidders, wanted as simple as possible to just clear title to the 80 percent ownership in ONCOR. They didn't want anything else associated with the asset. That was the only asset that they saw value in."); *id.* at 135:23-136:16 ("We thought the best thing for EFH was to get rid of those assets"); *id.* 141:18-142:18; *id.* at 136:9-12; DX003 NextEra Merger Agreement [D.I. 9190-2] at page 104 of 429.

[33]   Keglevic 8/17/16 Hr'g Tr. at 230:20.

[34]   Keglevic 8/17/16 Hr'g Tr. at 103:1-8; *id.* at 117:1-118:12; Doré 8/22/17 at 117:6-14.

Debtor could "throw down the gauntlet" and pursue a path to Tax Armageddon. The EFH Objectors' attempts to weigh the risks differently or conjure up hypothetical alternative transactions cannot overcome the evidence supporting the Debtors' decision to pursue the Plan.

### A. EFH Does Not Necessarily Have Uncontested Ownership of its NOLs Under Applicable Legal Authority or Equitable Principles.

23.     The EFH Objectors have largely staked their case on the proposition that the NOLs generated by the EFH Group were, at least after the 2015 Settlement Agreement, solely the property of EFH, and that TCEH had no right to use those NOLs,[35] even though the overwhelming majority of the EFH Group's NOLs were generated by TCEH.[36] Indeed TCEH generated more NOLs than will be consumed in the Preferred Stock Sale—that is the only reason any NOLs survive for the benefit of EFH in the first place.[37]

24.     There is authority that supports the proposition that a subsidiary is not entitled to compensation for its parent's use of NOLs attributable to the subsidiary.[38] However, TCEH has asserted that the 2015 Settlement Agreement did not eliminate its rights under the Tax Sharing Agreement if it is not permitted to utilize the EFH Group's NOLs in the Preferred Stock Sale.[39]

---

[35]   *See, e.g.*, *Pretrial Brief of EFH Indenture Trustee Regarding Applicable Fraudulent Transfer Law* [D.I. 9316 at 5] ("Unquestionably, EFH Group's tax attributes, including its NOLs, are property of EFH Corp.'s estate. A disregarded entity's right to future use of, or reimbursement by its owner for use of, NOLs economically attributable to losses of the disregarded entity - if any - is purely contractual." (citations committed)).

[36]   Howard 8/18/16 Hr'g Tr. at 64:18-21.

[37]   D-DIR Howard ¶ 6.

[38]   *See In re Conex Holdings, LLC*, 518 B.R. 792 (Bankr. D. Del. 2014); *In re Marvel Entm't Gr'p, Inc.*, 273 B.R. 58 (D. Del. 2002) (corporate subsidiary brought fraudulent transfer claim against corporate parent). These cases are arguably in some tension with other authority, such as *Prudential Lines, Inc.*, 928 F.2d 565, 574 (2d Cir. 1991), that hold that a debtor, including a debtor in a consolidated group, has a protectable property interest in NOLs. *But see In re Trial Guaranty, Inc.*, Mem. Op. June 27, 2016 (D. Del) (involving facts applying a state rehabilitation order, but broadly holding that the subsidiary that was subject to the state rehabilitation order had a property interest in the consolidated NOL).

[39]   *See, e.g.*, DX050 July 27, 2016 Restructuring, Tax, and M&A Update [EFH06365951 at EFH06365980] ("EFH creditors argue that the Company's tax attributes are assets of EFH Corp. because EFH Corp. is the taxpayer, while the TCEH Debtors are disregarded entities. . . . In the event the NOLs were not used in the step-up transaction, but instead were kept and used by the [sic] EFH, that outcome could give rise to claims TCEH contends it would have claims against EFH under the tax sharing agreement.").

Since TCEH is a disregarded entity for tax purposes, TCEH's assets are EFH's assets, and the Debtors are simply utilizing the EFH Group's NOLs to offset taxable gain that will be included on the EFH Group's tax return. There is thus no "transfer" or "obligation" undertaken of NOLs. Rather, as the court in *Marvel* recognized, the EFH Group's NOLs are simply being consumed by operation of law to shelter EFH Group income for the benefit of the EFH Group.[40]

25.    The Debtors' boards properly took all of these principles—and fundamental principles of fairness—into account to determine the most equitable utilization of tax attributes. *See In re Bob Richards* 473 F.2d 262, 264 (9th Cir. 1973) (holding that an insolvent consolidated corporate subsidiary, in the absence of a tax sharing agreement, had an equitable entitlement to a refund that could be traced to a payment by a subsidiary and the use of the subsidiary's NOLs). Here, TCEH generated more NOLs than are being used in the Preferred Stock Sale, the taxable gain in the Preferred Stock Sale will be attributable to TCEH's assets, and EFH will then receive an unexpected benefit from surviving NOLs (worth up to approximately $380 million), many of them generated by TCEH's operations.[41]  This outcome is fair and equitable to all of the EFH constituencies.

**B.    Prior to the IRS's Unexpected Policy Shift In May, No One Believed the Residual NOLs Had Value If Not Used In the Preferred Stock Sale.**

26.    The uncontroverted testimony of Mr. Keglevic, Ms. Doré, and Ms. Howard is that, prior to the IRS's announcement in May of this year, no one in these cases believed that the EFH Group's NOLs had any significant value to EFH if they were not utilized in the Preferred

---

[40]    D-DIR Howard ¶ 21.

[41]    D-DIR Keglevic ¶ 30.

Stock Sale.[42] The original request for a private letter ruling, submitted on June 10, 2014, included a request for a ruling (the "Section 108 Ruling") that the cancellation of TCEH's debt would be subject to the so-called "Bankruptcy Exclusion" under section 108(a)(1)(A) of the Internal Revenue Code (the "IRC").[43]

27.     When the Bankruptcy Exclusion under section 108(a)(1)(A) applies, cancellation of debt income ("CODI") is not included in the debtor's taxable income (i.e., CODI does not generate taxable income or gain for the debtor).[44] Rather, CODI first reduces a specified list of tax attributes, including NOLs, and any remaining CODI goes into a so-called "black hole" without further consequence to the debtor's taxable income or tax attributes.[45] Accordingly, none of the EFH Group's NOLs were expected to survive.

28.     The section 108 Ruling was, in essence, a request that the IRS rule that TCEH's debt is recourse debt for purposes of the Bankruptcy Exclusion, because the Bankruptcy Exclusion does not apply to the cancellation of nonrecourse debt that involves transfers of assets encumbered by the debt out of the Debtor in satisfaction of the debt.[46] The Debtors had good reason to believe the IRS would agree with that position.[47] TCEH's debt is recourse to TCEH for state law purposes, and it was guaranteed by EFCH, an entity that was treated as a

---

[42]   Keglevic 8/17/16 Hr'g Tr. at 102:3-14; Doré 8/22/16 Hr'g Tr. at 79:19-25; Howard 8/18/16 Hr'g Tr. at 127:7-15; D-DIR Howard ¶ 19.

[43]   DX692 June 10,2014 IRS Submission [EFH06363115 at EFH0636317].

[44]   IRC § 108(a).

[45]   Keglevic 8/17/16 Hr'g Tr. at 106:2-8; see also IRC §§ 108(b), 1017(b)(2).

[46]   See PLR 9302001 (Aug. 31, 1992). This PLR cited Rev. Rul. 90-16, 1990-1 C.B. 12 in support of its position because, under that Revenue Ruling, the IRS appeared to conclude that section 108(a) applied only to cancellation of indebtedness income under section 61(a)(12), not gain under section 1001. The IRS reaffirmed this view in Ruling #11 of the PLR, by specifically ruling that "Sections [of the IRC] 61(a)(12) and 108(a) are not applicable" to the cancellation of TCEH's debt.

[47]   See DX364, June 29, 2016 IRS Submission; DX 361, June 10, 2016 IRS Submission; DX359, May 13, 2016 IRS Submission; Howard 8/18/16 Hr'g Tr. at 71:2-72:23.

corporation until 2013.[48]   The Debtors emphasized this view to the IRS in multiple IRS submissions and in their June 15 "Conference of Right."

29.     The IRS ultimately ruled adversely with respect to the Debt Characterization Ruling.[49]  The IRS's ruling has two key impacts.  **First**, if a Taxable Separation occurs, or if the tax-free spin-off is later found to be taxable (*i.e.*, a failed or "busted" spin-off), the alternative rulings described in Ms. Howard's testimony that prevent a large tax liability in the tax-free spin-off would have no effect, and the cancellation of the TCEH debt would give rise to a significant tax liability for the EFH Group.[50]  **Second**, because the attribute reduction rule of section 108(b) is tied to the application of the Bankruptcy Exclusion, the attribute reduction rule should not apply, so NOLs will potentially survive for EFH's benefit.

30.     As the trial testimony showed, after the IRS made its position known, the Debtors thoroughly considered whether compensation to EFH might be possible.  Mr. Keglevic made an inquiry, the TCEH First Lien Lenders made their position clear, and the Debtors concluded that the risk of a $6.5 billion "Tax Armageddon" was too great.[51]

> **C.     The EFH Objectors Overstate the Incremental Value of the Preferred Stock Sale and Dramatically Understates the Drawbacks of a Spin-Off to the TCEH First Lien Lenders.**

31.     As discussed in Mr. Keglevic's uncontroverted testimony and in Ms. Howard's uncontested written direct testimony, the EFH Objectors' focus on the $1.1 billion valuation of the basis step-up from the Preferred Stock Sale is overstated.

---

[48]   *See* PLR 201010015 (Mar. 12, 2010); PLR 200709013 (Mar. 2, 2007); PLR 200630002 (July 28, 2006); PLR 200315001 (Apr. 11, 2003).

[49]   *See* DX343_R, Private Letter Ruling, Ruling #11.

[50]   Howard 8/18/16 Hr'g Tr. at 74:2-8

[51]   Keglevic 8/17/16 Hr'g Tr. at 112:20-113:17

32.    ***First***, the true incremental value of the Preferred Stock Sale over a Taxable Separation is only approximately $430 million.[52]   It is certainly true that, as a matter of hypothetical tax law, the tax-free spin-off could be performed with *no* basis step-up.   But the TCEH First Lien Lenders would not consent to that transaction.

33.    ***Second***, even the $430 million figure does not account for the additional risks and limitations imposed on the TCEH First Lien Lenders and Reorganized TCEH as a result of the tax-free spin-off.   Mr. Ying's testimony confirmed that limitations on stock buybacks, potential M&A structures, and dividend recapitalizations are material in light.[53]   The risk associated with "consolidated group" liability and other limitations imposed by the Tax Matters Agreement were significantly negotiated, are real limitations, and apply only because of the application of the applicable tax rules and the need to preserve the tax-free nature of the spin-off.[54]   Finally, the EFH Objectors fail to grapple with the fact that the TCEH First Lien Lenders have accepted essentially *all* risk with respect to regular income tax liability that would result from the Preferred Stock Sale if (a) the EFH Group's NOLs are lower than anticipated or (b) the assets contributed in the Preferred Stock Sale are worth more than anticipated, in addition to certain other "ordinary way" taxes (such as Texas Margin Tax).[55]

34.    ***None*** of these limitations and risks would apply in a Taxable Separation.[56]   As a result, Reorganized TCEH would never be exposed to consolidated group liability, the restrictions and allocation of earnings and profits applicable to tax-free spin-offs would not

---

[52]    Keglevic 8/17/16 Hr'g Tr. at 210:11-15.

[53]    Ying 8/18/16 Hr'g Tr. at 168:6-169:23.

[54]    Howard 8/18/16 Hr'g Tr. at 85:13-86:1.

[55]    Howard 8/18/16 Hr'g Tr. at 91:18-93:2; DX766 Tax Matters Agreement §§ 2.04, 2.05, definition of "Additional Preferred Stock Sale Tax."

[56]    DX002 Third Amended Disclosure Statement [D.I. 8747 at 192/204.]

apply, and the risk allocation mechanics would not exist.  The TCEH First Lien Lenders never would have accepted such limitations and risks in the absence of the basis step-up contemplated in the Plan.

**D.    A Taxable Separation Is a Real Risk.**

35.    There is no question that a Taxable Separation, in light of the potential "Tax Armageddon" it would cause, would be subject to significant litigation risk.[57]  However, as discussed in greater detail in the Debtors' reply brief in support of confirmation [D.I. 9298], courts have approved transactions that resulted in stranded taxes over spirited objections from the Department of Justice on multiple occasions.[58]  While these cases did not involve objections from the Debtors, it should be noted that it is not necessarily true that *TCEH*, as opposed to EFH and EFIH, would object to a Taxable Separation of *TCEH*.  Indeed, as reflected in the June 13 version of the TMA, TCEH insisted on preserving its right to pursue a Taxable Separation if agreement could not be reached on key terms of the TMA.[59]

36.    To be sure, the fact that there was no available alternative animated the courts' decisions in the "stranded tax" cases.  However, there is a very real risk that in the absence of the support of the TCEH First Lien Lenders, there will be no available alternative to a Taxable Separation in this case.  To consummate a tax-free spin-off under sections 368(a)(1)(G) and 355 of the IRC, it is indisputable that the TCEH First Lien Lenders must receive stock in Reorganized TCEH.[60]  Accordingly, any non-consensual tax-free spin-off would require the Debtors to "cram up" the TCEH First Lien Lenders with the stock of a newly spun-off entity that

---

57    Howard 8/18/16 Hr'g Tr. at 83:18-84:8.

58    *Inner City Media*, No. 11-13967 (Bankr. S.D.N.Y. 2012); *In re ICL Holding Co.*, No. 12-13319 [Docket No. 617] (Bankr. D. Del. 2013); *In re MSR Resort Golf Course LLC, et al.*, No. 11-10372 (Bankr. S.D.N.Y. 2013).

59    DX013 Form of Tax Matters Agreement [D.I. 8699-1 at 5/40].

60    *See* DX046 Omnibus Tax Memorandum [D.I. 2296].

has exposure to the significant risks and limitations inherent in a spin-off transaction. The fight over whether the massively undersecured TCEH First Lien Lenders could be forced to accept stock would at a minimum require significant litigation.[61]

### E.    Spreading the Pain is No Solution.

37.    The Debtors have repeatedly explained why "checking the box" on TCEH is simply not a solution to the complex dynamics in this case.[62]  To be clear, "checking the box" is simply a way by which EFH could make TCEH liable for massive taxes that TCEH does not currently owe.  All TCEH creditors and stakeholders would fight that attempt to the hilt.  It would lead to another year of litigation and hundreds of millions of additional fees and expenses. "Checking the box" solves nothing.  It also completely ignores that "spreading the pain" in this manner still would not prime the TCEH First Lien Lenders, thus primarily inflicting harm on the TCEH unsecured creditors.

38.    "Successor liability" and similar state-law theories against Reorganized TCEH also present significant fact-intensive hurdles.  Notably, the IRS could (and likely would) pursue EFH for any available recovery before attempting to collect from Reorganized TCEH in a highly contested liability fight.[63]  Thus, "checking the box" and successor liability are, at "best," mutually assured destruction, catastrophe for all.

---

61    *See Matter of TM Monroe Manor Assocs., Ltd.*, 140 B.R. 298, 300-01 (Bankr. N.D. Ga. 1991) (not approving partnership interests in reorganized debtor as it would violate Congressional intent where creditors were creditors of the debtor and interests would create "several potential conflicts in operating the company, all of which would doom debtor's prospects of reorganization"); *cf. In re Future Energy Corp.*, 83 B.R. 470, 474 (Bankr. S.D. Ohio 1988) (finding stock in debtor parent was not indubitable equivalent but without relevantly citing the congressional record); *Inv. Co. of The Sw*, 341 B.R. at 325; *In re Cottonwood Corners Phase V, LLC*, No. 11-11-12663, 2012 WL 566426, at *24 (Bankr. D. N.M. Feb. 17, 2012) ("A creditor's proposed treatment is the indubitable equivalent when '*there is no reasonable doubt*' that the creditor will receive the full benefit of its bargain made at the inception of its contract with the debtor.").

62    *See* DX046 Omnibus Tax Memorandum [D.I. 2296 at 21/50 - 22/50]; Howard 8/18/16 Hr'g Tr. at 81:16-82:14.

63    Howard 8/18/16 Hr'g Tr. at 133:14-24. This is partially because EFH essentially has "negative basis" in its interests in Oncor: if TCEH is separated in a taxable separation and no NOLs remain, a transfer of Oncor for even $1 would generate approximately $800 million of tax liability.

### F.  Even Taking Discounting Into Account, A Fight Over a Taxable Separation is "Mini Armageddon."

39.    Mr. Keglevic's testimony strongly illustrated the fact that even fighting the TCEH First Lien Lenders about these issues represent a "Mini Armageddon."[64]  Even discounting the risk of a Taxable Separation to 5% leads to a $375 million risk (5% times the $6.5 billion stranded tax liability).  When combined with the follow-on risk of an E-side taxable separation that would generate billions of additional tax liability, the $430 million of incremental value of the Preferred Stock Sale compared to a Taxable Separation is easily exceeded at 5%, and swamped at 10%.  Those discounted risks do not even account for the certainty of extensive incremental fees associated with a continued stay in chapter 11, especially in the context of yet another lengthy, contested confirmation trial that would probably make this confirmation trial look like a contested joint administration motion by comparison.  And a continued stay in bankruptcy inevitably presents the potential for declines in the value of the business associated with ongoing risks and limitations on the Debtors' businesses.

### CONCLUSION

40.    For the reasons set forth herein, the Debtors respectfully request that the Court confirm the Plan as it relates to TCEH Debtors and EFH Shared Services Debtors and enter the Confirmation Order.

*[Remainder of page intentionally left blank.]*

---

[64]    Keglevic 8/17/16 Hr'g Tr. at 112:20-113:17; Doré 8/22/16 Hr'g Tr. 101:6-103:5.

Dated: August 24, 2016
     Wilmington, Delaware

*/s/ Jason M. Madron*
_____

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D.  Collins (No.  2981)
Daniel J.  DeFranceschi (No.  2732)
Jason M.  Madron (No.  4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
        defranceschi@rlf.com
        madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O.  Sassower, P.C.  (admitted *pro hac vice*)
Stephen E.  Hessler (admitted *pro hac vice*)
Brian E.  Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
        stephen.hessler@kirkland.com
        brian.schartz@kirkland.com

-and-

James H.M.  Sprayregen, P.C.  (admitted *pro hac vice*)
Marc Kieselstein, P.C.  (admitted *pro hac vice*)
Chad J.  Husnick (admitted *pro hac vice*)
Steven N.  Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
        marc.kieselstein@kirkland.com
        chad.husnick@kirkland.com
        steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession

--and--

**PROSKAUER ROSE LLP**
Mark K.  Thomas (admitted *pro hac vice*)
Peter J.  Young (admitted *pro hac vice*)
Three First National Plaza
70 W.  Madison Street, Suite 3800
Chicago, Illinois 60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551
Email:  mthomas@proskauer.com
pyoung@proskauer.com

Co-Counsel to the Debtor Energy Future Holdings Corp.