IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related Documents: 9190** |
| | ) | **Obj. Deadline: August 25, 2016 at 4:00 p.m.** |
| | ) | |

**OBJECTION OF CERTAIN FUNDS AND ACCOUNTS ADVISED OR SUB-ADVISED
BY FIDELITY MANAGEMENT & RESEARCH COMPANY OR ITS AFFILIATES
TO MOTION OF THE EFH/EFIH DEBTORS FOR ORDER (A) AUTHORIZING
ENTRY INTO MERGER AGREEMENT, (B) APPROVING TERMINATION FEE,
AND (C) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER
PLAN SUPPORT AGREEMENT**

Certain funds and accounts advised or sub-advised by Fidelity Management & Research Company or its affiliates (collectively, "Fidelity") file this objection (the "Objection") to the *Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance under Plan Support Agreement* [D.I. 9190] (the "Motion"). In support of its Objection, Fidelity respectfully states as follows.

---

[1] The last four digits of Energy Future Holding Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## PRELIMINARY STATEMENT

1.      In connection with the Debtors' proposed sale of substantially all of the assets of the E-Side Debtors to NextEra Energy, Inc. ("NextEra"), the Debtors seek authority to pay NextEra a $275,000,000 break-up fee (the "Break-Up Fee") in the event the Agreement and Plan of Merger (the "Merger Agreement") with NextEra is terminated and any alternative transaction is consummated.  Third Circuit precedent dictates that the Break-Up Fee may only be approved if it is an actual and necessary cost to preserve the value of the Debtors' estates, and requires a showing that without the Break-Up Fee, NextEra would abandon its bid.  Given NextEra's relentless pursuit of the Debtors' assets for the past two-plus years, the Debtors have not and cannot make such a showing.

2.      As this Court is well aware, since as far back as June 2014, NextEra has been one of Oncor's most eager and determined suitors.  At the outset of these chapter 11 cases, in connection with the Debtors' efforts to obtain approval of the original restructuring support agreement (the "Restructuring Support Agreement") and the proposed convertible second lien DIP facility (the "RSA EFIH Second Lien DIP Facility"), NextEra submitted multiple unsolicited bids to fund a convertible lien DIP and acquire the equity of reorganized EFH.  As a direct result of NextEra's involvement, the Debtors terminated the Restructuring Support Agreement and commenced a two-stage marketing process in which NextEra was a key participant.  After the marketing process failed to yield a satisfactory proposal, the Debtors signed the plan support agreement (the "Original PSA") with, among others, the Hunt Consortium, and filed a chapter 11 plan (as amended, the "Original Plan")[2], pursuant to which reorganized EFH would be converted into a REIT.

---

[2]      *Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 7187].

3.     Even as the Debtors moved forward with the Original Plan, NextEra persevered. During the confirmation hearing for the Original Plan, NextEra stated it was prepared to consummate an alternative transaction that would pay in full or otherwise leave all E-Side creditors unimpaired.  And finally, after confirmation of the Original Plan and prior to issuance of the Termination Notice (as defined below) related to the Original Plan, NextEra lobbied regulators to not approve the transactions contained in the Original Plan and continued to engage the Debtors on a renewed bid for Oncor.

4.     Time and time again over the past two-plus years, NextEra has openly pursued its very serious interest in acquiring Oncor.  NextEra's persistence – often unsolicited – since the commencement of these chapter 11 cases proves that the Debtors cannot meet their heavy burden to show that the Break-Up Fee was necessary to induce NextEra to bid or that its approval is necessary to prevent NextEra from abandoning its bid.  In fact, NextEra's conduct throughout these cases demonstrates the opposite – NextEra will continue to pursue Oncor with or without a break-up fee.  Accordingly, approval of the Break-Up Fee must be denied.

## BACKGROUND

5.     On April 29, 2014, each of the Debtors filed a voluntary petition for bankruptcy relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court (the "Court") for the District of Delaware.  No trustee or examiner has been appointed.

6.     On December 1, 2015, the Debtors filed the Original Plan.  On December 7, 2015, the Court entered an order confirming the Original Plan [D.I. 7244] (the "Confirmation Order").

7.     The Original Plan required timely approval by the Public Utility Commission of Texas ("PUCT") for the transactions contemplated therein, including an order approving the change of control application submitted by Oncor and the Hunt Consortium.  The Original PSA

gave certain parties, including the ad hoc group of TCEH first lien creditors (the "TCEH First Lien Group"), the right to terminate the support obligations related to the Original Plan should all required PUCT approvals not be obtained by April 30, 2016 (the "Plan Support Outside Date"). Original PSA §11(g).

8.      On May 1, 2016, the TCEH First Lien Group sent a plan support termination notice (the "Termination Notice") to the parties to the Original PSA. Delivery of the Termination Notice triggered a "Plan Support Termination Event" under Section 11 of the Original PSA and as a result rendered the Original Plan and Confirmation Order "null and void" under Article IX.D of the Original Plan and paragraph 147 of the Confirmation Order.

9.      On May 1, 2016, the Debtors filed the *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (as subsequently amended, the "New Plan") [D.I. 8355].

10.     On August 3, 2016, the Debtors filed the Motion and accompanying Merger Agreement. As described in the Motion, the Merger Agreement contemplates a merger of EFH Corp. into a wholly-owned subsidiary of NextEra by which NextEra would acquire the Debtors' interest in Oncor.

11.     The Merger Agreement provides that, if it is terminated and any alternative transaction is consummated, the Debtors are to pay NextEra a two hundred and seventy-five million dollar ($275,000,000) Break-Up Fee. Merger Agreement § 8.5(c).

## OBJECTION

**I.      For Bankruptcy Court Approval, a Break-up Fee Must Be Necessary to Preserve the Value of the Estate**

12.     In the Third Circuit, approval of a break-up fee requested in connection with a 363(b) sale is governed by § 503(b) of the Bankruptcy Code, which provides that "[a]fter notice

and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1)(A). *See, e.g.*, *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 532 (3d. Cir. 1999).

13.    According to the Third Circuit, "'the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.'" *In re Reliant Energy Channelview LP, et al.*, 594 F.3d 200, 206 (3d. Cir. 2010) (quoting *O'Brien*, 181 F.3d at 535). The party seeking the award of a break-up fee bears a "heavy burden" to show this standard is met. *In re Bernard Techs., Inc.*, 342 B.R. 174, 177 (Bankr. D. Del. 2006) (quoting *O'Brien*, 181 F.3d at 533). Necessity, and *not* the business judgment rule, is the appropriate standard in this context. *See Reliant*, 594 F.3d at 209 ("'the business judgment rule does not apply as such in the bankruptcy context'") (quoting *O'Brien*, 181 F.3d at 535).

14.    Where a break-up fee was not necessary to induce a stalking horse bidder to submit its bid (in other words, when the party would have bid even without the break-up fee), and where the award of a break-up fee would not be necessary to preserve the bid, such fee is <u>not</u> necessary to preserve the value of the estate. *See Reliant*, 594 F.3d at 206 (stating there were "two ways a break-up fee could have preserved the value of the estate. First, the opportunity to obtain a break-up fee could have induced [the bidder] to make its bid . . . second, the provision for the break-up fee may have been necessary to induce [the bidder] to adhere to its bid"). As stated succinctly in *O'Brien*, "in some cases a potential purchaser will bid whether or not break-up fees are offered . . . In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate" and cannot be approved. 181 F.3d at 535.

15.     The related question of whether a break-up fee would cause harm to the bidding process is also relevant to the "necessary to preserve the value of the estate" calculus.  Where "the potential harm to the estate that a break-up fee would cause by deterring other bidders outweigh[s] [any] benefit", the break-up fee should not be approved.  *See Reliant*, 594 F. 3d at 208; *see also O'Brien*, 181 F.3d at 536-38 (concluding the bankruptcy court was justified in refusing to approve a break-up fee where the bankruptcy court found, among other considerations, that allowing such fee would have "'chilled or at best certainly complicated the competitive bidding process'").

**II.     The Break-Up Fee Was Not Necessary to Induce NextEra to Bid; Nor Is Its Approval Necessary for NextEra to Adhere to Its Bid**

16.     Despite clear and binding Third Circuit precedent regarding the standard for approval of a break-up fee, the Debtors simply ignore such precedent.  The Debtors fail to cite *O'Brien* or any other Third Circuit decision addressing break-up fees and make no reference whatsoever to § 503(b).  Rather, the Debtors rely only upon § 363(b) and argue that "[i]n light of the consideration provided by the Merger Agreement, and the firm commitment from a credit-worthy acquirer that supports it, the Break-Up Fee is reasonable under the circumstances." Motion at ¶ 40.  They further submit that the agreement to pay the Break-Up Fee "is a sound exercise of their business judgment." *Id.* at ¶ 43.  However, as the Third Circuit has made very clear, reasonableness and business judgment are not the correct inquiry here, and not the standard this Court is bound to apply.

17.     Moreover, the Debtors, who bear the heavy burden to show that the Break-Up Fee is necessary to preserve the value of the estate, have offered no evidence whatsoever to support approval of the Break-Up Fee.  Without citing any factual evidence, and while ignoring the entire history of these chapter 11 cases, the Debtors baldly claim that the Break-Up Fee "was

ultimately necessary to induce NextEra to enter into the Merger Agreement." Motion at ¶ 40. Any suggestion that the unavailability of the Break-Up Fee would actually have deterred NextEra from bidding for Oncor or would cause it to abandon its bid for Oncor strains credibility. NextEra has made it clear to the world for the past two-plus years that it is one of Oncor's most eager suitors. As the Debtors themselves point out in the Motion, "NextEra has had a longstanding interest in acquiring the Debtors' economic interest in Oncor, dating back to before the Court entered the bidding procedures order in January of 2015." *Id.* at ¶ 23.

18.    At the outset of the chapter 11 cases, the Debtors executed the Restructuring Support Agreement. Under the Restructuring Support Agreement, certain EFIH and EFH creditors (the "RSA DIP Parties") proposed to backstop the RSA EFIH Second Lien DIP Facility, which would have mandatorily converted into 60% of the reorganized EFH Corp. equity. As a result of the conversion feature, the RSA DIP Parties would ultimately own the Debtors' interest in Oncor. Almost immediately, competition to fund an EFIH second lien DIP facility broke out.

19.    On June 18, 2014, NextEra, together with a group of holders of the EFIH second lien claims (the "EFIH Second Lien Group"), submitted a letter to Paul Keglevic, the Debtors' chief financial officer and co-chief restructuring officer, proposing an alternative EFIH second lien DIP facility and plan structure pursuant to which NextEra would acquire, through the convertible EFIH second lien DIP facility, the Debtors' interest in Oncor. *See Declaration of Todd R. Snyder* [D.I. 1070] (the "Snyder Declaration"). This initial competing alternative proposal contemplated a break-up fee. *See id.* at Exhibit 2 (providing that, in the event an alternative transaction was entered into, "Debtors shall pay an amount in cash equal to [1.5%] of $1.9 billion to the Backstop Parties").

20.     On June 21, 2014, the Debtors informed NextEra and the EFIH Second Lien Group that the RSA DIP Parties had amended the RSA EFIH Second Lien DIP Facility to reduce the fees payable thereunder.  Snyder Declaration at ¶ 23.  The next day, NextEra and the EFIH Second Lien Group transmitted a term sheet containing improvements to their alternative proposal to the Debtors' advisors.  *Id.* at ¶¶ 23, 24.  Notably, the cover letter and the term sheet for NextEra's improved proposal expressly provided that the proposal did not contemplate a break-up fee.  *See* Snyder Declaration at Exhibit 4 ("Specifically, we have . . . [e]liminated any Alternative Transaction Fee.").

21.     On June 22, 2014, the Debtors informed NextEra and the EFIH Second Lien Group that the Debtors would pursue approval of the revised RSA EFIH Second Lien DIP Facility.  *Id.* at ¶ 25.  Just days later, on June 27, 2014, NextEra filed a *Notice of Enhanced Terms Relating to Alternative Second Lien DIP Financing Proposed by NextEra Energy, Inc. and EFIH Second Lien Group* [D.I. 1224] (the "Notice of Enhanced Terms") pursuant to which NextEra yet again improved the terms of their proposed convertible EFIH second lien DIP facility.  *See* Notice of Enhanced Terms at Exhibit A.  As before, NextEra's further revised proposal did not contemplate a break-up fee.  *See id.*

22.     Following two days of hearings regarding the RSA EFIH Second Lien DIP Facility, on July 1, 2014, the Debtors indefinitely adjourned the hearing regarding the RSA EFIH Second LIP DIP Facility in order "to continue discussions among certain creditors and third parties," among other considerations.  *See Notice of Adjourned/Rescheduled Hearing* [D.I. 1504].  Seizing the opportunity, on July 16, 2014, NextEra submitted a letter to Mr. Keglevic outlining the terms of a strategic proposal pursuant to which NextEra would acquire the Debtors' interest in Oncor (the "NextEra Strategic Proposal").  *See Notice of Strategic Proposal* [D.I.

1593]. According to the Debtors, the bidding to fund a convertible EFIH second lien DIP facility "culminated in a proposal from strategic bidder NextEra Energy that provided superior value to the [RSA] EFIH Second Lien DIP Facility" and, as a consequence, on July 24, 2014, the Debtors terminated the Restructuring Support Agreement. *See Motion for Sale of Property Free and Clear of Liens under Section 363(f)* (the "Oncor Sale Motion") [D.I. 2087] at ¶ 1.

23.    Following receipt of the NextEra Strategic Proposal and termination of the Restructuring Support Agreement, the Debtors worked with NextEra with the goal of signing a definitive agreement, until an increasing number of potential bidders expressed interest in participating in the bidding process. *See* Oncor Sale Motion at ¶ 21. On August 26, 2014, the Debtors filed a *Notice Regarding Marketing Process* [D.I. 1919], announcing that "given the interest in Reorganized EFH expressed by potential strategic and financial bidders" they would seek approval of a Court-supervised marketing process. *See Notice Regarding Marketing Process* at 1-2. That same day, NextEra withdrew the NextEra Strategic Proposal, stating that NextEra and EFH had engaged in discussions regarding the terms on which NextEra would serve as stalking horse bidder in an auction process for the equity of reorganized EFH, and that it was withdrawing its proposal as a result of the fact that EFH had filed its plan to run an auction process. *See Notice of Withdrawal of Strategic Proposal* [D.I. 1294]. The Debtors filed the Oncor Sale Motion on September 19, 2014.

24.    As explained in the Motion, after completing the bidding and sales process provided for in the Oncor Sale Motion, the Debtors determined in June 2015 that the process had not yielded a sufficiently high offer to justify selecting a stalking horse, and in August of 2015, the Debtors entered into the Original PSA and filed the Original Plan, which sought to unimpair E-Side creditors. *See* Motion at ¶¶ 14, 16. A confirmation hearing in connection with the

Original Plan commenced on November 3, 2015. On November 18, 2015, in the midst of that confirmation hearing, NextEra filed a *Statement with Respect to Pending Confirmation Matters and Feasible Alternative Restructuring* [D.I. 7028] (the "NextEra Statement"), stating that NextEra was prepared to consummate an alternative transaction that would pay in full or otherwise leave all E-Side creditors unimpaired, and that from June 2014 through June 2015, NextEra had been prepared to "immediately negotiate and sign definitive agreements at a bid value equal to its July 2014 proposal." NextEra Statement at ¶¶ 1, 3. The NextEra Statement noted that NextEra had maintained its July 2014 proposal "for almost a year, notwithstanding the significant market risk to NextEra . . . ." *Id.* at ¶ 3, FN1. NextEra stressed that it "continue[d] to be interested in Oncor", "[stood] ready to reengage immediately" and was "prepared to execute definitive documentation that would provide for specific performance remedies against NextEra." *Id.* at ¶¶ 7, 8. Notably, NextEra endeavored to purchase Oncor – including keeping its July 14 proposal open for almost a year and submitting competing proposals in the face of a transaction that would unimpair E-side creditors – all while NextEra neither benefited from nor was protected by a break-up fee.

25.     Ultimately, on December 7, 2015 this Court entered the Confirmation Order confirming the Original Plan. Even after entry of the Confirmation Order, NextEra was heavily involved lobbying behind the scenes during the Hunt Consortium's PUCT approval process, working to ensure that the PUCT did not approve the Hunt Consortium's change of control application for Oncor so that NextEra would have another chance to acquire Oncor.

26.     Then, in April 2016, even before the termination of the Original Plan, NextEra again approached the Debtors with unsolicited proposals. As Stacey Doré, the Debtors' general counsel and co-chief restructuring officer testified, "[w]e didn't approach NextEra. They

approached us . . . . I think they reached out to us in late April and said[,] we want to send you a

new proposal." Hrg. Tr. 163:20-24, Aug. 22, 2016. *See also*, DX096, Minutes of Joint Meeting

(Apr. 29, 2016) at 2 ("Discussion followed concerning the marketing process for the sale of EFH

Corp.'s economic interest in Oncor and the associated timing. Sassower noted that [NextEra]

has indicated continued interest in Oncor . . ."). Thereafter, "after termination of the Original

Plan, the Debtors immediately began implementing their contingency plan," and in connection

therewith, the Debtors "refreshed the Oncor marketing process." Motion at ¶¶ 20, 21. Of the

potential bidders, "NextEra was the most engaged from the outset." *Id.* at ¶ 23.

27.    It bears noting, as well, that NextEra is a creditor and party-in-interest in these

cases, owning approximately $45.3 million in principal amount of EFIH PIK notes as of May 16,

2016. See *Objection of NextEra to Motion of Energy Future Holdings Corp., et al., for Entry of*

*an Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols*

*in Connection with the Confirmation of Debtors' Joint Plan of Reorganization and Approval of*

*Debtors' Disclosure Statement* [D.I. 8452] at ¶ 2. Given that NextEra is a publicly traded utility

company and does not regularly acquire debt securities of other companies, its purchase of the

EFIH PIK Notes highlights the lengths to which NextEra will go to obtain leverage in its pursuit

of Oncor without the promise of any break-up fee. As an existing creditor, NextEra is already

invested in the Debtors' capital structure with a vested financial interest in the outcome of the

Oncor sales process. In addition to the many determined advances NextEra has made at Oncor,

this fact, as well, belies the notion that NextEra will abandon its bid absent approval of the

Break-Up Fee.

28.    In light of NextEra's track record, it simply strains credulity for the Debtors to

attempt to argue that NextEra would have walked away from these latest negotiations and

refused to bid without the promise of the Break-Up Fee. NextEra has repeatedly submitted

proposals without requiring a break-up fee and has not wavered from its two-plus year pursuit of

Oncor. The fact that NextEra's bid, on paper, is contingent on approval of the Break-Up Fee

does not change this fact and does not meet the standards of section 503(b). As the Third Circuit

found in *Reliant*,

> [it does not necessarily follow] that the bidder will withdraw its bid, pass up on
> the opportunity to acquire the asset to be sold, and nullify its work in preparing its
> bid if a court . . . declines to authorize a break up fee. *O'Brien* makes that clear
> because even though [the bidder] had made its bid contingent on the award of a
> break-up fee, it competed at the auction after the Bankruptcy Court rejected the
> request for a break-up fee.

594 F.3d at 207.

29.    Moreover, the Debtors and NextEra have offered <u>no</u> facts to the contrary, despite

their "heavy burden" to prove the "necessity" of the Break-Up Fee. *See In re Bernard Techs*,

342 B.R. at 177; *Reliant*, 594 F.3d at 206. The Debtors filed two declarations in support of the

Motion, but neither the Motion nor the Declarations offer any facts to justify the award of the

Break-Up Fee. *See Declaration of William O. Hiltz in Support of the Motion of the EFH/EFIH*

*Debtors for Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination*

*Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement*

[D.I. 9191]; *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for*

*Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C)*

*Authorizing Entry Into and Performance Under Plan Support Agreement* [9192]. The Debtors

are silent on this issue because no facts exist to support the conclusion that the Break-Up Fee

was necessary to induce NextEra's bid or that NextEra would not adhere to its bid without its

approval.

IV.    **The Break-Up Fee Will Chill Bidding**

30.    In both *O'Brien* and *Reliant*, the requested break-up fees were denied because of the negative effect the fees would have on bidding. This is, of course, a salient consideration in these chapter 11 cases as well. Approval of the Break-Up Fee could have a serious chilling effect on other potential bidders. Mr. Keglevic has testified that once the Break-Up Fee is approved, the opportunity to receive higher bids – and thus improve creditor recoveries – evaporates. Specifically, at the T-Side confirmation hearing for the New Plan, Mr. Keglevic stated ". . . I'm pleased where we got to with NextEra. I think there's some, you know, opportunities maybe . . . until the Judge approves the break fee to even do better." Hrg. Tr. 130:10-13, Aug. 17, 2016 (emphasis added).

31.    In addition to NextEra, other parties have expressed interest in EFH Corp.'s assets. For example, Hunt Consolidated, Inc. has publicly confirmed its renewed interest in acquiring Oncor and recently announced that it had negotiated with PUCT staff and other parties that intervened in the PUCT process to resolve some of the objections that derailed the Original Plan. *See* Peggy Brickley, *Hunt Consolidated in Bid to Revive Deal for Energy Future's Oncor*, Wall Street Journal, Aug. 17, 2016, http://www.wsj.com/articles/hunt-consolidated-in-bid-to-revive-deal-for-energy-futures-oncor-1471474949 (attached hereto as **Exhibit A**); *see also* Memorandum of Understanding Regarding Potential STM and Letter from Brian H. Lloyd, Executive Director, PUCT, to David Campbell, President, Hunt Utility Services (Aug. 16, 2016), (attached hereto as **Exhibit B**). In addition, press reports indicate that seven other entities, including Berkshire Hathaway and Edison International, have expressed interest in Oncor. *See, e.g.*, Harry Weber and Matthew Monks, *NextEra Said to Bid on Oncor as Berkshire, Edison Interested*, Bloomberg, June 28, 2016, http://www.bloomberg.com/news/articles/2016-06-

27/nextera-said-to-bid-on-oncor-as-berkshire-edison-eye-utility (attached hereto as **Exhibit C**). The opportunity to "do better" with any other interested party would be severely weakened by the approval of the Break-Up Fee. This Court should find that not only is the Break-Up Fee not necessary to preserve the value of the Debtors' estate, its net effect could well prove deleterious.

32.    Moreover, while the Debtors go to great lengths to highlight that the Break-Up Fee is within the range of percentages of other approved break-up fees, see Motion at ¶¶ 41-42, the Debtors ignore the fact that the proposed Break-Up Fee – $275,000,000 – is more than the aggregate recovery proposed to be distributed to all creditors of EFH. As Ms. Doré testified, the Debtors currently estimate that the total consideration available for distribution to EFH creditors is $250,000,000. Hrg. Tr. 101:18-19, Aug. 22, 2016. If the Break-Up Fee is approved, an overbid would have to more than double the recovery being paid to EFH creditors, yet none of that amount will inure to the benefit of the EFH creditors. A proposed break-up fee that exceeds the total amount of consideration payable to EFH creditors simply cannot be justified under any circumstances, least of all here, given NextEra's unrelenting pursuit of Oncor.

## CONCLUSION

For the reasons set forth in the Objection, Fidelity respectfully requests that this Court deny the Break-Up Fee and grant such other relief as is just and proper.

Dated:  Wilmington, Delaware
        August 25, 2016

**CROSS & SIMON, LLC**

_____
Michael J. Joyce (No. 4563)
1105 North Market Street
Suite 901
Wilmington, Delaware 19801
Telephone: (302) 777-4200
Facsimile: (302) 777-4224
Email: mjoyce@crosslaw.com

– and –

**FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP**

Brad Eric Scheler
Gary L. Kaplan
Matthew M. Roose
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
Email:  brad.eric.scheler@friedfrank.com
gary.kaplan@friedfrank.com
matthew.roose@friedfrank.com

_Counsel to certain funds and accounts advised or sub-
advised by Fidelity Management & Research Company
or its affiliates_