# **EXHIBIT B**

## Memorandum of Understanding Regarding Potential STM

This document memorializes the undersigned's understanding of the general structure for a potential Sale, Transfer, or Merger ("STM") proceeding to be initiated by a subsidiary of Hunt Transmission Services, L.L.C. or its designee(s) ("Purchasers") to acquire Energy Future Holdings Corp.'s indirect majority interest in Oncor Electric Delivery Company LLC and certain other transactions (together, the "Transaction"). The parties to this document include the undersigned entities and are collectively referred to as the "Parties."

### Company Structure

- Purchasers intend that their transaction will separate Oncor into a Distribution Company and a Transmission Company. It is anticipated that there will be no significant ownership overlap between the two companies, but coordination will be necessary between the two companies.

- Purchasers will separate the Transmission Company into an asset company and an operating company, which will enable the asset company to elect REIT status (the "T-REIT") and that a Hunt affiliated entity will control the operating company ("T-Utility").

- The T-REIT board of directors will be comprised of a majority of disinterested directors. The Distribution Company shall have two seats on the T-REIT board and will be counted as disinterested directors. The board will have an appropriate conflicts committee. The T-REIT will also have and an advisory board comprised of company-appointed customers and market stakeholders.

- The Distribution Company will retain the current ring fence, including dividend restrictions, board composition, governance requirements and other applicable provisions currently in place. It is anticipated that current Oncor management will become the management of the Distribution Company. The Distribution Company will not be separated into an asset company and operating company, and it will not be placed into a REIT structure.

- Total debt at the holding companies of the Distribution and Transmission utilities will be no more than $3.5 billion, and the Transmission company holding company debt will not exceed $1.6 billion.

### Tangible Benefits

- Purchasers commit to sharing tangible benefits equal to 20% of the T-REIT income tax allowance (calculated at a 35% federal income tax ("FIT") rate -- estimated to be $24 million per year) that will arise from election of REIT status for the transmission company.

- o  Prior to the next rate case, it is intended that the sharing of the income tax allowance will be accomplished through a credit that will be allocated to ERCOT customers consistent with the method of recovering transmission costs through the postage stamp method.

- o  Purchasers commit that a transmission rate case will be filed by June 1, 2017 and a second rate case no later than June 1, 2022.

- o  In the 2017 rate proceeding, Purchasers commit that equivalent income tax allowance benefits will be shared with retail customers in the Oncor service area through appropriate mechanisms that are consistent with PURA.

- o  The Parties agree they will support this construct for sharing the T-REIT income tax allowance with ratepayers and will not argue for a greater sharing or for a reduction in the income tax allowance. After the rates from the first rate case (to be filed no later than June 1, 2017) become effective, all parties are free to advocate for any level of income tax allowance to be included in transmission rates.

- Purchasers agree the Distribution Company will provide a credit of $50 million per year for two years (total of $100 million) for Oncor's retail customers, which will be allocated to retail customers without regard the voltage level at which the customers receive service. This credit is separate from the income tax allowance sharing described above.

### Commission Authority

- Purchasers agree that the PUC has regulatory authority over material terms of the T-REIT leases. Lease payments, formulae, or other structures of the lease will be reviewed and approved in rate proceedings. The T-REIT and T-Utility will jointly file rate cases, and the Commission has authority to set rates for the two entities as the Commission deems appropriate consistent with PURA.

- Purchasers expressly agree that the Commission has considerable discretion to determine the appropriate method to calculate an FIT expense, the amount of such expense, and the ratemaking treatment of any tax benefits resulting from a REIT in a utility's ownership structure. Purchasers and the undersigned retain the right to make any argument that the PUCT exercised its discretion in an arbitrary and capricious manner.

- Purchasers agree that it is proper for the Commission to review all transactions between the T-REIT and T-Utility and their respective affiliates under the standards of PURA 36.058.

## Agreement

The Parties do not intend this document to be enforceable by or against the Parties, but is intended to provide a broad outline of the mutual understanding of the Parties as to the major points that will be included in an STM filing seeking a determination by the PUCT that the Transaction is in the public interest under PURA §§ 14.101, 39.262(l)-(m) and 39.915, should such a filing be made. The Parties' will support the treatment of income taxes consistent with the principles outlined herein. Each of the Parties will endeavor to negotiate an agreement relating to the subject matter of this document as promptly as practicable in the event that Energy Future Holdings indicates it is willing to commence negotiations with Purchasers for the acquisition of Oncor with the goal of presenting a settlement for Commission approval, recognizing that significant details remain regarding the precise corporate structure, governance protections, mechanisms of implementing the income tax savings sharing, and other matters not discussed in this document. If no agreement is reached, and Purchasers proceed to file an STM application, the Parties are under no obligation to support the STM or to take the positions as set forth herein.

This document reflects an understanding reached as a compromise among the Parties with respect to the STM, and does not represent any Party's endorsement or approval of any principle, theory or methodology that is contemplated by or may underlie the document. The document shall not be regarded as binding any party, nor shall it be considered precedent as to the appropriateness or applicability of any principle, theory or methodology contemplated by or underlying the document. The document and any such principle, theory or methodology shall not be invoked or applied by any Party in any other proceeding involving any of the Parties or HUS or any of their respective affiliates, whether currently existing or that may be filed in the future, except the STM contemplated herein.

Date of Execution: August 17, 2016.

**HUNT UTILITY SERVICES**

By: _/s/ Lino Mendiola_
Lino Mendiola
Attorney for Hunt Utility Services


**STEERING COMMITTEE OF CITIES SERVED BY ONCOR ("Cities")**

By: _/s/ Geoffrey Gay_
Geoffrey Gay
Attorney for Cities



Brian H. Lloyd
Executive Director

# Public Utility Commission of Texas

August 16, 2016

Mr. David Campbell,
President, Hunt Utility Services
1807 Ross Avenue, 4th Floor
Dallas, Texas 75021

Dear Mr. Campbell,

Thank you for all the time that you and Mr. Lino Mendiola have spent with the PUCT Staff ("Staff") and other parties regarding a general structure of a new Sale, Transfer, Merger ("STM") proceeding that may be initiated by a subsidiary of Hunt Transmission Services, L.L.C. or its designee(s) ("Purchasers") to acquire Energy Future Holdings Corp.'s indirect majority interest in Oncor Electric Delivery Company LLC and certain other transactions (together, the "Transaction") should the other announced or proposed transactions not come to fruition.

My understanding of your intended transaction is as follows:

### Company Structure

Purchasers intend that their transaction will separate Oncor into a Distribution Company and a Transmission Company. It is anticipated that there will be no significant ownership overlap between the two companies, but coordination will be necessary between the two companies. Purchasers will separate the Transmission Company into an asset company and an operating company, which will enable the asset company to elect REIT status (the "T-REIT") and that a Hunt affiliated entity will control the operating company ("T-Utility"). The T-REIT board of directors will be comprised of a majority of disinterested directors. The Distribution Company shall have two seats on the T-REIT board. The board will have an appropriate conflicts committee. The T-REIT will also have and an advisory board comprised of company-appointed customers and market stakeholders.

It is intended that the Distribution Company will retain the current ring fence, including dividend restrictions, board composition, governance requirements and other applicable provisions currently in place. It is anticipated that current Oncor management will become the management of the Distribution Company. The Distribution Company will not be separated into an asset company and operating company, and it will not be placed into a REIT structure. Purchasers further commit that total debt at the holding companies of the Distribution and Transmission utilities will be no more than $3.5 billion, and the Transmission company holding company debt will not exceed $1.6 billion.

## Tangible Benefits

The Purchasers are willing to commit to a sharing of 20% of a 35% T-REIT income tax allowance (estimated to be $24 million per year) that will arise from the election of REIT status. Prior to the next rate case, it is intended that there will be some mechanism created that will provide a credit to customers in a manner consistent with PURA. It is your intention that a transmission rate case will be filed no later than June 1, 2017 and you commit to continue this sharing of income tax savings in an appropriate mechanism. After that rate case, all parties, including Purchasers, would be free to advocate for the level of income tax allowance, if any, that should be included in transmission rates. Additionally, the Purchasers will commit to a credit of $50 million per year for two years for Oncor's distribution utility to be provided by the Distribution Company. All told, these tangible benefits are estimated to be approximately $220 million over the first five years post-transaction.

## Commission Authority

Finally, it is my understanding that Purchasers will agree that the PUC has regulatory authority over material terms of the T-REIT leases. Lease payments, formulae, or other structures of the lease will be reviewed and approved in rate proceedings. The T-REIT and T-Utility will jointly file rate cases, and the Commission has authority to set rates for the two entities as the Commission deems appropriate consistent with PURA. Purchasers also expressly agree that the Commission has considerable discretion to determine the appropriate method to calculate an FIT expense, the amount of such expense, and the ratemaking treatment of any tax benefits resulting from a REIT in a utility's ownership structure, while recognizing that the Commission must exercise that discretion in a manner that is not arbitrary and capricious. Additionally, Purchasers agree that it is proper for the Commission to review all transactions between the T-REIT and T-Utility and their respective affiliates under the standards of PURA 36.058.

David, it is my view that this proposal addresses many of the Staff and intervenor concerns voiced in Docket No. 45188 and I commend you for the flexibility you have shown in this effort. I am encouraged that such a structure increases the likelihood that the Purchasers, Oncor, Staff, and other intervenors would be able to reach a settlement that recommends the Commission approve such a transaction, recognizing that the Staff will need to perform its independent review of the significant details that remain regarding the precise corporate structure, governance protections, mechanisms of implementing the income tax savings sharing, and other items. As we have discussed, placing only the Transmission Company in a REIT structure, in my view, lowers the risks of the structure to ratepayers, as the Distribution Company will continue to operate as a traditional utility, minimizing the risks that it cannot meet its obligation to reliably serve customers at just and reasonable rates. Additionally, your intended transaction would provide tangible financial benefit to customers as compensation for the risks that remain. Furthermore, your intended transaction may continue to provide avenues to discuss business combinations between Oncor and Sharyland, which may provide an added benefit to ratepayers in the state. As such, you have my commitment that, should such a transaction come to fruition, that the Staff will engage productively in settlement discussions, recognizing that the Staff's recommendation and positions are not binding upon the Commissioners, who must each independently evaluate the evidence presented before them.

This letter is not intended to suggest that any other transaction that may be presented to the Commission would receive any different treatment or analysis by the Commission Staff, nor is it intended to in any way bind the Commission Staff position on related matters in Docket No. 45414. Indeed, I take great pride in our Staff's independent and thoughtful review of all proposed transactions that have come before the Commission during my tenure and transactions with other potential owners may ultimately receive favorable recommendations as well. However, as I have noted above, this proposal addresses many of the concerns voiced by parties in the last transaction, and I thought it appropriate to convey these thoughts to you.

Sincerely,

Brian H. Lloyd
Executive Director