## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: September 26, 2016 at 10:00 a.m.** |
| | ) | **Objection Deadline: September 9, 2016 at 4:00 p.m.** |

## OBJECTION OF ENERGY FUTURE HOLDINGS
## CORP., *ET AL.*, TO PROOF OF CLAIM 13319 FILED BY THE CITY OF DALLAS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this objection (this "Objection") to the proof of claim[2] (the "Proof of Claim") filed by the City of

Dallas, Texas (the "City of Dallas") for unpaid future rent on the untreated water purchase

contract between Luminant Generation Company LLC ("Luminant") and the City of Dallas,

executed as of March 10, 2011, effective as of January 1, 2011, and adopted by resolution of the

City of Dallas on February 23, 2011, including any amendments or modifications thereto

(the "Water Rights Lease").    In support of the Objection, the Debtors respectfully state as

follows:

### Preliminary Statement

The Debtors object to the Proof of Claim on the following bases.  *First*, the City of

Dallas did not use the water rate on the date of rejection of $182.90 per acre foot to calculate the

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The
location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large
number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete
list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.
A complete list of such information may be obtained on the website of the debtors' claims and noticing
agent at http://www.efhcaseinfo.com.

[2] The City of Dallas filed Proof of Claim No. 13319 (attached hereto as **Exhibit A**) against
Luminant Generation Company, LLC.

Water Rights Lease payments; instead, the City of Dallas used the higher, post-rejection-date water rate of $271.60 per acre-foot. *Second*, the Water Rights Lease payments have not been discounted to present value. *Third*, the City of Dallas seeks amounts that exceed the statutory cap set forth in 11 U.S.C. § 502(b)(6). *And fourth,* the City of Dallas has not proven that it has taken any necessary steps to mitigate damages. The City of Dallas has filed a proof of claim for $16,223,382.78, which is comprised of a $6,445,897.62 administrative claim under section 503(b)(7) of the Bankruptcy Code and a $9,777,485.16 general unsecured claim under section 502(b)(6) of the Bankruptcy Code. The Debtors request that this claim be reduced to $5,910,226.06—a $4,053,043.84 administrative claim under section 503(b)(7) of the Bankruptcy Code and a $1,857,182.22 general unsecured claim under section 502(b)(6) of the Bankruptcy Code. In further support of this Objection, the Debtors respectfully state as follows.

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware to the entry of a final order by the Court in connection with this Objection to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested in this Objection are section 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and rules 3001, 3003, and 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4. On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Court has entered an order for joint administration of these chapter 11 cases. The Court has not appointed a trustee. On June 6, 2014, the Court entered a final order approving the use of cash collateral by Energy Future Competitive Holdings Company LLC ("EFCH"), its direct subsidiary, Texas Competitive Electric Holdings Company LLC ("TCEH") and the direct and indirect Debtor subsidiaries of EFCH and TCEH (together with EFCH and TCEH, the "TCEH Debtors") [D.I. 855] (the "TCEH Cash Collateral Order") and a final order approving postpetition financing by the TCEH Debtors [D.I. 856] (the "TCEH DIP Order").

5. The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors of the TCEH Debtors and EFH Corporate Services Company (the "TCEH Creditors' Committee") on May 13, 2014 [D.I. 420] and an official committee of unsecured creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC, EFIH Finance, Inc., and EECI, Inc. (the "EFH Creditors' Committee") on October 27, 2014 [D.I. 2570]. Further information regarding the Debtors' business operations and capital structure is set forth in the declaration of Paul Keglevic in support of the Debtors' first day motions [D.I. 98].

## I.    The Water Rights Lease.

6.    On February 18, 1974, Texas Utilities Generating Company ("Texas Utilities"), the predecessor-in-interest to Luminant, and the Sabine River Authority of Texas ("SRA") entered into a water supply facilities agreement (the "Original Water Supply Contract") whereby SRA would construct, own, and operate the Lake Fork Reservoir and Texas Utilities would pay SRA the debt service of the construction bonds and operating and maintenance costs.  In return, Texas Utilities would have the right to use up to 120,000 acre-feet of water per year from SRA's water rights in the Lake Fork Reservoir (the "TXU Junior Water Rights").  That same year, the Texas Water Rights Commission, predecessor to the Texas Commission on Environmental Quality ("TCEQ"), granted Permit No. 2948 allowing SRA to construct the Lake Fork Reservoir, impound a certain amount of water in the Lake Fork Reservoir, and divert a certain amount of water from the Lake Fork Reservoir for industrial use (the "SRA Senior Water Rights").

7.    On October 1, 1981, SRA, Texas Utilities, and the City of Dallas entered into a Water Supply Contract and Conveyance Agreement (the "Water Rights Option Agreement") under which the City of Dallas obtained the TXU Junior Water Rights from Texas Utilities (following such transfer, the "City of Dallas Junior Water Rights").  The Water Rights Option Agreement allowed Texas Utilities to reserve an option to purchase, for a period running through the end of 2013, the right to use up to 17,000 acre-feet of water out of the City of Dallas Junior Water Rights (the "Water Rights Option"), based on potential long-term plans, including possible expansion of the Martin Lake Steam Electric Station ("MLSES"), located in Tatum, Texas.  Under the Water Rights Option Agreement, Texas Utilities' deadline to exercise the Water Rights Option was to expire on September 1, 1994.

8.    On July 30, 1986, SRA, Texas Utilities, and the City of Dallas amended the Water Rights Option Agreement to extend Texas Utilities' deadline to exercise the Water Rights Option

to September 1, 2009, and to extend the term of the water use right (if the Water Rights Option was exercised) from December 31, 2013 to the date that is 40 years from the date of exercise. TXU Generation Company LP, predecessor-in-interest to Luminant, exercised the Water Rights Option for the right to purchase up to 17,000 acre-feet of water on July 24, 2006.

9.      In 2007, SRA and Luminant entered into a water release agreement setting forth the terms of SRA's release of water for use by Luminant in connection with its exercise of the Water Rights Option.[3] Then, in 2011, to maintain sufficient water levels in Martin Creek Lake Reservoir ("Martin Lake") in connection with the operation of the MLSES, Luminant and the City of Dallas entered into the Water Rights Lease providing Luminant the right to use up to 12,000 acre-feet of water per year for a defined term commencing on January 1, 2011 and remaining in effect for a term of 40 years until December 31, 2050.[4] Luminant entered into the Water Rights Lease in a time of drought, when rainfall at Martin Lake was 50% below normal, and with the foresight to manage its potential water needs at the MLSES.

## II.      Costs and Usage Under the Water Rights Lease.

10.      The Water Rights Lease provides that payments will be calculated based on the current prevailing rate for untreated water, as specified by the City of Dallas ordinance (the "Ordinance"), as may be amended from time to time. When the Debtors assumed the Water Rights Lease on October 27, 2014, in advance of the deadline set forth under section 365(d)(4) of the Bankruptcy Code, the rate that the City of Dallas charged Luminant for water was $0.5613 per 1000 gallons (equivalent to $182.90 per acre-foot); on September 22, 2015, the date the

---

[3] The water release agreement stipulated the location from which the water would be released—Lake Fork Dam, the maximum quantity of water that would be released—17,000 acre feet, the maximum rate of release, and the point at which the water would be released.

[4] The Water Rights Lease is subject to the terms of the Water Rights Option Agreement.

Debtors subsequently rejected the Water Rights Lease, the rate remained $0.5613 per 1000 gallons (equivalent to $182.90 per acre-foot, the "Rejection Date Rate").[5]

11.    The Original Water Supply Contract stated that the rate the City of Dallas would pay for water during the renewal term was to be determined by "mutual agreement" between SRA and the City of Dallas.  SRA  failed to reach a mutual agreement with the City of Dallas, however, and on October 9, 2014, SRA unilaterally set the water rate that it would charge the City of Dallas equal to the rate the City of Dallas was charging to its wholesale customers—$182.90 per acre-foot (equivalent to $0.5613 per 1000 gallons) (the "SRA Rate").  The rate that the City of Dallas charges its customers includes a markup for the City of Dallas' costs to provide water to its customers.  By setting the SRA Rate equal to the rate the City of Dallas charged its wholesale customers, the rate paid by the City of Dallas' wholesale customers no longer covered the City of Dallas' costs to provide the water.  Therefore, after SRA unilaterally imposed the SRA Rate, the City of Dallas recalculated the water rate for its wholesale customers, adding a markup for its costs to the SRA Rate.  Consequently, the City of Dallas' wholesale rate for untreated water increased to $0.8335 per 1000 gallons (equivalent to $271.60 per acre-foot, the "Increased 2016 Rate"), effective October 1, 2015.

12.    **_SRA-City of Dallas Litigation._**  The City of Dallas has been engaged in protracted litigation with SRA, involving three separate legal proceedings, regarding this rate increase (the "SRA-City of Dallas Litigation").  First, the City of Dallas appealed the SRA Rate to the Public Utility Commission of Texas ("PUC") seeking to lower the rates that SRA charges the City of Dallas on the basis that the SRA Rate is "contrary to public interest," "unreasonably preferential,

---

[5] The conversion rate for 1 acre-foot to 1000 gallons is 0.00306889.

prejudicial, and discriminatory."[6]  The PUC abated the matter until the underlying contractual dispute is resolved, but set an interim rate to be paid by the City of Dallas to SRA at the SRA Rate and required the SRA to deposit all collections from November 2014 onwards into an escrow account.[7]  Second, the City of Dallas filed a declaratory judgment action in Travis County District Court seeking a declaration that the SRA Rate was not set pursuant to a written contract.[8]  The court dismissed on the grounds that SRA has governmental immunity from such an action.  The City of Dallas has appealed.  And third, the City of Dallas filed a suit against SRA and its directors for the alleged *ultra vires* actions of unilaterally setting the water rate charged to the City of Dallas.[9]

13.    The City of Dallas notified its wholesale customers that the administrative law judge assigned by the PUC ordered the City of Dallas to pay the SRA Rate into escrow during the dispute.[10]  Wholesale customers were subsequently notified by the City of Dallas that the water rate for the year 2016, absent the SRA Rate, would have been $206.30 per acre-foot (equivalent to $0.6331 per 1000 gallons) (the "City of Dallas 2016 Rate").[11]

---

[6] *See Petition for Review by the City of Dallas from Action of the Sabine River Authority and Request for Interim Rates*, PUC Docket No. 43674 (Tex. Public Util. Comm'n October 30, 2014).

[7] *Petition of the City of Dallas for Review of a Decision by The Sabine River Authority:  Before the State Office of Administrative Hearings*, SOAH Docket No. 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.WS, PUC Docket No. 43674 (Austin, Texas) (Order Establishing Interim Rates, April 2, 2015, Docket No. 12 and Order Granting Motion for Approval of Escrow Agreement, Aug. 3, 2015, Docket No. 14).

[8] *See City of Dallas v. Sabine River Auth.*, No. 03-15-00371-CV (3d Court of Appeals, filed June 16, 2015).

[9] *See City of Dallas v. Abney*, No. D-150045-C in the 260th Judicial District Court of Orange County, Texas.

[10] *See* Correspondence from Jacqueline Culton, Program Manager Wholesale Services Division (August 3, 2015), a copy of the correspondence and attachment is included in **Exhibit B**.

[11] *See* Correspondence from Jacqueline Culton, Program Manager Wholesale Services Division (September 25, 2015), a copy of which is included in **Exhibit B**.

**III.    The Water Rights Lease Rejection.**

14.    On October 27, 2014, the Debtors assumed the Water Rights Lease as a nonresidential real property lease, in advance of the deadline set forth under section 365(d)(4) of the Bankruptcy Code.

15.    After the Debtors determined that it was no longer economically feasible or operationally justifiable to continue the Water Rights Lease, the Debtors sought to reject the previously-assumed lease.  On October 14, 2015, the Court authorized the rejection of the Water Rights Lease in the *Order Authorizing Rejection of a Previously Assumed Nonresidential Real Property Lease Between Luminant Generation Company LLC and the City of Dallas, Texas, Effective Nunc Pro Tunc to September 22, 2015* [D.I. 6447].

<u>**The City of Dallas' Proof of Claim**</u>

16.    On November 12, 2015, the City of Dallas filed Proof of Claim No. 13319, with supporting addendum attached thereto, seeking $16,223,382.78.  *See* Ex. A.  The addenda to the Proof of Claim states that the $16,223,382.78 claim is comprised of two parts: (i) a $6,445,897.62 administrative claim under section 503(b)(7) of the Bankruptcy Code and (ii) a $9,777,485.16 general unsecured claim under section 502(b)(6) of the Bankruptcy Code.  *Id.* Additionally, the City of Dallas included a "Projected Revenues" statement, which provided the projected monthly rental payments from September 22, 2015 to September 22, 2017.  *Id.*

<u>**Relief Requested**</u>

17.    By this Objection, the Debtors request that the Court enter an order reducing, modifying, and allowing the City of Dallas Proof of Claim in the aggregate amount of $5,910,226.06—a $4,053,043.84 administrative claim under section 503(b)(7) of the Bankruptcy

Code and a $1,857,182.22 general unsecured claim under section 502(b)(6) of the Bankruptcy

Code.

## Objection

18.    A chapter 11 debtor "has the duty to object to the allowance of any claim that is

improper."  *Int'l Yacht & Tennis, Inc. v. Wasserman (In re Int'l Yacht & Tennis, Inc.)*,

922 F.2d 659, 661-62 (11th Cir. 1991); *see also* 11 U.S.C. §§ 704(a)(5), 1106(a)(1), and 1107(a).

19.    The burden of proof for determining the validity of claims rests on different

parties at different stages of the objection process.  As explained by the United States Court of

Appeals for the Third Circuit:

> Initially, the claimant must allege facts sufficient to support the
> claim.  If the averments in his filed claim meet this standard of
> sufficiency, it is '*prima facie*' valid.  In other words, a claim that
> alleges facts sufficient to support a legal liability to the claimant
> satisfies the claimant's initial obligation to go forward.  The
> burden of going forward then shifts to the objector to produce
> evidence sufficient to negate the *prima facie* validity of the filed
> claim. . . .  In practice, the objector must produce evidence which,
> if believed, would refute at least one of the allegations that is
> essential to the claim's legal sufficiency.  If the objector produces
> sufficient evidence to negate one or more of the sworn facts in the
> proof of claim, the burden reverts to the claimant to prove the
> validity of the claim by a preponderance of the evidence.

*In re Allegheny Int'l Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992) (citation omitted).  Once the

*prima facie* validity of a claim is rebutted, "it is for the claimant to prove his claim, not for the

objector to disprove it."  *In re Kahn*, 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990) (citations omitted).

20.    A claim, proof of which was filed under section 501 of the Bankruptcy Code, is

deemed allowed unless a party in interest objects.  11 U.S.C. § 502(a).  Once a party objects, the

court must determine the amount of the allowed claim.  The City of Dallas filed a Proof of Claim

for $16,223,382.78.  *See* Ex. A.  And through this Objection, the Debtors object to the allowed

amount of the claim.  Thus, the Court is called on to determine the amount of the claim under section 502(b) of the Bankruptcy Code.

21.     Here, the following items are uncontested: (a) the Water Rights Lease was to expire in 2050; (b) Luminant previously assumed the Water Rights Lease and cured all defaults; and (c) Luminant subsequently rejected the Water Rights Lease, effective *nunc pro tunc* to September 22, 2015.   However, these uncontested variables are insufficient to ascertain the amount of the claim.  In determining the allowed amount of a claim, the Court is called on to take following steps: (1) estimate the allowed amount of the claim; (2) determine how the Bankruptcy Code alters those claims, including capping and prioritizing the claim; (3) reduce the claim by the City of Dallas' recovery in SRA-City of Dallas Litigation; and (4) verify that the full amount of the claim has been proven.

## I.     Estimating the Allowed Amount of the Claim Under Section 502.

22.     Where the allowed value of a claim cannot be determined, that claim is unliquidated.  *In re Mazzeo*, 131 F.3d 295, 304 (2d Cir. 1997) ("The terms 'liquidated' and 'unliquidated' generally refer to a claim's value . . . and the ease with which that value can be ascertained."); *Matter of Mattera*, 203 B.R. 565, 571 (Bankr. D.N.J. 1997) ("A claim is unliquidated when it is '[n]ot ascertained in amount' or 'not determined'" (quoting Black's Law Dictionary 1557 (6th ed. 1990))).  Section 502(c) of the Bankruptcy Code requires that an unliquidated claim "shall be estimated for purpose of allowance" by the bankruptcy court.  11 U.S.C. § 502(c).  Here, the Water Rights Lease provides that Luminant will pay for 12,000 acre feet (equivalent to 3,910,212,000 gallons) of untreated water each year at the rate set by City of Dallas Ordinance.  This rate is variable, and where the future rate is unknown, the future rent is unknown.  Moreover, the claim is for a future amount that must be discounted to the present

value.  Accordingly, it is up to this Court to estimate (a) the future untreated water rate and (b) determine whether the future rent payments should be discounted to the present.

### A.    Estimating the Future Untreated Water Rate.

23.    Courts have discretion in choosing the best method to estimate the claim. *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135-36 (3d Cir. 1982) ("[T]here are no other limitations [after following the legal rules that govern the value of a claim] on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code."); *see also In re Enron Corp.*, 2006 WL 544463, at *3-4 (Bankr. S.D.N.Y. Jan. 17, 2006) (noting that bankruptcy courts are "free to use the best method available to it under the circumstances to value the claim" and highlighting three methods bankruptcy courts have used in the past in estimating a claim: conducting a trial, conducting a hearing where each side could present witnesses, and using a non-binding arbitral decision).  Section 365(g) of the Bankruptcy Code provides the timing of breach when a rejection occurs:

> [T]he rejection of an . . . unexpired lease of the debtor constitutes a breach of such . . . lease (1) if such contract or lease has not been assumed under this section . . . , immediately before the date of the filing of the petition; or (2) if such contract or lease has been assumed under this section . . .  at the time of such rejection.

11 U.S.C. § 365(g).  The rejection constitutes a breach of the lease on the date of the petition where the lease has not been assumed.  *Id.*  And relevant to this claim, rejection constitutes a breach of the lease on the date of the rejection where the lease has been previously assumed.  *Id.* Accordingly, the cases cited below for the proposition that using the market price as the appropriate rate are applicable to this objection.

24.    Courts have upheld the use of the market price on the date of the petition to estimate the future unknown price of a commodity.  *Matter of Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984) (affirming bankruptcy court's use of the market price of

cotton on the date of the petition in estimating creditors' claims against the debtor even though the use of this price was contrary to state law, which allowed the creditors to fix a reasonable price on the cotton when the contract is breached).  When the issue of determining whether to use the market price on the date the counterparty learned of the breach or on the section-365(g) date, the court used the section-365(g) date.  *In re Am. HomePatient, Inc.*, 414 F.3d 614, 620 (6th Cir. 2005) ("[W]e reject the Bank's argument that the relevant date for calculating [the counterparties'] rejection damages is the date [the counterparties] learned of Debtors' breach."); *see also In re Enron Corp.*, 2005 WL 3874286, at *6 (Bankr. S.D.N.Y. Sept. 26, 2005) (holding that the contract damages were to be determined as of the section-365(g) date).

25.    Although the Debtors have been unable to locate any case law on point which speaks to the estimation of an unliquidated claim for a nonresidential real property lease that was first assumed and then rejected, the Debtors believe that the appropriate rate to use is the Rejection Date Rate of $182.90 per acre-foot.  The market price for untreated water was $174.49 per acre-foot on the Petition Date (the "Petition Date Rate").  Because the Water Rights Lease was assumed and then subsequently rejected, the Rejection Date Rate should be used.  A similar approach was taken by the court in *Brints Cotton.*  In that case, that court chose the market rate as of the petition date as the most appropriate when considering the policy of fairness and administrative efficiency.  *See Brints Cotton*, 737 F.2d at 1341.  And, just as the valuation date in *American HomePatient* was the section-365(g) date, the valuation date in this case should be the section-365(g) date.  *See Am. HomePatient*, 414 F.3d at 618.  The section-365(g) date for the Water Rights Lease is September 22, 2016.[12]  Applying the market rate, as of the section-365(g)

_____

[12] Assuming, *arguendo*, that the City of Dallas' interpretation of section 502(b)(6) and 503(b)(7) is correct—*i.e.*, that a claim can be given two years' administrative priority and a second claim under 502(b)(6) which is capped at three years—the  Petition Date Rate of $174.49 should be applied to the

date (*i.e.*, rejection date), is the most equitable choice and the best for administrative efficiency; to use any other rate would cause much uncertainty.

26.     As the City of Dallas has communicated to Luminant and its other customers, the current rate of $271.60 per acre-foot was calculated to reflect SRA's unilaterally implemented new rate.  Furthermore, in lieu of paying SRA and as ordered by the PUC, the City of Dallas is escrowing all payments due to the until the SRA-City of Dallas Litigation has concluded and the new rate SRA will charge the City of Dallas for water has been decided.  If the City of Dallas is successful in any one of the three current SRA-City of Dallas Litigation matters, the City of Dallas is expected to give its customers a pro-rata rebate—effectively nullifying the SRA Rate. These factors, among others, raise considerable doubt that the Increased 2016 Rate of $271.60 per acre-foot is the rate that Luminant would in fact have paid.  Thus, the Rejection Date Rate of $182.90 per acre-foot is the more equitable rate to apply, and the Court should do so.

### B.     Discounting to the Present Value.

27.     The term "without acceleration" in section 502(b)(6) specifically means that the rent payments used in calculating the cap are to be discounted to the present.  *See In re Oakwood Homes Corp.*, 449 F.3d 588, 603 (3d Cir. 2006) (noting that the term "without acceleration" in sections (6) and (7) of section 502(b) leads to the conclusion that only those two subsections are to be discounted while the other subsections of section 502(b) are not to be discounted).  This is consistent with the requirement that a landlord's future damages are to be discounted to the present value.  *See City Bank Farmers Trust Co. v. Irving Trust Co.*, 299 U.S. 433, 443 (1937) ("The amount of the landlord's claim for the loss of his lease necessarily is the difference between the rental value of the remainder of the term and the rent reserved, both discounted to

---

second claim because the section 502(b)(6) cap applies to the rent reserved starting on the earlier of the petition date and the turnover of the property.  In this case, the date is the Petition Date.

present worth.  This, we have said, is a method of liquidation familiar and fair."); *Chesapeake & O. Ry. Co. v. Kelly*, 241 U.S. 485, 491 (1916) ("[W]hen future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only."); *In re O.P.M. Leasing Servs., Inc.*, 56 B.R. 678, 684-85 (Bankr. S.D.N.Y. 1986) ("The discounting of claims to their present value has traditionally been followed when determining the amount of an unearned obligation which is due in the future." (citing *Kuehner v. Irving Trust Co.,* 299 U.S. 445 (1937); *Connecticut Ry. & Lighting Co. v. Palmer,* 305 U.S. 493, 504 (1939))).  The City of Dallas has failed to discount any of the payments in determining its claim.

28.    When discounting future rent amounts to their present value, the Court must determine the appropriate discount rate.  "There is, however, no mandated method in federal law for the determination of discount rates so as to reduce a claim to its present value." *In re Mirant Corp.*, 332 B.R. 139, 156–57 (Bankr. N.D. Tex. 2005) (citing *St. Louis Sw. Ry. Co. v. Dickerson,* 470 U.S. 409, 412 (1985)).  Using market based methods is appropriate, and relying on treatises as support for the appropriate method is common.  *See e.g., In re Spansion, Inc.*, 426 B.R. 114, 133 n.28 (Bankr. D. Del. 2010) (citing Aswath Damodaran treatise); *In re Am. Home Mortgage Holdings, Inc.*, 411 B.R. 181, 194 (Bankr. D. Del. 2009) (same), *aff'd,* 637 F.3d 246 (3d Cir. 2011); *In re Mirant Corp.*, 334 B.R. 800, 815 n.45 (Bankr. N.D. Tex. 2005) (same); *In re Bachrach Clothing, Inc.*, 480 B.R. 820, 870 (Bankr. N.D. Ill. 2012) (same); *c.f.* Hon. Christopher S. Sontchi, *Valuation Methodologies: A Judge's View*, 20 Am. Bankr. Inst. L. Rev. 1, 1 n.a1 (2012) (acknowledging Aswath Damodaran treatise as primary resource).  "For financial analysis we should treat all lease payments as financial expenses and convert future lease commitments into debt by discounting them back to the present, using the pre-tax cost of borrowing for the firm as the discount rate." Aswath Damodaran, Damodaran on Valuation 72 (2d ed. 2006).  Here,

a reliable estimate of Luminant's pre-tax cost of debt is the weighted average cost of capital ("WACC") of the TCEH Debtors. As discussed in the *Declaration of Sesh Raghavan in Support of the Objection of Energy Future Holdings Corp., et al., to Proof of Claim 13319 Filed by the City of Dallas* (a copy of which is attached hereto as **Exhibit C**), the TCEH Debtors' WACC was calculated by combining the weighted cost of equity and the weighted cost of secured debt. First, because the pre-tax cost of debt would be higher than the cost of secured debt but lower than the cost of equity, the WACC is an appropriate estimation of the pre-tax cost of debt. Second, using the rate of the TCEH Debtors is appropriate because the TCEH Debtors' riskiness is commensurate with the riskiness of the contract counterparty (*i.e.*, Luminant) on the Water Rights Lease.  Accordingly, the discount rate used is 6.8%.  *See* Ex. C.

II.     **Determining How the Bankruptcy Code Alters the Claims, Including Capping the Claim and Prioritizing the Claim.**

29.     After determining the allowed amount of the claim for the full lease term, the next step is to determine (i) how the claim is capped under section 502(b)(6) and (ii) how section 502(b)(6) and section 503(b)(7) interact.

A.     **The Section 502(b)(6) Cap.**

30.     The capping language of section 502(b)(6)(A)—"the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease"—leads to a cap of three years on the future unpaid rent on single-rent leases with a remaining term of 20 years or more.  It is uncontroverted that the section 502(b)(6) cap for the Water Rights Lease is 36 months.

31.     As stated in Section I.B *supra*, after discounting each of the remaining months left in the Water Rights Lease to the present, the City of Dallas' allowed claim will be reduced.  And

section 502(b)(6) limits the claim to 36 months.  Accordingly, after applying the 36 month cap,

the present value of the unpaid future rent totals $5,958,999.45.[13]

**B.      Section 502(b)(6) and Section 503(b)(7).**

32.      The City of Dallas and Luminant disagree on application of the 502(b)(6) cap—

specifically, which three-year period the cap considers.  Luminant interprets 502(b)(6) to cap

damages at an amount equal to the rent reserved over the next three years, and the administrative

expense language of section 503(b)(7) only moves two of those three allowable years up to

priority status.  Conversely, the City of Dallas believes that section 503(b)(7) allows for two

years of administrative expense recovery and—in addition to those two years—three additional

years of general unsecured recovery under section 502(b)(6), totaling five years of rent.

33.      Because, to the Debtors' knowledge, this is a matter of first impression for this

Court, the Court is called to make its own interpretation.  When interpreting a statute, a court

should begin with the language of the statute.  *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69

(2011) ("Our interpretation of the Bankruptcy Code starts where all such inquiries must begin:

with the language of the statute itself.") (internal quotation marks omitted).  The relevant

language from section 502(b)(6) is as follows:

> [T]he court . . . shall determine the amount of [the objected-to
> lease-of-real-property] claim . . . and shall allow such claim . . .
> except to the extent that . . . such [lease-of-real-property] claim
> exceeds . . . the rent reserved by such lease . . . for . . . 15 percent,
> *not to exceed three year*s, of the remaining term of such lease . . . .

11 U.S.C. § 502(b)(6) (emphasis added).  The relevant language from section 503(b)(7) is as

follows:

---

[13] Each monthly rental payment of $182,900.16 (equivalent to 325,851,000 gallons multiplied by $0.5613 per 1000 gallons) for each of the 36 months is discounted to the present.  The sum of those 36 present value payments is $5,958,999.45. This amount is calculated before reducing by $48,773.38 for amounts already paid.

> After notice and a hearing, there shall be allowed administrative expenses . . . with respect to a nonresidential real property lease previously assumed under section 365, and subsequently rejected, a sum equal to all monetary obligations due, excluding those arising from or relating to a failure to operate or a penalty provision, for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, without reduction or setoff for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor, *and the claim for remaining sums due for the balance of the term of the lease shall be a claim under section 502(b)(6).*

11 U.S.C. § 503(b)(7) (emphasis added).

34.    Starting with section 503(b)(7), the language is clearly ambiguous. *See* Matters of First Impression — Business: The Death of Retail Chapter 11? BAPCPA in Practice in Retail Bankruptcy Cases, 061130 ABI-CLE 269 ("What remains unclear is what the final words of [section 503(b)(7)] mean—'shall be a claim under section 502(b)(6).'"); *see also* Creditors' Rights in Bankruptcy § 9:2 (2d ed.) ("[The last clause of section 503(b)(7)] is hard to understand since section 502(b)(6) is a limitation on an otherwise allowable claim rather than the source of a claim."); Friedman, Milton R., and Randolph, Patrick A., Jr., "Friedman on Leases," §19A:4 (Practicing Law Institute Nov. 2005) (noting that section 503(b)(7) is "fraught with ambiguity"); Jerald I. Ancel et. al., *The New Real Estate Lease Dilemma Landlord Administrative Claims Under 11 U.S.C. § 503(b)(7) for Leases Rejected Post-Assumption*, Am. Bankr. Inst. J., May 2007, at 16, 60 ("Debtor's counsel must be cognizant, however, that the imprecise drafting of this section creates numerous and significant questions as to the practical effect of §503(b)(7)."). Not only is the statute itself ambiguous, but the Debtors have uncovered no legislative history on how the two statutes should interact. *See* Friedman, Milton R., and Randolph, Patrick A., Jr., "Friedman on Leases," §19A:4 (Practicing Law Institute Nov. 2005) ("There appears to be no history to indicate how Congress intended these two caps to interact.").

35.     If Congress meant for courts to change from pre-Code practice, Congress' intent must be clear.  In *Dewsnup v. Timm*, the United States Supreme Court stated:

> When Congress amends the bankruptcy laws, it does not write "on a clean slate." Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.

502 U.S. 410, 419 (1992) (internal citations omitted).

36.     In support of Luminant's interpretation, there are several reasons to find that section 503(b)(7) merely increases the priority of the first two years, including: (i) the history of section 502(b)(6), (ii) the public policy of the Bankruptcy Code, and (iii) the fact that a creditor cannot collect twice on its claim.

### 1.     History of Section 502(b)(6).

37.     When looking at the history of section 502(b)(6), two central tenets explain why the City of Dallas should be awarded no more than three years of recovery: (a) the plain meaning of the "three years" term and (b) the policy behind enactment of section 502(b)(6).

### a.     Plain-Meaning of "Three Years."

38.     In 1934, Congress amended the Bankruptcy Act of 1898 (the "<u>Bankruptcy Act</u>") to allow a landlord to recover unpaid future rent "for the 3 years next succeeding." 11 U.S.C. § 207(b)(10) (repealed); *City Bank Farmers Trust Co.*, 299 U.S. at 443 ("The provision is that the landlord's claim . . . shall be limited to an amount not exceeding the rent reserved '*for the three years next succeeding* the date of surrender of the premises to the landlord or the date of re-entry of the landlord, whichever first occurs, whether before or after the filing of the petition.'" (quoting 11 U.S.C. § 207(b)(10))) (emphasis added);  *see also In re Episode USA, Inc.*, 202 B.R.

691, 694 n.2 (Bankr. S.D.N.Y. 1996), *as amended* (Nov. 20, 1996) (quoting repealed statute in full).

39.     When the Bankruptcy Code was enacted, Congress implemented the same three-year limit found in the Bankruptcy Act on landlords into section 502(b)(6).  *See In re Allegheny Int'l, Inc.*, 136 B.R. 396, 402 (Bankr. W.D. Pa. 1991) *aff'd and remanded,* 145 B.R. 823 (W.D. Pa. 1992) (noting that section 502(b)(6) was derived from the Bankruptcy Act's limit to "'the three years next succeeding'"); *In re Filene's Basement,* 2015 WL 1806347, at *6 (same); *In re Connectix Corp.*, 372 B.R. 488, 493 (Bankr. N.D. Cal. 2007) ("There is no indication, however, that Congress intended to move away from calculating the cap based on the rent that would become due within a time period immediately succeeding the statutory trigger date.").

40.     It is a general principle of statutory construction that words are to be given their meaning at the time they are adopted.  *See, e.g.*, Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 78 § 7 Fixed-Meaning Canon (2012) ("Words must be given the meaning they had when the text was adopted.").  When section 502(b)(6) was adopted the term "three years" was to be interpreted as "the three years next succeeding."  And, as stated above, bankruptcy courts in this circuit have used the "time" approach in determining that the section 502(b)(6) cap applies to the next three succeeding years.  *See, e.g., In re Filene's Basement,* 2015 WL 1806347.

### b.     Policy Behind Section 502(b)(6).

41.     Congress' intent in enacting section 502(b)(6) was to prevent landlords from receiving a windfall that would  harm other creditors.  *In re PPI Enters. (U.S.), Inc.*, 324 F.3d at 207; *see also* S. Rep. 95-989, at 63 (1978) ("[The section 502(b)(6) cap] is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term

lease) as to prevent other general unsecured creditors from recovering a dividend from the estate."); *see also* 110. H.R. Rep. No. 95-595, at 353 (1977) (same).  The limits Congress placed on a landlord's claim in the Bankruptcy Act—which were carried over to the Bankruptcy Code—were put in place because Congress recognized that landlords have an added protection over other creditors: landlords get the property back.  *See In re Filene's Basement, LLC*, 2015 WL 1806347, at *7 (citing *In re Connectix Corp.*, 372 B.R. 488, 494 (Bankr. N.D. Cal. 2007)) ("[Congress] was also influenced by the fact that landlords, unlike other general unsecured creditors, have added protection at the termination of a lease arrangement.  Landlords get the property back.").

42.    Here, the City of Dallas seeks a windfall.  Not only would the City of Dallas get two additional years of its future unpaid rent—thereby preventing other unsecured creditors from getting the share Congress intended for them when it enacted section 502(b)—but it would also be entitled to administrative priority on that claim.  Further, the water, subject to the Water Rights Lease, has been returned to the City of Dallas.  Although the water remained unutilized by Luminant in recent years, the City of Dallas was still required to set it aside for Luminant's sole use.  Now, the City of Dallas has the benefit of utilizing this water for other purposes, including leasing the water to a different third party.  To allow the City of Dallas to recover, in addition to the returned water and two years of rejection damages, an additional three years of general unsecured claims would result in a windfall that is inconsistent with the public policy of the Bankruptcy Code.

### 2.    Narrowly Construing Bankruptcy Code Provisions That Grant Priority Is Consistent with Public Policy.

43.    Provisions of the Bankruptcy Code granting priority are to be narrowly construed. *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006) (noting the

principle that provisions granting a priority "must be tightly construed"); Collier on Bankruptcy ¶ 507.01 ("Because priorities grant special rights to the holders of priority claims, priorities under the Code are to be narrowly construed.") *see also In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001) ("Priority claims affect two important bankruptcy concerns: minimizing administrative costs during Chapter 11 to preserve the debtor's scarce resources and thus encourage rehabilitation,  and obtaining maximum and equitable distribution of estate assets to creditors.") (internal citations omitted); *but see In re NE Opco, Inc.*, 501 B.R. 233, 248 (Bankr. D. Del. 2013) (finding that a court should not narrowly or loosely construe the administrative expense provision of section 503(b)(9) but should "simply apply the law as written"). Construing these provisions narrowly is consistent with public policy.  *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 240 (Bankr. N.D. Tex. 2009).  Section 503(b)(7) grants administrative status and administrative claims are given priority under section 507.  *See* 11 U.S.C. § 507(a)(2). Because this Court is called on to decide whether a statute granting administrative priority should be read narrowly or broadly, the Court should take into account public policy as an additional reason to interpret the statute narrowly.

### 3.     The City of Dallas Cannot Collect Twice.

44.     By filing a proof of claim for both an amount under section 502(b)(6) and an amount under section 503(b)(7), the City of Dallas has attempted to collect the rent due for certain months twice.

45.     Prior to the Bankruptcy Abuse Prevention and Consumer Protection Act amendments to the Bankruptcy Code that limited a landlord's administrative claim to two years, there was unlimited administrative priority for the full allowed amount of the claim. *See, e.g., In re Klein Sleep Products, Inc.*, 78 F.3d 18, 29 (2d Cir. 1996).  However, in none of the *Klein*

*Sleep* line of cases was a landlord allowed to recover both an administrative claim and an unsecured claim for the same time period.

46.     First, as shown above, the section 502(b)(6) cap applies to the next three succeeding years.  Luminant does not object to paying the City of Dallas for the next three years, which is the period from September 22, 2015 through September 21, 2018.    Second, section 503(b)(7) applies to "the period of 2 years following" the termination of the lease. 11 U.S.C. § 503(b)(7).  The interplay of the two statutes creates an overlap for the first two years following September 22, 2015—from September 2015 through September 2017.    While Luminant does not object to paying the City of Dallas an administrative priority for those two years, Luminant does object to the City of Dallas' claim that it should be paid for a total of five years (*i.e.*, three years for a section 502(b)(6) claim and two years for a section 503(b)(7) claim). The City of Dallas cannot collect both an administrative priority claim *and* an unsecured claim for this time period.  Rather, the City of Dallas is only entitled to have an administrative priority claim for the first two years and an unsecured claim for the third year.

47.     Accordingly, the section 502(b)(6) cap of the next three years—from September 22, 2015 through September 21, 2018—would be approximately $5,958,999.45.  Of that amount, the portion attributed to the first two years, $4,053,043.84, after reducing amounts of $48,773.38 for payments made, would be given administrative priority.  And the remaining third year under the cap—an amount totaling $1,857,182.22—would be an unsecured claim.

## III.     The City of Dallas is Seeking to Recover the Same Amounts From Sabine River Authority.

48.     One final estimate the Court is called on to make is the City of Dallas' recovery in its suit against the SRA and its directors.  It is a general principle of bankruptcy law that a creditor cannot collect more than 100% on its claim.  *See, e.g., Nuveen Mun. Trust ex rel. Nuveen*

*High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 296 (3d Cir. 2012) ("A creditor cannot collect more in total than it is owed.").

49.     As discussed above, *see* Background *supra*, the SRA-City of Dallas Litigation involves a petition to the Public Utility Commission of Texas seeking to lower the rates, a lawsuit seeking a declaration that the SRA improperly set the water rate, and a lawsuit against the directors of SRA.  To the best of the Debtors' knowledge, all cases are ongoing or pending appeal.

50.     Should the City of Dallas be successful in any of the SRA-City of Dallas Litigation, the City of Dallas could recover more than 100% of its claim.  Any recovery the City of Dallas receives as a result of SRA-City of Dallas Litigation—whether retroactive reduction of the rate or the release of funds from escrow to the City of Dallas—is a windfall for the City of Dallas.  The City of Dallas would receive a substantial benefit from the lawsuit as well as from its claim in these chapter 11 cases.  Accordingly, if the City of Dallas receives a recovery in the SRA-City of Dallas Litigation, that recovery should reduce the City of Dallas' claim.

## IV.     Proving the Full Amount of the Claim by Showing Mitigation of Damages.

51.     Section 502 claims are not liquidated-damages claims and the claimant must prove actual damages.  In particular, landlords of non-residential real property have a duty to mitigate under Texas law.  *See* Tex. Prop. Code Ann. § 91.006(a) (West 2007); *Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.,* 948 S.W.2d 293, 299 (Tex. 1997).  If the damages from a breach have already been mitigated, the claim is reduced to the extent of such mitigation.  Moreover, if the landlord fails to make commercially reasonable efforts to mitigate, the damages claim is barred.  *White v. Harrison*, 390 S.W.3d 666, 675 (Tex. App. 2012) ("The landlord's duty to mitigate requires him to use objectively reasonable efforts to re-lease the premises to a tenant suitable under the circumstances.  If the landlord fails to use reasonable efforts to mitigate

damages, his recovery from the tenant is barred to the extent that damages reasonably could have been avoided.") (internal citations and quotations omitted).   Thus, prior to establishing any claim, the City of Dallas must prove that it has met its duty to mitigate.

### Conclusion

52.      In sum, the Debtors object to the City of Dallas Proof of Claim on four bases: *First*, the water rate that the City of Dallas used to calculate the Water Rights Lease payments is incorrect and it should instead use the Rejection Date Rate.   *Second*, the Water Rights Lease payments have not been discounted to the present value.   *Third*, the City of Dallas seeks amounts that exceed the statutory cap of section 502(b)(6) of the Bankruptcy Code.   And *fourth*, the City of Dallas has not proven that it has taken all necessary steps to mitigate damages.

53.      For the foregoing reasons, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto as **Exhibit D**, reducing, modifying, and allowing the City of Dallas' Proof of Claim to the extent provided in this Objection.

### Reservation of Rights

54.      Nothing contained in this Objection or in the exhibits attached to this Objection and to the order or any actions taken by the Debtors is intended or should be construed as: (a) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; (b) a request or authorization to assume or reject any agreements under section 365 of the Bankruptcy Code; (b) a waiver of any party's rights to assert that any other party is in breach or default of any agreement; or (d) an admission that any contract or lease is integrated with any other contract or lease.

### Notice

55.      The Debtors shall provide notice of this Objection on the date hereof via first class mail to:  (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) counsel to

the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii) , the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims

against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; (y) counsel to the City of Dallas; and (z) those parties that have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

56.    No prior request for the precise relief sought in this Objection has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

Dated: August 26, 2016
   Wilmington, Delaware

         */s/ Jason M. Madron*
         **RICHARDS, LAYTON & FINGER, P.A.**
         Mark D. Collins (No. 2981)
         Daniel J. DeFranceschi (No. 2732)
         Jason M. Madron (No. 4431)
         920 North King Street
         Wilmington, Delaware 19801
         Telephone: (302) 651-7700
         Facsimile: (302) 651-7701
         Email: collins@rlf.com
          defranceschi@rlf.com
          madron@rlf.com

         -and-

         **KIRKLAND & ELLIS LLP**
         **KIRKLAND & ELLIS INTERNATIONAL LLP**
         Edward O. Sassower, P.C. (admitted *pro hac vice*)
         Stephen E. Hessler (admitted *pro hac vice*)
         Brian E. Schartz (admitted *pro hac vice*)
         601 Lexington Avenue
         New York, New York 10022-4611
         Telephone: (212) 446-4800
         Facsimile: (212) 446-4900
         Email: edward.sassower@kirkland.com
          stephen.hessler@kirkland.com
          brian.schartz@kirkland.com

         -and-

         James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
         Marc Kieselstein, P.C. (admitted *pro hac vice*)
         Chad J. Husnick (admitted *pro hac vice*)
         Steven N. Serajeddini (admitted *pro hac vice*)
         300 North LaSalle
         Chicago, Illinois 60654
         Telephone: (312) 862-2000
         Facsimile: (312) 862-2200
         Email: james.sprayregen@kirkland.com
          marc.kieselstein@kirkland.com
          chad.husnick@kirkland.com
          steven.serajeddini@kirkland.com

         Co-Counsel to the Debtors and Debtors in Possession