## EXHIBIT A

**The City of Dallas filed Proof of Claim No. 13319**

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
Grand Central Station, P.O. Box 4613
New York, NY 10163-4613

**PROOF OF CLAIM**

COURT USE ONLY

Filed: USBC - District of Delaware
Energy Future Holdings Corp. (B10)
14-10979(CSS)

| Name of Debtor: | Case Number: |
|---|---|
| LUMINANT GENERATION COMPANY, LLC | 14-11032 |

**0000013319**

NOTE: Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. §503.

Name and address where notices should be sent:

CITY OF DALLAS
C/O MARK BAGGETT
ASST. CITY ATTORNEY
1500 E. MARILLA, 7BN
DALLAS, TEXAS  75201

Telephone number:
(214)671-8272

Email:
mark.baggett@dallascityhall.com

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____
(if known)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**RECEIVED**

NOV 1 2 2015

**LEGAL SERVICES**

Name and address where payment should be sent (if different from above):

Telephone number:          Email:

COURT USE ONLY

5.  Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $12,475), earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,775 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☒ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)( __2__ ).

Amount entitled to priority:
$6,445,897.62

(See attached
Statement of Claim)

1.  Amount of Claim  $ 16,223,382.78
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
If all or part of the claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete item 6.
☐  Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest charges.

2.  Basis for Claim: Rejection of assumed nonresidential real property lease
(See instruction #2)  (see attached statement of claim)

3.  Last four digits of any number by which creditor identifies debtor: ___ ___ ___ ___
3a. Debtor may have scheduled account as: _____
(See instruction #3a)

4.  Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff:
☐ Real Estate   ☐ Motor Vehicle   ☐ Other

Describe: _____
Value of Property: $ _____
Annual Interest Rate _____% ☐ Fixed or ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of time case was filed, included in secured claim, if any:
$ _____
Basis for perfection: _____
Amount of Secured Claim: $ _____
Amount Unsecured: $ _____

6.  Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $ 6,445,897.62  (See instruction #6)

7.  Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8.  Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. (See instruction #8, and definition of "redacted".)
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

9.  Signature: (See instruction #9)   Check the appropriate box.
☐ I am the creditor.   ☒ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or their   ☐ I am a guarantor, surety, indorser, or other codebtor.
(Attached copy of power of attorney, if any.)   authorized agent. (See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)
I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Tony Reder
Title: Credit Services Manager
Company: City of Dallas Water Utilities

(Signature)
(Date) 11/12/15

Address, telephone number, and email (if different from notice address above):

Telephone number: _____
Email: _____

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**

Fill in the debtor's full name, and the case number. The full list of debtors is provided under the general information section on the Claims Agent's website:

http://www.efhcaseinfo.com

If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice. If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**

Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**

State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5, and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**

State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**

State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**

Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**

Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.)

If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**

If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):**

State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**

An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**

Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**9. Date and Signature:**

The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

## DEFINITIONS

**Debtor**

A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**

A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**

A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**

A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

**If by First Class Mail:**

Energy Future Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
Grand Central Station, P.O. Box 4613
New York, NY 10163-4613

**If by Hand Delivery or Overnight Mail:**

Energy Future Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

**Secured Claim Under 11 U.S.C. §506(a)**

A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property of those creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**

An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**

Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, and all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**

Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

## INFORMATION

**Acknowledgment of Filing of Claim**

To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the Claims Agent's website (http://www.efhcaseinfo.com) to view your filed proof of claim under "Claims."

**Offers to Purchase a Claim**

Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.



**City of Dallas**

November 12, 2015

*Via Fed-Ex*
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

> *Re:*   *Luminant Generation Company, LLC*
> *Energy Future Holdings*
> *Our File No.: L14-0598*

Dear Sir or Madam:

Enclosed please find a copy of a proof of claim from the City of Dallas relating to Luminant Generation Company, LLC's rejection of a Water Rights Lease. The original will be delivered via Fed Ex tomorrow morning. Attached to the proof of claim is a copy of a spreadsheet from Dallas Water Utilities, a certified copy of City of Dallas' Ordinance No 29879, and a certified copy of Untreated Water Purchase Contract. Please file this claim with the appropriate Debtor.

If you have any question, please do not hesitate to call me at (214) 671-8272.

Sincerely,

Mark Baggett
Assistant City Attorney

MB/jk
Encl.

# ATTACHMENTS TO CITY OF DALLAS'
## PROOF OF CLAIM

1.   Statement of Claim

2.   "Projected Revenues" spreadsheet reflecting amount due under 11 U.S.C. §503(b)(7)

3.   October 14, 2015 Order (D.I. 6447)

4.   Contract between Luminant Generation Company, LLC and City of Dallas

5.   Certified copy of City of Dallas' Ordinances passed Sept. 22, 2015 (see Section 37, Page 31)

# STATEMENT OF CLAIM

The claims of the City of Dallas as evidenced on the foregoing Proof of Claim form are based on the rejection by Debtor Luminant Generation Company, LLC ("Luminant") of the non-residential real property lease between Luminant and the City of Dallas (the "Lease"), a true and correct copy of which is attached hereto, which Luminant had previously assumed during the bankruptcy case, but then rejected pursuant to the authority contained in the Order dated October 14, 2015 (D.I. 6447), a true and correct copy of which is attached hereto. The City of Dallas' claim is in the total amount of **$16,223,382.78**, comprised of two parts, as follows:

1. Administrative Claim under 11 U.S.C. § 503(b)(7): **$6,445,897.62**
   *(See* "Projected Revenues" Statement attached hereto)

2. General Unsecured Claim under 11 U.S.C. § 502(b)(6): **$9,777,485.16**

   Remaining term of the Lease (less the period covered by Item 1, above):

   33 years and 3 months, or 399 months

   Monthly rental: $271,596.81

   502(b)(6) "One Year" Calculation:  12 months × $271,596.81 = $3,259,161.72

   502(b)(6) "15%, Not to Exceed Three Years" Calculation:

   399 months × $271,596.81 = $108,367,127.19 × 15% = $16,255,069.08
   36 months × $271,596.81 = $9,777,485.16

CITY OF DALLAS WATER UTILITIES DEPARTMENT
LUMINANT LAKE FORK UNTREATED WATER CONTRACT
PROJECTED REVENUES
Account Number 100728155

| FY 2014-15 (POST CONTRACT CANCELLATION PERIOD ONLY: SEPTEMBER 23-30, 2015) | | | FY 2015-16 | | | FY 2016-17 | | |
|---|---|---|---|---|---|---|---|---|
| SERVICE PERIOD | INVOICE AMOUNT | USAGE (1,000 GALLONS) | SERVICE PERIOD | INVOICE AMOUNT | USAGE (1,000 GALLONS) | SERVICE PERIOD | INVOICE AMOUNT | USAGE (1,000 GALLONS) |
| SEPTEMBER 23-30 (1)    2015 | $48,773.38 | 86,894 | OCTOBER    2015 | $271,596.81 | 325,851 | OCTOBER    2016 | $271,596.81 | 325,851 |
| | | | NOVEMBER    2015 | $271,596.81 | 325,851 | NOVEMBER    2016 | $271,596.81 | 325,851 |
| | | | DECEMBER    2015 | $271,596.81 | 325,851 | DECEMBER    2016 | $271,596.81 | 325,851 |
| | | | JANUARY    2016 | $271,596.81 | 325,851 | JANUARY    2017 | $271,596.81 | 325,851 |
| | | | FEBRUARY    2016 | $271,596.81 | 325,851 | FEBRUARY    2017 | $271,596.81 | 325,851 |
| | | | MARCH    2016 | $271,596.81 | 325,851 | MARCH    2017 | $271,596.81 | 325,851 |
| | | | APRIL    2016 | $271,596.81 | 325,851 | APRIL    2017 | $271,596.81 | 325,851 |
| | | | MAY    2016 | $271,596.81 | 325,851 | MAY    2017 | $271,596.81 | 325,851 |
| | | | JUNE    2016 | $271,596.81 | 325,851 | JUNE    2017 | $271,596.81 | 325,851 |
| | | | JULY    2016 | $271,596.81 | 325,851 | JULY    2017 | $271,596.81 | 325,851 |
| | | | AUGUST    2016 | $271,596.81 | 325,851 | AUGUST    2017 | $271,596.81 | 325,851 |
| | | | SEPTEMBER    2016 | $271,596.81 | 325,851 | SEPTEMBER 1 - 22    2017 | $199,170.90 | 238,957 |
| TOTAL | $48,773.38 | 86,894 | TOTAL | $3,259,161.72 | 3,910,212 | TOTAL | $3,186,735.90 | 3,823,318 |

OFFSET FOR AMOUNT PAID FOR SEPTEMBER 23-30, 2015    ($48,773.38)
GRAND TOTAL    $6,445,897.62

Notes:

(1) The figures provided for the period September 23-30, 2015 are prorated amounts. (Luminant has paid for the entire service period of September 1-30, 2015 as invoiced by Dallas via September 2015 invoice.)

(2) Dallas' FY 2014-15 non-interruptible untreated water rate was $0.5613/1,000 gallons.

(3) Effective October 1, 2015 new untreated water rate is $.08335/1,000 gallons

Revised: 11-11-15

OCT 19 2015

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Re: D.I. 6141, 6142 . |

ORDER AUTHORIZING REJECTION OF A PREVIOUSLY ASSUMED
NONRESIDENTIAL REAL PROPERTY LEASE BETWEEN LUMINANT
GENERATION COMPANY LLC AND THE CITY OF DALLAS, TEXAS,
EFFECTIVE *NUNC PRO TUNC* SEPTEMBER 22, 2015

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), for entry of an order (this "Order") authorizing the

Debtors to reject that certain Agreement, dated March 10, 2011, and adopted on February 23,

2011, between Luminant Generation Company LLC ("Luminant") and the City of Dallas, Texas

("Dallas"), including any amendments or modifications thereto (the "Water Rights Lease"),

effective *nunc pro tunc* to September 22, 2015, all as more fully set forth in the Motion; and

upon the Frenzel Declaration; and the Court having found that it has jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of these cases and the

Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      Pursuant to sections 365(a) and 503(b)(7) of the Bankruptcy Code and Bankruptcy Rule 6006, the Water Rights Lease, including any related agreements, amendments, or modifications thereto, is deemed rejected, effective *nunc pro tunc* to September 22, 2015.

3.      The Water Rights Lease is a nonresidential real property lease subject to section 503(b)(7) of the Bankruptcy Code.

4.      The counterparties to the Water Rights Lease must file any proofs of claim relating to the rejection of the Water Rights Lease by 30 days after the date of entry of this Order.

5.      Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

6.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

9.  ·    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: October ___, 2015
       Wilmington, Delaware

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE



**City of Dallas**

| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF DALLAS** | § |
| **CITY OF DALLAS** | § |

I, **BILIERAE JOHNSON,** Assistant City Secretary of the City of Dallas, Texas, do hereby certify that the attached is a true and correct copy of:

### RESOLUTION NO. 11-0579

which was passed by the Dallas City Council on **February 23, 2011.**

WITNESS MY HAND AND THE SEAL OF THE CITY OF DALLAS, TEXAS, this the **11**th day of **November, 2015.**

**BILIERAE JOHNSON**
**ASSISTANT CITY SECRETARY**
**CITY OF DALLAS, TEXAS**

PREPARED BY: AG

COUNCIL CHAMBER
**110579**
February 23, 2011

**WHEREAS,** on July 8, 1981, pursuant to Resolution No. 81-1936, the Dallas City Council authorized execution of the Water Supply and Conveyance Contract between Dallas and Sabine River Authority (SRA) and Texas Utilities Generating Company (TUGCO) (Power Companies); and

**WHEREAS,** on July 30, 1986, the City of Dallas entered into the First Supplement to Water Supply Contract and Conveyance agreement between Dallas, SRA and Texas Utilities Electric Company (TUEC) which set a deadline of September 1, 2009 for TUEC to exercise the option to purchase 17,000 acre-feet per year of water from Dallas; and,

**WHEREAS,** Luminant Generation Company LLC, (formerly Texas Utilities Electric Company) exercised their option on July 24, 2006 to purchase 17,000 acre-feet of water per year and desires to enter into a forty year contract with Dallas for 12,000 acre-feet of water per year; and,

**WHEREAS,** Luminant will pay Dallas for the water and incur the cost of capital improvements necessary to transport the water to Martin Creek and any operations and maintenance and capital costs imposed by SRA; **Now, Therefore,**

**BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF DALLAS:**

**SECTION 1.** That following approval as to form by the City Attorney, the City Manager is hereby authorized to enter into an Untreated Water Contract with Luminant Generation Company LLC for 12,000 acre feet of Dallas' Lake Fork water.

**SECTION 2.** That the City Controller be and is hereby authorized and directed to deposit receipts for service provided under this contract to the Water Utilities Operation Fund as follows:

| FUND | DEPT | UNIT | FUNC | REVENUE RESOURCE CODE |
|------|------|------|------|----------------------|
| 0100 | DWU | 7005 | 7REV | 7849 |

**SECTION 3.** That this resolution shall take effect immediately from and after its passage in accordance with the provisions of the Charter of the City of Dallas and it is accordingly so resolved.

APPROVED BY
CITY COUNCIL

FEB 23 2011

*Deborah Watterie*
City Secretary

110579

STATE OF TEXAS §
§
COUNTY OF DALLAS §

## UNTREATED WATER PURCHASE CONTRACT

WHEREAS, on July 30, 1986, the Sabine River Authority of Texas (hereinafter called "SRA"), Texas Utilities Electric Company, and the City of Dallas (hereinafter called "Dallas") entered into the First Supplement to Water Supply Contract and Conveyance, whereby Dallas granted to Texas Utilities Electric Company an option to purchase up to and including 17,000 acre feet of water per year from the rights of Dallas in Lake Fork (hereinafter called "the Option"); and

WHEREAS, Luminant Generation Company LLC, a Texas limited liability corporation (hereinafter called "Purchaser"), is the lawful successor to Texas Utilities Electric Company in regard to the rights granted under the Option, which option Purchaser now wishes to exercise for the purchase of 12,000 acre-feet of water per year to allow Purchaser to maintain proper water levels in Martin Lake in connection with the Martin Lake Steam Station; and

WHEREAS, Purchaser does not need the remaining 5,000 acre-feet of water per year that is a part of the Option and desires to release said 5,000 acre-feet of water per year to Dallas; and

WHEREAS, Dallas, pursuant to Certificate of Adjudication No. 05-4669, as amended, has existing contractual rights to use the water of Lake Fork and Purchaser, pursuant to Certificate of Adjudication No. 05-4649, as amended, has water rights in Martin Lake; and

WHEREAS, the diversion and use of the water by Purchaser from Lake Fork, on Lake Fork Creek, a tributary of the Sabine River, Sabine River Basin, affects the contractual water rights of Dallas in Lake Fork; and

WHEREAS, the parties desire to enter into this Untreated Water Purchase Contract ("Contract") for a term of 40 years in accordance with the terms of the Option, applicable regulations and procedures established by the Texas Commission on Environmental Quality ("TCEQ") and the Texas Water Development Board ("TWDB"), allowing Purchaser to purchase untreated water (in an amount of 6,000 acre-feet in calendar year 2011 and 12,000 acre-feet per year in calendar years 2012 through 2050) at the Dallas ordinance rate in effect on the date of this Contract, which rate may thereafter be changed from time to time in the manner set out below in this Contract.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and conditions given by each party, Dallas and Purchaser agree as follows:

Luminant Generation Company LLC
Untreated Water Purchase Contract
Page 1 of 10

110579

1.   CONTRACT ADMINISTRATION

This Contract shall be administered on behalf of Dallas by its Director of Water Utilities, or the Director's designated representative (hereinafter called "Director"), and on behalf of Purchaser by its authorized official or designated representative.

2.   AVAILABILITY

Dallas agrees to sell untreated water to Purchaser for industrial uses related to Purchaser's operation, as outlined below, when available. The sale of untreated water to meet the requirements of Purchaser is subject to and limited by available system supply (as determined by the Director). Sales, however, shall not be unreasonably withheld.

3.   MAXIMUM PURCHASE

Purchaser agrees to take not more than 6,000 acre-feet (1,955,106,000 gallons) of untreated water in year 2011 and 12,000 acre-feet (3,910,212,000 gallons) of untreated water per year during the remaining term of this Contract. It is an express condition of this Contract that this Contract may be terminated if Purchaser knowingly takes untreated water in excess of the maximum amount prescribed for the calendar year in question; provided, however, that if Purchaser breaches this Contract by taking more than the maximum amount, Purchaser shall remain liable for the additional amounts taken at the rates as specified in Section 4 below.

4.   RELEASE OF WATER BY PURCHASER

A.   Purchaser hereby releases and relinquishes all its interest in 5,000 acre-feet of water of the 17,000 acre-feet of water per year under the Option, as described in Article 5 of the First Supplement to Water Supply Contract and Conveyance to the City of Dallas ("Supply Contract"). The Supply Contract provides that Luminant may release back to Dallas its option and right to purchase any or all of the 17,000 acre-feet of water. This release and relinquishment dates from the effective date of this contract and is effective in perpetuity, regardless of the expiration of this Contract.

B.   In releasing and relinquishing the 5,000 acre-feet of water per year to Dallas, Purchaser is relieved of any further payment obligation to Dallas with respect to that 5,000 acre-feet of water.

C.   Dallas and Purchaser acknowledge that under this Contract, Dallas may divert, use, sell and reuse up to 6,000 acre-feet of water under the Option and this Contract in year 2011 (from January 1, 2011 to June 30, 2011). The 6,000 acre-feet of water represents one-half of that amount of water Purchaser is obligating itself to purchase from Dallas under the Option and this Contract.

5.   RATES

Purchaser shall pay Dallas for untreated water taken under this Contract at the current prevailing regular (non-interruptible) rate for untreated water sales as specified by Dallas

110579

ordinance, as same may be amended from time to time, and shall pay all other applicable charges for untreated water sales as may be adopted from time to time by ordinance of the Dallas City Council. Purchaser shall also be solely responsible for all costs, fees, or charges imposed by SRA to implement untreated water deliveries and maintain any necessary delivery facilities under this Contract. Purchaser shall maintain the Water Release Agreement executed on April 1, 2007 ("Water Release Agreement") with SRA in connection with the untreated water deliveries under this Contract, which separate agreement shall govern the terms and conditions under which SRA will release water to Purchaser from Lake Fork pursuant to this Contract. The separate Water Release Agreement between SRA and Purchaser does not modify or amend Dallas' water rights in Lake Fork under the Water Supply Contract and Conveyance, as amended.

6.    CURTAILMENT

Purchaser agrees that during periods of water shortages Dallas may, in accordance with its drought contingency plan as approved by TCEQ, reasonably restrict Purchaser's withdrawals of untreated water when such water is needed for Dallas' municipal use. No restrictions will be imposed on Purchaser unless Dallas has imposed restrictions on withdrawals as to all similarly situated users. In the event withdrawals are restricted, untreated water shall be allocated to Purchaser on a pro rata basis. The amount to be paid to Dallas pursuant to Section 7 of this Contract in the event of a curtailment shall be reduced in proportion to the reduction in the maximum number of acre-feet of untreated water to which Purchaser is annually entitled under this Contract.

7.    PAYMENTS

A.    For all calendar years during the term of this Contract except year 2011, the purchase price due, which price Purchaser hereby agrees to pay, is based on the applicable maximum amount described in Section 3 (12,000 acre-feet of untreated water) times the applicable rate as described in Section 5. Purchaser agrees that payment for untreated water made available under this Contract pursuant to the exercise of Purchaser's Option is due and shall be paid, regardless of whether or not Purchaser actually takes the maximum amount of water during such period. The purchase price due shall be paid monthly by taking the maximum amount described in Section 3 (12,000 acre-feet of untreated water or 3,910,212,000 gallons), dividing it by twelve (12), and multiplying that sum by the applicable rate as described in Section 5 in effect for that month. Dallas agrees to render a statement to Purchaser monthly and Purchaser agrees to pay promptly. Payment is due upon receipt of statement.

B.    For calendar year 2011, the purchase price due shall be paid monthly by taking the maximum amount described in Section 3 for year 2011 (6,000 acre-feet of untreated water or 1,955,106,000 gallons), dividing it by six (6), and multiplying that sum by the applicable rate as described in Section 5 in effect for that month.

C.    A payment is deemed late if received by Dallas more than 30 days from the statement date. Late payments shall accrue interest at the interest rate provided in Section 2-1.1 of the Dallas City Code, as amended.

110579

8.    MEASUREMENT OF CONSUMPTION

A.    Consumption shall be based upon daily releases made by SRA on behalf of Purchaser under this Contract.

B.    Dallas and Purchaser agree that Purchaser will bear all losses including transportation and evapotranspiration losses (hereinafter collectively referred to as "transmission losses") from Lake Fork downstream to Purchaser's diversion point. For the purpose of this contract, it shall be assumed that none of the water released by SRA on behalf of Purchaser under this contract will be lost in transmission from Lake Fork to Purchaser's diversion point on the Sabine River. If it is later determined that a transmission loss actually occurs, the amount of the transmission loss, expressed in percentage terms, shall be utilized in determining the quantity of water actually used. If an alternate conveyance is used to deliver contract water to Martin Lake, an amendment to this contract and a subsequent analysis shall be required to determine if transmission losses occur due to the use of the alternate conveyance. The Parties agree that the cost of such analysis shall be borne exclusively by Purchaser.

C.    For days on which Purchaser pumps water under this Contract, Purchaser shall maintain a daily pumping log to provide a manner for determining the amount of water withdrawn at Purchaser's diversion point on the Sabine River. Monthly reports, in a format satisfactory to the Director of Dallas Water Utilities, showing daily requests (if any) by Purchaser, releases made by SRA on behalf of Purchaser, and daily amount of gallons pumped by Purchaser shall be furnished to the Director of Dallas Water Utilities. Dallas may request modification of any daily pumping report required to be maintained by Purchaser under this Subsection 8.C. if Dallas reasonably believes any such report is inaccurate.

D.    Measurement of water provided to Purchaser under this Agreement will be measured at the Point of Release at meter facilities maintained by SRA and/or Purchaser under the Water Release Agreement. Additionally, Purchaser shall furnish, install, operate, and maintain at its Point of Withdrawal on the Sabine River measuring equipment properly equipped with meters and devices of standard types for measuring within generally accepted standards of accuracy as established by the American Water Works Association the quantity of water diverted and used by Purchaser under this Contract. For purposes of this Contract, also, Purchaser shall be responsible for the continued accuracy of the meter(s) at the Point of Release in accordance with the terms and conditions of Section Article IV, Measuring Equipment, of said Water Release Agreement. Should Purchaser exercise any inspection or calibration options under the Water Release Agreement or this Contract, Purchaser will notify the Director before any calibration or inspection of records or metering facilities, so that Dallas may participate, at its election.

E.    Purchaser shall maintain weekly and monthly reports of water pumped under this contract in accordance with Texas Commission on Environmental Quality Rules. Purchaser shall provide Dallas the opportunity to inspect such records during regular business hours upon reasonable notice. Purchaser shall submit to the Director of Dallas Water Utilities by March 1st of each year a copy of the annual water use reports provided to the Texas Commission on Environmental Quality and the Texas Water Development Board in accordance with 30 Texas Administrative Code, Section 295.202 and 31 T.A.C. Section 358.5.

Luminant Generation Company LLC
Untreated Water Purchase Contract
Page 4 of 10

110579

9.   DIVERSION POINT AND DISCHARGE

A.   Pumping equipment for withdrawal of the water and metering facilities may only be located as authorized by TCEQ in a water rights permit issued to Purchaser. Purchaser shall designate the diversion point at which Purchaser wishes to withdraw water, subject to the approval of the Director, SRA, and TCEQ. The designated diversion point shall be reflected in a vicinity map prepared by Purchaser prior to review and approval of the designation by the Director which shall be deemed, when completed and approved by both the Director and SRA, as attached to and made a part of this Contract as Exhibit A.

B.   Ownership and maintenance responsibility for the pumps and facilities housing pumps shall remain with Purchaser. Purchaser shall maintain pumps and motors in accordance with good engineering practice.

10.   TERM

Even though Purchaser's obligations to purchase water under this Contract do not begin until July 1, 2011, the term of this Contract shall commence on January 1, 2011 and shall remain in effect for a term of forty (40) years until December 31, 2050, subject to the terms of Purchaser's and Dallas' Water Supply Contract and Conveyance with SRA, dated October 1, 1981, as amended. This Contract may be renewed, upon the same terms and conditions (except as to rates), for an additional twenty (20) year period by mutual agreement of Dallas and Purchaser. If Dallas and Purchaser cannot mutually agree to a renewal by the end of the term of this Contract, Purchaser may continue to purchase untreated water under the terms of this Contract at the then prevailing rate for as long as the parties continue to negotiate a renewal in good faith and until negotiations either terminate or result in an approved Contract renewal.

11.   INSPECTION AND METER READING

Upon reasonable advance notice to Purchaser, authorized Dallas employees shall have the right of reasonable ingress and egress on Purchaser's property and facilities during business hours to observe pumping operations, to review pumping records and to read meters.

12.   DEFAULT - TERMINATION

A.   Dallas, acting through the Director, shall have the right to terminate this Contract upon non-payment of the charges set out in this Contract. Dallas, however, shall provide notice of intent to terminate under this Subsection 12.A. at least ten (10) days prior to the proposed effective date of termination, in order for Purchaser to tender payment and thereby cure a default as to non-payment under this Contract.

B.   Dallas, acting through the Director, shall have the right to terminate this Contract if it is found that pumping logs are not adequately maintained or that the meter is being bypassed. In addition, if the Contract is terminated under this Subsection 12.B., Dallas shall be entitled to payment for the maximum quantity of water for that calendar year in which the default under this subsection occurs.

110579

C.      In addition to the foregoing, Dallas, acting through the Director, may terminate this Contract for noncompliance with any other contractual condition upon thirty (30) days advance written notice to Purchaser of its intent to terminate; provided, however, that if Purchaser cures the condition of contractual noncompliance within the thirty (30) day period, Dallas may, at its sole option, continue this Contract.

D.      The remedies set forth in this Section 12 shall not be considered exclusive, and Dallas retains all other rights and remedies available at law and in equity in the event of any breach by Purchaser of any of the terms or provisions of this Contract.

13.     **NO REPRESENTATIONS OR WARRANTIES; FORCE MAJEURE**

DALLAS MAKES NO REPRESENTATIONS OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE CHARACTER, QUALITY OR AVAILABILITY OF THE WATER TO BE TAKEN AND PURCHASER AGREES TO ASSUME ALL SUCH RISKS, ACCEPTING SAID WATER, IF AVAILABLE, IN THE SAME STATE AS IT IS PUMPED OR RELEASED FROM THE DESIGNATED DIVERSION POINTS. DALLAS ALSO DOES NOT MAKE ANY REPRESENTATION THAT THE WATER WILL BE SUITABLE FOR THE PURPOSES FOR WHICH PURCHASER DESIRES TO USE IT. DALLAS SHALL NOT BE LIABLE IN ANY EVENT FOR THE INABILITY OF DALLAS TO PERFORM ANY OBLIGATION UNDER THIS CONTRACT FOR REASONS BEYOND ITS CONTROL, INCLUDING BUT NOT LIMITED TO ACTS OF GOD OR NATURAL DISASTER, WAR, DROUGHT, TERRORISM, FIRE, PUBLIC UTILITY POWER OUTAGE, OR THE RULES, REGULATIONS, OR ORDERS OF COURTS OR OF GOVERNMENTAL AGENCIES.

14.     **RIGHTS AND TITLE; LIMITED RIGHT TO RESALE**

A.      Purchaser agrees that it shall acquire no rights or title to the use of water other than those rights explicitly set forth in this Contract.

B.      If Purchaser projects its annual usage under this Contract to be less than 12,000 acre-feet of water in any year and desires to resell the remaining water to other persons, Dallas hereby gives its consent for such short-term water sale. In this Contract, short-term water sale means the sale of untreated water pursuant to a contract, the term of which does not exceed three years. Short-term water sale contracts may be renewed at the option of Purchaser.

C.      Purchaser shall ensure that its total maximum amount of water sold or used in any calendar year does not exceed 12,000 acre-feet.

15.     **ASSIGNMENT**

Other than to an affiliate or subsidiary of Purchaser, Purchaser shall not sell, assign, transfer or convey its interest in this Contract, in whole or in part, without the prior written consent of the Director. Such consent shall not be unreasonably withheld. If consent of the Director is denied, Purchaser may release back to Dallas its rights to purchase under this Contract and shall thereby be relieved of any further payment obligation to Dallas for untreated water under this Contract.

Luminant Generation Company LLC
Untreated Water Purchase Contract
Page 6 of 10

110579

16.    PERMITS AND FEES

Should the acquisition of any permits or the payment of any regulatory or other fees be required in connection with this Contract, including but not limited to permits or regulatory or other fees that may be required by TCEQ, Purchaser shall be responsible for same and shall provide written proof of the permit or regulatory or other fee payment to the Director. Purchaser shall divert water under this Contract only pursuant to such permit or amendment to any existing permit that TCEQ may issue to Purchaser relating to diversion of water from Lake Fork, to applicable regulations of TCEQ and TWDB, and the terms of this Contract.

17.    NOTICES

Except as otherwise provided in Section 18, any notice, statement, or demand required or permitted to be given under this Contract by either party to the other may be effected by personal delivery in writing or by mail, postage prepaid. Mailed notices shall be addressed to the parties at the addresses appearing below, but each party may change its address by written notice in accordance with this section. Mailed notices shall be deemed communicated as of three (3) days after mailing.

TO DALLAS:

Director
Dallas Water Utilities
Dallas City Hall
1500 Marilla – Room 4/a/North
Dallas, Texas 75201

TO PURCHASER:

Environmental Generation Director
Luminant Generation Company LLC
500 North Akard Street
Suite 9-095
Dallas, Texas 75201-3411

With a copy to:
General Counsel
500 North Akard Street
14th Floor
Dallas, Texas 75201

18.    NOTICE OF CONTRACT CLAIM

This Contract is subject to the provisions of Section 2-86 of the Dallas City Code, as amended, relating to requirements for filing a notice of a breach of contract claim against City. Section 2-86 of the Dallas City Code, as amended, is expressly incorporated by reference and made a part of this Contract as if written word for word in this Contract. Purchaser shall comply with the requirements of this ordinance as a precondition of any claim relating to this Contract, in addition to all other requirements in this Contract related to claims and notice of claims.

19.    CONFLICT OF INTEREST

The following section of the Charter of the City of Dallas shall be one of the conditions, and a part of, the consideration of this Contract, to wit:

110579

"CHAPTER XXII. Sec. 11. FINANCIAL INTEREST OF EMPLOYEE OR OFFICER PROHIBITED --

(a)    No officer or employee shall have any financial interest, direct or indirect, in any contract with the City or be financially interested, directly or indirectly, in the sale to the City of any land, materials, supplies or services, except on behalf of the City as an officer or employee. Any violation of this section shall constitute malfeasance in office, and any officer or employee guilty thereof shall thereby forfeit the officer's or employee's office or position with the City. Any violation of this section, with knowledge, express or implied, of the person or corporation contracting with the City shall render the contract involved voidable by the City Manager or the City Council.

(b)    The alleged violations of this section shall be matters to be determined either by the Trial Board in the case of employees who have the right to appeal to the Trial Board, and by the City Council in the case of other employees.

(c)    The prohibitions of this section shall not apply to the participation by City employees in federally-funded housing programs, to the extent permitted by applicable federal or state law."

20.    GIFT TO PUBLIC SERVANT

A.    Dallas may terminate this Contract immediately if Purchaser has offered, or agreed to confer any benefit upon a Dallas employee or official that the Dallas employee or official is prohibited by law from accepting.

B.    For purposes of this section, "benefit" means anything reasonably regarded as pecuniary gain or pecuniary advantage, including benefit to any other person in whose welfare the beneficiary has a direct or substantial interest, but does not include a contribution or expenditure made and reported in accordance with law.

C.    Notwithstanding any other legal remedies, Dallas may require Purchaser to remove any officer or employee of Purchaser from the administration of this Contract or any role in the performance of this Contract who has violated the restrictions of this section or any similar state or federal law, and obtain reimbursement for any expenditures made as a result of the improper offer, agreement to confer, or conferring of a benefit to a Dallas employee or official.

21.    VENUE

The parties agree that this Contract shall be enforceable in Dallas County, Texas, and if legal action is necessary to enforce it, exclusive venue shall lie in Dallas County, Texas.

22.    GOVERNING LAW

A.    This Contract shall be governed by and construed in accordance with the laws and court decisions of the State of Texas, without regard to conflict of law or choice of law principles of Texas or any other state.

Luminant Generation Company LLC
Untreated Water Purchase Contract
Page 8 of 10

110579

B.     No presumption will apply in favor of either party in the interpretation of this Contract or in the resolution of any ambiguity of any provisions hereof.

23.     LEGAL CONSTRUCTION

A.     In case any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision thereof and this Contract shall be considered as if such invalid, illegal, or unenforceable provision had never been contained in this Contract.

B.     Notwithstanding the foregoing, if any provision of this Contract shall be deemed to be invalid, illegal, or unenforceable, and such provision served as consideration for either Dallas' or Purchaser's agreement to any term or condition of this Contract still remaining in effect, Dallas and Purchaser agree to work together in good faith to provide an alternate means for providing consideration, such that their respective interests are protected and made whole.

24.     COUNTERPARTS

This Contract may be executed in any number of counterparts, each of which shall be deemed an original and constitute one and the same instrument. If this Contract is executed in counterparts, then it shall become fully executed only as of the execution of the last such counterpart called for by the terms of this Contract to be executed.

25.     CAPTIONS

The captions to the various clauses of this Contract are for informational purposes only and shall not alter the substance of the terms and conditions of this Contract.

26.     APPLICABLE LAWS

This Contract is made subject to, and Purchaser agrees to comply with, all applicable laws of the State of Texas, applicable rules, regulations and orders of TCEQ and TWDB, Federal law (including but not limited to environmental and water quality laws, rules, orders, and regulations), and the Charter and ordinances of the City of Dallas, as same may hereafter be amended. This Contract may be subject to review and approval by TCEQ or TWDB. Purchaser shall comply with all terms, conditions and provisions of the permit to be obtained from the State of Texas as amended, so long as same may remain in effect. In the event of any final judgment finding any violation or violations of the laws, rules, regulations, or orders described above, Purchaser shall be strictly liable for any damages caused to the property of Dallas, including but not limited to Dallas' interest in Lake Fork water, as a result of such violation or violations.

27.     SUCCESSORS AND ASSIGNS

This Contract shall be binding upon and inure to the benefit of the parties and their respective successors and, except as otherwise provided in this Contract, their assigns.

110579

28.    ENTIRE AGREEMENT; NO ORAL MODIFICATIONS

    This Contract embodies the entire agreement of both parties, superseding all oral or written previous and contemporary agreements between the parties relating to matters set forth in this Contract. Except as otherwise provided elsewhere in this Contract, this Contract cannot be modified without written supplemental agreement executed by both parties.

EXECUTED as of the _10th_ day of _March_, 2011, on behalf of Dallas by its City Manager, duly authorized by Resolution No. 11-_0579_, adopted on _February 23_, 2011 and approved as to form by its City Attorney; and on behalf of Purchaser by its duly authorized officials.

APPROVED AS TO FORM:
THOMAS P. PERKINS, JR.
City Attorney

BY _____
    Assistant City Attorney
    Submitted to City Attorney

CITY OF DALLAS
MARY K. SUHM
City Manager

BY _____
    Assistant City Manager

PURCHASER:
LUMINANT GENERATION COMPANY LLC,
a Texas limited liability company

BY _____
    Senior Vice-President



**City of Dallas**

| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF DALLAS** | § |
| **CITY OF DALLAS** | § |

I, **BILIERAE JOHNSON,** Assistant City Secretary, of the City of Dallas, Texas, do hereby certify that the attached is a true and correct copy of:

**ORDINANCE NO. 29879**

Which was passed by the Dallas City Council on **September 22, 2015.**

WITNESS MY HAND AND THE SEAL OF THE CITY OF DALLAS, TEXAS, this the 11th day of **November, 2015.**

**BILIERAE JOHNSON**
**ASSISTANT CITY SECRETARY**
**CITY OF DALLAS, TEXAS**

Prepared By: AG

**1 5 1 7 8 7**

9/2/2015

ORDINANCE NO. **2 9 8 7 9**

An ordinance amending Sections 5A-3, 5A-8, and 5A-14 of Chapter 5A, "Air Pollution";

amending Sections 7-2.6, 7-4.11, and 7-6.2 of Chapter 7, "Animals"; amending Section 15D-5 of

Chapter 15D, "Emergency Vehicles; amending Sections 105, 115, 501, and 901 of Chapter 16,

"Dallas Fire Code"; amending Sections 18-2, 18-3, 18-9, and 18-57 of Chapter 18, "Municipal

Solid Wastes"; amending Sections 27-32, 27-42, 27-62, and 27-72 of Chapter 27, "Minimum

Urban Rehabilitation Standards"; amending Sections 43A-17 and 43A-18 of Chapter 43A,

"Swimming Pools"; amending Section 48B-8 of Chapter 48B, "Vacant Buildings"; amending

Sections 49-18.1, 49-18.2, 49-18.4, 49-18.5, 49-18.7 and 49-18.9 of Chapter 49, "Water and

Wastewater"; and amending Sections 50-82, 50-101, 50-116, 50-137, and 50-149 of Chapter 50,

"Consumer Affairs," of the Dallas City Code, as amended; repealing Section 5A-5.1 of Chapter

5A, "Air Pollution," of the Dallas City Code; removing the registration fee and registration

requirement for used car lots; adjusting registration fees for facilities that emit or have the

potential to emit air contaminants; adjusting fees for redeeming an impounded animal from a city

animal shelter; adjusting the intact animal permit fee; adjusting the fee for a temporary regulated

animal permit; adjusting emergency ambulance transport fees; adjusting permit fees overseen by

the Dallas Fire-Rescue Department; adjusting building reinspection fees; adjusting inspection

charges for high risk buildings and occupancies; adjusting plan review fees for fire apparatus

access roads and for limited access gates that obstruct such roads; adjusting installation

acceptance retest fees; authorizing sanitation services to collect recycling from commercial

establishments and establishing a fee for such collection; authorizing more than once-a-week

collection of garbage and recycling from certain commercial establishments; adjusting fees for

29879                 151787

sanitation collection service; adjusting fees for tire business licenses and mobile tire repair unit permits; adjusting fee for a certificate of registration for a multi-tenant property; adjusting fees for multi-tenant property inspections; adjusting fees for multi-tenant property inspections; adjusting the annual fee for a certificate of registration for a non-owner occupied rental property; adjusting the reinspection fee for non-owner occupied rental property; adjusting the public swimming pool permit fee; adjusting the swimming pool manager training course fee; adjusting the vacant building registration fee; adjusting rates and charges for treated water service, wastewater service, wholesale water, and wastewater service to governmental entities, untreated water service, service connections, and fire hydrant usage; adjusting the wood vendor license fee; adjusting the electronic repair license fee; adjusting the motor vehicle repair license fee; adjusting the home repair license fee; adjusting the credit access business registration fee; making certain conforming, semantic, grammatical, and structural changes; providing for a penalty not to exceed $2,000; providing a saving clause; providing a severability clause; and providing an effective date.

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1. That Section 5A-3, "Chapter Definitions," of Chapter 5A, "Air Pollution," of the Dallas City Code is amended to read as follows:

"SEC. 5A-3.        CHAPTER DEFINITIONS.

The definition of a term in this section applies to each grammatical variation of the term. In this chapter, unless the context requires a different definition:

(1)    AIR CONTAMINANT means dust, fumes, gas, mist, odor, particulate matter, toxic materials, smoke, or vapor, individually or in combination, that is produced by a process other than natural.

(2)    AIR POLLUTION means the presence in the atmosphere of one or more air contaminants in such concentration and of such duration:

29879             151787

(A)    as to have or tend to have an injurious or adverse effect on human health or safety, animal or vegetable life, or property; or

(B)    as to interfere with the normal use or enjoyment of animals, vegetation, or other property.

(3)    DIRECTOR means the director of the department designated by the city manager to enforce and administer this chapter and includes representatives, agents, or city employees designated by the director to assist in the enforcement and administration of this chapter.

(4)    FACILITY means any stationary source of air contaminants and includes the following classes.

(A)    Class "1" facility means a stationary source of air contaminants whose actual emissions at design capacity are greater than or equal to 100 tons per year of any pollutant.

(B)    Class "2" facility means a stationary source of air contaminants whose uncontrolled emissions at design capacity would be greater than or equal to 100 tons per year for any pollutant, but whose actual emissions are less than 100 tons per year.

(C)    Class "3" facility means a stationary source of air contaminants whose uncontrolled emissions at design capacity are less than 100 tons per year, but greater than or equal to five tons per year.

(D)    Class "4" facility means a facility whose uncontrolled emissions at design capacity are less than five tons per year but whose emissions are significant, or have the potential to be significant, or have a potential to be a nuisance.

(E)    Class "5" facility means a dry cleaner that uses trichloroethylene, perchloroethylene, or naphtha when conducting cleaning operations on clothing or other fabrics.

(5)    PERSON means an individual; corporation; government or governmental subdivision; or agency, trust, partnership, or two or more persons having a joint or common economic interest.

[(6)    USED CAR LOT means a facility or location where used automobiles, trucks, vans, or recreational vehicles are displayed for sale or lease.]"

SECTION 2.  That Chapter 5A, "Air Pollution," of the Dallas City Code is amended by

repealing Section 5A-5.1 as follows:

"SEC. 5A-5.1.        RESERVED. [USED CAR LOTS:  REGISTRATION REQUIRED; FEES.]

29879                     151787

[(a)    ~~Any person who owns or operates a used car lot within the city shall register with the director on a form provided for that purpose.~~

(b)    ~~Before a used car lot will be registered, an annual registration fee must be paid to the director in accordance with the following schedule:~~

| ~~Number of vehicle display spaces~~ | ~~Fee~~ |
|---|---|
| ~~1 to 9~~ | ~~$200~~ |
| ~~10 to 49~~ | ~~$245~~ |
| ~~50 or more~~ | ~~$295~~ |

(c)    ~~Registration expires one year from the date of issuance and renewal must be obtained annually.~~

(d)    ~~At least once a year, the director shall inspect a used car lot for compliance with state and federal laws requiring proper installation of pollution control devices on used motor vehicles.~~]"

SECTION 3.   That Subsection (b) of Section 5A-8, "Registration Fees," of Chapter 5A, "Air Pollution," of the Dallas City Code is amended to read as follows:

"(b)    The fee for each class of facility is as follows:

Class "1" facility   $1,465

Class "2" facility   $1,200

Class "3" facility   $940

Class "4" facility   $960

Class "5" facility   $110 [80]"

SECTION 4.   That Subsection (a) of Section 5A-14, "Offenses," of Chapter 5A, "Air Pollution," of the Dallas City Code is amended to read as follows:

"(a)    A person commits an offense if he:

(1)    refuses to submit information requested by the director under Section 5A-5(a); or

29879                              151787

(2)    violates a rule of the Texas Natural Resource Conservation Commission identified in Section 5A-6; or

(3)    owns, controls, or manages a source that violates the emission standard prescribed by Section 5A-7(a), (b) or (c); or

(4)    interferes with the director in the exercise of his authority under Section 5A-9(b); or

(5)    violates a rule established under Section 5A-10; or

(6)    refuses to allow or interferes with an inspection authorized under Section 5A-11; or

(7)    violates a variance or order granted or issued by the Texas Natural Resource Conservation Commission under the Texas Clean Air Act[; or

(8)    fails to register a used car lot in compliance with Section 5A-5.1]."

SECTION 5.    That Subsection (a) of Section 7-2.6, "Redemption of Impounded Animals," of Article II, "Animal Services; City Animal Shelters," of Chapter 7, "Animals," of the Dallas City Code is amended to read as follows:

"(a)    To redeem an impounded animal from a city animal shelter, the owner of the animal must provide proof of ownership and pay to the director the following fees:

(1)    a redemption fee of:

(A)    $50 [7] for an animal delivered for impoundment to a city animal shelter by a person other than a city employee in the performance of official duties; or

(B)    $50 [27] for an animal delivered for impoundment to a city animal shelter by a city employee in the performance of official duties;

(2)    $15 [10] for each night the animal is housed in a city animal shelter;

(3)    $19 [10] for a rabies vaccination of a dog, cat, or ferret if the owner cannot show either:

(A)    a current certificate of vaccination for the animal; or

(B)    proof that the animal was not vaccinated due to health reasons as verified by a licensed veterinarian;

29879                                 151787

(4)     the applicable registration fee for a dog or cat under Section 7-4.2, if the owner cannot show proof of current registration;

(5)     $15 for a microchip implant and initial national registration of a dog or cat, unless:

(A)     the animal was injected with a microchip implant prior to impoundment; or

(B)     a licensed veterinarian certifies that the animal should not be injected with a microchip implant for health reasons; and

(6)     $<u>139</u> [60] for the sterilization of a dog or $<u>139</u> [40] for the sterilization of a cat, unless:

(A)     the animal was spayed or neutered prior to impoundment;

(B)     the animal is under six months of age;

(C)     a licensed veterinarian certifies that the dog or cat should not be spayed or neutered for health reasons or is permanently non-fertile;

(D)     the animal is being held for sale by a retail pet store or for adoption by animal services or an animal welfare organization;

(E)     the animal is a competition cat or competition dog;

(F)     the animal is a service animal; or

(G)     the owner of the animal has, or obtains at the time of redemption, a valid intact animal permit for the animal under Section 7-4.11 of this chapter."

SECTION 6.  That Subsection (c) of Section 7-4.11, "Intact Animal Permit," of Article IV, "Specific Requirements for Dogs and Cats," of Chapter 7, "Animals," of the Dallas City Code is amended to read as follows:

"(c)     To obtain an intact animal permit, a person must submit an application to the director (on a form provided by the director for that purpose) and pay an annual intact animal permit fee of $<u>100</u> [70]. The intact animal permit application must include:

(1)     the name, address, and telephone number of the applicant;

(2)     the location where the dog or cat is harbored;

29879                    151787

(3)     a description of the dog or cat;

(4)     proof that the animal is qualified for an intact animal permit under Subsection (b) of this section; and

(5)     any other information determined necessary by the director for the enforcement and administration of this section."

SECTION 7.  That Subsection (e) of Section 7-6.2, "Regulated Animals," of Article VI, "Prohibited and Regulated Animals," of Chapter 7, "Animals," of the Dallas City Code is amended to read as follows:

"(e)    The fees for a regulated animal permit are as follows:

| Type of Permit | Fee |
|---|---|
| (1)     Annual | $500 |
| (2)     Temporary | $250 [100]." |

SECTION 8.  That Subsection (b) of Section 15D-5, "Emergency Ambulance Service Provided by Fire Department; Fee," of Division 2, "Emergency Medical Services," of Chapter 15D, "Emergency Vehicles," of the Dallas City Code is amended to read as follows:

"(b)    The city shall charge the following fees for emergency ambulance services in the city provided in response to a call received by the fire department requesting the services:

(1)     $1,485 [800] for each transport of a resident of the city of Dallas to a hospital and $1,578 [900] for each transport of a nonresident of the city of Dallas to a hospital.

(2)     $125 for treatment of a person who is not transported by ambulance.

(3)     The reasonable cost of any expendable items that are medically required to be used on a person transported by ambulance or treated without being transported by ambulance, including but not limited to drugs, dressings and bandages, airways, oxygen masks, intravenous fluids and equipment, syringes, and needles.

(4)     The reasonable cost of any EKG/telemetry that is medically required to be performed on a person transported by ambulance or treated without being transported by ambulance.

29879                              151787

        (5)    The reasonable cost of each additional paramedic over two that is medically required to respond to an emergency call.

        (6)    $15 for each loaded mile of transport by ambulance, beginning when the patient is loaded into the ambulance and ending upon arrival at the hospital."

        SECTION 9.   That Subsection 105.8 "Fees and Permits Schedule," of Section 105, "Permits and Fees," of Part 2, "Administrative Provisions," of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

"**105.8 Fees and permits schedule.** An applicant for a permit required by Section 105.6 shall pay, upon issuance of the permit, a nonrefundable permit fee in accordance with the following schedule.

| | |
|---|---|
| 1. Acetylene generator, annual | $300.00 [~~175.00~~] |
| 2. Aerosol products, annual | $250.00 [~~175.00~~] |
| 3. Air curtain incinerator/pit burner, daily | $404.00 [~~350.00~~] |
| 4. Amusement building, annual | $150.00 [~~135.00~~] |
| 5. Asphalt (tar) kettles, annual | $199.00 [~~95.00~~] |
| 6. Aviation facilities, annual | $300.00 [~~150.00~~] |
| 7. Calcium carbide storage, annual | $300.00 [~~175.00~~] |
| 8. Candle and open flames | $125.00 [~~95.00~~] |
| 9. Carnivals and fairs, daily | $200.00 [~~160.00~~] |
| 10. Combustible storage (miscellaneous), annual | $250.00 [~~150.00~~] |
| 11. Commercial cooking fire-extinguishing system | $267.00 [~~200.00~~] |
| 12. Compressed gas filling/storage/use, annual | $250.00 [~~95.00~~] |
| 13. Cryogenic fluids, annual | $250.00 [~~150.00~~] |
| 14. Dry cleaning plant, annual | $300.00 [~~140.00~~] |
| 15. *Explosive* /blasting, daily | $450.00 [~~260.00~~] |
| 16. Fireworks/*explosive* storage, daily | $300.00 [~~160.00~~] |
| 17. Fireworks/*explosive* transportation, daily | $300.00 [~~190.00~~] |
| 18. Fireworks display (initial) | $500.00 [~~405.00~~] |
| 19. Fireworks display (subsequent) | $300.00 [~~215.00~~] |
| 20. Flammable and combustible liquids, annual | $250.00 [~~125.00~~] |
| 21. Floor/wall finishing | $150.00 [~~135.00~~] |
| 22. Fruit and crop ripening, annual | $279.00 [~~175.00~~] |
| 23. Hazardous materials, annual | $550.00 [~~175.00~~] |
| 24. Hazardous production material (HPM), annual | $550.00 [~~175.00~~] |
| 25. High-piled storage, annual | $200.00 [~~160.00~~] |
| 26. Industrial oven, annual | $250.00 [~~175.00~~] |
| 27. Limited access gates, annual (1 to 3 gates) | $250.00 [~~150.00~~] |

29879                                      151787

| | |
|---|---|
| (4 to 7 gates) | $300.00 [205.00] |
| (8 or more gates) | $400.00 [260.00] |

28. Liquid- or gas-fueled vehicles or equipment in assembly buildings, per event:

| | |
|---|---|
| (1 to 10 vehicles or pieces of equipment) | $200.00 [63.00] |
| (11 to 30 vehicles or pieces of equipment) | $300.00 [127.00] |
| (31 to 400 [or more] vehicles or pieces of equipment) | $400.00 [191.00] |
| (over 400 vehicles or pieces of equipment) | $500.00 |
| 29. LP-gas storage/use | $254.00 [122.00] |
| 30. LP-gas demonstration/portable cooking (cart) | $150.00 [125.00] |
| 31. LP-gas demonstration/portable cooking (vehicle) | $300.00 |
| 32. Lumber yards and woodworking plants, annual | $269.00 [160.00] |
| 33. [32.] Magnesium, annual | $250.00 [175.00] |
| 34. [33.] Mobile fueling | |
| (site survey), annual | $400.00 [245.00] |
| (vehicle inspection) annual | $300.00 [100.00] |
| 35. [34.] Open burning/recreational fires | $250.00 [230.00] |
| 36. [35.] Private fire hydrant and water supplies, annual | $350.00 [105.00] |
| 37. [36.] Pyrotechnic special effects material, daily: | |
| Initial performance | $300.00 [185.00] |
| Subsequent performances | $300.00 [92.00] |
| 38. [37.] Refrigeration equipment, annual | $205.00 [160.00] |
| 39. [38.] Scrap tire storage, annual | $200.00 [160.00] |
| 40. [39.] Spray painting/dipping, annual | $200.00 [135.00] |
| 41. [40.] State licensed facilities | |
| (child care facility, 35 children or fewer), annual | $150.00 |
| (child care facility, more than 35 children), annual | $200.00 |
| (residential care facility, annual | $200.00 [150.00] |
| (small assisted living), annual | $200.00 [150.00] |
| (adult day care facility), annual | $200.00 [150.00] |
| 42. [41.] Temporary membrane structures and tents, per event | $300.00 [125.00] |
| 43. [42.] Tire-rebuilding plant, annual | $200.00 [160.00] |
| 44. [43.] Torch and open flames | $200.00 [120.00 |
| 44. Trench burning (per day) | $350.00] |
| 45. Waste handling, annual | $250.00 [160.00] |
| 46. Welding/cutting/hotworks | $194.00 [125.00]" |

SECTION 10.   That Paragraph 105.9.1, "When Required," of Subsection 105.9

"Reinspection Fee," of Section 105, "Permits and Fees," of Part 2, "Administrative Provisions,"

of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City

Code is amended to read as follows:

29879                                               151787

"**105.9.1 When required.** Whenever a building or premises in the city is inspected by the *fire code official* and a violation of this code is found, the building or premises shall, after the expiration of any time limit for compliance given in a notice or order issued because of the violations, be reinspected by the *fire code official* to determine that the violation has been eliminated. The owner, occupant, operator or other person responsible for the violation shall pay to the city assessor and collector of taxes a fee in accordance with the following schedule for each reinspection that is conducted until the violation is determined to be eliminated:

| NUMBER OF REINSPECTIONS | FEE |
|---|---|
| 1ST | $00 |
| 2ND | $125 [100] |
| 3RD AND EACH SUBSEQUENT | $205 [105] |

**Exception:** No fee shall be charged for a reinspection of the following:

1. A Group R-3 or R-4 occupancy, as defined in the *Dallas Building Code.*

2. An individual *dwelling unit* within an apartment house or residential condominium complex, as defined in the *Dallas Building Code*, when the violation is the responsibility of the occupant of the *dwelling unit* and not the responsibility of the owner or operator of or the person responsible for the building or premises.

3. Activities directly related to construction conducted on a building or premises, or part of the building or premises, pursuant to a valid building permit issued by the building official, including any reinspection that is required before a certificate of occupancy related to the construction activities may be issued for the building or premises."

SECTION 11.   That Subsection 115.4, "Registration Fee and Inspection Charge," of Section 115, "Registration and Inspection of High Risk Buildings and Occupancies," of Part 2, "Administrative Provisions," of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

"**115.4 Registration fee and inspection charge.** The fee for a certificate of registration for a high risk occupancy is $25, plus an inspection charge in accordance with the following schedule.

| BUILDING TYPE: | INSPECTION CHARGE [FEE]: |
|---|---|
| Public Assembly | |
| Under 5,000 square feet | $150 [40] |
| 5,000 - 9,999 square feet | $200 [80] |
| 10,000 - 59,999 square feet | $250 [120] |

29879                                    151787

| | |
|---|---|
| 60,000 - 99,999 square feet | $250 [160] |
| 100,000 square feet and over | $300 [200] |

Hazardous Materials

| | |
|---|---|
| Under 5,000 square feet | $250 [125] |
| 5,000 - 9,999 square feet | $250 [175] |
| 10,000 - 59,999 square feet | $300 [225] |
| 60,000 - 99,999 square feet | $313 [300] |
| 100,000 square feet and over | $400 [350] |

High-rise Office/Storage/Assembly

| | |
|---|---|
| Under 200,000 square feet | $250 [200] |
| 200,000 - 600,000 square feet | $260 [400] |
| Over 600,000 square feet | $291 [500] |

High-rise Residential

| | |
|---|---|
| Under 250 *dwelling units* | $300 [200] |
| 250 to 600 *dwelling units* | $439 [400] |
| Over 600 *dwelling units* | $550 [500] |

Health Care Facilities

| | |
|---|---|
| Under 100 patient rooms or individual *dwelling units* | $300 [200] |
| 100-500 patient rooms or individual *dwelling units* | $550 [400] |
| Over 500 patient rooms or individual *dwelling units* | $650 [500] |

**Exceptions:**

1.  The inspection charge shall not be assessed for inspecting a building or occupancy that is subject to inspection in order to obtain one of the following operational permits from the fire code official:

    a.  Amusement building.

    b.  Aviation facilities.

    c.  Dry cleaning plant.

    d.  Lumber yards and woodworking plants.

    e.  State licensed facility (child care, residential care, small assisted living, adult day care).

2.  The inspection charge shall not be assessed for any property that is exempt from paying City of Dallas property taxes.

29879                    151787

    3.     The inspection charge shall not be assessed for any property that has a current vacant building certificate of registration from the City of Dallas."

SECTION 12.  That Subsection 115.5, "Expiration and Renewal of Registration," of Section 115, "Registration and Inspection of High Risk Buildings and Occupancies," of Part 2, "Administrative Provisions," of Chapter 1, "Scope and Administration," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

"**115.5 Expiration and renewal of registration.** A certificate of registration for high risk buildings and occupancies expires [according to the following schedule:

    1.  Assembly certificates expire] one year after the date of issuance.

    [2.  Hazardous materials certificates expire two years after the date of issuance.

    3.  High rise certificates expire two years after the date of issuance.

    4.  Health care certificates expire one year after the date of issuance.]"

SECTION 13.  That Paragraph 501.3.1, "Plan Review Fees," of Subsection 501.3, "Construction Documents," of Section 501, "General," of Chapter 5, "Fire Service Features," of Chapter 16, "Dallas Fire Code," of the Dallas City Code is amended to read as follows:

"**501.3.1 Plan review fees.** Plans for fire apparatus access roads (in accordance with Section 503 and Appendix D) shall be accompanied by a nonrefundable $200 [75] review fee.  This shall apply to new and existing construction.

**Exception:** No plan review fee shall be charged when the plans are directly related to construction conducted on a building or premises pursuant to a valid building permit issued by the building official.

Plans for limited access gates which obstruct fire apparatus access roads (in accordance with Section L104, 'Limited Access Gates' of Appendix L) shall be accompanied by a nonrefundable $200 [75] review fee. This plan review fee shall apply to new and existing construction."

29879                    151787

SECTION 14. That Subsection 901.5, "Installation Acceptance Testing," of Section 901,

"General," of Chapter 9, "Fire Protection Systems," of Chapter 16, "Dallas Fire Code," of the

Dallas City Code is amended to read as follows:

"**901.5 Installation acceptance testing.** Fire detection and alarm systems, fire-extinguishing
systems, fire hydrant systems, fire standpipe systems, fire pump systems, private fire service
mains and all other *fire protection systems* and appurtenances thereto shall be subject to
acceptance tests as contained in the installation standards and as *approved* by the *fire code
official*. The *fire code official* shall witness any required acceptance testing. A retest fee shall
be charged for retesting *fire protection system*s when the testing of the system fails after the
contractor has submitted to the *fire code official* a pre-test certification certifying that the
system has been pre-tested and is in an *approved* condition. The retest fee shall be $622.00
[500.00]."

SECTION 15.   That Paragraph (41) of Section 18-2, "Definitions," of Article I,

"Collection and Disposal," of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is

amended to read as follows:

"(41) ROLLCART. A plastic receptacle, which is furnished by the city for the
collection of residential refuse and recyclable materials, that:

        (A)    has two wheels and a lid;

        (B)    is designed to be lifted and emptied mechanically;[ and]

        (C)    is too large for handling by manual means[.] ; and

        (D)    is from 48 to 96 gallons."

SECTION 16.   That Subsection (a), "Containers for Residences and Duplexes," of

Section 18-3, "Regulating Containers for Municipal Solid Waste Materials," of Article I,

"Collection and Disposal" of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is

amended to read as follows:

"(a)   Containers for residences and duplexes. Every occupant of a residence or duplex
shall provide the premises with a sufficient number of solid waste containers to provide for the
peak output of municipal solid wastes from those premises without overloading the containers.
The containers must be rollcarts [(except that bags may be used as containers for recyclable

materials-or-as-containers-for-grass-cuttings-collected-under-Section 18-8(b)(3))] and must meet the requirements of this subsection.

(1)     [At a residence or duplex, a bag used as a container for recyclable materials must be blue or clear, must have at least a 1.3-mil thickness, and must not exceed 33 gallons in capacity. The combined weight of the recyclable materials and the bag must not exceed 50 pounds.

(2)] At a residence or duplex, a person shall use only city owned and provided rollcarts as solid waste containers, except that blue rollcarts[, clear or blue bags, or any combination of each] may be used as solid waste containers for recyclable materials.

(2[3]) A person shall comply with the following requirements when using a rollcart or a blue or clear recycling bag as a solid waste container:

(A)     A container must not be overloaded to the point where spillage occurs from overflow, wind, or handling.

(B)     A container must be closed or secured at the top to prevent spillage.

(C)     Glass and other wastes that are dangerous to handle must be securely wrapped, and the container must be labeled to warn of the need for careful handling.

(D)     Ashes must be cold before being placed in a container.

(E)     Non-recyclable materials must not be placed in a container (rollcart [or blue or clear recycling bag]) designated for recyclable materials. A recycling rollcart that is used for non-recyclable materials may be removed from the premises at the direction of the director of sanitation.

(3[4]) Unless otherwise specified by the director of sanitation, and in addition to the requirements of Subsection (a)(3), a person shall comply with the following requirements when using a rollcart as a solid waste container:

(A)     A rollcart must be placed for collection so that there is a minimum clearance of three feet to each side of the rollcart and one and one-half feet to the rear of the rollcart from any fence, gas meter, telephone pole, utility box, tree, shrub, additional collection container, or other potential obstruction. A rollcart must be placed so that its handle faces the dwelling unit.

(B)     No person shall block or cause to be blocked access to or hinder collection of a rollcart that has been placed for curbside collection.

**29879**                                            **151787**

     (C)    Solid waste, including recyclable materials, must be placed in a rollcart in a manner that prevents the contents from blowing out of the rollcart when being emptied.

     (D)    The director of sanitation must be promptly notified of any need for repair or replacement of a rollcart. Cleanliness of a rollcart is the responsibility of the occupant or owner of the premises to which the rollcart is provided.

     (E)    A 60 to 65 gallon rollcart may not weigh more than 200 pounds when loaded, and a 90 to 96 gallon rollcart may not weigh more than 250 pounds when loaded.

     (F)    Additional rollcarts for garbage may be obtained from the director of sanitation for an additional fee set forth in Section 18-9(c)(1) of this article. Additional rollcarts for recyclable materials may be obtained from the director of sanitation for no additional fee.

     (G)    A rollcart that is lost or damaged due to a customer's negligence may be replaced for a fee as set forth in Section 18-9(c)(8) of this article."

SECTION 17.  That Subsection (b), "Containers for Apartments, Mobile Home Parks, Institutions, and Commercial Establishments," of Section 18-3, "Regulating Containers for Municipal Solid Waste Materials," of Article I, "Collection and Disposal," of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is amended to read as follows:

"(b)   Containers for apartments, mobile home parks, institutions, and commercial establishments.  Every owner of an apartment, mobile home park, institution, or commercial establishment shall provide the premises with a sufficient number of solid waste containers to provide for the peak output of municipal solid wastes from those premises without overloading the containers.

     (1)    A container must be watertight and constructed of a solid and durable grade of metal or plastic material. Any container that is manually collected by city sanitation services employees must not exceed 96 [50] gallons in capacity, and the combined weight of the waste and the container must not exceed 250 [50] pounds. A container must not be overloaded to a point where spillage occurs from overflow, wind, or handling.

     (2)    All containers [(except blue or clear recycling bags)] must meet the following requirements:

     (A)    A container must be provided with suitable lifting handles on the outside and a close-fitting or other approved cover equipped with a handle.

29879                        151787

(B)    A container must not contain any inside structure, such as a band or reinforcing angle, or anything within the container to prevent the free discharge of the contents. A container that has deteriorated or become damaged to the extent that the cover will not fit securely or that has a jagged or sharp edge capable of causing injury to a sanitation services employee or other person whose duty it is to handle the container will be condemned by the city. If such a container is not replaced after notice to the owner or user, the container will be removed along with its contents.

[(C)    ~~The lid of a container must be close-fitting and must remain in place covering the container at all times when there is any material in the container. The lid may be attached by an appropriate means to the rack upon which the container is placed or to an adjacent fence or other appropriate fixed object in order to prevent the lid from getting into the pathway of a vehicle. Except on a mechanically emptied container, the lid must not be directly attached to the container. A container that has the lid directly attached to it is a hazard to any sanitation services employee engaged in the collection of solid waste and will be condemned by the city. If such an attachment is not removed after notice to the owner or user, the container will be removed along with its contents.~~]"

SECTION 18. That Section 18-9, "Specifying Charges for Sanitation Service," of Article I, "Collection and Disposal" of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is amended to read as follows:

## "SEC. 18-9.    SPECIFYING CHARGES FOR SANITATION SERVICE.

(a)    <u>Method of charging and billing for sanitation services.</u>

(1)    A sanitation service charge <u>for garbage and recycling</u> will be made for the following:

(A)    All dwelling units in the city that are served with water delivered under an active water account of the water utilities department of the city.

(B)    All dwelling units in the city that are served with wastewater service only under an active account of the water utilities department of the city.

(C)    <u>All commercial properties in the city that can be adequately serviced with no more than 10 garbage rollcarts and 10 recycling rollcarts and that are served with water delivered under an active water account of the water utilities department of the city or that are served with wastewater service only under an active account of the water utilities department of the city.</u>

(D)    <u>All commercial properties that are serviced with a single garbage rollcart. These properties have the option to receive one recycling rollcart of the same size or greater than the garbage rollcart, at no additional cost.</u>

29879                    151787

(E)    All property that is served with sanitation services by the city and that is not specified by Subparagraphs (A), [or] (B), (C), or (D) of this paragraph.  The water utilities department shall bill for sanitation services in a manner that distinguishes the sanitation charges from water or wastewater charges.

(2)    The water utilities department shall bill the person in whose name the water service or wastewater service account appears.  If a sanitation services customer is not served with water or wastewater service by the city, the water utilities department shall bill the person in control of the premises or, if that person is unknown, the owner of the premises. Payment of the fee for sanitation services is due on or before the date stated on the face of the customer's bill and is delinquent after that date.  A bill is delinquent if not paid within 15 days from the date it is rendered by the water utilities department.

(3)    In addition to all other legal remedies available for the collection of a debt, the following actions and remedies are authorized for delinquent payment of the charges authorized in this article:

(A)    The sanitation services may refuse to pick up and dispose of the garbage and trash (or rubbish) at the delinquent location;

(B)    The water and/or wastewater service, if any, serving the delinquent premises in question may be shut off and terminated.

(C)    A five percent late payment fee will be added to the total net bill.

(4)    All collections by the water utilities department will be applied first to the water utilities charges, and the customer will be deemed to have paid such water utilities charges first if any question arises as to how outstanding balances should be composed and applied.

(A)    All present water utilities department customers to be billed under this article will be automatically placed on the billing for sanitation services charges, regardless of whether or not a written contract exists between the city and such customers.

(B)    All present water utilities guaranty deposits upon termination of wastewater service and/or water service may be applied to any amounts due either for sanitation services charges or fees of water utilities bills.

(C)    All water utilities services contracts entered into between the water utilities department and the customer must contain an agreement that any guaranty deposit upon termination of wastewater service and/or water service may be applied to sanitation services fees and charges and to water utilities charges that have become due.

29879                              151787

(b)    <u>General regulations.</u>

(1)    Establishment of service charges will be based upon the current use of the property rather than being based upon the zoning.

(2)    There will be no proration of service charges for a portion of a billing period. The initial billing will be made concurrent with the initial water billing. The final billing for sanitation charges will be for a full billing period.

(3)    Except as otherwise set forth in this article, collection service must be provided by the sanitation services of the city for all residences and duplexes and for all manual collection from apartments and mobile home parks, and such service may not be contracted or performed by other than the city's sanitation services.

(4)    A commercial property in the city cannot receive service for more than 10 recycling rollcarts.

(A)    A commercial property has the option to apply for an exemption to receive more than 10 recycling rollcarts upon written approval from the director of sanitation. Approval of the exemption will be at the discretion of the director of sanitation.

(B)    The director of sanitation has the discretion to limit a commercial property to fewer than 10 recycling rollcarts if the property does not have adequate space or if the property cannot reasonably be provided with recycling service.

(5)    A commercial property in the city cannot receive service for more than 10 garbage rollcarts.

(A)    A commercial property has the option to apply for an exemption to receive more than 10 garbage rollcarts upon written approval from the director of sanitation. Approval of the exemption will be at the discretion of the director of sanitation.

(B)    The director of sanitation has the discretion to limit a property to fewer than 10 garbage rollcarts if the property does not have adequate space or if the property cannot reasonably be provided with garbage service.

(6)    Commercial establishments that are located within a 1.5-mile radius of Dallas City Hall may receive more than one garbage and recycling collection per week by sanitation services. Commercial establishments that are located outside of a 1.5-mile radius of Dallas City Hall may receive more than one garbage and recycling collection per week by the sanitation services of the city only if the director of sanitation agrees in writing.

(7)    A commercial property shall comply with the following requirements when using a recycling rollcart:

29879                              151787

(A)    The rollcart must not be overloaded to the point where spillage occurs from overflow, wind, or handling.

(B)    The rollcart must be closed or secured at the top to prevent spillage.

(C)    Only recyclable materials may be placed in a recycling rollcart. A recycling rollcart that is used for non-recyclable materials or that contains a significant amount of non-recyclable materials may be removed from the premises at the direction of the director of sanitation.

(D)    A recycling rollcart must be placed on the curb in accordance with Section 18-3(a)(4) and Section 18-4(c). A recycling rollcart that is not kept clean or that causes a nuisance may be removed from the premises at the direction of the director of sanitation.

(8)    The director may provide for alternative solid waste collection service to a customer, if the director determines that the customer cannot be adequately serviced with the standard collection service.

(c)    Schedule of service charges.

(1)    The collection service charge for a residence or duplex is as follows:

(A)    Alley or curb collection service for municipal solid waste - $22.79 [21.31] per dwelling unit per month for one rollcart, plus $10.56 per month for each additional garbage rollcart requested by the owner or occupant of the premises.

(B)    Packout or drive-in collection service for municipal solid waste - $79.35 [71.17] per dwelling unit per month.

(2)    The collection service charge for an apartment or a mobile home park that receives manual collection service from the sanitation services of the city is as follows:

(A)    Alley, curb, or drive-in collection service for municipal solid waste - $22.79 [21.31] per apartment unit or mobile home space per month.

(B)    Packout collection service for municipal solid waste - $79.35 [71.17] per apartment unit or mobile home space per month.

(3)    A monthly collection service charge will be made for all commercial establishments for collection service provided by the sanitation services of the city as follows:

29879                     151787

## TABLE OF MONTHLY CHARGES
[(Rear-end Loaders)

| QUANTITY OF SOLID WASTE | NUMBER OF COLLECTIONS PER WEEK | | | | | |
|---|---|---|---|---|---|---|
| Gallons | 2 | 3 | 4 | 5 | 6 | 7 |
| 60 | $37.79 | $68.76 | $93.53 | $113.77 | $138.95 | $169.70 |
| 100 | $50.18 | $93.53 | $116.24 | $147.20 | $246.31 | $412.13 |
| 200 | $85.27 | $182.31 | $235.98 | $297.93 | $351.61 | $414.96 |
| 300 | $134.83 | $246.31 | $326.83 | $407.36 | $492.00 | $594.25] |

(Garbage & Recycling, per Section 18-9(b)(6), more than once a week)

| 96-gallon RollCarts | NUMBER OF COLLECTIONS PER WEEK* | | | | | |
|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 5 | 6 | 7 |
| 1 | $59.59 | $88.85 | $118.11 | $147.37 | $176.63 | $205.89 |
| 2 | $119.18 | $177.70 | $236.22 | $294.73 | $353.25 | $411.77 |
| 3 | $178.77 | $266.54 | $354.32 | $442.10 | $529.88 | $617.66 |
| 4 | $238.36 | $355.39 | $472.43 | $589.47 | $706.51 | $823.54 |
| 5 | $297.95 | $444.24 | $590.54 | $736.84 | $883.13 | $1,029.43 |
| 6 | $357.54 | $533.09 | $708.65 | $884.20 | $1,059.76 | $1,235.32 |
| 7 | $417.13 | $621.94 | $826.75 | $1,031.57 | $1,236.39 | $1,441.20 |
| 8 | $476.72 | $710.78 | $944.86 | $1,178.94 | $1,413.01 | $1,647.09 |
| 9 | $536.31 | $799.63 | $1,062.97 | $1,326.30 | $1,589.64 | $1,852.98 |
| 10 | $595.90 | $888.48 | $1,181.08 | $1,473.67 | $1,766.27 | $2,058.86 |

29879                    151787

TABLE OF MONTHLY CHARGES
(Garbage & Recycling, per Section 18-9(b)(6), once a week only)

| 96-gallon RollCarts | NUMBER OF COLLECTIONS PER WEEK <br> 1 |
|---|---|
| 1 | $30.33 |
| 2 | $60.66 |
| 3 | $90.99 |
| 4 | $121.32 |
| 5 | $151.65 |
| 6 | $181.98 |
| 7 | $212.31 |
| 8 | $242.64 |
| 9 | $272.97 |
| 10 | $303.30 |

(4)    A monthly recycling-only collection service charge will be made for all commercial properties for weekly collection service provided by the sanitation services of the city as follows:

TABLE OF MONTHLY CHARGES
(Recycling-Only Service, Outside of the Central Business District)

| NUMBER OF 96-GALLON RECYCLING ROLLCARTS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| $19.83 | $39.66 | $59.49 | $79.32 | $99.15 | $118.98 | $138.81 | $158.64 | $178.47 | $198.30 |

(5)    Extraordinary collection and removal service:  A cost plus rate determined by the director of sanitation for materials not included in the regular collection service as described in Section 18-8.

(6[5])  Miscellaneous collection service charges will be as follows:

(A)    Public housing may be charged as apartments.

(B)    Churches, clinics, hospitals, public buildings, and schools will be charged as commercial locations.

29879                    151787

(7[6]) The service charge for the collection and removal of grass cuttings from any premises is:

(A)    $1.50 per bag, if the service is performed by city sanitation services; and

(B)    an amount specified by city contract, if the service is performed by a contractor selected by the city under Section 18-8(b)(3).

(8[7]) Packout or drive-in service for certain handicapped persons meeting uniform requirements specified by the director of sanitation will be provided at the rate for alley or curb collection service. Any applicant for a reduced rate under this subparagraph who intentionally makes any misrepresentation in any written statement required by such uniform requirements is guilty of an offense and, upon conviction, is punishable by a fine not to exceed $500.

(9[8]) The fee for replacement of a rollcart that is lost or damaged due to a customer's negligence is $49.59 for a garbage rollcart or $52.94 for a recycling rollcart.

(10[9]) Large dead animals, including but not limited to horses, cattle, and other animals of similar size, will be picked up by the city for a fee of $100 per animal.

(d)    A person claiming entitlement to a refund of sanitation services paid to the city must notify the director of sanitation of the claim within 180 days from the date the disputed payment was received by the city."

SECTION 19.   That Section 18-57, "License and Permit Fees," of Article V, "Tires," of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code is amended to read as follows:

"SEC. 18-57.       LICENSE AND PERMIT FEES.

(a)    The annual fee for a tire business license is $75 [315].

(b)    The annual fee for each mobile tire repair unit permit is $75 [30].

(c)    The fee for issuing a duplicate tire business license or mobile tire repair unit permit for one that is lost, stolen, or mutilated is $32 [10].

(d)    The applicant shall pay all fees required by this section to the director before a license or permit will be issued. No refund of a fee will be made."

29879                                    151787

SECTION 20.  That Subsection (a) of Section 27-32, "Registration Fees," of Article VII,

"Registration and Inspection of Multi-Tenant Properties," of Chapter 27, "Minimum Urban

Rehabilitation Standards," of the Dallas City Code is amended to read as follows:

"(a)    The fee for a certificate of registration for a multi-tenant property is an amount
equal to $6.00 [10.00] times the total number of units in the multi-tenant property, whether
occupied or unoccupied."

SECTION 21.  That Subsection (c) of Section 27-42, "Property Inspections; Inspection

and Reinspection Fees," of Article VII, "Registration and Inspection of Multi-Tenant

Properties," of Chapter 27, "Minimum Urban Rehabilitation Standards," of the Dallas City Code

is amended to read as follows:

"(c)    The owner or operator of a multi-tenant property shall pay to the director the
following fees for a graded inspection of the property:

(1)    For a graded inspection in which the property scores 85 or higher or where
Subsection (b)(3) applies to the property, no inspection fee will be charged.

(2)    For a graded inspection in which the property scores lower than 85
because of substandard conditions or other premises violations existing on the property and
where Subsection (b)(4) applies to the property, the inspection fee is $46 [30] times the total
number of units in the multi-tenant property.

(3)    For a graded inspection in which the property scores lower than 85 only
because of failure to have or display required documentation, including but not limited to
permits, notices, licenses, records, or certificates of occupancy, and where Subsection (b)(4)
applies to the property, the inspection fee is $87 [20] times the total number of units in the multi-
tenant property."

SECTION 22.  That Subsection (e) of Section 27-42, "Property Inspections; Inspection

and Reinspection Fees," of Article VII, "Registration and Inspection of Multi-Tenant

Properties," of Chapter 27, "Minimum Urban Rehabilitation Standards," of the Dallas City Code

is amended to read as follows:

"(e)    The owner, occupant, operator, or other person responsible for the violation shall
pay to the director the following fees for each reinspection after the first reinspection that must
be conducted before the violation is determined to be eliminated:

29879                                              151787

(1)     For a reinspection conducted inside units of a multi-tenant property, the fee is $50 times the number of units actually reinspected.

(2)     For a reinspection of the exterior and common areas of a multi-tenant property, the fee is $20 [50] for each separate violation site reinspected."

SECTION 23.  That Subsection (a) of Section 27-62, "Registration Fees," of Article IX, "Registration and Inspection of Non-Owner Occupied Rental Property," of Chapter 27, "Minimum Urban Rehabilitation Standards," of the Dallas City Code is amended to read as follows:

"(a)     The annual fee for a certificate of registration for a non-owner occupied rental property is $17 [25]."

SECTION 24.  That Subsection (c) of Section 27-72, "Property Inspections; Reinspection Fees," of Article IX, "Registration and Inspection of Non-Owner Occupied Rental Property," of Chapter 27, "Minimum Urban Rehabilitation Standards," of the Dallas City Code is amended to read as follows:

"(c)     The owner, occupant, or other person responsible for the violation shall pay to the director $19 [50] for each reinspection after the first reinspection that must be conducted before the violation is determined to be eliminated."

SECTION 25.  That Section 43A-3, "Inspections," of Article I, "General Provisions," of Chapter 43A, "Swimming Pools," of the Dallas City Code is amended to read as follows:

"SEC. 43A-3.         INSPECTIONS AND REINSPECTIONS.

The director may inspect a swimming pool at any reasonable time and has authority to enter upon the premises where a pool is located to the extent necessary to make a full examination. Water samples from a pool may be taken. If a reinspection is required, the fee for the reinspection is $43."

SECTION 26.  That Subsection (c) of Section 43A-17, "Permit and Manager of Operations Required," of Article III, "Maintenance and Operation of Swimming Pools," of Chapter 43A, "Swimming Pools," of the Dallas City Code is amended to read as follows:

29879                                     151787

"(c)    The director shall issue a permit to an applicant if a qualified manager of operations has been designated and the fee has been paid. The amount of the fee is $47 [175] for [the first] each pool owned by an applicant [at one location, plus $100 for each additional pool owned by the applicant at the same location]. The fee is due on or before the first day of March of each calendar year. If a permit is initially issued after the first day of March of a calendar year, the fee for that year will be prorated according to the number of whole months remaining in the year. No refunds will be made."

SECTION 27.   That Subsection (b) of Section 43A-18, "Certification of Manager of Operations," of Article III, "Maintenance and Operation of Swimming Pools," of Chapter 43A, "Swimming Pools," of the Dallas City Code is amended to read as follows:

"(b)    The certification of a manager of operations expires two years from the date of certification and a manager must repeat the training course to maintain certification. The fee for the [attending a] training course and certificate [for the purpose of managing a pool in the city] is $47 [40; the fee for others is $60]."

SECTION 28.   That Subsection (a) of Section 48B-8, "Registration Fee and Inspection Charge," of Article II, "Registration and Inspection of Vacant Buildings," of Chapter 48B, "Vacant Buildings," of the Dallas City Code is amended to read as follows:

"(a)    The fee for a certificate of registration for a vacant building is $73 [75], plus an inspection charge in an amount equal to $185.64 + ($0.009282 x total square feet of building area, excluding stairwells, elevator shafts, and mechanical rooms)."

SECTION 29. That Subsection (c), "Rate Tables," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(c)    Rate tables.  The director shall charge customers for treated water service in accordance with the following tables:

(1)    Water Service Customer Charges.

| METER SIZE | RATE PER METER |
| --- | --- |
| 5/8-inch meter | $5.12 [4.85] |
| 3/4-inch meter | 7.07 [6.70] |
| 1-inch meter | 10.28 [9.74] |
| 1-1/2-inch meter | 19.14 [18.13] |

29879                     151787

| | |
|---|---|
| 2-inch meter | 31.14[29.50] |
| 3-inch meter | 72.93 [69.09] |
| 4-inch meter | 121.17 [114.79] |
| 6-inch meter | 240.61 [227.94] |
| 8-inch meter | 400.50 [378.85] |
| 10-inch meter or larger | 614.98 [582.59] |

    (2)   <u>Usage Charge - Rate Per 1,000 Gallons</u>.

        <u>TYPE OF USAGE</u>

        (A)   Residential:

| | | | |
|---|---|---|---|
| | (i) | Up to 4,000 gallons | $1.87 [1.80] |
| | (ii) | 4,001 to 10,000 gallons | 4.13 [3.91] |
| | (iii) | 10,001 to 15,000 gallons | 5.81 [5.50] |
| | (iv) | Above 15,000 gallons | 8.20 [7.63] |

        (B)   General service:

| | | | |
|---|---|---|---|
| | (i) | Up to 10,000 gallons | 3.47 [3.05] |
| | (ii) | Above 10,000 gallons | 3.71 [3.45] |
| | (iii) | Above 10,000 gallons and 1.4 times annual average monthly usage | 5.63 [5.00]" |

SECTION 30. That Paragraph (1) of Subsection (f), "Election for Certain General Water Service Customers," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

    "(1)   The customer must agree to pay each year:

        (A)   the monthly customer charge provided in Subsection (c);

        (B)   $2,135.27 [2,025.00] per month as a usage charge on the first 1,000,000 gallons used in a billing period; and

29879                                    151787

        (C)    $2.95 [2.75] per 1,000 gallons used in excess of 1,000,000 gallons per month."

SECTION 31. That Subsection (g), "Adjusted Rates for Hidden Water Leaks," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(g)   Adjusted rates for hidden water leaks. When a customer experiences a substantial increase in water or wastewater usage from a hidden water leak and the customer meets the requirements of Section 49-9(e), the director will adjust the account and bill the customer:

        (1)    an estimated amount of normal water usage for the period at the regular rate;

        (2)    the excess water usage caused by the hidden leak at the following applicable rate:

| TYPE OF USAGE | RATE PER 1,000 GALLONS |
|---|---|
| (A)  Residential | $1.87 [1.80] |
| (B)  General service | 3.47 [3.05] |
| (C)  Optional general service | 2.95 [2.75] |
| (D)  Municipal service | 2.38 [2.35] |

and

        (3)    the applicable wastewater rate prescribed in Section 49-18.2(c), based on an adjustment of wastewater volume to estimated normal volume, where adjustment is appropriate."

SECTION 32. That Subsection (i), "Rates for Municipal Purpose Water Service," of Section 49-18.1, "Rates for Treated Water Service," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(i)   Rates for municipal purpose water service. Water service to property owned by the city of Dallas that is used solely for municipal purposes may be charged $2.38 [2.35] per 1,000 gallons of water used."

29879                              151787

SECTION 33.   That Section 49-18.2, "Rates for Wastewater Service," of Article II,

"Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City

Code is amended to read as follows:

"SEC. 49-18.2.        RATES FOR WASTEWATER SERVICE.

(a)     Form of rate. The monthly rate for wastewater service to a customer consists of:

   (1)     a customer charge;

   (2)     a usage charge; and

   (3)     a surcharge for excessive concentration of wastes, if applicable.

(b)     Billing cycle. In this section, water used per month is based upon the billing cycle of the department.

(c)     Rate tables. The director shall charge a customer for wastewater service in accordance with the following tables:

Wastewater Service Charges.

(1)     Monthly customer charges

| METER SIZE | RATE PER METER |
| --- | --- |
| 5/8-inch meter | $4.58 [4.45] |
| 3/4-inch meter | 6.27 [6.00] |
| 1-inch meter | 9.10 [8.75] |
| 1-1/2-inch meter | 17.52 [16.60] |
| 2-inch meter | 27.60 [26.15] |
| 3-inch meter | 66.72 [63.79] |
| 4-inch meter | 106.68 [103.90] |
| 6-inch meter | 209.97 [206.50] |
| 8-inch meter | 350.51 [340.15] |
| 10-inch meter or larger | 550.72 [525.50] |

(2)     Monthly residential usage charge

$5.20 [4.95] per 1,000 gallons of the average water consumption billed in the months of December, January, February, and March, or of the actual Month's water consumption, whichever is less, up to a maximum

|     |                                                                          | charge of 40,000 gallons per month                                                     |
|-----|--------------------------------------------------------------------------|----------------------------------------------------------------------------------------|
| (3) | Monthly general service usage charge                                     | $3.95 [3.70] per 1,000 gallons of water used                                           |
| (4) | Monthly usage charge for Section 49-18.1(f) customer                     | $3.56 [3.38] per 1,000 gallons of water used                                           |
| (5) | Monthly general service usage charge for wastewater separately metered   | $3.65 [3.50] per 1,000 gallons of wastewater discharged                                |
| (6) | Monthly surcharge for excessive concentrations of waste                  | An amount calculated in accordance with Sections 49-18.12, 49-48 and 49-49 of this chapter |
| (7) | Monthly surcharge for excessive concentrations of waste for wastewater separately metered | An amount calculated in accordance with Sections 49-18.12, 49-48 and 49-49 of this chapter |

(d)     Where residential water service is not used.  If a residential customer does not receive water service solely from the city, the director shall estimate water used per month to determine the usage charge in Subsection (c).

(e)     Where general water service is not used.  If a general service customer does not receive water service solely from the city, the customer must install and maintain, at the customer's expense, adequate meters that measure total water usage from other sources and that meet American Water Works Association standards.  The customer must pay an additional customer charge of $10.00 per month for each meter, regardless of size, installed under this subsection.  When a meter is inaccurate, the director may estimate water usage.

(f)     Rates for municipal purpose wastewater service.  Wastewater service to property owned by the city of Dallas that is used solely for municipal purposes may be charged $2.58 [2.55] per 1,000 gallons of water used."

SECTION 34.   That Subsection (b), "Rate Table," of Section 49-18.4, "Rates for Wholesale Water and Wastewater Service to Governmental Entities," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(b)   Rate table.  The director shall charge a governmental entity for wholesale water service in accordance with the following:

(1)    The volume charge for treated water is $0.4305 [0.3382] per 1,000 gallons of water used, and the annual water year demand charge is $243.453 [223,308] per each mgd, as established by the highest rate of flow controller setting.

(2)    If a flat rate charge for treated water is provided by contract, or in the absence of a rate of flow controller, the charge is $1.9521 [1.7339] per 1,000 gallons of treated water used.

(3)    A monthly readiness-to-serve charge will be assessed for any standby service point. The monthly fee, based on size of connection, is as follows:

| Size of Connection | Monthly Standby Fee |
|---|---|
| 3-inch | $72.93 [69.09] |
| 4-inch | 121.17 [114.79] |
| 6-inch | 240.61 [227.94] |
| 8-inch | 400.50 [378.85] |
| 10-inch or larger | 614.98 [582.59] |

(4)    The rate for regular untreated water service to a governmental entity is $0.8335 [0.5613] per 1,000 gallons of untreated water used. The rate for interruptible untreated water service to a governmental entity is $0.4044 [0.2451] per 1,000 gallons of untreated water used."

SECTION 35.  That Subsection (e), Wholesale Wastewater Rates," of Section 49-18.4,

"Rates for Wholesale Water and Wastewater Service to Governmental Entities," of Article II,

"Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City

Code is amended to read as follows:

"(e)    Wholesale wastewater rates.  The director may provide wholesale wastewater service to other governmental entities by contract, in accordance with the following rules:

(1)    The monthly rate for wholesale wastewater service is $2.2688 [2.3031] per 1,000 gallons of wastewater discharged.  The director is authorized to compensate those governmental entities located within the boundaries of the city for the city's use of integrated facilities owned by those governmental entities.

(2)    An infiltration and inflow adjustment factor of 11.3 [13.2] percent will be added to the average water consumption for the months of December, January, February, and March to determine billable volume for a governmental entity with unmetered wholesale wastewater service.

**29879**                                    **151787**

(3)    If the BOD or suspended solids concentration of waste discharged exceeds 250 mg/L, the governmental entity must pay a surcharge calculated in accordance with Section 49-18.12(1)(A) or (B), whichever applies."

SECTION 36.    That Subsection (f),    Treatment of Water Owned By Another Governmental Entity," of Section 49-18.4, "Rates for Wholesale Water and Wastewater Service to Governmental Entities," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(f)    Treatment of water owned by another governmental entity. The director may provide treatment services at the Elm Fork water treatment plant to water owned by another governmental entity in accordance with a written contract. The volume charge for treating water owned by another governmental entity is $0.2994 [0.2982] per 1,000 gallons of water treated, and the annual water year demand charge is $43.640 [38,177] per each mgd, as established by the maximum demand capacity set forth in the contract."

SECTION 37.    That Subsection (a), "Regular Rate," of Section 49-18.5, "Rate for Untreated Water," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(a)    Regular rate.    The charge for untreated water is $0.8335 [0.5613] per 1,000 gallons of water used."

SECTION 38.    That Subsection (b), "Interruptible Rate," of Section 49-18.5, "Rate for Untreated Water," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(b)    Interruptible rate.    The charge for interruptible service is $0.4044 [0.2451] per 1,000 gallons of water used."

SECTION 39. That Subsection (a), "Water Service Installation and Connection Charge," of Section 49-18.7, "Service Connection Charges," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

**151787**

**29879**

"(a)  Water service installation and connection charge.  The director shall charge for the installation of all water service connections at the following rates:

    (1)   Water Service Installation Charges.

| Connection Size | Fee |
| --- | --- |
| 3/4-inch | $2.972 [2,650].00 |
| 1-inch | $3.103 [2,750].00 |
| 1 1/2-inch | $4.625 [3,603].00 |
| 2-inch | $4.462 [3,605].00 |

    (2)   Connecting Existing Water Service.

| Connection Size | Fee |
| --- | --- |
| 3/4-inch | $718 [925].00 |
| 1-inch | $762 [975].00 |
| 1 1/2-inch | $1.704 [1,325].00 |
| 2-inch | $1.885 [1,575].00 |
| Up to 2-inch bullhead | $3.947 [2,575].00" |

SECTION 40.  That Subsection (b), "Wastewater Service Installation and Connection Fees" of Section 49-18.7, "Service Connection Charges," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

"(b)  Wastewater service installation and connection fees. Except as provided in Subsection (d), the city shall charge the following rates for the installation or connection of residential wastewater service lines:

    (1)   First wastewater service line installation and connection charge    $2.778 [2,674].00

    (2)   For connecting existing wastewater service lines constructed by other persons    $475.00"

SECTION 41.  That Section 49-18.9, "Charges for Use of Fire Hydrants," of Article II, "Rates, Charges and Collections," of Chapter 49, "Water and Wastewater," of the Dallas City Code is amended to read as follows:

29879 . 151787

"SEC. 49-18.9.       CHARGES FOR USE OF FIRE HYDRANTS.

A person requesting use of water from a fire hydrant pursuant to Section 49-27 shall pay the following application charges:

(1)     a deposit of $1,500 to be refunded when the service is discontinued and the meter is returned to the city by the person or the person's authorized representative, less any unpaid fees for services and any costs to repair damage in excess of normal wear;

(2)     a monthly fire hydrant service charge of $72.93 [69.09]; and

(3)     a usage charge for water that will be billed at the general service rate prescribed in Section 49-18.1(c)(2)(B)."

SECTION 42.  That Section 50-82, "Fee," of Article V, "Wood Vendors," of Chapter 50,

"Consumer Affairs," of the Dallas City Code is amended to read as follows:

"SEC. 50-82.       FEE.

The applicant shall pay an annual permit fee of $64 [75] to the director at the time the license is issued.  No refund of license fees shall be made."

SECTION 43.  That Section 50-101, "Fees," of Article VIII, "Electronic Repairs," of

Chapter 50, "Consumer Affairs," of the Dallas City Code is amended to read as follows:

"SEC. 50-101.       FEES.

The annual fee for an electronic repair license is $72 [175]. The fee for issuing a duplicate license for additional establishments or for a lost, destroyed or mutilated license is $4. The fee is payable to the director upon issuance of a license. No refund of license fees shall be made."

SECTION 44.  That Section 50-116, "Fees," of Article IX, "Motor Vehicle Repairs," of

Chapter 50, "Consumer Affairs," of the Dallas City Code is amended to read as follows:

"SEC. 50-116.       FEES.

The annual fee for a motor vehicle repair license is $75 [200] for the first location and $75 [200] for a duplicate license for each additional location.  The fee for issuing a replacement license for one lost, destroyed, or mutilated is $2.  The fee is payable to the director upon issuance of a license.  No refund of license fees will be made."

29879                    151787

SECTION 45.  That Subsection (a) of Section 50-137, "License Fees," of Article X,

"Home Repairs," of Chapter 50, "Consumer Affairs," of the Dallas City Code is amended to read

as follows:

"(a)     The fee for a home repair license is $68 [100] a year."

SECTION 46.  That Subsection (a) of Section 50-149, "Registration Application," of

Division 2, "Registration of Credit Access Businesses," of Article XI, "Credit Access

Businesses," of Chapter 50, "Consumer Affairs," of the Dallas City Code is amended to read as

follows:

"(a)     To obtain a certificate of registration for a credit access business, a person must
submit an application on a form provided for that purpose to the director. The application must
contain the following:

(1)     The name, street address, mailing address, facsimile number, and
telephone number of the applicant.

(2)     The business or trade name, street address, mailing address, facsimile
number, and telephone number of the credit access business.

(3)     The names, street addresses, mailing addresses, and telephone numbers of
all owners of the credit access business and other persons with a financial interest in the credit
access business, and the nature and extent of each person's interest in the credit access business.

(4)     A copy of a current, valid state license held by the credit access business.

(5)     A copy of a current, valid certificate of occupancy showing that the credit
access business is in compliance with the Dallas Development Code.

(6)     A non-refundable application fee of $76 [50]."

SECTION 47.  That, unless specifically provided otherwise by this ordinance or

by state law, a person violating a provision of this ordinance governing fire safety, zoning, or

public health and sanitation, including dumping of refuse, is, upon conviction, punishable by a

fine not to exceed $2,000 and that a person violating any other provision of this ordinance is,

upon conviction, punishable by a fine not to exceed $500.

**29879**                    **151787**

SECTION 48. That Chapters 5A, 7, 15D, 16, 18, 27, 43A, 48B, 49, and 50 of the Dallas City Code, as amended, will remain in full force and effect, save and except as amended by this ordinance. Any proceeding, civil or criminal, based upon events that occurred prior to the effective date of this ordinance are saved, and the former law is continued in effect for that purpose.

SECTION 49. That the terms and provisions of this ordinance are severable and are governed by Section 1-4 of Chapter 1 of the Dallas City Code, as amended.

SECTION 50. That a certificate of registration for high risk buildings and occupancies issued under Chapter 16 of the Dallas City Code before April 1, 2016, shall remain valid until the expiration date of that certificate.

SECTION 51. That Section 12 of this ordinance shall take effect on April 1, 2016.

SECTION 52. That the charges in the "Table of Monthly Charges (Garbage & Recycling, per Section 18-9(b)(6), once a week only)" added to Subsection (c)(3) of Section 18-9, "Specifying Charges for Sanitation Service," of Article I, "Collection and Disposal" of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code, as indicated in Section 18 of this ordinance, shall take effect on January 1, 2016.

SECTION 53. That the charges in the "Table of Monthly Charges, (Recycling-Only Service, Outside of the Central Business District)" added to Subsection (c)(4) of Section 18-9, "Specifying Charges for Sanitation Service," of Article I, "Collection and Disposal" of Chapter 18, "Municipal Solid Wastes," of the Dallas City Code, as indicated in Section 18 of this ordinance, shall take effect on January 1, 2016.

SECTION 54. That all parts of Section 18 of this ordinance not specifically referenced in Sections 52 and 53 of this ordinance, and all other amendments not specifically referenced in

**29879**                    **151787**

Sections 51 through 53 of this ordinance shall take effect on October 1, 2015, and it is accordingly so ordained.


APPROVED AS TO FORM:

WARREN M. S. ERNST, City Attorney

By _Alen Young_

    Assistant City Attorney

Passed _____ SEP 2 2 2015 _____

1 5 1 7 8 7



## PROOF OF PUBLICATION – LEGAL ADVERTISING

The legal advertisement required for the noted ordinance was published in the Dallas Morning News, the official newspaper of the city, as required by law, and the Dallas City Charter, Chapter XVIII, Section 7.

DATE ADOPTED BY CITY COUNCIL ___SEP 2 2 2015___

ORDINANCE NUMBER ___2 9 8 7 9___

DATE PUBLISHED ___SEP 2 6 2015___

ATTESTED BY:

OFFICE OF CITY SECRETARY
P:\PROOF OF PUBLICATION.docx

# Alpha Express Services

## Professional Office & Legal
**On-Call Document Courier**
**PO Box-Mail Service**
**Package Delivery**
**Airport Transportation**

## Suppliers & Manufacturers
**On-Call Customer Delivery**
**City & Regional Services**
**Site to Site Transport**
**Route Delivery Schedules**
**Airport Transportation**

## Equipment & Small Parcel
**On-Call Courier**
**Scheduled Delivery**
**Light Freight**
**FedEx & PDX Service**
**Same Day Delivery**

# Rush, On-Call, Scheduled Services

# 503-888-7410

**M-Su 8am-8pm**



# Alpha Express
Logistics, Inc.

## Courier - Transport - Delivery

**Professional**

**Efficient**   **Service to:**

**Fast**

Seattle Metro

North Coast          Vancouver

PDX          Gresham

Hillsboro   **Portland Metro**

Forest Grove   Beaverton   Oregon City

Tigard/Tualatin          Wilsonville

Newberg          Salem

McMinnville   Eugene   Bend

Medford

## Rush, Scheduled and On-Call Services



503-888-7410

M-Su 8am-8pm

## www.alphaexpresslogistics.com

City of Dallas
c/o Mark Baggett
Assistant City Attorney
1500 S. Marilla, 7BN
Dallas, Texas 75201

Energy Future Holdings Corp. Claims
Processing Center
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd.
Beaverton, OR  97005

Alpha Express Logistics, Inc.
503-888-7410
PO Box 91336, Portland OR 97291
www.alphaexpresslogistics.com

**Invoice**

D2210T

| | |
|---|---|
| **SOLD TO** City of Dallas — Mark Baggett | **SHIP TO** Epiq Bankruptcy Solutions |
| **ADDRESS** | **ADDRESS** 10300 SW Allen Blvd |
| **CITY, STATE, ZIP** | **CITY, STATE, ZIP** Bvtn 97005 |

| CUSTOMER ORDER NO. | | SOLD BY | TERMS | F.O.B. | DATE |
|---|---|---|---|---|---|
| | | 11 | Billed | Fav | 11/12/13 |

| ORDERED | SHIPPED | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|---|
| n/a | 130 pm   V | EMAILED DOCS | | | |
| | | | | | |
| | | | **RECEIVED** | | |
| Del | | V Sara Club | NOV 1 2 2015 | | |
| | | Sara Club | LEGAL SERVICES | | |
| | | | | | |
| | | Alpha Express Logistics, Inc. | | | |
| | | 503-888-7410 | | | |
| | | PO Box 91336, Portland OR 97291 | | | |
| | | www.alphaexpresslogistics.com | | | |

A-5840 T-46706/46721

01-11