Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                    :    Chapter 11

6    ENERGY FUTURE HOLDINGS         :

     CORP., et al.,                 :    Case No. 14-10979(CSS)

7                                    :

             Debtors.               :    (Jointly Administered)

8    _____ :

9

10

11

12

13                               United States Bankruptcy Court

14                               824 North Market Street

15                               Wilmington, Delaware

16

17                               August 26, 2016

18                               12:38 PM - 1:46 PM

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCEHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECR OPERATOR:  LESLIE MURIN

1    Notice of Filing Third Amended Joint Plan of Reorganization

2    of Energy Future Holdings Corp., et al., Pursuant to Chapter

3    11 of the Bankruptcy Code [D.I. 9199; filed August 5th,

4    2016] (as may be further modified, amended, or supplemented,

5    the "Plan")

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3        Attorney for the Debtors

4

5   BY:  MARK MCKANE, ESQ.

6        MARC KIESELSTEIN, ESQ.

7        CHAD HUSNICK, ESQ.

8

9   POTTER ANDERSON CARROON LLP

10        Attorney for Deutsche Bank New York

11

12   BY:  R. STEPHEN MCNEILL, ESQ.

13

14   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

15        Attorneys for the Ad Hoc Committee of TCEH First Lien

16        Creditors

17

18   BY:  JACOB A. ADLERSTEIN, ESQ.

19        MOSES SILVERMAN, ESQ.

20

21   YOUNG CONAWAY STARGATT & TAYLOR, LLP

22        Attorney for the Ad Hoc Committee of TCEH First Lien

23        Creditors

24

25   BY:  PAULINE K. MORGAN, ESQ.

Page 4

1   NIXON PEABODY

2       Attorneys for AST as EFH Indenture Trustee

3

4   BY:  RICHARD PEDONE, ESQ.

5

6   MCELROY DEUTSCH MULVANEY & CARPENTER LLP

7       Attorney for TCEH Debtors - Conflict counsel

8

9   BY:  DAVID A. PRIMACK, ESQ.

10

11  MORRIS JAMES

12      Attorney for Law Debenture

13

14  BY:  STEPHEN MILLER, ESQ.

15

16  PROSKAUER ROSE

17      Attorneys for EFH Corp.

18

19  BY:  MICHAEL FIRESTEIN, ESQ.

20

21  CROSS & SIMON, LLP

22      Attorneys for EFH Indenture Trustee

23

24  BY:  CHRISTOPHER SIMON, ESQ.

25

```
 1   BIELLI & KLAUDER

 2         Attorneys for EFH Corp.

 3

 4   BY:  CORY STEPHENSON, ESQ.

 5

 6   CHADBOURNE & PARKE

 7         Attorneys for NextEra Energy

 8

 9   BY:  ERIC DAUCHER, ESQ.

10

11   POTTER ANDERSON CARROON LLP

12         Attorney for Deutsche Bank New York

13

14   BY:  JEREMY W. RYAN, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  All rise.

 3              THE COURT:  Please be seated.

 4              Good afternoon, Mr. McKane.

 5              MR. MCKANE:  Good afternoon, Your Honor.  Mark

 6    McKane of Kirkland & Ellis on behalf of the debtors, for the

 7    record.

 8              Your Honor, we have a comprehensive trial record

 9    that's been signed off on by all of the objectors.  May I

10    approach?

11              THE COURT:  Yes.

12         (Pause)

13              THE COURT:  Somebody worked very hard on this.

14              MR. MCKANE:  A number of people did, Your Honor.

15    Yes.

16              THE COURT:  Okay.  All right.  Thank you.  The

17    Court will keep this as part of the record.

18              All right.  Thank you all for coming.  And as I

19    said at the last time that we were together is the Court's

20    ready to give its ruling in connection with confirmation of

21    the plan for the T-Side debtors, EFH Corporate Services and,

22    of course, EFH Properties, although not a debtor.

23              And I want to reiterate what I said before on the

24    record today about the Court's appreciation and thanks for

25    the professionalism of all the parties and really the
```

Page 7

1    excellent job done by the people in court and outside of

2    court to present a very efficient and complete record and

3    series of arguments before the Court.  I won't say you made

4    my job easy, but you certainly made my job easier and I

5    appreciate that.

6              So I won't bury the lead like I often do.  And

7    I'll just start with my ruling and then take some time to go

8    through the facts and the legal issues.  I could spend hours

9    going through this.  I don't think -- I'm not going to.  I

10   don't think that's particularly helpful.  I'm relying on the

11   record, of course, and I'm going to basically point out

12   highlights of my understanding of the important and salient

13   factors that lead to the Court's conclusion.

14             So I am going to overrule all of the remaining

15   objections to confirmation and I am prepared to confirm the

16   -- I think we're on third amended plan, okay, of

17   reorganization for the T-Side debtors, subject, of course,

18   to agreement on a confirmation order.  And I know I received

19   earlier today the notice of filing of amended confirmation

20   order and I have reviewed the blackline, but I don't know if

21   there are any open issues.

22             All right.  So here we go.  I think we have to

23   look at confirmation of this plan of reorganization for the

24   T-Side debtors in the context of the entire history of the

25   case, including the prepetition efforts which really go back

Page 8

1    to 2012 and ultimately led to the filing in April of 2014,

2    the initial RSA, the various litigation regarding the RSA,

3    the termination of the RSA, the beginning of the Encore

4    sales process, the institution of the disinterested

5    directors in November of 2014, all of the Legacy discovery

6    that went on in 2013 -- 2014 and 2015, the briefing on

7    various issues in the spring of 2015, ultimately leading to

8    the mediation in the summer of 2015 which, in combination

9    with the T-Unsecured ovation/Hunt plan that was put together

10   in the summer and early fall of 2015, the PSA which I think

11   is critical to an understanding of where we are today in the

12   fall of 2015, obviously, Plan A which went through

13   confirmation in December of last year, the various, vigorous

14   efforts that were made to attain the regulatory approvals in

15   2016 which ultimately proved both successful and

16   unsuccessful and the pivot to Plan B and all the

17   negotiations around that.

18         Meanwhile going all the way back two years the --

19   dealing with the elephant in the room in the case which was

20   the potential for a massive tax liability had the tax issues

21   related to these estates, decoupling these estates that led

22   to the private letter ruling in the summer of 2016, and

23   we'll talk a lot about that a little bit later.

24         And throughout this the various parties have

25   negotiated vigorously.  There have been a number of issues

1    that have arisen that there are some themes that are very

2    relevant for today.  One of the themes that carries through

3    this case from the very beginning is the issue of tax and

4    the potential for a multi-billion dollar tax liability

5    resulting from a spinoff or a decoupling of the estates or

6    even a reorganization of the estates.

7          And, also, a vigorous position from the T-First

8    lenders which was articulated in, beginning in May 2014 and

9    has continued to be their position which is one for a desire

10   for speed, to reorganize as quickly as possible and, also, a

11   position from day one of the case that they were just fine

12   with a taxable spin because they felt the tax liability

13   would be, in all likelihood, stranded at EFH Corp and sort

14   of not be their problem.

15         I feel that a lot of the sort of push of the

16   objectors' case, once we need to ignore all of that backdrop

17   and think about the case as if it started in February of

18   this year fresh with no background, no backdrop of parties'

19   positions from the beginning of the case and developments in

20   the case.  And I don't think that's appropriate.  I don't

21   think it would be appropriate for management to think about

22   that -- think about the case in that way.  I don't think it

23   would be appropriate for the directors to think about the

24   case in that way, and I don't think it's appropriate for me

25   as the judge to think about the case in that way.

1            And when I decide an evidentiary matter I

2      certainly decide it based on the evidence in front of the

3      court at the time, but I also am not required to, nor would

4      it be helpful for the Court to ignore everything it knows

5      about a case coming in and about the negotiations in the

6      case coming in.  I'm not required to nor encouraged to by

7      the case law to leave my common sense or experience at the

8      door and come in with a blank slate.

9            So the Court takes consideration and knowledge of

10     the cases its developed in making all of its decisions,

11     including its decision in -- its decisions in connection

12     with confirmation of this plan.  And I think that's an

13     important perspective on figuring out where to go today,

14     August 26th, 2016 and making a decision on confirmation of

15     this plan.  We really have to draw on my experience

16     throughout the case in making my findings.

17           The -- just a couple of highlights on that.  So

18     the position of the T-Firsts I think has been vigorous and

19     steadfast from the beginning of the case that they desired a

20     quick reorganization.  Well, they haven't gotten that.  And

21     they were very serious about pursuing a taxable spin if that

22     was in their best interest.

23           I think that the history of the case as well as

24     the specific evidence in front of the Court today make it

25     clear to me that the first liens are very serious about

1    pursuant a taxable spin if the plan in front of the Court is

2    not confirmed.  I'm convinced, based on my experience in the

3    case and the facts specific to the plan that the possibility

4    of a taxable spin is not a remote possibility at all.

5    Indeed, I think it's a probable result were the plan in

6    front of the Court not to be confirmed, and I do not believe

7    that such a plan is in such a way is patently unconfirmable.

8              While it certainly would generate a tremendous

9    amount of litigation, I've signaled in previous comments

10   from the bench and I would signal them today, that the Court

11   wouldn't necessarily hold up confirming a taxable spin at T

12   simply because it generates a stranded tax at the E-Side.

13   We have to take the facts where they are and as they are and

14   the liabilities fall where they may.

15             So I think a taxable spin is quite possible, if

16   not probable, and is certainly not patently un-confirmable

17   notwithstanding the litigation that might ensue in following

18   through with such a transaction.

19             And that finding is based on specific evidence in

20   the record for the hearing.  It's based on the debtors'

21   management and director, disinterested directors' experience

22   in their direct negotiations and their perception of the

23   reality of the T-Side -- of the T-First position, and it's

24   something they've kept sight of and considered as they go

25   forward and something the Court considers.

1           I'm going to jump around a little.  I apologize.

2    I'll do my best not to.  I'm working off an outline and not

3    a written script.

4        (Pause)

5           So that's a critical point; that the T's are very

6    serious about at taxable spin and that's been the core, I

7    believe, throughout the case.  And they negotiated for this,

8    what we have in front of us today last year when they

9    negotiated the PSA.  And the PSA that was approved last fall

10   clearly contemplated pivoting to a Plan B that would result

11   in a tax free spin along the lines of what we have in front

12   of the Court.  I think it's important in looking at the

13   facts of this case that when the debtors started to pivot to

14   Plan B and considered and opened discussions in late January

15   or early February throughout the spring nothing had changed

16   between when the PSA was approved, the plan was confirmed

17   that had a T-Side tax free spin.  The IRS continued to be in

18   discussion over the PLR.

19          However, they had not yet come out with a

20   tentatively adverse ruling or any other indication, at least

21   not in the record, that would change the tax universe as it

22   existed at that time.

23          And, indeed, I think debtors' management had,

24   perhaps, gained some leverage throughout 2015 and 2016 as

25   unfortunately losses continued to accumulate at TCEH which

1    created an increase in NOLs, but also decreased the

2    enterprise value of T.  So we were getting to a situation

3    where if we are in a universe where the debtors are asking

4    for a ruling based on value, not cancelation of debt income

5    where the gap that would create a tax liability and a

6    taxable spin continues to diminish.  And this was put on the

7    record a couple of times for the Court and sort of updates,

8    but it -- the reality was, you know, the threat, the

9    Armageddon that would result from a taxable spin wasn't

10   necessarily looking like it would be the catastrophe that

11   perhaps we had considered it possible that it would be.

12          Critical to the issues in front of this Court is

13   the universe changes at the end of May and two things

14   happen.  One, tax Armageddon raises its head full force

15   again that, no, the IRS is going to treat a taxable spin

16   based on cancelation of debt income that would consume all

17   of the NOLs that existed and still leave a sufficient gap to

18   generate a six and a half billion dollar tax at EFH Corp as

19   the taxpayer, a six and a half billion dollar administrative

20   liability that would render EFH Corp massively

21   administratively insolvent.

22          The good news, if you could call it that -- so

23   back up a second.  So that created, I think, for the TCEH

24   first lien lenders even more leverage than they've had and

25   sort of back up their position that, you know, if you're

1   going to make us do a tax free spin we need to be sweetheart

2   talked into it and, oh, by the way, your alternative just

3   got a heck of a lot worse, so you need to be even nicer to

4   us to convince us to do this because your downside if we

5   don't do it has gotten a lot worse.

6          All right.  So what good happens.  Well, the good

7   that happens is that the NOLs, it appears, will no longer go

8   into a black hole.  So if there are any NOLs left after the

9   tax free spin, they will be available for EFH Corp that EFH

10  Corp can then use to offset taxes on future income either on

11  a standalone basis or after some sort of reorganization.

12  Now there are all sorts of limitations that go with the use

13  of NOLs and you just don't plug them in.  And there are

14  complications involved with that.

15         But that created for the first time a situation

16  where, wait a minute, the NOLs sitting at EFH Corp as the

17  taxpayer might have value.  They don't go into the black

18  hole.  Should EFH Corp be compensated in some way for the

19  use of those NOLs to the advantage of the T-First lien

20  lenders.  So the universe changes.

21         The evidence on that is, I believe, very clear

22  that that did -- created sort of two things:  One, based on

23  the CODI ruling it actually acted as -- to take away

24  leverage from management and to take away leverage from the

25  disinterested directors in their negotiations with the first

1    lien lenders because the downside, the tax liability risk of

2    a taxable transaction was much worse than people had thought

3    it would be.

4           It also created an opportunity to try to extract

5    additional value from the T-First lien lenders to compensate

6    for the NOLs.  And that's important when I say additional

7    value because we're going to go through the gives and the

8    gets in a little bit.  But there was and continues to be

9    significant consideration flowing to EFH Corp. as part of

10   this integrated transaction that compensates EFH Corp at

11   least in part or as part of the transaction for the use of

12   those or the consumption of those NOLs.

13          The question became in late May and early June,

14   was there any ability to go back to the first lien lenders

15   and extract additional consideration, however that might be.

16   And the evidence is -- and I want to get into some detail on

17   this.  The evidence is that both Mr. Keglevic and the

18   disinterested directors through Proskauer tried.

19          Mr. Keglevic testified that he went back and had a

20   conversation with a gentleman -- I forget his name, I'm

21   sorry -- at Apollo who was one of the T-First lien lenders

22   on the committee that was -- of the ad hoc committee and

23   tried to open negotiations.  And his testimony was, I guess

24   that was the nicest way for the TCEH first lien lenders to

25   say consideration for the NOLs was a non-starter, and let

1    you know the E had no basis for asking that and the TCEH

2    first lien creditors were done discussing it.

3              Similarly, Ms. Williamson testified, then we

4    learned that the NOLs might be more valuable and that is

5    when we instructed Proskauer to go back.  There was no sense

6    in going back again before then because we had been turned

7    down in our previous discussions and negotiations with the

8    T-First creditors.

9              And then Ms. Dore testified, I remember a

10   conference call with Proskauer in which they were going to

11   ask the first liens to compensate EFH for the NOLs.  And so

12   they reported to us that they -- that Mark Thomas had spoken

13   to Alan Kornberg and that his request for compensation had

14   been rejected, and so they were coming to us to say that

15   they were trying to come up with alternative tax structures

16   that would potentially provide a lower step up in basis to

17   the T-Side which would preserve more value for the E-Side

18   and ultimately those attempts to have those discussions

19   between Proskauer and Paul Weiss were rebuffed by the first

20   liens as well.

21              So there was an attempt to go back and negotiate

22   more consideration.  It didn't go very far, and why?

23   Because EFH Corp, its disinterested directors, the

24   management of EFH Corp had no leverage.  They had nothing to

25   hold over the heads of the T-Side lenders to force any kind

1   of movement because, in fact, their leverage was work

2   because the downside had become more massive and more

3   probable of occurring.  And I think Ms. Williams said --

4   well, let me back up for a second.

5          At the heart here I think is a disagreement

6   between the objectors, management -- the objectors on one

7   side and management and the disinterested directors and

8   their advisors on the other.  And the objectors take the

9   position that the disinterested directors and management

10  should have thrown down the gauntlet I think was the phrase

11  and threatened to blow up the entire deal unless there was

12  an agreement to provide additional consideration for the use

13  of the NOLs.

14         And I don't think that stance was required by the

15  law.  Indeed, I think that it would have been reckless on

16  the part of management and the disinterested directors, and

17  to the extent it's being requested of me -- and Mr. Glenn

18  sort of touched on this in oral argument at the closing, I

19  am declining the invitation to be that reckless with this

20  estate.

21         As Ms. Williamson put it, and I thought she put it

22  well, it would be like pointing an empty gun at someone and

23  threatening them.  There was just -- there were no bullets

24  in the gun.  There was no leverage to enforce additional

25  consideration.  And at the same time the consideration that

1   was already being given which was avoiding the potential tax

2   liability at EFH had actually gotten more valuable because

3   the potential for that liability had become worse because

4   the amount had become more massive, and as a result the harm

5   had become more massive which makes considerations of

6   likelihood, you know, a lower likelihood results in the same

7   result if the liability is more massive.  So there was just

8   no leverage.

9           And that's really, you know, at the heart of what

10  we've been talking about for the last two weeks.  Should the

11  directors, should management have done more or did they do

12  enough in the context of the facts of the case.  And I think

13  that the facts here overwhelmingly support a conclusion that

14  they tried, that they didn't have any leverage and as a

15  result they didn't get anywhere on that negotiation.

16          So where does this leave us?  This left us in the

17  summer of this year, June and July, with the serious

18  negotiations.  The disinterested directors are extremely

19  active.  The boards are extremely active.  Management is

20  extremely active.  A series of negotiations occur including,

21  importantly, on the ancillary documents.

22          And here I think the tax matters agreement is --

23  was extremely important.  And the you break it, you own it

24  provision that was ultimately agreed to on the eve of trial

25  I think was a critical decision that provided a tremendous

1    amount of value ultimately to EFH Corp in limiting the

2    potential liability that might arise anyway if this thing

3    somehow falls apart through no fault of the debtors'

4    estates.

5            So that's kind of the background.  I want to talk

6    a little bit about the gives and the gets as it's described,

7    and I think they're important because when the Court looks

8    at this transaction and issues are raised about corporate

9    governance, whether it was a reasonable exercise of the

10   debtors' business judgment to approve these transaction,

11   whether entire fairness somehow applies and if it's met,

12   whether there's a fraudulent conveyance going on, I think

13   it's important that we keep knowledge of the various

14   benefits and costs associated with the transaction as an

15   integrated whole and specifically focusing on EFH Corp and

16   also TCEH.

17           So -- and we're going to spend some time with this

18   as Mr. McKane had us do, and I compared -- importantly I

19   compared the demonstratives at closing, Mr. McKane's

20   demonstrative and Mr. Pedone's demonstrative on the gives

21   and the gets, and I think that Mr. McKane's more fulsomely

22   and fairly discusses the record and that there were big

23   empty spots in Mr. Pedone's demonstrative that I don't think

24   fairly set forth, you know, the gives and the gets.

25           So from the T-Side, you know, the benefits, well,

1    we get the tax free spin.  Clearly a benefit.  And that

2    provides TCEH first liens with an incremental step up of

3    basis worth approximately 430 million over the taxable step

4    up.

5             Now the ultimate step up is worth 1.2 billion, but

6    the question is -- because there's going to be one of two

7    things, right?  We're either going to have a tax free spin

8    or a taxable spin.  And if we do a taxable spin they're

9    going to get basis step up.  And if we do a tax free spin

10   they're going to get a basis step up.  And they get a bigger

11   basis step up in a tax free spin.  So the incremental value

12   is 430 million.  And, of course, the benefit is speed for

13   the T-Sides.  They get out of this case.  They get to

14   reorganize this business.  They get to go forward.

15            At the same time they're taking a lot -- T-Side,

16   the TCEH first lien lenders/reorganized TCEH which will be

17   owned by the first lien lenders are taking on a number of

18   costs and risks.  They are taking on dash six liability

19   which would include a busted spin.

20            Under the tax matters agreement they're unable to

21   share that liability if it exists with the E-Side.

22   Reorganized TCEH is prohibited from engaging in certain

23   types of M&A activity or selling its assets for two years,

24   prohibited from instituting certain types of stock

25   repurchase agreements programs for two years, taking on 50

1    percent of the 14 to $20 million of AMT liability that's

2    being allocated to them under TMA.

3              There's a risk that if they do a dividend recap,

4    which might be a nice thing to do given the low leverage

5    that's going to exist at the reorganized TCEH level that

6    that might be taxable.  We talked about the you break it,

7    you own it provision.  Ordinary course tax liabilities under

8    the TMA.  That would include the gross margin tax at Texas,

9    audit risks associated with the busted 351, and of course

10   the assumption of the contingent liabilities associated with

11   corporate services and the risk that EFH Properties is cash

12   flow negative for the remainder of the lease.

13             Let's flip it over and look at what the gives and

14   gets are for EFH Corp.  First, foremost, all caps, bold,

15   they avoid a potentially taxable T-Side transaction with

16   devastating consequences, $26 billion plus of taxable gain

17   which wipes out all of the groups' NOLs and all of its cash,

18   a stranded administrative tax liability of six and a half

19   billion which makes that case hopelessly administratively

20   insolvent, protracted litigation over the tax separation,

21   which even if it was successful in stopping that taxable

22   separation would nonetheless result in months of delay and

23   the costs of tens of millions of dollars of professional

24   fees.

25             EFH Corp has the ability to pursue and close the

1    NextEra merger or something along those lines.  The spinoff

2    of TCEH is an express condition to that merger, whether that

3    E-Side merger will be confirmed or not, of course, is

4    another issue for a later date and continues to be something

5    the parties will negotiate and litigate, and I saw there

6    were some objections filed about that.  So we'll be back at

7    it on September 19th.

8            The tax free spin preserves 1.2 billion of NOLs

9    with an NPV of approximately 300 million -- 380 million for

10   reorganized EFH Corp.  The TMA avoids quite a bit of risk

11   for the E-Side.  E-Side -- EFH Corp receives 14 million of

12   EFH Properties' cash.  EFH Corp Services and Properties'

13   equity contributions increase the marketability of Encore

14   and the other E-Side assets because the evidence is that the

15   parties that have been involved in those negotiations don't

16   want those entities to remain.

17           And we avoid -- or EFH Corp avoids a potential

18   cost at EFH Corporate Services associated with severance.

19   And that cost actually nets out at zero, right, because what

20   would happen is EFH Corp Services would be administratively

21   insolvent.  So unless there's some liability at EFH Corp

22   under some of the employment agreements, which may be true,

23   EFH Corp isn't necessarily avoiding a liability, but it's

24   certainly no worse off.  Let's put it that way.

25           So what are the costs and risks?  Well, obviously

1    we're losing almost $6 billion in NOLs that would otherwise

2    be available for EFH Corp that are being consumed under the

3    tax free spin.  There's 50 percent of the 14 to 20 million

4    AMT liability that goes to EFH.  There are some liability

5    risks under the TMA for no fault breaches, et cetera, and

6    there are restrictions on taxable M&A activity.

7            But when you balance out the gives and the gets in

8    connection with the integrated transaction, I believe -- and

9    we'll talk about the law in just a minute.  But I believe

10   that not only is this the best available transaction for the

11   EFH Corp creditors, it's a really remarkably good result for

12   the EFH Corporate creditors.

13           And they are certainly not unimpaired.  It looks

14   like they will definitely be impaired.  Hopefully more value

15   flows, but we'll have to see as events continue to evolve.

16   But certainly as we talked today with the NextEra

17   transaction on the table as it is today those EFH Corp

18   creditors are impaired.  But they're getting a recovery.

19   And there's cash, unencumbered cash.  There may be other

20   consideration that flows to those creditors and the

21   alternative is they get absolutely nothing in a hopelessly

22   insolvent estate.

23           So I believe that at the end of the day this is

24   the best possible deal for all the estates, but in

25   particular for relevance here certainly for EFH Corp.

1           All right.  A couple cleanup points before I turn

2    to the law.

3           Yeah.  So like I said just backing up and I may be

4    repeating myself a little bit.  Again, this complaint that

5    more wasn't done to throw down the gauntlet and bet the

6    entire reorganization in a game of chicken with the first

7    liens to extract additional value for the NOLs I don't think

8    was required by the law, and we'll talk about that in a

9    minute.  I think it would have been reckless on the facts of

10   this case.  And the Court declines to play that game of

11   chicken as well.

12          There was something I would take issue with in

13   oral argument that I think Mr. Glenn said; that basically

14   the debtors' management, the directors, the disinterested

15   directors, the DDAs were bullied by the first lien lenders.

16   I think the facts of this case, both on this specific issue

17   and based on other things that have happened in this case,

18   clearly would not support anything along those lines.

19          And I'm -- you know, advocates are advocates, but

20   I really think that comment was out of line.  Nobody's

21   bullied this management team.  Nobody's bullied these

22   professionals, and nobody's bullied these disinterested

23   directors.  And I challenge anyone in this room to bully Ms.

24   Williamson.

25       (Laughter)

1           All right.  Good luck with that.  It's just not

2      happening.  It's just inconsistent with the record.  And I

3      don't think I've been bullied by the first lien lenders.  I

4      think Mr. Kornberg would probably in private and maybe even

5      in public complain bitterly about --

6           (Laughter)

7           -- his treatment at times by the Court and the

8      delay that his clients have had to live with based on

9      various rulings this Court has made throughout the case.

10     You know -- well, I'll leave it at that.  Okay.

11          So let's turn to the legal issues and we'll start

12     with corporate governance.

13          The corporate governance standard really when

14     we're talking about I think we need to sort of separate out,

15     are we talking about the plan or are we talking about the

16     363 type transactions contemplated by the plan because there

17     are protections built into 1129 of the Code that deal with

18     confirmation that make to a certain extent sort of state law

19     corporate fiduciary law somewhat irrelevant.

20          So what are the protections of a creditor in a

21     confirmation situation?  Those protections are built into

22     1129.  We've got the best interest creditors' test.  Okay.

23     We have the cram down provisions.  We have court

24     supervision.  So to say that the fiduciaries did or didn't

25     make transactions -- decisions to confirm a plan and that

1    entire fairness should apply to look at a plan, I'm not sure

2    that holds together, certainly not in the context of the

3    plan.

4              However, EFH Corp isn't a party to this plan.

5    Well, they are.  They're part of the plan, but they're not

6    being confirmed under this confirmation order.  This isn't a

7    reorganization of EFH Corp.  And assets of EFH Corp are

8    being used as part of the TCEH reorganization:  NOLs, EFH

9    Corporate Services, EFH Properties.

10             So those transactions, the use of that property

11   even though it's not part -- being done as part of a

12   reorganization of EFH Corp, I think does make the issue of

13   corporate governance relevant for purposes of the Court's

14   consideration of what is occurring here.

15             So what standard applies in looking at this

16   transaction from the standpoint of EFH Corp and the EFH

17   directors, specifically the disinterested directors, the EFH

18   board, and EFH management?

19             I believe and find that the business judgment

20   standard applies here because there was no inter-debtor

21   conflict between EFH Corp and TCEH.  Now we are talking

22   about the TCEH reorganization, but we have to look, I think,

23   practically speaking at who was on the other side of the

24   table.  And it wasn't Mr. Sawyer.  It was the ad hoc

25   committee of first lien T-Side lenders.  That's who was

1    being negotiated with; that's who the adversary was.  That

2    doesn't create an inter-debtor conflict.  That's a conflict

3    between a T-Side creditor and the EFH Corp estate.

4             However, even if there was a conflict I think

5    it's important that the disinterested directors at EFH Corp

6    treated all matters in front of the Court today as if they

7    were conflict matters so there is no harm that would flow or

8    no practical effect that flows from the fact that there may

9    have been a conflict.  If there was a conflict we would be

10   exactly where we are today.  The disinterested directors

11   would have called a conflict and made the decision.

12            They looked at this from an independent

13   standpoint, non-conflicted and approved it as if it were a

14   conflict matter.  So it's six of one, half a dozen the

15   other.  And I think again the business judgment standard

16   would apply.

17            But even if the Court were to find that that's not

18   enough, that somehow heightened scrutiny applies, maybe even

19   entire fairness applies, I find that the record clearly

20   establishes that the integrated transaction before the Court

21   is entirely fair with regard to EFH Corp's estate.

22            Talking a little bit about the duty of care, this

23   was raised at the beginning of the trial and in the briefs

24   and appears to have sort of fallen off as the record

25   developed over the trial to not be an issue necessarily

1    today or still being pressed, but just to be clear.  I think

2    that both the broader board and the disinterested directors

3    clearly and overwhelmingly satisfied their obligation under

4    the duty of care.  I don't know what more you could

5    reasonably ask of a board of directors or disinterested

6    directors than what occurred with regard to care.  I

7    understand the disagreement about whether or not to push the

8    negotiations harder.

9            Again, I find that there was no leverage to push

10   any harder than was pushed, but from a care perspective

11   which really drops away from that decision and whether the

12   directors took care in understanding the transaction and

13   reaching -- transactions, reaching their agree -- their

14   decisions based on an understanding, clearly the duty of

15   care was satisfied.

16           Talk a little bit about fraudulent conveyance

17   theories, and this is really a major part of the argument of

18   the objectors.

19           Hang on.

20       (Pause)

21           I'm going to back up a sec.  I skipped something.

22   Never mind.  No, I didn't.  I apologize.  Again, I'm working

23   off an outline.  I apologize.

24           Fraudulent conveyance.  Okay.  First, Texas

25   fraudulent conveyance law as it applies to the transactions

1    contemplated by the plan, inapplicable and unnecessary.  A

2    fraudulent conveyance law looks at prepetition out of court

3    transactions taken by a debtor prior to bankruptcy that may

4    have harmed creditors.

5         Post-petition through a 363 sale or a plan of

6    reorganization or some combination thereof, we're talking

7    court-approved transactions on full notice to creditors with

8    an opportunity to be heard, comment and object to it.  The

9    whole purpose behind fraudulent conveyance law doesn't

10   apply.  You actually have a court hearing evidence, making a

11   decision about whether to approve or not approve a

12   transaction.

13        If one were to challenge this decision in the

14   future as a fraudulent conveyance I don't think as a

15   practical matter you would find a court that would be

16   willing to make a ruling that a court-approved transaction,

17   subject to appeal, decision, et cetera somehow constituted a

18   fraudulent conveyance.

19        I think that as a technical point as well, forget

20   about sort of the point of the whole law to begin with, but

21   if we look at the law I agree with the Centennial Textiles

22   case, 227 BR 606, and the Metro Cosmetic case, 125 BR 556

23   that found that fraudulent conveyance law challenging post-

24   petition transactions based on fraudulent conveyance

25   theories was inapplicable.  You look at unauthorized post-

1    petition transfers under 559.  559? Yeah, well, I never

2    quote the numbers right so I'll just say unauthorized post-

3    petition transfers.

4         (Laughter)

5              I actually wrote on this in the context of a

6    preference question which is, you know, why don't we have

7    post-petition preference analysis.  Well, we don't need it,

8    right, because we have unauthorized post-petition

9    transactions can be challenged.  But otherwise the debtor is

10   allowed to operate in the ordinary course of business and do

11   transactions, or outside the ordinary course of business

12   with court approval.  You simply don't need a preference

13   analysis on a post-petition basis just like you don't need a

14   fraudulent conveyance analysis on a post-petition basis.

15             However, let's assume the fraudulent transfer law

16   applies here.  When viewing the entire integrated

17   transaction, which I think is the appropriate way to look at

18   this, EFH Corp is receiving reasonably equivalent value in

19   this deal.  And let me make some specific points on that.

20             EFH Properties and EFH Corporate Services have

21   zero or negative value to EFH Corp.  The equity value of

22   Services of $13 million that Dr. Williams -- Professor

23   Williams testified to is just one side of the equation.

24   And, importantly, I think it may have even been the last

25   question on cross or redirect -- no, it was cross.  Mr. --

1    Professor Williams testified he was not testifying as to

2    what reasonably equivalent value is.

3              So even if Services and Properties have some

4    positive value to reorganize TCEH, okay, which is unclear to

5    me, but let's assume that there's positive value in

6    Properties and Services to EFH -- excuse me -- to TCEH,

7    transferring an asset that is worthless or has negative

8    value to the transferor, but has positive value to the

9    transferee is not a fraudulent conveyance because there's no

10   harm to the transferor or its creditors or its equity

11   holders.

12             And that's exactly what we have here.

13   Importantly, there is no scenario under the facts of this

14   case where EFH Corporate Services stays on the E-Side of the

15   ledger and continues as a going concern.  We have a binary

16   set of circumstances here.  Stays at the E-Side and is

17   liquidated in which case it has either negative or no value

18   to EFH Corp, or it's transferred for nothing and has a value

19   to TCEH, but in neither instance EFH Corp, vis-à-vis its

20   ownership interest in EFH Corporate Services has either no

21   or negative liability.  There's just no harm here.  Negative

22   liability if it -- possibly negative liability if Services

23   remains.

24             Properties, you know, the evidence on Properties

25   is it's worth -- it's break even at best -- well, it's break

1    even or marginally profitable at best.  Maybe it stays at

2    EFH Corp, but, again, the Encore deal says, no.  You need to

3    spin that off.  So we -- again, we have a binary situation

4    here, what happens to Properties.

5              Marginal if at best value of EFH Properties to EFH

6    Corp being exchanged for not nothing, $14 million of money

7    goes up.  14 million?  $14 million of money goes up to EFH

8    Corp as part of that transaction.  So, again, you actually

9    have a net benefit to the transferor of Properties.

10              Anyway, another point.  Elimination of risk of tax

11   liability at EFH Corp that would render EFH Corp hopelessly

12   administratively insolvent is a huge identifiable value to

13   EFH Corp.  As I said before, the Court believes that there

14   is a probability that the T-Firsts would pursue a taxable

15   transaction in the alternative and there is a significant

16   risk that that transaction would be approved, which would

17   give rise to (a) a tremendous amount of litigation expense

18   and (b) a massive tax.

19              Third point.  The risk of tax Armageddon is not

20   equally divided between EFH Corp and TCEH.  There was a lot

21   of time spent on this in the briefs, the post-trial briefs.

22   There's no question EFH Corp would be administratively

23   insolvent with a -- with this tax liability.  I think

24   there's a substantial question as to whether TCEH would

25   ultimately be jointly and severally liable for that tax.  We

1    would have to litigate the check the box, unclear what

2    effect that would have, certainly less than a hundred

3    percent sure TCEH would be liable.  So there's a difference

4    there.

5            And even if liable, the effect on creditors at

6    TCEH of this tax is substantially less than the effect on

7    the EFH creditors because the TCEH creditors are secured and

8    their recovery would be senior to even an administrative tax

9    claim.  So it's not equally weighted as argued in the

10   briefs.

11           Almost done.

12           There was an argument made that there was

13   insufficient evidence to support a good faith finding in

14   connection with the transactions in the plan.  I disagree.

15   I think that, again, the evidence clearly establishes that

16   all the parties including the TCEH first lien lenders were

17   operating in good faith and at arm's length.

18           The final objections were sort of kind of catch

19   all objections that I haven't discussed so far.

20           With regard to regulatory approvals most have been

21   obtained, specifically the PLR and the NRC approval, and the

22   others are reasonably likely to be obtained.  Hopefully I'm

23   right this time.

24       (Laughter)

25           But regulatory approvals didn't -- the need to get

1    regulatory approvals post-confirmation pre-effective date

2    did not render a case un-confirmable and are indeed often

3    the case.

4            The feasibility, I think the evidence

5    overwhelmingly indicates this would be a massively

6    deleveraged company to say the least.  And even though it is

7    in a challenging industry to say the least, the evidence of

8    Mr. Ying clearly supports that the plan is feasible.

9            I find that the use of the EFH group NOLs, the EFH

10   Corporate Service contribution and the Properties'

11   contribution do not constitute a sub rosa plan.  It is a

12   post-petition use of property of EFH Corp., part of an

13   integrated transaction that provides value to EFH Corp and

14   as a result there's no sub rosa or reorganization going on.

15   It's simply a use of assets and we do this all the time.

16           This idea that multiple confirmation orders on a

17   joint plan of reorganization has already actually been dealt

18   with, I think, previously in the case.  But to the extent

19   it's still extant, that's not a impediment to this case and,

20   indeed, there have been cases including, oh my goodness,

21   General Growth Properties where a number of confirmation

22   orders have been entered off of the same plan.  And I don't

23   know if I would have -- if it was my reorganization I think

24   I would have done two plans.  But nobody's paying me to

25   think in this case.

1          (Laughter)

2              And certainly not objectionable to do it the way

3      the debtors have chosen to do it.  And I'm sure there's

4      stuff I don't understand that's behind that decision.

5              Notice here was sufficient, I believe.  Certainly,

6      this has been a fluid process this summer.  However, I

7      believe that the Court has approved the process previously,

8      continues to stand by it and that the parties in interest

9      received sufficient notice of what was going on and an

10     ability to react to that notice and participate in a

11     vigorous manner.

12             So my memory of the objectors that are left is

13     American Stock Transfer as indenture trustee, Contrarian,

14     Ms. -- the Fenicle, Fehy & Jones.  I've spent all this time

15     talking about their objections.  So to be specific they're

16     overruled.

17             In addition, we had the objection of Joanna

18     Robinson.  That's overruled.

19             I guess sort of an objection of Mr. Stewart.  I

20     think I've already dealt with that, but to the extent I

21     haven't that's overruled.

22             Forgetting all the objections, looking at the

23     facts of the case as a whole and dealing with 1129, based on

24     the facts before the Court all of the 1129 standards are

25     satisfied and the evidence clearly supports confirming the

1    plan of reorganization.

2             That's the end of my ruling.  Does anybody have

3    any questions?  No?  Okay.

4             We have a confirmation order that I received

5    earlier today.  I don't know if there are issues with that

6    or not.

7             MR. HUSNICK:  Your Honor, it's Chad Husnick from

8    Kirkland & Ellis on behalf of the debtors.

9             Your Honor, we did file the order last -- we filed

10   it at the beginning of the confirmation hearing.  I think it

11   was the day before it started, the original draft and then

12   we've periodically updated it.  I think we filed the latest

13   version late last night.

14            I understand that Mr. Pedone has a few objections

15   to the order, although I'm somewhat optimistic that Your

16   Honor's ruling resolved a few of them.  But let me -- if I

17   may, there were some comments that we received this morning

18   and I have an interlineated draft that has -- it doesn't

19   touch on the provisions that Mr. Pedone raised with one

20   exception.  Mr. Pedone was objecting to the immediately

21   effective language in the plan, and we agree we don't need

22   that finding right now.  So we've agreed to take that out.

23            If I can approach I'll walk you through those

24   changes.

25            THE COURT:  Okay.

1            That latter point you just touched on was actually

2    my primary comment as well, so.

3            MR. HUSNICK:  Thank you, Your Honor.

4            So what you're looking at here on the redline, I

5    gave you a clean which is marked original and then the

6    redline which has some -- is what we filed last night.  And

7    I'll focus, unless Your Honor has any questions about the

8    redline itself, I'll focus on the interlineations.

9            THE COURT:  I don't.

10            MR. HUSNICK:  So the first interlineation is in

11    paragraph 109.

12            Your Honor, this is the provision.  There's a

13    series of these provisions that relate to --

14            THE COURT:  Can you give me a page number?

15            MR. HUSNICK:  I'm sorry.  Page 61.

16            THE COURT:  Okay.  This is a series of provisions

17    in the order that relate to payment of the professional fees

18    under the settlement agreement.  And in effect what's

19    happening, as Your Honor knows, based on the ruling -- on

20    the letter exchange between the fee review committee and the

21    TCEH ad hoc group that the fees are going to be subject to

22    the fee review committee.  But subsequently once the

23    distributions are out, of course the liens, charging liens

24    would apply in the ordinary fashion.

25            So all this is basically this change, what we're

1    interlineating here was meant to sync up to paragraph 122

2    which is the operative paragraph about the TCEH cash

3    payments and how deductions are made from that payment.

4              THE COURT:  Okay.

5              MR. HUSNICK:   Paragraph 110, right below that,

6    Your Honor, is cutting the immediately effective language

7    and the waiver of the automatic stay of the order.

8              THE COURT:  Okay.

9              MR. HUSNICK:  Your Honor, that takes me to

10   paragraph 122 on page 66.

11             Here, Your Honor, we add at the end, "upon entry

12   of the Bankruptcy Court order approving the pending

13   settlement agreement fees," that is the operative provision

14   that then pulls back in the fact that the fee review

15   committee will be reviewing these fees and the order has

16   jurisdiction over that.

17             THE COURT:  Okay.

18             MR. HUSNICK:  And then lastly on the next page

19   it's very similar, but just saying "order of the Bankruptcy

20   Court" instead of such ruling.

21             THE COURT:  Right.

22             MR. HUSNICK:  Your Honor, with that what I would

23   say is Mr. Pedone raised to me before the hearing two

24   particular issues.  It probably makes most sense for me to

25   reply to Mr. Pedone's arguments because I'm not sure how

1    many of them remain extant in light of the ruling.

2              THE COURT:  Okay.

3              MR. HUSNICK:  Thank you.

4              THE COURT:  Mr. Pedone.

5              MR. PEDONE:  Your Honor, as you know things have

6    been going pretty quickly and --

7              THE COURT:  Sure.

8              MR. PEDONE:  -- we received this last night at

9    midnight.  What I would ask first is to have until Monday

10   morning to give final comments on a form of order in case

11   we've missed anything.

12             THE COURT:  Okay.

13             MR. PEDONE:  The one issue, the 6004 relief, was

14   something that Mr. Husnick had told me that was taken out,

15   but, in fact, was described as extraneous still in there

16   and, frankly, I need a little more time to figure out what

17   else is extraneous here.  But I'll touch on the points that

18   I'm aware of right now.

19             Your Honor, I don't believe you made a particular

20   finding on 363(m) in connection with your ruling, and yet

21   there's one that is still in the order and that is an

22   important issue to us.

23             THE COURT:  I meant to, so I am.  I'm making a

24   363(m) finding in favor of the debtors.

25             MR. PEDONE:  Okay.  Thank you.

1          And then, Your Honor, the other point that I'm

2     aware of at this time is paragraph 72 and 132 contain

3     language with regard to EFH Corp assuming and assigning

4     contracts.  No motion has been made in that regard.  I think

5     this may be able to be worked out, but we don't actually

6     have EFH Corp's plan here, and there's no separate motion,

7     and there was no language in the disclosure statement

8     describing that EFH Corp in connection with this process

9     would be moving to assume and assign under 365.

10          I may very well get past that, but that is an

11     important issue right now.

12          THE COURT:  Okay.

13          MR. PEDONE:  And those are the comments that I

14     have at this point.  And I would like until Monday morning

15     to provide any final --

16          THE COURT:  All right.

17          MR. PEDONE:  -- and try to work out -- work them

18     out over the weekend if we can.

19          THE COURT:  All right.

20          MR. PEDONE:  Thank you.

21          THE COURT:  Mr. Husnick, if you could -- I'll say

22     I think it's fair to give Mr. Pedone the -- some time to

23     digest the ruling, to digest his comments, and you can

24     certainly submit something under certification of counsel

25     early next week and I'll consider it.

1          MR. HUSNICK:  In light of the timing I -- and I'm

2    doing this without having talked to the TCEH first lien

3    lenders or my client, frankly, but I think we would be fine

4    waiting until Monday.  We would ask that they get us any

5    comments, if possible, over the weekend so that we can read

6    and respond to them.

7          In particular on 365(m) I know that we got a

8    request for, you know, where was this disclosed.  We filed

9    in the plan supplement specific disclosures of what was

10   assumed.  There are some minor contract --

11         THE COURT:  All right.  You said (m) so --

12         MR. HUSNICK:  I'm sorry.  365 --

13         THE COURT:  Okay.

14         MR. HUSNICK:  -- not (m).

15         THE COURT:  Okay.

16         MR. HUSNICK:  365 contract assumption --

17         THE COURT:  Right.

18         MR. HUSNICK:  -- and assignment.  We did file in

19   the plan supplement, we identified which contracts are going

20   over.  The plan is binding as the plan proponents on these

21   entities and we baked in the finding that these assignments

22   are sufficient.

23         I'm happy to talk to Mr. Pedone, but, frankly,

24   leaving these contracts behind is not going to be all that

25   helpful.  It relates -- one or two of them relate to the

1    employees that are still employees of EFH that will no

2    longer be employees of EFH after confirmation of the plan.

3            THE COURT:  All right.  Well, I'll let you work on

4    that and if it's -- it continues to take -- to be an issue,

5    you can identify it when you submit your order under cert

6    and I'll make a decision.

7            MR. PEDONE:  Thank you.  We may very well get an

8    agreement on the 365 issue --

9            THE COURT:  Okay.

10            MR. PEDONE:  -- without needing that.  Thank you.

11            MR. HUSNICK:  Thank you.

12            THE COURT:  You're welcome.

13            MR. HUSNICK:  And, Your Honor, I think -- I don't

14    think we have anything further.

15            THE COURT:  All right.  Well, again, subject to

16    getting an order under certification of counsel and I'll

17    resolve any disputes so you can identify them for me Monday

18    in the cert.  If you want to give alternative language or if

19    -- assuming there are some open issues, it sounds like there

20    probably won't be, I will decide those and I'll sign what I

21    think is an appropriate order resolving those disputes.

22            But I'll look forward to receiving a confirmation

23    order on Monday and I will sign it one way or the other,

24    although I may tweak it based on any outstanding issues.

25            MR. HUSNICK:  Thank you, Your Honor.

Page 43

1           THE COURT:  You're welcome.

2           Anything further for today?

3           MR. PEDONE:  No.  Thank you, Your Honor.

4           THE COURT:  You're welcome.  We are adjourned.

5       (Whereupon these proceedings were concluded at 1:46 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 44

1                           I N D E X

2

3                         R U L I N G S

4                                                    PAGE

5    Confirmation of the Third Amended Plan

6    of reorganization for T-Side debtors                7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 45

1                  C E R T I F I C A T I O N

2

3     I, Sherri L. Breach, certify that the foregoing transcript

4     is a true and accurate record of the proceedings.

5     Sonya                    Digitally signed by Sonya
                               Ledanski Hyde
                               DN: cn=Sonya Ledanski Hyde,
6     Ledanski Hyde            o=Veritext, ou,
                               email=digital@veritext.com, c=US
7     _____  Date: 2016.08.29 10:57:42 -04'00'

8     Sherri L. Breach

9     AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10

11

12

13

14

15

16    Date:  August 26, 2016

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501