**<u>EXHIBIT B</u>**

**Engagement Letter**

**EXECUTION COPY**

**DEUTSCHE BANK SECURITIES INC.**

60 Wall Street

New York, NY 10005

August 31, 2016

<u>**CONFIDENTIAL**</u>

Energy Future Intermediate Holding Company LLC
1601 Bryan St.
Dallas, Texas 75201

Attn:   Anthony R. Horton
        Senior Vice President and Treasurer

<u>Engagement Letter</u>

Ladies and Gentlemen:

You have advised Deutsche Bank Securities Inc. ("**DBSI**", "**us**" or "**we**") that Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("**you**" or the "**Company**") is seeking an amendment (the "**Amendment**") to the Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of June 19, 2014, by and among the Company, the lenders from time to time parties thereto (the "**Existing Lenders**") and Deutsche Bank AG New York Branch, as administrative agent and collateral agent (as amended, restated, extended, supplemented or otherwise modified prior to the date hereof, the "**Credit Agreement**") in order to (i) initially extend (the "**Extension**") the scheduled final maturity date of all of the Loans from December 19, 2016 to June 30, 2017, (ii) include the ability to further extend the scheduled final maturity date of all of the Loans from June 30, 2017 to December 30, 2017 subject to the fees set forth in paragraph 4 herein and other conditions to be mutually agreed and (iii) make other modifications to the Credit Agreement to be mutually agreed. In addition, the Company is seeking to increase the indebtedness outstanding under the Credit Agreement by up to $75.0 million (the "**Increase**"). Capitalized terms used but not defined herein are used with the meanings assigned to them in the Credit Agreement. As used herein, the term "**Transactions**" means, collectively, the negotiation and entering into of the Amendment, the arrangement and incurrence of the Increase, and all other related transactions, including the payment of reasonable and documented fees and expenses in connection therewith. The date on which the effectiveness of the Amendment and Increase occurs is referred to as the "**Closing Date**".

     We are pleased to confirm the arrangements under which DBSI is exclusively authorized by the Company to act as the sole lead arranger and sole lead bookrunner for the Amendment, the Extension and the Increase, on the terms and subject to the conditions set forth in this letter (the "**Engagement Letter**").

1.   <u>Titles and Roles</u>

     You hereby appoint DBSI to act, and DBSI hereby agrees to act, as the sole lead arranger and sole lead bookrunner for the Amendment, the Extension and the Increase (in such capacities, the "**Lead Arranger**"). In such capacities, the Lead Arranger agrees to use commercially reasonable efforts to (i) solicit the required consents under the Credit Agreement to effect the Amendment and the Extension (including replacing any non-Extending Lenders (as defined below) with Replacement Lenders (as defined below)) and (ii) obtain commitments from the Existing Lenders or from additional financial institutions and institutional lenders selected by the Lead Arranger and acceptable to you (such additional

lenders, the "**Increase Lenders**") to provide the Increase. The Company acknowledges and agrees that this Engagement Letter is not a commitment by us or our affiliates to provide any financing or provide or purchase any loans in connection with the Amendment, the Extension or the Increase or to backstop the proposed Amendment or Increase, nor does this Engagement Letter constitute an express or implied guarantee with respect to the outcome of the Amendment or the Extension, and no assurance can be given that the Amendment or the Extension will be successful.

You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation will be paid to any such other person in connection with the Amendment and the Increase, unless you and DBSI shall so agree.

2.   Syndication

The Lead Arranger intends to approach the existing Lenders, the Increase Lenders and other possible replacement lenders (all such lenders, collectively, the "**Lenders**") acceptable to you regarding the Amendment, the Extension and the Increase promptly upon the execution of this Engagement Letter. You agree, following the date hereof, to use your commercially reasonable efforts to assist the Lead Arranger in arranging the Amendment, the Extension and the Increase. Such commercially reasonable efforts to assist shall include (A) your using your commercially reasonable efforts to cause direct contact between your senior management and advisors and the Lenders at mutually agreed times, (B) your preparing and providing to the Lead Arranger all customary information with respect to you and such of your subsidiaries as are subject to proceedings under Title 11 of the United States Code (the "**Bankruptcy Code**") (such subsidiaries, together with you, the "**Debtors**"), including all financial information and Projections (as defined below), as the Lead Arranger may reasonably request in connection with the arrangement of the Amendment, the Extension and the Increase and your assistance in the preparation of customary marketing materials to be used in connection with the arrangement of the Amendment, the Extension and the Increase (all such information and materials, "**Information Materials**") and (C) the hosting, with the Lead Arranger, of one or more meetings (which may be telephonic) of Lenders at reasonable times and locations to be mutually agreed. For the avoidance of doubt, you will not be required to provide any information to the extent that the provision thereof would violate any attorney-client privilege (as reasonably determined by your counsel), law, rule or regulation, or any obligation of confidentiality binding on you, the other Debtors or your or their respective affiliates (provided that if you do not provide information in reliance on the forgoing exclusions, you shall use commercially reasonable efforts to promptly notify the Lead Arranger that such information is being withheld).

Subject to the foregoing, the Lead Arranger will manage, with your consent, all aspects of the arrangement of the Amendment, the Extension and the Increase, including decisions as to when the Lenders will be approached, selection of institutions acceptable to you that will (i) replace the Existing Lenders that do not consent to the Amendment, if any, or (ii) provide the Increase, when commitments from such institutions will be accepted and the allocation of the commitments among such additional (or increasing) financial institutions. You hereby acknowledge and agree that the Lead Arranger will not be subject to any fiduciary or other implied duties.

At the request of the Lead Arranger, you agree, at the reasonable request of the Lead Arranger, to use commercially reasonable efforts to assist in the preparation of a public version of each Information Material (a "**Public Version**") consisting exclusively of information with respect to you and your affiliates that is either publicly available or does not contain material non-public information (within the meaning of United States federal securities laws) with respect to you and your subsidiaries, or any of your or their respective securities for purposes of United States federal and state securities laws (such

information, "**Non-MNPI**", and any information that is not Non-MNPI is referred to as "**MNPI**"). Such Public Versions, together with any other information prepared by you or your subsidiaries or your representatives and conspicuously marked "**Public**" (collectively, the "**Public Information**"), which at a minimum means that the word "**Public**" will appear prominently on the first page of any such information, may be distributed by us to Lenders and prospective Lenders who have advised us that they wish to receive only Non-MNPI ("**Public Side Lenders**"), and you shall be deemed to have authorized the Public Side Lenders to treat such Public Versions and such marked information as containing Non-MNPI.   You agree that, unless expressly identified as Public Information, each document to be disseminated by us to any Lender in connection with the Transactions will be deemed to contain MNPI. Notwithstanding the foregoing, you acknowledge and agree that, in addition to Public Information and unless you promptly notify us otherwise after being provided a reasonable amount of time to review such documentation provided by us, (a) the final definitive documentation with respect to the Amendment, (b) administrative materials prepared by the Lead Arranger for Lenders and prospective Lenders (such as a lender meeting invitation, allocation and funding and closing memoranda), (c) the court order approving the Amendment, the Extension and the Increase (the "**Court Order**") and (d) notifications of changes in the terms of the Amendment may be distributed to Public Side Lenders.

In connection with our distribution to Lenders and prospective Lenders of any Information Material, you will execute and deliver to us a customary authorization letter authorizing such distribution and, in the case of any Public Version thereof, representing that it contains only Non-MNPI. Each Information Material will be accompanied by a disclaimer exculpating you and us (in each case, including our respective affiliates) with respect to any use thereof.

3.   Information

You hereby represent and warrant that (a) all written information concerning you or any of your subsidiaries or the Transactions (including all Information Materials), other than the Projections (including estimates included in the Projections), forward looking information and information of a general economic or industry specific nature (the "**Information**"), that has been or will be made available to us by you or any of your representatives in connection with the Transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto) and (b) the financial and/or business projections and other forward-looking information (the "**Projections**") that have been or will be made available to us by you or any of your representatives in connection with the Transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time delivered (it being recognized by the Lead Arranger that such Projections are as to future events and are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurances are given that any particular Projections will be realized, that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and that such differences may be material). You agree that if, at any time prior to the Closing Date, you become aware that any of the representations in the preceding sentence is incorrect in any material respect then you will promptly supplement the Information and the Projections so that such representations and warranties, as supplemented, are correct in all material respects under those circumstances. You understand that in providing our services pursuant to this Engagement Letter we may use and rely on the Information and Projections without independent verification thereof.   Notwithstanding anything to the contrary in this Engagement Letter, except to the extent requested by the Lead Arranger, you will not be obligated to supplement such Information or the Projections to reflect changes in commodity prices, market heat rates, interest rates, regulatory issues of

general applicability, general market conditions or similar assumptions relating to, or impacting, the Debtors' businesses.

4.  Fees

In consideration for our execution and delivery of this Engagement Letter and in consideration for providing the services described herein, you agree to pay (or cause to be paid) to DBSI (a) a non-refundable arrangement fee (the "**Extension Arrangement Fee**") equal to ▇▇% of the aggregate principal amount of the Loans held immediately prior to the Closing Date by Lenders that agree to the Extension (such Lenders being the "**Extending Lenders**"), (b) a non-refundable arrangement fee (the "**Non-Extending Lender Arrangement Fee**") equal to ▇▇% of the aggregate principal amount of the Loans, if any, held immediately prior to the Closing Date by non-Extending Lenders for which replacement Lenders (including any Extending Lender which agrees to increase the aggregate principal amount of extended Loans held by it) are identified and obtained in connection with the Amendment and Extension (such replacement Lenders being the "**Replacement Lenders**") and (c) a non-refundable arrangement fee (the "**Increase Arrangement Fee**" and, together with the Extension Arrangement Fee and Non-Extending Lender Arrangement Fee, the "**Fees**") equal to ▇▇% of the aggregate principal amount of the Increase provided to the Company on the Closing Date. All Fees shall be payable in full on, and subject to the occurrence of, the Closing Date.

It is expected that in connection with the Amendment and Extension that each Extending Lender and Replacement Lender shall receive (a) an extension fee equal to ▇▇% of the aggregate principal amount of Loans held by such Extending Lender and Replacement Lender (which may, for any Replacement Lender, at the Company's option, be paid in whole or in part as original issue discount), as the case may be, and (b) an additional extension fee equal to ▇▇% of the aggregate principal amount of Loans held by such Extending Lender and Replacement Lender, as the case may be, if an additional 6-month extension is required.  As consideration for the lenders providing the Increase, you agree to pay to the Lead Arranger, for the ratable account of such lenders, a non-refundable upfront fee in an amount to be agreed but not to exceed ▇▇% of the aggregate principal amount of the Increase provided to the Company on the Closing Date, such fee to be due and payable on, and subject to the occurrence of, the Closing Date (but only to the extent necessary to place such loans or commitments at market pricing in syndication).

The Fees will be payable in U.S. dollars, in immediately available funds, to the Lead Arranger, for its own account or as directed by it, without deduction for any sales, use or similar taxes and will not be subject to reduction by way of setoff or counterclaim. Once paid, no portion of any such fee will be refundable under any circumstances. Your obligation to pay any fees set forth herein or to cause any such fees to be paid shall be joint and several with any other party having such an obligation. You agree that we may, in our sole discretion, share all or any portion of any fee payable hereunder to any of us with any of our affiliates or any other Lender.

It is understood that such payments will also be subject to the entry of an order of the Bankruptcy Court authorizing the Debtors to perform their obligations under this Engagement Letter and to pay the fees and expenses set forth or referred to herein.

5.  Indemnification and Expenses

You agree (a) to indemnify and hold harmless the Lead Arranger, its affiliates and controlling persons and its and their respective directors, officers, employees, partners, advisors, agents and other representatives (each, an "**indemnified person**") from and against any and all losses incurred, claims, damages, liabilities and expenses (in each case, other than any anticipated and unrealized profits) to

4

which any such indemnified person may become subject arising out of, resulting from or in connection with this Engagement Letter, the Amendment, the Increase, the use of the proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "**Proceeding**") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person promptly following written demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses (x) to the extent they are found by a final non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of such indemnified person or its affiliates, directors, officers, employees, advisors, agents or other representatives (collectively, the "**Related Parties**"), (y) to the extent arising from any dispute solely among indemnified persons other than any claims against the Lead Arranger in its capacity or in fulfilling its role as Lead Arranger or any similar role under the Amendment or the Increase and other than any claims arising out of any act or omission on the part of you or the other Debtors, and (z) to the extent they are found by a final non-appealable judgment of a court of competent jurisdiction to arise from any material breach of this Engagement Letter by such indemnified person (or its Related Parties) and (b) to reimburse within 30 days of written demand (together with reasonably detailed supporting documentation) (or, if earlier, on the Closing Date to the extent invoiced prior thereto) the Lead Arranger and its affiliates for all reasonable and documented out-of-pocket expenses that have been invoiced prior to such time or following termination or expiration of the commitments hereunder (including reasonable and documented out-of-pocket due diligence expenses, syndication expenses, travel expenses, reasonable fees and reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel, and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)) incurred in connection with the Amendment, the Increase, this Engagement Letter, or the administration, amendment, modification or waiver thereof. It is further agreed that the Lead Arranger shall only have liability to you (as opposed to any other person) arising out of the Transactions. No indemnified person or party hereto shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of such person (or any of its Related Parties); provided that nothing in this sentence shall limit your indemnification and reimbursement obligations set forth herein to the extent any such damages are incurred or paid by an indemnified person to a third party unaffiliated with the Lead Arranger with respect to which the applicable indemnified person is entitled to indemnification or reimbursement pursuant to this Section. None of the indemnified persons, you, your affiliates and the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Engagement Letter, the Amendment, the Increase or the Transactions; provided that nothing in this sentence shall limit your indemnification and reimbursement obligations set forth herein to the extent any such indirect, special, punitive or consequential damages are included in any third party claim with respect to which the applicable indemnified person is entitled to indemnification or reimbursement pursuant to this Section.

6. Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that the Lead Arranger (or an affiliate thereof) is a full service securities firm and such person may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, or your affiliates (subject, in each case, to the terms and conditions of any other applicable agreements in

5

effect between you and us (or our affiliates) applicable to the Transactions, which other applicable agreements remain in full force and effect in accordance with their terms).

You also acknowledge that the Lead Arranger and its affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Lead Arranger or any of its affiliates is intended to be or has been created in respect of any of the transactions contemplated by this Engagement Letter, irrespective of whether the Lead Arranger has advised or is advising you on other matters, (b) the Lead Arranger, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Lead Arranger, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Engagement Letter, (d) you have been advised that the Lead Arranger is engaged in a broad range of transactions that may involve interests that differ from your interests and that the Lead Arranger has no obligation to disclose such interests and transactions to you (provided, however, that we will be subject to the provisions applicable to us set forth in the preceding paragraph), (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) the Lead Arranger has been, is and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) the Lead Arranger has no obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by the Lead Arranger and you or any such affiliate.

In addition, please note that the Lead Arranger does not provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, the Company (and each employee, representative or other agent of the Company) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Amendment and the Increase and all materials of any kind (including opinions or other tax analyses) that are provided to the Company relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure will remain subject to the confidentiality provisions hereof (and the foregoing sentence will not apply) to the extent reasonably necessary to enable the parties hereto, their respective affiliates, and their respective affiliates' directors and employees to comply with applicable securities laws. For this purpose, "tax treatment" means U.S. federal or state income tax treatment, and "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the transactions contemplated by this Engagement Letter, but does not include information relating to the identity of the parties hereto or any of their respective affiliates.

7.  Confidentiality

This Engagement Letter is delivered to you on the understanding that neither this Engagement Letter, nor any of its terms or substance, shall be disclosed by you, directly or indirectly, to any other person except (a) at your election, to your officers, directors, employees, affiliates, attorneys and accountants, on a confidential and "need to know" basis, (b) as may be required in (or necessary in connection with) any legal, judicial or administrative proceeding (including, without limitation, as may be required to obtain court approval in connection with any acts or obligations to be taken pursuant to this Engagement Letter or the transactions contemplated hereby (in which case you agree to inform us in writing promptly thereof) and further that you may disclose this Engagement Letter to the official committee of unsecured creditors appointed in any of the Debtors' bankruptcy cases (collectively, the "**Creditors' Committee**") and its advisors and to any other official committee appointed in any of the

Debtors' bankruptcy cases (together with the Creditors' Committee, the "**Committees**"), so long as the disclosure of this Engagement Letter to the Committees, any other official committee and their respective advisors is on a confidential "professionals only" basis), to the Office of the United States Trustee, and as otherwise required by applicable law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us in writing promptly in advance thereof and it being understood and agreed that you shall take such reasonable actions as shall be necessary to prevent this Engagement Letter from becoming publicly available (it being acknowledged such actions may not be successful)), (c) this Engagement Letter but not the Fees, other than as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings may be disclosed in any syndication or other marketing material in connection with the Amendment or the Increase or in connection with any public filing requirement, and (d) in connection with any remedy or enforcement of any right under this Engagement Letter. Notwithstanding anything to the contrary in the foregoing, (i) you shall be permitted to file this Engagement Letter with the Bankruptcy Court under seal and provide an unredacted copy of this Engagement Letter to the Bankruptcy Court, the Office of the United States Trustee and the advisors to the Committees so long as the disclosure to such advisors to the Committees is on a confidential "professionals only" basis and (ii) you may disclose (and you may file with the Bankruptcy Court) the fees and expenses payable under this Engagement Letter on an aggregate basis with the other fees and expenses payable by you in connection with the Transactions (including legal, professional and advisory and other out of pocket fees and expenses).

The Lead Arranger shall use all confidential information received by it in connection with the Transactions and the related transactions solely for the purposes of providing the services that are the subject of this Engagement Letter and shall treat confidentially all such information; provided, however, that nothing herein shall prevent the Lead Arranger from disclosing any such information (a) to rating agencies (provided that as to rating agencies, we will disclose information acting only through you and with your prior agreement), (b) to any Lenders or participants or prospective Lenders or participants that agree in writing, for the benefit of the Company, to keep such information confidential on terms reasonably acceptable to the Company or substantially similar to the terms set forth herein (including pursuant to customary "click through" or similar electronic agreements), (c) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case the Lead Arranger shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over the Lead Arranger or any of its affiliates, (e) to the Lead Arranger's affiliates and the Lead Arranger's and its affiliates' respective employees, officers, directors, legal counsel, independent auditors, professionals and other experts or agents (collectively, "**Representatives**") on a "need to know" basis (provided that any such Representative or affiliate, is advised of its obligation to retain such information as confidential, and the Lead Arranger shall be responsible for its Representatives' and affiliates' compliance with this paragraph), in each such case solely in connection with the Transactions, (f) to the extent any such information becomes publicly available other than by reason of disclosure by the Lead Arranger's affiliates or Representatives in breach of this Engagement Letter, and (g) to the extent such information is independently developed by the Lead Arranger, its affiliates or its Representatives so long as not based on information obtained in a manner that would otherwise violate this provision; provided that the disclosure of any such information to any Lender or prospective Lender or participant or prospective participant referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of the Lead Arranger or customary market standards for dissemination of such type of information. The obligations of the Lead Arranger under this paragraph shall remain in effect until the earlier of (i) two years from the date hereof and (ii) the Closing Date, at which point any confidentiality undertaking in the Amendment and Credit Agreement (as amended by the Amendment) shall supersede the provisions of this paragraph.

8.  Miscellaneous

This Engagement Letter shall not be assignable by you without the prior written consent of the Lead Arranger (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein. The Lead Arranger reserves the right to employ the services of its affiliates (other than certain units of affiliates (such units, "**Trading Affiliates**") providing any commodities, hedge or derivatives trading or brokerage activities conducted, advised, agented or brokered by us or our respective affiliates) in providing services contemplated hereby and to allocate, in whole or in part, to its affiliates (other than Trading Affiliates) certain fees payable to the Lead Arranger in such manner as the Lead Arranger and its affiliates (other than Trading Affiliates) may agree in its sole discretion. This Engagement Letter may not be amended or waived except by an instrument in writing signed by you and the Lead Arranger. The Lead Arranger's engagement hereunder may be terminated by the Company in writing at any time.

This Engagement Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Engagement Letter by facsimile or electronic transmission (e.g., "**pdf**" or "**tif**") shall be effective as delivery of an original executed counterpart hereof. This Engagement Letter is the only agreement that has been entered into among us and you with respect to the Transactions and sets forth the entire understanding of the parties with respect thereto.

This Engagement Letter shall be governed by, and construed and interpreted in accordance with, the law of the State of New York. Each of the parties hereto agrees that as of the date hereof, this Engagement Letter is the only agreement that has been entered into among us and you with respect to the Transactions and sets forth the entire understanding of the parties with respect thereto.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court and, to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Engagement Letter or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive (to the extent permitted by applicable law) any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive (to the extent permitted by applicable law) trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Engagement Letter or the performance of services hereunder or thereunder.

The Lead Arranger hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**PATRIOT Act**"), it and each Lender may be required to obtain, verify and record information that identifies each Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow the Lead Arranger or such Lender to identify each Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Lead Arranger and each Lender.

The indemnification, fee, expense, jurisdiction, waiver of jury trial, service of process, venue, governing law, sharing of information, no agency or fiduciary duty and your confidentiality provisions contained herein shall remain in full force and effect regardless of whether definitive documentation for the Amendment shall be executed and delivered and notwithstanding the termination of this Engagement Letter or the commitments hereunder; provided that your obligations under this Engagement Letter (other than your obligations with respect to (a) Sections 2, 3 and 4 hereof and (b) confidentiality of this Engagement Letter and the contents hereof and thereof subject to Section 7 hereof) shall automatically terminate and be superseded by the provisions of the Amendment and the Credit Agreement (as amended by the Amendment) upon the Closing Date, and you shall automatically be released from all liability in connection therewith at such time, in each case to the extent the Amendment or Credit Agreement (as amended by the Amendment) have comparable provisions with comparable coverage.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Engagement Letter by returning to us executed counterparts of this Engagement Letter on or before the close of business on September 2, 2016.  If not signed and returned as described in the preceding sentence by such date, this offer will terminate on such date. In the event that (a) the Company shall not have filed a motion with the Bankruptcy Court in form and substance reasonably satisfactory to DBSI, for the entry of the Court Order on or prior to September 2, 2016, (b) the Bankruptcy Court shall not have entered the Court Order (in form and substance reasonably satisfactory to DBSI (it being agreed and understood that the form of Court Order attached hereto as Exhibit A is reasonably satisfactory to DBSI), on or prior to 45 days after the filing of the motion referenced in clause (a) above (or 60 days after such filing if the Bankruptcy Court has not entered the Court Order by such 45th day after use of commercially reasonable efforts by the Company to obtain such Court Order by such 45th day), (c) the Court Order shall have been amended, supplemented, waived or otherwise modified in a manner that is, in the aggregate, materially adverse to the interests of DBSI unless DBSI consents in writing, (d) after the date hereof but prior to the entry of the Court Order, the Company shall have knowingly and actively solicited commitments for an alternative financing that would be provided in lieu of the Transaction, (e) the bankruptcy case with respect to the Company is converted to a proceeding under Chapter 7 of the Bankruptcy Code or (f) a trustee or examiner with enlarged powers (having powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) is appointed with respect to the Company and substantially all of its respective properties, then this Engagement Letter shall automatically terminate upon the occurrence of such event unless we shall, in our sole discretion, agree to an extension.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

We are pleased to have been given the opportunity to assist you in connection with this matter.

Very truly yours,

**DEUTSCHE BANK SECURITIES INC.**

By: _____

Name: Craig Molson
Title: Managing Director

By: _____

Name:
Title:

Ian Dorrington
Managing Director

Accepted and agreed to as of the date first written above:

**ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC**

By: _____

    Name:  Anthony R. Horton
    Title:   Senior Vice President & Treasurer

**EXHIBIT A**

**COURT ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER (A) AUTHORIZING THE EFIH
DEBTORS TO ENTER INTO A FIRST AMENDMENT TO THE EFIH
DEBTOR-IN-POSSESSION CREDIT AGREEMENT (B) AUTHORIZING
ENTRY INTO AN ENGAGEMENT LETTER, (C) AUTHORIZING PAYMENT OF
RELATED FEES AND EXPENSES, (D) AUTHORIZING THE USE OF CASH
COLLATERAL, AND (E) MODIFYING THE AUTOMATIC STAY**

Upon the motion (the "Motion")[2] of the Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance Inc. (together with EFIH, the "Borrower"), each as a debtor and debtor-in-possession (collectively, the "EFIH Debtors") for entry of an order (this "Order") pursuant to sections 105, 361, 362, 363, 364, 502, 506, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 3012, 4001, 6003, 6004, and 9014, and Local Bankruptcy Rules 2002, 4001, and 9014: (a) authorizing the EFIH Debtors to enter into the proposed amendment to the EFIH First Lien DIP Credit Agreement, (b) authorizing entry into the related engagement letter (c) authorizing the EFIH Debtors to pay any fees, premiums, and expenses incurred in connection with the foregoing and transactions related thereto, (d) authorizing the use of cash

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

collateral, and (e) modifying the automatic stay; all as more fully set forth in the Motion and the McMullan Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the EFIH Debtors' estates, their creditors, and other parties in interest, and that the EFIH Debtors' obligations under the Engagement Letter and the Amendment are actual, necessary costs and expenses of preserving the estates; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion, the McMullan Declaration, and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND:[3]

A.    Good cause has been shown for the entry of this Order.

B.    The Amendment and Engagement Letter fees are fair, reasonable, and appropriate under the circumstances.

C.    The Amendment and Engagement Letter are fair and reasonable, reflects the EFIH Debtors' exercise of business judgment consistent with their fiduciary duties and is supported by reasonably equivalent value and fair consideration.

---

[3]   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

D.      The Amendment and Engagement Letter have been negotiated in good faith and at arm's length between the EFIH Debtors, the DIP Agent, and the EFIH First Lien DIP Lenders, and the EFIH Debtors' obligations and indebtedness arising under, in respect of or in connection with the Amendment shall be deemed to have been extended by the EFIH First Lien DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

Based upon the foregoing findings, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor; it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein on a final basis.

2.      Any and all objections to the Motion are hereby overruled in all respects.

3.      The Debtors' entry into (a) the Engagement Letter, in the form attached hereto as **Exhibit B** and (b) the Amendment in the form attached hereto as **Exhibit 1** to **Exhibit A**, is approved and the EFIH Debtors are authorized to use cash collateral, subject to the terms and conditions set forth in this Order.

4.      The EFIH Debtors are authorized to enter into the Amendment and the Engagement Letter and perform all obligations thereunder on the terms and conditions set forth therein, without notice, hearing, or further order of this Court when and to the extent they become due under the Amendment and Engagement Letter pursuant to sections 105(a) and 363 of the Bankruptcy Code.

5.      The Amendment is deemed to be a EFIH First Lien DIP Document (as defined in the Existing DIP Order) and the obligations of the EFIH Debtors under the Amendment are deemed to be EFIH First Lien DIP Obligations (as defined in the Existing DIP Order),

6.      The Existing DIP Order, entered on March 10, 2015 has become a final and non-appealable order.  The findings, terms, provisions, and protections set forth in the Existing

DIP Order, including, without limitation, any and all claims, liens and rights granted to the EFIH First Lien DIP Lenders therein remain fully in effect, are fully applicable to the Amendment and the Engagement Letter and are incorporated herein by reference as if fully set forth herein.

7.     The EFIH Debtors hereby are authorized to use the cash and cash equivalent proceeds of the collateral securing the EFIH Prepetition Secured Obligations (as defined in the EFIH First Lien DIP Credit Agreement) that constitute "cash collateral" within the meaning of section 363 of the Bankruptcy Code and other property in which the EFIH Prepetition Collateral Trustee and Prepetition Secured Notes Trustees (as defined in the EFIH First Lien DIP Credit Agreement) have an interest pursuant to sections 363(b) and 363(c) of the Bankruptcy Code in accordance with the terms and conditions of the Amendment and Engagement Letter, the EFIH First Lien DIP Credit Agreement and as set forth in this Order, *provided, however*, that use of cash or transfers of cash to any debtor other than the EFIH Debtors shall not be permitted, except to the extent permitted under the "first day" order authorizing the EFIH Debtors to, among other things, continue using their cash management system (the "Cash Management Order"), *provided further, however*, that the foregoing shall not restrict intercompany payments and other transfers of cash collateral in connection with any bankruptcy-related expenses of the EFIH Debtors (including payment of professionals' fees of the EFIH Debtors) to the extent that such payments or other transfers are approved by the Cash Management Order, including, but not limited to, pursuant to any Shared Services Agreement, Separation Agreement, or Tax Sharing Agreement (as defined in the EFIH First Lien DIP Credit Agreement).

8.     The EFIH Debtors are authorized to pay to the DIP Agent and the EFIH First Lien DIP Lenders the fees and expenses associated with the Amendment and Engagement Letter, including, without limitation, all fees and expenses incurred prior to the date of this Order, on the

terms and conditions set forth in the Amendment and Engagement Letter, without notice, hearing, or further order of this Court as, when and to the extend they become due and payable under the terms of the Amendment and Engagement Letter.

9.      The fees and expenses associated with the Amendment and Engagement Letter, to the extent payable under the Amendment, Engagement Letter, and this Order, are actual, necessary costs and expenses of preserving the EFIH Debtors' estates and shall be treated as allowed administrative priority claims against the EFIH Debtors under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.  Such fees, expenses, and indemnities shall not be discharged, modified, or otherwise affected by any chapter 11 Plan of the EFIH Debtors, dismissal of these chapter 11 cases, or conversion of these chapter 11 cases to chapter 7 cases, nor shall any of such amount be required to be disgorged.

10.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.     The EFIH Debtors are authorized to take all actions reasonably necessary or advisable to effectuate the relief granted in this Order in accordance with the Motion.

12.     This Court shall retain jurisdiction with respect to all matters arising from or related to the interpretation, implementation, and enforcement of this Order.

13.     The terms and provisions of this Order shall be binding in all respects upon all parties in these Cases, the EFIH Debtors, their estates, and all successors and assigns thereof, including any chapter 7 trustee or chapter 11 trustee appointed in any of these cases or after conversion of any of these cases to cases under chapter 7 of the Bankruptcy Code.

Wilmington, Delaware
Dated: _____, 2016

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE