**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
| *Debtors.* | ) | (Jointly Administered) |
| | ) | Related to D.I. No. 9200, 9201 |

**OBJECTION OF DELAWARE TRUST COMPANY TO
DISCLOSURE STATEMENT FOR THE THIRD AMENDED JOINT PLAN OF
REORGANIZATION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*,
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE
AS IT APPLIES TO THE EFH DEBTORS AND EFIH DEBTORS**

Pursuant to 11 U.S.C. § 1125 and the Order Scheduling Certain Hearing Dates

and Deadlines and Establishing Certain Protocols in Connection with the Confirmation of

Debtors' Joint Plan of Reorganization as it Relates to the EFH/EFIH Debtors dated

August 24, 2016 [D.I. 9381][1], Delaware Trust Company, as indenture and collateral

trustee ("Trustee") for the first-lien notes ("Notes") issued by Energy Future Intermediate

Holding Company LLC and EFIH Finance Inc. (together, "EFIH"), submits this

Objection to the proposed Disclosure Statement ("Disclosure Statement")[2] for the

Debtors' Third Amended Joint Plan of Reorganization As It Applies to the EFH Debtors

and EFIH Debtors (the "Plan")[3].  In support of this Objection, the Trustee states as

follows:

**Introduction**

1.      The Disclosure Statement does not provide "adequate information," 11

U.S.C. § 1125, with respect to the claims of the Trustee and the holders of the Notes (the

---

[1] Unless otherwise specified, references to docket entries refer to entries in the above-captioned bankruptcy case, No. 14-10979, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

[2] D.I. 9200, as it may be further amended and modified.

[3] D.I. 9199, as modified [D.I. 9321] and as it may be further amended and modified.

"Noteholders") in at least three critical respects. *First*, in some respects, the Disclosure Statement is simply inaccurate, stating in some places, for example, that the claims of the Trustee and the Noteholders are unimpaired, when in fact the Plan now provides that those claims are impaired. *Second*, the Disclosure Statement does not adequately disclose how the claims of the Trustee and Noteholders will be treated in several other respects, such as whether the holders of those claims will retain their liens after the Plan's effective date; whether any make-whole claims that may be allowed on appeal as unsecured claims will be allowed under the Plan; whether the Plan purports to impair the rights of the Trustee and the Noteholders with respect to the claims-allowance process, the pending appeals they are pursuing, or their subordination agreements with other creditors; and when and how any claims that are allowed will be paid. *Third*, the Disclosure Statement discloses the Debtors' position on various issues, *e.g.*, asserting that the Plan satisfies the requirements for confirmation and reserving the Debtors' rights to seek to dismiss the Trustee's pending make-whole appeal as "equitably moot" if the Plan is confirmed and goes effective, but (unlike the disclosure statement for the prior, confirmed plan) does not adequately inform creditors and parties in interest of the Trustee's position on those issues, or of how the Plan could affect them if the Trustee and the Noteholders prevail in the make-whole appeal.

2.      The Disclosure Statement needs to be amended to correct these deficiencies, so that creditors and other parties in interest can make an informed judgment about the Plan. The Trustee has provided EFIH's counsel with a proposed mark-up of the Disclosure Statement (and of the Plan) to address these deficiencies. A copy of that mark-up to the Disclosure Statement is attached as Exhibit A (the "Trustee Disclosure

2

Statement Mark-up"). The Trustee and its counsel stand ready to meet with the Debtors and their professionals in an effort to reach a mutually satisfactory resolution of the Trustee's objections to the Disclosure Statement.[4]

3.      The Trustee also objects to certain of the related relief requested in the Debtors' motion seeking approval of the Disclosure Statement and other relief [D.I. 9201] ("Disclosure Statement Motion") and proposed order thereto [D.I. 9201-2] ("Proposed Order"). *First*, although the Plan provides that the Trustee and Noteholders are not "Releasing Parties" under the Plan's non-debtor release provisions, the form of ballots the Debtors ask the Court to approve in the Proposed Order include provisions that purport to transform the Trustee and Noteholders into "Releasing Parties" unless they affirmatively opt out of the releases. *Second*, the Proposed Order would set a voting record date that is not consistent with the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"). *Third*, the solicitation procedures the Debtors ask the Court to approve would allow the claims of the Trustee and Noteholders in the amount of only $1.00 for voting purposes, which is impermissible under the Bankruptcy Code and Rules and at the very least misleading. Those provisions should likewise be corrected.

## Discussion

4.      The Bankruptcy Code requires that:

> [a]n acceptance or rejection of a plan may not be solicited after the commencement of a case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation,

---

[4] Because the only matter before the Court at this time is approval of the Disclosure Statement, not confirmation of the Plan, the Trustee will not address here any possible objections it and the Noteholders may have to confirmation of the Plan. The Trustee and the Noteholders reserve and do not waive any and all rights to assert any such objections at the appropriate time.

> there is transmitted to such holder the plan or a summary of
> the plan, and a written disclosure statement approved, after
> notice and a hearing, by the court as containing adequate
> information.

11 U.S.C. § 1125(b).  "Adequate Information" is "information of a kind, and in sufficient

detail, as far as is reasonably practicable in light of the nature and history of the debtor

that would enable a hypothetical reasonable investor typical of claims or interests in the

relevant class to make an informed judgment about the plan ... ." 11 U.S.C. § 1125(a)(1).

5.      Courts in this circuit have recognized that a disclosure statement

containing adequate information plays a pivotal role in the reorganization of a debtor.

*See, e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337

F.3d 314, 322 (3d Cir. 2003). "The importance of full disclosure is underlaid by the

reliance placed upon the disclosure statement by the creditors and the court." *Oneida

Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1998).  Any

disclosure statement must, therefore, contain "'sufficient financial and operating

information to enable each participant to make an "informed" judgment whether to

approve or reject the proposed plan.'"  *In re Civitella*, 15 B.R. 206, 208 (Bankr. E.D. Pa.

1981); *see also In re Autobacs Strauss, Inc.,* 473 B.R. 525, 584 (Bankr. D. Del. 2012)

(disclosure statement must contain information that is "reasonably practicable [to permit

an] informed judgment" by holders of claims or interests entitled to vote on the plan).

**A.      The Disclosure Statement Contains Inaccurate Statements Regarding
The Plan's Treatment Of The Trustee's and Noteholders' Claims.**

6.      In several instances, the Disclosure Statement does not accurately disclose

the actual terms of the Plan.  For example, while earlier-filed plans, including the plan

this Court confirmed last year, provided that the Trustee's and Noteholders' EFIH First

4

Lien Note Claims[5] were "unimpaired," the current Plan now provides that the EFIH First

Lien Note Claims are "impaired."  Plan Art. III.B.19.  Yet, the Disclosure Statement's

"summary of treatment of claims" in its "executive summary" incorrectly states that the

EFIH First Lien Note Claims are "unimpaired" and that the holders of those claims will

not have a right to vote on the Plan.  *See, e.g.*, Disclosure Statement at 22-23.

7.      Likewise, the Plan provides for the payment of the EFIH First Lien Note

Claims in full, in cash, if, when and to the extent they are allowed, whether by order of

this Court or on appeal, and whether that allowance occurs before or after the EFH

Effective Date.  *See* Plan Art. III.B.19.  The EFIH First Lien Note Claims include the

"make-whole" claims of the Trustee and the Noteholders.  Although this Court has

disallowed those claims, the Trustee and Noteholders have appealed that ruling, and that

appeal is currently pending in the Third Circuit, where oral argument is scheduled to be

heard on September 27, 2016.  The Plan provides that if such make-whole claims are

allowed by a final order as a result of that appeal—including after the EFH Effective

Date—the make-whole claims (and interest thereon) shall be allowed and paid in full in

cash.  *See* Plan Art. III.B.19, VI.A.  Yet, the Disclosure Statement states that "[t]he

Debtors disagree with [the] assertions" that "the Plan must provide for payment in full of

their respective Makewhole Claims as, and to the extent, such Claims are Allowed

(including after the Effective Date)."  *See* Disclosure Statement at 16.  That statement

makes no sense in light of the terms of the Plan.

8.      In addition, while the Plan provides that a condition to occurrence of the

EFH Effective Date is that "every Claim against any EFH Debtor or EFIH Debtor that is

---

[5] Capitalized Terms not defined herein shall have the meaning ascribed to them in the Plan.

a Makewhole Claim shall be a Disallowed Makewhole Claim," Plan Art. IX.D.10, the

Plan further provides that such condition "may be waived by the Plan Sponsor in its sole

and absolute discretion," Plan Art. IX.E.  But a section of the Disclosure Statement

addressing "Objections to Makewhole Claims" states that the "effectiveness of the Plan is

conditioned on every Claim against any EFH Debtor or EFIH Debtor that is a Makewhole

Claim being a Disallowed Makewhole Claim" and that "in order for the EFH Effective

Date to occur" Makewhole Claims against the EFIH Debtors must be disallowed.

Disclosure Statement at 15.  These statements do not disclose that, under the Plan, the

Plan Sponsor may waive the condition that, as of the Effective Date, all Makewhole

Claims must be disallowed.  Nor do these statements make clear what the Plan provides

elsewhere—that, even if all Makewhole Claims of the Trustee and the Noteholders have

been disallowed as of the Effective Date, those Claims are the subject of a pending appeal

and if that appeal is successful, the Claims must and will be paid in full, in cash, by

Reorganized EFIH.

9.       As a result, these statements are misleading if not directly contrary to the

actual terms of the Plan.  The Trustee has endeavored to correct these deficiencies in

Trustee Disclosure Statement Mark-up.  These mis-statements should be corrected before

the Disclosure Statement is approved and sent to the Trustee and Noteholders (and any

other parties in interest who will vote) to solicit their votes on the Plan.

10.      The Trustee's Disclosure Statement Mark-up also contains various other

edits to the Disclosure Statement not specifically discussed in this Objection, most of

which correct smaller mis-statements about the Plan or update statements taken from the

disclosure statement for the prior confirmed plan.  The Trustee incorporates such edits

into this Objection.  The Trustee believes that many of those mis-statements (along with many of the mis-statements specifically discussed herein) are likely scrivener's errors or otherwise non-controversial and can be resolved consensually.  Accordingly, it will not dwell on them here.

**B.**     **The Disclosure Statement Fails To Provide Adequate Disclosure Of How The Plan Treats The Trustee's and Noteholders' Claims In Several Respects.**

11.     In addition to containing inaccurate statements, the Disclosure Statement does not provide adequate information regarding the Plan's treatment of the claims of the Trustee and Noteholders in at least the following respects.

12.     *First*, the Disclosure Statement should disclose how the Plan treats the liens securing the EFIH First Lien Note Claims.

13.     As the Court will recall, the plan that the Court confirmed last year provided that the Trustee and Noteholders would retain their liens after the plan's effective date until their claims were either allowed and paid in full or disallowed by final order, including the make-whole claims asserted by the Trustee and the Noteholders in the pending appeal from this Court's disallowance of those claims.  *See* Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code [D.I. 7285-1] ("Confirmed Plan"), Art. III.B.19.

14.     Under the current Plan, however, those lien-retention provisions have been deleted.  Now, the Plan provision describing the treatment of the EFIH First Lien Note Claims does not address whether the Trustee and Noteholders will retain their liens after the EFH Effective Date.  *See* Plan Art. III.B.19.  Other provisions of the Plan, however, appear to provide that liens will generally be released on the Plan's effective date, except

7

as specifically provided otherwise in the Plan.  *See* Plan Art. IV.H, IV.I, VIII.B.  It may be that this is intentional and explains (at least in part) why the Plan treats the EFIH First Lien Note Claims as impaired.

15.     If the Debtors intend for the Plan to extinguish the liens securing the EFIH First Lien Note Claims, they should say so in plain English.  Specifically, the Disclosure Statement should make clear (1) whether the liens securing the EFIH First Lien Note Claims will remain in place after the EFH Effective Date pending payment of EFIH First Lien Note Claims that are Allowed as of the EFH Effective Date;[6] and (2) whether the liens securing the EFIH First Lien Note Claims will remain in place after the EFH Effective Date pending allowance (and payment) or disallowance by Final Order of EFIH First Lien Note Claims that are not Allowed as of the EFH Effective Date.  The Trustee will leave for the confirmation hearing whether such treatment complies with the Bankruptcy Code, but the Disclosure Statement should clearly state whether or not the Trustee and Noteholders will retain their liens after the EFH Effective Date.

---

[6] As discussed below, *infra* ¶ 26, the Plan appears to provide that the EFIH First Lien Note Claims, even the portion thereof that are Allowed as of the EFH Effective Date, will not be paid on the EFH Effective Date.  Again, the Trustee and the Noteholders will leave for any confirmation proceedings whether such a provision is proper.

16.     *Second*, the Disclosure Statement should disclose how the Plan treats any make-whole claims of the Trustee and Noteholders that may be allowed on appeal as *unsecured* claims.[7]

17.     The Plan provides that any *secured* make-whole claims that are held to be allowed by a court of competent jurisdiction by Final Order will be Allowed under the Plan and paid in full (as Class B3 claims).  *See* Art. III.B.19; *see also* Art. I.A.174 (defining "EFIH First Lien Note Claim" as "any *Secured* Claim derived from or based upon the EFIH First Lien Notes" (emphasis added)).  The Plan further provides that any *unsecured* claims based upon or derived from the EFIH First Lien Notes will be allowed and provided the same treatment as other general unsecured claims against the EFIH Debtors in Class B6, but specifically "*excluding* any Makewhole Claims."  Art. III.B.22. Article III of the Plan does not otherwise specify any treatment for unsecured Makewhole Claims that are allowed on appeal by Final Order.  *See id.*

18.     Other sections of the Plan suggest that such claims are simply to be extinguished.  Article VI.A provides that "[a]ny Makewhole Claim against an EFH Debtor or an EFIH Debtor that is not either an EFIH First Lien Note Claim or an EFIH Second Lien Note Claim that becomes Allowed, whether before, on, or after the EFH

---

[7] The Trustee and the Noteholders have argued that, as an alternative to a claim for the makewhole itself prescribed in the indentures for the Notes (the "Indentures"), the Noteholders are entitled to a claim for breach of their right under the Indentures to rescind any acceleration of the Notes.  In its summary judgment opinion on the Trustee's and Noteholders' claims relating to the makewhole, this Court held that the Indentures do not specify any "charge" for a breach of the right to rescind acceleration and that, accordingly, any such claim would not be an allowed secured claim under Section 506 of the Bankruptcy Code.  *See* Findings of Facts and Conclusions of Law Regarding Cross-Motions for Summary Judgment dated March 26, 2015 [D.I. 3984] at 31-32.  The Trustee and the Noteholders respectfully disagree, but in any event have argued (including on appeal) that they are, at a minimum, entitled to an unsecured claim for that breach.

Effective Date, shall receive treatment set forth in its respective class set forth in Article III.B of the Plan," and that none of the Plan Sponsor, Debtors, or Reorganized Debtors shall have any liability for such claims.  This provision would seemingly apply to a Makewhole Claim based upon or derived from the EFIH First Lien Notes that is allowed as *unsecured* claim because "EFIH First Lien Note Claim" is defined to only include *secured* claims.  While it provides that such claims "shall receive the treatment set forth in Article III.B of the Plan," as noted above, Article III.B is silent as to the treatment of unsecured Makewhole Claims.

19.     Again, the Trustee will leave for plan confirmation whether the Debtors can simply extinguish unsecured Makewhole Claims, even where an appellate court holds that such claims are valid and must be allowed under the Bankruptcy Code.  But if the Debtors intend for the Plan to so provide, the Disclosure Statement should clearly say so.

20.     ***Third***, the Disclosure Statement should disclose how the Plan affects the rights of the Trustee and the Noteholders under the Notes and related agreements and in their pending appellate proceedings.

21.     As the Court will recall, the plan confirmed last year provided that the Notes and related agreements (including the indentures, collateral trust agreement, and other security documents) would continue in full force and effect after the plan's effective date for purposes of establishing or supporting the allowance of any claims based on or derived from the EFIH First Lien Notes.  *See* Confirmed Plan, Art. III.B.19, 22.  It likewise provided that the Trustee and the Noteholders would retain their rights in their pending appeal from this Court's disallowance of their make-whole claims, as well as in their inter-creditor action against the second-lien trustee (now pending on appeal),

and in their pending appeal from this Court's approval of the EFIH First Lien Settlement. *See id.* These were carefully negotiated provisions that helped resolve the Trustee's objections to confirmation of that plan.

22.     Under the current Plan, however, all of those provisions have been deleted. *See* Art. III.B.19, 22. Moreover, the Plan contains provisions that, with limited exceptions, generally cancel all notes, indentures, security documents, and other agreements as of the EFH Effective Date, and that enjoin any party from continuing any legal proceeding after the EFH Effective Date with respect to any Claim that is discharged under the Plan. *See* Plan Art. IV.I, VIII.A, VIII.E, VIII.F.

23.     A related issue arises under the Plan's provisions for distributions and payments, and the Disclosure Statement's descriptions of those provisions. The Plan would make distributions in respect of the EFIH second-lien debt to the "Holders" of those claims. Because the EFIH second-lien debt is held through the securities holding system, that "Holder" is presumably the Depositary Trust Company, through its nominee, Cede & Co. That is, the Plan could be read to provide that the distributions to EFIH second-lien holders would not flow through the indenture trustee for the second-lien debt, but rather directly into the securities holding system. This makes a significant difference with respect to the first-lien Trustee's intercreditor claims. It is not clear whether this distribution scheme is intentional, although it is worth noting that at the outset of these cases, the Debtors attempted to refinance the second-lien debt via direct payments that went "around" the second-lien trustee, thereby obligating the first-lien Trustee to sue, inter alia, Cede & Co. (and not just the second-lien indenture trustee). For a time in these cases this created additional disputes (and potential indemnification claims of Cede &

Co. against the estates). The Debtors ultimately agreed not to use such a direct-to-Cede & Co. structure, streamlining disputes in the case. The Trustee believes that the Plan (like the refinancing before it) does not need such a direct-to-Cede structure, but leaves for another day whether, in light of the intercreditor / subordination agreements between the Trustee and the second-lien trustee, the Plan should or can provide for any such distribution mechanism (if that is what is actually intended). It may be that the issue can be avoided again. But at the very least, clear and unequivocal disclosure is required, given that the Debtors have attempted a similar, problematic structure before.

24.     The Disclosure Statement should clearly disclose whether the Debtors intend for the Plan to impair the rights of the Trustee and the Noteholders to establish the allowance of their claims against the bankruptcy estate and the second-lien noteholders and to litigate their pending appeals to completion, and if so, exactly how the Plan would impair those rights. Again, the Trustee leaves for another day whether any provisions purporting to so alter and impair the Trustee's and the Noteholders' contractual rights and legal claims could be lawful. But, for now, clear and unequivocal disclosure is required.

25.     *Fourth*, the Disclosure Statement should disclose when any allowed EFIH First Lien Note Claims will be paid.

26.     The Plan's provision specifying the treatment of the EFIH First Lien Note Claims states that Allowed EFIH First Lien Note Claims will be paid in full in cash, but it does not state *when* they will be paid. *See* Art. III.B.19. Other provisions of the Plan, however, appear to provide that most claims against EFIH will be paid not on the EFH Effective Date, but only after completion of the claims-reconciliation process, payment of all professional fees, and the completion of post-merger audits. *See* Art. VI.A.

12

27.     The Disclosure Statement should clearly state whether EFIH First Lien

Note Claims that are Allowed *as of* the EFH Effective Date will be paid on the EFH

Effective Date and if not, for how long payment will be delayed, and whether the Plan

provides for interest sufficient to ensure the Noteholders are paid the full value of their

secured claims as of the EFH Effective Date.  The Disclosure Statement should also

clearly state whether EFIH First Lien Note Claims that are Allowed *after* the EFH

Effective Date will be paid as soon as practicable after the date on which any such claim

is Allowed, and if not, for how long payment will be delayed, and whether the Plan

provides for interest sufficient to ensure the Noteholders are paid the full value of their

secured claims as of the EFH Effective Date.

28.     *Fifth***,** the Disclosure Statement should provide adequate information to

the Trustee regarding the allowance of claims for fees, expenses, and indemnification.

29.     The Trustee filed proofs of claims against the EFIH Debtors seeking,

among other things, payment of fees, expenses, and indemnification claims under the

collateral trust agreement, indentures, and other documents governing the EFIH First

Lien Notes.  *See, e.g.*, Proof of Claim Nos. 8025, 8026, 8028, 8031, 8032, 8033.  In

addition, the Trustee has submitted to the Debtors and the Fee Committee invoices and

other documentation requested by the Debtors documenting the Trustee's fees and

expenses through July 2016.  No objection has been filed to any of these claims.

30.     The Plan provides that EFIH First Lien Note Claims that are Allowed

under the Plan include:

> all reasonable and documented fees and expenses and indemnification
> claims, whether incurred or accruing before, on, or after the EFH Effective
> Date, including those reasonable and documented fees and expenses and
> indemnification claims incurred in connection with any appeal, remand, or

other litigation of any Makewhole Claims, (a) that (with respect only to such fees, expenses and claims incurred prior to the EFH Effective Date) are allowed under section 506(b) of the Bankruptcy Code and (b) that are owed under the EFIH First Lien Notes, the EFIH First Lien 2017 Note Indenture, the EFIH First Lien 2020 Note Indenture, and/or any related agreement (and interest thereon to the extent provided by such notes, indentures, or agreements), as applicable.

Plan Art. III.B.19(b)(iii).  The Plan provides that such claims will be paid in full and in cash.  Art. III.B.19(c).  The Plan also provides, however, that "[e]xcept as specifically provided as Allowed Claims pursuant to Article III.B of the Plan or otherwise objected to by the Debtors in the Chapter 11 Cases, the Plan shall serve as the Debtors' objection to all other EFIH First Lien Note Claims."  Art. VII.A.  To the extent the Debtors take the position that a portion of fees and expenses for which the Trustee has provided documentation to the Debtors are not Allowed under Article III.B.19(b)(iii) and are instead being objected to by the Debtors under Article VII.A, the Disclosure Statement should make that clear, and should specify the amount being objected to and the basis for the objection.  A generalized plan provision does not satisfy the requirements for objecting to claims under Bankruptcy Rule 3007(a).  The Disclosure Statement should also provide how or when any such objections are to be resolved.

      **C.**      **The Disclosure Statement Fails To Provide Adequate Disclosure Of The Trustee's Position On The Debtors' Assertions In The Disclosure Statement And Of How The Plan's Treatment of The Trustee's and Noteholders' Claims May Affect Other Creditors And Parties In Interest.**

      31.      The Disclosure Statement includes assertions by the Debtors setting forth their position that the Plan complies with statutory requirements for confirmation of a Chapter 11 plan.  *See, e.g.*, Disclosure Statement at 138-141.  As discussed above, the Plan's treatment of the Trustee's and Noteholders' Claims is unclear in several critical respects and, at a minimum, calls into question the Debtors' flat assertions that the Plan

complies with the requirements for confirmation.  The Disclosure Statement should not present a one-sided discussion of the issues, but should also include a statement of the Trustee's positions, including changes to the Plan that must be made to satisfy the requirements for confirmation under the Bankruptcy Code, so that the Noteholders and other creditors and parties in interest can make a fully informed judgment about the Plan. As the Court will recall, the Debtors did amend the disclosure statement for the last, confirmed plan to include a statement of the Trustee's position, as drafted by the Trustee. *See* Disclosure Statement for Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code [D.I. 6124] at 57-58.  The same should occur here.  The Trustee has included such a statement of its position on these issues in its Disclosure Statement Mark-up.

32.    Furthermore, to the extent the make-whole and/or other EFIH First Lien Note Claims are ultimately allowed, Reorganized EFIH may have to satisfy liabilities of several hundred million dollars to the Trustee and the Noteholders.  To provide "adequate information," the Disclosure Statement must include clear disclosure of that possibility. *See In re Williams*, No. 87-4-0093, 1992 WL 521537, at *3 (D. Md. Sept. 1, 1992) ("Debtors apparently assume that because they assert the claims are not legitimate, that's that, and no further analysis need be done.  However, a disclosure statement must include an examination of what effect, if any, there will be to the Debtors' proposed plan if disputed claims are allowed.") *aff'd*, 998 F.2d 1012 (4th Cir. 1993) (unpublished).

33.    If the make-whole claims of the Trustee and the Noteholders are allowed on appeal after the EFH Effective Date, Reorganized EFIH would be obligated under the Plan to pay those claims in full in cash—an amount that could exceed $550 million

(including interest). That could affect and/or reduce the value of the Plan Sponsor NextEra's investment in Reorganized EFH and Reorganized EFIH. Moreover, while most of the consideration under the Plan to be paid to EFIH and EFH creditors is in the form of cash, and the Plan is clear that these distributions will not be reduced if the Trustee's and the Noteholders' make-whole claims are allowed on appeal (Plan Art. VI.A), some of the consideration may also be in the form of stock in NextEra. The value of that stock could be reduced if the make-whole claims of the Trustee and the Noteholders are allowed on appeal. *See* Plan Art. III.B. Accordingly, the Disclosure Statement should adequately disclose these potential consequences of the Plan. The Trustee has included a statement of the Trustee's position on these issues in its Disclosure Statement Mark-up to ensure that creditors and other parties in interest are fully advised of these potential consequences of the Plan.

34.    Finally, the Disclosure Statement states that the Debtors "reserve all rights" to argue that confirmation and substantial consummation of the Plan will render the Trustee's and Noteholders' pending make-whole appeal "equitably moot." Disclosure Statement at 15-16. The Trustee disagrees and believes that such an argument would be contrary to the controlling law of this Circuit. *See In re Philadelphia Newspapers*, 690 F.3d 161, 170 (3d Cir. 2012) (rejecting argument that appeal from denial of a claim was equitably moot where, as here, the debtor's plan provided that if the claim were allowed on appeal, it would be paid). As *Philadelphia Newspapers* makes clear, a court could fashion effective relief by requiring Reorganized EFIH to pay the make-whole claims in full if they are allowed by a final order after the EFH Effective Date, and that granting such relief—which is required by the express terms of the Plan—

16

would not "unravel" the Plan.  In any event, even if a court were to conclude that relief

could no longer be granted as against Reorganized EFIH, the Trustee believes that a court

could still fashion effective relief on appeal by requiring, inter alia, junior stakeholders to

disgorge distributions they receive under the Plan to the extent those distributions are

derived from the collateral securing the EFIH First Lien Note Claims, against which the

Trustee and Noteholders have a senior first-priority claim.  *See In re Tribune Co.*, 2015

WL 4925923, at *9-*10 (3d Cir. 2015) (creditor's appeal asserting its recovery was

unlawfully distributed to junior creditors not equitably moot); *Ahuja v LightSquared Inc.*,

644 F. App'x 24, 26-28 (2d Cir. 2016).  Accordingly, the Disclosure Statement should

also disclose that possibility, so that creditors can make a fully-informed judgment about

the Plan.

35.    The Trustee has provided to EFIH's counsel proposed language in its

Disclosure Statement Mark-up to address these deficiencies as well.

**D.    The Proposed Disclosure Statement Order Seeks Inappropriate Relief**

36.    Certain of the other relief sought by the Debtors in the Disclosure

Statement Motion and Proposed Order is improper and should be denied.

37.    *First*, the form of ballots proposed by the Debtors—which purports to

bind creditors to the Plan's releases unless they affirmatively opt out—is both unlawful

and inconsistent with the Plan as applied to the Trustee and Noteholders.  While this may

be simply a scrivener's error, it nevertheless needs to be corrected.

38.    The Plan expressly provides in the definition of "Releasing Parties" that

"the EFIH First Lien Notes Trustee [and] all Holders of Claims derived from or based on

the EFIH First Lien Notes … shall not be 'Releasing Parties,' except as otherwise agreed

by a Holder in its capacity as such." Art. I.A.333. "Item 3" in the proposed ballots restates, in full, the release provision in Article VIII.D of the Plan, and then restates the Plan's definition of "Releasing Parties," including the language providing that the EFIH First Lien Notes Trustee and Holders of Claims derived from or based on the EFIH First Lien Notes shall not be Releasing Parties unless expressly agreed otherwise. The ballots then provide, however:

> AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT-OUT OF THE RELEASES AND ONLY IF YOU (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN. IN THE CASE OF SUCH A DETERMINATION BY THE COURT, IF YOU VOTE TO REJECT THE PLAN, YOU WILL AUTOMATICALLY BE CONSIDERED TO HAVE OPTED OUT OF THE RELEASES, REGARDLESS OF WHETHER YOU CHECK THE BOX BELOW. IF YOU SATISFY THE ABOVE REQUIREMENTS AND CHECK THE BOX BELOW (OR VOTE TO REJECT THE PLAN), YOUR OPTOUT WILL ONLY BE EFFECTIVE IF SO ORDERED BY THE COURT. REGARDLESS OF WHETHER THE COURT DETERMINES THAT YOU HAVE A RIGHT TO OPT-OUT OF THE RELEASES, IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE EFH/EFIH VOTING DEADLINE, OR (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN.

This provision of the ballot, which purports to make all creditors voting on the Plan "Releasing Parties" unless a creditor opts out, is impermissible for multiple reasons.

39.     The opt-out requirements purportedly imposed by this provision violate applicable law. As courts in this district have recognized, consent to a third-party release can only be demonstrated by voting in favor of a plan and not opting out of releases.

18

Failing to return a ballot or returning a blank ballot cannot constitute consent to a release. *See In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("the opt out mechanism is not sufficient to support the third party releases anyway, particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place). Failing to return a ballot is not a sufficient manifestation of consent to a third party release… Therefore, the Court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases.").

40.     Even if this opt-out provision were permissible under applicable law, requiring the Trustee and Noteholders to opt out of the Plan releases if they do not want to be bound by them—as this provision purports to do—directly contradicts the language of the Plan, which provides that the Trustee and Noteholders shall not be Releasing Parties unless (and except to the extent) they expressly agree otherwise, *i.e.*, they opt *in*.

41.     Accordingly, the ballots should be revised to make clear that the Trustee and Noteholders will not be "Releasing Parties" under the Plan regardless of whether and how they vote on the Plan and regardless of whether they check the opt-out box in the

ballot, and will only be "Releasing Parties" if and to the extent that they expressly and *affirmatively* so agree.[8]

42.    ***Second,*** the voting record date requested by the Debtors does not comply with the Bankruptcy Rules.  The Bankruptcy Rules provide that a "creditor whose claim is based on a security of record shall not be entitled to accept or reject a plan unless the … creditor is the holder of record of the security on the date the order approving the disclosure statement is entered or on another date fixed by the court, for cause, after notice and a hearing."  Fed. R. Bankr. P. 3018(a).  Accordingly, unless "cause" is shown, the voting record date should be the date on which the Court enters an order approving the Disclosure Statement.  The Debtors ask the Court to set September 1, 2016 as the EFH/EFIH Voting Record Date, Proposed Order at 13-14, but the hearing on the Disclosure Statement is not until September 19.  The Debtors have not even attempted to show cause for setting an early voting record date:  the Debtors cite Bankruptcy Rule 3018(a) and ask the Court to set September 1 as the voting record date, but provide no reason or basis for such relief.  Disclosure Statement Motion at 24.

---

[8] Even if requiring the Trustee and Noteholders to opt out to avoid being bound by the releases were otherwise permissible, that requirement is not adequately disclosed.  The Plan expressly provides that the Trustee and Noteholders are not "Releasing Parties" unless they opt *in*, the Disclosure Statement incorporates the Plan's definition of "Releasing Parties," and the requirement that they opt *out* is buried on page 12 of the ballot.  Even on page 12 of the ballot, the language purportedly requiring the Trustee and Noteholders to opt out to avoid being bound by the releases is directly contradicted by the preceding paragraph, which states that the Trustee and Noteholders are not "Releasing Parties" unless they opt *in*.  And even read in isolation, the ballot's opt-out paragraph is misleading and incomprehensible.  For example, it provides that "you may check the box below to elect not to grant the release … only if the court determines that you have the right to opt-out of the releases," which incorrectly suggests that leave from the Court is required before a creditor can check the opt-out box.

43.     In fact, no cause exists to set the voting record deadline before September 19.  There will undoubtedly be numerous revisions to the Disclosure Statement and Plan between September 1 and the approval of the Disclosure Statement as parties work to resolve objections consensually.  Accordingly, it is possible if not likely that the holders of at least some claims against the Debtors will change between September 1 and when the Disclosure Statement is ultimately approved, and, to the extent possible, the current (as opposed to former) holders of claims should be permitted to vote on the Plan.  In addition, setting the voting record date as the date on which the Disclosure Statement is approved will not require the delay of other confirmation deadlines, as the Debtors' Proposed Order provides that the Debtors shall have up to 10 days after the approval of the Disclosure Statement to send out solicitation packages.  Proposed Order at 14.

44.     Accordingly, the Court should set the date on which the Disclosure Statement is approved as the EFH/EFIH Voting Record Date.

45.     *Third,* the Trustee objects to the provision in the proposed solicitation procedures governing the allowance of the EFIH First Lien Note Claims for voting purposes in the amount of only $1.00 for two reasons.  First, as this Court is aware, acceptance of the Plan by Class B3 requires acceptance by at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected such plan.  11 U.S.C. § 1126(c).  The only rational way to determine whether two-thirds in amount has voted to accept the Plan is to look at the face amount of EFIH First Lien Notes held.  To the extent the Debtors are seeking to determine the "amount" that has accepted the Plan by a different metric, the Trustee objects to the proposed solicitation procedures and allowance of the EFIH First Lien Note

Claims in the amount of only $1.00 on that basis.  Second, at a minimum, allowing the

EFIH First Lien Note Claims in the amount of only $1.00 for voting purposes is

misleading as to the actual allowed amounts of such claims, and the allowed amounts of

such claims (in dollar amounts) is not contained elsewhere in the Disclosure Statement.

46.    The solicitation procedures proposed by the Debtors (attached as Exhibit

10 to the Proposed Order) provide: "with respect to the EFIH First Lien Note Claims

included in Class B3, Claim amounts are disallowed unless otherwise allowed by Final

Order, and shall be temporarily allowed for voting purposes only, and not for purposes of

allowance or distribution, at $1.00."  Proposed Order, Exhibit 10, at 5.  The solicitation

procedures further provide:

> with respect to <u>all</u> Claims, if a Claim for which a Proof of Claim has been
> timely filed for unknown or undetermined amounts, or is wholly
> unliquidated, or contingent or disputed (as determined (i) on the face of
> the Claim, (ii) pursuant to the Plan, or (iii) after a reasonable review of the
> supporting documentation by the EFH/EFIH Debtors or the Solicitation
> Agent) and such Claim has not been allowed, such Claim shall be
> temporarily allowed for voting purposes only, and not for purposes of
> allowance or distribution, at $1.00; provided, that with respect to (iii) any
> such determinations will be documented in the Voting Report.

*Id.* at 6.

47.    Since the EFIH First Lien Note Claims are the only claims in Class B3

under the Plan, allowing them for voting purposes only in the amount of $1.00 may not

have much, if any, practical effect with respect to whether Class B3 votes to accept or

reject the Plan.  But suggesting that the EFIH First Lien Note Claims could be as little as

$1.00 is fundamentally misleading and not consistent with the statutory goal of providing

adequate disclosure to all creditors.

48.    As noted above, *supra* ¶29, the Trustee filed proofs of claims against the

EFIH Debtors seeking, among other things, payment of fees, expenses, and

22

indemnification claims and submitted to the Debtors and the Fee Committee invoices and other documentation requested by the Debtors documenting the Trustee's fees and expenses through the beginning of 2016.  No objection has been filed to such claims, and Article III.B.19(b)(iii) of the Plan provides that EFIH First Lien Note Claims that are Allowed under the Plan include, in general terms, reasonable fees and expenses owed under the EFIH First Lien Notes and related documents.  In other words, the Trustee's fees and expenses that have already accrued and been submitted to the Debtors constitute a liquidated claim not subject to a pending objection.

49.     In addition, the proofs of claims filed by the Trustee also seek payment of accrued interest on the Notes.  A portion of the interest that had already accrued on the Notes when principal on the Notes was repaid on June 19, 2014 has not yet been paid. That claim for interest is liquidated, undisputed, and expressly allowed under the Plan, *see* Art. III.B.19(b).

50.     While it is not uncommon for a claim to be allowed in the amount of only $1.00 for voting purposes, that generally occurs when an objection to a claim has been filed and the court allows the claim in the amount of $1.00 *notwithstanding the objection* under Bankruptcy Rule 3018(a).  Here, however, while the Debtors have objected to the Trustee's and the Noteholders' make-whole claims, neither the Debtors nor any other party in interest has objected to the Trustee's claims for fees and expenses or for accrued interest.  Nothing in the Bankruptcy Code or Rules permit a claim to be allowed for voting purposes only in the amount of $1.00 when the claim was filed for a larger,

liquidated amount and no objection to the claim has been filed.[9]  At a minimum, the

allowance of the EFIH First Lien Note Claims in the amount of only $1.00 for voting

purposes misleadingly suggests that the entirety of those claims are subject to a pending

objection when in reality, the only claims that have been objected to (the make-whole

claims) are the subject of a pending appeal.  The Trustee's claims for fees and expenses

and for accrued interest are not the subject of any objection.  Indeed, the Plan provides

for reasonable fees and expenses owed under the Notes and related documents to be

allowed and paid and for accrued but unpaid interest on the Notes to be allowed and paid.

51.    Accordingly, the EFIH First Lien Note Claims should either be allowed

for voting purposes in the sum representing the total amount of the Trustee's fees and

expenses for which documentation has been submitted to the Debtors as of the date on

which the Disclosure Statement is approved plus the total amount of accrued but unpaid

interest on the Notes as of June 19, 2014, or the Disclosure Statement should be revised

to fully disclose that amount.

## Conclusion

52.    The Disclosure Statement should be amended as outlined above and set

forth in the Trustee's Disclosure Statement Mark-up attached hereto.  Furthermore, the

Proposed Order approving the Disclosure Statement, form of ballots, voting record date,

solicitation procedures, and related relief should be revised as set forth above.

---

[9] The Debtors cannot avoid this problem by providing that "with respect to the EFIH First Lien Note Claims included in Class B3, Claim amounts are disallowed unless otherwise allowed by Final Order."  Proposed Order, Exhibit 10, at 5.  The Debtors cannot insert language in the solicitation procedures contrary to the Bankruptcy Code and Rules, which provide that "a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects," 11 U.S.C. §502(a), and which provide specific procedures and requirements for filing an objection to a proof of claim, *see* Fed. R. Bankr. P. 3007.

Dated:  September 7, 2016

COLE SCHOTZ P.C.

*/s/ Norman L. Pernick*
Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  302-652-3131
Facsimile:  302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile:  201-489-1536
wusatine@coleschotz.com

WILMER CUTLER PICKERING HALE AND DORR LLP
Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile:  212-230-8888
Philip.Anker@wilmerhale.com

ROPES & GRAY LLP
Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile:  212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA  02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:  212-248-3141
James.Millar@dbr.com

Todd C. Schiltz
222 Delaware Ave, Suite 1410
Wilmington, DE 19801-1612
Telephone: 302-467-4200
Facsimile: 302-467-4201
Todd.Schiltz@dbr.com

*Counsel for Delaware Trust Company as trustee*