in the event of a Taxable Separation, unless EFH has received a private letter ruling (or a legally binding agreement with the IRS, including a closing agreement) that income realized upon the cancellation of the TCEH First Lien Claims will be excluded from EFH's gross income pursuant to Section 108(a)(1)(A); and (ii) in the event of a Spin-Off, unless EFH has received a private letter ruling (or a legally binding agreement with the IRS, including a closing agreement), that (A) subject to the penultimate sentence of this Section 9.18(b), income realized upon the cancellation of the TCEH First Lien Claims will be excluded from EFH's gross income pursuant to Section 108(a)(1)(A); or that (B) (x) assuming the Distribution satisfies the requirements of Section 368(a)(1)(G) and Section 355, EFH will recognize no income or gain from the cancellation of the TCEH First Lien Claims; and (y) no amount of the TCEH debt will be treated as having been (1) assumed by [Reorganized TCEH] pursuant to Section 357(c) and Section 357(d) or (2) treated as an amount realized in connection with the Preferred Stock Sale.  In the event that this Agreement becomes null, void and of no force or effect pursuant to the foregoing sentence, the holders of TCEH First Lien Claims reserve all rights to seek Bankruptcy Court approval of a Taxable Separation or a Spin-Off that includes the Preferred Stock Sale, and EFH and EFIH reserve all rights to object to such transactions.  In the event the IRS informs the Parties that a ruling or rulings required by this Section 9.18(b) are not provided on the basis that such ruling does not present a significant issue, the requirement to obtain such rulings can be satisfied by the provision of a "will" opinion to EFH, in form and substance satisfactory to the EFH Parties and Reorganized TCEH, without substantive qualifications, of a nationally recognized law or accounting firm, which firm is reasonably acceptable to the EFH Parties and Reorganized TCEH, addressing the matter covered by such rulings.  For the purposes of such opinion, each of the EFH Parties and Reorganized TCEH acknowledges that Paul, Weiss, Rifkind, Wharton & Garrison LLP, Kirkland & Ellis LLP and KPMG LLP are reasonably acceptable to such entity.

(c)    This Agreement shall not become effective with respect to Merger Sub or Parent until the Merger is consummated.

Section 9.20    Further Assurances.  The EFH Parties shall cause each other Person that is or becomes a Subsidiary of EFH (other than any such Person or Subsidiary that is "ring fenced," including the Oncor Entities) to execute a joinder to this Agreement (a) to become an EFH Party (effective as of the date such Person becomes a Subsidiary of EFH or ceases to be "ring fenced") and (b) to be bound by the obligations of the EFH Parties under this Agreement on a joint and several basis.  Reorganized TCEH shall cause each Reorganized TCEH Entity on the date of this Agreement (y) to execute a joinder to this Agreement to become a Reorganized TCEH Entity (effective as of the date of this Agreement) and (z) to be bound by the obligations of the Reorganized TCEH Entities under this Agreement on a joint and several basis.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

ENERGY FUTURE HOLDINGS CORP.


By:_____


ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC


By:_____


EFIH FINANCE INC.


By:_____


[REORGANIZED TCEH]


By:_____


[MERGER SUB]


By:_____

Exhibit A

With respect to Reorganized TCEH, each Subsidiary of Reorganized TCEH at the time of the Distribution.

With respect to the EFH Parties, each Subsidiary of the EFH Parties and (without duplication) Oncor and each of its Subsidiaries.

## Exhibit B

The Applicable Percentage (by value, determined as of the Distribution Date) of the Applicable Assets; provided, that for purposes of determining whether the Applicable Percentage is met, any Applicable Asset (i) whose function in furtherance of the trade or business in which it was used at the time of the Distribution is materially reduced as a result of casualty, theft, labor strike or other similar action, breakdown, wear-and-tear, obsolescence, material change in applicable legal or regulatory rules, or other similar event or occurrence, (ii) that is taken out of production, shut down or sold and whose possible shutdown was disclosed in any IRS Submission and addressed in the Private Letter Ruling, (iii) that is operated for at least six months after the Distribution and subsequently disposed of pursuant to a decision of a majority of the board of directors of the relevant entity made after the expiration of such six-month period following the Distribution or (iv) that is taken out of production or shut down pursuant to a decision of a majority of the board of directors of the relevant entity, provided such Applicable Asset is maintained in a state of readiness in which it can resume production, in each case after the Distribution, shall be ignored (i.e., excluded from the numerator and the denominator of the calculation).

As used in this Exhibit, the following terms shall have the following meanings:

"<u>Applicable Assets</u>" means (i) with respect to Reorganized TCEH, the assets held by any Reorganized TCEH Entity (other than any asset (or portion thereof) directly or indirectly held by the Preferred Stock Entity) and (ii) with respect to the EFH Parties, the assets held by any Reorganized EFH Entity.

"<u>Applicable Percentage</u>" means (i) with respect to Reorganized TCEH, 95% and (ii) with respect to the EFH Parties, 67%.

## **Exhibit H**

## **Transition Services Agreement**

(See Attached)

# FORM OF
# TRANSITION SERVICES AGREEMENT

This **TRANSITION SERVICES AGREEMENT** (as hereinafter amended, restated or modified from time to time in accordance with the terms hereof, this "Agreement") is made and entered into, as of this [●] day of [●], 2016 (the "Effective Date"), by and between Energy Future Holdings Corp., a Texas corporation (and any entity successor thereto, including, upon consummation of the Merger (as defined below), the Surviving Company, (the "Company")), and TEX Operations Company LLC, a Delaware limited liability company ("OpCo"). Each of the Company and OpCo is referred to herein as a "Party" and are collectively referred to herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Merger Agreement (as defined below).

## WITNESSETH:

**WHEREAS**, on April 29, 2014 (the "Petition Date"), the Company and certain of its Subsidiaries (collectively, the "Debtors"), and Texas Competitive Electric Holdings Company LLC ("TCEH"), a Delaware limited liability company and subsidiary of the Company, commenced voluntary cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes only under Case No. 14-10979, and any proceedings relating thereto (collectively, the "Chapter 11 Cases");

**WHEREAS**, on July 29, 2016, the Company, Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), NextEra Energy, Inc., a Florida corporation ("Parent"), and EFH Merger Co., LLC, a Delaware limited liability company and direct wholly owned subsidiary of Parent ("Merger Sub") entered into that certain Agreement and Plan of Merger (the "Merger Agreement"), which provides for, among other things, the merger of the Company with and into Merger Sub (the "Merger"), with Merger Sub being the surviving company and the successor to the Company;

**WHEREAS**, prior to the Effective Date, the Bankruptcy Court entered an order approving and confirming the restructuring of the TCEH Debtors pursuant to the Third Amended Joint Plan of Reorganization (the "Plan of Reorganization"), which contemplated, among other things, the consummation of the Merger and the other transactions described in the Merger Agreement;

**WHEREAS**, pursuant to the Plan of Reorganization: (a) TCEH formed TEX Energy LLC, a Delaware limited liability company ("SpinCo"); (b) TCEH transferred all of TCEH's interests in its Subsidiaries (excluding the stock of TCEH Finance, Inc., a Delaware corporation) to SpinCo in exchange for (i) 100% of the newly-issued equity interests of SpinCo and (ii) the cash proceeds of new SpinCo debt (such transfer, the "TCEH Contribution"), as well as the assumption by SpinCo of certain liabilities; (c) immediately following the TCEH Contribution, SpinCo transferred certain of its assets to New Holdco in exchange for 100% of New Holdco's equity; (d) immediately following the transfer described in clause (c), SpinCo completed the Preferred Stock Sale; and (e) immediately following the TCEH Contribution and the Preferred Stock Sale, SpinCo converted into a Delaware corporation pursuant to applicable Law;

**WHEREAS**, pursuant to the Plan of Reorganization, the Company contributed the equity interests of (i) EFH Corporate Services Company, a Texas corporation ("EFH Corporate Services"), (ii) EFH Properties Company (but not including any cash or cash equivalents on hand at EFH Properties Company), and (iii) the respective Subsidiaries of EFH Corporate Services and EFH Properties Company to OpCo, as well as certain other assets, liabilities and equity interests related to the TCEH Debtors' operations, all as provided in the Plan of Reorganization (the "EFH Contribution");

**WHEREAS**, pursuant to the Plan of Reorganization and as a result of the EFH Contribution, the employees of EFH Corporate Services became employees of OpCo or one or more of its Subsidiaries prior to the Effective Time;

**WHEREAS**, on the TCEH Effective Date (as defined in the Plan of Reorganization), the Company and OpCo entered into a transition services agreement (the "Interim TSA") for OpCo to provide certain transition services to the Company during the interim period between the TCEH Effective Date and the Effective Date;

**WHEREAS**, upon entry into this Agreement, the Interim TSA will terminate and be of no further force and effect and the parties thereto will be released from any liability thereunder as of the Effective Date;

**WHEREAS**, pursuant to the Plan of Reorganization, and concurrent with the execution of this Agreement (i) the Company and EFIH will be reorganized, and (ii) the Closing Date Transactions contemplated by the Merger Agreement, including the Merger, will be consummated by the reorganized Company, reorganized EFIH, Parent and Merger Sub;

**WHEREAS**, the Company and its Subsidiaries (which for purposes of this Agreement shall include the Oncor Entities) wish to receive the Transition Services (as defined below) from OpCo and/or its Subsidiaries during the Term (as defined below);

**WHEREAS**, OpCo is willing to provide, and to cause its Subsidiaries to provide, the Transition Services to the Company and its Subsidiaries upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, this Agreement is being executed and delivered in accordance with Section 6.16 of the Merger Agreement and the applicable provisions of the Plan of Reorganization.

**NOW, THEREFORE**, in consideration of the premises, the covenants and agreements set forth herein, the mutual benefits to be gained by the performance thereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE 1 - SERVICES

1.1     Transition Services.

(a)     During the Term, OpCo hereby agrees to provide, or cause to be provided (whether through one or more of its Subsidiaries or as permitted pursuant to Section 1.2), to the Company and its Subsidiaries upon the terms and subject to the conditions set forth in this Agreement (i) the services described on *Annex A* attached hereto (the "Service Schedule"), (ii) as reasonably requested by the Company, any other service historically provided to the Company and/or its Subsidiaries during the period from April 29, 2014 through the date hereof by EFH Corporate Services, OpCo and/or their respective Subsidiaries, or (iii) if applicable, other services that may be agreed upon by the Parties in writing after the date hereof ("Additional Services" and, together with the services in clauses (i) and (ii), the "Transition Services"). In the event that the Parties identify and agree upon Additional Services to be provided under this Agreement, the Parties shall execute an amendment to this Agreement that provides for the substitution of the relevant Service Schedule, or additions or supplements to the relevant Service Schedule, in order to describe such Additional Services and other specific terms and conditions applicable thereto.

2

(b)    Notwithstanding the foregoing, during the Term, the Parties agree, subject to Article 6 hereof, that the Transition Services include, to the extent applicable, the transitioning of information of the Company and its Subsidiaries to the Company and its Subsidiaries that such Company and/or Subsidiary reasonably require to operate their businesses (including historical books and records and electronic and other data related to the business of the Company and its Subsidiaries).

(c)    In no event shall OpCo or its Affiliates be required to (i) lend any funds to the Company or its Affiliates or (ii) make any payments or disbursements on behalf of the Company, except to the extent the Company has previously delivered to OpCo sufficient funds to make any such payment or disbursement.

(d)    Subject to Section 1.1(f), unless otherwise expressly required under the terms of any relevant Service Schedule hereto, the Tax Matters Agreement, the Separation Agreement, the Split Participant Agreement, or as otherwise agreed to by the Parties in writing, in providing the Transition Services, OpCo or its Affiliates shall not be obligated to: (i) expend funds and other resources beyond levels that would be customary and reasonable for any other nationally recognized service provider to perform services that are similar to the relevant Transition Services; (ii) maintain the employment of any specific employee or subcontractor; (iii) purchase, lease or license any additional (measured as of the date hereof) equipment or materials (expressly excluding any renewal or extension of any leases or licenses required for OpCo to perform the relevant Transition Services during the Term; *provided*, that such extension or renewal shall be subject to Section 3.1 in all respects); or (iv) pay any of the Company's costs related to its or any of its Affiliates' receipt of the Transition Services.

(e)    The Parties acknowledge the transitional nature of the Transition Services. In this regard, the Company acknowledges and agrees that it has the responsibility for the daily and strategic management of the Company and its Subsidiaries and that the intent of this Agreement and the extent of the Transition Services to be provided hereunder are for OpCo solely to provide, during the Term, the back-office and administrative services necessary to support the on-going daily operations of the Company and its Subsidiaries in a reasonably prudent manner. Given the transitional nature of the Transition Services, the Company acknowledges and agrees that OpCo may make changes from time-to-time in the personnel performing the Transition Services, subject to Section 1.1(f).

(f)    Nothing in Section 1.1(d) or Section 1.1(e) shall alter the obligations of OpCo to provide the Transition Services during the Term in accordance with the other provisions of this Agreement, including with regard to type, skill, care, quantity, scope, timeliness and diligence as provided in Section 1.4(a).

1.2    Personnel; Third-Party Providers.

(a)    OpCo hereby agrees, except as otherwise provided in this Section 1.2, it will not delegate its responsibilities under this Agreement to any unaffiliated third Person (a "Third-Party Provider") without the Company's express prior written consent (such consent not to be unreasonably withheld, conditioned, or delayed; it being understood that it would be reasonable for the Company not to consent to any delegation that would adversely change in any material respect the obligations of the Company under this Agreement (including any delegation that would obligate the Company to provide any incremental credit support or that would materially increase the cost of the services subject to such delegation)). Notwithstanding the foregoing, the Parties acknowledge and agree that the Transition Services that have historically been provided and supported by Third-Party Providers may be provided and supported without the consent of the Company; *provided* that such Third-Party Provider provision and support does not alter the obligations of OpCo to provide the Transition Services during the Term in accordance with this Agreement, including with regard to type, skill, care, quantity, scope, timeliness and

diligence as provided in Section 1.4(a); *provided, further*, that, without the prior written consent of the Company (which consent may be withheld, conditioned or delayed in the Company's sole discretion), in no event shall OpCo enter into any arrangement or contract with a Third-Party Provider (1) in the name of the Company (or any of its affiliates) on its behalf or (2) that would reasonably be expected to result in the Company (or any of its affiliates) being required to make, directly or indirectly, any payments to such Third-Party Provider (or to Opco for services provided by any Third-Party Provider) following completion of the Transition Services (except, for the avoidance of doubt, any payments to OpCo for Transition Services performed in accordance with this Agreement prior to the completion of the Transition Services which may not have been paid but are otherwise due and payable in accordance with this Agreement).

(b)    In the event OpCo or a Third-Party Provider requires incremental credit support in connection with the provision of Transition Services, OpCo may request that the Company provide reasonable credit support to OpCo or such Third Party Provider with respect thereto. In the event that the Company elects not to provide such requested credit support (which it may do in its sole discretion), the Company agrees that the fees to be charged hereunder shall include any reasonable and documented incremental cost and expense that OpCo or such Third Party Provider incurs in connection with providing OpCo or such Third-Party Provider the required credit support for the applicable Transition Services.

(c)    OpCo shall perform its obligations under this Agreement as an independent contractor. No employees or representatives of OpCo or a Third-Party Provider shall be deemed to be employees or representatives of the Company. In performing the Transition Services, such employees and representatives of OpCo or a Third-Party Provider shall be under the direction, control and supervision of OpCo or the Third-Party Provider, as applicable, and, subject to compliance with the requirements set forth in the Service Schedule. OpCo or the Third-Party Provider, as applicable, shall be solely responsible for exercising all authority with respect to, and shall bear all liabilities arising from, the employment (including termination of employment), assignment and compensation of such employees or representatives (including the payment of all salary and benefits and all premiums and remittances with respect to employees used to provide any Transition Services hereunder).

(d)    If a Third-Party Provider provides Transition Services in accordance with this Agreement, such Third-Party Provider shall be a subcontractor engaged by OpCo. OpCo shall cause each such Third Party Provider to be subject to service standards and confidentiality provisions at least equivalent to those set forth herein. OpCo shall remain responsible for the performance by it of all of its obligations hereunder with respect to the Transition Services provided by such Third-Party Provider.

1.3    Third Party Consents.

(a)    The Parties acknowledge and agree that it may be necessary to obtain from third parties certain consents, waivers, permits, licenses or sublicenses ("Consents") in order for (i) OpCo to use third-party applications, Intellectual Property, systems, networks and similar services and functions in the provision of Transition Services and/or (ii) the Company to receive Transition Services.

(b)    The Parties will cooperate and use their respective commercially reasonable efforts to obtain the Consents; *provided, however*, that the failure to obtain any such Consent shall not relieve OpCo of its obligation to provide the relevant Transition Service unless (A) the provision of such Transition Service is prohibited by applicable Law or (B) such Consent cannot be obtained in a timely manner after using commercially reasonable efforts. In either case of clauses (A) or (B) in the preceding sentence, OpCo shall promptly notify the Company thereof and the Parties will use their commercially reasonable efforts to implement an alternative means of continuing the provision of the applicable Transition Service for which the Consent is required, in accordance with the service standards described

in Section 1.4. Each Party shall use commercially reasonable efforts to mitigate the effects (including the cost) of such alternative means.

    1.4     Level of Service and Limitations.

        (a)     During the Term, OpCo shall perform, or cause to be performed, the Transition Services (i) in a professional and workmanlike manner at a quality substantially equivalent (including with regard to type, skill, care, quantity, scope, timeliness and diligence) as provided by EFH Corporate Services and/or any of its Subsidiaries in the ordinary course of business during the twelve (12) month period prior to the Petition Date (or, to the extent new services commenced following the Petition Date, during the twelve (12) month period prior to the Effective Date) and (ii) in compliance with all applicable Laws, in all material respects.

        (b)     During the Term, the Company shall (i) use commercially reasonable efforts to terminate its need to receive the Transition Services as soon as commercially practicable after the Effective Date and (ii) allow representatives of OpCo reasonable access to its employees, facilities, assets, advisors, systems and information as reasonably requested by OpCo for purposes of rendering the Transition Services under this Agreement; *provided*, that no such access shall unreasonably interfere with the ongoing operations of the Company and its Subsidiaries; and *provided, further*, that the Company may exclude any OpCo personnel at its sole discretion from access to any of its employees, facilities, assets, advisors, systems and/or information due to a material violation by OpCo personnel of the Company's reasonable health, safety, data security, conduct or other policies.

        (c)     In connection with its provision of the Transition Services under this Agreement, OpCo shall be permitted to rely on any written information or data provided by the Company, its Subsidiaries or its Representatives, to OpCo, except to the extent that OpCo has actual knowledge that such information or data is inaccurate.

        (d)     Notwithstanding anything to the contrary contained herein, OpCo shall not be obligated to (and shall not be obligated to cause any Third Party Provider to) provide any Transition Services if the provision of such Transition Services would (i) violate any Law or (ii) with respect to legal, accounting or similar professional services, violate or be in contravention of any rules, regulations or standards of practice promulgated by any organization or authority governing such professional service; *provided, however*, in each case, that the Parties shall work diligently together in good faith to obtain or cause to be obtained such Transition Services (including, if applicable, professional services) from another provider on a commercially reasonable basis.

        (e)     During the Term, each Party agrees to use commercially reasonable efforts to cooperate with the other Party in all matters relating to the provision and receipt of the Transition Services and to effect an orderly transition of the Transition Services. This Agreement is a purely commercial transaction between the Parties and nothing stated in this Agreement shall operate to create any partnership, or special or fiduciary duty between the Parties.

    1.5     Project Managers. OpCo and the Company shall each appoint one or more individuals to act as project managers (each, a "Project Manager") to (i) serve as the primary contact for any issues arising out of the performance of this Agreement or any portion of the Transition Services and (ii) be primarily responsible for administering the orderly provision or receipt, as applicable, of the Transition Services (or applicable portion thereof) on its behalf. The initial Project Managers, as well as their respective addresses for notices and other communications, are set forth in the Service Schedule. Each Party agrees to provide reasonable access (in person, by telephone or electronically via e-mail) during normal business hours to its Project Manager for problem resolution. Either Party may replace its Project

Manager at any time by providing notice in accordance with <u>Section 7.5</u>, such replacement to be effective as of the date of the other Party's receipt of such notice.

      1.6     <u>No Service Warranty</u>. Except to the extent provided in <u>Section 1.2(d)</u> and <u>Section 1.4(a)</u>, OpCo makes no warranties or representations relating to the Transition Services or the results of the Transition Services hereunder and hereby disclaims all representations or warranties, whether express, implied or statutory, with respect to its performance under this Agreement, including without limitation any warranty of adequacy, merchantability or fitness for a particular purpose.

      1.7     <u>No Conflicts</u>.  OpCo hereby represents and warrants to the Company that, except as set forth on ***Annex B*** attached hereto, to the knowledge of OpCo (after reasonable inquiry) (i) the execution and delivery of this Agreement by OpCo and (ii) the performance by OpCo of its obligations under this Agreement do not violate, in any material respect, applicable Law .

**ARTICLE 2 - TERM AND TERMINATION**

      2.1     <u>Term</u>. The term of this Agreement shall commence on the Effective Date and shall continue until the earlier of (i) the date that is twelve (12) months from the Effective Date for tax services referred to in ***Annex A*** or six (6) months from the Effective Date for other Transition Services and (ii) the termination of all Transition Services pursuant to <u>Section 2.2</u> or <u>Section 2.3</u> (the "<u>Term</u>"). At the end of the Term all rights and obligations under this Agreement shall cease, except (a) the rights and obligations that are expressly stated to survive termination pursuant to <u>Section 2.4</u> and (b) rights and obligations that have accrued prior to such termination, including the obligation to pay any amounts that have become due and payable prior to such termination.

      2.2     <u>Discontinuation of Services</u>. During the Term, the Company may terminate any particular Transition Service (whether provided directly or indirectly by OpCo and/or any of its Affiliates or by any Third-Party Provider) and eliminate it from the scope of the Transition Services provided under this Agreement upon at least thirty (30) days' (or such other amount of time as mutually agreed in writing between the Parties) prior written notice to OpCo, and following such termination the Company shall only be liable to OpCo for the Fees (as defined below) owed to OpCo in connection with, and attributable to, the provision of such discontinued Transition Services to the extent attributable to the period on and before such discontinuation. During the Term, the Parties shall cooperate as reasonably required to effectuate an orderly and systematic transfer to the Company, or any such Person at the request of the Company, of all of the duties and obligations previously performed by OpCo (whether provided directly or indirectly by Opco and/or any of its Affiliates or by any Third-Party Provider) under this Agreement that the Company desires to continue following the Term.

      2.3     <u>Early Termination</u>.

      (a)     Notwithstanding anything in this Agreement to the contrary, this Agreement or any particular Transition Service may be terminated prior to the expiration of the Term as follows:

      (i)     with respect to any particular Transition Service, by the Company pursuant to <u>Section 2.2</u>;

      (ii)     by mutual written consent of the Company and OpCo; or

      (iii)     by the Company, on the one hand, or OpCo, on the other hand, if the other Party is in material breach of any of its covenants or obligations set forth in this Agreement and fails to cure such breach as promptly as

reasonably practicable but in any event within twenty (20) Business Days (or ten (10) Business Days with respect to any failure to make a required payment under this Agreement that is not subject to a good faith dispute pursuant to Section 3.3) after receipt of written notice thereof from the other Party (which notice must specify, in reasonable detail, the nature of such breach).

2.4     Survival. The termination of this Agreement with respect to any particular Transition Service pursuant to Section 2.2 or Section 2.3 shall not affect the provisions of this Agreement and the Service Schedule with respect to a Transition Service not terminated. Neither the termination of this Agreement with respect to any particular Transition Service pursuant to Section 2.2 or Section 2.3 nor the expiration of the Term shall affect (i) the liability of a Party for a breach of this Agreement prior to the termination or expiration hereof, (ii) the Parties' obligations set forth in this Section 2.4, Article 5, Article 6 and Article 7, which shall survive any termination or expiration of this Agreement and (iii) any rights or obligations arising out of or in connection with this Agreement that have vested, matured or accrued prior to such termination or expiration, including, the right of OpCo to receive any and all amounts owed to OpCo hereunder to the extent attributable to the period on and before such termination or expiration.

## ARTICLE 3 - COMPENSATION

3.1     Fees. In consideration for the provision of the Transition Services, the Company shall pay to OpCo all reasonable and documented fees, costs, and expenses (including employee-related, overhead, general and administrative expenses) incurred by OpCo related directly to the Transition Services provided during the Term, plus a twenty-five percent (25%) additional mark-up on all such fees, costs and expenses, excluding from the mark-up all fees, costs and expenses invoiced, directly or indirectly, by any Third-Party Provider (which for the avoidance of doubt will be payable by the Company solely at the amount invoiced by the Third-Party Provider) (collectively, the "Fees"). *Annex C* attached hereto sets forth a good faith "ballpark" estimate of all Fees that OpCo expects the Company will incur under this Agreement during the Term for the Transition Services that OpCo expects will be required to support the on-going daily operations of the Company and its subsidiaries in a reasonably prudent manner (it being understood that such the amounts set forth on *Annex C* are an estimate and the actual Fees to be incurred may differ from such estimate and OpCo shall, except as otherwise provided under this Agreement, have no liability solely as a result of such difference).

3.2     Invoices. Within ten (10) Business Days after the end of each calendar month, OpCo (on behalf of itself and each of its Subsidiaries providing Transition Services) shall submit an invoice (each, an "Invoice") to the Company setting forth (i) a reasonably detailed description of the Transition Services provided by OpCo and its Subsidiaries during such calendar month and (ii) reasonable documentation and supporting detail of the Fees owing for such Transition Services (including any third-party invoices related thereto).

3.3     Time of Payment; Disputes; Interest; No Deductions.

(a)     The Company shall pay, or cause to be paid, all undisputed amounts due under this Agreement within thirty (30) days after receipt of the applicable Invoice. Such payment shall be made in immediately available funds by bank wire transfer to an account designated by OpCo.

(b)     The Company shall promptly (and in no event later than thirty (30) days following receipt of any Invoice) notify OpCo of any good faith objection of the Company with regard to such Invoice and the failure to so object shall be definitive evidence of the acceptance of such Invoice. If requested by the Company, OpCo shall promptly furnish reasonable documentation to substantiate the

amounts invoiced, including listing the date(s), time(s) and amount(s) of the Transition Services in question. Following any good faith invoice objection, the Company and OpCo shall cooperate in good faith and use commercially reasonable efforts to resolve any remaining dispute expeditiously, without prejudice to either Party's rights under Section 7.3 or Section 7.8. The Company shall pay all disputed amounts in accordance with the resolution of such disputed amount within five (5) Business Days after such resolution.

(c)     If the Company has not paid any undisputed amounts within thirty (30) days after receipt of the applicable Invoice with respect thereto, such undisputed amounts shall accrue interest at the lesser of (i) the maximum rate allowed by applicable Law, and (ii) the prime rate published in *The Wall Street Journal* plus 4% per annum, and the Company shall pay OpCo such accrued interest. Notwithstanding the foregoing, the failure of the Company to pay any material undisputed amounts within thirty (30) days after receipt of the applicable Invoice with respect thereto shall also constitute a material breach of this Agreement.

3.4     Taxes.

(a)     All Fees shall be exclusive of any goods and services taxes, value added taxes or similar taxes on the performance or delivery of Transition Services (collectively "Sales Taxes").

(b)     To the extent that OpCo is obligated to collect and remit any Sales Tax in respect of the Transition Services herein provided, the Company shall pay the amount of such Sales Taxes to OpCo in addition to the Fees otherwise payable hereunder. Any amount required to be paid under this Section 3.4(b) and not paid by the due date for payment shall be subject to the late charges specified in Section 3.3(c).

(c)     Subject to Section 3.4(b), OpCo shall be responsible for and shall pay all taxes, assessments or other charges against it in connection with the Transition Services, including taxes on OpCo's income or profits thereon and all taxes imposed on or assessed or levied against or on account of salaries or other compensation or other benefits or amounts paid or provided to OpCo's employees or subcontractors. OpCo accepts full and exclusive liability for and shall indemnify, defend and hold the Company harmless from and against any and all claims arising out of income or payroll taxes or withholding taxes assessed or levied in respect of the provision of Transition Services hereunder by any Governmental Entity.

(d)     OpCo shall not be reimbursed for any (i) real or personal property taxes on property it owns or leases, (ii) franchise, margin, privilege or similar taxes on its business, (iii) payroll or employment taxes of its employees (including income tax, social security taxes, unemployment compensation, workers' compensation tax, other employment taxes or withholdings), (iv) taxes based on its income or gross receipts or (v) withholding taxes. Should there be any withholding tax required for payment made hereunder, the Company shall have the right to withhold such amount from money due to OpCo under this Agreement for payment of taxes, assessment or other charges. Such payment by the Company shall relieve the Company of further obligation with respect to any amount withheld and OpCo shall assist the Company by submitting the necessary documents to support the application for the Company to recover such amount later, if applicable.

(e)     Within thirty (30) days after receiving notification of the commencement of any Sales Tax, VAT or other similar tax audit by a tax authority which involves the provision of any Transition Services or access to any facilities provided hereunder, the Party receiving such notice shall notify the other Party of such audit. Thereafter, the Party receiving such notice shall control all proceedings taken in connection with such Sales Tax or VAT or other similar tax audit and shall take

reasonable steps to keep the other Party informed of the progress of any such audit; *provided, however*, that where the other Party is liable to pay an amount in respect of such Sales Tax, VAT or other similar tax pursuant to this <u>Section 3.4</u>, the controlling Party shall not settle or otherwise compromise such audit without the other Party's consent. The other Party shall have the right (but not the duty) to participate in any proceeding to contest Sales Tax, VAT or other similar liability, and shall have the right to retain tax advisers or counsel at its own expense.

(f)     Subject to applicable Law, the Parties shall use commercially reasonable efforts to cooperate with each other in connection with obtaining any available reduction of, or exemption from, any taxes due in respect of the provision of Transition Services to the extent possible.

## ARTICLE 4 - FORCE MAJEURE

4.1     <u>Force Majeure</u>.

(a)     If any Party is rendered unable, wholly or in part, by Force Majeure (as defined below) to carry out its obligations under this Agreement, other than obligations to make monetary payments, that Party shall give the non-affected Party prompt written notice of the cause and extent of the Force Majeure, the date of commencement thereof and the means proposed to be adopted to remedy or abate such Force Majeure, following which the affected Party shall be excused from performance of its obligations under this Agreement solely to the extent, and for the period, that such performance is prevented by such Force Majeure. The affected Party shall use commercially reasonable diligence to remove or remediate the Force Majeure as quickly as possible and shall use commercially reasonable efforts to develop a mutually satisfactory solution to such Force Majeure with the non-affected Party. If any Transition Service is interrupted or suspended due to an event of Force Majeure, (i) the Company shall be entitled to an equitable reduction of Fees payable for the affected Transition Services and (ii) the Company shall have the right to immediately terminate the affected Transition Service and/or any Transition Service linked to the affected Transition Service.

(b)     The term "<u>Force Majeure</u>" shall mean any act of God, industry wide strikes directly impacting the Transition Services, act of the public enemy, war, blockade, terrorism, public riot, lightning, fire, storm, flood, explosion, governmental action, or other circumstance that is beyond the reasonable control of the affected Party and which did not arise from the fraud, bad faith, intentional or willful misconduct or gross negligence of the affected Party.

## ARTICLE 5 - INDEMNIFICATION AND DISCLAIMER

5.1     <u>The Company's Indemnity</u>. SUBJECT TO <u>SECTION 5.4</u>, THE COMPANY HEREBY AGREES TO INDEMNIFY, HOLD HARMLESS AND DEFEND OPCO AND OPCO'S SUBSIDIARIES AND ITS AND THEIR OFFICERS, DIRECTORS, EMPLOYEES, CONTRACTORS AGENTS AND REPRESENTATIVES (COLLECTIVELY, THE "<u>OPCO GROUP</u>") FROM AND AGAINST ANY AND ALL LOSSES ARISING OUT OF OR RESULTING FROM ANY THIRD-PARTY ACTION IN RESPECT OF (I) THE PERFORMANCE OF THE TRANSITION SERVICES IN ACCORDANCE WITH THIS AGREEMENT OR (II) FRAUD, GROSS NEGLIGENCE, OR INTENTIONAL OR WILLFUL MISCONDUCT OF THE COMPANY, THE COMPANY'S AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, CONTRACTORS, AGENTS OR REPRESENTATIVES (COLLECTIVELY, THE "<u>COMPANY GROUP</u>") IN CONNECTION WITH THE TRANSITION SERVICES, EXCEPT TO THE EXTENT CAUSED BY, OR ARISING OUT OF THE FRAUD, GROSS NEGLIGENCE, OR INTENTIONAL OR WILLFUL MISCONDUCT OF, OR MATERIAL BREACH OF THIS AGREEMENT BY, ANY MEMBER OF THE OPCO GROUP OR ANY THIRD PARTY PROVIDER.

5.2    OpCo's Indemnity. SUBJECT TO SECTION 5.3 AND SECTION 5.4, OPCO HEREBY AGREES TO INDEMNIFY, HOLD HARMLESS AND DEFEND THE COMPANY GROUP FROM AND AGAINST ANY AND ALL LOSSES ARISING OUT OF OR RESULTING FROM ANY THIRD-PARTY ACTION IN RESPECT OF THE FRAUD, GROSS NEGLIGENCE, OR INTENTIONAL OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE OPCO GROUP IN PROVIDING THE TRANSITION SERVICES, EXCEPT TO THE EXTENT CAUSED BY OR ARISING OUT OF THE FRAUD, GROSS NEGLIGENCE, OR INTENTIONAL OR WILLFUL MISCONDUCT OF, OR MATERIAL BREACH OF THIS AGREEMENT BY, ANY MEMBER OF THE COMPANY GROUP OR ANY THIRD PARTY PROVIDER. SUBJECT TO SECTION 5.4, OPCO HEREBY AGREES TO INDEMNIFY, HOLD HARMLESS AND DEFEND THE COMPANY GROUP FROM AND AGAINST ANY AND ALL LOSSES TO THE EXTENT ARISING OUT OF OR RESULTING FROM ANY ACTION OR CLAIM AGAINST THE COMPANY GROUP BY ANY THIRD-PARTY PROVIDER, RELATED TO (X) THE PROVISION OF THE TRANSITION SERVICES HEREUNDER OR (Y) ANY DISPUTE BY AND BETWEEN OPCO OR ANY OF ITS AFFILIATES AND SUCH THIRD PARTY PROVIDER OR ANY OF ITS AFFILIATES (WHETHER OR NOT SUCH DISPUTE RELATES TO THE PROVISION OF THE TRANSITION SERVICES HEREUNDER BUT SPECIFICALLY EXCLUDING ANY SUCH LOSSES CAUSED BY OR ARISING OUT OF THE FRAUD, GROSS NEGLIGENCE, OR INTENTIONAL OR WILLFUL MISCONDUCT OF, OR MATERIAL BREACH OF THIS AGREEMENT BY, ANY MEMBER OF THE COMPANY GROUP). FOR THE AVOIDANCE OF DOUBT, THE INDEMNITY IN THE PRECEDING SENTENCE SHALL NOT EFFECT THE OBLIGATION OF THE COMPANY TO PAY FEES IN ACCORDANCE WITH ARTICLE III.

5.3    Limited Liability of the OpCo Group. NO MEMBER OF THE OPCO GROUP SHALL HAVE ANY LIABILITY TO ANY MEMBER OF THE COMPANY GROUP, IN CONTRACT, TORT OR OTHERWISE, FOR OR IN CONNECTION WITH (A) ANY TRANSITION SERVICES PROVIDED OR TO BE PROVIDED OR ANY ACCESS TO ANY FACILITIES PROVIDED OR TO BE PROVIDED BY OPCO PURSUANT TO THIS AGREEMENT OR (B) ANY ACTIONS OR INACTIONS OF ANY COMPANY GROUP MEMBER IN CONNECTION WITH ANY SUCH SERVICES OR ACCESS TO ANY SUCH FACILITIES REFERRED TO IN THE IMMEDIATELY PRECEDING CLAUSE (A), IN EACH CASE, EXCEPT TO THE EXTENT THAT ANY MEMBER OF THE COMPANY GROUP SUFFERS A LOSS THAT RESULTS FROM SUCH OPCO GROUP MEMBER'S MATERIAL BREACH OF THIS AGREEMENT, FRAUD, GROSS NEGLIGENCE, OR INTENTIONAL OR WILLFUL MISCONDUCT IN CONNECTION WITH ANY SUCH SERVICES OR ACCESS TO ANY SUCH FACILITIES.

5.4    Enforceability. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IF SECTION 5.1, SECTION 5.2 OR ANY OTHER PROVISION HEREIN MODIFYING SECTION 5.1 OR SECTION 5.2 CONTAINS AN INDEMNITY OBLIGATION THAT IS UNENFORCEABLE UNDER APPLICABLE LAW, THEN THIS ARTICLE 5 WILL BE MODIFIED, READ, CONSTRUED AND ENFORCED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND ANY OBLIGATION THAT IS ENFORCEABLE WILL REMAIN IN FULL FORCE AND EFFECT AND BE BINDING ON THE PARTIES.

5.5    Determination of Losses; Limitation of Losses.

(a)    NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IN NO EVENT SHALL ANY PARTY BE LIABLE FOR, AND "LOSSES" SHALL BE DEEMED NOT TO INCLUDE, CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION, DIMINUTION IN VALUE OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING

UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSITION SERVICES, EXCEPT, IN EACH CASE, TO THE EXTENT SUCH DAMAGES ARE PAYABLE TO A THIRD PARTY.

(b)     FOR PURPOSES OF THIS AGREEMENT, THE TERM "LOSSES" MEANS ACTIONS, CHARGES, DAMAGES, FINES, PENALTIES, DEFICIENCIES, JUDGMENTS, INJUNCTIONS, ORDERS, LOSSES, LIABILITIES, AMOUNTS PAID IN SETTLEMENT, OBLIGATIONS, LIENS, COSTS AND REASONABLE EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND EXPENSES, INTEREST, COURT COSTS AND OTHER COSTS OF SUIT, LITIGATION OR OTHER PROCEEDINGS OF ANY KIND OR OF ANY CLAIM, DEFAULT OR ASSESSMENT).

(c)     NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE PARTIES AGREE AND ACKNOWLEDGE THAT IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE OPCO GROUP FOR ANY CLAIMS MADE IN RESPECT OF THIS AGREEMENT EXCEED FOR ANY REASON, IN THE AGGREGATE, AN AMOUNT EQUAL TO ONE HUNDRED PERCENT (100%) OF THE AGGREGATE AMOUNT OF FEES ACTUALLY PAID UNDER THIS AGREEMENT (THE "CAP"), EXCEPT THAT THE CAP SHALL NOT APPLY TO (1) ANY INDEMNIFICATION OBLIGATION OF OPCO UNDER SECTION 5.2 OR (2) ANY LOSS INCURRED BY ANY MEMBER OF THE COMPANY GROUP CAUSED BY OR ARISING OUT OF THE FRAUD, GROSS NEGLIGENCE, OR INTENTIONAL OR WILLFUL MISCONDUCT OF, ANY MEMBER OF THE OPCO GROUP OR ANY THIRD PARTY PROVIDER.

(d)     NEITHER PARTY SHALL CONSENT TO THE ENTRY OF ANY JUDGMENT OR ENTER INTO ANY SETTLEMENT OF ANY CLAIM TO THE EXTENT INDEMNIFIABLE UNDER THIS AGREEMENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY, WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD, CONDITIONED OR DELAYED.

5.6     Acknowledgement of the Parties; Conspicuousness. Each Party agrees that it shall not contest the validity or enforceability of any provision of this Agreement on the basis that the Party had no notice or knowledge of such provisions or that such provisions are not "conspicuous." The Parties acknowledge and agree that the provisions contained in this Agreement that are set out in "ALL CAPS" satisfy the "express negligence rule" (to the extent applicable) and any other requirement at law or in equity that provisions contained in a contract be conspicuously marked or highlighted.

**ARTICLE 6 - CONFIDENTIALITY**

6.1     Confidential Information.

(a)     For purposes of this Agreement, "Business Information" means all confidential or proprietary business, financial or technical data, documents, plans, intellectual property and other information, in whatever form, relating to the operations, businesses or assets of a Party or its Affiliates (the "Discloser") that is disclosed to, or received by, the other Party (the "Recipient") in connection with the services or arrangements contemplated by this Agreement. Each Recipient shall, and shall cause its Affiliates, directors, officers, employees, and contractors and its and their Representatives to, hold the Business Information of the Discloser in confidence and not to use or disclose such Business Information, except as reasonably required for the purposes of this Agreement or otherwise expressly permitted hereunder. Each Party (as the Recipient) shall use no less than the same degree of care that it uses to protect its own confidential information of similar sensitivity to protect the Business Information of the

other Party, but in no event less than a commercially reasonable degree of care. The restrictions of this Article 6 shall not apply to Business Information that:

(i)      is or becomes generally available to the public other than as a result of a violation of this Section 6.1 by the Recipient or its Affiliates, directors, officers, employees, or contractors or its or their Representatives;

(ii)     is developed by the Recipient or its Affiliates, directors, officers, employees, or contractors or its or their Representatives without the use of or reference to any of the Discloser's Business Information;

(iii)    is rightfully obtained by the Recipient or its Affiliates, directors, officers, employees, or contractors or its or their Representatives from a third-party source which such Person reasonably believes was not subject to any legal, contractual or fiduciary duty to the Discloser; or

(iv)    is identified in writing by the Discloser as no longer proprietary or confidential.

(b)      Nothing herein shall prevent a Recipient or its Affiliates, directors, officers, employees, or contractors or its or their Representatives from disclosing Business Information (i) as required by applicable Law or upon the order of any court or administrative agency, (ii) upon the request or demand of, or pursuant to any regulation of, any regulatory agency or authority (including any self-regulatory agency, stock exchange or quotation system), (iii) to the extent reasonably required in connection with the exercise of any remedy hereunder in connection with the conduct or defense of any civil, criminal or administrative actions, suits, complaints, enforcement actions, penalty assessments, claims, hearings, arbitrations, investigations, inquiries, audits or other proceedings (formal or informal, public or non-public) (each, an "Action"), (iv) to its Affiliates, directors, officers, employees, or contractors or its or their Representatives as necessary to perform the Transition Services pursuant to the terms of this Agreement, *provided* that such Persons are informed of the confidential nature of the Business Information, and the Recipient shall be liable to the Discloser for the use or disclosure thereof by such Person in violation of the terms hereof; *provided, further,* that if Recipient or its Affiliates, directors, officers, employees, or contractors or its or their Representatives is requested or required pursuant to clause (i) or (ii) to disclose any Business Information of the Discloser, such Recipient shall notify the Discloser promptly in writing, to the extent permitted by applicable Law, of such requirement so that the Discloser may seek a protective order or other appropriate remedy or waive compliance with this Article 6, and the Recipient or its Affiliates, directors, officers, employees, or contractors or its or their Representatives (as applicable) shall disclose only that portion of such Business Information which it believes in its reasonable judgment is legally required to be disclosed and shall use its commercially reasonable efforts to obtain assurances that confidential treatment shall be accorded such Business Information.

6.2     Length of Confidentiality Obligation. Each Party agrees to maintain and protect the confidentiality of the Business Information of the other Party as set forth in this Article 6 during the Term and for two (2) years after the expiration of the Term.

### ARTICLE 7 - MISCELLANEOUS

7.1     Waiver of Compliance. Any failure of OpCo, on the one hand, or the Company, on the other hand, to comply with an obligation, covenant, agreement or condition contained in this Agreement may be expressly waived in writing by the non-failing Party, but such waiver or failure to insist upon

strict compliance shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

7.2     Waiver of Jury Trial. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.2.

7.3     Governing Law and Venue. THIS AGREEMENT, TOGETHER WITH ANY CLAIM, DISPUTE, REMEDY OR LEGAL PROCEEDING ARISING FROM OR RELATING TO THIS AGREEMENT OR ANY RELIEF OR REMEDIES SOUGHT BY THE PARTIES, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. Each of the Parties (i) submits to the exclusive jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Court declines to accept jurisdiction over a particular matter, then the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware) in any Action arising out of or relating to this Agreement, (ii) agrees that all claims in respect of such Action may be heard and determined in any such court and (iii) agrees not to bring any Action arising out of or relating to this Agreement (whether on the basis of a claim sounding in contract, tort or otherwise) in any other court. Each of the Parties agrees that a final judgment in any such Action shall be conclusive (subject to any appeals therefrom) and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the Parties hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any Action arising out of or relating to this Agreement or the transactions contemplated hereby in any Delaware or federal court in accordance with the provisions of this Section 7.3. Each of the Parties hereby irrevocably waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such Action in any such court. Each of the Parties hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 7.5. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

7.4     Counterparts. This Agreement may be executed in any number of counterparts (including by electronic means), each such counterpart being deemed to be an original instrument, and all such counterparts taken together constituting one and the same agreement.

7.5     Notices. Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by email or overnight courier:

**If to the Company:**

NextEra Energy, Inc.
700 Universe Blvd.
Juno Beach, FL 33408
Attention: Mark Hickson
Email: mark.hickson@nexteraenergy.com

<u>with copies (which shall <u>not</u> constitute notice) to</u>:

NextEra Energy, Inc.
700 Universe Blvd.
Juno Beach, FL 33408
Attention:    Charles E. Sieving
Email:        Charles.sieving@nexteraenergy.com

and

Chadbourne & Parke LLP
1301 Avenue of the Americas
New York, New York 10019
Attention:    Howard Seife
              David LeMay
              William Greason
Email:        hseife@chadbourne.com
              dlemay@chadbourne.com
              wgreason@chadbourne.com

**If to OpCo:**

TEX Operations Company LLC
1601 Bryan Street
Dallas, Texas 75201
Attention: General Counsel
Email: stacey.dore@energyfutureholdings.com
       awright@energyfutureholdings.com

<u>with copies (which shall <u>not</u> constitute notice) to</u>:

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, TX 77002
Attention: Andrew T. Calder, P.C.
           Kevin L. Morris
           John D. Pitts
Email:  andrew.calder@kirkland.com
        kevin.morris@kirkland.com
        john.pitts@kirkland.com

and

14

Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue
Dallas, TX 75201-6912
Attention: Robert Little
Email: RLittle@gibsondunn.com

or to such other persons or addresses as may be designated in writing by the party to receive such notice as provided above. Any notice, request, instruction or other document given as provided above shall be deemed given to the receiving party upon actual receipt, if delivered personally; three (3) Business Days after deposit in the mail, if sent by registered or certified mail; upon receipt if sent by email and received by 5:00 pm (Eastern Time), on a Business Day (otherwise the next Business Day) (*provided* that if given by email such notice, request, instruction or other document shall be followed up within one (1) Business Day by dispatch pursuant to one of the other methods described herein); or on the next Business Day after deposit with an overnight courier, if sent by an overnight courier.

7.6    Modification or Amendment. Subject to the provisions of applicable Law, the Parties may only modify or amend this Agreement by written agreement executed and delivered by duly authorized officers of the respective Parties.

7.7    No Third Party Beneficiaries. Except for the indemnification of members of the Company Group (other than the Company) or members of the Opco Group (other than Opco) set forth in Article V, the Parties hereby agree that their respective covenants and agreements set forth herein are solely for the benefit of the other Parties and their permitted successors and assigns, in accordance with and subject to the terms of this Agreement, and this Agreement is not intended to, and does not, confer upon any Person other than the Parties and their permitted successors and assigns any rights or remedies hereunder, including the right to rely upon the representations and warranties set forth herein.

7.8    Specific Performance. The Parties agree that irreparable damage may occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 7.8, each of the Parties shall be entitled to enforce specifically the terms and provisions of this Agreement and to obtain an injunction, injunctions or any form of equitable relief to prevent or remedy breaches of this Agreement. Each Party hereby waives any requirement for the security or posting of any bond in connection with any such equitable remedy.

7.9    No Transfer. The Parties acknowledge and agree that nothing in this Agreement is intended to transfer any right, title, or interest in and to any tangible, intangible, real or personal property (including any and all intellectual property rights). Notwithstanding any materials, deliverables, or other products that may be created or developed by OpCo or its Affiliates from the date hereof through the expiration or termination of the Term with respect to Transition Services, OpCo does not hereby convey, nor does the Company or any of its Affiliates hereby obtain, any right, title, or interest in or to any of OpCo's or any of its Affiliates' equipment, materials, deliverables, products, or any other rights or property used to provide the Transition Services. All data, files, property or other materials and information that are supplied by the Company or any of its Affiliates in connection with this Agreement shall remain the Company's or such Affiliate's property, respectively, and OpCo shall not have any rights or interests with respect thereto.

7.10    Intellectual Property Rights.

(a)    Except as otherwise expressly provided in this Section 7.10, each of OpCo and the Company and their respective Affiliates shall retain all right, title and interest in and to their respective intellectual property and any and all improvements, modifications and derivative works thereof. No license or right, express or implied, is granted under this Agreement by OpCo, the Company or their respective Affiliates in or to their respective intellectual property, except that, solely to the extent required for the provision or receipt of the Transition Services in accordance with this Agreement, each of OpCo and the Company, for itself and on behalf of their respective Affiliates, hereby grants to the other (and their respective Affiliates) a non-exclusive, revocable, non-transferable license during the Term to such intellectual property that is provided by the granting party to the other party ("Licensee") in connection with this Agreement, but only to the extent and for the duration necessary for the Licensee to provide or receive the applicable Transition Services as permitted by this Agreement. Upon the expiration of such time, or the earlier termination of such Transition Service in accordance with this Agreement, the license to the relevant intellectual property will terminate; *provided, however,* that all licenses granted hereunder shall terminate immediately upon the expiration or earlier termination of this Agreement in accordance with the terms hereof. The foregoing license is subject to any licenses granted by others with respect to intellectual property not owned by OpCo, the Company or their respective Affiliates.

(b)    Subject to the limited license granted in Section 7.10(a), in the event that any intellectual property is created by OpCo (or a Third-Party Provider, if applicable) in the performance of the Transition Services or provision of access to the facilities, all right, title and interest throughout the world in and to all such intellectual property shall vest solely in OpCo (or such Third-Party Provider, if applicable) unconditionally and immediately upon such intellectual property having been developed, written or produced.

(c)    Except as otherwise expressly provided in this Agreement, none of OpCo (or its Affiliates) and the Company (or its Affiliates) shall have any rights or licenses with respect to any intellectual property (including software), hardware or facility of the other Party. All rights and licenses not expressly granted in this Agreement or in any other agreement contemplated by the transactions set forth in the Merger Agreement are expressly reserved by the relevant Party. Each of OpCo and the Company shall from time to time execute any documents and take any other actions reasonably requested by the other Party to effectuate the intent of this Section 7.10.

7.11    No Assumption; Other Agreements. Nothing herein shall be deemed to (a) constitute the assumption by OpCo or any of its Affiliates, or the agreement to assume, any duties, obligations or liabilities of the Company or its Affiliates whatsoever; or (b) alter, amend or otherwise modify any obligation of the Parties or their Affiliates under the Separation Agreement, the Tax Matters Agreement, the Split Participant Agreement or in any other agreement contemplated by the transactions set forth in the Merger Agreement.

7.12    Severability. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability,

nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

7.13    Interpretation; Construction.

(a)    Headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof. Where a reference in this Agreement is made to a section, annex or schedule, such reference shall be to a section of or annex or schedule to this Agreement unless otherwise indicated. Such annexes and schedules are an integral part of this Agreement and shall be treated as if fully set forth herein. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement.

(b)    The Parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

7.14    Assignment; Delegation. This Agreement shall not be assigned or delegated by a Party (in each case, whether (x) by merger, consolidation or dissolution of a Party, (y) by contract, operation of law or (z) otherwise) without the prior written consent of the other Parties, and any purported assignment or delegation in violation of this Agreement shall be null and void. Notwithstanding the foregoing, the Company and OpCo hereby acknowledge that, following the Merger, Merger Sub, as the surviving company in the Merger, shall be entitled and subject to all of the rights, benefits and obligations of the Company pursuant to this Agreement. For purposes of this Section 7.14, the term "merger" refers to any merger in which a Party is a constituent entity, regardless of whether it is the surviving or merged entity. As a condition to, and prior to the consummation of, any direct or indirect transfer or other disposition of all or substantially all of its assets (whether in a single transaction or a series of related or unrelated transactions) the Party engaging in such transfer or other disposition shall require the transferee to assume all of such Party's obligations hereunder.

7.15    Entire Agreement. This Agreement (which includes the Service Schedule), together with the Merger Agreement, the Separation Agreement, the Tax Matters Agreement, the Split Participant Agreement and the other agreements contemplated by the Merger Agreement, constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties both written and oral, between the Parties, with respect to the subject matter hereof.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized representatives as of the date and year first set forth above.

**TEX OPERATIONS COMPANY LLC**

By: _____
Name:
Title:

**ENERGY FUTURE HOLDINGS CORP.**

By: _____
Name:
Title:

**Annex A**

**Service Schedule**

| Service Category | Description |
|---|---|
| Business Services Administration | Service Category shall include the administration, maintenance, reporting, analysis, and other activities relating to benefits, payroll, taxes, and other general business functions. |
| Corporate Controller | Service Category shall include the administration, maintenance, reporting, analysis, and other activities relating to the tasks of a corporate controller, including external auditing, outsourced accounting services, and other accounting-related functions. |
| Corporate Secretary | Service Category shall include the administration, maintenance, reporting, analysis, and other activities relating to historical corporate records, and other general administrative functions. |
| Tax (covering all types of income and non-income taxes; *e.g.*, federal, state, property, sales/use) | Service Category shall include the administration, maintenance, reporting, analysis, consulting, and other activities relating to tax returns, external audits, tax payments, and other tax-related accounting functions. Includes, but is not limited to:<br><br>• Filing any extensions<br>• Preparation and filing of the final federal short period income tax return for the EFH group<br>• Preparation and filing of all state income and franchise tax returns for the EFH group, whether relating to pre-close or post-close periods<br>• Preparation and filing of property tax returns for the EFH group<br>• Preparation and filing of sales/use tax returns for the EFH group<br>• Assistance, as requested, with tax examinations, including appeals of any property tax valuations or assessments<br><br>Tax-related systems integration and assistance with transitioning responsibility for the EFH group Tax function to Parent. |
| Human Resources | Service Category shall include the administration, maintenance, reporting, analysis, and other activities relating to benefits, records, compliance, and other HR-related functions. |
| Information Technology | Service Category shall include the administration, maintenance, reporting, analysis, and other activities relating to Company information technology systems, including general oversight, facilities, application and infrastructure services, and other functions, including the migrating of data and information as described in Section 1.1(b). |
| Internal Audit and SOX Compliance | Service Category shall include the administration, maintenance, reporting, analysis, and other activities relating to internal audits and SOX compliance, including administration of a key control system, management of officer certifications, and other internal compliance |

| Service Category | Description |
|---|---|
| | functions. |
| Treasury | Service Category shall include the administration, maintenance, reporting, analysis, and other activities relating to treasury operations, liquidity management, risk management relating to insurance, trust and pension funds and other treasury-related functions. |
| Legal Services | Service Category shall include support for the administration, maintenance, reporting, analysis, and other activities relating to litigation management, compliance with respect to all applicable Laws, general corporate transactions, employee benefits, labor Laws, reporting (periodic and current Exchange Act reports) and other compliance with applicable securities Laws and other applicable Laws and regulations, and other legal functions, in each case only as such relates to non-privileged assistance or historical information. |

**Project Managers**

<u>For the Company</u>

| <u>**Service Category**</u> | <u>**Name**</u> | <u>**Telephone**</u> | <u>**Email**</u> |
|---|---|---|---|
| Business Services Administration | Kirk Crews<br>Jessica Wang | 561-694-3228<br>561-304-6124 | kirk.crews@nee.com<br>jessica.wang@nee.com |
| Corporate Controller | Kirk Crews | 561-694-3228 | kirk.crews@nee.com |
| Corporate Secretary | Scott Seeley | 561-691-7038 | scott.seeley@nee.com |
| Tax | David Tahan | 561-691-7279 | david.tahan@nee.com |
| Human Resources | Jessica Wang | 561-304-6124 | jessica.wang@nee.com |
| Information Technology | Lakshman Charanjiva | 561-694-4639 | lakshman.charanjiva@nee.com |
| Internal Audit and SOX Compliance | Kate Stengle | 561-304-5311 | kate.stengle@nee.com |
| Treasury | Joe Balzano | 561-691-7353 | joseph.balzano@nee.com |
| Legal Services | Aruna Chandra | 561-304-5359 | aruna.chandra@nee.com |

<u>For OpCo</u>

[Project Managers for OpCo and their respective contact details will be provided by OpCo as soon as practicable and prior to the Closing Date, and will include at least one OpCo officer to oversee the Transition Services.]

**Annex B**

**No Conflicts**

None.

**Annex C**

**Fees**

Approximately $7.5 million for six months.

## Exhibit I

### Private Letter Ruling and Tax Opinions[1]

The following are "Supplemental Rulings":

<blockquote>

(a)     The unsecured EFH Creditors and the unsecured EFIH Creditors, to the extent such creditors receive Common Stock in the EFH Issuances, will be treated as "owners of the enterprise" with respect to EFH for purposes of Treasury Regulations Section 1.355-2(c)(1).

(b)     Persons receiving Reorganized EFH Common Stock pursuant to the EFH Issuances will not be aggregated for purposes of applying Section 355(d) to the Reorganized TCEH Spin-Off.

(c)     In addition to the specific Supplemental Rulings listed above, a ruling in form and substance reasonably satisfactory to the Company and Parent that the Merger does not cause Section 355(d) to apply to the Reorganized TCEH Spin-Off. A ruling that provides that Parent will not be aggregated with persons receiving Reorganized EFH Common Stock pursuant to the EFH Issuances shall be a reasonably satisfactory ruling for these purposes

</blockquote>

The following are "Fundamental Opinions":

<blockquote>

(a)     The following opinions of nationally recognized tax counsel or a Big Four accounting firm (who shall be permitted to rely upon reasonable representations, including a representation that the Debtors and Reorganized TCEH have no plan or intention at the time of the Merger to take, and have not taken, any action that is inconsistent with the Spin-Off Intended Tax Treatment), at a "should" level:

> (i)     Taking into account the Merger, the Contribution, Reorganized TCEH Conversion, and Distribution should meet the requirements of Sections 368(a)(1)(G), 355, and 356 of the Internal Revenue Code.

> (ii)     EFH should not recognize gain for U.S. federal income tax purposes as a result of the Contribution or the Reorganized TCEH Conversion other than gain recognized pursuant to the transfer of assets to the Preferred Stock Entity and the Preferred Stock Sale.

> (iii)     EFH should recognize no gain or loss for U.S. federal income tax purposes upon the Distribution.

(b)     The following opinion of nationally recognized tax counsel or a Big Four

</blockquote>

---

[1] Terms used but not defined in this Exhibit I shall have the meanings ascribed to them in the Initial IRS Submissions.

Exhibit I

accounting firm (who shall be permitted to rely upon reasonable representations, including a representation that the Debtors and Reorganized TCEH have no plan or intention at the time of the Merger to take, and have not taken, any action that is inconsistent with the Spin-Off Intended Tax Treatment), at a "will" level that Section 355(g) will not apply to the Reorganized TCEH Spin-Off.

Exhibit I

## Exhibit J

**Separation Agreement**

*(See Attached)*

# FORM OF
# SEPARATION AGREEMENT

THIS SEPARATION AGREEMENT (as hereinafter amended, restated or modified from time to time in accordance with the terms hereof, this "Agreement"), is made and entered into as of [●], 2016, by and between Energy Future Holdings Corp., a Texas corporation (the "Company"), TEX Energy LLC, a Delaware limited liability company ("SpinCo"), and TEX Operations Company LLC, a Delaware limited liability company ("OpCo," and together with the Company and SpinCo, the "Parties" and each individually, a "Party"). Section 1.1 contains the defined terms set forth herein; and capitalized terms used but not defined herein are set forth in the Plan of Reorganization (as defined below).

## RECITALS

WHEREAS, on April 29, 2014, the Company and certain of its Subsidiaries (collectively, the "Debtors"), including Texas Competitive Electric Holdings Company LLC ("TCEH"), a Delaware limited liability company, commenced voluntary cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes only under Case No. 14-10979 (collectively, together with any proceedings relating thereto, the "Chapter 11 Cases");

WHEREAS, the Debtors continue to operate their respective businesses as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on July 29, 2016, the Company, Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), NextEra Energy, Inc., a Florida corporation ("Parent"), and EFH Merger Co., LLC, a Delaware limited liability company and direct wholly owned subsidiary of Parent ("Merger Sub"), entered into that certain Agreement and Plan of Merger (as amended, the "Merger Agreement"), which provides for, among other things, the merger of the Company with and into Merger Sub (the "Merger"), with Merger Sub being the surviving company and the successor to the Company;

WHEREAS, the Third Amended Joint Plan of Reorganization filed by the Debtors with the Bankruptcy Court on July 29, 2016 (as amended as of the date hereof, the "Plan of Reorganization") provides that the confirmation and effective date of the Plan of Reorganization with respect to the TCEH Debtors may occur separate from, and independent of, the confirmation and effective date of the Plan of Reorganization with respect to the EFH Debtors.

WHEREAS, on [●], 2016, the Bankruptcy Court entered an [amended] order approving and confirming, among other things, the restructuring of the TCEH Debtors pursuant to the Plan of Reorganization;

WHEREAS, the Plan of Reorganization provides for the Parties to enter into this Agreement as part of the means for implementing the Restructuring Transactions under Article IV.B.2 of the Plan of Reorganization;

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, the mutual benefits to be gained by the performance thereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, each of the Parties hereby agrees as follows:

# ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  Except as otherwise expressly provided in this Agreement, or unless the context otherwise requires, whenever used in this Agreement (including any Schedules hereto), the following terms shall have the respective meanings specified therefor below.

"Acquired TCEH Assets" means the Assets set forth in Schedule 1. For the avoidance of doubt, the Acquired TCEH Assets specifically exclude any third-party professional advisor engagement letters.

"Action" means civil, criminal or administrative actions, suits, complaints, enforcement actions, penalty assessments, claims, hearings, arbitrations, investigations, inquiries, audits or other proceedings (formal or informal, public or non-public).

"Affiliate" means, with respect to any Person, any other Person, directly or indirectly controlling, controlled by or is under common control with, such Person. For purposes of this definition, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Approvals and Notifications" means any consents, waivers, approvals, permits or authorizations to be obtained from, notices, registrations or reports to be submitted to, or other filings to be made with, any third Person, including any Governmental Entity.

"Assets" means all rights, properties or other assets, whether real, personal or mixed, tangible or intangible, of any kind, nature and description, whether accrued, contingent or otherwise, and wherever situated and whether or not carried or reflected, or required to be carried or reflected, on the books of any Person.

"Assignment and Assumption Agreement" means (i) any Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit A, executed to transfer the Acquired TCEH Assets as provided in Section 2.1(b)(i), and (ii) any Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit B, executed to transfer the Contributed Plans as provided in Section 2.1(b)(ii), in each case, individually or collectively as the context requires.

"Assumed Liabilities" means, subject to Section 5.11, all Liabilities set forth on Schedule 4 and all Liabilities of the Company, EFCH and TCEH, under, resulting from, or arising out of, as applicable, the Acquired TCEH Assets, in each case arising out of facts, circumstances, events or conditions in existence before, on or after the TCEH Effective Date.

"Assumed Plan" has the meaning ascribed to such term in the Merger Agreement.

"Benefit Plans" means all material benefit and compensation plans, programs, policies or arrangements (as amended through the date hereof) covering current or former employees, officers, managers, members and directors of the Company and its Subsidiaries, including "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, and employment, deferred compensation, change in control, non-competition, retention, termination, severance, stock option, stock purchase, stock appreciation rights, stock based, incentive and bonus plans, agreements, programs, policies or arrangements sponsored, contributed to, or entered into by the Company or its Subsidiaries.

"Company Group" means the Company, each Subsidiary or Affiliate of the Company, and each other Person that is controlled, directly or indirectly, by the Company, in each case, immediately

2

after the Distribution Effective Time; *provided*, *however*, that no Representative of any of the foregoing who is a natural person shall be deemed a member of the Company Group.

"Company Disclosure Letter" means the Company Disclosure Letter to the Merger Agreement.

"Contributed Plans" means each Benefit Plan that will be transferred by the Company or its Subsidiaries as an active plan to SpinCo or one of its Subsidiaries as set forth in Section 5.1(h)(i)(B) of the Company Disclosure Letter.

"Contribution Effective Time" means the time on the TCEH Effective Date, immediately following the cancellation of Claims against the TCEH Debtors when the transfers and other transactions referred to in Section 2.1 have been completed, determined without taking into account any Acquired TCEH Assets or Assumed Liabilities that may be retained in accordance with Section 2.2(b) or Section 2.2(c).

"Distribution Effective Time" means the effective time of the Distribution.

"EFH Non-Qualified Benefit Plans" means the following benefit plans sponsored by the Company and/or its Affiliates: (1) Retirement Income Restoration Plan of Enserch Corporation and Participating Subsidiaries; (2) ENSERCH Supplemental Payment Plan for Retired Employees; (3) EFH Salary Deferral Program, as amended; and (4) EFH Second Supplemental Retirement Plan, effective as of October 10, 2007, as amended.

"EFH/TCEH Guarantees" means the guarantees, indemnification obligations, surety bonds or other credit support agreements, arrangements or understandings or other commitments of the Company or any of its Subsidiaries in connection with or in support of TCEH, any TCEH Company or the TCEH Assets, including those set forth on Schedule 2.

"Excluded Liabilities" means, other than the Assumed Liabilities (which for the avoidance of doubt are being assumed by SpinCo or a member of the SpinCo Group pursuant to Section 2.1) and the TCEH Company Liabilities (which for the avoidance of doubt are and shall remain Liabilities of the TCEH Companies), (i) the DiscOp OPEB Liabilities (as defined in the Merger Agreement) and (ii) all Liabilities of each of the Persons listed on Schedule 6 that are not discharged, released, finally settled or otherwise disposed of under the Plan of Reorganization, in each case, arising out of facts, circumstances, conditions or events in existence before, on or after the TCEH Effective Date.

"Governmental Entity" means any federal, state or local, domestic or foreign governmental or regulatory authority, agency, commission, body, arbitrator, court, regional reliability entity (including the TRE), ERCOT, or any other legislative, executive or judicial governmental entity.

"Group" means the Company Group or the SpinCo Group, as the context requires.

"Information" means information, whether or not patentable or copyrightable, in written, oral, electronic or other tangible or intangible forms, stored in any medium, including studies, reports, records, books, contracts, instruments, surveys, discoveries, ideas, concepts, know-how, techniques, designs, specifications, drawings, blueprints, diagrams, models, prototypes, samples, flow charts, data, computer data, disks, diskettes, tapes, computer programs or other software, marketing plans, customer names, and other technical, financial, employee or business information or data.

"Insurance Proceeds" means those monies (i) received by an insured from an insurance carrier, (ii) paid by an insurance carrier on behalf of the insured or (iii) received (including by way of set off) from any third Person (which, for greater clarity, shall not include any controlled Affiliate of the Company Group or SpinCo Group) in the nature of insurance, contribution or indemnification in respect of any Liability; in any such case net of any applicable retrospective premium adjustments (including

3

reserves and retrospectively rated premium adjustments) and net of any costs or expenses incurred in the collection thereof.

"Law" means any federal, state, local or foreign law, statute or ordinance, common law or any rule, regulation, legally binding standard, judgment, order, writ, injunction, decree, arbitration award, agency requirement or License of any Governmental Entity.

"Liabilities" means any and all debts, guarantees, liabilities, costs, expenses, interest and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, reserved or unreserved, or determined or determinable (now or in the future), including those arising under any Law, claim (including any third Person product liability claim), demand, Action, whether asserted or unasserted, or order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Entity and those arising under any contract, agreement, obligation, indenture, instrument, lease, promise, arrangement, release, warranty, commitment or undertaking, or any fines, damages or equitable relief that is imposed, in each case, including all reasonable out-of-pocket costs and expenses relating thereto. For the avoidance of doubt, Liabilities shall specifically exclude (i) all Taxes, which are solely the subject of the Tax Matters Agreement and (ii) all matters subject to and governed by the Split Participant Agreement or the Transition Services Agreement.

"Oncor Agreements" means collectively, (i) the Oncor Holdings Second Amended and Restated Limited Liability Company Agreement dated as of November 5, 2008, (ii) the Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Company LLC, dated as of November 5, 2008, as amended, and (iii) the Investor Rights Agreement, dated as of November 5, 2008.

"Organizational Documents" means, with respect to any Person, the articles or certificate of incorporation or organization and by-laws, the limited partnership agreement, the partnership agreement or the limited liability company agreement, trust agreement, or other organizational documents of such Person, including (i) any shareholder, voting trust or similar contract and (ii) any that are required to be registered or kept in the place of incorporation, organization or formation of such Person and which establish the legal personality or governance of such Person.

"Permits" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents and orders issued or granted by a Governmental Entity.

"Person" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Entity or other entity of any kind or nature.

"Refund" means any refund (or credit in lieu thereof) of Taxes (including any overpayment of Taxes that can be refunded or, alternatively, applied to other Taxes payable), including any interest paid on or with respect to such refund of Taxes.

"Related to the TCEH Business" means assets of the Company or any of its Subsidiaries that are owned, leased, licensed, held or used primarily for or in connection with the business of the TCEH Companies.

"Representatives" means, with respect to any Person, its members, partners, directors, officers, managers, employees, advisors, agents or other representatives.

"Specified Approvals" means those Approvals and Notifications set forth in Schedule 3.

"SpinCo Group" means SpinCo, each Subsidiary of SpinCo and each other Person that is controlled directly or indirectly by SpinCo, in each case, immediately after the Distribution, including the TCEH Companies; *provided, however,* that no Representative of any of the foregoing who is a natural person shall be deemed a member of the SpinCo Group.

4

"Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or other ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions, is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries (*provided that*, notwithstanding the foregoing, the Subsidiaries of the Company shall be deemed to include Oncor).

"Tax" or "Taxes" means any and all U.S. federal, state or local, or foreign, income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever (including any assessment, duty, fee or other charge in the nature of or in lieu of any such tax) and any interest, penalty, or addition thereto, whether disputed or not.

"Tax Benefit" means any decrease in Tax payments actually required to be made to a Governmental Entity (or any increase in any Refund otherwise receivable from any Governmental Entity) including any decrease in Tax payments (or increase in any Refund) that actually results from an increase in net operating losses, deductions or other Tax attributes (computed on a "with" or "without" basis).

"Tax Cost" means any increase in Tax payments actually required to be made to a Governmental Entity (or any decrease in any Refund otherwise receivable from any Governmental Entity) including any increase in Tax payments (or decrease in any Refund) that actually results from a decrease in net operating losses, deductions or other Tax attributes (computed on a "with" or "without" basis).

"Tax Return" means any return, report, certificate, form or similar statement or document (including any related or supporting information or schedule attached thereto and any information return or declaration of estimated Tax) supplied to, filed with or required to be supplied to or filed with a Governmental Entity in connection with the payment, determination, assessment or collection of any Tax or the administration of any laws relating to any Tax, and any amended Tax return or claim for Refund.

"TCEH Assets" has the meaning ascribed to such term in the Plan of Reorganization.

"TCEH Companies" means each of the Persons listed in Schedule 5, individually or collectively as the context requires.

"TCEH Company Liabilities" means, subject to Section 5.11, (i) all Liabilities of the TCEH Companies, including all Liabilities under the Organizational Documents of the TCEH Companies to provide indemnification to any Person acting as a manager, member, partner, agent, attorney-in-fact, or other Representative of any TCEH Company, in each case arising out of facts, circumstances, events or conditions in existence before, on or after the TCEH Effective Date, and (ii) all Liabilities of the Company arising out of or resulting from owning, holding or voting, directly or indirectly, any equity securities of, or having "control" (as defined in the Merger Agreement) of, any of the TCEH Companies, other than any such Liabilities arising out of or resulting from Taxes (which shall be governed solely by the Tax Matters Agreement) or any Assumed Plan.

"TCEH Effective Date" has the meaning ascribed to such term in the Plan of Reorganization.

"Transaction Agreements" has the meaning ascribed to such term in the Plan of Reorganization.

"Transition Services Agreement" has the meaning ascribed to such term in the Merger Agreement.

Section 1.2    Additional Defined Terms.    In addition to the terms defined in Section 1.1, additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated in the table below.

| **Defined Term** | **Section** |
| --- | --- |
| Agreement | Preamble |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Beneficiaries | Section 7.4(g) |
| Chapter 11 Cases | Recitals |
| Company | Preamble |
| Company Change in Control | Section 7.4(b) |
| Company Indemnified Parties | Section 5.2 |
| Company Policy Liabilities | Section 7.19(a) |
| Contribution | Recitals |
| Debtors | Recitals |
| Distribution | Recitals |
| EFH D&O Policies | Section 7.4(a) |
| EFIH | Recitals |
| E-Side Letters of Credit | Section 7.19(c) |
| Indemnified Party | Section 5.6 |
| Indemnifying Party | Section 5.6 |
| Indemnity Payment | Section 5.6 |
| Merger | Recitals |
| Merger Agreement | Recitals |
| Parent | Recitals |
| Party | Preamble |
| Pre-Spin Group | Section 7.4(a) |
| PUCT | Section 7.3 |
| PUCT Filing | Section 7.3 |
| Run-Off Coverage | Section 7.4(b) |
| Spin-Off | Recitals |
| SpinCo | Preamble |
| SpinCo Conversion | Recitals |
| SpinCo Policy Liabilities | Section 7.19(a) |
| Split Letters of Credit | Section 7.19(a) |
| TCEH | Recitals |
| Third Party Claims | Section 5.7(a) |
| Wrongful Acts | Section 7.4(a) |

Section 1.3    Construction.  In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)    the descriptive headings of the Articles, Sections, Exhibits and Schedules of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(c)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (.pdf), facsimile transmission or comparable means of communication;

6

(d)     words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(e)     the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Schedules attached to this Agreement, and not to any provision of this Agreement;

(f)     "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(g)     references to "day" or "days" are to calendar days;

(h)     references to "the date hereof" means as of the date of this Agreement; and

(i)     unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder in effect as of the applicable date.

## ARTICLE II

## THE CONTRIBUTION TRANSACTIONS

Section 2.1     Contribution.

(a)     On the TCEH Effective Date, (i) the Company shall, and shall cause its Subsidiaries which are, or hold, TCEH Assets to, transfer, convey and deliver to SpinCo or a member of the SpinCo Group designated by SpinCo, and SpinCo or such member of the SpinCo Group, as applicable, shall accept from the Company and such Subsidiaries, the TCEH Assets, and (ii) SpinCo or such member of the SpinCo Group designated by SpinCo, as applicable, shall accept, assume and agree faithfully to perform, discharge and fulfill all the Assumed Liabilities.

(b)     In furtherance of the transactions described in Section 2.1(a), on the TCEH Effective Date:

(i)     the Company and SpinCo shall, and the Company and SpinCo shall cause their applicable Subsidiaries to, execute assignment and assumption agreements substantially in the form attached hereto as Exhibit A, and such additional bills of sale, quitclaim deeds, stock or equity powers, certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment and other documents as are reasonably necessary to evidence the transfer, conveyance and assignment of the TCEH Assets to SpinCo or the applicable member of the SpinCo Group designated by SpinCo and the valid and effective assumption of the Assumed Liabilities by SpinCo or the applicable member of the SpinCo Group designated by SpinCo; and

(ii)     the Contributed Plans will be transferred and assigned by the Company and the applicable Debtors and assumed by OpCo pursuant to the Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit B.

Each of the assignments, transfers, assumptions and other transactions described in this Section 2.1(b) shall be deemed effective simultaneously on the TCEH Effective Date at the Contribution Effective Time, except with respect to any transfer or assignment of any Acquired TCEH Assets or assumption of any Assumed Liabilities required to be delayed pursuant to Section 2.2(b).

(c)     SpinCo hereby waives compliance by each and every member of the Company Group, and the Company hereby waives compliance by each and every member of the SpinCo Group, with the requirements and provisions of any "bulk-sale" or "bulk-transfer" Laws of any

jurisdiction that may otherwise be applicable with respect to the transfer or sale of any or all of the Acquired TCEH Assets to SpinCo.

Section 2.2      Approvals and Notifications.

(a)      The Parties will use their commercially reasonable efforts to obtain all material Approvals and Notifications, if any, necessary to consummate the transactions contemplated by this Agreement, as soon as reasonably practicable, including the Specified Approvals, if any.

(b)      If the transfer or assignment of any Acquired TCEH Assets or assumption of any Assumed Liabilities would violate, in any material respect, any applicable Law or require any Approvals and Notifications or release which have not been obtained or made, notwithstanding the receipt of the Specified Approvals, then those Acquired TCEH Assets or Assumed Liabilities will be identified in reasonable detail in a written notice given by any Party that would violate such Law by the transfer or receipt of the Acquired TCEH Assets or the assignment or assumption of the Assumed Liability or require such Approvals and Notifications or release, and unless the Parties mutually shall otherwise determine, the transfer or assignment of such Acquired TCEH Assets or the assumption of such Assumed Liabilities, as the case may be, shall be automatically deemed deferred and any such purported transfer, assignment or assumption shall be null and void until such time as all such Approvals and Notifications or releases have been obtained or made.

(c)      If any transfer or assignment of any Acquired TCEH Asset or any assumption of any Assumed Liability intended to be transferred, assigned or assumed hereunder, as the case may be, is not consummated on the TCEH Effective Date, as a result of the provisions of Section 2.2(b) or otherwise, then the Parties shall use commercially reasonable efforts to effect such transfer, assignment or assumption as promptly following the TCEH Effective Date as shall be reasonably practicable. The member of the Company Group retaining such Acquired TCEH Asset or such Assumed Liability, as the case may be, shall thereafter hold such Acquired TCEH Asset or Assumed Liability, as the case may be, for the use and benefit of the member of the SpinCo Group entitled thereto (at the expense of the member of the SpinCo Group entitled thereto) until such Acquired TCEH Asset or Assumed Liability is transferred and conveyed to, and assumed by, or until such time as the Company, in good faith, concludes that it is unable, using commercially reasonable efforts, to obtain or cause to be obtained, any consent, approval or release required to transfer such Acquired TCEH Asset or Assumed Liability to, a member of the SpinCo Group, and SpinCo shall, or shall cause the applicable member of the SpinCo Group to, pay or reimburse the Party retaining such Acquired TCEH Asset or Assumed Liability for all amounts reasonably paid or incurred in connection with the retention of such Acquired TCEH Asset or Assumed Liability.  The Parties agree that, as between the Parties, as of the TCEH Effective Date, the applicable member of the SpinCo Group shall be deemed to have acquired complete and sole beneficial ownership over all of the Acquired TCEH Assets, together with all rights, powers and privileges incident thereto, and shall be deemed to have assumed in accordance with the terms of this Agreement all of the Assumed Liabilities, and all duties, obligations and responsibilities incident thereto, which such member is entitled to acquire or required to assume pursuant to the terms of this Agreement.

(d)      With respect to any Acquired TCEH Assets or Assumed Liabilities described in Section 2.2(c), each of the Company and SpinCo shall, and shall cause the members of its respective Group to, (i) treat for all income Tax purposes and for all purposes of the Tax Matters Agreement, (A) any Acquired TCEH Asset retained by the Company Group as having been transferred to and owned by the member of the SpinCo Group entitled to such Acquired TCEH Asset not later than the TCEH Effective Date and (B) any Assumed Liability retained by the Company Group as a liability having been assumed and owned by the member of the SpinCo Group intended to be subject to such Assumed Liabilities not later than the TCEH Effective Date

and (ii) neither report nor take any income Tax position (on a Tax Return or otherwise) inconsistent with such treatment (unless required by a change in applicable Tax Law or good faith resolution of a dispute with a Governmental Entity relating to income Taxes).

(e)     If and when any violation of Law or other impediment with respect to such retained Acquired TCEH Asset or Assumed Liabilities has been resolved, the transfer or assignment of the applicable Acquired TCEH Asset or the assumption of the applicable Assumed Liability, as the case may be, shall be effected in accordance with the terms of this Agreement and the applicable Assignment and Assumption Agreement.

(f)     Any member of the Company Group retaining an Acquired TCEH Asset or Assumed Liability due to the deferral of the transfer or assignment of such Acquired TCEH Asset or the deferral of the assumption of such Assumed Liability, as the case may be, shall not, in connection with such retention, be obligated, unless the Parties have executed documentation providing for such asset or liability to be retained by such member of the Company Group pursuant to Section 2.2(b), to expend any money whatsoever unless the necessary funds are advanced (or otherwise made available) by SpinCo or the member of the SpinCo Group entitled to the Acquired TCEH Asset or Assumed Liability.

Section 2.3    Responsibility for Assumed Liabilities Retained by the Company. If the Company or SpinCo is unable to obtain, or to cause to be obtained, any consent, approval, amendment or release required to transfer an Assumed Liability to a member or members of the SpinCo Group, then the applicable member of the Company Group shall continue to retain such Assumed Liability and, the applicable member of the SpinCo Group shall, as agent or subcontractor for such member of the Company Group, as the case may be, pay, perform and discharge fully all the obligations or other Liabilities of such member of the Company Group that constitute or are caused by such Assumed Liabilities, as the case may be, thereunder from and after the Contribution Effective Time. From and after the Contribution Effective Time, OpCo shall indemnify each Company Indemnified Party, and hold each of them harmless, against any Liabilities arising from any such retained Assumed Liability; *provided that* OpCo shall have no obligation to indemnify any Company Indemnified Party that has engaged in any fraud, willful misconduct or knowing and intentional violation of Law, in each case in connection therewith. The Company shall cause each member of the Company Group without further consideration, to pay and remit, or cause to be paid or remitted, to the applicable member of the SpinCo Group, promptly all money, rights and other consideration received by it or any member of the Company Group in respect of such performance under any agreement, lease, license or other obligations or Liabilities under any Assumed Liability retained by any member of the Company Group; *provided that* the Company shall be entitled to offset any amounts owed by the SpinCo Group to any member of the Company Group hereunder. If and when any such consent, substitution, approval, amendment or release shall be obtained, or the obligations under any agreement, lease, license or other obligations or Liabilities under any Assumed Liability retained by any member of the Company Group shall otherwise become assignable or able to be novated, the applicable member of the Company Group shall promptly assign, or cause to be assigned, all its obligations and other Liabilities thereunder or any obligations of any member of the Company Group to the applicable member of the SpinCo Group without payment of further consideration, and the applicable member of the SpinCo Group shall, without the payment of any further consideration, assume such obligations or other Liabilities in accordance with the terms of this Agreement and the applicable Assignment and Assumption Agreement.

## ARTICLE III

## ACCESS TO INFORMATION

Section 3.1    Agreement for Exchange of Information. After the TCEH Effective Date and until the seventh (7th) anniversary of the TCEH Effective Date, each of the Company and SpinCo agrees to provide, or to cause any Person that after giving effect to the Contribution is controlled by the

Company or SpinCo, as applicable, to provide, to the other Party, as soon as reasonably practicable after written request therefor, any Information regarding the Company Group or the SpinCo Group, as applicable, which is in the possession or under the control of such Party and which the requesting Party reasonably requests; *provided, however,* that in the event that any Party determines that any such provision of Information could be commercially detrimental, violate any Law or agreement, or waive any attorney-client privilege, such Party shall not be required to provide any such Information; *provided, further*, that such Party shall use commercially reasonable efforts to cooperate with reasonable requests that would enable such otherwise not-required disclosures to the other Party to occur without commercial detriment and without contravening any such Law or jeopardizing privilege, *provided, further*, that, as applicable, the Party making such assertion that Information be withheld, shall, to the extent permitted by applicable Law, provide notice to the receiving party that Information is being withheld pursuant to this proviso and the Parties shall use their respective commercially reasonable efforts to find a mutually agreeable solution to any such commercial, legal and/or privilege concerns, including, if applicable, by providing any privileged Information pursuant to a joint defense agreement to be mutually agreed and executed between the applicable Parties. None of the Company Group shall transfer any Information regarding the SpinCo Group to any of its Affiliates not controlled, directly or indirectly, by the Company. Notwithstanding the foregoing, requests for and provision of Information relating to Taxes shall be governed by Section 7.01 of the Tax Matters Agreement.

Section 3.2    Ownership of Information. Unless specifically set forth herein, nothing contained in this Agreement shall be construed as granting or conferring rights of license or otherwise in any Information requested or provided pursuant to Section 3.1.

Section 3.3    Compensation for Providing Information. The Party requesting Information agrees to reimburse the other Party for the reasonable third-party out-of-pocket costs and expenses, if any, of creating, gathering and copying such Information to the extent that such costs are incurred in connection with such other Party's provision of Information in response to the requesting Party; *provided, however*, nothing in this Section 3.3 shall limit any of the reimbursement or indemnification obligations of any member of the SpinCo Group under Section 2.2(c) or Section 2.3.

Section 3.4    Record Retention.

(a)    To facilitate the possible exchange of Information pursuant to this Article III and other provisions of this Agreement after the TCEH Effective Date, the Parties agree to use their commercially reasonable efforts to retain all Information in their respective possession or control in accordance with the policies or ordinary course practices of the Company in effect on the TCEH Effective Date or such other policies or practices as may be reasonably adopted by the appropriate Party after the TCEH Effective Date that are substantially consistent with the policies of the Company and its subsidiaries as in effect on the TCEH Effective Date; *provided*, that, in any event, the Parties agree to retain such Information in their respective possession or control until the seventh (7th) anniversary of the TCEH Effective Date in accordance with Section 3.1.

(b)    Until the seventh (7th) anniversary of the TCEH Effective Date, no Party will destroy, or permit any of its Subsidiaries to destroy, any Information that would, in accordance with such policies or ordinary course practices described in Section 3.4(a), be archived or otherwise filed in a centralized filing system by such Party or its applicable Subsidiaries, until the later of the seventh (7th) anniversary of the TCEH Effective Date and the period required by applicable Law.

(c)    In the event of any Party's or any of its Subsidiaries' inadvertent failure to comply with this Section 3.4, such Party shall be liable to the other Party solely for the amount of any monetary fines or penalties imposed or levied against such other Party by a Governmental Entity (which fines or penalties shall not include any Liabilities asserted in connection with the claims underlying the applicable Action, other than fines or penalties resulting from any claim of

spoliation) as a result of such other Party's inability to produce Information caused by such inadvertent failure and, notwithstanding Section 5.2 and Section 5.3, shall not be liable to such other Party for any other Liabilities arising out of its or any of its Subsidiaries' inadvertent failure to comply with this Section 3.4; *provided*, *however*, no member of the Company Group shall have any Liability to any member of the SpinCo Group under this Section 3.4(c) in connection with any Acquired TCEH Assets or Assumed Liabilities that are retained by a member of the Company Group pursuant to Section 2.2 or Section 2.3.

(d)    Notwithstanding the foregoing, record retention relating to Taxes shall be governed by Section 7.02 of the Tax Matters Agreement.

Section 3.5    Confidentiality. Each Party recognizes and acknowledges that it has received, or is in possession of, certain non-public, confidential, or proprietary Information (including trade secrets) of the other Party or its respective Group (the "Confidential Information"). Each Party agrees that it will not, that it will cause its Affiliates not to, and that it will use commercially reasonable efforts to cause each of its and their respective Representatives not to, for a period of five (5) years after the TCEH Effective Date, directly or indirectly, use Confidential Information of the other Party or its respective Group for its competitive, commercial or proprietary advantage, or disclose, divulge or publish, whether in written or unwritten form or through any medium, such Confidential Information publicly or to any Person or group of Persons for any reason or purpose whatsoever, except: (i) to authorized Representatives of such Party as reasonably necessary in the course of performing such Party's obligations, or enforcing such Party's rights, under this Agreement or the other Transaction Agreements and (ii) to the extent required to be disclosed by order of a Governmental Entity, or by subpoena, summons or legal process, or by Law, provided that, to the extent permitted by Law, the disclosing Party shall provide prompt notice of such disclosure to the applicable other Party, so that such Party whose Confidential Information is required to be disclosed may seek to obtain an order or other reliable assurance that confidential treatment will be accorded to designated portions of such Confidential Information, and the disclosing Party shall reasonably cooperate with the other Party in connection with such other Party's efforts to obtain confidential treatment or similar reliable assurances that the relevant Confidential Information will remain confidential. For purposes of this Section 3.5, such Confidential Information shall not include any Confidential Information that (a) was or becomes generally available to the public other than as a result of a disclosure by such Person (or its Affiliates or Representatives) in violation of this Agreement, (b) becomes available to such Person or any of such Person's Affiliates or Representatives after the date hereof from a source other than the other Party hereto or its respective Group or such Group's Representatives, provided that such source is not known by such Person to be subject to an obligation of confidentiality (whether by agreement or otherwise) to the other Party with respect to the Information or (c) was independently developed by such Person (or its Affiliates) after the date hereof without reference to, incorporation of, or other use of any Confidential Information. The limitations in this Section 3.5 are in addition to, and not in lieu of, any other restrictions by which a Party may be bound (whether by contract or otherwise).

Section 3.6    Other Agreements Providing for Exchange of Information.

(a)    Any Party that receives, pursuant to a request for Information in accordance with this Article III, Information that is not relevant to its request shall promptly either destroy such Information or return it to the providing Party, at the option of the providing Party, and if the receiving Party elects to destroy such Information, then the receiving party shall promptly deliver written confirmation (including by email) of the destruction of such Information to the providing Party.

(b)    When any Information provided by one Group to the other is no longer needed for the purposes contemplated by this Agreement or any other Transaction Agreement or is no longer required to be retained by applicable Law, the receiving Party will promptly, after request of the providing Party, at the receiving Party's option (and expense), either return to the providing

Party all Information in a tangible form (including all copies thereof and all notes, extracts or summaries based thereon) or destroy such Information (and such copies thereof and such notes, extracts or summaries based thereon); *provided* that if the receiving Party elects to destroy such Information, then the receiving Party shall promptly deliver written confirmation (including by email) of the destruction of such Information to the providing Party; and *provided, further,* that the receiving Party shall not be deemed to have retained or failed to return or destroy any Confidential Information stored in digital format that is deleted from local hard drives so long as no attempt is made to recover such Confidential Information from servers or back-up sources, provided that any such retained Confidential Information shall remain subject to the terms hereof in all respects.

(c)    Nothing in this Section 3.6 shall require any Receiving Party to destroy or return any Information that the Receiving Party would routinely retain pursuant to its record retention policies aimed at legal, corporate governance or regulatory compliance or that the Receiving Party is required to retain under any applicable Law or regulation or the terms of the Tax Matters Agreement or any other Transaction Agreement; *provided* that any such retained Confidential Information shall remain subject to the terms hereof in all respects for so long as such Confidential Information is so retained.

Section 3.7    Production of Witnesses; Records; Cooperation.

(a)    After the TCEH Effective Date, except in the case of an adversarial Action by one Party against another Party, each Party shall use its commercially reasonable efforts to make available to each other Party, upon written request, the former, current and future directors, officers, employees, other personnel and agents of the members of its respective Group as witnesses and any books, records or other documents within its control or which it otherwise has the ability to make available, to the extent that any such person (giving consideration to business demands of such directors, officers, employees, other personnel and agents) or books, records or other documents may reasonably be required in connection with any Action in which the requesting Party may from time to time be involved, regardless of whether such Action is a matter with respect to which indemnification may be sought hereunder; *provided,* that no such access shall unreasonably interfere with the ongoing operations of such Party and its Subsidiaries; *provided, further,* that no Party shall be required to make available to the requesting Party any such persons or materials if doing so could be commercially detrimental, violate any Law or agreement, or waive any attorney-client privilege held by such Party *provided, further,* that, as applicable, the Party making such assertion shall, to the extent permitted by applicable Law, provide notice to the receiving party that any Information is being withheld pursuant to this proviso and the Parties shall use their respective commercially reasonable efforts to find a mutually agreeable solution to any such commercial, legal and/or privilege concerns, including, if applicable, by providing any privileged Information pursuant to a joint defense agreement to be mutually agreed and executed between the applicable Parties. The requesting Party shall bear all reasonable out-of-pocket costs and expenses in connection therewith.

(b)    For the avoidance of doubt, the provisions of this Section 3.7 are in furtherance of the provisions of Section 3.1 and shall not be deemed to in any way limit or otherwise modify the Parties' rights and obligations under Section 3.1.

## ARTICLE IV

## MUTUAL REPRESENTATIONS AND WARRANTIES

Each Party, severally and not jointly, represents and warrants to, and agrees with, the other Party as set forth below.

Section 4.1    Organization and Authority.  Such Party is an entity, duly organized, validly existing and in good standing under the state of its formation. Each Party has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and to own, lease or operate its property and to carry on its business as presently conducted and, to the extent required under applicable Law, is, in all material respects, qualified to do business and in good standing in each jurisdiction in which the nature of its business or the character of its property make such qualification necessary.

Section 4.2    Due Authorization.  The execution, delivery and performance of this Agreement by such Party have been duly and validly authorized by all necessary action of such Party. This Agreement constitutes the legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Law relating to creditors' rights and general principles of equity.

Section 4.3    No Conflicts; Consents and Approvals.  The execution and delivery of this Agreement by such Party, the performance by such Party of its obligations hereunder, the consummation of the transactions contemplated hereby and the taking of any action contemplated to be taken by such Party hereunder do not:

(a)    result in a violation or breach of any of the terms, conditions or provisions of the Organizational Documents of such Party; or

(b)    except with respect to the Specified Approvals, (i) result in a violation or breach of any Law applicable to such Party; (ii) require the consent of any Governmental Entity under any applicable Law (other than the Bankruptcy Court); or (iii) cause a default, or require the consent of any Person, under any material contract or Permit, in each case other than any such violation, breach, default or consent which, if not made or obtained, would not reasonably be expected to impair in any material respect such Party's ability to carry out the transactions contemplated hereunder or have a material adverse effect on the financial condition or business of such Party.

Section 4.4    No Other Representations or Warranties.  (a) No party to this Agreement or any other agreement or document contemplated by this Agreement is making any representation as to, warranty of or covenant, express or implied, with respect to: (i) any of the TCEH Assets, the Assumed Liabilities or the Excluded Liabilities, including any warranty of merchantability or fitness for a particular purpose, (ii) the value or freedom from encumbrances of, or any other matter concerning, any TCEH Assets, Assumed Liabilities or Excluded Liabilities or regarding the absence of any defense or right of setoff or freedom from counterclaim with respect to any claim or other TCEH Asset, Assumed Liability or Excluded Liability or (iii) the legal sufficiency of any assignment, document or instrument delivered hereunder to convey title to any TCEH Asset upon the execution, delivery and filing hereof or thereof.

(a)    ALL TCEH ASSETS TO BE TRANSFERRED AS SET FORTH HEREIN OR ANY OTHER AGREEMENT OR DOCUMENT CONTEMPLATED BY THIS AGREEMENT SHALL BE TRANSFERRED "AS IS, WHERE IS" (AND, IN THE CASE OF ANY REAL PROPERTY, BY MEANS OF A QUITCLAIM OR SIMILAR FORM DEED OR CONVEYANCE) AND THE TRANSFEREE SHALL BEAR THE ECONOMIC AND LEGAL RISK THAT ANY CONVEYANCE SHALL PROVE TO BE INSUFFICIENT TO VEST IN THE TRANSFEREE GOOD AND MARKETABLE TITLE, AND CLEAR OF ANY SECURITY INTEREST OR ANY NECESSARY CONSENTS OR GOVERNMENTAL APPROVALS ARE NOT OBTAINED OR THAT ANY REQUIREMENTS OF LAWS OR JUDGMENTS ARE NOT COMPLIED WITH.

## ARTICLE V

## RELEASES AND INDEMNIFICATION

Section 5.1    Termination of Guarantees. The Parties acknowledge and agree that the obligations of the Company Group under or with respect to the EFH/TCEH Guarantees shall be terminated and extinguished as of the Contribution Effective Time pursuant to the Plan of Reorganization.

Section 5.2    General Indemnification by OpCo. Subject to the provisions and limitations of this Article V, from and after the Contribution Effective Time, OpCo shall indemnify, defend and hold harmless each Person that after the Contribution Effective Time is a member of the Company Group (including all Affiliates of the Company) and each of their respective Representatives and, as applicable, each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the "Company Indemnified Parties"), from and against:

(a)    any Assumed Liability, including the failure of any member of the SpinCo Group or any other Person to pay, perform or otherwise promptly discharge any Assumed Liability in accordance with its terms, whether prior to, at or after the Contribution Effective Time;

(b)    any TCEH Company Liability, including the failure of any member of the SpinCo Group or any other Person to pay, perform or otherwise promptly discharge any TCEH Company Liability in accordance with its terms, whether prior to, at or after the Contribution Effective Time; and

(c)    any Liability arising from any breach by any member of the SpinCo Group of any covenant or other agreement (other than any representation or warranty) set forth in this Agreement or in any Assignment and Assumption Agreement, subject to any limitations of liability provisions and other provisions applicable to any such breach set forth herein or therein.

Section 5.3    General Indemnification by the Company. Subject to the provisions and limitations of this Article V, from and after the Contribution Effective Time, the Company shall indemnify, defend and hold harmless each Person that after the Contribution Effective Time is a member of the SpinCo Group (including all Affiliates of SpinCo) and each of their respective Representatives and, as applicable, each of the heirs, executors, successors and assigns of any of the foregoing, from and against:

(a)    any Excluded Liability, including the failure of any member of the Company Group or any other Person to pay, perform or otherwise promptly discharge any Excluded Liability in accordance with their respective terms, whether prior to, at or after the Contribution Effective Time; and

(b)    any Liability arising from any breach by any member of the Company Group of any covenant or other agreement (other than any representation or warranty) set forth in this Agreement or in any Assignment and Assumption Agreement, subject to any limitations of liability provisions and other provisions applicable to any such breach set forth herein or therein.

Section 5.4    Tax Indemnification. Notwithstanding anything in Article V to the contrary, indemnification for Taxes and for other matters subject to the Tax Matters Agreement is governed solely by the terms, provisions and procedures of the Tax Matters Agreement and not by this Article V.

Section 5.5    Contribution. If the indemnification provided for in this Article V shall, for any reason, be unavailable or insufficient to hold harmless any Indemnified Party hereunder in respect of any Liability, then each Indemnifying Party shall, in lieu of indemnifying such Indemnified Party,

contribute to the amount paid or payable by such Indemnified Party as a result of such Liability, in such proportion as shall be sufficient to place the Indemnified Party in the same position as if such Indemnified Party were indemnified hereunder, the Parties intending that their respective contributions hereunder be as close as possible to the indemnification under <u>Section 5.2</u> and <u>Section 5.3</u>, as the case may be. If the contribution provided for in the previous sentence shall, for any reason, be unavailable or insufficient to put any Indemnified Party in the same position as if it were indemnified under <u>Section 5.2</u> or <u>Section 5.3</u>, as the case may be, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liability, in such proportion as shall be appropriate to reflect the relative benefits received by and the relative fault of the indemnifying Party on the one hand and the Indemnified Party on the other hand with respect to the matter giving rise to the Liability.

Section 5.6    <u>Indemnification Obligations Net of Insurance Proceeds and Other Amounts</u>. Any Liability subject to indemnification or contribution pursuant to this <u>Article V</u> will be (a) net of Insurance Proceeds that are actually received by the Indemnified Party, (b) decreased by any actual recoveries from third parties pursuant to indemnification or otherwise with respect thereto, (c) decreased by any Tax Benefit actually recovered, and (d) increased by any Tax Cost actually incurred as a result of the receipt of (or entitlement to) such indemnity payment, as applicable. Accordingly, the amount which any Party (an "<u>Indemnifying Party</u>") is required to pay to any Person entitled to indemnification under this <u>Article V</u> (an "<u>Indemnified Party</u>") will be reduced by any such Insurance Proceeds and/or recoveries actually received from third parties and/or Tax Benefits actually recovered, and increased by Tax Costs actually incurred, in each case, by or on behalf of the Indemnified Party in respect of the related Liability, as applicable. If an Indemnified Party receives a payment (an "<u>Indemnity Payment</u>") required by this Agreement from an Indemnifying Party in respect of any Liability and subsequently receives Insurance Proceeds or any other recovery from a third party (including any Tax Benefit actually recovered), then the Indemnified Party will pay to the Indemnifying Party an amount equal to the lesser of (x) the amount of such Insurance Proceeds or the amount actually received from the third party (including any Tax Benefit actually recovered) and (y) the Indemnity Payment previously received. If an Indemnified Party receives an Indemnity Payment from an Indemnifying Party in respect of any Liability and subsequently incurs Tax Costs associated by that Indemnity Payment, then the Indemnifying Party will pay to the Indemnified Party an amount equal to those Tax Costs promptly after receipt of a reasonably detailed statement of those Tax Costs given by the Indemnified Party to the Indemnifying Party within a reasonable period of time (not to exceed six months) after the Tax Cost is actually incurred. In the case of Tax Benefits, "actually recovered" means an Indemnified Party actually realizes a Refund or a decrease in Taxes reported on a filed Tax Return (in or with respect to a taxable year that ends on or before December 31, 2021) in connection with the incurrence or the payment by the Indemnified Party of such fees or costs or indemnifiable amounts determined using a "with and without" methodology (treating any deductions attributable to such fees or costs or indemnifiable amounts as the last items claimed for any taxable year, including after the utilization of any available net operating loss carryovers). In the case of Tax Costs, "actually incurred" means an Indemnified Party actually realizes a Tax Cost reported on a filed Tax Return (in or with respect to a taxable year that ends on or before December 31, 2021) in connection with the receipt of (or entitlement to) an Indemnity Payment determined using a "with and without" methodology (treating any receipt of (or entitlement to) such Indemnity Payment as the last items claimed for any taxable year, including after the utilization of any available net operating loss carryovers). For the avoidance of doubt, for purposes of determining the amount "actually recovered" (for purposes of Tax Benefits) or "actually incurred" (for purposes of Tax Costs), a netting approach shall be taken for determining any increase or decrease, as the case may be, of taxable income or loss, net operating losses, deductions or other Tax attributes.

Section 5.7    <u>Procedures for Indemnification of Third Party Claims</u>.

(a)    If an Indemnified Party receives written notice that a Person (including any Governmental Entity) that is not a member of the Company Group or the SpinCo Group, or any Affiliate thereof, has asserted any claim or commenced any Action (any such claim or Action, a

"Third Party Claim") that may give rise to an Indemnifying Party's obligation to indemnify pursuant to Section 5.2 or Section 5.3, as the case may be, then the Indemnified Party shall provide the Indemnifying Party written notice thereof as promptly as practicable (and no later than fifteen (15) Business Days, or sooner, if the nature of the Third Party Claim so requires) after becoming aware of the Third Party Claim. Such notice shall describe the Third Party Claim in reasonable detail and include copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third Party Claim. Notwithstanding the foregoing, the failure of an Indemnified Party to provide notice in accordance with this Section 5.7(a) shall not relieve an Indemnifying Party of its indemnification obligations under this Agreement, except to the extent the Indemnifying Party is actually prejudiced by the Indemnified Party's failure to provide notice in accordance with this Section 5.7(a).

(b)    Subject to this Section 5.7(b) and Section 5.7(c), an Indemnifying Party may elect to control the defense of (and seek to settle or compromise), at its own expense and with its own counsel, any Third Party Claim if the Indemnifying Party irrevocably and unconditionally acknowledges its obligation to indemnify the Indemnified Party in respect of such Third Party Claim in accordance with and subject to the terms hereof. Within thirty (30) Business Days after the receipt of notice from an Indemnified Party in accordance with Section 5.7(a), the Indemnifying Party shall notify the Indemnified Party whether the Indemnifying Party will assume responsibility for defending the Third Party Claim. After receiving notice of an Indemnifying Party's election to assume the defense of a Third Party Claim, an Indemnified Party shall have the right to employ separate counsel and to participate in (but not control) the defense, compromise, or settlement thereof, but the Indemnified Party shall be responsible for the fees and expenses of its counsel and, in any event, shall cooperate with the Indemnifying Party in such defense in accordance with Section 5.7(f). If an Indemnifying Party has elected to assume the defense of a Third Party Claim, then such Indemnifying Party shall be solely liable for all fees and expenses incurred by it in connection with the defense of such Third Party Claim and shall not be entitled to seek any indemnification or reimbursement from the Indemnified Party for any such fees or expenses incurred during the course of its defense of such Third Party Claim.

(c)    Notwithstanding Section 5.7(b), if, in the reasonable opinion of counsel to the Indemnified Party, such Indemnified Party and the Indemnifying Party have actual or potential differing defenses or conflicts of interest between them that make joint representation inappropriate, then the Indemnified Party shall have the right to employ separate counsel and to participate in (but not control) the defense, compromise, or settlement thereof, and the Indemnifying Party shall bear the reasonable fees and expenses of one (and only one) such counsel for all Indemnified Parties.

(d)    If an Indemnifying Party elects not to assume responsibility for defending a Third Party Claim, or fails to notify an Indemnified Party of its election within thirty (30) Business Days after the receipt of notice from an Indemnified Party as provided in Section 5.7(b), then the Indemnified Party may defend the Third Party Claim at the cost and expense of the Indemnifying Party; *provided*, that the Indemnified Party shall not be permitted to settle or compromise any Third Party Claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed.  If the Indemnified Party is conducting the defense against any such Third Party Claim, then the Indemnified Party and its counsel shall keep the Indemnifying Party informed of all developments relating to such Third Party Claim and provide copies of all relevant correspondence and documents relating thereto.

(e)    Notwithstanding any other provision of this Agreement, without the prior written consent of any Indemnified Party, no Indemnifying Party shall consent to the entry of any judgment or enter into any settlement or compromise of any pending or threatened Third Party Claim for which the Indemnified Party is seeking or may seek indemnity pursuant to this Section 5.7 unless such judgment or settlement is solely for monetary damages (which shall be fully paid

16

by the Indemnifying Party), does not impose any expense or obligation on the Indemnified Party (other than obligations for which the Indemnified Party is indemnified hereunder and which are fully paid by the Indemnifying Party), does not involve any finding or determination of wrongdoing or violation of Law by the Indemnified Party and provides for a full, unconditional and irrevocable release of that Indemnified Party and its Affiliates and Representatives from all liability in connection with the Third Party Claim.

(f)    Each of the Indemnifying Party and the Indemnified Party shall use commercially reasonable efforts to make available to the other, upon written request, the former, current and future directors, officers, employees, other personnel and agents of the members of its respective Group as witnesses and any books, records or other documents within its control or which it otherwise has the reasonable ability to make available, to the extent that any such persons (giving consideration to business demands of such directors, officers, employees, other personnel and agents) or books, records or other documents may reasonably be required in connection with the defense, settlement or compromise, or the prosecution, evaluation or pursuit of any Third Party Claim, and shall otherwise reasonably cooperate in such defense, settlement or compromise, or such prosecution, evaluation or pursuit, as the case may be of such Third Party Claim; *provided*, that no such cooperation shall unreasonably interfere with the ongoing operations of such Party and its Subsidiaries; *provided, further*, that no Party shall be required to make available to the requesting Party any such Persons or materials if doing so would reasonably be expected to be materially commercially detrimental, violate any Law or agreement, or waive any attorney-client privilege held by such Party; *provided, further*, that, as applicable, the Party asserting such detriment, violation or privilege shall, to the extent permitted by applicable Law, provide notice to the receiving party that any Information is being withheld pursuant to the foregoing proviso and the Parties shall use their respective commercially reasonable efforts to find a mutually agreeable solution to any such commercial, legal and/or privilege concerns, including, if applicable, by providing any privileged Information pursuant to a joint defense agreement to be mutually agreed and executed between the applicable Parties. The Indemnifying Party shall bear all reasonable out-of-pocket costs and expenses in connection therewith.

Section 5.8    Additional Matters.

(a)    Indemnification or contribution payments in respect of any Liabilities for which an Indemnified Party is entitled to indemnification or contribution under this Article V shall be paid by the Indemnifying Party to the Indemnified Party as such Liabilities are incurred upon demand by the Indemnified Party, including reasonably satisfactory documentation setting forth the basis for the amount of such indemnification or contribution payment, including documentation with respect to calculations made and consideration of any Insurance Proceeds and/or recoveries from third parties that actually reduce the amount of such Liabilities and/or Tax Benefits actually recovered or Tax Costs actually incurred; *provided*, that no Indemnifying Party shall be entitled to condition, delay or withhold any payment pending claim for, or receipt of, any Insurance Proceeds and/or recoveries from third parties or actual recovery of any Tax Benefits or actual incurrence of Tax Costs. The indemnity and contribution agreements contained in this Article V shall remain operative and in full force and effect, regardless of (i) any investigation made by or on behalf of any Indemnified Party and (ii) the knowledge by the Indemnified Party of Liabilities for which it might be entitled to indemnification or contribution hereunder.

(b)    Any claim for indemnification under this Agreement which does not result from a Third Party Claim shall be asserted by written notice given by the Indemnified Party to the applicable Indemnifying Party. Such Indemnifying Party shall have a period of thirty (30) days after the receipt of such notice within which to respond thereto. If such Indemnifying Party does not respond within such thirty (30)-day period, such Indemnifying Party shall be deemed to have refused to accept responsibility to make payment. If such Indemnifying Party does not respond

17

within such thirty (30)-day period or rejects such claim in whole or in part, such Indemnified Party, shall be free to pursue such remedies as may be available to such party as contemplated by this Agreement without prejudice to its continuing rights to pursue indemnification or contribution hereunder.

(c)    If payment is made by or on behalf of any Indemnifying Party to any Indemnified Party in connection with any Third Party Claim, such Indemnifying Party shall be subrogated to and shall stand in the place of such Indemnified Party as to any events or circumstances in respect of which such Indemnified Party may have any right, defense or claim relating to such Third Party Claim against any claimant or plaintiff asserting such Third Party Claim or against any other Person. Such Indemnified Party shall cooperate with such Indemnifying Party in a reasonable manner, and at the cost and expense of such Indemnifying Party, in prosecuting any subrogated right, defense or claim.

Section 5.9    Exclusive Remedy; Limitations of Liability; Mitigation. After the Contribution Effective Time, except for the rights under Section 7.13, the indemnification and contribution provisions of this Article V shall be the sole and exclusive remedy for the matters set forth herein and in any Assignment and Assumption Agreement and the transactions contemplated hereby and thereby and no party shall pursue or seek to pursue any other remedy. Neither SpinCo or its Affiliates, on the one hand, nor the Company or its Affiliates, on the other hand, shall be liable to the other for any Liabilities arising under or relating to this Agreement, any Assignment and Assumption Agreement or the transactions contemplated hereby or thereby that are (i) not direct, actual damages or (ii) special, indirect, consequential, punitive, exemplary, remote, speculative or similar damages or lost profits (except to the extent such lost profits constitute direct, actual damages) of the other arising in connection with the transactions contemplated hereby (other than such damages described in this clause (ii) payable to a third party in respect of a Third Party Claim). Any Indemnified Party that becomes aware of a Liability for which it seeks indemnification or contribution under this Article V shall to the extent required by law mitigate such Liability, and the Indemnifying Party shall not be liable for any such Liability to the extent that it is attributable to the failure of the Indemnified Party to use such commercially reasonable efforts to mitigate to the extent required by law. For the avoidance of doubt, no provision of this Agreement provides indemnification for a breach, misrepresentation or violation under the Merger Agreement.

Section 5.10    Survival of Indemnities.    The rights and obligations of each of the Company and SpinCo and their respective Indemnified Parties under this Article V shall survive the sale or other transfer by any Party of any Assets or businesses or the assignment by it of any Liabilities. Each Party hereby agrees that prior to the consummation of any sale or transfer of all or substantially all of the Assets of such Party, it will require the acquirer of such Assets to assume the obligations of such Party under this Agreement as a condition thereto.

Section 5.11    No Assumption of Discharged Liabilities; Obligations under Transaction Agreements.  For the avoidance of doubt, nothing herein shall require or be construed to effectuate the assumption, for any period of time, of any Liability or Tax discharged, released or otherwise satisfied (or to be discharged, released or otherwise satisfied on the EFH Effective Date) pursuant to the Plan of Reorganization. Additionally, for the avoidance of doubt, nothing herein shall require or be construed to effectuate the assumption, for any period of time or at all, of any obligations of any Person, or otherwise affect in any way the rights or obligations of any of the Parties or their respective Groups, under the Plan of Reorganization, the Tax Matters Agreement, the Transition Services Agreement, the Split Participant Agreement, the Merger Agreement or any other Transaction Agreement.

**ARTICLE VI**
**[RESERVED]**

**ARTICLE VII**
**MISCELLANEOUS AND GENERAL; COVENANTS**

Section 7.1    <u>Survival</u>.  The representations and warranties of the Parties set forth in this Agreement (other than <u>Section 4.4</u>) shall not survive the Distribution Effective Time, and shall cease to have any force or effect immediately upon the Distribution Effective Time. The covenants and other agreements contained in this Agreement, and liability for the breach of any obligations thereunder, shall survive the Distribution Effective Time and shall remain in full force and effect in accordance with their terms.

Section 7.2    <u>Termination, Wind-Down and Distribution of EFH Non-Qualified Benefit Plans and EFH Split Dollar Life Insurance Plan</u>.  In connection with the termination, wind-down and distribution of the remaining liabilities and obligations of the EFH Non-Qualified Benefit Plans and the EFH Split Dollar Life Insurance Plan as contemplated by the Plan of Reorganization, the Parties acknowledge and agree that (a) the Company shall (or cause the applicable third party service provider to) provide SpinCo with, and accept all reasonable comments of SpinCo to (i) drafts of all notices and other written correspondence with participants in such EFH Non-Qualified Benefit Plans and the EFH Split Dollar Life Insurance Plan as soon as reasonably practicable, but, in each case, no later than five (5) Business Days prior to the date of such distribution to such participants and (ii) any estimated calculations of payouts and distributions to such participants promptly upon receipt of such calculations from the third party administrator of such EFH Non-Qualified Benefit Plans or the EFH Split Dollar Life Insurance Plan, as applicable, but in each case, no later than fifteen (15) Business Days prior to the making of any such payments or distributions with respect thereto and (b) SpinCo shall review, comment upon and approve as soon after receipt as is administratively practicable (i) all such notices and other written correspondence with participants in such EFH Non-Qualified Benefit Plans and the EFH Split Dollar Life Insurance Plan and (ii) any such estimated calculations of payouts and distributions to such participants, in each case from such third parties as are assisting with such terminations, wind-downs and distributions.

Section 7.3    <u>Regulatory Matters</u>.  In connection with obtaining any required approval by the Public Utility Commission of Texas (the "<u>PUCT</u>") with respect to the transactions contemplated by the Merger Agreement or any other transaction constituting a direct or indirect change of control of Oncor Electric Delivery Company LLC that requires the approval of the PUCT (in each case, the "<u>PUCT Filing</u>"), the Company shall use its reasonable best efforts to cause, including by exercising its rights to consent and vote (if any) under the Oncor Agreements as an indirect equity owner of Oncor, Oncor Electric Delivery Company LLC to request from the PUCT, as part of the PUCT Filing, an order stating that none of TCEH, SpinCo, or any subsidiaries or Affiliates of SpinCo will, from and after the TCEH Effective Date, be subject to any obligation set forth in the Final Order on Rehearing issued in PUCT Docket No. 34077 on April 24, 2008.  The Company's obligations under this <u>Section 7.3</u> including using its reasonable best efforts, shall not include any obligation to (A) pay any amounts to the Oncor Entities (as defined in the Merger Agreement) or any other Person or incur any liabilities or other obligation, (B) execute or enter into or perform any new agreement (other than an agreement contemplated hereby or in the Plan of Reorganization or that confirms or makes effective its obligations hereunder), or (C) breach any Law or commence any Action against any Person, including any of the Oncor Entities or their respective officers and managers.

Section 7.4    <u>D&O Insurance</u>.

(a)    During the period beginning on the date hereof and ending on the EFH Effective Date, the Company agrees to and to cause its Subsidiaries to maintain, as in effect immediately prior to the TCEH Effective Date (i) the Company's and its Subsidiaries' directors', managers'

and officers' insurance policies, and (ii) the Company's fiduciary liability insurance policies ((i) and (ii), collectively, the "EFH D&O Policies"), in each case, with terms, conditions, retentions and limits of liability that are no less advantageous than the coverage provided under the Company's and its Subsidiaries' policies as of immediately prior to the TCEH Effective Date with respect to any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty or any matter claimed against a current or former director, officer or other Representative of TCEH, the TCEH Companies, the Company Group or the SpinCo Group or any of their respective Subsidiaries (collectively, the "Pre-Spin Group") by reason of him or her serving in such capacity ("Wrongful Acts") that existed or occurred on or prior to the TCEH Effective Date (including in connection with this Agreement and the transactions or actions contemplated by this Agreement).

(b)    The Company agrees that, on or before the EFH Effective Date or any other event constituting a change in control as described in Section IX(C)(2) of the EFH D&O Policies (a "Company Change in Control"), it will obtain and fully pay the premium for a run-off of the EFH D&O Policies for the benefit of each member of the Pre-Spin Group and their respective current and former directors, officers and other Representatives, in each case for a claims reporting or discovery period of at least six (6) years from and after the EFH Effective Date (or the effective date of such other Company Change in Control, as applicable) with respect to any claim arising from actual or alleged Wrongful Acts on or prior to the EFH Effective Date (it being understood that, with respect to any claim arising from actual or alleged Wrongful Acts of such Persons in their capacity as a current or former director or officer or other Representative of any TCEH Company or the SpinCo Group, such period shall be limited to the period on or prior to the TCEH Effective Date), from insurance carriers with the same or better credit rating as the insurance carrier(s) for the EFH D&O Policies with terms, conditions, retentions and limits of liability that are no less advantageous than the coverage provided for members of the Pre-Spin Group and their respective current and former directors, officers and other Representatives under the EFH D&O Policies with respect to any actual or alleged Wrongful Act that existed or occurred on or prior to the EFH Effective Date (the "Run-Off Coverage").

(c)    If the Company, after its good faith efforts, is unable to obtain such Run-Off Coverage as of the EFH Effective Date, then the Company shall use its reasonable best efforts to purchase insurance comparable to the EFH D&O Policies for such six-year period with terms, conditions, retentions and limits of liability that are at least as favorable as provided in the EFH D&O Policies; *provided, however,* that in no event shall the Company be required to expend for such policies pursuant to this sentence an annual premium amount in excess of 200% of the annual premiums paid by the Company for such insurance as of immediately prior to the TCEH Effective Date; and *provided, further,* that if the annual premiums of such insurance coverage exceed such amount, the Company shall obtain a policy with the greatest coverage available for a cost not exceeding such amount.

(d)    If the Effective Time under the Merger Agreement occurs and the Company complies with its obligation under Section 6.8(b) of the Merger Agreement (as such obligations are set forth in the Merger Agreement as of the date hereof and without giving effect to any subsequent amendment thereof) and obtains the "D&O Insurance" (as defined in the Merger Agreement), then the Company shall be deemed to have satisfied its obligations under Section 7.4(b) and (c) hereof; *provided, however* that this Section 7.4(d) shall have no effect and be null and void if the Merger Agreement is terminated or the Effective Time under the Merger Agreement otherwise never occurs.

(e)    Additionally, the Company agrees not to seek or, subject to Section 7.4(c), agree to any changes or amendments to the EFH D&O Policies or the Run-Off Coverage that have or would reasonably be expected to have the effect of reducing or limiting coverage

20

available to any member of the Pre-Spin Group or any of their respective current and former directors, officers and other Representatives.

(f)       Within ten (10) Business Days of the written request of SpinCo, the Company shall provide SpinCo copies of all EFH D&O Policies or Run-Off Coverage policies.

(g)       The Parties agree that the provisions of this Section 7.4 are for the benefit of each member of the Pre-Spin Group and their respective current and former directors, officers and other Representatives (collectively, the "Beneficiaries"). The provisions of this Section 7.4 shall be enforceable by each of the Beneficiaries as if such Person were a party to this Agreement.

Section 7.5       Amendment. No provision of this Agreement shall be terminated, amended, modified or supplemented by any Party, unless such termination, amendment, supplement or modification is in writing and signed by each of the Parties.

Section 7.6       Waiver of Default.

(a)       Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party or the Parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently given for the purposes of this Agreement if, as to any Party, it is in writing signed by an authorized representative of such Party.

(b)       Waiver by any Party of any default by the other Party of any provision of this Agreement or any Assignment and Assumption Agreement shall not be construed to be a waiver by the waiving party of any subsequent or other default, nor shall it in any way affect the validity of this Agreement or any Party or prejudice the rights of the other Party or Parties thereafter to enforce each and every such provision. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 7.7       Third Party Beneficiaries. Except (i) for the indemnification rights under this Agreement of any Indemnified Party in their respective capacities as such, (ii) the Beneficiaries pursuant to Section 7.4 as specifically provided in any Assignment and Assumption Agreement, the provisions of this Agreement and each Assignment and Assumption Agreement are solely for the benefit of the parties hereto and thereto and their respective successors and permitted assigns and are not intended to confer upon any Person, except the parties hereto and thereto and their respective successors and permitted assigns, any rights or remedies hereunder and there are no third party beneficiaries of this Agreement or any Assignment and Assumption Agreement; and neither this Agreement nor any Assignment and Assumption Agreement shall provide any third party with any remedy, claim, liability, reimbursement, claim of action or other right in excess of those existing without reference to this Agreement or any Assignment and Assumption Agreement.

Section 7.8       Counterparts.  This Agreement may be executed in any number of counterparts (including by electronic means), each such counterpart being deemed to be an original instrument, and all such counterparts taken together constituting one and the same agreement.

Section 7.9       GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL.

(a)       THIS AGREEMENT, TOGETHER WITH ANY CLAIM, DISPUTE, REMEDY OR ACTION ARISING FROM OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY RELIEF OR REMEDIES SOUGHT BY ANY PARTY, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN

ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. Each of the parties hereto (i) submits to the exclusive jurisdiction of the Bankruptcy Court; *provided* that if the Bankruptcy Court declines to accept jurisdiction over a particular Action, then the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware) in any Action arising out of or relating to this Agreement, (ii) agrees that all claims in respect of such Action may be heard and determined in any such court and (iii) agrees not to bring any Action arising out of or relating to this Agreement (whether on the basis of a claim sounding in contract, equity, tort or otherwise) in any other court. Each of the Parties agrees that a final judgment (subject to any appeals therefrom) in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the Parties hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any Action arising out of or relating to this Agreement or the transactions contemplated hereby in any Delaware or federal court in accordance with the provisions of this Section 7.9(a). Each of the Parties hereby irrevocably waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such Action in any such court. Each of the Parties hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 7.11. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (W) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (X) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (Y) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (Z) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.9.

Section 7.10    Transaction Expenses. Except as expressly set forth herein, each Party shall bear its own costs and expenses incurred in connection with the transactions contemplated hereby.

Section 7.11    Notices. Any notice, request, instruction or other document to be given hereunder or under any Assignment and Assumption Agreement by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by email or overnight courier:

If to the Company:

Energy Future Holdings Corp.
1601 Bryan Street
Dallas, Texas 75201
Attention: President

with copies to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:  James Sprayregen
            Marc Kieselstein
            Chad Husnick
Email: jsprayregen@kirkland.com
       mkieselstein@kirkland.com
       chusnick@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Edward Sassower
Email: edward.sassower@kirkland.com

If to SpinCo or OpCo:

TEX Energy LLC
1601 Bryan Street
Dallas, Texas 75201
Attention:  General Counsel
Email: stacey.dore@energyfutureholdings.com;
       awright@energyfutureholdings.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, TX 77002
Attention: Andrew T. Calder, P.C.
           Kevin L. Morris
           John Pitts
Email:  andrew.calder@kirkland.com;
        kmorris@kirkland.com;
        john.pitts@kirkland.com

and

Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue

Dallas, TX 75201-6912
Attention: Robert Little
Email: RLittle@gibsondunn.com

or to such other persons or addresses as may be designated in writing by the party to receive such notice as provided above. Any notice, request, instruction or other document given as provided above shall be deemed given to the receiving party upon actual receipt, if delivered personally; three (3) Business Days after deposit in the mail, if sent by registered or certified mail; upon receipt if sent by email and received by 5:00 pm (Eastern Time), on a Business Day (otherwise the next Business Day) (*provided* that if given by email such notice, request, instruction or other document shall be followed up within one (1) Business Day by dispatch pursuant to one of the other methods described herein); or on the next Business Day after deposit with an overnight courier, if sent by an overnight courier.

Section 7.12    Entire Agreement. Subject to Section 7.17, this Agreement (including any schedules and exhibits hereto, including as finally executed agreements) constitutes the entire agreement of the Parties with respect to the subject matter hereof, and cancels, merges and supersedes all other prior or contemporaneous oral or written agreements, understandings, representations and warranties both written and oral, among the Parties, with respect to the subject matter hereof. EACH PARTY HERETO AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, NONE OF THE SPINCO GROUP OR THE COMPANY GROUP MAKES ANY REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING AS TO THE ACCURACY OR COMPLETENESS OF ANY OTHER INFORMATION WITH RESPECT TO, OR IN CONNECTION WITH, THE NEGOTIATION, EXECUTION OR DELIVERY OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING. The Parties further represent that, in entering into this Agreement (a) they have been represented and advised by counsel in connection with this Agreement, which they have entered into voluntarily and of their own choice, and not under coercion or duress; (b) they are relying upon their own knowledge and the advice of counsel; (c) they knowingly waive any claim that this Agreement was induced by any misrepresentation or nondisclosure which could have been or was discovered before signing this Agreement; and (d) they knowingly waive any right to rescind or avoid this Agreement based upon presently existing facts, known or unknown.

Section 7.13    Specific Performance. In the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement, the Party or Parties who are or are to be thereby aggrieved shall have the right to specific performance and injunctive or other equitable relief (on an interim or permanent basis) of its rights under this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. The Parties agree that the remedies at law for any breach or threatened breach, including monetary damages, may be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is hereby waived. Any requirements for the securing or posting of any bond with such remedy are also hereby waived by each of the Parties.

Section 7.14    Severability.    The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such

24

invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 7.15    Interpretation; Construction. The Parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

Section 7.16    Assignment; Delegation. This Agreement shall not be assigned or delegated by a Party (in each case, whether (x) by merger, consolidation or dissolution of a Party, (y) by contract, operation of law or (z) otherwise) without the prior written consent of the other Parties, and any purported assignment or delegation in violation of this Agreement shall be null and void. Notwithstanding the foregoing, (i) SpinCo and OpCo hereby acknowledge that, following the Merger, Merger Sub, as the surviving company in the Merger, shall be entitled and subject to all of the rights, benefits and obligations of the Company pursuant to this Agreement; and (ii) SpinCo shall have the right to delegate its right to acquire any of the TCEH Assets or assume any of the Assumed Liabilities to one or more of its Subsidiaries (including OpCo) without the prior written consent of the Company. For purposes of this Section 7.16, the term "merger" refers to any merger in which a Party is a constituent entity, regardless of whether it is the surviving or merged entity. As a condition to, and prior to the consummation of, any direct or indirect transfer or other disposition of all or substantially all of its assets (whether in a single transaction or a series of related or unrelated transactions) the Party engaging in such transfer or other disposition shall require the transferee to assume all of such Party's obligations hereunder.

Section 7.17    Controlling Documents. To the extent that the provisions of the Plan of Reorganization, the Merger Agreement, the Tax Matters Agreement, the Amended and Restated Split Participant Agreement or the Transition Services Agreement conflict with the provisions of this Agreement, the provisions of such other agreement or agreements shall govern.

Section 7.18    [EFH Properties Company Cash; EPA Settlement.    Prior to the Contribution Effective Time, the Company shall cause the distribution or transfer of all cash held by EFH Properties Company to a member of the Company Group; *provided that*, EFH Properties Company may retain cash in an amount required to pay the Environmental Protection Agency under the terms of the EPA Settlement (as defined in paragraph 5 of Section 5.1(g)(i) of the Company Disclosure Letter).][1]

Section 7.19    Split Policies; Covered Letters of Credit.

(a)    Annex A attached hereto sets forth certain workers compensation insurance policies (the "Split Policies") that insure workers compensation Liabilities arising out of or resulting from (1) the Company and its Subsidiaries (together, the "Company Policy Liabilities") and (2) the TCEH Companies (the "SpinCo Policy Liabilities").

(b)    Each of the Company and SpinCo acknowledge and agree that (i) the Company Policy Liabilities and all costs, fees and expenses under the Letters of Credit identified on Annex A attached hereto (the "Split Letters of Credit") (including any draws on the Split Letters of Credit in respect of the Company Policy Liabilities and the costs of maintaining such Split Letters of Credit allocable to the Company Policy Liabilities) arising out of or resulting from the Company Policy Liabilities are Excluded Liabilities for all purposes hereunder, and (ii) the SpinCo Policy Liabilities and all costs, fees and expenses arising out of or resulting from the SpinCo Policy Liabilities under the Split Letters of Credit (including any draws on the Split Letters of Credit in respect of the SpinCo Policy Liabilities and the costs of maintaining such

---

[1]    References to the EPA Settlement will only be included in the final agreement if such payment has not been made by the date of the agreement.

Split Letters of Credit allocable to the SpinCo Policy Liabilities) are TCEH Company Liabilities for all purposes hereunder.

(c)     The Company shall and shall cause its Subsidiaries to use its reasonable best efforts to, as promptly as practicable, provide for the termination, release and return of the Letters of Credit set forth on Annex B attached hereto (including any renewals or replacements thereof) (the "E-Side Letters of Credit") to SpinCo or its designee by providing adequate security to the applicable beneficiary of each E-Side Letter of Credit in the form of cash collateral, back-to-back letters of credit, a parent company guaranty or similar security as necessary to obtain the return and cancellation of each E-Side Letter of Credit at or prior to the earlier of (A) the Effective Time (as defined in the Merger Agreement), and (B) the EFH Effective Date.

Section 7.20     Generation Development Company LLC Boiler. The Parties hereby agree to negotiate in good faith a mutually agreeably resolution for the treatment of the boiler and related parts owned by Generation Development Company LLC stored at the Monticello power plant site of the TCEH Companies, as soon as reasonably practicable, but in any event no later than the EFH Effective Date.

*[Signature page follows.]*

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first written above.

**ENERGY FUTURE HOLDINGS CORP.**

By: _____

Name: _____

Title: _____

**TEX ENERGY LLC**

By: _____

Name: _____

Title: _____

**TEX OPERATIONS COMPANY LLC**

By: _____

Name: _____

Title: _____

**Schedule 1**
Acquired TCEH Assets

The assets of the Company, Energy Future Competitive Holdings Company LLC ("EFCH") and TCEH, whether tangible or intangible, real, personal or mixed, listed below.

1. The Contributed Plans set forth on Section 5.1(h)(i)(B) of the Company Disclosure Letter to the Merger Agreement;

2. All agreements, licenses and contracts Related to the TCEH Business, whether written or oral ("Contracts"), including but not limited to the following:

   a. The following employment agreements:

      i. James A. Burke Amended and Restated Employment Agreement, dated as of March 27, 2015;

      ii. Stacey H. Doré Amended and Restated Employment Agreement, dated as of March 27, 2015;

      iii. Paul Keglevic Amended and Restated Employment Agreement, dated as of March 27, 2015;

      iv. Carrie L. Kirby Amended and Restated Employment Agreement, dated as of March 27, 2015;

      v. Mark Allen McFarland Amended and Restated Employment Agreement, dated as of March 27, 2015;

      vi. John Young Amended and Restated Employment Agreement, dated as of March 30, 2015;

      vii. Donald L. Evans Amended and Restated Employment Agreement, dated as of April 23, 2014;

   b. The following Contracts relating to the administration of the Contributed Plans:

      i. Professional Services Agreement – PersonalEdge Program, between the Company and Baylor Health Care System;

      ii. Investment Management Agreement, dated 03/13/2014, and Amendment to Investment Management Agreement, dated 12/02/2014, between the Company and Integrity Asset Management, LLC;

      iii. Prudential Trust Company Collective Trust Adoption Agreement, dated 08/27/2009, between the Company and Standish Mellon Asset Management Company.

   c. The following Confidentiality and Non-Disclosure Agreements:

      i. Confidentiality Agreement, dated as of January 29, 2015, by and between Merrill Lynch, Pierce, Fenner & Smith Incorporated and the Company;

      ii. Confidentiality Agreement, dated as of April 5, 2016, by and among Barclays Bank PLC, the Company, EFCH, TCEH and EFIH;

  iii. Confidentiality Agreement, dated as of April 1, 2016, by and among Citigroup Global Markets Inc., the Company, EFCH, TCEH and EFIH;

  iv. Confidentiality Agreement, dated as of May 11, 2016, by and among ING Capital LLC, the Company, EFCH, TCEH and EFIH;

  v. Confidentiality Agreement, dated as of May 12, 2016, by and among Natixis North America LLC, the Company, EFCH, TCEH and EFIH;

  vi. Confidentiality Agreement, dated as of May 11, 2016, by and among UBS Securities LLC, the Company, EFCH, TCEH and EFIH;

  vii. Confidentiality Agreement, dated as of April 28, 2016, by and among CSG Investments, Inc., the Company, EFCH, TCEH and EFIH;

  viii. Confidentiality Agreement, dated as of April 6, 2016, by and among Morgan Stanley & Co. LLC, the Company, EFCH, TCEH and EFIH;

  ix. Confidentiality Agreement, dated as of February 29, 2016, by and among RBC Capital Markets, LLC, the Company, EFCH, TCEH and EFIH;

  x. Confidentiality Agreement, by and between TCEH and Cargill, Incorporated;

  xi. Confidentiality Agreement, by and between TCEH and Citigroup Energy Inc.;

  xii. Confidentiality Agreement, by and between TCEH and Energy Ventures Analysis, Inc.;

  xiii. Non-Disclosure Agreement, by and between TCEH and Franklin Advisors, Inc.;

  xiv. Confidentiality Agreement, by and between TCEH and Futuregen Industrial Alliance, Inc.;

  xv. Confidentiality Agreement, by and between TCEH and Jordan, Jones & Goulding, Inc.; and

  xvi. Confidentiality Agreement, by and between TCEH and Seth Schwartz.

d. The following licenses and service agreements:

  i. Software License and Support Agreement, dated 04/30/2001, by and between TCEH and Genesys Telecommunications Laboratories, Inc., including all amendments and Statements of Work;

  ii. Services Agreement, dated November 21, 2006, by and between TCEH and SAP America, Inc.;

  iii. Software License and Support Agreement, dated June 30, 2006, by and between TCEH and SAP Public Services, Inc.;

e. The following leases:

  i. CAT Leases 001-0017139, 001-0627126, 001-0627129, by and between TCEH and Caterpillar Financial Services Corp., including all related amendments and schedules;

    ii.  Rail Equipment Lease Agreement, between EFCH, and Owner Trustee, dated November 1, 1996, and Assignment and Assumption Agreement, between EFCH and TCEH;

   iii.  Railcar Master Net Lease Agreement, by and between TCEH and GATX Corporation, including Supplements 1, 2 & 3 and amendments thereto;

   iv.  Master Railcar Lease Agreements, by and between TCEH and SMBC Rail Services LLC;

    v.  Rail Equipment Lease Agreement, dated November 1, 1996 (and each of the Other Operative Documents (as defined therein), by and between TCEH and U.S. Bank Global Trust Services;

   vi.  Rail Equipment Lease Agreement, dated November 1, 1996, (and each of the Other Operative Documents (as defined therein), by and between TCEH and Wells Fargo Bank Northwest, N.A.;

   vii.  Equipment Lease Agreements, dated September 30, 2005, as amended by Amendment dated October 27, 2015, and Other Operative Documents (as defined therein), by and between TXU Railcar Trust 2005-A and each of (i) Zully Gonzalez dba Optimal Energy Consultants, (ii) DVB Bank SE, as Loan Participant, (iii) Farm Bureau Life Insurance Co of Michigan, as Loan Participant, (iv) Great Western Insurance Company, as Loan Participant, (v) John Hancock Life Insurance Co, as Loan Participant, (vi) John Hancock Life Insurance Company (U.S.A.) (f/k/a John Hancock Variable Life Insurance ), as Loan Participant, (v) Key Equipment Finance, Inc, (vi) Manulife Insurance Company, as Loan Participant, (vii) American Republic Insurance Company, as Loan Participant, (viii) Blue Cross And Blue Shield of Florida Inc., as Loan Participant, (ix) Catholic United Financial (fka: The Catholic Aid Association, as Loan Participant, (x) Mtl Insurance Company, as Loan Participant, (xi) The Lafayette Insurance Company, as Loan Participant, (xii) US Bank National Association, as Indenture Trustee, (xiii) Western United Life Assurance Company, as Loan Participant, and (xiv) Wilmington Trust Company, as Owner Trustee;

  viii.  Capital Lease, assumed in accordance with the terms of that certain Amended and Restated Lease, dated as of December 30, 2015, between TCEH and TXU Railcar Leasing.

  f.  Any contracts or arrangements with members of Sustainable Energy Advisory Board (SEAB) and Nuclear Oversight Advisory Board (NOAB).

  g.  Any contracts of EFH, EFCH or TCEH identified for assumption and assignment to a TCEH Company in the Plan Supplement.

3.  All cars, trucks, buses, trailers, ATVs and other vehicles, including but not limited to those listed on Schedule 1-A;

4.  All intellectual property and industrial property recognized under applicable Law Related to the TCEH Business, including trademarks (including the trademark for "Luminant Energy"), service marks, Internet domain names (including the web domain "www.energyfutureholdings.com" and

email addresses "@energyfutureholdings.com"), logos, trade dress, trade names and all goodwill associated therewith and symbolized thereby, inventions, discoveries, patents, trade secrets, copyrights and copyrightable works, software, databases, data (including customer, employee, technical, research and development and manufacturing data) and related items and (if applicable) any registrations, issuances and applications for registration or issuance of any of the foregoing;

5. All computers, computer systems, software, computer code, networks, firmware, middleware, hardware, servers, workstations, hubs, routers, email archives, databases and all other information technology equipment and assets Related to the TCEH Business;

6. All equipment, tools, furniture, furnishings, fixtures and other personal property located at Energy Plaza;

7. All books, ledgers, files, reports, plans, records, manuals and other materials (in any form or medium) Related to the TCEH Business;

8. All causes of action, lawsuits, judgments, claims and demands of any nature against any third party available to or being pursued by the Company, EFCH or TCEH to the extent Related to the TCEH Business; and

9. To the extent permitted by Law, all licenses, permits, certificates and other authorizations and approvals Related to the TCEH Business.

For the avoidance of doubt, the Acquired TCEH Assets shall not include any cash of the Company or any Person that remains a Subsidiary of the Company after giving effect to the Contribution or [, subject to Section 7.18,] of EFH Properties Company.

**Schedule 1-A**
<u>Vehicles</u>

[*See attached.*]

**Schedule 2**
EFH/TCEH Guarantees

| Guarantor | Benefiting Company | Creditor/Counterparty | Issue Date |
|---|---|---|---|
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | ADM Investor Services, Inc. | 11/27/2013 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Arch Coal Sales Company, Inc. | |
| Texas Competitive Electric Holdings Company LLC | La Frontera Holdings LLC | BP Energy Company | 3/31/2016 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | BP Energy Company | 1/16/2003 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Brazos Electric Power Cooperative, Inc. | 10/24/2003 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Brazos Wind, L.P. | 6/26/2003 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Calpine Energy Services, L.P. | 4/5/2007 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Cargill, Incorporated | 10/4/2013 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Chesapeake Energy Marketing, Inc. | 4/7/2010 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Citigroup Energy Inc. | 12/22/2006 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Direct Energy, LP and Energy America, LLC | 4/26/2002 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | EDF Trading North American, LLC | 12/22/2014 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Electric Reliability Council of Texas, Inc. (ERCOT) | 4/10/2008 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | ETC Marketing, Ltd. and/or Energy Transfer Fuel, LP and/or Houston Pipe Line Company LP and/or ETC Katy Pipeline, Ltd and/or Oasis Pipeline, LP and/or Texas | 12/20/2006 |

| Guarantor | Benefiting Company | Creditor/Counterparty | Issue Date |
|---|---|---|---|
| | | Energy Transfer Company, Ltd. (individually and collectively) | |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Exelon Generation Company, LLC (f/k/a Constellation Energy Commodities Group, Inc.) | 7/6/1999 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | GDF SUEZ Energy Marketing NA, Inc. | 6/24/2014 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Goldman, Sachs & Co. | 9/23/2011 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | J. Aron & Company | 8/13/2014 |
| Texas Competitive Electric Holdings Company LLC | Luminant Holding Company LLC | La Frontera Ventures, LLC | 11/25/2015 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Macquarie Futures USA LLC (formerly Macquarie Futures USA Inc.) | 11/17/2009 |
| Texas Competitive Electric Holdings Company LLC | La Frontera Holdings LLC | Merrill Lynch Commodities, Inc. | 3/31/2016 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Merrill Lynch Commodities, Inc. | 12/30/2014 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Mercuria Energy America, Inc. | 3/25/2016 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Morgan Stanley Capital Group Inc. | 8/14/2014 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Munich Re Trading LLC | 2/28/2014 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | New York Mercantile Exchange | 3/18/1996 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | NextEra Energy Power Marketing, LLC (f/k/a Florida Power & Light Company & NextEra Energy Power Marketing, | 3/22/2010 |

| Guarantor | Benefiting Company | Creditor/Counterparty | Issue Date |
|---|---|---|---|
| | | LLC )(f/k/a Florida Power & Light Company, FPL Energy Power Marketing, Inc.) | |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Noble Americas Gas & Power Corp. | 11/11/2011 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | NRG Power Marketing LLC (f/k/a NRG Power Marketing Inc.) | 8/31/2006 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Peabody COALSALES, LLC and/or Peabody COALTRADE, LLC | 3/25/2016 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Sweetwater Wind 1 LLC | 6/24/2014 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Tenaska Marketing Ventures, Tenaska Gas Storage, LLC | 4/3/1997 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Tenaska Power Services Co. | 3/7/2001 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Valero Texas Power Marketing, Inc. | 6/2/2010 |
| Texas Competitive Electric Holdings Company LLC | Luminant Energy Company LLC | Worsham Steed Gas Storage, L.P. | 3/22/2010 |
| Texas Competitive Electric Holdings Company LLC | TXU Energy Retail Company LLC | Baylor Scott & White Health | 4/17/2009 |
| Texas Competitive Electric Holdings Company LLC | TXU Energy Retail Company LLC | Lexington Acquiport Colinas L.P. | 11/26/2007 |
| Texas Competitive Electric Holdings Company LLC | Luminant ET Services Company | Public Utility Commission of Texas | 3/12/2007 |

**Schedule 3**
<u>Specified Approvals</u>

None.

**Schedule 4**
<u>Assumed Liabilities</u>

1.  Liabilities of the Company resulting from *Stephen Dyson v. Michael Leeland Lee; Energy Future Holdings Corp; Lisa McElroy; and Allstate Fire and Casualty Insurance Company*, Cause No. DC-16-04256 in the District Court of Dallas County, Texas, 68th Judicial District.

**Schedule 5**
TCEH Companies

4CHANGE ENERGY COMPANY
4CHANGE ENERGY HOLDINGS LLC
BIG BROWN 3 POWER COMPANY LLC
BIG BROWN LIGNITE COMPANY LLC
BIG BROWN POWER COMPANY LLC
BRIGHTEN ENERGY LLC
BRIGHTEN HOLDINGS LLC
COLLIN POWER COMPANY LLC
DALLAS POWER & LIGHT COMPANY, INC.
DECORDOVA II POWER COMPANY LLC
DECORDOVA POWER COMPANY LLC
EAGLE MOUNTAIN POWER COMPANY LLC
EFH CG HOLDINGS COMPANY LP
EFH CORPORATE SERVICES COMPANY
EFH CG MANAGEMENT COMPANY LP
FORNEY PIPELINE, LLC
LA FRONTERA HOLDINGS, LLC
GENERATION MT COMPANY LLC
GENERATION SVC COMPANY
LAKE CREEK 3 POWER COMPANY LLC
LONE STAR ENERGY COMPANY, INC.
LONE STAR PIPELINE COMPANY, INC.
LUMINANT BIG BROWN MINING COMPANY LLC
LUMINANT ENERGY COMPANY LLC
LUMINANT ENERGY TRADING CALIFORNIA COMPANY
LUMINANT ET SERVICES COMPANY
LUMINANT GENERATION COMPANY LLC
LUMINANT HOLDING COMPANY LLC
LUMINANT MINERAL DEVELOPMENT COMPANY LLC
LUMINANT MINING COMPANY LLC
LUMINANT RENEWABLES COMPANY LLC
MARTIN LAKE 4 POWER COMPANY LLC
MONTICELLO 4 POWER COMPANY LLC
MORGAN CREEK 7 POWER COMPANY LLC
NCA RESOURCES DEVELOPMENT COMPANY LLC
OAK GROVE MANAGEMENT COMPANY LLC
OAK GROVE MINING COMPANY LLC
OAK GROVE POWER COMPANY LLC
SANDOW POWER COMPANY LLC
SOUTHWESTERN ELECTRIC SERVICE COMPANY, INC.
TEX ASSET COMPANY LLC
TEX CP COMPANY LLC
TEX ENERGY LLC
TEX FINANCE CORP.
TEX INTERMEDIATE COMPANY LLC
TEX OPERATIONS COMPANY LLC
TEX PREFERRED LLC
TEXAS ELECTRIC SERVICE COMPANY, INC.

TEXAS ENERGY INDUSTRIES COMPANY, INC.
TEXAS POWER & LIGHT COMPANY, INC.
TEXAS UTILITIES COMPANY, INC.
TEXAS UTILITIES ELECTRIC COMPANY, INC.
TRADINGHOUSE 3 & 4 POWER COMPANY LLC
TRADINGHOUSE POWER COMPANY LLC
TXU ELECTRIC COMPANY, INC.
TXU ENERGY RECEIVABLES COMPANY LLC
TXU ENERGY RETAIL COMPANY LLC
TXU ENERGY SOLUTIONS COMPANY LLC
TXU RETAIL SERVICES COMPANY
TXU SEM COMPANY
VALLEY NG POWER COMPANY LLC
VALLEY POWER COMPANY LLC

**Schedule 6**

Energy Future Holdings Corp.
Ebasco Services of Canada Limited
EEC Holdings, Inc.
EECI, Inc.
EFH Australia (No. 2) Holdings Company
EFH Finance (No. 2) Holdings Company
EFH FS Holdings Company
EFH Renewables Company LLC
EFH Vermont Insurance Company
EFIH Finance Inc.
Energy Future Intermediate Holding Company LLC
Generation Development Company LLC
LSGT Gas Company LLC
LSGT SACROC, Inc.
NCA Development Company LLC
Oncor Electric Delivery Holdings Company LLC
Oncor License Holdings Company LLC
Oncor Communications Holdings Company
Oncor Electric Delivery Company LLC
Oncor Management Investment LLC
Oncor Electric Delivery Transition Bond Company LLC
Oncor Electric Delivery Administration Corp.
TXU Receivables Company

**Annex A**
Split Policies and Split Letters of Credit

**Split Policies**

| Insurer | Policy Numbers[2] | Policy Type | % Company Policy Liabilities[3] | % SpinCo Policy Liabilities |
|---|---|---|---|---|
| Reliance National Indemnity Company; Reliance Insurance Company; Planet Insurance Company | NWA-1498458-00; NWA-1498458-01; NWA-1498458-02; NWA-1498458-03; NWA-1498458-04; NWA-1498458-05; NWA-1498458-06; NWA-1498458-07; NWA-0105545-04; NXC-0105548-04; NWA-0105545-03; NXC-105548-03; NWA-0105545-02; NWA-0119509-00; NXC-0105548-02; NWA-0105545-01; NXC-0105548-01; NWA-0105545-00; NXC-0105548-00; NWA-0102137-00; NWA-0102138-01; NGB-0142913-01; NGB-0142913-02; NGB-1498908-00; NGB-1498908-01; NGB-1498908-02; NGB-1498908-03; NGB-1498908-04; NGB-1498908-05 | Workers' Compensation and General Liability | 78% | 22% |
| Liberty Mutual Insurance | WA1-69D-004224-022; WA1-69D-004224-023; WA1-69D-004224-024; WA1-691-004224-012; WC-691-004224-013; WA7-69D-004224-025; WA7-69D-004224-026; WA7-69D-004224-027; WA7-69D-004224-028; WA7-69D-004224-029; WA7-69D-004224-038; | Workers' Compensation and General Liability | 22% | 78% |

---

[2]    Policy Numbers to be confirmed.

[3]    % Company Policy Liabilities and % SpinCo Policy Liabilities are based on open/outstanding loss reserves as of 6/30/2016.

| | WA7-69D-004224-039;<br>WA7-69D-004224-020;<br>WA7-69D-004224-021;<br>WA7-69D-004224-022 | | | |
|---|---|---|---|---|
| Lumbermen's Mutual | NWA-0164584-00;<br>NWA-1498458-09;<br>5BA-130-175-00;<br>5BA 130 176-00 | Workers' Compensation and General Liability | 18% | 82% |
| Old Republic | MWZY-55443;<br>MWZY-55629;<br>MWZY-56071;<br>MWZY-56766;<br>MWZY-57145;<br>MWZY-57388 | General Liability | 92% | 8% |

## Split Letters of Credit

| Beneficiary | Letter of Credit Number | Amount | Expiration |
|---|---|---|---|
| Reliance National Indemnity Company; Reliance Insurance Company; Planet Insurance Company | 63663022 | $12,014,128.00 | 4/30/2017 |
| Liberty Mutual Insurance | 63663534 | $4,400,000.00 | 5/5/2017 |
| Lumbermen's Mutual | 63663753 | $2,742,851.44 | 11/7/2016 |
| Old Republic | 63663167 | $3,000,000.00 | 5/5/2017 |

**Annex B**
E-Side Letters of Credit

| Beneficiary | Letter of Credit Number. | Amount | Expiration |
|---|---|---|---|
| Director of Rhode Island | 63663219 | $250,000.00 | 5/5/2017 |
| State of Vermont | 63664034 | $250,000.00 | 11/7/2016 |
| Reliance National Indemnity Company; Reliance Insurance Company; Planet Insurance Company | 63663693 | $1,453,902.00 | 11/7/2016 |

## Exhibit A

### Assignment and Assumption Agreements
### (TCEH Assets)

### ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is effective as of [●], 2016, by and among Energy Future Holdings Corp., a Texas corporation (the "Company"), Texas Competitive Electric Holdings Company LLC, a Delaware limited liability company ("TCEH"), and TEX Energy LLC, a Delaware limited liability company ("SpinCo").

WHEREAS, TCEH is an indirect wholly owned subsidiary of the Company and SpinCo is a direct wholly owned subsidiary of TCEH;

WHEREAS, the Company owns (i) the Acquired TCEH Assets (as defined in the Separation Agreement referred to below) (the "EFH Contributed Assets") and (ii) directly or indirectly, all of the outstanding equity interests of the entities listed on Schedule B hereto (the "EFH Contributed Subsidiaries");

WHEREAS, TCEH owns (i) the assets identified on Schedule A hereto (the "TCEH Contributed Assets," and together with the EFH Contributed Assets, the "Contributed Assets") and (ii) directly or indirectly, all of the outstanding equity interests of the entities listed on Schedule B hereto (the "TCEH Contributed Subsidiaries"); and

WHEREAS, as contemplated by that certain Separation Agreement, dated as of the date hereof, by and between the Company, SpinCo, and TEX Operations Company LLC, a Delaware limited liability company and indirect wholly owned subsidiary of TCEH (as amended, the "Separation Agreement"), the Company desires to contribute, convey, transfer and assign the EFH Contributed Assets and the EFH Contributed Subsidiaries, and TCEH desires to contribute, convey, transfer and assign the TCEH Contributed Assets and the TCEH Contributed Subsidiaries, to SpinCo.

NOW THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Capitalized Terms. Capitalized terms used herein and not defined herein have the meanings assigned to them in the Separation Agreement.

2.      EFH Contribution.  The Company hereby contributes, conveys, transfers and assigns the EFH Contributed Assets and the EFH Contributed Subsidiaries to SpinCo, and SpinCo hereby accepts such contribution, conveyance, transfer and assignment (the "EFH Contribution").  SpinCo hereby assumes and agrees to pay, discharge, perform or otherwise satisfy as and when due all liabilities and obligations of any kind and nature, in each case, arising out of facts, circumstances, events or conditions in existence before, on or after the date hereof of, under, related to, resulting from, or arising out of or in connection with, as applicable, the EFH Contributed Subsidiaries, the EFH Contributed Assets and all Assumed Liabilities (as defined in the Separation Agreement) (the "EFH Assumed Liabilities").

3.    <u>TCEH Contribution</u>. TCEH hereby contributes, conveys, transfers and assigns the TCEH Contributed Assets and TCEH Contributed Subsidiaries to SpinCo, and SpinCo hereby accepts such contribution, conveyance, transfer and assignment (the "<u>TCEH Contribution</u>," and together with the EFH Contribution, the "<u>Contributions</u>"). SpinCo hereby assumes and agrees to pay, discharge, perform or otherwise satisfy all liabilities and obligations of any kind and nature arising out of or otherwise relating to the TCEH Contributed Assets and any other liabilities identified on <u>Schedule C</u> hereto (the "<u>TCEH Assumed Liabilities</u>," and together with the EFH Assumed Liabilities, the "<u>Assumed Liabilities</u>").

4.    <u>Further Assurances</u>. In furtherance of the transactions described herein, the parties hereto shall, and shall cause their applicable subsidiaries to, execute such additional bills of sale, quitclaim deeds, stock or equity powers, certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment and other documents reasonably necessary to evidence the transfer, conveyance and assignment of the Contributed Assets to SpinCo and the valid and effective assumption of the Assumed Liabilities by SpinCo, including any which are not transferred on the date hereof as a result of <u>Section 2.2(b)</u> of the Separation Agreement or for any other reason.

5.    <u>Tax Treatment</u>. For federal income tax purposes, at the time of the Contributions, each of TCEH and SpinCo is an entity that is disregarded as separate from the Company, and accordingly, the Contributions will have no federal income tax effect. For Texas sales and use tax purposes, the Contributions will be treated as (i) a transfer of intangible assets not subject to Texas sales and use tax, and/or (ii) a transfer of assets constituting a separate division, branch, or identifiable segment of a business that is exempt from Texas sales and use tax as an occasional sale.

6.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts (including by electronic means), each such counterpart being deemed to be an original instrument, and all such counterparts taken together constituting one and the same agreement.

7.    <u>Captions</u>. The captions of the paragraphs herein are inserted for convenience of reference only and shall not be used in construing the terms and provisions hereof.

8.    <u>Successors and Assigns</u>. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.

9.    <u>Governing Law and Venue; Waiver of Jury Trial</u>.

(a)    THIS AGREEMENT, TOGETHER WITH ANY CLAIM, DISPUTE, REMEDY OR ACTION ARISING FROM OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY RELIEF OR REMEDIES SOUGHT BY ANY PARTY, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. Each of the parties hereto (i) submits to the exclusive jurisdiction of the Bankruptcy Court; provided that if the Bankruptcy Court declines to accept jurisdiction over a particular Action, then the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware, in any Action arising out of or relating to this Agreement, (ii) agrees that all claims in respect of such Action may be heard and determined in any such court and (iii) agrees not to bring any Action arising out of or relating to this Agreement (whether on the basis of a claim sounding in contract, equity, tort or otherwise) in any other court. Each of the parties agrees that a final judgment (subject to any

appeals therefrom) in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any Action arising out of or relating to this Agreement or the transactions contemplated hereby in any Delaware or federal court in accordance with the provisions of this Section. Each of the parties hereby irrevocably waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such Action in any such court. Each of the parties hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in the Separation Agreement. Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Law.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (W) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (X) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (Y) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (Z) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.    <u>Limitations of Liability</u>. The Liabilities of any party hereto arising out of or relating to this Agreement shall be limited pursuant to and as provided in the Separation Agreement.

11.    <u>No Third Party Beneficiaries</u>. Except for the indemnification rights under the Separation Agreement of any Indemnified Party in their respective capacities as such, the provisions of this Agreement and the Separation Agreement are solely for the benefit of the parties hereto and thereto and their respective successors and permitted assigns and are not intended to confer upon any Person, except the parties hereto and thereto and their respective successors and permitted assigns, any rights or remedies hereunder and there are no third party beneficiaries of this Agreement or the Separation Agreement; and neither this Agreement nor the Separation Agreement shall provide any third party with any remedy, claim, liability, reimbursement, cause of action or other right in excess of those existing without reference to this Agreement or the Separation Agreement.

12.    <u>Assignment</u>. Neither party shall assign its rights or obligations under this Agreement (by operation of law or otherwise) unless, such party concurrently assigns its rights and obligations under the Separation Agreement to the same assignee of its rights and obligations hereunder.

*Signature page follows.*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first above written.

**Energy Future Holdings Corp.**

By:_____
Name: [_____]
Title: [_____]

**Texas Competitive Electric Holdings Company LLC**

By:_____
Name: [_____]
Title: [_____]

**TEX Energy LLC**

By:    _____
Name: [_____]
Title: [_____]

## Schedule A

TCEH Contributed Assets

[Schedule A to set forth any assets listed on Schedule 1 that are owned by the applicable company executing the Assignment Agreement]

## Schedule B

TCEH Contributed Subsidiaries

The following Delaware limited liability companies:

TEX Intermediate Company LLC

TEX Operations Company LLC

TEX Asset Company  LLC

TEX Preferred LLC

Oak Grove Management Company LLC

Brighten Energy LLC

Forney Pipeline, LLC

La Frontera Holdings, LLC


The following Texas limited liability companies:

Luminant Energy Company LLC

Luminant ET Services Company LLC

Luminant Energy Trading California Company

Luminant Generation Company LLC

Sandow Power Company LLC

Luminant Mining Company LLC

Big Brown Power Company LLC

4Change Energy Company LLC

TXU Energy Retail Company LLC

TEX CP Company LLC

The following Delaware corporations:

 TEX Finance Corp.

 TXU Retail Services Company

The following Texas corporations:

 Generation SVC Company

## **EFH Contributed Subsidiaries**

The following Texas corporations:

 EFH Properties Company

 EFH Corporate Services Company

**Schedule C**

TCEH Assumed Liabilities

[Schedule C to set forth any Liabilities listed on Schedule 4 that are obligations of the applicable company executing the Assignment Agreement]

**Exhibit B**

<u>Assignment and Assumption Agreement</u>
<u>(Contributed Plans)</u>

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "<u>Agreement</u>") is entered into effective as of [●], 2016 (the "<u>Effective Date</u>") by and between Energy Future Holdings Corp., a Texas corporation ("<u>EFH</u>"), and TEX Operations Company LLC, a Delaware limited liability company ("<u>OpCo</u>"), and with respect to the assignment of certain Agreements hereunder, EFH Corporate Services Company ("<u>Corporate Services</u>"), Luminant Holding Company LLC ("<u>Luminant</u>"), TXU Energy Retail Company, LLC ("<u>Retail</u>"), Texas Energy Future Holdings Limited Partnership ("<u>Holdings</u>"), and Texas Competitive Electric Holdings Company LLC ("<u>TCEH</u>"). Corporate Services, Luminant, Retail, Holdings and TCEH are referred to herein as the "<u>Agreement Parties</u>").

## RECITALS

**WHEREAS,** EFH currently sponsors and maintains the employee benefit plans, programs and policies listed on <u>Exhibit A</u> attached hereto and made a part hereof (the "<u>Contributed Plans</u>"), and EFH and the Agreement Parties are parties to the employment agreements listed on <u>Exhibit A</u>, as well as certain agreements relating to the operation and administration of the Contributed Plans (collectively, the "<u>Agreements</u>");

**WHEREAS,** on April 29, 2014, EFH and certain entities in which it, directly or indirectly, held an equity interest and certain of their respective subsidiaries (collectively, the "<u>Debtors</u>") commenced voluntary cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq. (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes only under Case No. 14-10979 (collectively, with any proceedings relating thereto, the "<u>Chapter 11 Cases</u>");

**WHEREAS,** on July 29, 2016, EFH, Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("<u>EFIH</u>"), NextEra Energy, Inc., a Florida corporation ("<u>Parent</u>"), and EFH Merger Co., LLC, a Delaware limited liability company and direct wholly owned subsidiary of Parent ("<u>Merger Sub</u>"), entered into that certain Agreement and Plan of Merger (as amended, the "Merger Agreement"), which provides for, among other things, the merger of EFIH with and into Merger Sub with Merger Sub being the surviving company and the successor to EFIH;

**WHEREAS**, the Third Amended Joint Plan of Reorganization filed by the Debtors with the Bankruptcy Court on July 29, 2016 (as amended, the "<u>Plan of Reorganization</u>") provides that the confirmation and effective date of the Plan of Reorganization with respect to the TCEH Debtors (as defined in the Plan of Reorganization) ("<u>TCEH Effective Date</u>") may occur separate from, and independent of, the confirmation and effective date of the Plan of Reorganization with respect to the EFH Debtors (as defined in the Plan of Reorganization);

**WHEREAS,** effective as of [●], 2016, the Bankruptcy Court entered an [amended] order (the "<u>Confirmation Order</u>") approving and confirming, among other things, the restructuring of the TCEH Debtors pursuant to the Plan of Reorganization, subject to certain contingencies set forth in the Confirmation Order, all of which contingencies have, as of [●], 2016, been satisfied or waived;

**WHEREAS,** in connection with the implementation of the Plan of Reorganization, all employees of EFH, and its affiliates (other than Oncor Electric Delivery Company, LLC and its direct and indirect subsidiaries), have been or will be transferred to OpCo prior to the TCEH Effective Date;

**WHEREAS,** as provided for, and required under, the Plan of Reorganization and the Merger Agreement, EFH desires to transfer and assign to OpCo the sponsorship (including the assumption of all assets and liabilities thereto) of each of the Contributed Plans and the Agreement Parties desire to transfer and assign its rights and obligations under each Agreement to which it is a party, and OpCo desires to accept and assume all such transfers; and

**WHEREAS,** the parties desire to enter into this Agreement to evidence and effectuate such transfer and assignment, and acceptance and assumption of the Contributed Plans and the Agreements.

**NOW, THEREFORE,** in consideration of the premises, representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.    <u>Assignment and Assumption of Plans</u>.  Effective as of the TCEH Effective Date, the sponsorship and all obligations relating to the maintenance and administration of each of the Contributed Plans are hereby transferred and assigned from EFH to OpCo, and OpCo hereby accepts such transfer and assignment.  By virtue of such assignment and assumption, OpCo hereby possesses all rights, authority, and responsibility as plan sponsor, employer and a participating employer and fiduciary under each of the Contributed Plans.  Effective as of the TCEH Effective Date, OpCo hereby assumes full responsibility for the liabilities, qualification, administration and compliance with all applicable legal requirements relating to each of the Contributed Plans, including without limitation the provision of all benefits due or required to be paid under the Contributed Plans (including benefits accrued or which become payable prior to the Effective Date).

2.    <u>Assignment and Assumption of Agreements</u>.  Effective as of the TCEH Effective Date, the rights and obligations of the Agreement Party under each of the applicable Agreements are hereby transferred and assigned from the applicable Agreement Parties to OpCo, and OpCo hereby accepts such transfer and assignment.  By virtue of such assignment and assumption, OpCo hereby possesses all rights and obligations of the applicable Agreement Parties under each of the Agreements.  Effective as of the TCEH Effective Date, OpCo hereby assumes full responsibility for the performance of all obligations of the Agreement Party under each of the applicable Agreements.  EFH, the Agreement Party and OpCo shall reasonably cooperate with each other to cause each of the Contributed Plans and Agreements to be amended, as necessary, to reflect the assignment, transfer and assumption evidenced hereby.  To the extent that the transfer, acceptance and assignment of any of the Agreements require the consent of an individual employee, affiliate or third party, as applicable, the parties shall reasonably cooperate to obtain such consent.

3.    <u>Plan Administrator</u>.  From and after the TCEH Effective Date, the named fiduciary and plan administrator, as applicable, of each of the Contributed Plans shall be the applicable administrative committee, or other designee, of OpCo, which shall replace the applicable named fiduciary and plan administrator of EFH in such capacity, and shall have all responsibility and authority necessary or appropriate to administer the Contributed Plans in accordance with their terms.  All policies and decisions adopted by the applicable EFH plan administrator prior to the TCEH Effective Date shall, unless and until changed by the applicable OpCo plan administrator, continue in effect.  Without limiting the generality of the foregoing, all funding and investment policies, loan, withdrawal and distribution procedures, procedures for processing domestic relations orders and qualified medical child support orders,

procedures for processing claims, and any other policies or procedures relating to the administration of any of the Contributed Plans, previously adopted by the applicable EFH plan administrator, shall remain in full force and effect unless and until changed by the applicable OpCo plan administrator.

     4.    Fidelity Bond; Liability Insurance. EFH and OpCo shall timely notify the issuer of any fidelity bond or liability insurance policy relating to any Contributed Plan or Agreement of the transfer, assignment and assumption provided for herein, and the parties shall fully cooperate and take all action necessary to effectuate the transfer, assignment and assumption with respect to such fidelity bonds and insurance policies so as to ensure coverage of OpCo, the applicable OpCo plan administrators and all entities and individuals involved in the administration of the Contributed Plans and Agreements from and after the TCEH Effective Date.

     5.    Effect on Employment. It is the intent of the parties, that the transfer of employment of employees from EFH, and certain of its affiliates (other than Oncor Electric Delivery Holdings Company, LLC and its subsidiaries), to OpCo shall be treated as a transfer of employment and not as a termination of employment for purposes of any of the Contributed Plans. In this connection, each employee shall be treated as if his/her employment has not been terminated as a result of the transfer from EFH, or an affiliate of EFH, to OpCo, and his/her service, for all purposes under each Contributed Plan and Agreement, shall be treated as continuous without any break in service related to such transfer. Notwithstanding the foregoing, consistent with the Plan of Reorganization, the Closing of the transactions contemplated in the Plan of Reorganization shall be deemed to constitute a change in control of EFH for purposes of the applicable Contributed Plans.

     6.    Employee Communications. OpCo shall be responsible for preparing and distributing summaries of material modifications and other communication materials to notify employees of the assignment, transfer and assumption evidenced hereby. EFH shall cooperate with OpCo in the preparation of such materials as may be reasonably requested by OpCo.

     7.    Reports to Governmental Agencies; Audits. From and after the TCEH Effective Date, OpCo shall be responsible for preparing, filing and/or distributing all required governmental reports relating to the Contributed Plans including without limitation, Annual Returns/Reports (Form 5500 Series), Summary Annual Reports, Annual Funding Notices, and all filings required under the Affordable Care Act. EFH shall, or shall cause its affiliates to, cooperate with OpCo, and provide OpCo with all information available to EFH or its affiliates, as OpCo may reasonably request, in connection with the preparation of such reports. Additionally, in the event of a governmental audit, investigation or inquiry relating to any of the Contributed Plans, EFH and OpCo shall fully cooperate with each other, and EFH shall, or shall cause its affiliates to, provide OpCo with all information or documentation in EFH's, or its affiliates' possession or control as may be reasonably requested by OpCo in connection with any such audit, investigation or inquiry.

     8.    Transfer of Records. To the maximum extent allowed under applicable law, EFH shall, or shall cause its affiliates to, transfer to OpCo all records pertaining to the Contributed Plans and Agreements in EFH's, or its affiliates, possession or control as soon as reasonably practical following the Effective Date.

     9.    No Plan Amendment. Except as expressly provided for herein, nothing in this Agreement shall be construed or deemed to constitute an amendment to any Contributed Plan, and nothing in this Agreement shall limit, in any way, the right and authority of OpCo to amend each of the Contributed Plans, in whole or in part, from time to time.

     10.    No Third Party Beneficiary. Nothing in this Agreement shall create any rights in any person or entity other than the parties hereto, including without limitation any participant, beneficiary, dependent or other covered person under any Contributed Plan.

11.    <u>Further Acts</u>.  The parties agree to take any and all further action and to execute any and all further documents as either of them may reasonably determine to be necessary or appropriate to effectuate the transfer, assignment and assumption of the Contributed Plans and the Agreements, and all other matters contemplated in this Agreement.

12.    <u>Applicable Law</u>.  TO THE EXTENT NOT OTHERWISE GOVERNED BY FEDERAL LAWS SUCH AS ERISA AND THE CODE (AS SUCH TERMS ARE DEFINED IN THE MERGER AGREEMENT) THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF TEXAS.

13.    <u>Binding Effect; Assignment</u>.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of, and be enforceable by the parties hereto and their respective successors and permitted assigns.  Neither party shall assign its rights or obligations under this Agreement (by operation of law or otherwise) unless, such party concurrently assigns its rights and obligations under the Separation Agreement to the same assignee of its rights and obligations hereunder.

14.    <u>Invalidity of Provisions</u>.  In the event that one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality or enforceability of the remaining provisions hereof shall not be affected or impaired thereby.

15.    <u>Entire Agreement</u>.  This Agreement, together with that certain Separation Agreement, by and among EFH, OpCo and TEX Energy LLC, a Delaware limited liability company, dated as of the date hereof (the "<u>Separation Agreement</u>"), constitutes the whole and entire agreement between the parties hereto and supersedes any prior agreement, undertaking, declaration, commitment or representation, verbal or oral, with respect to the subject matter hereof.

16.    <u>Limitations of Liability</u>.  The liabilities of the parties hereto arising out of or relating to this Agreement shall be limited pursuant to and as provided in the Separation Agreement.

17.    <u>Defined Terms</u>.  Capitalized terms not defined herein shall be given the meaning ascribed to them in the Merger Agreement, Plan of Reorganization or Separation Agreement.  In the event of a conflict between any such definitions, the definition in the Merger Agreement shall be controlling.

18.    <u>Captions</u>.  The captions of the sections and paragraphs of this Agreement are for convenience and reference only and in no way define, limit or describe the scope or intent of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the Effective Date.

TEX OPERATIONS COMPANY LLC


By:_____

Title:_____


ENERGY FUTURE HOLDINGS CORP.


By:_____

Title:_____


**AGREEMENT PARTIES:**

EFH CORPORATE SERVICES COMPANY


By:_____

Title:_____


LUMINANT HOLDING COMPANY LLC


By:_____

Title:_____


TXU ENERGY RETAIL COMPANY, LLC


By:_____

Title:_____

TEXAS ENERGY FUTURE HOLDINGS
LIMITED PARTNERSHIP


By:_____

Title:_____


TEXAS COMPETITIVE ELECTRIC HOLDINGS
COMPANY LLC


By:_____

Title:_____

**EXHIBIT A**
**TO**
**ASSIGNMENT AND ASSUMPTION AGREEMENT**
**BETWEEN**
**ENERGY FUTURE HOLDINGS CORP., TEX OPERATIONS COMPANY LLC, AND CERTAIN**
**OTHER AGREEMENT PARTIES NAMED THEREIN**

**Contributed Plans:**

1. EFH Retirement Plan, as amended and restated effective as of January 1, 2015 (and related trust agreement with The Bank of New York Mellon)

2. EFH Thrift Plan, as amended and restated effective as of January 1, 2015 (and related trust agreement with Fidelity Management Trust Company)

3. EFH Executive Annual Incentive Plan, effective as of October 30, 2014

4. EFH Broad-Based Annual Incentive Plan, effective as of October 30, 2014

5. Energy Future Holdings Corp. Executive Change in Control Policy, as amended

6. EFH Corp. Change in Control Policy for Non-Leadership Team LTIP Participants (to the extent not terminated prior to the TCEH Effective Date)

7. EFH Severance Plan, as amended

8. Energy Future Holdings Corp. 2005 Executive Severance Plan, as amended

9. EFH Corp., Executive Financial Advisement Benefit

10. EFH Executive Physical Program, dated January 1, 2013

11. EFH Health and Welfare Benefit Program, consisting of the:

    (i)     EFH Health Care and Life Insurance Plan

    (ii)    EFH Welfare Benefit Plan; *provided, however,* for the avoidance of doubt, the DiscOp OPEB Liabilities to be transferred to the New DiscOp OPEB Plan (as defined in the Merger Agreement) pursuant to Section 6.6(a) of the Merger Agreement shall not be included as part of the EFH Health and Welfare Benefit Program and, therefore, not a Contributed Plan from and after the assumption of such New DiscOp OPEB Plan to Parent or Company..

12. Amended and Restated Energy Future Holdings Corp. 2013 Performance Bonus Plan, as amended

13. Amended and Restated Energy Future Holdings Corp. 2013 Bonus Plan, as amended

14. EFH Appliance Purchase Plan, revised May 26, 2013

15. EFH Educational Expense Reimbursement Plan, revised May 26, 2013

16. EFH Energy Conservation Program for Employee Homes, revised May 26, 2013

17. EFH Paid Time Off Policy, revised May 26, 2013

18. EFH Short-Term Disability Payment Policy, revised September 11, 2013

19. EFH Holidays Policy, revised May 26, 2013

20. Any individual retention agreements (non-owner/operator)

21. EFH Spot Bonus Award Program

22. EFH Project Completion Bonus Program

23. EFH Employee Referral Program, revised April 1, 2013 (as set forth in the EFH Relocation Policy Tier V)

24. EFH US Domestic Relocation Policy, effective July 2013

25. DART Transit Program

26. EFH Service and Safety Award Program, revised May 26, 2013

27. Survivor's Benefit Policy

**Agreements**:

1. James A. Burke Amended and Restated Employment Agreement, dated as of March 27, 2015

2. Stacey H. Doré Amended and Restated Employment Agreement, dated as of March 27, 2015

3. Paul Keglevic Amended and Restated Employment Agreement, dated as of March 27, 2015

4. Carrie L. Kirby Amended and Restated Employment Agreement, dated as of March 27, 2015

5. Mark Allen McFarland Amended and Restated Employment Agreement, dated as of March 27, 2015

6. John Young Amended and Restated Employment Agreement, dated as of March 30, 2015

7. Donald L. Evans Amended and Restated Employment Agreement, dated as of April 23, 2014

## Exhibit K

**Oncor Letter Agreement**

*(See Attached)*