# KOBRE & KIM LLP

800 THIRD AVENUE
NEW YORK, NEW YORK 10022
WWW.KOBREKIM.COM

TEL +1 212 488 1200
FAX +1 212 488 1220

NEW YORK
LONDON
HONG KONG
SEOUL
WASHINGTON DC
SAN FRANCISCO
MIAMI
CAYMAN ISLANDS
BVI

Dear Judge Sontchi,

  We represent Delaware Trust Company solely in its capacity as TCEH First Lien Notes Trustee. Pursuant to the *Stipulation And Consent Order* (D.I. 9696), we hereby set forth the Trustee's Proposal for the calculation of the TCEH First Lien Dispute Reserve and request that the Court enter the corresponding attached proposed order.

  The Trustee's Proposal is premised on the simple notion that a deal is a deal. It is no accident that the express language of the Plan requires the Debtors to "establish a reserve . . . with respect to any TCEH First Lien Creditor Distributions that remain subject to the TCEH First Lien Creditor Plan Distribution Allocation Dispute." (D.I. 9321-1, at 64). This provision was included in the Plan because the Trustee and certain Noteholders insisted upon it in exchange for their support for the Plan. By way of background, after the Trustee filed suit in the underlying allocation dispute, certain First Lien Bank and Swap Creditors sought to non-consensually resolve that dispute through a chapter 11 plan containing a "deemed direction" provision that would have amended the intercreditor agreement at the heart of the dispute. (D.I. 5244, at 53). This maneuver prompted an objection by the Trustee (D.I. 5360), and the refusal by Noteholders to join a plan support agreement ("PSA") that (at that time) lacked requisite support from TCEH First Lien Creditors. Following intense negotiations, a deal was struck premised on carving the dispute out of the Plan entirely in exchange for the withdrawal of the Trustee's objection and the support of the PSA by certain members of the Ad Hoc Group of First Lien Creditors that owned Notes. To effectuate this carve-out, the plan was modified to replace the "deemed direction" provision with the reserve provision at issue today, which requires the Debtors to establish a reserve if the plan goes effective before the allocation dispute has been resolved by entry of a final non-appealable order. In short, the reserve is the primary benefit of the bargain struck in exchange for Noteholder support which led directly to the proposal of a largely consensual plan for the T-Side Debtors. That was and always has been the deal, and any resolution of the instant issue that does not direct the Debtors to create a reserve would undermine that deal by not adhering to the carefully negotiated language of the Plan and deprive Noteholders of the treatment they voted overwhelmingly to accept.[1]

  We understand the Court's comment at the September 25 status conference that it seems "ironic" to require the prevailing party in the dispute to fund the reserve. Under different circumstances, it might be. But here, the reserve provision *expressly contemplates* the protection of the non-prevailing party through appeal. This makes perfect sense because the provision was agreed to prior to this Court's decision in the underlying dispute, when all parties equally faced the prospect of their recoveries being prematurely distributed to hundreds of other TCEH First Lien Creditors

---

[1] Any such resolution would also violate applicable law governing plan modification. See 11 U.S.C. § 1127.

Hon. Christopher Sontchi
September 28, 2016
Page 2

pursuant to an allocation order that later might be reversed on appeal. This is not the equivalent situation to a non-prevailing party seeking a stay pending appeal. Rather, it is members of a class of creditors under a chapter 11 plan being held to the treatment that was expressly bargained for and agreed to as part of that plan. The reserve has been a material and integral part of the treatment of TCEH First Lien Claims in every version of the plan for the last year and was accepted by 695 out of the 698 TCEH First Lien Creditors that voted on the Plan (D.I. 9296). For these reasons, the Court cannot and should not endorse a proposal that fails to establish a reserve in accordance with the express terms of the Plan.[2]

The real question before the Court is not *whether* there should be a reserve, but *how* it should be calculated. The ultimate goal of that calculation is to determine the amounts due to and from each party in the event that the Post-Petition Allocation Method applies to Plan distributions. The primary determinant of that calculation is the appropriate post-petition interest rate for each of the various tranches of TCEH First Lien Claims. Part of that calculation is clear—no one disputes that the Notes bear interest at 11.5%, and no one disputes that that is the highest rate of all parties. There is therefore no scenario in which the Noteholders would owe anyone anything if the Post-Petition Interest Allocation Method applies, and thus it would be illogical for the Noteholders to contribute anything to the reserve.[3] The calculation is less clear, however, for the other TCEH First Lien Creditors because there is no consensus as to their rates. However, in the course of negotiations, all parties have made it clear what they believe their *own* rate should be.

The Trustee's Proposal to, as the Court put it, "cut this Gordian knot", is based on a simple and equitable premise: **all parties should be entitled to interest accruing at the rate that *they themselves* claim they are due.**[4] For the Swap Parties, that means the rates derived from their proofs of claim. For the Banks, that means their default rates under the Credit Agreement. Applying these rates yields the reserve calculation found in <u>Appendix A</u> hereto. In sum, the Proposal would require withholding 2.09% of distributions to holders of non-extended Bank debt (equal to 0.31% of total distributions to the class), 7.20% of distributions to Swap party J. Aron & Company (equal to 0.26% of total distributions to the class), and 12.22% of distributions to the remaining Swap parties (equal to 0.14% of total distributions to the class). Accordingly, the reserve would comprise only 0.72% of the total distributions to the class of TCEH First Lien Creditors to be made on the Effective Date—the other 99.28% of distributions would be made to the TCEH First Lien Creditors on October 3. For all the foregoing reasons, the Trustee respectfully request that the Court accept this Proposal and enter the attached proposed order.

---

[2] The Trustee agreed to accept undertakings from certain Swap Parties as a condition to release certain adequate protection payments from escrow under materially different circumstances. Among other things, there was a serious question (not present here) as to whether the reserve provision applied to the escrowed payments, and the Trustee's agreement avoided litigation of that issue while preserving half of the total amount of adequate protection payments in escrow. Here, given the clear plan language and the amounts at stake, the Trustee is not willing to assume the credit-risk of parties when that risk was never part of the deal bargained for or expressed in the Plan voted upon.

[3] For the same reason, the Noteholders should not be required to post any bond to protect against downside risk for those creditors whose stock distributions are placed into the reserve. If the Court is concerned about the downside risk, however, the Trustee would work with the parties to agree on a mechanism that permitted creditors to liquidate their reserved stock distributions in exchange for a cash replacement.

[4] The appropriate rates are materially lower in certain instances, and thus the total amount withheld from certain parties should have been much greater. Consistent with the Stipulation and Order, the Trustee reserves all rights.