**EXHIBIT 1**

**Merger Agreement**

EXECUTION VERSION

# AGREEMENT

## AND

# PLAN OF MERGER

By and among

# NEXTERA ENERGY, INC.,

# EFH MERGER CO., LLC,

# ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC,

and

# ENERGY FUTURE HOLDINGS CORP.

Dated as of July 29, 2016

## TABLE OF CONTENTS

**Page**

**ARTICLE I Issuances; DIP and Second Lien Note Repayments; Accessible Account Deposit; Merger; Closing; Effective Time**........................................................**14**

Section 1.1    Issuance..........................................................................14
Section 1.2    Merger............................................................................14
Section 1.3    DIP Repayment................................................................14
Section 1.4    Closing............................................................................14
Section 1.5    Effective Time .................................................................15
Section 1.6    Effects of the Merger .......................................................15
Section 1.7    Accessible Account Deposit .............................................15
Section 1.8    Stock Consideration ........................................................17
Section 1.9    Certain Defined Terms.....................................................18
Section 1.10   Determination of Aggregate Closing Date Cash; Closing Statement........18
Section 1.11   Determination of Final Closing Date Cash; Post-Closing Audit .............18
Section 1.12   Adjustments to Allocations...............................................19

**ARTICLE II Certificate of Formation and LLC Agreement of the Surviving Company**............................................................................................**19**

Section 2.1    The Certificate of Formation ...........................................19
Section 2.2    LLC Agreement ..............................................................20

**ARTICLE III Member-Manager and Officers of the Surviving Company**............................**20**

Section 3.1    Managers.........................................................................20
Section 3.2    Officers ..........................................................................20

**ARTICLE IV Effect of the Merger on Capital Stock; Exchange of Certificates**....................**20**

Section 4.1    Effect on Capital Stock ....................................................20
Section 4.2    Exchange of Certificates...................................................21
Section 4.3    Adjustments to Prevent Dilution.......................................25

**ARTICLE V Representations and Warranties**......................................................**25**

Section 5.1    Representations and Warranties of the Company ....................25
Section 5.2    Representations and Warranties of Parent and Merger Sub ....................51

**ARTICLE VI Covenants**................................................................................**60**

Section 6.1    Interim Operations ..........................................................60
Section 6.2    Acquisition Proposals ......................................................65
Section 6.3    Filings; Other Actions; Notification ..................................70
Section 6.4    Access and Reports .........................................................77
Section 6.5    Publicity .........................................................................78

Section 6.6      Employee Benefits ..................................................................78
Section 6.7      Expenses ...............................................................................80
Section 6.8      Indemnification; Directors' and Officers' Insurance ..................80
Section 6.9      Resignation of Directors and Officers ......................................82
Section 6.10     Bankruptcy Court Matters .......................................................82
Section 6.11     Listing and SEC Registration...................................................83
Section 6.12     Parent and Merger Sub Waiver.................................................83
Section 6.13     Tax-Free Reorganization Treatment .........................................84
Section 6.14     Tax Matters .............................................................................84
Section 6.15     Registration Rights...................................................................86
Section 6.16     Transition Services Agreement.................................................86
Section 6.17     Notice of Current Events .........................................................86
Section 6.18     Drag-Along Rights....................................................................87
Section 6.19     Enforcement of Certain Investor Rights ..................................88
Section 6.20     IPO Conversion Plan................................................................91
Section 6.21     Oncor Entities .........................................................................92
Section 6.22     Financing..................................................................................92

**ARTICLE VII Conditions................................................................................95**

Section 7.1      Conditions to All Parties' Obligations......................................95
Section 7.2      Conditions to Obligations of Parent and Merger Sub................97
Section 7.3      Conditions to Obligation of the Company and EFIH ..............100

**ARTICLE VIII Termination ..........................................................................101**

Section 8.1      Termination by Mutual Consent ............................................101
Section 8.2      Termination by Either Parent or the Company/ EFIH ............102
Section 8.3      Termination by the Company and/or EFIH .............................102
Section 8.4      Termination by Parent............................................................103
Section 8.5      Effect of Termination and Abandonment ...............................105

**ARTICLE IX Miscellaneous and General....................................................106**

Section 9.1      Survival..................................................................................106
Section 9.2      Modification or Amendment..................................................107
Section 9.3      Waiver of Conditions.............................................................107
Section 9.4      Counterparts...........................................................................107
SECTION 9.5    GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL .......107
Section 9.6      Notices ...................................................................................108
Section 9.7      Entire Agreement ...................................................................110
Section 9.8      No Third Party Beneficiaries ..................................................110
Section 9.9      Obligations of Parent .............................................................111
Section 9.10     Remedies.................................................................................111
Section 9.11     Transfer Taxes .......................................................................111
Section 9.12     Definitions..............................................................................111
Section 9.13     Severability ............................................................................111
Section 9.14     Interpretation; Construction ...................................................111
Section 9.15     Assignment ............................................................................112

## Exhibits

Exhibit A ......................................................................................... Plan of Reorganization
Exhibit B ......................................................................................................................... Offer
Exhibit C ............................................................................................................ IPO Conversion Plan
Exhibit D ......................................................................................... Asbestos Escrow Agreement
Exhibit E ....................................................................................... Key Regulatory Terms
Exhibit F ........................................... Form of Amended and Restated Split Participant Agreement
Exhibit G .................................................................................... Form of Tax Matters Agreement
Exhibit H ................................................................. Form of Transition Services Agreement
Exhibit I .......................................................... Private Letter Ruling and Tax Opinions
Exhibit J ................................................................................ Form of Separation Agreement
Exhibit K ............................................................................ Form of Oncor Letter Agreement

## TABLE OF DEFINED TERMS
*(with page reference)*

Acceptable Confidentiality Agreement..... 69

Accessible Account Deposit ..................... 15

Acquisition Proposal................................. 69

Adjusted Company Cash Amount ............ 19

Affiliate .................................................... 26

Agreement................................................... 9

Applicable Date ........................................ 33

Applications .............................................. 71

Approval Order .......................................... 95

Asbestos Account...................................... 17

Asbestos Escrow Agreement .................... 17

Assumed Pension Plan .............................. 38

Audit Procedures....................................... 19

Auditor ...................................................... 19

Auditor Cash Report ................................. 19

Bankruptcy and Equity Exception ............ 50

Bankruptcy Code ........................................ 9

Bankruptcy Court........................................ 9

Benefit Plans ............................................. 37

Book-Entry Shares .................................... 20

Burdensome Condition(s) ......................... 75

Business Day.............................................. 14

Cash and Cash Equivalents ....................... 18

CBA ........................................................... 46

Certificate.................................................. 20

Certificates of Merger ............................... 15

Chapter 11 Cases......................................... 9

Class A Merger Consideration................... 20

Class A Share ............................................ 20

Class A Stock Consideration .................... 18

Class B Merger Consideration................... 20

Class B Share ............................................ 20

Class B Stock Consideration...................... 18

Closing ...................................................... 14

Closing Date.............................................. 14

Closing Date Transactions ........................ 14

Closing Statement ..................................... 18

Code .......................................................... 10

Common Shares Trust................................ 24

Company ..................................................... 9

Company Acquisition Agreement............. 67

Company Approvals .................................. 31

Company Board ......................................... 30

Company Disclosure Letter ...................... 26

Company Material Adverse Effect ........... 27

Company Material Contract....................... 49

Company Notice ........................................ 67

Company Reports....................................... 33

Confidentiality Agreements .................... 110

Contract..................................................... 32

Contributed Plan ....................................... 37

control ....................................................... 27

D&O Insurance ......................................... 81

Debt Financing.......................................... 92

Debtors........................................................ 9

Designated Officer .................................... 39

DIP and Second Lien Note Repayments... 16

DIP Facility ............................................... 16

DIP Repayment ......................................... 14

Discharged Plan ........................................ 37

DiscOp OPEB Liabilities.......................... 78

DiscOp OPEB Participants ....................... 78

DLLCA ...................................................... 13

Drag-Along Rights..................................... 12

Early Financing Date ................................ 94

EFCH ........................................................ 26

Effective Time ........................................... 15

EFH Class A Issuance............................... 12

EFH Class B Issuance ............................... 12

EFH Common Stock .................................. 29

EFH Confirmation Order ........................... 95
EFH Contribution ...................................... 10
EFH Corporate Services ........................... 10
EFH Retirement Plan ................................ 38
EFH Stakeholders ..................................... 13
EFIH ............................................................ 9
EFIH Subsidiary Stakeholders ................. 13
Emergence Fees ........................................ 17
Emergence Payments ................................ 17
Employees ................................................. 37
Enforcement Action .................................. 88
Environment .............................................. 41
Environmental Claim ................................ 42
Environmental Law ................................... 42
Environmental Permits .............................. 41
Equity Financing ....................................... 92
ERCOT ....................................................... 27
ERCOT Protocols ...................................... 48
ERISA ........................................................ 37
ERISA Affiliate ......................................... 38
ERISA Event .............................................. 38
ERISA Plan ................................................ 37
E-Side Debtors ............................................ 9
Estimated Company Cash Amount ........... 18
Excess Shares ............................................ 23
Exchange Act ............................................. 31
Exchange Agent ......................................... 21
Exchange Fund ........................................... 21
Fair Market Value ..................................... 18
FCC ............................................................ 29
FCC Approval ............................................ 31
FCC/FERC Applications ........................... 71
Federal Power Act ..................................... 31
FERC .......................................................... 29
FERC Approval .......................................... 31
Filing Subsidiaries .................................... 25
Financing ................................................... 92
Form S-4 .................................................... 53

GAAP ......................................................... 28
Governmental Entity ................................. 31
Hazardous Substance ................................ 42
HSR Act ..................................................... 31
HSR Filing ................................................. 71
Initial IRS Submissions ............................ 84
Initial Ruling Request ............................... 84
Initial Termination Date .......................... 102
Insurance Policies ..................................... 47
Intellectual Property ................................. 47
Intended Tax-Free Treatment ................... 84
Investor Rights Agreement ....................... 12
IPO Conversion Plan ................................ 12
IPO Conversion Plan Notice ..................... 91
IRS ............................................................. 37
Issuances ................................................... 12
IT Assets .................................................... 47
Key Regulatory Terms .............................. 72
Knowledge ................................................. 36
Laws ........................................................... 40
Licenses ..................................................... 40
Lien ............................................................ 30
LLC Agreement ........................................ 20
Merger ....................................................... 13
Merger Consideration ............................... 20
Merger Sub .................................................. 9
Merger Sub Cash Amount ......................... 15
Minority Interest ....................................... 12
Minority Interest Acquisition .................... 12
Money Laundering Laws ........................... 51
Multiemployer Plan ................................... 38
NERC ......................................................... 48
New DiscOp OPEB Plan ........................... 78
New Holdco ............................................... 10
Non-Oncor Employee ............................... 79
NYSE ......................................................... 18
Offer .......................................................... 12
Oncor ......................................................... 12

Oncor Agreements ...................................... 50
Oncor Employee ........................................ 79
Oncor Entities .......................................... 26
Oncor Holdings ......................................... 26
Oncor Holdings LLC Agreement............. 50
Oncor Letter Agreement .......................... 13
Oncor LLC Agreements............................ 50
Oncor Management................................... 12
Parent ...................................................... 9
Parent Approvals...................................... 53
Parent Common Stock ............................. 17
Parent Disclosure Letter........................... 51
Parent Material Adverse Effect................ 56
Parent Reports.......................................... 54
Pension Plan............................................. 37
Person....................................................... 14
Plan of Reorganization.............................. 9
Plan Support Agreement ............................ 9
Post-Closing Audit.................................... 19
Preferred Stock Entity............................... 10
Preferred Stock Sale................................. 11
Prior PUCT Order ..................................... 50
Private Letter Ruling................................. 84
PUCT ....................................................... 28
PUCT Approval ........................................ 31
PUCT Filing.............................................. 71
PUHCA ..................................................... 59
Release ...................................................... 42
Remedial Action ....................................... 42
Reorganized EFH Class A Common Stock
    ............................................................. 12
Reorganized EFH Class B Common Stock
    ............................................................. 12
Reorganized EFH Common Stock............ 12
Reorganized TCEH................................... 10
Reorganized TCEH Contributions............ 10
Reorganized TCEH Conversion ............... 11
Reorganized TCEH Spin-Off.................... 10
Representatives ......................................... 65

Retained Subsidiaries................................ 11
RTOs......................................................... 27
Sarbanes-Oxley Act .................................. 33
SEC ........................................................... 32
Second Lien Note Repayment ................... 16
Securities Act............................................ 32
Separation Agreement............................... 86
Shares........................................................ 20
Spin-Off Entities ....................................... 10
Split Participant Agreement...................... 79
Split Participant Service............................ 79
Stakeholders.............................................. 13
Stock Consideration .................................. 18
Subsidiary ................................................. 26
Successful Outcome................................... 89
Superior Proposal...................................... 70
Supplemental IRS Submissions ................ 85
Supplemental Ruling Request.................... 85
Supplemental Rulings ............................... 85
Surviving Company ................................... 14
Tax ............................................................ 45
Tax Matters Agreement ............................ 86
Tax Return ................................................ 45
Taxes......................................................... 45
TBOC......................................................... 13
TCEH ........................................................ 10
TCEH Contribution................................... 10
TCEH Effective Date................................. 10
TCEH Entities........................................... 51
TCEH Finance .......................................... 10
TCEH Released Claims ............................. 83
TCEH Released Persons ............................ 83
Termination Date ...................................... 102
Termination Fee ....................................... 106
TRA........................................................... 10
TRA Rights ............................................... 10
Transition Services Agreement................. 86
TRE........................................................... 27

TTI ........................................................... 12

U.S. ......................................................... 25

Vermont Insurance Approval.................... 31

WARN Act................................................ 46

wholly owned Subsidiary.......................... 30

## AGREEMENT AND PLAN OF MERGER

This **AGREEMENT AND PLAN OF MERGER** (as hereinafter amended, modified or changed from time to time in accordance with the terms hereof, this "Agreement"), dated as of July 29, 2016, is by and among Energy Future Holdings Corp., a Texas corporation (the "Company"), Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), NextEra Energy, Inc., a Florida corporation ("Parent"), and EFH Merger Co., LLC, a Delaware limited liability company and direct wholly owned subsidiary of Parent ("Merger Sub").

## RECITALS

**WHEREAS**, on April 29, 2014, the Company and certain entities in which it, directly or indirectly, holds an equity interest, including TCEH and EFCH (each as defined below) and their respective Subsidiaries (as defined below) (collectively, the "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are currently pending before the Honorable Christopher S. Sontchi and jointly administered for procedural purposes only under Case No. 14-10979, and any proceedings relating thereto (collectively, the "Chapter 11 Cases");

**WHEREAS**, the Debtors continue to operate their respective businesses as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Company, EFIH, Parent and the other parties thereto, entered into the Plan Support Agreement dated as of the date hereof (the "Plan Support Agreement"), pursuant to which each of the parties thereto has agreed, among other things, to support the Plan of Reorganization (as defined below);

**WHEREAS**, under the Plan of Reorganization (as defined below), prior to the Effective Time (as defined below), the EFH Debtors and EFIH Debtors (as such terms are defined in the Plan of Reorganization) (collectively, the "E-Side Debtors"), on the one hand, and the TCEH Debtors (as such term is defined in the Plan of Reorganization), on the other, will have been separated from common ownership under the Company, subject to the terms of this Agreement and the Plan of Reorganization;

**WHEREAS**, subject to approval of this Agreement by the Bankruptcy Court, the Company, EFIH, Parent and Merger Sub have determined to engage in a strategic business combination as more fully set forth below;

**WHEREAS**, the Debtors will file an amended Chapter 11 plan of reorganization, as provided in the Plan Support Agreement and attached hereto as Exhibit A (as such plan may be further amended, modified or changed from time to time in accordance with the terms and conditions thereof and the Plan Support Agreement, the "Plan of Reorganization");

**WHEREAS**, under the Plan of Reorganization, on or before the TCEH Effective Date (as defined below), Texas Competitive Electric Holdings Company LLC, a Delaware limited

9

liability company and a wholly owned, indirect subsidiary of the Company ("TCEH"), and the other TCEH Debtors, together with certain other direct and indirect Subsidiaries of the Company identified in the Plan of Reorganization, shall be restructured in a transaction intended to qualify as a reorganization under Section 368(a)(1)(G) and 355 of the Internal Revenue Code of 1986, as amended (the "Code") and a taxable transfer of certain assets to a separate subsidiary of Reorganized TCEH (the "Preferred Stock Entity") in the Preferred Stock Sale (as defined below) (the steps in this clause, collectively, the "Reorganized TCEH Spin-Off").

WHEREAS, TCEH formed a new wholly-owned subsidiary, TEX Energy LLC ("Reorganized TCEH"), that (a) will be treated as disregarded from the Company for U.S. federal income tax purposes until the date on which the Reorganized TCEH Spin-Off is consummated (the "TCEH Effective Date") and (b) will be the "controlled corporation" in connection with the Reorganized TCEH Spin-Off. New Holdco (as defined below) will be treated as disregarded from the Company for U.S. federal income tax purposes until the TCEH Effective Date, pursuant to which certain assets of TCEH and the Company will be transferred to New Holdco in connection with the Preferred Stock Sale.

WHEREAS, on the TCEH Effective Date, all claims against the TCEH Debtors, except for liabilities assumed by Reorganized TCEH or a subsidiary thereof pursuant to the Plan of Reorganization, will be cancelled in connection with the Reorganized TCEH Spin-Off.

WHEREAS, (a) TCEH will transfer all of TCEH's interests in its Subsidiaries (excluding the stock of TCEH Finance, Inc., a Delaware corporation ("TCEH Finance")) to Reorganized TCEH (the "TCEH Contribution"); and (b) the EFH Debtors will transfer to Reorganized TCEH the equity interests in EFH Corporate Services Company ("EFH Corporate Services"), EFH Properties Company and the other Subsidiaries of EFH specified in the Plan of Reorganization and the Separation Agreement (as defined below), and will also contribute certain other assets and liabilities related to the TCEH Debtors' operations, all as provided in the Plan of Reorganization and the Separation Agreement (as defined below) (such entities, together with TCEH and Reorganized TCEH and their respective Subsidiaries, the "Spin-Off Entities", and such contributions by the EFH Debtors, collectively, the "EFH Contribution", and the EFH Contribution, together with the TCEH Contribution, the "Reorganized TCEH Contributions"). In exchange for the Reorganized TCEH Contributions, TCEH shall receive (a) all of the equity interests of Reorganized TCEH, (b) the net cash proceeds of the new Reorganized TCEH debt issued for cash or, if not issued for cash, the Reorganized TCEH debt as take-back paper (if any), (c) the right to receive payments under a tax receivables agreement, if any (such agreement, the "TRA", and such rights, the "TRA Rights"), and (d) the right to receive the net cash proceeds of the Preferred Stock Sale.

WHEREAS, immediately following the Reorganized TCEH Contribution but before the Reorganized TCEH Conversion (defined below), (a) Reorganized TCEH will contribute the equity in certain of its subsidiaries (potentially including one or more entities contributed to Reorganized TCEH in the EFH Contribution) or, potentially, certain assets or joint interests in certain assets, to an entity formed before the TCEH Effective Date that will elect to be treated as a corporation immediately following the TCEH Contribution but before the Reorganized TCEH Conversion ("New Holdco") in exchange for all of the equity interests of New Holdco, including any common stock and preferred stock issued by New Holdco; and (b) immediately thereafter,

10

and pursuant to a prearranged and binding agreement, Reorganized TCEH will sell all of the preferred stock of New Holdco authorized to be issued by New Holdco to one or more third party investors in exchange for cash, and Reorganized TCEH will thereafter distribute the cash consideration attributable thereto to TCEH (the "Preferred Stock Sale").

**WHEREAS,** immediately after the Preferred Stock Sale, Reorganized TCEH will convert to a Delaware corporation pursuant to applicable Law (as defined below) (the "Reorganized TCEH Conversion");

**WHEREAS,** immediately following the Reorganized TCEH Conversion and as a condition to effectiveness of the Plan of Reorganization with respect to the TCEH Effective Date, TCEH will distribute or cause to be distributed in the Reorganized TCEH Spin-Off (a) all of the outstanding equity interests in Reorganized TCEH, (b) the new Reorganized TCEH debt as take-back paper (or cash proceeds thereof, if any), (c) cash proceeds of the Preferred Stock Sale, and (d) the TRA Rights;

**WHEREAS,** pursuant to the Plan of Reorganization and as part of the EFH Contribution, the employees of EFH Corporate Services shall become the employees of Reorganized TCEH or one or more of its Subsidiaries;

**WHEREAS,** pursuant to the Plan of Reorganization, at the TCEH Effective Time and the Effective Time (as defined below) the Company and the reorganized Company, as the case may be, and their Subsidiaries will not have any employees other than the employees of the Oncor Entities (as defined below);

**WHEREAS,** on or before the Closing Date, each of EFCH, TCEH, TCEH Finance, Inc., TXU Europe Limited and its Subsidiaries and each other Subsidiary of EFH (excluding only (a) EFIH and the Oncor Entities (as defined below), (b) the Spin-Off Entities, (c) (i) LSGT Gas Company LLC, (ii) EECI, Inc., (iii) EEC Holdings, Inc., (iv) LSGT SACROC, Inc., (v) EFH Vermont Insurance Company and (ii) any other entities mutually agreed upon by Parent and the Company, the entities listed in clauses (c)(i) – (v) collectively, the "Retained Subsidiaries") not already disposed of, wound down, or liquidated in accordance with applicable law shall be deemed dissolved without any further court or corporate action, including the filing of any documents with the Secretary of State for any state in which any such subsidiary is incorporated or any other jurisdiction; *provided, however,* that any entity that is included in the definition of the Spin-Off Entities that for any reason is not contributed to Reorganized TCEH shall also be deemed dissolved pursuant to the Plan of Reorganization;

**WHEREAS,** the respective boards of directors (or similar governing bodies) of each of the Company, EFIH, Parent and Merger Sub have, by resolutions duly adopted, declared that the transactions contemplated by this Agreement, including the Merger (as defined below), are advisable, and approved and adopted this Agreement;

**WHEREAS,** Parent, in its capacity as the sole member-manager of Merger Sub, has approved and adopted this Agreement and the transactions contemplated by this Agreement;

**WHEREAS,** contemporaneous with the execution and delivery of this Agreement, Parent and Merger Sub delivered to the Company an offer, in the form attached hereto as

Exhibit B, to purchase all outstanding LLC Units (as defined in the Investor Rights Agreement) in Oncor held indirectly by the Company and held by each of Texas Transmission Investment LLC, a Delaware limited liability company ("TTI"), and Oncor Management Investment LLC, a Delaware limited liability company ("Oncor Management") (the "Offer");

WHEREAS, on or prior to the Closing Date, Parent, Merger Sub or an Affiliate of Parent may acquire all or a portion of the equity interests (the "Minority Interest") in Oncor Electric Delivery Company LLC, a Delaware limited liability company ("Oncor") (a) held by TTI pursuant to the drag-along rights (the "Drag-Along Rights") set forth in Section 3.3 of the Investor Rights Agreement, dated as of November 5, 2008 (the "Investor Rights Agreement"), among Oncor and certain of its direct and indirect equityholders, including the Company and TTI, or (b) held by TTI and/or Oncor Management, in privately negotiated transactions with TTI and/or Oncor Management (the acquisition under clause (a) or (b), the "Minority Interest Acquisition");

WHEREAS, unless Parent, Merger Sub or an Affiliate of Parent has otherwise acquired, or entered into definitive agreements with TTI that provide for the Minority Interest Acquisition with respect to TTI's interest in Oncor prior to or on the Closing Date (as defined below), Parent may request that the Company exercise, or cause to be exercised, the Drag-Along Rights set forth in Section 3.3 of the Investor Rights Agreement in accordance with the terms and subject to the conditions set forth herein and therein;

WHEREAS, in connection with the Merger, Parent, the Company and EFIH have formulated the plan attached hereto as Exhibit C, (as may be amended, modified or supplemented from time to time by Parent, in a manner consistent with the terms of the Investor Rights Agreement (as defined below) (the "IPO Conversion Plan") subject to the prior written consent of the Company and EFIH (such consent not to be unreasonably withheld, conditioned or delayed)), to create and implement an IPO Conversion (as such term is defined in the Investor Rights Agreement), pursuant to which a vehicle shall be created to serve as the IPO Corporation (as defined in the Investors Rights Agreement), if Parent so elects;

WHEREAS, on the Closing Date, and after the Reorganized TCEH Spin-Off, the Company will issue one new share of Class A common stock, no par value, of the Company (the "Reorganized EFH Class A Common Stock") to the applicable Disbursing Agent (as defined in the Plan of Reorganization) and allocated to the EFH Creditor Recovery Pool (as defined in the Plan of Reorganization) (the "EFH Class A Issuance");

WHEREAS, on the Closing Date, and after the Reorganized TCEH Spin-Off, the Company will issue one new share of Class B common stock, no par value, of the Company (the "Reorganized EFH Class B Common Stock" and together with the Reorganized EFH Class A Common Stock, the "Reorganized EFH Common Stock") to the applicable Disbursing Agent (as defined in the Plan of Reorganization) and allocated to EFIH Unsecured Creditor Recovery Pool (as defined in the Plan of Reorganization) (the "EFH Class B Issuance" and, together with the EFH Class A Issuance, the "Issuances");

WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, the Plan of Reorganization, the applicable provisions of Chapter 10 of the Texas Business

Organizations Code (the "TBOC") and the Delaware Limited Liability Company Act (the "DLLCA"), on the Closing Date, immediately following the Issuances, but to take effect at the Effective Time, the Company shall merge with and into Merger Sub (the "Merger"), with Merger Sub surviving as a wholly owned subsidiary of Parent;

WHEREAS, it is intended that, for federal income tax purposes, the Merger pursuant to the terms and conditions of this Agreement and as contemplated by the Plan of Reorganization will qualify as a "reorganization" within the meaning of Section 368(a)(1)(A) or Sections 368(a)(1)(G), 354, and 356 of the Code, and that this Agreement and the Plan of Reorganization shall constitute the adoption of a plan of reorganization within the meaning of Section 368 of the Code;

WHEREAS, on the Closing Date, following the Merger, and immediately subsequent to the DIP and Second Lien Note Repayments (as defined below), the Merger Sub Cash Amount (as defined below) shall be placed into the EFH/EFIH Distributions Account (as defined in the Plan of Reorganization) designated by the Company prior to the Closing to be distributed to the holders of claims and interests in EFIH (the "EFIH Stakeholders") in accordance with the Plan of Reorganization;

WHEREAS, on the Closing Date, following the Issuances and immediately subsequent to the Merger, the DIP and Second Lien Note Repayments shall occur;

WHEREAS, at the Effective Time, the Reorganized EFH Common Stock shall become exchangeable for the Class A Stock Consideration (as defined below) and Class B Stock Consideration (as defined below) in accordance with this Agreement and the right to receive such cash consideration (if any) to be paid out in accordance with the Plan of Reorganization;

WHEREAS, notwithstanding the foregoing, the EFIH Stakeholders and certain holders of claims and interests in the Company (the "EFH Stakeholders" and, collectively with the EFIH Stakeholders, the "Stakeholders") will also have the right to receive such cash consideration (if any) to be paid out in accordance with the Plan of Reorganization;

WHEREAS, Parent, Merger Sub, Oncor and Oncor Holdings (each as defined below) intend to enter into a letter agreement (the "Oncor Letter Agreement") in favor of and enforceable by, Parent and Merger Sub, pursuant to which Oncor and Oncor Holdings are agreeing to take certain actions in furtherance of the transactions contemplated herein;

WHEREAS, the Company, EFIH, Parent and Merger Sub desire to make certain representations, warranties, covenants and agreements in connection with this Agreement; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of this Agreement by the Bankruptcy Court, and will be consummated pursuant to the order confirming the Plan of Reorganization to be entered in the Chapter 11 Cases.

NOW, THEREFORE, in consideration of the premises, representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I
### Issuances; DIP and Second Lien Note Repayments; Accessible Account Deposit; Merger; Closing; Effective Time

Section 1.1    <u>Issuances</u>. Upon the terms and subject to the conditions set forth herein and pursuant to the Plan of Reorganization, on the Closing Date, following the Reorganized TCEH Spin-Off, immediately prior to the Effective Time, the Company will consummate the Issuances.

Section 1.2    <u>Merger</u>. Upon the terms and subject to the conditions set forth herein, in accordance with the TBOC and DLLCA and pursuant to the Plan of Reorganization, at the Effective Time, immediately subsequent to the Issuances, the reorganized Company shall, and Parent shall cause Merger Sub to, effectuate the Merger pursuant to which the separate corporate existence of the reorganized Company shall thereupon cease. Merger Sub shall continue as the surviving company in the Merger (sometimes hereinafter referred to as the "<u>Surviving Company</u>"), and the separate corporate existence of Merger Sub, with all of its and the reorganized Company's rights, privileges, immunities, powers and franchises, shall continue unaffected by the Merger, except as set forth in <u>Article II</u>.

Section 1.3    <u>DIP Repayment</u>. On the Closing Date, following the Issuances and immediately subsequent to the Merger, Parent shall, or shall cause an Affiliate thereof to, contribute to EFIH sufficient funds to repay all outstanding "obligations" (as defined in the DIP Facility (as defined below)) owed under the DIP Facility and any fees and expenses related to such repayment to the extent required by the terms thereof (the "<u>DIP Repayment</u>") (and EFIH shall use such funds solely for such purpose). Parent or an Affiliate thereof may make the DIP Repayment in respect of the DIP Facility on behalf of EFIH directly to the lenders or an agent thereof.

Section 1.4    <u>Closing</u>. On the terms and subject to the conditions set forth in this Agreement, the closing (the "<u>Closing</u>") of the Issuances, the DIP and Second Lien Note Repayments, the Merger, the Accessible Account Deposit (as defined below) and the issuance of the Stock Consideration (as defined below) (collectively, the "<u>Closing Date Transactions</u>"), shall take place at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, at 10:00 a.m. (Eastern Time) on (a) the third (3rd) Business Day (as defined below) or (b) such other date and time as mutually agreed in writing between the Company and Parent, in each case, following the day on which the last of the conditions set forth in <u>Article VII</u> is satisfied or waived in accordance with this Agreement (other than those conditions that by their nature or pursuant to the terms of this Agreement are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The date on which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date</u>". For purposes of this Agreement, the term "<u>Business Day</u>" shall mean any day ending at 11:59 p.m. (Eastern Time) other than a Saturday or Sunday, or a day on which banks are required or authorized to close in New York, New York and the term "<u>Person</u>" shall mean any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Entity (as defined below) or other entity of any kind or nature. At the Closing, Parent, Merger Sub, reorganized EFIH and the reorganized Company shall execute and deliver all certificates, instruments and documents required to be executed and/or delivered

by such Person and/or any of its Affiliates (as defined below) under this Agreement in order for the conditions to the other party's obligations to consummate the Closing to be satisfied.

Section 1.5    Effective Time. On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, the reorganized Company and Parent will cause a certificate of merger to be executed, acknowledged and filed with the Secretary of State of the State of Delaware as provided under Section 18-209 of the DLLCA and with the Secretary of State of the State of Texas as provided under Section 10.153 of the TBOC (the "Certificates of Merger"), and shall take all such further actions as may be required by applicable Law to make the Merger effective. The Merger shall become effective as soon as reasonably practicable after the Issuances (or at such other time as is mutually agreed to by the parties hereto in writing and specified in each of the Certificates of Merger) (such effective date and time, the "Effective Time"); and shall be immediately followed by the Accessible Account Deposit and the DIP and Second Lien Note Repayments.

Section 1.6    Effects of the Merger. The effects of the Merger shall be as provided in this Agreement, the Plan of Reorganization and in the applicable provisions of the DLLCA, the TBOC and other applicable Law. Without limiting the generality of the foregoing, at the Effective Time, all of the property, rights, privileges, powers and franchises of the reorganized Company and Merger Sub shall vest in the Surviving Company, and all debts, liabilities and duties of the reorganized Company (to the extent not assumed by Reorganized TCEH or discharged under the Plan of Reorganization) and Merger Sub shall become the debts, liabilities and duties of the Surviving Company.

Section 1.7    Accessible Account Deposit.

(a)    Prior to, or on, the Closing Date, Parent shall contribute to Merger Sub the Merger Sub Cash Amount (as defined below). At the Closing, (a) subject to Section 1.7(c), Merger Sub will deliver the Merger Sub Cash Amount by wire transfer of immediately available funds to the EFH Plan Administrator Board (as defined in the Plan of Reorganization), and (b) EFIH will send any cash held by EFIH as of the Closing Date, by wire transfer of immediately available funds, to the EFIH Plan Administrator Board (such deposits together with the amounts required to be deposited pursuant to Section 1.7(d) and Section 1.7(e), the "Accessible Account Deposit"), to be deposited in the EFH/EFIH Distribution Account and disbursed at the direction of the EFH Plan Administrator Board in accordance with the Plan of Reorganization. The "Merger Sub Cash Amount" shall mean $4,096,000,000; provided, that such amount shall be adjusted by the following amounts:

(i)    to the extent that the Closing has not occurred by January 1, 2017, the Merger Sub Cash Amount shall be increased by 50% of daily interest expense on the DIP Facility and EFIH Second Lien Notes (as defined in the Plan of Reorganization) for each day that elapses thereafter if on such day the PUCT Approval is the only condition set forth in Article VII not satisfied or waived in accordance with this Agreement (other than those conditions that by their nature or pursuant to the terms of this Agreement are to be satisfied at the Closing);

(ii)    if the EFIH first lien debtor-in-possession financing facility (the "DIP Facility") is refinanced prior to the Closing, and any portion of the fees, expenses and costs related thereto increase the amount required for the DIP Repayment, then the Merger Sub Cash Amount shall be decreased by 50% of the amount of such increase until such time as such decrease is equal to $25,000,000 and thereafter, 100% of the amount of such increase shall be deducted from the Merger Sub Cash Amount;

(iii)    if the DIP Facility is refinanced prior to Closing and any portion of the fees, expenses and costs related thereto are paid in cash prior to the Closing such that the amount required for the DIP Repayment is not increased, then the Merger Sub Cash Amount will be increased by 50% of such paid amount, up to a $25,000,000 increase;

(iv)    to the extent the amount of obligations (as defined in the DIP Facility) outstanding under the DIP Facility at the Closing exceeds $5,400,000,000 and such excess is not a result of fees, expenses or costs relating to the refinancing of the DIP Facility that increase the amount required for the DIP Repayment, then the Merger Sub Cash Amount shall be reduced by 100% of the amount of such excess;

(v)    the Merger Sub Cash Amount shall be decreased by an amount sufficient to repay, in accordance with the Plan of Reorganization, all EFIH Second Lien Claims (as defined in the Plan of Reorganization) in accordance with, and to the extent provided in, Article II.B.20 of the Plan of Reorganization (the "Second Lien Note Repayment") (the Second Lien Note Repayment and together with the DIP Repayment, the "DIP and Second Lien Note Repayments");

(vi)    solely if the Estimated Company Cash Amount (as defined below) is either $0 or a positive number less than $116,000,000, then the Merger Sub Cash Amount shall be decreased by the difference between $116,000,000 and the Estimated Company Cash Amount, or solely if the Estimated Company Cash Amount is less than $0, then the Merger Sub Cash Amount shall be decreased by $116,000,000 *plus* the positive expression of the amount by which the Estimated Company Cash Amount is less than $0; and

(vii)    solely if the Company obtains the Asbestos Insurance Policy in accordance with Section 1.7(c), then the Merger Sub Cash Amount shall be decreased by all of the costs and expenses of acquiring the Asbestos Insurance Policy (including all premiums and brokers fees related thereto) that are not paid by the Company or EFIH at or prior to the Closing.

(b)    Prior to or on the Closing Date, Parent shall deliver, by wire transfer of immediately available funds to the EFH Plan Administrator Board for deposit in the EFH/EFIH Distributions Account, an amount equal to the Second Lien Note Repayment.

(c)      On the Closing Date, $250,000,000 of the Merger Sub Cash Amount shall be set aside and such amount shall be deposited and held in a segregated, restricted account (the "Asbestos Account"), and invested and disbursed in accordance with that certain Escrow Agreement in the form attached hereto as Exhibit D (the "Asbestos Escrow Agreement"), dated as of the Closing Date, between Merger Sub and U.S. Bank National Association, and used solely to satisfy asbestos claims and related costs, including court costs, expert witness costs, attorneys' fees, the cost to procure insurance and all other related costs from time to time during the fifty year term of the Asbestos Escrow Agreement and, to the extent any balance (including accrued interest, if any) remains at the end of such term, such balance shall only be paid over to a charity specified in accordance with the terms of the Asbestos Escrow Agreement, *provided,* that, for the avoidance of doubt, the funds in the Asbestos Account shall not constitute the only source of recovery with respect to such asbestos claims, to the extent such asbestos claims (together with others costs and expenses) ultimately exceed the funds in the Asbestos Account. Notwithstanding the foregoing, in the event the Company and its Subsidiaries are able to obtain and have in full force and effect as of the Closing insurance that covers the foregoing matters on terms and conditions that are satisfactory to Parent in its sole discretion (the "Asbestos Insurance Policy"), then the Asbestos Escrow Agreement shall not be funded (and, for the avoidance of doubt, subject to Section 1.7(a)(vii), such amount shall be included in the Accessible Account Deposit). If, during the 18-month period following the Closing, the reorganized Company and its Subsidiaries acquires an Asbestos Insurance Policy, the reorganized Company shall (i) notify the EFH Plan Administrator Board and (ii) deposit in the Accessible Account the amount then-remaining in the Asbestos Account *minus* the costs and expenses of acquiring such Asbestos Insurance Policy (including all premiums and brokers fees related thereto).

(d)      On or prior to the Closing Date, but in any event prior to the determination of the Estimated Company Cash Amount, the Company shall deliver, by wire transfer of immediately available funds to the EFH Plan Administrator Board for deposit in the EFH/EFIH Distributions Account, an amount of cash equal to the Company's good faith estimate of those fees and expenses set forth on Schedule 1.7(d) that are payable by the Company on or following the Closing (collectively the "Emergence Fees").

(e)      On or following the Closing Date and upon receipt thereof, the Company shall deliver, by wire transfer of immediately available funds to the EFH Plan Administrator Board for deposit in the EFH/EFIH Distributions Account, any amounts received by the Company in respect of those items set forth on Schedule 1.7(e) (collectively, the "Emergence Payments").

Section 1.8      Stock Consideration.

(a)      On the Closing Date, Parent shall issue and deliver to the Exchange Agent (as defined below), in accordance with Section 4.2, a number of shares of common stock, par value $0.01, of Parent ("Parent Common Stock") with a Fair Market Value equal to the Estimated Company Cash Amount *less* $35,000,000; *provided* that, in the event that such calculation would produce a negative number, one share of Parent Common Stock shall be issued pursuant to this Section 1.8(a) (the "Class A Stock Consideration").

(b)    On the Closing Date, Parent shall deliver to the Exchange Agent, in accordance with Section 4.2, a number of shares of Parent Common Stock with a Fair Market Value of the greater of (i) $151 million *less* the Class A Stock Consideration and (ii) $35,000,000 (such amount, the "Class B Stock Consideration" and together with the Class A Stock Consideration, the "Stock Consideration").

Section 1.9    Certain Defined Terms: The following terms have the meanings set forth below:

(a)    "Cash and Cash Equivalents" means, with respect to any Person, as of any date of determination, the sum of the fair market value (expressed in United States dollars) of all cash and cash equivalents (including marketable securities, checks, bank deposits and short term investments) of such Person, including the amounts of any received but uncleared checks, drafts and wires issued prior to such time, less the amounts of any outstanding checks or transfers at such time, determined in accordance with GAAP. In no event shall Cash and Cash Equivalents of the Company include any Emergence Fees or Emergence Payments.

(b)    "Estimated Company Cash Amount" means the amount of the estimated Cash and Cash Equivalents of the Company in the final Closing Statement, calculated on the same basis as monthly cash flow projections in the form provided by the Company to Parent as set forth on Schedule 1.9(b). In no event shall the Estimated Company Cash Amount include any Emergence Fees or Emergence Payments.

(c)    "Fair Market Value" means, with respect to a share of Parent Common Stock, the per share volume weighted average of the trading prices of Parent Common Stock on the New York Stock Exchange (the "NYSE") (as reported by Bloomberg L.P. or, if not reported therein, in another authoritative source mutually selected by the parties hereto) during each of the twenty (20) preceding consecutive full trading days ending on (and including) the trading day that is three (3) trading days prior to the Closing Date.

Section 1.10    Determination of Aggregate Closing Date Cash; Closing Statement. Not less than ten (10) Business Days prior to the Closing Date, the Company will deliver to Parent a written statement, signed by its chief financial officer, that (i) sets forth its estimate of the Estimated Company Cash Amount, and (ii) includes a schedule showing in reasonable detail the computation of the Estimated Company Cash Amount, in sufficient detail for Parent to analyze the estimate (the "Closing Statement"). To the extent Parent does not agree with the estimates set forth in the Closing Statement, it shall notify the Company and provide comments to the Company as promptly as practicable, and in no event later than seven (7) Business Days prior to the Closing Date. The Company shall consider such comments in good faith and incorporate those comments of Parent with which it agrees two (2) Business Days prior to the Closing Date, which revised Closing Statement shall be deemed final and binding in all respects for purposes of the payments to be made on the Closing Date.

Section 1.11    Determination of Final Closing Date Cash; Post-Closing Audit. Within three (3) Business Days after the Closing Date, Parent shall instruct Deloitte & Touche, LLP (or another internationally recognized firm of accountants agreed in writing by the parties hereto)

18

(the "Auditor") to (a) determine the Adjusted Company Cash Amount (as defined below) in accordance with the Audit Procedures (as defined below) and, as applicable, this Agreement and the Plan of Reorganization (the "Post-Closing Audit"); (b) to issue a written report within sixty (60) Business Days after such instructions are given; (c) to include in the report a reasonably detailed explanation of each component of the Adjusted Company Cash Amount, the source of information or computation thereof and the Adjusted Company Cash Amount; and (iv) to deliver copies of the report to Parent and the Plan Administrator (as defined in the Plan of Reorganization) (the "Auditor Cash Report"). The fees and expenses of the Auditor in conducting the Post-Closing Audit and preparing the Auditor Cash Report shall treated as Administrative Expenses (as defined in the Plan of Reorganization) for purposes of determining the Adjusted Company Cash Amount under this Agreement and shall be paid to the Auditor as provided in the Plan of Reorganization. Absent manifest error, the Auditor Cash Report will be the conclusive determination of the final Adjusted Company Cash Amount and be final and binding on the parties hereto for all purposes of this Agreement and the Plan of Reorganization. As used herein, "Audit Procedures" means those procedures for the audit of the Cash and Cash Equivalents of the Company, as of the Closing Date, to be conducted by the Auditor, such procedures to be developed in writing by the Auditor prior to the Closing consistent with this Agreement and reasonably acceptable to the Company and Parent. "Adjusted Company Cash Amount" means the amount of Cash and Cash Equivalents of the Company at Closing as determined in accordance with this Section 1.11 and, for the avoidance of doubt, excluding any Emergence Fees or Emergence Payments. If the Adjusted Company Cash Amount is greater than the Estimated Company Cash Amount, Parent shall deliver by wire transfer of immediately available funds to the EFH Plan Administrator Board an amount equal to the difference in such amounts, to be distributed in accordance with the Plan of Reorganization. If the Adjusted Company Cash Amount is less than the Estimated Company Cash Amount, Parent shall receive, by wire transfer of immediately available funds from the EFH Plan Administrator Board, an amount equal to the difference in such amounts, in accordance with the Plan of Reorganization.

Section 1.12   Adjustments to Allocations. For the avoidance of doubt, the provisions in Sections 1.7 through 1.11 are intended to ensure the satisfaction of the continuity of interest requirement under Sections 355 and 368 of the Code, and reasonable adjustments shall be made, including by issuing additional shares of Parent Common Stock (with a corresponding decrease in the Merger Sub Cash Amount), to the extent Parent reasonably concludes such adjustments are necessary to ensure such satisfaction, and further reasonable adjustments shall be made to the allocation of Parent Common Stock and the Merger Sub Cash Amount to account for the payment of Cash to the Holders of Allowed EFH Non-Qualified Benefit Claims (as defined in the Plan of Reorganization) in accordance with the Plan of Reorganization.

## ARTICLE II
### Certificate of Formation and LLC Agreement
### of the Surviving Company

Section 2.1   The Certificate of Formation. At the Effective Time, the certificate of formation of Merger Sub as in effect immediately prior to the execution of this Agreement shall be the certificate of formation of the Surviving Company, until thereafter amended as provided therein and/or by applicable Law.

Section 2.2    LLC Agreement. The limited liability company agreement of Merger Sub in effect immediately prior to the Effective Time shall be the limited liability company agreement of the Surviving Company (the "LLC Agreement"), until thereafter amended as provided therein and/or by applicable Law.

### ARTICLE III
### Member-Manager and Officers of the Surviving Company

Section 3.1    Managers. Parent, as member-manager of Merger Sub at the Effective Time shall, from and after the Effective Time, be the member-manager of the Surviving Company until its successor is duly elected or appointed and qualified or until its earlier resignation or removal in accordance with the LLC Agreement.

Section 3.2    Officers. The officers of Merger Sub at the Effective Time shall, from and after the Effective Time, be the officers of the Surviving Company until their successors are duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the LLC Agreement.

### ARTICLE IV
### Effect of the Merger on Capital Stock;
### Exchange of Certificates

Section 4.1    Effect on Capital Stock. At the Effective Time, by virtue of the Merger and without any action on the part of the Company, reorganized EFIH, Parent, Merger Sub, the holder of the Reorganized EFH Class A Common Stock, the holder of the Reorganized EFH Class B Common Stock, or the sole member of Merger Sub:

(a)    Stock Consideration. On the terms set forth in this Agreement, at the Closing, (i) the share of Reorganized EFH Class A Common Stock issued and outstanding immediately prior to the Effective Time (the "Class A Share") shall be converted into the right to receive the Class A Stock Consideration (such consideration, the "Class A Merger Consideration") and (ii) the share of Reorganized EFH Class B Common Stock issued and outstanding immediately prior to the Effective Time (the "Class B Share" and, together with the Class A Share, the "Shares") shall be converted into the right to receive the Class B Stock Consideration (such consideration, the "Class B Merger Consideration" and, together with the Class A Merger Consideration, the "Merger Consideration"). For the avoidance of doubt, the EFH Stakeholders and EFIH Stakeholders shall, notwithstanding the foregoing, continue to have the right to receive such cash consideration (if any) to be paid out in accordance with the Plan of Reorganization. All of the Shares, when so converted (including if a Share is converted into the right to receive Merger Consideration having no value), shall no longer be outstanding and shall automatically be cancelled and shall cease to exist, and each holder of a certificate that immediately prior to the Effective Time represented a Share (each a "Certificate") and each holder of a Share held in uncertificated book-entry form (the "Book-Entry Shares") shall cease to have any rights with respect thereto, except the right to receive the Class A Stock Consideration or Class B Stock Consideration (including any cash in lieu of fractional shares of Parent Common Stock to be issued or paid in consideration therefor in accordance with Section 4.2(g)), as applicable, upon delivery of a fully completed and validly executed letter of transmittal and, in

20

the case of certificated Shares, upon the surrender of such Certificate(s) and at the times provided in this Agreement or the Plan of Reorganization.

(b)    Merger Sub.    Each membership interest in Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one (1) membership interest unit in the Surviving Company, which shall be held by Parent, and shall constitute the only issued and outstanding limited liability company membership interests of the Surviving Company.

Section 4.2    Exchange of Certificates.

(a)    Exchange Agent. Prior to the Closing, the Company shall enter into an exchange agent agreement with an exchange agent selected by Parent with the Company's prior approval (such approval not to be unreasonably withheld, conditioned or delayed) (the "Exchange Agent"). The Exchange Agent shall act as exchange agent, registrar and transfer agent for the purpose of exchanging Certificates or Book-Entry Shares, for the Merger Consideration applicable thereto. At or prior to the Effective Time, Parent shall deposit with the Exchange Agent, for the benefit of the holders of Shares immediately prior to the Effective Time, for exchange in accordance with this Article IV, a sufficient number of shares of Parent Common Stock to issue the aggregate Stock Consideration. All such Parent Common Stock deposited with the Exchange Agent is hereinafter referred to as the "Exchange Fund".

(b)    Exchange Procedures. As soon as reasonably practicable after entry of the EFH Confirmation Order (as defined below) and in any event not later than the third (3rd) Business Day following the Effective Time, Parent shall cause the Exchange Agent to mail to each holder of record of a Certificate or Book-Entry Share that immediately prior to the Effective Time represented outstanding Shares, (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to such Certificates and Book-Entry Shares shall pass, only upon delivery of such Certificates or Book-Entry Shares, as applicable, to the Exchange Agent and shall be in such form and have such other provisions as Parent and the Company may reasonably specify) and (ii) instructions for use in surrendering such Certificates or Book-Entry Shares in exchange for whole shares of Parent Common Stock and cash in lieu of fractional shares pursuant to Section 4.2(g). Upon surrender of a Certificate or Book-Entry Share for cancellation to the Exchange Agent, together with such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, and such other documents as may reasonably be required by the Exchange Agent, the holder of such Certificate or Book-Entry Share shall be entitled to receive in exchange therefor (as promptly as possible but in any event within three (3) Business Days following such surrender) that number of whole shares of Parent Common Stock (which shall be in uncertificated book-entry form through a direct registration system unless a physical certificate is requested), that such holder has the right to receive pursuant to the provisions of this Article IV and cash in lieu of any fractional share of Parent Common Stock in accordance with Section 4.2(g), and each Certificate or Book Entry Share so surrendered shall forthwith be cancelled. In the event of a transfer of ownership of Shares that is not registered in the transfer records of the Company, the proper number of shares of Parent Common Stock may be issued to

a Person other than the Person in whose name the Certificate or Book-Entry Share so surrendered is registered if such Certificate or Book-Entry Share shall be properly endorsed or otherwise be in proper form for transfer and the Person requesting such issuance shall pay any transfer or other taxes required by reason of the issuance of shares of Parent Common Stock to a Person other than the registered holder of such Certificate or Book-Entry Share or establish to the reasonable satisfaction of Parent that such tax has been paid or is not applicable. Until surrendered as contemplated by this Section 4.2(b), each Certificate and Book-Entry Share shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the Merger Consideration applicable thereto, which the holder thereof has the right to receive in respect of such Certificate or Book-Entry Share pursuant to the provisions of this Agreement, including, for the avoidance of doubt, cash in lieu of any fractional share of Parent Common Stock payable as part of the Merger Consideration applicable thereto, in accordance with Section 4.2(g), together with any unpaid dividends or distributions thereon with a record date on or after the Effective Time payable at such time in accordance with Section 4.2(k). No interest shall be paid or will accrue on the Merger Consideration or any cash payable to holders of Certificates or Book-Entry Shares pursuant to the provisions of this Article IV. The portion of the Merger Consideration receivable by any holder of a Certificate or Book-Entry Shares shall be aggregated with respect to all Shares held by such holder immediately prior to the Effective Time, and following such aggregation, the Exchange Agent shall determine the number of whole and fractional shares of Parent Common Stock to which such holder is entitled for purposes of this Article IV.

(c)    Transfers. From and after the Effective Time, there shall be no transfers on the stock transfer books of the Surviving Company of the Shares that were outstanding immediately prior to the Effective Time. If, after the Effective Time, any Certificate or Book-Entry Share is presented to the Surviving Company, Parent or the Exchange Agent for transfer, it shall be cancelled and exchanged for the Merger Consideration applicable thereto to which the holder thereof is entitled pursuant to and in accordance with this Article IV, together with any unpaid dividends or distributions thereon with a record date on or after the Effective Time payable at such time in accordance with Section 4.2(k).

(d)    Lost, Stolen or Destroyed Certificates. In the event any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent, the posting by such Person of a bond in customary amount and upon such terms as may be required by Parent as indemnity against any claim that may be made against it or the Surviving Company with respect to such Certificate, the Exchange Agent will treat such Person as having delivered his, her or its Certificate for purposes of Section 4.2(b).

(e)    Withholding Rights. Each of Parent and the Surviving Company shall be entitled to deduct and withhold from any consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, or any other applicable state, local or foreign Tax (as defined below) Law. To the extent that amounts are so withheld by the Surviving Company or Parent, as the case may be, such withheld amounts (i) shall be remitted by Parent or the Surviving Company, as applicable, to the applicable Governmental Entity,

and (ii) shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made by the Surviving Company or Parent, as the case may be.

(f)      No Further Ownership Rights in the Shares. After the Merger, no dividends or other distributions with respect to capital stock of the Surviving Company with a record date on or after the Effective Time shall be paid to the holder of any unsurrendered Certificate or Book-Entry Shares. The shares of Parent Common Stock issued, and cash paid (if any), in accordance with the terms of this Article IV upon the surrender of Certificates or Book-Entry Shares, as applicable, and delivery of a duly completed and validly executed letter of transmittal, including any cash paid pursuant to Section 4.2(g), shall be deemed to have been issued and paid in full satisfaction of all rights pertaining to such Certificates or Book-Entry Shares.

(g)      Fractional Shares.

(i)      No fractional shares of Parent Common Stock shall be issued upon the surrender for exchange of Certificates or Book-Entry Shares, no dividend or distribution by Parent shall relate to such fractional share of Parent Common Stock and such fractional share of Parent Common Stock shall not entitle the owner thereof to vote or to any rights of a shareholder of Parent but, in lieu thereof, each holder of such Certificate or Book-Entry Shares shall be entitled to a cash payment in accordance with the provisions of this Section 4.2(g).

(ii)      As promptly as practicable following the Effective Time, the Exchange Agent shall determine the excess of (A) the number of whole shares of Parent Common Stock delivered to the Exchange Agent by Parent pursuant to Section 4.2(a) representing the EFH Stock Consideration over (B) the aggregate number of whole shares of Parent Common Stock to be distributed to former holders of Shares pursuant to Section 4.2(b) (such excess being herein called the "Excess Shares"). Following the Effective Time, the Exchange Agent shall, on behalf of former shareholders of the Company, sell the Excess Shares at then-prevailing prices on the NYSE all in the manner provided in Section 4.2(g)(iii). The parties hereto acknowledge that payment of the cash consideration in lieu of issuing fractional shares of Parent Common Stock was not separately bargained for consideration but merely represents a mechanical rounding off for purposes of avoiding the expense and inconvenience to Parent that would otherwise be caused by the issuance of fractional shares of Parent Common Stock.

(iii)      The sale of the Excess Shares by the Exchange Agent shall be executed on the NYSE through one or more member firms of the NYSE and shall be executed in round lots to the extent practicable. The Exchange Agent shall use reasonable efforts to complete the sale of the Excess Shares as promptly as practicable following the Effective Time, in the Exchange Agent's sole judgment, consistent with obtaining the best execution of such sales in light of prevailing market conditions. Until the net proceeds of such sale or sales have been distributed to the holders of Certificates formerly representing Shares or Book-

23

Entry Shares, the Exchange Agent shall hold such proceeds in trust for such holders (the "Common Shares Trust"). The Surviving Company shall pay all commissions, transfer taxes and other out-of-pocket transaction costs, including the expenses and compensation of the Exchange Agent incurred in connection with such sale of the Excess Shares. The Exchange Agent shall determine the portion of the Common Shares Trust to which each former holder of Shares is entitled, if any, by multiplying the amount of the aggregate net proceeds composing the Common Shares Trust by a fraction, the numerator of which is the fractional share of Parent Common Stock to which such former holder of Shares would otherwise be entitled pursuant to Section 4.1(a) and the denominator of which is the aggregate amount of fractional shares of Parent Common Stock to which all former holders of Shares would otherwise be entitled pursuant to Section 4.1(a).

(iv)    As soon as practicable after the determination of the amount of cash, if any, to be paid to holders of Certificates formerly representing Shares or Book-Entry Shares with respect to any fractional share of Parent Common Stock, the Exchange Agent shall pay such amounts to such holders of Certificates formerly representing Shares or Book-Entry Shares, without interest, subject to and in accordance with the terms of Section 4.2(b).

(h)    Termination of Exchange Fund. Any portion of the Exchange Fund or Common Shares Trust that remains undistributed for one hundred eighty (180) days after the Effective Time shall be delivered to Parent, upon demand, and any holders of the Certificates or Book-Entry Shares who have not theretofore complied with this Article IV shall thereafter look only to Parent for payment of their portion of the Merger Consideration (including any cash in lieu of fractional shares of Parent Common Stock) and any dividends or distributions with respect to Parent Common Stock with a record date on or after the Effective Time.

(i)    No Liability. None of Parent, the Company, EFIH, Merger Sub, the Surviving Company or the Exchange Agent or any of their respective directors, officers, employees, representatives and agents shall be liable to any Person in respect of any shares of Parent Common Stock, any unpaid dividends or distributions with respect thereto with a record date after the Effective Time or any cash in lieu of fractional shares of Parent Common Stock, in each case delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificate or Book-Entry Shares shall not have been surrendered prior to the earlier of (i) any time set forth in the terms of the Plan of Reorganization and (ii) five (5) years after the Effective Time (or immediately prior to such earlier date on which any portion of the Stock Consideration (including any cash in lieu of fractional shares payable to a holder of such Certificate formerly representing Shares or Book-Entry Shares pursuant to this Article IV) or any dividends or distributions payable with a record date on or after the Effective Time with respect to any shares of Parent Common Stock comprising the Stock Consideration, would escheat to or become the property of any Governmental Entity), any such Stock Consideration, dividends, and cash shall, to the extent permitted by applicable Law,

become the property of the Surviving Company, free and clear of all claims or interest of any Person previously entitled thereto.

(j)     *Investment of Exchange Fund.* The Exchange Agent shall invest any cash in the Exchange Fund or Common Shares Trust as directed by Parent in (i) short-term obligations of the United States of America (the "U.S."), (ii) short-term obligations for which the full faith and credit of the U.S. is pledged to provide for the payment of principal and interest and/or (iii) short-term commercial paper rated the highest quality by each of Moody's Investors Service Inc. and Standard and Poor's Ratings Service. Any interest and other income resulting from such investments shall be paid to Parent, which shall also be responsible for any tax on such income. Parent shall promptly replace any cash held in the Exchange Fund or Common Shares Trust with the Exchange Agent lost through any investment made pursuant to this Section 4.2(j).

(k)     *Distributions with Respect to Unexchanged Shares.* After the Merger, no dividends or other distributions with respect to shares of Parent Common Stock with a record date on or after the Effective Time shall be paid to the holder of any un-surrendered Certificate or Book-Entry Shares until such Certificate or Book-Entry Shares is surrendered for exchange in accordance with this Article IV. Subject to the effect of applicable Law, following surrender of any such Certificate or Book Entry Shares, there shall be issued and/or paid to the holder of the shares of Parent Common Stock issued in exchange therefor, without interest, at the time of such surrender, any unpaid dividends or other distributions with a record date on or after the Effective Time theretofore payable with respect to such shares of Parent Common Stock.

Section 4.3    *Adjustments to Prevent Dilution.* Notwithstanding the foregoing, if from the date of this Agreement until the earlier of (i) the Effective Time and (ii) the termination of this Agreement in accordance with Article VIII, the outstanding shares of Reorganized EFH Common Stock are changed into a different number of shares or a different class, by reason of any stock dividend, subdivision, reclassification, recapitalization, split, combination, consolidation or exchange of shares, or any similar event occurs, then any number or amount contained herein which is based upon the number of shares of Reorganized EFH Common Stock will be appropriately adjusted.

**ARTICLE V**
**Representations and Warranties**

Section 5.1    *Representations and Warranties of the Company.* Except (i) as set forth in any of the Company's, Oncor's, EFIH's and Oncor Electric Delivery Transition Bond Company LLC's (such Subsidiaries, collectively, the "Filing Subsidiaries") Annual Report on Form 10-K for the year ended December 31, 2015, the Company or any of its Filing Subsidiaries' Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016 and June 30, 2016 (as applicable), or the Company's or any of the Filing Subsidiaries' Current Reports on Form 8-K filed since December 31, 2015, in each case, filed with the SEC prior to the date hereof and to the extent the relevance of the disclosure of any item therein is reasonably apparent from the information disclosed (other than disclosures in the "Risk Factors" sections thereof or any such disclosures included in such filings that are cautionary, predictive or forward-looking in nature) (it being

agreed that such disclosures shall not be exceptions to Section 5.1(b)(i) or Section 5.1(d)(i)), or (ii) as set forth in the disclosure letter delivered to Parent by the Company prior to entering into this Agreement (the "Company Disclosure Letter") (it being agreed that disclosure of any item in any section or subsection of the Company Disclosure Letter shall be deemed to have been disclosed with respect to any other section or subsection of the Company Disclosure Letter to which the relevance of such item is reasonably apparent from the information disclosed, *provided that* no such disclosure shall be deemed to qualify Section 5.1(f)(i) or Section 6.1 unless expressly set forth in Section 5.1(f)(i) or Section 6.1, as applicable, of the Company Disclosure Letter), the Company hereby represents and warrants to Parent and Merger Sub, as of the date hereof and as of the Closing Date, that:

       (a)    Organization, Good Standing and Qualification.  Each of the Company and its Subsidiaries is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease, use and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation or similar entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, qualified or in good standing, or to have such power or authority, has not had, and would not have, individually or in the aggregate, a Company Material Adverse Effect (as defined below). The Company has made available to Parent complete and correct copies of the Company's and its Subsidiaries' certificates of incorporation or formation and bylaws or operating agreement or comparable governing documents.

      As used in this Agreement, the term (i) "Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or other ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions, is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries (*provided that*, notwithstanding the foregoing, the Subsidiaries of the Company shall be deemed to include Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") and its Subsidiaries (including Oncor) (collectively, the "Oncor Entities") and deemed to exclude (A) Energy Future Competitive Holdings Company LLC ("EFCH"), TCEH, Reorganized TCEH and their respective Subsidiaries; (B) TXU Europe Limited and any entity directly or indirectly owned by TXU Europe Limited; (C) EFH Corporate Services and its Subsidiaries; (D) EFH Properties Company and its Subsidiaries, and (E) any other entity that is a Spin-Off Entity not listed above; (ii) "Affiliate" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by or under common control with, such Person; *provided that*, notwithstanding the foregoing, Affiliates of the Company shall be deemed to include the Oncor Entities and deemed to exclude (A) EFCH, TCEH, Reorganized TCEH and their respective Subsidiaries; (B) TXU Europe Limited and any entity directly or indirectly owned by TXU Europe Limited; (C) EFH Corporate Services and its Subsidiaries; (D) EFH Properties Company and its Subsidiaries, (E) Texas Energy Future Capital Holdings LLC, a Delaware limited liability company; (F) Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership; and (G) any other entity that is a Spin-Off Entity not listed above;

(iii) "<u>control</u>" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; and (iv) "<u>Company Material Adverse Effect</u>" means (A) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with all other facts, events, changes, effects, developments, circumstances or occurrences, has had or would reasonably be expected to have a material and adverse effect on, or change in, the financial condition, business, assets, liabilities or results of operations of the Company and its Subsidiaries, taken as a whole (for the avoidance of doubt any reference in any provision hereof to any item that "would have a Company Material Adverse Effect or any similar phrase, shall be interpreted as "individually or in the aggregate, has had or would be reasonably expected to have, a Company Material Adverse Effect" (and such interpretation shall extend to the negative expression of such phrase, or any similar phrase, *mutatis mutandis*), or (B) anything that prevents, materially restricts or materially impairs the Company or any of its Subsidiaries from consummating the Closing Date Transactions; *provided, however,* that, none of the following shall constitute or be taken into account in determining whether there has been or is a Company Material Adverse Effect:

(i) (x) changes or developments in general economic or political conditions or the securities, credit or financial markets, in general, globally or outside of or in the U.S. or in the State of Texas or (y) changes that are the result of acts of war or terrorism or any hurricane, tornado, tsunami, flood, earthquake or other natural disaster or other weather-related event, circumstance or development (other than any such acts of war or terrorism or any hurricane, tornado, tsunami, flood, earthquake or other natural disaster or other weather-related event, circumstance or development that cause any physical damage or destruction to or render physically or operationally unusable any facility or property of the Company, EFIH or any of their respective Subsidiaries (other than any facility or property contributed to Reorganized TCEH pursuant to the TCEH Contribution or the EFH Contribution));

(ii) any adoption, implementation, promulgation, repeal, modification, reinterpretation or proposal of any rule, regulation, ordinance, order, protocol or any other Law of or by any national, regional, state or local Governmental Entity or by the Electric Reliability Council of Texas, Inc. ("<u>ERCOT</u>") or the Texas Reliability Entity, Inc. ("<u>TRE</u>," and, together with ERCOT, the "<u>RTOs</u>");

(iii) any condition or requirement attached to any order or approval issued by the Bankruptcy Court;

(iv) changes or developments generally affecting electric transmission or distribution systems (other than changes or developments that render operationally unusable any facility or property of the Company, EFIH or any of their respective Subsidiaries (other than any facility or property contributed to Reorganized TCEH pursuant to the TCEH Contribution or the EFH Contribution));

27

(v)     changes or developments that are the result of factors generally affecting the industry in which the Company or its Subsidiaries operate;

(vi)    any loss or threatened loss of, or adverse change or threatened adverse change in, the relationship of the Company or any of its Subsidiaries with its customers, employees, regulators, financing sources or suppliers to the extent caused by the pendency or the announcement of the transactions contemplated by this Agreement and/or the Plan of Reorganization;

(vii)   changes, effects or developments to the extent relating to the entry into this Agreement, the performance of actions or obligations required to be taken by a party hereunder or consented to in writing by Parent, including any change in the Company's or any of its Subsidiaries' credit ratings to the extent resulting therefrom;

(viii)  changes or developments in U.S. generally accepted accounting principles ("GAAP") or authoritative interpretation thereof after the date hereof;

(ix)    any failure by the Company or any of its Subsidiaries to meet any internal or public projections or forecasts or estimates of revenues or earnings for any period, in and of itself, *provided* that the exception in this clause shall not prevent or otherwise affect a determination that any change, effect or development underlying such failure has resulted in, or contributed to, a Company Material Adverse Effect;

(x)     changes, effects or developments solely to the extent such changes, effects or developments affect the assets contributed to Reorganized TCEH or its Subsidiaries pursuant to the TCEH Contribution or the EFH Contribution or liabilities for which the Company and its Subsidiaries will be fully and unconditionally discharged as of the Effective Time pursuant to the Plan of Reorganization;

(xi)    the mere existence, in and of itself, of the Chapter 11 Cases; and

(xii)   the inclusion or exclusion of any ruling in the Private Letter Ruling or any other aspect of the Private Letter Ruling.

*provided, further*, that (x) facts, events, changes, effects, developments, circumstances or occurrences set forth in clauses (i) through (v) above (other than clause (iii) above) may be taken into account in determining whether there has been or is a Company Material Adverse Effect to the extent such matters, changes, effects or developments have a disproportionate and adverse effect on the Company and its Subsidiaries, taken as a whole, as compared to other entities engaged in the relevant business in Texas or other relevant geographic area and (y) any condition or requirement attached to any order or approval issued by the Public Utility Commission of Texas (the "PUCT"), the Federal Energy Regulatory Commission (the "FERC") or the Federal Communications Commission (the "FCC") that is necessary or was sought in order to consummate the transactions contemplated by this Agreement, and/or the Plan of Reorganization (solely

as the Plan of Reorganization relates to the E-Side Debtors) shall not constitute, or be deemed to contribute to, a Company Material Adverse Effect.

    (b)    Capital Structure.

        (i)    The authorized capital stock of the Company consists of 2,000,000,000 shares of common stock no par value, of the Company (the "EFH Common Stock") of which 1,669,861,379.02 shares of EFH Common Stock are outstanding as of the date hereof. All of the outstanding shares of EFH Common Stock have been duly authorized and are validly issued, fully paid and nonassessable. Upon the issuance of shares of Reorganized EFH Common Stock in connection with the Issuance, such shares of Reorganized EFH Common Stock will be duly authorized, validly issued, fully paid and non-assessable. Other than up to 7,164,000 shares of EFH Common Stock issuable pursuant to the terms of outstanding awards under the Company Stock Plan outstanding as of the date hereof, there are no options to purchase shares of EFH Common Stock issued and outstanding. Except as set forth in this Section 5.1(b)(i) and Section 5.1(b)(i) of the Company Disclosure Letter, there are no, and upon the issuance of shares of Reorganized EFH Common Stock in connection with the Issuances there will be no, preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, performance units, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate the Company, the reorganized Company, or any of their Subsidiaries to issue or sell any shares of capital stock or other equity securities of the Company, the reorganized Company, or any of their Subsidiaries or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any equity securities of the Company, the reorganized Company or any of their Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding.

        (ii)    Except as set forth on Section 5.1(b)(ii) of the Company Disclosure Letter, none of the Subsidiaries of the Company own any shares of EFH Common Stock. Section 5.1(b)(ii) of the Company Disclosure Letter sets forth a list of the Company's Subsidiaries and the Company's and each other Person's equity interests in such Subsidiaries. Except as set forth on Section 5.1(b)(ii) of the Company Disclosure Letter, each of the outstanding shares of capital stock or other equity securities of each of the Company's Subsidiaries is duly authorized, validly issued, fully paid and non-assessable, in the case of capital stock, and, in the case of equity securities that are not capital stock, the owners of such equity securities have no obligation to make capital contributions or other payments with respect to such equity securities under the organizational or governing documents of the applicable Subsidiary of the Company or under applicable Law or to make payments to creditors of the applicable Subsidiary of the Company solely by reason of ownership of such equity securities. Except as set forth on Section 5.1(b)(ii) of the Company Disclosure Letter, the ownership interests in each Subsidiary is owned by the Company or by a direct or indirect wholly owned Subsidiary of the Company, free and clear of any lien, charge,

pledge, security interest, claim or other encumbrance (each, a "Lien"), other than Liens permitted under and pursuant to EFIH's debtor-in-possession credit facility and restrictions on transfer arising under applicable securities laws. Except as set forth on Section 5.1(b)(ii) of the Company Disclosure Letter, neither the Company nor any of its Subsidiaries has entered into any commitment, arrangement or agreement, or are otherwise obligated, to contribute capital, loan money or otherwise provide funds or make additional investments in any other Person, other than any such commitment, arrangement or agreement with respect to, direct or indirect, wholly owned Subsidiaries of the Company or pursuant to a Contract (as defined below) binding on the Company or any of its Subsidiaries and set forth in Section 5.1(b)(ii) of the Company Disclosure Letter. For purposes of this Agreement, a "wholly owned Subsidiary" shall include any Subsidiary of the Company (or Parent) of which all of the shares of capital stock or other equity interests are owned by the Company (or Parent) or one or more wholly owned Subsidiaries of the Company (or Parent), as applicable.

(iii)    Except as set forth in Section 5.1(b)(iii) of the Company Disclosure Letter, there are no shareholder agreements, voting trusts or other agreements or understandings to which the Company or any of its Subsidiaries is a party or by which any of the foregoing is bound relating to the voting or registration of any equity securities of the Company or any of its Subsidiaries.

(iv)    Except with respect to the right to vote on a plan of reorganization of the Debtors under the Bankruptcy Code in connection with the Chapter 11 Cases, no bonds, debentures, notes or other indebtedness of the Company or any of its Subsidiaries having the right to vote on any matters on which equity holders of the Company or its Subsidiaries may vote, are issued or outstanding.

(c)    Corporate Authority. Each of the Company and EFIH has all requisite corporate or limited liability company, as applicable, power and authority and has taken all corporate or limited liability company, as applicable, action necessary in order to execute and deliver this Agreement and to perform its obligations under this Agreement and to consummate the Closing Date Transactions and the other transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by each of the Company and EFIH and subject only to entry of the Approval Order (as defined below), constitutes a valid and binding agreement of each of the Company and EFIH and no vote or consent of any equity holder of the Company or EFIH, or any other corporate or limited liability company action, is necessary to approve this Agreement or the transactions contemplated hereby on behalf of the Company and EFIH (other than the requisite votes for approval of the Plan of Reorganization under the Bankruptcy Code). This Agreement is enforceable against each of the Company and EFIH in accordance with its terms subject to entry of the Approval Order. The Board of Directors of the Company (the "Company Board") has taken all action so that neither Parent nor Merger Sub will be an "affiliated shareholder" (as such term is defined in Section 21.602 of the TBOC) or prohibited from entering into or consummating a "business combination" (as such term is defined in Section 21.604 of the TBOC) with the Company as a result of the execution of this Agreement or the consummation of any of the transactions

30

contemplated hereby. No other "fair price," "moratorium," "control share acquisition," "business combination" or any other anti-takeover statute or regulation or any anti-takeover provision in the certificate of formation or bylaws of the Company is applicable to the Transactions contemplated hereby.

(d)    Governmental Filings; No Violations; Certain Contracts.

(i)    Other than the filings, reports and/or notices to, and consents, registrations, approvals, permits and authorizations (A) pursuant to Section 1.5, (B) required as a result of facts and circumstances solely attributable to Parent or Merger Sub or any of their Affiliates, (C) in connection with the Chapter 11 Cases, (D) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") and the expiration or earlier termination of applicable waiting periods thereunder, (E) under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, as amended (the "Exchange Act"), (F) with the FERC pursuant to Section 203 of the Federal Power Act (the "Federal Power Act") and the FERC's regulations thereunder, and the approval of the FERC thereunder (the "FERC Approval"), (G) to or from the PUCT pursuant to authority asserted by the PUCT pursuant to the Public Utility Regulatory Act, the PUCT's regulations thereunder and the approval of the PUCT thereunder (the "PUCT Approval"), (H) in connection with the issuance of the Private Letter Ruling in accordance with Section 7.1(f), (I) with the FCC for the assignment and/or transfer of control, as applicable, of radio licenses, including point-to-point private microwave licenses held by the Company and/or its Subsidiaries and the consent(s) of the FCC for such assignment and/or transfer of control (the "FCC Approval" and, together with the other items referred to in subsections (C) through (I) of this Section 5.1(d)(i), the "Company Approvals"), and (J) the approval of the Vermont Department of Financial Regulation with respect to the change of control of EFH Vermont Insurance Company (the "Vermont Insurance Approval") and except as set forth in Section 5.1(d)(i) of the Company Disclosure Letter, no notices, reports or other filings are required to be made by the Company or any of its Subsidiaries with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by the Company or any of its Subsidiaries from, any federal, state or local, domestic or foreign governmental or regulatory authority, agency, commission, body, arbitrator, court, regional reliability entity (including the TRE), ERCOT, or any other legislative, executive or judicial governmental entity, excluding in each case, the Bankruptcy Court (subject to the foregoing exclusion, each a "Governmental Entity") in connection with the execution, delivery and performance of this Agreement by the Company and the consummation by the Company or any of its Subsidiaries of the Closing Date Transactions and the other transactions contemplated by this Agreement, except those which the failure to make or obtain has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(ii)    The execution, delivery and performance of this Agreement by the Company does not, and the consummation by the Company or any of its Subsidiaries of the Closing Date Transactions and the other transactions

31

contemplated by this Agreement will not, constitute or result in (A) a breach or violation of, or a default under, or otherwise contravene or conflict with, the certificate of formation or bylaws of the Company or the comparable governing documents of any of its Subsidiaries, (B) assuming compliance with the matters referred to in Section 5.1(d)(i) and except as set forth in Section 5.1(d)(ii)(B) of the Company Disclosure Letter, with or without notice, lapse of time or both, a breach or violation of, a termination, cancellation (or right of termination or amendment) or a default under, the creation or acceleration of any obligations under, the requirement of any consent under, the requirement of any loss of any benefit under, or the creation of a Lien on any of the assets of the Company or any of its Subsidiaries pursuant to, any agreement, lease, license, contract, note, mortgage, indenture, credit agreement, arrangement or other obligation (each, a "Contract") binding upon the Company or any of its Subsidiaries or any license from a Governmental Entity to which the Company or any of its Subsidiaries is subject or (C) assuming compliance with the matters referred to in Section 5.1(d)(i) a violation of any Law to which the Company or any of its Subsidiaries is subject, except, in the case of clause (B) or (C) above, for any such breach, violation, termination, cancellation, default, creation, acceleration, consent, loss or change that has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(iii)     The consent dated May 6, 2016, for the direct and indirect transfer of control of Comanche Peak Nuclear Power Plant, Unit Nos. 1 and 2 requested by application dated November 12, 2015, in Docket Nos. 50-445 and 50-446 (License Nos. NPF-87 and NPF-89), as supplemented, in connection with the Reorganized TCEH Spin-Off as required from the U.S. Nuclear Regulatory Commission (the "NRC") pursuant to Section 184 of the Atomic Energy Act of 1954, as amended, and the NRC's implementing regulations at 10 CFR 50.80 has been obtained and is in full force and effect and no challenge thereto is pending. No further NRC consents are required absent material changes to the Plan of Reorganization and supporting information described to the NRC in connection with such application.

(e)     Company Reports; Financial Statements.

(i)     Except as set forth in Section 5.1(e)(i) of the Company Disclosure Letter, each of the Company and each of the Filing Subsidiaries has filed or furnished, as applicable, on a timely basis, all forms, statements, certifications, reports and other documents (including exhibits, financial statements and schedules thereto, and other information incorporated therein) required to be filed or furnished by it with the Securities and Exchange Commission (the "SEC") pursuant to the Exchange Act or the Securities Act of 1933 and the rules and regulations promulgated thereunder, as amended (the "Securities Act") or any Contract governing any indebtedness of the Company or such Filing Subsidiary requiring such filings to be made since December 31, 2012 (the "Applicable Date") (the forms, statements, certifications, reports and documents filed or furnished since the Applicable Date and those filed or furnished subsequent to the

32

date hereof, including any amendments thereto, the "Company Reports"). Except as set forth in Section 5.1(e)(i) of the Company Disclosure Letter, each of the Company Reports, including any financial statements or schedules included therein, at the time of its filing or being furnished complied or, if not yet filed or furnished, will comply, in all material respects with the requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act of 2002, as amended, and the rules and regulations promulgated thereunder (the "Sarbanes-Oxley Act") applicable to the Company Reports. Except as set forth in Section 5.1(e)(i) of the Company Disclosure Letter, as of their respective dates (or, if amended prior to, or after, the date hereof, as of the date of such amendment), the Company Reports filed with or furnished to the SEC prior to the date hereof did not, and any Company Reports filed with or furnished to the SEC subsequent to the date hereof will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. There are no outstanding or unresolved comments received from the SEC staff with respect to the Company Reports. None of the Company Reports is, to the Knowledge (as defined below) of the Company, the subject of ongoing SEC review.

(ii)    Each of the consolidated balance sheets included in, or incorporated by reference into, the Company Reports, as amended prior to the date hereof (including the related notes and schedules thereto) fairly presents in all material respects, or, in the case of Company Reports filed after the date hereof, will fairly present in all material respects, the financial position of the applicable entity and its consolidated Subsidiaries as of its date (and if amended, as of the date of the last such amendment prior to the date hereof) and each of the statements of consolidated income, comprehensive income, cash flows and shareholders' equity included in or incorporated by reference into the Company Reports (including any related notes and schedules thereto), as finally amended prior to the date hereof, fairly presents in all material respects, or, in the case of Company Reports filed after the date hereof, will fairly present in all material respects, the financial position, results of operations and cash flows, as the case may be, of the applicable entity and its consolidated Subsidiaries for the periods set forth therein (subject, in the case of unaudited statements, to the lack of notes and to normal year-end adjustments), in each case in accordance with GAAP, except as may be noted therein.

(iii)    Except as set forth on Section 5.1(e)(iii) of the Company Disclosure Letter, the Company maintains internal control over financial reporting (as defined in Rule 13a-15 or 15d-15, as applicable, under the Exchange Act). Such internal control over financial reporting is effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, in each case, in each case, in all material respects. Except as has not had, individually or in the aggregate, a material effect on the nature or reliability of the information disclosed in the Company's periodic reports filed under the Exchange Act,

(A) each of the Company and the Filing Subsidiaries maintains disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act that are effective to ensure that information required to be disclosed by it is recorded and reported on a timely basis to the individuals responsible for the preparation of its filings with the SEC and other public disclosure documents (including its chief executive officer and chief financial officer) and (B) neither the Company nor any of the Filing Subsidiaries has disclosed, and is not required to disclose, based on its most recent evaluation prior to the date of this Agreement, to its outside auditors and the audit committee of its board of directors (or similar governing body): (1) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that are reasonably likely to adversely affect its ability to record, process, summarize and report financial information and (2) any fraud, known to it, whether or not material, that involves management or other employees who have a significant role in its internal controls over financial reporting.

(iv)    Except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect, each of the Company and its Subsidiaries is in compliance with the applicable provisions of the Sarbanes-Oxley Act. Without limiting the generality of the foregoing, neither the Company nor any of its Subsidiaries is a party to, or has a commitment to become a party to, any joint venture, off-balance sheet partnership or any similar Contract or arrangement (including any Contract or arrangement relating to any transaction or relationship between or among the Company or any of its Subsidiaries, on the one hand, and any unconsolidated Affiliate, including any structured finance, special purpose or limited purpose entity or Person, on the other hand) or any "off-balance sheet arrangements" (as defined in Item 303(a) of Regulation S-K of the SEC), where the result, purpose or effect of such Contract or arrangement is to avoid disclosure of any material transaction involving, or material liabilities of, the Company or any of its Subsidiaries in the Company Reports or the financial statements included therein.

(f)    Absence of Certain Changes.

(i)    Except as set forth in Section 5.1(f)(i) of the Company Disclosure Letter, since December 31, 2015 there has not occurred a Company Material Adverse Effect.

(ii)    Except as set forth in Section 5.1(f)(ii) of the Company Disclosure Letter or in accordance with the orders of the Bankruptcy Court, (a) since December 31, 2015, and through the date of this Agreement, the Oncor Entities have conducted their respective businesses in the ordinary course of business and (b) since April 29, 2014, and through the date of this Agreement, the Company and its Subsidiaries (other than the Oncor Entities) have conducted their respective businesses in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court. Without limiting the foregoing, except as set forth in

Section 5.1(f)(ii) of the Company Disclosure Letter, since December 31, 2015, in the case of the Oncor Entities, and since April 29, 2014, in the case of the Company and its Subsidiaries (other than the Oncor Entities), and, in each case, through the date of this Agreement, there has not been:

(1)    any declaration, setting aside or payment of any dividend or other distribution with respect to any shares of capital stock of the Company or any of its Subsidiaries (except for (A) dividends or other distributions by any direct or indirect wholly owned Subsidiary to the Company or to any wholly owned Subsidiary of the Company and (B) Oncor's or Oncor Holding's issuance of dividends or other distributions (as permitted by their respective limited liability company agreements, in each case in the ordinary course of business);

(2)    any material change in any non-Tax method of financial accounting or accounting practice by the Company or any of its Subsidiaries, other than as required by GAAP;

(3)    any material physical damage to, destruction to or other casualty loss with respect to any material asset, facility or property owned, leased or otherwise used by the Company, EFIH or any of their respective Subsidiaries (other than any facility or property contributed to Reorganized TCEH pursuant to the TCEH Contribution or the EFH Contribution), whether or not covered by insurance;

(4)    any material Tax elections or changes in Tax accounting methods by the Company or any of its Subsidiaries or any settlement or compromise by the Company or any of its Subsidiaries of any material Tax liability or refund if such action would result in the inclusion of any material item of income in, or the exclusion of any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date which taxable income was realized (and reflects economic income arising) prior to the Closing Date, other than with respect to adjustments, extensions, waivers, agreements, and any similar item agreed to in connection with any audit or other Tax proceedings disclosed in Section 6.1(a)(xiv) of the Company Disclosure Letter;

(5)    any action taken by the Company or any of its Subsidiaries that the Company or any of its Subsidiaries, as applicable, would be prohibited from freely taking by Section 6.1(a) (subject to the exclusions set forth in Section 6.1(a)) or, in the case of Oncor Holdings or Oncor, the Oncor Letter Agreement (subject to the exclusions set forth in the Oncor Letter Agreement), in each case, if such action had been taken after the date hereof.

(g)     Litigation and Liabilities.

(i)     Except as set forth on Section 5.1(g)(i) of the Company Disclosure Letter, there are no civil, criminal or administrative actions, suits, complaints, enforcement actions, penalty assessments, claims, hearings, arbitrations, investigations, inquiries, audits or other proceedings (formal or informal, public or non-public) pending or, to the Knowledge (as defined below) of the Company, threatened in writing against the Company or any of its Subsidiaries, in each case that has had or would have, individually or in the aggregate, a Company Material Adverse Effect. Except as set forth on Section 5.1(g)(i) of the Company Disclosure Letter, none of the Company or any of its Subsidiaries is a party to or subject to the provisions of any judgment, settlement, order, writ, injunction, decree or award of the Bankruptcy Court or any Governmental Entity specifically imposed upon the Company, any of its Subsidiaries or any of their respective businesses, assets or properties that, has had or would have, individually or in the aggregate, a Company Material Adverse Effect.

(ii)     Except as set forth on Section 5.1(g)(ii) of the Company Disclosure Letter, neither the Company nor any of its Subsidiaries has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise), other than liabilities and obligations (A) asserted in connection with the Chapter 11 Cases, (B) set forth in the Company's or any of the Filing Subsidiaries' consolidated balance sheet as of December 31, 2015, including the notes thereto, (C) incurred in the ordinary course of business (and, solely with respect to the Oncor Entities, incurred consistent with past practice) since December 31, 2015, (D) incurred in connection with the Closing Date Transactions or any other transaction or agreement specifically permitted by this Agreement or the Plan of Reorganization, (E) pursuant to any Company Material Contract (as defined below) (but not including any liability for breach thereunder), (F) that will be liabilities or obligations of Reorganized TCEH and/or any of its Subsidiaries after the separation of the E-Side Debtors and the TCEH Debtors pursuant to the Plan of Reorganization or (G) that have not had or would not have, individually or in the aggregate, a Company Material Adverse Effect. None of the Retained Subsidiaries has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise), other than liabilities and obligations (A) that are set forth on Section 5.1(g)(ii) of the Company Disclosure Schedule or (B) that will not be liabilities of the Company or any of its Subsidiaries because they are to be discharged or contributed to Reorganized TCEH pursuant to the Plan of Reorganization.

The term "Knowledge" when used in this Agreement with respect to the Company shall mean the actual knowledge after reasonable inquiry of those persons set forth in Section 5.1(g) of the Company Disclosure Letter.

(h)    Employee Benefits.

(i)    All material benefit and compensation plans, programs, policies or arrangements (as amended through the date hereof) covering current or former employees, officers, managers, members and directors of the Company and its Subsidiaries (the "Employees") or any other individuals, including "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and employment, deferred compensation, change in control, non-competition, retention, termination, severance, stock option, stock purchase, stock appreciation rights, stock based, incentive and bonus plans, agreements, programs, policies or arrangements sponsored, contributed to, or entered into by the Company or its Subsidiaries (the "Benefit Plans") are listed in Section 5.1(h)(i) of the Company Disclosure Letter. Each Benefit Plan that (A) will continue to be sponsored, maintained and administered or otherwise remain the responsibility of the Surviving Company or its Subsidiaries following the Closing is listed in Section 5.1(h)(i)(A) of the Company Disclosure Letter as an "Assumed Plan", (B) will be transferred by the Company or its Subsidiaries as an active plan to Reorganized TCEH or one of its Subsidiaries as part of the Reorganized TCEH Contributions is listed in Section 5.1(h)(i)(B) of the Company Disclosure Letter as a "Contributed Plan" and (C) whether pursuant to the Plan of Reorganization or otherwise, shall be terminated and all liabilities thereunder otherwise discharged on or prior to the Closing Date, is listed in Section 5.1(h)(i)(C) of the Company Disclosure Letter as a "Discharged Plan".

(ii)    True and complete copies of all Assumed Plans and all amendments thereto have been made available to Parent and to the extent applicable, the following have also been made available to Parent: (A) any related trust agreement or other funding instrument; (B) the most recent determination or opinion letter issued by the IRS; (C) any summary plan description, and (D) for each of the following: (v) the most recent Form 5500 and attached schedules, (w) the three most recent audited financial statements, (x) the two most recent actuarial valuation reports related to an Assumed Plan, (y) the most recent annual non-discrimination and coverage compliance tests, and (z) third-party administration and except as set forth in Section 5.2(h)(ii) of the Company Disclosure Letter vendor Contracts, in each case related to an Assumed Plan.

(iii)    All Assumed Plans are in compliance in all material respects with their respective terms and ERISA, the Code and other applicable Laws. Each Assumed Plan that is subject to ERISA (an "ERISA Plan") that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (a "Pension Plan") intended to be qualified under Section 401(a) of the Code, has either received a favorable determination letter from the Internal Revenue Service (the "IRS"), has applied to the IRS for such favorable determination letter or may rely on a favorable opinion letter issued by the IRS and, to the Knowledge of the Company, no circumstance exists that would be reasonably expected to result in the revocation of such determination or opinion letter. Neither the Company nor

any of its Subsidiaries has engaged in a transaction with respect to any ERISA Plan that, assuming the taxable period of such transaction expired as of the date hereof, would subject the Company or any Subsidiary to a tax or penalty imposed by either Section 4975 of the Code or Section 502(i) of ERISA in an amount that would be material to the Company. All contributions to and premium payments in respect of any Assumed Plan have been timely made and there are no contributions or premium payments that are past due and owing, except as would not reasonably be expected to be material to the Company.

(iv)    (A) Except as set forth in Section 5.1(h)(iv)(A) of the Company Disclosure Letter, none of the Assumed Plans ("Assumed Pension Plan") is a Pension Plan subject to Title IV of ERISA or plan described in Section 4001(a)(3) of ERISA ("Multiemployer Plan") and neither the Company nor any Person, trade or business that, together with the Company, is or was treated as a single-employer within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA ("ERISA Affiliate") has, during any time in the six-year period preceding the Closing Date, contributed to, sponsored, maintained or administered or incurred any liability in respect of any Pension Plan or Multiemployer Plan that would reasonably be expected to result in material liability to Parent or the Oncor Entities (other than the EFH Retirement Plan and the Oncor Retirement Plan) after the Closing. Since the Applicable Date, no ERISA Event (as defined below) has occurred or is reasonably expected to occur with respect to any Assumed Pension Plan or the EFH Retirement Plan that would reasonably be expected to result in material liability to Parent or the Oncor Entities after the Closing. (B) Each Assumed Pension Plan and the EFH Retirement Plan has satisfied its minimum funding obligations under Sections 412 and 430 of the Code, or Section 302 of ERISA. For purposes of this Section 5.1(h)(iv), the term "ERISA Event" means any: (1) "reportable event" within the meaning of Section 4043 of ERISA and the regulations thereunder with respect to any Assumed Pension Plan or EFH Retirement Plan; (2) occurrence of any accumulated funding deficiency (whether or not waived with respect to such Pension Plan); (3) determination that such Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 4010(d)(2) of ERISA); (4) imposition of any material liability to or on account of such Pension Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code; (5) institution of proceedings by the Pension Benefit Guaranty Corporation to terminate such Pension Plan or to appoint a trustee to administer any Assumed Pension Plan or EFH Retirement Plan; or (6) imposition of any Lien under the Code or ERISA on the assets of the Company in relation to such Pension Plan.

(v)    There is no material pending or, to the Knowledge of the Company, threatened claims, actions, suits, court or Governmental Entity proceedings, and arbitrations relating to the Assumed Plans, other than routine claims for benefits, that would reasonably be expected to result in material liability to the Company or any of its Subsidiaries or to Parent. There are no pending or, to the Knowledge of the Company, threatened audits or investigations

by any Governmental Entity involving any Assumed Plan that would reasonably be expected to result in material liability to the Company or any of its Subsidiaries or to Parent.

(vi)    Except for any payments made at or prior to the Effective Time, none of the execution of this Agreement, the consummation of the transactions contemplated by this Agreement, nor a termination or resignation of employment following the Effective Time will result in an obligation of Parent or the Surviving Company after the Effective Time with respect to any Non-Oncor Employee to severance pay or any material increase in severance pay. Except as set forth in Section 5.1(h)(vi) of the Company Disclosure Letter, neither the execution of this Agreement nor the consummation of the transactions contemplated by this Agreement will (A) result in an obligation of Parent or the Surviving Company with respect to any Designated Officer (as defined below) to severance pay or any material increase in severance pay upon any termination of employment after the date hereof, (B) accelerate the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any of the Assumed Plans, (C) obligate the Company or its Subsidiaries to transfer or set aside any assets to fund any material benefits under any Assumed Plan due to any directors, officers or employees of the Company or its Subsidiaries, or (D) result in payment under any Assumed Plans that would not be deductible under Section 280G of the Code.

(vii)    All workers' compensation insurance policies of the Oncor Entities are valid and effective and, except as set forth in Section 5.1(h)(vii) of the Company Disclosure Letter or that would not reasonably be expected to result in material liability to Parent or the Oncor Entities, there are no pending or, to the Knowledge of the Company, threatened material claims for workers' compensation insurance.

(viii)    Each Assumed Plan provides benefits to only those employees, former employees and other participants who are eligible participants under the written terms of such Assumed Plan.

(ix)    This Agreement, the Split Participant Agreement, the Discharged Plans, the certificates, articles of incorporation, by-laws, limited liability company operating agreements, and any other organizational document of Parent, the Company or any of the Company's Subsidiaries and insurance policies maintained by Parent, the Company or any of the Company's Subsidiaries for indemnification or advancement of expenses, neither Parent nor the Company or any of its Subsidiaries will have any obligations or liabilities with respect to any employees of Reorganized TCEH or its Subsidiaries or the Contributed Plans following the Closing Date.

The term "Designated Officer" when used in this Agreement shall mean those Oncor Employees set forth in Section 5.1(h) of the Company Disclosure Letter.

Notwithstanding any other provisions of the this Agreement to the contrary, the representations and warranties set forth in Section 5.1(h)(ii), (iii), (v), (vi)(B) and (C) and (viii) shall also apply with respect to the EFH Retirement Plan but only to the extent a breach of such representations or warranties could reasonably be expected to result in a material liability to Parent or the Oncor Entities. Except as provided in Sections 5.1(c), (e), (f), (g), (i), (k), (l), (n) and (r), the representations and warranties set forth in this Section 5.1(h) are the Company's and its Subsidiaries' sole and exclusive representations and warranties regarding employee benefit matters.

(i)     Compliance with Laws; Licenses. Except as set forth in Section 5.1(i) of the Company Disclosure Letter, the businesses of each of the Company and its Subsidiaries have not been since the Applicable Date, and are not being, conducted in violation of any federal, state, local or foreign law, statute or ordinance, common law or any rule, regulation, legally binding standard, judgment, order, writ, injunction, decree, arbitration award, agency requirement or License of the Bankruptcy Court or any Governmental Entity (collectively, "Laws"), except for violations that, individually or in the aggregate, have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect. Except with respect to regulatory matters that are the subject of Section 6.3 hereof or are set forth in Section 5.1(i) of the Company Disclosure Letter, no investigation or review by any Governmental Entity with respect to the Company or any of its Subsidiaries is pending or, to the Knowledge of the Company, threatened in writing, nor, to the Knowledge of the Company, has any Governmental Entity indicated in writing an intention to conduct the same or alleged in writing that the Company or any of its Subsidiaries is not in compliance with any applicable Law or License held by the Company or any of its Subsidiaries or which challenges or questions the validity of any rights of the holder of any such License, except for such investigations, reviews or allegations, the outcome of which have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect. Except as set forth in Section 5.1(i) of the Company Disclosure Letter, the Company and each of its Subsidiaries has obtained and possesses and is in compliance with all permits, certifications, approvals, registrations, clearances, consents, authorizations, franchises, variances, exemptions and orders issued or granted by the Bankruptcy Court or a Governmental Entity ("Licenses") necessary to enable it to own, operate, lease or otherwise hold its properties and assets and to conduct its business as presently conducted, except those the absence of which have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect. Except as set forth in Section 5.1(i) of the Company Disclosure Letter, such Licenses are in full force and effect, and no suspension or cancellation of such Licenses is pending or, to the Knowledge of the Company, threatened in writing, except where such failure to be in full force and effect, suspension or cancellation has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(j)     Environmental Matters. Except for such matters of the type referred to in clauses (i) through (v) of this Section 5.1(j) that have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect:

(i)    The Company and its Subsidiaries are in compliance with all applicable Environmental Laws (as defined below), and none of them has received any written communication since the Applicable Date from any Governmental Entity or any other Person that alleges that any of them is not or has not been in material compliance with Environmental Laws, which remains unresolved.

(ii)    Each of the Company and its Subsidiaries has obtained and possesses all Licenses necessary under Environmental Laws for the ownership, operation and maintenance of its facilities and properties and the conduct of its business as presently conducted (the "<u>Environmental Permits</u>"), and all such Environmental Permits are in good standing, in full force and effect, no suspension or cancellation of such Environmental Permits is pending or, to the Knowledge of the Company, threatened in writing, and each of the Company and its Subsidiaries is in compliance with all terms and conditions of the Environmental Permits granted to it.

(iii)    Except as set forth in <u>Section 5.1(j)(iii)</u> of the Company Disclosure Letter, there is no Environmental Claim (as defined below) (A) pending or, to the Knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries or (B) to the Knowledge of the Company, pending or threatened in writing against any real or personal property that the Company or any of its Subsidiaries owns, leases or operates.

(iv)    Except as set forth in <u>Section 5.1(j)(iv)</u> of the Company Disclosure Letter, there has been no Release (as defined below) of any Hazardous Substance that has resulted in, or would reasonably be expected to result in, (A) any Environmental Claim against the Company or any of its Subsidiaries or (B) any requirement under Environmental Law on the part of the Company or any of its Subsidiaries to undertake Remedial Action (as defined below).

(v)    To the Knowledge of the Company, the Company and its Subsidiaries have disclosed all current, known conditions relating to the business, operations, properties or assets of the Company or any of its Subsidiaries which, as of the date hereof, are reasonably expected to result in, individually, an obligation of the Company or any of its Subsidiaries to incur costs in excess of $5,000,000 for (A) installing pollution control equipment required under applicable Environmental Laws or (B) conducting Remedial Action.

Except as provided in <u>Sections 5.1(e)</u>, <u>(f)</u>, and <u>(n)</u>, this <u>Section 5.1(j)</u> contains the sole and exclusive representations and warranties of the Company and its Subsidiaries relating to the Environment, Environmental Laws, Environmental Permits, Environmental Claims, Releases, Remedial Action, or Hazardous Substances.

As used herein, the term "<u>Environment</u>" means any and all ambient air, indoor air, surface water and groundwater (including navigable water and wetlands), the land surface or subsurface strata or sediment and flora and fauna.

Case 14-10979-CSS    Doc 9732-3    Filed 10/03/16    Page 43 of 148

As used herein, the term "Environmental Claim" means any and all actions, suits, claims, demands, demand letters, directives, liens, written notices of noncompliance or violation by any Person, hearings, arbitrations, or other legal or administrative proceedings alleging potential liability under any Environmental Laws (including potential responsibility for or liability for enforcement costs, Remedial Action costs, natural resource damages, property damages, personal injuries, fines or penalties) arising out of, based on or resulting from (A) the presence, or Release or threatened Release into the Environment, or alleged presence, Release or threatened Release into the Environment, of any Hazardous Substance; or (B) any violation, or alleged violation, of any Environmental Law.

As used herein, the term "Environmental Law" means any and all Laws in effect on or prior to the Closing Date relating to (A) pollution, the protection of the Environment or the protection of human health and safety as it relates to exposure to Hazardous Substances or (B) the use, treatment, storage, transport, handling, release or disposal of any Hazardous Substances.

As used herein, the term "Hazardous Substance" means any chemical, material or substance listed, defined, designated or classified as, or included in the definition of, "hazardous substances," hazardous waste," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants" or "pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law, including petroleum and any derivative or by-products thereof, asbestos or asbestos-containing materials, polychlorinated biphenyls and any other substance regulated pursuant thereto, or the presence or Release of, or exposure to which could reasonably be expected to form the basis for liability under any applicable Environmental Law, in each case because of its dangerous or deleterious properties or characteristics.

As used herein, the term "Release" means any spilling, emitting, leaking, pumping, pouring, emptying, injecting, escaping, dumping, disposing, discharging, migrating or leaching into, onto or through the Environment.

As used herein, the term "Remedial Action" means all actions required by a Governmental Entity or required under any Environmental Law, to (A) clean up, remove, treat, or in any other way ameliorate or address any Hazardous Substance in the Environment; (B) prevent the Release or threat of Release, or minimize the further Release of any Hazardous Substance so it does not endanger the public health or welfare or the Environment; (C) perform pre-remedial studies and investigations or post remedial monitoring and care pertaining or relating to a Release; or (D) bring the applicable property into compliance with any Environmental Law.

(k)     Taxes.

(i)     The Company and each of its Subsidiaries (as used in this Section 5.1(k), "Subsidiaries" of the Company include each of the Persons specifically excluded from the definition thereof set forth in Section 5.1(a)), provided,

however, that with respect to TXU Europe Limited and any entity directly or indirectly owned by TXU Europe Limited, any representation herein shall be limited to information actually known to officers of the Company primarily responsible for Tax matters and, for the avoidance of doubt, there shall be no duty of inquiry with respect to any such information, have (A) prepared in good faith and duly and timely filed (taking into account any extension of time within which to file) all material Tax Returns (as defined below) required to be filed by any of them, and all such filed Tax Returns are complete and accurate in all material respects, and (B) timely paid all material Taxes that are required to be paid or that the Company or any of its Subsidiaries are obligated to withhold from amounts owing to any employee, creditor or third party, except with respect to matters contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP.

(ii)    Except as set forth in Section 5.1(k)(ii) of the Company Disclosure Letter, there are no pending, or threatened in writing, audits (or other similar proceedings initiated by any Governmental Entity) in respect of Taxes due from or with respect to the Company or any of its Subsidiaries or Tax matters to which the Company or any Subsidiary is a party, which (if determined adversely to the Company) would have a material effect on the Company and its Subsidiaries. Except as set forth in Section 5.1(k)(ii) of the Company Disclosure Letter, neither the Company nor any of its Subsidiaries has granted any extension of the period of limitations for the assessment or collection of any Tax of the Company or any of its Subsidiaries for any taxable period that remains open to assessment.

(iii)    None of the Company or any of its Subsidiaries has participated in any listed transaction under Section 6011, 6111 or 6112 of the Code and the Treasury Regulations promulgated thereunder.

(iv)    None of the Company or any of its Subsidiaries has taken or agreed to take any action, and none of the officers of the Company responsible for Tax matters has actual information relating to any facts or circumstances, in each case, that would prevent or impede, or would reasonably be expected to prevent or impede, the Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code or the Reorganized TCEH Spin-Off from qualifying as a reorganization within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Code (if applicable).

(v)    Except pursuant to the Reorganized TCEH Spin-Off, none of the Company or any of its Subsidiaries has been a "distributing corporation" or "controlled corporation" in any distribution occurring during the last 30 months that was purported or intended to be governed by Section 355 of the Code (or any similar provision of state, local or non-U.S. Law).

(vi)    Except as set forth in Section 5.1(k)(vi) of the Company Disclosure Letter, there are no Tax sharing, indemnification or allocation agreements (or similar agreements) to which the Company or any of its

Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound (other than (A) agreements between or among the Company and its Subsidiaries or EFCH, TCEH and their Subsidiaries, which agreements are set forth in Section 5.1(k)(vi) of the Company Disclosure Letter, and (B) agreements the primary purpose of which is not the allocation or sharing of any Tax) and none of the Company or any of its Subsidiaries has any material liability for the Taxes of any person (other than the Company and its Subsidiaries) under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or non-U.S. Law.

(vii)    Other than as a result of adjustments agreed to in connection with any audit or other Tax proceedings disclosed in Section 6.1(a)(xiv) of the Company Disclosure Letter, neither the Company nor any of its Subsidiaries will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date which taxable income was realized (and reflects economic income arising) prior to the Closing Date as a result of any: (A) change in method of accounting for a taxable period ending on or prior to the Closing Date, including by reason of the application of Section 481 of the Code (or any analogous provision of state, local or foreign Law), (B) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Law) executed on or prior to the Closing Date, (C) intercompany transaction or excess loss account described in any Treasury Regulation under Section 1502 of the Code (or any corresponding or similar provision of state, local, or foreign income Tax Law) or (D) election under Section 108(i) of the Code.

(viii)    The amount of net operating losses of the Company for federal income tax purposes as of the Closing Date that are available to and can be used to offset taxable income and gain (as reasonably determined by the Company) (without limitation under Section 382 of the Code and after taking into account any reduction in such net operating losses (x) as a result of the recognition of any income that has previously been deferred under Section 108(i) of the Code and (y) under Sections 108 and 1017 of the Code) exceed the sum of (i) the amount of taxable gain that will result from the Preferred Stock Sale plus (ii) the excess, if any, of (A) the amount of liabilities deemed assumed for tax purposes by Reorganized TCEH over (B) the tax basis of the assets deemed contributed for tax purposes to Reorganized TCEH (after taking into account the Preferred Stock Sale), in each of clause (A) and (B), as a result of the Reorganized TCEH Contributions and the conversion of Reorganized TCEH to a corporation.

(ix)    The facts and statements set forth in the IRS Submissions (as defined below) are true, correct, and complete in all material respects except to the extent the facts and statements set forth in such IRS Submissions relate to transactions that are not contemplated by this Agreement.

(x)    The facts and statements set forth in PLR 201326006 were true, correct and complete in all material respects as of April 15, 2013.

(xi)    The Company has not filed any IRS Submissions other than IRS Submissions provided to Parent.

(xii)    Since the internal corporate transactions on April 15, 2013 to eliminate the excess loss account and a deferred intercompany gain, it has not taken any action to change the entity classification for U.S. tax purposes of any Debtor entity, by changing their legal form or otherwise, *provided, however*, that (i) Eagle Mountain Power Company LLC, a Debtor entity that is a disregarded entity for U.S. federal income tax purposes, was formed after April 15, 2013; (ii) Comanche Peak Nuclear Power Company LLC, a non-Debtor indirect subsidiary of TCEH, became a disregarded entity after April 15, 2013; (iii) certain entities were formed as subsidiaries of TCEH, information with respect to such subsidiaries having been provided to Parent; and (iv) certain internal restructuring steps will have been taken on or before the Effective Time, information with respect to such steps having been provided to and agreed to by Parent, *provided, that*, Parent shall not withhold such agreement to the extent Parent reasonably concludes such steps would not have a material risk of creating any liability for any Tax that would be allocated to the Company under the Tax Matters Agreement.

(xiii)    During the three-year period ending on the Closing Date, the Company has not taken any action (and, to its knowledge, none of its direct or indirect owners has taken any action) that has resulted in an ownership change of the Company within the meaning of Section 382(g) of the Code (including by treating the equity interests of the Company as becoming worthless within the meaning of Section 382(g)(4)(D) of the Code).

For purposes of this Section 5.1(k), (A) the term "Tax" (including, with correlative meaning, the term "Taxes") includes all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, margin, customs duty, capital stock, severances, stamp, transfer, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions, and (B) the term "Tax Return" includes all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) required to be supplied to a Tax authority relating to Taxes.

This Section 5.1(k) and Section 5.1(h) contain the sole and exclusive representations and warranties of the Company and its Subsidiaries relating to Tax matters.

(l)    Labor and Employment Matters. Except as set forth in Section 5.1(l) of the Company Disclosure Letter, neither the Company nor any of its Subsidiaries (i) has

agreed to recognize any labor union or labor organization, nor has any labor union or labor organization been certified, as the exclusive bargaining representative of any employees of the Company or any of its Subsidiaries; (ii) is a party to or otherwise bound by, or currently negotiating, any collective bargaining agreement with a labor union or labor organization (a "CBA"); or (iii) is the subject of any proceeding asserting that the Company or any of its Subsidiaries has committed an unfair labor practice or seeking to compel it to bargain with any labor union or labor organization, nor, to the Knowledge of the Company, is any such proceeding threatened in writing in each case, that, individually or in the aggregate, has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect. There is not now, nor has there been since the Applicable Date any labor strike, walk-out, work stoppage, slow-down or lockout, or any material labor dispute, involving the Company or any of its Subsidiaries nor, to the Knowledge of the Company, is any such dispute threatened in writing. To the Knowledge of the Company, there is no campaign being conducted to solicit cards from employees of the Company or any of its Subsidiaries to authorize representation by a labor organization. Neither the Company nor any of its Subsidiaries have closed any plant or facility or effectuated any layoffs of employees or implemented any early retirement, separation or window program since the Applicable Date, nor has any such action or program been announced for the future in any case that would reasonably be expected to give rise to any material obligation under the United States Worker Adjustment and Retraining Notification Act or any similar Law, or the rules and regulations thereunder (collectively, the "WARN Act"), except for any such obligation that was satisfied on or prior to December 31, 2015.  To the Knowledge of the Company, all Persons who provide services to the Company or any of its Subsidiaries have been properly classified as exempt or non-exempt under the Fair Labor Standards Act and similar state Law and as employees or independent contractors for all purposes, including tax, employment law and employee benefit plan purposes, except for immaterial instances of mis-classification (if any). Except as set forth in Section 5.1(l) of the Company Disclosure Letter, the Company and its Subsidiaries are in compliance with all workplace health and safety Laws and there are no pending or threatened claims related to workplace health or safety or employment of any employees of the Company or any of its Subsidiaries, except in each case for such non-compliance or claims that have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect. No employee of the Company or any of its Subsidiaries is employed outside the United States.

(m)     Intellectual Property.

(i)     The Company and each of its Subsidiaries own, or are licensed or otherwise possess legally enforceable rights to use, all Intellectual Property and IT Assets (each as defined below) necessary to conduct their respective businesses, all of which rights shall survive unchanged following the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(ii)     (A) Except as set forth in Section 5.1(m) of the Company Disclosure Letter, the business of the Company and its Subsidiaries, as presently

46

conducted and conducted since the Applicable Date, have not infringed, diluted, misappropriated or otherwise violated any Intellectual Property (as defined below) of any other Person, and (ii) no Person is infringing, diluting, misappropriating, or otherwise violating any Intellectual Property owned by the Company or its Subsidiaries, except, in each case, as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect. There is no material civil, criminal or administrative actions, suits, complaints, enforcement actions, penalty assessments, claims, hearings, arbitrations, investigations, inquiries, audits or other proceedings (formal or informal, public or non-public) pending or, to the Knowledge of the Company, threatened in writing by a third party against the Company or any of its Subsidiaries that asserts infringement, misappropriation or violation of such third party's Intellectual Property by the Company or any of its Subsidiaries or seeks to recover any damages or other relief in respect thereof.

(iii)    Except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect, each of the Company and its Subsidiaries complies with, and has complied with, all applicable Laws, consents and Contracts, and its own rules, policies and procedures, relating to privacy, data protection, and the collection and use of personal information or other data. There are no investigations or material actions currently pending concerning the data or privacy practices of the Company or any of its Subsidiaries. No material claims have been asserted or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries alleging a violation of any of the foregoing, and the consummation of the transactions contemplated by this Agreement will not result in any such violation.

(iv)    For purposes of this Agreement, the term "Intellectual Property" means all intellectual property and industrial property recognized under applicable Law, including trademarks, service marks Internet domain names, logos, trade dress, trade names and all goodwill associated therewith and symbolized thereby, inventions, discoveries, patents, trade secrets, copyrights and copyrightable works, software, databases, data (including customer, employee, technical, research and development and manufacturing data) and related items and (if applicable) any registrations, issuances and applications for registration or issuance of any of the foregoing. For purposes of this Agreement, the term "IT Assets" means all computers, computer systems, software, computer code, networks, firmware, middleware, hardware, servers, workstations, hubs, routers, databases and all other information technology equipment and assets.

(n)    Insurance. Except as set forth in Section 5.1(n) of the Company Disclosure Letter, all casualty, public liability excess, professional liability, worker's compensation liability, directors and officers liability, environmental and pollution liability, property and machinery breakdown and extra expense liability, fiduciary and employee benefits liability and other material insurance policies maintained by the Company or any of its Subsidiaries (other than insurance policies contributed to Reorganized TCEH pursuant to the TCEH Contribution or the EFH Contribution) ("Insurance Policies") are in full force

and effect and all premiums due with respect to all Insurance Policies have been paid, with such exceptions that, individually or in the aggregate, have not had, or would not have a Company Material Adverse Effect. Except as set forth in Section 5.1(n) of the Company Disclosure Letter, to the Company's Knowledge, there is no claim pending with respect to the Company or any of its Subsidiaries under any of the Insurance Policies that covers any of their respective businesses, assets or properties for more than $5,000,000. The coverage provided by such policies is of the kinds, in the amounts and provides protection against the risks, required to comply with applicable Law as it relates to the business of the Company and its Subsidiaries and the Company's and its Subsidiaries' obligations under existing Material Contracts, except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(o)    Energy Regulatory Matters. Except as set forth on Section 5.1(o) of the Company Disclosure Letter, the Company is a "holding company" under the Public Utility Holding Company Act of 2005 (including the regulations of the FERC thereunder) with a currently effective waiver of the accounting, record-retention and reporting requirements to the extent set forth in 18 C.F.R.§ 366.3(c). Oncor is subject to regulation (i) under Texas Law as a "public utility," an "electric utility" and a "transmission and distribution utility" (as such terms are defined under the Texas Public Utility Regulatory Act, as amended and under the ERCOT Protocols (as defined below) as a "transmission and/or distribution service provider" (as such term is defined in the ERCOT Protocols), (ii) by FERC as a "transmitting utility" under the Federal Power Act and (iii) by FERC, the North American Electric Reliability Corporation ("NERC") and the TRE as a "user, owner and operator of the bulk-power system" under Section 215 of the Federal Power Act, and its associated contracts, tariffs and other facilities listed in Section 5.1(o) of the Company Disclosure Letter are subject to FERC jurisdiction under FERC orders. As identified in Section 5.1(o) of the Company Disclosure Letter, Oncor also holds franchises granted by municipalities and other Governmental Entities for the placement of utility facilities in or along public rights of way. Except as set forth in Section 5.1(o) of the Company Disclosure Letter, the Company and its Subsidiaries are not parties to any ongoing regulatory proceedings at the PUCT or the FERC, and the Company and its Subsidiaries are not parties to any ongoing enforcement actions by the PUCT, the FERC, the TRE or the NERC, except for such regulatory proceedings and enforcement actions that have not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

As used in this Agreement, the term "ERCOT Protocols" means the documents adopted by ERCOT, including any attachments or exhibits referenced therein, as amended from time to time that contain the scheduling, operating, planning, reliability and settlement (including customer registration) policies, rules, guidelines, procedures, standards and criteria of ERCOT including all polices, guidelines, procedures, forms, and applications contained within the "Other Binding Documents" adopted by ERCOT.

(p)    Brokers and Finders. Except as set forth in Section 5.1(p) of the Company Disclosure Letter, neither the Company nor any of its Subsidiaries has employed any agent, broker, finder or investment banker or incurred any liability for any brokerage,

finders' or other fee or commissions in connection with the Closing Date Transactions or the other transactions contemplated by this Agreement.

(q)     Real Property. Except as set forth in Section 5.1(q) of the Company Disclosure Letter or has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect, the Company and its Subsidiaries have either good title, in fee or valid leasehold, easement or other rights, to the real property, including the land, buildings, wires, pipes, structures and other improvements thereon and fixtures thereto, necessary to permit the Company and its Subsidiaries to conduct their business as currently conducted free and clear of any Liens, options, rights of first refusal or other similar encumbrances. In the case of any such real property leased by the Company or any of its Subsidiaries, except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect, there exists no uncured breach or default on the part of the Company or any of its Subsidiaries or, to the Knowledge of the Company, the landlord, under the applicable lease. There are no condemnation or eminent domain proceedings pending, or to the Knowledge of the Company threatened in writing, with respect to any real property that the Company or any of its Subsidiaries owns, leases or operates except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect.

(r)     Company Material Contracts. Section 5.1(r) of the Company Disclosure Letter lists any Contract (other than a Contract filed as an exhibit to the Company Reports) (i) that would be required to be filed by the Company or any Filing Subsidiary as a "material contract" (as such term is defined in item 601(b)(10) of Regulation S-K of the Securities Act), except for any such Contract that is a Benefit Plan, (ii) that imposes any material restriction on the right of the Company or any of its Subsidiaries to compete with any other Person or to engage or compete in any line of business or in any geographic area, or (iii) that, by its terms, (A) involves potential payments or obligations by or to the Company or any of its Subsidiaries in excess of (x) $10,000,000, in the case of the Company and its Subsidiaries other than the Oncor Entities, or (y) $150,000,000, in the case of the Oncor Entities, or (B) involves the grant to the Company or any of its Subsidiaries of any franchise or right to conduct business in any location or geographic area in which the total number of residential retail customers served by Oncor exceeds 50,000 customers or under which material revenues are generated by the Company or its Subsidiaries (each such Contract, including any Contracts entered into after the date hereof, which, if entered into prior to the date hereof, would have been required to be so listed, a "Company Material Contract"); *provided, however*, that the Company Material Contracts shall not be deemed to include any Contracts (I) if the rights and interests thereunder are to be contributed to Reorganized TCEH pursuant to the Plan of Reorganization and the Company and its Subsidiaries will not have any obligation or liability in respect thereof after the Closing or (II) that are to be fully and unconditionally terminated, discharged or rejected pursuant to the Plan of Reorganization. Except as has not had and would not have, individually or in the aggregate, a Company Material Adverse Effect, (x) each Company Material Contract is in full force and effect unless terminated in accordance with its terms (assuming the due execution, authorization, and delivery by each other party thereto), (y) other than as a result of the filing of the Chapter 11 Cases, the Company and its Subsidiaries are not in breach of, or default under, the

terms of such Company Material Contract and, to the Knowledge of the Company, no other party to a Company Material Contract is in breach of, or default under, the terms of such Company Material Contract, and (z) each Company Material Contract is a valid and binding obligation of the Company or its Subsidiary that is a party thereto and, to the Knowledge of the Company, each other party to such Company Material Contracts in accordance with its terms subject, as to enforceability in the case of clauses (x) and (z), to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles (the "Bankruptcy and Equity Exception").

(s)    Oncor Entities. Notwithstanding the covenants of the Company and EFIH set forth in Section 6.21, and without limiting those covenants, the Company and EFIH represent and warrant that the ability of the Company and EFIH to exercise control over the Oncor Entities, or cause the Oncor Entities to take any action, is only limited due to applicable Law (including the Prior PUCT Order) and the provisions set forth in the Investor Rights Agreement, the Oncor LLC Agreement and the Oncor Holdings Second Amended and Restated Limited Liability Company Agreement dated as of November 5, 2008 ("Oncor Holdings LLC Agreement," and collectively with the Oncor LLC Agreement, the "Oncor LLC Agreements" and the Oncor LLC Agreements together with the IRA, the "Oncor Agreements"). The "Prior PUCT Order" means the order issued by the PUCT on April 24, 2008 in PUCT Docket No. 34077.

(t)    Affiliate Transactions.

(i)    Except as disclosed in Section 5.1(t) of the Company Disclosure Letter, and other than those agreements and arrangements related to ordinary course employment, employee or director compensation and benefits, or employee or director incentive arrangements, no officer or director of the TCEH Entities (as defined below) is a party to any agreement, commitment or transaction with the Company or any of its Subsidiaries (excluding the TCEH Entities) or has any material interest in the Company or any of its Subsidiaries (excluding the TCEH Entities).

(ii)    Except for (x) the services to be provided under the Transition Services Agreement and (y) the goods, services and applications described in Section 5.1(t) of the Company Disclosure Letter, since December 31, 2015, no TCEH Entity has directly or indirectly, (A) provided or received material services to or from the Company or any of its Subsidiaries (excluding the TCEH Entities) or (B) billed to, or purchased a material amount of goods or other assets from, the Company or any of its Subsidiaries (excluding the TCEH Entities).

(iii)    Except as otherwise set forth in the Transition Services Agreement and the agreements disclosed in Section 5.1(t) of the Company Disclosure Letter, there are no material written agreements or arrangements whereby (x) any of the TCEH Entities currently, directly or indirectly, licenses rights to use Intellectual Property to the Company or any of its Subsidiaries (excluding the TCEH Entities), or (y) the Company or any of its Subsidiaries (excluding the TCEH

Entities) currently, directly or indirectly, licenses rights to use Intellectual Property to any of the TCEH Entities. "TCEH Entities" means collectively, (A) EFCH, TCEH, Reorganized TCEH and each of their respective Subsidiaries, (B) EFH Corporate Services and its Subsidiaries and (C) EFH Properties Company and its Subsidiaries.

(u)     Anti-Corruption; OFAC.

(i)     Since the Applicable Date, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any of their respective directors, officers or employees nor any agent or other Person acting on behalf of the Company or any of its Subsidiaries, has: (a) used any funds of the Company or any of its Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

(ii)     The operations of the Company and its Subsidiaries are, and since the Applicable Date have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar Laws (collectively, the "Money Laundering Laws"), and no action, suit or proceeding by or before any Governmental Entity or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened in writing.

(iii)     Neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any of their respective directors, officers or employees nor any agent or other Person acting with authority on behalf of the Company or any of its Subsidiaries, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

Section 5.2     Representations and Warranties of Parent and Merger Sub. Except as set forth in reasonable detail in Parent's Annual Report on Form 10-K for the year ended December 31, 2015, Parent's Quarterly Report on Form 10-Q for the quarter ended March 31, 2016 and Parent's Current Reports on Form 8-K filed since December 31, 2015, in each case, filed with the SEC prior to the date hereof and to the extent the relevance of such disclosure of any item therein is reasonably apparent from the information disclosed (other than disclosures in the "Risk Factors" sections thereof or any such disclosures included in such filings that are cautionary, predictive or forward-looking in nature) (it being agreed that such disclosures shall not be exceptions to Section 5.2(a) and 5.2(d)(i)), or in the disclosure letter delivered to the Company by Parent prior to entering into this Agreement (the "Parent Disclosure Letter") (it

51

being agreed that disclosure of any item in any section or subsection of the Parent Disclosure Letter shall be deemed disclosure with respect to any other section or subsection of the Parent Disclosure Letter to which the relevance of such item is reasonably apparent from the information disclosed, *provided that* no such disclosure shall be deemed to qualify Section 5.2(f), unless expressly set forth in Section 5.2(f), of the Parent Disclosure Letter)), Parent and Merger Sub each hereby represent and warrant to the Company and EFIH, as of the date hereof and as of the Closing Date, that:

(a)    Organization, Good Standing and Qualification. Each of Parent and Merger Sub is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, qualified or in such good standing, or to have such power or authority, has not had and would not have, individually or in the aggregate, a Parent Material Adverse Effect (as defined below). Parent has made available to the Company a complete and correct copy of the certificate of formation and operating agreement or comparable governing documents of each of Parent and Merger Sub, each as amended through the date hereof.

(b)    Capital Structure.

(i)    The authorized capital stock of Parent consists of 800,000,000 shares of Parent Common Stock, of which 461,995,594 shares of Parent Common Stock were issued and outstanding as of the date hereof and 100,000,000 shares of Serial Preferred Stock, none of which is issued or outstanding on the date hereof. All of the outstanding shares of Parent Common Stock have been duly authorized and are validly issued, fully paid and nonassessable. As of the date hereof, other than up to 4,600,000 shares of Parent Common Stock issuable pursuant to the (A) terms of outstanding awards under employee incentive awards for employees of Parent, or (B) pursuant to this Agreement, there were no options to purchase shares of Parent Common Stock issued and outstanding. Except as set forth in this Section 5.2(b) there are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, performance units, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate Parent or any of its Subsidiaries to issue or sell any shares of capital stock or other equity securities of Parent or any of its Subsidiaries or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any equity securities of Parent or any of its Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding except in connection with the Merger.

(ii)    Upon any issuance of shares of Parent Common Stock pursuant to this Agreement, such shares of Parent Common Stock will be duly authorized,

validly issued, fully paid and non-assessable, approved for listing on the NYSE, subject only to official notice of issuance, and freely saleable and not subject to any resale restrictions except to the extent such restrictions are due to the status of the holder thereof.

(c)    Corporate Authority. No vote of holders of capital stock of Parent is necessary to approve this Agreement, the Oncor Letter Agreement, the Closing Date Transactions, or the other transactions contemplated by this Agreement. Each of Parent and Merger Sub has all requisite corporate or limited liability company, as applicable, power and authority and has taken all corporate or limited liability company, as applicable, action necessary in order to execute, deliver and perform its obligations under this Agreement, the Oncor Letter Agreement and any other agreement contemplated herein to be entered into by Parent or Merger Sub. This Agreement, the Plan Support Agreement and the Oncor Letter Agreement have been duly executed and delivered by each of Parent and Merger Sub and each constitutes a valid and binding obligation of Parent and Merger Sub. This Agreement and the Oncor Letter Agreement are enforceable against each of Parent and Merger Sub in accordance with its terms, subject to the Bankruptcy and Equity Exception.

(d)    Governmental Filings; No Violations; Etc.

(i)    Other than the Vermont Insurance Approval, FERC Approval, the PUCT Approval, the FCC Approval, and filings in respect thereof and the filings and/or notices (A) pursuant to Section 1.5, (B) required as a result of facts or circumstances solely attributable to the Company or its Subsidiaries, a direct or indirect change of control thereof, or the operation of their businesses, (C) under the HSR Act and (D) under the Securities Act with respect to any registration statement to be filed with the SEC on Form S-4 (the "Form S-4") or other applicable registration statement in connection with the issuance by Parent of Parent Common Stock issuable pursuant to this Agreement, (E) under the Exchange Act, (F) under any securities or "blue sky" laws of any jurisdiction in connection with the issuance by Parent of Parent Common Stock issuable pursuant to this Agreement, and (G) with the NYSE in connection with the listing by Parent on the NYSE of the shares of Parent Common Stock issuable pursuant to this Agreement (other than those items set forth in clauses (A) and (B), all such approvals being collectively the "Parent Approvals"), no notices, reports or other filings are required to be made by Parent or Merger Sub with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by Parent or Merger Sub from, the Bankruptcy Court or any Governmental Entity in connection with the execution, delivery and performance of this Agreement by Parent and Merger Sub and the consummation by Parent and Merger Sub of the Closing Date Transactions and the other transactions contemplated by this Agreement, except those the failure of which to make or obtain has not had and would not have, individually or in the aggregate, a Parent Material Adverse Effect.

(ii)    The execution, delivery and performance of this Agreement by Parent and Merger Sub do not, and the consummation by Parent and Merger Sub of the Merger and the other transactions contemplated by this Agreement will not, constitute or result in (A) a breach or violation of, or a default under, the certificate of incorporation, certificate of formation or bylaws or comparable governing documents of Parent or Merger Sub or the comparable governing instruments of any of Parent's Subsidiaries; (B) with or without notice, lapse of time or both, a breach or violation of, a termination (or right of termination) or a default under, the creation or acceleration of any obligations or the creation of a Lien on any of the assets of Parent or any of its Subsidiaries pursuant to, any Contracts binding upon Parent or any of its Subsidiaries or any Laws or governmental or non-governmental permit or license to which Parent or any of its Subsidiaries is subject; (C) any change in the rights or obligations of any party under any such Contracts; or (D) assuming compliance with the matters referred to in Section 5.2(d)(i), a violation of any Law to which Parent or any of its Subsidiaries is subject, except, in the case of clause (B), (C) or (D) above, for any breach, violation, termination, default, creation, acceleration or change that has not had and would not have, individually or in the aggregate, a Parent Material Adverse Effect.

(e)    Parent Reports; Financial Statements.

(i)    Parent has filed or furnished, as applicable, on a timely basis, all forms, statements, certifications, reports and other documents (including exhibits, financial statements and schedules thereto, and other information incorporated therein) required to be filed or furnished by it with the SEC pursuant to the Exchange Act or the Securities Act or any Contract governing any indebtedness of Parent requiring such filings to be made since the Applicable Date (the forms, statements, certifications, reports and documents filed or furnished since the Applicable Date and those filed or furnished subsequent to the date hereof, including any amendments thereto, the "Parent Reports"). Each of the Parent Reports, including any financial statements or schedules included therein, at the time of its filing or being furnished complied or, if not yet filed or furnished, will comply in all material respects with the requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act applicable to the Parent Reports. As of their respective dates (or, if amended prior to, or after, the date hereof, as of the date of such amendment), the Parent Reports filed with or furnished to the SEC prior to the date hereof did not, and any Parent Reports filed with or furnished to the SEC subsequent to the date hereof will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. There are no outstanding or unresolved comments received from the SEC staff with respect to the Parent Reports. None of the Parent Reports is, to the knowledge of Parent, the subject of ongoing SEC review.

(ii)    Each of the consolidated balance sheets included in or incorporated by reference into the Parent Reports as amended prior to the date hereof (including the related notes and schedules) fairly presents in all material respects, or, in the case of Parent Reports filed after the date hereof, will fairly present in all material respects the financial position of Parent and its consolidated Subsidiaries as of its date (and if amended, as of the date of the last such amendment prior to the date hereof) and each of the statements of consolidated income, comprehensive income, cash flows and shareholders' equity included in or incorporated by reference into the Parent Reports (including any related notes and schedules), as finally amended prior to the date hereof, fairly presents in all material respects, or in the case of Parent Reports filed after the date hereof, will fairly present in all material respects the financial position, results of operations and cash flows, as the case may be, of Parent and its consolidated Subsidiaries for the periods set forth therein (subject, in the case of unaudited statements, to notes and normal year-end adjustments), in each case in accordance with GAAP, except as may be noted therein.

(iii)    Parent maintains internal control over financial reporting (as defined in Rule 13a-15 or 15d-15, as applicable, under the Exchange Act). Such internal control over financial reporting is effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, in each case, in all material respects. Except as has not had, or would not reasonably be expected to have, individually or in the aggregate, a material effect on the nature or reliability of the information disclosed in Parent's periodic reports filed under the Exchange Act, (A) Parent maintains disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act that are effective to ensure that information required to be disclosed by Parent is recorded and reported on a timely basis to the individuals responsible for the preparation of Parent's filings with the SEC and other public disclosure documents (including Parent's chief executive officer and chief financial officer) and (B) Parent has not disclosed, and is not required to disclose, based on its most recent evaluation prior to the date of this Agreement, to Parent's outside auditors and the audit committee of Parent's board of directors, and has not had, (1) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that are reasonably likely to adversely affect Parent's ability to record, process, summarize and report financial information and (2) any fraud, known to Parent, whether or not material, that involves management or other employees who have a significant role in Parent's internal controls over financial reporting.

(iv)    Except as has not had and would not have, individually or in the aggregate, a Parent Material Adverse Effect, each of Parent and its Subsidiaries is in compliance with the applicable provisions of the Sarbanes-Oxley Act. Without limiting the generality of the foregoing, neither Parent nor any of its Subsidiaries is a party to, or has a commitment to become a party to, any joint venture, off-balance sheet partnership or any similar Contract or arrangement (including any

55

Contract or arrangement relating to any transaction or relationship between or among Parent or any of its Subsidiaries, on the one hand, and any unconsolidated Affiliate, including any structured finance, special purpose or limited purpose entity or Person, on the other hand) or any "off-balance sheet arrangements" (as defined in Item 303(a) of Regulation S-K of the SEC), where the result, purpose or effect of such Contract or arrangement is to avoid disclosure of any material transaction involving, or material liabilities of, Parent or any of its Subsidiaries in the Parent Reports or the financial statements included therein.

(f)     Absence of Certain Changes. Since December 31, 2015, there has not occurred a Parent Material Adverse Effect. Neither Parent nor any of its Subsidiaries has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise), other than liabilities and obligations (A) set forth in Parent's consolidated balance sheet as of December 31, 2015, including the notes thereto, included in the Company Reports, (B) incurred in the ordinary course of business consistent with past practice since December 31, 2015, (C) incurred in connection with the Closing Date Transactions or any other transaction or agreement contemplated by this Agreement, (D) pursuant to any Contract that would be required to be filed by Parent as a "material contract" (as such term is defined in item 601(b)(10) of Regulation S-K of the Securities Act, except for any such Contract that is a Benefit Plan) or that was or is material to the business, operations or financial condition of Parent and its Subsidiaries, taken as a whole (but not including any liability for breach thereunder), or (E) that has not had and would not have, individually or in the aggregate, have a Parent Material Adverse Effect.

For purposes of this Agreement "Parent Material Adverse Effect" means (i) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with all other facts, events, changes, effects, developments, circumstances or occurrences, has had or would reasonably be expected to have a material and adverse effect on, or change in, the financial condition, business, assets, liabilities or results of operations of Parent and its Subsidiaries, taken as a whole (for the avoidance of doubt any reference in any provision hereof to any item that "would have a Parent Material Adverse Effect", or any similar phrase, shall be interpreted as "individually or in the aggregate, has had or would be reasonably be expected to have, a Parent Material Adverse Effect" (and such interpretation shall extend to the negative expression of such phrase, or any similar phrase, *mutatis mutandis*), or (ii) anything that prevents, materially restricts, or materially impairs Parent or Merger Sub from consummating the Closing Date Transactions; *provided, however*, that, none of the following shall constitute or be taken into account in determining whether there has been or is a Parent Material Adverse Effect:

(i)     (x) changes or developments in general economic or political conditions or the securities, credit or financial markets, in general, globally or outside of or in the U.S. or in the State of Texas or (y) changes that are the result of acts of war or terrorism or any hurricane, tornado, tsunami, flood, earthquake or other natural disaster or other weather-related event, circumstance or development (other than such acts of war or terrorism or any hurricane, tornado, tsunami, flood, earthquake or other natural disaster or other weather-related event,

56

circumstance or development that cause any physical damage or destruction to or render physically or operationally unusable any facility or property of Parent, Merger Sub or any of their respective Subsidiaries);

(ii)    any adoption, implementation, promulgation, repeal, modification, reinterpretation or proposal of any rule, regulation, ordinance, order, protocol or any other Law of or by any national, regional, state or local regulatory Governmental Entity (including, for the avoidance of doubt, the RTOs);

(iii)    changes or developments generally affecting electric transmission or distribution systems (other than changes or developments that render operationally unusable any facility or property of Parent or Merger Sub or any of their respective Subsidiaries);

(iv)    changes or developments that are the result of factors generally affecting any industry in which Parent or its Subsidiaries operate;

(v)    any loss or threatened loss of, or adverse change or threatened adverse change in, the relationship of Parent or any of its Subsidiaries with its customers, employees, regulators, financing sources or suppliers to the extent caused by the pendency or the announcement of the transactions contemplated by this Agreement or Plan of Reorganization;

(vi)    changes, effects or developments to the extent relating to the entry into this Agreement, the performance of actions or obligations required to be taken by a party hereunder or consented to in writing by the Company and EFIH, including any change in Parent's or any of its Subsidiaries' credit ratings to the extent resulting therefrom;

(vii)    changes or developments in GAAP or authoritative interpretation thereof after the date hereof; and

(viii)    any failure by Parent or any of its Subsidiaries to meet any internal or public projections or forecasts or estimates of revenues or earnings for any period, in and of itself, *provided* that the exception in this clause shall not prevent or otherwise affect a determination that any change, effect or development underlying such failure has resulted in, or contributed to, a Parent Material Adverse Effect;

*provided, further*, that (x) facts, events, changes, effects, developments, circumstances or occurrences set forth in clauses (i) through (iv) above may be taken into account in determining whether there has been or is a Parent Material Adverse Effect to the extent such matters, changes, effects or developments have a disproportionate and adverse effect on Parent and its Subsidiaries, taken as a whole, as compared to other entities engaged in the relevant business in Texas or other relevant geographic area and (y) any condition or requirement attached to any order or approval issued by the PUCT, FERC or FCC that is necessary or was sought in order to consummate the transactions contemplated by this Agreement, and/or the Plan of Reorganization (solely as the Plan of Reorganization

57

relates to the E-Side Debtors) shall not constitute, or be deemed to contribute, to a Parent Material Adverse Effect.

(g)    Litigation. There are no civil, criminal or administrative actions, suits, complaints, enforcement actions, penalty assessments, claims, hearings, arbitrations, investigations, inquiries, audits or other proceedings (formal or informal, public or non-public) pending or, to the knowledge of Parent, threatened in writing against Parent or any of its Subsidiaries, in each case that, individually or in the aggregate, has had or would have a Parent Material Adverse Effect. None of Parent or any of its Subsidiaries is a party to or subject to the provisions of any judgment, settlement, order, writ, injunction, decree or award of any Governmental Entity specifically imposed upon Parent, any of its Subsidiaries or any of their respective businesses, assets or properties which, individually or in the aggregate, has had or would have a Parent Material Adverse Effect.

(h)    Available Funds. Parent and Merger Sub currently have available to them, and on or before the Effective Time, will have available to them, (i) all funds necessary to satisfy Parent's and Merger Sub's obligations to consummate the Merger and the other transactions required of it by this Agreement, including funding the Merger Sub Cash Amount, the DIP Repayment and the payment of all of Parent's and Merger Sub's fees and expenses related to the foregoing and to satisfy all other payment obligations required to be paid or satisfied by Parent or Merger Sub in connection therewith, and (ii) the authority to issue shares of Parent Common Stock necessary to effect the Merger described in Section 1.4. Parent and Merger Sub acknowledge and agree that the consummation of the DIP and Second Lien Note Repayments, the Merger, and the other transactions contemplated by this Agreement, is not conditional upon the receipt by Parent or Merger Sub or availability of the proceeds of any financing and that any failure by Parent or Merger Sub to consummate the Merger on the Closing Date (*provided* that at such time the conditions to the Closing set forth in Section 7.1 and 7.2 are otherwise satisfied or are to be satisfied at the Closing), by reason of absence of financing, shall constitute a breach by Parent and/or Merger Sub of this Agreement.

(i)    Merger Sub. All of the issued and outstanding membership interests of Merger Sub are validly issued and outstanding and are, and at the Effective Time will be, owned by Parent. Merger Sub has not conducted any business prior to the date hereof and has no, and prior to the Effective Time will have no, assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement.

(j)    Brokers. No agent, broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Parent or Merger Sub for which the Company could have any liability prior to the Effective Time.

(k)    Taxes. Merger Sub is classified as a disregarded entity and as a division of Parent for federal income tax purposes. Parent is classified as a corporation for federal income tax purposes. Parent and Merger Sub have not taken or agreed to take any action, and are not aware of any facts or circumstances, in each case, that would prevent or

58

impede, or would reasonably be expected to prevent or impede, the Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code.

(l)    Regulatory Status. Parent is a public utility holding company under the Public Utility Holding Company Act of 2005 ("PUHCA"). Merger Sub is not a public utility holding company under PUHCA. Neither Parent nor Merger Sub is a public utility under the Federal Power Act.

(m)    Oncor Entities. Parent and Merger Sub acknowledge that the ability of the Company and EFIH to exercise control over the Oncor Entities, or cause the Oncor Entities to take any action, is limited due to applicable Law and the provisions set forth in the Oncor Agreements.

(n)    Certain Subsidiaries. Parent and Merger Sub acknowledge and agree that, for purposes of determining the satisfaction of the condition set forth in Section 7.2(a), none of the representations and warranties of the Company and EFIH in this Agreement shall be deemed to be untrue, or fail to be true, due to the existence of any liability of a Spin-Off Entity or any other Subsidiary of the Company that will dissolve, liquidate, merge out of existence or be abandoned in accordance with the Plan of Reorganization and applicable Law, in each case which will be fully and unconditionally discharged at or prior to the Effective Time pursuant to the Plan of Reorganization or otherwise.

(o)    Disclaimer of Other Representations and Warranties. EACH OF PARENT AND MERGER SUB (INDIVIDUALLY AND ON BEHALF OF THEIR RESPECTIVE SUBSIDIARIES) ACKNOWLEDGES AND AGREES THAT NEITHER THE COMPANY NOR ANY OF ITS SUBSIDIARIES MAKES ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE ONCOR LETTER AGREEMENT, AS APPLICABLE, OR IN ANY CERTIFICATE DELIVERED BY THE COMPANY OR ITS SUBSIDIARIES TO PARENT IN ACCORDANCE WITH THE TERMS HEREOF OR THE ONCOR LETTER AGREEMENT, AND SPECIFICALLY (BUT WITHOUT LIMITING THE GENERALITY OF THE FOREGOING) THAT NEITHER THE COMPANY NOR ANY OF ITS SUBSIDIARIES MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO (X) ANY PROJECTIONS, ESTIMATES OR BUDGETS OF THE COMPANY AND ITS SUBSIDIARIES DELIVERED OR MADE AVAILABLE TO PARENT (OR ANY OF ITS AFFILIATES, OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES OR REPRESENTATIVES) OF FUTURE REVENUES, RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), CASH FLOWS OR FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF THE COMPANY AND/OR ANY OF ITS SUBSIDIARIES OR (Y) THE FUTURE BUSINESS AND OPERATIONS OF THE COMPANY AND/OR ANY OF ITS SUBSIDIARIES.

## ARTICLE VI
### Covenants

Section 6.1    <u>Interim Operations</u>.

    (a)    Each of the Company and EFIH covenants and agrees as to itself and each of its Subsidiaries (other than the Oncor Entities and other than with respect to any entities, assets or liabilities to be contributed to Reorganized TCEH in the Reorganized TCEH Contributions or pursuant to the Plan of Reorganization) that, except (i) as otherwise specifically permitted or required by the provisions of this Agreement and the Plan of Reorganization, and any action reasonably necessary to effectuate the Reorganized TCEH Spin-Off, the Reorganized TCEH Contributions, the Preferred Stock Sale and the Reorganized TCEH Conversion, (ii) as Parent may approve in writing (such approval, not to be unreasonably withheld, delayed or conditioned), (iii) as is required by any applicable Law or any Governmental Entity; provided that, to the extent legally permissible, the Company or EFIH shall provide prompt written notice to Parent of any such requirement; (iv) as set forth in <u>Section 6.1(a)</u> of the Company Disclosure Letter, or (v) as required by the Bankruptcy Court in the Chapter 11 Cases without any of the Debtors having requested or applied (or having requested that any of their respective Affiliates make such request or application) for the Bankruptcy Court to impose such requirement (and with the Company and EFIH, to the extent requested by Parent prior to such imposition, having used commercially reasonable efforts to challenge such imposition before the Bankruptcy Court), in each case after the date hereof and prior to the earlier of the Termination Date (as defined below) and the Effective Time, each of the Company and EFIH shall, and shall cause each of their respective Subsidiaries (other than the Oncor Entities and other than with respect to any entities, assets or liabilities to be contributed to Reorganized TCEH in the Reorganized TCEH Contributions or the Plan of Reorganization) to, conduct its business and the Chapter 11 Cases in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court and use its reasonable best efforts to preserve its business organizations intact, and maintain existing relations and goodwill with Governmental Entities, customers, suppliers, employees and business associates. Notwithstanding the foregoing, from the date of this Agreement until the earlier of the Termination Date and the Effective Time, except (A) as otherwise specifically permitted or required by the provisions of this Agreement and the Plan of Reorganization, and any action reasonably necessary to effectuate the Reorganized TCEH Spin-Off, the Reorganized TCEH Contributions, the Preferred Stock Sale and the Reorganized TCEH Conversion, (B) as Parent may approve in writing (such approval, not to be unreasonably withheld, delayed or conditioned), (C) as is required by any applicable Law or any Governmental Entity, (D) as set forth in <u>Section 6.1(a)</u> of the Company Disclosure Letter or (E) as required by the Bankruptcy Court in the Chapter 11 Cases without any of the Debtors having requested or applied (or having requested that any of their respective Affiliates make such request or application) for the Bankruptcy Court to impose such requirement (and with the Company and EFIH, to the extent requested by Parent prior to such imposition, having used commercially reasonable efforts to challenge such imposition before the Bankruptcy Court), each of the Company and EFIH will not and will not permit any of its respective Subsidiaries (other than the Oncor Entities and other than with respect to any asset, liability or entity to be

60

contributed to Reorganized TCEH in the Reorganized TCEH Contributions or pursuant to the Plan of Reorganization) to:

       (i)     adopt any change in its certificate of incorporation, bylaws, limited liability company agreement or other applicable governing instruments;

       (ii)    merge or consolidate with any other Person;

       (iii)   adopt a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization other than the Plan of Reorganization;

       (iv)   make any acquisition of any assets or Person for a purchase price individually or in the aggregate in excess of $10,000,000;

       (v)    issue, sell, pledge, dispose of, grant, transfer, lease, license, guarantee, encumber or authorize the issuance, sale, pledge, disposition, grant, transfer, lease, license, guarantee or encumbrance of any shares of its capital stock or other equity interests (other than (A) the issuance of shares of EFH Common Stock upon the settlement of awards under the Company Stock Plans (and dividend equivalents thereon, if applicable), (B) the issuance of equity interests by a wholly owned Subsidiary of the Company to the Company or another wholly owned Subsidiary of the Company, or (C) pursuant to the modification, replacement, refunding, renewal, extension or refinancing of EFIH's first lien debtor-in-possession financing facility or the modification, replacement, refunding, renewal, extension or refinancing thereof (*provided* that any modification, replacement, refunding, renewal, extension or refinancing shall not be for an amount greater than the then current outstanding principal amount thereof except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refunding, renewal, extension or refinancing), or, securities convertible or exchangeable into or exercisable for any shares of such capital stock or other equity interests, or any options, warrants or other rights of any kind to acquire any shares of such capital stock or other equity interests or such convertible or exchangeable securities;

       (vi)   make any loans, advances or capital contributions to, or investments in, any Person (other than in or to the Company or any direct or indirect wholly owned Subsidiary of the Company) individually or in the aggregate in excess of $10,000,000;

       (vii)  declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock or other equity interests (except for dividends paid by any direct or indirect wholly owned Subsidiary to the Company or to any other direct or indirect wholly owned Subsidiary of the Company) or enter into any agreement with respect to the voting of its capital stock or other equity interests or take any action that

would result in the Company or any of its Subsidiaries becoming subject to any restriction not in existence on the date hereof with respect to the payment of distributions or dividends;

(viii)    reclassify, split, combine or subdivide, directly or indirectly, any of its capital stock, equity interests or securities convertible or exchangeable into or exercisable for any shares of its capital stock or equity interests;

(ix)    repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any of its capital stock or equity interests or any securities of convertible into or exchangeable or exercisable for capital stock or equity interests, or any warrants, calls, options or other rights to acquire any such capital stock, securities or interests;

(x)    repurchase, redeem, defease, cancel, prepay, forgive, issue, sell, incur or otherwise acquire any indebtedness for borrowed money or any debt securities or rights to acquire debt securities, of the Company or any of its Subsidiaries other than pursuant to the Plan of Reorganization, or assume, guarantee or otherwise become responsible for such indebtedness of another Person (other than a wholly owned Subsidiary of the Company), except for indebtedness for borrowed money (A) incurred or repaid under EFIH's first lien debtor-in-possession financing facility or the modification, replacement, refunding, renewal, extension, repayment or refinancing (subject to clause (v) above) thereof, in each case, to the extent approved by the Bankruptcy Court in the Chapter 11 Cases, or (B) incurred by drawing under outstanding letters of credit;

(xi)    (A) grant to any Employee or any member of the board of directors (or similar governing body) or consultant any increase in compensation or benefits other than increases in the ordinary course of business, (B) grant to any Employee or any member of the board of directors (or similar governing body) or consultant any increase in change in control, severance or termination pay, (C) amend in any material respect or terminate any Assumed Plan or the EFH Retirement Plan or related agreement thereunder or establish, adopt, enter into any plan or related agreement that would be a Benefit Plan if in existence on the date hereof and, in the case of a Contributed Plan, other than in the ordinary course of business, or with respect to any actions taken to terminate and wind-down any Discharged Plan or as otherwise required under the terms of this Agreement, (D) take any action to accelerate the time of vesting, funding or payment of any compensation or benefits under any Assumed Plan or EFH Retirement Plan or related agreement thereunder (or any plan or related agreement that would be an Assumed Plan if in existence on the date hereof); *provided* that with respect to the EFH Retirement Plan, such actions may be taken between the date hereof and the effective date of the Split Participant Agreement that are consistent with that certain Separation Agreement between TXU Corporation and Oncor Holdings dated October 10, 2007, and *provided further* that with respect to the Discharged Plans, such actions may be taken that are in

furtherance of the confirmation of a plan of reorganization or the termination and wind-down of such Discharged Plans, (E) grant any new awards, or any outstanding awards, under any Assumed Plan or related agreement thereunder (or any plan or related agreement that would be an Assumed Plan if in existence on the date hereof), or (F) enter into or amend any collective bargaining agreement or other agreement with a labor union, works council or similar organization, except in the case of the foregoing clauses (A) through (F) for actions required pursuant to the terms of any Benefit Plan, or in accordance with the terms and conditions of this Agreement or applicable Law; provided, however, that following the date of this Agreement, the Company and EFIH may, and may permit any of their respective Subsidiaries to, hire any individual or engage any individual, as an interim employee through a third party staffing agency or as an independent contractor or consultant, with such engagements to end in all instances prior to the Closing Date, to the extent reasonably necessary for the Company's operations between the TCEH Effective Date and the Closing, and may, notwithstanding anything contained in this Agreement to the contrary, provide compensation and benefits that, for all such persons as a group, (i) does not exceed $15,000,000 in the aggregate in any annual period and (ii) does not impose any liability on the reorganized Company and its Subsidiaries following the Closing;

(xii)    make or authorize any capital expenditure in an amount in excess of $1,000,000, in the aggregate, during any 12 month period;

(xiii)    make any material changes with respect to its financial accounting methods, principles, policies, practices or procedures, except as required by Law or by changes in GAAP;

(xiv)    make (excluding any elections made (a) in the ordinary course of business or (b) under Section 168(k) of the Code) or change any material Tax election, change any material method of Tax accounting, settle or compromise any material Tax liability, claim or assessment or agree to an extension or waiver of the limitation period to any material Tax claim or assessment, grant any power of attorney with respect to material Taxes, enter into any closing agreement with respect to any material Tax or refund, amend any material Tax Return, or surrender any right to claim a material Tax Refund of the Company or any of its Subsidiaries, in each case, other than with respect to any such actions agreed to in connection with any audit or other Tax proceedings disclosed in Section 6.1(a)(xiv) of the Company Disclosure Letter; provided, however, that the full details of any such actions shall be disclosed to Parent if such actions would result in the inclusion of any material item of income in, or the exclusion of any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date which taxable income was realized (and reflects economic income arising) prior to the Closing Date;

(xv)    waive, release, assign, settle or compromise any pending or threatened claim, action, suit or proceeding against the Company or any of its Subsidiaries other than settlements or compromises (A) that would result in the

63

payment by the Company and its Subsidiaries of less than $10,000,000 in the aggregate, and (B) that do not entail the acceptance or imposition of any material restrictions on the business or operations of the Company or its Subsidiaries;

(xvi)   transfer, sell, lease, license, mortgage, pledge, surrender, encumber, divest, cancel, abandon or allow to lapse or expire or otherwise dispose of any assets, product lines or businesses of the Company or its Subsidiaries with a fair market value in excess of $10,000,000 in the aggregate for all such actions, other than (A) sales of obsolete goods or equipment, or (B) cancellation of, abandonment of, allowing to lapse or expire, or the licensing or sublicensing of, material Intellectual Property, in each of (A) and (B) , in the ordinary course of business consistent with past practice or in accordance with the Bankruptcy Code or the orders of the Bankruptcy Court; *provided, however*, that in no event shall the Company or any of its Subsidiaries (other than the Oncor Entities) transfer, sell, lease, license, mortgage, pledge, surrender, encumber, divest, cancel, abandon or allow to lapse or expire or otherwise dispose of any capital stock or other equity interests of any of their respective Subsidiaries other than in connection with the modification, replacement, refunding, renewal, extension or refinancing (subject to clause (v) above) of EFIH's first lien debtor-in-possession financing facility;

(xvii)  except as permitted by clause (v)(C) above, enter into, terminate (other than at the end of a term), renew or materially extend or amend any Company Material Contract or Contract (other than the Interim TSA (as such is defined in the Separation Agreement) that, if in effect on the date hereof, would be a Company Material Contract; or waive any material default under, or release, settle or compromise any material claim against the Company or any of its Subsidiaries or liability or obligation owing to the Company or any of its Subsidiaries, under any Company Material Contract or Contract (other than the Interim TSA)) that, if in effect on the date hereof, would be a Company Material Contract, other than pursuant to the Plan of Reorganization;

(xviii) enter into any Contract that contains a change of control or similar provision that would require a payment to any Person counterparty thereto in connection with the consummation of the transactions contemplated by this Agreement that would not otherwise be due;

(xix)   fail to maintain in full force and effect material insurance policies covering the Company and its Subsidiaries (other than the Oncor Entities) and their respective properties, assets and businesses in a form and amount consistent with past practice; or

(xx)    agree, authorize or commit to do any of the foregoing.

(b)     Notwithstanding anything in Section 6.1(a) to the contrary, the Company and its Subsidiaries may take commercially reasonable actions consistent with prudent industry practices that would otherwise be prohibited pursuant to Section 6.1(a) in order

64

to prevent the occurrence of, or mitigate the existence of, an emergency situation involving endangerment of life, human health, safety or the Environment or the protection of equipment or other assets; *provided, however*, that the Company shall provide Parent with notice of such emergency situation and any such action taken by the Company or any of its Subsidiaries (other than the Oncor Entities) as soon as reasonably practicable after obtaining Knowledge thereof.

(c)    Except for actions required, or specifically permitted, under the terms of this Agreement or the Plan of Reorganization or as required by the Bankruptcy Code or the Bankruptcy Court in the Chapter 11 Cases without any of the Debtors having requested or applied (or having requested that any of their respective Affiliates make such request or application) for the Bankruptcy Court to impose such requirement (and with the Company and EFIH, to the extent requested by Parent prior to such imposition, having used commercially reasonable efforts to challenge such imposition before the Bankruptcy Court), and subject to Sections 6.19, 6.20 and 6.21, none of Parent, Merger Sub, the Company or EFIH shall intentionally take (or fail to take if required by this Agreement, the Plan of Reorganization, the Plan Support Agreement, any Governmental Entity, the Bankruptcy Court, applicable Law or contractual obligation) or permit any of its Subsidiaries to take (or fail to take if required by this Agreement, the Plan of Reorganization, the Plan Support Agreement, any Governmental Entity, the Bankruptcy Court, applicable Law or contractual obligation) any action that if taken (or failed to be taken) would reasonably be expected to prevent or impair in any material respect the consummation of the Closing Date Transactions or the Minority Interest Acquisition or the IPO Conversion Plan.

(d)    Nothing contained in this Agreement is intended to give Parent, directly or indirectly, the right to control or direct the Company's or its Subsidiaries' operations prior to the Effective Time.

Section 6.2    Acquisition Proposals.

(a)    (i) Notwithstanding anything to the contrary herein, during the period beginning at the date of this Agreement and continuing until the entry of the Approval Order, the Company and EFIH and their respective directors, officers, employees, investment bankers, attorneys, accountants and other advisors, agents or representatives (collectively, "Representatives") shall have the right to: (x) solicit, initiate, encourage, induce or facilitate Acquisition Proposals, including by way of providing access to non-public information concerning the Company or its Subsidiaries to any Person pursuant to an Acceptable Confidentiality Agreement (as defined below); *provided that*, to the extent not previously made available to Parent, the Company and EFIH shall substantially concurrently make available to Parent and Merger Sub any material non-public information concerning the Company or its Subsidiaries that is provided by or on behalf of the Company or any of its Subsidiaries (or the Oncor Entities to the extent Parent is aware of the Oncor Entities providing such information) to any such Person which was not previously made available to Parent or Merger Sub; (y) enter into, maintain or continue discussions or negotiations with respect to Acquisition Proposals or otherwise cooperate with or assist or participate in, or facilitate any such inquiries, proposals,

discussions or negotiations; and (z) adopt, approve or recommend or propose to adopt, approve or recommend (publicly or otherwise) any such Acquisition Proposal which the Company Board or the board of managers of EFIH determines in good faith (after consultation with their independent financial advisor and outside legal counsel, and based on the advice of such counsel) is, or is reasonably likely to lead to, a Superior Proposal.

(ii) Notwithstanding anything to the contrary herein, and subject to compliance with the other provisions of this Section 6.2, during the period beginning at the entry of the Approval Order and continuing until the entry of the EFH Confirmation Order, the Company and EFIH and their Representatives shall have the right to: (x) (A) continue discussions or negotiations with respect to Acquisition Proposals with any Person (*provided, that* such Persons is a party to an Acceptable Confidentiality Agreement (as defined below)) that has submitted prior to the entry of the Approval Order a written indicative bid that the Company or EFIH is in active negotiations over at the time of the entry of the Approval Order, and (B) have discussions or negotiations with (or otherwise encourage or facilitate) any Person that submits an unsolicited bona fide written Acquisition Proposal that did not arise from a breach of this Section 6.2 which the Company Board or the EFIH board of managers determines in good faith (in each case, after consultation with their independent financial advisor and outside legal counsel, and based on advice of such counsel) is, or is reasonably likely to lead to a Superior Proposal; *provided, that* such Persons are party to an Acceptable Confidentiality Agreement; (y) provide access to non-public information concerning the Company or its Subsidiaries (including providing access to an online or physical dataroom) to any such Person; *provided, that,* to the extent not previously made available to Parent, the Company and EFIH shall substantially concurrently make available to Parent and Merger Sub any material non-public information concerning the Company or its Subsidiaries that is provided by or on behalf of the Company or any of its Subsidiaries (or the Oncor Entities to the extent that Parent is aware of the Oncor Entities providing such information) to any such Person which was not previously made available to Parent or Merger Sub; and (z) adopt, approve or recommend or propose to adopt, approve or recommend (publicly or otherwise) any such Acquisition Proposal which the Company Board or the board of managers of EFIH determines in good faith (after consultation with their independent financial advisor and outside legal counsel, and based on advice of such counsel) is a Superior Proposal.

(b)    Except as expressly permitted pursuant to Section 6.2(a), at the time of entry of the Approval Order the Company and EFIH shall, and shall cause their Subsidiaries (other than the Oncor Entities, subject to Section 6.21) to, and the Company, EFIH and such Subsidiaries shall cause their respective Representatives to, immediately (w) cease and cause to be terminated all existing discussions or negotiations with, and all ongoing solicitations of, any Person with respect to any Acquisition Proposal, (x) not to initiate, encourage, induce or facilitate any inquiry or proposal that is reasonably expected to lead to an Acquisition Proposal, (y) instruct the prompt return or destruction of all confidential information previously furnished to any Person by or on behalf of the Company or EFIH or their respective Subsidiaries in connection with an Acquisition Proposal or any inquiry or proposal that could reasonably be expected to lead to an Acquisition Proposal (other than with respect to any Person that the Company and EFIH

are permitted to continue to negotiate with pursuant to Section 6.2(a)(ii)) and (z) terminate all physical and electronic dataroom access previously granted to any Person by or on behalf of the Company or EFIH or their respective Subsidiaries in connection with an Acquisition Proposal or any inquiry or proposal that could reasonably be expected to lead to an Acquisition Proposal (other than with respect to any Person that the Company and EFIH are permitted to continue to negotiate with pursuant to Section 6.2(a)(ii)), other than in each case, and solely in connection with this Agreement or any other proposal from Parent, the Company, its Subsidiaries and their respective Representatives.

(c)    Except as expressly permitted pursuant to Section 6.2(a), from the entry of the Approval Order until the earlier of the Termination Date or the Closing Date, the Company and EFIH shall not, and shall cause their Subsidiaries (other than the Oncor Entities, subject to Section 6.21) not to, and the Company, EFIH and such Subsidiaries shall cause their respective Representatives not to, (i) directly or indirectly solicit, initiate, encourage, or knowingly induce or knowingly facilitate any Acquisition Proposal, or any inquiry or proposal that is reasonably expected to lead to an Acquisition Proposal, or (ii) directly or indirectly participate in any discussions or negotiations with any Person regarding, or furnish to any Person, any information with respect to, or cooperate in any way with any Person with respect to, any Acquisition Proposal, or any inquiry or proposal that is reasonably expected to lead to an Acquisition Proposal, other than in each case, and solely in connection with this Agreement or any other proposal from Parent, the Company, its Subsidiaries and their respective Representatives.

(d)    Except as set forth in Section 6.2(e), neither the Company Board nor the EFIH board of managers, nor any committee thereof shall allow the Company or EFIH, as the case may be, or any of their respective Subsidiaries (other than the Oncor Entities, subject to Section 6.21) to execute or enter into, any binding letter of intent, memorandum of understanding, term sheet, agreement or commitment (other than an Acceptable Confidentiality Agreement), that constitutes an Acquisition Proposal, or requires, or would reasonably be expected to cause, the Company or EFIH to terminate this Agreement (a "Company Acquisition Agreement").

(e)    Prior to the Company or EFIH, as applicable, terminating this Agreement pursuant to Section 8.3(e) or Section 8.3(f), as the case may be, (A) the Company shall provide prior written notice to Parent of the submission of any Acquisition Proposal for which the Company or EFIH is prepared to terminate this Agreement at least three (3) Business Days prior to terminating this Agreement, which notice shall specify the material terms and conditions of any such Acquisition Proposal, the identity of the Person making such Acquisition Proposal and a copy of the most current draft of each Company Acquisition Agreement related thereto ("Company Notice") (it being understood that neither the Company nor EFIH shall enter into any agreement or commitment which prohibits the Company or EFIH, as a condition of an Acquisition Proposal or as a condition to the submission of an Acquisition Proposal, from furnishing the Company Notice), and (B) the Company Board or the board of managers of EFIH, as the case may be, shall have determined in good faith (in each case, after consultation with its independent financial advisor and outside legal counsel, and based on advice of such counsel) that such Acquisition Proposal is a Superior Proposal, and after such three (3)

Business Days the Company Board or the board of managers of EFIH, as the case may be, may terminate this Agreement pursuant to <u>Section 8.3(e)</u> or <u>Section 8.3(f)</u>, as applicable and enter into a Company Acquisition Agreement, if concurrently with such termination, it determines in its sole discretion after consultation with its independent financial advisor and outside legal counsel, and based on advice of such counsel, that such Acquisition Proposal is a Superior Proposal and, that as a result, the failure to terminate this Agreement is inconsistent with its fiduciary duties. In determining whether to terminate this Agreement pursuant to <u>Section 8.3(e)</u> or <u>Section 8.3(f)</u>, the relevant board shall take into account all changes to the terms of this Agreement proposed by Parent after the date hereof in response to such a Company Notice, and any other information deemed relevant or appropriate by such board. The obligations set forth in this <u>Section 6.2(e)</u> are in addition to those set forth in the other provisions of this <u>Section 6.2</u>, including for the avoidance of doubt <u>Section 6.2(f)</u>.

(f)        Following the entry of the Approval Order, the Company or EFIH shall as promptly as reasonably practicable (i) and in any event before engaging in, or continuing, any material discussions with any Person (or its Representatives) who submits, or has submitted, an Acquisition Proposal, or providing material information to such Person (or its Representatives), enter into an Acceptable Confidentiality Agreement with such Person (to the extent an Acceptable Confidentiality Agreement is not already in effect with such Person), and advise Parent in writing of each such Acquisition Proposal, the material terms and conditions of any such Acquisition Proposal (including any material changes to such material terms and conditions promptly after receipt thereof) and provide to Parent a copy of each Company Acquisition Agreement relating to such Acquisition Proposal and the identity of such Person and its Representatives; (ii) make available to Parent and Merger Sub any material information that it or its Representatives make available to each such Person described in preceding clause (i) or its Representatives which was not previously made available to Parent or Merger Sub, concurrently with the making available of such information to such Person or its Representatives; and (iii) inform Parent and Merger Sub of any material developments with respect to each Acquisition Proposal described in this sentence.  The obligations set forth in this <u>Section 6.2(f)</u> shall apply with respect to any Acquisition Proposal submitted before or after the date hereof, and the Company and EFIH acknowledge and agree that, to the extent an Acquisition Proposal which meets the requirements for discussions or other actions to occur as contemplated by this <u>Section 6.2</u> is submitted by or on behalf of a Person with whom the Company or any of its Subsidiaries has previously entered a confidentiality agreement, such obligations set forth in this <u>Section 6.2(f)</u> may require an amendment to such agreement in order for such Acquisition Proposal to be pursued by the Company or EFIH.  To the extent that Parent or any of its Affiliates receive the identity of any other potential acquiror from the Company or EFIH pursuant to this Section 6.2, the recipient thereof shall maintain the confidentiality of such identity, and shall only share such identity with its legal advisors for purposes of receiving legal advice.

(g)        Notwithstanding anything to the contrary herein, during the period beginning at the date of the entry of the Confirmation Order and continuing until the earlier of the Termination Date or the Closing Date, the Company and EFIH and their Representatives shall have the right to: (x) solicit, initiate, encourage, induce or facilitate

Backup Plan Proposals, including by way of providing access to non-public information concerning the Company or its Subsidiaries to any Person pursuant to an Acceptable Confidentiality Agreement; (y) enter into, maintain or continue discussions or negotiations with respect to Backup Plan Proposals or otherwise cooperate with or assist or participate in, or facilitate any such inquiries, proposals, discussions or negotiations; and (z) adopt, approve, recommend, or enter into a definitive agreement with respect to or propose to adopt, approve, recommend, or enter into a definitive agreement with respect to (publicly or otherwise) any such Backup Plan Proposal; *provided*, *however*, that the Company and EFIH shall use commercially reasonable efforts (x) to keep confidential any solicitation, negotiation, facilitation, and documentation by any Debtor of a Backup Plan Proposal and (y) to enter into confidentiality agreements with any counterparty to any agreement regarding support for and/or financing of a Backup Plan Proposal, which confidentiality agreement provides that the existence and terms of such Backup Plan Proposal shall be kept confidential and shall not be publicly disclosed, except in each case to the extent required by applicable Law.

(h)    For purposes of this Agreement:

"Acceptable Confidentiality Agreement" means a confidentiality agreement that contains provisions that are not less favorable in the aggregate to the Company than those contained in the Confidentiality Agreement and, solely to the extent executed after the date of this Agreement, does not prohibit the Company or any of its Subsidiaries from providing information to Parent that Parent is expressly entitled to receive from the Company in accordance with this Section 6.2.

"Acquisition Proposal" means any inquiry, proposal or offer from or by a Person (other than Parent or any of its Subsidiaries and their respective agents and Representatives) with respect to (i) a merger, acquisition, consolidation, dissolution, equitization, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination or similar transaction involving the Company and/or one or more of its Subsidiaries, or (ii) any other transaction involving the Company and/or one or more of its Subsidiaries which results in the direct or indirect acquisition of more than 20% of the assets of the Company and its Subsidiaries on a consolidated basis or in the direct or indirect acquisition of more than 20% of the equity interests or voting power of the Company, EFIH or any of the Oncor Entities *provided*, *however*, that a Backup Plan Proposal (as defined below) shall not constitute an Acquisition Proposal.

"Backup Plan Proposal" means an any inquiry, proposal or offer that (i) would constitute an Acquisition Proposal (including, for the avoidance of doubt, a standalone plan of reorganization negotiated with existing creditors of the Company or EFIH) but for its express exclusion from the definition of Acquisition Proposal and, (ii) by its terms, contemplates consummation or closing of such Backup Plan Proposal only after

termination of this Agreement other than a termination arising as a result of the adoption, approval, recommendation, or entry into a definitive agreement with respect to such Backup Plan Proposal.

"Superior Proposal" means a bona fide Acquisition Proposal (except that references to 20% shall be changed to 50%) which the Company Board or the board of managers EFIH, as the case may be, determines in good faith would, if consummated, result in a superior transaction to the Company or EFIH, as applicable, than the transactions contemplated by this Agreement after consultation with its independent financial advisors and outside legal counsel, and based on advice of such counsel, and, taking into account (x) the likelihood and timing of consummation and (y) all material legal, financial (including the financing terms of any such proposal), conditionality, regulatory and other aspects of such proposal, in each case as compared to the transactions contemplated by this Agreement.

Section 6.3    Filings; Other Actions; Notification.

(a)    Cooperation.

(i)    The Company and EFIH, on the one hand, and Parent and Merger Sub, on the other hand, shall cooperate with each other and use, and shall cause their respective Subsidiaries (other than, with respect to the Company and EFIH, the Oncor Entities, subject to Section 6.21 and with respect to Parent, its regulated Subsidiaries and regulated controlled Affiliates) to use, their respective reasonable best efforts to take or cause to be taken all actions, and do or cause to be done, and assist and cooperate with the other parties and the Oncor Entities in doing, all things reasonably necessary, proper or advisable on its part under this Agreement and applicable Laws to consummate and make effective the transactions contemplated by this Agreement and the Plan of Reorganization, as promptly as reasonably practicable, including negotiating, preparing and filing as promptly as reasonably practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as reasonably practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party and/or any Governmental Entity in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement and the Plan of Reorganization. The Company agrees that, prior to the termination of this Agreement, it will not withdraw any Application (as defined below) made pursuant to the terms of this Agreement or the Plan of Reorganization (solely as the Plan of Reorganization relates to the E-Side Debtors) without the prior written consent of Parent, such consent not to be unreasonably withheld, conditioned or delayed. The Company and Parent shall supply as promptly as reasonably practical any additional information and documentary material that may be requested by any Governmental Entity in connection with the Applications; *provided* that notwithstanding the foregoing or anything else in this Agreement to the contrary, the Company's and its Subsidiaries' (other than the Oncor Entities,

subject to Section 6.21) sole obligations with respect to (i) the Minority Interest Acquisition are set forth in this Section 6.3, Section 6.18 and Section 6.19 and (ii) the IPO Conversion Plan are set forth in Section 6.20.

(ii)     The Company and Parent shall use their respective reasonable best efforts to make all filings required of the Company, EFIH, Parent and Merger Sub under the HSR Act in connection with the transactions contemplated by this Agreement which shall be filed as promptly as reasonably practicable, but in no event later than the later to occur of (A) forty-five (45) days after the date hereof and (B) two (2) Business Days following receipt of the Approval Order. The filing fees of the Company and Parent required under the HSR Act in connection with the Merger shall be at Parent's sole cost and expense and any other filing fees in connection with any filing(s) under the HSR Act shall be at the cost and expense of the Person considered to be the "acquiring person" pursuant to the HSR Act in connection with such filing(s).

(iii)     Parent shall, pursuant to the Oncor Letter Agreement or otherwise, and the Company and EFIH shall, pursuant to Section 6.21 or otherwise, use their reasonable best efforts to cause Oncor to file with the FERC an application for the FERC Approval as promptly as reasonably practicable, but in no event later than the later to occur of (A) forty-five (45) days after the date hereof and (B) two (2) Business Days following receipt of the Approval Order.

(iv)     Each party shall, and shall cause its respective Subsidiaries (other than, with respect to the Company and EFIH, the Oncor Entities subject to Section 6.21 and with respect to Parent, its regulated Subsidiaries and regulated controlled Affiliates) to appear formally (including by providing testimony) or informally before the Bankruptcy Court or any Governmental Entity if reasonably requested by the other party or required by the Bankruptcy Court or such Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan of Reorganization.

(v)     Parent shall, pursuant to the Oncor Letter Agreement or otherwise, and the Company and EFIH shall, pursuant to Section 6.21 or otherwise, use their reasonable best efforts to cause Oncor to submit to the PUCT a single, integrated filing (on behalf of the parties) that requests prior approval by the PUCT of the transactions contemplated by this Agreement (the "PUCT Filing") as promptly as practicable, but in no event later than the later to occur of (A) forty-five (45) days after the date hereof and (B) two (2) Business Days following receipt of the Approval Order.

(vi)     Notwithstanding anything in this Section 6.3 or otherwise in this Agreement, in connection with any filing under the HSR Act (the "HSR Filing"), the PUCT Filing or application submitted to the FCC or FERC with respect to the transactions contemplated by this Agreement (together, the "FCC/FERC Applications" and, together with the PUCT Filing, the HSR Filing, the "Applications"), the Company will not object to Parent    leading, in close

cooperation with Oncor and in cooperation with the Company, (A) the scheduling and conducting of all formal meetings with all Governmental Entities (and the staffs thereof), (B) the coordination and making of all Applications and filings with any Governmental Entity and (C) the process for obtaining any consents, registrations, approvals, permits and authorizations of any Governmental Entity, in each case, as may be necessary or advisable to be made or obtained in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, including the Closing Date Transactions (other than with respect to any governmental approvals relating exclusively to the Reorganized TCEH Spin-Off, the Reorganized TCEH Contributions, the Preferred Stock Sale or the Reorganized TCEH Conversion) and, subject to Sections 6.19, 6.20 and 6.21, the Minority Interest Acquisition and the IPO Conversion Plan. Parent shall also have the right to reasonably determine the content, terms and conditions of such Applications (and any amendments or supplements thereto) and filings (but for the avoidance of doubt the PUCT Filing shall contain all of the key terms and undertakings set forth in Exhibit E hereto (the "Key Regulatory Terms") and may at the election of Parent (exercised in its sole discretion) contain the matters specified in Section 6.3(a)(vi) of the Parent Disclosure Letter, and to resolve any investigation or other inquiry of any Governmental Entity (and the staffs thereof), including the PUCT, in each case, as may be necessary or reasonably advisable to be made or obtained (in the case of such applications or filings) or resolved (in the case of such investigations and other inquiries), in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, including the Closing Date Transactions and, subject to Sections 6.19, 6.20 and 6.21, the Minority Interest Acquisition and the IPO Conversion Plan. Prior to making any decisions pursuant to this Section 6.3(a)(vi), Parent shall consult and collaborate in good faith with the Oncor Entities and the Company and EFIH with respect to such decisions and consider in good faith the views of the Oncor Entities and the Company and EFIH.

(vii)    Subject to Laws relating to the exchange of information, Parent and Merger Sub, on the one hand, and the Company and EFIH, on the other hand, shall, and shall cause their respective Subsidiaries (other than the Oncor Entities) and controlled Affiliates (other than Parent's regulated Subsidiaries and regulated controlled Affiliates) to, use their respective reasonable best efforts to provide the other a reasonable opportunity to review in advance and, to the extent practicable, each will consult with the other on and consider in good faith the views of the other in connection with, all material information that appears in any filing made with, or written materials submitted to, or oral presentations or testimony made to any Governmental Entity (other than with respect to any governmental approvals relating exclusively to the Reorganized TCEH Spin-Off, the Reorganized TCEH Contributions, the Preferred Stock Sale or the Reorganized TCEH Conversion) in connection with the transactions contemplated by this Agreement. In exercising the foregoing rights and obligations, each of the Company, EFIH, Parent and Merger Sub shall act reasonably and as promptly as practicable.

(viii)    Parent and Merger Sub, on the one hand, and the Company and EFIH, on the other hand, agree not to schedule, to the extent reasonably practicable, any substantive meetings or substantive communications with any Governmental Entity or in pursuit of obtaining any necessary clearances pursuant to the HSR Act (other than with respect to any governmental approvals relating exclusively to the Reorganized TCEH Spin-Off, the Reorganized TCEH Contributions, the Preferred Stock Sale or the Reorganized TCEH Conversion) regarding the transactions contemplated by this Agreement or the Plan of Reorganization (solely as the Plan of Reorganization relates to the E-Side Debtors) without giving the other party or its Representatives a reasonable opportunity to participate in such meeting or communication to the extent permitted by such Governmental Entity and to the extent with respect to matters involving any of the Applications, unless Parent reasonably believes that such participation would be imprudent provided that Parent may not exclude the Company or EFIH from any such meeting or communication if a Governmental Entity has requested that the Company or EFIH participate, and in any event the parties hereto shall keep each other reasonably apprised of all material substantive communications with Governmental Entities (other than with respect to any governmental approvals relating exclusively to the Reorganized TCEH Spin-Off, the Reorganized TCEH Contributions, the Preferred Stock Sale or the Reorganized TCEH Conversion) of which they are aware regarding the transactions contemplated by this Agreement or the Plan of Reorganization (solely as the Plan of Reorganization relates to the E-Side Debtors).  Parent and Merger Sub, on the one hand, and the Company and EFIH, on the other hand, shall use their reasonable best efforts to obtain the PUCT Approval and the FERC Approval as expeditiously as possible.

(ix)    In the event that the Company and Parent agree in writing upon the use of common counsel or consultants with respect to the negotiation, preparation or filing of any necessary consent, registration, approval, permits and/or authorizations under this Section 6.3(a), they shall share equally the fees and expenses of such counsel and consultants.

(b)    Information. Subject to Section 6.3(f), the Company and EFIH, on the one hand, and Parent and Merger Sub, on the other hand, shall, upon request by the other, furnish the other with all information concerning itself, its Subsidiaries and controlled Affiliates (other than, with respect to the Company, the Oncor Entities, subject to Section 6.21 and with respect to Parent, its regulated Subsidiaries and regulated controlled Affiliates), directors, officers and equityholders and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of Parent, Merger Sub, the Company or any of their respective Subsidiaries (other than the Oncor Entities subject to Section 6.21 hereof) to or with any Governmental Entity in connection with the Applications.

(c)    Status. Subject to Section 6.3(f) and the instructions of the Bankruptcy Court or any Governmental Entity, the Company and EFIH, on the one hand, and Parent and Merger Sub, on the other hand, shall keep the other reasonably apprised of the status

of material matters relating to completion of the transactions contemplated by this Agreement or the Plan of Reorganization (solely as the Plan of Reorganization relates to the E-Side Debtors), including, upon reasonable request, promptly furnishing the other with copies of notices or other communications received by Parent or Merger Sub or the Company or EFIH, as the case may be, or any of their Subsidiaries (other than the Oncor Entities, subject to Section 6.21), from the Bankruptcy Court or any third party and/or any Governmental Entity with respect to the transactions contemplated by this Agreement or the Plan of Reorganization (solely as the Plan of Reorganization relates to the E-Side Debtors). The Company and EFIH will also keep Parent reasonably and regularly advised of the status and progress of, and provide to Parent any information reasonably requested by Parent regarding, any other consents of the Bankruptcy Court or any Governmental Entities required in connection with the implementation and consummation of the transactions contemplated by the Plan of Reorganization that are related to or could reasonably be expected to affect the transactions contemplated by this Agreement.

(d)     Regulatory Matters. Subject to the terms and conditions set forth in this Agreement, without limiting the generality of the other undertakings pursuant to this Section 6.3, each of the Company and EFIH and Parent and Merger Sub shall use its reasonable best efforts to take, or cause to be taken, the following actions:

(i)     the prompt provision to each and every federal, state, local or foreign court or Governmental Entity (including the FCC, the FERC and the PUCT) with jurisdiction over any Company Approvals or Parent Approvals of information and documents reasonably requested by any such court or Governmental Entity or that are necessary, proper or advisable to permit consummation of the transactions contemplated by this Agreement or the Plan of Reorganization (solely as the Plan of Reorganization relates to the E-Side Debtors);

(ii)     with respect to the HSR Filing, obtaining the expiration or earlier termination of any waiting period under the HSR Act applicable to the transactions contemplated by this Agreement, and with respect to the FCC Approval, the FERC Approval and the PUCT Approval and all other approvals and consents of a Governmental Entity, obtaining all such necessary approvals and avoiding the entry or enactment of any permanent, preliminary or temporary injunction or other order, decree, decision, determination, judgment or Law that, individually or in the aggregate, would be reasonably likely to prevent, enjoin or otherwise prohibit, or materially impair, restrain or restrict, the transactions contemplated by this Agreement or the Plan of Reorganization (solely as the Plan of Reorganization relates to the E-Side Debtors), including Parent and Merger Sub, subject to the first sentence of the last paragraph of Section 6.3(e), taking all actions required by, and accepting all conditions and/or requirements imposed under the terms of any, consent, registration, order, approval or authorization issued by any Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan of Reorganization to the extent that

any such condition or requirement is a Key Regulatory Term or is not otherwise a Burdensome Condition; and

(iii)    in the event that any permanent, preliminary or temporary injunction, decision, order, judgment, determination, decree or Law is entered, issued or enacted, or becomes reasonably foreseeable to be entered, issued or enacted, in any proceeding, review or inquiry of any kind that would make consummation of the transactions contemplated by this Agreement or the Plan of Reorganization (solely as the Plan of Reorganization relates to the E-Side Debtors) unlawful or that would prevent, enjoin or otherwise prohibit, or materially impair, restrain or restrict, the transactions contemplated by this Agreement or the Plan of Reorganization (solely as the Plan of Reorganization relates to the E-Side Debtors), vacate, modify, reverse, suspend, prevent, eliminate, avoid, remove or comply with such actual, anticipated or threatened injunction, decision, order, judgment, determination, decree or enactment so as to permit prompt consummation of the transactions contemplated by this Agreement.

(e)    Acceptable Conditions. Notwithstanding the obligations set forth in this Section 6.3 or elsewhere in this Agreement, (A) Parent and Merger Sub shall not be required to, and (B) the Company, EFIH and their Subsidiaries (other than the Oncor Entities, subject to Section 6.21) shall not be permitted to, without the prior written consent of Parent, take any action pursuant to this Section 6.3 or otherwise if the taking of such efforts or action, individually or in the aggregate, would result in a Burdensome Condition.

"Burdensome Condition" means any term or condition, order, sanction, requirement, law, rule or regulation that, individually or in the aggregate, would, or would be reasonably expected to have a material and adverse effect on, or change in, the condition (financial or otherwise), business, assets, liabilities or results of operations (i) of Oncor and its Subsidiaries, taken as a whole, or (ii) of Parent and its Subsidiaries, taken as whole; *provided* that, for purposes of this clause (ii) Parent and its Subsidiaries, taken as a whole, shall be deemed to be a consolidated group of entities that is the size and scale of the Oncor Entities; *provided, however,* that terms or conditions, orders, sanctions, requirements, laws, rules or regulations that result in changes or developments generally affecting electric transmission or distribution systems in the State of Texas shall not be deemed to be, or contribute to, a Burdensome Condition (except such changes or developments affecting electric transmission or distribution systems in the State of Texas shall be taken into account in determining whether there has been or is a Burdensome Condition to the extent such changes, or developments have a disproportionate and adverse effect on Oncor and its Subsidiaries, taken as a whole, or Parent and its Subsidiaries, taken as a whole (where Parent and its Subsidiaries, including the Oncor Entities, are deemed to be a consolidated group of entities that is the size and scale of the Oncor Entities), as compared to other entities engaged in the relevant business in the State of Texas); *provided, further,* that, the approval of any of the Key Regulatory Terms, or any comparable condition, requirement or similar item that, in each case, is substantively the same

or results in the same effect as any of the Key Regulatory Terms, by the PUCT shall not be deemed to be, or contribute to, a Burdensome Condition, but adverse variations or changes to any of the Key Regulatory Terms may contribute to, or be, a Burdensome Condition; and *provided, further, however,* that the PUCT Approval shall be deemed to be a Burdensome Condition (X) if the PUCT Approval does not approve changes of control of Oncor (a) pursuant to which Parent and its Affiliates will own, directly or indirectly, all of the equity securities of Oncor and (b) pursuant to which Parent and its Affiliates will own, directly or indirectly, all of the equity securities of Oncor (other than indirect interests in Oncor that are issued to the public, interests issued to directors, officers and employees of the Oncor Entities pursuant to a management equity incentive plan and direct or indirect interests held by the current members of Oncor and their successors), (Y) if the PUCT Approval imposes (i) any requirement, restriction, limitation or condition on Parent's ability to, directly or indirectly, appoint, remove and replace from time to time any individual who serves on the board of directors of Oncor or Oncor Holdings from time to time (and otherwise to fill vacancies on such boards of directors) or the process for the appointment, removal or replacement of such directors or (ii) imposes any requirement, restriction, limitation or condition on the qualifications for the directors of the Oncor Entities (including the independence thereof) other than requiring that no more than a majority of the directors of Oncor Holdings and Oncor shall consist of persons who qualify as "independent" in accordance with the rules and regulations of the NYSE, *provided that*, if any such requirement, restriction, limitation or condition pursuant to this clause (Y) is only effective during periods in which Parent and its subsidiaries, other than Oncor and Oncor Holdings, have outstanding new debt that is solely or almost entirely dependent on the revenues of Oncor, then such requirement, restriction, limitation or condition shall not, in and of itself, be deemed to be a Burdensome Condition, or (Z) if the PUCT Approval imposes any requirement, restriction, limitation, condition or obligation that limits or prevents any of the Oncor Entities from making distributions, dividends or other payments to Parent or its Affiliates, except in the case of this clause (Z), (i) as provided for in the Key Regulatory Terms without modification thereto, or any comparable condition, requirement or similar item that, in each case, is substantively the same or results in the same effect as any of the Key Regulatory Terms, or (ii) for any condition that would restrict the Oncor Entities from making distributions, dividends or other payments to Parent or its Affiliates if such distribution, dividend or other payments would cause Oncor's actual equity ratio to fall below the equity ratio established by the Commission from time to time, as such actual equity ratio appears in Oncor's annual Earnings Monitoring Report, and, except in the case of each of clauses (X), (Y) and (Z), as would not cause any nationally recognized rating agency, rating Parent, any of Parent's Affiliates or any securities issued by Parent or any of its Affiliates, (1) to assign to Parent, any of its Affiliates (including any Affiliate that is an issuer of indebtedness) or any securities issued by Parent or any of its Affiliates, a lower rating, or (2) to place Parent, any of its Affiliates (including any Affiliate that is an issuer of indebtedness) or any securities issued by Parent or any of its

Affiliates, on credit watch or negative outlook, in the case of clause (ii) in connection with the transactions contemplated by this Agreement or as a result of the Merger (as reasonably demonstrated by Parent to the Company).

Nothing in this Agreement, including this Section 6.3, shall require, or be construed to require, Parent, Merger Sub or any of their Affiliates to agree to the sale, license, divestiture, hold separate or other disposition of any assets, categories of assets or businesses or other segments of Parent or Merger Sub or any of their respective Affiliates (other than the Company and its Subsidiaries). In the event that the Company or its Subsidiaries are required to agree to the sale, license, divestiture, hold separate or other disposition of any assets, categories of assets or businesses of the Company or any of its Subsidiaries in connection with obtaining a Company Approval, then such requirement may contribute to, or be, a Burdensome Condition.

(f)     Confidentiality. Notwithstanding the foregoing, all information disclosed pursuant to this Section 6.3 shall be subject to the Confidentiality Agreement and nothing in this Section 6.3 shall require any party (i) to violate any of its binding obligations with respect to confidentiality, (ii) to disclose any privileged information or (iii) to violate any applicable Laws or Orders; *provided*, that, as applicable, each of the Company and EFIH, on the one hand, and Parent and Merger Sub, on the other hand, shall, to the extent permitted by applicable Law, provide notice to each other that any information is being withheld pursuant to this provision and shall use their respective commercially reasonable efforts to find a mutually agreeable solution to any such confidentiality and/or privilege concerns, including providing any such privileged information pursuant to a joint defense agreement.

Section 6.4     Access and Reports. Subject to applicable Law, upon reasonable notice, the Company and EFIH shall (and each shall cause its Subsidiaries (other than the Oncor Entities) to) afford Parent's officers and other Representatives reasonable access, during normal business hours throughout the period from the date hereof through the earlier of the Termination Date and the Effective Time, to its employees, properties, books, contracts and records and, during such period, the Company and EFIH shall (and each shall cause its Subsidiaries (other than the Oncor Entities) to) furnish to Parent all such information concerning its business, properties, facilities, operations and personnel as Parent reasonably requests; *provided that,* no investigation pursuant to this Section 6.4 shall (a) unreasonably interfere with the ongoing operations of the Company or its Subsidiaries or (b) affect or be deemed to modify any representation or warranty made by the Company herein, and *provided, further,* that the foregoing shall not require the Company or any of its Subsidiaries to (i) permit any inspection, or to disclose any information, that in the reasonable judgment of the Company or such Subsidiary would result in the disclosure of any trade secrets of third parties or violate any of its or any of its Subsidiaries' obligations with respect to confidentiality if the Company or such Subsidiary shall have used reasonable best efforts to furnish such information in a manner that does not result in any such disclosure, including obtaining the consent of such third party to such inspection or disclosure, (ii) disclose any privileged information of the Company or any of its Subsidiaries if the Company or such Subsidiary shall have used reasonable best efforts to furnish such information in a manner that does not result in the loss of such privilege or (iii) permit any invasive environmental investigation or sampling, including a Phase II environmental

assessment. All information requested pursuant to this <u>Section 6.4</u> shall be governed by the Confidentiality Agreement.

Section 6.5    <u>Publicity</u>. The initial press release or press releases regarding this Agreement and the transactions contemplated by this Agreement, including the Closing Date Transactions, shall be in a form mutually acceptable to Parent and the Company and thereafter the Company, EFIH and Parent each shall consult with each other to the extent reasonably practicable prior to issuing any press releases or otherwise making public announcements (except as required by Law) with respect to the Closing Date Transactions.

Section 6.6    <u>Employee Benefits</u>.

(a)    Pursuant to the Plan of Reorganization or otherwise, the Company and EFIH shall, and shall cause their respective Subsidiaries to take all such actions within their control as may be necessary, appropriate or desirable to transfer the sponsorship, maintenance and administration of, and all liabilities (and related contracts or agreements with third parties) in respect of, the Contributed Plans to Reorganized TCEH or its Subsidiaries on or prior to the date of the Reorganized TCEH Spin-Off.  As soon as administratively practicable following the Reorganized TCEH Spin-Off, Reorganized TCEH shall transfer the liabilities related to the post-retirement health, life, dental and vision benefits for participants previously employed by certain discontinued operations of the Company and its Subsidiaries and their predecessors, and the participants' beneficiaries (identified by employee number) set forth on Schedule 6.6(a) of the Company Disclosure Letter (the "<u>DiscOp OPEB Participants</u>") and the related accrued benefits liabilities (the "<u>DiscOp OPEB Liabilities</u>") from the EFH Retiree Welfare Plan to a new mirror  health and welfare plan established by Reorganized TCEH or another plan reasonably acceptable to Parent and the Company (the "<u>New DiscOp OPEB Plan</u>" which such plan shall be transferred to and assumed by the Company or one of its Subsidiaries prior to or on the Closing Date. For the avoidance of doubt, upon the transfer of the New DiscOp OPEB Plan to the Company or its Subsidiary, the New DiscOp OPEB Plan (including the DiscOp OPEB Liabilities) shall be an Assumed Plan and the Surviving Company shall indemnify, defend and hold harmless Reorganized TCEH and its Subsidiaries from and against any claim, action, suit, proceeding relating to any modification or termination of the post-retirement health and life benefits to any DiscOp OPEB Participants on or after the Closing Date. Parent, the Company and Reorganized TCEH shall take all actions necessary to effectuate the transfer of the New DiscOp OPEB Plan from Reorganized TCEH to Parent or Company as soon as administratively practicable following the establishment of such plan, but in any event prior to the Closing Date.  Notwithstanding anything in this Agreement to the contrary, during the period beginning on the Reorganized TCEH Spin-Off  date and ending on the date the New DiscOp OPEB Plan is assumed by the Company or its Subsidiary as set forth in this <u>Section 6.6</u>, the Company, Surviving Company or its Subsidiaries shall reimburse Reorganized TCEH and its Affiliates for all claims incurred by DiscOp OPEB Participants under the EFH Retiree Welfare Plan or New DiscOp OPEB Plan, as applicable, plus any reasonable out of pocket expenses incurred by Reorganized TCEH and its Affiliates in providing such benefits.  Notwithstanding the foregoing, except as otherwise provided herein (including, without limitation, the Assumed Plans) or in the

Split Participant Agreement (as defined below), none of Parent, any Oncor Entity or any of their Affiliates shall assume or otherwise incur any liability or obligation under any compensatory, severance or similar arrangement in respect of any Non-Oncor Employee (as defined below), it being understood that Reorganized TCEH and Oncor shall enter into the Split Participant Agreement. For purposes of Section 6.6(a):

"Non-Oncor Employee" means consistent with past practices (i) any individual employed by the Company, EFIH, TCEH, Reorganized TCEH or any of their respective Affiliates (other than the Oncor Entities) on or immediately following the Reorganized TCEH Spin-Off or (ii) any individual formerly employed by TCEH or any Affiliate of TCEH or Reorganized TCEH (which for this purpose would constitute an Affiliate immediately following the Closing Date), other than an Oncor Employee;

"Oncor Employee" means consistent with past practices (i) any individual employed by an Oncor Entity on or immediately following the Closing Date or (ii) any individual formerly employed by an Oncor Entity or, by any predecessor regulated electric utility business on a full time basis, who terminated employment with and did not subsequently become employed by a non-Oncor Entity; and

"Split Participant Service" means service of Oncor Employees or Non-Oncor Employees, as applicable, whose employment includes service with both the Oncor Entities (or a predecessor regulated electric business) and a business of the Company or its Affiliates other than the Oncor Entities.

(b)    EFIH, the Company and Parent shall use commercially reasonable efforts to obtain unconditional bankruptcy court approval authorizing the termination and distribution of all payments and obligations under the Discharged Plans (other than any such Discharged Plans that are equity based plans or the Ebasco Services of Canada Limited Pension Plan) prior to the effective date of the Plan of Reorganization under which the Non-Qualified Plans are to be discharged; provided, however, if EFIH, the Company and Parent cannot obtain such unconditional bankruptcy court approval prior to such date, such Discharged Plans will be terminated as the effective date of the Plan of Reorganization under which the Non-Qualified Plans are to be discharged and paid out and all associated liabilities discharged in accordance with the terms and procedures of such Plan of Reorganization.

(c)    Prior to the Closing Date, Oncor and Reorganized TCEH (or Opco (as defined in the Separation Agreement)) shall execute and deliver a Split Participant Agreement substantially in the form attached hereto as Exhibit F (the "Split Participant Agreement").

(d)    No provision of this Agreement shall obligate Parent or the Company or any of its Subsidiaries or Affiliates to continue the employment of any employee of the Company or any of its Subsidiaries (other than the Oncor Entities) after the Closing Date.

(e)     The Company and Parent agree to cooperate in good faith using commercially reasonable efforts to minimize the risk of any Contributed Plan and Assumed Plan becoming a "multiple employer plan" (within the meaning of Section 413 of the Code) or "multiple employer welfare plan" (within the meaning of Section 3(40) of ERISA) following the Closing Date.

(f)     The Company and Parent agree to work together in good faith to develop such timelines, plans, agreements, and communications, and to exchange such information as is necessary to effectuate the intent of this Section 6.6 in an orderly manner.

(g)     For a period of ninety (90) days immediately following the Closing Date, neither Parent nor the Surviving Company shall close any facility or lay off any Employees of the Surviving Company or its Subsidiaries, if such closure or layoff would result in any material obligations or liabilities for Reorganized TCEH.

(h)     The provisions of this Section 6.6 are solely for the benefit of the parties to this Agreement, and no current or former Employee or any other individual associated therewith shall be regarded for any purpose as a third party beneficiary of this Agreement, and nothing herein shall be (i) construed as an amendment to any Benefit Plan for any purpose, or (ii) give any employee or former employee or any other individual associated therewith or any employee benefit plan or trustee thereof or any other third person any right to enforce the provisions of this Section 6.6 or (iii) obligate Parent, the Merger Sub, Reorganized TCEH or any of their respective Affiliates to (A) maintain any particular benefit plan or refrain from amending or terminating any benefit plan, except as provided otherwise in the Split Participant Agreement or (B) retain the employment of any particular employee.

Section 6.7     Expenses. The Surviving Company shall pay all charges and expenses, including those of the Exchange Agent, in connection with the transactions contemplated in Article IV. Except as otherwise provided in Section 6.3, Section 6.18, Section 6.19, Section 6.20 and Section 6.22 or any administrative expenses of the Debtors' estates addressed in the Plan of Reorganization, whether or not the Merger is consummated, all costs and expenses incurred in connection with this Agreement and the Closing Date Transactions and the other transactions contemplated by this Agreement shall be paid by the party incurring such expense.

Section 6.8     Indemnification; Directors' and Officers' Insurance.

(a)     From and after the Effective Time for a period of six (6) years, the Surviving Company agrees that it will indemnify and hold harmless, to the fullest extent permitted under applicable Law (and the Surviving Company shall also advance expenses as incurred to the fullest extent permitted under applicable Law, *provided* that, the Person to whom expenses are advanced provides an undertaking to repay such advances if it is ultimately determined that such Person is not entitled to indemnification), each present and former director, manager and officer of the Company and each of its Subsidiaries (together, the "Indemnified Parties") against any costs or expenses (including reasonable and necessary attorneys' fees and experts' fees), and sums which an Indemnified Party

becomes legally obligated to pay solely as a result of judgments, fines, losses, claims, damages, settlements or liabilities (collectively, "Costs") arising out of any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or related to such Indemnified Parties' service as a manager, director or officer of the Company or any of its Subsidiaries or other services performed by such persons at the request of the Company or any of its Subsidiaries at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, including the transactions contemplated by this Agreement; *provided, however*, that the Surviving Company shall not indemnify any Indemnified Party for any Costs brought about or contributed to in fact by fraudulent act by such Indemnified Party; and *provided, further*, that the Surviving Company shall not be obligated to reimburse any Indemnified Party for any Costs unless and until such Indemnified Party has exhausted the limits of recovery from any other Person obligated to indemnify and reimburse such Indemnified Party (unless the Company has agreed otherwise in writing prior to the date hereof with any such other Person, in which case this proviso shall be limited with respect to such other Person to the extent of such agreement).

(b)     Prior to the Effective Time, the Company shall obtain, effective as of the Effective Time, and fully pay the premium for a run-off of (i) the Company's and its Subsidiaries' existing directors', managers' and officers' insurance policies as of the date hereof, and (ii) the Company's existing fiduciary liability insurance policies as of the date hereof, in each case for a claims reporting or discovery period of at least six (6) years from and after the Effective Time with respect to any claim based on alleged acts or omissions occurring during any period of time at or prior to the Effective Time (it being understood that, with respect to any claim arising from actual or alleged acts or omissions of such Persons in their capacity as a current or former director or officer or other Representative of any of TCEH Companies or the SpinCo Group (each as defined in the Separation Agreement), such period shall be limited to the period on or prior to the TCEH Effective Date) from an insurance carrier with the same or better credit rating as the Company's current insurance carrier with respect to directors' and officers' liability insurance and fiduciary liability insurance (collectively, "D&O Insurance") with terms, conditions, retentions and limits of liability that are no less advantageous than the coverage provided under the Company's existing policies with respect to any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty or any matter claimed against a current or former director or officer or other Representative of the Company or any of its Subsidiaries by reason of him or her serving in such capacity that existed or occurred at or prior to the Effective Time (including in connection with this Agreement and the transactions or actions contemplated by this Agreement). If the Company, after its good faith efforts to obtain, is unable to obtain such run-off insurance policies as of the Effective Time, the Surviving Company shall, and Parent shall cause the Surviving Company to, continue to maintain in effect for a period of at least six (6) years from and after the Effective Time the D&O Insurance in place as of the date hereof with terms, conditions, retentions and limits of liability that are no less advantageous than the coverage provided under the Company's existing policies as of the date hereof, or the Surviving Company shall, and Parent shall cause the Surviving Company to, use reasonable best efforts to purchase comparable D&O Insurance for such six-year period with terms, conditions, retentions and limits of liability that are at least as

favorable as provided in the Company's existing policies as of the date hereof; *provided, however*, that in no event shall Parent or the Surviving Company be required to expend for such policies pursuant to this sentence an annual premium amount in excess of 200% of the annual premiums currently paid by the Company for such insurance; and *provided, further*, that if the annual premiums of such insurance coverage exceed such amount, the Surviving Company shall obtain a policy with the greatest coverage available for a cost not exceeding such amount.

(c)     If the Surviving Company or any of its successors or assigns shall (i) consolidate with or merge into any other corporation or entity and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfer all or substantially all of its properties and assets to any individual, corporation or other entity, then, and in each such case, proper provisions shall be made so that the successors and assigns of the Surviving Company shall assume all of the obligations set forth in this Section 6.8.

(d)     The provisions of this Section 6.8 are intended to be for the benefit of, and shall be enforceable by, each of the Indemnified Parties.

(e)     The rights of the Indemnified Parties under this Section 6.8 shall be in addition to any rights such Indemnified Parties may have under the certificate of incorporation or formation or bylaws, operating agreement or comparable governing documents of the Company or any of its Subsidiaries, or under any applicable Contracts or Laws. All rights to indemnification and exculpation from liabilities for acts or omissions occurring at or prior to the Effective Time and rights to advancement of expenses relating thereto now existing in favor of any Indemnified Party as provided in the certificate of formation, bylaws, operating agreement or comparable governing documents of the Company or any of its Subsidiaries or any indemnification agreement between such Indemnified Party and the Company or any of its Subsidiaries shall be continued or be assumed by the Surviving Company following the Merger and shall not be amended, repealed or otherwise modified in any manner that would adversely affect any right thereunder of any such Indemnified Party for a period of six (6) years after the Effective Time.

Section 6.9     Resignation of Directors and Officers. Pursuant to the Plan of Reorganization, except as otherwise may be agreed by Parent in writing, the Company Board, all officers of the Company and all members of any board of directors or similar governing body and all officers of any Subsidiary of the Company (other than the Oncor Entities), in each case who are in office immediately prior to the Effective Time, shall be deemed to have resigned from such position(s) effective at the Effective Time. In addition, immediately prior to the Effective Time, EFIH shall cause the Member Directors (as defined in the Oncor Holdings LLC Agreement) to resign and shall provide to the boards of directors of Oncor Holdings and Oncor EFIH's written consent to the resignation of the Independent Directors (as defined in the LLC Agreements) of each of Oncor Holdings and Oncor.

Section 6.10     Bankruptcy Court Matters. The Company and EFIH shall comply with the following covenants and agreements contained in the Plan Support Agreement as if such

covenants and agreements were set forth herein, solely to the extent they affect the rights of Parent or Merger Sub: Section 3, Sections 4.02(a) and Sections 7.02 through and including 7.05.

Section 6.11    Listing and SEC Registration. Parent shall use its best efforts to cause (i) the shares of Parent Common Stock issuable pursuant to this Agreement to be approved for listing on the NYSE, subject to official notice of issuance, and (ii) all state securities or "blue sky" authorizations to have been received, in each case, as promptly as practicable after the date of the entry of the EFH Confirmation Order, and in any event prior to the Closing Date. Prior to the Closing Date, Parent shall use its best efforts to seek a "no-action" letter from the SEC seeking confirmation that the issuance of the Parent Common Stock pursuant to this Agreement is exempt from the registration requirements of the Securities Act and from applicable state securities laws, pursuant to Section 1145 of the Bankruptcy Code. Notwithstanding the foregoing, prior to seeking the "no-action" letter (or any amendment or supplement thereto) or responding to any comments of the SEC with respect thereto, Parent (i) shall provide the Company and EFIH an opportunity to review and comment on such document or response (including the proposed final version of such document or response) and (ii) shall consider in good faith all comments reasonably proposed by the Company or EFIH. In the event that the staff of the SEC does not issue a favorable "no action" letter with respect to the application of Section 1145 of the Bankruptcy Code in connection with the issuance described above, (a) Parent shall use it best efforts to, as applicable, cause the shares of Parent Common Stock issuable pursuant to this Agreement to be registered with the SEC on Form S-4 or other applicable registration statement on or before the Closing Date and (b) Parent and the Company shall each use its reasonable best efforts to cause all of the information supplied by it or any of its Subsidiaries (other than the Oncor Entities) for inclusion or incorporation by reference into the Form S-4 or other applicable registration statement at the time such registration statement becomes effective under the Securities Act, not to contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading.

Section 6.12    Parent and Merger Sub Waiver. Subject to the receipt by Parent, Merger Sub, the Company and EFIH of a reciprocal release from Reorganized TCEH and its Subsidiaries pursuant to the Plan of Reorganization which is substantially consistent with the release contained herein, except as set forth in Section 6.12 of the Parent Disclosure Letter, each of Parent, Merger Sub, the Company and EFIH, acknowledges and agrees that, effective from and after the Closing, to the fullest extent allowed by Law, Reorganized TCEH and any of its Subsidiaries and their respective directors, employees, managers, equityholders, successors and assigns (the "TCEH Released Persons") shall be deemed released and discharged by Parent, Merger Sub, the Company and EFIH, and each of their respective Subsidiaries from any and all Claims and causes of action, Debts, liabilities and obligations, of any nature, whether known or unknown, in law or equity, including any derivative claims, asserted on behalf of the E-Side Debtors, that Parent, Merger Sub, the Company and EFIH, and each of their respective Subsidiaries would have been legally entitled to assert in their own right before the effectiveness of such release (whether individually or collectively) or on behalf of the holder of any Claim or Interest (the "TCEH Released Claims"), and except for obligations issued or required to be paid pursuant to the Plan of Reorganization, all entities that have held, hold, or may hold TCEH Released Claims are permanently enjoined, from and after the Closing Date, from taking any of the following actions against the TCEH Released Persons: (i) commencing or continuing in any

manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such entities or the property or the estates of such entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such entities or against the property of such entities on account of or in connection with or with respect to any such claims or interests unless such entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan of Reorganization. Subject to the receipt by Parent, the Surviving Company and EFIH of a reciprocal indemnity from Reorganized TCEH and its Subsidiaries pursuant to the Plan of Reorganization which is substantially consistent with the indemnity contained herein, each of Parent, the Surviving Company and EFIH hereby agrees, on behalf of itself, effective from and after the Closing, to indemnify and hold harmless each of the TCEH Released Persons from and against, and in respect of, any and all losses, liabilities, damages, obligations, costs or expenses (including reasonable legal fees) incurred by or on behalf of any TCEH Released Person as a result of such entity's violation of this Section 6.12.

Section 6.13    Tax-Free Reorganization Treatment. The parties to this Agreement intend that the Merger will qualify as a reorganization under Section 368(a) of the Code, and each shall not, and shall not permit any of its respective Subsidiaries or controlled Affiliates (other than the Oncor Entities) to take any action, or fail to take any action, that would reasonably be expected to jeopardize the qualification of the Merger as a reorganization under Section 368(a) of the Code.

Section 6.14    Tax Matters.

(a)    Private Letter Ruling. The Company, on behalf of the Debtors, has received a private letter ruling (the "Private Letter Ruling") from the IRS in response to a written request, dated June 10, 2014 (the "Initial Ruling Request," and together with all related materials and supplements thereto filed with respect to the Initial Ruling Request, the "Initial IRS Submissions"). The Private Letter Ruling addresses certain issues related to the qualification of the Reorganized TCEH Contributions, the Reorganized TCEH Conversion, and the Reorganized TCEH Spin-Off as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Code (collectively, the "Intended Tax-Free Treatment") and certain other matters. The parties hereto acknowledge and agree that the Private Letter Ruling is acceptable to the parties hereto with respect to the Intended Tax-Free Treatment. The transactions contemplated by this Agreement are not conditioned on the receipt of any additional rulings from the IRS, other than the Supplemental Rulings (defined below).

(b)    Supplemental Ruling.   The Company shall be responsible for the preparation and filing with the IRS of one or more supplemental ruling requests that, among other things, request rulings that address the effect of the Merger on certain of the rulings received in the Private Letter Ruling, as reflected on Exhibit I (such request, the "Supplemental Ruling Request," the rulings granted pursuant to thereto, the "Supplemental Rulings," and the materials to be filed in respect of the Supplemental Ruling Request, the "Supplemental IRS Submissions").

(c)    Supplemental IRS Submissions. The Company shall be responsible for the preparation and filing of the Supplemental IRS Submissions. The Company shall provide tax counsel of Parent with a reasonable opportunity to review and comment on drafts of all IRS Submissions and any pre-filing agreement or closing agreement that is intended to satisfy the requirements of Section 7.1(d) or that could reasonably be determined to affect the treatment of the restructuring transactions contemplated by this Agreement and the Plan of Reorganization to be submitted or entered into on or after the date hereof. The Company agrees to supplement or modify any Supplemental IRS Submissions and agreements related to Supplemental IRS Submissions as may be reasonably requested by Parent; provided, however, that the Company shall not be required to supplement or modify any Supplemental IRS Submission, request any additional ruling, or modify any ruling being requested with respect to the Initial Private Letter Ruling (other than with respect to the effect of the Merger) if the Company determines, in its reasonable discretion, that making such supplement, modification, or request could result in any delay in obtaining the Supplemental Ruling or be otherwise detrimental to the process of obtaining the Supplemental Ruling. The parties hereto acknowledge and agree that it is anticipated that this Agreement and the facts related to the contemplated Merger will be disclosed to the IRS pursuant to a Supplemental IRS Submission. To the extent that the Company, in its good faith judgment, or upon a reasonable request by any other person, considers any information included in an IRS Submission or a Supplemental IRS Submission (or drafts thereof) to be confidential, the Company may redact such documents to exclude such information before providing such documents to Parent. Subject to the foregoing, the Company shall provide Parent with copies of each Supplemental IRS Submission promptly following the filing thereof.

(d)    IRS Communications and Cooperation. The Company shall notify Parent of any substantive communications with the IRS regarding the Supplemental IRS Submissions and restructuring transactions contemplated by this Agreement and by the Plan of Reorganization. Notwithstanding the foregoing, a single Representative from Parent shall be (i) given the opportunity to participate in all scheduled communications with the IRS concerning the Supplemental Ruling Requests or any restructuring transactions contemplated by this Agreement and by the Plan of Reorganization, including, (A) all scheduled conference calls and in-person meetings, to the extent a Representative of the TCEH First Lien Creditors or Reorganized TCEH is given the opportunity to participate in such communications, conference calls, or in-person meetings; and (ii) updated in a timely fashion regarding any unscheduled communications from the IRS or any other communication with respect to which a Representative of Parent does not participate. The Company and Parent agree to cooperate and use their reasonable best efforts to assist in obtaining the rulings requested

in the Supplemental Ruling Requests (including, for the avoidance of doubt, the requested rulings, if any, that are not Fundamental Rulings described on Exhibit I), including providing such appropriate information and representations as the IRS shall reasonably require in connection with the Supplemental Rulings or any restructuring transactions contemplated by this Agreement and by the Plan of Reorganization. The Company and Parent agree to use their commercially reasonable efforts to provide any appropriate information and additional representations, and to implement any changes to the restructuring transactions contemplated by this Agreement and by the Plan of Reorganization to the extent such changes would not, unless otherwise agreed by Parent, result in (x) a material economic detriment to Parent or the Company or any of their respective Subsidiaries (y) the issuance of common stock by Parent or its Affiliates, if requested by the IRS in order to issue reasonably satisfactory Supplemental Rulings.

(e)     Tax Opinion. Prior to the Closing, the Company shall use its commercially reasonable efforts to obtain the tax opinion contemplated by Section 7.3(c), if applicable, and Parent shall use its commercially reasonable efforts to obtain the tax opinion contemplated by Section 7.2(e), if applicable.

(f)     Tax Matters Agreement. Prior to, but contingent upon the Reorganized TCEH Spin-Off, the Company and Reorganized TECH shall duly execute and deliver a Tax Matters Agreement substantially in the form of Exhibit G (the "Tax Matters Agreement"), in accordance with the Plan of Reorganization.

Section 6.15   Registration Rights. To the extent that any recipients of any Parent Common Stock pursuant to this Agreement would become or continue to be affiliates of Parent for purposes of Rule 144 under the Securities Act as a result of receipt of such Parent Common Stock, Parent shall provide such recipients customary registration rights pursuant to a registration rights agreement effective as of the Effective Time reasonably satisfactory to the Company.

Section 6.16   Transition Services Agreement; Separation Agreement. At the Closing, the Company and Reorganized TCEH shall duly execute and deliver a Transition Services Agreement substantially in the form of Exhibit H (the "Transition Services Agreement"). Prior to, but contingent upon the Reorganized TCEH Spin-Off, the Company and Reorganized TCEH and Opco (as defined in the Separation Agreement) shall duly execute and deliver a Separation Agreement (the "Separation Agreement") substantially in the form of Exhibit J, in each case in accordance with the Plan of Reorganization. Following the execution of the Separation Agreement, the Company shall (i) use its reasonable best efforts to comply with its covenants and other obligations thereunder, and (ii) enforce its rights and remedies thereunder in the event of a breach by Reorganized TCEH or Opco.

Section 6.17   Notice of Current Events. From and after the date of this Agreement until the Effective Time, the Company and Parent shall promptly notify each other orally and in writing upon becoming aware of any (i) occurrence, or non-occurrence, of any event that, individually or in the aggregate, would reasonably be expected to cause any condition to the obligations of the other party to effect the Closing not to be satisfied; (ii) written notice from any third party (other than a notice that has been previously identified pursuant to the Company Disclosure Letter) alleging that the consent of such party is or may be required in connection

with the Closing Date Transactions or the other transactions contemplated by this Agreement or the Plan of Reorganization; and (iii) written notice of any proceeding commenced or, to the Knowledge of the Company or Parent, threatened against the Company, Parent or their respective Subsidiaries (other than the Oncor Entities), that has had or would have, individually or in the aggregate, a Company Material Adverse Effect or a Parent Material Adverse Effect; *provided, however*, that in each case the delivery of any notice pursuant to this Section 6.17 shall not cure any breach of any representation or warranty requiring disclosure of such matter prior to the date of this Agreement or otherwise limit or affect the remedies available hereunder to either Party, and the failure to deliver any such notice shall not affect any of the conditions set forth in Article VII.

Section 6.18   Drag-Along Rights.

(a)      Each of the parties hereto acknowledges and agrees that the Offer (together with this Agreement to the extent referred to therein) constitutes an offer by Parent and Merger Sub to purchase (i) all of the LLC Units in Oncor held indirectly by the Company and (ii) all of the LLC Units in Oncor that are owned by Oncor Management and by TTI as provided for in Section 3.3(a) of the Investor Rights Agreement.

(b)      So long as Parent and Merger Sub have not (x) rescinded the Offer or (y) amended or modified the Offer in a manner that violates the Investor Rights Agreement, at any time following the receipt of a written request from Parent and prior to the Termination Date, the Company shall (i) prepare a Required Sale Notice (as such term is defined in the Investor Rights Agreement) in form and substance reasonably satisfactory to Parent and the Company and consistent with Section 3.3 of the Investor Rights Agreement and the terms of this Agreement and (ii) promptly deliver such Required Sale Notice to TTI.

(c)      Notwithstanding anything to the contrary in Section 6.7, all reasonable out-of-pocket Costs incurred by the Company or any of its Subsidiaries (including those of its Representatives) after the date of this Agreement in connection with (i) this Section 6.18, (ii) the Offer or (iii) delivery of the Required Sale Notice to TTI, shall be paid, or reimbursed, by Parent in immediately available funds within thirty (30) days after termination of this Agreement in accordance with its terms (1) except if the Company or EFIH terminate this Agreement pursuant to Section 8.3(e) or Section 8.3(f), in which event no amounts shall be payable by Parent, and (2) other than any Costs arising from a material breach by the Company or EFIH of its obligations under this Agreement (including under this Section 6.18 and Section 6.19) with respect to such matters or from the gross negligence or willful misconduct of the Company or EFIH in connection with such matters.

(d)      Parent shall indemnify and hold harmless the Company, its Subsidiaries and its and their respective Representatives from and against any and all Costs suffered or reasonably incurred by them in connection with (i) this Section 6.18, (ii) the Offer, or (iii) the Required Sale Notice, other than any Costs arising from a material breach by the Company or EFIH of its respective obligations under this Agreement (including under

this Section 6.18 and Section 6.19) with respect to such matters or the gross negligence or willful misconduct of the Company or EFIH in connection with such matters.

(e)    Parent and Merger Sub shall be responsible for their own Costs in connection with (i) this Section 6.18, (ii) the Offer or (iii) delivery of the Required Sale Notice to TTI.

Section 6.19    Enforcement of Certain Investor Rights.

(a)    Following the execution of this Agreement, Parent and Merger Sub shall use reasonable efforts to negotiate and execute definitive documentation with TTI (or, if applicable, its equityholders) providing for the acquisition of the Minority Interest as of the Closing Date for consideration in an amount sufficient to satisfy the applicable requirements of Section 3.3 of the Investor Rights Agreement and otherwise on terms to be mutually agreed by Parent, Merger Sub and TTI (or, if applicable, its equityholders). Solely to the extent that, at any time after the date that is thirty (30) days from the date on which the Required Sale Notice is delivered in accordance with Section 6.18, (x) neither Merger Sub nor any of its Affiliates has executed definitive documentation with TTI (or, if applicable, its equityholders) providing for the acquisition of the Minority Interest, (y) Merger Sub and Parent have complied, in all material respects, with their obligations under this Section 6.19(a) and (z) Parent and Merger Sub have neither rescinded the Offer nor amended or modified the Offer in a manner that violates the Investor Rights Agreement, Parent or Merger Sub shall be entitled to send a written notice to the Company requesting that the Company commence an Enforcement Action (as defined below). The parties hereto hereby agree that Parent and Merger Sub shall have complied with their respective obligations under this Section 6.19(a) to the extent Parent, Merger Sub or an Affiliate of Parent has made and not rescinded a good faith offer to TTI consistent with the Offer and otherwise made good faith efforts to propose the basis for negotiations and propose draft definitive documentation providing for the acquisition of the Minority Interest as of the Closing Date consistent with the terms of the Offer and the Investor Rights Agreement.

(b)    Promptly following, and in no case more than fourteen (14) Business Days after, the delivery of the written notice described in Section 6.19(a), the Company shall file an action (the "Enforcement Action") in the Bankruptcy Court (or, if the Bankruptcy Court issues a final order confirming that it does not have jurisdiction over the Enforcement Action, another appropriate court mutually agreed in good faith by the Company and Parent) that seeks any or all of the following remedies (as determined by consultation among the parties hereto, but including, at a minimum, the remedies described in clauses (i) and (ii) below): (i) a determination that the Company has the right to enforce the Drag-Along Rights and TTI is accordingly bound to consummate the sale of the Minority Interest at the Closing, (ii) a determination that TTI is obligated to take such actions as may be reasonably required on its part in connection with consummating the IPO Conversion Plan (*provided* the Company shall not be required to file an Enforcement Action including this remedy if the Company, based on the advice of outside counsel, reasonably determines that an actual case or controversy regarding such obligation does not exist at that time; *provided further*, that if TTI indicates that it will

not comply with its obligations in connection with the IPO Conversion within thirty (30) days of delivery of the Required Sale Notice any temporal requirement for a case or controversy to exist shall be deemed to be satisfied, (iii) a determination, if applicable, that TTI has failed to comply with its obligations under the Investor Rights Agreement with respect to the Drag-Along Rights contained therein or with respect to the IPO Conversion Plan, (iv) enforcement of any other obligations of TTI arising under the Investor Rights Agreement or the Oncor LLC Agreement, in each case solely relating to the matters described in clause (i) and/or (ii) above and (v) any other remedy available to the Company at law or in equity in connection with such matters. For the avoidance of doubt, the Company shall have no obligation to bring any other action (whether in law, equity or otherwise) against TTI pursuant to this Section 6.19; *provided, however*, that, to the extent that TTI or any of its Affiliates commences any action relating to the matters identified in this Section 6.19 against the E-Side Debtors or any of their Affiliates, the Company or such other Person shall as promptly as practicable seek to remove any such action to the Bankruptcy Court and, to the extent applicable, seek to enforce the automatic stay against such action pending removal.

(c)     The Enforcement Action shall be conducted by the Company with counsel selected by the Company, in its reasonable discretion, which may include Kirkland & Ellis LLP. To the extent that Parent and/or Merger Sub move to intervene in and otherwise participate in the Enforcement Action, at their own cost and expense and with their own counsel (which may include Chadbourne & Parke LLP), the Company and EFIH shall not oppose such motion, or knowingly take any action with the intent of preventing, restricting or hindering Parent or Merger Sub from intervening and participating in the Enforcement Action, and shall support the their right to intervene in the Enforcement Action for any and all purposes related to the Enforcement Action (including related counterclaims) with full rights of participation.

(d)     To the extent that, after the commencement of the Enforcement Action, (i) none of Merger Sub or any of its Affiliates has executed definitive documentation with TTI (or, if applicable, its equityholders) providing for the acquisition of the Minority Interest, (ii) Parent and Merger Sub have complied, in all material respects, with their obligations under Section 6.19 and (iii) Merger Sub has neither rescinded the Offer nor amended or modified the Offer in a manner that violates the Investor Rights Agreement, the Company shall prosecute the Enforcement Action diligently until entry of a final order resolving the Enforcement Action in its entirety. Subject to the terms of this Section 6.19, the Company and Parent shall (and shall cause their respective attorneys and advisors to) cooperate with each other and use reasonable best efforts to take all actions, and do, or cause to be done, all things reasonably necessary or advisable to achieve a Successful Outcome (as defined below) of the Enforcement Action, including preparing and filing all documentation reasonably required in connection therewith. A "Successful Outcome" means obtaining the applicable remedies referred to in clauses (i) through (iv) of Section 6.19(b) or entering into a settlement or compromise of the Enforcement Action as set forth in Section 6.19(f).

(e)     In connection with the Enforcement Action, the Company and EFIH shall (i) provide Parent, Merger Sub and their designated advisors with a reasonable

opportunity to review in advance and provide comments to any material filings made in connection therewith, and consider those comments in good faith, (ii) reasonably consult with, and consider in good faith the views of, Parent, Merger Sub and their designated counsel in connection with the prosecution, defense and/or settlement of such Enforcement Action and (iii) allow Parent, Merger Sub and their designated legal advisors to attend, and, if permitted by applicable Law (and only if appropriate agreements are entered into designed to minimize the risk of waiving, and with the intention of maintaining, any privilege or work product doctrine), participate in, all material meetings, communications and proceedings with respect to such Enforcement Action. Without limitation to the foregoing sentence, the Company shall consult with, and consider in good faith the views of, Parent and Merger Sub regarding all material strategic decisions relating to the conduct of the Enforcement Action, and Parent shall be entitled to set the timing for the filing of any summary judgment or other dispositive motion and for any trial or other significant hearing; *provided, however*, that notwithstanding anything to contrary in this Section 6.19, the Company shall be entitled to refrain from taking any action proposed by Parent that it reasonably determines (based on the advice of its counsel) is (A) likely to have a material and adverse effect on the ability of the Company and/or EFIH to effectuate the Closing Date Transactions or the other transactions contemplated hereby or in the Plan of Reorganization, or (B) inconsistent with its board of directors' applicable fiduciary duties. Subject to the limitations set forth in the first sentence of Section 6.19(d), the Company shall, and shall direct its counsel to, use reasonable best efforts to take all steps to prosecute the Enforcement Action as promptly as reasonably practicable, including filing motions with the court, as appropriate, to seek a ruling on expedited treatment for the Enforcement Action, and Parent (including designated legal counsel and other advisors) shall use its and their reasonable best efforts to support and assist the Company in fulfilling its obligations with respect to the Enforcement Action.

(f)     Without limiting any other provision of this Section 6.19, the Company shall not settle or compromise any Enforcement Action or consent to the entry of any order in connection therewith without the prior written consent of Parent (in its sole discretion). Parent shall be entitled to cause the Company to settle or compromise any Enforcement Action or consent to the entry of any order in connection therewith without the consent of the Company so long as (i) any such settlement or compromise, and any payment obligations in connection therewith, shall be contingent on the occurrence of the Closing and (ii) Parent provides advance notice of at least five (5) Business Days to the Company of the proposed terms of such settlement or compromise and the Company does not notify Parent in writing within such five (5) Business Day period that the Company has reasonably determined (based on the advice of its counsel) that such settlement or compromise (A) is likely to have a material and adverse effect on the ability of the Company and/or EFIH to effectuate the Closing Date Transactions or the other transactions contemplated hereby or in the Plan of Reorganization, or (B) is inconsistent with its board of directors' applicable fiduciary duties.

(g)     The Company shall cause its counsel to track separately all fees and expenses incurred in connection with the Enforcement Action as part of its ongoing fee application process. Notwithstanding anything to the contrary in Section 6.7, the

Company shall invoice Parent for all reasonable and documented fees and expenses incurred by it and its Affiliates in connection with the Enforcement Action on a monthly basis and such invoices shall be payable by Parent in immediately available funds within thirty (30) days after termination of this Agreement in accordance with its terms (except if the Company or EFIH terminate this Agreement pursuant to Section 8.3(e) or Section 8.3(f), in which event no amounts shall be payable by Parent).

(h)    In addition, Parent shall indemnify and hold harmless the Company, its Affiliates and its and their respective Representatives from and against any and all Costs suffered or reasonably incurred as a result of actions taken pursuant to this Section 6.19, to the extent such actions are taken during the period from the date of this Agreement to its termination in accordance with it terms except if this Agreement is terminated pursuant to Section 8.3(e) or Section 8.3(f) and other than any Costs arising from a material breach by the Company or EFIH of its respective obligations under this Section 6.19 or from the gross negligence or willful misconduct of the Company in connection with the Enforcement Action.

(i)    If requested by Parent, the Company, EFIH and their respective advisors shall promptly consent to, execute and deliver to Parent a mutually agreeable common interest or joint defense or prosecution agreement regarding the defense and/or prosecution of any Enforcement Action that is consistent with the foregoing provisions of this Section 6.19. For purposes of this Agreement, the term "Enforcement Action" shall include any appeals therefrom.

Section 6.20    IPO Conversion Plan.

(a)    The Company hereby agrees that it shall (i) reasonably promptly (but in no event later than ten (10) Business Days) following the receipt of the Approval Order, approve the IPO Conversion Plan, (ii) reasonably promptly (but in no event later than ten (10) Business Days) following written request of Parent, deliver notice to Oncor of the Company's intent to undertake the IPO Conversion pursuant to the IPO Conversion Plan (the "IPO Conversion Plan Notice") and (iii) undertake the steps of the IPO Conversion Plan reasonably requested by Parent).

(b)    Notwithstanding anything to the contrary in Section 6.7, all reasonable out-of-pocket Costs incurred by the Company or any of its Subsidiaries (including those of its Representatives) after the date of this Agreement in connection with (i) this Section 6.20, (ii) the IPO Conversion Plan or (iii) delivery of the IPO Conversion Plan Notice to Oncor, shall be paid, or reimbursed, by Parent in immediately available funds within thirty (30) days of the termination of this Agreement in accordance with its terms (except if the Company or EFIH terminate this Agreement pursuant to Section 8.3(e) or Section 8.3(f), in which event no amounts shall be payable by Parent and other than any Costs arising from a material breach by the Company or EFIH of its respective obligations under this Agreement (including under Section 6.19 and this Section 6.20) or the gross negligence or willful misconduct of the Company or EFIH in connection with such matters. Parent and Merger Sub shall be responsible for their own Costs in connection

with (i) this Section 6.20, (ii) the IPO Conversion Plan or (iii) delivery of the IPO Conversion Plan Notice to Oncor.

(c)      Parent shall indemnify and hold harmless the Company, its Subsidiaries and its and their respective Representatives, if this Agreement is terminated in accordance with its terms from and against any and all Costs suffered or reasonably incurred by them in connection with (i) this Section 6.20, (ii) the IPO Conversion Plan, or (iii) delivery of the IPO Conversion Plan Notice to Oncor, other than any Costs arising from a material breach by the Company or EFIH of its respective obligations under this Agreement (including under Section 6.19 and this Section 6.20) or from the gross negligence or willful misconduct of the Company or EFIH in connection with such matters.

Section 6.21    Oncor Entities.

(a)      Each of the Company and EFIH covenants that it will exercise its rights to consent and vote (if any) under the Oncor Agreements as direct or indirect equity owners of the Oncor Entities in a manner intended to cause the Oncor Entities to comply with each of their respective covenants and agreements set forth in the Oncor Letter Agreement, the Investor Rights Agreement and under applicable Law.  Notwithstanding the foregoing, Parent and Merger Sub acknowledge and agree that neither the Company nor EFIH shall be required, in connection with such party's obligations under this Section 6.21, and their reasonable best efforts shall not include any obligation, to (A) pay any amounts to the Oncor Entities or any other Person or incur any liabilities or other obligation, (B) execute or enter into or perform any new agreement (other than an agreement contemplated hereby or in the Plan of Reorganization or that confirms or makes effective its obligations hereunder), or (C) breach any Law or commence any Action against any Person, including any of the Oncor Entities or their respective officers and managers, other than the Enforcement Action.

(b)      Each of the Company and EFIH shall, and shall cause each of their respective Subsidiaries to not permit Oncor Holdings to take, or permit Oncor to take, any of the actions set forth in the Oncor Holdings LLC Agreement or the Oncor LLC Agreement, in each case that require the approval or consent of the Company or any of its Subsidiaries.

Section 6.22    Financing.

(a)      Prior to the date hereof, Parent has provided the Company with a description of the potential debt financing (the "Debt Financing") and equity financing (the "Equity Financing" and together with the Debt Financing, the "Financing") it may incur in order to raise proceeds sufficient to consummate the transactions contemplated by this Agreement. Prior to the earlier of the Closing Date and the Termination Date, the Company agrees to use reasonable best efforts to provide, and to use reasonable best efforts to cause its Subsidiaries (other than Oncor Entities, subject to Section 6.21) and their respective officers and employees to provide, reasonable cooperation in connection with the arrangement of the Financing; provided that, Parent shall use reasonable best

efforts to provide the Company with notice of any information needed by Parent as soon as reasonably practicable. The Company's reasonable best efforts contemplated by this Section 6.22 include the following: (i) assisting with the preparation of customary materials for rating agencies and rating agency presentations, offering documents, private placement memoranda, bank information memoranda, prospectuses and similar documents required in connection with the Financing, together with procuring customary authorization letters authorizing the distribution of information to prospective lenders or investors (which customary authorization letters shall be required notwithstanding the reasonable best efforts standard required of the Company above); (ii) furnishing (x) all information and data reasonably requested by Parent to prepare all pro forma financial statements customary in connection with the Financing and (y) all financial statements and financial data of the type and form prepared in accordance with Regulation S-X and Regulation S-K under the Securities Act for offerings of debt or equity securities on a registration statement on Form S-1 or Form S-3 under the Securities Act (which, for the avoidance of doubt, in no event shall require financial information otherwise required by Rule 3-10 and Rule 3-16 of Regulation S-X (*provided* that information with respect to assets, liabilities, revenue and EBITDA with respect to non-guarantors in the aggregate shall be provided) or "segment reporting" and any Compensation Discussion and Analysis or executive compensation information required by Item 402 of Regulation S-K)) to the extent customary to consummate the Financing, including all information required to be incorporated therein (subject to exceptions customary for a private Rule 144A offering); (iii) furnishing Parent and the lenders and investors for such Financing or their respective Affiliates promptly, and in any event no later than three (3) Business Days prior to an Early Financing Date (as defined below) or the Closing Date, as applicable, with all documentation and other information which any lender or investor providing or arranging the Financing has reasonably requested, including under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act in each case to the extent such request is made at least ten (10) Business Days prior to the Early Financing Date or the Closing Date, as applicable; (iv) providing customary management representation letters to the independent accountants and using reasonable best efforts to cause the Company's independent auditors to cooperate in connection with the Financing (including providing accountant's comfort letters and consents to use their audit reports from the Company's independent auditors to the extent required in connection with such Financing); (v) obtaining customary payoff letters, releases of liens and other instruments of termination or discharge reasonably requested by Parent in connection with the repayment of indebtedness of the Company and its Subsidiaries (other than Oncor Entities) as necessary to consummate the transactions contemplated by this Agreement or the Plan of Reorganization; and (vi) otherwise cooperating with Parent to satisfy any express conditions precedent to the Financing within the control of the Company, provided in each case (A) such requested cooperation shall not unreasonably interfere with the ongoing operations of the Company and its Subsidiaries, (B) neither the Company nor any of its Subsidiaries shall be required to pay any commitment or other similar fee or incur any other liability or obligation in connection with the Financing prior to the Closing Date, (C) other than customary authorization letters, none of the Company, its Subsidiaries or their respective officers, directors, or employees shall be required to

93

execute or enter into or perform any agreement with respect to the Financing that is not contingent upon the Closing or that would be effective prior to the Closing Date nor prepare any pro forma financial statements, (D) Persons who are on the board of directors or the board of managers (or similar governing body) of the Company and any of its Subsidiaries prior to the Closing Date in their capacity as such shall not be required to pass resolutions or consents to approve or authorize the execution of the Financing, and (E) none of the Company or its Subsidiaries or their respective officers, directors, or employees shall be required to execute any solvency certificate in connection with the Financing. Nothing contained in this Section 6.22(a) or otherwise shall require the Company or any of its Subsidiaries, prior to the Closing, to be an issuer or other obligor with respect to the Financing.

(b)    From and after the date hereof until the earlier of the Termination Date and the Closing Date, it is understood that Parent may seek to market and consummate all or a portion of the Financing (the date of any such issuance, an "Early Financing Date"). In this regard, and for the avoidance of doubt, the Company and EFIH acknowledge that their cooperation obligations set forth in Section 6.22(a) include the obligation to use their reasonable best efforts to cooperate with any such efforts, provided such cooperation obligations are limited to those set forth in Section 6.22(a).

(c)    Prior to the Closing Date, none of the Company, its Subsidiaries and its and their respective Representatives shall be required to take any action that would subject such Person to actual or potential liability, to bear any cost or expense or to pay any commitment or other similar fee or make any other payment or incur any other liability or provide or agree to provide any indemnity in connection with the Financing or their performance of their respective obligations under this Section 6.22 or any information utilized in connection therewith. Parent shall indemnify and hold harmless the Company, its Subsidiaries and its and their respective Representatives from and against any and all Costs suffered or incurred by them in connection with the arrangement of the Financing and the performance of their respective obligations under this Section 6.22 and any information utilized in connection therewith (other than arising from information provided by the Company or its Subsidiaries). Parent shall, promptly upon request of the Company if this Agreement is terminated in accordance with its terms, reimburse the Company and its Subsidiaries for all reasonable and documented out-of-pocket costs and expenses incurred by the Company or its Subsidiaries (including those of its Representatives), in connection with the cooperation required by this Section 6.22. The Company hereby consents to the use of the logos of the Company and its Subsidiaries in connection with the Financing; provided that such logos are used solely in a manner that is not intended to or reasonably likely to harm or disparage the Company or any of its Subsidiaries or the reputation or goodwill of the Company or any of its Subsidiaries.

(d)    Parent and Merger Sub acknowledge and agree that the consummation by Parent of the transactions contemplated by this Agreement or the Plan of Reorganization is not conditional upon the consummation of, or the receipt by Parent or Merger Sub or any of their Affiliates of the proceeds of, the Financing.

## ARTICLE VII
### Conditions

Section 7.1    Conditions to All Parties' Obligations. The obligations of each party to effect the Closing are subject to the satisfaction or mutual waiver (as determined by the Company and, to the extent EFIH would be adversely affected by the Company's actions, EFIH, on the one hand, and by Parent, on the other hand) of the following conditions at or prior to the Closing:

(a)    Bankruptcy Orders. The Bankruptcy Court shall have entered (in a form which is not materially inconsistent, in any substantive legal or economic respect, with the rights and obligations of the Company or EFIH or Parent or Merger Sub hereunder or in the Plan of Reorganization) (i) the order of the Bankruptcy Court approving this Agreement, including, among other things, approval of the Termination Fee and the Company's and EFIH's entry into and performance of their obligations under this Agreement and the related agreements (the "Approval Order"); (ii) an order, in form reasonably satisfactory to Parent, confirming the Plan of Reorganization with respect to the E-Side Debtors and authorizing all of the transactions and agreements contemplated by this Agreement (the "EFH Confirmation Order"); and (iii) an order confirming the Plan of Reorganization with respect to the TCEH Debtors, which in each case shall be in full force and effect and not subject to any stay.

(b)    Orders. No court or other Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or order (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins, renders illegal or otherwise prohibits consummation of the Closing Date Transactions.

(c)    Opinion of Counsel with respect to the Reorganized TCEH Spin-Off. By the time of the Reorganized TCEH Spin-off the Company and Reorganized TCEH shall have obtained an opinion of nationally recognized counsel or accounting firm selected by the Company in form and substance reasonably acceptable to the Company and Parent at a "should" or higher level, to the effect that the Reorganized TCEH Contributions, Reorganized TCEH Conversion and Reorganized TCEH Spin-Off meet the requirements of Sections 368(a)(1)(G), 355 and 356 of the Code and including the Fundamental Opinions listed in Exhibit I; provided however, that if the Fundamental Rulings of Exhibit I in respect of section 368 continuity of interest, active trade or business, section 355 continuity of interest, and/or section 355(d) cannot be obtained because insufficient information is available regarding the reorganization of the E-Side Debtors, but all other conditions to the Closing have been satisfied, then the opinion may assume such provisions are satisfied by the provision of a representation that the Company and its Subsidiaries has no plan or intention to enter into any transaction that is inconsistent with the Intended Tax-Free Treatment. In rendering such opinion, the party providing the opinion shall be permitted to rely upon reasonable representations, including a representation that the Company and its Subsidiaries have no plan or intention at the time of the Reorganized TCEH Spin-Off to take any action that is inconsistent with the Intended Tax-Free Treatment.

95

(d)    TCEH Separation. The Reorganized TCEH Spin-Off shall have occurred in all material respects in accordance with the Plan of Reorganization and the Private Letter Ruling.

(e)    Closing Debt. Assuming the Closing Date Transactions are consummated, neither the Company nor any of its Subsidiaries (other than the Oncor Entities) will have any indebtedness for borrowed money immediately following the Effective Time.

(f)    Private Letter Rulings.  The Initial Private Letter Ruling shall remain in full force and effect and shall not have been revoked or withdrawn, and the Supplemental Rulings shall have been obtained by the Company from the IRS in a form reasonably satisfactory to Parent; *provided, however*, that (A) a particular ruling that, in the reasonable determination of Parent covers substantially the same subject matter as any one or more of the Supplemental Rulings set forth in Exhibit I shall not be grounds for concluding that the Supplemental Rulings (collectively) are not reasonably satisfactory to Parent due to its failure to include such ruling, (B) in the event a specific Supplemental Ruling set forth in Exhibit I is not given because the IRS communicates that there is no significant issue with respect to the requested ruling, the absence of such ruling shall not, standing alone (or collectively) be grounds for concluding the Supplemental Rulings (collectively) are not reasonably satisfactory to Parent *provided* that Parent, and unless waived by Parent, the Company, obtain an opinion of nationally recognized tax counsel, in form and substance acceptable to Parent, at a "will" level with respect to the issue that was initially requested pursuant to the Supplemental Ruling Request, or (C) a pre-filing agreement (including an agreement in accordance with Revenue Procedure 2016-30) or closing agreement with the IRS shall be acceptable in lieu of such specific Supplemental Ruling set forth in Exhibit I, *provided* that such agreement is both (i) binding on the IRS to the same degree as a private letter ruling or is otherwise acceptable to Parent in its reasonable discretion and (ii) contains, in the reasonable determination of Parent conclusions that are substantially similar, and have substantially the same practical effect, to those contained in the specific rulings initially requested pursuant to the Supplemental Ruling Requests.

(g)    Tax Matters Agreement. Prior to, but contingent upon the Reorganized TCEH Spin-Off, the Tax Matters Agreement shall have been entered into between the Company and Reorganized TCEH, in accordance with the terms hereof and the Plan of Reorganization, shall be in full force and effect and shall not have been amended, modified or supplemented without the consent of Parent.

(h)    Split Participant Agreement. Prior to, but contingent upon the Reorganized TCEH Spin-Off, the Split Participant Agreement, shall have been entered into between Oncor and Reorganized TCEH, in accordance with the terms hereof, the Plan of Reorganization and the Oncor Letter Agreement, shall be in full force and effect and shall not have been amended, modified or supplemented without the consent of Parent.

(i)    NYSE Listing and SEC Registration. The shares of Parent Common Stock issuable pursuant to this Agreement shall have been approved for listing on the NYSE, subject only to official notice of issuance, shall be freely saleable and not subject to any

resale restrictions except to the extent such restrictions are due to the status of the holder thereof, and either (i) the Form S-4, or other registration statement as applicable, shall have become and continue to be effective under the Securities Act and shall not be the subject of any stop order or proceedings seeking a stop order, and Parent shall have received the state securities or "blue sky" authorizations necessary for the issuance of the shares of Parent Common Stock to be issued as the Stock Consideration or (ii) the SEC shall have issued a favorable "no-action" letter to the effect that the exemption from the registration requirements of the Securities Act and from applicable state securities laws provided by Section 1145 of the Bankruptcy Code is applicable in connection with such issuances.

Section 7.2     Conditions to Obligations of Parent and Merger Sub. The obligations of Parent and Merger Sub to effect the Closing are also subject to the satisfaction or waiver by Parent at or prior to the Closing of the following conditions:

(a)     Representations and Warranties. (i) The representations and warranties of the Company and EFIH set forth in this Agreement other than Section 5.1(b), 5.1(c) and 5.1(f)(i) (without giving effect to any materiality or Company Material Adverse Effect qualifications set forth therein) shall be true and correct on the date hereof and as of the Closing as though made on and as of such date and time (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall, subject to the qualifications below, be true and correct as of such earlier date) except where any failures of any such representations and warranties to be so true and correct, individually or in the aggregate, have not had and would not have, a Company Material Adverse Effect; (ii) the representations and warranties of the Company and EFIH set forth in (x) Section 5.1(b)(i) shall be true and correct in all material respects on the date hereof and as of the Closing and (y) Section 5.1(b)(ii), Section 5.1(c) and Section 5.1(f)(i) shall be true and correct in all respects on the date hereof and as of the Closing; and (iii) Parent shall have received at the Closing a certificate signed on behalf of the Company and EFIH (in each case by a senior executive officer of such entity) to the effect that such officer has read this Section 7.2(a) and the conditions set forth in this Section 7.2(a) have been satisfied. The representations and warranties of Oncor and Oncor Holdings in the Oncor Letter Agreement shall be true and correct in all respects on the date hereof and as of the Closing as though made on and as of such date and time (except where any failures of any such representations and warranties to be so true and correct, individually or in the aggregate, has not had and would not have a material adverse effect on the ability of Oncor Holdings or Oncor to comply with their respective obligations thereunder) and Parent shall have received at the Closing a certificate signed on behalf of Oncor and Oncor Holdings (in each case by a senior executive officer of such entity) to that effect.

(b)     Performance of Obligations of the Company, EFIH and the Oncor Entities. Each of the Company and EFIH shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing (other than the obligations in Section 6.6(a)(i) (excluding written assignment of the third party administration agreements of the Contributed Plans) and Section 6.9 hereof, which shall have been performed in all respects), and Parent shall have received a certificate

97

signed on behalf of the Company and EFIH (in each case, by a senior executive officer of such entity) to such effect. Each of Oncor and Oncor Holdings shall have performed in all material respects all obligations required to be performed by it under the Oncor Letter Agreement at or prior to the Closing (other than the obligations in Section 16 of the Oncor Letter Agreement, which shall have been performed in all respects), and Parent shall have received at the Closing a certificate signed on behalf of Oncor and Oncor Holdings (in each case by a senior executive officer of such entity) to that effect.

(c)    Regulatory Consents. The FERC Approval, the FCC Approval, the PUCT Approval and the Vermont Insurance Approval shall have been obtained and shall remain in full force and effect and the applicable waiting period under the HSR Act shall have expired or been terminated; *provided that*, notwithstanding anything to the contrary included elsewhere in this Agreement, no such consent or approval shall, individually or in the aggregate, impose a Burdensome Condition; and *provided further* that this condition shall not be deemed to be satisfied if the Vermont Insurance Approval shall impose any material, adverse term or condition, order, sanction, or requirement that, individually or in the aggregate, would, or would be reasonably expected to have a material and adverse effect on, or change in, the condition (financial or otherwise), business, assets, liabilities or results of operations (i) of Oncor and its Subsidiaries, taken as a whole, or (ii) of Parent and its Subsidiaries, taken as whole; *provided* that, for purposes of this clause (ii) Parent and its Subsidiaries, taken as a whole, shall be deemed to be a consolidated group of entities that is the size and scale of the Oncor Entities.

(d)    Company Tax Opinion. The Company shall have received the opinion specified in Section 7.3(c).

(e)    Parent Tax Opinion. Parent shall have received an opinion of Chadbourne & Parke LLP on the basis of the representations and warranties set forth or referred to in such opinion, dated as of the Closing Date, wherein the party providing the opinion opines (1) to the effect that the Merger will qualify as a reorganization within the meaning of Section 368(a) of the Code and (2) the Fundamental Opinions listed in Exhibit I; *provided, however* in the event Chadbourne & Parke LLP is unwilling or unable to provide the relevant opinion with the requisite degree of certainty set forth in this Section 7.2(e), Parent shall have received an opinion with the requisite degree of certainty from McDermott, Will & Emery LLP. In rendering such opinion, such tax counsel providing the opinion shall be permitted to rely upon reasonable representations, including a representation that the Company and its Subsidiaries had no plan or intention at the time of the Reorganized TCEH Spin-Off and that the Company and its Subsidiaries and Reorganized TCEH have no intention at the time of the Merger to take, and did not take, any action that is inconsistent with the Intended Tax-Free Treatment.  In giving the opinion described in (1) above, such tax counsel providing the opinion shall assume that the Reorganized TCEH Contributions, the Reorganized TCEH Conversion and the Reorganized TCEH Spin-Off meet the requirements of Sections 368(a)(1)(G), 355, and 356 of the Code.

(f)    Oncor Holdings and Oncor Board of Directors. Each member of the board of directors of Oncor Holdings and Oncor (other than officers of Oncor Holdings or

Oncor serving on either board of directors and the designees of TTI serving on the board of directors of Oncor if the Minority Interest Acquisition is not consummated on or prior to the Closing Date, but including the designees of TTI serving on the board of directors of Oncor if the Minority Interest Acquisition is consummated on or prior to the Closing Date) shall have resigned from such boards of directors, effective as of the Closing and the designees of Parent shall constitute the entire board of directors of Oncor Holdings and Oncor (other than officers of Oncor Holdings or Oncor serving on either board of directors and the designees of TTI serving on the board of directors of Oncor if the Minority Interest Acquisition is not consummated on or prior to the Closing Date), in each case, effective as of the Closing. The "Special Members" (as defined in the Oncor Holdings LLC Agreement) shall have resigned and, *provided*, that Parent has made a designation, the designees of Parent shall have become the Special Members.

(g)    EFH Confirmation Order.  The Bankruptcy Court shall have entered the EFH Confirmation Order, which order includes: (i) a finding that the Plan of Reorganization and this Agreement satisfy, among other things, section 1129(a)(4) and section 1129(a)(5) of the Bankruptcy Code; (ii) a finding that Parent is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protections afforded to good faith purchasers to the fullest extent permitted under the Bankruptcy Code; and (iii) a finding that the purchase price to be provided by Parent pursuant to this Agreement was not controlled by any agreement between Parent and any potential bidders and was not reduced or suppressed in any manner by any agreement or arrangement involving Parent and any creditor.

(h)    Third Party Consents.  Any third party consents and approvals, other than any consents or approvals of a Governmental Entity or the Bankruptcy Court, necessary in connection with the consummation of the transactions contemplated by this Agreement shall have been obtained and shall remain in full force and effect, except such third party consents and approvals the failure of which to obtain would not have, individually or in the aggregate, a Company Material Adverse Effect or Parent Material Adverse Effect.

(i)    Employees.  Except as agreed by Parent, the reorganized Company and its Subsidiaries shall not have any employees (other than employees of the Oncor Entities) and shall not be responsible for any liabilities or obligations (other than to the extent, if at all, set forth in the Assumed Plans, this Agreement, the Split Participant Agreement, the Separation Agreement, the certificates, articles of incorporation, by-laws, limited liability company operating agreements, and any other organizational document of Parent, the Company or any of the Company's subsidiaries, and insurance policies maintained after the Closing by Parent, the Company or any of the Company's subsidiaries for indemnification or advancement of expenses) owed to any current or former employee of the Company or any of its Subsidiaries (other than the Oncor Entities), including change of control or severance payments or similar obligations.

(j)    Ownership Structure.  The Company's ownership structure of its Subsidiaries as of the Effective Time shall be as disclosed in Section 7.2(j) of the Company Disclosure Letter, including with respect to the Company's 100% indirect

ownership interest in Oncor Holdings and Oncor Holdings' approximately 80% ownership interest in Oncor.

     (k)    IRS Submissions. The facts presented and the representations made in the IRS Submissions are true, correct, and complete in all material respects except to the extent the facts and statements set forth in such IRS Submissions relate to transactions that are not contemplated by this Agreement.

     (l)    No Ownership Change. Except as contemplated by the Plan of Reorganization, (i) no Debtor shall have taken any action that results in an ownership change of the Company within the meaning of Section 382(g) of the Code (including by treating the equity interests of the Company as becoming worthless within the meaning of Section 382(g)(4)(D) of the Code); and (ii) Texas Energy Future Holdings Limited Partnership shall not have (A) taken any action that results in an ownership change of the Company within the meaning of Section 382(g) of the Code (including by treating the equity interests of the Company as becoming worthless within the meaning of Section 382(g)(4)(D) of the Code and thereby resulting in an ownership change of the Company within the meaning of Section 382(g) of the Code); (B) knowingly permitted any Person (other than Texas Energy Future Holdings Limited Partnership) to own directly, indirectly or constructively (by operation of Section 318 as modified by Section 382(1)(3)(A) of the Code) 50% or more of the equity interests of the Company during the three-year period ending on the Closing Date; or (C) changed its taxable year to be other than the calendar year.

     (m)    Company Material Adverse Effect.  From the date hereof through the Closing Date, except for matters set forth in the Company Disclosure Letter, no Company Material Adverse Effect shall have occurred and be continuing as of the Closing Date.

Section 7.3    Conditions to Obligation of the Company and EFIH. The obligations of each of the Company and EFIH to effect the Closing are also subject to the satisfaction (or waiver by the Company, and to the extent EFIH would be adversely affected by the Company's actions, EFIH) at or prior to the Closing of the following conditions:

     (a)    Representations and Warranties. (i) The representations and warranties of Parent set forth in this Agreement other than Section 5.2(b), 5.2(c), and the first sentence of 5.2(f) (without giving effect to any materiality or Parent Material Adverse Effect qualifications set forth therein) shall be true and correct as of the date hereof and as of the Closing as though made on and as of such date and time (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date) except where any failures of any such representations and warranties to be so true and correct, individually or in the aggregate, have not had and would not have a, Parent Material Adverse Effect; (ii) the representations and warranties set forth in (x) Section 5.2(b) shall be true and correct in all material respects on the date hereof and as of the Closing and (y) Section 5.2(c) and the first sentence of Section 5.2(f) shall be true and correct in all respects on the date hereof and as of the Closing; and (iii) the Company shall have received at the Closing a certificate signed on behalf of Parent by a

senior executive officer of Parent to the effect that such officer has read this Section 7.3(a) and the conditions set forth in this Section 7.3(a) have been satisfied.

(b)    Performance of Obligations of Parent and Merger Sub. Each of Parent and Merger Sub shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing, and the Company and EFIH shall have received a certificate signed on behalf of Parent and Merger Sub by a senior executive officer of Parent and Merger Sub, respectively, to such effect.

(c)    Company Tax Opinions.  Unless the receipt of the following opinion is waived by Parent, the Company shall have received an opinion of Kirkland & Ellis LLP, on the basis of the representations and warranties set forth or referred to in such opinion, dated as of the Closing Date, wherein the party providing the opinion opines (1) to the effect that the Merger will qualify as a reorganization within the meaning of Section 368(a) of the Code and (2) the Fundamental Opinions listed in Exhibit I; *provided, however* in the event Kirkland & Ellis LLP is unwilling or unable to provide the relevant opinion with the requisite degree of certainty set forth in this Section 7.3(c), the Company shall have received an opinion with the requisite degree of certainty from Cravath, Swaine & Moore, LLP. In rendering such opinion, such tax counsel or accounting firm providing the opinion shall be permitted to rely upon reasonable representations, including a representation that the Company and its Subsidiaries had no plan or intention at the time of the Reorganized TCEH Spin-Off and have no plan or intention at the time of the Merger to take, and did not take, any action that is inconsistent with the Intended Tax-Free Treatment. In giving the opinion described in (1) above, such tax counsel or accounting firm providing the opinion shall assume that the Reorganized TCEH Contributions, Reorganized TCEH Conversion and the Reorganized TCEH Spin-Off meet the requirements of Sections 368(a)(1)(G), 355, and 356 of the Code.

(d)    Registration Rights. Parent shall have provided customary registration rights, pursuant to a registration rights agreement reasonably satisfactory to the Company, to any recipients of Parent Common Stock in connection with the Merger that would become or remain affiliates of Parent for purposes of Rule 144 under the Securities Act as a result of the receipt of such Parent Common Stock.

(e)    Regulatory Consents. Any and all governmental consents and approvals referred to in Section 7.2(c) shall have been obtained and shall remain in full force and effect and the applicable waiting period under the HSR Act shall have expired or been terminated.

## ARTICLE VIII
### Termination

Section 8.1    Termination by Mutual Consent. This Agreement may be terminated at any time prior to the Closing, whether before or after the Bankruptcy Court shall have entered the EFH Confirmation Order, by mutual written consent of the Company, EFIH, Parent and Merger Sub by action of each of their respective boards of directors or managers.

Section 8.2    Termination by Either Parent or the Company/ EFIH. This Agreement may be terminated at any time prior to the Closing by action of either (x) Parent, on the one hand, or (y) the Company and EFIH (acting together), on the other hand:

(a)    if the Closing (including the Closing Date Transactions) shall not have been consummated within two hundred forty (240) days of the date of this Agreement (including as extended pursuant to this Section 8.2(a), the "Initial Termination Date"), provided, that, if as of such date any of the FERC Approval, the PUCT Approval or the Private Letter Ruling (if applicable) shall not have been obtained (and such approval or Private Letter Ruling is still capable of being obtained within ninety (90) days), the Initial Termination Date shall be extended for ninety (90) days for the purpose of continuing to pursue such approval or Private Letter Ruling, unless the Company and EFIH (acting together) and Parent agree otherwise in writing (the Initial Termination Date (as extended pursuant to this Section 8.2(a), as applicable) being, the "Termination Date"), provided, further, that, the right to terminate this Agreement pursuant to this clause (a) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of (directly or indirectly), or resulted in, the failure of the Closing to occur on or before the Termination Date; or

(b)    if any order of any court or other Governmental Entity permanently restraining, enjoining, rendering illegal or otherwise prohibiting, directly or indirectly, consummation of the Closing Date Transactions shall have become final and non-appealable; provided, however, that the termination right in this clause (b) shall not be available if the party seeking to terminate this Agreement pursuant to this clause (b) shall not have used its reasonable best efforts (and caused each of its Subsidiaries and controlled Affiliates (other than the Oncor Entities) to use its reasonable best efforts) to contest such order prior to its becoming permanent if such party (or Subsidiary or controlled Affiliate had the right to contest such order.

Section 8.3    Termination by the Company and/or EFIH. This Agreement may be terminated at any time prior to the Closing:

(a)    by the Company and EFIH (acting together) if there has been a breach of any representation, warranty, covenant or agreement made by Parent or Merger Sub in this Agreement, or any such representation or warranty shall have become untrue after the date of this Agreement, as if, in each such case, such representation or warranty were required by the Agreement to be true on and as of each such date between the date hereof and the Closing Date, which breach or failure of a representation, warranty, covenant or agreement to be true or to be performed (i) would result in a failure of a condition set forth in any provision of Section 7.1 or Section 7.3 (which for the purpose of such clauses it shall be assumed such breach is continuing as of the Closing) and (ii) cannot be, or has not been, cured within thirty (30) Business Days after Parent's receipt of written notice thereof from the Company or EFIH; provided, however, that the termination right in this clause (a) shall not apply if either the Company or EFIH is then in breach of this Agreement in a manner that would result or has resulted in any of the conditions set forth in Section 7.1 or Section 7.2 not being satisfied;

(b)      by the Company and EFIH (acting together) if Parent and Merger Sub have failed to consummate the Closing no later than the date required by Section 1.4; *provided, however*, that the termination right in this clause (b) shall not apply if either the Company or EFIH is then in breach of this Agreement in a manner that would result or has resulted in any of the conditions set forth in Section 7.1 or Section 7.2 not being satisfied;

(c)      by the Company and EFIH (acting together) if the Bankruptcy Court enters an order approving a plan of reorganization not proposed or supported by the Company or EFIH (and which the Company and EFIH, to the extent requested by Parent, used commercially reasonable efforts to challenge before the Bankruptcy Court) that is inconsistent with this Agreement or the Plan of Reorganization;

(d)      by the Company and EFIH (acting together) if the Chapter 11 Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal or conversion contemplates the Closing Date Transactions; *provided*, that such dismissal or conversion was not proposed or supported by the Company or EFIH (and which the Company and EFIH, to the extent requested by Parent, used commercially reasonable efforts to challenge before the Bankruptcy Court);

(e)      until the entry of the EFH Confirmation Order, by the Company if concurrently with such termination, the Company Board determines in its sole discretion after consultation with its independent financial advisors and outside legal counsel, and based on the advice of such counsel, that the failure to terminate this Agreement is inconsistent with its fiduciary duties, *provided* that a material breach of the Company's or EFIH's obligations under Section 6.2 has not provided the basis for such determination;

(f)      until the entry of the EFH Confirmation Order, by EFIH if concurrently with such termination, the board of managers of EFIH determines in its sole discretion after consultation with its independent financial advisors and outside legal counsel, and based on the advice of such counsel, that the failure to terminate this Agreement is inconsistent with its fiduciary duties, *provided* that a material breach of the Company's or EFIH's obligations under Section 6.2 has not provided the basis for such determination; or

(g)      by the Company and EFIH (acting together) upon any termination of the Plan Support Agreement in accordance with its terms as to the Company, EFIH, Parent or Merger Sub.

Section 8.4      Termination by Parent. This Agreement may be terminated at any time prior to the Closing by Parent:

(a)      if there has been a breach of any representation, warranty, covenant or agreement made by the Company and/or EFIH in this Agreement, or any such representation or warranty shall have become untrue after the date of this Agreement, as if, in each such case, such representation or warranty were required by the Agreement to be true on and as of each such date between the date hereof and the Closing Date, which

breach or failure of a representation, warranty, covenant or agreement to be true or to be performed (i) would result in a failure of a condition set forth in any provision of Section 7.1 or Section 7.2 (which for the purpose of such clauses it shall be assumed such breach is continuing as of the Closing), and (ii) cannot be or has not been cured within thirty (30) Business Days after the Company's or EFIH's receipt of written notice thereof from Parent; *provided, however*, that the termination right in this clause (a) shall not apply if either Parent or Merger Sub is then in breach of this Agreement or the Oncor Letter Agreement in a manner that would result or has resulted in any of the conditions set forth in Section 7.1 or Section 7.3 not being satisfied;

(b)    if there has been a breach of any representation, warranty, covenant or agreement made by Oncor or Oncor Holdings under the Oncor Letter Agreement, or any such representation or warranty shall have become untrue after the date of this Agreement, as if, in each such case, such representation or warranty were required by the Agreement to be true on and as of each such date between the date hereof and the Closing Date, which breach or failure of a representation, warranty, covenant or agreement to be true or to be performed (i) would result in a failure of a condition set forth in any provision of Section 7.1 or Section 7.2 (which for the purpose of such clauses it shall be assumed such breach is continuing as of the Closing) and (ii) cannot be or has not been cured within thirty (30) Business Days after the Company's, EFIH's, Oncor's and Oncor Holdings' receipt of written notice thereof from Parent; *provided, however*, that the termination right in this clause (b) shall not apply if either Parent or Merger Sub is then in breach of this Agreement or the Oncor Letter Agreement in a manner that would result or has resulted in any of the conditions set forth in Section 7.1 or Section 7.3 not being satisfied;

(c)    if the Company and/or EFIH fail to consummate the Closing on or prior to the date required by Section 1.4; *provided, however*, that the termination right in this clause (c) shall not apply if either Parent nor Merger Sub is then in breach of this Agreement or the Oncor Letter Agreement in a manner that would result or has resulted in the failure to consummate the Closing;

(d)    if the Company or EFIH files or expressly supports in the Bankruptcy Court a plan of reorganization that is inconsistent in any substantive legal or economic respect with this Agreement and the Plan of Reorganization (solely as it the Plan of Reorganization relates to the E-Side Debtors) and such inconsistency cannot be or has not been cured within thirty (30) Business Days after the Company's or EFIH's receipt of written notice thereof from Parent (which notice must occur within five (5) Business Days of the filing of such Plan);

(e)    if the Bankruptcy Court enters an order, or if the Company or EFIH files a motion seeking entry of an order, approving any sale or other disposition (other than a sale or other disposition permitted by this Agreement) of (i) any material portion of the assets of the Company or its Subsidiaries or (ii) any equity interests in EFIH or any of its Subsidiaries (including the Oncor Entities), to any Person(s) other than Parent, Merger Sub or any of their respective Affiliates (excluding those Subsidiaries to be transferred to

Reorganized TCEH or disposed of, in each case pursuant to this Agreement and/or the Plan of Reorganization);

(f)      if a trustee is appointed in the Chapter 11 Cases pursuant to Section 1104 of the Bankruptcy Code;

(g)      if any Chapter 11 Case, other than the cases relating to (i) LSGT Gas Company LLC, (ii) EECI, Inc., (iii) EEC Holdings, Inc., and (iv) LSGT SACROC, Inc., is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal or conversion contemplates the Closing Date Transactions and the other transactions contemplated by this Agreement;

(h)      if the Bankruptcy Court orders the substantive consolidation of (i) the chapter 11 estates of the Company and/or EFIH and/or any of their respective Subsidiaries, on one hand, with (ii) the chapter 11 estates of EFCH and/or any of its Subsidiaries, on the other hand;

(i)      upon any termination of the Plan Support Agreement in accordance with its terms as to the Company, EFIH, Parent or Merger Sub;

(j)      if the Bankruptcy Court does not enter an order approving this Agreement within forty-five (45) days of the date of this Agreement; or

(k)      if Parent, Merger Sub, Oncor and Oncor Holdings fail to enter into the Oncor Letter Agreement in substantially the form attached hereto as Exhibit K within seven (7) days following the date hereof; *provided however* if Parent has not terminated this Agreement pursuant to this Section 8.4(k) thirteen (13) days after such seven (7) day period elapses, this Section 8.4(k) shall be of no further force and effect and Parent shall have no such right to terminate this Agreement.

Section 8.5      Effect of Termination and Abandonment.

(a)      In the event of a termination of this Agreement pursuant to this Article VIII, this Agreement shall become void and of no further force or effect and no party shall have any liability to any other party hereto (or of any of its Representatives or Affiliates) with respect hereto; *provided, however,* and notwithstanding anything in the foregoing to the contrary, that, (i) this Section 8.5(a) and the provisions set forth in the second sentence of Section 9.1 shall survive the termination of this Agreement and the parties hereto may have further liability with respect thereto, and (ii) liability may exist for willful or intentional breaches of this Agreement (where willful or intentional breach means a breach of this Agreement by a party that has actual knowledge that its action (or failure to act) would reasonably be expected to breach this Agreement) by a party prior to the time of such termination and, in the case of Parent and Merger Sub, any failure to have sufficient immediately available funds at the Closing for the consummation of the transactions contemplated by this Agreement (which liability the parties hereto acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs).

(b)    If this Agreement is terminated pursuant to this Article VIII and any alternative transaction is consummated (including any transaction or proceeding that permits the E-Side Debtors that are the direct or indirect owners of Oncor Holdings to emerge from the Chapter 11 Cases) pursuant to which neither Parent nor any of its Affiliates will obtain direct or indirect ownership of 100% of Oncor Holdings and Oncor Holdings' approximately 80% equity interest in Oncor, then, subject to the approval of the Bankruptcy Court, no later than five (5) days following the consummation of such alternative transaction, the Company and EFIH shall pay to Parent the Termination Fee (as defined below), by wire transfer, as directed by Parent, in immediately available funds; *provided, however*, that the Termination Fee (as defined below) will not be payable if this Agreement is terminated (i) pursuant to Section 8.1, (ii) by Parent pursuant to Section 8.2(a) and the receipt of the PUCT Approval (without the imposition of a Burdensome Condition) is the only condition set forth in Article VII not satisfied or waived in accordance with this Agreement (other than those conditions that by their nature or pursuant to the terms of this Agreement are to be satisfied at the Closing)  or 8.2(b), or 8.4(g) (unless the Chapter 11 Cases are dismissed or converted to Chapter 7 of the Bankruptcy Code with respect to the Company or EFIH in which case the Termination Fee is payable) or Section 8.4(i) if the Plan Support Agreement is terminated pursuant to a breach thereof by Parent or Merger Sub, or (iii) by the Company pursuant to Section 8.3(a), 8.3(b), or 8.3(g) to the extent that the Plan Support Agreement is terminated pursuant to a breach thereof by Parent or Merger Sub.  In the event the Company and EFIH pay the Termination Fee pursuant to this Section 8.5(b), such payment shall be the sole and exclusive remedy of Parent and Merger Sub against the Company, EFIH and their respective Affiliates, Representatives, creditors or shareholders with respect to any breach of this Agreement prior to such termination. Subject to the Bankruptcy Court's approval of the Termination Fee, the Company's and EFIH's obligation to pay the Termination Fee pursuant to this Section 8.5(b) shall survive the termination of this Agreement.  The Termination Fee, to the extent approved by the Bankruptcy Court, shall constitute an administrative expense of the Company and EFIH under the Bankruptcy Code. "Termination Fee" shall mean an amount equal to $275,000,000, inclusive of all expense reimbursements, including reasonable and documented professional fees of Parent and Merger Sub; *provided that*, in no event shall such claim be senior or *pari passu* with the superpriority administrative claims granted to the secured parties pursuant to the DIP Facility (as in effect on the date hereof).

(c)    The parties hereto acknowledge that the agreements contained in this Section 8.5 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the parties hereto would not enter into this Agreement.

## ARTICLE IX
## Miscellaneous and General

Section 9.1    Survival. This Article IX and the agreements of the Company and EFIH, Parent and Merger Sub contained in Section 6.6 (*Employee Benefits*), Section 6.7 (*Expenses*), Section 6.8 (*Indemnification; Directors' and Officers' Insurance*), Section 6.13 (*Tax-Free Reorganization Treatment*), Section 6.18 (*Drag-Along Rights*), Section 6.19 (*Enforcement of Certain Investor Rights*), Section 6.20 (*IPO Conversion Plan*) and Section 6.22 (*Financing*) shall

survive the consummation of the Closing. This <u>Article IX</u> and the agreements of the Company and EFIH, Parent and Merger Sub contained in the last sentence of <u>Section 6.7</u> (*Expenses*) and <u>Section 8.5</u> (*Effect of Termination and Abandonment*) shall survive the termination of this Agreement. Subject to the foregoing, all other representations, warranties, covenants and agreements in this Agreement shall not survive the Closing or the termination of this Agreement.

Section 9.2    <u>Modification or Amendment</u>. Subject to the provisions of the applicable Laws (including, if applicable, the approval of the Bankruptcy Court), the parties hereto may modify or amend this Agreement, by written agreement executed and delivered by duly authorized officers of the respective parties.

Section 9.3    <u>Waiver of Conditions</u>. The conditions to each of the parties' obligations to consummate the transactions contemplated by this Agreement are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable Laws.

Section 9.4    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts (including by electronic means), each such counterpart being deemed to be an original instrument, and all such counterparts taken together constituting one and the same agreement.

SECTION 9.5 <u>GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL</u>.

(a)    THIS AGREEMENT SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. Each of the parties hereto (i) submits to the exclusive jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Court declines to accept jurisdiction over a particular matter, then the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware) in any action or proceeding arising out of or relating to this Agreement, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the parties hereto agrees that a final judgment (subject to any appeals therefrom) in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement in any Delaware or federal court in accordance with the provisions of this <u>Section 9.5(a)</u>. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each of the parties hereto hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in

Section 9.6. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by Law.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 9.5.

Section 9.6    Notices. Except as set forth in Section 6.18, Section 6.19, Section 6.20 and Section 6.22 hereof, any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by (a) registered or certified mail, postage prepaid, (b) email or (c) overnight courier:

If to Parent or Merger Sub:

NextEra Energy, Inc.
700 Universe Blvd.
Juno Beach, FL 33408
Attention:    Mark Hickson
Email:        mark.hickson@nexteraenergy.com

with copies (which shall not constitute notice) to:

NextEra Energy, Inc.
700 Universe Blvd.
Juno Beach, FL 33408
Attention:    Charles E. Sieving
Email:        charles.sieving@nexteraenergy.com

and

Chadbourne & Parke LLP
1301 Avenue of the Americas
New York, New York 10019
Attention:    Howard Seife

David LeMay
William Greason
Email:    hseife@chadbourne.com
dlemay@chadbourne.com
wgreason@chadbourne.com

If to the Company and/or EFIH:

Energy Future Holdings Corp., et al.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention:    General Counsel
Email:    stacey.dore@energyfutureholdings.com; and
awright@energyfutureholdings.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention:    Andrew Calder
John Pitts
Email:    andrew.calder@kirkland.com
john.pitts@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:    James Sprayregen
Marc Kieselstein
Chad Husnick
Email:    jsprayregen@kirkland.com
mkieselstein@kirkland.com
chusnick@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Edward Sassower
Email:    edward.sassower@kirkland.com

or to such other persons or addresses as may be designated in writing by the party to receive such notice as provided above. Any notice, request, instruction or other document given as provided above shall be deemed given to the receiving party upon actual receipt, if delivered personally; three (3) Business Days after deposit in the mail, if sent by registered or certified mail; upon receipt if sent by email and received by 5:00 pm (Eastern Time), on a Business Day (otherwise the next Business Day) (*provided that* if given by email such notice, request, instruction or other document shall be followed up within one (1) Business Day by dispatch pursuant to one of the other methods described herein); or on the next Business Day after deposit with an overnight courier, if sent by an overnight courier.

Section 9.7    Entire Agreement. This Agreement (including any exhibits or schedules hereto including as actually executed), the Company Disclosure Letter, the Parent Disclosure Letter, the Oncor Letter Agreement, the Plan Support Agreement, the Confidentiality Agreement, dated June 1, 2016, by and among Parent, the Company and EFIH and, pursuant to a Joinder dated June 1, 2016, Oncor (the "Confidentiality Agreement") and the other agreements named herein constitute the entire agreement of the parties hereto with respect to the subject matter hereof, and cancel, merge and supersede all other prior or contemporaneous oral or written agreements, understandings, representations and warranties both written and oral, among the parties hereto, with respect to the subject matter hereof. EACH PARTY HERETO AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, THE PLAN SUPPORT AGREEMENT AND THE ONCOR LETTER AGREEMENT, NEITHER PARENT AND MERGER SUB NOR THE COMPANY AND ITS SUBSIDIARIES MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, AND EACH HEREBY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OR AS TO THE ACCURACY OR COMPLETENESS OF ANY OTHER INFORMATION, MADE BY, OR MADE AVAILABLE BY, ITSELF OR ANY OF ITS REPRESENTATIVES, WITH RESPECT TO, OR IN CONNECTION WITH, THE NEGOTIATION, EXECUTION OR DELIVERY OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE OTHER OR THE OTHER'S REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.

Section 9.8    No Third Party Beneficiaries. Except as provided in Section 6.8, and Section 6.12, Parent, Merger Sub, EFIH and the Company hereby agree that their respective representations, warranties and covenants set forth herein are solely for the benefit of the other parties hereto, in accordance with and subject to the terms of this Agreement, and this Agreement is not intended to, and does not, confer upon any Person other than the parties hereto any rights or remedies hereunder, including the right to rely upon the representations and warranties set forth herein. The parties hereto further agree that the rights of third party beneficiaries under Section 6.8 shall not arise unless and until the Effective Time occurs. The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties hereto. In some instances, the representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the knowledge of any of the parties hereto. Consequently, Persons other than the parties hereto may not rely upon the

representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 9.9    Obligations of Parent. Whenever this Agreement requires a Subsidiary of Parent, including Merger Sub, to take any action, such requirement shall be deemed to include an undertaking on the part of Parent to cause such Subsidiary to take such action.

Section 9.10    Remedies. The parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed by the Company, EFIH, Parent or Merger Sub in accordance with the terms hereof and that monetary damages, even if available, would not be an adequate remedy therefor. As a result, prior to the termination of this Agreement pursuant to Article VIII, each party shall be entitled to specific performance to prevent breaches of this Agreement and of the terms hereof (including the obligation to consummate the Closing Date Transactions and the other transactions contemplated herein, subject to the terms and conditions hereof), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy) in addition to any other remedy at law or equity. The parties hereto further agree not to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

Section 9.11    Transfer Taxes. To the extent payable under applicable Law (notwithstanding section 1146 of the Bankruptcy Code), all transfer, documentary, sales, use, stamp, registration and other similar such Taxes and fees (including penalties and interest) incurred in connection with the Merger shall be paid by the Surviving Company when due.

Section 9.12    Definitions. Each term set forth in the Table of Defined Terms is defined on the page of this Agreement set forth opposite such term.

Section 9.13    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule or Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the extent possible.

Section 9.14    Interpretation; Construction.

(a)    The table of contents and headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof. Where a reference in this Agreement is made to a section or exhibit, such reference shall be to a section of or exhibit to this Agreement unless otherwise indicated. Such exhibits are an integral part of this Agreement as if fully set forth herein. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words

"without limitation." The words "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "made available" and words of similar import means that the relevant documents, instruments or materials were either (i) posted and made available to the other party or its designated Representatives on the Intralinks due diligence data site maintained by the Company for purposes of the transaction(s) contemplated by this Agreement, (ii) sent to the other party or its representatives directly, or (iii) publicly available by virtue of the relevant party's filing of a publicly available final registration statement, prospectus, report, form, schedule or definitive proxy statement filed with the SEC pursuant to the Securities Act or the Exchange Act, in each case, at least five (5) Business Days prior to the date hereof or such prior date with respect to which such documents, instruments or materials were represented by a party to have been made available to the other party. The words "shall" and "will" have the same meaning.

(b)     The parties hereto have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(c)     Subject to the first paragraphs of Sections 5.1 and 5.2, respectively, each of the Company, EFIH, Parent and Merger Sub has, or may have, set forth information in its respective Disclosure Letter in a section thereof that corresponds to the section of this Agreement to which it relates. The fact that any item of information is disclosed in a Disclosure Letter to this Agreement shall not be construed to mean that such information is required to be disclosed by this Agreement.

Section 9.15    Assignment. This Agreement shall not be assignable by operation of law or otherwise without the prior written consent of the non-assigning parties hereto (such consent not to be unreasonably withheld, conditioned or delayed). Any purported assignment in violation of this Agreement is void.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first written above.

**NEXTERA ENERGY, INC.**

By:

Name:    James L. Robo

Title:    Chairman, President and Chief
Executive Officer

**EFH MERGER CO., LLC**

By:

Name:    James L. Robo

Title:    Chief Executive Officer

*[Signature Page to Agreement and Plan of Merger]*

**ENERGY FUTURE HOLDINGS CORP.**

By: _____

Name:   Anthony R. Horton

Title:   Senior Vice President & Treasurer


**ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC**

By: _____

Name:   Anthony R. Horton

Title:   Senior Vice President & Treasurer

*[Signature Page to Agreement and Plan of Merger]*

**Exhibit A**

**Plan of Reorganization**

*(See Attached)*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### THIRD AMENDED JOINT PLAN OF REORGANIZATION
### OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*,
### PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
--and--
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Counsel to the Debtors and Debtors in Possession

--and--

**PROSKAUER ROSE LLP**
Three First National Plaza
70 W. Madison Street, Suite 3800
Chicago, Illinois 60602
Telephone: (312) 962-3550
Facsimile: (312) 962-3551

Co-Counsel to the Debtor Energy Future Holdings Corp.

--and--

**RICHARDS LAYTON & FINGER**
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

**BIELLI & KLAUDER, LLC**
1204 North King Street
Wilmington, Delaware 19801
Telephone: (302) 803-4600
Facsimile: (302) 397-2557

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

**CRAVATH, SWAINE AND MOORE LLP**
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1978
Facsimile: (212) 474-3700

**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Facsimile: (212) 891-1699

Co-Counsel to the Debtor Energy Future Intermediate
Holding Company LLC

--and--

**MUNGER, TOLLES & OLSON LLP**

355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-4022

Co-Counsel to the TCEH Debtors

Dated: _____, 2016

**STEVENS & LEE, P.C.**
1105 North Market Street, Suite 700
Wilmington, Delaware  19801
Telephone: (302) 425-3310
Facsimile: (610) 371-7927

**MCELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP**
300 Delaware Avenue, Suite 770
Wilmington, Delaware  19801
Telephone: (302) 300-4515
Facsimile: (302) 654-4031

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ....................................................................................................................4
    A.      Defined Terms. ...........................................................................................................4
    B.      Rules of Interpretation. .............................................................................................42
    C.      Computation of Time. ...............................................................................................43
    D.      Governing Law. .........................................................................................................44
    E.      Reference to Monetary Figures. ................................................................................44

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS ...........................44
    A.      Administrative Claims. ..............................................................................................44
    B.      DIP Claims. ...............................................................................................................46
    C.      Priority Tax Claims. ..................................................................................................48

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................................48
    A.      Classification of Claims and Interests. ....................................................................48
    B.      Treatment of Claims and Interests. ..........................................................................51
    C.      Special Provision Governing Unimpaired Claims. ...................................................69
    D.      Elimination of Vacant Classes. ................................................................................69
    E.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................69
    F.      Controversy Concerning Impairment. .......................................................................69
    G.      Subordinated Claims and Interests. ..........................................................................69

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..............................................................70
    A.      General Settlement of Claims and Interests. .............................................................70
    B.      Restructuring Transactions. .......................................................................................70
    C.      Sources of Consideration for Plan Distributions. .....................................................74
    D.      Intercompany Account Settlement. ...........................................................................76
    E.      Competitive Tax Sharing Agreement. .......................................................................77
    F.      Oncor Tax Sharing Agreement. ................................................................................77
    G.      Corporate Existence. .................................................................................................77
    H.      Vesting of Assets in the Reorganized Debtors. .........................................................77
    I.      Cancelation of Existing Securities and Agreements. ................................................77
    J.      Corporate Action. ......................................................................................................78
    K.      New Organizational Documents. ...............................................................................79
    L.      Directors and Officers of the Reorganized Debtors. .................................................79
    M.      Section 1146 Exemption. ...........................................................................................79
    N.      Director, Officer, Manager, and Employee Liability Insurance. ...............................80
    O.      Reorganized TCEH Debtor Management Incentive Plan. .........................................80
    P.      Employee Obligations. ..............................................................................................80
    Q.      Preservation of Causes of Action. .............................................................................81
    R.      Payment of Certain Fees. ..........................................................................................81
    S.      Treatment of Certain Claims of the PBGC and Pension Plan. ..................................82
    T.      Spin-Off Tax Receivable Agreement. .......................................................................82
    U.      Taxable Separation Tax Receivable Agreement. .......................................................82

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........................83
    A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. .............83
    B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. ................84
    C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ............84
    D.      Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. ...........85
    E.      Indemnification Obligations. .....................................................................................85
    F.      Insurance Policies. .....................................................................................................86
    G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ............86
    H.      Reservation of Rights. ...............................................................................................86

I.      Nonoccurrence of Effective Date..................................................................86
J.      Contracts and Leases Entered Into After the Petition Date...........................87

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................87
A.      Timing and Calculation of Amounts to Be Distributed. .................................87
B.      Rights and Powers of EFH Plan Administrator Board.....................................88
C.      Disbursing Agent.............................................................................................88
D.      Rights and Powers of Disbursing Agent. ........................................................88
E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions......89
F.      Manner of Payment. ........................................................................................90
G.      SEC Registration/Exemption. .........................................................................91
H.      Compliance with Tax Requirements. ..............................................................92
I.      No Postpetition or Default Interest on Claims. ..............................................92
J.      Setoffs and Recoupment..................................................................................92
K.      No Double Payment of Claims. ......................................................................92
L.      Claims Paid or Payable by Third Parties ........................................................92

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
        DISPUTED CLAIMS..........................................................................................93
A.      Allowance of Claims........................................................................................93
B.      Claims Administration Responsibilities...........................................................93
C.      Estimation of Claims........................................................................................94
D.      Adjustment to Claims without Objection.........................................................94
E.      Time to File Objections to Claims or Interests................................................94
F.      Disallowance of Claims....................................................................................94
G.      Amendments to Proofs of Claim......................................................................95
H.      Reimbursement or Contribution.......................................................................95
I.      No Distributions Pending Allowance...............................................................95
J.      Distributions After Allowance. .......................................................................95

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS..............95
A.      Discharge of Claims and Termination of Interests..........................................95
**B.**      **Release of Liens.**...........................................................................................96
**C.**      **Releases by the Debtors.**...............................................................................96
**D.**      **Releases by Holders of Claims and Interests.**...............................................97
**E.**      **Exculpation.**...................................................................................................98
**F.**      **Injunction.**......................................................................................................98
G.      Liabilities to, and Rights of, Governmental Units...........................................99
H.      Environmental Law Matters.............................................................................99
I.      Protections Against Discriminatory Treatment...............................................100
J.      Recoupment. ..................................................................................................100
K.      Document Retention. ......................................................................................100

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
        THE PLAN.........................................................................................................100
A.      Conditions Precedent to Confirmation of a Plan as to the TCEH Debtors and EFH Shared
        Services Debtors. ...........................................................................................100
B.      Conditions Precedent to Confirmation of a Plan as to the EFH Debtors and EFIH
        Debtors.............................................................................................................101
C.      Conditions Precedent to the TCEH Effective Date. ......................................102
D.      Conditions Precedent to the EFH Effective Date...........................................104
E.      Waiver of Conditions. ....................................................................................105
F.      Effect of Failure of Conditions. .....................................................................106
G.      Certain IRS Matters. ......................................................................................106

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....................106

A.      Modification and Amendments...............................................................................106
B.      Effect of Confirmation on Modifications...............................................................107
C.      Revocation or Withdrawal of Plan.........................................................................107

ARTICLE XI. RETENTION OF JURISDICTION.................................................................108

ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................................109
A.      Immediate Binding Effect.......................................................................................109
B.      Additional Documents. ...........................................................................................110
C.      Payment of Statutory Fees. ....................................................................................110
D.      Statutory Committee and Cessation of Fee and Expense Payment. ......................110
E.      Reservation of Rights..............................................................................................110
F.      Successors and Assigns............................................................................................111
G.      Consent Rights in Taxable Separation. ..................................................................111
H.      Notices. ....................................................................................................................111
I.      Term of Injunctions or Stays..................................................................................113
J.      Entire Agreement. ...................................................................................................113
K.      Exhibits. ..................................................................................................................114
L.      Nonseverability of Plan Provisions.........................................................................114
M.      Votes Solicited in Good Faith. ...............................................................................114
N.      Waiver or Estoppel..................................................................................................114
O.      Conflicts...................................................................................................................114

**INTRODUCTION**

The Debtors (as defined herein) propose this third amended joint plan of reorganization (the "Plan") for the resolution of the outstanding claims against, and interests in, the Debtors pursuant to the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article I.A of the Plan. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, events during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Disclosure Statement also contains a summary and description prepared by the EFH/EFIH Plan Supporters of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. Accordingly, the Plan constitutes a separate plan of reorganization for each of the Debtors. For the avoidance of doubt and notwithstanding anything herein to the contrary, the Plan may be confirmed and consummated as to each of the TCEH Debtors and EFH Shared Services Debtors separate from, and independent of, confirmation and/or consummation of the Plan as to any of the EFH Debtors or EFIH Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth below.

1.    "*2005 Oncor Transfer*" means those certain 2005 transactions pursuant to which the equity of Oncor's predecessor, TXU Electric Delivery Company LLC, was dividended from EFCH's predecessor, TXU US Holdings Company, to EFH Corp.'s predecessor, TXU Corp.

2.    "*2007 Acquisition*" means the transactions that occurred in October 2007 in which TEF and Texas Holdings and their direct and indirect equity holders became the direct and indirect equity holders of each of the Debtors.

3.    "*2011 Amend and Extend Transactions*" means those certain transactions effectuated by TCEH and EFCH in April 2011, including the TCEH Credit Amendment and the issuance of the TCEH First Lien Notes.

4.    "*2013 Revolver Extension*" means those certain transactions effectuated by TCEH and EFCH in January 2013, including the maturity extension of revolving credit commitments due 2013, the Incremental Amendment Agreement, and the incurrence of the TCEH 2012 Incremental Term Loans.

5.    "*2015 Compensation Order*" means the order entered by the Bankruptcy Court on December 17, 2014 [D.I. 3052], authorizing the Debtors to implement the Debtors' 2015 compensation programs.

6.    "*2016 Compensation Order*" means the order entered by the Bankruptcy Court on February 18, 2016 [D.I. 7883] authorizing the Debtors to implement the Debtors' 2016 compensation programs.

7.    "*503(b)(9) Claim*" means a Claim or any portion thereof entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

8.    "*Additional Interest*" means additional interest payable on the EFIH First Lien Notes, the EFIH Second Lien Notes, or the EFIH Unsecured Notes, as applicable, under the registration rights agreements

4

associated with such notes so long as EFIH has not registered such notes in accordance with the Securities Act, on the terms set forth in such registration rights agreements.

9.      *"Adjusted Company Cash Amount"* means the "Adjusted Company Cash Amount" as defined in the Merger Agreement.

10.      *"Administrative Claim"* means a Claim for costs and expenses of administration of the Estates under sections 503(b) (including 503(b)(9) Claims), 507(b), or 1114(e)(2) of the Bankruptcy Code, other than DIP Claims, including: (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the applicable Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930; and (d) all Intercompany Claims authorized pursuant to the Cash Management Order.

11.      *"Administrative Claims Bar Date"* means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to General Administrative Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

12.      *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

13.      *"Allowed"* means with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest as to which no objection has been Filed prior to the Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; or (c) a Claim or Interest that is upheld or otherwise allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith, or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided, however,* that unless otherwise expressly specified in the Plan, the consummation of the Plan and the occurrence of the Effective Date is not intended to impair the right of any Holder or any of the Indenture Trustees to prosecute an appeal from, or otherwise petition for review of, any order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) disallowing any Claim; *provided, further,* for the avoidance of doubt, all parties reserve all rights in connection with any such appeal or petition, including (a) the right of any of the Reorganized Debtors to move for the dismissal of any such appeal or petition on grounds of equitable mootness or any other prudential basis and (b) the right of any Holder or any of the Indenture Trustees to oppose any such motion on any grounds, including on grounds that the relief sought in the appeal or petition is contemplated by or provided for under the Plan.  Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

14.      *"Amended and Restated Split Participant Agreement"* means that certain Amended and Restated Split Participant Agreement, by and among Oncor Electric, Reorganized TCEH, and OpCo, to be entered into on or before the TCEH Effective Date, which shall govern the rights and obligations of each party thereto with respect to certain employment matters, which shall be in form and substance acceptable to the Debtors, the TCEH Supporting First Lien Creditors, and the Plan Sponsor, and which shall be included in the Plan Supplement.

15.      *"Approval Order"* means the order (which may be the TCEH Confirmation Order), which shall (i) be in form and substance acceptable to the Debtors and the TCEH Supporting First Lien Creditors, and the Plan Sponsor, (ii) authorize and direct EFH Corp., EFIH, and Reorganized TCEH to enter into (a) the Tax Matters Agreement, (b) the Transition Services Agreement, if any, (c) the Amended and Restated Split Participant Agreement, and (d) the Separation Agreement; and (iii) contain terms and conditions consistent with each of the agreements in the foregoing clause (ii).

16.    "*Assumed Executory Contract or Unexpired Lease*" means any EFH/EFIH Assumed Executory Contract or Unexpired Lease or any TCEH Assumed Executory Contract or Unexpired Lease.

17.    "*Assumed Executory Contract and Unexpired Lease List*" means, as applicable, the EFH/EFIH Assumed Executory Contract and Unexpired Lease List or the TCEH Assumed Executory Contract and Unexpired Lease List.

18.    "*AST&T*" means American Stock Transfer & Trust Company, LLC.

19.    "*Auditor*" means the "Auditor" as defined in, and designated to conduct the Post-Closing Audit in accordance with, the Merger Agreement.

20.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

21.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

22.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

23.    "*Bar Date*" means the applicable date established by the Bankruptcy Court by which respective Proofs of Claims and Interests must be Filed.

24.    "*Basis Step-Up*" means the net increase in the aggregate U.S. federal income tax basis of the assets transferred or deemed transferred to the Preferred Stock Entity pursuant to the Spin-Off Preferred Stock Sale equal to the aggregate utilized amount of the net losses, net operating losses, and net capital losses (but only to the extent such net capital losses are deductible under applicable tax law against gain recognized on the Spin-Off Preferred Stock Sale) (in each case, including carryovers) available to the EFH Group as of the TCEH Effective Date (determined (a) as if the "consolidated year" (within the meaning of Section 1503(e)(2)(B) of the Internal Revenue Code) of the EFH Group ended on the TCEH Effective Date, and (b) without regard to any income, gain, loss or deduction generated as a result of the Spin-Off Preferred Stock Sale or transactions occurring outside the ordinary course of business on the TCEH Effective Date after the Spin-Off Preferred Stock Sale (other than any Deferred Intercompany and ELA Items (if any) and other transactions expressly contemplated by the Plan, any plan support agreement, or any definitive documentation related thereto)), such amount to be determined in accordance with the relevant procedures under the Plan Support Agreement, as modified consistent with the Tax Matters Agreement; *provided, however*, that any such Basis Step-Up shall not exceed the built-in gain in the assets subject to the Spin-Off Preferred Stock Sale.

25.    "*BNY*" means, collectively:  (a) BNYM; and (b) BNYMTC.

26.    "*BNYM*" means The Bank of New York Mellon.

27.    "*BNYMTC*" means The Bank of New York Mellon Trust Company, N.A.

28.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

29.    "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the U.S.

30.    "*Cash Collateral Order*" means the *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Adequate*

6

*Protection, and (C) Modifying the Automatic Stay* [D.I. 855], as further amended, modified, and supplemented from time to time, including D.I. 5922 and D.I. 5923.

31.    *"Cash Management Order"* means the *Final Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority* [D.I. 801].

32.    *"Causes of Action"* means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

33.    *"Chapter 11 Cases"* means, collectively: (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

34.    *"Claim"* means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

35.    *"Claims and Noticing Agent"* means Epiq Bankruptcy Solutions, LLC, retained as the Debtors' notice and claims agent pursuant to the *Order Approving the Retention and Appointment of Epiq Bankruptcy Solutions as the Claims and Noticing Agent for the Debtors* [D.I. 321].

36.    *"Claims Objection Deadline"* means the later of: (a) the date that is 180 days after the Effective Date; and (b) such other date as may be fixed by the Bankruptcy Court, after notice and hearing, upon a motion Filed before the expiration of the deadline to object to Claims or Interests.

37.    *"Claims Register"* means the official register of Claims maintained by the Claims and Noticing Agent.

38.    *"Class"* means a category of Claims or Interests as set forth in Article III of the Plan.

39.    *"CM/ECF"* means the Bankruptcy Court's Case Management and Electronic Case Filing system.

40.    *"Collective Professional Fee Claims"* means Professional Fee Claims incurred by a Professional for the collective benefit of two or more of TCEH, EFH Corp., and EFIH.

41.    *"Committees"* means, collectively: (a) the TCEH Committee; and (b) the EFH/EFIH Committee.

42.    *"Competitive Tax Sharing Agreement"* means that certain Federal and State Income Tax Allocation Agreement Among the Members of the Energy Future Holdings Corp. Consolidated Group (as amended and restated from time to time), dated May 15, 2012, by and among EFH Corp. and certain of its direct and indirect subsidiaries.

43.    *"Computershare Trust"* means, collectively: (a) Computershare Trust Company, N.A.; and (b) Computershare Trust Company of Canada.

44.    "*Confirmation*" means the entry of the EFH Confirmation Order and/or the TCEH Confirmation Order, as applicable, on the docket of the Chapter 11 Cases.

45.    "*Confirmation Date*" means EFH Confirmation Date and/or the TCEH Confirmation Date, as applicable.

46.    "*Confirmation Hearing*" means the one or more hearings held by the Bankruptcy Court to consider Confirmation of the Plan as to one or more Debtors pursuant to section 1129 of the Bankruptcy Code.

47.    "*Confirmation Order*" means the EFH Confirmation Order and/or the TCEH Confirmation Order, as applicable.  The Confirmation Order may be comprised of one or more orders entered by the Bankruptcy Court.

48.    "*Conflict Matters*" means for each of EFH Corp., EFIH, and EFCH/TCEH, as defined in the respective resolutions of the applicable Board of Directors or Board of Managers dated November 7, 2014 and December 9, 2014 including the determination of whether any matter constitutes a "Conflict Matter."

49.    "*Consummation*" means the occurrence of the EFH Effective Date and/or the TCEH Effective Date, as applicable.

50.    "*Contributed TCEH Debtors*" means those one or more TCEH Debtors mutually agreed on by EFH Corp. and the TCEH Supporting First Lien Creditors whose equity will be contributed by Reorganized TCEH to the Preferred Stock Entity in the Spin-Off Preferred Stock Sale, if any.

51.    "*Contribution*" means, as part of the Spin-Off, immediately following the cancelation of Claims against the TCEH Debtors, the transfer to Reorganized TCEH by TCEH and the EFH Debtors of their applicable portion of the TCEH Assets, in exchange for the consideration described in Article IV.B.2 of the Plan.

52.    "*Cure Claim*" means a Claim based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

53.    "*Dealer Managers*" means the dealer managers under that certain dealer manager agreement approved under the EFIH First Lien Approval Order.

54.    "*Debtor*" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in its respective Chapter 11 Case.  As used herein, the term "Debtor" shall refer to the TCEH Debtors when referencing the plan of reorganization of the TCEH Debtors, shall refer to the EFH Debtors when referencing the plan of reorganization of the EFH Debtors, shall refer to the EFIH Debtors when referencing the plan of reorganization of the EFIH Debtors, and shall refer to the EFH Shared Services Debtors when referencing the plan of reorganization of the EFH Shared Services Debtors.

55.    "*Debtor Intercompany Claim*" means a Claim by any Debtor against any other Debtor.

56.    "*Debtors*" means, collectively:  (a) the TCEH Debtors; (b) the EFIH Debtors; (c) the EFH Debtors; and (d) the EFH Shared Services Debtors.  As used herein, the term "Debtors" shall refer to the TCEH Debtors when referencing the plan of reorganization of the TCEH Debtors, shall refer to the EFH Debtors when referencing the plan of reorganization of the EFH Debtors, shall refer to the EFIH Debtors when referencing the plan of reorganization of the EFIH Debtors, and shall refer to the EFH Shared Services Debtors when referencing the plan of reorganization of the EFH Shared Services Debtors.

57.    "*Deferred Intercompany and ELA Items*" means intercompany items (as such term is defined in Treasury Regulations Section 1.1502-13(b)(2)) or any excess loss account (as such term is defined in Treasury Regulations Section 1.1502-19(a)), in each case, of any subsidiary of TCEH (other than TCEH Finance) that are accelerated into income as a result of the Distribution pursuant to Treasury Regulations Section 1.1502-13(d) or Section 1.1502-19.

58.     "*DIP Agents*" means, collectively:  (a) the TCEH DIP Agent; and (b) the EFIH First Lien DIP Agent.

59.     "*DIP Agreements*" means, collectively:  (a) the TCEH DIP Credit Agreement; and (b) the EFIH First Lien DIP Credit Agreement.

60.     "*DIP Claims*" means, collectively:  (a) the TCEH DIP Claims; and (b) the EFIH First Lien DIP Claims.

61.     "*DIP Facilities*" means, collectively:  (a) the TCEH DIP Facility; and (b) the EFIH First Lien DIP Facility.

62.     "*DIP Lenders*" means the DIP Agents, the TCEH DIP L/C Issuers, the banks, financial institutions, and other lenders party to the DIP Facilities from time to time, and each arranger, bookrunner, syndication agent, manager, and documentation agent under the DIP Facilities.

63.     "*DIP Orders*" means, collectively:  (a) the TCEH Final DIP Order; and (b) the EFIH First Lien Final DIP Order.

64.     "*Direct Professional Fee Claims*" means Professional Fee Claims incurred by a Professional for the benefit of only one of the following: (a) the EFH Debtors; (b) the EFIH Debtors; or (c) the TCEH Debtors.

65.     "*Disallowed Makewhole Claim*" means (a) with respect to any Makewhole Claim against any EFH Debtor or any EFIH Debtor that is not an EFIH First Lien Note Claim or an EFIH Second Lien Note Claim, a Makewhole Claim as to which the Bankruptcy Court has entered a Final Order disallowing such Claim; and (b) with respect to any Makewhole Claim that is an EFIH First Lien Note Claim or an EFIH Second Lien Note Claim, a Makewhole Claim as to which the Bankruptcy Court has entered an order disallowing the Claim, and such order has not been stayed or reversed or remanded on appeal as of the EFH Effective Date.

66.     "*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities authorized to make or facilitate distributions under the Plan as selected by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Plan Sponsor and the TCEH Supporting First Lien Creditors, provided that (a) the EFH Notes Trustee shall be the Disbursing Agent for Classes A4, A5, A6, and B5; and (b) the EFIH Unsecured Notes Trustee shall be the Disbursing Agent for distributions to Holders of EFIH Unsecured Note Claims.

67.     "*Disclosure Statement*" means, as applicable, the TCEH Disclosure Statement and/or the EFH Disclosure Statement.

68.     "*Disclosure Statement Order*" means, as applicable, the TCEH Disclosure Statement Order and/or the EFH Disclosure Statement Order.

69.     "*Disinterested Directors and Managers*" means the disinterested directors and managers of EFH Corp., EFIH, and EFCH/TCEH.

70.     "*Disinterested Directors Settlement*" means the settlement negotiated by and among the Disinterested Directors and Managers regarding Debtor Intercompany Claims set forth in the Initial Plan.

71.     "*Disputed*" means with regard to any Claim or Interest, a Claim or Interest that is not yet Allowed.

72.     "*Distribution*" means, as part of the Spin-Off, and following the Contribution and the Reorganized TCEH Conversion, distribution of (a) the Reorganized TCEH Common Stock; (b) the net Cash proceeds of the New Reorganized TCEH Debt (or at the TCEH Supporting First Lien Creditors' election, all or a portion of such New Reorganized TCEH Debt) and the Spin-Off Preferred Stock Sale, if any, (c) the Spin-Off TRA Rights (if any); and (d) proceeds from the TCEH Settlement Claim, if determined as of the TCEH Effective Date, in each case received in the Contribution to Holders of Allowed TCEH First Lien Secured Claims.

73.    "*Distribution Date*" means the Effective Date and any Periodic Distribution Date thereafter.

74.    "*Distribution Record Date*" means other than with respect to any publicly-held securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims and Allowed Interests (other than DIP Claims), which date shall be the date that is five (5) Business Days after the Confirmation Date, as applicable, or such other date as designated in an order of the Bankruptcy Court; *provided, however*, that the Distribution Record Date for all Holders of EFH Unexchanged Note Claims, EFH Legacy Note Claims, and EFH LBO Note Claims shall be [___], 2016; *provided further, however*, that the Distribution Record Date for the Holders of Allowed Class C3 Claims shall be the date that is five (5) Business Days after the TCEH Confirmation Date, or such other date as designated in an order of the Bankruptcy Court, regardless of whether distributions on account of such Claims are made on the TCEH Effective Date or the EFH Effective Date.

75.    "*DTC*" means the Depository Trust Company.

76.    "*EFCH*" means Energy Future Competitive Holdings Company LLC, a Delaware limited liability company.

77.    "*EFCH 2037 Note Claim*" means any Claim derived from or based upon the EFCH 2037 Notes.

78.    "*EFCH 2037 Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated December 1, 1995, by and between EFCH, successor to TXU US Holdings Company, as issuer, and the EFCH 2037 Notes Trustee.

79.    "*EFCH 2037 Notes*" means, collectively:  (a) the EFCH Fixed 2037 Notes; and (b) the EFCH Floating 2037 Notes.

80.    "*EFCH 2037 Notes Trustee*" means BNYMTC, or any successor thereto, as trustee under the EFCH 2037 Note Indenture.

81.    "*EFCH Fixed 2037 Notes*" means the 8.175% fixed rate notes due January 30, 2037, issued by EFCH pursuant to the EFCH 2037 Note Indenture.

82.    "*EFCH Floating 2037 Notes*" means the 1.245% floating rate notes due January 30, 2037, issued by EFCH pursuant to the EFCH 2037 Note Indenture.

83.    "*Effective Date*" means the EFH Effective Date and/or the TCEH Effective Date, as applicable with respect to any particular Debtor.

84.    "*Effective Dates*" means, collectively:  (a) the EFH Effective Date; and (b) the TCEH Effective Date.

85.    "*EFH 2019 Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated November 16, 2009, by and among EFH Corp., as issuer, and the EFH Notes Trustee.

86.    "*EFH 2019 Notes*" means the 9.75% unsecured notes due October 15, 2019, issued by EFH Corp. pursuant to the EFH 2019 Note Indenture.

87.    "*EFH 2020 Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated January 12, 2010, by and among EFH Corp., as issuer, and the EFH Notes Trustee.

88.    "*EFH 2020 Notes*" means the 10.0% unsecured notes due January 15, 2020, issued by EFH Corp. pursuant to the EFH 2020 Note Indenture.

89.    "*EFH Beneficiary Claims*" means, collectively: (a) the Allowed EFH Non-Qualified Benefit Claims; (b) the Allowed EFH Unexchanged Note Claims; and (c) the Allowed General Unsecured Claims Against

EFH Corp.; *provided, however*, that any of the foregoing Claims shall cease to constitute EFH Beneficiary Claims if the Class comprised of such Claims fails to accept or fails to reject the Plan consistent with the Voting Indication (as such term is defined in the EFH/EFIH Committee Settlement), if any.

90.    "*EFH Committee Settlement Escrow*" means an escrow account in an amount equal to $9,450,000.00, which shall be funded from and reduce the TCEH Cash Payment dollar for dollar; *provided* that such escrow account shall provide that distributions from such account shall be made *first* to Reorganized TCEH in an amount equal to the EFH Committee Settlement Payment Amount, and *second*, to the extent the EFH Committee Settlement Escrow Amount exceeds the EFH Committee Settlement Payment Amount, such excess amounts shall be distributed in a manner consistent with the distribution of the TCEH Cash Payment in accordance with Article III.B.30 of the Plan.

91.    "*EFH Committee Settlement Payment Amount*" means an amount equal to 25% of the TCEH Settlement Claim Turnover Distributions.

92.    "*EFH Confirmation Date*" means the date upon which the Bankruptcy Court enters the EFH Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

93.    "*EFH Confirmation Order*" means one or more orders of the Bankruptcy Court confirming the Plan with respect to one or more EFH Debtors or EFIH Debtors pursuant to section 1129 of the Bankruptcy Code. The EFH Confirmation Order shall be reasonably acceptable to the EFIH DIP Agents and acceptable to the Plan Sponsor.

94.    "*EFH Corp.*" means Energy Future Holdings Corp., a Texas corporation.

95.    "*EFH Corp. Claims*" means, collectively:  (a) the Allowed EFH Legacy Note Claims; (b) the Allowed EFH Swap Claims; (c) the Allowed EFH LBO Note Primary Claims; (d) the Allowed TCEH Settlement Claim; (e) the Allowed EFH Non-Qualified Benefit Claims; (f) the Allowed EFH Unexchanged Note Claims; (g) the Allowed General Unsecured Claims Against EFH Corp.; (h) the Allowed General Unsecured Claims Against EFH Debtors Other Than EFH Corp; and (i) the Allowed Tex-La Guaranty Claims; *provided, however*, that if the Holders of Allowed EFH LBO Note Primary Claims receive a recovery on account of their Allowed Class B5 EFH LBO Note Guaranty Claims, the Allowed EFH LBO Note Primary Claims shall not be included in this definition of EFH Corp. Claims; *provided further, however*, that if the Holders of Allowed Tex-La Guaranty Claims receive full recovery on account of their Allowed Class C1 Other Secured Claims Against the TCEH Debtors, the Allowed Tex-La Guaranty Claims shall not be included in this definition of EFH Corp. Claims.

96.    "*EFH Corporate Services*" means EFH Corporate Services Company, a Texas corporation.

97.    "*EFH Creditor Recovery Pool*" means the Reorganized EFH Class A Common Stock as set forth in Article IV.B.9 of the Plan, which shall, at the Merger Closing, convert to the right to receive the NextEra Class A Common Stock Investment in accordance with the Merger Agreement; *provided, however*, that the Holders of Allowed EFH Non-Qualified Benefit Claims shall receive Cash on account of their Claims (including any TCEH Settlement Claim Turnover Distributions distributed to such Holders of EFH Non-Qualified Benefit Claims); *provided, further, however*, that (a) the amount of the NextEra Class A Common Stock Investment shall be reduced proportionately on account of such Cash payment and (b) to the extent necessary to satisfy the continuity of interest requirement, the amount of Cash in the EFH/EFIH Distribution Account, with respect to the EFIH Unsecured Creditor Cash Recovery Pool, shall be reduced by reducing the Merger Sub Cash Amount by such amount, with a corresponding equal increase in the amount of the NextEra Class B Common Stock Investment.

98.    "*EFH Debtor Intercompany Claim*" means any Claim by an EFH Debtor against another EFH Debtor.

99.    "*EFH Debtors*" means, collectively:  (a) EFH Corp.; (b) Ebasco Services of Canada Limited; (c) EEC Holdings, Inc.; (d) EECI, Inc.; (e) EFH Australia (No. 2) Holdings Company; (f) EFH Finance (No. 2)

Holdings Company; (g) EFH FS Holdings Company; (h) EFH Renewables Company LLC; (i) Generation Development Company LLC; (j) LSGT Gas Company LLC; (k) LSGT SACROC, Inc.; (l) NCA Development Company LLC; and (m) TXU Receivables Company.

100.    "*EFH Disclosure Statement*" means the *Disclosure Statement for the Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code with Respect to the EFH Debtors and EFIH Debtors*, dated [___], 2016 [D.I. ___], including all exhibits and schedules thereto, as approved pursuant to the Disclosure Statement Order.

101.    "*EFH Disclosure Statement Order*" means the *Order (A) Approving the EFH Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan, and (D) Approving the Manner and Forms of Notice and Other Related Documents* [D.I. ___].

102.    "*EFH Effective Date*" means, with respect to the Plan, the date after the EFH Confirmation Date selected by (i) the EFH Debtors and EFIH Debtors, including, in the case of any Conflict Matter between any Debtors, each Debtor acting at the direction of its respective Disinterested Director or Manager and without the consent of any other Debtor and (ii) the Plan Sponsor, on which: (a) no stay of the EFH Confirmation Order is in effect; and (b) all conditions precedent to the EFH Effective Date specified in Article IX.D have been satisfied or waived (in accordance with Article IX.E).

103.    "*EFH/EFIH Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be assumed by the Reorganized EFH and Reorganized EFIH, as set forth on the EFH/EFIH Assumed Executory Contract and Unexpired Lease List.

104.    "*EFH/EFIH Assumed Executory Contract and Unexpired Lease List*" means the list of Executory Contracts and Unexpired Leases to be assumed (with proposed cure amounts), as determined by the Plan Sponsor, in its sole discretion, the form of which shall be included in the Plan Supplement; *provided, however*, that notwithstanding Article V.F. herein, the following contracts to the extent such contracts are executory contracts, shall be deemed assumed by Reorganized EFH and Reorganized EFIH, as applicable: (a) the Insurance Policies that provide coverage to the TCEH Debtors or EFH Shared Services Debtors, (b) D&O Insurance Policies at EFH Corp. for the benefit of current or former directors, managers, officers, and, employees, and (c) any D&O priority agreement between EFH Corp. and the sponsoring institution of certain directors.

105.    "*EFH/EFIH Committee*" means the statutory committee of unsecured creditors of EFH Corp., EFIH, EFIH Finance, and EECI, Inc., appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on October 27, 2014, the membership of which may be reconstituted from time to time.

106.    "*EFH/EFIH Committee Settlement*" means the Settlement & Support Agreement, dated as of November 23, 2015, by and among EFH Corp., EFIH, EFIH Finance, EEC Holdings, Inc., EECI, Inc., LSGT Gas Company LLC, LSGT SACROC, Inc., TCEH, the EFH/EFIH Committee, the EFH Notes Trustee, the TCEH Supporting First Lien Creditors, the Original Plan Sponsors, and the TCEH Committee, as approved under the EFH/EFIH Committee Settlement Order.

107.    "*EFH/EFIH Committee Settlement Order*" means the *Order Approving Settlement Among Debtors, EFH Committee, EFH Notes Trustee, and Certain Other Parties* [D.I. 7143], entered by the Bankruptcy Court on November 25, 2015.

108.    "*EFH/EFIH Committee Standing Motion*" means the *Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Luminant Debtors' Estates* [D.I. 3605].

109.    "*EFH/EFIH Distribution Account*" means one or more escrow accounts designated by EFH Corp. prior to the EFH Effective Date to hold Cash to fund distributions under the Plan consisting of (a) the Merger Sub

Cash Amount, (b) the EFIH Second Lien Note Repayment Amount, (c) the Cash distributed to satisfy Allowed EFH Non-Qualified Benefit Claims, and (d) the EFIH Unsecured Creditor Cash Recovery Pool, and (e) any other amounts to be funded into the EFH/EFIH Distribution Account pursuant to the terms of the Plan or Merger Agreement, which account shall be administered by the EFH Plan Administrator Board.

110.    "*EFH/EFIH Plan Supporters*" means, collectively: (a) the Plan Sponsor; and, (b) excluding the EFH Debtors and the EFIH Debtors, all other parties to the New EFH/EFIH Plan Support Agreement, if any.

111.    "*EFH/EFIH Rejected Executory Contract and Unexpired Lease List*" means the list of Executory Contracts and Unexpired Leases to be rejected, as determined by the Plan Sponsor, in its sole discretion, the form of which shall be included in the Plan Supplement.

112.    "*EFH Group*" means the "affiliated group" (within the meaning of Section 1504(a)(1) of the Internal Revenue Code), and any consolidated, combined, aggregate, or unitary group under state or local law, of which EFH Corp. is the common parent.

113.    "*EFH LBO Note Claims*" means, collectively: (a) the EFH LBO Note Primary Claims; and (b) the EFH LBO Note Guaranty Claims.

114.    "*EFH LBO Note Guaranty Claim*" means any Claim against EFIH derived from or based upon the EFH LBO Notes.

115.    "*EFH LBO Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated October 31, 2007, by and among EFH Corp., as issuer, EFCH and EFIH as guarantors, and the EFH Notes Trustee.

116.    "*EFH LBO Note Primary Claim*" means any Claim against EFH Corp. derived from or based upon the EFH LBO Notes.

117.    "*EFH LBO Notes*" means, collectively: (a) the EFH LBO Senior Notes; and (b) the EFH LBO Toggle Notes.

118.    "*EFH LBO Senior Notes*" means the 10.875% senior notes due November 1, 2017, issued by EFH Corp. pursuant to the EFH LBO Note Indenture.

119.    "*EFH LBO Toggle Notes*" means the 11.25%/12.00% toggle notes due November 1, 2017, issued by EFH Corp. pursuant to the EFH LBO Note Indenture.

120.    "*EFH Legacy Note Claims*" means, collectively: (a) the EFH Legacy Series P Claims; (b) the EFH Legacy Series Q Claims; and (c) the EFH Legacy Series R Claims.

121.    "*EFH Legacy Note Indentures*" means, collectively: (a) the EFH Legacy Series P Indenture; (b) the EFH Legacy Series Q Indenture; and (c) the EFH Legacy Series R Indenture.

122.    "*EFH Legacy Notes*" means, collectively: (a) the EFH Legacy Series P Notes; (b) the EFH Legacy Series Q Notes; and (c) the EFH Legacy Series R Notes.

123.    "*EFH Legacy Series P Claim*" means any Claim derived from or based upon the EFH Legacy Series P Notes, excluding any Claims derived from or based upon EFH Legacy Series P Notes held by EFIH (if any).

124.    "*EFH Legacy Series P Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated November 1, 2004, by and among EFH Corp., as issuer, and the EFH Notes Trustee.

125. *"EFH Legacy Series P Notes"* means the 5.55% Series P Senior Notes due November 15, 2014, issued by EFH Corp. pursuant to the EFH Legacy Series P Indenture and related officer's certificate.

126. *"EFH Legacy Series Q Claim"* means any Claim derived from or based upon the EFH Legacy Series Q Notes, excluding any Claims derived from or based upon EFH Legacy Series Q Notes held by EFIH (if any).

127. *"EFH Legacy Series Q First Supplemental Indenture"* means that certain Supplemental Indenture, dated December 5, 2012, by and among EFH Corp., as issuer, and the EFH Notes Trustee.

128. *"EFH Legacy Series Q Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated November 1, 2004, by and among EFH Corp., as issuer, and the EFH Notes Trustee.

129. *"EFH Legacy Series Q Notes"* means the 6.50% Series Q Senior Notes due November 15, 2024, issued by EFH Corp. pursuant to the EFH Legacy Series Q Indenture and related officer's certificate.

130. *"EFH Legacy Series R Claim"* means any Claim derived from or based upon the EFH Legacy Series R Notes, excluding any Claims derived from or based upon EFH Legacy Series R Notes held by EFIH (if any).

131. *"EFH Legacy Series R First Supplemental Indenture"* means that certain Supplemental Indenture, dated December 5, 2012, by and among EFH Corp., as issuer, and the EFH Notes Trustee.

132. *"EFH Legacy Series R Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated November 1, 2004, by and among EFH Corp., as issuer, and the EFH Notes Trustee.

133. *"EFH Legacy Series R Notes"* means the 6.55% Series R Senior Notes due November 15, 2034, issued by EFH Corp. pursuant to the EFH Legacy Series R Indenture and related officer's certificate.

134. *"EFH Non-Debtors"* means, collectively: (a) TXU Europe Limited; (b) TXU Eastern Finance (A) Ltd; (c) TXU Eastern Finance (B) Ltd; (d) TXU Finance (No. 2) Limited; (e) TXU Eastern Funding Company; (f) TXU Acquisitions Limited; (g) Humphreys & Glasgow Limited; (h) EFH Vermont Insurance Company; and (i) any other non-U.S., non-Debtor Entities.

135. *"EFH Non-Qualified Benefit Claim"* means any Claim against the EFH Debtors derived from or based upon an EFH Non-Qualified Benefit Plan.

136. *"EFH Non-Qualified Benefit Plan"* means either: (a) a non-contributory, non-qualified pension plan that provides retirement benefits to participants whose tax-qualified pension benefits are limited due to restrictions under the Internal Revenue Code and/or deferrals to other benefit programs; and/or (b) a contributory, non-qualified defined contribution plan that permits participants to voluntarily defer a portion of their base salary and/or annual incentive plan bonuses.

137. *"EFH Note Indentures"* means, collectively: (a) the EFH Legacy Note Indentures; (b) the EFH LBO Note Indenture; (c) the EFH 2019 Note Indenture; and (d) the EFH 2020 Note Indenture.

138. *"EFH Notes Trustee"* collectively means AST&T, in its capacity as successor trustee to BNYMTC under the EFH Note Indentures.

139. *"EFH Plan Administrator Board"* shall be a two-member board of directors comprised of current disinterested directors of EFH Corp. and EFIH, which board shall be appointed on or after the TCEH Effective Date by the Plan Sponsor and the EFH Debtors. and which board shall be tasked with directing the Disbursing Agent with respect to Cash distributions made on account of Allowed Claims asserted against the EFH Debtors and EFIH Debtors and shall not, for the avoidance of doubt, be authorized to direct the Disbursing Agent with respect

to any Cash distributions made on account of Allowed Claims asserted against the TCEH Debtors or EFH Shared Services Debtors, if any.

140.    "*EFH Profesional Fee Escrow Account*" means an escrow account established and funded pursuant to Article II.A.2(b) of the Plan for Professional Fee Claims allocated to the EFH Debtors or the Reorganized EFH Debtors pursuant to pursuant to Article II.A.2(d) of the Plan.

141.    "*EFH Professional Fee Reserve Amount*" means the total amount of Professional Fee Claims estimated to be allocated to the EFH Debtors or the Reorganized EFH Debtors in accordance with Article II.A.2(c) of the Plan.

142.    "*EFH Series N Note Claim*" means any Claim derived from or based upon the EFH Series N Notes.

143.    "*EFH Series N Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated July 3, 2003, by and among EFH Corp., as issuer, and the EFH Series N Trustee.

144.    "*EFH Series N Notes*" means the floating rate convertible notes due 2033 issued by EFH Corp. pursuant to the EFH Series N Note Indenture.

145.    "*EFH Series N Notes Trustee*" means BNYMTC, in its capacity under the EFH Series N Notes.

146.    "*EFH Shared Services Debtor Intercompany Claim*" means any Claim by an EFH Shared Services Debtor against another EFH EFH Shared Services Debtor.

147.    "*EFH Shared Services Debtors*" means, collectively:  (a) EFH Corporate Services; (b) Dallas Power and Light Company, Inc.; (c) EFH CG Holdings Company LP; (d) EFH CG Management Company LLC; (e) Lone Star Energy Company, Inc.; (f) Lone Star Pipeline Company, Inc.; (g) Southwestern Electric Service Company, Inc.; (h) Texas Electric Service Company, Inc.; (i) Texas Energy Industries Company, Inc.; (j) Texas Power and Light Company, Inc.; (k) Texas Utilities Company, Inc.; (l) Texas Utilities Electric Company, Inc.; (m) TXU Electric Company, Inc.; (n) Brighten Energy LLC; and (o) Brighten Holdings LLC.

148.    "*EFH Swap Claim*" means any Claim against EFH Corp. derived from or based upon the EFH Swaps.

149.    "*EFH Swaps*" means those certain swaps entered into by EFH Corp. on an unsecured basis.

150.    "*EFH Unexchanged Note Claim*" means any Claim derived from or based upon the EFH Unexchanged Notes.

151.    "*EFH Unexchanged Notes*" means, collectively:  (a) the EFH 2019 Notes; and (b) the EFH 2020 Notes.

152.    "*EFIH*" means Energy Future Intermediate Holding Company LLC, a Delaware limited liability company.

153.    "*EFIH Debtor Intercompany Claim*" means any Claim by an EFIH Debtor against another EFIH Debtor.

154.    "*EFIH Debtors*" means, collectively:  (a) EFIH; and (b) EFIH Finance.

155.    "*EFIH DIP Secured Cash Management Banks*" means the "Secured Cash Management Banks," as defined in the EFIH First Lien Final DIP Order.

156.    "*EFIH DIP Secured Cash Management Obligations*" means the "Secured Cash Management Obligations," as defined in the EFIH First Lien Final DIP Order.

157.    "*EFIH DIP Secured Hedge Banks*" means the "Secured Hedge Banks," as defined in the EFIH First Lien Final DIP Order.

158.    "*EFIH DIP Secured Hedge Obligations*" means the "Secured Hedge Obligations," as defined in the EFIH First Lien Final DIP Order.

159.    "*EFIH Finance*" means EFIH Finance Inc., a Delaware corporation.

160.    "*EFIH First Lien 2017 Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated August 14, 2012, by and among the EFIH Debtors, as issuers, and the EFIH First Lien Notes Trustee.

161.    "*EFIH First Lien 2017 Notes*" means the 6.875% senior secured notes due August 15, 2017, issued by the EFIH Debtors pursuant to the EFIH First Lien 2017 Note Indenture.

162.    "*EFIH First Lien 2020 Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated August 17, 2010, by and among the EFIH Debtors, as issuers, and the EFIH First Lien Notes Trustee.

163.    "*EFIH First Lien 2020 Notes*" means the 10.0% senior secured notes due December 1, 2020, issued by the EFIH Debtors pursuant to the EFIH First Lien 2020 Note Indenture.

164.    "*EFIH First Lien Approval Order*" means the *Order Approving EFIH First Lien Settlement* [D.I. 858].

165.    "*EFIH First Lien DIP Agent*" means Deutsche Bank AG New York Branch, or its duly appointed successor, in its capacity as administrative agent and collateral agent for the EFIH First Lien DIP Facility.

166.    "*EFIH First Lien DIP Claim*" means any Claim derived from or based upon the EFIH First Lien DIP Credit Agreement or the EFIH First Lien Final DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges.

167.    "*EFIH First Lien DIP Collateral*" means the "EFIH DIP Collateral," as defined in the EFIH First Lien Final DIP Order.

168.    "*EFIH First Lien DIP Contingent Obligations*" means the "Contingent Obligations," as defined in the EFIH First Lien DIP Credit Agreement, including any and all expense reimbursement obligations of the Debtors that are contingent as of the EFH Effective Date.

169.    "*EFIH First Lien DIP Credit Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of June 19, 2014, as amended, supplemented, or modified from time to time, by and among EFIH, EFIH Finance, the banks, financial institutions, and other lenders from time to time party thereto, the EFIH First Lien DIP Agent, and the other agents and entities party thereto, collectively with the "EFIH First Lien DIP Documents," as defined in the EFIH First Lien Final DIP Order.

170.    "*EFIH First Lien DIP Facility*" means the EFIH Debtors' $5.4 billion debtor-in-possession financing facility, as approved on a final basis pursuant to the EFIH First Lien Final DIP Order.

171.    "*EFIH First Lien DIP Repayment Amount*" means an amount in Cash sufficient to repay all outstanding Allowed EFIH First Lien DIP Claims in accordance with Article II.B.2 of the Plan.

172.    "*EFIH First Lien Final DIP Order*" means the *Final Order (A) Approving Postpetition Financing For Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Approving the Use of Cash Collateral by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., (D) Authorizing the EFIH First Lien Repayment, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Orders, and (F) Modifying the Automatic Stay* [D.I. 859], as amended by the *Amended Final Order (A) Approving Postpetition Financing for Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Approving the Use of Cash Collateral by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., (D) Authorizing the EFIH First Lien Repayment, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Orders, and (F) Modifying the Automatic Stay* [D.I. 3856].

173.    "*EFIH First Lien Note Claim*" means any Secured Claim derived from or based upon the EFIH First Lien Notes.

174.    "*EFIH First Lien Notes*" means, collectively:  (a) the EFIH First Lien 2017 Notes; and (b) the EFIH First Lien 2020 Notes (and the EFIH  First Lien 2017 Note Indenture and the EFIH First Lien 2020 Note Indenture).

175.    "*EFIH First Lien Notes Trustee*" means Delaware Trust Company, as successor indenture trustee to BNY.

176.    "*EFIH First Lien Settlement*" means that certain settlement approved by the EFIH First Lien Approval Order.

177.    "*EFIH Intercreditor Litigation*" means the litigation commenced by the EFIH First Lien Notes Trustee against the EFIH Second Lien Notes Trustee for turnover and other relief, *Delaware Trust Company, as Indenture Trustee* v. *Computershare Share Trust Company, N.A., et al.*, Adv. Pro. Np. 14-50410-CSS (Bankr. D. Del.) and any pending appeals related thereto.

178.    "*EFIH Profesional Fee Escrow Account*" means an escrow account established and funded pursuant to Article II.A.2(b) of the Plan for Professional Fee Claims allocated to the EFIH Debtors or the Reorganized EFIH Debtors pursuant to pursuant to Article II.A.2(d) of the Plan.

179.    "*EFIH Professional Fee Reserve Amount*" means the total amount of Professional Fee Claims estimated to be allocated to the EFIH Debtors or the Reorganized EFIH Debtors in accordance with Article II.A.2(c) of the Plan.

180.    "*EFIH Second Lien Note Claim*" means any Secured Claim derived from or based upon the EFIH Second Lien Notes.

181.    "*EFIH Second Lien Note Indenture*" means that certain Indenture, as amended or supplemented from time to time, dated April 25, 2011, by and among the EFIH Debtors, as issuers, and the EFIH Second Lien Notes Trustee.

182.    "*EFIH Second Lien Notes*" means, collectively:  (a) the 11.0% senior secured second lien notes due October 1, 2021; and (b) the 11.75% senior secured second lien notes due March 1, 2022, issued by the EFIH Debtors pursuant to the EFIH Second Lien Note Indenture (and the EFIH Second Lien Note Indenture).

183.    "*EFIH Second Lien Note Repayment Amount*" means an amount in Cash sufficient to repay all outstanding EFIH Second Lien Note Claims in accordance with, and to the extent provided in, Article II.B.20 of the Plan, excluding any amounts paid on account of EFIH Second Lien Note Claims that are Makewhole Claims.

184.    "*EFIH Second Lien Notes Trustee*" means Computershare Trust, as successor indenture trustee to BNY.

185. *"EFIH Second Lien Partial Repayment"* means the partial repayment of EFIH Second Lien Notes, in the amount of up to $750 million, effectuated pursuant to the *Order (A) Authorizing Partial Repayment of EFIH Second Lien Notes; (B) Approving EFIH DIP Consent; and (C) Authorizing Consent Fee* [D.I. 3855].

186. *"EFIH Senior Toggle Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated December 5, 2012, by and among the EFIH Debtors, as issuers, and the EFIH Unsecured Notes Trustee.

187. *"EFIH Senior Toggle Notes"* means the 11.25%/12.25% senior unsecured notes due December 1, 2018, issued by the EFIH Debtors pursuant to the EFIH Senior Toggle Note Indenture.

188. *"EFIH Unexchanged Note Indenture"* means that certain Indenture, as amended or supplemented from time to time, dated November 16, 2009, by and among the EFIH Debtors, as issuers, and the EFIH Unsecured Notes Trustee.

189. *"EFIH Unexchanged Notes"* means the 9.75% unsecured notes due October 15, 2019, issued by the EFIH Debtors pursuant to the EFIH Unexchanged Note Indenture.

190. *"EFIH Unsecured Creditor Equity Pool"* means (a) the Reorganized EFH Class B Common Stock as set forth in Article IV.B.9 of the Plan, which shall, on the EFH Effective Date, covert to the right to receive the NextEra Class B Common Stock and (b) any other amounts payable to Holders of Claims entitled to distributions from the EFIH Unsecured Creditor Equity Pool as expressly provided in the Plan.

191. *"EFIH Unsecured Creditor Cash Pool"* means (a) the balance of any Cash held by EFIH after giving effect to all other transactions and distributions that are contemplated by the Plan or the Merger Agreement to occur on or before the EFH Effective Date and (b) any other amounts payable to Holders of Claims entitled to distributions from the EFIH Unsecured Creditor Cash Pool as expressly provided in the Plan.

192. *"EFIH Unsecured Creditor Recovery Pool"* means, collectively, the EFIH Unsecured Creditor Equity Pool and the EFIH Unsecured Creditor Cash Pool.

193. *"EFIH Unsecured Note Claim"* means any Claim derived from or based upon the EFIH Unsecured Notes.

194. *"EFIH Unsecured Note Indentures"* means, collectively:  (a) the EFIH Senior Toggle Note Indenture; and (b) the EFIH Unexchanged Note Indenture.

195. *"EFIH Unsecured Notes"* means, collectively:  (a) the EFIH Senior Toggle Notes; and (b) the EFIH Unexchanged Notes.

196. *"EFIH Unsecured Notes Trustee"* means UMB Bank, N.A., as successor trustee to BNY.

197. *"Employment Agreements"* means all existing employment agreement by and between any employee of the Debtors and the Debtors, each of which shall be assumed and assigned to Reorganized TCEH on the TCEH Effective Date.

198. *"Entity"* has the meaning set forth in section 101(15) of the Bankruptcy Code.

199. *"Environmental Action"* means the pending case of *United States v. Luminant Generation Company LLC*, et al., 3:13-cv-3236-K (N.D. Tex.).

200. *"Environmental Law"* means all federal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law, all judicial and administrative orders, agreements and determinations and all common law concerning pollution or protection of the environment, or environmental impacts on human health and safety, including, without limitation, the Atomic Energy Act; the Comprehensive

Environmental Response, Compensation, and Liability Act; the Clean Water Act; the Clean Air Act; the Emergency Planning and Community Right-to-Know Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the Nuclear Waste Policy Act; the Resource Conservation and Recovery Act; the Safe Drinking Water Act; the Surface Mining Control and Reclamation Act; the Toxic Substances Control Act; and any state or local equivalents.

201.    "*EPA Settlement Amount*" means $1,000,000.00, as set forth in the order approving that certain Stipulation and Settlement Agreement, dated as of December 1, 2015, by and among EFH Corp., TCEH, EFCH, the United States on behalf of the U.S. Environmental Protection Agency, certain Holders of TCEH First Lien Claims, the Original Plan Sponsors, and the TCEH Committee [D.I. 7204].

202.    "*Equity Investment*" means the equity investments to be made pursuant to the Merger, including the Plan Sponsor Investment.

203.    "*ERISA*" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 as amended, (2006 V. Supp. 2011), and the regulations promulgated thereunder.

204.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

205.    "*Estimated Company Cash Amount*" means the "Estimated Company Cash Amount" as defined in the Merger Agreement.

206.    "*Exchange Agent*" means "Exchange Agent," as such term is defined in the Merger Agreement.

207.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Committees and each of their respective members; and (c) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

208.    "*Executive Severance Policy*" means the Energy Future Holdings Corp. Executive Change in Control Policy, effective as of May 20, 2005, as amended on December 23, 2008 and December 20, 2010, and in effect as of the date of Filing of the Plan.

209.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

210.    "*FCC*" means the Federal Communications Commission.

211.    "*Federal Judgment Rate*" means the rate of interest calculated pursuant to the provisions of 28 U.S.C. § 1961, which shall be a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, as of the Petition Date, which rate was 0.11%, compounded annually.

212.    "*Fee Committee*" means that certain fee review committee appointed pursuant to the *Stipulation and Consent Order Appointing a Fee Committee* [D.I.1891].

213.    "*FERC*" means the Federal Energy Regulatory Commission.

214.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, including with respect to a Proof of Claim or Proof of Interest, the Claims and Noticing Agent.

215.  "*Final Order*" means (i) an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction, or (ii) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in any Chapter 11 Case (or any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided, however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

216.  "*Fundamental Opinions*" shall include:

(a)  the following opinions of nationally recognized tax counsel or a Big Four accounting firm (who shall be permitted to rely upon reasonable representations, including a representation that the Debtors have no plan or intention at the time of the Distribution[2] that is inconsistent with the Spin-Off Intended Tax Treatment), in substance reasonably acceptable to the TCEH Supporting First Lien Creditors and the Plan Sponsor, at a "should" level:

    (i)  Taking into account the Merger, the Contribution, Reorganized TCEH Conversion, and Distribution should meet the requirements of Sections 368(a)(1)(G), 355, and 356 of the Internal Revenue Code.

    (ii)  EFH should not recognize gain for U.S. federal income tax purposes as a result of the Contribution or the Reorganized TCEH Conversion other than gain recognized pursuant to the transfer of assets to the Preferred Stock Entity and the Spin-Off Preferred Stock Sale.

    (iii)  EFH should recognize no gain or loss for U.S. federal income tax purposes upon the Distribution.

(b)  the following opinions of nationally recognized tax counsel or a Big Four accounting firm (who shall be permitted to rely upon reasonable representations, including a representation that the Debtors have no plan or intention at the time of the Distribution that is inconsistent with the Spin-Off Intended Tax Treatment), in substance reasonably acceptable to the TCEH Supporting First Lien Creditors and the Plan Sponsor, at a "will" level:

    (i)  Section 355(g) will not apply to the Reorganized TCEH Spin-Off.

217.  "*General Administrative Claim*" means any Administrative Claim, other than a Professional Fee Claim.

218.  "*General Unsecured Claim Against EFCH*" means any Unsecured Claim against EFCH that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, including the EFCH 2037 Note Claims, but excluding:  (a) Administrative Claims against EFCH; (b) Priority Tax Claims against EFCH; (c) Intercompany Claims against EFCH; (d) Other Priority Claims against EFCH; and (e) DIP Claims.

---

[2]  Capitalized terms in this definition that are not defined herein shall have the meanings given such terms in the request submitted to the IRS for the Private Letter Ruling and all other IRS Submissions; *provided, however*, that nothing herein shall require the public disclosure of the IRS Submissions.

219.    "*General Unsecured Claim Against EFH Corp.*" means any Unsecured Claim against EFH Corp. that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, including the EFH Series N Note Claims, but excluding: (a) Legacy General Unsecured Claims Against the EFH Debtors; (b) EFH Legacy Note Claims; (c) EFH Unexchanged Note Claims; (d) EFH LBO Note Primary Claims; (e) EFH Swap Claims; (f) EFH Non-Qualified Benefit Claims; (g) the TCEH Settlement Claim; (h) Tex-La Guaranty Claims; (i) Administrative Claims against EFH Corp.; (j) Priority Tax Claims against EFH Corp.; (k) Intercompany Claims against EFH Corp.; (l) Other Priority Claims against EFH Corp.; and (m) EFIH First Lien DIP Claims.

220.    "*General Unsecured Claim Against the EFH Debtors Other Than EFH Corp.*" means any Unsecured Claim against one or more of the EFH Debtors (other than EFH Corp.) that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, but excluding: (a) Legacy General Unsecured Claims Against the EFH Debtors; (b) EFH Non-Qualified Benefit Claims; (c) Administrative Claims against the EFH Debtors other than EFH Corp.; (d) Priority Tax Claims against the EFH Debtors other than EFH Corp.; (e) Intercompany Claims against the EFH Debtors other than EFH Corp.; (f) Other Priority Claims against the EFH Debtors other than EFH Corp.; and (g) EFIH First Lien DIP Claims.

221.    "*General Unsecured Claim Against the EFH Shared Services Debtors*" means any Unsecured Claim against one or more of the EFH Shared Services Debtors that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, excluding: (a) Administrative Claims against the EFH Shared Services Debtors; (c) Priority Tax Claims against the EFH Shared Services Debtors; (d) Intercompany Claims against the EFH Shared Services Debtors; (e) Other Priority Claims against the EFH Shared Services Debtors; and (f) DIP Claims.

222.    "*General Unsecured Claim Against the EFIH Debtors*" means any Unsecured Claim against one or more of the EFIH Debtors that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, including the EFIH Unsecured Note Claims and any Unsecured Claims derived from or based upon the EFIH First Lien Notes or EFIH Second Lien Notes, but excluding: (a) EFH LBO Note Guaranty Claims; (b) Administrative Claims against the EFIH Debtors; (c) Priority Tax Claims against the EFIH Debtors; (d) Intercompany Claims against the EFIH Debtors; (e) Other Priority Claims against the EFIH Debtors; and (f) EFIH First Lien DIP Claims.

223.    "*General Unsecured Claim Against the TCEH Debtors Other Than EFCH*" means any Unsecured Claim against one or more of the TCEH Debtors other than EFCH that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, including the Legacy General Unsecured Claims Against the TCEH Debtors, but excluding: (a) TCEH Unsecured Debt Claims; (b) Administrative Claims against the TCEH Debtors Other Than EFCH; (c) Priority Tax Claims against the TCEH Debtors Other Than EFCH; (d) Intercompany Claims against the TCEH Debtors Other Than EFCH; (e) Other Priority Claims against the TCEH Debtors Other Than EFCH; and (f) DIP Claims.

224.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

225.    "*Holder*" means an Entity holding a Claim or an Interest, as applicable.

226.    "*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

227.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

228.    "*Incremental Amendment Agreement*" means that certain Incremental Amendment No. 1, dated as January 4, 2013, by and among the Incremental 2012 Term Lenders (as defined therein), EFCH, TCEH, the Credit Parties (as defined therein) party thereto, and Citibank, N.A., as administrative and collateral agent.

229.    "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers,

employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, as applicable.

230.    *"Indenture Trustees"* means, collectively:  (a) the EFH Notes Trustee; (b) the EFCH 2037 Notes Trustee; (c) the EFIH First Lien Notes Trustee; (d) the EFIH Second Lien Notes Trustee; (e) the EFIH Unsecured Notes Trustee; (f) the TCEH First Lien Notes Trustee; (g) the TCEH Second Lien Notes Trustee; (h) the TCEH Unsecured Notes Trustee; (i) the PCRB Trustee; (j) the EFH Series N Notes Trustee; and (k) the TCEH Second Lien Notes Collateral Agent.

231.    *"Initial Plan"* means the *Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the United States Bankruptcy Code* [D.I. 4142], dated April 14, 2015.

232.    *"Insurance Policies"* means any insurance policies, insurance settlement agreements, coverage-in-place agreements, or other agreements relating to the provision of insurance entered into by or issued to or for the benefit of any of the Debtors or their predecessors.

233.    *"Intercompany Claim"* means a Claim by EFH Corp. or any direct or indirect subsidiary of EFH Corp. against EFH Corp. or any direct or indirect subsidiary of EFH Corp.

234.    *"Interest"* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Entity.

235.    *"Interim Compensation Order"* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [D.I. 2066].

236.    *"Intermediate"* means the new Entity that will be a wholly owned subsidiary of TCEH.

237.    *"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended.

238.    *"Investor Rights Agreement"* means that certain Investor Rights Agreement, dated as of November 5, 2008, by and among Oncor and certain of its direct and indirect equityholders, including EFH Corp. and TTI.

239.    *"IPO Conversion Plan"* means the plan, if any, attached as an exhibit to the Merger Agreement, as may be modified, amended or supplemented in accordance with the Merger Agreement.

240.    *"IRS"* means the Internal Revenue Service.

241.    *"IRS Submissions"* means all submissions to the IRS in connection with the Ruling Request.

242.    *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

243.    *"Legacy General Unsecured Claim Against the EFH Debtors"* means (i) any Claim against the EFH Debtors derived from or based upon liabilities based on asbestos or, to the extent set forth on Schedule 6.6 to the Merger Agreement, qualified post-employment benefits relating to discontinued operations of the EFH Debtors.

244.    *"Legacy General Unsecured Claim Against the TCEH Debtors"* means any Claim against the TCEH Debtors derived from or based upon liabilities based on asbestos or qualified post-employment benefits relating to the TCEH Debtors.

245.    *"Liability Management Program"* means the various transactions, including debt buybacks, new debt issuances, debt exchanges, debt payoffs, intercompany debt forgiveness, dividends, and maturity extensions, by EFH Corp. and its direct and indirect subsidiaries, and restructuring of such Entities' debt obligations completed

before the Petition Date, as described in the 2009-2013 SEC filings of EFH Corp., EFIH, EFIH Finance, and TCEH.

246.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

247.    "*Litigation Letters*" means, collectively:  (a) the TCEH Committee Litigation Letters; and (b) the TCEH Unsecured Group Litigation Letter.

248.    "*Luminant*" means Luminant Holding Company LLC and its direct and indirect Debtor subsidiaries.

249.    "*Luminant Makewhole Settlement*" means those transactions in settlement of Luminant's obligations to Oncor under the Tax and Interest Makewhole Agreements, by which EFIH purchased Luminant's obligations from Oncor in August 2012, and Luminant paid EFIH the same respective amount in September 2012.

250.    "*Makewhole Claim*" means any Claim, whether secured or unsecured, derived from or based upon makewhole, applicable premium, redemption premium, or other similar payment provisions provided for by the applicable indenture or other agreement calculated as of the EFH Effective Date (or in the case of the EFIH First Lien Notes, the closing date of the EFIH First Lien DIP Facility, and in the case of EFIH Second Lien Notes, the closing date of the EFIH Second Lien Partial Repayment, with respect to the amount repaid at such time) or any other alleged premiums, fees, or Claims relating to the repayment of the principal balance of any notes, including any Claims for damages, or other relief arising from the repayment, prior to the respective stated maturity or call date, of the principal balance of any notes or any denial of any right to rescind any acceleration of such notes.

251.    "*Management Agreement*" means that certain management agreement, dated as of October 10, 2007, by and among EFH Corp., TEF, Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., Goldman, Sachs & Co., and Lehman Brothers Inc.

252.    "*Merger*" means that certain merger on the EFH Effective Date of Reorganized EFH with and into Merger Sub in a transaction intended to qualify as a tax-free reorganization under section 368(a) of the Internal Revenue Code, with Merger Sub continuing as the surviving entity.

253.    "*Merger Agreement*" means that certain Agreement and Plan of Merger, dated as of [___] 2016, by and among NextEra, Merger Sub, EFH Corp., and EFIH, as may be amended, supplemented, or otherwise modified from time to time in accordance therewith, including all exhibits attached thereto, which shall be included in the Plan Supplement.

254.    "*Merger Closing*" means "Closing," as that term is defined in the Merger Agreement.

255.    "*Merger Effective Time*" means "Effective Time," as that term is defined in the Merger Agreement.

256.    "*Merger Sub*" means EFH Merger Co., LLC, a Delaware limited liability company wholly owned by NextEra, with whom and into which Reorganized EFH will merge.

257.    "*Merger Sub Cash Amount*" means the Cash to be contributed by Merger Sub to the EFH/EFIH Distribution Account at the Merger Closing in accordance with the Merger Agreement.

258.    "*Merger Sub Account*" means a segregated, restricted account, and invested and disbursed in accordance with that certain escrow agreement, dated as of the EFH Effective Date, between Merger Sub and US Bankcorp, and used solely to satisfy Allowed Legacy General Unsecured Claims Against the EFH Debtors that are based on asbestos claims and related costs, including court costs, expert witness costs, attorneys' fees, the cost to procure insurance and all other related costs from time to time during the fifty year term of the escrow agreement and, to the extent any balance (including accrued interest, if any) remains at the end of such term, such balance shall only be paid over to a charity specified in accordance with the terms of such escrow agreement.

23

259. "*Minority Interest Acquisition*" means the acquisition by Merger Sub, Reorganized EFH, or an Affiliate thereof of (a) the Oncor Minority Interest in one or more privately negotiated transactions with TTI or Oncor Management or (b) the portion of the Oncor Minority Interest held by TTI pursuant to the drag-along rights set forth in Section 3.3 of the Investor Rights Agreement.

260. "*New Boards*" means, collectively:   (a) the Reorganized TCEH Board; and (b) the New EFH/EFIH Board.

261. "*New EFH/EFIH Board*" means the board of directors or managers, if any, of the Merger Sub and Reorganized EFIH, as applicable, on and after the EFH Effective Date, in each case to be appointed by the Plan Sponsor.

262. "*New EFH/EFIH Plan Support Agreement*" means that certain Alternative E-Side Restructuring Agreement, dated as of [     ], 2016, by and among the Plan Sponsor, the EFH Debtors, and the EFIH Debtors, as may be amended, supplemented or otherwise modified from time to time in accordance therewith.

263. "*New Employee Agreements/Arrangements*" means the agreements or other arrangements entered into by the 18 members of the Debtors' management team who are considered "insiders" but who are not party to an Employment Agreement as of the date of the Plan Support Agreement to be adopted by Reorganized TCEH on the TCEH Effective Date and which shall include the applicable terms set forth in Section 10(o) of the Plan Support Agreement and shall otherwise be substantially in the form included in the Plan Supplement and reasonably acceptable to the TCEH Supporting First Lien Creditors (in consultation with the TCEH Committee); *provided, however,* that none of the EFH Debtors, Reorganized EFH Debtors, EFIH Debtors, Reorganized EFIH Debtors, or Plan Sponsor shall have any liability with respect thereto.

264. "*New Organizational Documents*" means such certificates or articles of incorporation, by-laws, or other applicable formation documents of each of the Reorganized Debtors, as applicable, the form of which shall be included in the Plan Supplement; provided that any New Organization Document with respect to any Reorganized EFH Debtor or any Reorganized EFIH Debtor shall be in form and substance acceptable to the Plan Sponsor.

265. "*New Reorganized TCEH Debt*" means the new long-term debt of Reorganized TCEH to be issued on the TCEH Effective Date prior to the Reorganized TCEH Conversion.

266. "*New Reorganized TCEH Debt Documents*" means the documents necessary to effectuate the New Reorganized TCEH Debt, which shall be included in the Plan Supplement.

267. "*NextEra*" means NextEra Energy, Inc., a Florida corporation.

268. "*NextEra Common Stock*" means the NextEra Class A Common Stock and the NextEra Class B Common Stock.

269. "*NextEra Common Stock Investment*" means the NextEra Class A Common Stock Investment and the NextEra Class B Common Stock Investment.

270. "*NextEra Class A Common Stock*" means the shares of NextEra Common Stock issued in connection with the NextEra Class A Common Stock Investment.

271. "*NextEra Class A Common Stock Investment*" means the shares of NextEra Common Stock entitled to be received by the Holder of the Reorganized EFH Class A Common Stock upon its conversion at the Merger Effective Time in accordance with the Merger Agreement.

272. "*NextEra Class B Common Stock*" means the shares of NextEra Common Stock to be issued in connection with the NextEra Class B Common Stock Investment.

273.    "*NextEra Class B Common Stock Investment*" means the shares of NextEra Common Stock entitled to be received by the Holder of the Reorganized EFH Class B Common Stock upon its conversion at the Merger Effective Time in accordance with the Merger Agreement.

274.    "*Non-EFH Debtor Intercompany Claim*" means any Claim, other than the TCEH Settlement Claim, by any direct or indirect subsidiary of EFH Corp. (other than an EFH Debtor) against an EFH Debtor, including any Claims derived from or based upon EFH Legacy Notes held by EFH.

275.    "*Non-EFH Shared Services Debtor Intercompany Claim*" means any Claim by EFH. Corp. or any direct or indirect subsidiary of EFH Corp. (other than an EFH Shared Services Debtor) against an EFH Shared Services Debtor.

276.    "*Non-EFIH Debtor Intercompany Claim*" means any Claim by EFH Corp. or any direct or indirect subsidiary of EFH Corp. (other than an EFIH Debtor) against an EFIH Debtor.

277.    "*Non-TCEH Debtor Intercompany Claim*" means any Claim by EFH Corp. or any direct or indirect subsidiary of EFH Corp. (other than a TCEH Debtor) against a TCEH Debtor, including any Claim derived from or based upon the TCEH Credit Agreement, the TCEH First Lien Notes, or TCEH Unsecured Notes held by EFH Corp. and EFIH.

278.    "*NRC*" means the United States Nuclear Regulatory Commission.

279.    "*Nuclear Decommissioning Obligations*" means the Debtors' funding obligations related to a nuclear decommissioning trust that will be used to fund the decommissioning of the Comanche Peak nuclear power plant, as required by the Department of Energy.

280.    "*Oak Grove Promissory Note*" means that certain Promissory Note, dated December 22, 2010, by and among Oak Grove Power Company LLC, as issuer, and North American Coal Royalty Company, as holder, and John W. Harris, as trustee, with face amount of $7,472,500 due in annual installments through December 22, 2017, which note is secured by all coal, lignite, and other near-surface minerals on and under certain real property in Robertson County, Texas.

281.    "*Oak Grove Promissory Note Claim*" means any Claim derived from or based upon the Oak Grove Promissory Note.

282.    "*Oncor*" means Oncor Holdings and its direct and indirect subsidiaries.

283.    "*Oncor Electric*" means Oncor Electric Delivery Company LLC.

284.    "*Oncor Holdings*" means Oncor Electric Delivery Holdings Company LLC.

285.    "*Oncor Letter Agreement*" means that certain letter agreement to be entered into contemporaneously with the Merger Agreement, by and among NextEra, Merger Sub, Oncor Electric, and Oncor Holdings, pursuant to which, among other things, each of Oncor Electric and Oncor Holdings will agree to take and not to take certain actions in furtherance of the transactions contemplated by the Merger Agreement, which shall be included in the Plan Supplement.

286.    "*Oncor Management*" means Oncor Management Investment LLC

287.    "*Oncor Minority Interest*" means the minority interests in Oncor Electric held by TTI and Oncor Management.

288.    "*Oncor Tax Sharing Agreement*" means that certain Amended and Restated Tax Sharing Agreement, dated as of November 5, 2008, by and among EFH Corp., Oncor Holdings, Oncor Electric, TTI, and Oncor Management.

289.    "*OpCo*" means TEX Operations Company LLC, a Delaware limited liability company.

290.    "*Ordinary Course Professional Order*" means the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [D.I. 765].

291.    "*Original Confirmed Plan*" means the *Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 7235].

292.    "*Original Plan Sponsors*" means "Plan Sponsors," as such term was defined in the Original Confirmed Plan.

293.    "*Original Plan Supplement*" means the *Plan Supplement for the Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 6544], and any amendments and modifications thereto, including D.I. 7191 and D.I. 7866.

294.    "*Other Priority Claims*" means any Claim, other than an Administrative Claim, a DIP Claim, or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

295.    "*Other Secured Claim Against the EFH Debtors*" means any Secured Claim against any of the EFH Debtors, excluding DIP Claims.

296.    "*Other Secured Claim Against the EFH Shared Services Debtors*" means any Secured Claim against any of the EFH Shared Services Debtors, excluding DIP Claims.

297.    "*Other Secured Claim Against the EFIH Debtors*" means any Secured Claim against any of the EFIH Debtors, excluding:  (a) EFIH First Lien Note Claims, if any; (b) EFIH Second Lien Note Claims; and (c) DIP Claims.

298.    "*Other Secured Claim Against the TCEH Debtors*" means any Secured Claim against any of the TCEH Debtors, including the Oak Grove Promissory Note Claims and Tex-La Obligations, but excluding:  (a) TCEH First Lien Secured Claims; and (b) DIP Claims.

299.    "*OV2*" means Ovation Acquisition II, L.L.C., a Delaware limited liability company.

300.    "*Parent Disclosure Letter*" means "Parent Disclosure Letter" as such term is defined in the Merger Agreement.

301.    "*PBGC*" means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation, and an agency of the United States created by ERISA.

302.    "*PCRB Claim*" means any Claim derived from or based upon the PCRBs, excluding the Repurchased PCRBs.

303.    "*PCRBs*" means the pollution control revenue refunding bonds and pollution control revenue bonds outstanding from time to time, including: (a) 7.70% Fixed Series 1999C due March 1, 2032; (b) 7.70% Fixed Series 1999A due April 1, 2033; (c) 6.30% Fixed Series 2003B due July 1, 2032; (d) 6.75% Fixed Series 2003C due October 1, 2038; (e) 5.40% Fixed Series 2003D due October 1, 2029; (f) 5.40% Fixed Series 1994A due May 1, 2029; (g) 5.00% Fixed Series 2006 due March 1, 2041; (h) 8.25% Fixed Series 2001A Due October 1, 2030; (i) 8/25% Fixed Series 2001D-1 due May 1, 2033; (j) 6.45% Fixed Series 2000A due June 1, 2021; (k) 5.80% Fixed Series 2003A due July 1, 2022; (l) 6.15% Fixed Series 2003B due August 1, 2022; (m) 5.20% Fixed Series 2001C due May 1, 2028; (n) 6.25% Fixed Series 2000A due May 1, 2028; (o) Series 1994B due May 1, 2029 (variable rate); (p) Series 1995A due April 1, 2030 (variable rate); (q) Series 1995B due June 1, 2030 (variable rate); (r) Series 2001B due May 1, 2029 (variable rate); (s) Series 2001C due May 1, 2036 (15% ceiling); (t) Floating Taxable Series 2001I due December 1, 2036; (u) Floating Series 2002A due May 1, 2037; (v) Series 2003A due April 1, 2038 (15% ceiling); (w) Series 1999B due September 1, 2034 (15% ceiling); (x) Floating

Series 2001D-2 due May 1, 2033; (y) Series 2001A due May 1, 2022 (15% ceiling); (z) Series 2001B due May 1, 2030 (15% ceiling); and (aa) Series 2001A due May 1, 2027 (variable rate), to which, among others, the PCRB Trustee is party.

304. *"PCRB Trustee"* means BNYM, as indenture trustee for the PCRBs.

305. *"Pension Plans"* means the two single-employer defined benefit plans insured by the PBGC and covered by Title IV of ERISA, 29 U.S.C. §§ 1301-1461, including (a) the plan sponsored by EFH Corp., and (b) the plan sponsored by Oncor Electric.

306. *"Periodic Distribution Date"* means, unless otherwise ordered by the Bankruptcy Court, the first Business Day that is 120 days after the Effective Date, and, for the first year thereafter, the first Business Day that is 120 days after the immediately preceding Periodic Distribution Date. After one year following the Effective Date, the Periodic Distribution Date will occur on the first Business Day that is 180 days after the immediately preceding Periodic Distribution Date, unless and until otherwise ordered by the Bankruptcy Court.

307. *"Petition Date"* means April 29, 2014, the date on which the Debtors commenced the Chapter 11 Cases.

308. *"Plan"* means this *Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement.

309. *"Plan Sponsor"* means NextEra, acting through its wholly-owned subsidiary, NextEra Energy Capital Holdings, Inc., the beneficial owner of approximately $45 million principal amount of EFIH Senior Toggle Notes and a creditor and party in interest in the Chapter 11 Cases.

310. *"Plan Sponsor Cash Amount"* mean collectively, (a) the Merger Sub Cash Amount, (b) the EFIH First Lien DIP Repayment Amount, and (c) the EFIH Second Lien Notes Repayment Amount.

311. *"Plan Sponsor Investment"* means, collectively: (a) the Plan Sponsor Cash Amount; and (b) the NextEra Common Stock Investment.

312. *"Plan Supplement"* means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 14 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement comprised of, among other documents, the following, if any and as applicable: (a) New Organizational Documents; (b) the Rejected Executory Contract and Unexpired Lease List; (c) the Assumed Executory Contract and Unexpired Lease List (which shall include the Employment Agreements and provide that such Employment Agreements are assigned to Reorganized TCEH on the TCEH Effective Date); (d) a list of retained Causes of Action; (e) the Reorganized TCEH Debtor Management Incentive Plan; (f) the New Employee Agreements/Arrangements; (g) the Reorganized TCEH Registration Rights Agreement; (h) the identity of the members of the New Boards and management for the Reorganized Debtors; (i) the New Reorganized TCEH Debt Documents; (j) the Merger Agreement; (k) the Tax Matters Agreement; (l) the Transition Services Agreement; (m) the Reorganized TCEH Shareholders' Agreement; (n) the Oncor Letter Agreement; (o) the Separation Agreement; (p) the Spin-Off Tax Receivable Agreement or the Taxable Separation Tax Receivable Agreement (as applicable); (q) the Amended and Restated Split Participant Agreement; (r) the Taxable Separation Memorandum; and (s) the TRA Information Form. Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (s), as applicable. Other than with respect to the assumption and assignment of the Employment Agreements as set forth herein, the documents that comprise the Plan Supplement shall be: (i) subject to any consent or consultation rights provided hereunder and thereunder, including as provided in the definitions of the relevant documents; and (ii) in form and substance reasonably acceptable (or, to the extent otherwise provided hereunder or thereunder, including as provided in the applicable definitions of the applicable documents, acceptable) to the Plan Sponsor, the TCEH Supporting First Lien Creditors, and the DIP Agents. The Parties entitled to amend the documents contained in the

Plan Supplement shall be entitled to amend such documents in accordance with their respective terms through and including the Effective Date.

313.    *"Plan Support Agreement"* means that certain Plan Support Agreement, dated as of August 9, 2015 (as amended on September 11, 2015, October 27, 2015, and November 12, 2015, and as may be amended, supplemented, or otherwise modified from time to time in accordance therewith), by and among the Debtors, the Original Plan Sponsors, the TCEH Supporting First Lien Creditors, the TCEH First Lien Agent, the TCEH Supporting Second Lien Creditors, the TCEH Committee, and certain other Entities, including all exhibits and schedules attached thereto.

314.    *"Post-Closing Audit"* means the "Post-Closing Audit" as defined in the Merger Agreement.

315.    *"Preferred Stock Entity"* means, as part of the Spin-Off, the new Entity pursuant to which certain assets and liabilities will be transferred as part of the Spin-Off Preferred Stock Sale, it being understood that, if the Spin-Off is effectuated pursuant to the terms and conditions set forth in Article IV.B.2, the Preferred Stock Entity will undertake the Preferred Stock Entity Conversion on the TCEH Effective Date.

316.    *"Preferred Stock Entity Conversion"* means, as part of the Spin-Off, the conversion of the Preferred Stock Entity from a Delaware limited liability company to a Delaware corporation on the TCEH Effective Date, immediately following the Contribution and immediately prior to the Spin-Off Preferred Stock Sale.

317.    *"Priority Tax Claim"* means the Claims of Governmental Units of the type specified in section 507(a)(8) of the Bankruptcy Code.

318.    *"Private Letter Ruling"* means the private letter ruling issued by the IRS applied for in connection with the Ruling Request, and issued by the IRS to the Debtors on July 28, 2016.

319.    *"Pro Rata"* means the proportion that the amount of an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims or Allowed Interests in that Class, or the proportion of the Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Claim or Interest under the Plan.

320.    *"Professional"* means an Entity, excluding those Entities entitled to compensation pursuant to the Ordinary Course Professional Order:  (a) retained  pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; *provided, however,* that each of the professionals employed by the DIP Agents shall not be "Professionals" for the purposes of the Plan.

321.    *"Professional Fee Claims"* means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

322.    *"Professional Fee Escrow Account"* means the TCEH Professional Fee Escrow Account, the EFIH Professional Fee Escrow Account, and the EFH Professional Fee Escrow Account, as applicable.

323.    *"Professional Fee Escrow Agents"* means each escrow agent for the applicable Professional Fee Escrow Account appointed pursuant Artcile II.A.2(b) of the Plan and the escrow agreements entered into pursuant thereto.

324.    *"Proof of Claim"* means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

325.    *"Proof of Interest"* means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

326.    *"PUC"* means the Public Utility Commission of Texas.

327.    *"PUC Approval"* means the PUC's approval, as applicable, of the transactions contemplated by the Merger Agreement pursuant to authority asserted by the PUC pursuant to the Public Utility Regulatory Act and the PUC's regulations thereunder.

328.    *"RCT"* means the Railroad Commission of Texas.

329.    *"Reinstate," "Reinstated,"* or *"Reinstatement"* means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

330.    *"Rejected Executory Contract or Unexpired Lease"* means any EFH/EFIH Rejected Executory Contract or Unexpired Lease or any TCEH Rejected Executory Contract or Unexpired Lease.

331.    *"Rejected Executory Contract and Unexpired Lease List"* means, as applicable, the EFH/EFIH Rejected Executory Contract and Unexpired Lease List or the TCEH Rejected Executory Contract and Unexpired Lease List.

332.    *"Released Parties"* means collectively, and in each case only in its capacity as such:  (a) the EFH/EFIH Plan Supporters; (b) Merger Sub; (c) Holders of TCEH First Lien Claims; (d) Holders of TCEH Second Lien Note Claims; (e) Holders of TCEH Unsecured Note Claims; (f) Holders of EFH Legacy Note Claims; (g) Holders of EFH Unexchanged Note Claims; (h) Holders of EFH LBO Note Primary Claims; (i) Holders of EFIH Unsecured Note Claims; (j) Holders of EFH LBO Note Guaranty Claims; (k) the DIP Lenders; (l) the TCEH First Lien Agent; (m) the Indenture Trustees other than the EFIH First Lien Notes Trustee and the EFIH Second Lien Notes Trustee; (n) the Dealer Managers; (o) TEF; (p) Texas Holdings; (q) Oncor; (r) funds and accounts managed or advised by Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P. or Goldman, Sachs & Co. that hold direct or indirect interests in Texas Holdings, TEF, or EFH Corp.; (s) the Committees and each of their respective members; (t) Holders of General Unsecured Claims Against the TCEH Debtors Other Than EFCH; (u) Holders of General Unsecured Claims Against EFCH; (v) Holders of General Unsecured Claims Against the EFIH Debtors; (w) Holders of General Unsecured Claims Against EFH Corp.; (x) Holders of General Unsecured Claims Against the EFH Debtors Other Than EFH Corp.; (y) Holders of General Unsecured Claims Against the EFH Shared Services Debtors; (y) the Original Plan Sponsors; (aa) OV2; (bb) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (aa), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (cc) the DTC; *provided, however,* that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party"; *provided, further, however,* that the EFIH First Lien Notes Trustee, all Holders of Claims derived from or based on the EFIH First Lien Notes, the EFIH Second Lien Notes Trustee, and all Holders of Claims derived from or based on the EFIH Second Lien Notes, shall not be "Released Parties," except as otherwise agreed to by a Holder in its capacity as such.

333.    *"Releasing Parties"* means collectively, and in each case only in its capacity as such:  (a) the EFH/EFIH Plan Supporters; (b) Merger Sub; (c) Holders of TCEH First Lien Claims; (d) Holders of TCEH Second Lien Note Claims; (e) Holders of TCEH Unsecured Note Claims; (f) Holders of EFH Legacy Note Claims; (g) Holders of EFH Unexchanged Note Claims; (h) Holders of EFH LBO Note Primary Claims; (i) Holders of EFIH Unsecured Note Claims; (j) Holders of EFH LBO Note Guaranty Claims; (k) the DIP Lenders; (l) the TCEH First

Lien Agent; (m) the Indenture Trustees other than the EFIH First Lien Notes Trustee and the EFIH Second Lien Notes Trustee; (n) the Dealer Managers; (o) TEF; (p) Texas Holdings; (q) Oncor; (r) funds and accounts managed or advised by Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P. or Goldman, Sachs & Co. that hold direct or indirect interests in Texas Holdings, TEF, or EFH Corp.; (s) the Committees and each of their respective members; (t) Holders of General Unsecured Claims Against the TCEH Debtors Other Than EFCH; (u) Holders of General Unsecured Claims Against EFCH; (v) Holders of General Unsecured Claims Against the EFIH Debtors; (w) Holders of General Unsecured Claims Against EFH Corp.; (x) Holders of General Unsecured Claims Against the EFH Debtors Other Than EFH Corp.; (y) Holders of General Unsecured Claims Against the EFH Shared Services Debtors; (z) all Holders of Claims and Interests that are deemed to accept the Plan; (aa) all Holders of Claims and Interests who vote to accept the Plan; (bb) all Holders in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (cc) OV2; (dd) the Original Plan Sponsors; (ee) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (dd), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (ff) all Holders of Claims and Interests, solely with respect to releases of all Holders of Interests in EFH Corp. and their current and former Affiliates, and such Entities' and their Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and their current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided, however*, that the EFIH First Lien Notes Trustee, all Holders of Claims derived from or based on the EFIH First Lien Notes, the EFIH Second Lien Notes Trustee, and all Holders of Claims derived from or based on the EFIH Second Lien Notes, shall not be "Releasing Parties," except as otherwise agreed by a Holder in its capacity as such.

334.   *"Reorganized Debtor"* means any Debtor as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, including Merger Sub, on or after the Effective Date.

335.   *"Reorganized EFH"* means EFH Corp. on and after the EFH Effective Date, or any successor thereto, including Merger Sub, by merger, consolidation, or otherwise, unless otherwise indicated in the Plan.

336.   *"Reorganized EFH Common Stock"* means the Reorganized EFH Class A Common Stock and the Reorganized EFH Class B Common Stock.

337.   *"Reorganized EFH Class A Common Stock"* means one new validly issued, fully paid and nonassessable share of Class A common stock, no par value, of Reorganized EFH to be issued and distributed under and in accordance with the Plan.

338.   *"Reorganized EFH Class B Common Stock"* means one new validly issued, fully paid and nonassessable share of Class B common stock, no par value, of Reorganized EFH to be issued and distributed under and in accordance with the Plan.

339.   *"Reorganized EFH Debtors"* means the EFH Debtors, other than the EFH Shared Services Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, including Merger Sub, on or after the EFH Effective Date.

340.   *"Reorganized EFH Shared Services Debtors"* means the EFH Shared Services Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the TCEH Effective Date.

341.   *"Reorganized EFH Stock Value"* means $1 per share of Reorganized EFH Common Stock.