**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.*,<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 14-10979 (CSS)<br>)<br>) (Jointly Administered)<br>)<br>) **Related to Docket No. 9409**<br>) **Hearing Date:  October 26, 2016 at 10:00 a.m.**<br>) **Objection Deadline: October 7, 2016 at 4:00 p.m.**[1] |

**RESPONSE OF THE CITY OF DALLAS, TEXAS**
**IN OPPOSITION TO THE OBJECTION OF ENERGY FUTURE**
**HOLDINGS CORP., *ET AL.*, TO PROOF OF CLAIM NO. 13319**

The City of Dallas, Texas ("Dallas" or "the City") hereby responds in opposition to the

*Objection of Energy Future Holdings Corp., et al., to Proof of Claim No. 13319 Filed by The City*

*of Dallas* [D.I. 9409] (the "Objection").

## I.    PRELIMINARY STATEMENT

Dallas' claim arises from the post-assumption rejection of a non-residential real

property lease (the "Water Lease") between Dallas and Debtor Luminant Generation Company

LLC ("Luminant").[2]  By Order entered on October 27, 2014 [Docket No. 2574] Luminant assumed

the Water Lease.  Then, by Order entered on October 14, 2015 [Docket No. 6447], Luminant

rejected the Water Lease *nunc pro tunc* to September 22, 2015.

---

[1]      The objection deadline was extended to October 7, 2016 and the initially scheduled September 26, 2016 hearing was adjourned to October 26, 2016 by agreement of counsel for the City and the Debtors.

[2]      *See Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing Rejection of a Previously Assumed Nonresidential Real Property Lease Between Luminant Generation Company LLC and the City of Dallas, Texas, Effective Nunc Pro Tunc to September 22, 2015* [Docket No. 6141] (the "Rejection Motion").  A true and correct copy of the Rejection Motion is attached hereto as Exhibit 1.

The remaining term of the Water Lease as of rejection was just over 35 years, terminating in 2050. The revenue to the City under the Water Lease for the balance of the term would have been approximately $115 million (assuming a constant water lease rate that, contrary to Dallas' prior experience, did not increase over the remainder of the term).

Following rejection, in November 2015, the City timely filed its proof of claim (the "Original POC") properly evidencing, based on the information available at such time, (i) an administrative claim of $6,445,897.62 under section 503(b)(7) of the Bankruptcy Code for the two year period following rejection, and (ii) its pre-petition unsecured claim of $9,777,485.16 for the remaining lease term, subject to the statutory cap imposed by section 502(b)(6) of the Bankruptcy Code.[3] Based on updated information (the increase in the Water Lease rate effective October 1, 2016 as described in detail below), Dallas intends to file, as quickly as reasonably possible, an amended proof of claim (the "Amended POC"), pursuant to which its claims will increase to $6,825,275.04 under 503(b)(7) and $10,698,339.96 under 502(b)(6).

By the Objection Debtors seek to reduce the City's claims as evidenced by the Original POC in the amount of approximately $10 million in the aggregate (about $2.4 million off the 503(b)(7) claim and almost $8 million off the 502(b)(6) claim) on four grounds, which also presumably would apply to Dallas' claims as evidenced by the Amended POC:

> (i)        that, contrary to their plain language and resultant meaning, sections
>
> 503(b)(7) and 502(b)(6) together allow only for a two year administrative claim and

---

[3]        Under the plan of reorganization [Docket No. 9374] (the "Plan") confirmed by the Court by its order entered on August 29, 2016 [Docket No. 9421], it is estimated that general unsecured claims against Luminant will receive a distribution of 7.4% with the possibility, under certain circumstances, that the distribution could decrease to 6.8%. *See Third Amended Disclosure Statement for the Second Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the TCEH Debtors and EFH Shared Services Debtors* [Docket No. 8753], at page 17 and fn. 17.

a one year general unsecured claim for contracts first assumed and then rejected by a debtor;

(ii)     that the water lease rate of $271.60 per acre foot, which became effective on October 1, 2015, and the water lease rate of $297.18 per acre foot, which became effective on October 1, 2016 pursuant to ordinances enacted by the Dallas City Council, should not be used to calculate the City's claims and, instead, the rate of $182.90 per acre foot in effect on September 22, 2015 (the *nunc pro tunc* rejection date) should;

(iii)     again contrary to the language of sections 503(b)(7) and 502(b)(6), that the City's claims must be reduced to present value (using the Debtors' weighted average cost of capital as the discount rate, which the City submits is not an appropriate rate even if discounting is warranted); and

(iv)     despite it being Debtors' burden, the City has not "proven" that it mitigated its damages.

Debtors' arguments do not provide any valid basis to reduce the City's claims. First, the City calculated its administrative and unsecured claims in accordance with the plain meaning of sections 503(b)(7) and 502(b)(6), which provide that when a nonresidential real property lease is assumed then later rejected the lessor is entitled both to a two year administrative claim and also to a 502(b)(6) general unsecured claim "for remaining sums due for the balance of the term of the lease." Neither 503(b)(7) nor 502(b)(6) provide for reduction of the 502(b)(6) claim on account of the 503(b)(7) two year administrative claim.

Second, in calculating its claims the City is not relegated to the water lease rate in effect on September 22, 2015. Rather, it is entitled to recover based on increases to the rate

3

enacted through the valid legislative processes of Dallas City Council, which has had and will continue to have the authority to set the water lease rate for its wholesale untreated water customers. Such rent "step ups" are allowable as part of a lessor's rejection claim. By ordinance enacted by the Dallas City Council on September 22, 2015, the Water Lease rate was increased to $271.60 effective as of October 1, 2015 (which is the rate Dallas used to calculate its claims with the exception of eight days in the two year period relating to the 503(b)(7) claim). The rate increased to $297.18, effective as of October 1, 2016. Those rates, which recoup water service costs for the prior year, were set by Dallas' City Council after lengthy and open rate setting processes that begin, as they do every year, in January. All of the City's major wholesale customers, including Luminant for 2015/16, received notice of the proposed rate and the bases for the proposed rate at various stages beginning months before the enactment of the ordinance by City Council. *See* Rejection Motion at ¶ 12. In light of the actual and projected costs that will be incorporated into future rates, the City does not anticipate that future water rates ever will be less than $297.18; and the City submits it will receive adequate and fair compensation for the damages caused by Luminant's rejection of the water lease using the $297.18 per acre foot rate.

Third, Luminant's suggestion that the City's claims, already subject to the significant reductions through the 503(b)(7) and 502(b)(6) caps, also should be discounted to present value must be rejected. It finds no support in the text of either section. For example, 503(b)(7) explicitly states that the lessor's claim thereunder is "without reduction or setoff for any reason whatsoever …." Section 502(b)(6) speaks of the claim thereunder being the "amount" of the rent reserved under the lease subject to the caps provided, not the "value" of such claim or amount, a distinction drawn by the Third Circuit in *In re Oakwood Homes Corporation*, 449 F.3d 588 (3d Cir. 2006), in holding that discounting was not *per se* appropriate for claims under section

502(b).  Assuming discounting otherwise was appropriate under the statutes, the City submits that no reduction is warranted either (i) for the period of time subsequent to the September 22, 2015 rejection until the City actually has received payment on its claims, which is now more than a year and counting, or (ii) to the extent that any discount rate applied is in excess of a reasonable short term, risk free rate (and certainly not the Debtors' weighted average cost of capital, which includes both the risk and the reward of much higher rates relating to equity and riskier long term debt instruments than should be applicable here).

Finally, with respect to mitigation, for which Debtors have the burden as it is an affirmative defense under applicable Texas law, the City has no authority to sell the water dedicated to Luminant under the Water Lease outside of the Sabine River basin.  Dallas has had no reasonable opportunity to sell that water to another customer as it is not aware of any potential customers for such water in the Sabine River basin.  The City is not aware of any other entity that has a use for this water within the Sabine River basin and the Debtors have not identified any such other possible user.

For all of these reasons, as well as those set forth below, the City respectfully requests that Luminant's objection to the City's proof of claim be denied and that the Court enter an order allowing the City's administrative and unsecured claims, as amended, in full.

## II.    FACTUAL BACKGROUND

### A.    The Water Use Agreement

1.  The Lake Fork Reservoir is located within the Sabine River Authority watershed jurisdiction in east Texas, approximately 70 miles from Dallas.  It was constructed beginning in 1975.  Dallas funded 100% of the construction of the Lake Fork Reservoir specifically for the purpose of obtaining the right to use, and sell, water from the reservoir.  The

5

City has paid over $470 million with respect to the Lake Fork Reservoir and the related pump station and pipelines, including funding 100% of the cost of their construction.

2.   In 1981, Dallas, the Sabine River Authority, and certain utilities, acting through the Texas Utilities Generating Company entered into an agreement (the "Sabine Water Agreement") which provides, *inter alia*, for the conveyance to the City of up to 74% of the dependable yield of the Lake Fork Reservoir for municipal and resale purposes in return for the City's payment of 74% of the operation and maintenance expenses associated with Lake Fork. This water represents just over 21% of Dallas' entire water supply.

3.   Dallas sells water from Lake Fork and from other sources on a wholesale basis to approximately 26 wholesale customers, which number included Luminant prior to its rejection of the Water Lease.

4.   The term of the Sabine Water Agreement automatically renewed for a 40-year term commencing November 1, 2014.  The Sabine Water Agreement automatically renewed for another 40 years unless Dallas gave written notice of termination at least one year prior to November 1, 2014.  Well prior to November 1, 2014 the City affirmatively notified the Sabine River Authority of its intent for the Sabine Water Agreement not to terminate, but rather to renew for the additional 40 year term.

5.   The Sabine Water Agreement provides that "[t]he amount of compensation that [the Sabine River Authority] shall be entitled to receive during any renewal term (exclusive of the City of Dallas' prorated share of the service charge) shall be determined by mutual agreement between the City of Dallas and [the Sabine River Authority], taking into account such prices as prevailing in the general area at the time for like contract sales of water of similar quality, quantity, and contract period."

6.   The Sabine Water Agreement further provides that if the City and the Sabine River Authority are unable to agree on the amount of compensation due to the Sabine River Authority prior to the expiration of the term, the Public Utility Commission of Texas ("PUC") (formerly the Texas Water Commission) may establish interim compensation, until the amount of compensation is finally determined.

7.   For more than six (6) years prior to November 1, 2014 Dallas attempted to negotiate a rate with the Sabine River Authority for the renewal term.  An agreement was not reached before the Sabine River Authority unilaterally, and without requesting the PUC to establish interim compensation as contemplated by the Agreement, set a renewal rate without the City's approval or agreement.

8.   On October 9, 2014 the Sabine River Authority Board increased the rate to be charged to Dallas to $0.5613 per thousand gallons, payable on a "take or pay" basis for 131,860 acre feet of water per year, with an additional price escalator based on the Consumer Price Index.  The City has not voluntarily agreed to this rate; but, has been paying the increased rate into escrow.  *See* paragraphs 23-34, *infra*.

9.   The new rate imposed by the Sabine River Authority increased the City's cost for untreated water from the Lake Fork Reservoir by 900%, from approximately $3 million per year to approximately $27 million per year.  This, in turn, required Dallas to increase the rate it charges its wholesale customers.

10.   The rate for untreated water charged to Dallas' wholesale customers is a system-wide rate based on all costs and expenses incurred over the entire system.  Although the water from Lake Fork comprises only just over 21% of Dallas' connected water supply, the compensation increase imposed by the Sabine River Authority with respect to Lake Fork water is

7

included in the wholesale rate charged to all wholesale customers regardless whether their water is drawn entirely, partially, or not at all from Lake Fork.  That is a benefit to Luminant, as the Sabine River Authority compensation increase is spread over all of Dallas' wholesale customers over the entire Dallas water system and is not borne only by the customers that draw their water from Lake Fork.

**B.    The Luminant Water Lease**

11.  In 2011, Dallas and Luminant entered into the Water Lease, which provided Luminant the right to use, and obligates Luminant to pay for, regardless whether it actually uses any water, 12,000 acre-feet of water per year for a 40 year term commencing January 1, 2011 ending December 31, 2050.  Payments under the Water Lease are calculated based on the current prevailing rate for untreated water set by Dallas for all of its wholesale water customers.  The water that Luminant contracted to use, and pay for, is from the Lake Fork Reservoir, which is in the Sabine River watershed and subject to the jurisdiction of the Sabine River Authority.

12.  Under the Sabine Water Agreement, the City is authorized to draw up to 131,860 acre feet of water from the Lake Fork Reservoir per year to sell to its wholesale customers; but the City cannot remove more than 120,000 acre feet of such water from the Sabine River basin.  The facility at which the water dedicated to Luminant under the Water Lease was to be used is located in the Sabine River basin.  In effect, pursuant to the Water Lease, the City sold to Luminant the 11,860 acre feet of water that it could not remove from the Sabine River basin under the Sabine Water Agreement, plus 140 acre feet that could be removed, to get to the 12,000 acre feet amount dedicated to Luminant under the Water Lease.

**C.    Dallas' Rate Setting Process for its Wholesale Customers**

13.  The water rate that Dallas charges its wholesale customers is set on an annual basis following a comprehensive review process.  That process includes input and comment from

8

its wholesale customers.  The rate is set to recover costs incurred by the City during the prior year

related to the Lake Fork Reservoir and otherwise with respect to the City's provision of untreated

water to its customers.  Such costs include operations and maintenance, depreciation of equipment

and infrastructure repairs.

14.  The City's rate setting process typically begins in January of each year and

continues for several months.  *See* Exhibit 2 attached hereto (2015 and 2016 Schedules for

Wholesale Water and Wastewater Cost of Service Study).

15.  The 2015 rate setting process began in January 2015, and lead to the Dallas

City Council ordinance enacted on September 22, 2015 raising the rate to $271.60/acre foot

effective as of October 1, 2015.  The 2015/16 rate captures the increased compensation to the

Sabine River Authority that Dallas has been paying.  *See* Rejection Motion at ¶10, fn 6 ("The

[2014/15] rate does not include the costs, fees, and other expenses imposed by the SRA for the

period.  As such, the rate is expected to be substantially higher than what is currently reflected.")

16.  The September 22, 2015 City Council meeting agenda, attached hereto as

Exhibit 3, states in this regard:

> **BACKGROUND**
>
> In compliance with the City's Financial Performance Management Criteria
> (FMPC) #15, an annual review of selected fees and charges is conducted to
> determine the extent to which the full cost of associated services is being
> recovered by revenues.  The charges which are incorporated into the
> proposed ordinance relate to adjusting … (24) rates and charges for treated
> water service, wastewater service, wholesale water and wastewater service
> to governmental entities, untreated water service. Service connections, and
> fire hydrant usage; ….

17.  The rate setting process is monitored by a committee of wholesale customers

who remain informed through every stage of the process.  *See* Exhibit 4 attached hereto (2015

Cost of Service Study Participants).  Meetings are held by the City with wholesale customers and

questions are posed by wholesale customers both in writing and orally at such meetings, to which the City provides responses, both in written form, and at such meetings.  *See* Exhibit 5 attached hereto (Questions and Follow-up Questions from 2015 Wholesale Cost of Service Studies).  Such questions and answers are not confidential and are available to all wholesale customers.

18.  The City typically submits proposed rates to its wholesale customers in July and the Dallas City Council votes on the proposed rates in September of each year.  Assuming they are approved, the rates become effective on or about the first of October of the year.  That was the process followed for setting the October 1, 2015 through September 30, 2016 rate.

19.  By ordinance enacted on September 22, 2015, a copy of which is attached to Dallas' Original POC, the Dallas City Council raised the rate for untreated water to $271.60 per acre foot, effective as of October 1, 2015, in part due to the 900% rate increase imposed on Dallas by the Sabine River Authority.  This rate remained in effect through September 30, 2016.  Before this rate went into effect, all wholesale customers, including Luminant, were provided with notice of the proposed new rate.  *See* Exhibit 6 attached hereto (July 17, 2015 letter from Dallas water Utilities to Luminant).  No customer objected to the rate set effective as of October 1, 2015.

20.  Consistent with the process described above for 2015 (and consistent with the processes in prior years), on September 21, 2016 the Dallas City Council set the water rate effective as of October 1, 2016 and continuing through September 30, 2017 at $0.9120 per 1,000 gallons (equivalent to $297.18 per acre foot). [4]

21.  Wholesale water rates have been trending upward for several years due to many factors, including the Sabine River Authority rate increase and the addition of an integrated pipeline system which has increased the City's operating costs by $29 million.  Some or all of

---

[4]    Again, before this rate went into effect, all wholesale customers were provided with notice of the proposed new rate.  None of them objected to the rate.

SL1 1434844v2 101189.00003

such costs are passed on to the City's wholesale customers in accordance with the 2010

Memorandum of Agreement, s*ee* Exhibit 7 attached hereto.  Dallas also anticipates substantial

future costs in connection with the Dallas water system, some or all of which will continue to be

passed on to the City's wholesale customers in accordance with the 2010 Memorandum of

Agreement, including (i) Dallas' share of the repairs required to the Lewisville Lake Dam from

2018 to and including 2020, costing an estimated $100-$200 million; and (ii) continuing

substantial costs to connect Lake Palestine to the Dallas water system.

22.    Consistent with the processes described above, Dallas' wholesale water rate

has increased over the course of these bankruptcy cases.  It was $174.49 as of the commencement

of the cases.  Later in 2014 it was raised to $182.90.  Of course, as set forth above, the rate has

been raised twice since, to $271.60 as of October 1, 2015 and to $297.18 as of October 1, 2016.

**D.    Dallas' Legal and Administrative Responses to the Sabine River Authority Rate
Increase**

23.    In a good faith effort to protect the City and its customers from the effect of

such action, Dallas has commenced three legal challenges to the Sabine River Authority's

unilateral water rate increase which have been pending for over a year with no expectation that

they will be resolved in the near future.

24.    Dallas' wholesale customers, including Luminant, also have been kept

informed of the ongoing dispute between the City and the Sabine River Authority, both with

respect to the litigation between them and the possible effect of such on the water rate.  *See*

Exhibit 5, *infra*; and Exhibit 8 attached hereto (email exchanges between Dallas and Luminant

from September 2015).  *See also*, Rejection Motion at ¶12.

25.    The first challenge is an appeal to the PUC (the "PUC Appeal"), filed on

October 30, 2014, in which the City has asserted that the rate set by the Sabine River Authority

violated the Texas Water Code and the Sabine Water Agreement.  The City has requested the PUC to establish an interim and final rate that is fair, reasonable and nondiscriminatory.

26.  The PUC referred the action to the State Office of Administrative Hearings which, in turn, assigned an Administrative Law Judge ("ALJ") to hear the dispute.

27.  On April 2, 2015, the ALJ ruled that Dallas: (i) would be required to pay, on an interim basis,  the Sabine River Authority's unilaterally established renewal rate; and (ii) would make those interim payments ($24.1 million annually) into an escrow account until the dispute is resolved (the "PUC Escrow").

28.  The Sabine River Authority also requested that the ALJ abate the PUC proceeding until a court ruled on the issue of whether the renewal rate was set pursuant to a contract (namely, the Sabine Water Agreement).  The PUC's handling of a water rate case varies, depending upon whether the rate is set pursuant to a written contract.  On January 21, 2015, the ALJ abated the proceeding as required under the PUC's substantive rules.

29.  Following the ALJ's ruling, Dallas filed a declaratory judgment action against the Sabine River Authority in Travis County, Texas state court (the "Declaratory Judgment Action")[5] seeking a declaration that the renewal rate was not set pursuant to a contract.  In response, the Sabine River Authority asserted that it had governmental immunity from that claim and therefore the trial court lacked subject matter jurisdiction.  On May 21, 2015, the trial court granted the jurisdictional challenge and dismissed the Declaratory Judgment Action on the basis of governmental immunity, finding that the City had not demonstrated a waiver of immunity.  The

---

[5]    *City of Dallas v. Sabine River Auth.*, No. D-1-GN-15-000398 (in the 53rd District Court of Travis County, Texas, filed on January 30, 2015).

City has appealed from that decision and awaits a ruling from the Third Court of Appeals in Austin, Texas.[6]

30.    If the Travis County trial court's decision in the Declaratory Judgment Action is upheld on appeal, the City could appeal to the Texas Supreme Court, further delaying an ultimate ruling on the issue of whether the renewal rate was set by the Sabine River Authority pursuant to a contract, which is necessary for continuation of the PUC Appeal.  If all of the City's avenues of appeal fail, the issue will not be adjudicated by the Travis County court.  Absent such a ruling from of court of proper jurisdiction, Dallas submits that the ALJ will likely not be in a position to resolve the PUC Appeal.

31.    In addition to the PUC Appeal and the related Declaratory Judgment Action, Dallas filed a declaratory judgment action on February 13, 2015 in state district court against the individual members of the Sabine River Authority's Board of Directors in their official capacities (the "SRA Board Action").[7]  In the SRA Board Action, Dallas asserted that the Sabine River Authority's Board members acted *ultra vires* when they established the renewal rate and requested the court to declare such actions as void.

32.    On June 30, 2015, the Sabine River Authority intervened in the SRA Board Action and filed a claim against Dallas for breach of contract.  The Board members and the Sabine River Authority moved for partial summary judgment on February 23, 2016.  The court has not ruled on those motions.

33.    In response to the Sabine River Authority's breach of contract claim against it, the City filed a plea to the jurisdiction asserting that its governmental immunity from suit

---

[6]    *City of Dallas v. Sabine River Auth.*, No. 03-15-00371-CV (in the Third Court of Appeals, Austin, Texas filed June 16, 2015).

[7]    *City of Dallas v. Abney, et al.,* No. D150045-C (in the 260th Judicial District, Court of Orange County, Texas).

13

deprived the court of subject matter jurisdiction over that claim.  The trial court denied the City's

plea on June 13, 2016.  The City has appealed that ruling to the Ninth Court of Appeals in

Beaumont, Texas.[8]  On September 28, 2016, the Ninth Court of Appeals ordered that all trial

court proceedings in the SRA Board Action are stayed until the appeal of the City's plea to

jurisdiction is decided.

34.  Notwithstanding the City's best efforts to reduce the wholesale rate through

litigation with the Sabine River Authority, the potential outcomes of those litigations, the timing

of such outcomes, and their impact on the wholesale water rate are, at best, uncertain.

**E.    Debtors' Assumption and Subsequent Rejection of the Lease**

35.  On October 27, 2014, upon Debtors' request, this Court entered an Order

approving Luminant's assumption of the Lease [D.I. 2571].

36.  On September 22, 2015 Debtors filed the Rejection Motion; and on

October 14, 2015, this Court entered an Order [D.I. 6447] (the "Rejection Order"): (i) finding that

the Lease was a non-residential real property lease subject to section 503(b)(7) of the Bankruptcy

Code; and (ii) authorizing rejection of the Lease.  The Rejection Order also provided that any

claims resulting from the rejection of the Lease must be filed within thirty (30) days from the date

of the Order.

37.  On November 12, 2015 Dallas timely filed its Original POC, designated by the

Debtors as Claim No. 13319, consisting of: (i) the administrative claim provided by

section 503(b)(7) for the two year period following rejection (September 23, 2015 –

September 22, 2017) in the amount of $6,445,897.62; and (ii) a general unsecured claim for the

remaining term under the Water Lease - section 502(b)(6) – $9,777,485.66.

---

[8]    *City of Dallas v. Abney, et al.;* No. 09-16-00246-CV (in the 9th Court of Appeals, Beaumont, Texas filed July 1, 2016).

SL1 1434844v2 101189.00003

38. Based on the increase in the water rate pursuant to Dallas City Council's ordinance effective October 1, 2016 (which impacts the second year of the City's two year administrative claim under 503(b)(7) and its 502(b)(6) rejection claim), the City's soon-to-be-filed Amended POC will evidence the City's increased claims for $6,825,275.04 under 503(b)(7) and for $10,698,339.96 under 502(b)(6). [9]

## III.  ARGUMENT

39. Dallas' claims were (and are) properly calculated under the Water Lease, applicable state law, and sections 503(b)(7) and 502(b)(6) of the Bankruptcy Code.  Its proof of claim was properly submitted and supported with sufficient and appropriate documentation. Accordingly, Dallas' claim is entitled to *prima facie* validity, shifting the burden to Luminant to demonstrate why the City's claims should not be allowed as filed.

40. The Third Circuit has summarized the evidentiary burdens in a contested matter involving an objection to a proof of claim as follows:

> [A] claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim.  It is often said that the objector must produce evidence equal in force to the prima facie case.  In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.  If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant

---

[9]     In calculating its 503(b)(7) claim Dallas used the $271.60 rate in effect from October 1, 2015 through September 30, 2015 (Debtors had paid the amount due for September 2015) and the $297.18 rate in effect from October 1, 2016 through September 30, 2017.  As of the effective date of rejection on September 22, 2015, the remaining term of the Water Lease was 35 years through December 31, 2050. Using the $297.18 rate the monthly rental under the Water Lease would be $297,176.11.  Thus, the section 502(b)(6) "One-Year" calculation is: 12 months x $297,176.11 monthly payment = $3,566,113.32. The section 502(b)(6) "15% Not To Exceed Three Years" calculation is: 399 months x $297,176.11 monthly payment = $110,194,267.89 x 15% = $16,529,140.14; with three years at 36 months x $297,176.11 monthly payment = $10,698,339.76.

to prove the validity of the claim by a preponderance of the evidence.

*In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173–74 (3d Cir.1992) (citations omitted).

41.  Dallas submits that Debtors' Objection fails to satisfy its burden.  Nevertheless, the City will respond below to each of their positions.

## A.    Dallas Properly Applied the Caps Under Section 503(b)(7) and 502 (b)(6)

42.  Section 503(b)(7) clearly and unambiguously specifies the procedure in which the administrative and unsecured components of a landlord's post-assumption rejection damages claims are to be calculated.  Section 503(b)(7) provides, in relevant part:

> After notice and a hearing, there shall be allowed, administrative expenses . . . including-
>
> (7) with respect to a nonresidential real property lease previously assumed under section 365, and subsequently rejected, a sum equal to all monetary obligations due, . . . for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, without reduction or setoff for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor, and the claim for remaining sums due for the balance of the term of the lease shall be a claim under section 502(b)(6) . . . .

43.  There are two basic components to section 503(b)(7).  First, it grants lessors an administrative claim for all monetary obligations for two (2) years following the later of rejection or actual turnover of the leased premises (and turnover is not applicable here).[10]  Then, section

---

[10]    Before BAPCPA, extensions of time to assume or reject non-residential real property leases could be granted multiple times by a bankruptcy court up to and (perhaps even after, in some circumstances) confirmation of a plan.  BAPCPA changed 365(d)(4) to put a hard stop at 210 days for assumption or rejection of leases, no matter where the debtor stood in the reorganization process at such time.  Before BAPCPA a lease assumed by a debtor but later rejected created an administrative claim for the rent due for the entirety of the remaining term of the lease.  *See* BAPCPA: Review and Analysis of Business Bankruptcy Provisions After One Year, Deutsch, D., Lemay, D., *Pratts Journal of Bankruptcy Law*, January/February, 2007, p. 503.  Here, that amount would have been well in excess of $100 million as the remaining term of the Lease as of post-assumption rejection by the Debtors was 35 years, 3 months.  To ameliorate the burden to an estate from an assumption of a lease within the 210 day period, section

16

503(b)(7) states clearly that the amounts due for the remaining term of the lease are calculated in accordance with section 502(b)(6).

44.    Contrary to the clear and unambiguous language of 503(b)(7), Luminant argues that the two year administrative claim provided thereunder is, in effect, a two year time credit against the three year rejection claim that is possible under section 502(b)(6) for a lessor with a long term lease.  Such an interpretation is contrary to the plain meaning of 503(b)(7).

45.    To determine the interplay between sections 503(b)(7) and 502(b)(6) the intent of Congress must be ascertained, *In re Lord Abbett Mutual Funds Fee Litig*., 553 F.3d 248, 255 (3d Cir. 2009), by following established principles of statutory construction.  *In re J.E. Brenneman Co., Inc.,* 277 F. Supp. 2d 518, 521 (E.D. Pa. 2003).  "Because it is presumed that Congress expresses its intent through ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute." *Alston v. Countrywide Fin. Corp.,* 585 F.3d. 753, 758-60 (3d Cir. 2009)(citationscitation and internal quotation marks omitted).  If a statute's language is plain, the court's sole function is to enforce it according to its terms.  *Lamie v. United States Tr.,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed. 2d. 1024 (2004).

46.    In determining whether statutory language has a plain and unambiguous meaning, the court must determine whether the assertedly ambiguous language is "reasonably susceptible of different interpretations." *Dobrek v. Phelan,* 419 F.3d 259, 264 (3d Cir. 2005)(internal quotation marks and citation omitted).  If no ambiguity exists, then the plain meaning of the text is conclusive and the inquiry, subject only to consideration of whether absurd results would result, comes to an end.  *United States v. Ron Pair Enters., Inc.* 489 U.S. 235, 242,

---

503(b)(7) was enacted to cap the lessor's administrative rejection claim for a previously assumed lease at two years.

109 S.Ct. 1026, 103 L.Ed. 2d 290 (1989); *Lawrence v. City of Phila., Pa.* 527 F.3d 299, 316-17 (3d Cir. 2008).  Only if the language is ambiguous or would lead to an absurd result should a court employ other means of statutory construction to divine Congressional intent.  *In re Philadelphia Newspapers, LLC*, 418 B.R. 548, 560 (E.D. Pa. 2009).

47.  Thus, the analysis begins with the text of section 503(b)(7).  The only words of section 503(b)(7) with respect to how it works with 502(b)(6) after the two year administrative claim has been calculated are "… and the claim for remaining sums due for ***the balance of the term of the lease shall be a claim under section 502(b)(6)*** . . . (emphasis supplied).

48.  The Rejection Order provides that the Water Lease was rejected effective as of September 22, 2015.  Thus, under section 503(b)(7), Dallas is entitled to an administrative claim for the payments due under the Water Lease for a period of two (2) years following September 22, 2015.  *See* 11 U.S.C. § 503(b)(7).

49.  How then is the City of Dallas compensated for the remaining term of the Water Lease?  The answer lies in the remainder of section 503(b)(7): ". . . the claim for the remaining sums due for *the balance of the term of the lease* shall be a claim under section 502(b)(6)."  Such language is clear and unambiguous, leading to only one possible result: that after the two year administrative claim is calculated, the amounts due for the balance of the Water Lease term (33 years and three months after the two year administrative period) are allowable subject to the 502(b)(6) caps – rent reserved by the lease for one year or 15%, not to exceed three years, of the remaining term.

50.  Despite the plain language, and meaning, of section 503(b)(7), the Debtors contend the statute is ambiguous.  Debtors do not cite any case law either in support of their position that the statute is ambiguous or in support of their view that, taken together, sections

503(b)(7) and 502(b)(6) provide at most a three year rejection damages claim – two years administrative and one year general unsecured.  The City is not surprised by the absence of authority in support of the Debtors' position as it submits section 503(b)(7) is clear and unambiguous on its face.

51.  *Colliers*' interpretation of § 503(b)(7) is consistent with the City's:

If the lessor's claim for damages exceeds the amount of the cap, the lessor is entitled to assert an unsecured claim for such excess, subject to section 502(b)(6).  That section provides for a cap on the amount of a lessor's unsecured claim for the breach of a lease of real property.  The statute is not clear on how to calculate the unsecured claim under section 502(b)(6) if a lessor's damages exceed the section 503(b)(7) cap and there is no case law addressing the issue.  One method is to calculate the total section 502(b)(6) claim first and then reduce the claim by the administrative expense allowed under section 503(b)(7).  An alternative approach is to first calculate the administrative expense for the first two years remaining on the lease after rejection (or turnover of the premises, whichever is later).  If more than two years remain on the lease, the unsecured claim capped by section 502(b)(6) would be calculated based on the number of additional years remaining beyond two years.  The following example illustrates how this methodology would be applied.  Assume a 20-year lease at $15,000 per month.  In year four of the lease, the tenant files a chapter 11 petition.  The lease is timely assumed by the debtor in possession, but the reorganization fails and the lease is subsequently rejected.  The premises are turned back to the lessor with 16 years remaining on the lease.  Lessor is entitled to an administrative claim for the first 2 years of the 16 years remaining on the lease.  Assuming no mitigation, the lessor's administrative expense would be $360,000 ($15,000 x 24 months).  Lessor's unsecured claim would then be calculated based on rent due for the remaining 14 years, capped by section 502(b)(6) at 15% of the total rent for the remaining 14 years.  The allowed unsecured claim would be $378,000 (168 months (14 years) x 15% x $15,000).  The calculation method illustrated here appears consistent with the language of the statute which provides for an unsecured claim section 502(b)(6) "for remaining sums due for the balance of the term of the lease."

4 *Collier on Bankruptcy* ¶ 503.14 [2] (16th ed. 2009).

52. The Debtors ask this Court to reject the plain language of 503(b)(7) and instead adopt a construction that contradicts the statute's plain meaning, which, as the case law highlights, is the clearest manifestation of Congressional intent, as well as common sense.

53. If a lessor's claims were intended to be limited in the manner the Debtors suggest, Congress easily could have drafted 503(b)(7), or amended 502(b)(6), to impose those limitations. Indeed, the final proviso of section 503(b)(7) could have stated that in the event the remaining term of the lease exceeded the 2 year period that was recoverable as an administrative expense, that a *maximum* of only one additional year of the remaining lease term could be recovered as a general unsecured rejection claim. Congress did not impose that limitation.

54. Had Congress intended to limit a lessor's rejection damages as Debtors suggest, there would have been no need for a general reference in section 503(b)(7) to section 502(b)(6) for the balance of the lessor's claim in addition to the administrative claim as there would be no need to conduct the "15%, not to exceed three years" analysis required under section 502(b)(6).

55. Contrary to Debtors' argument, this plain meaning interpretation of 503(b)(7) would not result in a windfall for the City. Absent the limitations imposed under section 503(b)(7), Dallas would be entitled to an administrative claim in this case for all the monetary obligations due under the Water Lease for its remaining 33+ years, which represents in excess of $100 million. Instead, 503(b)(7) limits Dallas to two years and 502(b)(6) limits Dallas to three years (at a steeply reduced plan dividend recovery rate), which is far from a windfall either in the context of a pre-BAPCPA assumed contract claim or under state law.

**B.    The City's Rejection Damages Claims Were Properly Calculated**

56. Calculation of rejection damage claims begins with section 365(g), which provides that "rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease …." 11 U.S.C. §365(g). Other than the caps that are set forth in

sections 502(b)(6) and 503(b)(7), the Bankruptcy Code does not address specifically how to calculate lease rejection damages claims. Thus, bankruptcy courts must look to state law and the terms of the contract, *In re Highland Superstores, Inc.,* 154 F.3d 573, 579 (6th Cir. 1998), which should be applied to the extent not in conflict with the Bankruptcy Code. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed 2d 136 (1979).

57. In awarding damages for breach of a lease, it is well settled that the non-breaching party is entitled to damages for its "expectations interests" to put that party in as good a position as it would have been if the contract had been performed fully. *Highland Superstores*, *supra*, 154 F.3d at 580 (citing *Restatement (Second) of Contracts*, §§344, 347 (1981)).

58. Calculation of the aggregate amount of the City's lease rejection damages (before the statutory caps under sections 502(b)(6) and 503(b)(7) are applied) is a function of two basic components: the wholesale water rate and the remaining Water Lease term. The remaining term under the Water Lease is not disputed – it was 35 years and three months as of rejection. Thus, the critical component is the wholesale water rate.

59. In calculating its administrative and unsecured claims in its Original POC, the City used the $271.60 per acre foot rate established pursuant to the City's 2015 rate setting process which ended with the City Council Ordinance of September 22, 2015. Pursuant to that process, the proposed water rate had been noticed, circulated to customers, and, in effect, determined well before September 22, 2015. In its Amended POC, the City used the $297.18 rate established by the Dallas City Council effective as of October 1, 2016, as follows:

(i) Since Debtors were "paid in full" through September 30, 2015, Dallas

used the $271.60 rate effective October 1, 2015 to calculate year one of its two year

administrative claim under 503(b)(7) and used the $297.18 rate effective October 1,

2016 for the period October 1, 2016 through September 22, 2017; and

(ii)  Dallas used the $297.18 rate to calculate its unsecured claim under

502(b)(6).

60.  Dallas will use the $297.18 rate over the 33+ year balance of the Water Lease

term in its Amended POC because: (i) based on past history, and its anticipation of future

substantial, additional expenses, as described above, Dallas believes it is unlikely the wholesale

rate will decrease in the future; and (ii) the outcomes in the PUC Appeal and SRA Board Action

are at best uncertain (and, to date, Dallas has not obtained any rulings nullifying the Sabine River

Authority rate increase for itself or its wholesale customers).

61.  Although the City does not necessarily agree with the Debtors that estimation

proceedings are necessary here, the City also submits that if the Court were to exercise its

discretion to determine the appropriate rate to calculate the City's unsecured claims based on an

estimation process that it should conclude that the $297.18 rate used by the City is the appropriate

rate based on the doubtful probability of success in the litigation involving the Sabine River

Authority and its Board and the City's anticipated increasing water-related costs.

62.  The manner in which claims are to be estimated is not delineated by the

Bankruptcy Code or in the Bankruptcy Rules.  *Bittner v. Borne Chemical Co., Inc.,* 691 F.2d 134,

135 (3d Cir. 1982).  Bankruptcy judges may do so "using whatever method is best suited to the

particular contingencies at issue." *Id.*  "[T]he Court is permitted to make the most intelligible and

probable estimate which the nature of the case will permit, given all the facts and circumstances

having relevancy to show the probabl[e] amount of damages suffered." *In re Stone & Webster,*

*Inc.*, 279 B.R. 748, 794 (Bankr. D. Del. 2002) (citations and internal quotation marks omitted).

63.    When dealing with contingent litigation outcomes, many courts have adopted the expected value approach by estimating the expected value of the claim based upon the probability of success of various potential outcomes if the litigation were decided on the merits.  *In re Chemtura Corp.*, 448 B.R. 635, 650 (Bankr. S.D.N.Y. 2011).  In other words, the estimated claim is determined by taking "the amount of the claim diminished by probability that it may be sustainable in part or not at all…"  *Id.* (citations omitted).

64.    Section 502(c)(1) permits estimation of claims to avoid any undue delay in the closing of an estate.  This provision serves at least two purposes.  First, it is designed to avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions.  Thus, parties can more rapidly determine the payout to each creditor.  Second, section 502(c)(1) is designed to promote a fair distribution to creditors through a realistic assessment of uncertain claims.  *In the Matter of Sam E. Ford*, 967 F.2d 1047, 1053 (5th Cir. 1992).

65.    It might be argued that there are two possible contingencies relating to the calculation of the wholesale water rate: (i) the annual rate setting process over the remaining term of the Lease, and (ii) the eventual outcome of the litigation with the Sabine River Authority (which, at some time in the future possibly could result in a rebate to the City's wholesale customers from the PUC Escrow).

1.    **The Wholesale Water Rate for the 503(b)(7) Administrative Claim Does Not Require Estimation**

66.    As stated above, the two-year period for the administrative expense portion of the City's rejection damages claim covers the period from September 23, 2015 through

September 22, 2017.[11]  The wholesale water rates for that two year period are known: $182 for the eight days from September 23, 2015 through September 30, 2015; $271.60 for the period October 1, 2015 through September 30, 2015; and $297.18 for the period October 1, 2016 through September 30, 2017.  The water rates actually in effect for the 503(b)(7) administrative period should be used to calculate that claim; they need not be estimated.

### 2. The Wholesale Water Rate for the Unsecured Claim Under Section 502(b)(6) Can Be Estimated at $297.18 Per Acre Foot

67.  The wholesale water rate for the 502(b)(6) claim relating to the remaining term of the Lease from September 23, 2017 through December 31, 2050, could be the subject of estimation due to the annual rate setting undertaken by Dallas City Council for wholesale water. The Debtors suggest that the rate in effect on the date of rejection – $182.90 per acre foot – should be used to calculate the damages for the entire 33+ year remaining term of the Water Lease.

68.  As an initial matter, the rate proposed by the Debtors was in effect for only 8 days of the 33+ year remaining term of the Water Lease. [12]

69.  When examining this issue, it is important to note that the recovery of rejection damages is intended to compensate a lessor for the loss of revenue over the course of the rejected lease, subject to the statutory caps. *In re The Leslie Fay Companies, Inc.,* 166 B.R. 802, 809 (Bankr. S.D.N.Y. 1994).  It cannot be said that the $182.90 per acre foot rejection rate that was in effect for 8 days of the 33+ year remaining Water Lease term, and which is approximately $115 per acre foot below the current rate, adequately compensates the City for its losses.

---

[11]  Again, the City recognizes that in the event that it prevails in either the PUC Appeal or the SRA Board Action, the wholesale rate that was in effect during the administrative period may be subject to a retroactive reduction if the customers receive a rebate from the PUC Escrow.

[12]  Of course, the Debtors controlled the timing of rejection, and sought to reject the Water Lease *nunc pro tunc* to September 22, 2015.

70.    The City has every reason to believe that the wholesale rates for untreated water will continue to rise in the future.  As set forth above, necessary repairs to the Lewisville Dam are projected to cost between $100 and $200 million over the next few years.  A portion of those costs must be passed along to wholesale customers in the form of increased rates.  Also, as the Integrated Pipeline Project to connect Lake Palestine to Dallas' system continues, the increased costs will impact wholesale customer rates.  The projected increase in wholesale rates is not in dispute.  Debtors concede that, historically, wholesale rates have increased over time and such trend is expected to continue into the future.  Rejection Motion at ¶¶ 10-11.

71.    Debtors' position fails to take into account that courts in fact have recognized increased lease rates over the course of a lease term in calculating rejection claims.  *See In re MDC Sys., Inc.*, 488 B.R. 74, 88-89 (Bankr. E.D. Pa. 2013)(the cap period was one year, and the rent increase for the last month of that year was included in calculating the rejection claim); *In re Shane Co.*, 464 B.R. 32, 45 (Bankr. D. Colo. 2012)(rent increased every three months and the rent increases were included in the calculation of the rejection claim using the 15% time measurement); *In re Peters*, 2004 WL 1291125, at *6 (Bankr. E.D. Pa. 2004)(rent increase in the last month of the applicable one year cap period included in the calculation of the rejection claim).  *See also, In re Transamerican National Gas Corp.*, 79 B.R. 663, 668 (Bankr. S.D. Tex. 1987)(factoring rate schedule increases in utility contract into estimation analysis); *In re Rappaport*, 517 B.R. 518, 542 (Bankr. D.N.J. 2014)(awarding escalating future damages under rejected contract).

72.    Debtors reliance on *In the Matter of Brints Cotton Mktg., Inc.,* 737 F.2d 1338 (5th Cir. 1984), is misplaced.  Prior to bankruptcy, the debtor, which was in the business of marketing cotton, had entered into numerous option or "call" contracts with cotton farmers.  Under those contracts, the debtor would purchase cotton at a price that was partially fixed as of the

contract date.  The remaining portion of the contract price was established at the existing market

price at the time the farmer exercised the call.  As of the petition date, approximately 1,200 of such

options had not been exercised.  Thereafter, the farmers attempted to exercise their options in order

to take advantage of an increase in the price of cotton after the petition date.  In determining the

amount of the farmers' contractual claims, the bankruptcy court considered whether the market

price should be determined as of the petition date or as of a later date when the option was

exercised.

73.  The bankruptcy court held that the petition date was the appropriate date to fix

the market price of the cotton. On appeal, the farmers argued that under state law they could

exercise their option rights after the petition date up until the bar date.  The Fifth Circuit, in

applying an abuse of discretion standard, upheld the bankruptcy court ruling and concluded that

valuation as of the petition date allowed for a fair and equitable method of compensating claims of

similarly situated farmers.  *Id.* at 1342.  The Court stated that the use of a single date provided the

most administratively effective methodology to determine the call price for over 1,200 contracts

and allowing each farmer to exercise a call price at any time prior to the bar date, the Court

concluded, would have imposed an administrative burden as to delay the closing of the bankruptcy

case.  *Id.*

74.  *Brints* is not this case as it is distinguishable on several grounds.  First, *Brints*

did not involve the rejection of a non-residential real property lease pursuant to section 365 of the

Bankruptcy Code.  Rather, that case addressed valuation of a rapidly fluctuating commodity over a

brief period of time.  Here, water lease rates are set annually by the City following a deliberative

legislative process.  The rates do not fluctuate in accordance with supply and demand and, unlike

in *Brints,* each wholesale water customer does not have an option to exercise a water lease right at

the time of its choosing. The risk of creating disparate values for the same claims or commodities is also not at issue here. Additionally, the methodology adopted by the *Brints* court was to avoid the administrative inefficiency associated with determining the option price for 1,200 different option contracts exercised at different times. Here, only one water lease is at issue; hence, similar administrative concerns are not implicated. In short, the determination of an appropriate water lease rate to calculate the City's claims is not analogous to the fixing of a price for a publically traded commodity subject to rapid market fluctuations over numerous contractual relationships. The Debtors conceded as much when they elected to reject the Water Lease pursuant to the Rejection Order as a non-residential real property lease subject to section 503(b)(7). Thus, *Brints* is inapposite.[13]

75. In sum, the Debtors offer no controlling or otherwise apt authority for their suggestion that the rate must be established as of the rejection date and must remain fixed for the remaining term of the Water Lease.

### 3. The Impact of the Ongoing SRA Litigation and Increasing Costs on the City's Claims

76. Estimation of the claims for the remaining term of the Water Lease (following the 503(b)(7) period) also involve two primary variables: (i) the outcome of the litigation with the Sabine River Authority; and (ii) ongoing infrastructure repairs.

---

[13] Debtors' reliance on *In re American Homepatient, Inc.*, 414 F.3d 614 (6th Cir. 2005) is similarly misplaced as it also does not involve a non-residential real estate lease. In *American Homepatient*, the debtors were parties to warrant agreements with their secured creditors that allowed the creditors to exercise warrants to purchase common stock, which the debtors rejected. In a hearing before the bankruptcy court to value the resulting rejection damages claim, experts from both parties initially agreed that the valuation of those claims should be based on the value of the warrants immediately prior to the petition date. The valuation evidence presented by both parties was based on a valuation as of that date. Not surprisingly, given this agreement and the absence of any record evidence of valuation as of any other date, the Sixth Circuit upheld the bankruptcy court's valuation. *Id.* at 619.

77.  As highlighted in the Debtors' Objection, it is uncertain whether the City will prevail in its litigation with the Sabine River Authority.  While a rate reduction and a consequent rebate based on any reduction in funding required for the escrow fund remain possibile, they are not a probability.  In conducting this analysis, it is important to note that the Declaratory Judgment Action was dismissed on the grounds that the Sabine River Authority has governmental immunity.  Although that ruling is on appeal, the outcome is uncertain.  The PUC's rules require that when a water seller and a water buyer disagree about whether a water rate is charged pursuant to a written contract, as is the case here, a PUC rate proceeding will be abated until a court of proper jurisdiction resolved the issue.  Here, if the Sabine River Authority prevails on appeal in its argument that the trial court does not have subject matter jurisdiction because of the Sabine River Authority's governmental immunity, the City is unsure whether it will be able to move forward with the PUC Appeal.

78.  Second, in the SRA Board Action, the individual Board member defendants and the Sabine River Authority all have filed dispositive motions that remain pending, while the trial court has ruled against the City and held that the Sabine River Authority's claim in intervention for breach of contract is not barred by the City's governmental immunity.  The case is currently stayed while the City's appeal of its jurisdictional motion on the breach of contract claim is pending.  The outcome of the litigation is uncertain, and resolution of the appeal and then the remaining trial court issues is unlikely until later in 2017 at the earliest.

79.  Debtors highlighted these litigation risks in their Rejection Motion, acknowledging that:

> …there is no guaranty that the SRA-Dallas Litigation will be resolved in Dallas' favor…even if Dallas is successful in the SRA-Dallas Litigation, Luminant has no guarantee that its rate will be reduced or to what it will be reduced…

Rejection Motion at ¶ 12.

### C.    The City's Claims Need Not Be Discounted to "Present Value"

80.    Debtors argue that the City's claims must be discounted to present value. However, Debtors do not vigorously make this argument with respect to the 503(b)(7) claim and Dallas submits there is no basis in the text of section 503(b)(7) to do so.  Dallas further submits that the language used in section 502(b)(6), in the context of the Bankruptcy Code as a whole, does not support the notion of discounting the 502(b)(6) claim and Dallas submits there otherwise  is no compelling rationale to do so.

81.    Section 503(b)(7) provides that a lessor's post-rejection administrative claim is comprised of "all monetary obligations due …for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, *without reduction or setoff for any reason whatsoever*…."  11 U.S.C.§503(b)(7)(emphasis added).  The City submits that the language "without reduction or setoff for any reason whatsoever" ends the analysis.  Discounting to "present value" is a reduction to the 503(b)(7) claim, which is a claim consisting of the "sum equal to all monetary obligations due, . . . for the period of 2 years following the … rejection date." The claim allowable under 503(b)(7) is not expressed as a "value" (which implies a value as of a certain date, which may involve a present valuation) but as a sum that cannot be reduced for any reason whatsoever.[14]

82.    Moreover, it is already more than a year past rejection of the Water Lease, the City has not received a distribution on its 503(b)(7) administrative claim, and, there is no telling

---

[14]    It also should be noted that the primary basis for the Debtors' argument that the City's 502(b)(6) claim must be discounted to present value is the inclusion of the phrase "without acceleration" in section 502(b)(6).  First, the City does not agree such words require present valuation of its 502(b)(6) claim. Second, those words do not appear in 503(b)(7) and, thus, provide no support, under Debtors' theory, for present valuation of the 503(b)(7) claim.  By implication, the absence of such words implicitly means that present valuation of the 503(b)(7) claim is improper.

when that distribution may be made.  Thus, as a practical matter in light of the economic policy

behind present valuation (*i.e.,* that a dollar to be paid tomorrow is worth less than a dollar paid

today) discounting the 503(b)(7) claim to present value is not appropriate.

83.   With respect to the City's 502(b)(6) claim, Debtors cite to *In re Oakwood*

*Homes Corp.*, 449 F.3d. 588 (3d Cir. 2006) ("*Oakwood*"), in support of their request for present

valuation.  But the actual holding of *Oakwood* was not that all claims representative of a future

stream of payments must be discounted to "present value."  In *Oakwood*, the Third Circuit actually

held that the principal amounts of a claim under debt instruments with respect to which payments

stretched into the future should not be discounted to "present value" after the unmatured interest

component of the claim already had been disallowed under section 502(b)(2).

84.   The Third Circuit also clearly stated that the text of section 502(b) does not

clearly and unambiguously require present valuation of all claims representative of a stream of

future payments because, in contrast to sections of the Bankruptcy Code which clearly do require

present valuation (including section 1129), which use the words "value, as of" to signify such,

section 502(b)(6) uses the word "amount" in connection with claim allowance matters. *Oakwood*,

*supra*, 449 F.3d. at 595.  The Court noted that because the other provisions of the Bankruptcy

Code use "value, as of" to signify the need to discount to present value, it is significant that the

non-synonymous word "amount" is used in section 502.  *Id*.  Thus, section 502(b) does not clearly

and unambiguously require discounting to present value in all situations.  *Id*. at 598.

85.   The *Oakwood* rationale compels the conclusion here that section 502(b) (6)

claims need not be discounted.  Clearly, the "value, as of" language is missing from 502(b) (6).

Rather, the "amount" of the claim is to be determined, subject to the applicable cap.

86. This issue was addressed by the Massachusetts Bankruptcy Court in *In re Gretag Imaging, Inc.*, 485 B.R. 39 (Bankr. D. Mass. 2013) ("*Gretag*"). In *Gretag*, the debtor leased space in supermarkets to operate photo labs. The debtor agreed to provide its supermarket chain customer with a $200 per month rebate for each photo lab the debtor had in the customer's stores for the remaining term of the lease. The supermarket customer filed a claim in the bankruptcy for $5,540,000, which represented the sum of the rebates due for the balance of the lease term. In rejecting the chapter 7 trustees' argument that such claim must be discounted to present value, the Massachusetts court relied on the Third Circuit's rationale in *Oakwood*:

> Bankruptcy Code § 502(b) requires the court to determine the amount of a claim to which an objection has been interposed "as of the date of the filing of the petition." Based upon this phrase, many courts, including the court in *Loewen*, 274 B.R. at 432, have concluded that a bankruptcy proof of claim which includes a component for future damages or payments must be discounted to present value as of the bankruptcy petition date.

> Supervalu, citing [*Oakwood*] argues that discounting its claim by present-valuing post-petition payments would be inappropriate. In *Oakwood*, the Third Circuit Court of Appeals, in a two to one decision, reversed the district court's order affirming the bankruptcy court's present-valuing the claims of certain certificate holders. The bankruptcy court applied the present value discount in addition to disallowing the holder's claims for unmatured interest in accordance with Bankruptcy Code § 502(b)(2). In reversing, the Third Circuit undertook an examination of the language of § 502(b) and concluded that it did not contain a clear directive to present-value all future claims.

> > Stated simply, 11 U.S.C. § 502(b) speaks in terms of determining the "amount" of a claim "as of" the petition date. However, given that the remainder of the Bankruptcy Code uses the term "value, as of" to signify discounting to present value, and "amount" and "value" are not synonymous, we cannot say that § 502(b) clearly and unambiguously requires discounting to present value in all situations.

> *Id.* at 595. Section 502(b) contains a series of exceptions to the statute's general mandate that the court value claims as of the petition date and allow them in such amounts. Excluded from allowance are, among other things, claims for unmatured interest (§ 502(b)(2)), claims for certain lease

rejection damages (§ 502(b)(6)), and certain employment contract termination damage claims (§ 502(b)(7)). If § 502(b) required all claims to be present-valued, there would be no need for these exceptions.

*Gretag*, *supra*, 485 B.R. 45-46.

87. In effect, the *Gretag* court acknowledged, consistent with *Oakwood*, that discounting lease rejection damages claims is not required given the cap provided in section 502(b)(6). It was found not applicable in *Gretag* and is not here either given that the City's 33+ year claim for damages already has been decreased to 3 years pursuant to the operation of the 502(b)(6) cap. *See*, *e.g.*, *In re Allegheny Int'l, Inc.*, 136 B.R. 396 (Bankr. W.D. Pa. 1991)(refusing to further reduce lessor's rejection damages claim to present value).

88. Nevertheless, if the Court concludes that a present value discount is appropriate for the City's 502(b)(6) claim, the Debtors' weighted average cost of capital ("WACC") is not an appropriate discount rate here.

89. There is no federally-mandated methodology for discounting claims to their present value. It is left to the court's discretion to set an appropriate rate. *In re Mirant Corp.*, 332 B.R. 139, 156 (Bankr. N.D. Tex. 2005).

90. The City's rejection claim is a three year claim and, in light of the Debtors' pre-petition conduct (Luminant did not fail to make any pre-petition payments under the Lease) and their obligations under the Plan, it should be considered as tantamount to a short-term and essentially risk-free investment. As Debtors admit, their WACC includes components for equity and riskier longer term debt instruments.

91. Dallas respectfully submits that if the Court concludes that a present value discount is appropriate, a short-term and risk-free rate is the appropriate discount rate for several reasons including, without limitation, the short term nature of the future stream of payments actually comprising Dallas' lease rejection claims and because the Debtors did not miss any

payments prior to the time that the Water Lease was rejected.  *See In re USGEN New England, Inc.,* 429 B.R. 437, 490 (Bankr. D.Md. 2010)(applying risk free rate as the appropriate discount rate); *see generally Kucin v. Devan*, 251 B.R. 269 (D.Md. 2000)(payments need not be discounted for risk of non-payment).  That rate should be no more than 1% (based on the City's investment pool return of 0.94% and the Consumer Price Index as of August 2016 of 1.1%).

**D.    The City's Claims are Not Subject to Reduction Through Mitigation**

92.    Consistent with its position with respect to discounting to present value, mitigation is not applicable to its 503(b)(7) claim because such claim is not subject to reduction for any reason whatsoever.

93.    Regardless (and equally applicable to the 503(b)(7) claim if its contended there is a duty to mitigate with respect to such claim), it has not been possible for the City to mitigate post-rejection based on the terms of Dallas' access to the Lake Fork Reservoir water.

94.    Under Texas law there is a duty on the non-breaching contract party to mitigate damages if such can be done with "slight expense" and "reasonable care."  *Allen v. Am. Gen. Fin., Inc.*, 251 S.W.3d 676 (Tex. App. 2007), *vacated pursuant to settlement* (Mar. 5, 2010) (citing *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W. 2d 415, 426 (Tex. 1995). Mitigation is an affirmative defense with respect to which the breaching party – Luminant – bears the burden of proof.  *Great Am. Ins. Co.*, *supra*, 908 S.W. 2d at 426.

95.    Further, mitigation, if appropriate as a defense, or reduction, to a claim, is applied to and reduces the total claim before application of the 502(b)(6) cap.  *In re PPI Enterprises, (U.S.) Inc.,* 324 F.3d 197, 208 n. 17 (3d Cir. 2003)(citations omitted); 4 *Collier's on Bankruptcy* ¶ 502.03[7][i] (16th ed. 2009).

96.    The Sabine Water Agreement authorizes Dallas to draw up to 131,860 acre feet of water from Lake Fork.  It also allows Dallas to remove up to 120,000 acre feet from the Sabine

33

River watershed.  It cannot transfer more than 120,000 acre feet of water per year from Lake Fork out of the Sabine River basin.  The remaining 11,860 acre feet of water Dallas can draw from Lake Fork pursuant to the Sabine Water Agreement was sold to Luminant, for use by Luminant in the Sabine River basin.  Thus, the City sold Luminant the water that it was contractually obligated not to remove from the Sabine River basin (plus an additional 140 acre feet per year).

97.    Any hypothetical purchaser of the water that the City contracted to sell to Luminant must have a service area in the Sabine River basin (with the exception of 140 acre feet).

98.    The City is not a commodity trader.  It provides water to its wholesale customers but is not otherwise affirmatively engaged in business operations in a traditional sense. Dallas itself is a customer of the Sabine River Authority.  That said, the City is unaware of any potential water customer(s) having a need for approximately 12,000 acre feet of water in the Sabine River basin.  No such purchasers have approached the City and Luminant has not suggested any potential purchaser for this water.  Had such a purchaser existed, Luminant presumably could have sold the water directly and retained any profit from the resale or, would have alerted Dallas to it in furtherance of its mitigation affirmative defense.[15]

---

[15]    The difficulty in finding an alternative buyer for the subject water, and hence to mitigate damages, was noted by the Debtors.  In the Rejection Motion they highlighted the significant limitations on inter-basin transfers:

> The Debtors are limited in the sources to which this water can be marketed under Texas law.  While other basins in Texas may be depleted or in need of water, the ability of Debtors to perform inter-basin transfers is an arduous, lengthy, and costly regulatory process. Once submitted, an application for inter-basin transfers is subject to notice, comments, at least one public meeting, and submission of a drought contingency plan.  Not only is it costly to sell any unused Luminant Water outside of the Sabine River Basin, it is also unlikely that the Debtors would be successful in reselling the Luminant Water within the Sabine River Basin in a period of drought because any potential purchaser would likely prefer to contract directly with [the Sabine River Authority] to avoid any additional costs to the water imposed by Dallas.

Rejection Motion at ¶ 14

## IV.   CONCLUSION

Dallas' claims as-filed are proper under sections 503(b)(7) and 502(b)(6); are not subject to present valuation; and should be allowed in full.  Accordingly, Debtors' objection must be overruled.

**WHEREFORE**, the City of Dallas respectfully requests that the Court enter an Order allowing the City's claims in the amounts stated in its proof of claim and requests such other and further relief that this Court deems necessary and just.

Dated:  October 7, 2016

**STEVENS & LEE, P.C.**

  _/s/ *John D. Demmy*_
John D. Demmy (DE Bar No. 2802)
919 North Market Street, Suite 1300
Wilmington, Delaware 19801
Telephone: (302) 425-3308
Email: jdd@stevenslee.com

-and-

John C. Kilgannon
STEVENS & LEE, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: (215)
Email: jck@stevenslee.com

*Attorneys for the City of Dallas*