# Exhibit A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 9635** |

### ORDER ESTIMATING ASBESTOS CLAIMS FILED AGAINST THE TCEH DEBTORS

Upon the motion (the "Motion")[2] of the TCEH Debtors for entry of an order (this "Order") estimating the TCEH Asbestos Claims; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of these cases and the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion (the "Hearing") under the circumstances; and the Court having reviewed the Motion and the evidence provided in support of the relief requested; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing (if any) establish just cause for the relief granted herein; and the Court having noted that no objections were filed; and upon

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is granted as set forth herein.

2.      As reflected in Scenario 1 in **<u>Exhibit 1</u>** to the Motion, the high-end nominal value of $17.2 million for the aggregate resolution costs (including, but not limited to, indemnity and defense costs) for present and future asbestos-related claims against the TCEH Debtors shall constitute, for distribution purposes only, the maximum value of the TCEH Asbestos Claims (the "<u>Maximum Value</u>").

3.      The Maximum Value is not an admission or an agreement by the TCEH Debtors that said amount is the true value of the TCEH Asbestos Claims.

4.      This Order does not prejudice the rights of the TCEH Debtors, or any other party in interest, to object to any of the TCEH Asbestos Claims on any and all grounds whatsoever and to assert any and all defenses related thereto.   Moreover, the TCEH Debtors retain all further substantive and/or procedural objections they have with respect to every TCEH Asbestos Claim.

5.      The TCEH Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.


Dated: October _____, 2016
         Wilmington, Delaware
                                                  _____
                                                  THE HONORABLE CHRISTOPHER S. SONTCHI
                                                  UNITED STATES BANKRUPTCY JUDGE

### EXHIBIT 1

**Summary Ankura Report**

**Summary Report Regarding Forecast of the Cost of Resolving All Pending and Proofs of Claim Filings of Asbestos-Related Bodily Injury Claims against Energy Future Holdings Corp. – Claims Associated with TCEH**

**Prepared by Thomas Vasquez, Ph.D.**
**Ankura Consulting Group, Washington, DC**

**September 22, 2016**



Table of Contents

Summary ................................................................................................................................... 3
Section 1: Historical Experience .............................................................................................. 5
Section 2: Analysis of POC Filings ........................................................................................ 10
Section 3: Forecast of the Cost of Resolving All Pending and POC Claims Against the EFH-T
Company .................................................................................................................................. 12
Appendices ............................................................................................................................... 16
Appendix A: CV of Thomas Vasquez Ph. D. .......................................................................... 17
Appendix B: Companies Included in EFH – T-Side .............................................................. 21
Appendix C: Methodology to Forecast the Level of Future Filings Against EFH-T under the
Assumption of No Bankruptcy Filing ..................................................................................... 22

# Summary

I was asked by Energy Future Holdings Corp. (EFH) to prepare an estimate of the total cost of resolving all pending and Proofs of Claim (POC) filings of asbestos-related personal injury claims associated with the Luminant power generation business and TXU Energy's retail electric provider business – the so called T-Side of the Company.[1]  Luminant owns and operates power plants and lignite coal mines.  It has never mined or processed asbestos or manufactured asbestos-containing products.  TXU Energy acquires wholesale electric energy and sells it to end users.  It does not own or operate power plants and has never mined or processed asbestos or manufactured asbestos-containing products.

The company has been named in a limited number of bodily injury lawsuits alleging impairment as a result of exposure to asbestos at one of the Debtor's power generation plants.  Prior to the bankruptcy, 160 individuals have filed asbestos claims against the company of which 38 asserted mesothelioma.  From 1992 through the end of April 2014, the Company incurred approximately $5 million in indemnity costs to resolve 136 of these asbestos claims.

Table S.1 summarizes my forecast.  I estimated two alternative scenarios.  The difference between the two scenarios is the historical calibration period used in determining the key forecasting parameters.  Because there are so few claim filings and settlements, there is a great deal of volatility in the average amount paid to resolve claims and the percent of claims dismissed.  To account for this variance, I select alternative time periods to measure the forecasting parameters.  Scenario 1 uses a slightly earlier time period than used for Scenario 2.

---

[1] A copy of my CV is in Appendix A.  Appendix B provides a list of the companies comprising the T-Side of the business (EFH-T)

**Table S-1**

**Summary of Indemnity and Defense Costs to Resolve All Pending
and Future Claims Against EFH-T Side**

($ Millions)

| Category | Scenario 1 | | Scenario 2 | |
| --- | --- | --- | --- | --- |
| | Nominal | Net Present Value | Nominal | Net Present Value |
| Inventory | | | | |
|    Indemnity | $3.3 | $3.1 | $1.2 | $1.1 |
|    Defense Costs | $2.0 | $2.0 | $2.1 | $2.0 |
|    Total Costs | $5.3 | $5.1 | $3.3 | $3.2 |
| Future Claims | | | | |
|    Indemnity | $7.4 | $5.1 | $2.8 | $1.9 |
|    Defense Costs | $4.5 | $3.0 | $4.7 | $3.2 |
|    Total Costs | $11.9 | $8.1 | $7.6 | $5.1 |
| Total Cost | | | | |
|    Indemnity | $10.7 | $8.2 | $4.0 | $3.1 |
|    Defense Costs | $6.5 | $5.0 | $6.9 | $5.2 |
|    Total Costs | $17.2 | $13.2 | $10.9 | $8.3 |

Note: The value of POC claims is estimated by proxy as the estimated value of

     Future Claims if not for the bankruptcy filing.

   Scenario 1 - 2012 to 2014 propensity to sue

        2009 to 2013 dismissal rate

        2010 to 2013 average indemnity

   Scenario 2 - 2012 to 2014 propensity to sue

        2011 to 2013 dismissal rate

        2011 to 2013 average indemnity

The remainder of this report describes the data and methodology used for the analysis.  Section 1 describes EFH-T's asbestos litigation experience. Section 2 provides an analysis of the POC filings. Section 3 describes the estimate of the total costs associated with resolving all pending and POC filings against the Company.

I continue to review additional data including POC claims.  I reserve the right to modify my forecast as appropriate.

4

## Section 1: Historical Experience

The primary data source for the analysis in this report is a database of claimants that have filed an asbestos-related personal injury claim against EFH-T. The database includes key items of information such as: (1) the name of the claimant; (2) the injury alleged by the claimant; (3) the names of the defense and plaintiff firms and (4) administrative and financial information related to the claim (including year filed, status of the claim, jurisdiction of filing, amount of indemnity paid to resolve the claim, etc.).

The key parameters in a company's historical experience as it relates to the costs associated with future resolutions are claim filings levels[2] (the propensity to sue), the zero pay rate (the percent of claims resolved without payment of indemnity) and the average indemnity paid to settled claims. This section addresses each of these components separately.

*Filings*

EFH-T received its first asbestos-related claim in 1992. From the filing of the first such suit in 1992, 160 claimants filed claims against EFH-T, mostly in Texas. The majority of these cases were filed before 2006. Approximately 25 claims have been filed against EFH-T since 2007. 69 of the claims were dismissed with zero payment. 23 claims remain pending.

As is generally the case in asbestos litigation, EFH-T is named as one of many asbestos defendants in most, if not all, of the lawsuits. Often, claimants allege exposure to the products or activities of 50 or more defendants. Because of this, many claims against EFH-T are dismissed. When this is not the case, claimants who are paid receive reduced amounts to reflect the fact that the claimant's impairment was likely caused by exposure to asbestos from the products and activities of other companies.

Table 1.1 summarizes the number of claims filed against EFH-T through the end of April 2014. There are three primary conclusions that can be drawn from the historical experience:

- There have been no filings alleging Other Cancer or Non-Malignant diseases in the past nine years;
- Lung cancer filings have fallen off significantly in the past nine years and
- While somewhat volatile, mesothelioma has remained relatively stable over the past four years – an average of slightly more than three mesotheliomas a year from 2005 through 2010 and steady at approximately three per year over 2011 through 2014.

---

[2] The estimated cost to resolve POC filings relies heavily of the forecast of the expected level of compensable claims had there not been a bankruptcy filing.

## Table 1.1

## Historical Asbestos Bodily Injury Claim Filings Against EFH T-Side

| Year | Mesothelioma | Lung Cancer | Other Cancer | Non-Malignant | Total |
|------|-------------|-------------|--------------|---------------|-------|
| Pre 2001 | 5 | 2 | 0 | 55 | 62 |
| 2001 | 1 | 1 | 2 | 9 | 13 |
| 2002 | 4 | 1 | 0 | 20 | 25 |
| 2003 | 1 | 4 | 0 | 10 | 15 |
| 2004 | 1 | 0 | 0 | 5 | 6 |
| 2005 | 3 | 4 | 1 | 7 | 15 |
| 2006 | 0 | 0 | 0 | 0 | 0 |
| 2007 | 4 | 0 | 0 | 0 | 4 |
| 2008 | 1 | 0 | 0 | 0 | 1 |
| 2009 | 2 | 1 | 0 | 0 | 3 |
| 2010 | 4 | 0 | 0 | 0 | 4 |
| 2011 | 5 | 0 | 0 | 0 | 5 |
| 2012 | 1 | 1 | 0 | 0 | 2 |
| 2013 | 1 | 1 | 0 | 0 | 2 |
| 2014 | 5 | 0 | 0 | 0 | 5 |
| Total | 38 | 15 | 3 | 106 | 162 |

Note: 2014 includes one claims recorded as filed in 2015.

*Propensity to Sue*

Claims alleging mesothelioma or lung cancer come from a pool of individuals that: (1) contract these diseases and (2) allege exposure to asbestos at EFH-T plants. Not all the individuals that contract an asbestos-related disease will sue EFH-T; indeed a very small percentage of such individuals will do so. For example, in the years 2012 through 2014 approximately 8,100 individuals contracted mesothelioma in the U.S. from occupational exposure, but only 6 of these individuals filed a claim against EFH-T.

Since asbestos-containing products have not been sold in any significant quantity for decades, the number of individuals still alive that were occupationally exposed to asbestos has peaked and is now declining. The annual number of deaths from mesothelioma has been declining over the last 11 years – peaking at 3,249 in 2002 and declining to an estimated 2,705 in 2013.

Lung cancer deaths, on the other hand, has been declining throughout the entire period[3] – from 45,875 in 1995 to an estimated 27,921 in 2013. The primary reasons for the difference in the temporal patterns of mesothelioma and lung cancer incidence are: (1) the latency period for mesothelioma is significantly longer than for lung cancer and (2) the incidence of lung cancer is affected by both asbestos exposure

---

[3] The count of the incidence of lung cancer is solely for individuals contracting lung cancer that have also been exposed to asbestos in their work environment. It is not a count of the total incidence of lung cancer in the U.S.

and smoking, the latter of which has decreased. Mesothelioma takes longer to manifest than lung cancer, resulting in a later peak year for mesothelioma.

As seen on Table 1.2, the propensity to sue is very low, but because of the low number of claim is volatile year to year.

## Table 1.2

## Propensity to Sue EFH - T-Side for Mesothelioma and Lung Cancer

| Year | Mesothelioma | Lung Cancer |
|---|---|---|
| 2005 to 2010 | 0.076% | 0.003% |
| 2011 | 0.175% | 0.000% |
| 2012 | 0.036% | 0.003% |
| 2013 | 0.037% | 0.004% |
| 2014 | 0.191% | 0.000% |
| All Years | 0.088% | 0.002% |
| 2011 through 2014 | 0.109% | 0.002% |

The forecast of propensity to sue for other cancer and non-malignant claims is based on the historical ratio of the incidences of these diseases to lung cancer. The same ratios that held for each disease in the past is assumed to hold in the future.

*Average Positive Pay Settlement Values*

Table 1.3 shows the average settlement amounts by type of disease by year for the period 2004 to 2013. The figures are in 2014 dollars and include positive pays only. As the table shows, the amounts are volatile during the period, with Mesotheliomas ranging from a low of about $19,000 in 2004 to as much as $761,000 in 2010.

## Table 1.3

### Average Settlement Amounts (Positive Pays) by Year and Type of Disease (2014 Dollars)

| Resolved Year | Mesothelioma | Lung Cancer | Other Cancer | Non-Malignant |
|---|---|---|---|---|
| 2004 | $18,818 | $255,092 | na | $13,486 |
| 2005 | $200,260 | $103,164 | na | $13,108 |
| 2006 | na | na | na | $17,637 |
| 2007 | $732,523 | $34,290 | na | na |
| 2010 | $760,728 | $380,364 | na | $5,434 |
| 2013 | $144,966 | na | na | na |
| | | | | |
| Average '10 to '13 | $350,220 | $380,364 | $0 | $5,434 |
| Average '11 to '13 | $144,966 | na | na | na |

*Percent of Claims Resolved Without Payment of Indemnity (Zero Pays)*

Table 1.4 shows the percent of claims dismissed or resolved without indemnity by year and type of disease.

## Table 1.4

## Percent of Claims Dismissed or Otherwise Resolved Without Indemnity by Year, Type of Disease

| Resolved Year | Mesothelioma | Lung Cancer | Other Cancer | Non-Malignant |
|---|---|---|---|---|
| Pre-2008 | 31.3% | 12.5% | 0.0% | 55.2% |
| 2008 | 100.0% | na | 100.0% | na |
| 2009 | 100.0% | na | na | na |
| 2010 | 66.7% | 0.0% | na | 0.0% |
| 2011 | 100.0% | na | na | na |
| 2012 | 100.0% | na | na | na |
| 2013 | 0.0% | na | na | na |
| Average '09 to '13 | 70.0% | 0.0% | 0.0% | 0.0% |
| Average '11 to '13 | 66.7% | 0.0% | 0.0% | 0.0% |

9

*Average Defense Cost*

Table 1.5 shows the average defense costs by type of disease and resolution type during the 2004 to 2013 period. The figures are based on 2014 dollars. As this table shows, Mesothelioma cases are the most expensive to resolve. They have a higher cost for settlement defense than zero pays so it is not surprising that relatively low amounts have been spent on defense so far.

### Table 1.5

### Average Defense Costs by Type of Disease and Resolution Type
### 2014 Dollars (Resolutions 2004 to 2013)

| Type of Disease | Resolved | | Pending | All Claim Average |
|---|---|---|---|---|
| | Zero Pay | Settled | | |
| Mesothelioma | $25,275 | $215,841 | $10,830 | $92,342 |
| Lung Cancer | $59,745 | $62,644 | $21,121 | $44,641 |
| Other Cancer | $133,741 | $46,325 | na | $90,033 |
| Non-Malignant | $35,164 | $36,258 | $11,847 | $32,184 |
| Average | $35,044 | $110,650 | $13,960 | $55,903 |

NA - No claims in this category

Other Cancer Zero Pay is one claim

## Section 2: Analysis of POC Filings

Individuals filed approximately 4,900 POC forms naming EFH T-Side[4]. However, not all of the forms are unique claimants. Table 2.1 shows the number of duplicate POC filings by reason for duplication. Many individuals filed multiple POCs naming separate EFH entities. In addition, many individuals filed multiple POCs against the same entity. Finally, six individuals had filed claims before the petition date and are pending claims.

---

[4] The number of POC filings is slightly changing and I continue to review the additional filings.

## Table 2.1

## Duplicate POC Filings

| Filing Category | Number of Filings |
|---|---|
| Total POC Filings | 4,934 |
| Duplicate Filings | |
|     Same claimant, multiple debtors names | 971 |
|     Same claimant duplicate POC | 949 |
|     Pending Claim | 6 |
|       Total Duplicates | 1,926 |
| Unique Claims | 3,008 |

Table 2.2 shows the alleged exposure and the alleged presence of disease for the unique POC claimants. A few key observations are seen on the table:

- 88% of the POC claimants do not report a manifested disease
- None of the claimants with a manifested disease report working at an included plant.

I understand that there may be additional POC claimants that are not recorded on the database used for this report.  In addition, I understand that there are certain inconsistencies in the information recorded on the POC forms related to whether the claimant worked at an included plant.  I continue to work on both of these issues.

## Table 2.2

## Alleged Exposure Status, by Disease Manifestation

| | Type of Claim | | |
|---|---|---|---|
| Alleged Exposure Status of Claimant | Not Manifested | Manifested | Total |
| Claimant worked at an included plant | 1,205 | 0 | 1,205 |
| Claimant did NOT work at an included plant | 1,452 | 351 | 1,803 |
|     Total, All Unique POC Claimants | 2,657 | 351 | 3,008 |

Note: Not manifested includes one claim of unknown type of claim

    An included plant is a plant identified by EFH as a potential, valid exposure site

    The source of the entries in this table reply on the response to questions on the POC form concerning whether the claimant worked at an included plant.

11

## Section 3: Forecast of the Cost of Resolving All Pending and POC Claims Against the EFH-T Company

The POC claims do not provide a basis for determining the indemnity cost required to bring to resolution. As is typical, there is very little information provided on the POC forms. The information that is available suggests that the claims are of relatively low quality.

Because of these shortcomings, I have adopted an alternative approach to estimate the maximum value of the POC filings. The alternative approach is to ignore the POC filings and instead estimate the cost of resolving all of the future claims that would have been filed against the company if not for the bankruptcy. This approach is used in most asbestos bankruptcy estimations when there is not an asbestos POC bar date.

The approach utilizes the methodology used by most analysts in forecasting asbestos claims and costs. A detailed explanation of the methodology is provided in Appendix D. The approach requires the determination of a number of forecasting parameters. All of the parameters are estimated by relying on the actual historical experience of the company.

There are four key parameters: (1) propensity to sue, (2) zero-pay rate, (3) positive pay average indemnity and (4) average defense costs. The forecast parameters used in determining indemnity costs under two alternative scenarios are shown in Table 3.1. The difference between the two scenarios is the historical calibration period used in determining the key forecasting parameters. Because there are so few claim filings and settlements, there is a great deal of volatility in the average amount paid to resolve claims and the percent of claims dismissed. To account for this variance, I select alternative time periods to measure the forecasting parameters. Scenario 1 uses slightly earlier time periods for determining the dismissal rates and the average indemnity than used for Scenario 2.

**Table 3.1**

**Parameters Used in the Forecast**

| Disease and Forecasting Parameter | Scenario 1 | Scenario 2 |
|---|---|---|
| Mesothelioma | | |
|     Propensity to Sue | 0.1094% | 0.1094% |
|     Zero Pay Rate | 70.00% | 66.67% |
|     Average Positive Pay Indemnity | $350,220 | $144,966 |
|     Average Defense Costs | | |
|         Settled | $215,841 | $215,841 |
|         Dismissed | $25,275 | $25,275 |
| Lung Cancer | | |
|     Propensity to Sue | 0.0018% | 0.0018% |
|     Zero Pay Rate | 0.0000% | 0.0000% |
|     Average Positive Pay Indemnity | $380,364 | $103,164 |
|     Average Defense Costs | | |
|         Settled | $62,644 | $62,644 |
|         Dismissed | $59,745 | $59,745 |
| Other Cancer | | |
|     Propensity to Sue (Ratio to Lung Cancer) | 0.0000% | 0.0000% |
|     Zero Pay Rate | 0.0000% | 0.0000% |
|     Average Positive Pay Indemnity | $0 | $0 |
|     Average Defense Costs | | |
|         Settled | $46,325 | $46,325 |
|         Dismissed | $46,325 | $46,325 |
| Non-Malignant | | |
|     Propensity to Sue (Ratio to Lung Cancer) | 0.0000% | 0.0000% |
|     Zero Pay Rate | 0.0000% | 0.0000% |
|     Average Positive Pay Indemnity | $5,434 | $5,434 |
|     Average Defense Costs | | |
|         Settled | $36,258 | $36,258 |
|         Dismissed | $35,164 | $35,164 |

Note:

    Scenario 1 - 2012 to 2014 propensity to sue

                 2009 to 2013 dismissal rate

                 2010 to 2013 average indemnity

                 2004 to 2013 average defense costs

    Scenario 2 - 2012 to 2014 propensity to sue

                 2011 to 2013 dismissal rate

                 2011 to 2013 average indemnity

                 2004 to 2013 average defense costs

Since the dollar amounts are in 2014 dollars, the amount is increased annually to reflect estimated inflation. I estimate that average settlement amounts will increase by an average of 1.0% per year. This is the net effect of two offsetting factors. First, it is assumed that all else equal, average settlement

amounts will increase by the general inflation rate, which is assumed to be 2.5% per year through the entire forecast period.  This is partially offset by the effect of increasing age of plaintiffs on settlement amounts, which reduces average settlement amounts by 1.5% per year.[5]  It is generally true in the asbestos area as well as U.S. torts generally, that the older the claimant (all else equal), the lower the settlement amount paid by the defendant.  Since the asbestos-claiming population is getting older each year, the average indemnity declines.

The forecasts are presented in nominal dollars as well as discounted dollars.  I used a long run real discount rate of 2.0% to compute the net present value.

---

[5] This effect holds on average for most asbestos defendants.  It was not possible to determine the precise effect on EFH-T settlements because the age of the claimant is not recorded on the Company's claimant data base.

*Forecast of Total Costs*

Table 3.2 shows the total nominal indemnity and defense costs under the two scenarios.

## Table 3.2

## Total Cost of Resolving All Pending and Future Asbestos-Related Claims Against EFH-T

($ Millions)

| Category | Scenario 1 | | Scenario 2 | |
| --- | --- | --- | --- | --- |
| | Nominal | Net Present Value | Nominal | Net Present Value |
| **Inventory** | | | | |
| Indemnity | $3.3 | $3.1 | $1.2 | $1.1 |
| Defense Costs | $2.0 | $2.0 | $2.1 | $2.0 |
| Total Costs | $5.3 | $5.1 | $3.3 | $3.2 |
| **Future Claims** | | | | |
| Indemnity | $7.4 | $5.1 | $2.8 | $1.9 |
| Defense Costs | $4.5 | $3.0 | $4.7 | $3.2 |
| Total Costs | $11.9 | $8.1 | $7.6 | $5.1 |
| **Total Cost** | | | | |
| Indemnity | $10.7 | $8.2 | $4.0 | $3.1 |
| Defense Costs | $6.5 | $5.0 | $6.9 | $5.2 |
| Total Costs | $17.2 | $13.2 | $10.9 | $8.3 |

Note: The value of POC claims is estimated by proxy as the estimated value of
   Future Claims if not for the bankruptcy filing.
      Scenario 1 - 2012 to 2014 propensity to sue
         2009 to 2013 dismissal rate
         2010 to 2013 average indemnity
      Scenario 2 - 2012 to 2014 propensity to sue
         2011 to 2013 dismissal rate
         2011 to 2013 average indemnity

**Appendices**

# Appendix A: CV of Thomas Vasquez Ph. D.

Mr. Vasquez is a Senior Managing Director at Ankura Consulting Group (Ankura) in the New York office.  Dr. Vasquez has over 35 years of experience in management consulting for private sector clients, the development of economic models for US and foreign governments to analyze and develop tax, expenditure and regulatory policy and providing expert testimony over a wide range of issues.

Dr. Vasquez has provided management consulting services for private sector companies in a wide array of industry sectors.  The services include identifying methods to: (1) increase the stock price or value of the company; (2) leverage the firm's brand asset; (3) assist underperforming companies and (4) provide general valuation services.

Dr. Vasquez has assisted US and foreign governments in the development of tax, expenditure and regulatory policy.  The services include the development of large scale micro-economic models to allow policymakers to determine individual and company behavioral reactions to tax and regulatory policy.

Dr. Vasquez has provided expert testimony, depositions and analytical litigation support on a broad spectrum of issues involving statistical techniques, computer simulation, economic behavior and economic models, including, among others:

- Using statistical models to forecast a company's future liability from lawsuits related to its former production of asbestos including the following representative assignments – National Gypsum Corporation, the Fibreboard Corporation, Owens Corning, Congoleum, Western MacArthur, Burns and Roe, Inc. and Specialty Products Holding Corp.,
- Using statistical models to forecast a company's future liability from lawsuits related to its former sales of products.
- Using statistical models to determine the settlement value of bodily injury and financial loss claims resulting from exposure to a wide range of hazardous or defective materials or activities.
- The statistical analysis of the determinants of supply and demand in certain industry segments for use in business valuations before the Bankruptcy Court.
- The impact of regulation and tax policy on prices, sales and production.
- Analyzing the allocation of liability from a state's superfund tax.
- The statistical analysis of reasonable officer compensation levels in closely held companies.

Over the past 20 years, Dr. Vasquez has focused on evaluating the economic and non-economic loss from bodily injury claims.  In recent years, Dr. Vasquez has designed the algorithm for determining the damage from the BP Gulf Oil Spill, the NFL Concussion Settlement, the GM Ignition Failure settlement fund and virtually all of the major asbestos settlement trusts.

Prior to joining Ankura, Dr. Vasquez was a vice president at Analysis, Research & Planning Corporation (ARPC) from 1998 through 2015.  From 1997 to 1998, Dr. Vasquez was the president and CEO of Yankelovich Partners, Inc., a leading market research firm.  While at Yankelovich Partners, Dr. Vasquez had responsibility for engagements designed to determine the best approach to maximize the value of the client's firm.  These engagements involved understanding the source of the value components of the firm – value of the firm's brand,

17

product/service lines responsible for increasing (decreasing) stock price, the role of joint products and other key components of the firm's value.

From 1993 to 1997, Dr. Vasquez was the National Partner in Charge of Corporate Transactions Services for KPMG Peat Marwick. In this role he practiced in and led four of KPMG's national practices. One practice area was in the area of litigation support. This area involved almost exclusively the use of highly trained professionals in providing expert testimony in a wide range of litigation issues. The second practice area involved providing consulting services in the bankruptcy and troubled company area. This area involved analyzing the condition and prospects of a company in financial distress, generally involving recommendations for expense control, revenue growth, elimination/sale of product and distribution lines and the elimination/selling of production sites. The third area is investment banking. This area focused on three major components: (1) buying and/or selling of companies for middle market clients; (2) advice to non-public clients preparing an Initial Public Offering, and (3) advice to clients on methods to increase share price and/or cash flow in anticipation of sale. The fourth area was business valuation. This area focused on the valuation of businesses in a wide range of settings including bankruptcy, fairness opinions, mergers and acquisitions, estate planning and other venues requiring valuation services.

Dr. Vasquez served on the Firm's Board of Directors from 1993 to 1997 and served as the Chairman of the Board's Strategic Planning Committee.

Prior to selling his firm to KPMG, Dr. Vasquez was the founder and President of the Policy Economics Group. Dr. Vasquez was responsible for all data base development and tax simulation modeling for federal and state government clients in the United States as well as foreign governments including among others Egypt, Pakistan, Hungary, the former Soviet Union, Trinidad-Tobago, Virgin Islands, Guam, El Salvador and Guatemala. Dr. Vasquez also developed similar models using specialized industry data bases to determine tax impacts and behavioral responses for commercial firms, industry associations and law firms. These models were also used to formulate the client's strategic direction, market initiatives and value maximization strategies.

Prior to establishing the Policy Economics Group, Dr. Vasquez was the Deputy Director for the U.S. Department of the Treasury Office of Tax Analysis. While there, he guided U.S. tax policy analysis and designed large micro-simulation models and data bases for the U.S. Treasury Department and the Joint Tax Committee of the U.S. Congress. He appeared before Congress to provide testimony on such issues as capital gains taxation. He also designed numerous specialized models and data bases for analyzing policy issues at the company, industry, and individual levels.

**Professional Experience:**

President and CEO, Yankelovich Partners Inc., 1997 to 1999
National Partner in Charge, Corporate Transactions Services, KPMG Peat Marwick, 1993 to 1997.
Managing Partner, Policy Economics Group, KPMG Peat Marwick, 1987 to 1993.
Founder and President, Policy Economics Group, 1983 to 1987.
Deputy Director, Office of Tax Analysis, U.S. Department of the Treasury, 1979 to 1983. Assistant Director, 1978 to 1979; Fiscal Economist, 1972 to 1976.
Chief Economist, New York State Economic Development Board, 1977 to 1978.
Staff Economist, Congressional Joint Committee on Taxation, 1976.
Staff Economist, American Enterprise Institute for Public Policy Research, 1972.

**Education:**
Ph.D., Economics, Clark University, 1973.
M.A., Economics, Clark University, 1972.
B.S., Mathematics, State University of New York - Potsdam, 1970.

**Legal Experience and Testimony:**
National Gypsum Company Bankruptcy Proceedings, 1991
    Deposition
    Testimony
Gerald Ahern, et. al. vs. Fiberboard Corporation, et. al., 1994
    Deposition
    Testimony
Ezell Thomas, et. al. vs. R.J. Reynolds Tobacco Company, et. al., 1999
    Deposition
Fiberboard Corporation and Owens Corning vs. R.J.Reynolds Tobacco Company, et. al., 1999
    Deposition
Western Mac Arthur Company and Mac Arthur Company vs. General Accident Insurance Co. of America;
United States Fidelity & Guaranty Co.; Argonaut Insurance Company, 1999
    Affidavit
CSX Transportation, Inc. and American Home Ins. Co., 2000
    Deposition
ADR Proceeding Celotex vs. Travelers Casualty and Surety Co. and London Market Insurers, 2000
    Deposition, 2004
    Testimony, 2004
Owens Corning Bankruptcy Proceedings, 2001
    Deposition, 2004
    Trial Testimony, 2005
Michael Albanese vs. Compaq Computer Corporation, 2002
    Affidavit
ADR Proceeding ACandS, Inc. vs. Travelers Casualty and Surety Co., 2003
ASARCO vs
    Deposition, 2003
Western Mac Arthur Company and Mac Arthur Company Bankruptcy Proceedings, 2003
Oglebay Norton Bankruptcy Proceedings, 2004
    Deposition, 2004
    Trial Testimony, 2004
Halliburton Bankruptcy Proceedings, 2004
Congoleum vs Ace Ins. Et al, 2005
    Deposition, 2005
    Trial Testimony, 2006
Gene B. Griego, et al., Plaintiffs, vs. Bechtel National, Inc. et al., Defendants
    Deposition, 2005
Sandra Sue Fullen, et al, Plaintiffs v. Philips Electronics North America Corporation, a Delaware corporation, et al., Defendants

Deposition, 2005

St. Paul Fire and Marine Insurance Company, Plaintiff, vs. A.P.I., Inc., Defendant and Counter-Claimant

Deposition, 2005

Dana Corporation Bankruptcy Proceedings, Case No. 06-10354(BLR), 2007

Deposition, 2007

Trial Testimony, 2007

API, INC. Asbestos Settlement Trust v. Atlantic Mutual Insurance Company; Civil No. 09-0665 (JRT/JJG); United States District Court, D. Minnesota; July 9, 2010.

Deposition, 2010

Applebee's International, Inc., DineEquity, Inc. and Weight Watchers International, Inc.  Sheree Shepard and Anthony Watts, On Behalf of Themselves and All Others Similarly Situated vs. DineEquity, Inc. et al.; United States District Court; District of Kansas; No. 08-cv-2416.

Deposition, 2010

API, Inc. Asbestos Settlement trust, et al. v. Zurich American Insurance Company, et al. Court File No. 09-CV-975 (JRT/JJG)

Deposition, March 29, 2011

Tronox Incorporated, Tronox Worldwide, LLC f/k/a; Kerr-McGee Chemical Worldwide LLC, and Tronox, LLC, f/k/a Kerr-McGee Chemical LLC vs. Anadarko Petroleum Corporation and Kerr-McGee Corporation

Deposition 2012

Specialty Products Holding Corp., et al Bankruptcy proceedings, Case No. 10-11780(JFK), 2012

Deposition, 2012

Trial Testimony, 2013

Fundamental Long Term Care, Inc., Debtor; The Estate of Juanita Amelia Jackson, et al, v. General Electric Capital Corporation, et al; Case No.: 8:11-bk-22258-MGW Chapter 7; United States Bankruptcy Court, Middle District of Florida, Tampa Division.

Deposition, 2014

Trial Testimony, 2014

David M. Elsea, et al, vs U.S. Engineering Company and Jackson County, Missouri; Case No. 1016-CV159-76; Circuit Court of Jackson County, Missouri at Kansas City.

Deposition, 2016

# Appendix B: Companies Included in EFH – T-Side

## Appendix Table B.1
## Companies Included in EFH - T-Side

**Debtor**

4Change Energy Company
4Change Energy Holdings LLC
Big Brown 3 Power Company LLC
Big Brown Lignite Company LLC
Big Brown Power Company LLC
Collin Power Company LLC
DeCordova II Power Company LLC
DeCordova Power Company LLC
Eagle Mountain Power Company LLC
Generation MT Company LLC
Generation SVC Company
Lake Creek 3 Power Company LLC
Luminant Big Brown Mining Company LLC
Luminant Energy Company LLC
Luminant Energy Trading California Company
Luminant ET Services Company
Luminant Generation Company LLC
Luminant Holding Company LLC
Luminant Mineral Development Company LLC
Luminant Mining Company LLC
Luminant Renewables Company LLC
Martin Lake 4 Power Company LLC
Monticello 4 Power Company LLC
Morgan Creek 7 Power Company LLC
NCA Resources Development Company
Oak Grove Management Company LLC
Oak Grove Mining Company LLC
Oak Grove Power Company LLC
Shadow Power Company LLC
TCEH Finance, Inc
Texas Competitive Electric Holdings Company LLC
Tradinghouse 3 & 4 Power Company LLC
Tradinghouse Power Company LLC
TXU Energy Receivables Company LLC
TXU Energy Retail Company LLC
TXU Energy Solutions Company LLC
TXU Retail Services Company LLC
TXU SEM Company
Valley NG Power Company LLC
Valley Power Company LLC

## Appendix C: Methodology to Forecast the Level of Future Filings against EFH-T under the Assumption of No Bankruptcy Filing

There are four key steps in the procedure to forecast future asbestos liability: (1) determining the total number of claims to be filed against a company by disease type and filing year; (2) determining the average settlement paid to resolve a claim; (3) determining the percent of claims that will be dismissed or otherwise resolved with no payment of indemnity (zero-pay rate); and (4) determining the average defense costs. The total future indemnity is determined from the first three components.

The total overall asbestos liability is the sum of the total liability related to future claims and the total related to pending claims (claims already filed, but still unresolved).  Figure C.1 provides an overview of the key forecasting steps in determining future liability.

### Figure C.1: Overview of Forecasting Steps



*DETERMINING THE TOTAL NUMBER OF CLAIMS TO BE RESOLVED*

The total number of claims to be resolved is the sum of pending and anticipated future claims. Estimating the cost of pending claims is a relatively easier exercise than for future claims since the number of claims is known.

Our approach to forecasting future claims is epidemiologically based.  That is, the forecast of the number of future claims is based on a forecast of the incidence of asbestos-related disease contracted by the relevant exposed population.

The methodology is based on the Nicholson/KPMG methodology.  The Nicholson/KPMG methodology has been used in virtually all forecasts in major asbestos bankruptcies.  In addition, the procedures are used in nearly all other asbestos-related settings, such as insurance coverage litigation and for mergers and acquisitions.  The methodology is now used by other analysts in virtually every bankruptcy case and in other situations requiring a forecast of future asbestos liabilities.

The approach involves the following main steps for forecasting future claims:

1.  Examine historical experience of the company, including;

    - the number and timing of claims filed against the company;

    - the characteristics of the claims (including the type of disease, age, year of filing, diagnosis year and asbestos exposure history);

    - the status of the claims (dismissed, settled, open, etc.); and

    - the amount paid to resolve claims.

2.  Forecast the incidence of mesothelioma.

3.  Estimate the rate of claiming by:

    - determining the rate at which individuals alleging mesothelioma sue the defendant by comparing the defendant's historical claims experience to the estimate of the total U.S. incidence (or industry specific incidence) of mesothelioma – the propensity to sue; and

    - estimating the number of future mesothelioma claims by applying the historical filing rate for mesothelioma to the forecast of U.S. incidence of asbestos-related mesothelioma.[6]

*Nicholson/KPMG Method*

The first step in developing a forecast of future claims under the Nicholson/KPMG method is to determine the incidence of mesothelioma[7] for the U.S.  The forecast of the U.S. incidence of mesothelioma is based on a methodology originally developed by William J. Nicholson, George Perkel, and Irving J. Selikoff.  Their study represented a joint effort of scientists, physicians, lawyers, economists and statisticians from The Mount Sinai School of Medicine and other institutions and was designed to estimate the total number of cancer deaths attributable to asbestos exposure.

---

[6] There are individuals that file claims who were not occupationally exposed.  These individuals have so-called secondary exposure.  To the extent that these claims have been filed against the Company, they are captured in the propensity to sue and are therefore accounted for in the forecast.

[7] The first step focuses on mesothelioma.  This is the single disease that most agree is entirely (or at least predominately) due to exposure to asbestos.  If the incidence model accurately forecasts mesothelioma, it most likely accurately forecasts other asbestos related disease.  The reliance on mesothelioma is also because the government tracks the number of mesothelioma deaths each year – allowing for a relatively easy accuracy test.

The methodology developed by Nicholson in 1982 was first applied in forecasting asbestos liability in a bankruptcy setting over twenty years ago, in connection with the National Gypsum bankruptcy case. In that application, in consultation with William Nicholson, I made a number of enhancements to the Nicholson 1982 model, including updating the dose-response functions, incorporating workers who entered the workforce in the 1930s, expanding the number of industries and refining the estimated age of individuals entering the workforce. Subsequently, the enhanced version of the model has been used in virtually all major asbestos-related bankruptcies.

The basic approach has four steps:
    (1) estimate the number of workers occupationally exposed to asbestos;
    (2) estimate the intensity and duration of their asbestos exposure;
    (3) apply dose–response functions to compute the probability of contracting a disease; and
    (4) age the exposed population to determine the number of workers that will contract an asbestos-related disease before dying of other causes.

*Number of Workers Occupationally Exposed to Asbestos*

There are 13 primary industry/occupation categories with significant exposure to asbestos in the workplace:

    1) primary manufacturing;
    2) secondary manufacturing;
    3) shipbuilding and repair;
    4) WWII shipbuilding and repair;
    5) construction;
    6) electric, gas, and combination utility services;
    7) asbestos insulation workers;
    8) WWII asbestos insulation workers;
    9) automobile body repair;
    10) engine room personnel of the U.S. Merchant Marine;
    11) maintenance employees in chemical and petroleum manufacturing;
    12) steam locomotive repair; and
    13) stationary engineers and firemen.

Table C.1 shows the estimate of the exposed labor force used by my model. By the end of 1979 (the last year of any significant asbestos exposure in the workplace), approximately 29.8 million workers were exposed to asbestos. Workers first exposed in the 1940s account for over one-third of the total number of exposed workers.

**Table C.1**

**Workers Exposed to Asbestos by Year and Industry**

(thousands)

| Year | Insulation | Shipbuilding | Construction | Manufacturing | Other | Total |
|------|-----------|--------------|--------------|---------------|-------|-------|
| Pre-1930 | 3 | 116 | 433 | 69 | 843 | 1,464 |
| 1930 to 1939 | 8 | 258 | 517 | 174 | 1,395 | 2,352 |
| 1940 to 1949 | 44 | 4,758 | 1,786 | 524 | 4,100 | 11,212 |
| 1950 to 1959 | 47 | 354 | 1,452 | 330 | 2,170 | 4,353 |
| 1960 to 1969 | 38 | 434 | 1,866 | 345 | 2,226 | 4,909 |
| 1970 to 1979 | 47 | 381 | 1,964 | 382 | 2,687 | 5,461 |
| Total | 187 | 6,301 | 8,019 | 1,825 | 13,421 | 29,751 |

*Intensity of Exposure to Asbestos*

The second stage of the methodology applies clinical and epidemiological estimates of the level of risk for each industry and occupation to project the number of excess cancer deaths due to asbestos exposure. Table C.2 provides the relative risk factors used in my model for selected industries and exposure years.

The intensity of exposure varies by industry and by year of exposure. The highest level of intensity was experienced by workers directly engaged in the installation of asbestos containing products. In general, the intensity of exposure for workers peaked in the early 1940s and declined thereafter. Only in the construction industry did the intensity of exposure continue to increase, peaking in the early 1970s.

**Table C.2**

**Intensity of Asbestos Exposure by Year and Industry Category**

(1.0 equals 15 Fibers per mL)

| Year | Insulation | Shipbuilding | Construction | Manufacturing | Other |
|------|-----------|--------------|--------------|---------------|-------|
| Pre-1940 | 0.75 | 0.40 | 0.12 | 0.60 | 0.05 |
| 1940 to 1945 | 1.30 | 0.65 | 0.20 | 0.90 | 0.10 |
| 1946 to 1957 | 1.00 | 0.50 | 0.15 | 0.65 | 0.09 |
| 1958 to 1959 | 1.00 | 0.50 | 0.25 | 0.65 | 0.09 |
| 1960 to 1972 | 0.50 | 0.25 | 0.25 | 0.30 | 0.07 |
| 1973 to 1979 | 0.10 | 0.10 | 0.05 | 0.10 | 0.03 |

25

*OSHA Dose-Response Models for Mesothelioma and Lung Cancer*

The asbestos exposure risk assessment models of the Occupational Safety and Health Administration (OSHA) of the Department of Labor were first described in an October, 1983, paper, Quantitative Risk Assessment for Asbestos Related Cancers.  Its dose–response calculations were based on an evaluation of 11 epidemiological studies of actual worker populations exposed to asbestos in different industries.  These studies involved approximately 53,000 individuals and approximately 1,300 lung cancer and mesothelioma fatalities.  This research formed the basis for the construction of the mesothelioma and lung cancer dose–response mathematical models that link exposure conditions (i.e., intensity and duration) to likelihood of death caused by these diseases, and the estimation of the parameters, Km and Kl, associated with the models.  Both prior to its publication and subsequently, this paper was subject to peer review among government agencies and academics.

In November 1983, and April, 1984, OSHA published notices in the Federal Register of a proposed rulemaking on permissible levels of asbestos exposure.  These notices contained an elaboration of its risk assessment models and public comment was solicited.  OSHA then held a series of public hearings on its proposed rulemaking, from 19 June until 10 July 1984, at which any person or organization that wished could testify.  These hearings resulted in more than 55,000 pages of testimony and 340 exhibits.  This record, along with the peer reviews of the October 1983, report, was made available to the public, and comments again solicited.  On 20 June 1986, after an evaluation of all testimony and comments, OSHA published its final rulemaking and risk assessment models in the Federal Register.[8]

During this three-year period, no peer reviewer challenged the mathematical equations devised by OSHA in its models to predict risk of lung cancer and mesothelioma from asbestos exposure.  The consensus was that the data behind their assumptions were correct and that the models were appropriate and acceptable means of risk assessment.  The risk estimates elaborated in the 1983 report were never revised, and the models and results have been adopted by several other regulatory and scientific bodies for use in risk assessments.

*The Model for Absolute Risk of Mesothelioma*

This model relates absolute risk of mesothelioma to asbestos fiber concentration in fibers/cc, time since the first exposure to asbestos in years, and exposure duration in years.  Absolute risk is defined as the likelihood of death due to mesothelioma for one person–year at risk.  In the equation which follows, $m(f,t,d)$ represents the function value, $f$ the concentration, $t$ the time since first exposure, and $d$ the exposure duration.  The quantity $K_m$ is an empirically determined constant whose value is chosen to maximize the correspondence of the function to the data.

---

[8] Occupational Safety and Health Administration, Department of Labor, U.S. Government.  *Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite; Final Rules.*  Federal Register, 29 CFR Parts 1910 and 1926, June 20, 1986.

$$m(f,t,d) = \begin{cases} 0, \text{ if } t \leq 10 \text{ years,} \\ K_m \times f \times (t-10)^3, \text{ if } 10 < t \leq d + 10, \\ K_m \times f \times [(t-10)^3 - (t-10-d)^3], \text{ otherwise.} \end{cases}$$

Based upon fits of this function to the data of four studies, OSHA set the value of $K_m$ to $10^{-8}$.

The factor $(t-10)^3$ dominates the computation of the function's value; in effect, absolute risk of death due to mesothelioma increases as the third power of the time since first exposure less 10 years. The subtraction of 10 years along with the conditions selecting which expression to use in the equation above ensures that the minimum time from exposure to any death due to mesothelioma is at least 10 years.

### The OSHA Model for Relative Risk of Lung Cancer

The OSHA dose–response model quantifying the impact of asbestos exposure on lung cancer is a model for *relative risk*. Relative risk is defined as the ratio of two rates or proportions—for example, the death rate for those exposed to the risk factor (asbestos) relative to the death rate for those not exposed; the standardized mortality ratio, SMR, is an example of a measure of relative risk.

The lung cancer model has the same components as the mesothelioma model: $f$, the fiber concentration (number of fibers per cubic centimeter), $t$, the time since first exposure (years), and $d$, the exposure duration (also in years):

$$l(f,t,d) = \begin{cases} 1, \text{ if } t \leq 10 \text{ years,} \\ 1 + K_l \times f \times (t-10), \text{ if } 10 < t \leq d + 10, \text{ and} \\ 1 + K_l \times f \times d, \text{ otherwise.} \end{cases}$$

Based upon the results of fitting this function to the data of eight studies that had sufficient quantitative information about the fiber concentration, OSHA set the proportionality parameter, $K_l$, to $10^{-2}$. The credible range within which $K_l$ might fall was $[3\times10^{-3}, 3\times10^{-2}]$.

For long periods of time since the first exposure, relative risk of lung cancer is proportional to the product of fiber concentration and exposure duration (the third line of the equation above). The first line enforces a 10-year delay between exposure to asbestos and increased risk of lung cancer while the second line linearly ramps up the risk after the 10-year delay.

In order to convert a relative risk to a death rate, the relative risk must be multiplied by the "background" death rate for lung cancer:

$$l(f,t,d) \times u_a \, ,$$

where $u_a$ is the age-specific death rate for lung cancer. This expression implies that the death rate for asbestos-related lung cancer will depend upon fiber concentration, time since first exposure, exposure duration, and age.

27

*Modifications to Allow the Fiber Concentration to Vary From Year to Year*

The OSHA models presented above assume that the fiber concentration does not change over the duration of exposure. In fact, there are substantial changes in fiber concentration over time for each of the industries, generally with concentration first increasing and then decreasing (see Table C.2 above). The models must be adjusted to allow fiber concentration, $f$, to change over time. First, both models can be re-expressed using the max function ($\max(a, b)$ = the larger of $a$ or $b$) to capture the impact of time since first exposure ($t$) and exposure duration ($d$) on risk. The mesothelioma absolute risk model can be rewritten as

$$m(f, t, d) = K_m \times f \times \left( \max(0, t - 10)^3 - \max(0, t - 10 - d)^3 \right)$$

and the lung cancer relative risk model can be restated as

$$l(f, t, d) = 1 + K_l \times f \times \left( \max(0, t - 10) - \max(0, t - 10 - d) \right)$$

Next, rather than having a uniform fiber concentration of $f$ fibers/cc over an exposure duration of $d$ years, the formulas are altered to allow fiber concentration to vary from year to year.

Let $n$ equal the largest integer less than or equal to $d$ and let $w$ equal $d - n$. This splits $d$ into an integer part, $n$, and a fractional part, $w$. Let $f_i$ be the fiber concentration in year $i$ of the exposure duration; $i$ ranges from 1, 2, …, up to $n$ (if $d$ is an integer) or $n+1$ (if $d$ is not an integer). The expression for mesothelioma risk is

$$m = K_m \left( \sum_{i=1}^{n} f_i \left( \max(0, t - i - 9)^3 - \max(0, t - i - 10)^3 \right) + f_{n+1} \left( \max(0, t - n - 10)^3 - \max(0, t - n - 10 - w)^3 \right) \right)$$

The expression for lung cancer risk is

$$l = 1 + K_l \left( \sum_{i=1}^{n} f_i \left( \max(0, t - i - 9) - \max(0, t - i - 10) \right) + f_{n+1} \left( \max(0, t - n - 10) - \max(0, t - n - 10 - w) \right) \right)$$

*Aging of the Population of Exposed Workers*

The incidence model "ages" the exposed population. For every year, computations are made based on the status of the worker. For example, the worker may simply continue to work and accumulate additional asbestos exposure, the worker may retire, the worker may die of causes unrelated to asbestos or the worker may contract mesothelioma or lung cancer.

During the aging process, the incidence model takes each one of these workers and first applies the epidemiological risk equations to compute the likelihood of contracting an asbestos-related cancer (mesothelioma and lung cancer).

The model then applies overall mortality rates to compute the likelihood of dying of some other cause. The mortality rates used to compute the likelihood of death due to other causes are those for all causes for white males.[9]

---

[9] It is not possible to know the precise mix of exposed individuals by year, by gender and by race. The mortality rates for white males were selected as best representative of the majority of exposed individuals.

These steps are repeated year-by-year (changing the death rates as necessary) until the last member of the population is no longer alive.  Table C.3 shows the number of exposed workers that are still alive for selected years in the forecast period.  By the end of 2010, only 8.8 million, approximately 30% of the 29.8 million workers exposed, remain alive.  By 2040 only 489,000 workers remain alive.

### Table C.3
### Surviving Exposed Workers, By Year
(millions)

| Year | Remaining Alive | |
| | Number | Percent of Workers Originally Exposed |
|---|---|---|
| 2010 | 8.8 | 29.7% |
| 2020 | 5.1 | 17.2% |
| 2030 | 2.2 | 7.5% |
| 2040 | 0.5 | 1.6% |

*Validation of the Incidence Model*

The incidence model produces an estimate of mesothelioma and lung cancer deaths from 1960 to 2049, the last year that any of the exposed workers are expected to be alive.  The historical estimates of mesothelioma incidence provide the basis for a test of the validity of the model.  The National Cancer Institute conducts an annual study of the number of deaths from mesothelioma and publishes it as part of the Institute's Survey of Epidemiological End Results (SEER) program.

Figure C.2 shows the estimate of mesothelioma deaths from the incidence model compared to the actual number of mesothelioma deaths derived from the SEER program's data.  Without any statistical calibration or data fitting, the model is very close to both the level and temporal pattern of mesothelioma deaths.

**Figure C.2: Mesothelioma Deaths: Actual vs. Estimated**



*Incidence Projections*

The determination of the future asbestos-related claims for a company is dependent upon the proportion of disease incidence that has not yet occurred and the propensity of these individuals to sue the company. As seen on Table C.4, overall, over three-quarters of the expected mesothelioma and lung cancer incidence has already occurred.

## Table C.4

### Past and Future Incidence of Mesothelioma and Lung Cancer for Individuals Exposed to Asbestos

| Disease Type | Incidence | | | Future Incidence as a Percent of Total Incidence |
| --- | --- | --- | --- | --- |
| | Past Incidence: 1960 through 2013 | Future Incidence: 2014 through 2049 | Total | |
| Mesothelioma | 113,497 | 31,521 | 145,018 | 21.7% |
| Lung Cancer | 1,680,296 | 374,431 | 2,054,727 | 18.2% |

30

However, since the number of workers, their age at first exposure and the intensity of their exposure varies by industry/occupation classes, the percent of incidence remaining varies among these classes. Table C.5 shows the peak year of incidence for the two types of disease. On average, the peak incidence for mesothelioma occurred in 2002 and the peak incidence for lung cancer occurred in 1992. For shipbuilding and construction, however, the incidence of mesothelioma peaks in a significantly different year than the average. Shipbuilding peaked in 1993, nine years earlier than the average. Construction did not peak until 2009, seven years after the average. There are two reasons that the peaks of these two industries vary from the average. For shipbuilding, the overwhelming majority of workers were first exposed in the 1940s and this time period also aligns with the highest level of intensity of exposure. For construction, the number of workers exposed actually increases into the 1970s and the intensity of exposure increases until the early 1970s. Construction is the only industry assumed to experience an increase in asbestos exposure in the post-World War II time period due to the popularity of sprayed asbestos fireproofing products used in construction between 1958 and 1972.

### Table C.5

### Peak Year of Incidence, by Disease
### Type and Industry/Occupation

| Industry/Occupation | Mesothelioma | Lung Cancer |
|---|---|---|
| Manufacturing | 1998 | 1992 |
| Insulators | 1999 | 1995 |
| Shipbuilding | 1993 | 1992 |
| Construction | 2009 | 2000 |
| Railroad and Auto | 1996 | 1992 |
| Other | 2001 | 1992 |
| Overall Average | 2002 | 1992 |

The variations in the temporal pattern of the intensity of exposure and the timing of first exposure to asbestos result in considerable differences in the percent of incidence remaining among the industry/occupation classes. Table C.6 shows the percent of incidence remaining for the two disease types by industry/occupation class. Again, shipbuilding and construction differ significantly from the average. While on average approximately 72.5% of the mesothelioma incidence has already occurred, approximately 87% has already occurred in shipbuilding, but only 67% has already occurred in construction.

31

**Table C.6**

**Future Incidence as a Percent of Total Incidence
by Disease Type and Industry/Occupation**

| Industry/Occupation | Mesothelioma | Lung Cancer |
|---|---|---|
| Manufacturing | 18.8% | 22.6% |
| Insulators | 17.3% | 21.0% |
| Shipbuilding | 12.8% | 8.3% |
| Construction | 32.7% | 28.9% |
| Railroad and Auto | 23.4% | 24.9% |
| Other | 22.8% | 18.7% |
| Overall Average | 27.5% | 23.8% |