Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                   :    Chapter 11

6    ENERGY FUTURE HOLDINGS, INC.  :

                                   :    Case No. 14-10979

7                                  :

          Debtors.                 :    (Jointly Administration

8    _____:    Requested)

9

10                                 United States Bankruptcy Court

11                                 824 North Market Street

12                                 Wilmington, Delaware

13                                 November 8, 2016

14                                 10:15 a.m. – 11:55 a.m.

15

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN

1   HEARING re Debtors' Third Omnibus (Non-Substantive)

2   Objection to (No Supporting Documentation) Customer Claims

3   Pursuant to Section 502(b) of the Bankruptcy Code,

4   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

5   Rule 3007-1 [D.I. 2992; filed December 12, 2014]

6

7   HEARING re Debtors' Sixth Omnibus (Non-Substantive)

8   Objection to (Insufficient Documentation) Claims Pursuant to

9   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

10   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

11   3212; filed January 9, 2015]

12

13   HEARING re Debtors' Eighth Omnibus (Non-Substantive)

14   Objection to (Insufficient Documentation) Claims Pursuant to

15   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

16   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

17   3381; filed January 27, 2015]

18

19   HEARING re Debtors' Twelfth Omnibus (Non-Substantive)

20   Objection to (Insufficient Documentation) Claims Pursuant to

21   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

22   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

23   3896; filed March 13, 2015]

24

25

1    HEARING re Debtors' Thirteenth Omnibus (Non-Substantive)

2    Objection to (Insufficient Documentation) Claims Pursuant to

3    Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

4    3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

5    4003; filed March 27, 2015]

6

7    HEARING re Debtors' Sixteenth Omnibus (Non-Substantive)

8    Objection to (Insufficient Documentation, Amended, and Wrong

9    Debtor) Claims Pursuant to Section 502(b) of the Bankruptcy

10   Code, Bankruptcy Rules 3001, 3003, and 3007, and Local

11   Bankruptcy Rule 3007-1 [D.I. 4782; filed June 16, 2015]

12

13   HEARING re Debtors' Seventeenth Omnibus (Substantive)

14   Objection to (Substantive Duplicate, No Liability, and No

15   Claim Asserted) Claims Pursuant to Section 502(b) of the

16   Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and

17   Local Bankruptcy Rule 3007-1 [D.I. 4784; file June 16, 2015]

18

19   HEARING re Debtors' Thirty-Ninth Omnibus (Substantive)

20   Objection to Substantive Duplicate and No Liability Claims

21   Pursuant to Section 502(b) of the Bankruptcy Code,

22   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

23   Rule 3007-1 [D.I. 8069; filed March 24, 2016]

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   POTTER ANDERSON & CORROON LLP

 4        Attorneys for Deutche Bank New York

 5

 6   BY:  R. STEPHEN MCNEILL

 7

 8   KIRKLAND & ELLIS LLP

 9        Attorneys for the Debtor

10

11   BY:  MARK MCKANE

12        APARNA YENAMANDRA

13        JUSTIN SOWA

14        REBECCA CHAIKIN

15

16   RICHARDS, LAYTON & FINGER, P.A.

17        Attorneys for the Debtor

18

19   BY:  JASON M. MADRON

20

21   KLEHR HARRISON HARVEY BRANZBURG LLP

22        Attorneys for UMB Bank, Indenture Trustee

23

24   BY:  RAYMOND H. LEMISCH

25
```

1    HOGAN MCDANIEL

2         Attorney for Fenicle, Fahy, Jones & Harman

3

4    BY:  DANIEL HOGAN

5

6    ALSO PRESENT TELEPHONICALLY:

7

8    KELLIE CAIRNS

9    JOSEPH A. FLORCZAK

10   MARK F. HEBBELN

11   NATASHA HWANGPO

12   CHRISTIAN JENSEN

13   HAROLD KAPLAN

14   JOANNA S. NEWDECK

15   LORENZO PIPKIN III

16   ERICA RICHARDS

17   CHRISTY RIVERA

18   NED S. SCHODEK

19   NOAH M. SCHOTTENSTEIN

20   ANGELO THALASSINOS

21   AMER TIWANA

22   TERETTA VAUGHN

23   ROSE WASHINGTON

24   APARNA YENAMANDRA

25   MARK A. CODY

```
 1                    P R O C E E D I N G S

 2            CLERK:  All rise.

 3            THE COURT:  Please be seated.  Good morning.

 4            MS. CHAICAN:  Good morning, Your Honor.  Rebecca

 5    Chaican with Kirkland & Ellis, counsel for the Debtors.

 6    It's an honor to be before you today for this, the first of

 7    two pro se claims hearings.  Those are hearings to

 8    adjudicate the remaining claims that were filed by

 9    unrepresented individuals.  And to be clear, none of these

10    claims implicate asbestos matters.

11            As Your Honor is no doubt aware, there are also a

12    number of outstanding affections to claims that were filed

13    by trade counterparties and individuals who are represented

14    by counsel.  The Debtors are continuing to negotiate

15    consensual resolutions to those claims and will address any

16    unresolvable disputes at future omnibus hearings.

17            THE COURT:  Okay.

18            MS. CHAICAN:  For the pro se claims hearings,

19    including today, we have a proposal for how to structure

20    things.  So if that's all right with Your Honor, I might

21    describe the proposal?

22            THE COURT:  Okay.

23            MS. CHAICAN:  The Debtors propose to begin with a

24    short opening presentation, including brief direct testimony

25    from two of our witnesses in support of the reply that we
```

1    filed a couple of weeks ago.  The first is Ms. Sinead

2    Soesbe, Senior Counsel at EFH Corporate Services, and she

3    generally oversaw the claims administrative process as it

4    relates to the pro se claimants.  Our second witness is Mr.

5    Daniel McKillop; he is the Senior Manager of Customer

6    Advocacy Services at TXU Energy.  Mr. McKillop oversaw our

7    administration as it relates to customer account issues.

8    Mr. Steven Kotarba, who's a Managing Director at A&M, is

9    also in the Courtroom here today.  He was the declarant on

10   the original omnibus objections that we filed, and he will

11   be available to testify if the need arises.

12            After the Debtor's opening presentation, each of

13   the claimants who are joining us today will have an

14   opportunity to respond to the Debtor's presentation and make

15   any arguments that he or she may have.  And I understand

16   that while there are no pro so claimants in the room with us

17   today, three have signed up to participate by telephone.

18            The Debtors respectfully request to reserve time

19   at the end of all the claimant presentations for any

20   rebuttal that might be necessary and for a very short

21   closing presentation.

22            And if that's acceptable to Your Honor, we can

23   begin.

24            THE COURT:  I think that makes sense.

25            MS. CHAICAN:  All right, thank you.  So Your Honor

1  over the past two years, over 10,000 non-asbestos proofs of

2  claim were timely filed in these cases.  And since that

3  time, the Debtors have filed objections to over half of

4  those claims; that's more than 5500 claims in 43 omnibus

5  objections.  And today, disputes with only 55 claimants

6  remain unresolved.  That's -- and less than a dozen of those

7  claimants are non-pro se claimants.  I think this is a

8  testament to the Debtor's commitment, both to consensual

9  resolution and also to accurately reconciling the claims.

10          As Your Honor has seen throughout these cases, the

11  Debtors only bring claim disputes to your door when there is

12  an intractable dispute, and where the Debtors believe that

13  the facts and the law are squarely on the Debtor's side, and

14  today is no different.

15          The claimants who filed the contested pro so

16  claims that are before us today and at the December 13th

17  hearing have been unable to demonstrate a valid claim

18  against the Debtors.  Meanwhile, the Debtors have done

19  everything they and their advisors can possibly think of to

20  diligence these claims.  And in every case, we could find

21  nothing to support the existence of a liability against the

22  Debtors.  That lack of evidence to support often

23  inadequately described claims compels the Debtors to

24  maintain and prosecute their objections to these claims.

25          To be entitled to an allowed claim, a claimant

1    must meet certain evidentiary standards in a burden shifting

2    test.  Many of the contested posted claims do not meet even

3    their initial burden, to allege facts sufficient to support

4    a claim against the Debtors.  In several instances, the

5    claimant has yet to even identify the claim that they're

6    attempting to assert.  The claimants that have made

7    relatively specific statements about their claims did not

8    provide any supporting evidence, let alone sufficient

9    evidence to prove their claim by a preponderance, which is

10   their ultimate burden.

11           While some of the claims and formal responses

12   appended documents, as far as the Debtors could discern,

13   none of those documents actually demonstrated that a claim

14   against the Debtors existed.  For example, several claimants

15   included copies of their energy bills, but without any

16   indication of what on their bill was incorrect and why they

17   thought so.  In other instances, claimants attached papers

18   that did not, on their face, relate to the Debtors.  And

19   such is an invoice related to a matter with a third party, a

20   company that wasn't the Debtors.  In looking at these

21   papers, it's impossible for the Debtors to discern what

22   exactly a claim against the Debtors could be.

23           By contrast, the Debtors have all made -- they've

24   made all reasonable efforts, and sometimes even beyond, to

25   investigate and evaluate the validity of these claims.  And

1    the result these exercises is, in every instance, the clear

2    absence of any valid legal liability against the Debtors.

3              Now, Your Honor, I understand our A/V system isn't

4    working today, but we do have some demonstratives.  And if

5    that's all right, I can hand some up to you.

6              THE COURT:  Yes, okay.

7              MS. CHAICAN:  If you'll turn to the first slide,

8    which is a timeline.  If you'll allow me, I'd like to take

9    just a couple of minutes to walk Your Honor and the

10   claimants who are joining us by telephone today through the

11   Debtor's reconciliation process.  And, of course, we

12   describe this in some detail in our reply papers and our

13   declarants will speak to more detail on this process in just

14   a moment.

15             So as you may recall, the bar date set by Your

16   Honor was October 27, 2014.  And as proofs of claim were

17   filed, the Debtor's advisors reviewed and categorized claims

18   to help organize the diligence process.  As part of this

19   review, the Debtors identified approximately 3,500 claims

20   that were customer claims, if you will.

21             And if you'll turn to the next slide, this is just

22   a visual representation of that initial round of diligence

23   that we did.  Of these customer claims, the Debtors

24   identified approximately 200 where the Debtors thought that

25   there was enough detail to warrant reaching out to the

1    claimant and have a further -- have a more detailed

2    discussion about their account.

3           Where the Debtors saw in their records that there

4    was, in fact, an issue with a customer's account, the

5    customer service representative speaking to that claimant

6    resolved the issue in accordance with the relief that Your

7    Honor granted through the customer programs order, which you

8    had entered and approved in the early months of these

9    Chapter 11 cases.  Importantly, throughout these cases,

10   valid customer issues that arose have been addressed and

11   remedied through that relief in the ordinary course of the

12   Debtor's businesses.

13          So claims from that group are 200 that were not

14   resolved, along with claims that were blank or provided what

15   the Debtors felt was insufficient documentation to really

16   understand the claim being asserted.  Those were all slated

17   for inclusion in an omnibus objection.

18          And if you'll flip to the next page, which is a

19   timeline again.  You'll see that at the end of 2014, the

20   Debtors filed their first omnibus objection and that began

21   the process of filing 43 omnibus objections over the

22   following year and a half, and the most recent one was filed

23   several months ago.  And over the course of that period, as

24   I said before, we objected to approximately five and a half

25   thousand claims, largely to disallow, but many were also to

1   modify the claim to match what was in the Debtor's books and

2   records.

3           And if you'll turn to Slide 4, this is a visual

4   representation of the reconciliation process that happened

5   once we filed an objection.  So as you'll see, the vast

6   majority of the claimants that we had objected to their

7   claims, they did not respond to the objections.  But among

8   those who did respond were approximately 190 pro se

9   claimants who had either filed letters or other items on the

10  docket or had sent letters to Kirkland & Ellis or Richards

11  Layton & Finger, the local counsel, the Debtor's bankruptcy

12  counsel.  They'd also left voicemails and sent emails to

13  dedicated hotline numbers and an email address.

14          The Debtor's bankruptcy counsel attempted to

15  contact every single one of those 190 claimants.  And in

16  many cases, the claimant was simply looking for an

17  explanation of the bankruptcy process, the papers they were

18  receiving, what the claim is.  And in those cases,

19  obviously, the Debtor's counsel provided an explanation that

20  was satisfactory to the claimant.

21          Other had made specific allegations that were

22  unconnected to the Debtors.  And once counsel explained that

23  they felt that the claim that they held didn't relate to the

24  Debtors, the claimant agreed that their claim actually was

25  against a different company and resolved the objection.  And

1    still other claimants had discreet questions about things

2    like employee benefits that the Debtors were also able to

3    answer their questions.  So approximately 118 responses to

4    objections were resolved by that first layer of outreach.

5          The remaining 72 claimants, nearly 50 indicated in

6    some way to bankruptcy counsel that they were asserting an

7    issue with their customer account.  And as Mr. McKillop will

8    describe, the TXU customer service team reviewed the

9    customer account for each of those claimants and attempted

10   to contact them to discuss their claims, and 16 of the

11   claims were resolved through that process.

12         The remaining responses from pro se claimants,

13   each asserted a non-customer related claim.  And as Ms.

14   Soesbe will describe, the Debtors appropriately diligenced

15   each of those claims, and ultimately concluded that either

16   the claim did not relate to any of the Debtors and was

17   properly asserted against a third party, or did not

18   constitute a valid liability against any of the Debtors.

19         Flipping again to the next slide, which is back to

20   our timeline.  As the discussions wound down earlier this

21   year, the Debtors requested that Your Honor implement a

22   schedule in certain procedures to organize the adjudication

23   of the dozens of pro se claims that remain disputed.

24         On August 15th, Your Honor entered an Order

25   setting that protocol.  And among the key provisions are

1   that the claimants were required to file a formal response

2   on the docket if they had not at that point done so already,

3   as well as to return a questionnaire to the Debtor's

4   bankruptcy counsel indicating whether they wanted to

5   participate in a hearing regarding their claims; and if so,

6   how they would like to participate -- in person or via

7   telephone.  In both of the items, the formal response and

8   the questionnaire, were due on September 19th of this year.

9           Importantly, the protocol provided that if a pro

10  se claimant had not filed a formal response on the docket

11  and, again, did not file one by September 19th, that their

12  claim could be disallowed and expunged from the claims

13  register.  A number of claimants, however, while they did

14  not file a formal response, they did submit a questionnaire.

15  And so in keeping with the Debtor's policy throughout these

16  cases to be as accommodating as possible to pro se and other

17  unrepresented claimants, the Debtors decided that they would

18  request that Your Honor enter Orders disallowing only those

19  claims where no formal response was filed, as well as no

20  questionnaire was submitted.  And Your Honor entered those

21  Orders at the end of September and disallowing 12 claims.

22          So now 44 pro so claimants remain and will be

23  addressed today or at the second hearing we have scheduled

24  for December 13th.  That is our reconciliation process.  So

25  with that, unless Your Honor has any questions, I will yield

1    the podium to my colleague, Mr. Justin Sowa.

2              THE COURT:  Okay, thank you.

3              MS. CHAICAN:  Thank you.

4              MR. SOWA:  Thank you, Your Honor.  Justin Sowa,

5    Kirkland & Ellis, on behalf of the Debtors.  At this time,

6    the Debtors will call their first witness, Sinead Soesbe.

7              THE COURT:  All right.

8              CLERK:  Please raise your right hand.  Do you

9    affirm that you will tell the truth, the whole truth, and

10   nothing but the truth to the best of your knowledge and

11   ability?

12             MS. SOESBE:  Yes, I will.

13             CLERK:  Please state and spell your name for the

14   record.

15             MS. SOESBE:  Sinead Soesbe, S-I-N-E-A-D, last name

16   S-O-E-S-B-E.

17             CLERK:  Thank you.

18   [WITNESS SINEAD SOESBE SWORN IN]

19             THE COURT:  Welcome.

20             MR. SOWA:  Your Honor, we've prepared binders for

21   the Court with demonstratives and exhibits.

22             THE COURT:  Okay.

23             MR. SOWA:  May I approach?

24             THE COURT:  Yes.

25                  DIRECT EXAMINATION OF SINEAD SOESBE

1    Q    Ms. Soesbe, you have a binder.

2    A    I do.

3    Q    Good morning, Ms. Soesbe.

4    A    Good morning.

5    Q    Ms. Soesbe, who is your current employer?

6    A    EFH Corporate Services Company.

7    Q    And who's the owner of EFH Corporate Services Company?

8    A    Vistra Energy Company, formerly TCEH Corp.

9    Q    And before TCEH's emergence from bankruptcy, who was

10   your employer?

11   A    It was also EFH Corporate Services Company, but it was

12   owned by EFH Corp.

13   Q    Ms. Soesbe, what's your current job title?

14   A    I'm senior counsel.

15   Q    And what are your responsibilities as senior counsel?

16   A    I am in charge of commercial disputes, claims, and

17   litigation for the company.

18   Q    Can you please give the Court a brief overview of your

19   educational and professional background?

20   A    I have an undergraduate degree in political science

21   from the University of Texas at Austin, and I have a Juris

22   Doctorate from the same institution.

23   Q    And before working at EFH Corporate Services, where

24   were you employed?

25   A    At Locke Lord.

1    Q    And how long have you been at EFH Corporate Services?

2    A    Since 2009.

3    Q    Ms. Soesbe, this morning I'd like to discuss with you

4    the steps that the Debtors have taken to analyze and

5    reconcile claims in these Chapter 11 cases, specifically

6    with regard to the claims before the Court today, okay?

7    A    Okay.

8    Q    Ms. Soesbe, in your role as senior counsel, have you

9    been involved in the claims reconciliation process?

10   A    Yes, I have been.

11   Q    And what has your involvement been?

12   A    I have been the internal legal department person in

13   charge of assisting with the claims reconciliation process.

14   Q    And did you prepare a declaration in support of the

15   Debtor's reply with respect to the claims under

16   consideration today?

17   A    Yes.

18   Q    And can you please turn to Tab 1 in your binder?

19   A    Okay.

20   Q    Is this that declaration?

21   A    It is.

22   Q    And is everything in that declaration true and accurate

23   to the best of your knowledge?

24   A    Yes.

25              MR. SOWA:  Your Honor, we'll be moving to admit

1    the declaration into evidence, but I will save that to the

2    close of direct testimony.

3              THE COURT:  Okay.

4    Q    Okay, so Ms. Soesbe, is it safe to say that you're

5    generally familiar with the steps that the Debtors and their

6    advisors took to analyze and reconcile claims filed in the

7    Chapter 11 cases?

8    A    Yes, I am.

9    Q    Ms. Soesbe, did you have demonstratives prepared to

10   assist your testimony today?

11   A    Yes.

12   Q    Could you please turn to Tab 2 in your binder?

13   A    Okay.

14   Q    Please turn to the second page of Tab 2.

15   A    Okay.

16   Q    Do you recognize this demonstrative?

17   A    The second page is a timeline.

18   Q    What's it a timeline of?

19   A    It's the timeline of the claims process.

20   Q    And so looking at this timeline, it appears to have

21   bene roughly a two-year long process; is that correct?

22   A    Yes.

23   Q    And now looking at the third page of your demonstrative

24   tab, do you recognize this demonstrative?

25   A    Yes, this is a representation of the 10,000 non-

1    asbestos claims that were filed and how they've been

2    whittled down to the 44 remaining pro se claims.

3    Q    Okay, thank you.  Now please turn to Tab 3 in the

4    binder.  It's labeled Debtor's Exhibit DX-001.

5    A    Yes.

6    Q    Do you recognize this document?

7    A    This is a bar date Order for non-customer's proofs of

8    claim.

9    Q    So were claimants in these cases given notice of the

10   need to file a proof of claim to preserve their claims?

11   A    Yes, they were.

12   Q    And does this bar date notice provide that information?

13   A    It does.

14   Q    All right, Ms. Soesbe, how many non-asbestos claims

15   were filed in the Debtor's Chapter 11 cases?

16   A    10,000.

17   Q    And so what were the first steps that the Debtors and

18   their advisors took to get their hands around those 10,000

19   claims?

20   A    The first step was working with our bankruptcy

21   advisors, Epic and A&M.  And Epic went through and took the

22   first stab at categorizing the claims that came in, if they

23   could, based on the face of the document; and then A&M did a

24   deeper value and looked at the attachments and made some

25   further characterizations.

1   Q     So when you say characterizations or categorizations,

2   what sorts of categories were they?

3   A     So customer claims; claims that were -- like, they were

4   clearly TAC customer claims; claims that looked like they

5   had been asserted against a party that wasn't affiliated

6   with us; lease claims; employment claims.  There were

7   various categories of claims.

8   Q     Okay.  And so as the Debtors and their advisors began

9   this process, did you have any specific goals in mind for

10  what you were hoping to accomplish?

11  A     Yes.  Since were 10,000, we were hoping to find a way

12  to get through it as efficiently as possible to get the

13  categorization done, to find ones that were quite clearly

14  unrelated to our bankruptcy, for instance, and get rid of

15  those as quickly as possible, but to also make sure that we

16  were looking at the claims.  And if there was a liability

17  there or a valid customer claim or a proof of claim, that we

18  were able to pay those out and resolve those where we could.

19  Q     So out of those 10,000 non-asbestos claims, how many

20  did the Debtors ultimately object to?  You can refer to your

21  demonstrative if that'll help refresh your recollection.

22  A     Yes, 5500.

23  Q     And so how did the Debtors and their advisors determine

24  which 5500 claims should be objected to?

25  A     Well, again, we worked with our advisors -- bankruptcy

1    advisors and outside counsel -- and looked at the claims.

2    And if there really didn't appear to be a claim that was

3    related to our bankruptcy, that was related to us, if it was

4    insufficient information, we decided to object to those

5    claims with outside counsel.

6    Q    Were some of these claims filed by customers?

7    A    Yes.

8    Q    Okay.  Now were those customers informed that they

9    would need to take certain steps to preserve their claims?

10   A    Yes.

11   Q    Turn to Tab 4 in your binder.  This is the document

12   labeled Debtor's Exhibit DX-002.

13   A    Okay.

14   Q    Do you recognize this document?

15   A    Yes, this is the customer bar date notice Order.

16   Q    Does this document include any provisions regarding

17   notice of what the claimants would need to do to preserve

18   their claim?

19   A    Yes, it provides them all the information that they

20   need to know, the date -- the relevant dates, it gives an

21   example forms.  Yeah, so this gives them all the information

22   they need to know what they need to do to preserve their --

23   Q    Where's the example form?

24   A    It should be the last exhibit, Exhibit 3 is a proof of

25   claim form.

1    Q    So the last few pages of the document.

2    A    Yes.

3    Q    So, in general, for claims filed on this customer proof

4    of claim form, what were they, what were they alleging?

5    A    A wide variety of things.  The vast majority of the

6    customer claims were related to their accounts.  There was a

7    lot of overcharge or overbilling.  It would just simply be

8    one word -- overcharge or overbilling.  A lot of them were

9    blank; most of them were unliquidated; some of them related

10   to their deposits.  So there was a wide variety of things.

11   Q    And was every claim filed on this proof of claim form,

12   a customer claim in fact?

13   A    No.

14   Q    So what were the next steps that the Debtors took to

15   address the customer claims specifically?

16   A    So where it was a customer claim specifically, we

17   worked with our advisors, outside counsel, myself, and we

18   had a group of employees at TCH Energy that was able to help

19   us research the claims, look at the customer -- pull up the

20   customer's account.  If there was anything on the claim form

21   that gave an indication about what the dispute was, we

22   looked at that.  And even if there wasn't, we would just

23   pull up their account and just look at their account history

24   if there was any notes on the account noting a problem in

25   the past.  We would reach out to the customers, talk to them

1    if we weren't really sure what the issue was and why they

2    filled out the claim form.

3    Q    And did this process successfully resolve some of those

4    claims?

5    A    It did.

6    Q    And what happened if it didn't?

7    A    If it didn't, those customers -- I think those are some

8    of the ones that are still at issue today.  If it didn't

9    resolve, we objected to them.

10    Q    Okay.

11    A    Yeah.

12    Q    And did you personally review those objections before

13    they were filed?

14    A    I did.

15    Q    And when the Debtors objected to a customer claim, or

16    any claim for that matter, was the claimant provided a

17    notice of the objection?

18    A    Yes.

19    Q    Turn to Tab 5 in your binder.

20    A    Okay.

21    Q    This document is labeled Debtor's Exhibit DX-003.  Do

22    you recognize this document?

23    A    Yeah, this is a notice form to a customer that we made

24    an objection to their claim at one of the omnibus hearings.

25    This is the eighth omnibus objection.

1    Q    And were the claimants given instructions regarding how

2    to respond to the objection?

3    A    Yes, this document provides them notice of when the

4    hearing will be and when the deadline is for them to file a

5    response to the objection.

6    Q    So what happened if the Debtors did not receive a

7    response to the objection?

8    A    If we did not receive a response, our outside counsel,

9    Kirkland & Ellis, would inform the Court of that and see if

10   we could get those claims expunged.

11   Q    And of the responses that were received, do you know

12   how many were sent by pro se claimants?  Refer to the

13   demonstrative if that's helpful.

14   A    190.

15   Q    Okay.  So leaving aside for now the customer account

16   claims, which Mr. McKillop will explain, what sorts of pro

17   se claims were included in this 190?

18   A    Okay.  So aside from the customer claims, we had a lot

19   of claims that just appeared to be against the wrong debtor,

20   against an entity that was not an affiliate that we could

21   figure out, just unrelated companies; there were some claims

22   about leases, some oil and gas leases, and we're not in that

23   business; but then there were also some mineral leases that

24   were unrelated to our company; there were a few employee-

25   type claims; and then there were some customers that

1    appeared to think that the notice documents we sent to them

2    were actually class action forms.

3    Q    Okay.  So upon receiving a response from a pro se

4    claimant, what steps did the Debtors take?

5    A    Well, whenever we got a response, we would take that

6    response, look to see who got any additional information

7    that wasn't on the proof of claim form, and we would

8    research that.  For instance, in the case of some of these

9    people, if we got more information about the lease that they

10   were referring to that they thought that they were owed some

11   money on, I would contact our real estate department.  And

12   they have a system in which they can search to see if we

13   made payments or if we have any contracts or leases with

14   those people, and we weren't able to find any information.

15   Q    And with regard to employee benefits issues, what steps

16   did you take?

17   A    So for the employee benefits issues, we looked to see

18   if they gave us any additional information, and we went and

19   looked at our HR systems to see if they had qualified for

20   whatever they were asserting.  And in this instance, we

21   weren't able to find that they were owed or entitled to any

22   money.

23   Q    And did you take any additional steps with regard to

24   claims against what you though were non-debtor entities?

25   A    I did.  I went to our corporate secretary group, and I

1    had them verify that the entities listed in the forms or the

2    objections were not affiliates of the company now, nor had

3    they ever been affiliates of the company.

4    Q    So generally speaking, were the Debtor's diligence and

5    outreach efforts with regard to pro se claimants successful?

6    A    Yes.

7    Q    And so when you say yes, you know, roughly how many

8    were resolved, if you know?

9    A    I think the majority of them were resolved, yeah.

10   Q    Okay.  So did the Debtors provide notice of today's

11   hearing to pro se claimants?

12   A    Yes.

13   Q    Please turn to Tab 6 in your binder.  This document is

14   marked Debtor's Exhibit DX-004.

15   A    Okay.

16   Q    Do you recognize this document?

17   A    Yes, this is notice of hearing for the pro se

18   claimants.

19   Q    And turn to Tab 7.

20   A    Okay.

21   Q    It's a document labeled Debtor's Exhibit DX-005.

22   A    Yes.

23   Q    Do you recognize this document?

24   A    This is also notice of hearings on objections to pro so

25   claims.

1    Q    And what's the difference between 6 and 7?

2    A    There's the dates for both hearings -- ones today,

3    November 8th, and the other is December 13th.

4    Q    And then if you look at the second page of DX-006, the

5    page with the caption on it.

6    A    Okay.

7    Q    If you look down below the schedule, you see what it

8    says.

9    A    DX-006, sorry.

10   Q    Tab 6.

11   A    Tab 6, okay.

12   Q    Sorry, yeah, DX-4.

13   A    Yes.  There's some deadlines listed here.

14   Q    And then below the deadlines.

15   A    Yeah.

16   Q    That says, because you have filed a formal response to

17   the objection, you are not required to file an additional

18   response?

19   A    It does say that.

20   Q    Compare that to Tab 7, DX-5.

21   A    Right.  In that one, it says, you must file a response

22   with the Court by September 19th.

23   Q    So is the distinction between the two is one was for

24   claimants who had filed a formal response and the other was

25   for claimants who have not; is that accurate?

1   A    That's right, one is for claimants that filed a formal

2   response, and the other is for claimants who had not filed a

3   formal response.

4   Q    Now how many pro so claims are still in dispute?

5   A    I believe 44; yes, 44.

6   Q    For those 44 claims, are you aware of evidence or

7   support for any claim against the Debtors?

8   A    I am not.

9   Q    And are you aware of any additional steps the Debtors

10  could have taken to further diligence those claims?

11  A    I'm not aware of any further steps.

12  Q    Okay, thank you.

13          MR. SOWA:  Your Honor, I have no more question for

14  Ms. Soesbe.  At this time, the Debtors would ask to move

15  into evidence Miss Soesbe's October 21, 2016 declaration,

16  which is Docket #9915, and Debtor's Exhibits DX-001 through

17  DX-005.

18          THE COURT:  Is there any objection to admission of

19  these documents by anyone in present in the Courtroom or on

20  the telephone?  Okay, the Court hears no objection to the

21  admission of the documents.  They are admitted.

22      [EXHIBITS 1-5 ARE ADMITTED INTO EVIDENCE]

23          MR. SOWA:  Your Honor, one additional documents,

24  and Debtors would seek here that the supplemental

25  declaration that was filed on the docket, I believe,

1    yesterday by Ms. Soesbe.

2              THE COURT:  Docket #10050?

3              MR. SOWA:  Yes.

4              THE COURT:  And that's specific to Mr. --

5              MR. SOWA:  Mr. Jeffers.

6              THE COURT:  -- Jeffers, okay.  Any objection to

7    the admission of the supplemental declaration.  Okay, I hear

8    none.  It's admitted.

9              MR. SOWA:  Thank you, Your Honor.

10             THE COURT:  Let's mark it.  Well, I guess we don't

11   need to mark it because it has a docket number, so never

12   mind.

13             MR. SOWA:  Yup.

14             THE COURT:  How do you want to do cross?  Do you

15   want to wait until we give the claimant -- here's my

16   proposal.  Let's wait until we're dealing with individual

17   claimants.

18             MR. SOWA:  Sure.

19             THE COURT:  And if they have any questions, they

20   can at that time ask Miss Soesbe to retake the stand and

21   answer those questions, or as opposed to frontloading it now

22   and it might get confusing.  Is that acceptable?

23             MR. SOWA:  Agreed, as the Debtors, we just ask to

24   be allowed to do a brief redirect in that event.

25             THE COURT:  Of course.

1           MR. SOWA:  Thank you.

2           THE COURT:  Of course.  All right, Miss Soesbe,

3    thank you.  You remain available for cross-examination, so

4    please don't leave this exciting hearing.  Trying to figure

5    out who had the more difficult task -- the tax people or the

6    claimant people -- a lot to do.

7           MR. SOWA:  Your Honor, at this time, the Debtors

8    will call their second witness, Mr. Daniel McKillop.

9           THE COURT:  Okay.

10          CLERK:  Please raise your right hand.  Do you

11   affirm that you will tell the truth, the whole truth, and

12   nothing but the trust to the best of your knowledge and

13   ability?

14          MR. McKILLOP:  Yes.

15          CLERK:  Please state and spell your name for the

16   record.

17          MR. McKILLOP:  Dan McKillop, D-A-N M-c-K-I-L-L-O-

18   P.

19          CLERK:  Thank you.

20          THE COURT:  Thank you.  Please be seated, Mr.

21   McKillop.

22          MR. McKILLOP:  Thank you.

23          MR. SOWA:  Your Honor, we have a binder for Mr.

24   McKillop.

25          THE COURT:  Thank you.

1                    DIRECT EXAMINATION OF DAN McKILLOP

2     Q     Good morning, Mr. McKillop.

3     A     Good morning.

4     Q     Mr. McKillop, who is your current employer?

5     A     TXU Energy.

6     Q     And what does TXU Energy do?

7     A     TXU Energy is a retail electric provider.

8     Q     And what's your job title?

9     A     Senior Manager at our Customer Advocacy Services Group.

10    Q     What are your responsibilities in that role?

11    A     I have responsibility for leading the department's

12    customer escalations group.  So if customers have an issue

13    that they feel has not been resolved, I lead the team that's

14    responsible for working with the customers to resolve those

15    issues.

16    Q     And just for clarity of the record, what was your title

17    prior to the separation of TCEH from EFH?

18    A     Prior to was Senior Manager, Contact Center Operations.

19    Q     You were still employed by TXU Energy at that time,

20    correct?

21    A     Yes, I was.

22    Q     Mr. McKillop, can you please just give a brief overview

23    of your education and professional background?

24    A     Sure.  I completed a management certificate program

25    through the University of Illinois in Chicago.  I've been

1    with TXU Energy for seven years in various management roles

2    within their contact center operations/customer operations

3    organization.  Prior to joining TXU, I was with Verizon and

4    predecessor company, GTE, for 25 years, most recently as a

5    Director in their Internet Operations Group, where I had

6    responsibility for providing customer service, website

7    development services, and paid search advertising services

8    to Verizon's small and medium-sized business customers.

9    Q    Thank you, Mr. McKillop.  This morning, I'd like to

10   cover with you the steps the Debtors took to analyze and

11   reconcile claims filed specifically by customers of TXU

12   Energy, and specifically the steps that the Debtors took for

13   all customer service (indiscernible), okay?

14   A    Okay.

15   Q    Mr. McKillop, did you prepare a declaration in support

16   of the Debtor's reply with respect to the claims under

17   consideration today?

18   A    Yes.

19   Q    Can you please turn to Tab 1 of your binder?  Is this

20   that declaration?

21   A    Yes.

22   Q    And is everything within this declaration true and

23   accurate to the best of your knowledge?

24   A    Yes, it is.

25            MR. SOWA:  Again, Your Honor, we'll seek to move

1    the declaration in at the close of Mr. McKillop's direct

2    testimony.

3              THE COURT:  Okay.

4    Q    Mr. McKillop, in the course of your duties at TXU

5    Energy, did you become familiar with TXU Energy's processes

6    for addressing customer complaints in the ordinary course of

7    business?

8    A    Yes.

9    Q    Can you describe the processes that TXU Energy used for

10   that purpose?

11   A    Sure.  In general, TXU Energy provides customers with

12   access to speak with a customer service representative 24

13   hours a day/7 days a week/365 days a year.  In addition, we

14   also provide access to chat with an online representative,

15   as well as communicate with customers through email, as well

16   as providing the capability to self-serve on our TXU.com

17   website.  In addition, if a customer is not satisfied with a

18   resolution or a response to an inquiry, they can certainly

19   ask to speak with a supervisor, at which point, they would

20   be transferred either to that representative's specific

21   supervisor or to an escalation team that we have, and that

22   team would work with the customer to resolve their issue.

23   In addition, we have an Office of the President team that is

24   another avenue for customers if they continue to feel that

25   their issue is not resolved and choose to escalate their

1   issue to a TXU Energy executive.

2   Q    And why does TXU Energy provide all these avenues for

3   customer service?

4   A    I think primarily because we want to make sure that

5   we're doing everything possible to resolve a customer's

6   issue and make sure that we're doing our due diligence in

7   that effort.

8   Q    Mr. McKillop, if a customer calls or emails or chats

9   and says that they think they were overcharged on their

10   bill, what steps might the customer service team take?

11   A    Again, we would, you know, certainly work with that

12   customer.  We would ask questions and make sure we were

13   clear on what the customer was identifying as their issue.

14   If we weren't clear on that, we would ask additional

15   questions to make sure that we understood specifically what

16   the concern was.  We would review, right, the information

17   that we have in the customer's account.  And if we

18   identified an issue, we would certainly take action to

19   resolve that; and if not, we would certainly, you know, do

20   our best to explain, you know, why the issue is what it is.

21   Q    So turning specifically to the issues that we're here

22   for today, do you understand that TXU Energy was, until

23   recently, a Debtor in the Chapter 11 proceedings in this

24   Court?

25   A    Yes, recently emerged.

1    Q    And do you generally understand that to preserve a

2    right of the creditor to recover in bankruptcy, they need to

3    take certain steps?

4    A    Yes.

5    Q    Do you know what that the steps are?

6    A    Yes.  To preserve the claim, they are -- they need to

7    file a proof of claim form.

8    Q    Did TXU Energy alert its customers to the fact that

9    they would need to file a proof of claim to preserve a

10   claim?

11   A    Yes.

12   Q    Do you know how they alerted their customers of that?

13   A    Yes, there was a customized claim form that was sent to

14   all current and former TXU Energy customers.

15   Q    So are you generally familiar with the proofs of claim

16   filed by customers in these proceedings?

17   A    Yes.

18   Q    Did you participate in the review and reconciliation of

19   those claims?

20   A    Yes, I did.

21   Q    In general, what role did you take in that process?

22   A    I was the main point of contact within TXU Energy for

23   the customer claims review process.  I worked with our

24   internal customer service team, as well as with internal and

25   outside counsel and our advisors.

1    Q    Mr. McKillop, did you have any demonstratives prepared

2    to assist your testimony today?

3    A    Yes.

4    Q    Please turn to Tab 2 in your binder, and you're turning

5    to the second page.  Do you recognize this demonstrative?

6    A    Yes.

7    Q    What is it?

8    A    It is a timeline of our diligence efforts.

9    Q    So looking at the period indicated on the timeline as

10   late-2014 where it says pre-objection customer service

11   outreach; what were the Debtors doing in that time period

12   with regard to customer claims?

13   A    At that time, we were working on developing a process

14   to reconcile customer claims.

15   Q    So what was the first step in that process?

16   A    The first step in that process was to actually identify

17   which claims were customer claims.

18   Q    And how did the Debtors and their advisors go about

19   doing that?

20   A    Epic did a first-level review of those claims and

21   identified those that could potentially be customer account

22   related.  In those instances, there is either a clearly-

23   asserted claim of a customer issue, or there was some

24   information that was provided on the proof of claim form

25   that would allow us to do some account research.  There were

1   many claims that were filed with little or no information,

2   which made it difficult to determine what the customer was

3   asserting, or if they were asserting a claim.  There were

4   many claim forms that were customer proof of claim forms

5   that were submitted, but the information contained on the

6   form was not specific to a customer account.  And finally,

7   there were just many claims that were submitted with little

8   or no information at all.

9   Q    So considering all of those claims, how many customer

10  proofs of claim did Epic identify?

11  A    Roughly 3500.

12  Q    So looking back at your demonstrative tab, look at the

13  third page.  Do you recognize this demonstrative?

14  A    Yes, that is a summary of the claims in our diligence

15  efforts before objecting.

16  Q    So aside from identifying 3500 customer claims, did

17  Epic further subdivide customer claims in any way?

18  A    Yes, they did.  The claims were basically put into what

19  I'll call two groupings.  Again, as discussed a little bit

20  previously, the first one was where customers had provided

21  some information that would allow us to further review and

22  research their account; and the second grouping was those

23  claims that were submitted with little or no information,

24  making it difficult to understand if or what the claim was

25  for.

1  Q    Why did Epic split up the claims along the lines?

2  A    It would not be cost effective for us to try to do a

3  customer outreach to 3500 former or current customers.  So

4  we worked with Epic to identify those claims that appeared

5  to be or could potentially be customer-related claims.

6  Q    So after this division of claims, what was the next

7  step that the Debtors took?

8  A    The next step in that process would be to review the

9  customer claims, perform an outreach to the customer to

10  provide them with the result of the review of that claim.

11  In that process, we would make three attempts to contact the

12  customer.  If we were unsuccessful in those attempts, we

13  would leave a voicemail with contact information where it

14  was possible to do so.

15  Q    And who were the customer service team members

16  conducting this outreach?

17  A    The primary team that we used to review the customer

18  claims was our Office of the President team.

19  Q    Can you remind the Court who the Office of the

20  President team is?

21  A    So lack of a better terminology, they're a third-level

22  of customer service review.  They are, you know, some of our

23  more highly skilled customer service agents.

24  Q    So if the team was able to make contact with a customer

25  claimant, what would they then do?

1    A     If we were able to make contact with a claimant, we

2    would review the information, provide them with the results

3    of the account review.  So for example, the customer was

4    indicating they believe they were charged an incorrect rate,

5    we would take a look at the information on that customer's

6    account, we'd take a look at the service plans that the

7    customer had enrolled on over time, and we would compare

8    that to the invoices that were -- that would have been sent,

9    and did a comparison and made sure that the customer was

10   billing on the correct rate for the timeframe involved.  If

11   we were able to satisfy the customer through that process,

12   we would ask the customer if they would be willing to

13   withdraw their claim.  And we would also provide counsel and

14   our outside advisors the results of those outreach efforts.

15   Q     So when you mention the customer account that was

16   reviewed, what sort of information is in the account for

17   each customer?

18   A     Sure.  There's quite a bit of customer information on

19   the account.  There's information with regard to the various

20   service plans that the customer would have been on in their

21   time with us; documents such as their electricity bps

22   labels, which outlines the rates that would be charged for a

23   service plan; their terms of service agreement; your rights

24   as a customer documentation.  Also billing history, images

25   of prior bills, as well as notations from any interactions

1   that the customer may have had with our customer service

2   group.

3   Q    Do you have bill images for the entire history of the

4   account?

5   A    No, we don't.  We typically have bill images that go

6   back to 2009-2010.

7   Q    And for dates prior to that, what information is

8   available?

9   A    For dates prior to that, the information is little more

10  sparse, not as much detail.  We have information around

11  billing dates, usage information, and bill amounts.

12  Q    Okay.  Mr. McKillop, do you recall approximately how

13  many claims TXU customer service team diligenced in this

14  way?

15  A    It was approximately 200.

16  Q    So Mr. McKillop, why did TXU Energy go through this

17  process; what were TXU Energy's goals while conducting it?

18  A    Certainly, what we wanted to do was make sure that we

19  were understanding any concerns that our customer had or

20  customers had, and that we were taking action to review,

21  resolve, and take care of many of those issues as possible.

22  We are in a very competitive market; customers have a

23  choice, and can certainly choose another electric provider.

24  So, you know, we pride ourselves on providing excellent

25  customer service.  And at the end of the day, the bankruptcy

1    doesn't change any of that.  We had a goal and objective

2    that we would continue to make customer service our job one

3    throughout this process.

4    Q    So you said that the bankruptcy doesn't change it.

5    Does this process differ much from how you would address

6    customer claims in the ordinary course of business?

7    A    No.  During normal course of business, if a customer

8    contacts with an issue, this is really the same process that

9    we would utilize.

10   Q    Okay.  So what was the outcome of this diligence

11   process?

12   A    For roughly half of the customers, we were able to

13   resolve their issue, either by providing a credit or taking

14   other action under our customer programs; or for really the

15   large majority, it was really being able to explain the

16   issue to the customer's satisfaction to the extent that they

17   were willing to withdraw their claim.

18   Q    And so did about a hundred claimants withdraw their

19   claims?

20   A    A hundred claimants indicated they would withdraw their

21   claim; less than that actually took the required steps to

22   officially remove those claims with Epic.  And for those

23   where the claim was not removed, they were included in an

24   omnibus objection.

25   Q    Okay.  And these omnibus objections, did you personally

1    review and approve them before filing?

2    A    Yes.

3    Q    Do you know if those objections were in fact filed?

4    A    Yes, they were.

5    Q    And were the customers provided notice that the

6    objection was going to be filed?

7    A    Yes.  I reviewed the custom notices and cover letters

8    that were sent with each omnibus objection.

9    Q    If you can turn back to your timeline on Tab 2 of your

10   binder.  So when did your team next become involved in the

11   claims process after this initial round of diligence?

12   A    After the objections, as I understand it, some

13   customers responded indicating that they did not want to

14   withdraw their claim and/or provided additional information

15   that could be used to further research the customer's

16   account.  So we would go through another diligence effort

17   and customer outreach.

18   Q    And which period on the timeline is this?

19   A    That is the early-2015 post-objection customer service

20   outreach.

21   Q    Okay.  Can you describe your involvement in this phase

22   of the process?

23   A    Yes.  After each round of the objection process,

24   bankruptcy counsel would provide us a list of customers that

25   had responded and provided additional information, and our

1    customer service team would review those accounts and

2    conduct another round of outreach.

3    Q    Do you recall approximately how many claims your team

4    looked into in this round?

5    A    I believe it was about 50 claims.

6    Q    And were these the same claimants whose claims you

7    looked into before the objections?

8    A    I think there may have been some overlap; but for the

9    most part, no.  Most of these were claims that were deemed

10   unactionable in the first round, and claimants responded

11   indicating that they chose not to withdraw and/or provide

12   additional information.

13   Q    So what steps did you and your team take to try to

14   resolve these 50 claims?

15   A    Again, really a similar process to what we did in the

16   pre-objection phase.  We would take the information that the

17   customer provided, utilize that to help conduct additional

18   review and research and investigation of their account.  We

19   would again reach back out to customers and provide them the

20   results of that.  If there was action that we could take to

21   resolve, we certainly did that.  Our goal was certainly was

22   to resolve every claim that we possibly could.

23   Q    And did you use a document to keep track of your

24   outreach efforts in this stage?

25   A    I did, yes.

1   Q    Could you please turn to Tab 3 in your binder?  This is

2   a document marked Debtor's Exhibit DX-006.  Mr. McKillop, do

3   you recognize this document?

4   A    Yeah, this is the tracking spreadsheet that I

5   maintained with the assistance of outside counsel to track

6   our outreach efforts.

7   Q    Okay.  And at this time, I'd like to walk through a

8   couple of examples, just to sort of be able to show the

9   Court exactly how this process worked.  Can you start by

10   looking at Row 8 in your spreadsheet?  Are you there?

11   A    Yes.

12   Q    Okay.  So looking at the comments column to the far

13   right, can you describe what the outcome of the diligence

14   and to this particular customer's claim was?

15   A    Sure.  In -- are we omitting names?

16   Q    Yes, no names.

17   A    Excuse me?

18   Q    No names.

19   A    Okay.  In review of customer's account, it was

20   determined that the customer did not get rolled over to the

21   lower priced MTM, or month-to-month plan, after her term

22   contract expired.  The customer continued to be billed based

23   on her contract rate -- I'm sorry -- to bill her based on

24   the contract rate from 1-13-2011 to 2-20-2012, which

25   resulted in overbilling of $923.55.  A credit has been

1   applied to the customer's account and a refund will be

2   issued.  Closing after three unsuccessful attempts to reach

3   customer.  Despite not being able to reach customer, action

4   has been taken to apply credit to the customer's account and

5   a refund will be issued.

6   Q    Okay.  So in general, you can just sort of translate

7   that, what happened here?

8   A    Sure.  The customer, this particular customer was on a

9   24-month term plan.  When that term plan expired, the

10  customer was sent notification that they could either choose

11  another term plan; and, if not, they would be rolled over to

12  a month-to-month plan.  And along with that communication,

13  was an electricity bps labels that provided them the details

14  of that one.

15  Q    So let's stop there for now.  Turn to Tab 4 in your

16  binder.  It's document Debtor's Exhibit DX-007.

17  A    Okay.

18  Q    What's this document?

19  A    Tab 4 is the electricity facts labels for the Texas

20  Choice 24 Plan, which was the plan that was expiring at the

21  time that we identified the issue.

22  Q    Okay.  And then turn to Tab 5, Debtor's Exhibit DX--

23  008.

24  A    Yeah.

25  Q    And what's this document?

1   A    So this is a renewal rollover letter.  It was sent out

2   to the customer.  The bottom is a tab, if the customer

3   decided to sign up for a new TXU Energy Texas Choice 24 term

4   plan, they could sign this and submit it back.  If not,

5   within the detail of the communication, it indicates that if

6   the customer does not contact us to make a choice, that they

7   would be placed on a month to month plan.  And the

8   electricity facts label for that plan was sent as part of

9   the communication.

10  Q    And now this is just a generic form, I take it, that a

11  filled out version of this form was sent to the customer

12  over (indiscernible)?

13  A    Yes.  That is correct.

14  Q    Okay.  So turning to Tab 6, Document labeled Debtor's

15  Exhibit DX--009.

16  A    Yes.  This is the electricity facts label that was sent

17  to the customer for the month to month plan that was to take

18  effect after the expiration of their prior 24-month term

19  plan.

20  Q    And how do the rates compare for this plan versus the

21  plan at Tab 5?

22  A    So if you take a look on Tab 5, about at the same

23  level, where it says --

24  Q    Tab 4, I think, sorry.

25  A    Tab 4.  Yes, I'm sorry.  About even with the -- where

1   it says -- electricity price, you see an all-in kilowatt

2   hour at $515.09.

3   Q    Mm hmm.

4   A    And if you review the document under Tab 6, you will

5   see an energy charge of $13.04 per kilowatt hour.

6   Q    So that's a lower rate?

7   A    Yes, it's 2.5 cents per kilowatt hour.

8   Q    Okay.  So turning to Tab 7, what's this document, the

9   document marked Debtor's Exhibit D010?

10  A    So the document DX--010 is a copy of the bill image for

11  the -- this should have been the last bill that the customer

12  billed at the 15.9 cent rate for their 24-month term plan.

13  Q    And where can they find that 15.9 cent rate on this

14  invoice?

15  A    If you turn the page over and look to the left of the

16  electricity usage graph, you'll see a header that says TXU

17  Energy Texas Choice 24.  And it will have an energy charge,

18  and it shows 2710 kilowatt hours at 15.9 cents.

19  Q    Okay.  Let's turn to Tab 8, Debtor's Exhibit DX--11.

20  A    Okay.

21  Q    So what's this invoice?

22  A    So this is the first invoice, where the customer's

23  month-to-month plan should've become effective.  If you turn

24  the next page, you will see that the customer continued to

25  bill on the TXU Energy Texas Choice 24 at the 15.9 cent per

1     kilowatt hour rate.

2     Q     Right.  And so, is that correct?

3     A     That is not correct.  They should've been billed for

4     the month-to-month Texas Choice Plan, which should've billed

5     at the 13.4 cents per kilowatt hour rate.

6     Q     Okay.  So let's turn to the next tab, Tab 9, Debtor's

7     Exhibit DX--12.

8     A     Yes.

9     Q     And what's the date on this invoice?

10    A     The date on this invoice is February 24th, 2012.

11    Q     So this is approximately how long after the plans

12    should've been changed?

13    A     No, it's approximately 12, 13 months.

14    Q     Okay.  And what was the billing rate on this invoice?

15    A     Again, the customer was billed incorrectly at the 15.9

16    cents per kilowatt hour rate.

17    Q     And was this a customer's last invoice?

18    A     This is.  The customer switched to another electricity

19    provider.

20    Q     Okay.  And so, what did your team determine after

21    reviewing these invoices and other documents?

22    A     Yeah.  So in reviewing this customer's account, what we

23    did identify again, was that the customer was being billed

24    at an incorrect rate, a difference of 2.5 cents per kilowatt

25    hour for that 13 month period.  And so, we calculated what

1   the customer's credit should be based on taking their usage

2   for each of those invoices, multiplying by the 2.5 cents to

3   determine the credit that should be applied to that

4   customer's account.  And we applied the credit to the

5   customer's account and issued a refund.

6   Q    And was your team able to contact this customer to

7   explain?

8   A    Despite our attempts to reach the -- this customer, we

9   were not able to.

10  Q    But the refund was provided, nonetheless?

11  A    Yes, it was.

12  Q    Okay.  Let's go back to your spreadsheet at Tab 3.

13  Take a look at Row 34.  And looking at the comments column

14  for this customer, what was the outcome of your diligence in

15  this case?

16  A    So, in reviewing the account, there is no information

17  of the customer being charged more than the service plan

18  enrolled on.  There are no discrepancies in the service

19  contract, pricing or billing.  Reviewed account with

20  customer and customer needed to withdraw a claim.

21  Q    Okay.  So let's look at what your team looked at for

22  this customer, starting with Tab 10.

23  A    Okay.

24  Q    Document labeled Debtor's Exhibit DX--13.  Here's

25  another electricity fact label, I believe.

1    A    Yes, this is the electricity -- this was the service

2    plan that the customer was on at the time that we, you know,

3    went back to review the customer's claim.

4    Q    Okay.  And what's the rate under this plan, according

5    to the (indiscernible)?

6    A    Yeah, the energy charge for this plan is 13 cents per

7    kilowatt hour.

8    Q    Okay.  So the next tab, Tab 11, Debtor's Exhibit DX--

9    14.  Can you describe this document?

10   A    So this, in speaking with the customer, the customer

11   reached out to (indiscernible) and the customer agreed to

12   sign-up for a used service plan.  This is the customer's

13   welcome letter that was sent at that time.

14   Q    Okay.  And then turning to Tab 12, Debtor's Exhibit DX-

15   -15.

16   A    Yeah.  Tab 12 is the electricity facts label for the

17   Texas Choice 24 plan, which is the plan that the customer

18   agreed to sign up for.

19   Q    And what's the energy charge under this plan?

20   A    The energy charge on this plan is 10.537 cents per

21   kilowatt hour.

22   Q    Okay.  So then, if you turn to Tab 13, this is Debtor's

23   Exhibit DX--16 and describe this document.

24   A    Yes.  This is the customer's invoice dated May 6, 2011.

25   And if we turn the page to the second page, you will see two

1    service plans for this customer.  Again, this customer's

2    service plan expired during their billing cycle, so there

3    were actually two days for this customer that were billed on

4    the prior rate of 13 cents per kilowatt hour.  So you can

5    see that, again, to the left of the usage chart.

6           The lower of the two plans, it says TXU Energy

7    Texas Choice 24, service period 4/4 to 4/5, so two days of

8    this billing cycle were on the customer's previous term

9    plan, and then were billed out to 13 cents per kilowatt

10   hour, that were displayed on the electricity facts label.

11          The remaining period for this particular invoice,

12   4/6 through 5/3, the new plan became effective and the

13   customer was billed at 10.537 cents per kilowatt hour.

14   Q    All right.  So turning then to Tab 14, Debtor's Exhibit

15   DX--17, what do we have here?

16   A    So upon expiration of the prior plan that we just

17   reviewed, the customer again made a decision to renew with

18   TXU Energy and signed up for a new service plan.

19   Q    All right.  And if we go to Tab 15, Exhibit DX--18.

20   A    Yes.  Tab 15 is the electricity facts label that was

21   sent to the customer in association with the use service

22   plan change, indicating that the customer would be billed an

23   energy charge at 8.2 cents per kilowatt hour.

24   Q    Okay.  And then, turning to the next tab, Exhibit DX--

25   19.  Describe this document.

1    A     So this -- yes, this would've been the customer's first

2    invoice on the new service plan.  Again, turning to Page 2,

3    to the left of the electricity usage graphs -- graph --

4    excuse me, you'll see that -- again, the customer's new

5    plan, TXU Energy Texas Choice 12, and you see that the

6    customer is billed that 8.2 cents per kilowatt hour.

7    Q     And continuing the story to the next tab, DX--20.

8    A     Similar.  Again, upon expiration of the prior term

9    plan, the customer contacted TXU and agreed to a new service

10   plan.  This was the welcome letter that would've been sent

11   to the customer at that time.

12   Q     And then, DX--021 at Tab 18.

13   A     DX--021 would be the electricity facts label that was

14   associated with the letter when the customer signed up for

15   the new service plan, indicating an energy charge of 8.7

16   cents per kilowatt hour.

17   Q     And then the final tab in your binder, Tab 19, Exhibit

18   DX--022.  What does this invoice show us?

19   A     This was the first invoice where that new service plan

20   became effective.  And if looking, again, to the left of the

21   usage graph, you'll see the plan change to the TXU Energy

22   Texas Choice 12 with 100 percent win.  And you can see the

23   rate billed per kilowatt hour is 8.7 cents.

24   Q     Okay.  So after going through the review of these

25   documents, what did your team conclude, with regard to this

1    customer?

2    A     So the conclusion was that there were no issues.

3    Everything appeared to be in order with respect to the

4    service plans that the customer selected and the rate that

5    was being charged on the invoices.

6    Q     And did a member of your team communicate that to the

7    customer?

8    A     Yes, we did reach out to this customer and explained

9    that billing scenario as similar to what we did here.

10   Q     And what was the outcome?

11   A     The customer agreed to withdraw her claim.

12   Q     All right.  You can just turn back to your timeline one

13   more time, Tab 2.  So it appears from the timeline that

14   discussions with customers continued well into this year.

15   Is that accurate?

16   A     Yes, it is.  It is recently as last week, we were in

17   discussions with some claimants, again, doing everything we

18   could to resolve as many claims as possible.

19   Q     And do you know how many claims were resolved in this

20   post-objection period of outreach?

21   A     In this post-objection period, I believe it was about

22   16.

23   Q     Okay.  Out of 50 or so, you started at?

24   A     Out of 50, yes.

25   Q     And I (indiscernible) resolve the remaining 34?

1    A    For the remaining, we were either unable to reach the

2    customer or the customer chose not to speak with us or after

3    reviewing the customer's account and their information, some

4    customers still felt that there was just something wrong.

5    Q    And so, among those 34, are the claims under

6    consideration today?

7    A    Yes.

8    Q    And do you have a sense of how much time your team

9    dedicated to this diligence process, both pre and post

10   objections?

11   A    We didn't draft at the time, but there was certainly a

12   significant amount of time and energy and effort that went

13   into reviewing the customer claims in completing the

14   outreach efforts.

15   Q    And based on your outreach and your review of the

16   customer accounts with regard to the claims under

17   consideration today, were you able to identify any basis for

18   a claim against TXU?

19   A    No, we were not.

20   Q    And are there any steps that you or your team could've

21   taken that you didn't, that you think would've revealed any

22   issues?

23   A    Not that I'm aware of.  I do not believe so.

24         MR. SOWA:  I have no further questions for Mr.

25   McKillop.  At this time, the Debtor's would ask to move into

1    evidence Mr. McKillop's October 21st declaration, Docket

2    Number 9914, and also Debtor's Exhibits 6 through 22.

3              THE COURT:  Any objection?  The Court hears none,

4    they're admitted.

5              (Docket 9914, Debtor's Exhibits 6 - 22 Admitted

6    Into Evidence)

7              MR. SOWA:  Thank you, Your Honor.

8              THE COURT:  And with as with witness, Soebae,

9    we'll hold you off for cross-examination, if necessary, if

10   any other claimants have any questions.

11             MR. MCKILLOP:  Okay.

12             THE COURT:  So thank you, sir.

13             MR. MCKILLOP:  Thank you.

14             MR. SOWA:  Your Honor, the Debtors would also seek

15   to move into evidence the declarations of Mr. Steven Kotarba

16   of Alvarez & Marsal, which accompanied the original omnibus

17   objections.  Mr. Kotarba is in the courtroom, if anyone

18   would like to cross-examine him, but we have no questions

19   for Mr. Kotarba.

20             THE COURT:  Okay.  Can you identify on the record

21   --

22             MR. SOWA:  Yes.

23             THE COURT:  Because we're talking about eight or

24   nine objections.

25             MR. SOWA:  Yeah.  We have a list.  So the

1   declarations accompany the Debtor's third, fourth, sixth,

2   seventh, eighth, 10th, 12th, 13th, 15th, 16th, 17th, and

3   39th omnibus objections.  The declarations are at Docket

4   Numbers 2993, 2995, 3213, 3219, 3382, 3474, 3897, 4004,

5   4053, 4783, 4785, and 8070.

6           THE COURT:  All right.  Well, that list doesn't

7   comport with my list of the omnibus objections that are on

8   the agenda for today.

9           MR. SOWA:  That's both -- yes, so this includes

10  the claims that are up for December as well.

11          THE COURT:  Oh all right.

12          MR. SOWA:  Just get it all into the record at

13  once, was the idea.

14          THE COURT:  Okay.  Does anyone object to those

15  declarations being admitted?  All right, they're admitted.

16          (Declarations at Docket 2993, 2995, 3213, 3219,

17  3382, 3474, 3897, 4004, 4053, 4783, 4785, and 8070 Admitted

18  Into Evidence)

19          MR. SOWA:  Okay, Your Honor.  We also, we haven't

20  printed everything out, but we would ask that the Court take

21  judicial notice of the proofs of claims, the objections, and

22  any responses, all of which were filed on the docket, which

23  I have a list of.  In this case, they will only be for

24  claimants scheduled for today.

25          THE COURT:  All right.

1          MR. SOWA:  So I'll start with the proofs of claim.

2    It's numbers 3831, 1637, 3927, 2304, 417, 9600, 4465, 3619,

3    251, 8052, 3256, 3557, 6162, 2899, 5735, 2636, 8063, 4830,

4    9919, 4959, 2014, 2738, 7526, 9650, 100421 -- sorry

5    correction.  The last one is 10042, 10074, 10619.  The

6    objections --

7          THE COURT:  All right.  Well, again, I'm -- you

8    skipped a lot, so I'm looking at the binder you provided me,

9    you missed at least a dozen or more proofs of claim.

10          MR. SOWA:  That's the next one.  The next one.

11          THE COURT:  The next one, what?

12          MR. SOWA:  The documents in your binder that

13    weren't on that list are claimants who were scheduled not

14    for today, but for the December 13th hearing.

15          THE COURT:  Oh all right.

16          MR. SOWA:  Yeah, we included everything, Your

17    Honor, just in the event that a claimant who was scheduled

18    for the 13th came today, so we'd be able to address their

19    claims.

20          THE COURT:  All right.  Okay.

21          MR. SOWA:  But we are formally asking you to take

22    notice of those claims, yeah.

23          THE COURT:  Got it.

24          MR. SOWA:  Okay.  So the objections.  Or, well,

25    the objections are the same as the objections for the

1    declarations so the 3rd, 4th, 6th, 7th, 8th, 10th, 12th,

2    13th, 15th, 16th, 17th and 39th omnibus objections, those

3    are Docket Numbers 2992, 2994, 3212, 3218, 3381, 3473, 3896,

4    4003, 4052, 4782, 4784, and 8069.

5              And then, finally, there are a handful of formal

6    responses that were filed by claimants.  They are at Docket

7    Numbers 3352, 3511, 3500, 4906, 4150, 4154, 4919, 5258,

8    4204, 4151, 3998, 3355, 4089, 3389, 3926, 6451, 8897, 8996,

9    9310, 4153, 3153, 8134, and 9567.

10             THE COURT:  Okay.

11             MR. SOWA:  And we have a list for you.

12             THE COURT:  Okay.  Please approach.

13             MR. SOWA:  Thank you.  So here, Your Honor,

14   there's two lists.  One are the materials that we've

15   addressed on testimony, and then the list of the documents

16   we just went through, for the --

17             THE COURT:  For judicial notice.

18             MR. SOWA:  Yes, for judicial notice.

19             THE COURT:  All right.  The Court will take

20   judicial notice of those documents.

21             MR. SOWA:  Okay?

22             THE COURT:  Yes, please.  Thank you.

23             MR. SOWA:  All right.  Your Honor, at this time,

24   the Debtors will rest their affirmative case.  We'll turn

25   the podium over to Ms. Chaican to just give a brief

1    explanation of what comes next.

2              THE COURT:  All right.  Can we take a short recess

3    at this point?

4              MR. SOWA:  Sure.

5              THE COURT:  So if you're on the phone, don't hang

6    up.  We're just taking a short recess here in Court,

7    probably five minutes or so, and then we'll reconvene.

8              (Recess)

9              CLERK:  All rise.

10             THE COURT:  Please be seated.  Don't mind me.

11   Just tripping over myself over here.

12             RS:  Good morning again, Your Honor.  For the

13   record, Rebecca Chaican from Kirkland & Ellis, counsel to

14   the Debtors.  Thank you so much for sticking with us through

15   all of this.  So unless Your Honor has any questions, we

16   thought we would open the floor to the claimants who are

17   joining us by telephone.  I understand that there are three

18   who signed up, in several -- and some of them, if not all of

19   them, may have in fact joined us.

20             I see that you do have the binder that we provided

21   before, so I can tell you that the claimants who signed up

22   to join us are Lorenzo Pipkin, and he is Tab Number 12 in

23   that rather large binder;  Rose S. Washington, Tab 17 in

24   that binder; and Teretta Vaughn, Tab 21 in that binder.

25             And I would like to just take this moment very

1    quickly, before turning it over to the claimants, to remind

2    everyone that the protocol that Your Honor entered back in

3    August placed a time limit of 10 minutes per claimant.  And

4    we would ask that everyone keep to that time limit as much

5    as possible, to ensure that everyone has a fair opportunity

6    to be heard during that time, if at all possible.

7              And may I suggest that we take the claimants in

8    the order that I stated?  So if Mr. Pipkin is on the line, I

9    think it would make sense to start with him, if that works

10   for Your Honor.

11             THE COURT:  All right.  Before we turn it over to

12   Mr. Pipkin -- that's fine -- given that we're talking about

13   three people who've actually made the extraordinary effort

14   of being present by telephone, I am going to be very

15   flexible with the --

16             MS. CHAICAN:  Understood.

17             THE COURT:  -- time, and allow these people an

18   opportunity to tell their story.  So Mr. Pipkin, are you on

19   the phone?

20             OPERATOR:  (indiscernible) is not connected, Your

21   Honor.

22             THE COURT:  He's list -- I'm looking -- did you

23   sign him up as listen only?  Lorenzo Pipkin, he was on the

24   checklist.

25             OPERATOR:  I did.  It looks like his line was

1   established earlier, but he has since been disconnected and

2   he has not dialed back.

3          THE COURT:  Okay.  All right.  So that takes care

4   of Mr. Pipkin.

5          MS. CHAICAN:  Yes.  Ms. Washington?

6          THE COURT:  I did not have her as signed in.  Is

7   Rose Washington on the telephone?

8          OPERATOR:  She is not present on the court call.

9          THE COURT:  Okay.  That leaves Teretta Vaughn.

10  Ms. Vaughn?

11         MS. VAUGHN:  Good morning, Your Honor.  How are

12  you?

13         THE COURT:  Good morning.  I'm very well.  Thank

14  you for asking.  Have you had an opportunity to vote this

15  morning?

16         MS. VAUGHN:  Yes sir.  I did.

17         THE COURT:  Oh excellent.  I won't ask you who

18  for.  So this -- thank you for your patience.  I know there

19  was a lot that counsel went over.  This is your opportunity

20  to tell me whatever you want me to hear about, why you think

21  you have a claim against the Debtors and what you think that

22  claim is.

23         MS. VAUGHN:  Okay, Your Honor.  I think that I

24  have, on my opinion, I did respond to some of the mail that

25  I received.  I did turn in the bills.  I have been -- with

1    TXU for years.  I turned in what I thought would be evidence

2    (indiscernible) with TXU.

3              I got all the information that I thought would be

4    evident, which was just bills from years in the past, turn

5    that in, but they objected those bills, as that wasn't

6    enough evidence.  And then, I think last year, I received a

7    call from one of my (indiscernible) third party managers or,

8    you know, a higher level saying that it was an objection

9    that there wasn't enough evidence, that I never called in to

10   complain about my bill, anything like that.

11             But I still pursued, you know, the case, saying

12   that, you know, I think I did pay into a lot of money to

13   (indiscernible) bills and (indiscernible) towards TXU bills

14   and stuff I had.  And even me and my friend had a

15   conversation saying that, you know, the bills were

16   (indiscernible) here and there, and she said, "I've even

17   called and they told me that they had to, you know, come out

18   and (indiscernible) and (indiscernible), they were

19   (indiscernible) to re-read the bill, to re-read the meter."

20             I'm like, oh my gosh.  But anyway, Your Honor, I

21   did turn in my bills to TXU.  I hadn't received a call from

22   anyone else, you know, trying to, you know, sell or anything

23   like that, or ban, you know, that I have no claim or

24   anything like that.  I've just been following my bills and

25   turning in my objections and stuff like that, more

1    (indiscernible) with the claims.

2          But I just feel that I paid more money than I

3    should have, and to TXU, and (indiscernible) on the phone,

4    they called me.  I guess (indiscernible) reviewed the bills

5    saying that I never called in to make a claim saying that my

6    bills are too high.  And no one had reached out to me,

7    (indiscernible).

8          THE COURT:  Okay.  Let me look at something here.

9    So your complaint isn't that they charged you the wrong

10   amount for like, kilowatt hour or whatever.  The problem is,

11   you think there's a meter that wasn't read right?  Or do you

12   just not know, but you think it's high?

13         MS. VAUGHN:  I don't know.  I think it was just

14   higher.  It was like, it would just fluctuate, my bill.

15         THE COURT:  Fluctuate -- well, you know, of

16   course, in the summer, it's going to be higher than the

17   winter.

18         MS. VAUGHN:  Right.

19         THE COURT:  But something other than that, I

20   assume?

21         MS. VAUGHN:  Right.

22         THE COURT:  Okay.  I'm looking for you on a list

23   here, so just give me a second.  Okay.  So I'm looking at

24   the spreadsheet that Mr. McKillop put in, and it indicates

25   you did speak to, it looks like a person named Sabrina, last

1   spring.  And at that time, you said -- what did they tell

2   you?

3               MS. VAUGHN:  She just said that I never called in

4   and to complain about the bill being high.  So basically, I

5   really didn't have a claim towards them, because I never

6   called in and complained about my bill being high at all.

7               THE COURT:  All right.  Let's see.  Mr. McKillop,

8   can you take the stand?

9               MR. MCKILLOP:  Yes.

10              THE COURT:  So I'm going to ask a couple of

11  questions.

12              MS. CHAICAN:  Yeah, that's fine.

13              THE COURT:  So Mr. McKillop, you've heard what Ms.

14  Vaughn had to say about the conversation she had with, it

15  looks like according to your spreadsheet, probably a person

16  named Sabrina?

17              MR. MCKILLOP:  Mm hmm.

18              THE COURT:  And it sounds at least that she's

19  relating it that the discussion really wasn't on the merits,

20  but on the fact that she never sort of complained before.

21  Can you address that, if possible?

22              MR. MCKILLOP:  Sure.  I'll do -- I'll certainly do

23  the best I can.  I certainly was not involved in the call,

24  but again, we would've done the same review on Ms. Vaughn's

25  account that we just went through the exercise when we

1    reviewed the other accounts and taking a look at the service

2    plans they were on, the rates they should've been charged.

3              And based on that review, identified that

4    everything was in order.  So not sure about the piece of the

5    customer never calling previously.  Our intent in reviewing

6    the claims, it sounds like, and I don't have the information

7    in front of me, the customer submitted all of the bills that

8    they'd previously paid.  But again, in our review of that

9    information, the billing and the pricing plans that they

10   were on, that billing was all accurate.

11             THE COURT:  Well, I'm looking at her -- at what

12   she provided, which is a sort of summary chart that it looks

13   like she received from TXU of bills from December 2013

14   through May of 2014.  That was what was attached to her

15   proof of claim.

16             And maybe you can help me a little bit out about

17   seasonability because I'm -- it's showing, as I'm looking at

18   it, it's showing higher kilowatt consumption in the winter

19   as opposed to the summer months.  And my understanding of

20   how electricity usage is operating in Texas is that's sort

21   of the opposite of what you generally see.

22             MR. MCKILLOP:  It actually depends, Your Honor --

23             THE COURT:  Okay.

24             MR. MCKILLOP:  -- on whether a customer has

25   electric heat --

1          THE COURT:  Electric heat.

2          MR. MCKILLOP:  -- or a forced gas system.

3          THE COURT:  Ms. Vaughn, do you have electric heat?

4          MS. VAUGHN:  Yes.

5          THE COURT:  Okay.

6          MR. MCKILLOP:  We do actually see higher winter

7     bills than summer bills with customers that have electric

8     heat.

9          THE COURT:  Can you -- Ms. Vaughn, I'm trying to

10    help you out as best I can, but you're being a little -- I'm

11    just trying to get a better idea, whether you have any sort

12    of specific examples you can give me of how you feel you

13    were over charged or under charged.  Are your bills still

14    running about 140 or so a month?  Is that --

15         MS. VAUGHN:  Your Honor, I'm in a loan with TXU.

16         THE COURT:  Oh okay.

17         MS. VAUGHN:  But our -- but that bill was just for

18    that (indiscernible).  I was way -- I was prior to TXU,

19    years before then.  That's the only thing that customer

20    service could give me, just that printout there.

21         THE COURT:  Right.

22         MS. VAUGHN:  Right.  But I'm no longer with TXU.

23         THE COURT:  You're no longer with TXU.

24         MS. VAUGHN:  No.

25         THE COURT:  All right.  Do you have any questions

1    you want to ask any of the witnesses?

2              MS. VAUGHN:  No sir.  I don't.

3              THE COURT:  Okay, all right.  All right.  Well,

4    thank you.  Anything else you want to let me know?

5              MS. VAUGHN:  No, no sir.

6              THE COURT:  Okay, that's fine.  We'll make sure

7    you have a chance to speak up.  So we'd like --

8              MR. SOWA:  We don't have any questions.

9              THE COURT:  You -- okay, yeah, but do you have any

10   closing comment in connection with Ms. Vaughn?

11             MR. SOWA:  We don't have a specific closing, but

12   Ms. Chaican has a brief closing that we'll address as

13   (indiscernible) as well.

14             THE COURT:  All right.  Before we do that, is

15   there anyone else on the phone, other than Ms. Vaughn or

16   present in the court room who is subject to today's

17   proceeding that wishes to be heard?  Okay, the Court hears

18   none, so I'll close the evidentiary record, and I'll turn it

19   over to the Debtors for their closing argument.

20             MS. CHAICAN:  Thank you, Your Honor.  Again, for

21   the record, Rebecca Chaican from Kirkland & Ellis, counsel

22   to the Debtors.  As we heard today and as was described in

23   detail on the Debtor's papers and by the Debtor's witnesses,

24   Debtors have taken the claims reconciliation process

25   extremely seriously.

1          The Debtor's employees and their advisors have

2    collectively spent hundreds of hours carefully reconciling

3    and diligencing claims, and patiently speaking with

4    claimants, sometimes multiple times.

5          As you heard from Mr. McKillop, this is a customer

6    driven business.  But the Debtors also have a

7    responsibility, both under the law and to their key

8    stakeholders to object to invalid claims.  The Debtor's

9    omnibus objections thus far have resulted in the clearing or

10   modification of over 5,200 claims, and the removal of $179

11   billion from the claim's registrar.

12          The fact that so few disputed claims remain goes

13   to show that the Debtors have applied their case long

14   commitment to consensus to the claim's reconciliation

15   process as well.

16          With that being (indiscernible), we carefully

17   listened to Ms. Vaughn's presentation today.  However, we

18   have not heard any new information that changes the Debtor's

19   position regarding her claim.

20          Ms. Vaughn indicated that she has some concerns

21   that her bills were too high, however, a general sense that

22   your bills are too high rather than being charged the

23   incorrect rate does not give rise to a claim against the

24   Debtors in these bankruptcy cases.  And there are other

25   remedies for general dissatisfaction.

1          Again, Your Honor, the remaining claims that are

2     before us represent the very few instances of intractable

3     dispute, whether because you can not make contact with the

4     claimant, or simply could not agree with the claimant.

5          And ultimately, the Debtors believe that there is

6     no evidence of an allowable claim against the Debtors here.

7     This lack of evidence persists, despite the Debtor's

8     painstaking efforts to review their books and records, and

9     to solicit information from each claimant.

10         As you heard from both of our witnesses, but

11    especially, Mr. McKillop's exhaustive review of the sample

12    process that we underwent with each of the customer

13    claimants in reviewing their accounts and speaking with the

14    claimants, you can see that we have dug deep into the books

15    and records.

16         The lack of evidence also persists after the

17    claimants themselves have had as many as 20 months to gather

18    additional support for their claims and reach back out to us

19    and help us understand the claim that they're trying to

20    assert.

21         So after all of that, the fact that there is an

22    absence of reliable factual or legal support for any of the

23    contested pro se claims requires that these claims be

24    disallowed.  And we would respectfully request that Your

25    Honor enter orders disallowing those claims.

1           THE COURT:  Okay.  Thank you.

2           MS. CHAICAN:  Thank you.

3           MR. SOWA:  All right.  Well, I also, well, and the

4    Court, the Court family spent a significant amount of time

5    reviewing each of these claims as well.  And the response or

6    reply filed by the Debtors, we take very seriously,

7    objections to pro se claimants, as we take seriously any pro

8    se participant, because they are operating at a

9    disadvantage, not being represented by counsel.

10          So I'll turn to Ms. Vaughn in just a moment, but

11   based on the uncontested record on behalf of all the

12   claimants subject to today's proceedings who have not

13   appeared, so that (indiscernible) Ms. Vaughn, the Court

14   clearly finds that the claims either did not raise a prima

15   facie claim in the first place, and thus should be

16   disallowed, or the evidence -- uncontested evidence is

17   submitted by the Debtors rebuts the prima facie validity to

18   that claim.  And as a result, the claim should be expunged.

19   So the Court will expunge all of those claims.

20          In connection with Ms. Vaughn specifically, the

21   Court finds that Ms. Vaughn has not presented sufficient

22   evidence of a detailed complaint or claim with regard to the

23   charges that she was levying on her in connection with the

24   electricity she was buying from the Debtors.

25          The general dissatisfaction or concern is not

1    specific enough to rise to the level that would create a

2    prima facie claim, a proof of claim, so there's simply a

3    lack of specific enough evidence to support any kind of

4    claim.

5            What I would need would be something that would

6    show that the kilowatt hour usage was wrong or some evidence

7    or a complaint about the meter readings.  But I believe that

8    the evidence Ms. Vaughn has provided is simply too vague and

9    insufficient to give rise to a claim.

10           And while I certainly appreciate the concern about

11   electric bills, I always have concern about my own, and very

12   much appreciate Ms. Vaughn taking time out of what I'm sure

13   is a busy life with other demands to appear today in Court

14   by telephone, I am nonetheless constrained by the law and

15   the evidence to disallow her claim.  So I will disallow all

16   the claims subject to today's proceedings, and I am prepared

17   to sign the order.

18           MS. CHAICAN:  Thank you, Your Honor.  Now that we

19   know the exact list of claimants who are up for hearing

20   today, we'll plan to submit under certification of counsel

21   the standard forms of order that are consistent with your

22   ruling just now and the record of this hearing.  I will note

23   that we don't plan on circulating them to the pro se

24   claimants before submitting.

25           THE COURT:  That's not necessary.  Yes.

1          MS. CHAICAN:  Thank you, Your Honor.

2          THE COURT:  Very good.  Anything else for today?

3   Does anybody have any final statements they'd wish to make

4   on the record before we adjourn?  Okay.  The Court hears

5   none.  We are adjourned.  I will look for an order under

6   certification of counsel.

7          MR. SOWA:  Thank you, Your Honor.

8

9                          *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 73

1                        I N D E X

2

3                        RULINGS

4   DESCRIPTION                          PAGE        LINE

5

6   Court Expunges Debtor's Claims        70          19

7

8   Disallow All Claims                   71          15

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 74

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing

transcript is a true and accurate record of the proceedings.

Sonya
Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o=Veritext,
ou, email=digital@veritext.com, c=US
Date: 2016.11.09 16:12:08 -05'00'

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  November 9, 2016