# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
| *Debtors*. | ) | (Jointly Administered) |
| | ) | Related to D.I. 9612 |
| | ) | |

## OBJECTION OF DELAWARE TRUST COMPANY,
## AS TRUSTEE FOR THE EFIH FIRST LIEN NOTES,
## TO CONFIRMATION OF
## <u>FOURTH AMENDED JOINT PLAN OF REORGANIZATION</u>

WILMER CUTLER PICKERING HALE AND DORR LLP

Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile: 212-230-8888
Philip.Anker@wilmerhale.com

Joel Millar
David Gringer
Isley Gostin
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: 202-663-6000
Facsimile: 202-663-6363
Joel.Millar@wilmerhale.com
David.Gringer@wilmerhale.com
Isley.Gostin@wilmerhale.com

ROPES & GRAY LLP

Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile: 212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA 02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP

James H. Millar
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
Telephone: 212-248-3264
Facsimile: 212-248-3141
James.Millar@dbr.com

COLE SCHOTZ P.C.

Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: 302-652-3131
Facsimile: 302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile: 201-489-1536
wusatine@coleschotz.com

*Counsel for Delaware Trust Company*

Dated: November 15, 2016

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT .................................................................................................................... 2

I.     THE PLAN'S LIEN-STRIPPING PROVISIONS DO NOT
COMPLY WITH SECTION 1129(b)'S REQUIREMENTS FOR
THE TREATMENT OF SECURED CLAIMS ...................................................... 2

     A.     The Plan Strips The Noteholders' Liens ..................................................... 4

     B.     The Plan Does Not Satisfy Section 1129(b)(2)(A)(i)'s
Requirement That The Noteholders Retain Their Liens ........................... 11

     C.     The Plan Does Not Satisfy Section 1129(b)(2)(A)(iii)'s
Requirement That The Noteholders Receive The
"Indubitable Equivalent" Of Their Secured Claims ................................. 16

II.    THE PLAN INCLUDES ADDITIONAL PROVISIONS THAT
DO NOT COMPLY WITH SECTION 1129'S REQUIREMENTS .................... 19

     A.     The Plan Asserts An Improper "Blanket Objection" To The
Noteholders' Claims ................................................................................. 19

     B.     To The Extent The Plan Could Be Read To Deny Other
Rights Of The Trustee And The Noteholders, It Cannot Be
Confirmed ................................................................................................. 21

          1.     Right to prosecute make-whole appeal ......................................... 21

          2.     Right to compound interest on the make-whole ........................... 23

          3.     Right to allowance of secured claims for fees and
interest ........................................................................................... 25

          4.     Fee-Review Process ...................................................................... 26

JOINDER IN EFIH SECOND LIEN TRUSTEE'S OBJECTION TO
PLAN .............................................................................................................. 28

RESERVATION OF RIGHTS ....................................................................................... 29

CONCLUSION ............................................................................................................... 30

Exhibit A

## TABLE OF AUTHORITIES

### CASES

Page(s)

*In re Allegheny International, Inc.*, 954 F.2d 167 (3d Cir. 1992)..............................19, 20

*In re Azabu Buildings Co.*, No. 05-50011, 2007 WL 1964306 (Bankr. D.
    Haw. June 28, 2007) ....................................................................................15

*In re Bataa/Kierland LLC*, 496 B.R. 183 (D. Ariz. 2013).................................17

*In re Bicoastal Corp.*, 146 B.R 492 (Bankr. M.D. Fla. 1992) ...........................11

*In re Cady*, No. 06-502, 2007 WL 2215384 (Bankr. D. Idaho July 30,
    2007) .............................................................................................................15

*In re Congoleum Corp.*, 362 B.R. 198 (Bankr. D.N.J. 2007) ............................13

*In re DeMarco*, 258 B.R. 30 (Bankr. M.D. Fla. 2000) .....................................12

*In re Dynamic Brokers, Inc.*, 293 B.R. 489 (B.A.P. 9th Cir. 2003)...................20

*In re Greenwood Point, LP*, 445 B.R. 885 (Bankr. S.D. Ind. 2011)....................7

*In re Investment Company of The Southwest*, 341 B.R. 298 (B.A.P. 10th
    Cir. 2006) .....................................................................................................17

*In re Lightsquared Inc.*, 513 B.R. 56 (Bankr. S.D.N.Y. 2014).........................17

*In re MCorp Financial, Inc.*, 160 B.R. 941 (S.D. Tex. 1993) ..........................11

*In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935)....................................18

*In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009) ...................................17

*In re Pulliam*, 54 B.R. 624 (W.D. Mo. 1985).....................................................17

*In re Simmons*, 765 F.2d 547 (5th Cir. 1985) .....................................................20

*In re Terex Corp.*, 984 F.2d 170 (6th Cir. 1993) ...............................................13

*In re U.S. Mineral Products Co.*, No. 01-2471, 2005 WL 5898300 (Bankr.
    D. Del. Nov. 29, 2005), *order confirmed*, No. 01-2471, 2005 WL
    5887219 (Bankr. D. Del. Dec. 29, 2005).......................................................15

*In re Whatley*, 155 B.R. 775 (Bankr. D. Colo. 1993), *aff'd*, 169 B.R. 698
    (D. Colo. 1994), *aff'd*, 54 F.3d 788 (10th Cir. 1995).................................11

*In re Yates Development, Inc.*, 258 B.R. 36 (Bankr. M.D. Fla. 2000)................14

*Merrill Lynch Interfunding Inc. v. Argenti*, No. 00-933, 2000 WL 490739
(S.D.N.Y. Apr. 26, 2000), *aff'd*, 2 F. App'x 98 (2d Cir. 2001) ..............................8

*Pinson v. Thacker*, No. 2008-1525, 2009 WL 5124996 (Ky. Ct. App. Dec.
30, 2009) ................................................................................................................8

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065
(2012) ....................................................................................................................3

*Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S.
443 (2007) ............................................................................................................23

*United States v. Pound*, No. 07-427, 2010 WL 2330240 (E.D. Okla. June
8, 2010) ..................................................................................................................8

## STATUTES, RULES, AND REGULATIONS

11 U.S.C.
  § 361 ...............................................................................................15, 18
  § 501 .............................................................................................12, 19, 24
  § 501(a) ...........................................................................................15, 19
  § 502 .............................................................................................12, 23, 27
  § 502(a) ...................................................................................................19
  § 502(b) .......................................................................................23, 24, 27
  § 506(a) ...................................................................................................25
  § 506(b) .............................................................................................6, 23, 25, 27
  §§ 1121-1129 ...........................................................................................12
  § 1123(a) .................................................................................................11
  § 1129 ...........................................................................................1, 2, 3, 13
  § 1129(a) ...............................................................................2, 19, 22, 24, 26, 27
  § 1129(b) .......................................................................................... *passim*

28 U.S.C.
  § 158(a) ...................................................................................................12
  § 158(d) ...................................................................................................12

Fed. R. Bankr. P.
  Rule 3001(f) ............................................................................................19
  Rule 3007 .................................................................................................21
  Rule 3007(a) ............................................................................................19
  Rule 7062 .................................................................................................11

## OTHER AUTHORITIES

*Collier on Bankruptcy* ¶ 3007.01 (16th ed.) ................................................................20

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ..............................18

Delaware Trust Company, as indenture and collateral trustee ("Trustee") for the first-lien notes ("Notes") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (together, "EFIH" or the "EFIH Debtors"), submits this objection (the "Objection") to Confirmation of the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., *et al.* (D.I. 9612) (the "Plan").[1]  In support thereof, the Trustee states as follows:

### PRELIMINARY STATEMENT

The Trustee objects to confirmation of the Plan because it purports to strip the liens securing the claims of the holders of the Notes (the "Noteholders") and could be read to impair their rights in other ways that do not comply with the requirements for confirmation of a plan under section 1129 of the Bankruptcy Code.  The Trustee recognizes that allowing the E-side Debtors to emerge from Chapter 11 is a desirable goal.  But the Trustee is compelled to object to confirmation because the Plan, as currently drafted, fails to provide the treatment that the Bankruptcy Code requires for over-secured creditors like the Trustee and the Noteholders.  Instead, the Plan seeks to extinguish the Noteholders' liens.  Furthermore, it can be read to seek, without any basis, to disallow other claims of the Trustee and the Noteholders through an improper blanket objection.  And to the extent the Plan could likewise be read to deny other rights to which the Trustee and the Noteholders are lawfully entitled (as specified below), it similarly cannot be confirmed.

---

[1]     Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Plan.  This Objection has been redacted pursuant to the Confidentiality and Stipulated Protective Order, D.I. 9381-1 (the "Protective Order").  An unredacted copy of the Objection is being filed under seal pursuant to the Protective Order.

These impediments to confirmation could be removed with modest changes to the Plan that would preserve the Trustee's and the Noteholders' liens and other rights (much as the plan the Court confirmed last year did). To that end, set out in Exhibit A are a handful of proposed modifications to the Plan designed to address the issues raised in this Objection. In the event these modifications were made and the concerns of the Trustee and the Noteholders were otherwise adequately addressed, the Trustee would be prepared to consider withdrawing this Objection.

### ARGUMENT

The Plan cannot be confirmed in its current form because it does not satisfy the requirements for confirmation under section 1129 of the Bankruptcy Code.

**I.      THE PLAN'S LIEN-STRIPPING PROVISIONS DO NOT COMPLY WITH SECTION 1129(b)'S REQUIREMENTS FOR THE TREATMENT OF SECURED CLAIMS**

As the Debtors concede, the Plan impairs the EFIH First Lien Note Claims. *See* Plan Art. III.B.19(d) ("Class B3 is Impaired under the Plan"). Accordingly, because the Trustee anticipates that the Noteholders will reject the Plan (the voting deadline expires the same day this Objection is due), the Plan cannot be confirmed unless it meets the requirements of the "cram-down" provisions in section 1129(b). *See* 11 U.S.C. §§1129(a)(8), 1129(b)(1).

Section 1129(b) provides that a plan cannot be crammed down over the objection of a class of secured claims unless the plan treats those claims in one of three ways. The plan must provide:

> "(i)      (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

        (II) that each holder of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

    (ii)    for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

    (iii)    for the realization by such holders of the indubitable equivalent of such claims."

11 U.S.C. § 1129(b)(2)(A).

The Plan does not comply with any of these three alternatives.

The Plan cannot be confirmed under prong (ii) because the Plan does not provide for a sale of the collateral at which the Noteholders may credit bid. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-2072 (2012).

Nor can the Plan be confirmed under prong (i) or prong (iii). By purporting to release the Noteholders' liens on the Plan's Effective Date, the Plan does not satisfy the requirement in prong (i) that the Noteholders retain the liens securing their claims until those claims are paid in full, including the Noteholders' "make-whole" claim if it is allowed on appeal after the Effective Date. And by purporting to convert the Noteholders' secured claims into unsecured claims, the Plan also does not satisfy the requirement in prong (iii) that the Noteholders receive the "indubitable equivalent" of their secured claims.

Accordingly, assuming the class votes to reject the Plan in its current state, the Plan cannot be confirmed unless it is modified to provide that the Noteholders will retain their liens, such that the Plan would be accepted by the requisite number and amount of Noteholders or would otherwise comply with section 1129 of the Bankruptcy Code.

A.      **The Plan Strips The Noteholders' Liens**

Prepetition, the Notes were secured by first-priority liens on substantially all of EFIH's assets, including EFIH's interest in Oncor.[2]  Those liens continue to secure all of EFIH's obligations with respect to the Notes, including the Noteholders' make-whole claims, interest, fees, indemnification claims, and any other damages or liabilities.[3] There is no dispute that the Notes are over-secured and have priority over the second-lien notes and all unsecured claims.[4]

---

[2]      *See* Deposition of Andy Wright (Oct. 19, 2016) ("Wright Dep."), attached as Exhibit A to the Declaration of Philip Anker being filed contemporaneously herewith ("2016 Anker Decl."), at 32:13-16; *accord* ███████████████████████████████████████████ Collateral Trust Agreement (dated as of Nov. 16, 2009) ("Collateral Trust Agreement"), attached as Exhibit A to the Declaration of Philip Anker With Respect To Exhibits In Support Of Objection Of Delaware Trust Company To Confirmation Of Fifth Amended Plan Of Reorganization, D.I. 6602 ("2015 Anker Decl."), at § 2.1; Pledge Agreement (dated as of Nov. 16, 2009) ("Pledge Agreement"), attached as Exhibit B to 2015 Anker Decl., at § 1; EFIH First Lien Notes Indenture (dated as of Aug. 17, 2010) ("Indenture"), attached as Exhibit C to 2015 Anker Decl., at § 10.04.

[3]      *See* Collateral Trust Agreement at § 1.1 (definitions of "Parity Lien Obligations" and "Obligations") and § 2.1 (granting security interest to secure, among other things, "any principal, interest (including all interest accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the Secured Debt Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding), premium, penalties, fees, indemnifications, reimbursements, damages and other liabilities"); Pledge Agreement § 2 (granting security interest to secure "the payment of all Obligations … under the Parity Lien Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise"); Indenture § 10.04 ("[T]he principal, premium, if any, and interest on the Notes … and interest on the overdue principal, premium, if any, and interest (to the extent permitted by law), on the Notes and performance of all other Obligations of EFIH to the Holders of the Notes or the Trustee under this Indenture and the Notes, according to the terms hereunder or thereunder, are secured as provided in the Pledge Agreement and the Collateral Trust Agreement").

[4]      *See* Wright Dep. 32:13-16; *accord* ████████████████ ; Collateral Trust Agreement § 2.3.

As the Court is aware, the Trustee asserts that EFIH owes the Noteholders a contractual "make-whole" payment of approximately $431 million (plus interest) as a result of EFIH's redemption of the Notes in June 2014. The Court, of course, has held that EFIH does not owe the make-whole. However, the Trustee and the Noteholders have appealed that ruling, and that appeal is currently awaiting decision by the Third Circuit, which heard argument on September 27, 2016.[5]

In addition, the Trustee and Noteholders have claims for interest and fees. Their claims for interest include (but are not limited to) unpaid "Additional Interest" (and interest thereon) that accrued pre-petition and post-petition through the June 2014 principal repayment, as a result of prepetition increases in the interest rate as specified in the Indenture and the Notes and related agreements because of EFIH's failure to register certain of the Notes under the securities laws. The Trustee and Noteholders also have claims for the reasonable fees and expenses they have already incurred, or may incur in the future, including in connection with the make-whole litigation, which EFIH is obligated to reimburse under the Indenture for the Notes and related agreements.

The Plan contemplates that at least some of these claims may be paid over time, rather than in full on the Plan's Effective Date. The Plan provides that the Makewhole Claims (and interest thereon) will be Allowed "if and to the extent such Claims are held to be allowed by a court of competent jurisdiction pursuant to a Final Order, whether entered before, on, or after the EFH Effective Date." *See* Plan Art. III.B.19(b)(iv). It further provides that if any such Makewhole Claims are "Allowed by Final Order after

---

[5]     *In re Energy Future Holdings Corp.*, No. 16-1351 (3d Cir.). A transcript of the oral argument is available on the Third Circuit docket for that appeal. *See* Transcript of Oral Argument, filed ECF on Oct. 6, 2016.

the EFH Effective Date," those claims "shall be paid in full, in Cash, as soon as reasonably practicable after becoming Allowed Makewhole Claims by Final Order." *See Id.* Art. VI.A; *id.* Art. III.B.19(c).

In addition, the Plan provides that the Noteholders' claims for Additional Interest (and interest thereon) are Allowed, and that they will be paid in full in cash "as soon as reasonably practicable after the EFH Effective Date." *See* Plan Article III.B.19(b)(i)-(ii), (c); *id.* Art. VI.A.

Furthermore, the Plan provides that the Noteholders' claims for reasonable fees and expenses, "whether incurred or accruing before, on, or after the EFH Effective Date, including those … incurred in connection with any appeal, remand, or other litigation of any Makewhole Claims," will be Allowed to the extent they are allowed under Bankruptcy Code section 506(b) (with respect to those fees and expenses incurred before the Effective Date) and owed under the Indenture and related agreements. *See* Plan Art. III.B.19(b)(iii). The Plan further provides that any such fees and expenses that are Allowed "shall be paid in full in cash as soon as reasonably practicable following completion of the fee review process to be set forth in the Plan Supplement." *See id.* Art. VI.A; *id.* Art. III.B.19(c). The Plan Supplement, which the Debtors filed just a few days ago (and which purportedly remains subject to further amendments), contemplates a fee review process that would not be completed until after the Effective Date. *See* Plan Supplement, Ex. F, D.I. 10101-6 (Non-Retained Professionals Fee Process).

Although the Plan thus contemplates that the Trustee's and Noteholders' secured claims may be paid over time, it does not provide that the Trustee and Noteholders will retain their liens until those claims are paid in full. Instead, it provides that all of their

liens will be released immediately when the Plan goes effective:  "on the Effective Date,"

the Trustee's and the Noteholders' liens will be "fully released and discharged," and the

"Liens on the collateral securing the EFIH First Lien Note Claims … will be released on

the EFH Effective Date even if the Makewhole Claims … are the subject of an ongoing

appeal as of the EFH Effective Date."  *See* Plan Art. VIII.B.; *see also id.* Art. IV.H

(providing that "on the Effective Date, all property in each Estate … shall vest in each

applicable Reorganized Debtor, free and clear of all Liens").  The Debtors' and

NextEra's witnesses have confirmed that the Plan purports to provide for the

Noteholders' liens to be stripped in their entirety on the Effective Date, even if the

Noteholders have claims that are either Allowed as of the Effective Date, or that become

Allowed thereafter, but that are not paid in full until after the Effective Date.[6]

As the Debtors concede, that treatment impairs the Noteholders.  Plan Art.

III.B.19(d);Wright Dep. 33:9-34:21, 46:4-12 (testimony of Debtors' general counsel)

("My understanding is that the B3 claims are impaired because the liens are being

stripped."); *see, e.g.*, *In re Greenwood Point, LP*, 445 B.R. 885, 907 (Bankr. S.D. Ind.

2011) ("The proposed loss of the [creditor's] valid lien rights prior to payment in full of

its claim under the Plan is additional, and significant, impairment under Section 1124.").

Under state law, the Trustee and the Noteholders are entitled to retain their liens until all

---

[6]     *See* Wright Dep. 39:19-41:4 ("Q. So my question is, in that scenario, does the plan provide for the liens securing our make-whole claim to be extinguished upon emergence? A. Yes. Q. So if the first lien make-whole claim were then to be allowed after the effective date, that claim would not be secured by a lien, correct? A. Correct."); *id.* at 41:18-42:25 ("And are there any circumstances under the terms of the plan in which the liens securing the EFIH first lien notes will not be extinguished upon emergence? [Objections to form] A. No."); *accord id.* at 36:5-20, 39:13-18; Deposition of Paul Keglevic (Oct. 13, 2016) ("Keglevic Dep."), attached as Exhibit C to 2016 Anker Decl., at 54:4-12; Deposition of Mark Hickson (Oct. 25, 2016) ("Hickson Dep."), attached as Exhibit D to 2016 Anker Decl., at 79:15-80:3.

obligations owed to them have been paid in full[7]—indeed, under the parties' agreement, the liens continue even after payment in full until at least October 15, 2019.[8]  While this Court has held that EFIH does not owe the make-whole, the orders denying the make-whole are on appeal.  Moreover, the Court has entered no order (let alone a final, non-appealable order) disallowing any claim for fees and expenses, or interest.  Accordingly, the Trustee and the Noteholders are entitled to retain their liens pending final resolution of their claims for the make-whole, interest, and fees, and indefeasible payment in full of all such claims that are ultimately determined to be owed.  *See, e.g.*, *Merrill Lynch Interfunding Inc. v. Argenti*, No. 00-933, 2000 WL 490739, at *4 (S.D.N.Y. Apr. 26, 2000) (unpublished) (holding that, where state law required secured creditor to release lien upon satisfaction of the debt, the creditor was not required to release its lien following trial court's determination that debtor's payment satisfied the debt, because the creditor had appealed and sought a ruling that it was owed additional amounts), *aff'd*, 2 F. App'x 98 (2d Cir. 2001).[9]

---

[7]    *See* Collateral Trust Agreement §§ 3.2, 4.1(a) (providing that the "Trustee's Liens upon the Collateral will be released" only upon "payment in full of all outstanding Secured Debt Obligations"); *accord* Pledge Agreement § 19(b); Indenture § 10.04.

[8]    *See* Pledge Agreement § 18 ("This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until the latest of (i) the payment in full in cash of the Secured Obligations and (ii) October 15, 2019[.]").

[9]    *See also, e.g.*, *United States v. Pound*, No. 07-427, 2010 WL 2330240, at *1 (E.D. Okla. June 8, 2010) ("[P]laintiff is under no obligation to release the tax liens pending appeal. … [S]uch release could result in severe prejudice to plaintiff if assets were dissipated. Should the Tenth Circuit agree with plaintiff's position on the merits, the parties should as a matter of equity return to the *status quo ante*.  Release of the tax liens might render that impossible."); *Pinson v. Thacker*, No. 2008-1525, 2009 WL 5124966, at *3 (Ky. Ct. App. Dec. 30, 2009) (holding that secured creditor was entitled to retain its lien because fees to which it was entitled were continuing to accrue pending appeal; hence "[the creditor] had a good cause for declining to release the lien while the appeal was pending").

Stripping the Trustee's and Noteholders' liens deprives them of their right to look to the assets securing their claims to obtain payment.  The Trustee and Noteholders would be left instead to collect their claims by resort to the far weaker remedies and protections afforded general unsecured creditors.  The Code does not permit a debtor to strip a secured creditor of the security it bargained for without the creditor's consent.  Because this Plan does so, it cannot be confirmed.

While the law could not be overridden in any event, the Debtors have not identified any economic reason why EFIH could not provide for the Noteholders to retain their liens.  Indeed, the plan this Court confirmed last year retained those liens.  And the Debtors' fact and expert witnesses ███████████████ testified that under this Plan, NextEra and/or Reorganized EFIH will have more than sufficient financial means to secure and ultimately pay any make-whole claims of the Noteholders or the second-lien noteholders that may be allowed after the Effective Date.[10]

---

[10]    This Court can and should so find.  *See* Deposition of David Ying (Nov. 8, 2016), attached as Exhibit E to 2016 Anker Decl., at 38:8-15 ("the total dollar amounts [for all make-whole claims] could easily be met by NextEra and/or EFIH, yes"); ████████████ Horton Dep. 45:11-21 ("Q. Do the debtors have any material doubts about being able to satisfy the full amount of the EFIH first and second lien make-whole claims if both are allowed?  A. No. Q. And is that true if you assume that the EFIH first lien claim is $600 million and the second lien claim is $350 million? A. Yes."); *id.* at 52:17-21 ("I believe that this is going to be an extremely well-capitalized company and that there will be – whether  the first lien, second lien and the PIK make-wholes are made and are allowed, the plan will be feasible"); Keglevic Dep. 41:23-42:15 (same); ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  █████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████.[12]

---

[11] *See* ████████████████████████████████████████

[12] *See* ████████████████████████████████████████



**B.    The Plan Does Not Satisfy Section 1129(b)(2)(A)(i)'s Requirement That The Noteholders Retain Their Liens**

Section 1129(b) provides that a plan cannot be confirmed over the objection of a class of secured claims unless it provides that the holders of those claims will "retain the liens securing such claims." *See* 11 U.S.C. § 1129(b)(2)(A)(i)(I). That requirement is not met here. The Plan expressly provides that the Noteholders' liens will be extinguished, not retained, on the Plan's Effective Date. *See* Plan Art. VIII.B. That violates the express terms of the statute.

When the Debtors previously sought to strip the Noteholders' liens—before they subsequently agreed to retain the Noteholders' liens in the prior plan this Court confirmed last year—they argued that they could do so because this Court had disallowed the Noteholders' make-whole claims, and that order had not been stayed pending appeal and hence was enforceable.[13] That argument was wrong then and it is wrong now. No one disputes that this Court has entered orders disallowing the make-whole. But if the Noteholders prevail in their appeal from those orders, the make-whole will then be an allowed claim. And under section 1129(b), the Plan must provide that the Noteholders will retain their liens to the extent their claims are "allowed." 11 U.S.C.

---

[13]    Debtors' Omnibus Reply to Plan Confirmation Objections, D.I. 6817, at 30-34. None of the cases the Debtors relied upon for their misguided position construed §1129(b)(2)(A), much less held that a plan may strip the liens of a secured creditor who has appealed an order disallowing its claim. *See, e.g.*, *In re Whatley*, 155 B.R. 775, 781 (Bankr. D. Colo. 1993), *aff'd*, 169 B.R. 698 (D. Colo. 1994), *aff'd*, 54 F.3d 788 (10th Cir. 1995) (holding that Fed. R. Bankr. P. 7062's 10-day stay on acts to "execute" a judgment did not stay order disallowing claim, which was "self-executing"); *In re MCorp Fin., Inc.*, 160 B.R. 941, 962-963 (S.D. Tex. 1993) (holding plan did not violate equal-treatment requirement of §1123(a)(4) by distinguishing between allowed and disallowed claims in setting reserves); *In re Bicoastal Corp.*, 146 B.R 492, 494 (Bankr. M.D. Fla. 1992) (holding that §1129(b) was inapplicable because all impaired classes accepted the plan).

§ 1129(b)(2)(A)(i)(I) (requiring that plan provide "that the holders of [secured] claims retain the liens securing such claims … to the extent of the allowed amount of such claims").

The Debtors' argument thus has no basis in the statute.  Nothing in section 1129(b) says that secured creditors are entitled to retain their liens only to the extent those liens secure claims that have been allowed "as of the effective date of the plan," but not claims that are "allowed" thereafter.  Congress certainly knew how to say so, if that had been its intent.  *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II) (requiring that secured creditors receive deferred cash payments having a value, "as of the effective date of the plan," equal to the secured claim).  But instead, section 1129(b) says that a plan must provide that secured creditors will retain their liens securing *all* claims that are ultimately "allowed," whenever that may occur.  *Cf. In re DeMarco*, 258 B.R. 30, 36 (Bankr. M.D. Fla. 2000) (holding chapter 13 plan could not be confirmed because it would strip lien of creditor notwithstanding creditor's pending appeal of order disallowing the creditor's secured claim).

That is consistent with the basic structure of the Bankruptcy Code.  Congress provided separate processes for determining the allowance of claims and for confirming a plan.  In Chapter 5, Congress provided a procedure to govern the allowance and disallowance of claims, 11 U.S.C. §§ 501, 502, and it further provided a process for appellate review of such rulings, 28 U.S.C. § 158(a), (d).  In Chapter 11, Congress provided a plan-confirmation process to govern how the debtor must treat the classes of claims against it, as those claims are determined in the claims-allowance process.  *See* 11 U.S.C. §§ 1121-1129.

Nothing in the Code requires that the claims-allowance process under Chapter 5 be completed before the court may consider whether to confirm a plan under Chapter 11. To the contrary, the Code permits debtors to confirm a plan before the claims-allowance process is complete—while preserving creditors' rights in that process—precisely so that debtors are not required to spend years finishing claims-allowance litigation before it can reorganize and emerge from bankruptcy. *See, e.g.*, *In re Terex Corp.*, 984 F.2d 170, 171-172 (6th Cir. 1993) (affirming decision allowing creditor's claim two years after Chapter 11 plan had been confirmed and awarding distribution that plan specified for "allowed" claims of that type); *In re Congoleum Corp.*, 362 B.R. 198, 203 (Bankr. D.N.J. 2007) ("The claims objection process in bankruptcy is something entirely separate from plan classification."). Thus, Chapter 11 plans routinely provide for much of the claims-allowance process to take place after confirmation—as the Plan here does with respect to other claims. *See* Plan Art. VII (providing for post-Effective Date resolution of disputed claims and distributions on those claims that are ultimately allowed after the Effective Date).

But what the Code does require is that, to the extent a creditor's claim is ultimately allowed through the process Congress provided—whether before or after confirmation—the debtor must provide for that claim in its plan in accordance with the treatment that Congress specified in section 1129. The Debtors have recognized as much. Although this Court has disallowed the Noteholders' make-whole claim, the Plan provides that if the make-whole claim is allowed after the Effective Date, it must be paid in full, as section 1129(b) requires. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II) (plan must provide deferred cash payments totaling at least "the allowed amount of such claim");

13

Plan Art. VI.A. ("Any Makewhole Claim based on or derived from the EFIH First Lien Notes … that is first Allowed after the EFH Effective Date … shall be paid in full, in cash, by Reorganized EFIH as [soon as] reasonably practicable after becoming Allowed Makewhole Claims by Final Order[.]").  So, too, here, just as the Plan must provide that any make-whole claim allowed after the Effective Date will be paid in full, 11 U.S.C. § 1129(b)(2)(A)(i)(II), it must also provide that the Noteholders will retain their liens securing that claim until the claim is paid in full, *id.* § 1129(b)(2)(A)(i)(I).

Indeed, the facts of this case highlight the flaws with the Debtors' argument.  The litigation over the allowance of the make-whole claim began more than two years ago.  The Noteholders' appeal has now been fully briefed and argued in the Third Circuit, and a decision could be issued at any time.  If a decision reversing the disallowance of the make-whole claim were to be issued before confirmation, there is no question that section 1129(b) would require that the Noteholders retain their liens.  Yet, in the Debtors' view, if the Third Circuit were to issue the very same decision one day after confirmation, section 1129(b) would permit the Plan to strip the Noteholders' liens.  Nothing in the Code remotely suggests that Congress intended to deny secured creditors the fundamental protections of the cram-down provisions merely because of the happenstance of timing by which the appellate courts work through their docket case load—or because a debtor is able to beat the clock and get its plan confirmed before the appeal is decided.  *Cf. In re Yates Dev., Inc.*, 258 B.R. 36, 42 (Bankr. M.D. Fla. 2000) (noting debtor's ability to manipulate timing of plan consummation to its benefit with respect to pending appeal of claims-allowance order).

Even less defensible is the notion that the Plan can strip the liens securing the Noteholders' claims for interest and fees. These claims have not been disallowed at all. To the contrary, the Plan allows the Noteholders' claims for pre-petition and post-petition interest. *See* Plan Art. III.B.19(b)(i)-(ii). Similarly, the Noteholders have filed proofs of claim seeking payment of their fees and expenses and have submitted documentation of those fees and expenses incurred from May 2014 through July 2016 (and expect to submit subsequent invoices shortly) to the Debtors (and other parties in interest), and neither the Debtors nor anyone else has filed an objection thereto. *See* Wright Dep. 27:8-28:7, 29:19-23. A proof of claim is deemed allowed unless a party in interest objects. *See* 11 U.S.C. § 501(a). Even were the Debtors to assert an objection, the law is clear that the Debtors cannot strip the Noteholders' liens merely by raising disputes that have not been adjudicated, let alone adjudicated by a final, non-appealable order.[14] If the law were otherwise, debtors could game they system and strip creditors' rights merely by waiting until immediately before confirmation to file objections to claims, leaving no time to resolve those disputes before the plan is confirmed and goes effective.

---

[14]    *See, e.g.*, *In re Cady*, No. 06-502, 2007 WL 2215384, at *4 (Bankr. D. Idaho July 30, 2007) ("Debtors' plan provides a timely mechanism by which Creditor's disputed claim will be resolved. Creditor will retain its lien, and its ability to foreclose, if it does not receive prompt payment. The proposed plan treatment, in the Court's opinion, constitutes the indubitable equivalent of Creditor's rights."); *In re Azabu Bldgs. Co.*, No. 05-50011, 2007 WL 1964306, at *8 (Bankr. D. Haw. June 28, 2007) ("The preservation of their Liens pending the Closing and the transfer of the Liens from the existing collateral to a fund of Cash that exceeds the aggregate sum allegedly owed to all of the holders of Disputed Secured Claims constitutes adequate protection pursuant to Bankruptcy Code § 361 and indubitable equivalence pursuant to Bankruptcy Code § 1129(b)(2)(A)(iii)[.]"); *In re U.S. Mineral Prods. Co.*, No. 01-2471, 2005 WL 5898300, at *13 (Bankr. D. Del. Nov. 29, 2005), *order confirmed*, No. 01-2471, 2005 WL 5887219 (Bankr. D. Del. Dec. 29, 2005) (settlement between debtor and creditor provided that creditor would receive a lien on an escrow account containing cash in the full amount asserted in proof of claim pending resolution of claim objection).

### C.    The Plan Does Not Satisfy Section 1129(b)(2)(A)(iii)'s Requirement That The Noteholders Receive The "Indubitable Equivalent" Of Their Secured Claims

Nor can the Plan be confirmed pursuant to the third prong of section 1129(b), which requires that a class of dissenting secured claims receive the "indubitable equivalent" of their secured claims.  *See* 11 U.S.C. § 1129(b)(2)(A)(iii).  The Plan turns the Noteholders' secured claims into unsecured claims.  But an unsecured claim cannot be the "indubitable equivalent" of a secured claim.

The Plan would extinguish the Noteholders' liens on the Effective Date and convert their first-priority secured claims against EFIH into general unsecured obligations of Reorganized EFIH.  *See* Plan Art. VIII.B; Keglevic Dep. 63:19-64:14; Wright Dep. 40:19-41:4. ███████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████ And while the Plan contemplates that Reorganized EFIH would emerge from Chapter 11 with no other significant debt, the Noteholders would be exposed to the risk that Reorganized EFIH would incur new debt after emergence, including new secured debt that would then rank ahead of the Noteholders' previously secured claims.  The Plan would thus subordinate the Noteholders from their existing senior secured position to a junior unsecured position.

That treatment does not provide the Noteholders the "indubitable equivalent" of their secured claims.  It is well settled that a debtor cannot satisfy the "indubitable equivalent" standard by giving a secured creditor an unsecured claim in place of its secured claim.  *See, e.g.*, *In re Pac. Lumber Co.*, 584 F.3d 229, 246 (5th Cir. 2009) ("Nor are unsecured notes or equity securities sufficient to constitute the 'indubitable equivalent' of secured claims."); *In re Investment Company of The Southwest*, 341 B.R. 298, 324 (B.A.P. 10th Cir. 2006) ("*[T]rading its first lien on the most easily salable assets for* a junior lien on less easily marketable assets, or *a totally unsecured interest* in personal property never valued by the Court, *is not the indubitable equivalent of its claim.* … [E]ven if the personal property assets are highly valued, the [unsecured] right to receive payment upon liquidation, from personal property assets that would have to be shared with all other creditors (assuming none has a security or other superior claim to that collateral) does not provide [a secured creditor] the indubitable equivalent of its claim." (emphasis added)); *In re Bataa/Kierland LLC*, 496 B.R. 183, 199 (D. Ariz. 2013) ("What escapes explanation is how [the plan's treatment] is the 'indubitable equivalent' …. The bankruptcy court did not provide any substitute security for payment, i.e., it effectively substituted an unsecured obligation for a secured obligation. … [T]his constituted error[.]"); *In re Pulliam*, 54 B.R. 624, 625 (W.D. Mo. 1985) ("[A]n *unsecured* right to payment in the future is not the 'indubitable equivalent' of the present right to possession and sale.").[15]

---

[15]    Indeed, even substituting a new *secured* claim for a secured creditor's existing claim often fails to satisfy the strict standards of "indubitable equivalence."  *See, e.g.*, *In re Lightsquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014) (holding that new secured note was not the "indubitable equivalent" of creditor's pre-petition secured claim where

As the legislative history explains, while "[a]bandonment of the collateral to the creditor would clearly satisfy indubitable equivalence, as would a lien on similar collateral," "*[u]nsecured notes as to the secured claim* or equity securities of the debtor *would not be the indubitable equivalent*."  H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6544 (emphasis added).  Congress incorporated this standard of indubitable equivalence from *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935).  Interpreting § 1129(b)'s predecessor, Judge Learned Hand explained that a plan's treatment of dissenting secured creditors "must be completely compensatory":  a secured creditor is entitled "to get his money or at least the property," and "[w]e see no reason to suppose that the statute was intended to deprive him of that …, unless by a substitute of the most indubitable equivalence."  *See id.* at 942; *see also* H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, at 6474-6475, 6544 (relying on *Murel*).  Indeed, in the context of adequate protection, the Code expressly provides that an unsecured claim—even one that, unlike here, is given administrative-expense priority over most other unsecured claims—does not provide the "indubitable equivalent" of a secured claim.  *See* 11 U.S.C. § 361.

Accordingly, because the Plan would strip the Noteholders of their liens and substitute an unsecured claim in place of their secured claims, the Plan does not meet the "indubitable equivalent" requirement under the third prong of section 1129(b)(2)(A).  And because the Plan does not meet the requirements under the first or second prongs either, the Plan cannot be crammed down over the dissent of the Noteholders unless it is modified to preserve their liens.

---

"the note, instead of providing [the creditor] with a first lien, provides for far riskier third lien treatment").

## II.    THE PLAN INCLUDES ADDITIONAL PROVISIONS THAT DO NOT COMPLY WITH SECTION 1129'S REQUIREMENTS

### A.    The Plan Asserts An Improper "Blanket Objection" To The Noteholders' Claims

The Plan does not comply with section 1129's requirement that the plan "compl[y] with the applicable provisions of this title," 11 U.S.C. § 1129(a)(1), because it could be read to purport to assert an objection to the Noteholders' claims, without any basis, in violation of the applicable Code provisions governing the allowance of claims.

The Plan provides that:

> "Except as specifically provided as Allowed Claims pursuant to Article III.B of the Plan or otherwise objected to by the Debtors in the Chapter 11 Cases, the Plan shall serve as the Debtors' objection to all other EFIH First Lien Note Claims … under the respective indentures.  If the Bankruptcy Court sustains the Debtors' objection to these Claims, the Confirmation Order shall disallow such Claims.  The Holders of such Claims may respond to the Debtors' objections to such Claims by filing an objection to the Plan."

Plan Art. VII.A.

That is not permissible.  A creditor's claim cannot be disallowed merely because a debtor has declared in its plan that it objects to the claim.  Where, as here, a creditor has filed a timely proof of claim setting forth the nature and factual basis of its claims, the claim is deemed allowed unless a party objects, and the filed claim is "prima facie evidence of the validity and amount of the claim."  *See* 11 U.S.C. §§ 501, 502(a); Fed. R. Bankr. P. 3001(f); *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-174 (3d Cir. 1992) (explaining that under §502(a), if a creditor files a proof of claim that "allege[s] facts sufficient to support the claim," "it is 'prima facie' valid").  Any party wishing to object to the claim must file a written objection asserting the basis for the objection, *see* 11 U.S.C. § 501(a); Fed. R. Bankr. P. 3007(a), and "the burden of going forward then shifts

to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim." *Allegheny*, 954 F.2d at 173-174 ("In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."); *see also Collier on Bankruptcy* ¶ 3007.01, at 9-3007 (16th ed.) ("an objection to a claim" "should also, at a minimum, allege those facts necessary to support the objection (ordinarily this must include allegations sufficient to overcome the prima facie validity of the filed proof of claim) and provide a description of the theories on which it is based").

If the Debtors wish to object to any of the Noteholders' claims, including their claims for interest, fees and costs, they must file an objection setting forth the basis of their dispute in accordance with the applicable provisions of Chapter 5 and the Federal Rules of Bankruptcy Procedure (as they have done with respect to other claims, like the make-whole).  They cannot circumvent that process by inserting a provision in their plan that asserts a blanket "objection" to any and all claims.  The Debtors' purported "objection" here consists of a single sentence that does not even identify the specific claims to which the Debtors are objecting, much less provide any factual or legal basis for the objection.

That is not sufficient.  Courts have squarely rejected attempts by debtors to invalidate creditors' claims through the use of such blanket objections in a plan.  *See, e.g.*, *In re Simmons*, 765 F.2d 547, 553 (5th Cir. 1985) ("The Code and the Rules do not envision the use of a plan as a means for objecting to proofs of claims. Consequently, we hold that Simmons' plan did not constitute an objection to Savell's proof of secured claim."); *In re Dynamic Brokers, Inc.*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003)

("[T]here is no rule that authorizes an objection to [a] claim to be litigated in chapter 11 plan confirmation proceedings without complying with Rule 3007. Nor would it make sense to do so in light of the fact that a plan confirmation is a collective proceeding while a claim objection is typically a two-party dispute. …  Moreover, utilizing a plan confirmation proceeding as a method of objecting to a claim presents troubling policy issues in the face of rules of procedure that appear to require formal objections to claims.").

Accordingly, the Plan should be modified to eliminate any blanket objection to the Trustee's and Noteholders' claims.

### B.    To The Extent The Plan Could Be Read To Deny Other Rights Of The Trustee And The Noteholders, It Cannot Be Confirmed

#### 1.    Right to prosecute make-whole appeal

As discussed, the Plan provides that the Noteholders' make-whole claims will be allowed and paid if those claims are "held to be allowed by a court of competent jurisdiction pursuant to a Final Order, whether entered before, on, or after the EFH Effective Date."  Plan Art. III.B.19(b)(iv).  Although the obvious intent is that the Noteholders' right to the make-whole should be determined in accordance with the pending appeal process, without alteration by the Plan, *see* Keglevic Dep. 13:8-14:17, the Plan's definition of "Allowed" includes language that could potentially invite unnecessary mischief.

It provides that a claim is "Allowed" if, in relevant part:

"a Claim … is upheld or otherwise allowed … by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided, however*, that **unless otherwise expressly specified in the Plan**, the consummation of the Plan and the occurrence of the Effective Date is not

> intended to impair the right of any Holder or any of the Indenture Trustees to prosecute an appeal from, or otherwise petition for review of, any order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) disallowing any Claim; *provided, further*, for the avoidance of doubt, all parties reserve all rights in connection with any such appeal or petition, including (a) the right of any of the Reorganized Debtors to move for the dismissal of any such appeal or petition on grounds of equitable mootness or any other prudential basis and (b) the right of any Holder or any of the Indenture Trustees to oppose any such motion on any grounds, including on grounds that the relief sought in the appeal or petition is contemplated by or provided for under the Plan."

Plan Art. I.A.13 (definition of "Allowed") (emphasis added in second alteration).

The highlighted language might be read to suggest that some unspecified provisions in the Plan *are* "intended to impair the right of any Holder or any of the Indenture Trustees to prosecute an appeal from, or otherwise petition for review of, any order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) disallowing any Claim."

If the Plan were so read to impair the Trustee's and Noteholders' statutory right to prosecute their pending make-whole appeal—notwithstanding all of the Plan's provisions that explicitly contemplate continued litigation of the appeal after the Effective Date—the Plan obviously could not be confirmed.  *See* 11 U.S.C. § 1129(a)(1); *see also id.* § 1129(a)(3) (requiring that plan be "proposed in good faith and not by any means forbidden by law").

There is an easy fix here.  The Debtors could simply revert to the language in their prior plan that this Court confirmed last year, by replacing the phrase "unless otherwise expressly specified in the Plan" with the phrase "notwithstanding anything in the Plan to the contrary."  *See* Sixth Amended Joint Plan of Reorganization, D.I. 7285-1, Art. I.A.12 (definition of "Allowed").

2.      **Right to compound interest on the make-whole**

If the Noteholders' make-whole claim is allowed as a result of the appeal, the Trustee and the Noteholders will be entitled under the terms of the Indenture and Notes to receive interest on the make-whole that has accrued since June 19, 2014, when EFIH redeemed the Notes and the make-whole would have become due.  Furthermore, because EFIH has not paid any of the interest that has accrued on the make-whole, the Trustee and the Noteholders will also be entitled to interest on that unpaid interest—i.e., compound interest.

The parties' agreements plainly so provides.  The EFIH First Lien Notes provide that EFIH "will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue … premium" and, in addition, "it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest," in each case, "at the interest rate on the Notes."  Notes ¶ 1, attached as Exhibit E to 2015 Anker Decl.; *see also* Indenture § 4.01.  Section 502 of the Bankruptcy Code, in turn, generally provides that contract claims are allowed inside bankruptcy if they are valid outside of bankruptcy under applicable state law.  *See* 11 U.S.C. § 502(b)(1); *Travelers Cas. & Sur. Co. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 449 (2007).  And while section 502(b)(2) disallows certain unsecured claims for unmatured interest (at least where the debtor is insolvent), section 506 provides that "there shall be allowed" to oversecured creditors like the Noteholders post-petition "interest on such claim."   11 U.S.C. § 506(b).

The Plan Allows "any Makewhole Claims" that are held to be allowed by Final Order, "and interest thereon (whether accruing before, on or after the EFH Effective

Date, as calculated in accordance with the EFIH First Lien Notes, [the Indentures] and/or any related agreement, as applicable, or otherwise as determined by Final Order)." *See* Plan Art. III.B.19(b)(iv). The plain import of that language is that the Plan allows any valid claim for interest on the make-whole, including compound interest, that is provided for under the parties' contracts and allowed under the Bankruptcy Code. ▮

▮

▮

▮[16]

However, other language in the Plan might potentially be misconstrued to create unnecessary confusion. Some provisions of the Plan provide for compound interest in slightly more explicit terms, specifically allowing "interest on interest" if required under the Indenture and Notes. Plan Art. III.B.19(b)(i) (allowing "any accrued but unpaid prepetition interest (including any Additional Interest and interest on interest)"). If the lack of identical language in the make-whole clause were read to mean the Noteholders are not entitled to compound interest on the make-whole, even if they are lawfully entitled to it, the Plan would not be confirmable. *See* 11 U.S.C. §§ 501, 502(b), 506(b), 1129(a)(1). Again, the Plan can be easily clarified to conform the language in the make-whole clause to specify that "interest on interest" must also be awarded on the make-whole, to the extent it is allowed under the Indenture and the Notes or by Final Order.

---

[16] *See* ▮

▮ *see also* Keglevic Dep. 13:8-14:17 ("Q. And it is also your understanding that if there is a final order providing for compounding of interest, that is interest on interest, that will be paid, right? A. [Objection to form] A. Yes.").

### 3.      Right to allowance of secured claims for fees and interest

As discussed above, the Trustee and the Noteholders have various claims for interest, fees, expenses and indemnification claims.  Because all of those claims are secured by liens on EFIH's assets whose value far exceeds the amount of those claims, the Trustee and the Noteholders are entitled to have all of those claims allowed and treated as secured claims under the Code.  *See* 11 U.S.C. §§ 506(a)-(b), 1129(b)(2)(A).

Here, too, the Plan includes language that might potentially be misread to suggest otherwise.  The Plan's lien-stripping  provision states that:

> "The Liens on the collateral securing the EFIH First Lien Note Claims …
> will be released on the EFH Effective Date even if the Makewhole Claims
> asserted by the EFIH First Lien Notes Trustee, … [and] the Holders of
> EFIH First Lien Note Claims … are the subject of an ongoing appeal as of
> the EFH Effective Date; *provided*, for the avoidance of doubt, that for
> purposes of determining whether any such Makewhole Claims are Secured
> Claims entitled to treatment as Class B3 … Claims (rather than as
> Unsecured Claims entitled to treatment as Class B6 Claims), the secured
> status of such Makewhole Claims shall be determined as if the Liens had
> not been released on the EFH Effective Date and remained in effect to the
> same extent they did immediately before the EFH Effective Date."

Plan Art. VIII.B.

As discussed *supra* part I, the Plan cannot strip the Noteholders' liens at all.  But, even if it could, the Plan would still be unconfirmable if this language were read to mean that the lien-stripping provision *does* affect the secured status of claims *other* than the Makewhole Claims (i.e., whether such claims are treated as Class B3 Claims or Class B6 Claims).  For example, the Trustee and the Noteholders have secured claims for any reasonable fees, expenses and indemnification claims (and interest thereon) that may be incurred in the future, including those incurred after the Effective Date.  For purposes of claims-allowance and treatment under the Plan (in Article III.B.19 and Article III.B.22),

any such claims incurred after the Effective Date should be treated as secured claims (as opposed to unsecured claims) to the same extent they would be entitled to such treatment today; the Plan's purported extinguishment of the liens cannot affect that determination. As noted, the Plan explicitly provides that the secured status of any Makewhole Claims allowed after the Effective Date should be determined as if the liens remained in place to the same the extent they did before the Effective Date.  To the extent that the Plan could be read to provide otherwise with respect to any other claims of the Trustee and the Noteholders, such as any fees and expenses (and interest thereon) they may incur after the Effective Date, it would not be confirmable.  *See* 11 U.S.C. § 1129(a)(1).[17]

### 4.    Fee-Review Process

Five days before this objection was due, the Debtors filed the Plan Supplement, which includes a process for reviewing the documented fees and expenses of the Trustee and the Noteholders.  *See* Plan Supplement, Ex. F, ECF 10101-6.  The proposed fee-review process raises at least three potential issues.

*Post-Effective Date fees*.  The fee-review process provides a deadline by which professionals and indenture trustees may submit invoices for fees and expenses incurred through the Effective Date.  It does not explicitly address the submission of invoices for fees and expenses incurred after the Effective Date.  The Plan, however, expressly allows reasonable and documented fees and expenses incurred after the Effective Date

---

[17]    The Plan's lien-stripping provision thus harms the Trustee and the Noteholders in potentially two distinct ways.  The first, discussed in text above, concerns the *allowance and treatment* of the Trustee's and Noteholders' claims against the estate—i.e., whether their claims are allowed and treated as Class B3 Claims or Class B6 Claims.  The second, discussed *supra* in part I, concerns the right to *collect* their allowed claims against Reorganized EFIH if it otherwise fails to pay those claims—i.e., as a secured creditor with a first-priority lien on EFIH's interests in Oncor or as a general unsecured creditor.

(including in the make-whole litigation), to the extent they are owed under the Indenture and the Notes.  Plan Art. III.B.19(b)(iii).  To the extent anything in the fee-review process could be read to deny such fees and expenses, the Plan would not be confirmable.  *See* 11 U.S.C. §§ 502, 1129(a)(1).

*Standard of review*.  The fee-review process contemplates that fees and expenses may be denied "if, and to the extent, the Court determines that such amounts are not reasonable."  *See* Plan Supplement, Ex. F, D.I. 10101-6, at 2.  The Plan allows "all reasonable and documented fees and expenses" of the Trustee and the Noteholders "(a) that (with respect only to such fees, expenses and claims incurred prior to the EFH Effective Date) are allowed under section 506(b) of the Bankruptcy Code and (b) that are owed under the EFIH First Lien Notes, the EFIH First Lien Note 2017 Note Indenture, the EFIH First Lien 2020 Note Indenture and/or any related agreement)."  Plan Art. III.B.19(b)(iii).  The reference in the Plan Supplement fee-review process to a "reasonableness" review is thus presumably the same reasonableness review specified in the Plan (i.e., reasonable within the meaning of the Indenture and the Notes and, solely with respect to pre-Effective Date fees and expenses, within the meaning of section 506(b) of the Bankruptcy Code).  To the extent anything in the fee-review process were read to provide any different, more restrictive, standard of review, it would not be confirmable.  *See* 11 U.S.C. §§ 502, 506(b), 1129(a)(1).

*Timing of review and payment*.  The fee-review process proposes the following time-line for the review and payment of fees and expenses:  (1) invoices for pre-Effective Date fees and expenses to be submitted within 45 calendar days after the Effective Date; (2) 80% of the fees and 100% of expenses to be paid within 10 business days after receipt

of such invoices, subject to disgorgement; (3) objections to such invoices to be asserted within 90 calendar days after receipt of such invoices; and (4) any request for a court hearing to resolve any fee disputes to be filed only after expiration of a minimum 30-day negotiation period following receipt of any such objections.

This proposed time-line is unnecessarily long.  The Trustee and the Noteholders submitted invoices to the Debtors' counsel nearly a year ago—in December 2015—for the fees and expenses they had incurred since the commencement of the case in May 2014, and they have regularly submitted invoices for fees and expenses incurred since then, and will continue to do so.  The Debtors have thus already had a substantial amount of time to review most of the pre-Effective Date fees and expenses that the Trustee and the Noteholders have incurred.  There is no reason the Debtors cannot assert any objections they have to those fees and expenses now and proceed toward resolving any disputes before the Plan goes effective.  Nor is there any reason why the Debtors cannot pay those fees and expenses in full on the Effective Date (or at least 80%, as they have proposed, with respect to any disputed portion of such fees that has not been fully resolved before the Effective Date).  Moreover, to the extent the Trustee and the Noteholders incur any additional fees and expenses after the Effective Date, including in connection with the make-whole appeal, there is no reason why the Debtors need 90 days after the receipt of each monthly invoice to determine whether they have any objection to it.

## JOINDER IN EFIH SECOND LIEN TRUSTEE'S OBJECTION TO PLAN

The Trustee hereby joins in the objections asserted in the *EFIH Second Lien Trustee's Objection to Debtors' Plan of Reorganization*, filed contemporaneously herewith, to the extent the Second-Lien Trustee's Objection addresses proposed terms of

the Plan that are equally applicable to the EFIH First Lien Notes Claims of the Trustee and Noteholders.

## **RESERVATION OF RIGHTS**

The Trustee reserves the right to supplement this Objection to the extent the Plan Supplement, or any further supplement or change to the Plan, affects the rights of the Trustee and the Noteholders.

## <u>CONCLUSION</u>

The Court should deny confirmation of the Plan unless it is modified to preserve

the Noteholders' liens and preserve their other rights, as set forth above and in <u>Exhibit A</u>.

Dated:  November 15, 2016

COLE SCHOTZ P.C.

 /s/ J. Kate Stickles                                 Warren A. Usatine
Norman L. Pernick (Bar No. 2290)        Court Plaza North
J. Kate Stickles (Bar No. 2917)        25 Main Street
500 Delaware Avenue, Suite 1410        Hackensack, NJ 07602
Wilmington, DE  19801        Telephone: 201-489-3000
Telephone: 302-652-3131        Facsimile:  201-489-1536
Facsimile:  302-652-3117        wusatine@coleschotz.com
npernick@coleschotz.com
kstickles@coleschotz.com


WILMER CUTLER PICKERING HALE AND DORR LLP
Philip D. Anker        Joel Millar
7 World Trade Center        David Gringer
250 Greenwich Street        Isley Gostin
New York, NY 10007        1875 Pennsylvania Avenue, NW
Telephone: 212-230-8800        Washington, DC 2006
Facsimile:  212-230-8888        Telephone:  202-663-6000
Philip.Anker@wilmerhale.com        Facsimile: 202-663-6363
        Joel.Millar@wilmerhale.com
        David.Gringer@wilmerhale.com
        Isley.Gostin@wilmerhale.com


ROPES & GRAY LLP
Keith H. Wofford        D. Ross Martin
Mark Somerstein        Andrew Devore
1211 Avenue of the Americas        800 Boylston Street, Prudential Tower
New York, NY 10036-8704        Boston, MA  02199-3600
Telephone: 212-596-9000        Telephone: 617-951-7000
Facsimile:  212-596-9090        Facsimile: 617-951-7050
Keith.Wofford@ropesgray.com        Ross.Martin@ropesgray.com
Mark.Somerstein@ropesgray.com        Andrew.Devore@ropesgray.com


DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714

Telephone:  212-248-3264
Facsimile:   212-248-3141
James.Millar@dbr.com

*Counsel for Delaware Trust Company*

## Exhibit A

NOTE:  Proposed additions are shown in bold font and deletions are shown with strikethrough effects.

1.        Plan Art. I.A.13 (Definition of "Allowed"):

"Allowed" means "… (c) a Claim or Interest that is upheld or otherwise allowed … (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); provided, however, that ~~unless otherwise expressly specified in the Plan~~ **notwithstanding anything to the contrary in the Plan**, the consummation of the Plan and the occurrence of the Effective Date is not intended to impair the right of any Holder or any of the Indenture Trustees to prosecute an appeal from, or otherwise petition for review of, any order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) disallowing any Claim; provided, further, for the avoidance of doubt, all parties reserve all rights in connection with any such appeal or petition, including (a) the right of any of the Reorganized Debtors to move for the dismissal of any such appeal or petition on grounds of equitable mootness or any other prudential basis and (b) the right of any Holder or any of the Indenture Trustees to oppose any such motion on any grounds, including on grounds that the relief sought in the appeal or petition is contemplated by or provided for under the Plan. …"

2.        Plan Art. III.B.19 ("Class B3 – EFIH First Lien Note Claims"):

"(b)      *Allowance*:  As Class B3 Claims, the EFIH First Lien Note Claims are Allowed in an amount equal to the sum of:

            ….

            (iv)  the amount of any other Claims, including any Makewhole Claims, and interest thereon**, including any Additional Interest and interest on interest** (whether accruing before, on or after the EFH Effective Date, as calculated in accordance with the EFIH First Lien Notes, the EFIH First Lien 2017 Note Indenture, the EFIH First Lien 2020 Note Indenture, and/or any related agreement, as applicable, or otherwise as determined by Final Order) …"

(c)      *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class B3, with the consent of the Plan Sponsor (such consent not to be unreasonably withheld), agrees to a less favorable treatment of its Allowed Claim, each Holder shall receive, up to the Allowed amount of its claim, payment in full in cash.  **Notwithstanding anything to the contrary in**

**the Plan, Holders of Class B3 Claims shall retain all existing Liens on all collateral securing such Claims (including the EFIH Debtors' ownership interests in Oncor) until all Class B3 Claims have been either (1) Allowed (whether before, on, or after the EFH Effective Date) and paid in full in Cash, or (2) disallowed by a Final Order, with such Liens to be senior to and have priority over all other Liens.**"

3.      Plan Art. VII.A ("Allowance of Claims"):

"Except as specifically provided as Allowed Claims pursuant to Article III.B of the Plan or otherwise objected to by the Debtors in the Chapter 11 Cases, the Plan shall serve as the Debtors' objection to all other ~~EFIH First Lien Note Claims~~, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, EFH LBO Note Claims, and EFH Legacy Note Claims under the respective indentures. …"

4.      Plan Art. VIII.B ("Releases of Liens"):

"Except as otherwise specifically provided in the Plan **(including Article III.B.19)** or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 (subject to the consent of the Plan Sponsor), III.B.17 (subject to the consent of the Plan Sponsor), III.B.27, or III.B.37 of the Plan (and, with respect to any Allowed Other Secured Claims Against the TCEH Debtors asserted by the Taxing Units or the Texas Comptroller which the TCEH Debtors shall Reinstate on the TCEH Effective Date until such Allowed Other Secured Claims are satisfied in the full Allowed amount), all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. ~~The Liens on the collateral securing the EFIH First Lien Note Claims and EFIH Second Lien Note Claims will be released on the EFH Effective Date even if the Makewhole Claims asserted by the EFIH First Lien Notes Trustee, the EFH Second Lien Notes Trustee, the Holders of EFIH First Lien Note Claims, and the Holders of EFIH Second Lien Note Claims are the subject of an ongoing appeal as of the EFH Effective Date; provided, for the avoidance of doubt, that for purposes of determining whether any such Makewhole Claims are Secured Claims entitled to treatment as Class B3 or Class B4 Claims (rather than Unsecured Claims entitled to treatment~~**

~~as Class B6 Claims), the secured status of such Makewhole Claims shall~~
~~be determined as if such Liens had not been released on the EFH Effective~~
~~Date and remained in effect to the same extent they did immediately~~
~~before the EFH Effective Date.~~"