```
                                              Page 1
 1    UNITED STATES BANKRUPTCY COURT

 2    DISTRICT OF DELAWARE

 3

 4

 5    In re:                     :

                                 :    Chapter 11

 6    ENERGY FUTURE HOLDINGS      :

      CORP., et al.,              :    Case No. 14-10979(CSS)

 7                                :

            Debtors.              :    (Jointly Administered)

 8    _____ :

 9

10

11

12

13                            United States Bankruptcy Court

14                            824 North Market Street

15                            Wilmington, Delaware

16

17                            August 23, 2016

18                            10:10 AM - 2:53 PM

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCEHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECR OPERATOR:  LESLIE MURIN
```

1    Notice of Filing Third Amended Joint Plan of Reorganization

2    of Energy Future Holdings Corp., et al., Pursuant to Chapter

3    11 of the Bankruptcy Code [D.I. 9199; filed August 5th,

4    2016] (as may be further modified, amended, or supplemented,

5    the "Plan")

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South and Sherri L. Breach

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3       Attorney for the Debtors

4

5   BY:  BARACK ECHOLS, ESQ.

6        BRYAN STEPHANY, ESQ.

7        MARK MCKANE, ESQ.

8        MARC KIESELSTEIN, ESQ.

9        MICHAEL ESSER, ESQ.

10       JUSTIN SOWA, ESQ.

11       CHAD HUSNICK, ESQ.

12

13   RICHARDS, LAYTON & FINGER

14       Attorneys for the Debtors

15

16   BY:  DANIEL J. DEFRANCESCHI, ESQ.

17       JASON MADRON, ESQ.

18

19   POTTER ANDERSON CARROON LLP

20       Attorney for Deutsche Bank New York

21

22   BY:  R. STEPHEN MCNEILL, ESQ.

23

24

25

```
1    VENABLE, LLP

2         Attorneys for Pimco

3

4    BY:  JEFFREY S. SABIN, ESQ.

5         JAMIE EDMONSON, ESQ.

6

7    WHITE & CASE

8         Attorney for TCEH Ad Hoc Group

9

10   BY:  J. CHRISTOPHER SHORE, ESQ.

11

12   FOX ROTHSCHILD

13        Attorney for the Ad Hoc TCEH Noteholders

14

15   BY:  JEFFREY M. SCHLERF, ESQ.

16

17   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

18        Attorneys for the Ad Hoc Committee of TCEH First Lien

19        Creditors

20

21   BY:  ALAN W. KORNBERG, ESQ.

22        JACOB A. ADLERSTEIN, ESQ.

23        KELLIE CAIRNS, ESQ.

24        MOSES SILVERMAN, ESQ.

25        ROBERT KILLIP, ESQ.
```

1  YOUNG CONAWAY STARGATT & TAYLOR, LLP

2       Attorney for the Ad Hoc Committee of TCEH First Lien

3       Creditors

4

5  BY:  PAULINE K. MORGAN, ESQ.

6

7  PACHULSKI STANG ZIEHL & JONES

8       Attorney for EFIH Second Lien Noteholder

9

10  BY:  LAURA DAVIS JONES, ESQ.

11

12  SULLIVAN & CROMWELL

13       Attorney for E-Side Committee

14

15  BY:  BRIAN GLUECKSTEIN, ESQ.

16

17  NIXON PEABODY

18       Attorneys for AST as EFH Indenture Trustee

19

20  BY:  GEORGE SKELLY, ESQ.

21       RICHARD PEDONE, ESQ.

22       ERIK SCHNEIDER, ESQ.

23       MORGAN NIGHAN, ESQ.

24       CHRIS FONG, ESQ.

25

1   MCELROY DEUTSCH MULVANEY & CARPENTER LLP

2        Attorney for TCEH Debtors - Conflict counsel

3

4   BY:  DAVID A. PRIMACK, ESQ.

5

6   MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

7        Attorney for E-Side Committee

8

9   BY:  MARK A. FINK, ESQ.

10

11  MORRIS JAMES

12        Attorney for Law Debenture

13

14  BY:  STEPHEN MILLER, ESQ.

15

16  MUNGER, TOLLES & OLSON

17        Attorney for TCEH Debtors - Conflict Counsel

18

19  BY:  TOM WALPER, ESQ.

20

21

22

23

24

25

1   SEWARD KISSEL, LLP

2        Attorney for Wilmington Trust as TCEH First Lien

3        Agent

4

5   BY:  ARLENE ALVES, ESQ.

6        MARK KOTWICK, ESQ.

7

8   KLEHR HARRISON HARVEY BRANZBURG LLP

9        Attorney for UMB Bank, Indenture Trustee

10

11  BY:  RAYMOND H. LEMISCH, ESQ.

12

13  AKIN GUMP STRAUSS HAUER & FELD

14       Attorneys for UMB Bank, Indenture Trustee

15

16  BY:  CHRISTOPHER CARTY, ESQ.

17       ABID QURESHI, ESQ.

18

19  PATTERSON BELKNAP

20       Attorney for Law Debenture Trust Company

21

22  BY:  DANIEL LOVENTHAL, ESQ.

23

24

25

1    PROSKAUER ROSE

2        Attorneys for EFH Corp.

3

4    BY:  PETER YOUNG, ESQ.

5        MARK THOMAS, ESQ.

6        MICHAEL FIRESTEIN, ESQ.

7

8    REED SMITH, LLP

9        Attorney for EFCH 2037 Notes Trustee

10

11   BY:  SARAK KAM, ESQ.

12

13   MORRISON & FOERSTER, LLP

14       Attorneys for TCEH Committee

15

16   BY:  BRETT MILLER, ESQ.

17       ERICA RICHARDS, ESQ.

18

19   CROSS & SIMON, LLP

20       Attorneys for EFH Indenture Trustee

21

22   BY:  CHRISTOPHER SIMON, ESQ.

23       KEVIN MANN, ESQ.

24

25

1  HOGAN MCDANIEL

2        Attorneys for Fenicle, Fehy & Jones

3

4  BY:  DANIEL K. HOGAN, ESQ.

5        GARVAN MCDANIEL, ESQ.

6

7  DRINKER, BIDDLE & REATH, LLP

8        Attorney for Citibank, DIP Agent

9

10  BY:  HOWARD A. COHEN, ESQ.

11

12  BIELLI & KLAUDER

13        Attorneys for EFH Corp.

14

15  BY:  DAVID KLAUDER, ESQ.

16        CORY STEPHENSON, ESQ.

17

18  ASHBY & GEDDES

19        Attorney for WSFS

20

21  BY:  RICARDO PALACIO, ESQ.

22

23

24

25

```
1   BROWN RUDNICK

2        Attorney for WSFS

3

4   BY:  JONATHAN MARSHALL, ESQ.

5

6   KASOWITZ BENSON TORRES & FRIEDMAN, LLP

7        Attorneys for Fenicle, Fehy & Jones

8

9   BY:  ANDREW GLENN, ESQ.

10       NII-AMAR AMAMOO, ESQ.

11

12  FRIED FRANK

13       Attorneys for Fidelity

14

15  BY:  GARY KAPLAN, ESQ.

16       ALICIA AIN, ESQ.

17       MATT ROOSE, ESQ.

18

19  UNITED STATES DEPARTMENT OF JUSTICE

20       Attorney for U.S. Trustee

21

22  BY:  RICHARD L. SCHEPACARTER, ESQ.

23

24

25
```

1                   P R O C E E D I N G S

2                   P R O C E E D I N G S

3            THE CLERK:  All rise.

4            THE COURT:  Please be seated.   Give me just a

5     minute.  I've got a bit of a mess here.

6        (Pause)

7            MS. NIGHAN:  Good morning, Your Honor.

8            THE COURT:  Good morning.  Sorry about that.

9            MS. NIGHAN:  No worries.  Morgan Nighan from Nixon

10    Peabody on behalf of American Stock Transfers, the EFH

11    indenture trustee.

12            Your Honor, this morning we would like to move in

13    a series of exhibits in connection with testimony that has

14    been elicited this week, and my understanding is that

15    there's no objection.  Your clerk has a copy of this list.

16            For the record the exhibits to be moved in are

17    AST-11, AST-179, AST-407, AST-408, AST-409, AST-411, AST-

18    412, AST-422, DX-17, DX-355, DX-373 and DX-468.

19            THE COURT:  Any objection?

20            MR. MCKANE:  No objection, Your Honor.

21            THE COURT:  They're admitted.

22            MS. NIGHAN:  Thank you.

23            THE COURT:  You're welcome.

24            MS. NIGHAN:  At this time the EFH indenture

25    trustee would like to call Jack Williams.

1           THE COURT:  Very good.

2           Dr. Williams, if you would just take the stand and

3    remain standing.

4           DR. WILLIAMS:  Yes, Your Honor.

5           THE CLERK:  Please raise your right hand.

6              JACK FREDERICK WILLIAMS, WITNESS, SWORN

7           THE CLERK:  Please state and spell your name for

8    the record.

9           THE WITNESS:  Jack Frederick Williams, J-A-C-K

10   F-R-E-D-E-R-I-C-K W-I-L-L-I-A-M-S.

11          THE CLERK:  Thank you very much.

12          THE WITNESS:  You're welcome.

13                    DIRECT EXAMINATION

14   BY MR. SKELLY:

15   Q    Good morning, Professor Williams.  I'm George Skelly,

16   as you know, for American Stock Transfer, the EFH indenture

17   trustee.

18          Mr. Williams, where do you work?

19   A    I'm presently working with Baker, Tilly, Virchow and

20   Krause as a consultant.  I head up the restructuring and

21   valuation division at Baker Tilly.

22   Q    And, Professor, where do you teach?

23   A    I teach at Georgia State University in the College of

24   Law.  I also teach classes in the business school as well.

25   Q    How long have you been a professor there?

1    A    I've been a professor at Georgia State University since

2    1991.

3    Q    And what do you teach?

4    A    I teach in the area of bankruptcy, taxation.  I teach

5    mergers and acquisitions, an advanced business

6    reorganizations class, corporate finance, and a few other

7    classes as well.

8    Q    Do you at times teach in a satellite program?

9    A    Yes, I do.  I do a lot of continuing legal and

10   professional education, and I have in the past taught

11   bankruptcy taxation to the Internal Revenue Service's Office

12   of Chief Counsel through, for example, the New York

13   University IRS CPE program.  And that was material that I

14   would present involving tax issues that are -- would arise

15   in restructurings outside of bankruptcy and in the

16   bankruptcy process itself.

17   Q    Very briefly can you describe your academic

18   publications?

19   A    Sure.  I have approximately 18 books and/or chapters.

20   I have about 85 to 90 articles, and I have about 150 to --

21   about 150, I believe, CPE or CLE outlines in a broad

22   spectrum of subjects and disciplines.

23   Q    Is this writing primarily in the areas of taxation and

24   bankruptcy?

25   A    It covers a number of areas.  I do bankruptcy.  I do

1    taxation.  I focus on bankruptcy and tax.  I do a lot of

2    writing in the valuation area as well and in the fraudulent

3    transfer and avoidance powers areas.

4    Q    What does Baker Tilly do?

5    A    Baker Tilly is a public accounting firm that does audit

6    and attestation, tax and consulting advisory services.  It's

7    the thirteenth largest firm in the United States and part of

8    an international organization.

9    Q    And how long have you been a principal there?

10   A    I've been there since January of this year.  Prior to

11   that I was at Mesirow Financial Consulting.

12   Q    Can you briefly describe your career prior to Mesirow?

13   A    Prior to Mesirow I was -- besides teaching I was with

14   BDO Seidman for about 11 years, and I was their national

15   director of special situations in the consulting practice

16   where I focused on tax and bankruptcy and distressed mergers

17   and acquisitions.

18   Q    And can you give us a very brief overview of your

19   education and certifications?

20   A    Sure.  I have a bachelors degree in economics from the

21   University of Oklahoma.  I have a JD from George Washington

22   University and a PhD in archeology from the University of

23   Lester.

24   Q    And certifications?

25   A    I -- I'm a certified insolvency and restructuring

1    advisor with CIRA and I have a certificate in distressed

2    business valuations.

3    Q    Who were you retained by in this matter?

4    A    The retention took place, I believe, in 2014 originally

5    when I was at Mesirow Financial Consulting and it was by

6    counsel of the EFH indenture trustee.

7    Q    Did you prepare a written statement summarizing your

8    testimony here today?

9    A    Yes, I did.

10   Q    Okay.

11            MR. SKELLY:  Your Honor, consistent with the

12   practice in this case we provided binders for Your Honor and

13   for the witness and the clerk.

14   BY MR. SKELLY:

15   Q    And I would like to direct your attention to the first

16   tab in your binder, Professor.

17   A    I have it.

18   Q    Can you tell us what that -- what's behind that tab?

19   A    This is the expert direct testimony of Professor

20   Williams, my expert direct testimony.

21        (Laughter)

22   Q    And did you prepare this?

23   A    Yes, I did.

24   Q    And is the information contained there accurate to the

25   best of your knowledge?

1   A    Yes, it is.

2          MR. SKELLY:  Your Honor, I move Professor Williams

3   direct testimony into evidence at this time.

4          MR. ECHOLS:  No objection, Your Honor.

5          THE COURT:  It's admitted.

6      (EFH Indenture Trustee's Exhibit AST-DIR Williams was

7   admitted)

8   BY MR. SKELLY:

9   Q    Professor, can you tell us what you were asked by

10  counsel for the EFH indenture trustee to do with respect to

11  these conf -- to this confirmation trial?

12  A    Yes.  I was asked to address the question of the -- to

13  address the question of value of EFH Corporation's interest

14  in EFH Corporate Services, to assess and analyze and render

15  an opinion as to the -- as to that value.

16  Q    In connection with providing your opinion did you

17  prepare an expert report?

18  A    Yes, I did.

19  Q    And a supplemental report?

20  A    Yes.  I prepared both the initial report and the

21  supplemental report.

22  Q    Do you have an opinion regarding the value of the

23  equity in EFH Corporate Services?

24  A    Yes, I do.

25  Q    And what is that opinion?

1    A    I -- my opinion is that the value of the equity in EFH

2    Corporate Services is at least $12.88 million without giving

3    or assigning any value to the assembled workforce which is

4    an intangible asset of EFH Corporate Services.

5    Q    Can you describe for the Court how you arrived at your

6    opinion?

7    A    Yes, I can.  I applied well accepted valuation

8    methodologies and structures.  I began first with the -- an

9    assessment of the purposes for which the valuation would be

10   given, looked at the facts and circumstances surrounding

11   Corporate Services' historical present and projected role.

12   I looked at the facts and circumstances involving the terms

13   and conditions of the proposed plan and Corporate Services'

14   role in that proposed plan.

15          I then identified the interest of the debtor, EFH

16   Corporation, in Corporate Services for purposes of valuation

17   and evaluating that interest.

18          My next step then was to, in accordance with well

19   accepted valuation procedures and valuation theory, was to

20   identify an appropriate premise and standard of value.

21          After identifying the appropriate premise and

22   standard of value I then applied the appropriate

23   methodologies which would include an identification of the

24   appropriate approach and method within that approach given

25   the premise and standard of value.

1            Then I reached a conclusion following the rigors

2    of that methodology as to the estimated value of the equity

3    in EFH Corporate Services.  And as I mentioned I reached

4    that conclusion that the equity value was at least $12.88

5    million without assigning value to the assembled workforce

6    in these circumstances.

7            And I concluded that, for reasons I discuss in my

8    report and I'm happy to share with the Court that although

9    the assembled workforce has significant value, that in these

10   circumstances there were reasons for me to conclude that

11   although it's an intangible asset it would not be consistent

12   with the valuation theory and literature as I understood it

13   and my own judgment in concluding that I would assign a

14   value to it for purposes of this valuation and these

15   circumstances.

16   Q    Let's back up.  I think you said the first step was to

17   determine the correct premise.

18   A    Yes.  The -- well, the first step is to identify the

19   purpose for which the valuation is undertaken.

20   Q    Right.  And then based on that to identify the correct

21   premise?

22   A    Correct.

23   Q    And what was the premise that you concluded was

24   appropriate here?

25   A    I concluded that the premise that would be appropriate

1    in these circumstances, given the purpose for which the

2    property, the interest of the debtor and the property that

3    was being transferred would be a going concern premise.

4    Q    Okay.  And having established that the going concern

5    premise is the proper premise, you then would determine what

6    is the appropriate standard; is that right?

7    A    That is correct.  It's part of the same step, if you

8    will.  They're both often times referred to together as the

9    definition of value.

10   Q    Okay.  And --

11   A    But --

12   Q    And what did you decide was the appropriate standard to

13   use here?

14   A    In these circumstances I thought the appropriate

15   standard in my opinion would be the fair valuation standard.

16   It's a standard that's commonly used in the bankruptcy

17   context and it allows a consideration of the actual parties

18   to the transaction and the purpose for which the transaction

19   is undertaken.

20   Q    And then you moved on in light of the appropriate

21   premise and standard to determine the appropriate approach;

22   is that correct?

23   A    That is correct.

24   Q    And what did you determine was the appropriate

25   approach?

1    A     In these circumstances I believe the appropriate

2    approach was the asset approach.  It's a well accepted

3    approach for determining the value of the company and, here,

4    the value of the equity held in that company.

5    Q     And did that then lead in turn to your conclusion of

6    what would be the appropriate method within that approach?

7    A     Yes.  The appropriate methodology within that approach

8    would be the -- what's often called the adjusted balance

9    sheet method.  It's also a common methodology that's

10   employed in the bankruptcy context and I found it to be

11   appropriate in these circumstances.

12   Q     Is there a reason that in doing such a valuation you

13   begin with identifying a premise for the valuation?

14   A     You start with the purpose, the premise and the

15   standard because those are the steps that impose a rigor and

16   discipline on the application of the methodology going

17   forward.  Those are well accepted steps, and then they

18   trigger or suggest well accepted methodologies.  And so then

19   others who are trained in the field can then identify and

20   follow the application of those methodologies, and in many

21   instances have the ability to assess, test and replicate the

22   ultimate estimate of value even though another valuation

23   expert may disagree with the ultimate estimate of value.

24   Q     Does having determined to proceed under a going concern

25   premise have consequences for what types of costs you would

1    include in making a valuation determination?

2    A    Yes, it does.  There's a lot that goes into a valuation

3    of a company right at that stage because there are

4    consequences associated with the premise because it helps

5    frame the standards and methodology that we're following.

6    So it's not something that's likely taken -- you take it

7    under consideration.  I did and I did with my team.  I had

8    four to five others who were working with me.  And we

9    considered this very carefully.  We looked at the

10   alternative premises and the alternative standards.  We

11   debate them, and I ultimately make the conclusion, and I

12   did, that the appropriate premise given the purpose was a

13   going concern premise.

14        That then leaves me to focus on the types of

15   adjustments that would take place under my approach and

16   under my method that would be appropriate with a going

17   concern, which would lead me not to consider as part of the

18   adjusted balance sheet approach hypothetical costs

19   associated with a liquidation, for example.

20   Q    Can you describe what steps you took in applying the

21   adjusted balance sheet method?

22   A    Yes.  We started with the debtors' financial

23   statements, particularly the balance sheet.  This was the

24   balance sheet of Corporate Services.  We then made

25   adjustments to those balance sheets based on a deep dive

1    into the various accounts that appear on the balance sheet.

2    Then we considered off balance sheet assets, one of those

3    would be the assembled workforce, and off balance sheet

4    liabilities if any were present.

5            We adjusted those accounts after digging deep into

6    the books and records of the company to their fair value and

7    then estimate the fair value of the assets and the fair

8    value of the liabilities, and the difference between the two

9    would be the total equity at a fair valuation as a going

10   concern.

11   Q    Did you prepare a chart that summarizes your

12   adjustments?

13   A    Yes, I did.

14   Q    I would like you to turn to the -- I think it's the

15   second tab in your binder.

16   A    Yes, I have it.

17   Q    And is that the chart you prepared to summarize your

18   adjustments?

19   A    Yes, it is.

20   Q    Can you explain generally what the chart shows?

21   A    Sure.  So the chart shows various asset accounts and

22   liability accounts that you can find on the balance sheet of

23   the debtor.  This was, I believe, an April balance sheet

24   published I think in June or had a June run date on it.

25   Then the stated values that are on the balance sheet, then

1    the adjustments that I made, and then the estimated fair

2    value of those adjustments.

3            And so the -- a balance sheet is a summary of

4    various accounts, asset accounts and liability accounts here

5    to get a proper sense of the meaning behind or the narrative

6    behind the numbers if you will.  We looked at the backup to

7    those particular accounts and then we made our fair value

8    adjustment based on the facts and circumstances that we were

9    able to develop in the balance sheets of the company, the

10   monthly operating reports of the company.  We went back to

11   the ledgers and the subledgers as well to understand what

12   was behind the stated values so that we could properly make

13   the adjustments.

14           And we also had the opportunity to have a

15   conversation -- it was a telephone conversation -- with

16   Alvarez & Marsal, the financial advisor to the debtors and

17   they were very helpful in helping us understand some of the

18   issues that we had and provided a lot of help in the

19   process.

20   Q    I note that there are parentheses around all of the

21   adjustments in the assets column on the top half of your

22   chart there?

23   A    Well, all but the 3.05.

24   Q    All but the 3.05.  All right.

25   A    Yeah.  That's a zeroing out, though.  Those are

1    downward adjustments.  Based on our analysis to just a -- to

2    fair value some of the accounts required a downward

3    adjustment after our own review of the support behind those

4    particular adjustments.  I go into much greater detail in my

5    initial report and my supplemental report as to those

6    particular adjustments.

7              And, of course, some accounts rarely would have an

8    adjustment.  Occasionally they'll pop up, but cash and cash

9    equivalents, for example, it's stated value or book value

10   that's estimated.  Fair value would generally be the same

11   absent some encumbrance or lien that may not be present.

12   Q    And does the --

13   A    Present.  I should say may not be present on the

14   balance sheet, but you find out when you dig into the

15   supporting documents.

16   Q    And did your estimated fair value conclusion of 12.88

17   million attribute any value to the assembled workforce?

18   A    No, it did not.  What we would do after we've

19   identified the asset accounts and the liability accounts

20   would be to look for off balance sheet assets and

21   liabilities.  This process often times begins with a gap, a

22   generally accepted accounting principal balance sheet.  But

23   gap informs the process.  It doesn't constrain it.  We would

24   also include contingent assets and contingent liabilities,

25   and off balance sheet assets and off balance sheet

1    liabilities.  The assembled workforce is not on this, but it

2    would be part of a fulsome valuation.

3            I concluded based on the facts and circumstances

4    here attributing value to the assembled workforce would be

5    inappropriate under applicable valuation theory.  And,

6    again, not because it doesn't have value, but it was -- we

7    were looking at the valuation in the context of a given

8    transaction.

9            And to value an assembled workforce you would

10   usually use a variant of the replacement cost.  You have an

11   assembled workforce in place.  How much would it cost to

12   replicate it or to replace it, and that cost then becomes an

13   estimate of the value of that workforce.  And that would

14   include costs associated with hiring, recruiting, training,

15   but training to -- not for their basic requirements, but for

16   the particular job.  And, of course, the efficiency costs.

17           And here I concluded that since the proposed

18   transfer was going to reorganized TCEH and the workforce

19   predominantly worked for TCEH, and if the E-Side was not

20   going to use the workforce going forward, then the T-Side if

21   you will could replicate it, that workforce, without the

22   classic expenditures of going out to try to find a

23   workforce, recruiting it, hiring it, training it.

24           And so for this buyer in these circumstances I did

25   not think it would be appropriate to assign a value to the

1    assembled workforce.

2    Q    Did you understand, Professor Williams, that the

3    debtors in this case have retained Mr. John Stewart of

4    Alvarez & Marsal to respond to your valuation of EFH

5    Corporate Services?

6    A    Yes.  And I've had the opportunity to read his expert

7    reports and rebuttal report.

8    Q    And both his initial expert report and the rebuttal

9    report?

10   A    That is correct.

11   Q    And did you have an opportunity to read his direct

12   testimony, his declaration?

13   A    Yes, I did.

14   Q    And were you present yesterday during his testimony?

15   A    Yes.  All but for about two or three minutes.

16   Q    Do you understand that Mr. Stewart has also performed

17   an adjusted balance sheet valuation of EFH Corporate

18   Services?

19   A    Yes.  He is -- my understanding in reviewing his report

20   and his direct testimony is that he has applied an adjusted

21   balance sheet methodology to the valuation of the equity in

22   Corporate Services.

23   Q    And what was his conclusion?

24   A    I believe his conclusion was the equity value was $15.2

25   million.

1    Q     If you could turn to your binder to the Stewart

2    rebuttal report.  And this is the rebuttal report that you

3    reviewed, correct?

4    A     Yes, it is.

5    Q     And if you could turn your attention to the last page?

6              THE COURT:  Just for the record this is marked DX-

7    381?

8              MR. SKELLY:  Yes, Your Honor.  I apologize.  Yes.

9              THE COURT:  It's okay.

10             MR. SKELLY:  DX-381.

11   BY MR. SKELLY:

12   Q     Are you aware, Professor Williams, that Mr. Stewart's

13   expert report, his rebuttal report criticized your analysis

14   in part because he asserted, and I'm going to just read the

15   second bullet here:

16             "The Williams' report also failed to consider the

17             transaction holistically, effectively ignoring the

18             benefit that the E-Side creditors will realize as

19   a         result of avoiding a significant stranded tax

20             liability."

21             You're --

22   A     Yes.  I --

23   Q     -- aware of that.  Yes.  Do you have an understanding

24   based on the testimony that you're aware of in this case

25   that this report was provided to the joint boards?

1    A    Yes.  The report I believe in a June or a July 27th

2    deck went to the boards.

3    Q    In your view is Mr. Stewart's statement that I just

4    directed your attention to, is that correct?

5    A    No, it's not.

6    Q    Okay.  I would like to direct your attention to the

7    next tab, the Stewart declaration, which is D-Dir Stewart,

8    for the record.  And in particular I'll direct your

9    attention to paragraph 82 which is on page 24.  And the

10   first sentence there where Mr. Stewart asserts:

11              "In short, the failure to consider the value of

12   EFH      Corporate Services in the context of a plan as a

13              whole, and the failure to consider other potential

14              liabilities EFH Corporate Services could incur

15              absent the proposed transfer leads to an

16              overstatement of the equity value of EFH Corporate

17              Services."

18              Do you see that?

19   A    Yes, I do.

20   Q    Do you agree with Mr. Stewart's conclusion there?

21   A    No, I do not.  The assessment of the facts and

22   circumstances of a given transaction are an important part

23   of the process.  And that process was undertaken by me and

24   my team, by my team and I in this engagement.  We used that

25   process, among other things, to identify the purposes of the

1   transactions, the parties to the transaction, and the terms

2   and conditions of the plan to arrive at our conclusion that

3   a going concern premise and a fair valuation standard would

4   be appropriate in these circumstances.

5         We then used the facts and circumstances in the

6   application in the following of the method -- the approach

7   and methodologies identified which leaded -- which led to an

8   estimate of the value of 12.88 million.  Facts and

9   circumstances are clearly important, but the methodologies

10  that have identified are designed to impose a rigor and

11  discipline on how the valuation expert approaches those

12  facts and circumstances.

13        And in this situation the -- once you apply the

14  premise, the standard, the approach and methodology it would

15  be inappropriate under well-accepted valuation theory than

16  to make post-valuation adjustments based on the facts and

17  circumstances that were inconsistent with the premise and

18  standard of value originally undertaken.

19  Q   Prior to Mr. Stewart's live testimony on Monday did you

20  understand his criticism to be implying that your valuation

21  should have been reduced to take into account --

22  A   Yeah.  This --

23  Q   -- these factors?

24  A   Yeah.  I think I was surprised in part by the

25  testimony.  I felt the criticism in reading the Stewart

1    rebuttal report is that once you concluded -- the criticism

2    means that once you concluded that the value was 13 million

3    or 15 million the next step in the methodology would then be

4    to reduce it by the liabilities that he identified, the

5    hypothetical cost of the liquidation that would be avoided

6    in the going concern.  That particular approach would be

7    inconsistent with the valuation theory in literature I'm

8    familiar with because it would be inconsistent with the

9    premise.

10           But in his testimony Mr. Stewart stated that that

11   wasn't the case; that he wasn't going to subtract one from

12   the other and that the avoided hypothetical liquidation

13   costs were further considerations, but not a reduction per

14   se of a valuation model.  And that's nuance, but a different

15   approach to how I understood his rebuttal report.

16   Q    Okay.  Mr. Stewart's criticism mentioned -- suggested

17   that there was a failure on your part to consider the

18   transaction holistically and that the implication seems to

19   be that somehow that would have an impact on the valuation,

20   whether it implies that you should be subtracting some

21   amount or otherwise.  You know, it's, I suppose, a little

22   unclear.

23           Are you familiar with any accepted valuation

24   methodology that uses a holistic approach to impose post-

25   valuation adjustments?

1   A     In response to that question, no, I'm not.  But I --

2   holistic is in the eye of the beholder.  And as I've said a

3   couple of times, you do consider the nature and

4   circumstances.  You do that on the front end.  And so I'm

5   very comfortable with a holistic assessment on the front end

6   of the analysis.

7           But using then a holistic approach to modify post-

8   valuation, your estimate of value would be inappropriate,

9   particularly when that holistic approach now includes the

10  very types of costs one would avoid in a going concern.

11  Q    And when you say the types of costs one would avoid in

12  a going concern, are you referring to, for instance,

13  liquidation costs?

14  A    Sure.  That's precisely what I'm referring to.

15  Nothing's free in the world including the liquidation of a

16  company.  So if one were to liquidate there are costs

17  associated with the liquidation of that company.  But those

18  costs are avoided in a going concern, so they're not

19  incurred.  They're hypothetical.

20  Q    And, again, Mr. Stewart's criticism mentions the

21  subject of a potential stranded tax liability.  In the

22  course of your work on this matter did you actually consider

23  stranded tax liability?

24  A    Yes, I have.  I've been quite fascinated with all of

25  the tax issues in this case, which may be more commentary on

1   my social life than anything else.  But I'm quite excited

2   about the tax.

3       (Laughter)

4   Q    Did you conclude that the possibility of a stranded tax

5   liability under certain circumstances is something that

6   would require an adjustment in the value?

7   A    No.  The stranded tax would not acquire -- would not

8   require an adjustment in the estimate of the value in this

9   case.  It's -- when we talk about the stranded tax or when

10  it's talked about in this context, and focusing on Corporate

11  Services, it's really -- it should be recast in a context of

12  a forbearance by the secured creditors on the T-Side of a

13  taxable transaction lead by them.  That would not constitute

14  an adjustment to the value estimate of the equity in

15  Corporate Services.

16          That may be a question for motivation.  It may be

17  a question that a board might consider.  But the stranded

18  tax threat, and I don't mean it in a pejorative sense, it's

19  just simply the first liens saying on the T-Side saying that

20  they would go forward with at taxable transaction.  It

21  doesn't result in an adjustment of the value, otherwise it

22  could justify transfers without equivalent value.

23  Q    Can you explain what you mean by that last comment?

24  A    Certainly.  The -- Mr. Stewart and I applied I believe

25  the same premise, the same standard, and the same approach

1    and same methodology, and we concluded based on the facts

2    and circumstances almost -- well, very close to each other

3    that the fair value of this company is 13 to $15 million.

4            A board should hear that.  The company is worth 13

5    to $15 million.  It's not worth zero.  So that when a board

6    considers the value of the equity in Corporate Services it's

7    considering it from the perspective of what am I getting in

8    exchange, not for zero, but what am I getting in exchange

9    for 13 to $15 million at a time that I'm insolvent in the

10   bankruptcy case.  That's what I mean.

11           And now the stranded tax, potential stranded tax

12   could be viewed in that context of a forbearance, but it

13   isn't an adjustment to the actual value that Mr. Stewart and

14   I have reached in this case.  It becomes a possibly value

15   consideration in exchange, but that would have to be

16   quantified and identified and then considered by a board.

17           THE COURT:  I'm sorry to interrupt, but is it your

18   testimony that EFH Corporate Services is insolvent?

19           THE WITNESS:  No.  My testimony is that EFH --

20   excuse me -- EFH Corporation, the parent, may be insolvent.

21   And, therefore, what's being sold here is actually the

22   equity at EFH Properties and EFH Corporate Services.  And so

23   that transfer then, if there's a failure of equivalent

24   value, would be at the expense of their unsecured creditors.

25   That's where my focus is.

1            THE COURT:  Okay.

2            THE WITNESS:  My conclusion is Corporate Services

3    is solvent and has positive equity value.

4            THE COURT:  That's what I thought so I was

5    confused when you said that it would constitute a transfer

6    without value.  So -- excuse me -- would constitute a

7    transfer of value at a time when the transferor was

8    insolvent.  But your position is that EFH Corp has -- EFH

9    Corp is insolvent or may be insolvent and is transferring

10   the solvent equity value of EFH Corporate Services.

11           THE WITNESS:  That is correct.

12   BY MR. SKELLY:

13   Q    And in that context if it were to transfer for that

14   solvent equity which you and Mr. Stewart valued at between

15   13 and $15 million for zero dollars because of a

16   consideration that there might have been a possible stranded

17   tax, I think you said earlier that that could lead to a

18   situation where that transfer was for less than equivalent

19   value.

20   A    Yes.  Business judgment is from a financial perspective

21   and that's all I'm testifying to.  Business judgment is

22   value from a financial perspective, not a defense to a lack

23   of reasonably equivalent value from a financial perspective.

24   Of course, those are ultimately legal determinations.

25           But from a financial perspective the transferor,

1    EFH Corporate, here the parent, would be transferring an

2    asset of 13 to $15 million and then the question becomes

3    what do they receive in exchange for that.

4             The what they receive in exchange for that,

5    whether it's in the form of a stranded tax or some other,

6    doesn't reduce the value estimate of what was transferred.

7    It's just a consideration of what was received in exchange

8    for the transfer --

9             THE COURT:  So let me --

10            THE WITNESS:  -- that was made.

11            THE COURT:  Since I'm confused let me --

12            THE WITNESS:  Sure.

13            THE COURT:  Why is it not the case that receiving

14   an exchange for the transfer of value, the elimination of a

15   contingent liability not consideration that you take into

16   account?  So why doesn't that count against the value that's

17   being given up?

18            THE WITNESS:  The -- your question is a great one.

19   The --

20            THE COURT:  Great.  Well, thank you.

21       (Laughter)

22            THE WITNESS:  Because it's precisely -- it really

23   is precisely the question.

24            I've identified that the value being transferred,

25   the equity interest in Corporate Services by the parent is

1   worth $13 million.  Now what did they receive in exchange

2   for that $13 million could include direct, you know, I would

3   argue indirect benefits from a financial perspective.

4   Forbearance could possibly be part of the value that one

5   would consider.

6          For the -- if the forbearance, the relief from the

7   stranded tax, for example, and the forbearance, the flip

8   side of that, the forbearance by the first liens on the T-

9   Side could constitute value, but it would require us then to

10  value at a fair valuation the stranded tax liability, which

11  would require us then to look at the probability or

12  likelihood if you will of a taxable transaction given the

13  facts and circumstances that we have now.

14         It doesn't reduce the 13 million, but it is a

15  consideration for what value the debtor, EFH Corporate, the

16  parent received in exchange for the 13 million.  And it's a

17  classic example that valuation theory is really the

18  handmaiden of the Court, not it's jailer.  The -- we're --

19  Mr. Stewart and I are here to help aid the trier of fact.

20  But there are a number of problematic legal issues.  For

21  example, how you would consider the stranded tax.

22         From a valuation perspective, if I were looking at

23  the stranded tax liability, we know what the potential

24  magnitude and worst case scenario is.  You've heard that

25  testimony.  The question then becomes what's the

1    probability, given the transaction, of a stranded tax or a

2    taxable plan being proposed by the first lien filed and

3    confirmed by the Court in these circumstances.

4            And then we would then value that based on the

5    likelihood of the stranded tax and alternatives here that

6    may be available as well.  Those are the types of things

7    that I would anticipate that a board would do in assessing.

8    So, for example, questions like, the actual plan in place

9    now, does it have a taxable transaction.  That's been put in

10   stasis.  The first liens have said that they will file a

11   plan if this isn't confirmed that will be a taxable

12   transaction.  I can't say they've said that.  I don't know

13   if they've testified.  But the debtors believe it because

14   they've testified, the debtors' representatives.

15           But, you know, the first liens, when you've done

16   this many times and we all have, the first liens are not

17   monolithic.  I think I saw 18 pages worth of first lien

18   holders with different risk appetites.  So you would want to

19   assess whether that group can come to consensus on the risk

20   associated with a taxable transaction.

21           Then you would look at alternative ways out,

22   alternative plans short of what you have on the table and

23   there's a lot of opportunity for that, and determining

24   whether there would be a potential taxable transaction.

25           And then, of course, the debtors have said through

1    their representatives that they would object to any taxable

2    plan and the Justice Department, if there's a stranded tax,

3    potentially would certainly object to a taxable plan.  And I

4    haven't found in my research any plan that's been confirmed

5    where both Justice and the debtor have objected to a plan,

6    particularly where they may be an alternate way out.

7              But, of course, you're talking also about a large

8    magnitude of tax liability as well, although those I would

9    expect to be things that the board would have considered in

10   the process in determining what value to attribute to the

11   avoidance of a stranded tax in exchange for the $13 million.

12             THE COURT:  Okay.

13             MR. SKELLY:  Okay.

14             THE COURT:  Thank you.  That's helpful.

15             MR. ECHOLS:  I'm sorry, Judge.  If I could ask a

16   favor.  I'm having a little bit of trouble hearing Mr.

17   Williams.  If he could be a little closer to the mic.

18             THE COURT:  All right.  We'll turn him up, too.

19             MR. ECHOLS:  Oh, thank you.

20             THE WITNESS:  I apologize, Counsel.

21             THE COURT:  Go ahead.

22        (Pause)

23   BY MR. SKELLY:

24   Q    Setting aside for the moment the issue of potential

25   stranded tax, you understand that Mr. Stewart also

1    criticizes your analysis for what he perceives as a failure

2    to consider potential liquidation costs, including severance

3    and some other potential liquidation costs if EFH Corporate

4    Services were not to be transferred; is that right?

5    A    Yes.  That's how I understand the criticism.

6    Q    And you don't agree with that conclusion?

7    A    No, I do not.

8    Q    And, again, why not?

9    A    Again, I've gone through the analysis that we undertook

10   regarding the determination of the appropriate premise in

11   these circumstances and concluded that the appropriate

12   premise for value is a going concern premise.  That would be

13   the actual transactions being proposed here and the highest

14   and best use of Corporate Services in these circumstances.

15           Once you conclude that a going concern is the

16   appropriate premise of value, then the liquidation cost

17   associated with a hypothetical liquidation aren't an

18   adjustment of the value itself.  That would be inconsistent

19   with the going concern premise in the first instance.

20           MR. SKELLY:  If we could have just a moment, Your

21   Honor.

22           THE COURT:  Uh-huh.

23       (Pause)

24           MR. SKELLY:  I have no further questions and would

25   pass the witness, Your Honor.

1          THE COURT:  Okay.  We'll take a very short recess

2     and then we'll move to cross-examination.

3          (Recessed at 10:58 a.m.; reconvened at 11:05 a.m.)

4          THE CLERK:  All rise.

5          THE COURT:  Please be seated.

6          Okay.  Thought we were done.

7          MR. SKELLY:  Your Honor, we've been asked by the

8     clerk to designate the two exhibits that Professor Williams

9     talked about with designations that are consistent with

10    others that have been used in the record, and so what we are

11    going to do and state on the record, with your permission,

12    is designate the expert direct testimony of Professor Jack

13    Williams as AST-DIR J. Williams, and the demonstrative we

14    will designate as AST-DEM J. Williams.

15         THE COURT:  Okay.

16         MR. SKELLY:  Thank you, Your Honor.

17         THE COURT:  Cross?

18         MR. ECHOLS:  Good morning, Your Honor.  Once again

19    Your Honor, Barack Echols from Kirkland & Ellis on behalf of

20    the debtors.

21         May I proceed, Your Honor?

22         THE COURT:  Yes.

23                   CROSS-EXAMINATION

24    BY MR. ECHOLS:

25    Q    Professor Williams, nice to meet you, I just met you

1    two minutes ago; is that correct?

2    A    Yes, and it's an honor to finally meet you as well,

3    Mr. Echols.

4    Q    Well all right.  And good morning.

5            You know, throughout the course of listening to

6    Mr. Stuart's and your own there were some things that

7    appeared like we were ships passing in the night.  And you

8    heard Mr. Stuart's testimony yesterday, correct?

9    A    Yes, I did.

10   Q    And it is correct, is it not, that apart from

11   reorganized TCEH there have been no other buyers identified

12   for Corporate Services on a stand-along basis?

13   A    That is correct.

14   Q    Okay.  And I know the debtors haven't identified -- no

15   one of the E-Side of the house has identified a buyer

16   separate and apart from TCEH reorganized for Corporate

17   Services, correct?

18   A    I don't know the answer to that, but I have not heard

19   about an identification of the buyer on the E-Side --

20   Q    And do you -- oh, I'm sorry.

21   A    -- for Corporate Services.

22   Q    Sorry.  And you yourself haven't identified any?

23   A    That is correct.

24   Q    All right.  And you would agree will me, would you not,

25   that the market for the entity EFH Corporate Services, given

1    its specialized nature, that the market on a third-party

2    basis is extremely limited, would you not?

3    A    Yes, it's limited to those people who would be

4    interested in buying the operating assets and limited here

5    specifically, and of course those people plus reorganized

6    TCEH.

7    Q    Correct.  Separate and apart from reorganized TCEH

8    unless there were some other party that were going to buy

9    the assets of the T-Side, correct?

10   A    Correct.  It's very similar to, for example, non-

11   severable good will, which would also be derivative of the

12   assets that are being transferred and be very valuable.

13   Q    Similarly if the E-Side were to put a for sale sign on

14   EFH Corporate Services right now it's very unlikely that any

15   third-party purchaser would come in and buy EFH Corporate

16   Services on its own?

17   A    Right, if we exclude reorganized TCEH as the market

18   participant at this time that would be correct.

19   Q    And the adjusted book value of $12.88 million that you

20   have come up with as the equity value, you're not telling

21   the Court that any third-party purchaser would come in today

22   and pay $12.88 million for EFH Corporate Services are you?

23   A    I wouldn't limit it to that.  There may be third- party

24   purchasers who would be interested in buying the operating

25   assets and would be interested in Corporate Services as

1    well.

2            But the typical buyer and therefore the market, if

3    you will, of Corporate Services beyond reorganized TCEH

4    would be any entity that wanted to buy the operating assets

5    of the T-Side and would want the economy to scale and other

6    value associated with Corporate Services.

7    Q    But that's correct, right?  The reorganized TCEH is the

8    party that under the debtors' plan -- the proposed plan that

9    your clients are opposing, reorganized TCEH is the party

10   that gets Corporate Services, correct?

11   A    That is correct.

12   Q    And separate and apart from reorganized TCEH if we're

13   looking at alternatives, because this is an opposed plan,

14   there aren't any third-party purchasers out there who would

15   pay $12.88 million or frankly any number of million dollars

16   for EFH Corporate Services on a stand-alone basis that you

17   can identify, correct?

18   A    That's correct.  That's why the sale at $12.88 million

19   to reorganized TCEH is the appropriate resolution.

20   Q    I'd like to make sure it's very clear precisely the

21   parameters of the valuation analysis that you did if we

22   could.

23            The entire valuation analysis pertained strictly

24   to the transfer of equity in EFH Corporate Services; is that

25   right?

1   A    That's partly right.  Of course that's the focus of the

2   interest of the property that's being transferred, but that

3   requires us to look at the assets and liabilities of

4   Corporate Services.

5   Q    And I think you just testified earlier you understand

6   that this is just one small part of the overall plan that

7   the debtors are seeking to have confirmed here, right?

8   A    Yes, but an important part for the unsecured creditors

9   of EFH Corp.

10  Q    And that overall plan includes many other elements,

11  such as the transfer of properties, such as the elimination

12  of potential liabilities from a stranded tax, other

13  agreements that are ancillary, you're familiar with all of

14  those?

15  A    Yes, I am.

16  Q    Okay.  You reviewed, did you not, the agreement under

17  which Corporate Services -- the equity of Corporate Services

18  is being transferred to the T-Side in the plan, the

19  separation agreement?

20  A    I looked at the separation agreement and tax matters

21  agreement and the --

22          THE COURT:  The transition services agreement?

23          THE WITNESS:  That's right.  The transition

24  services agreement.  I think there's a -- yes, the so-called

25  ancillary agreements.

1    BY MR. ECHOLS:

2    Q    Okay.  And ancillary means they're part of this overall

3    plan that's proposed here, you understand that?

4    A    Yes, I do.

5    Q    Okay.  Could we take just a quick look at the

6    separation agreement, the separation agreement that's

7    proposed here for the transfer of the equity of Corporate

8    Services.

9         MR. ECHOLS:  And, Your Honor, it's been the

10   practice we've got a couple of binders -- or one binder.

11   May I approach?

12        THE COURT:  Yes.  Thank you.

13        THE WITNESS:  Thank you.

14   BY MR. ECHOLS:

15   Q    And if I could ask you, sir, to please turn to tab 2 in

16   that binder.  It's a document which is DX-004.

17   A    Yes, I have it.

18   Q    Okay.  And do you recognize that, sir, as the

19   separation agreement under which this transfer, the proposed

20   transfer of EFH Corporate Services, is taking place to the

21   reorganized TCEH?

22   A    Yes.

23   Q    Okay.  If we could look just at a couple of portions of

24   this agreement.  If we turn to the back in Schedule B, if

25   you look at the top it would be page 50 of 121.

1      MR. ECHOLS:  If we could put that up, please.

2   BY MR. ECHOLS:

3   Q    And you see we've got the Schedule B below listing a

4   number of the entities, subsidiaries that are being

5   contributed.  I do that so you can see that it is Schedule

6   B.  If you turn to the next page, please.

7           Now under the separation agreement, you know,

8   which is part of the overall proposed plan, the -- EFH is

9   contributing the subsidiaries of EFH Properties Company and

10  EFH Corporate Services Company.  You're aware of that,

11  correct?

12  A    Yes.

13  Q    And you're fair value -- I'm sorry.

14  A    I'm sorry, could you repeat the question?

15  Q    Sure.  There are two subsidiaries that EFH is

16  contributing to reorganized TCEH as part of the separation

17  agreement.

18  A    Yes.

19  Q    And as listed here it's EFH Properties Company and EFH

20  Corporate Services Company?

21  A    Yes, that is correct.

22  Q    And your fair value valuation pertains only to the EFH

23  Corporate Services Company, right?

24  A    That is correct.

25  Q    To the extent that there are any liabilities attached

1   to EFH Properties Company that EFH is being relieved of as

2   part of this transaction, that's not anything that you've

3   quantified?

4   A    That is correct.  I focused on the outbound value, if

5   you will, of the equity in Corporate Services, I did not

6   focus on any value in exchange in my assessment of the value

7   of the equity in EFH Corporate Services.

8   Q    And I'm not sure if you're aware as well that as part

9   of the overall separation agreement with these transfers

10  there's at least $14 million in cash coming back to EFH

11  Corp.  Are you aware of that?

12          MR. SKELLY:  Objection.  Lack of foundation for

13  this line and --

14          THE COURT:  I can't hear a word you're saying.

15          MR. SKELLY:  Sorry.  Objection.

16          THE COURT:  You need to speak --

17          MR. SKELLY:  Objection.  Lack of foundation.

18          MR. ECHOLS:  I'm not certainly how that works on

19  the cross when I asked if he was aware of it, Judge, but --

20          THE COURT:  Yeah, he's -- he said he's aware of

21  the document.

22          MR. SKELLY:  But there's been a representation now

23  about a transfer of cash.

24          MR. ECHOLS:  I asked if he was aware of it.

25          MR. SKELLY:  And I'm saying -- my objection is

1    there's a lack of foundation.  The cash is there and the

2    cash stays there.

3              THE COURT:  All right.  Can you point --

4              MR. ECHOLS:  Okay.

5              THE COURT:  -- you're asking the preliminary -- I

6    think you're going to focus him in on the actual provision

7    or --

8              MR. ECHOLS:  Yeah.  Actually --

9              THE COURT:  -- can you focus on the actual

10   provision?

11             MR. ECHOLS:  Sure, Judge.

12             THE COURT:  Uh-huh.

13             MR. ECHOLS:  And I'll do it in summary form, which

14   I think you said.

15   BY MR. ECHOLS:

16   Q    You haven't done any quantification or valuation of the

17   consideration that's coming back or that EFH is getting out

18   of this transaction?

19             MR. SKELLY:  Objection.  Same lack of foundation

20   question.

21             THE COURT:  Overruled.

22             THE WITNESS:  By EFH?

23   BY MR. ECHOLS:

24   Q    EFH Corp.

25   A    EFH Corp.?  I have not done a quantification of the

1    value coming in in exchange for the value of the equity

2    interest going out.

3    Q    Or as Mr. Skelly pointed out, value that may be

4    retained as a result of, you know, this transaction?

5              MR. ECHOLS:  That's was to your point, correct?

6    The $14 million?

7              MR. SKELLY:  Yes.

8              MR. ECHOLS:  All right.  I just wanted to make

9    sure I'm being honest and fair.

10             THE WITNESS:  Well no, I have not, I don't

11   understand the relevance of that in a -- from a financial

12   perspective, but I have not done that.

13   BY MR. ECHOLS:

14   Q    Okay.  If we could turn, please, to the page that says

15   page 29 of 121, Schedule 1 of acquired TCEH assets.

16             Now, and if we could look under --

17   A    Excuse me just a minute, Counselor.

18   Q    I'm sorry.  Sure.

19             THE COURT:  I'm sorry, which exhibit?

20             MR. ECHOLS:  I'm sorry, we're still in the same

21   exhibit, Judge, this tab 2, and on the top we have page 29

22   of 121 --

23             THE COURT:  Okay.  Thank you.

24             MR. ECHOLS:  -- of Schedule 1.

25             THE WITNESS:  I have it, Mr. Echols.

1   BY MR. ECHOLS:

2   Q    Okay.  Very good.  And you'll see under a number 2

3   error -- but number 2 there there's a list of number of

4   employment contracts that are contemplated of being

5   transferred to reorganized TCEH as part of this transaction,

6   correct?

7   A    Yes.

8   Q    And you are aware that those contracts are being

9   transferred as part of the proposed plan here with the

10  transfer of Corporate Services?

11  A    Yes, I am.

12  Q    Have you --

13  A    That would be consistent with the going concern premise

14  and value.

15  Q    Have you, sir, done any quantitative analysis of what

16  costs EFH Corp. is avoiding by transferring these contracts

17  to reorganized TCEH as proposed?

18  A    I have reviewed a calculation by the debtors'

19  representatives on a gross basis, the total potential costs,

20  but the review of the actual costs that would be assumed

21  would be -- would require a legal determination, but would

22  be inconsistent with a going concern premise of value.

23  Q    Because it would be inconsistent with the method that

24  you've used as not something that you quantified in

25  connection with the going concern premise that -- analysis

1    you did?

2    A    It's inconsistent with the well accepted methodology,

3    which I happened to use in this case in reaching my estimate

4    of value.

5    Q    And similar to that I take it if we go to 2-B there's a

6    list of certain vendor contracts, professional services

7    agreement, and the like, you see those as well?

8    A    Yes, I do.

9    Q    And under your going concern premise it wasn't

10   necessary, wouldn't have been appropriate to quantitatively

11   assign a value of the costs EFH Corporation is avoiding by

12   transferring it?

13   A    That is correct, that would not be a reduction in the

14   value of EFH Corporate Services -- the equity in EFH

15   Corporate Services as a going concern.  In fact you

16   undertake the going concern because you benefit and that

17   circumstances for a going concern value.

18   Q    Then I guess if we turn a couple pages in to page 31 of

19   121 and you go down to G towards the bottom of that page

20   there's an identification of a number of contracts that are

21   identified for assumption and assignment.

22            Consistent with your methodology it doesn't make

23   sense from this going concern perspective to quantify the

24   costs that EFH Corporation is avoiding by transferring it?

25   A    That would be correct.  There would be no reduction in

1    the cost, these are going concerns.  All of this was on

2    Corporate Services, if you will, it's simply a transfer of a

3    going concern business.  This would follow with the

4    transfer.

5    Q    And this separation agreement by itself, you know, is

6    just one of the many agreements that make up the part of the

7    overall proposed plan?

8    A    That is correct.

9    Q    Okay.  And similarly I think as you testified you

10   yourself haven't identified or valued the consideration from

11   these other agreements, the ancillary agreements and the

12   like, as coming back to EFH Corp. as a result of the

13   proposed plan?

14   A    Well I have assigned to the severance costs and other

15   avoided hypothetical costs in a hypothetical liquidation

16   zero probability, as I've testified to, because that would

17   be inconsistent with the going concern analysis.

18   Q    Right.  But one thing I want to make sure we're focused

19   on at least for purposes of here, the facts and

20   circumstances today are that EFH Corporate Services sits on

21   the E-Side, correct?

22   A    Technically EFH Corporate Services is a direct

23   subsidiary of EFH Corp.

24   Q    Right.

25   A    Right.

1  Q    And the reason we're here in part for this confirmation

2  trial is because the indenture trustee is opposing the plan

3  that includes the transfer of Corporate Services out of EFH

4  Corp. to reorganized TCEH?

5  A    No, that's not correct.

6  Q    It's not opposing the plan?

7  A    It's opposing the plan because the EFH indenture

8  trustee believes its debtor should reasonable equivalent

9  value in exchange for the transfer of Corporate Services.

10  Q    To the extent that the opposition to the plan succeeds

11  and EFH Corporate Services remains on the E-Side, then that

12  would be an entirely different premise that you would use

13  for assigning any value to EFH Corporate Services, would it

14  not?

15  A    You would have to assess the probability of the

16  likelihood of holding up this particular plan because of the

17  failure to pay $13 million when you look at both the value

18  -- the incremental value that will be received by the T-Side

19  in this transaction.

20        I would find it to be highly unlikely that $13

21  million with $20 million on the balance sheet right now,

22  which will be added to the balance sheet of consolidated

23  TCEH, would be an impediment to this overall transaction.

24  Q    I'm sorry, you know, Professor William, are you saying

25  that in your exercise of your business judgment the debtors

1    should pay $13 million to the -- to allow this transfer to

2    occur?

3    A    I would say that my professional judgment, based on my

4    valuation, that the debtors should receive at least

5    $12.88 million in exchange for the equity in Corporate

6    Services.  And the way that can be effectuated quite

7    commonly -- I've done this many times in mergers and

8    acquisitions -- is you simply distribute up $13 million of

9    the 24- or $26 million in cash on the balance sheet right

10   now, then you internally transfer under 368(a)(1)(e) non-

11   taxable transaction Corporate Services to the T-Side and you

12   avoid the problem that we're talking about right now and

13   have protected the interest of the unsecured creditors at

14   EFH Corporation.

15   Q    And thus in your -- strike that.

16        Your opinion is that in your business judgment

17   that the board that approved this transaction rather than

18   taking into account as it did, as we've had testimony over

19   the past days, the value of avoiding the stranded tax

20   liability, the value of avoiding the costs and obligations

21   that would remain on the E-Side and all of the other values

22   coming over to EFH Corp., the benefits by consummating this

23   transaction, you're substituting your business judgment for

24   the board in rendering your opinion of the value of the

25   equity here?

1   A    No.

2           MR. SKELLY:  Objection.  Your Honor, he was just

3   responding to the questions that were asked.

4           THE COURT:  Overruled.

5           THE WITNESS:  No.  You prefaced your -- the last

6   couple of questions with in your business judgment, that's

7   different than a valuation analysis.

8           You've asked me now as a financial advisor to the

9   board, and as a financial advisor to the board I would tell

10  the board look, you're looking at a billion dollars or more

11  in value going to the T-Side, you're looking at incremental

12  value of hundreds of millions of dollars.  You can avoid an

13  issue by paying $13 million and there is no quantification

14  of any of the value in exchange for that equity.

15          It's a -- in that particular situation if I were

16  advising the board I would say, again, distribute up

17  $13 million from the 24- or $26 million on Corporate

18  Services balance sheet, keep the rest of the assets, the

19  assembled workforce, a turn-key operation, access to the

20  accounting and tax staff, access to the systems, the ability

21  to prove your tax position going forward, because you have

22  the tax personnel and you have the tax back up, and put this

23  issue in the rearview window.  That would assure no

24  likelihood of a finding of lack of reasonably equivalent

25  value and it would take that issue off the table.

1    BY MR. ECHOLS:

2    Q    I just want to make sure, were you done with your

3    answer?

4    A    Yes, on that particular issue.

5    Q    Now we do have a quantification of the potential amount

6    of the stranded tax liability, right, it's $6 billion?

7    A    Yes, you do.  You have the worse case scenario -- or

8    excuse me -- you have the -- a scenario which identifies the

9    stranded tax liability of $6 billion, and now for purposes

10   of quantification we would look at the likelihood that the

11   T-Side would force a taxable transaction as opposed to pay

12   $13 million for the equity in Corporate Services.

13   Q    And you would discount then the $6 billion based on

14   some probability factor, correct, the likelihood?

15   A    Yes, including the inputs that I've identified in the

16   past, plus the incremental value -- at least the incremental

17   value of the T-Side going forward with the plan as proposed,

18   what I'm calling the bankruptcy premium.

19   Q    And if we assign for instance a 1 percent probability

20   of the T-Side going taxable, you know, 1 percent of

21   $6 billion of stranded tax that's what, $60 million, is my

22   math correct?

23   A    Yeah, it is a very high number, it's above 13 million

24   if that's the point --

25   Q    Yeah.

1    A    -- you'd want to make.

2    Q    Right.  Well about -- well above 13 million, right?

3    A    Yes, it is well above 13 million.

4    Q    Ten percent is 600 million, you know, we can all do the

5    math.

6    A    Yes, that is correct.

7    Q    Okay.  And similarly let's say that there's not a

8    taxable transaction that takes place on the next day if this

9    plan is not confirmed but we're stuck in bankruptcy for

10   another six months or another year.  Have you done any

11   quantifications, sir, of how much money, how much cash will

12   be burned during the process of opposing the taxable

13   transaction of staying in bankruptcy month after month after

14   month and how that relates to the $13 million of equity

15   value?

16   A    Yeah, it would be a lot more than $13 million of

17   equity, which would suggest that that would be the price

18   that we would pay.

19   Q    All right.

20   A    After all both Mr. Stuart and I have applied the

21   appropriate approach methodology, we both have come to the

22   conclusion that there's positive equity here, 13- to

23   $15 million, and we own that.  Now the question becomes what

24   did the debtor, EFH Corp., receive in exchange for the 13-

25   to $15 million?

1    Q    But that's not exactly right.  You were here for

2    Mr. Stuart's testimony, correct?

3    A    Yes, I was.

4    Q    And you reviewed both of his reports, right?

5    A    Yes.

6    Q    Yeah.  And he at no point in time agreed that the

7    methodology -- the proper methodology for valuing EFH

8    Corporate Services was this adjusted balance sheet valuation

9    in the context of the overall plan.

10           MR. SKELLY:  I'm going to object, Your Honor.  His

11   testimony stands for what it is, his written testimony has

12   been submitted.  I think it's a mischaracterization.

13           THE COURT:  Overruled.

14           THE WITNESS:  My understanding listening to the

15   testimony of Mr. Stuart is that he concluded that the equity

16   value of -- in Corporate Services was $15.2 million and that

17   someone would then consider a number of facts and

18   circumstances to determine whether to go forward with the

19   transaction.  But I clearly remember Mr. Stuart testifying

20   that he would not subtract those amounts from the

21   $15.2 million.

22   BY MR. ECHOLS:

23   Q    Okay.  And I did want to make sure that was right,

24   because it seemed like -- it sounded a little different on

25   your direct.  But Mr. Stuart at no point in time said used

1    the subtract amount from the $15 million or the $13 million

2    that you've come up with, that's not what he was saying is

3    the way to do this adjusted book value methodology, correct?

4    A    That -- according to his testimony that's how I

5    understood that.

6    Q    Yeah.  Instead, you know, as he testified, he said

7    these other considerations, you know, things that you say

8    that the board should take into account are appropriately

9    considered in the context of the overall transaction?

10   A    Yes.  They go to motivate and negotiation and leverage,

11   but the presentation that went to the board would have been

12   truncated, it didn't consider in a fulsome way all of the

13   facts and circumstances that one would want to take into

14   consideration.

15   Q    They had his rebuttal report, right?  I mean first of

16   all in fact let's be clear about that.  Mr. Stuart's report

17   was a rebuttal to yours, correct?

18   A    That is correct.

19   Q    Yeah.  And this was an earlier report you submitted

20   where you came up with I believe a $22 million or so

21   appropriate value?

22   A    No.  The first report identified positive equity value

23   working off the disclosure statement.  We were surprised

24   that the debtor had proposed a transaction involving its

25   subsidiaries without ever having undertaken a valuation,

```
1    that required us to do one.  That's why our report was first

2    and the debtors was rebuttal, because we simply did not find

3    and confirm that the debtor had never undertaken a valuation

4    until Mr. Stuart's report.

5    Q    And again, Mr. Stuart's report with respect to applying

6    this adjusted balance sheet methodology was in rebuttal to

7    the report that you did, correct?

8    A    Yes, it was styled a rebuttal report.

9    Q    I want to talk -- changing topics slightly -- about

10   going concern valuations and methods of performing going

11   concern valuations, and I think you said a number of times,

12   you know, that the way you should evaluate the value of a

13   particular business depends on the facts and circumstances

14   at issue; is that correct?

15   A    It depends on the purpose for which the valuation is

16   undertaken, which includes an assessment of the facts and

17   circumstances, correct.

18   Q    And I don't think there's any dispute about this, the

19   -- you would agree that the Corporate Services are provided

20   at cost?

21   A    That is correct.

22   Q    And it -- EFH Corporate Services itself is not an

23   independent or profit entity?

24   A    That is correct.

25   Q    And as you know it's not been operated to be a profit
```

1    generating entity?

2    A    That is correct.

3    Q    Okay.  Now there's more than just the asset based

4    method as a matter of performing a going concern valuation;

5    is that true?

6    A    The asset based approach.

7    Q    Asset based approach.  I'm sorry.

8    A    Yes, true.

9    Q    That's one of several?

10   A    That is correct.

11   Q    And in connection with this proceeding you're not

12   offering any fair market value opinion with respect to EFH

13   Corporate Services, right?

14   A    I did note in my direct that the fair market value

15   opinion be substantially similar to my fair value opinion

16   because the adjustments on the balance sheet largely involve

17   cash and cash equivalence and whether it's a fair valuation

18   or a fair market value that would be very similar.  But a

19   fair market value analysis I believe would most certainly

20   involve the value of the assembled workforce.

21   Q    Okay.

22   A    And so because I did not believe that would be an

23   appropriate asset to add in these circumstances I undertook

24   the fair valuation approach.

25   Q    Okay.  And that was my fault, that was a bad question.

1          You know, when we talk about fair market valuation

2     if we use the opinion of the value or price that a

3     hypothetical willing buyer and a hypothetical seller would

4     reach, assuming they have reasonable access to relevant

5     information and neither is under the compulsion to buy or

6     sell, you have not applied the fair market value standard in

7     its traditional form at least in that context, correct?

8     A    That is correct, because I looked at the actual buyers

9     and sellers as opposed to a hypothetical transaction.

10    Q    And you don't have and you're not offering any opinion

11    with respect to what any hypothetical third party would pay

12    for EFH Corporate Services?

13    A    That is correct, because I'm looking at the proposed

14    transaction and the purpose for which the valuation is being

15    asked.

16    Q    And the -- a couple of times both today and yesterday

17    we've referred to the AIRA distress sales standards.  Are

18    you familiar with that?

19    A    Yes, I am.  It's the Association of Insolvency and

20    Restructuring Advisors or AIRA.

21    Q    And --

22    A    Standards on distressed business valuations.

23    Q    And that's something that you cite and refer to as an

24    authoritative source in connection with addressing questions

25    of this nature?

1    A    Yes.

2    Q    Okay.  I just want to look at just because I'll screw

3    up the definitions if I have to do it on my own, you know, a

4    couple of things in the AIRA standards, and I think we've

5    got it as tab 7 in your binder.

6    A    I have it.

7    Q    Okay.  And I just want to quickly look at some of the

8    definitions.  If we could, if you go back to page 70 first,

9    please.

10   A    I have it.

11   Q    All right.

12        MR. ECHOLS:  And if we could put that up, Matt.

13   BY MR. ECHOLS:

14   Q    There's the -- in the center of the lower portion there

15   there's a definition there of a discounted cash flow method.

16   Now this is a method that can be used to perform a going

17   concern valuation is it not?

18   A    That is correct.

19   Q    And so this premise of going concern, you know, under

20   particular certain circumstances you could -- you would use

21   and you've used this method before in work that you've done?

22   A    Yes, I have.

23   Q    All right.  And the DCF definition is a method within

24   the income approach whereby the present value of future

25   expected net cash flows as calculated using a discount rate.

Page 64

1    You agree with that definition?

2    A    Yes, generally I certainly do.

3    Q    In this particular circumstance you're looking at EFH

4    Corporate Services because it sells its services at cost, it

5    doesn't generate any profit, the net cash flows therefore

6    would be zero more or less?

7    A    Well first we had no projections, so with no

8    projections we would be hesitant about the discounted cash

9    flow method.  But we also recognized that it provides its

10   services at cost and that the appropriate approach in many

11   of those circumstances for a shared services or Corporate

12   Services entity would recognize that fact.

13   Q    And if you were to look at it as incoming cash flows,

14   you know, that don't exist under the discounted cash flow

15   method for a going concern the value for EFH Corporate

16   Services would be zero or close to zero?

17   A    It would not be appropriate in these circumstances.

18   Q    Right.  If you inappropriately did it, you know, like

19   I'm doing in my head, it would end up being zero.

20   A    I would have to do it.

21   Q    Okay.

22   A    I'd have to look at the projections --

23   Q    All right.

24   A    -- before I could make that determination.

25   Q    Right.  In any event that's not something you did?

1    A     That is correct.

2    Q     And then if you go back a couple of pages there's

3    another approach to valuation on page 72, the market

4    approach.  And I believe you explained if not live here

5    today in your written direct that that was another approach

6    you decided wasn't appropriate to do here, correct?

7    A     That is correct.

8    Q     And this is one at least in layman's terms where you

9    have in one instance like a comparable company's analysis,

10   would that be under this market approach?

11   A     Yes, we would look at comparable companies or guideline

12   public companies and the trade multiples and we could also

13   look, for example, at comparable transactions, the merged

14   and acquired method.

15   Q     These are both types of valuation methodologies you can

16   also do on a going concern valuation, correct?

17   A     That is correct.

18   Q     All right.  And again, those are things I'm sure you've

19   done a million times.

20   A     Not a million times, but a lot of times.

21   Q     But that's not something that you did here?

22   A     No.  We concluded that based on the natures and

23   circumstances of the transactions proposed use that the

24   market approach would not be appropriate in these

25   circumstances.  There would be a limited market to begin

1   with.  But there is a market, but it would be a limited

2   market and derivative, and that's consistent with the

3   valuation literature.

4            Mr. Hisner in his trius (ph) on looking at

5   assembled workforces and corporate services of that type has

6   a section which we cite in our report that walks you through

7   very much your questions that you've asked, and his

8   conclusion based on well accepted valuation methodologies

9   that the appropriate approach is a derivative approach where

10  we would look at replacement cost, which is a form of a --

11  the asset approach.

12  Q    And you used the asset approach and within the asset

13  approach it was the adjusted book value method; is that

14  right?

15  A    That's correct.

16  Q    And just so again we're thinking of it the same way if

17  we go to page 68 we have a definition in the AIRA standards

18  here as well, and you'd agree that this method is as you

19  said within the asset approach whereby all assets and

20  liabilities, including off balance sheet, intangible, and

21  contingent are adjusted to their fair market value, correct?

22  A    That's correct.  That's the definition under the

23  international glossary, and that is an accepted definition

24  of the adjusted book value method applying the fair market

25  value approach, because as you can see this particular list

1    of definitions comes from accounting associations where fair

2    market value or fair that looks like a value in exchange is

3    often the value with the use.

4            If you look into the natural body, the substance

5    of the distressed business guidelines you'll see that that

6    method doesn't always subsume fair market value, it could be

7    fair value, for example, and there are criteria and analysis

8    identified as well as a discussion in the standards that

9    help guide the determination and the appropriate standard.

10           But yes, you would include all balance sheet

11   intangible like the assembled workforce and contingent

12   liabilities, for example, like environmental liabilities and

13   things of that nature.

14   Q    Yeah.  Or severance obligations could be a contingent

15   liability, correct?

16   A    Not necessarily.  The severance liabilities -- or if

17   they are contingent liability -- we can look at it both

18   ways.  If they are a contingent liability in a going concern

19   analysis, the contingency of severance would be zero at

20   least as the transaction is concerned.  So that zero times

21   the severance liability would equal zero.  The WARN Act, no

22   one today would be able to file a claim for a WARN Act

23   violation.  That's not even a right to payment at this

24   particular point in time.

25           And again, in a going concern valuation where this

1    line is zero probability (indiscernible), and then the tax,

2    which was also something Mr. Stuart identified a potential

3    tax.  If we're liquidating Corporate Services and now we're

4    avoiding the potential tax Corporate Services is technically

5    a Dash 6 taxpayer, but we would be liquidating it on its

6    own.  There's no suggestion that we would liquidate everyone

7    else for the liquidation value of Corporate Services.  And

8    as you mentioned, Corporate Services has no income, so it's

9    not paying an income tax on its income, and if you look at

10   the assets on the balance sheet these are assets where the

11   fair value is equal to the basis, so there would be for tax

12   on gain.

13          So it just technically would be incorrect to

14   assign any tax to a hypothetical liquidation of Corporate

15   Services in this example just based on the facts and

16   circumstances.

17   Q    Yeah.  And I just wanted to make sure we're all focused

18   facts and circumstances of why we're here at this trial

19   today and what the circumstances are today that we have an

20   opposed plan, part of that plan involves the transfer of

21   Corporate Services, we're all in agreement there, right?

22   A    I'm sorry, would you repeat the question?

23   Q    Sure.  This transfer of Corporate Services to

24   reorganized TCEH is part of this proposed plan?

25   A    Yes, it is.

1    Q    And because, you know, this has become in dispute, as

2    far as the objection here of the indenture trustee, one

3    alternative would be for the first liens, the T-Firsts would

4    be to say, go ahead, keep it, keep Corporate Services on

5    your side.  That's always a possibility, right?

6    A    I think it's fair to say it is a possibility.  There

7    have been times in bankruptcy cases where stakeholders have

8    undertaken actions that were inconsistent with their

9    economic interests.

10   Q    Well let's say that given this desire to get out of

11   bankruptcy promptly -- you work with me on my hypothetical

12   -- and the T-firsts say, go ahead, keep EFH Corporate

13   Services, you know, we'll figure out our own way to get the

14   services we need, okay, we're in that world.  Okay?

15   A    I have your hypothetical.

16   Q    In that world as a going concern the value of EFH

17   Corporate Services would be very different from the

18   $12.88 million that you've come forward with, because you're

19   valuing it assuming the transaction takes place?

20   A    I'm valuing it as the going concern, that's correct.

21   Q    Right.

22   A    It is presently a going concern and it will be sold as

23   a going concern.

24   Q    If in the world where the T-firsts say keep EFH

25   Corporate Services, you know, we never wanted it as Ms. Dore

1    said, we had to force them to even include it in the

2    discussion, if we can walk out of court go ahead and keep

3    it, it stays there, that changes the assessment of value it

4    put on EFH Corporate Services.  If you're advising EFH

5    Corp., you know, what is it worth now?  It's a whole

6    different world?

7    A    I would advice EFH Corp. that that's not my

8    understanding of what Ms. Dore said or my understanding of

9    the other representatives.

10           If you listened to their language very carefully I

11   think it's very important, Ms. Dore said that she had to

12   convince the T-Side to take the equity in Corporate

13   Services.  Mr. Keglevic in his deposition, which I

14   considered in preparation of my report, said that he had to

15   convince the T-Side to take the entities.

16           No one has said that they had to convince the T-

17   Side to take the assembled workforce or the systems or the

18   institutional knowledge that's going to be needed on a going

19   concern basis for among other things the tax positions

20   they're going to be taking going forward.

21   Q    Well that was probably another bad question of mine, so

22   if we stay with the hypothetical where the T-firsts say, go

23   ahead keep it, you know, we're in that world?

24   A    I can take that --

25   Q    Okay.

1    A    -- I set that hypothetical.

2    Q    In that hypothetical the value of EFH Corporate

3    Services to EFH Corp. isn't $12.8 million?

4    A    No, it is not.

5    Q    All right.  And we're in agreement that, you know,

6    there are 420 to 450 employees of EFH Corporate Services?

7    A    Yes, that is correct.

8    Q    And about approximately 95 percent of the services that

9    EFH Corporate Services provides are to the T-Side?

10   A    I know that's the testimony of Mr. Stuart, I have not

11   been able to confirm that based on the documents that have

12   been produced, but I would agree that the substantial

13   majority of the services would be on the -- would have been

14   on the T-Side.

15   Q    All right.  It was the testimony of Mr. Stuart and I

16   think of Ms. Dore and Mr. Keglevic and you're familiar with

17   that testimony too?

18   A    I am, but I'm also familiar with the document that was

19   provided that supports that testimony and I can't verify

20   that document.  But I have no reason to disagree with their

21   testimony.

22   Q    And you're also not disagreeing with the testimony that

23   if EFH Corporate Services stayed on the E-Side it would

24   probably need only 15 employees or so to be able to maintain

25   the services it needs to operate?

1    A    Yes, I'm familiar with that testimony.

2    Q    But you haven't gone down the list of 400 and said and

3    that's wrong, I would transfer these people over there, it's

4    going to be 20, it's going to be 25, it's going to be 100,

5    that's not anything that you did?

6    A    No, and I don't know the 15 and I don't know how

7    important those 15 would be to the T-Side as well as the E-

8    Side.

9    Q    Sure.  Sure.  In the absence of this transaction, this

10   proposed transaction, the E-Side would not have a use for

11   most of this company, EFH Corporate Services; is that

12   correct?

13   A    I believe that's correct.  I think that's a fair

14   statement based on the facts that I know.

15   Q    And in the absence of this proposed transaction there

16   would be liabilities to the E-Side of owning this company

17   without being able to provide services for the T-Side,

18   right?

19   A    At this point now because of the limited liability

20   nature of the legal entities on the E-Side I'd have to ask

21   you to be more specific.  Because if you're talking about

22   EFH Corp. right, it's liable up to the investment in its

23   subsidiary.  So its liability would be capped at its

24   investment so that it's equity would be zero that would be

25   the extent of its liability at that particular point in

1    time.  So I would need more facts when you say E-Side.

2    Q    I see.  And maybe I'm not looking for a specific

3    quantification, but you would agree with the fact that in

4    the absence of this transaction there would be liabilities

5    to the E-Side, however you define it, of owning this company

6    without being able to provide services to the T-Side, right?

7    A    Based on the perspective of the unsecured creditors of

8    EFH Corporation they're no worse off than liquidation

9    because they're getting nothing in return for Corporate

10   Services now and they will get nothing in return for

11   Corporate Services if we liquidate.

12              THE COURT:  Doesn't that mean they're not being

13   harmed by getting nothing now?

14              THE WITNESS:  No, they are being harmed in the

15   fact that the -- I shouldn't say --

16              THE COURT:  They get nothing now --

17              THE WITNESS:  That's -- no --

18              THE COURT:  -- and they get nothing if they keep

19   the company.

20              THE WITNESS:  They get nothing now --

21              THE COURT:  So how are they harmed?

22              THE WITNESS:  They get nothing now based on the

23   price that was negotiated.

24              THE COURT:  Uh-huh.

25              THE WITNESS:  So we have a value of the equity of

```
 1    13 million --

 2              THE COURT:  Uh-huh.

 3              THE WITNESS:  -- the negotiated price for the

 4    equity is zero --

 5              THE COURT:  Uh-huh.

 6              THE WITNESS:  -- if you liquidate it would be

 7    zero.

 8              THE COURT:  Right.

 9              THE WITNESS:  So the negotiations have added no

10    value.

11              THE COURT:  But they haven't taken any value away.

12              THE WITNESS:  They've taken $13 million.

13              THE COURT:  Under what scenario?

14              THE WITNESS:  The scenario of conveying

15    $13 million worth of value from EFH Corporation in exchange

16    for at least no direct consideration.

17              THE COURT:  Okay.  Sorry.  Go ahead.

18    BY MR. ECHOLS:

19    Q    Let's talk about some of the things that would happen

20    if EFH Corporate Services, you know, stays on the E-Side,

21    stays part of EFH Corp. and does not go to the T-Side, okay?

22    A    Certainly.

23    Q    And I recognize that what you analyzed is assuming the

24    transaction takes place, you know, that -- you know, if it

25    doesn't take place there are going to be some costs and
```

1    potential liabilities that sit on the E-Side.

2    A    Yes, I didn't assume the transaction takes place, I

3    took the terms and conditions of the plan.

4    Q    Oh, I'm sorry, yes.

5    A    And used the terms and conditions of the plan as part

6    of the facts and circumstances in determining the premise

7    and standard and approaching methodology.

8    Q    Now, so if EFH Corporate Services were to stay on the

9    E-Side, not providing the services to the T-Side, you'd

10   agree there's a possibility that a large number of the

11   employees would be terminated if the T-Side left behind EFH

12   Corporate Services and did not take those employees with

13   them?

14   A    That's the testimony, and I have no reason to disagree

15   with that.

16   Q    All right.  And I saw -- I mean you were here yesterday

17   for Mr. Stuart's testimony, there were some questions about

18   whether there was a legal obligation or would be a legal

19   obligation to pay severance, but you know that there is a

20   severance policy and program that EFH Corporation has in

21   place, correct?

22   A    Yes, for its general employees they have a policy in

23   place.

24   Q    All right.  And actually if we can look -- if you'd

25   look at tab 10 in your binder, please.

1    A    I have it.

2    Q    And tab 10, I believe if you could confirm for me, is

3    the general plan and policy, and this is the non-executive

4    policy severance plan and program that it has for its

5    employees.  This is something that you reviewed and

6    considered?

7    A    I don't recall this specifically.  I think I saw

8    sections of it, I don't recall the full document.  I may

9    have, but I don't -- I have seen sections of it or reference

10   -- and references to the document.

11   Q    Fair to say at least you know and knew there was a

12   severance program in place at EFH Corporation?

13   A    Yes.

14   Q    All right.  And looking at this tab 10 --

15             MR. ECHOLS:  And this is a document produced in

16   discovery, Your Honor, it has the title the EFH severance

17   plan and summary plan description.

18   BY MR. ECHOLS:

19   Q    You'll see if you look at the second page of that the

20   company here is defined as Energy Future Holdings Corp. and

21   each of its subsidiaries, except for Oncor.  Do you see

22   that?

23   A    Yes, I do.

24   Q    Okay.  And if you look to -- at -- a couple more pages

25   in at the bottom ending with the number 149 there's as

1    question, what benefits will I receive?  And then the

2    statement, you know, all eligible employees who choose to

3    participate in the severance plan will receive these

4    benefits.  Do you see that?

5    A    Yes, I do.

6    Q    Okay.  And no reason to believe that this is not the

7    severance program that EFH Corporation has?

8    A    I have no reason to believe that it's not.

9    Q    And similarly if you look at tab 9 you'll see there's

10   another severance plan, the executive severance plan, that

11   was something you considered the existence of that in

12   connection with rendering your opinion?

13   A    Yes, I did.

14   Q    Now there's been times during the course of these

15   proceedings distinctions made between EFH Corporate Services

16   and EFH Corp. with respect to how liabilities might run, so

17   I just want to be clear that you were taking into account

18   both of the entities.  And so for instance if you'd look at

19   tab 6 in your binder.

20   A    I have it.

21   Q    All right.  And the tab 6 is an employment agreement as

22   you see between EFH Corp. and Don Evans, correct?

23   A    Yes.

24   Q    Okay.  To the extent that there are any severance

25   liabilities or obligations that would arise as a result of

1    the termination then this would be obligations -- these

2    would be obligations that run to EFH Corp,, correct, to your

3    understanding?

4    A    Yes.

5    Q    All right.  And then similarly if you look at tab 8

6    briefly we've got another employment agreement here with

7    Mr. Young.  If you can just confirm for me again this is an

8    agreement with EFH Corp.?

9    A    Yes, that's the recital at the top.

10   Q    Now if EFH Corp. or Corporate Services terminate some

11   of its employees that could potentially trigger severance

12   obligations, you'd agree?

13   A    If the EFH Corporation is liable under the employment

14   agreement, yes, there would be a liability.

15   Q    And that applies on both sides, Corporate Services if

16   it terminates employees that are its employees it could be

17   liable for severance, Corp. could be liable to severance and

18   -- on its own part with these employees as we talked about.

19   Sorry.  Strike that.

20           Both EFH Corporate Services and EFH Corp. could be

21   liable for severance to the extent they terminate any of

22   their employees?

23   A    I think I got your question, but it -- to make sure if

24   you could repeat it or rephrase it.

25   Q    Right.  All right.  Let me break it into two pieces

1    them.

2            EFH Corporate Services could be liable for

3    severance obligations if it terminates some of its

4    employees?

5    A    That is correct.

6    Q    EFH Corp. could be liable for severance obligations if

7    it terminates some of its employees?

8    A    That is correct.

9    Q    Are you aware, sir, that there have been severance

10   payments being made during the course of these proceedings?

11   A    Yes.

12   Q    Okay.  And in fact if we take a look at -- what tab do

13   we have?  At tab 5.  If you'd look at tab 5 in your binder,

14   please.

15   A    I have it.

16   Q    Okay.  If we could go to the second page of that,

17   please.  And if you could pull out the one, two, three under

18   the it's hereby ordered that.

19   A    Yes.

20   Q    All right.  You are aware, sir, that the debtors

21   requested the Court's authority to honor their severance

22   program, right?

23   A    Yes, they sought authorization --

24   Q    Right.

25   A    -- but not a compelled order, correct.

1    Q    Right.  And the Court gave the debtors, you know, based

2    on the showing they provided, the authorization to honor the

3    severance program, right?

4    A    That is correct.

5    Q    And that's what reflects, you're familiar with this

6    order generally?

7    A    Yes, I am.

8    Q    Do you know how much has been spent in severance

9    obligations -- severance payments thus far?

10   A    No, I do not.

11   Q    Okay.  Let's go if we could, please, I think you should

12   have in the very front of your binder a tab A, which is a

13   version of the demonstrative that Mr. Stuart used and we

14   provided it to your counsel.

15          MR. ECHOLS:  If we could put that up, please.

16   BY MR. ECHOLS:

17   Q    I understand from your testimony that based on the

18   methodology that you used, the adjusted balance sheet

19   methodology, you would not subtract potential liabilities on

20   the right-hand side as shown on this red bar from the equity

21   value that you came up as your -- with your valuation,

22   correct?

23   A    Mr. Echols, I don't think this is what Mr. Stuart spoke

24   to yesterday.

25   Q    Well the only thing that's different on this is as I

1   mentioned it's a modified version.  I took off the top that

2   had Mr. Stuart's $15 million on there and left it just with

3   your valuation.  So if we can use this demonstrative.

4   A    Okay.

5   Q    Okay.

6   A    Because I did remember his opinion of $15.2 million and

7   then my opinion of $12.88 million --

8   Q    Right.

9   A    -- on the demonstrative that was used yesterday.

10  Q    Right.  Right.  Since I have you here on the stand I

11  just put yours in.

12  A    I understand.

13  Q    All right.

14  A    I just wanted to make it clear.

15  Q    Right.  And so you wouldn't subtract in your

16  methodology the costs on the right-hand side as far as

17  reaching the value -- the equity value that you did with the

18  adjusted balance sheet method?

19  A    That is correct.

20  Q    But these costs are things you testified before that --

21  strike that.

22           These are contingent liabilities that if EFH

23  Corporate Services remained on the E-Side, you know, should

24  be taken into account?

25  A    The problem with your characterization is do we mean

1    the same thing when we talk about contingent liabilities.

2    Q    That's a good point.  We should just say costs.  These

3    are potential costs.

4    A    These are avoided costs.

5    Q    These are --

6    A    Like, for example, the liquidation costs, including

7    let's say the trustee's fee, that's not a contingent

8    liability, that is just a hypothetical cost.  The WARN Act,

9    that's not a contingent liability, that's a hypothetical

10   cost if certain actions took place.  And the severance are

11   conditional -- are require condition precedent, and I don't

12   know whether they would be identified as a contingent

13   liability, but if they were on a going concern analysis we

14   would assign zero to them.  The transaction itself wouldn't

15   trigger the severance.

16   Q    Yeah, I'll keep it with your language, they're avoided

17   costs, correct?

18   A    My language is avoided hypothetical costs.

19   Q    Avoided hypothetical costs, in the hypothetical where

20   EFH Corporate Services stays on the E-Side?

21   A    That's correct, and there's a decision to liquidate.

22   Q    Right.  And you do agree that there is a possibility

23   that at least a portion of it, and perhaps a large portion

24   of EFH Corporate Services, may need to be liquidated if it

25   is not transferred?

1    A    That is correct.

2    Q    In fact indeed it is possible that at least a

3    significant portion of it would need to liquidate?

4    A    Yes.

5    Q    There would potentially be a reduction in force?

6    A    Yes, I believe that is the testimony.

7    Q    Yeah.  And there would be wind down costs if it had to

8    liquidate, right?

9    A    Yes.  Again, nothing is it free, even winding down a

10   bankruptcy estate.

11   Q    And then there'd also be potential rejection costs from

12   rejecting contracts; is that right?

13   A    Yes, in a liquidation premise that would be correct.

14   Q    Yeah.  But in your methodology you assign zero to any

15   of those costs?

16   A    Because the probability of those happening are zero

17   based on the transaction.

18   Q    Based on the transaction in the plan that your clients

19   are objecting to?

20   A    Based on the proposed transaction for the purpose of

21   the valuation.

22   Q    All right.  And you don't have -- you don't take any

23   issue with the actual amounts that are reflected here?

24   A    I do.

25   Q    I beg your pardon?

1    A    I do.  I do take issue with the actual numbers.

2    Q    With the calculation, the mathematical calculation?

3    A    Oh, if you're looking at total amounts then I don't

4    have a reason to disagree, but obviously if you're looking

5    at this from a perspective that this is a contingent

6    liability or contingent liabilies you would discount it by

7    the life of the event taking place.

8    Q    Right.

9    A    And then the likelihood of the -- of achieving the full

10   amount if the event did take place.

11            So there would be multiple adjustments if you were

12   to view this as a contingent liability on a going concern

13   premise, but I would disagree with that methodology and I

14   don't find anything in the valuation literature that would

15   support it.

16   Q    I think if I take outside of valuation methodology and

17   I call it a voided hypothetical cost the math that's

18   involved here that Mr. Stuart engaged in, the $49.1 million

19   he came up with total, you don't have any problem with his

20   math?

21   A    Not from a total perspective I don't except for the

22   extent the liquidation costs may include tax.

23            MR. ECHOLS:  All right.  We can take that down.

24   BY MR. ECHOLS:

25   Q    All right.  Just about done here.

1          The -- you've recognized that if the separation

2    here were to take place by a taxable -- if the T-Firsts went

3    taxable EFH Corp. will be left with a substantial and

4    possibly stranded tax liability?  I think that's in your

5    written direct.

6    A    Yes.

7    Q    Okay.  And you do understand that EFH Corp. would be

8    jointly severly liable for that tax liability?

9    A    You mean EFH Corporate Services?

10   Q    No, Corp.

11   A    Yeah, EFH Corp. is liable, it's the --

12   Q    It's the tax --

13   A    -- it's the parent.

14   Q    Right.

15   A    It's the parent of a consolidated group, yes.

16   Q    Right.  It would be liable for that tax liability?

17   A    That is correct.

18   Q    All right.  And I take it in the course of this you've

19   heard of tax Armageddon, you know, the statement that's been

20   tossed around?

21   A    Yes, I teach bankruptcy tax and also biblical

22   archaeology and probably have a unique perspective on tax

23   Armageddon.

24        (Laughter)

25   A    Yes, I'm familiar with it.

1   Q     Okay.  Armageddon is a bad thing.

2   A     Yes, Armageddon is usually a bad thing, at least for

3   the conquered army it's a bad thing.

4   Q     All right.  You know, last topic, you know, briefly.

5         You know this is a two-step confirmation process

6   at least as anticipated.  We have the T-Side confirmation

7   first and then the E-Side confirmation, right?

8   A     Yes.

9   Q     Okay.  And there is on file a proposed buyer for the E-

10  Side, you know, a proposed merger by NextEra.  Are you

11  familiar with that?

12  A     Yes, I am.

13  Q     All right.  And you would agree when Mr. Keglevic

14  testified earlier that there is a benefit to the estates of

15  making the E-Side assets as attractive as possible to

16  potential buyers?

17  A     I don't remember that testimony, but I certainly would

18  agree with that proposition.

19  Q     Uh-huh.  And have you taken a look at the bid that's on

20  file, the proposed merger agreement?

21  A     I saw a term sheet and I think I have seen, if it was

22  part of the most recent plan, I think I've seen it.  Not

23  definitive documents, but I think I've seen the merger

24  document.

25  Q     Yeah.  Let's --

1    A    Some of the merger documents.

2    Q    Sure.

3    A    Or excuse me, some of the transaction documents.

4    Q    All right.

5            MR. ECHOLS:  If we could just pull that up

6    briefly, the merger agreement.

7            UNIDENTIFIED SPEAKER:  What tab is that?

8            MR. ECHOLS:  It's DX-3.  It's tab 4 in the binder,

9    Judge.

10   BY MR. ECHOLS:

11   Q    Do you have that, sir?

12   A    Oh, yes, I'm sorry.

13   Q    Oh, okay.  No, no problem.

14   A    Sorry, Mr. Echols.

15   Q    Do you recognize this as the proposed merger agreement

16   that's on file with NextEra buying the E-Side?

17   A    Yes, I do.

18   Q    All right.  And if you'd turn back if you would to the

19   page that has page 104 of 429.  If we could go down, please,

20   to the section that says employees.

21   A    Page 99?

22   Q    It says -- at the top it says page 104 of 429.

23   A    Oh, I'm sorry.  I have it.

24   Q    Okay.  You're -- are you aware, sir, that one of the

25   closing conditions for the proposed merger transaction here

1    is that except as agreed the reorganized company shall not

2    have any employees?  Were you aware of that provision in the

3    proposed merger agreement?

4    A    I'm aware of that provision, but I think we have to

5    read on.  It's going to have some employees, not any

6    employees, but the whole thing.  I think this is a market

7    provision teaching mergers and acquisitions.  They're not

8    taking the parent that's NextEra I believe is defined here,

9    it's not going to take any employees unless it agrees to

10   take them other than the Oncor entity employees it looks

11   like.  So it wants a consent right before it takes on any

12   other employees other than Oncor entities.

13            That technically doesn't mean they aren't

14   interested in some of the employees of Corporate Services,

15   what it means is that they're going to have to agree to take

16   on any other employees, and that might be a matter of

17   negotiation.  That's I'm not privy to.

18   Q    Okay.  Since this is a closing condition that that

19   would mean if there's additional negotiations, you know, we

20   would have to -- strike that.

21            The provision says, "Upon closing the reorganized

22   company shall not have any employees."  You know, and then

23   it follows from there, correct?

24   A    Right, other than the employees of the Oncor entity.

25   Q    Of Oncor.  And then at the very bottom it also says

1   that it shall not have any obligations -- liabilities or

2   obligations owed to any current or former employee of the

3   company or any of its subsidiaries, including change of

4   control or severance payments or similar obligations, right?

5   A    That is correct.

6   Q    Right.  To the extent that we take this as a market

7   test, you know, of the value of EFH Corporate Services to

8   NextEra, you'd agree, would you not, that NextEra is not

9   assigning any value to EFH Corporate Services?

10  A    I would disagree with the first part.

11  Q    Of it being a market test?

12  A    Correct.  But I would agree with the second part.

13  Q    Okay.  With the proposed transaction that's on file

14  with the Court now as the second level of the E-Side

15  confirmation, NextEra is assigning no value to EFH Corporate

16  Services and in fact is insisting that there be no employees

17  as a closing condition?

18  A    They're assigning no value to Corporate Services.  They

19  are saying they'll take no employees absent their consent,

20  which I think is the fair reading of that particular

21  component -- that particular clause and the overall merger

22  agreement.

23  Q    All right.  I think that means we agree.

24           MR. ECHOLS:  But I don't have any further

25  questions.

1          THE COURT:  All right.

2      (Pause)

3                    CROSS-EXAMINATION

4  BY MR. SILVERMAN:

5  Q    Good afternoon, Professor Williams.

6  A    Good afternoon.  It's a pleasure to see you.

7  Q    It's a pleasure to see you too, sir.  Moses Silverman,

8  Paul, Weiss, Rifkind, Wharton & Garrison for the first lien

9  lenders.  Just a couple of follow-up questions.

10          I think you said in your written direct that a

11 fair market standard would be inappropriate in this context;

12 is that correct?

13 A    Yes.

14 Q    And you've not offered an opinion concerning the fair

15 market value of EFH Corporate Services; is that correct?

16 A    That is correct, because it would include the assembled

17 workforce for a fair market value analysis here.

18 Q    And you said in your direct examination that there's no

19 secondary market no EFH Corporate Services; is that correct?

20 A    That is correct.

21 Q    And you don't know of your own knowledge of any

22 particular third party that would be interested in buying

23 EFH Corporate Services in the absence of TCEH; is that

24 correct?

25 A    That is correct.

1   Q    And you haven't determined what a hypothetical willing

2   buyer would pay for EFH Corporate Services, correct?

3   A    That is correct, I focused on the actual buyers and

4   sellers --

5   Q    Okay.

6   A    -- to the transaction.

7   Q    And you haven't considered whether the potential

8   absence of any liable buyer has any bearing on the value of

9   EFH Corporate Services; is that correct?

10  A    No, that was part of the facts and circumstances.

11  That's not correct, that's part of the facts and

12  circumstances in the initial analysis in identifying what

13  would be the appropriate premise and standard of value and

14  in the methodology.

15  Q    And the appropriate premise and standard do not include

16  the possibility of a rival bidder; is that correct?

17  A    It did, there just wasn't a rival bidder.

18  Q    Okay.  So the absence of a rival bidder in your view

19  does not affect the valuation that your performed; is that

20  right?

21  A    That is correct.  It may affect motivate and it may be

22  a negotiation point, but the value of the company would not

23  be adjusted in these circumstances.

24  Q    But I think you've already testified that you

25  understand that EFH Corporate Services is not a for profit

1    entity, correct?

2    A    That is correct.

3    Q    And I think you said in your direct written direct that

4    given the nature of its operations and character of its

5    assets EFH Corporate Services cannot readily be valued using

6    a discounted cash flow method or at an income approach or a

7    relative value method, a market approach; is that correct?

8    A    That is correct.

9    Q    You've testified at some length and I don't want to go

10   over it in any length, that there would be costs to EFH

11   Corporate Services if it was not transferred to TCEH; is

12   that right?

13   A    Yes, I believe so.

14   Q    And there would possibly be a liquidation; is that

15   right?

16   A    That is a possible viable alternative absent the

17   transaction.

18   Q    And there might be certain costs in connection with

19   severance and WARN Act and contractual responsibilities; is

20   that correct?

21   A    Yes, there would be a potential cost, which I've called

22   the hypothetical liquidation costs.

23   Q    And the value of EFH Corporate Services in the event it

24   was not transferred to TCEH could be zero, correct?

25   A    Yes, it could be if it was liquidated.

1    Q    And in your valuation, given the purpose and premises

2    as you've defined it, you have not take into consideration

3    that the value of EFH Services to EFH in the absence of this

4    transfer could be zero, correct?

5    A    No, we did in the initial analysis and that's why we

6    believe that the transaction at 12.88 million would be the

7    appropriate course for the board and not liquidation.

8    Q    You don't have an opinion as to what the value would be

9    if EFH did not transfer EFH Corporate Services to TCEH,

10   true?

11   A    I have an opinion that it would be substantially less

12   than 12.88 million.

13   Q    And you are not considering that fact in your 12.88

14   million valuation; is that correct?

15   A    No, I did -- we determined what would be the

16   appropriate premise of value.

17   Q    And having determined that premise of value you did not

18   take into account that the value could be zero for EFH if it

19   held onto the asset; is that right?

20   A    That is correct, it would be inconsistent with the

21   going concern premise and the well accepted methodology in

22   the field.

23   Q    You have testified in response to Mr. Echols' questions

24   I think and perhaps your own counsel's that you understand

25   that this transfer is part of a larger plan of

1   reorganization, right?

2   A     That is correct.

3   Q     And you said that one of the elements in the plan is

4   that the -- there was a forbearance by the T-Side creditors

5   on pursuing a taxable plan, right?

6   A     Yeah, that's how I characterize from a valuation

7   perspective the threat of a taxable transaction.

8   Q     Yeah.  And I tried to write down your words as best I

9   could.  You said that the forbearance could be part of the

10  value considered in connection with this plan as a whole,

11  right?

12  A     Forbearance -- ultimately that's a legal determination,

13  but from a financial perspective forbearance, if it's

14  appropriately introduced and quantified from a financial

15  perspective, could be value in exchange, but it's not an

16  adjustment in the value that was transferred.

17  Q     Well you have not offered any opinion to this Court as

18  to what value the E-Side received for the transfer of EFH

19  Corporate Services, correct?

20  A     I would restate it a little differently.  I have not

21  offered on opinion as to the value that EFH Corp. as opposed

22  to the E-Side --

23  Q     Okay.

24  A     -- as the transferor has received.  My focus was on the

25  value of the transfer from EFH Corp., and that's the extent

1    of my opinion in my reports.

2    Q    I'm sorry, could you just restate that?

3    A    Sure.  I focused on the value transferred by EFH

4    Corporation --

5    Q    And you did not --

6    A    -- to --

7    Q    Oh, I'm sorry.

8    A    -- yeah, to the -- to reorganized TCEH, and I didn't

9    address the question of the value received.

10   Q    So you are not expressing any opinion as to whether

11   reasonably equivalent value was exchanged from the T-Side to

12   the E-Side in connection with a transfer of EFH Corporate

13   Services, correct?

14   A    That is correct.

15              MR. SILVERMAN:  Thank you.

16              THE COURT:  Thank you.  Do we have redirect?

17              MR. SKELLY:  No questions, Your Honor.

18              THE COURT:  Okay.  Thank you, Professor Williams.

19              THE WITNESS:  Thank you, Your Honor, it was a

20   pleasure.

21              THE COURT:  Oh, absolutely.

22              MR. MCKANE:  Your Honor, I understand there's only

23   one witness left for the day.  What's your estimate on

24   direct?  With the direct testimony, if it's not more than an

25   hour, it may be appropriate to take a lunch break now.

1          THE COURT:  Yes, let's do that.  We do have the E-

2     Side lawyers coming in at 3:00, but we can always push them

3     back.

4          (Laughter)

5          THE COURT:  If necessary.

6          MR. MCKANE:  Your Honor, they've kept us waiting

7     for a long, long time.

8          THE COURT:  Because they were optimistic last week

9     and I told them not to be.  No, we're proceeding fine.

10          So let's see, yeah, we'll break, we'll reconvene,

11     let's try to be as prompt as possible as 1:30.  I know it

12     was me that delayed us this morning so I apology, everyone

13     else was ready.  So we'll reconvene at 1:30 and we'll take

14     Mr. Sawyer that the time.

15          MR. MCKANE:  Very good.  Thank you, Your Honor.

16          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

17          (Recessed at 12:21 p.m.; reconvened at 1:34 p.m.)

18          THE CLERK:  All rise.

19          THE COURT:  Please be seated.  Okay.  Yes.

20          MS. NIGHAN:  Good afternoon, Your Honor.

21          THE COURT:  Good afternoon.

22          MS. NIGHAN:  Morgan Nighan from Nixon Peabody for

23     the EFH indenture trustee American Stock Transfer.

24          Your Honor, before we call our next witness we

25     have just one item to take care of.

1            As has been previously discussed, we have a copy

2    of Ms. Williamson's revised written direct that's been

3    highlighted to reflect the fact that the parties have

4    reached an agreement that certain paragraphs are to be

5    considered only for their effect on the listener and not for

6    the truth of the matters asserted therein.  May I approach?

7            THE COURT:  Yes.

8            MS. NIGHAN:  Would you like a copy?

9            THE COURT:  Yes, please.  Thank you.

10           MS. NIGHAN:  I've conferred with my colleague,

11   Mike Firestein, and I understand that there's no objection.

12           MR. FIRESTEIN:  Your Honor, my understanding is

13   that all this is is a merely highlighting the paragraphs to

14   which the hearsay objections had been asserted and the

15   Court's already made its ruling, they're just reflecting it

16   in the declaration that those are the precise provisions

17   because the objections were not otherwise of record per se

18   with respect to those provisions.

19           So there's nothing that's changing about the

20   contents of the declaration, merely highlighting the

21   paragraphs or sentences of the paragraphs to which the

22   objection had been originally presented.  And on that basis

23   we have no objection.

24           THE COURT:  Okay.  All right.  So D-DIR Williamson

25   R-2 is admitted.

1           MS. NIGHAN:  Thank you.

2      (Debtors' Exhibit D-DIR Williamson R-2 was admitted)

3           MS. NIGHAN:  With that we'd like to call our next

4      witness, Mr. Hugh Sawyer.

5           THE COURT:  Okay.  Mr. Hugh Sawyer?  Please step

6      up to the stand and remain standing, Mr. Sawyer.

7           THE CLERK:  Please raise your right hand.

8                    HUGH SAWYER, WITNESS SWORN

9           THE CLERK:  Please state and spell your name for

10     the record.

11          THE WITNESS:  Infers name is huge, H-U-G-H, last

12     name is Sawyer, S-A-W-Y-E-R.

13          THE CLERK:  Thank you.

14          THE WITNESS:  You're welcome.

15          THE COURT:  Please be seated, Mr. Sawyer, and if

16     you could scooch up to the microphone that would be

17     terrific.  Thank you.

18          All right, go ahead.

19                    DIRECT EXAMINATION

20     BY MS. NIGHAN:

21     Q    Good afternoon, Mr. Sawyer.  Can you please state your

22     position with the debtors for the Court?

23     A    I am the sole disinterested manager for TCEH and EFCH.

24     Q    And is it correct that you do not hold any positions

25     with any of the E-Side debtors?

1    A    That is correct.

2    Q    What in general are your responsibilities as

3    disinterested director for those entities?

4    A    To exercise my independent business judgment utilizing

5    the duty of care and duty of loyalty to the T-Side estates.

6    Q    And as part of your responsibilities do you participate

7    in board meetings?

8    A    I do.

9    Q    Do you attend joint board meetings?

10   A    I do.

11   Q    And did you approve the filing of the current plan that

12   was filed May 1st, 2016?

13   A    I did.

14   Q    And would you agree that you were generally aware of

15   the negotiations of the terms of the current plan?

16   A    Yes.

17   Q    And did you approve the filing of the tax matters

18   agreement?

19   A    Yes.

20   Q    And would you agree that you were kept apprised of the

21   developments and the negotiations of the tax matters

22   agreement?

23   A    Sure, yes.

24   Q    Do you recall the plan that was confirmed in December

25   of 2015?

1    A     Yes.

2    Q     I'll refer to that has Plan A.

3    A     Sure.

4    Q     And you would agree that Plan A was terminated,

5    correct?

6    A     It was, yes.

7    Q     So when did you first become aware that discussion were

8    taking place regarding the development of Plan B, which was

9    filed May 1st, 2016?

10   A     Well it was always contemplated that there may be a

11   contingency plan related to Plan A, and as early as January

12   of this year we began to consider contingencies.

13   Q     Okay.  And it's your understanding, isn't it, that the

14   transfer of EFH Corporate Services was assumed in Plan A?

15   A     The transfer of EFH Corporate Services has been a part

16   of every plan the company has filed.

17   Q     And you'd agree that the transfer of EFH Corporate

18   Services is essentially part of the plumbing of the deal?

19   A     Yes, and it's been a part of every plan that's been

20   filed.

21   Q     And for that reason it's your understanding and

22   recollection that the board did not revisit the issue of the

23   transfer of EFH Corporate Services; is that right?

24   A     That's correct.

25   Q     With respect to EFH Properties you would agree that the

1    transfer of EFH Properties was a commonsensical part of the

2    separation of EFH and TCEH?

3    A    That's right.

4    Q    And you'd agree that the transfer of EFH Properties was

5    contemplated in Plan A, correct?

6    A    Yes.

7    Q    And to the best of your recollection the transfer of

8    EFH Properties was not revisited by the board of EFH since

9    the filing of Plan A?

10   A    That's right.

11   Q    And would you agree that the use of NOLs to provide the

12   T-Side with a step up in basis has been contemplated since

13   the filing of Plan A?

14   A    Yes.

15   Q    And to the best of your recollection the issue of

16   whether NOLs should be used to provide the T-Side with the

17   step up in basis and for what consideration was not

18   revisited since the filing of Plan A; is that correct?

19   A    That's right, it was not revisited, Counselor, the

20   NOLs, the property, and the Corporate Services group were a

21   part of a highly engineered, complex, global transaction.

22   We did not revisit those matters because no other vital

23   option ever came before the board other than the option

24   that's in front of the Court today.

25   Q    And do you recall whether the transfer of EFH Corporate

1    Services or EFH Properties was specifically discussed at a

2    board meeting in 2016 prior to July 22nd?

3    A    I don't recall.

4    Q    And that's because it was part of Plan A, right?

5    A    Yes, as I've testified it's been a part of every plan

6    that's been filed by the debtor.

7    Q    And isn't it true that no representative from the E-

8    Side ever asked you or your advisors about the E-Side

9    receiving any consideration in exchange for the T-Side's use

10   of its NOLs?

11   A    That is correct, but as I've testified previously

12   there's a massive amount of consideration moving to the E-

13   Side in this transaction.

14   Q    Isn't it true that no board member of EFH ever asked at

15   a board meeting what is the value of EFH Corporate Services?

16   A    My recollection is that did not occur, but as I've

17   testified, there's a massive amount of consideration moving

18   to the E-Side.

19   Q    And isn't it true that no board member of EFH ever

20   asked at a board meeting what is the value of NOLs to be

21   used to provide a step up in basis to the T-Side?

22   A    Not that I recall, no.

23   Q    And isn't it true that you have no knowledge of whether

24   any of the disinterested directors ever discussed or

25   considered having reorganized TCEH pay some amount of

1    consideration to EFH Corp. in exchange for the use of NOLs?

2    A    You know, I can't testify to what went on inside the E-

3    Side disinterested director board meetings.  I am very well

4    aware that the E-Side is receiving massive consideration in

5    the form of the avoidance of a $6 million stranded tax, in

6    the form of a tax matters agreement where the T-Side has

7    agreed to a break it and take it provision, and in the form

8    of the risk transfer of Corporate Services and the EFH

9    Properties group, along with form of the billion dollars in

10   NOLs that the E-Side will receive.

11   Q    But you'd agree that you don't have knowledge that

12   disinterested directors ever discussed or considered having

13   reorganized TCEH pay some consideration for the use of NOLs,

14   to your knowledge?

15   A    Well and respectfully in my view there's a massive

16   amount of consideration being, to use your word, paid to the

17   E-Side.  I can't speak to what the disinterested directors

18   there did.

19   Q    And is it also true that you have no knowledge whether

20   the disinterested directors discussed a possible agreement

21   to a lesser amount of NOLs being used to offset the gain

22   from the step up transaction?

23   A    Yeah, I have no knowledge of what they may have done in

24   their meetings.

25   Q    But, Mr. Sawyer, you're a fiduciary for TCEH, correct?

1    A    Solely, yes.

2    Q    And it's true that you owe duties to creditors of the

3    TCEH estate to maximize the value of the estate and their

4    recovery; is that right?

5    A    Yes.

6    Q    And in connection with carrying out your duty you

7    determined that confirmation of the plan is in the best

8    interest of the TCEH estate, correct?

9    A    Yes.

10   Q    And you're aware of the fact that EFH Corp. could at

11   any point check the box and make reorganized TCEH liable on

12   a joint and several basis for any tax triggered by a T-Side

13   taxable transaction; is that right?

14   A    I'm aware that that hypothetical possibility exists.

15   I'm also aware it would be highly litigated, and I'm aware

16   it would be catastrophic for the E-Side estates.

17   Q    And are you also aware that there are other ways that

18   TCEH could become liable for a tax, for example, as

19   explained in the omnibus tax memorandum, the IRS could come

20   after the T-Side if there was a stranded tax; you're aware

21   of that?

22   A    I'm aware of it, but believe it's largely fantasy

23   because I don't think those things are going to occur.

24   Q    So you would agree that a benefit of the plan is that

25   TCEH avoids the risk of a tax Armageddon occurring?

1    A    I think a benefit of the plan as is before the Court is

2    that both the T-Side estates and the E-Side estates avoid

3    the catastrophic tax risk of a stranded tax that EFH, where

4    EFH would be jointly liable for that tax, along with the T-

5    Side.

6    Q    And you would agree that the avoidance of this tax is a

7    benefit to TCEH, correct?

8    A    Sure.

9              MS. NIGHAN:  That's all I have.

10             THE COURT:  Thank you.  Cross?

11             MW. WALPER:  Your Honor, can I have just a couple

12   of minutes?

13             THE COURT:  Yes, of course.

14             MW. WALPER:  Thank you.

15        (Pause)

16             MW. WALPER:  No redirect, Your Honor.

17             THE COURT:  Thank you, Mr. Sawyer.

18             THE WITNESS:  Thank you, Judge.

19             THE COURT:  Any further evidence by the objectors?

20             MS. NIGHAN:  Your Honor, at this time we would

21   like to close or case.

22             THE COURT:  Very good.  Thank you.

23             Mr. McKane, any rebuttal case?

24             MR. MCKANE:  Your Honor, I -- respectfully I know

25   that the objectors have dep designations that they want to

1    hand up, and candidly, Your Honor, I thought they'd be

2    available just to be handed up right at this moment.

3              THE COURT:  They're not?

4         (Laughter)

5              THE COURT:  So be it.  While we -- I told

6    Mr. Madron no and now maybe I can -- I understand there's a

7    settlement with the EPA someone wants to read into the

8    record, but we have to have the EPA on the phone.  I don't

9    know if they're on the phone.

10             MR. MCKANE:  There is, Your Honor, and I -- I'm

11   not blaming Mr. Husnick, but if -- he is the man with the --

12             THE COURT:  Well they asked to defend Mr. Husnick

13   and Mr. Madron, they asked my clerk whether they could do

14   that right now and I said, no, because I thought we would

15   take longer and I didn't want to jam up the testimony.

16   So --

17             MR. MCKANE:  Your Honor, I guess the real question

18   is can we get the -- how quickly could we get the EPA on the

19   phone, and maybe it's -- I believe the next -- the E-Side

20   conference is at 3:00.

21             THE COURT:  Yes.

22             MR. MCKANE:  Perhaps we could --

23             THE COURT:  We can take a recess.

24             MR. MCKANE:  -- do this at 2:30, you know, recess

25   until 2:00?  Yeah, so maybe we'll see what we can do with

1    the EPA and let you know.  Maybe 2:30 just as a targeted

2    time.  Would that work?

3              THE COURT:  To get them on the phone and to deal

4    with the dep designations?

5              MR. MCKANE:  Yeah.  Oh, actually to be fair, 2:45

6    is plenty of time.  This is a short resolution.

7              THE COURT:  All right.  But we need to deal with

8    the deposition designations, right?

9              MR. MCKANE:  We do.  We do.  And I don't believe

10   there's any issue other than a printer, so --

11             THE COURT:  All right.  So let's do this.  So

12   we'll reconvene at 2:45 for purposes of the EPA.  We'll take

13   a recess now until the dep designations are ready, and then

14   whenever they're ready we can reconvene before 2:45.  So

15   whenever they're ready we'll deal with that and then we'll

16   take another break and deal with the EPA at 2:45 and then

17   still be on target for 3 o'clock in connection with the E-

18   Side's scheduling conference.

19             MR. MCKANE:  And we greatly appreciate your

20   patience in accommodating, Your Honor.

21             THE COURT:  That's not a problem.

22             MS. NIGHAN:  I just wanted to clarify for the

23   record.  We'd like our case to remain open until the dep

24   designations come in.

25             THE COURT:  Of course.  Yes.

1           MR. MCKANE:  Absolutely, Your Honor.

2           THE COURT:  All right.  Not a problem.  Okay.

3   Anything else before we break then?

4           All right, we're in recess.  Just let us know

5   whenever you're ready to go forward on the dep designations

6   and then we'll target 2:45 for the EPA settlement.

7           MR. MCKANE:  Thank you, Your Honor.

8           UNIDENTIFIED SPEAKER:  Thank you.

9       (Recessed at 1:48 p.m.; reconvened at 2:47 p.m.)

10          THE CLERK:  All rise.

11          THE COURT:  Please be seated.  Take your time.

12  Don't want anybody to get hurt.

13          All right.  Mr. Husnick.

14      (Laughter)

15          MR. HUSNICK:  Good afternoon, Judge Sontchi, Chad

16  Husnick from Kirkland & Ellis on behalf of the debtors.

17          We have a settlement that we filed on the docket,

18  Your Honor, for approval.  The settlement agreement is

19  between the EFH Properties, which is the non-debtor entity,

20  and the United States government, it's the Department of

21  Justice on behalf of the USA -- various entities of the USA

22  in particular.

23          This settlement agreement dates back into December

24  of 2015.  You may have remembered that the EPA had objected

25  to the TCEH -- or to the joint plan of reorganization back

1    in December.  As part of the resolution of that objection we

2    agreed to allow a claim that EFCH as well as to a settlement

3    that was going to take place at EFH Properties, the non-

4    debtor.

5           We went ahead and consummate it had first part of

6    that settlement agreement, but the second part of it

7    required additional time both for the parties to work

8    through the documentation as well as the government to run

9    its process.  That process is now concluded and did

10   memorialize the remaining terms of that agreement in the

11   stipulation that we filed.

12          It is required under the law that we file the

13   settlement agreement publicly, so we went ahead given its

14   related nature to this bankruptcy proceeding, and they're

15   all wholly-owned subsidiaries, we went ahead and filed it on

16   Your Honor's docket, and would ask that the Court go ahead

17   and enter an order approving the settlement agreement.

18          THE COURT:  Okay.  Does anyone wish to be heard?

19   All right.  I hear nobody.  Do you have a form of order?

20          MR. HUSNICK:  I do.  May I approach?

21          THE COURT:  Yes.  And this is the settlement that

22   was reached back in December.

23          MR. HUSNICK:  That's correct, and this reflects a

24   $4 million cash payment from EFH Properties to the

25   government.

1          THE COURT:  Okay.

2          MR. HUSNICK:  Thank you.

3          THE COURT:  Thank you.

4     (Pause)

5          THE COURT:  I have signed the order.

6          MR. HUSNICK:  Thank you, Your Honor.

7          THE COURT:  You're welcome.

8          MR. HUSNICK:  I believe that's all I had for now.

9     The scheduling item is up at 3 o'clock, I don't know if

10    we're ready to do that.

11         THE COURT:  That's right.  But it looks like

12    somebody handed me deposition designations.

13         MR. HUSNICK:  Oh, go ahead.  Sorry.

14         MR. MCKANE:  Yes, Your Honor, and I -- the debtors

15    and the objectors were able to work together throughout the

16    course of these proceedings on deposition designations, and

17    as been previously represented the deposition designations

18    are largely by the objectors with some designations by the

19    debtor simply as counters for completeness purposes --

20         THE COURT:  Uh-huh.

21         MR. MCKANE:  -- and through the exercise over the

22    last week and a half we were actually able to narrow the

23    number of deposition designations thanks in large part to

24    the EFIH indenture trustee's efforts.

25         So we have provided I believe two sets of copies

1    of those to Your Honor and Your Honor's staff, and there are

2    electronic copies available for all participating parties as

3    well.

4              And with that --

5              THE COURT:  All right.  So -- yes.

6              MS. NIGHAN:  Good afternoon.  Morgan Nighan from

7    Nixon Peabody for the EFH indenture trustee, and with the

8    designations we'd like to close our case.

9              THE COURT:  Okay.  So formally the deposition

10   designations will be admitted into evidence.  So they're

11   admitted.

12        (Deposition designations were admitted)

13             MR. MCKANE:  Thank you, Your Honor.

14             THE COURT:  Very good.

15             MR. MCKANE:  The debtors have no rebuttal case and

16   we will submit on COC a listing of all materials that are

17   part of this record designating which came in as exhibits,

18   demonstratives, opening statements, and then closing

19   argument as well.

20             THE COURT:  All right.  So subject to receiving

21   that and any potential disputes, which I expect there will

22   not be any, I will close the factual record for the case.

23             MR. PEDONE:  Thank you, Your Honor.

24             THE COURT:  Your Honor.

25             MR. MCKANE:  Thank you, Your Honor.

1            THE COURT:  Very good.  So we will reconvene

2    tomorrow at 12:30 for closing argument.  Very good.

3            MR. PEDONE:  Thank you.

4            THE COURT:  You're welcome.

5            I'll say it again tomorrow, but thank you very

6    much for an incredibly professionally presented case by all

7    the parties, and I very much appreciate the respect for the

8    Court's resources and the efficiency of what was presented,

9    and we got a lot of evidence in in a short amount of time

10   and I know it took a lot of work by a lot of people,

11   including a bunch of people I never see, who I know worked

12   very hard for both sides.  So I thank them as well.

13           So see you tomorrow at 12:30, and we'll reconvene

14   the E-Side scheduling conference as close to 3:00 as we can.

15   We have to do new sign in sheets and new call ins, so it

16   might take a little while.

17           All right.  We're adjourned.

18       (A chorus of thank you)

19       (Whereupon these proceedings were concluded at 2:53 PM)

20

21

22

23

24

25

1                        I N D E X

2

3    WITNESSES                EXAM BY                      PAGE

4    Jack Frank Williams      Mr. Skelly                    12

5                             Mr. Echols                    40

6                             Mr. Silverman                 90

7

8    Hugh Sawyer              Ms. Nighan                    98

9

10

11                       E X H I B I T S

12   PARTY           NO.                             EVID.

13   Debtors'        D-DIR Williams                     16

14                   D-DIR Williamson R-2               98

15                   Deposition Designations           111

16

17   AST             AST-11                             11

18                   AST-179                            11

19                   AST-407-409                        11

20                   AST-411-412                        11

21                   AST-422                            11

22                   DX-17                              11

23                   DX-355                             11

24                   DX-373                             11

25                   DX-468                             11

1                         I N D E X

2

3                         RULINGS

4                                                           PAGE

5    2015 Settlement Agreement                              110

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 115

1              C E R T I F I C A T I O N

2

3    We, Sherri L. Breach and Dawn South, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    **Sherri Breach**  Digitally signed by Sherri Breach
                        DN: cn=Sherri Breach, o=Veritext, ou,
                        email=digital@veritext.com, c=US
7    _____  Date: 2016.08.24 13:02:30 -04'00'

8    Sherri L. Breach

9    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10   **Sherri Breach**  Digitally signed by Sherri Breach
                        DN: cn=Sherri Breach, o=Veritext, ou,
                        email=digital@veritext.com, c=US
11   _____  Date: 2016.08.24 13:03:52 -04'00'

12   Dawn South

13   AAERT Certified Electronic Transcriber CET**D-408

14

15

16

17

18   Date:  August 23, 2016

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501