## EXHIBIT A

**Debtors' Brief**

Civil Action No. 15-1213

# United States District Court for the District of Delaware

IN RE:  ENERGY FUTURE HOLDINGS CORP., *ET AL.*,

*DEBTORS.*

KENNETH R. STEWART,

*Appellant,*

v.

ENERGY FUTURE HOLDINGS CORP., *ET AL.*,

*Appellees.*

On Appeal from the U.S. Bankruptcy Court for the District of Delaware
No. 14-10979 (The Hon. Christopher J. Sontchi)

## BRIEF OF APPELLEES

Mark D. Collins
Daniel J. DeFranceschi
Jason M. Madron
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C.
Chad J. Husnick
Steven N. Serajeddini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Additional counsel on following page*

March 7, 2016

Edward O. Sassower, P.C.
Stephen E. Hessler
Brian E. Schartz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

*Counsel for Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8012, the Appellees, Energy Future Holdings Corp. and its subsidiaries provide the following disclosure:

1.      EFH Corp. is the lead debtor in the procedurally consolidated chapter 11 bankruptcy case from which this appeal has been taken.  EFH Corp. is the ultimate parent for each of the Debtor entities.

2.      No publicly held company holds 10% or more of any Debtor entity.

EFH Corp. also provides the following disclosure:

1.      EFH Corp.'s parent is Texas Energy Future Holdings Limited Partnership.

2.      No publicly held company holds 10% or more of EFH's stock.  Through various private equity funds, Goldman Sachs Capital Partners, a subsidiary of publicly traded Goldman Sachs Group Inc., and publicly traded KKR & Co. L.P. each own in aggregate more than 10% of the membership interests of Texas Energy Future Holdings Limited Partnership's general partner, Texas Energy Future Capital Holdings LLC.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ......................................................................... 3

GLOSSARY ................................................................................................................................ 5

INTRODUCTION ...................................................................................................................... 7

STATEMENT OF THE ISSUES AND STANDARDS OF REVIEW .................................... 7

STATEMENT OF THE CASE AND FACTS ........................................................................... 8

SUMMARY OF THE ARGUMENT ...................................................................................... 11

ARGUMENT ............................................................................................................................ 11

A.      The Debtors Conducted an Extensive Process to Confirm The Absence of
        Liability Relating to the Claims. ......................................................................... 11

A.      The Claimant And Her Purported Agents Have Not Submitted Any
        Materials Evidencing a Relationship Between the Claims and the Debtors ......... 13

CONCLUSION ........................................................................................................................ 15

# GLOSSARY

| | |
|---|---|
| Addendum | The Addendum to the Statement filed by Mr. Stewart in the Court. |
| Answer | The answer filed by the Appellees in response to the Statement and Addendum. |
| Appellees or Debtors | EFH Corp. and its subsidiaries that filed for chapter 11 protection listed above in the Corporate Disclosure Statement. |
| Bankruptcy Court | The United States Bankruptcy Court for the District of Delaware with jurisdiction over the Debtors' chapter 11 cases. |
| Bankruptcy Court Order | The order of the Bankruptcy Court disallowing the Claims, issued orally at the Trial and entered at Docket Nos. 7381 and 7382. |
| Bar Date | October 27, 2014, at 4:00 p.m. (prevailing Eastern Time). |
| Claimant | Ms. Kuk Ja Stewart. |
| Claims | The Filed Claims, together with any claims Mr. Stewart purports to assert on his own behalf. |
| Court | United States District Court for the District of Delaware. |
| EFH Corp. | Energy Future Holdings Corp. |
| Filed Claims | The claims filed by the Claimant and, in certain instances, filed by Mr. Stewart or other purported agents of the Claimant on behalf of the Claimant in the Bankruptcy Court. Specifically, POC No. 5739, for an unliquidated amount, POC No. 10003, for $1.8 billion, and after the Bar Date had passed, POC No. 10982, for an unliquidated amount. |

| | |
|---|---|
| Fourteenth Omnibus Objection | *Debtors' Fourteenth Omnibus (Substantive) Objection to Certain Substantive Duplicate, No Liability, and No Claim Asserted Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1* [Bankr. D.I. 3218]. |
| Objections | The Fourteenth Omnibus Objection and Thirty-Third Omnibus Objection. |
| Petition Date | April 29, 2014. |
| Mr. Stewart or Appellant | Mr. Kenneth R. Stewart, the purported agent of the Claimant, who filed the appeal on behalf of the Claimant (and potentially on behalf of himself). |
| Statement | The Statement filed by Mr. Stewart in the Court. |
| Thirty-Third Omnibus Objection | *Debtors' Thirty-Third Omnibus (Substantive) Objection to Substantive Duplicate and No Liability Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1* [Bankr. D.I. 6499]. |
| Trial | The trial held in front of the Bankruptcy Court on December 16, 2015 regarding the Claims and the Objections, after which the Bankruptcy Court Order disallowing the Claims was entered. |

## INTRODUCTION

Appellees[1] believe the Statement and Addendum are intended to serve as a brief in support of the Appellant's appeal of the Bankruptcy Court Order disallowing certain Claims asserted by the Claimant and her purported agents (including Mr. Stewart). The Bankruptcy Court based its decision to disallow the Claims upon the record, which demonstrated that the Debtors have no connection to the Claims. Specifically, over the course of several months, the Debtors undertook significant efforts to evaluate and investigate the Claims, including (a) conducting several in-person and telephonic conferences with the Claimant, her purported agents, and her once-retained counsel, (b) undertaking a thorough search of the Debtors' records for any connection to the Claimant or Mr. Stewart, (c) reviewing thousands of pages of ultimately irrelevant materials produced by the Claimant and Mr. Stewart, and (d) responding to discovery requests served by the Claimant's once-retained counsel. The Debtors presented evidence to support their efforts to research the alleged connection and their conclusion that no such connection exists during a day-long trial in the Bankruptcy Court (which Mr. Stewart attended, with counsel).

Based on that record and for the reasons described below, the Court must affirm the Bankruptcy Court Order disallowing the Claims.

## STATEMENT OF THE ISSUES AND STANDARDS OF REVIEW

1.    Whether the Bankruptcy Court clearly erred when it ruled that (i) the Debtors presented credible and complete evidence that there is no connection between the Debtors and any of the Claims asserted on behalf of the Claimant and Mr. Stewart and (ii) neither the

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Glossary or the Objection, as applicable.

Claimant nor her purported agents submitted evidence evidencing a relationship between the Claims and the Debtors.

**Standard of review:** The Court reviews findings of fact under the clearly erroneous standard. *In re Myers*, 491 F.3d 120, 125 (3rd Cir. 2007).

<div align="center">

**STATEMENT OF THE CASE AND FACTS**

</div>

2.      On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases are currently under the jurisdiction of the United States Bankruptcy Court for the District of Delaware.

3.      On May 2, 2014, the Bankruptcy Court entered an order establishing October 27, 2014 at 5:00 p.m. (prevailing Eastern Time), as the final Bar Date for certain customer claimants holding or asserting a claim against the Debtors arising on or before the Petition Date to file proofs of claim in the chapter 11 cases [Bankr. D.I. 307].  Written notice of the Bar Date was mailed to current and certain former customers of the Debtors, including the Claimant in her capacity as a former customer of TXU Energy Retail Company LLC. *See* Dec. 16, 2015 Hr'g Tr. at 16:18-21.[2]

4.      The Claimant, who the Debtors understand to be the mother of the Appellant, filed (a) a Proof of Claim [POC No. 5739] for an unliquidated amount, (b) a Proof of Claim [POC No. 10003] for $1.8 billion, and (c) after the Bar Date had passed, a Proof of Claim [POC No. 10982] for an unliquidated amount, each of which is attached hereto as **Exhibit A**, **Exhibit B**, **Exhibit C**, respectively.  The Debtors understand that Mr. Stewart is the purported agent of the Claimant.  To the extent Mr. Stewart believes he has separate claims against the Debtors, such claims have never been properly asserted and were disallowed pursuant to the

---

[2]      A full transcript of the Trial is attached hereto as **Exhibit N**.

Bankruptcy Court Order to the extent such claims arise from the same asserted facts that support the Filed Claims. All of the Claims relate to the same set of alleged facts—certain mineral rights related to parcels of land the Claimant (and, as described below, certain of her purported agents) asserts are owned or controlled by the Debtors and certain pipelines and transmission lines in which the Claimant asserts ownership interests, both of which Mr. Stewart asserts were fraudulently taken from the Claimant and himself.

5.      On April 2, 2015, the Debtors filed the Fourteenth Omnibus Objection, objecting to Proof of Claim numbers 5739 and 10003. The Fourteenth Omnibus Objection is attached hereto as **Exhibit D**.

6.      On October 16, 2015, the Debtors filed the Thirty-Third Omnibus Objection, objecting to Proof of Claim number 10982, which the Claimant filed after the Debtors filed the Fourteenth Omnibus Objection. The Thirty-Third Omnibus Objection is attached hereto as **Exhibit E**. Each Objection was supported by a declaration from Mr. Steven Kotarba, who is a managing director with Alvarez & Marsal North America, LLC, the Debtors' restructuring advisor [Bankr. D.I. 4051, 6501], each attached hereto as **Exhibit F** and **Exhibit G**, respectively.

7.      In addition to the Filed Claims, Mr. Stewart has filed many documents in the Debtors' chapter 11 cases, including several letters and statements of facts [Bankr. D.I. 5384, 5716, 6101, 6934, 7369], which are attached hereto as **Exhibits H-L**.

8.      After the Debtors informed Claimant's counsel and Mr. Stewart that none of the thousands of pages of materials submitted to the Bankruptcy Court evidenced any relationship whatsoever between the Claims and the Debtors, Claimant's counsel served certain discovery requests on the Debtors, requesting any documents that relate to any leases, easements, or agreements between the Debtors, on the one hand, and the Claimant and her family on the other

hand, or the parcels of land identified by the Claimant and her purported agents.  The Debtors provided responses to the discovery requests explaining that the Debtors are not aware of any responsive documents and, therefore, no such documents were in the Debtors' possession.  The Debtors' responses are attached hereto as **Exhibit M**.

9.    On December 16, 2015, the Bankruptcy Court held a day-long trial on the Objections that consisted of evidence regarding the extraordinary efforts Debtors and their advisors undertook to engage with Mr. Stewart, and to investigate, evaluate, and ultimately confirm the absence of any connection between the Claims and the Debtors—including offering the testimony of Mr. Kotarba, whom Mr. Stewart and his counsel had an opportunity to cross-examine.

10.    At the Trial, the Bankruptcy Court issued an oral ruling disallowing the Claims in full:

> I'm going to rule.  I'm going to grant the objection.  I'm going to disallow all the claims.  The claims are prima facie valid under the law.  It's the burden of the Debtors to rebut that presumption.  They've done that through the submission of evidence today that indicates that there is no connection between the Debtors and any of the allegations you have made.
>
> I find that evidence to be credible and complete.  It would then shift to you to try to convince me otherwise, and I've looked at your documents, I've read what you've submitted to the Court, both previously, and in preparation for today.

Exhibit N, Dec. 16, 2015 Hr'g Tr. at 128:3-15.  A full transcript of the Trial is attached hereto as **Exhibit N**.

11.    The Court subsequently entered the *Order (Second) Sustaining Debtors' Fourteenth Omnibus (Substantive) Objection to Certain No Liability Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rule 3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1* [Bankr. D.I. 7382] and the *Order (Second) Sustaining Debtors' Thirty-Third*

*Omnibus (Substantive) Objection to Certain No Liability Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rule 3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1* [Bankr. D.I. 7381].

12.     On December 29, 2015, Appellant filed a notice of appeal of the Bankruptcy Court Order.  [Bankr. D.I. 7462] and submitted the Statement on February 18, 2016.  The Court ordered the Appellees to submit their response brief on March 7, 2016.

## SUMMARY OF THE ARGUMENT

13.     This Court should affirm the Bankruptcy Court Order.  At Trial, the Bankruptcy Court ruled that the Debtors rebutted the prima facie validity of the Filed Claims and that Mr. Stewart, arguing on behalf of the Claimant and himself, did not carry his burden to prove the validity of the Claims, based on the evidence presented at trial, including the Claimant's admissions in the Claims, the materials submitted by Mr. Stewart in "support" of the Claims, and the extensive process the Debtors undertook to search their books and records.  Exhibit N, Dec. 16, 2015 Hr'g Tr. at 128:3-129:4.  Mr. Stewart has offered nothing in his Statement or Addendum nor pointed to a single piece of evidence in the record to support an accusation that the Bankruptcy Court's factual findings were clearly erroneous.

## ARGUMENT

### A.     The Debtors Conducted an Extensive Process to Confirm The Absence of Liability Relating to the Claims.

14.     The Debtors have undertaken a substantial effort to engage with the Claimant, Mr. Stewart, their various purported agents, and their retained attorneys (of whom, Delaware counsel has since withdrawn from their representation of the Claimant and Mr. Stewart, as evidenced by filings with the Bankruptcy Court [Bankr. D.I. 7857] and communications from Mr. Stewart to

the Debtors' advisers), and to review their books and records to confirm the absence of liability with respect to the Claims.

15.    *First*, before filing the Objections, the Debtors conducted a reasonable search of their books and records and found no relationship between any Debtor entity and the asserted Claims. Exhibit N., Dec. 16, 2015 Hr'g Tr. at 24:6-12; 96:6-97:10; 101:11-102:10. *Second*, members of the Debtors' legal team (both in-house and their retained counsel in their chapter 11 cases) engaged in telephonic and in-person conferences with the Claimant's purported agents to better understand the Claims. *Id.* at 28:25-29:3. These meetings did not result in the production of any additional material or otherwise evidence a relationship between the Debtors, the Claimant, or the Claims. *Id.* at 29:3-7. *Third*, in response to certain discovery requests served on the Debtors, the Debtors reviewed (a) multiple internal software systems, including the mining account system maintained by Debtor Luminant Mining Company LLC's real estate group (through which it is possible to review all of the coal leases to which any Company entity is a party), and the residential customer payment system maintained by Debtor TXU Energy Retail Company LLC (through which the Claimant received notice of the Bar Date in her capacity as a former customer), (b) hard copy books and records maintained by their land department, (c) Dallas county property records, and (d) general internet searches. *Id.* at 19:4-18; 104:4-106:10. Yet again, the Debtors found no relationship between any Debtor entity and the Claims. *Id.* at 18:23-19:25; 29:14-15; 104:4-107:4. The Debtors also conducted a simple online search for a sample of the documented references listed in the discovery request and found that: (a) certain of the document references yielded no results at all, (b) certain of the document references yielded results showing no relationship to the Debtors (*e.g.,* one result yielded a mortgage executed between two parties that have no relationship to the Debtors or the Claimant,

while another result yielded a grant from the Claimant to a company formed by the Claimant), and (c) certain of the results showed no relationship between the identified land parcels and the Claimant or her family (*e.g.,* a deed from 1986 from the Las Colinas Corporation to Woodrow & Co. (neither of which has any affiliation to the Debtors or the Claimant) and an assessment of non-payment of homeowner fees from an unrelated third party). *Id.* at 29:15-30:7.  After the Debtors detailed these results in connection with their discovery response, the Claimant's Delaware counsel attempted to withdraw as counsel [Bankr. D.I. 7343].  *Fourth*, the Debtors' non-Debtor affiliate, Oncor Electric Holdings Company LLC, conducted a reasonable review of its books and records despite the fact that it had no obligation to do so under the Bankruptcy Code or applicable law.  Exhibit N, Dec. 16, 2015 Hr'g Tr. at 126:3-11.

16.    These efforts yielded the same result time and time again: there is no connection between the Debtors or the Claimant other than the Claimant was at one time a customer of TXU Energy Retail Company LLC.

### B.    The Claimant And Her Purported Agents Have Not Submitted Any Materials Evidencing a Relationship Between the Claims and the Debtors.

17.    The Claimant and her purported agents appended extensive materials with the Filed Claims and filed a number of documents with the Bankruptcy Court [Bankr. D.I. 5384, 5716, 6101, 6934, 7369] purporting to show a relationship between the Debtors and the Claims. *See* Exhibits H-L.  These materials, while voluminous, reaffirm what the Debtors discovered through multiple searches of their books and records—the Debtors do not have any relationship to the Claims or the Claimant (other than the prior customer relationship).

18.    Among other things, the materials submitted by the Claimant and her purported agents reference (a) alleged actions taken by entities with no relationship to the Debtors (to name a few, AT&T, Verizon, AllState Insurance, Edison International, Cede& Co., and Gifco

Properties) and (b) land with no relationship to the Debtors (for example, 1800 Hunter Ferrell Road, which is the only land parcel identifiable in any of the appended materials, and which is approximately ten miles from any Debtor operations).

19.      This theme continues in the Statement, which is rife with misstatements and unsupported allegations, but notable for the lack of evidence in support of the Claims or of reversal of the Bankruptcy Court Order.  With respect to the Debtors, the Statement references certain "hidden" accounts and alleged Debtor insurance policies without attempting to explain the relevance of such accounts and policies or providing any facts in support of the existence of such accounts and policies.  Statement, ¶¶ 3, 4.  In addition, ignoring the Bankruptcy Court's recent confirmation of the Debtors' chapter 11 plan of reorganization, the Statement erroneously states that the Debtors are in contempt of the Bankruptcy Court and that the Bankruptcy Court has "recognized" the Debtors' "fraud, security violations, mismanagement, and lack of fiduciary duties."  Statement, ¶¶ 7, 8.  Contrary to the allegations set forth in the Statement, neither the Debtors nor their advisors have ever threatened the Claimant or offered a billion dollar settlement to the Claimant.[3]  Statement, ¶¶ 5, 6.  All communications between the Debtors and the Claimant have been focused on answering one question—what, if anything, is the relationship between the Claims, the Claimant, and the Debtors?

20.      As the Debtors evidenced to the Bankruptcy Court, the answer is clear.  There is no relationship between the Debtors, the Claims, and the Claimant and, consequently, no liability on the part of any Debtor entity with respect to any portion of the Claims.  On December 16, 2015, the Debtors and Mr. Stewart and his attorney at the time, Mr. Montemayor (who the Debtors understand no longer represents the Claimant) presented the Bankruptcy Court with

---

[3]      The Statement also contains a number of unsupported allegations against third parties, including, among others, Hunt Oil, the Texas Attorney General, and the Public Utility Commission of Texas.

evidence regarding the Claims.  Mr. Stewart had an opportunity to present any affirmative admissible evidence in support of the Claims, to cross-examine Mr. Kotarba, make statements on the record, and directly discuss the Claims with the Bankruptcy Court.    Ultimately, the Bankruptcy Court entered the Bankruptcy Court Order, disallowing the Claims in full.  Bankr. D.I. 7381; Bankr. D.I. 7382; Exhibit N, Dec. 16, 2015 Hr'g Tr. at 128:3-129:4.

21.    The adjudication of the Claims does not raise a close question of fact or law. There is, simply, no evidence of any relationship between the Debtors, the Claimants, or the Claims.  The Debtors exhausted all avenues to confirm the absence of any liability.  Despite extensive discussions and a hearing before the Bankruptcy Court, the Claimant has not—and cannot—produce a single document that evidences any kind of liability on the part of any Debtor.  The credible and complete evidence presented to the Bankruptcy Court supports its decision to disallow the Claims in full.  Exhibit N, Dec. 16, 2015 Hr'g Tr. at 128:3-129:4.

## CONCLUSION

22.    For the foregoing reasons, this Court should affirm the Bankruptcy Court.

*[Remainder of page intentionally left blank.]*

Dated: March 7, 2016
      Wilmington, Delaware

*/s/ Jason M. Madron*
                             
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:        collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Stephen E. Hessler Brian E. Schartz
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. Marc Kieselstein, P.C.
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

-and-

Mark E. McKane (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Telephone:  (415) 439-1400
Facsimile:  (415) 439-1500
E-mail:  mark.mckane@kirkland.com

-and-

Jonathan F. Ganter (admitted *pro hac vice*)
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200
E-mail:  jonathan.ganter@kirkland.com

*Co-Counsel to Appellees*

# **Exhibit A**

POC No. 5739

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | | **PROOF OF CLAIM** |
|---|---|---|

Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
Grand Central Station, P.O. Box 4613
New York, NY 10163-4613

**COURT USE ONLY**

| Name of Debtor: | Case Number: |
|---|---|
| ENERGY FUTURE Holdings Corp | 14/0979 |

Filed: USBC - District of Delaware
Energy Future Holdings Corp., et al., Et Al.
14-10979 (CSS)      0000005739

**NOTE:** Do not use this form to make a claim for an administrative expense that arises <u>after</u> the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.

Name and address where notices should be sent:

BAR(23) MAIL ID *** 000084562631 ***
EFH POC 05-15-2014 (CREDITOR,CREDNUM) 1002910198
KUK JA STEWART
2028 SANDY LN
IRVING, TX 75060-5639

Telephone number:          Email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**
(If known) _____

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**FILED / RECEIVED**

**OCT 2 0 2014**

**Epiq Bankruptcy Solutions, LLC**

| Name and address where payment should be sent (if different from above): | **COURT USE ONLY** |
|---|---|

Telephone number:          Email:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $12,475), earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,775 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$ _____

**1. Amount of Claim as of Date Case Filed:**    $ UNKNOWN
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
If all or part of the claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete item 6.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest charges.

**2. Basis for Claim:** UNPAID MINERAL LEASES
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** 9 8 | 0
**3a. Debtor may have scheduled account as:** CUSTOMER NO. 13214284
(See instruction #3a)

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:**
☐ Real Estate    ☐ Motor Vehicle    ☐ Other
**Describe:**
**Value of Property:** $ _____
**Annual Interest Rate** _____ % ☐ Fixed or ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of time case was filed, included in secured claim, if any:

$ _____

**Basis for perfection:** _____

**Amount of Secured Claim:** $ _____

**Amount Unsecured:** $ _____

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $** _____    (See instruction #6)

**7. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attach **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8 and definition of "redacted".)*
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**9. Signature:** (See instruction #9)   Check the appropriate box:
☐ I am the creditor.   ☐ I am the creditor's authorized agent.      ☐ I am the trustee, or the debtor, or their      ☐ I am a guarantor, surety, indorser, or other codebtor.
         (Attached a copy of power of attorney, if any.)      authorized agent. (See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Address, telephone number, and email (if different from notice address above):

Print Name: Kuk Ja Stewart
Title: Owner
Company: UP-G. KUK, EMC

(Signature) Kuk Ja Stewart
(Date) 10-16-14

Telephone number: 972-251-0317
Email: Kev Stew 721 @ gmail. Con

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# CHARLES MONTEMAYOR

ATTORNEY AT LAW

MAPLE PLAZA LAW CENTER

5353 MAPLE AVENUE ✦ SUITE 100 ✦ DALLAS, TEXAS 75235

TELEPHONE: 214.634.0771 ✦ FAX: 214.634.0465

October 17, 2014

## CASE NO: 14-10979 (CSS)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:    ENERGY FUTURE HOLDINGS CORP, et al,

Debtors

KUK JA STEWART
    UP G KUK, INC
KENNETH JAMES STEWART
KENNETH ROBERT STEWART

Creditors

CREDITORS SUPPORTING DOCUMENTION

MINERAL LEASE AGREEMENTS:    ENERGY FUTURE INTERMEDIATE HOLDINGS,LLC

861-Survey:County of Dallas    Subsidiary: TXU-ONCOR-LUMINANT
and Tarrent County

Gifco  Properties: Mangum&Mangrum

    1963 - Big Brown Energy Plant
    1975 - A-1 Program to aid comsumers

    1984 - Dallas Power & Light, Tesco, Texas Power & Light
    1988 - Texas Utilities/T.U.

    1995 - Eastern Energy, Limited, PCS PRIMECO
    1997 - Ensearch, Lufkin-Conroe Communication Company

    1998 - The Energy Group
    2000 - Fort Bend Communications Co.

    2001 - ONCOR
    2004 - TXU Electric Delivery (renamed) Texas Energy Delivery

        CAPGEMINI ENERGY PARTNERSHIP - (OUTSOURCE)
        (Through misfiled records as shown on plats)

        KOHLBERG KRAVIS ROBERTS & CO. TPG'S GOLDMAN SACHS
        CAPITAL PARTNERS
        (Investing Group-reformed as FUTURE ENERGY HOLDINGS,INC.

    TRUSTEE: WARD WILLIFORD: NOTIFIED, NO RESPONSE:

                    Respectfully Submitted,

                    CHARLES MONTEMAYOR
                    Attorney for Creditors



# DALLAS-FORT WORTH
## AND VICINITY

Limited Access Divided Highways

Other Divided Highways (on numbered Highways)

Paved Roads —all weather

Improved Roads—second class

Dirt Roads

National Interstate Highways

U.S. Highways Abbreviations indicate: B.R.=Business Route

State Highways

Farm, Loop or Park Roads

Mileage shown between points

**POPULATION OF CITIES AND TOWNS.**

0-250
250-1000
1,000-2,500
2,500-5,000
5,000-10,000
20,000-100,000
100,000 and over

One inch equals approximately 4.2 miles

Scale: 0 1 2 3 4 5 miles

Copyright © by Rand McNally & Co. All rights reserved. Lithographed in U.S.A.

West Side
Hunter Farrell
Where Well
Cut

*OWNER POLICY OF TITLE INSURANCE*

44 0298 100 7631

# CHICAGO TITLE INSURANCE COMPANY

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, Chicago Title Insurance Company, a Missouri corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1.  Title to the estate or interest described in Schedule A being vested other than as stated therein;

2.  Any defect in or lien or encumbrance on the title;

3.  Any statutory or constitutional mechanic's, contractor's, or materialman's lien for labor or material having its inception on or before Date of Policy;

4.  Lack of a right of access to and from the land;

5.  Lack of a good and indefeasible title.

The Company also will pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured, but only to the extent provided in the Conditions and Stipulations.

*In Witness Hereof,* CHICAGO TITLE INSURANCE COMPANY has caused this policy to be executed by its President under the seal of the Company, but this policy is to be valid only when it bears an authorized countersignature, as of the date set forth in Schedule A.

ISSUED BY:

SAFECO LAND TITLE OF DALLAS

CHICAGO TITLE INSURANCE COMPANY

8080 N. Central Expressway, Suite 120
Dallas, Texas 75206
(214) 987-0800
Fax (214) 987-4446

*Lynn Hudson*
Authorized Signatory

*Richard J. Pollo*
President.

*Thomas J Adams*
Secretary.

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

(b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking that has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

(a) created, suffered, assumed or agreed to by the insured claimant;

(b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

(c) resulting in no loss or damage to the insured claimant;

(d) attaching or created subsequent to Date of Policy;

(e) resulting in loss or damage that would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

4. The refusal of any person to purchase, lease or lend money on the estate or interest covered hereby in the land described in Schedule A because of unmarketability of the title.

5. Any claim which arises out of the transaction vesting in the person named in paragraph 3 of Schedule A the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or other state or federal creditors' rights laws that is based on either (i) the transaction creating the estate or interest of the insured by this Policy being deemed a fraudulent conveyance or fraudulent transfer or a voidable distribution or voidable dividend, (ii) the subordination or recharacterization of the estate or interest being insured by this Policy as a result of the application of the doctrine of equitable subordination or (iii) the transaction creating the estate or interest insured by this Policy being deemed a preferential transfer except where the preferential transfer results from the failure of the Company or its issuing agent to timely file for record the instrument of transfer to the Insured after delivery or the failure of such recordation to impart notice to a purchaser for value or a judgement or lien creditor.

## CONDITIONS AND STIPULATIONS

. **DEFINITION OF TERMS**

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A, and, subject to any rights or defenses the Company would have had against the named insured, those who succeed to the interest of the named insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devices, survivors, personal representatives, next of kin, or corporate, partnership or fiduciary successors, and specifically, without limitation, the following:

(i) the successors in interest to a corporation resulting from merger or consolidation or the distribution of the assets of the corporation upon partial or complete liquidation;

(ii) the partnership successors in interest to a general or limited partnership which dissolves but does not terminate;

(iii) the successors in interest to a general or limited partnership resulting from the distribution of the assets of the general or limited partnership upon partial or complete liquidation;

(iv) the successors in interest to a joint venture resulting from the distribution of the assets of the joint venture upon partial or complete liquidation;

(v) the successor or substitute trustee(s) of a trustee named in a written trust instrument; or

(vi) the successors in interest to a trustee or trust resulting from the distribution of all or part of the assets of the trust to the beneficiaries thereof.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice that may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto that by law constitute real property. The term "land" does not include any property beyond the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to . _____ for value and without knowledge. With respect to

include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "access": legal right of access to the land and not the physical condition of access. The coverage provided as to access does not assure the adequacy of access for the use intended.

## 2. CONTINUATION OF INSURANCE AFTER CONVEYANCE OF TITLE

The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

## 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, or (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest that is adverse to the title to the estate or interest, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

When, after the date of the policy, the insured notifies the Company as required herein of a lien, encumbrance, adverse claim or other defect in title to the estate or interest in the land insured by this policy that is not excluded or excepted from the coverage of this policy, the Company shall promptly investigate the charge to determine whether the lien, encumbrance, adverse claim or defect is valid and not barred by law or statute. The Company shall notify the insured in writing, within a reasonable time, of its determination as to the validity or invalidity of the insured's claim or charge under the policy. If the Company concludes that the lien, encumbrance, adverse claim or defect is not covered by this policy, or was otherwise addressed in the closing of the transaction in connection with which this policy was issued, the Company _____ for its determination. If

1/21/93
Title
Policy
(Safeco)
w/
legal
description

```
┌─────────────────────────────────────────────────────────────┐
│                 OWNER POLICY OF TITLE INSURANCE               │
└─────────────────────────────────────────────────────────────┘
```

* SCHEDULE A *

FILE NO.: 106531 CH/NP/GPB/sf
POLICY NO.:OP 44 0298 100 7631

Amount of Insurance: $108,000.00
Premium: $1,075.00

Date of Policy:      January 21, 1993 at 3:58 p.m.

1.    Name of Insured:  Kuk Ja Stewart

2.    The estate or interest in the land that is covered by this policy is:
      (fee simple, leasehold, easement, etc. - identify or describe)

      Fee Simple

3.    Title to the estate or interest in the land is insured as vested in:

      Kuk Ja Stewart

4.    The land referred to in this policy is described as follows:

      A tract of land being situated in Dallas County, Texas and being more
      fully described by metes and bounds in Exhibit "A" attached.


                              SAFECO LAND TITLE OF DALLAS

                              Authorized Signature

## EXHIBIT "A"

BEING a tract of land situated in the JOSEPH MANGUM SURVEY, ABSTRACT NO. 861, Dallas County, Texas, and being part of two tracts of land described in deed to Jasper Federal Savings and Loan Association, as recorded in Volume 86166, Page 2069, Deed Records, Dallas County, Texas, and being more particularly described as follows:

BEGINNING at a 1/2" diameter iron rod found in the South line of a tract of land described in deed from Ashlin Development Company, to Ward Williford, Trustee, as recorded in Volume 88119, Page 0715, Deed Records, Dallas County, Texas, said iron rod also being at the most Northerly Northwest corner of a tract of land described in deed from Gifford-Hill & Co., Inc. to the County of Dallas as recorded in Volume 70009, Page 0319, Deed Records, Dallas County, Texas, said iron rod also being in the West line of Hunter Ferrell Road (a 57.5 foot right-of-way at this point);

THENCE South, 1538.53 feet, with the said West line of Hunter Ferrell Road and with the West line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found;

THENCE South 45 degrees 03 minutes 05 seconds West, 70.65 feet, with the Northwest line of said Hunter Ferrell Road and with the Northwest line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found, said iron rod also being in the North line of Hunter Ferrell Road (a 60' right-of-way at this point);

THENCE South 89 degrees 59 minutes 05 seconds West, 1126.74 feet, with the North line of said Hunter Ferrell Road and with the North line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found at the Southeast corner of a tract of land described in deed to Jasper Federal Savings and Loan Association, as recorded in Volume 86166, Page 2069, Deed Records, Dallas County, Texas;

THENCE North 00 degrees 19 minutes 26 seconds East, 1594.79 feet, with the East line of said Jasper Federal Savings and Loan Association tract, to a 1/2" diameter iron rod found in the South line of said Ward Williford, Trustee, tract;

THENCE South 89 degrees 42 minutes 16 seconds East, 1167.74 feet, with the said South line of Ward Williford, Trustee, tract and along a fence line, to the PLACE OF BEGINNING

```
OWNER POLICY OF TITLE INSURANCE
```

### * SCHEDULE B *

FILE NO.:106531 CH/NP/GPB/sf
POLICY NO.:OP 44 0298 100 7631

#### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) that arise by reason of the terms and conditions of the leases or easements insured, if any, shown in Schedule A and the following matters:

1.  (This item intentionally deleted)

2.  Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3.  Homestead or community property or survivorship rights, if any, of any spouse of any insured.

4.  Any title or rights asserted by anyone, including but not limited to, persons, the public, corporations, governments or other entities,

    a. to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or
    b. to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or
    c. to filled-in lands, or artificial islands, or
    d. to statutory water rights, including riparian rights,or
    e. to the area extending from the line of mean low tide to the line of vegetation or the right of access to that area or easement along and across that area.

5.  Standby fees, taxes and assessments by any taxing authority for the year 1993 and subsequent years, and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership.

SEE SCHEDULE B CONTINUED

Issued by:
SAFECO LAND TITLE OF DALLAS
1510 Pacific Avenue, Dallas, Texas  75201  (214) 720-1100

## OWNER POLICY OF TITLE INSURANCE

\* SCHEDULE B CONTINUED \*

FILE NO.:106531 CH/NP/GPB/sf
POLICY NO.:OP 44 0298 100 7631

6. The following matters and all terms of the documents creating or offering evidence of the matters. (We must insert matters or delete this exception.):

a. Easement granted by Gifco Properties, Inc. to Tommy R. Barton, et al, as evidenced by the instrument dated August 5, 1980 recorded in Volume 84211, Page 350, of the Deed Records, Dallas County, Texas.

b. The rights of tenants in possession under the terms of any unrecorded leases or rental agreements.

c. All visible and apparent easements and all underground easements the existence of which may arise by virtue of unrecorded grant or use.

d. Any portion of the subject property lying within the boundaries of any road or roadway, public or private.

he Company concludes that the lien, encumbrance, adverse claim or defect s valid, the Company shall take one of the following actions: (i) institute the ecessary proceedings to clear the lien, encumbrance, adverse claim or defect rom the title to the estate as insured; (ii) indemnify the insured as provided n this policy; (iii) upon payment of appropriate premium and charges herefor, issue to the insured claimant or to a subsequent owner, mortgagee or iolder of the estate or interest in the land insured by this policy, a policy of itle insurance without exception for the lien, encumbrance, adverse claim or efect, said policy to be in an amount equal to the current value of the property ir, if a mortgagee policy, the amount of the loan; (iv) indemnify another title nsurance company in connection with its issuance of a policy(ies) of title nsurance without exception for the lien, encumbrance, adverse claim or efect; (v) secure a release or other document discharging the lien, ncumbrance, adverse claim or defect; or (vi) undertake a combination of (i) hrough (v) herein.

. **DEFENSE AND PROSECUTION OF ACTIONS;
DUTY OF INSURED CLAIMANT TO COOPERATE**

(a) Upon written request by the insured and subject to the options ontained in Section 6 of these Conditions and Stipulations, the Company, at s own cost and without unreasonable delay, shall provide for the defense of n insured in litigation in which any third party asserts a claim adverse to the tle or interest as insured, but only as to those stated causes of action alleging defect, lien or encumbrance or other matter insured against this policy. The Company shall have the right to select counsel of its choice (subject to the right f the insured to object for reasonable cause) to represent the insured as to 10se stated causes of action and shall not be liable for and will not pay the fees f any other counsel. The Company will not pay any fees, costs or expenses 1curred by the insured in the defense of those causes of action that allege 1atters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and rosecute any action or proceeding or to do any other act that in its opinion may e necessary or desirable to establish the title to the estate or interest, as 1sured, or to prevent or reduce loss or damage to the insured. The Company 1ay take any appropriate action under the terms of this policy, whether or not . shall be liable hereunder, and shall not thereby concede liability or waive any rovision of this policy. If the Company shall exercise its rights under this aragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a efense as required or permitted by the provisions of this policy, the Company 1ay pursue any litigation to final determination by a court of competent urisdiction and expressly reserves the right, in its sole discretion, to appeal rom any adverse judgement or order.

(d) In all cases where this policy permits or requires the Company to rosecute or provide for the defense of any action or proceeding, the insured hall secure to the Company the right to so prosecute or provide defense in 1e action or proceeding, and all appeals therein, and permit the Company to se, at its option, the name of the insured for this purpose. Whenever requested y the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing vidence, obtaining witnesses, prosecuting or defending the action or pro-eeding or effecting settlement, and (ii) in any other lawful act that in the pinion of the Company may be necessary or desirable to establish the title to 1e estate or interest as insured. If the Company is prejudiced by the failure f the insured to furnish the required cooperation, the Company's obligations ) the insured under the policy shall terminate, including any liability or bligation to defend, prosecute, or continue any litigation, with regard to the 1atter or matters requiring such cooperation.

. **PROOF OF LOSS OR DAMAGE**

In addition to and after the notices required under Section 3 of these onditions and Stipulations have been provided the Company, a proof of loss r damage signed and sworn to by the insured claimant shall be furnished to 1e Company within 91 days after the insured claimant shall ascertain the facts iving rise to the loss or damage. The proof of loss or damage shall describe 1e defect in, or lien or encumbrance on the title, or other matter insured gainst by this policy that constitutes the basis of loss or damage and shall tate, to the extent possible, the basis of calculating the amount of the loss or amage. If the Company is prejudiced by the failure of the insured claimant ) provide the required proof of loss or damage, the Company's obligations to 1e insured under the policy shall terminate, including any liability or bligation to defend, prosecute, or continue any litigation, with regard to the 1atter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to xamination under oath by any authorized representative of the Company and hall produce for examination, inspection and copying, at such reasonable mes and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memo-anda, whether bearing a date before or after Date of Policy, which reasonably

representative of the Company, the insured claimant shall grant sion, in writing, to any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgement of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS;
TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

**(a) To Pay or Tender Payment of the Amount of Insurance.**

To pay or tender payment of the amount of insurance under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

**(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.**

(i) To pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) To pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company up to the time of payment and which the Company is obligated to pay. Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

**7. DETERMINATION, EXTENT OF LIABILITY
AND COINSURANCE**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A; or

(ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy at the date the insured Claimant is required to furnish to Company a proof of loss or damage in accordance with Section 5 of these Conditions and Stipulations.

(b) In the event the Amount of Insurance stated in Schedule A at the Date of Policy is less than 80 percent of the value of the insured estate or interest or the full consideration paid for the land, whichever is less, or if subsequent to the Date of Policy an improvement is erected on the land which increases the value of the insured estate or interest by at least 20 percent over the Amount of Insurance stated in Schedule A, then this Policy is subject to the following:

(i) where no subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that the amount of insurance at Date of Policy bears to the total value of the insured estate or interest at Date of Policy; or

(ii) where a subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that 120 percent of the Amount of Insurance stated in Schedule A bears to the sum of the Amount of Insurance stated in Schedule A and the amount expended for the improvement.

The provisions of this paragraph shall not apply to costs, attorneys' fees and expenses for which the Company is liable under this policy, and shall only apply to that portion of any loss which exceeds, in the aggregate, 10 percent of the Amount of Insurance stated in Schedule A.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

ne Company concludes that the lien, encumbrance, adverse claim or defect is valid, the Company shall take one of the following actions: (i) institute the necessary proceedings to clear the lien, encumbrance, adverse claim or defect om the title to the estate as insured; (ii) indemnify the insured as provided n this policy; (iii) upon payment of appropriate premium and charges nerefor, issue to the insured claimant or to a subsequent owner, mortgagee or older of the estate or interest in the land insured by this policy, a policy of tle insurance without exception for the lien, encumbrance, adverse claim or efect, said policy to be in an amount equal to the current value of the property r, if a mortgagee policy, the amount of the loan; (iv) indemnify another title nsurance company in connection with its issuance of a policy(ies) of title nsurance without exception for the lien, encumbrance, adverse claim or efect; (v) secure a release or other document discharging the lien, ncumbrance, adverse claim or defect; or (vi) undertake a combination of (i) rough (v) herein.

## . DEFENSE AND PROSECUTION OF ACTIONS: DUTY OF INSURED CLAIMANT TO COOPERATE

(a) Upon written request by the insured and subject to the options ontained in Section 6 of these Conditions and Stipulations, the Company, at s own cost and without unreasonable delay, shall provide for the defense of n insured in litigation in which any third party asserts a claim adverse to the tle or interest as insured, but only as to those stated causes of action alleging defect, lien or encumbrance or other matter insured against this policy. The 'ompany shall have the right to select counsel of its choice (subject to the right f the insured to object for reasonable cause) to represent the insured as to lose stated causes of action and shall not be liable for and will not pay the fees f any other counsel. The Company will not pay any fees, costs or expenses ncurred by the insured in the defense of those causes of action that allege natters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and rosecute any action or proceeding or to do any other act that in its opinion may e necessary or desirable to establish the title to the estate or interest, as nsured, or to prevent or reduce loss or damage to the insured. The Company nay take any appropriate action under the terms of this policy, whether or not shall be liable hereunder, and shall not thereby concede liability or waive any rovision of this policy. If the Company shall exercise its rights under this aragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a efense as required or permitted by the provisions of this policy, the Company nay pursue any litigation to final determination by a court of competent risdiction and expressly reserves the right, in its sole discretion, to appeal om any adverse judgement or order.

(d) In all cases where this policy permits or requires the Company to rosecute or provide for the defense of any action or proceeding, the insured hall secure to the Company the right to so prosecute or provide defense in ne action or proceeding, and all appeals therein, and permit the Company to se, at its option, the name of the insured for this purpose. Whenever requested y the Company, the insured, at the Company's expense, shall give the 'ompany all reasonable aid (i) in any action or proceeding, securing vidence, obtaining witnesses, prosecuting or defending the action or pro- eeding or effecting settlement, and (ii) in any other lawful act that in the pinion of the Company may be necessary or desirable to establish the title to ne estate or interest as insured. If the Company is prejudiced by the failure f the insured to furnish the required cooperation, the Company's obligations ) the insured under the policy shall terminate, including any liability or bligation to defend, prosecute, or continue any litigation, with regard to the natter or matters requiring such cooperation.

## . PROOF OF LOSS OR DAMAGE

In addition to and after the notices required under Section 3 of these 'onditions and Stipulations have been provided the Company, a proof of loss r damage signed and sworn to by the insured claimant shall be furnished to ne Company within 91 days after the insured claimant shall ascertain the facts iving rise to the loss or damage. The proof of loss or damage shall describe ne defect in, or lien or encumbrance on the title, or other matter insured gainst by this policy that constitutes the basis of loss or damage and shall :ate, to the extent possible, the basis of calculating the amount of the loss or amage. If the Company is prejudiced by the failure of the insured claimant ) provide the required proof of loss or damage, the Company's obligations to ne insured under the policy shall terminate, including any liability or bligation to defend, prosecute, or continue any litigation, with regard to the natter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to xamination under oath by any authorized representative of the Company and hall produce for examination, inspection and copying, at such reasonable mes and places as may be designated by any authorized representative of the 'ompany, all records, books, ledgers, checks, correspondence and memo- randa, whether bearing a date before or after Date of Policy, which reasonably

representative of the Company, the insured claimant shall gr— sion, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgement of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

## 6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

**(a) To Pay or Tender Payment of the Amount of Insurance.**

To pay or tender payment of the amount of insurance under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

**(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.**

(i) To pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) To pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company up to the time of payment and which the Company is obligated to pay. Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prose- ecute, or continue any litigation.

## 7. DETERMINATION, EXTENT OF LIABILITY AND COINSURANCE

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A; or

(ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy at the date the insured Claimant is required to furnish to Company a proof of loss or damage in accordance with Section 5 of these Conditions and Stipulations.

(b) In the event the Amount of Insurance stated in Schedule A at the Date of Policy is less than 80 percent of the value of the insured estate or interest or the full consideration paid for the land, whichever is less, or if subsequent to the Date of Policy an improvement is erected on the land which increases the value of the insured estate or interest by at least 20 percent over the Amount of Insurance stated in Schedule A, then this Policy is subject to the following:

(i) where no subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that the amount of insurance at Date of Policy bears to the total value of the insured estate or interest at Date of Policy; or

(ii) where a subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that 120 percent of the Amount of Insurance stated in Schedule A bears to the sum of the Amount of Insurance stated in Schedule A and the amount expended for the improvement.

The provisions of this paragraph shall not apply to costs, attorneys' fees and expenses for which the Company is liable under this policy, and shall only apply to that portion of any loss which exceeds, in the aggregate, 10 percent of the Amount of Insurance stated in Schedule A.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

he Company concludes that the lien, encumbrance, adverse claim or defect s valid, the Company shall take one of the following actions: (i) institute the ecessary proceedings to clear the lien, encumbrance, adverse claim or defect rom the title to the estate as insured; (ii) indemnify the insured as provided n this policy; (iii) upon payment of appropriate premium and charges herefor, issue to the insured claimant or to a subsequent owner, mortgagee or older of the estate or interest in the land insured by this policy, a policy of itle insurance without exception for the lien, encumbrance, adverse claim or efect, said policy to be in an amount equal to the current value of the property or, if a mortgagee policy, the amount of the loan; (iv) indemnify another title nsurance company in connection with its issuance of a policy(ies) of title nsurance without exception for the lien, encumbrance, adverse claim or efect; (v) secure a release or other document discharging the lien, ncumbrance, adverse claim or defect; or (vi) undertake a combination of (i) hrough (v) herein.

## . DEFENSE AND PROSECUTION OF ACTIONS: DUTY OF INSURED CLAIMANT TO COOPERATE

(a) Upon written request by the insured and subject to the options ontained in Section 6 of these Conditions and Stipulations, the Company, at s own cost and without unreasonable delay, shall provide for the defense of n insured in litigation in which any third party asserts a claim adverse to the tle or interest as insured, but only as to those stated causes of action alleging defect, lien or encumbrance or other matter insured against this policy. The Company shall have the right to select counsel of its choice (subject to the right f the insured to object for reasonable cause) to represent the insured as to hose stated causes of action and shall not be liable for and will not pay the fees f any other counsel. The Company will not pay any fees, costs or expenses ncurred by the insured in the defense of those causes of action that allege natters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and rosecute any action or proceeding or to do any other act that in its opinion may e necessary or desirable to establish the title to the estate or interest, as nsured, or to prevent or reduce loss or damage to the insured. The Company nay take any appropriate action under the terms of this policy, whether or not shall be liable hereunder, and shall not thereby concede liability or waive any rovision of this policy. If the Company shall exercise its rights under this aragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a efense as required or permitted by the provisions of this policy, the Company nay pursue any litigation to final determination by a court of competent urisdiction and expressly reserves the right, in its sole discretion, to appeal rom any adverse judgement or order.

(d) In all cases where this policy permits or requires the Company to rosecute or provide for the defense of any action or proceeding, the insured hall secure to the Company the right to so prosecute or provide defense in ne action or proceeding, and all appeals therein, and permit the Company to se, at its option, the name of the insured for this purpose. Whenever requested y the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing vidence, obtaining witnesses, prosecuting or defending the action or pro-eeding or effecting settlement, and (ii) in any other lawful act that in the pinion of the Company may be necessary or desirable to establish the title to ne estate or interest as insured. If the Company is prejudiced by the failure f the insured to furnish the required cooperation, the Company's obligations o the insured under the policy shall terminate, including any liability or bligation to defend, prosecute, or continue any litigation, with regard to the natter or matters requiring such cooperation.

## . PROOF OF LOSS OR DAMAGE

In addition to and after the notices required under Section 3 of these onditions and Stipulations have been provided the Company, a proof of loss r damage signed and sworn to by the insured claimant shall be furnished to ne Company within 91 days after the insured claimant shall ascertain the facts iving rise to the loss or damage. The proof of loss or damage shall describe ne defect in, or lien or encumbrance on the title, or other matter insured gainst by this policy that constitutes the basis of loss or damage and shall tate, to the extent possible, the basis of calculating the amount of the loss or amage. If the Company is prejudiced by the failure of the insured claimant o provide the required proof of loss or damage, the Company's obligations to ne insured under the policy shall terminate, including any liability or bligation to defend, prosecute, or continue any litigation, with regard to the natter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to xamination under oath by any authorized representative of the Company and hall produce for examination, inspection and copying, at such reasonable mes and places as may be designated by any authorized representative of the ompany, all records, books, ledgers, checks, correspondence and memo-anda, whether bearing a date before or after Date of Policy, which reasonably

representative of the Company, the insured claimant shall g... sion, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgement of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

## 6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the amount of insurance under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) To pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) To pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company up to the time of payment and which the Company is obligated to pay. Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

## 7. DETERMINATION, EXTENT OF LIABILITY AND COINSURANCE

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A; or

(ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy at the date the insured Claimant is required to furnish to Company a proof of loss or damage in accordance with Section 5 of these Conditions and Stipulations.

(b) In the event the Amount of Insurance stated in Schedule A at the Date of Policy is less than 80 percent of the value of the insured estate or interest or the full consideration paid for the land, whichever is less, or if subsequent to the Date of Policy an improvement is erected on the land which increases the value of the insured estate or interest by at least 20 percent over the Amount of Insurance stated in Schedule A, then this Policy is subject to the following:

(i) where no subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that the amount of insurance at Date of Policy bears to the total value of the insured estate or interest at Date of Policy; or

(ii) where a subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that 120 percent of the Amount of Insurance stated in Schedule A bears to the sum of the Amount of Insurance stated in Schedule A and the amount expended for the improvement.

The provisions of this paragraph shall not apply to costs, attorneys' fees and expenses for which the Company is liable under this policy, and shall only apply to that portion of any loss which exceeds, in the aggregate, 10 percent of the Amount of Insurance stated in Schedule A.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

## 8. APPORTIONMENT

If the land described in Schedule A consists of two or more parcels that are not used as a single site, and a loss is established affecting one or more of the parcels but not all, the loss shall be computed and settled on a pro rata basis as if the amount of insurance under this policy was divided pro rata as to the value on Date of Policy of each separate parcel to the whole, exclusive of any improvements made subsequent to Date of Policy, unless a liability or value has otherwise been agreed upon as to each parcel by the Company and the insured at the time of the issuance of this policy and shown by an express statement or by an endorsement attached to this policy.

## 9. LIMITATION OF LIABILITY

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, all is insured, or takes action in accordance with Section 3 or Section 6, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

## 10. REDUCTION OF INSURANCE:
### REDUCTION OR TERMINATION OF LIABILITY

All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto.

## 11. LIABILITY NONCUMULATIVE

It is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy to the insured owner.

## 12. PAYMENT OF LOSS

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

## 13. SUBROGATION UPON PAYMENT OR SETTLEMENT
### (a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies that the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to these rights and remedies in the proportion which the Company's payment bears to the whole amount of the loss.

If loss should result from any act of the insured claimant, as stated above, that act shall not void this policy, but the Company, in that event, shall be required to pay only that part of any losses insured against this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

### (b) The Company's Rights Against Non-Insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments that provide for subrogation rights by reason of this policy.

## 14. ARBITRATION

Unless prohibited by applicable law or unless this arbitration section is deleted by specific provision in Schedule B of this policy, either the Company or the insured may demand arbitration pursuant to the Title Arbitration Rules or the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service of the Company in connection with the issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less SHALL BE arbitrated at the request of either the Company or the Insured, unless the Insured is an individual person (as distinguished from a corporation, trust, partnership, association or other legal entity). All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgement upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

## 15. LIABILITY LIMITED TO THIS POLICY:
### POLICY ENTIRE CONTRACT

**(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.**

**(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.**

**(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.**

## 16. SEVERABILITY

In the event any provision of the policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

## 17. NOTICES, WHERE SENT

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at Chicago Title Insurance Company, Claims Department, 171 North Clark, Chicago, Illinois 60601.

## COMPLAINT NOTICE

**Should any dispute arise about your premium or about a claim that you have filed, contact the agent or write to the Company that issued the policy. If the problem is not resolved, you also may write the Texas Department of Insurance, P.O. Box 149091, Austin, TX 78714-9091, Fax No. (512) 475-1771. This notice of complaint procedure is for information only and does not become a part or condition of this policy.**

# FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL:
# 1-800-442-4303



**Dallas Central Appraisal District**

## Commercial Account

Location  Owner  Legal Desc  Value  Improvements  Land  Exemptions  Tax Abatements  TIF  Estimated Taxes
Building Footprint  History  Comments

**DBA:** VACANT

**Property Location (Current 2014)**
**Address:** 1900 HUNTER FERRELL RD
**Market Area:** 0
**Mapsco:** 41A-Q (DALLAS)

**Legal Desc (Current 2014)**
**1:** JOSEPH MANGRUM ABST 861 PG 140
**2:** TR 1 ACS 19.5642 CALC
**3:**
**4:** INT200503579476 DD08312005 CO-DC
**5:** 0861140100100 1CI08611401
**Deed Transfer Date:** 11/12/2005

**Customer Service Survey**
Enter PIN:    [ Submit ]

**DCAD Property Map**

**View Photo**

🖶 **Print Homestead Exemption Form**
**2013 Appraisal Notice**

YAHOO! Maps

### Value

| 2013 Certified Values | |
|---|---|
| **Improvement:** | $0 |
| **Land:** | + $117,380 |
| **Market Value:** | = $117,380 |
| **Revaluation Year:** | 2011 |
| **Previous Revaluation Year:** | 2009 |

**Owner (Current 2014)**
UPG KUK INC
2028 SANDY LN
IRVING, TEXAS 750605639

### Multi-Owner (Current 2014)

| Owner Name | Ownership % |
|---|---|
| UPG KUK INC | 100% |

### Improvements (Current 2014)

No Improvements.

## Land (Certified 2013)

| # | State Code | Zoning | Frontage (ft) | Depth (ft) | Area | Pricing Method | Unit Price | Market Adjustment | Adjusted Price | Ag Land |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | COMMERCIAL - VACANT PLOTTED LOTS/TRACTS | AGRICULTURAL | 0 | 0 | 19.5640 ACRE | STANDARD | $10,000.00 | -40% | $117,384 | N |

\* All Exemption information reflect Certified 2013. \*

### Exemptions (Certified 2013)
No Exemptions

### Exemption Details
### Tax Abatements (Certified 2013)
No Abatements.
### Tax Increment Financing (TIF) (Certified 2013)
No Tax Increment Financing. (TIF)
### Estimated Taxes (Certified 2013)

|  | City | School | County and School Equalization | College | Hospital | Special District |
|---|---|---|---|---|---|---|
| Taxing Jurisdiction | IRVING | GRAND PRAIRIE ISD | DALLAS COUNTY | DALLAS CO COMMUNITY COLLEGE | PARKLAND HOSPITAL | UNASSIGNED |
| Tax Rate per $100 | $0.5986 | $1.465 | $0.2531 | $0.1247 | $0.276 | N/A |
| Taxable Value | $117,380 | $117,380 | $117,380 | $117,380 | $117,380 | $0 |
| Estimated Taxes | $702.64 | $1,719.62 | $297.09 | $146.37 | $323.97 | N/A |
| Tax Ceiling |  |  |  |  | N/A | N/A |
| | | | | | Total Estimated Taxes: | $3,189.68 |

**DO NOT PAY TAXES BASED ON THESE ESTIMATED TAXES.** You will receive an **official tax bill** from the appropriate agency when they are prepared. Taxes are collected by the agency sending you the **official** tax bill. To see a listing of agencies that collect taxes for your property. Click Here

The estimated taxes are provided as a courtesy and should not be relied upon in making financial or other decisions. The Dallas Central Appraisal District (DCAD) does not control the tax rate nor the amount of the taxes, as that is the responsibility of each Taxing Jurisdiction. Questions about your taxes should be directed to the appropriate taxing jurisdiction. We cannot assist you in these matters. These tax estimates are calculated by using the most current certified taxable value multiplied by the most current tax rate. It does not take into account other special or unique tax scenarios. If you wish to calculate taxes yourself, you may use the TaxEstimator to assist you.

### Building Footprint (Current 2014)

Building Footprint Not Available



## History

### History
### Comment (Current 2014)

| # | Year | Date | Comment |
|---|------|------|---------|
| 1 | 1000 | 01/01/1900 | 081187 AG DENIED 87. NEW OWNER-NO APPLICATION. NO AG USE; ROLLBACK/PL SW-032889-CHG NBHD CD TO 6 8/23/89 FLIP RES TO COMM.CAH 040290 DELETED LOA CODE 70 PER LISTING TBJ LB 011692 JF REVAL 92 062492 CHGD M/A PER PO COPY OF FWD NOTICE LW/REC 4/7/93 LED - DEED PROJECT 041993 ASSOC ACCT W/ SALE DATA #30015: 65086114010020000. VS 050593- PER TP, PROPERTY IS NOT BUILDABLE PER THE CITY AND IN FLOOD AREA. 120993 IL-REVAL 94 111593 COMM/V ROBERTS 100996 BL 100296 97 REVAL FOR SALE 43 ACREW 956-8888 COMM/N KELLOUGH 031400 SDW 022400 2000 REVAL COMM/R SHIPMAN |
| 2 | 2003 | 03/17/2003 | MARKET ADJUSTMENTS FOR MIS-IMPROVEMENT |
| 3 | 2005 | 12/16/2004 | 121604 2005 REVAL. VACANT LAND, FOR SALE 817-781-9464. COMM/PNGUYEN |
| 6 | 2006 | 06/13/2006 | UPDATED INT200503579476 PER S/T. REC/K NGUYEN |
| 7 | 2007 | 02/27/2007 | LAND ADJ FOR SIZE AND FLOOD PLAIN |
| 8 | 2008 | 10/11/2007 | 101107 2008 REVAL. VACANT. COMM/R VILLATORO |
| 9 | 2009 | 03/05/2009 | 3/5/09 2009 LAND REAPP. COMM/C VILLATORO |
| 10 | 2011 | 08/11/2010 | ADJUST THIS 33.33 ACS ACCOUNT PER DEED INST 201000065956. FROM 33.33 ACS ACCOUNT SPLIT 5.3195 ACS TO RIGHT OF WAY & SPLIT 3.1798 ACS TO 65086114010010100 & SPLIT 5.2665 ACS TO 65086114010010200 BY NONCONTIG LEAVING 19.5642 ACS CALC REMAINING IN THIS ACCOUNT. ACS BY GIS CALCULATION. AFFECTS 2011 |
| 11 | 2011 | 09/21/2010 | PER AFC DTD 081110 SPLIT 5.3195 ACRES TO ROW (LTR INFO TO S. TAYLOR) & SPLIT 3.1798 ACRES TO 65086114010010100 & 5.2665 ACRES TO 65086114010010200 FOR 2011 |
| 12 | 2011 | 01/04/2011 | SENT ROW LTR TO ENTITIES PER VOL201000065956 EFF 02/11/2010 41 DAYS TAXABLE |
| 13 | 2011 | 03/09/2011 | LAND MASS UPDATE |
| 14 | 2011 | 05/16/2011 | RQUEST TO OCMBINE RCVD ON 05/12/2011 |
| 15 | 2011 | 07/13/2011 | DENIED REQ TO COMBINE FOR 2011, CANNOT COMBINE SEPARATELY PLATTED PARCELS. |
| 16 | 2012 | 07/26/2011 | REQUEST TO COMBINE DENIAL LETTER SENT (LETTER DATED 07/26/2011) |
| 17 | 2014 | 02/05/2014 | LAND MASS UPDATE |
| 18 | 2014 | 02/10/2014 | REVAL 2014. LAND ONLY. |

© 2014 Dallas Central Appraisal District.
All Rights Reserved.

Hunter Ferrell



**City of Irving**
**Tax Statement 2004**
**Harry Huson TAC**
**825 West Irving Boulevard**
**Irving, TX 75060**
**(972) 721-2411**

10,167-1,167

STEWART KUK JA
2028 SANDY LN
IRVING, TX 75060-5639

DATE: 10/12/2004

LEGAL: JOSEPH MANGRUM ABST 861 PG 140
TR 2 ACS 9.47VOL93014/1966 EX0
10893 CO-DALLAS0861140100200
23208611401
PIDN: 65086114010020000
ACRES: 9470.000000

| LAND VALUE 25,570 | APPRAISED VAL 25,570 | | | | | |
|---|---|---|---|---|---|---|
| TAXING ENTITIES | EXEMPTION AMOUNT | | TAXABLE VALUE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST |
| CITY OF IRVING | | 0 | 25,570 | 0.547900 | 140.10 | 0.00 |
| | | | | SUBTOTAL | 140.10 | 0.00 |

TOTAL AMOUNT DUE     140.10

189683

*This top portion and your canceled check will serve as your receipt.*

*^ Detach on perforation and return this portion with your check payable to:*

**Make Checks Payable to:  The City of Irving - Revenue Collections**
                             **P O Box 152288**

TOTAL AMOUNT DUE

House



**City of Irving**
**Tax Statement 2004**
**Harry Huson TAC**
**825 West Irving Boulevard**
**Irving, TX 75060**
**(972) 721-2411**

10,166-1,166

STEWART KENNETH JAMES
2028 SANDY LN
IRVING, TX 75060-5639

DATE: 10/12/2004

LEGAL: ELLISBLK B LT 3  SANDY LN10650
00200300        13210650002

PIDN: 32106500020030000
ACRES: 0.000000

| LAND VALUE 25,000 | IMPROVEMENT VAL 96,320 | APPRAISED VAL 121,320 | | | | |
|---|---|---|---|---|---|---|
| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | BASE TAX | | PENALTY & INTEREST |
| CITY OF IRVING | 0 | 121,320 | 0.547900 | 664.71 | | 0.00 |
| | | | SUBTOTAL | 664.71 | | 0.00 |

TOTAL AMOUNT DUE        664.71

25558

*This top portion and your canceled check will serve as your receipt.*

*^ Detach on perforation and return this portion with your check payable to:*

**Make Checks Payable to:  The City of Irving - Revenue Collections**
**P O Box 152288**

TOTAL AMOUNT DUE

Trustees'
Deed
6/7/88

# The State of Texas,  } Know All Men by These Presents:

**County of** DALLAS

- COUNTY CLERK'S MEMO -
PORTIONS OF THIS
DOCUMENT NOT
REPRODUCIBLE
WHEN RECORDED

11.00 DEED
2 06.7 TX/BB

WHEREAS, On the   7th   day of   April   A. D. 19 85 , 1871

Ashlin Development Company, a Texas general partnership

executed and delivered to   Ward Williford   , as Trustee,

a Deed of Trust of said date, which is of Record in book   85072 , page   1180   , of the Records of

Deeds of Trusts of   Dallas   County, Texas, whereby, for the purpose of securing the

payment of certain indebtedness set out in said Deed of Trust   Granted, Sold and Conveyed

to the said   Ward Williford   , in trust, the following described

property, situated, lying, and being in the County of   Dallas   , State of Texas, viz :

Fully described in Exhibit "A" attached hereto and made a part hereof.

This Trustee's Deed is given and accepted with the understanding and agreement
by Grantee(s) herein that Grantor herein (the Trustee or Substitute Trustee as
the case may be) has acted with respect to the matters set out herein and in this
conveyance in a representative capacity, that is, as Trustee or Substitute Trustee
as the case may be, and the Grantor shall have no personal liability by reason
of the execution of this Trustee's Deed nor by reason of any matter arising out
of the sale described herein.

## THE STATE OF TEXAS

### AFFIDAVIT

COUNTY OF DALLAS

BEFORE ME, the undersigned authority, on this day personally appeared Michael V. Killough, who, being by me first duly sworn, upon his oath deposes and states:

I am the person who executed this Trustee's Deed.

At least 21 days preceding the date of the sale described in this Trustee's Deed, notice of such proposed sale was given by posting written notice thereof at the courthouse door of each county in which the real estate described herein is situated and by filing said notice with the county clerk of each county in which said real estate is situated. All provisions as to posting and notice as contained in the Deed of Trust above described were complied with.

At least 21 days preceding the date of the sale described in this deed, written notice of the proposed sale was served by certified mail on each debtor obligated to pay the debt secured by said Deed of Trust, as such debtors appeared in the records of the holder of said debt. Service on such debtors was completed by depositing such written notice, enclosed in a postpaid wrapper, properly addressed to such debtor at the most recent address as shown by the records of the holder of the debt, in a post office or official depository under the care and custody of the United States Postal Service.

Michael V. Killough

SWORN TO AND SUBSCRIBED BEFORE ME THIS ___7___ DAY OF ___June___.
19 88

Janice Nash
Notary Public, State of Texas

TO HAVE AND TO HOLD, The herein described premises, together with all and singular, the rights and appurtenances thereto in any wise belonging unto the said Trustee, to his successor or substitute in this trust, and to his and their assigns forever;

AND, WHEREAS, Default has been made in the payment of said indebtedness and

Mary B. Christensen
the holder          of said indebtedness ha s          since said default, requested the said Trustee, to sell said property in accordance with the provisions of said Deed of Trust, for the purpose of paying said indebtedness;

AND, WHEREAS, On account of the          removal                          of the said

Ward Williford                                  Trustee; thereupon and thereafter I,

Michael V. Killough                              was, by instrument in writing, duly appointed as Substitute Trustee under the provisions of said Deed of Trust; thereupon demand was made of me that I proceed as Substitute Trustee to make sale of the property above described under the terms of said Deed of Trust for the purpose of paying said indebtedness;

AND, WHEREAS, Pursuant to said request and to the provisions of said Deed of Trust, I proceeded

to sell said property at public auction, at the Court House door, of          Dallas          County, Texas,

between the hours of ten o'clock A. M. and four o'clock P. M., on Tuesday, the          7th

day of          June          A. D. 19 88 , after having given notice of the time, place and terms of such sale, as prescribed by the terms of said Deed of Trust, and after first posting written notice thereof for at least twenty one (21) days (three consecutive weeks) preceding the day of sale at the Court House door of said County, ~~and at two other public places in said County~~.

AND, WHEREAS, At such sale said property was by me struck off to   Mary B. Christensen

for the price and

sum of   FOUR-HUNDRED EIGHTY-THOUSAND AND NO/100---------------------------DOLLARS,

she   being the best and highest bidder   for the same, and said sum being the best and highest bid

therefor; now, therefore,

KNOW ALL MEN BY THESE PRESENTS, That I,   Michael V. Killough

of          Dallas          County, Texas, Substitute Trustee as aforesaid, by virtue of the powers granted to me by said Deed of Trust, and in consideration of the foregoing premises and of the sum of

FOUR-HUNDRED EIGHTY-THOUSAND AND NO/100---------------------------------DOLLARS,

to me cash in hand paid by the said   Mary B. Christensen
the receipt whereof is hereby acknowledged (which said sum of money I have applied accordingly to the directions of said Deed of Trust), have Granted, Sold and Conveyed, and by these presents do Grant, Sell and Convey unto the said   Mary B. Christensen

of the County of          Dallas          State of   Texas          , the property hereinbefore described.

TO HAVE AND TO HOLD, The said property, together with all and singular, the rights and appurtenances thereto in any wise belonging unto the said   Mary B. Christensen

and          her          heirs and assigns forever. And for and on behalf of the said   Ashlin Development Company, a Texas general partnership
Grantor s   in said Deed of Trust, and   its **heirs**, executors and administrators, I do hereby bind the
                                                          successors
said   Ashlin Development Company, a Texas general partnership

                                                          successors
                                              and   its   **heirs**
executors and administrators to Warrant and Forever Defend, all and singular, said premises, in so far as is

authorized by said Deed of Trust, unto the said   Mary B. Christensen

and          her          heirs and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

WITNESS MY HAND, This          7th          day of   June          A. D. 19 88 .

                                        Michael V. Killough, Substitute Trustee.

* The words, "and at two other public places in said county", may be deleted if not appropriate.

1819 0716

**THE STATE OF TEXAS** }

COUNTY OF    Dallas }

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared    Michael V. Killough

known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the    7 th    day of    June A. D. 19 88

(L.S.)    *Janice Nash*

My Commission Expires: 10/24/88    Notary Public in and for the State of Texas

**THE STATE OF TEXAS** }

COUNTY OF }

I HEREBY CERTIFY that the foregoing instrument of writing with its certificate of authentication was filed for record in my office on the    day of    , A. D. 19 at    o'clock    M., and was duly recorded by me on the    day of A. D. 19    in Vol.    page    , of the Records of said County.

WITNESS MY HAND and the Seal of the County Court of said County, at my office in the day and year last above written.

(L.S.)    County Clerk    County, Texas.

By _____ ., Deputy

No....................................

# TRUSTEE'S DEED
### (By Substitute Trustee)

.................................................... Substitute Trustee

TO

....................................................

## FILED FOR RECORD

This.................day of .......................... ......A. D. 19......

at.................o'clock...................M.

....................................................
County Clerk.

By.................................................
Deputy.

## RECORDED

..........................................................A. D. 19......

In.................................................County Record

of Trustee's Deeds in Book.................................on

Page.........................................

....................................................
County Clerk.

By.................................................
Deputy.

When recorded return to

The Odes Company, Publishers, Dallas

Return to:
MAILING ADDRESS OF GRANTEE

Mary B. Christensen

9423 Parkford Drive

Dallas, Texas 75238

18119 0718

## EXHIBIT "A"

BEING a survey of a tract of land in the JOSEPH MANGUM SURVEY, Abstract No. 861 in Dallas County, Texas and being in the City of Irving, Texas; and being the same tract as conveyed by deed from Floyd Culpepper to Martin B. Christensen, Jr., et ux as recorded in Volume 4611, Page 93, Deed Records, Dallas County, Texas and being more particularly described as follows:

BEGINNING at the point of intersection of the East line of said Mangum Survey with the centerline of Bear Creek;

THENCE South 00 degrees 08' 49" East along the East line of said Survey, 172.77' to an iron rod in the North line of Hunter-Ferrell Road (30' from centerline);

THENCE South 89 degrees 57' 20" West along the North line of Hunter-Ferrell Road 30' to its intersection with the West line of same, an iron rod;

THENCE South 00 degrees 08' 49" East along the West line of Hunter-Ferrell Road (30' from centerline), 303.26' to an iron rod for in the South line of said Culpepper tract;

THENCE North 89 degrees 58' 22" West along the South line of said Culpepper tract same being the North line of a certain 138.92 acre tract as described in deed to Gifco Properties, Inc., filed 1/5/71, Deed Records, Dallas County, Texas and along the North line of a certain 56.0 acre tract as described in deed to Tommy R. Barton recorded in Volume 80199, Page 1301, Deed Records, Dallas County, Texas, (these lines are evidenced on the ground by an old crooked fence), 8666.44' to an old post at the Southwest corner of said Culpepper tract (a point in the North line of said Barton tract) same being the Southeast corner of a certain 40.287 acre tract as described in deed to TKO Equipment, recorded in Volume 81108, Page 3537, Deed Records, Dallas County, Texas.

THENCE North 00 degrees 01' 52" East along the West line of said Culpepper tract and along the East line of a certain 13.771 acre T.P. & L. Co. tract as per deed recorded 8/29/75, Deed Records, Dallas County, Texas (these lines are evidenced on the ground by an old fence), 1002.75' to a fence corner post at the most Southerly Northwest corner of said Culpepper tract, same being the Northeast corner of said T.P. & L. Co. tract conveyed by Quit Claim Deed to Alvin V. Graff, recorded 5/16/63, Deed Records, Dallas County Texas;

THENCE South 89 degrees 51' 23" East 665.41' to an iron rod at an inside corner of said Culpepper tract, same being the Southeast corner of said Graff tract;

THENCE North 00 degrees 31' 48" East along the most Easterly West line of said Culpepper tract and the East line of said Graff tract (as evidenced on the ground by an old fence), 800.33' to a point in the centerline of Bear Creek;   85072   1184

Thence in a generally Southeasterly direction with the meanders of the centerline of Bear Creek as follows: 1st-South 76 degrees 02'34" East 77.06'; 2nd-South 59 degrees 06' 12" East 100.0'; 3rd-South 29 degrees 14' 52' East 100.4'; 4th-South 19 degrees 50' 06" West 49.7'; 5th South 51 degrees 16'01" West 89.2'; 6th-South 59 degrees 43' 05" West 79.2'; 7th-South 33 degrees 00' 54" East 76.3'; 8th-South 89 degrees 44' 37" East 154.4'; 9th-North 87 degrees 09' 52" East 90.3'; 10th-South 64 degrees 80' 11° East, 90.8'; 11th-South 29 degrees 00' 29° East 337.2'; 12th-South 47 degrees 19' 49° East 118.8'; 13th-North 89 degrees 86' 49° East 65.7'; 14th-North 68 degrees 39' 19° East 55.6'; 15th-North 46 degrees 36' 29° East 60.5'; 16th-North 89 degrees 05' 06" East 125.4'; 17th-North 61 degrees 47' 28° East 70.7'; 18th-South 76 degrees 42' 50" East, 851.3'; 19th-North 77 degrees 25' 33° East, 121.1'; 20th-South 74 degrees 41' 52° East 121.2'; 21st-South 41 degrees 10'24° East 90'; 22nd-South 86 degrees 35' 59° East 122.3'; 23rd-South 23 degrees 42' 18° West 87.9'; 24th-South 85 degrees 45' 42° West 126'; 25th-South 51 degrees 85' 43° West 62.6'; 26th-South 10 degrees 04' 49° West 77.7'; 27th-South 75 degrees 23' 47° East 129.8'; 28th-North 63 degrees 26' 57° East 177.3'; 29th-South 78 degrees 09' 04° East 153.4'; 30th-South 45 degrees 09' 35° East 225.5'; 31st-North 83 degrees 57' 31° East 50'; 32nd-North 81 degrees 29'16° East 123.0'; 33rd-South 70 degrees 36' 34° East 57'; 34th-South 19 degrees 27' 03° East 98.6'; 35th-South 11 degrees 34' 34° West 63';36th-South 62 degrees 85' 00° West 96.3'; 37th-South 78 degrees 07' 20° East, 150.9' to the POINT OF BEGINNING and containing 66.0667 acres of land.

88119 0721

Return to:
MAILING ADDRESS OF GRANTEE
Gary B. Christensen
9423 Parkford Drive
Dallas, Texas 75238

88 JUN 20 9:57

PROVISIONS CONTAINED IN ANY DOCUMENT WHICH RESTRICT THE SALE, RENTAL, OR USE OF THE REAL PROPERTY DESCRIBED THEREIN BECAUSE OF RACE OR COLOR ARE INVALID UNDER FEDERAL LAW AND ARE UNENFORCEABLE.

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

STATE OF TEXAS COUNTY OF DALLAS
I hereby certify that this Instrument was filed on the date and time stamped hereon by me and was duly recorded in the volume and page of the named records of Dallas County, Texas as stamped hereon by me.

JUN 20 1988

Earl Bullock

COUNTY CLERK, Dallas County, Texas

Deed
Record
1/12/70

DEED RECORD

# The State of Texas,

### County of   DALLAS

## Know All Men by These Presents:

That I, MINNIE ADA ROBINSON, a widow,

of the County of **Dallas**                State of **Texas**                for and in consideration

of the sum of  Ten and No/100 ($10.00) Dollars, and other good and valuable consideration,

to me   paid, and secured to be paid, by

M. W. WORLEY and wife, LYDIA LOUISE WORLEY,

AND the cancellation by M. W. Worley of the obligation on the part of Minnie Ada Robinson to pay the balance due in the amount of $4,500.00 on one certain note in the original principal sum of $5,000.00, which said note is secured by a lien on the hereinafter described property evidenced by a Deed of Trust recorded among the Deeds of Trust Records of Dallas County, Texas'

AND the execution by M. W. Worley and wife, Lydia Louise Worley, and delivery to Minnie Ada Robinson, of one certain first vendor's lien note, in the original principal sum of $12,500.00, payable to the order of Minnie Ada Robinson in equal monthly installments of $100.00 each; the first such installment being due and payable on or before the 15th day of February, 1970, and one such installment due and payable on or before the 15th day of each month thereafter until paid in full; said note being secured by a vendor's lien retained herein, and further secured by a Deed of Trust conveying the below-described property in trust to Rebecca A. Hugman, Trustee, for the benefit of the holder of said note;

have Granted, Sold and Conveyed, and by these presents do Grant, Sell and Convey, unto the said M. W. WORLEY and wife, LYDIA LOUISE WORLEY,

of the County of  **Dallas**          State of          **Texas**          all that certain lot, tract or parcel of land, lying and being situated in the County of Dallas, State of Texas, and
BEING Lot 38, in Block C, of Westridge Annex addition to the City of Lancaster, Dallas County, Texas, according to the Map thereof recorded in Volume 9, Pages 467-468, Map Records, Dallas County, Texas.

TO HAVE AND TO HOLD the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said

M. W. WORLEY and wife, LYDIA LOUISE WORLEY, their

heirs and assigns forever and  I  do hereby bind  myself, my

heirs, executors and administrators, to Warrant and Forever Defend, all and singular the said premises unto the said

M. W. WORLEY and wife, LYDIA LOUISE WORLEY, their

heirs and assigns, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

But it is expressly agreed and stipulated that the Vendor's Lien is retained against the above described property, premises and improvements, until the above described note  , and all interest thereon are fully paid according to  its  face and tenor, effect and reading, when this deed shall become absolute.

WITNESS  my  hand  at  Lancaster, Texas
this  12th  day of  January  1970.

Minnie Ada Robinson
Minnie Ada Robinson

Witness at request of Grantor:

**SINGLE ACKNOWLEDGMENT**

THE STATE OF TEXAS,
COUNTY OF DALLAS

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared **Minnie Ada Robinson, a widow,** known to me to be the person whose name **is** subscribed to the foregoing instrument, and acknowledged to me that **she** executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE,

this the *13th* day of **January** A. D. 19 **70**

(L. S.)

Notary Public in and for **Dallas** County, Texas

**SINGLE ACKNOWLEDGMENT**

THE STATE OF TEXAS,
COUNTY OF

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared known to me to be the person whose name subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE,

this the day of A. D. 19

(L. S.)

Notary Public in and for County, Texas

**SINGLE ACKNOWLEDGMENT**

THE STATE OF TEXAS,
COUNTY OF

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared known to me to be the person whose name subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE,

this the day of A. D. 19

(L. S.)

Notary Public in and for County, Texas

THE STATE OF TEXAS,
COUNTY OF

I HEREBY CERTIFY that the foregoing instrument of writing with its certificate of authentication, was filed for record in my office on the day of , A. D. 19 at o'clock M., and was duly recorded by me on the day of A. D. 19 in Vol. , page , of the Records of said County.

WITNESS MY HAND and the Seal of the County Court of said County, at my office in the day and year last above written.

(L. S.)

County Clerk County, Texas

By_____ Deputy.

VOL PAGE
70009 0319

**Warranty Deed**
(WITH VENDOR'S LIEN)

FROM

MINNIE ADA ROBINSON,

a widow,

TO

M. W. WORLEY, ET UX,

LYDIA LOUISE WORLEY

FILED FOR RECORD

This _____ day of _____ A. D. 19 ____

at _____ o'clock _____ M.

_____
County Clerk

By _____ Deputy

RECORDED _____ A. D. 19 ____

_____ County Records

In Book _____ on Page _____

In Book _____

_____
County Clerk

By _____ Deputy

Recording Fee $ _____

This instrument should be filed immediately with
the County Clerk for Record.

Mr. Wm. Worley
St. 7. By Min St.
Lewisville, Texas

CRC/9/Re.

THE COOK COMPANY, PUBLISHERS, DALLAS

STATE OF TEXAS                    COUNTY OF DALLAS
I hereby certify that this instrument was filed on the
date and time stamped hereon by me and was duly re-
corded in the volume and page of the named records
of Dallas County, Texas as stamped hereon by me.

JAN 15 1970

Tom E. Tullis
COUNTY CLERK, Dallas County, Texas

FILED
John E. Ellis
DALLAS COUNTY
COUNTY CLERK
JAN 15 10 34 AM '70

VOL   PAGE
70009  0320

## SUBSTITUTE TRUSTEE'S DEED

1752

THE STATE OF TEXAS                    X
                                            KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF DALLAS                      X

WHEREAS, on the 23rd   day of    October      , 19 84   ,

.......................... DEAN I. DAULEY ..........................

executed and delivered to    Robert D. Smith          , as Trustee,

a Deed of Trust of said date which is of record in Volume84211, Page 0366 ,

Deed of Trust Records of  Dallas     County, Texas (herein "Deed of Trust"),

to secure that certain Promissory Note of even date therewith in the

original principal sum of One Million One Hundred Twenty Thousand and No/100--

($1,120,000.00) (herein "Note"), executed by the said   Dean I. Dauley

..........                          and payable to Jasper Federal Savings

and Loan Association (herein "Beneficiary"); and

WHEREAS, the said Deed of Trust conveyed to   Robert D. Smith

in trust, that certain tract or parcel of land, together with improvements

thereon, if any, described as follows:

> See Exhibit "A" attached hereto and made a part hereof for a full
> and complete description of the subject property.

> This conveyance, however, is subject to all mineral reservations
> and royalties, and any and all other restrictions, easements,
> covenants and conditions of record in the office of the County
> Clerk of Dallas County, Texas, which relate to or in anywise
> affect the herein-described property.

WHEREAS, the said  Robert D. Smith    , Trustee, having resigned as

Trustee, I, Richard R. Mays,was by execution of Appointment of Substitute

Trustee dated  April 4, 1986      , duly appointed by Jasper Federal

Savings and Loan Association as Substitute Trustee, fully in accordance

with the terms of the Deed of Trust; and

WHEREAS, default having occurred under the terms of the Note and

under the terms of the Deed of Trust, Beneficiary thereupon requested

that I proceed as Substitute Trustee to make sale of the property for

the purpose of satisfying the obligations arising under the Note

and Deed of Trust; and

## SUBSTITUTE TRUSTEE'S DEED

1752

7, set DEED
1  'IR/2A/3A

THE STATE OF TEXAS                    X
                                       KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF DALLAS                      X

WHEREAS, on the 23rd  day of    October        , 19 84   ,

........................... DEAN I. DAULEY ........................

executed and delivered to    Robert D. Smith            , as Trustee,

a Deed of Trust of said date which is of record in Volume 84211, Page 0366 ,

Deed of Trust Records of  Dallas    County, Texas (herein "Deed of Trust"),

to secure that certain Promissory Note of even date therewith in the

original principal sum of One Million One Hundred Twenty Thousand and No/100--

($1,120,000.00) (herein "Note"), executed by the said   Dean I. Dauley

...........                          and payable to Jasper Federal Savings

and Loan Association (herein "Beneficiary"); and

WHEREAS, the said Deed of Trust conveyed to   Robert D. Smith

in trust, that certain tract or parcel of land, together with improvements

thereon, if any, described as follows:

> See Exhibit "A" attached hereto and made a part hereof for a full
> and complete description of the subject property.

> This conveyance, however, is subject to all mineral reservations
> and royalties, and any and all other restrictions, easements,
> covenants and conditions of record in the office of the County
> Clerk of Dallas County, Texas, which relate to or in anywise
> affect the herein-described property.

WHEREAS, the said  Robert D. Smith    , Trustee, having resigned as

Trustee, I, Richard R. Mays, was by execution of Appointment of Substitute

Trustee dated  April 4, 1986      , duly appointed by Jasper Federal

Savings and Loan Association as Substitute Trustee, fully in accordance

with the terms of the Deed of Trust; and

WHEREAS, default having occurred under the terms of the Note and

under the terms of the Deed of Trust, Beneficiary thereupon requested

that I proceed as Substitute Trustee to make sale of the property for

the purpose of satisfying the obligations arising under the Note

and Deed of Trust; and

WHEREAS, pursuant to said request and fully in accordance with the terms of the Deed of Trust, I, Richard R. Mays, Substitute Trustee, proceeded to sell the property at public auction at the Courthouse Door of Dallas County, Texas, Courthouse between the hours of 10:00 a.m. and 4:00 p.m., on Tuesday, August 5, 1986 , and after having given notice of the time, place and terms of such sale, as prescribed by law and by the terms of the Deed of Trust, and after first posting and causing to be posted written notice thereof for at least twenty-one (21) days preceding the day of the proposed sale at the Courthouse Door of the Dallas County, Texas, Courthouse and after first serving written notice at least twenty-one (21) days preceding the day of the proposed sale by Certified Mail to the debtor's most current address as shown by holder's records, and after first filing with the County Clerk Notice of Sale at least twenty-one (21) days preceding the date of same in compliance with the law; and

WHEREAS, at such sale the property was by me struck off to JASPER FEDERAL SAVINGS AND LOAN ASSOCIATION, whose address is Post Office Box 760, Jasper, Texas, 75951, for and in consideration of the sum of TEN DOLLARS ($10.00), and other good and valuable consideration, it being the best and highest bidder therefor, and said consideration being the best and highest bid therefor.

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS, that I, Richard R. Mays, of Jasper County, Texas, Substitute Trustee as aforesaid, by virtue of the powers granted to me by the Deed of Trust and Appointment of Substitute Trustee and in consideration of the foregoing premises and of the value expressed above conveyed to me by Jasper Federal Savings and Loan Association, the receipt and sufficiency of which is hereby acknowledged, have GRANTED, SOLD and CONVEYED and by these presents do GRANT, SELL and CONVEY the property unto JASPER FEDERAL SAVINGS AND LOAN ASSOCIATION.

TO HAVE AND TO HOLD the property, together with all and singular the rights and appurtenances thereto in anywise belonging to Jasper Federal

36156 2070

Savings and Loan Association, and its successors and assigns, forever; and for and on behalf of the said DEAN I. DAULEY, ..........

Grantor in said Deed of Trust, his   successors and assigns, to WARRANT and FOREVER DEFEND all and singular the property hereinbefore described, insofar as authorized by said Deed of Trust, unto Jasper Federal Savings and Loan Association and its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

WITNESS MY HAND this 8th day of August, 1986.

Richard R. Mays, Substitute Trustee

THE STATE OF TEXAS                 I

COUNTY OF  JASPER                  I

This instrument was acknowledged before me on the 8th day of August, 1986.

Notary Public, State of Texas
Printed Name:  Sue Linke
My Commission Expires:  6-14-90

GRANTEE'S ADDRESS:

Jasper Federal Savings & Loan Association
Post Office Box 760
271 East Lamar
Jasper, Texas  75951

36166 2071

## EXHIBIT A

BEING a tract of land situated in the Joseph Mangum Survey,
Abstract No. 861, Dallas County, Texas, as recorded in
Volume P, Page 480, Deed Records, Dallas County, Texas, and
also being a portion of a 33.33 acre tract and a 38.92 acre
tract described in deed to GIFCO PROPERTIES, INC. from
GIFFORD HILL CO., in Volume 71002, Page 1746, Deed Records,
Dallas County, Texas, and being more particularly described
as follows:

BEGINNING at a set 1/2 inch iron rod, said point being the
northeast corner of the tract described herein and also
lying in the west right-of-way line of Hunter-Ferrell Road
(40 foot R.O.W.), said right-of-way being described in deed
to Dallas County from GIFFORD HILL CO., in Volume 70005, Page
319, Deed Records, Dallas County, Texas, and also being N 89°
42' 16" W, 10.00 feet, from a found 1/2 inch iron rod, said
point being set by Wendell Partain, R.P.S. No. 2104, as
depicted on a survey by same dated April 17, 1984;

THENCE due South, 1538.53 feet, along the said west line of
Hunter-Ferrell Road, and more or less following an old fence
line to a set 1/2 inch iron rod;

THENCE S 45° 03' 05" W, 70.65 feet, continuing, more or less
along said fence line, to a set 1/2 inch iron rod;

THENCE S 89° 59' 05" W, 1126.74 feet, continuing, more or less,
along said fence line, to a found 1/2 inch iron rod, said
point being a point set by the aforementioned Wendell Partain,
as depicted on the aforementioned survey;

THENCE N 00° 19' 26" E, 1594.79 feet, leaving said fence line
to a found 1/2 inch iron rod, said point being a point set
by the aforementioned Wendell Partain, as depicted on the
aforementioned survey, and also lying more or less in a fence
line running in an easterly-westerly direction;

THENCE S 89° 42' 16" E, 1167.74 feet, more or less, along said
fence line to the said POINT OF BEGINNING;

CONTAINING 1,864,476.15 square feet, or 42.80 acres.

36|66 2072

Mary L. O'Connor
Akin, Gump, et al.
4100 First City Center
1700 Pacific Avenue
Dallas, TX 75201-4618

COUNTY CLERK, Dallas County, Texas



Earl Bullock

AUG 26 1986

STATE OF TEXAS
COUNTY OF DALLAS
I hereby certify that this instrument was filed on the
date and time stamped hereon by me and was duly re-
corded in the volume and page of the named records
of Dallas County, Texas as stamped hereon by me.

ES AUG 26 PM 1:01

86166 2073

Grantees' Address
6937 Vista Willow
Dallas, Texas  75248

A

5245

7.00 DEED
0   2 08/28/86

**WARRANTY DEED**

(With Reservation of Right of Repurchase and Right of First Refusal)

THE STATE OF TEXAS    §
                      §       KNOW ALL MEN BY THESE PRESENTS:
COUNTY  OF  DALLAS    §

That LAS COLINAS CORPORATION, a Texas corporation ("Grantor"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other valuable consideration to the undersigned paid by Grantees, hereinafter named, the receipt of which is hereby acknowledged, has GRANTED, SOLD and CONVEYED, and by these presents does GRANT, SELL and CONVEY unto WOODROW & COMPANY [herein referred to as "Grantees" (whether one or more)], subject to the exceptions and reservations stated hereinafter, the following described property (the "Property") to-wit:

LOT 6, BLOCK 8, of COTTONWOOD VALLEY, AREA XV, an addition to the City of Irving, Dallas County, Texas, according to the Final Revised Plat thereof recorded in Volume 79110, Page 1848 of the Map Records of Dallas County, Texas, and according to a Consent to Certificate of Correction and Acceptance of Corrected Preliminary Final Plat-Revised, filed on 1/23/80, recorded in Volume 80017, Page 1, Deed Records, Dallas County, Texas.

TO HAVE AND TO HOLD the above described Property subject to the reservations set forth below and the matters set forth in Exhibit A attached hereto and incorporated herein by reference for all purposes, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantees, their heirs, successors and assigns, forever; and Grantor does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the said premises unto Grantees, their heirs, successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

Grantor hereby reserves the right to repurchase the Property on the terms set forth herein and Grantees for themselves, their heirs, successors and assigns, agree to reconvey the Property to Grantor for a sum equal to the identical purchase price paid by Grantees to Grantor, if Grantees have not obtained approval of their plans and specifications from The Las Colinas Association Architectural Control Committee and substantially commenced construction of an approved structure on said Property in accordance with said approved plans and specifications within six (6) months from the date of this deed. Grantor's right of repurchase under such reservation, and all renewals and extensions thereof, shall be superior to all liens and encumbrances placed on the Property by Grantees. If Grantees fail to satisfy such construction obligation within such six (6) month period, Grantor may exercise its repurchase right by giving Grantees written notice within six (6) months after the end of the initial six (6) month period; i.e., within one (1) year from the date of such deed. Upon the exercise of such repurchase right, Grantees shall, within thirty (30) days after the date that Grantor exercises this right of repurchase: (i) reconvey the Property to Grantor by general warranty deed free of all defects and encumbrances to title except those shown in Schedule B to that certain owners policy of title insurance provided by Grantor to Grantees through Dallas Title Company in connection with Grantees' purchase of the Property, excluding any liens shown therein; and (ii) execute any and all other documents necessary to complete the reconveyance of the Property to Grantor. At the closing of the reconveyance to Grantor, Grantor shall tender to Grantees the full repurchase price (which shall be equal to the price paid by Grantees to Grantor) in cash or by cashier's check or other good funds immediately available to Grantor. Ad valorem taxes and assessments (governmental or otherwise) shall be prorated at closing as of the date of such reconveyance. For purposes of this deed and Grantor's right to repurchase the Property, "substantially commenced construction of an approved structure" shall be deemed to mean the initial grading, setting of forms and completion of all foundation work for the approved structure.

1

36168  2089

Grantor hereby further reserves for itself, its successors and assigns, a right of first refusal to purchase the Property upon the terms and conditions more particularly set forth hereinafter. Grantor's right of first refusal under this reservation, and all renewals and extensions thereof, shall be superior to all liens and encumbrances placed on the Property by Grantees. If Grantees, prior to having substantially commenced construction of an approved structure, as defined in the preceding paragraph, receive from a "third party" a bona fide written offer acceptable to Grantees for the purchase of the Property, Grantees shall deliver a true and correct copy of such offer to Grantor within ten (10) days after Grantees' receipt thereof at 5215 North O'Connor Blvd., Williams Square - Central Tower, 15th Floor, Irving, Texas 75039, Attention: President, with a copy to 5215 North O'Connor Blvd., Williams Square - Central Tower, 14th Floor, Irving, Texas 75039, Attention: General Counsel. Grantor shall have thirty (30) days after its actual receipt of such copy of the offer to give Grantees written notice whether Grantor elects to purchase the Property upon the same terms and conditions as contained in the offer. If Grantor does not give notice to Grantees within such thirty (30) day period that Grantor elects to exercise its right of first refusal with respect to the offer, Grantor shall be deemed to have waived the right to do so. Once Grantor waives, or is deemed to have waived, its right of first refusal of the Property, such right of first refusal shall be terminated and deemed to be of no further force and effect as to the Property if Grantees complete the sale contemplated by the offer in strict accordance with the terms and conditions of such offer; otherwise, the terms and conditions of this right of first refusal shall remain in full force and effect and must again be complied with by Grantees in connection with any other sale thereof to or offer by a third party. If Grantor timely gives the required notice that it elects to exercise this right of first refusal, Grantees shall sell the Property to Grantor in accordance with the terms and conditions of the offer. Any sale or transfer of the Property to a third party shall be subject to Grantor's right to purchase the Property from such third party for the price and on the identical terms and conditions contained herein unless Grantees have satisfied the terms of this right of first refusal concerning same. It is further agreed this right of first refusal shall automatically terminate and be of no further force and effect as to the Property upon the substantial commencement of construction of an approved structure on the Property.

EXECUTED this 18th day of August, 1986.

GRANTOR:

LAS COLINAS CORPORATION

ATTEST:

B. Carl Klinke, Secretary

BY: _____  
Ernest O. Perry, Jr., President

THE STATE OF TEXAS    §  
                      §  
COUNTY OF DALLAS      §

This instrument was acknowledged before me on August 18th, 1986, by Ernest O. Perry, Jr., President of Las Colinas Corporation, a Texas corporation, on behalf of said corporation.

Notary Public  
Notary's Printed Name: CATHY SHARP  
My commission expires: 7-31-89

2

1515E 2070

EXHIBIT A TO THE DEED
COTTONWOOD VALLEY, AREA XV, PHASE I

All covenants, restrictions, easements, assessments, and other matters of
record in Dallas County, Texas, affecting title to the subject property,
including without limitation the following:

1.    Covenants, restrictions, easements and assessments set forth in the
Declaration of Covenants and Restrictions recorded in Volume 73166, Page 1001,
Correction to Declaration recorded in Volume 77154, Page 1096, Second
Correction to Declaration recorded in Volume 79122, Page 0749, Third
Correction to Declaration recorded in Volume 82071, Page 3244 and
Supplementary Declaration No. 15 recorded in Volume 80036, Page 0015, of the
Deed Records of Dallas County, Texas.

2.    Covenants, restrictions, easements and assessments set forth in the
Declaration recorded in Volume 80036, Page 0028, and Corrected Declaration
recorded in Volume 80038, Page 1192, of the Deed Records of Dallas County,
Texas.

3.    Easements and other matters shown in the Final Revised Plat of
COTTONWOOD VALLEY, AREA XV, recorded in Volume 79110, Page 1848, of the Map
Records of Dallas County, Texas, and according to a Consent to Certificate of
Correction and Acceptance of Corrected Preliminary Final Plat-Revised, filed
on 1/23/80, recorded in Volume 80017, Page 1, Deed Records, Dallas County,
Texas.

4.    Taxes and assessments for the year 1986 and subsequent years.

AFTER RECORDING PLEASE RETURN TO:

Woodrow & Company
6937 Vista Willow
Dallas, Texas 75248

85168  207'

STATE OF TEXAS COUNTY OF DALLAS
I hereby certify that the instrument was filed on the date and time stamped hereon by me and was duly recorded in the volume and page of the named records of Dallas County, Texas as stamped hereon by me.

AUG 28 1986

Earl Bullock
COUNTY CLERK, Dallas County, Texas

AUG 28 [illegible] 57

2072

TO:    CBM ✓
        PR

STEWART, KUKJA / JACOB
CBM. Reminder —
left a message for
[illegible] 7/19/05
thanks 7/9/85

# HOLMAN ROBERTSON ELDRIDGE

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
5949 SHERRY LANE
SUITE 1700
DALLAS, TEXAS 75225

214/361-9494
214/691-2109(FAX)

## FAX COVER SHEET

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED BELOW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA U.S. POSTAL SERVICE. THANK YOU.

*To:*        **CHARLES B. MITCHELL, JR.**

Facsimile No.        (817)870-2427

Client No.

*From:*      **RONALD O. HOLMAN**

*Date:*      **JULY 19, 2005**

Sending 2 pages, including this cover sheet. If you have any problems receiving this, please contact Lynda Anderson at (214) 361-9494.

## MESSAGE

# HOLMAN ROBERTSON ELDRIDGE
A Professional Corporation
Attorneys and Counselors
5949 Sherry Lane
Suite 1700
Dallas, Texas 75225

Telephone
214 / 361-9494

Writer's Extension
113

Facsimile
214 / 691-2109

Writer's E-Mail Address
rholman@hrepc.com

Shareholders
H. DOUGLAS BAER
CHARLES R. BIDDLE
RICHARD T. CHEATHAM
DAVID A. ELDRIDGE
RONALD O. HOLMAN
JOHN CROW MILLER
J. MALCOLM ROBERTSON, JR.
ROBERT A. SOLOMON

July 19, 2005

<u>VIA FAX 817/870-2427</u>
Mr. Charles B. Mitchell, Jr.
Brown, Dean, Wiseman, Liser,
    Proctor & Hart, L.L.P.
306 West 7th Street, Suite 200
Fort Worth, Texas 76102-4905

> Re:    Letter of intent dated June 10, 2005 by and between Kuk Ja Stewart, as Lessor, and
>          Scout Exploration, J.V., as Lessee

Dear Mr. Mitchell:

As you will recall, I represent Scout Exploration, J.V. in connection with the referenced letter of intent. As of the time I am writing this letter, neither my client nor I have had any communications regarding the proposed Oil and Gas Lease I sent you on June 29. I would appreciate it if you would call me so we can finalize this transaction.

I look forward to hearing form you.

Very truly yours,

Ronald O. Holman

ROH/lma

cc:    Scout Exploration, J.V.

H:\05\ROH\SCOUT\MITCHELL-L01.doc

EXCEPTION TO FILING AND REPORTING REAL ESTATE TRANSACTIONS ON

FORM 1099-B


RE:  LEGAL DESCRIPTION OF PROPERTY:

Lot 17, Block 41, Southland Subdivision, Tarrant County, Texas


Under penalty of law I/we hereby state and affirm that as Sellers
(Transferors) of the above property that I/we are entitled to a exception
to filing a 1099-B return for one of the following reasons:


(   )     A financing or refinancing that is not related to the
          acquisition of real estate.


( XXX)    A gift.


(   )     A foreclosure or abandonment.


(   )     An involuntary conversion.


(   )     Any transaction in which the transferor is a corporation or
          a governmental unit, including a foreign government and an
          international organization.


Signed this __28th__ day of __September__, 19 9 .



_Kuk  G  Stewort_____          Social Security No. _____
     Stewart Hong Kuk


_____          Social Security No. _____

TO WHOM IT MAY CONCERN:

We, the undersigned, are Sellers and Purchasers of the following property:

Lot 17, Block 41, Southland Subdivision, Tarrant County, Texas

We understand that title to said property HAS NOT been examined,by Donald R. Campbell Inc. as of this date and are selling and purchasing said property with that knowledge.

We further agree not to hold Rattikin Title Company, Chicago Title Insurance Company or Donald R. Campbell, Inc. (its agents or employees) responsible for any errors, discrepancies, omissions or problems in regard to the status of title to the property.

We requested Donald R. Campbell, Inc. to prepare a Gift Deed and Exemption to filing a Form 1099B.

We further agree that Donald R. Campbell, Inc., its agents or employees, shall not be held responsible because of any added income tax liability, gift tax liability, or disqualification of any benefits due under Department of Human Services, and that no representation has been made as to the above by Donald R. Campbell, Inc., its agents or employees.

We further understand that we have not retained Donald R. Campbell Inc to give us legal advise on the above closing and the fee paid is for preparation of papers and closing of the transaction only.

**Purchaser has been informed that Title Insurance on the above transaction would cost $278.00 and by their signature below specifically declines coverage.**

Stewart Hong Kuk                                         Seller

Raymond Barrett                                         Purchaser

Robert Blackman                                         Purchaser

SWORN TO AND SUBSCRIBED before me by STEWART HONG KUK, on the _____ day of September, 1993.


CRAIG R. CAMPBELL
MY COMMISSION EXPIRES
February 20, 1997

Notary Public, State of Texas

SWORN TO AND SUBSCRIBED before me by RAYMOND BARRETT and ROBERT BLACKMAN, on the _____ day of _____, 1993.

CRAIG R. CAMPBELL
MY COMMISSION EXPIRES
February 20, 1997

Notary Public, State of Texas

## WARRANTY DEED

Date:                September 22, 1993

Grantor:            STEWART HONG KUK, a single person

Grantor's Mailing Address:        2306 Rock Island
                                  Irving, Texas  75060

Grantee:            RAYMOND BARRETT AND ROBERT BLACKMAN TRUSTEES OF
                    FIRST SAMARIA BAPTIST CHURCH

Grantee's Mailing Address:        1125 East Elmwood
                                  Fort Worth, Texas   76104

Consideration:    The love and affection which I have and bear for the
                  First Samaria Baptist Church

Property:         Lot 17, Block 41, of SOUTHLAND SUBDIVISION OF BLOCKS 24 TO
                  41 OF HYDE PARK ADDITION, an Addition to the City of Fort
                  Worth, Tarrant County, Texas, according to the Plat
                  thereof recorded in Volume 310, Page 11, Deed Records of
                  Tarrant County, Texas.

Reservations from and Exceptions to Conveyance:

This conveyance is given and accepted subject to any and all restrictions,
covenants, reservations, conditions, rights of way, easements, municipal
or other governmental zoning laws, regulations and ordinances, if any,
affecting the herein described property.

        Grantor, for the consideration and subject to the reservations
from and exceptions to conveyance and warranty, grants, sells, and conveys
to Grantee the property, together with all and singular the rights and
appurtenances thereto in any wise belonging, to have and hold it to
Grantee, Grantee's heirs, executors, administrators, successors, or
assigns forever.  Grantor binds Grantor and Grantor's heirs, executors,
administrators, and successors to warrant and forever defend all and
singular the property to Grantee and Grantee's heirs, executors,
administrators, successors, and assigns against every person whomsoever
lawfully claiming or to claim the same or any part thereof, except as to
the reservations from and exceptions to conveyance and warranty.

        When the context requires, singular nouns and pronouns include the
plural.

                                    _Stewart Hong Kuk_

                                    _Kuk Ge Stewart_
                                    Stewart Hong Kuk


THE STATE OF TEXAS          )
                            )
COUNTY OF TARRANT           )

        This instrument was acknowledged before me on the ___28th___ day
of September, 1993, by STEWART HONG KUK.

                                    _____
                                    Notary Public, State of Texas

CRAIG R. CAMPBELL
MY COMMISSION EXPIRES
February 20, 1997

2008 May 1, Chesapeake Operating INC.
17.45 P.O 1846 and Its Partners
OK City 73154

2005 SHAW Interests, INC. Sarah 2/5/2014 →
310 W. Wall St. 305 Dawson Geographical
Midland, TX 79701-5117 P.O Box 122
432-685-1404
Active WM - Dale Resources, Redl #22711 file #
2-5-2005

Expired
2011 January 6, 2011 * 15 days — Real Time
Dawson Geophysical Recorder Readings
P.O Box 122646 Energy
Ft, TX 76121
2-Syrs * RSR *
Images of Oil Gas? Radio Tele Reading 408 or 428
PPV? particle motion
Monitoring Agency?
Force of Vibes? Lower than 68 *
System USED ? who permited?
How long was occupied ? Start ___ End ___
Damages -
Data -

SHAW — Permitted land —

3 yrs. Lease

Bonus Payment —

Why Dale involved — 214-979-9010

○ 1.8 miles

Paper Report.

Willis 3D

Dawson —
20/0   /2010/1/20/2011 :

○ Kikja

Chesapeake — 405-848-8000

Dale Resources Reported well
is Longest 3 Deepest

2008

RR

Scout Exploration Inc.
(949) 265-7717
(949) 660-9700 — Thomas
Stepp. JR

Kathleen Scalzo
(604) 738-9242
Sauder

98 0501467
Nevada

5/2005
(512) 463-6838
Go online" Railroad
701 North Congress
William B TRavis
Austin, Tx 7

State Auditor's Office ATTN GW
Section 321.022   PO BOX 12067
                  SAO  1 (800) 892-8348
Austin, TX 78711 - 2067

) Landman(ᵒᵒ) Company | - Date Permited
                       |   Start        Ford

                SHAW
1 Lease Analyst — Kendre Sparks


HAIFF Engineer -(817) 847.1422
      Dallas County - contrated


Dale


3illy Barker-  Atty


'houles Montemaya-


heasapel


NewARK

Jennior WISEMAN

NO KNOWLEDGE of case or if conflict.
interest would be in affect.

Railroad Commission Texas
401 W. 13th St. Ft North

Report Fraud
3





Google earth

feet ▬▬▬▬▬▬▬▬▬▬▬▬▬ 1000

meters ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ 500



© 2013 Google

Google

500

100







Go gle earth

feet
meters

1000

500



Google earth

feet
meters

500
100

Google earth
500
1000
meters
feet
Google earth

Page 1 of 2

ArcIMS Viewer



Warranty
Deed
2005

## WARRANTY DEED

STATE OF TEXAS          }
                        }          KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF DALLAS        }

Grantor, KUK JA STEWART, of Irving, Dallas County, Texas, for good and valuable consideration received, GRANTS AND CONVEYS to:

UP_G_KUK,INC., a corporation organized and existing under the laws of the State of Texas, as Grantee, whose mailing address is:

2028 Sandy Lane
Irving, Texas 75060

that certain tract or parcel of real property located in Dallas County, Texas, more particularly described on Exhibit "A" attached hereto, together with all tenements, hereditaments and appurtenances thereto, subject to the permitted exceptions set forth on Exhibit "B" attached hereto.

TO HAVE AND TO HOLD the property described, together with all rights and appurtenances lawfully accompanying it, by the Grantee forever. Grantor binds herself and Grantor's heirs, personal representatives, successors, and assigns to warrant and forever defend the property against every person lawfully claiming or to claim all or any part of the property; provided, however, it is expressly understood and agreed that this conveyance is made subject to all easements, exceptions, covenants, conditions, restrictions, reservations, and rights appearing of record.

EXECUTED on August 31, 2005.

_Kuk Ja Stewart_
KUK JA STEWART

STATE OF TEXAS     }

                   }           CERTIFICATE OF ACKNOWLEDGMENT:

COUNTY OF DALLAS   }

BEFORE ME, the undersigned notary public, on this day personally appeared KUK JA STEWART, known to me by identification through an identification card bearing her photograph and signature to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the instrument for the purposes and considerations expressed in it.

SUBSCRIBED AND SWORN TO BEFORE ME on this 31st day of August, 2005.

**N. JEANNINE JENKINS**
**NOTARY PUBLIC**
**STATE OF TEXAS**
My Comm. Expires 5-16-2009

NOTARY PUBLIC, State of Texas

My Comm. Expires: _05 - 16 - 09_

W:\CHARLES\FILES\INDIVIDUAL CLIENTS\STEWART, KUJA [REAL ESTATE 22711]\WARRANTY DEED.WPD

## EXHIBIT "A"

BEING a tract of land situated in the JOSEPH MANGUM SURVEY, ABSTRACT NO. 861, Dallas County, Texas, and being part of two tracts of land described in deed to Jasper Federal Savings and Loan Association, as recorded in Volume 86166, Page 2069, Deed Records, Dallas county, Texas, and being more particularly described as follows:

BEGINNING at a 1/2" diameter iron rod found in the South line of a tract of land described in deed from Ashlin Development Company to Ward Williford, Trustee, as recorded in Volume 88119, Page 0715, Deed Records, Dallas County, Texas, said iron rod also being at the most Northerly Northwest corner of a tract of land described in deed from Gifford-Hill & Co., Inc. to the County of Dallas as recorded in Volume 70009, Page 0319, Deed Records, Dallas County, Texas, said iron rod also being in the West line of Hunter Ferrell Road (a 57.5 foot right-of-way at this point);

THENCE SOUTH, 1538.53 feet, with the said West line of Hunter Ferrell Road and with the West line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found;

THENCE South 45 degrees 03 minutes 05 seconds West, 70.65 feet, with the Northwest line of said Hunter Ferrell Road and with the Northwest line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found, said iron rod also being in the North line of Hunter Ferrell Road (a 60' right-of-way at this point);

THENCE South 89 degrees 59 minutes 05 seconds West, 1126.74 feet, with the North line of said Hunter Ferrell Road and with the North line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found at the Southeast corner of a tract of land described in Deed to Jasper Federal Savings and Loan Association, as recorded in Volume 86166, Page 2069, Deed Records, dallas county, Texas;

THENCE North 00 degrees 19 minutes 26 seconds East, 1594.79 feet, with the East line of said Jasper Federal Savings and Loan Association tract, to a 1/2" diameter iron rod found in the South line of said Ward Williford, Trustee tract;

THENCE South 89 degrees 42 minutes 16 seconds East, 1167.74 feet, with the said South line of Ward Williford, Trustee tract and along a fence line, to the PLACE OF BEGINNING and containing 1,864,485 square feet (42.803 acres) of land, more or less.

## EXHIBIT "B"

1. Easement granted by GIFCO PROPERTIES, INC. to TOMMY R. BARTON, ET AL, as evidenced by the instrument dated August 5, 1980 recorded in Volume 84211, Page 350, {Pg. 23} of the Deed Records, Dallas County, Texas.

2. The rights of tenants in possession under the terms of any unrecorded leases or rental agreements.

3. All visible and apparent easements and all underground easements the existence of which may arise by virtue of unrecorded grant or use.

4. Any portion of the subject property lying within the boundaries of any road or roadway, public or private.

DEED   **200503579476**

4 PGS

## WARRANTY DEED

STATE OF TEXAS     }

                      }        KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF DALLAS  }

Grantor, KUK JA STEWART, of Irving, Dallas County, Texas, for good and valuable consideration received, GRANTS AND CONVEYS to:

UP_G_KUK,INC., a corporation organized and existing under the laws of the State of Texas, as Grantee, whose mailing address is:

2028 Sandy Lane
Irving, Texas 75060

that certain tract or parcel of real property located in Dallas County, Texas, more particularly described on Exhibit "A" attached hereto, together with all tenements, hereditaments and appurtenances thereto, subject to the permitted exceptions set forth on Exhibit "B" attached hereto.

TO HAVE AND TO HOLD the property described, together with all rights and appurtenances lawfully accompanying it, by the Grantee forever. Grantor binds herself and Grantor's heirs, personal representatives, successors, and assigns to warrant and forever defend the property against every person lawfully claiming or to claim all or any part of the property; provided, however, it is expressly understood and agreed that this conveyance is made subject to all easements, exceptions, covenants, conditions, restrictions, reservations, and rights appearing of record.

EXECUTED on August 31, 2005.

KUK JA STEWART

KUK JA STEWART

Temp.
Ease-
ment
2010

**Notice of Confidentiality Rights: If you are a natural person, you may remove or strike any or all of the following information from any Instrument that transfers an interest in real property before it is filed for record in the public records: Your social security number or your driver's license number.**

## TEMPORARY EASEMENT

THE STATE OF TEXAS §

COUNTY OF DALLAS §

KNOW ALL BY THESE PRESENTS:

201000065959

03/18/2010 09:57:13 AM          EASEMENT   1/6

That, UP_G_KUK, INC., a Texas corporation, hereinafter Grantor, whether one or more, of the County of Dallas, State of Texas, for and in consideration of the sum of One and No/100 Dollars ($1.00), and other good and valuable consideration to Grantor, in hand paid by the Grantee, herein named, receipt of which is hereby acknowledged and confessed, and for which no lien is retained, either expressed or implied, does by these presents Grant, Bargain, Sell and Convey unto the COUNTY OF DALLAS, a political subdivision of the State of Texas, hereinafter termed Grantee, its successors and assigns, a temporary easement for the purpose of a construction work area and grading, sloping or filling, along, upon and across said property to provide a more subtle grade change transition along, upon and across the real property described in Exhibit "A" attached hereto, and incorporated herein by reference for all purposes.

This easement shall expire on the 25th day of June, 2014, unless vacated and released earlier at the request of the Grantor.

TO HAVE AND TO HOLD UNTO THE SAID Grantee as aforesaid, for the purposes set forth above, the premises herein described.

Executed this _17th_ day of _February_, 2010.

UP_G_KUK, INC., a Texas corporation

Kuk Ja Stewart, Director

Project:     Hunter Ferrell Rd. MCIP 40704(805)
             (Belt Line Rd. to MacArthur Blvd.)

Parcel:      22TCE

*Cdmydoc/proj/temp ease 22*

**ACKNOWLEDGMENT**

THE STATE OF TEXAS        §
COUNTY OF DALLAS        §

BEFORE ME, the undersigned authority, on this day personally appeared KUK JA STEWART, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of said UP_G_KUK, INC., a Texas corporation and that she executed the same as the act of such corporation for the purpose and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office, this _17^th_ day of _February_ , 2010.

(Personalized Seal)

Marcia Mitchell

Notary Public in and for the State of Texas

Printed Name: _Marcia Mitchell_

My Commission Expires: _08-22-2012_

**MARCIA MITCHELL**
**NOTARY PUBLIC**
**STATE OF TEXAS**
My Comm. Exp. 08-22-2012

*Acknow corp p 22*

**After Recording Please Return To:**
**Dallas County Public Works**
**411 Elm Street, 3rd Floor**
**Dallas, Texas 75202**

Legal
Desc.
2008

## EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 TCE
May 06, 2008
Page 1 of 2

### LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 4008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East, a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,534.06 feet to a point on the proposed north right-of-way line of Hunter Ferrell Road (variable width right-of-way, proposed 120 foot wide at this point) and also being on a circular curve to the left having a radius of 1,340.00 feet, whose chord bears North 66 degrees 33 minutes 30 seconds East, a distance of 240.65 feet;

THENCE Northeasterly, along said proposed north right-of-way line and along said circular curve to the left through a central angle of 10 degrees 18 minutes 13 seconds, an arc length of 240.98 feet to a point for corner being also the southeast corner of a slope easement;

THENCE North 28 degrees 35 minutes 38 seconds West, departing said proposed north right-of-way line and along said slope easement, a distance of 49.87 feet to a point for the southwest corner of said slope easement, being on a circular curve to the left, not being tangent to the preceding course, having a radius of 1,300.00 feet, whose chord bears North 50 degrees 25 minutes 40 seconds East, a distance of 481.12 feet;

THENCE Northeasterly, continuing along said slope easement and along the arc of said circular curve to the left through a central angle of 21 degrees 19 minutes 40 seconds, an arc length of 483.91 feet to THE POINT OF BEGINNING, being the southwest corner of a temporary construction easement;

THENCE North 51 degrees 15 minutes 31 seconds West, departing said slope easement and along said temporary construction easement, a distance of 142.95 feet to a point for corner;

THENCE North 38 degrees 44 minutes 29 seconds East, continuing along said temporary construction easement, a distance of 52.00 feet to a point for corner;



Exhibit "A"

**HALFF**

4000 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS 76137
TEL (817) 847-1422
FAX (817) 232-9784

COUNTY OF DALLAS PUBLIC WC
DEPARTME

TEMPORARY CONSTRUCTION EASEMENT PLAT

HUNTER FERRELL ROAD
FROM BELTLINE ROAD TO
MacARTHUR BLVD.

Dad

Mom

$$\frac{Agent}{Estate} \quad charles \quad 89/$$

- Joe River — Howell —
   Release



 Sign In

- **Home**
- **Search:** [Documents, titles, companies, etc.]    GO
- Subscriptions
    - Subscriptions
    - Cancellations
    - FAQs
- About Us
    - News
    - Rankings
- Support
    - Contact Us
    - FAQs
    - Obtain Receipt
    - Resend

Cart: 0

- Contracts
    - Business
    - Compensation
    - Employment
    - Fee Agreements
    - Financing
    - Leasing
    - Legal
    - Licensing
    - Loans
    - Miscellany
    - Plans
    - Purchase & Sale
    - Real Estate
    - Securities
- Companies
- Industries
    - Biotech & Drugs
    - Capital Goods
    - Commodities
    - Construction
    - Consumer
    - Energy
    - Financial
    - Healthcare
    - Insurance
    - Miscellany

- Real Estate
- Retail
- Services
- Technology
- Transportation
- Utilities
- Services
  - Company Research
  - Contract Administration
  - Contract Reviews
  - Document Searches
  - Legal Audits
  - Negotiation Services
  - Strategy
- Intelligence
  - Private Equity Fees

Home / Industry*Intelligence* / Financial / Fixture Filings

# Financial

## Fixture Filings

Page 1 of 9 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Last »

| | | | | |
|---|---|---|---|---|
| Preview Full Doc | 2003 | Deed of Trust with Assignment of Rents and Fixture Filing | BofA; | Coast Casinos Inc. |
| Preview Full Doc | 2003 | Deed of Trust with Assignment of Rents and Fixture Filing | BofA; Dorsey & Whitney LLP; | Equitable Deed Company; Coast Hotels & Casinos Inc |
| Preview Full Doc | 2001 | Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing | Commercial; HRPT Properties; REIT Management; | First Union; ML Mortgage |
| Preview Full Doc | 2003 | Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing | Clifford Chance; LCPI; | Spanish Broadcasting System Inc. |
| Preview Full Doc | 2004 | | Inland Western; | BofA |

| | | | | |
|---|---|---|---|---|
| | | Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture | | |
| Preview Full Doc | 2003 | Deed of Trust, Assignment of Leases And Rents, Security Agreement and Fixture Filing | CLT; Library Square; Maguire; | Maguire; Fannie Mae; More... |
| Preview Full Doc | 2003 | Deed of Trust, Assignment of Leases And Rents, Security Agreement and Fixture Filing | CLT; Maguire; Maguire; | North Tower; Fannie Mae; More... |
| Preview Full Doc | 2003 | Deed of Trust, Assignment of Leases And Rents, Security Agreement and Fixture Filing | CLT; Library Square; Maguire; | Maguire; Fannie Mae; More... |
| Preview Full Doc | 2003 | Deed of Trust, Assignment of Leases And Rents, Security Agreement and Fixture Filing | CLT; Maguire; Maguire; | North Tower; Fannie Mae; More... |
| Preview Full Doc | 2001 | Deed of Trust, Assignment of Leases And Rents, Security Agreement and Fixture Filing | HRPT Properties; First Union; | ML Mortgage; Sidley Austin |
| Preview Full Doc | 2001 | Deed of Trust, Assignment of Leases And Rents, Security Agreement and Fixture Filing | HRPT Properties; First Union; | ML Mortgage; Sidley Austin |
| Preview Full Doc | 2001 | Deed of Trust, Assignment of Leases And Rents, Security Agreement and Fixture Filing | Commercial; HRPT Properties; REIT Management; | First Union; ML Mortgage |
| Preview Full Doc | 2001 | Deed of Trust, Assignment of Leases And Rents, Security Agreement and Fixture Filing | HRPT Properties; REIT Management; | First Union; ML Mortgage |
| | 2001 | | CLT; | |

| | | Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing | Innkeepers USA; Marriott Int'l; | First Union; Hunton; Orrick |
|---|---|---|---|---|
| Preview Full Doc | | Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing | Innkeepers USA; Marriott Int'l; | First Union; Hunton; Orrick |
| Preview Full Doc | 2004 | Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing | FelCor Lodging; JPMorgan Chase; | Thacher Proffitt |
| Preview Full Doc | 2003 | Deed of Trust, Assignment of Leases Security Agreement, Financing Statement and Fixture Filing | Clifford Chance; Marconi; | BNY; JPMorgan Chase |
| Preview Full Doc | 2003 | Deed of Trust, Assignment of Leases Security Agreement, Financing Statement and Fixture Filing | Clifford Chance; Marconi; | BNY; JPMorgan Chase |
| Preview Full Doc | 2004 | Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing | Jacobs Entertainment; | Wells Fargo Bank |
| Preview Full Doc | 2002 | Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing | Jacobs Entertainment; | Wells Fargo Bank |
| Preview Full Doc | 2002 | Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing | Jacobs Entertainment; | Wells Fargo Bank |

Page 1 of 9 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Last »



🔒 Sign In

- **Home**  Search: `Documents, titles, companies, etc.`  GO
- Subscriptions
  - Subscriptions
  - Cancellations
  - FAQs
- About Us
  - News
  - Rankings
- Support
  - Contact Us
  - FAQs
  - Obtain Receipt
  - Resend

🛒 Cart: 0

- Contracts
  - Business
  - Compensation
  - Employment
  - Fee Agreements
  - Financing
  - Leasing
  - Legal
  - Licensing
  - Loans
  - Miscellany
  - Plans
  - Purchase & Sale
  - Real Estate
  - Securities
- Companies
- Industries
  - Biotech & Drugs
  - Capital Goods
  - Commodities
  - Construction
  - Consumer
  - Energy
  - Financial
  - Healthcare
  - Insurance
  - Miscellany
  - Real Estate
  - Retail
  - Services
  - Technology
  - Transportation
  - Utilities
- Services
  - Company Research
  - Contract Administration
  - Contract Reviews
  - Document Searches
  - Legal Audits
  - Negotiation Services
  - Strategy
- Intelligence

○ Private Equity Fees

Home / Preview ID: 277856

# Agreement and Plan of Merger

**Entities:** Kirkland & Ellis; Inveresk Research Group, Inc.; Clifford Chance US LLP

**Date:** 2003

**Size:** 178K

**ID:** #277856

| Subscribe | Full Document |
|-----------|---------------|

**Start of Preview**

AGREEMENT AND

PLAN OF MERGER

BY AND AMONG

INVERESK RESEARCH GROUP, INC.

TANGO ACQUISITION CORPORATION

PHARMARESEARCH CORPORATION

AND

WILLIAM BLAIR CAPITAL PARTNERS V, L.P.

as Stockholders' Representative

Dated as of July 29, 2003

TABLE OF CONTENTS

|      |      |                                                                                         | Page |
|------|------|-----------------------------------------------------------------------------------------|------|
| 1.   |      | The Merger............................................................................... | 1    |
|      | 1.1. | The Merger............................................................................... | 1    |
|      | 1.2. | Effective Time........................................................................... | 2    |
|      | 1.3. | Closing.................................................................................. | 2    |
|      | 1.4. | Effects of the Merger.................................................................... | 2    |
|      | 1.5. | Certificate of Incorporation, By-Laws and Officers and Directors of the Surviving Corporation......................................................... | 2    |
|      | 1.6. | Further Assurances...................................................................... | 2    |
| 2.   |      | Conversion of Shares..................................................................... | 2    |
|      | 2.1. | Conversion of Capital Stock............................................................. | 2    |
|      | 2.2. | Closing Statement Procedures............................................................ | 5    |
|      | 2.3. | Closing Transactions.................................................................... | 7    |
|      | 2.4. | Payment for Certificates................................................................ | 8    |
| 3.   |      | Representations and Warranties of the Company............................................ | 9    |



Building

## Arbitration Scope Statement

Name: KEN Stewart & Kukja Stewart

Department: Arbitration

Customer: Kukja Stewart

Date: 2. 3. 2014

Prepared By

| Document Owner(s) | Project/Organization Role |
|---|---|
| Charles Mitchell~<br>Feb. 4. 2014- HALFF stated 4 properties were surveyed<br>1 well- | |

## Arbitration Closure Report

| Version | |
|---|---|
| Date: | |
| Author: | |
| Created Document: | |

Confidential

Arbitration Scope Statement

Dale

(214) 888 · 8591

Zachry miesman
(214) 888 · 8597

New Year

Yahoo.

Tiptop122243

Boone (mail) folder
Invoices

1/27/2014    "    same  #4114⁰⁰
1/28/2014    "    "    #4112⁰⁰
1/29/2014    "    "    #4114⁰⁰
1/30/2014    "    different   #4114⁰⁰
# 1/31/2014    different University   44-12 RH#
        #4114⁰⁰         WADE
# 2/1/2014    . . . #207⁰⁰ "   ""    """
- Travel -   #200 ⁰⁰

Boone Payroll   Invoice #2

Boonepayroll @ aol. com

A-1 Building Contractors Edwards

4426 Nerving St.

— The Colony — Old Panel —

KNOCK OFF **50⁰⁰**

9-721-1199

8-344-0655

2/554 7168 Junior

9/333-5146 Edwards

Easement Expires 6/24/2014 filed 3/18/2010

Signed 2/17/2010

Parcel 22 TCE

County Clerk's Document NO 200503579476

42.803 Acre TRACT — Northwest

RAC 37.0313 Acre TRACT — TRACT 4 — Northwest East corner

Deed to Harrington Corp.

42.803 West   1534.06 Ft. to a point on proposed N Right
              240.65 Ft. Southeast Corner   Hand
                       Slope Easement   120 Side wide
              49.81 Ft. West — East — 481.12
              483.91 Ft. Northeast

AMEC

37TC

MLS# 10166191

# 10166196

jkswuttle ve@ 4685832427

| | | |
|---|---|---|
| 3.1. | Organization............................................................ | 9 |
| 3.2. | Capitalization......................................................... | 10 |
| 3.3. | Authority.............................................................. | 11 |
| 3.4. | No Conflicts; Governmental Requirements................................ | 11 |
| 3.5. | Subsidiaries........................................................... | 11 |
| 3.6. | Books and Records...................................................... | 12 |
| 3.7. | Financial Statements................................................... | 12 |
| 3.8. | Absence of Undisclosed Liabilities; Off-Balance Sheet Financing; Funded Indebtedness........................................................... | 13 |
| 3.9. | Operations and Obligations............................................. | 13 |
| 3.10. | Properties............................................................. | 13 |
| 3.11. | Accounts Receivable.................................................... | 14 |
| 3.12. | Contracts.............................................................. | 14 |
| 3.13. | Significant Customers; Backlog......................................... | 16 |
| 3.14. | Litigation............................................................. | 17 |
| 3.15. | Compliance with Law; Authorizations.................................... | 17 |
| 3.16. | Intellectual Property; Software........................................ | 17 |
| 3.17. | Tax Matters............................................................ | 18 |
| 3.18. | Employee Benefit Plans; ERISA.......................................... | 20 |

(i)

| | | |
|---|---|---|
| 3.19. | Employee Compensation.................................................. | 22 |
| 3.20. | Employees and Labor Controversies...................................... | 22 |
| 3.21. | Environmental Laws..................................................... | 23 |
| 3.22. | Insurance.............................................................. | 24 |
| 3.23. | Bank Accounts, Letters of Credit and Powers of Attorney................ | 24 |
| 3.24. | Transactions with Affiliates........................................... | 24 |
| 3.25. | Vote Required.......................................................... | 24 |
| 3.26. | Consent Solicitation; Merger Materials................................. | 24 |
| 3.27. | No Adverse Development................................................. | 24 |
| 3.28. | Brokers................................................................ | 25 |
| 4. | Representations and Warranties of Inveresk and Acquisition............. | 25 |
| 4.1. | Organization........................................................... | 25 |
| 4.2. | Corporate Authority.................................................... | 25 |
| 4.3. | No Conflicts; Governmental Requirements................................ | 25 |
| 4.4. | Litigation............................................................. | 26 |
| 4.5. | Brokers................................................................ | 26 |
| 5. | Covenants and Additional Agreements.................................... | 26 |
| 5.1. | Access to Books and Records............................................ | 26 |

|       | 5.2.  | Certain Accruals.................................................................... | 26 |
| 6.    | Survival; Indemnification; Tax Matters................................................... | | 26 |
|       | 6.1.  | Survival............................................................................ | 26 |
|       | 6.2.  | Indemnification of Inveresk and Related Parties................................ | 26 |
|       | 6.3.  | Indemnification of Selling Parties............................................. | 28 |
|       | 6.4.  | Notice of Claims................................................................... | 29 |
|       | 6.5.  | Defense of Third Party Claims................................................... | 29 |
|       | 6.6.  | Dispute Resolution: Negotiation and Arbitration.............................. | 30 |
|       | 6.7.  | Exclusivity of Remedy............................................................ | 30 |
|       | 6.8.  | Post Closing Tax Matters......................................................... | 30 |
| 7.    | Fees and Expenses....................................................................... | | 33 |
|       | 7.1.  | Expenses........................................................................... | 33 |
|       | 7.2.  | Stockholders of the Company...................................................... | 33 |
| 8.    | Definitions............................................................................. | | 33 |
| 9.    | Miscellaneous.......................................................................... | | 38 |
|       | 9.1.  | Press Releases..................................................................... | 38 |

|       | 9.2.  | Integration........................................................................ | 38 |
|       | 9.3.  | Assignment and Binding Effect.................................................... | 38 |
|       | 9.4.  | Waiver............................................................................. | 38 |
|       | 9.5.  | Acknowledgment by Inveresk....................................................... | 38 |
|       | 9.6.  | Notices............................................................................ | 38 |
|       | 9.7.  | Amendment.......................................................................... | 40 |
|       | 9.8.  | Governing Law...................................................................... | 40 |
|       | 9.9.  | Third Party Beneficiaries........................................................ | 40 |
|       | 9.10. | Performance........................................................................ | 40 |
|       | 9.11. | Severability....................................................................... | 40 |
|       | 9.12. | Construction....................................................................... | 40 |
|       | 9.13. | Extensions......................................................................... | 40 |
|       | 9.14. | Section Headings................................................................... | 41 |
|       | 9.15. | Exhibits; Company Disclosure Schedule............................................ | 41 |
|       | 9.16. | Counterparts....................................................................... | 41 |

AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of July 29, 2003, by and among INVERESK RESEARCH GROUP, INC. a Delaware corporation ("Inveresk"), TANGO ACQUISITION CORPORATION, a Delaware corporation and a wholly owned subsidiary of Inveresk ("Acquisition"), PHARMARESEARCH CORPORATION, a Delaware corporation (the "Company"), and WILLIAM BLAIR CAPITAL PARTNERS V,

L.P., a Delaware limited partnership, as representative for the Company's stockholders and optionholders (the "Stockholders' Representative"). Capitalized terms used in this Agreement and not otherwise defined have the meanings ascribed to them in Section 8 of this Agreement.

### RECITALS

A. The Company is a Delaware corporation, with its principal executive office located at 1011 Ashes Drive, Wilmington, North Carolina 28405.

B. Inveresk is a Delaware corporation with its principal offices located at 11000 Weston Parkway, Suite 100, Cary, North Carolina 27513. Acquisition is a wholly owned subsidiary of Inveresk and was formed to merge with and into the Company so that, as a result of the merger, the Company will survive and become a wholly owned subsidiary of Inveresk.

C. The respective Boards of Directors of each of Inveresk, Acquisition and the Company have determined that the merger of Acquisition with and into the Company (hereinafter referred to as the "Merger") in accordance with the laws of the State of Delaware and subject to the terms and conditions of this Agreement, is advisable and in the best interests of Inveresk, Acquisition and the Company and their respective stockholders and have approved this Agreement and the Merger.

D. All of the stockholders of the Company voted their shares in favor of the Merger and adoption of this Agreement.

E. Inveresk, Acquisition and the Company desire to make certain representations and warranties, covenants and agreements in connection with the Merger and also to set forth the terms and conditions of the Merger, all as set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto intending to be legally bound do hereby agree as follows:

1. The Merger.

1.1. The Merger. At the Effective Time (as defined in Section 1.2), upon the terms and subject to the conditions of this Agreement, Acquisition shall be merged with and into the Company in accordance with the provisions of the General Corporation Law of the State of Delaware (the "DGCL"). The Company shall be the surviving corporation in the Merger (the "Surviving Corporation"). As a result of the Merger, all of the respective outstanding shares of capital stock of the Company and Acquisition shall be converted or cancelled in the manner provided in Section 2.

1.2. Effective Time. At the Closing, a certificate of merger (the "Certificate of Merger") shall be duly prepared and executed by the Surviving Corporation and thereafter delivered to the Secretary of State of the State of Delaware (the "Secretary of State") for filing, as provided in Section 251 of the DGCL, on, or as soon as practicable after, the Closing Date. The Merger shall become effective at the time (but not prior to the Closing Date) of the filing of the Certificate of Merger with the Secretary of State, or at such later time as may be agreed by Inveresk and the Company and stated in the Certificate of Merger (the date and time of such filing (or stated later time, if any) being referred to herein as the "Effective Time").

1.3. Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Clifford Chance US LLP, 200 Park Avenue, New York, New York 10166, at 10:00 a.m., local time, on the date hereof (the "Closing Date"). At the Closing there shall be delivered to Inveresk, Acquisition, the Company and the Stockholders' Representative the certificates and other documents and instruments required to be delivered under Section 2.3.

1.4. Effects of the Merger. At the Effective Time, the effects of the Merger shall be as provided in the applicable provisions of the DGCL.

1.5. Certificate of Incorporation, By-Laws and Officers and Directors of the Surviving Corporation. The Certificate of Incorporation of the Company, as in effect immediately prior to the Effective Time, shall be the Certificate of Incorporation of the Surviving Corporation until thereafter amended as provided by law and such Certificate of Incorporation. The By-Laws of Acquisition as in effect immediately prior to the Effective Time shall be the By-Laws of the Surviving Corporation until thereafter amended as provided by

law, the Certificate of Incorporation of the Surviving Corporation and such By-Laws. From and after the Effective Time, the directors and officers of the Surviving Corporation shall be as set forth on Exhibit A to this Agreement, until their respective successors are duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the Surviving Corporation's Certificate of Incorporation and By-Laws.

1.6. Further Assurances. Each party hereto shall execute such further documents and instruments and take such further actions as may reasonably be requested by one or more of the others to consummate the Merger, to vest the Surviving Corporation with full title to all assets, properties, rights, approvals, immunities and franchises of Acquisition and the Company or to otherwise effect the purposes of this Agreement.

2. Conversion of Shares.

2.1. Conversion of Capital Stock. At the Effective Time, by virtue of the Merger and without any further action on the part of any holder of capital stock of the Company:

(a) Capital Stock of Acquisition. Each issued and outstanding share of the common stock, par value $.01 per share, of Acquisition ("Acquisition Common Stock") shall be converted into and become one fully paid and nonassessable share of common stock, par value $.01 per share, of the Surviving Corporation ("Surviving Corporation Common Stock"). Each certificate representing outstanding shares of Acquisition Common Stock shall at the Effective Time represent an equal number of shares of Surviving Corporation Common Stock.

(b) Cancellation of Treasury Stock and Stock Owned by Inveresk and Acquisition. All shares of capital stock that are owned by the Company as treasury stock and any shares of Company Common Stock (as defined in Section 2.1(c)(ii)) owned by Inveresk or Acquisition automatically shall be cancelled and retired and shall cease to exist and no consideration shall be delivered in exchange therefor.

2

(c) Conversion of Company Capital Stock.

(i) Except as otherwise provided in Section 2.1(b) or Section 2.1(d), each share of the Company's Class A Preferred Stock, par value $.01 per share (the "Class A Preferred Stock"), issued and outstanding immediately prior to the Effective Time shall be converted into the right to receive in cash (w) the Unreturned Original Cost (as such term is defined in the Company's Certificate of Incorporation as in effect on the date of this Agreement) of such share of Class A Preferred Stock, together with the unpaid Accrued Yield thereon (as such term is defined in the Company's Certificate of Incorporation as in effect on the date of this Agreement) through the Closing Date, payable to the holder thereof in accordance with Section 2.1(e) or Section 2.4 (the aggregate amount described in this clause (w) is hereinafter referred to as the "Class A Preferred Amount"); (x) the Per Share Portion of the Closing Residual Cash Consideration, payable to the holder thereof in accordance with Section 2.1(e) or Section 2.4; (y) the Per Share Portion of any Closing Liquid Net Worth Adjustment Payments (as defined in Section 2.2(d)(iv)) arising under Section 2.2; and (z) the Per Share Portion of any Escrow Release Amount and any Remaining Escrow Balance, payable to the holder thereof in accordance with the Escrow Agreement following the termination of the Escrow Period. The aggregate consideration to which holders of Class A Preferred Stock become entitled pursuant to this Section 2.1(c)(i) is collectively referred to herein as the

**End of Preview**

REL    200503618909
4 PGS

PRODUCERS 88 (4-89) — PAID UP POUND PRINTING ... STATIONERY COMPANY
WITH 640 ACRES POOLING PROVISION    4703-C RICHMOND, HOUSTON, TEXAS 77027 (713) 552-9797

# PAID UP OIL AND GAS LEASE

THIS LEASE AGREEMENT is made as of the 15th day of September, 2005, between UP G KUK, INC., A TEXAS CORPORATION, as Lessor (whether one or more), whose address is 2028 Sandy Lane, Irving, Texas 75060-5639, and SCOUT EXPLORATION, J.V., a Texas Joint Venture, as Lessee, whose address is 5956 Sherry Lane, Suite 1810, Dallas, Texas 75225. All printed portions of this lease were prepared by the party hereinabove named as Lessee, but all other provisions (including the completion of blank spaces) were prepared jointly by Lessor and Lessee.

1.    In consideration of a cash bonus in hand paid and the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lessee the following described land, hereinafter called leased premises: (use Exhibit "A" for long description):

42.803 acres of land, more or less, out of the J. Mangum Survey, A-861, Dallas County, Texas, more particularly described on Exhibit "A" attached hereto and made a part hereof for all purposes, which land is hereinafter referred to as the "leased premises",

in the county of Dallas, State of Texas, containing 42.803 gross acres, more or less (including any interests therein which Lessor may hereafter acquire by reversion, prescription or otherwise), for the purpose of exploring for, developing, producing and marketing oil and gas, along with all hydrocarbon and nonhydrocarbon substances produced in association therewith. The term "gas" as used herein includes helium, carbon dioxide and other commercial gases, as well as hydrocarbon gases. In addition to the above-described leased premises, this lease also covers accretions and any small strips or parcels of land now or hereafter owned by Lessor which are contiguous or adjacent to the above-described leased premises, and, in consideration of the aforementioned cash bonus, Lessor agrees to execute at Lessee's request any additional or supplemental instruments for a more complete or accurate description of the land so covered. For the purpose of determining the amount of any shut-in royalties hereunder, the number of gross acres above specified shall be deemed correct, whether actually more or less.

2.    This lease, unless it is a "paid-up" lease requiring no rentals, shall be in force for a primary term of five (5) years from the date hereof, and for as long thereafter as oil or gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith or this lease is otherwise maintained in effect pursuant to the provisions hereof.

3.    Royalties on oil, gas and other substances produced and saved hereunder shall be paid by Lessee to Lessor as follows: (a) For oil and other liquid hydrocarbons separated at Lessee's separator facilities, the royalty shall be 1/4 of such production, to be delivered at Lessee's option to Lessor at the wellhead or to Lessor's credit at the oil purchaser's transportation facilities, provided that Lessee shall have the continuing right to purchase such production at the wellhead market price then prevailing in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) for production of similar grade and gravity; (b) for gas (including casinghead gas) and all other substances covered hereby, the royalty shall be 1/4 of the proceeds realized by Lessee from the sale thereof, less a proportionate part of ad valorem taxes and production, severance, or other similar taxes and the costs incurred by Lessee in delivering, processing or otherwise marketing such gas or other substances, provided that Lessee shall have the continuing right to purchase such production at the prevailing wellhead market price paid for production of similar quality in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) pursuant to comparable purchase contracts entered into on the same or nearest preceding date as the date on which Lessee commences its purchases hereunder; and (c) if at the end of the primary term or any time thereafter one or more wells on the leased premises or lands pooled therewith are capable of producing oil or gas or other substances covered hereby in paying quantities, but such well or wells are either shut in or production therefrom is not being sold by Lessee, such well or wells shall nevertheless be deemed to be producing in paying quantities for the purpose of maintaining this lease. If for a period of 90 consecutive days such well or wells are shut in or production therefrom is not being sold by Lessee, then on or before the end of said 90-day period and thereafter on or before each anniversary of the end of said 90-day period while the well or wells are shut in or production therefrom is not being sold by Lessee, provided that if this lease is otherwise being maintained by operations, or if production is being sold by Lessee from another well or wells on the leased premises or lands pooled therewith, no shut-in royalty shall be due until the end of the 90-day period next following cessation of such operations or production. Lessor's failure to properly pay shut-in royalty shall render Lessee liable for the amount due, but shall not operate to terminate this lease.

4.    All shut-in royalty payments under this lease shall be paid or tendered to Lessor or to Lessor's credit in

at

or its successors, which shall be Lessor's depository agent for receiving payments regardless of changes in the ownership of said land. All payments or tenders may be made in currency, or by check or by draft and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails in a stamped envelope addressed to the depository or to the Lessor at the last address known to Lessee shall constitute proper payment. If the depository should liquidate or be succeeded by another institution, or for any reason fail or refuse to accept payment hereunder, Lessor shall, at Lessee's request, deliver to Lessee a proper recordable instrument naming another institution as depository agent to receive payments.

5.    If Lessee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled therewith, or if all production (whether or not in paying quantities) permanently ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Paragraph 6 or the action of any governmental authority, then in that event, this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee commences operations for reworking or an existing well or for drilling an additional well or for otherwise obtaining or restoring production on the leased premises or lands pooled therewith within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production. If at the end of the primary term, or at any time thereafter, this lease is not otherwise being maintained in force but Lessee is then engaged in drilling, reworking or any other operations reasonably calculated to obtain or restore production therefrom, this lease shall remain in force so long as any one or more of such operations are prosecuted with no cessation of more than 90 consecutive days, and, if any such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying quantities from the leased premises or lands pooled therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additional wells on the leased premises or lands pooled therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased premises as to formations then capable of producing in paying quantities on the leased premises or lands pooled therewith, or (b) to protect the leased premises from uncompensated drainage by any well or wells located on other lands not pooled therewith. There shall be no covenant to drill exploratory wells or any additional wells except as expressly provided herein.

6.    Lessee shall have the right but not the obligation to pool all or any part of the leased premises or interest therein with any other lands or interests, as to any or all depths or zones, and as to any or all substances covered by this lease, either before or after commencement of production, whenever Lessee deems it necessary or proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or interests. The unit formed by such pooling for an oil well which is not a horizontal completion shall not exceed 80 acres plus a maximum acreage tolerance of 10%, and for a gas well or a horizontal completion shall not exceed 640 acres plus a maximum acreage tolerance of 10%, provided that a larger unit may be formed for an oil well or gas well or horizontal completion to conform to any well spacing or density pattern that may be prescribed or permitted by any governmental authority having jurisdiction to do so. For the purpose of the foregoing, the terms "oil well" and "gas well" shall have the meanings prescribed by applicable law or the appropriate governmental authority, or, if no definition is so prescribed, "oil well" means a well with an initial gas-oil ratio of less than 100,000 cubic feet per barrel and "gas well" means a well with an initial gas-oil ratio of 100,000 cubic feet or more per barrel, based on a 24-hour production test conducted under normal producing conditions using standard lease separator facilities or equivalent testing equipment, and the term "horizontal completion" means an oil well in which the horizontal component of the gross completion interval in the reservoir exceeds the vertical component thereof. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit and stating the effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were production, drilling or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit production which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit, but only to the extent such proportion of unit production is sold by Lessee. Pooling in one or more instances shall not exhaust Lessee's pooling rights hereunder, and Lessee shall have the recurring right but not the obligation to revise any unit formed hereunder by expansion or contraction or both, either before or after commencement of production, in order to conform to the well spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination made by such governmental authority. In making such a revision, Lessee shall file of record a written declaration describing the revised unit and stating the effective date of revision. To the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which royalties are payable hereunder shall thereafter be adjusted accordingly. In the absence of production in paying quantities from a unit, or upon permanent cessation thereof, Lessee may terminate the unit by filing of record a written declaration describing the unit and stating the date of termination. Pooling hereunder shall not constitute a cross-conveyance of interests.

7.    If Lessor owns less than the full mineral estate in all or any part of the leased premises, the royalties and shut-in royalties payable hereunder for any well on any part of the leased premises or lands pooled therewith shall be reduced to the proportion that Lessor's interest in such part of the leased premises bears to the full mineral estate in such part of the leased premises.

8. The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or zone, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns. No change in Lessor's ownership shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee until 80 days after Lessee has been furnished the original or certified or certified copies of the documents establishing such change of ownership to the satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessees usual form of division order. In the event of the death of any person entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to the credit of decedent or decedent's estate in the depository designated above. If at any time two or more persons are entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to such persons or to their credit in the depository, either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee shall be relieved of all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this lease, the obligation to pay or tender shut-in royalties hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease then held by each.

9. Lessee may, at any time and from time to time, deliver to Lessor or file of record a written release of this lease as to a full or undivided interest in all or any portion of the area covered by this lease or any depths or zones thereunder, and shall thereupon be relieved of all obligations thereafter arising with respect to the interest so released. If Lessee releases all or an undivided interest in less than all of the area covered hereby, Lessee's obligation to pay or tender shut-in royalties shall be proportionately reduced in accordance with the net acreage interest retained hereunder.

10. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises as may be reasonably necessary for such purposes, including but not limited to geophysical operations, the drilling of wells, and the construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport production. Lessee may use in such operations, free of cost, any oil, gas, water and/or other substances produced on the leased premises, except water from Lessor's wells or ponds. In exploring, developing, producing or marketing from the leased premises or lands pooled therewith, the ancillary rights granted hereto shall apply (a) to the entire leased premises described in Paragraph 1 above, notwithstanding any partial release or other partial termination of this lease; and (b) to any other lands in which Lessee now or hereafter has authority to grant such rights in the vicinity of the leased premises or lands pooled therewith. When requested by Lessor in writing, Lessee shall bury its pipelines below ordinary plow depth on cultivated lands. No well shall be located less than 200 feet from any house or barn now on the leased premises or other lands used by Lessee hereunder, without Lessor's consent, and Lessee shall pay for damage caused by its operations to buildings and other improvements now on the leased premises or such other lands, and to commercial timber and growing crops thereon. Lessee shall have the right at any time to remove its fixtures, equipment and materials, including well casing, from the leased premises or such other lands during the term of this lease or within a reasonable time thereafter.

11. Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. When drilling, reworking, production or other operations are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this lease shall not terminate because of such prevention or delay, and at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other operations are so prevented, delayed or interrupted.

12. In the event that Lessor, during the primary term of this lease, receives a bona fide offer which Lessor is willing to accept from any party offering to purchase from Lessor a lease covering any or all of the substances covered by this lease and covering all or a portion of the land described herein, with the lease becoming effective upon expiration of this lease, Lessor hereby agrees to notify Lessee in writing of said offer immediately, including in the notice the name and address of the offeror, the price offered and all other pertinent terms and conditions of the offer. Lessee, for a period of fifteen days after receipt of the notice, shall have the prior and preferred right and option to purchase the lease or part thereof or interest therein, covered by the offer at the price and according to the terms and conditions specified in the offer.

13. No litigation shall be initiated by Lessee with respect to any breach or default, and then only if Lessee fails to remedy the breach or default, within such period. In the event the matter is litigated and there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after said judicial determination to remedy the breach or default and Lessee fails to do so.

14. Lessor hereby warrants and agrees to defend title unto and to Lessee hereunder, and agrees that Lessee, at Lessee's option may pay and discharge any taxes, mortgages or liens existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to whom payment is made, and, in addition to its other rights, may reimburse itself out of any royalties or shut-in royalties otherwise payable to Lessor hereunder. In the event Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in royalties hereunder, without interest, until Lessee has been furnished satisfactory evidence that such claim has been resolved.

15. The parties hereto agree that Lessee shall pay to the owner(s) of the surface estate of the leased premises the sum of $25,000.00 for each drill site constructed on the leased premises, which sum shall represent payment in full for all damages done to said drill site in connection with Lessee's operations thereon, which drill site shall not exceed five (5) acres of land, more or less.

16. Concurrently with Lessor's execution hereof, Lessee shall pay Lessor the sum of $500.00 per net mineral acre of land covered by this lease as bonus consideration for the execution of this lease by Lessor.

17. The parties hereto agree that a Memorandum of Paid Up Oil and Gas Lease may be filed of record for the purpose of providing record notice of the existence of this lease in lieu of recording the executed original hereof.

IN WITNESS WHEREOF, this lease is executed by Lessor on the date set forth in the certificate of acknowledgment below, but shall be effective as of the date first above written.

Lessor:                                          Lessee:

UP_G_KUK, INC.                                   SCOUT EXPLORATION, J.V.

By: Kuk Q Stewart                                By: _____
KUK J A Stewart                                  WALLACE L. HARN, JR - JOINT VENTURES
[Print/Type Name, Title]                         [Print/Type Name, Title]

PRESIDENT

STATE OF TEXAS          §
                        §
COUNTY OF _Tarrant_     §

 This instrument was acknowledged before me on this the 27th day of September, 2005, by _Kok Ja Stewart_, as _President_ of UP_G_KUK INC., a Texas corporation, on behalf of said corporation.

N. JEANNINE JENKINS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 5-16-2009

Notary Public in and for the State of Texas

STATE OF TEXAS          §
                        §
COUNTY OF Dallas         §

 This instrument was acknowledged before me on this the 30th day of September, 2005, by _Wallace L. Hall, Jr._, as _Joint Venturer_ of SCOUT EXPLORATION, J.V., a Texas joint venture, on behalf of said joint venture.

CHRISTINA GILLILAN
MY COMMISSION EXPIRES
July 31, 2008

Notary Public in and for the State of Texas

EXHIBIT "A"

BEING a tract of land situated in the JOSEPH MANGUM SURVEY, ABSTRACT NO. 861, Dallas County, Texas, and being part of two tracts of land described in deed to Jasper Federal Savings and Loan Association, as recorded in Volume 86168, Page 2069, Deed Records, Dallas County, Texas, and being more particularly described as follows:

BEGINNING at a 1/2" diameter iron rod found in the South line of a tract of land described in deed from Ashlin Development Company to Ward Williford, Trustee, as recorded in Volume 88119, Page 0715, Deed Records, Dallas County, Texas, said iron rod also being at the most Northerly Northwest corner of a tract of land described in deed from Gifford-Hill & Co., Inc. to the County of Dallas as recorded in Volume 70009, Page 0319, Deed Records, Dallas County, Texas, said iron rod also being in the West line of Hunter Ferrell Road (a 57.5 foot right-of-way at this point);

THENCE South 1,536.53 feet with the said West line of Hunter Ferrell Road and with the West line of said County of Dallas tract and along a fence line to a 1/2" diameter iron rod found;

THENCE South 45° 03' 05" West 70.65 feet with the Northwest line of said Hunter Ferrell Road and with the Northwest line of said County of Dallas tract and along a fence line to a 1/2" diameter iron rod found, said iron rod also being in the North line of Hunter Ferrell Road (a 60' right-of-way at this point);

THENCE South 89° 59' 05" West, 1,126.74 feet, with the North line of said Hunter Ferrell Road and with the North line of said County of Dallas tract and along a fence line to a 1/2 diameter iron rod found at the Southeast corner of a tract of land described in deed to Jasper Federal Savings and Loan Association, as recorded in Volume 86168, Page 2069, Deed Records, Dallas County, Texas;

THENCE North 00° 19' 26" East 1,594.79 feet, with the East line of said Jasper Federal Savings and Loan Association tract, to a 1/2" diameter iron rod found in the South line of said Ward Williford, Trustee tract;

THENCE South 89° 42' 16" East 1,167.74 feet, with the said South line of Ward Williford, Trustee tract and along a fence line to the PLACE OF BEGINNING and containing 1,864,485 square feet (42.803 acres) of land, more or less.

AFTER RECORDING, PLEASE RETURN TO:

Mr. Ronald O. Holman
Holman Robertson Eldridge
5949 Sherry Lane, Suite 1700
Dallas, Texas 75225

**FILED AND RECORDED**

OFFICIAL PUBLIC RECORDS

*Cynthia Figueroa Calhoun*

Cynthia Figueroa Calhoun, County Clerk
Dallas County TEXAS
December 06, 2005  08:45:17 AM
FEE: $28.00          200503610909

EXHIBIT "A" – Solo Page
H:\WP\09\ROH\SCOUT\STEWART PU OGL-01.DOC

# Scout Exploration Inc (SCXN:OTC US)

**Last $0.04 USD**     **Change Today 0.00 / 0.00%**     **Volume 0.0**          **SCXN** On Other Exchanges

As of 8:10 PM 01/30/14 All times are local (Market data is delayed by at least 15 minutes).

Snapshot   **News**   **Charts**   **Financials**   **Earnings**   **People**   **Ownership**   **Transactions**   **Options**

**Overview**   **Board Members**   **Committees**

*Handwritten: Scott K Wilputz Sherry Ln. Dallas*

### Insiders At Scout Exploration Inc (SCXN)

| Name (Connections) | Board Relationships | Title | Type of Board Member | Age |
|---|---|---|---|---|
| **John Roozendaal B.Sc. (Geology)** | 36 Relationships | Chief Executive Officer, President and Director | -- | 47 |
| **Jason Walsh B.Bus, MBA** | 10 Relationships | Chief Financial Officer, Principal Accounting Officer, Secretary, Treasurer and Director | -- | 42 |

### Other Board Members On Board*

| Name (Connections) | Board Relationships | Type of Board Member | Primary Company | Age |
|---|---|---|---|---|
| **Gerald Fletcher** | 7 Relationships | -- | Axis Energy Corporation | -- |
| **Rene Lange B.Eng.** | 3 Relationships | -- | Scout Exploration Inc. | 42 |

*Data is at least as current as the most recent Definitive Proxy.

### Report Data Issue

## From Around the Web

Sponsored Content by Taboola






# Scout Exploration Inc (SCXN:OTC US)

**Last $0.04 USD**    **Change Today 0.00 / 0.00%**    **Volume 0.0**    **SCXN** On Other Exchanges

As of 8:10 PM 01/30/14 All times are local (Market data is delayed by at least 15 minutes).

Snapshot    News    Charts    Financials    Earnings    People    Ownership    Transactions    Options

Insider Ownership    Institutional Ownership

Scout Exploration Inc (SCXN) Key Developments

## Scout Exploration Inc. announced delayed 10-Q filing

Aug 14 13

On 08/14/2013, Scout Exploration Inc. announced that they will be unable to file their next 10-Q by the deadline required by the SEC.

## Scout Exploration Inc. announced delayed 10-Q filing

May 14 13

On 05/14/2013, Scout Exploration Inc. announced that they will be unable to file their next 10-Q by the deadline required by the SEC.

## Scout Exploration Inc. Appoints Rene Lange as Board of Directors

Mar 14 13

Scout Exploration Inc. appointed Rene Lange to its Board of Directors. Mr. Lange, B.Eng. Ocean and Naval Architecture, Memorial University.

Report Data Issue

## From Around the Web

Sponsored Content by Taboola

    

**Businessweek**

# Scout Exploration Inc (SCXN:OTC US)

. More About *"scout exploration"*

**Last $0.04 USD    Change Today 0.00 / 0.00%    Volume 0.0       SCXN** On Other Exchanges

As of 8:10 PM 01/30/14 All times are local (Market data is delayed by at least 15 minutes).

**Scout Capital to Return Investor Money as Weiss Steps Back (2)**

Snapshot   News   Charts   Financials   Earnings   People   Ownership   Transactions   Options

— -      -- ---- -- --      ---—

---

**Scout Exploration Inc (SCXN) Snapshot**

| | | | |
|---|---|---|---|
| Open | $0.04 | Previous Close | $0.04 |
| Day High | $0.04 | Day Low | $0.04 |
| 52 Week High | 04/23/13 - $0.41 | 52 Week Low | 08/30/13 - $0.02 |
| Market Cap | 628.6K | Average Volume 10 Days | 2.1K |
| EPS TTM | $-0.03 | Shares Outstanding | 16.5M |
| EX-Date | -- | P/E TM | -- |
| Dividend | -- | Dividend Yield | -- |

**SCXN:US Advanced Stock Chart**

---

## From Around the Web

Sponsored Content by Taboola



Teacher Shares Her Secret





5 Q...   ...That
Not...   ...



for Women: Emergency

---

Related News

Scout Exploration Inc (SCXN) Related Businessweek News

No related news articles were found.          No Related Businessweek News Found

---

**Scout Exploration Inc (SCXN) Details**

Scout Exploration, Inc. does not have significant operations. It intends to develop the airborne oil spill response system for the oil exploration, production, and transportation industries. Previously, it was engaged in the exploration, development, and exploitation of oil and gas properties in Alberta, Canada. The company was formerly known as Virtual Curricula Corp. and changed its name to Scout Exploration, Inc. in April 2006. Scout Exploration, Inc. was incorporated in 1999 and is based in Vancouver, Canada.

Detailed SCXN:US Company Description...

**Scout Exploration Inc (SCXN) Top Compensated Officers**

No compensation data is available at this time for the top officers at this company.

Executives, Board Directors

| www.scoutexploration.com | Latest 10-K |
|---|---|
| Founded in **1999** | Latest 10-Q |
| | More SCXN SEC Filings... |

---

**Scout Exploration Inc (SCXN) Key Developments**

## Scout Exploration Inc. announced delayed 10-Q filing

Aug 14 13

On 08/14/2013, Scout Exploration Inc. announced that they will be unable to file their next 10-Q by the deadline required by the SEC.

## Scout Exploration Inc. announced delayed 10-Q filing

May 14 13

On 05/14/2013, Scout Exploration Inc. announced that they will be unable to file their next 10-Q by the deadline required by the SEC.

## Scout Exploration Inc. Appoints Rene Lange as Board of Directors

Mar 14 13

Scout Exploration Inc. appointed Rene Lange to its Board of Directors. Mr. Lange, B.Eng. Ocean and Naval Architecture, Memorial University.

 **Dallas Central Appraisal District**

Home | Find Property | Contact Us

## Commercial Account

Location  Owner  Legal Desc  Value  Improvements  Land  Exemptions  Estimated Taxes  Building Footprint  History

### Location (Current 2014)
**Address:** 1900 HUNTER FERRELL RD
**Market Area:** 0
**Mapsco:** 41A-Q (DALLAS)

#### Customer Service Survey
Enter PIN: [        ]  [ Submit ]

### DCAD Property Map

**View Photo**

**2013 Appraisal Notice**

**Electronic Documents (ENS)**

 **Print Homestead Exemption Form**

**YAHOO! Maps**

### Owner (Current 2014)
UPG KUK INC
2028 SANDY LN
IRVING, TEXAS 750605639

#### Multi-Owner (Current 2014)

| Owner Name | Ownership % |
|---|---|
| UPG KUK INC | 100% |

### Legal Desc (Current 2014)
**1:** JOSEPH MANGRUM ABST 861 PG 140
**2:** TR 1.2 ACS 5.2665 CALC
**3:**
**4:** INT200503579476 DD08312005 CO-DC
**5:** 0861140100100 1CI08611401
**Deed Transfer Date:** 11/12/2005

### Value

| 2013 Certified Values | |
|---|---|
| Improvement: | $0 |
| Land: | + $31,600 |
| Market Value: | = $31,600 |
| **Revaluation Year:** | 2011 |
| **Previous Revaluation Year:** | 2010 |

### Improvements (Current 2014)

No Improvements.

## Land (2013 Certified Values)

| # | State Code | Zoning | Frontage (ft) | Depth (ft) | Area | Pricing Method | Unit Price | Market Adjustment | Adjusted Price | Ag Land |
|---|-----------|--------|---------------|------------|------|----------------|------------|-------------------|----------------|---------|
| 1 | COMMERCIAL - VACANT PLOTTED LOTS/TRACTS | AGRICULTURAL | 0 | 0 | 5.2670 ACRE | STANDARD | $10,000.00 | -40% | $31,602 | N |

\* All Exemption information reflects 2013 Certified Values. \*

## Exemptions (2013 Certified Values)
No Exemptions

## Estimated Taxes (2013 Certified Values)

| | City | School | County and School Equalization | College | Hospital | Special District |
|---|------|--------|-------------------------------|---------|----------|------------------|
| Taxing Jurisdiction | IRVING | GRAND PRAIRIE ISD | DALLAS COUNTY | DALLAS CO COMMUNITY COLLEGE | PARKLAND HOSPITAL | UNASSIGNED |
| Tax Rate per $100 | $0.5986 | $1.465 | $0.2531 | $0.1247 | $0.276 | N/A |
| Taxable Value | $31,600 | $31,600 | $31,600 | $31,600 | $31,600 | $0 |
| Estimated Taxes | $189.16 | $462.94 | $79.98 | $39.41 | $87.22 | N/A |
| Tax Ceiling | | | | | N/A | N/A |
| | | | | | Total Estimated Taxes: | $858.70 |

**DO NOT PAY TAXES BASED ON THESE ESTIMATED TAXES.** You will receive an **official tax bill** from the appropriate agency when they are prepared. Taxes are collected by the agency sending you the **official** tax bill. To see a listing of agencies that collect taxes for your property. **Click Here**

The estimated taxes are provided as a courtesy and should not be relied upon in making financial or other decisions. The Dallas Central Appraisal District (DCAD) does not control the tax rate nor the amount of the taxes, as that is the responsibility of each Taxing Jurisdiction. Questions about your taxes should be directed to the appropriate taxing jurisdiction. We cannot assist you in these matters. These tax estimates are calculated by using the most current certified taxable value multiplied by the most current tax rate. **It does not take into account other special or unique tax scenarios.** If you wish to calculate taxes yourself, you may use the TaxEstimator to assist you.

## Building Footprint (Current 2014)

Building Footprint Not Available



201000065955
PR REL 1/27

03/18/2010 09:57:09 AM

## PARTIAL RELEASE OF LEASE

October 7, 2009

Description of unrecorded Residential Lease Agreement:

Dated:        January 10, 2005

Lessee:       Todd Curtis of Chris Nasrallah

Lessor:       Kuk Ja Stewart

Property (including any improvements) subject to lease:

Being seven tracts of land situated in the Joseph Mangrum Survey, Abstract No. 861, Dallas County, Texas, and being more particularly described on Exhibit "A", attached hereto and incorporated herein by reference for all purposes

In consideration of the partial payment of One and No/100 Dollar ($1.00) and other good and valuable consideration, Lessee does hereby remise, release and forever quitclaim to Lessor, owner of the property, any and all its right, title, interest, lien or claim in and to the real property described in Exhibit "A", located in the City of Irving, Dallas County, Texas, to be conveyed to the County of Dallas for right of way purposes.

It is expressly understood and agreed that this is a Partial Release of Lease and releases all of Lessee's right, title and interest in the property described on Exhibit "A" only, to the Owner for the right-of-way required by Dallas County in conjunction with its Hunter Ferrell Road Project (Belt Line Road to MacArthur Blvd.), Parcel 22, 22SE(1,2,3), 22DE(1,2,3) and 22TCE and nothing herein shall be construed to waive, affect, release or impair the validity of said lease agreement or any other property in said instrument(s) mentioned.

Executed this 2nd day of November, 2009.

OWNER:                              LESSEE:

By: _Kuk J Stewart_                 By: _Todd R Curtis_

Name: _KUK JA Stewart_             Name: _TODD R. CURTIS_

Title: _____           Title: _OWNER, FOUNDER, MANAGER_

Project: Hunter Ferrell Rd. MCIP 40704(805)
(Belt Line Rd. to MacArthur Blvd.)
Parcel: 22,22SE(1,2,3),22DE(1,2,3), 22TCE

## ACKNOWLEDGMENTS

THE STATE OF TEXAS            §

COUNTY OF DALLAS           §

This instrument was acknowledged before me on this 2nd day of November ,2009 by Kuk Ja Stewart .

(Personalized Seal)

PATRICIA ANN RIEN
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 04-17-2012

Notary Public in and for the State of Texas

Printed Name: Patricia Ann Rien

My Commission Expires: 4/17/2012

THE STATE OF TEXAS            §

COUNTY OF DALLAS           §

This instrument was acknowledged before me on this 2nd day of November ,2009 by Todd R Curtis .

(Personalized Seal)

Notary Public in and for the State of Texas

Printed Name: Rosemary L. Cotten

My Commission Expires: May 24, 2010

ROSEMARY L. COTTEN
MY COMMISSION EXPIRES
May 24, 2010

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 ROW
May 06, 2008
Page 1 of 3

LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 4008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,534.06 feet to a point for corner having Texas State Plane Coordinate (Texas North Central Zone (4202), NAD83, U.S. Feet (Surface), Combined Scale Factor 0.999863512631) values of N=6970348.53, E=2435595.84 for the POINT OF BEGINNING said point being on the proposed north right-of-way line of Hunter Ferrell Road (variable width right-of-way, proposed 120 foot wide at this point) and also being on a circular curve to the left, not being tangent to the preceding course, having a radius of 1,340.00 feet, whose chord bears North 51 degrees 24 minutes 52 seconds East, a distance of 929.61 feet;

THENCE Northeasterly, departing said common line, along said proposed north right-of-way line and along said circular curve to the left through a central angle of 40 degrees 35 minutes 31 seconds, an arc length of 949.34 feet for the point of tangency with values of N=6970928.31, E=2436322.49;

THENCE North 31 degrees 07 minutes 06 seconds East, continuing along said proposed north right-of-way line, a distance of 510.57 feet to a point for corner with values of N=6971365.42, E=2436586.36;

THENCE North 60 degrees 22 minutes 45 seconds West, continuing along said called proposed north right-of-way line, a distance of 65.03 feet to a point for corner with values of N=6971397.56, E=2436529.83;

THENCE North 31 degrees 07 minutes 06 seconds East, continuing along said north right-of-way line a distance of 149.10 feet to a point for corner with values of N=6971525.20, E=2436606.89 for the point of curvature of a circular curve to the right having a radius of 1,525.00 feet, whose chord bears North 35 degrees 35 minutes 33 seconds East, a distance of 237.93 feet;