EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 ROW
May 06, 2008
Page 2 of 3

THENCE Northeasterly, continuing along said proposed north right-of-way line and along said circular curve to the right through a central angle of 08 degrees 56 minutes 54 seconds, an arc length of 238.17 feet to a 1/2-inch set iron rod with yellow cap stamped "HALFF ASSOC. INC." (hereinafter referred to as "with cap") at the intersection of said proposed north right-of-way line and the existing west right-of-way line of Hunter Ferrell Road (variable width right-of-way);

THENCE South 00 degrees 16 minutes 12 seconds East, departing said proposed north right-of-way line and along said existing west right-of-way line, a distance of 444.86 feet to a 1/2-inch set iron rod with cap at the intersection of said existing west right-of-way line and the proposed south right-of-way line of Hunter Ferrell Road (variable width right-of-way);

THENCE North 60 degrees 22 minutes 45 seconds West, departing said existing west right-of-way line and along said proposed south right-of-way line, a distance of 60.28 feet to a point for corner with values of N=6971303.61, E=2436695.06;

THENCE South 31 degrees 07 minutes 06 seconds West, continuing along said proposed south right-of way line, a distance of 513.84 feet to a point for corner with values of N=6970863.71, E=2436429.51 for the point of curvature of a circular curve to the right having a radius of 1,465.00 feet, whose chord bears South 33 degrees 40 minutes 53 seconds West, a distance of 131.02 feet;

THENCE Southwesterly, continuing along said proposed south right-of way line and along said circular curve to the right through a central angle of 05 degrees 07 minutes 34 seconds, an arc length of 131.07 feet to a point for corner with values of N=6970754.68, E=2436356.84;

THENCE South 05 degrees 15 minutes 47 seconds East, continuing along said proposed south right-of way line a distance of 37.16 feet to a point for corner with values of N=6970717.68, E=2436360.25 for the point of curvature of a circular curve to the right having a radius of 1,012.50 feet, whose chord bears South 32 degrees 41 minutes 28 seconds East a distance of 485.14 feet;

THENCE Southeasterly, continuing along said proposed south right-of way line and along said circular curve to the right through a central angle of 27 degrees 43 minutes 22 seconds, an arc length of 489.90 feet to a 1/2-inch set iron rod with cap for the intersection of said proposed south right-of-way line and said existing north right-of-way line;

THENCE South 88 degrees 57 minutes 39 seconds West, departing said proposed south right-of-way line and along said existing north right-of-way line, a distance of 67.45 feet to a 1/2-inch set iron rod with cap at the intersection of said existing north right-of-way line and said proposed south right-of-way line and also being on a circular curve to the left having a radius of 948.50 feet, whose chord bears North 33 degrees 17 minutes 49 seconds West, a distance of 433.90 feet;

## EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 ROW
May 06, 2008
Page 3 of 3

THENCE Northwesterly, departing said existing north right-of-way line and along said proposed south right-of-way line and also being along said circular curve to the left through a central angle of 26 degrees 26 minutes 40 seconds, an arc length of 437.77 feet to a point for corner (with values of N=6970670.84, E=2436316.64;

THENCE South 86 degrees 28 minutes 08 seconds West, continuing along said proposed south right-of-way line, a distance of 34.57 feet to a point for corner with values of N=6970668.71, E=2436282.14 for the point of curvature of a circular curve to the right having a radius of 1,460.00 feet, whose chord bears South 53 degrees 00 minutes 42 seconds West, a distance of 622.46 feet;

THENCE Southwesterly, continuing along said proposed south right-of-way line and along said circular curve to the right through a central angle of 24 degrees 37 minutes 00 seconds, an arc length of 627.27 feet to a point for corner with values of N=6970294.20, E=2435784.94 being the intersection of said proposed south right-of-way line and said existing north right-of-way line;

THENCE South 88 degrees 57 minutes 39 seconds West, departing said proposed south right-of-way line and along said existing north right-of-way line, a distance of 188.44 feet to a point for corner with values of N=6970290.79, E=2435596.53, said point being the common southwest corner of said called 42.803 acre tract and southeast corner of said called 37.0313 acre Harrington tract;

THENCE North 00 degrees 41 minutes 26 seconds West, departing said existing north right-of-way line and along the common west line of said 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 57.75 feet to the POINT OF BEGINNING AND CONTAINING 261,722 square feet or 6.0083 acres of land, more or less.

A Plat accompanies this legal description.

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

DOUGLAS A. CALHOUN                    DATE: 5/06/08
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 DB-1
May 06, 2008
Page 1 of 2

LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 4008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,317.84 feet to a the POINT OF BEGINNING at the intersection of said common line and the north line of a drainage easement;

THENCE South 51 degrees 20 minutes 32 seconds East, departing said common line and along the north line of said drainage easement, a distance of 87.12 feet to a point for corner;

THENCE North 64 degrees 53 minutes 59 seconds East, continuing along the north line of said drainage easement, a distance of 105.00 feet to a point for the northeast corner of said drainage easement;

THENCE South 28 degrees 35 minutes 38 seconds East, along the east line of said drainage easement, a distance of 125.95 feet to a point on a circular curve to the right, being on the proposed north right-of-way line of Hunter Ferrell Road (variable width right-of-way, 120 foot wide at this point), said curve not being tangent to the preceding course and having a radius of 1,340.00 feet, whose chord bears South 66 degrees 33 minutes 30 seconds West, a distance of 240.65 feet;

THENCE Southwesterly, along said proposed north right-of-way line and along said circular curve through a central angle of 10 degrees 18 minutes 13 seconds for an arc distance of 240.98 feet to a point for corner at the intersection of said proposed north right-of-way line and said common line;

THENCE North 00 degrees 41 minutes 26 seconds West, departing said proposed north right-of-way line and along said common line, a distance of 216.22 feet to the POINT OF BEGINNING AND CONTAINING 29,481 square feet or 0.6768 acres of land, more or less.

A Plat accompanies this legal description.

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 DE-1
May 06, 2008
Page 2 of 2

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

DOUGLAS A. CALHOUN
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

DATE

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 DB-2
May 06, 2008
Page 1 of 2

LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 4008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,591.81 feet to a point for the intersection of said common line and the existing north right-of-way line of Hunter Ferrell Road (variable width right-of-way);

THENCE North 88 degrees 57 minutes 39 seconds East, departing said common line and along said existing north right-of-way line, a distance of 188.44 feet for the POINT OF BEGINNING, being the intersection of the proposed south right-of-way line of Hunter Ferrell Road with said existing north right-of-way line, and also being on a circular curve to the left, not being tangent to the preceding course, and having a radius of 1,460.00 feet, whose chord bears North 62 degrees 49 minutes 47 seconds East, a distance of 126.87 feet;

THENCE Northeasterly, departing said existing north right-of-way line and along said proposed south right-of-way line, and along said circular curve through a central angle of 04 degrees 58 minutes 50 seconds, an arc length of 126.91 feet to a point for corner being the most northerly corner of a variable width drainage easement;

THENCE South 25 degrees 53 minutes 02 seconds East, departing said proposed south right-of-way line and along the east side of said drainage easement, a distance of 61.58 feet to a point for corner on said existing north right-of-way line;

THENCE South 88 degrees 57 minutes 39 seconds West, along said existing north right-of-way line, a distance of 139.78 feet to the POINT OF BEGINNING AND CONTAINING 3,789 square feet or 0.0870 acres of land, more or less.

A Plat accompanies this legal description.

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 DE-2
May 06, 2008
Page 2 of 2

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

_____              _____
DOUGLAS A. CALHOUN                                        DATE
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 DE-3
May 06, 2008
Page 1 of 2

## LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No, 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

BEGINNING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 4008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and also being on the south line of that called 66.0667 acre tract land described in Substitute Trustee's Deed to Mary B. Christensen as recorded in Volume 88119, Page 0715 D.R.D.C.T., from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East a distance of 0.39 feet;

THENCE North 89 degrees 17 minutes 27 seconds East, along the common line between the north line of said called 42.803 acre tract and the south line of said called 66.0667 acre tract, a distance of 1,167.27 feet to a point for corner on the existing west right-of-way line of Hunter Ferrell Road (variable width right-of-way);

THENCE South 00 degrees 16 minutes 12 seconds East, departing said common line and along said existing west right-of-way line, a distance of 178.25 feet to a 1/2-inch set iron rod with yellow plastic cap stamped "HALFF ASSOC. INC." at the intersection of said existing west right-of-way line and the proposed north right-of-way line of Hunter Ferrell Road (variable width right-of-way, 250 feet wide at this point) and also being on a circular curve to the left, not being tangent to the preceding course, having a radius of 1,525.00 feet, whose chord bears South 35 degrees 35 minutes 33 seconds West, a distance of 237.93 feet;

THENCE Southwesterly, departing said existing west right-of-way line, along said proposed north right-of-way line and along said circular curve to the left through a central angle of 08 degrees 56 minutes 54 seconds, an arc length of 238.17 feet to a point for corner;

THENCE South 31 degrees 07 minutes 06 seconds West, continuing along said proposed north right-of-way line, a distance of 42.79 feet to a point for the southeast corner of a variable width drainage easement;

THENCE North 59 degrees 28 minutes 47 seconds West, departing said proposed north right-of-way line and along the south line of said drainage easement, a distance of 113.94 feet to a point for corner;

THENCE North 65 degrees 40 minutes 46 seconds West, continuing along the south line of said drainage easement, a distance of 329.02 feet to a point for corner;

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 DE-3
May 06, 2008
Page 2 of 2

THENCE North 75 degrees 41 minutes 12 seconds West, continuing along the south line of said drainage easement, a distance of 324.52 feet to a point for corner;

THENCE North 72 degrees 34 minutes 25 seconds West, continuing along the south line of said drainage easement, a distance of 308.85 feet to a point for corner;

THENCE North 00 degrees 41 minutes 26 seconds West, a distance of 27.82 feet to the POINT OF BEGINNING AND CONTAINING 240,552 square feet or 5.5223 acres of land, more or less.

A Plat accompanies this legal description.

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

DOUGLAS A. CALHOUN
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

DATE: 5/06/08

STATE OF TEXAS
REGISTERED
DOUGLAS A. CALHOUN
5619
PROFESSIONAL
LAND SURVEYOR

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-1
May 06, 2008
Page 1 of 3

LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 4008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,591.81 feet to a point for corner on the existing north right-of-way line of Hunter Ferrell Road (variable width right-of-way);

THENCE North 88 degrees 57 minutes 39 seconds East, departing said common line and along said existing north right-of-way line, a distance of 188.44 feet to a point of a circular curve to the left having a radius of 1,460.00 feet, whose chord bears North 62 degrees 49 minutes 47 seconds East, a distance of 126.87 feet, said point being on the proposed south right-of-way line of Hunter Ferrell Road (variable width right-of-way, 120 feet wide at this point);

THENCE Northeasterly, departing said existing north right-of-way line and along said proposed south right-of-way line and along said circular curve to the left through a central angle of 04 degrees 58 minutes 50 seconds for an arc length of 126.91 feet for the POINT OF BEGINNING, being a corner on a variable width slope easement and also being a continuation of the preceding circular curve to the left, having a radius of 1,460.00 feet, whose chord bears North 50 degrees 31 minutes 17 seconds East, a distance of 497.92 feet;

THENCE Northeasterly, continuing along said proposed south right-of-way line and along the arc of said circular curve to the left through a central angle of 19 degrees 38 minutes 10 seconds, an arc length of 500.36 feet to a point for corner;

THENCE North 86 degrees 28 minutes 08 seconds East, continuing along said proposed south right-of-way line, a distance of 34.57 feet to a point for the point of curvature of a circular curve to the right, not being tangent to the preceding course, having a radius of 948.50 feet, whose chord bears South 33 degrees 17 minutes 49 seconds East, a distance of 433.90 feet;

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-1
May 06, 2008
Page 2 of 3

THENCE Southeasterly, continuing along said proposed south right-of-way line and along the arc of said circular curve to the right through a central angle of 26 degrees 26 minutes 40 seconds, an arc length of 437.77 feet to a 1/2-inch set iron rod with yellow cap stamped "HALFF ASSOC. INC." for corner at the intersection of said proposed south right-of-way line and said existing north right-of-way line;

THENCE South 88 degrees 57 minutes 39 seconds West, departing said proposed south right-of-way line and along said existing north right-of-way line, a distance of 28.44 feet to a point for corner on the south line of a variable width slope easement, said point also being on a circular curve to the left, not being tangent to the preceding course, and having a radius of 947.26 feet and whose chord bears North 26 degrees 56 minutes 04 seconds West, a distance of 139.37 feet;

THENCE Northwesterly, departing said existing north right-of-way line, along the south line of said slope easement and along said circular curve to the left through a central angle of 08 degrees 26 minutes 15 seconds for an arc length of 139.50 feet to a point on a circular curve to the left having a radius of 730.23 feet, whose chord bears North 38 degrees 18 minutes 29 seconds West, a distance of 213.81 feet;

THENCE Northwesterly, continuing along the south line of said slope easement and along the arc of said circular curve to the left through a central angle of 16 degrees 50 minutes 12 seconds, an arc length of 214.58 feet to a point for corner;

THENCE North 48 degrees 46 minutes 46 seconds West, continuing along the south line of said slope easement, a distance of 40.11 feet to a point on a circular curve to the right, not being tangent to the preceding course, and having a radius of 1,582.37 feet, whose chord bears South 49 degrees 15 minutes 57 seconds West, a distance of 498.61 feet;

THENCE Southwesterly, continuing along the south line of said slope easement and along the arc of said circular curve to the right through a central angle of 18 degrees 07 minutes 46 seconds, an arc length of 500.69 feet to a point for corner;

THENCE North 25 degrees 53 minutes 02 seconds West, continuing along said slope easement, a distance of 57.12 feet to the POINT OF BEGINNING AND CONTAINING 39,091 square feet or 0.8974 acres of land, more or less.

## EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-1
May 06, 2008
Page 3 of 3

A Plat accompanies this legal description.

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

DOUGLAS A. CALHOUN                                    DATE: 5/06/08
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-2
May 06, 2008
Page 1 of 2

LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 19664008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,534.06 feet to a point on the proposed north right-of-way line of Hunter Ferrell Road (variable width right-of-way, proposed 120 foot wide at this point) and also being on a circular curve to the left having a radius of 1,340.00 feet, whose chord bears North 66 degrees 33 minutes 30 seconds East, a distance of 240.65 feet;

THENCE Northeasterly, along said proposed north right-of-way line and along said circular curve to the left through a central angle of 10 degrees 18 minutes 13 seconds, an arc length of 240.98 feet to the POINT OF BEGINNING being also the southeast corner of a slope easement;

THENCE North 28 degrees 35 minutes 38 seconds West, departing said proposed north right-of-way line and along said slope easement, a distance of 49.87 feet to a point for the southwest corner of said slope easement, being on a circular curve to the left, not being tangent to the preceding course, and having a radius of 1,300.00 feet, whose chord bears North 45 degrees 21 minutes 22 seconds East, a distance of 705.11 feet;

THENCE Northeasterly, continuing along said slope easement and along the arc of said circular curve to the left through a central angle of 31 degrees 28 minutes 15 seconds, an arc length of 714.05 feet to a point for corner;

THENCE North 29 degrees 37 minutes 15 seconds East, continuing along said slope easement, a distance of 476.27 feet to a point for the northwest corner of said slope easement, said point also being on said proposed north right-of-way line;

THENCE South 60 degrees 22 minutes 45 seconds East, along said proposed north right-of-way line, a distance of 65.03 feet to a point for the northeast corner of said slope easement;

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-2
May 06, 2008
Page 2 of 2

THENCE South 31 degrees 07 minutes 06 seconds West, continuing along said proposed north right-of-way line, a distance of 510.57 feet for the point of curvature of a circular curve to the right having a radius of 1,340.00 feet, whose chord bears South 46 degrees 15 minutes 45 seconds West, a distance of 700.14 feet;

THENCE Southwesterly, continuing along said proposed north right-of-way line and along the arc of said circular curve to the right through a central angle of 30 degrees 17 minutes 18 seconds for an arc length of 708.36 feet to the POINT OF BEGINNING AND CONTAINING 65,366 square feet or 1.5006 acres of land, more or less.

A Plat accompanies this legal description.

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

DOUGLAS A. CALHOUN
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

DATE: 5/06/08

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-3
May 06, 2008
Page 1 of 3

LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 4008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,591.81 feet to a point for the common southwest corner of said called 42.803 acre tract and the southeast corner of said called 37.0313 acre tract, said point also being on the existing north right-of-way line of Hunter Ferrell Road (variable width right-of-way);

THENCE North 88 degrees 57 minutes 39 seconds East, departing said common line and along said existing north right-of-way line, a distance of 1,025.92 feet to a 1/2-inch set iron rod with yellow plastic cap stamped "HALFF ASSOC. INC" (hereinafter referred to as "with cap") for the POINT OF BEGINNING, being at the intersection of said existing north right-of-way line and the proposed south right-of-way line of Hunter Ferrell Road (variable width right-of-way), also being on a circular curve to the left, not being tangent to the preceding course, and having a radius of 1,012.50 feet, whose chord bears North 32 degrees 41 minutes 28 seconds West, a distance of 485.14 feet;

THENCE Northwesterly, departing said existing north right-of-way line, along said proposed south right-of-way line and along the circular curve to the left through a central angle of 27 degrees 43 minutes 22 seconds, an arc length of 489.90 feet to a point for corner;

THENCE North 05 degrees 15 minutes 47 seconds West, continuing along said proposed south right-of-way line, a distance of 37.16 feet to a point for the point of curvature of a circular curve to the left, not being tangent to the preceding course, and having a radius of 1,465.00 feet, whose chord bears North 33 degrees 40 minutes 53 seconds East, a distance of 131.02 feet;

THENCE Northeasterly, continuing along said proposed south right-of-way line and along said circular curve to the left through a central angle of 05 degrees 07 minutes 34 seconds, an arc length of 131.07 feet to a point for corner;

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-3
May 06, 2008
Page 2 of 3

THENCE North 31 degrees 07 minutes 06 seconds East, continuing along said proposed south right-of-way line, a distance of 513.84 feet to a point for corner;

THENCE South 60 degrees 22 minutes 45 seconds East, continuing along said proposed south right-of-way line, a distance of 60.28 feet to a 1/2-inch set iron rod with cap for corner at the intersection of said proposed south right-of-way line and the existing west right-of-way line of said Hunter Ferrell Road;

THENCE South 00 degrees 16 minutes 12 seconds East, along said existing west right-of-way line, a distance of 22.55 feet to a point for corner at the intersection of said existing west right-of-way line and the south line of a slope easement;

THENCE South 33 degrees 26 minutes 10 seconds West, departing said existing west right-of-way line and along a slope easement, a distance of 578.87 feet to a point for corner;

THENCE South 24 degrees 03 minutes 38 seconds West, along said slope easement, a distance of 43.71 feet to a point on a circular curve to the right, not being tangent to the preceding course and having a radius of 2,600.18 feet, whose chord bears South 34 degrees 46 minutes 20 seconds East, a distance of 236.04 feet;

THENCE Southeasterly, continuing along said slope easement and along the arc of said circular curve to the right through a central angle of 05 degrees 12 minutes 11 seconds, an arc length of 236.12 feet to the beginning of a circular curve to the right and having a radius of 930.85 feet, whose chord bears South 23 degrees 29 minutes 25 seconds East, a distance of 244.94 feet;

THENCE Southeasterly, continuing along said slope easement and along said circular curve to the right through a central angle of 15 degrees 07 minutes 13 seconds, an arc length of 245.65 feet to a point for corner at the intersection of said slope easement and said existing north right-of-way line;

THENCE South 88 degrees 57 minutes 39 seconds West, departing said slope easement and along said existing north right-of-way line, a distance of 20.76 feet to the POINT OF BEGINNING AND CONTAINING 53,589 square feet or 1.2302 acres of land, more or less.

A Plat accompanies this legal description.

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-3
May 06, 2008
Page 3 of 3

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

DOUGLAS A. CALHOUN
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 TCE
May 06, 2008
Page 1 of 2

### LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 4008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East, a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,534.06 feet to a point on the proposed north right-of-way line of Hunter Ferrell Road (variable width right-of-way, proposed 120 foot wide at this point) and also being on a circular curve to the left having a radius of 1,340.00 feet, whose chord bears North 66 degrees 33 minutes 30 seconds East, a distance of 240.65 feet;

THENCE Northeasterly, along said proposed north right-of-way line and along said circular curve to the left through a central angle of 10 degrees 18 minutes 13 seconds, an arc length of 240.98 feet to a point for corner being also the southeast corner of a slope easement;

THENCE North 28 degrees 35 minutes 38 seconds West, departing said proposed north right-of-way line and along said slope easement, a distance of 49.87 feet to a point for the southwest corner of said slope easement, being on a circular curve to the left, not being tangent to the preceding course, having a radius of 1,300.00 feet, whose chord bears North 50 degrees 25 minutes 40 seconds East, a distance of 481.12 feet;

THENCE Northeasterly, continuing along said slope easement and along the arc of said circular curve to the left through a central angle of 21 degrees 19 minutes 40 seconds, an arc length of 483.91 feet to THE POINT OF BEGINNING, being the southwest corner of a temporary construction easement;

THENCE North 51 degrees 15 minutes 31 seconds West, departing said slope easement and along said temporary construction easement, a distance of 142.95 feet to a point for corner;

THENCE North 38 degrees 44 minutes 29 seconds East, continuing along said temporary construction easement, a distance of 52.00 feet to a point for corner;

## EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 TCE
May 06, 2008
Page 2 of 2

THENCE South 51 degrees 15 minutes 31 seconds East, a distance of 142.83 feet to a point on a circular curve to the right having a radius of 1,300.00 feet, whose chord bears South 38 degrees 37 minutes 04 seconds West, a distance of 52.00 feet;

THENCE Southwesterly, along said circular curve to the right through a central angle of 02 degrees 17 minutes 31 seconds, an arc length of 52.00 feet to the POINT OF BEGINNING, AND CONTAINING 7,439 square feet or 0.1708 acres of land, more or less.

A Plat accompanies this legal description.

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

DOUGLAS A. CALHOUN
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

5/06/08
DATE:





**LEGEND**

EXISTING FENCE
SLOPE EASEMENT
SURVEY LINE
PROPERTY LINE OF SUBJECT PARCEL
PROPOSED EASEMENT LINE
PROPERTY LINE OF OTHER PARCELS
EXISTING EASEMENT LINE
PROPOSED BACK OF CURB

EXISTING EDGE OF ASPHALT
F IR    FOUND IRON ROD
1/2" SIR  1/2" SET IRON ROD W/YELLOW
W/CAP  PLASTIC CAP STAMPED
"HALFF ASSOC. INC."
PFC   POINT FOR CORNER
P  POWER POLE
TRAFFIC SIGN

SCALE IN FEET

# HALFF

4000 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS 76137
TEL (817) 847-1422
FAX (817) 232-9784

COUNTY OF DALLAS PUBLIC WORKS DEPARTMENT

SLOPE & DRAINAGE EASEMENT PLAT

HUNTER FERRELL ROAD
FROM BELTLINE ROAD TO
MacARTHUR BLVD.



COUNTY OF DALLAS PUBLIC WORKS DEPARTMENT

SLOPE & DRAINAGE EASEMENT PLAT

HUNTER FERRELL ROAD
FROM BELTLINE ROAD TO
MacARTHUR BLVD.

**HALFF**

4000 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS 76137
TEL (817) 847-1422
FAX (817) 232-0784



## CURVE DATA TABLE

(1)
Δ=10°18'13"
R=1340.00'
T=120.81'
L=240.98'
CB=N66°33'30"E
CL=240.65'

(2)
Δ=31°28'15"
R=1300.00'
T=366.28'
L=714.05'
CB=N45°21'22"E
CL=705.11'

(3)
Δ=30°17'18"
R=1340.00'
T=362.67'
L=708.36'
CB=S 46°15'45"W
CL=700.14'

(4)
Δ=04°58'50"
R=1460.00'
T=63.50'
L=126.91'
CB=N62°49'47"E
CL=126.87'

(5)
Δ=19°38'10"
R=1460.00'
T=252.66'
L=500.36'
CB=N50°31'17"E
CL=497.92'

(6)
Δ=26°26'40"
R=948.50'
T=222.86'
L=437.77'
CB=S33°17'49"E
CL=433.90'

(7)
Δ=08°26'15"
R=947.26'
T=69.88'
L=139.50'
CB=N26°56'04"W
CL=139.37'

(8)
Δ=16°50'12"
R=730.23'
T=108.07'
L=214.58'
CB=N38°18'29"W
CL=213.81'

(9)
Δ=18°07'46"
R=1582.37'
T=252.46'
L=500.69'
CB=S49°15'57"W
CL=498.61'

(10)
Δ=27°43'22"
R=1012.50'
T=249.85'
L=489.90'
CB=N32°41'28"W
CL=485.14'

(11)
Δ=05°07'34"
R=1465.00'
T=65.58'
L=131.07'
CB=N33°40'53"E
CL=131.02'

(12)
Δ=05°12'11"
R=2600.18'
T=118.14'
L=236.12'
CB=S34°46'20"E
CL=236.04'

(13)
Δ=15°07'13"
R=930.85'
T=123.54'
L=245.65'
CB=S23°29'25"E
CL=244.94'

PARCEL 22 DE-2    3,789 SF ( 0.0870 AC.)
PARCEL 22 SE-1    39,091 SF ( 0.8974 AC.)
PARCEL 22 SE-2    65,366 SF ( 1.5005 AC.)
PARCEL 22 SE-3    55,589 SF ( 1.2302 AC.)

PROPERTY
INSET
N.T.S.

Basis of bearing is NAD 83 (1993)
Texas Coordinate System, Texas
North Central Zone (4202), based
upon Western Data Systems
Dallas/Fort Worth area RTK
Cooperative Network using base
stations DMLN, DTMA, and DUNP.

A metes and bounds description
accompanies this plat of survey

I, Douglas A. Calhoun, a Registered Professional
Land Surveyor, hereby certify that the legal
description hereon and this accompanying plat of
even date represent an actual survey made on the
ground under my supervision

Douglas A. Calhoun
Registered Professional Land Surveyor
Texas No. 5619

STATE OF TEXAS
REGISTERED
DOUGLAS A. CALHOUN
5619
PROFESSIONAL
LAND SURVEYOR

### HALFF

4000 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS 76137
TEL (817) 847-1422
FAX (817) 232-9784

COUNTY OF DALLAS PUBLIC WORKS DEPARTMENT

SLOPE & DRAINAGE EASEMENT PLAT

HUNTER FERRELL ROAD
FROM  BELTLINE ROAD  TO
MacARTHUR BLVD.

PARCEL #22 SE-4
22 SE-2,22 SE-3
& 22 DE-2

SHEET 4 OF 4

P.O.C.
22 SE-1, 22 SE-2,
22 SE-3 & 22 DE-2

N89°17'21"E   1161.21'

N

P.O.B.
22 SE-2

P.O.B.
22 SE-1

P.O.B.
22 SE-3

P.O.B.
22 DE-2

S44°23'37"E
71.12'



Exhibit "A"

HALFF

4000 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS 76137
TEL (817) 847-1422
FAX (817) 232-9784

COUNTY OF DALLAS PUBLIC WORKS DEPARTMENT

TEMPORARY CONSTRUCTION EASEMENT PLAT

HUNTER FERRELL ROAD
FROM BELTLINE ROAD TO
MacARTHUR BLVD.



Filed and Recorded
Official Public Records
John F. Warren, County Clerk
Dallas County, TEXAS
03/18/2010 09:57:09 AM
$.00

201000065955

After Recording Please Return To:
Dallas County Public Works
411 Elm Street, Suite 300

**Notice of Confidentiality Rights: If you are a natural person, you may remove or strike any or all of the following information from any Instrument that transfers an interest in real property before it is filed for record in the public records: Your social security number or your driver's license number.**

## EASEMENT

THE STATE OF TEXAS   §

COUNTY OF DALLAS   §

        KNOW ALL BY THESE PRESENTS:

      That, UP_G_KUK, Inc., a Texas corporation, hereinafter Grantor, whether one or more, of the County of Dallas, State of Texas, for and in consideration of the sum of One and No/100 Dollars ($1.00) and other good and valuable consideration to Grantor, in hand paid by the Grantee herein named, the receipt and sufficiency of which is hereby acknowledged and confessed, and for which no lien is retained either expressed or implied, does by these presents Grant, Sell and Convey unto the COUNTY OF DALLAS, a political subdivision of the State of Texas, hereinafter Grantee, its successors and assigns, an easement, in, under, over, along, upon and across the real property more particularly described in Exhibit "A" attached hereto, and incorporated herein by reference for all purposes.

      Grantee is acquiring this easement and right of way together with all rights and privileges hereby granted for the purpose of grading, sloping or filling along, upon and across said property for lateral and subsurface support.

      It is further expressly provided that access to and from the remainder of the tract of land of which the above described parcel of land is a part, to the public road facilities to be built, SHALL NOT BE DENIED: and that the owners of said tract of land and their heirs, executors, administrators, successors and assigns shall retain all rights and privileges pertaining to the use and enjoyment of the parcel of land herein described which DOES NOT IMPEDE OR PROHIBIT exercise of the hereinabove specified easement rights acquired in said parcel of land by the said Grantee.

      As a part of the grant hereby made it is agreed between the parties hereto that any stone, earth, gravel or caliche which may be excavated in the opening, construction or maintenance of said drainage easement may be removed from said premises by the Grantee.

      TO HAVE AND TO HOLD said easement, together with all and singular the rights, appurtenances and hereditaments thereto in anywise belonging unto the said Grantee, its successors and assigns, for so long as said property is used by Grantee, its successors or assigns, for the purpose of the easement herein granted.

      Grantor hereby binds Grantor and Grantor's heirs, executors, administrators, successors and assigns to Warrant and Defend all and singular the easement described herein and rights unto Grantee, successors and assigns, against every person whosoever lawfully claiming or to claim the same or any part thereof.

      Executed this _17th_ day of _February_, 2010.

                              UP_G_KUK, INC., a Texas corporation

                              Kuk Ja Stewart, Director

Project:     Hunter Ferrell Rd. MCIP 40805
              (Belt Line Rd. to MacArthur Blvd.)
Parcel:     22SE (1,2,3)

_Cdmydoc/proj/perm ease p 22_

## ACKNOWLEDGMENT

THE STATE OF TEXAS     §
COUNTY OF DALLAS     §

BEFORE ME, the undersigned authority, on this day personally appeared KUK JA STEWART, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of said UP_G_KUK, INC., a Texas corporation and that she executed the same as the act of such corporation for the purpose and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office, this 17th day of _Februāry_____, 2010.

(Personalized Seal)



Marcia Mitchell
Notary Public in and for the State of Texas
Printed Name: _MARCIA MiTCHEll_
My Commission Expires: _09-22-2012_

MARCIA MITCHELL
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 09-22-2012

*Acknow corp p 22*

**After Recording Please Return To:**
**Dallas County Public Works**
**411 Elm Street, 3rd Floor**
**Dallas, Texas 75202**

Many
legal
descriptions
from
5/6/08

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-1
May 06, 2008
Page 1 of 3

### LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 4008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,591.81 feet to a point for corner on the existing north right-of-way line of Hunter Ferrell Road (variable width right-of-way);

THENCE North 88 degrees 57 minutes 39 seconds East, departing said common line and along said existing north right-of-way line, a distance of 188.44 feet to a point of a circular curve to the left having a radius of 1,460.00 feet, whose chord bears North 62 degrees 49 minutes 47 seconds East, a distance of 126.87 feet, said point being on the proposed south right-of-way line of Hunter Ferrell Road (variable width right-of-way, 120 feet wide at this point);

THENCE Northeasterly, departing said existing north right-of-way line and along said proposed south right-of-way line and along said circular curve to the left through a central angle of 04 degrees 58 minutes 50 seconds for an arc length of 126.91 feet for the POINT OF BEGINNING, being a corner on a variable width slope easement and also being a continuation of the preceding circular curve to the left, having a radius of 1,460.00 feet, whose chord bears North 50 degrees 31 minutes 17 seconds East, a distance of 497.92 feet;

THENCE Northeasterly, continuing along said proposed south right-of-way line and along the arc of said circular curve to the left through a central angle of 19 degrees 38 minutes 10 seconds, an arc length of 500.36 feet to a point for corner;

THENCE North 86 degrees 28 minutes 08 seconds East, continuing along said proposed south right-of-way line, a distance of 34.57 feet to a point for the point of curvature of a circular curve to the right, not being tangent to the preceding course, having a radius of 948.50 feet, whose chord bears South 33 degrees 17 minutes 49 seconds East, a distance of 433.90 feet;

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-1
May 06, 2008
Page 2 of 3

THENCE Southeasterly, continuing along said proposed south right-of-way line and along the arc of said circular curve to the right through a central angle of 26 degrees 26 minutes 40 seconds, an arc length of 437.77 feet to a 1/2-inch set iron rod with yellow cap stamped "HALFF ASSOC. INC." for corner at the intersection of said proposed south right-of-way line and said existing north right-of-way line;

THENCE South 88 degrees 57 minutes 39 seconds West, departing said proposed south right-of-way line and along said existing north right-of-way line, a distance of 28.44 feet to a point for corner on the south line of a variable width slope easement, said point also being on a circular curve to the left, not being tangent to the preceding course, and having a radius of 947.26 feet and whose chord bears North 26 degrees 56 minutes 04 seconds West, a distance of 139.37 feet;

THENCE Northwesterly, departing said existing north right-of-way line, along the south line of said slope easement and along said circular curve to the left through a central angle of 08 degrees 26 minutes 15 seconds for an arc length of 139.50 feet to a point on a circular curve to the left having a radius of 730.23 feet, whose chord bears North 38 degrees 18 minutes 29 seconds West, a distance of 213.81 feet;

THENCE Northwesterly, continuing along the south line of said slope easement and along the arc of said circular curve to the left through a central angle of 16 degrees 50 minutes 12 seconds, an arc length of 214.58 feet to a point for corner;

THENCE North 48 degrees 46 minutes 46 seconds West, continuing along the south line of said slope easement, a distance of 40.11 feet to a point on a circular curve to the right, not being tangent to the preceding course, and having a radius of 1,582.37 feet, whose chord bears South 49 degrees15 minutes 57 seconds West, a distance of 498.61 feet;

THENCE Southwesterly, continuing along the south line of said slope easement and along the arc of said circular curve to the right through a central angle of 18 degrees 07 minutes 46 seconds, an arc length of 500.69 feet to a point for corner;

THENCE North 25 degrees 53 minutes 02 seconds West, continuing along said slope easement, a distance of 57.12 feet to the POINT OF BEGINNING AND CONTAINING 39,091 square feet or 0.8974 acres of land, more or less.

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-1
May 06, 2008
Page 3 of 3

A Plat accompanies this legal description.

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

DOUGLAS A. CALHOUN
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

DATE: 5/06/08

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-2
May 06, 2008
Page 1 of 2

## LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 19664008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,534.06 feet to a point on the proposed north right-of-way line of Hunter Ferrell Road (variable width right-of-way, proposed 120 foot wide at this point) and also being on a circular curve to the left having a radius of 1,340.00 feet, whose chord bears North 66 degrees 33 minutes 30 seconds East, a distance of 240.65 feet;

THENCE Northeasterly, along said proposed north right-of-way line and along said circular curve to the left through a central angle of 10 degrees 18 minutes 13 seconds, an arc length of 240.98 feet to the POINT OF BEGINNING being also the southeast corner of a slope easement;

THENCE North 28 degrees 35 minutes 38 seconds West, departing said proposed north right-of-way line and along said slope easement, a distance of 49.87 feet to a point for the southwest corner of said slope easement, being on a circular curve to the left, not being tangent to the preceding course, and having a radius of 1,300.00 feet, whose chord bears North 45 degrees 21 minutes 22 seconds East, a distance of 705.11 feet;

THENCE Northeasterly, continuing along said slope easement and along the arc of said circular curve to the left through a central angle of 31 degrees 28 minutes 15 seconds, an arc length of 714.05 feet to a point for corner;

THENCE North 29 degrees 37 minutes 15 seconds East, continuing along said slope easement, a distance of 476.27 feet to a point for the northwest corner of said slope easement, said point also being on said proposed north right-of-way line;

THENCE South 60 degrees 22 minutes 45 seconds East, along said proposed north right-of-way line, a distance of 65.03 feet to a point for the northeast corner of said slope easement;

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-2
May 06, 2008
Page 2 of 2

THENCE South 31 degrees 07 minutes 06 seconds West, continuing along said proposed north right-of-way line, a distance of 510.57 feet for the point of curvature of a circular curve to the right having a radius of 1,340.00 feet, whose chord bears South 46 degrees 15 minutes 45 seconds West, a distance of 700.14 feet;

THENCE Southwesterly, continuing along said proposed north right-of-way line and along the arc of said circular curve to the right through a central angle of 30 degrees 17 minutes 18 seconds for an arc length of 708.36 feet to the POINT OF BEGINNING AND CONTAINING 65,366 square feet or 1.5006 acres of land, more or less.

A Plat accompanies this legal description.

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

DOUGLAS A. CALHOUN
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

DATE: 5/06/08

STATE OF TEXAS
REGISTERED
DOUGLAS A. CALHOUN
5619
PROFESSIONAL SURVEYOR

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-3
May 06, 2008
Page 1 of 3

LEGAL DESCRIPTION

Being part of a tract of land situated in the Joseph Mangrum Survey, Abstract No. 861, City of Irving, Dallas County, Texas and being a part of that called 42.803 acre tract land described in Warranty Deed to UP_G_KUK, Inc., as recorded in County Clerk's Document No. 200503579476 of the Official Public Records of Dallas County, Texas (O.P.R.D.C.T.) and being more particularly described as follows:

COMMENCING at a point for the common northwest corner of said called 42.803 acre tract and northeast corner of that called 37.0313 acre tract of land described as Tract 4 in Warranty Deed to the Harrington Corporation, as recorded in Volume 90005, Page 4008 of the Deed Records of Dallas County, Texas (D.R.D.C.T.) and from which a 1/2-inch found iron rod bears South 00 degrees 41 minutes 26 seconds East a distance of 0.39 feet;

THENCE South 00 degrees 41 minutes 26 seconds East, along the common west line of said called 42.803 acre tract and east line of said called 37.0313 acre Harrington tract, a distance of 1,591.81 feet to a point for the common southwest corner of said called 42.803 acre tract and the southeast corner of said called 37.0313 acre tract, said point also being on the existing north right-of-way line of Hunter Ferrell Road (variable width right-of-way);

THENCE North 88 degrees 57 minutes 39 seconds East, departing said common line and along said existing north right-of-way line, a distance of 1,025.92 feet to a 1/2-inch set iron rod with yellow plastic cap stamped "HALFF ASSOC. INC" (hereinafter referred to as "with cap") for the POINT OF BEGINNING, being at the intersection of said existing north right-of-way line and the proposed south right-of-way line of Hunter Ferrell Road (variable width right-of-way), also being on a circular curve to the left, not being tangent to the preceding course, and having a radius of 1,012.50 feet, whose chord bears North 32 degrees 41 minutes 28 seconds West, a distance of 485.14 feet;

THENCE Northwesterly, departing said existing north right-of-way line, along said proposed south right-of-way line and along the circular curve to the left through a central angle of 27 degrees 43 minutes 22 seconds, an arc length of 489.90 feet to a point for corner;

THENCE North 05 degrees 15 minutes 47 seconds West, continuing along said proposed south right-of-way line, a distance of 37.16 feet to a point for the point of curvature of a circular curve to the left, not being tangent to the preceding course, and having a radius of 1,465.00 feet, whose chord bears North 33 degrees 40 minutes 53 seconds East, a distance of 131.02 feet;

THENCE Northeasterly, continuing along said proposed south right-of-way line and along said circular curve to the left through a central angle of 05 degrees 07 minutes 34 seconds, an arc length of 131.07 feet to a point for corner;

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-3
May 06, 2008
Page 2 of 3

THENCE North 31 degrees 07 minutes 06 seconds East, continuing along said proposed south right-of-way line, a distance of 513.84 feet to a point for corner;

THENCE South 60 degrees 22 minutes 45 seconds East, continuing along said proposed south right-of-way line, a distance of 60.28 feet to a 1/2-inch set iron rod with cap for corner at the intersection of said proposed south right-of-way line and the existing west right-of-way line of said Hunter Ferrell Road;

THENCE South 00 degrees 16 minutes 12 seconds East, along said existing west right-of-way line, a distance of 22.55 feet to a point for corner at the intersection of said existing west right-of-way line and the south line of a slope easement;

THENCE South 33 degrees 26 minutes 10 seconds West, departing said existing west right-of-way line and along a slope easement, a distance of 578.87 feet to a point for corner;

THENCE South 24 degrees 03 minutes 38 seconds West, along said slope easement, a distance of 43.71 feet to a point on a circular curve to the right, not being tangent to the preceding course and having a radius of 2,600.18 feet, whose chord bears South 34 degrees 46 minutes 20 seconds East, a distance of 236.04 feet;

THENCE Southeasterly, continuing along said slope easement and along the arc of said circular curve to the right through a central angle of 05 degrees 12 minutes 11 seconds, an arc length of 236.12 feet to the beginning of a circular curve to the right and having a radius of 930.85 feet, whose chord bears South 23 degrees 29 minutes 25 seconds East, a distance of 244.94 feet;

THENCE Southeasterly, continuing along said slope easement and along said circular curve to the right through a central angle of 15 degrees 07 minutes 13 seconds, an arc length of 245.65 feet to a point for corner at the intersection of said slope easement and said existing north right-of-way line;

THENCE South 88 degrees 57 minutes 39 seconds West, departing said slope easement and along said existing north right-of-way line, a distance of 20.76 feet to the POINT OF BEGINNING AND CONTAINING 53,589 square feet or 1.2302 acres of land, more or less.

A Plat accompanies this legal description.

EXHIBIT A

HUNTER FERRELL ROAD
Project: MCIP 40704/40805
Parcel 22 SE-3
May 06, 2008
Page 3 of 3

Basis of bearing is NAD 83 (1993) Texas Coordinate System, Texas North Central Zone (4202), based upon Western Data Systems Dallas/Fort Worth area RTK Cooperative Network using base stations DMLN, DTNA, and DUNP.

I, Douglas A. Calhoun, a Registered Professional Land Surveyor, hereby certify that the legal description hereon and the accompanying plat of even date represent an actual survey made on the ground under my supervision.

DOUGLAS A. CALHOUN
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS NO. 5619

DATE: 5/06/08



COUNTY OF DALLAS PUBLIC WORKS DEPARTMENT

SLOPE & DRAINAGE EASEMENT PLAT

HUNTER FERRELL ROAD
FROM BELTLINE ROAD TO
MacARTHUR BLVD.

**HALFF**

4000 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS 76137
TEL (817) 847-1422
FAX (817) 232-9784



**LEGEND**

EXISTING FENCE
SLOPE EASEMENT
SURVEY LINE
PROPERTY LINE OF SUBJECT PARCEL
PROPOSED EASEMENT LINE
PROPERTY LINE OF OTHER PARCELS
EXISTING EASEMENT LINE
PROPOSED BACK OF CURB

EXISTING EDGE OF ASPHALT
FIR    FOUND IRON ROD
1/2" SIR W/CAP   1/2" SET IRON ROD W/YELLOW PLASTIC CAP STAMPED 'HALFF ASSOC. INC.'
△PFC   POINT FOR CORNER
"pI    POWER POLE
▲ "    TRAFFIC SIGN

SCALE IN FEET
0   25   50   75   100

**HALFF**
4000 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS 76137
TEL (817) 847-1422
FAX (817) 232-9784

COUNTY OF DALLAS PUBLIC WORKS DEPARTMENT

SLOPE & DRAINAGE EASEMENT PLAT

HUNTER FERRELL ROAD
FROM BELTLINE ROAD TO
MacARTHUR BLVD.



PARCEL * 22 SE-L
22 SE-2,22-SE-3
& 22 DE-2

SHEET 3 OF 4

PFC
STA. 51+63.87
OFF. 112.56' LT

PROPOSED C.L.
Δ=57° 50' 45"
R=1400.00'
T=773.57'
L=1413.44'
CB=N60°02'29"E
CL=1354.17'

UP_G_KUK, INC.
CALLED 42.803 ACRES
CC 20050357947б
O.P.R.D.C.T.

PFC
STA. 56+39.98
OFF. 125.00' LT

PROPOSED
DRAINAGE
EASEMENT
22 DE-2 BY
SEPARATE
INSTRUMENT

N29°37'15"E    476.27'

JOSEPH MANGRUM SURVEY
ABSTRACT NO. 941

PARCEL
22 SE-2

WIDTH
VARIES

S60°22'45"E
65.03'

S31°07'06"W    510.57'

PFC
STA. 51+31.10
OFF. 60.00' LT

PROPOSED CONCRETE
PAVEMENT

PFC
STA. 56+41.68
OFF. 60.00' LT

PROPOSED VARIABLE WIDTH
RIGHT-OF-WAY

PROPOSED BRIDGE

N31°07'06"E    657.99'

PARCEL 22
BY SEPARATE
INSTRUMENT

HUNTER FERRELL ROAD

PROPOSED CONCRETE
PAVEMENT

PFC
STA. 56+44.95
OFF. 65.00' RT

N31°07'06"E    513.84'    PROPOSED HIKE & BIKE TRAIL

PFC
STA. 51+31.10
OFF. 65.00' RT

WIDTH
VARIES

PARCEL
22 SE-3

S60°22'45"E
60.28'

1/2" SIR W/CAP
STA. 56+46.52
OFF. 125.26' RT

S33°26'10"W    578.87'

LEGEND

S00°16'12"E
22.55'

SURVEY LINE

EXISTING ASPHALT
PAVEMENT

PFC
STA. 56+27.27
OFF. 137.00' RT

EXISTING HUNTER
FERRELL ROAD
(70' R.O.W.)

City of Grand Prairie
Vol. 99150, Pg. 878
D.R.D.C.T.

ls of bearing is NAD 83 (1993)
as Coordinate System, Texas
'th Central Zone (4202), based
n Western Data Systems
os/Fort Worth area RTK
operative Network using base
tions DMLN, DTNA, and DUNF.

ates and bounds description
companies this plat of survey

SHEET 4 OF 4 FOR WHOLE
PERTY COMPOSITE AND
/E DATA TABLE.

| | EXISTING FENCE | FIR | FOUND IRON ROD |
| | SLOPE EASEMENT | 1/2" SIR W/CAP | 1/2" SET IRON ROD W/YELLOW PLASTIC CAP STAMPED "HALFF ASSOC. INC." |
| | SURVEY LINE | | |
| | PROPERTY LINE OF SUBJECT PARCEL | PFC | POINT FOR CORNER |
| | PROPOSED EASEMENT LINE | ⚡ | POWER POLE |
| | PROPERTY LINE OF OTHER PARCELS | ⚐ | TRAFFIC SIGN |
| | EXISTING EASEMENT LINE | | SANITARY SEWER MANHOLE |
| | PROPOSED BACK OF CURB | | |
| | EXISTING EDGE OF ASPHALT | | |

SCALE IN FEET
0    25    50    75    100

NO.    REVISION    BY    DATE

COUNTY OF DALLAS PUBLIC WORKS DEPARTMENT

SLOPE & DRAINAGE EASEMENT PLAT

HUNTER FERRELL ROAD
FROM BELTLINE ROAD TO
MacARTHUR BLVD.

DRAWN RLS    CHECKED DJC    DATE INF 012008    PREV 4DTN/WKRS

HALFF

4000 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS 76137
TEL (817) 847-1422
FAX (817) 232-9784

## CURVE DATA TABLE

**(1)**
Δ=10°18'13"
R=1340.00'
T=120.81'
L=240.98'
CB=N66°33'30"E
CL=240.65'

**(2)**
Δ=31°28'15"
R=1300.00'
T=366.28'
L=714.05'
CB=N45°21'22"E
CL=705.11'

**(3)**
Δ=30°17'18"
R=1340.00'
T=362.67'
L=708.36'
CB=S 46°15'45"W
CL=700.14'

**(4)**
Δ=04°58'50"
R=1460.00'
T=63.50'
L=126.91'
CB=N62°49'47"E
CL=126.87'

**(5)**
Δ=19°38'10"
R=1460.00'
T=252.66'
L=500.36'
CB=N50°31'17"E
CL=497.92'

**(6)**
Δ=26° 26' 40'
R=948.50
T=222.86'
L=437.77'
CB=S33°17'49"E
CL=433.90

**(7)**
Δ=08°26'15"
R=947.26'
T=69.88'
L=139.50'
CB=N26°56'04"W
CL=139.37'

**(8)**
Δ=16° 50' 12"
R=730.23'
T=108.07'
L=214.58'
CB=N38°18'29"W
CL=213.81'

**(9)**
Δ=18°07'46"
R=1582.37'
T=252.46'
L=500.69'
CB=S49°15'57"W
CL=498.61'

**(10)**
Δ=27°43'22"
R=1012.50'
T=249.85'
L=489.90'
CB=N32°41'28"W
CL=485.14'

**(11)**
Δ=05°07'34"
R=1465.00'
T=65.58'
L=131.07'
CB=N33°40'53"E
CL=131.02'

**(12)**
Δ=05°12'11"
R=2600.18'
T=118.14'
L=236.12'
CB=S34°46'20"E
CL=236.04'

**(13)**
Δ=15°07'13"
R=930.85'
T=123.54'
L=245.65'
CB=S23°29'25"E
CL=244.94'

PARCEL 22 DE-2    3,789 SF    ( 0.0870 AC. )
PARCEL 22 SE-1    39,091 SF    ( 0.8974 AC. )
PARCEL 22 SE-2    65,366 SF    ( 1.5006 AC. )
PARCEL 22 SE-3    55,589 SF    ( 1.2302 AC. )

P.O.C.
22 SE-1, 22 SE-2,
22 SE-3 & 22 DE-2

PARCEL # 22, SE-1,
22 SE-2, 22-SE-3
& 22 DE-2

SHEET 1 OF 1

N89°17'2"E  1161.27"

N



PROPERTY
INSET
N.T.S.

P.O.B.
22 SE-2

P.O.B.
22 SE-1

P.O.B.
22 SE-3

P.O.B.
22 DE-2

S44°23'31"W
71.12'

Basis of bearing is NAD 83 (1993)
Texas Coordinate System, Texas
North Central Zone (4202), based
upon Western Data Systems
Dallas/Fort Worth area RTK
Cooperative Network using base
stations DMLN, DTNA, and DUNP.

A metes and bounds description
accompanies this plat of survey

Miss A Calhoun, a Registered Professional
Surveyor, hereby certify that this legal
option hereon and the accompanying plat of
state represent an actual survey made on the
1 under my supervision

STATE OF TEXAS
REGISTERED
DOUGLAS A. CALHOUN
5615
PROFESSIONAL
LAND SURVEYOR

A. Calhoun
ored Professional Land Surveyor
No.5615



4000 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS 76137
TEL (817) 847-1422
FAX (817) 232-9784

COUNTY OF DALLAS PUBLIC WORKS DEPARTMENT

SLOPE & DRAINAGE EASEMENT PLAT

HUNTER FERRELL ROAD
FROM BELTLINE ROAD TO
MacARTHUR BLVD.

Filed and Recorded
Official Public Records
John F. Warren, County Clerk
Dallas County, TEXAS
03/18/2010 09:57:12 AM
$.00



201000065958

After Recording Please Return To:
Dallas County Public Works
411 Elm Street, Suite 300
Dallas, Texas 75202



Home | Find Property | Contact Us

## Commercial Account ██████

Location   Owner   Legal Desc   Value   Improvements   Land   Exemptions   Estimated Taxes   Building Footprint   History

### Location (Current 2014)
**Address:** 1800 HUNTER FERRELL RD
**Market Area:** 0
**Mapsco:** 41A-Q (DALLAS)

#### Customer Service Survey
Enter PIN: [          ]   Submit

#### DCAD Property Map

View Photo

2013 Appraisal Notice

Electronic Documents (ENS)

Print Homestead Exemption Form

YAHOO! Maps

### Owner (Current 2014)
UPG KUK INC
2028 SANDY LN
IRVING, TEXAS 750605639

#### Multi-Owner (Current 2014)

| Owner Name | Ownership % |
|---|---|
| UPG KUK INC | 100% |

### Legal Desc (Current 2014)
**1:** JOSEPH MANGRUM ABST 861 PG 140
**2:** TR 2.2 ACS 0.0469 CALC
**3:**
**4:** TNT200503579476 DD08312006 CO-DC
**5:** 0861140100202 1CI08611401
    **Deed Transfer Date:** 3/1/2010

### Value

| 2013 Certified Values | |
|---|---|
| Improvement: | $0 |
| Land: | + $280 |
| Market Value: | = $280 |
| **Revaluation Year:** | 2011 |
| **Previous Revaluation Year:** | 2010 |

### Improvements (Current 2014)

## Land (2013 Certified Values)

| # | State Code | Zoning | Frontage (ft) | Depth (ft) | Area | Pricing Method | Unit Price | Market Adjustment | Adjusted Price | Ag Land |
|---|------------|--------|---------------|------------|------|----------------|------------|-------------------|----------------|---------|
| 1 | COMMERCIAL - VACANT PLOTTED LOTS/TRACTS | AGRICULTURAL | 0 | 0 | 0.0470 ACRE | STANDARD | $10,000.00 | -40% | $282 | N |

\* All Exemption information reflects 2013 Certified Values. \*

## Exemptions (2013 Certified Values)
No Exemptions

## Estimated Taxes (2013 Certified Values)

| | City | School | County and School Equalization | College | Hospital | Special District |
|---|------|--------|-------------------------------|---------|----------|------------------|
| Taxing Jurisdiction | IRVING | GRAND PRAIRIE ISD | DALLAS COUNTY | DALLAS CO COMMUNITY COLLEGE | PARKLAND HOSPITAL | UNASSIGNED |
| Tax Rate per $100 | $0.5986 | $1.465 | $0.2531 | $0.1247 | $0.276 | N/A |
| Taxable Value | $280 | $280 | $280 | $280 | $280 | $0 |
| Estimated Taxes | $1.68 | $4.10 | $0.71 | $0.35 | $0.77 | N/A |
| Tax Ceiling | | | | | N/A | N/A |
| | | | | | Total Estimated Taxes: | $7.61 |

**DO NOT PAY TAXES BASED ON THESE ESTIMATED TAXES.** You will receive an **official tax bill** from the appropriate agency when they are prepared. Taxes are collected by the agency sending you the **official** tax bill. To see a listing of agencies that collect taxes for your property. Click Here

The estimated taxes are provided as a courtesy and should not be relied upon in making financial or other decisions. The Dallas Central Appraisal District (DCAD) does not control the tax rate nor the amount of the taxes, as that is the responsibility of each Taxing Jurisdiction. Questions about your taxes should be directed to the appropriate taxing jurisdiction. We cannot assist you in these matters. These tax estimates are calculated by using the most current certified taxable value multiplied by the most current tax rate. **It does not take into account other special or unique tax scenarios.** If you wish to calculate taxes yourself, you may use the TaxEstimator to assist you.

## Building Footprint (Current 2014)

Building Footprint Not Available

## PURCHASE AND SALE AGREEMENT

Name of Project: ___Hunter Ferrell Road___

City and State: _____Irving_____, **TEXAS**

RTC Project No.: _24 – GF106531_____

## TABLE OF CONTENTS

ARTICLE 1.   Agreement to Purchase and Sell ................................... 6

ARTICLE 2.   Purchase Price ................................................... 6

ARTICLE 3.   Earnest Money Deposit ........................................... 6

ARTICLE 4.   Auction Brochure ................................................ 7

ARTICLE 5.   Payment of Purchase Price ....................................... 7

ARTICLE 6.   Property Information Materials; Non-Liability .................... 8

ARTICLE 7.   Title ........................................................... 8

ARTICLE 8.   Representations and Warranties .................................. 9

ARTICLE 9.   Condition Precedent to Closing .................................. 10

ARTICLE 10.  Disclaimers; Condition of Property .............................. 10

ARTICLE 11.  Closing; Deliveries at Closing .................................. 11

ARTICLE 12.  Costs; Prorations ............................................... 12

ARTICLE 13.  Default ......................................................... 13

ARTICLE 14.  Time of the Essence ............................................. 14

ARTICLE 15.  Condemnation .................................................... 14

ARTICLE 16.  Risk of Loss - Casualty ........................................ 15

ARTICLE 17.  Brokers ......................................................... 15

ARTICLE 18.  Release of Claims ............................................... 16

ARTICLE 19.  Liability of Seller and Seller's Representatives ................ 16

ARTICLE 20.  Notices ......................................................... 16

ARTICLE 21.  Survival ........................................................ 16

ARTICLE 22.  Assignment of Agreement ......................................... 17

ARTICLE 23.  Access to Property .............................................. 17

ARTICLE 24.  Miscellaneous ................................................... 17

ARTICLE 25.  Interpretation .................................................. 18

ARTICLE 26.  Governing Law ................................................... 19

ARTICLE 27.  Provisions with Respect to the Escrow Agent ..................... 19

ARTICLE 28.  Specific Provisions Required by the Jurisdiction
             in Which the Property is Located ................................ 19

**Exhibits**

| Exhibit "A" | - | Description of the Real Property |
|---|---|---|
| Exhibit "B" | - | Terms of Seller Financing (if applicable) |
| Exhibit "B-1" | - | Forms of Seller Financing Documents (if applicable) |
| Exhibit "C" | - | Identification of Property Information Materials |
| Exhibit "D" | - | Title Commitment |
| Exhibit "E" | - | Form of Deed |
| Exhibit "F" | - | Form of Bill of Sale |
| Exhibit "G" | - | Form of Assignment and Assumption Agreement |
| Exhibit "H" | - | Form of Assignment of Tenant Leases and Assumption Agreement |
| Exhibit "I" | - | Form of Assignment of Service Contracts |
| Exhibit "J" | - | Form of Notice to Tenants |
| Exhibit "K" | - | Buyer's Closing Affidavit |
| Exhibit "L" | - | Disclosure Affidavit for Individual Buyers |
| Exhibit "M" | - | Certain Provisions with respect to Escrow Agent |

**Addenda**

Some or all of the following may be attached to the Agreement if applicable.

Texas Utility District and Standby Fees Disclosure
Gulf Coast Disclosure
Environmental Addendum

Buyer hereby acknowledges receipt of the foregoing notice(s), if applicable, and any applicable addenda attached hereto concerning the required statutory notices at or prior to execution of this Agreement for the purchase of the Property.

> THIS WRITTEN AGREEMENT TOGETHER WITH THE EXHIBITS ATTACHED HERETO REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

> THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, Buyer has signed and delivered this Agreement as its own free act and deed.

**BUYER:**

[If an individual
or individuals]

_____

Print Name:_____

_____

Print Name:_____

[If a Corporation]

_____,

a _____ corporation

Attest:                                By:_____

_____    Print Name:_____

Print Name: _____    Title:_____
                    Secretary

[If a Partnership or
Joint Venture]

_____,

a _____
      [Limited / General Partnership]   [Joint Venture]

By:_____

Print Name:_____

Title:_____

-20-

IN WITNESS WHEREOF, Escrow Agent has signed this Agreement for the limited purpose of evidencing its acceptance of the escrow and to acknowledge its responsibilities with regard to same as set forth in this Agreement, including **Exhibit "M"**.

**ESCROW AGENT:**

SAFECO LAND TITLE OF DALLAS Title Company

By: _____

Print Name: _____

Title: _____

Date of Escrow Agent's Signature: ___December 8_____, 1992

M3\124-09.Auc
October 22, 1992

-22-

Brochure No. __24__
NPI

### ENVIRONMENTAL ADDENDUM TO PURCHASE AGREEMENT

This Environmental Addendum to Purchase Agreement ("Environmental Addendum") is incorporated into and shall amend and supplement the Purchase Agreement (the "Agreement") of even date herewith, between RESOLUTION TRUST CORPORATION as __RECEIVER__ for __JASPER FEDERAL SAVINGS & /__ ("Seller") and ____K . k____ __S t ·  · · +__ ("Purchaser"). All warranties, indemnities and disclosures contained herein shall survive closing.
LOAN ASSOCIATION

1.      Purchaser specifically acknowledges that Seller has confirmed that Seller has not previously requested preliminary environmental reports or studies prepared in connection with the Property and that the Property may be subject to certain environmental concerns and that Purchaser acknowledges that Purchaser has been advised by Seller to conduct, at its own cost, risk and liability, its own environmental inspections, studies and non-destructive tests (the "Studies") concerning the Property.

2.      Purchaser hereby agrees to indemnify, protect, defend, save and hold harmless Seller and Seller's employees, officers, directors, representatives, and attorneys from and against, and agrees to reimburse Seller for, any and all claims, demands, lawsuits, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorney's fees and expenses, and court costs) of any kind or character, known or unknown, asserted against or incurred by Seller at any time and from time to time in any way relating to, connected with, or arising out of or under any Applicable Environmental Laws with respect to the Property, or arising out of any act, omission, event or circumstance involving the disposal, release or presence of any Hazardous Materials on, under or about the Property. The foregoing indemnity shall be effective with respect to any claims arising out of acts or events occurring both prior to an subsequent to the Closing Date.

3.      As used herein, the term "Applicable Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-9675 ("CERCLA"), the Resource Conservation and Recovery Act, as amended 42 U.S.C. §§ 6901-6991i ("RCRA"), the Clean Air Act, 42 U.S.C. §§ 7401-7642, the Clean Water Act, 33 U.S.C. §§ 1251-1387, the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2654, and all other laws, rules and regulations pertaining to public health or the environment. The term "Hazardous Materials" means any "hazardous waste", as defined in RCRA, any "hazardous substance," as defined in CERCLA, or any broader meaning established by any other Applicable Environmental Laws.

4.      In the event any of the provisions of this Environmental Addendum conflict with or contradict any of the terms in the Agreement, this Environmental Addendum shall control.

EXECUTED ON this __8TH__ day of __DECEMBER__, 1992.

PURCHASER:                              SELLER:

                                        RESOLUTION TRUST CORPORATION AS
                                        __RECEIVER__ FOR __JASPER FEDERAL SAVINGS & LOAN ASSOCIATION__

By:_____             By:_____
Name:_____             Name:_____
Title:_____             Title:__ATTORNEY-IN-FACT__

**Purchase and Sale Agreement**
**Basic Information Sheet**

The Articles and the Exhibits of this Agreement make reference to the following items, which must be completed or noted as "Not Applicable" prior to the signing of this Agreement:

   1.    "**Seller**" is the Resolution Trust Corporation, as Receiver for _____ JASPER FEDERAL SAVINGS AND LOAN ASSOCIATION .

   2.    "**Buyer**" is _____
_____, [check which is applicable]:

   - a corporation incorporated in the State of _____.

   - a general partnership in the State of _____.

   - a limited partnership in the State of _____.

   - a joint venture organized in the State of _____.

   - Trustee of the _____
          [name of trust] Trust under Trust Agreement dated _____
          _____, 19___.

   - an individual residing in the State of _____.

   - husband and wife residing in the State of _____.

   3.    The social security number or federal taxpayer identification number of Buyer is _____ (see Section 3.4 of this Agreement).

   4.    "**Purchase Price**" is _____ _____ and No/100 Dollars ($_____), and consists of the following:

          (a)    "**Initial Earnest Money**" in the amount of _____$5,000000_____ _____ and No/100 Dollars ($_____); and

          (b)    "**Additional Earnest Money**" in the amount of _____ _____ and No/100 Dollars ($_____), which is the difference between ten percent (10%) of the Purchase Price and the Initial Earnest Money; and

          (c)    "**Cash Balance of the Purchase Price**" in the amount of _____ _____ and No/100 Dollars ($_____), which is the entire Purchase Price less (if applicable) the following:

                 (i)   the Earnest Money Deposit, as hereafter defined, and

                 (ii)  the Amount of Seller Financing, or

                 (iii) a Cash Discount ("**Cash Discount**") if applicable.  A Cash Discount of ten percent (10%) of the Purchase Price applied at Closing (as hereinafter defined) as a credit against the Purchase Price, shall be given if (1) the Purchase Price is $100,000.00 or greater; (2) the Buyer elects to close this transaction for cash; and (3) the Closing occurs no later than thirty (30) days after the Effective Date (as hereinafter defined).  The Buyer shall be entitled to the Cash Discount only if Buyer notifies Seller at least seven (7) days prior to the Closing Date of Buyer's election to purchase the Property for cash.  If Buyer does not do so, then this contract shall be for the full Purchase Price and the Discount shall not apply.

          (d)    "**Seller Financing**" shall be offered for Properties with a Purchase Price of $100,000.00 or greater and is the financing provided by Seller pursuant to **Exhibit "B"** hereof.  "**Amount of Seller Financing**" (if applicable) is the amount of _____ _____ and No/100 Dollars ($_____),at _____percent per annum, amortized over _____ (____) years with a _____-year term, for which Buyer shall apply under Article 5 hereof.  The completion of this information is not a promise or assurance that Buyer will be approved for such Seller Financing.

   5.    "**Broker**" is Kennedy-Wilson, Inc.; and the Registered Broker, if applicable, is _____.

   6.    "**Escrow Agent**" is Safeco Land Title.

   7.    "**Effective Date**" is _____December 8_____, 1992, which is the date Seller signs this Agreement.

-4-

8.      "Closing Date," shall be, in the event Purchaser has elected to purchase the Property for cash in accordance with the terms of this Agreement, no later than thirty (30) days after the Effective Date or, in the event Purchaser has elected to purchase the Property with Seller Financing in accordance with the terms of this Agreement, no later than fifteen (15) days after Buyer's application for Seller Financing is approved and Buyer is notified in writing in accordance with Article 5, but in no event shall such date exceed ninety (90) days from the Effective Date hereof, subject to Section 24.4 of this Agreement.

9.      "Notices" shall be addressed as follows:

If to Seller, to:

Kennedy-Wilson, Inc.
9525 Katy Freeway, Suite 471
Houston, Texas 77024
Attention: Kelly Keenan

Phone No. (713) 467-0469
Telecopier No. (713) 467-0776

With a copy to:

Trevino & Leppert
3200 Wilcrest, Suite 440
Houston, Texas 77042
Attention: Mike Leppert

Phone No. (713) 780-3437
Telecopier No. (713) 780-9136

With a copy to:
Jane Pearson
Resolution Trust Corporation
3500 Maple Avenue, 15th Floor
Dallas, Texas 75219-3931

Phone No. 214/443-4703
Telecopier No. 214/443-4630

If to Buyer, to:

_____
_____
Attention: _____

Phone No. _____
Telecopier No. _____

With a copy to:

_____
_____
Attention: _____

Phone No. _____
Telecopier No. _____

If to Escrow Agent, to:
Safeco Land Title
8080 N. Central Expressway, Suite 120
Dallas, Texas 75206
Attention: Nancy Perdue or Diane Heintze

Phone No. (214) 987-0800
Telecopier No. (214) 987-4446

10.      "Title Company" is Safeco Land Title.

-5-

### PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("**Agreement**") is entered into by and between Seller and Buyer. The Basic Information Sheet attached to this Agreement is incorporated herein and made a part hereof by this reference, and this Agreement is invalid and unenforceable without a fully completed Basic Information Sheet attached hereto.

**ARTICLE 1    Agreement to Purchase and Sell.**

1.1    Property Sold. Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, under the terms and conditions set forth in this Agreement, all right, title and interest of Seller in and to the following:

(a)    The parcel(s) of real property described on **Exhibit "A"**, and any improvements situated on such parcel(s), if any, together with any and all easements, covenants and other rights appurtenant to such parcel(s) (collectively, "**Real Property**"); and

(b)    All furniture, furnishings, fixtures, equipment and other tangible personal property, if any, that is now or hereafter affixed to and/or located at the Real Property and used in connection with the management, operation, or repair of the Real Property (collectively, "**Personal Property**"); and

(c)    Intangible property (collectively, "**Intangible Property**") consisting of (i) all rights of Seller, if any, under any and all Leases and Contracts in effect on the Closing Date, (ii) any and all refundable tenant security deposits, prepaid rents and other deposits (and interest thereon, if required by law), if any in Seller's possession with respect to said Leases and Contracts (and Buyer acknowledges Seller may not have received all of the tenant security deposits, other deposits and prepaid rent otherwise attributable to the Leases), with the conveyance of such deposits and prepaid rent to Buyer to be made in the manner set forth in Section 12.4 of this Agreement, (iii) any and all transferable licenses, permits, authorizations, certificates of occupancy and other approvals in effect as of the Closing Date and necessary for the current use and operation of the Real Property or the Personal Property (collectively, "**Permits**"), and (iv) any and all transferable warranties, architectural or engineering plans and specifications and tests and studies, and development rights that exist as of the Closing Date and relate to the Real Property or the Personal Property (it being understood and agreed, however, that the "Intangible Property" does not include any trade names or franchises). As used herein, "**Leases**" means all leases, tenancies, licenses and other rights of occupancy or use of or for any portion of the Real Property or the Personal Property, and any amendments, renewals and extensions thereof, and "**Contracts**" means all contracts and agreements of any kind for the management, repair or operation of the Property (as hereafter defined) other than Leases.

1.2    Definition. The Real Property, Personal Property and the Intangible Property are hereafter collectively referred to as the "**Property**".

**ARTICLE 2    Purchase Price.**

The purchase price for the Property ("**Purchase Price**"), payable in U.S. dollars, in cash in the form of wire transfer or certified check in immediately good and available funds, is set forth on the Basic Information Sheet.

**ARTICLE 3    Earnest Money Deposit.**

3.1    Initial Earnest Money. Simultaneously with delivery by Buyer of an executed copy of this Agreement to Seller, Buyer shall tender the Initial Earnest Money in the amount shown on the Basic Information Sheet payable in the form of a certified or cashier's check made payable to or endorsed over to the order of Safeco Land Title, with a notation that the same is an earnest money payment under this Agreement. If Seller accepts this Agreement, Seller shall sign and deliver this Agreement and shall forward the Initial Earnest Money to the escrow agent designated by Seller on the Basic Information Sheet ("**Escrow Agent**"). Seller shall instruct the Escrow Agent to deposit the Initial Earnest Money in a separate, federally insured account ("**Escrow Account**"). In the event that the Initial Earnest Money is equal to or greater than the sum of Ten Thousand and No/100 Dollars ($10,000.00), the Escrow Account shall additionally be an interest-bearing account. This Agreement shall not be binding upon Seller until executed by Seller. Failure of Seller to notify Buyer on a timely basis that Seller accepts Buyer's offer shall not constitute a rejection by Seller of Buyer's offer.

3.2    Additional Earnest Money. If the Initial Earnest Money is less than ten percent (10%) of the Purchase Price, the Buyer shall be required to make an additional deposit ("**Additional Earnest Money**"), the amount of which, when taken together with the Initial Earnest Money, shall equal ten percent (10%) of the Purchase Price ("**Earnest Money Deposit**"). Buyer shall tender the Additional Earnest Money, at the time Buyer signs this Agreement, in the form of a personal or corporate check

made payable to Safeco Land Title, or a certified or cashier's check endorsed over to Safeco Land Title, with a notation that the same is an earnest money payment under this Agreement. The Escrow Agent shall deposit the Additional Earnest Money in the Escrow Account and shall hold the same pursuant to the same instructions given with respect to the Initial Earnest Money.

3.3    Interest on Account. No interest shall be earned on any payment required to be made hereunder unless (i) good funds are received into the Escrow Account, and (ii) the amount of Earnest Money paid hereunder is equal to or greater than the sum of Ten Thousand and No/100 Dollars ($10,000.00). No interest earned on the Initial Earnest Money shall be credited toward the amount of Additional Earnest Money due.

3.4    Escrow Terms. The Earnest Money Deposit (including all interest that is earned thereon) is to be held in escrow and disbursed in accordance with the terms of this Agreement. To allow the Escrow Account to be opened, Buyer is setting forth Buyer's federal tax employer identification number, or Social Security number, as the case may be, on the Basic Information Sheet.

ARTICLE 4    Auction Brochure.

Buyer acknowledges that Buyer has received a copy of the Auction Information and Terms ("Auction Terms") prepared by Kennedy-Wilson, Inc. for the auction to be held on December 8, 1992, at the Loew's Anatole Hotel in Dallas, Texas, setting forth the conditions governing the sale of the Property to Buyer and agrees to fully comply with all Auction Terms. In the event of any conflict between the Auction Terms and this Agreement, the terms of this Agreement shall control.

ARTICLE 5    Payment of Purchase Price.

5.1    Payment of Purchase Price. The Purchase Price shall be paid at Closing as follows:

(a)    At Closing, the Earnest Money Deposit shall be credited on the settlement statement towards the Cash Portion of the Purchase Price (as designated on the Basic Information Sheet); and

(b)    Buyer shall deliver to Escrow Agent the Cash Portion of the Purchase Price (less the amount of the Earnest Money Deposit) by certified check, cashier's check, or wire transfer of current funds received and credited to the Escrow Account; and

(c)    If Buyer is approved for Seller Financing, Buyer shall sign, acknowledge and deliver to Escrow Agent loan documents in favor of Seller in accordance with the provisions of Section 5.2 and Exhibit "B".

5.2    Terms of Seller Financing. Seller Financing shall be offered to Buyers of properties for which the Purchase Price is $100,000.00 or greater. If any portion of the Purchase Price is to be financed by Seller, then the amount of such financing is described as the Amount of Seller Financing on the Basic Information Sheet. The terms and conditions of the Seller Financing are set forth on Exhibit "B", and the loan documents to be used in connection therewith shall be in the forms set forth on Exhibit "B-1".

5.3    Financing Application. If Buyer is seeking Seller financing, this Agreement and Seller's obligations hereunder are expressly subject to and conditioned upon the recommendation for approval of Buyer for such financing by Seller's loan processing agent ("Loan Underwriter"). Unless this Agreement has been previously terminated in accordance with the terms hereof, Buyer shall make application for the Seller Financing with the Loan Underwriter within five (5) business days after the Effective Date. The costs of securing financing for the purchase of IMPROVED PROPERTIES shall include a non-refundable seller financing application fee (the "Application Fee") in the amount of the greater of $1,500.00 or one-tenth (1/10th) of one percent (1%) of the Loan Amount. The costs of securing financing for the purchase of UNIMPROVED PROPERTIES shall include an Application Fee in the amount of (a) the greater of $1,500.00 or one-tenth (1/10th) of one percent (1%) of the Loan Amount for transactions with a Purchase Price exceeding $500,000.00, or (b) the greater of $250.00 or one-tenth (1/10th) of one percent (1%) of the Loan Amount for transactions with a Purchase Price of $500,000.00 or less. The costs of securing financing shall also include Seller's attorney's fees and expenses in connection therewith. Buyer shall use its best efforts thereafter to deliver or cause to be delivered to the Loan Underwriter such information as the Loan Underwriter may reasonably request to evaluate the creditworthiness of Buyer.

5.4    Effect of Failure to Apply. If Buyer wishes to seek Seller Financing but fails to make its application to the Loan Underwriter within the time periods set forth in Section 5.3 above, Buyer shall forfeit its right to apply for Seller Financing and this Agreement shall become an enforceable contract for Buyer's purchase of the Property by payment of the entire Purchase Price in cash. Buyer irrevocably agrees that by any failure to apply for Seller Financing within such time period, Buyer consents to such a modification of this Agreement.

5.5    Effect if Buyer is Rejected for Seller Financing. The Loan Underwriter shall be responsible for notifying Buyer of the approval or disapproval of Buyer for Seller Financing. The Loan

Underwriter shall be entitled to use any form of notification which the Loan Underwriter in its sole discretion deems is appropriate under the circumstances, and shall not be bound, for purposes of this notification, to the notice provisions otherwise applicable to this Agreement. If Buyer is not approved for Seller Financing, Buyer shall have five (5) business days from the date of the Loan Underwriter's notification of such disapproval, to either (a) elect to purchase the Property for "all cash", or (b) terminate this Agreement by written notice to Seller in which case the Earnest Money with any interest thereon shall be paid to Buyer. If Buyer does not timely make such election, Buyer shall be deemed to have elected to purchase Property for "all cash". Buyer irrevocably agrees that by failing to make such election within such time period, Buyer consents to such a modification of this Agreement. In the event Buyer elects or is deemed to have elected to purchase the Property for "all cash," pursuant to this Section 5.5, Buyer shall close the transaction within ten (10) business days from the date Buyer so elects or is deemed to have so elected, and Buyer shall be entitled to the Cash Discount as set forth in the Basic Information Sheet attached hereto. If Seller determines, in its sole discretion, that Buyer's failure to qualify for Seller Financing is the result of a material misrepresentation or omission by Buyer in the completion of this Agreement or the Loan Application, Buyer shall forfeit the Earnest Money to Seller, unless Buyer has elected to purchase the Property for cash in accordance with the provisions of this Section 5.5.

**ARTICLE 6    Property Information Materials; Non-Liability.**

Buyer acknowledges that, prior to Buyer's execution of this Agreement, Seller has delivered to Buyer, and Buyer has reviewed, the materials and information concerning the Property identified on **Exhibit "C"** within Seller's possession (collectively, "**Property Information Materials**"). Buyer acknowledges and understands that the Property Information Materials may have been prepared by parties other than Seller and that Seller makes no representation or warranty whatsoever, express or implied, with respect to the content or accuracy of the Property Information Materials or with respect to any of the matters disclosed thereby. Buyer hereby acknowledges that Buyer has not relied upon such materials and information in electing to purchase the Property and Buyer specifically releases Seller from any and all claims, demands, causes of action, losses, damages, liabilities, judgments, costs and expenses (including, without limitation, attorneys' fees, whether suit is instituted or not) (collectively, "**Claims**") in connection with information that is contained in, or that should have been contained in, the Property Information Materials. Buyer acknowledges that Buyer has had an ample opportunity to investigate the Property and all aspects of its operation, and that Buyer is relying upon its own investigation in purchasing the Property. The acreage and/or square footage of the Property as may be stated in the Property Information Materials is approximate, and Buyer shall have no right to terminate this Agreement, obtain a reduction in the Purchase Price, or otherwise receive any concessions or change the terms of this Agreement, by reason of any inaccuracy in the acreage and/or square footage of the Property as may be stated in the Property Information Materials.

**ARTICLE 7    Title.**

7.1    State of Title. Buyer hereby acknowledges that Buyer has reviewed and approved a current Owner's Title Policy Commitment attached hereto as **Exhibit "D"** (the "Title Commitment"), setting forth the state of title to the Property, as represented by the Title Company together with the Title Company's description of all recorded exceptions or conditions to such title, including, without limitation all easements, restrictions, right-of-ways, covenants, reservations and all other encumbrances affecting the Property. Title to the Property is to be conveyed at Closing to Buyer free of liens, encumbrances, judgments, covenants, conditions, restrictions, easements, encroachments and rights-of-way, recorded and unrecorded which materially affect the use of the Property; subject, however, to the Permitted Encumbrances. "**Permitted Encumbrances**" shall mean those matters affecting title that are set forth on the Title Commitment, and includes those items on Schedule C of the Title Commitment which are not cleared or released, by Seller (at Seller's sole determination and option), prior to the Closing Date and shall additionally include any other matters of record or which would be revealed by a physical inspection or survey of the Property and which affect the Property.

7.2    Seller shall have the option, but not the obligation, at Seller's sole cost and expense, to cure or remove any other Permitted Encumbrances and any title defects which arise after the date of the title insurance commitment which are not included as Permitted Encumbrances on **Exhibit "D"** attached hereto (such items are "**Further Encumbrances**") either by direct action or payment or by providing title insurance coverage which insures against the Permitted Encumbrances or Further Encumbrances or insures around such Permitted Encumbrances or Further Encumbrances) or to pay the Buyer at Closing (by credit toward the Cash Portion of the Purchase Price) an amount of money which Seller estimates to be sufficient to fully discharge the Permitted Encumbrances or Further Encumbrances.

7.3    Seller may extend the Closing Date by up to ninety (90) days in order to remove or cure the Permitted Encumbrances or Further Encumbrances. If Seller elects not to cure or is unable to cure the Further Encumbrances, Seller shall so notify Buyer prior to the Closing Date (or any extension thereof), and Buyer's remedy shall be either (i) to terminate this Agreement by giving Seller written notice thereof, in which event the Earnest Money Deposit together with interest thereon shall be returned to Buyer, and neither party thereafter shall have any further rights, duties or obligations hereunder; or (ii) to elect to purchase the Property subject to the Permitted Encumbrances and the Further Encumbrances not so removed or cured, in which event any encumbrances not removed or

-8-

cured shall be deemed to be Permitted Encumbrances, and the Purchase Price shall not be reduced or offset by any amount.

**ARTICLE 8     Representations and Warranties.**

8.1     <u>Seller's Representations and Warranties.</u>  Seller represents and warrants to Buyer that, as of the Effective Date, each of the persons executing this Agreement on behalf of Seller is duly authorized to do so, Seller has full right and authority to enter into this Agreement and to consummate the transactions contemplated herein, and this Agreement constitutes the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms.

8.2     <u>Buyer's Representations and Warranties.</u>  Buyer represents and warrants to Seller that the following are true, accurate and complete as of the Effective Date:

(a)     If Buyer is a corporation or partnership, Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was organized, and is qualified to do business in the jurisdiction in which the Property is located or will be so qualified within thirty (30) days after the Effective Date. If Buyer is a Trustee, an individual, or husband and wife, Buyer resides at the address shown on the Basic Information Sheet.

(b)     Each of the persons executing this Agreement on behalf of Buyer is duly authorized to do so. Buyer has full right and authority to enter into this Agreement and to consummate the transactions contemplated herein. This Agreement constitutes the valid and legally binding obligation of Buyer and is enforceable against Buyer in accordance with its terms, subject to the application of laws relating to bankruptcy, moratorium, and other laws relating to creditors' rights generally, and subject to the discretion of a court of equity in granting the remedy of specific performance with respect to any provisions hereof.

(c)     There are no actions, suits, claims or other proceedings pending or, to the best of Buyer's knowledge, contemplated or threatened against Buyer that could affect Buyer's ability to perform its obligations under this Agreement.

(d)     If Buyer is not obtaining Seller Financing hereunder, Buyer has sufficient funds available to consummate the Closing of the transaction described in this Agreement.

(e)     If Buyer is obtaining Seller Financing hereunder, that (i) Buyer has sufficient funds available to tender at Closing the Cash Balance of the Purchase Price; (ii) Buyer, its principals and (if applicable) guarantors, have (and anticipate continuing to have) resources and cash flow available from all sources to cover the anticipated negative cash flow from the Property (including debt service) over the term of the Seller Financing loan; (iii) neither Buyer nor any entity related to Buyer (including without limitation any corporations which are parents or subsidiaries of Buyer, or which have common ownership or officers with Buyer, and any partnerships in which Buyer was/is a general partner and any beneficiary of a trust for which Buyer is acting as a trustee) has been the subject of an order for relief under the federal Bankruptcy Code within the past ten years; and (iv) neither Buyer nor any related entity (as described above) is subject to any outstanding federal or state income tax liens.

(f)     Neither Buyer nor any Affiliate of Buyer, nor any general partner or joint venturer in Buyer, nor any trustee or beneficiary of a trust for which Buyer is acting as a trustee is a Prohibited Buyer. "<u>Prohibited Buyer</u>" means any party to whom a transfer or assignment would not be permitted pursuant to the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990, and the rules and regulations now or hereafter promulgated thereunder. "<u>Affiliate</u>" means any person, firm or corporation that controls or is controlled by Buyer, or is controlled by the same persons or entities as Buyer. "<u>Control</u>" with respect to a corporation means the ownership of, and the right to exercise, more than fifty percent (50%) of the total combined voting power of all classes of stock of the controlled corporation issued, outstanding and entitled to vote for the election of directors, whether such ownership be direct or indirect through control of another corporation(s) or firm(s).

(g)     Except as set forth in the Buyer's Closing Affidavit attached hereto as <u>Exhibit "K"</u>, Buyer (and each of the persons executing this Contract on behalf of Buyer if Buyer is not an individual) hereby represents and warrants that neither Buyer nor any officer or director, general partner or principal of Buyer (nor any person in control of or under common control of Buyer if Buyer is not an individual), nor any beneficiary of a trust for which Buyer is acting as a trustee is now, or, during the two-year period ending on the date of Buyer's execution of this Agreement, has been an employee of, or is currently an adverse party in litigation with any of the following entities or their successors:  the Federal Home Loan District Bank; the Federal Home Loan Bank Board; the Federal Savings and Loan Insurance Corporation ("FSLIC"); a FSLIC Receivership, or any subsidiaries or affiliates thereof;  the Federal Asset Disposition Association ("FADA"); the Federal Deposit Insurance Corporation ("FDIC"); the Resolution Trust Corporation ("RTC"); any contractor assisting the FSLIC, FDIC, RTC or the receivership of any financial institution in the management to disposition of assets; any of the agencies created under the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"); or the Association for which Seller is acting as receiver.

(h)     Neither the execution and delivery of this Agreement nor the consummation of the transactions hereby contemplated will violate or be in conflict with (i) any applicable provisions of law, (ii) any order of any court or government agency having jurisdiction over the Buyer, or (iii) any agreement or instrument to which Buyer is a party or by which Buyer is bound.

8.3     Limitation on Subsequent Contracts.  Subsequent to the Effective Date, Seller shall not, without Buyer's prior consent, such consent not to be unreasonably withheld, enter into any Contracts other than (a) Contracts for work to be completed, or that are to terminate, at or before Closing, and (b) service Contracts that are terminable on not more than sixty (60) days' notice.

8.4     Survival.  All representations and warranties of Buyer and Seller made herein shall survive Closing and not be merged therein.

ARTICLE 9     Condition Precedent to Closing.

9.1     Conditions Precedent for Buyer.  The obligation of Buyer to purchase the Property from Seller under this Agreement is subject to the satisfaction, as of Closing, of each of the following conditions:

(a)     The representations and warranties made by Seller in this Agreement shall be true, accurate and complete in all material respects on and as of the Closing Date with the same force and effect as if such representations and warranties had been made on and as of such date.

(b)     Title to the Property shall conform with the requirements of Article 7.

9.2     Conditions Precedent for Seller.  The obligation of Seller to sell the Property to Buyer under this Agreement is subject to the satisfaction, as of Closing, of each of the following conditions:

(a)     The representations and warranties made by Buyer herein shall be true, accurate and complete in all material respects on and as of the Closing Date with the same force and effect as if such representations and warranties had been made on or as of such date.

(b)     Buyer shall have performed all of the covenants and obligations required by this Agreement to be performed by Buyer on or before Closing, including, without limitation, satisfaction of all requirements in connection with Seller financing, if applicable.

(c)     Neither Buyer nor its general partners, nor any beneficiary of a trust for which Buyer is acting as a trustee, if any, (i) shall be in receivership or dissolution, (ii) shall have made an assignment for the benefit of creditors or admitted in writing its or their inability to pay its or their debts as they mature, or (iii) shall have been adjudicated a bankrupt or filed a petition in voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with creditors under the federal Bankruptcy Code or any other similar law or statute of the United States or any jurisdiction and no such petition shall have been filed against Buyer or its general partners if any.

9.3     Certain Items Not Contingencies.  Obtaining licenses, permits and authorizations necessary to operate the Property, or transfers of Seller's licenses, is not a condition to Buyer's obligation to close.  Buyer shall be responsible for obtaining, at its own expense, any and all such licenses, permits and authorizations or an assignment of the same.  All costs of such licenses, permits and authorizations, or assignments of the same from Seller, shall be paid by Buyer.  Should Buyer not obtain any required consent for such transfers by the Closing, Seller shall cooperate with Buyer, including but not limited to, the execution of any documents reasonably required after the Closing to transfer such items, but Seller shall not be required to incur any additional costs or expenses.

ARTICLE 10     Disclaimers; Condition of Property.

10.1     CONDITION OF PROPERTY.  BUYER ACKNOWLEDGES AND AGREES THAT THE PROPERTY WILL BE CONVEYED "AS IS", "WHERE IS", AND WITH ALL FAULTS AND SELLER MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER WHETHER EXPRESSED OR IMPLIED WITH RESPECT TO THE PROPERTY, THE AVAILABILITY OF UTILITIES TO THE PROPERTY, ACCESS OF THE PROPERTY TO PUBLIC ROADS, OR THE CONDITION, ADEQUACY OR SUITABILITY OF THE PROPERTY FOR BUYER'S PURPOSES. BUYER AGREES THAT BUYER IS NOT RELYING ON ANY WARRANTY OR REPRESENTATION OF SELLER OR ANY AGENT, EMPLOYEE, OR REPRESENTATIVE OF SELLER, AND THAT BUYER IS BUYING THE PROPERTY "AS IS," "WHERE IS," SUBJECT TO ALL FAULTS AND WITHOUT ANY EXPRESSED OR IMPLIED WARRANTIES OF ANY KIND, INCLUDING BUT NOT LIMITED TO, MATERIALS, WORKMANSHIP, GOOD AND WORKMANLIKE CONSTRUCTION, DESIGN, CONDITION, HABITABILITY, TENANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY OR THE ENVIRONMENTAL CONDITION OF THE PROPERTY AND THE PRESENCE OF OR CONTAMINATION BY HAZARDOUS MATERIALS AND SELLER HEREBY DISCLAIMS ANY SUCH WARRANTY. BUYER HAS DETERMINED ON BUYER'S BEHALF (I) THE PHYSICAL CONDITION OF THE PROPERTY AND THAT THERE IS NO DEFECT OR CONDITION WHICH IS UNACCEPTABLE TO BUYER, (II) WHETHER ANY PORTION OF THE PROPERTY LIES IN ANY FLOOD PLAIN, FLOOD WAY OR SPECIAL FLOOD HAZARD AREA, (III) WHETHER ANY GEOLOGICAL FAULT OR UNSATISFACTORY SOIL, CONDITION EXISTS ON ANY PORTION OF THE PROPERTY, (IV) THAT THE PROPERTY

-10-

COMPLIES WITH ALL CITY OR COUNTY ZONING AND BUILDING REGULATIONS, AND (V) THAT ALL ENVIRONMENTAL CONDITIONS RELATING TO THE PROPERTY ARE ACCEPTABLE TO BUYER. BUYER ACKNOWLEDGES THAT SELLER ACQUIRED TITLE TO THE PROPERTY BY FORECLOSURE, DEED IN LIEU THEREOF OR OTHER REALIZATION OF ITS LIEN OR SECURITY INTEREST IN THE PROPERTY. BUYER FURTHER ACKNOWLEDGES THAT SELLER HAS NOT OCCUPIED THE PROPERTY; AND THEREFORE, THE PROPERTY MAY CONTAIN DEFECTS, OR MAY BE IN NEED OF REPAIR. IN THE EVENT ANY INFORMATION RECEIVED FROM ANY BROKER OR SALES AGENT OR CONTAINED IN ANY AUCTION INFORMATION (ORAL OR WRITTEN) CONFLICTS WITH EXHIBIT "A" OR THE TITLE COMMITMENT, THE LATTER SHALL CONTROL. BUYER EXPRESSLY WAIVES, TO THE FULLEST EXTENT OF THE LAW, ANY CLAIMS UNDER FEDERAL, STATE OR OTHER LAW THAT BUYER MIGHT OTHERWISE HAVE AGAINST SELLER RELATING TO THE CONDITION OF THE PROPERTY. IT IS THE SOLE RESPONSIBILITY OF BUYER TO INSPECT THE PROPERTY PRIOR TO THE SALE. BUYER ACKNOWLEDGES THAT BUYER HAS BEEN PROVIDED AN OPPORTUNITY TO FULLY INSPECT THE PROPERTY PRIOR TO SALE. NO REDUCTION IN THE SALES PRICE WILL BE GIVEN BY SELLER, AND BUYER MAY NOT TERMINATE THE PURCHASE AGREEMENT BASED UPON AN INSPECTION OF THE PROPERTY AFTER THE SALE REGARDLESS OF THE UNSUITABILITY OF THE PROPERTY AS TO BUYER'S INTENDED USE, PHYSICAL AND ENVIRONMENTAL CONDITION, VALUE, AND EXTENT OF NEEDED REPAIRS, IF ANY. SELLER SHALL NOT BE RESPONSIBLE FOR ANY DAMAGED, LOST, OR STOLEN ITEMS OF PERSONAL PROPERTY FROM, IN, OR ON THE PROPERTY PRIOR TO THE DATE OF CLOSING.

10.2   DISCLAIMER OF WARRANTIES. SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE PROPERTY, EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT. BUYER ACKNOWLEDGES THAT BUYER HAS HAD AN OPPORTUNITY TO EXAMINE THE FINANCIAL AND LEGAL DOCUMENTS, RECORDS, FILES AND INFORMATION RELATING TO THE PROPERTY NOW IN THE POSSESSION OF SELLER, ITS AGENTS OR CONTRACTORS AND IS PURCHASING THE PROPERTY BASED SOLELY ON ITS OWN INDEPENDENT INVESTIGATIONS AND FINDINGS AND NOT IN RELIANCE ON ANY INFORMATION PROVIDED BY SELLER.

10.3   BUYER INSPECTION.   ANY FACTUAL INFORMATION SUCH AS PROPERTY DIMENSIONS, FLOOR PLANS, SQUARE FOOTAGE, SKETCHES OR LEASE ABSTRACTS SHOWN TO BUYER OR SET FORTH HEREIN ARE OR MAY BE APPROXIMATE, AND BUYER REPRESENTS TO SELLER THAT BUYER HAS INSPECTED AND VERIFIED THE FACTS AND INFORMATION PRIOR TO EXECUTING THIS AGREEMENT. NO LIABILITY FOR ANY INACCURACIES, ERRORS OR OMISSIONS IS ASSUMED BY SELLER, THE BROKER OR OTHER AGENTS OR REPRESENTATIVES OF SELLER.

10.4   Assumption of Leases and Contracts. At Closing, Buyer shall assume the interests and obligations of Seller under all Leases and Contracts then in effect.

ARTICLE 11   Closing; Deliveries at Closing.

11.1   Time and Place of Closing. The closing of the transaction described in this Agreement ("Closing") shall take place on the date shown on the Basic Information Sheet, which is, in the event Purchaser has elected to purchase the Property for cash in accordance with the terms of this Agreement, thirty (30) days after the Effective Date or, in the event Purchaser has elected to purchase the Property with Seller Financing in accordance with the terms of this Agreement, fifteen (15) days after Buyer's application for Seller Financing is approved and Buyer is notified in writing, subject to Section 24.4 of this Agreement. If the Closing date falls on a weekend or federal holiday, the Closing date shall be the next succeeding business day. Except as permitted under Articles 7, 15 and 16, the Closing date shall not be later than ninety (90) days after the Effective Date of this Agreement. The Closing shall be at the time of day designated by Seller, such time to be during normal business hours on the Closing Date, and at such reasonable location as Seller designates. Nothing herein shall prevent the parties from closing by means of mail and/or express delivery of documents to the Title Company, if the parties so agree.

11.2   Seller's Deliveries at Closing. At Closing, Seller shall deliver to Title Company the following documents, duly and fully executed, acknowledged and notarized as appropriate:

(a)   A special warranty deed in substantially the form of Exhibit "E" ("Deed");

(b)   A bill of sale in substantially the form of Exhibit "F", conveying title to the Personal Property, if any ("Bill of Sale");

(c)   An Assignment and Assumption Agreement in substantially the form of Exhibit "G", in which Seller conveys and Buyer assumes the Intangible Property, if any ("Assignment and Assumption Agreement");

(d)   An Assignment of Tenant Leases and Assumption Agreement in substantially the form of Exhibit "H", in which Seller conveys and Buyer assumes the rights duties and obligations under any existing Leases if any ("Assignment of Leases");

-11-

(e)    An Assignment of Service Contracts in substantially the form of __Exhibit "I"__, in which Seller conveys and Buyer assumes the rights, duties, and obligations under any existing Contracts, if any (__"Assignment of Contracts"__);

(f)    An affidavit with respect to compliance with the Foreign Investment in Real Property Tax Act (Internal Revenue Code § 1445, as amended, and the regulations issued thereunder);

(g)    An affidavit with respect to the elimination of any standard or printed exceptions in a final policy of title insurance for unrecorded mechanics' liens; and

(h)    Written notice from Seller or Seller's representative to each tenant of the Property, if any, in the form of __Exhibit "J"__.

11.3    __Delivery of Possession__. If applicable, all keys to the Property then in Seller's possession; all Leases, Contracts, and Permits then in effect; and copies of all books and records in Seller's possession and necessary for the orderly transition of operation of the Property (except any books and records which Seller may be legally obligated to retain, in which event Seller shall allow Buyer to make photocopies of the same) shall be made available to Buyer at the Property on the Closing Date.

11.4    __Title Insurance Policy__. Seller shall at Closing make the necessary arrangements with the Title Company for the Title Company to provide Buyer after Closing with an Owner's Policy of Title Insurance, in the form stated in the Title Commitment, which policy shall insure Buyer's fee simple title to the Property in the amount of the Purchase Price, subject to the Permitted Encumbrances and such other exceptions as may be acceptable to Buyer.

11.5    __Buyer's Deliveries at Closing__. At Closing, Buyer shall deliver to Title Company the following documents, duly and fully executed, acknowledged and notarized as appropriate:

(a)    Written instructions to Escrow Agent to release the Earnest Money Deposit for disbursement to Seller, to be credited against the Cash Portion of the Purchase Price;

(b)    The balance of the Cash Portion of the Purchase Price and other funds sufficient to pay all Closing and other costs and adjustments to be paid by Buyer under this Agreement (to be delivered by cashier's or certified check, or by wire transfer to the escrow account of Title Company);

(c)    If applicable, all documents evidencing, governing or securing any financing provided by Seller (including such documents as may be required by the Title Company in connection with issuance of the mortgagee's policy of title insurance in favor of Seller as lender);

(d)    If Buyer is a corporation or partnership, a certificate of corporate resolution or a partnership resolution to evidence Buyer's capacity and authority to consummate Closing, and execute all documents prepared in connection therewith, and a certified copy of Buyer's articles of incorporation, bylaws and a certificate of good standing from the proper authority of the state of incorporation or, if applicable, a partnership agreement, including all amendments thereto. If Buyer is a trust, a written trust agreement disclosing all beneficiaries of the trust and evidencing the Trustee's authority to act on behalf of the trust. In addition, if Buyer receives Seller financing, Buyer shall supply an opinion letter in a form acceptable to Seller or Loan Underwriter opining as to proper entity status and authority and other items which in Loan Underwriter's opinion are relevant;

(e)    The Assignment and Assumption Agreement;

(f)    A certificate in the form of __Exhibit "K"__ that the representations and warranties made by Buyer in this Agreement (and the Loan Application, if Buyer is seeking Seller Financing) are true and accurate in all material respects on and as of the Closing Date. In addition, in the case of a trust, the beneficiary of the trust will also execute such certificate; and

(g)    If Buyer is an individual, the affidavit set forth on __Exhibit "L"__.

11.6    __Settlement Statement__. Seller and Buyer each agree to sign and deliver, at Closing, a settlement statement setting forth the charges, adjustments and credits to each party and to execute and deliver such other documents and take such other actions as either party or the Title Company or Escrow Agent might reasonably request to consummate the transactions herein contemplated.

11.7    __Instructions to Title Company__. At Closing, the Title Company shall record, among the appropriate public records, all documents to be recorded, and disburse all funds, and deliver all original documents and copies thereof, to the appropriate parties.

ARTICLE 12    __Costs; Prorations__.

12.1    __Payments by Seller__. At Closing, subject to the provisions of Section 7.2 hereof, Seller shall pay (a) the costs of releasing all liens, judgments and other encumbrances on the Property as of the Closing Date that are not Permitted Encumbrances and of recording such releases; (b) the costs

of the owner's policy of title insurance naming Buyer as the insured, but not including the costs for any special coverages, including, but not limited to, deletion or modification of the standard survey exception and the deletion of the exception as to rights of parties in possession; and (c) all other expenses to be paid by Seller, if any, under the terms of this Agreement. Seller also shall be responsible for the payment of Seller's own attorneys' fees, except that Buyer shall be responsible for the payment of all of Seller's attorneys' fees incurred in connection with the approval, documentation and closing of any financing provided by Seller under Section 5.2.

12.2    Payments by Buyer. At Closing, Buyer shall pay (i) the costs of securing financing for the purchase of the Property as described in Section 5.3; (ii) all the fees and costs due Escrow Agent for its services, including but not limited to, all escrow fees charged by the Escrow Agent (including but not limited to, the $200.00 escrow fee charged for processing this order); (iii) to the extent permitted by law in the jurisdiction where the Property is located, the amount or cost of all recordation costs; (iv) the costs of title examination and issuance of any and all mortgagee title policies of title insurance; (v) the costs of any special coverages in the owner's policy of title insurance, including, but not limited to, deletion of the standard survey exception; (vi) all other costs of Closing, except as provided in Section 12.1; and (vii) any and all other expenses to be paid by Buyer under the other terms of this Agreement. Buyer shall also be responsible for the payment of Buyer's own attorneys' fees.

12.3    Prorations. Current real estate taxes, assessments which the Seller is legally obligated to pay, rents, maintenance fees, utility charges, if any, and fees or charges under all Contracts, shall be prorated as of the Closing Date. If real estate taxes for the tax year(s) in which the Closing occurs are not available as of the Closing Date, then such taxes shall be prorated on the basis of the taxes assessed in the previous year, with no subsequent cash adjustment of that proration between Seller and Buyer. If the rent from any tenant of the Property includes percentage rent or conditional rent of any kind or if the tenant pays a pro rata or other fractional share of certain operating expenses of the Property, or if any other adjustments cannot be calculated on the Closing Date, then Seller and Buyer shall prorate such amounts as of the Closing Date in accordance with their best estimate of the amounts payable for the year in which the Closing occurs and there shall be no subsequent adjustment of the same. Buyer and Seller acknowledge and agree that Seller shall have no obligation to pay any taxes in connection with the Property other than ad valorem real estate taxes. In addition, in the event the Property has been assessed for property tax purposes at such rates as would result in "roll-back" taxes upon the change in land usage or ownership of the Property, Buyer hereby agrees to pay all such taxes and to indemnify and save Seller harmless from and against all such claims and liability for such taxes. Such indemnity shall survive the Closing and not be merged therein. Seller shall not be liable for any increase in property taxes resulting from the sale of the Property to Buyer.

12.4    Credits to Buyer. Buyer shall be credited with the amount of any prepaid rents paid by tenants of the Property and actually received by Seller for periods subsequent to the Closing Date and with the amount of any deposits actually received by Seller from or for tenants of the Property (including rental security, cleaning, utility, key, damage and other deposits) and any required interest on those deposits. In no event shall Buyer be entitled to, nor shall Seller have any liability or obligation with respect to, any such deposits, unless actually received by Seller from or for tenants of the Property. Buyer shall be obligated under the Leases after the Closing to make any refunds of deposits made thereunder, regardless of whether Buyer receives a credit for the same hereunder. All amounts received by Buyer after Closing for the account of any tenant, licensee, concessionaire, or other person or entity with respect to the Property shall be applied in the following order: (i) first toward any amount then due Buyer from such person or entity, (ii) with any balance then remaining toward any amount then due Seller from such person or entity with respect to the Property for the period prior to Closing, and (iii) with any balance then remaining toward Buyer. No proration shall be made at Closing for delinquent rents existing as of the Closing Date.

12.5    Utilities. As of Closing, if applicable, Buyer shall be responsible for the transfer of accounts and establishment of all utility services to the Property in the name of Buyer, including the making of any new utility deposits with the utility providers. All refunds of utility service deposits, if any, covering the period prior to the Closing Date shall be the property of Seller.

**ARTICLE 13    Default.**

13.1    Buyer's Default; Termination.

(a)    If Seller tenders to Escrow Agent the Deed and the other documents and other matters required of Seller at Closing but Buyer fails to close in accordance with the terms of this Agreement (including without limitation any failure to close by reason of Seller's discovery that any of Buyer's representations and warranties herein are inaccurate, or because the approval of Buyer for Seller Financing is withdrawn because of inaccuracies discovered in the materials presented by Buyer to Seller or the Loan Underwriter) or if Buyer fails to perform any of its obligations under this Agreement, then Seller shall have the right to terminate this Agreement by giving notice to that effect to Buyer (with a copy to Escrow Agent), in which event Escrow Agent is hereby instructed to pay the Earnest Money Deposit to Seller promptly and neither party shall have any further rights or obligations hereunder. Notwithstanding Escrow Agent's obligations hereunder, at Seller's request, Buyer shall

-13-

execute a release of the Earnest Money Contract in a form satisfactory to Seller acting in its sole discretion.

(b)   Seller and Buyer agree that payment of the Earnest Money Deposit as aforesaid shall be liquidated damages and not a penalty, and that actual damages resulting to Seller from Buyer's breach of this Agreement would be difficult or impossible to measure because of the uncertainties of the real estate market and fluctuations of property values and differences with respect thereto, and that the Earnest Money Deposit is a reasonable estimate of what those damages would be. (However, Buyer shall be liable for payment of both the Initial Earnest Money and the Additional Earnest Money if not previously paid.) Escrow Agent shall thereafter deliver the Earnest Money Deposit to Seller in accordance with the provisions of Exhibit "M". Buyer hereby releases Escrow Agent from all liability to Buyer for compliance with the provisions of this Section.

13.2   Seller's Default. If Buyer tenders to Escrow Agent the Cash Portion of the Purchase Price and the other moneys and documents required of Buyer at Closing, but Seller fails to close in accordance with the terms of this Agreement, or if Seller shall otherwise be in material default of any of Seller's obligations under this Agreement, then Buyer must give written notice specifying the nature of the default to Seller (with a copy to Escrow Agent). Seller shall have thirty (30) days from Seller's receipt of that notice within which to cure the specified default. If at the end of said thirty (30) day period Seller is diligently pursuing such cure but such cure shall not have been completed, then Seller shall have an additional period of thirty (30) days within which to complete such cure. If Seller still does not cure the specified default within the applicable extension period, then Buyer shall have the right, as its sole and exclusive remedy, to terminate this Agreement by giving written notice to that effect to Seller (with a copy to Escrow Agent), in which event Escrow Agent is hereby instructed to pay the Earnest Money Deposit to Buyer in accordance with the provisions of Exhibit "M". In the event that Buyer fails to provide such written notice of termination to Seller, Buyer shall be deemed to have waived such default and shall have no further right to object to such default and this transaction will close in accordance with the terms of this Agreement. Buyer specifically waives any and all rights Buyer may have to any lis pendens or other lien or encumbrance against the Property, equitable relief (including but not limited to, specific performance), or consequential or punitive damages. However, it is understood and agreed that, in no event shall Seller be liable for damages due to the existence of, or failure to cure, any defects in title.

13.3   Attorneys' Fees. To the extent permissible under applicable law, the losing party shall pay all attorneys' fees and costs incurred by the prevailing party in any proceeding to enforce the provisions of this Agreement, whether the same are incurred in preparation for or in pursuit of litigation, or both.

## ARTICLE 14   Time of the Essence.

TIME SHALL BE OF THE ESSENCE WITH RESPECT TO EACH AND EVERY PROVISION OF THIS AGREEMENT.

## ARTICLE 15   Condemnation.

15.1   Condemnation of Portion of Property. If Seller has or obtains actual knowledge of any pending or threatened condemnation proceedings or actions, Seller shall notify Buyer thereof. If, on or prior to the Closing Date, any portion of the Property shall be taken or condemned pursuant to any governmental or other power of eminent domain, any written notice of such a taking or condemnation shall be issued, or any proceeding for such a taking or condemnation shall be instituted by any governmental authority having the power of eminent domain (collectively, "Taking"), and if Buyer would be substantially prevented from continuing the existing use of the Property after the Taking, then Buyer shall have the right, exercisable only by giving notice to that effect to Seller (with a copy to Escrow Agent) within fifteen (15) days after Buyer's receipt of Seller's notice, to terminate this Agreement. If Buyer duly exercises that right, Escrow Agent is hereby instructed to return the Earnest Money Deposit to Buyer promptly. If Buyer does not duly exercise that right to terminate this Agreement, then Buyer shall be deemed to have waived any objection to the Taking. If Buyer does not have the right to terminate this Agreement under the foregoing provisions of this Section due to the Taking or if Buyer shall be deemed to have waived any objection to the Taking under those provisions, then, at Closing (a) Buyer shall accept the Property subject to the Taking, (b) the Purchase Price shall be reduced by the amount of any award theretofore received by Seller with respect to the Taking, and (c) Seller shall assign to Buyer all of Seller's rights to any and all awards not theretofore made or paid with respect to the Taking. If Seller is providing any Seller Financing, then the foregoing reduction in the Purchase Price shall be applied against the Amount of Seller Financing and shall not affect the amount of the Cash Portion of the Purchase Price.

15.2   Total Condemnation. Notwithstanding the foregoing provisions of this Article, if the award payable or that would be payable due to any Taking shall exceed the Purchase Price, then Seller shall have the right, exercisable only by giving notice to that effect to Buyer (with a copy to Escrow Agent) within fifteen (15) days after Seller is notified of the amount or anticipated amount of such award but prior to the Closing, to terminate this Agreement. If Seller duly exercises that right, Escrow Agent is hereby instructed to return the Earnest Money Deposit to Buyer promptly.

15.3   <u>Delay in Closing Date</u>.  If the Closing Date is to occur during either of the fifteen (15)-day periods described in the foregoing provisions of this Article, then the Closing Date shall be extended to be thirty (30) days after the applicable fifteen (15)-day period.

## ARTICLE 16   <u>Risk of Loss - Casualty</u>.

16.1   <u>Risk of Loss</u>.  Subject to the provisions of Section 16.2 and except for reasonable wear and tear, Seller shall bear the risk of all loss, destruction and damage to the Property or any portion thereof from any and all causes whatsoever prior to Closing, and from the Closing Date forward, all risk of loss shall pass to Buyer.

16.2   <u>Destruction or Damage Prior to Closing</u>.  If at any time prior to the Closing, all or any portion of the Property is destroyed or damaged as a result of fire or any other cause whatsoever, Seller shall promptly so notify Buyer.  The rights and obligations of the parties by reason of such destruction or damage shall be as follows:

(a)   If the amount of the insured casualty loss is ten percent (10%) of the Purchase Price or less (determined as provided in Section 16.2(e) below), then Buyer's obligation to purchase the Property shall not be affected, all proceeds of insurance collectible by reason of such taking or damage will be absolutely payable to Buyer, the Purchase Price will be reduced by any deductible amount which must be paid in order to make an insurance claim so long as the deductible is paid by the Buyer, and the sale of the Property will be otherwise closed in accordance with this Agreement. In the event the loss is self-insured by Seller, the Purchase Price shall be reduced by an amount sufficient to repair the loss (determined as provided in Section 16.2(e) below).  If Seller is providing any Seller Financing under Article 5, then the foregoing reduction in the Purchase Price shall be applied against the Amount of Seller Financing and shall not affect the amount of the Cash Portion of the Purchase Price.

(b)   If the amount of the insured casualty loss exceeds ten percent (10%) of the Purchase Price (determined as provided in Section 16.2(e) below), then Buyer shall have the right, exercisable only by giving written notice to that effect to Seller (with a copy to Escrow Agent) within fifteen (15) days after the amount of the loss is determined under the foregoing provisions, to terminate this Agreement.  If Buyer duly exercises that right, Escrow Agent is hereby instructed to return the Earnest Money Deposit to Buyer promptly.  If Buyer does not duly exercise that right to terminate this Agreement, then (A) Buyer shall be deemed to have waived any objection to such destruction or damage, (B) at Closing, Buyer shall accept the Property subject to such destruction or damage, (C) at Closing, the Purchase Price shall be reduced by the amount of any and all insurance proceeds theretofore received by Seller from independent private insurance companies for the physical loss associated with such destruction or damage, or, in the event Seller is self-insured with respect to the loss, the Purchase Price will be reduced by an amount sufficient to repair the loss (determined as provided in Section 16.2(e) below), and (D) at Closing, Seller shall assign to Buyer all of Seller's rights to any and all insurance proceeds not theretofore paid by independent private insurance companies with respect to such physical loss.  If Seller is providing any financing under Section 5.2, then the foregoing reduction in the Purchase Price shall be applied against the Amount of Seller Financing and shall not affect the amount of the Cash Portion of the Purchase Price.

(c)   Notwithstanding the foregoing provisions of this Section, if the proceeds payable or that would be payable due to any destruction or damage shall exceed the Purchase Price, then Seller shall have the right to terminate this Agreement, which right shall be exercisable only by giving notice to that effect to Buyer (with a copy to Escrow Agent) within fifteen (15) days after Seller is notified of the amount or anticipated amount of such proceeds but prior to the Closing.  If Seller duly exercises that right, Escrow Agent is hereby instructed to promptly return to Buyer the Earnest Money Deposit together with interest earned thereon.

(d)   If the Closing Date is to occur during either of the fifteen (15)-day periods described in the foregoing provisions of this Section, then the Closing Date shall be extended to be thirty (30) days after the applicable fifteen (15)-day period.

(e)   In determining the percentage of the Purchase Price represented by the casualty loss, or the amount of any reduction of the Purchase Price if the loss is self-insured, Seller shall identify an independent third-party contractor, engineer or other party familiar with construction costs and materials in the general location of the Property, and shall retain such person to provide a written estimate of the cost of repairing the damage and restoring the Property to its previous condition.  The estimate provided by such person shall be binding upon both Seller and Buyer, and Seller and Buyer shall each pay one half of the cost of such appraisal.

## ARTICLE 17   <u>Brokers</u>.

Buyer represents and warrants to Seller that Buyer has not dealt with any real estate broker, agent or finder in connection with this Agreement or the transaction described in this Agreement, other than the Broker as defined in the Basic Information Sheet attached hereto.  Subject to the terms of a separate agreement between Seller and Broker, Seller shall pay the commissions (if any) due in connection with this transaction to the respective persons and/or entities constituting the Broker.

Buyer shall defend, indemnify and hold harmless Seller from and against any and all Claims asserted against or incurred by Seller in connection with any breach of Buyer's representations or warranties under this Article 17.  Notwithstanding anything to the contrary contained in this Agreement, no Registered Broker shall be entitled to receive any commission from Seller hereunder unless such Registered Broker has fully complied with all of the terms and conditions set forth in the Auction Terms.

**ARTICLE 18    Release of Claims.**

The Environmental Addendum, if any, attached hereto is hereby incorporated by reference and made a part of this Agreement and to the extent the terms of this Agreement conflict with the terms of said Environmental Addendum, the terms of the Environmental Addendum shall govern and control. Except as otherwise specifically provided in this Agreement, Buyer hereby releases Seller from any Claims arising from or related to any construction defects, errors or omissions in the design or construction of the Property, if any, and from all other conditions, including, without limiting the generality of the foregoing, environmental conditions, affecting the Property.  The foregoing release specifically includes any Claims under any Environmental Laws.  "Environmental Laws" includes, but is not limited to, the following: the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act (42 U.S.C. § 9601, et seq.), the Clean Air Act (42 U.S.C. § 4701, et seq.); the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 1101, et seq.; the Hazardous Materials Transportation Act of 1974, 49 U.S.C. § 1801, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251, et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136, et seq.; the Safe Drinking Water Act 42 U.S.C. § 3001, et seq.; and the Toxic Substance Control Act, 15 U.S.C.  § 2601, as any of the same may be amended from time to time, and any comparable or successor provisions of federal, state or local law, and any regulations, orders, rules, procedures, guidelines and the like promulgated in connection therewith.

**ARTICLE 19    Liability of Seller and Seller's Representatives.**

19.1    Seller as Receiver.  It is understood and agreed that the Property is being sold by Seller solely in Seller's capacity as receiver of a depository institution or as the sole shareholder of a subsidiary thereof.  All of the obligations of Seller under or in connection with this Agreement are (a) obligations of Seller solely in the capacity in which it stands as the owner of the Property, and (b) chargeable solely to the assets of the subject receivership and not to Seller in its corporate capacity. Seller in its corporate or any other capacity shall have no liability or obligation whatsoever in connection with this Agreement, the transaction described in this Agreement, or any related document or agreement.

19.2    No Personal Liability.  None of Seller's employees, officers, directors, agents or independent contractors shall have any personal liability with respect to this Agreement or the transactions described herein.

**ARTICLE 20    Notices.**

20.1    Delivery Method.  All notices, waivers, demands, requests and other communications required or permitted by this Agreement (collectively, "Notices"), to be effective, shall be in writing and shall be given as follows by (a) personal delivery, (b) established overnight commercial courier with delivery charges prepaid or duly charged, (c) registered or certified mail, return receipt requested, first class postage prepaid, or (d) facsimile transmission addressed to Seller, Buyer or Escrow Agent, as applicable, at the address (or telecopier number) designated in the Basic Information Sheet or to any other address or addressee as any party entitled to receive notice under this Agreement shall designate, from time to time, by Notice given to the others in the manner provided in this Article.

20.2    Date of Receipt.  Notices thus given by personal delivery shall be deemed to have been received upon tender to the address shown on the Basic Information Sheet.  Notices given by overnight courier shall be deemed to have been received the next business day after delivery to the overnight courier.  Notices given by mail shall be deemed to have been received on the second (2nd) day after deposit with the United States Postal Service.  Notices given by facsimile transmission shall be deemed to have been received upon confirmation of transmission to the correct telecopy number of the intended recipient.  All copies to the respective person(s) and/or entity(ies) listed on the Basic Information Sheet to receive copies shall be given in the same manner as the original Notice, and such giving shall be a prerequisite to the effectiveness of any Notice.

**ARTICLE 21    Survival.**

21.1    General Survival.  All of the obligations of the parties, including all covenants, agreements, indemnities, representations and warranties (to the extent not performed at the Closing) including but not limited to the provisions of Sections 12.3, 12.4, 12.5 and 25.7 and Articles 6, 10, 17, 18, and 19, shall survive the Closing and shall not be deemed to merge upon the acceptance of the Deed by Buyer.

21.2   <u>Termination of Agreement</u>. If and when this Agreement is terminated in accordance with its terms, Seller and Buyer shall each be relieved of all further liability or obligation under this Agreement, at law or in equity, except  with respect to any breaches which shall have theretofore occurred (it being understood and agreed that any defects in title not permitted under Article 7 shall not be deemed to be such a breach).

**ARTICLE 22    Assignment of Agreement.**

Buyer shall not assign or transfer this Agreement, or any interest herein, without the prior written consent of Seller, which consent Seller shall not unreasonably withhold, except that if Buyer is seeking financing from Seller, Seller may withhold its consent in its sole and absolute discretion. Seller shall require, as a condition of such consent, that Seller (a) have a right to approve the instrument of assignment or transfer and that such document provide that Seller shall: receive any and all amounts paid by an assignee or transferee, directly or indirectly, to Buyer, as consideration for such assignment or transfer; that no assignment or transfer permitted by Seller shall relieve Buyer of its liabilities or obligations under this Agreement, but the assignee of Buyer's rights hereunder shall also be fully bound to perform all of Buyer's obligations hereunder; that such assignee shall also be deemed to have made all of the warranties and representations of Buyer hereunder, as of the date of the assignment; and that no assignment or transfer permitted by Seller shall be valid unless and until Seller shall have received a true and complete copy of the instrument of assignment or transfer, together with the name, address and telecopy number of the assignee or transferee and a written agreement from the assignee wherein the assignee assumes all of Buyer's obligations hereunder. Any change in the ownership of, or the power to vote, any capital stock, partnership interest or other legal or equitable ownership interest in Buyer shall be deemed an assignment of this Agreement, and, as such, shall be subject to the foregoing provisions of this Article, unless Buyer is a publicly held corporation (<u>i.e.</u>, a corporation that has one hundred (100) or more unrelated stockholders and whose stock is traded "over-the-counter" or on a recognized public stock exchange). Assignments or transfers of this Agreement, or of any of the outstanding capital stock or partnership interests of Buyer, to a Prohibited Buyer are expressly prohibited.

**ARTICLE 23    Access to Property.**

Upon request by Buyer, Seller shall allow Buyer access to the Property at reasonable times, during normal business hours, prior to Closing, subject to the rights of any tenants and Seller may require that Buyer be accompanied by a representative of Seller.  Buyer shall enter and inspect the Property at Buyer's own risk, and Buyer shall be liable for all damage or injury to persons or property resulting from any such entry or inspection occasioned by the acts of Buyer, its employees, agents, or representatives.  Buyer shall defend, indemnify, and hold Seller harmless from and against any liabilities, claims, demands, or actions incident to, resulting from, or in any way arising out of any entry or inspection by or on behalf of Purchaser onto the Property.

**ARTICLE 24    Miscellaneous.**

24.1   <u>Right to Waive Conditions</u>.  Either party may waive any of the terms or conditions of this Agreement made for such party's benefit provided that such waiver is in a writing signed by the waiving party.

24.2   <u>Strict Compliance</u>.  Any failure by either party to insist upon strict performance by the other party of any provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, regardless of the number of violations or breaches that may occur, and each party, not-withstanding any such failure, shall have the right thereafter to insist upon strict performance by the other of any and all provisions of this Agreement.

24.3   <u>Binding Effect</u>.  Subject to the limitations set forth in Article 22, all of the terms and conditions of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, legal representatives, successors and assigns.

24.4   <u>Business Days</u>.  If any date upon which action is required under this Agreement shall be a Saturday, Sunday or Federally-recognized legal holiday, the date for such action shall be extended to the first business day after such date that is not a Saturday, Sunday or Federally-recognized legal holiday.

24.5   <u>Partial Invalidity</u>.  If any term or condition of this Agreement, or the application thereof, to any person or circumstance shall be invalid, illegal or unenforceable at any time or to any extent, then the remainder of this Agreement, or the application of such term or condition to persons or circumstances other than those as to which it is invalid, illegal or unenforceable, shall not be affected thereby. Each term and  condition of this Agreement shall be valid and enforced to the fullest extent permitted by law.

24.6    Entire Agreement.  This Agreement contains the entire agreement between the parties with respect to the Property.  There are no promises, agreements, conditions, undertakings, understandings, warranties, covenants or representations, oral or written, express or implied, between them with respect to the Property, this Agreement or the transaction described in this Agreement, other than as set forth in this Agreement.

24.7    Modifications.  This Agreement may not be modified orally or in any manner, other than by an agreement in writing signed by all the parties or their respective successors in interest.  Escrow Agent shall not be required to sign any modification unless its rights or responsibilities under this Agreement are directly affected.

24.8    No Recordation.  Neither Seller nor Buyer shall be entitled to record this Agreement or a memorandum or other notice of this Agreement among the land records or other public records of the jurisdiction(s) in which the Property is located.  This Section shall be deemed to be a specific directive to the officials of such jurisdiction(s) NOT to accept this Agreement or a memorandum or other notice of this Agreement for recordation in any form whatsoever.

24.9    Further Assurances.  In addition to the respective obligations required to be performed under this Agreement, Seller and Buyer each shall perform, at Closing or from time to time thereafter, such other acts, and shall execute, acknowledge and/or deliver such other instruments, documents and other materials, as may be reasonably required in order to consummate the transaction described in this Agreement.  It is understood and agreed, inter alia, that the foregoing provisions shall not be deemed to require (a) either party to perform any of the obligations of the other, (b) Seller to undertake any obligation with respect to title not required by Article 7, or (c) Seller to expend any funds.

24.10    Information.  If Seller hereafter receives any actual written notices specifically concerning the Property from any governmental agency or judicial authority (other than Seller itself, in either its receivership or its corporate capacity), then Seller shall provide Buyer with a true and complete copy thereof.

24.11    More Than One Buyer.  If Buyer consists of more than one person or entity, then the obligations of Buyer under this Agreement shall be the joint and several obligations of said persons and/or entities.

24.12    Waiver of Jury Trial.  To the extent permitted by applicable law, the parties hereto each expressly waive the right to a jury trial in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby.  With respect to any matter for which a jury trial cannot by law be waived, the parties agree not to assert any such claim as a counterclaim, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

ARTICLE 25    Interpretation.

25.1    Headings.  The Article and Section headings used in this Agreement are for reference and convenience only, and shall not be used to interpret this Agreement.

25.2    Attorneys' Fees.  Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees.

25.3    Plurality and Gender.  Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

25.4    Exhibits.  All Exhibits and Addenda described herein and attached to this Agreement, together with the Basic Information Sheet attached to this Agreement, shall be considered incorporated in this Agreement by reference and made a material part of this Agreement for all purposes.

25.5    Definitions.  Some or all of the capitalized terms used in this Agreement are defined in the respective Articles or Sections cited in the Glossary of Certain Defined Terms at the beginning of this Agreement.

25.6    Rule of Construction.  Buyer and Seller each have read and fully understand the terms of this Agreement, and each has had the opportunity to have this Agreement reviewed by its own counsel.  The rule of construction providing that ambiguities in an agreement shall be constructed against the party drafting same shall not apply.

25.7    Scope of Release.  In this Agreement, whenever Buyer releases Seller from any Claims or from further liability or obligation, such release includes a release of Seller, in its receivership, corporate or any other capacity, and Seller's agents, employees, contractors, officers, directors and representatives as well as the United States Government.  In this Agreement, whenever Seller releases Buyer from further liability or obligation, such release includes a release of Buyer and Buyer's agents, employees, contractors, officers, directors, and representatives.

25.8   Certain References. The terms "herein", "hereof", "hereunder" or similar terms used in this Agreement refer to the entire Agreement and not to the particular provision in which the term is used.

25.9   Counterparts. This Agreement may be executed in counterparts, all of which, when taken together, shall constitute a single Agreement.

25.10   Counterpart Facsimile Execution.   For purposes of executing this Agreement, a document signed and transmitted by facsimile machine or telecopier shall be treated as an original document. The signature of any party thereon (including the Escrow Agent) shall be for purposes hereof, considered as an original signature, and the document transmitted shall be considered to have the same binding effect as an original signature or an original document. At the request of any party, any facsimile or telecopy document shall be re-executed by both parties in original form. No party hereto may raise the use of a facsimile machine or telecopier or the fact that any signature was transmitted through the use of a facsimile or telecopier machine as a defense to the enforcement of this Agreement or any amendment executed in compliance with this paragraph. This paragraph does not supersede the requirements for Notices contained in Article 20, above.

## ARTICLE 26   Governing Law.

All questions with respect to the construction of this Agreement and the rights and liabilities of the parties under this Agreement shall be determined in accordance with the laws of the jurisdiction in which the Property is located, without regard to the application of choice of law principles, except to the extent that such laws are superseded by Federal law.

## ARTICLE 27   Provisions with Respect to the Escrow Agent.

Escrow Agent is signing this Agreement solely to undertake Escrow Agent's responsibilities under this Agreement. Seller, Buyer and Escrow Agent also shall have the respective rights and responsibilities set forth in Exhibit "M". Escrow Agent's responsibilities may be modified only by a written amendment to this Agreement signed by Escrow Agent, as well as by Seller and Buyer. If required by the Escrow Agent, Seller and Buyer shall enter into a separate escrow agreement with the Escrow Agent, containing terms and conditions substantially similar to those contained in this Agreement.

## ARTICLE 28   Specific Provisions Required by the Jurisdiction in Which the Property is Located.

28.1   Waiver of Texas Deceptive Trade Practices-Consumer Protection Act. It is the intent of Seller and Buyer that the rights and remedies with respect to the transaction contemplated by this Agreement shall be governed by legal principles other than the Texas Deceptive Trade Practices-Consumer Protection Act. Buyer acknowledges and agrees (i) that it has knowledge and experience in financial and business matters that enable it to evaluate the merits and risks of the transaction contemplated by this Agreement, and (ii) that Buyer and Seller are not in significantly disparate bargaining positions with respect to this Agreement. Accordingly, Buyer, to the fullest extent allowed by law, hereby waives the provisions of Chapter 17, Subchapter E, Sections 17.41 through 17.63, inclusive (other than Section 17.555, which is not waived) of the Texas Business and Commerce Code, generally known as the "Texas Deceptive Trade Practices-Consumer Protection Act." In compliance with Section 17.42 of the Texas Deceptive Trade Practices-Consumer Protection Act, within five (5) days after the date Buyer executes this Agreement (as designated on the signature page hereof) Buyer shall (i) obtain the signature of Buyer's legal counsel on the signature page hereof, or (ii) provide Seller with Buyer's most recent certified financial statement, prepared in accordance with generally accepted accounting principles and reflecting Buyer's ownership of assets in excess of $5,000,000. If Buyer does not comply with either of the requirements set forth in the preceding sentence within the five (5)-day period, then Seller shall have the right to terminate this Agreement by giving notice to that effect to Buyer (with a copy to Escrow Agent), in which event Escrow Agent is hereby instructed to pay the Earnest Money to Seller promptly.

28.2   Statutory Disclosures. If, and only if, there is a check marked in the brackets which appear below, the Property is located in a municipal utility district or other similar taxing authority and Buyer should carefully read the following notice, and the fact that the Property is in a municipal utility district or other similar taxing authority or is located in a county that borders on the Gulf of Mexico shall be Permitted Exceptions under this Agreement:

[ ]   The Property which you are about to purchase is located in the _____ District. The district has taxing authority separate from any other taxing authority, and may, subject to voter approval, issue an unlimited amount of bonds and levy an unlimited rate of tax in payment of such bonds; therefore, the written disclosure required by Texas law is attached as an Addendum to this Agreement.

[ ]   Coastal Property. The Property is located in a County that borders the Gulf of Mexico; therefore, the written disclosure required by Texas law is attached as an Addendum to this Agreement.

-19-  — Utility District to calf map —

[If a Trust]

_____,

_____ Trust

By Agreement Dated _____, 19___

By:_____

Print Name:_____

Title:        [Trustee] [Co-Trustee]

By:_____

Print Name:_____

Title:        [Trustee] [Co-Trustee]

Date of Buyer's Signature : _December 8_____, 1992

The undersigned represents that the undersigned is legal counsel for Buyer and is executing this Agreement as such counsel for the sole purpose of effecting Buyer's waiver of Chapter 17, Subchapter E, Sections 17.41 through 17.63, inclusive (other than Section 17.555, which is not waived) of the Texas Business and Commerce Code, generally known as the "Texas Deceptive Trade Practices-Consumer Protection Act", which signature of the undersigned is required by Section 7.42 of such Act and by Section 28.1 of this Agreement.

_____

[Name of Law Firm]

By:_____

[Name of partner or shareholder]

Date of Signature of Buyer's Legal Counsel: _____, 1992

IN WITNESS WHEREOF, Seller has signed and delivered this Agreement as its own free act and deed.

SELLER:

RESOLUTION TRUST CORPORATION, as Receiver

for JASPER FEDERAL SAVINGS AND LOAN ASSOCIATION

_____

By: _James D. Quarry_

Print Name: _JAMES G. QUARRY_

Title: _Attorney-in-Fact_

Date of Seller's Signature: _December 8_____, 1992

-21-



**Halff Associates**

ENGINEERS · ARCHITECTS · SCIENTISTS · PLANNERS · SURVEYORS

4000 FOSSIL CREEK BOULEVARD
FORT WORTH, TEXAS 76137
817) 847-1422
METRO (817) 429-0076
FAX (817) 232-9784

December 16, 2005
AVO 23423

Ms. Kuk Ja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:   **Hunter Ferrell Road**
      **From Beltline Road to MacArthur Boulevard**

Dear Ms. Stewart:

Halff Associates, Inc. was selected by Dallas County, Texas, to begin the Preliminary Design of Hunter Ferrell Road improvements, from Beltline Road to MacArthur Boulevard. This project is a cooperative effort between Dallas County and the cities of Irving and Grand Prairie to provide improved access for the area.

The design includes a feasibility and alignment study to determine the proposed route for Hunter Ferrell Road. Improvements to a portion of Story Road are also planned with the project.

Right-of-way and design surveys are currently underway, and our surveyors will be in the area for the next several weeks. They are locating and tying property monuments, structures and other facilities for use in the study. A Right of Entry permission letter is enclosed, with a stamped return envelope. Please indicate if we have permission to enter your property and return the completed letter. A copy will be sent to you for your records.

Please contact James O'Connor at the City of Irving or me if you have any questions.

Sincerely,

**HALFF ASSOCIATES, INC.**

Lisa M. Rhudy, P.E.

Attachments

Cc:   Jerry F. Roberts, P.E. - Halff Associates
      John L. Mears, P.E. – Dallas County
      James O'Connor, P.E. - City of Irving

FORT WORTH · DALLAS · HOUSTON · McALLEN · AUSTIN · FRISCO · SAN ANTONIO

TRANSPORTATION · WATER RESOURCES · LAND DEVELOPMENT · MUNICIPAL · ENVIRONMENTAL · STRUCTURAL
MECHANICAL · ELECTRICAL · SURVEYING · GEOGRAPHIC INFORMATION SYSTEMS
ARCHITECTURE · LANDSCAPE ARCHITECTURE · PLANNING



**Halff Associates**

ENGINEERS · ARCHITECTS · SCIENTISTS · PLANNERS · SURVEYORS

4000 FOSSIL CREEK BOULEVARD
FORT WORTH, TEXAS 76137
(817) 847-1422
METRO (817) 429-9975
FAX (817) 232-9764

_____ . 2005

AVO 23423

Project: Hunter Ferrell Road
         From Beltline Road to MacArthur Blvd.

Name: _____

Address: _____

_____

Dear Property Owner:

Dallas County has contracted Halff Associates, Inc. to design roadway improvements for Hunter
Ferrell Road, from Beltline Road to MacArthur Blvd. The project also includes improvements to
a portion of Story Road and Bear Creek.

We are beginning design, and request permission to enter your property for a preliminary survey
to locate property corners and/or to survey existing features immediately adjacent to the proposed
roadway. Also, we request permission to enter your property, if additional right of way is
required, in order to mark the new right of way lines, and/or easements.

A survey crew from Halff Associates, Inc. and/or Arredondo, Zepeda, and Brunz, Inc., will be
collecting field data on behalf of Dallas County. We will begin our field work in August, 2005.
Should you have any questions, please contact Jerry Roberts or Lisa Rhudy at Metro number
(817) 429-9975 during normal business hours.

Please sign below to indicate that we have permission to enter your property. A copy will be
returned to you for your records.

Sincerely,

**HALFF ASSOCIATES, INC.**

Lisa M. Rhudy, P.E.

FORT WORTH · DALLAS · HOUSTON · McALLEN · AUSTIN · FRISCO · SAN ANTONIO

TRANSPORTATION · WATER RESOURCES · LAND DEVELOPMENT · MUNICIPAL · ENVIRONMENTAL · STRUCTURAL
MECHANICAL · ELECTRICAL · SURVEYING · GEOGRAPHIC INFORMATION SYSTEMS
ARCHITECTURE · LANDSCAPE ARCHITECTURE · PLANNING



# Halff Associates

ENGINEERS · ARCHITECTS · SCIENTISTS · PLANNERS · SURVEYORS

Project: Hunter Ferrell Road
From Beltline Road to MacArthur Blvd.

Re:   Request for Right-of-Entry

## RIGHT-OF-ENTRY FORM
Permission to Access Private Property for Surveying Purposes

I hereby grant Halff Associates, Inc., their employees, or their representatives access to my Property for purposes of conducting field survey work in connection with the Hunter Ferrell Road project. The Right of Entry is for the purpose of locating property corners of existing boundary lines, surveying existing features adjacent to the project, and marking the proposed right-of-way.

It is expressly understood that this Right of Entry in no way waives or affects Owner's right to the proposed land conveyance or any damages to Owner's remaining property occasioned by said conveyance, said rights being hereby especially reserved unto Owner, Owner's heirs, successors and assigns.

This Right of Entry shall expire upon completion of land conveyance of the right-of-way to the County of Dallas, Texas, or upon written request by the owner to rescind Right-of-Entry, or 24 months from date of execution.

| | |
|---|---|
| Property Description: | 42.8 AC IN JOSEPH MANGRUM SURVEY, A-861 |
| Property Owner: | KUK JA STEWART |
| Mailing Address: | 2028 SANDY LANE, IRVING, TX 75060 |
| Telephone Number. | |
| Tenant Name (if applicable): | |
| Signature: | |
| Printed Name: | |
| Date: | |

(1-89) -- PAID UP POUND PRINTING
: POOLING PROVISION
TIONERY COMPANY
4703-C RICHMOND, HOUSTON, TEXAS 77027 (713) 552-9797

# PAID UP OIL AND GAS LEASE

SE AGREEMENT is made as of the 15th day of September, 2005, between UP G KUK, INC., A TEXAS CORPORATION, as r one or more), whose address is 2028 Sandy Lane, Irving, Texas 75060-5639, and SCOUT EXPLORATION, J.V., a Texas re, as Lessee, whose address is 5956 Sherry Lane, Suite 1810, Dallas, Texas 75225. All printed portions of this lease were prepared by the ve named as Lessee, but all other provisions (including the completion of blank spaces) were prepared jointly by Lessor and Lessee.

nsideration of a cash bonus in hand paid and the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lessee the following hereinafter called leased premises: (use Exhibit "A" for long description):

803 acres of land, more or less, out of the J. Mangum Survey, A-861, Dallas County, Texas, more particularly cribed on Exhibit "A" attached hereto and made a part hereof for all purposes, which land is hereinafter referred is the "leased premises",

Dallas, State of Texas, containing 42.803 gross acres, more or less (including any interests therein which Lessor may hereafter acquire by reversion, therwise), for the purpose of exploring for, developing, producing and marketing oil and gas, along with all hydrocarbon and nonhydrocarbon substances ociation therewith. The term "gas" as used herein includes helium, carbon dioxide and other commercial gases, as well as hydrocarbon gases. In addition to ribed leased premises, this lease also covers accretions and any small strips or parcels of land now or hereafter owned by Lessor which are contiguous or above-described leased premises, and, in consideration of the aforementioned cash bonus, Lessor agrees to execute at Lessees request any additional or struments for a more complete or accurate description of the land so covered. For the purpose of determining the amount of any shut-in royalties hereunder, ross acres above specified shall be deemed correct, whether actually more or less.

lease, which is a "paid-up" lease requiring no rentals, shall be in force for a primary term of five (5) years from the date hereof, and for as long thereafter other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith or this lease is otherwise ffect pursuant to the provisions hereof.

alties on oil, gas and other substances produced and saved hereunder shall be paid by Lessee to Lessor as follows: (a) For oil and other liquid hydrocarbons ssees separator facilities, the royalty shall be 1/4 of such production, to be delivered at Lessee's option to Lessor at the wellhead or to Lessor's credit at the ransportation facilities, provided that Lessee shall have the continuing right to purchase such production at the wellhead market price then prevailing in the there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) for production of similar grade and as (including casinghead gas) and all other substances covered hereby, the royalty shall be 1/4 of the proceeds realized by Lessee from the sale thereof, nate part of ad valorem taxes and production, severance, or other excise taxes and the costs incurred by Lessee in delivering, processing or otherwise gas or other substances, provided that Lessee shall have the continuing right to purchase such production at the prevailing wellhead market price paid for nilar quality in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) parable purchase contracts entered into on the same or nearest preceding date as the date on which Lessee commences its purchases hereunder; and (c) he primary term or any time thereafter one or more wells on the leased premises or lands pooled therewith are capable of producing oil or gas or other ered hereby in paying quantities, but such well or wells are either shut in or production therefrom is not being sold by Lessee, such well or wells shall deemed to be producing in paying quantities for the purpose of maintaining this lease. If for a period of 90 consecutive days such well or wells are shut in or efrom is not being sold by Lessee, then Lessee shall pay shut-in royalty of one dollar per acre then covered by this lease, such payment to be made to sors credit in the depository designated below, on or before the end of said 90-day period and thereafter on or before each anniversary of the end of said hile the well or wells are shut in or production therefrom is not being sold by Lessee; provided that if this lease is otherwise being maintained by operations, is being sold by Lessee from another well or wells on the leased premises or lands pooled therewith, no shut-in royalty shall be due until the end of the ext following cessation of such operations or production. Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the amount due, but a to terminate this lease.

nut-in royalty payments under this lease shall be paid or tendered to Lessor or to Lessor's credit in

s, which shall be Lessor's depository agent for receiving payments regardless of changes in the ownership of said land. All payments or tenders may be y, or by check or by draft and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails in a stamped envelope addressed to the the Lessor at the last address known to Lessee shall constitute proper payment. If the depository should liquidate or be succeeded by another institution, or ail or refuse to accept payment hereunder, Lessor shall, at Lessees request, deliver to Lessee a proper recordable instrument naming another institution as t to receive payments.

ssee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled therewith, or if all ther or not in paying quantities) permanently ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Paragraph 6 or the vernmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee commences working an existing well or for drilling an additional well or for otherwise obtaining or restoring production on the leased premises or lands pooled therewith fter completion of operations on such dry hole or within 90 days after such cessation of all production. If at the end of the primary term, or at any time iase is not otherwise being maintained in force but Lessee is then engaged in drilling, reworking or any other operations reasonably calculated to obtain or on therefrom, this lease shall remain in force so long as any one or more of such operations are prosecuted with no cessation of more than 90 consecutive such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying quantities from ises or lands pooled therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additional wells on the or lands pooled therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased premises as to capable of producing in paying quantities on the leased premises or lands pooled therewith, or (b) to protect the leased premises from uncompensated well or wells located on other lands not pooled therewith. There shall be no covenant to drill exploratory wells or any additional wells except as expressly

ee shall have the right but not the obligation to pool all or any part of the leased premises or interest therein with any other lands or interests, as to any or all , and as to any or all substances covered by this lease, either before or after the commencement of production, whenever Lessee deems it necessary or n order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or interests. The ich pooling for an oil well which is not a horizontal completion shall not exceed 80 acres plus a maximum acreage tolerance of 10%, and for a gas well or a letion shall not exceed 640 acres plus a maximum acreage tolerance of 10%; provided that a larger unit may be formed for an oil well or gas well or etion to conform to any well spacing or density pattern that may be prescribed or permitted by any governmental authority having jurisdiction to do so. For ie foregoing, the terms "oil well" and "gas well" shall have the meanings prescribed by applicable law or the appropriate governmental authority, or, if no 'escribed, "oil well" means a well with an initial gas-oil ratio of less than 100,000 cubic feet per barrel and "gas well" means a well with an initial gas-oil ratio ; feet or more per barrel, based on a 24-hour production test conducted under normal producing conditions using standard lease separator facilities or g equipment; and the term "horizontal completion" means an oil well in which the horizontal component of the gas completion interval in the reservoir ical component thereof. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit and stating the pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were ig or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit t the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit, but only to the extent such proportion of unit d by Lessee. Pooling in one or more instances shall not exhaust Lessees pooling rights hereunder, and Lessee shall have the recurring right but not the se any unit formed hereunder by expansion or contraction or both, either before or after commencement of production, in order to conform to the well y pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination made by such thority. In making such a revision, Lessee shall file of record a written declaration describing the revised unit and stating the effective date of revision. To ortion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which royalties are er shall thereafter be adjusted accordingly. In the absence of production in paying quantities from a unit, or upon permanent cessation thereof, Lessee may t by filing of record a written declaration describing the unit and stating the date of termination. Pooling hereunder shall not constitute a cross-conveyance

sor owns less than the full mineral estate in all or any part of the leased premises, the royalties and shut-in royalties payable hereunder for any well on any d premises or lands pooled therewith shall be reduced to the proportion that Lessor's interest in such part of the leased premises bears to the full mineral irt of the leased premises.

interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or zone, and
obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns. No change in
rship shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee
after Lessee has been furnished the original or certified or duly authenticated copies of the documents establishing such change of ownership to the
Lessee or until Lessor has satisfied the notification requirements contained in Lessees usual form of division order. In the event of the death of any person
-in royalties hereunder, Lessee may pay or tender such shut-in royalties to the credit of decedent or decedent's estate in the depository designated above, If
o or more persons are entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to such persons or to their credit in the
ner jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee shall be relieved of
hereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall
ights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this
gation to pay or tender shut-in royalties hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease
ach.

see may, at any time and from time to time, deliver to Lessor or file of record a written release of this lease as to a full or undivided interest in all or any
rea covered by this lease or any depths or zones thereunder, and shall thereupon be relieved of all obligations thereafter arising with respect to the interest
Lessee releases all or an undivided interest in less than all of the area covered hereby, Lessee's obligation to pay or tender shut-in royalties shall be
reduced in accordance with the net acreage interest retained hereunder.

exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized
rimary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises as
ably necessary for such purposes, including but not limited to geophysical operations, the drilling of wells, and the construction and use of roads, canals,
s, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover,
, treat and/or transport production. Lessee may use in such operations, free of cost, any oil, gas, water and/or other substances produced on the leased
xcept water from Lessor's wells or ponds. In exploring, developing, producing or marketing from the leased premises or lands pooled therewith, the ancillary
herein shall apply (a) to the entire leased premises described in Paragraph I above, notwithstanding any partial release or other partial termination of this
o any other lands in which Lessor now or hereafter has authority to grant such rights in the vicinity of the leased premises or lands pooled therewith. When
essor in writing, Lessee shall bury its pipelines below ordinary plow depth on cultivated lands. No well shall be located less than 200 feet from any house or
he leased premises or other lands used by Lessee hereunder, without Lessor's consent, and Lessee shall pay for damage caused by its operations to
ther improvements now on the leased premises or such other lands, and to commercial timber and growing crops thereon. Lessee shall have the right at any
its fixtures, equipment and materials, including well casing, from the leased premises or such other lands during the term of this lease or within a reasonable

see's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental
g jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. When drilling,
duction or other operations are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment,
ial, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor
inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not
in Lessees control, this lease shall not terminate because of such prevention or delay, and at Lessees option, the period of such prevention or delay shall be
rm hereof. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other operations are so
yed or interrupted.

e event that Lessor, during the primary term of this lease, receives a bona fide offer which Lessor is willing to accept from any party offering to purchase
ase covering any or all of the substances covered by this lease and covering all or a portion of the land described herein, with the lease becoming effective
of this lease, Lessor hereby agrees to notify Lessee in writing of said offer immediately, including in the notice the name and address of the offeror, the price
other pertinent terms and conditions of the offer. Lessee, for a period of fifteen days after receipt of the notice, shall have the prior and preferred right and
ase the lease or part thereof or interest therein, covered by the offer at the price and according to the terms and conditions specified in the offer.

tigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee
lly describing the breach or default, and then only if Lessee fails to remedy the breach or default, within such period. In the event the matter is litigated and
judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a
 after said judicial determination to remedy the breach or default and Lessee fails to do so.

or hereby warrants and agrees to defend title conveyed to Lessee hereunder, and agrees that Lessee at Lessees option may pay and discharge any taxes,
ns existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to
 is made, and, in addition to its other rights, may reimburse itself out of any royalties or shut-in royalties otherwise payable to Lessor hereunder. In the event
 aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in royalties hereunder, without interest, until
n furnished satisfactory evidence that such claim has been resolved.

 parties hereto agree that Lessee shall pay to the owner(s) of the surface estate of the leased premises the sum of
 for each drill site constructed on the leased premises, which sum shall represent payment in full for all damages
 drill site in connection with Lessee's operations thereon, which drill site shall not exceed five (5) acres of land,
.

icurrently with Lessor's execution hereof, Lessee shall pay Lessor the sum of $500.00 per net mineral acre of land
 his lease as bonus consideration for the execution of this lease by Lessor.

 parties hereto agree that a Memorandum of Paid Up Oil and Gas Lease may be filed of record for the purpose of
 cord notice of the existence of this lease in lieu of recording the executed original hereof.

 JESS WHEREOF, this lease is executed by Lessor on the date set forth in the certificate of acknowledgment
 nall be effective as of the date first above written.

Lessee:

INC.                                                    SCOUT EXPLORATION, J.V.

*2 (q Stewart*                                          By _____

*K JA Stewart*
Print/Type Name, Title]                                 [Print/Type Name, Title]

*esiDent*

WART PU OGL-01.DOC

TEXAS § J
§
OF _Tarrant_ §
§

is instrument was acknowledged before me on this the 27th day of September, 2005, by
Ja Stewart , as President of UP_G_KUK INC., a Texas corporation, on behalf poration.

```
N. JEANNINE JENKINS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 5-16-2009
```

_____
Notary Public in and for the State of Texas

§
§
OF _____ §
§

iis instrument was acknowledged before me on this the ___ day of September, 2005, by
_____, as _____ of SCOUT EXPLORATION, J.V., a Texas joint venture,
of said joint venture.

_____
Notary Public in and for the State of Texas

## EXHIBIT "A"

BEING a tract of land situated in the JOSEPH MANGUM SURVEY, ABSTRACT NO. 861, Dallas County, Texas, and being part of two tracts of land described in deed to Jasper Federal Savings and Loan Association, as recorded in Volume 86168, Page 2069, Deed Records, Dallas County, Texas, and being more particularly described as follows:

BEGINNING at a 1/2" diameter iron rod found in the South line of a tract of land described in deed from Ashlin Development Company to Ward Williford, Trustee, as recorded in Volume 88119, Page 0715, Deed Records, Dallas County, Texas, said iron rod also being at the most Northerly Northwest corner of a tract of land described in deed from Gifford-Hill Co., Inc. to the County of Dallas as recorded in Volume 70009, Page 0319, Deed Records, Dallas County, Texas, said iron rod also being in the West line of Hunter Ferrell Road (a 57.5 foot right-of-way at this point);

THENCE South 1,536.53 feet with the said West line of Hunter Ferrell Road and with the West line of said County of Dallas tract and along a fence line to a 1/2" diameter iron rod found;

THENCE South 45° 03' 05" West 70.65 feet with the Northwest line of said Hunter Ferrell Road and with the Northwest line of said County of Dallas tract and along a fence line to a 1/2" diameter iron rod found, said iron rod also being in the North line of Hunter Ferrell Road (a 60' right-of-way at this point);

THENCE South 89° 59' 05" West, 1,126.74 feet, with the North line of said Hunter Ferrell Road and with the North line of said County of Dallas tract and along a fence line to a 1/2 diameter iron rod found at the Southeast corner of a tract of land described in deed to Jasper Federal Savings and Loan Association, as recorded In Volume 86168, Page 2069, Deed Records, Dallas County, Texas;

THENCE North 00° 19' 26" East 1,594.79 feet, with the East line of said Jasper Federal Savings and Loan Association tract, to a 1/2" diameter iron rod found in the South line of said Ward Williford, Trustee tract;

THENCE South 89° 42' 16" East 1,167.74 feet, with the said South line of Ward Williford, Trustee tract and along a fence line to the PLACE OF BEGINNING and containing 1,864,485 square feet (42.803 acres) of land, more or less.



# JIMMY STEWART

2028 Sandy Lane
Irving, TX 75060
Phone: (972)313-9952
Cell: (214)316-0110
Fax: (972)313-9802

January 6, 2006

Dallas County Public Works
Administration Building
411 Elm Street, fourth Floor
Dallas, TX 75202

To John Mears:

Mr. Mears, I had contacted you on December 16, 2005 seeking information concerning my mother's property in the 1800 and 1900 block of Hunter Ferrell Road in Irving. I am writing this letter to file a formal complaint on Halff Associates, Inc for trespassing, surveying and staking her property without receiving any written consent, nor did they try to contact my mother (Kuk Ja Stewart) for permission to do a survey. We found out the land had been surveyed from an individual with whom my mom had leased the property. He said a survey crew was on the property at 5:30 one evening when he and his neighbor arrived to tend to the livestock. He said over half the property was surveyed and staked when he and his neighbor arrived. He spoke to the survey crew. They asked if he were the owner so he could sign the release document. He let them know he was not the owner. He and his neighbor also saw a document stating, "get owners permission before entering the property". They survey crew finished the process of surveying and staking her property after their conversation. This individual said there were no identifications on the surveyor's vehicle nor did they have any uniforms or company tags stating who employed them. To get access to the land as the surveyors had done, they would have to climb the fence. The entrance is locked and has to have a key for entrance. I had a heck of a time trying to find out who surveyed the property. I made numerous phone calls and talked to the renter several times to see if he or his neighbor could recall anything that would help my search. I received your number from a City of Irving employee, who told me "I think Halff Associates did the survey, but I can give you the name and number of the person who would know". I want to thank you for giving me the name of the survey company (Halff Associates) along with the contact person (Lisa Rhudy). I contacted Ms Rhudy right after our conversation. I asked her for a copy explaining why they were on my mother's land along with all relevant information including to the plans and layout of the road that was going to cut through my mother's property. I let her know that the way the stakes were going through would make over one third of her property useless. She said "this was in the beginning stage and that it was only 10% done". I told her it looked like a perfect road especially by the way the stakes looked going through the land. We did not receive the information I asked for, instead my mother received two documents asking for a release for Halff Associates to enter her property. There was no apology for trespassing and surveying her property. My mother has not responded to signing the releases and is adamant about giving any kind of release for a survey especially to Halff Associates. This letter is also written on behalf of my mother, Kuk Ja Stewart.

Sincerely

Jimmy Stewart

Owner of the Above Mentioned Land

Kuk Ja Stewart

cc:  Lisa M. Rhudy, P. E.
     Halff Associates, Inc.
     4000 Fossil Creek Boulevard
     Fort Worth, TX 76137


     Charles B. Mitchell, Jr.
     Brown, Dean, Wiseman, Liser, Proctor & Hart, LLP
     306 W. 7th Street, Suite200
     Fort Worth, TX 76034


     Scott K. Wilpitz, CPL
     Petroleum Landman
     7230 Stonetrail Drive
     Dallas, TX 75230



James Stewart
2028 Sandy Ln
Irving TX 75060

NORTH TEXAS P&DC
TX 750 1 L
06 JAN 2006 PM





RECEIVED
JAN 07 2005

Charles B. Mitchell, Jr.
Brown, Dean, Wiseman, Liser, Proctor and Hart, LLP
306 W. 7th Street Suite 200
Fort Worth, TX 76034

76102+4905 C062

TRANSACTION REPORT

P. 01

SEP-27-2005 TUE 04:40 PM

FOR:

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE | M# | DP |
|------|-------|----------|---------|-------|------|------|----|----|
| SEP-27 | 04:36 PM | ##00696#2148919855 | 3'43" | 6 | SEND | OK | 931 | |
| | | | | TOTAL : | | 3M 43S  PAGES:  6 | | |

# Fax

| | |
|---|---|
| **Name:** | Mr. Wallace Hall |
| **Organization:** | Scout Exploration, J.V. |
| **Fax:** | (214) 891-9855 |
| **Phone:** | |
| **From:** | Sterling J. Elza |
| **Date:** | September 27, 2005 |
| **Subject:** | Kuja Stewart |
| | Our File No.:    3251.22711 |

**Pages:**     __6__ (including fax cover sheet)

Comments:     Please see attached.

# **Fax**

| | |
|---|---|
| **Name:** | Mr. Wallace Hall |
| **Organization:** | Scout Exploration, J.V. |
| **Fax:** | (214) 891-9855 |
| **Phone:** | |
| **From:** | Sterling J. Elza |
| **Date:** | September 27, 2005 |
| **Subject:** | Kuja Stewart |
| | Our File No.:        3251.22711 |

**Pages:**        ___6___ (including fax cover sheet)

Comments:        Please see attached.

---

THE INFORMATION CONTAINED IN THIS FACSIMILE IS LEGALLY PRIVILEGED AND
CONFIDENTIAL INFORMATION, WHICH IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR
ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT,
YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR
REPRODUCTION OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS
MESSAGE IN ERROR, THAT MATERIAL HEREWITH SHOULD BE DESTROYED IMMEDIATELY AND
THE SENDER LISTED ABOVE SHOULD BE NOTIFIED BY TELEPHONE AT (817) 332-1391.

---

**BROWN, D⌐ I, WISEMAN, LISER, PROCTOR &˙ ⌐T, L.L.P.**
Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
JOHN W. PROCTOR
•• JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

• Also licensed to practice in Louisiana
•• Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

September 27, 2005

*Via Fax - 214/891-9855 and Regular Mail*
Mr. Wallace Hall
Scout Exploration, J.V.
5956 Sherry Lane, Suite 1810
Dallas, Texas 75225

Dear Mr. Hall:

Attached please find the signed and notarized copy of the Paid Up Oil and Gas Lease. Once Scout Exploration has signed the Lease, please provide me with a copy and then file the appropriate documents with the County Clerk.

Please feel free to contact me with any questions you may have.

Sincerely,

Sterling J. Elza

SJE/jj
Enclosure

cc:    Mr. Charles B. Mitchell, Jr. - Firm

September 27, 2005
Page 2

---

bcc:    UP_G_KUK, Inc.
      c/o Kuk Ja Stewart
      2028 Sandy Lane
      Irving, Texas 75060

W:\CHARLES\FILES\INDIVIDUAL CLIENTS\STEWART, KUJA [REAL ESTATE 22711]\CORRESPONDENCE\HALL.002.WPD

**ᴌOLMAN ROBERTSON ELDRIDGE**
A Professional Corporation
Attorneys and Counselors
5949 Sherry Lane
Suite 1700
Dallas, Texas 75225

Shareholders:
H. DOUGLAS BAER
CHARLES R. BIDDLE
RICHARD T. CHEATHAM
DAVID A. ELDRIDGE
RONALD O. HOLMAN
JOHN CROW MILLER
J. MALCOLM ROBERTSON, JR.
ROBERT A. SOLOMON

Telephone
214 / 361-9494

Writer's Extension
113

Facsimile
214 / 691-2109

Writer's E-Mail Address
rholman@hrepc.com

September 15, 2005

Mr. Sterling Elza
Brown, Dean, Wiseman,
  Liser, Proctor & Hart
306 West 7ᵗʰ Street, Suite 200
Fort Worth, Texas 76102

> Re:    UP_G_Kuk, Inc.
>        Paid Up Oil and Gas Lease with Scout Exploration, J.V.
>        42.803 acres of land, more or less
>        J. Mangum Survey, A-861
>        Dallas County, Texas

Dear Mr. Elza:

I write to you as counsel for Scout Exploration, J.V., the lessee of the referenced lease. Enclosed you will find the original of the lease for execution by your client. I have also enclosed my client's check in the amount of $21,401.50 as payment of the lease bonus. You are instructed to hold this check in trust until such time as you have secured the proper execution of the lease by your client and placed the executed original in the mail to me for further handling. At that time, you will then be authorized to release the lease bonus check from trust and deliver it to your client for deposit and collection.

Thank you for your attention to this matter and, if you have any questions regarding same, please do not hesitate to contact me.

Very truly yours,

Ronald O. Holman

ROH/lma
Enclosures
cc:    Scout Exploration, J.V. (w/encl.)

## Patty Rien

**From:** Sterling Elza

**Sent:** Monday, September 12, 2005 4:53 PM

**To:** 'whall@wetlandpartners.com'

**Cc:** Charles Mitchell; Patty Rien

**Subject:** Kuk Ja Stewart-Oil and Gas Lease

Wallace:

The Oil and Gas Lease looks fine. Obviously, the name of the lessor needs to be changed from Kuk Ja Stewart to UP_G_KUK, INC. Other than that, everything is good. Once the corrections are made, please forward the lease to me for my client's signature.

Thanks for your assistance in this matter. Please feel free to contact me with any questions you may have.
-Sterling

| **Sterling Elza** | **Brown, Dean, Wiseman, Liser, Proctor & Hart** |
|---|---|
| | 306 West 7th Street, Suite 200 |
| | Fort Worth, Tx 76102 |
| | tel: 817-332-1391 |
| selza@browndean.com | fax: 817-870-2427 |

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

*Stewart
Oil & Gas
general
con*

# Scout Exploration, J.V.
**5956 SHERRY LANE, SUITE 1810**
**DALLAS, TEXAS 75225**

---

(214) 891-0920
(214) 891-9855 FAX
whall@wetlandpartners.com

**Date:** 9/9/05

**Recipient:** MR. STERLING ELZA

**Company:** BROWN, DEAN, WISEMAN, LISEN

**Fax number:** (512) 870-2427

**From:** WALLACE HALL

**Number of pages (including cover):** _____

**Message:**

STERLING,

PER OUR CONVERSATION TODAY, I AM RE-SENDING
THE LEASE FORM FOR YOUR REVIEW & COMMENT.
WE ARE PREPARED TO MOVE FORWARD ASAP IN LIGHT
OF THE RECENT COMPLETION OF THE TRANSFER THAT
WE WERE WAITING ON. THANKS!

Wallace

# HOLMAN ROBERTSON ELDRIDGE
A Professional Corporation
Attorneys and Counselors
5949 Sherry Lane
Suite 1700
Dallas, Texas 75225

Shareholders:
H. DOUGLAS BAER
CHARLES R. BIDDLE
RICHARD T. CHEATHAM
DAVID A. ELDRIDGE
RONALD O. HOLMAN
JOHN CROW MILLER
J. MALCOLM ROBERTSON, JR.
ROBERT A. SOLOMON

Telephone
214 / 361-9494

Writer's Extension
113

Facsimile
214 / 691-2109

Writer's E-Mail Address
rholman@hrepc.com

June 29, 2005

Mr. Charles B. Mitchell, Jr.
Brown, Dean, Wiseman, Liser,
    Proctor & Hart, L.L.P.
306 West 7th Street, Suite 200
Fort Worth, Texas 76102-4905

> Re:     Letter of intent dated June 10, 2005 by and between Kuk Ja Stewart, as Lessor, and
>         Scout Exploration, J.V., as Lessee

Dear Mr. Mitchell:

I write to you on behalf of Scout Exploration, J.V. in connection with the referenced letter of intent. In that regard, enclosed please find a draft only dated June 24, 2005 of the proposed Paid Up Oil and Gas Lease between our respective clients.

I look forward to working with you in this matter.

Very truly yours,

Ronald O. Holman

ROH/lma
Enclosure
cc: -     Scout Exploration, J.V.

H:\wp\05\roh\scout\MITCHELL-L01.doc

PRODUCERS 88 (4-89) — PAID UP POUND PRINTING & STATIONERY COMPANY
WITH 640 ACRES POOLING PROVISION    4703-C RICHMOND, HOUSTON, TEXAS 77027 (713) 552-9797

# PAID UP OIL AND GAS LEASE

THIS LEASE AGREEMENT is made as of the _____ day of _____, 2005 ___, between KUK JA STEWART, as Lessor (whether one or more), whose address is 2028 Sandy Lane, Irving, Texas 75060-5639, and SCOUT EXPLORATION, J.V., a Texas Joint Venture, as Lessee, whose address is 5956 Sherry Lane, Suite 1810, Dallas, Texas 75225. All printed portions of this lease were prepared by the party hereinabove named as Lessee, but all other provisions (including the completion of blank spaces) were prepared jointly by Lessor and Lessee.

1.    In consideration of a cash bonus in hand paid and the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lessee the following described land, hereinafter called leased premises: (use Exhibit "A" for long description):

42.803 acres of land, more or less, out of the J. Mangrum Survey, A-861, being the same land described in that certain deed dated _____, recorded in Volume 93014, Page 196__, Deed Records, Dallas County, Texas, from _____ to _____, which land is hereinafter referred to as the "leased premises",

In the county of Dallas, State of Texas, containing 42.803 gross acres, more or less (including any interests therein which Lessor may hereafter acquire by reversion, prescription or otherwise), for the purpose of exploring for, developing, producing and marketing oil and gas, along with all hydrocarbon and nonhydrocarbon substances produced in association therewith. The term "gas" as used herein includes helium, carbon dioxide and other commercial gases, as well as hydrocarbon gases. In addition to the above-described leased premises, this lease also covers accretions and any small strips or parcels of land now or hereafter owned by Lessor which are contiguous or adjacent to the above-described leased premises, and, in consideration of the aforementioned cash bonus, Lessor agrees to execute at Lessees request any additional or supplemental instruments for a more complete or accurate description of the land so covered. For the purpose of determining the amount of any shut-in royalties hereunder, the number of gross acres above specified shall be deemed correct, whether actually more or less.

2.    This lease, which is a "paid-up" lease requiring no rentals, shall be in force for a primary term of five (5) years from the date hereof, and for as long thereafter as oil or gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith or this lease is otherwise maintained in effect pursuant to the provisions hereof.

3.    Royalties on oil, gas and other substances produced and saved hereunder shall be paid by Lessee to Lessor as follows: (a) For oil and other liquid hydrocarbons separated at Lessees separator facilities, the royalty shall be 1/4 of such production, to be delivered at Lessee's option to Lessor at the wellhead or to Lessor's credit at the oil purchaser's transportation facilities, provided that Lessee shall have the continuing right to purchase such production at the wellhead market price then prevailing in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) for production of similar grade and gravity; (b) for gas (including casinghead gas) and all other substances covered hereby, the royalty shall be 1/4 of the proceeds realized by Lessee from the sale thereof, less a proportionate part of ad valorem taxes and production, severance, or other excise taxes and the costs incurred by Lessee in delivering, processing or otherwise marketing such gas or other substances, provided that Lessee shall have the continuing right to purchase such production at the prevailing wellhead market price paid for production of similar quality in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) pursuant to comparable purchase contracts entered into on the same or nearest preceding date as the date on which Lessee commences its purchases hereunder; and (c) if at the end of the primary term or any time thereafter one or more wells on the leased premises or lands pooled therewith are capable of producing oil or gas or other substances covered hereby in paying quantities, but such well or wells are either shut in or production therefrom is not being sold by Lessee, such well or wells shall nevertheless be deemed to be producing in paying quantities for the purpose of maintaining this lease. If for a period of 90 consecutive days such well or wells are shut in or production therefrom is not being sold by Lessee, then Lessee shall pay shut-in royalty of one dollar per acre then covered by this lease, such payment to be made to Lessor or to Lessors credit in the depository designated below, on or before the end of said 90-day period and thereafter on or before each anniversary of the end of said 90-day period while the well or wells are shut in or production therefrom is not being sold by Lessee; provided that if this lease is otherwise being maintained by operations, or if production is being sold by Lessee from another well or wells on the leased premises or lands pooled therewith, no shut-in royalty shall be due until the end of the 90-day period next following cessation of such operations or production. Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the amount due, but shall not operate to terminate this lease.

4.    All shut-in royalty payments under this lease shall be paid or tendered to Lessor or to Lessor's credit in

at _____ or its successors, which shall be Lessor's depository agent for receiving payments regardless of changes in the ownership of said land. All payments or tenders may be made in currency, or by check or by draft and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails in a stamped envelope addressed to the depository or to the Lessor at the last address known to Lessee shall constitute proper payment. If the depository should liquidate or be succeeded by another institution, or for any reason fail or refuse to accept payment hereunder, Lessor shall, at Lessees request, deliver to Lessee a proper recordable instrument naming another institution as depository agent to receive payments.

5.    If Lessee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled therewith, or if all production (whether or not in paying quantities) permanently ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Paragraph 6 or the action of any governmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee commences operations for reworking an existing well or for drilling an additional well or for otherwise obtaining or restoring production on the leased premises or lands pooled therewith within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production. If at the end of the primary term, or at any time thereafter, this lease is not otherwise being maintained in force but Lessee is then engaged in drilling, reworking or any other operations reasonably calculated to obtain or restore production therefrom, this lease shall remain in force so long as any one or more of such operations are prosecuted with no cessation of more than 90 consecutive days, and if any such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying quantities from the leased premises or lands pooled therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additional wells on the leased premises or lands pooled therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased premises as to formations then capable of producing in paying quantities on the leased premises or lands pooled therewith, or (b) to protect the leased premises from uncompensated drainage by any well or wells located on other lands not pooled therewith. There shall be no covenant to drill any additional wells except as expressly provided herein.

6.    Lessee shall have the right but not the obligation to pool all or any part of the leased premises or interest therein with any other lands or interests, as to any or all depths or zones, and as to any or all substances covered by this lease, either before or after the commencement of production, whenever Lessee deems it necessary or proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or interests. The unit formed by such pooling for an oil well which is not a horizontal completion shall not exceed 80 acres plus a maximum acreage tolerance of 10%, and for a gas well or a horizontal completion shall not exceed 640 acres plus a maximum acreage tolerance of 10%; provided that a larger unit may be formed for an oil well or gas well or horizontal completion to conform to any well spacing or density pattern that may be prescribed or permitted by any governmental authority having jurisdiction to do so. For the purpose of the foregoing, the terms "oil well" and "gas well" shall have the meanings prescribed by applicable law or the appropriate governmental authority, or, if no definition is so prescribed, "oil well" means a well with an initial gas-oil ratio of less than 100,000 cubic feet per barrel and "gas well" means a well with an initial gas-oil ratio of 100,000 cubic feet or more per barrel, based on a 24-hour production test conducted under normal producing conditions using standard lease separator facilities or equivalent testing equipment; and the term "horizontal completion" means an oil well in which the horizontal component of the gross completion interval in the reservoir exceeds the vertical component thereof. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit and stating the effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were production, drilling or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit production which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit, but only to the extent such proportion of unit production is sold by Lessee. Pooling in one or more instances shall not exhaust Lessees pooling rights hereunder, and Lessee shall have the recurring right but not the obligation to revise any unit formed hereunder by expansion or contraction or both, either before or after commencement of production, in order to conform to the well spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination made by such governmental authority. In making such a revision, Lessee shall file of record a written declaration describing the revised unit and stating the effective date of revision. To the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which royalties are payable hereunder shall thereafter be adjusted accordingly. In the absence of production in paying quantities from a unit, or upon permanent cessation thereof, Lessee may terminate the unit by filing of record a written declaration describing the unit and stating the date of termination. Pooling hereunder shall not constitute a cross-conveyance of interests.

DRAFT ONLY (6/24/05)

7.   If Lessor owns less than the full mineral estate in all or any part of the leased premises, the royalties and sh___ royalties payable hereunder for any well on any part of the leased premises or lands pooled therewith shall be reduced to the proportion that Lessor's interest in such part of the leased premises bears to the full mineral estate in such part of the leased premises.

8.   The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or zone, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns. No change in Lessor's ownership shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee until 60 days after Lessee has been furnished the original or certified or duly authenticated copies of the documents establishing such change of ownership to the satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessees usual form of division order. In the event of the death of any person entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to the credit of decedent or decedent's estate in the depository designated above, if at any time two or more persons are entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to such persons or to their credit  in the depository, either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee shall be relieved of all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this lease, the obligation to pay or tender shut-in royalties hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease then held by each.

9.   Lessee may, at any time and from time to time, deliver to Lessor or file of record a written release of this lease as to a full or undivided interest in all or any portion of the area covered by this lease or any depths or zones thereunder, and shall thereupon be relieved of all obligations thereafter arising with respect to the interest so released. If Lessee releases all or an undivided interest in less than all of the area covered hereby, Lessee's obligation to pay or tender shut-in royalties shall be proportionately reduced in accordance with the net acreage interest retained hereunder.

10.   In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises as may be reasonably necessary for such purposes, including but not limited to geophysical operations, the drilling of wells, and the construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to di__ cover, produce, store, treat and/or transport production. Lessee may use in such operations, free of cost, any oil, gas, water and/or other substances produced on the leased premises, except water from Lessor's wells or ponds, in exploring, developing, producing or marketing from the leased premises or lands pooled therewith, the ancillary rights granted herein shall apply (a) to the entire leased premises described in Paragraph 1 above, notwithstanding any partial release or other partial termination of this lease; and (b) to any other lands in which Lessor now or hereafter has authority to grant such rights in the vicinity of the leased premises or lands pooled therewith. When requested by Lessor in writing, Lessee shall bury its pipelines below ordinary plow depth on cultivated lands. No well shall be located less than 200 feet from any house or barn now on the leased premises or other lands used by Lessee hereunder, without Lessor's consent, and Lessee shall pay for damage caused by its operations to buildings and other improvements now on the leased premises or such other lands, and to commercial timber and growing crops thereon. Lessee shall have the right at any time to remove its fixtures, equipment and materials, including well casing, from the leased premises or such other lands during the term of this lease or within a reasonable time thereafter.

11.   Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. When drilling, reworking, production or other operations are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessees control, this lease shall not terminate because of such prevention or delay, and at Lessee option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other operations  are so prevented, delayed or interrupted.

12.   In the event that Lessor, during the primary term of this lease, receives a bona fide offer which Lessor is willing to accept from any party offering to purchase from Lessor a lease covering any or all of the substances covered by this lease and covering all or a portion of the land described herein, with the lease becoming effective upon expiration of this lease, Lessor hereby agrees to notify Lessee in writing of said offer immediately, including in the notice the name and address of the offeror, the price offered and all other pertinent terms and conditions of the offer, Lessee, for a period of fifteen days after receipt of the notice, shall have the prior and preferred right and option to purchase the lease or part thereof or interest therein, covered by the offer at the price and according to the terms and conditions specified in the offer.

13.   No litigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default, within such period. In the event the matter is litigated and there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after said judicial determination to remedy the breach or default and Lessee fails to do so.

14.   Lessor hereby warrants and agrees to defend title conveyed to Lessee hereunder, and agrees that Lessee at Lessees option may pay and discharge any taxes, mortgages or liens existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to whom payment is made, and, in addition to its other rights, may reimburse itself out of any royalties or shut-in royalties otherwise payable to Lessor hereunder. In the event Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in royalties hereunder, without interest, until Lessee has been furnished satisfactory evidence that such claim has been resolved.

15.  The parties hereto agree that Lessee shall pay to the owner(s) of the surface estate of the leased premises the sum of $25,000.00 for each drill site constructed on the leased premises, which sum shall represent payment in full for all damages done to said drill site in connection with Lessee's operations thereon, which drill site shall not exceed _____ acres of 'and, more or less.

16.  Concurrently with Lessor's execution hereof, Lessee shall pay Lessor the sum of $500.00 per net mineral acre of land covered by this lease as bonus consideration for the execution of this lease by Lessor.

17.  The parties hereto agree that a Memorandum of Paid Up Oil and Gas Lease may be filed of record for the purpose of providing record notice of the existence of this lease in lieu of recording the executed original hereof.

IN WITNESS WHEREOF, this lease is executed by Lessor on the date set forth in the certificate of acknowledgment below, but shall be effective as of the date first above written.

SCOUT EXPLORATION, J.V.

By_____

_____
KUK JA STEWART

DRAFT ONLY (6/24/05)

**BROWN, D.    ', WISEMAN, LISER, PROCTOR &    'T, L.L.P.**

Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
JOHN W. PROCTOR
•• JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

September 8, 2005

*Via Fax - 214/891-9855*
Mr. Wallace Hall
Scout Exploration, J.V.
5956 Sherry Lane, Suite 1810
Dallas, Texas 75225

Dear Mr. Hall:

As we discussed, attached please find a signed copy of a Warranty Deed transferring the subject property from Kuk Ja Stewart to UP_G_KUK, Inc., a corporation owned and operated by Mrs. Stewart. In addition, I have attached a copy of Scout Exploration's letter of intent with Mrs. Stewart. The basic terms and conditions are agreeable. Obviously, the Lessor will no longer be Kuk Ja Stewart, but UP_G_KUK, Inc.

Please feel free to contact me with any questions you may have.

Sincerely,

Sterling J. Elza

SJE/jj
Enclosure

cc:    Mr. Charles B. Mitchell, Jr. - Firm  ✓

September 8, 2005
Page 2

bcc:    Kuk Ja Stewart
        2028 Sandy Lane
        Irving, Texas 75060

W:\CHARLES\FILES\INDIVIDUAL CLIENTS\STEWART, KUJA [REAL ESTATE 22711]\CORRESPONDENCE\HALL.001.WPD