

4000 FOSSIL CREEK BOULEVARD
FORT WORTH, TEXAS 76137
(817) 847-1422
METRO (817) 429-9375
FAX (817) 232-9784

December 16, 2005
AVO 23423

Ms. Kuk Ja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:   **Hunter Ferrell Road**
      **From Beltline Road to MacArthur Boulevard**

Dear Ms. Stewart:

Halff Associates, Inc. was selected by Dallas County, Texas, to begin the Preliminary Design of Hunter Ferrell Road improvements, from Beltline Road to MacArthur Boulevard. This project is a cooperative effort between Dallas County and the cities of Irving and Grand Prairie to provide improved access for the area.

The design includes a feasibility and alignment study to determine the proposed route for Hunter Ferrell Road. Improvements to a portion of Story Road are also planned with the project.

Right-of-way and design surveys are currently underway, and our surveyors will be in the area for the next several weeks. They are locating and tying property monuments, structures and other facilities for use in the study. A Right of Entry permission letter is enclosed, with a stamped return envelope. Please indicate if we have permission to enter your property and return the completed letter. A copy will be sent to you for your records.

Please contact James O'Connor at the City of Irving or me if you have any questions.

Sincerely,

**HALFF ASSOCIATES, INC.**

Lisa M. Rhudy, P.E.

Attachments

Cc:   Jerry F. Roberts, P.E. - Halff Associates
      John L. Mears, P.E. – Dallas County
      James O'Connor, P.E. - City of Irving

FORT WORTH • DALLAS • HOUSTON • McALLEN • AUSTIN • FRISCO • SAN ANTONIO

TRANSPORTATION • WATER RESOURCES • LAND DEVELOPMENT • MUNICIPAL • ENVIRONMENTAL • STRUCTURAL
MECHANICAL • ELECTRICAL • SURVEYING • GEOGRAPHIC INFORMATION SYSTEMS
ARCHITECTURE • LANDSCAPE ARCHITECTURE • PLANNING



### Halff Associates
ENGINEERS · ARCHITECTS · SCIENTISTS · PLANNERS · SURVEYORS

4000 FOSSIL CREEK BOULEVARD
FORT WORTH, TEXAS 76137
(817) 847-1422
METRO (817) 429-9975
FAX (817) 232-9784

_____, 2005

AVO 23423

Project: Hunter Ferrell Road
         From Beltline Road to MacArthur Blvd.

**Name:** _____

**Address:** _____

_____

Dear Property Owner:

Dallas County has contracted Halff Associates, Inc. to design roadway improvements for Hunter Ferrell Road, from Beltline Road to MacArthur Blvd. The project also includes improvements to a portion of Story Road and Bear Creek.

We are beginning design, and request permission to enter your property for a preliminary survey to locate property corners and/or to survey existing features immediately adjacent to the proposed roadway. Also, we request permission to enter your property, if additional right of way is required, in order to mark the new right of way lines, and/or easements.

A survey crew from Halff Associates, Inc. and/or Arredondo, Zepeda, and Brunz, Inc., will be collecting field data on behalf of Dallas County. We will begin our field work in August, 2005. Should you have any questions, please contact Jerry Roberts or Lisa Rhudy at Metro number (817) 429-9975 during normal business hours.

Please sign below to indicate that we have permission to enter your property. A copy will be returned to you for your records.

Sincerely,

**HALFF ASSOCIATES, INC.**

Lisa M. Rhudy, P.E.

FORT WORTH · DALLAS · HOUSTON · McALLEN · AUSTIN · FRISCO · SAN ANTONIO

TRANSPORTATION · WATER RESOURCES · LAND DEVELOPMENT · MUNICIPAL · ENVIRONMENTAL · STRUCTURAL
MECHANICAL · ELECTRICAL · SURVEYING · GEOGRAPHIC INFORMATION SYSTEMS
ARCHITECTURE · LANDSCAPE ARCHITECTURE · PLANNING



# Halff Associates

ENGINEERS · ARCHITECTS · SCIENTISTS · PLANNERS · SURVEYORS

Project:  Hunter Ferrell Road
          From Beltline Road to MacArthur Blvd.

Re:    Request for Right-of-Entry

## RIGHT-OF-ENTRY FORM
Permission to Access Private Property for Surveying Purposes

I hereby grant Halff Associates, Inc., their employees, or their representatives access to my Property for purposes of conducting field survey work in connection with the Hunter Ferrell Road project. The Right of Entry is for the purpose of locating property corners of existing boundary lines, surveying existing features adjacent to the project, and marking the proposed right-of-way.

It is expressly understood that this Right of Entry in no way waives or affects Owner's right to the proposed land conveyance or any damages to Owner's remaining property occasioned by said conveyance, said rights being hereby especially reserved unto Owner, Owner's heirs, successors and assigns.

This Right of Entry shall expire upon completion of land conveyance of the right-of-way to the County of Dallas, Texas, or upon written request by the owner to rescind Right-of-Entry, or 24 months from date of execution.

Property Description:    42.8 AC IN JOSEPH MANGRUM SURVEY, A·861

Property Owner:    KUK JA STEWART

Mailing Address:    2028 SANDY LANE, IRVING, TX 75060

Telephone Number:

Tenant Name
(if applicable):

Signature:

Printed Name:

Date:

## Charles Mitchell

| | |
|---|---|
| **From:** | Mr James Stewart [jimbobandfishing@verizon.net] |
| **Sent:** | Tuesday, December 20, 2005 2:20 PM |
| **To:** | Charles Mitchell |
| **Subject:** | Recieved Info in Mail |

Charlie, we received some information from Halff Associates in the mail today. If the three attachments do not come through, call me and I'll fax them over to you. I asked Ms. Rhudy all information pertaining to the survey, the dates they staked the land and the papers that the survey crew had with them that day. This is all that was sent. My mother is not going to do anything until she hears from you. Thanks and have a very merry Christmas.

**Charles Mitchell**



| | |
|---|---|
| **From:** | James Stewart [jimbobandfishing@verizon.net] |
| **Sent:** | Wednesday, December 14, 2005 8:42 PM |
| **To:** | Charles Mitchell |

**Subject:** Hunter Ferrell

Charlie, I don't know if Kenny has given you the following information. Todd Curtis is the person who is renting my mom's land. He came by last night looking for Kenny. I asked Todd if he had seen any signs of the oil company. He said no, but that the road that the surveyours staked down is taking up a third of her land and more than half the pasture. He was there when the surveyours were there. He said there was not any markings on their truck nor did they have any shirts that had what company they were with. He also had seen a document stating "contact owner before entering property", his neighbor who was with Todd saw it too and Todd did say if Mom had to go to court over this, that he and his neighbor would be there. Todd kept stressing that the way they staked it and with the recent developments, my mom is going to lose a hell of a lot more land thant the survey maps that my mom had shown him. Charlie, please call me when you get this e-mail because my mom is talking about going to Dallas County to request that they pay her full value and I told her to wait until get a hold of you. Now she wants to know if it is too late to file that application for strip center. I told her to wait, that you would take care of her and tell her what you and her need to do. Todd also said you can call him at work if you need to and that if he is not there, to leave a message and he will call you back. His name is Todd Curtis, (214)543-1327. Charlie, I appreciate everything you have done for our family! My dad always was there to give us the guidance we needed and for that I'm very grateful for the guidance we have recieved from you. Thanks! What do you think of my dorky e-mail address.
D

12/15/2005

# GEOPHYSICAL

**P. O. BOX 122646**
**Fort Worth, TX 76121**
**Office: (817) 944-3859 or (817) 944-4750**          **Fax: (866) 462-4198**          **Prospect: Willis 3D**
**Date: January 6, 2011**

Dear Landowner:

Dawson Geophysical Co. will be conducting a 3-D seismic geophysical survey (i.e., mapping beneath the earth's surface) in your area in the near future. The purpose of the survey is to create a three dimensional image that will aid in the oil and gas exploration process.

A seismic survey is a safe and time-tested process. In urban environments, vibrator energy sources mounted on vehicles are used to create seismic energy. Similar to the way an echo bounces off the walls of a canyon, this seismic energy bounces back from geological formations deep within the earth, providing data which facilitates horizontal drilling. The vehicles are present in the neighborhoods for a very brief amount of time, preventing any interruption of daily activities.

Perhaps the most visible evidence that a survey will be taking place is the laying of a cable line that will run along the curb in the city's right of way with an occasional small receiving device placed in the grass next to the curb (where possible). The cable is approximately the size of a household extension cord and will be around or near your property for approximately fourteen (14) to thirty (30) days (weather permitting). This cable carries no current nor does it penetrate the surface of the ground.

Our Client, Chesapeake Operating, Inc. (and/or its partners), is the record owner or assignee of an oil and gas lease beneath your property. These oil and gas leases grant the right to conduct the planned survey. Our operations will be handled in a prudent and careful manner. We agree to indemnify and hold you harmless from all liability and claims, if any, which may result from our upcoming seismic operations.

This is a letter of notification. For more information on how the survey will be conducted please feel free to give us a call at our field office: (817) 944-3859 or (817) 944-4750.

Respectfully,

Jeff Seay
Permit Agent

(817) 944-3859 or (817) 944-4750

Dawson Geophysical Co

**BROWN, WISEMAN, LISER, PROCTOR & HART, L.L.P.**

Attorneys at Law

SEALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
JOHN W. PROCTOR
** JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

September 27, 2005

*Via Fax - 214/891-9855 and Regular Mail*
Mr. Wallace Hall
Scout Exploration, J.V.
5956 Sherry Lane, Suite 1810
Dallas, Texas 75225

Dear Mr. Hall:

Attached please find the signed and notarized copy of the Paid Up Oil and Gas Lease. Once Scout Exploration has signed the Lease, please provide me with a copy and then file the appropriate documents with the County Clerk.

Please feel free to contact me with any questions you may have.

Sincerely,

Sterling J. Elza

SJE/jj
Enclosure

cc:    Mr. Charles B. Mitchell, Jr. - Firm



PRODUCERS 88 (4-89) -- PAID UP POUND PRINTING    TIONERY COMPANY
WITH 640 ACRES POOLING PROVISION    4703-C RICHMOND, HOUSTON, TEXAS 77027 (713) 552-9797

# PAID UP OIL AND GAS LEASE

THIS LEASE AGREEMENT is made as of the 15th day of September, 2005, between UP G KUK, INC., A TEXAS CORPOR Lessor (whether one or more), whose address is 2028 Sandy Lane, Irving, Texas 75060-5639, and SCOUT EXPLORATION, J.V Joint Venture, as Lessee, whose address is 5956 Sherry Lane, Suite 1810, Dallas, Texas 75225. All printed portions of this lease were p party hereinabove named as Lessee, but all other provisions (including the completion of blank spaces) were prepared jointly by Lessor and Lessee.

1. In consideration of a cash bonus in hand paid and the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lesse described land, hereinafter called leased premises: (use Exhibit "A" for long description):

> 42.803 acres of land, more or less, out of the J. Mangum Survey, A-861, Dallas County, Texas, more particula described on Exhibit "A" attached hereto and made a part hereof for all purposes, which land is hereinafter referr to as the "leased premises",

In the county of Dallas, State of Texas, containing 42.803 gross acres, more or less (including any interests therein which Lessor may hereafter acquir prescription or otherwise), for the purpose of exploring for, developing, producing and marketing oil and gas, along with all hydrocarbon and nonhydrocarb produced in association therewith. The term "gas" as used herein includes helium, carbon dioxide and other commercial gases, as well as hydrocarbon gase the above-described leased premises, this lease also covers accretions and any small strips or parcels of land now or hereafter owned by Lessor which are adjacent to the above-described leased premises, and, in consideration of the aforementioned cash bonus, Lessor agrees to execute at Lessees request a supplemental instruments for a more complete or accurate description of the land so covered. For the purpose of determining the amount of any shut-in royal the number of gross acres above specified shall be deemed correct, whether actually more or less.

2. This lease, which is a "paid-up" lease requiring no rentals, shall be in force for a primary term of five (5) years from the date hereof, and for as as oil or gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith or this leas maintained in effect pursuant to the provisions hereof.

3. Royalties on oil, gas and other substances produced and saved hereunder shall be paid by Lessee to Lessor as follows: (a) For oil and other liquid separated at Lessees separator facilities, the royalty shall be 1/4 of such production, to be delivered at Lessee's option to Lessor at the wellhead or to Lesso oil purchaser's transportation facilities, provided that Lessee shall have the continuing right to purchase such production at the wellhead market price then p same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) for production of sin gravity; (b) for gas (including casinghead gas) and all other substances covered hereby, the royalty shall be 1/4 of the proceeds realized by Lessee from th less a proportionate part of ad valorem taxes and production, severance, or other excise taxes and the costs incurred by Lessee in delivering, processin marketing such gas or other substances, provided that Lessee shall have the continuing right to purchase such production at the prevailing wellhead marke production of similar quality in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a pr pursuant to comparable purchase contracts entered into on the same or nearest preceding date as the date on which Lessee commences its purchases here if at the end of the primary term or any time thereafter one or more wells on the leased premises or lands pooled therewith are capable of producing oil substances covered hereby in paying quantities, but such well or wells are either shut in or production therefrom is not being sold by Lessee, such wel nevertheless be deemed to be producing in paying quantities for the purpose of maintaining this lease. If for a period of 90 consecutive days such well or well production therefrom is not being sold by Lessee, then Lessee shall pay shut-in royalty of one dollar per acre then covered by this lease, such payment Lessor or to Lessors credit in the depository designated below, on or before the end of said 90-day period and thereafter on or before each anniversary of t 90-day period while the well or wells are shut in or production therefrom is not being sold by Lessee; provided that if this lease is otherwise being maintained or if production is being sold by Lessee from another well or wells on the leased premises or lands pooled therewith, no shut-in royalty shall be due until 90-day period next following cessation of such operations or production. Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the an shall not operate to terminate this lease.

4. All shut-in royalty payments under this lease shall be paid or tendered to Lessor or to Lessor's credit in

at
or its successors, which shall be Lessor's depository agent for receiving payments regardless of changes in the ownership of said land. All payments or te made in currency, or by check or by draft and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails in a stamped envelope ad depository or to the Lessor at the last address known to Lessee shall constitute proper payment. If the depository should liquidate or be succeeded by anothe for any reason fail or refuse to accept payment hereunder, Lessor shall, at Lessees request, deliver to Lessee a proper recordable instrument naming anothe depository agent to receive payments.

5. If Lessee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled th production (whether or not in paying quantities) permanently ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Parr action of any governmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lesse operations for reworking an existing well or for drilling an additional well or for otherwise obtaining or restoring production on the leased premises or lands po within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production. If at the end of the primary term, thereafter, this lease is not otherwise being maintained in force but Lessee is then engaged in drilling, reworking or any other operations reasonably calcula restore production therefrom, this lease shall remain in force so long as any one or more of such operations are prosecuted with no cessation of more than f days, and if any such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying o the leased premises or lands pooled therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additior leased premises or lands pooled therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased p formations then capable of producing in paying quantities on the leased premises or lands pooled therewith, or (b) to protect the leased premises from un drainage by any well or wells located on other lands not pooled therewith. There shall be no covenant to drill exploratory wells or any additional wells excep provided herein.

6. Lessee shall have the right but not the obligation to pool all or any part of the leased premises or interest therein with any other lands or interests, depths or zones, and as to any or all substances covered by this lease, either before or after the commencement of production, whenever Lessee deems it proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or unit formed by such pooling for an oil well which is not a horizontal completion shall not exceed 80 acres plus a maximum acreage tolerance of 10%, and for horizontal completion shall not exceed 640 acres plus a maximum acreage tolerance of 10%; provided that a larger unit may be formed for an oil well horizontal completion to conform to any well unit which is not a horizontal completion but may be prescribed or permitted by any governmental authority having jurisdiction the purpose of the foregoing, the terms "oil well" and "gas well" shall have the meanings prescribed by applicable law or the appropriate governmental aut definition is so prescribed, "oil well" means a well with an initial gas-oil ratio of less than 100,000 cubic feet per barrel and "gas well" means a well with an init of 100,000 cubic feet or more per barrel, based on a 24-hour production test conducted under normal producing conditions using standard lease separat equivalent testing equipment, and the term "horizontal completion" means an oil well in which the horizontal component of the gross completion interval ir exceeds the vertical component thereof. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit a effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treate production, drilling or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion production which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit, but only to the extent such pro production is sold by Lessee. Pooling in one or more instances shall not exhaust Lessees pooling rights hereunder, and Lessee shall have the recurring rig obligation to revise any unit formed hereunder by expansion or contraction or both, either before or after commencement of production, in order to confo spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination governmental authority. In making such a revision, Lessee shall file of record a written declaration describing the revised unit and stating the effective date o the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on whic payable hereunder shall thereafter be adjusted accordingly. In the absence of production in paying quantities from a unit, or upon permanent cessation thereo terminate the unit by filing of record a written declaration describing the unit and stating the date of termination. Pooling hereunder shall not constitute a cros of interests.

7. If Lessor owns less than the full mineral estate in all or any part of the leased premises, the royalties and shut-in royalties payable hereunder for a part of the leased premises or lands pooled therewith shall be reduced to the proportion that Lessor's interest in such part of the leased premises bears to th estate in such part of the leased premises.

PAID UP OIL AND GAS LEASE - Page 1 of 3 Pages
H:\WP08\ROH\SCOUT\STEWART PU OGL-01.DOC

# BROWN, WISEMAN, LISER, PROCTOR, L.L.P.

Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
JOHN W. PROCTOR
•• JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

*   Also licensed to practice in Louisiana
**  Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

September 27, 2005

*Via Fax - 214/891-9855 and Regular Mail*
Mr. Wallace Hall
Scout Exploration, J.V.
5956 Sherry Lane, Suite 1810
Dallas, Texas 75225

Dear Mr. Hall:

Attached please find the signed and notarized copy of the Paid Up Oil and Gas Lease. Once Scout Exploration has signed the Lease, please provide me with a copy and then file the appropriate documents with the County Clerk.

Please feel free to contact me with any questions you may have.

Sincerely,

Sterling J. Elza

SJE/jj
Enclosure

cc:   Mr. Charles B. Mitchell, Jr. - Firm

PRODUCERS 88 (4-89) – PAID UP POUND PRINTING        TIONERY COMPANY
WITH 640 ACRES POOLING PROVISION     4703-C RICHMOND, HOUSTON, TEXAS 77027 (713) 552-9797

# PAID UP OIL AND GAS LEASE

THIS LEASE AGREEMENT is made as of the 15th day of September, 2005, between UP G KUK, INC., A TEXAS CORPOR.
Lessor (whether one or more), whose address is 2028 Sandy Lane, Irving, Texas 75060-562, and SCOUT EXPLORATION, J.V.
Joint Venture, as Lessee, whose address is 5956 Sherry Lane, Suite 1810, Dallas, Texas 75225. All printed portions of this lease were pr
party hereinabove named as Lessee, but all other provisions (including the completion of blank spaces) were prepared jointly by Lessor and Lessee.

1.    In consideration of a cash bonus in hand paid and the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lessee
described Land, hereinafter called leased premises: (use Exhibit "A" for long description):

> 42.803 acres of land, more or less, out of the J. Mangum Survey, A-861, Dallas County, Texas, more particularl
> described on Exhibit "A" attached hereto and made a part hereof for all purposes, which land is hereinafter referre
> to as the "leased premises",

In the county of Dallas, State of Texas, containing 42.803 gross acres, more or less (including any interests therein which Lessor may hereafter acquire
prescription or otherwise), for the purpose of exploring for, developing, producing and marketing oil and gas, along with all hydrocarbon and nonhydrocarbon
produced in association therewith. The term "gas" as used herein includes helium, carbon dioxide and other commercial gases, as well as hydrocarbon gases.
the above-described leased premises, this lease also covers accretions and any small strips or parcels of land now or hereafter owned by Lessor which are o
adjacent to the above-described leased premises, and, in consideration of the aforementioned cash bonus, Lessor agrees to execute at Lessees request any
supplemental instruments for a more complete or accurate description of the land so covered. For the purpose of determining the amount of any shut-in royalty
the number of gross acres above specified shall be deemed correct, whether actually more or less.

2.    This lease, which is a "paid-up" lease requiring no rentals, shall be in force for a primary term of five (5) years from the date hereof, and for as lo
as oil or gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith or this lease
maintained in effect pursuant to the provisions hereof.

3.    Royalties on oil, gas and other substances produced and saved hereunder shall be paid by Lessee to Lessor as follows: (a) For oil and other liquid
separated at Lessees separator facilities, the royalty shall be 1/4 of such production, to be delivered at Lessee's option to Lessor at the wellhead or to Lessor'
oil purchaser's transportation facilities, provided that Lessee shall have the continuing right to purchase such production at the wellhead market price then pr
same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) for production of simi
gravity; (b) For gas (including casinghead gas) and all other substances covered hereby, the royalty shall be 1/4 of the proceeds realized by Lessee from the
less a proportionate part of ad valorem taxes and production, severance, or other excise taxes and the costs incurred by Lessee in delivering, processing
marketing such gas or other substances, provided that Lessee shall have the continuing right to purchase such production at the prevailing wellhead market
production of similar quality in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a pre
pursuant to comparable purchase contracts entered into on the same or nearest preceding date as the date on which Lessee commences its purchases here
if at the end of the primary term or any time thereafter one or more wells on the leased premises or lands pooled therewith are capable of producing oil or
substances covered hereby in paying quantities, but such well or wells are either shut in or production therefrom is not being sold by Lessee, such well a
nevertheless be deemed to be producing in paying quantities for the purpose of maintaining this lease. If for a period of 90 consecutive days such well or wells
production therefrom is not being sold by Lessee, then Lessee shall pay shut-in royalty of one dollar per acre then covered by this lease, such payment to
Lessor or to Lessors credit in the depository designated below, on or before the end of said 90-day period and thereafter on or before each anniversary of th
90-day period while the well or wells are shut in or production therefrom is not being sold by Lessee; provided that if this lease is otherwise being maintained t
or if production is being sold by Lessee from another well or wells on the leased premises or lands pooled therewith, no shut-in royalty shall be due until th
90-day period next following cessation of such operations or production. Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the am
shall not operate to terminate this lease.

4.    All shut-in royalty payments under this lease shall be paid or tendered to Lessor or to Lessor's credit in

at
or its successors, which shall be Lessor's depository agent for receiving payments regardless of changes in the ownership of said land. All payments or ten
made in currency, or by check or by draft and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails in a stamped envelope add
depository or to the Lessor at the last address known to Lessee shall constitute proper payment. If the depository should liquidate or be succeeded by another
for any reason fail or refuse to accept payment hereunder, Lessor shall, at Lessees request, deliver to Lessee a proper recordable instrument naming another
depository agent to receive payments.

5.    If Lessee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled ther
production (whether or not in paying quantities) permanently ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Parag
action of any governmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee
operations for reworking an existing well or for drilling an additional well or for otherwise obtaining or restoring production on the leased premises or lands poo
within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production. If at the end of the primary term, o
thereafter, this lease is not otherwise being maintained in force but Lessee is then engaged in drilling, reworking or any other operations reasonably calculate
restore production therefrom, this lease shall remain in force so long as any one or more of such operations are prosecuted with no cessation of more than 90
days, and if any such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying qu
the leased premises or lands pooled therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additione
leased premises or lands pooled therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased pr
formations then capable of producing in paying quantities on the leased premises or lands pooled therewith, or (b) to protect the leased premises from unc
drainage by any well or wells located on other lands not pooled therewith. There shall be no covenant to drill exploratory wells or any additional wells except
provided herein.

6.    Lessee shall have the right but not the obligation to pool all or any part of the leased premises or interest therein with any other lands or interests, a
depths or zones, and as to any or all substances covered by this lease, either before or after the commencement of production, whenever Lessee deems it r
proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or i
unit formed by such pooling for an oil well which is not a horizontal completion shall not exceed 80 acres plus a maximum acreage tolerance of 10%, and for a
horizontal completion shall not exceed 640 acres plus a maximum acreage tolerance of 10%; provided that a larger unit may be formed for an oil well or
horizontal completion to conform to any well spacing or density pattern that may be prescribed or permitted by any governmental authority having jurisdiction
the purpose of the foregoing, the terms "oil well" and "gas well" shall have the meanings prescribed by applicable law or the appropriate governmental auth
definition is so prescribed, "oil well" means a well with an initial gas-oil ratio of less than 100,000 cubic feet per barrel and "gas well" means a well with an initia
of 100,000 cubic feet or more per barrel, based on a 24-hour production test conducted under normal producing conditions using standard lease separato
equivalent testing equipment; and the term "horizontal completion" means an oil well in which the horizontal component of the gross completion interval in r
exceeds the vertical component thereof. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit an
effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated
production, drilling or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion o
production which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit, but only to the extent such prop
production is sold by Lessee. Pooling in one or more instances shall not exhaust Lessees pooling rights hereunder, and Lessee shall have the recurring righ
obligation to revise any unit formed hereunder by expansion or contraction or both, either before or after commencement of production, in order to confom
spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination m
governmental authority. In making such a revision, Lessee shall file of record a written declaration describing the revised unit and stating the effective date of
the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which
payable hereunder shall thereafter be adjusted accordingly. In the absence of production in paying quantities from a unit, or upon permanent cessation thereof,
terminate the unit by filing of record a written declaration describing the unit and stating the date of termination. Pooling hereunder shall not constitute a cross-
of interests.

7.    If Lessor owns less than the full mineral estate in all or any part of the continued premises, the royalties and shut-in royalties payable hereunder for an
part of the leased premises or lands pooled therewith shall be reduced to the proportion that Lessor's interest in such part of the leased premises bears to the
estate in such part of the leased premises.

8.   The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by dept
the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns.
Lessor's ownership shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be bindi
until 60 days after Lessee has been furnished the original or certified or duly authenticated copies of the documents establishing such change of ow
satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessees usual form of division order. In the event of the death
entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to the credit of decedent or decedent's estate in the depository desig
at any time two or more persons are entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to such persons or to the
depository, either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee sha
all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferre
not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area c
lease, the obligation to pay or tender shut-in royalties hereunder shall be divided between Lessee and the transferee in proportion to the net acreage intere
then held by each.

9.   Lessee may, at any time and from time to time, deliver to Lessor or file of record a written release of this lease as to a full or undivided intere
portion of the area covered by this lease or any depths or zones thereunder, and shall thereupon be relieved of all obligations thereafter arising with respect
so released. If Lessee releases all or an undivided interest in less than all of the area covered hereby, Lessee's obligation to pay or tender shut-in roy
proportionately reduced in accordance with the net acreage interest retained hereunder.

10.   In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pool
therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the lease
may be reasonably necessary for such purposes, including but not limited to geophysical operations, the drilling of wells, and the construction and use of r
pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Less
produce, store, treat and/or transport production. Lessee may use in such operations, free of cost, any oil, gas, water and/or other substances produced
premises, except water from Lessor's wells or ponds. In exploring, developing, producing or marketing from the leased premises or lands pooled therewith
rights granted herein shall apply (a) to the entire leased premises described in Paragraph I above, notwithstanding any partial release or other partial termi
lease; and (b) to any other lands in which Lessor now or hereafter has authority to grant such rights in the vicinity of the leased premises or lands pooled the
requested by Lessor in writing, Lessee shall bury its pipelines below ordinary plow depth on cultivated lands. No well shall be located less than 200 feet from
barn now on the leased premises or other lands used by Lessee hereunder, without Lessor's consent, and Lessee shall pay for damage caused by its
buildings and other improvements now on the leased premises or such other lands, and to commercial timber and growing crops thereon. Lessee shall have t
time to remove its fixtures, equipment and materials, including well casing, from the leased premises or such other lands during the term of this lease or withir
time thereafter.

11.   Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any
authority having jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. V
reworking, production or other operations are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permit
services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, s
disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any ot
reasonably within Lessees control, this lease shall not terminate because of such prevention or delay, and at Lessees option, the period of such prevention or
added to the term hereof. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other oper
prevented, delayed or interrupted.

12.   In the event that Lessor, during the primary term of this lease, receives a bona fide offer which Lessor is willing to accept from any party offerin
from Lessor a lease covering any or all of the substances covered by this lease and covering all or a portion of the land described herein, with the lease beco
upon expiration of this lease, Lessor hereby agrees to notify Lessee in writing of said offer immediately, including in the notice the name and address of the off
offered and all other pertinent terms and conditions of the offer. Lessee, for a period of fifteen days after receipt of the notice, shall have the prior and prefe
option to purchase the lease or part thereof or interest therein, covered by the price and according to the terms and conditions specified in the

13.   No litigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has
written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default, within such period. In the event the matter i
there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Less
reasonable time after said judicial determination to remedy the breach or default and Lessee fails to do so.

14.   Lessor hereby warrants and agrees to defend title conveyed to Lessee hereunder, and agrees that Lessee at Lessees option may pay and dischar
mortgages or liens existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights
whom payment is made, and, in addition to its other rights, may reimburse itself out of any royalties or shut-in royalties otherwise payable to Lessor hereunde
Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in royalties hereunder, without
Lessee has been furnished satisfactory evidence that such claim has been resolved.

15.   The parties hereto agree that Lessee shall pay to the owner(s) of the surface estate of the leased premises t
$25,000.00 for each drill site constructed on the leased premises, which sum shall represent payment in full for all
done to said drill site in connection with Lessee's operations thereon, which drill site shall not exceed five (5) acre
more or less.

16.   Concurrently with Lessor's execution hereof, Lessee shall pay Lessor the sum of $500.00 per net mineral ac
covered by this lease as bonus consideration for the execution of this lease by Lessor.

17.   The parties hereto agree that a Memorandum of Paid Up Oil and Gas Lease may be filed of record for the p
providing record notice of the existence of this lease in lieu of recording the executed original hereof.

IN WITNESS WHEREOF, this lease is executed by Lessor on the date set forth in the certificate of acknow
below, but shall be effective as of the date first above written.

Lessor:                                                    Lessee:

UP_G_KUK, INC.                                             SCOUT EXPLORATION, J.V.

By: Kuk Q Stewart                                          By

KUK JA Stewart
[Print/Type Name, Title]                                   [Print/Type Name, Title]

PResiDent

AND GAS LEASE - Page 2 of 3 Pages
*TEWART PU OGL--01.DOC

STATE OF TEXAS

COUNTY OF _Tarrant_

    This instrument was acknowledged before me on this the 27ᵗʰ day of September, 2
_KuK Ja Stewart_ , as _President_ of UP_G_KUK_INC., a Texas corporation,
of said corporation.

N. JEANNINE JENKINS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 5-16-2009

Notary Public in and for the State of Texas

STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this the ___ day of September, 2
_____, as _____ of SCOUT EXPLORATION, J.V., a Texas join
on behalf of said joint venture.

Notary Public in and for the State of Texas

## EXHIBIT "A"

BEING a tract of land situated in the JOSEPH MANGUM SURVEY, ABSTRACT NO. 86  
Dallas County, Texas, and being part of two tracts of land described in deed to Jaspe  
Federal Savings and Loan Association, as recorded in Volume 86168, Page 2069, Dee  
Records, Dallas County, Texas, and being more particularly described as follows:

BEGINNING at a 1/2" diameter iron rod found in the South line of a tract of land describe  
in deed from Ashlin Development Company to Ward Williford, Trustee, as recorded i  
Volume 88119, Page 0715, Deed Records, Dallas County, Texas, said iron rod also bein  
at the most Northerly Northwest corner of a tract of land described in deed from Gifford-H  
& Co., Inc. to the County of Dallas as recorded in Volume 70009, Page 0319, Dee  
Records, Dallas County, Texas, said iron rod also being in the West line of Hunter Ferre  
Road (a 57.5 foot right-of-way at this point);

THENCE South 1,536.53 feet with the said West line of Hunter Ferrell Road and with th  
West line of said County of Dallas tract and along a fence line to a 1/2" diameter iron ro  
found;

THENCE South 45° 03' 05" West 70.65 feet with the Northwest line of said Hunter Ferre  
Road and with the Northwest line of said County of Dallas tract and along a fence line to  
1/2" diameter iron rod found, said iron rod also being in the North line of Hunter Ferre  
Road (a 60' right-of-way at this point);

THENCE South 89° 59' 05" West, 1,126.74 feet, with the North line of said Hunter Ferre  
Road and with the North line of said County of Dallas tract and along a fence line to a 1/  
diameter iron rod found at the Southeast corner of a tract of land described in deed t  
Jasper Federal Savings and Loan Association, as recorded In Volume 86168, Page 2069  
Deed Records, Dallas County, Texas;

THENCE North 00° 19' 26" East 1,594.79 feet, with the East line of said Jasper Federa  
Savings and Loan Association tract, to a 1/2" diameter iron rod found in the South line o  
said Ward Williford, Trustee tract;

THENCE South 89° 42' 16" East 1,167.74 feet, with the said South line of Ward Willifor  
Trustee tract and along a fence line to the PLACE OF BEGINNING and containin  
1,864,485 square feet (42.803 acres) of land, more or less.

# Fax

## BROWN, DEAN, WISEMAN, LISER, PROCTOR & HART, L.L.P.
### Attorneys at Law

ERALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
JOHN W. PROCTOR
•• JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

• Also licensed to practice in Louisiana
•• Also licensed to practice in Minnesota

346 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (317) 429-0851
FAX (817) 970-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JONATHAN B. CHEATHAM
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1923-1975)
WILLIAM M. BROWN (1912-1967)

| | |
|---|---|
| **Name:** | Jimmy Stewart for Kuja Stewart |
| **Organization:** | |
| **Fax:** | (972) 313-9952 |
| **Phone:** | |
| **From:** | Charles B. Mitchell, Jr., Esq. |
| **Date:** | June  /5 , 2005 |
| **Subject:** | Kuja Stewart |
| | Our File No.: 3251.22711 |
| **Pages:** | 5  (including fax cover sheet) |

Comments:

Dear Jimmy:

Per our conversation this morning, attached is the facsimile for your mother. Please give it to her as soon as possible as there is a deadline on this proposal.

Thank you.

Marcia Mitchell
Legal Secretary for Charles B. Mitchell, Jr.

THE INFORMATION CONTAINED IN THIS FACSIMILE IS LEGALLY PRIVILEGED AND CONFIDENTIAL INFORMATION, WHICH IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR REPRODUCTION OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS MESSAGE IN ERROR, THAT MATERIAL HEREWITH SHOULD BE DESTROYED IMMEDIATELY AND THE SENDER LISTED ABOVE SHOULD BE NOTIFIED BY TELEPHONE AT (817) 332-1391.

## Scout Exploration, J.V.

5956 Sherry Lane, Suite 1619
Dallas, Texas 75225
214.891.0920 (Office)
214.891.9895 (Fax)

June 10, 2005

Mrs. Kuk Ja Stewart
2028 Sandy Lane
Irving, Texas 75060-5639

Re:    Letter of Intent- Oil and Gas Lease
       33.33 acres / 9.47 acres, J. Mangrum Survey, A-861
       Dallas County, Texas

Dear Mrs. Stewart:

This Letter of Intent (LOI) shall serve to set forth the basic terms and conditions
under which Lessor and Lessee would desire to enter in to an oil and gas lease (the
"Lease") pertaining to the land described below.

Lessor:          Kuk Ja Stewart

Lessee:          Scout Exploration, J.V.

**Property Description:** A tract or tracts of land totaling approximately **42.80+/- acres**
(comprised of a 33.33 acre tract and a 9.47 acre tract) located in Dallas County, Texas,
and being further described on Exhibit "A" attached hereto and being (the "Property").

Bonus Price:      **$500.00 (Five Hundred Dollars) per net mineral acre**
Royalty:          **25%**
Term:             **5 year paid-up lease**
Surface Use Fee:  **$25,000.00 (payable for each pad built)**

**Mutually acceptable Lease:** Lessee shall have sixty (60) days from the Lessor's
Execution Date of this LOI to negotiate in good faith with Lessor to execute a mutually
acceptable Lease.

**Execution of Lease and Title Examination:** Lessee shall have a minimum of sixty (60)
days after Lessor's Execution Date to obtain a Mineral Title Report covering the
Property. Lessee and Lessor both agree that as long as Lessee is diligently working to

FAX NO.                                P. 03

obtain said title report and if overcrowding in the County Clerk's office, or other issues out of Lessee's control prevents Lessee from finishing the reports within said sixty (60) day period, it is herein agreed that Lessee shall have the option and right, but not the obligation, to pay Lessor $1,000.00 for an additional thirty (30) day period within which to complete the title examination. In such event, Lessee agrees to keep Lessor closely apprised of Lessee's progress, and Lessor shall hold the minerals under the Property for exclusive lease by Lessee during such title examination period. Upon final completion of the Mineral Title Report, and if such Mineral Title Report is acceptable to Lessee, then Lessee will submit a formal Lease for execution by Lessor, and pay to Lessor the Lease bonus money due based upon Lessor's net mineral acre interest ownership in the Property as determined by said Mineral Title Report. Payment will be by Sight Draft given to Lessor at the time of execution of the Lease or if Lessor prefers, by company check within 10 days of the completion of the final Mineral Title Report.

**Property Information:** Lessor agrees to provide Lessee access to all information pertinent to the Property in its (or its consultant's) possession, including any and all title information or documentation, site plans, engineering plans, well logs, topographic surveys, existing Surveys and/or Plats of the Property as well as evidence of any past or current mineral lease in the possession of Lessor.

**Representations and Warranties.** Lessor shall make the usual and customary representations and warranties to the Lessee regarding the Property. **Lessor agrees to keep the terms and conditions of this agreement confidential.**

The above proposal is a statement of the terms under which Lessor and Lessee are prepared to enter into a Lease covering the Property, subject to and expressly conditioned upon (1) the execution and delivery of a mutually acceptable Lease and (2) title to the Property being acceptable to Lessee, in Lessee's sole and exclusive opinion. Notwithstanding any provision herein to the contrary, Lessor hereby agrees that while this LOI is in effect they shall negotiate exclusively with Lessee regarding the leasing of Lessor's mineral interest lying under the Property, and Lessor will not negotiate with any third parties during such time period.

If the terms of this LOI are acceptable to you, please sign where indicated below and return a copy of the letter to me so that we may begin our title due diligence. I appreciate your consideration to this proposal and look forward to hearing from you. **If you have any questions please contact Scott K. Wilpitz at 214.673.8719.**

Unless otherwise agreed to in writing this offer shall expire as of 5:00 pm on Thursday June 16, 2005. A signed copy may be faxed by Lessor to at Scout Exploration, J.V., Attn: Wallace Hall, Jr., (214) 891.9855 (fax).

LESSEE:
Scout Exploration, J.V.

By: _____

Name: Scott K. Wilpitz
Title: Land Representative for Scout Exploration, J.V.
Lessee's Execution Date:    _JUNE 13___, 2005

LESSOR:

By: _____

Name: Kuk Ja Stewart
Title: Owner
Lessor's Execution Date:    6 - 15 - 05, 2005

Page 3 of 3

File No. 100531-CHP
KW #24

### EXHIBIT 'A'

BEING a tract of land situated in the JOSEPH MANGUM SURVEY, ABSTRACT NO. 981, Dallas County, Texas, and being part of two tracts of land described in deed to Jasper Federal Savings and Loan Association, as recorded in Volume 96168, Page 2008, Deed Records, Dallas County, Texas, and being more particularly described as follows:

BEGINNING at a 1/2" diameter iron rod found in the South line of a tract of land described in deed from Ashlin Development Company to Ward Williford, Trustee, as recorded in Volume 96118, Page 9719, Deed Records, Dallas County, Texas, said iron rod also being at the most Northerly Northwest corner of a tract of land described in deed from Gilliard-Hill & Co., Inc. to the County of Dallas as recorded in Volume 70006, Page 0910, Deed Records, Dallas County, Texas, said iron rod also being in the West line of Hunter Ferrell Road (a 67.5 foot right-of-way at this point);

THENCE SOUTH, 1688.53 feet, with the said West line of Hunter Ferrell Road and with the West line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found;

THENCE South 45 degrees 02 minutes 05 seconds East, 70.86 feet, with the Northwest line of said Hunter Ferrell Road and with the Northwest line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found, said iron rod also being in the North line of Hunter Ferrell Road (a 80' right-of-way at this point);

THENCE South 89 degrees 56 minutes 05 seconds West, 1128.74 feet, with the North line of said Hunter Ferrell Road and with the North line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found at the Southeast corner of a tract of land described in Deed to Jasper Federal Savings and Loan Association, as recorded in Volume 96168, Page 2008, Deed Records, Dallas County, Texas;

THENCE North 05 degrees 19 minutes 36 seconds East, 1594.79 feet, with the East line of said Jasper Federal Savings and Loan Association tract, to a 1/2" diameter iron rod found in the South line of said Ward Williford, Trustee tract;

THENCE South 89 degrees 42 minutes 15 seconds East, 1167.74 feet, with the said South line of Ward Williford, Trustee tract and along a fence line, to the PLACE OF BEGINNING and containing 1,664,428 square feet (42.203 acres) of land, more or less.

93014  1968

F

# JIMMY STEWART

2028 Sandy Lane
Irving, TX 75060
Phone: (972)313-9952
Cell: (214)316-0110
Fax: (972)313-9802

January 6, 2006

Dallas County Public Works
Administration Building
411 Elm Street, fourth Floor
Dallas, TX 75202

*They change the address or I can't send the proof on Hunter Ferrell*

To John Mears:

Mr. Mears, I had contacted you on December 16, 2005 seeking information concerning my mother's property in the 1800 and 1900 block of Hunter Ferrell Road in Irving. I am writing this letter to file a formal complaint on Halff Associates, Inc for trespassing, surveying and staking her property without receiving any written consent, nor did they try to contact my mother (Kuk Ja Stewart) for permission to do a survey. We found out the land had been surveyed from an individual with whom my mom had leased the property. He said a survey crew was on the property at 5:30 one evening when he and his neighbor arrived to tend to the livestock. He said over half the property was surveyed and staked when he and his neighbor arrived. He spoke to the survey crew. They asked if he were the owner so he could sign the release document. He let them know he was not the owner. He and his neighbor also saw a document stating, "get owners permission before entering the property". They survey crew finished the process of surveying and staking her property after their conversation. This individual said there were no identifications on the surveyor's vehicle nor did they have any uniforms or company tags stating who employed them. To get access to the land as the surveyors had done, they would have to climb the fence. The entrance is locked and has to have a key for entrance. I had a heck of a time trying to find out who surveyed the property. I made numerous phone calls and talked to the renter several times to see if he or his neighbor could recall anything that would help my search. I received your number from a City of Irving employee, who told me "I think Halff Associates did the survey, but I can give you the name and number of the person who would know". I want to thank you for giving me the name of the survey company (Halff Associates) along with the contact person (Lisa Rhudy). I contacted Ms Rhudy right after our conversation. I asked her for a copy explaining why they were on my mother's land along with all relevant information including to the plans and layout of the road that was going to cut through my mother's property. I let her know that the way the stakes were going through would make over one third of her property useless. She said "this was in the beginning stage and that it was only 10% done". I told her it looked like a perfect road especially by the way the stakes looked going through the land. We did not receive the information I asked for, instead my mother received two documents asking for a release for Halff Associates to enter her property. There was no apology for trespassing and surveying her property. My mother has not responded to signing the releases and is adamant about giving any kind of release for a survey especially to Halff Associates. This letter is also written on behalf of my mother, Kuk Ja Stewart.

Sincerely

Jimmy Stewart
Jimmy Stewart

Owner of the Above Mentioned Land

Kuk Ja Stewart

*Not Her signature Fraud*

# WARRANTY DEED

STATE OF TEXAS       }

                      }       KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF DALLAS    }

Grantor, KUK JA STEWART, of Irving, Dallas County, Texas, for good and valuable consideration received, GRANTS AND CONVEYS to:

UP_G_KUK,INC., a corporation organized and existing under the laws of the State of Texas, as Grantee, whose mailing address is:

2028 Sandy Lane
Irving, Texas 75060

that certain tract or parcel of real property located in Dallas County, Texas, more particularly described on Exhibit "A" attached hereto, together with all tenements, hereditaments and appurtenances thereto, subject to the permitted exceptions set forth on Exhibit "B" attached hereto.

TO HAVE AND TO HOLD the property described, together with all rights and appurtenances lawfully accompanying it, by the Grantee forever. Grantor binds herself and Grantor's heirs, personal representatives, successors, and assigns to warrant and forever defend the property against every person lawfully claiming or to claim all or any part of the property; provided, however, it is expressly understood and agreed that this conveyance is made subject to all easements, exceptions, covenants, conditions, restrictions, reservations, and rights appearing of record.

EXECUTED on August 31, 2005.

KUK JA STEWART

---

*WARRANTY DEED*                                                                 *PAGE 1*

STATE OF TEXAS           }
                         }        CERTIFICATE OF ACKNOWLEDGMENT:
COUNTY OF DALLAS         }

BEFORE ME, the undersigned notary public, on this day personally appeared KUK JA STEWART, known to me by identification through an identification card bearing her photograph and signature to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the instrument for the purposes and considerations expressed in it.

SUBSCRIBED AND SWORN TO BEFORE ME on this $3/^{st}$ day of August, 2005.



N. JEANNINE JENKINS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 5-16-2009

NOTARY PUBLIC, State of Texas

My Comm. Expires: _$05 - 16 - 09$_

W:\CHARLES\FILES\INDIVIDUAL CLIENTS\STEWART, KUJA [REAL ESTATE 22711]\WARRANTY DEED.WPD

STATE OF TEXAS      }

                         }         CERTIFICATE OF ACKNOWLEDGMENT:

COUNTY OF DALLAS   }

     BEFORE ME, the undersigned notary public, on this day personally appeared KUK JA STEWART, known to me by identification through an identification card bearing her photograph and signature to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the instrument for the purposes and considerations expressed in it.

     SUBSCRIBED AND SWORN TO BEFORE ME on this 31st day of August, 2005.



                                      NOTARY PUBLIC, State of Texas

N. JEANNINE JENKINS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 5-16-2009

                                    My Comm. Expires:   05 - 16 - 09

W:\CHARLES\FILES\INDIVIDUAL CLIENTS\STEWART, KUJA [REAL ESTATE 22711]\WARRANTY DEED.WPD

**EXHIBIT "A"**                    *L.D. Hereat*

BEING a tract of land situated in the JOSEPH MANGUM SURVEY, ABSTRACT NO. 861, Dallas County, Texas, and being part of two tracts of land described in deed to Jasper Federal Savings and Loan Association, as recorded in Volume 86166, Page 2069, Deed Records, Dallas county, Texas, and being more particularly described as follows:

BEGINNING at a 1/2" diameter iron rod found in the South line of a tract of land described in deed from Ashlin Development Company to Ward Williford, Trustee, as recorded in Volume 88119, Page 0715, Deed Records, Dallas County, Texas, said iron rod also being at the most Northerly Northwest corner of a tract of land described in deed from Gifford-Hill & Co., Inc. to the County of Dallas as recorded in Volume 70009, Page 0319, Deed Records, Dallas County, Texas, said iron rod also being in the West line of Hunter Ferrell Road (a 57.5 foot right-of-way at this point);

THENCE SOUTH, 1538.53 feet, with the said West line of Hunter Ferrell Road and with the West line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found;

THENCE South 45 degrees 03 minutes 05 seconds West, 70.65 feet, with the Northwest line of said Hunter Ferrell Road and with the Northwest line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found, said iron rod also being in the North line of Hunter Ferrell Road (a 60' right-of-way at this point);

THENCE South 89 degrees 59 minutes 05 seconds West, 1126.74 feet, with the North line of said Hunter Ferrell Road and with the North line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found at the Southeast corner of a tract of land described in Deed to Jasper Federal Savings and Loan Association, as recorded in Volume 86166, Page 2069, Deed Records, dallas county, Texas;

THENCE North 00 degrees 19 minutes 26 seconds East, 1594.79 feet, with the East line of said Jasper Federal Savings and Loan Association tract, to a 1/2" diameter iron rod found in the South line of said Ward Williford, Trustee tract;

THENCE South 89 degrees 42 minutes 16 seconds East, 1167.74 feet, with the said South line of Ward Williford, Trustee tract and along a fence line, to the PLACE OF BEGINNING and containing 1,864,485 square feet (42.803 acres) of land, more or less.

**BROWN, ⬤ , WISEMAN, LISER, PROCTOR & ⬤ T, L.L.P.**

Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
⬤HN W. PROCTOR
⬤HN C. HART
⬤RRY W. WILSHIRE
⬤ANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

September 8, 2005

*Via Fax - 214/891-9855*
Mr. Wallace Hall
Scout Exploration, J.V.
5956 Sherry Lane, Suite 1810
Dallas, Texas 75225

Dear Mr. Hall:

As we discussed, attached please find a signed copy of a Warranty Deed transferring the subject property from Kuk Ja Stewart to UP_G_KUK, Inc., a corporation owned and operated by Mrs. Stewart. In addition, I have attached a copy of Scout Exploration's letter of intent with Mrs. Stewart. The basic terms and conditions are agreeable. Obviously, the Lessor will no longer be Kuk Ja Stewart, but UP_G_KUK, Inc.

Please feel free to contact me with any questions you may have.

Sincerely,

Sterling J. Elza

SJE/jj
Enclosure

cc:    Mr. Charles B. Mitchell, Jr. - Firm

## EXHIBIT "B"

1.   Easement granted by GIFCO PROPERTIES, INC. to TOMMY R. BARTON, ET AL, as evidenced by the instrument dated August 5, 1980 recorded in Volume 84211, Page 350, {Pg. 23} of the Deed Records, Dallas County, Texas.

2.   The rights of tenants in possession under the terms of any unrecorded leases or rental agreements.

3.   All visible and apparent easements and all underground easements the existence of which may arise by virtue of unrecorded grant or use.

4.   Any portion of the subject property lying within the boundaries of any road or roadway, public or private.

761025490S C062

Charles B. Mitchell, Jr.
Brown, Dean, Wiseman, Liser, Proctor and Hart, LLP
306 W. 7th Street Suite 200
Fort Worth, TX 76034





James Stewart
2028 Sandy Ln
Irving TX 75060



NORTH TEXAS PBDC
TX 750   11
05 JAN 2006 PM

RECEIVED
JAN 07 2005

cc:    Lisa M. Rhudy, P. E.
       Halff Associates, Inc.
       4000 Fossil Creek Boulevard
       Fort Worth, TX 76137


       Charles B. Mitchell, Jr.
       Brown, Dean, Wiseman, Liser, Proctor & Hart, LLP
       306 W. 7th Street, Suite200
       Fort Worth, TX 76034


       Scott K. Wilpitz, CPL
       Petroleum Landman
       7230 Stonetrail Drive
       Dallas, TX 75230

PRODUCERS 88 (4-89) — PAID UP/POUND PRINTING & STATIONERY COMPANY
WITH 640 ACRES POOLING PROVISION    4703-C RICHMOND, HOUSTON, TEXAS 77027 (713) 552-9797

# PAID UP OIL AND GAS LEASE

*Look*

THIS LEASE AGREEMENT is made as of the _____ day of _____, 2005, between KUK JA STEWART, as Lessor (whether one or more), whose address is 2028 Sandy Lane, Irving, Texas 75060-5639, and SCOUT EXPLORATION, J.V., a Texas Joint Venture, as Lessee, whose address is 5958 Sherry Lane, Suite 1810, Dallas, Texas 75225. All printed portions of this lease were prepared by the party hereinabove named as Lessee, but all other provisions (including the completion of blank spaces) were prepared jointly by Lessor and Lessee.

1.    In consideration of a cash bonus in hand paid and the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lessee the following described land, hereinafter called leased premises: (use Exhibit "A" for long description):

> 42.803 acres of land, more or less, out of the J. Mangrum Survey, A-861, being the same land described in that certain deed dated _____, recorded in Volume 93014, Page 196__, Deed Records, Dallas County, Texas, from _____ to _____, which land is hereinafter referred to as the "leased premises",

In the county of Dallas, State of Texas, containing 42.803 gross acres, more or less (including any interests therein which Lessor may hereafter acquire by reversion, prescription or otherwise), for the purpose of exploring for, developing, producing and marketing oil and gas, along with all hydrocarbon and nonhydrocarbon substances produced in association therewith. The term "gas" as used herein includes helium, carbon dioxide and other commercial gases, as well as hydrocarbon gases. In addition to the above-described leased premises, this lease also covers accretions and any small strips or parcels of land now or hereafter owned by Lessor which are contiguous or adjacent to the above-described leased premises, and, in consideration of the aforementioned cash bonus, Lessor agrees to execute at Lessee's request any additional or supplemental instruments for a more complete or accurate description of the land so covered. For the purpose of determining the amount of any shut-in royalties hereunder, the number of gross acres above specified shall be deemed correct, whether actually more or less.

2.    This lease, which is a "paid-up" lease requiring no rentals, shall be in force for a primary term of five (5) years from the date hereof, and for as long thereafter as oil or gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith or this lease is otherwise maintained in effect pursuant to the provisions hereof.

3.    Royalties on oil, gas and other substances produced and saved hereunder shall be paid by Lessee to Lessor as follows: (a) For oil and other liquid hydrocarbons separated at Lessee's separator facilities, the royalty shall be 1/4 of such production, to be delivered at Lessee's option to Lessor at the wellhead or to Lessor's credit at the oil purchaser's transportation facilities, provided that Lessee shall have the continuing right to purchase such production at the wellhead market price then prevailing in the same field (or if there is no such price then prevailing in the nearest field in which there is such a prevailing price) for production of similar grade and gravity; (b) for gas (including casinghead gas) and all other substances covered hereby, the royalty shall be 1/4 of the proceeds realized by Lessee from the sale thereof, less a proportionate part of ad valorem taxes and production, severance, or other excise taxes and the costs incurred by Lessee in delivering, processing or otherwise marketing such gas or other substances, provided that Lessee shall have the continuing right to purchase such production at the prevailing wellhead market price paid for production of similar quality in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) pursuant to comparable purchase contracts entered into on the same or nearest preceding date as the date on which Lessee commences its purchases hereunder; and (c) if at the end of the primary term or any time thereafter one or more wells on the leased premises or lands pooled therewith are capable of producing oil or gas or other substances covered hereby in paying quantities, but such well or wells are either shut in or production therefrom is not being sold by Lessee, such well or wells shall nevertheless be deemed to be producing in paying quantities for the purpose of maintaining this lease. If for a period of 90 consecutive days such well or wells are shut in or production therefrom is not being sold by Lessee, then Lessee shall pay shut-in royalty of one dollar per acre then covered by this lease, such payment to be made to Lessor or to Lessor's credit in the depository designated below, on or before the end of said 90-day period and thereafter on or before each anniversary of the end of said 90-day period while the well or wells are shut in or production therefrom is not being sold by Lessee; provided that if this lease is otherwise being maintained by operations, or if production is being sold by Lessee from another well or wells on the leased premises or lands pooled therewith, no shut-in royalty shall be due until the end of the 90-day period next following cessation of such operations or production. Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the amount due, but shall not operate to terminate this lease.

4.    All shut-in royalty payments under this lease shall be paid or tendered to Lessor or to Lessor's credit in

_____
at _____

or its successors, which shall be Lessor's depository agent for receiving payments regardless of changes in the ownership of said land. All payments or tenders may be made in currency, or by check or by draft and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails in a stamped envelope addressed to the depository or to the Lessor at the last address known to Lessee shall constitute proper payment. If the depository should liquidate or be succeeded by another institution, or for any reason fail or refuse to accept payment hereunder, Lessor shall, at Lessee's request, deliver to Lessee a proper recordable instrument naming another institution as depository agent to receive payments.

5.    If Lessee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled therewith, or if all production (whether or not in paying quantities) permanently ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Paragraph 6 or the action of any governmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee commences operations for reworking an existing well or for drilling an additional well or for otherwise obtaining or restoring production on the leased premises or lands pooled therewith within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production. If at the end of the primary term, or at any time thereafter, this lease is not otherwise being maintained in force but Lessee is then engaged in drilling, reworking or any other operations reasonably calculated to obtain or restore production therefrom, this lease shall remain in force so long as any one or more of such operations are prosecuted with no cessation of more than 90 consecutive days, and if any such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying quantities from the leased premises or lands pooled therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additional wells on the leased premises or lands pooled therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased premises as to formations then capable of producing in paying quantities on the leased premises or lands pooled therewith, or (b) to protect the leased premises from uncompensated drainage by any well or wells located on other lands not pooled therewith. There shall be no covenant to drill exploratory wells or any additional wells except as expressly provided herein.

6.    Lessee shall have the right but not the obligation to pool all or any part of the leased premises or interest therein with any other lands or interests, as to any or all depths or zones, and as to any or all substances covered by this lease, either before or after the commencement of production, whenever Lessee deems it necessary or proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or interests. The unit formed by such pooling for an oil well which is not a horizontal completion shall not exceed 80 acres plus a maximum acreage tolerance of 10%, and for a gas well or a horizontal completion shall not exceed 640 acres plus a maximum acreage tolerance of 10%; provided that a larger unit may be formed for an oil well or gas well or horizontal completion to conform to any well spacing or density pattern that may be prescribed or permitted by any governmental authority having jurisdiction to do so. For the purpose of the foregoing, the terms "oil well" and "gas well" shall have the meanings prescribed by applicable law or the appropriate governmental authority, or, if no definition is so prescribed, "oil well" means a well with an initial gas-oil ratio of less than 100,000 cubic feet per barrel and "gas well" means a well with an initial gas-oil ratio of 100,000 cubic feet or more per barrel, based on a 24-hour production test conducted under normal producing conditions using standard lease separator facilities or equivalent testing equipment; and the term "horizontal completion" means an oil well in which the horizontal component of the gross completion interval in the reservoir exceeds the vertical component thereof. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit and stating the effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were production, drilling or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit production which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit, but only to the extent such proportion of unit production is sold by Lessee. Pooling in one or more instances shall not exhaust Lessee's pooling rights hereunder, and Lessee shall have the recurring right but not the obligation to revise any unit formed hereunder by expansion or contraction or both, either before or after commencement of production, in order to conform to the well spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination made by such governmental authority. In making such a revision, Lessee shall file of record a written declaration describing the revised unit and stating the effective date of revision. To the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which royalties are payable hereunder shall thereafter be adjusted accordingly. In the absence of production in paying quantities from a unit, or upon permanent cessation thereof, Lessee may terminate the unit by filing of record a written declaration describing the unit and stating the date of termination. Pooling hereunder shall not constitute a cross-conveyance of interests.

PAID UP OIL AND GAS LEASE - Page 1 of 2 Pages
KIMP0ERICK\AB\COUNTDOKART PU OSL-01.DOC

DRAFT ONLY (6/24/05)

7. If Lessor owns less than the full mineral estate in all or any part of the leased premises, the royalties and sh... royalties payable hereunder for any well on any part of the leased premises or lands pooled therewith shall be reduced to the proportion that Lessor's interest in such part of the leased premises bears to the full mineral estate in such part of the leased premises.

8. The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or zone, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns. No change in Lessor's ownership shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee until 60 days after Lessee has been furnished the original or certified or duly authenticated copies of the documents establishing such change of ownership to the satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessee's usual form of division order. In the event of the death of any person entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to the credit of decedent or decedent's estate in the depository designated above. If at any time two or more persons are entitled to shut-in royalties hereunder, Lessee may pay or tender shut-in royalties to such persons or to their credit in the depository, either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee shall be relieved of all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this lease, the obligation to pay or tender shut-in royalties hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease then held by each.

9. Lessee may, at any time and from time to time, deliver to Lessor or file of record a written release of this lease as to a full or undivided interest in all or any portion of the area covered by this lease or any portion of this lease or any depths or zones thereunder, and shall thereupon be relieved of all obligations thereafter arising with respect to the interest so released. If Lessee releases all or an undivided interest in less than all of the area covered hereby, Lessee's obligation to pay or tender shut-in royalties shall be proportionately reduced in accordance with the net acreage interest retained hereunder.

10. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises as may be reasonably necessary for such purposes, including but not limited to geophysical operations, the drilling of wells, and the construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport production. Lessee may use in such operations, free of cost, any oil, gas, water and/or other substances produced on the leased premises, except water from Lessor's wells or ponds. In exploring, developing, producing or marketing from the leased premises or lands pooled therewith, the ancillary rights granted herein shall apply (a) to the entire leased premises described in Paragraph I above, notwithstanding any partial release or other partial termination of this lease; and (b) to any other lands in which Lessor now or hereafter has authority to grant such rights in the vicinity of the leased premises or lands pooled therewith. When requested by Lessor in writing, Lessee shall bury its pipelines below ordinary plow depth on cultivated lands. No well shall be located less than 200 feet from any house or barn now on the leased premises or other lands used by Lessee hereunder, without Lessor's consent, and Lessee shall pay for damage caused by its operations to buildings and other improvements now on the leased premises or such other lands, and to commercial timber and growing crops thereon. Lessee shall have the right at any time to remove its fixtures, equipment and materials, including well casing, from the leased premises or such other lands during the term of this lease or within a reasonable time thereafter.

11. Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. When drilling, reworking, production or other operations are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this lease shall not terminate because of such prevention or delay, and at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other operations are so prevented, delayed or interrupted.

12. In the event that Lessor, during the primary term of this lease, receives a bona fide offer which Lessor is willing to accept from any party offering to purchase from Lessor a lease covering any or all of the substances covered by this lease and covering all or a portion of the land described herein, with the lease becoming effective upon expiration of this lease, Lessor hereby agrees to notify Lessee in writing of said offer immediately, including in the notice the name and address of the offeror, the price offered and all other pertinent terms and conditions of the offer. Lessee, for a period of fifteen days after receipt of the notice, shall have the prior and preferred right and option to purchase the lease or part thereof or interest therein, covered by the offer at the price and according to the terms and conditions specified in the offer.

13. No litigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default, within such period. In the event the matter is litigated and there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after said judicial determination to remedy the breach or default and Lessee fails to do so.

14. Lessor hereby warrants and agrees to defend title conveyed to Lessee hereunder, and agrees that Lessee at Lessees option may pay and discharge any taxes, mortgages or liens existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to whom payment is made, and, in addition to its other rights, may reimburse itself out of any royalties or shut-in royalties otherwise payable to Lessor hereunder. In the event Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in royalties hereunder, without interest, until Lessee has been furnished satisfactory evidence that such claim has been resolved.

15. The parties hereto agree that Lessee shall pay to the owner(s) of the surface estate of the leased premises the sum of $25,000.00 for each drill site constructed on the leased premises, which sum shall represent payment in full for all damages done to said drill site in connection with Lessee's operations thereon, which drill site shall not exceed _____ acres of 'and, more or less.

16. Concurrently with Lessor's execution hereof, Lessee shall pay Lessor the sum of $500.00 per net mineral acre of land covered by this lease as bonus consideration for the execution of this lease by Lessor.

17. The parties hereto agree that a Memorandum of Paid Up Oil and Gas Lease may be filed of record for the purpose of providing record notice of the existence of this lease in lieu of recording the executed original hereof.

IN WITNESS WHEREOF, this lease is executed by Lessor on the date set forth in the certificate of acknowledgment below, but shall be effective as of the date first above written.

SCOUT EXPLORATION, J.V.

By_____

_____
KUK JA STEWART

8.    The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or zone, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns. No change in Lessor's ownership shall have the effect of reducing or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee until 60 days after Lessee has been furnished the original or certified or duly authenticated copies of the documents establishing such change of ownership to the satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessees usual form of division order. In the event of the death of any person entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to the credit of decedent or decedent's estate in the depository designated above. If at any time two or more persons are entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to such persons or to their credit in the depository, either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee shall be relieved of all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this lease, the obligation to pay or tender shut-in royalties hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease then held by each.

9.    Lessee may, at any time and from time to time, deliver to Lessor or file of record a written release of this lease as to a full or undivided interest in all or any portion of the area covered by this lease or any depths or zones thereunder, and shall thereupon be relieved of all obligations thereafter arising with respect to the interest so released. If Lessee releases all or an undivided interest in less than all of the area covered hereby, Lessee's obligation to pay or tender shut-in royalties shall be proportionately reduced in accordance with the net acreage interest retained hereunder.

10.  In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises as may be reasonably necessary for such purposes, including but not limited to geophysical operations, the drilling of wells, and the construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport production. Lessee may use in such operations, free of cost, any oil, gas, water and/or other substances produced on the leased premises, except water from Lessor's wells or ponds. In exploring, developing, producing or marketing from the leased premises or lands pooled therewith, the ancillary rights granted herein shall apply (a) to the entire leased premises described in Paragraph I above, notwithstanding any partial release or other partial termination of this lease; and (b) to any other lands in which Lessor now or hereafter has authority to grant such rights in the vicinity of the leased premises or lands pooled therewith. When requested by Lessor in writing, Lessee shall bury its pipelines below ordinary plow depth on cultivated lands. No well shall be located less than 200 feet from any house or barn now on the leased premises or other lands used by Lessee hereunder, without Lessor's consent, and Lessee shall pay for damage caused by its operations to buildings and other improvements now on the leased premises or such other lands, and to commercial timber and growing crops thereon. Lessee shall have the right at any time to remove its fixtures, equipment and materials, including well casing, from the leased premises or such other lands during the term of this lease or within a reasonable time thereafter.

11.  Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. When drilling, reworking, production or other operations are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessees control, this lease shall not terminate because of such prevention or delay, and at Lessees option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other operations are so prevented, delayed or interrupted.

12.  In the event that Lessor, during the primary term of this lease, receives a bona fide offer which Lessor is willing to accept from any party offering to purchase from Lessor a lease covering any or all of the substances covered by this lease and covering all or a portion of the land described herein, with the lease becoming effective upon expiration of this lease, Lessor hereby agrees to notify Lessee in writing of said offer immediately, including in the notice the name and address of the offeror, the price offered and all other pertinent terms and conditions of the offer. Lessee, for a period of fifteen days after receipt of the notice, shall have the prior and preferred right and option to purchase the lease or part thereof or interest therein, covered by the offer at the price and according to the terms and conditions specified in the offer.

13.  No litigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default, within such period. In the event the matter is litigated and there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after said judicial determination to remedy the breach or default and Lessee fails to do so.

14.  Lessor hereby warrants and agrees to defend title conveyed to Lessee hereunder, and agrees that Lessee at Lessees option may pay and discharge any taxes, mortgages or liens existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to whom payment is made, and, in addition to its other rights, may reimburse itself out of any royalties or shut-in royalties otherwise payable to Lessor hereunder. in the event Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in royalties hereunder, without interest, until Lessee has been furnished satisfactory evidence that such claim has been resolved.

15.  The parties hereto agree that Lessee shall pay to the owner(s) of the surface estate of the leased premises the sum of $25,000.00 for each drill site constructed on the leased premises, which sum shall represent payment in full for all damages done to said drill site in connection with Lessee's operations thereon, which drill site shall not exceed five (5) acres of land, more or less.

16.  Concurrently with Lessor's execution hereof, Lessee shall pay Lessor the sum of $500.00 per net mineral acre of land covered by this lease as bonus consideration for the execution of this lease by Lessor.

17.  The parties hereto agree that a Memorandum of Paid Up Oil and Gas Lease may be filed of record for the purpose of providing record notice of the existence of this lease in lieu of recording the executed original hereof.

IN WITNESS WHEREOF, this lease is executed by Lessor on the date set forth in the certificate of acknowledgment below, but shall be effective as of the date first above written.

Lessor:                                                   Lessee:

UP_G_KUK, INC.                                    SCOUT EXPLORATION, J.V.

By:_____            By_____

_____            _____
[Print/Type Name, Title]                            [Print/Type Name, Title]

STATE OF TEXAS          §
                       §
COUNTY OF _____    §

This instrument was acknowledged before me on this the ___ day of September, 2005, by _____, as _____ of UP_G_KUK, INC., a Texas corporation, on behalf of said corporation.

_____
Notary Public in and for the State of Texas

STATE OF TEXAS          §
                       §
COUNTY OF _____    §

This instrument was acknowledged before me on this the ___ day of September, 2005, by _____, as _____ of SCOUT EXPLORATION, J.V., a Texas joint venture, on behalf of said joint venture.

_____
Notary Public in and for the State of Texas

**Scout Exploration, J.V.**
5956 SHERRY LANE, SUITE 1810
DALLAS, TEXAS 75225

(214) 891-0920
(214) 891-9855 FAX
whall@wetlandpartners.com

**Date:** 9/9/05

**Recipient:** MR. STERLING ELZA

**Company:** BROWN, DEAN, WISEMAN, LISEN

**Fax number:** (918) 870-2427

**From:** WALLACE HALL

**Number of pages (including cover):** _____

**Message:**

STERLING,

PER OUR CONVERSATION TODAY, E AM RE-SENDING
THE LEASE FORM FOR YOUR REVIEW & COMMENT.
WE ARE PREPARED TO MOVE FORWARD ASAP IN LIGHT
OF THE RECENT COMPLETION OF THE TRANSFER THAT
WE WERE WAITING ON. THANKS!

Wallace



EXHIBIT

F

**LMAN ROBERTSON ELDRIDGE**
A Professional Corporation
Attorneys and Counselors
5949 Sherry Lane
Suite 1700
Dallas, Texas 75225

Shareholders:
H. DOUGLAS BAER
CHARLES R. BIDDLE
RICHARD T. CHEATHAM
DAVID A. ELDRIDGE
RONALD O. HOLMAN
JOHN CROW MILLER
J. MALCOLM ROBERTSON, JR.
ROBERT A. SOLOMON

Telephone
214 / 361-9494

Writer's Extension
113

Facsimile
214 / 691-2109

Writer's E-Mail Address
rholman@hrepc.com

June 29, 2005

Mr. Charles B. Mitchell, Jr.
Brown, Dean, Wiseman, Liser,
   Proctor & Hart, L.L.P.
306 West 7th Street, Suite 200
Fort Worth, Texas 76102-4905

Re:    Letter of intent dated June 10, 2005 by and between Kuk Ja Stewart, as Lessor, and
       Scout Exploration, J.V., as Lessee

Dear Mr. Mitchell:

       I write to you on behalf of Scout Exploration, J.V. in connection with the referenced
letter of intent. In that regard, enclosed please find a draft only dated June 24, 2005 of the
proposed Paid Up Oil and Gas Lease between our respective clients.

       I look forward to working with you in this matter.

                                   Very truly yours,

                                   Ronald O. Holman

ROH/lma
Enclosure
cc: ·    Scout Exploration, J.V.

H:\wp\05\roh\scout\MITCHELL-L01.doc

BROWN, WISEMAN, LISER, PROCTOR, L.L.P.

Attorneys at Law

EALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
JOHN W. PROCTOR
** JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

\* Also licensed to practice in Louisiana
\*\* Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

September 27, 2005

*Via Fax - 214/891-9855 and Regular Mail*
Mr. Wallace Hall
Scout Exploration, J.V.
5956 Sherry Lane, Suite 1810
Dallas, Texas 75225

Dear Mr. Hall:

Attached please find the signed and notarized copy of the Paid Up Oil and Gas Lease. Once Scout Exploration has signed the Lease, please provide me with a copy and then file the appropriate documents with the County Clerk.

Please feel free to contact me with any questions you may have.

Sincerely,

Sterling J. Elza

SJE/jj
Enclosure

cc:     Mr. Charles B. Mitchell, Jr. - Firm

BROWN, L● N, WISEMAN, LISER, PROCTOR & ●RT, L.L.P.

Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
* JOHN W. PROCTOR
* JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

September 19, 2005

Ms. Kuk Ja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:     Kuk Ja Stewart
        Oil & Gas Lease
        42.803 acres, Joseph Mangum Survey
        Abstract No. 881, Dallas County, Texas
        Our File No.: 3251.22711

Dear Ms. Stewart:

        Enclosed please find a copy of the Oil and Gas Lease provi●                 ●.oration, J.V.
Please review the Lease and contact Patty Rien in my office to set u● an appointment so that you
can come to the office to sign and have the Lease notarized. Once the Lease has been signed and
notarized, Scout will release the check made payable to UP_G_Kuk, Inc.

        Please feel free to contact me with any questions you may have.

                                        Sincerely,

                                        Sterling J. Elza

SJE/jj
Enclosure

cc:     Mr. Charles B. Mitchell, Jr. - Firm
        (w/o Enclosure)

**BROWN, I⬤ ⬤N, WISEMAN, LISER, PROCTOR & ⬤RT, L.L.P.**

Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
⬤ANT LISER
⬤CHARD W. WISEMAN
⬤HN W. PROCTOR
⬤OHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

\* Also licensed to practice in Louisiana
\*\* Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

September 19, 2005

Ms. Kuk Ja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:    Kuk Ja Stewart
       Oil & Gas Lease
       42.803 acres, Joseph Mangum Survey
       Abstract No. 881, Dallas County, Texas
       Our File No.: 3251.22711

— ⬤ Different Abstract# —
881

Dear Ms. Stewart:

Enclosed please find a copy of the Oil and Gas Lease provided by Scout Exploration, J.V.
Please review the Lease and contact Patty Rien in my office to set up an appointment so that you
can come to the office to sign and have the Lease notarized. Once the Lease has been signed and
notarized, Scout will release the check made payable to UP_G_Kuk, Inc.

Please feel free to contact me with any questions you may have.

Sincerely,

Sterling J. Elza

SJE/jj
Enclosure

cc:    Mr. Charles B. Mitchell, Jr. - Firm
       (w/o Enclosure)

PRODUCERS 88 (4-89) — PAID UP POUND PRINTING & STATIONERY COMPANY
WITH 640 ACRES POOLING PROVISION      4703-C RICHMOND, HOUSTON, TEXAS 77027 (713) 552-9797

# PAID UP OIL AND

*[handwritten: Difficent Volume]*

*[handwritten left margin: Take Note Date]*

as of the _____ day of _____, 2005, between KUK JA STEWART, as
ss is 2028 Sandy Lane, Irving, Texas 75060-5639, and SCOUT EXPLORATION, J.V., a Texas
ss is 5956 Sherry Lane, Suite 1810, Dallas, Texas 75225. All printed portions of this lease were prepared by the
ll other provisions (including the completion of blank spaces) were prepared jointly by Lessor and Lessee.

in hand paid and the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lessee the following
_____ land, hereinafter called leased premises: (use Exhibit "A" for long description):

42.803 acres of land, more or less, out of the J. Mangrum Survey, A-861, being the same land described in that
certain deed dated _____, recorded in Volume 93014, Page 196___, Deed Records,
Dallas County, Texas, from _____ to _____, which
land is hereinafter referred to as the "leased premises",

in the county of Dallas, State of Texas, containing 42.803 gross acres, more or less    sy hereafter acquire by reversion,
prescription or otherwise), for the purpose of exploring for, developing, producing and mar    nd nonhydrocarbon substances
produced in association therewith. The term "gas" as used herein includes helium, carbon    hydrocarbon gases. In addition to
the above-described leased premises, this lease also covers accretions and any small stri    r Lessor which are contiguous or
adjacent to the above-described leased premises, and, in consideration of the aforemenc    ossees request any additional or
supplemental instruments for a more complete or accurate description of the land so cove    of any shut-in royalties hereunder,
the number of gross acres above specified shall be deemed correct, whether actually m

*[handwritten: Take Note Volume]*

2.    This lease, which is a "paid-up" lease requiring no rentals, shall be in force for    hereof, and for as long thereafter
as oil or gas or other substances covered hereby are produced in paying quantities from    rewith or this lease is otherwise
maintained in effect pursuant to the provisions hereof.

3.    Royalties on oil, gas and other substances produced and saved hereunder shall be paid by Lessee to Lessor as follows: (a) For oil and other liquid hydrocarbons
separated at Lessees separator facilities, the royalty shall be 1/4 of such production, to be delivered at Lessee's option to Lessor at the wellhead or to Lessor's credit at the
oil purchaser's transportation facilities, provided that Lessee shall have the continuing right to purchase such production at the wellhead market price then prevailing in the
same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) for production of similar grade and
gravity; (b) for gas (including casinghead gas) and all other substances covered hereby, the royalty shall be 1/4 of the proceeds realized by Lessee from the sale thereof,
less a proportionate part of ad valorem taxes and production, severance, or other excise taxes and the costs incurred by Lessee in delivering, processing or otherwise
marketing such gas or other substances, provided that Lessee shall have the continuing right to purchase such production at the prevailing wellhead market price paid for
production of similar quality in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price)
pursuant to comparable purchase contracts entered into on the same or nearest preceding date as the date on which Lessee commences its purchases hereunder; and (c)
if at the end of the primary term or any time thereafter one or more wells on the leased premises or lands pooled therewith are capable of producing oil or gas or other
substances covered hereby in paying quantities, but such well or wells are either shut in or production therefrom is not being sold by Lessee, such well or wells shall
nevertheless be deemed to be producing in paying quantities for the purpose of maintaining this lease. If for a period of 90 consecutive days such well or wells are shut in or
production therefrom is not being sold by Lessee, then Lessee shall pay shut-in royalty of one dollar per acre then covered by this lease, such payment to be made to
Lessor or to Lessors credit in the depository designated below, on or before the end of said 90-day period and thereafter on or before each anniversary of the end of said
90-day period while the well or wells are shut in or production therefrom is not being sold by Lessee; provided that if this lease is otherwise being maintained by operations,
or if production is being sold by Lessee from another well or wells on the leased premises or lands pooled therewith, no shut-in royalty shall be due until the end of the
90-day period next following cessation of such operations or production. Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the amount due, but
shall not operate to terminate this lease.

4.    All shut-in royalty payments under this lease shall be paid or tendered to Lessor or to Lessor's credit in

at
or its successors, which shall be Lessor's depository agent for receiving payments regardless of changes in the ownership of said land. All payments or tenders may be
made in currency, or by check or by draft and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails in a stamped envelope addressed to the
depository or to the Lessor at the last address known to Lessee shall constitute proper payment. If the depository should liquidate or be succeeded by another institution, or
for any reason fail or refuse to accept payment hereunder, Lessor shall, at Lessees request, deliver to Lessee a proper recordable instrument naming another institu. ion as
depository agent to receive payments.

5.    If Lessee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled therewith, or if all
production (whether or not in paying quantities) permanently ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Paragraph 6 or the
action of any governmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee commences
operations for reworking an existing well or for drilling an additional well or for otherwise obtaining or restoring production on the leased premises or lands pooled therewith
within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production. If at the end of the primary term, or at any time
thereafter, this lease is not otherwise being maintained in force but Lessee is then engaged in drilling, reworking or any other operations reasonably calculated to obtain or
restore production therefrom, this lease shall remain in force so long as any one or more of such operations are prosecuted with no cessation of more than 90 consecutive
days, and if any such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying quantities from
the leased premises or lands pooled therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additional wells on the
leased premises or lands pooled therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased premises as to
formations then capable of producing in paying quantities on the leased premises or lands pooled therewith, or (b) to protect the leased premises from uncompensated
drainage by any well or wells located on other lands not pooled therewith. There shall be no covenant to drill exploratory wells or any additional wells except as expressly
provided herein.

6.    Lessee shall have the right but not the obligation to pool all or any part of the leased premises or interest therein with any other lands or interests, as to any or all
depths or zones, and as to any or all substances covered by this lease, either before or after the commencement of production, whenever Lessee deems it necessary or
proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or interests. The
unit formed by such pooling for an oil well (which is not a horizontal completion shall not exceed 80 acres plus a maximum acreage tolerance of 10%, and for a gas well or a
horizontal completion shall not exceed 640 acres plus a maximum acreage tolerance of 10%; provided that a larger unit may be formed for an oil well or gas well or
horizontal completion to conform to any well spacing or density pattern that may be prescribed or permitted by any governmental authority having jurisdiction to do so. For
the purpose of the foregoing, the terms "oil well" and "gas well" shall have the meanings prescribed by applicable law or the appropriate governmental authority, or, if no
definition is so prescribed, "oil well" means a well with an initial gas-oil ratio of less than 100,000 cubic feet per barrel and "gas well" means a well with an initial gas-oil ratio
of 100,000 cubic feet or more per barrel, based on a 24-hour production test conducted under normal producing conditions using standard lease separator facilities or
equivalent testing equipment; and the term "horizontal completion" means an oil well in which the horizontal component of the gross completion interval in the reservoir
exceeds the vertical component thereof. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit and stating the
effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were
production, drilling or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit
production which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit, but only to the extent such proportion of unit
production is sold by Lessee. Pooling in one or more instances shall not exhaust Lessees pooling rights hereunder, and Lessee shall have the recurring right but not the
obligation to revise any/unit formed hereunder by expansion or contraction or both, either before or after commencement of production, in order to conform to this well
spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination made by such
governmental authority. In making such a revision, Lessee shall file of record a written declaration describing the revised unit and stating the effective date of revision. To
the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which royalties are
payable hereunder shall thereafter be adjusted accordingly. In the absence of production in paying quantities from a unit, or upon permanent cessation thereof, Lessee may
terminate the unit by filing of record a written declaration describing the unit and stating the date of termination. Pooling hereunder shall not constitute a cross-conveyance
of interests.

PAID UP OIL AND GAS LEASE - Page 1 of 2 Pages    DRAFT ONLY (6/24/05)
KSMP588\GAS\SCOUT\DWART PU OGL-91.DOC

F

7. If Lessor owns less than the full mineral estate in all or any part of the leased premises, the royalties and shut-in royalties payable hereunder for any well on any part of the leased premises or lands pooled therewith shall be reduced to the proportion that Lessor's interest in such part of the leased premises bears to the full mineral estate in such part of the leased premises.

8. The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or zone, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns. No change in Lessor's ownership shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee until 60 days after Lessee has been furnished the original or certified or duly authenticated copies of the documents establishing such change of ownership to the satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessees usual form of division order. In the event of the death of any person entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to the credit of decedent or decedent's estate in the depository designated above. If at any time two or more persons are entitled to shut-in royalties hereunder, Lessee may pay or tender shut-in royalties to such persons or to their credit in the depository, either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee shall be relieved of all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this lease, the obligation to pay or tender shut-in royalties hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease then held by each.

9. Lessee may, at any time and from time to time, deliver to Lessor or file of record a written release of this lease as to a full or undivided interest in all or any portion of the area covered by this lease or any depths or zones thereunder, and shall thereupon be relieved of all obligations thereafter arising with respect to the interest so released. If Lessee releases all or an undivided interest in less than all of the area covered hereby, Lessee's obligation to pay or tender shut-in royalties shall be proportionately reduced in accordance with the net acreage interest retained hereunder.

10. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises as may be reasonably necessary for such purposes, including but not limited to geophysical operations, the drilling of wells, and the construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to dir onvv, produce, store, treat and/or transport production. Lessee may use in such operations, free of cost, any oil, gas, water and/or other substances produced on the leased premises, except water from Lessor's wells or ponds. In exploring, developing, producing or marketing from the leased premises or lands pooled therewith, the ancillary rights granted herein shall apply (a) to the entire leased premises described in Paragraph 1 above, notwithstanding any partial release or other partial termination of this lease; and (b) to any other lands in which Lessor now or hereafter has authority to grant such rights in the vicinity of the leased premises or lands pooled therewith. When requested by Lessor in writing, Lessee shall bury its pipelines below ordinary plow depth on cultivated lands. No well shall be located less than 200 feet from any house or barn now on the leased premises or other lands used by Lessee hereunder, without Lessor's consent, and Lessee shall pay for damage caused by its operations to buildings and other improvements now on the leased premises or such other lands, and to commercial timber and growing crops thereon. Lessee shall have the right at any time to remove its fixtures, equipment and materials, including well casing, from the leased premises or such other lands during the term of this lease or within a reasonable time thereafter.

11. Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. When drilling, reworking, production or other operations are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessees control, this lease shall not terminate because of such prevention or delay, and at Lessees option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other operations are so prevented, delayed or interrupted.

12. In the event that Lessor, during the primary term of this lease, receives a bona fide offer which Lessor is willing to accept from any party offering to purchase from Lessor a lease covering any or all of the substances covered by this lease and covering all or a portion of the land described herein. with the lease becoming effective upon expiration of this lease, Lessor hereby agrees to notify Lessee in writing of said offer immediately, including in the notice the name and address of the offeror, the price offered and all other pertinent terms and conditions of the offer. Lessee, for a period of fifteen days after receipt of the notice, shall have the prior and preferred right and option to purchase the lease or part thereof or interest therein, covered by the offer at the price and according to the terms and conditions specified in the offer.

13. No litigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default, within such period. In the event the matter is litigated and there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after said judicial determination to remedy the breach or default and Lessee fails to do so.

14. Lessor hereby warrants and agrees to defend title conveyed to Lessee hereunder, and agrees that Lessee at Lessees option may pay and discharge any taxes, mortgages or liens existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to whom payment is made, and, in addition to its other rights, may reimburse itself out of any royalties or shut-in royalties otherwise payable to Lessor hereunder. In the event Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in royalties hereunder, without interest, until Lessee has been furnished satisfactory evidence that such claim has been resolved.

15. The parties hereto agree that Lessee shall pay to the owner(s) of the surface estate of the leased premises the sum of $25,000.00 for each drill site constructed on the leased premises, which sum shall represent payment in full for all damages done to said drill site in connection with Lessee's operations thereon, which drill site shall not exceed _____ acres of 'and, more or less.

16. Concurrently with Lessor's execution hereof, Lessee shall pay Lessor the sum of $500.00 per net mineral acre of land covered by this lease as bonus consideration for the execution of this lease by Lessor.

17. The parties hereto agree that a Memorandum of Paid Up Oil and Gas Lease may be filed of record for the purpose of providing record notice of the existence of this lease in lieu of recording the executed original hereof.

IN WITNESS WHEREOF, this lease is executed by Lessor on the date set forth in the certificate of acknowledgment below, but shall be effective as of the date first above written.

SCOUT EXPLORATION, J.V.

By_____

_____
KUK JA STEWART

interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or zone, and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns. No change in rship shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee after Lessee has been furnished the original or certified or duly authenticated copies of the documents establishing such change of ownership to the Lessee or until Lessor has satisfied the notification requirements contained in Lessees usual form of division order. In the event of the death of any person -in royalties hereunder, Lessee may pay or tender such shut-in royalties to the credit of decedent or decedent's estate in the depository designated above, if o or those persons are entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to such persons or to their credit in the er jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part Lessee shall be relieved of hereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall ghts of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this ation to pay or tender shut-in royalties hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease ach.

see may, at any time and from time to time, deliver to Lessor or file of record a written release of this lease as to a full or undivided interest in all or any rea covered by this lease or any depths or zones thereunder, and shall thereupon be relieved of all obligations thereafter arising with respect to the interest Lessee releases all or an undivided interest in less than all of the area covered hereby, Lessee's obligation to pay or tender shut-in royalties shall be reduced in accordance with the net acreage interest retained hereunder.

xploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized mary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises as ably necessary for such purposes, including but not limited to geophysical operations, the drilling of wells, and the construction and use of roads, canals, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, treat and/or transport production. Lessee may use in such operations, free of cost, any oil, gas, water and/or other substances produced on the leased pt water from Lessor's wells or ponds. In exploring, developing, producing or marketing from the leased premises or lands pooled therewith, the ancillary herein shall apply (a) to the entire leased premises described in Paragraph 1 above, notwithstanding any partial release or other partial termination of this o any other lands in which Lessor now or hereafter has authority to grant such rights in the vicinity of the leased premises or lands pooled therewith. When essor in writing, Lessee shall bury its pipelines below ordinary plow depth on cultivated lands. No well shall be located less than 200 feet from any house or e leased premises or other lands used by Lessee hereunder, without Lessor's consent, and Lessee shall pay for damage caused by its operations to ther improvements now on the leased premises or such other lands, and to commercial timber and growing crops thereon. Lessee shall have the right at any its fixtures, equipment and materials, including well casing, from the leased premises or such other lands during the term of this lease or within a reasonable

see's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental g jurisdiction including restrictions on the drilling and production of wells, and the price of oil, gas and other substances covered hereby. When drilling, duction or other operations are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, ial, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not in Lessees control, this lease shall not terminate because of such prevention or delay, and at Lessees option, the period of such prevention or delay shall be rm hereof. Lessee shall not be liable for breach of any express or implied covenants of this lease when drilling, production or other operations are so yed or interrupted.

e eve that Lessor, during the primary term of this lease, receives a bona fide offer which Lessor is willing to accept from any party offering to purchase ase ing any or all of the substances covered by this lease and covering all or a portion of the land described herein, with the lease becoming effective of this lease, Lessor hereby agrees to notify Lessee in writing of said offer immediately, including in the notice the name and address of the offeror, the price other pertinent terms and conditions of the offer. Lessee, for a period of fifteen days after receipt of the notice, shall have the prior and preferred right and ase the lease or part thereof or interest therein, covered by the offer at the price and according to the terms and conditions specified in the offer.

tigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee lly describing the breach or default, and then only if Lessee fails to remedy the breach or default, within such period. In the event the matter is litigated and udicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a after said judicial determination to remedy the breach or default and Lessee fails to do so.

or hereby warrants and agrees to defend title conveyed to Lessee hereunder, and agrees that Lessee at Lessees option may pay and discharge any taxes, ns existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to is made, and, in addition to its other rights, may reimburse itself out of any royalties or shut-in royalties otherwise payable to Lessor hereunder. In the event aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in royalties hereunder, without interest, until n furnished satisfactory evidence that such claim has been resolved.

parties hereto agree that Lessee shall pay to the owner(s) of the surface estate of the leased premises the sum of for each drill site constructed on the leased premises, which sum shall represent payment in full for all damages l drill site in connection with Lessee's operations thereon, which drill site shall not exceed five (5) acres of land, .

icurrently with Lessor's execution hereof, Lessee shall pay Lessor the sum of $500.00 per net mineral acre of land his lease as bonus consideration for the execution of this lease by Lessor.

parties hereto agree that a Memorandum of Paid Up Oil and Gas Lease may be filed of record for the purpose of cord notice of the existence of this lease in lieu of recording the executed original hereof.

IESS WHEREOF, this lease is executed by Lessor on the date set forth in the certificate of acknowledgment hall be effective as of the date first above written.

INC.

Lessee:

SCOUT EXPLORATION, J.V.

J Stewart

By_____

K JA StewART

_____
[Print/Type Name, Title]

esiDent

[Print/Type Name, Title]

GAS LEASE - Page 2 of 3 Pages
ART PU.OGL-01.DOC

TEXAS §
OF _Tarrant_ §
§

is instrument was acknowledged before me on this the 27th day of September, 2005, by
Ji Stewart , as President of UP_G_KUK_INC., a Texas corporation, on behalf
poration.

N. JEANNINE JENKINS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 5-16-2009

Notary Public in and for the State of Texas

§
§
OF _____ §

his instrument was acknowledged before me on this the ___ day of September, 2005, by
_____, as _____ of SCOUT EXPLORATION, J.V., a Texas joint venture,
of said joint venture.

Notary Public in and for the State of Texas

## EXHIBIT "A"

BEING a tract of land situated in the JOSEPH MANGUM SURVEY, ABSTRACT NO. 861, Dallas County, Texas, and being part of two tracts of land described in deed to Jasper Federal Savings and Loan Association, as recorded in Volume 86168, Page 2069, Deed Records, Dallas County, Texas, and being more particularly described as follows:

BEGINNING at a 1/2" diameter iron rod found in the South line of a tract of land described in deed from Ashlin Development Company to Ward Williford, Trustee, as recorded in Volume 88119, Page 0715, Deed Records, Dallas County, Texas, said iron rod also being at the most Northerly Northwest corner of a tract of land described in deed from Gifford-Hill & Co., Inc. to the County of Dallas as recorded in Volume 70009, Page 0319, Deed Records, Dallas County, Texas, said iron rod also being in the West line of Hunter Ferrell Road (a 57.5 foot right-of-way at this point);

THENCE South 1,536.53 feet with the said West line of Hunter Ferrell Road and with the West line of said County of Dallas tract and along a fence line to a 1/2" diameter iron rod found;

THENCE South 45° 03' 05" West 70.65 feet with the Northwest line of said Hunter Ferrell Road and with the Northwest line of said County of Dallas tract and along a fence line to a 1/2" diameter iron rod found, said iron rod also being in the North line of Hunter Ferrell Road (a 60' right-of-way at this point);

THENCE South 89° 59' 05" West, 1,126.74 feet, with the North line of said Hunter Ferrell Road and with the North line of said County of Dallas tract and along a fence line to a 1/2" diameter iron rod found at the Southeast corner of a tract of land described in deed to Jasper Federal Savings and Loan Association, as recorded In Volume 86168, Page 2069, Deed Records, Dallas County, Texas;

THENCE North 00° 19' 26" East 1,594.79 feet, with the East line of said Jasper Federal Savings and Loan Association tract, to a 1/2" diameter iron rod found in the South line of said Ward Williford, Trustee tract;

THENCE South 89° 42' 16" East 1,167.74 feet, with the said South line of Ward Williford, Trustee tract and along a fence line to the PLACE OF BEGINNING and containing 1,864,485 square feet (42.803 acres) of land, more or less.

*Stewart*
*Oil-Gas*
*general*
*con*

# Scout Exploration, J.V.
5956 SHERRY LANE, SUITE 1810
DALLAS, TEXAS 75225

(214) 891-0920
(214) 891-9855 FAX
whall@wetlandpartners.com

**Date:** 9/9/05

**Recipient:** MR. STERLING ELZA

**Company:** BROWN, DEAN, WISEMAN, LISEN

**Fax number:** (918) 870-2427

**From:** WALLACE HALL

**Number of pages (including cover):** _____

**Message:**

STERLING,

PER OUR CONVERSATION TODAY, I AM RE-SENDING
THE LEASE FORM FOR YOUR REVIEW & COMMENT.
WE ARE PREPARED TO MOVE FORWARD ASAP IN LIGHT
OF THE RECENT COMPLETION OF THE TRANSFER THAT
WE WERE WAITING ON. THANKS!

Wallace

```
┌──────────────┐
│   EXHIBIT    │
│              │
│      F       │
│              │
└──────────────┘
```

# BROWN, DEAN, WISEMAN, LISER, PROCTOR & HART, L.L.P.
### Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
JOHN W. PROCTOR
** JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JONATHAN E. CHEATHAM
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

July 7, 2005

Ms. Kuk Ja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:    Kuk Ja Stewart
       Oil & Gas Lease
       42.803 acres, Joseph Mangum Survey
       Abstract No. 881, Dallas County, Texas
       Our File No.: 3251.22711

Dear Ms. Stewart:

Enclosed please find the original real estate related documents which you loaned to me for use regarding the above-referenced matter. I have now made copies of the documents that I needed for my file and as such, I am herein returning these original documents to you for future safe keeping.

Thank you for your assistance.

Sincerely yours,

Charles B. Mitchell, Jr.

CBM:PR:mm
Enclosures

W:\Charles\files\Individual Clients\Stewart, Kuja [Real Estate 22711]\Correspondence\Ltr to Ms. Stewart 008 07.06.05.wpd



# Fax

## BROWN, DEAN, WISEMAN, LISER, PROCTOR & HART, L.L.P.
### Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
JOHN W. PROCTOR
••JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

• Also licensed to practice in Louisiana
•• Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JONATHAN E. CHEATHAM
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

| | |
|---|---|
| **Name:** | Jimmy Stewart for Kuja Stewart |
| **Organization:** | |
| **Fax:** | (972) 313-9952 |
| **Phone:** | |
| **From:** | Charles B. Mitchell, Jr., Esq. |
| **Date:** | June _15_, 2005 |
| **Subject:** | Kuja Stewart |
| | Our File No.: 3251.22711 |
| **Pages:** | _5_ (including fax cover sheet) |

Comments:

Dear Jimmy:

Per our conversation this morning, attached is the facsimile for your mother. Please give it to her as soon as possible as there is a deadline on this proposal.

Thank you.

Marcia Mitchell
Legal Secretary for Charles B. Mitchell, Jr.

---

THE INFORMATION CONTAINED IN THIS FACSIMILE IS LEGALLY PRIVILEGED AND CONFIDENTIAL INFORMATION, WHICH IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR REPRODUCTION OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS MESSAGE IN ERROR, THAT MATERIAL HEREWITH SHOULD BE DESTROYED IMMEDIATELY AND THE SENDER LISTED ABOVE SHOULD BE NOTIFIED BY TELEPHONE AT (817) 332-1391.

---

```
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
X                              TRANSACTION REPORT                          P. 01    X
X                                                                                   X
X                                                          JUN-15-2005 WED 09:20 AM X
X       FOR:                                                                        X
X-----------------------------------------------------------------------------------X
X    DATE  START   RECEIVER       TX TIME   PAGES TYPE      NOTE            M#  DP   X
X-----------------------------------------------------------------------------------X
X  JUN-15 09:18 AM 9723139952      2'17"     5  SEND       OK              217      X
X-----------------------------------------------------------------------------------X
X                                                                                   X
X                                  TOTAL :      2M 17S PAGES:   5                    X
X                                                                                   X
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

# Fax

### BROWN, DEAN, WISEMAN, LISER, PROCTOR & HART, L.L.P.
#### Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
N W. PROCTOR
N C. HART
RY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

3+6 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JONATHAN E. CHEATHAM
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

| | |
|---|---|
| **Name:** | Jimmy Stewart for Kuja Stewart |
| **Organization:** | |
| **Fax:** | (972) 313-9952 |
| **Phone:** | |
| **From:** | Charles B. Mitchell, Jr., Esq. |
| **Date:** | June _15_, 2005 |
| **Subject:** | Kuja Stewart |
| | Our File No.: 3251.22711 |

BROWN, WISEMAN, ZISER, PROCTOR & HART, L.L.P.

Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
JOHN W. PROCTOR
••JOHN C. HART
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JASON C. MOON
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
WILLIAM M. BROWN (1912-1987)

September 27, 2005

*Via Fax - 214/891-9855 and Regular Mail*
Mr. Wallace Hall
Scout Exploration, J.V.
5956 Sherry Lane, Suite 1810
Dallas, Texas 75225

Dear Mr. Hall:

Attached please find the signed and notarized copy of the Paid Up Oil and Gas Lease. Once Scout Exploration has signed the Lease, please provide me with a copy and then file the appropriate documents with the County Clerk.

Please feel free to contact me with any questions you may have.

Sincerely,

Sterling J. Elza

SJE/jj
Enclosure

cc:     Mr. Charles B. Mitchell, Jr. - Firm ✓

## Scout Exploration, J.V.

5956 Sherry Lane, Suite 1810
Dallas, Texas 75225
214.891.0920 (Office)
214.891.9855 (Fax)

June 10, 2005

Mrs. Kuk Ja Stewart
2028 Sandy Lane
Irving, Texas 75060-5639

Re:    Letter of Intent- Oil and Gas Lease
       33.33 acres / 9.47 acres, J. Mangrum Survey, A-861
       Dallas County, Texas

Dear Mrs. Stewart:

This Letter of Intent (LOI) shall serve to set forth the basic terms and conditions under which Lessor and Lessee would desire to enter in to an oil and gas lease (the "Lease") pertaining to the land described below.

**Lessor:**          Kuk Ja Stewart

**Lessee:**          Scout Exploration, J.V.

**Property Description:** A tract or tracts of land totaling approximately **42.80+/-** acres (comprised of a 33.33 acre tract and a 9.47 acre tract) located in Dallas County, Texas, and being further described on Exhibit "A" attached hereto and being (the "Property").

| | |
|---|---|
| **Bonus Price:** | **$500.00 (Five Hundred Dollars) per net mineral acre** |
| **Royalty:** | **25%** |
| **Term:** | **5 year paid-up lease** |
| **Surface Use Fee:** | **$25,000.00 (payable for each pad built)** |

**Mutually acceptable Lease:** Lessee shall have sixty (60) days from the Lessor's Execution Date of this LOI to negotiate in good faith with Lessor to execute a mutually acceptable Lease.

**Execution of Lease and Title Examination:** Lessee shall have a minimum of sixty (60) days after Lessor's Execution Date to obtain a Mineral Title Report covering the Property. Lessee and Lessor both agree that as long as Lessee is diligently working to

obtain said title report and if overcrowding in the County Clerk's office, or other issues out of Lessee's control prevents Lessee from finishing the reports within said sixty (60) day period, it is herein agreed that Lessee shall have the option and right, but not the obligation, to pay Lessor $1,000.00 for an additional thirty (30) day period within which to complete the title examination. In such event, Lessee agrees to keep Lessor closely apprised of Lessee's progress, and Lessor shall hold the minerals under the Property for exclusive lease by Lessee during such title examination period. Upon final completion of the Mineral Title Report, and if such Mineral Title Report is acceptable to Lessee, then Lessee will submit a formal Lease for execution by Lessor, and pay to Lessor the Lease bonus money due based upon Lessor's net mineral acre interest ownership in the Property as determined by said Mineral Title Report. Payment will be by Sight Draft given to Lessor at the time of execution of the Lease or if Lessor prefers, by company check within 10 days of the completion of the final Mineral Title Report.

**Property Information:** Lessor agrees to provide Lessee access to all information pertinent to the Property in its (or its consultant's) possession, including any and all title information or documentation, site plans, engineering plans, well logs, topographic surveys, existing Surveys and/or Plats of the Property as well as evidence of any past or current mineral lease in the possession of Lessor.

**Representations and Warranties.** Lessor shall make the usual and customary representations and warranties to the Lessee regarding the Property. **Lessor agrees to keep the terms and conditions of this agreement confidential.**

The above proposal is a statement of the terms under which Lessor and Lessee are prepared to enter into a Lease covering the Property, subject to and expressly conditioned upon (1) the execution and delivery of a mutually acceptable Lease and (2) title to the Property being acceptable to Lessee, in Lessee's sole and exclusive opinion. Notwithstanding any provision herein to the contrary, Lessor hereby agrees that while this LOI is in effect they shall negotiate exclusively with Lessee regarding the leasing of Lessor's mineral interest lying under the Property, and Lessor will not negotiate with any third parties during such time period.

If the terms of this LOI are acceptable to you, please sign where indicated below and return a copy of the letter to me so that we may begin our title due diligence. I appreciate your consideration to this proposal and look forward to hearing from you. **If you have any questions please contact Scott K. Wilpitz at 214.673.8719.**

Unless otherwise agreed to in writing this offer shall expire as of 5:00 pm on Thursday June 16, 2005. A signed copy may be faxed by Lessor to at Scout Exploration, J.V., Attn: Wallace Hall, Jr., (214) 891.9855 (fax).

File No. 106531-CHP
KW #24

## EXHIBIT "A"

BEING a tract of land situated in the JOSEPH MANGUM SURVEY, ABSTRACT NO. 881, Dallas County, Texas, and being part of two tracts of land described in deed to Jasper Federal Savings and Loan Association, as recorded in Volume 88166, Page 2069, Deed Records, Dallas county, Texas, and being more particularly described as follows:

BEGINNING at a 1/2" diameter iron rod found in the South line of a tract of land described in deed from Ashlin Development Company to Ward Williford, Trustee, as recorded in Volume 88119, Page 0715, Deed Records, Dallas County, Texas, said iron rod also being at the most Northerly Northwest corner of a tract of land described in deed from Gifford-Hill & Co., Inc. to the County of Dallas as recorded in Volume 70009, Page 0316, Deed Records, Dallas County, Texas, said iron rod also being in the West line of Hunter Ferrell Road (a 57.5 foot right-of-way at this point);

THENCE SOUTH, 1638.53 feet, with the said West line of Hunter Ferrell Road and with the West line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found;

THENCE South 45 degrees 03 minutes 05 seconds West, 70.85 feet, with the Northwest line of said Hunter Ferrell Road and with the Northwest line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found, said iron rod also being in the North line of Hunter Ferrell Road (a 60' right-of-way at this point);

THENCE South 89 degrees 59 minutes 05 seconds West, 1126.74 feet, with the North line of said Hunter Ferrell Road and with the North line of said County of Dallas tract and along a fence line, to a 1/2" diameter iron rod found at the Southeast corner of a tract of land described in Deed to Jasper Federal Savings and Loan Association, as recorded in Volume 88166, Page 2069, Deed Records, dallas county, Texas;

THENCE North 00 degrees 19 minutes 25 seconds East, 1594.79 feet, with the East line of said Jasper Federal Savings and Loan Association tract, to a 1/2" diameter iron rod found in the South line of said Ward Williford, Trustee tract;

THENCE South 89 degrees 42 minutes 18 seconds East, 1157.74 feet, with the said South line of Ward Williford, Trustee tract and along a fence line, to the PLACE OF BEGINNING and containing 1,854,485 square feet (42.503 acres) of land, more or less.

93014 1968

```
XXXX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
X                                                                              X
X                          TRANSACTION REPORT                           P. 01  X
X                         ─────────────────────                                X
X                                                    JUL-27-2004 TUE 11:14 AM   X
X                                                                              X
X      FOR:                                                                    X
X──────────────────────────────────────────────────────────────────────────  X
X  DATE  START    RECEIVER         TX TIME  PAGES TYPE      NOTE        M#  DP  X
X──────────────────────────────────────────────────────────────────────────  X
X  JUL-27 11:13 AM ##47003#8174884768   28"   2  SEND      OK          836     X
X──────────────────────────────────────────────────────────────────────────  X
X                                                                              X
X                                        TOTAL :     28S PAGES:   2            X
X                                                                              X
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

# Fax

## BROWN, DEAN, WISEMAN, LISER, PROCTOR & HART, L.L.P.
### Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
**JOHN C. HART
JOHN W. PROCTOR
LARRY W. WILSHIRE

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

06 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

SANDRA LISER
CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JAMES K. HURLBURT
JASON C. MOON

JESSE M. BROWN (1883-1976)
A. M. HERMAN (1905-1987)
WILLIAM M. BROWN (1912-1987)

**Name:**          Nancy Croney
**Organization:**  Re/Max Associates
**Fax:**           (817) 488-476x
**Phone:**
**From:**          Charles B. Mitchell, Jr., Esq.
**Date:**          July _27_, 2004
**Subject:**       Kuja Stewart
                   1800 and 1900 Hunter Ferrell Roads
                   Irving, Texas
                   Our File No.:        3251.22711



## Main Identity

**From:** "Nancy Croney" <Nancy@croneyteam.com>
**To:** <jdriscoll@ci.irving.tx.us>
**Cc:** "Nancy Croney" <Nancy@croneyteam.com>
**Sent:** Thursday, April 29, 2004 2:25 PM
**Subject:** 1800 and 1900 Hunter Ferrell Roads

Mr. Driscoll,

I am currently marketing the above captioned properties for sale and have some interested parties that would like to operate a trucking business on 1800 Hunter Ferrell Road. That current piece is 9.47 acres and the buyer is interested in dividing the property into two lots. I spoke to Ron Ruthven, Planner, yesterday and he was concerned about the proposed Trinity Blvd and other new roads that would affect these lots. I would appreciate your comments, concerns and opinions concerning the feasibility of developing this land and what your department would require from the owners of this property.
Sincerely,
Nancy Croney
817-781-9464
Nancy@Croneyteam.com
Re/Max Associates Realty

## Main Identity

**From:**     "Nancy Croney" <Nancy@croneyteam.com>
**To:**       <gfennell@ci.irving.tx.us>
**Cc:**       "Nancy Croney" <Nancy@croneyteam.com>
**Sent:**     Thursday, April 29, 2004 2:22 PM
**Subject:**  1800 and 1900 Hunter Ferrell Road

Mr. Fennell,
I am currently marketing the above captioned properties for sale and have some interested parties
that would like to operate a trucking business on 1800 Hunter Ferrell Road. That current piece is
9.47 acres and the buyer is interested in dividing the property into two lots. I spoke to Ron Ruthven,
Planner, yesterday and he was concerned about the flood zone areas in those lots. I would
appreciate your comments, concerns and opinions concerning the feasibility of developing this land
and what your department would require from the owners of this property.
Sincerely,
Nancy Croney
817-781-9464
Nancy@Croneyteam.com
Re/Max Associates Realty

## BROWN, HERMAN, DEAN, WISEMAN, LISER & HART, L.L.P.
### Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
•• JOHN C. HART
JOHN W. PROCTOR
LARRY W. WILSHIRE

OF COUNSEL
CATHERINE JANE ALDER, P.C
*   Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

SANDRA LISER
CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JAMES K. HURLBURT
JASON C. MOON
JENNIFER WILLINGHAM

JESSE M. BROWN (1883-1978)
A. M. HERMAN (1905-1987)
WILLIAM M. BROWN (1912-1987)

February 4, 2005

Kuja Stewart
2028 Sandy Lane
Irving, Texas 75060

> Re:    Kuja Stewart
>        1800 and 1900 Hunter Ferrell Roads
>        Irving, Texas
>        Our File No.:  3251.22711

Dear Ms. Stewart:

I am assisting Mr. Mitchell in determining whether a claim based on inverse condemnation may be brought against the City of Irving based on the Corridor Development Certificate ("CDC") Ordinance § 6311. I have prepared this letter to summarize our most recent activity and, based on such, to inform you that it is our opinion that you may have an inverse condemnation claim against the City of Irving, though it is not presently "ripe" under Texas law. As the term implies, like fruit, a "ripe" claim is a claim which is fully developed, and not premature. Currently, your inverse condemnation would be considered premature, though we believe it could likely become "ripe". In order to hold a "ripe" claim, you would need to begin the CDC application process, which includes filing an application for a certificate. This application process may include seeking an exemption or waiver as well. However, if at the end of this process your CDC application is denied, then, and only then, would your inverse condemnation claim become "ripe". For this reason, beyond the analysis that follows, once you have reviewed this letter, please contact myself or Mr. Mitchell to discuss what next steps you wish to take in this matter regarding the CDC application process, if any. We are certainly available to assist you in the application process though it would require expanding the scope of our current agreement.

### *City of Irving's CDC Ordinance § 6311*

As you likely know, the CDC Ordinance § 6311 ("§ 6311") was passed primarily to adopt FEMA's requirements for flood plans and flood ways along the Trinity River Corridor. This has had the effect of restricting the utilization of properties in flood plans and flood ways. We understand as well that

*Steward*
*Real Estate*
*Corr. w/ client*

## BROWN, HERMAN, DEAN, WISEMAN, LISER & HART, L.L.P.
### Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
•• JOHN C. HART
JOHN W. PROCTOR
LARRY W. WILSHIRE

OF COUNSEL
CATHERINE JANE ALDER, P.C
• Also licensed to practice in Louisiana
•• Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

SANDRA LISER
CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JAMES K. HURLBURT
JASON C. MOON
JENNIFER WILLINGHAM

JESSE M. BROWN (1883-1978)
A. M. HERMAN (1905-1987)
WILLIAM M. BROWN (1912-1987)

February 4, 2005

Kuja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:    Kuja Stewart
        1800 and 1900 Hunter Ferrell Roads
        Irving, Texas
        Our File No.: 3251.22711

Dear Ms. Stewart:

I am assisting Mr. Mitchell in determining whether a claim based on inverse condemnation may be brought against the City of Irving based on the Corridor Development Certificate ("CDC") Ordinance § 6311. I have prepared this letter to summarize our most recent activity and, based on such, to inform you that it is our opinion that you may have an inverse condemnation claim against the City of Irving, though it is not presently "ripe" under Texas law. As the term implies, like fruit, a "ripe" claim is a claim which is fully developed, and not premature. Currently, your inverse condemnation would be considered premature, though we believe it could likely become "ripe". In order to hold a "ripe" claim, you would need to begin the CDC application process, which includes filing an application for a certificate. This application process may include seeking an exemption or waiver as well. However, if at the end of this process your CDC application is denied, then, and only then, would your inverse condemnation claim become "ripe". For this reason, beyond the analysis that follows, once you have reviewed this letter, please contact myself or Mr. Mitchell to discuss what next steps you wish to take in this matter regarding the CDC application process, if any. We are certainly available to assist you in the application process though it would require expanding the scope of our current agreement.

### *City of Irving's CDC Ordinance § 6311*

As you likely know, the CDC Ordinance § 6311 ("§ 6311") was passed primarily to adopt FEMA's requirements for flood plans and flood ways along the Trinity River Corridor. This has had the effect of restricting the utilization of properties in flood plans and flood ways. We understand as well that

W:\Charles\files\Individual Clients\Stewart, Kuja [Real Estate 22711]\Correspondence\Ltr to Ms. Stewart 003 020205.wpd

**BROWN,    EAN, WISEMAN, LISER, PROCTOR   .1ART, L.L.P.**
*Attorneys at Law*

BEALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
••JOHN C. HART
JOHN W. PROCTOR
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

WRITER'S DIRECT DIAL (817) 820-1103
WRITER'S E-MAIL ADDRESS
jcheatham@browndean.com

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JAMES K. HURLBURT
JASON C. MOON
JONATHAN E. CHEATHAM
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
A. M. HERMAN (1905-1987)
WILLIAM M. BROWN (1912-1987)

March 7, 2005

*Via First Class Mail*
Ms. Kuja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:    Kuja Stewart
       1800 and 1900 Hunter Ferrell Roads
       Irving, Texas
       Our File No.:  3251.22711

Dear Ms. Stewart:

On March 4, 2005, a conference call took place at 2:00 p.m. initiated by Charlie Mitchell, myself and you. The purpose of the conference call was to establish a plan for the application of a CDC permit with the City of Irving regarding the approximate 43-acres of property you own. As you are aware, the property has been designated as "flood plain" and such designation may be deemed an inverse condemnation if the City's decision to deny your application for commercial use takes place. As explained in previous correspondence from Jim Hurlburt, the application for a CDC permit will set the tone for determining whether you have a viable claim against the City of Irving for an inverse condemnation. At the present time, without the rejection of a CDC permit requesting a zoning change to commercial use for the property, your claim is not ripe.

The process begins when you submit a CDC permit with the City of Irving to change the zoning of your property for commercial use from its present designation as agricultural. Ostensibly, we anticipate that the City will deny this permit because the land has been designated "flood plain" and is an unlikely candidate for re-zoning for commercial use. If and when this denial of your CDC permit takes place, the next step would be to obtain the services of a qualified property appraiser to prepare an appraisal of the value of your property. If it can be demonstrated through this expert that the value of your property is significantly diminished, you may have a viable claim to assert for an inverse condemnation with the City of Irving.

As we discussed, it was determined that the most likely profitable commercial re-zoning of your property would be for a strip shopping center and/or gas station primarily due to the proximity of the property to Lone Star Park in Grand Prairie, Texas. Such a retail use would appear financially profitable based upon the increased frequency of visitors to Lone Star Park and ingress and egress from the neighborhood. The next step will be for our office to obtain a CDC permit application so that we can submit same to the City of Irving and await their decision regarding the acceptance or rejection of the re-zoning as expressed in the application. Depending on the decision of the City of Irving whether to accept the re-zoning change will set the tone for the next action you wish to pursue.

BROWN, L    .N, WISEMAN, LISER, PROCTOR & .    .RT, L.L.P.
Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
** JOHN C. HART
JOHN W. PROCTOR
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

WRITER'S DIRECT DIAL (817) 820-1103
WRITER'S E-MAIL ADDRESS
jcheatham@browndean.com

March 7, 2005

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JAMES K. HURLBURT
JASON C. MOON
JONATHAN E. CHEATHAM
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
A. M. HERMAN (1905-1987)
WILLIAM M. BROWN (1912-1987)

*Via First Class Mail*
Ms. Kuja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:    Kuja Stewart
       1800 and 1900 Hunter Ferrell Roads
       Irving, Texas
       Our File No.:  3251.22711

Dear Ms. Stewart:

On March 4, 2005, a conference call took place at 2:00 p.m. initiated by Charlie Mitchell, myself and you. The purpose of the conference call was to establish a plan for the application of a CDC permit with the City of Irving regarding the approximate 43-acres of property you own. As you are aware, the property has been designated as "flood plain" and such designation may be deemed an inverse condemnation if the City's decision to deny your application for commercial use takes place. As explained in previous correspondence from Jim Hurlburt, the application for a CDC permit will set the tone for determining whether you have a viable claim against the City of Irving for an inverse condemnation. At the present time, without the rejection of a CDC permit requesting a zoning change to commercial use for the property, your claim is not ripe.

The process begins when you submit a CDC permit with the City of Irving to change the zoning of your property for commercial use from its present designation as agricultural. Ostensibly, we anticipate that the City will deny this permit because the land has been designated "flood plain" and is an unlikely candidate for re-zoning for commercial use. If and when this denial of your CDC permit takes place, the next step would be to obtain the services of a qualified property appraiser to prepare an appraisal of the value of your property. If it can be demonstrated through this expert that the value of your property is significantly diminished, you may have a viable claim to assert for an inverse condemnation with the City of Irving.

As we discussed, it was determined that the most likely profitable commercial re-zoning of your property would be for a strip shopping center and/or gas station primarily due to the proximity of the property to Lone Star Park in Grand Prairie, Texas. Such a retail use would appear financially profitable based upon the increased frequency of visitors to Lone Star Park and ingress and egress from the neighborhood. The next step will be for our office to obtain a CDC permit application so that we can submit same to the City of Irving and await their decision regarding the acceptance or rejection of the re-zoning as expressed in the application. Depending on the decision of the City of Irving whether to accept the re-zoning change will set the tone for the next action you wish to pursue.

FILE COPY

**BROWN,  . AN, WISEMAN, LISER, PROCTOR & . ART, L.L.P.**
Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
** JOHN C. HART
JOHN W. PROCTOR
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

WRITER'S DIRECT DIAL (817) 820-1103
WRITER'S E-MAIL ADDRESS
jcheatham@browndean.com

March 7, 2005

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JAMES K. HURLBURT
JASON C. MOON
JONATHAN E. CHEATHAM
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
A. M. HERMAN (1905-1987)
WILLIAM M. BROWN (1912-1987)

*Via First Class Mail*
Ms. Kuja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:    Kuja Stewart
1800 and 1900 Hunter Ferrell Roads
Irving, Texas
Our File No.:  3251.22711

Dear Ms. Stewart:

On March 4, 2005, a conference call took place at 2:00 p.m. initiated by Charlie Mitchell, myself and you. The purpose of the conference call was to establish a plan for the application of a CDC permit with the City of Irving regarding the approximate 43-acres of property you own. As you are aware, the property has been designated as "flood plain" and such designation may be deemed an inverse condemnation if the City's decision to deny your application for commercial use takes place. As explained in previous correspondence from Jim Hurlburt, the application for a CDC permit will set the tone for determining whether you have a viable claim against the City of Irving for an inverse condemnation. At the present time, without the rejection of a CDC permit requesting a zoning change to commercial use for the property, your claim is not ripe.

The process begins when you submit a CDC permit with the City of Irving to change the zoning of your property for commercial use from its present designation as agricultural. Ostensibly, we anticipate that the City will deny this permit because the land has been designated "flood plain" and is an unlikely candidate for re-zoning for commercial use. If and when this denial of your CDC permit takes place, the next step would be to obtain the services of a qualified property appraiser to prepare an appraisal of the value of your property. If it can be demonstrated through this expert that the value of your property is significantly diminished, you may have a viable claim to assert for an inverse condemnation with the City of Irving.

As we discussed, it was determined that the most likely profitable commercial re-zoning of your property would be for a strip shopping center and/or gas station primarily due to the proximity of the property to Lone Star Park in Grand Prairie, Texas. Such a retail use would appear financially profitable based upon the increased frequency of visitors to Lone Star Park and ingress and egress from the neighborhood. The next step will be for our office to obtain a CDC permit application so that we can submit same to the City of Irving and await their decision regarding the acceptance or rejection of the re-zoning as expressed in the application. Depending on the decision of the City of Irving whether to accept the re-zoning change will set the tone for the next action you wish to pursue.

Ms. Kuja Stewart
March 7, 2005
Page 2

As discussed, the case can be handled either on a hourly rate or a contingency fee. The hourly rate quoted by Mr. Mitchell is his discounted rate of $200/hour and would also involve any work done by myself at $180/hour and paralegal time at $100/hour. A rough estimate of attorneys' fees to pursue the City of Irving for inverse condemnation would run anywhere from $10,000 to $20,000 in any case. The scope of the representation will set the tone for the amount of legal services rendered and it depends how much the City of Irving would be willing to fight an inverse condemnation proceeding filed against them.

A contingency fee agreement, the other option, would be a percentage of any recovery you obtain against the City of Irving should this case wind up in litigation. A contingency fee for a matter of this type would be approximately 25% of your gross recovery and spelled out in a written contract. All experts and expenses on the file would be your responsibility. The only expense immediately foreseeable would be the retention of an expert appraiser to appraise your property if the CDC permit with the City of Irving is denied. It is estimated that an expert appraiser would run between $1,500 and $2,500.

We next discussed the mineral rights of your property and their lease to an exploration company who has proposed the drilling of core samples on your property to determine whether there are sufficient reserves of oil and gas for production in paying quantities. Fortuitously, you mentioned you mentioned your recently began receiving Social Security benefits. Mr. Mitchell then discussed the idea that it would be wise to set up a corporation, limited partnership, or limited liability company for the payment of any and all royalties from the leased mineral rights should there by any. Setting up the corporation, you would be the sole shareholder, and the corporation would be able to pay dividends to you,personally. The possibility of transfer was also discussed to your three children. Taxes must still be paid if the interest is transferred. Mr. Mitchell suggested Subchapter S status for taxation purposes is preferable for your children. It was then emphasized that the sale of the mineral rights will definitely devalue your property and that the highest value of the property would come from commercial use.

We will need to obtain a CDC permit application for the change of zoning with the City of Irving and furnish it to you personally or establish a time where you can attend a meeting in our office for our assistance in filling out the forms and paperwork. The foregoing represents a brief outline of the matters discussed and action proposed. Should your recollection of any of these items requiring any further action be different, please contact me and we will work toward all being on the same page. Likewise, please do not hesitate to contact me or Mr. Mitchell should you have any questions.

Sincerely,

Jonathan E. Cheatham

JEC/khg

cc:     Charles B. Mitchell, Jr. - Interoffice
        Patty Rien - Interoffice

Ms. Kuja Stewart
March 7, 2005
Page 2

As discussed, the case can be handled either on a hourly rate or a contingency fee. The hourly rate quoted by Mr. Mitchell is his discounted rate of $200/hour and would also involve any work done by myself at $180/hour and paralegal time at $100/hour. A rough estimate of attorneys' fees to pursue the City of Irving for inverse condemnation would run anywhere from $10,000 to $20,000 in any case. The scope of the representation will set the tone for the amount of legal services rendered and it depends how much the City of Irving would be willing to fight an inverse condemnation proceeding filed against them.

A contingency fee agreement, the other option, would be a percentage of any recovery you obtain against the City of Irving should this case wind up in litigation. A contingency fee for a matter of this type would be approximately 25% of your gross recovery and spelled out in a written contract. All experts and expenses on the file would be your responsibility. The only expense immediately foreseeable would be the retention of an expert appraiser to appraise your property if the CDC permit with the City of Irving is denied. It is estimated that an expert appraiser would run between $1,500 and $2,500.

We next discussed the mineral rights of your property and their lease to an exploration company who has proposed the drilling of core samples on your property to determine whether there are sufficient reserves of oil and gas for production in paying quantities. Fortuitously, you mentioned you mentioned your recently began receiving Social Security benefits. Mr. Mitchell then discussed the idea that it would be wise to set up a corporation, limited partnership, or limited liability company for the payment of any and all royalties from the leased mineral rights should there by any. Setting up the corporation, you would be the sole shareholder, and the corporation would be able to pay dividends to you personally. The possibility of transfer was also discussed to your three children. Taxes must still be paid if the interest is transferred. Mr. Mitchell suggested Subchapter S status for taxation purposes is preferable for your children. It was then emphasized that the sale of the mineral rights will definitely devalue your property and that the highest value of the property would come from commercial use.

We will need to obtain a CDC permit application for the change of zoning with the City of Irving and furnish it to you personally or establish a time where you can attend a meeting in our office for our assistance in filling out the forms and paperwork. The foregoing represents a brief outline of the matters discussed and action proposed. Should your recollection of any of these items requiring any further action be different, please contact me and we will work toward all being on the same page. Likewise, please do not hesitate to contact me or Mr. Mitchell should you have any questions.

Sincerely,

Jonathan E. Cheatham

JEC/khg

cc:    Charles B. Mitchell, Jr. - Interoffice
       Patty Rien - Interoffice

Ms. Kuja Stewart
March 7, 2005
Page 2

As discussed, the case can be handled either on a hourly rate or a contingency fee. The hourly rate quoted by Mr. Mitchell is his discounted rate of $200/hour and would also involve any work done by myself at $180/hour and paralegal time at $100/hour. A rough estimate of attorneys' fees to pursue the City of Irving for inverse condemnation would run anywhere from $10,000 to $20,000 in any case. The scope of the representation will set the tone for the amount of legal services rendered and it depends how much the City of Irving would be willing to fight an inverse condemnation proceeding filed against them.

A contingency fee agreement, the other option, would be a percentage of any recovery you obtain against the City of Irving should this case wind up in litigation. A contingency fee for a matter of this type would be approximately 25% of your gross recovery and spelled out in a written contract. All experts and expenses on the file would be your responsibility. The only expense immediately foreseeable would be the retention of an expert appraiser to appraise your property if the CDC permit with the City of Irving is denied. It is estimated that an expert appraiser would run between $1,500 and $2,500.

We next discussed the mineral rights of your property and their lease to an exploration company who has proposed the drilling of core samples on your property to determine whether there are sufficient reserves of oil and gas for production in paying quantities. Fortuitously, you mentioned you mentioned your recently began receiving Social Security benefits. Mr. Mitchell then discussed the idea that it would be wise to set up a corporation, limited partnership, or limited liability company for the payment of any and all royalties from the leased mineral rights should there by any. Setting up the corporation, you would be the sole shareholder, and the corporation would be able to pay dividends to you personally. The possibility of transfer was also discussed to your three children. Taxes must still be paid if the interest is transferred. Mr. Mitchell suggested Subchapter S status for taxation purposes is preferable for your children. It was then emphasized that the sale of the mineral rights will definitely devalue your property and that the highest value of the property would come from commercial use.

We will need to obtain a CDC permit application for the change of zoning with the City of Irving and furnish it to you personally or establish a time where you can attend a meeting in our office for our assistance in filling out the forms and paperwork. The foregoing represents a brief outline of the matters discussed and action proposed. Should your recollection of any of these items requiring any further action be different, please contact me and we will work toward all being on the same page. Likewise, please do not hesitate to contact me or Mr. Mitchell should you have any questions.

Sincerely,

Jonathan E. Cheatham

JEC/khg

cc:    Charles B. Mitchell, Jr. - Interoffice
       Patty Rien - Interoffice

**FILE COPY**

**BROWN, DEAN, WISEMAN, LISER, PROCTOR, HART, L.L.P.**
Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
•• JOHN C. HART
JOHN W. PROCTOR
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

• Also licensed to practice in Louisiana
•• Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

WRITER'S DIRECT DIAL (817) 820-1103
WRITER'S E-MAIL ADDRESS
jcheatham@browndean.com

CHARLES B. MITCHELL, JR
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JAMES K. HURLBURT
JASON C. MOON
JONATHAN E. CHEATHAM
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
A. M. HERMAN (1905-1987)
WILLIAM M. BROWN (1912-1987)

April 1, 2005

*Via First Class Mail*
Ms. Kuja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:    Kuja Stewart
       Oil & Gas Lease
       42.803 acres, Joseph Mangum Survey
       Abstract No. 881, Dallas County, Texas
       Our File No.: 3251.22711

Dear Ms. Stewart:

On March 18, 2005, a meeting was held between yourself, your sons, Jimmy Stewart and Kenny Stewart, Charlie Mitchell and myself regarding several items involved in the furnishing of legal services to you from our firm. Items discussed at this meeting included your potential mineral rights and the potential lease for drilling rights on your property, the improvement of your 40-acres of property with a CDC permit filed with the City of Irving, the establishment of Subchapter S Corporations for beneficial tax purposes which will not interfere with the receipt of your Social Security benefits, the transfer of your company into Kenny Stewart's name via a sale and lease back transaction, and the recording of a 40-acre tract purchased in Smith County for which you have yet to receive a deed. A brief outline of the topics discussed and the items determined at the meeting are outlined below as well as a proposed fee schedule for the completion of these legal tasks by our office.

Your initial inquiry was into the development of your 40-acres of property which currently partially lies in the flood way or flood plain where no development is allowed. As this property is adjacent to Lone Star Park in Grand Prairie, Texas it is anticipated that a retail shopping strip mall or gas station would be a profitable development of your property. However, as your property lies partially in the flood plain, it may be impossible to obtain the necessary permits and subsequently commercially develop your property. We discussed the possibility of filing an inverse condemnation proceeding with the City of Irving based upon the denial of the CDC permit application which we have yet to initiate. In order to commercially develop your property, a filing of a CDC permit is required and the approval of the City of Irving must be granted. However, based upon the fact that your property lies partially in the flood plain, it is anticipated that the City of Irving will not approve any commercial development of this property without raising the surface ground level and determining the economic feasibility of allowing a retail or commercial shopping development on your property.

**BROWN, I    .N, WISEMAN, LISER, PROCTOR &    .RT, L.L.P.**

Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
• GRANT LISER
RICHARD W. WISEMAN
••JOHN C. HART
JOHN W. PROCTOR
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

WRITER'S DIRECT DIAL (817) 820-1103
WRITER'S E-MAIL ADDRESS
jcheatham@browndean.com

April 1, 2005

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JAMES K. HURLBURT
JASON C. MOON
JONATHAN E. CHEATHAM
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
A. M. HERMAN (1905-1987)
WILLIAM M. BROWN (1912-1987)

*Via First Class Mail*
Ms. Kuja Stewart
2028 Sandy Lane
Irving, Texas 75060

> Re:    Kuja Stewart
>         Oil & Gas Lease
>         42.803 acres, Joseph Mangum Survey
>         Abstract No. 881, Dallas County, Texas
>         Our File No.: 3251.22711

Dear Ms. Stewart:

On March 18, 2005, a meeting was held between yourself, your sons, Jimmy Stewart and Kenny Stewart, Charlie Mitchell and myself regarding several items involved in the furnishing of legal services to you from our firm. Items discussed at this meeting included your potential mineral rights and the potential lease for drilling rights on your property, the improvement of your 40-acres of property with a CDC permit filed with the City of Irving, the establishment of Subchapter S Corporations for beneficial tax purposes which will not interfere with the receipt of your Social Security benefits, the transfer of your company into Kenny Stewart's name via a sale and lease back transaction, and the recording of a 40-acre tract purchased in Smith County for which you have yet to receive a deed. A brief outline of the topics discussed and the items determined at the meeting are outlined below as well as a proposed fee schedule for the completion of these legal tasks by our office.

Your initial inquiry was into the development of your 40-acres of property which currently partially lies in the flood way or flood plain where no development is allowed. As this property is adjacent to Lone Star Park in Grand Prairie, Texas it is anticipated that a retail shopping strip mall or gas station would be a profitable development of your property. However, as your property lies partially in the flood plain, it may be impossible to obtain the necessary permits and subsequently commercially develop your property. We discussed the possibility of filing an inverse condemnation proceeding with the City of Irving based upon the denial of the CDC permit application which we have yet to initiate. In order to commercially develop your property, a filing of a CDC permit is required and the approval of the City of Irving must be granted. However, based upon the fact that your property lies partially in the flood plain, it is anticipated that the City of Irving will not approve any commercial development of this property without raising the surface ground level and determining the economic feasibility of allowing a retail or commercial shopping development on your property.

**BROWN, I͟   ͟N, WISEMAN, LISER, PROCTOR &   ͟ RT, L.L.P.**

Attorneys at Law

BEALE DEAN
JAMES T. BLANTON
* GRANT LISER
RICHARD W. WISEMAN
**JOHN C. HART
JOHN W. PROCTOR
LARRY W. WILSHIRE
SANDRA LISER

OF COUNSEL
CATHERINE JANE ALDER, P.C

* Also licensed to practice in Louisiana
** Also licensed to practice in Minnesota

306 WEST 7TH STREET, SUITE 200
FORT WORTH, TEXAS 76102-4905

TELEPHONE (817) 332-1391
METRO (817) 429-0851
FAX (817) 870-2427

WRITER'S DIRECT DIAL (817) 820-1103
WRITER'S E-MAIL ADDRESS
jcheatham@browndean.com

April 1, 2005

CHARLES B. MITCHELL, Jr.
MICHAEL L. PECK
BRUCE H. ROGERS
STERLING J. ELZA
BILLY McGILL
JAMES K. HURLBURT
JASON C. MOON
JONATHAN E. CHEATHAM
JENNIFER L. WILLINGHAM

JESSE M. BROWN (1883-1978)
A. M. HERMAN (1905-1987)
WILLIAM M. BROWN (1912-1987)

*Via First Class Mail*
Ms. Kuja Stewart
2028 Sandy Lane
Irving, Texas 75060

Re:     Kuja Stewart
        Oil & Gas Lease
        42.803 acres, Joseph Mangum Survey
        Abstract No. 881, Dallas County, Texas
        Our File No.: 3251.22711

Dear Ms. Stewart:

On March 18, 2005, a meeting was held between yourself, your sons, Jimmy Stewart and Kenny Stewart, Charlie Mitchell and myself regarding several items involved in the furnishing of legal services to you from our firm. Items discussed at this meeting included your potential mineral rights and the potential lease for drilling rights on your property, the improvement of your 40-acres of property with' a CDC permit filed with the City of Irving, the establishment of Subchapter S Corporations for beneficial tax purposes which will not interfere with the receipt of your Social Security benefits, the transfer of your company into Kenny Stewart's name via a sale and lease back transaction, and the recording of a 40-acre tract purchased in Smith County for which you have yet to receive a deed. A brief outline of the topics discussed and the items determined at the meeting are outlined below as well as a proposed fee schedule for the completion of these legal tasks by our office.

Your initial inquiry was into the development of your 40-acres of property which currently partially lies in the flood way or flood plain where no development is allowed. As this property is adjacent to Lone Star Park in Grand Prairie, Texas it is anticipated that a retail shopping strip mall or gas station would be a profitable development of your property. However, as your property lies partially in the flood plain, it may be impossible to obtain the necessary permits and subsequently commercially develop your property. We discussed the possibility of filing an inverse condemnation proceeding with the City of Irving based upon the denial of the CDC permit application which we have yet to initiate. In order to commercially develop your property, a filing of a CDC permit is required and the approval of the City of Irving must be granted. However, based upon the fact that your property lies partially in the flood plain, it is anticipated that the City of Irving will not approve any commercial development of this property without raising the surface ground level and determining the economic feasibility of allowing a retail or commercial shopping development on your property.

Ms. Kuja Stewart
April 1, 2005
Page 2

Kenny Stewart informed us that he noticed new town home construction at the intersection of Royal and Carrier Parkway in Grand Prairie for which zoning changes and permits were presumably obtained by developers in order to improve property which may be similarly situated. Obviously, the commercial development of your property would require the same type of zoning changes and permits to make the necessary improvements, roads and pad sites available for retail development. Based upon the similar commercial development of the adjacent property, it was determined that it would be advisable to check the county property records of the adjacent property to determine how they went about obtaining appropriate zoning changes and permits to develop it.

Another potential use of your property has already come to light in the form of a proposed lease to drill for oil and gas reserves which may lie beneath your property. Giving a lessor oil or gas company the right to drill core samples on your property may determine that there are sufficient oil and gas reserves for production in paying quantities. Previously, you indicated a willingness to allow an oil and gas concern to drill core samples on your property. However, it was determined that you would first need Subchapter S tax filing status before you sign any lease such that it does not effect the receipt of social security benefits should any profitable reserves be found under your property.

Charlie Mitchell explained that Subchapter S tax filing status allows you to place assets including land, buildings, and real estate into a corporation which will alleviate any negative impact on your current receipt of Social Security benefits. Establishing Subchapter S corporation tax filing status is not difficult but we will need you to furnish our office with three (3) proposed corporate names with which we may begin research with the Secretary of State to obtain the name of your corporation for Subchapter S tax filing status.

Another issue discussed was the imminent transfer of your company, JSC Manufacturing, to Kenny Stewart's name whereafter Kenny Stewart makes payments to you which do not exceed the per year financial gift threshold for the IRS. According to your best estimates, the land, buildings, machines and goodwill of your business amounts to approximately $250,000. You indicated you prefer to retain ownership of the building where JSC Manufacturing is housed but transfer the other assets into Kenny's name so that he may run the business. It was also determined that Kenny may want to establish his own Subchapter S corporation for tax purposes once the transfer of JSC Manufacturing is complete.

The last topic addressed was your purchase of approximately 40-acres of land in Smith County around the year 2000. You indicated this property was purchased from a relative, and although you did not receive a deed, you do believe a title search was completed. Importantly, you communicated that the property was not currently in your name and your interest is not recorded in Smith County at this time. We asked you to obtain all paperwork evidencing a contract of sale so that we may record this property in your name as soon as possible to avoid any issues of adverse possession and/or the sale of that property to another individual for whom a deed was furnished. At your earliest convenience, please furnish our office with copies of any contracts of sale and/or written agreements evidencing an intent to both sell and purchase this property so that we may properly record it in your name in Smith County.

We discussed the legal fees associated with your desire to accomplish the foregoing tasks. Charlie Mitchell indicated he would offer his discounted rate for individual clients at $200 per hour and

Ms. Kuja Stewart
April 1, 2005
Page 3

charge $1,500 to establish a Subchapter S corporation in your name for the placing of your assets, $250 to conduct research on the zoning and permits obtained by the adjacent property which is currently being commercially developed, and $500 for the completion of the City of Irving CDC permit application which will establish permission to either move forward with an inverse condemnation proceeding or move forward with the commercial development and/or sale of your 40-acres of property in Grand Prairie.

If you wish to move forward with the items discussed and are agreeable to the fee schedule, please remit a check or money order in the amount of $2,250 payable to BROWN, DEAN, WISEMAN, LISER, PROCTOR & HART, L.L.P. and we can begin work on the above-mentioned items. If any of the foregoing does not meet with your understanding of our plans to initiate these legal services, please contact either myself or Charlie Mitchell at your earliest convenience and we will hopefully resolve any concerns that you may have.

Sincerely,

Jonathan E. Cheatham

JEC/khg

cc:    *Via Interoffice*
       Charles B. Mitchell, Jr.
       Patty Rien

W:\Charles\files\Individual Clients\Stewart, Kuja [Real Estate 22711]\Correspondence\Ltr to Ms. Stewart 005 04.01.05.wpd

Ms. Kuja Stewart
April 1, 2005
Page 2

Kenny Stewart informed us that he noticed new town home construction at the intersection of Royal and Carrier Parkway in Grand Prairie for which zoning changes and permits were presumably obtained by developers in order to improve property which may be similarly situated. Obviously, the commercial development of your property would require the same type of zoning changes and permits to make the necessary improvements, roads and pad sites available for retail development. Based upon the similar commercial development of the adjacent property, it was determined that it would be advisable to check the county property records of the adjacent property to determine how they went about obtaining appropriate zoning changes and permits to develop it.

Another potential use of your property has already come to light in the form of a proposed lease to drill for oil and gas reserves which may lie beneath your property. Giving a lessor oil or gas company the right to drill core samples on your property may determine that there are sufficient oil and gas reserves for production in paying quantities. Previously, you indicated a willingness to allow an oil and gas concern to drill core samples on your property. However, it was determined that you would first need Subchapter S tax filing status before you sign any lease such that it does not effect the receipt of social security benefits should any profitable reserves be found under your property.

Charlie Mitchell explained that Subchapter S tax filing status allows you to place assets including land, buildings, and real estate into a corporation which will alleviate any negative impact on your current receipt of Social Security benefits. Establishing Subchapter S corporation tax filing status is not difficult but we will need you to furnish our office with three (3) proposed corporate names with which we may begin research with the Secretary of State to obtain the name of your corporation for Subchapter S tax filing status.

Another issue discussed was the imminent transfer of your company, JSC Manufacturing, to Kenny Stewart's name whereafter Kenny Stewart makes payments to you which do not exceed the per year financial gift threshold for the IRS. According to your best estimates, the land, buildings, machines and goodwill of your business amounts to approximately $250,000. You indicated you prefer to retain ownership of the building where JSC Manufacturing is housed but transfer the other assets into Kenny's name so that he may run the business. It was also determined that Kenny may want to establish his own Subchapter S corporation for tax purposes once the transfer of JSC Manufacturing is complete.

The last topic addressed was your purchase of approximately 40-acres of land in Smith County around the year 2000. You indicated this property was purchased from a relative, and although you did not receive a deed, you do believe a title search was completed. Importantly, you communicated that the property was not currently in your name and your interest is not recorded in Smith County at this time. We asked you to obtain all paperwork evidencing a contract of sale so that we may record this property in your name as soon as possible to avoid any issues of adverse possession and/or the sale of that property to another individual for whom a deed was furnished. At your earliest convenience, please furnish our office with copies of any contracts of sale and/or written agreements evidencing an intent to both sell and purchase this property so that we may properly record it in your name in Smith County.

We discussed the legal fees associated with your desire to accomplish the foregoing tasks. Charlie Mitchell indicated he would offer his discounted rate for individual clients at $200 per hour and

Ms. Kuja Stewart
April 1, 2005
Page 3

charge $1,500 to establish a Subchapter S corporation in your name for the placing of your assets, $250 to conduct research on the zoning and permits obtained by the adjacent property which is currently being commercially developed, and $500 for the completion of the City of Irving CDC permit application which will establish permission to either move forward with an inverse condemnation proceeding or move forward with the commercial development and/or sale of your 40-acres of property in Grand Prairie.

If you wish to move forward with the items discussed and are agreeable to the fee schedule, please remit a check or money order in the amount of $2,250 payable to BROWN, DEAN, WISEMAN, LISER, PROCTOR & HART, L.L.P. and we can begin work on the above-mentioned items. If any of the foregoing does not meet with your understanding of our plans to initiate these legal services, please contact either myself or Charlie Mitchell at your earliest convenience and we will hopefully resolve any concerns that you may have.

Sincerely,

Jonathan E. Cheatham

JEC/khg

cc:     *Via Interoffice*
        Charles B. Mitchell, Jr.
        Patty Rien

W:\Charles\files\Individual Clients\Stewart, Kuja [Real Estate 22711]\Correspondence\Ltr to Ms. Stewart 005 04.01.05.wpd

*Kuja Stewart*
*Real Estate*
*.com*
*w/client*

## Patty Rien

| | |
|---|---|
| **From:** | Jonathan Cheatham [jcheatham@browndean.com] |
| **Sent:** | Friday, April 08, 2005 1:37 PM |
| **To:** | Charles Mitchell; Patty Rien |
| **Subject:** | FW: 40 acres in Smith County |

I haven't looked at these yet but saw that they came to my attention and not yours that I can tell. JEC

Jonathan Cheatham
Brown, Dean, Wiseman, Liser, Proctor & Hart, LLP
306 West 7th Street, Suite 200
Ft. Worth, Texas 76102
(817) 820-1103-direct
(817)870-2427-fax
jcheatham@browndean.com

**From:** james stewart [mailto:JIMMYSTEWART@peoplepc.com]
**Sent:** Thursday, April 07, 2005 12:35 AM
**To:** Jonathan E Cheatham
**Subject:** 40 acres in Smith County

I'm going to try to put this in a nutshell. My mom is good friends with Don Tipton and Don's wife, they probably have known each other for about 20-25 years. My mom bought the acreage from Don's mother. Don's sister is the one causing all the problems. Her name is Pam Mahan, Don has told my mother that he and his sister don't get along at all. When my mother went to Tyler that weekend we met with you and Charlie. She said everything was going to be taking care of, but now Don's sister is saying my mom never bought the land. Attachments are the hand written statement of sale along with another payment to Don's mom of $5000.00.

concerns from the City of Dallas, downstream from your property, were the principal drivers toward the enactment of § 6311 which went into effect on August 26, 1993. In sum, § 6311 regulates the use of your property, and as you well know, the regulation can seriously impact a property's marketability and value.

### *Texas Law Regarding "Inverse Condemnation"*

With this in mind, a potential inverse condemnation claim would be based on the assumption that this "regulation" of your property constitutes a "taking" under the Texas Constitution, Art. 1, § 17. Pursuant to the Texas Constitution, "no person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by consent of such persons." Id. This particular section 17 of the Texas Constitution is the well-settled source for a legal remedy in Texas for inverse condemnation.

Texas law further states that if the government "takes" or appropriates property without paying adequate compensation, the owner may recover the resulting damages in an "inverse condemnation" suit. To recover under the theory of inverse condemnation, the property owner must establish that: (1) the governmental entity intentionally performed certain acts; (2) that resulted in a taking of property; (3) for public use. *Waddy v. City of Houston,* 834 S.W.2d 97, 102 (Tex.App.-Houston [1st Dist.] 1992, writ denied). Under our facts, it would appear that elements (1) and (3) are satisfied. The city was clearly intentional about enacting the ordinance and, based on its flood control purposes, would clearly constitute a public use. The central dispute is element (2), which asks whether the regulation constitutes a "taking" under Texas law.

### *"Regulatory Taking" May Constitute An Inverse Condemnation Claim*

As noted above, under the facts of your case, an inverse condemnation claim would arise upon the denial of your CDC application. Under Texas law, the denial will constitute a "regulatory taking" for which compensation is required under the Texas Constitution if the restrictions imposed by § 6311 (1) deny a landowner of all economically viable use of their property or (2) unreasonably interferes with a landowner's right to use and enjoy their property. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 935 (Tex. 1998). What we do not know yet is whether § 6311 would deny "all economically viable use" of your property or whether it "unreasonably interferes" with your right to "use and enjoy" your property.

### *Key Question No. 1: Does § 6311 Destroy All Economically Viable Use?*

Guidance on this first key question is found in the above-referenced Texas Supreme Court decision, as follows:

> A restriction denies the landowner all economically viable use of the property or totally destroys the value of the property if the restriction renders the property valueless. Determining whether all economically viable use of a property has been denied entails a

relatively simple analysis of whether value remains in the property after the governmental action. *Id*. at 935. (Citations omitted)

You will need to learn whether § 6311 - and more specifically the denial of a CDC permit with its consequences - would destroy the value of your property. To make this determination, we recommend hiring a certified appraiser to appraise the property with this assumption in mind. If there is no economic value remaining in the property based on this assumption, then under Texas law, you could bring a claim against the City of Irving for the difference in value upon denial of your CDC application.

### *Key Question No. 2: Does § 6311 Unreasonably Interfere With Use and Enjoyment of Property?*

Alternatively, Texas law provides a second approach to determine if a "regulatory taking" has occurred, that is, the "unreasonable interference" with your "use and enjoyment" of your property. The Texas Supreme Court explains there are two factors to consider:

> [D]etermining whether the government has unreasonably interfered with a landowner's right to use and enjoy property requires a consideration of two factors: the economic impact of the regulation and the extent to which the regulation interferes with distinct investment-backed expectations. The first factor, the economic impact of the regulation, merely compares the value that has been taken from the property with the value that remains in the property. The loss of anticipated gains or potential future profits is not usually considered in analyzing this factor. The second factor is the investment-backed expectation of the landowner. The existing and permitted uses of the property constitute the "primary expectation" of the landowner that is affected by regulation...[K]nowledge of existing zoning is to be considered in determining whether the regulation interferes with investment-backed expectations. *Id*. at 935. (Citations omitted).

From our perspective at this point, we simply do not have enough information to offer any opinion on whether the City of Irving has "unreasonably interfered" with your property based on either factor listed. Once again, an appraiser and/or an economist may be valuable in determining this issue. Some key issues will be: (1) comparing the before and after value of your property with regard to § 6311's impact **but without** regard to anticipated gains or potential future profits and (2) looking at the existing use of your property as a basis for determining the extent of interference with the owner's 'primary expectation concerning the use of the parcel. Said another way, what have you done with the property since you acquired it and what did you reasonably believe you could do with the property based on any existing zoning laws **other than §6311?** These are the issues to be discussed if you choose to move forward with any inverse condemnation claim.

### *10-year Statute Of Limitations For Inverse Condemnation Claim*

As a final observation, we note that Texas law provides a 10-year statute of limitations period for

W:\Charles\files\Individual Clients\Stewart, Kuja [Real Estate 22711]\Correspondence\Ltr to Ms. Stewart 003 020205.wpd

an inverse condemnation claim. *See Trail Enters, Inc. v. City of Houston*, 957 S.W.2d 625, 632 (Tex. App. -- Houston [14th Dist.] 1997, writ denied). If you begin the application process - including seeking an exemption, waiver, variance, etc. - and are ultimately denied a CDC permit, **be sure to calendar the date of the denial**, as the 10-year clock will begin to run on that date and expire 10 years later. If you were to bring a claim past this 10-year period, it would be barred.

We note the 10-year period would have started when § 6311 was enacted in August 1993, except that § 6311 on its face provides for exemptions and waivers. Texas law provides that when an regulatory ordinance provides for some variance or exemption, etc. on its face - such as § 6311 - that the ordinance is not final. *See Town of Sunnyvale v. Mayhew*, 905 S.W.2d, 234,246 (Tex. App. -- Dallas 1994, rev'd other grounds) (citing *Herrington v. County of Sonoma*, 857 F.2d 567, 569-70, (9th Cir. 1988) *cert. denied* 489 U.S. 1090, 109 S.Ct. 1557, 103.L.Ed. 2d 860 (1989)). In other words, and related to what stated in the beginning about a "ripe" claim, because the possibility exists that you might obtain an exemption or waiver, the courts in Texas have said they cannot necessarily conclude that the City of Irving is "taking" your property simply because the ordinance has been enacted. Said otherwise, if there is no "ripe" claim, then the 10-year clock does not begin to run.

*Conclusion*

This concludes our evaluation of the case at this point. In sum, based on a preliminarily view of the facts regarding your property, it would appear that a "regulatory taking" may ultimately present itself such that a claim for inverse condemnation against the City of Irving could be brought. However, obtaining an accurate assessment of whether a "regulatory taking" has occurred will be contingent on (1) going through the CDC application process (2) ultimately being denied a CDC permit and (3) hiring experts - such as an appraiser or economist - to evaluate the impact of such denial to your property. While we always want to view a case in its most positive light, we also want to advise you that it is conceivable that even if you were ultimately denied a CDC permit, the effect of the denial may not be so extreme as to destroy all value in the property or "unreasonably interfere" with your use of the property. In other words, simply being denied the CDC permit does not necessarily equal a "regulatory taking" for which an inverse condemnation claim could be successfully brought against the City of Irving. Nevertheless we do recognize there has been some negative impact already to your use of the property and stand available to assist you in any steps you wish to take. If you are interested in taking the next step, we would recommend meeting with you to discuss the issues raised herein. If you have any questions concerning our efforts to date, please feel free to give me or Mr. Mitchell a call. Thanks again for the opportunity to evaluate this matter for you.

Sincerely yours,

James K. Hurlburt

cc:    Charles B. Mitchell, Jr.

W:\Charles\files\Individual Clients\Stewart, Kuja [Real Estate 22711]\Correspondence\Ltr to Ms. Stewart 003 020205.wpd

concerns from the City of Dallas, downstream from your property, were the principal drivers toward the enactment of § 6311 which went into effect on August 26, 1993. In sum, § 6311 regulates the use of your property, and as you well know, the regulation can seriously impact a property's marketability and value.

### *Texas Law Regarding "Inverse Condemnation"*

With this in mind, a potential inverse condemnation claim would be based on the assumption that this "regulation" of your property constitutes a "taking" under the Texas Constitution, Art. 1, § 17. Pursuant to the Texas Constitution, "no person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by consent of such persons." Id. This particular section 17 of the Texas Constitution is the well-settled source for a legal remedy in Texas for inverse condemnation.

Texas law further states that if the government "takes" or appropriates property without paying adequate compensation, the owner may recover the resulting damages in an "inverse condemnation" suit. To recover under the theory of inverse condemnation, the property owner must establish that: (1) the governmental entity intentionally performed certain acts; (2) that resulted in a taking of property; (3) for public use. *Waddy v. City of Houston,* 834 S.W.2d 97, 102 (Tex.App.-Houston [1st Dist.] 1992, writ denied). Under our facts, it would appear that elements (1) and (3) are satisfied. The city was clearly intentional about enacting the ordinance and, based on its flood control purposes, would clearly constitute a public use. The central dispute is element (2), which asks whether the regulation constitutes a "taking" under Texas law.

### *"Regulatory Taking" May Constitute An Inverse Condemnation Claim*

As noted above, under the facts of your case, an inverse condemnation claim would arise upon the denial of your CDC application. Under Texas law, the denial will constitute a "regulatory taking" for which compensation is required under the Texas Constitution if the restrictions imposed by § 6311 (1) deny a landowner of all economically viable use of their property or (2) unreasonably interferes with a landowner's right to use and enjoy their property. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 935 (Tex. 1998). What we do not know yet is whether § 6311 would deny "all economically viable use" of your property or whether it "unreasonably interferes" with your right to "use and enjoy" your property.

### *Key Question No. 1:  Does § 6311 Destroy All Economically Viable Use?*

Guidance on this first key question is found in the above-referenced Texas Supreme Court decision, as follows:

A restriction denies the landowner all economically viable use of the property or totally destroys the value of the property if the restriction renders the property valueless. Determining whether all economically viable use of a property has been denied entails a

relatively simple analysis of whether value remains in the property after the governmental action. *Id.* at 935. (Citations omitted)

You will need to learn whether § 6311 - and more specifically the denial of a CDC permit with its consequences - would destroy the value of your property. To make this determination, we recommend hiring a certified appraiser to appraise the property with this assumption in mind. If there is no economic value remaining in the property based on this assumption, then under Texas law, you could bring a claim against the City of Irving for the difference in value upon denial of your CDC application.

### *Key Question No. 2: Does § 6311 Unreasonably Interfere With Use and Enjoyment of Property?*

Alternatively, Texas law provides a second approach to determine if a "regulatory taking" has occurred, that is, the "unreasonable interference" with your "use and enjoyment" of your property. The Texas Supreme Court explains there are two factors to consider:

> [D]etermining whether the government has unreasonably interfered with a landowner's right to use and enjoy property requires a consideration of two factors: the economic impact of the regulation and the extent to which the regulation interferes with distinct investment-backed expectations. The first factor, the economic impact of the regulation, merely compares the value that has been taken from the property with the value that remains in the property. The loss of anticipated gains or potential future profits is not usually considered in analyzing this factor. The second factor is the investment-backed expectation of the landowner. The existing and permitted uses of the property constitute the "primary expectation" of the landowner that is affected by regulation...[K]nowledge of existing zoning is to be considered in determining whether the regulation interferes with investment-backed expectations. *Id.* at 935. (Citations omitted).

From our perspective at this point, we simply do not have enough information to offer any opinion on whether the City of Irving has "unreasonably interfered" with your property based on either factor listed. Once again, an appraiser and/or an economist may be valuable in determining this issue. Some key issues will be: (1) comparing the before and after value of your property with regard to § 6311's impact **but without** regard to anticipated gains or potential future profits and (2) looking at the existing use of your property as a basis for determining the extent of interference with the owner's 'primary expectation concerning the use of the parcel. Said another way, what have you done with the property since you acquired it and what did you reasonably believe you could do with the property based on any existing zoning laws **other than §6311?** These are the issues to be discussed if you choose to move forward with any inverse condemnation claim.

### *10-year Statute Of Limitations For Inverse Condemnation Claim*

As a final observation, we note that Texas law provides a 10-year statute of limitations period for

an inverse condemnation claim. *See Trail Enters, Inc. v. City of Houston*, 957 S.W.2d 625, 632 (Tex. App. -- Houston [14th Dist.] 1997, writ denied). If you begin the application process - including seeking an exemption, waiver, variance, etc. - and are ultimately denied a CDC permit, **be sure to calendar the date of the denial,** as the 10-year clock will begin to run on that date and expire 10 years later. If you were to bring a claim past this 10-year period, it would be barred.

We note the 10-year period would have started when § 6311 was enacted in August 1993, except that § 6311 on its face provides for exemptions and waivers. Texas law provides that when an regulatory ordinance provides for some variance or exemption, etc. on its face - such as § 6311 - that the ordinance is not final. *See Town of Sunnyvale v. Mayhew,* 905 S.W.2d, 234,246 (Tex. App. -- Dallas 1994, rev'd other grounds) (citing *Herrington v. County of Sonoma*, 857 F.2d 567, 569-70, (9th Cir. 1988) *cert. denied* 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed. 2d 860 (1989)). In other words, and related to what stated in the beginning about a "ripe" claim, because the possibility exists that you might obtain an exemption or waiver, the courts in Texas have said they cannot necessarily conclude that the City of Irving is "taking" your property simply because the ordinance has been enacted. Said otherwise, if there is no "ripe" claim, then the 10-year clock does not begin to run.

### *Conclusion*

This concludes our evaluation of the case at this point. In sum, based on a preliminarily view of the facts regarding your property, it would appear that a "regulatory taking" may ultimately present itself such that a claim for inverse condemnation against the City of Irving could be brought. However, obtaining an accurate assessment of whether a "regulatory taking" has occurred will be contingent on (1) going through the CDC application process (2) ultimately being denied a CDC permit and (3) hiring experts - such as an appraiser or economist - to evaluate the impact of such denial to your property. While we always want to view a case in its most positive light, we also want to advise you that it is conceivable that even if you were ultimately denied a CDC permit, the effect of the denial may not be so extreme as to destroy all value in the property or "unreasonably interfere" with your use of the property. In other words, simply being denied the CDC permit does not necessarily equal a "regulatory taking" for which an inverse condemnation claim could be successfully brought against the City of Irving. Nevertheless we do recognize there has been some negative impact already to your use of the property and stand available to assist you in any steps you wish to take. If you are interested in taking the next step, we would recommend meeting with you to discuss the issues raised herein. If you have any questions concerning our efforts to date, please feel free to give me or Mr. Mitchell a call. Thanks again for the opportunity to evaluate this matter for you.

Sincerely yours,

James K. Hurlburt

cc:    Charles B. Mitchell, Jr.

W:\Charles\files\Individual Clients\Stewart, Kuja [Real Estate 22711]\Correspondence\Ltr to Ms. Stewart 003 020205.wpd

## Main Identity

**From:** "Nancy Croney" <Nancy@croneyteam.com>
**To:** <gfennell@ci.irving.tx.us>
**Cc:** "Nancy Croney" <Nancy@croneyteam.com>
**Sent:** Thursday, April 29, 2004 2:22 PM
**Subject:** 1800 and 1900 Hunter Ferrell Road

Mr. Fennell,
I am currently marketing the above captioned properties for sale and have some interested parties
that would like to operate a trucking business on 1800 Hunter Ferrell Road. That current piece is
9.47 acres and the buyer is interested in dividing the property into two lots. I spoke to Ron Ruthven,
Planner, yesterday and he was concerned about the flood zone areas in those lots. I would
appreciate your comments, concerns and opinions concerning the feasibility of developing this land
and what your department would require from the owners of this property.
Sincerely,
Nancy Croney
817-781-9464
Nancy@Croneyteam.com
Re/Max Associates Realty

5/27/2004



PLACE OF BEGINNING

Ward Williford, Tr.
Vol. 88118, Pg. 0725

S 89°03'18"E ~ 1162.76'

Zone B

42.663 ACRES

Approx. Limit of 100 Year
Flood Plain As Shown on
Federal Emergency Management
Agency Community Panel No.
480130.0045 C dated 6-15-84.

Zone A7

No longer
in effect

Approx. 30' Wide
Drainage Ditch

S 89°53'05"W ~ 1126.76'

40' R.R.W. from Gifford-Hill R.R.
To County of Dallas
Vol. 7003 Pg. 0315
S 45°03'05"W ~

HUNTER

FERRELL
Underground Telephone Cable
(80' Right of Way)

ROAD

Both Parcels 1900 and 1800 Hunter
Ferrell









Map Output



## Main Identity

**From:**   "Nancy Croney" <Nancy@croneyteam.com>
**To:**     <jdriscoll@ci.irving.tx.us>
**Cc:**     "Nancy Croney" <Nancy@croneyteam.com>
**Sent:**   Thursday, April 29, 2004 2:25 PM
**Subject:** 1800 and 1900 Hunter Ferrell Roads

Mr. Driscoll,

I am currently marketing the above captioned properties for sale and have some interested parties
that would like to operate a trucking business on 1800 Hunter Ferrell Road. That current piece is
9.47 acres and the buyer is interested in dividing the property into two lots. I spoke to Ron Ruthven,
Planner, yesterday and he was concerned about the proposed Trinity Blvd and other new roads that
would affect these lots. I would appreciate your comments, concerns and opinions concerning the
feasibility of developing this land and what your department would require from the owners of this
property.
Sincerely,
Nancy Croney
817-781-9464
Nancy@Croneyteam.com
Re/Max Associates Realty

5/27/2004

Case 14-10979-CSS    Doc 10223-7    Filed 11/18/16    Page 85 of 90

PER E. SARLES UPDATE YEARS:

2011



# DALLAS CENTRAL APPRAISAL DISTRICT
## 2949 N. STEMMONS FWY
## DALLAS, TX 75247-6195

| AFC DATE: | 8/11/2010 |
|---|---|

**VOLUME & PAGE/SEQ#**

201000065956

**ACCOUNT FLOWCHART ACTION:**

| SPLIT | NEW ADDITION | RESEARCH/ SUA |
|---|---|---|
| ☒ | ☐ | ☐ |

**DCS/DRAFTER:  CRAIG E. BROWNE**

| ENTITIES: | | |
|---|---|---|
| COUNTY | CITY | SCHOOL |
| DC | CI | PS |

| EXEMPTIONS | | | |
|---|---|---|---|
| TE | ABATE | AG | TIF |
| ☐ | ☐ | ☐ | ☐ |
| Historic Exemption | ☐ | | |

| *SUBJECT ACCOUNT* | *COMMENTS* |
|---|---|
| **1.  65086114010010000** | ADJUST THIS 33.33 ACS ACCOUNT PER DEED INST 201000065956. FROM 33.33 ACS ACCOUNT SPLIT 5.3195 ACS TO RIGHT OF WAY & SPLIT 3.1798 ACS TO 65086114010010100 & SPLIT 5.2665 ACS TO 65086114010010200 BY NONCONTIG LEAVING 19.5642 ACS CALC REMAINING IN THIS ACCOUNT. ACS BY GIS CALCULATION. AFFECTS 2011 |
| **2.  65086114010020000** | ADJUST THIS 9.47 ACS ACCOUNT PER DEED INST 201000065956. FROM 9.47 ACS SPLIT 0.6888 ACS TO RIGHT OF WAY AND SPLIT 0.0469 ACS CALC TO 65086114010020200 BY NONCONTIG LEAVING 8.7343 ACS REMAINING IN THIS ACCOUNT. ACS BY GIS CALCULATION. AFFECTS 2011 |

## PRIOR TO ADJUSTMENT

**TOTAL ACCOUNTS AFFECTED:  5**



H



EXHIBIT
H

The following criteria was used to produce these results:
Date recorded from 01/01/1964 to 12/30/2011

Bk like 861 AND LEGAL_TYPE = 'OPR'

INDEX TYPE IN (BN,BR,CS,DE,DF,DP,DV,FN,FS,LR,MA,MD,ML,OB,PL,VB)

**All Records verified through 01/23/2015.**

| Ver | Date | Name | Role | OtherName | Doc Type/Legacy# | Book/Pg/Inst | First Legal |
|---|---|---|---|---|---|---|---|
| Y | 11/3/1977 12:00:00AM | RDG RLTY CO TR | Grantor | OLYMPIC PROP INC | DEED / 19770082546 | ALL 77215 1558 / 19770082546 | MANGUM J VOL 861... |
| Y | 2/23/1978 12:00:00AM | CHRISTENSEN MARY B | Grantor | TEXAS P&L CO DAL | EASEMENT / 197800533785 | ALL 78038 651 / 197800533785 | MANGUM J VOL 861... |
| Y | 3/21/1978 12:00:00AM | BROWN JANICE | Grantor | PURVIS PATRICIA A | DEED / 197800552955 | ALL 78056 1338 / 197800552955 | MANGM VOL 861... |
| Y | 3/21/1978 12:00:00AM | PURVIS PATRICIA A | Grantor | BROWN STEPHEN M | DT / 197800552956 | ALL 78056 1341 / 197800552956 | MANGUM VOL 861... |
| Y | 3/21/1978 12:00:00AM | PURVIS PATRICIA A | Grantor | FIRST CITY BK DAL | DT / 197800552957 | ALL 78056 1345 / 197800552957 | MANGUM VOL 861... |
| Y | 3/8/1979 12:00:00AM | OLYMPIC PROP INC | Grantor | LINCOLN LIBERTY LF INS C | TR DEED / 197900483064 | ALL 79048 1856 / 197900483064 | MANGUM DALLAS SURVEYS VOL 861... |
| Y | 3/8/1979 12:00:00AM | OLYMPIC PROP INC | Grantor | LINCOLN LIBERTY LF INS C | TR DEED / 197900483065 | ALL 79048 1860 / 197900483065 | MANGUM DALLAS SURVEYS VOL 861... |
| Y | 3/16/1979 12:00:00AM | PURVIS PATRICIA A | Grantor | WINN ROBERT P | DEED / 197900549223 | ALL 79054 1141 / 197900549223 | MANGUM DALLAS SURVEYS VOL 861... |
| Y | 3/16/1979 12:00:00AM | FIRST CITY BK DAL | Grantor | PURVIS PATRICIA A | REL / 197900549176 | ALL 79054 1023 / 197900549176 | MANGUM J DALLAS SURVEYS VOL 861... |
| Y | 3/16/1979 12:00:00AM | WINN ROBERT P | Grantor | PURVIS PATRICIA A | DT / 197900549224 | ALL 79054 1145 / 197900549224 | MANGUM DALLAS SURVEYS VOL 861... |
| Y | 3/16/1979 12:00:00AM | WINN ROBERT P | Grantor | PURVIS PATRICIA A | DT / 197900549248 | ALL 79054 1242 / 197900549248 | MANGUM DALLAS SURVEYS VOL 861... |
| Y | 9/17/1979 12:00:00AM | LINCOLN LIBERTY LF INS C | Grantor | DABAR CORP | DEED / 197901828315 | ALL 79182 3499 / 197901828315 | MANGRUM J DALLAS SURVEYS VOL 861... |
| Y | 9/17/1979 12:00:00AM | DABAR CORP | Grantor | MERCANTILE NATL BK DAL | DT / 197901828318 | ALL 79182 3512 / 197901828318 | MANGUM J DALLAS SURVEYS VOL 861... |
| Y | 9/25/1979 12:00:00AM | BROWN JANICE | Grantor | BROWN BILL L | AL / 197901885116 | ALL 79188 2989 / 197901885116 | MANGUM J DALLAS SURVEYS VOL 861... |
| Y | 11/5/1979 12:00:00AM | IRVING CITY | Grantor | OWNERS | ORD / 197902177758 | ALL 79217 4054 / 1979021777580 | LT 1 BLK B MEADOWS IRVING... |
| Y | 1/9/1980 12:00:00AM | TULEY BETTY S | Grantor | TULEY GLEN R | DEED / 198000073977 | ALL 80007 2895 / 198000073977 | MANGUM DALLAS SURVEYS VOL 861... |
| Y | 2/4/1980 12:00:00AM | CENTENNIAL HOMES INC | Grantor | IRVING CITY | DEED / 198000261009 | ALL 80026 241 / 198000261009 | MANGUM DALLAS SURVEYS VOL 861... |
| Y | 2/6/1980 12:00:00AM | PURVIS PATRICIA A | Grantor | WINN ROBERT P | REL / 198000272854 | ALL 80027 1941 / 198000272854 | MANGUM DALLAS SURVEYS VOL 861... |
| Y | 2/6/1980 12:00:00AM | WINN ROBERT P | Grantor | WINN PATRICIA AP | DEED / 198000272853 | ALL 80027 1939 / 198000272853 | MANGUM DALLAS SURVEYS VOL 861... |
| Y | 3/10/1980 12:00:00AM | OLYMPIC PROP INC | Grantor | LINCOLN LIBERTY LF INS C | DEED / 198000505327 | ALL 80050 2731 / 198000505327 | MANGUM VOL 861... |

1/30/2015  1:15:45PM

| Ver | Date | Name | Role | OtherName | Doc Type/Legacy | Book/Pg/Inst | First Legal | References |
|---|---|---|---|---|---|---|---|---|
| Y | 3/10/1980 12:00:00AM | OLYMPIC PROP INC | Grantor | LINCOLN LIBERTY LF INS C | DEED / 198000505328 | ALL 80050 2733 / 198000505328 | MANGUM VOL 861... | |
| Y | 3/10/1980 12:00:00AM | TARVER JAMES L JR | Grantor | LINCOLN LIBERTY LF INS C | DEED / 198000505329 | ALL 80050 2735 / 198000505329 | MANGUM DALLAS SURVEYS VOL 861... | |
| Y | 3/10/1980 12:00:00AM | TARVER JAMES L JR | Grantor | LINCOLN LIBERTY LF INS C | DEED / 198000505330 | ALL 80050 2737 / 198000505330 | MANGUM VOL 861... | |
| Y | 4/7/1980 12:00:00AM | MICHALK DON G | Grantor | USLIFE CREDIT CORP | UCCI / 198000705970 | ALL 80070 2109 / 198000705970 | MANGRUM J VOL 861... | |
| Y | 5/15/1980 12:00:00AM | BAXTER ERNEST E | Grantor | PRATT LOIS E | REL / 198000980774 | ALL 80098 579 / 198000980774 | MANGUM VOL 861... | |
| Y | 5/15/1980 12:00:00AM | BAXTER ERNEST E | Grantor | SMITH ROBERT E | REL / 198000980775 | ALL 80098 581 / 198000980775 | MANGUM DALLAS SURVEYS VOL 861... | |
| Y | 9/11/1980 12:00:00AM | DABAR CORP | Grantor | DABAR CORP | RESOLUTION / 198001807066 | ALL 80180 991 / 198001807066 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 9/11/1980 12:00:00AM | DABAR CORP | Grantor | MURDOCK DT | DEED / 198001807064 | ALL 80180 981 / 198001807064 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 9/11/1980 12:00:00AM | MURDOCK DT | Grantor | TEXOMA NATL BK SHERMAN | DT / 198001807065 | ALL 80180 985 / 198001807065 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 9/18/1980 12:00:00AM | DABAR CORP | Grantor | WALKER DON | DEED / 198001853578 | ALL 80185 3706 / 198001853578 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 10/8/1980 12:00:00AM | BARTON TOMMY R | Grantor | GRAND PRAIRIE ST BK | DT / 198001998748 | ALL 80199 1304 / 198001998748 | MANGUM JOSE DALLAS SURVEYS VOL 861... | |
| Y | 10/8/1980 12:00:00AM | GIFCO PROP INC | Grantor | DOOLEY JOE M | DEED / 198001998747 | ALL 80199 1301 / 198001998747 | MANGUM JOSE DALLAS SURVEYS VOL 861... | |
| Y | 10/9/1980 12:00:00AM | MERCANTILE NATL BK DAL | Grantor | DABAR CORP | REL / 198002000103 | ALL 80200 1766 / 198002000103 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 12/23/1980 12:00:00AM | CENTENNIAL HOMES INC | Grantor | IRVING CITY | DEED / 198002502739 | ALL 80250 733 / 198002502739 | MANGRAM JOS DALLAS SURVEYS VOL 861... | 20070000005 |
| Y | 3/13/1981 12:00:00AM | IRVING CITY | Grantor | TAYLOR JOE | REL LABOR LIEN / 198100515043 | ALL 81051 2776 / 198100515043 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 3/13/1981 12:00:00AM | IRVING CITY | Grantor | CENTENNIAL HOMES | REL LABOR LIEN / 198100515048 | ALL 81051 2786 / 198100515048 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 3/13/1981 12:00:00AM | IRVING CITY | Grantor | PRATT LEROY | REL LABOR LIEN / 198100515045 | ALL 81051 2780 / 198100515045 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 3/13/1981 12:00:00AM | IRVING CITY | Grantor | IRVING CITY | REL LABOR LIEN / 198100515046 | ALL 81051 2782 / 198100515046 | LT 1 BLK 3 MANGUM J DALLAS SURVEYS VOL S0861 PG 5... | |
| Y | 4/29/1981 12:00:00AM | CASTILLO J | Grantor | FEDERAL DIVERSIFIED SERV | UCCI / 198100847446 | ALL 81084 583 / 198100847446 | MAGNUM VOL 861... | |
| Y | 5/14/1981 12:00:00AM | BARTON TOMMY R | Grantor | AMERICAN MULTI CINEMA IN | DEED / 198100959043 | ALL 81095 1184 / 198100959043 | MANGUM JOSE DALLAS SURVEYS VOL 861... | |
| Y | 5/14/1981 12:00:00AM | AMERICAN MULTI CINEMA IN | Grantor | UNITED CONTR CO P/S | DEED / 198100959044 | ALL 81095 1188 / 198100959044 | MANGUM JOSE DALLAS SURVEYS VOL 861... | |
| Y | 5/19/1981 12:00:00AM | GRAND PRAIRIE ST BK | Grantor | BARTON TOMMY R | PR REL / 198100982275 | ALL 81098 1344 / 198100982275 | MANGUM DALLAS SURVEYS VOL 861... | |
| Y | 6/3/1981 12:00:00AM | TKO EQUIPMENT CO | Grantor | MURDOCK DT | DT / 198101082395 | ALL 81108 1542 / 198101082395 | MANGUM J DALLAS SURVEYS VOL 861... | |

| Ver | Date | Name | Role | OtherName | Doc Type/L... | ...ok/Pg/Inst | First Legal | Re... |
|-----|------|------|------|-----------|---------------|---------------|-------------|-------|
| Y | 6/3/1981 12:00:00AM | TKO EQUIPMENT CO | Grantor | TKO EQUIPMENT CO | RESOLUTION / 198101082397 | ALL 81108 1553 / 198101082397 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 6/3/1981 12:00:00AM | MURDOCK BARBARA A | Grantor | TKO EQUIPMENT CO | DEED / 198101082394 | ALL 81108 1537 / 198101082394 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 6/18/1981 12:00:00AM | CASTILLIO BERTHA B | Grantor | PACESETTER PROD INC | ML / 198101194453 | ALL 81119 2809 / 1981011944531 | MAGNUM DALLAS SURVEYS VOL 861... | |
| Y | 6/18/1981 12:00:00AM | PACESETTER PROD INC | Grantor | FEDERAL DIVERSIFIED SERV | AL / 198101194453 | ALL 81119 2809 / 1981011944530 | MAGNUM DALLAS SURVEYS VOL 861... | |
| Y | 7/27/1981 12:00:00AM | IRVING CITY | Grantor | SMITH ROBERT E | REL LABOR LIEN / 198101450540 | ALL 81145 567 / 198101450540 | MANGUM JOSE DALLAS SURVEYS VOL 861... | |
| Y | 9/29/1981 12:00:00AM | IRVING CITY | Grantor | SMITH ROBERT E | REL LABOR LIEN / 198101905775 | ALL 81190 1437 / 198101905775 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 8/12/1982 12:00:00AM | HALL ANN LM | Grantor | PHILLIPS AC | DEED / 198201589132 | ALL 82158 2999 / 198201589132 | MUNDEN J DALLAS SURVEYS VOL 861... | |
| Y | 8/27/1982 12:00:00AM | TEXOMA NATL BK | Grantor | REPUBLICBANK GARL NA | AL / 198201709840 | ALL 82170 825 / 198201709840 | MANGUM DALLAS SURVEYS VOL 861... | |
| Y | 8/27/1982 12:00:00AM | TEXOMA NATL BK | Grantor | REPUBLICBANK GARL NA | AL / 198201709841 | ALL 82170 828 / 198201709841 | MANGUM DALLAS SURVEYS VOL 861... | |
| Y | 5/16/1983 12:00:00AM | FEDERAL DIVERSIFIED SERV | Grantor | CASTILLIO JESUS | REL / 198300978403 | ALL 83097 3695 / 198300978403 | MAGNUM DALLAS SURVEYS VOL 861... | |
| Y | 6/23/1983 12:00:00AM | LACEY OMETA | Grantor | AUTO WAREHOUSERS INC | REL / 198301249343 | ALL 83124 1825 / 198301249343 | MANGRAM J DALLAS SURVEYS VOL 861... | |
| Y | 6/30/1983 12:00:00AM | IRVING CITY | Grantor | CASTELLO R | REL LABOR LIEN / 198301296125 | ALL 83129 2043 / 198301296125 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 7/28/1983 12:00:00AM | KHALEEL MOHAMED | Grantor | TULEY GLEN R | DT / 198301485642 | ALL 83148 2574 / 198301485642 | MANGUN DALLAS SURVEYS VOL 861... | |
| Y | 7/28/1983 12:00:00AM | TULEY GLEN R | Grantor | KHALEEL MOHAMED | DEED / 198301485641 | ALL 83148 2570 / 198301485641 | MANGUN DALLAS SURVEYS VOL 861... | 20080107954 |
| Y | 1/10/1984 12:00:00AM | ZACHRY HB CO | Grantor | WDS INC | DT / 198400075459 | ALL 84007 5840 / 198400075459 | MANGRAM J DALLAS SURVEYS VOL 861... | |
| Y | 1/10/1984 12:00:00AM | WDS INC | Grantor | ZACHRY HB CO | DEED / 198400075458 | ALL 84007 5835 / 198400075458 | MANGRUM J DALLAS SURVEYS VOL 861... | |
| Y | 2/27/1984 12:00:00AM | SUN LF ASSUR CO CD | Grantor | MOORE JAMES P | REL / 198400416335 | ALL 84041 4400 / 198400416335 | VOL 861 PG 1683... | |
| Y | 3/30/1984 12:00:00AM | MERCANTILE BK GP | Grantor | JONES GILBERT O | REL / 198400650968 | ALL 84065 1209 / 198400650968 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 5/2/1984 12:00:00AM | BAXTER EARNEST E | Grantor | MULLEN MAX H | DEED / 198400880125 | ALL 84088 4890 / 198400880125 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 5/2/1984 12:00:00AM | HARALSON LUTHER V | Grantor | BAXTER GRACE A | DEED / 198400880124 | ALL 84088 4887 / 198400880124 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 5/2/1984 12:00:00AM | MULLEN MAX H | Grantor | BAXTER GRACE A | DT / 198400880126 | ALL 84088 4894 / 198400880126 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 5/8/1984 12:00:00AM | GIFCO PROP INC | Grantor | BARTON TOMMY R | DEED / 198400926608 | ALL 84092 2171 / 198400926608 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 9/5/1984 12:00:00AM | MURDOCK BARBARA A | Grantor | TKO EQUIPMENT CO | REL / 198401759424 | ALL 84175 2554 / 198401759424 | MANGUM JOSE DALLAS SURVEYS VOL 861... | |

1/30/2015 1:15:45PM

| Ver | Date | Name | Role | OtherName | Doc Type/Legacy# Book/Pg/Inst | | First Legal | Reference |
|-----|------|------|------|-----------|------|------|-------------|-----------|
| Y | 9/5/1984 12:00:00AM | MURDOCK BARBARA A | Grantor | TKO EQUIPMENT CO | REL / 198401759425 | ALL 84175 2558 / 198401759425 | MANGUM JOSE DALLAS SURVEYS VOL 861... | |
| Y | 10/24/1984 12:00:00AM | DAULEY DEAN I | Grantor | JASPER FED S&L ASN | DT / 198402110842 | ALL 84211 366 / 198402110842 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 10/24/1984 12:00:00AM | GIFCO PROP INC | Grantor | RIDGWAY I BOYD | DEED / 198402110838 | ALL 84211 350 / 198402110838 | MANGUM J DALLAS SURVEYS VOL 861... | 200503579476 |
| Y | 10/24/1984 12:00:00AM | GIFCO PROP INC | Grantor | SAFECO LAND TITLE DAL | AFF / 198402110839 | ALL 84211 354 / 198402110839 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 10/24/1984 12:00:00AM | GIFCO PROP INC | Grantor | SAFECO LAND TITLE DAL | AFF / 198402110840 | ALL 84211 357 / 198402110840 | MANGUM J VOL 861... | |
| Y | 10/24/1984 12:00:00AM | RIDGWAY I BOYD | Grantor | DAULEY DEAN I | DEED / 198402110841 | ALL 84211 360 / 198402110841 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 10/24/1984 12:00:00AM | RIDGWAY I BOYD | Grantor | SAFECO TITLE INS CO | AFF / 198402110843 | ALL 84211 375 / 198402110843 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 10/24/1984 12:00:00AM | RIDGWAY I BOYD | Grantor | SAFECO TITLE INS CO | AFF / 198402110844 | ALL 84211 378 / 198402110844 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 11/27/1984 12:00:00AM | WALKER DON R | Grantor | MBANK GP | DT / 198402310072 | ALL 84231 2206 / 198402310072 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 12/6/1984 12:00:00AM | DAULEY DEAN I | Grantor | REPUBLICBANK GP NA | DT / 198402390897 | ALL 84239 1082 / 198402390897 | MANGUM JOSE DALLAS SURVEYS VOL 861... | |
| Y | 12/10/1984 12:00:00AM | DAULEY DEAN I | Grantor | SAFECO LAND TITLE DAL | AFF / 198402403206 | ALL 84240 3541 / 198402403206 | MANGUM DALLAS SURVEYS VOL 861... | |
| Y | 1/22/1985 12:00:00AM | SMITH C RICHARD TR | Grantor | WALKER DON | DT / 198500154372 | ALL 85015 1740 / 198500154372 | MANGUM DALLAS SURVEYS VOL 861... | |
| Y | 1/22/1985 12:00:00AM | WALKER DON | Grantor | SMITH C RICHARD TR | DEED / 198500154373 | ALL 85015 1747 / 198500154373 | MANGUM DALLAS SURVEYS VOL 861... | |
| Y | 1/22/1985 12:00:00AM | WALKER DON | Grantor | MBANK GP | AL / 198500154374 | ALL 85015 1752 / 198500154374 | MANGUM DALLAS SURVEYS VOL 861... | |
| Y | 1/23/1985 12:00:00AM | MBANK GP | Grantor | WALKER DON R | REL / 198500176750 | ALL 85017 684 / 198500176750 | MANGUM DALLAS SURVEYS VOL 861... | |
| Y | 3/19/1985 12:00:00AM | WDS INC | Grantor | WDS ASSOC LTD P/S | AL / 198500558757 | ALL 85055 2700 / 198500558757 | MANGRAM J DALLAS SURVEYS VOL 861... | |
| Y | 3/29/1985 12:00:00AM | HARTZOG LARRY D | Grantor | LIBERTY NATL B&T CO OKLA | AL / 198500630299 | ALL 85063 3762 / 198500630299 | MANGRAM J DALLAS SURVEYS VOL 861... | |
| Y | 4/10/1985 12:00:00AM | ASHLIN DEV CO P/S | Grantor | CHRISTENSEN MARY B | DT / 198500723625 | ALL 85072 1180 / 198500723625 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 4/10/1985 12:00:00AM | CHRISTENSEN MARY F | Grantor | SAFECO TITLE INS CO | AFF / 198500723626 | ALL 85072 1188 / 198500723626 | MANGUM J VOL 861... | |
| Y | 4/10/1985 12:00:00AM | CHRISTENSEN MARY F | Grantor | ASHLIN DEV CO P/S | DEED / 198500723624 | ALL 85072 1173 / 198500723624 | MANGUM J DALLAS SURVEYS VOL 861... | |
| Y | 4/12/1985 12:00:00AM | HARRINGTON MYRTLE K | Grantor | ZACHRY HB CO | DT / 198500735723 | ALL 85073 2649 / 198500735723 | MANGRAM J DALLAS SURVEYS VOL 861... | |
| Y | 4/12/1985 12:00:00AM | HARRINGTON MYRTLE K | Grantor | ZACHRY HB CO | EASEMENT / 198500735725 | ALL 85073 2670 / 198500735725 | MANGRAM J DALLAS SURVEYS VOL 861... | |
| Y | 4/12/1985 12:00:00AM | ZACHRY HB CO | Grantor | HARRINGTON MYRTLE K | DEED / 198500735722 | ALL 85073 2643 / 198500735722 | MANGRAM J DALLAS SURVEYS VOL 861... | |

1/30/2015 1:15:45PM