## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. 10074, 10075, 10076** |

### OPPOSITION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, TO THE MOTION OF SHIRLEY FENICLE, DAVID WILLIAM FAHY, JOHN H. JONES, AND DAVID HEINZMANN TO DISMISS CHAPTER 11 PETITIONS OF ASBESTOS DEBTORS EECI, INC., EEC HOLDINGS, INC., LSGT SACROC, INC., AND LSGT GAS CO. LLC PURSUANT TO 11 U.S.C. § 1112(b)

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this opposition (the "Opposition") to the *Motion of Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann to Dismiss Chapter 11 Petitions of Asbestos Debtor EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Co. LLC Pursuant to 11 U.S.C. § 1112(b)* [D.I. 10074] (the "Motion") and the *Memorandum in Support of the Motion of Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann to Dismiss Chapter 11 Petitions of Asbestos Debtor EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Co. LLC Pursuant to 11 U.S.C. § 1112(b)* [D.I. 100075; 10076] (the "Motion Memorandum") filed by Shirley Fenicle, David William Fahy, John H. Jones, and David

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

Heinzmann (collectively, the "<u>Asbestos Objectors</u>").  In response to the Motion, the Debtors respectfully state as follows:[2]

## Introduction

1.      The LSGT Debtors (as defined below) filed their chapter 11 cases in good faith, and the untimely Motion should be denied.  The Motion is nothing more than another thinly veiled collateral attack on the Asbestos Bar Date Opinion and the Asbestos Bar Date and Notice Order (each as defined below).  Despite the fact that many of the Asbestos Objectors have been actively involved in these chapter 11 proceedings for more than two years, this is the first time the Asbestos Objectors have argued that the LSGT Debtors' bankruptcy petitions were filed in bad faith.  Indeed, certain Asbestos Objectors requested a committee to represent the EFH unsecured creditors and were members of that committee, and forced the EFH Debtors (as defined in the Plan) to spend millions of dollars due to their opposition to the establishment of a bar date, without even whispering the notion of a bad faith filing—it is pure gamesmanship.  The Motion does not rely on new facts or developments, but rather comes after this Court has rejected the Asbestos Objectors' repeated attempts to collaterally attack the Asbestos Bar Date Opinion.  If the Asbestos Objectors truly believed that the LSGT Debtors' cases were filed in bad faith, they should not have waited two and a half years to raise the issue.

2.      In any event, the Motion has no merit.  The LSGT Debtors had no realistic alternative to filing for bankruptcy.  The LSGT Debtors are only one part of the Debtors' overall business enterprise.  When the confluence of numerous factors described in the EFH/EFIH

---

[2] Capitalized terms used but not defined herein shall be given the meanings ascribed to them in the *Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9612] (the "<u>Plan</u>") and the *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors* [D.I. 9616] (the "<u>EFH/EFIH Disclosure Statement</u>").

Disclosure Statement left the Debtors with insufficient cash flows to service their $42 billion of total indebtedness, it became apparent that the Debtors needed chapter 11 protection to reorganize and rehabilitate their businesses, including the LSGT Debtors.  If the Asbestos Objectors are to challenge the good faith filing of any of the Debtors, they must challenge the filing of the Debtors' cases as a whole, rather than asking the Court to improperly narrow its vision and ignore the Debtors' status as one enterprise seeking to reorganize.  Such a limited view contravenes the Third Circuit's requirement that courts look to the "totality of the facts and circumstances" and ignores the crucial role that filing the LSGT Debtors played in the Debtors' broader reorganizational efforts.

3.      However, even in the narrow factual portrait presented by the Asbestos Objectors, the LSGT Debtors meet the good faith filing standard for several reasons.  *First*, the LSGT Debtors' only means of funding their asbestos liabilities was through then-impaired inter-company obligations.  Simply put, if the other Debtors commenced their chapter 11 cases and the LSGT Debtors did not, then the LSGT Debtors would have been unable to satisfy their debts as they came due, including settlement and defense costs associated with the asbestos claims—the textbook definition of insolvency.  *Second,* the Debtors' pre-filing tax arrangement, under certain reorganization scenarios, would have left the three LSGT Debtors that are C corporations liable for potentially billions in deconsolidation tax.[3]  As the Court is well aware, tax considerations have permeated the Debtors' entire reorganization and the three corporate LSGT Debtors would have been jointly and severally liable for any deconsolidation tax.  By filing, the LSGT Debtors were able to participate in any resolution of tax liabilities with the other Debtors.  *Third*, every potential owner of Reorganized EFH insisted as a condition to their bids that the LSGT Debtors

---

[3] LSGT Gas Company, LLC, formed as a Texas limited liability company, would not be liable for any deconsolidation tax because it is a disregarded entity for federal tax purposes.

seek chapter 11 protection and/or establish an asbestos-related bar date.  For example, the original restructuring support agreement, which required the Debtors to take certain actions, contemplated that the LSGT Debtors would file for chapter 11.  Both the plan sponsors for the first confirmed plan and NextEra Energy, Inc. ("NextEra") insisted that the EFH Debtors establish an asbestos bar date.  In other words, every viable reorganization proposal has required that the EFH Debtors take action to afford potential purchasers some degree of certainty regarding their alleged asbestos-related liabilities.[4]

4.      *Fourth*, the LSGT Debtors have properly utilized the bankruptcy process to maximize the value of their estates by convincing the current Plan sponsor, NextEra, to assume the LSGT Debtors' corporate structure in whole, including existing liabilities.  At the time of the LSGT Debtors' filing, the intercompany claims that fund the defense and settlement of asbestos claims would have been severely impaired under a liquidation scenario.  Now, due to the protections of the Bankruptcy Code and the substantial efforts of the directors and officers of the LSGT Debtors, the current Plan contemplates that the asbestos liabilities will be reinstated, and Reorganized EFH, who will have an asset (an indirect ownership of Oncor Electric Delivery Company LLC ("Oncor")) with an equity value of approximately $12 billion, will be the obligor on the intercompany debts previously owned by insolvent EFH Corp.

5.      Unsurprisingly, for the all of these reasons and as will be explained further in this Opposition and through evidence put forth at the hearing, the LSGT Debtors filed for bankruptcy

---

[4] That said, the Debtors have at all times managed to secure the reinstatement of asbestos claims and related intercompany claims under every proposed plan of reorganization, including the current Plan—a rather thankless task, given the numerous attacks by the Asbestos Objectors on the Debtors' efforts in the past two and a half years, which has amounted to millions of dollars in wasted resources. The assertion that the manager, directors, and officers of the LSGT Debtors have not maximized value is extraordinary.  They have fought hard to ensure that the claims of asbestos plaintiffs are reinstated.

rather than face the dire consequences of failing to reorganize with the other Debtors.  Such a legitimate reorganizational objective is the epitome of a good faith filing.

6.     Accordingly, the Court should deny the Motion.

## Background

7.     On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  Among the Debtors are Energy Future Holdings Corp. ("EFH Corp.") and certain of its direct and indirect subsidiaries (together with EFH Corp., the "EFH Debtors").

### A.     The LSGT Debtors.

8.     The Motion concerns four EFH Debtor subsidiaries:  EECI, Inc., a Nevada corporation ("EECI"); EEC Holdings, Inc., a Nevada corporation ("EEC Holdings"); LSGT SACROC, Inc., a Texas corporation ("Sacroc"); and LSGT Gas Company, LLC, a Texas limited liability company ("LSGT Gas" and collectively, the "LSGT Debtors").  LSGT Gas is a subsidiary of EFH Corp.  EEC Holdings and Sacroc are direct subsidiaries of LSGT Gas.  EECI is a subsidiary of EEC Holdings.



9.      EFH Corp. largely adopted its current organizational structure in October 2007, as a result of the going private transaction of its predecessor, TXU Corp.  The LSGT Debtors are successors to certain entities acquired through the 1996 merger of TXU Corp. and ENSERCH Corporation ("Enserch").  The capital and corporate structure of the LSGT Debtors is the result of a series of transactions going back decades.

10.     Enserch was an integrated natural gas company with operations in natural gas distribution and transmission, oil and gas exploration and production, oil-field services, and engineering and construction.[5]  LSGT Gas was previously the primary Enserch natural gas distribution and transmission business unit, and as explained below, EEC Holdings and EECI relate to Enserch's engineering and construction businesses.

11.     As of the Petition Date, the Debtors' books and records reflect a $560 million payable owed to LSGT Gas by EFH Corp., and approximately $990 million in payables owed to Sacroc, EECI, and EEC Holdings by LSGT Gas.[6]  Interest has not accrued on these intercompany claims since the Petition Date, but upon emergence, due to reinstatement of the intercompany claims, postpetition interest will be added to the balance of the intercompany claims.

12.     The LSGT Debtors' primary assets and liabilities have been in the form of these intercompany receivables, certain residual pension obligations, and asbestos liabilities.  The LSGT Debtors' alleged asbestos liabilities primarily arise from certain discontinued operations of Ebasco Services Incorporated ("Ebasco").  Enserch owned Ebasco from 1976 to 1993.[7]

---

[5] Ex. A, TXU Corp. Form 10-K (FY 1997) [EFH01434704].  Exhibits referenced are attached to the Declaration of Jonathan F. Ganter, filed contemporaneously herewith.

[6] Ex. B, Select Intercompany Balances as of June 30, 2015 [EFH06448281].

[7] Ex.C, Stock Purchase Agreement dated May 11, 1976 [EFH06440537].

Ebasco was an engineering, construction, and consulting firm that designed, constructed, or performed maintenance at power plants during a time when the utility industry used asbestos-containing materials.[8]

13.     In 1993, United Engineers & Constructors, Inc. and Raytheon Engineers & Constructors, Inc. (together, "Raytheon") entered into an Asset Purchase Agreement to acquire certain of Ebasco's assets.[9]  Section 13.1 of the Asset Purchase Agreement required Enserch and Ebasco to indemnify Raytheon for "any and all losses" arising from their previous operations prior to the sale.[10]

14.     Enserch formed an indirect subsidiary, Enserch E&C, Inc., a Nevada corporation, to acquire the retained assets, claims, and liabilities in connection with the sale of Ebasco, including the indemnity obligation.[11]  Following a name change, Enserch E&C, Inc. became EECI.[12]  While claimants in the Debtors' chapter 11 cases filed proofs of claim alleging asbestos-related liabilities against other LSGT Debtors and EFH Corp., the Debtors believed that EECI holds the substantial majority of the LSGT Debtors' potential asbestos liability, arising from the discontinued Ebasco operations.

15.     EECI's asbestos obligations and related defense costs have totaled approximately $12.5 million since 2004.  In the three years before the Petition Date, the annual amounts grew: $1.2 million, $1.6 million, and $3.8 million in 2011, 2012, and 2013, respectively.[13]

---

[8] Ex. D, Generating History of Ebasco [EFH06582051].

[9] Ex. E, Asset Purchase Agreement between Enserch Corp., Ebasco Services Inc., Raytheon Engineers & Constructors, Inc., and United Engineers & Constructors, Inc. [EFH06440586].

[10] *Id.*

[11] Ex. F, Purchase and Sale Agreement between Ebasco Services Inc. and Enserch E&C, Inc. [EFH06440731].

[12] Ex. G, Name Change of Enserch E&C, Inc. to EECI, Inc. [EFH06441281].

[13] *See* Ex. H, E-Side Claims History [EFH06578105].

**B.        LSGT Debtors' Decision to File Chapter 11 Petitions.**

16.        The table below reflects the directors, officers, and manager of the LSGT Debtors as of the Petition Date:[14]

| Debtor | Directors / Manager[15] | Officers |
|--------|------------------------|----------|
| LSGT Gas | Anthony R. Horton (Manager) | Anthony R. Horton - President and Treasurer<br>Kristopher E. Moldovan - Assistant Treasurer<br>Jeffrey J. Walker - Vice President and Secretary<br>Kevin M. Ashby - Tax Signing Officer |
| EEC Holdings | Anthony R. Horton (Director) | Anthony R. Horton - President and Treasurer<br>Kristopher E. Moldovan - Assistant Treasurer<br>Jeffrey J. Walker - Vice President and Secretary<br>Kevin M. Ashby - Tax Signing Officer |
| EECI | Anthony R. Horton<br>Kristopher E. Moldovan (Directors) | Anthony R. Horton - President and Treasurer<br>Kristopher E. Moldovan - Assistant Treasurer<br>Jeffrey J. Walker - Vice President and Secretary<br>Kevin M. Ashby - Tax Signing Officer |
| Sacroc | Anthony R. Horton (Director) | Anthony R. Horton - President and Treasurer<br>Kristopher E. Moldovan - Assistant Treasurer<br>Jeffrey J. Walker - Vice President and Secretary<br>Kevin M. Ashby - Tax Signing Officer |

17.        Approximately two months before the Petition Date, Mr. Horton and Mr. Moldovan attended a meeting regarding the decision-making process whether to file an entity for bankruptcy.    The attendees reviewed information regarding fiduciary duties, including with

---

[14] Ex. I, Management Structure – Point in Time Report [EFH06440765].

[15] Mr. Horton has served as the Chief Financial Officer and Executive Vice President of EFH and EFIH since September 30, 2016.   *See* Ex. J, Sept. 30, 2016 Minutes of Meeting of Joint Boards [EFH06578080 at EFH0657890].   Prior to that, and since 2004, Mr. Horton was the Senior Vice President, Treasurer, and Assistant Secretary of EFH, Senior Vice President and Treasurer of EFIH, and the Treasurer of former TCEH.

Paul Keglevic was previously a Director of the LSGT Debtors from August 2008 through February 3, 2014, and was President of each of those entities from March 7, 2011 through February 3, 2014.   He resigned his positions at the LSGT Debtors prior to the Petition Date.   Ex. I, Management Structure – Point in Time Report [EFH06440765].   Mr. Keglevic re-joined the Boards of each LSGT Debtors on October 4, 2016, following the separation of TCEH Corp. from EFH Corp. on October 4, 2016.

Until October 4, 2016, Mr. Moldovan was the Assistant Treasurer of each of the Debtors.

regard to the decision to file a chapter 11 petition.  The attendees also reviewed information about the potential pros and cons of a chapter 11 filing.

18.     On April 25, 2014, EECI held a formal board meeting to discuss the decision of whether to file a chapter 11 petition.[16]  Directors Horton and Moldovan attended, as did K&E's Chad Husnick and Anthony Sexton.[17]

19.     At the meeting, K&E reiterated the fiduciary framework applicable to the EECI board's decision whether to file a chapter 11 petition.  K&E provided an overview of asbestos claims asserted against EECI and explained that EFH Corp. historically had funded the settlements and defense costs on account of such claims.

20.     K&E discussed several factors for Mr. Horton and Mr. Moldovan to consider.  *First*, as a result of the impending bankruptcy filing of other Debtors, EECI could lose access to funds to satisfy its ongoing obligations related to settling or defending asbestos litigation.  In short, if EFH Corp.—EECI's sole cash source to fund asbestos liability costs[18]—filed for bankruptcy and EECI did not, EFH Corp. would need court approval to send cash down to fund those costs.  Also, if EECI did not file, any claims it had against EFH Corp. would be treated like other general unsecured claims against EFH Corp., at the bottom of the waterfall.

21.     *Second*, filing for bankruptcy would give EECI the benefit of the automatic stay, which K&E explained prohibits creditors from collecting prepetition debts or exercising

---

[16] Ex. K, April 25, 2014 Minutes of the Board of Directors Meeting of EECI, Inc. [EFH06449434 at EFH06449593].

[17] As explained below, the minutes from this meeting—which the Debtors previously produced—contradict the Asbestos Objectors' allegations the LSGT Debtors did not have formal meetings, (b) did not "make the decision to file the chapter 11 petitions," and (c) EFH Corp. filed the LSGT Debtors "to shed their asbestos liabilities."  *See Motion Memorandum* at *2.  Had the Asbestos Objectors reviewed the Debtors' productions, the Court and these estates may have been spared from another 11th-hour and costly disruption to these cases.

[18] EECI's sole source of funding was its intercompany claim against LSGT Gas.  In turn, LSGT Gas's sole source of funding was its intercompany claim against EFH Corp.

remedies against a chapter 11 debtor's estate.  K&E informed the board that a chapter 11 filing by EFH Corp. could cause an increase in claims, including asbestos claims, against EECI at a time when EECI would not have access to cash to defend itself in litigation (because EECI is solely funded through intercompany agreements and those intercompany claims would be blocked by the automatic stay operative in the other Debtors cases).  ***Third***, as a corporation, EECI could be jointly and severally liable for any deconsolidation-related tax obligations, which could easily wipe out all the value at EECI and cause EECI to file for bankruptcy on its own. Filing for bankruptcy with the rest of the corporate family would permit EECI to be a part of any resolution of such tax liabilities.  ***Fourth***, the chapter 11 process could provide a single forum to permanently address all claims against EECI, although discharging asbestos claims was not a significant consideration.[19]

22.      In light of those considerations, on April 28, 2014, Mr. Horton and Mr. Moldovan executed a Written Consent in Lieu of a Meeting of the Board of Directors, approving the chapter 11 filing of EECI.[20]

23.      As the sole director of Sacroc and EEC Holdings and the sole manager of LSGT Gas, Mr. Horton did not convene formal meetings to consider filing those entities.  However, similar to EECI, Mr. Horton understood that:  (a) the intercompany claims of these entities could be more effectively preserved by including them in the restructuring process; (b) as corporations, Sacroc and EEC Holdings could be liable for deconsolidation-related tax obligations, and that chapter 11 would enable them to be part of any resolution of tax liabilities; and (c) filing for

---

[19] *Id.*

[20] Ex. L, Written Consent in Lieu of a Meeting of the Board of Directors of EECI, Inc. dated April 28, 2014 [EFH06449594].

bankruptcy would give the entities the benefit of the automatic stay, while preserving access to the funds necessary to satisfy any ongoing obligations.

24.     In light of those considerations, on April 28, 2014—the same day he approved the filing of EECI—Mr. Horton executed Written Consents in Lieu of a Meeting, approving the chapter 11 filings of LSGT Gas, Sacroc, and EEC Holdings.[21]

## C.     Governance of the LSGT Debtors and Establishment of the Asbestos Bar Date.

25.     Throughout the bankruptcy, the manager and directors of the LSGT Debtors have worked diligently to protect holders of asbestos-related claims.  Those efforts were successful: the Plan reinstates the Legacy General Unsecured Claims Against the EFH Debtors (as defined in the Plan) and reinstates the intercompany claims between and among the LSGT Debtors and EFH Corp.[22]  Moreover, NextEra, the Plan sponsor, is a large, publicly-traded, investment-grade company with a market capitalization of approximately $60 billion.  Following emergence, NextEra has committed that Reorganized EFH/EFIH will hold no debt above Oncor.  In short, the LSGT Debtors' financial situation will be significantly improved following consummation of the Plan and Merger Agreement, and Reorganized EFH will have the financial wherewithal to fund any potential asbestos liabilities of the LSGT Debtors.

26.     Reinstatement, however, was never a foregone conclusion.  First, the original restructuring support agreement was silent on the treatment of the intercompany claims; the fate of those claims was subject to multi-party negotiations.[23]  Second, during the multi-year Oncor

---

[21] Ex. M, Apr. 28, 2014 Omnibus Written Consent In Lieu of a Meeting of the Boards of Directors and Boards of Managers of EFH Finance (No. 2) Holdings Company, EFH FS Holdings Company, EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Company LLC [EFH06448786 at EFH06448857-65].

[22] Plan, Art. III(B)(3), (13) [D.I. 9612].

[23] Restructuring Support Agreement, at 70 [D.I. 505-2].

marketing process, potentially interested parties repeatedly expressed concern about reinstating asbestos liabilities, especially unquantified liabilities.[24]   In fact, interested parties repeatedly expressed a desire for the Debtors to quantify the potential exposure of the LSGT Debtors.

27.    To help convince potential acquirers of Oncor to reinstate the asbestos claims, the Debtors sought a bar date for all "claims" against them.[25]   Following intense litigation, on January 7, 2015, the Court issued a lengthy published opinion holding that it could establish a bar date for unmanifested asbestos claims (the "Asbestos Bar Date Opinion").[26]   After a thorough review of the applicable law, the Court concluded that an appropriate notice program may satisfy due process and allow for the discharge of unmanifested asbestos claims.[27]

28.    On April 7, 2015, EECI and LSGT Gas held a joint, formal board meeting regarding the establishment of an asbestos bar date.  At this meeting, K&E provided an update on the Debtors' efforts to set a bar date for asbestos-related claims, and the participants discussed the notice plan and the claims process.[28]

29.    On July 30, 2015, the Court entered an order establishing December 14, 2015, at 5:00 p.m. (prevailing Eastern Time) (the "Asbestos Bar Date") as the final date and time for all

---

[24] Ex. N, March 6, 2015 Restructuring Update at slide 14 [EFH05547309-37]; Ex. O, May 2, 2016 Email from S. Dore to K&E, EFH forwarding NEE Bid Letter and Term Sheet [EFH06362905-27]; Ex. P, May 18, 2016 Email from P. Keglevic to T. Horton forwarding NextEra Revised Bid Letter [EFH06337329-52]; Ex. Q, June 18, 2016 Email from C. Sieving to S. Dore re Next Week and Diligence [EFH06436044].

[25] *See Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Setting Bar Dates for Filing Non-Customer Proofs of Claim and Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, (B) Approving the Form of and Manner for Filing Non-Customer Proofs of Claim and Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, and (C) Approving Notice Thereof* [D.I. 1682].

[26] *In re Energy Future Holdings Corp.*, 522 B.R. 520, 540 (Bankr. D. Del. 2015).

[27] *Id.* at 527.  Additionally, applying the Bankruptcy Code's plain language, the Bankruptcy Court concluded, "The formation of a trust pursuant to section 524 is permissive."  *Id.* at 539.

[28] Ex. R, Minutes of Joint Meeting dated April 7, 2015 [EFH06449607].

persons and entities holding or asserting an asbestos-related claim against the Debtors to file proofs of claim in these chapter 11 cases.[29]

30.    The Asbestos Bar Date provided for some certainty as to the scope (but not the amount) of asbestos liability of the LSGT Debtors, while the extensive, Court-approved notice program, which the Debtors negotiated with the asbestos claimants, ensured that claimants would be able to preserve their claims.   Yet even with the Asbestos Bar Date in place, the Debtors still had to engage in significant negotiations with NextEra and other potential purchasers to convince them to reinstate the asbestos claims in the current Plan.[30]

31.    For example, after the Hunt Plan terminated on May 1, 2016, NextEra sent the Debtors numerous due diligence questions related to the LSGT Debtors and asbestos claims.[31] As late as July 17, 2016, the treatment of claims and interests related to asbestos, including the reinstatement of those claims at the LSGT Debtors, was subject to further negotiation and diligence.[32]

---

[29] *See Order (A) Setting Bar Date for Filing Asbestos Proofs of Claim, (B) Approving the Form of and Manner for Filing Asbestos Proofs of Claim, and (C) Approving Notice Thereof* [D.I. 5171].

[30] Ex. Q, June 18, 2016 Email from C. Sieving to S. Dore re Next Week and Diligence [EFH06436044].

[31] *See* Ex. S, June 6, 2016 Email from P. Williams to A. Horton et al., forwarding NextEra Due Diligence Tracker, listing as "High Priority" total projected claim amounts for "EFH Legacy Unsecured Claims (including discontinued operations asbestos and OPEB liabilities." [EFH06523195-97]; Ex. T, June 14, 2016 Email from P. Williams to A. Horton et al., forwarding updated NextEra Due Diligence Tracker, including additional questions about asbestos claims data [EFH06526698-99]; Ex. U, June 16, 2016 Email from P. Williams to A. Horton et al., forwarding updated NextEra Due Diligence Tracker, including additional questions related to the LSGT Debtors [EFH06526526-30]; Ex. V, July 8, 2016 Email from C. Sieving (NextEra) to A. Horton et al., checking on, among other issues, "if you have any update on asbestos work/timing," "when you may allow us to start to get access to any asbestos data/work you may have," and "if and when you may want us to meet with your asbestos historians/experts." [EFH06403919]; Ex. W, July 11, 2016 Email from C. Sieving A. Horton, et al., including a list of additional questions and topics related to due diligence for asbestos claims and liabilities [EFH06522822-23].

[32] Ex. X, July 22, 2016 Email from A. Yenamandra to A. Horton *et al.*, attaching July 17, 2016 NextEra Redline of Draft Third Amended Joint Plan of Reorganization [EFH06410609-826].

32.     Ultimately, after intensive due diligence and negotiations, the Debtors were able to convince NextEra to agree to reinstate the intercompany claims and the asbestos claims against the LSGT Debtors.[33]

**Objection**

I.      **The LSGT Debtors Filed Chapter Their 11 Petitions in Good Faith.**

33.     "The decision to dismiss a petition for lack of good faith rests within the sound discretion of the bankruptcy court which should not lightly infer a lack of good faith and should utilize its powers of dismissal on this basis only in ***egregious cases***." *In re S. Canaan Cellular Investments, LLC*, 420 B.R. 625, 631 (E.D. Pa. 2009) (emphasis added).    There is nothing egregious about the LSGT Debtors' decision to utilize chapter 11 protections to maximize the value of their estates to the benefit of all parties in interest.   The LSGT Debtors filed for bankruptcy because: (a) the impending bankruptcy filing of the other Debtors risked cutting off the sole cash source to fund asbestos liabilities; (b) certain LSGT Debtors could be jointly and severally liable for deconsolidation taxes; and (c) failure to do so could have materially hampered the Debtors' massive reorganizational efforts due to potential investor concerns.   The LSGT Debtors had no alternative to commencing their chapter 11 cases and obtaining "breathing room."

34.     Nonetheless, over two and a half years after the Petition Date, and long after the formation of an official committee of EFH unsecured creditors to represent the interest of all EFH unsecured creditors, including the asbestos claimants, and the expenditure of millions of dollars to protect the interests of asbestos claimants, the Asbestos Objectors claim that the LSGT

---

[33] Plan, Art. III(B)(13) [D.I. 9612].

Debtors' filing was not in good faith.  The facts here simply do not support the finding the Asbestos Objectors seek.

35.    Courts in the Third Circuit follow a list of non-exclusive factors that may be relevant to whether a bankruptcy filing was in good faith:

- whether the debtor has one asset;

- whether there are only a few unsecured creditors;

- whether there are no employees or ongoing business;

- whether the petition was filed on the eve of foreclosure;

- whether the dispute is really a two-party dispute which can be resolved in pending state court action;

- whether the debtor has no cash or income;

- whether there is no pressure from non-moving creditors;

- whether the debtor has previously filed for bankruptcy;

- whether there was improper prepetition conduct;

- whether there is no possibility of reorganization;

- whether the debtor filed solely to create the automatic stay; and

- whether the debtor had the subjective intent to use the bankruptcy for an improper purpose.

*In re Primestone Inv. Partners L.P.*, 272 B.R. 554, 557 (D. Del. 2002).  Taken together, these factors weigh heavily toward good faith.  In any event, rather than ticking through the foregoing factors, courts "***must examine 'the totality of facts and circumstances***[.]'" *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) (emphasis added).  "The focus of the inquiry is whether the petitioner sought 'to achieve objectives outside the legitimate scope of bankruptcy laws' when filing for protection under Chapter 11."  *Primestone*, 272 B.R. at 557 (citation omitted).  Accordingly, "as long as a debtor is 'motivated by plausible, legitimate

reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure to hinder creditors, bad faith is not present in a chapter 11 case.'" *In re Paradigm Elizabeth, LLC*, 2015 WL 435067, *3 (Bankr. D. N.J. Feb. 2, 2015) (citing *In re Clinton Centrifuge, Inc*., 72 B.R. 900, 905 (Bankr. E.D. Pa. 1987)).

36.     Here, the totality of the circumstances demonstrates that the LSGT Debtors filed their chapter 11 petitions for a legitimate reorganizational purpose (and not to hinder creditors whose claims are being reinstated under the Plan), and the dismissal of these cases would be unjustified.

## II.     The LSGT Debtors' Filings Are Integral to the Debtors' Enterprise-Wide Restructuring.

37.     The LSGT Debtors' chapter 11 cases are not simply about a single subsidiary (or group of subsidiaries); these cases concern the integrated EFH enterprise as a whole.  Thus, looking at the totality of the circumstances, the relevant question is not whether the LSGT Debtors filed in good faith, but whether EFH as a whole did.  Because the Asbestos Objectors have not, and could not, challenge the good faith of the EFH filing, the Motion should be denied.

38.     In *In re U.I.P. Engineered Products Corp.*, the Fourth Circuit affirmed the denial of a motion to dismiss the chapter 11 petitions of solvent subsidiaries of an insolvent parent, holding that the good or bad faith of the subsidiaries simply was not material:

> Whether Harry Davies and UIPE independently demonstrated good faith in filing for bankruptcy is simply not relevant to this dispute.  The ultimate question in this appeal is whether those wholly-owned subsidiaries should have been included in their parent company's bankruptcy estate, when the parent company had filed in good faith for Chapter 11 reorganization.  Under the circumstances, it was *clearly sound business practice* for Eastmet *to seek Chapter 11 protection for its wholly-owned subsidiaries when those subsidiaries were crucial to its own reorganization plan*.

*In re U.I.P. Engineered Products Corp.*, 831 F.2d 54 (4th Cir. 1987) (emphasis added).  The Fourth Circuit's holding has been followed by other courts. *See In re General Growth*

*Properties, Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y 2009); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 301 (Bankr. D. Del. 2011) ("The Court concludes that it **does not have to have blinders on** and ignore events subsequent to the Mezz II filing, ***particularly the filing of its affiliates*** within ten days of its own bankruptcy filing.") (emphasis added); *In re Mirant Corp.*, 2005 WL 2148362 (Bankr. N.D. Tex. Jan. 26, 2005).  The court in *Mirant* explained that "a 'family' filing is common when the debtors are part of a common business enterprise," and that it was "appropriate to provide a standard different from that applied to good faith dismissal in a single debtor case to that of a key operating affiliate placed in chapter 11 in conjunction with necessary filings by its family of affiliates." *In re Mirant Corp.*,  2005 WL 2148362 at *5-6. The court held that "[w]here, as here, the need for rehabilitation of the corporate family enterprise is obvious, it is clearly a valid use of chapter 11 to address that need." *Id.* at *6.

39.     These cases offer compelling reasons for treating corporate bankruptcies as one for good faith purposes instead of looking at every single individual company separately.  As the *Mirant* court explained, corporate families are usually structured based on considerations such as "the needs of financing structuring or efforts to shift or eliminate tax liability." *Id.* at *6. Corporate structures thus often are not based on the fundamental, economic realities of the overall corporate entity, and in particular are "not devised to facilitate the corporate family's eventual need for chapter 11 reorganization." *Id.*  For these reasons, the Court should not be bound by the particular corporate structures and divisions into nominally separate entities, but instead should examine the integrated enterprise as a whole.

40.     Moreover, as a practical matter, entity-by-entity examination for good faith would disserve the purposes of the Bankruptcy Code.  Modern corporate enterprises are usually made up of dozens or even hundreds of related entities.  Examining the good faith of each individual

entity would substantially increase the costs and times for the bankruptcies of large corporate debtors.  And the results of such an examination could be disastrous (*i.e.* not value maximizing) for the enterprise as a whole.  Most modern enterprises depend on a variety of nominally separate entities coordinating with each other on a daily basis.  The best opportunity for successfully reorganizing such an enterprise is to have as many of the entities file for chapter 11 that the parent's management determines are necessary.  An entity-by-entity analysis could lead to some portions of the enterprise being excluded from chapter 11 because, if looked at through tunnel vision that ignores how the entities relate to each other and function as part of a broader whole, those particular entities do not satisfy the good faith test.  This splitting of the enterprise will decrease the chances of a successful reorganization, in contravention of the purposes of chapter 11.  *Pioneer Inv. Services Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 (1993) ("Chapter 11 provides for reorganization with the aim of rehabilitating the debtor and avoiding forfeitures by creditors."); *In re Combustion Engineering, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004) (noting the "purpose of Chapter 11" of "facilitating the reorganization and rehabilitation of the debtor as an economically viable entity").

41.     The EFH bankruptcy filing was the result of a drastic downturn in the energy market that left the Debtors unable to service their approximately $42 billion in liabilities.  The Debtors were composed of dozens of entities, many of which are enormous enterprises in their own right.  The need for EFH to reorganize is obvious and no party, including the Asbestos Objectors, has attempted to contest that fact.  Instead, the Asbestos Objectors attempt to sequester the LSGT Debtors from the whole and improperly narrow the totality of the circumstances to those facts that they believe are favorable to them.  Even if the Court disagrees that a "different standard" should apply in these corporate family cases, the fact-intensive good

faith inquiry looks to the totality of the circumstances, and those circumstances here include the LSGT Debtors as an integral part of a much broader reorganizational effort.

42.     Indeed, during the multi-year Oncor marketing process, potentially interested parties repeatedly expressed concern about reinstating asbestos liabilities, especially unquantified liabilities.  Interested parties also repeatedly expressed a need for the Debtors to quantify the potential asbestos liability exposure of the LSGT Debtors.

43.     The Asbestos Objectors state that "the LSGT Debtors' desire to shed their future liabilities to make their corporate parent more attractive to potential purchasers is not a valid reorganizational purpose." *Motion Memorandum* at *15.  However, the case cited to support that assertion involved a completely different set of facts.  *See In re Liberate Techs.,* 314 B.R. 206 (Bankr. N.D. Cal. 2004).  *Liberate* involved a single debtor, not a corporate family in bankruptcy.  *Id.*  In fact, the debtor had no parent at all.  *Id.*  Further, the debtor in *Liberate* had $212 million in unrestricted cash and $59 to $167 million in total liabilities, and the court found that shareholders were merely using bankruptcy as a tool to enrich themselves at the expense of fully in-the-money creditors.  *Id.* at 208.

44.     This is not a case where a highly solvent debtor, like in *Liberate*, is trying to use the Bankruptcy Code to enrich itself.  On the contrary, the Debtors entered into chapter 11 utterly insolvent and have continued to utilize the Bankruptcy Code to maximize value for each of their respective estates and all parties in interest.  The filing of the LSGT Debtors allowed the Debtors to better determine the scope of total asbestos liabilities—an essential part of the Debtors' sale process.  Thus the inclusion the LSGT Debtors in the Debtors' filing increased sale value and creditor recovery (*i.e.*, maximizing value).  Further, as discussed below, the LSGT Debtors themselves were completely cash-flow insolvent at the Petition Date.

45.     Accordingly, considering the totality of the circumstances, the LSGT Debtors filed their bankruptcy petitions for the good faith purpose of reorganizing and rehabilitating the Debtors as economically viable entities.

### III.    The LSGT Debtors Had Legitimate Reorganizational and Independent Purposes for Filing.

46.     As explained above, the individual good faith of the LSGT Debtors, as integrated members of the EFH corporate family, is not the appropriate inquiry, but even if the Court were to consider the individual circumstances of the LSGT Debtors, the evidence demonstrates that the LSGT Debtors filed in good faith.

47.     As the Asbestos Objectors concede, there is no solvency requirement in the Bankruptcy Code, but courts generally consider the debtor's degree of financial distress.   *See Motion Memorandum* at *11.  This evaluation of financial distress stems logically from the core chapter 11 goals of "maximizing property available to satisfy creditors," *see Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 LaSalle St. P'ship*, 526 U.S. 434, 435 (1999), and avoiding liquidation, *see Official Committee of Unsecured Creditors of Cybernetics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003).  If a debtor has no financial difficulties, there is no danger of liquidation and the property available to satisfy stakeholders is already maximized.

48.     In addition to the enterprise-level restructuring concerns discussed above, the LSGT Debtors faced imminent financial risks upon the filings of the other Debtors that would constitute a good faith filings standing alone.  This demonstrates that their chapter 11 filings were in good faith.

49.      *First,* the LSGT Debtors balance sheet consists almost entirely of asbestos liabilities and intercompany receivable claims against EFH Corp. to fund the settlement and defense of those liabilities.  Once the other Debtors (including EFH Corp.) commenced chapter

11 cases, these liabilities would remain, but the automatic stay would block the LSGT Debtors from enforcing the intercompany receivable claims against EFH Corp.  Thus the LSGT Debtors would have been left without any means of defending against or satisfying their respective liabilities.

50.    *Second*, tax considerations have played a pivotal role in these chapter 11 cases, and the Debtors' tax arrangement, under certain reorganization scenarios, would have left the three LSGT Debtors that are C corporations liable for potentially billions in deconsolidation tax. Corporations within the EFH control group are jointly and severally liable for any deconsolidation tax.  By filing, the LSGT Debtors were able to participate in any resolution of tax liabilities with the other Debtors.

51.    Therefore, unlike the case cited by Asbestos Objectors—*In re SGL Carbon Corp.*, 200 F.3d 154, 164 (3d Cir. 1999) —financial crisis for the LSGT Debtors was not "an attenuated possibility."  Once the other Debtors filed for chapter 11 protection, the LSGT Debtors would lose access to cash while still being pursued for a likely increasing number of claims against them, unless they commenced their own bankruptcy proceedings.  The fact that the LSGT Debtors chose the latter demonstrates good business judgment, not bad faith.

52.    Indeed, the LSGT Debtors' decisions to file have been validated throughout these chapter 11 proceedings.  At the time of the LSGT Debtors' filing, the intercompany claims that fund the defense and settlement of asbestos claims would have been severally impaired under a liquidation scenario.  However, due to the benefits of bankruptcy protection and the substantial efforts of the directors and officers of the LSGT Debtors, the LSGT Debtors were able to convince NextEra to assume their corporate structure in whole, including all of their liabilities. Now, the Plan contemplates that the asbestos liabilities will be reinstated in full and protected by

a parent with an approximately $12 billion equity cushion. Thus, not only did the LSGT Debtors file to maximize value for the estate, but the evidence shows they are on the cusp of achieving that goal.

## IV.    The LSGT Debtors Were in Imminent Financial Distress at Filing.

53.    The Asbestos Objectors seek to have the cases of the LSGT Debtors dismissed on the grounds that their petitions were *filed* in bad faith, but confusingly rely on the LSGT Debtors' treatment under the Plan as admissions of being "highly solvent."    *See Motion Memorandum* at *10.  The fact that the LSGT Debtors will likely be able to satisfy their asbestos liabilities postpetition is completely disconnected to the LSGT Debtors' solvency at the time of filing.  Indeed, the purpose of chapter 11 is "facilitating the reorganization and rehabilitation of the debtor as an economically viable entity[,]" *see In re Combustion Engineering*, 391 F.3d 190 at 234, not mandating that debtors emerge insolvent.

54.    The current Plan contemplates that certain intercompany claims, *e.g.*, the $560 million claim of LSGT Gas against EFH Corp., will be reinstated, and thus the LSGT Debtors will likely have the means to satisfy the all of the asbestos claims, which are also being reinstated under the Plan.  But at the time of their filings, the LSGT Debtors had no way of predicting the course of the Debtors' chapter 11 proceedings.  Indeed, over two and a half years later, many uncertainties remain.  Regardless, any potential reinstatement would not have altered the fact that the automatic stay would have blocked the enforcement of the intercompany claims against EFH Corp.  Thus, once EFH Corp. filed, the LSGT Debtors would be blocked from enforcing the $560 million receivable and instantly become cash-flow insolvent.  The fact that the Reorganized EFH expects to satisfy asbestos claims post-emergence and will be a much more creditworthy parent is irrelevant to the decision to file the LSGT Debtors in 2014.

**V.      The LSGT Debtors' Cases Were Not Filed Merely to Obtain Litigation Advantages.**

55.      The Asbestos Objectors correctly state that "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities." *Motion Memorandum* at * 13 (citing *SGL Carbon*, 200 F.3d. at 166). However, their attempt to group the LSGT Debtors with cases where debtors used the Bankruptcy Code merely as a means to obtain litigation advantages relies on a gross misconstruction of the facts.  Moreover, the Debtors' decision to reinstate all timely-filed asbestos claims and the related intercompany claims can hardly be construed as an attempt to evade liabilities.

56.      None of the Asbestos Objectors' case law suggests otherwise, and all of the cases cited by the Asbestos Objectors are easily distinguishable.  For instance, in *In SGL Carbon*, the debtor allegedly filed for bankruptcy to avoid the "possibility of a significant judgment that 'could very well force [SGL Carbon] out of business.'"  200 F.3d at 163.  However, the evidence showed that SGL Carbon had a book value of $400 million, and liabilities of $276 million.  *Id*. The value of the antitrust claims were unknown, but SGL Carbon had "estimated the liquidation value of the antitrust claims at $54 million."  *Id*.  SGL Carbon was the only member of the corporate family that filed.

57.      Similarly, in *Integrated Telecom*, 384 F.3d at 112, the debtor wanted to liquidate its assets and filed for bankruptcy solely to utilize the section 502(b)(6) damage cap.  According to the debtor's schedules, the debtor had approximately $107 million in assets and only approximately $26 million in liabilities.  *Id*.  The debtor did not have a corporate family.  *Id*.  As mentioned above, *Liberate* involved a similar set of facts.  14 B.R. 206.

58.    All of the foregoing cases involved highly solvent debtors that were only using bankruptcy to reduce liabilities they could have easily afforded.  These were not corporate family filing cases.  In stark contrast, if the LSGT Debtors did not file, they would have been fully liable on all of their liabilities with zero ability to obtain cash to pay those liabilities, and thus utterly insolvent.  Further, the LSGT Debtors were part of a larger, good faith effort to reorganize the Debtors to preserve value and maximize recoveries for all parties in interest.

59.    Finally,  *In re 15375 Memorial Corp. v. Bepco, LP*, 589 F.3d 605, 609-10 (3d Cir. 2009), involved two subsidiary debtors that filed for bankruptcy to avoid litigation, one of which was engaged in no business and the other which had actually been dissolved (but not long enough to avail itself of the applicable statute of limitation in the litigation).  The filing occurred purely to protect the solvent parent, which did not file, from litigation liability.  *Id*. at 613.

60.    Again, the foregoing facts present a situation utterly distinct from that of the LSGT Debtors.  The LSGT Debtors did not file to shield a solvent parent from liability.

61.    Moreover, the Debtors are reinstating the asbestos claims and related intercompany claims, which can hardly be construed as an attempt to evade liability.   If such intercompany claims were not reinstated, the LSGT Debtors would be unsecured creditors and would receive a substantially lower recovery than they will under the current Plan. Consequently, the pool of cash available to pay asbestos claimants will be increased due to the LSGT Debtors' filing and the Debtors' subsequent reinstatement of the asbestos intercompany claims.  Such voluntary reinstatement would be self-defeating to a debtor who filed in order to unfairly impair its creditors.

62.    Accordingly, the actual facts demonstrate that LSGT Debtors did not file in order to game the bankruptcy system in order to unfairly alter the rights of their creditors.  On the

contrary, the evidence suggests that the LSGT Debtors acted to maximize the estate and further effectuate an enterprise-wide restructuring, to substantial benefit to holders of asbestos claims.

## VI.    The Asbestos Objectors' Motion Is Untimely.

63.    For all the foregoing reasons, the Motion is meritless.  It is also unjustifiably untimely and inappropriate.  While section 1112(b) of the Bankruptcy Code places no time limitations on the dismissal of chapter 11 cases, courts have applied the doctrine of laches to reject untimely motions to dismiss.  *See Mirant*, 2005 WL 2148362 at *11; *In re I.D. Craig Serv. Corp.*, 118 B.R. 335, 338 (Bankr. W.D. Pa. 1990).  Courts apply the doctrine when (i) there was a delay asserting the claim, (ii) there is no excuse for the delay, and (iii) the delay resulted in undue prejudice.  *Mirant*, 2005 WL 2148362 at *11.  Here, all three factors are present.

64.    *First*, there can be no question that there was a delay—the LSGT Debtors' filed their chapter 11 cases 31 months ago.  *Second*, there is no excuse for that delay.  The Asbestos Objectors have been extremely active in these chapter 11 cases, and certain of the Asbestos Objectors sit on the official committee of EFH unsecured creditors.  There is no colorable reason why the Asbestos Objectors waited so long to probe the LSGT Debtors' commencement of chapter 11 cases.   The facts and circumstances that led to that decision are unchanged since 2014.  The Asbestos Objectors make no attempt to excuse the delay.

65.    *Third*, the Debtors and their estates have been unduly prejudiced by the delay. The efforts to set an Asbestos Bar Date, and the extensive litigation that has followed, including this Motion and numerous others, would not have occurred but for the inclusion of the LSGT Debtors in these chapter 11 cases.  Instead of timely bringing a motion to dismiss, the Asbestos Objectors challenged—and collaterally attacked—the Asbestos Bar Date on numerous grounds, waiting for the 11th hour to try a new strategy and file the Motion.  The inexcusable delay directly caused the Debtors to expend millions of dollars—and the Court to devote significant

judicial resources—on issues related to the LSGT Debtors, all to the detriment of the Debtors' estates and parties in interest.

66.     Accordingly, the application of the doctrine of laches is justified in this case and the Motion should be denied.

### Conclusion

67.     The Asbestos Objectors cannot provide any rational basis to dismiss the LSGT Debtors' chapter 11 cases.  The LSGT Debtors are part of the integrated EFH corporate family, and thus only the good faith of EFH—not its subsidiaries— is relevant.  There is no question that the EFH corporate family filed in good faith.  Further, no party has questioned that the LSGT Debtors filed in good faith until now, over two and a half years after their filings.  Indeed, several of the Asbestos Objectors have actively participated in these chapter 11 cases on the official committee and only filed the Motion after their other efforts to end-run on the Asbestos Bar Date failed on several occasions.

68.     Even if LSGT Debtors are considered individually, the filing was necessitated by financial circumstances outside of the LSGT Debtors' control.  The LSGT Debtors filed with the legitimate intent of reorganizing with the integrated EFH family as a whole at a time when they were facing imminent cash flow insolvency.  They, therefore, satisfy the good faith filing standard.  Accordingly, the Motion should be denied.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter an order denying the

Motion and granting the Debtors such other and further relief as is appropriate under the

circumstances.

Dated: November 23, 2016
　　　　 Wilmington, Delaware

*/s/ Jason M. Madron*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:　　(302) 651-7700
Facsimile:　　(302) 651-7701
Email:　　　　collins@rlf.com
　　　　　　　defranceschi@rlf.com
　　　　　　　madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:　　(212) 446-4800
Facsimile:　　(212) 446-4900
Email:　　　　edward.sassower@kirkland.com
　　　　　　　stephen.hessler@kirkland.com
　　　　　　　brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:　　(312) 862-2000
Facsimile:　　(312) 862-2200
Email:　　　　james.sprayregen@kirkland.com
　　　　　　　marc.kieselstein@kirkland.com
　　　　　　　chad.husnick@kirkland.com
　　　　　　　steven.serajeddini@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*
