# EXHIBIT A

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 RCstLuOZXB1Pb183DqrWckn/ChYpqnj9t6apx0bc8V3KBRvOS/FqY+krRpdVhjos
 OGUoMcHH/FlgWD1y4Br9gg==

<SEC-DOCUMENT>0000930661-98-000618.txt : 19980330
<SEC-HEADER>0000930661-98-000618.hdr.sgml : 19980330
ACCESSION NUMBER:		0000930661-98-000618
CONFORMED SUBMISSION TYPE:	10-K405
PUBLIC DOCUMENT COUNT:		24
CONFORMED PERIOD OF REPORT:	19971231
FILED AS OF DATE:		19980327
SROS:			CSX
SROS:			NYSE
SROS:			PCX

FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:			TEXAS UTILITIES CO /TX/
		CENTRAL INDEX KEY:			0001023291
		STANDARD INDUSTRIAL CLASSIFICATION:	ELECTRIC SERVICES [4911]
		IRS NUMBER:				752669310
		STATE OF INCORPORATION:			TX
		FISCAL YEAR END:			1231

	FILING VALUES:
		FORM TYPE:		10-K405
		SEC ACT:
		SEC FILE NUMBER:	001-12833
		FILM NUMBER:		98575855

	BUSINESS ADDRESS:
		STREET 1:		C/O TEXAS UTILITIES CO
		STREET 2:		1601 BRYAN ST
		CITY:			DALLAS
		STATE:			TX
		ZIP:			75201
		BUSINESS PHONE:		2148124600

	MAIL ADDRESS:
		STREET 1:		TEXAS UTILITIES CO
		STREET 2:		1601 BRYAN STREET
		CITY:			DALLAS
		STATE:			TX
		ZIP:			75201

	FORMER COMPANY:
		FORMER CONFORMED NAME:	TUC HOLDING CO
		DATE OF NAME CHANGE:	19960919

FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:			TEXAS UTILITIES ELECTRIC CO
		CENTRAL INDEX KEY:			0000710182
		STANDARD INDUSTRIAL CLASSIFICATION:	ELECTRIC SERVICES [4911]
		IRS NUMBER:				751837355
		STATE OF INCORPORATION:			TX
		FISCAL YEAR END:			1231
```

```
           FILING VALUES:
                     FORM TYPE:            10-K405
                     SEC ACT:
                     SEC FILE NUMBER:      001-11668
                     FILM NUMBER:          98575856

           BUSINESS ADDRESS:
                     STREET 1:             ENERGY PLAZA 1601 BRYAN TOWER
                     CITY:                 DALLAS
                     STATE:                TX
                     ZIP:                  75201
                     BUSINESS PHONE:       2148124600
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K405
<SEQUENCE>1
<DESCRIPTION>FORM 10-K405
<TEXT>

<PAGE>
```

================================================================================

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

-----------------------------------

FORM 10-K

[X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
                    SECURITIES EXCHANGE ACT OF 1934

For the Fiscal Year Ended December 31, 1997

--OR--

[_]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
                    SECURITIES EXCHANGE ACT OF 1934

-----------------------------------------

For the Transition Period From          to
                            ---------   ---------

| Commission File Number | Exact Name of Registrant as Specified in its Charter; Address of Principal Executive Offices; and Telephone Number | I.R.S. Employer Identification No. |
| --- | --- | --- |
| 1-12833 | Texas Utilities Company<br>Energy Plaza, 1601 Bryan Street<br>Dallas, TX 75201-3411<br>(214) 812-4600 | 75-2669310 |
| 0-11442 | Texas Utilities Electric Company<br>Energy Plaza, 1601 Bryan Street<br>Dallas, TX 75201-3411<br>(214) 812-4600 | 75-1837355 |

================================================================================

```
<PAGE>
```

Securities registered pursuant to Section 12(b) of the Act:

```
<TABLE>
<CAPTION>
                                                                      Name
                                                                      Which
     Registrant                     Title of Each Class              -----
     ----------                     -------------------
<S>                                 <C>                               <C>
   Texas Utilities Company          Common Stock, without par value  New Y
                                                                      The C
                                                                      The P

Texas Utilities Electric Company    Depositary Shares, Series A, each representing   New Y
                                    1/4 of a share of $7.50 Cumulative
                                    Preferred Stock, without par value

Texas Utilities Electric            Depositary Shares, Series B, each representing   New Y
  Company                           1/4 of a share of $7.22 Cumulative
                                    Preferred Stock, without par value

TU Electric Capital I, a            8.25% Trust Originated Preferred Securities       New Y
subsidiary of Texas Utilities
Electric Company

TU Electric Capital III, a          8.00% Quarterly Income Preferred Securities       New Y
subsidiary of Texas Utilities
Electric Company
</TABLE>
```

Securities registered pursuant to Section 12(g) of the Act:  Preferred Stock of
Texas Utilities Electric Company, without par value

                    ------------------------------------

Indicate by check mark whether the registrants (1) have filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrants were required to file such reports), and (2) have been subject to
such filing requirements for the past 90 days.   Yes  X    No
                                                      ----      ----

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of the registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K. [X]

Aggregate market value of Texas Utilities Company Common Stock held by non-
affiliates, based on the last reported sale price on the composite tape on March
13, 1998: $9,863,560,270.

Aggregate market value of Texas Utilities Electric Company Common Stock held by
non-affiliates: None

Common Stock outstanding at March 13, 1998:

        Texas Utilities Company - 245,237,688 shares, without par value
        Texas Utilities Electric Company - 142,931,000 shares, without par value

             -------------------------------------------------------

                    DOCUMENTS INCORPORATED BY REFERENCE

EFH01434706

Portions of the definitive proxy statement pursuant to Regulation 14A, which was filed with the Commission on March 19, 1998, are incorporated by reference into Part III of this report.

-------------------------------------------------------

This combined Form 10-K is filed separately by Texas Utilities Company and Texas Utilities Electric Company. Information contained herein relating to an individual registrant is filed by that registrant on its own behalf except that the information with respect to Texas Utilities Electric Company, other than the financial statements of Texas Utilities Electric Company, is filed by each of Texas Utilities Company and Texas Utilities Electric Company.  Each registrant makes no representation as to information filed by the other registrant.
<PAGE>

## TABLE OF CONTENTS

### PART I

|  |  | Page |
|---|---|---|
| Item 1. | BUSINESS................................................ | 1 |
|  | Texas Utilities Company and Subsidiaries................ | 1 |
|  | Texas Energy Industries, Inc. and Subsidiaries.......... | 3 |
|  | ENSERCH Corporation and Subsidiaries.................... | 5 |
|  | Texas Utilities Electric Company and Subsidiaries....... | 5 |
|  | Electricity Peak Load and Capability.................... | 6 |
|  | Gas Distribution Peaking................................ | 8 |
|  | Fuel Supply and Purchased Power......................... | 8 |
|  | Regulation and Rates.................................... | 12 |
|  | Competition............................................. | 17 |
|  | Environmental Matters................................... | 21 |
| Item 2. | PROPERTIES............................................. | 24 |
|  | Capital Expenditures................................... | 25 |
| Item 3. | LEGAL PROCEEDINGS...................................... | 26 |
| Item 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS....... | 26 |
| EXECUTIVE OFFICERS OF THE COMPANY............................... | | 27 |

### PART II

| Item 5. | MARKET FOR EACH REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS ..................................... | 28 |
|---|---|---|
| Item 6. | SELECTED FINANCIAL DATA................................ | 28 |
| Item 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS..................... | 29 |
| Item 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK............................................. | 29 |
| Item 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA............. | 29 |
| Item 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE..................... | 29 |

### PART III

| Item 10. | DIRECTORS AND EXECUTIVE OFFICERS OF EACH REGISTRANT....... | 30 |
|---|---|---|

Item 11.  EXECUTIVE COMPENSATION............................. 33

Item 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS
          AND MANAGEMENT...................................... 40

Item 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS............ 40


                         PART IV

Item 14.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND
          REPORTS ON FORM 8-K................................. 41


APPENDIX A - Financial Information of Texas Utilities Company and Subsidiaries
             and Texas Utilities Electric Company and Subsidiaries

APPENDIX B - Financial Information of ENSERCH Corporation and Subsidiaries

                              i
<PAGE>

                           PART I

ITEM 1.  BUSINESS

                TEXAS UTILITIES COMPANY AND SUBSIDIARIES

     Texas Utilities Company (Company), a Texas corporation organized in 1996,
which was named as TUC Holding Company, is a holding company for its predecessor
companies, Texas Energy Industries, Inc. (TEI), formerly known as Texas
Utilities Company, and ENSERCH Corporation (ENSERCH). Through subsidiaries and
divisions of TEI and ENSERCH, the Company engages in the generation,
transmission and distribution of electricity; the processing, transmission,
distribution and marketing of natural gas; and telecommunications, power
development and other businesses. Additional information concerning TEI and
ENSERCH and their respective subsidiaries and divisions follows. The Company
holds no franchises other than its corporate franchise.

     At December 31, 1997, the Company and its direct and indirect wholly-owned
subsidiaries (System Companies) had 14,751 full-time employees.

MERGERS AND ACQUISITIONS

     Certain comparisons in this Form 10-K have been affected by the August 1997
acquisition of ENSERCH and the November 1997 acquisition of Lufkin-Conroe
Communications Co. (LCC) by the Company and by the December 1995 acquisition of
Eastern Energy Limited (Eastern Energy) by Texas Utilities Australia Pty. Ltd.
(TU Australia), a wholly-owned subsidiary of the Company. The results of each
acquired company are included only for the periods subsequent to acquisition.

     On August 5, 1997, the merger transactions (Merger) between the former
Texas Utilities Company, now known as TEI, and ENSERCH were completed. At the
effective time of the Merger: (i) the former Texas Utilities Company changed its
name to TEI, (ii) TEI and ENSERCH merged with wholly-owned subsidiaries of TUC
Holding Company, which, as a result, owned all the common stock of TEI and of
ENSERCH, (iii) TUC Holding Company changed its name to Texas Utilities Company
(now the Company), (iv) each share of TEI's common stock was automatically
converted into one share of common stock of the Company, and (v) each share of
common stock of ENSERCH was automatically converted into 0.225 share of common
stock of the Company, with cash issued in lieu of fractional shares. The share
conversions were tax-free transactions. In the Merger, approximately 15. 9
million shares of the Company's common stock were issued to former holders of
ENSERCH common stock. The value assigned to the Company shares issued and costs
incurred in connection with the acquisition of ENSERCH aggregated $579 million.
At the date of the Merger, ENSERCH had debt and preferred stock outstanding of

approximately $1.3 billion:

On November 21, 1997, the Company acquired LCC. Approximately 8.7 million shares of the Company's common stock were issued to LCC stockholders in a stock-for-stock exchange. The value assigned to the Company shares issued and costs incurred in connection with the acquisition of LCC aggregated $319 million. At the date of the acquisition, LCC had debt outstanding of approximately $31 million. Immediately following the acquisition, the Company contributed its investment in LCC to TEI.

The acquisitions of ENSERCH, LCC and Eastern Energy were accounted for as purchase business combinations. The assets and liabilities of the acquired companies at the acquisition dates were adjusted to their estimated fair values. The excess of the purchase price paid by the Company over the estimated fair value of net assets acquired and liabilities assumed was recorded as goodwill and is being amortized over 40 years. The process of determining the fair value of assets and liabilities of ENSERCH and LCC as of the date of acquisition is continuing, and the final results await primarily the resolution of income tax and other contingencies and finalization of some preliminary estimates.

1

<PAGE>

For financial reporting and other purposes, the Company is being treated herein as the successor to TEI. Unless otherwise specified, all references to the Company which relate to a period prior to August 5, 1997, shall be deemed to be references to TEI.

The Company continues to seek potential investment opportunities from time to time when it concludes that such investments are consistent with its business strategies and are likely to enhance the long-term return to its shareholders. In January 1998, the Company announced that it had approached The Energy Group PLC (TEG), a diversified international energy group, in connection with its possible interest in acquiring TEG. TEG is the holding company for Eastern Electricity PLC, which is one of the largest regional electric companies in the United Kingdom (U.K.), one of the largest U.K. generators of electricity and one of the largest U.K. suppliers of natural gas. On March 2, 1998, the Company announced through its wholly owned subsidiary, TU Acquisitions PLC (TU Acquisitions), an offer to holders of TEG securities, to acquire 100% of TEG's ordinary shares, including the ordinary shares evidenced by American Depository Receipts, which was increased on March 3, 1998 to an offer of (Pounds)8.40 per share. Alternatively, up to 20% of the TEG shares may be exchanged for Company common stock with a value of approximately (Pounds)8.65 per TEG share. There is currently a competing offer for TEG shares at (Pounds)8.20 per share. The offer by the Company is subject to certain conditions and to certain regulatory consents and confirmations which the Company anticipates will be satisfactorily resolved within the normal timetable for an offer in the U.K. As of March 17, 1998, the Company had acquired 21.96% of TEG's shares in the U.K. market. The TEG businesses to be acquired by the Company (which exclude TEG's Peabody Coal and Citizens Power businesses, which are to be sold by TEG to an unaffiliated party in connection with the Company's offer) had assets of approximately $10.3 billion at September 30, 1997 and $5.2 billion of revenues for the twelve months ended on that date. Such businesses had debt outstanding at September 30, 1997 of approximately $3.8 billion. The estimated purchase price for the TEG shares is approximately $7.3 billion. The Company estimates that the financing necessary to purchase all outstanding TEG shares at the (Pounds)8.40 price and to pay all associated expenses will be approximately (Pounds)4.6 billion ($7.6 billion). The Company and TU Acquisitions and other intermediate U.K. holding companies have entered into credit facilities with banking institutions in the United States (U.S.) and the U.K., respectively, which will provide committed financing sufficient to purchase the outstanding TEG shares and pay related expenses. The U.S. credit facilities, which will aggregate $5.0 billion, will replace the Company's current Credit Facilities described in Note 3 to the Consolidated Financial Statements. The timing, amount and funding of any other new business investment opportunities are presently undetermined.

<PAGE>

The Company's more significant subsidiaries are as follows:

      TEXAS ENERGY INDUSTRIES, INC.
        Texas Utilities Electric Company
          TU Electric Capital I Trust
          TU Electric Capital III Trust
          TU Electric Capital IV Trust
          TU Electric Capital V Trust
        Southwestern Electric Service Company
        Texas Utilities Australia Pty. Ltd.
          Eastern Energy Limited
        Texas Utilities Fuel Company
        Texas Utilities Mining Company
        Lufkin-Conroe Communications Co.
          Lufkin-Conroe Telephone Exchange, Inc.
          Lufkin-Conroe Telecommunications Corp.
           LCT Long Distance, Inc.
           East Texas Fiber Line, Inc. (67% owned)
        Texas Utilities Integrated Solutions Inc.
        Texas Utilities Services Inc.
        Texas Utilities Properties Inc.
        Texas Utilities Communications Inc.
        Basic Resources Inc.
        Chaco Energy Company
        Enserch Development Corporation
        Lone Star Gas International, Inc.
        National Pipeline Company
        Enserch International Services, Inc.
ENSERCH CORPORATION
        Lone Star Gas Company, a Division of ENSERCH Corporation
        Lone Star Pipeline Company, a Division of ENSERCH Corporation
        Enserch Processing, Inc.
        Enserch Energy Services, Inc.
TU FINANCE (NO. 1) LIMITED
        TU Finance (No. 2) Limited (90% owned by TU Finance (No. 1) Limited and
          10% owned by Texas Utilities Services Inc.)
          TU Acquisitions PLC

TEXAS ENERGY INDUSTRIES, INC. AND SUBSIDIARIES

    TEI is a holding company whose principal subsidiary, Texas Utilities
Electric Company (TU Electric), is an operating public utility company engaged
in the generation, purchase, transmission, distribution and sale of electric
energy in the north central, eastern and western portions of Texas. For
information concerning TU Electric, see TU Electric below. Two other
subsidiaries of TEI are also engaged directly or indirectly in electric utility
operations. Southwestern Electric Service Company (SESCO) is engaged in the
purchase, transmission, distribution and sale of electric energy in ten counties
in the eastern and central parts of Texas with a population estimated at
126,900. TU Australia owns all of the common stock of Eastern Energy, an
Australian company engaged in the purchase, distribution, marketing and sale of
electric energy to approximately 489,000 customers in a 31,000 square mile
distribution service area extending from the outer eastern suburbs of the
Melbourne metropolitan area to the eastern coastal areas of the State of
Victoria and north to the State of New South Wales border. References herein to
TU Australia include its subsidiary, Eastern Energy.

3

<PAGE>

    Texas Utilities Fuel Company (Fuel Company) owns a natural gas pipeline
system, acquires, stores and delivers fuel gas and provides other fuel services,
at cost, for the generation of electric energy by TU Electric.

Texas Utilities Mining Company (Mining Company) owns, leases and operates fuel production facilities for the surface mining and recovery of lignite, at cost, for the generation of electric energy by TU Electric.

LCC is the parent company of Lufkin-Conroe Telephone Exchange, Inc. (LCTX) and Lufkin-Conroe Telecommunications Corporation (LCT) and its subsidiaries. LCTX is an independent local exchange carrier which has provided telephone services for almost 100 years, and as of December 1997, was the fourth largest telephone company in Texas (28th largest in the U.S.). LCTX has sixteen exchanges that serve approximately 100,000 access lines in the Alto, Conroe and Lufkin areas of southeast Texas. It also provides access services to a number of interexchange carriers, who provide long distance services. LCT and its subsidiaries own fiber optic cable systems which they lease to interexchange carriers, provide Internet access, radio communications tower rentals, cellular mobile telephones and radio paging services and private branch exchange service to local customers. LCT, through a subsidiary, also provides interexchange long distance service, with a primary focus on business customers.

Texas Utilities Integrated Solutions Inc. is an unregulated company providing retail energy services. The company bundles energy-related products and services for selected target market segments.

Texas Utilities Services Inc. (TU Services) provides financial, accounting, information technology, environmental services, customer services, procurement, personnel and other administrative services, at cost, to the System Companies. TU Services acts as transfer agent, registrar and dividend paying agent with respect to the common stock of the Company, the preferred stock and preferred securities of TU Electric, and as agent for participants under the Company's Automatic Dividend Reinvestment and Common Stock Purchase Plan.

Texas Utilities Properties Inc. (TU Properties) owns, leases and manages real and personal properties, primarily the Company's corporate headquarters.

Texas Utilities Communications Inc. was organized to provide access to advanced telecommunications technology, primarily for the Company's expected expansion of the energy services business.

Basic Resources Inc. was organized for the purpose of developing natural resources, primarily energy sources, and other business opportunities.

Chaco Energy Company (Chaco) was organized to own and operate facilities for the acquisition, production, sale and delivery of coal and other fuels and currently leases extensive coal reserves.

In December 1997, TEI acquired from ENSERCH the companies which had constituted its power development and international gas distribution operations. Enserch Development Corporation (EDC) develops and finances independent electric power plant and cogeneration facilities. EDC's efforts are currently focused on international projects. International gas operations, which are conducted through Lone Star Gas International, Inc., National Pipeline Company and Enserch International Services, Inc., are currently focused in Mexico and Central and South America and consist primarily of minority ownership in gas distribution systems.

TU Electric, SESCO, TU Australia, LCTX and LCT possess all of the necessary franchises, licenses and certificates required to enable them to conduct their respective businesses (see Regulation and Rates).

At December 31, 1997, TEI and its direct and indirect wholly-owned subsidiaries had 11,758 full-time employees.

4

<PAGE>

ENSERCH CORPORATION AND SUBSIDIARIES

ENSERCH is an integrated company focused on natural gas. Its major business operations consist of the gathering, processing, transmission, distribution and marketing of natural gas through the following companies.

Enserch Processing, Inc. (EPI) gathers and processes natural gas to remove impurities and extract natural gas liquids for sale.

Lone Star Pipeline Company (Lone Star Pipeline), a division of ENSERCH, is a partially rate-regulated business that owns and operates interconnected natural-gas transmission lines, underground storage reservoirs, compressor stations and related properties, all within Texas. With a system consisting of approximately 7,600 miles of gathering and transmission pipelines in Texas, Lone Star Pipeline is one of the largest pipelines in the United States. Through these facilities, it transports natural gas to distribution systems of Lone Star Gas Company (Lone Star Gas) and other customers. Rates for the services to Lone Star Gas are regulated by the Railroad Commission of Texas (RRC) while rates for services to other customers are generally only subject to RRC jurisdiction through complaint proceedings.

Lone Star Gas, a partially rate-regulated division of ENSERCH, owns and operates natural-gas distribution systems and related properties. One of the largest gas distribution companies in the United States and the largest in Texas, Lone Star Gas provides service through over 23,800 miles of distribution mains. Through these facilities, it purchases, distributes and sells natural gas to over 1.35 million residential, commercial and industrial customers in approximately 550 cities and towns, including the 11-county Dallas/Fort Worth Metroplex. Lone Star Gas also transports natural gas within its distribution system as market opportunities require.

Enserch Energy Services, Inc. (EES) is a wholesale and retail marketer of natural gas in several areas of the U.S. Its primary U.S. retail markets are in Texas, the Northeast, the Midwest and the West Coast. In January 1998, the Federal Energy Regulatory Commission approved an Order authorizing EES to make physical sales of electricity in the wholesale market throughout the U.S. other than within the area of the Electric Reliability Council of Texas (ERCOT).

ENSERCH possesses all of the necessary franchises and certificates required to enable it to conduct its business (see Regulation and Rates). See Appendix B to this report for additional information concerning the various operations of ENSERCH.

At December 31, 1997, ENSERCH and its direct and indirect wholly-owned subsidiaries had 2,987 full-time employees.


TEXAS UTILITIES ELECTRIC COMPANY AND SUBSIDIARIES

TU Electric is an electric utility engaged in the generation, purchase, transmission, distribution and sale of electric energy wholly within the State of Texas.  TU Electric possesses all of the necessary franchises and certificates required to enable it to conduct its business (see Regulation and Rates).  TU Electric is the principal subsidiary of the Company.  References herein to TU Electric include its financing subsidiaries (see Note 7 to Consolidated Financial Statements included in Appendix A to this report).

5

<PAGE>

TU Electric's service area is located in the north central, eastern and western parts of Texas, with a population estimated at 6,020,000 -- about one-third of the population of Texas.  Electric service is provided in 91 counties and 372 incorporated municipalities, including Dallas, Fort Worth, Arlington, Irving, Plano, Waco, Mesquite, Grand Prairie, Wichita Falls, Odessa, Midland, Carrollton, Tyler, Richardson and Killeen.  The area is a diversified commercial and industrial center with substantial banking, insurance, communications,

EFH01434712

electronics, aerospace, petrochemical and specialized steel manufacturing, and
automotive and aircraft assembly.  The territory served includes major portions
of the oil and gas fields in the Permian Basin and East Texas, as well as
substantial farming and ranching sections of the State.  Its service territory
also includes the Dallas-Forth Worth International Airport and the Alliance
Airport. For energy sales and operating revenues contributed by each customer
classification, see Texas Utilities Electric Company and Subsidiaries --
Consolidated Operating Statistics included in Appendix A to this report.

       At December 31, 1997, TU Electric had 6,053 full-time employees.


                    ELECTRICITY PEAK LOAD AND CAPABILITY


THE COMPANY AND TU ELECTRIC
- -------------------------

       The electricity peak load and net capability for the System Companies
include those of TU Electric, contained in the chart below, SESCO and Eastern
Energy. For SESCO, peak load was 238 megawatts (MW) on July 29, 1997 and for
Eastern Energy was 1,042 MW on February 19, 1997. SESCO and Eastern Energy
generate no electric energy.

       TU Electric's net capability, peak load and reserve, in MW, at the time of
peak were as follows during the years indicated:

|  |  | ELECTRICITY PEAK LOAD (a) | | | |
| YEAR | NET CAPABILITY | AMOUNT | INCREASE OVER PRIOR YEAR | FIRM PEAK LOAD | RESERVE(b) |
| ---- | ---------- | ------- | ---------- | ------ | ---------- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| 1997...... | 22,449(c) | 20,351 | 3.5% | 19,229 | 3,220 |
| 1996...... | 22,389(d) | 19,668 | 2.5 | 18,930 | 3,459 |
| 1995...... | 22,469(e) | 19,180 | 6.4 | 18,631 | 3,619 |

- -------------------
(a) The 1997 peak load occurred on August 20. TU Electric's  peak load includes
    interruptible load at the time of peak of 1,122 MW in 1997, 738 MW in 1996
    and 744 MW in 1995.
(b) Amount of net capability in excess of firm peak load at the time of peak.
(c) Included in net capability is 1,224 MW of firm purchased capacity, of which
    1,164 MW is cogeneration and small power production, and 60 MW is short-term
    firm summer capacity purchased in 1997 from a power marketer.
(d) Included in net capability is 1,164 MW of firm purchased capacity, all of
    which is cogeneration and small power production.
(e) Included in net capability is 1,244 MW of firm purchased capacity, of which
    1,164 MW is cogeneration and small power production.


TU ELECTRIC
- -----------

       The peak load changes for 1997 as compared to 1996 resulted primarily from
customer growth and increased customer usage.  The peak load changes for 1996
and 1995, compared in each case to the prior year, resulted primarily from
customer growth and weather factors.  TU Electric expects to continue to
purchase capacity in the future from various sources.  (See Fuel Supply and
Purchased Power and Note 15 to Consolidated Financial Statements included in
Appendix A to this report.)  Firm peak load increases over the next ten years
are expected to average approximately 1.7% annually, after consideration of load
management programs (including interruptible contracts).

<PAGE>

Changes in utility regulation and legislation at the federal and state levels such as the Public Utility Regulatory Policy Act of 1978 (PURPA), the National Energy Policy Act of 1992 (Energy Policy Act) and the 1995 amendments to the Public Utility Regulatory Act (PURA) in Texas have significantly changed the way in which utilities plan for new resources. TU Electric believes that competitive market forces will be a major factor in determining future resource additions to serve customer loads. Thus, for planning purposes, TU Electric can no longer readily identify the ownership and types of resources to include in its plan before the actual selection of those resources. TU Electric has reflected this uncertainty through use of the term "Unspecified Resources." Except for known contracts, all potential new resource needs are designated as "Unspecified Resources."

In January 1996, in accordance with an order of the PUC, TU Electric filed an updated ten-year Integrated Resource Plan (IRP) with the PUC for the period 1996 through 2005 along with a proposed plan for the solicitation of resources through a competitive bidding process. The PUC issued its final order on TU Electric's IRP in October 1996, and modified the order in December 1996 and February 1997. The modified order approved a flexible solicitation plan that will allow TU Electric to conduct up to three optional resource solicitations for a total of 2,074 MW of demand-side and supply-side resources prior to the filing of its next IRP in June 1999. A large portion of TU Electric's near-term resource needs have been alleviated with the extension of an existing purchased power contract through the year 2002. Thus, the immediate need to issue a short-term solicitation for additional resources was deferred past 1997. TU Electric is also evaluating the possible extension of its remaining purchased power contracts and exploring opportunities in the short-term market. TU Electric is continuing to review the need and timing for conducting the resource solicitations.

In addition to its solicitation plan in the IRP docket, TU Electric requested and received approval from the PUC to expand its Power Cost Recovery tariff to provide current cost recovery of resource acquisition costs for demand-side management resources acquired in the solicitations and for eight previously approved demand-side management contracts entered into by TU Electric to the extent such costs are not currently reflected in TU Electric's base rates.

RESOURCE ESTIMATES

The resource additions identified in TU Electric's 1998 IRP for the next five years are as follows:

|  | 1998-2002 | |
| --- | --- | --- |
|  | FIRM CAPABILITY | |
| RESOURCE ADDITIONS | (MW) | PERCENT |
| Load management (a)..................... | 376 | 20.5% |
| Renewable resources (b).................. | 4 | 0.2 |
| Long-term purchase (c).................. | 25 | 1.4 |
| Unspecified resources .................. | 1,427 | 77.9 |
| Total................................ | 1,832 | 100.0% |

- ---------------------

(a) TU Electric has executed an agreement to purchase 75 MW during the summer peak months of 1998 and has negotiated and signed contracts with eight suppliers of demand-side management services designed to displace a total of 72 MW by 2004.
(b) TU Electric has negotiated and signed one purchased power contract for approximately 35 MW (4 MW firm) of wind-powered resources to be placed in

service during 1999.

(c) TU Electric has negotiated and signed a three-year extension to an existing purchased power contract for an increase in contract capacity from 410 MW to 435 MW.

The exact timing of when retail competition will occur in Texas is unknown at this time. Some areas in the U.S. already have retail competition (e.g., California), many others are considering it, including Texas. During the next session of the Texas legislature, which will be in 1999, the issue of retail competition will likely be discussed, and some form of legislation may be enacted. Because of this uncertainty and the potential impact of retail competition on TU Electric's ability to retain customers presently served, any forecasts of future resource needs beyond the near-term (i.e., five years or less) are speculative and likely to be in error. Thus, TU Electric is providing only resource information for the next five years (1998-2002).

7

<PAGE>

## GAS DISTRIBUTION PEAKING

THE COMPANY
- -----------

Lone Star Gas estimates its peak-day availability from long-term contracts and withdrawals from underground storage to be 1.4 billion cubic feet (Bcf). Short-term peaking contracts and daily spot contracts raise this availability level to meet anticipated sales needs.

During 1997, the average daily demand of Lone Star Gas' residential and commercial customers was .3 Bcf. Lone Star Gas' greatest daily demand in 1997 was on January 13 when the arithmetic-mean temperature was 22 degrees F. and deliveries to all customers reached 2.3 Bcf, including estimated deliveries to residential and commercial customers of 2.1 Bcf.

## FUEL SUPPLY AND PURCHASED POWER

THE COMPANY AND TU ELECTRIC
- ---------------------------

Net input for the System Companies during 1997 totaled 108,468 million kilowatt-hours (kWh) of which 91,298 million kWh were generated by TU Electric. Average fuel and purchased power cost (excluding capacity charges) per kWh of net input for the Company and TU Electric were 1.97 and 1.84 cents for 1997, 1.94 and 1.79 cents for 1996 and 1.64 and 1.62 cents for 1995, respectively. The Company's increase for 1997 primarily reflects TU Electric's increased natural gas costs. A comparison of TU Electric's resource mix for net kWh input and the unit cost per million British thermal units (Btu) of fuel during the last three years is as follows:
<TABLE>
<CAPTION>

|                              | MIX FOR NET KWH INPUT | | | UNIT COST PER MILLION BTU | | |
|------------------------------|--------|--------|--------|--------|--------|--------|
|                              | 1997   | 1996   | 1995   | 1997   | 1996   | 1995   |
|                              | ----   | ----   | ----   | ----   | ----   | ----   |
| Fuel for Electric Generation: |        |        |        |        |        |        |
| <S>                          | <C>    | <C>    | <C>    | <C>    | <C>    | <C>    |
| Gas/Oil (a)................... | 32.9%  | 33.0%  | 33.4%  | $2.80  | $2.66  | $2.31  |
| Lignite/Coal (b)................ | 38.9   | 39.6   | 37.4   | 1.04   | 1.03   | 1.02   |
| Nuclear....................... | 17.1   | 15.0   | 17.9   | 0.57   | 0.56   | 0.59   |
|                              | -----  | -----  | -----  | ----   | ----   | ----   |
| Total/Weighted Average Fuel Cost.. | 88.9   | 87.6   | 88.7   | $1.62  | $1.58  | $1.43  |
| Purchased Power (c)............... | 11.1   | 12.4   | 11.3   |        |        |        |
|                              | -----  | -----  | -----  |        |        |        |

```
Total......................  100.0% 100.0%  100.0%
                             =====  =====   =====
```

</TABLE>

- ------------------

(a) Fuel oil was an insignificant component of total fuel and purchased power requirements.
(b) Lignite cost per ton to TU Electric was $13.24 in 1997, $13.22 in 1996 and $13.05 in 1995.
(c) Excludes SESCO's and Eastern Energy's purchased power: 1997 - 543 million kWh and 5,190 million kWh, respectively; 1996 -616 million kWh and 5,090 million kWh, respectively; 1995 - 865 million kWh and 335 million kWh, respectively.

    TU Electric, SESCO and Eastern Energy are unable to predict: (i) whether or not problems may be encountered in the future in obtaining the fuel and purchased power each will require, (ii) the effect upon operations of any difficulty any of them may experience in protecting rights to fuel and purchased power now under contract, or (iii) the cost of fuel and purchased power. The reasonable costs of fuel and purchased power of TU Electric and SESCO are generally recoverable subject to the rules of the PUC. (See Regulation and Rates for information pertaining to the method of recovery of purchased power and fuel costs.)

GAS/OIL

TU ELECTRIC
- -----------

    Fuel gas for units at nineteen of the principal generating stations of TU Electric, having an aggregate net gas/oil capability of 13,100 MW, was provided during 1997 by Fuel Company. Fuel Company supplied

                              8

<PAGE>

approximately 16% of such fuel gas requirements under contracts with producers at the wellhead and 84% under contracts with commercial suppliers.

THE COMPANY
- -----------

    Fuel Company -- Fuel Company has acquired supplies of gas from producers at the wellhead under contracts expiring at intervals through 2008. As gas production under these contracts declines and contracts expire, new contracts are expected to be negotiated to replenish or augment such supplies. Fuel Company has negotiated gas purchase contracts, with terms ranging from one to ten years, with a number of commercial suppliers. Additionally, Fuel Company has entered into a number of short-term gas purchase contracts with other commercial suppliers at spot market prices. In general, these spot gas purchase contracts require both the buyer and seller to purchase and deliver the gas on negotiated terms during the agreed-upon delivery period. In the past, curtailments of gas deliveries have been experienced during periods of winter peak gas demand; however, such curtailments have been of relatively short duration, have had a minimal impact on operations and have generally required utilization of fuel oil and gas storage inventories to replace the gas curtailed. During 1997, Fuel Company experienced no curtailments.

    Fuel Company owns and operates an intrastate natural gas pipeline system that extends from the gas-producing area of the Permian Basin in West Texas to the East Texas gas fields and southward to the Gulf Coast area. This system includes a one-half interest in a 36-inch pipeline that extends 395 miles from the Permian Basin area to a point of termination south of the Dallas-Fort Worth area and has a total estimated capacity of 885 million cubic feet per day with existing compression facilities. Additionally, Fuel Company owns a 39% undivided interest in another 36-inch pipeline connecting to this pipeline and extending 58 miles eastward to one of Fuel Company's underground gas storage facilities.

Fuel Company also owns and operates approximately 1,550 miles of various smaller capacity lines that are used to gather and transport natural gas from other gas-producing areas. The pipeline facilities of Fuel Company form an integrated network through which fuel gas is gathered and transported to certain TU Electric generating stations for use in the generation of electric energy.

Fuel Company also owns and operates three underground gas storage facilities with a usable capacity of 28.2 Bcf with approximately 14.8 Bcf of gas in inventory at December 31, 1997. Gas stored in these facilities currently can be withdrawn for use during periods of peak demand to meet seasonal and other fluctuations or curtailment of deliveries by gas suppliers. Under normal operating conditions, up to 400 million cubic feet can be withdrawn each day for a ten-day period, with withdrawals at lower rates thereafter.

Fuel oil can be stored at eighteen of the principally gas-fueled generating stations.  At December 31, 1997, the System Companies had fuel oil storage capacity sufficient to accommodate approximately 6.2 million barrels of oil, with approximately 2.3 million barrels of oil in inventory.

Lone Star Gas -- Lone Star Gas' gas supply consists of contracts for the purchase of specific reserves, contracts not  related to specific reserves or fields, and gas in storage. The total gas supply as of January 1, 1998, was 489 Bcf, which is approximately three times Lone Star Gas' purchases during 1997. Of this total, 130 Bcf are specific reserves and 34 Bcf are working gas in storage. Management has calculated that 325 Bcf, including 131 Bcf under one contract, are committed to Lone Star Gas under gas supply contracts not related to specific reserves or fields.  In 1997, Lone Star Gas' gas requirement was purchased from some 125 independent producers and non-affiliated pipeline companies, one of which supplied approximately 28% of total requirements.

To meet peak-day gas demands during winter months, Lone Star Gas utilizes the service of seven affiliated gas storage fields, all of which are located in Texas. These fields have a working gas capacity of 47 Bcf and a day-one storage withdrawal capacity of 1.3 Bcf per day.

Lone Star Gas has historically maintained a contractual right to curtail, which is designed to achieve the highest load factor possible in the use of the pipeline system while assuring continuous and uninterrupted service

<center>9</center>

<PAGE>

to the residential and commercial customers. Under the program, industrial customers select their own rates and relative priorities of service. Interruptible service contracts include the right to curtail gas deliveries up to 100% according to a strict priority plan. The last sales curtailment for Lone Star Gas occurred in 1990 and lasted for only 30 hours.

Estimates of gas supplies and reserves are not necessarily indicative of Lone Star Gas' ability to meet current or anticipated market demands or immediate delivery requirements because of factors such as the physical limitations of gathering and transmission systems, the duration and severity of cold weather, the availability of gas reserves from its suppliers, the ability to purchase additional supplies on a short-term basis and actions by federal and state regulatory authorities. Curtailment rights provide Lone Star Gas flexibility to meet the human-needs requirements of its customers on a firm basis. Priority allocations and price limitations imposed by federal and state regulatory agencies, as well as other factors beyond the control of Lone Star Gas, may affect its ability to meet the demands of its customers.

The Lone Star Gas supply program is designed to contract for new supplies of gas (and to recontract targeted expiring sources) connected to Lone Star Pipeline's pipeline system. In addition to being heavily concentrated in the established gas-producing areas of central, northern and eastern Texas, Lone Star Pipeline's intrastate pipeline system also extends into or near the major producing areas of the Texas Gulf Coast and the Delaware and Val Verde Basins of

West Texas. Nine basins located in Texas are estimated to contain a substantial portion of the nation's remaining onshore natural-gas reserves. Lone Star Pipeline's pipeline system provides access to all of these basins. Lone Star Pipeline is well situated to receive large volumes into its system at the major hubs, such as Katy and Waha, as well as at the major third-party owned storage facilities where suppliers maintain instantaneous high delivery capabilities.

Lone Star Gas buys gas under long-term, intrastate contracts in order to assure reliable supply to its customers. Many of these contracts require minimum purchases of gas. Presently, based on estimated gas demand which assumes normal weather conditions, requisite gas purchases are expected to substantially satisfy purchase obligations for the year 1998 and thereafter.

LIGNITE/COAL

TU ELECTRIC
- -----------

Lignite is used as the primary fuel in two units at the Big Brown generating station (Big Brown), three units at the Monticello generating station (Monticello), three units at the Martin Lake generating station (Martin Lake), and one unit at the Sandow generating station (Sandow), having an aggregate net capability of 5,825 MW. TU Electric's lignite units have been constructed adjacent to surface minable lignite reserves. At the present time, TU Electric owns in fee or has under lease an estimated 508 million tons of proven reserves dedicated to the Big Brown, Monticello, and Martin Lake generating stations. TU Electric also owns in fee or has under lease in excess of 270 million tons of proven reserves not dedicated to specific generating stations. Mining Company operates owned and/or leased equipment to remove the overburden and recover the lignite. One of TU Electric's lignite units, Sandow Unit 4, is fueled from lignite deposits owned by Alcoa, which furnishes fuel at no cost to TU Electric for that portion of energy generated from such unit that is equal to the amount of energy delivered to Alcoa (see Texas Utilities Electric Company and Subsidiaries - Consolidated Operating Statistics included in Appendix A to this report).

Lignite production operations at Big Brown, Monticello, and Martin Lake are accompanied by an extensive reclamation program that returns the land to productive uses such as wildlife habitats, commercial timberland, and pasture land. For information concerning federal and state laws with respect to surface mining, see Environmental Matters. TU Electric supplements TU Electric-owned lignite fuel at Monticello with western coal from the Powder River Basin (PRB) in Wyoming. The coal is purchased from two suppliers under two-year contracts, and is transported from the PRB to TU Electric's generating plants by railcar under a two-year contract scheduled to expire on December 31, 1998.

10

<PAGE>

TU Electric currently plans to supplement its lignite fuel at Martin Lake and Big Brown utilizing western coal to be delivered by the year 2000. Construction of a 25 mile rail spur into Big Brown to facilitate the delivery of the western coal will begin later this year.

THE COMPANY
- -----------

Chaco has a coal lease agreement for the rights to certain surface minable coal reserves located in New Mexico. The agreement encompasses a minimum of 228 million tons of coal with provisions for advance royalty payments to be made annually through 2017. The Company has entered into a surety agreement to assure the performance by Chaco with respect to this agreement. Because of the present ample availability of western coal at favorable prices from other mines, Chaco has delayed plans to commence mining operations, and accordingly, is reassessing its alternatives with respect to its coal properties including seeking purchasers thereof. (See Item 2. Properties and Management's Discussion and

Analysis of Financial Condition and Results of Operation and Notes 14 and 15 to
Consolidated Financial Statements included in Appendix A to this report.)

NUCLEAR

TU ELECTRIC
- ----------

    TU Electric owns and operates two nuclear-fueled generating units at the
Comanche Peak nuclear generating station (Comanche Peak), each of which is
designed for a net capability of 1,150 MW. (See Electricity Peak Load and
Capability.)

    The nuclear fuel cycle requires the mining and milling of uranium ore to
provide uranium oxide concentrate ($U\\3\\O\\8\\$), the conversion of $U\\3\\O\\8\\$
to uranium hexafluoride ($UF\\6\\$), the enrichment of the $UF\\6\\$ and the
fabrication of  the enriched uranium into fuel assemblies.  TU Electric has on
hand, or has contracted for, the raw materials and services it expects to need
for its nuclear units through future years as follows:  uranium (1999),
conversion (2003), enrichment (2014), and fabrication (2002).  Although TU
Electric cannot predict the future availability of uranium and nuclear fuel
services, TU Electric does not currently expect to have difficulty obtaining
$U\\3\\O\\8\\$ and the services necessary for its conversion, enrichment and
fabrication into nuclear fuel for years later than those shown above.

    The Energy Policy Act has provisions for the recovery of a portion of the
costs associated with the decommissioning and decontamination of the gaseous
diffusion plants used to enrich uranium for fuel. These costs are being
recovered in annual fees paid to the United States Department of Energy (DOE) as
determined by the Secretary of Energy.  The total unescalated assessment for all
domestic utilities is capped at $150 million per federal fiscal year assessable
for fifteen years.  TU Electric's assessment for the 1998 federal fiscal year,
as calculated by the DOE, is $994,000.

    The Nuclear Waste Policy Act of 1982, as amended (NWPA), provides for the
development by the DOE of interim storage and permanent disposal facilities for
spent nuclear fuel and/or high level radioactive waste materials.  In December
1996, the DOE notified program participants that it did not expect to meet its
obligation to begin acceptance of spent nuclear fuel by 1998.  The DOE continues
to maintain its position despite a U.S. Court of Appeals decision affirming the
Company's position that such an obligation exists.  TU Electric is unable to
predict what impact, if any, the DOE delay will have on TU Electric's future
operations.  Under provisions of the NWPA, funding for the program is provided
by a one-mill per kWh fee currently levied on electricity generated and sold
from nuclear reactors, including the Comanche Peak units.

    Currently, TU Electric's onsite storage capability for spent nuclear fuel
is sufficient to accommodate the operation of Comanche Peak through the year
2000, while fully maintaining the capability to off-load one of the nuclear-
fueled generating unit's core. TU Electric is currently pursuing options for
increasing its storage capability, subject to approval by the Nuclear Regulatory
Commission (NRC).

                                   11
<PAGE>

PURCHASED POWER

THE COMPANY AND TU ELECTRIC
- --------------------------

    In 1997, System Companies purchased a net of 17,170 million kWh or
approximately 16% of their energy requirements. TU Electric and SESCO had
available 1,292 MW of firm purchased capacity under contract, including 60 MW of
short-term firm capacity to meet the 1997 summer peak. During 1997, TU Electric
extended, from 1999 to 2002, an existing contract which increased the purchase

of capacity from 410 MW to 435 MW in July 1998, SESCO will begin receiving
power under a full requirements contract with another supplier and will no
longer receive power from TU Electric. Beginning in 1999, TU Electric expects to
receive energy under a contract with a developer for the purchase of energy
produced from wind turbines equivalent to approximately 35 MW (or approximately
4 MW of firm capacity at peak). The proposed facility will include four of the
largest commercial wind turbines in the world, rated at 1.65 MW each. TU
Electric expects to acquire additional amounts of purchased resources in the
future to adequately and reliably accommodate its customers' electrical needs.
Such resources will be acquired in accordance with the requirements of PURA and
the PUC Substantive Rules. ( For information concerning future resources
requirements, see the Electricity Peak Load and Capability section.)

    Eastern Energy and other distribution and retail companies in the State of
Victoria, Australia purchase their electric energy needs from a competitive
power pool owned and operated by the Victorian government. A full national
market will commence in 1998 among the participants in the States of New South
Wales, Victoria, Queensland, South Australia and the Australian Capital
Territory, and will be operated by a corporation owned by the governments of
those jurisdictions. While the spot price of electric energy from the pool can
vary substantially, Eastern Energy enters into hedging contracts with electric
energy generators and others to manage its exposure to such price fluctuations
(see Management's Discussion and Analysis of Financial Condition and Results of
Operation and Note 9 to Consolidated Financial Statements included in Appendix A
to this report).


                        REGULATION AND RATES
GENERAL

THE COMPANY
- -----------

    The Company is a holding company as defined in the Public Utility Holding
Company Act of 1935. However, the Company and all of its subsidiary companies
are exempt from the provisions of such Act, except Section 9(a)(2) which relates
to the acquisition of securities of public utility companies.

    The System Companies are also subject to various other federal, state and
local regulations. (See discussion below and Environmental Matters.)

THE COMPANY AND TU ELECTRIC
- ---------------------------

    TU Electric and SESCO do not transmit electric energy in interstate
commerce or sell electric energy at wholesale in interstate commerce, or own or
operate facilities therefor, and their facilities are not connected directly or
indirectly to other systems which are involved in such interstate activities,
except during the continuance of emergencies permitting temporary or permanent
connections or under order of the Federal Energy Regulatory Commission (FERC)
exempting TU Electric and SESCO from jurisdiction under the Federal Power Act.
In view thereof, TU Electric and SESCO believe that they are not public
utilities as defined in the Federal Power Act and have been advised by their
counsel that they are not subject to general regulation under such Act.

    The PUC has original jurisdiction over electric rates and service in
unincorporated areas and those municipalities that have ceded original
jurisdiction to the PUC and has exclusive appellate jurisdiction to review the
rate and service orders and ordinances of municipalities. Generally, PURA
prohibits the collection of any rates or charges (including charges for fuel) by
a public utility that does not have the prior approval of the PUC.

                              12
<PAGE>

    TU Electric is subject to the jurisdiction of the NRC with respect to

nuclear power plants. NRC regulations govern the granting of licenses for the construction and operation of nuclear power plants and subject such plants to continuing review and regulation.

LCC is not subject to direct rate or service regulation. However, its affiliates, LCTX and LCT Long Distance, Inc. (LCTLD), are regulated at both the state and federal level. LCTX is a local exchange company providing a variety of local and intrastate long distance services. LCTX is regulated in Texas by the PUC. This regulation applies to the geographical areas served, the intrastate local and long distance rates and tariffs and the intrastate access services provided by LCTX. Because LCTX has elected to provide intrastate services under an incentive rate regulation plan available under the PUC's enabling statute, intrastate rates are subject to only limited regulation by the PUC. LCTX is also regulated by the Federal Communications Commission (FCC) for certain services. Regulation by the FCC is limited primarily to interstate access rates and services. LCTLD provides long distance service in the States of Texas and Louisiana as well as interstate long distance service. Interstate long distance service is regulated by the FCC. Intrastate, interexchange service is regulated by the respective state commissions. In Texas, regulation is limited to certification to do business and the filing of rate sheets. The rates charged are not subject to direct regulation by the PUC. In Louisiana, LCTLD is required to file rate tariffs, but rate regulation is subject to maintaining rates for services within a "band" or range of rates set by the Louisiana Public Service Commission. At the federal level, LCTLD's interstate long distance rates are filed in the form of rate sheets. The FCC does not establish rates for interstate long distance service, since their rates are subject to competition from a large number of interexchange long distance service providers.

Lone Star Gas and Lone Star Pipeline are wholly intrastate in character and perform distribution utility operations and transportation services in the State of Texas subject to regulation by the RRC and municipalities in Texas. The RRC regulates the charge for the transportation of gas by Lone Star Pipeline to Lone Star Gas' distribution systems for sale to Lone Star Gas' residential and commercial consumers. Lone Star Pipeline owns no certificated interstate transmission facilities subject to the jurisdiction of FERC under the Natural Gas Act, has no sales for resale under the rate jurisdiction of FERC and does not perform any transportation service that is subject to FERC jurisdiction under the Natural Gas Act.

The city gate rate for the cost of gas Lone Star Gas ultimately delivers to residential and commercial customers is established by the RRC and provides for full recovery of the actual cost of gas delivered, including out-of-period costs such as gas purchase contract settlement costs. The rates Lone Star Gas charges its residential and commercial customers are established by the municipal governments of the cities and towns served, with the RRC having appellate jursidication.

In October 1996, Lone Star Pipeline filed a request with the RRC to increase the rate it charges Lone Star Gas to store and transport gas ultimately destined for residential and commercial customers in the 550 Texas cities and towns served by Lone Star Gas. Lone Star Gas also requested that the RRC separately set rates for costs to aggregate gas supply for these cities. Rates previously in effect were set by the RRC in 1982. In September 1997, the RRC issued an order reducing the charges by Lone Star Pipeline to Lone Star Gas for storage and transportation services. In that order, the RRC did authorize separate charges for the Lone Star Pipeline storage and transportation services, a separate charge by Lone Star Gas for the cost of aggregating gas supplies, and a continuation of the 100% flow through of purchased gas expense. The RRC also imposed some new criteria for affiliate gas purchases and a new reconciliation procedure that will require a review of purchased gas expenses every three years. The RRC order has become final, but is being appealed by several parties including Lone Star Pipeline and Lone Star Gas. The rates authorized by the order became effective on December 1, 1997, and will result in an annual margin reduction of approximately $8.2 million.

On August 20, 1996, the RRC ordered a general inquiry into the rates and services of Lone Star Gas, most notably a review of Lone Star Gas' historic gas cost and gas acquisition practices since the last rate setting. The inquiry docket has been separated into different phases. Two of the phases, conversion to the NARUC account numbering system and unbundling, have been dismissed by the RRC, and one other phase, rate case expense, is pending RRC action on the basis of a stipulation of all parties. In the phase dealing with historic gas cost and gas

13

<PAGE>

acquisition practices, Lone Star Gas and Lone Star Pipeline have filed a motion for summary disposition stating that any retroactive rate action would be inappropriate and unlawful. Settlement discussions with intervenor cities are ongoing. If the motion for summary disposition is denied, a hearing has been scheduled to begin in August 1998. A number of management and transportation related issues have been placed in a separate phase which still has an undefined scope and is being held in abeyance pending the resolution of the phase dealing with gas costs. Management believes that gas costs were prudently incurred and were properly accounted for and recovered through the gas cost recovery mechanism previously approved by the RRC. At this time, management is unable to determine the ultimate outcome of the inquiry.

Eastern Energy is subject to regulation by the Office of the Regulator General (ORG). The ORG has the power to issue licenses for the supply, distribution and sale of electricity within Victoria and regulates tariffs for the use of the transmission system, distribution system, and other ancillary services. The existing tariff under which Eastern Energy operates is in effect through December 31, 2000. The ORG will review the existing tariff to see if it will be effective for the period commencing after December 31, 2000.

TU ELECTRIC
- -----------

DOCKET 9300

The PUC's final order (Order) in connection with TU Electric's January 1990 rate increase request (Docket 9300) was reviewed by the 250th Judicial District Court of Travis County, Texas (District Court) and thereafter was appealed to the Court of Appeals for the Third District of Texas and to the Supreme Court of Texas (Supreme Court). As a result of such review and appeals, an aggregate of $909 million of disallowances with respect to TU Electric's reacquisitions of minority owners' interests in Comanche Peak, which had previously been recorded as a charge to the Company's and TU Electric's earnings, has been remanded to the District Court with instructions that it be remanded to the PUC for reconsideration on the basis of a prudent investment standard. On remand, the PUC would also be required to reevaluate the appropriate level of TU Electric's construction work in progress included in rate base in light of its financial condition at the time of the initial hearing. In January 1997, the Supreme Court denied a motion for rehearing on the Comanche Peak minority owners issue filed by the original complainants. TU Electric cannot predict the outcome of the reconsideration of the Order on remand by the PUC.

In its decision, the Supreme Court also affirmed the previous $472 million prudence disallowance related to Comanche Peak. Since the Company and TU Electric each has previously recorded a charge to earnings for this prudence disallowance, the Supreme Court's decision did not have an effect on the Company's or TU Electric's current financial position, results of operation or cash flows.

DOCKET 11735

In July 1994, TU Electric filed a petition in the 200th Judicial District Court of Travis County, Texas to seek judicial review of the final order of the PUC granting a $449 million, or 9.0%, rate increase in connection with TU

Electric's January 1995 rate increase request of $760 million, or 15.4% (Docket 11735). Other parties to the PUC proceedings also filed appeals with respect to various portions of the order.

DOCKETS 15638 AND 15840

In May 1996, TU Electric filed with the PUC its transmission cost information and tariffs for open-access wholesale transmission service (Docket 15638) in accordance with PUC rules adopted in February 1996. These tariffs also provide for generation-related ancillary services necessary to support wholesale transactions. In August 1997, the PUC approved final tariffs for TU Electric and implemented rates for other transmission providers within ERCOT (Docket 15840). Under rates implemented by the PUC, TU Electric's payments for transmission service will exceed its revenues for providing transmission service. The PUC has adopted a rate-moderation plan that will minimize the impact of the new pricing mechanism for the first three years the rules are in effect. As such, the current maximum impact on TU Electric for 1998 is an $8.52 million deficit, which, in the

14

<PAGE>

opinion of TU Electric, is not expected to have a material effect on its financial position, results of operation or cash flows.

TU Electric joined a lawsuit in state district court challenging the validity of the cost-shifting aspects of the PUC wholesale open-access rules. In December 1997, the District Court judge issued a decision upholding the validity of the PUC pricing rules.

DOCKET 17250

In late 1996, as part of its regular earnings monitoring process, the PUC staff advised the PUC, after reviewing the 1995 Electric Investor-Owned Utilities Earnings Report of TU Electric, that it believed TU Electric was earning in excess of a reasonable rate of return, and the PUC and TU Electric subsequently began discussions concerning possible remedies.  It was decided to limit negotiations to a resolution of issues concerning TU Electric's earnings through 1997, and discussion of a longer-term resolution was deferred.  In July 1997, the PUC issued its final written order approving TU Electric's proposal to make a one-time $80 million refund to its customers (Rate Settlement) and to leave rates unchanged during the remainder of 1997.  TU Electric recorded the charge to revenues in July 1997 and included the refunds in August 1997 billings.  The proposal was the result of a joint stipulation in which TU Electric was joined by the PUC General Counsel, on behalf of the PUC Staff and the public interest, the Office of Public Utility Counsel, the state agency charged with representing the interests of residential and small commercial customers, and the Coalition of Cities served by TU Electric.

DOCKET 18490

On December 17, 1997, TU Electric, together with the PUC General Counsel, the Office of Public Utility Counsel and various other parties interested in TU Electric's rates and services, filed with the PUC a stipulation and joint application which, if granted, would among other things: (i) result in permanent retail base rate credits beginning January 1, 1998, of 4% for residential customers, 2% for general service secondary customers and 1% for all other retail customers, (ii) result in additional permanent retail base rate credits beginning January 1, 1999, of 1.4% for residential customers, (iii) impose a 11.35% cap on TU Electric's rate of return on equity during 1998 and 1999, with any sums earned above that cap being applied as additional nuclear production depreciation, (iv) allow TU Electric to record depreciation applicable to transmission and distribution assets in 1998 and 1999 as additional depreciation of nuclear production assets, (v) establish an updated cost of service study that includes interruptible customers as customer classes, (vi) result in the permanent dismissal of pending appeals of prior PUC orders including Docket No.

11735, if all other parties that have filed appeals of those dockets also dismiss their appeals, (vii) result in the stay of any proceedings in the remand of Docket 9300 prior to January 1, 2000, and (viii) result in all gains from off-system sales of electricity in excess of the amount included in base rates being flowed to customers through the fuel factor.

The PUC has until March 31, 1998 to approve or reject the stipulation and joint application.  Otherwise, TU Electric may terminate the base rate reductions and all other aspects of the proposal upon giving two weeks notice to the PUC.

FUEL COST RECOVERY RULE

Pursuant to a PUC rule, the recovery of TU Electric's eligible fuel costs is provided through fixed fuel factors. The rule allows a utility's fuel factor to be revised upward or downward every six months, according to a specified schedule. A utility is required to petition to make either surcharges or refunds to ratepayers, together with interest based on a twelve month average of prime commercial rates, for any material, as defined by the PUC, cumulative under- or over-recovery of fuel costs. If the cumulative difference of the under- or over-recovery, plus interest, is in excess of 4% of the annual estimated fuel costs most recently approved by the PUC, it will be deemed to be material. In accordance with PUC approvals, TU Electric has, since the inception of the rule in 1986, made thirteen refunds of over-collected fuel costs and two surcharges of under-collected fuel costs. The most recent refund was made pursuant to a petition filed by TU Electric in July 1997 to refund approximately $67 million, including interest, in over-collected fuel costs for the period October 1995 through May 1997 (Fuel Refund). Such

15

<PAGE>

over-collection was primarily due to TU Electric's ability to use less expensive nuclear fuel and purchased power to offset a higher-priced natural gas market during the period. Customer refunds were included in August 1997 billings. A final order confirming the Fuel Refund was entered by the PUC in October 1997. The two surcharges (one in the amount of $147.3 million and the other in the amount of $93 million) have been appealed by certain intervenors to district courts of Travis County, Texas. In those appeals, those parties are contending that the PUC is without authority to allow a fuel cost surcharge without a hearing and resultant findings that the costs are reasonable and necessary and that the prices charged to TU Electric by supplying affiliates are no higher than the prices charged by those affiliates to others for the same item or class of items. TU Electric is unable to predict their outcome.

The fuel cost recovery rule also contains a procedure for an expedited change in the fixed fuel factor in the event of an emergency. Final reconciliation of fuel costs must be made either in a reconciliation proceeding, which may cover no more than three years and no less than one year, or in a general rate case. In a final reconciliation, a utility has the burden of proving that fuel costs under review were reasonable and necessary to provide reliable electric service, that it has properly accounted for its fuel-related revenues, and that fuel prices charged to the utility by an affiliate were reasonable and necessary and not higher than prices charged for similar items by such affiliate to other affiliates or nonaffiliates. In addition, for generating utilities like TU Electric, the rule provides for recovery of purchased power capacity costs through a power cost recovery factor (PCRF) with respect to purchases from qualifying facilities, to the extent such costs are not otherwise included in base rates. The energy-related costs of such purchases are included in the fixed fuel factor. For non-generating utilities like SESCO, the rule provides for the recovery of all costs of power purchased at wholesale chargeable under rate schedules approved by a federal or state regulatory authority and all amounts paid to qualifying facilities for the purchase of capacity and/or energy, to the extent such costs are not otherwise included in base rates. Penalties of up to 10% will be imposed in the event an emergency increase has been granted when there was no emergency or when collections under

the PCRF exceed PCRF costs by 10% in any month or 5% in the most recent twelve
months .

FUEL RECONCILIATION PROCEEDING

     In July 1997, the PUC ruled on TU Electric's petition seeking final
reconciliation of all eligible fuel and purchased power expenses incurred during
the reconciliation period of July 1, 1992 through June 30, 1995 (approximately
$4.7 billion).  In the ruling, the PUC disallowed approximately $81 million of
eligible fuel related costs (including interest of $12 million) incurred during
the reconciliation period (Fuel Disallowance).  The majority of the Fuel
Disallowance (approximately $67 million) is related to replacement fuel costs as
a result of the November 1993 collapse of the emissions chimney serving Unit 3
of the Monticello lignite-fueled generating station.  In addition, the PUC ruled
that approximately $10 million from the gain on sale of sulfur dioxide
allowances should be deferred and reconsidered at a future date.  TU Electric
received a final  written order from the PUC and recorded the charge to revenues
in August 1997.  TU Electric strongly disagrees with the Fuel Disallowance and
continues to vigorously defend its position.  TU Electric has appealed the PUC's
order to the District Court of Travis County, Texas.

FLEXIBLE RATE INITIATIVES

     TU Electric continues to offer flexible rates in over 160 cities with
original regulatory jurisdiction within its service territory (including the
cities of Dallas and Fort Worth) to existing non-residential retail and
wholesale customers that have viable alternative sources of supply and would
otherwise leave the system. TU Electric also continues to offer in those cities
an economic development rider to attract new businesses and to encourage
existing customers to expand their facilities as well as an environmental
technology rider to encourage qualifying customers to convert to technologies
that conserve energy or improve the environment. TU Electric will continue to
pursue the expanded use of flexible rates when such rates are necessary to be
price-competitive.

                                   16
<PAGE>

                             COMPETITION

THE COMPANY AND TU ELECTRIC
- --------------------------

GENERAL

     As legislative, regulatory, economic and technological changes occur, the
energy and utility industries are faced with increasing pressure to become more
competitive while adhering to regulatory requirements.  The level of competition
is affected by a number of variables, including price, reliability of service,
the cost of energy alternatives, new technologies and governmental regulations.

     The National Energy Policy Act of 1992 (Energy Policy Act) addresses a wide
range of energy issues and is intended to increase competition in electric
generation and broaden access to electric transmission systems.  In addition,
the Public Utility Regulatory Act of 1995, as amended (PURA),  impacts the PUC
and its regulatory practices and encourages increased competition in some
aspects of the electric utility industry in Texas.  Although the Company is
unable to predict the ultimate impact of the Energy Policy Act, PURA and any
related regulations or legislation on the System Companies' operations, it
believes that such actions are consistent with the trend toward increased
competition in the energy industry.

     In order to remain competitive, the System Companies are aggressively
managing their operating costs and capital expenditures through streamlined
business processes and are developing and implementing strategies to address an
increasingly competitive environment. These strategies include initiatives to

EFH01434725

improve their return on corporate assets and to maximize shareholder value through new marketing programs, creative rate design and new business opportunities. Additional initiatives under consideration include the potential disposition or alternative utilization of existing assets and the restructuring of strategic business units.

While TU Electric has experienced competitive pressures in the wholesale market resulting in a small loss of load since the beginning of 1993, wholesale sales represented a relatively low percentage of TU Electric's consolidated operating revenues in 1997.  TU Electric is unable to predict the extent of future competitive developments in either the wholesale or retail markets or what impact, if any, such developments may have on its operations.

Federal legislation such as the PURPA and, more recently, the Energy Policy Act, as well as initiatives in various states, encourage wholesale competition among electric utility and non-utility power producers.  Together with increasing customer demand for lower-priced electricity and other energy services, these measures have accelerated the industry's movement toward a more competitive pricing and cost structure.  Competition in the electric utility industry was also addressed in the 1995 session of the Texas legislature.  PURA was amended to encourage greater wholesale competition and flexible retail pricing.  PURA amendments also require the PUC to report to the legislature, during each legislative session, on competition in electric markets. Accordingly, PUC reports were submitted to the Texas legislature in January 1997, recommending that the legislature continue the process of expanding competition in the Texas electricity markets, leading to expanded retail competition, and authorize the PUC to take numerous steps toward that goal.  The PUC further recommended that full competition not occur prior to the year 2000 in order to provide an environment through which both retail customers and utilities in Texas move more smoothly to achieve the perceived benefits of competition.  The PUC is seeking guidance from the legislature and authority to address the issue of recovery of stranded costs (i.e., costs of assets that may not be recoverable from customers as a result of competitive pricing).  The PUC's latest available estimate for TU Electric's potentially stranded retail costs ranged from a projected excess of net book value over market value of $7.7 billion to a projected excess of market value over net book value of $2.1 billion.  Legislation that would have authorized retail competition was not enacted by the 1997 Texas legislature.

17

<PAGE>

As a result of the shift in emphasis toward greater competition, large and small industry participants are offering energy services and energy-related products that are both economically and environmentally attractive to customers. In Texas, aggressive marketing of competitive prices by rural electric cooperatives, municipally-owned electric systems, and other energy providers who are not subject to the traditional governmental regulation experienced by the energy and utility industries has intensified competition within the state's wholesale markets and, in multi-certificated areas, retail customer markets.

Furthermore, there is increasing pressure on utilities to reduce costs, including the cost of power, and to tailor energy services to the specific needs of customers.  Such competitive pressures among electric utility and non-utility power producers could result in the loss by TU Electric of customers and the cost of certain of its assets becoming stranded costs.  To the extent stranded costs cannot be recovered from customers, it may be necessary for such costs to be borne partially or entirely by shareholders. In response to these competitive pressures, many utilities are implementing significant restructuring and re-engineering initiatives designed to make them more competitive.  Since the implementation of an Operations Review and Cost Reduction program in April 1992, the System Companies continue to take steps to reduce costs by streamlining business processes and operating practices.  (For information pertaining to the effects of competition on the treatment of certain regulatory assets and liabilities, see Management's Discussion and Analysis of Financial Condition and Results of Operation and Note 2 to Consolidated Financial Statements included in

Appendix A to this report.)

LCC's long distance service at both the intrastate and interstate level is subject to competition. Interexchange long distance service has been subject to competition for more than ten years. LCTLD competes with numerous interexchange carriers ranging from small resellers to large, facilities-based carriers such as AT&T and MCI. While monitored by regulatory authorities, rates for these long distance services are largely market based and have been essentially deregulated.

LCTX also provides intrastate intraLATA long distance service. Upon divestiture of the Bell System, the state was divided into long distance calling areas called Local Access Transport Areas (LATA's). Direct dialed long distance calls made within the boundaries of the LATA are reserved to be handled by the local exchange carrier at state-wide average rates. Customers may use the carrier of their choice for intraLATA calls only by dialing a special carrier access code before each call. Because intraLATA service was not subject to equal access, the local exchange companies have dominated this service sector. Recent changes in federal and state law have applied equal access principles to this service sector and it is anticipated that competition will likely become more intense beginning in mid-1998.

LCTX is also subject to, but to-date has not experienced significant levels of, local competition. It is too early to predict whether significant local competition will emerge in LCTX's service area.

Customer sensitivity to energy prices and the availability of competitively priced gas in the non-regulated markets continue to provide intense competition in the electric-generation and industrial-user markets. Natural gas faces varying degrees of competition from electricity, coal, natural gas liquids, oil and other refined products throughout Lone Star Gas' service territory. Pipeline systems of other companies, both intrastate and interstate, extend into or through the areas in which Lone Star Gas' markets are located, creating competition from other sellers of natural gas. Competitive pressure from other pipelines and alternative fuels has caused a decline in sales by Lone Star Gas to industrial and electric-generation customers. Sales by ENSERCH's non-regulated companies, along with transportation services provided by Lone Star Pipeline, have served to offset much of the effects of this decline. As developments in the energy industry point to a continuation of these competitive pressures, Lone Star Gas maintains its focus on customer service and the creation of new services for its customers in order to remain its customers' supplier of choice.

Lone Star Pipeline is the sole transporter of natural gas to Lone Star Gas' distribution systems. Lone Star Pipeline competes with other pipelines in Texas to transport natural gas to off-system markets. This business is highly competitive and greatly influenced by the demand to move natural gas across Texas to supply Northeast and upper Midwest U.S. markets.

18

<PAGE>

Natural gas liquids processing is highly competitive and includes competition among producers, third-party owners and processors for cost-sharing and interest-sharing arrangements.

EES pursues markets connected to pipelines other than Lone Star Pipeline's. As natural-gas markets continue to evolve following the implementation of the 1992 Order 636 of the FERC, additional opportunities are created in the broader, more active trading markets and in serving non- regulated customers. This highly competitive market demands that a wide array of services be offered, including term contracts with interruptible and firm deliveries, risk management, aggregation of supply, nominations, scheduling of deliveries and storage.

RETAIL ELECTRIC MARKET

TU Electric and SESCO are experiencing competition for retail load in areas
that are multi-certificated with rural electric cooperatives or municipal
utilities.  Except in areas where there is multi-certification by the PUC, TU
Electric and SESCO currently have the exclusive right to provide electric
service to the public within their service areas.

In addition, some energy consumers have the ability to produce their own
electricity or to use alternative forms of energy.  Industrial customers may
also be able to relocate their facilities to lower-cost service areas.  To some
degree, there is competition among utilities with defined service areas to
attract and retain large customers. TU Electric and SESCO are pursuing efforts
to remain competitive through competitive pricing, economic development and
other initiatives.  (See Regulation and Rates.)

Congress, as well as legislatures and regulatory commissions in several
states, have begun to examine the possibility of mandated "retail wheeling," the
required delivery by an electric utility over its transmission and distribution
facilities of energy produced by another entity to retail customers in such
utility's service territory. If implemented, such access could allow a retail
customer to purchase electric service from any other electric service provider,
subject to the practical constraints of long distance transmission.  To date,
retail wheeling has not been implemented in Texas; however, this issue is likely
to be pursued again during the 1999 session of the Texas legislature and in the
106th Congress.

While the Company and TU Electric anticipate legislation being enacted
during the 1999 session of the Texas legislature to authorize competition in the
retail market, they cannot predict the ultimate outcome of the ongoing efforts
that are taking place to restructure the electric utility industry or whether
such outcome will have a material effect on their financial position, results of
operation or cash flows.

The energy supply franchise portion of Eastern Energy's business is
gradually being exposed to competition through a phase-in of customers' right to
choose their energy supplier. This phase-in is by customer class and is expected
to be complete by December 31, 2000, at which time all energy customers in
Victoria will have the right to choose their energy supplier. Eastern Energy is
required to offer distribution of electric energy in its service territory on
behalf of other electric suppliers and distribution companies to those customers
having a right to choose their supplier, and Eastern Energy can similarly supply
electric energy to such customers in other service territories by utilizing the
distribution networks of the distribution companies in those service
territories. A national electricity market continues to develop in Australia,
with full contestabilty for all customers to be phased in progressively through
2001. Eastern Energy currently has a license to provide retail electricity in
New South Wales and may pursue retail licences in other states.

TU Electric, SESCO and Eastern Energy are not able to predict the extent of
future competitive developments or what impact, if any, such developments may
have on their operations.

                                    19

<PAGE>

TU ELECTRIC
- -----------

WHOLESALE MARKET

In the wholesale power market, TU Electric competes with a variety of
utilities and other suppliers, some of which are willing and able to sell at
rates below TU Electric's standard wholesale power service rate as approved by
the PUC.  As a result, TU Electric has received notifications of termination of
approximately 700 MW of wholesale load through 1999.  In 1997, wholesale
revenues represented about 3% of TU Electric's total consolidated operating
revenues.

Amendments to PURA made during the 1995 session of the Texas legislature allow for wholesale pricing flexibility. While wholesale rates for electric utilities are not deregulated, wholesale tariffs or contracts with charges less than approved rates but greater than the utility's marginal cost may be approved by the regulatory authority upon application by the utility.

OPEN-ACCESS TRANSMISSION

In February 1996, pursuant to the 1995 amendments to PURA, the PUC adopted rules requiring each electric utility in ERCOT to provide wholesale transmission and related services to other utilities and non-utility power suppliers at rates, terms and conditions that are comparable to those applicable to such utility's use of its own transmission facilities.

Under the rules, the PUC established a transmission pricing mechanism consisting of an ERCOT system-wide component and a distance-sensitive component. The ERCOT system-wide component provides that each load-serving entity in ERCOT will pay a share of the ERCOT-wide transmission cost of service based on the entity's load.  The distance-sensitive component provides that a distance-sensitive rate will be paid to utilities that own transmission facilities, based on the impact of transmitting power and energy to loads.  The rates charged for using the transmission system are designed to ensure that all market participants pay on a comparable basis to use the system.  While all users of the transmission grid pay rates that are comparably designed, the impact on individual users will differ.

In May 1996, TU Electric filed with the PUC, under Docket 15638, its transmission cost information and tariffs for open-access wholesale transmission service.  These tariffs also provide for generation-related ancillary services necessary to support wholesale transactions.  Company-specific proceedings to determine transmission rates for each transmission provider within ERCOT were concluded in 1996.  In August 1997, the PUC approved final tariffs for TU Electric and implemented rates for other transmission providers within ERCOT. (See Regulation and Rates.)

As a result of the PUC rules, the organization and structure of ERCOT has been changed to provide for equal governance among all wholesale electricity market participants. These changes were made in order to facilitate wholesale competition while ensuring continued reliability within ERCOT.

At the federal level, the Energy Policy Act empowers the FERC to require utilities to provide transmission service for the delivery of wholesale power from other power producers to qualified resellers, such as municipalities, cooperatives and other utilities. In April 1996, the FERC issued Order No. 888 which requires all FERC-jurisdictional electric utilities to offer third parties wholesale transmission services under an open-access tariff and provides a framework for recovery of "legitimate, prudent and verifiable stranded costs" resulting from the implementation of open-access wholesale transmission service. In May 1997, TU Electric filed with the FERC a modification of its tariff governing service to, from and over certain High Voltage Direct Current (HVDC) interconnections (TFO Tariff) between ERCOT and the Southwest Power Pool. This modification conformed TU Electric's TFO Tariff to the rates, terms and conditions governing open-access wholesale transmission service within ERCOT previously approved by the PUC. In October 1997, the FERC accepted TU Electric's TFO Tariff with minor modifications.

20

<PAGE>

THE COMPANY
- -----------

Lone Star Pipeline has been an open access transporter under Section 311 of the Natural Gas Policy Act of 1978 (NGPA) on its intrastate transmission facilities since July 1988. Such transportation is performed pursuant to Section

EFH01434729

311(a)(2) of the NGPA and is subject to an exemption from the jurisdiction of the FERC under the Natural Gas Act, pursuant to Section 601 of the NGPA.


ENVIRONMENTAL MATTERS

THE COMPANY AND TU ELECTRIC
- -------------------------

GENERAL

    The System Companies are subject to various federal, state and local regulations dealing with air and water quality and related environmental matters. (See Item 2. Properties - Capital Expenditures and Management's Discussion and Analysis of Financial Condition and Results of Operation included in Appendix A to this report.)

AIR

    Under the Texas Clean Air Act, the Texas Natural Resource Conservation Commission (TNRCC) has jurisdiction over the permissible level of air contaminant emissions from generating facilities located within the State of Texas. In addition, the new source performance standards of the Environmental Protection Agency (EPA) promulgated under the federal Clean Air Act, as amended (Clean Air Act), which have also been adopted by the TNRCC, are applicable to generating units, the construction of which commenced after August 17, 1971. TU Electric's generating units have been constructed to operate in compliance with current regulations and emission standards promulgated pursuant to these Acts; however, due to variations in the quality of the lignite fuel, operation of certain of the lignite-fueled generating units at reduced loads is required from time to time in order to maintain compliance with these standards.

    The Clean Air Act includes provisions which, among other things, place limits on the sulfur dioxide emissions produced by generating units. In addition to the new source performance standards applicable to sulfur dioxide, the Clean Air Act required that fossil-fueled plants meet certain sulfur dioxide emission allowances by 1995 (Phase I), and will require more restrictions on sulfur dioxide emission allowances by 2000 (Phase II). TU Electric's generating units were not affected by the Phase I requirements. The applicable Phase II requirements currently are met by 52 out of the 56 of TU Electric's generating units to which those requirements apply. Because the sulfur dioxide emissions from the other four units are relatively low and alternatives are available to enable these units to reduce sulfur dioxide emissions or utilize compensatory reduction allowances achieved in other units, compliance with the applicable Phase II sulfur dioxide requirements is not expected to have a significant impact on TU Electric. In January 1993, the EPA issued its "core" regulations to implement the sulfur dioxide reduction program. TU Electric is preparing compliance plans in accordance with these regulations and expects these plans to be implemented by January 1, 2000.

    To meet these sulfur dioxide requirements, the Clean Air Act provides for the annual allocation of sulfur dioxide emission allowances to utilities. Under the Clean Air Act, utilities are permitted to transfer allowances within their own systems and to buy or sell allowances from or to other utilities. The EPA grants a maximum number of allowances annually to TU Electric based on the amount of emissions from units in operation during the period 1985 through 1987. TU Electric intends to utilize internal allocation of emission allowances within its system and, if cost effective, may purchase additional emission allowances to enable both existing and future electric generating units to meet the requirements of the Clean Air Act. TU Electric may also sell excess emission allowances. TU Electric is unable to predict the extent to which it may generate excess allowances or will be able to acquire allowances from others if needed but does not anticipate any significant problems in keeping emissions within its allotted allowances.

21

TU Electric's generating units meet the nitrogen oxide (NOx) limits currently required by the Clean Air Act. The TNRCC and the EPA have determined that the requirements of the Clean Air Act for ozone nonattainment areas will not require NOx emission reductions at TU Electric's generating units in the Dallas-Fort Worth area; however, the TNRCC is re-evaluating its position since the Dallas-Fort Worth area did not achieve attainment of the ozone standard in 1996 as required by Clean Air Act regulations. Additionally, in 1996, TU Electric elected for an early opt-in under Phase I related to NOx limits for its coal-fired generating units. This election locks in NOx limits for these generating units for a ten-year period. The Clean Air Act also requires studies, which began in 1991, by the EPA to assess the potential for toxic emissions from utility boilers. TU Electric is unable to predict either the results of such studies or the effects of any subsequent regulations. Recently, the EPA finalized more stringent standards for ambient levels of ozone and of fine particulates and issued proposed rules for regional haze. The impact of these new standards or proposed regional haze rules, if adopted, is unknown at this time.

In December 1997, the Conference of the Parties of the United Nations Framework Convention on Climate Change adopted the Kyoto Protocol which specifies targets and timetables for certain countries to reduce greenhouse gas emissions. The Company is unable to predict whether the Kyoto Protocol will be ratified by the United States Congress and to what extent, if any, such protocol might impact the Company.

The 1997 session of the Texas legislature directed the TNRCC to develop a voluntary post-construction state permitting program for older air emission facilities, including many of TU Electric's generating facilities as well as certain ENSERCH facilities. All of these facilities, including the so-called "grandfathered units," are in compliance with state and federal regulations. At this time, the Company is unable to predict the impact of this voluntary permitting program on Company operations.

In 1997, the Clean Air Act required some System Companies to submit Title V Operating Permit applications for many of their facilities, including TU Electric's generating plants and certain Fuel Company and ENSERCH facilities. These System Companies anticipate the approval of all such permit applications.

Additional Clean Air Act regulations have been proposed and others are not yet finalized by the EPA. The Company believes that the requirements necessary to be in compliance with additional regulatory provisions can be met as they are developed. Estimates for the capital requirements related to the Clean Air Act are included in the Company's and TU Electric's estimated construction expenditures. (See Item 2. Properties - Capital Expenditures and Management's Discussion and Analysis of Financial Condition and Results of Operation included in Appendix A to this report.) Any additional capital expenditures, as well as any increased operating costs associated with new requirements or compliance measures, are expected to be recoverable through rates, as similar costs have been recovered in the past. For ENSERCH facilities, certain emission sources may be required to reduce emissions or to install monitoring equipment under proposed rules and regulations. The Company currently believes, however, that if the rules and regulations under the Clean Air Act are adopted as proposed, operating costs that will be incurred under operating permits, new permit fee structures, capital expenditures associated with equipment modifications to reduce emissions, or any expenditures on monitoring equipment, in the aggregate, will not have a materially adverse effect on the Company's financial position, results of operation or cash flows.

WATER

The TNRCC, the EPA and the RRC  have jurisdiction over water discharges (including storm water) from all System Companies' domestic facilities. The System Companies' domestic facilities are presently in compliance with applicable state and federal requirements relating to discharge of pollutants

into the water. TU Electric, ENSERCH, Fuel Company and Mining Company have obtained all required waste water discharge permits from the TNRCC, the EPA and the RRC for facilities in operation and have applied for or obtained necessary permits for facilities under construction. TU Electric, ENSERCH, Fuel Company and Mining Company believe they can satisfy the requirements necessary to obtain any required permits or renewals.

<center>22</center>

<PAGE>

OTHER

Diversion, impoundment and withdrawal of water for cooling and other purposes are subject to the jurisdiction of the TNRCC. System Companies, including TU Electric, possess all necessary permits for these activities from the TNRCC for their present operations.

Federal legislation regulating surface mining was enacted in August 1977 and regulations implementing the law have been issued. Mining Company's lignite mining operations are currently regulated at the state level by the RRC, with oversight by the United States Department of the Interior's Office of Surface Mining, Reclamation and Enforcement. Surface mining permits have been issued for current Mining Company operations that provide fuel for Big Brown, Monticello and Martin Lake.

Treatment, storage and disposal of solid and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act (Texas Act) and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended (RCRA) and the Toxic Substances Control Act (TSCA). The EPA has issued regulations under the RCRA and TSCA, and the TNRCC and the RRC have issued regulations under the Texas Act applicable to System Companies' domestic facilities. The Company has registered its solid waste disposal sites and has obtained or applied for such permits as are required by such regulations.

Beginning in 1998, certain TU Electric and Mining Company facilities came under the jurisdiction of the toxic release inventory requirements of the Emergency Planning Community Right-To-Know Act (EPCRA) as finalized by the EPA. Regulatory reporting of toxic releases under EPCRA will begin in 1999.

Under the federal Low-Level Radioactive Waste Policy Act of 1980, as amended, the State of Texas is required to provide, either on its own or jointly with other states in a compact, for the disposal of all low-level radioactive waste generated within the state. The State of Texas is taking steps to site, construct and operate a low-level radioactive waste disposal site by 1999 and submitted a license application in March 1992 for such a facility. The license application has been finalized and a contested Administrative Hearing on the adequacy of the application began in January 1998. The State of Texas has agreed to a compact with the States of Maine and Vermont, which is subject to ratification by Congress, for such a facility. Low-level waste material will continue to be shipped off-site as long as an alternate disposal site is available. Otherwise the low-level waste material will be stored on-site. TU Electric's on-site storage capacity is expected to be adequate until other facilities are available.

Eastern Energy is subject to various Australian federal and Victorian state environmental regulations, the most significant of which is the Victorian Environmental Protection Act of 1970 (VEPA). VEPA regulates, in particular, the discharge of waste into air, land and water, site contamination, the emission of noise and the storage, recycling and disposal of solid and industrial waste. VEPA establishes the Environmental Protection Authority (Authority) and grants the Authority a wide range of powers to control and prevent environmental pollution. These powers include issuing approvals for construction of works which may cause noise or emissions to air, water or land, waste discharge licenses and pollution abatement notices. No licenses or works approvals from the Authority are currently required for activities undertaken by Eastern Energy.

EFH01434732

<PAGE>


ITEM 2.  PROPERTIES

THE COMPANY AND TU ELECTRIC
- -------------------------

     The Company does not directly own utility plant or real property.  At
December 31, 1997, TU Electric owned or leased and operated the following
generating units:

<TABLE>
<CAPTION>

| ELECTRIC GENERATING UNITS | FUEL SOURCE | NET CAPABILITY (MW) | % |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 46 | Natural Gas (a)............. | 12,105 | 57.0% |
| 9 | Lignite/Coal................ | 5,825 | 27.5 |
| 2 | Nuclear..................... | 2,300 | 10.8 |
| 15 | Combustion Turbines (b)...... | 975 | 4.6 |
| 10 | Diesel...................... | 20 | 0.1 |
| | Total | 21,225 | 100.0% |

</TABLE>
- ----------------------

(a)  Twenty-four natural gas units are capable of operating on fuel oil for
     short periods when gas supplies are interrupted or curtailed. In addition,
     five natural gas units are capable of operating on fuel oil for extended
     periods.
(b)  Natural gas units leased and operated by TU Electric.  Such units are
     capable of operating on fuel oil for extended periods.


     The principal generating facilities of TU Electric and load centers of TU
Electric and SESCO are connected by 3,863 circuit miles of 345,000 volt
transmission lines and 9,327 circuit miles of 138,000 and 69,000 volt
transmission lines.

     TU Electric is connected by six 345,000 volt lines to Houston Lighting &
Power Company; by three 345,000 volt, eight 138,000 volt and nine 69,000 volt
lines to West Texas Utilities Company; by two 345,000 volt and eight 138,000
volt lines to the Lower Colorado River Authority; by four 345,000 volt and eight
138,000 volt lines to the Texas Municipal Power Agency; by one asynchronous HVDC
interconnection to Southwestern Electric Power Company; and at several points
with smaller systems operating wholly within Texas. SESCO is connected to TU
Electric by three 138,000 volt lines, ten 69,000 volt lines and three lines at
distribution voltage. TU Electric and SESCO are members of ERCOT, an intrastate
network of investor-owned entities, cooperatives, public entities, non-utility
generators and power marketers. ERCOT is the regional reliability coordinating
organization for member electric power systems in Texas and is responsible for
ensuring equal access to transmission service by all wholesale market
participants in the ERCOT region.

     The generating stations and other important units of property of TU
Electric and SESCO are located on lands owned primarily in fee simple. The
greater portion of the transmission and distribution lines of TU Electric and
SESCO, the gas gathering and transmission lines of Fuel Company and the gas
gathering, transmission and distribution lines of Lone Star Gas and Lone Star
Pipeline, have been constructed over lands of others pursuant to easements or
along public highways and streets as permitted by law. The gas gathering lines

of EPI are not utility property and are primarily constructed over lands of others pursuant to private easements. The rights of the System Companies in the realty on which their properties are located are considered by them to be adequate for their use in the conduct of their business. Minor defects and irregularities customarily found in titles to properties of like size and character may exist, but any such defects and irregularities do not materially impair the use of the properties affected thereby. TU Electric, SESCO, Fuel Company, Eastern Energy, Lone Star Gas and Lone Star Pipeline have the right of eminent domain whereby they may, if necessary, perfect or secure titles or gain access to privately held land used or to be used in their operations. Utility plant of TU Electric and SESCO is generally subject to the liens of their respective mortgages.

24

<PAGE>

Eastern Energy's distribution network is comprised primarily of subtransmission and distribution assets. It owns no generating or transmission facilities. Eastern Energy's distribution system is interconnected with an intrastate power network comprised of the operator of the transmission system, and each of the other distribution companies within Victoria. Eastern Energy has entered into distribution system agreements with each of the distribution businesses which share the boundaries of its distribution area to provide for wheeling of electricity on behalf of those distribution businesses and for the reciprocal provision of other distribution services.

LCC and its affiliates provide a full range of telecommunications services over a variety of state of the art facilities. As of December 31, 1997, LCC's local exchange affiliate, LCTX, provided service to 97,959 access lines and 74,287 customers in 16 exchanges. All calls are switched by state of the art digital switches. LCTLD has a separate digital switch for providing long distance services.

LCC's affiliate, LCT, owns 63% of East Texas Fiber Line, Inc. (ETFL). ETFL provides voice and data capacity to interexchange carriers over its fiber optic lines. LCT owns an additional two hundred route miles of fiber optic lines and markets that capacity to interexchange carriers including LCTLD. LCT also has cellular interests in the Houston Metropolitan Serving Area as well as interests in the three rural service areas.

At December 31, 1997, Lone Star Pipeline operated approximately 7,600 miles of transmission and gathering lines and operated 22 compressor stations having a total rated horsepower of approximately 76,455. Lone Star Pipeline also owns seven active gas-storage fields, all located on its system in Texas, and three major gas-treatment plants to remove undesirable components from the gas stream. At December 31, 1997, EPI had interests in 15 processing plants, 10 of which were wholly owned, and operated approximately 1,714 miles of gathering lines. At December 31, 1997, Lone Star Gas operated approximately 23,800 miles of distribution mains.

ENSERCH owns a five-building office complex in Dallas, containing approximately 453,000 square feet of space that is occupied by ENSERCH and some of its affiliates. In addition, ENSERCH leases a 21-story, 400,000 square-foot building in Houston under a two-year lease that is automatically extended each year unless terminated. This building is sub-leased, primarily to non-affiliated parties.

TU Properties currently leases a 48-story office building in Dallas containing approximately 1,027,000 square feet of space (Energy Plaza) from a bank leasing company, and expects to generate revenue by offering competitively priced business office space to interested parties. TU Properties has entered into a tenant agreement with TU Services on behalf of the System Companies that allows the System Companies to occupy certain office space in Energy Plaza at a market price.

THE COMPANY AND TU ELECTRIC
- --------------------------

    The Company has taken steps to aggressively manage its construction
expenditures.  Such construction expenditures for utility related activities,
excluding allowance for funds used during construction, (see Note 15 to
Consolidated Financial Statements included in Appendix A to this report) are
presently estimated at $886 million, $799 million and $852 million for the
Company and $449 million, $439 million and $441 million for TU Electric for each
of the years 1998, 1999, and 2000, respectively.  The System Companies are
subject to federal, state and local regulations dealing with environmental
protection.  (See Item 1. Business - Environmental Matters.)  Such expenditures
for construction to meet the requirements of environmental regulations at
existing generating units are estimated to be $27 million for 1998 (included in
the 1998 construction estimates noted above) and were approximately $33 million
in 1997, $14 million in 1996 and $64 million in 1995.  Expenditures for nuclear
fuel are presently estimated to be $104 million, $81 million and $92 million for
the Company and TU Electric for each of the years 1998, 1999 and 2000,
respectively.

                                   25
<PAGE>

    The re-evaluation of growth expectations, the effects of inflation,
additional regulatory requirements and the availability of fuel, labor,
materials and capital may result in changes in estimated construction costs and
dates of completion. Commitments in connection with the construction program are
generally revocable subject to reimbursement to manufacturers for expenditures
incurred or other cancellation penalties. (See Item 1. Business -Electricity
Peak Load and Capability.)

    The Company and TU Electric continue to seek potential investment
opportunities from time to time when it concludes that such investments are
consistent with its business strategies and are likely to enhance the long-term
return to its shareholders.  In January 1998, the Company announced that it had
approached The Energy Group PLC (TEG), a diversified international energy group,
in connection with its possible interest in acquiring TEG.  (See Item 1.
Business - Texas Utilities Company and Subsidiaries - Mergers and Acquisitions.)
The estimated purchase price for the TEG shares is approximately $7.3 billion.
The Company estimates that the financing necessary to purchase all outstanding
TEG shares and to pay all associated expenses will be approximately (Pounds)4.6
billion ($7.6 billion).  The Company and TU Acquisitions and other intermediate
U.K. holding companies have entered into credit facilities with banking
institutions in the U.S. and the U.K., respectively, which will provide
committed financing sufficient to purchase the outstanding TEG shares and pay
related expenses.  The U.S. credit facilities, which will aggregate $5.0
billion, will replace the Company's current Credit Facilities described in Note
3 to the Consolidated Financial Statements.  The timing, amount and funding of
any other new business investment opportunities are presently undetermined.

    For information regarding the financing of capital expenditures, see
Management's Discussion and Analysis of Financial Condition and Results of
Operation included in Appendix A to this report.

ITEM 3.  LEGAL PROCEEDINGS

THE COMPANY AND TU ELECTRIC
- --------------------------

    The Company and its subsidiaries are party to lawsuits arising in the
ordinary course of its business. The Company believes, based on its current
knowledge and the advice of counsel, that all such lawsuits and resulting claims
would not have a material adverse effect on its financial position, results of
operation or cash flows.

ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS


THE COMPANY AND TU ELECTRIC
- -------------------------

   None.

                                26

<PAGE>


           -----------------------------------------------

              EXECUTIVE OFFICERS OF THE COMPANY
<TABLE>
<CAPTION>

                              POSITIONS AND OFFICES      DATE FIRST ELECTED TO
                                  PRESENTLY HELD             PRESENT OFFICES
                              (CURRENT TERM EXPIRES       (CURRENT TERM EXPIRES                BUSINESS
NAME OF OFFICER        AGE        MAY 8, 1998)                MAY 8, 1998)                   (PRECEDIN
- ---------------      ---    ------------------------    ---------------------    ----------------
<S>                    <C>    <C>                         <C>                       <C>
Erle Nye               60     Chairman of the Board       May 23, 1997             Chairman of the B
                              Chief Executive                                         of and D
                                                                                     TU Elect
                                                                                     Corporat
                                                                                     Presiden
                                                                                     Executiv
                                                                                     Chairman
                                                                                     Executiv

David W. Biegler       51     President and Chief         August 5, 1997           President and Chi
                              Operating Officer                                       the Comp
                                                                                     ENSERCH
                                                                                     thereto,
                                                                                     Chief Ex
                                                                                     ENSERCH

H. Jarrell Gibbs       60     Vice Chairman of            August 5, 1997           Vice Chairman of
                              the Board                                               Presiden
                                                                                     thereto,
                                                                                     Principa
                                                                                     the Comp

Michael J. McNally     43     Executive Vice President    May 23, 1997             Executive Vice Pr
                              and Chief Financial                                     Financia
                              Officer                                                 thereto,
                                                                                     Transmis
                                                                                     Electric
                                                                                     Executiv
                                                                                     Presiden
                                                                                     prior th
                                                                                     Enron De
                                                                                     prior th
                                                                                     of Indus
                                                                                     Capital
                                                                                     and Pres
                                                                                     Line Com
                                                                                     Liquids,
</TABLE>

There is no family relationship between any of the above-named Executive
Officers.

                                27

EFH01434736

<PAGE>

PART II

ITEM 5.   MARKET FOR EACH REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER
          MATTERS

THE COMPANY
- ----------

     The Company's common stock is listed on the New York, Chicago and Pacific
stock exchanges (symbol: TXU).

     The price range of the common stock of the Company on the composite tape,
as reported by The Wall Street Journal and the dividends paid for each of the
calendar quarters of 1997 and 1996 were as follows:

<TABLE>
<CAPTION>

|                   | Price Range       |         |          |          | Dividends Paid |        |
|-------------------|-------|-------|----------|----------|--------|--------|
|                   | 1997  |       | 1996     |          | 1997   | 1996   |
| Quarter Ended     | High  | Low   | High     | Low      |        |        |
|-------------------|-------|-------|----------|----------|--------|--------|
| March 31.......   | $42.0000 | $33.7500 | $42.8750 | $38.8750 | $0.525 | $0.50 |
| June 30........   | 37.0000 | 31.5000 | 42.7500 | 38.5000 | 0.525  | 0.50  |
| September 30...   | 36.1875 | 33.5000 | 43.7500 | 39.3750 | 0.525  | 0.50  |
| December 31....   | 41.8125 | 34.1875 | 42.1250 | 38.7500 | 0.525  | 0.50  |
|                   |       |       |          |          | $2.100 | $2.00 |

</TABLE>

     The Company or its predecessor TEI, have declared common stock dividends
payable in cash in each year since TEI's incorporation in 1945. The Board of
Directors of the Company, at its February 1998 meeting, declared a quarterly
dividend of $0.55 a share, payable April 1, 1998 to shareholders of record on
March 6, 1998. For information concerning the Company's dividend policy, see
Management's Discussion and Analysis of Financial Condition and Results of
Operation included in Appendix A to this report. Future dividends may vary
depending upon the Company's profit levels and capital requirements as well as
financial and other conditions existing at the time. Reference is made to Note 5
to Consolidated Financial Statements included in Appendix A to this report
regarding limitations upon payment of dividends on common stock of TU Electric
and SESCO.

     The number of record holders of the common stock of the Company as of March
13, 1998 was 88,868.

TU ELECTRIC
- ----------

     All of TU Electric's common stock is owned by the Company. Reference is
made to Note 5 to Consolidated Financial Statements included in Appendix A to
this report regarding limitations upon payment of dividends on common stock of
TU Electric.

ITEM 6.   SELECTED FINANCIAL DATA

THE COMPANY AND TU ELECTRIC
- ---------------------------

     The information required hereunder for the Company and TU Electric is set

forth under Selected Financial Data included in Appendix A to this report.

<PAGE>

<center>28</center>

ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
           RESULTS OF OPERATION

THE COMPANY AND TU ELECTRIC
- ---------------------------

       The information required hereunder for the Company and TU Electric is set
forth under Management's Discussion and Analysis of Financial Condition and
Results of Operation included in Appendix A to this report.

ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

THE COMPANY AND TU ELECTRIC
- ---------------------------

       The information required hereunder for the Company and TU Electric is set
forth in Management's Discussion and Analysis of Financial Condition and Results
of Operation included in Appendix A to this report.

ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

THE COMPANY AND TU ELECTRIC
- ---------------------------

       The information required hereunder for the Company and TU Electric is set
forth under Statements of Responsibility, Independent Auditors' Reports,
Statements of Consolidated Income, Statements of Consolidated Cash Flows,
Consolidated Balance Sheets, Statements of Consolidated Common Stock Equity, and
Notes to Consolidated Financial Statements included in Appendix A to this
report.

ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
           FINANCIAL DISCLOSURE

THE COMPANY AND TU ELECTRIC
- ---------------------------

       None.

<center>29</center>

<PAGE>

<center>PART III</center>

Item 10.   DIRECTORS AND EXECUTIVE OFFICERS OF EACH REGISTRANT

       For financial reporting and other purposes, the Company is being treated
herein as the successor to TEI. Unless otherwise specified, all references to
the Company which relate to a period prior to August 5, 1997, shall be deemed to
be references to TEI.

The Company
- -----------

       Information with respect to this item is found under the heading Election
of Directors in the definitive proxy statement filed by the Company with the
Commission on March 19, 1998. Additional information with respect to Executive
Officers of the Company is found at the end of Part I.

TU Electric
- -----------

Identification of Directors, business experience and other directorships:

```
<TABLE>
<CAPTION>
```

| Name of Director | Age | Other Positions and Offices Presently Held With TU Electric (Current Term Expires May 8, 1998) | Date First Elected as Director (Current Term Expires May 8, 1998) | Presen Emp Busin |
|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` |
| T. L. Baker | 52 | President, Electric Service Division | February 20, 1987 | President, El Electric an prior there Electric; p of TU Elect |
| David W. Biegler | 51 | President and Chief Operating Officer | August 29, 1997 | President and Company, TU thereto, Ch Executive O directorshi Inc. |
| Barbara B. Curry | 43 | None | August 29, 1997 | Executive Vic thereto, Vi prior there Company; ot |
| M. S. Greene | 52 | President, Transmission Division | May 27, 1997 | President, Tr prior there Fuel Compan |

```
</TABLE>
```

30

```
<PAGE>
<TABLE>
<CAPTION>
```

| Name of Director | Age | Other Positions and Offices Presently Held With TU Electric (Current Term Expires May 8, 1998) | Date First Elected as Director (Current Term Expires May 8, 1998) | Presen Emp Busin |
|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` |
| Michael J. McNally | 43 | None | February 16, 1996 | Executive Vic Officer of President, Electric; p President o Principal o prior there Services (E and Preside Enron Gas L ENSERCH. |
| Erle Nye | 60 | Chairman of the Board and Chief Executive | September 17, 1982 | Chairman of t Company, TU thereto, Pr the Company Executive o the Company |

EFH01434739

| | | | | |
|---|---|---|---|---|
| W. M. Taylor | 55 | President, Generation Division | May 20, 1986 | President, Ge prior there Electric. |

</TABLE>

Directors of TU Electric receive no compensation in their capacity as Directors of TU Electric.

31

<PAGE>

Identification of Executive Officers and business experience:

<TABLE>
<CAPTION>

| Name of Director | Age | Positions and Offices Presently Held With TU Electric (Current Term Expires May 8, 1998) | Date First Elected as Director (Current Term Expires May 8, 1998) | ( |
|---|---|---|---|---|
| - --------------- | --- | --------------------- | -------------------- | |
| <S> | <C> | <C> | <C> | <C> |
| Erle Nye | 60 | Chairman of the Board and Chief Executive | February 20, 1987 | Chairman of t Company, TU thereto, Pr the Company Executive o |
| David W. Biegler | 51 | President and Chief Operating Officer | January 1, 1998 | President and Company, TU thereto, Ch Executive O |
| T. L. Baker | 52 | President, Electric Service Division | February 16, 1996 | President, El Electric an prior there Electric; p of TU Elect |
| M. S. Greene | 52 | President, Transmission Division | May 27, 1997 | President, Tr prior there Fuel Compan |
| W. M. Taylor | 55 | President, Generation Division | February 16, 1996 | President, Ge prior there Electric. |

</TABLE>

There is no family relationship between any of the above- named Directors and Executive Officers.

SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

All required reports relating to changes in beneficial ownership have been timely filed.

32

<PAGE>

Item 11.   EXECUTIVE COMPENSATION

The Company
- -----------

Information with respect to this Item is found under the heading Executive Compensation in the definitive proxy statement filed by the Company with the Commission on March 19, 1998.

TU Electric
- -----------

　　TU Electric and its affiliates have paid or awarded compensation during the last three calendar years to the following Executive Officers for services in all capacities:

<TABLE>
<CAPTION>

SUMMARY COMPENSATION TABLE

| | | Annual Compensation | | | Long-Term Compensat | |
| | | | | | Awards | |
| Name and Principal Position | Year | Salary ($) | Bonus ($)(4) | Other Annual Compensation ($) | Restricted Stock Awards ($) | Securitie Underlying Options/ SARs (#) |
| --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Erle Nye, | 1997 | 760,417 | 325,000 | - | 499,375 | - |
| Chairman of the Board | 1996 | 723,333 | 185,000 | - | 351,500 | - |
| and Chief Executive of the | 1995 | 679,167 | 140,000 | - | 266,000 | - |
| Company and TU Electric (1) | | | | | | |
| | | | | | | |
| H. Jarrell Gibbs, | 1997 | 354,583 | 103,000 | - | 185,125 | - |
| Vice Chairman of the Board | 1996 | 321,250 | 113,000 | - | 189,500 | - |
| of the Company (2) | 1995 | 282,917 | 67,200 | - | 120,300 | - |
| | | | | | | |
| W. M. Taylor, | 1997 | 339,583 | 83,000 | - | 161,750 | - |
| President, Generation | 1996 | 312,500 | 83,500 | - | 156,625 | - |
| Division - TU Electric | 1995 | 282,917 | 64,700 | - | 117,800 | - |
| | | | | | | |
| Michael J. McNally, | 1997 | 279,167 | 105,000 | - | 172,500 | - |
| Executive Vice President | 1996 | 229,166 | 75,000 | - | 131,250 | - |
| and Chief Financial | 1995 | 170,833 | 0 | - | 0 | - |
| Officer of the Company (3) | | | | | | |
| | | | | | | |
| T. L. Baker, | 1997 | 294,583 | 71,000 | - | 139,625 | - |
| President, Electric | 1996 | 275,833 | 60,500 | - | 123,500 | - |
| Service Division - TU | 1995 | 261,667 | 44,900 | - | 93,500 | - |
| Electric | | | | | | |
| | | | | | | |
| M. S. Greene, | 1997 | 233,750 | 53,000 | - | 107,000 | - |
| President, Transmission | 1996 | 220,833 | 45,000 | - | 95,625 | - |
| Division - TU Electric | 1995 | 206,667 | 25,800 | - | 64,500 | - |

</TABLE>
- --------------------------------

(1) Amounts reported in the table for Mr. Nye consist entirely of compensation paid by the Company.

(2) Mr. Gibbs served as President of TU Electric until December 31, 1997 and was also elected to his current position with the Company effective August 5, 1997; a portion of the 1997 compensation represents compensation paid by the Company.

(3) Mr. McNally served as President of the Transmission Division of TU Electric through May 23, 1997; compensation after that date represents compensation

paid by the Company.

(4) Amounts reported as Bonus in the Summary Compensation Table are attributable
    to the named officer's participation in the Annual Incentive Plan (AIP).
    Elected corporate officers of the Company and its participating subsidiaries
    with a title of Vice President or above are eligible to participate in the
    AIP.  Under the terms of the AIP, target incentive

                                    33

<PAGE>

    awards ranging from 35% to 50% of base salary, and a maximum award of 100%
    of base salary, are established. The percentage of the target or the maximum
    actually awarded, if any, is dependent upon the attainment of per share net
    income goals established in advance by the Organization and Compensation
    Committee (Committee) as well as the Committee's evaluation of the
    participant's and the Company's performance. One-half of each such award is
    paid in cash and is reflected as Bonus in the Summary Compensation Table.
    Payment of the remainder of the award is deferred under the Deferred and
    Incentive Compensation Plan (DICP) discussed hereinafter in footnote (5).

(5) Amounts reported as Long-Term Compensation are attributable to the named
    officer's participation in the DICP. Elected corporate officers of the
    Company and its participating subsidiaries with the title of Vice President
    or above are eligible to participate in the DICP.  Participants in the DICP
    may defer a percentage of their base salary not to exceed a maximum
    percentage determined by the Committee for each Plan year and in any event
    not to exceed 15% of the participant's base salary. The Company makes a
    matching award (Matching Award) equal to 150% of the participant's deferred
    salary.  In addition, one-half of any AIP award (Incentive Award) is
    deferred and invested under the DICP.  The Matching Awards and Incentive
    Awards are subject to forfeiture under certain circumstances. Under the
    DICP, a trustee purchases Company common stock with an amount of cash equal
    to each participant's deferred salary, Matching Award and Incentive Award,
    and accounts are established for each participant containing performance
    units (Units) equal to such number of common shares.  DICP investments,
    including reinvested dividends, are restricted to Company common stock.  On
    the expiration of the applicable maturity period (three years for the
    Incentive Awards and five years for deferred salary and Matching Awards),
    the values of the participant's accounts are paid in cash based upon the
    then current value of the Units; provided, however, that in no event will a
    participant's account be deemed to have a cash value which is less than the
    sum of such participant's deferred salary together with a 6% per annum
    (compounded annually) interest equivalent thereon.  The maturity period is
    waived if the participant dies or becomes totally and permanently disabled
    and may be extended under certain circumstances.

    Incentive Awards and Matching Awards that have been made under the DICP are
    included under Restricted Stock Awards in the Summary Compensation Table for
    each of the last three years. As a result of these awards, undistributed
    Incentive Awards and Matching Awards made under the DICP in prior years, and
    dividends reinvested thereon, the number and market value of such Units at
    December 31, 1997 (each of which is equal to one share of common stock) held
    in the DICP accounts for Messrs. Nye, Gibbs, Taylor, McNally, Baker and
    Greene were 39,725 ($1,648,588), 17,134 ($711,061), 15,597 ($647,276), 8,299
    ($344,409), 13,278 ($551,037) and 9,887 ($410,310), respectively.

    The Long-Term Incentive Compensation Plan (LTICP) is a comprehensive, stock-
    based incentive compensation plan providing for discretionary grants of
    common stock-based awards, including restricted stock. Outstanding awards to
    named executive officers vest over a three year period and such executive
    officers may earn from 0% to 200% of the number of shares awarded based on
    the Company's total return to shareholders over such three year period
    compared to the total return provided by the companies comprising the
    Standard & Poor's Electric Utility Index. Dividends are paid and reinvested
    on such restricted stock awards at the same rate as dividends on the

Company's common stock. As a result of restricted stock awards under the LTICP, and dividends reinvested thereon, the number of shares of restricted stock and the value of such shares at December 31, 1997 held for Messrs. Nye, Gibbs, Taylor, McNally, Baker and Greene were 22,666 ($940,639), 5,151 ($213,767), 4,121 ($171,022), 11,333 ($470,320), 5,151 ($213,767), and -0- ($-0-), respectively.

<center>34</center>

<PAGE>

Salary deferred under the DICP is included in amounts reported as Salary in the Summary Compensation Table. Amounts shown in the table below represent the number of shares purchased under the DICP with such deferred salaries for 1997 and the number of shares awarded under the LTICP:

<TABLE>
<CAPTION>

Long-Term Incentive Plans - Awards in Last Fiscal Year

| | Deferred and Incentive Compensation Plan | | Long-Term Incentive | | |
|---|---|---|---|---|---|
| Name | Number of Shares, Units or Other Rights (#) | Performance or Other Period Until Maturation or Payout | Number of Shares, Units or Other Rights (#) | Performance or Other Period Until Maturation or Payout | - M |
| ---- | ---------- | ------------ | ----------- | -------------- | - |
| <S> | <C> | <C> | <C> | <C> | < |
| Erle Nye | 3,305 | 5 Years | 22,000 | 3 Years | |
| H. Jarrell Gibbs | 1,556 | 5 Years | 5,000 | 3 Years | |
| W. M. Taylor | 1,492 | 5 Years | 4,000 | 3 Years | |
| Michael J. McNally | 1,279 | 5 Years | 11,000 | 3 Years | |
| T. L. Baker | 1,300 | 5 Years | 5,000 | 3 Years | |
| M. S. Greene | 1,023 | 5 years | 0 | - | |

</TABLE>

Amounts reported as LTIP Payouts in the Summary Compensation Table represent payouts maturing during such years of earnings on salary deferred under the DICP in prior years.

(6) Amounts reported as All Other Compensation are attributable to the named officer's participation in certain plans and as otherwise described hereinafter in this footnote.

Under the Employees' Thrift Plan of the Texas Utilities Company System (Thrift Plan) all employees with at least six months of eligible service with the Company or any of its participating subsidiaries may invest up to 16% of their regular salary or wages in common stock of the Company, or in a variety of selected mutual funds. Under the Thrift Plan, the Company matches a portion of an employee's savings in an amount equal to 40%, 50% or 60% (depending on the employee's length of service) of the first 6% of such employee's savings. All matching amounts are invested in common stock of the Company. The amounts reported under All Other Compensation in the Summary Compensation Table include these matching amounts which, for Messrs. Nye, Gibbs, Taylor, McNally, Baker and Greene amounted to $5,760, $4,800, $5,760, $3,840, $5,760 and $5,760, respectively, during 1997.

The Company has a Salary Deferral Program (Program) under which each employee of the Company and its participating subsidiaries whose annual

salary is equal to or greater than an amount established under the Program ($94,760 for the Program Year beginning April 1997) may elect to defer a percentage of annual salary for a period of seven years, a period ending with the retirement of such employee, or for a combination thereof. Such deferrals may not exceed in the aggregate 10% of the employee's annual salary. Salary deferred under the Program is included in amounts reported under Salary in the Summary Compensation Table. The Company makes a matching award, subject to forfeiture under certain circumstances, equal to 100% of the salary deferred under the Program. The trustee for the Program distributes, at the end of the applicable maturity period, cash equal to the greater of the actual earnings of Program assets, or the average yield during the applicable maturity period of U. S. Treasury Notes with a maturity of ten years. The distribution of the amounts due under the Program is in a lump sum if the maturity period is seven years or, if the retirement option is elected, in twenty annual installments. The Company is financing the retirement portion of the Program through the purchase of corporate-owned life insurance on the lives of the participants. The proceeds from such insurance are expected to allow the Company to fully recover the cost of the retirement option. During 1997, matching awards, which are included under All Other Compensation in the Summary Compensation Table, were made for Messrs. Nye, Gibbs, Taylor, McNally, Baker and Greene in the amounts of $76,042, $35,458, $33,958, $27,917, $29,458 and $23,375, respectively.

Under the Split-Dollar Life Insurance Program of the Texas Utilities Company System (Insurance Program), split-dollar life insurance policies are purchased for elected corporate officers of the Company and its participating subsidiaries with a title of Vice President or above, with a death benefit equal to four times their annual Insurance Program compensation. New participants vest in the policies issued under the Insurance Program over a six year period. The Company pays the premiums for these policies and has received a collateral assignment of the policies equal in value to the sum of all of its insurance premium payments. Although the Insurance Program is terminable

35

<PAGE>

at any time, it is designed so that if it is continued, the Company will fully recover all of the insurance premium payments it has made either upon the death of the participant or, if the assumptions made as to policy yield are realized, upon the later of fifteen years of participation or the participant's attainment of age sixty-five. During 1997, the economic benefit derived by Messrs. Nye, Gibbs, Taylor, McNally, Baker and Greene from the term insurance coverage provided and the interest foregone on the remainder of the insurance premiums paid by the Company amounted to $62,161, $25,968, $20,230, $5,582, $21,385 and $11,533, respectively.

The amount of $66,291 included in the All Other Compensation column of the Summary Compensation Table for Mr. McNally for 1997 represents additional compensation that the Company agreed to pay Mr. McNally incident to his employment with the Company in lieu of payments he would have received from a prior employer.

PENSION PLAN TABLE

| Remuneration | Years of Service | | | | |
|---|---|---|---|---|---|
| | 20 | 25 | 30 | 35 | 40 |
| $   50,000 | $ 14,688 | $ 18,360 | $ 22,032 | $ 25,704 | $ 29,376 |
| 100,000 | 29,688 | 37,110 | 44,532 | 51,954 | 59,376 |
| 200,000 | 59,688 | 74,610 | 89,532 | 104,454 | 119,376 |
| 400,000 | 119,688 | 149,610 | 179,532 | 209,454 | 239,376 |
| 800,000 | 239,688 | 299,610 | 359,532 | 419,454 | 479,376 |
| 1,000,000 | 299,688 | 374,610 | 449,532 | 524,454 | 599,376 |

1,400,000      415,688      524,610      625,532      734,454      839,376

The Company and its subsidiaries maintain retirement plans (Plans) which are qualified under applicable provisions of the Internal Revenue Code of 1986, as amended (Code). Annual retirement benefits are computed as follows: for each year of accredited service up to a total of 40 years of service, 1.3% of the first $7,800, plus 1.5% of the excess over $7,800 of the participant's average annual earnings during his or her three years of highest earnings. Amounts reported under Salary for the named officers in the Summary Compensation Table approximate earnings as defined by the Plans and the Supplemental Retirement Plan (Supplemental Plan). Benefits paid under the Plans are not subject to any reduction for Social Security payments but are limited by provisions of the Code. The Supplemental Plan provides for the payment of retirement benefits which would otherwise be limited by the Code or by the definition of earnings in the Plans. Under the Supplemental Plan, retirement benefits are calculated in accordance with the same formula used under the Plans, except that earnings also include AIP awards (50% of the AIP award is reported under Bonus for the named officers in the Summary Compensation Table). As of February 28, 1998, years of accredited service under the plans for Messrs. Nye, Gibbs, Taylor, McNally, Baker and Greene were 35, 35, 30, 1, 27 and 27, respectively. The table illustrates the total annual benefit payable at retirement under the Plans and Supplemental Plan prior to any reduction for a contingent beneficiary option which may be selected by the participant.

The following report and performance graph are presented herein for information purposes only. This information is not required to be included herein and shall not be deemed to form a part of this report or be "filed" with the Securities and Exchange Commission. The report set forth hereinafter is the report of the Organization and Compensation Committee of the Board of Directors of the Company and is illustrative of the methodology utilized in establishing the compensation of executive officers of the Company and TU Electric.

36

<PAGE>

ORGANIZATION AND COMPENSATION COMMITTEE REPORT
ON EXECUTIVE COMPENSATION

The Organization and Compensation Committee of the Board of Directors (Committee) is responsible for reviewing and establishing the compensation of the executive officers of the Company. The Committee consists of all of the nonemployee directors of the Company and is chaired by James A. Middleton. The Committee has directed the preparation of this report and has approved its contents and submission to the shareholders.

As a matter of policy, the Committee believes that levels of executive compensation should be based upon an evaluation of the performance of the Company and its officers generally, as well as in comparison to persons with comparable responsibilities in similar business enterprises. Compensation plans should align executive compensation with returns to shareholders with due consideration accorded to balancing both long-term and short-term objectives. The overall compensation program should provide for an appropriate and competitive balance between base salaries and performance-based annual and long-term incentives. The Committee has determined that, as a matter of policy to be implemented over time, the base salaries of the officers will be established at the median, or 50th percentile, of the top ten electric utilities in the United States and that opportunities for total direct compensation (defined as the sum of base salaries, annual incentives and long-term incentives) to reach the 75th percentile, or above, of such utilities will be provided through performance-based compensation plans. Such compensation principles and practices have allowed, and should continue to allow, the Company to attract, retain and motivate its key executives.

In furtherance of these policies, a nationally recognized compensation

consultant has been retained since 1994 to assist the Committee in its periodic reviews of compensation and benefits provided to officers. The consultant's evaluations include comparisons to the largest utilities as well as to general industry with respect both to the level and composition of officers' compensation. The consultant's recommendations including the Annual Incentive Plan, the Long-Term Incentive Compensation Plan and certain benefit changes have generally been implemented. The Annual Incentive Plan, which was approved by the shareholders in 1995, is generally referred to as the AIP and is described in this report as well as in footnote 4 to the Summary Compensation Table. The Long-Term Incentive Compensation Plan, referred to as the Long-Term Plan or LTICP, was approved by the shareholders in 1997 and is described in this report as well as in footnote 5 to the Summary Compensation Table.

In recent years, the compensation of the officers of the Company has consisted principally of base salaries, the opportunity to participate in the Deferred and Incentive Compensation Plan (referred to as the DICP and described in footnote 5 to the Summary Compensation Table) and the opportunity to earn an incentive award under the AIP. Benefits provided under the DICP and the AIP have represented a substantial portion of officers' compensation, and the value of future payments under the DICP, as well as the value of the deferred portion of any award under the AIP, is directly related to the future performance of the Company's common stock. It is anticipated that performance-based incentive awards under the AIP and the Long-Term Plan, will, in future years, constitute an increasing percentage of the officers' total compensation.

The AIP is administered by the Committee and provides an objective framework within which annual Company and individual performance can be evaluated by the Committee. Depending on the results of such performance evaluations, and the attainment of the per share net income goals established in advance, the Committee may provide annual incentive compensation awards to eligible officers. The evaluation of each individual participant's performance is based upon the attainment of individual and business unit objectives. The Company's performance is evaluated, compared to the ten largest electric utilities and/or the electric utility industry, based upon its total return to shareholders and return on invested capital, as well as other measures relating to competitiveness, service quality and employee safety. The combination of individual and Company performance results, together with the Committee's evaluation of the competitive level of compensation which is appropriate for such results, determines the amount, if any, actually awarded.

The Long-Term Plan, which is also administered by the Committee, is a comprehensive stock-based incentive compensation plan under which all awards are made in, or based on the value of, the Company's common stock. The Long-Term Plan provides that, in the discretion of the Committee, awards may be in the form of stock options, stock appreciation rights, performance and/or restricted stock or stock units or in any other stock-based form. The purpose of the Long-Term Plan is to provide performance-related incentives linked to long-term performance goals. Such performance goals may be based on individual performance and/or may include criteria such as absolute or relative levels of total shareholder return, revenues, sales, net income or net worth of the Company, any of its subsidiaries, business units or other areas, all as the Committee may determine. Awards under the Long-Term Plan are expected to constitute the principal long-term component of officers' compensation. At its meeting in May 1997, the Committee provided awards of performance-based restricted stock to certain officers, including the Chief Executive. The future value of those awards will be determined by the Company's total return to shareholders over a three year period compared to the total return for that period of the companies comprising the Standard & Poor's Electric Utility Index. Depending upon the Company's relative return for such period, the officers may earn from 0% to 200% of the original award and their compensation is, thereby, directly related to shareholder value. These awards, and any awards that may be made in the future, are based upon the Committee's evaluation of the appropriate level of long-term compensation consistent with its policy relating to total direct compensation.

In establishing levels of executive compensation at its May 1997 meeting, the Committee reviewed various performance and compensation data, including the performance measures under the AIP and the report of its compensation consultant. Information was also gathered from industry sources and other published and private materials which provided a basis for comparing the largest electric and gas utilities and other survey groups representing a large variety of business organizations. Included in the data considered was that the Company's total return to shareholders in 1996 was 4.4%, which was the third highest total return amongst the ten largest utilities. The comparative returns provided by the largest electric and gas utilities are represented by the returns of the Standard & Poor's Electric Utility Index and are reflected in the graph herein. The graph also reflects the returns provided by the Moody's 24 Utilities, and that disclosure will be discontinued after this year in light of the greater comparability of the Company to the companies comprising such S&P index. In 1996, TU Electric, the Company's principal subsidiary, was the largest electric utility in the United States as measured by megawatt hour sales and, compared to other electric utilities in the United States, was fifth in electric revenues, sixth in total assets, fourth in net generating capability, eighth in number of customers and twelfth in number of employees. Compensation amounts were established by the Committee based upon its consideration of the above comparative data and its subjective evaluation of Company and individual performance at levels consistent with the Committee's policy relating to total direct compensation.

In May 1997 the Committee increased Mr. Nye's base salary as Chief Executive to an annual rate of $775,000 representing a $35,000 or 4.7% increase over the amount established for Mr. Nye in May 1996. Based upon the Committee's evaluation of individual and Company performance, as called for by the AIP, the Committee also provided Mr. Nye with an AIP award of $650,000 compared to the prior year's award of $370,000. The Committee also awarded 22,000 shares of performance-based restricted stock to Mr. Nye. Under the terms of the award, Mr. Nye can earn from 0% to 200% of the award depending on the Company's total return to shareholders over a three-year period (April 1, 1997 through March 31, 2000) compared to the total return provided by the companies comprising the Standard & Poor's Electric Utility Index. This level of compensation was established based upon the Committee's subjective evaluation of the information described in this report.

In discharging its responsibilities with respect to establishing executive compensation, the Committee normally considers such matters at its May meeting held in conjunction with the Annual Meeting of Shareholders. Although Company management may be present during Committee discussions of officers' compensation, Committee decisions with respect to the compensation of the Chairman of the Board and Chief Executive and the President are reached in private session without the presence of any member of Company management.

Section 162(m) of the Code limits the deductibility of compensation which a publicly traded corporation provides to its most highly compensated officers. As a general policy, the Company does not intend to provide compensation which is not deductible for federal income tax purposes. Awards under the AIP in 1996 and subsequent years as well as awards under the Long-Term Plan are expected to be fully deductible, and the DICP and the Salary Deferral Program have been amended to require the deferral of distributions of amounts earned in 1995 and subsequent years until the time when such amounts would be deductible. Awards provided under the AIP in 1995 and distributions under the DICP and the Salary Deferral Program which were earned in plan years prior to 1995, may not be fully deductible but such amounts are not expected to be material.

Shareholder comments to the Committee are welcomed and should be addressed to the Secretary of the Company at the Company's offices.

Organization and Compensation Committee

James A. Middleton, Chair          Margaret N. Maxey

Bayard H. Friedman      J. E. Oesterreicher
William M. Griffin      Charles R. Perry
Kerney Laday            Herbert H. Richardson

38

<PAGE>

PERFORMANCE GRAPH

The following graph compares the performance of the Company's common stock to the S&P 500 Index, the Moody's 24 Utilities and the S&P Electric Utility Index for the last five years.  The graph assumes the investment of $100 at December 31, 1992 and that all dividends were reinvested.  The amount of the investment at the end of each year is shown in the graph and in the table which follows.

[LINE GRAPH APPEARS HERE]

Cumulative Total Returns
for the Five Years Ended 12/31/97

<TABLE>
<CAPTION>

|                           | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
| ------------------------- | ---- | ---- | ---- | ---- | ---- | ---- |
| <S>                       | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  |
| Texas Utilities           | 100  | 109  | 88   | 123  | 128  | 138  |
| S&P 500 Index             | 100  | 110  | 111  | 153  | 188  | 251  |
| Moody's 24 Utilities      | 100  | 110  | 94   | 123  | 125  | 152  |
| S&P Electric Utility Index| 100  | 113  | 98   | 128  | 128  | 162  |

</TABLE>

39

<PAGE>

Item 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The Company
- -----------

Information with respect to this item is found under the headings Beneficial Ownership of Common Stock of the Company in the definitive proxy statement filed by the Company with the Commission on March 19, 1998.  Additional information with respect to Executive Officers of the Company is found at the end of Part I.

TU Electric
- -----------

Security ownership of certain beneficial owners at February 28, 1998:

<TABLE>
<CAPTION>

| Title of Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
| -------------- | ------------------------------------ | ----------------------------------------- | ---------------- |
| <S>            | <C>                                  | <C>                                       | <C>              |
| Common stock,  | Texas Energy                         | 142,931,000                               | 100.0%           |

```
without par value,        Industries, Inc.    shares
   of TU Electric          Energy Plaza,       sole voting and
                           1601 Bryan Street   investment power
                           Dallas, Texas
                           75201
```

</TABLE>

Security ownership of management at February 28, 1998:

The following lists the common stock of the Company owned by the Directors and Executive Officers of TU Electric.  The named individuals have sole voting and investment power for the shares of common stock reported. Ownership of such common stock by the Directors and Executive Officers, individually and as a group, constituted less than 1% of the outstanding shares at February 28, 1998. None of the named individuals own any of the preferred stock of TU Electric or the preferred securities of any subsidiaries of TU Electric.

<TABLE>
<CAPTION>

|  | Number of Shares | | |
| Name | Beneficially Owned | Deferred Plan * | Total |
| ----- | ------------ | -------- | ------- |
| <S> | <C> | <C> | <C> |
| T. L. Baker | 8,575 | 18,752 | 27,327 |
| David W. Biegler | 15,272 | 0 | 15,272 |
| Barbara B. Curry | 2,444 | 3,612 | 6,056 |
| H. Jarrell Gibbs | 14,323 | 23,494 | 37,817 |
| M. S. Greene | 745 | 14,130 | 14,875 |
| Michael J. McNally | 20,551 | 10,688 | 31,239 |
| Erle Nye | 49,466 | 54,462 | 103,928 |
| W. M. Taylor | 14,847 | 21,850 | 36,697 |
| All Directors and Executive Officers as a group (8) | ------- | ------- | ------- |
|  | 126,223 | 146,988 | 273,211 |
|  | ======= | ======= | ======= |

</TABLE>

- -----------

    *  Share units held in deferred compensation accounts under the Deferred and
       Incentive Compensation Plan. Although this plan allows such units to be
       paid only in the form of cash, investments in such units create
       essentially the same investment stake in the performance of the Company's
       common stock as do investments in actual shares of common stock.

Item 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The Company
- -----------

    Information with respect to this item is found under the heading Beneficial
Ownership of Common Stock of the Company in the definitive proxy statement filed
by the Company with the Commission on March 19, 1998.  Additional information
with respect to Executive Officers of the Company is found at the end of Part I.

TU Electric
- -----------

    None.

                                    40

<PAGE>

                                 PART IV

Item 14.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

<TABLE>

<S>        <C>
(a)        Documents filed as part of this Report:

The Company and TU Electric
- --------------------------

         Financial Statements (included in Appendix A to this report):

         The Company and TU Electric:
               Selected Financial Data - Consolidated Financial and Operating Statistics.........
               Management's Discussion and Analysis of Financial Condition
                  and Results of Operation...............................................
               Statements of Responsibility.............................................
               Independent Auditors' Reports............................................

         The Company:
               Statements of Consolidated Income for each of the three years in the
                  period ended December 31, 1997.........................................
               Statements of Consolidated Cash Flows for each of the three years in
                  the period ended December 31, 1997.....................................
               Consolidated Balance Sheets, December 31, 1997 and 1996...................
               Statements of Consolidated Common Stock Equity for each of the three years in
                  the period ended December 31, 1997.....................................

         TU Electric:
               Statements of Consolidated Income and Retained Earnings for each of the three year
                  in the period ended December 31, 1997..................................
               Statements of Consolidated Cash Flows for each of the three years in
                  the period ended December 31, 1997.....................................
               Consolidated Balance Sheets, December 31, 1997 and 1996...................

         The Company and TU Electric:
               Notes to Consolidated Financial Statements.................................
</TABLE>

         The consolidated financial statement schedules are omitted because of
the absence of the conditions under which they are required or because the
required information is included in the consolidated financial statements or
notes thereto.

Other financial information included :

<TABLE>


         <S>
         Financial Statements (included in Appendix B to this report):

         ENSERCH Corporation:
               Selected Financial Data...................................................
               Management's Discussion and Analysis of Financial Condition and
                  Results of Operation...................................................
               Independent Auditors' Report..............................................
               Statements of Consolidated Income for each of the three years in the
                  period ended December 31, 1997.........................................
               Statements of Consolidated Cash Flows for each of the three years in

the period ended December 31, 1997.............................
Consolidated Balance Sheets, December 31, 1997 and 1996.......................
Statements of Consolidated Common Stock Equity for each of the three years in
the period ended December 31, 1997...........................
Notes to Consolidated Financial Statements...................................

```
</TABLE>
```

41

```
<PAGE>
```

(b)     Reports on Form 8-K:

        Reports on Form 8-K filed since September 30, 1997, are as follows:

The Company
- -----------

        Date of Report      Item Reported
        --------------      -------------

        November 21, 1997   Item 5. OTHER EVENTS

        December 17, 1997   Item 5. OTHER EVENTS

        February 26, 1998   Item 5. OTHER EVENTS

        March 13, 1998      Item 5. OTHER EVENTS

TU Electric
- -----------

        Date of Report      Item Reported
        --------------      -------------

        December 17, 1997   Item 5. OTHER EVENTS

(c)     Exhibits:

The Company and TU Electric
- ---------------------------

```
<TABLE>
```

|  | Previously Filed* | | | | | |
|---|---|---|---|---|---|---|
|  | ---------------------------- | | | | | |
|  | With File | As | | | | |
| Exhibits | Number | Exhibit | | Number | | Dated |
| - -------- | ------ | ------- | | ------ | | ----- |
| <S> | <C> | <C> | | <C> | <C> | <C> |
| 2(a) | 333-12391 | 2(a) | - | Amended and Restated Agreement and Plan of Merg | | |
|  |  |  |  | April 13, 1996, among the Company, ENSERCH Corp | | |
|  |  |  |  | Holding Company. | | |
| 3(a) | 333-12391 | 4(a) | - | Restated Articles of Incorporation of the Compa | | |
| 3(b) | 333-45657 | 4(b) | - | Bylaws, as amended, of the Company. | | |
| 3(c) | 0-11442 Form 10-Q (Quarter ended June 30, 1997) | 4(a) | - | Restated Articles of Incorporation of TU Electr | | |
| 3(d) | 33-64694 | 4(c) | - | Bylaws of TU Electric, as amended. | | |
| 4(a) | 2-90185 | 4(a) | - | Mortgage and Deed of Trust, dated as of Decembe | | |
|  |  |  |  | between TU Electric and Irving Trust Company (n | | |

```
4(a)(1)                                    -  Supplemental Indentures to Mortgage and Deed of
                                              New York), Trustee.
          2-90185          4(b)       First                  April 1, 1984
          2-92738          4(a)-1     Second                 September 1, 198
          2-97185          4(a)-1     Third                  April 1, 1985
          2-99940          4(a)-1     Fourth                 August 1, 1985
          2-99940          4(a)-2     Fifth                  September 1, 198
          33-01774         4(a)-2     Sixth                  December 1, 1985
          33-9583          4(a)-1     Seventh                March 1, 1986
          33-9583          4(a)-2     Eighth                 May 1, 1986
</TABLE>
```

42

```
<PAGE>

<TABLE>
<CAPTION>

                    Previously Filed*
                    ---------------------------
                With
                File                As
Exhibits        Number              Exhibit                 Number          Dated
- --------       ------              -------                 ------          -----
<S>             <C>                 <C>       <C>            <C>             <C>
                33-11376            4(a)-1    Ninth                          October 1, 1986
                33-11376            4(a)-2    Tenth                          December 1, 1986
                33-11376            4(a)-3    Eleventh                       December 1, 1986
                33-14584            4(a)-1    Twelfth                        February 1, 1987
                33-14584            4(a)-2    Thirteenth                     March 1, 1987
                33-14584            4(a)-3    Fourteenth                     April 1, 1987
                33-24089            4(a)-1    Fifteenth                      July 1, 1987
                33-24089            4(a)-2    Sixteenth                      September 1, 198
                33-24089            4(a)-3    Seventeenth                    October 1, 1987
                33-24089            4(a)-4    Eighteenth                     March 1, 1988
                33-24089            4(a)-5    Nineteenth                     May 1, 1988
                33-30141            4(a)-1    Twentieth                      September 1, 198
                33-30141            4(a)-2    Twenty-first                   November 1, 1988
                33-30141            4(a)-3    Twenty-second                  January 1, 1989
                33-35614            4(a)-1    Twenty-third                   August 1, 1989
                33-35614            4(a)-2    Twenty-fourth                  November 1, 1989
                33-35614            4(a)-3    Twenty-fifth                   December 1, 1989
                33-35614            4(a)-4    Twenty-six                     February 1, 1990
                33-39493            4(a)-1    Twenty-seventh                 September 1, 199
                33-39493            4(a)-2    Twenty-eighth                  October 1, 1990
                33-39493            4(a)-3    Twenty-ninth                   October 1, 1990
                33-39493            4(a)-4    Thirtieth                      March 1, 1991
                33-45104            4(a)-1    Thirty-first                   May 1, 1991
                33-45104            4(a)-2    Thirty-second                  July 1, 1991
                33-46293            4(a)-1    Thirty-third                   February 1, 1992
                33-49710            4(a)-1    Thirty-fourth                  April 1, 1992
                33-49710            4(a)-2    Thirty-fifth                   April 1, 1992
                33-49710            4(a)-3    Thirty-sixth                   June 1, 1992
                33-49710            4(a)-4    Thirty-seventh                 June 1, 1992
                33-57576            4(a)-1    Thirty-eighth                  August 1, 1992
                33-57576            4(a)-2    Thirty-ninth                   October 1, 1992
                33-57576            4(a)-3    Fortieth                       November 1, 1992
                33-57576            4(a)-4    Forty-first                    December 1, 1992
                33-60528            4(a)-1    Forty-second                   March 1, 1993
                33-64692            4(a)-1    Forty-third                    April 1, 1993
                33-64692            4(a)-2    Forty-fourth                   April 1, 1993
                33-64692            4(a)-3    Forty-fifth                    May 1, 1993
                33-68100            4(a)-1    Forty-sixth                    July 1, 1993
                33-68100            4(a)-3    Forty-seventh                  October 1, 1993
                33-68100            4(a)-4    Forty-eighth                   November 1, 1993
                33-68100            4(a)-5    Forty-ninth                    May 1, 1994
```

| | | | | |
|---|---|---|---|---|
| 33-68100 | 4(a)-6 | Fiftieth | | May 1, 1994 |
| 33-68100 | 4(a)-7 | Fifty-first | | August 1, 1994 |
| 0-11442<br>Form 10-Q<br>(Quarter ended<br>March 31, 1995) | 99 | Fifty-second | | April 1, 1995 |
| 0-11442<br>Form 10-Q<br>(Quarter ended<br>June 30, 1995) | 99 | Fifty-third | | June 1, 1995 |
| 0-11442<br>Form 8-K (Dated | 4 | Fifty-fourth | | October 1, 1995 |

</TABLE>

43

<PAGE>

<TABLE>
<CAPTION>

| | Previously Filed* | | | | |
|---|---|---|---|---|---|
| | With<br>File | As | | | |
| Exhibits | Number | Exhibit | | Number | Dated |
| - -------- | ------ | ------- | | ------ | ----- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| | (September 26, 1995) | | | | |
| | 0-11442<br>Form 10-Q<br>(Quarter ended<br>March 31, 1996) | 4(a) | | Fifty-fifth | March 1, 1996 |
| | 0-11442<br>Form 10-Q<br>(Quarter ended<br>September 30, 1996) | 4(a) | | Fifty-sixth | September 1, 199 |
| | 33-83976 | 4(g) | | Fifty-seventh | February 1, 1997 |
| | 0-11442<br>Form 10-Q<br>(Quarter ended<br>June 30, 1997) | 4(b) | | Fifty-eighth | July 1, 1997 |
| 4(b)(1) | | | - | Agreement to furnish certain debt instruments ( | |
| 4(b)(2) | | | - | Agreement to furnish certain debt instruments ( | |
| 4(c) | 33-68104 | 4(b)-17 | - | Deposit Agreement between TU Electric and Chemi<br>as of August 4, 1993. | |
| 4(d) | 0-11442<br>Form 10-K<br>(1993) | 4(e) | - | Deposit Agreement between TU Electric and Chemi<br>as of October 14, 1993. | |
| 4(e) | 0-11442<br>Form 10-K<br>(1995) | 4(f) | - | Indenture (For Unsecured Subordinated Debt Secu<br>Trust Securities), dated as of December 1, 1995<br>Electric and The Bank of New York, as Trustee. | |
| 4(f) | 0-11442<br>Form 10-K<br>(1995) | 4(g) | - | Amended and Restated Trust Agreement, dated as<br>1995, between TU Electric, as Depositor, and Th<br>York, The Bank of New York (Delaware) and the A<br>Trustees thereunder, as Trustees for TU Electri | |
| 4(g) | 0-11442<br>Form 10-K<br>(1995) | 4(h) | - | Guarantee Agreement with respect to TU Electric<br>as of December 12, 1995, between TU Electric, a<br>The Bank of New York, as Trustee. | |
| 4(h) | 0-11442 | 4(i) | - | Agreement as to Expenses and Liabilities, dated | |

| Form 10-K (1995) | | | 12, 1995, between TU Electric and TU Electric C |
| 4(i) | 0-11442 Form 10-K (1996) | 4(j) | – | Officer's Certificate, dated as of December 12, the terms of the Junior Subordinated Debentures connection with the preferred securities of TU |
| 4(j) | 0-11442 Form 10-K (1995) | 4(j) | – | Amended and Restated Trust Agreement, dated as 1995, between TU Electric, as Depositor, and Th York, The Bank of New York (Delaware) and the A Trustees thereunder, as Trustees for TU Electri |
| 4(k) | 0-11442 Form 10-K (1995) | 4(k) | – | Guarantee Agreement with respect to TU Electric as of December 12, 1995, between TU Electric, a The Bank of New York, as Trustee. |
| 4(l) | 0-11442 Form 10-K (1995) | 4(l) | – | Agreement as to Expenses and Liabilities, dated 12, 1995, between TU Electric and TU Electric C |

```
</TABLE>

                             44

<PAGE>

<TABLE>
<CAPTION>
```

|  | Previously Filed* | | | | |
|---|---|---|---|---|---|
|  | ----------------------------- | | | | |
| Exhibits | With File Number | As Exhibit | | Number | Dated |
| - -------- | ------ | ------- | | ------ | ----- |
| <S> | <C> | <C> | | <S> | |
| 4(m) | 0-11442 Form 10-K (1996) | 4(n) | – | Officer's Certificate, dated as of December 12, the terms of the Junior Subordinated Debentures connection with the preferred securities of TU |
| 4(n) | 0-11442 Form 10-K (1995) | 4(m) | – | Amended and Restated Trust Agreement, dated as 1995, between TU Electric, as Depositor, and Th York, The Bank of New York (Delaware), and the Trustees thereunder, as Trustees for TU Electri |
| 4(o) | 0-11442 Form 10-K (1995) | 4(n) | – | Guarantee Agreement with respect to TU Electric as of December 13, 1995, between TU Electric, a The Bank of New York, as Trustee. |
| 4(p) | 0-11442 Form 10-K (1995) | 4(o) | – | Agreement as to Expenses and Liabilities, dated 13, 1995, between TU Electric and TU Electric C |
| 4(q) | 0-11442 Form 10-K (1996) | 4(r) | – | Officer's Certificate, dated as of December 13, the terms of the Junior Subordinated Debentures connection with the preferred securities of TU |
| 4(r) | 0-11442 Form 10-K (1996) | 4(s) | – | Amended and Restated Trust Agreement, dated as 1997, between TU Electric, as Depositor, and Th York (Delaware), and the Administrative Trustee Electric Capital IV. |
| 4(s) | 0-11442 Form 10-K (1996) | 4(t) | – | Guarantee Agreement with respect to TU Electric as of January 30, 1997, between TU Electric, as Bank of New York, as Trustee. |
| 4(t) | 0-11442 Form 10-K (1996) | 4(u) | – | Agreement as to Expenses and Liabilities, dated 1997, between TU Electric and TU Electric Capit |
| 4(u) | 0-11442 Form 10-K (1996) | 4(v) | – | Officer's Certificate, dated as of January 30, terms of the Junior Subordinated Debentures iss with the preferred securities of TU Electric Ca |
| 4(v) | 0-11442 Form 10-K (1996) | 4(w) | – | Amended and Restated Trust Agreement, dated as 1997, between TU Electric, as Depositor, and Th York (Delaware), and the Administrative Trustee Electric Capital V. |
| 4(w) | 0-11442 | 4(x) | – | Guarantee Agreement with respect to TU Electric |

| Exhibits | With File Number | As Exhibit | | Number |
|---|---|---|---|---|
| | Form 10-K (1996) | | | as of January 30, 1997, between TU Electric, as Bank of New York, as Trustee. |
| 4(x) | 0-11442 Form 10-K (1996) | 4(y) | – | Agreement as to Expenses and Liabilities, dated 1997, between TU Electric and TU Electric Capit |
| 4(y) | 0-11442 Form 10-K (1996) | 4(z) | – | Officer's Certificate, dated as of January 30, terms of the Junior Subordinated Debentures iss with the preferred securities of TU Electric Ca |
| 4(z) | 333-45999 | 4(a) | – | Indenture, dated October 1, 1997, relating to t 6.20% Series A Senior Notes and 6.20% Series A (together, Series A Notes). |
| 4(aa) | 333-45999 | 4(c) | – | Registration Rights Agreement with respect to S |
| 4(bb) | 333-45999 | 4(e) | – | Officers' Certificate establishing Series A Not |
| 4(cc) | 333-45999 | 4(b) | – | Indenture, dated October 1, 1997, relating to t 6.375% Series B Senior Notes and 6.375% Series Notes (together, Series B Notes). |

</TABLE>

45

<PAGE>

<TABLE>
<CAPTION>

| Exhibits | Previously Filed* With File Number | As Exhibit | | Number | Dated |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| 4(dd) | 333-45999 | 4(d) | – | Registration Rights Agreement with respect to S | |
| 4(ee) | 333-45999 | 4(f) | – | Officer's Certificate establishing Series B Not | |
| 4(ff) | | | – | Indenture, dated January 1, 1998, relating to t 6.375% Series C Senior Notes and 6.375% Series Notes (together, Series C Notes). | |
| 4(gg) | | | – | Registration Rights Agreement with respect to S | |
| 4(hh) | | | – | Officers' Certificate establishing Series C Not | |
| 4(ii) | 0-11442 Form 10-Q (Quarter ended Sept. 30, 1997) | | – | Indenture (For Unsecured Debt Securities), date 1997, between TU Electric and The Bank of New Y | |
| 4(jj) | 0-11442 Form 10-Q (Quarter ended Sept. 30, 1997) | | – | Officer's Certificate establishing the TU Elect due August 1, 2007. | |
| 4(kk) | | | – | Indenture (For Unsecured Debt Securities), date ENSERCH Corporation and The Bank of New York. | |
| 4(ll) | | | – | Officer's Certificate establishing the ENSERCH Notes due January 1, 2003. | |
| 4(mm) | | | – | Officer's Certificate establishing the ENSERCH Notes due January 1, 2008. | |
| 4(nn) | 33-45688 | 4.2 | – | Indenture, dated February 15, 1992, between ENS and The First National Bank of Chicago. | |
| 4(oo) | | | – | ENSERCH Corporation 7% Note due 1999, dated Aug | |
| 4(pp) | | | – | ENSERCH Corporation 8 7/8% Note due 2001, dated | |
| 4(qq) | | | – | ENSERCH Corporation 6 3/8% Note due 2004, dated | |
| 4(rr) | | | – | ENSERCH Corporation 7 1/8% Note due 2005, dated | |
| 10(a)** | 1-3591 Form 10-Q (Quarter ended June 30, 1995) | 10(a) | – | Deferred and Incentive Compensation Plan of the Company System, as amended February 20, 1998. | |
| 10(b)** | 1-3591 Form 10-Q (Quarter ended | 10(f) | – | Salary Deferral Program of the Texas Utilities as amended February 20, 1998. | |

7/13/2007

EFH01434755

| | June 30, 1995) | | | |
|---|---|---|---|---|
| 10(c)** | 1-3591<br>Form 10-Q<br>(Quarter ended<br>June 30, 1995) | 10(c) | – | Restated Supplemental Retirement Plan for Emplo<br>Texas Utilities Company System, as restated eff |
| 10(d)** | 1-3591<br>Form 10-Q<br>(Quarter ended<br>June 30, 1995) | 10(b) | – | Deferred Compensation Plan for Outside Director<br>effective as of July 1, 1995. |
| 10(e)** | 1-3591<br>Form 10-Q<br>(Quarter ended<br>June 30, 1995) | 10(d) | – | Long-Term Incentive Plan of the Texas Utilities<br>dated as of May 19, 1995. |
| 10(f)** | 333-45657 | | – | Deferred Compensation Plan for Directors of Sub<br>Utilities Company dated as of February 5, 1998. |

</TABLE>

46

<PAGE>

<TABLE>
<CAPTION>

| | Previously Filed* | | | | |
|---|---|---|---|---|---|
| | ---------------------------- | | | | |
| | With<br>File | As | | | |
| Exhibits | Number | Exhibit | | Number | Dated |
| - -------- | ------ | ------- | | ------ | ----- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| 10(g)** | 1-3591<br>Form 10-Q<br>(Quarter ended<br>June 30, 1995) | 10(e) | – | Management Transition Agreement, dated as of Ma<br>between the Company and J.S. Farrington. | |
| 10(h) | 1-12833<br>Schedule 14D-1<br>(filed March 10,<br>1998) | (b)(1) | – | 364 Day Competitive Advance and Revolving Credi<br>Agreement, dated as of March 2, 1998 among Texa<br>Company, Texas Utilities Electric Company, ENSE<br>Corporation, The Chase Manhattan Bank, as Compe<br>Facility Agent and Chase Bank of Texas, Nationa<br>Administrative Agent and certain banks listed t<br>(US Facility A). | |
| 10(i) | 1-12833<br>Schedule 14D-1<br>(filed March 10,<br>1998) | (b)(2) | – | 5-Year Competitive Advance and Revolving Credit<br>Agreement dated as of March 2, 1998 among Texas<br>Company, Texas Utilities Electric Company, ENSE<br>The Chase Manhattan Bank, as Competitive Advanc<br>and Chase Bank of Texas, National Association,<br>Agent and certain banks listed therein<br>(US Facility B). | |
| 10(j) | 1-12833<br>Schedule 14D-1<br>(filed March 10,<br>1998) | (b)(3) | – | Amendment No. 1, dated March 3, 1998, to US Fac<br>Facility B. | |
| 10(k) | 1-12833<br>Schedule 14D-1<br>(filed March 10,<br>1998) | (b)(4) | – | Facilities Agreement for (Pounds)3,625,000,000<br>Finance (No. 1) Limited, TU Finance (No. 2) Lim<br>Acquisitions PLC, Chase Manhattan plc, Lehman B<br>International and Merrill Lynch Capital Corpora<br>Arrangers, the Chase Manhattan Bank, Lehman Com<br>Inc. and Merrill Lynch Capital Corporation as U<br>Facility). | |
| 10(l) | 1-12833<br>Schedule 14D-1<br>(filed March 10,<br>1998) | (b)(5) | – | Amendment No. 1, dated March 3, 1998 to UK Faci | |
| 10(m) | 1-12833 | (b)(6) | – | 364-Day Competitive Advance and Revolving Credi | |

EFH01434756

```
Schedule 14D-1           Agreement (Interim Facility), dated as of March
(filed March 10,         Texas Utilities Company, Chase Bank of Texas, N
1998)                    Association, as Administrative Agent and The Ch
                         Bank, as Competitive Advance Facility Agent, In
                         The Chase Manhattan Bank, Lehman Commercial Pap
                         Lynch Capital Corporation, Chase Securities Inc
                         Inc. and Merrill Lynch & Co. as Joint Lead Arra
                         banks listed therein (Interim Facility).
10(n)                 -  Amendment No. 1, dated March 23, 1998 to the In
12(a)                 -  Computation of Ratio of Earnings to Fixed Charg
12(b)                 -  Computation of Ratio of Earnings to Fixed Charg
                         Charges and Preferred Dividends for TU Electric
21                    -  Subsidiaries of the Company.
23(a)                 -  Consent of Counsel to the Company.
23(b)                 -  Consent of Counsel to TU Electric.
23(c)                 -  Independent Auditors' Consent for the Company.
23(d)                 -  Independent Auditors' Consent for TU Electric.
</TABLE>
```

47

<PAGE>

```
<TABLE>
<CAPTION>
```

| Exhibits | Previously Filed* With File Number | As Exhibit | | Number | Dated |
|----------|------|------|---|--------|-------|
| `<S>` | `<C>` | `<C>` | | `<C>` | |
| 23(e) | | | - | Independent Auditors' Consent for ENSERCH. | |
| 27(a) | | | - | Financial Data Schedule for the Company. | |
| 27(b) | | | - | Financial Data Schedule for TU Electric. | |
| 99(a) | 1-3591 Form 10-K (1987) | 28(b) | - | Agreement, dated as of February 12, 1988, and Texas Municipal Power Agency. | |
| 99(b) | 33-55408 | 99(a) | - | Agreement, dated as of July 5, 1988, between T Electric and Tex-La Electric Cooperative of Te | |
| 99(c) | 33-23532 | 4(c)(I) | - | Trust Indenture, Security Agreement and Mortga December 1, 1987, as supplemented by Supplemen dated as of May 1, 1988 among the Lessor, TU E Trustee. | |
| 99(d) | 33-24089 | 4(c)-1 | - | Supplement No. 2 to Trust Indenture, Security Mortgage, dated as of August 1, 1988. | |
| 99(e) | 33-24089 | 4(e)-1 | - | Supplement No. 3 to Trust Indenture, Security Mortgage, dated as of August 1, 1988. | |
| 99(f) | 0-11442 Form 10-Q (Quarter ended June 30, 1993) | 99(c) | - | Supplement No. 4 to Trust Indenture, Security Mortgage, including form of Secured Facility B | |
| 99(g) | 33-23532 | 4(d) | - | Lease Agreement, dated as of December 1, 1987 Lessor and TU Electric as supplemented by Supp thereto dated as of May 20, 1988 between the L Electric. | |
| 99(h) | 33-24089 | 4(f) | - | Lease Agreement Supplement No. 2, dated as of | |
| 99(i) | 33-24089 | 4(f)-1 | - | Lease Agreement Supplement No. 3, dated as of | |
| 99(j) | 33-63434 | 4(d)(iv) | - | Lease Agreement Supplement No. 4, dated as of | |
| 99(k) | 33-63434 | 4(d)(v) | - | Lease Agreement Supplement No. 5, dated as of | |
| 99(l) | 0-11442 Form 10-Q (Quarter ended June 30, 1993) | 99(d) | - | Lease Agreement Supplement No. 6, dated as of | |
| 99(m) | 33-23532 | 4(e) | - | Participation Agreement dated as of December 1 | |

<table>
<tr><td></td><td></td><td></td><td></td><td>amended by a Consent to Amendment of the Parti<br>Agreement, dated as of May 20, 1988, each amon<br>Trustee, the Owner Participant, certain bankin<br>Capcorp, Inc. and TU Electric.</td></tr>
<tr><td>99(n)</td><td>33-24089</td><td>4(g)</td><td>-</td><td>Consent to Amendment of the Participation Agre<br>of August 18, 1988.</td></tr>
<tr><td>99(o)</td><td>33-24089</td><td>4(g)-1</td><td>-</td><td>Supplement No. 1 to the Participation Agreemen<br>August 18, 1988.</td></tr>
<tr><td>99(p)</td><td>33-24089</td><td>4(g)-2</td><td>-</td><td>Supplement No. 2 to the Participation Agreemen<br>August 18, 1988.</td></tr>
<tr><td>99(q)</td><td>33-63434</td><td>4(e)(v)</td><td>-</td><td>Supplement No. 3 to the Participation Agreemen<br>December 1, 1988.</td></tr>
</table>

</TABLE>

48

<PAGE>

<TABLE>
<CAPTION>

| Exhibits | Previously Filed* | | Number | Dated |
|---|---|---|---|---|
| | With File Number | As Exhibit | | |
| `<S>` | `<C>` | `<C>` | `<C>` | |
| 99(r) | 0-11442 Form 10-Q (Quarter ended June 30, 1993) | 99(e) | - Supplement No. 4 to the Participation Agreemen June 17, 1993. | |
| 99(s) | 0-11442 Form 10-Q (Quarter ended March 31, 1996) | 4(b) | - Supplement No. 1, dated October 25, 1995, to T Security Agreement and Mortgage, dated as of D among the Owner Trustee, TU Electric and the I | |
| 99(t) | 0-11442 Form 10-Q (Quarter ended March 31, 1996) | 4(c) | - Supplement No. 1, dated October 19, 1995, to A Restated Participation Agreement, dated as of among the Owner Trustee, The First National Ba As Original Indenture Trustee, the Indenture T Participant, Mesquite Power Corporation and TU | |
| 99(u) | 0-11442 Form 10-Q (Quarter ended March 31, 1997) | 99(a) | - Amended and Restated 364 Day Competitive Advan Revolving Credit Facility Agreement, "Facility April 24, 1997, among the Company, TEI, TU Ele certain banks, Chemical Bank and Texas Commerc Association, as Agents. | |
| 99(v) | 0-11442 Form 10-Q (Quarter ended June 30, 1997) | 99(a) | - Amendment, dated as of September 4, 1997, to F | |
| 99(w) | 0-11442 Form 10-Q (Quarter ended September 30, 1997) | 99(w) | - Second Amendment, dated as of November 10, 199 A. | |
| 99(x) | 0-11442 Form 10-Q (Quarter ended March 31, 1997) | 99(u) | - Amended and Restated Five Year Competitive Adv Revolving Credit Facility Agreement, "Facility April 24, 1997, among the Company, TEI, TU Ele certain banks, Chemical Bank and Texas Commerc Association, as Agents. | |
| 99(y) | 0-11442 Form 10-Q (Quarter ended June 30, 1997) | 99(v) | - Amendment, dated as of September 4, 1997, to F | |
| 99(z) | 0-11442 Form 10-Q (Quarter ended September 30, 1997) | 99(z) | - Second Amendment, dated as of November 10, 199 B. | |

</TABLE>

```
- ----------------------
*     Incorporated herein by reference.
**    Management contract or compensation plan or arrangement required to be
      filed as an exhibit to this report pursuant to Item 14(c) of Form 10-K.
```

                                    49
<PAGE>


                                SIGNATURES

   Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange
Act of 1934, Texas Utilities Company has duly caused this report to be signed on
its behalf by the undersigned, thereunto duly authorized.

                          TEXAS UTILITIES COMPANY

Date:   March 26, 1998          By:   /s/   ERLE NYE
                                      -------------------------------------
                                      (Erle Nye, Chairman of the Board and
                                          Chief  Executive)

   Pursuant to the requirements of the Securities Exchange Act of 1934, this
report has been signed below by the following persons on behalf of Texas
Utilities Company and in the capacities and on the date indicated.

         Signature                    Title                      Date
         ---------                    -----                      ----

/s/        ERLE NYE            Principal Executive
- -------------------------------  Officer and Director
(Erle Nye, Chairman of the Board and
      Chief Executive)


/s/   MICHAEL J. McNALLY       Principal Financial Officer
- -------------------------------
  (Michael J. McNally, Executive
   Vice President and Chief
      Financial  Officer)


/s/   J. W. PINKERTON          Principal Accounting Officer
- -------------------------------
      (J. W. Pinkerton, Controller)


/s/   J. S. FARRINGTON         Director
- -------------------------------
      (J. S. Farrington)


/s/   BAYARD H. FRIEDMAN       Director
- -------------------------------
      (Bayard H. Friedman)

/s/   WILLIAM M. GRIFFIN       Director            March 26, 1998
- -------------------------------
      (William M. Griffin)


/s/     KERNEY LADAY           Director
- -------------------------------
      (Kerney Laday)

```
/s/  MARGARET N. MAXEY              Director
- ------------------------------------
    (Margaret N. Maxey)


/s/  JAMES A. MIDDLETON            Director
- ------------------------------------
    (James A. Middleton)


/s/  J. E. OESTERREICHER          Director
- ------------------------------------
    (J. E. Oesterreicher)


/s/  CHARLES R. PERRY             Director
- ------------------------------------
    (Charles R. Perry)


/s/  HERBERT H. RICHARDSON        Director
- ------------------------------------
    (Herbert H. Richardson)
```

                               50
<PAGE>

## SIGNATURES

   Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange
Act of 1934, Texas Utilities Electric Company has duly caused this report to be
signed on its behalf by the undersigned, thereunto duly authorized.

                     TEXAS UTILITIES ELECTRIC COMPANY

Date:   March 26, 1998          By:  /s/   ERLE NYE
                                     ------------------------------------
                                     (Erle Nye, Chairman of the Board and
                                           Chief  Executive)

   Pursuant to the requirements of the Securities Exchange Act of 1934, this
report has been signed below by the following persons on behalf of Texas
Utilities Electric Company and in the capacities and on the date indicated.

```
        Signature                 Title                    Date
        ---------                 -----                    ----

/s/      ERLE NYE            Principal Executive
- ------------------------------    Officer and Director
(Erle Nye, Chairman of the Board and
       Chief Executive)


/s/    ROBERT S. SHAPARD     Principal Financial Officer
- ------------------------------------
(Robert S. Shapard, Treasurer and
Assistant Secretary)


/s/     J. W. PINKERTON      Principal Accounting Officer
- ------------------------------------
    (J. W. Pinkerton, Controller)

/s/      T. L. BAKER         Director
```

```
                                     (T. L. Baker)

/s/      D. W. Biegler                Director
- -------------------------------------
         (D. W. Biegler)

/s/      BARBARA B. CURRY             Director              March 26, 1998
- -------------------------------------
         (Barbara B. Curry)

/s/        M. S. GREENE               Director
- -------------------------------------
         (M. S. Greene)

/s/      MICHAEL J. McNALLY           Director
- -------------------------------------
         (Michael J. McNally)

/s/        W. M. TAYLOR               Director
- -------------------------------------
         (W. M. Taylor)
```

                                     51
<PAGE>


                                                           Appendix A


TEXAS UTILITIES COMPANY AND SUBSIDIARIES AND
TEXAS UTILITIES ELECTRIC COMPANY AND SUBSIDIARIES

<TABLE>
<CAPTION>
INDEX TO  FINANCIAL INFORMATION
December 31, 1997


<S>
Texas Utilities Company and Subsidiaries and Texas Utilities Electric
  Company and Subsidiaries:
Selected Financial Data - Consolidated Financial and Operating Statistics .....................
Management's Discussion and Analysis of Financial Condition and Results
  of Operation ...........................................................................
Statements of Responsibility .............................................................
Independent Auditors' Reports ............................................................

Financial Statements:

Texas Utilities Company and Subsidiaries:
Statements of Consolidated Income ........................................................
Statements of Consolidated Cash Flows ....................................................
Consolidated Balance Sheets ..............................................................
Statements of Consolidated Common Stock Equity ...........................................

Texas Utilities Electric Company and Subsidiaries:
Statements of Consolidated Income and Retained Earnings ..................................
Statements of Consolidated Cash Flows ....................................................
Consolidated Balance Sheets ..............................................................

Notes to Consolidated Financial Statements ...............................................

</TABLE>
                                     A-1
<PAGE>

EFH01434761

TEXAS UTILITIES COMPANY AND SUBSIDIARIES
SELECTED FINANCIAL DATA
CONSOLIDATED FINANCIAL STATISTICS

<TABLE>
<CAPTION>

|  | Year Ended De |  |  |
|---|---|---|---|
|  | 1997 | 1996 | 1995 |
|  | (Dollars in Thousands, except |  |  |
| <S> | <C> | <C> | <C> |
| Total assets -- end of year ..................... | $24,874,129 | $21,397,655 | $21,535 |
| Property, plant & equipment - gross -- end of year ....... | $26,579,187 | $24,931,239 | $24,911 |
| Accumulated depreciation and amortization -- end of year........................................ | 7,172,152 | 6,496,724 | 5,857 |
| Reserve for regulatory disallowances -- end of year .... | 836,005 | 836,005 | 1,308 |
| Construction expenditures (including allowance for funds used during construction) ...................... | 586,097 | 434,139 | 434 |
| Capitalization -- end of year |  |  |  |
| Long-term debt, less amounts due currently ............. | $ 8,759,379 | $ 8,668,111 | $ 9,174 |
| TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric ......................... | 875,146 | 381,311 | 381 |
| Preferred stock of subsidiaries: |  |  |  |
| Not subject to mandatory redemption ............. | 304,194 | 464,427 | 489 |
| Subject to mandatory redemption ................. | 20,600 | 238,391 | 263 |
| Common stock equity ............................. | 6,843,062 | 6,032,913 | 5,731 |
| Total ......................................... | $16,802,381 | $15,785,153 | $16,040 |
| Capitalization ratios -- end of year |  |  |  |
| Long-term debt, less amounts due currently ............. | 52.1% | 54.9% |  |
| TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric ......................... | 5.2 | 2.4 |  |
| Preferred stock of subsidiaries ..................... | 2.0 | 4.5 |  |
| Common stock equity ............................. | 40.7 | 38.2 |  |
| Total ......................................... | 100.0% | 100.0% | 1 |
| Embedded interest cost on long-term debt -- end of year ............................................. | 7.9% | 8.1% |  |
| Embedded distribution cost on TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric -- end of year ......................... | 8.3% | 8.7% |  |
| Embedded dividend cost on preferred stock of subsidiaries -- end of year* ......................... | 9.2% | 7.5% |  |
| Net income (loss) ................................... | $660,454 | $753,606 | $(138 |
| Dividends declared on common stock .................. | $496,244 | $456,059 | $ 634 |
| Common stock data |  |  |  |
| Shares outstanding -- average .................... | 230,957,999 | 225,159,846 | 225,841 |
| Shares outstanding -- end of year ................ | 245,237,559 | 224,602,557 | 225,841 |
| Basic Earnings (loss) per share .................. | $2.86 | $3.35 | $( |
| Diluted Earnings (loss) per share ................ | $2.85 | $3.35 | $( |
| Dividends declared per share ..................... | $2.125 | $2.025 | $ |
| Book value per share -- end of year .............. | $27.90 | $26.86 | $2 |
| Return on average common stock equity ............ | 10.3% | 12.8% | (2 |
| Ratio of earnings to fixed charges: |  |  |  |
| Pre-tax ......................................... | 2.3 | 2.4 |  |

EFH01434762

| After-tax ................................ | | 1.8 | 2.0 |
|---|---|---|---|
| Allowance for funds used during construction as percent of net income ................................ | | 2.1% | 1.7% |

---

</TABLE>

\* Includes the unamortized balance of the loss on reacquired preferred stock and associated amortization. The embedded dividend cost excluding the effects of the loss on reacquired preferred stock is 6.6% for 1997, 6.8% for 1996, and 6.9% for 1995.

Certain financial statistics for 1997 were affected by the August 1997 acquisition of ENSERCH and the November 1997 acquisition of LCC; for 1996 and 1995 were affected by the December 1995 acquisition of Eastern Energy; for the year 1995, were affected by recording of the impairment of certain assets (see Note 14 to Consolidated Financial Statements); and for the year 1993, were affected by TU Electric recording a regulatory disallowance in a rate order issued by the PUC in Docket 11735 (see Note 13 to Consolidated Financial Statements).  Shares outstanding assuming dilution for 1997 was 231,957,491. There were no additional diluted shares for any of the prior periods presented.

A-2

<PAGE>

TEXAS UTILITIES COMPANY AND SUBSIDIARIES
CONSOLIDATED OPERATING STATISTICS

<TABLE>
<CAPTION>

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 1997 | 1996 | 1995 | 1994 |
| <S> | <C> | <C> | <C> | <C> |
| ELECTRIC ENERGY GENERATED AND PURCHASED (MWh) | | | | |
| Generated -- net station output............... | 91,297,900 | 88,129,637 | 83,876,565 | 81,320, |
| Purchased and net interchange................. | 17,170,477 | 18,119,171 | 11,880,174 | 12,551, |
| Total generated and purchased.............. | 108,468,377 | 106,248,808 | 95,756,739 | 93,872, |
| Company use, losses and unaccounted for...... | 6,255,458 | 5,905,076 | 5,653,698 | 5,246, |
| Total electric energy sales........... | 102,212,919 | 100,343,732 | 90,103,041 | 88,625, |
| SALES VOLUMES | | | | |
| Electric Energy Sales (MWh) | | | | |
| Residential................................. | 36,376,916 | 35,855,314 | 31,284,477 | 30,460, |
| Commercial.................................. | 28,851,097 | 27,946,728 | 25,899,942 | 25,073, |
| Industrial.................................. | 26,253,835 | 25,755,045 | 23,586,291 | 23,154, |
| Government and municipal.................... | 6,231,775 | 6,161,150 | 5,752,800 | 5,619, |
| Total general business.................. | 97,713,622 | 95,718,237 | 86,523,510 | 84,307, |
| Other electric utilities............... | 4,499,296 | 4,625,495 | 3,579,531 | 4,318, |
| Total electric energy sales........... | 102,212,919 | 100,343,732 | 90,103,041 | 88,625, |
| Gas Distribution (million cubic feet): | | | | |
| Residential................................. | 33,417 | -- | -- | |
| Commercial.................................. | 20,996 | -- | -- | |
| Industrial.................................. | 2,094 | -- | -- | |
| Electric generation......................... | 463 | -- | -- | |
| Total gas distribution................ | 56,970 | -- | -- | |
| Pipeline transportation (million cubic feet).. | 255,391 | -- | -- | |
| Gas liquids (thousand barrels)................ | 2,521 | -- | -- | |
| Gas marketing (million cubic feet)............ | 292,264 | -- | -- | |

OPERATING REVENUES (thousands)
  Electric base rate:

| | | | | |
|---|---|---|---|---|
| Residential................................ | $2,248,411 | $2,251,734 | $1,920,087 | $1,862, |
| Commercial................................ | 1,368,057 | 1,357,326 | 1,219,443 | 1,183, |
| Industrial................................ | 668,805 | 690,943 | 602,518 | 595, |
| Government and municipal................... | 319,795 | 322,013 | 287,674 | 283, |
| Total general business.......... | 4,605,068 | 4,622,016 | 4,029,722 | 3,925, |
| Other electric utilities............. | 138,974 | 146,358 | 117,904 | 155, |
| Total base rate revenues........... | 4,744,042 | 4,768,374 | 4,147,626 | 4,080, |
| Fuel revenue (including over/under-recovered). | 1,696,409 | 1,670,844 | 1,418,211 | 1,513, |
| Transmission service revenues............. | 113,196 | -- | -- | |
| Other operating revenues................... | 110,670 | 111,710 | 72,851 | 68, |
| Total electric operating revenues...... | 6,664,317 | 6,550,928 | 5,638,688 | 5,663, |
| | | | | |
| Gas distribution | | | | |
| Residential................................ | 205,760 | -- | -- | |
| Commercial................................ | 108,650 | -- | -- | |
| Industrial................................ | 8,594 | -- | -- | |
| Electric generation......................... | 6,424 | -- | -- | |
| Total gas distribution............... | 329,428 | -- | -- | |
| Pipeline transportation..................... | 57,544 | -- | -- | |
| Gas liquids................................ | 36,514 | -- | -- | |
| Gas marketing.............................. | 858,566 | -- | -- | |
| Telecommunications......................... | 11,900 | -- | -- | |
| Other...................................... | 43,877 | -- | -- | |
| Less intercompany revenues.................. | (56,538) | -- | -- | |
| Total operating revenues............. | $7,945,608 | $6,550,928 | $5,638,688 | $5,663, |

</TABLE>

A-3

<PAGE>

TEXAS UTILITIES COMPANY AND SUBSIDIARIES
CONSOLIDATED OPERATING STATISTICS

<TABLE>
<CAPTION>

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1997 | 1996 | 1995 | 1994 | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CUSTOMERS (end of year) | | | | | |
| Electric | | | | | |
| Residential................................ | 2,607,803 | 2,558,025 | 2,504,128 | 2,053,235 | 2,0 |
| Commercial................................ | 281,694 | 274,076 | 267,579 | 225,479 | 2 |
| Industrial................................ | 50,153 | 49,390 | 49,558 | 21,673 | |
| Government and municipal................... | 32,289 | 31,108 | 30,458 | 29,437 | |
| Total general business.................. | 2,971,939 | 2,912,599 | 2,851,723 | 2,329,824 | 2,2 |
| Other electric utilities.................. | 128 | 161 | 165 | 212 | |
| Total electric customers............... | 2,972,067 | 2,912,760 | 2,851,888 | 2,330,036 | 2,2 |
| | | | | | |
| Gas distribution........................... | 1,355,402 | -- | -- | -- | |

ELECTRIC RESIDENTIAL STATISTICS
  (excludes master-metered
  customers, kWh sales and revenues)
    Average annual kWh per customer.........    13,495    13,551    12,003    14,192
    Average revenue per kWh.................     7.95c     8.02c     8.08c     8.25c


- ----------
Industrial classification
  includes service to Alcoa-Sandow:
    Electric energy sales (Mwh).............   3,820,421   3,841,904   3,764,658   3,886,258   3,1
    Operating revenues (thousands)..........    $46,755    $46,853    $47,739    $54,699    $
</TABLE>


Certain previously reported operating statistics have been reclassified to
conform to current classifications.  The operating statistics include the
operations of ENSERCH and Eastern Energy from their date of acquisition, August
1997 and December 1995, respectively.

                            A-4

<PAGE>

              TEXAS UTILITIES ELECTRIC COMPANY AND SUBSIDIARIES
                         SELECTED FINANCIAL DATA
                    CONSOLIDATED FINANCIAL STATISTICS


<TABLE>
<CAPTION>

|  |  | Year Ended De |
| --- | --- | --- | --- |
|  | 1997 | 1996 | 1995 |
|  | ---- | ---- | ---- |
|  |  |  | (Dollars in T |
| <S> | <C> | <C> | <C> |
| Total assets -- end of year............................. | $18,833,433 | $18,794,939 | $19,003 |
| Electric plant - gross -- end of year.................. | $22,219,894 | $22,664,086 | $22,747 |
| Accumulated depreciation and amortization -- end of year............................................. | 6,120,309 | 5,963,477 | 5,370 |
| Reserve for regulatory disallowances -- end of year..... | 836,005 | 836,005 | 1,308 |
| Construction expenditures (including allowance for funds used during construction)...................... | 446,088 | 377,438 | 407 |
| Capitalization -- end of year |  |  |  |
| Long-term debt........................................ | $ 5,475,447 | $ 6,310,594 | $ 7,212 |
| TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric.......................... | 875,146 | 381,311 | 381 |
| Preferred stock: |  |  |  |
| Not subject to mandatory redemption.................. | 129,194 | 464,427 | 489 |
| Subject to mandatory redemption...................... | 20,600 | 238,391 | 263 |
| Common stock equity................................... | 6,298,445 | 6,105,907 | 5,799 |
| Total........................................... | $12,798,832 | $13,500,630 | $14,146 |
| Embedded interest cost on long-term debt -- end of year............................................ | 8.3% | 8.3% |  |
| Embedded distribution cost on TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric -- end of year ................................ | 8.3% | 8.7% |  |

EFH01434765

| Embedded dividend cost on preferred stock -- end of year*...................................... | 14.1% | 7.5% | |
| --- | --- | --- | --- |
| Net income available for common stock.................... | $  745,024 | $  809,337 | $  367 |
| Dividends declared on common stock..................... | $  136,416 | $  503,328 | $  682 |
| Ratio of earnings to fixed charges: | | | |
| Pre-tax.............................................. | 2.9 | 3.0 | |
| After-tax............................................ | 2.3 | 2.5 | |
| Ratio of earnings to combined fixed charges and preferred dividends...................................... | 2.8 | 2.7 | |
| Allowance for funds used during construction as a percent of consolidated net income available for common stock.. | 1.8% | 1.6% | |
| Return on average common stock equity................... | 12.0% | 13.6% | |

</TABLE>
* Includes the unamortized balance of the loss on reacquired preferred stock and associated amortization. The embedded dividend cost excluding the effects of the loss on reacquired preferred stock is 6.9% for 1997, 6.8% for 1996, and 6.9% for 1995.

Certain financial statistics for 1995 were affected by the recording of the impairment of certain assets (see Note 14 to Consolidated Financial Statements); and for the year 1993, were affected by TU Electric recording a regulatory disallowance in a rate order issued by the PUC in Docket 11735 (see Note 13 to Consolidated Financial Statements).

A-5

<PAGE>

TEXAS UTILITIES ELECTRIC COMPANY AND SUBSIDIARIES
CONSOLIDATED OPERATING STATISTICS

<TABLE>
<CAPTION>

|  | Year Ended De | | |
| --- | --- | --- | --- |
|  | 1997 | 1996 | 19 |
| <S> | <C> | <C> | <C> |
| ELECTRIC ENERGY GENERATED AND PURCHASED (MWh) | | | |
| Generated -- net station output............................ | 91,297,900 | 88,129,637 | 83,8 |
| Purchased and net interchange.......................... | 11,442,749 | 12,417,774 | 10,6 |
| Total generated and purchased......................... | 102,740,649 | 100,547,411 | 94,5 |
| Company use, losses and unaccounted for................... | 6,161,070 | 5,804,526 | 5,5 |
| Total electric energy sales........................ | 96,579,579 | 94,742,885 | 89,0 |
| ELECTRIC ENERGY SALES (MWh) | | | |
| Residential......................................... | 33,529,811 | 33,038,399 | 30,7 |
| Commercial.......................................... | 27,322,757 | 26,455,954 | 25,5 |
| Industrial.......................................... | 24,609,131 | 24,214,960 | 23,3 |
| Government and municipal............................. | 6,039,407 | 5,929,249 | 5,6 |
| Total general business.............................. | 91,501,106 | 89,638,562 | 85,1 |
| Other electric utilities.............................. | 5,078,473 | 5,104,323 | 3,8 |
| Total electric energy sales......................... | 96,579,579 | 94,742,885 | 89,0 |
| OPERATING REVENUES (thousands) | | | |
| Base rate: | | | |
| Residential......................................... | $ 1,990,903 | $ 1,993,506 | $ 1,8 |

EFH01434766

| | | | |
|---|---|---|---|
| Commercial............................................... | 1,230,330 | 1,227,271 | 1,1 |
| Industrial............................................... | 582,345 | 590,174 | 5 |
| Government and municipal.................................. | 292,623 | 291,020 | 2 |
| | ----------- | ----------- | ----- |
| Total general business................................ | 4,101,201 | 4,101,971 | 3,9 |
| Other electric utilities................................. | 163,663 | 165,619 | 1 |
| | ----------- | ----------- | ----- |
| Total from base rate revenues......................... | 4,264,864 | 4,267,590 | 4,0 |
| Fuel revenues (including over/under-recovered)............ | 1,707,044 | 1,679,009 | 1,4 |
| Transmission service revenues............................. | 113,811 | -- | |
| Other operating revenues.................................. | 49,698 | 83,012 | |
| | ----------- | ----------- | ----- |
| Total operating revenues.............................. | $ 6,135,417 | $ 6,029,611 | $ 5,5 |
| | =========== | =========== | ===== |

ELECTRIC CUSTOMERS (end of year)

| | | | |
|---|---|---|---|
| Residential.............................................. | 2,152,362 | 2,109,343 | 2,0 |
| Commercial............................................... | 237,312 | 230,253 | 2 |
| Industrial............................................... | 21,004 | 21,002 | |
| Government and municipal.................................. | 30,628 | 30,062 | |
| | ----------- | ----------- | ----- |
| Total general business................................ | 2,441,306 | 2,390,660 | 2,3 |
| Other electric utilities................................. | 140 | 173 | |
| | ----------- | ----------- | ----- |
| Total electric customers.............................. | 2,441,446 | 2,390,833 | 2,3 |
| | =========== | =========== | ===== |

RESIDENTIAL STATISTICS (excludes master-metered
 customers, kWh sales and revenues)

| | | |
|---|---|---|
| Average annual kWh per customer......................... | 15,026 | 15,100 |
| Average revenue per kWh................................. | 7.85c | 7.91c |

- -------------------------
Industrial classification includes service to Alcoa-Sandow:

| | | | |
|---|---|---|---|
| Electric energy sales (MWh)............................. | 3,820,421 | 3,841,904 | 3,7 |
| Operating revenues (thousands).......................... | $46,755 | $46,853 | $ |

</TABLE>

Certain previously reported operating statistics have been reclassified to
conform to current classifications.

                                  A-6
<PAGE>

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
OPERATION

FORWARD-LOOKING STATEMENTS

   This report and other presentations made by Texas Utilities Company  (the
Company or TUC) and its direct and indirect subsidiaries (System Companies) or
Texas Utilities Electric Company and its subsidiaries (TU Electric) contain
forward-looking statements within the meaning of Section 21E of the Securities
Exchange Act of 1934, as amended.  Although the Company and TU Electric each
believes that in making any such statement its expectations are based on
reasonable assumptions, any such statement involves uncertainties and is
qualified in its entirety by reference to the following important factors, among
others, that could cause the actual results of the Company or TU Electric to
differ materially from those projected in such forward-looking statement: (i)
prevailing governmental policies and regulatory actions, including those of the
Federal Energy Regulatory Commission, the Public Utility Commission of Texas
(PUC), the Railroad Commission of Texas (RRC), the Nuclear Regulatory
Commission, and, in the case of the Company, the Office of the Regulator General
of Victoria, Australia, with respect to allowed rates of return, industry and
rate structure, purchased power and investment recovery, operations of nuclear
generating facilities, acquisitions and disposal of assets and facilities,
operation and construction of plant facilities, decommissioning costs, present

or prospective wholesale and retail competition, changes in tax laws and
policies and changes in and compliance with environmental and safety laws and
policies, (ii) weather conditions and other natural phenomena, (iii)
unanticipated population growth or decline, and changes in market demand and
demographic patterns, (iv) competition for retail and wholesale customers, (v)
pricing and transportation of crude oil, natural gas and other commodities, (vi)
unanticipated changes in interest rates, rates of inflation or in foreign
exchange rates, (vii) unanticipated changes in operating expenses and capital
expenditures, (viii) capital market conditions, (ix) competition for new energy
development opportunities, (x) legal and administrative proceedings and
settlements, (xi) inability of the various counterparties to meet their
obligations with respect to the Company's and TU Electric's financial
instruments, (xii) changes in technology used and services offered by the
Company and TU Electric, and (xiii) significant changes in the Company's
relationship with its employees and the potential adverse effects if labor
disputes or grievances were to occur.

    Any forward-looking statement speaks only as of the date on which such
statement is made, and neither the Company nor TU Electric undertakes any
obligation to update any forward-looking statement to reflect events or
circumstances after the date on which such statement is made or to reflect the
occurrence of unanticipated events.  New factors emerge from time to time and it
is not possible for the Company or TU Electric to predict all of such factors,
nor can they assess the impact of each such factor or the extent to which any
factor, or combination of factors, may cause results to differ materially from
those contained in any forward-looking statement.

FINANCIAL CONDITION

Mergers and Acquisitions

    Certain comparisons in this Form 10-K have been affected by the August 1997
acquisition of ENSERCH Corporation (ENSERCH) and the November 1997 acquisition
of Lufkin-Conroe Communications Co. (LCC) by the Company and by the December
1995 acquisition of Eastern Energy Limited (Eastern Energy) by Texas Utilities
Australia Pty. Ltd. (TU Australia), a wholly-owned subsidiary of the Company.
The results of each acquired company are included only for the periods
subsequent to acquisition.  (See Note 1 to Consolidated Financial Statements.)

    On August 5, 1997, the merger transactions (Merger) between the former Texas
Utilities Company, now known as Texas Energy Industries Inc. (TEI), and ENSERCH
were completed.  At the effective time of the Merger:  (i) the former  Texas
Utilities Company changed its name to TEI, (ii) TEI and ENSERCH merged with
wholly-owned subsidiaries of TUC Holding Company, which, as a result, owned all
the common stock of TEI and of ENSERCH, (iii) TUC Holding Company changed its
name to Texas Utilities Company (now the Company), (iv) each share of TEI's
common stock was automatically converted into one share of common stock of TUC,
and (v) each share of common stock of ENSERCH was automatically converted into
0.225 share of common stock of TUC, with cash issued in lieu of fractional
shares.  The share conversions were tax-free transactions.

                                    A-7

<PAGE>

    In the Merger, approximately 15. 9 million  shares of TUC common stock were
issued to former holders of ENSERCH common stock.  The value assigned to the TUC
shares issued and costs incurred in connection with the acquisition of ENSERCH
aggregated $579 million.  At the date of the Merger,  ENSERCH had debt and
preferred stock outstanding of approximately $1.3 billion.

    Businesses and subsidiaries acquired in the Merger were Lone Star Gas Company
(Lone Star Gas), a gas distribution company  in Texas, Lone Star Pipeline
Company (Lone Star Pipeline) and subsidiaries engaged in natural gas processing,
natural gas marketing,  independent power production and international gas
distribution systems development.

On November 21, 1997, the Company acquired LCC.  Approximately 8.7 million shares of TUC common stock were issued to LCC stockholders in a stock-for-stock exchange.  The value assigned to the TUC shares issued and costs incurred in connection with the acquisition of LCC aggregated $319 million.  At the date of the acquisition, LCC had debt outstanding of approximately $31 million.

The acquisitions of ENSERCH, LCC and Eastern Energy were accounted for as purchase business combinations.  The assets and liabilities of the acquired companies at the acquisition dates were adjusted to their estimated fair values.  The excess of the purchase price paid by the Company over the estimated fair value of net assets acquired and liabilities assumed was recorded as goodwill and is being amortized over 40 years.  The process of determining the fair value of assets and liabilities of ENSERCH and LCC as of the date of acquisition is continuing, and the final result awaits primarily the resolution of income tax and other contingencies and finalization of some preliminary estimates.

For financial reporting purposes, the Company is being treated as the successor to TEI.  Unless otherwise specified, all references to the Company which relate to a period prior to August 5, 1997, shall be deemed to be references to TEI.

The Company continues to seek potential investment opportunities from time to time when it concludes that such investments are consistent with its business strategies and are likely to enhance the long-term return to its shareholders. In January 1998, the Company announced that it had approached the Energy Group plc (TEG) in connection with its possible interest in acquiring TEG.  TEG is a diversified international energy group.  Discussions between the Company and TEG are continuing and may or may not lead to an offer being made by the Company. Likewise, the timing, amount and funding of any specific new business investment opportunities are presently undetermined.

Capital Expenditures

The Company and TU Electric
- --------------------------

The primary capital expenditures of the Company and all of its majority-owned subsidiaries (System Companies) in 1997 and as estimated for 1998 through 2000 are as follows:

|  | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|
|  | ---- | ---- | ---- | ---- |
|  |  | Thousands of Dollars |  |  |
| Cash construction expenditures (excluding allowance for funds used during construction)..... | $ 577,000 | $ 886,000 | $ 799,000 | $ 852,000 |
| Nuclear fuel (excluding allowance for funds used during construction).......... | 71,000 | 104,000 | 81,000 | 92,000 |
| Maturities and redemptions of long-term debt, sinking fund requirements, redemptions of preferred stock and reacquisitions of common stock......... | 2,276,000 | 772,000 | 505,000 | 1,859,000 |
| Total..................... | $2,924,000 | $1,762,000 | $1,385,000 | $2,803,000 |

For information concerning construction work contemplated by the System Companies and the commitments with respect thereto, see Note 15 to the Consolidated Financial Statements.

A-8

EFH01434769

<PAGE>

In 1997, the Company bought ENSERCH for $579 million and LCC for $319 million primarily through the issuance of common stock.

The primary capital expenditures of TU Electric in 1997 and as estimated for 1998 through 2000 are as follows:

<TABLE>
<CAPTION>

|  | 1997 | 1998 |
| --- | --- | --- |
|  |  | Thousands |
| <S> | <C> | <C> |
| Cash construction expenditures (excluding allowance for funds used during construction) ..................... | $  438,000 | $  449,000 |
| Nuclear fuel (excluding allowance for funds used during construction) ............................................ | 71,000 | 104,000 |
| Maturities and redemptions of long-term debt, sinking fund requirements and redemptions of preferred stock ............................................. | 1,775,000 | 753,000 |
| Total ............................................. | $2,284,000 | $1,306,000 |

</TABLE>

See Item 2. Properties -- Capital Expenditures and Note 15 to Consolidated Financial Statements.

Liquidity and Capital Resources

For 1997, the System Companies generated cash from operations sufficient to meet operating needs and debt service requirements, pay dividends on capital stock, pay distributions on preferred securities of trusts and finance capital expenditures. Factors affecting the continued ability of TU Electric, the Company's primary subsidiary, to fund its capital requirements from operations include responsive regulatory practices allowing recovery of capital investment through adequate depreciation rates, recovery of the cost of fuel and purchased power and the opportunity to earn competitive rates of return required in the capital markets.

External funds of a permanent or long-term nature are obtained through the issuance of common and preferred stock, preferred securities and long-term debt by the System Companies. The capitalization ratios of the Company and its subsidiaries at December 31, 1997, consisted of approximately 52% long-term debt, 5% TU Electric  obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric, 2% preferred stock and 41% common stock equity.

The capitalization ratios of TU Electric at December 31, 1997 consisted of approximately 43% long-term debt, 7% TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric, 1% preferred stock and 49% common stock equity.

Proceeds from financings by System Companies in 1997 were used primarily for the early redemption or reacquisition of debt and preferred stock. The financings consisted of:

<TABLE>
<CAPTION>

|  | Principal Amount | C Inte |
| --- | --- | --- |
| Description |  |  |
| ----------- | ---------- | ---- |

EFH01434770

<S>                                                                    <C>      Thousands
                                                                                <C>

| | | |
|---|---|---|
| Senior Notes issued by the Company ................................... | $ 300,000 | 6.20% |
| Unsecured Debentures issued by TU Electric ........................... | 300,000 | 7. |
| Pollution Control Revenue Bonds (backed by TU Electric First Mortgage Bonds) ............................................................... | 212,715 | 3.70% |
| TU Electric obligated, mandatorily redeemable, preferred securities .... | 493,273 | 7.183% |
| Other ................................................................ | 9,964 | |
| Total ................................................................ | $1,315,952 | |

</TABLE>

During 1997, the Company purchased and retired 4,015,000 shares of its common stock at a cost of $148.8 million. In addition, long-term debt and preferred stock of subsidiary companies totaling $2.1 billion was retired. Early redemptions of long-term debt and preferred stock may occur from time to time in amounts presently undetermined. (See Notes 6 and 8 to Consolidated Financial Statements.)

                                    A-9
<PAGE>

At December 31, 1997, TUC, TU Electric and ENSERCH had joint lines of credit under credit facility agreements (Credit Agreements) with a group of commercial banks. The Credit Agreements have two facilities. Facility A provides for short-term borrowings aggregating up to $570 million outstanding at any one time at variable interest rates and terminates April 23, 1998. Facility B provides for short-term borrowings aggregating up to $1,330 million outstanding at any one time at variable interest rates and terminates April 24, 2002. The combined borrowings of TUC, TU Electric and ENSERCH under both facilities are limited to an aggregate of $1,900 million outstanding at any one time. ENSERCH's borrowings under both facilities are limited to an aggregate of up to $650 million outstanding at any one time. Borrowings under these facilities will be used for working capital and other corporate purposes, including commercial paper backup. The total of short-term borrowings authorized by the Board of Directors of TUC at December 31, 1997, from banks or other lenders, was $2,150 million.

In addition, certain non-U.S. subsidiaries have revolving credit agreements aggregating approximately $95 million, of which $61 million was outstanding at December 31, 1997. These revolving credit agreements expire at various dates through 2000.

In January 1998, the Company issued $200 million of 6.375% Series C Senior Notes due 2008, and ENSERCH issued $125 million of 6 1/4% Series A Notes due 2003 and $125 million of Remarketed Reset Notes due 2008 with a variable interest rate (5.82% at date of issuance). Net proceeds from these borrowings were used to refinance or redeem like amounts of higher rate debt and preferred stock.

The System Companies may issue additional debt and equity securities as needed, including the possible future sale: (i) by TU Electric of up to $148.9 million principal amount of debt securities, (ii) by TU Electric of up to 250,000 shares of Cumulative Preferred Stock ($100 liquidation value), and (iii) by ENSERCH of up to $250 million aggregate principal amount of securities, all of which are currently registered with the Securities and Exchange Commission (SEC) for offering pursuant to Rule 415 under the Securities Act of 1933.

Quantitative and Qualitative Disclosure About Market Risk

The Company's market risk exposure is primarily a result of changes in interest rates and commodity price exposures. Derivative instruments including options, swaps, futures and other contractual commitments are used to reduce and manage a portion of those risks. With the exception of the marketing activities

of a subsidiary, Enserch Energy Services, Inc. (EES), the Company's participation in derivative transactions are designated for hedging purposes; derivative instruments are not held or issued for trading purposes.

CREDIT RISK - Credit risk relates to the risk of loss that the Company would incur as a result of nonperformance by counterparties to their respective derivative instruments. The Company maintains credit policies with regard to its counterparties that management believes significantly minimize overall credit risk. The Company does not obtain collateral to support the agreements but monitors the financial viability of counterparties and believes its credit risk is minimal on these transactions. The Company believes the risk of nonperformance by counterparties is minimal.

INTEREST RATE MARKET RISK - The table below provides information concerning the Company's and TU Electric's financial instruments as of December 31, 1997 that are sensitive to changes in interest rates, which include debt obligations and interest rate swaps. For debt obligations, the table presents principal cash flows and related weighted average interest rates by expected maturity dates. The Company or TU Electric have entered into interest rate swaps under which they have agreed to exchange the difference between fixed-rate and variable-rate interest amounts calculated with reference to the specified notional principal amounts. The contracts require settlement of net interest receivable or payable at specified intervals (primarily semi-annually) which generally coincide with the dates on which interest is payable on the underlying debt. When differences exist between the swap settlement dates and the dates on which interest is payable on the underlying debt, the gap exposure, or basis risk, is managed by means of forward rate agreements. These forward rate agreements are not expected to have a material effect on the Company's and TU Electric's financial position, results of operations or cash flows.  For interest rate swaps, the table presents notional amounts and weighted average interest rates by expected (contractual) maturity dates. Weighted average variable rates are based on rates in effect at the reporting date.

A-10

<PAGE>

<TABLE>
<CAPTION>

|  | Expected Maturity Da |
| --- | --- |

| The Company | 1998 | 1999 | 2000 | 2001 | 2002 |
| - ----------- | ---- | ---- | ---- | ---- | ---- |
| December 31, 1997 |  |  |  | Millions of Dollar |  |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Long-term Debt (including current maturities) |  |  |  |  |  |
|   Fixed Rate ($US)........................... | $772.1 | $504.7 | $868.5 | $344.4 | $595.1 |
|     Average interest rate..................... | 7.18% | 8.38% | 6.61% | 8.00% | 7.53% |
|   Variable Rate ($US)........................ | -- | -- | $990.4 | -- | -- |
|     Average interest rate..................... | -- | -- | 6.18% | -- | -- |
|  |  |  |  |  |  |
| Interest Rate Swaps (notional amounts) |  |  |  |  |  |
|   Variable to Fixed ($US)..................... | $16.3 | $110.5 | $32.5 | -- | $468.2 |
|     Average pay rate.......................... | 5.29% | 6.68% | 6.14% | -- | 8.45% |
|     Average receive rate...................... | 5.08% | 4.89% | 4.89% | -- | 5.23% |
|  |  |  |  |  |  |
|   Fixed to Variable ($US)..................... | -- | -- | -- | -- | -- |
|     Average pay rate.......................... | -- | -- | -- | -- | -- |
|     Average receive rate...................... | -- | -- | -- | -- | -- |

TU Electric
- -----------
December 31, 1997

| Long-term Debt Obligations (including current maturities) | | | | | |
|---|---|---|---|---|---|
| Fixed Rate ($US).............................. | $752.6 | $335.9 | $159.4 | $225.5 | $373.8 |
| Average interest rate...................... | 7.12% | 8.92% | 6.62% | 7.49% | 8.22% |
| Variable Rate ($US)........................... | -- | -- | -- | -- | -- |
| Average interest rate..................... | -- | -- | -- | -- | -- |
| Interest Rate Swaps (notional amounts) | | | | | |
| Variable to Fixed ($US)...................... | -- | -- | -- | -- | -- |
| Average pay rate........................... | -- | -- | -- | -- | -- |
| Average receive rate....................... | -- | -- | -- | -- | -- |

</TABLE>

The Company and TU Electric
- ---------------------------

   ENERGY MARKETING MARKET RISK - As part of its natural gas marketing
activities, EES enters into forward contracts that principally involve physical
delivery of natural gas and derivative financial instruments, including options,
swaps, futures and other contractual arrangements to offset price risks of gas
supply. These activities involve price commitments into the future and,
therefore, give rise to market risk. EES applies mark-to-market accounting to
its business activities. At December 31, 1997, natural gas marketing operations
had net commitments to sell approximately 50.6 billion cubic feet (Bcf) of
natural gas through the year 2003 with offsetting net financial positions to
purchase approximately 61.3 Bcf.

   For purposes of new SEC disclosure requirements, EES has performed a
sensitivity analysis to estimate its exposure to market risk of its commodity
and related financial commitments. The exposure for fixed price natural gas
purchase and sale commitments, and derivative financial instruments, including
options, swaps, futures and other contractual commitments, is based on a
methodology that uses a five-day holding period and a 95% confidence level.  EES
uses market-implied volatilities to determine its exposure to volatility risk.
Market risk is estimated as the potential loss in fair value resulting from at
least a 15% change in market factors which may differ from actual results.
Using 15%, the most adverse change in fair value at December 31, 1997 as a
result of this analysis, was a reduction of $1.1 million.  For additional
information regarding derivative instruments, see Note 9 to Consolidated
Financial Statements.

                                 A-11
<PAGE>

   NUCLEAR DECOMMISSIONING AND DISPOSAL OF SPENT FUEL TRUST -- TU Electric has
established an external trust to provide for nuclear decommissioning and
disposal of spent fuel. The trust is invested in marketable fixed income debt
and equity securities. At December 31, 1997, the current market value of the
debt and equity securities was $85.9 million and $74. 1 million, respectively.
A hypothetical 10% increase in interest rates and 10% decrease in equity prices
would result in a $10.8 million reduction in the fair value of the trust assets.
However, adjustments to market value result in a corresponding adjustment to
related liability accounts based on current regulatory treatment.

Regulation and Rates

   Under the current regulatory environment, certain System Companies are
subject to the provisions of Statement of Financial Accounting Standards (SFAS)
No. 71, "Accounting for the Effects of Certain Types of Regulation" (SFAS 71).
This statement applies to utilities that have cost-based rates established by a
regulator and charged to and collected from customers. In accordance with this
statement, these companies may defer the recognition of certain costs
(regulatory assets) and certain obligations (regulatory liabilities) that, as a
result of the ratemaking process, have probable corresponding increases or

EFH01434773

decreases in future revenues. Future significant changes in regulation or
competition could affect these companies' ability to meet the criteria for
continued application of SFAS 71 and may affect these companies' ability to
recover such regulatory assets from, or refund such regulatory liabilities to,
customers. These regulatory assets and liabilities are being amortized over
various periods (5 to 40 years). The amortization is currently, or is expected
to be, included in rates. In the event all or a portion of these companies'
operations fail to meet the criteria for application of SFAS 71, these companies
would be required to write-off all or a portion of their regulatory assets and
liabilities. Should significant changes in regulation or competition occur, the
affected System Companies would be required to assess the recoverability of
certain assets, including plant and regulatory assets, and, if impaired, to
write down the assets to reflect their fair market value. (See Note 2 to
Consolidated Financial Statements.) The System Companies cannot predict the
timing or extent of changes in the business environment that may require the
discontinuation of SFAS 71 application.


The Company and TU Electric
- -------------------------

   Although TU Electric cannot predict future regulatory or legislative actions
or any changes in economic and securities market conditions, no changes are
expected in trends or commitments, other than those discussed in this Form 10-K,
which might significantly alter its basic financial position, results of
operation or cash flows. (See Note 15 to Consolidated Financial Statements.)

   Docket 9300 -- The PUC's final order (Order) in connection with TU Electric's
January 1990 rate increase request (Docket 9300) was reviewed by the 250th
Judicial District Court of Travis County, Texas, (District Court) and thereafter
was appealed to the Court of Appeals for the Third District of Texas and to the
Supreme Court of Texas (Supreme Court). As a result of such review and appeals,
an aggregate of $909 million of disallowances with respect to TU Electric's
reacquisitions of minority owners' interests in Comanche Peak, which had
previously been recorded as a charge to the Company's and TU Electric's
earnings, has been remanded to the District Court with instructions that it be
remanded to the PUC for reconsideration on the basis of a prudent investment
standard. On remand, the PUC would also be required to reevaluate the
appropriate level of TU Electric's construction work in progress included in
rate base in light of its financial condition at the time of the initial
hearing. In January 1997, the Supreme Court denied a motion for rehearing on
the Comanche Peak minority owners issue filed by the original complainants. TU
Electric cannot predict the outcome of the reconsideration of the Order on
remand by the PUC.

   In its decision, the Supreme Court also affirmed the previous $472 million
prudence disallowance related to Comanche Peak. Since the Company and TU
Electric each has previously recorded a charge to earnings for this prudence
disallowance, the Supreme Court's decision did not have an effect on the
Company's or TU Electric's current financial position, results of operation or
cash flows.

   Docket 11735 -- In July 1994, TU Electric filed a petition in the 200th
Judicial District Court of Travis County, Texas to seek judicial review of the
final order of the PUC granting a $449 million, or 9.0%, rate increase in
connection with TU Electric's January 1993 rate increase request of $760
million, or 15.3% (Docket 11735). Other parties to the PUC proceedings also
filed appeals with respect to various portions of the order.

                                    A-12
<PAGE>

   Dockets 15638 AND 15840 -- In May 1996, TU Electric filed with the PUC its
transmission cost information and tariffs for open-access wholesale transmission
service (Docket 15638) in accordance with PUC rules adopted in February 1996.
These tariffs also provide for generation-related ancillary services necessary
to support wholesale transactions. In August 1997, the PUC approved final

tariffs for TU Electric and implemented rates for other transmission providers within the Electric Reliability Council of Texas (ERCOT) (Docket 15840). Under rates implemented by the PUC, TU Electric's payments for transmission service will exceed its revenues for providing transmission service. The PUC has adopted a rate-moderation plan that will minimize the impact of the new pricing mechanism for the first three years the rules are in effect. As such, the current maximum impact on TU Electric for 1998 is an $8.52 million deficit, which, in the opinion of TU Electric, is not expected to have a material effect on its financial position, results of operation or cash flows.

Docket 17250 -- In late 1996, as part of its regular earnings monitoring process, the PUC staff advised the PUC, after reviewing the 1995 Electric Investor-Owned Utilities Earnings Report of TU Electric, that it believed TU Electric was earning in excess of a reasonable rate of return, and the PUC and TU Electric subsequently began discussions concerning possible remedies. It was decided to limit negotiations to a resolution of issues concerning TU Electric's earnings through 1997, and discussion of a longer-term resolution was deferred. In July 1997, the PUC issued its final written order approving TU Electric's proposal to make a one-time $80 million refund to its customers (Rate Settlement) and to leave rates unchanged during the remainder of 1997.  TU Electric recorded the charge to revenues in July 1997 and included the refunds in August 1997 billings.  The proposal was the result of a joint stipulation in which TU Electric was joined by the PUC General Counsel, on behalf of the PUC Staff and the public interest, the Office of Public Utility Counsel, the state agency charged with representing the interests of residential and small commercial customers, and the Coalition of Cities served by TU Electric.

Docket 18490 -- On December 17, 1997, TU Electric, together with the PUC General Counsel, the Office of Public Utility Counsel and various other parties interested in TU Electric's rates and services, filed with the PUC  a stipulation and joint application which, if granted, would among other things: (i) result in permanent retail base rate credits beginning January 1, 1998, of 4% for residential customers, 2% for general service secondary customers and 1% for all other retail customers, (ii) result in additional permanent retail base rate credits beginning January 1, 1999, of 1.4% for residential customers, (iii) impose a 11.35% cap on TU Electric's rate of return on equity during 1998 and 1999, with any sums earned above that cap being applied as additional nuclear production depreciation, (iv) allow TU Electric to record depreciation applicable to transmission and distribution assets in 1998 and 1999 as additional depreciation of nuclear production assets, (v) establish an updated cost of service study that includes interruptible customers as customer classes, (vi) result in the permanent dismissal of pending appeals of prior PUC orders including Docket No. 11735, if all other parties that have filed appeals of those dockets also dismiss their appeals, (vii) result in the stay of any proceedings in the remand of Docket 9300 prior to January 1, 2000, and  (viii) result in all gains from off-system sales of electricity in excess of the amount included in base rates being flowed to customers through the fuel factor.

The PUC has until March 31, 1998 to approve or reject the stipulation and joint application. Otherwise, TU Electric may terminate the base rate reductions and all other aspects of the proposal upon giving two weeks notice to the PUC.

Fuel Cost Recovery Rule  -- TU Electric in July 1997, petitioned the PUC for and received interim approval to refund approximately $67 million, including interest, in over-collected fuel costs for the period October 1995 through May 1997 (Fuel Refund). Such over-collection was primarily due to TU Electric's ability to use less expensive nuclear fuel and purchased power to offset a higher-priced natural gas market during the period. Customer refunds were included in August 1997 billings. A final order confirming the Fuel Refund was entered by the PUC in October 1997.

Fuel Reconciliation Proceeding -- In July 1997, the PUC ruled on TU Electric's petition seeking final reconciliation of all eligible fuel and purchased power expenses incurred during the reconciliation period of July 1, 1992 through June 30, 1995 (approximately $4.7 billion ). In the ruling, the

PUC disallowed approximately $81 million of eligible fuel related costs (including interest of $12 million) incurred during the reconciliation period (Fuel Disallowance). The majority of the Fuel Disallowance (approximately $67 million) is related to replacement fuel costs as a result of the November 1993 collapse of the emissions chimney serving Unit 3 of the Monticello lignite-fueled generating station. In addition, the PUC ruled that approximately $10 million from the gain on sale of sulfur dioxide allowances should be deferred and reconsidered at a future date. TU Electric received a final written order from the PUC and recorded the charge to revenues in August 1997. TU Electric strongly disagrees with the Fuel Disallowance and has appealed the PUC's order.

A-13

<PAGE>

Flexible Rate Initiatives -- TU Electric continues to offer flexible rates in over 160 cities with original regulatory jurisdiction within its service territory (including the cities of Dallas and Fort Worth) to existing non-residential retail and wholesale customers that have viable alternative sources of supply and would otherwise leave the system. TU Electric also continues to offer an economic development rider to attract new businesses and to encourage existing customers to expand their facilities as well as an environmental technology rider to encourage qualifying customers to convert to technologies that conserve energy or improve the environment. TU Electric will continue to pursue the expanded use of flexible rates when such rates are necessary to be price-competitive.

Integrated Resource Plan -- In October 1994, TU Electric filed an application for approval by the PUC of certain aspects of its Integrated Resource Plan (IRP) for the ten year period 1995 - 2004. The IRP, developed as an experimental pilot project in conjunction with regulatory and customer groups, included the acquisition of electric energy through a competitive bidding process of third party-supplied demand-side management resources and renewable resources. In August 1995, the PUC remanded the case to an Administrative Law Judge for development of a solicitation plan and to more closely conform the TU Electric 1995 IRP to new state legislation that required the PUC to adopt a state-wide integrated resource planning rule by September 1, 1996. In January 1996, TU Electric filed an updated IRP with the PUC along with a proposed plan for the solicitation of resources through a competitive bidding process. The PUC issued its final order on TU Electric's IRP in October 1996, and modified the order in December 1996 and February 1997. The modified order approved a flexible solicitation plan that will allow TU Electric to conduct up to three optional resource solicitations for a total of 2,074 MW of demand-side and supply-side resources prior to the filing of its next IRP in June 1999. TU Electric is currently reviewing the need and timing for conducting the first of these resource solicitations.

In addition to its solicitation plan in the IRP docket, TU Electric requested and received approval from the PUC to expand its Power Cost Recovery tariff to provide current cost recovery of resource acquisition costs for demand-side management resources acquired in the solicitations and for eight previously approved demand-side management contracts entered into by TU Electric to the extent such costs are not currently reflected in TU Electric's base rates.

Open-Access Transmission -- In February 1996, pursuant to the 1995 amendments to PURA, the PUC adopted rules requiring each electric utility in ERCOT to provide wholesale transmission and related services to other utilities and non-utility power suppliers at rates, terms and conditions that are comparable to those applicable to such utility's use of its own transmission facilities.

Under the rules, the PUC established a transmission pricing mechanism consisting of an ERCOT system-wide component and a distance-sensitive component. The ERCOT system-wide component provides that each load-serving entity in ERCOT will pay a share of the ERCOT-wide transmission cost of service based on the entity's load. The distance-sensitive component provides that a distance-sensitive rate will be paid to utilities that own transmission facilities, based on the impact of transmitting power and energy to loads. The rates charged for

EFH01434776

using the transmission system are designed to ensure that all market
participants pay on a comparable basis to use the system. While all users of
the transmission grid pay rates that are comparably designed, the impact on
individual users will differ.

In May 1996, TU Electric filed with the PUC, under Docket 15638, its
transmission cost information and tariffs for open-access wholesale transmission
service. These tariffs also provide for generation-related ancillary services
necessary to support wholesale transactions. Company-specific proceedings to
determine transmission rates for each transmission provider within ERCOT were
concluded in 1996. In August 1997, the PUC approved final tariffs for TU
Electric and implemented rates for other transmission providers within ERCOT.

As a result of the PUC rules, the organization and structure of ERCOT has
been changed to provide for equal governance among all wholesale electricity
market participants. These changes were made in order to facilitate wholesale
competition while ensuring continued reliability within ERCOT.

A-14

<PAGE>

The Company
- -----------

LONE STAR GAS COMPANY AND LONE STAR PIPELINE COMPANY RATES -- In October
1996, Lone Star Pipeline filed a request with the RRC to increase the rate it
charges Lone Star Gas to store and transport gas ultimately destined for
residential and commercial customers in the 550 Texas cities and towns served by
Lone Star Gas. Lone Star Gas also requested that the RRC separately set rates
for costs to aggregate gas supply for these cities. Rates previously in effect
were set by the RRC in 1982. In September 1997, the RRC issued an order
reducing the charges by Lone Star Pipeline to Lone Star Gas for storage and
transportation services. In that order, the RRC did authorize separate charges
for the Lone Star Pipeline storage and transportation services, a separate
charge by Lone Star Gas for the cost of aggregating gas supplies, and a
continuation of the 100% flow through of purchased gas expense. The RRC also
imposed some new criteria for affiliate gas purchases and a new reconciliation
procedure that will require a review of purchased gas expenses every three
years. The RRC order has become final, but is being appealed by several parties
including Lone Star Pipeline and Lone Star Gas. The rates authorized by the
order became effective on December 1, 1997, and will result in an annual margin
reduction of approximately $8.2 million.

On August 20, 1996, the RRC ordered a general inquiry into the rates and
services of Lone Star Gas, most notably a review of Lone Star Gas' historic gas
cost and gas acquisition practices since the last rate setting. The inquiry
docket has been separated into different phases. Two of the phases, conversion
to the NARUC account numbering system and unbundling, have been dismissed by the
RRC, and one other phase, rate case expense, is pending RRC action on the basis
of a stipulation of all parties. In the phase dealing with historic gas cost
and gas acquisition practices, Lone Star Gas and Lone Star Pipeline have filed a
motion for summary disposition stating that any retroactive rate action would be
inappropriate and unlawful. Settlement discussions with intervenor cities are
ongoing. If the motion for summary disposition is denied, a hearing has been
scheduled to begin in August 1998. A number of management and transportation
related issues have been placed in a separate phase which still has an undefined
scope and is being held in abeyance pending the resolution of the phase dealing
with gas costs. Management believes that gas costs were prudently incurred and
were properly accounted for and recovered through the gas cost recovery
mechanism previously approved by the RRC. At this time, management is unable to
determine the ultimate outcome of the inquiry.

Competition

The Company and TU Electric
- ---------------------------

The National Energy Policy Act of 1992 (Energy Policy Act) addresses a wide range of energy issues and is intended to increase competition in electric generation and broaden access to electric transmission systems. In addition, the Public Utility Regulatory Act of 1995, as amended (PURA), impacts the PUC and its regulatory practices and encourages increased competition in some aspects of the electric utility industry in Texas. Although the Company is unable to predict the ultimate impact of the Energy Policy Act, PURA and any related regulations or legislation on the System Companies' operations, it believes that such actions are consistent with the trend toward increased competition in the energy industry.

In order to remain competitive, the System Companies are aggressively managing their operating costs and capital expenditures through streamlined business processes and are developing and implementing strategies to address an increasingly competitive environment. These strategies include initiatives to improve their return on corporate assets and to maximize shareholder value through new marketing programs, creative rate design and new business opportunities. Additional initiatives under consideration include the potential disposition or alternative utilization of existing assets and the restructuring of strategic business units.

While TU Electric has experienced competitive pressures in the wholesale market resulting in a small loss of load since the beginning of 1993, wholesale sales represented a relatively low percentage of TU Electric's consolidated operating revenues in 1997. TU Electric is unable to predict the extent of future competitive developments in either the wholesale or retail markets or what impact, if any, such developments may have on its operations.

Federal legislation such as the PURPA and, more recently, the Energy Policy Act, as well as initiatives in various states, encourage wholesale competition among electric utility and non-utility power producers. Together with increasing customer demand for lower-priced electricity and other energy services, these measures have accelerated the industry's movement

A-15

<PAGE>

toward a more competitive pricing and cost structure. Competition in the electric utility industry was also addressed in the 1995 session of the Texas legislature. PURA was amended to encourage greater wholesale competition and flexible retail pricing. PURA amendments also require the PUC to report to the legislature, during each legislative session, on competition in electric markets. Accordingly, PUC reports were submitted to the Texas legislature in January 1997, recommending that the legislature continue the process of expanding competition in the Texas electricity markets, leading to expanded retail competition, and authorize the PUC to take numerous steps toward that goal. The PUC further recommended that full competition not occur prior to the year 2000 in order to provide an environment through which both retail customers and utilities in Texas move more smoothly to achieve the perceived benefits of competition. The PUC is seeking guidance from the legislature and authority to address the issue of stranded cost recovery. The PUC's current estimate for TU Electric's potentially stranded retail costs ranged from a projected excess of net book value over market value of $7.7 billion to a projected excess of market value over net book value of $2.1 billion. Legislation that would have authorized retail competition was not enacted by the 1997 Texas legislature.

While the Company and TU Electric anticipate legislation being enacted during the 1999 session of the Texas legislature to authorize competition in the retail market, they cannot predict the ultimate outcome of the ongoing efforts that are taking place to restructure the electric utility industry or whether such outcome will have a material effect on their financial position, results of operation or cash flows.

RESULTS OF OPERATION

The Company
- -----------

     For the year ended December 31, 1997, net income for the Company decreased
approximately 12% from the prior period. Results for 1997 were reduced by the
recognition of TU Electric's $80.0 million Rate Settlement refund in July 1997,
the August 1997 $81.1 million Fuel Disallowance (including interest) and a
charge of $10.1 million from the sale of sulfur dioxide allowances previously
recognized.   After revenue-related and income taxes, these settlements reduced
income by $103.4 million. Excluding these items, 1997 net income increased
slightly over the 1996 period.   For the year ended December 31, 1996, net
income increased approximately 14% over the comparable 1995 period, excluding
the after-tax effect of recording a September 1995 impairment of several non-
performing assets.  Such impairment, on an after-tax basis, amounted to $802
million.  (See Note 14 to Consolidated Financial Statements.)

     TU Electric continued to experience core revenue and sales volume growth in
excess of 3% due to increases in both number of customers and usage.  Warmer
than normal summer weather contributed to 1996 results, while summer weather was
normal in 1995 and 1997.

     Operating revenues increased approximately 21% and 16% for the years ended
December 31, 1997 and 1996, respectively.  In 1997, the increase in operating
revenues was due primarily to the inclusion of ENSERCH revenues ($1,278.0
million) for the period following the Merger and to TU Electric's transmission
service revenues ($113.8 million) from implementing the PUC's Open Access
Transmission Rule effective January 1, 1997.  LCC's revenues after acquisition
were $11.9 million.  In 1996, the increase was due primarily to a full year of
Eastern Energy's revenues ($474 million).

     Base rate electricity revenues (including unbilled sales) decreased slightly
from 1996 as a result of the Rate Settlement refund mentioned above, while
electric energy sales in megawatt hours (including unbilled sales) increased
approximately 2% and 11% for 1997 and 1996, respectively.   Fuel revenue
increased in 1997 and 1996 due primarily to increases in fuel costs driven by
increased energy sales and spot market gas prices, partially offset, in 1997, by
the Fuel Disallowance.

     Fuel and purchased power expense increased approximately 4% and 30% for 1997
and 1996, respectively.  The increases were primarily due to increased energy
sales and increased spot market gas prices and in 1996 included 13.1%
attributable to Eastern Energy for a full year.   (See Consolidated Operating
Statistics.) Gas purchased for resale represents the cost of gas ultimately sold
to ENSERCH gas customers, which is recovered in rates.

     Total operating expenses, excluding fuel and purchased power and gas
purchased for resale, increased approximately 15% for 1997 and 9% for 1996
(including 8.6% in 1997 attributable to ENSERCH companies since acquisition and
5.7% in

                                    A-16
<PAGE>

1996 attributable to Eastern Energy).   Operation and maintenance expense
increased in 1997 as result of recording third party transmission expenses in
accordance with the PUC's Open Access Transmission Rule, partially offset by
decreased employee benefit expenses.  The 1996 increase is due primarily to
increases in employee benefit expenses and payroll expenses.  Taxes other than
income increased in 1997 due primarily to the effect of ENSERCH and LCC amounts
subsequent to acquisition. Taxes other than income decreased in 1996 as a result
of a reduction in TU Electric's ad valorem tax obligation due primarily to a
property tax rate reduction, partially offset by an increase in state and local
gross receipts tax.

     The change in other income (deductions) - net  in 1997 was primarily due to

losses from an interest in a telecommunications partnership.  Amounts for 1996 were lower than the previous year due primarily to increased non-utility property expenses and decreased allowance for equity funds used during construction, partially offset by gains on the disposition of certain properties.

Interest expense and distributions on preferred securities and preferred stock of subsidiaries totaled $860.6 million in 1997, $884.3 million in 1996 and $792.9 million in 1995. The Company's capital restructuring and debt reduction programs have favorably affected the comparisons. Year – to – year comparisons are also affected by the debt incurred or assumed in connection with the 1997 acquisitions of ENSERCH and LCC and the December 1995 acquisition of Eastern Energy. Interest expense in 1996 included an interest payment related to a settlement with the Internal Revenue Service, and 1997 interest expense included a charge related to the settlement on over-recovered fuel. Allowance for funds used during construction (AFUDC) decreased $2.4 million from 1996 to 1997 and $4.1 million from 1995 to 1996.

The change in income tax expense (benefit) from 1995 to 1996 was due primarily to the effects of the recording of the September 1995 asset impairment.  (See Note 10 to Consolidated Financial Statements for a reconciliation of income taxes (benefit) computed at the statutory rate to provision for income taxes (benefit).)

TU Electric
– -----------

For the year ended December 31, 1997,  net income for TU Electric decreased approximately 11% from the prior period. Results for 1997 were reduced by  the Rate Settlement, Fuel Disallowance and charge mentioned above which totaled $103.4 million after-taxes.  Excluding these items, 1997 net income increased slightly over the 1996 period.   For the year ended December 31, 1996, net income increased approximately 12% over the comparable 1995 period (excluding the $316 million after-tax effect of the September 1995 asset impairment).

Operating revenues increased approximately 2% and 8% for the years ended December 31, 1997 and 1996, respectively. In 1997, the increase in operating revenue reflects transmission service revenues ($113.5 million) from implementing the PUC's Open Access Transmission Rule effective January 1, 1997, with revenue increases due to customer growth essentially offsetting the impact of the Rate Settlement, the Fuel Disallowance and the charge related to the sulphur dioxide allowances. In 1996, the increase was a result of customer growth, increased usage and warmer than normal summer weather.

Base rate electricity revenues (including unbilled sales) decreased slightly from 1996 as a result of the Rate Settlement refund mentioned above while electric energy sales in MWh (including unbilled sales) increased approximately 2% and 6% for 1997 and 1996, respectively.   Fuel revenue increased in 1997 and 1996 due primarily to increases in fuel costs driven by increased energy sales and spot market gas prices, partially offset, in 1997, by the Fuel Disallowance.

Fuel and purchased power expense increased approximately 5% and 16% for 1997 and 1996, respectively.  The increases were primarily due to increased energy sales and increased spot market gas prices.

Total operating expenses, excluding fuel and purchased power and gas purchased for resale, increased approximately 5% for 1997 and 4% for 1996.  Operation and maintenance expense  increased in 1997 as result of recording third party transmission expenses in accordance with the PUC's Open Access Transmission Rule, partially offset by decreased employee benefit expenses.  The 1996 increase is due primarily to increases in employee benefit expense and payroll expense.  Taxes, other than income taxes decreased in 1996 as a result of a reduction in TU Electric's ad valorem tax obligation due primarily to a property tax rate reduction, partially offset by an increase in state and local gross receipts tax.

<PAGE>

   Other income (deductions) - net decreased in 1997 primarily due to lower
income tax benefits while 1995 included the after tax effects of the impairment
write-down.

   Total interest charges, excluding AFUDC and distributions on preferred
securities of subsidiary trusts, decreased approximately 5% in each of the years
1997 and 1996 compared to the prior year period.  The capital restructuring and
debt reduction programs have favorably affected the comparisons.

CHANGES IN ACCOUNTING STANDARDS

The Company and TU Electric
- --------------------------

   SFAS 130, "Reporting Comprehensive Income," will become effective in 1998.
This statement requires companies to report and display comprehensive income and
its components (revenues, expenses, gains and losses).  Comprehensive income
includes all changes in equity during a period except those resulting from
investments by owners and distributions to owners.

   SFAS 131, "Disclosures About Segments of an Enterprise and Related
Information," will become effective in 1998.  This statement establishes
standards for defining and reporting business segments.  The Company and TU
Electric are currently determining their reportable segments.

   The adoption of SFAS 130 and SFAS 131 will not affect financial position,
results of operations or cash flows.

YEAR 2000 ISSUES

   Many existing computer programs use only two digits to identify a year in the
date field.  These programs were designed and developed without considering the
impact of the upcoming change in the century.  If not corrected, many computer
applications could fail or produce erroneous data by or at the Year 2000.  The
Year 2000 issues affect virtually all companies and organizations.

   The Company began its Year 2000 initiative in 1996 by addressing mainframe-
based application systems.  In early 1997, an infrastructure project to address
information technology (IT) related equipment and systems software was begun.
In late 1997, a corporate-wide project to address Year 2000 issues related to
embedded systems such as process controls for energy production and delivery and
client-developed applications was begun.  Most of the ENSERCH mainframe
applications, infrastructure, embedded systems and client-developed applications
that will not be migrated to existing or planned Company systems have been
incorporated into these projects.  These projects extend beyond the Company's
organization in an effort to also work with key  vendors, service suppliers and
others so that the Company can appropriately  prepare for Year 2000.

   The remediation and replacement work on the majority of IT application systems
and infrastructure are expected to be completed by the end of 1998.  Much of the
work on the corporate-wide Year 2000 project is expected to be completed by the
end of 1998, although the project will extend into 1999.  Based on present
assessments of the IT and infrastructure projects, a cost of $11.25 million is
estimated.  These costs are being expensed as incurred over the four-year period
(1996 through 1999) covered by the projects.  Assessment of the cost of the
corporate-wide Year 2000 project is in the early stages.

   Eastern Energy initiated a Year 2000 project in the third quarter of 1997.
The estimated cost of that project is $1.8 million, with completion anticipated
in early 1999.  The cost to either modify or replace LCC application systems
affected by Year 2000 is estimated to be $1.5 million, with completion
anticipated in 1999.  The effect on LCC's embedded systems is still being
assessed.

A-18

<PAGE>

TEXAS UTILITIES COMPANY AND SUBSIDIARIES

STATEMENT OF RESPONSIBILITY

The management of Texas Utilities Company is responsible for the preparation, integrity and objectivity of the consolidated financial statements of the Company and its subsidiaries and other information included in this report.  The consolidated financial statements have been prepared in conformity with generally accepted accounting principles.  As appropriate, the statements include amounts based on informed estimates and judgments of management.

The management of the Company has established and maintains a system of internal control designed to provide reasonable assurance, on a cost-effective basis, that assets are safeguarded, transactions are executed in accordance with management's authorization and financial records are reliable for preparing consolidated financial statements.  Management believes that the system of control provides reasonable assurance that errors or irregularities that could be material to the consolidated financial statements are prevented or would be detected within a timely period.  Key elements in this system include the effective communication of established written policies and procedures, selection and training of qualified personnel and organizational arrangements that provide an appropriate division of responsibility. This system of control is augmented by an ongoing internal audit program designed to evaluate its adequacy and effectiveness.  Management considers the recommendations of the internal auditors and independent certified public accountants concerning the Company's system of internal control and takes appropriate actions which are cost-effective in the circumstances.  Management believes that, as of December 31, 1997, the Company's system of internal control was adequate to accomplish the objectives discussed herein.

The Board of Directors of the Company addresses its oversight responsibility for the consolidated financial statements through its Audit Committee, which is composed of directors who are not employees of the Company.  The Audit Committee meets regularly with the Company's management, internal auditors and independent certified public accountants to review matters relating to financial reporting, auditing and internal control.  To ensure auditor independence, both the internal auditors and independent certified public accountants have full and free access to the Audit Committee.

The independent certified public accounting firm of Deloitte & Touche LLP is engaged to audit, in accordance with generally accepted auditing standards, the consolidated financial statements of the Company and its subsidiaries and to issue their report thereon.

/s/ ERLE NYE
---------------------------------------------
Erle Nye, Chairman of the Board
and Chief Executive


/s/ D. W. BIEGLER
---------------------------------------------
D. W. Biegler, President and
Chief Operating Officer


/s/ MICHAEL J. McNALLY
---------------------------------------------
Michael J. McNally, Executive Vice President
and Chief Financial Officer

EFH01434782

```
                            /s/ J. W. PINKERTON
          ---------------------------------------------
                J. W. Pinkerton, Controller and
                   Principal Accounting Officer
```

A-19

<PAGE>

### TEXAS UTILITIES ELECTRIC COMPANY AND SUBSIDIARIES

### STATEMENT OF RESPONSIBILITY

   The management of Texas Utilities Electric Company is responsible for the preparation, integrity and objectivity of the financial statements of TU Electric and its subsidiaries and other information included in this report. The financial statements have been prepared in conformity with generally accepted accounting principles.  As appropriate, the statements include amounts based on informed estimates and judgments of management.

   The management of TU Electric has established and maintains a system of internal control designed to provide reasonable assurance, on a cost-effective basis, that assets are safeguarded, transactions are executed in accordance with management's authorization and financial records are reliable for preparing financial statements.  Management believes that the system of control provides reasonable assurance that errors or irregularities that could be material to the financial statements are prevented or would be detected within a timely period. Key elements in this system include the effective communication of established written policies and procedures, selection and training of qualified personnel and organizational arrangements that provide an appropriate division of responsibility. This system of control is augmented by an ongoing internal audit program designed to evaluate its adequacy and effectiveness.  Management considers the recommendations of the internal auditors and independent certified public accountants concerning TU Electric's system of internal control and takes appropriate actions which are cost-effective in the circumstances.  Management believes that, as of December 31, 1997, TU Electric's system of internal control was adequate to accomplish the objectives discussed herein.

   The independent certified public accounting firm of Deloitte & Touche LLP is engaged to audit, in accordance with generally accepted auditing standards, the financial statements of TU Electric and to issue their report thereon.

```
                            /s/  ERLE NYE
          ---------------------------------------------
                Erle Nye, Chairman of the Board
                    and Chief Executive


                           /s/ D. W. BIEGLER
          ---------------------------------------------
                D. W. Biegler, President and
                   Chief Operating Officer


                         /s/ ROBERT S. SHAPARD
          ---------------------------------------------
              Robert S. Shapard, Treasurer and Assistant
              Secretary and Principal Financial Officer

                            /s/ J. W. PINKERTON
          ---------------------------------------------
                J. W. Pinkerton, Controller and
                   Principal Accounting Officer
```

A-20

EFH01434783

&lt;PAGE&gt;

INDEPENDENT AUDITORS' REPORT

Texas Utilities Company and Subsidiaries:


We have audited the accompanying consolidated balance sheets of Texas
Utilities Company and subsidiaries as of December 31, 1997 and 1996, and the
related consolidated statements of income, cash flows and common stock equity
for each of the three years in the period ended December 31, 1997. These
financial statements are the responsibility of the Company's management. Our
responsibility is to express an opinion on these financial statements based on
our audits.

We conducted our audits in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to obtain
reasonable assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting
the amounts and disclosures in the financial statements. An audit also includes
assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.
We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all
material respects, the financial position of the Texas Utilities Company and
subsidiaries at December 31, 1997 and 1996, and the results of their operations
and their cash flows for each of the three years in the period ended December
31, 1997, in conformity with generally accepted accounting principles.


DELOITTE & TOUCHE LLP

Dallas, Texas
February 24, 1998

                              A-21

&lt;PAGE&gt;

INDEPENDENT AUDITORS' REPORT

Texas Utilities Electric Company and Subsidiaries:


We have audited the accompanying consolidated balance sheets of Texas Utilities
Electric Company (TU Electric) and subsidiaries as of December 31, 1997 and
1996, and the related consolidated statements of income, retained earnings and
cash flows for each of the three years in the period ended December 31, 1997.
These financial statements are the responsibility of TU Electric management.
Our responsibility is to express an opinion on these financial statements based
on our audits.

We conducted our audits in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to obtain
reasonable assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting
the amounts and disclosures in the financial statements. An audit also includes
assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.
We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all
material respects, the financial position of Texas Utilities Electric Company
and subsidiaries at December 31, 1997 and 1996, and the results of their
operations and their cash flows for each of the three years in the period ended
December 31, 1997, in conformity with generally accepted accounting principles.

DELOITTE & TOUCHE LLP

Dallas, Texas
February 24, 1998

                              A-22
<PAGE>

                TEXAS UTILITIES COMPANY AND SUBSIDIARIES
                    STATEMENTS OF CONSOLIDATED INCOME

<TABLE>
<CAPTION>

|  |  | Year Ended Decemb |
|---|---|---|
|  | 1997 | 1996 |
|  | ---- | ---- |
|  |  | Thousands of D |
| <S> | <C> | <C> |
| OPERATING REVENUES............................................... | $7,945,608 | $6,550,928 |
|  | ---------- | ---------- |
| OPERATING EXPENSES |  |  |
| Fuel and purchased power................................... | 2,212,689 | 2,136,309 |
| Gas purchased for resale................................... | 1,052,977 | -- |
| Operation and maintenance.................................. | 1,548,150 | 1,256,280 |
| Depreciation and amortization.............................. | 666,448 | 620,505 |
| Taxes other than income................................... | 558,673 | 534,844 |
|  | ---------- | ---------- |
| Total operating expenses................................ | 6,038,937 | 4,547,938 |
|  | ---------- | ---------- |
| OPERATING INCOME................................................ | 1,906,671 | 2,002,990 |
| OTHER INCOME (DEDUCTIONS) -- NET................................ | (17,588) | (1,148 |
|  | ---------- | ---------- |
| INCOME BEFORE INTEREST, OTHER CHARGES |  |  |
| AND INCOME TAXES........................................... | 1,889,083 | 2,001,842 |
|  | ---------- | ---------- |
| INTEREST AND OTHER CHARGES |  |  |
| Interest................................................... | 762,937 | 797,893 |
| Allowance for borrowed funds used during construction......... | (8,890) | (11,248 |
| Impairment of assets....................................... | -- | -- |
| Distributions on TU Electric obligated, mandatorily |  |  |
| redeemable, preferred securities of subsidiary trusts |  |  |
| holding solely debentures of TU Electric.................... | 69,701 | 33,001 |
| Preferred stock dividends of subsidiaries.................... | 27,983 | 53,358 |
|  | ---------- | ---------- |
| Total interest and other charges........................ | 851,731 | 873,004 |
|  | ---------- | ---------- |
| INCOME (LOSS) BEFORE INCOME TAXES............................... | 1,037,352 | 1,128,838 |
| INCOME TAX EXPENSE (BENEFIT).................................... | 376,898 | 375,232 |
|  | ---------- | ---------- |
| NET INCOME (LOSS)............................................... | $  660,454 | $  753,606 |
|  | ========== | ========== |
| Average shares of common stock |  |  |
| outstanding (thousands).................................... | 230,958 | 225,160 |

```
Per share of common stock:
  Basic earnings (loss)......................................    $2.86     $3.35
  Diluted earnings (loss)....................................    $2.85     $3.35
  Dividends declared.........................................    $2.125    $2.02
</TABLE>
```

See Notes to Consolidated Financial Statements.


A-23

<PAGE>


TEXAS UTILITIES COMPANY AND SUBSIDIARIES
STATEMENTS OF CONSOLIDATED CASH FLOWS

<TABLE>
<CAPTION>

|  | Year |
|---|---|
|  | 1997 |
|  | ---- |
|  | Tho |

```
CASH FLOWS FROM OPERATING ACTIVITIES
<S>                                                             <C>
  Net income (loss)..........................................   $  660,454
  Adjustments to reconcile net income (loss) to cash
  provided by operating activities:
    Depreciation and amortization (including amounts charged to fuel).......   838,606
    Deferred income taxes -- net.............................   167,705
    Investment tax credits -- net............................   (22,851)
    Allowance for equity funds used during construction......   (5,236)
    Impairment of assets.....................................   --
    Changes in operating assets and liabilities:
      Accounts receivable....................................   (441,964)
      Inventories............................................   (13,891)
      Accounts payable.......................................   333,763
      Interest and taxes accrued.............................   39,902
      Other working capital..................................   90,322
      Over/(under) - recovered fuel revenue -- net of deferred taxes.......   (20,483)
      Gas marketing risk management assets and liabilities...   (13,142)
      Other -- net...........................................   45,933
                                                                ----------
        Cash provided by operating activities...............   1,659,118
                                                                ----------

CASH FLOWS FROM FINANCING ACTIVITIES
  Issuances of securities:
    First mortgage bonds.....................................   212,715
    Other long-term debt.....................................   609,964
    TU Electric obligated, mandatorily redeemable, preferred securities
      of subsidiary trusts holding solely debentures of TU Electric.........   493,273
  Retirements of securities:
    First mortgage bonds.....................................   (939,467)
    Other long-term debt.....................................   (634,407)
    Preferred stock of subsidiaries.........................   (553,093)
    Common stock............................................   (148,780)
  Change in notes payable:
    Commercial paper........................................   1,102,749
    Banks...................................................   (543,080)
  Common stock dividends paid...............................   (478,592)
  Debt premium, discount,  financing and reacquisition expenses.............   (40,774)
                                                                ----------
        Cash used in financing activities...................   (919,492)
                                                                ----------

CASH FLOWS FROM  INVESTING ACTIVITIES
```

| | |
|---|---:|
| Construction expenditures............................................ | (586,097) |
| Allowance for equity funds used during construction (excluding amount for nuclear fuel)................................................ | 2,941 |
| Change in construction receivables/payables -- net...................... | (1,688) |
| Nuclear fuel (excluding allowance for equity funds used during construction)..................................................... | (74,510) |
| Acquisitions.......................................................... | 4,777 |
| Other investments.................................................... | (58,753) |
| | ---------- |
| Cash used in investing activities.............................. | (713,330) |
| | ---------- |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH................................. | 2,294 |
| | ---------- |
| NET CHANGE IN CASH AND CASH EQUIVALENTS................................. | 28,590 |
| CASH AND CASH EQUIVALENTS -- BEGINNING BALANCE......................... | 15,845 |
| | ---------- |
| CASH AND CASH EQUIVALENTS -- ENDING BALANCE............................ | $  44,435 |
| | ========== |

</TABLE>

See Notes to Consolidated Financial Statements.


A-24

<PAGE>


TEXAS UTILITIES COMPANY AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

ASSETS

<TABLE>
<CAPTION>

| | December 31, | |
|---|---:|---:|
| | 1997 | 1996 |
| | ---- | ---- |
| | Thousands of Dollars | |
| <S> | <C> | <C> |
| PROPERTY, PLANT AND EQUIPMENT | | |
| Electric: | | |
| Production........................................ | $16,294,778 | $16,277,151 |
| Transmission..................................... | 1,675,681 | 1,607,925 |
| Distribution..................................... | 5,779,226 | 5,655,677 |
| Gas distribution and pipeline......................... | 1,068,708 | -- |
| Telecommunications................................. | 145,125 | 14 |
| Other.............................................. | 562,890 | 503,674 |
| | ----------- | ----------- |
| Total.......................................... | 25,526,408 | 24,044,441 |
| Less accumulated depreciation........................ | 6,715,662 | 6,127,610 |
| | ----------- | ----------- |
| Net of accumulated depreciation................... | 18,810,746 | 17,916,831 |
| Construction work in progress........................ | 330,184 | 240,612 |
| Nuclear fuel (net of accumulated amortization: 1997 -- $456,490,000; 1996 --$369,114,000)............................. | 242,018 | 252,589 |
| Held for future use.................................. | 24,087 | 24,483 |
| Less reserve for regulatory disallowances | 836,005 | 836,005 |
| | ----------- | ----------- |
| Net property, plant and equipment.................... | 18,571,030 | 17,598,510 |
| | ----------- | ----------- |
| INVESTMENTS | | |
| Goodwill (net of accumulated amortization: 1997-- $33,444,000; 1996--$15,894,000).................... | 1,423,420 | 528,102 |
| Other investments.................................... | 851,320 | 630,121 |

| | 1997 | 1996 |
|---|---|---|
| Total investments.......................................... | 2,274,740 | 1,158,223 |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents.................................. | 44,435 | 15,845 |
| Accounts receivable: | | |
|   Customers................................................ | 941,506 | 290,111 |
|   Other.................................................... | 50,883 | 44,032 |
|   Allowance for uncollectible accounts...................... | (11,322) | (6,262) |
| Inventories -- at average cost: | | |
|   Materials and supplies................................... | 209,825 | 200,601 |
|   Fuel stock............................................... | 81,490 | 77,227 |
|   Gas stored underground................................... | 156,637 | 44,472 |
| Gas marketing risk management assets....................... | 365,650 | -- |
| Prepayments................................................ | 59,809 | 56,324 |
| Deferred income taxes...................................... | 76,307 | 50,972 |
| Other current assets....................................... | 19,628 | 14,084 |
|     Total current assets............................... | 1,994,848 | 787,406 |
| **DEFERRED DEBITS** | | |
| Unamortized regulatory assets.............................. | 1,853,016 | 1,753,418 |
| Deferred income taxes...................................... | -- | 10,997 |
| Other deferred debits...................................... | 180,495 | 89,101 |
|     Total deferred debits.............................. | 2,033,511 | 1,853,516 |
|     Total.............................................. | $24,874,129 | $21,397,655 |

</TABLE>

See Notes to Consolidated Financial Statements.

A-25

<PAGE>

TEXAS UTILITIES COMPANY AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

CAPITALIZATION AND LIABILITIES

| | December 31, | |
|---|---|---|
| | 1997 | 1996 |
| | Thousands of Dollars | |
| **CAPITALIZATION** | | |
| Common stock without par value -- net.............. | $ 5,587,200 | $ 4,787,047 |
| Retained earnings.................................. | 1,311,875 | 1,202,390 |
| Cumulative currency translation adjustment........ | (56,013) | 43,476 |
|     Total common stock equity..................... | 6,843,062 | 6,032,913 |
| Preferred stock of subsidiaries: | | |
|   Not subject to mandatory redemption.............. | 304,194 | 464,427 |
|   Subject to mandatory redemption.................. | 20,600 | 238,391 |
| TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts | | |
|   holding solely debentures of TU Electric.......... | 875,146 | 381,311 |
| Long-term debt, less amounts due currently........ | 8,759,379 | 8,668,111 |

Total capitalization............................    16,802,381    15,785,153
                                                    ----------    ----------

CURRENT LIABILITIES
Notes payable:
  Commercial paper...............................       570,000       253,151
  Banks..........................................        44,442        69,788
Long-term debt due currently.....................       772,071       356,076
Accounts payable.................................       879,593       336,391
Gas marketing risk management liabilities........       357,044            --
Dividends declared...............................       139,994       129,879
Customers' deposits..............................        91,440        80,390
Taxes accrued....................................       182,532       143,424
Interest accrued.................................       193,125       156,758
Deferred income taxes............................         7,919        10,951
Over-recovered fuel revenue......................        11,987        42,984
Other current liabilities........................       271,853        90,485
                                                    ----------    ----------

   Total current liabilities.....................     3,522,000     1,670,277
                                                    ----------    ----------


DEFERRED CREDITS AND OTHER NONCURRENT LIABILITIES
Accumulated deferred income taxes................     2,989,254     2,812,623
Unamortized investment tax credits...............       570,283       589,713
Pensions and other postretirement benefits.......       402,292       195,667
Other deferred credits and noncurrent liabilities..     587,919       344,222
                                                    ----------    ----------

   Total deferred credits and other noncurrent
     liabilities.................................     4,549,748     3,942,225


COMMITMENTS AND CONTINGENCIES (Note 15)


                                                    ----------    ----------

   Total.........................................   $24,874,129   $21,397,655
                                                    ==========    ==========

See Notes to Consolidated Financial Statements.

                           A-26
<PAGE>

               TEXAS UTILITIES COMPANY AND SUBSIDIARIES
               STATEMENTS OF CONSOLIDATED COMMON STOCK EQUITY
<TABLE>
<CAPTION>

                                                         Year Ended Decemb
                                                       ----------------------
                                                         1997          1996
                                                         ----          ----
                                                       Thousands of Doll
<S>                                                     <C>           <C>
COMMON STOCK without par value-authorized shares -- 500,000,000:
  Balance at beginning of year....................    $4,787,047    $4,806,912
    Issued for acquisitions:
      ENSERCH Corporation (15,861,272 shares).....       565,105            --
      Lufkin-Conroe Communications Co.  (8,727,730 shares).......       317,142            --
    Issued for Long-Term Incentive Compensation Plan
      (61,000 shares).............................         2,594            --
    Net change in unamortized costs of Long-Term Incentive
      Compensation Plan...........................        (2,197)           --

```
Common stock repurchased and retired (4,019,000 shares in 1997
    and 1,238,480 shares in 1996)..............................    (90,186)    (27,980)
Special allocation to Thrift Plan by trustee...................      8,115       8,137
Other..........................................................       (420)        (22)
                                                                 ----------  ----------

Balance at end of year (1997-245,237,559 shares;
    1996 -- 224,602,557  shares; and 1995 - 225,841,037 shares)  5,587,200   4,787,047
                                                                 ----------  ----------


RETAINED EARNINGS:
Balance at beginning of year...................................  1,202,390     924,444
Net income (loss)..............................................    660,454     753,606
Dividends declared on common stock.............................   (496,244)   (456,059)
Common stock repurchased and retired...........................    (58,594)    (23,633)
LESOP dividend deduction tax benefit and other.................      3,869       4,032
                                                                 ----------  ----------

Balance at end of year.........................................  1,311,875   1,202,390
                                                                 ----------  ----------


CUMULATIVE CURRENCY TRANSLATION ADJUSTMENT:
Balance at beginning of year...................................     43,476         397
    Change during the year - net of deferred income taxes.......   (99,489)     43,079
                                                                 ----------  ----------

Balance at end of year.........................................    (56,013)     43,476
                                                                 ----------  ----------

COMMON STOCK EQUITY............................................ $6,843,062  $6,032,913
                                                                 ==========  ==========
```

</TABLE>

See Notes to Consolidated Financial Statements.

A-27

<PAGE>

TEXAS UTILITIES ELECTRIC COMPANY AND SUBSIDIARIES
STATEMENTS OF CONSOLIDATED INCOME

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 1997 | 1996 | 1995 |
| | Thousands of Dollars | | |
| OPERATING REVENUES | $6,135,417 | $6,029,611 | $5,560,462 |
| OPERATING EXPENSES | | | |
| Fuel and purchased power | 2,062,709 | 1,965,756 | 1,697,091 |
| Operation and maintenance | 1,226,384 | 1,111,911 | 1,049,034 |
| Depreciation and amortization | 572,277 | 561,902 | 549,611 |
| Income taxes | 419,681 | 421,012 | 382,315 |
| Taxes other than income | 507,306 | 506,432 | 512,045 |
| Total operating expenses | 4,788,357 | 4,567,013 | 4,190,096 |
| OPERATING INCOME | 1,347,060 | 1,462,598 | 1,370,366 |
| OTHER INCOME (LOSS) | | | |
| Allowance for equity funds used during construction | 5,202 | 1,549 | 6,658 |
| Impairment of assets | -- | -- | (486,350) |
| Other income (deductions) -- net | (1,699) | 503 | 8,625 |
| Income taxes | 10,135 | 15,513 | 169,362 |
| Total other income (loss) | 13,638 | 17,565 | (301,705) |

| INCOME BEFORE INTEREST AND OTHER CHARGES | 1,360,698 | 1,480,163 | 1,068,661 |
|---|---|---|---|
| INTEREST AND OTHER CHARGES | | | |
| Interest on mortgage bonds | 439,398 | 486,791 | 526,977 |
| Interest on other long-term debt | 22,124 | 26,456 | 44,071 |
| Other interest | 65,744 | 82,459 | 58,500 |
| Distributions on TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric | 69,701 | 33,001 | 1,801 |
| Allowance for borrowed funds used during construction | (8,143) | (11,239) | (15,319) |
| Total interest and other charges | 588,824 | 617,468 | 616,030 |
| NET INCOME | 771,874 | 862,695 | 452,631 |
| PREFERRED STOCK DIVIDENDS | 26,850 | 53,358 | 84,914 |
| NET INCOME AVAILABLE FOR COMMON STOCK | $ 745,024 | $ 809,337 | $ 367,717 |

## STATEMENTS OF CONSOLIDATED RETAINED EARNINGS

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 1997 | 1996 | 1995 |
|  | Thousands of Dollars | | |
| BALANCE AT BEGINNING OF YEAR | $1,373,602 | $1,067,593 | $ 948,136 |
| Net income | 771,874 | 862,695 | 452,631 |
| Transfer from common stock | -- | -- | 433,820 |
| Preferred stock dividends | (26,850) | (53,358) | (84,914) |
| Common stock dividends | (136,416) | (503,328) | (682,080) |
| BALANCE AT END OF YEAR | $1,982,210 | $1,373,602 | $1,067,593 |

See Notes to Consolidated Financial Statements.

A-28

<PAGE>

TEXAS UTILITIES ELECTRIC COMPANY AND SUBSIDIARIES
STATEMENTS OF CONSOLIDATED CASH FLOWS

<TABLE>
<CAPTION>

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 1997 | 1996 | 1 |
|  | Thousands of Dollars | | |
| <S> | <C> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES | | | |
| Net income | $ 771,874 | $ 862,695 | $  4 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |

| | | | |
|---|---|---|---|
| Depreciation and amortization (including amounts charged to fuel)................................... | 710,366 | 684,710 | 6 |
| Deferred income taxes -- net............................ | 134,263 | 149,851 | |
| Investment tax credits -- net........................... | (21,222) | (31,501) | ( |
| Allowance for equity funds used during construction.... | (5,202) | (1,549) | |
| Impairment of assets................................... | -- | -- | 4 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable................................... | (123,735) | 9,190 | ( |
| Inventories.......................................... | (4,122) | 3,366 | |
| Accounts payable..................................... | 44,169 | 52,126 | |
| Interest and taxes accrued........................... | 42,086 | (18,718) | (1 |
| Other working capital................................ | 82,651 | (1,255) | |
| Over/(under) - recovered fuel revenue -- net of deferred taxes...................................... | (20,488) | (47,368) | |
| Other -- net......................................... | 58,890 | 39,908 | |
| | --------- | --------- | --- |
| Cash provided by operating activities.............. | 1,669,530 | 1,701,455 | 1,5 |
| | --------- | --------- | --- |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | |
| Issuances of securities: | | | |
| First mortgage bonds................................. | 212,715 | 244,225 | 5 |
| Other long-term debt................................. | 300,000 | -- | 3 |
| TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric.................... | 493,273 | -- | 3 |
| Retirements of securities: | | | |
| First mortgage bonds................................. | (939,440) | (556,820) | (6 |
| Other long-term debt................................. | (2,413) | (302,458) | (1 |
| Preferred stock...................................... | (553,094) | (50,269) | (5 |
| Common stock......................................... | (279,654) | -- | |
| Change in notes receivable/payable -- affiliates......... | 218,444 | (33,159) | |
| Change in notes payable -- commercial paper............. | (253,151) | (68,839) | ( |
| Preferred stock dividends paid.......................... | (36,246) | (54,411) | ( |
| Common stock dividends paid............................. | (272,832) | (366,912) | (6 |
| Debt premium, discount, financing and reacquisition expenses.............................................. | (26,892) | (37,898) | (1 |
| | --------- | --------- | --- |
| Cash used in financing activities....................... | (1,139,290) | (1,226,541) | (1,0 |
| | --------- | --------- | --- |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | |
| Construction expenditures............................... | (446,088) | (377,438) | (4 |
| Allowance for equity funds used during construction (excluding amount for nuclear fuel).................... | 2,907 | 867 | |
| Change in construction receivables/payables -- net....... | (1,688) | (706) | |
| Nuclear fuel (excluding allowance for equity funds used during construction)................................... | (74,510) | (58,895) | ( |
| Other investments.................................... | (12,037) | (48,370) | ( |
| | --------- | --------- | --- |
| Cash used in investing activities....................... | (531,416) | (484,542) | (4 |
| | --------- | --------- | --- |
| NET CHANGE IN CASH AND CASH EQUIVALENTS.................. | (1,176) | (9,628) | |
| CASH AND CASH EQUIVALENTS -- BEGINNING BALANCE........... | 13,005 | 22,633 | |
| | --------- | --------- | --- |
| CASH AND CASH EQUIVALENTS -- ENDING BALANCE............. | $   11,829 | $   13,005 | $ |
| | ========= | ========= | === |

</TABLE>


See Notes to Consolidated Financial Statements.

<PAGE>


TEXAS UTILITIES ELECTRIC COMPANY AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

ASSETS

|  | December 31, | |
|---|---|---|
|  | 1997 | 1996 |
|  | ---- | ---- |
|  | Thousands of Dollars | |
| ELECTRIC PLANT | | |
| In service: | | |
| Production............................................ | $15,369,306 | $15,330,974 |
| Transmission......................................... | 1,669,259 | 1,601,628 |
| Distribution......................................... | 4,745,270 | 4,442,547 |
| General.............................................. | 436,059 | 432,178 |
|  | ----------- | ----------- |
| Total............................................ | 22,219,894 | 21,807,327 |
| Less accumulated depreciation....................... | 6,120,309 | 5,594,363 |
|  | ----------- | ----------- |
| Electric plant in service, less | | |
| accumulated depreciation...................... | 16,099,585 | 16,212,964 |
| Construction work in progress....................... | 190,579 | 210,573 |
| Nuclear fuel (net of accumulated amortization: | | |
| 1997 -- $456,490,000, 1996 -- $369,114,000)....... | 242,017 | 252,589 |
| Held for future use................................. | 23,966 | 24,483 |
|  | ----------- | ----------- |
| Electric plant, less accumulated | | |
| depreciation and amortization................. | 16,556,147 | 16,700,609 |
| Less reserve for regulatory disallowances.......... | 836,005 | 836,005 |
|  | ----------- | ----------- |
| Net electric plant.............................. | 15,720,142 | 15,864,604 |
|  | ----------- | ----------- |
| INVESTMENTS.......................................... | 534,487 | 508,437 |
|  | ----------- | ----------- |
| CURRENT ASSETS | | |
| Cash and cash equivalents........................... | 11,829 | 13,005 |
| Accounts receivable: | | |
| Customers......................................... | 345,041 | 215,706 |
| Other............................................. | 18,710 | 23,282 |
| Allowance for uncollectible accounts............. | (6,049) | (5,021) |
| Notes receivable -- affiliates...................... | -- | 35,515 |
| Inventories -- at average cost: | | |
| Materials and supplies............................ | 181,157 | 181,405 |
| Fuel stock........................................ | 81,489 | 77,119 |
| Prepayments......................................... | 31,338 | 31,758 |
| Deferred income taxes............................... | 49,359 | 50,882 |
| Other current assets................................ | 1,818 | 3,246 |
|  | ----------- | ----------- |
| Total current assets............................ | 714,692 | 626,897 |
|  | ----------- | ----------- |
| DEFERRED DEBITS | | |
| Unamortized regulatory assets....................... | 1,796,516 | 1,735,306 |
| Other deferred debits............................... | 67,596 | 59,695 |
|  | ----------- | ----------- |
| Total deferred debits........................... | 1,864,112 | 1,795,001 |
|  | ----------- | ----------- |
| Total............................................ | $18,833,433 | $18,794,939 |
|  | =========== | =========== |

See Notes to Consolidated Financial Statements.

<PAGE>

TEXAS UTILITIES ELECTRIC COMPANY AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

CAPITALIZATION AND LIABILITIES

|  | December 31, | |
|---|---|---|
|  | 1997 | 1996 |
|  | Thousands of Dollars | |
| **CAPITALIZATION** | | |
| Common stock without par value: | | |
| Authorized shares -- 180,000,000 | | |
| Outstanding shares 1997 -- 142,931,000; 1996 -- 156,800,000................................... | $ 4,316,235 | $ 4,732,305 |
| Retained earnings.................................. | 1,982,210 | 1,373,602 |
| Total common stock equity........................ | 6,298,445 | 6,105,907 |
| Preferred stock: | | |
| Not subject to mandatory redemption............. | 129,194 | 464,427 |
| Subject to mandatory redemption.................. | 20,600 | 238,391 |
| TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric........... | 875,146 | 381,311 |
| Long-term debt, less amounts due currently......... | 5,475,447 | 6,310,594 |
| Total capitalization............................ | 12,798,832 | 13,500,630 |
| | | |
| **CURRENT LIABILITIES** | | |
| Notes payable: | | |
| Affiliates.................................... | 182,929 | -- |
| Commercial paper.............................. | -- | 253,151 |
| Long-term debt due currently...................... | 752,645 | 338,213 |
| Accounts payable: | | |
| Affiliates.................................... | 289,075 | 126,143 |
| Other......................................... | 152,367 | 136,401 |
| Dividends declared................................ | 2,567 | 148,379 |
| Customers' deposits............................... | 74,256 | 70,141 |
| Taxes accrued..................................... | 167,009 | 132,514 |
| Interest accrued.................................. | 140,538 | 132,947 |
| Over-recovered fuel revenue....................... | 11,987 | 42,984 |
| Other current liabilities | 134,369 | 57,681 |
| Total current liabilities....................... | 1,907,742 | 1,438,554 |
| | | |
| **DEFERRED CREDITS AND OTHER NONCURRENT LIABILITIES** | | |
| Accumulated deferred income taxes.................. | 3,216,951 | 2,989,612 |
| Unamortized investment tax credits................ | 556,743 | 577,965 |
| Other deferred credits and noncurrent liabilities | 353,165 | 288,178 |
| Total deferred credits and other noncurrent liabilities................................... | 4,126,859 | 3,855,755 |

COMMITMENTS AND CONTINGENCIES (Note 15)

```
                                                   -----------   -----------
    Total........................................  $18,833,433   $18,794,939
                                                   ===========   ===========
```

See Notes to Consolidated Financial Statements.

A-31

<PAGE>

TEXAS UTILITIES COMPANY AND SUBSIDIARIES
TEXAS UTILITIES ELECTRIC COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS


1.   BUSINESS, MERGERS AND ACQUISITIONS

The Company
- -----------

    Texas Utilities Company (TUC, or the Company) is a holding company which owns
all of the outstanding common stock of Texas Energy Industries Inc. (TEI) and
ENSERCH Corporation (ENSERCH). TEI is a holding company; the assets of its
primary subsidiary, Texas Utilities Electric Company (TU Electric), and the
Company's other electric utility businesses represent in excess of 85% of the
total assets and in excess of 75% of the total revenues of the Company. TU
Electric is engaged in the generation, purchase, transmission, distribution and
sale of electric energy wholly within Texas. Two other subsidiaries of TEI are
engaged directly or indirectly in public utility operations: Southwestern
Electric Service Company (SESCO) and Texas Utilities Australia Pty. Ltd. (TU
Australia), which in December 1995 acquired the common stock of Eastern Energy
Limited (Eastern Energy), one of five electricity distribution companies
operating in Victoria, Australia. Neither SESCO nor Eastern Energy generate
electric energy. TEI has other wholly-owned service subsidiaries, which support
the operations of the Company and its operating subsidiaries. For 1997, none of
the Company's other businesses are significant individually or in the aggregate
and, accordingly, do not require separate segment disclosure under existing
accounting standards. The Company is currently determining its reportable
segments under Statement of Financial Accounting Standards (SFAS) No. 131,
which becomes effective in 1998.

    On August 5, 1997, the merger transactions (Merger) between the former Texas
Utilities Company, now known as TEI and ENSERCH were completed. At the effective
time of the Merger: (i) the former Texas Utilities Company changed its name to
TEI, (ii) TEI and ENSERCH merged with wholly-owned subsidiaries of TUC Holding
Company, which, as a result, owned all the common stock of TEI and of ENSERCH,
(iii) TUC Holding Company changed its name to Texas Utilities Company (now the
Company), (iv) each share of TEI's common stock was automatically converted into
one share of common stock of TUC, and (v) each share of common stock of ENSERCH
was automatically converted into 0.225 share of common stock of TUC, with cash
issued in lieu of fractional shares. The share conversions were tax-free
transactions.

    Businesses and subsidiaries acquired in the Merger were Lone Star Gas Company
(Lone Star Gas), a gas distribution company in Texas, serving over 1.35 million
customers and providing service through over 23,800 miles of distribution mains;
Lone Star Pipeline Company (Lone Star Pipeline), which has approximately 7,600
miles of gathering and transmission pipeline in Texas; and subsidiaries engaged
in natural gas processing, natural gas marketing, independent power production
and international gas distribution systems development.

    In the Merger, approximately 15.9 million shares of TUC common stock were
issued to former holders of ENSERCH common stock. The value assigned to the TUC
shares issued and costs incurred in connection with the acquisition of ENSERCH

EFH01434795

aggregated $579 million. At the date of the Merger, ENSERCH had debt and preferred stock outstanding of approximately $1.3 billion. Effective with the Merger, under terms specified in the Merger agreement, outstanding options for ENSERCH common stock were exchanged for options for 532,913 shares of the Company's common stock exercisable at prices ranging from $7.03 to $37.71 per share, and ENSERCH was precluded from awarding further options. The estimated fair value of these options of $3,214,000 was accounted for as a part of the cost of the acquisition. At December 31, 1997, 402,966 of these options remained outstanding and exercisable.

On November 21, 1997, the Company acquired Lufkin-Conroe Communications Co. (LCC). Approximately 8.7 million shares of TUC common stock were issued to LCC stockholders in a stock-for-stock exchange. The value assigned to the TUC shares issued and costs incurred in connection with the acquisition of LCC aggregated $319 million. At the date of the acquisition, LCC had debt outstanding of approximately $31 million. LCC is the parent company of Lufkin-Conroe Telephone Exchange, Inc. (LCTX) and Lufkin-Conroe Telecommunications Corporation (LCT) and its subsidiaries. LCTX is an independent local exchange carrier that serves approximately 100,000 access lines in the Alto, Conroe and Lufkin areas of southeast Texas. It also provides access services to a number of interexchange carriers who provide long distance services.

<div align="center">A-32</div>

<PAGE>

LCT and its subsidiaries own fiber optic cable systems which they lease to interexchange carriers, provide Internet access, radio communications tower rentals, cellular mobile telephones and radio paging services and private branch exchange service to local customers. LCT, through a subsidiary, also provides interexchange long distance service, with primary focus on business customers.

The acquisitions of ENSERCH, LCC and Eastern Energy were accounted for as purchase business combinations. The assets and liabilities of the acquired companies at the acquisition dates were adjusted to their estimated fair values. The excess of the purchase price paid by the Company over the estimated fair value of net assets acquired and liabilities assumed was recorded as goodwill and is being amortized over 40 years. The process of determining the fair value of assets and liabilities of ENSERCH and LCC as of the date of acquisition is continuing, and the final result awaits primarily the resolution of income tax and other contingencies and finalization of some preliminary estimates. The results of operations of ENSERCH, LCC and Eastern Energy, are reflected in the consolidated financial statements of the Company from the respective dates of their acquisition.

The Company continues to seek potential investment opportunities from time to time when it concludes that such investments are consistent with its business strategies and are likely to enhance the long-term return to its shareholders. In January 1998, the Company announced that it had approached the Energy Group plc (TEG) in connection with its possible interest in acquiring TEG. TEG is a diversified international energy group. Discussions between the Company and TEG are continuing and may or may not lead to an offer being made by the Company. Likewise, the timing, amount and funding of any specific new business investment opportunities are presently undetermined.

Following is a summary of unaudited pro forma results of the Company's operations assuming the ENSERCH and LCC acquisitions had occurred at the beginning of the periods presented:

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 1997 | 1996 |
|  | Thousands of dollars | |
| Revenues........................................ | $9,315,952 | $8,526,600 |

EFH01434796

```
Operating income.........................................    1,9/1,/90    2,069,610
Net income...............................................      665,593      751,333
Earnings per share of common stock:
  Basic..................................................        $2.68        $3.01
  Diluted................................................        $2.67        $2.99
```

## 2. SIGNIFICANT ACCOUNTING POLICIES

The Company and TU Electric
---------------------------

Consolidation --  The consolidated financial statements include the accounts of the Company and all of its majority-owned subsidiaries (System Companies). Prior to August 5, 1997, the date of the Merger, the Company did not have any assets or operations.  Pursuant to the Merger, the Company became the parent of each of TEI and ENSERCH.  For financial reporting purposes, the Company  is treated as the successor to TEI.  Unless otherwise specified, all references to the Company for periods prior to August 5, 1997, are deemed to be references to TEI since the merger of the Company and TEI is the combination of entities under common control.  The Company's financial statements have been restated in a manner similar to pooling of interests accounting.  Since the acquisitions of ENSERCH, LCC and Eastern Energy were purchase business combinations, no financial and other information for those companies  are presented for periods prior to their dates of acquisition.  The consolidated financial statements of TU Electric include all of its business trusts.

All significant intercompany items and transactions have been eliminated in consolidation.  Investments in significant unconsolidated affiliates are accounted for by the equity method.  Certain previously reported amounts have been reclassified to conform to current classifications.

Use of Estimates -- The preparation of the Company's and TU Electric's consolidated financial statements, in conformity with generally accepted accounting principles, requires management to make estimates and assumptions about future events that affect the reporting and disclosure of assets and liabilities at the balance sheet dates and the reported amounts of revenue

<center>A-33</center>

<PAGE>

and expense during the periods covered by the consolidated financial statements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments were made to previous estimates during the current year.

System of Accounts -- The accounting records of TU Electric and SESCO are maintained in accordance with the Federal Energy Regulatory Commission's (FERC) Uniform System of Accounts as adopted by the Public Utility Commission of Texas (PUC). Lone Star Gas and Lone Star Pipeline, divisions of ENSERCH, are subject to the accounting requirements prescribed by the National Association of Regulatory Utility Commissioners (NARUC).

Property, Plant and Equipment -- Electric and gas utility plant is stated at original cost less certain regulatory disallowances.  The cost of property additions to electric and gas utility plant includes labor and materials, applicable overhead and payroll-related costs and an allowance for funds used during construction (AFUDC).  Other property is stated at cost.

Allowance For Funds Used During Construction -- AFUDC is a cost accounting procedure whereby amounts based upon interest charges on borrowed funds and a return on equity capital used to finance construction are added to utility plant. The accrual of AFUDC is in accordance with generally accepted accounting principles for the industry, but does not represent current cash income.

TU Electric capitalizes AFUDC, compounded semi-annually, on expenditures for

EFH01434797

ongoing construction work in progress (CWIP) and nuclear fuel in process not
otherwise allowed in rate base by regulatory authorities. For 1997, 1996 and
1995, TU Electric used rates of 7.9%, 7.4%, and 7.7%, respectively. Other
regulated subsidiaries also capitalize AFUDC.

Depreciation of Property, Plant and Equipment -- Depreciation of the
Company's electric and gas utility plant is generally based upon an amortization
of the original cost of depreciable properties (net of regulatory disallowances)
on a straight-line basis over the estimated service lives of the properties.
Depreciation also includes an amount for TU Electric's Comanche Peak
decommissioning costs which is being accrued over the lives of the units and
deposited to external trust funds. (See Note 15.)  Depreciation of all other
plant and equipment generally is determined by the straight-line method over the
useful life of the asset. Consolidated depreciation as a percent of average
depreciable property for the Company and System Companies approximated 2.6% for
1997, 2.7% for 1996 and 2.6% for 1995.

Amortization of Nuclear Fuel and Refueling Outage Costs -- The amortization
of nuclear fuel in the reactors (net of regulatory disallowances) is calculated
on the units of production method and is included in nuclear fuel expense.  TU
Electric accrues a provision for costs anticipated to be incurred during the
next scheduled Comanche Peak nuclear generating station (Comanche Peak)
refueling outage.

Foreign Currency Translation -- The assets and liabilities of foreign
operations denominated in foreign currencies are translated at rates in effect
at year end. Revenues and expenses are translated at average rates for the
applicable periods. Generally, local currencies are considered to be the
functional currency, and adjustments resulting from such translation are
included in the cumulative currency translation adjustment, a separate component
of common stock equity.

Derivative Instruments -- The Company  enters into interest rate swaps to
reduce exposure to interest rate fluctuations. Amounts paid or received under
interest rate swap agreements are accrued as interest rates change and are
recognized over the life of the agreements as adjustments to interest expense.
The Company also enters into derivative contracts in connection with the
wholesale purchases of electric energy by Eastern Energy  and defers the impact
of changes in the market value of the contracts, which serve as hedges, until
the related transaction is completed.  (See Note 9.)

A-34

<PAGE>

Energy Marketing Activities -- The Company, through its natural gas marketing
subsidiary, Enserch Energy Services, Inc. (EES), is a marketer of natural gas
and natural gas services.  As part of these business activities, EES enters into
a variety of transactions, including forward contracts principally involving
physical delivery of natural gas and derivative financial instruments, including
options, swaps, futures and other contractual arrangements.  The derivative
transactions are concentrated with established energy companies and major
financial institutions.  EES uses the mark-to-market method of valuing and
recognizing earnings from firm contractual commitments to purchase and sell
natural gas in the future and from its portfolio of derivative financial
instruments, including options, swaps, futures and other contractual
commitments. (See Note 9.)

Revenues --Electric revenues include billings under approved rates (including
a fixed fuel factor) applied to meter readings each month on a cycle basis and
an accrual of base rate revenue for energy provided after cycle billing but not
billed through the end of each month.  Revenues also include an amount for
under- or over-recovery of fuel revenue representing the difference between
actual fuel cost and billings under the approved fixed fuel factor and a
provision that generally allows recovery through a Power Cost Recovery Factor,
on a monthly basis, of the capacity portion of purchased power cost and wheeling
cost from qualifying facilities not included in base rates.  The fuel portion of

purchased power cost is included in the fixed fuel factor. A utility's fuel factor can be revised upward or downward every six months, according to a specified schedule. A utility is required to petition to make either surcharges or refunds to ratepayers, together with interest based on a twelve month average of prime commercial rates, for any material cumulative under- or over-recovery of fuel costs. If the cumulative difference of the under- or over-recovery, plus interest, is in excess of 4% of the annual estimated fuel costs most recently approved by the PUC, it will be deemed to be material. A procedure exists for an expedited change in fuel factors in the event of an emergency. Final reconciliation of fuel costs must be made either in a reconciliation proceeding, which may cover no more than three years and no less than one year, or in a general rate case. (See Note 13.)

The city gate rate for the cost of gas Lone Star Gas ultimately delivers to residential and commercial customers is established by the Railroad Commission of Texas (RRC) and provides for full recovery of the actual cost of gas delivered, including out-of-period costs such as gas-purchase contract settlement costs. The rates Lone Star Gas charges its residential and commercial customers are established by the municipal governments of the cities and towns served, with the RRC having appellate jurisdiction. Lone Star Gas records revenues on the basis of cycle meter readings throughout the month and accrues revenues for gas delivered from the meter reading dates to the end of the month. The rate Lone Star Pipeline charges to Lone Star Gas for transportation and storage of gas ultimately consumed by residential and commercial customers is established by the RRC.

Income Taxes --The Company and its domestic (U.S.) subsidiaries file a consolidated federal income tax return, and federal income taxes are allocated to subsidiaries based upon their respective taxable income or loss. Investment tax credits are normally amortized to income over the estimated service lives of the properties. Deferred income taxes are currently provided for temporary differences between the book and tax basis of assets and liabilities (including the provision for regulatory disallowances). Certain provisions of SFAS 109 provide that regulated enterprises are permitted to recognize such adjustments as regulatory tax assets or tax liabilities if it is probable that such amounts will be recovered from, or returned to, customers in future rates. Accordingly, at December 31, 1997, the consolidated balance sheet includes a net regulatory tax asset of $1,249,338,000.

Effective January 1, 1997, TU Electric's state franchise tax status changed from a tax based on net taxable capital to a tax based on net taxable earned surplus. Certain other subsidiaries of the Company are also taxed on the earned surplus method. Net taxable earned surplus is based on the federal income tax return. The portion of the franchise tax calculated under the earned surplus method is an income tax.

Income Taxes on Undistributed Earnings of Foreign Subsidiaries -- The Company intends to reinvest the earnings of its foreign subsidiaries into those businesses. Accordingly, no provision has been made for taxes which would be payable if such earnings were to be repatriated to the United States.

Earnings Per Share --Under the provisions of SFAS 128, which became effective in December 1997, basic earnings per share applicable to common stock are based on the weighted average number of common shares outstanding during the

A-35

<PAGE>

year. Diluted earnings per share since the Merger include the effect of potential common shares resulting from the assumed conversion of the outstanding 6 3/8% Convertible Subordinated Debentures due 2002 of ENSERCH and the exercise of all outstanding stock options. For the period from the effective date of the Merger to December 31, 1997, 999,492 shares were added to the average shares outstanding for 1997 and $1,545,964 of after-tax interest expense was added to earnings applicable to common stock for the purpose of calculating diluted earnings per share. Previously reported earnings per share amounts for prior

years were not affected by the new standard.

Consolidated Cash Flows -- For purposes of reporting cash flows, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents.

The schedule below details the Company's and TU Electric's cash payments and noncash investing and financing activities:

<TABLE>
<CAPTION>

|  | Year Ended December 3 | | |
| --- | --- | --- | --- |
|  | 1997 | 1996 | |
|  | ---- | ---- | |
|  |  | Thousands of Dollars | |
| <S> | <C> | <C> | <C |
| The Company | | | |
| - ----------- | | | |
| CASH PAYMENTS | | | |
| Interest (net of amounts capitalized).................... | $   630,844 | $757,092 | $ |
| Income taxes............................................ | 174,908 | 246,556 | |
| NON-CASH INVESTING AND FINANCING ACTIVITIES | | | |
| Acquisition of ENSERCH and LCC (1997) and Eastern Energy (1995) | | | |
| Book value of assets acquired........................ | $ 2,033,311 | $    -- | $ |
| Goodwill............................................. | 1,005,277 | -- | |
| Common stock issued, net of capitalized expenses...... | (892,068) | 9,821 | |
| Liabilities assumed.................................. | (2,124,878) | -- | ( |
|  | ----------- | -------- | -- |
| Cash used........................................ | 21,642 | 9,821 | |
| Cash acquired....................................... | (26,419) | -- | -- |
|  | ----------- | -------- | |
| Net cash used (provided)......................... | $   (4,777) | $ 9,821 | $ |
|  | =========== | ======== | == |
| TU Electric | | | |
| - ----------- | | | |
| CASH PAYMENTS | | | |
| Interest (net of amounts capitalized).................... | $   467,760 | $558,039 | $ |
| Income taxes............................................ | 231,809 | 303,204 | |

</TABLE>

Regulatory Assets and Liabilities -- SFAS 71 applies to utilities which have cost-based rates established by a regulator and charged to and collected from customers.  In accordance with this statement, the Company's regulated subsidiaries may defer the recognition of certain costs (regulatory assets) and certain obligations (regulatory liabilities) that, as a result of the rate making process, have probable corresponding increases or decreases in future revenues.   These regulatory assets and liabilities are being amortized over various periods of 5 to 40 years and are currently included in rates, or are expected to be included in future rates.

Significant net regulatory assets are as follows:

<TABLE>
<CAPTION>

|  | The Company December 31, | | TU Electric December 31, | |
| --- | --- | --- | --- | --- |
| Item | 1997 | 1996 | 1997 | 1996 |
| ---- | ---- | ---- | ---- | ---- |
|  |  | Thousands of Dollars | | |
| <S> | <C> | <C> | <C> | <C> |

| | | | |
|---|---|---|---|
| Securities reacquisition costs............... | $ 397,480 | $ 396,539 | $ 396,702 | $ 394,733 |
| Canceled lignite unit costs................ | 9,208 | 12,322 | 9,208 | 12,322 |
| Rate case costs............................ | 56,637 | 59,444 | 56,637 | 59,444 |
| Litigation and settlement costs........... | 72,685 | 72,685 | 72,685 | 72,685 |
| Voluntary retirement/severance program..... | 100,337 | 128,337 | 107,776 | 108,884 |
| Recoverable deferred income taxes -- net... | 1,249,338 | 1,167,922 | 1,254,456 | 1,173,413 |
| Other regulatory assets (liabilities)...... | 40,008 | (10,942) | (28,263) | (13,490) |
| Reserve for regulatory disallowances....... | (72,685) | (72,685) | (72,685) | (72,685 |
| Unamortized regulatory assets............ | 1,853,016 | 1,753,418 | 1,796,516 | 1,735,306 |
| Unamortized investment tax credits........ | (570,283) | (589,713) | (556,743) | (577,965) |
| Unamortized regulatory assets -- net....... | $1,282,733 | $1,163,705 | $1,239,773 | $1,157,341 |

</TABLE>

A-36

<PAGE>

Future significant changes in regulation or competition could affect the
regulated subsidiaries' ability to meet the criteria for continued application
of SFAS 71 and may affect their ability to recover these regulatory assets from,
or refund these regulatory liabilities to, customers. If the affected System
Companies were to discontinue the application of SFAS 71, they would be required
to assess the recoverability of certain assets, including plant and regulatory
assets, and, if impaired, to write down the assets to reflect their fair market
value. The Company and TU Electric cannot predict the ultimate outcome of the
ongoing efforts that are taking place to restructure the electric utility
industry or whether the outcome of such efforts will have a material effect on
its financial position, results of operation or cash flows. However, the
Company and TU Electric have no current knowledge of planned or impending
actions by regulators, including the legislature of the State of Texas, that
would affect recoverability of its plant and net regulatory assets.

TU Electric
- -----------

Affiliates -- The Company provides common stock capital and partial
requirements for short-term financing to TU Electric and System Companies. The
Company has other subsidiaries which perform specialized services for the System
Companies, including TU Electric; Texas Utilities Services Inc. (TU Services)
which provides financial, accounting, information technology, environmental
services, customer services, procurement, personnel, shareholder services and
other administrative services at cost; Texas Utilities Fuel Company (Fuel
Company) which owns a natural gas pipeline system, acquires, stores and delivers
fuel gas and provides other fuel services at cost for the generation of
electric energy by TU Electric; and Texas Utilities Mining Company (Mining
Company) which owns, leases and operates lignite production facilities for the
surface mining and recovery of lignite at cost for use at TU Electric's
generating stations; and ENSERCH. TU Electric provided services such as energy
sales, wheeling and scheduling to SESCO.

TU Electric has entered into agreements with Fuel Company for the procurement
of certain fuels and related services and with Mining Company for the
procurement and production of lignite. Payments are at cost for the services
received and are required by the agreements to be "at least equivalent in the
aggregate to the annual charge to income on the books" of Fuel Company and of
Mining Company. TU Electric is, in effect, obligated for the principal,
$382,142,000 at December 31, 1997, and interest on long-term notes of Mining
Company through payments described above. Such notes mature at various dates
through 2005 and have interest rates ranging from 6.50% to 9.42%.

The schedule below details TU Electric's significant billings to and from
affiliates for services rendered and interest on short-term financings:

|                                    | Year Ended December 31, |          |          |
|------------------------------------|----------|----------|----------|
|                                    | 1997     | 1996     | 1995     |
|                                    | Thousands of Dollars |          |          |
| Billings from:                     |          |          |          |
|   TU Services............................ | $270,547 | $263,869 | $182,334 |
|   Fuel Company.......................... | 995,635  | 922,200  | 763,346  |
|   Mining Company....................... | 354,896  | 368,937  | 327,856  |
| Billings to:                       |          |          |          |
|   SESCO................................. | $ 35,195 | $ 29,171 | $ 20,657 |
|   Fuel Company.......................... | 900      | 1,619    | 5,669    |

## 3. SHORT-TERM FINANCING

The Company
- -----------

The Company had outstanding short-term borrowings of $614,442,000 consisting of commercial paper of $570,000,000 and bank borrowings of $44,442,000 at December 31, 1997.  The weighted average interest rates on such borrowings was 6.18% at December 31, 1997.  During the years 1997, 1996 and 1995, the Company's average amounts outstanding for short-term borrowings, including amounts classified as long-term, were $1,222,176,000, $593,660,000 and $149,806,000, respectively.  Weighted average interest rates for short-term borrowings during such periods were 5.86%, 5.94%, and 6.33%, respectively.

At December 31, 1997, the Company, TU Electric and ENSERCH had joint lines of credit under credit facility agreements (Credit Agreements) with a group of commercial banks.  The Credit Agreements have two facilities.  Facility A provides for short-term borrowings aggregating up to $570,000,000 outstanding at any one time at variable interest rates and

A-37

<PAGE>

terminates April 23, 1998. Facility B provides for short-term borrowings aggregating up to $1,330,000,000 outstanding at any one time at variable interest rates and terminates April 24, 2002. The combined borrowings of the Company, TU Electric and ENSERCH under both facilities are limited to an aggregate of $1,900,000,000 outstanding at any one time. ENSERCH's borrowings under both facilities are limited to an aggregate of up to $650,000,000 outstanding at any one time. Borrowings under these facilities will be used for working capital and other corporate purposes, including commercial paper backup. The total of short-term borrowings authorized by the Board of Directors of the Company at December 31, 1997, from banks or other lenders, was $2,150,000,000.

In addition, certain non-U.S. subsidiaries have revolving credit agreements aggregating approximately $95,000,000, of which $61,000,000 was outstanding at December 31, 1997.  These revolving credit agreements expire at various dates through 2000.

The Company intends to refinance up to $990,440,000 of its current short-term borrowings beyond one year of the balance sheet date of December 31, 1997. As a result, such amount has been reclassified from notes payable - commercial paper to long-term debt on the Company's 1997 Balance Sheet (see Note 8). If necessary, the Company would draw upon Facility B if such amount were not refinanced in the normal course of business.

TU Electric
- -----------

TU Electric had no borrowings from banks in 1997 or 1996.  Average amounts outstanding to banks for borrowings were $11,667,000 during 1995 and TU

EFH01434802

Electric's average commercial paper outstanding was $56,761,000, $294,627,000, and $340,579,000 for 1997, 1996 and 1995, respectively. During such periods, weighted average interest rates to banks for borrowings were 6.51%, and to holders of commercial paper were 5.61%, 5.53%, and 6.10%, respectively. Average borrowings outstanding from other affiliates were $157,608,000, $9,586,000 and $4,079,000 during 1997, 1996, and 1995, respectively, and the respective weighted average interest rates for such borrowings were 5.88%, 5.91% and 6.38%


4. COMMON STOCK

The Company
- -----------

   The Company has an Automatic Dividend Reinvestment and Common Stock Purchase Plan (DRIP) and an Employees' Thrift Plan of the Texas Utilities Company System (Thrift Plan). During each of the last three years, requirements under the DRIP and Thrift Plan have been met through open market purchases of the Company's common stock.

   At December 31, 1997, the Thrift Plan had an obligation of $250,000,000 outstanding in the form of a note, which the Company purchased from the original third-party lender and recorded as a reduction to common equity. At December 31, 1997, the Thrift Plan trustee held 5,375,158 shares of common stock (LESOP Shares) of the Company under the leveraged employee stock ownership provision of the Thrift Plan. LESOP Shares are held by the trustee until allocated to Thrift Plan participants when required to meet the System Companies' obligations under terms of the Thrift Plan. The Thrift Plan uses dividends on the LESOP Shares held and contributions from the System Companies, if required, to repay interest and principal on the note. Common stock equity increases at such time as LESOP Shares are allocated to participants' accounts although shares of common stock outstanding include unallocated LESOP Shares held by the trustee. Allocations to participants' accounts in each of the years 1997 and 1995 increased common stock equity by $8,115,000; 1996 increased by $8,137,000.

   The Long-Term Incentive Compensation Plan was approved and adopted by the directors of the Company and approved by the shareholders in 1997. The purpose of the plan is to assist the Company in attracting, retaining and motivating executive officers and other key employees essential to the success of the Company through performance-related incentives linked to long-range performance goals. The plan is a comprehensive, stock-based incentive compensation plan, providing for discretionary awards (Awards) of incentive stock options, nonqualified stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares, performance units, bonus stock and other stock-based awards. All Awards will be made in, or based on the value of, the Company's common stock. The maximum number of shares of common stock for which Awards may be granted under the plan is 2,500,000 subject to adjustment in the event of a merger, consolidation, reorganization, recapitalization, stock dividend, stock split, or other similar event. During 1997, the Board of Directors

A-38

<PAGE>

authorized the award of 61,000 shares of restricted common stock, which were issued in 1997 subject to performance and vesting requirements over a three to five year period. No stock options were granted.

   At December 31, 1997, 14,154,372 shares of the authorized but unissued common stock of the Company were reserved for issuance and sale pursuant to the above plans, for conversion of the 6% Convertible Subordinated Debentures due 2002 (see Note 8) and for other purposes.

   In November 1997, the Company's Board of Directors increased the common stock repurchase limit to $350 million of which $148,780,000 was used as of December

31, 1997 to purchase and retire 4,015,000 shares of the Company's issued and outstanding common stock during 1997. The cost of the repurchased shares, to the extent it exceeded the estimated amount received upon their original issuance, has been charged to retained earnings.

The Company has 50,000,000 authorized shares of serial preference stock having a par value of $25 a share, none of which has been issued.

TU Electric
- -----------

During the year ended December 31, 1997, TU Electric purchased and retired a total of 13,869,000 shares of its issued and outstanding common stock at a total cost of approximately $416,070,000. TU Electric had no common stock transactions in 1995 or 1996.

No shares of TU Electric's common stock are held by or for its own account, nor are any shares of such capital stock reserved for its officers and employees or for options, warrants, conversions and other rights in connection therewith.

5.   DIVIDEND RESTRICTIONS OF TU ELECTRIC AND OTHER SUBSIDIARIES OF THE COMPANY

The articles of incorporation and/or the mortgages, as supplemented, and certain other debt instruments of TU Electric and SESCO contain provisions which, under certain conditions, restrict distributions on or acquisitions of common stock. At December 31, 1997, $29,236,000 of retained earnings of TU Electric, and $13,970,000 of retained earnings of SESCO, were thus restricted as a result of such provisions.

In 1995, TU Electric transferred approximately $433,820,000 from its common stock account to retained earnings. Such amount represented the Company's equity in undistributed earnings, since acquisition, included in previous transfers by TU Electric.

A-39

<PAGE>

6. PREFERRED STOCK OF TU ELECTRIC AND OTHER SUBSIDIARIES OF THE COMPANY

<TABLE>
<CAPTION>

| Dividend Rate | Shares Outstanding December 31, | | Amount December 31, | | (Be - Dec |
|---|---|---|---|---|---|
| - ------------------------------------ | ------------------ | | -------------------- | | --- |
| | 1997 | 1996 | 1997 | 1996 | Dec |
| | ---- | ---- | ---- | ---- | --- |
| | | | Thousands of Dollars | | |

Not Subject to Mandatory Redemption:
- ------------------------------------
TU Electric (cumulative, without par value, entitled upon liquidation to $100 a share; authorize
- -----------------------------------------------------------------------------------------------

| <S> | <C> | <C> | <C> | <C> | <C> |
|---|---|---|---|---|---|
| $   4.50 series...................... | 22,406 | 74,367 | $  2,242 | $  7,440 | |
|     4.00 series (Dallas Power).......... | 20,755 | 70,000 | 2,090 | 7,049 | |
|     4.56 series (Texas Power).......... | 52,879 | 133,628 | 5,291 | 13,371 | |
|     4.00 series (Texas Electric)........ | 69,221 | 110,000 | 6,922 | 11,000 | |
|     4.56 series (Texas Electric)........ | 22,237 | 64,947 | 2,246 | 6,560 | |
|     4.24 series...................... | 18,194 | 100,000 | 1,834 | 10,081 | |
|     4.64 series...................... | 25,195 | 100,000 | 2,524 | 10,016 | |
|     4.84 series...................... | 15,964 | 70,000 | 1,597 | 7,000 | |
|     4.00 series (Texas Power).......... | 27,391 | 70,000 | 2,739 | 7,000 | |
|     4.76 series...................... | 23,181 | 100,000 | 2,318 | 10,000 | |
|     5.08 series...................... | 27,716 | 80,000 | 2,773 | 8,004 | |
|     4.80 series...................... | 20,420 | 100,000 | 2,044 | 10,009 | |
|     4.44 series...................... | 33,672 | 150,000 | 3,381 | 15,061 | |

EFH01434804

| | | | | |
|---|---:|---:|---:|---:|
| 7.20 series........................ | | 200,000 | | 20,044 |
| 6.84 series........................ | -- | 200,000 | -- | 20,023 |
| 7.24 series........................ | -- | 247,862 | -- | 24,905 |
| 8.20 series (a) (c)................ | 146,501 | 338,872 | 14,138 | 32,704 |
| 7.98 series........................ | 261,075 | 474,000 | 25,774 | 46,794 |
| 7.50 series (a)................... | 308,308 | 392,234 | 29,918 | 38,062 |
| 7.22 series (a)................... | 220,448 | 301,132 | 21,363 | 29,182 |
| Adjustable rate series A.............. | -- | 884,700 | -- | 86,878 |
| Adjustable rate series B.............. | -- | 440,137 | -- | 43,244 |
| Total.......................... | 1,315,563 | 4,701,879 | 129,194 | 464,427 |

<CAPTION>

ENSERCH (entitled upon liquidation to stated value per share; authorized 2,000,000 shares)

| Adjustable Rate Preferred Stock: | | | | |
|---|---:|---:|---:|---:|
| Series E (c) (d)................ | 100,000 | -- | 100,000 | -- |
| Series F (d)................... | 75,000 | -- | 75,000 | -- |
| Total...................... | 175,000 | -- | 175,000 | -- |
| Total.......................... | 1,490,563 | 4,701,879 | $304,194 | $464,427 |

<CAPTION>

TU Electric - Subject to Mandatory Redemption (e)

| | | | | |
|---|---:|---:|---:|---:|
| $  9.64 series.................... | -- | 400,000 | $    -- | $ 39,981 |
| 6.98 series.................... | 107,500 | 1,000,000 | 10,672 | 99,199 |
| 6.375 series................... | 100,000 | 1,000,000 | 9,928 | 99,211 |
| Total...................... | 207,500 | 2,400,000 | $ 20,600 | $238,391 |

</TABLE>

(a) The preferred stock series is the underlying preferred stock for depositary shares that were issued to the public. Each depositary share represents one quarter of a share of underlying preferred stock.

(b) Preferred stock series is not redeemable at December 31, 1997.

(c) Preferred stock series redeemed in January 1998.

(d) Stated value $1,000 per share. The preferred stock series is the underlying preferred stock for depositary shares that were issued to the public. Each depositary share represents one-tenth of a share of underlying preferred stock for Series E ($100 per share) and one-fortieth of a share for Series F ($25 per share). Dividend rates are determined quarterly, in advance, based on certain U.S. Treasury rates. At December 31, 1997, the Series E bears a dividend rate of 7.0% and the Series F bears a dividend rate of 5.54%.

(e) TU Electric is required to redeem at a price of $100 per share plus accumulated dividends a specified minimum number of shares annually or semi-annually on the initial/next dates shown below. These redeemable shares may be called, purchased or otherwise acquired. Certain issues may not be redeemed at the option of TU Electric prior to 2003. TU Electric may annually call for redemption, at its option, an aggregate of up to twice the number of shares shown below for each series at a price of $100 per share plus accumulated dividends.

| Series | Minimum Redeemable Shares | Initial/Next Date of Mandatory Redemption |
|---|---|---|
| $ 6.98 | 50,000 annually | July 1, 2003 |
| 6.375 | 50,000 annually | October 1, 2003 |

The carrying value of preferred stock subject to mandatory redemption is being

increased periodically to equal the redemption amounts at the mandatory redemption dates with a corresponding increase in preferred stock dividends.

A-40

<PAGE>

During the year ended December 31, 1997, TU Electric redeemed or purchased 5,578,816 shares of its preferred stock (including 3,989,640 shares purchased by the Company in March 1997 pursuant to a tender offer and subsequently sold to TU Electric) with annual dividend rates ranging from 4.00% to 9.64% at a total cost of approximately $553,093,000.  In January 1998, TU Electric redeemed all of the outstanding shares of the $8.20 series preferred stock, and ENSERCH redeemed the Series E Adjustable Rate Preferred Stock, in each case at 100% of the liquidation price plus accumulated and unpaid dividends.

7. TU ELECTRIC OBLIGATED, MANDATORILY REDEEMABLE, PREFERRED SECURITIES OF
    SUBSIDIARY TRUSTS HOLDING SOLELY DEBENTURES OF TU ELECTRIC

Five statutory business trusts, each a TU Electric Trust, have been established as financing subsidiaries of TU Electric for the purposes, in each case, of issuing common and preferred trust securities and holding Junior Subordinated Debentures issued by TU Electric (Debentures).  TU Electric Capital I, II and III preferred trust securities have a liquidation preference of $25 per unit and TU Electric Capital IV and V preferred trust securities have a liquidation preference of $1,000 per unit (Capital Securities).  The Debentures held by each TU Electric Trust are its only assets.  The interest on Trust assets matches the dividend rates on the trust securities.  Each TU Electric Trust will use interest payments received on the Debentures it holds to make cash distributions on the trust securities it has issued.

The preferred securities are subject to mandatory redemption upon payment of the Debentures at maturity or upon redemption. The Debentures are subject to redemption, in whole or in part at the option of TU Electric, as 100% of their principal amount plus accrued interest, after an initial period during which they may not be redeemed and at any time upon the occurrence of certain events. The carrying value of the preferred securities is being increased periodically to equal the redemption amounts at the mandatory redemption dates with a corresponding increase in preferred securities distributions.

At December 31, 1997 and 1996, the following preferred securities and related trust assets of the TU Electric Trusts were outstanding:

<TABLE>
<CAPTION>

| | Preferred Securities | | | | |
|---|---|---|---|---|---|
| | Units Outstanding December 31, | | Amount December 31, | | --- |
| | 1997 | 1996 | 1997 | 1996 | |
| | ---- | ---- | ---- | ---- | |
| | | | | Thousands of Do | |
| <S> | <C> | <C> | <C> | <C> | <C |
| TU Electric Capital I (8.25% Series)..... | 5,871,044 | 5,871,044 | $140,851 | $140,671 | $1 |
| TU Electric Capital II (9.00% Series).... | 1,991,253 | 1,991,253 | 47,374 | 47,301 | |
| TU Electric Capital III (8.00% Series)... | 8,000,000 | 8,000,000 | 193,510 | 193,339 | 2 |
| TU Electric Capital IV (floating rate Capital Securities)(a)................. | 100,000 | -- | 97,570 | -- | 1 |
| TU Electric Capital V (8.175% Capital Securities)........................... | 400,000 | -- | 395,841 | -- | 4 |
| Total | 16,362,297 | 15,862,297 | $875,146 | $381,311 | $9 |

</TABLE>

(a)   Floating rate is determined quarterly based on LIBOR. The related
      interest rate swap fixes the rate at 7.183%.


   At December 31, 1997, TU Electric, with respect to its Capital IV securities,
had an interest rate swap agreement with a notional principal amount of
$100,000,000 expiring 2002 that fixed the rate on the securities at 7.183% per
annum.


   The combination of the obligations of TU Electric pursuant to agreements to
pay the expenses of each of the TU Electric Trusts and TU Electric's guarantees
of distributions with respect to trust securities, to the extent the issuing
trust has funds available therefor, constitutes a full and unconditional
guarantee by TU Electric of the obligations of each trust under the trust
securities it has issued.  TU Electric is the owner of all the common trust
securities of each trust, which, in each case, constitutes 3% or more of the
liquidation amount of all the trust securities issued by such trust.


   In January 1998, TU Electric redeemed all of the outstanding shares of the TU
Electric Capital II preferred trust securities at 100% of the liquidation amount
of $25 per preferred security, plus accumulated and unpaid dividends.

                                  A-41
<PAGE>

8. LONG-TERM DEBT, less amounts due currently

<TABLE>
<CAPTION>

| | | | The Company December 31, | | TU De |
| --- | --- | --- | --- | --- | --- |
| Interest Rate | Series Due | | 1997 | 1996 | 199 |
| ---- | --- | | ---- | ---- | --- |
| <S> | | <C> | | <C> | Thousands of Dollars<br><C> |
| First mortgage bonds: | | | | | |
| 5-1/2% series due 1998........................... | | $    -- | | $125,000 | $ |
| 5-3/4% series due 1998........................... | | -- | | 150,000 | |
| 5-7/8% series due 1998........................... | | -- | | 175,000 | |
| 6-1/2% series due 1998........................... | | -- | | 1,065 | |
| 7-3/8% series due 1999........................... | | 100,000 | | 100,000 | 100, |
| Floating rate series due 1999................... | | -- | | 300,000 | |
| 9-1/2% series due 1999........................... | | 200,000 | | 200,000 | 200, |
| 7-3/8% series due 2001........................... | | 150,000 | | 150,000 | 150, |
| 7.95 % series due 2002........................... | | 888 | | 900 | |
| 8    % series due 2002........................... | | 147,000 | | 147,000 | 147, |
| 8-1/8% series due 2002........................... | | 150,000 | | 150,000 | 150, |
| 6-3/4% series due 2003........................... | | 200,000 | | 200,000 | 200, |
| 6-3/4% series due 2003........................... | | 100,000 | | 100,000 | 100, |
| 6-1/4% series due 2004........................... | | 125,000 | | 125,000 | 125, |
| 8-1/4% series due 2004........................... | | 100,000 | | 100,000 | 100, |
| 6-3/4% series due 2005........................... | | 100,000 | | 100,000 | 100, |
| 10.44% series due 2008........................... | | 3,000 | | 3,000 | 3, |
| 9-3/4% series due 2021........................... | | 135,855 | | 280,855 | 135, |
| 8-7/8% series due 2022........................... | | 125,000 | | 175,000 | 125, |
| 9    % series due 2022........................... | | -- | | 100,000 | |
| 7-7/8% series due 2023........................... | | 300,000 | | 300,000 | 300, |
| 8-3/8% series due 2023........................... | | 135,550 | | 195,550 | 135, |
| 7-7/8% series due 2024........................... | | 225,000 | | 225,000 | 225, |
| 8-1/2% series due 2024........................... | | 113,000 | | 163,000 | 113, |
| 7-3/8% series due 2025........................... | | 208,000 | | 208,000 | 208, |
| 7-5/8% series due 2025........................... | | 250,000 | | 250,000 | 250, |
| Pollution control series: | | | | | |
| Brazos River Authority | | | | | |
| 7-7/8% series due 2017........................... | | -- | | 81,305 | |
| 9-7/8% series due 2017........................... | | -- | | 28,765 | |

| | | | |
|---|---|---|---|
| 9-1/4% series due 2018............................ | 54,605 | 54,605 | 54, |
| 8-1/4% series due 2019............................ | 100,000 | 100,000 | 100, |
| 8-1/8% series due 2020............................ | 50,000 | 50,000 | 50, |
| 7-7/8% series due 2021............................ | 100,000 | 100,000 | 100, |
| Taxable series due 2021 (5.86%) (a)............... | 40,895 | 65,940 | 40, |
| 5-1/2% series due 2022............................ | 50,000 | 50,000 | 50, |
| 6-5/8% series due 2022............................ | 33,000 | 33,000 | 33, |
| 6.70 % series due 2022............................ | 16,935 | 16,935 | 16, |
| 6-3/4% series due 2022............................ | 50,000 | 50,000 | 50, |
| Series 1997D due 2022 (3.75%) (c)................. | 28,765 | -- | 28, |
| Taxable series due 2023 (5.85%) (a)............... | 100,000 | 100,000 | 100, |
| 6.05 % series due 2025............................ | 90,000 | 90,000 | 90, |
| Series 1996 A due 2026 (5.10%)(c)................. | 25,060 | 25,060 | 25, |
| 6-1/2% series due 2027............................ | 46,660 | 46,660 | 46, |
| 6.10 % series due 2028............................ | 50,000 | 50,000 | 50, |
| Series 1994A due 2029 (3.75% to 3.85%) (b)........ | 39,170 | 39,170 | 39, |
| Series 1994B due 2029 (3.75% to 3.80%) (b)........ | 39,170 | 39,170 | 39, |
| Series 1995A due 2030 (5.10%) (c)................. | 50,670 | 50,670 | 50, |
| Series 1995B due 2030 (4.60%) (c)................. | 118,355 | 118,355 | 118, |
| Series 1995C due 2030 (5.10%) (c)................. | 118,355 | 118,355 | 118, |
| Series 1996B due 2030 (4.60%) (c)................. | 61,215 | 61,215 | 61, |
| Series 1996C due 2030 (5.10%) (c)................. | 50,000 | 50,000 | 50, |
| Series 1997A due 2032 (5.10%) (c)................. | 50,000 | -- | 50, |
| Series 1997B due 2032 (4.95%) (c)................. | 31,305 | -- | 31, |
| Series 1997C due 2032 (5.10%) (c)................. | 25,045 | -- | 25, |
| Sabine River Authority of Texas | | | |
| 9   % series due 2007............................ | -- | 51,525 | |
| 8-1/8% series due 2020............................ | 40,000 | 40,000 | 40, |
| 8-1/4% series due 2020............................ | 11,000 | 11,000 | 11, |

</TABLE>

A-42

<PAGE>

<TABLE>
<CAPTION>

| Interest Rate | Series Due | The Company December 31, | | T D |
|---|---|---|---|---|
| ---- | --- | 1997 | 1996 | 199 |
| | | ---- | ---- | --- |
| | | | Thousands of Dolla | |

Sabine River Authority of Texas (continued)

| | | | |
|---|---|---|---|
| <S> | | <C> | <C> | <C> |
| 5.55 %  series due 2022................................... | $  75,000 | $  75,000 | $  75, |
| 6.55 %  series due 2022................................... | 40,000 | 40,000 | 40, |
| 5.85 %  series due 2022................................... | 33,465 | 33,465 | 33, |
| Series 1997A due 2022 (3.70%)(c).......................... | 51,525 | -- | 51, |
| Series 1996A  due 2026 (5.10%) (c)........................ | 57,950 | 57,950 | 57, |
| Series 1996B  due 2026 (5.10%) (c)........................ | 25,000 | 25,000 | 25, |
| Series 1995A  due 2030 (5.20%) (c)........................ | 16,000 | 16,000 | 16, |
| Series 1995B  due 2030 (4.50%) (c)........................ | 12,050 | 12,050 | 12, |
| Series 1995C  due 2030 (4.60%) (c)........................ | 18,475 | 18,475 | 18, |
| Trinity River Authority of  Texas | | | |
| 9   % series due 2007..................................... | -- | 12,000 | |
| Series 1997A due 2022 (3.75%) (c)......................... | 12,000 | -- | 12, |
| Series 1996 A  due 2026 (5.10%) (c)....................... | 25,000 | 25,000 | 25, |
| Series 1997B due 2032 (5.95%) (c)......................... | 14,075 | -- | 14, |
| Secured medium-term notes, series A...................... | 30,000 | 30,000 | 30, |
| Secured medium-term notes, series B...................... | 114,200 | 114,200 | 114, |
| Secured medium-term notes, series D...................... | 201,150 | 201,150 | 201, |
| | ---------- | ---------- | ------- |
| Total first mortgage bonds............................ | 5,063,788 | 6,205,790 | 5,062, |
| General obligation bonds................................. | 9,646 | 10,000 | |
| Debt assumed for purchase of utility plant (d)........... | 153,537 | 156,182 | 153, |

| | | | |
|---|---|---|---|
| TU Electric 7.17% Senior Debentures due 2007.................. | 300,000 | -- | 300, |
| Senior notes: | | | |
| TEI (due through 2010 at 10.2% to 10.58%).................... | 235,800 | 239,350 | |
| TUC (due through 2004 at 6.20% to 6.375%)................... | 300,000 | -- | |
| ENSERCH (due through 2005 at 6.25% to 8.875%).............. | 575,000 | -- | |
| TUMCO (due through 2005 at 6.5% to 9.42%)................... | 367,856 | 382,142 | |
| LCC (due through 2003 at 7.15% to 10.5%)................... | 648 | -- | |
| Eastern Energy (due through 2016 at 6.75% to 7.25%) (e)..... | 280,994 | 343,389 | |
| 6 3/8% Convertible subordinated debentures due 2002.......... | 90,750 | -- | |
| Term credit facilities (f)................................. | 1,416,728 | 1,381,290 | |
| Unamortized premium and discount and fair value adjustments.. | (35,368) | (50,032) | (40, |
| | ---------- | ---------- | ------- |
| Total long-term debt, less amounts due currently................................. | $8,759,379 | $8,668,111 | $5,475, |
| | ========== | ========== | ======= |

</TABLE>

- ------------------------------

(a) Interest rates in effect at December 31, 1997 are presented. Taxable
    pollution control series are in a flexible rate mode. Series 1991D bonds due
    2021 were remarketed on June 1, 1995 for rate periods up to 180 days and are
    secured by an irrevocable letter of credit with maturities in excess of one
    year. Series 1993 bonds due 2023 will be remarketed for periods of less than
    270 days and are secured by an irrevocable letter of credit with maturities
    in excess of one year.
(b) Interest rates in effect at December 31, 1997 are presented. These series
    are in a flexible mode with varying interest rates and, while in such mode,
    will be remarketed for periods of less than 270 days and are secured by an
    irrevocable letter of credit with maturities in excess of one year.
(c) Interest rates in effect at December 31, 1997 are presented. These series
    are in a daily mode with varying interest rates and are supported by either
    municipal bond insurance policies and standby bond purchase agreements or
    are secured by irrevocable letters of credit with maturities in excess of
    one year.
(d) In 1990, TU Electric purchased the ownership interest in Comanche Peak of
    Tex-La Electric Cooperative of Texas, Inc. (Tex-La) and assumed debt of Tex-
    La payable over approximately 32 years. The assumption is secured by a
    mortgage on the acquired interest. The Company has guaranteed these
    payments.
(e) Eastern Energy has entered into cross-currency and interest rate swap
    agreements expiring on concurrent dates with the underlying fixed rate debt
    through 2016. Such agreements effectively convert these fixed rate U.S.
    dollar denominated Senior Notes to a floating rate Australian Dollar
    liability based on the Australian Bank Bill Swap rate plus a margin. At
    December 31, 1997, such floating rates ranged from 5.29% to 8.45%.
(f) Includes the Company's $990,440,000 reclassified short-term debt (see Note
    3). Also includes Eastern Energy's $297,837,000 Multi Option Credit Facility
    due 2001 with a floating interest rate of 5.44% on December 31, 1997 and
    Eastern Energy's $128,451,000 reclassified short-term debt (all of which is
    included under interest rate swap agreements with notional principal amounts
    of $627,539,000 expiring at various dates through 2002 with fixed interest
    rates ranging from 5.29% to 8.45% per annum and forward contracts with
    notional principal amounts of $45,521,000 expiring at various dates through
    1998 with an average rate of 4.8%).

    Long-term debt of the Company does not include Junior Subordinated Debentures
held by each TU Electric Trust.  (See Note 7.)

    The ENSERCH convertible subordinated debentures, which have an interest rate
of 6 3/8%, are due in 2002 and effective with the Merger, each $1,000 of the
$90,750,000 total principal amount outstanding became convertible into 25.947
shares of TUC common stock at the option of the debenture holder.  The
debentures may be redeemed at 101.27% of the principal amount, plus accrued
interest, through March 31, 1998, and at declining premiums thereafter.  The
Company currently intends to redeem these debentures in 1998.

A-43

Sinking fund and maturity requirements for the years 1998 through 2002 under long-term debt instruments in effect at December 31, 1997, were as follows:

| | The Company | | | TU Electric | | |
|---|---|---|---|---|---|---|
| Year | Sinking Fund | Maturity | Minimum Cash Requirement | Sinking Fund | Maturity | Minimum Cash Requirement |
| | | | Thousands of Dollars | | | |
| 1998.. | $ 20,994 | $   751,077 | $   772,071 | $2,645 | $750,000 | $752,645 |
| 1999.. | 24,680 | 480,012 | 504,692 | 5,906 | 330,000 | 335,906 |
| 2000.. | 261,040 | 1,597,891 | 1,858,931 | 3,199 | 156,150 | 159,349 |
| 2001.. | 22,415 | 322,012 | 344,427 | 3,502 | 222,000 | 225,502 |
| 2002.. | 8,546 | 586,602 | 595,148 | 3,838 | 370,000 | 373,838 |

TU Electric's and SESCO's first mortgage bonds are secured by mortgages and deeds of trust with major financial institutions.  Electric plant of TU Electric and SESCO is generally subject to the liens of their respective mortgages.

9.  DERIVATIVE INSTRUMENTS

The Company and TU Electric
- --------------------------

The Company enters into derivative instruments, including options, swaps, futures and other contractual commitments to manage market risks related to changes in interest rates and commodity price exposures.  The Company's participation in derivative transactions, except for the gas marketing activities, have been designated for hedging purposes and are not held or issued for trading purposes.  (For a discussion of accounting policies relating to derivative instruments, see Note 2.)

Interest Rate Risk Management -- At December 31, 1997, Eastern Energy had interest rate swaps outstanding with an aggregate notional amount of $977,500,000.  These swap agreements establish a mix of fixed and variable interest rates on the outstanding debt and have remaining terms up to 19 years. (See Note 8.)

At December 31,1997, TU Electric had an interest rate swap agreement with respect to preferred securities of TU Electric Capital IV, with a notional principal amount of $100,000,000 expiring 2002 that fixed the rate at 7.183% per annum.  (See Note 7.)

At December 31, 1997, there were $50,900,000 of net unrealized deferred hedging losses on interest rate swaps.

Electricity Price Risk Management -- Eastern Energy and the other distribution companies in Victoria purchase their power from a competitive power pool operated by a statutory, independent corporation.  Eastern Energy purchases about 95% of its energy from this pool, the cost of which is based on spot market prices.  Eastern Energy and other distribution companies were required to enter into wholesale market contracts to cover a substantial majority of its forecasted franchise load through the end of 2000.  Eastern Energy also maintains a strategy that is aimed at seeking hedging contracts with individual generators to cover forecast contestable loads.  These contracts fix the price of energy within a certain range for the purpose of hedging or protecting against fluctuations in the spot market price.  During 1997, the average spot price for electric energy from the pool approximated $14 per megawatt-hour (MWh) as compared with the average fixed price of Eastern Energy's electric energy under its contracts of approximately $29 per MWh.  At December 31, 1997, Eastern Energy's contracts related to its forecasted contestable and franchise load

cover a notional volume of approximately 15.6 million MWH's for 1998 through 2000. Under these contracts, payments are made between Eastern Energy and the generators representing the difference between the wholesale electricity market price and the contract price. The net payable or receivable is recognized in earnings as adjustments to purchased power expense in the period the related transactions are completed.

Natural Gas Marketing Activities -- EES's marketing activities involve price commitments into the future and, therefore, give rise to market risk, which represents the potential loss that can be caused by a change in the market value of a particular commitment. Net open portfolio positions often result from the origination of new transactions or in response to changing market conditions. The Company closely monitors its exposure to market risk. The Company utilizes a number of methods to monitor market risk, including sensitivity analysis. The exposure for fixed price natural gas purchase and sale commitments, and derivative financial instruments, including options, swaps, futures and other contractual commitments,

<div align="center">A-44</div>

<PAGE>

is based on a methodology that uses a five-day holding period and a 95% confidence level. EES uses market-implied volatilities to determine its exposure to market risk. Market risk is estimated as the potential loss in fair value resulting from at least a 15% change in market factors which may differ from actual results. Using 15%, the most adverse change in fair value at December 31, 1997 as a result of this analysis was a reduction of $1.1 million.

EES enters into contracts to purchase and sell natural gas for physical delivery in the future. At December 31, 1997, EES had net commitments to sell approximately 50.6 billion cubic feet (Bcf) of natural gas through the year 2003 with offsetting net financial positions to purchase approximately 61.3 Bcf.

Concurrent with the Merger, EES conformed its accounting for its gas marketing activities to mark-to-market accounting. Under mark-to-market accounting, changes (whether positive or negative) in the value of contractual commitments  to purchase and sell natural gas in the future and from its portfolio of derivative financial instruments, including options, swaps, futures and other contractual commitments are recognized as an adjustment to operating revenues in the period of change.  The market prices used to value these transactions reflect management's best estimate of market prices considering various factors including closing exchange and over-the-counter quotations, time value of money and volatility factors underlying the commitments.  These market prices are adjusted to reflect the potential impact of liquidating EES's position in an orderly manner over a reasonable period of time under present market conditions.

EES has a number of risks and costs associated with the future contractual commitments included in its natural gas portfolio, including credit risks associated with the financial condition of counterparties, product location (basis) differentials and other risks that management policies dictate.  EES continuously monitors the valuation of identified risk and adjusts the portfolio valuation based on present market conditions.  Reserves are established in recognition that certain risks exist until delivery of natural gas has occurred, counterparties have fulfilled their financial commitments and related financial instruments mature or are closed out.

The following table displays the mark-to-market values of EES's natural gas marketing risk management assets and liabilities at December 31, 1997 and the average value for the period from August 5, 1997 through December 31, 1997:

|  | Assets | Liabilities | Net |
| --- | --- | --- | --- |
|  | ------ | ----------- | --- |
|  | Thousands of Dollars | | |
| Fair Value: | | | |
| Current......................... | $365,650 | $357,044 | $ 8,606 |

EFH01434811

| Noncurrent...................... | 412,522 | 312,524 | 18,998 |
| Total........................... | $407,172 | $388,368 | 18,804 |
| Less reserves................... | | | 9,251 |
| Net of reserves................. | | | $ 9,553 |

Average Value:

| Total........................... | $291,809 | $278,332 | $13,477 |
| Less reserves................... | | | 8,134 |
| Net of reserves................. | | | $ 5,343 |

EES incurred net trading losses of $286,000 from gas marketing activities for the period from August 5, 1997 through December 31, 1997.

Credit Risk - Credit risk relates to the risk of loss that the Company would incur as a result of nonperformance by counterparties to their respective derivative instruments. The Company maintains credit policies with regard to its counterparties that management believes significantly minimize overall credit risk. The Company does not obtain collateral to support the agreements but monitors the financial viability of counterparties and believes its credit risk is minimal on these transactions. The Company believes the risk of nonperformance by counterparties is minimal.

A-45

<PAGE>

10.   INCOME TAXES

The components of the Company's and TU Electric provision for income taxes are as follows:

| | Year Ended December 31, | | |
| | 1997 | 1996 | 1995 |
| | | Thousands of Dollars | |

The Company
- -----------
Current:

| Federal.................................. | $181,632 | $198,522 | $ 222,358 |
| State.................................... | 39,900 | -- | -- |
| Total............................... | 221,532 | 198,522 | 222,358 |

Deferred

| Federal.................................. | 175,573 | 196,957 | (259,445) |
| State.................................... | (17,102) | -- | -- |
| Foreign................................. | 19,746 | 12,828 | (174) |
| Total............................... | 178,217 | 209,785 | (259,619) |
| Investment Tax Credits...................... | (22,851) | (33,075) | (22,774) |
| Total............................... | $376,898 | $375,232 | $ (60,035) |

TU Electric
- -----------

Charged (credited) to operating expenses:
  Current:

| | | | |
|---|---|---|---|
| Federal............................. | $283,464 | $291,807 | $ 260,988 |
| State.............................. | 43,601 | -- | -- |
| Total current...................... | 327,065 | 291,807 | 260,988 |
| **Deferred:** | | | |
| Depreciation differences and capitalized construction costs..................... | 146,623 | 151,391 | 205,280 |
| Over/under-recovered fuel revenue........ | 10,339 | 25,506 | (49,798) |
| Alternative minimum tax................. | 728 | 15,000 | (30,937) |
| Other.................................. | (43,852) | (32,024) | 17,983 |
| Total deferred -- net............... | 113,838 | 159,873 | 142,528 |
| Investment tax credits.................. | (21,222) | (30,668) | (21,201) |
| Total to operating expenses.......... | 419,681 | 421,012 | 382,315 |
| | | | |
| **Charged (credited) to other income:** | | | |
| **Current:** | | | |
| Federal................................ | (35,964) | (30,164) | (59,454) |
| State.................................. | (5,105) | -- | -- |
| Total current...................... | (41,069) | (30,164) | (59,454) |
| **Deferred:** | | | |
| **Federal:** | | | |
| Impairment of assets.................... | -- | -- | (149,617) |
| Regulatory disallowance................. | 34,208 | 13,623 | -- |
| Other.................................. | 13,462 | 1,861 | 39,709 |
| Total  federal...................... | 47,670 | 15,484 | (109,908) |
| State.................................. | (16,736) | -- | -- |
| Investment tax credits.................. | -- | (833) | -- |
| Total to other income............. | (10,135) | (15,513) | (169,362) |
| Total........................... | $409,546 | $405,499 | $ 212,953 |

A-46

<PAGE>

   Reconciliation of income taxes (benefit) computed at the federal statutory
rate to provision for income taxes (benefit).

| The Company<br>- ----------- | Year Ended December 31, | | |
|---|---|---|---|
| | 1997<br>---- | 1996<br>---- | 1995<br>---- |
| | Thousands of Dollars | | |
| **Income (loss) before income taxes:** | | | |
| Domestic........................ | $1,001,867 | $1,108,386 | $ (197,373) |
| Foreign......................... | 35,485 | 20,452 | (1,307) |
| Total........................ | 1,037,352 | 1,128,838 | (198,680) |
| Preferred stock  dividends of subsidiaries.................... | 27,983 | 53,358 | 84,914 |
| Income (loss) before preferred stock dividends of subsidiaries.................. | $1,065,335 | $1,182,196 | $(113,766) |

| | | | |
|---|---|---|---|
| Income taxes (benefit) at the federal statutory rate of 35%...................... | $ 372,867 | $ 413,769 | $ (39,188) |
| Allowance for funds used during construction.................... | (1,821) | (542) | (2,330) |
| Depletion allowance.............. | (22,691) | (25,657) | (23,564) |
| Amortization of investment tax credits........................ | (22,877) | (23,203) | (23,036) |
| Amortization of tax rate differences..................... | (6,856) | (9,084) | (9,648) |
| Amortization of prior flow-through amounts............ | 36,559 | 35,128 | 38,974 |
| Foreign operations.............. | 7,326 | 5,670 | 283 |
| Prior year adjustments.......... | (7,673) | (25,250) | (4,136) |
| State income taxes, net of federal tax benefit............. | 14,812 | -- | -- |
| Amortization of goodwill......... | 3,263 | -- | -- |
| Other............................ | 3,989 | 4,401 | 2,610 |
| Provision for income taxes (benefit)....................... | $ 376,898 | $ 375,232 | $ (60,035) |
| Effective tax rate (on income before preferred stock dividends of subsidiaries)........ | 35.4% | 31.7% | 52.8% |

    The Company had net tax benefits from LESOP dividend deductions of $3.9
million, $4.0 million and $6.5 million in 1997, 1996 and 1995, respectively,
which were credited directly to retained earnings.

| TU Electric | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 1997 | 1996 | 1995 |
| | Thousands of Dollars | | |
| Income before income taxes | $1,181,420 | $1,268,194 | $665,584 |
| Income taxes at the federal statutory rate of 35%............. | $413,497 | $443,868 | $232,954 |
| Allowance for funds used during construction.................... | (1,821) | (542) | (2,330) |
| Depletion allowance.............. | (22,636) | (25,657) | (23,564) |
| Amortization of investment tax credits........................ | (21,222) | (21,629) | (21,463) |
| Amortization of tax rate differences..................... | (6,559) | (8,740) | (9,288) |
| Amortization of prior flow-through amounts........... | 36,332 | 34,896 | 38,630 |
| Prior year adjustments........... | (6,914) | (21,813) | (5,669) |
| State income taxes, net of federal tax benefit............. | 14,144 | -- | -- |
| Other............................ | 4,725 | 5,116 | 3,683 |
| Provision for income taxes......... | $409,546 | $405,499 | $212,953 |
| Effective tax rate................. | 34.7% | 32.0% | 32.0% |

A-47

<PAGE>

    Deferred income taxes provided by the liability method for significant
temporary difference based on tax laws in effect at the December 31, 1997 and

1996 balance sheet dates are as follows:

<TABLE>
<CAPTION>

| The Company | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 1997 | | | |
| | Total | Current | Non current | Total |
| | | | | Thousand of Dollars |
| <S> | <C> | <C> | <C> | <C> |
| Deferred Tax Assets: | | | | |
| Unbilled revenues................................. | $   28,469 | $ 28,469 | $      -- | $   28,521 |
| Over-recovered fuel revenue....................... | 4,530 | 4,530 | -- | 15,045 |
| Unamortized investment tax credits............... | 300,871 | -- | 300,871 | 312,665 |
| Impairment of assets............................. | 141,678 | -- | 141,678 | 143,210 |
| Regulatory disallowance.......................... | 183,729 | -- | 183,729 | 222,428 |
| Alternative minimum tax.......................... | 589,989 | -- | 589,989 | 587,052 |
| Tax rate differences............................. | 78,477 | -- | 78,477 | 78,141 |
| Employee benefits................................ | 163,632 | -- | 163,632 | 100,397 |
| Net operating loss  carryforwards................ | 155,871 | -- | 155,871 | -- |
| Deferred benefits of state income tax........... | 156,237 | 5,129 | 151,108 | -- |
| Unrealized currency translation adjustments..... | 27,685 | -- | 27,685 | -- |
| Other............................................ | 35,130 | 35,130 | -- | 35,316 |
| Total deferred federal income tax asset........ | 1,866,298 | 73,258 | 1,793,040 | 1,522,775 |
| Deferred state income taxes...................... | 52,996 | 3,170 | 49,826 | -- |
| Deferred foreign income taxes.................... | 77,222 | 5,573 | 71,649 | 69,541 |
| Total  deferred tax assets.................... | 1,996,516 | 82,001 | 1,914,515 | 1,592,316 |
| | | | | |
| Deferred Tax Liabilities: | | | | |
| Depreciation differences and capitalized   construction costs.............................. | 4,257,455 | -- | 4,257,455 | 4,010,105 |
| Redemption of long-term debt..................... | 123,354 | -- | 123,354 | 125,601 |
| Deferred charges for state income tax........... | 24,433 | -- | 24,433 | -- |
| Other............................................ | 122,304 | 121 | 122,183 | 148,720 |
| Total deferred federal income tax liability.. | 4,527,546 | 121 | 4,527,425 | 4,284,426 |
| Deferred state income taxes...................... | 295,246 | -- | 295,246 | -- |
| Deferred foreign income taxes.................... | 94,590 | 13,492 | 81,098 | 69,495 |
| Total deferred tax liabilities................ | 4,917,382 | 13,613 | 4,903,769 | 4,353,921 |
| Net Deferred Tax Liability (Asset)........... | $2,920,866 | $(68,388) | $2,989,254 | $2,761,605 |

</TABLE>

   At December 31, 1997, the Company had approximately $590 million of
alternative minimum tax credit carryforwards available to offset future tax
payments.  At December 31, 1997, ENSERCH had $445 million of net operating loss
(NOL) carryforwards which begin to expire in 2003.  Such NOL's were generated by
ENSERCH and subsidiaries prior to the Merger and can be  used only to offset
future taxable income generated by ENSERCH and subsidiaries pursuant to Section
382 of the Internal Revenue Code.  The Company expects to fully utilize such
NOL's prior to their expiration date.

                                    A-48

<PAGE>

   Separately, the ENSERCH consolidated income tax returns have been audited and
settled with the Internal Revenue Service (IRS) through the year 1992.  The IRS

is currently auditing the year 1993 and as yet no notice of proposed adjustments
has been issued.  The IRS has indicated that it will commence an audit of
ENSERCH's returns for the years 1994 through 1997 in 1998.  To the extent that
adjustments to income tax accounts for periods prior to the Merger are required
as a result of an IRS audit, the adjustment will be added to or deducted from
goodwill in accordance with the provisions of SFAS 109.

<TABLE>
<CAPTION>

| TU Electric | | | December 31, | |
| --- | --- | --- | --- | --- |
| | | 1997 | | |
| | Total | Current | Non current | Total |
| | ----- | ------- | ------- | ----- |
| <S> | | | Thousand of Dollars | |
| | <C> | <C> | <C> | <C> |
| Deferred Tax Assets: | | | | |
| Unbilled revenues.............................. | $  28,257 | $ 28,257 | $       -- | $  28,521 |
| Over-recovered fuel revenue.................... | 4,530 | 4,530 | -- | 15,045 |
| Unamortized investment tax credits............ | 296,155 | -- | 296,155 | 307,153 |
| Impairment of assets.......................... | 71,548 | -- | 71,548 | 71,791 |
| Regulatory disallowance....................... | 183,729 | -- | 183,729 | 222,428 |
| Alternative minimum tax....................... | 422,593 | -- | 422,593 | 431,277 |
| Tax rate differences.......................... | 76,641 | -- | 76,641 | 77,248 |
| Employee benefits............................. | 90,088 | -- | 90,088 | 76,060 |
| Deferred benefits of state income tax......... | 152,276 | 5,095 | 147,181 | -- |
| Other......................................... | 21,678 | 8,408 | 13,270 | 19,664 |
| Total deferred federal income tax asset...... | 1,347,495 | 46,290 | 1,301,205 | 1,249,187 |
| Deferred state income taxes................... | 47,319 | 3,069 | 44,250 | -- |
| Total  deferred tax assets................... | 1,394,814 | 49,359 | 1,345,455 | 1,249,187 |
| | | | | |
| Deferred Tax Liabilities: | | | | |
| Depreciation differences and capitalized construction costs | 4,027,135 | -- | 4,027,135 | 3,938,325 |
| Redemption of long-term debt.................. | 122,691 | -- | 122,691 | 125,123 |
| Deferred charges for state income tax......... | 21,817 | -- | 21,817 | -- |
| Other......................................... | 116,484 | -- | 116,484 | 124,469 |
| Total deferred federal income tax liability.. | 4,288,127 | -- | 4,288,127 | 4,187,917 |
| Deferred state income taxes................... | 274,280 | -- | 274,280 | -- |
| Total deferred tax liability................ | 4,562,407 | -- | 4,562,407 | 4,187,917 |
| Net Deferred Tax Liability (Asset)............ | $3,167,593 | $(49,359) | $3,216,952 | $2,938,730 |

</TABLE>

11. RETIREMENT PLANS AND OTHER POSTRETIREMENT BENEFITS

    Most employees of System Companies are covered by defined benefit pension
plans which provide benefits based on years of service and average earnings.  At
the date of their acquisition by the Company, both ENSERCH and LCC had defined
benefit pensions plans covering most of their employees and providing benefits
similar to those provided to employees of other System Companies.  As a part of
the purchase accounting for ENSERCH and LCC, their accrued pension liabilities
were adjusted to recognize all previously unrecognized gains or losses arising
from past experience different from that assumed, the effects of changes in
assumptions, all unrecognized prior service costs and the remainder of any
unrecognized obligation or asset existing at the date of the initial application
of SFAS 87 by the respective company.  These adjustments to the accrued pension

liability, to the extent associated with rate-regulated operations, were recorded as regulatory assets or liabilities and, to the extent associated with non-regulated operations, as goodwill.

Effective January 1, 1998, the ENSERCH retirement plan was merged into another retirement plan of the Company. Also, effective during 1998, employees of certain of the Company's emerging business units will be eligible to participate in a cash balance plan, rather than the traditional defined benefit plans. This change, which affects a relatively small percentage of employees, was made in connection with overall changes in the compensation plans of these business units designed to bring them closer to the prevailing practices of the companies in the industries in which they compete.

<center>A-49</center>

<PAGE>

In connection with the ENSERCH acquisition, certain employees of ENSERCH and other System Companies were offered and accepted an early retirement option. Effects of the early retirement option associated with ENSERCH employees were included in purchase accounting adjustments as regulatory assets or goodwill, as appropriate.  Effects of the early retirement option associated with employees of other System Companies were recorded as regulatory assets, or liabilities.

<TABLE>
<CAPTION>

|  | The Company Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 1997 | 1996 | 1995 |
|  | ---- | ---- | ---- |
| <S> | <C> | <C> | Thousands o <C> |
| Components of Net Pension Costs(including amounts charged to fuel cost, deferred and capitalized): | | | |
| Service cost -- benefits earned during the period.......... | $  36,712 | $  36,779 | $  23,515 |
| Interest cost on projected benefit obligation.............. | 92,121 | 75,501 | 65,675 |
| Actual return on plan assets.............................. | (299,800) | (183,390) | (241,887) |
| Net amortization and deferral............................ | 190,203 | 97,988 | 160,198 |
|  | --------- | --------- | --------- |
| Net periodic pension cost............................ | $  19,236 | $  26,878 | $   7,501 |
|  | ========= | ========= | ========= |
| Valuation Assumptions: | | | |
| Discount rate............................................ | 7.25% | 7.75% | 7.25% |
| Rate of increase in compensation levels.................... | 4.3% | 4.3% | 4.3% |
| Expected long-term rate of return........................ | 9.0% | 9.0% | 9.0% |

</TABLE>

<TABLE>
<CAPTION>

|  | The Company December 31, | | |
| --- | --- | --- | --- |
|  | 1997 | 1996 | -- |
|  | ---- | ---- | |
| <S> | <C> | <C> | Thousands of Do <C> |
| Amounts Recognized: | | | |
| Actuarial present value of accumulated benefits: | | | |
| Accumulated benefit obligation........................ | $(1,337,120) | $  (889,057) | $ |
|  | =========== | =========== | == |
| Vested benefit obligations............................ | $(1,264,450) | $  (823,918) | $ |
|  | =========== | =========== | == |
| Projected benefit obligation for service rendered to date................................ | $(1,546,854) | $(1,065,396) | $ |

<TABLE>

| | | | |
|---|---|---|---|
| Plan assets at fair value -- primarily equity investments, government bonds and corporate bonds..................................... | 1,790,715 | 1,296,025 | 1 |
| | ----------- | ----------- | -- |
| Plan assets in excess of projected benefit obligation...... | 243,861 | 230,629 | |
| Unrecognized net gain from past experience different from that assumed and effects of changes in assumptions....................................... | (422,503) | (350,295) | |
| Prior service cost not yet recognized in net periodic pension expense................................. | 31,574 | 41,566 | |
| Unrecognized plan assets in excess of projected benefit obligation at initial application............. | (4,700) | (5,708) | |
| | ----------- | ----------- | -- |
| Accrued pension cost.................................. | $ (151,768) | $ (83,808) | $ |
| | =========== | =========== | == |

</TABLE>

The Eastern Energy, ENSERCH and LCC plans use economic assumptions similar to the other System Companies' plans and are included in the tabular information above.

A-50

<PAGE>

In addition to the retirement plans, the System Companies offer certain health care and life insurance benefits to substantially all employees, including those of ENSERCH and LCC but excluding those of Eastern Energy, and their eligible dependents at retirement. Benefits received vary in level depending on years of service and retirement dates. The purchase accounting adjustments described above for the retirement plans of ENSERCH and LCC were also applied to the accrued liabilities for the post employment health care and life insurance benefits.

<TABLE>
<CAPTION>

| | The Company Year Ended December 31, | | |
|---|---|---|---|
| | 1997 | 1996 | 1995 |
| | ---- | ---- | ---- |
| <S> | <C> | <C> | Thousan<br><C> |
| Components of Net Periodic Postretirement Benefit Costs (including amounts charged to fuel cost, deferred and capitalized): | | | |
| Service cost -- benefits earned during the period................... | $ 12,084 | $13,513 | $ 9,7 |
| Interest cost on the accumulated postretirement benefit obligation.. | 43,057 | 40,809 | 38,8 |
| Amortization of the transition obligation........................... | 16,953 | 16,978 | 16,9 |
| Actual return on plan assets........................................ | (13,260) | (7,079) | (6,0 |
| Net amortization and deferral....................................... | 7,015 | 8,303 | 4,6 |
| | -------- | ------- | ----- |
| Net postretirement benefits cost................................... | $ 65,849 | $72,524 | $64,1 |
| | ======== | ======= | ===== |
| Valuation assumption: | | | |
| Discount rate....................................................... | 7.25% | 7.75% | 7. |
| Medical cost trend rate............................................. | 5.0% | 5.0% | 5 |

</TABLE>

<TABLE>
<CAPTION>

| | The Company December 31, | |
|---|---|---|
| | 1997 | 1996 |
| | ---- | ---- |
| <S> | <C> | <C> |

EFH01434818

Amounts Recognized:
Accumulated postretirement benefit obligation (APBO):

| | | |
|---|---:|---:|
| Retirees...................................................... | $ (412,919) | $ (325,672) |
| Fully eligible active employees.............................. | (40,901) | (38,320) |
| Other active employees....................................... | (137,033) | (187,451) |
| | --------- | --------- |
| Total APBO................................................... | (590,853) | (551,443) |
| Plan assets at fair value.................................... | 111,799 | 81,480 |
| | --------- | --------- |
| APBO in excess of plan assets................................ | (479,054) | (469,963) |
| Unrecognized net loss........................................ | 67,023 | 92,589 |
| Unrecognized prior service cost.............................. | 18,557 | 819 |
| Unrecognized transition obligation........................... | 162,359 | 271,649 |
| | --------- | --------- |
| Accrued postretirement benefits cost......................... | $ (231,115) | $ (104,906) |
| | ========= | ========= |

</TABLE>

The expected increase in costs of future benefits covered by the plan is projected using a health care cost trend rate of 5% in 1998 and thereafter. A one percentage point increase in the assumed health care cost trend rate in each future year would increase the APBO at December 31, 1997 by approximately $65,900,000 for the System Companies and $40,300,000 for TU Electric, and other postretirement benefits cost for 1997 by approximately $9,800,000 for System Companies and $7,300,000 for TU Electric.

12. SALES OF ACCOUNTS RECEIVABLE

TU Electric has facilities with financial institutions whereby it is entitled to sell and such financial institutions may purchase, on an ongoing basis, undivided interests in customer accounts receivable representing up to an aggregate of $350,000,000. ENSERCH has a facility for $100,000,000. Additional receivables are continually sold to replace those collected. At December 31, 1997 and 1996, accounts receivable of TU Electric was reduced by $300,000,000 and at December 31, 1997, accounts receivable of ENSERCH companies were reduced by $100,000,000, to reflect the sales of such receivables to financial institutions under such agreements.

A-51

<PAGE>

13. REGULATION AND RATES

The Company and TU Electric
- -------------------------

Docket 9300 -- The PUC's final order (Order) in connection with TU Electric's January 1990 rate increase request (Docket 9300) was reviewed by the 250th Judicial District Court of Travis County, Texas, (District Court) and thereafter was appealed to the Court of Appeals for the Third District of Texas and to the Supreme Court of Texas (Supreme Court). As a result of such review and appeals, an aggregate of $909 million of disallowances with respect to TU Electric's reacquisitions of minority owners' interests in Comanche Peak, which had previously been recorded as a charge to the Company's and TU Electric's earnings, has been remanded to the District Court with instructions that it be remanded to the PUC for reconsideration on the basis of a prudent investment standard. On remand, the PUC would also be required to reevaluate the appropriate level of TU Electric's construction work in progress included in rate base in light of its financial condition at the time of the initial hearing. In January 1997, the Supreme Court denied a motion for rehearing on the Comanche Peak minority owners issue filed by the original complainants. TU

Electric cannot predict the outcome of the reconsideration of the order on remand by the PUC.

In its decision, the Supreme Court also affirmed the previous $472 million prudence disallowance related to Comanche Peak.  Since the Company and TU Electric have previously recorded a charge to earnings for this prudence disallowance, the Supreme Court's decision did not have an effect on the Company's or TU Electric's current financial position, results of operation or cash flows.

Docket 11735 -- In July 1994, TU Electric filed  a petition in the 200th Judicial District Court of Travis County, Texas to seek judicial review of the final order of the PUC granting a $449 million, or 9.0%, rate increase in connection with TU Electric's  January 1993 rate increase request of $760 million, or 15.3% (Docket 11735).  Other parties to the PUC proceedings also filed appeals with respect to various portions of the order.

Dockets 15638 and 15840 -- In May 1996, TU Electric filed with the PUC its transmission cost information and tariffs for open-access wholesale transmission service (Docket 15638) in accordance with PUC rules adopted in February 1996. These tariffs also provide for generation-related ancillary services necessary to support wholesale transactions. In August 1997, the PUC approved final tariffs for TU Electric and implemented rates for other transmission providers within the Electric Reliability Council of Texas (ERCOT) (Docket 15840).  Under rates implemented by the PUC, TU Electric's payments for transmission service will exceed its revenues for providing transmission service.  The PUC has adopted a rate-moderation plan that will minimize the impact of the new pricing mechanism for the first three years the rules are in effect.  As such, the current maximum impact on TU Electric for 1998 is an $8.52 million deficit, which, in the opinion of TU Electric, is not expected to have a material effect on its financial position,  results of operation or cash flows.

Docket 17250 --  In late 1996, as part of its regular earnings monitoring process, the PUC staff advised the PUC, after reviewing the 1995 Electric Investor-Owned Utilities Earnings Report of TU Electric, that it believed TU Electric was earning in excess of a reasonable rate of return, and the PUC and TU Electric subsequently began discussions concerning possible remedies.  It was decided to limit negotiations to a resolution of issues concerning TU Electric's earnings through 1997, and discussion of a longer-term resolution was deferred. In July 1997, the PUC issued its final written order approving TU Electric's proposal to make a one-time $80 million refund to its customers and to leave rates unchanged during the remainder of 1997.  TU Electric recorded the charge to revenues in July 1997 and included the refunds in August 1997 billings.  The proposal was the result of a joint stipulation in which TU Electric was joined by the PUC General Counsel, on behalf of the PUC Staff and the public interest, the Office of Public Utility Counsel, the state agency charged with representing the interests of residential and small commercial customers, and the Coalition of Cities served by TU Electric.

Docket 18490 -- On December 17, 1997, TU Electric, together with the PUC General Counsel, the Office of Public Utility Counsel and various other parties interested in TU Electric's rates and services, filed with the PUC  a stipulation and joint application which, if granted would, among other things: (i) result in permanent retail base rate credits beginning January 1, 1998, of 4% for residential customers, 2% for general service secondary customers and 1% for all other retail

A-52

<PAGE>

customers, (ii) result in additional permanent retail base rate credits beginning January 1, 1999, of 1.4% for residential customers, (iii) impose a 11.35% cap on TU Electric's rate of return on equity during 1998 and 1999, with any sums earned above that cap being applied as additional nuclear production depreciation, (iv) allow TU Electric to record depreciation applicable to transmission and distribution assets in 1998 and 1999 as additional depreciation

of nuclear production assets, (v) establish an updated cost of service study
that includes interruptible customers as customer classes, (vi) result in the
permanent dismissal of pending appeals of prior PUC orders including Docket No.
11735, if all other parties that have filed appeals of those dockets also
dismiss their appeals, (vii) result in the stay of any proceedings in the remand
of Docket 9300 prior to January 1, 2000, and, (viii) result in all gains from
off-system sales of electricity in excess of the amount included in base rates
being flowed to customers through the fuel factor.

The PUC has until March 31, 1998 to approve or reject the stipulation and
joint application.  Otherwise, TU Electric may terminate the base rate
reductions and all other aspects of the proposal upon giving two weeks notice to
the PUC.

Fuel Cost Recovery Rule -- Pursuant to a PUC rule, the recovery of TU
Electric's eligible fuel costs is provided through fixed fuel factors.  The rule
allows a utility's fuel factor to be revised upward or downward every six
months, according to a specified schedule.  A utility is required to petition to
make either surcharges or refunds to ratepayers, together with interest based on
a twelve month average of prime commercial rates, for any material, as defined
by the PUC, cumulative under- or over-recovery of fuel costs.  If the cumulative
difference of the under- or over-recovery, plus interest, is in excess of 4% of
the annual estimated fuel costs most recently approved by the PUC, it will be
deemed to be material. In accordance with PUC approvals, TU Electric has, since
the inception of the rule in 1986, made thirteen refunds of over-collected fuel
costs and two surcharges of under-collected fuel costs.  The most recent refund
was made pursuant to a petition filed by TU Electric in July 1997 to refund
approximately $67 million, including interest, in over-collected fuel costs for
the period October 1995 through May 1997 (Fuel Refund). Such over-collection was
primarily due to TU Electric's ability to use less expensive nuclear fuel and
purchased power to offset a higher-priced natural gas market during the period.
Customer refunds were included in August 1997 billings.  A final order
confirming the Fuel Refund was entered by the PUC in October 1997.  The two
surcharges (one in the amount of $147.3 million and the other in the amount of
$93 million) have been appealed by certain intervenors to district courts of
Travis County, Texas.  In those appeals, those parties are contending that the
PUC is without authority to allow a fuel cost surcharge without a hearing and
resultant findings that the costs are reasonable and necessary and that the
prices charged to TU Electric by supplying affiliates are no higher than the
prices charged by those affiliates to others for the same item or class of
items.  TU Electric is unable to predict their outcome.

Fuel Reconciliation Proceeding -- In July 1997, the PUC ruled on TU
Electric's petition seeking final reconciliation of all eligible fuel and
purchased power expenses incurred during the reconciliation period of July 1,
1992 through June 30, 1995 (approximately $4.7 billion).  In the ruling, the PUC
disallowed approximately $81 million of eligible fuel related costs (including
interest of $12 million) incurred during the reconciliation period (Fuel
Disallowance).  The majority of the Fuel Disallowance (approximately $67
million) is related to replacement fuel costs as a result of the November 1993
collapse of the emissions chimney serving Unit 3 of the Monticello lignite-
fueled generating station.  In addition, the PUC ruled that approximately $10
million from the gain on sale of sulfur dioxide allowances should be deferred
and reconsidered at a future date.  TU Electric received a final written order
from the PUC and recorded the charge to revenues in August 1997.  TU Electric
strongly disagrees with the Fuel Disallowance and continues to vigorously defend
its position. TU Electric has appealed the PUC's order to the District Court of
Travis County, Texas.

Flexible Rate Initiatives -- TU Electric continues to offer flexible rates in
over 160 cities with original regulatory jurisdiction within its service
territory (including the cities of Dallas and Fort Worth) to existing non-
residential retail and wholesale customers that have viable alternative sources
of supply and would otherwise leave the system.  TU Electric also continues to
offer in those cities an economic development rider to attract new businesses
and to encourage existing customers to expand their facilities as well as an

environmental technology rider to encourage qualifying customers to convert to technologies that conserve energy or improve the environment. TU Electric will continue to pursue the expanded use of flexible rates when such rates are necessary to be price-competitive.

Integrated Resource Plan -- In October 1994, TU Electric filed an application for approval by the PUC of certain aspects of its Integrated Resource Plan (IRP) for the ten year period 1995 - 2004. The IRP, developed as an experimental

A-53

<PAGE>

pilot project in conjunction with regulatory and customer groups, included the acquisition of electric energy through a competitive bidding process of third party-supplied demand-side management resources and renewable resources. In August 1995, the PUC remanded the case to an Administrative Law Judge for development of a solicitation plan and to more closely conform the TU Electric 1995 IRP to new state legislation that required the PUC to adopt a state-wide integrated resource planning rule by September 1, 1996. In January 1996, TU Electric filed an updated IRP with the PUC along with a proposed plan for the solicitation of resources through a competitive bidding process. The PUC issued its final order on TU Electric's IRP in October 1996, and modified the order in December 1996 and February 1997. The modified order approved a flexible solicitation plan that will allow TU Electric to conduct up to three optional resource solicitations for a total of 2,074 MW of demand-side and supply-side resources prior to the filing of its next IRP in June 1999. TU Electric is currently reviewing the need and timing for conducting the first of these resource solicitations.

In addition to its solicitation plan in the IRP docket, TU Electric requested and received approval from the PUC to expand its Power Cost Recovery tariff to provide current cost recovery of resource acquisition costs for demand-side management resources acquired in the solicitations and for eight previously approved demand-side management contracts entered into by TU Electric to the extent such costs are not currently reflected in TU Electric's base rates.

Open-Access Transmission -- In February 1996, pursuant to the 1995 amendments to PURA, the PUC adopted rules requiring each electric utility in ERCOT to provide wholesale transmission and related services to other utilities and non-utility power suppliers at rates, terms and conditions that are comparable to those applicable to such utility's use of its own transmission facilities.

Under the rules, the PUC established a transmission pricing mechanism consisting of an ERCOT system-wide component and a distance-sensitive component. The ERCOT system-wide component provides that each load-serving entity in ERCOT will pay a share of the ERCOT-wide transmission cost of service based on the entity's load. The distance-sensitive component provides that a distance-sensitive rate will be paid to utilities that own transmission facilities, based on the impact of transmitting power and energy to loads. The rates charged for using the transmission system are designed to ensure that all market participants pay on a comparable basis to use the system. While all users of the transmission grid pay rates that are comparably designed, the impact on individual users will differ.

In May 1996, TU Electric filed with the PUC, under Docket 15638, its transmission cost information and tariffs for open-access wholesale transmission service. These tariffs also provide for generation-related ancillary services necessary to support wholesale transactions. Company-specific proceedings to determine transmission rates for each transmission provider within ERCOT were concluded in 1996. In August 1997, the PUC approved final tariffs for TU Electric and implemented rates for other transmission providers within ERCOT.

As a result of the PUC rules, the organization and structure of ERCOT has been changed to provide for equal governance among all wholesale electricity market participants. These changes were made in order to facilitate wholesale competition while ensuring continued reliability within ERCOT.

EFH01434822

The Company
- -----------

    Lone Star Gas and Lone Star Pipeline Rates -- In October 1996, Lone Star
Pipeline filed a request with the RRC to increase the rate it charges Lone Star
Gas to store and  transport gas ultimately destined for residential and
commercial customers in the 550 Texas cities and towns served by Lone Star Gas.
Lone Star Gas also requested that the RRC separately set rates for costs to
aggregate gas supply for these cities.  Rates previously in effect were set by
the RRC in 1982.  In September 1997, the RRC issued an order reducing the
charges by Lone Star Pipeline to Lone Star Gas for storage and transportation
services.  In that order, the RRC did authorize separate charges for the Lone
Star Pipeline storage and transportation services, a separate charge by Lone
Star Gas for the cost of aggregating gas supplies, and a continuation of the
100% flow through of purchased gas expense.  The RRC also imposed some new
criteria for affiliate gas purchases and a new reconciliation procedure that
will require a review of purchased gas expenses every three years.  The RRC
order has become final, but is being appealed by several parties including Lone
Star Pipeline and Lone Star Gas.  The rates authorized by the order became
effective on December 1, 1997, and will result in an annual margin reduction of
approximately $8.2 million.

                                     A-54

<PAGE>

    On August 20, 1996, the RRC ordered a general inquiry into the rates and
services of Lone Star Gas, most notably a review of historic gas cost and gas
acquisition practices since the last rate setting.  The inquiry docket has been
separated into different phases.  Two of the phases, conversion to the NARUC
account numbering system and unbundling, have been dismissed by the RRC, and one
other phase, rate case expense, is pending RRC action on the basis of a
stipulation of all parties.  In the phase dealing with historic gas cost and gas
acquisition practices, Lone Star Gas and Lone Star Pipeline have filed a motion
for summary disposition stating that any retroactive rate action would be
inappropriate and unlawful. Settlement discussions with intervenor cities are
ongoing.  If the motion for summary disposition is denied, a hearing has been
scheduled to begin in August 1998.  A number of management and transportation
related issues have been placed in a separate phase which still has an undefined
scope and is being held in abeyance pending the resolution of the phase dealing
with gas costs.  Management believes that gas costs were prudently incurred and
were properly accounted for and recovered through the gas cost recovery
mechanism previously approved by the RRC.  At this time, management is unable to
determine the ultimate outcome of the inquiry.

14. IMPAIRMENT OF ASSETS

The Company and TU Electric
- ---------------------------

    In September 1995, the Company and TU Electric recorded the impairment of
several non-performing assets pursuant to SFAS 121 which prescribes a
methodology for assessing and measuring impairments in the carrying value of
certain assets.  The September 1995 impairment of the Company's assets,
including the partially completed Twin Oak and Forest Grove lignite-fueled
facilities of TU Electric, and Chaco Energy Company's (Chaco's) coal reserves in
New Mexico, as well as several minor assets, aggregated $1,233 million ($802
million after tax) for the Company and $486 million ($316 million after tax) for
TU Electric.  The Company and TU Electric have determined that the Twin Oak and
Forest Grove lignite-fueled facilities are not necessary to satisfy TU
Electric's capacity requirements as currently projected due to changes in load
growth patterns and availability of alternative generation.  The impairment of
TU Electric's lignite-fueled facilities has been measured based on management's
current expectations that these assets will either be sold or constructed
outside the traditional regulated utility business.  The Company has determined
that the Chaco coal reserves will no longer be developed through traditional

means due to ample availability of alternative fuels at favorable prices.
Chaco's impairment was measured based on a significant decrease in the market
value of the coal reserves as determined by an external study.  A variety of
options are being considered with respect to the Chaco coal reserves. (See Note
15.) The impairment of these assets involved a  write-down to their estimated
fair values using a valuation study based on the discounted expected future cash
flows from the respective assets' use.  With respect to the other assets
impaired, fair values were determined based on current market values of similar
assets.

15. COMMITMENTS AND CONTINGENCIES

    Capital Expenditures -- The Company's construction expenditures, excluding
AFUDC, are presently estimated at $886 million, $799 million and $852 million
for 1998, 1999 and 2000, respectively.   TU Electric's construction
expenditures for utility related activities, excluding AFUDC, are presently
estimated at $449 million, $439 million and $441 million for 1998, 1999 and
2000, respectively.  Expenditures for TU Electric nuclear fuel are presently
estimated at $104 million for 1998, $81 million for 1999 and $92 million for
2000.

    The re-evaluation of growth expectations, the effects of inflation,
additional regulatory requirements and the availability of fuel, labor,
materials and capital may result in changes in estimated construction costs and
dates of completion.  Commitments in connection with the construction program
are generally revocable subject to reimbursement to manufacturers for
expenditures incurred or other cancellation penalties.

TU Electric
- -----------

    Clean Air Act -- The Federal Clean Air Act, as amended (Clean Air Act)
includes provisions which, among other things, place limits on the sulfur
dioxide emissions produced by generating units.  To meet these sulfur dioxide
requirements, the Clean Air Act provides for the annual allocation of sulfur
dioxide emission allowances to utilities. Under the Clean Air Act, utilities are
permitted to transfer allowances within their own systems and to buy or sell

                                   A-55
<PAGE>

allowances from or to other utilities.  The Environmental Protection Agency
grants a maximum number of allowances annually to TU Electric based on the
amount of emissions from units in operation during the period 1985 through 1987.
TU Electric's capital requirements have not been significantly affected by the
requirements of the Clean Air Act. Although TU Electric is unable to fully
determine the cost of compliance with the Clean Air Act, it is not expected to
have a significant impact on the company.  Any additional capital expenditures,
as well as any increased operating costs, associated with these new requirements
are expected to be recoverable through rates, as similar costs have been
recovered in the past.

The Company and TU Electric
- ---------------------------

    Purchased Power Contracts --The System Companies have entered into purchased
power contracts to purchase portions of the generating output of certain
qualifying cogenerators and qualifying small power producers through the year
2005.  These contracts provide for capacity payments subject to a facility
meeting certain operating standards and energy payments based on the actual
power taken under the contracts.  The cost of these and other purchased power
contracts is recovered currently through base rates, power cost and fuel
recovery factors applied to customer billings. Capacity payments under these
contracts for the years ended December 31, 1997, 1996 and 1995 were
$240,174,000, $232,915,000, and $229,340,000, respectively, for the Company, and
$236,867,000, $228,336,000 and $223,910,000 respectively, for TU Electric.

EFH01434824

Assuming operating standards are achieved, future capacity payments under the agreements are estimated as follows:

| Years | The Company | TU Electric |
|-------|-------------|-------------|
|       | Thousands of Dollars | |
| 1998.......................... | $  248,168 | $244,568 |
| 1999.......................... | 220,281 | 213,081 |
| 2000.......................... | 168,961 | 161,761 |
| 2001.......................... | 139,039 | 131,839 |
| 2002.......................... | 106,745 | 99,545 |
| Thereafter.................... | 140,345 | 136,745 |
| Total capacity payments.. | $1,023,539 | $987,539 |

Leases -- The System Companies have entered into operating leases covering various facilities and properties including combustion turbines, transportation, mining and data processing equipment, and office space.  Lease costs charged to operation expense for the years ended December 31, 1997, 1996 and 1995 were $156,710,000, $144,553,000, and $141,775,000, respectively, for the Company, and $65,755,000, $56,376,000, and $60,156,000, respectively, for TU Electric.

Future minimum lease commitments under such operating leases that have initial or remaining noncancellable lease terms in excess of one year as of December 31, 1997, were as follows:

| Years | The Company | TU Electric |
|-------|-------------|-------------|
|       | Thousands of Dollars | |
| 1998........................... | $  83,729 | $  35,049 |
| 1999........................... | 73,024 | 34,152 |
| 2000........................... | 64,161 | 33,834 |
| 2001........................... | 96,387 | 33,619 |
| 2002........................... | 55,428 | 32,857 |
| Thereafter..................... | 546,148 | 408,886 |
| Total minimum lease commitments.. | $918,877 | $578,397 |

Financial Guarantees -- TU Electric has entered into contracts with public agencies to purchase cooling water for use in the generation of electric energy. In connection with certain contracts, TU Electric has agreed, in effect, to guarantee the principal, $30,005,000 at December 31, 1997, and  interest on bonds issued  to finance the reservoirs from which the water is supplied.  The bonds mature at various dates through 2011 and have interest rates ranging from 5-1/2% to 7%.  TU Electric is required to make periodic payments equal to such principal and interest, including amounts assumed by a third party and reimbursed to TU Electric, for the years 1998 through 2001 as follows: $4,435,000 for each of the

A-56

<PAGE>

years 1998 and 1999, $4,419,000 for 2000 and $4,422,000 for 2001. Payments made by TU Electric, net of amounts assumed by a third party under such contracts, for 1997, 1996 and 1995 were $3,750,000, $3,548,000, and $3,628,000, respectively. In addition, TU Electric is obligated to pay certain variable costs of operating and maintaining the reservoirs. TU Electric has assigned to a municipality all contract rights and obligations of TU Electric in connection with $69,395,000 remaining principal amount of bonds at December 31, 1997,

issued for similar purposes which had previously been guaranteed by TU Electric.
TU Electric is, however, contingently liable in the unlikely event of default by
the municipality. The Company and/or its subsidiaries are the guarantor on
various commitments and obligations of others aggregating some $45,000,000 at
December 31, 1997.

The Company
- -----------

    Chaco Coal Properties -- Chaco has a coal lease agreement for the rights to
certain surface minable coal reserves located in New Mexico.  The agreement
encompasses a minimum of 228 million tons of coal with provisions for minimum
advance royalty payments of approximately $16 million per year through 2017.
The Company has entered into a surety agreement to assure the performance by
Chaco with respect to this agreement.  Because of the present ample availability
of western coal at favorable prices from other mines, Chaco has delayed plans to
commence mining operations, and accordingly, is reassessing its alternatives
with respect to its coal properties, including seeking purchasers thereof.  (See
Note 14.)

TU Electric
- -----------

Nuclear Insurance -- With regard to liability coverage, the Price-Anderson Act
(Act) provides financial protection for the public in the event of a significant
nuclear power plant incident.  The Act sets the statutory limit of public
liability for a single nuclear incident currently at $8.9 billion and requires
nuclear power plant operators to provide financial protection for this amount.
As required, TU Electric provides this financial protection for a nuclear
incident at Comanche Peak resulting in public bodily injury and property damage
through a combination of private insurance and industry-wide retrospective
payment plans.  As the first layer of financial protection, TU Electric has
purchased $200 million of liability insurance from American Nuclear Insurers
(ANI), which provides such insurance on behalf of a major stock  insurance pool,
Nuclear Energy Liability Insurance Association.  The second layer of financial
protection is provided under an industry-wide retrospective payment program
called Secondary Financial Protection (SFP).

    Under the SFP, each operating licensed reactor in the United States is
subject to an assessment of up to $79.275 million, subject to increases for
inflation every five years, in the event of a nuclear incident at any nuclear
plant in the United States.  Assessments are limited to $10 million per
operating licensed reactor per year per incident.  All assessments under the SFP
are subject to a 3% insurance premium tax which is not included in the amounts
above.

    With respect to nuclear decontamination and property damage insurance,
Nuclear Regulatory Commission (NRC) regulations require that nuclear plant
license-holders maintain not less than $1.06 billion of such insurance and
require the proceeds thereof to be used to place a plant in a safe and stable
condition, to decontaminate it pursuant to a plan submitted to and approved by
the NRC before the proceeds can be used for plant repair or restoration or to
provide for premature decommissioning. TU Electric maintains nuclear
decontamination and property damage insurance for Comanche Peak in the amount of
$4.1 billion, above which TU Electric is self-insured.  The primary layer of
coverage of $500 million is provided by Nuclear Electric Insurance Limited
(NEIL), a nuclear electric utility industry mutual insurance company.  The
remaining coverage includes premature decommissioning coverage and is provided
by ANI and Mutual Atomic Energy Liability Underwriters (MAELU) in the amount of
$1.1 billion and additional insurance from NEIL in the amount of $2.5 billion.
TU Electric is subject to a maximum annual assessment from NEIL of $26 million
in the event NEIL's losses under this type of insurance for major incidents at
nuclear plants participating in these programs exceed the mutual's accumulated
funds and reinsurance.

    TU Electric maintains Extra Expense Insurance through NEIL to cover the

EFH01434826

additional costs of obtaining replacement power from another source to one of both of the units at Comanche Peak are out of service for more than seventeen weeks as a result of covered direct physical damage.  The coverage provides for weekly payments of $3.5 million for the first fifty-eight weeks and $2.8 million for the next 104 weeks for each outage, respectively, after the initial seventeen week period.  The total maximum coverage is $494 million per unit. The coverage amounts applicable to each unit will be

A-57

<PAGE>

reduced to 80% if both units are out of service at the same time as a result of the same accident. Under this coverage, TU Electric is subject to a maximum annual assessment of $9 million per year.

The Company
- -----------

   Gas Purchase Contracts -- Texas Utilities Fuel Company (Fuel Company)  buys gas under long-term intrastate contracts in order to assure reliable supply to its customers.  Many of these contracts require minimum purchases ("take-or-pay") of gas.  Based on Fuel Company's estimated gas demand, which assumes normal weather conditions, requisite gas purchases are expected to substantially satisfy purchase obligations for the year 1998 and thereafter.

   Lone Star Gas  buys gas under long-term, intrastate contracts in order to assure reliable supply to its customers.  Many of these contracts require minimum purchases of gas.  Lone Star Gas has made accruals for payments that may be required for settlement of gas-purchase contract claims asserted or that are probable of assertion.  Lone Star Gas continually evaluates its position relative to asserted and unasserted claims, above-market prices or future commitments.  Management believes that Lone Star Gas has not incurred losses for which reserves should be provided at December 31, 1997.  Based on estimated gas demand, which assumes normal weather conditions, requisite gas purchases are expected to substantially satisfy purchase obligations for the year 1998 and thereafter.

TU Electric
- -----------

   Nuclear Decommissioning and Disposal of Spent Fuel -- TU Electric has established a reserve, charged to depreciation expense and included in accumulated depreciation, for the decommissioning of Comanche Peak, whereby decommissioning costs are being recovered from customers over the life of the plant and deposited in external trust funds (included in other investments).  At December 31, 1997, such reserve totaled $120,452,000 which includes an accrual of $18,179,000 for the year ended  December 31, 1997.  As of December 31, 1997, the  market  value of deposits  in the external trust for decommissioning of Comanche Peak was $160,062,000.  Any difference between the market value of the external trust fund and the decommissioning reserve, that represents unrealized gains or losses of the trust fund, is treated as a regulatory asset or a regulatory liability.  Realized earnings on funds deposited in the external trust are recognized in the reserve.  Based on a site-specific study completed during 1997 using the prompt dismantlement method and then-current dollars, decommissioning costs for Comanche Peak Unit 1, and Unit 2 and common facilities were estimated to be $271,000,000 and $404,000,000, respectively.

   Decommissioning activities are projected to begin in 2030 and 2033 for Comanche Peak Unit 1, and Unit 2 and common facilities, respectively.  TU Electric is recovering decommissioning costs based upon a 1992 site-specific study through rates placed in effect under Docket 11735 (see Note 13).  Actual decommissioning costs are expected to differ from estimates due to changes in the assumed dates of decommissioning activities, regulatory requirements, technology and costs of labor, materials and equipment. In addition, the marketable fixed income debt and equity securities in which assets of the external trust are invested are subject to interest rate and equity price

sensitivity.

   TU Electric has a contract with the United States Department of Energy (DOE) for the future disposal of spent nuclear fuel. In December 1996, the DOE notified TU Electric that it did not expect to meet its obligation to begin acceptance of spent nuclear fuel by 1998. TU Electric is unable to predict what impact, if any, the DOE delay will have on TU Electric's future operations. The disposal fee is at a cost to TU Electric of one mill per kilowatt-hour of Comanche Peak net generation and is included in nuclear fuel expense.

The Company and TU Electric
- --------------------------

   General -- In addition to the above, the Company and TU Electric are involved in various legal and administrative proceedings which, in the opinion of each, should not have a material effect upon their financial position, results of operation or cash flows.

                                   A-58
<PAGE>

16.  FAIR VALUE OF FINANCIAL INSTRUMENTS

     The carrying amounts and related estimated fair values of the Company's and TU Electric's significant financial instruments at December 31, 1997 and 1996, are as follows:

<TABLE>
<CAPTION>

|  | December 31, 1997 | |
| --- | --- | --- |
|  | Carrying Amount | Fair Value |
|  | ------ | ----- |
| <S> | <C> | <C> Thousand |
| The Company | | |
| - ---------- | | |
| On balance sheet assets (liabilities): | | |
| Long-term debt (including current maturities)................. | $(9,531,450) | $(9,932,157) |
| TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures of TU Electric............................................... | (875,146) | (913,447) |
| Preferred stock of subsidiary subject to mandatory redemption................................................... | (20,600) | (22,019) |
| Other investments......................................... | 241,959 | 248,980 |
| LESOP note receivable...................................... | 250,000 | 280,910 |
| Off-balance sheet assets (liabilities): | | |
| Financial guarantees....................................... | (144,732) | (148,628) |
| Interest rate swaps........................................ | -- | (50,476) |
| Currency swap*............................................. | -- | 76,420 |
</TABLE>

*The foreign currency swap is a hedge of a foreign currency transaction. (See Note 8.)

<TABLE>

|  |  |  |
| --- | --- | --- |
| <S> | <C> | <C> |
| TU Electric | | |
| - ---------- | | |
| On balance sheet assets (liabilities): | | |
| Long-term debt (including current maturities)................... | $(6,228,092) | $(6,573,526) |
| TU Electric obligated, mandatorily redeemable, preferred securities of subsidiary trusts holding solely debentures | | |

EFH01434828

```
  of TU Electric........................................   (875,146)    (913,447)
Preferred stock subject to mandatory redemption.............   (20,600)    (22,019)
Other investments...........................................    204,794     209,190


Off balance sheet assets (liabilities):

Financial guarantees........................................   (99,400)   (103,296)
Interest rate swap..........................................        --      (1,368)
</TABLE>
```

The fair values of long-term debt and preferred stock subject to mandatory redemption are estimated at the lesser of either the call price or the market value as determined by quoted market prices, where available, or, where not available the present value of future cash flows discounted at rates consistent with comparable maturities for credit risk.  The fair values of preferred securities are based on quoted market prices.  The carrying amounts reflected in the Consolidated Balance Sheets for financial assets classified as current assets and the carrying amounts for financial liabilities classified as current liabilities approximate fair value due to the short maturity of such instruments.

Other investments include deposits in an external trust fund for nuclear decommissioning of Comanche Peak.  The trust funds are invested  primarily in fixed income debt and equity securities, which are considered as available-for-sale. Any unrealized gains or losses are treated as regulatory assets or regulatory liabilities, respectively.

                                A-59
<PAGE>

Common stock -- net has been reduced by the note receivable from the trustee of the leveraged employee stock ownership provision of the Thrift Plan. The fair value of such note is estimated at the lesser of the Company's call price or the present value of future cash flows discounted at rates consistent with comparable maturities adjusted for credit risk.

The fair value of the financial guarantees is based on the present value of the instruments' approximate cash flows discounted at the year-end risk free rate for issues of comparable maturities adjusted for credit risk.

Fair values for the System Companies' off-balance-sheet instruments (interest rate and currency swaps) are based either on quotes or the cost to terminate the agreements.

The fair values of other financial instruments for which carrying amounts and fair values have not been presented are not materially different than their related carrying amounts.

17.  SUPPLEMENTARY FINANCIAL INFORMATION (Unaudited)

In the opinion of the Company and TU Electric, respectively, the information below includes all adjustments (constituting only normal recurring accruals) necessary to a fair statement of such amounts.  Quarterly results are not necessarily indicative of expectations for a full year's operations because of seasonal and other factors, including rate changes, variations in maintenance and other operating expense patterns, and the charges for regulatory disallowances. Certain quarterly information has been reclassified to conform to the current year presentation.

```
<TABLE>
<CAPTION>


The Company
- -----------
```

| Quarter Ended | Operating Revenues | | Operating Income | |
| --- | --- | --- | --- | --- |
| | 1997 | 1996 | 1997 | 1996 |
| | ---- | ---- | ---- | ---- |
| | Thousands of Dollars (except | | | |
| March 31...................................... | $1,493,804 | $1,463,900 | $ 381,807 | $ 414,938 |
| June 30...................................... | 1,588,485 | 1,691,313 | 459,929 | 535,047 |
| September 30.................................. | 2,264,945 | 1,930,097 | 684,063 | 743,610 |
| December 31................................... | 2,598,374 | 1,465,618 | 380,872 | 309,395 |
| | ---------- | ---------- | ---------- | ---------- |
| | $7,945,608 | $6,550,928 | $1,906,671 | $2,002,990 |
| | ========== | ========== | ========== | ========== |

</TABLE>

- ----------------------------------------

* The sum of the quarters may not equal annual earnings per share due to
rounding.  Diluted earnings per share for all other quarters were not different
from basic earnings per share.

    The difference in operating income for the third quarter 1997 from amounts
previously reported reflects the reclassification of certain costs by ENSERCH to
conform to the Company's presentation.


TU Electric
- ----------

<TABLE>
<CAPTION>

| Quarter Ended | Operating Revenues | | Operating Income | | Consolidated Net Income | |
| --- | --- | --- | --- | --- | --- | --- |
| | 1997 | 1996 | 1997 | 1996 | 1997 | 1996 |
| | ---- | ---- | ---- | ---- | ---- | ---- |
| | Thousands of Dollars | | | | | |
| March 31............... | $1,365,459 | $1,348,330 | $ 271,867 | $ 305,057 | $143,011 | $152,785 |
| June 30................ | 1,451,541 | 1,558,778 | 329,871 | 391,019 | 182,987 | 227,869 |
| September 30........... | 1,851,356 | 1,787,412 | 476,910 | 522,270 | 321,992 | 379,438 |
| December 31............ | 1,467,061 | 1,335,091 | 268,412 | 244,252 | 123,884 | 102,603 |
| | ---------- | ---------- | ---------- | ---------- | -------- | -------- |
| | $6,135,417 | $6,029,611 | $1,347,060 | $1,462,598 | $771,874 | $862,695 |
| | ========== | ========== | ========== | ========== | ======== | ======== |

</TABLE>

A-60

<PAGE>

Appendix B


ENSERCH CORPORATION AND SUBSIDIARIES
(A WHOLLY-OWNED SUBSIDIARY OF TEXAS UTILITIES COMPANY)

INDEX TO FINANCIAL INFORMATION
December 31, 1997

                                                                      Page
Selected Financial Data.................................................. B-2
Management's Discussion and Analysis of Financial Condition and Results
  of Operation........................................................... B-3
Independent Auditors' Report............................................. B-9
Statements of Consolidated Income........................................ B-10

Statements of Consolidated Cash Flows................................ B-11
Consolidated Balance Sheets......................................... B-12
Statements of Consolidated Common Stock Equity...................... B-13
Notes to Consolidated Financial Statements.......................... B-14

B-1

<PAGE>

ENSERCH CORPORATION AND SUBSIDIARIES
(A WHOLLY-OWNED SUBSIDIARY OF TEXAS UTILITIES COMPANY)
SELECTED FINANCIAL DATA

<TABLE>
<CAPTION>

|  |  |  | Predecessor | |
| --- | --- | --- | --- | --- |
| <S> | Period from Acquisition Date to December 31, 1997 | Period from January 1, 1997 to Acquisition Date | Year Ended D | |
|  |  |  | 1996 | 1995 |
|  | <C> | <C> | (Dollars in thousands) | |
|  |  |  | <C> | <C> |
| Total assets -- end of year.. | $3,236,784 |  | $2,721,142 | $2,535,400 |
| Capitalization -- end of year |  |  |  |  |
| Long-term Debt.............. | $  646,796 |  | $  932,721 | $  801,226 |
| Advances from Parent........ | 293,843 |  | -- | -- |
| Preferred Stock............. | 175,000 |  | 175,000 | 175,000 |
| Common Stock Equity......... | 761,644 |  | 743,391 | 719,182 |
| Total.................... | $1,877,283 |  | $1,851,112 | $1,695,408 |
| Capitalization ratios - end of year |  |  |  |  |
| Long-term Debt.............. | 34.5% |  | 50.4% | 47.3% |
| Advances from Parent........ | 15.6 |  | -- | -- |
| Preferred Stock............. | 9.3 |  | 9.4 | 10.3 |
| Common Stock Equity......... | 40.6 |  | 40.2 | 42.4 |
| Total.................... | 100.0% |  | 100.0% | 100.0% |
| Sales Volumes: |  |  |  |  |
| Gas distribution (million cubic feet): |  |  |  |  |
| Residential................. | 33,417 | 52,891 | 83,054 | 76,896 |
| Commercial.................. | 20,996 | 33,162 | 52,265 | 48,765 |
| Industrial.................. | 2,094 | 3,148 | 7,380 | 13,566 |
| Electric generation........ | 463 | 4,179 | 11,199 | 11,023 |
| Total gas distribution.... | 56,970 | 93,380 | 153,898 | 150,250 |
| Pipeline transportation (million cubic feet)....... | 255,391 | 362,020 | 652,339 | 561,134 |
| Gas liquids (thousand barrels)................... | 2,521 | 3,352 | 6,114 | 5,984 |
| Gas marketing (million cubic feet)................ | 292,264 | 223,207 | 315,332 | 419,243 |

Operating Revenues
Gas distribution:

| | | | |
|---|---|---|---|
| Residential...................... | $   205,760 | $   335,647 | $   514,724 | $   496,993 |
| Commercial....................... | 108,650 | 178,897 | 275,045 | 269,448 |
| Industrial....................... | 8,594 | 13,861 | 28,647 | 55,724 |
| Electric generation........ | 6,424 | 23,317 | 48,139 | 50,929 |
| | ---------- | ---------- | ---------- | ---------- |
| Total gas distribution.... | 329,428 | 551,722 | 866,555 | 873,094 |
| | | | | |
| Pipeline transportation..... | 57,544 | 77,307 | 133,930 | 143,487 |
| Gas liquids.................. | 36,514 | 49,345 | 97,391 | 69,751 |
| Gas marketing................ | 858,566 | 601,826 | 825,009 | 750,463 |
| Other........................ | 41,952 | 83,628 | 134,140 | 85,600 |
| Less intercompany revenues.. | (47,897) | (85,671) | (162,765) | (131,354) |
| | ---------- | ---------- | ---------- | ---------- |
| Total operating revenues... | $1,276,107 | $1,278,157 | $1,894,260 | $1,791,041 |
| | ========== | ========== | ========== | ========== |
| | | | | |
| Income (Loss) from Continuing Operations....... | $  (9,565) | $  (15,377) | $   9,751 | $  21,362 |
| | ========== | ========== | ========== | ========== |
| | | | | |
| Ratio of earnings to fixed charges.................... | 0.66 | 0.58 | 1.31 | 1.46 |
| Ratio of earnings to combined fixed charges and preferred dividends........ | 0.57 | 0.49 | 1.01 | 1.18 |

</TABLE>

Financial information of Predecessor for all periods prior to the Acquisition Date (August 5, 1997) have been restated to reflect the results of Enserch Exploration, Inc. and Lone Star Energy Plant Operations, Inc., as well as engineering and construction and environmental businesses, as discontinued operations.

                                    B-2

<PAGE>

              MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
                   CONDITION AND RESULTS OF OPERATION


FORWARD-LOOKING STATEMENTS

    This report and other presentations made by ENSERCH Corporation (ENSERCH or the Corporation) contain forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended.  Although ENSERCH believes that in making any such statement its expectations are based on reasonable assumptions, any such statement involves  uncertainties and is qualified in its entirety by reference to the following important factors that could cause the actual results of ENSERCH to differ materially from those projected in such forward-looking statement: (i) prevailing governmental policies and regulatory actions, including those of the Railroad Commission of Texas (RRC), acquisitions and disposal of assets and facilities, operation and construction of plant facilities, present or prospective wholesale and retail competition, changes in tax laws and policies and changes in and compliance with environmental and safety laws and policies, (ii) weather conditions and other natural phenomena, (iii) unanticipated population growth or decline, and changes in market demand and demographic patterns, (iv) competition for retail and wholesale customers, (v) pricing and transportation of natural gas and other commodities, (vi) unanticipated changes in interest rates or rates of inflation, (vii) unanticipated changes in operating expenses and capital expenditures, (viii) capital market conditions, (ix) competition for new energy development opportunities, (x) legal and administrative proceedings and settlements, (xi) inability of various counterparties to meet their obligations with respect to ENSERCH's financial instruments, (xii) changes in technology used and services offered by ENSERCH and (xiii) significant changes in ENSERCH's relationship with its employees and the potential adverse effects if labor disputes or grievances

EFH01434832

were to occur.

Any forward-looking statement speaks only as of the date on which such statement is made, and ENSERCH undertakes no obligation to update any forward-looking statement to reflect events or circumstances after the date on, which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for ENSERCH to predict all of such factors, nor can the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement be assessed.

FINANCIAL CONDITION

Merger With TUC

On August 5, 1997 (Merger Date or Acquisition Date), all of the common stock of ENSERCH Corporation was converted to common stock of Texas Utilities Company (TUC), and ENSERCH became a wholly-owned subsidiary of TUC. ENSERCH shareholders received .225 share of TUC common stock for each share of ENSERCH.  Immediately prior to ENSERCH's merger with TUC, Enserch Exploration, Inc. (EEX) and Lone Star Energy Plant Operations, Inc. (LSEPO) were merged to form a new company (New EEX), and ENSERCH distributed to its common shareholders its ownership interest in New EEX,  which was represented by approximately 105 million shares of New EEX common stock with a carrying value of $583 million. In the distribution, which was tax free to the recipients, ENSERCH shareholders of record on August 4, 1997 received approximately 1.5 shares of New EEX common stock for each share of ENSERCH common stock owned. ENSERCH's financial statements for all periods presented have been restated to reflect EEX and LSEPO as discontinued operations.  ENSERCH's discontinued operations also include its engineering and construction and environmental businesses, the principal assets of which were sold in prior years.  On December 31, 1997, ENSERCH sold to Texas Energy Industries, Inc., a wholly-owned subsidiary of TUC, at net book value, the group of companies which had constituted its power development and international gas distribution operations. As a result, ENSERCH is no longer engaged in these activities. The sale was effected in order to strengthen the Corporation's financial position by relieving it of certain indebtedness as well as its obligation to make capital expenditures in the future. For accounting purposes, the sale was considered to be a merger of commonly controlled companies, accordingly, it was reflected effective as of the Merger Date. Operating results for periods following the Merger Date exclude these operations.

B-3

<PAGE>

TUC accounted for its acquisition of ENSERCH as a purchase, and push down accounting has been applied, with the result that purchase accounting adjustments have been reflected in the financial statements of ENSERCH and its subsidiaries for the period subsequent to August 5, 1997.  Financial statements for periods prior to that date were prepared using ENSERCH's historical basis of accounting and are designated as "Predecessor".  For purposes of the discussion of operating results provided herein, the financial information of the Predecessor for the 1997 periods prior  to the Merger Date have been combined with the post-merger 1997 financial information.  The business operations of ENSERCH were not significantly changed as a result of the merger, and post-merger and pre-merger operating results, except as noted in the discussion, are comparable.

Capital Expenditures

The primary capital expenditures of the Corporation and its subsidiaries in 1997 and as estimated for 1998 through 2000 are as follows:

1997......................... $119,000,000
1998.........................  143,000,000

1999........................  133,000,000
2000........................  140,000,000

The planned expenditures are expected to be funded from internal cash flows, borrowings under credit lines or advances from TUC.

Liquidity and Financial Resources

Continuing operations used cash of $12.2 million for operating activities in 1997 compared with providing cash of $105.0 million in 1996 and $127.8 million in 1995. Changes in operating assets and liabilities used cash of $71.0 million in 1997 and $15.3 million in 1995 but provided cash of $16.0 million in 1996.

Discontinued exploration and production operations used cash of $21.8 million in 1997 compared with providing cash of $19.6 million and $37.6 million in 1996 and 1995, respectively. The discontinued engineering and construction operations used cash of $12.2 million in 1997, $5.0 million in 1996 and $28.1 million in 1995.

Investing activities required $125.6 million in 1997 versus $176.4 million in 1996 and $120.1 million in 1995. Capital spending in 1997 was about 10% lower than in 1996 but 11% greater than in 1995. Also, investments in unconsolidated affiliates provided cash in 1997 but required significant cash in 1996. Other investing activities used cash of $14.3 million in 1997 and $.9 million in 1995 versus providing cash of $8.6 million in 1996.

Total capitalization at December 31, 1997 was $1.9 billion, up slightly from year-end 1996. Common stock equity as a percentage of total capitalization was 40.6% at December 31, 1997 compared with 40.2% at year-end 1996.

Shortly after the merger with TUC, ENSERCH's commercial paper program and bank lines in the form of a revolving credit agreement were discontinued. ENSERCH retired $204.5 million of commercial paper outstanding at the Merger Date and $260.4 million of long-term debt outstanding under the credit agreement, using advances from TUC to fund the retirements. In December 1997, TUC purchased additional shares of ENSERCH common stock for $200 million. These funds were used to reduce borrowings from TUC.

In January 1998, ENSERCH issued $125 million of 6 1/4% Series A Notes due 2003 and $125 million of Remarketed Reset Notes due 2008 with a variable interest rate (5.82% at date of issuance). Net proceeds from these borrowings were used to refinance or redeem like amounts of higher rate debt and preferred stock. Also in January, the Series E Adjustable

                                    B-4
<PAGE>

Rate Preferred Stock was redeemed at 100% of its liquidation price plus accrued and unpaid dividends. On February 25, 1998, the Corporation called for redemption the 6 3/8% Convertible Subordinated Debentures. ENSERCH may issue additional debt and equity securities as needed, including the possible future sale of up to $250 million aggregate principal amount of securities currently registered with the Securities and Exchange Commission (SEC) for offering pursuant to Rule 415 under the Securities Act of 1933.

At December 31, 1997, TUC, Texas Utilities Electric Company, a wholly-owned indirect subsidiary of TUC, and ENSERCH had joint lines of credit under credit facility agreements (Credit Agreements) with a group of commercial banks. The Credit Agreements have two facilities. Facility A provides for short-term borrowings aggregating up to $570 million outstanding at any time at variable interest rates and terminates April 23, 1998. Facility B provides for short-term borrowings aggregating up to $1,330 million outstanding at any time at variable interest rates and terminates April 24, 2002. ENSERCH borrowings under both facilities are limited to an aggregate of $650 million outstanding at any time. ENSERCH borrowings under these facilities will be used for working capital and other needs. At December 31, 1997, ENSERCH had no borrowings under

EFH01434834

these facilities.

Quantitative and Qualitative Disclosure About Market Risk

The Corporation's market risk exposure is primarily a result of changes in interest rates and commodity price exposures. Derivative instruments including options, swaps, futures and other contractual commitments are used to reduce and manage a portion of those risks. With the exception of the marketing activities of a subsidiary, Enserch Energy Services, Inc. (EES), the Corporation's participation in derivative transactions is designated for hedging purposes; derivative instruments are not held or issued for trading purposes.

CREDIT RISK -- Credit risk relates to the risk of loss that the Corporation would incur as a result of nonperformance by counterparties to their respective derivative instruments. The Corporation maintains credit policies with regard to its counterparties that management believes significantly minimize overall credit risk. The Corporation does not obtain collateral to support the agreements but monitors the financial viability of counterparties and believes its credit risk is minimal on these transactions. The Corporation believes the risk of nonperformance by counterparties is minimal.

INTEREST RATE MARKET RISK -- The table below provides information concerning the Corporation's financial instruments as of December 31, 1997 that are sensitive to changes in interest rates, which consist only of debt obligations. The table presents principal cash flows and related weighted average interest rates by expected maturity dates.

<TABLE>
<CAPTION>

|  | Expected Maturity Date | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 1998 | 1999 | 2000 | 2001 | 2002 | The af |
|  | ------ | ------ | ----- | ------ | ------ | --- |
| <S> | <C> | <C> | Millions of Dollars <C> | <C> | <C> | <C> |
| Long-term Debt (including current maturities) |  |  |  |  |  |  |
|    Fixed Rate................................. | $ -- | $150.0 | $ -- | $100.0 | $90.8 | $30 |
|    Average interest rate..................... | -- | 7.00% | -- | 8.88% | 6.38% | 6 |

</TABLE>

ENERGY MARKETING MARKET RISK -- As part of its natural gas marketing activities, EES enters into forward contracts that principally involve physical delivery of natural gas and derivative financial instruments, including options, swaps, futures and other contractual arrangements to offset price risks of gas supply. These activities involve price commitments into the future and, therefore, give rise to market risk. EES applies mark-to-market accounting to its business activities. At December 31, 1997, natural gas marketing operations had net commitments to sell approximately 50.6 billion cubic feet (Bcf) of natural gas through the year 2003 with offsetting net financial positions to purchase approximately 61.3 Bcf.

B-5

<PAGE>

EES has performed a sensitivity analysis to estimate its exposure to market risk of its commodity and related financial commitments. The exposure for fixed price natural gas purchase and sale commitments, and derivative financial instruments, including options, swaps, futures and other contractual commitments, is based on a methodology that uses a five-day holding period and a 95% confidence level. EES uses market-implied volatilities to determine its exposure to volatility risk. Market risk is estimated as the potential loss in fair value resulting from at least a 15% change in market factors which may differ from actual results. Using 15%, the most adverse change in fair value at

EFH01434835

December 31, 1997 as a result of this analysis, was a reduction of $141 million. For additional information regarding derivative instruments, see Note 7 to Consolidated Financial Statements.

Regulation and Rates

In October 1996, Lone Star Pipeline Company, a division of ENSERCH (Lone Star Pipeline), filed a request with the RRC to increase the rate it charges Lone Star Gas Company, a division of ENSERCH (Lone Star Gas), to store and transport gas ultimately destined for residential and commercial customers in the 550 Texas cities and towns served by Lone Star Gas. Lone Star Gas also requested that the RRC separately set rates for costs to aggregate gas supply for these cities. Rates previously in effect were set by the RRC in 1982. In September 1997, the RRC issued an order reducing the charges by Lone Star Pipeline to Lone Star Gas for storage and transportation services. In that order, the RRC did authorize separate charges for the Lone Star Pipeline storage and transportation services, a separate charge by Lone Star Gas for the cost of aggregating gas supplies, and a continuation of the 100% flow through of purchased gas expense. The RRC also imposed some new criteria for affiliate gas purchases and a new reconciliation procedure that will require a review of purchased gas expenses every three years. The RRC order has become final, but is being appealed by several parties including Lone Star Pipeline and Lone Star Gas. The rates authorized by the order became effective on December 1, 1997, and will result in an annual margin reduction of approximately $8.2 million.

On August 20, 1996, the RRC ordered a general inquiry into the rates and services of Lone Star Gas, most notably a review of Lone Star Gas' historic gas cost and gas acquisition practices since the last rate setting. The inquiry docket has been separated into different phases. Two of the phases, conversion to the NARUC account numbering system and unbundling, have been dismissed by the RRC, and one other phase, rate case expense, is pending RRC action on the basis of a stipulation of all parties. In the phase dealing with historic gas cost and gas acquisition practices, Lone Star Gas and Lone Star Pipeline have filed a motion for summary disposition stating that any retroactive rate action would be inappropriate and unlawful. Settlement discussions with intervenor cities are ongoing. If the motion for summary disposition is denied, a hearing has been scheduled to begin in August 1998. A number of management and transportation related issues have been placed in a separate phase which still has an undefined scope and is being held in abeyance pending the resolution of the phase dealing with gas costs. Management believes that gas costs were prudently incurred and were properly accounted for and recovered through the gas cost recovery mechanism previously approved by the RRC. At this time, management is unable to determine the ultimate outcome of the inquiry.

RESULTS OF OPERATION

For purposes of the discussion of operating results provided herein, the financial information of the Predecessor for the 1997 periods prior to the Merger Date have been combined with the post-merger 1997 financial information. The business operations of ENSERCH were not significantly changed as a result of the merger, and post-merger and pre-merger operating results, except as noted in the discussion, are comparable.

For the year ended December 31, 1997, ENSERCH had a loss from continuing operations of $24.9 million compared with income of $9.8 million in 1996 and income of $21.4 million in 1995. The 1997 results were reduced by a first quarter $8.6 million pretax, $5.6 million after-tax, provision for a credit Lone Star Gas made voluntarily to its customers, and were improved by third quarter income of $12.5 million pretax, $8.1 million after-tax, from the sale of interests in cogeneration projects. Also, results for 1997 were reduced by merger-related expenses, which totaled $25.1 million pretax, $21.3 million after-tax, and the amortization of goodwill of $8.1 million arising from the merger with TUC.

B-6

<PAGE>

EFH01434836

Consolidated revenues for 1997 were $2.6 billion compared with $1.9 billion for 1996 and $1.8 billion for 1995.  The higher revenues reflect an increase of $.6 billion in gas marketing revenues.  (The table of Selected Financial Data provides additional information on revenues.)  Gas purchased for resale increased from $1.3 billion in 1996 to $2.0 billion in 1997, reflecting the increase in natural gas marketing activity.  Operating income was $66.7 million in 1997 compared with $105.1 million in 1996 and $100.1 million in 1995. Operating income from natural gas gathering and processing operations decreased $12 million in 1997 from 1996 but increased $18 million in 1996 from 1995. Fluctuations in natural gas liquids (NGL) demand, price volatility for NGL products and natural-gas feedstock costs are the major factors that influence financial results in the NGL processing business.  Lone Star Pipeline operating income increased $10 million in 1997 from 1996 but decreased $3 million in 1996 from 1995.  The higher results in 1997, which were after a voluntary refund of $8.6 million made prior to the Merger to residential and commercial customers, were primarily attributable to lower operating and maintenance expenses and lower costs of gas lost in transmission, while the decline from 1995 to 1996 was principally due to higher operating and maintenance expenses.  Lone Star Gas operating income decreased $15 million in 1997 from 1996 after increasing $15 million in 1996 from 1995.  The 1997 decline from 1996 was primarily due to higher operating and maintenance expenses.  Results for 1996 were improved from 1995 because of the higher volume of residential and commercial sales, which have the highest margins.  Natural gas marketing activities reported an increased operating loss of $32 million in 1997 from 1996 and an increased loss of $12 million in 1996 from 1995.  Those losses were the result of low margins, inadequate systems infrastructure and costs associated with new systems that were implemented around year-end 1997.  Natural gas marketing operations are expected to be profitable in 1998.  Power development income (prior to the transfer of these operations to a TUC affiliate effective with the Merger) improved $16 million in 1997 mostly due to the income from the sale of interests in projects.  The Corporation's 1997 operating results also include $8.1 million of amortization of goodwill resulting from the Merger.

Other income (deductions) - net in 1997 included $2.4 million in gains from the sale of cogeneration plants.  Other amounts consisted principally of gains on disposals of assets and interest income, less losses from unconsolidated affiliates.

Interest charges for 1997 were $76.3 million compared with $76.7 million in 1996 and $71.4 million in 1995.  Interest charges for 1997 included $10.7 million related to advances from TUC.

The extraordinary loss in 1996 of $2.1 million represented a premium incurred in connection with the prepayment of ENSERCH's 9.06% Notes to facilitate the merger with TUC.

For the year ended December 31, 1997, there was a loss from discontinued operations of $224.7 million which  included a $236 million after-tax impact of a write-down of the carrying value of EEX's oil and gas properties due to the U.S. cost center ceiling limitation at March 31, 1997, and a $9.7 million ($14.9 million pre-tax) provision for estimated costs and expenses to wind-up engineering and construction operations.  For the years 1996 and 1995, discontinued operations had income of $11.4 million and a loss of $8.3 million, respectively.  (See Note 12 to consolidated financial statements.)

CHANGES IN ACCOUNTING STANDARDS

Statement of Financial Accounting Standards (SFAS) No. 130, "Reporting Comprehensive Income," (SFAS 130) will become effective in 1998.  This statement requires companies to report and display comprehensive income and its components (revenues, expenses, gains and losses).  Comprehensive income includes all changes in equity during a period except those resulting from investments by owners and distributions to owners.

SFAS 131, "Disclosures About Segments of an Enterprise and Related

Information," will become effective in 1998. This statement establishes standards for defining and reporting business segments.  The Corporation is currently determining its reportable segments.

The adoption of SFAS 130 and SFAS 131 will not affect the Corporation's consolidated financial position, results of operations or cash flows.

B-7

<PAGE>

YEAR 2000 ISSUES

Many existing computer programs use only two digits to identify a year in the date field.  These programs were designed and developed without considering the impact of the upcoming change in the century.  If not corrected, many computer applications could fail or produce erroneous data by or at the Year 2000.  The Year 2000 issues affect virtually all companies and organizations.

As a result of the Merger, many of the Corporation's existing computer applications and systems will be migrated to existing or planned TUC systems. TUC began its Year 2000 initiative in 1996 by addressing mainframe-based application systems.  In early 1997, an infrastructure project to address information technology (IT) related equipment and systems software was begun. In late 1997, a corporate-wide project to address Year 2000 issues related to embedded systems such as process controls for energy  production and delivery and client-developed applications was begun.  Most of the ENSERCH mainframe applications, infrastructure, embedded systems and client-developed applications that will not be migrated to existing or planned TUC systems have been incorporated into these projects.  These projects extend beyond the TUC organization in an effort to also work with key vendors, service suppliers and others so that TUC and ENSERCH can appropriately prepare for Year 2000.

The remediation and replacement work on the majority of IT application systems and infrastructure are expected to be completed by the end of 1998. Much of the work on the TUC Year 2000 project is expected to be completed by the end of 1998, although the project will extend into 1999.  Based on present assessments of the IT and infrastructure projects, a cost of $11.25 million for TUC was estimated.  ENSERCH will be billed for its share of the costs.  The TUC costs are being expensed as incurred over the four-year period (1996 through 1999) covered by the projects.  Assessment of the cost of the TUC Year 2000 project is in the early stages.

B-8

<PAGE>

INDEPENDENT AUDITORS' REPORT

ENSERCH Corporation and Subsidiaries:

We have audited the accompanying consolidated balance sheets of ENSERCH Corporation and subsidiaries (the Corporation) as of December 31, 1997 and also 1996 (Predecessor Company balance sheet), and the related statements of consolidated income, cash flows and common stock equity for the period from August 5, 1997 (acquisition date) to December 31, 1997, and the period from January 1, 1997 to the acquisition date and for each of the two years in the period ended December 31, 1996 (Predecessor Company Operations).  These financial statements are the responsibility of the Corporation's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes

assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ENSERCH Corporation and subsidiaries at December 31, 1997 and 1996, and the results of their operations and their cash flows for the period from the acquisition date to December 31, 1997, the period from January 1, 1997 to the acquisition date and for the two years in the period ended December 31, 1996, in conformity with generally accepted accounting principles.

DELOITTE & TOUCHE LLP

Dallas, Texas
February 24, 1998

B-9

<PAGE>

ENSERCH CORPORATION AND SUBSIDIARIES
(A WHOLLY-OWNED SUBSIDIARY OF TEXAS UTILITIES COMPANY)
STATEMENTS OF CONSOLIDATED INCOME

<TABLE>
<CAPTION>

| | | Predecessor | |
| | | --- | --- |
| <S> | Period From Acquisition Date to December 31, 1997 | Period From January 1, 1997 To Acquisition Date | Year En Decembe 1996 |
| | <C> | Thousands of Dollars | |
| | | <C> | <C> |
| OPERATING REVENUES......................... | $1,276,107 | $1,278,157 | $1,894,260 |
| OPERATING EXPENSES | | | |
|     Gas purchased for resale.............. | 1,052,658 | 941,626 | 1,316,137 |
|     Operation and maintenance............. | 150,569 | 209,596 | 348,830 |
|     Depreciation and amortization......... | 29,720 | 33,693 | 53,802 |
|     Gross receipts taxes.................. | 12,312 | 29,134 | 43,212 |
|     Payroll, ad valorem and other taxes.... | 11,024 | 17,224 | 27,186 |
|         Total operating expenses........ | 1,256,283 | 1,231,273 | 1,789,167 |
| OPERATING INCOME........................... | 19,824 | 46,884 | 105,093 |
| MERGER RELATED EXPENSES.................... | -- | (25,135) | (6,790) |
| OTHER INCOME (DEDUCTIONS) -- NET........... | 881 | 2,799 | (1,575) |
| INTEREST CHARGES........................... | (31,755) | (44,537) | (76,700) |
| INCOME (LOSS) BEFORE INCOME TAXES.......... | (11,050) | (19,989) | 20,028 |
| INCOME TAX EXPENSE (BENEFIT)............... | (1,485) | (4,612) | 10,277 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS.... | ( 9,565) | (15,377) | 9,751 |
| INCOME (LOSS) FROM DISCONTINUED OPERATIONS.. | -- | (224,691) | 11,387 |
| EXTRAORDINARY LOSS ON EXTINGUISHMENT     OF DEBT.............................. | -- | -- | (2,096) |

| | | | |
|---|---|---|---|
| NET INCOME (LOSS)........................... | (9,565) | (240,068) | 19,042 |
| PREFERRED STOCK DIVIDENDS................... | 4,677 | 6,725 | 11,339 |
| | ---------- | ---------- | ---------- |
| NET INCOME (LOSS) AVAILABLE FOR COMMON STOCK................................... | $ (14,242) | $ (246,793) | $ 7,703 |
| | ========== | ========== | ========== |

</TABLE>

See Notes to Consolidated Financial Statements.

B-10

<PAGE>

ENSERCH CORPORATION AND SUBSIDIARIES
(A WHOLLY-OWNED SUBSIDIARY OF TEXAS UTILITIES COMPANY)
STATEMENTS OF CONSOLIDATED CASH FLOWS

<TABLE>
<CAPTION>

| | | Predecessor | | |
|---|---|---|---|---|
| | Period From Acquisition Date to December 31, 1997 | Period From January 1, 1997 To Acquisition Date | Year Ended December 31, | |
| | | | 1996 | 1995 |
| | ---------- | ---------- | ------- | ------- |
| <S> | <C> | Thousands of Dollars <C> | <C> | <C> |
| CASH FLOWS -- OPERATING ACTIVITIES | | | | |
| Income (loss) from continuing operations.... | $ (9,565) | $ (15,377) | $ 9,751 | $ 21, |
| Adjustments to reconcile income (loss) from continuing operations to cash provided by operating activities: | | | | |
| Depreciation and amortization............ | 29,720 | 33,693 | 53,802 | 48, |
| Deferred income-tax expense (benefit)..... | 18,718 | (8,803) | 5,317 | 5, |
| Recoveries of gas-purchase contract settlements............................ | 318 | 27 | 7,926 | 51, |
| Other.................................... | 4,587 | 5,503 | 12,224 | 17, |
| Changes in operating assets and liabilities | | | | |
| Accounts receivable.................... | (340,758) | 132,763 | (101,288) | (13, |
| Other current assets................... | 22,683 | 33,529 | (24,995) | (24, |
| Accounts payable | | | | |
| Affiliates.......................... | 4,926 | -- | -- | |
| Other............................... | 279,756 | (148,859) | 98,148 | 10, |
| Other current liabilities.............. | (33,737) | (8,194) | 44,121 | 11, |
| Gas marketing risk management assets and liabilities............................ | (13,142) | -- | -- | |
| | --------- | --------- | --------- | ------ |
| Cash provided by (used for) operating activities......................... | (36,494) | 24,282 | 105,006 | 127, |
| | --------- | --------- | --------- | ------ |
| CASH FLOWS -- INVESTING ACTIVITIES | | | | |
| Additions to property, plant and equipment.. | (56,690) | (62,074) | (132,262) | (106, |
| Sales and retirements of property, plant and equipment............................ | (250) | 171 | 6,863 | 5, |
| Investments in unconsolidated affiliates.... | 188 | 12,267 | (59,627) | (8, |
| Sale of subsidiaries to an affiliated company................................. | (4,891) | -- | -- | |
| Purchases of businesses, net of cash acquired................................. | -- | -- | -- | (8, |
| Other........................................ | (4,777) | (9,539) | 8,605 | ( |

EFH01434840

| | | | |
|---|---|---|---|
| Cash used for investing activities...... | (66,420) | (59,175) | (176,421) | (120, |

**CASH FLOWS -- FINANCING ACTIVITIES**

| | | | |
|---|---|---|---|
| Change in commercial paper and other short-term borrowings.................... | (198,473) | 66,540 | (49,000) | 32, |
| Advances from parent...................... | 382,641 | -- | -- | |
| Issuance of senior long-term debt........... | -- | 100,000 | 160,000 | 150, |
| Debt issuance costs......................... | -- | -- | (786) | ( |
| Borrowings under revolving credit agreement. | -- | -- | 25,000 | |
| Retirement of senior long-term debt........ | (269,335) | (100,784) | (66,960) | (162, |
| Change in assignments of future gas purchase credits........ | -- | -- | -- | (17, |
| Issuance of common stock Parent........ | 200,000 | -- | -- | |
| Other........ | -- | 3,757 | 27,678 | 4, |
| Cash dividends paid........................ | (5,728) | (12,771) | (25,144) | (25, |
| Other...................................... | -- | (7) | (3,289) | ( |
| Cash from (used for) financing activities. | 109,105 | 56,735 | 67,499 | (19, |

**CASH PROVIDED BY (USED FOR) DISCONTINUED OPERATIONS**

| | | | |
|---|---|---|---|
| Exploration and production................. | -- | (21,773) | 19,636 | 37, |
| Engineering and construction............... | (6,564) | (5,641) | (5,001) | (28, |
| Cash from (used for) Discontinued Operations............................... | (6,564) | (27,414) | 14,635 | 9, |

| | | | |
|---|---|---|---|
| NET CHANGE IN CASH AND CASH EQUIVALENTS....... | (373) | (5,572) | 10,719 | (2, |
| CASH AND CASH EQUIVALENTS -- BEGINNING BALANCE | 12,143 | 17,715 | 6,996 | 9, |
| CASH AND EQUIVALENTS -- ENDING BALANCE........ | $ 11,770 | $ 12,143 | $ 17,715 | $ 6, |

</TABLE>
See Notes to Consolidated Financial Statements.

B-11

<PAGE>

ENSERCH CORPORATION AND SUBSIDIARIES
(A WHOLLY-OWNED SUBSIDIARY OF TEXAS UTILITIES COMPANY)
CONSOLIDATED BALANCE SHEETS

| | Predecessor | |
|---|---|---|
| | December 31, | |
| | 1997 | 1996 |
| | In thousands | |

**ASSETS**
**Current Assets**

| | | |
|---|---|---|
| Cash and cash equivalents......................... | $ 11,770 | $ 17,715 |
| Accounts receivable............................... | 506,284 | 350,535 |
| Gas marketing risk management assets.............. | 365,650 | -- |
| Gas stored underground............................ | 114,244 | 119,178 |
| Deferred income taxes............................. | 22,663 | 20,683 |
| Other............................................. | 35,094 | 88,989 |
| Total current assets...................... | 1,055,705 | 597,100 |
| Investments....................................... | 37,041 | 113,771 |

| | | |
|---|---:|---:|
| Net Investment in Discontinued Exploration and Production Operations................................ | -- | 798,229 |
| | ---------- | ---------- |
| Property, Plant and Equipment........................ | 1,200,864 | 1,942,528 |
| Less accumulated depreciation and amortization... | 24,669 | 787,205 |
| Net property, plant and equipment............ | 1,176,195 | 1,155,323 |
| | ---------- | ---------- |
| Goodwill (net of accumulated amortization: 1997 -- $8,113,000; 1996 -- $901,000).......... | 791,401 | 8,740 |
| | ---------- | ---------- |
| **Other Assets** | | |
| Unamortized regulatory assets for pension and other postretirement benefits................. | 52,336 | -- |
| Deferred income taxes........................... | 69,267 | 26,306 |
| Other........................................... | 54,839 | 21,673 |
| | ---------- | ---------- |
| Total other assets......................... | 176,442 | 47,979 |
| | ---------- | ---------- |
| Total................................. | $3,236,784 | $2,721,142 |
| | ========== | ========== |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current Liabilities** | | |
| Commercial paper and short-term bank loans....... | $    6,067 | $  138,000 |
| Current portion of long-term debt................ | -- | 1,598 |
| Accounts payable | | |
| Affiliates.................................. | 4,926 | -- |
| Other....................................... | 491,645 | 393,097 |
| Gas marketing risk management liabilities........ | 357,044 | -- |
| Other current liabilities........................ | 115,030 | 152,458 |
| Liabilities for discontinued engineering and construction operations........................ | 12,932 | 17,933 |
| | ---------- | ---------- |
| Total current liabilities................... | 987,644 | 703,086 |
| | ---------- | ---------- |
| Advances from Parent................................ | 293,843 | -- |
| | ---------- | ---------- |
| Long-term Debt...................................... | 646,796 | 932,721 |
| | ---------- | ---------- |
| **Other Liabilities** | | |
| Pension and other postretirement benefits........ | 165,514 | 48,075 |
| Deferred income taxes............................ | 10,498 | 13,888 |
| Other............................................ | 195,845 | 104,981 |
| | ---------- | ---------- |
| Total other liabilities.................... | 371,857 | 166,944 |
| | ---------- | ---------- |
| Commitments and Contingent Liabilities (Note 10).... | | |
| **Shareholders' Equity** | | |
| Adjustable rate preferred stock.................. | 175,000 | 175,000 |
| Common stock equity.............................. | 761,644 | 743,391 |
| | ---------- | ---------- |
| Shareholders' equity....................... | 936,644 | 918,391 |
| | ---------- | ---------- |
| Total................................. | $3,236,784 | $2,721,142 |
| | ========== | ========== |

See Notes to Consolidated Financial Statements.

<PAGE>

ENSERCH CORPORATION AND SUBSIDIARIES
(A WHOLLY-OWNED SUBSIDIARY OF TEXAS UTILITIES COMPANY)
STATEMENTS OF CONSOLIDATED COMMON STOCK EQUITY

<TABLE>
<CAPTION>

| | Period From Acquisition Date to December 31, 1997 |
|---|---|
| <S> | <C> |
| COMMON STOCK -- authorized 100 million shares | |
|   Balance at beginning of period .................... | $  -- |
|     Issuance of common stock to parent (2,000,000 shares) ................... | 2 |
|     Issued for stock plans (0; 215,000; 1,764,000; and 358,000 shares) ...... | -- |
|     Reclassify par value of common stock canceled at acquisition date .................... | -- |
|     Change in par value to $.01 from $4.45 per share ........................ | -- |
|   Balance at end of period (par value: $.01; $.01; $.01; and $4.45 per share - outstanding shares: 201,000; 1,000; 70,280,000; and 68,516,000) ......... | 2 |
| PAID IN CAPITAL | |
|   Balance at beginning of period ........................ | 579,126 |
|     Issuance of common stock to parent ............................... | 199,998 |
|     Excess of proceeds over par value of common stock issued for stock plans ........................ | -- |
|     Dividends declared ....................................... | (4,677) |
|     Change in par value of common stock ........................ | -- |
|     Other ................................................... | (3,240) |
|     Distribution of EEX to common shareholders ............... | -- |
|     Reclassify common stock and accumulated loss at acquisition date ..... | -- |
|     Purchase accounting adjustments ........................ | -- |
|       Subtotal ........................................ | 771,207 |
|     Excess of purchase price over paid in capital at acquisition date..... | -- |
|   Balance at end of period ................................... | 771,207 |
| RETAINED EARNINGS | |
|   Balance at beginning of period ........................ | -- |
|     Net income (loss) ....................................... | (9,565) |
|     Dividends declared ....................................... | -- |
|     Reclassify accumulated loss at acquisition date ........... | -- |
|     Other ................................................... | -- |
|   Balance at end of period ................................... | (9,565) |
| FOREIGN CURRENCY TRANSLATION ADJUSTMENT | |
|   Balance at beginning of year ......................... | -- |
|     Change during the year ............................... | -- |
|     Deferred income tax effects .......................... | -- |
|     Purchase accounting adjustments ...................... | -- |
|   Balance at end of period ............................. | -- |

UNAMORTIZED RESTRICTED STOCK COMPENSATION

EFH01434843

```
Balance at beginning of period ...........................................        --
   Shares granted .......................................................        --
   Cancellations ........................................................        --
   Market valuation adjustments .........................................        --
   Amortization .........................................................        --
                                                                           --------
Balance at end of period .................................................        --

                                                                           --------
COMMON STOCK EQUITY ......................................................  $761,644
                                                                           ========
```

</TABLE>

See Notes to Consolidated Financial Statements.

B-13

<PAGE>

ENSERCH CORPORATION AND SUBSIDIARIES
(A WHOLLY-OWNED SUBSIDIARY OF TEXAS UTILITIES COMPANY)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.  BUSINESS , MERGERS AND DISPOSITIONS

    ENSERCH Corporation (ENSERCH or the Corporation) is an integrated company
focused on natural gas. Substantially all of its business operations consist of
the gathering, processing, transmission, distribution and marketing of natural
gas. Businesses and subsidiaries of ENSERCH include Lone Star Gas Company
(Lone Star Gas), a gas distribution company in Texas, serving over 1.35
million customers and providing service through over 23,800 miles of
distribution mains; Lone Star Pipeline Company (Lone Star Pipeline), which has
approximately 7,600 miles of gathering and transmission pipeline in Texas; and
subsidiaries engaged in natural gas processing (Enserch Processing, Inc.) and
natural gas marketing (Enserch Energy Services, Inc.).

    On August 5, 1997 (Merger Date or Acquisition Date), the merger transactions
between Texas Utilities Company (TUC) and ENSERCH were completed.  All of the
common stock of ENSERCH was converted into common stock of TUC, and ENSERCH
became a wholly-owned subsidiary of TUC. ENSERCH shareholders became entitled
to receive .225 share of TUC common stock for each share of ENSERCH. At the
effective time of the merger, each of the 1,000 outstanding shares of common
stock of ENSERCH Merger Corp. (a transitory corporation organized to facilitate
the merger transaction and owned by TUC) was converted to one share of ENSERCH
Corporation Common Stock, (ENSERCH common stock). All of the shares of ENSERCH
common stock outstanding prior to the effective time of the merger were
converted to shares of TUC and, upon conversion, were canceled and ceased to
exist. Accordingly, upon completion of the merger the outstanding common stock
of ENSERCH consisted of 1,000 shares, par value $0.01 per share, all of which
were owned by TUC. Immediately prior to ENSERCH's merger with TUC, Enserch
Exploration, Inc. (EEX) and Lone Star Energy Plant Operations, Inc. (LSEPO),
former subsidiaries of the Corporation, were merged to form a new company (New
EEX), and ENSERCH distributed to its common shareholders its ownership interest
in these businesses, which was represented by approximately 105 million shares
of New EEX common stock with a carrying value of $583 million. In the
distribution, which was tax free to recipients, ENSERCH shareholders of record
on August 4, 1997 received approximately 1.5 shares of New EEX common stock for
each share of ENSERCH common stock owned.

    The value of the TUC shares issued and costs incurred by TUC in connection
with the acquisition of ENSERCH aggregated $579 million. TUC accounted for its
acquisition of ENSERCH as a purchase, and purchase accounting adjustments,
including goodwill, have been pushed down and are reflected in the financial
statements of ENSERCH and its subsidiaries for the period subsequent to August
5, 1997. The financial statements of ENSERCH for the periods ended before
August 5, 1997, were prepared using ENSERCH's historical basis of accounting and

are designated as "Predecessor." The comparability of the operating results for the Predecessor and the periods encompassing push down accounting are affected by the purchase accounting adjustments including the amortization of goodwill over a period of forty years.

   The Predecessor financial statements for all periods presented have been restated to reflect EEX and LSEPO as a discontinued operation. The historical financial statements of ENSERCH reflect certain reclassifications made to conform to TUC's presentation style. On December 31, 1997, ENSERCH sold, to another subsidiary of TUC, at net book value, the group of companies which had constituted the Corporation's power development and international gas distribution operations. For financial reporting purposes, the sale was deemed to have occurred on August 5, 1997. Prior periods were not restated to reflect the sale.

   The fair value of the assets and liabilities of ENSERCH's rate-regulated natural gas utility business (conducted through its Lone Star Gas Company and Lone Star Pipeline Company divisions) is considered to be equivalent to the historical basis of accounting and accordingly, no adjustment has been made to the carrying value.  The excess of the consideration paid by TUC over the estimated fair value of the assets and liabilities of ENSERCH at the merger date was approximately $800 million and  is  reflected as goodwill in the ENSERCH balance sheet as of December 31, 1997.  The process of determining

                              B-14

<PAGE>

the fair value of assets and liabilities at the merger date is continuing, and the final result awaits the resolution of income tax and other contingencies and finalization of certain estimates. The following table summarizes the changes made to the accounts of ENSERCH as of August 5, 1997 as a result of the merger and application of push down accounting.

|                                              | Purchase Accounting Adjustments |
|----------------------------------------------|--------------------------------:|
|                                              | Thousands of Dollars            |
| Investments                                  | $ (4,730)                       |
| Net property, plant and equipment            | (35,357)                        |
| Goodwill                                     | 791,386 *                       |
| Other assets                                 | 57,794                          |
|                                              | --------                        |
| Total assets                                 | $809,093                        |
|                                              | ========                        |
| Current liabilities                          | $  9,732                        |
| Long-term debt                               | 8,299                           |
| Deferred income taxes                        | (45,728)                        |
| Pension and other postretirement benefits    | 125,892                         |
| Other liabilities                            | 43,509                          |
| Shareholders' equity                         | 667,389                         |
|                                              | --------                        |
| Total liabilities and equity                 | $809,093                        |
|                                              | ========                        |

   * Net of write-off of a premerger goodwill balance of $8,128 thousand.


   The following is a summary of unaudited pro forma results of operations assuming the distribution to shareholders and the Merger with TUC had occurred at the beginning of the periods presented.

                         Year Ended December 31,
                         -------------------------

|                                       | 1995        | 1996        |
|---------------------------------------|-------------|-------------|
|                                       | Thousands of Dollars |      |
| Revenues............................. | $2,553,564  | $1,887,774  |
| Operating income..................... | 62,318      | 86,710      |
| Income (loss) before income taxes...  | (12,034)    | 10,945      |
| Income taxes (benefit)..............  | (235)       | 11,816      |
| Net income (loss)...................  | (11,799)    | (871)       |
| Net loss after preferred dividends..  | (23,201)    | (12,210)    |

On June 29, 1995, ENSERCH purchased the principal operating assets of a
nonregulated marketer of natural gas for approximately $9 million in cash,
including some $8 million of cost in excess of net assets acquired. The
acquisition was accounted for as a purchase. The goodwill was written off as a
purchase adjustment in connection with the merger with TUC. Operations of the
acquired company are included in the accompanying consolidated financial
statements from the date of acquisition.

Effective June 30, 1995, the Corporation exchanged 1,204,098 shares of
ENSERCH common stock for 100% of the outstanding shares of a company, which,
through its subsidiary, is a marketer of natural gas and natural-gas services.
The transaction was accounted for as a pooling-of-interests.

B-15

<PAGE>

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES AND OTHER INFORMATION

Consolidation -- The consolidated financial statements include the accounts
of the Corporation and its majority-owned subsidiaries. All significant
intercompany items and transactions have been eliminated in consolidation.
Investments in significant unconsolidated affiliates are accounted for by the
equity method.

System of Accounts and Other Policies -- Lone Star Gas and Lone Star Pipeline
are subject to the accounting requirements prescribed by the National
Association of Regulatory Utility Commissioners (NARUC).

Use of Estimates -- The preparation of the Corporation's consolidated
financial statements, in conformity with generally accepted accounting
principles, requires management to make estimates and assumptions about future
events that affect the reporting and disclosure of assets and liabilities at the
balance sheet dates and the reported amounts of revenue and expense during the
periods covered by the consolidated financial statements. In the event
estimates and/or assumptions prove to be different from actual amounts,
adjustments are made in subsequent periods to reflect more current information.

Revenue Recognition -- The city gate rate for the cost of gas Lone Star Gas
ultimately delivers to residential and commercial customers is established by
the Railroad Commission of Texas (RRC) and provides for full recovery of the
actual cost of gas delivered, including out-of-period costs such as gas purchase
contract settlement costs. The rates Lone Star Gas charges it residential and
commercial customers are established by the municipal governments of the cities
and towns served, with the RRC having appellate jurisdiction. Lone Star Gas
records revenues on the basis of cycle meter readings throughout the month and
accrues revenues for gas delivered from the meter reading dates to the end of
the month. Gas stored underground is valued at average cost. The rate Lone
Star Pipeline charges to Lone Star Gas for transportation and storage of gas
ultimately consumed by residential and commercial customers is established by
the RRC.

Depreciation of Property, Plant and Equipment -- The pipeline and
distribution systems are depreciated by the straight line method over the
useful life of the asset; approximately 30 to 40 years from original
acquisition, respectively.

Energy Marketing Activities -- The Corporation, through its natural gas marketing subsidiary, Enserch Energy Services, Inc. (EES), is a marketer of natural gas and natural gas services. As part of these business activities, EES enters into a variety of transactions, including forward contracts principally involving physical delivery of natural gas and derivative financial instruments, including options, swaps, futures and other contractual arrangements. The derivative transactions are concentrated with established energy companies and major financial institutions. Concurrent with the Merger, EES conformed its accounting for such activities to the mark-to-market accounting method of valuing and recognizing earnings from firm contractual commitments to purchase and sell natural gas in the future and from its portfolio of derivative financial instruments, including options, swaps, futures and other contractual commitments. Hedge accounting was used previously by Predecessor.

Stock-Based Compensation -- Statement of Financial Accounting Standards (SFAS) No. 123 encourages companies to record compensation cost for stock-based employee compensation plans at fair value but permits other methods. Prior to the Merger, the Corporation chose to account for stock-based compensation using the intrinsic value method. Accordingly, compensation cost for stock options was measured as the excess, if any, of the quoted market price of the Corporation's stock at the date of the grant over the amount an employee must pay to acquire the stock. The final compensation cost for restricted stock awards was based on the quoted market price of the Corporation's stock at the date the award became vested. As a result of the Merger, unexercised stock options at the Merger date that had been granted under an ENSERCH plan were exchanged for options to acquire TUC shares, and the estimated fair value assigned to such options as of the Merger date was accounted for by TUC as a part of the cost of the acquisition.

Consolidated Cash Flows -- For purposes of reporting cash flows, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents.

B-16

<PAGE>

The schedule below details the Corporation's cash payments and noncash investing and financing activities:

<TABLE>
<CAPTION>

|  | | Predecessor | |
| --- | --- | --- | --- |
|  | Period From Acquisition Date to December 31, 1997 | Period From January 1, 1997 To Acquisition Date | Year En Decemb 1996 |
| <S> | <C> | <C> | <C> |
|  | Thousands of Dollars | | |
| Cash payments (refunds): | | | |
|   Interest costs (net of amounts capitalized) ....... | $ 33,535 | $45,960 | $75,833 |
|   Income taxes -- net ............................. | $ (9,776) | $ 4,415 | $ 1,585 |
| Non-cash investing and financing activities: | | | |
|   Sales and purchases of businesses: | | | |
|     Book value of assets (sold) acquired ........... | $(105,878) | $ -- | $ -- |
|     Goodwill ........................................ | -- | -- | -- |
|     Reduction in advances due parent ............... | 20,143 | -- | -- |
|     Liabilities sold (assumed) ..................... | 85,735 | -- | -- |

EFH01434847

```
Cash required ...............................                        --          --
Cash sold (acquired) ........................      4,891            --          --
                                                  ---------        -------     -------
    Net cash used .............................  $  4,891        $   --      $   --
                                                  =========        =======     =======
```

</TABLE>

3. AFFILIATES

   Transactions between ENSERCH and TUC for the period  from acquisition date
through December 31, 1997 included $10,674,000 in interest expense related to
ENSERCH borrowings from TUC. In addition, ENSERCH had revenues of $8,576,000
from the sale and transportation of gas to other TUC subsidiaries during the
period. The outstanding net amount payable to TUC (including advances) was
$298,769,000 at December 31, 1997.

4. BORROWINGS AND LINES OF CREDIT

   ENSERCH's commercial paper program was discontinued following the merger with
TUC, and the borrowings outstanding at the Merger Date, which totaled
$204,500,000, were paid off at maturity with funds advanced to ENSERCH by TUC.
In addition, ENSERCH redeemed long-term debt of $260,400,000 outstanding under a
revolving credit agreement with funds advanced by TUC.  At December 31, 1997,
advances from TUC totaled approximately $293,843,000.

   At December 31, 1997, TUC, Texas Utilities Electric Company (TU Electric), a
wholly-owned indirect subsidiary of TUC, and ENSERCH had joint lines of credit
under credit facility agreements (Credit Agreements) with a group of commercial
banks.  The Credit Agreements have two facilities.  Facility A provides for
short-term borrowings aggregating up to $570,000,000 outstanding at any time at
variable interest rates and terminates April 23, 1998.  Facility B provides for
short-term borrowings aggregating up to $1,330,000,000 outstanding at any time
at variable interest rates and terminates April 24, 2002.  The combined
borrowings of TUC, TU Electric and ENSERCH under both facilities are limited to
an aggregate of $1,900,000,000 outstanding at any one time.  ENSERCH borrowings
under both facilities are limited to an aggregate of $650,000,000 outstanding at
any time.  ENSERCH borrowings under these facilities will be used for working
capital and other needs.  At December 31, 1997, ENSERCH had no borrowings under
these facilities.

                                    B-17

<PAGE>

<TABLE>
<CAPTION>

| | Decemb |
|---|---|
| | --------------- |
| | 1997 |
| | -------- |
| | Thousand |
| <S> | <C> |
| Senior Long-term Debt: | |
| 8% Notes due 1997.......................................... | $      -- |
| 7% Notes due 1999.......................................... | 150,000 |
| Subsidiary Revolving Credit Agreement Maturing 2000........ | -- |
| ENSERCH Revolving Credit Agreement Maturing 2001........... | -- |
| 8 7/8% Notes due 2001...................................... | 100,000 |
| 6 3/8% Notes due 2004...................................... | 150,000 |
| 7 1/8% Notes due 2005...................................... | 150,000 |
| 6 3/8% Convertible Subordinated Debentures due 2002........ | 90,750 |
| Unamortized premium and discount and fair value adjustments. | 6,046 |
| | -------- |
| Total...................................................... | 646,796 |

EFH01434848

Less current maturities...............................................    --
                                                                      --------
    Noncurrent..........................................................  $646,796
                                                                      ========

<CAPTION>

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|------|------|------|------|------|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Maturities (for next 5 years) | $ -- | $150,000 | $ -- | $100,000 | $90,750 |

</TABLE>

The carrying value of ENSERCH debt has been adjusted to reflect fair value as of the Merger date.

In connection with the Merger, the 6 3/8% Convertible Subordinated Debentures Due in 2002 became convertible into shares of TUC common stock at $38.54 per share (equal to 25.947 shares per $1,000 principal amount). The debentures may be redeemed at 101.27% of the principal amount, plus accrued interest, through March 31, 1998 and at declining premiums thereafter. The Corporation currently intends to redeem these debentures in 1998.

In January 1998, the Corporation issued $125,000,000 of 6 1/4% Series A Notes due 2003 and $125,000,000 of Remarketed Reset Notes due 2008 with a variable interest rate (5.82% at date of issuance).  Net proceeds from these borrowings were used to refinance or redeem like amounts of higher rate debt and preferred stock.

ENSERCH may issue additional debt and equity securities as needed, including the possible future sale of up to $250,000,000 aggregate principal amount of securities currently registered with the SEC for offering pursuant to Rule 415 under the Securities Act of 1933.

In September 1996, the Corporation paid off the outstanding balance of the 9.06% Notes due through 1999, including a prepayment premium of $3,200,000 ($2,100,000 after-tax) which has been accounted for as an extraordinary loss on early extinguishment of debt.

<TABLE>
<CAPTION>

Interest Charges were as follows:

|  | Period from Acquisition Date to December 31, 1997 | Period from January 1, 1997 To Acquisition Date |
|---|---|---|
|  |  | Thousand o |
| <S> | <C> | <C> |
| Interest costs incurred ................................. | $31,801 | $44,668 |
| Interest capitalized ................................... | (46) | (131) |
|  | ------- | ------- |
| Charged to expense ..................................... | $31,755 | $44,537 |
|  | ======= | ======= |

</TABLE>

                                 B-18

<PAGE>

5.    SHAREHOLDERS' EQUITY

Common Stock -- On August 5, 1997, all of the common stock of ENSERCH Corporation was converted into common stock of TUC, and ENSERCH became a wholly owned subsidiary of TUC. At the effective time of the merger, each of the 1,000 outstanding shares of common stock of ENSERCH Merger Corp. (a transitory corporation organized to facilitate the merger transaction and owned by TUC) was converted to one share of ENSERCH Corporation Common Stock, (ENSERCH common stock). All of the shares of ENSERCH common stock outstanding prior to the effective time of the merger were converted to shares of TUC and, upon conversion, were canceled and ceased to exist. Accordingly, at August 5, 1997, the outstanding common stock of ENSERCH consisted of 1,000 shares, par value $0.01 per share, all of which were owned by TUC.

In December 1997, TUC purchased an additional 200,000 shares for $200,000,000.

At the special shareholders meeting on November 15, 1996, shareholders of the Corporation approved a change in the par value of ENSERCH common stock from $4.45 per share to $.01 per share to facilitate the distribution of the Corporation's interest in EEX. The reduction in par value was recorded by the transfer of $312,000,000 to the paid-in-capital account.

<TABLE>
<CAPTION>

| Adjustable Rate Preferred Stock at December 31, 1997 and 1996: | Stated Value Per | | Shares Outstanding | | |
| --- | --- | --- | --- | --- | --- |
| | Preferred Share | Depositary Share | Preferred Shares | Depositary Shares | Amount (Thousands) |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Series E.................... | $1,000 | $100 | 100,000 | 1,000,000 | $100,000 |
| Series F.................... | 1,000 | 25 | 75,000 | 3,000,000 | 75,000 |
| Total.................... | | | | | $175,000 |

</TABLE>

On January 16, 1998, the Corporation redeemed all of the outstanding shares of its Adjustable Rate Preferred Stock, Series E, at $1,000 per share, plus accrued and unpaid dividends of $14.777 per share.

The Series F stock is redeemable at stated value after May 1, 1999. Holders of the preferred stock are entitled to its stated value upon involuntary liquidation.

Dividend rates for the Series F Stock are determined quarterly, in advance, based on the "Applicable Rate" (highest of the three-month Treasury bill rate, the Treasury ten-year constant maturity rate and either the Treasury twenty-year or thirty-year constant maturity rate, as defined), as set forth below:

<TABLE>
<CAPTION>

| | Per Annum Rate (Determined Quarterly) |
| --- | --- |
| | Series F |
| <S> | <C> |
| Dividend rate.................... | 87% of Applicable Rate |
| Minimum rate.................... | 4.50% |
| Maximum rate.................... | 10.50% |

</TABLE>

&lt;PAGE&gt;

&lt;TABLE&gt;
&lt;CAPTION&gt;

Dividends Declared:

| | Period from Acquisition Date to December 31, 1997 | Period from January 1, 1997 To Acquisition Date |
|---|---|---|
| &lt;S&gt; | &lt;C&gt; | Thousan &lt;C&gt; |
| Adjustable Rate Preferred Stock: | | |
| Series E ($6.42, $7.00, $7.00 per depositary share)... | $2,917 | $ 3,500 |
| Series F ($1.34, $1.45, $1.54 per depositary share)... | 1,760 | 2,270 |
| Common Stock ($.10, $.20, $.20 per share)................. | -- | 7,048 |
| Total.......................................... | $4,677 | $12,818 |

&lt;/TABLE&gt;

## 6.  STOCK COMPENSATION PLANS

Effective with the Merger, outstanding options for ENSERCH common stock were exchanged for options for 532,913 shares of TUC common stock exercisable at prices ranging from $7.03 to $37.71 per share, and ENSERCH was precluded from awarding further options.  The estimated fair value of these options of $3,214,000 was accounted for as a part of the cost of the acquisition.  At December 31, 1997, 402,966 of these options remained outstanding and exercisable.  Prior to the Merger, the Corporation had three fixed option plans. Stock options had been awarded to key employees and were outstanding under all three plans. Options generally expire ten years after the date of the grant.

&lt;TABLE&gt;
&lt;CAPTION&gt;

Summary of Stock Option Activity:

| | Weighted Average Exercise Price | | Number of Options | | |
|---|---|---|---|---|---|
| | 1997 | 1996 | 1997 | 1996 | 1995 |
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| Outstanding -- Beginning of year... | $17.71 | $17.27 | 1,182,308 | 2,514,598 | 2,308,823 |
| Granted......................... | -- | 15.13 | -- | 326,300 | 263,200 |
| Exercised (a)................... | 17.15 | 16.47 | (214,278) | (1,579,289) | (27,825) |
| Canceled or expired............ | 16.72 | 17.87 | (126,225) | (79,301) | (29,600) |
| Converted into TUC options....... | 18.00 | -- | (841,805) | -- | -- |
| Outstanding -- End of year........ | -- | 17.71 | -- | 1,182,308 | 2,514,598 |
| Exercisable...................... | | | -- | 1,182,308 | 1,957,637 |

&lt;/TABLE&gt;

(a)  Price ranges for options exercised in 1997 (prior to the Merger) were $4.45 to $21.00; in 1996 were $4.45 to $21.13; and in 1995 were $12.50 to $17.00.

The weighted average fair value of stock options granted in 1996 and 1995 was $4.97 and $4.80, respectively. The fair value for these options granted since December 31, 1994 was estimated at the date of grant using a Black-Scholes option pricing model with the following weighted average assumptions for 1996 and 1995, respectively: risk-free interest rates of 5.48% and 7.17%; dividend yields of 1.33% and 1.48%; volatility factor of the expected market price of the Corporation's common stock of .29; and a weighted average expected life of the options of 6.3 years.

The stock option plans included provisions for issuing the Corporation's common stock under performance-based grants. In 1996 and 1995, the Corporation granted 83,500 and 59,000 shares of restricted stock under its stock option plan, respectively. The weighted average grant-date fair value of these restricted shares was $15.38 and $14.66, respectively. Fair value is equal to the market value of the Corporation's common stock on the date of grant. Upon the Board of Directors' agreement to merge with TUC in April 1996, all restrictions were lifted on the 211,956 shares of restricted stock outstanding. The unamortized portion of the cost of these shares of $3,100,000 was charged to compensation expense in 1996.

B-20

<PAGE>

Pro forma information regarding net income is mandated by SFAS 123 and has been determined as if the Corporation had accounted for its employee stock options under the fair value method of that Statement. Had compensation cost for the Corporation's stock option plans been determined based on the fair value at the grant dates for awards under those plans in accordance with the provision of SFAS 123, the Corporation's net income (loss) for the following periods would have been reduced to the pro forma amounts indicated below:

<TABLE>
<CAPTION>

|  | Prede |
|  | Period from January 1, 1997 To Acquisition Date | Year ——— 1996 ———— |
|  | ————————— Thousands of D |
| <S> | <C> | <C> |
| Net income (loss) (after provision for dividends on preferred stock): |  |  |
| As reported.......................................... | $(246,793) | $7,703 |
| Pro forma............................................ | (246,793) | 5,498 |

</TABLE>

7. DERIVATIVE INSTRUMENTS

The Corporation enters into derivative instruments, including options, swaps, futures and other contractual commitments to manage market risks related to changes in interest rates and commodity price exposures. The Corporation's participation in derivative transactions, except for the gas marketing activities, has been designated for hedging purposes, and the derivatives are not held or issued for trading purposes. (For a discussion of accounting policies relating to derivative instruments, see Note 2.)

Natural Gas Marketing Activities -- EES's marketing activities involve price commitments into the future and, therefore, give rise to market risk, which represents the potential loss that can be caused by a change in the market value of a particular commitment. Net open portfolio positions often result from the origination of new transactions or in response to changing market conditions.

The Corporation closely monitors its exposure to market risk. The Corporation utilizes a number of methods to monitor market risk, including sensitivity analysis. The exposure for fixed price natural gas purchase and sale commitments, and derivative financial instruments, including options, swaps, futures and other contractual commitments, is based on a methodology that uses a five-day holding period and a 95% confidence level. EES uses market-implied volatilities to determine its exposure to market risk. Market risk is estimated as the potential loss in fair value resulting from at least a 15% change in market factors which may differ from actual results. Using 15%, the most adverse change in fair value at December 31, 1997, as a result of this analysis, was a reduction of $1,100,000.

EES enters into contracts to purchase and sell natural gas for physical delivery in the future. At December 31, 1997, EES had net commitments to sell approximately 50.6 billion cubic feet (Bcf) of natural gas through the year 2003 with offsetting net financial positions to purchase approximately 61.3 Bcf.

Concurrent with the Merger, EES conformed its accounting for its gas marketing activities to mark-to-market accounting, which is the accounting method used by TUC. Under mark-to-market accounting, changes (whether positive or negative) in the value of contractual commitments to purchase and sell natural gas in the future and from its portfolio of derivative financial instruments, including options, swaps, futures and other contractual commitments are recognized as an adjustment to operating revenues in the period of change. The market prices used to value these transactions reflect management's best estimate of market prices considering various factors including closing exchange and over-the-counter quotations, time value of money and volatility factors underlying the commitments. These market prices are adjusted to reflect the potential impact of liquidating EES's position in an orderly manner over a reasonable period of time under present market conditions.

B-21

<PAGE>

EES has a number of risks and costs associated with the future contractual commitments included in its natural gas portfolio, including credit risks associated with the financial condition of counterparties, product location (basis) differentials and other risks that management policies dictate. EES continuously monitors the valuation of identified risk and adjusts the portfolio valuation based on present market conditions. Reserves are established in recognition that certain risks exist until delivery of natural gas has occurred, counterparties have fulfilled their financial commitments and related financial instruments mature or are closed out.

The following table displays the mark-to-market values of EES's natural gas marketing risk management assets and liabilities at December 31, 1997 and the average value for the period from August 5, 1997 through December 31, 1997:

| | Assets | Liabilities | Net |
|---|---|---|---|
| | ------ | ----------- | --- |
| | | Thousands of Dollars | |
| Fair Value: | | | |
|   Current............. | $365,650 | $357,044 | $ 8,606 |
|   Noncurrent......... | 41,522 | 31,324 | 10,198 |
| | -------- | -------- | ------- |
|   Total............. | $407,172 | $388,368 | 18,804 |
| | ======== | ======== | |
|   Less reserves....... | | | 9,251 |
| | | | ------- |
|   Net of reserves.... | | | $ 9,553 |
| | | | ======= |
| Average Value: | | | |
|   Total............. | $291,809 | $278,332 | $13,477 |
| | ======== | ======== | |
|   Less reserves....... | | | 8,134 |

```
Net of reserves....              $ 5,343
                                 =======
```

The following table summarizes EES results from its gas marketing activities for the periods presented:

| | Period from Acquisition Date to December 31, 1997 | Predecessor | | |
| | | Period from January 1, 1997 To Acquisition Date | Year Ended December 31, | |
| | | | 1996 | 1995 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| | | Thousands of Dollars | | |
| Revenues...................... | $858,467 | $601,881 | $825,009 | $750,463 |
| Net trading income (loss)...... | (286) | (4,709) | 18,144 | 26,166 |

Credit Risk -- Credit risk relates to the risk of loss that the Corporation would incur as a result of nonperformance by counterparties to their respective derivative instruments.  The Corporation maintains credit policies with regard to its counterparties that management believes significantly minimize overall credit risk.  The Corporation does not obtain collateral to support the agreements but monitors the financial viability of counterparties and believes its credit risk is minimal on these transactions.  The Company  believes the risk of nonperformance by counterparties is minimal.

B-22

<PAGE>

8.  INCOME TAXES

| Income Tax Expense (Benefit) of Continuing Operations: | Period from Acquisition Date to December 31, 1997 | Predecessor | | |
| | | Period from January 1, 1997 To Acquisition Date | Year Ended December 31, | |
| | | | 1996 | 1995 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| | | Thousands of Dollars | | |
| Current | | | | |
| Federal.................. | $(20,378) | $ 4,297 | $ 4,745 | $ 6,230 |
| State.................... | 175 | 9 | 136 | 92 |
| Foreign.................. | -- | (115) | 79 | 50 |
| Total................... | (20,203) | 4,191 | 4,960 | 6,372 |
| Deferred | | | | |
| Federal.................. | 18,775 | (8,719) | 5,429 | 5,185 |
| Foreign.................. | -- | -- | 29 | -- |

| | | | |
|---|---|---|---|
| Total................... | 18,775 | (8,719) | 5,458 | 5,185 |
| | -------- | ------- | ------- | ------- |
| Investment Tax Credits..... | (57) | (84) | (141) | (142) |
| | -------- | ------- | ------- | ------- |
| Total................... | $ (1,485) | $(4,612) | $10,277 | $11,415 |
| | ======== | ======= | ======= | ======= |

</TABLE>

Reconciliation of Income Taxes (Benefit) Computed at the Federal Statutory Rate
to Income Tax Expense (Benefit) of Continuing Operations:

<TABLE>
<CAPTION>

| | Period from Acquisition Date to December 31, 1997 | Period f January 1997 To Acquisit Date |
|---|---|---|
| | ---------- | -------- |
| | | Thousa |
| <S> | <C> | <C> |
| Income (loss) from continuing operations before income taxes: | | |
| Domestic.............................................. | $(11,072) | $(22,81 |
| Foreign............................................... | 22 | 2,82 |
| | -------- | ------- |
| Total.......................................... | $(11,050) | $(19,98 |
| | ======== | ======= |
| Income taxes (benefit) at the federal statutory rate of 35%..... | $ (3,868) | $ (6,99 |
| Amortization of investment tax credits.......................... | (57) | (8 |
| Amortization of goodwill........................................ | 2,840 | - |
| State and foreign taxes, net of federal tax benefit............. | 114 | (6 |
| Nondeductible distribution and merger related costs............. | -- | 4,94 |
| Nondeductible meals and entertainment........................... | 175 | 18 |
| Change in cash surrender value of life insurance policies....... | (313) | (38 |
| Increase in (reduction of) prior year tax liabilities........... | -- | (2,53 |
| Other --- net................................................... | ( 376) | 32 |
| | -------- | ------- |
| Income Tax Expense (Benefit)............................... | $ (1,485) | $ (4,61 |
| | ======== | ======= |

</TABLE>

B-23

<PAGE>

    Deferred income taxes provided by the liability method for significant
temporary differences based on tax laws and statutory rates in effect at the
December 31, 1997 and 1996 balance sheet dates are as follows:

<TABLE>
<CAPTION>

| | | Predecessor |
|---|---|---|
| | | ------------------------ |
| | 1997 | 1996 |
| | ------------------------------- | ------------------------ |

| | Total | Current | Noncurrent | Total | Current | Noncur |
|---|---|---|---|---|---|---|
| | | | Thousands of Dollars | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Deferred Tax Assets: | | | | | | |
| Net operating--loss and other tax-- credit carryforwards............... | $163,061 | $ -- | $163,061 | $154,558 | $ -- | $154 |
| Retirement and other employee benefit obligations............... | 47,128 | 4,469 | 42,659 | 22,916 | 2,600 | 20 |
| Accruals and allowances.............. | 11,779 | 10,004 | 1,775 | 24,728 | 11,420 | 13 |
| Losses of controlled foreign corporations...................... | 2,557 | -- | 2,557 | 5,936 | -- | 5 |
| All other........................... | 8,358 | 8,358 | -- | 23,712 | 8,053 | 15 |
| Total............................ | 232,883 | 22,831 | 210,052 | 231,850 | 22,073 | 209 |
| Deferred Tax Liabilities: | | | | | | |
| Property-- related differences....... | 139,934 | -- | 139,934 | 136,617 | -- | 136 |
| All other........................... | 11,517 | 168 | 11,349 | 62,132 | 1,390 | 60 |
| Total............................ | 151,451 | 168 | 151,283 | 198,749 | 1,390 | 197 |
| Net Deferred Tax Asset.............. | $ 81,432 | $22,663 | $ 58,769 | $ 33,101 | $20,683 | $ 12 |

</TABLE>

At December 31, 1997, domestic net operating-loss (NOL) carryforwards total $445 million, which begin to expire in 2003, and alternative minimum tax-credit carryforwards total $7 million. The tax benefits of these carryforwards of $163 million, as shown above, are available to offset future tax payments. ENSERCH expects to fully utilize such NOL's prior to their expiration date. At December 31, 1997, ENSERCH also had $17 million of general business credit carryforwards which begin to expire in 1999. As a result of limitations on the timing of use arising from the Merger, ENSERCH does not expect to fully utilize such tax credit carryforwards prior to their expiration date; therefore, such credits were written off as a purchase accounting adjustment.

<TABLE>
<CAPTION>

| | | | Pre |
|---|---|---|---|
| | | Period From January 1, 1997 | |
| | Period From Acquisition Date to December 31, 1997 | To Acquisition Date | Yea --- |
| Cash Payments (Refunds) of Income Taxes Allocated to Continuing Operations: | | | |
| <S> | <C> | <C> | Thousands of D <C> |
| Federal: | | | |
| Current year, including alternative minimum tax............ | $(9,245) | $2,203 | $ |
| Prior years........................................... | (586) | 2,149 | |
| Total............................................... | (9,831) | 4,352 | |
| State.................................................. | 55 | 63 | |
| Foreign............................................... | -- | -- | -- |
| Total............................................... | $(9,776) | $4,415 | $ |

</TABLE>

B-24

<PAGE>

9. EMPLOYEE BENEFIT PLANS

     Pension Plan -- At the date of the Merger, ENSERCH had a defined benefit
pension plan providing retirement income benefits for substantially all of its
employees. As a part of purchase accounting, the accrued pension liability was
adjusted to recognize all previously unrecognized gains or losses arising from
past experience different from that assumed, the effects of changes in
assumptions, all unrecognized prior service costs and the remainder of
unrecognized asset existing at the date of the initial application of SFAS 87.
These adjustments to the accrued pension liability, to the extent associated
with rate-regulated operations, were recorded as regulatory assets or
liabilities and, to the extent associated with non-regulated operations, as
goodwill. Accrued retirement costs are funded to the extent such amounts are
deductible for federal income-tax purposes. Plan assets consist primarily of
equity investments, government bonds and corporate bonds. Benefits are based on
years of credited service and average compensation.

     Effective January 1, 1998, the ENSERCH qualified retirement plan was merged
into another retirement plan of TUC.

     In connection with the Merger, certain employees of ENSERCH were offered
and accepted an early retirement option. Effects of the early retirement option
associated with ENSERCH employees were included in purchase accounting
adjustments as regulatory assets or goodwill, as appropriate.

<TABLE>
<CAPTION>

|  |  | Predecessor | |
|  |  | ------------------------- | |
|  | Period from Acquisition Date to December 31, 1997 | Period from January 1, 1997 To Acquisition Date | Year Ended D 1996 |
|  | ------------- | ------------ | ----------- |
| <S> | <C> | Thousands of Dollars<br><C> | <C> |
| Components of Net Pension Costs: |  |  |  |
| Service cost -- benefits earned during the period.. | $ 1,758 | $ 2,466 | $ 5,228 |
| Interest cost on projected benefit obligation...... | 11,186 | 14,367 | 24,418 |
| Actual return on plan assets....................... | (9,606) | (46,504) | (40,474 |
| Net amortization and deferral..................... | (1,016) | 31,226 | 14,295 |
|  | ------- | -------- | -------- |
| Net periodic pension cost......................... | $ 2,322 | $ 1,555 | $ 3,467 |
|  | ======= | ======== | ======== |
| Valuation Assumptions: |  |  |  |
| Discount rate...................................... | 7.25% | 7.75% | 7.75 |
| Rate of increase in compensation levels........... | 4.30% | 4.30% | 4.00 |
| Expected long-term rate of return on assets........ | 9.00% | 9.00% | 9.50 |
| Amounts Recognized: |  |  |  |
| Actuarial present value of accumulated benefits: |  |  |  |
| Accumulated benefit obligation..................... | $(351,976) |  | $(305,041 |
|  | ========= |  | ========= |
| Vested benefit obligation.......................... | $(349,711) |  | $(302,360 |

| | | |
|---|---:|---:|
| Projected pension benefit obligation for service rendered to date.................................. | $(379,217) | $(333,955 |
| Plan assets at fair value – primarily equity investments, government bonds and corporate bonds.... | 275,863 | 285,810 |
| Projected benefit obligation in excess of plan assets.. | (103,354) | (48,145 |
| Unrecognized net gain from past experience different from that assumed and effects of changes in assumptions....................................... | 24,743 | 3,437 |
| Prior service cost not yet recognized in net periodic pension expense........................................ | (6,077) | (3,555 |
| Unrecognized plan assets in excess of projected benefit obligation at initial application................. | -- | (3,406 |
| Accrued pension cost........................... | $(84,688) | $ (51,669 |

</TABLE>

B-25

<PAGE>

Postretirement Benefits Other than Pensions -- In addition to the retirement plan, ENSERCH offers certain health care and life insurance benefits to substantially all employees and their eligible dependents at retirement.  In connection with the Merger, the plan was amended to provide coverage to those employees hired after July 1, 1989 not previously eligible for postretirement medical benefits.  In addition, the health care benefits provided to retirees under the Plan were enhanced to reflect the same level of benefits as offered by other such plans of TUC companies.  The unrecognized prior service cost at December 31, 1997 arose from these two changes which occurred after the Merger Date.  Obligations have not been prefunded.  Benefits received vary in level depending on years of service and retirement dates.  The purchase accounting adjustments described above for the retirement plan of ENSERCH were also applied to the accrued liabilities for the postretirement health care and life insurance benefits.

<TABLE>
<CAPTION>

| | Period from Acquisition Date to December 31, 1997 | Period from January 1, 1997 To Acquisition Date |
|---|---:|---:|
| <S> | <C> | Thousand <C> |
| Components of Net Periodic Postretirement Benefit Cost: | | |
| Service cost -- benefits earned during the period................. | $     84 | $  142 |
| Interest cost on accumulated postretirement benefit obligation......................................... | 2,514 | 2,899 |
| Amortization of the transition obligation......................... | -- | 2,189 |
| Net amortization and deferral.................................... | -- | 128 |
| Net periodic postretirement benefits cost........................ | $   2,598 | $5,358 |
| Valuation Assumptions: | | |
| Discount rate.................................................... | 7.25% | 7.75% |
| Medical cost trend rate.......................................... | 5.0% | 5.0% |

Amounts Recognized:
Accumulated postretirement benefit obligation (APBO):

| | |
|---|---:|
| Retirees.......................................... | $ (82,570) |
| Fully eligible active employees................... | (3,339) |
| Other active employees............................ | (20,504) |
| | --------- |
| Total APBO........................................ | (106,413) |
| Unrecognized transition obligation................ | -- |
| Unrecognized prior service cost................... | 17,822 |
| Unrecognized net loss............................. | 3,455 |
| | --------- |
| Accrued postretirement benefits cost............. | $ (85,136) |
| | ========= |

</TABLE>

The expected increase in costs of future benefits covered by the plan is projected using a health care cost trend rate of 5% in 1998 and thereafter. A one percentage point increase in the assumed health care cost trend rate in each future year would increase the APBO at December 31, 1997 by approximately $11.6 million and other postretirement benefits cost for 1997 by approximately $.1 million.

B-26

<PAGE>

10. COMMITMENTS AND CONTINGENT LIABILITIES

Legal Proceedings -- A lawsuit was filed on February 24, 1987, in the 112th Judicial District of Sutton County, Texas, against subsidiaries and affiliates of the Corporation and its utility division. The plaintiffs have claimed that defendants failed to make certain production and minimum-purchase payments under a gas-purchase contract. The plaintiffs initially alleged a conspiracy to violate purchase obligations, improper accounting of amounts due, fraud, misrepresentation, duress, failure to properly market gas and failure to act in good faith. Under amended pleadings filed in January 1997, plaintiffs have added allegations of negligence and gross negligence in connection with the measurement of gas and conversion. Plaintiffs seek actual damages in excess of $5,000,000 and punitive damages in an amount equal to .5% of the consolidated gross revenues of the Corporation for the years 1982-1986 (approximately $85,000,000), interest, costs and attorneys' fees.

On October 30, 1995, a lawsuit was filed in the Supreme Court of Western Australia by Woodside Petroleum Ltd. and its joint venture partners against the Corporation, a former subsidiary of the Corporation and others. Plaintiffs seek damages of approximately $18,000,000 from the Corporation based on an indemnity arrangement and approximately $208,000,000 from the other defendants for alleged breaches of contract and breaches of a trade practice act, all in connection with the construction of an offshore gas and condensate drilling production platform. The Corporation has agreed to indemnify the current owner of the former subsidiary pursuant to the provisions in the prior sales agreement. Following a preliminary hearing, the Court, on December 4, 1997, delivered an opinion in favor of the Corporation, the former subsidiary and the other defendants finding that the defendants are additional insurers under certain insurance policies owned by the plaintiffs and that the plaintiffs and their insurers are precluded from bringing a subrogated claim against the defendants. An appeal of this ruling is anticipated.

Management of the Corporation believes it has meritorious defenses to the claims made in these and other actions brought in the ordinary course of business. In the opinion of management, the Corporation will incur no liability from these and all other pending claims and suits that is material for financial reporting purposes.

Environmental Matters -- The Corporation is subject to federal, state and

local environmental laws and regulations that regulate the discharge of materials into the environment. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The level of future expenditures for environmental matters, including costs of obtaining operating permits, equipment monitoring and modifications under the Clean Air Act and cleanup obligations, cannot be fully ascertained until the regulations that implement the applicable laws have been approved and adopted. It is management's opinion that all such costs, when finally determined, will not have a material adverse effect on the consolidated financial position, results of operations or cash flows of the Corporation.

Commitments -- Future minimum commitments are as follows (in thousands):

<TABLE>
<CAPTION>

|  | 1998 | 1999 | 2000 | 2001 | 2002 | Thereafter |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Operating leases........ | $ 6,100 | $ 5,500 | $4,800 | $3,500 | $3,200 | $54,500 |
| Gas-purchase contracts.. | 87,600 | 33,900 | 8,100 | 5,400 | 3,000 | 1,400 |

</TABLE>

The Corporation had a number of noncancelable long-term operating leases at December 31, 1997, principally for office space and machinery and equipment. Rental expenses for continuing operations incurred under all operating leases aggregated $2,600,000 for the pre-and post-merger periods of 1997, $3,600,000 in 1996 and $5,600,000 in 1995. Rental income received for subleased office space was $2,000,000 in 1997, $3,400,000 in 1996 and $3,400,000 in 1995. Future minimum rental income to be received for subleased office space is $11,500,000 over the next five years.

B-27

<PAGE>

Gas-Purchase Contracts -- Lone Star Gas buys gas under long-term, intrastate contracts in order to assure a reliable supply to its customers. Many of these contracts require minimum purchases of gas. Lone Star Gas has made accruals for payments that may be required for settlement of gas-purchase contract claims asserted or that are probable of assertion. Lone Star Gas continually evaluates its position relative to asserted and unasserted claims, above-market prices or future commitments. Management believes that Lone Star Gas has not incurred losses for which reserves should be provided at December 31, 1997. Based on estimated gas demand, which assumes normal weather conditions, requisite gas purchases are expected to substantially satisfy purchase obligations for the year 1998 and thereafter.

Sales of Receivables -- The Corporation has sold $100 million of receivables under an amended limited recourse agreement that matures on September 22, 1998. Additional receivables are continually sold to replace those collected. The uncollected balances of receivables sold were $100 million at both year-end 1997 and 1996.

Guarantees -- The Corporation and/or its subsidiaries are the guarantor on various commitments and obligations of others aggregating some $45,300,000 at December 31, 1997. The Corporation is exposed to loss in the event of nonperformance by other parties. However, the Corporation does not anticipate nonperformance by the counterparties.

Concentrations of Credit Risk -- Lone Star Gas operations have trade receivables from a few large industrial customers in North Central Texas arising from the sale of natural gas. A change in economic conditions may affect the ability of customers to meet their contractual obligations. At December 31, 1997 and 1996, the allowance for possible losses deducted from accounts receivable was $3,902,000 and $3,968,000 respectively. The Corporation believes that its provision for possible losses on uncollectible accounts receivable is

adequate for its credit loss exposure.

Inquiry into Lone Star Gas Company Rates -- In October 1996, Lone Star Pipeline filed a request with the RRC to increase the rate it charges Lone Star Gas to store and transport gas ultimately destined for residential and commercial customers in the 550 Texas cities and towns served by Lone Star Gas. Lone Star Gas also requested that the RRC separately set rates for costs to aggregate gas supply for these cities. Rates previously in effect were set by the RRC in 1982. In September 1997, the RRC issued an order reducing the charges by Lone Star Pipeline to Lone Star Gas for storage and transportation services. In that order, the RRC did authorize separate charges for the Lone Star Pipeline storage and transportation services, a separate charge by Lone Star Gas for the cost of aggregating gas supplies, and a continuation of the 100% flow through of purchased gas expense. The RRC also imposed some new criteria for affiliate gas purchases and a new reconciliation procedure that will require a review of purchased gas expenses every three years. The RRC order has become final, but is being appealed by several parties including Lone Star Pipeline and Lone Star Gas. The rates authorized by the order became effective on December 1, 1997, and will result in an annual margin reduction of approximately $8.2 million.

On August 20, 1996, the RRC ordered a general inquiry into the rates and services of Lone Star Gas, most notably a review of historic gas cost and gas acquisition practices since the last rate setting. The inquiry docket has been separated into different phases. Two of the phases, conversion to the NARUC account numbering system and unbundling, have been dismissed by the RRC, and one other phase, rate case expense, is pending RRC action on the basis of a stipulation of all parties. In the phase dealing with historic gas cost and gas acquisition practices, Lone Star Gas and Lone Star Pipeline have filed a motion for summary disposition stating that any retroactive rate action would be inappropriate and unlawful. Settlement discussions with intervenor cities are ongoing. If the motion for summary disposition is denied, a hearing has been scheduled to begin in August 1998. A number of management and transportation related issues have been placed in a separate phase which still has an undefined scope and is being held in abeyance pending the resolution of the phase dealing with gas costs. Management believes that gas costs were prudently incurred and were properly accounted for and recovered through the gas cost recovery mechanism previously approved by the RRC. At this time, management is unable to determine the ultimate outcome of the inquiry.

B-28

<PAGE>

11.  FAIR VALUE OF FINANCIAL INSTRUMENTS

The carrying value and related estimated fair values of the Corporation's significant financial instruments at December 31, 1997 and 1996 are as follows:

<TABLE>
<CAPTION>

|  | 1997 | |
| --- | --- | --- |
|  | Carrying or Notional Amount | Estimated Fair Value |
| <S> | <C> | Thousan<br><C> |
| On-balance sheet liabilities: | | |
| Long-term debt (including current maturities) (a)........ | $(646,796) | $(649,089) |
| Off-balance sheet assets (liabilities): | | |
| Financial guarantees (b)................................. | -- | (45,332) |
| EES derivatives (c)..................................... | -- | -- |

Estimated fair value:  (a) variable-rate debt – approximates carrying amount, exchange traded debt – quoted market prices, and other debt – discounted value using rates for debt with similar characteristics; (b) approximates carrying or notional amount; (c) 1996 based on mark-to-market valuations (see Note 7 concerning EES accounting in 1997).

   The fair values of other financial instruments for which carrying amounts and fair values have not been presented are not materially different than their related carrying amounts.

                              B-29
<PAGE>

12.  DISCONTINUED OPERATIONS

   In connection with the merger of ENSERCH with TUC, EEX and LSEPO were merged to form a new company (New EEX), and ENSERCH distributed to its common shareholders its ownership interest in New EEX,  which was represented by approximately 105 million shares of New EEX common stock with a carrying value of $583 million. In the distribution, which was tax free to the recipients, ENSERCH shareholders of record on August 4, 1997 received approximately 1.5 shares of New EEX common stock for each share of ENSERCH common stock owned. ENSERCH's financial statements for all periods presented have been restated to reflect EEX and LSEPO as discontinued operations. ENSERCH's discontinued operations also include its engineering and construction and environmental businesses, the principal assets of which were sold in prior years.  The results of operations of ENSERCH's discontinued businesses were as follows:

<TABLE>
<CAPTION>

|  |  | Pr |
|  | | ----------------------- |
|  | Period From Acquisition Date to December 31, 1997 | Period From January 1, 1997 To Acquisition Date |
|  | ------------- | ------------ |
| <S> | <C> | (Thousands of <C> |
| Revenues from exploration and production operations.. | $    -- | $ 159,547 |
|  | ======= | ========= |
|  |  |  |
| Operating income (loss) from exploration and     production operations........................... | $    -- | $(375,510)* |
|  | ======= | ========= |
|  |  |  |
| Income (loss) from exploration and production     operations.................................. | $    -- | $(215,006)* |
| Provision for additional costs and expenses  for the wind-up of discontinued engineering and  construction business, net of tax benefit of $5,215  in 1997 and tax provision of $2,160 in 1996........ | -- | (9,685) |
|  | ------- | ---------- |
|  |  |  |
|     Total....................................... | $    -- | $(224,691) |
|  | ======= | ========= |
|  |  |  |
| Cash Flow Information: |  |  |
| Net cash flows from (used for) |  |  |
|   Operating activities.............................. | $(6,564) | $ 111,533 |
|   Investing activities.............................. | -- | (125,333) |
|   Purchase of business, net of cash acquired......... | -- | -- |

```
Financing activities..................................................        (13,614)
                                                                      -------      ---------
Net cash flows from (used for) discontinued
  operations.........................................      $(6,564)      $ (27,414)
                                                          =======      =========


By Discontinued Operation:
  Exploration and production..........................      $   --        $ (21,773)
  Engineering and construction........................      (6,564)         (5,641)
                                                          -------      ---------
    Total.............................................      $(6,564)      $ (27,414)
                                                          =======      =========
```

</TABLE>

* Includes a $426 million pretax ($236 million after-tax) write-down of the
  carrying value of EEX's oil and gas properties due to the U.S. cost center
  ceiling limitation at March 31, 1997.

B-30

<PAGE>

    The net investment in the discontinued exploration and production business as
of December 31, 1996 consisted of the following (in thousands):

```
    Current assets....................................      $  114,329
    Net property, plant and equipment.................       1,493,210
    Other assets......................................          12,161
    Current liabilities...............................        (118,191)
    Long-term debt....................................         (95,564)
    Deferred income taxes payable.....................        (258,712)
    Other liabilities.................................        (349,004)
                                                           ----------
      Net investment..................................      $  798,229
                                                           ==========
```

    Loss provisions of $9.7 million in 1997 and $1.6 million in 1996 after-tax
were recorded in recognition that certain claims and accounts receivable were
settled at amounts less than previously estimated and costs and expenses
incurred for the windup of discontinued engineering and construction businesses
would be greater than previously estimated.

    At December 31, 1997, discontinued engineering and construction businesses
had assets of $42 million, consisting principally of retained claims and
accounts receivable of the Ebasco and Enserch Environmental business units, and
current and other liabilities and reserves of $14 million.  The Corporation has
filed suit against certain parties to recover amounts outstanding.  Management
expects that substantially all disputes will be resolved by year-end 1998 and
that adequate provision for uncollectible claims and accounts receivable,
income-tax matters and expenses for windup of discontinued engineering and
construction operations has been made.

B-31

<PAGE>

QUARTERLY RESULTS (UNAUDITED)  -- The results of operations by quarters are
summarized below.  In the opinion of the Corporation's management, all
adjustments (consisting only of normal recurring accruals) necessary for a fair
presentation have been made.  Previously reported amounts have been restated to
reflect EEX and LSEPO as discontinued operations and to reflect the sale of the
power development and international gas distribution operations to Texas Energy
Industries, Inc., a wholly-owned subsidiary of TUC.  For accounting purposes,
the sale was considered to be effective as of the Merger date.

<TABLE>

<CAPTION>

| | Predecessor | | |
| | --------------------------------- | | |
| | Quarter Ended | | Period From July 1 To Acquisition Date | Period F Acquisit Date Septembe |
| | --------------------- | | ------------ | -------- |
| | March 31 | June 30 | | |
| | --------- | -------- | | |
| | | | Thousands of Dollars | |
| <S> | <C> | <C> | <C> | <C> |
| **1997:** | | | | |
| Revenues................................ | $ 794,813 | $348,047 | $135,297 | $275 |
| Operating Income (Loss)................. | 51,328 | (16,250) | 11,806 | (6 |
| Income (Loss) From Continuing Operations........ | 18,576 | (21,576) | (12,377) | (12 |
| Income (Loss) From Discontinued Operations...... | (219,501) | (8,511) | 3,321 | |
| Net Income (Loss)...................... | (200,925) | (30,087) | (9,056) | (12 |
| Loss Applicable to Common Stock................ | (203,787) | (32,980) | (10,026) | (14 |

<CAPTION>

| | Predecessor | | |
| | ------------------------------------------- | | |
| | Quarter Ended | | |
| | ------------------------------------------- | | |
| | March 31 | June 30 | September |
| | -------- | ------- | --------- |
| | | Thousands of Dollars | |
| <S> | <C> | <C> | <C> |
| **1996:** | | | |
| Revenues........................................ | $650,237 | $341,432 | $311 |
| Operating Income (Loss)......................... | 63,911 | (377) | (5 |
| Income (Loss) From Continuing Operations........ | 29,485 | (12,805) | (17 |
| Income From Discontinued Operations............. | 292 | 6,104 | 2 |
| Extraordinary Loss on Extinguishment of Debt.... | -- | -- | (2 |
| Net Income (Loss).............................. | 29,777 | (6,701) | (17 |
| Earnings (Loss) Applicable to Common Stock...... | 27,018 | (9,518) | (20 |

</TABLE>

B-32

<PAGE>

RECONCILIATION OF PREVIOUSLY REPORTED AMOUNTS

Results of operations were restated for discontinued operations of EEX and
LSEPO effective with the quarterly report ended June 30, 1997.  During the
fourth quarter of 1997, results of operations were also restated to reflect the
sale of the power development and international gas distribution operations
effective as of the Merger date.  Following the Merger, certain
reclassifications, which only affected operating income, were made to prior
periods to conform to TUC's presentation.

<TABLE>
<CAPTION>

| | Increase (Decrease) | | |
| | ------------------------------------------------- | | |
| | Quarter Ended | | Period From July 1 To Acquisition Date | Period Fro Acquisitio Date to September 3 |
| | --------------------- | | ------------ | ----------- |
| | March 31 | June 30 | | |
| | ---------- | ---------- | ------------ | ----------- |
| | | Thousands of Dollars | | |

<S>

**1997:**

| | | | | |
|---|---|---|---|---|
| Revenues................................. | $ (73,154) | $ -- | $ -- | $ (74 |
| Operating Income (Loss).................... | 395,448 | (1,481) | (500) | 62 |
| Income From Continuing Operations.......... | 219,501 | -- | -- | 1,50 |
| Loss From Discontinued Operations.......... | (219,501) | -- | -- | - |
| Net Income (Loss)......................... | -- | -- | -- | 1,50 |
| Earnings (Loss) Applicable to Common Stock.. | -- | -- | -- | 1,50 |

<CAPTION>

| | Quarter Ended | | |
|---|---|---|---|
| | March 31 | June 30 | September 3 |
| | | | Thousands of Dollars |

<S>

<C>     <C>     <C>

**1996:**

| | | | |
|---|---|---|---|
| Revenues................................. | $ (28,406) | $(73,723) | $ (74,47 |
| Operating Income (Loss).................... | (6,481) | (15,452) | (10,28 |
| Loss From Continuing Operations............ | (292) | (6,104) | (2,11 |
| Income From Discontinued Operations........ | 292 | 6,104 | 2,11 |

</TABLE>

B-33

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-4.(B)(1)
<SEQUENCE>2
<DESCRIPTION>AGREEMENT
<TEXT>

<PAGE>

Exhibit 4(b)(1)

March 24, 1998

Securities and Exchange Commission
Judiciary Plaza
450 Fifth Street, N.W.
Washington, D.C.  20549

Re:   Texas Utilities Company
      1997 Annual Report on Form 10-K
      -------------------------------

Gentlemen:

    Pursuant to the exemption afforded by Item 601(b)(4)(iii)(A) of Regulation
S-K, Texas Utilities Company (Company) is not filing as exhibits to its Annual
Report on Form 10-K for 1997 instruments with respect to its long-term debt of
the Company and/or its subsidiaries.  These instruments include (i) agreements
with respect to pollution control revenue bonds and (ii) agreements with respect
to senior notes.  Each item of long-term debt referenced above does not exceed
10% of the total assets of the Company and its subsidiaries on a consolidated
basis.  Reference is made to Note 8 to Consolidated Financial Statements
(included in Appendix A of the Company's Annual Report on Form 10-K for 1997).

The Company agrees to furnish a copy of the above instruments to the Securities and Exchange Commission upon request.


                              Sincerely,




                         /s/    J. W. Pinkerton
                    ------------------------------------------
                              J. W. Pinkerton
                    Controller and Principal Accounting Officer

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-4.(B)(2)
<SEQUENCE>3
<DESCRIPTION>AGREEMENT
<TEXT>

<PAGE>


                                                      Exhibit 4(b)(2)




                        March 24, 1998



Securities and Exchange Commission
Judiciary Plaza
450 Fifth Street, N.W.
Washington, D.C.  20549

Re:    Texas Utilities Electric Company
       1997 Annual Report on Form 10-K
       -------------------------------

Gentlemen:

    Pursuant to the exemption afforded by Item 601(b)(4)(iii)(A) of Regulation
S-K, Texas Utilities Electric Company (Company) is not filing as exhibits to its
Annual Report on Form 10-K for 1997 instruments with respect to its long-term
debt consisting of pollution control revenue bonds, as the aggregate amounts
represented thereby do not exceed 10% of the total assets of the Company and its
subsidiaries on a consolidated basis.  Reference is made to Note 8 to
Consolidated Financial Statements (included in Appendix A of the Company's
Annual Report on Form 10-K for 1997).

    The Company agrees to furnish a copy of the above instruments to the
Securities and Exchange Commission upon request.


                              Sincerely,




                         /s/    J. W. Pinkerton
                    ------------------------------------------
                              J. W. Pinkerton
                    Controller and Principal Accounting Officer

</TEXT>

```
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-4.(FF)
<SEQUENCE>4
<DESCRIPTION>INDENTURE, DATED JANUARY 1, 1998
<TEXT>

<PAGE>
```

                                                        Exhibit 4(ff)




                    ---------------------------------------------


                           TEXAS UTILITIES COMPANY

                                     TO

                          THE BANK OF NEW YORK

                                                   TRUSTEE



                                 ---------


                                 INDENTURE
                   (FOR UNSECURED DEBT SECURITIES SERIES C)

                          DATED AS OF JANUARY 1, 1998




                    ---------------------------------------------
```
<PAGE>
```
                                     i


                             TABLE OF CONTENTS

```
<TABLE>
<S>
```
PARTIES..................................................................................................

RECITAL OF THE COMPANY...................................................................................

ARTICLE ONE..............................................................................................

Definitions and Other Provisions of General Application..................................................
        SECTION 101.  Definitions.......................................................................
                      Act...............................................................................
                      Affiliate.........................................................................
                      Authenticating Agent..............................................................
                      Authorized Officer................................................................
                      Board of Directors................................................................

Board Resolution...............................................................
Business Day..................................................................
Commission....................................................................
Company.......................................................................
Company Request or Company Order..............................................
Corporate Trust Office........................................................
corporation...................................................................
Defaulted Interest............................................................
Discount Security.............................................................
Dollar or $...................................................................
Eligible Obligations..........................................................
Event of Default..............................................................
Governmental Authority........................................................
Government Obligations........................................................
Holder........................................................................
Indenture.....................................................................
Interest Payment Date.........................................................
Maturity......................................................................
Officer's Certificate.........................................................
Opinion of Counsel............................................................
Outstanding...................................................................
Paying Agent..................................................................
Periodic Offering.............................................................
Person........................................................................
Place of Payment..............................................................
Predecessor Security..........................................................
Redemption Date...............................................................
Redemption Price..............................................................
Regular Record Date...........................................................
Required Currency.............................................................
Responsible Officer...........................................................

&lt;/TABLE&gt;
Note:  This table of contents shall not, for any purpose, be deemed to be part
of the Indenture.
&lt;PAGE&gt;


                                    ii


&lt;TABLE&gt;
&lt;S&gt;
            Securities........................................................
            Security Register and Security Registrar..........................
            Special Record Date...............................................
            Stated Interest Rate..............................................
            Stated Maturity...................................................
            Subsidiary........................................................
            Tranche...........................................................
            Trust Indenture Act...............................................
            Trustee...........................................................
            United States.....................................................
    SECTION 102.  Compliance Certificates and Opinions.......................
    SECTION 103.  Form of Documents Delivered to Trustee.....................
    SECTION 104.  Acts of Holders...........................................
    SECTION 105.  Notices, etc. to Trustee and Company.......................
    SECTION 106.  Notice to Holders of Securities; Waiver....................
    SECTION 107.  Conflict with Trust Indenture Act..........................
    SECTION 108.  Effect of Headings and Table of Contents...................
    SECTION 109.  Successors and Assigns.....................................
    SECTION 110.  Separability Clause........................................
    SECTION 111.  Benefits of Indenture......................................
    SECTION 112.  Governing Law..............................................
    SECTION 113.  Legal Holidays.............................................


ARTICLE TWO...................................................................


Security Forms................................................................

          SECTION 201.  Forms Generally.............................................
          SECTION 202.  Form of Trustee's Certificate of Authentication...........................

ARTICLE THREE...............................................................................

The Securities..............................................................................
          SECTION 301.  Amount Unlimited; Issuable in Series.......................
          SECTION 302.  Denominations..............................................
          SECTION 303.  Execution, Authentication, Delivery and Dating...........................
          SECTION 304.  Temporary Securities.......................................
          SECTION 305.  Registration, Registration of Transfer and Exchange.......
          SECTION 306.  Mutilated, Destroyed, Lost and Stolen Securities.........................
          SECTION 307.  Payment of Interest; Interest Rights Preserved............
          SECTION 308.  Persons Deemed Owners......................................
          SECTION 309.  Cancellation by Security Registrar.........................
          SECTION 310.  Computation of Interest....................................
          SECTION 311.  Payment to Be in Proper Currency..........................

ARTICLE FOUR................................................................................
</TABLE>
<PAGE>


                                              iii

<TABLE>
<S>
Redemption of Securities....................................................................
          SECTION 401.  Applicability of Article..................................
          SECTION 402.  Election to Redeem; Notice to Trustee.....................
          SECTION 403.  Selection of Securities to Be Redeemed....................
          SECTION 404.  Notice of Redemption......................................
          SECTION 405.  Securities Payable on Redemption Date.....................
          SECTION 406.  Securities Redeemed in Part...............................

ARTICLE FIVE................................................................................

Sinking Funds...............................................................................
          SECTION 501.  Applicability of Article..................................
          SECTION 502.  Satisfaction of Sinking Fund Payments with Securities.....
          SECTION 503.  Redemption of Securities for Sinking Fund.................

ARTICLE SIX.................................................................................

Covenants...................................................................................
          SECTION 601.  Payment of Principal, Premium and Interest................
          SECTION 602.  Maintenance of Office or Agency...........................
          SECTION 603.  Money for Securities Payments to Be Held in Trust.........
          SECTION 604.  Corporate Existence.......................................
          SECTION 605.  Maintenance of Properties.................................
          SECTION 606.  Annual Officer's Certificate as to Compliance............
          SECTION 607.  Waiver of Certain Covenants...............................
          SECTION 608.  Limitation on Liens.......................................

ARTICLE SEVEN...............................................................................

Satisfaction and Discharge..................................................................
          SECTION 701.  Satisfaction and Discharge of Securities..................
          SECTION 702.  Satisfaction and Discharge of Indenture...................
          SECTION 703.  Application of Trust Money................................

ARTICLE EIGHT...............................................................................

Events of Default; Remedies.................................................................
          SECTION 801.  Events of Default.........................................
          SECTION 802.  Acceleration of Maturity; Rescission and Annulment........
          SECTION 803.  Collection of Indebtedness and Suits for Enforcement by Trustee..........

EFH01434869

```
            SECTION 804.  Trustee May File Proofs of Claim.................................
            SECTION 805.  Trustee May Enforce Claims Without Possession of Securities.............
            SECTION 806.  Application of Money Collected................................
            SECTION 807.  Limitation on Suits............................................
            SECTION 808.  Unconditional Right of Holders to Receive Principal,
                          Premium and Interest...........................................
```

</TABLE>
<PAGE>


                                      iv

<TABLE>
<S>
```
            SECTION 809.  Restoration of Rights and Remedies.............................
            SECTION 810.  Rights and Remedies Cumulative................................
            SECTION 811.  Delay or Omission Not Waiver.................................
            SECTION 812.  Control by Holders of Securities..............................
            SECTION 813.  Waiver of Past Defaults......................................
            SECTION 814.  Undertaking for Costs.......................................
            SECTION 815.  Waiver of Stay or Extension Laws.............................
```

ARTICLE NINE................................................................

The Trustee................................................................
```
            SECTION 901.  Certain Duties and Responsibilities............................
            SECTION 902.  Notice of Defaults..........................................
            SECTION 903.  Certain Rights of Trustee....................................
            SECTION 904.  Not Responsible for Recitals or Issuance of Securities...........
            SECTION 905.  May Hold Securities.........................................
            SECTION 906.  Money Held in Trust.........................................
            SECTION 907.  Compensation and Reimbursement.............................
            SECTION 908.  Disqualification; Conflicting Interests........................
            SECTION 909.  Corporate Trustee Required; Eligibility.......................
            SECTION 910.  Resignation and Removal; Appointment of Successor.............
            SECTION 911.  Acceptance of Appointment by Successor.......................
            SECTION 912.  Merger, Conversion, Consolidation or Succession to Business........
            SECTION 913.  Preferential Collection of Claims Against Company.............
            SECTION 914.  Co-trustees and Separate Trustees............................
            SECTION 915.  Appointment of Authenticating Agent..........................
```

ARTICLE TEN.................................................................

Holders' Lists and Reports by Trustee and Company...........................
```
            SECTION 1001.  Lists of Holders...........................................
            SECTION 1002.  Reports by Trustee and Company.............................
```

ARTICLE ELEVEN..............................................................

Consolidation, Merger, Conveyance or Other Transfer..........................
```
            SECTION 1101.  Company May Consolidate, etc., Only on Certain Terms............
            SECTION 1102.  Successor Corporation Substituted...........................
```

ARTICLE TWELVE..............................................................

Supplemental Indentures.....................................................
```
            SECTION 1201.  Supplemental Indentures Without Consent of Holders.............
            SECTION 1202.  Supplemental Indentures With Consent of Holders..............
            SECTION 1203.  Execution of Supplemental Indentures........................
            SECTION 1204.  Effect of Supplemental Indentures...........................
```

</TABLE>
<PAGE>


                                      v

<TABLE>
<S>
```
            SECTION 1205.  Conformity With Trust Indenture Act.........................
```

          SECTION 1206.  Reference in Securities to Supplemental Indentures..........................
          SECTION 1207.  Modification Without Supplemental Indenture.............................


ARTICLE THIRTEEN.................................................................................

Meetings of Holders; Action Without Meeting.....................................................
          SECTION 1301.  Purposes for Which Meetings May Be Called..............................
          SECTION 1302.  Call, Notice and Place of Meetings....................................
          SECTION 1303.  Persons Entitled to Vote at Meetings..................................
          SECTION 1304.  Quorum; Action.......................................................
          SECTION 1305.  Attendance at Meetings; Determination of Voting Rights;
                         Conduct and Adjournment of Meetings..................................
          SECTION 1306.  Counting Votes and Recording Action of Meetings.......................
          SECTION 1307.  Action Without Meeting................................................


ARTICLE FOURTEEN................................................................................

Immunity of Incorporators, Shareholders, Officers and Directors................................
          SECTION 1401.  Liability Solely Corporate............................................


ARTICLE FIFTEEN.................................................................................

Securities of the First Series and Second Series...............................................
          SECTION 1501.  Designation of Securities of the First Series.........................
          SECTION 1502.  Designation of Securities of the Second Series........................


Testimonium....................................................................................

Signatures.....................................................................................

Acknowledgements...............................................................................
</TABLE>
<PAGE>


                         TEXAS UTILITIES COMPANY

              RECONCILIATION AND TIE BETWEEN TRUST INDENTURE ACT OF 1939
                    AND INDENTURE, DATED AS OF JANUARY 1, 1998


TRUST INDENTURE ACT SECTION                                    INDENTURE SECTION

S.310      (a)(1)...........................................................909
           (a)(2)...........................................................909
           (a)(3)...........................................................914
           (a)(4)...............................................Not Applicable
           (b)..............................................................908
                                                                           910
S.311      (a)..............................................................913
           (b)..............................................................913
           (c)..............................................................913
S.312      (a).............................................................1001
           (b).............................................................1001
           (c).............................................................1001
S.313      (a).............................................................1002
           (b).............................................................1002
           (c).............................................................1002
S.314      (a).............................................................1002
           (a)(4)...........................................................606
           (b)..................................................Not Applicable
           (c)(1)...........................................................102
           (c)(2)...........................................................102
           (c)(3)...............................................Not Applicable
           (d)..................................................Not Applicable
           (e)..............................................................102
S.315      (a)..............................................................901

|          | (b) | 902 |
|          | (c) | 901 |
|          | (d) | 901 |
|          | (e) | 814 |
| S.316    | (a) | 812 |
|          |     | 813 |
|          | (a)(1)(A) | 802 |
|          |     | 812 |
|          | (a)(1)(B) | 813 |
|          | (a)(2) | Not Applicable |
|          | (b) | 808 |
| S.317    | (a)(1) | 803 |
|          | (a)(2) | 804 |
|          | (b) | 603 |
| S.318    | (a) | 107 |

<PAGE>

INDENTURE, dated as of January 1, 1998, between TEXAS UTILITIES COMPANY, a corporation duly organized and existing under the laws of the State of Texas (herein called the "Company"), having its principal office at Energy Plaza, 1601 Bryan Street, Dallas, Texas 75201, and THE BANK OF NEW YORK, a corporation of the State of New York, having its principal corporate trust office at 101 Barclay Street, New York, New York 10286, as Trustee (herein called the "Trustee").

## RECITAL OF THE COMPANY

The Company has duly authorized the execution and delivery of this Indenture to provide for the issuance from time to time of its unsecured debentures, notes or other evidences of indebtedness (herein called the "Securities"), in an unlimited aggregate principal amount to be issued in one or more series as contemplated herein; and all acts necessary to make this Indenture a valid agreement of the Company have been performed.

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires, capitalized terms used herein shall have the meanings assigned to them in Article One of this Indenture.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the purchase of the Securities by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders of the Securities or of any series thereof, as follows:

## ARTICLE ONE

### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 101. DEFINITIONS.

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(a) the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(b) all terms used herein without definition which are defined in the Trust Indenture Act, either directly or by reference therein, have the meanings assigned to them therein;

(c) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles in the United States, and, except as otherwise herein expressly

provided, the term "generally accepted accounting
<PAGE>

-2-

principles" with respect to any computation required or permitted hereunder
shall mean such accounting principles as are generally accepted in the
United States at the date of such computation or, at the election of the
Company from time to time, at the date of the execution and delivery of
this Indenture; provided, however, that in determining generally accepted
accounting principles applicable to the Company, the Company shall, to the
extent required, conform to any order, rule or regulation of any
administrative agency, regulatory authority or other governmental body
having jurisdiction over the Company; and

    (d) the words "herein", "hereof" and "hereunder" and other words of
similar import refer to this Indenture as a whole and not to any particular
Article, Section or other subdivision.

    Certain terms, used principally in Article Nine, are defined in that
Article.

    "ACT", when used with respect to any Holder of a Security, has the
meaning specified in Section 104.

    "AFFILIATE" of any specified Person means any other Person directly or
indirectly controlling or controlled by or under direct or indirect common
control with such specified Person. For the purposes of this definition,
"CONTROL" when used with respect to any specified Person means the power to
direct the management and policies of such Person, directly or through one or
more intermediaries, whether through the ownership of voting securities, by
contract or otherwise; and the terms "CONTROLLING" and "CONTROLLED" have
meanings correlative to the foregoing.

    "AUTHENTICATING AGENT" means any Person (other than the Company or an
Affiliate of the Company) authorized by the Trustee pursuant to Section 915 to
act on behalf of the Trustee to authenticate one or more series of Securities .

    "AUTHORIZED OFFICER" means the Chairman of the Board, the President,
any Vice President, the Treasurer, any Assistant Treasurer, or any other officer
or agent of the Company duly authorized by the Board of Directors to act in
respect of matters relating to this Indenture.

    "BOARD OF DIRECTORS" means either the board of directors of the
Company or any committee thereof duly authorized to act in respect of matters
relating to this Indenture.

    "BOARD RESOLUTION" means a copy of a resolution certified by the
Secretary or an Assistant Secretary of the Company to have been duly adopted by
the Board of Directors and to be in full force and effect on the date of such
certification, and delivered to the Trustee.

    "BUSINESS DAY", when used with respect to a Place of Payment or any
other particular location specified in the Securities or this Indenture, means
any day, other than a Saturday or Sunday, which is not a day on which banking
institutions or trust companies in such Place of
<PAGE>

-3-


Payment or other location are generally authorized or required by law,
regulation or executive order to remain closed, except as may be otherwise
specified as contemplated by Section 301.

EFH01434873

"COMMISSION" means the Securities and Exchange Commission, as from time to time constituted, created under the Securities Exchange Act of 1934, as amended, or, if at any time after the date of execution and delivery of this Indenture such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body, if any, per forming such duties at such time.

"COMPANY" means the Person named as the "Company" in the first paragraph of this Indenture until a successor Person shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Company" shall mean such successor Person.

"COMPANY REQUEST" or "COMPANY ORDER" means a written request or order signed in the name of the Company by an Authorized Officer and delivered to the Trustee.

"CORPORATE TRUST OFFICE" means the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of execution and delivery of this Indenture is located at 101 Barclay Street, New York, New York 10286.

"CORPORATION" means a corporation, association, company, joint stock company or business trust.

"DEFAULTED INTEREST" has the meaning specified in Section 307.

"DISCOUNT SECURITY" means any Security which provides for an amount less than the principal amount thereof to be due and payable upon a declaration of acceleration of the Maturity thereof pursuant to Section 802. "Interest" with respect to a Discount Security means interest, if any, borne by such Security at a Stated Interest Rate.

"DOLLAR" or "$" means a dollar or other equivalent unit in such coin or currency of the United States as at the time shall be legal tender for the payment of public and private debts.

"ELIGIBLE OBLIGATIONS" means:

(a)  with respect to Securities denominated in Dollars, Government Obligations; or

(b) with respect to Securities denominated in a currency other than Dollars or in a composite currency, such other obligations or instruments as shall be specified with respect to such Securities, as contemplated by Section 301.

"EVENT OF DEFAULT" has the meaning specified in Section 801.
<PAGE>

-4-

"GOVERNMENTAL AUTHORITY" means the government of the United States or of any State or Territory thereof or of the District of Columbia or of any county, municipality or other political subdivision of any of the foregoing, or any department, agency, authority or other instrumentality of any of the foregoing.

"GOVERNMENT OBLIGATIONS" means:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States and entitled to the benefit of the full faith and credit thereof; and

(b) certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clause (a)

above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company (which may include the Trustee or any Paying Agent) subject to Federal or state supervision or examination with a combined capital and surplus of at least $50,000,000; and provided, further, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom.

"HOLDER" means a Person in whose name a Security is registered in the Security Register.

"INDENTURE" means this instrument as originally executed and delivered and as it may from time to time be supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof and shall include the terms of a particular series of Securities established as contemplated by Section 301.

"INTEREST PAYMENT DATE", when used with respect to any Security, means the Stated Maturity of an installment of interest on such Security.

"MATURITY", when used with respect to any Security, means the date on which the principal of such Security or an installment of principal becomes due and payable as provided in such Security or in this Indenture, whether at the Stated Maturity, by declaration of acceleration, upon call for redemption or otherwise.

"OFFICER'S CERTIFICATE" means a certificate signed by an Authorized Officer and delivered to the Trustee.
<PAGE>

-5-

"OPINION OF COUNSEL" means a written opinion of counsel, who may be counsel for the Company, or other counsel acceptable to the Trustee.

"OUTSTANDING", when used with respect to Securities, means, as of the date of determination, all Securities theretofore authenticated and delivered under this Indenture, except:

(a)  Securities theretofore canceled or delivered to the Security Registrar for cancellation;

(b)  Securities deemed to have been paid in accordance with Section 701; and

(c)  Securities which have been paid pursuant to Section 306 or in exchange for or in lieu of which other Securities have been authenticated and delivered pursuant to this Indenture, other than any such Securities in respect of which there shall have been presented to the Trustee proof satisfactory to it and the Company that such Securities are held by a bona fide purchaser or purchasers in whose hands such Securities are valid obligations of the Company;

provided, however, that in determining whether or not the Holders of the requisite principal amount of the Securities Outstanding under this Indenture, or the Outstanding Securities of any series or Tranche, have given any request, demand, authorization, direction, notice, consent or waiver hereunder or whether or not a quorum is present at a meeting of Holders of Securities,

(x)  Securities owned by the Company or any other obligor upon the Securities or any Affiliate of the Company or of such other obligor (unless the Company, such Affiliate or such obligor owns all Securities Outstanding

under this Indenture, if (except for the purposes of actions to be taken by Holders of (i) more than one series voting as a class under Section 812 or (ii) more than one series or more than one Tranche, as the case may be, voting as a class under Section 1202) all Outstanding Securities of each such series and each such Tranche, as the case may be, determined without regard to this clause (x)) shall be disregarded and deemed not to be Out standing, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver or upon any such determination as to the presence of a quorum, only Securities which the Trustee knows to be so owned shall be so disregarded; provided, however, that Securities so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledge's right so to act with respect to such Securities and that the pledgee is not the Company or any other obligor upon the Securities or any Affiliate of the Company or of such other obligor; and

<PAGE>

-6-

(y) the principal amount of a Discount Security that shall be deemed to be Outstanding for such purposes shall be the amount of the principal thereof that would be due and payable as of the date of such determination upon a declaration of acceleration of the Maturity thereof pursuant to Section 802;

provided, further, that, in the case of any Security the principal of which is payable from time to time without presentment or surrender, the principal amount of such Security that shall be deemed to be Outstanding at any time for all purposes of this Indenture shall be the original principal amount thereof less the aggregate amount of principal thereof theretofore paid.

"PAYING AGENT" means any Person, including the Company, authorized by the Company to pay the principal of, and premium, if any, or interest, if any, on any Securities on behalf of the Company.

"PERIODIC OFFERING" means an offering of Securities of a series from time to time any or all of the specific terms of which Securities, including without limitation the rate or rates of interest, if any, thereon, the Stated Maturity or Maturities thereof and the redemption pro visions, if any, with respect thereto, are to be determined by the Company or its agents upon the issuance of such Securities.

"PERSON" means any individual, corporation, partnership, joint venture, trust or unincorporated organization or any Governmental Authority.

"PLACE OF PAYMENT", when used with respect to the Securities of any series, or any Tranche thereof, means the place or places, specified as contemplated by Section 301, at which, subject to Section 602, principal of and premium, if any, and interest, if any, on the Securities of such series or Tranche are payable.

"PREDECESSOR SECURITY" of any particular Security means every previous Security evidencing all or a portion of the same debt as that evidenced by such particular Security; and, for the purposes of this definition, any Security authenticated and delivered under Section 306 in exchange for or in lieu of a mutilated, destroyed, lost or stolen Security shall be deemed (to the extent lawful) to evidence the same debt as the mutilated, destroyed, lost or stolen Security.

"REDEMPTION DATE", when used with respect to any Security to be redeemed, means the date fixed for such redemption by or pursuant to this Indenture.

"REDEMPTION PRICE", when used with respect to any Security to be

redeemed, means the price at which it is to be redeemed pursuant to this Indenture.

    "REGULAR RECORD DATE" for the interest payable on any Interest Payment Date on the Securities of any series means the date specified for that purpose as contemplated by Section 301.
<PAGE>

-7-

    "REQUIRED CURRENCY" has the meaning specified in Section 311.

    "RESPONSIBLE OFFICER", when used with respect to the Trustee, means any officer of the Trustee assigned by the Trustee to administer its corporate trust matters.

    "SECURITIES" has the meaning stated in the first recital of this Indenture and more particularly means any securities authenticated and delivered under this Indenture.

    "SECURITY REGISTER" and "SECURITY REGISTRAR" have the respective meanings specified in Section 305.

    "SPECIAL RECORD DATE" for the payment of any Defaulted Interest on the Securities of any series means a date fixed by the Trustee pursuant to Section 307.

    "STATED INTEREST RATE" means a rate (whether fixed or variable) at which an obligation by its terms is stated to bear simple interest. Any calculation or other determination to be made under this Indenture by reference to the Stated Interest Rate on a Security shall be made without regard to the effective interest cost to the Company of such Security and without regard to the Stated Interest Rate on, or the effective cost to the Company of, any other indebtedness in respect of which the Company's obligations are evidenced or secured in whole or in part by such Security.

    "STATED MATURITY", when used with respect to any obligation or any installment of principal thereof or interest thereon, means the date on which the principal of such obligation or such installment of principal or interest is stated to be due and payable (without regard to any provisions for redemption, prepayment, acceleration, purchase or extension).

    "SUBSIDIARY" means a corporation more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Company or by one or more other Subsidiaries, or by the Company and one or more other Subsidiaries. For the purposes of this definition, "voting stock" means stock that ordinarily has voting power for the election of directors, whether at all times or only so long as no senior class of stock has such voting power by reason of any contingency.

    "TRANCHE" means a group of Securities which (a) are of the same series and (b) have identical terms except as to principal amount and/or date of issuance.

    "TRUST INDENTURE ACT" means, as of any time, the Trust Indenture Act of 1939, or any successor statute, as in effect at such time.

    "TRUSTEE" means the Person named as the "Trustee" in the first paragraph of this Indenture until a successor Trustee shall have become such with respect to one or more series of Securities pursuant to the applicable provisions of this Indenture, and thereafter "Trustee"
<PAGE>

-8-

EFH01434877

shall mean or include each Person who is then a Trustee hereunder, and if at any time there is more than one such Person, "Trustee" as used with respect to the Securities of any series shall mean the Trustee with respect to Securities of that series.

"UNITED STATES" means the United States of America, its Territories, its possessions and other areas subject to its political jurisdiction.

SECTION 102.   COMPLIANCE CERTIFICATES AND OPINIONS.

Except as otherwise expressly provided in this Indenture, upon any application or request by the Company to the Trustee to take any action under any provision of this Indenture, the Company shall, if requested by the Trustee, furnish to the Trustee an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action (including any covenants compliance with which constitutes a condition precedent) have been complied with and an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with, except that in the case of any such application or request as to which the furnishing of such documents is speci fically required by any provision of this Indenture relating to such particular application or request, no additional certificate or opinion need be furnished.

Every certificate or opinon with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(a) a statement that each Person signing such certificate or opinion has read such covenant or condition and the definitions herein relating thereto;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c) a statement that, in the opinion of each such Person, such Person has made such examination or investigation as is necessary to enable such Person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d) a statement as to whether, in the opinion of each such Person, such condition or covenant has been complied with.

SECTION 103.   FORM OF DOCUMENTS DELIVERED TO TRUSTEE.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by
<PAGE>

-9-

only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which such Officer's Certificate or opinion are based are erroneous. Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or

EFH01434878

representations by an officer or officers of the Company stating that the information with respect to such factual matters is in the possession of the Company, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever, subsequent to the receipt by the Trustee of any Board Resolution, Officer's Certificate, Opinion of Counsel or other document or instrument, a clerical, typographical or other inadvertent or unintentional error or omission shall be discovered therein, a new document or instrument may be substituted therefor in corrected form with the same force and effect as if originally filed in the corrected form and, irrespective of the date or dates of the actual execution and/or delivery thereof, such substitute document or instrument shall be deemed to have been executed and/or delivered as of the date or dates required with respect to the document or instrument for which it is substituted. Anything in this Indenture to the contrary notwithstanding, if any such corrective document or instrument indicates that action has been taken by or at the request of the Company which could not have been taken had the original document or instrument not contained such error or omission, the action so taken shall not be invalidated or otherwise rendered ineffective but shall be and remain in full force and effect, except to the extent that such action was a result of willful misconduct or bad faith. Without limiting the generality of the foregoing, any Securities issued under the authority of such defective document or instrument shall nevertheless be the valid obligations of the Company entitled to the benefits of this Indenture equally and ratably with all other Outstanding Securities, except as aforesaid.

SECTION 104.  ACTS OF HOLDERS.

(a) Any request, demand, authorization, direction, notice, consent, election, waiver or other action provided by this Indenture to be made, given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly

<PAGE>

-10-

evidenced by the record of Holders voting in favor thereof, either in person or by proxies duly appointed in writing, at any meeting of Holders duly called and held in accordance with the provisions of Article Thirteen, or a combination of such instruments and any such record. Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments or record or both are delivered to the Trustee and, where it is hereby expressly required, to the Company. Such instrument or instruments and any such record (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments and so voting at any such meeting. Proof of execution of any such instrument or of a writing appointing any such agent, or of the holding by any Person of a Security, shall be sufficient for any purpose of this Indenture and (subject to Section 901) conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section. The record of any meeting of Holders shall be proved in the manner provided in Section 1306.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the

execution thereof or may be proved in any other manner which the Trustee and the Company deem sufficient. Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority.

(c) The principal amount (except as otherwise contemplated in clause (y) of the first proviso to the definition of Outstanding) and serial numbers of Securities held by any Person, and the date of holding the same, shall be proved by the Security Register.

(d) Any request, demand, authorization, direction, notice consent, election, waiver or other Act of a Holder shall bind every future Holder of the same Security and the Holder of every Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Security.

(e) Until such time as written instruments shall have been delivered to the Trustee with respect to the requisite percentage of principal amount of Securities for the action contemplated by such instruments, any such instrument executed and delivered by or on behalf of a Holder may be revoked with respect to any or all of such Securities by written notice by such Holder or any subsequent Holder, proven in the manner in which such instrument was proven.

<PAGE>

-11-

(f) Securities of any series, or any Tranche thereof, authenticated and delivered after any Act of Holders may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any action taken by such Act of Holders. If the Company shall so determine, new Securities of any series, or any Tranche thereof, so modified as to conform, in the opinion of the Trustee and the Company, to such action may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for Outstanding Securities of such series or Tranche.

(g) If the Company shall solicit from Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Company shall have no obligation to do so. If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on the record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of the Outstanding Securities have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the Outstanding Securities shall be computed as of the record date.

SECTION 105.  NOTICES, ETC. TO TRUSTEE AND COMPANY.

Any request, demand, authorization, direction, notice, consent, election, waiver or Act of Holders or other document provided or permitted by this Indenture to be made upon, given or furnished to, or filed with, the Trustee by any Holder or by the Company, or the Company by the Trustee or by any Holder, shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and delivered personally to an officer or other responsible employee of the addressee, or transmitted by facsimile transmission or other direct written electronic means to such telephone number or other electronic communications address as the parties hereto shall from time

to time designate, or transmitted
<PAGE>

-12-

by certified or registered mail, charges prepaid, to the applicable address set
opposite such party's name below or to such other address as either party hereto
may from time to time designate:

                    If to the Trustee, to:

                    The Bank of New York
                    101 Barclay Street - 21W
                    New York, New York  10286

                    Attention:    Vice President, Corporate Trust Administration
                    Telephone:    (212) 815-5375
                    Telecopy:     (212) 815-5915

                    If to the Company, to:

                    Texas Utilities Company
                    Energy Plaza
                    1601 Bryan Street
                    Dallas, Texas   75201

                    Attention:    Treasurer
                    Telephone:    (214) 812-4646
                    Telecopy:     (214) 812-3366


         Any communication contemplated herein shall be deemed to have been
made, given, furnished and filed if personally delivered, on the date of
delivery, if transmitted by facsimile transmission or other direct written
electronic means, on the date of transmission, and if transmitted by certified
or registered mail, on the date of receipt.

SECTION 106.  NOTICE TO HOLDERS OF SECURITIES; WAIVER.

         Except as otherwise expressly provided herein, where this Indenture
provides for notice to Holders of any event, such notice shall be sufficiently
given, and shall be deemed given, to Holders if in writing and mailed, first-
class postage prepaid, to each Holder affected by such event, at the address of
such Holder as it appears in the Security Register, not later than the latest
date, if any, and not earlier than the earliest date, if any, prescribed for the
giving of such notice.

         In case by reason of the suspension of regular mail service or by
reason of any other cause it shall be impracticable to give such notice to
Holders by mail, then such notification as shall be made with the approval of
the Trustee shall constitute a sufficient no-
<PAGE>

-13-

tification for every purpose hereunder. In any case where notice to Holders is
given by mail, neither the failure to mail such notice, nor any defect in any
notice so mailed, to any particular Holder shall affect the sufficiency of such
notice with respect to other Holders.

         Any notice required by this Indenture may be waived in writing by the
Person entitled to receive such notice, either before or after the event
otherwise to be specified therein, and such waiver shall be the equivalent of
such notice. Waivers of notice by Holders shall be filed with the Trustee, but

such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

SECTION 107.   CONFLICT WITH TRUST INDENTURE ACT.

        If any provision of this Indenture limits, qualifies or conflicts with another provision hereof which is required or deemed to be included in this Indenture by, or is otherwise governed by, any of the provisions of the Trust Indenture Act, such other provision shall control; and if any provision hereof otherwise conflicts with the Trust Indenture Act, the Trust Indenture Act shall control.

SECTION 108.   EFFECT OF HEADINGS AND TABLE OF CONTENTS.

        The Article and Section headings in this Indenture and the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 109.   SUCCESSORS AND ASSIGNS.

        All covenants and agreements in this Indenture by the Company and Trustee shall bind their respective successors and assigns, whether so expressed or not.

SECTION 110.   SEPARABILITY CLAUSE.

        In case any provision in this Indenture or the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 111.   BENEFITS OF INDENTURE.

        Nothing in this Indenture or the Securities, express or implied, shall give to any Person, other than the parties hereto, their successors hereunder and the Holders, any benefit or any legal or equitable right, remedy or claim under this Indenture.
<PAGE>

-14-

SECTION 112.   GOVERNING LAW.

        THIS INDENTURE AND THE SECURITIES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT THAT THE LAW OF ANY OTHER JURISDICTION SHALL BE MANDATORILY APPLICABLE.

SECTION 113.   LEGAL HOLIDAYS.

        In any case where any Interest Payment Date, Redemption Date or Stated Maturity of any Security shall not be a Business Day at any Place of Payment, then (notwithstanding any other provision of this Indenture or of the Securities other than a provision in Securities of any series, or any Tranche thereof, or in the Board Resolution or Officer's Certificate which establishes the terms of the Securities of such series or Tranche, which specifically states that such provision shall apply in lieu of this Section) payment of interest or principal and premium, if any, need not be made at such Place of Payment on such date, but may be made on the next succeeding Business Day at such Place of Payment, with the same force and effect, and in the same amount, as if made on the Interest Payment Date or Redemption Date, or at the Stated Maturity, as the case may be, and, if such payment is made or duly provided for on such Business Day, no interest shall accrue on the amount so payable for the period from and after such Interest Payment Date, Redemption Date or Stated Maturity, as the case may be, to such Business Day.

ARTICLE TWO

SECURITY FORMS

SECTION 201.   FORMS GENERALLY.

         The definitive Securities of each series shall be in substantially the
form or forms thereof established in the indenture supplemental hereto
establishing such series or in a Board Resolution establishing such series, or
in an Officer's Certificate pursuant to such supplemental indenture or Board
Resolution, in each case with such appropriate insertions, omissions,
substitutions and other variations as are required or permitted by this
Indenture, and may have such letters, numbers or other marks of identification
and such legends or endorsements placed thereon as may be required to comply
with the rules of any securities exchange or as may, consistently herewith, be
determined by the officers executing such Securities, as evidenced by their
execution of the Securities. If the form or forms of Securities of any series
are established in a Board Resolution or in an Officer's Certificate pursuant to
a Board Resolution, such Board Resolution and Officer's Certificate, if any,
shall be delivered to the Trustee at or prior to the delivery of the Company
Order contemplated by Section 303 for the authentication and delivery of such
Securities.
<PAGE>

                                   -15-


         Unless otherwise specified as contemplated by Sections 301 or 1201(g),
the Securities of each series shall be issuable in registered form without
coupons. The definitive Securities shall be produced in such manner as shall be
determined by the officers executing such Securities, as evidenced by their
execution thereof.

SECTION 202.   FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION.

         The Trustee's certificate of authentication shall be in substantially
the form set forth below:

              This is one of the Securities of the series designated therein
         referred to in the within-mentioned Indenture.

Dated:
                        ----------------------------------------
                        as Trustee


                        By: _____
                               Authorized Signatory


                            ARTICLE THREE

                            THE SECURITIES


SECTION 301.   AMOUNT UNLIMITED; ISSUABLE IN SERIES.

         The aggregate principal amount of Securities which may be
authenticated and delivered under this Indenture is unlimited.

         The Securities may be issued in one or more series. Subject to the
last paragraph of this Section, prior to the authentication and delivery of
Securities of any series there shall be established by specification in a
supplemental indenture or in a Board Resolution, or in an Officer's Certificate
pursuant to a supplemental indenture or a Board Resolution:

         (a) the title of the Securities of such series (which shall

distinguish the securities of such series from Securities of all other series);

(b) any limit upon the aggregate principal amount of the Securities of such series which may be authenticated and delivered under this Indenture (except for Securities authenticated and delivered upon registration of transfer of, or in exchange

<PAGE>

-16-

for, or in lieu of, other Securities of such series pursuant to Section 304, 305, 306, 406 or 1206 and except for any Securities which, pursuant to Section 303, are deemed never to have been authenticated and delivered hereunder);

(c) the Person or Persons (without specific identification) to whom interest on Securities of such series, or any Tranche thereof, shall be payable on any Interest Payment Date, if other than the Persons in whose names such Securities (or one or more Predecessor Securities) are registered at the close of business on the Regular Record Date for such interest;

(d) the date or dates on which the principal of the Securities of such series, or any Tranche thereof, is payable or any formulary or other method or other means by which such date or dates shall be determined, by reference to an index or other fact or event ascertainable outside of this Indenture or otherwise (without regard to any provisions for redemption, prepayment, acceleration, purchase or extension);

(e) the rate or rates at which the Securities of such series, or any Tranche thereof, shall bear interest, if any (including the rate or rates at which overdue principal shall bear interest, if different from the rate or rates at which such Securities shall bear interest prior to Maturity, and, if applicable, the rate or rates at which overdue premium or interest shall bear interest, if any), or any formulary or other method or other means by which such rate or rates shall be determined, by reference to an index or other fact or event ascertainable outside of this Indenture or otherwise; the date or dates from which such interest shall accrue; the Interest Payment Dates on which such interest shall be payable and the Regular Record Date, if any, for the interest payable on such Securities on any Interest Payment Date; and the basis of computation of interest, if other than as provided in Section 310;

(f) the place or places at which or methods by which (1) the principal of and premium, if any, and interest, if any, on Securities of such series, or any Tranche thereof, shall be payable, (2) registration of transfer of Securities of such series, or any Tranche thereof, may be effected, (3) exchanges of Securities of such series, or any Tranche thereof, may be effected and (4) notices and demands to or upon the Company in respect of the Securities of such series, or any Tranche thereof, and this Indenture may be served; the Security Registrar for such series or Tranche; and if such is the case, that the principal of such Securities shall be payable without presentment or surrender thereof;

(g) the period or periods within which, or the date or dates on which, the price or prices at which and the terms and conditions upon which the Securities of such series, or any Tranche thereof, may be redeemed, in whole or in part, at the option of the Company and any restrictions on such redemptions, including but not limited to a restriction on a partial redemption by the Company of the Securities of any series, or

<PAGE>

-17-

any Tranche thereof, resulting in delisting of such Securities from any national exchange;

(h) the obligation or obligations, if any, of the Company to redeem or purchase the Securities of such series, or any Tranche thereof, pursuant to any sinking fund or other mandatory redemption provisions or at the option of a Holder thereof and the period or periods within which or the date or dates on which, the price or prices at which and the terms and conditions upon which such Securities shall be redeemed or purchased, in whole or in part, pursuant to such obligation, and applicable exceptions to the requirements of Section 404 in the case of mandatory redemption or redemption at the option of the Holder;

(i) the denominations in which Securities of such series, or any Tranche thereof, shall be issuable if other than denominations of $1,000 and any integral multiple thereof;

(j) the currency or currencies, including composite currencies, in which payment of the principal of and premium, if any, and interest, if any, on the Securities of such series, or any Tranche thereof, shall be payable (if other than in Dollars);

(k) if the principal of or premium, if any, or interest, if any, on the Securities of such series, or any Tranche thereof, are to be payable, at the election of the Company or a Holder thereof, in a coin or currency other than that in which the Securities are stated to be payable, the period or periods within which and the terms and conditions upon which, such election may be made;

(l) if the principal of or premium, if any, or interest, if any, on the Securities of such series, or any Tranche thereof, are to be payable, or are to be payable at the election of the Company or a Holder thereof, in securities or other property, the type and amount of such securities or other property, or the formulary or other method or other means by which such amount shall be determined, and the period or periods within which, and the terms and conditions upon which, any such election may be made;

(m) if the amount payable in respect of principal of or premium, if any, or interest, if any, on the Securities of such series, or any Tranche thereof, may be determined with reference to an index or other fact or event ascertainable outside of this Indenture, the manner in which such amounts shall be determined to the extent not established pursuant to clause (e) of this paragraph;

(n) if other than the principal amount thereof, the portion of the principal amount of Securities of such series, or any Tranche thereof, which shall be payable upon declaration of acceleration of the Maturity thereof pursuant to Section 802;

<PAGE>

-18-

(o) any Events of Default, in addition to those specified in Section 801, with respect to the Securities of such series, and any covenants of the Company for the benefit of the Holders of the Securities of such series, or any Tranche thereof, in addition to those set forth in Article Six;

(p) the terms, if any, pursuant to which the Securities of such series, or any Tranche thereof, may be converted into or exchanged for shares of capital stock or other securities of the Company or any other Person;

(q) the obligations or instruments, if any, which shall be considered

to be Eligible Obligations in respect of the Securities of such series, or any Tranche thereof, denominated in a currency other than Dollars or in a composite currency, and any additional or alternative provisions for the reinstatement of the Company's indebtedness in respect of such Securities after the satisfaction and discharge thereof as provided in Section 701;

(r) if the Securities of such series, or any Tranche thereof, are to be issued in global form, (i) any limitations on the rights of the Holder or Holders of such Securities to transfer or exchange the same or to obtain the registration of transfer thereof, (ii) any limitations on the rights of the Holder or Holders thereof to obtain certificates therefor in definitive form in lieu of temporary form and (iii) any and all other matters incidental to such Securities;

(s) if the Securities of such series, or any Tranche thereof, are to be issuable as bearer securities, any and all matters incidental thereto which are not specifically addressed in a supplemental indenture as contemplated by clause (g) of Section 1201;

(t) to the extent not established pursuant to clause (r) of this paragraph, any limitations on the rights of the Holders of the Securities of such Series, or any Tranche thereof, to transfer or exchange such Securities or to obtain the registration of transfer thereof; and if a service charge will be made for the registration of transfer or exchange of Securities of such series, or any Tranche thereof, the amount or terms thereof;

(u) any exceptions to Section 113, or variation in the definition of Business Day, with respect to the Securities of such series, or any Tranche thereof;

(v) any collateral security, assurance or guarantee for the Securities of such series;

(w) the non-applicability of Section 608 to the Securities of such Series or any exceptions or modifications of Section 608 with respect to the Securities of such Series;

<PAGE>

-19-

(x) any rights or duties of another Person to assume the obligations of the Company with respect to the Securities of such series (whether as joint obligor, primary obligor, secondary obligor or substitute obligor) and any rights or duties to discharge and release any obligor with respect to the Securities of such series or the Indenture to the extent related to such series; and

(y) any other terms of the Securities of such series, or any Tranche thereof, not inconsistent with the provisions of this Indenture.

With respect to Securities of a series subject to a Periodic Offering, the indenture supplemental hereto or the Board Resolution which establishes such series, or the Officer's Certificate pursuant to such supplemental indenture or Board Resolution, as the case may be, may provide general terms or parameters for Securities of such series and provide either that the specific terms of Securities of such series, or any Tranche thereof, shall be specified in a Company Order or that such terms shall be determined by the Company or its agents in accordance with procedures specified in a Company Order as contemplated by the clause (b) of Section 303.

SECTION 302.  DENOMINATIONS.

Unless otherwise provided as contemplated by Section 301 with respect to any series of Securities, or any Tranche thereof, the Securities of each

series shall be issuable in denominations of $1,000 and any integral multiple thereof.

SECTION 303.    EXECUTION, AUTHENTICATION, DELIVERY AND DATING.

        Unless otherwise provided as contemplated by Section 301 with respect to any series of Securities, or any Tranche thereof, the Securities shall be executed on behalf of the Company by an Authorized Officer and may have the corporate seal of the Company affixed thereto or reproduced thereon attested by any other Authorized Officer or by the Secretary or an Assistant Secretary of the Company. The signature of any or all of these officers on the Securities may be manual or facsimile.

        Securities bearing the manual or facsimile signatures of individuals who were at the time of execution Authorized Officers or the Secretary or an Assistant Secretary of the Company shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Securities or did not hold such offices at the date of such Securities.
<PAGE>

                                    -20-


        The Trustee shall authenticate and deliver Securities of a series, for original issue, at one time or from time to time in accordance with the Company Order referred to below, upon receipt by the Trustee of:

        (a)  the instrument or instruments establishing the form or forms and terms of such series, as provided in Sections 201 and 301;

        (b) a Company Order requesting the authentication and delivery of such Securities and, to the extent that the terms of such Securities shall not have been established in an indenture supplemental hereto or in a Board Resolution, or in an Officer's Certificate pursuant to a supplemental indenture or Board Resolution, all as contemplated by Sections 201 and 301, either (i) establishing such terms or (ii) in the case of Securities of a series subject to a Periodic Offering, specifying procedures, acceptable to the Trustee, by which such terms are to be established (which procedures may provide, to the extent acceptable to the Trustee, for authentication and delivery pursuant to oral or electronic instructions from the Company or any agent or agents thereof, which oral instructions are to be promptly confirmed electronically or in writing), in either case in accordance with the instrument or instruments delivered pursuant to clause (a) above;

        (c) the Securities of such series, executed on behalf of the Company by an Authorized Officer;

        (d) an Opinion of Counsel to the effect that:

            (i)    the form or forms of such Securities have been duly authorized by the Company and have been established in conformity with the provisions of this Indenture;

            (ii)   the terms of such Securities have been duly authorized by the Company and have been established in conformity with the provisions of this Indenture; and

            (iii) such Securities, when authenticated and delivered by the Trustee and issued and delivered by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, will have been duly issued under this Indenture and will constitute valid and legally binding obligations of the Company, entitled to the benefits provided by this Indenture, and enforceable in accordance with their terms, subject, as to enforcement, to laws relating to or affecting generally the enforcement of creditors' rights, including,

without limitation, bankruptcy and insolvency laws and to general
principles of equity (regardless of whether such enforceability is
considered in a proceeding in equity or at law);

<PAGE>

-21-

provided, however, that, with respect to Securities of a series subject to a
Periodic Offering, the Trustee shall be entitled to receive such Opinion of
Counsel only once at or prior to the time of the first authentication of such
Securities (provided that such Opinion of Counsel addresses the authentication
and delivery of all Securities of such series) and that in lieu of the opinions
described in clauses (ii) and (iii) above Counsel may opine that:

      (x) when the terms of such Securities shall have been
established pursuant to a Company Order or Orders or pursuant to such
procedures (acceptable to the Trustee) as may be specified from time
to time by a Company Order or Orders, all as contemplated by and in
accordance with the instrument or instruments delivered pursuant to
clause (a) above, such terms will have been duly authorized by the
Company and will have been established in conformity with the
provisions of this Indenture; and

      (y) such Securities, when authenticated and delivered by the
Trustee in accordance with this Indenture and the Company Order or
Orders or specified procedures referred to in paragraph (x) above and
issued and delivered by the Company in the manner and subject to any
conditions specified in such Opinion of Counsel, will have been duly
issued under this In denture and will constitute valid and legally
binding obligations of the Company, entitled to the benefits provided
by the Indenture, and enforceable in accordance with their terms,
subject, as to enforcement, to laws relating to or affecting generally
the enforcement of creditors' rights, including, without limitation,
bankruptcy and insolvency laws, and to general principles of equity
(regardless of whether such enforceability is considered in a
proceeding in equity or at law).

With respect to Securities of a series subject to a Periodic
Offering, the Trustee may conclusively rely, as to the authorization by the
Company of any of such Securities, the form, terms thereof and the legality,
validity, binding effect and enforceability thereof, and compliance of the
authentication and delivery thereof with the terms and conditions of this
Indenture, upon the Opinion of Counsel and other documents delivered pursuant to
Sections 201 and 301 and this Section, as applicable, at or prior to the time of
the first authentication of Securities of such series unless and until such
opinion or other documents have been superseded or revoked or expire by their
terms. In connection with the authentication and delivery of Securities of a
series subject to a Periodic Offering, the Trustee shall be entitled to assume
that the Company's instructions to authenticate and deliver such Securities do
not violate any applicable law or any applicable rule, regulation or order of
any Governmental Authority having jurisdiction over the Company.

If the form or terms of the Securities of any series have been
established by or pursuant to a Board Resolution or an Officer's Certificate as
permitted by Sections 201 or 301, the Trustee shall not be required to
authenticate such Securities if the issuance of such
<PAGE>

-22-

Securities pursuant to this Indenture will materially or adversely affect the
Trustee's own rights, duties or immunities under the Securities and this
Indenture or otherwise in a manner which is not reasonably acceptable to the
Trustee.

EFH01434888

Unless otherwise specified as contemplated by Section 301 with respect to any series of Securities, or any Tranche thereof, each Security shall be dated the date of its authentication.

Unless otherwise specified as contemplated by Section 301 with respect to any series of Securities, no Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Security a certificate of authentication substantially in the form provided for herein executed by the Trustee or an Authenticating Agent by manual signature, and such certificate upon any Security shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder and is entitled to the benefits of this Indenture. Notwithstanding the foregoing, if any Security shall have been authenticated and delivered hereunder to the Company, or any Person acting on its behalf, but shall never have been issued and sold by the Company, and the Company shall deliver such Security to the Trustee for cancellation as provided in Section 309 together with a written statement (which need not comply with Section 102 and need not be accompanied by an Opinion of Counsel) stating that such Security has never been issued and sold by the Company, for all purposes of this Indenture such Security shall be deemed never to have been authenticated and delivered hereunder and shall never be entitled to the benefits hereof.

SECTION 304.   TEMPORARY SECURITIES.

Pending the preparation of definitive Securities of any series, or any Tranche thereof, the Company may execute, and upon Company Order the Trustee shall authenticate and deliver, temporary Securities which are printed, lithographed, typewritten, mimeographed or otherwise produced, in any authorized denomination, substantially of the tenor of the defi nitive Securities in lieu of which they are issued, with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Securities may determine, as evidenced by their execution of such Securities; provided, however, that temporary Securities need not recite specific redemption, sinking fund, conversion or exchange provisions.

Unless otherwise specified as contemplated by Section 301 with respect to the Securities of any series, or any Tranche thereof, after the preparation of definitive Securities of such series or Tranche, the temporary Securities of such series or Tranche shall be exchangeable, without charge to the Holder thereof, for definitive Securities of such series or Tranche upon surrender of such temporary Securities at the office or agency of the Company maintained pursuant to Section 602 in a Place of Payment for such Securities. Upon such surrender of temporary Securities for such exchange, the Company shall, except as aforesaid, execute and the Trustee shall authenticate and deliver in exchange therefor definitive Securities
<PAGE>

-23-

of the same series and Tranche of authorized denominations and of like tenor and aggregate principal amount.

Until exchanged in full as hereinabove provided, temporary Securities shall in all respects be entitled to the same benefits under this Indenture as definitive Securities of the same series and Tranche and of like tenor authenticated and delivered hereunder.

SECTION 305.   REGISTRATION, REGISTRATION OF TRANSFER AND EXCHANGE.

The Company shall cause to be kept in each office designated pursuant to Section 602, with respect to the Securities of each series, a register (all registers kept in accordance with this Section being collectively referred to as the "Security Register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Securities of

such series, or any Tranche thereof, and the registration of transfer thereof. The Company shall designate one Person to maintain the Security Register for the Securities of each series on a consolidated basis, and such Person is referred to herein, with respect to such series, as the "Security Registrar." Anything herein to the contrary notwithstanding, the Company may designate one or more of its offices as an office in which a register with respect to the Securities of one or more series shall be maintained, and the Company may designate itself the Security Registrar with respect to one or more of such series. The Security Register shall be open for inspection by the Trustee and the Company at all reasonable times.

Except as otherwise specified as contemplated by Section 301 with respect to the Securities of any series, or any Tranche thereof, upon surrender for registration of transfer of any Security of such series or Tranche at the office or agency of the Company maintained pursuant to Section 602 in a Place of Payment for such series or Tranche, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Securities of the same series and Tranche, of authorized denominations and of like tenor and aggregate principal amount.

Except as otherwise specified as contemplated by Section 301 with respect to the Securities of any series, or any Tranche thereof, any Security of such series or Tranche may be exchanged at the option of the Holder, for one or more new Securities of the same series and Tranche, of authorized denominations and of like tenor and aggregate principal amount, upon surrender of the Securities to be exchanged at any such office or agency. Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Securities which the Holder making the exchange is entitled to receive.

All Securities delivered upon any registration of transfer or exchange of Securities shall be valid obligations of the Company, evidencing the same debt, and entitled to
<PAGE>

-24-

the same benefits under this Indenture, as the Securities surrendered upon such registration of transfer or exchange.

Every Security presented or surrendered for registration of transfer or for exchange shall (if so required by the Company, the Trustee or the Security Registrar) be duly endorsed or shall be accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Security Registrar, as the case may be, duly executed by the Holder thereof or his attorney duly authorized in writing.

Unless otherwise specified as contemplated by Section 301 with respect to Securities of any series, or any Tranche thereof, no service charge shall be made for any regis tration of transfer or exchange of Securities, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Securities, other than exchanges pursuant to Section 304, 406 or 1206 not involving any transfer.

The Company shall not be required to execute or to provide for the registration of transfer of or the exchange of (a) Securities of any series, or any Tranche thereof, during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Securities of such series or Tranche called for redemption or (b) any Security so selected for redemption in whole or in part, except the unredeemed portion of any Security being redeemed in part.

SECTION 306.  MUTILATED, DESTROYED, LOST AND STOLEN SECURITIES.

EFH01434890

If any mutilated Security is surrendered to the Trustee, the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor a new Security of the same series and Tranche, and of like tenor and principal amount and bearing a number not contemporaneously outstanding.

If there shall be delivered to the Company and the Trustee (a) evidence to their satisfaction of the ownership of and the destruction, loss or theft of any Security and (b) such security or indemnity as may be reasonably required by them to save each of them and any agent of either of them harmless, then, in the absence of notice to the Company or the Trustee that such Security is held by a Person purporting to be the owner of such Security, the Company shall execute and the Trustee shall authenticate and deliver, in lieu of any such destroyed, lost or stolen Security, a new Security of the same series and Tranche, and of like tenor and principal amount and bearing a number not contemporaneously outstanding.

Notwithstanding the foregoing, in case any such mutilated, destroyed, lost or stolen Security has become or is about to become due and payable, the Company in its discretion may, instead of issuing a new Security, pay such Security.
<PAGE>

-25-

Upon the issuance of any new Security under this Section, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Security of any series issued pursuant to this Section in lieu of any destroyed, lost or stolen Security shall constitute an original additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Security shall be at any time enforceable by anyone other than the Holder of such new Security, and any such new Security shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Securities of such series duly issued hereunder.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

SECTION 307.  PAYMENT OF INTEREST; INTEREST RIGHTS PRESERVED.

Unless otherwise specified as contemplated by Section 301 with respect to the Securities of any series, or any Tranche thereof, interest on any Security which is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name that Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest.

Any interest on any Security of any series which is payable, but is not punctually paid or duly provided for, on any Interest Payment Date (herein called "Defaulted Interest") shall forthwith cease to be payable to the Holder on the related Regular Record Date by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company, at its election in each case, as provided in clause (a) or (b) below:

(a) The Company may elect to make payment of any Defaulted Interest to the Persons in whose names the Securities of such series (or their respective Predecessor Securities) are registered at the close of business on a date (herein called a "Special Record Date") for the payment of such Defaulted Interest, which shall be fixed in the following manner. The Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each

Security of such series and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Interest as in this clause provided. Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than

<PAGE>

-26-

15 days and not less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment. The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall promptly cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, to each Holder of Securities of such series at the address of such Holder as it appears in the Security Register, not less than 10 days prior to such Special Record Date. Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been so mailed, such Defaulted Interest shall be paid to the Persons in whose names the Securities of such series (or their respective Predecessor Securities) are registered at the close of business on such Special Record Date.

(b) The Company may make payment of any Defaulted Interest on the Securities of any series in any other lawful manner not inconsistent with the requirements of any securities exchange on which such Securities may be listed, and upon such notice as may be required by such exchange, if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

Subject to the foregoing provisions of this Section and Section 305, each Security delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Security shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Security.

SECTION 308.  PERSONS DEEMED OWNERS.

Prior to due presentment of a Security for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name such Security is registered as the absolute owner of such Security for the purpose of receiving payment of principal of and premium, if any, and (subject to Sections 305 and 307) interest, if any, on such Security and for all other purposes whatsoever, whether or not such Security be overdue, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.

SECTION 309.  CANCELLATION BY SECURITY REGISTRAR.

All Securities surrendered for payment, redemption, registration of transfer or exchange shall, if surrendered to any Person other than the Security Registrar, be delivered to the Security Registrar and, if not theretofore canceled, shall be promptly canceled by the Security Registrar. The Company may at any time deliver to the Security Registrar for cancellation any Securities previously authenticated and delivered hereunder which the Company may have acquired in any manner whatsoever or which the Company shall not have

<PAGE>

issued and sold, and all Securities so delivered shall be promptly canceled by the Security Registrar. No Securities shall be authenticated in lieu of or in exchange for any Securities canceled as provided in this Section, except as expressly permitted by this Indenture. All canceled Securities held by the Security Registrar shall be disposed of in accordance with a Company Order delivered to the Security Registrar and the Trustee, and the Security Registrar shall promptly deliver a certificate of disposition to the Trustee and the Company unless, by a Company Order, similarly delivered, the Company shall direct that canceled Securities be returned to it. The Security Registrar shall promptly deliver evidence of any cancellation of a Security in accordance with this Section 309 to the Trustee and the Company.

SECTION 310.  COMPUTATION OF INTEREST.

Except as otherwise specified as contemplated by Section 301 for Securities of any series, or any Tranche thereof, interest on the Securities of each series shall be computed on the basis of a 360-day year consisting of twelve 30-day months and for any period shorter than a full month, on the basis of the actual number of days elapsed in such period.

SECTION 311.  PAYMENT TO BE IN PROPER CURRENCY.

In the case of the Securities of any series, or any Tranche thereof, denominated in any currency other than Dollars or in a composite currency (the "Required Currency"), except as otherwise specified with respect to such Securities as contemplated by Section 301, the obligation of the Company to make any payment of the principal thereof, or the premium or interest thereon, shall not be discharged or satisfied by any tender by the Company, or re covery by the Trustee, in any currency other than the Required Currency, except to the extent that such tender or recovery shall result in the Trustee timely holding the full amount of the Required Currency then due and payable. If any such tender or recovery is in a currency other than the Required Currency, the Trustee may take such actions as it considers appropriate to exchange such currency for the Required Currency. The costs and risks of any such exchange, including without limitation the risks of delay and exchange rate fluctuation, shall be borne by the Company, the Company shall remain fully liable for any shortfall or delinquency in the full amount of Required Currency then due and payable, and in no circumstances shall the Trustee be liable therefor except in the case of its negligence or willful misconduct.

ARTICLE FOUR

REDEMPTION OF SECURITIES

SECTION 401.  APPLICABILITY OF ARTICLE.

Securities of any series, or any Tranche thereof, which are redeemable before their Stated Maturity shall be redeemable in accordance with their terms and (except as
<PAGE>

-28-

otherwise specified as contemplated by Section 301 for Securities of such series or Tranche) in accordance with this Article.

SECTION 402.  ELECTION TO REDEEM; NOTICE TO TRUSTEE.

The election of the Company to redeem any Securities shall be evidenced by a Board Resolution or an Officer's Certificate. The Company shall, at least 45 days prior to the Redemption Date fixed by the Company (unless a

shorter notice shall be satisfactory to the Trustee), notify the Trustee in writing of such Redemption Date and of the principal amount of such Securities to be redeemed. In the case of any redemption of Securities (a) prior to the expiration of any restriction on such redemption provided in the terms of such Securities or elsewhere in this Indenture or (b) pursuant to an election of the Company which is subject to a condition specified in the terms of such Securities, the Company shall furnish the Trustee with an Officer's Certificate evidencing compliance with such restriction or condition.

SECTION 403.   SELECTION OF SECURITIES TO BE REDEEMED.

          If less than all the Securities of any series, or any Tranche thereof, are to be redeemed, the particular Securities to be redeemed shall be selected by the Trustee from the Outstanding Securities of such series or Tranche not previously called for redemption, by such method as shall be provided for any particular series, or, in the absence of any such provision, by such method as the Trustee shall deem fair and appropriate and which may provide for the selection for redemption of portions (equal to the minimum authorized denomination for Securities of such series or Tranche or any integral multiple thereof) of the principal amount of Securities of such series or Tranche of a denomination larger than the minimum authorized denomination for Securities of such series or Tranche; provided, however, that if, as indicated in an Officer's Certificate, the Company shall have offered to purchase all or any principal amount of the Securities then Outstanding of any series, or any Tranche thereof, and less than all of such Securities as to which such offer was made shall have been tendered to the Company for such purchase, the Trustee, if so directed by Company Order, shall select for redemption all or any principal amount of such Securities which have not been so tendered.

          The Trustee shall promptly notify the Company and the Security Registrar in writing of the Securities selected for redemption and, in the case of any Securities selected to be redeemed in part, the principal amount thereof to be redeemed.

          For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to the redemption of Securities shall relate, in the case of any Securities redeemed or to be redeemed only in part, to the portion of the principal amount of such Securities which has been or is to be redeemed.
<PAGE>

                                   -29-


SECTION 404.   NOTICE OF REDEMPTION.

          Notice of redemption shall be given in the manner provided in Section 106 to the Holders of the Securities to be redeemed not less than 30 nor more than 60 days prior to the Redemption Date.

          All notices of redemption shall state:

          (a)   the Redemption Date,

          (b)   the Redemption Price (if known),

          (c) if less than all the Securities of any series or Tranche are to be redeemed, the identification of the particular Securities to be redeemed and the portion of the principal amount of any Security to be redeemed in part,

          (d) that on the Redemption Date the Redemption Price, together with accrued interest, if any, to the Redemption Date, will become due and payable upon each such Security to be redeemed and, if applicable, that interest thereon will cease to accrue on and after said date,

(e) the place of places where such Securities are to be surrendered for payment of the Redemption Price and accrued interest, if any, unless it shall have been specified as contemplated by Section 301 with respect to such Securities that such surrender shall not be required,

(f) that the redemption is for a sinking or other fund, if such is the case, and

(g) such other matters as the Company shall deem desirable or appropriate.

Unless otherwise specified with respect to any Securities in accordance with Section 301, with respect to any notice of redemption of Securities at the election of the Company, unless, upon the giving of such notice, such Securities shall be deemed to have been paid in accordance with Section 701, such notice may state that such redemption shall be conditional upon the receipt by the Paying Agent or Agents for such Securities, on or prior to the date fixed for such redemption, of money sufficient to pay the principal of and premium, if any, and interest, if any, on such Securities and that if such money shall not have been so received such notice shall be of no force or effect and the Company shall not be required to redeem such Securities. In the event that such notice of redemption contains such a condition and such money is not so received, the redemption shall not be made and within a reasonable time thereafter notice shall be given, in the manner in which the notice of redemption was given, that such money was not so received and such redemption was not required to be made, and the Paying Agent or Agents for the Securities otherwise to have been redeemed shall
<PAGE>

-30-

promptly return to the Holders thereof any of such Securities which had been surrendered for payment upon such redemption.

Notice of redemption of Securities to be redeemed at the election of the Company, and any notice of non-satisfaction of a condition for redemption as aforesaid, shall be given by the Company or, at the Company's request, by the Security Registrar in the name and at the expense of the Company. Notice of mandatory redemption of Securities shall be given by the Security Registrar in the name and at the expense of the Company.

SECTION 405.    SECURITIES PAYABLE ON REDEMPTION DATE.

Notice of redemption having been given as aforesaid, and the conditions, if any, set forth in such notice having been satisfied, the Securities or portions thereof so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after such date (unless, in the case of an unconditional notice of redemption, the Company shall default in the payment of the Redemption Price and accrued interest, if any) such Securities or portions thereof, if interest-bearing, shall cease to bear interest. Upon surrender of any such Security for redemption in accordance with such notice, such Security or portion thereof shall be paid by the Company at the Redemption Price, together with accrued interest, if any, to the Redemption Date; provided, however, that no such surrender shall be a condition to such payment if so specified as contemplated by Section 301 with respect to such Security; and provided, further, that except as otherwise specified as contemplated by Section 301 with respect to such Security, any installment of interest on any Security the Stated Maturity of which installment is on or prior to the Redemption Date shall be payable to the Holder of such Security, or one or more Predecessor Securities, registered as such at the close of business on the related Regular Record Date according to the terms of such Security and subject to the provisions of Section 307.

SECTION 406.    SECURITIES REDEEMED IN PART.

EFH01434895

Upon the surrender of any Security which is to be redeemed only in part at a Place of Payment therefor (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or his attorney duly authorized in writing), the Company shall execute, and the Trustee shall authenticate and deliver to the Holder of such Security, without service charge, a new Security or Securities of the same series and Tranche, of any authorized denomination requested by such Holder and of like tenor and in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Security so surrendered.
<PAGE>

-31-

ARTICLE FIVE

SINKING FUNDS

SECTION 501.   APPLICABILITY OF ARTICLE.

The provisions of this Article shall be applicable to any sinking fund for the retirement of the Securities of any series, or any Tranche thereof, except as otherwise specified as contemplated by Section 301 for Securities of such series or Tranche.

The minimum amount of any sinking fund payment provided for by the terms of Securities of any series, or any Tranche thereof, is herein referred to as a "mandatory sinking fund payment", and any payment in excess of such minimum amount provided for by the terms of Securities of any series, or any Tranche thereof, is herein referred to as an "optional sinking fund payment". If provided for by the terms of Securities of any series, or any Tranche thereof, the cash amount of any sinking fund payment may be subject to reduction as provided in Section 502. Each sinking fund payment shall be applied to the redemption of Securities of the series or Tranche in respect of which it was made as provided for by the terms of such Securities.

SECTION 502.   SATISFACTION OF SINKING FUND PAYMENTS WITH SECURITIES.

The Company (a) may deliver to the Trustee Outstanding Securities (other than any previously called for redemption) of a series or Tranche in respect of which a mandatory sinking fund payment is to be made and (b) may apply as a credit Securities of such series or Tranche which have been redeemed either at the election of the Company pursuant to the terms of such Securities or through the application of permitted optional sinking fund payments pursuant to the terms of such Securities, in each case in satisfaction of all or any part of such mandatory sinking fund payment with respect to the Securities of such series; provided, however, that no Securities shall be applied in satisfaction of a mandatory sinking fund payment if such Securities shall have been previously so applied. Securities so applied shall be received and credited for such purpose by the Trustee at the Redemption Price specified in such Securities for redemption through operation of the sinking fund and the amount of such mandatory sinking fund payment shall be reduced accordingly.

SECTION 503.   REDEMPTION OF SECURITIES FOR SINKING FUND.

Not less than 45 days prior to each sinking fund payment date for the Securities of any series, or any Tranche thereof, the Company shall deliver to the Trustee an Officer's Certificate specifying:

(a)   the amount of the next succeeding mandatory sinking fund payment for such series or Tranche;
<PAGE>

-32-

(b) to be made together with such mandatory sinking fund payment;

(c) the aggregate sinking fund payment;

(d) the portion, if any, of such aggregate sinking fund payment which is to be satisfied by the payment of cash;

(e) the portion, if any, of such aggregate sinking fund payment which is to be satisfied by delivering and crediting Securities of such series or Tranche pursuant to Section 502 and stating the basis for such credit and that such Securities have not previously been so credited, and the Company shall also deliver to the Trustee any Securities to be so delivered. If the Company shall not deliver such Officer's Certificate, the next succeeding sinking fund payment for such series shall be made entirely in cash in the amount of the mandatory sinking fund payment. Not less than 30 days before each such sinking fund payment date the Trustee shall select the Securities to be redeemed upon such sinking fund payment date in the manner specified in Section 403 and cause notice of the redemption thereof to be given in the name of and at the expense of the Company in the manner provided in Section 404. Such notice having been duly given, the redemption of such Securities shall be made upon the terms and in the manner stated in Sections 405 and 406.


ARTICLE SIX

COVENANTS

SECTION 601.  PAYMENT OF PRINCIPAL, PREMIUM AND INTEREST.

The Company shall pay the principal of and premium, if any, and interest, if any, on the Securities of each series in accordance with the terms of such Securities and this Indenture.

SECTION 602.  MAINTENANCE OF OFFICE OR AGENCY.

The Company shall maintain in each Place of Payment for the Securities of each series, or any Tranche thereof, an office or agency where payment of such Securities shall be made, where the registration of transfer or exchange of such Securities may be effected and where notices and demands to or upon the Company in respect of such Securities and this Indenture may be served. The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of each such office or agency and prompt notice to the Holders of any such change in the manner specified in Section 106. If at any time the Company shall fail to maintain any such required office or agency in respect of Securities of
<PAGE>

-33-

any series, or any Tranche thereof, or shall fail to furnish the Trustee with the address thereof, payment of such Securities shall be made, registration of transfer or exchange thereof may be effected and notices and demands in respect thereof may be served at the Corporate Trust Office of the Trustee, and the Company hereby appoints the Trustee as its agent for all such purposes in any such event.

The Company may also from time to time designate one or more other offices or agencies with respect to the Securities of one or more series, or any Tranche thereof, for any or all of the foregoing purposes and may from time to time rescind such designations; provided, however, that, unless otherwise specified as contemplated by Section 301 with respect to the Securities of such series or Tranche, no such designation or rescission shall in any manner relieve

the Company of its obligation to maintain an office or agency for such purposes in each Place of Payment for such Securities in accordance with the requirements set forth above. The Company shall give prompt written notice to the Trustee, and prompt notice to the Holders in the manner specified in Section 106, of any such designation or rescission and of any change in the location of any such other office or agency.

Anything herein to the contrary notwithstanding, any office or agency required by this Section may be maintained at an office of the Company, in which event the Company shall perform all functions to be performed at such office or agency.

SECTION 603. MONEY FOR SECURITIES PAYMENTS TO BE HELD IN TRUST.

If the Company shall at any time act as its own Paying Agent with respect to the Securities of any series, or any Tranche thereof, it shall, on or before each due date of the principal of and premium, if any, and interest, if any, on any of such Securities, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal and premium or interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided. The Company shall promptly notify the Trustee of any failure by the Company (or any other obligor on such Securities) to make any payment of principal of or premium, if any, or interest, if any, on such Securities.

Whenever the Company shall have one or more Paying Agents for the Securities of any series, or any Tranche thereof, it shall, on or before each due date of the principal of and premium, if any, and interest, if any, on such Securities, deposit with such Paying Agents sums sufficient (without duplication) to pay the principal and premium or interest so becoming due, such sums to be held in trust for the benefit of the Persons entitled to such principal, premium or interest, and (unless such Paying Agent is the Trustee) the Company shall promptly notify the Trustee of any failure by it so to act. <PAGE>

-34-

The Company shall cause each Paying Agent for the Securities of any series, or any Tranche thereof, other than the Company or the Trustee, to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section, that such Paying Agent shall:

(a) hold all sums held by it for the payment of the principal of and premium, if any, or interest, if any, on such Securities in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided;

(b) give the Trustee notice of any failure by the Company (or any other obligor upon such Securities) to make any payment of principal of or premium, if any, or interest, if any, on such Securities; and

(c) at any time during the continuance of any such failure, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent and furnish to the Trustee such information as it possesses regarding the names and addresses of the Persons entitled to such sums.

The Company may at any time pay, or by Company Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Company or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Company or such Paying Agent and, if so stated in a Company Order delivered to the Trustee, in accordance with the provisions of Article Seven; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with

respect to such money.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of and premium, if any, or interest, if any, on any Security and remaining unclaimed for two years after such principal and premium, if any, or interest has become due and payable shall be paid to the Company on Company Request, or, if then held by the Company, shall be discharged from such trust; and, upon such payment or discharge, the Holder of such Security shall, as an unsecured general creditor and not as a Holder of an Outstanding Security, look only to the Company for payment of the amount so due and payable and remaining unpaid, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such payment to the Company, may
<PAGE>

-35-

at the expense of the Company cause to be mailed, on one occasion only, notice to such Holder that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such mailing, any unclaimed balance of such money then remaining will be paid to the Company.

SECTION 604.  CORPORATE EXISTENCE.

Subject to the rights of the Company under Article Eleven, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

SECTION 605.  MAINTENANCE OF PROPERTIES.

The Company shall cause (or, with respect to property owned in common with others, make reasonable effort to cause) all its properties used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order and shall cause (or, with respect to property owned in common with others, make reasonable effort to cause) to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as, in the judgment of the Company, may be necessary so that the business carried on in connection therewith may be properly conducted; provided, however, that nothing in this Section shall prevent the Company from discontinuing, or causing the discontinuance of, the operation and maintenance of any of its properties if such discontinuance is, in the judgment of the Company, desirable in the conduct of its business.

SECTION 606.  ANNUAL OFFICER'S CERTIFICATE AS TO COMPLIANCE.

Not later than June 1 in each year, commencing June 1, 1998, the Company shall deliver to the Trustee an Officer's Certificate which need not comply with Section 102, executed by the principal executive officer, the principal financial officer or the principal accounting officer of the Company, as to such officer's knowledge of the Company's compliance with all conditions and covenants under this Indenture, such compliance to be determined without regard to any period of grace or requirement of notice under this Indenture.

SECTION 607.  WAIVER OF CERTAIN COVENANTS.

The Company may omit in any particular instance to comply with any term, provision or condition set forth in (a) Section 602 or any additional covenant or restriction specified with respect to the Securities of any series, or any Tranche thereof, as contemplated by Section 301, if before the time for such compliance the Holders of a majority in aggregate principal amount of the Outstanding Securities of all series and Tranches with respect to which compliance with Section 602 or such additional covenant or restriction is to be

EFH01434899

omitted, considered as one class, shall, by Act of such Holders, either waive
such compliance in such instance or generally waive compliance with such term,
provision or condition and (b) Section 604, 605 or Article Eleven if before the
time for such compliance the Holders of a majority
<PAGE>

-36-


in principal amount of Securities Outstanding under this Indenture shall, by Act
of such Holders, either waive such compliance in such instance or generally
waive compliance with such term, provision or condition; but, in the case of (a)
or (b), no such waiver shall extend to or affect such term, provision or
condition except to the extent so expressly waived, and, until such waiver shall
become effective, the obligations of the Company and the duties of the Trustee
in respect of any such term, provision or condition shall remain in full force
and effect.

SECTION 608.  LIMITATION ON LIENS.

        (a) Except as otherwise specified as contemplated by Section 301 for
Securities of any series, so long as any Securities of any series are
Outstanding, the Company will not pledge, mortgage, hypothecate or grant a
security interest in, or permit any mortgage, pledge, security interest or other
lien upon, any capital stock of any Subsidiary now or hereafter owned by the
Company, to secure any Indebtedness (hereinafter defined) without making
effective provision whereby the Outstanding Securities shall (so long as such
other Indebtedness shall be so secured) be equally and ratably secured with any
and all such other Indebtedness and any other indebtedness similarly entitled to
be equally and ratably secured; provided, however, that this restriction shall
not apply to nor prevent the creation or existence of:

        (1) any mortgage, pledge, security interest, lien or encumbrance
    upon any such capital stock created at the time of the acquisition of such
    capital stock by the Company or within one year after such time to secure
    all or a portion of the purchase price for such capital stock;

        (2) any mortgage, pledge, security interest, lien or encumbrance
    upon any such capital stock existing thereon at the time of the acquisition
    thereof by the Company (whether or not the obligations secured thereby are
    assumed by the Company); or

        (3) any extension, renewal or refunding of any mortgage, pledge,
    security interest, lien or encumbrance permitted by Subsection (1) or (2)
    above on capital stock of any Subsidiary theretofore subject thereto (or
    substantially the same capital stock) or any portion thereof.

        (4) any judgment, levy, execution, attachment or other similar
    lien arising in connection with court proceedings, provided that either

            (i) the execution or enforcement of each such lien is effectively
        stayed within 30 days after entry of the corresponding judgment (or
        the corresponding judgment has been discharged within such 30 day
        period) and the claims secured thereby are being contested in good
        faith by appropriate proceedings timely commenced and diligently
        prosecuted;
<PAGE>

-37-


            (ii) the payment of each such lien is covered in full by insurance
        and the insurance company has not denied or contested coverage
        thereof; or

            (iii) so long as each such lien is adequately bonded, any

appropriate legal proceedings that may have been duly initiated for
the review of the corresponding judgment, decree or order shall not
have been fully terminated or the period within which such proceedings
may be initiated shall not have expired.

For purposes of this Section 608, "Indebtedness" means all
indebtedness, whether or not represented by bonds, debentures, notes or other
securities, created or assumed by the Company for the repayment of money
borrowed. All indebtedness for money borrowed secured by a lien upon property
owned by the Company and upon which indebtedness for money borrowed the Company
customarily pays interest, although the Company has not assumed or become liable
for the payment of such indebtedness for money borrowed, shall for purposes of
this Section 608 be deemed to be Indebtedness of the Company. All indebtedness
of others for money borrowed which is guaranteed as to payment of principal by
the Company or in effect guaranteed by the Company through a contingent
agreement to purchase such indebtedness for money borrowed shall for purposes of
this Section 608 be deemed to be Indebtedness of the Company, but no other
contingent obligation of the Company in respect of indebtedness for money
borrowed or other obligations incurred by others shall for purposes of this
Section 608 be deemed to be Indebtedness of the Company.

In case the Company or any Subsidiary shall propose to pledge,
mortgage, hypothecate or grant a security interest in any capital stock of any
Subsidiary owned by the Company to secure any Indebtedness, other than as
permitted by Subsections (a)(1) to (a)(3), inclusive, of this Section, the
Company will prior thereto give written notice thereof to the Trustee, and the
Company will prior to or simultaneously with such pledge, mortgage,
hypothecation or grant of security interest, by supplemental indenture executed
to the Trustee (or to the extent legally necessary to another trustee or an
additional or separate trustee), in form satisfactory to the Trustee,
effectively secure (for so long as such other Indebtedness shall be so secured)
all the Securities equally and ratably with such Indebtedness and with any other
indebtedness for money borrowed similarly entitled to be equally and ratably
secured.

(b) Except as otherwise specified as contemplated by Section 301 for
Securities of any series, the provisions of Subsection (a) of this Section 608
shall not apply in the event that the Company or any Subsidiary shall pledge,
mortgage, hypothecate or grant a security interest in or other lien upon any
capital stock of any Subsidiary now or hereafter owned by the Company to secure
any Indebtedness which would otherwise be subject to the foregoing restriction
up to an aggregate amount which, together with all other Indebtedness (other
than mortgages, pledges, security interests, liens or encumbrances permitted by
Subsection (a) of this Section 608) which would otherwise be subject to the
foregoing restriction, does not at the time exceed 5% of Consolidated
Capitalization.
<PAGE>

-38-

For purposes of this Section 608:

(1) The term "Consolidated Capitalization" means the sum obtained by
adding (i) Consolidated Shareholders' Equity, (ii) Consolidated
Indebtedness for money borrowed (exclusive of any thereof which is due and
payable within one year of the date such sum is determined) and, without
duplication, (iii) any preference or preferred stock of the Company or any
Consolidated Subsidiary which is subject to mandatory redemption or sinking
fund provisions.

(2) The term "Consolidated Shareholders' Equity" means the total
Assets of the Company and its Consolidated Subsidiaries less all
liabilities of the Company and its Consolidated Subsidiaries. As used in
this definition, "liabilities" means all obligations which would, in
accordance with generally accepted accounting principles, be classified on

EFH01434901

a balance sheet as liabilities, including without limitation, (i)
indebtedness secured by property of the Company or any of its Consolidated
Subsidiaries whether or not the Company or such Consolidated Subsidiary is
liable for the payment thereof unless, in the case that the Company or such
Consolidated Subsidiary is not so liable, such property has not been
included among the Assets of the Company or such Consolidated Subsidiary on
such balance sheet, (ii) deferred liabilities, (iii) indebtedness of the
Company or any of its Consolidated Subsidiaries that is expressly
subordinated in right and priority of payment to other liabilities of the
Company or such Consolidated Subsidiary. As used in this definition,
"liabilities" includes preference or preferred stock of the Company or any
Consolidated Subsidiary only to the extent of any such preference or
preferred stock that is subject to mandatory redemption or sinking fund
provisions.

     (3) The term "Consolidated Subsidiary" means at any date any
Subsidiary the financial statements of which under generally accepted
accounting principles would be consolidated with those of the Company in
its consolidated financial statements as of such date.

     (4) The "Assets" of any Person means the whole or any part of its
business, property, assets, cash and receivables.

     (5) The term "Consolidated Indebtedness" means total indebtedness as
shown on the consolidated balance sheet of the Company and its Consolidated
Subsidiaries.
<PAGE>

                              -39-


                         ARTICLE SEVEN

                 SATISFACTION AND DISCHARGE

SECTION 701.  SATISFACTION AND DISCHARGE OF SECURITIES.

     Any Security or Securities, or any portion of the principal amount
thereof, shall be deemed to have been paid for all purposes of this Indenture,
and the entire indebtedness of the Company in respect thereof shall be deemed to
have been satisfied and discharged, if there shall have been irrevocably
deposited with the Trustee or any Paying Agent (other than the Company), in
trust:

     (a)  money in an amount which shall be sufficient, or

     (b) in the case of a deposit made prior to the Maturity of such
Securities or portions thereof, Eligible Obligations, which shall not
contain provisions permitting the redemption or other prepayment thereof at
the option of the issuer thereof, the princi pal of and the interest on
which when due, without any regard to reinvestment thereof, will provide
moneys which, together with the money, if any, deposited with or held by
the Trustee or such Paying Agent, shall be sufficient, or

     (c)  a combination of (a) or (b) which shall be sufficient,

to pay when due the principal of and premium, if any, and interest, if any, due
and to become due on such Securities or portions thereof on or prior to
Maturity; provided, however, that in the case of the provision for payment or
redemption of less than all the Securities of any series or Tranche, such
Securities or portions thereof shall have been selected by the Trustee as
provided herein and, in the case of a redemption, the notice requisite to the
validity of such redemption shall have been given or irrevocable authority shall
have been given by the Company to the Trustee to give such notice, under
arrangements satisfactory to the Trustee; and provided, further, that the
Company shall have delivered to the Trustee and such Paying Agent:

      (x) if such deposit shall have been made prior to the Maturity of such Securities, a Company Order stating that the money and Eligible Obligations deposited in accordance with this Section shall be held in trust, as provided in Section 703; and

      (y) if Eligible Obligations shall have been deposited, an Opinion of Counsel that the obligations so deposited constitute Eligible Obligations and do not contain provisions permitting the redemption or other prepayment at the option of the issuer thereof, and an opinion of an independent public accountant of nationally recognized standing, selected by the Company, to the

&lt;PAGE&gt;

-40-

effect that the requirements set forth in clause (b) above have been satisfied; and

      (z) if such deposit shall have been made prior to the Maturity of such Securities, an Officer's Certificate stating the Company's intention that, upon delivery of such Officer's Certificate, its indebtedness in respect of such Securities or portions thereof will have been satisfied and discharged as contemplated in this Section.

      Upon the deposit of money or Eligible Obligations, or both, in accordance with this Section, together with the documents required by clauses (x), (y) and (z) above, the Trustee shall, upon receipt of a Company Request, acknowledge in writing that the Security or Securities or portions thereof with respect to which such deposit was made are deemed to have been paid for all purposes of this Indenture and that the entire indebtedness of the Company in respect thereof has been satisfied and discharged as contemplated in this Section. In the event that all of the conditions set forth in the preceding paragraph shall have been satisfied in respect of any Securities or portions thereof except that, for any reason, the Officer's Certificate specified in clause (z) shall not have been delivered, such Securities or portions thereof shall nevertheless be deemed to have been paid for all purposes of this Indenture, and the Holders of such Securities or portions thereof shall nevertheless be no longer entitled to the benefits of this Indenture or of any of the covenants of the Company under Article Six (except the covenants contained in Sections 602 and 603) or any other covenants made in respect of such Securities or portions thereof as contemplated by Section 301, but the indebtedness of the Company in respect of such Securities or portions thereof shall not be deemed to have been satisfied and discharged prior to Maturity for any other purpose, and the Holders of such Securities or portions thereof shall continue to be entitled to look to the Company for payment of the indebtedness represented thereby; and, upon Company Request, the Trustee shall acknowledge in writing that such Securities or portions thereof are deemed to have been paid for all purposes of this Indenture.

      If payment at Stated Maturity of less than all of the Securities of any series, or any Tranche thereof, is to be provided for in the manner and with the effect provided in this Section, the Security Registrar shall select such Securities, or portions of principal amount thereof, in the manner specified by Section 403 for selection for redemption of less than all the Securities of a series or Tranche.

      In the event that Securities which shall be deemed to have been paid for purposes of this Indenture, and, if such is the case, in respect of which the Company's indebtedness shall have been satisfied and discharged, all as provided in this Section do not mature and are not to be redeemed within the 60 day period commencing with the date of the deposit of moneys or Eligible Obligations, as aforesaid, the Company shall, as promptly as practicable, give a notice, in the same manner as a notice of redemption with respect to such

Securities, to the Holders of such Securities to the effect that such deposit has been made and the effect thereof.

Notwithstanding that any Securities shall be deemed to have been paid for purposes of this Indenture, as aforesaid, the obligations of the Company and the Trustee in respect of such Securities under Sections 304, 305, 306, 404, 503 (as to notice of redemption), 602, 603, 907 and 915 and this Article Seven shall survive.

The Company shall pay, and shall indemnify the Trustee or any Paying Agent with which Eligible Obligations shall have been deposited as provided in this Section against, any tax, fee or other charge imposed on or assessed against such Eligible Obligations or the principal or interest received in respect of such Eligible Obligations, including, but not limited to, any such tax payable by any entity deemed, for tax purposes, to have been created as a result of such deposit.

Anything herein to the contrary notwithstanding, (a) if, at any time after a Security would be deemed to have been paid for purposes of this Indenture, and, if such is the case, the Company's indebtedness in respect thereof would be deemed to have been satisfied or discharged, pursuant to this Section (without regard to the provisions of this paragraph), the Trustee or any Paying Agent, as the case may be, shall be required to return the money or Eligible Obligations, or combination thereof, deposited with it as aforesaid to the Company or its representative under any applicable Federal or State bankruptcy, insolvency or other similar law, such Security shall thereupon be deemed retroactively not to have been paid and any satisfaction and discharge of the Company's indebtedness in respect thereof shall retroactively be deemed not to have been effected, and such Security shall be deemed to remain Outstanding and (b) any satisfaction and discharge of the Company's indebtedness in respect of any Security shall be subject to the provisions of the last paragraph of Section 603.

SECTION 702.   SATISFACTION AND DISCHARGE OF INDENTURE.

This Indenture shall upon Company Request cease to be of further effect (except as hereinafter expressly provided), and the Trustee, at the expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when

(a)  no Securities remain Outstanding hereunder; and

(b)  the Company has paid or caused to be paid all other sums payable hereunder by the Company;

provided, however, that if, in accordance with the last paragraph of Section 701, any Security, previously deemed to have been paid for purposes of this Indenture, shall be deemed retroactively not to have been so paid, this Indenture shall thereupon be deemed retroactively
<PAGE>

-42-

not to have been satisfied and discharged, as aforesaid, and to remain in full force and effect, and the Company shall execute and deliver such instruments as the Trustee shall reasonably request to evidence and acknowledge the same.

Notwithstanding the satisfaction and discharge of this Indenture as aforesaid, the obligations of the Company and the Trustee under Sections 304, 305, 306, 404, 503 (as to notice of redemption), 602, 603, 907 and 915 and this

Article Seven shall survive.

Upon satisfaction and discharge of this Indenture as provided in this Section, the Trustee shall assign, transfer and turn over to the Company, subject to the lien provided by Section 907, any and all money, securities and other property then held by the Trustee for the benefit of the Holders of the Securities other than money and Eligible Obligations held by the Trustee pursuant to Section 703.

SECTION 703.  APPLICATION OF TRUST MONEY.

Neither the Eligible Obligations nor the money deposited pursuant to Section 701, nor the principal or interest payments on any such Eligible Obligations, shall be with drawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and premium, if any, and interest, if any, on the Securities or portions of principal amount thereof in respect of which such deposit was made, all subject, however, to the provisions of Section 603; provided, however, that, so long as there shall not have occurred and be continuing an Event of Default, any cash received from such principal or interest payments on such Eligible Obligations, if not then needed for such purpose, shall, to the extent practicable and upon Company Request, be invested in Eligible Obligations of the type described in clause (b) in the first paragraph of Section 701 maturing at such times and in such amounts as shall be sufficient, together with any other moneys and the principal of and interest on any other Eligible Obligations then held by the Trustee, to pay when due the principal of and premium, if any, and interest, if any, due and to become due on such Securities or portions thereof on and prior to the Maturity thereof, and interest earned from such reinvestment shall be paid over to the Company as received, free and clear of any trust, lien or pledge under this Indenture except the lien provided by Section 907; and provided, further, that, so long as there shall not have occurred and be continuing an Event of Default, any moneys held in accordance with this Section on the Maturity of all such Securities in excess of the amount required to pay the principal of and premium, if any, and interest, if any, then due on such Securities shall be paid over to the Company free and clear of any trust, lien or pledge under this Indenture except the lien provided by Section 907; and provided, further, that if an Event of Default shall have occurred and be continuing, moneys to be paid over to the Company pursuant to this Section shall be held until such Event of Default shall have been waived or cured.
<PAGE>

-43-

ARTICLE EIGHT

EVENTS OF DEFAULT; REMEDIES

SECTION 801.  EVENTS OF DEFAULT.

"Event of Default", wherever used herein with respect to Securities of any series, means any one of the following events:

(a)  failure to pay interest, if any, on any Security of such series within 30 days after the same becomes due and payable; or

(b)  failure to pay the principal of or premium, if any, on any Security of such series at its Maturity; or

(c)  failure to perform or breach of any covenant or warranty of the Company in this Indenture (other than a covenant or warranty a default in the performance of which or breach of which is elsewhere in this Section specifically dealt with or which has expressly been included in this Indenture solely for the benefit of one or more series of Securities other than such series) for a period of 90 days after there has been given, by registered or certified mail, to the Company by the Trustee, or to the Com

pany and the Trustee by the Holders of at least 33% in principal amount of
the Outstanding Securities of such series, a written notice specifying such
default or breach and requiring it to be remedied and stating that such
notice is a "Notice of Default" hereunder, unless the Trustee, or the
Trustee and the Holders of a principal amount of Securities of such series
not less than the principal amount of Securities the Holders of which gave
such notice, as the case may be, shall agree in writing to an extension of
such period prior to its expiration; provided, however, that the Trustee,
or the Trustee and the Holders of such principal amount of Securities of
such series, as the case may be, shall be deemed to have agreed to an
extension of such period if corrective action is initiated by the Company
within such period and is being diligently pursued; or

          (d)  the entry by a court having jurisdiction in the premises of (1) a
decree or order for relief in respect of the Company in an involuntary case
or proceeding under any applicable Federal or State bankruptcy, insolvency,
reorganization or other similar law or (2) a decree or order adjudging the
Company a bankrupt or insolvent, or approving as properly filed a petition
by one or more Persons other than the Company seeking reorganization,
arrangement, adjustment or composition of or in respect of the Company
under any applicable Federal or State law, or appointing a custodian,
receiver, liquidator, assignee, trustee, sequestrator or other similar
official for the Company or for any substantial part of its property, or
ordering the winding up or liquidation of its affairs, and any such decree
or order for relief or any such other decree or order shall have remained
unstayed and in effect for a period of 90 consecutive days; or
<PAGE>

                              -44-


          (e)  the commencement by the Company of a voluntary case or proceeding
under any applicable Federal or State bankruptcy, insolvency,
reorganization or other similar law or of any other case or proceeding to
be adjudicated a bankrupt or insolvent, or the consent by it to the entry
of a decree or order for relief in respect of the Company in a case or
proceeding under any applicable Federal or State bankruptcy, insolvency,
reorganization or other similar law or to the commencement of any
bankruptcy or insolvency case or proceeding against it, or the filing by it
of a petition or answer or consent seeking reorganization or relief under
any applicable Federal or State law, or the consent by it to the filing of
such petition or to the appointment of or taking possession by a custodian,
receiver, liquidator, assignee, trustee, sequestrator or similar official
of the Company or of any substantial part of its property, or the making by
it of an assignment for the benefit of creditors, or the ad mission by it
in writing of its inability to pay its debts generally as they become due,
or the authorization of such action by the Board of Directors; or

          (f)  any other Event of Default specified with respect to Securities
of such series.

SECTION 802.  ACCELERATION OF MATURITY; RESCISSION AND ANNULMENT.

          If an Event of Default due to the default in payment of principal of,
or interest on, any series of Securities or due to the default in the
performance or breach of any other covenant or warranty of the Company
applicable to the Securities of such series but not applicable to all
Outstanding Securities shall have occurred and be continuing, either the Trustee
or the Holders of not less than 33% in principal amount of the Securities of
such series may then declare the principal amount (or, if any of the Securities
of such series are Discount Securities, such portion of the principal amount as
may be specified in the terms thereof as contemplated by Section 301) of all
Securities of such series and interest accrued thereon to be due and payable
immediately. If an Event of Default due to default in the performance of any
other of the covenants or agreements herein applicable to all Outstanding
Securities or an Event of Default specified in Section 801(d) or (e) shall have

EFH01434906

occurred and be continuing, either the Trustee or the Holders of not less than
33% in principal amount of all Securities then Outstanding (considered as one
class), and not the Holders of the Securities of any one of such series, may
declare the principal of all Securities and interest accrued thereon to be due
and payable immediately. As a consequence of each such declaration (herein
referred to as a declaration of acceleration) with respect to Securities of any
series, the principal amount (or portion thereof in the case of Discount
Securities) of such Securities and interest accrued thereon shall become due and
payable immediately.

At any time after such a declaration of acceleration with respect to
Securities of any series shall have been made and before a judgment or decree
for payment of the money
<PAGE>

-45-

due shall have been obtained by the Trustee as hereinafter in this Article
provided, the Event or Events of Default giving rise to such declaration of
acceleration shall, without further act, be deemed to have been waived, and such
declaration and its consequences shall, without further act, be deemed to have
been rescinded and annulled, if

(a)  the Company shall have paid or deposited with the Trustee a sum
sufficient to pay

(1)  all overdue interest on all Securities of such series;

(2) the principal of and premium, if any, on any Securities of
such series which have become due otherwise than by such declaration
of acceleration and interest thereon at the rate or rates prescribed
therefor in such Securities;

(3) to the extent that payment of such interest is lawful,
interest upon overdue interest, if any, at the rate or rates
prescribed therefor in such Securities;

(4)  all amounts due to the Trustee under Section 907;

and

(b) any other Event or Events of Default with respect to Securities of
such series, other than the nonpayment of the principal of Securities of
such series which shall have become due solely by such declaration of
acceleration, shall have been cured or waived as provided in Section 813.

No such rescission shall affect any subsequent Event of Default or impair any
right consequent thereon.

SECTION 803.  COLLECTION OF INDEBTEDNESS AND SUITS FOR ENFORCEMENT BY TRUSTEE.

If an Event of Default described in clause (a) or (b) of Section 801
shall have occurred and be continuing, the Company shall, upon demand of the
Trustee, pay to it, for the benefit of the Holders of the Securities of the
series with respect to which such Event of Default shall have occurred, the
whole amount then due and payable on such Securities for principal and premium,
if any, and interest, if any, and, to the extent permitted by law, interest on
any overdue principal and interest, at the rate or rates prescribed therefor in
such Securities, and, in addition thereto, such further amount as shall be
sufficient to cover any amounts due to the Trustee under Section 907.
<PAGE>

-46-

EFH01434907

If the Company shall fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon such Securities and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon such Securities, wherever situated.

If an Event of Default with respect to Securities of any series shall have occurred and be continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders of Securities of such series by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

SECTION 804.  TRUSTEE MAY FILE PROOFS OF CLAIM.

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Company or any other obligor upon the Securities or the property of the Company or of such other obligor or their creditors, the Trustee (irrespective of whether the principal of the Securities shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Company for the payment of overdue principal or interest) shall be entitled and empowered, by intervention in such proceeding or otherwise,

(a) to file and prove a claim for the whole amount of principal, premium, if any, and interest, if any, owing and unpaid in respect of the Securities and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for amounts due to the Trustee under Section 907) and of the Holders allowed in such judicial proceeding, and

(b) to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amounts due it under Section 907.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Securities or the rights of any Holder
<PAGE>

-47-

thereof or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 805.  TRUSTEE MAY ENFORCE CLAIMS WITHOUT POSSESSION OF SECURITIES.

All rights of action and claims under this Indenture or the Securities may be prosecuted and enforced by the Trustee without the possession of any of the Securities or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the

ratable benefit of the Holders in respect of which such judgment has been recovered.

SECTION 806.   APPLICATION OF MONEY COLLECTED.

Any money collected by the Trustee pursuant to this Article shall be applied in the following order, at the date or dates fixed by the Trustee and, in case of the distribution of such money on account of principal or premium, if any, or interest, if any, upon pre sentation of the Securities in respect of which or for the benefit of which such money shall have been collected and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

FIRST:  To the payment of all amounts due the Trustee under Section 907;

SECOND: To the payment of the amounts then due and unpaid upon the Securities for principal of and premium, if any, and interest, if any, in respect of which or for the benefit of which such money has been collected, ratably, without preference or priority of any kind, according to the amounts due and payable on such Securities for principal, premium, if any, and interest, if any, respectively; and

THIRD:  To the payment of the remainder, if any, to the Company or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

SECTION 807.   LIMITATION ON SUITS.

No Holder shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a) such Holder shall have previously given written notice to the Trustee of a continuing Event of Default with respect to the Securities of such series;
<PAGE>

-48-

(b) the Holders of a majority in aggregate principal amount of the Outstanding Securities of all series in respect of which an Event of Default shall have occurred and be continuing, considered as one class, shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c) such Holder or Holders shall have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d) the Trustee for 60 days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such proceeding; and

(e) no direction inconsistent with such written request shall have been given to the Trustee during such 60-day period by the Holders of a majority in aggregate principal amount of the Outstanding Securities of all series in respect of which an Event of Default shall have occurred and be continuing, considered as one class;

it being understood and intended that no one or more of such Holders shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in

the manner herein provided and for the equal and ratable benefit of all of such Holders.

SECTION 808.   UNCONDITIONAL RIGHT OF HOLDERS TO RECEIVE PRINCIPAL,
               PREMIUM AND INTEREST.

        Notwithstanding any other provision in this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and premium, if any, and (subject to Section 307) interest, if any, on such Security on the Stated Maturity or Maturities expressed in such Security (or, in the c se of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

SECTION 809.   RESTORATION OF RIGHTS AND REMEDIES.

        If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, and Trustee and such Holder shall be restored severally and respectively to their former positions
<PAGE>

                                -49-


hereunder and thereafter all rights and remedies of the Trustee and such Holder shall continue as though no such proceeding had been instituted.

SECTION 810.   RIGHTS AND REMEDIES CUMULATIVE.

        Except as otherwise provided in the last paragraph of Section 306, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 811.   DELAY OR OMISSION NOT WAIVER.

        No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

SECTION 812.   CONTROL BY HOLDERS OF SECURITIES.

        If an Event of Default shall have occurred and be continuing in respect of a series of Securities, the Holders of a majority in principal amount of the Outstanding Securities of such series shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee, with respect to the Securities of such series; provided, however, that if an Event of Default shall have occurred and be continuing with respect to more than one series of Securities, the Holders of a majority in aggregate principal amount of the Outstanding Securities of all such series, considered as one class, shall have the right to make such direction, and not the Holders of the Securities of any one of such series; and provided, further, that such direction shall not be in conflict with any rule of law or with this Indenture. The Trustee may take any other action, deemed proper by the Trustee, which is not inconsistent with any such direction. Before proceeding to exercise any right or power hereunder

EFH01434910