**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 10074, 10076, 10249, 10252, 10274** |

**SURREPLY OF ENERGY FUTURE
HOLDINGS CORP., *ET AL.*, TO THE MOTION OF
SHIRLEY FENICLE, DAVID WILLIAM FAHY, JOHN H. JONES,
AND DAVID HEINZMANN TO DISMISS CHAPTER 11 PETITIONS
OF ASBESTOS DEBTORS EECI, INC., EEC HOLDINGS, INC., LSGT
SACROC, INC., AND LSGT GAS COMPANY LLC PURSUANT TO 11 U.S.C. § 1112(b)**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this surreply in further opposition to the *Motion of Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann to Dismiss Chapter 11 Petitions of Asbestos Debtor EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Co. LLC Pursuant to 11 U.S.C. § 1112(b)* [D.I. 10074] (the "Motion") and in response to the *Reply in Support of Motion of Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann to Dismiss Chapter 11 Petitions of Asbestos Debtors EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Co. LLC Pursuant to 11 U.S.C. § 1112(b)* [D.I. 10274] (the "Reply") filed by Shirley

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

Fenicle, David William Fahy, John H. Jones, and David Heinzmann (collectively, the "Asbestos Objectors").  In further opposition to the Motion, the Debtors respectfully state as follows:[2]

**Preliminary Statement**

1.  The Asbestos Objectors continue to deviate from established bankruptcy law, modern restructuring practice, and the facts of these chapter 11 cases.  Among the many misunderstandings and mistruths contained in the Reply, the Asbestos Objectors raise three new arguments that warrant correction.[3]

2.  *First*, filing for chapter 11 was the only realistic and responsible option available to the LSGT Debtors.  If the LSGT Debtors had not filed for chapter 11, a motion to compel EFH Corp. to fund the defense and settlement costs associated with asbestos-related litigation brought against the LSGT Debtors would have faced stiff creditor resistance and a material chance of failure.

3.  *Second*, avoiding a value-destructive tax bill was a legitimate concern for many of the entities within the EFH corporate structure—Debtors and non-Debtors, alike.  The Asbestos Objectors fail to appreciate that non-Debtors like EFH Properties Company faced strong countervailing considerations that counseled against a chapter 11 filing.  Further, that the IRS issued a private letter ruling *in 2016* that largely neutralized the tax risk (a) illustrates that

---

[2]  The Debtors incorporate the arguments made in the *Opposition of Energy Future Holdings Corp., et al., to the Motion of Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann to Dismiss Chapter 11 Petitions of Asbestos Debtor EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Co. LLC Pursuant to 11 U.S.C. § 1112(b)* [D.I. 10249] (the "Opposition Brief").

Capitalized terms used but not defined herein shall be given the meanings ascribed to them in the Opposition Brief or the *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10290] (the "Plan"), as applicable.

[3]  While the Debtors disagree with many of the statements made in the Reply, this limited surreply addresses only some of the issues the Debtors wanted to highlight.  The Debtors reserve all rights to address the Asbestos Objectors' other arguments at the hearing.

the pre-filing concerns were legitimate, but (b) is irrelevant to analyzing the LSGT Debtors' decision *in 2014* to file for bankruptcy.

4. ***Third***, the reinstatement of the LSGT Debtors' intercompany claims and the properly-preserved asbestos claims against them is the value-maximizing result of ***including*** the LSGT Debtors in these chapter 11 cases. The Asbestos Objectors fancifully assume that those intercompany claims would be reinstated regardless of the LSGT Debtors' status in these cases, ignoring the plain language of the Plan Support Agreement and Merger Agreement.[4] If the Court were to dismiss the LSGT Debtors, LSGT Gas Company LLC ("LSGT Gas") would have a $560 million unsecured claim against EFH Corp (and the other three LSGT Debtors would have claims against LSGT Gas). Unless the Asbestos Objectors convinced creditors of the EFH Debtors to take a further haircut by supporting the reinstatement of that $560 million intercompany claim, that claim would be subject to the waterfall proposed under the current Plan. In short, the LSGT Debtors' decision to file for chapter 11 maximized the source of recovery available to asbestos claimants of the LSGT Debtors.

5. For those reasons, the arguments set forth in the Opposition Brief, and the evidence the Debtors will present at the hearing, the Court should deny the Motion.

## Argument

**I. The LSGT Debtors Had No Realistic or Responsible Alternative to Filing for Bankruptcy.**

6. The Asbestos Objectors are correct that the LSGT Debtors could have sought court approval to lift the automatic stay on their intercompany claims against EFH Corp. and filed a motion to compel the payment of those claims. But, they are wrong that the LSGT

---

[4] *See* Reply at 20 ("The only impact dismissal will have is that asbestos claims will not be discharged.").

Debtors had "every reason to expect that this Court would have granted such a request."[5] As explained below, well-established law strongly suggests that such a request would have been denied. In any event, the outcome of a motion to lift the automatic stay with regards to the LSGT Debtors' intercompany claims against EFH was at best uncertain, and the Asbestos Objectors have cited no cases that suggest the Debtors must attempt every possible course of action outside of bankruptcy before they can file for bankruptcy.[6] On the contrary, the Asbestos Objectors rely heavily on *SGL Carbon*, where the Third Circuit was clear that "the Bankruptcy Code ***encourages*** early filing." *See In re SGL Carbon*, 200 F.3d 154, 163 (3d Cir. 1999) (emphasis added).

7.  In the Third Circuit, "[u]nder the doctrine of necessity, a debtor may pay a pre-petition creditor when such creditor 'will not supply services or material essential to the conduct of the business until [its] pre-reorganization claims shall have been paid.'" *In re Newpage Corp.*, 555 B.R. 444, 452 (Bankr. D. Del. 2016) (citing *In re LeHigh & N.E.R. Co.*, 657 F.2d 570, 581 (3d Cir. 1981)). The LSGT Debtors do not supply services or material essential to the conduct of EFH's business—in fact, they are non-operating business units that do not supply any services or materials to EFH. The LSGT Debtors exist to handle the settlement and defense of various legacy liabilities. While assessing the scope of these legacy liabilities was an important consideration for potential bidders and an important part of the global restructuring, the payment

---

[5] *See id.* at 4.

[6] The Asbestos Objectors argue that there was no need for the LSGT Debtors to worry about the flood of asbestos litigation following EFH's bankruptcy filing because "[e]ven if claims could not be paid until EFH Corp. was reorganized, claimants would prefer to have the Asbestos Debtors remain out of bankruptcy, so that they could liquidate their claims." *Reply* at *5. This assertion ignores several facts. *First*, the LSGT Debtors would have had no means of forcing creditors to wait until EFH Corp. was reorganized to bring their claims. *Second*, the four Asbestos Objectors can hardly speak to how the tens of thousands of the alleged asbestos claimants would have conducted themselves in the absence of the stay. *Third*, the LSGT Debtors would not have been able to fund the defense and settlement cost if claimants liquidated their claims.

of these liabilities was not essential to the day-to-day operations of EFH Corp. Accordingly, the LSGT Debtors could not have relied on the doctrine of necessity to have the automatic stay lifted, and the Asbestos Objectors do not attempt to argue otherwise.

8. Instead, the Asbestos Objectors' argument that lifting of the automatic stay was a foregone conclusion relies entirely on one case, which they misconstrue. The court may lift the automatic stay if cause exists. *See* 11 U.S.C. §362(d)(1). To determine if causes exist, this Court applies a three-prong balancing test: (i) whether lifting the stay will cause any great prejudice to either the bankrupt estate or the debtor; (ii) whether the hardship to the debtor is "***considerably outweigh[ed]***" by the hardship to the non-bankrupt party if the stay is maintained; and (iii) the probability of prevailing on the merits. *In re Downey Financial Corp.*, 428 B.R. 595, 608-09 (Bankr. D. Del. 2010) (emphasis added). However, the facts of *Downey* are distinct from the facts of this case, and the Asbestos Debtors misread what constitutes "cause."

9. In *Downey*, the debtor's directors and officers sought relief from the stay to allow them to access the directors' and officers' liability insurance proceeds. *Id.* at 598. This Court ruled that the policy proceeds were not property of the estate, but also ruled that "[e]ven if the Policy proceeds were property of the estate cause exist[ed] to lift the automatic stay to allow the Insureds access to the Policy proceeds." *Id.* at 608. Because the policy provided coverage up to $10 million, and the movants were only seeking to collect $880,000, the court found that the estate would not suffer any great prejudice by lifting the stay because the claim would be entirely paid for by the insurance proceeds. *Id.* at 609.

10. Had the LSGT Debtors not filed for bankruptcy and instead sought relief from the automatic stay—unlike in *Downey*—they would not be seeking to collect from insurance proceeds. The LSGT Debtors would have sought relief from the automatic stay to allow them to

access the Debtors' cash to satisfy their intercompany claims—*i.e.*, the LSGT Debtors would have been mere affiliates seeking to have their unsecured claims satisfied ahead, and at the expense, of the Debtors' general unsecured creditors. In other words, the LSGT Debtors would have been asking this Court to violate "a fundamental policy of bankruptcy law" that there is "equality among creditors." *Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 896 F.2d 54, 57 (3d Cir. 1990); *Clarke v. Rogers*, 228 U.S. 534, 544 (1913) ("[T]he fundamental purpose of the bankruptcy law; that is, equality between creditors.").

11. The Asbestos Objectors argue that there was (i) obvious prejudice because the LSGT Debtors would have been cash-strapped and (ii) there would be no hardship to the Debtors because the annual costs of defending and settling asbestos claims were "no more" than $3 million a year.[7] Thus, the Asbestos Objectors believe that cause exists when a creditor really needs its claim satisfied. Setting aside the irony of the Asbestos Objectors' assertion that the LSGT Debtors are cash-strapped enough to justify lifting the automatic stay of other Debtors, but somehow not financially distressed enough to justify a bankruptcy filing, this simply is not the law. Every creditor wants their claim satisfied to some extent, and $3 million annually can hardly be considered a *de minimis* claim. If general unsecured creditors could so easily lift the automatic stay to collect on their claims, then one would expect such relief would be a common occurrence. Yet, the Asbestos Objectors have not cited one case with such facts.[8] Further, the harm to the creditor must considerably outweigh the harm to the Debtors—and forcing the Debtors to litigate asbestos claims across the country is a significant prejudice when they are trying to reorganize.

---

[7]  *See* Reply at 6.

[8]  Indeed, if cause was so easily found for general unsecured creditors, it would seem the doctrine of necessity would have no reason to exist.

12. It is likely that an attempt to skip the line of other unsecured creditors and circumvent the distribution scheme contemplated by the Bankruptcy Code would have been denied. In any event, the LSGT Debtors certainly had good reason to believe such an attempt would be denied and their ability to access their only asset faced a substantial and significant risk. Instead of accepting that risk, the LSGT Debtors opted to file for bankruptcy to utilize the protection of the automatic stay so that they could obtain "breathing room" to preserve the value of their estates while they evaluated their restructuring options.

II. **The Debtors' Decision Not to File EFH Properties and Basic Resources Does not Support a Finding that the LSGT Debtors Filed in Bad Faith.**

13. The Asbestos Objectors suggest that the LSGT Debtors' stated interest in avoiding and resolving potential deconsolidation-related tax issues was not a good-faith basis for filing the LSGT Debtors because other regarded entities—namely, EFH Properties Company ("EFH Properties") and its subsidiary Basic Resources, Inc. ("Basic Resources")—were not filed for bankruptcy.[9] These entities were like EECI, Inc. ("EECI"), LSGT Gas, and EEC Holdings, Inc. ("EEC Holdings") in that they were potentially liable for any deconsolidation tax, but differences between EFH Properties and the LSGT Debtors render the Asbestos Objectors' argument unpersuasive. Indeed, were deconsolidation tax risk the only factor at play, EFH Properties and Basic Resources would also have filed to participate in a resolution of tax issues that may have arisen. But strong countervailing considerations—not present with the LSGT Debtors—counseled against filing EFH Properties in April 2014.

14. While the Debtors ultimately received a private letter ruling from the IRS and reached an agreement on a tax-free separation of the TCEH Debtors that largely neutralized the tax risk, the risk *did* exist—particularly at the time the LSGT Debtors filed for bankruptcy in

---

[9] *See* Reply at 8.

April 2014. The LSGT Debtors' decision to file, in part to avoid tax risk, reflects their Directors' good faith effort to protect the value of their estates, which could have been entirely wiped out by a deconsolidation tax.

### A. Considerations Underlying the Decision Not to File EFH Properties for Bankruptcy.

15. The Court heard extensive testimony on EFH Properties at the hearing on confirmation of the Plan with regard to the TCEH Debtors and the EFH Corporate Services Debtors (the "T-Side Confirmation Hearing").[10] In short, EFH Properties concluded that the risks and complications associated with filing outweighed the risks of not filing. No similar countervailing reasons exist for the LSGT Debtors.

16. EFH Properties was a direct subsidiary of EFH Corp. that held the master lease on Energy Plaza, the Debtors' principal headquarters building in downtown Dallas, Texas, which it sublet to EFH Corporate Services Company and Oncor, among others.[11] Basic Resources was a wholly-owned subsidiary of EFH Properties that held a handful of patents to which the Debtors ascribed no value.[12] EFH Properties' cash flows were roughly neutral to slightly positive.[13]

17. At the T-Side Confirmation Hearing, Kristopher Moldovan, then the Assistant Treasurer of EFH Properties, enumerated a number of factors that weighed against filing EFH Properties, including: (1) if the Debtors rejected the Energy Plaza lease, EFH Properties and its

---

[10] *See, e.g.*, Ganter Decl. Ex. A, 8/18/16 Hr'g Tr. at 13:15-51:2.

[11] Ganter Decl. Ex. B, *Declaration of Kristopher E. Moldovan in Support of Confirmation of the Third Amended Plan of Reorganization*, dated Aug. 13, 2016, ¶¶ 4, 15.

[12] Ganter Decl. Ex. A, 8/18/16 Hr'g Tr. at 17:12-18:5.

[13] *See* Ganter Decl. Ex. B, *Declaration of Kristopher E. Moldovan in Support of Confirmation of the Third Amended Plan of Reorganization*, dated Aug. 13, 2016, ¶ 14.

subtenants would have had to vacate the Energy Plaza building;[14] (2) EFH Properties' ability to recover the cash proceeds of the 2009 draw-down on a letter of credit securing the Energy Plaza lease, which was held in a segregated account, was highly uncertain; and (3) potentially significant rejection damages could be incurred if EFH Properties filed for bankruptcy and rejected the Energy Plaza lease.[15] Thus, despite the looming threat of a deconsolidation tax, EFH Properties concluded that the risks and complications associated with filing outweighed the risks of not filing, and elected to keep EFH Properties out of bankruptcy while the Debtors worked toward a comprehensive restructuring plan and assessed alternatives for EFH Properties.[16]

18.    As the evidence at the hearing will show, the LSGT Debtors' situation was materially different. In addition to the deconsolidation tax risk, the LSGT Debtors faced imminent cash flow insolvency in the absence of filing, and knotty issues regarding intercompany claims that needed to be resolved through the global restructuring process. In the absence of strong countervailing considerations, the LSGT Debtors chose to file to address those concerns.

---

[14]   Under 11 U.S.C. § 365(d)(4)(A), an unexpired lease will be deemed rejected if not assumed or rejected, and the property must be surrendered to the lessee, "by the earlier of—(i) the date that is 120 days after the date of the order for relief; or (ii) the date of the entry of an order confirming a plan." While the Debtors were considering rejection of the lease, they wanted time to assess their options. *See* Ganter Decl. Ex. B, *Declaration of Kristopher E. Moldovan in Support of Confirmation of the Third Amended Plan of Reorganization*, dated Aug. 13, 2016, ¶ 12.

[15]   *See* Ganter Decl. Ex. B, *Declaration of Kristopher E. Moldovan in Support of Confirmation of the Third Amended Plan of Reorganization*, dated Aug. 13, 2016, ¶ 13.

[16]   *See* Ganter Decl. Ex. C, 8/17/16 Hr'g Tr. at 138:13-21 [P. Keglevic] ("Yes. The original plan in '15, we were still evaluating properties because properties was not a debtor to the case and we were understanding our ability to file them and potentially received some monies back from the lessor of the property. We decided that that was not a likely outcome and, therefore, decided that the only way to get rid of it, economically, was the same way we dealt with corporate services.").

### B. The Disposition of EFH Properties in a Tax-Free Transaction Is Irrelevant to the LSGT Debtors' Decision to File for Bankruptcy.

19. Ultimately, as the Court is aware, EFH transferred EFH Properties to Reorganized TCEH as part of a tax-free TCEH separation. But this outcome was the product of extensive negotiations and the receipt of a private letter ruling from the IRS that was years in the making. The LSGT Debtors could not have known in 2014 how the deconsolidation tax issue would play out, and the Asbestos Objectors' assertion that this hard-fought resolution means "the Asbestos Debtors did not have to be in bankruptcy to participate in any resolution of the tax issues" is a non sequitur.[17]

20. The Asbestos Objectors offer no support for the proposition that the LSGT Debtors would have been able to participate in a global resolution of a deconsolidation tax outside of bankruptcy—or, for that matter, that EFH Properties could have.[18] Instead, they suggest that because a deconsolidation tax was avoided, and EFH Properties was part of the transaction, there was no reason for the LSGT Debtors to file.[19] But as the Debtors demonstrated

---

[17] *See* Reply at 8.

[18] Nor do Asbestos Objectors' cases lend any additional support. In *In re Integrated Telecom Express, Inc.*, a clearly solvent standalone entity filed for bankruptcy allegedly to escape its obligations to its landlord. The court found that one of the debtor's stated rationales for filing—"an efficient procedure for the dissolution of Debtor and distribution of its assets to parties in interest"—achieved no additional efficiencies over state law because dissolution is "not an objective that can be attained in bankruptcy." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 126 (3d Cir. 2004). Here, by contrast, the LSGT Debtors filed in order to participate in a global restructuring process that could have provided a holistic resolution to potential joint and several tax liabilities—a process clearly unavailable outside of bankruptcy. In *In re 15375 Memorial Corporation*, the debtors—non-operating holding companies—filed bankruptcy principally to avoid litigation. 589 F.3d 605, 619 (3d Cir. 2009). The Third Circuit reversed the Bankruptcy Court's denial of a motion to dismiss the petitions, rejecting the debtors' argument, *inter alia*, that the filing was in good faith because bankruptcy enabled the debtors to manage and search for assets. *Id*. at 624. The court found that such a search could be done outside of bankruptcy and that "filing for bankruptcy has only increased the Debtors' cash shortfall." *Id*. By contrast, as will be demonstrated at the hearing, the LSGT Debtors filed to **preserve** access to cash, and to avoid potential annihilation of their assets through a deconsolidation tax.

[19] Reply at 8 ("[T]he Asbestos Debtors did not have to be in bankruptcy to participate in any resolution of the tax issues, as demonstrated by the fact that other EFH Corp. subsidiaries that would have been jointly and severally liable for any deconsolidation related taxes were not placed in bankruptcy, including EFH Properties Company

at the T-Side Confirmation Hearing, and as the Court recognized, the deconsolidation tax risk was real.[20] And as the evidence at the hearing will demonstrate, avoiding a tax bill that could wipe out any value at EECI, LSGT Gas, and EEC Holdings was an important factor underlying the LSGT Debtors' decision to file for bankruptcy, and doing so helped ensure that value would be preserved at their respective estates.

**III.  Reinstatement of the Intercompany Claims and Asbestos Liabilities Is the Value-Maximizing Outcome of Including the LSGT Debtors in the Restructuring Process.**

21.  In arguing for dismissal, the Asbestos Objectors take for granted that the intercompany claims would have been reinstated absent an Asbestos Bar Date and a chapter 11 filing by the LSGT Debtors.  That is purely hypothetical and ignores the "gives and gets" of the Debtors' enterprise-wide restructuring efforts, which were necessary to maximizing the value of the LSGT Debtors' estates.  *As a result*—and not regardless—*of the restructuring process*, the Debtors have been able to propose a plan of reorganization that preserves the intercompany claims in full, thereby ensuring that the LSGT Debtors' properly-preserved asbestos liabilities can be satisfied post-emergence.  As the Debtors' negotiations with potential investors show, without the protections and constraints of the bankruptcy process, such favorable treatment for the LSGT Debtors and their creditors would have been much more difficult to secure.

**A.  Absent Filing, the LSGT Debtors Stood To Recover a Mere Fraction of the Value of Their Unsecured Intercompany Claims Against EFH Corp.**

22.  Had the LSGT Debtors not filed chapter 11 cases, their participation in the other Debtors' bankruptcy proceedings would have been limited and their intercompany claims

---

and Basic Resources, Inc. Although those entities had not filed for Chapter 11 protection themselves, both were transferred to TCEH as part of the TCEH Settlement Plan.").

[20] *See* Ganter Decl. Ex. D, 8/26/16 Hr'g Tr. at 9:2-6 ("One of the themes that carries through this case from the very beginning is the issue of tax and the potential for a multi-billion dollar tax liability resulting from a spinoff or a decoupling of the estates or even a reorganization of the estates.").

significantly impaired.  LSGT Gas would have had a $560 million unsecured claim against EFH Corp., and the other LSGT Debtors would have had claims against LSGT Gas.  Under the recovery waterfall proposed in the current Plan (which is a potential result not foreseeable in May 2014), as an EFH unsecured creditor, LSGT Gas would recover roughly 10 cents on the dollar for its claim, or about $56 million dollars.  In turn, this impaired recovery would impair the LSGT Debtors' other intercompany claims, including EECI's $84 million claim against LSGT Gas.  Consequently, the significant impairment of the intercompany claims would provide little cushion for the LSGT Debtors to defend and settle their alleged asbestos liabilities.[21]  In contrast, by participating in the enterprise-wide restructuring process, the LSGT Debtors can fully unimpair their intercompany claims, for reasons discussed further below.

      **B.     The LSGT Debtors' Participation In the Bankruptcy Process Allowed the Debtors To Secure Full Reinstatement of the Intercompany Claims.**

23.     As the Asbestos Objectors ignore the risks of remaining outside the chapter 11 process, so too do they ignore the benefits that the LSGT Debtors and their creditors have obtained for themselves and their creditors by filing for bankruptcy.  For example, the Plan expressly provides for the reinstatement of the LSGT Debtors' intercompany claims, although other EFH Debtor intercompany claims are canceled and released without any distribution.[22]

---

[21] The Asbestos Objectors cannot have it both ways.  They have consistently claimed that the LSGT Debtors' asbestos liabilities are much larger than the Debtors' estimates—even in the billions of dollars—and yet now they argue that the Debtors acted in bad faith in seeking to maximize the assets available to address those liabilities through chapter 11.  *Compare* Reply at 11 (arguing the LSGT Debtors did not file in order to address a distribution problem, "as they would have more than adequate assets to pay all of their asbestos creditors in full, even if no asbestos claims were discharged") *with Joinder of Shirley Fenicle, as Successor-in-Interest to the Estate of George Fenicle, and David William Fahy to the Motion of Charlotte and Curtis Liberda to Appoint Legal Representative* [D.I. 5191] at ¶ 16 n. 4 (claiming a conservative "back-of-an envelope" estimate of the liabilities is "at minimum" between $3 billion and $5 billion).

[22] *See* Plan, Art. III(B)(13), (14).

Likewise, properly-preserved asbestos claims against the LSGT Debtors are reinstated under the Plan.[23]

24. The LSGT Debtors' creditors, including manifested and unmanifested asbestos claimants, further benefitted from representation by the Official Committee of Unsecured Creditors of EFH Corp., EFIH, EFIH Finance, and EECI (the "<u>EFH Committee</u>") from early on in these chapter 11 cases.[24] In addition to helping the Debtors craft the Asbestos Bar Date Notice Program in the spring and summer of 2015, the EFH Committee reached a settlement with the Debtors on November 23, 2015, which requires reinstatement of preserved asbestos claims and the intercompany claims under any plan proposed by the Debtors.[25] In short, this reinstatement—far from being guaranteed under all circumstances—is the product of the many protections afforded under the Bankruptcy Code. In filing chapter 11 petitions, the LSGT Debtors chose, in good faith, to take on these protections, in exchange for submitting to the procedural requirements of the bankruptcy process.

    C.    **The Debtors' Negotiations With Bidders Demonstrate the Importance of the LSGT Debtors' Participation in the Bankruptcy Process For Securing Reinstatement of the Intercompany Claims and Asbestos Liabilities.**

---

[23] *See* Plan, Art. III(B)(3).

[24] *Notice of Appointment of Committee of Unsecured Creditors* [D.I. 2570]. Despite the Asbestos Objectors' incredible assertions to the contrary, the EFH Committee does and can represent unmanifested asbestos claimants, who are unsecured creditors of EECI. *Cf.* Reply at 19 n. 28. Indeed, Asbestos Objector Shirley Fenicle, an unmanifested asbestos claimant, ***is one of the five EFH Committee members***. Indeed, the Court has already ruled that the EFH Committee adequately represented the interests of unmanifested claimants throughout the Asbestos Bar Date process, and declined to appoint a separate unmanifested claimants' representative. *See, e.g.*, Ganter Decl. Ex. E, 8/11/15 Hr'g Tr. at 115:6-116:13 ("I have no basis to find that there is anything inadequate in the representation of these creditors that's specific to these creditors that would require an additional representative to be appointed. . . . I certainly wouldn't expect any court appointed representative to do anything other than what was done by the E-side committee [with respect to providing notice of the Asbestos Bar Date].").

[25] *See Notice of Settlement Among Debtors, EFH Committee, EFH Notes Trustee, Plan Sponsors, Consenting TCEH First Line Creditors, and TECH Committee* [D.I. 7090] at Exhibit A, Settlement & Support Agreement, by and among the Debtors and the EFH Committee, Section 6.

25.     The Asbestos Objectors' contention that EFH Corp. acted out of self-interest in reinstating the intercompany claims is demonstrably wrong.  First, the Debtors' efforts to convince bidders for Oncor to reinstate the LSGT Debtors' properly-preserved asbestos liabilities were specifically intended to benefit the LSGT Debtors and their creditors, not EFH Corp.  If anything, EFH Corp. expended leverage by asking bidders to assume the asbestos liabilities.  For example, bidders discounted their purchase price when the asbestos liabilities were included in the proposed asset sale.[26]  And, the $100 million asbestos escrow set-aside in the Merger Agreement is a sum that would otherwise go to other unsecured creditors of EFH.[27]

26.     As the evidence will show, in exchange for reinstating the LSGT Debtors' properly-preserved asbestos liabilities, pre-filing buyers and post-filing bidders such as the Hunts and NextEra indicated a need for a bar date in order to understand the scope of those liabilities. In turn, the Debtors sought an Asbestos Bar Date, not to limit the LSGT Debtors' liabilities, but to *identify* them, in order to provide the certainty that bidders sought before they could agree to reinstate asbestos liabilities and related intercompany claims.[28]

27.     The deal reflected in the Plan Support Agreement and Merger Agreement with NextEra further demonstrates the importance of the LSGT Debtors' chapter 11 cases and the application of the Asbestos Bar Date to their liabilities.  For example, the Plan Support Agreement includes a termination right for NextEra if the LSGT Debtors' chapter 11 cases are

---

[26] *See, e.g.*, Ganter Decl. Ex. F, July 18, 2016 Email from Evercore to EFH, KE re Merger Agreement Analysis [EFH06533450-53] (adjusting bid analyses by lowering recoveries to EFIH and EFH unsecured noteholders due to asbestos set-aside in NextEra's bid and noting a second bidder discounted its bid amount to account for asbestos risk).

[27] *See, e.g.*, *Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I. 9584] at Exhibit A, July 29, 2016 Amended Merger Agreement  (releasing $150 million from the asbestos escrow pursuant to settlement with Fidelity, which increased the EFH unsecured creditors' recoveries).

[28] *See, e.g.*, Ganter Decl. Ex. G, June 16, 2016 email from S. Dore to C. Sieving [EFH06522696-701]; Ganter Decl. Ex. H, June 18, 2016 email from C. Sieving to S. Dore and A. Calder [EFH06436044-45].

dismissed, and termination of the Plan Support Agreement in turn allows NextEra to terminate the Merger Agreement. Thus, it is not true that the "only impact dismissal will have is that asbestos claims will not be discharged."[29] To the contrary, dismissal of the LSGT Debtors' chapter 11 cases would jeopardize the Debtors' enterprise-wide restructuring plan, including preservation of the LSGT Debtors' source of funding for their asbestos liabilities.

28. In conclusion, filing for bankruptcy afforded the LSGT Debtors the protections and flexibility they needed to maximize the value of their estates and, in turn, recoveries for their creditors; and no alternative to filing offered a better opportunity to do so.

[*Remainder of page intentionally left blank.*]

---

[29] *See* Reply at 20.

WHEREFORE, the Debtors respectfully request that the Court enter an order denying the Motion and granting the Debtors such other and further relief as is appropriate under the circumstances.

Dated: December 4, 2016
       Wilmington, Delaware

/s/ Jason M. Madron
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 651-7700
Facsimile:   (302) 651-7701
Email:   collins@rlf.com
       defranceschi@rlf.com
       madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:   edward.sassower@kirkland.com
       stephen.hessler@kirkland.com
       brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:   james.sprayregen@kirkland.com
       marc.kieselstein@kirkland.com
       chad.husnick@kirkland.com
       steven.serajeddini@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*