# <u>EXHIBIT A</u>

1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                          :
                                    :   Chapter 11
6   ENERGY FUTURE HOLDINGS          :
    CORP., et al.,                  :   Case No. 14-10979(CSS)
7                                   :
             Debtors.              :    (Jointly Administered)
8   _____ :

9

10

11

12

13                          United States Bankruptcy Court

14                          824 North Market Street

15                          Wilmington, Delaware

16

17                          August 18, 2016

18                          10:07 AM - 4:39 PM

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

1     (Pause)

2         MR. MCKANE:  Your Honor, also with regards to the

3     submissions to the IRS there are going to be a series of

4     them that are going to be moved into evidence by I believe

5     the EFH indenture trustee.  The debtor has no objection to

6     what they're moving in; they are what they purport to be.

7     So there's no need to lay a foundation with Ms. Howard and

8     that will help I think shorten her examination.

9         THE COURT:  Okay.

10        MR. MCKANE:  With that, Your Honor, I'll cede the

11    podium to my partner Mr. Michael Esser.

12        THE COURT:  Okay.

13        MR. ESSER:  Good morning, Your Honor.

14        THE COURT:  Good morning.

15        MR. ESSER:  Mike Esser, Kirkland & Ellis, for the

16    debtors.  At this time, Your Honor, we are prepared to call

17    Kristopher Moldovan.

18        THE COURT:  Okay.

19        MR. ESSER:  And we do call Mr. Kristopher Moldovan

20    to the stand.

21        THE COURT:  Mr. Moldovan, if you'd just take the

22    stand and remain standing, please, for your affirmation.

23        THE CLERK:  Please raise your right hand.

24         KRISTOPHER MOLDOVAN, WITNESS, AFFIRMED

25        THE CLERK:  Please state and spell your name for

1    the record.

2              THE WITNESS:  Kristopher Moldovan,

3    K-R-I-S-T-O-P-H-E-R  M-O-L-D-O-V-A-N.

4              THE CLERK:  Thank you.

5              THE COURT:  Thank you, sir.

6              THE WITNESS:  Good morning.

7              THE COURT:  Good morning.  If you could just slide

8    up to the microphone?  Thank you.

9                        DIRECT EXAMINATION

10   BY MR. ESSER:

11   Q      Good morning.

12   A      Good morning.

13   Q      Sir, could you please state your name for the record?

14   A      Kristopher Moldovan.

15   Q      Mr. Moldovan, do you hold a position with the debtors?

16   A      I do.  I'm the assistant treasurer of every debtor

17   other than Energy Future Holdings Corp.

18   Q      Do you also hold a position with any non-debtor

19   affiliates of the debtors?

20   A      I do.  I'm the assistant treasurer of EFH Properties

21   Company and Basic Resources, Inc., among other non-debtors.

22   Q      How long have you held your current positions?

23   A      Since April of 2010.

24   Q      Have you held any other positions with the company

25   prior to your current position?

15

1    A    Yes.  I was senior counsel in the legal department from

2    October 2006 through April 2010.

3    Q    And have you testified in these cases before?

4    A    I have.  I testified in the first lien make-whole

5    trial.

6    Q    Well, welcome back.

7    A    Thank you.

8    Q    Mr. Moldovan, did you prepare a declaration in

9    anticipation of your testimony here today?

10    A    I did.

11    Q    Have you prepared a revised declaration after

12    submitting your original declaration?

13    A    I have.

14         MR. ESSER:  Your Honor, if I may approach?  I've

15    got witness binders for both you and your staff.

16         THE COURT:  Thank you.

17      (Pause)

18         THE COURT:  Thanks.

19    BY MR. ESSER:

20    Q    Mr. Moldovan, could you please turn to the tab labeled

21    Moldovan Declaration?

22    A    I'm there.

23    Q    Is this your revised declaration?

24    A    It is.

25    Q    How does this revised declaration differ from your

1   original declaration submitted?

2   A     When I signed the original declaration to the best of

3   my information and belief, I did not believe that EFH

4   Properties had ever made a payment to reduce a receivable it

5   had with EFH Corp.  After I signed and this declaration was

6   submitted, upon preparing for my examination today I learned

7   that there was one payment made in August 2009.

8   Q     Have there been any payments since that original

9   payment?

10  A     No.

11  Q     And is that change reflected on page 7 of your revised

12  declaration?

13  A     There's a deletion of the sentence that said "No

14  payment has ever been made," that's correct.

15  Q     Now, is all other information contained in this

16  document true and accurate to the best of your knowledge?

17  A     Yes.

18         MR. ESSER:  Your Honor, we had received some

19  evidentiary objections to Mr. Moldovan's declarations --

20  declaration, but I believe we have resolved them with the

21  following caveat.  The EFH indenture trustee objected to

22  paragraphs 21, 23 and 28 as hearsay, but we have resolved

23  that objection with the following statement:  "We've agreed

24  to admit them for their effect on the listener as statements

25  informing the debtors' decision-making process."

1          So, Your Honor, with that proviso, we move Mr.

2   Moldovan's revised written declaration into evidence.

3          THE COURT:  Any objection?

4          MR. PEDONE:  No, Your Honor.

5          THE COURT:  It's admitted.

6      (Debtors' Exhibit Moldovan Declaration admitted)

7   BY MR. ESSER:

8   Q     Mr. Moldovan, where does EFH Properties sit in the

9   company's corporate organizational structure?

10  A     EFH Properties is a wholly owned subsidiary of Energy

11  Future Holdings Corp.

12  Q     Does EFH Properties itself have any subsidiaries?

13  A     It does.  Basic Resources, Inc. is a wholly owned

14  subsidiary of EFH Properties Company.

15  Q     What is the principal function of Basic Resources,

16  Inc.?

17  A     Basic Resources, Inc. holds what remains of the active

18  patents that the company has and has a few patent

19  applications as well.

20  Q     Does the company ascribe any value to these patents?

21  A     No, it does not.

22  Q     Why not?

23  A     The patent application -- the patents that it's had,

24  there's been no value ascribed either from the accounting or

25  the business groups and in fact, because the costs of

18

1  renewal exceeds the value company believes, over time we've

2  been letting the patents expire when the renewals come.  And

3  that is our plan going forward with the remaining active

4  patents is as they come, the plan is to let them expire

5  rather than pay to renew them.

6  Q    What is the principal function of EFH Properties

7  Company itself?

8  A    It's the lessee of record for the entire Energy Plaza

9  Building, which is the headquarters of Energy Future

10  Holdings Corp. and its competitive subsidiaries.

11  Q    Sir, did you help prepare a demonstrative to aid your

12  testimony today?

13  A    I did.

14  Q    Could you turn to Tab Moldovan 1 in your binder?

15      (Pause)

16  Q    Is this that demonstrative?

17  A    It is.

18  Q    Sir, when was the Energy Plaza lease first executed?

19  A    February 14th, 2002.

20  Q    Can you please describe the transaction that led to the

21  execution of the lease?

22  A    Sure.  That was executed in connection with a sales

23  leaseback.  At the time, EFH Properties was known as TXU

24  Properties.  It owned the building; it sold the building to

25  an affiliate of Zurich Structured Finance.  Zurich

19

1  Structured Finance financed it in a leveraged -- there was a

2  leveraged lease, they financed it with the pro --

3  principally with the proceeds of debt that was issued to

4  certain insurance companies, including Prudential Insurance

5  Corporation.  And then the affiliate of Zurich Structured

6  Finance who bought the building leased it back to TXU

7  Properties and again leased the entire building to them.

8  Q    Can you please describe the rent obligations under the

9  lease?

10  A    Yeah, the lease requires both basic rent -- basic rent

11  is fixed, semi-annual rent -- those rent amounts are equal

12  to the principal and interest payments on the debt.  The

13  lease agreement also requires supplemental rent, which is

14  variable rent and is paid almost daily.

15  Q    At the time of execution, did the lease require a

16  guaranty of these rental payments?

17  A    It did.  At the time of execution TXU Corp., which is

18  now EFH Corp., provided a guaranty of all obligations of EFH

19  Properties Company, including its payment obligations.

20  Q    Were any other guaranties given after that?

21  A    Yes.  In May, 2002 TXU Europe, which was a wholly owned

22  subsidiary of EFH Corp., filed for administration in England

23  and Wales.  As a wholly owned subsidiary of the guarantor,

24  that filing resulted in a lease event of default.  In

25  connection with that the company sought to get a waiver from

1    the counterparties, the lessor and the noteholders, for that

2    lease event of default.  In order to obtain that waiver, the

3    counterparties required an additional guaranty be provided

4    from an investment grade-rated company.  That guaranty at

5    the time was provided by TXU Energy Company, which is now

6    known as TCEH.  It was investment grade-rated at the time

7    and it provided a second guaranty of all obligations of the

8    lease.

9    Q    What happened to the guaranties after that?

10   A    In February of 2007, the LBO was announced and all the

11   debt related to the LBO was announced and the rating

12   agencies downgraded, subsequently downgraded TCEH to below

13   investment grade.  The terms of that guaranty required that

14   either a third guaranty be provided from another investment

15   grade-rated corporation or a qualified letter of credit as

16   defined in the lease documentation be provided as security,

17   or else there would be a lease event of default.

18   Q    What did the parties do?

19   A    Well, first the parties analyzed whether we could find

20   an investment grade-rated corporation to provide a guaranty;

21   the company could not find one to do that.  The company

22   looked at the documents and determined that the provisions

23   related to qualified letter of credit were not sufficient

24   for providing a letter of credit the size that was going to

25   be required.  It was not well thought out when it was

1    drafted in 2002.

2            So the company sought to negotiate amendments to

3    the documents and worked with the counterparties for several

4    months, and ultimately amended all of the lease

5    documentation and provided a letter of credit from TCEH to

6    the counterparties to secure its obligations.  And at the

7    time that it provided the letter of credit we were able to

8    obtain the release of the guaranties from EFH Corp. and

9    TCEH.

10   Q    What happened to the letter of credit after 2007?

11   A    Yeah, the letter of credit was issued by JP Morgan, who

12   at the time met the criteria of an acceptable bank.  An

13   acceptable bank required certain ratings of the bank that

14   was issuing the letter of credit.  As we got into 2008 and

15   2009, JP Morgan resigned as a letter of credit issuer under

16   TCEH's credit facility.  The -- after that resignation and

17   as the letter of credit was about to come up for renewal, JP

18   Morgan sent the notice of nonrenewal.  When that was sent,

19   that allowed the company a certain period of time to provide

20   a replacement letter of credit from an acceptable bank and

21   the company sought to do that.  Unfortunately, the company

22   did not have any letter of credit issuers available to it

23   that met the definition.

24            And then it sought -- and so because it could not

25   give a letter of credit from an acceptable bank it sought to

22

1    amend the documents again with the counterparties so that

2    they would accept the letter of credit from Citibank, who

3    just barely missed those qualifications.  And after a

4    proposal was made, the counterparties considered it and

5    informed the company that they would not be accepting the

6    letter of credit from Citibank.

7    Q    What happened next?

8    A    As soon as the period ran where the company had the

9    right to provide a letter of credit, once that ran, very

10   shortly thereafter the beneficiary of the letter of credit

11   drew on the full amount of the letter of credit, which was

12   approximately $115 million.

13   Q    Have you prepared a demonstrative exhibit to aid your

14   explanation of this transaction?

15   A    I have.

16   Q    Could you please turn to D-DEM Moldovan 2 in your

17   binder.

18   A    Okay.

19   Q    Could you please walk the Court through how the company

20   accounted for this letter of credit draw?

21   A    Sure.  There was a reduction of restricted cash at TCEH

22   that came out of a TCEH restricted cash account and then

23   there was a payable put on the books and records, a payable

24   and receivable, a payable from EFH Corp. to TCEH for that

25   approximately $115 million.  There was a corresponding

1    payable and receivable put on the books of EFH Properties

2    and EFH Corp.; it was a payable from Properties to Corp. of

3    the same amount, approximately $115 million.  And then EFH

4    Properties had an increase in its prepaid rent.

5    Q    At that time were these intercompany payables and

6    receivables memorialized in any formal loan agreements or

7    notes?

8    A    No, they were just put on the accounting books as an

9    intercompany payable/receivable.

10   Q    What happened to the payable between EFH Corp. and

11   TCEH?

12   A    Yeah, later in 2009 that payable was incorporated into

13   an SG&A note that was outstanding from EFH Corp. to TCEH.

14   At the time the interest rates were the same and so the

15   amount was incorporated into that note.  And then subsequent

16   to that, over time that SG&A note was repaid in full,

17   including the amount that was incorporated from this

18   payable.

19   Q    Have there been any payments on the payable between EFH

20   Properties and EFH Corp?

21   A    Yeah, as I said earlier, there was one payment in

22   August 2009, but there have been none since then.

23   Q    Does the company currently forecast to make any

24   payments on account of it?

25   A    No.

1    Q    What is the approximate balance of that payable today?

2    A    It's approximately $158 million.

3    Q    Thank you.

4         How did EFH Properties' rent obligations change

5    after the draw on the TCEH letter of credit?

6    A    The amount of the TCEH letter of credit was equal to

7    the undiscounted base rent payments from that period through

8    the end of the lease, plus $5 million.  Those amounts were

9    put into accounts at the servicer of the debt and the base

10   rent payments, which are made semi-annual again in the

11   amounts of the debt payments, are now drawn from those

12   accounts and made with money drawn from those accounts.  And

13   EFH Properties therefore no longer makes any base rent

14   payments unless -- it still does have an obligation if for

15   some reason the servicer wouldn't withdraw, it still would

16   have an obligation to make the base rent payments, but

17   otherwise it has effectively prepaid the base rent payments

18   through the end of the term.

19   Q    EFH Properties control those escrow accounts?

20   A    No.  In fact the -- one of the documents signed when we

21   amended the documents in 2007 EFH Properties specifically

22   disclaims any interest at all in those accounts.

23   Q    I'd like to shift gears a bit.  What is the primary

24   source of EFH Properties' cash flow?

25   A    Rent from subtenants offset by the expenses to run and

1    maintain the building.

2    Q    Have you prepared a demonstrative on this issue?

3    A    I have.

4    Q    Could you turn to Moldovan 3 in your binder?

5    A    Okay.

6    Q    Please walk the Court through EFH Properties' primary

7    subtenants?

8    A    Yeah, the primary subtenants are EFH Corporate

9    Services, the Federal Deposit Insurance Corporation, and

10    Oncor Electric Delivery Company.

11    Q    Does Oncor sublease its space?

12    A    It does.    Oncor does not occupy any space in Energy

13    Plaza anymore; it has sub-subleased its space to Luminant.

14    Q    I don't see TXU Energy listed as a subtenant here; why

15    is that?

16    A    TXU -- at the time of the LBO, TXU Energy moved to a

17    building outside of downtown Dallas at a suburban campus and

18    it inhabits that building plus another customer operations

19    facility.

20    Q    About how long of a drive is that from Energy Plaza?

21    A    Oh, depending on the time of day, it's probably 20 to

22    30 minutes.

23    Q    Would you please walk the Court through when each

24    sublease expires?

25    A    Yeah.    The Corporate Services sublease has already

1    expired, it expired in 2004; it's now on a month-to-month

2    arrangement.  The FDIC sublease expires in November 2017,

3    and the Oncor sublease expires in March 2017, and then of

4    course the Luminant sub-sublease expires at the same time as

5    the Oncor sublease in March of 2017.

6    Q    How about the EFH Properties master lease?

7    A    It expires in February 2022.

8    Q    So there are five and a half years left?

9    A    Approximately.

10   Q    What are EFH Properties' expenses other than base rent?

11   A    Again, it's got supplemental rent.  Supplemental rent

12   is all-inclusive of both operating and maintaining a Class A

13   building in downtown Dallas, as well as it has the

14   supplemental rent covers, the expenses -- the annual and

15   period expenses of the counterparties to the lease,

16   including the servicer, the indenture trustee, the

17   owner/lessor, the noteholders, their counsel.

18   Q    Could you please give the Court some example of the

19   cost to operate the building?

20   A    Yeah.  The operating expenses include janitorial,

21   security, property -- we have an outside property manager,

22   we have an internal facilities group, it includes utilities.

23   I think those are the -- property taxes -- those are the

24   primary.

25   Q    Does EFH Properties receive any reimbursement at all

1    from the owner/lessor for these costs?

2    A    No and, again, in fact all the costs that the

3    owner/lessor and the other counterparties have EFH

4    Properties actually reimburses them, not the opposite.

5    Q    Are any floors currently vacant at Energy Plaza?

6    A    Yes, four floors are entirely vacant and several other

7    floors have partial vacancy.

8    Q    How does the remaining duration of the lease impact

9    your ability to sublease the space?

10    A    Well, there's only five and a half years until the

11    duration of the lease and to attract significant subtenants

12    that's a very short time.  The time it takes to fix the

13    space for their specifications and for them to move, they'd

14    probably actually have less than five years; that's actually

15    very expensive.  So our experience is it's been very

16    difficult to lease given the short duration of the remaining

17    tenure of the lease.

18    Q    Have the debtors spent any efforts to assess moving to

19    alternative office space?

20    A    We have.  Before the LBO, in 2006 and 2007 we sought to

21    move the headquarters and in fact signed a lease at a

22    building in -- another building in the downtown Dallas area

23    to move our headquarters.  That -- we never did end up

24    moving to that location, but had that lease in place

25    throughout the term until we were able to terminate.  And

1  then again in 2014 and 2015, we engaged Jones Ling LaSalle

2  to find alternative space and toured and went through a

3  significant process to locate an alternative space.

4  Q    Has EFH Properties ever approached the current

5  owner/lessor in an attempt to restructure the lease

6  documents?

7  A    We did.   In 2014, late 2014, given the fact that being

8  a landlord is not a core business of either the E-side or

9  the T-side, we approached the current owner of the building.

10  We offered to convert the lease that EFH Properties had from

11  a lease of the entire building that was responsible for

12  everything in the building, so just a more typical landlord-

13  tenant relationship.   We would transfer the obligations and

14  the upside of the building back to the owner where we

15  thought it was more appropriate, especially given the fact

16  that we are not -- EFH Properties is not able to sublease

17  beyond 2022, whereas the owner of the building has an

18  interest in keeping tenant beyond that date, it will own the

19  building after the lease of the entire building expires.

20  And we would assign them all the subleases, that they were

21  getting all the sublease rent.   We would enter into a lease

22  with them and then again they would then control the ability

23  to sublease the vacant space and to negotiate with the FDIC

24  beyond the 2022 expiration date that we have on our lease.

25          MR. PEDONE:   Objection.   Move to strike the

1   statements with regard to the ability to sublease beyond the

2   expiration date; it calls for a legal conclusion.

3              THE COURT:  No, I think -- I don't think it

4   requires a legal conclusion.  I think he can answer that

5   based on his experience, so overruled.

6   BY MR. ESSER:

7   Q    I just want to understand this:  the company proposed

8   that the landlord take on the costs of running the building?

9   A    That's correct.

10  Q    And in turn the landlord would receive all rents going

11  forward?

12  A    That's correct.

13  Q    How did the landlord respond to this proposal?

14  A    Well, we sent them a term sheet.  There was an initial

15  cursory response.  We responded to that term sheet, we

16  didn't get a response for some period of time, and then they

17  came back and declined to engage in any future discussions

18  and informed us that they wanted to maintain the status quo.

19  Q    Are you familiar with the EFH Properties' financial

20  forecast about which Mr. Keglevic testified yesterday?

21  A    I am.

22  Q    Does that forecast include assumptions about whether or

23  not the FDIC will renew all floors currently under lease

24  when its lease expires in 2017?

25  A    It does include an assumption and assumes that they

1    will not renew all of the floors that they're currently

2    subleasing.

3    Q      Why does it include that assumption?

4    A      FDIC has sent us a request for proposal for 13 to 14

5    floors; they currently occupy 21 floors.

6    Q      Does that forecast include assumptions about whether or

7    not Oncor will renew its sublease when it expires in March

8    of 2017?

9    A      It does include an assumption and it assumes that Oncor

10   will not renew any portion of its sublease.

11   Q      Why is that assumption in that forecast?

12   A      Well, Oncor doesn't occupy any of the space, it sub-

13   subleases to Luminant.  That sub-sublease, that arrangement

14   that Oncor has entered into has done so at a loss of

15   approximately $1.1 million a year.  So there's no reason to

16   believe that they would continue to extend that loss.

17   Q      So Oncor pays more in sublease rent than it receives

18   from its sub-sublease to Luminant?

19   A      Yeah, it pays more to EFH Properties than it receives

20   from Luminant by approximately $1.1 million per year.

21   Q      If EFH Properties loses these subtenants, will there be

22   any large reductions in expenses at Energy Plaza?

23   A      No.  There will be slight reductions for utilities and

24   janitorial, but all the other costs including the outside

25   property management, the inside facilities department, the

1  property taxes, the capital expenditures, those all remain

2  the same.  So it will be very -- there will be a very small

3  reduction.

4  Q    What are some examples of the overhead costs or capital

5  expenditures that EFH Properties would still have to pay?

6  A    Yeah, EFH Properties, again, is responsible for

7  maintaining the building as a Class A building.  So it's got

8  to maintain the roof -- there's multiple roofs on the

9  building given its structure, there's a separate parking

10 garage that it has to maintain and repair, there's a number

11 of elevators, escalators, there's the HVAC system, cooling

12 towers, chillers; there's the sidewalks, there's a plaza in

13 front, there's -- you know, it has to upkeep the building,

14 again, as a Class A building in Dallas.

15 Q    Shifting gears a little bit.  Are you aware that the

16 plan contemplates that EFH Corp. will contribute its equity

17 interests in EFH Properties to reorganize TCEH?

18 A    I am.

19 Q    What is your understanding of what EFH Corp. is

20 conveying and what EFH Corp. is receiving through this

21 transaction?

22 A    Well, again, EFH Corp. is going to transfer the equity

23 interests to reorganize TCEH, but immediately prior to the

24 transfer all cash that is at EFH Properties, which is

25 anticipated to be approximately $14 million, will be

1    distributed or otherwise transferred to EFH Corp. or one of

2    the E-side entities designated by EFH Corp. and some

3    intercompany payables from EFH Properties to EFH Corp. will

4    be cancelled before that transfer.

5    Q    Have you assisted with the preparation of any board

6    presentations on this subject?

7    A    I have.

8    Q    Can you please turn to Tab DX-57 in your witness

9    binder?

10    (Pause)

11    Q    Do you recognize this document?

12    A    I do.

13    Q    What is this document?

14    A    This is the presentation that was prepared in advance

15    of the board meeting and presented at the board meeting on

16    July 22nd, 2016.

17    Q    Did you provide and put on this presentation?

18    A    I did.

19    Q    Could you please turn to page 10 of the presentation?

20    A    Okay, I'm there.

21    Q    Did you provide input on this portion of the

22    presentation?

23    A    I did.

24    Q    When did you provide your comments?

25    A    In advance of the meeting, my last set of comments were

1    submitted right before this presentation was sent to the

2    board, which would have been the day before the board

3    meeting.

4    Q    Can you please turn to Tab DX-48 in your witness

5    binder?

6         (Pause)

7    A    I'm there.

8    Q    What is this document?

9    A    This is a presentation that was prepared for a board

10   meeting that occurred on July 27th, 2016.

11   Q    Did you provide input on this presentation?

12   A    I did.

13   Q    Can you please turn to page 21?

14   A    I'm there.

15   Q    Did you provide input on this part of the presentation?

16   A    I did.

17   Q    Did you provide multiple rounds of edits?

18   A    I did.

19   Q    When did you provide your final comments?

20   A    Again, my final comments were provided very shortly

21   before the materials were sent to the board, which would

22   have been the day before the board meeting.

23   Q    In advance of a July 27, 2016 board meeting, did you

24   meet with any of the disinterested directors of EFH

25   regarding EFH Properties?

34

1    A    I did; I met with Billie Williamson.

2    Q    Who requested that meeting?

3    A    Billie Williamson.

4    Q    When was that meeting held?

5    A    It was held on the morning of the 27th.

6    Q    About how long did it last?

7    A    Approximately an hour.

8    Q    What was the purpose of the meeting?

9    A    It was Ms. Williamson asked me to go over the history

10    of the Energy Plaza lease and the transactions.

11    Q    Were her advisers present?

12    A    They were present by phone, yes.

13    Q    Anyone else?

14    A    Yes.  Ms. Doray was at that meeting, Mr. McKane, and I

15    believe other Kirkland lawyers were on the phone.

16    Q    Did Ms. Williamson ask you questions?

17    A    She did.

18    Q    And what details did you provide to her?

19    A    I provided her a history of the lease transactions,

20    including the letter of credit draw and the origination of

21    the payables and receivables on the books, and answered the

22    questions that she had.

23        MR. ESSER:  Your Honor, at this time, unless I

24    need to lay any additional foundation for exhibits, I have

25    no further questions for Mr. Moldovan.  I believe we have a

1    relatively uncontested set of exhibits to move in at this

2    time.

3              THE COURT:  All right.

4              MR. ESSER:  Your Honor, I've --

5              MR. PEDONE:  Your Honor --

6              THE COURT:  Mr. Pedone?

7              MR. PEDONE:  -- could we just briefly --

8              THE COURT:  Sure.

9              MR. PEDONE:  -- go off the record --

10             THE COURT:  Yes, of course.

11             MR. PEDONE:  -- and see if we can make this go a

12   little more quickly.

13        (Pause)

14             MR. ESSER:  Okay, my understanding is it will in

15   fact be uncontested.

16             THE COURT:  Okay.

17             MR. ESSER:  Okay.  Your Honor, as to DX-356, this

18   is an EFH Properties balance sheet, which I will move into

19   the record subject to the following attorney representation,

20   if you would like.

21             THE COURT:  Okay.

22             MR. ESSER:  Okay.  Your Honor, DX-356 is an EFH

23   Properties assets and liabilities balance sheet pulled from

24   the company's general ledger from Alvarez & Marcel as of

25   April 30, 2016.

1          Your Honor, as you know, Alvarez & Marcel has been

2     advising the company since before the petition date, has

3     been embedded with the company's accounting and planning

4     group, and is often the company's arms and legs when it

5     comes to summarizing voluminous company records such as the

6     general ledger.

7          Your Honor, this document was created by a member

8     of Alvarez & Marcel at the direction of a member of the

9     company's planning group.  This exhibit was made at or near

10    the time of creation by someone with knowledge from

11    information kept in the course of a regularly conducted

12    activity of the company and was made subject to a current

13    practice of the company.

14         With this representation, I believe we have

15    resolved the objection and move DX-356 into evidence.

16         THE COURT:  All right.  Any objection?

17         MR. PEDONE:  No objection, Your Honor.

18         THE COURT:  It's admitted.

19     (Debtors' Exhibit No. DX-356 was admitted)

20         MR. ESSER:  Your Honor, DX-519, DX-572, and DX-577

21    are Excel spreadsheets that I will move in with a similar

22    proffer -- excuse me, or attorney representation.

23         THE COURT:  Okay.

24         MR. ESSER:  Okay.

25         THE COURT:  They're admitted.

1          (Debtors' Exhibit Nos. DX-519, DX-572, and DX-577 were

2     admitted)

3               MR. ESSER:  Okay, thank you.

4               MR. PEDONE:  Your Honor, we need the

5     representation as to the business records foundation.

6               THE COURT:  He --

7               MR. ESSER:  I'm happy to make it again.

8               THE COURT:  Okay.

9               MR. PEDONE:  I believe it's different because

10    Alvarez is not involved with that one.

11              THE COURT:  Oh, I see.

12              MR. PEDONE:  Yes.

13              THE COURT:  Okay, very good.  Thank you.  I

14    apologize.

15              MR. ESSER:  Yes, this one is a little bit

16    narrower.  So these exhibits are company records, they were

17    made from information transmitted by someone with knowledge

18    from information kept in the course of a regularly conducted

19    activity of the company and made subject to a current

20    practice of the company.

21              With this attorney representation, we move these

22    exhibits into the record.

23              MR. PEDONE:  No objection, Your Honor.

24              THE COURT:  All right, they're admitted this time

25    for real.

38

1          (Laughter)

2          (Debtors' Exhibit Nos. DX-519, DX-572, and DX-577 were

3     admitted)

4               MR. ESSER:  Thank you, Your Honor.

5               The remaining exhibits will be moved in, I will

6     read the list in, no proffers will be made.

7               THE COURT:  Okay.

8               MR. ESSER:  Your Honor, at this time we move in

9     DX-382, DX-457, DX-491, DX-493, DX-494, DX-508, DX-512, DX-

10    514, DX-515, DX-528, DX-530, DX-574, DX-575, DX-576, DX-578,

11    DX-579, DX-580, DX-581 -- that's 581 -- DX-582, and DX-583.

12              THE COURT:  Okay, any objection?

13              MR. PEDONE:  No, Your Honor.

14              THE COURT:  They're admitted.

15         (Debtors' Exhibit Nos. DX-382, DX-457, DX-491, DX-493,

16    DX-494, DX-508, DX-512, DX-514, DX-515, DX-528, DX-530, DX-

17    574, DX-575, DX-576, DX-578, DX-579, DX-580, DX-581, DX-582,

18    and DX-583 were admitted)

19              MR. PEDONE:  Thank you, Your Honor.  That's all I

20    have.

21              THE COURT:  All right, very good.

22              Mr. Pedone?

23                        CROSS-EXAMINATION

24    BY MR. PEDONE:

25    Q    Good morning, Mr. Moldovan.  I'm Richard Pedone,

39

1    counsel for American Stock Transfer Indenture Trustee for

2    the EFH bonds.

3    A    Good morning.

4    Q    Mr. Moldovan, the building that we've been discussing

5    is located in Dallas, Texas, correct?

6    A    That's correct.

7    Q    And it's approximately a million square feet of space,

8    correct?

9    A    Approximately, yes.

10   Q    How many floors?

11   A    Forty -- approximately 47, 46 or 47.

12   Q    And a few of those floors are devoted to engineering

13   space and are not potentially available for sublease,

14   correct?

15   A    That's correct.

16   Q    And as you discussed with Mr. Esser, the FDIC is a

17   subtenant, correct?

18   A    That's correct.

19   Q    And there are ongoing discussions and it appears likely

20   at this time that the FDIC will renew its sublease for 13 or

21   14 floors of the building, correct?

22   A    Well, they will -- their renewal right is for the

23   entire space, so they have requested a proposal for a

24   restructured lease for 13 to 14 floors.

25   Q    So I misspoke.  In effect, it will be effectively a new

1    lease for 13 or 14 floors, correct?

2    A    A restructured -- yeah, I would call it again a

3    restructured lease for 13 or 14 floors, yes.

4    Q    And the fact that they will be taking that additional

5    space is built into the cash-flow projections that have been

6    admitted into the Court for EFH Properties, correct?

7    A    When you say taking that additional space --

8    Q    Sorry, let me rephrase the question.  The fact that

9    they will be restructuring the lease and remaining in 13 or

10   14 floors is built into the cash-flow projections that have

11   been admitted into Court?

12   A    Yes.

13   Q    In addition to the $158 million note that you testified

14   about, EFH Properties also owes a payable to EFH Corp. of

15   approximately 70 to 85 million, doesn't it?

16   A    Yeah.

17              THE COURT:  I'm sorry, I didn't hear you.

18              THE WITNESS:  I believe it's 70 -- approximately

19   $74 million.

20   BY MR. PEDONE:

21   Q    Okay.  And you're not aware of any defenses that EFH

22   Properties has to payment on that obligation, are you?

23              MR. ESSER:  Objection.  It calls for a legal

24   conclusion, Your Honor.

25              THE COURT:  Are you a lawyer?

41

1          THE WITNESS:  Not -- I am --

2          MR. ESSER:  Retired, Your Honor.

3          THE WITNESS:  I'm a non-practicing attorney.

4          THE COURT:  Me too.

5     (Laughter)

6          THE COURT:  Overruled.  He can answer the

7  question.

8          THE WITNESS:  It's in the subject to compromise on

9  the books and records; I don't know whether that constitutes

10  a defense to payment.

11          MR. PEDONE:  Your Honor, excuse me for just one

12  second.

13     (Pause)

14  BY MR. PEDONE:

15  Q     Have you reviewed EFH Corp.'s schedules and financial

16  statements of affairs filed with the Bankruptcy Court?

17  A     I did some time ago, yes.

18  Q     And what's the basis of your testimony just now that

19  you believe that that payable is -- what were your words?

20  A     Subject to compromise.

21  Q     Why do you believe it's subject to compromise?

22  A     That's how it's currently reflected on the records that

23  I've reviewed.

24  Q     What records were those?

25  A     That was the balance sheet that was prepared by

1    Alvarez & Marcel and a trial balance given to me by the

2    accounting group.

3    Q      And do you have an understanding of what it means for

4    something to be subject to compromise on the records that

5    you reviewed?

6    A      They're very high-level.

7    Q      You're not aware of any real defenses to payment of

8    that obligation, are you?

9    A      No, not as I sit here.

10   Q      In your direct testimony -- back up actually.

11          (Pause)

12   Q      At your deposition do you recall that we discussed the

13   costs that reorganized TCEH would incur if it decided to

14   move the Corporate Services operations out of the building?

15   A      Yes, I do.

16   Q      And you provided an estimate -- and granted, the

17   estimate was looking back, not looking forward to

18   reorganized TCEH, but it was looking back to what it would

19   cost to move the people who comprise Corporate Services,

20   correct?

21   A      I believe it was an estimate to move people at

22   Corporate Services and Luminant to specific -- the specific

23   buildings that TXU Energy occupies.

24   Q      Okay.  And the hard costs of moving that you estimated

25   were between 16 and $25 million of hard moving costs,

1    correct?

2    A    My recollection is it was 16 to 24, but --

3    Q    I'm fine with 25.  24, I won't hand you your deposition

4    for that.

5    A    Okay.

6    Q    That estimate did not take any account of the

7    disruption cost to the business productivity, any of the

8    other typical disruptions that go with moving, did it?  It

9    was hard, fixed costs of undertaking the move.

10    A    That's my understanding.

11    Q    And you would agree that the time period to plan for

12    and undertake such a move would be at least six months to a

13    year -- would be six months to a year, correct?

14    A    I don't -- I don't believe that that's accurate.  We

15    have already -- the space is there that we're talking about,

16    those costs were to move to existing space that we're aware

17    of and our facilities group has -- already understands the

18    space.  And so I think the timing that it would take to plan

19    for that move would be shorter.

20        (Pause)

21    Q    Do you have a recollection of what you told me in your

22    deposition about the time for planning or would you like to

23    review a copy of your deposition?

24    A    I do not.

25            MR. PEDONE:  Your Honor, may I approach the

44

1  witness with a copy of his deposition?

2          THE COURT:  Yes.

3      (Pause)

4  BY MR. PEDONE:

5  Q    Mr. Moldovan, turning to the bottom of page 72 in your

6  deposition, do you recall that I asked you, "What would be

7  the timing required to achieve such a move?"  And you should

8  take a minute and read the bottom of page 70 above it, and

9  you can read through 71 to make sure you're familiar with

10 it.

11     (Pause)

12 A    Yes, I've --

13 Q    And in your deposition, isn't it true that you made a

14 reference to the analysis that the facilities group had

15 undertaken?

16 A    Yes.

17 Q    And then in describing that analysis you stated to me

18 that your recollection was -- you didn't know specifically,

19 but your recollection was that it would take six months to a

20 year?

21 A    Well, yes.  I think --

22 Q    Thank you.

23          THE COURT:  You can explain on redirect if --

24          THE WITNESS:  Okay.

25          THE COURT:  -- your counsel wants to explore that.

45

1    BY MR. PEDONE:

2    Q    Mr. Moldovan, in your direct testimony you indicated

3    that there might be limitations on obtaining subtenants

4    because the lease expired in 2022, correct?

5    A    That's correct.

6    Q    But in fact the lease contains a renewal option,

7    doesn't it?

8    A    It does, but it also prohibits -- there's a provision

9    in the lease that prohibits EFH Properties from entering

10   into a sublease beyond 2022.

11   Q    Certainly, but it would be entirely possible to locate

12   a tenant for the building and then assign certain renewal

13   option rights or rights under the lease, so that if you

14   found a tenant who was interested in the building there are

15   structures that could be analyzed, aren't there?

16   A    I think that's a hypothetical.  Right now EFH

17   Properties can offer a sublease into 2022, there's no

18   assurance that we could give anybody that they could stay in

19   the building beyond that time.

20   Q    Are any efforts currently undertaken to examine

21   structures to maximize the value of sub-tenancies and lease

22   restructuring opportunities going forward or is that

23   something not being looked at?

24   A    No, we have engaged outside brokers, one of the

25   premiere brokers in Dallas, Jones Ling & LaSalle, to assist

46

1    us in maximizing revenue at least through 2022.  I'm not

2    aware of any efforts to go beyond 2022 at this point.

3    Q    You've made a reference in the direct testimony to a

4    payment that had been made in 2009 on the intercompany

5    payable; how much was paid?

6    A    Approximately $5.7 million.

7    Q    And turning to the board deck, which is DX-48, if you

8    would, please?

9        (Pause)

10   A    Okay.

11   Q    Mr. Esser asked you a series of questions about your

12   participation in the drafting and preparation of this board

13   deck, correct?

14   A    He did.

15   Q    And he made a reference to exchanging drafts back and

16   forth, or you did in your testimony, I'm not sure who, but

17   that topic was discussed, correct?

18   A    He asked me if I had provided comments and I said that

19   I did.

20   Q    Who did you provide the comments to?

21   A    To Kirkland & Ellis.

22   Q    And then did Kirkland & Ellis at any point communicate

23   with you concerning the substance of your comments ahead of

24   the final draft being prepared?

25   A    I'm sorry, can you repeat that question?

1    Q    Sure.  Did you have an ongoing discussion at all with

2    Kirkland & Ellis about the substance of what would be

3    incorporated into this board deck?

4    A    I just provided written comments, I don't recall any

5    substantive conversations.

6    Q    Okay.  And do you know the comments between you and

7    Kirkland & Ellis go back and forth once or was there a

8    dialogue in writing?

9    A    On July 27th, I submitted multiple rounds of comments,

10   written comments, and then when I got drafts back confirmed

11   that my comments were addressed.

12   Q    Okay.  And then with regard to the July 22nd board

13   deck, what was the process -- what was your interaction with

14   Kirkland & Ellis in connection with the preparation of your

15   comments on that deck?

16   A    Again, I provided written comments to Kirkland & Ellis.

17   Q    So you first provided comments on what they delivered

18   to you, they were the initial author?

19   A    I believe they had the -- they had the pen on the

20   document, yes.  It was sent to me by somebody at Kirkland &

21   Ellis and I provided comments on that and subsequent drafts.

22   Q    Now, you described a discussion with Ms. Williamson

23   that took place on, was it July 27th?

24   A    That is correct.

25   Q    And had you had any other substantive discussions with

1   Ms. Williamson about EFH Properties prior to July 27th?

2   A    No, I had not.

3   Q    Had you had any substantive discussions with Mr. Evans

4   about EFH Properties prior to July 27th?

5   A    No, I had not.

6   Q    Had you had any substantive discussions with anyone at

7   Proskauer concerning EFH Properties prior to July 27th?

8   A    That I don't know.  We had substantive discussions

9   about properties when we did due diligence with the EF --

10  with the TCEH first lien lenders and I am not aware of

11  whether Proskauer was at or attending those meetings.

12  Q    So sitting here today you have no recollection of

13  specific discussions with Proskauer concerning EFH -- any

14  attorney at Proskauer concerning EFH Properties, do you?

15  A    No, I don't have any specific recollection.

16  Q    And when you provided your comments on both of the

17  board decks, you were aware that you were likely to be

18  deposed in this case, weren't you?

19  A    I don't recall when I was aware that I was going to be

20  deposed.

21       (Pause)

22  Q    You're aware you were designated as a designee of the

23  company to testify on certain specific topics related to EFH

24  Properties in connection with your deposition, aren't you?

25  A    I'm aware that I was designated, I just don't know when

1    I became aware of it.

2    Q      That's fine.   It's more that I wanted to make sure that

3    we were in agreement that you knew you were this

4    representative of the company speaking on certain topics --

5    A      That's correct.

6    Q      -- when you testified on August 1st.

7    A      That's correct.

8              MR. PEDONE:   Your Honor, if I could take one

9    minute and then I believe I'm wrapped up.

10             THE COURT:   Okay.

11       (Pause)

12   BY MR. PEDONE:

13   Q      You're aware that the plan of reorganization for these

14   debtors that is at issue today was filed initially on May 1?

15   A      The initial filing, yes.

16   Q      Yes.   And then the plan that went out with the

17   disclosure statement was filed in mid-June, you're aware of

18   that?

19   A      Approximately that time, yes.

20   Q      Yeah.   And in connection with the preparation of the

21   plan, did you have any discussions with anyone about EFH

22   Properties?   Strike the question, let me rephrase it.

23             Did you have any discussions with Ms. Williamson

24   or Mr. Evans with regard to the content of the plan and its

25   treatment of EFH Properties?

50

1   A    No.  As I stated before, I had not had a conversation

2   with them before my conversation with Ms. Williamson on July

3   27th.

4   Q    Thank you.

5             MR. PEDONE:  Thank you, Your Honor.  No further

6   questions.

7             THE COURT:  Thank you.

8             MR. ESSER:  Very brief redirect, Your Honor?

9             THE COURT:  Yes.  Yep, you're up.

10                    REDIRECT EXAMINATION

11  Q    Mr. Moldovan, you were handed a copy of your deposition

12  transcript and asked a question about how long it may take

13  for the company to move out of the space, and it sounded

14  like you wanted to explain that answer a little bit more;

15  would you like to do so?

16  A    Yeah.  The company has looked at several alternatives,

17  I think the alternative for -- where it was 16 to $25

18  million, that cost is specific to moving to current space

19  that is leased by TXU Energy, it's also looking at other

20  potential moves to other buildings.  And whether I

21  misunderstood the question, my understanding is it would

22  take six to 12 months for a building that has yet to be

23  identified and that we're not familiar with, and that it's

24  my understanding today would be shorter for those buildings

25  because we are familiar with them and have analyzed them

1    over time.

2    Q    Thank you.

3              MR. ESSER:  No further questions, Your Honor.

4              THE COURT:  Thank you, sir.  You may step down.

5              MR. MCKANE:  Your Honor, the debtors call Ms.

6    Carla Howard to the stand.

7              THE COURT:  All right.  We'll take a short recess

8    and then we'll hear Ms. Howard.

9              MR. MCKANE:  Thank you, Your Honor.

10         (Recessed at 11:04 a.m.)

11         (Reconvened; audio technical difficulties until 11:17

12   a.m.)

13                    DIRECT EXAMINATION (Continued)

14   BY MR. MCKANE:

15   Q    -- Number 4, D-DIR Howard.

16   A    Yes.

17   Q    And do you recognize it?

18   A    I do.

19   Q    Is the information contained in this document true and

20   correct to the best of your knowledge?

21   A    Yes.

22   Q    And is it made in support of the plan of reorganization

23   that's pending before the Court?

24   A    Yes.

25   Q    All right.