1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                          :
                                     :    Chapter 11
5    ENERGY FUTURE HOLDINGS CORP., :
     et al.                          :    Case No. 14-10979 (CSS)
6                                    :
             Debtors.               :    (Joint Administration
7    _____:    Requested)
                                     :
8                                    :
     DELAWARE TRUST COMPANY, as      :
9    TCEH First Lien Indenture       :
     Trustee,                        :
10                                   :
             Plaintiff,             :    Adv. Proc. No.
11                                   :    15-51239 (CSS)
         v.                          :
12                                   :
     WILMINGTON TRUST, N.A., as      :
13   First Lien Collateral Agent     :
     And First Lien Administrative : 
14   Agent,                          :
                                     :
15            Defendant.             :
                                     :
16   MORGAN STANLEY CAPITAL GROUP     :
     INC., J. ARON & COMPANY, and    :
17   TITAN INVESTMENT HOLDINGS LP    :
     _____:

18

19

20

21

22

23

24

25

1                          United States Bankruptcy Court

2                          824 North Market Street

3                          Wilmington, Delaware

4                          December 1, 2016

5                          2:05 p.m. – 2:55 p.m.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:   LESLIE MURIN

1    HEARING re Fourth Amended Joint Plan of Reorganization of

2    Energy Future Holdings Corp., et al., Pursuant to Chapter 11

3    of the Bankruptcy Code [D.I. 9612; filed September 21, 2016]

4

5    HEARING re Order [Civil Action No. 16-189 – D.I. 57; filed

6    November 23, 2016 / Main Case No. 14-10979 – D.I. 10261;

7    filed November 29, 2016]

8

9    HEARING re Motion of Shirley Fenicle, David William Fahy,

10   John H. Jones, and David Heinzmann to Dismiss Chapter 11

11   Petitions of Asbestos Debtors EECI Inc., EEC Holdings Inc.,

12   LSGT SACROC, Inc., and LSGT Gas Co. LLC Pursuant to 11

13   U.S.C. § 1112(b) [D.I. 10074; filed November 8, 2016]

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4         Attorneys for the Debtors

5

6    BY:  MARK MCKANE

7         CHAD HUSNICK

8         MARC KIESELSTEIN

9

10   RICHARDS, LAYTON & FINGER P.A.

11        Attorneys for the Debtor

12

13   BY:  JASON MADRON

14

15   POTTER ANDERSON & CORROON

16        Attorneys for Deutsche Bank of New York

17

18   BY:  R. STEPHEN MCNEILL

19

20   HOGAN MCDANIEL

21        Attorney for Fenicle, Fehy, Jones & Heinzmann

22

23   BY:  GARVAN MCDANIEL

24        DANIEL K. HOGAN

25

```
 1   STEVENS & LEE P.C.

 2        Attorneys for Wilmington Trust as Admin Agent

 3

 4   BY:  JOSEPH H. HUSTON, JR.

 5

 6   CHADBOURNE & PARKE

 7        Attorney for NextEra eNERGY

 8

 9   BY:  ERIC DAUCHER

10        ROBIN BALL

11        HOWARD SEIFE

12

13   SULLIVAN & CROMWELL LLP

14        Attorney for E-Side Committee

15

16   BY:  ALEXA J. KRANZLEY

17

18   MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

19        Attorney for for E-Side Committee

20

21   BY:  MARK A. FINK

22

23

24

25
```

1    COLE SCHOTZ

2        Attorney for Delaware Trust Company as Indenture

3        Trustee

4

5    BY:  KATE STICKLES

6

7    BIELLI & KLAUDER, LLC

8        Attorney for EFH Corp.

9

10   BY:  DAVID LAUDER

11

12   PROSKAUER ROSE

13       Attorney for EFH Corp.

14

15   BY:  PETER YOUNG

16       MARK THOMAS

17

18   UNITED STATES DEPARTMENT OF JUSTICE

19       Attorney for the U.S. Trustee

20

21   BY:  RICHARD L. SCHEPACARTER

22

23

24

25

1  BAYARD, P.A.

2       Attorney for Delaware Trust Company as Indenture

3       Trustee

4

5  BY:  GIANCLAUDIO FINIZIO

6

7  KOBRE & KIM

8       Attorney for Delaware Trust Company as Indenture

9       Trustee

10

11  BY:  JEREMY C. HOLLEMBEAK

12       ANDREW WANG

13

14  FOX ROTHSCHILD

15       Attorney for the Ad Hoc Group of TCEH Unsecured

16       Noteholders

17

18  BY   JEFFREY SCHLERF

19

20  WHITE & CASE LLP

21       Attorney for the Ad Hoc Group of TCEH Unsecured

22       Noteholders

23

24  BY:  J. CHRISTOPHER SHORE

25

Page 8

1   CADWALADER, WICKERSHAM & TAFT LLP

2        Attorney for Morgan Stanley

3

4   BY:  MARK ELLENBERG

5

6   KRAMER LEVIN NAFTALIS & FRANKEL LLP

7        Attorney for Second Lien Indenture Trustee

8

9   BY:  JOSHUA BRADY

10

11  PACHULSKI STANG ZIEHL & JONES

12        Attorney for Second Lien Indenture Trustee

13

14  BY:  COLIN R. ROBINSON

15

16  VENABLE LLP

17        Attorney for Pimco DIP Lender

18

19  BY:  JEFFREY S. SABIN

20        DANIEL O'BRIEN

21

22  CAPLIN & DRYSDALE

23        Attorney for Fenicle, Fehy, Jones & Heinzmann

24

25  BY:  LESLIE M. KELLEHER

```
 1   KLEHR HARRISON HARVEY BRANZBURG LLP

 2        Attorney for UMB Bank, N.A. Indenture Trustee

 3

 4   BY:  RAYMOND H. LEMISCH

 5

 6   FOLEY & LARDNER

 7        Attorney for UMB Bank, N.A. Indenture Trustee

 8

 9   BY:  HAROLD KAPLAN

10

11   AKIN GUMP STRAUSS HAUER & FELD LLP

12        Attorneys for UMB Bank, N.A. Indenture Trustee

13

14   BY:  IRA S. DIZENGOFF

15        ABID QURESHI

16

17   LANDIS RATH & COBB

18        Attorney for NextEra Energy

19

20   BY:  JOE WRIGHT

21

22   SEWARD & KISSEL LLP

23        Attorney for Wilmington Trust, First Lien Col. Agent

24

25   BY:  MARK KOTWICK
```

1   WILMER CUTLER PICKERING HALE & DORR

2        Attorneys for Delaware Trust, EFIH First Lien Indenture

3        Trustee and Ad Hoc Group

4

5   BY:  PHILIP ANKER

6

7   CLEARY GOTTLIEB

8        Attorney for J. Aron & Company

9

10  BY:  HUMAYUN KHALID

11

12  MORRIS JAMES LLP

13       Attorney for Law Debenture Trust Company of New York

14

15  BY:  STEPHEN MILLER

16

17  PATTERSON BELKNAP WEBB & TYLER LLP

18       Attorney for Law Debenture Trust Company of New York

19

20  BY:  BRIAN P. GUINEY

21

22  NIXON PEABODY

23       Attorney for EFH Indenture Trustee

24

25  BY:  RICHARD C. PEDONE

1    ALSO PRESENT TELEPHONICALLY:

2

3    ALYSA AIN

4    SCOTT L. ALBERINO

5    JACOB A. ALDERSTEIN

6    ARLENE R. ALVES

7    ASHLEY F. BARTRAM

8    MITCHELL BIALEK

9    LAUREN BILZIN

10   PEG A. BRICKLEY

11   MICHAEL CARTER

12   MARIA CHUTCHIAN

13   ANDREW COHEN

14   AMANDA D. DARWIN

15   ANDREW DEVORE

16   AMISH R. DOSHI

17   DAVID DUNN

18   JUSTIN K. EDELSON

19   JAMIE EDMONSON

20   CATHERINE EISENHUT

21   BENJAMIN D. FEDER

22   BARRY FELDER

23   MICHAEL FIRESTEIN

24   MARK FLANNAGAN

25   JOESPH A. FLORCZAK

1    RICHARD GITLIN

2    ANDREW GLENN

3    TODD M. GOREN

4    BRIAN GUINEY

5    THOMAS HALS

6    MARK F. HEBBELN

7    NATASHA HWANGPO

8    EMILY L. KATZ

9    ARI D. KUNOFSKY

10   EMILY L. KUZNICK

11   KEVIN M. LIPPMAN

12   HAL F. MORRIS

13   TINA MOSS

14   LARS A. PETERSON

15   MEREDITH PFISTER

16   MEREDITH QUICK

17   ABID QURESHI

18   NATALIE D. RAMSEY

19   ERIK SCHNEIDER

20   NED S. SCHODEK

21   NOAH M. SCHOTTENSTEIN

22   MICHAEL SHEPHERD

23   ANGELO THALASSINOS

24   ANDREW M. THAU

25   AMER TIWANA

1    CARL TULLSON

2    MICHAEL TURKEL

3    MATTHEW UNDERWOOD

4    TAMARA VAN HEEL

5    MEGAN WASSON

6    BRADY C. WILLIAMSON

7    JULIA M. WINTERS

8    APARNA YENAMANDRA

9    ELSBETH BENNETT

10   THOMAS J. CURTIN

11   PETER FRIEDMAN

12   HOWARD HAWKINS

13   SAL ROMANELLO

14   DANIEL S. SHAMAH

15   MARK A. CODY

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2          CLERK:  All rise.

3          THE COURT:  Please be seated.

4          Good afternoon.  I apologize for two sets, three

5    sets, I've forgotten now, of delays in conducting the

6    hearing today.  I had some personal issues to take care of.

7    I appreciate, very much, everyone's patience or what I am

8    going to assume is patience.  Even if you're impatient,

9    pretending to be patient.  So thank you very much.

10         And Mr. Husnick, let's get started.

11         MR. HUSNICK:  Thank you, Your Honor.  Chad Husnick

12   with Kirkland & Ellis on behalf of the Debtors.  I'm here

13   with my colleagues, Mark Kieselstein and Mark McKane.

14         Your Honor, the only item on the agenda for today

15   is, at Your Honor's request, for a status conference in

16   connection with confirmation of the EFH and EFIH Debtors.

17         Your Honor, I have a short statement to make here

18   and then coupled with some updates, some recent developments

19   that --

20         THE COURT:  Okay.

21         MR. HUSNICK:  -- are just hitting the docket this

22   morning.

23         Your Honor, as you were well aware, the Third

24   Circuit issued a judgment just 14 days ago, on November

25   17th, reversing the District Court's affirmance of Your

1    Honor's order disallowing the EFIH first lien and second

2    lien make whole claims.  Following that decision 14 days

3    ago, the Debtors, their advisors, NextEra and their advisors

4    began evaluating potential options for moving this case

5    forward and moving the deal forward that had been negotiated

6    with NextEra.

7              In addition, the Debtors actively engaged in

8    conversations with various stakeholders of the EFH and EFIH

9    Debtors in an effort to reallocate the division of the sale

10   proceeds from the NextEra sale with the eye towards creating

11   global peace and ultimately an agreement of how to move

12   forward.  Unfortunately, that did not bear fruit, not yet,

13   and will continue.

14             But because we recognized that we were unable to

15   continue on the schedule that we had negotiated, which would

16   have use here today for a confirmation hearing, we filed a

17   notice of adjournment on November 21st that indefinitely

18   adjourned plan confirmation.  And Your Honor entered an

19   order, shortly thereafter, recognizing the adjournment and

20   suspending the confirmation schedule.

21             First and foremost, during this interim time we

22   continued to carefully evaluate appellate options in

23   connection with the Third Circuit opinion, as well as the

24   solvency phase, that was Phase 2, of the make whole

25   litigation.  And we're mindful that pursuit of either or

1    both of those options comes at a significant cost, as

2    interest continues to accrue on the unpaid make whole

3    claims, and will continue to accrue at a very healthy clip.

4           Today, Your Honor, we filed an agreement -- or a

5    plan, a revised plan, and a revised disclosure statement

6    following reaching agreement with NextEra, on certain

7    modifications to the plan that are in response to the Third

8    Circuit's ruling and largely make our plan once again what

9    we believe confirmable even though it may not have the full

10   support of every stakeholder in the structure.  We believe

11   that it very clearly is confirmable and we are prepared to

12   move forward on that basis.

13          I'll summarize in a minute just some of the

14   modifications of how they work and what our view is on that

15   front.  But suffice it to say, before we filed the modified

16   plan and disclosure statement, one of the key pieces that we

17   needed to move on the chessboard was extending the milestone

18   under the planned support agreement, which ultimately trips

19   through the merger agreement.  We had a December 12th

20   milestone in the planned support agreement that Your Honor

21   approved on September 19th that required Your Honor to

22   either -- well, required the Debtors to either have Your

23   Honor approve, orally, confirmation by December 15, or enter

24   the order approving confirmation.

25          In light of the adjournment, we were clearly not

1    going to be able to hit that deadline.  So we've entered

2    into, this morning, a forbearance agreement pursuant to

3    which NextEra has agreed to extend that milestone date from

4    December 15 to February 15 and imposes an interim milestone

5    of January 5th to receive any necessary approvals in

6    connection with a modified disclosure statement.  We will

7    continue to work diligently with NextEra to prosecute this

8    plan of reorganization and to move these cases forward and

9    to implement the merger agreement that we have entered into.

10           Along that lines, and along the lines of trying to

11   reach global peace, we are also engaged, as I mentioned

12   earlier, with other stakeholders.  With the EFIH first liens

13   and second liens, we've been engaged with their

14   professionals on the terms of a potential settlement

15   regarding the asserted, not only make whole claims, but

16   other claims that would have been addressed in the Phase 2

17   proceedings.  Per Your Honor's request previously, we will

18   keep the Court apprised if those negotiations bear -- bore

19   fruit.  I believe Mr. Anker is here in the courtroom, if he

20   has anything to add.

21           Your Honor, let me just briefly summarize what the

22   amendments to the plan are before I talk about scheduling

23   going forward and what the Debtors would request.  The

24   amendments to the plan are very narrow.  Literally, I think,

25   six pages of plan changes and a handful more of changes to

1     what would be a modified disclosure statement.

2            The first change is the deletion of the condition

3     precedent that required that the make whole claims be

4     disallowed, make -- or disallowed claims as of the effective

5     date of the plan.  That condition precedent was very

6     problematic once the Third Circuit had ruled, it in effect

7     made a failure of the ability of reach a condition

8     precedent.  We feel, from the Debtors' perspective, that's

9     an important deletion and a very strong sign that we are

10    able to move forward and that we have the commitment of all

11    the right parties to move forward with this deal.

12           Other changes.  Your Honor in the plan of

13    reorganization, as it relates to the treatment of the EFIH

14    PIK noteholders, that's the unsecured constituency at the

15    EFIH box, there was a footnote to their treatment that in

16    effect said, if at any point in time the make wholes are

17    allowed, that the reorganized EFIH Debtor will pay -- will

18    ensure that the recovery set forth in the plan is paid.  It

19    was, in effect, taking away what would be a straight

20    waterfall plan and ensuring that the roughly 106 cent

21    recovery for the PIK noteholders would remain under all

22    circumstances.

23           That footnote has been removed.  And that footnote

24    -- the deletion of that footnote in effect means that

25    consideration will now flow through the waterfall as it was

1    intended for other classes at the EFIH Debtor.  Once the

2    EFIH first lien and second lien claims are paid in full, all

3    of their allowed claims, then will come recoveries to the

4    EFIH PIK noteholders and then ultimately, if there's any

5    excess, it would flow up.  However, Your Honor, I think the

6    allowance of the make whole claims does make the opportunity

7    for additional consideration to flow up to EFH unlikely and

8    recoveries at EFH are likely limited simply to the cash on

9    hand at EFH.

10          Your Honor, another change that we made was to

11   clarify in the plan that reorganized EFIH has no ongoing or

12   go forward liability for the make whole.  All consideration

13   that will be used to satisfy the make whole claims must come

14   from the purchase price that NextEra agreed to put up as it

15   comes through the waterfall.  There was some ambiguity; it's

16   been clarified that the amounts, because of the Third

17   Circuit's decision, will come from the waterfall.

18          Lastly, Your Honor, we added to the plan a lien on

19   the EFH -- or I'm sorry, on the EFIH distribution account.

20   This is the cash account that gets funded by the proceeds of

21   the consideration for use to satisfy any disputed or

22   contingent claims.  That account, one of the assertions in

23   the objections to the prior plan by the EFIH first lien and

24   second lien indentured trustee, was that we were stripping

25   the liens from the reorganized debtors.  We are now putting

1    liens on the distribution account, which is in effect the

2    proceeds of that transaction.  This was an attempt to try

3    and solve other objections.  We're still negotiating over

4    whether that goes anywhere or gets away, but clearly it's an

5    attempt by the Debtors to continue to move these forward.

6    And functionally we believe it just memorializes what

7    happens in the typical waterfall.

8          We are cognizant that any such hold back that

9    would go in the distribution account is likely to be large.

10   Not only is it going to take a significant amount of time to

11   litigate any appellate options with respect to the make

12   whole claims, but it also would take significant time with

13   respect to Phase 2.  The distribution account will be the

14   sole source of recovery for the first and seconds so it must

15   account for any continued accrual of interest, professional

16   fees, et cetera, that may be incurred in connection with

17   that litigation.  So to say it would be large is probably an

18   understatement.

19         Your Honor, the result of those modifications is

20   undoubtedly an obligation to re-solicit the EFIH PIK

21   noteholders.  We do not believe that the modifications are

22   materially adverse to any other stakeholders in the

23   structure that have voted on the current plan and we do not

24   intend to re-solicit those other classes.

25         Let me turn to timing.  It's incredibly important,

1    Your Honor, and I think Your Honor has recognized in the

2    past, to keep these cases moving forward and on track.  I

3    think there's two issues that -- or two reasons we would

4    highlight for Your Honor.  And the first, and perhaps the

5    most visible, is the interest accrual that I just mentioned

6    and professional fees.  These things continue to run at a

7    very high burn rate and now that EFH is limited to a finite

8    pool of assets, in all likelihood that cash continues to

9    burn with every passing day.

10             The second is a consideration that did not

11   necessarily affect the TCEH Debtors but is closely tied to

12   the EFH and EFIH Debtors' ability to emerge from Chapter 11,

13   and that is the parallel PUCT approval process.  The PUCT is

14   currently in the process of reviewing a joint change of

15   control application that was filed by NextEra in October.

16   I'm sorry, NextEra and Oncor.  The PUC is scheduled to hold

17   a hearing in late February regarding the merits of the

18   change in control application.  We believe that providing

19   additional clarity for the PUC regarding the intentions and

20   the timing in the confirmation will aid in the PUCT review

21   process.

22             So that takes me to the timing request.  In light

23   of all the foregoing, Your Honor, the Debtors would ask that

24   the -- that Your Honor schedule a disclosure statement

25   hearing, on shortened notice, for the hearing that we

1   currently have scheduled for December 14th and to set the

2   plan confirmation hearing for the dates -- any dates that

3   are available in the late January timeframe possible -- in

4   the late January timeframe, if possible.

5           We filed the plan and disclosure statement and

6   later today we anticipate filing a combined disclosure

7   statement motion and scheduling motion that will establish

8   interim litigation dates and deadlines that we believe can

9   allow us to commence plan confirmation in January.  That

10  motion will be accompanied by a motion to shorten notice to

11  December 14th. And while we recognize that that's a odd

12  piece of relief, when it comes to a disclosure statement

13  hearing, we think the case here -- or the circumstances here

14  are incredibly compelling.  We not only need to keep these

15  cases on track for the interest accrual and fee accrual, we

16  also need to keep the cases on track for the PUCT process.

17  And finally, we believe there's very, very little prejudice

18  to parties of shortening notice on a disclosure statement

19  hearing that had -- on a disclosure statement that has been

20  twice before approved and the modifications to that

21  disclosure statement are incredibly narrow, I think

22  somewhere between 6 and 20 pages.

23          It's not likely to be a very complex fight.  There

24  is another way to thread that needle if parties are not in

25  agreement to shortening notice on a disclosure statement.  I

1    think the Debtors would be amenable if dealing -- doing away

2    with the disclosure statement altogether and deeming that --

3    any rejecting class that wants to reject, to deem them to

4    reject, that's the PIKs, if they choose not to accept or

5    have an objection.  We think that is also a workable

6    solution that has been allowed by courts in the past,

7    although one that you could either do it or not, it may save

8    some time in the court.

9            Ultimately, Your Honor, the plan changes primary

10   were to effectuate the waterfall.  Once again, we think the

11   changes only affect the PIK class.  The plan always

12   contemplated the waterfall affect at EFH, so if the claims

13   were ever allowed at any point in time, it was going to

14   affect the waterfall of EFH, that's our read.

15           As for confirmation, if we do not have global

16   peace, we don't expect complicated valuation trials or

17   competing experts that would be associated with a

18   complicated valuation trial.  This is, perhaps, the most

19   marketed asset on the planet in the case of a Chapter 11

20   case.  Instead, we'd expect that plan confirmation is going

21   to be very narrowly focused on competing theories, on

22   waterfall priorities and the allocations of the

23   consideration that is coming in as a result of the NextEra

24   transaction.

25           Ultimately, Your Honor, and I'll conclude with

1    this statement, we do believe that establishing a time line

2    as in the past scheduling motions that we've filed is

3    incredibly important to keeping people on task and to

4    trimming the feed burn in these cases, especially in light

5    of the allowance or the reversal of the disallowance of the

6    EFIH first lien and second lien claims.

7           Unless Your Honor has any questions, that's the

8    status report from the Debtors.

9           THE COURT:  Okay.  Thank you.

10          MR. HUSNICK:  Okay.

11          THE COURT:  I'm sure there's plenty of people that

12   wish to be heard, but why don't I hear from the EFIH first

13   and second lienholders first, if they wish.

14          Mr. Anker?  Feel free to say, I told you so.

15          MR. ANKER:  I will not say that, Your Honor.

16          THE COURT:  Thank you.

17          MR. ANKER:  For the record, Philip Anker, Wilmer

18   Cutler Pickering Hill & Dorr for Delaware Trust as the first

19   lien indenture trustee and the ad hoc group of EFIH first

20   lienholders.

21          As Mr. Husnick suggested, we have been in

22   discussions, over the last several days, with the Debtors'

23   professionals both with respect to the plan that is on the

24   table and a possible resolution of the underlying claims.

25   Whether the latter will or will not bear fruit, time will

1    tell, but I am encouraged that discussions are going on and

2    they plainly are going on in good faith.

3           As for the current plan, our holders will have to

4    look at it.  I, frankly, even haven't read it yet, but I did

5    get some preview of some sections.  And again, I appreciate

6    the Debtors' professionals having shared that with us.

7           We plainly are impaired, even under this current

8    plan because our legal rights are being altered, in the

9    sense that we no longer would have a lien on the Debtors' 80

10   percent interest in Oncor and instead would get a lien on

11   cash, and that is an alteration of legal rights.  And so

12   either we would need to, if our class were to accept the

13   plan the 2-Ls would or the PIKs would, or you would not have

14   an impaired accepting class.  And I certainly can't speak

15   for our holders, they are going to have to read it.

16          There are clearly issues on the details that I, as

17   a professional, can see.  For example, just by way of

18   example and I think Mr. Husnick acknowledged this, if we

19   don't get to a settlement, the liens need to not only cover

20   the existing claim as of today, as of the effective date,

21   but going forward amounts, both continued accrual of

22   interest, which at the contract rate for my clients is a

23   blend between 10 and 10 1/2 percent on a non-default basis,

24   for the 2-Ls is higher than that.  And when you compound it,

25   this is real money accruing all the time.

1           And if you envision litigation, I'm not sure what

2     the arguments are going to be, that could go on for some

3     meaningful period, but I can't take rights away from people,

4     at least without a settlement.  That can add up to a large

5     total and the fees have to.  And how you figure that out,

6     and how you estimate it, and how you deal with it and

7     protect us is not the simplest issue; but it is one that I

8     am confident, in good faith, people can talk about and try

9     to reach a sensible resolution.  So I am encouraged by all

10    of that.

11          I'm encouraged by the hope that we can get to

12    something that is more final and stops the bleeding.

13    Although I will say, my clients are happy to continue to get

14    interest in this case, so, you know, if others want to

15    continue to fight forever and ever, that is their call, not

16    ours.

17          In terms of the shortening of notice, look, I

18    don't think disclosure is what this case turns on at this

19    point.  I tend to agree with Mr. Husnick.  We've been around

20    this block more than once, I think we know what the assets

21    are and the liabilities are.  I've not had a chance to speak

22    to my clients so I can't bind them, but I have great

23    difficulty thinking that we would be opposed to a shortened,

24    expedited process for disclosure.  I will simply say, as a

25    matter of just a disclosure to Your Honor, I need to be in a

1     different court on the 14th at a confirmation hearing, but

2     surely a disclosure statement hearing, if Your Honor

3     approves that date, can go forward in my absence.  And so we

4     certainly, as we sit here today -- again, I need to reserve

5     rights, because I need to talk to holders, but I don't

6     envision the timeframe that is being discussed being

7     problematic.  Thank you, Your Honor.

8               THE COURT:  Thank you.

9               Mr. Brody?

10              MR. BRODY:  Thank you, Your Honor.  Josh Brody

11     from Kramer Levin on behalf of Computershare's EFIH second

12     lien indentured trustee.

13              I think that we're all -- and I don't really have

14     much to say that's all that different from what Mr. Anker

15     has said.  We also have been in discussions with the

16     Debtors, more, you know, focusing on the possibility of

17     coming up with some path forward on a more final basis,

18     something that really settles everything.  And I'm also

19     somewhat encouraged and hopeful that those discussions

20     should bear fruit.  Of course I think I've stood at this

21     podium four or five times and said that to Your Honor

22     already, throughout the last 2 1/2 years, but hope springs

23     eternal.

24              As far as the plan itself and the schedule, you

25     know, Mr. Kieselstein had mentioned to you they were filing

1   this plan and I have no seen it and really have not had a

2   chance to look at it yet.  Overall, again, I take the same

3   view as Mr. Anker, obviously I need to discuss it with my

4   clients and I think from the disclosure perspective, again,

5   I don't think there's a lot that needs to be dealt with and

6   I don't necessarily have an issue there.

7          The one thing I'm kind of just unsure about is I'm

8   pretty sure that my clients or at least the 2-L class

9   rejected the plan.  So in terms of, you know, not

10  resoliciting the 2-Ls, I guess that's okay and perhaps it's

11  a question of figuring out how the plan is going to work to

12  make sure that my clients are unimpaired or will agree to

13  change their votes.  But as things currently stand, the 2-Ls

14  have not accepted the plan, so to use those votes and not

15  resolicit, I guess then there's ways to make that work.  But

16  it's not as if the votes are there and it's just a question

17  of having them ride through.  Thank you, Your Honor.

18          THE COURT:  Okay.  Thank you.

19          Mr. Anker?

20          MR. ANKER:  Your Honor, Philip Anker again for --

21  I just rise to say I may have not -- the acoustics here are

22  not the greatest, unfortunately.

23          THE COURT:  I know.

24          MR. ANKER:  I may not have heard Mr. Husnick, but

25  I strongly suspect that our clients, too, did not vote to

1    accept the plan that is on hand.  So I would think that if

2    the Debtor wants the first or the seconds to be an accepting

3    impaired client, they would need to resolicit us as well,

4    unless I'm mistaken on the facts.

5            MR. HUSNICK:  You are not mistaken on the facts.

6    Your Honor, the first liens and second lien classes did both

7    vote to reject the plan.  But parties can change their vote

8    and that's what we would anticipate doing.  You don't have

9    to do a formal resolicitation to accomplish that.

10           Number two, notwithstanding that the first liens

11   and second liens have rejected the plan, there is a class of

12   EFIH noteholders that did accept the plan; that is the EFH

13   LBO notes, which are guaranteed by EFIH and are therefore a

14   separate class there.  That class did accept the plan.  It

15   is a relatively small class of creditors, $60 million.  But

16   there is no similar footnote provision on that class that

17   required the reorganized Debtor to top them up in recovery

18   like there was on the PIK class.  And therefore we do not

19   believe that that class needs to be resolicited.

20           THE COURT:  Okay.

21           Anyone else?  Mr. Qureshi?

22           MR. QURESHI:  Good afternoon, Your Honor.  For the

23   record, Abid Qureshi, Akin Gump Strauss Hauer & Feld on

24   behalf of UMB as PIK note trustee.

25           Your Honor, a lot to respond to, given the events

1    of the last few hours with the amended plan.  The plan that,

2    until a few moments ago, Your Honor, was before the Court

3    was one that, as Your Honor is well aware, was painstakingly

4    negotiated over many, many months.  And with respect to the

5    risk that Your Honor's make whole ruling might be overturned

6    in the appellate process, the outcome of those negotiations

7    in the prior plan, Your Honor, was very clear.

8          NextEra agreed to take the risk of an adverse

9    judgment, an adverse appellate ruling away from the PIK

10   noteholders and that was the import and the significance of

11   the footnote that Mr. Husnick referenced.  That was a

12   footnote that provided that recoveries to the PIK notes

13   would not be reduced on account of any subsequent appellate

14   ruling with respect to the make wholes.

15         Now, Your Honor, what NextEra negotiated for is

16   two possible outcomes in the event of either an adverse

17   appellate ruling on make whole or no ruling at all on the

18   appeals no final ruling at all on the appeals by the

19   effective date of that plan.  One was they could close and

20   assume the risk of an adverse ruling, or alternative assume

21   the liability, if there already was a final order.  Or

22   secondly, they could walk away, in return for a break-up fee

23   of $275 million.  That was the deal, that was what was

24   negotiated.  That was the economic bargain, and that was the

25   extent of it.

1         Now, what the Debtors have done with this amended

2    plan, and from our perspective, Your Honor, it frankly is

3    rather inexplicable, they have given NextEra a third option,

4    an option that they did not negotiate for, an option that

5    they were not obligated to extent to NextEra, but an option

6    that is obviously appealing to NextEra.  And that is to

7    transfer the entirety of that $800 million potential make

8    whole liability risk to the PIK noteholders.  All of it.

9         So that is not, in any way, Your Honor, something

10   that can be fairly characterized as a, I think Mr. Husnick

11   used the words, very narrow change to the plan.  That is a

12   fundamental altering of the economic bargain that was struck

13   in the last round of negotiations.  So having completely

14   overturned the economics, the Debtors now come before Your

15   Honor and say, hurry up, we've got to speed this through and

16   we need to shorten notice, even waive a disclosure statement

17   hearing altogether and get this plan to confirmation as

18   quickly as possible.

19        But Your Honor, the plan that was just filed, to

20   be clear, that does not represent the outcome of any

21   negotiations between the PIK noteholders and the Debtors.

22   And nor have the PIK noteholders had a meaningful

23   opportunity at this point to negotiate with NextEra to try

24   to see if there is some sort of a full consensual resolution

25   that could be reached.  Instead, from our perspective, what

1    this plan represents, is a complete capitulation by the

2    Debtors to the demands of NextEra, entirely at the expense

3    of the unsecured creditors of this estate.  So that is a

4    very fundamental change in course.

5           Now, while we've barely had time to analyze the

6    plan, there are a number of confirmation issues that will

7    need to be explored, if that is indeed the path that we go

8    down; we certainly don't think expedited treatment is

9    appropriate.

10          So what is it that we are asking for today, Your

11   Honor?  What we are asking for is a brief timeout.  We think

12   that before setting a discovery schedule related to this

13   latest plan, that it is reasonable to allow unsecured

14   creditors the opportunity to determine whether the amended

15   plan is in fact the highest and best alternative that's out

16   there.  We want the opportunity, Your Honor, to explore

17   whether the PIK noteholders might propose an alternative

18   plan of their own or whether there might be another plan out

19   there with somebody else that would afford better treatment

20   to unsecured creditors.

21          While we obviously understand, Your Honor, the

22   imperative of these Debtors getting out of Chapter 11, the

23   fact is that this is not a melting ice cube situation, this

24   is not a business that is being harmed directly because it

25   is in Chapter 11.  The couple of timing issues that Mr.

1    Husnick pointed to to justify the extremely expedited

2    schedule that apparently the Debtors intend to propose,

3    first he pointed to interest accrual and the accrual of

4    professional fees.  And while I completely recognize that

5    those are very real costs that will be incurred, to the

6    extent that there is a delay, it's our risk; it's the PIK

7    noteholders' risk.  To the extent those costs continue to

8    accrue, and we can't come up with a better alternative, that

9    effective comes out of our recoveries.

10            Secondly, with respect to the PUC approval

11   process, I don't think anything that we are proposing, Your

12   Honor, requires any type of delay in the PUC process or

13   jeopardizes it in any ways.  And I understand that there are

14   hearings that are scheduled for the end of February, nothing

15   that we are proposing would suggest that that process ought

16   to stop.  And certainly by the end of February there would

17   be clarity for the PUC around what the confirmation schedule

18   would be and what the path is.

19            So, Your Honor, from the perspective of the PIK

20   noteholders' the Debtors have unfortunately chosen what I

21   think is the path of least resistance, which is to

22   capitulate for the benefit of NextEra.  They unilaterally

23   gave up the opportunity to try to satisfy the condition in

24   the plan by perhaps pursuing an expedited Phase 2 litigation

25   in keeping the planned confirmation schedule as it was.

1    That's a choice that the Debtors made, certainly without any

2    meaningful consultation with us.  So we should, at a

3    minimum, Your Honor, be entitled to a short window, and I

4    emphasize short, to explore potentially better alternatives.

5            So we think what would be reasonable is something

6    in the range of six weeks, to allow us the opportunity to do

7    two things.  First, as I mentioned, explore the possibility

8    now that exclusivity has, of course, lapsed of the PIK

9    noteholders' proposing an alternative plan of their own.

10   Second, an alternative plan perhaps by another plan sponsor.

11   And third, a meaningful opportunity to continue, or I

12   shouldn't even say continue, because it really hasn't

13   started, to negotiate with NextEra and with the Debtors on

14   changes to the proposed plan that was just filed.  None of

15   that has happened.  This, again, does not reflect -- this

16   plan does not reflect the outcome of any negotiations with

17   our constituency.  It is simply a wholesale transferring of

18   risk.

19           And so in those circumstances, Your Honor, we

20   think that a brief period of time to see if negotiations can

21   lead to a productive outcome is appropriate.  So unless Your

22   Honor has any questions, that's all I have.

23           THE COURT:  Okay.

24           MR. PEDONE:  Good afternoon, Your Honor.  Richard

25   Pedone on behalf of American Stock Transfer, indentured

1    trustee for the EFH bonds.

2           Your Honor, we feel strongly that there does need

3    to be a disclosure statement hearing and there may need to

4    be additional solicitation of all classes that are affected

5    on the EFH trustee.  We have not yet seen the voting results

6    from the last plan and would ask that the Debtors produce

7    them, if they're still planning on using them, as soon as

8    possible.  And would ask that the disclosure statement

9    hearing be set.  Parties have the opportunity to object and

10   actually read the plan that's been proposed, because

11   frankly, the court's -- the Third Circuit's ruling set off a

12   chain of dominos that we knew would require amendments to

13   this plan and we now need to evaluate those amendments and

14   decide the impact.  Thank you.

15          THE COURT:  Okay.  Thank you, Mr. Pedone.

16          FEMALE VOICE:  Alexa Kranzley from Sullivan &

17   Cromwell on behalf of the E-side Creditors Committee.  Your

18   Honor, I rise only to say that our committee has not had a

19   chance to review the revised plan and disclosure statement

20   and schedule, but we are generally supportive of the

21   Debtors' idea of moving the cases forward.

22          THE COURT:  Thank you.

23          Anyone else before Mr. Husnick?  Okay.

24          MR. HUSNICK:  Let me begin, Your Honor, by saying

25   it was merely a suggestion and if one class didn't feel the

1    need to have a disclosure statement, we wouldn't go through

2    the exercise of going there.  But happy to go there, albeit,

3    it hopefully doesn't take a multi-day hearing to approve six

4    pages of changes.

5              On the voting results, the Debtors are happy to

6    file the voting report.  We didn't file it because the plan

7    confirmation wasn't going forward, but I believe we have a

8    draft of it ready.  The voting tally was done, so we'll

9    complete that put it on file so everybody knows where the

10   classes sit as of today.

11             Let me respond to Mr. Qureshi's comments on behalf

12   of the PIK noteholders.  Your Honor, I feel like we're in a

13   bit of a twilight zone, I mean I stood here four or five

14   months ago and Mr. Qureshi absolutely refused to consent to

15   what then was an accelerated schedule, because we weren't

16   going fast enough, because his holders wanted to get out.  I

17   understand the facts have changed, in terms of why they want

18   to go slower now because they want more time to do

19   litigation negotiations, et cetera, but the underlying basis

20   for the case that we put on in support of motioning to

21   shorten the hearing back then was exactly the same.  It was

22   a need to preserve this deal, to move these cases forward,

23   to cut off the fee burn.

24             What we heard from Mr. Qureshi is in effect the

25   same thing we heard from Contrarian at confirmation, let's

1    throw down the gauntlet with NextEra, the Debtors didn't

2    call the condition.  Well, the fact is that calling the

3    condition, as Mr. Qureshi indicated, could cost the Debtors

4    upwards of $275 million.  We can't risk losing NextEra to

5    sit by for six weeks when we don't have NextEra's agreement

6    to sit by for six weeks.  That's not feasible.

7            Instead, we negotiated for the elimination of the

8    condition precedent in the plan that makes clear that

9    NextEra is still committed to closing this deal, for the

10   benefit of all parties on the E-side, which will get a

11   recovery to the EFIH first liens, the EFIH second liens, the

12   EFIH PIKs, the EFH LBO notes, and preserve the benefit of

13   the cash, that dwindling resource of cash, at EFH.

14           What we heard from Mr. Qureshi is slow down, let's

15   take a time out, there's no reason to hurry, we need time to

16   negotiate.  This doesn't cut off negotiations as Mr. Qureshi

17   indicated.  What do they need a break for, Your Honor?  The

18   negotiations aren't stopping, in fact, they're continuing

19   and they're continuing in parallel and they will continue in

20   parallel, as they have done for the last 2 1/2 years in

21   these cases, and 4 1/2 years -- 4 1/2 years that I've been

22   working on this case.

23           It's a weird statement to say that this is not a

24   melting ice cube.  We don't know where interest rates are

25   headed in the market.  We don't know if we started the

1    process all over ago today where we would be with

2    purchasers.  What we do know is we have a willing purchase

3    here, purchaser here who has signed an agreement, who's

4    agreed to modify the plan to delete the condition precedent

5    and has agreed to go forward on a time line that I

6    articulated, setting out a Feb. 15 deadline for confirmation

7    and a January 5th deadline for a disclosure statement.

8            Your Honor, we must protect the interests of all

9    stakeholders at EFIH.  And for Mr. Qureshi to stand here and

10   say to Your Honor that the PIKs are the only people that we

11   need to be caring about as Debtors is flat incorrect.  Your

12   Honor, there are other stakeholders at EFIH like the first

13   liens and the second liens, second liens are obviously a lot

14   closer to being impaired, but the loss of a sale transaction

15   to NextEra could be catastrophic.  We need to hold this

16   together and move these cases forward.  Thank you.

17           THE COURT:  Thank you.

18           MR. THOMAS:  Your Honor, if I may?

19           THE COURT:  Um hmm.

20           MR. THOMAS:  Thank you.  Mark Thomas on behalf of

21   EFH acting on behalf of and at the direction of the

22   Disinterested Directors.

23           Your Honor, I will be very brief.  EFH

24   unfortunately has been subjected to an $800 million absolute

25   priority claim that subordinated our stakes recovery from

1    the NextEra transaction.  That is what it is.  Allowing

2    NextEra to terminate and take that $275 million break-up fee

3    and then potentially renegotiate, is an unacceptable option.

4    Our cash dwindles every day, and as of now it is the only

5    means of distribution to EFH creditors.  There is no need

6    for an eight-week timeout.  Negotiations can and should

7    occur between today and whenever Your Honor may set as

8    hearings for confirmation of the plan that was filed.

9    Exclusivity has lapsed.  The NextEra transaction was put out

10   to the market in July.  At any time from them until today

11   higher, better bids could come forward from people within or

12   outside of the capital structure.  None have come forward.

13   It's imperative that we move forward as quickly as possible.

14   Thank you, Your Honor.

15            THE COURT:  Thank you.

16            MR. QURESHI:  Your Honor, can I briefly respond?

17            THE COURT:  Yes, of course, Mr. Qureshi.

18            MR. QURESHI:  Thank you.  Again, for the record,

19   Abid Qureshi on behalf of UMB as PIK note trustee.

20            Just a couple of points in response to Mr.

21   Husnick.  Your Honor -- and also Mr. Thomas.  First, with

22   respect to the deadlines, if it is the argument of the

23   Debtors that by giving us a short window to try to see where

24   we can get with negotiations, that that would trigger a

25   break-up fee to NextEra, and I'm not sure that that's what I

1    head, but to the extent that it is, that can't be the case,

2    because I don't think there is any further break-up fee that

3    could be payable to NextEra in light of the new deal that

4    has apparently been cut and the new amended plan that has

5    been filed.

6          Secondly, the deadlines that we heard about that

7    apparently have been negotiated with NextEra in some sort of

8    a forbearance agreement that we have yet to see, of I

9    believe it was January 5th for the approval of a disclosure

10   statement and February the 15th for approval of a plan, as

11   far as I'm aware, Your Honor, those dates have certainly not

12   been approved by this Court, let alone even presented to

13   this Court.  So the suggestion that some sort of liability

14   to NextEra might be triggered by the short window that we're

15   looking for I think is not the case.

16          And then the last point I'll make, Your Honor,

17   with respect to the consequences of remaining in Chapter 11,

18   my melting ice cube point was simply a recognition of the

19   fact that what we are talking about here is of course a

20   holding company, a holding company that holds a very stable

21   asset.  Of course that asset is subject to swings in value

22   with the passage of time, but those swings in value are not

23   a consequence of being in Chapter 11.  And certainly

24   something in the range of a six week delay is not going to

25   have any material impact on that.

1          THE COURT:  All right.

2          MR. QURESHI:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          All right.  This is what I'm prepared to do.  I do

5    think that we need another disclosure statement hearing and

6    I'm not comfortable with doing it on 13-days' notice.  Of

7    course we run into the problem of the Christmas and New

8    Year's holiday, so what I'm prepared to do on a disclosure

9    statement hearing is schedule it for January 4th.  That's a

10   day before your drop dead date, I understand, and we'll push

11   back a little on these dates you've negotiated with NextEra,

12   because I think it's appropriate to do so.  And we can have

13   that hearing, we'll start that hearing at -- I'll have to

14   move some things, we'll start that hearing at 10 a.m., so

15   we'll have the whole day.

16          I'm also going to push back on the confirmation

17   dates.  I think that too much has changed, both for the PIKs

18   and also for the EFH creditors to jam people too much on

19   when confirmation will occur.  It's one thing to say you

20   don't think you'll have a valuation fight, it's another

21   thing to see if it actually -- one actually breaks out.

22   Certainly market evidence is a strong indication of value,

23   and that is a heavily marketed asset, but I don't know what

24   other people are ultimately going to decide to do in

25   connection with what's the best thing to do for their

1    clients.

2            At the same time, I think this concept of a six-

3    week timeout is not reasonable.  There is a bird in the hand

4    here in the NextEra transaction and there are conditions

5    that NextEra has imposed which are not out of the ordinary,

6    by any sense, for approval by a date certain.  Even though

7    I'm going to push back a little on that, I don't find it

8    problematic that, you know, there are these dates.  And I do

9    think it's important that this case continue to move forward

10   in tandem with the PUCT schedule so that both the PUCT knows

11   what I'm doing and I know what they're doing and that

12   hopefully we all move in the same direction.

13           So what I'm going to do is schedule confirmation

14   for February 14th, that's a Tuesday.  That will be a half

15   day, we'll have to start at one o'clock on that day.  And

16   then the 15th, 16th and 17th we'll have all day, we'll start

17   at 10.  If 3 1/2 days isn't enough, if we get closer and we

18   need more time we'll have to negotiate into the next week,

19   although the next Monday's a federal holiday.

20           That means you're going to have to go back to

21   NextEra and say the 15th doesn't work.  I don't know what

22   that's going to cost you, but I don't have to write that

23   check, but that's what I'm prepared to do.

24           And a litigation schedule that is reasonable that

25   fits in those timeframes along the lines of what we've had

1  before, I'm prepared to sign an order along those lines.  I

2  think we can get that order signed at the next hearing,

3  right?  The 14th?

4          MR. HUSNICK:  December 14th?

5          MR. MCKANE:  Yes, Your Honor.  We can submit a

6  revised -- proposed scheduling order with those

7  modifications and then, you know, maybe as early as tomorrow

8  and consistent with this outline; we know what to do.

9          THE COURT:  Okay.

10          MR. HUSNICK:  I was just going to say, Your Honor,

11  it's a good thing my dating life is over, because you

12  scheduled a hearing on Valentine's Day, so I'm ready to go.

13          THE COURT:  Look it, I've been married 24 years

14  and I didn't even think about that.  So that doesn't -- how

15  bad is that?

16          MR. HUSNICK:  Your Honor, I --

17          THE COURT:  Maybe 25 isn't going to happen?  I

18  don't know.

19          MR. HUSNICK:  Your Honor, I'm looking at NextEra's

20  lawyers, I'm sure we'll be able to work something out on

21  accommodating that extra couple of days.  So with that, I

22  think -- I appreciate your time today and --

23          THE COURT:  All right.

24          MR. HUSNICK:  -- I think that's it for the agenda.

25          THE COURT:  Well, I have -- that's it for the E-

1    side status conference, but I also have a status conference

2    in connection with the case that was remanded from Judge

3    Andrews.  So I don't know where those --

4                MR. HUSNICK:  Thank you, Your Honor.

5                THE COURT:  -- people are?  And if the others

6    could just remain patient and stay in your seats, I'd

7    appreciate it so we don't have a general commotion.  This

8    should not take particularly long.

9                MAN 1:  Thank you, Your Honor.

10               THE COURT:  You're welcome.

11               Oh, I'm sorry, Mr. Husnick, where are you?  Let's

12   do a pretrial on confirmation on the 13th at 1:00.

13               MR. HUSNICK:  Okay.  Thank you, Your Honor.

14               THE COURT:  You're welcome.

15               THE COURT:  February 13th.

16               MR. HOLLEMBEAK:  Good afternoon, Your Honor.

17   Jeremy Hollembeak from Kobre & Kim on behalf of Delaware

18   Trust Company, the TCEH notes trustee.

19               Stop me at any time.  Your Honor called this

20   conference; I'm prepared to give you a brief background of

21   how we got here today and then what I think makes sense

22   going forward.

23               THE COURT:  Well, I know how we got here.  So we

24   don't --

25               MR. HOLLEMBEAK:  Right.

1          THE COURT:  -- need to do that.  And my question

2    really was to get everybody together to talk about where do

3    we go from here.  So we have an effective plan on the T-

4    side.

5          MR. HOLLEMBEAK:  Correct.

6          THE COURT:  So -- but we need to figure out how

7    that changes my previous decision.

8          MR. HOLLEMBEAK:  Correct.

9          THE COURT:  I will say that I intend to stand by

10   those provisions in my previous decision that were based on

11   the contract language but of course since we have a

12   different plan, although similar --

13         MR. HOLLEMBEAK:  Correct.

14         THE COURT:  -- that's what we really need to focus

15   on, what affect that might have on the Court's decision.

16         MR. HOLLEMBEAK:  Right.  And let me just cut to

17   the chase, Your Honor.  We think that we should just get the

18   opportunity to provide some limited briefing to Your Honor.

19   We've already had discussions on that front and I think we

20   could reach an agreement with the intervenors.  And if, you

21   know, Your Honor doesn't feel that the issues that we raise

22   should change the outcome, then Your Honor could just enter

23   an order.  And that, you know, at least as we explain in our

24   papers, gives us a clean appeal with a full record, to then

25   go back to Judge Andrews and move forward with the appellate

1    process.

2              THE COURT:  All right.

3              MR. HOLLEMBEAK:  I don't know --

4              THE COURT:  Anyone else?  Any other -- so we do

5    briefing?  Is that acceptable?

6              MR. ELLENBERG:  If the Court please, Mark

7    Ellenberg, Cadwalader on behalf of Morgan Stanley, and

8    speaking today for the intervenors.

9              Your Honor, yes.  We think some limited briefing

10   focused on the differences between the old plan and the new

11   plan would make sense.

12             THE COURT:  Okay.

13             MR. ELLENBERG:  We don't think it should take very

14   long or --

15             THE COURT:  All right.  So we're not talking about

16   new evidence, new -- well, we never really had evidence, I

17   mean, other than what --

18             MR. ELLENBERG:  Correct.

19             THE COURT:  -- the plan provisions and the

20   contract provisions.  So --

21             MR. ELLENBERG:  In my view that's right, Your

22   Honor.

23             MR. HOLLEMBEAK:  I would just -- there's maybe

24   some limited additional items that we would want to

25   introduce to the Court, in particular the private letter

1    ruling of the IRS that we think, you know, is relevant to

2    the changes that took place in the plan

3              THE COURT:  Okay.

4              MR. ELLENBERG:  But we have no problem with them

5    referencing the private letter ruling.  It said that there

6    was not a sale, so I'm not sure how it helps them, but --

7              THE COURT:  Well, we'll --

8              MR. ELLENBERG:  -- in any event, we don't object

9    to that.

10             THE COURT:  All right.  So why don't you work out

11   a schedule with each other on a briefing schedule that makes

12   sense.  And work with Ms. Gadson to come up with a date for

13   oral argument that will be at least two or three weeks after

14   the final -- after the submissions of briefs so that the

15   Court's prepared to make a ruling -- or well, to hear

16   argument in an informed manner and then hopefully make a

17   ruling in short order.

18             And you can just submit that.  Work with that

19   schedule, work with Ms. Gadson and then if you want to send

20   over a scheduling order I'd be happy to sign it.

21             MR. HOLLEMBEAK:  Thank you.

22             MR. ELLENBERG:  Thank you, Your Honor.

23             THE COURT:  You're welcome.  All right.  Very

24   good.  That was brief.  We're adjourned.

25                          * * * * *

Page 48

1                C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya Ledanski                Digitally signed by Sonya Ledanski Hyde
                                   DN: cn=Sonya Ledanski Hyde, o=Veritext,
      Hyde                         ou, email=digital@veritext.com, c=US
7                                  Date: 2016.12.05 10:08:41 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 2, 2016