1  UNITED STATES BANKRUPTCY COURT

2  DISTRICT OF DELAWARE

3

4  Case No. 14-10979-css

5  - - - - - - - - - - - - - - - - - - - -x

6

7  In the Matter of:

8

9  ENERGY FUTURE HOLDINGS CORP., et al.,

10

11              Debtors.

12

13  - - - - - - - - - - - - - - - - - - - -x

14

15              United States Bankruptcy Court

16              824 Market Street North, 3rd Floor

17              Wilmington, Delaware

18

19              December 5 2016

20              9:03 AM

21

22  B E F O R E:

23  HON. CHRISTOPHER S. SONTCHI

24  U.S. BANKRUPTCY JUDGE

25  ECR:  LESLIE MURIN

1   14-10979-css Energy Future Holdings Corp., et al.

2   Ch 11

3

4   HEARING re Motion of Shirley Fenicle, David William Fahy,

5   John H. Jones, and David Heinzmann to Dismiss Chapter 11

6   Petitions of Asbestos Debtors EECI, Inc., EEC Holdings Inc.,

7   LSGT SACROC, Inc., and LSGT Gas Co. LLC Pursuant to

8   11 U.S.C. § 1112(b) [D.I. 10074; filed November 8, 2016]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Beck, Jamie Gallagher and Pamela Skaw

```
 1   A P P E A R A N C E S :

 2   KIRKLAND & ELLIS LLP

 3        Attorneys for Debtors and Debtors-in-Possession

 4        601 Lexington Avenue

 5        New York, NY 10022

 6

 7   BY:  MARK MCKANE, ESQ.

 8

 9   KIRKLAND & ELLIS LLP

10        Attorneys for Debtors and Debtors-in-Possession

11        300 North LaSalle

12        Chicago, IL 60654

13

14   BY:  CHAD J. HUSNICK, ESQ.

15        LISA G. ESAYIAN, ESQ.

16

17   KIRKLAND & ELLIS LLP

18        Attorneys for Debtors and Debtors-in-Possession

19        655 Fifteenth Street, N.W.

20        Washington, D.C. 20005

21

22   BY:  JONATHAN F. GANTER, ESQ.

23        BRYAN M. STEPHANY, ESQ.

24

25
```

```
 1   RICHARDS LAYTON & FINGER, P.C.

 2        Co-Counsel to Debtors and Debtors-in-Possession

 3        One Rodney Square

 4        920 North King Street

 5        Wilmington, DE 19801

 6

 7   BY:  JASON M. MADRON, ESQ.

 8        DANIEL DEFRANCESCHI, ESQ.

 9

10   PROSKAUER ROSE LLP

11        Attorneys for Debtors and Debtors-in-Possession

12        Eleven Times Square

13        Eighth Avenue & 41st Street

14        New York, NY 10036

15

16   BY:  MARK K. THOMAS, ESQ.

17        PETER YOUNG, ESQ.

18

19   BIELLI & KLAUDER, LLC

20        Attorneys for EFH Corp.

21        1204 North King Street

22        Wilmington, DE 19801

23

24   BY:  DAVID KLAUDER, ESQ.

25
```

1   CAPLIN & DRYSDALE

2        Attorneys for Shirley Fenicle, individually and as

3         Successor-in-Interest to the Estate of George Fenicle,

4         David William Fahy, and John H. Jones

5        One Thomas Circle, NW

6        Suite 1100

7        Washington, DC 20005

8

9   BY:  LESLIE M. KELLEHER, ESQ.

10

11  CHADBOURNE & PARKE LLP

12       Attorneys for NextEra

13       350 South Grand Avenue

14       32nd Floor

15       Los Angeles, CA 90071

16

17  BY:  ROBIN D. BALL, ESQ.

18

19  CHADBOURNE & PARKE LLP

20       Attorneys for NextEra

21       1301 Avenue of the Americas

22       New York, NY 10019

23

24  BY:  ERIC DAUCHER, ESQ.

25

1    FOX ROTHSCHILD LLP

2         Attorneys for Ad Hoc Group of TCEH Unsecured

3          Noteholders

4         Citizens Bank Center

5         919 North Market Street

6         Suite 300

7         Wilmington DE 19899

8

9    BY:  L. JOHN BIRD, ESQ.

10

11   HOGAN MCDANIEL

12        Attorneys for Shirley Fenicle, individually and as

13         Successor-in-Interest to the Estate of George Fenicle,

14         David William Fahy, and John H. Jones

15        1311 Delaware Avenue

16        Wilmington, DE 19806

17

18   BY:  DANIEL K. HOGAN, ESQ.

19

20

21

22

23

24

25

1   KASOWITZ BENSON TORRES & FRIEDMAN LLP

2        Attorneys for Contrarian Capital Management, LLC

3        1633 Broadway

4        New York, NY 10019

5

6   BY:   ANDREW K. GLENN, ESQ. (TELEPHONICALLY)

7        EMILY L. KUZNICK, ESQ. (TELEPHONICALLY)

8

9   LANDIS RATH & COBB

10       Attorneys for NextEra

11       919 Market Street

12       Suite 1800

13       Wilmington DE 19801

14

15  BY:   JOSEPH D. WRIGHT, ESQ.

16

17  MONTGOMERY MCCRACKEN

18       Attorneys for E-Side Committee

19       1105 North Market Street

20       15th floor

21       Wilmington, DE 19801

22

23  BY:   NATALIE D. RAMSEY, ESQ.

24

25

```
 1   NIXON PEABODY LLP

 2        Attorneys for American Stock Transfer as EFH Trustee

 3        100 Summer Street

 4        Boston, MA 02110

 5

 6   BY:  MORGAN NIGHAN, ESQ.

 7

 8   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

 9        Attorneys for the Steering Committee of TCEH First Lien

10         Lenders

11        1285 Avenue of the Americas

12        New York, NY 10019

13

14   BY:  JACOB A. ADLERSTEIN, ESQ. (TELEPHONICALLY)

15

16   SULLIVAN & CROMWELL LLP

17        Attorneys for E-Side Committee

18        125 Broad Street

19        New York, NY 10004

20

21   BY:  BRIAN D. GLUECKSTEIN, ESQ.

22

23

24

25
```

```
1                    P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.

4        (Pause)

5            THE COURT:  Good morning.

6            MR. HUSNICK:  Good morning, Your Honor.  Chad

7    Husnick with Kirkland & Ellis on behalf of the debtors.  I'm

8    here with my colleagues, Mark McKane, John Ganter and Lisa

9    Esayian.

10            Your Honor, the only item, I believe, that's on

11   the agenda for today is the motion to dismiss the LSGT

12   Debtor Chapter 11 cases that was filed by certain of the

13   asbestos claimants.

14            Your Honor, you had mentioned in chambers, I think

15   correctly, that the debtors bear the ultimate burden, I

16   believe, on demonstrating good faith.  We are prepared to

17   move forward this morning and begin with openings.  And then

18   we have three witnesses to call in support of our case and

19   then conclude with closings to extent feasible.  I know Your

20   Honor has a hard stop at 3:30.

21            THE COURT:  I do.  Is that okay, everybody?  Yeah?

22   That's fine.  Why don't you get started.

23            MR. HUSNICK:  Thank you, Your Honor.

24            Can you put up the one slide, please?  Thank you.

25            Your Honor, this is a continuation of a case long
```

1   battle by the asbestos plaintiffs and, more likely, their

2   lawyers to evade the bankruptcy process.  The amazing part,

3   however, is that not once over the course of the last two

4   and a half years did we hear that the cases for the LSGT

5   debtors were filed in bad faith.  There was no complaint

6   from the official committee of unsecured creditors

7   representing the interest of the EFH/EFIH debtors including

8   the unmanifested claimants that proposed the move today.

9   There was no complaint from the asbestos lawyers.  There was

10  no complaint from the asbestos claimants.  There was no

11  complaint from any party.  And this is all despite the fact

12  that the asbestos claimants and their lawyers have been

13  actively involved in many aspects of the Chapter 11 cases.

14          And the Court can take judicial notice, and we'll

15  ask the Court to take judicial notice at the conclusion of

16  our case, as to the following involvement.

17          We begin -- and I lay this out in the timeline in

18  front of Your Honor.  The first time we heard from the

19  asbestos law firms -- it was the law firms, not the

20  plaintiffs -- is when they challenged the bar date in August

21  of 2014, over two years ago.  Despite all of the litigation

22  around the bar date, we didn't hear a whisper about bad

23  faith.  The Court overruled the law firms' objection and, in

24  the process, noted that the law firms needed to find some

25  clients so that they could have standing in the Chapter 11

Page 11

1   cases.

2          Those same law firms, now acting on behalf of

3   clients, sought the formation of an official committee.

4   This is the second time that we heard from the asbestos

5   plaintiffs and the law firms.

6          And while the United States trustee ultimately

7   declined to appoint an official committee of just asbestos

8   claimants, the U.S. trustee did appoint two of the movants

9   to the official committee.  But despite multiple hearings,

10  multiple letters, pleadings filed in front of Your Honor,

11  not once did we hear that the LSGT debtors were filed in bad

12  faith.

13         The third opportunity, Your Honor, was a bit later

14  after Your Honor had ruled on the asbestos bar date, was

15  when the official committee of unsecured creditors, again,

16  two out of the five members of which were asbestos

17  plaintiffs, negotiated with the debtors a multi-million

18  dollar noticing plan aimed exclusively at asbestos claimants

19  not just at the LSGT debtors but asbestos plaintiffs around

20  the capital structure.  Again, throughout those

21  negotiations, throughout the pleadings that were filed --

22  Your Honor may remember, we came right to the precipice of

23  having a trial on the noticing plan -- never a mention of

24  bad faith.

25         Fourth, Your Honor, the asbestos plaintiffs

1    requested an unmanifested claims representative.  The Court

2    denied that request but, once again, throughout the

3    pleadings, throughout the trial on that motion, never a word

4    of bad faith.

5            Fifth, the asbestos plaintiffs sought leave to

6    file an omnibus proof of claim.  The Court correctly denied

7    this motion as an impermissible and a run-around the

8    previous bar date order but nowhere in the papers, nowhere

9    in the argument did they raise bad faith.

10           Sixth -- and it keeps going.  Sixth, when engaged

11   with the official committee, again, represented with two

12   representatives who are movants here today, in detailed

13   negotiations around settlement of confirmation objections.

14   We ultimately reached a deal and Your Honor may remember and

15   can take judicial notice of the settlement agreement on the

16   docket that that settlement agreement expressly contemplates

17   how the asbestos claimants will be treated in these Chapter

18   11 cases.  And the debtors are obligated in order to fulfill

19   their obligations under the UCC settlement agreement to

20   either -- to reinstate the asbestos claims and to reinstate

21   the related intercompany claims.

22           Your Honor, but throughout those negotiations,

23   throughout the presentation of that settlement agreement to

24   Your Honor, never was there a mention of bad faith.

25           And seventh, and perhaps the most egregious and

1   the most troublesome to me, is that the asbestos plaintiffs

2   never once mentioned bad faith in connection with their

3   objection to confirmation of what now has turned out to be

4   round 1 of the confirmation proceedings in this bankruptcy

5   case.

6           While that plan, which was found to be filed and

7   prosecuted in good faith, ultimately was rendered null and

8   void, the failure of the asbestos plaintiffs and their

9   lawyers to challenge the filing of that plan as bad faith or

10  the filing of these cases as filed in bad faith at that time

11  or at any time over the last two and a half years is

12  important to understanding the ridiculousness of the motion

13  filed here.  Now at the eleventh hour, or at least what I

14  hope is the eleventh hour of these Chapter 11 cases, after

15  two and a half years, after multiple millions of dollars

16  spent on a noticing plan, after full representation on the

17  official committee of unsecured creditors for EFH, the

18  asbestos plaintiffs believe it's the appropriate time to

19  bring to Your Honor a case asserting that the LSGT debtors

20  were filed in bad faith in April of 2014.

21          Your Honor, it's not the appropriate time.  The

22  dismissal request is yet another attempt to end run Your

23  Honor's final non-appealable bar date order and it should be

24  strongly rejected.

25          The evidence, Your Honor, that we discuss in our

1   papers and will present today is going to make clear that

2   the LSGT debtors had a very sound business judgment, a very

3   sound reason for commencing these Chapter 11 cases and that

4   their decision was made in good faith easily satisfying the

5   standard under 1112(b) of the Bankruptcy Code.

6          Your Honor, the first piece of evidence that we're

7   going to show is that LSGT debtors are a necessary part of

8   this $42 billion enterprise wide restructuring of a

9   corporate group that entered Chapter 11 because it couldn't

10  service the $42 billion of liability.  You're going to hear

11  or read in declarations or designation of depositions

12  evidence from Mr. Horton and Mr. Moldovan, the two directors

13  of the LSGT debtors that the failure to file the LSGT

14  debtors could have materially hampered the massive

15  reorganizational efforts due to the investor concerns.

16  These are the investors who were seeking to either own --

17  purchase in a sale transaction or invest into reorganized

18  EFH.

19          Indeed, the evidence is going to show that the

20  potentially interested parties including NextEra and the

21  Hunt consortium that Your Honor has heard quite a bit from,

22  these interested parties that participated in the sale

23  process insisted that the debtors establish an asbestos bar

24  date, insisted that we go through the process that we've

25  done for the last two and a half years.

1           Yet, in the face of this evidence, you're going to

2    hear from the asbestos objectors that the only effective

3    dismissal would be the reinstatement of time-barred

4    unmanifested claims, in effect, negating the bar date.  But

5    that's simply not true.  The evidence is going to show that,

6    in reality, the current negotiated plan support agreement

7    and merger agreement would -- if we were to dismiss these

8    cases would provide NextEra with a right to terminate those

9    agreements and potentially trigger a $275 million breakup

10   fee.

11          The next set of evidence you're going to hear and

12   it's the second factor that we cite in favor of good faith

13   is about the cash flow insolvency.  Your Honor will hear

14   evidence that at the time of the filing, the LSGT debtors

15   would have been cash flow insolvent had they not commenced

16   these Chapter 11 cases.  While solvency is not a

17   prerequisite for a bankruptcy filing, insolvency is a strong

18   indicator of good faith when it is present.  The only source

19   of liquidity for these EFH debtors for the LSGT debtors, in

20   particular, were intercompany claims -- and you'll hear this

21   from Mr. Horton and Mr. Moldovan -- were intercompany claims

22   against a deeply insolvent EFH estate.  The evidence is

23   going to show that there was no guarantee and that the

24   directors received advice from their advisors that there was

25   no guarantee that if the LSGT debtors didn't commence

1   Chapter 11 on April 2014 along with the rest of the debtors

2   that there would not have been a guarantee to get access to

3   the EFH cash.  Indeed, the litigation surrounding

4   interdebtor transactions in these Chapter 11 cases is proof

5   positive that we would have had, at a minimum, a

6   drop-down-drag-out fight to continue to pay unsecured

7   creditors who are offering no go forward benefit to the

8   debtors' estates.

9         Mr. Horton and Mr. Moldovan will ultimately

10  testify that in their business judgment, they needed to

11  commence the Chapter 11 cases to obtain a breathing spell

12  from creditor actions and to allow these debtors to

13  participate in the negotiations around the comprehensive

14  restructuring along with the other 70 some odd debtors.

15        The second -- or, I'm sorry -- the third reason

16  that you're going to hear from the evidence is that the

17  debtors, the LSGT debtors in particular, had a legitimate

18  and independent restructuring purpose beyond addressing the

19  insolvency.  The evidence is going to show that the filing

20  of the bankruptcy allowed the LSGT debtors to be a part of a

21  global tax resolution negotiation.  As you know,

22  corporations within the corporate control group are jointly

23  and severally liable for any deconsolidation tax.  We saw a

24  lot of -- in the reply -- or the objection to -- I'm sorry.

25  It would have been the reply in support of the motion about

1   TCH checked the box is all completely irrelevant.  These

2   were corporations.  They were jointly and severally liable

3   for any deconsolidation tax.

4          Your Honor, you did hear in the reply that, well,

5   not all the debtors that were corporations that could be

6   liable for the tax filed and we'll present evidence, Your

7   Honor, that each of those entities that were referenced had

8   their own independent reasons for not commencing Chapter 11

9   cases in April of 2014.  For example, EFH Properties, which

10  was their most prominent example, and Your Honor may

11  remember, was an entity that was a conduit for various lease

12  transactions related to the headquarters of Energy Plaza.

13  That entity, Your Honor, you're going to hear from Mr.

14  Moldovan, had a reason not to file.  There are three very

15  good reasons not to file.  First, it would have triggered

16  unnecessary tax indemnification claims associated with

17  unwinding a leverage lease transaction that underlie the

18  Energy Plaza lease.

19         Second, it would have accelerated the need to make

20  a decision on whether to assume or reject the leases that

21  underlie the Energy Plaza lease.  Your Honor may remember

22  from the confirmation hearing, that decision wasn't made

23  until very near the end of the cases, over two years into

24  the case and well beyond the 210-day deadline that would

25  have applied under Section 365(d)(4) of the Bankruptcy Code

1    had we commenced the case in April of 2014.

2              And third, you're going to hear that EFH

3    Properties -- you already heard a lot about this in

4    confirmation -- was cash flow neutral.  It had cash on the

5    balance sheet.  It was not cash flow insolvent.  It didn't

6    need to commence Chapter 11 in April of 2014.

7              The evidence is going to show that those

8    considerations outweighed the considerations that were --

9    that counseled in favor of filing the LSGT debtors.  And

10   there were no countervailing reasons not to file the LSGT

11   debtors.

12             You're ultimately going to hear that that decision

13   not to file EFH Properties and not to file certain other

14   entities in the structure was revisited throughout the case.

15   And that decision, as it was revisited, ultimately we were

16   able to reach a deal that did not require the filing.

17             But with the benefit of hindsight, maybe we

18   wouldn't have had to file the LSGT debtors.  But that's not

19   the test.  The test is, did we need to file them in April

20   2014.  And the answer is quite clearly yes.

21             The other legitimate and independent factor for

22   filing these Chapter 11 cases was the maximization of value.

23   Your Honor, the sole asset of -- it's not the sole asset.

24   There's a very small piece of property down there.  But the

25   primary asset of the LSGT debtors is the intercompany claim

1   by the LSGT debtors against EFH Properties.  As I mentioned

2   earlier, a deeply insolvent -- against EFH.  The deeply

3   insolvent EFH, one that we have throughout this case --

4   value has jumped around a little bit in the Hunt

5   transaction, EFH arguably would have left their creditors

6   unimpaired.  But today, Your Honor, we stand here facing a

7   situation where EFH Corporation creditors stand to obtain

8   around 10 cents on the dollar.

9        We needed to deal with those intercompany claims.

10  That is yet an independent and legitimate reason why the

11  LSGT debtors needed to commence these Chapter 11 cases.

12  There would not have been an ability during the Chapter 11

13  case to get cash down to continue to fund litigation against

14  general unsecured creditors who are not critical vendors,

15  who are not satisfying the doctrine of necessity in order to

16  continue to keep them out of Chapter 11 basis.

17       Your Honor, the sum total of the legitimate and

18  independent purposes for filing these cases completely

19  rebuts the assertion in the motion and in the reply that the

20  debtors filed these solely for litigation tactics.  It's

21  just wrong.

22       In conclusion, Your Honor, we believe that the

23  Court should reject the untimely motion.  The Court should

24  not allow the asbestos plaintiffs and their lawyers to play

25  games by sitting on their hands for two and a half years, by

1    litigating with the debtors for two and a half years.  They

2    should not allow that to happen and the Court should deny it

3    simply as an untimely motion to dismiss these cases.  But

4    even if you entertain the motion, Your Honor, we

5    respectfully submit there was an undeniable need for the

6    LSGT debtors to commence Chapter 11 in April of 2014 to

7    obtain a breathing spell from creditor actions and to permit

8    them to negotiate for a value-maximizing transaction.  And I

9    submit to Your Honor, as I stand here today, we've done

10   exactly that.  We have a value-maximizing transaction that

11   we're going to propose to Your Honor for confirmation in

12   February of this year (sic) that reinstates the timely valid

13   -- timely filed valid asbestos claims.  We couldn't ask for

14   more.

15          Thank you.

16          THE COURT:  You're welcome.

17          Oh.  Do you want to -- wish to be heard?

18          MR. THOMAS:  Yes.

19          THE COURT:  Hang on.

20      (Pause)

21          MR. THOMAS:  Thank you, Your Honor.  Mark Thomas

22   of Proskauer on behalf of Energy Future Holdings acting on

23   behalf of and at the direction of its disinterested

24   directors.

25          Your Honor, in these cases, tens of thousands of

1   proofs of claim have been filed by asbestos claimants

2   against these asbestos debtors.  There will be no evidence

3   that you will hear to conclude that it is in the best

4   interest of those creditors to dismiss the case of the

5   asbestos debtors.  Only in EFH can creditors argue that

6   reinstating creditor claims and paying them in full is

7   somehow not in the best interest of creditors and is somehow

8   in the best interest of equity.

9           Your Honor, these -- the motion is based on a

10  false premise.  The false premise is that asbestos claims

11  are being discharged and the value of EFH's equity is being

12  enhanced.

13          EFH has no equity in the asbestos debtors.

14  There's no evidence that you will hear that there is any

15  such equity.  And, in fact, if the asbestos debtors' claims

16  are dismissed, the evidence is clear they will have an

17  unsecured claim in the EFH parent bankruptcy case.  And that

18  claim may, some day in the future, get a dividend depending

19  on what happens in the EFH plan.  But that prospect for a

20  future dividend is not in the best interest of the real

21  creditors of the asbestos debtors when they have on the

22  table a transaction that would reinstate them and pay them

23  in full.  So we don't think that the requirement of the best

24  interest of creditors has been met or will be met with

25  respect to the asbestos debtors.  And the motion should be

Page 22

1   denied.

2           THE COURT:  All right.

3           MR. THOMAS:  Thank you.

4           THE COURT:  Thank you, Mr. Thomas.

5           Ms. Kelleher?

6           MS. KELLEHER:  Good morning, Your Honor.  Leslie

7   Kelleher of Caplin & Drysdale for the movants.  And I'm here

8   with Dan Hogan of Hogan McDaniel.

9           May it please the Court.  I'd like to address

10  first the notion that this motion is not timely filed.  The

11  argument is made that asbestos claimants' firms have been

12  involved in this case from the outset.  However, Mr. Jones

13  and Mr. Heinzmann, who are movants, have not been involved

14  in this case from the outset.  They are what has been

15  referred to as unmanifested asbestos claimants in this case.

16  They fell ill after the bar date, were diagnosed after the

17  bar date and they are not and other future unmanifested

18  asbestos claimants are not represented by any committee in

19  this bankruptcy.  They are not represented by the E-side

20  committee.  They cannot be represented by that committee

21  because that committee has a conflict of interest.  It's

22  very clear, under Supreme Court precedent, that future and

23  current asbestos claimants cannot be represented by the same

24  committee.

25          In addition, there is no estate (indiscernible)

1    appointed to represent their interest because there was no

2    future claimants representative appointed.

3          THE COURT:  I'm going to be very -- I'm going to

4    be a stickler on this.  These are not future claimants we're

5    talking about.  These are unmanifested claimants, people who

6    have been exposed prior to the bar date not people who have

7    been exposed to asbestos in the future.  So I think that's

8    an important distinction.  I'm going to be a stickler on

9    that.

10          MS. KELLEHER:  I appreciate, Your Honor.  There is

11   another group of persons who have not yet been exposed to --

12   who were not exposed to the asbestos of these debtors and

13   have not, therefore, fallen ill.  Those people are not

14   claimants at all within the meaning of Section 1015.  I'm

15   distinguishing between persons who have been exposed and

16   have fallen ill and persons who have not fallen ill --

17          THE COURT:  I understand.

18          MS. KELLEHER:  -- what is often referred to here

19   as unmanifested.  That's correct.  Typically -- that's

20   correct.

21          So there is no delay here on the part of the

22   claimants.  And there's a certain irony that I'll note with

23   respect to that argument which is that throughout these

24   cases, certainly when we've appealed at the initial

25   confirmation order, there was an argument made that Mr.

1    Fenicle or Mr. Fahy and Ms. Fenicle didn't represent the

2    interest of those claimants and could not do so, that they

3    didn't have standing.  Now that we've got people who do

4    represent their interests, it's being argued that those

5    people cannot make these arguments now because they're too

6    late to come to the table.

7            Nor is this a collateral attack on Your Honor's

8    bar date order which was, in fact, an interrogatory order.

9    But apart from that, it's not a collateral attack because we

10   are not seeking this Court to overturn a bar date.  We are

11   not seeking that this Court make any determination with

12   respect to this motion as to whether or not the claims of

13   unmanifested claimants can be discharged.  So there's no

14   collateral attack there.

15           And I'd just like to point out that the law here

16   is clear that good faith is an objective test.  It's not

17   determined by the subjective intent of the asbestos debtors

18   as was just indicated by Mr. Husnick.  Your Honor is going

19   to hear testimony by the directors of the various asbestos

20   subsidiaries that they discussed these issues with their

21   counsel, that they understood that the filing was

22   appropriate for various reasons.  But ultimately, that's

23   really not the point whether they believe that they had

24   proper reasons for filing the bankruptcy.  If they did not

25   indeed have a proper reorganizational purpose, it's not good

1    faith.  It is not a matter of business judgment.  It's a

2    matter of whether, under the law, the reasons are proper

3    reorganizational purposes.  And as we all agree, the burden

4    is on the debtors of showing that they did have such a

5    proper reorganizational purpose.

6         What they have to show is two things.  One is that

7    they were in real financial distress.  And the other is that

8    they had a valid reorganizational purpose when they filed

9    their petitions.

10        The debtors say that they were in financial

11   distress, that the asbestos debtors were in financial

12   distress for two reasons.  One is that there was this

13   possibility of this potential deconsolidation tax for which

14   they would be jointly and severally liable.

15        Excuse me one moment.

16   (Pause)

17        Excuse me, Your Honor.

18        THE COURT:  That's fine.  No worries.

19        MS. KELLEHER:  A little bit of a cold.

20        One is that they assert that they may have had

21   this potential liability for deconsolidation taxes.  The

22   second is that their funding would be cut off when EFH filed

23   and they wouldn't be able to pay asbestos claims.

24        So the test, again, is whether there was immediate

25   financial difficulty.  It's not enough that there's a risk

1     that the debtor could become insolvent in the future.  And

2     it's the debtor's burden to prove that there was indeed this

3     immediate financial difficulty.

4          The potential impact of these deconsolidation

5     taxes were speculative at the time.  The asbestos debtors,

6     perhaps one of them placed into financial distress in the

7     future at the time they filed, if, and only if, the taxes

8     were indeed incurred, and they never were, and if, and only

9     if, the EFH and T-sides -- if and only if the parent EFH and

10    the T-side subsidiaries didn't have adequate cash to pay

11    those taxes.  And it appears that they did.  The point

12    being, and I certainly am not going to go back through this

13    whole issue of the deconsolidation taxes, but the point

14    being is that at the time that the bankruptcy was filed, it

15    was not clear that they were in financial distress because

16    of that.  So in that sense, it was premature.

17          As for the asbestos liability, the debtors have

18    acknowledged and recognize that the possibility that EFH

19    could have sought permission from this Court to free up some

20    funds to defend claims.  So we would argue there's no

21    immediate financial distress demonstrated there.  And they

22    say the Court would deny that.  It's not obvious.  Again,

23    it's their burden.  But the question would become, well, you

24    know, why wouldn't there be cause to lift the stay.  You

25    know, EFH owes LSGT $1.7 billion.  They say it's 560 million

1    but their expert says it's 1.7 billion because of accrued

2    interest, et cetera.  Because -- and that money's owed

3    because EFH borrowed from their subsidiary proceeds of the

4    sale of assets to which the asbestos liabilities attach.

5    There's no dispute that that money was owed.  And even if

6    LSGT could recover only 10 percent of such a claim, we're

7    still looking at $170 million.

8             So why wouldn't the Court allow the expenditure of

9    the funds that were necessary at least to liquidate the

10   claims that were asserted?  At least to write the letters to

11   settle those claims if not to pay some of the claims, the

12   settlements that -- for claims where there was some kind of

13   exigent circumstances.  That wasn't explored.  But we do

14   know that the Court did lift the stay to allow workers'

15   compensation claims to be paid, medical benefits, retiree

16   benefits, including for affiliates that were nondebtors.

17   And in asbestos cases, it's not unusual for the stay to be

18   lifted in order to permit claims to be liquidated.  And

19   again, even if they're not paid, why wouldn't the asbestos

20   claimants be willing to have their claims liquidated and

21   settled and forego collecting on the settlements until the

22   EFH bankruptcy was resolved and EFH emerged.

23             But we don't know because that wasn't something

24   that was discussed or attempted.

25             Now, in any event, financial distress is not, by

1    itself, a sufficient condition for filing for bankruptcy.

2    And it's important here that we step aside and realize that

3    I'm talking about the test that the Third Circuit has laid

4    out for filing for bankruptcy, whether you've got a proper

5    reorganizational purpose.  And that is whether the asbestos

6    debtors had a proper reorganizational purpose not whether

7    EFH did.  And that's something I'll come back to in a

8    minute.

9           But if, as the debtors now claim, the reason that

10   the asbestos debtors filed for Chapter 11 is because they

11   were going to be overwhelmed by their asbestos liability

12   then they have to show that they had a reorganizational

13   purpose.  They can't just file as they did here in order to

14   discharge as many claims as they can which does increase the

15   value of equity in the asbestos debtors.

16          Now if you're going to take advantage of the

17   protections of Chapter 11 you have to have a valid

18   reorganizational purpose and they don't have one.  They're

19   not a valid -- they're not a going concern so they have to

20   show that Chapter 11 protection would maximize the value of

21   the estate for the benefit of the creditors.  That is, for

22   the benefit of the asbestos claimants and that would

23   preserve some value that would be lost outside of

24   bankruptcy.

25          So they point to two things.  One is that we heard

```
 1   Mr. Husnick say that the -- what they were doing is they
 2   could only get resolution of these tax issues.  It seems to
 3   be the assertion is that the tax issues could only be
 4   resolved if these asbestos debtors were in bankruptcy.  But
 5   we know that's not the case.  I mean, we know that's not the
 6   case.  EFH Properties was not in bankruptcy and that
 7   demonstrates that it, too, is going to be on the line.
 8             So the Third Circuit is very clear in cases such
 9   as 15375 Memorial that you look at whether or not the
10   claimed benefits of filing for bankruptcy is one that could
11   be obtained by the debtor outside of bankruptcy.  And a
12   resolution of these tax matters is something that was up to
13   EFH.  It was not up to the asbestos debtors.
14             Nor is the -- they also point to the intercompany
15   receivables and say that only by filing for bankruptcy could
16   that issue have been resolved.  Well, again, that's a claim
17   that the asbestos debtors have.  It's their receivable.
18   They're a creditor of EFH.  That's a question of whether EFH
19   is going to reinstate them in its bankruptcy.  The asbestos
20   -- you know, the argument is that, well, they couldn't get
21   them reinstated unless they went and discharged their own
22   asbestos claims.  But that doesn't make it a valid
23   reorganizational purpose.
24             The point is, the asbestos debtors weren't
25   restructuring their own debt.  They weren't filing
```

1    bankruptcy to deal with a basic distributional problem that

2    Bankruptcy Code was designed to resolve.  What they were

3    going to do was just file for bankruptcy, pass through all

4    claims for which proofs of claim were filed and discharge

5    claims for which proofs of claim were not filed including

6    unmanifested claims.  And that does increase and indeed

7    increased the equity in EF -- in the asbestos debtors.  And

8    that was the plan from the beginning.  And the law is clear

9    that's not a valid reorganizational purpose.  You can't file

10   Chapter 11 to transfer value directly from your creditors to

11   equity.  That's bad faith.

12            And the reason EFH says it's not bad faith is

13   because they say that we had -- you, Your Honor, are

14   supposed to look at whether or not EFH had a valid

15   reorganizational purpose.  You're supposed to not worry

16   about whether the asbestos debtors -- they want this Court

17   to adopt a new rule.  They argue that all that matters is

18   the bad faith of EFH.  And that's really what this comes

19   down to.  That's what the crux of the issue is here.

20            EFH can't demonstrate that the asbestos debtors

21   had good faith as that is described by the Third Circuit in

22   controlling precedent.  So they're asking this Court to

23   ignore that precedent.  They're asking this Court to ignore

24   what the Third Circuit has said in SGL Carbon and in

25   Integrated Telecom and in 15375 Memorial.  They say that

```
1    those cases involved individual debtors only and they don't

2    have any application here.  Instead, you should adopt a new

3    rule that's never been approved by the Third Circuit and has

4    no supporting authority.  And this rule is that when

5    affiliated debtors file for bankruptcy, so long as the

6    parent has a valid purpose, the parent should be able to

7    determine which of the affiliates can get Chapter 11

8    protection.  And then the parents would be free to use the

9    bankruptcy to scrub the affiliates of their liabilities so

10   that the parents' equity stake is increased and their sale

11   value is increased.  That new rule, I submit, is directly

12   contrary to the basic principles of bankruptcy.  A Chapter

13   11 debtor can't file in order to discharge claims and

14   increase the value of the shareholder's equity.

15          So why would that be all right just because the

16   shareholder itself is in bankruptcy as well?  And, I would

17   submit, it is not even supported by the cases that the

18   debtors rely on, the UIP and Mirant cases.  In those cases,

19   situation involves situations in which there was an identity

20   of interest between the parent and the subsidiary such that

21   a judgment against one would effectively be a judgment

22   against the other.  And that's a result that EFH has

23   assiduously worked to avoid.

24          The reason these asbestos debtors are separate

25   entities is because EFH wants the assets and liabilities
```

1    kept separate to prevent any derivative liability of EFH for

2    the asbestos liabilities of those debtors.  They can't now

3    selectively ignore the separation between themselves and

4    their subsidiaries when it suits them.  The cases were filed

5    in bad faith and they must be dismissed.

6              Thank you.

7              THE COURT:  Thank you.

8              MR. MCKANE:  Good morning, Your Honor.

9              THE COURT:  Good morning.

10             MR. MCKANE:  Mark McKane on behalf of the debtors.

11             Your Honor, our first witness is going to be Mr.

12   Tony Horton.  As is our practice, we have binders for the

13   witness and the Court and its staff.  May I approach?

14             THE COURT:  Yes.

15             MR. MCKANE:  Your Honor, I apologize.  Before we

16   move to the evidentiary portion of these proceedings, I

17   understand one of the other creditors in the case would like

18   to make a statement.

19             THE COURT:  Okay.

20             MS. NIGHAN:  (Indiscernible), Your Honor.  Morgan

21   Nighan with Nixon Peabody representing American Stock

22   Transfer of the EFH debtor estate.

23             We just wanted to put on the record that we're

24   joining the debtors' opposition to the motion and we

25   respectfully request that the Court deny the motion to

1    dismiss.

2              THE COURT:  Okay.  Thank you.

3              MS. NIGHAN:  Thank you.

4        (Pause)

5              MR. MCKANE:  And with that, Your Honor, the

6    debtors call Mr. Tony Horton to the stand.

7              THE COURT:  All right.

8              Mr. Horton, you know how this works.  So --

9              THE WITNESS:  That's correct.

10             THE COURT:  -- just kind of take the stand and

11   remain standing, please.

12             THE CLERK:  Please raise your right hand.

13       (Witness sworn)

14             THE CLERK:  Please state and spell your name for

15   the record.

16             THE WITNESS:  Anthony Horton, H-O-R-T-O-N.

17             THE CLERK:  Thank you.

18             THE COURT:  Thank you, Mr. Horton.  Please be

19   seated.

20             THE WITNESS:  Thank you, Your Honor.

21             THE COURT:  You're welcome.

22   DIRECT EXAMINATION

23   BY MR. MCKANE:

24   Q    Good morning, Mr. Horton.

25   A    Good morning, Mr. McKane.

1    Q    Sir, can you please state your current titles and

2    positions with the debtors?

3    A    Yes, sir.  I am the executive vice president and CFO of

4    EFH and EFIH.

5    Q    And, sir, are you familiar with the four debtor

6    entities that are the subject of the asbestos objectors'

7    motion to dismiss?

8    A    I am.

9    Q    And for ease of reference, if I refer to those four

10   entities as the LSGT entities or the LSGT debtors, you'll

11   know to whom I'm referring?

12   A    Yes.

13   Q    And, sir, do you hold any positions with the LSGT

14   debtors?

15   A    Yes, sir.  I am the president and treasurer for each

16   one of those entities and I am the director and manager for

17   those entities -- manager of LSGT Gas and I am director for

18   EEC Holdings, EECI and LSGT SACROC.

19   Q    And, sir, did you hold those positions in 2004?

20   A    4?

21   Q    Sorry.  2014.  I apologize.

22   A    That's okay.

23   Q    It's not been that long.  And --

24   A    It seems that long.

25   Q    And, sir, did you hold those -- do you hold those same

```
1    positions today with the LSGT debtors when the Chapter 11

2    petitions were filed for each of those entities in 2014?

3    A    Yes, sir.

4    Q    And, sir, when were those petitions filed?

5    A    April 29th of 2014.

6    Q    All right.  And, sir, did you prepare a demonstrative

7    aid to help you with your testimony today?

8    A    I did.

9    Q    And, sir, if you could turn to the tab in your binder

10   that says "D - Dem Horton".

11            MR. MCKANE:  If you'd put that on the screen?

12   BY MR. MCKANE:

13   Q    Mr. Horton, does D - Dem Horton1 reflect the LSGT

14   entities for which you serve as director or manager?

15   A    Yes, sir.

16   Q    And can you briefly walk the Court through the

17   corporate structure of the LSGT debtors?

18   A    The LSGT debtors are direct subsidiaries of EFH Corp.,

19   of course, and you see LSGT Gas Company is the direct

20   subsidiary of Corp.  It has some -- two direct subsidiaries:

21   EEC Holdings, Inc., LSGT SACROC, Inc.  And EECI, Inc. is a

22   direct subsidiary of EEC Holdings.

23   Q    All right.  And, Mr. Horton, do you see a listing of

24   claim values on this demonstrative?

25   A    I do.
```

1  Q    Can you briefly describe what those claim values are

2  and what they represent?

3  A    They represent intercompany receivables and payables

4  amongst and between the entities.

5  Q    And what values -- what are the as of dates for those

6  values reflected in those receivables?

7  A    They are as of the petition date.

8  Q    And, sir, for the record, what are the amounts of the

9  receivables for the respective LSGT debtors?

10 A    LSGT Gas has a receivable from EFH Corp. for $560

11 million as of that date; LSGT SACROC has a $502 million

12 receivable from LSGT Gas Company; EEC Holdings has a $404

13 million receivable from LSGT Gas Company; and EECI, Inc. has

14 a $84 million receivable from LSGT Gas Company, LLC.

15 Q    And, sir, do the LSGT debtors have other assets and

16 liabilities in addition to these intercompany receivables

17 and payables?

18 A    The only ones I'm aware of are the asbestos claims at

19 EECI.

20 Q    And where do those asbestos liabilities come from?

21 A    It's my understanding that they were contractually

22 assumed by EECI from EBASCO Services.

23 Q    All right.  And, sir, what is your understanding about

24 the average yearly cost of these entities associated with

25 the defense and settlement of asbestos claims?

1    A    Roughly two to three million dollars is my

2    understanding.

3    Q    Two to three million dollars per year.

4    A    Per year, sir.

5    Q    Okay.  Sir, did you also prepare a declaration in

6    anticipation of this hearing today?

7    A    I did.

8    Q    And, sir, can you turn to tab of your binder labeled

9    "D - DIR Horton"?  It should be the first tab in your

10   binder.

11   A    Oh.  I see it here on the screen.

12   Q    All right.  Sir, do you recognize this document?

13   A    Yes, sir.

14   Q    And to the best of your knowledge, is this the

15   declaration you filed in support of the LSGT debtors'

16   opposition to the asbestos objectors' motion to dismiss?

17   A    Yes, sir.

18   Q    And, sir, is the information contained therein true and

19   accurate to the best of your knowledge?

20   A    To the best of my knowledge, yes.

21          MR. MCKANE:  Your Honor, we move Mr. Horton's

22   declaration into evidence.

23          THE COURT:  Any objection?

24          MR. HOGAN:  No objection, Your Honor.

25          THE COURT:  It's admitted.

1           MR. MCKANE:  Thank you, Your Honor.  And we will,

2     at the end, have a sheet of all the documents we're going to

3     move into evidence.

4           THE COURT:  Thank you.

5       (Declaration of Anthony Horton received in evidence)

6     BY MR. MCKANE:

7     Q    Mr. Horton, today I'd like to walk through a few topics

8     with you, okay?

9     A    Okay.

10    Q    Specifically, I want to cover the rationale for filing

11    the LSGT debtors at an enterprise level and at the

12    individual level for each of those debtors.  And then I'm

13    going to ask you some questions about the overall

14    restructuring strategy for the LSGT debtors.  And then I

15    want to discuss the impact of filing on those debtors as

16    well as the possible effects if the LSGT entities were

17    dismissed.  Okay?

18    A    Yes, sir.

19    Q    All right.  Let's start with the reasons for filing

20    these debtors at an enterprise level.  All right?

21    A    At an enterprise level, these specific debtors we

22    wanted to be as part of a comprehensive solution to -- in

23    any E-side type restructuring.

24    Q    And what were the issues that the E-side debtors were

25    facing in April of 2014 when they made the decision to file

1    for bankruptcy?

2    A    Well, clearly, they had $42 billion of debt and

3    negative free cash flow.  As you recall, we were, in 2013,

4    working through Project Olympus with the hope that we would

5    keep the entities together, that would actually keep the

6    E-side out of bankruptcy.  We had the infamous November 2013

7    interest payment that kind of put that project to the side.

8    And ultimately, we recognized that we were going to file the

9    E-side because of the 42 billion of debt and negative free

10   cash flow.

11        And then it was highly likely that we were going to

12   ultimately deconsolidate these entities.  You had the E-side

13   with Oncor and you had the T-side clearly with its debt in

14   the first lienholders.  And so, that was the process and why

15   we ultimately filed these.

16   Q    And were the LSGT debtors part of a holistic approach

17   to handling the E-side debtors?

18   A    That was our approach was to have it be part of a

19   holistic solution to the E-side restructuring.

20   Q    All right.  And let's turn now from the enterprise

21   level to the specific debtor level, okay?

22   A    Yes, sir.

23   Q    All right.

24        MR. MCKANE:  And if we could, could we put up the

25   motion to dismiss that was filed, page 1 of the motion to

1    dismiss.

2    BY MR. MCKANE:

3    Q    Mr. Horton, you've read the motion to dismiss that was

4    filed, correct?

5    A    Yes, sir.

6    Q    And, sir, are you aware that the movants have asserted

7    that the LSGT entities did not make an independent decision

8    to file for bankruptcy but rather that their corporate

9    parent, EFH Corp., made those decisions unilaterally?

10   A    Yes, sir.  I am aware.

11   Q    And, sir, do you see then the second sentence that they

12   assert:  "The board of the asbestos debtors did not have any

13   formal meetings.  They did not even make the decision to

14   file for the Chapter 11 petition."

15        Do you see that, sir?

16   A    I do.

17   Q    Sir, is that true?

18   A    No, sir.

19   Q    Okay.  What is -- you served as the director and

20   manager of these debtors.  What is your recollection about

21   who made the decision to file for bankruptcy?

22   A    The decision to file these entities for bankruptcy were

23   made at the EECI level between myself -- by myself and my

24   co-director, Mr. Moldovan.  The remaining LSGT debtors --

25   that decision -- as the sole either manager or director for

1    those entities, that decision was made by me.

2    Q    And, sir, before making those decisions, were you

3    advised by counsel as to your fiduciary duties as a director

4    and manager of the LSGT entities?

5    A    Yes.  As I recall, a couple months prior to filing in

6    the bankruptcy or Chapter 11 in 2014, there was a broad

7    meeting amongst the directors and managers for all of the

8    subsidiaries of EFH and TCEH.  And it was held by K&E and

9    our internal counsel.

10        They came into the -- they came to the meeting.  They

11   discussed our fiduciary responsibilities as directors for

12   each one of the subsidiaries before bankruptcy, as we

13   considered filing bankruptcy, and certainly during the

14   bankruptcy process.

15   Q    And in addition to this meeting, two months before

16   filing for bankruptcy, did you review any materials at the

17   meeting or in advance of the petition for filing for

18   bankruptcy?

19   A    Just the materials that are for the meeting.  And then

20   there was some discussions around the pros and cons and

21   general approach to a restructuring of -- you know, in a

22   Chapter 11 proceeding.

23   Q    And, sir, are you aware the movants have made the

24   allegation that the boards of each of LSGT entities made a

25   decision to file without a meeting?

1    A     I am aware of that.

2    Q     And, sir, is that allegation true?

3    A     No, sir.

4    Q     Why not?

5    A     On April 25th of 2014, Mr. Moldovan and I had a formal

6    meeting along with our legal counsel, Mr. Chad Husnick, Mr.

7    Anthony Sexton.  And we talked specifically about filing the

8    LSGT debtors.

9    Q     And with respect to the other debtors other than EECI,

10   did you have a separate meeting with those entities?

11   A     Yeah.  I should step back.  In that meeting, we

12   discussed specifically EECI.  With regards to the other

13   debtors, I was the sole manager, the sole director for those

14   entities.  I clearly didn't need to have a meeting with

15   myself.  I'd had the conversations at EECI.  I applied the

16   same rationale and fundamentals to those entities upon --

17   and also upon having other conversations with my legal

18   counsel.  And ultimately, I made the decision that we should

19   file those entities.

20   Q     All right.  Well, let's go into greater detail about

21   the meeting and analysis that you went through.

22   Specifically, can you turn to, in your binder, tab DX-91?

23   A     Yes, sir.

24   Q     All right.  And, sir, DX-91(a)?

25   A     I do.

1    Q    What is it?

2    A    It's the minutes from our meeting on April 25th of 2014

3    at EECI.

4    Q    And who attended the meeting?

5    A    As I said before, Mr. Moldovan, Mr. Husnick, myself and

6    Mr. Sexton.

7    Q    And before I ask you the substance of the meeting, I

8    need (indiscernible).  Earlier this year, were you deposed

9    in connection with the anticipated E-side confirmation

10   hearing that was scheduled to start this month?

11   A    Yes, sir.

12   Q    And when was that deposition?

13   A    As I recall, it was in October of 2016.

14   Q    And at that time, did you testify as a corporate

15   representative or a 30(b)(6) witness?

16   A    I did, sir.

17   Q    And, sir, at the time of your deposition, had the

18   movants filed their motion to dismiss the LSGT debtors?

19              MR. HOGAN:  Your Honor --

20              THE COURT:  I'm sorry.  Before you answer, Mr.

21   Hogan?

22              MR. HOGAN:  Yeah.  I just wanted some clarity.  I

23   have DX-91(c) as a April 7th and I think you had said April

24   25th.

25              THE COURT:  91(a).

```
 1            MR. MCKANE:  91(a).

 2            MR. HOGAN:  Oh, I apologize.

 3            MS. KELLEHER:  It's not in our binder.

 4            MR. HOGAN:  It's not in our binder.

 5       (Pause)

 6            MS. KELLEHER:  Oh, there it is.  Excuse me.

 7            MR. MCKANE:  It's okay.  No worries.

 8            MR. HOGAN:  Thank you.  I'm good.  I apologize.

 9            THE COURT:  That's all right.

10            Sir, would you restate the question, please?

11            MR. MCKANE:  Sure.

12  BY MR. MCKANE:

13  Q    I mean, Mr. Horton, let me -- we were discussing your

14  deposition that happened not what relates to this motion to

15  dismiss but relates to the EFH confirmation proceedings.

16  A    Yes, sir.  I recall.

17  Q    Okay.  And you were testifying as a 30(b)(6) witness at

18  that time or a corporate representative witness, right?

19  A    That's correct.

20  Q    Sir, did any of the topics that you were called to

21  testify about as serving as a corporate representative cover

22  whether the LSGT entities filed for Chapter 11 in good

23  faith?

24  A    No, sir.

25  Q    And, sir, is it fair to say in preparing for that
```

1    testimony, you didn't review the reasons and rationale for

2    filing the LSGT debtors for Chapter 11?

3    A    I did not.

4    Q    All right.  Well, sir, you said you read the motion to

5    dismiss.

6    A    Yes, sir.  I have.

7    Q    All right.  After reading -- reviewing the motion to

8    dismiss, did you take any steps to refresh your recollection

9    about the reasons for filing the LSGT entities for Chapter

10   11?

11   A    Yes, sir.  I did go back and review the minutes from

12   the April 25th meeting at EECI.

13   Q    And these are that meeting's minutes that are Exhibit

14   91(a), right?

15   A    That's correct.

16   Q    All right.  And what do you recall after reviewing the

17   minutes that was discussed at that meeting regarding a

18   potential Chapter 11 filing for EECI?

19   A    In general, as I recall, the conversation was around

20   these entities being in financial distress.  They were

21   negative free cash flow entities.  Their sole source of

22   funding was from an insolvent parent EFH, had -- LSGT Gas

23   had a receivable from this insolvent parent.  And we were

24   concerned about that negative free cash flow, the ability --

25   if we didn't file, the LSGT debtors -- the ability for us to

1    continue to get funding from LS -- excuse me -- from EFH.

2    Clearly, these are discontinued ops.  They're not vital

3    vendors to keep the company moving forward, keep the

4    company, you know, as a going concern.

5          So we were focused on that issue in particular.  We

6    also discussed the benefits of the automatic stay.

7    Q    And what were the ben -- what was your view as to a

8    potential benefit of the automatic stay as it relates to the

9    LSGT debtors?

10   A    It was to cut off the negative free cash flow

11   associated with the pre-petition claims at EECI.

12   Q    Okay.  And that was a separate reason that you thought

13   would be appropriate for filing for bankruptcy?

14   A    The other reason that we discussed filing EECI and the

15   rest of the debtors was around -- again, as I discussed

16   earlier, we knew that there was a high probability that we

17   were going to deconsolidate these entities.  That could

18   result in a deconsolidation tax.  We had entities within

19   this -- with the LSGT debtors that were corporations and

20   that they had -- there was a risk that they -- well, we knew

21   that they would be joint and severally liable for any

22   deconsolidation tax that was triggered.  We wanted to make

23   sure that we were part of that process in any discussions

24   around resolving the deconsolidation tax issues.

25   Q    All right.  Sir, we're going to go back to the

1    demonstrative for a moment.

2              THE COURT:  I'm sorry.  Mr. McKane, may we take a

3    five-minute recess?

4              MR. MCKANE:  Of course.

5              THE COURT:  Thank you.

6         (Recess from 9:56 a.m. until 10:03 a.m.)

7              THE CLERK:  All rise.

8              THE COURT:  Please be seated.  Thank you..

9              MR. MCKANE:  Thank you, Your Honor.

10   BY MR. MCKANE:

11   Q    Mr. Horton, I believe we were talking about the

12   deconsolidation tax.

13   A    That's correct.

14             MR. MCKANE:  And I think I'm going to ask to put

15   the demonstrative back up on the screen.

16   BY MR. MCKANE:

17   Q    You had mentioned the importance that certain of the

18   LSGT were C-corps.

19   A    That's correct.

20   Q    And, sir, just for the record, can you identify which

21   of the LSGT debtors are C-corporations -- C-corps?

22   A    Yes, sir.  It's EEC Holdings, Inc., EECI, Inc. and LSGT

23   SACROC, Inc.

24   Q    And, sir, why does it matter -- what is your

25   understanding as to why it matters that a company is a

1    C-corp as it relates to the potential deconsolidation tax

2    that these debtors were potentially facing?

3    A    I would say, in general, they're not deconsolidated

4    entities -- excuse me -- disregarded entities in that they

5    would be joint and severally liable for any tax that would

6    be triggered.

7    Q    And a joint -- and there was a -- can you give --

8    remind the Court of the potential magnitude of the

9    deconsolidation tax if there were a taxable transaction on

10   the E-side?

11   A    As I recall, in general -- and again, there were a lot

12   of scenarios.  But as I recall in general, it was roughly $7

13   billion.

14   Q    And, sir, did you review the minutes before they were

15   prepared, the minutes of the April 25th, 2014 meeting?

16   A    Yes, sir, I did.

17           MR. MCKANE:  And if we could call up --

18           THE WITNESS:  Not before they were prepared but

19   as --

20   BY MR. MCKANE:

21   Q    As they were finalized.

22   A    Yes.

23   Q    And, sir, do the minutes of this meeting, DX-91(a),

24   reflect the rationales for why the EECI filed for

25   bankruptcy?

1    A    Yes, sir.

2    Q    All right.  And, sir, what happened after the April

3    25th, 2014 board meeting with respect to your decision as a

4    director to vote to file EECI for bankruptcy?

5    A    Clearly, there was some follow-up conversation between

6    myself and Mr. Moldovan and some follow-up discussions, just

7    myself with the bankruptcy counsel, K&E bankruptcy counsel.

8    And ultimately, we came to the conclusion that we were going

9    to file -- both to file EECI for Chapter 11 bankruptcy and

10   we executed a unanimous written consent.

11   Q    Okay.  And, sir, is the unanimous written consent --

12   let me ask you to turn to DX-34 of your binder, and

13   specifically page 2 of that document, page 8 of 30 on the

14   top.  Are you there, sir?

15   A    Yes, sir.

16   Q    Sir, do you recognize this document entitled "Written

17   Consent in Lieu of Meeting of the Board of Directors of

18   EECI"?

19   A    I do.

20   Q    What is it?

21   A    It is the written consent that Mr. Moldovan and I

22   executed to file EECI for Chapter 11 reorganization.

23   Q    And, sir, if you could turn to the next tab of your

24   binder, DX-33?  And then if you could turn again to the

25   second page?

```
 1    A    Yes, sir.

 2    Q    Do you recognize this document?

 3    A    Yes, sir, I do.

 4    Q    What is it?

 5    A    It is the unanimous written consent that I executed and

 6    the decision to file the remaining LSGT debtors, LSGT Gas,

 7    LSGT SACROC and EEC Holdings.

 8    Q    And if you could turn to the last page of that

 9    document, sir.

10    A    Page 29?

11    Q    Yes, sir.

12    A    Yes, sir.

13    Q    And is that your signature?

14    A    Yes, sir, it is.

15    Q    And on what date did you execute the written consent?

16    A    As I recall, it was April 28th.  Yes.  April 28th.

17    Q    All right.  And what date did the debtors file for

18    bankruptcy?

19    A    April 29th, 2014.

20    Q    Now, Mr. Horton, let's transition away from the

21    decisions to file for bankruptcy to, once in bankruptcy,

22    what is the restructuring strategy for these debtors.  Okay?

23    A    Yes, sir.

24    Q    As a board member -- well, let's just start -- level

25    set.  As a board member for the LSGT debtors, what is your
```

1    understanding of your fiduciary duties?

2    A    To act in good faith for these particular debtors or

3    these entities at that point in time, whether they were in

4    or out of bankruptcy, and to maximize the value for these

5    estates specifically.

6    Q    And, sir, after you decided to file the LSGT entities

7    for bankruptcy, what did you conclude as a board member was

8    the best way to maximize value for these debtors, the LSGT

9    debtors' estates?

10   A    We decided -- and again, looking at EECI, my

11   co-director and I decided, we discussed, and then

12   independently to reinstate the organizational structure, the

13   structure of the entities, to reinstate the receivables

14   associated between and amongst those entities, to have a

15   receivable from LSGT Gas that was to a restructure -- if you

16   will, restructured E that was no longer insolvent but rather

17   restructured, well capitalized entity.  That was generally

18   our --

19   Q    Yeah.  Sir --

20   A    -- strategy and to get -- to convince bidders or

21   potential owners to assume those liabilities.

22   Q    All right.  Sir, you used the phrase, I believe, a

23   restructured E.  Were you referring to a restructured or a

24   reorganized EFH Corp.?

25   A    Yes, sir.  My apologies.

1    Q    All right.  And, sir, you said -- you were referring to

2    receivables.  At the time of the bankruptcy filing, did you

3    view the accounts receivable held by the LSGT debtors as

4    impaired?

5    A    From my perspective looking at the situation of EFH

6    Inc., the parent, and its financial condition and it being

7    insolvent, from my perspective, it was -- those receivables

8    were impaired.

9    Q    And was one of your goals for the restructuring

10   strategy of the LSGT debtors to unimpair those assets?

11   A    Absolutely.

12   Q    Sir, you mentioned that you thought part of your role

13   was to convince potential acquirers that they should

14   reinstate these claims and liabilities.  Did I hear you

15   correctly?

16   A    Yes, sir.

17   Q    Sir, what role did you have at the debtors in

18   persuading potential acquirers of the E-side assets to agree

19   to reinstate the asset claims and liabilities?

20   A    As the senior vice president and treasurer and head of

21   corporate development, I was actively involved in the

22   negotiations for selling the E-side businesses.

23   Q    And, sir, part of that effort, did you engage directly

24   with potential bidders and creditors regarding potential

25   plans to acquire the E-side?

1    A      I did.

2    Q      Okay.  And what steps did the debtors take, and in

3    particular the LSGT debtors take, to convince bidders to

4    take on the associated asbestos liabilities?

5    A      There was significant amount of due diligence around

6    the asbestos liabilities.  I didn't get into all the

7    specific details of -- first thing we did was going into our

8    historical reserve of 14 million.  Pointed them to that.

9    And then walked -- had them go through the history with who

10   I consider one of our experts, Mike Hunter, who had the long

11   history of the claims.  Walked them through the history of

12   the claims, the amounts of the claims and, again, just

13   general and in-depth due diligence.

14   Q      And then, sir, were these initial due diligence efforts

15   in 2014 and '15 sufficient to satisfy potential bidders to

16   take on the asbestos liabilities?

17   A      Unfortunately, no.

18   Q      All right.  And did the debtors' potential acquirers

19   make any requests with respect to quantifying the potential

20   exposure presented by the asbestos liabilities?

21   A      I can recall at least two bidders both who we signed a

22   transaction with, the Hunt and NextEra, being adamant about

23   filing for a bar date.

24   Q      And what is your understanding of why the bidders

25   wanted a bar date as it related to potential claims for

1   these debtors?

2   A    They wanted greater certainty.  They wanted more

3   insight to the magnitude.  They wanted to quantify what

4   these potential liabilities could be.

5   Q    And, sir, I believe you mentioned NextEra was one of

6   the bidders who specifically wanted a bar date?

7   A    Yes, sir.

8   Q    And who at NextEra did you interact with on that issue?

9   A    Specifically, Mark Hickson.

10  Q    And, sir, were there other members of the EFH

11  negotiating team that were interacting with other members of

12  the NextEra negotiating team?

13  A    Yes.  Ms. Dore was interacting.  Mr. Wright as well.

14  More on a, you know, high level, general basis around some

15  specific legal topics.

16  Q    And to whom was Ms. Dore and Mr. Wright interacting

17  with on a legal side for NextEra?

18  A    Charlie Sieving.

19  Q    And is he the general counsel of NextEra?

20  A    As I understand it.

21  Q    And, sir, did the debtors -- did the LSGT debtors

22  ultimately seek and obtain Court approval for a bar date?

23  A    Yes, sir.

24  Q    And did the boards of the LSGT debtors consider the

25  notice requirements in connection with the decision to

1    establish a bar date?

2    A    Yes, we did.

3    Q    And why were you focused on the notice requirements?

4    A    We wanted to ensure that adequate notice was being

5    provided to potential claimants.

6    Q    All right.  And, sir, if I could ask you to turn to --

7    go back to your binder to DX-91(c).  And now it's also on

8    the screen.

9    A    Yes, sir.

10   Q    Okay.  Do you recognize DX-91(c)?

11   A    Yes, sir.

12   Q    What is it?

13   A    It is the minutes of a joint meeting between EECI and

14   LSGT Gas Company, LLC.

15   Q    Okay.  And when did that meeting occur?

16   A    April 7th of 2015.

17   Q    And what was the purpose of this meeting?

18   A    It was to review the plan of notice for the asbestos

19   bar date?

20   Q    And who requested this meeting?

21   A    I requested this meeting as did Mr. Moldovan.

22   Q    Sir, let me ask you.  You said you mentioned that you

23   reviewed the motion to dismiss, right?

24   A    Yes, sir.

25   Q    All right.

1           MR. MCKANE:  If we can put up page 15 of the

2     motion to dismiss in the bottom.

3     BY MR. MCKANE:

4     Q     Sir, do you see the bottom of the page there where it

5     says, "By the same token, the asbestos debtors desire to

6     shed their future asbestos liabilities in order to make

7     their corporate parent more attractive to potential

8     purchasers is not a valid reorganizational purpose."

9           You see that?

10    A     I do.

11    Q     All right.  Are you aware that the movants have made

12    the allegation that it was the LSGT debtors' intent to shed

13    asbestos liabilities to the bankruptcy.  Are you aware of

14    that allegation?

15    A     I am.

16    Q     And are you aware that they also made the allegation

17    that the asbestos debtors did that to somehow make their

18    corporate parent more attractive to potential bidders.  You

19    see that?

20    A     Yes, sir.

21    Q     Are either of those allegations true?

22    A     No.

23    Q     Why not?

24    A     The sole purpose of the bar date was to help the

25    potential buyers become more comfortable with these asbestos

1   liabilities and to quantify the potential risk and to

2   persuade them to take on these liabilities to reinstate the

3   receivables.  That was the sole purpose behind setting a bar

4   date.

5   Q    Did you view setting a bar date as in the best interest

6   of the LSGT debtors?

7   A    Yes.  Back to our restructuring strategy of reinstating

8   the structure, reinstating and unimpairing the receivables

9   and having the liabilities assumed by the buyer.

10  Q    And the liabilities of LSGT -- of the LSGT debtors.

11  A    Of the LSGT debtors specifically.

12  Q    And the assets -- the receivables of the assets of the

13  LSGT debtors.

14  A    That's correct.

15  Q    All right.  Now, sir, you mentioned earlier that

16  NextEra was one of the bidders that was particularly adamant

17  about establishing a bar date.  Did establishing a bar date

18  -- was that sufficient to get NextEra comfortable with the

19  asbestos liabilities?

20  A    So when Next -- after the Hunt deal fell apart and so

21  kind of mid -- excuse me -- early May time frame in 2016, we

22  had the results of the bar date.  NextEra had seen the

23  magnitude of the claims.  I would view it as that was

24  certainly a necessary step but it was insufficient in

25  satisfying NextEra as to the magnitude of the claims and

1    their risk.

2    Q    All right.  So after setting the bar date and having

3    the claims come in, what else did the debtors do to get

4    NextEra comfortable with a plan that would reinstate

5    asbestos liabilities?

6    A    Again, we went back through -- they had several due

7    diligence requests.  I think we spent a significant amount

8    of time trying to walk them back through the history and try

9    to provide as much detail as possible to get them

10   comfortable to take on these liabilities.

11   Q    Well, sir, let me ask you to turn to DX-222 in the

12   binder.

13             MR. MCKANE:  And we'll also put that up on the

14   screen.

15   BY MR. MCKANE:

16   Q    Sir, you mentioned that Ms. Dore was involved in the

17   NextEra negotiations with Mr. Sieving, is that correct?

18   A    Yes, sir.  You said 221?

19   Q    222.

20   A    Okay.  Thank you.

21   Q    All right.  Sir, Exhibit 222 is an e-mail between Ms.

22   Dore and Mr. Sieving dated June 16, 2016.  You see that,

23   sir?

24   A    Yes, sir.

25   Q    And in the second e-mail of that string, the e-mail

1    that starts "Stacey", let me direct your attention to the

2    statement that starts, after the comma in the first line --

3    are you with me, sir?

4    A    Yes, sir.

5    Q    It says specifically, "Since we are really struggling

6    with the thought of taking uncapped asbestos liability for

7    claims and fact patterns, we have had very little visibility

8    to (indiscernible) to send this request separately to

9    accelerate it."

10       Sir, is Mr. Sieving talking to Ms. Dore about her --

11   the concerns about the diligence necessary to get

12   comfortable with the asbestos liabilities?

13   A    Yes, sir.

14   Q    And is that concern and that time period consistent

15   with your experience with NextEra in negotiating with them

16   about the -- to reinstate asbestos liabilities?

17   A    Absolutely.  In fact, I was told -- it's around this

18   point in time -- by Mr. Hickson that NextEra was not taking

19   the asbestos liabilities.

20   Q    All right.  And, sir, after -- at this same time, in

21   June of 2016, did the debtors redouble their due diligence

22   efforts in an effort to persuade NextEra to take, to

23   reinstate the asbestos liabilities and the intercompany

24   receivables?

25   A    I don't know if I would say doubled but we certainly

1    provided an intense focus on the due diligence.  I, as part

2    of the process of negotiations, tried to ensure that each

3    one of the parties were actually talking to one another,

4    that Mr. Sieving knew of the work was being done, Mr.

5    Hickson knew of the work that was being done, and just to

6    ensure that the teams were from both NextEra and from the

7    EFH side, were actually talking to each other and that was

8    being communicated up the chain.

9    Q    All right.  Let me direct your attention to another

10   communication around the same time period.  And

11   specifically, that's DX-106.

12            MR. MCKANE:  And you can put that up on the

13   screen.  Thank you.

14   BY MR. MCKANE:

15   Q    And, sir, you there?  DX-106?

16   A    Yes, sir.

17   Q    And DX-106 is, again, a communication between Mr.

18   Sieving and Ms. Dore in that June time period.  You see

19   that?

20   A    Yes, sir.

21   Q    And do you see -- let me direct your attention to the

22   middle of the page where the statements for Mr. Sieving

23   states -- starts "I don't think".  Are you with me?

24   A    Yes, sir.

25   Q    And specifically, Mr. Sieving says in this e-mail, "I

1    don't think we're going to get comfortable on 30K, 30,000,

2    uncapped asbestos claims (and I don't think any

3    (indiscernible) strategic no one would either).  But we are

4    close to having a proposal where we might be willing to have

5    the claims be reinstated."

6         Do you see that?

7    A    I do see that.

8    Q    Is that consistent with the position that NextEra was

9    taking in June of 2016 about their concerns even with the

10   bar date that they would not take the asbestos liabilities

11   or reinstate them as part of a plan of reorganization?

12   A    That's correct.

13   Q    Ultimately, how did the debtors get NextEra comfortable

14   to the position where they are now?

15   A    Well, to -- the way I would characterize it is we

16   continued the due diligence process.  And ultimately,

17   NextEra, through the due diligence process, agreed to set

18   aside in escrow approximately 200 -- approximately $250

19   million for the sole purpose of asbestos claims.

20   Q    All right.  And, sir, does the claim currently on file

21   have that same $250 million set aside?

22   A    No, sir.  That was ultimately, sometime in September,

23   probably September -- the weekend of September 17th and 18th

24   -- reduced to $100 million.

25   Q    And how were the debtors able to persuade NextEra to

1   reduce the -- set aside the $100 million for the -- and

2   increase the recoveries to other creditors?

3   A    I would characterize it as -- you know, it wasn't

4   necessarily our goal to reduce it from 250 to 100 but from

5   my perspective, we were trying to get NextEra comfortable,

6   more comfortable with the amount of the claims.  And we

7   ultimately hired -- I worked with Aon Risk and then through

8   K&E, we worked with Ankara (ph) on actually doing a true

9   actuarial analysis of the asbestos claims that had come

10  through the bar date.  And through that process, we got more

11  specific expected numbers from -- a notional amount from

12  these experts that we were able to share ultimately with

13  NextEra, particularly the Aon Risk.  I don't remember the

14  timing of when they saw that Ankara report but certainly

15  from the Aon Risk side.  They had seen the study itself.

16  Q    And so it was through the bar date and the claims that

17  came in and the ability to have experts apply actuarial

18  analysis to those claims that you were able to get NextEra

19  to become comfortable with the reinstatement of these

20  claims?

21  A    Yes.  I would say that plus the ability that we also --

22  I asked Aon Risk to, as a broker, find an insurance policy,

23  see if there was an insurance policy out there and available

24  that would provide insurance for these claims in the order

25  of a notional amount of 250 million.  Ultimately, we did

1    find someone who would provide that policy.  The premium was

2    roughly 150, $155 million.  That's ultimately, I think, how

3    they -- NextEra got comfortable with -- you know, this was

4    very serious people who were actually willing to insure it,

5    insure it for less than the amount of the notional amount.

6    They had seen the reports and the amounts in the report were

7    actually, you know, well below the hundred million.

8    Q    All right.  And, sir, let me direct your attention to

9    another allegation the asbestos objectors have made.  Okay?

10   A    Yes, sir.

11          MR. MCKANE:  If we could turn to page 9 of the

12   motion to dismiss.

13   BY MR. MCKANE:

14   Q    And in particular, the allegation that's highlighted

15   here.  Sir, do you see the assertion that's made that a

16   debtor can demonstrate a valid bankruptcy purpose by showing

17   the petition preserves a going concern or that the petition

18   maximizes the value of the debtors' estates by adding a

19   preserving value that would otherwise be unavailable to the

20   creditors outside bankruptcy."

21          You see that allegation, sir?

22   A    I do.

23   Q    That statement?

24   A    I do see the statement.

25   Q    Sir, are you aware the movants have alleged that the

1    LSGT debtors did not file in good faith because they did not

2    file their petitions to preserve a going concern or maximize

3    value?  Do you understand?  They say you haven't done this.

4    A    I -- I am aware of it.

5    Q    All right.  Do you agree with that assertion?

6    A    No, sir.

7    Q    Do you accept that as true?

8    A    No, sir.

9    Q    What step -- what do you believe you've done through

10   the restructuring process to preserve value or maximize

11   value of the LSGT debtors' estates?

12   A    One, we have the $100 million set aside for -- in

13   escrow for the asbestos claims themselves, specifically for

14   those.  We have a -- we have reinstated the impaired

15   receivables.  The receivable from LSGT Gas to EFH is now to

16   an entity that is -- if we close this transaction is no

17   longer insolvent.  It has $12.2 billion dollars --

18   approximately $12.2 billion of equity.  It is owned by a

19   parent that has $50 to $60 billion of equity as well.  They

20   have agreed, again, to reinstate the claims and take on the

21   asbestos liabilities.

22   Q    And --

23   A    I think that's value maximizing given to where they

24   were before which was had intercompany receivable from EFH

25   Corp., insolvent entity, back to LSGT Gas.  I think it's a

1    stark contrast to where we started.

2    Q    All right.  And, sir, let me just turn to one final

3    allegation that the LSGT debtors (sic) have made.  And

4    that's also on page 15 on the top of the page.

5              MR. MCKANE:  And if we could highlight that

6    allegation as well?

7    BY MR. MCKANE:

8    Q    Sir, do you see on page 15 of the motion to dismiss

9    where they say, "Rather than maximizing the value of the

10   estates for the benefit of the creditors, the only impact of

11   the bankruptcy would be to reduce creditor recoveries by

12   discharging the claims of unself-conscious, unaware and

13   unrepresented unmanifested asbestos claimants."

14   A    I do --

15   Q    See that, sir?

16   A    I do see that.

17   Q    Sir, do you believe that you have -- do you believe

18   that that statement is true?

19   A    No, I don't.

20   Q    And how would you want to respond to that allegation?

21   A    Again, I think we have focused solely on -- as the

22   director, we focused solely on reinstating the claims,

23   having the claims assumed, reinstating the intercompany

24   receivables between and amongst the entities and providing a

25   receivable to a very well capitalized restructured parent

1    and the set aside of the $100 million of -- for the purpose

2    of the asbestos claimants solely.

3    Q    All right.

4            MR. MCKANE:  One final area I need to cover with

5    Mr. Horton.

6    BY MR. MCKANE:

7    Q    And it's responding to another allegation.  And this is

8    the last allegation.  It's on page 20 of the reply.  Now --

9    and it's the last sentence of the first paragraph on page

10   20.

11        Do you see, sir, where the asbestos objectors make the

12   allegation that the only impact -- I believe they even say

13   of dismissal:  "The only impact dismissal will have is that

14   asbestos claims will not be discharged."  You see that

15   allegation, sir?

16   A    I do.

17   Q    Is that true?

18   A    No, sir.

19   Q    So what would happen if the Court dismissed the LSGT

20   debtor bankruptcy cases?  Is there a broader impact in the

21   case?

22   A    Yes.  I think, as you heard Mr. Husnick mention,

23   there's a condition precedent in the plan support agreement

24   that would allow NextEra to terminate the PSA which would

25   also allow them to terminate the merger agreement.

1    Q    And, sir, at this time, do you have any reason to

2    believe that NextEra would raise your rights and decide to

3    take the entities?

4    A    No, sir.

5              MR. MCKANE:  Your Honor, I don't have any further

6    questions for Mr. Horton at this time.  There are a series

7    of exhibits I'd like to move into evidence that were used in

8    his declaration and today.

9              THE COURT:  Okay.

10             MR. MCKANE:  And I guess -- and these materials

11   have been previously provided to the asbestos objectors.

12             THE COURT:  Okay.

13             MR. MCKANE:  All right.  The debtors would like to

14   move in the following exhibits that were used in the written

15   direct:  DX-2, 9, 30, 42, 91, 104, 105, 110, 135, 223, 226,

16   227 and 228.

17             THE COURT:  Any objection?

18             MR. HOGAN:  None, Your Honor.

19             THE COURT:  They're admitted.

20        (LSGT Debtors' Exhibits DX-2, 9, 30, 42, 91, 104, 105,

21   110, 135, 223, 226, 227 and 228 were received in evidence)

22             MR. MCKANE:  All right.  And, Your Honor, with

23   regard to those exhibits that were used today in the live

24   direct, the debtors move in -- request to move into

25   evidence:  DX-33, 34, 222 and 106.

1            THE COURT:  Any objection?

2            MR. HOGAN:  No objection, Your Honor.

3            THE COURT:  They're admitted.

4       (LSGT Debtors' Exhibits DX-33, 34, 222 and 106 received

5    in evidence)

6            MR. MCKANE:  Your Honor, we'd also like to move

7    into evidence two additional exhibits that were referenced

8    by Mr. Horton at the end of his testimony and that is DX-3

9    which is the plan that was (indiscernible).

10           MR. HOGAN:  No objection, Your Honor.

11           THE COURT:  It's admitted.

12      (LSGT Debtors' Exhibit DX-3 received in evidence)

13           MR. MCKANE:  All right.  Your Honor, we'd ask that

14   the demonstrative aid, Horton1, be included in the record --

15           THE COURT:  Okay.

16           MR. MCKANE:  -- as well.  And there are a series

17   of documentaries for which we'd ask the Court to take

18   judicial notice.

19           THE COURT:  All right.

20           MR. MCKANE:  All right.  They are D.I. 1 for the

21   EFH case, D.I. 1 for the EE Holdings case, D.I. 1 for the

22   EECI case and D.I. 1 for the LSGT Gas case, D.I. 1 for the

23   LSGT Gas SACROC, Inc. case.  And then the following docket

24   entries on the joint case.  And that is 1791, 2570, 4883,

25   5072, 6610, 7090-1, 7151 and 10074.

1            MR. HOGAN:  No objection, Your Honor.

2            THE COURT:  All right.  Court takes judicial

3    notice of those filings.

4            MR. MCKANE:  Thank you, Your Honor.  And just for

5    context, those are the docket entries for certain actions

6    taken by the asbestos law firms and the asbestos objectors

7    during the course of the case.

8            THE COURT:  All right.  Well, all except for the

9    number 1s which are your petitions.

10            MR. MCKANE:  They are the petitions, correct.

11   Exactly.

12            THE COURT:  Okay.

13            MR. MCKANE:  And with that, Your Honor, we pass

14   the podium.

15            THE COURT:  All right.  Very good.

16            Cross?

17            MR. HOGAN:  Sure.

18            Apologize, Your Honor.  We have a (indiscernible)

19   for Your Honor (indiscernible).

20            THE COURT:  You have what?

21            MR. HOGAN:  That reflects all this.

22            THE COURT:  Oh.  Give it to Ms. Werkheiser.  Thank

23   you.

24        (Pause)

25   CROSS-EXAMINATION

1    BY MR. HOGAN:

2    Q    Good morning, Mr. Horton.

3    A    Good morning.

4    Q    If I could, I'd like to start with your declaration.

5    A    Okay.

6    Q    Paragraph number 4 of your declaration, you articulate

7    that "The asbestos debtors are only one part of the debtors'

8    overall business enterprise."  And if you could, tell me

9    what part of the overall business enterprise did they

10   consist of?

11   A    That's kind of a broad question but they are

12   discontinued operations that, as I've described through the

13   demonstrative, are subsidiaries of EFH.

14   Q    And so they're not going concerns in any capacity then,

15   are they?

16   A    They don't have -- they do not have business

17   operations.

18   Q    And largely, what they have are these intercompany

19   claims as well as these asbestos potential claims against

20   them.  Is that a fair characterization of the universe of

21   their interests?

22   A    There's intercompany receivables and payables amongst

23   these entities and the asbestos liabilities, as you

24   mentioned.

25   Q    So, in fact, they have no role at all in the EFH

1    business enterprise, do they?

2    A    I'm not sure what you mean by the word "role" but they

3    are part of the EFH structure.  They're not part of the

4    ongoing business operations of EFH.

5    Q    And so, isn't it correct that their only function is to

6    pay Legacy employee benefit liabilities and asbestos

7    liabilities?

8    A    My understanding is that certainly regarding the

9    asbestos liabilities, yes.

10   Q    And there are also Legacy employee benefit liabilities

11   that they have, too, are there not?

12   A    There are.

13   Q    But aside from that, that's really their only role, is

14   it not, in that enterprise?

15   A    That is -- I would agree with that.

16   Q    Now those entities have maintained their separateness

17   from EFH on a corporate basis, wouldn't you agree?

18   A    They are standalone entities within the corporate

19   structure with its -- with their own directors and managers.

20   Q    And they have never been merged into EFH in any

21   capacity, have they?

22   A    Not that I can recall.

23   Q    So EFH would not have any direct responsibility for

24   those asbestos liabilities that are cabined at those

25   entities, would you agree?

```
 1   A     I would need to list -- I'd need to, you know, consult

 2   with my counsel as to whether or not EFH had any

 3   responsibility, but I generally understand what you're

 4   saying.

 5   Q     And would you generally agree with it that those

 6   liabilities are cabined at those entities that are not up at

 7   the EFH level?

 8   A     I think so.

 9   Q     I'm sorry?

10   A     I believe so.

11   Q     Thank you.

12         And the asbestos debtors, they have no business to be

13   reorganized, do they?

14   A     Say -- would you repeat that?  I apologize.

15   Q     Do the -- you refer to them as, I believe, the LSGT

16   debtors.  I refer to them as the asbestos debtors.  And my

17   question is, do those entities, those four entities that

18   we've talked about, do they have any business that needs to

19   be reorganized?

20   A     Business operations that --

21   Q     Yes.

22   A     -- need to be reorganized?  Other than how we described

23   early on that these entities are negative free cash flow and

24   that they have the asbestos claims and, as you said, post-

25   retirement benefits.
```

1   Q    Do they have any business operations that you plan to

2   rehabilitate in any capacity?

3   A    These are discontinued ops and not critical to the

4   organization.

5   Q    Thank you.

6        Now let's turn to --

7   A    Critical to the organization's operations.

8   Q    Thank you.  I didn't mean to step on your answer.

9   A    No, no.

10  Q    I apologize.

11  A    You didn't.  I was just clarifying it.

12  Q    If I could, I want to now turn to your declaration and

13  reference in your declaration to the meetings that you were

14  at regarding the restructuring.  And this is in the time

15  frame just prior to and then when these petitions were

16  filed.  So you understand where I'm at here.  Do you

17  understand what I'm talking about?

18  A    Yes, I do.

19  Q    Okay.  Good.  Okay.

20       So in your declaration, I think you made mention of two

21  separate meetings:  a meeting that happened, as I think you

22  characterized it, a couple months before the filings and I

23  believe that would have been in February of 2014; and then a

24  meeting immediately prior to the filing.  Do you recall

25  those statements in your declaration?

1    A    Yes, sir.

2    Q    Good.  Thank you.

3         So aside from those two meetings, are there any other

4    meetings at which these topics were discussed, as in the

5    decision to file the bankruptcy for the four asbestos

6    debtors?

7    A    Those are the two formal meetings.  Mr. Moldovan was 15

8    yards from my office and we had conversations around the

9    potential filing of these entities.  But nothing that was

10   more formal than this.

11   Q    How many meetings did you have with the Kirkland

12   attorneys about the restructuring of these entities, if you

13   recall, in that time frame?

14   A    I don't recall.  I know I had multiple conversations

15   and discussions.  I don't know how you're defining the word

16   "meeting".  I had phone conversations.  Were they in the

17   room with a corporate sec -- with a secretary?  Those are

18   the two that I recall.

19   Q    So aside from those what we'll refer to as more formal

20   meetings, were there other meetings or phone conversations

21   in that time frame with the Kirkland attorneys about

22   restructuring these entities?

23   A    Yes.

24   Q    And do you remember when you first discussed whether

25   the asbestos debtors would file for Chapter 11 with the

1    Kirkland attorneys?

2    A    I would -- I would suggest it would have been in that

3    February time frame.

4    Q    Of 2014.

5    A    Yes, sir.  I should have clarified that.

6    Q    In that first meeting that I believe you discuss in

7    your declaration, that was in Dallas, is that correct?

8    A    That's correct.

9    Q    And was that held at your offices or was that held

10   at -- somewhere else?

11   A    Our offices.

12   Q    Who attended that first meeting?  This is the February

13   meeting.  If you recall.

14   A    I couldn't tell you.  There was a multitude of, again,

15   directors and managers of various subsidiaries.  And I can't

16   recall specifically who was there.

17   Q    Do you remember --

18   A    It was a number --

19   Q    I'm sorry.

20   A    It was a number of them.  I can't recall specifically.

21   Q    Okay.  Do you remember what was said --

22   A    What was --

23   Q    -- at that meeting about the decision to file or

24   whether these four asbestos debtors needed to file for

25   Chapter 11 restructuring?

1    A    Again, the topics of the meeting, as I recall, were

2    around our general fiduciary responsibilities for the

3    specific entities that we are -- that we were directors or

4    managers of.   That we would have specific responsibilities,

5    fiduciary responsibilities as it related to the decision to

6    file bankruptcy.   And we had discussions about our fiduciary

7    responsibilities if indeed one of the subsidiaries was

8    filing for bankruptcy.

9    Q    Any other topics?

10   A    Again, other than -- I think I mentioned earlier there

11   was some discussions around the benefits and risk associated

12   with the Chapter 11.

13   Q    Now at that meeting, pardon my characterization, but

14   you were wearing multiple fiduciary hats at that point, were

15   you not?

16   A    If you don't mind giving me an example.

17   Q    You were an officer or director of various entities

18   when that meeting was conducted, is that correct?

19   A    Again, I don't want to be too specific here or dodge

20   your question, but I was the treasurer and senior vice

21   president of many of these entities, almost all of the

22   entities.   And I had roles and responsibilities related to

23   being the senior vice president and treasurer which included

24   liquidity management, investor relations, dealing

25   specifically with the operations of the company --

```
 1   Q     And that was up here at --

 2   A     -- of the company's --

 3   Q     -- the E level?

 4   A     No.  It crossed many companies --

 5   Q     Okay.

 6   A     -- many of the companies.  And then I was director of,

 7   as you can say from the LSGT -- director of other entities.

 8   Q     And so you were wearing multiple fiduciary hats in that

 9   instance then.  Wouldn't that be a fair characterization?

10   A     I have fiduciary responsibilities as the treasurer, the

11   senior vice president.  I had -- and those entailed specific

12   issues.  And I had fiduciary responsibilities as directors

13   for these subsidiaries.

14   Q     And was there a discussion at that time about how you

15   could thread the needle, as it were, as it arised (sic) --

16   if a fiduciary conflict arose between one entity and

17   another?  Was that discussed?

18   A     If there was a conflict, my understanding would be

19   that, you know, at some point in time, we would bring in an

20   independent director for those purposes.  We, at that point

21   in time, were not seeing conflicts.

22   Q     Okay.  And so at that February meeting, were there any

23   disinterested directors that were in attendance?

24   A     Not that I recall.

25   Q     Do you recall -- this is, again, at the February
```

1    meeting.  I don't want to trip you up because we're talking

2    about multiple meetings.  Focused here on the February

3    meeting.  But do you recall at that meeting whether the

4    possibility of a 524(g) plan was discussed?

5    A    I have no idea what you're talking about.

6    Q    Okay.  In your declaration, you discussed a meeting

7    that you and Mr. Moldovan attended that took place -- again,

8    the February meeting.  Now you were unclear in your

9    declaration about which directors and managers of which

10   subsidiaries.

11        Who attended that meeting from which entities.

12             MR. MCKANE:  Objection.  Asked and answered.

13             THE COURT:  Yeah.  We've just gone through this --

14             MR. MCKANE:  Where does it say --

15             THE COURT:  -- haven't we?

16             MR. HOGAN:  Excuse me, Your Honor?

17             THE COURT:  I thought we've already gone through

18   this.

19             MR. HOGAN:  Well, he -- I -- well, he went through

20   it generally.  But I need to know specifically which -- I

21   asked him what capacity he was at that meeting in.  And I

22   did ask that.  That's asked and answered.  What I'm asking

23   him is which entities and which directors for those entities

24   were at the February meeting which is a different question

25   than I asked him before.

1            MR. MCKANE:  And, Your Honor, he also asked him

2     who attended the meeting and for which entities.  And Mr.

3     Horton said I can't recall; there were lots of people there,

4     lots of subsidiaries.

5            MR. HOGAN:  Is --

6            MR. MCKANE:  That's why it's asked and answered.

7            THE WITNESS:  That -- I'm sorry, Your Honor.

8            THE COURT:  Go ahead, Mr. Horton.

9            THE WITNESS:  That specifically was my answer.

10            THE COURT:  Yeah.  I think we've been over that.

11            MR. HOGAN:  Thank you.

12     BY MR. HOGAN:

13     Q    And you testified, I believe, that Kirkland attorneys

14     also attended that meeting, correct?

15     A    That's correct.

16     Q    Were you told about how your fiduciary duty would

17     change if any of these entities that were asbestos debtors

18     filed for bankruptcy?

19     A    I don't know that it was anything that I can recall

20     specifically that how it would change.  I think the general

21     message that I got from those discussions and those meetings

22     is I had a fiduciary responsibility for those entities that

23     I was a director or manager of to act in good faith and to

24     maximize the value of those entities.

25     Q    Did the Kirkland attorneys that were in attendance tell

1   you that a Chapter 11 petition must be filed in good faith

2   at that meeting?

3   A    Yes.

4   Q    And what did you understand that to mean?

5   A    In good faith suggests to me that we had executed our

6   fiduciary responsibility to maximize the value of those

7   estates and to consider the impact of any decisions that we

8   were going to make on those specific entities unrelated to

9   EFH and what they were ultimately deciding as a corporate

10  board.

11  Q    And what about the fiduciary duty to the creditors?

12  Was that discussed?

13  A    I can't recall.

14  Q    Were you told that it was not a valid reorganizational

15  purpose to file in order to discharge debts and increase the

16  value of equity?

17         MR. MCKANE:  Objection, Your Honor.  I don't want

18  to have a debate as to what the law is or isn't as it

19  relates to what is a debtor's fiduciary duty and that the

20  witness has testified as to what his general recollection

21  was of the meeting.  And I think this one's actually going

22  into legal advice.  We've been very careful to allow this to

23  be among the topics involved.  But the more you probe into

24  what specifically was said at the meetings beyond

25  (indiscernible) concerning that he's questioning -- he's

1    asking the witness to -- inadvertent way to approach.

2              MR. HOGAN:  Well, Your Honor, I believe that the

3    privilege has been waived by the declaration.  If you look

4    at the declaration, it's clear that the debtors are

5    appearing to assert that EECI and its parents relied on the

6    advice of counsel and therefore had subjective good faith.

7    As they place the advice of counsel at issue, we're entitled

8    to explore.

9              MR. MCKANE:  Well, it's fascinating 'cause they

10   say that the standard is objective not subjective.  And now

11   they're saying (indiscernible) be waived.  The fact that

12   they received advice is undeniable and not a waiver.  Mr.

13   Horton can testify on what he relied on in making the

14   decision to file for bankruptcy.  And he has stated that.

15   Or that he received legal advice.  Clearly, he was.  All

16   right?  What's described in the declaration and what's

17   described in the papers is nothing more than (indiscernible)

18   privilege law.  The topics on which he (indiscernible)

19   advice.  The substance of the advice, the specific

20   recommendation, that has never been disclosed and is

21   (indiscernible).

22              THE COURT:  I agree.  Sustained.

23              MR. HOGAN:  Your Honor -- that's fine.  Thank you.

24   I was just going to -- just so the Court has clarity and I

25   create a record --

```
 1              THE COURT:  Yes.

 2              MR. HOGAN:  -- the minutes are replete in the

 3    April 25th meeting with the advice of counsel on these

 4    issues.  And so, the extent that that's your ruling, I

 5    understand but I just wanted to make the record.

 6              MR. MCKANE:  And with regards to the minutes, and

 7    they're available for review to the extent necessary, that

 8    if you look at the minutes, what you will see is a statement

 9    of the topics that were discussed.  Nothing specific of we

10    recommend a specific course of action to you.

11              THE COURT:  Okay.  My ruling stands.

12              MR. HOGAN:  Thank you.

13    BY MR. HOGAN:

14    Q    When you made the decision that the asbestos debtors

15    would file, you understood that EFH wanted them filed, is

16    that correct?

17    A    My understanding was there was a general recommendation

18    from the co-CROs that those entities should -- would be

19    filed or should be filed.  You said it like should be filed.

20    Q    Should be filed?

21    A    Yes.

22    Q    And that recommendation was made to you as a director

23    of those entities?

24    A    It wasn't made to me as a director.  It was made to the

25    board of EFH, as I understand it.  It wasn't made to me
```

1    specifically, no, sir.

2    Q    Okay.  And when was that recommendation made, if you

3    recall.

4    A    I don't recall.

5    Q    Was it at the February meeting?

6    A    No.  Again, I don't recall so you can go through this.

7    I don't recall.

8    Q    And you understood that if you didn't agree that you

9    could possibly be relieved of your duty as a director.  Did

10   you understand that?

11   A    I'm sure that was -- yeah.  I understood that.

12   Q    And that you could potentially lose your job at EFH?

13   Is that a possibility as well?

14            MR. MCKANE:  Objection.  He's asking the witness

15   to speculate as to what actions would be taken for something

16   that did not happen.  It's a counter (indiscernible).

17            MR. HOGAN:  He just answered, first of all, Your

18   Honor, that it was possible that he could -- you know, he

19   could lose his job or duties as a director.  So it's just an

20   extension about whether he could possibly lose his job at

21   EFH as well.  I think it's well within the purview given his

22   testimony as already elicited.

23            MR. MCKANE:  Your Honor, shame on me for not

24   objecting earlier.  (Indiscernible) is also objectionable.

25   But the fact of the matter is, he's posing hypotheticals

1    about what actions could or could not be taken with regard

2    to what -- whether if he didn't do something that he did as

3    a director.  He could state is it your own understanding of

4    what his employment agreement states or doesn't state.  But

5    it is speculation to say could you be fired if you didn't do

6    what someone else said to do.

7              THE COURT:  I'll allow the question.

8              THE WITNESS:  What was your question?

9    BY MR. HOGAN:

10   Q    My question is, is were you -- did you have a concern

11   that you could lose your job if you went against the advice

12   of the co-CROs as to how to handle the filing of the

13   asbestos debtors?

14   A    Absolutely not.

15   Q    If I could, let's turn to the deconsolidated tax issue.

16        You said that filing for bankruptcy enabled EECI to

17   avoid potential tax liability, is that correct?

18   A    What I stated was that they were joint and severally

19   liable in the event that there was a deconsolidation tax.

20   Q    I think one scenario described in the debtors' omnibus

21   tax memorandum that you may be aware of that was filed on

22   October 1st, 2014 is that "EFH C-corp subs would have joint

23   and several liability for any deconsolidated tax triggered

24   if creditors foreclosed on assets at T-side disregarded

25   entities (LLCs) and triggered a taxable gain at EFH."

1      Is that what you're referring to?

2   A    Generally speaking, yes.

3   Q    Are you also referring to the threat that EFH could

4   check the box on the LLCs so that they would become taxable

5   entities?

6   A    I'd ask that you talk to the tax counsel about that.  I

7   generally understand the checking of the box.  But of that

8   specific scenario, I -- that you described, I'm not for

9   certain -- for certain.

10  Q    It was not up to EECI whether the creditors of the

11  T-side subs triggered deconsolidation, was it?

12  A    Was it up to them?

13  Q    Was it up to the EE -- was it up to EECI whether those

14  T-side subs filed?

15  A    They filed -- I'm sorry.  I missed the "they filed"

16  part.

17  Q    My question is, was it up to EECI as to whether the

18  creditors of the T-side triggered deconsolidated tax

19  liabilities.  Was it?

20  A    I don't think it was up to them specifically, no.

21  Q    And it's EFH decision whether to check the box to make

22  T-side LLCs and the taxable entities so the LLCs would be

23  jointly and severally liable for the deconsolidated tax,

24  isn't that correct?

25  A    I believe that generally but I would again point you to

1    the tax counsel in the company if you want to get into the

2    specifics of that topic.

3    Q    Well, you did testify on those issues, did you not, in

4    your direct?

5              MR. MCKANE:  Objection.  Form.  I (indiscernible)

6    as to what he testified on it so he'd have an understanding

7    as to why he filed the debtors for (indiscernible)

8    deconsolidation tax was an issue for which they wanted

9    (indiscernible).  That was the scope of the testimony.  It

10   wasn't about checking the box.  It was why the risk of a

11   deconsolidation tax was a rationale for filing the

12   bankruptcy so that they could have (indiscernible) for

13   (indiscernible).  That was the scope of the testimony.  He

14   can pierce (indiscernible) test that all he wants.  But

15   going into checking the box which we all know changes an LLC

16   into a C-corp and the potential actions of the T-side into

17   the lower (indiscernible) E-side, that was not the subject

18   of the testimony.  It actually is not at issue today.  That

19   was all settled in December of 2015.  For that reason, we

20   object.

21             MR. HOGAN:  I'll withdraw the question, Your

22   Honor.

23             THE COURT:  Okay.

24   BY MR. HOGAN:

25   Q    EFH was responsible for negotiating a deal with the

1    T-side creditors, isn't that correct?

2    A    Would you repeat that?  I'm sorry.  I --

3    Q    I said EFH was responsible for negotiating a deal with

4    the T-side creditors, is that correct?

5    A    T-side creditors regarding --

6    Q    Regarding the resolution of the T-side estate.

7    A    I think the E-side -- the T-side were responsible.  The

8    independent director at the -- at TCEH was responsible.  The

9    independent directors at EFH were responsible.  So there was

10   multiple parties responsible for negotiating with the T-side

11   plan and the overall plan.

12   Q    Okay.  And what about the asbestos debtors?  Were they

13   responsible for those negotiations in any capacity?

14   A    We were certainly involved in it.

15   Q    Now not all of the EFH subsidiaries filed for

16   bankruptcy, is that correct?

17   A    That's my understanding.

18   Q    And EFH Properties, I believe, is an entity that didn't

19   file for bankruptcy.  Does that comport with your

20   recollection?

21   A    Yes, sir.

22   Q    And that's a C-corporation if you recall?

23   A    I do recall.

24   Q    And that's correct?  It is?

25   A    Yes, sir.

1    Q    Thank you.  And so, it would be jointly and severally

2    liable for deconsolidated taxes just like EECI would, is

3    that correct?

4    A    That is correct.

5    Q    And it's not necessary for EECI or any other asbestos

6    debtor to file for bankruptcy in order to participate in a

7    resolution of those tax issues, isn't that correct?

8    A    I think that's correct.

9    Q    Let's now turn to the topic of your -- of the loss of

10   access t funds which is one of the justifications that the

11   debtors give for this being a good faith filing.

12   A    Sure.

13   Q    And specifically, the April 25th meeting where EFH

14   filed, EECI would lose access to funds for paying and

15   defending and settling asbestos claims.  Do you recall that

16   in your declaration?

17   A    I do.

18   Q    What did Mr. Husnick and his colleagues tell you about

19   that issue?

20   A    I can't tell you specifically what they said.  I can

21   tell you my general understanding of it if --

22   Q    Of course.

23   A    -- that works for you.

24   Q    It does.

25   A    Okay.  So my understanding is we would have EFH as a

1   debtor entity.  If I understanding where your question is

2   going.  And if I'm going down the wrong path, please let me

3   know.

4   Q    With certainty.

5   A    But if we filed EFH as a debtor, which we were going to

6   do, and we knew that.  I talked about that previously.  And

7   then you had the LSGT debtors not filing.  Then having the

8   ability for this nondebtor estate to continue to get cash

9   flow.  Its only source of cash was EFH.  EFH was certainly

10  running low on cash.  According -- you know, in the

11  discussions with counsel, it was going to be extremely

12  difficult for us to convince not only the Court but the

13  creditors at EFH to allow money to continue to leak out of

14  that entity that was filed for Chapter 11 bankruptcy to a

15  nondebtor entity.  It was not critical to the operations of

16  the -- in the ongoing operations of the company as you and I

17  discussed previously.

18  Q    And was it discussed whether EFH can seek leave of

19  Court to continue to transfer funds to EECI in the event

20  that EECI didn't file for bankruptcy?

21  A    I'm sorry.  I missed your first word that you said in

22  that question.

23  Q    I asked whether it was discussed whether in the event

24  that EECI did not file for bankruptcy whether EFH could seek

25  leave of Court to have funds transferred to EECI during the

1    pendency of EFH bankruptcy in order for EECI to continue to

2    pay claims.

3    A    If you're asking me whether or not we discussed that

4    whether or not EFH -- again, EFH being filed as a debtor and

5    you said specifically EECI and we certainly had that

6    conversation at the EECI level.  We had it at the broader

7    level at LSGT debtors in general.  We did have that

8    conversation.  And we felt the discussion that we had with

9    K&E was that it was going to be extremely difficult to get

10   approval -- if this is, again, the question that you're

11   asking -- approval from the Court to have funds flow from

12   the debtor entity to the nondebtor entity that was not

13   critical -- was not a critical vendor, was not critical to

14   the ongoing businesses of the company and that we were going

15   to get several objections and strong resistance from

16   creditors.

17   Q    But you're aware that immediately after filing the

18   petitions that, in fact, were filed, the debtor did seek

19   permission to have certain funds, cash management system, to

20   make payments on intercompany obligations including the

21   nondebtors like EFH Properties.  Do you recall that?

22   A    I do recall that.

23   Q    And do --

24   A    I'm not sure about EFH Properties.  I can't recall.

25   You'll need to talk to Mr. Moldovan about the specifics

1    about but I know there were some.

2    Q    And so there were instances -- in fact, the way these

3    petitions were filed where relief was sought from the Court

4    so that monies could be taken out of the estates to pay

5    nondebtor entities, isn't that correct?

6    A    Yes.  I understood it was for the purpose of critical

7    vendors, critical relationships that would improve or

8    enhance or maintain the ongoing business operations of the

9    company

10   Q    Let's turn now to the automatic stay, if we could.

11   A    Okay.

12   Q    And specifically dealing with asbestos firms.

13        Your declaration indicates that Mr. Husnick told you

14   that EEC -- that if EECI filed for bankruptcy, there would

15   be an automatic stay enjoining claims against it.  Do you

16   recall that?

17   A    I recall.

18   Q    And that filing for Chapter 11 would "provide a forum

19   for addressing all claims against EECI".  Do you recall

20   that?

21   A    Yes.

22   Q    Did you understand that the automatic stay was one of

23   the reasons to file for bankruptcy?

24   A    Yes.

25   Q    And you understood at the time that the debtors'

1    intention was to seek a bar date and pass through all

2    asbestos claims for which a proof of claim had been filed

3    against the reorganized asbestos debtors, is that correct?

4    A    Are you talking about April of 2014?

5    Q    I am.

6    A    No.

7    Q    So in April of 2014, had a bar date been contemplated

8    at that point?

9    A    No.

10   Q    There was the original restructuring support agreement.

11   Are you --

12   A    Let me say it in a different -- let me answer that

13   question differently.

14   Q    Okay.

15   A    In that meeting, it was not discussed.

16   Q    Okay.  Let's drill that one down.  That -- which that

17   meeting?

18   A    You were referring to the EECI meeting, I believe, in

19   my declaration.

20   Q    The April -- that's the April meeting.

21   A    Yes, sir.

22   Q    Okay.  Was a bar date discussed at that meeting?

23   A    No.

24   Q    But there was this original -

25   A    Not that I recall.

1   Q    Okay.  Thank you.  Sorry.  I didn't mean to step on

2   your toes.

3   A    Well, you didn't.  I'm --

4   Q    You understand that there was this original

5   restructuring support agreement, correct?

6   A    I do.

7   Q    And you understood that it was in that -- it was going

8   to be that all claims were going to be reinstated?  Did you

9   understand that as asbestos claims?

10  A    I don't recall that.  I don't recall that.

11  Q    Do you recall if all intercompany claims as it relates

12  to the four asbestos debtors were going to be reinstated in

13  that support agreement?

14  A    I don't recall that.  If you -- I'd have to look back

15  at the document.  I don't recall that.

16  Q    So there was no bar date discussed at all at that April

17  2014 meeting and yet --

18  A    That I recall.

19  Q    Okay.  Paragraph 14 of your declaration talks about the

20  marketing process.  And this is specifically, "Potential

21  interested parties repeatedly expressed both a concern about

22  reinstating asbestos liabilities and a desire for the

23  debtors to quantify the potential exposure of the LSGT

24  debtors and that the Hunt consortium and NextEra urged EFH

25  to establish a bar date 'as a means to affording some

1    certain degree of certainty regarding the alleged asbestos

2    related liabilities.'"

3         Do you recall that statement?

4    A    I do.

5    Q    The aggregate liability that would affect the value of

6    the asbestos debtors, which are EFH wholly owned

7    subsidiaries --

8    A    Are you reading -- are you continuing to read?

9    Q    I'm not asking you --

10   A    Okay.

11   Q    -- a question.

12   A    I'm sorry.

13   Q    So the aggregate liabilities would affect the value of

14   the asbestos debtors, isn't that correct?

15   A    There were liabilities so it would impact the value of

16   the, again, negative value entity from an asbestos

17   perspective.

18   Q    And you knew that a bar date would not allow you to

19   determine with certainty the aggregate asbestos liability,

20   isn't that correct?

21   A    No.

22   Q    Why not?

23   A    I did not know that.

24   Q    What did you understand a bar date would do?

25   A    My understanding, it would give -- provide an

1    opportunity for the manifested -- unmanifested claimants to

2    actually file a claim with the Court.

3    Q    Well, isn't it true that a bar date would have the

4    effect to discharge certain claims?

5    A    I'm not aware.

6    Q    Well, you understand that to the extent that there's a

7    bar date in someone who has a claim and either is out of the

8    country or asleep in a coma or whatever and they don't file

9    a claim by the bar date, their claim would be discharged.

10   Would you agree with that?

11   A    Yes.  I would agree with that.

12   Q    Okay.  And so, to the --

13   A    I'm sorry.  I just didn't understand your question.

14   Q    No problem.  So to the extent that there's a bar date,

15   it would reduce the overall number of claims, would it not?

16   A    That I don't know.  If you had a 100 percent success

17   then it wouldn't reduce the claims.

18   Q    And it wouldn't allow you to determine with any certain

19   certainty the amount of a liability, would it?

20   A    I'm sorry.  I don't understand the question.

21   Q    Would the bar date allow you to determine with

22   certainty the amount of liability?

23   A    It certainly helped quantify and define the amount of

24   the claims from the bar date and give some view into the

25   size of the potential liability.

1    Q     Some view into size but not certainty necessarily.

2    A     More certainty.

3    Q     More certainty.  And were you aware of the argument of

4    the asbestos debtors that had been made regarding the future

5    unmanifested asbestos claims that couldn't be discharged in

6    the circumstances in this case?  Were you aware of that at

7    that time?

8              MR. MCKANE:  I'm objecting to that as to what --

9    I've lost you as to what time period we're talking about.

10             MR. HOGAN:  We're talking about this meeting --

11   this determination about the bar date.  Let me rephrase.

12             MR. MCKANE:  Thank you.

13             THE WITNESS:  I'm sorry.  Yeah.  Go ahead.

14   BY MR. HOGAN:

15   Q     We're talking about paragraph 14 in your declaration.

16   Okay?

17   A     Why don't we -- why don't you let me turn to that and

18   remind me what --

19   Q     That's fine.

20   A     -- part of my book.

21   Q     My apologies for not refreshing your recollection.

22   A     That's okay.

23   Q     This is --

24             THE COURT:  It should be at the beginning of your

25   book.

```
 1              THE WITNESS:  I'm sorry, sir.

 2              THE COURT:  It should be at the beginning of your

 3    book, Mr. Horton.  Very first tab.

 4              THE WITNESS:  Thank you.  Yeah.  Thank you, sir.

 5              Okay.  My apologies.  Where are you?

 6    BY MR. HOGAN:

 7    Q    No problem.  This is under Roman numeral III,

 8    "Governance of the LSGT Debtors During the Bankruptcy".

 9    A    Do you have a page number that you --

10    Q    Page 7.

11    A    Thank you.  And you're in paragraph --

12    Q    14.

13    A    Yes, sir.

14    Q    And in there, you state about the reinstatement of the

15    asbestos liabilities wasn't a foregone conclusion.  "As the

16    vice president and treasurer of EFH and EFIH during the

17    multi-year Oncor marketing process, I was frequently

18    involved in direct discussions with bidders, creditors, and

19    potential plan sponsors about the terms of the various

20    proposals as they were affected or offered, reviewed and

21    revised.  During this process, potentially interested

22    parties repeatedly expressed both the concern about

23    reinstating asbestos liabilities and the desire for the

24    debtors to quantify the potential exposure to LSGT debtors."

25         So I take it from that statement that that statement
```

1   really encapsulates most of 2014, 2015 and 2016.  Is that a

2   fair statement?

3   A    Yes.

4   Q    Okay.  And with regard to -- so if we go back to the

5   establishment of the bar date, you said I think in your

6   earlier testimony that in April of 2014 that the bar date

7   had not yet been discussed, correct?

8   A    At that meeting, I do not recall that it was discussed

9   is what I think I testified to.

10  Q    Okay.  And so I think somewhere else in your

11  declaration, and correct me if I'm wrong, but I think it was

12  in 2015, do you recall, when you first started discussing

13  the bar date, the possibility of a bar date?

14  A    With?

15  Q    With anyone.

16  A    As I recall in 2014, we began having conversations and

17  hearing from bidders that they were not comfortable with the

18  due diligence that they had gone through for quantifying the

19  potential magnitude of the asbestos claims and we began to

20  here quite adamantly from them that they wanted a bar date.

21  Q    Okay.

22          THE COURT:  Can you be specific about the timing?

23  More specific about the timing?

24          THE WITNESS:  I'll try, Your Honor.  It was more

25  -- it was after the termination of the RSA, which I think

1    was in July of 2014.

2             THE COURT:  July 2014.

3             THE WITNESS:  And so we were in conversations in

4    July and August of 2014 that would begin hearing those

5    requests from the bidders.  That's what I recall, sir.

6    BY MR. HOGAN:

7    Q    In your declaration, there is a mention of an

8    April 7th, 2015 meeting.  Do you recall that meeting?

9    A    Yes.

10   Q    And do you recall if at that meeting the bar date was

11   discussed?

12   A    Yes, it was.

13   Q    Do you remember what --

14   A    Should we turn to the minutes of that meeting?

15   Q    Do you remember what was discussed at that meeting,

16   specifically with regard to the bar date?

17   A    Generally, the discussion was regarding the notice

18   plan, the process for that, ensuring that we were providing

19   adequate notice to the potential claimants.

20   Q    Do you recall at that meeting any discussion of the

21   establishment of a trust for asbestos claimants and asbestos

22   claims?

23   A    No, I don't recall that.

24   Q    And did you discuss --

25   A    Can you point me to the minutes of that meeting in my

1    binder, please?

2    Q    I sure can.  Excuse me for one second, please.

3    A    D-19?

4    Q    I believe it's DX-91C in the debtor's binder.

5    A    Yes, thank you.

6    Q    And take a moment, if you would, and review that.  I

7    don't -- I'm not trying to play a game of catch.  I'm just

8    trying to understand.

9    A    No, no.  I know you're not, but I don't want to speak

10   out of school here.  Yes, I recall this.

11   Q    And so there's no mention made in there about the

12   discussion of a trust for the establishment of asbestos

13   claims, correct?

14   A    No, sir.

15   Q    Okay.  And so there was no discussion about obtaining

16   absolute certainty with regard to the resolution of the

17   asbestos claims at that point, then, is that correct?

18   A    I think the continuing -- fundamental objective was to

19   provide bidders certainty -- more certainty as to the

20   potential size of these claims.  And this was a necessary

21   step in that process.

22   Q    Okay, do me a favor if you would now and turn back to

23   your declaration of paragraph 17.  Take a moment and --

24   A    Yes, sir.

25   Q    -- read that if you would.

1    A    Page 8, paragraph 17?

2    Q    That's correct.

3    A    Yes, sir.

4    Q    Right.  And so it says even with the asbestos bar date

5    in place, the debtors still had to engage in significant

6    negotiations with NextEra and other potential purchasers to

7    convince them to reinstate the asbestos related claims

8    against the LSGT debtors in the current plan.  And then you

9    give some examples.

10   A    Yes, sir.

11   Q    Okay.  Isn't it true that, in fact, in the beginning of

12   July of 2016 that NextEra proposed a 524(g) trust to the

13   debtors?

14   A    I don't recall that.

15   Q    So you don't recall seeing an e-mail sent to you by

16   your counsel wherein they sent you a term sheet --

17   A    Do you have a copy of that?

18   Q    I do.

19   A    Would you please let me review that?

20   Q    Certainly.

21          MR. HOGAN:  Your Honor, permission to approach the

22   witness?

23          THE COURT:  Uh-huh.

24   BY MR. HOGAN:

25   Q    Take a moment, if you would, and review that.

Page 102

```
 1   A     Okay, I've looked at it at a very high level.

 2   Q     What's the date of that e-mail?

 3   A     July 6th.

 4   Q     2016?

 5   A     Yes, sir.

 6   Q     And --

 7             THE COURT:  Can we identify for the record some

 8   sort of bates number or something of what he's looking?

 9             MR. HOGAN:  Yes, Your Honor, certainly, of course.

10   My apologies.

11             THE COURT:  It's all right.

12             MR. HOGAN:  EFH-06524388.

13             THE COURT:  Thank you.

14   BY MR. HOGAN:

15   Q     So we have a July 6th, 2016 e-mail that appears to come

16   from one of Kirkland's attorneys, correct?

17   A     Yes, sir.  I see that.

18   Q     And that's directed to, I believe, Stacey Dore, Andy

19   Wright (ph), yourself, and then a number of other parties

20   are cc'd on that document.  Is that correct?

21   A     I do see that.

22   Q     And the subject matter was the EFH asbestos term sheet,

23   is that correct?

24   A     I think as it said in an e-mail that came over from

25   NextEra, so I would characterize it as NextEra's version of
```

1    a EFH Corp. term sheet.

2    Q    Okay.  And so the purpose of showing you that document

3    is just to refresh your recollection.  If you recall if

4    there was a discussion about the establishment of a trust to

5    satisfy asbestos claims at any time during the pendency of

6    your negotiations with NextEra.

7    A    I see that.

8    Q    I'm sorry?

9    A    I see what you're saying.  I see the term sheet.  I see

10   the e-mail.

11   Q    So I've refreshed your recollection.  So was there a

12   discussion at some point during that time?

13   A    No, you -- I see the e-mail.  Whether or not -- I don't

14   recall being involved in this conversation as you recall

15   earlier.  Mr. McKane asked was Ms. Dore involved in these

16   negotiations as well, and I said yes, she was across many

17   broad matters, including legal matters.  And I would assume

18   that I may have glanced at this and said what do you guys

19   think.  And it died.  So I don't know what the outcome was,

20   why we didn't do it, why it worked, didn't work.  So --

21   Q    And so if I could, I'd like to direct your attention

22   back to Horton demonstrative number 2.  And I'd ask that

23   that be pulled up on the monitor so that the Court has the

24   benefit of it.  Do you have it in front of your, Mr. Horton?

25   A    I'm waiting.  You said (indiscernible) --

1           THE COURT:  Can we put that on the screen?  Thank

2    you.

3    BY MR. HOGAN:

4    Q    And so I didn't see that -- any reference to that e-

5    mail on this demonstrative.  Is there a reason for that?

6    A    It's -- I'd be speculating as to why it's not on here.

7    My guess is that it's not -- it wasn't something that was

8    plausible or that it worked overall.  I'd be speculating on

9    it.  It did not rise to a level of my attention that this

10   was a viable option.  So, you know, I -- again, I don't know

11   specifically what the outcome was.  Some of these things in

12   these very complicated negotiations, you rely on your

13   lawyers and your counsel and say, what do you think of this?

14   Give me the executive summary.  I -- clearly, it didn't rise

15   to my level.

16   Q    Okay, and so if we look at that timeline and look for

17   -- I think there's a tab there for joint board meetings,

18   right, and restructuring updates, right?  And if I look in

19   July, I don't see a tab there that's immediately

20   contemporaneous with that e-mail, do you?

21   A    I'm sorry, you're referring to which board meeting?  My

22   apologies.

23   Q    I'm just asking you if there's a board meeting that

24   is --

25   A    Okay, so this is July 6th.  Sorry to talk over you.  So

1    it's going to have to be sometime between I'm assuming this

2    May 23rd and July 21st board meeting, is that what you're

3    referring to?

4    Q    Right, that's what I'm asking.

5    A    Okay, it's a lot of dates.

6    Q    And so obviously it couldn't have been talked about at

7    the May 23rd meeting unless you knew about it before that,

8    right?

9    A    Yeah, I'm trying to help with the timeline here, so --

10   Q    I appreciate it.

11   A    Okay.  So your question is was this discussed at the

12   board meeting?

13   Q    Yes.

14   A    I don't know.

15   Q    I'm sorry?

16   A    I do not know.

17   Q    Were you at that board meeting?

18   A    Which --

19   Q    The July --

20   A    -- all of these --

21   Q    The July 21st board meeting.

22   A    I was -- I couldn't recall, but I would speculate that

23   I am.  I was.  I would guess that I was.

24   Q    You would guess that you were.  So you have no

25   independent recollection that you were at that meeting?

1    A    There's a -- as you can see, we had a series of

2    meetings and there were other meetings on top of these

3    meetings, unrelated to specifically restructuring in this

4    transaction.  So I don't know.  Again, this topic in

5    discussion did not rise to a level of where -- from my

6    perspective, to where it was something that we were

7    seriously considering.

8    Q    But NextEra was considering it, wouldn't you agree?

9    A    Certainly a lot of proposals are thrown out in the

10   course of a negotiation of a transaction of this size and

11   complication -- complexity, so you know, again, a lot of

12   ideas, a lot of concepts were kicked around through this

13   entire restructuring, as you can imagine.

14   Q    And you testified earlier that NextEra was looking for

15   certainty, isn't that right?

16   A    More certainty, I would say.

17   Q    And isn't it true that a 524(g) would have given them

18   more certainty?

19   A    I'm not, again, an expert in 524(g).  I know that

20   escrow accounts provided more certainty and that's

21   ultimately where we landed.  Whether that's better or worse

22   than this, I couldn't tell you.

23   Q    And, in fact, the 524(g) is not a part of the current

24   plan and so instead, there's going to be the discharge of

25   certain claims, are there not?

1   A    Discharge of certain --

2   Q    Of certain unmanifested asbestos claims for which a

3   proof of claim was not filed.

4   A    There are claims that have not been filed as of the bar

5   date.  How those are ultimately handled through the Court

6   system, the process that you guys will manage, I don't know.

7   Q    Okay.  One last area I wanted to just touch on briefly

8   and that relates to your testimony regarding first what was

9   the $250 million amount that was set aside for asbestos

10  claims, which ultimately through the merger agreement and

11  the approval of the merger was reduced to $100 million.  You

12  recall that testimony?

13  A    Yes.

14  Q    Now, isn't it true that that set aside is not available

15  to asbestos claimants, is it?

16  A    I'm sorry, what --

17  Q    Well, let me put it to you this way, to whose benefit

18  does that $100 million inure?

19  A    It's to the benefit of -- the sole benefit of

20  claimants.

21  Q    It's not to the benefit of NextEra?

22  A    The 100 million?

23  Q    Yes.

24  A    No.

25  Q    And why not?

1    A    It's set aside for the sole purpose for asbestos

2    claims.

3    Q    It's for NextEra to use to pay claims, is it not?

4    A    It's their money that they put into an escrow account.

5    So it's not to their benefit.  They set that money aside for

6    the benefit in an escrow account for the claimants.  It's

7    not their money once it's in escrow.

8    Q    So it's the claimants' money?

9    A    It's for the benefit of paying claims that are allowed.

10   Q    But it's not the asbestos claimants' money, is that

11   correct?

12   A    It's for the benefit of claims -- to pay claims

13   associated with -- for asbestos claims.

14           MR. HOGAN:  Excuse me for one minute, Your Honor.

15   I just want to make sure I have nothing further I want to

16   address.

17           THE COURT:  Okay.

18           MR. HOGAN:  No further questions, Your Honor.

19           THE COURT:  Okay.  I have a couple, if I could

20   and, Mr. Hogan, if anything I ask triggers you wanting to

21   ask more questions, you're free to do so.

22           MR. HOGAN:  Thank you, Your Honor.

23           THE COURT:  Okay.  So we may have plowed this

24   ground a little bit already, but we're going to take another

25   shot at it for my purposes.

1              THE WITNESS:  You're the boss.

2              THE COURT:  Only here.  Very limited power.

3              THE WITNESS:  I understand the home life.

4              THE COURT:  So I think you said that in your April

5       meeting, you don't recall whether setting a bar date for

6       asbestos claims had -- was discussed.

7              THE WITNESS:  I don't believe it was.  I just

8       don't recall specifically.

9              THE COURT:  Right.  And at some point after July

10      when the RSA was terminated, the debtors entered into

11      negotiations with potential purchasers and at that time

12      started to hear that something had to be done to cabin --

13      sort of arrange, get the bidders comfortable with the

14      potential asbestos liabilities of the asbestos debtors.

15             THE WITNESS:  Yes, sir.  They were looking for

16      some way to --

17             THE COURT:  Right.

18             THE WITNESS:  How big is the bread basket here.

19             THE COURT:  Right, and it was -- is it fair to say

20      that at least at that point, that's when the idea of an

21      asbestos bar date arose or was starting to be discussed?

22             THE WITNESS:  It was starting to be discussed.

23      Yes, sir.

24             THE COURT:  Okay.  Now, we talked a little bit

25      about ongoing operations and there are no ongoing operations

1    at the asbestos debtors other than having the assets of

2    intercompany receivables and paying for the cost of

3    defending claims, and paying out those claims.  Is that

4    right?

5              THE WITNESS:  That's predominantly it.  Yes, sir.

6              THE COURT:  Okay.  Now, talking about the E-side

7    as it exists today.  So we've got EFH Corp., EFIH,

8    properties is now on the T-side, right, after the

9    reorganization?

10             THE WITNESS:  That is correct.

11             THE COURT:  Okay.  How many employees left?

12             THE WITNESS:  On the E-side?

13             THE COURT:  For the debtors today, as we sit here

14   today.  The non-reorganized debtors.

15             THE WITNESS:  Yeah.

16             THE COURT:  If you know.

17             THE WITNESS:  I believe it's just three of us.

18             THE COURT:  All right, so --

19             MR. MCKANE:  Your Honor, I don't want to testify,

20   but as a technical matter, they're actually independent

21   contractors.

22             THE COURT:  Okay.  So there are -- so assuming

23   you're an independent contractor, you're not at -- there are

24   -- including independent contractors, how many people are

25   there working for the unreorganized E-side of the estate?

1    Just three?

2            THE WITNESS:  No, sir, there's a few others.

3    There's four or five.  A handful.

4            THE COURT:  Okay.  And the E-side, other than

5    owning Oncor, doesn't operate a business correct?

6            THE WITNESS:  No, sir.

7            THE COURT:  So the only asset you have are --

8    well, the primary asset you have is the -- as you work down

9    the waterfall, an 80 percent stake in Oncor.

10           THE WITNESS:  That's correct, sir.

11           THE COURT:  Okay.  Those were my questions.

12   Mr. Hogan, anything to follow up?

13           MR. HOGAN:  One moment, your Honor.

14           THE COURT:  Yeah.  I don't think we have anything

15   else, Your Honor.  Thank you.

16           THE COURT:  All right.  Thank you.  Mr. McKane,

17   redirect?

18           MR. MCKANE:  No, Your Honor.

19           THE COURT:  All right.  Thank you, Mr. Horton,

20   sorry.

21           THE WITNESS:  Thank you.  No, no worries.  Thank

22   you, sir.

23           THE COURT:  I almost called you Hogan for some

24   reason.

25           THE WITNESS:  Thank you.

1          MR. MCKANE:  Your Honor, if Mr. Horton could be

2    excused, the debtors will call its next witness and it's

3    Mr. Kris Moldovan.

4          THE COURT:  All right.  Let's take a three or four

5    minute short break and then we'll have Mr. Moldovan.

6          MR. MCKANE:  Very good.  Thank you, Your Honor.

7       (Recess from 11:30 a.m. until 11:41 p.m.)

8          THE CLERK:  All rise.

9          THE COURT:  Please be seated.

10      (Pause)

11         THE COURT:  So, just for planning purposes, we'll

12   break around 12:30 or so for a lunch, for an hour and then

13   we'll pick up.  So --

14         MR. MCKANE:  Very good, Your Honor.

15         THE COURT:  Okay.

16         MR. GANTER:  Your Honor, Jonathan Ganter of

17   Kirkland and Ellis, on behalf of the debtors.  And the

18   debtors would call Kristopher Moldovan to the stand.

19         THE COURT:  Mr. Moldovan, if you'd just step up

20   there and remain standing.

21         THE CLERK:  Please raise your right hand.

22      (Witness sworn)

23         THE CLERK:  Please state and spell your name for

24   the record.

25         THE WITNESS:  Kristopher Moldovan,

1    K-R-I-S-T-O-P-H-E-R, M-O-L-D-O-V-A-N.

2              THE CLERK:  Thank you.

3              THE WITNESS:  Thank you.

4              MR. GANTER:  And, Your Honor, may I approach with

5    some binders?

6              THE COURT:  Yes.

7         (Pause)

8              THE COURT:  Thank you.

9         (Pause)

10   DIRECT EXAMINATION

11   BY MR. GANTER:

12   Q    Sir, can you, please, state your name for the record?

13   A    Sure.  Kristopher Moldovan.

14   Q    And who is your current employer?

15   A    It's Vistra Corporation Services which was formerly EFH

16   Corporate Services and Vistra Corporation Services is now an

17   indirect, wholly owned subsidiary of Vistra Energy, Inc. or

18   Vistra Energy Corp., which was formerly known as TCEH Corp.

19   Q    And what is your --

20             THE COURT:  So, who came up with -- who came up

21   with Vistra?

22             THE WITNESS:  Not --

23             THE COURT:  It's better than TCEH, I have to say

24   but --

25             THE WITNESS:  Not me, Your Honor.  I --

1          THE COURT:  It sounds like a new medication.

2          THE WITNESS:  There --

3          THE COURT:  Ask your doctor about Vistra.

4    BY MR. GANTER:

5    Q    Mr. Moldovan, what is your current position at Vistra

6    Corporate Services?

7    A    I am Vice President and Assistant Treasurer of Vistra

8    Corporate Services and all the other TC -- or Vistra

9    entities.

10   Q    And, prior to the separation of the TCEH debtors, did

11   you hold a position with any of the debtors?

12   A    Yes.  I was Assistant Treasurer of all of the debtors

13   other than EFH Corp.

14   Q    And does that include the LSGT debtors then?

15   A    It does.

16   Q    Did you hold any board positions at any of the debtors?

17   A    I did.  I was a director of EECI, Inc.

18   Q    And how long were you a director at EECI, Inc.?

19   A    I think I was elected in February -- on February 3rd,

20   2014 and I served as a director until October 3rd, 2016,

21   when the T-side emerged from bankruptcy.

22   Q    Have you ever served on any other debtor board?

23   A    No, I have not.

24   Q    Mr. Moldovan, did you prepare a declaration in

25   anticipation of your testimony here today?

1    A    I did.

2    Q    And, please, I'll refer you to tab D-DIR Moldovan in

3    your binder.

4    A    Okay.

5    Q    Is that your declaration, sir?

6    A    Yes, it is.

7    Q    And is all the information contained in there true and

8    accurate to the best of your knowledge?

9    A    It is.

10   Q    Mr. Moldovan, from your former role as Assistant

11   Treasurer for all of the debtors, other than EFH, are you

12   familiar with the inter-company payables and receivables

13   associated with the LSGT debtors that are the subject of

14   today's hearing?

15   A    Yes.  I'm generally familiar, yes.

16   Q    Can you, please, turn to D-DEM Horton 1 in your binder.

17        Mr. Moldovan, what does this demonstrative show?

18   A    This demonstrative shows the inter-company

19   payable/receivables between EFH Corp. and the LSGT debtors

20   and then amongst the LSGT debtors themselves.

21   Q    And is the mouse on here, is this as of the petition

22   date?

23   A    That's correct.

24   Q    And, so, these are the figures that as of the petition

25   date were reflecting the company's books and records?

1    A    Yes, that's -- they might have moved a little -- a

2    little bit from the petition date given some post-petition

3    expenses.  But they would be fairly minor.  These are --

4    these are substantially from the petition date, yes.

5    Q    Could you, please, look at DX-133 in your book?

6         And do you recognize this document?

7    A    I do.

8    Q    And what is it?

9    A    It's a summary.  It's a little bit more detailed

10   summary of those inter-company payable/receivables that were

11   on the demonstrative.

12   Q    And this is a summary of the materials that the company

13   keeps in the ordinary course of business?

14   A    It is.

15   Q    And are these numbers accurate to the best of your

16   knowledge?

17   A    To the best of my knowledge, yes.

18   Q    And they correspond with the numbers in the

19   demonstrative?

20   A    That's correct.

21   Q    Okay.  Turning back now to the demonstrative, could

22   you, please -- I'll wait until it's up there.  Could you,

23   please, describe the nature of the $560 million receivable

24   at LSGT Gas that is payable by EFH Corp.?

25   A    Yeah, sure.  Again, there's an inter-company claim

1    payable by EFH Corp. to LSGT Gas Company in the amount of

2    560 million.  That amount is -- consists of a note, a

3    written note that's in place in the amount of approximately

4    $372 million and then a money pool balance, which would not

5    be subject to -- if subject to a written money pool policy,

6    but not a specific note, and the balance of that, it would

7    be the money pool balance.

8    Q    Do you recall the interest rate on the note?

9    A    Yes.  The interest rate on the note was LIBOR plus 0.6

10   percent.

11   Q    And then how about the -- on the money pool interest

12   rate?

13   A    The money pool interest rate was 10.875 percent.

14   Q    Moving now, could you, please, now, describe the other

15   payables and receivables shown on the demonstrative?

16   A    Yeah.  Each of these are payables from LSGT Gas Company

17   to its subsidiaries.  So EECI has a claim against LSGT in

18   the amount of $84 million.  EEC Holdings has a claim against

19   its parent, LSGT Gas Company, in the amount of 404 million

20   and LSGT SACROC has a claim against its parent, LSGT Gas

21   Company in the amount of 502 million.

22        Again, all of these were largely pre-petition balances.

23   Q    And have these balances accrued interest since the

24   petition date?

25   A    They have not.

1    Q    Is it your understanding that, under the current plan

2    of reorganization, that these claims will be reinstated?

3    A    That's my understanding, yes.

4    Q    And, if these claims are reinstated, what is your

5    understanding of how post-petition interest will be treated?

6    A    My understanding is to reinstate these claims that they

7    -- the post-petition interest will be accrued as it would

8    have -- as it would at those rates and, so, that all of

9    these amounts would be, in some cases, substantially

10   increased by the amount of post-petition interest.

11   Q    I'd like to talk, now, a little bit about your

12   knowledge of historic asbestos defense costs associated with

13   these entities.

14        Are you generally familiar with that subject?

15   A    I am.

16        MR. GANTER:  You can leave that (inaudible).

17        UNIDENTIFIED SPEAKER: (Inaudible).

18   BY MR. GANTER:

19   Q    And how are you familiar?

20   A    When I became a director, I immediately started getting

21   some background on EECI and, obviously, have been very

22   involved with EECI -- well, I was involved with EECI before

23   I was elected as a director.

24        But, after I was elected as a director, I took further

25   steps to educate myself on the history of EECI and continue

1  to, obviously, be very focused on it throughout the

2  bankruptcy proceeding.

3  Q    And what is your understanding of the average yearly

4  cost to these entities associated with asbestos defense?

5  A    About in the neighborhood of two to three million per

6  year.

7  Q    And in which entities have these historic asbestos

8  claims generally been alleged?

9  A    Generally, all to ECI.

10  Q    And how have the costs associated with the claims

11  historically been funded?

12  A    Yeah, so, EECI has no cash and doesn't even have its

13  own bank account as a lot of the subsidiaries in the system

14  didn't have their own bank account.

15      So, to the extent a payment would be made, whether it

16  be made on a claim or to a representative or counsel or

17  whatever cost we were incurring, EFH Corp. would fund that

18  expense and then there would be book entries at LSGT Gas

19  Company and EECI, Inc.

20      So, for instance, if there was a million-dollar

21  payment, the receivable between LSGT Gas Company and EFH

22  Corp., in this example, would go down from 560 to 559

23  million and then the claim from EECI into LSGT Gas would go

24  down by a million to 83 million.

25  Q    Shifting gears, now, you were the Assistant Treasurer

1    of all the debtors, other than EFH, on the petition date,

2    correct?

3    A    Correct.

4    Q    What was your involvement in the process of filing the

5    debtors, as a while, for bankruptcy?

6    A    Yeah.  I would say that it's -- was my primary

7    responsibility, a substantial portion of my time was spent

8    on analyzing and working on bankruptcy matters, probably

9    starting in 2012 all the way through the petition date.

10       It was, I would say, a very substantial portion of my

11   time.

12   Q    And, upon your appointment -- you talked about this a

13   little bit earlier in the context of the asbestos claims

14   themselves, but upon your appointment to the board of EECI,

15   Inc., what steps -- what, if any, steps did you take to

16   familiar yourself with the LSGT debtors?

17   A    Yeah.  I -- again, I spoke both with Kirkland and

18   Ellis, who had been working with our team for quite some

19   time with respect to the specific matters relating to the

20   bankruptcy.  I spoke with several different attorneys there.

21       I spoke with internal counsel, especially our -- and

22   then I spoke with Mr. Hunter and Mr. Kelly, who works at our

23   company, again, to get a history of EECI and understand the

24   company a little bit more than I had even though I, again, I

25   did have some familiarity with it from my role as Assistant

1    Treasurer.

2    Q    Were you involved in the decision to file EECI for

3    bankruptcy?

4    A    Yes.

5    Q    And how did you approach that decision?

6    A    Well, I took that -- you know, from the minute I was

7    elected as a director, which was in February, I immediately

8    started discussing with Mr. Horton, who is the other

9    director, and counsel -- and internal counsel about roles,

10   responsibilities.

11        I think a lot of those discussions led to the meeting

12   that Mr. Horton referred to that happened in February and I

13   took the role extremely seriously knowing how important it

14   -- critical it was for a director to actually make the

15   decision to file a company for bankruptcy.

16   Q    Have you had an opportunity to review the pleadings

17   filed in support of the motion to dismiss?

18   A    I have.

19   Q    And are you aware that the movants assert that the LSGT

20   debtors never held a board meeting before deciding to file?

21   A    I am aware.

22   Q    Is that true?

23   A    No.

24   Q    And, please, explain what -- what do you mean -- you

25   just mentioned a meeting in February, beyond that.

1    A    Yeah.  Again, so, I -- we had -- before we filed for

2    bankruptcy, we had the one formal minuted board meeting that

3    occurred in April.  But discussions about my roles and

4    responsibilities for making the decision to file bankruptcy,

5    I can tell you, sir, to the day that I found out that I was

6    elected to the board.  Again, Mr. Horton, I reported to him.

7    His office was right down the hall from mine.  We went to

8    lunch together quite often.

9         We spent a lot of time talking about this role because

10   it was new, especially for me.  And I conveyed to him how

11   seriously that I was going to take it and, again, I think

12   those meetings, we had some calls with outside counsel.  I

13   had some meetings with internal counsel.  Those led, I

14   think, were a large reason why we had the meeting in -- or a

15   part of the reasoning for having the meeting later in

16   February with Kirkland and Ellis, the senior attorneys at

17   Kirkland and Ellis.

18        We continued to have discussions and meetings

19   cumulating with the formal board meeting in April.

20   Q    Let's talk about that formal board meeting; that's the

21   same April 25, 2014 meeting that we heard Mr. Horton talk

22   about earlier.

23   A    That's correct.

24   Q    Could you, please, put up -- could you turn to Exhibit

25   DX-91, 091A, in your binder?

1           And do you recognize this?

2      A    Yes.

3      Q    And what is it?

4      A    Those are the approved minutes of the meeting that was

5      held April 25th, 2014.

6      Q    All right.  And, then, so, it shows that in addition to

7      yourself and Mr. Horton, it was Mr. Cusack and Mr. Sexton,

8      as well, were present?

9      A    That's correct.

10     Q    Okay.

11          I'd direct you to the first paragraph of DX-91A and it

12     just -- the final sentence indicates there was a discussion

13     regarding fiduciary duty framework applicable to the board's

14     decision making process.

15          As A board member of EECI, what was your understanding

16     of your fiduciary duty?

17     A    It was to act in good faith and to maximize --

18     primarily to maximize the value of the EECI estate.

19     Q    Moving on, what was the overall purpose of this board

20     meeting?

21     A    Well, the overall purpose was to have a formal minuted

22     discussion about our decision, you know, it was clear that

23     there was going to be a decision forthcoming in the next few

24     days and we had a formal meeting to discuss, you know,

25     whether it was -- to discuss the appropriateness of filing

1    EECI, in particular, for Chapter 11 protection.

2    Q    And, looking down at the third paragraph that we looked

3    at earlier, there's -- there was a discussion of various

4    factors for consideration and the board's determination,

5    whether to commence a potential Chapter 11 filing?

6    A    That's correct.

7    Q    At a high level, what were those factors?

8    A    Again, one was the fact that ECI was continuing to

9    incur millions of dollars a year in expenses and settlements

10   and it would not have, in our estimation, an -- you know,

11   would have a substantial risk of losing access to any cash

12   to pay those.

13       And, then, we were also discussing the fact that EECI

14   was a corporation and that, you know, taxes have always been

15   a huge issue in this case and, you know, it took a PLR to

16   get over the hump that this ended up being treated the way

17   it was for tax purposes.  But there was always a big risk

18   that there would be a consolidated -- or a deconsolidation-

19   related tax obligations and that, as a corporation, it would

20   be jointly and severally liable.

21       And, so, we talked about being part of a holistic

22   solution where we would have, for lack of a better phrase, a

23   seat at the table or ability to approve any plan that was

24   voted or that was proposed to be filed.

25       And we talked about the automatic stay and how that

1    would pause the negative free cash flow while it was in

2    effect.  And, then, again, we talked a little bit about this

3    being a forum for determining how the asbestos liabilities

4    would be treated going forward.

5    Q    Okay.  Before we go through those a little more

6    closely, first, can you tell us, was this new information to

7    you at -- as of April 25th, 2014?

8    A    No.  And these are things that we had been discussing

9    leading up to this meeting.

10   Q    Okay.

11        Now, let's focus on the considerations you just

12   mentioned.  Starting with the combination of the access to

13   EFH Corp.'s cash and the automatic stay.

14        First, why was access to EFH Corp.'s cash important to

15   you?

16   A    Well, again, ECI has -- had no cash and it was

17   incurring two to three million dollars in expenses and I do

18   not recall seeing -- I recall believing that there was a

19   substantial risk that it would not be able to get any cash

20   from any of the debtors, which is where all the cash sat.

21        And, therefore, it would be incurring obligations for

22   which it could not pay.

23        My -- the one thing I understand is that the -- not to

24   -- I know that -- I used to be a lawyer, but people don't

25   tend to work for you if you're not going to end up paying

1    them.  So, it was just a risk that they would incur

2    liabilities or have trouble finding people to work for them

3    without the ability to pay them.

4    Q    What was the benefit to ECI of taking advantage of the

5    automatic stay?

6    A    Again, it was to put a pause on the cases while a

7    determination with a holistic solution was arrived at and

8    remove the cash flow negative part of EECI allowed us to

9    come up with a solution which, you know, I feel like the

10   solution that we did come up with has vastly increased the

11   benefit to the EECI creditors.

12       So, I think it was well worth it.

13   Q    Mr. Moldovan, what is your response to movant's

14   allegation that the LSGT debtors face no financial distress?

15   A    Well, I would say that incurring millions of dollars of

16   expense and not having any cash to pay for it is immediate

17   financial distress.

18   Q    And what is your response to the argument that the LSGT

19   entities could have not filed for bankruptcy and then the

20   EFH debtors could have simply sought Court approval to pay

21   the bills of the non-debtor LSGT entities as they came due?

22   A    My general understanding of bankruptcy law is that to

23   get something like that approved, that -- you know, that has

24   to be -- you have to show some sort of cause -- necessity

25   for it or --

1            MR. HOGAN:  Your Honor, I'm just going to object.

2      He's not an expert in this area.  I don't think he's being

3      offered for expert testimony in that regard so I would

4      object to that question.

5            THE COURT:  Well, he's giving his general

6      understanding as to a point that you've raised which is they

7      could have gotten the money inter-company without having

8      filed bankruptcy.

9            So, I'll allow it.

10            THE WITNESS:  I had -- I was involved in the

11      determination of who were critical vendors and other motions

12      that were made, a lot of them on the first day hearings.

13            Leading up to the bankruptcy, my understanding was

14      that, you know, since ECI was not a critical vendor, was not

15      critical to the ongoing operations of EFH, it wasn't -- you

16      know, it simply has an inter-company claim, an unsecured

17      inter-company claim that -- and my estimation was pair you

18      with the other unsecured claims which, at the time, were

19      somewhat unknown because we didn't know -- now, we know what

20      the TCEH unsecured claim is and EFH.

21            But, you know, the -- certainly, the discussions

22      leading up to filing were that they believed that those

23      would be much larger.

24            I just thought it would be very difficult for any

25      creditor to allow money to go to one unsecured -- you know,

1    for other unsecured creditors allow money to leave the

2    system to this particular unsecured creditor.

3    Q    Moving on, Mr. Moldovan, you also identified the risk

4    of deconsolidation tax liability as critical to your

5    decision whether to file the EECI; why?

6    A    Well, again, I think, for any company in the system

7    that was a corporation, the potential for being jointly and

8    severally liable for a massive deconsolidation tax was a

9    concern and a risk.

10        And, our belief at the time was that to be part of a

11   holistic solution; to be approving plans that are being

12   proposed by the co-CROs; to have the co-CROs represent not

13   just the other parties but also the asbestos debtors; to

14   have K&E represent -- you know, represent these debtors, it

15   was just a seat at the table to make sure that whatever plan

16   was being filed was in the best interests of EECI.

17   Q    Are you aware that the movants argue that the risk of a

18   deconsolidation tax should not be considered a valid reason

19   for filing the LSGT debtors because another member of the

20   EFH corporate family, EFH Properties, didn't file for

21   bankruptcy?

22   A    I'm aware.

23   Q    And how are you -- now, are you familiar with EFH

24   Properties?

25   A    I am, unfortunately.

1    Q    And you actually testified about EFH Properties

2    previously before this Court?

3    A    I did.

4    Q    EFH Properties was not a debtor, correct?

5    A    It was not.

6    Q    And are you familiar with the reasons EFH Properties

7    did not file for bankruptcy?

8    A    Yeah.  Well, first, I would say that whether or not to

9    file EFH Properties was -- that decision was, I would

10   classify, as extremely difficult and went on right up until

11   filing on April 29th and then continued on past the filing

12   of whether to add it as a debtor.

13        There -- the reasons it ultimately didn't file -- I

14   mean, we had -- there was a leverage lease.  There was

15   concern that there was going to be a large tax indemnity

16   that would be accelerated, that would add to the claims.

17        There was concern that the automatic -- my recollection

18   is that there was some concern that the automatic stay

19   wouldn't extend to the lenders who, you know, may or may not

20   have reached to them.

21        The company was not ready, at that time, to make a

22   decision on whether it wanted to accept or reject that lease

23   and that would have started that clock and, you know, and

24   potentially had the company move headquarters while it was,

25   obviously, busy with the bankruptcy case and then running

1    the company.

2         You know, the other thing is it -- there was some cash

3    that benefits the company now that had we filed for

4    bankruptcy, you know, there's a risk that we wouldn't be

5    able to get that cash.

6         And, then, finally, EFH Properties had a lot of cash.

7    It did not need to rely -- it had cash.  We had done

8    projections.  It was cash -- it's been cash flow positive

9    since we filed for the other companies for bankruptcy.

10        So, all that was weighed really against the -- you

11   know, the potential tax liability and, ultimately, a

12   decision was made to at least delay filing and then that

13   decision was continually revisited all the way until the

14   disclosure statement, I believe, was filed in 2015 and then,

15   ultimately, again, we can, now, look with hindsight and say

16   it all worked out for the best because we got the PLR and

17   the tax treatment worked out the way we hoped it would.

18        But I can tell you that that decision was not a simple

19   one and it -- you know, it was revisited several times.

20   Q    And just to tease out something that I think you just

21   mentioned, the risk of a deconsolidation tax was a

22   consideration -- part of the consideration as a whole when

23   deciding whether to file EFH Properties?

24   A    Absolutely.

25   Q    And in the absence of the factors, the other factors

1    that you mentioned, including the rejection of the lease,

2    vacating the premises; would EFH Properties you believe have

3    filed for bankruptcy?

4    A    I believe so.  Again, we were negotiating with the

5    lender all the way up to bankruptcy to try to get a

6    standstill and we, ultimately, were unsuccessful and that

7    that -- I mean, the intention was always to include it and I

8    believe, you know the recommendation at the very end was,

9    again, not to file on April 29th but to continue to monitor

10   the cases and determine, you know, continue to determine

11   going forward.

12   Q    Touching, briefly, on the final consideration discussed

13   in the April 25th meeting that you mentioned the

14   availability of a forum to address all claims; was that an

15   important issue for you?

16   A    No.  It certainly wasn't as important as the first

17   three.  I will say that addressing the claims, you know,

18   again, as I understood it, was very broad.  It was to be a

19   part of the holistic solution given the fact that the asset

20   of EECI was really a claim against somebody now in

21   bankruptcy.

22              So, it -- I can tell you that it never came up,

23   that it never crossed my mind that the purpose of filing for

24   bankruptcy was to discharge any rightful claim that any

25   asbestos debtor had.  That was never discussed.  That was

1   never -- you know, that would not have been something that

2   would have been one of my priorities.

3   Q    And, Mr. Moldovan, did you approve the filing of the

4   ECI, Inc. for bankruptcy?

5   A    I did.

6   Q    And did you do so -- was that by unanimous written

7   consent?

8   A    It was but it -- again, it came with lots of discussion

9   leading up to that, but, yes.

10  Q    And that's -- could you turn to DX-91B in your binder.

11  A    Okay.

12  Q    And you recognize that?

13  A    Yes.

14  Q    And is this the written consent?

15  A    It is.

16  Q    And did you execute the document?

17  A    I did.

18  Q    And, just for the record, Mr. Moldovan, this document

19  is dated three days after the minutes of the EECI board

20  meeting we just discussed, correct?

21  A    That's correct.

22  Q    Do you understand what the status of the inter-company

23  claim between LSGT Gas and EFH Corp. would have been had the

24  LSGT debtors not filed for bankruptcy?

25  A    Well, again, my understanding is that it would have

1    been an unsecured claim.  It would have -- again, my

2    understanding is that unsecured claim would not be entitled

3    to any post-petition interest or, if it would, it would be

4    an extremely different rate.

5         And, so, my understanding is that it would just -- it

6    would be -- it would be on the same footing pari passu with

7    the other unsecured claims that -- against EFH Corp.

8    Q    And what is your -- or was your understanding of EFH

9    Corp.'s ability to reinstate that --

10             MR. GANTER:  Could we put up the demonstrative?

11   BY MR. GANTER:

12   Q    -- to -- hold on one moment here -- to reinstate that

13   $560 million claim even if the LSGT entities hadn't filed

14   for bankruptcy?

15   A    Well, I think that would have been -- I'm trying to

16   think of a scenario where a plan sponsor would agree to

17   that, to -- or whether any creditors would allow that -- any

18   other creditors would allow that to occur.

19        Again, it's an unsecured claim against EFH Corp.  In

20   this particular plan, we were able to get the plan sponsor

21   to agree to it after a lot of negotiation and it was part of

22   a holistic solution that brought value, from my perspective,

23   tremendous value to EECI.

24        They're -- the LSGT claim is getting reinstated in

25   full; is getting post-petition interest, which adds another

1    $84 million to the claim.  EECI's claim is being reinstated

2    in full.  It's getting another $33 million in claims.

3          And, so, from my perspective, this was a great -- this

4    is a homerun for EECI because it now has a larger pool

5    against a plan sponsor that will -- has agreed not to put

6    any debt between it and the asset that it's buying.  And,

7    so, it's going to -- there's this inter-company claim and

8    then there's a claim against the plan, you know, plan

9    sponsor, or EFH.

10         EFH is going to have $12 billion equity into ownership

11   in Oncor.  So, it, in my view, increased the value of this

12   estate.  But it also was part of a holistic solution that --

13   while it cost some other creditors some money, they just

14   agreed that it was in their best interest as well.

15   Q    Do you agree with the movant's contention that the LSGT

16   debtors did not have a legitimate purpose for filing for

17   bankruptcy?

18   A    No, I don't.

19   Q    Mr. Moldovan --

20            MR. GANTER:  And you can go ahead and take that

21   down.  Thanks.

22   BY MR. GANTER:

23   Q    You mentioned your involvement with the global

24   restructuring efforts pre-petition a littler earlier.  Did

25   your involvement in those efforts continue post-petition?

1   A     They did.  And post exit apparently.

2   Q     Earlier we heard from Mr. Horton and he testified about

3   the debtors' efforts to seek a bar date for asbestos claims;

4   are you familiar with those efforts?

5   A     I am.

6   Q     And, to your understanding, why do the debtors seek a

7   bar date?

8   A     Again, to my understanding, we continued to press for

9   the asbestos -- the bar date or push forward as a result of

10  -- that was the path to getting a plan sponsor to agree to

11  purchase EFH and, ultimately, a path towards getting the

12  claims of the asbestos debtors reinstated and have them be

13  more valuable.

14  Q     And, so, you were generally involved in that process to

15  seek a bar date?

16  A     I was.

17  Q     And are you aware that the Court issued an opinion on

18  the bar date in January of 2015?

19  A     I'm aware.

20  Q     And that that opinion left the precise mechanism for

21  notice of the bar date open?

22  A     Yes, that's correct.

23  Q     Did EECI's board meet to discuss the notice plan?

24  A     We did.  You know, we had -- in this case, we've had a

25  standing weekly call with a large group where these topics

1   were discussed.  And we also had other random calls.  But,

2   at this point, Mr. Horton and I had been speaking about it

3   and we wanted to make sure that we had a meeting where we

4   could discuss, with K&E specifically, the plans around the

5   notice provisions.

6   Q    And was that meeting the April 7th, 2015 board meeting

7   that we heard Mr. Horton talk about earlier?

8   A    It was.

9   Q    Could you, please, turn to tab DX-91C in your binder?

10       And you recognize this as the minutes of that meeting?

11  A    I do.

12  Q    And what was the purpose of this meeting of yours?

13  A    Well, it was, again, just to get an update on the

14  status of setting the bar date and also to discuss the

15  notice plan.

16       And, you know, Mr. Horton and I had wanted to make sure

17  that we had a firm understanding of how the notice plan was

18  being designed and the status of the discussions around

19  that.

20  Q    And, as director of EECI, what was your general

21  position on how to notice the bar date?

22  A    Yeah.  Again, Mr. Horton and I -- again, in our

23  discussions and then in a discussion at this board meeting,

24  our intention was to have that notice plan be as

25  comprehensive as could reasonably -- you know, under all

1     reasonable circumstances.

2          So, we made that known and then this also allowed us --

3     gave us some information that then we could go and -- and I

4     did some, you know, further diligence by talking to our

5     internal folks working on the notice plan.

6     Q    So, you did, then -- as mentioned, you reviewed the

7     proposed notice at this meeting?

8     A    That's correct.

9     Q    And you had an opportunity, at this meeting, to state

10    your position on it?

11    A    That's correct.

12    Q    And, then, also you did further diligence afterwards?

13    A    Yeah.  I went and spoke to our internal expert --

14    experts on the matter and went through the notice plan to

15    get comfortable with it.  It was as comprehensive as we

16    could make it.

17    Q    And did the notice plan that was eventually implemented

18    reflect your input?

19    A    I believe so.  I believe it's -- from my understanding,

20    it's one of the most comprehensive notice plans with respect

21    to a bar date that anybody can point to.  That's my

22    understanding.

23    Q    Could you, please, turn to the motion tab in your

24    binder?

25    A    The motion --

1   Q    And then turn -- it's the actual -- it says; motion to

2   dismiss.

3   A    Okay.

4   Q    And then turn to page 17.

5        And then, in particular, looking at the last sentence

6   of the top paragraph.

7             MR. GANTER:  Could you, please, pull that up?

8   BY MR. GANTER:

9   Q    Mr. Moldovan, do you agree with the statement that

10  throughout these cases the asbestos debtors' representations

11  have been primarily concerned with protecting the interests

12  of EFH Corp. rather than the interests of the asbestos

13  debtors and their creditors?

14  A    No.  I disagree with that statement.

15            MR. GANTER:  Your Honor, at this time, we have no

16  further questions for Mr. Moldovan.

17            I do have -- we would like to move into evidence

18  the written -- Mr. Moldovan's written direct examination.

19            THE COURT:  Any objection?

20            MR. HOGAN:  None, Your Honor.

21            THE COURT:  It's admitted.

22       (Declaration of Kristopher Moldovan received in

23  evidence)

24            MR. GANTER:  And then DX-133 as well.

25            MR. HOGAN:  No objection, Your Honor.

1          THE COURT:  It's admitted.

2      (Debtors' Exhibit No. DX-133 received in evidence)

3          THE COURT:  Cross?

4      (Pause)

5          MR. HOGAN:  Your Honor, before I start, you had

6  indicated we were going to break at --

7          THE COURT:  Yeah, I was just thinking that.  Let's

8  break now rather than interrupting your cross.

9          So, we'll reconvene, sorry, at 1:15 --

10          MR. HOGAN:  That'd be great.

11          THE COURT:  -- for lunch -- for the lunch break

12  and, Mr. Moldovan, during the break, you may not discuss the

13  substance of your testimony with any person.

14          THE WITNESS:  Okay.

15          THE COURT:  All right.  Thank you.  We're in

16  recess until 1:15.

17      (Recess from 12:21 p.m. until 1:22 p.m.)

18          THE CLERK:  All rise.

19          THE COURT:  Please be seated.  Mr. Hogan?

20          MR. HOGAN:  Thank you, Your Honor.

21  CROSS-EXAMINATION

22  BY MR. HOGAN:

23  Q    Good afternoon, Mr. Moldovan.

24  A    Good afternoon.

25  Q    So I believe in your declaration, you made reference to

1    Mr. Stewart's report?  Are you familiar with that report?

2    A    Uhh --

3    Q    That would be the -- I believe the liquidation analysis

4    report.

5    A    I need -- could you point me to that in the

6    declaration?

7    Q    Well, you may not have made mention of it specifically

8    in the report, but let me ask you this.  Are you aware that

9    Mr. Stewart in his report stated that the intercompany claim

10   of LSGT against EFH as reflected on the books and records on

11   August 31st, 2016 was $1.7 billion?  Does that ring a bell?

12   A    I'm aware that he referenced a number that's in the --

13   I don't know that the books and records say that that would

14   be the claim.  But I'm aware that there is a -- that he

15   referenced a number in the books and records of $1.7

16   billion.

17   Q    And do you have any reason to believe that that figure

18   is not accurate?

19   A    Again, for what purpose it -- I don't have any reason

20   to believe that our books and records are inaccurate.  I do

21   not believe that that accurately represents a claim that

22   that company -- that LSGT Gas would have against EFH Corp.

23   Q    Okay.  So is it your understanding that if the asbestos

24   debtors, LSGT debtors, I think, as you all have referred to

25   them, were merged in with EFH that EFH would be directly

1    responsible for the asbestos liabilities of those entities?

2    A    Well, listen, if there was a straight merger of these

3    companies into EFH Corp. as opposed to a merger by division

4    or something else, then I -- my understanding would be that,

5    yes, if it were a direct merger of those companies into EFH

6    Corp. that EFH Corp. would be a successor to whatever

7    liabilities were at those entities.

8    Q    But that, in fact, isn't the plan, though, is it?

9    A    No, it is not.

10   Q    Right.  And, in fact, those entities have been kept

11   separate at all times, isn't that correct, separate legal

12   entities?

13   A    They're separate legal entities, yes.

14   Q    And you understand that the reason for that

15   separateness is to compartmentalize the asbestos liabilities

16   among other reasons?

17   A    I -- it's never been my responsibility to determine

18   whether or not -- you know, those were separate entities

19   when I joined the company and I don't recall ever having a

20   discussion of any decision -- to make a decision to change

21   the structure as it was when I joined.

22   Q    Are you familiar with the principal of veil piercing?

23   A    Generally, yes.

24   Q    And is it your understanding that if those entities had

25   been -- that they've been maintained as separate entities

1    and those separate assets in connection with the Enserch and

2    EBASCO assets, isn't that right?  Isn't that what you

3    testified to earlier?

4    A    I'm sorry.  Could you restate that question?

5    Q    Sure.  Allow me to.  I believe in your -- both in your

6    declaration and in your direct examination, you made

7    reference to how these four asbestos entities came into

8    being and that they were largely the result of certain asset

9    sales.  Is that a fair statement?

10   A    They are successors to companies that -- where the

11   assets were sold, yes.

12   Q    Okay.  And EFH was never a party to those transactions,

13   were they?

14   A    I don't know who was a party to the asset sale when,

15   for instance, I think we referenced the sale of LSGT Gas.  I

16   don't know who was a party to that -- who were the parties

17   to that transaction.  I believe EFH Corp. did provide a

18   guaranty in connection with that transaction.  So I would

19   not say that they weren't a party to the overall

20   transaction.

21   Q    That guaranty that you made reference to, is that

22   relative to indemnity claims?

23   A    That's my understanding.

24   Q    Let's turn to the meetings that you reference in your

25   declaration.

```
 1    A    Okay.

 2    Q    Your declaration states that you were involved in the

 3    global restructuring and in considering the bankruptcy

 4    strategies for EFH even before you became a director in

 5    EECI.  Do you recall that statement in your declaration?

 6    A    Yes, I do.

 7    Q    And that much of your day-to-day work was preparing for

 8    potential bankruptcy and considering restructuring

 9    strategies.  Do you recall that statement?

10    A    I do.

11    Q    And that was for which entities, if you know?

12    A    That was generally for a -- for all the debtors.  I

13    mean, it was to develop the strategies with respect to the

14    initial filing of the debtors globally, I would say.

15    Q    And at the time, you were an officer of EFH Corporate

16    Services as well, is that correct?

17    A    I was.

18    Q    And that was wholly owned by EFH?

19    A    Yes.

20    Q    And what ended up happening with that entity if you

21    recall?

22    A    EFH Corporate Services was ultimately assigned to what

23    is now Vistra Energy Corp. to the T-side in connection with

24    the transactions where the T-side emerged from bankruptcy.

25    Q    And so, with regard to those entities at that time, you
```

1    understood your fiduciary duties ran to whom?

2    A    Again, I was an officer of every debtor.  And I

3    understood that my fiduciary duties were to all the estates.

4    Q    But when we're talking about these meetings which pre-

5    dated the restructuring, your duty ran to the shareholders?

6    A    I always viewed my duties at those times was to

7    maximize the value of the estates to whoever was entitled to

8    that recovery.

9    Q    You were appointed to the board of EECI on, I believe,

10   February 3rd of 2014, is that correct?

11   A    That is correct.

12   Q    And when you were appointed as a director, what was

13   your understanding regarding to whom you owed your fiduciary

14   duties?

15   A    At that point in my capacity of director, I owed

16   fiduciary duties to the estate of EECI.

17   Q    And that was in addition to the fiduciary duties that

18   you owed to the other entities that you were also an officer

19   of, is that correct?

20   A    Yes.  I continued to owe duties in my role as an

21   officer of those other entities, yes.

22   Q    And I believe you testified that in your capacity as a

23   director having been appointed the director of EECI in

24   February of 2014 that you had conversations with a Mr.

25   Hunter and with, I think, a Dan Kelly, is that correct?

Page 145

1   A     That's correct.

2   Q     What was Dan Kelly's role with regard to EECI?

3   A     Well, he was a senior counsel and therefore

4   providing -- he's a senior counsel for, I believe, EFH

5   Corporate Services.  And in that role, he provided legal

6   services to EECI.

7   Q     Did he provide legal services to EECI in connection

8   with your fiduciary duties that you owed to EECI?

9   A     I did not discuss my fiduciary duties with Mr. Kelly,

10  no.

11  Q     What about with Mr. Hunter?

12  A     No.

13  Q     But with Mr. Horton you did.

14  A     With -- I discussed with Mr. Horton in conjunction with

15  Kirkland & Ellis and several calls and meetings.

16  Q     I believe during your testimony you indicated you

17  reported to Mr. Horton.  Is that a fair characterization?

18  A     Yes.  It is fair.  In my role as assistant treasurer of

19  the entities not in my role as the director of EECI.

20  Q     I want to draw your attention now to the Dallas

21  meeting.  Do you know what I mean by that?  That's the

22  meeting that I think was two months prior to the official

23  meeting which gave rise to the filing of the petitions.  Do

24  you understand what I mean?

25  A     I'm aware of the meeting you're talking about, yes.

1    Q    Okay.  Good.  I think it's also been referred to as the

2    February meeting?

3    A    Okay.

4    Q    Okay.  Mr. Husnick, in your declaration, indicates --

5    it indicates that he explained "the fiduciary duty framework

6    applicable to your decision whether to file".

7    A    I think you're referencing the minutes from the April

8    meeting not the February meeting.

9    Q    Okay.  Were fiduciary duties discussed at all at the

10   February meeting?

11   A    Yes, they were.

12   Q    And they were also discussed again at the April

13   meeting.

14   A    Yes.

15   Q    What were you told about the topic?

16            MR. GANTER:  Objection, Your Honor, to the extent

17   the question is seeking to waive privilege.

18            THE COURT:  Yeah.  I mean, aren't you asking for

19   legal advice here?

20            MR. HOGAN:  I'm not asking for legal advice.  In

21   fact, Your Honor, I believe it's a subject matter waiver.  I

22   mean, it's been discussed in the minutes as well as in the

23   declaration.  And so, to the extent that they waived it by

24   bringing that topic to the fore, it's a subject matter

25   waiver.  And I'm entitled to explore.

1          MR. GANTER:  Your Honor, for the readings that Mr.

2     McKane articulated earlier, we haven't -- the debtors have

3     not waived privilege.  Mr. Moldovan, if we could ask, could

4     testify to the fact of what is discussed in the minutes.

5     But the substance of the privilege of the communications

6     with counsel, any recommendations, we have not waived

7     privilege with regard to those.

8          THE COURT:  I agree.  Objection sustained.

9     BY MR. HOGAN:

10    Q    Your declaration, I believe, indicates that you were

11    given the opportunity to ask, "pointed and detailed

12    questions".  What questions did you ask?

13    A    I asked what were -- well, I asked about my fiduciary

14    framework, what things I should be considering to satisfy my

15    fiduciary duties.  And I specifically asked what process

16    and, again, what I should be doing in my role as the

17    director and how I should think about those duties.

18    Q    And to whom did you ask those questions?

19    A    To the attorneys present.

20    Q    Now the fiduciary framework, let's explore that because

21    at that meeting, you're wearing, again, as I've used the

22    term before, multiple hats, correct?

23    A    No, not at that meeting.  That meeting was called for

24    directors only.

25    Q    Okay.  And you were there only on behalf of EECI?

1    A    That's my understanding, yes.

2    Q    What was your understanding at that point about whether

3    the filing of the bankruptcy for EECI had to be done in good

4    faith or predicated on good faith?  Was that topic explored

5    at all?

6    A    My understanding, again, on a general basis is that I

7    was required to act in good faith and consider -- and

8    maximize the value of the estate.

9    Q    For whose benefit?

10   A    For the benefit of the estate of EECI.

11   Q    For the benefit of the estate.  And would that benefit

12   inure -- who would that benefit inure to?  What was your

13   understanding at that time?

14   A    Whoever the allowed creditors of EECI -- creditors or

15   whoever had -- who was ever allowed rights onto the value in

16   EECI.

17   Q    Let's now turn your attention to the April 25th meeting

18   which is, I believe, the formal meeting that you testified

19   about.  Who was at that meeting?

20   A    That was Mr. Horton, myself, Mr. Husnick and Mr.

21   Sexton.

22   Q    And that was a relatively short meeting, wasn't it?

23   A    I don't recall how long it lasted.

24   Q    Okay.  Now I want to turn your attention to the topic

25   of interest of the bankruptcy estates.

1      In your declaration, you said that "It made sense to

2  include EECI in a global restructuring process to ensure

3  that it had a say in developing a comprehensive

4  restructuring plan."

5      Do you recall that declaration language?

6  A    Could you --

7  Q    Paragraph 12.

8      (Pause)

9  A    That's correct.

10  Q    At this point, you were, what, an employee?

11  A    At what point?  I'm sorry.

12  Q    In the terms of when you said in your declaration that

13  it made sense to include EECI in a global restructuring

14  process to ensure that it had a say in developing a

15  comprehensive plan, when was that?

16  A    Again, this would have -- I would have considered these

17  -- this after February 3rd, after I was named the director.

18  Q    So you were an employee at that point.

19  A    I was employed by EFH Corporate Services and an officer

20  of all the debtors at that point, yes.

21  Q    Of all the debtors.

22  A    Except for EFH Corp., yes.

23  Q    Okay.  And you and Mr. Horton had to do what EFH told

24  you with regard to that decision about a global

25  restructuring process, isn't that correct?

1    A    That's not my understanding, no.

2    Q    So --

3    A    Nobody had -- not one time did anyone -- did anyone at

4    EFH Corp. or any of the co-CROs speak directly to me and

5    tell me what I had to do.

6    Q    Not even Mr. Horton?

7    A    He never instructed me what to do.  We talked about

8    what we thought would be right to do.  And we had those

9    conversations even though I reported to him in my capacity

10   as assistant treasurer and his capacity as treasurer.  When

11   we talked about EECI, we talked -- we talked definitely as

12   co-directors.  And he absolutely never told me what I had to

13   do or what I should do.  We discussed what we thought was

14   right to do.

15   Q    So in your mind, filing for EEC -- filing was in the

16   best interest -- filing bankruptcy was in the best interest

17   of EECI, would you agree?

18   A    That was my belief.

19   Q    And that was for the purpose of maximizing the value of

20   EECI for all those that had an interest in it.  Is that a

21   fair statement?

22   A    I -- it -- that was -- yes.  I thought that was going

23   to maximize the value of EECI.  I thought it was the

24   appropriate thing to do at the time.

25   Q    And I believe your testimony was, is that in terms of

1    who had a bene -- who had an interest in the EECI, it was

2    all the creditors of EECI, isn't that --

3    A    I didn't --

4    Q    -- correct?

5    A    Again, I never boiled it down to -- I knew there were

6    asbestos claimants.  I just was trying to maximize the value

7    of the estate to whoever ultimately was approved as having

8    claims against that value.

9    Q    And we talked about the claims a little bit.  But the

10   intercompany claims were a large component of these claims

11   that the asbestos debtors, isn't that correct?

12   A    The asbestos -- yes.  Their assets were, I would say,

13   you know, almost all related to the intercompany claims,

14   yes.

15   Q    And those were claims that were owed to the asbestos

16   debtors by -- ultimately by EFH once you walk through the

17   various paradigms?

18   A    Well, there's a claim from LSGT Gas Company that is

19   owed to it by EFH Corp.  The other asbestos debtors had

20   claims against LSGT Gas Company.  So only one of those

21   claims was against EFH Corp.

22   Q    And was it necessary for the asbestos debtors to be in

23   bankruptcy in order for their intercompany loans to be

24   reinstated?

25   A    Well, when you say necessary, I believe so.  I don't --

1    my belief is that if they were not in bankruptcy, part of a

2    holistic solution, that we -- that finding a plan sponsor to

3    agree whether that plan sponsor be a third party purchaser

4    or the existing creditors, to find somebody to agree to

5    reinstate those claims at the -- including the post-petition

6    interest accrual, I don't think that that -- I can't think

7    of a scenario where we could have been able to do that.

8    Q    There were intercompany claims that were owed to EFH

9    Properties as well, were there not?

10   A    I don't believe so.  I believe EFH Properties likely

11   owed money -- owed money to EFH Corp. not the other way

12   around.

13   Q    If the intercompany loans to the asbestos debtors were

14   not reinstated, then there would be a risk that the asbestos

15   debtors could argue that the veil should be pierced and that

16   EFH should be liable on a veil piercing theory, isn't that

17   correct?

18            MR. GANTER:  Objection, Your Honor, to the extent

19   the question calls for a legal conclusion.

20            THE COURT:  I'll allow it to the extent you know.

21            THE WITNESS:  I don't disagree that somebody could

22   make a claim for that.

23   BY MR. HOGAN:

24   Q    But you don't know how it would necessarily be treated

25   if it were?

1   A    I don't -- I do not know how that would be resolved,

2   no.

3   Q    But it would ultimately be at the EFH level, would it

4   not?

5   A    I -- you're asking me -- I do not know.  I have not

6   analyzed that scenario.

7   Q    Let's turn to a topic in your declaration.  It's a

8   discreet issue.  I just want to make sure I understand it.

9   There's mention made to D&O liability.  Are you familiar

10  with that topic?

11  A    I'm familiar with that topic.  It --

12  Q    I believe you stated in your declaration that you asked

13  Mr. Husnick whether EFH directors and officers' insurance

14  would cover any decisions that he said -- and that he said

15  he would follow up with you.  And I believe that's from one

16  of the minutes that you relied upon.  Do you recall that?

17  A    I believe that's in -- it's in one of the minutes, yes.

18  Q    Can you articulate your concern?

19  A    I was just simply asking a question if the insurance

20  covered -- the D&O insurance to the extent somebody made a

21  claim against the directors whether we'd be covered by D&O

22  insurance.

23  Q    And would that be a claim for, say, a faulty fiduciary

24  decision?

25  A    I didn't ask about specific claims.  I just wanted to

1    make sure -- I just wanted to ask if the insurance covered

2    us in that decision.

3    Q    To cover you in the event that a decision was made that

4    ended up being inappropriate.

5    A    For any reason.  I did not think of a specific fact

6    pattern.

7    Q    And do you know, did Mr. Husnick follow up with you on

8    that?

9    A    I don't recall.

10   Q    Let's turn now to the bar date, if you could.  EFH has

11   asserted that potential bidders demanded that the asbestos

12   liabilities be dealt with.  Do you understand that?

13   A    I won't submit to that exact wording but, yes, I was

14   here when Mr. Horton said that it was one of the

15   requirements that was consistently raised by potential

16   bidders.

17   Q    Well, did you discuss with anybody that the only way to

18   cap asbestos liabilities would be to establish a trust at

19   any time?

20   A    I don't recall that discussion.

21   Q    I believe you stated that potential acquirers had

22   expressed a desire to establish some certainty with regard

23   to the scope of asbestos liabilities.  Do you recall that

24   testimony?

25   A    Again, if you're -- are you talking about my

1   declaration?

2   Q    I'm talking about your direct.

3   A    I don't specifically recall that.  Sorry.  But --

4   Q    Do you know what a valid asbestos claim is?  Do you

5   know what that term means?

6   A    My understanding of what that claim would mean is an

7   asbestos claim that was, whether manifested or unmanifested,

8   that was filed in advance of the asbestos bar date.

9   Q    And any recognition of the application of state law to

10  that determination?

11  A    I'm not aware.

12  Q    Did you inform your attorneys that it was your hope

13  that all valid asbestos claims be reinstated?

14  A    Again, you're using very specific words.

15  Q    Well, use your words.  I'm not trying to put words --

16  A    Yeah.  No.  So I'll -- I'll -- Mr. Horton and I

17  expressed that -- we never -- we wanted the notice -- once

18  it was determined that getting an asbestos bar date was the

19  path towards a holistic solution that would add value to

20  bring the -- to get to a point where we could bring value to

21  the debtors including, in my view, EECI and that an asbestos

22  bar date was required to get to that path to maximizing

23  value, our intent was to make sure it was well known that we

24  were not trying -- we wanted to make sure that the notice

25  plan was as comprehensive as reasonably practicable.  I

1    didn't want to spend one billion dollars going door to door

2    through the hope but my understanding after doing much

3    research was the notice plan was as comprehensive a plan as

4    could be developed for -- as had been developed for an

5    asbestos -- for a bar date.  That was what we were trying to

6    convey.

7         We were not trying to cap -- I think, from my

8    perspective, I never wanted to cap the liability.  I -- it

9    was my hope and intention that everybody who may have a

10   claim was able to file by the bar date.  And we tried to

11   reach as many people as we could to make sure that -- and

12   evidenced by the fact that I think there's like 30,000

13   claims that came in.  So we did the best that we could under

14   the circumstances.

15   Q    You understand the general mechanics of how a bar date

16   works, correct?

17   A    Very high level.

18   Q    Very high level.  Okay.  And so you file a claim by the

19   bar date and your claim is either subject to allowance or

20   disallowance at some point down the road but you've crossed

21   the threshold necessary for that claim to be valid, for lack

22   of a better characterization.  Does that make sense to you?

23   A    Generally, yes.

24   Q    And so to the extent that someone misses that bar date

25   and fails to file a proof of claim by that bar date, they're

1    -- absent exigent circumstances or other issues, they're

2    barred from filing a claim at some later date.  Generally

3    your understanding?

4    A    I understand that that is one of -- is that is a

5    potential outcome.  That was not the intent is to have that

6    happen.  The intent was to reach as many people and make

7    sure they filed by the time the bar date -- not to cap the

8    amount.  It was to give certainty, more certainty, again, as

9    to the potential number of claimants.  Was it 10,000?  Was

10   it 30,000?  And it turned out to be 30,000.  I understand

11   there are likely some people who were unable to file for --

12   you know, each one's probably got their own reasons.

13   Q    Sure.

14   A    That was never the intent.

15   Q    And you understand that you've got this universe of

16   claims now, 30,000, I think your testimony was.  It is what

17   it is.  I'm not going to pin you to that number.  That's not

18   my point.  But would you agree with me that regardless of

19   whether you have 30 or 300,000, you still have no more

20   certainty about what the ultimate liability is, do you?

21   A    I -- again, we've -- I know that some third parties

22   have been retained to look at those.  So whether or not you

23   can determine based on those number of claimants and looking

24   at the claims that were filed whether you can make an

25   informed judgment, my belief that we certainly -- we

1    wouldn't have gone and retained these professionals in these

2    circumstances if it weren't at least plausible that you

3    could get a feeling -- get a better idea for the amount of

4    liabilities whether you -- if you had 30,000 claimants

5    versus 300,000 claimants.

6    Q    Okay.  And when you talk about these professionals,

7    just so the record's clear and we have clarity on that,

8    you're talking about Vasquez among others?

9    A    Among others, yes.

10   Q    And then Aon probably as well, among others?

11   A    It's my understanding.

12   Q    Okay.  And if I were to point to you in those reports

13   and say, well, they have specific language that carves out

14   or casts dispersions -- or on the issue of whether or not

15   this gives clarity, would that surprise you?

16   A    It would not surprise me that any representative

17   anywhere would -- on anything that's less than 100 percent

18   certain have language like that.

19   Q    And so those caveats exist, do they not?

20   A    Yes.

21   Q    So the bar date was not intended to discharge valid

22   claims unless a proof of claim was filed is effectively what

23   you're telling me, isn't that right?

24   A    The bar date was not intended to -- it was intended to

25   give more certainty as to the number of claimants.

1    Q    And are you aware of the argument that the asbestos

2    objectors have made that future unmanifested asbestos claims

3    cannot be discharged under the circumstances in this case?

4    Are you familiar with that whole line of logic?

5    A    No.

6    Q    Okay.  Did Kirkland ever discuss that issue with you at

7    any meetings you attended that you know of?

8    A

9              MR. GANTER:  Objection, Your Honor, to the

10   questions asks to reveal privileged communications.

11             MR. HOGAN:  I'm just asking --

12             THE COURT:  No.  He's just asking for the topic.

13             MR. HOGAN:  That's all it is.

14             THE WITNESS:  I do not recall.

15   BY MR. HOGAN:

16   Q    Did your attorneys ever tell you that if a 524(g) plan

17   was adopted that no claims would be discharged?

18             MR. GANTER:  Objection, Your Honor, to the

19   extent --

20             THE COURT:  That does -- that is definitely asking

21   for legal advice.  So sustained.

22   BY MR. HOGAN:

23   Q    Do you understand what a 524(g) plan is?

24   A    I'm not familiar with the specifics of a 524(g) plan,

25   no.

1    Q    Are you familiar with the negotiations that went on

2    between the various interested parties who ultimately made

3    bids to buy the corpus that is EFH Oncor?

4    A    I was directly involved in those negotiations.

5              MR. HOGAN:  Excuse me for one second, Your Honor.

6    I may be done.  I just want to check.

7         (Pause)

8              MR. HOGAN:  Nothing else, Your Honor.

9              THE COURT:  Thank you.

10             MR. GANTER:  We have nothing further, Your Honor.

11             THE COURT:  All right.  Thank you, sir.  You may

12   step down.

13        (Witness excused)

14             MR. MCKANE:  Your Honor, before we call our next

15   witness, the parties had worked together to do sort of dep

16   designations and counterdesignations --

17             THE COURT:  Yes.

18             MR. MCKANE:  -- that were -- to actually move

19   the -- advance the proceedings so that we didn't have to

20   call as many live witnesses.  And we have those materials

21   for your court staff that have previously been provided and

22   signed off on by opposing counsel.  And I just want to

23   approach to provide.  I believe a courtesy copy may have

24   already been provided.

25             THE COURT:  Oh.

1          MR. MCKANE:  At least one courtesy copy's already

2     been provided.

3          THE COURT:  Okay.  Yes.

4          MR. MCKANE:  My understanding is the court staff

5     has asked for two additional copies --

6          THE COURT:  Oh.

7          MR. MCKANE:  -- or three in total.

8          THE COURT:  Okay.  Whatever they want, they get.

9          MR. MCKANE:  Your Honor, we agree.

10     (Pause)

11          MR. MCKANE:  Your Honor, my partner, Ms. Esayian,

12     will handle the next witness, Mr. Hunter.

13          THE COURT:  All right.

14          MR. MCKANE:  I believe in an effort to streamline

15     the proceedings, we may not need live testimony.

16          THE COURT:  Okay.  Do you agree to a proffer, Mr.

17     Hogan?

18          MR. HOGAN:  No.  I did not agree to a proffer.

19          THE COURT:  No proffer without an agreement.

20          MR. MCKANE:  I just -- it's not a proffer.

21          THE COURT:  Okay.

22          MS. ESAYIAN:  Good afternoon, Your Honor.  Lisa

23     Esayian, Kirkland & Ellis, for the debtors.

24          So our thought was that we would -- Mr. Hunter is

25     here in the courtroom today.  He's available for cross-

1    examination.  We would move his written direct into

2    evidence.  Counsel has the written direct

3              THE COURT:  Oh, you don't want to supplement with

4    direct testimony --

5              MS. ESAYIAN:  Correct.

6              THE COURT:  -- is what you're saying.  You don't

7    want to supplement the -- you don't intend to supplement the

8    declaration with any further live testimony.

9              MS. ESAYIAN:  That's correct, Your Honor.  So --

10             THE COURT:  Okay.

11             MS. ESAYIAN:  -- we would move the declaration

12   into evidence.  It would be exhibits which I can recite into

13   evidence and then offer the witness for cross-examination.

14             THE COURT:  All right.  Any objection to the --

15             MR. HOGAN:  Sounds like a plan, Your Honor.

16             THE COURT:  Okay.  Very good.

17             MS. ESAYIAN:  Okay.  So with that, we -- Your

18   Honor, we offer the written direct declaration into

19   evidence.  It's dated -- it's Mr. Mike Hunter's written

20   declaration dated November 28, 2016.  It's number

21   D-DIR-Hunter.  And we offer the -- move the document

22   attached to it into evidence.  They are DX-107, DX-108, DX-

23   109, DX-120, DX-249, DX-259, DX-288 and DX-289.  One caveat

24   about DX-249.  That is a spreadsheet.  It gives names and

25   specific information about specific asbestos claimants.  We

1    would ask that that be filed under seal.  If that presents

2    any problems, we're happy to discuss it with Mr. Hogan.

3              THE COURT:  All right.  Any objection.

4              MR. HOGAN:  Well, normally, they've been kind

5    enough to give me a list of these exhibits that they're --

6    one moment, Your Honor.

7         (Pause)

8              MS. ESAYIAN:  So I'm hearing they agree to the

9    sealing of DX-249.

10             THE COURT:  All right.  249 is under seal.

11             Any objection to the admission of the documents or

12   the declaration?

13             MR. HOGAN:  No, Your Honor.  None.

14             THE COURT:  All right.  They're all admitted.

15        (LSGT Debtors' Exhibit D-DIR-Hunter, declaration of

16   Michael Hunter, received in evidence)

17        (LSGT Debtors' Exhibits DX-107, DX-108, DX-109, DX-120,

18   DX-249, DX-259, DX-288 and DX-289 received in evidence)

19             MR. MCKANE:  And, Your Honor, may I approach?

20             THE COURT:  Yep.

21             All right.  Mr. Hunter, please take the stand,

22   sir.  You just step up there and remain standing for your

23   affirmation.

24             THE CLERK:  Please raise your right hand.

25        (Witness sworn)

1              THE CLERK:  Please state and spell your name for

2      the record.

3              THE WITNESS:  Michael Hunter, M-I-C-H-A-E-L,

4      H-U-N-T-E-R.

5              THE CLERK:  Thank you.

6              THE COURT:  Would you happen to have -- all my

7      prep materials are in my office so I was expecting a

8      notebook.  Great.  Thank you.  Very good.  All right.

9              Mr. Hogan, you may proceed.

10             Mr. Hunter, if you could just try to stay close to

11     the microphone and keep your voice up.

12             THE WITNESS:  Yes, Your Honor.

13     CROSS-EXAMINATION

14     BY MR. HOGAN:

15     Q    Mr. Hunter, good afternoon.

16     A    Good afternoon.

17     Q    This will be a little awkward only because normally

18     you've already testified.  And so I'm going to have to

19     direct your attention to your declaration.  So if you would,

20     I believe you should have it up there or maybe they'll put

21     it up on the screen for you.

22     A    I have it.

23     Q    Do you have it?  Thank you.

24          So if I refer to the asbestos debtors -- the debtors, I

25     believe, have referred to them as the LSGT debtors -- do you

1    understand what I mean by the asbestos debtors?

2    A    Yes.

3    Q    What is your role or what was your role at the time of

4    the filing of the petitions with regard to the asbestos

5    debtors?

6    A    I was director of claims for EFH Corporate Services.

7    Q    And how long had you been in that role?

8    A    Since 2010.

9    Q    And prior to that, you've had extensive experience in

10   the asbestos claims world?  Is that a fair statement?

11   A    Well, only for our company, EFH and its predecessors.

12   Q    Your declaration recites numerous transactions which

13   gave rise to what ultimately are the asbestos debtors.  Is

14   that a fair statement?

15   A    Yes.

16   Q    And so, each of those transactions as recited in your

17   declaration gave rise, in part, in some if not all, to cash

18   receipts that came in to those entities.  Is that a fair

19   statement?

20   A    Cash receipts?

21              MS. ESAYIAN:  Objection, Your Honor.

22              THE WITNESS:  I don't understand.

23              MS. ESAYIAN:  I believe that's a vague and

24   confusing question.

25              MR. HOGAN:  Okay.

1    BY MR. HOGAN:

2    Q    What I mean is, assets were sold by these entities.  Is

3    that correct in some instances?  Certain assets were sold,

4    Enserch assets and -- for instance, I'll direct your

5    attention to your declaration, paragraph number 8, where you

6    say "United Engineering and Contractors Raytheon entered

7    into a purchase agreement to acquire certain of EBASCO

8    assets.

9    A    Yes.

10   Q    Right?  And as a result of that, certain proceeds were

11   obtained by the seller, is that correct?

12   A    That's correct.

13   Q    And what happened to those proceeds, if you know?

14   A    I have no personal knowledge of that.

15   Q    Then you talk about, in paragraph 10, "This 1996 merger

16   where TXU acquired Enserch ENC, Inc. and its parent, Enserch

17   ENC Holding, Inc."  You familiar with that transaction?

18   A    Yes.

19   Q    And that following certain name changes, that's where

20   EECI Holdings came into being, or name change, and then EECI

21   came into being via a name change.  Fair statement?

22   A    Yes.  EEC Holdings and EECI eventually resulted from

23   that.

24   Q    Okay.  Now let's turn, if we could, to liability here

25   which is ultimately the issue.  You're familiar with the

1    statement that these entities have certain asbestos

2    liabilities?

3    A    Yes.

4    Q    And those asbestos liabilities derive largely from

5    these historical transactions that we just looked at.  Is

6    that a fair statement?

7    A    The asset sale of EBASCO?  Is that what you're

8    referring to?

9    Q    Yes.

10   A    Yes.

11   Q    And you've testified, I believe, that you don't know

12   where the proceeds of those asset sales went.  Is that a

13   fair statement?

14   A    Yes.

15   Q    But you are familiar with estimations of the

16   liabilities that these entities have.  Is that a fair

17   statement?

18   A    And you're referring to Aon and Ankara estimation?

19   Q    Well, I'm referring to those reports, yes.  Are you

20   familiar with both of those reports?

21   A    Yes.

22   Q    Okay.  And you understand that both those reports, at

23   their core, are estimations of what the asbestos liability

24   could be, is that correct?

25   A    That's correct.

1   Q    And effectively, the Ankara report essentially assumes

2   that what passed is prologue, correct?  That the way it's

3   happened in the past with claims will continue on in the

4   future?  Fair statement?

5   A    You know, I don't -- and it's been several months since

6   I've looked at that report.  So I don't specifically recall

7   that.  But --

8   Q    Well, would you agree that the pattern of claims

9   against the debtors would be similar to the claiming

10  patterns in the past?

11  A    Probably.

12  Q    Would you agree that the Ankara report does not take

13  into account claims that may be discharged under the plan?

14  A    I -- again, I don't recall if the report states that.

15  Q    Well, you understand, right, that the Ankara report is

16  largely an estimation of what the liability can be.  You

17  would agree.

18  A    Yes.

19  Q    And that you would also agree, you've heard testimony

20  throughout the day about a bar date.  You understand

21  generally what the bar date is?

22  A    Right.

23  Q    And that to the extent that somebody searched a claim

24  by the bar date, they have a claim subject to disallowance.

25  A    Right.

1    Q    And if they don't have a claim -- if they don't submit

2    a claim by the bar date, they don't have a claim.  Would you

3    agree with that characterization?

4    A    Generally.  But I also understand they can still try to

5    assert a claim.

6    Q    And so, my question is in thinking about the Ankara

7    report, it doesn't take into account claims that have been

8    discharged, does it?  Aren't they really looking at the

9    claims that were filed?  For instance, doesn't the Ankara

10   report look at how many claims were asserted against the

11   asbestos debtors?

12   A    It looks at how many claims were asserted against the

13   asbestos debtors.  And I think it includes an estimation of

14   future claims.

15   Q    Okay.  Right.  But it doesn't include an estimation of

16   people who missed the bar date.

17   A    I don't recall if it --

18   Q    Okay.  That's fine.

19   A    -- the report covers that or not.

20   Q    That's fine.  And it assumes, what, no future

21   unmanifested claims would be discharged?  Is that correct,

22   do you know?

23   A    No future unmanifested claims.  Again, I'm sorry, but I

24   -- I'm just not familiar with the language of the report not

25   having looked at it in several months.

1   Q    Okay.  So that was going to be my next question.  You

2   anticipated it.  When did you last look at the report?

3   A    Shortly after it was generated.

4   Q    I'm going to ask you to take a look at the report.  Do

5   you mind?

6   A    No.

7        MR. HOGAN:  Permission to approach, Your Honor.

8        THE COURT:  Okay.

9        (Pause)

10       THE COURT:  What's the exhibit number you're

11  looking for?

12       MR. HOGAN:  I believe it's 1 -- either 129 or 130.

13  Bear with me one second.  It is 130, Your Honor.  It should

14  be the very last binder, the very last exhibit.

15       (Pause)

16       MS. ESAYIAN:  Your Honor, we have two objections

17  to this whole line of questioning.  One is that the written

18  direct which we moved into evidence doesn't discuss the

19  amount of the estimation calculated by the Ankara consulting

20  firm.

21       And the second is that Mr. Hunter has already said

22  he hasn't seen the report in a couple of months.  And he

23  didn't write the report.  So I'm not sure why he's being

24  asked questions about a report that he didn't write.

25       MR. HOGAN:  Okay, Your Honor.  Fair --

1                MS. ESAYIAN:  Beyond the scope and lack of

2       foundation.

3                MR. HOGAN:  Your Honor, we're not probing this

4       witness about the amount of the estimation.  We're probing

5       this witness about the caveats contained in this report to

6       demonstrate that the report -- that, first of all, we don't

7       even agree with the report.  So we're just probing him to

8       make sure he understands that this report contains caveats

9       and that it is -- the certainty that we've heard repeatedly

10      throughout the day that this report and that the debtors

11      were seeking for the benefit of NextEra has not been

12      provided by this report.  That's why we're looking at this

13      report, Your Honor.

14                So we're not offering it for the indication that

15      the debtors are telling you.

16                MS. ESAYIAN:  Except that Mr. Hunter didn't write

17      the report and the caveats aren't his.  If there are, I

18      mean, they're from the consulting firm.  So --

19                THE COURT:  Well --

20                MS. ESAYIAN:  -- and the report's not in evidence.

21      So how is it --

22                THE COURT:  And you put this witness forward for

23      the Court in connection with the history of claims, filing,

24      resolution, et cetera.  So I think it's fair that this be

25      the witness that be probed on this.  So I'll allow the

1    testimony.

2              MR. HOGAN:  Thank you, Your Honor.

3              THE COURT:  Certainly with the caveat that it's

4    not his report.  I understand that.

5    BY MR. HOGAN:

6    Q    If you would, take a minute.  Take a look at the

7    report.  Does it refresh your recollection with regard to

8    the report generally?  You've reviewed it, you said.  So I'm

9    not asking you to drill down or probe you for the estimation

10   of what the values were.  But I would ask you to take a look

11   at it and understand what it contains.

12        (Pause)

13   A    Okay.  I've looked at the table of contents.

14   Q    Okay.  And so, there -- let me just get back to my

15   questions.

16        (Pause)

17   Q    So would you agree with my earlier statement that this

18   report provides an estimation of what the liability could

19   be?  Is that a fair statement?

20   A    I believe so.

21   Q    Okay.  And would you agree that it contains caveats or

22   setoffs or issues where certainty could not be achieved in

23   any capacity?

24   A    Yes.

25   Q    And similarly, the Aon report -- you're familiar with

1    that report as well, are you not?

2    A    Yes.

3    Q    Okay.  And would you agree that that report also

4    contains certain caveats on the certainty that would be

5    provided by such a report?

6    A    Yes.

7    Q    And what -- and just generally.  I'm not asking you to

8    look at the report or quote from the report.  I understand

9    their concern.  But what do you understand the caveats or

10   concerns or limitations of these reports to be?

11   A    Oh boy.  You know, it's just a subject matter that I

12   don't -- I've really not concerned myself with greatly.  I

13   couldn't even begin to recite them.  But I know actuarial

14   forecasts do usually include caveats.

15   Q    And those caveats generally relate to number of claims,

16   type of claims, range of injury.  And is inherent

17   uncertainty relative to those issues?

18   A    They could, yes.

19   Q    Okay.

20            MR. HOGAN:  Your Honor, I have no further

21   questions for this witness.

22            THE COURT:  All right.  Any redirect?

23            MS. ESAYIAN:  No, Your Honor.

24            THE COURT:  All right.  Mr. Hunter, thank you for

25   coming a long way for a very short --

1            THE WITNESS:  You're welcome.

2            THE COURT:  -- short on the witness stand.  And

3    I've yet to meet a witness who has wanted to stay there any

4    longer.

5            THE WITNESS:  It's not really heaven.

6            MR. MCKANE:  Your Honor, can Mr. Hunter be

7    excused?

8            THE COURT:  Yes, of course.

9            MR. MCKANE:  Thank you, Your Honor.

10       (Witness excused)

11           MR. HOGAN:  Your Honor, I just want to move a few

12   exhibits into evidence.  And then we've provided you with a

13   rather robust amount out of an abundance of caution, but we

14   really only have four things that I want to move into

15   evidence.

16           THE COURT:  All right.

17           MR. HOGAN:  Two are actually judicial notice, Your

18   Honor.  One is the restructuring agreement which is at

19   docket 505.  And the other is the merger agreement -- merger

20   agreement motion -- excuse me -- at 9190.  Okay.

21           THE COURT:  All right.

22           MR. HOGAN:  And then --

23           THE COURT:  505.  Is that the -- which

24   restructuring support agreement?  Is that --

25           MR. HOGAN:  That's the original.

1            THE COURT:  The original RSA?  Should be --

2            MR. HOGAN:  Yeah.  516 --

3            MR. MCKANE:  Your Honor, I'm only pausing because

4    505 sounds like a really high docket number for something

5    that we had written and agreed to the day we filed for

6    bankruptcy.  So I'm concerned that that is a amendment to it

7    or a later RSA.  It might not have been the original.

8            MR. HOGAN:  Your Honor, I'll figure that out.  I

9    didn't have access to a computer so I was trying to do it on

10   my phone.  So --

11           THE COURT:  All right.

12           MR. HOGAN:  -- I'll follow up and inform the Court

13   about what that is.  But we're just asking for judicial

14   notice.  It is what it is, Your Honor.

15           MR. MCKANE:  And, Your Honor, Mr. Madron, who has

16   an -- incredible command of this case, has reminded that we

17   even filed a motion to get authority for entry of the RSA as

18   a post-effective matter until May.  And therefore, it may be

19   that 505 is the right docket number.  We'll work with

20   counsel to make sure that's correct.

21           THE COURT:  All right.  Well, I will take judicial

22   notice of the RSA, the original RSA.  And I'll leave the

23   record open to specify what the docket item number is.

24           MR. HOGAN:  That's great, Your Honor.  The other I

25   said was 9190 which is the merger motion.

1          THE COURT:  For the current deal, right?

2          MR. HOGAN:  That's correct.  And then with regard

3     to our exhibits, we only have two exhibits that we're

4     looking at -- enter into evidence.

5          THE COURT:  Okay.

6          MR. HOGAN:  PX-129 which is the Stewart report and

7     PX-130 --

8          THE COURT:  Okay.

9          MR. HOGAN:  -- which is the Vasquez report.

10          THE COURT:  Any objection?

11          MR. STEPHANY:  Yes, Your Honor.  Bryan Stephany,

12     Kirkland & Ellis, on behalf of the debtors.

13          We object to both of those expert reports.  Number

14     one, they are expert reports and as such, they're hearsay.

15     To the extent that the asbestos objectors want to argue that

16     they're not being offered for the truth of the matter

17     asserted therein, their brief, their memorandum of law in

18     support of the motion as well as the reply both cite to the

19     Stewart report for an amount of the value of intercompany

20     liabilities.  There's been testimony here today from the

21     witnesses as to the amount and value of those claims and

22     that testimony was supported by documents that were already

23     admitted into evidence, specifically DX-133 and

24     demonstrative D-Dem Horton1.

25          So to the extent that they're looking to establish

1   the value of those claims, that evidence is already in.  And

2   we would submit that it's not appropriate to come from an

3   expert report for which the expert was not called and does

4   not provide the appropriate context.  And so we would object

5   on that basis.

6           MR. HOGAN:  Your Honor, we're not offering those

7   reports for the accuracy of what's contained in those

8   reports.  In fact, we disagree with what's contained in

9   those reports, as the Court can probably well understand.

10  And so, it's not hearsay.  We're not relying upon what's

11  contained.

12          THE COURT:  What are you --

13          MR. HOGAN:  We're submitting that to give the

14  Court the benefit of our argument that what those reports

15  provide doesn't support the good faith that the debtors

16  articulate that it does.

17          MR. STEPHANY:  And if I may, Your Honor, we would

18  submit that to the extent that they're introducing those

19  reports to counter the good faith, we would submit that the

20  decision whether or not that was made in good faith in 2014

21  -- expert reports on liquidation analysis and the quantum of

22  bodily injury claims issued in fall of 2016 have no

23  relevance have no relevance to those.  There's also no

24  foundation that the debtors relied on those reports in

25  making their decision.  So we would say they have no

1   relevance for that purpose.

2          And as a final point, Your Honor, it's -- the

3   information that they're drawing from those reports,

4   specifically, the Stewart report with respect to the value

5   of the intercompany claims for these asbestos -- or the LSGT

6   debtors is simply wrong.  It's a misreading as characterized

7   in their briefing.  And so, we would submit for that reason

8   as well contradicted by the evidence presented today by the

9   witnesses and the documents, that's another reason it should

10  not come into evidence.

11         MR. HOGAN:  Your Honor, they discussed the bar

12  date as providing authority.  In the Vasquez report -- oh,

13  I'm sorry -- as providing certainty.  And the Vasquez report

14  shows that it doesn't provide certainty.  And that's we

15  offer it.  We're trying to demonstrate to the Court that the

16  certainty that the debtors have argued all along is not

17  supported by those reports.  And that's why we offer them.

18  They're not being offered for the benefit of what's in them

19  but rather for the inaccuracies that are contained therein.

20         THE COURT:  Well, that is a substance of what's in

21  them.

22         MR. STEPHANY:  Yeah.

23         THE COURT:  I'm going to sustain the objection.

24         MR. STEPHANY:  Thank you, Your Honor.

25         MR. MCKANE:  And, Your Honor, I am pleased to

1    report that through Mr. Madron's remarkable efforts, 505 is

2    correct.

3              THE COURT:  Ms. Werkheiser got it, too.  So --

4              MR. MCKANE:  Yeah.

5              THE COURT:  They're tied in amazingness.  So, yes,

6    D.I. 505 is the motion to assume the RSA.  So the Court will

7    take judicial notice of it.

8              MR. HOGAN:  All right.  Thank you.

9              MR. MCKANE:  Your Honor, with that, I believe the

10   parties are prepared to close the evidence.

11             THE COURT:  All right.  Any further evidence, Mr.

12   Hogan?

13             MR. HOGAN:  No, Your Honor.

14             MS. KELLEHER:  Your Honor, we don't have further

15   evidence but we did have some discussion about whether

16   closing arguments would be necessary or whether we would

17   leave that to post-trial briefing.  And I have expressed --

18   when we were in chambers on Thursday, I had expressed our

19   hope that we would simply have three very short post-trial

20   briefing in lieu of closing arguments (indiscernible).  It's

21   probably the easiest way to proceed here.

22             MR. MCKANE:  Your Honor, I apologize.  I recall

23   the discussion differently.  I recall that we would have

24   closing argument and the Court would decide whether it

25   wanted in addition to closing argument post-trial briefing

1    and, if so, on what (indiscernible).

2            THE COURT:  Yeah.  I think we have the time.  So

3    if you want, I think it would be helpful to hear.  I mean, I

4    heard openings and so I know the arguments and whether you

5    want to sort of work on what was put in front of the Court

6    today and to amplify those arguments.  We can do that.  I am

7    going to want post-trial briefing.  I could tell you, I'm

8    going to take the matter under advisement and I'm going to

9    issue a decision within 15 days as required by the law.  So

10   it'll be a very short period to provide certainly no longer

11   than 20 pages of briefing for, in effect, closing argument.

12   And we can talk -- after I'm done hearing you, we can talk

13   about how quickly to do that.  What is today?  Monday?

14   So --

15           MR. MCKANE:  Today's Monday.

16           THE COURT:  Could we do it by Friday?

17           MR. MCKANE:  Of course, Your Honor.  Yes.

18           THE COURT:  Ms. Kelleher.  All right.

19           MR. MCKANE:  (Indiscernible) person won't write

20   it.

21           THE COURT:  Yeah.  The guy in charge says that's

22   fine.

23           All right.  Before I hear you then, let's take

24   just a couple more minutes.  Then I'll hear.  And I very

25   much appreciate the efficiency today because of my hard stop

1    at 3:30.  I think we're well on track for that.  So thank

2    you very much for all the professionals concerned.

3            So we'll take five minutes and then we'll --

4            MR. MCKANE:  Thank you, Your Honor.

5        (Recess from 2:20 p.m. until 2:31 p.m.)

6            THE CLERK:  All rise.

7            THE COURT:  Please be seated.

8        (Pause)

9            THE COURT:  You guys can't go anywhere without a

10   Power Point; can you?

11           THE COURT:  All right.

12           MR. HUSNICK:  It's my crutch, Your Honor.

13           THE COURT:  Well, you don't need it but go ahead.

14           MR. HUSNICK:  Your Honor, Chad Husnick for -- from

15   Kirkland and Ellis on behalf of the debtors.

16           I'll just launch right in.

17           Your Honor, I addressed a lot in my opening about

18   where we're coming from and where we're going here.  But I

19   just want a level set because the tone of the questions, the

20   opening from the asbestos claimants really exposed them for

21   the true motives that we have here; which is getting a

22   trust.  Getting a pot of money that the asbestos claimants

23   can go after outside of the bankruptcy process.  They want a

24   trust.

25           And the attempt by the asbestos claimants to get a

1    trust under 524(g) exposes the true goal; which is to avoid

2    the bar date.  We know that goal's been around for a long

3    time.  We've been fighting about that since last year.

4          They want to set up this pot.  But has absolutely

5    nothing to do with whether the cases were filed in good

6    faith.  In fact, if we offered the asbestos claimants

7    exactly what they're asking for, a 524(g) injunction and a

8    plan, I submit that that's not in the best interests of the

9    estate.

10         But that's not the issue here today.  The issue

11   here, today, is whether the cases were commenced in good

12   faith.  And, undoubtedly, if you have access to a 524(g)

13   injunction as they (a) negotiated for and (b) submitted on

14   the record today through questioning and through the

15   opening, in order to get there, you got to have a

16   bankruptcy.

17         So, I'd submit, Your Honor, that kills it right

18   out of the box.

19         It's not surprising, therefore, that we waited two

20   and a half years for the asbestos objectors to claim that

21   these cases were filed in bad faith in the first place.

22         I'd submit, Your Honor, as we discussed this

23   morning, all of the participation by the asbestos

24   plaintiffs, their lawyers, et cetera; this is the classic

25   case of latches and the untimely motion should be denied.

1          But, as Your Honor heard, overwhelming evidence

2     here, in these Chapter 11 cases, supports the filing of

3     these Chapter 11 cases for the LSGT debtors and the motion,

4     simply, has absolutely no merit.

5          We summarize, very briefly, on slide three, the

6     three points, and I'll get into more detail a little bit

7     later in the closing, but, first, the LSGT debtors were a

8     part of a global reorganization of over $42 billion in

9     liability.  You can't throw blinders on and just ignore what

10    was going on in this enterprise.

11          They could try and argue that these are non-

12    operating companies.  I think Your Honor hit the nail right

13    on the head when you talked about the fact that EFIH, EFH,

14    EFH Properties, for the most part, these are holding

15    companies.  They have a few assets; whether it's stock in

16    the indirect ownership of Oncor, or whether it's stock in

17    EFIH.  On the TCH side, we have a lot of shell companies as

18    well whose assets were indirect companies.

19          These are not, necessarily, operating companies

20    and I'd submit it's irrelevant.  What's relevant is how were

21    we able to restructure the $42 billion and how were we able

22    to maximize the value of the enterprise at these particular

23    debtors and, ultimately, up at the EFH debtors were at

24    large.

25          Your Honor, the asbestos objectors also ignore, as

1    part of their effort to ignore the rest of the cases, the

2    effect of dismissal of the LSGT debtors and we'll hear --

3    and I'll summarize a little bit more later, but suffice it

4    to say, these cases, just being dismissed, it's not just

5    getting rid of the bar date.  It's actually blowing up the

6    NextEra merger agreement, potentially, sending the debtor

7    back to the drawing board in negotiations.

8           Your Honor, the real reason that these cases were

9    filed, as you heard, was to gain breathing room and to solve

10   the cash flow insolvency problem that we had had we not

11   commenced the Chapter 11 cases.  And we heard significant

12   evidence on that.

13          And, in addition to that, notwithstanding the fact

14   that the debtor was cash flow insolvent, the LSGT debtors

15   had legitimate and independent purposes for commencing the

16   cases; whether that was to address the tax issue or it was

17   to otherwise maximize the value of the inter-company claim,

18   the assets of these entities.

19          Ultimately, Your Honor, I submit that the cases is

20   incredibly strong for keeping these Chapter 11 cases going,

21   allowing the debtors to complete these reorganizations in

22   February of 2017, not to prejudice anything there.

23          Your Honor, we heard a lot about the background of

24   the inter-company claim.  So, I'm not going to spend too

25   much time on it.  We think this case is relatively clear.

1          I would highlight one thing that Mr. Stephany said

2     in the colloquy about the exhibits.  There was a reference

3     in the opening to the 1.7 -- alleged $1.7 billion of claims.

4     There was zero evidence to support that.  I'm not going to

5     get into why that number is wrong but the document that they

6     were relying on, which did not make it into evidence, they

7     are taking that completely out of context, telling half the

8     story.  We'll leave it at that.

9          Suffice it to say, the claims that exist are right

10    here on this slide, a $560 million payable from LSGT Gas

11    against EFH Corp. and various payables that are highlighted

12    in the arrow boxes against LSGT Gas.

13         Your Honor heard from -- and actually it was laid

14    out by Mr. Hunter, the corporate history of EECI, basically,

15    explaining how we got to where we are today.  No real

16    surprises there.

17         The legal standard.  Your Honor, we briefed this

18    quite extensively and will do so -- and we'll do additional

19    briefing in the post-trial briefs.  But I don't think

20    there's a lot of debate about the overarching legal

21    standard; that the courts look to the totality of the

22    circumstances to demonstrate whether the debtors were

23    motivated for a "legitimate reorganization purpose."  That's

24    the Third Circuit standard articulated in Integrated

25    Telecom.

1          And that -- so, you do look to the totality of the

2     circumstances and subsequent cases, by Judge Walrath's

3     decision in the Jameson case, which I'm pretty familiar

4     with, held that when you're looking to the totality of the

5     circumstances, you need to look to the affiliates of the

6     overall enterprise.  What was the goal of the

7     reorganization?

8          And the Judge held you were -- and actually the

9     Judge mentioned that she refused to put blinders on and

10    ignore the affiliate filings.

11         The asbestos objectors spent some time trying to

12    argue that Jameson actually supports their side.  I'd submit

13    it very much does not.  The Jameson ruling did focus on the

14    objective prong of the Third Circuit's test.  And I'll get

15    to the two-prong test in a second but, suffice it to say,

16    what Judge Walrath concluded in Jameson was that the debtor

17    could not confirm any plan.

18         We've already done that, Your Honor.  While that

19    plan is null and void, we have confirmed the plan and

20    Jameson is simply inapplicable on its facts in terms of

21    supporting the objectors' case for dismissal here.

22         What do the Courts look to?  They look to a host

23    of factors, Your Honor, that we summarized in the brief.

24    But they boil down to really two different prongs; one, is

25    the objective prong.  Was the -- was there a legitimate

1    reorganization purpose?  An objective reorganization purpose

2    for the Chapter 11 cases?

3            And there's also an element of the subjective

4    looking at it; did the debtors intend, did the directors and

5    officers intend for a legitimate reorganization purpose.

6    And, then, contrary to what my opposing counsel said in her

7    opening, it's not that you ignore the subjective.  It's just

8    one factor that you consider.

9            It's different than other circuits.  It's, of

10   course, more rigorous here in the Third Circuit where you

11   have to demonstrate both objective and subjective.  In the

12   Second Circuit, in contrast, you only have to demonstrate

13   one or the other.  But that's not for here today.  Suffice

14   it to say, you do need to consider both.  And I submit that

15   we hit both of them.

16           How do we hit both of them?  We emphasize and put

17   in three different lines of evidence in our argument.  The

18   first, of course, being the enterprise LIBOR structuring.

19   The second, the imminent financial distress facing the LSGT

20   debtors in April of 2014 and, last, the legitimate and the

21   independent purposes that surrounded the commencement of

22   these Chapter 11 cases.

23           Let me address argument number one.  You heard

24   from -- in the deposition designations from Mr. Keglevic

25   about the potential bidders were asking for the best

1    possible estimate of the asbestos liabilities.  And,

2    ultimately, what you heard from both Mr. Horton and

3    Mr. Moldovan, as well as Mr. Keglevic, through the

4    deposition DECKs, is that failure to file these entities

5    could have materially hampered the debtors' massive

6    reorganization efforts as potential purchasers, potential

7    investors, in the reorganized EFH, made is crystal clear

8    that they were unwilling to invest without addressing these

9    issues.  And, ultimately, we needed to get them comfortable

10   with the quantum of the liability as best we possible could.

11           Obviously, we couldn't do everything that they

12   would have loved to have done.  I think they would have

13   loved to discharged all the liabilities and done nothing

14   with that.  But, as we explored each and every alternative

15   and worked through these, it became very clear that in order

16   to achieve what you heard from Mr. Moldovan and Mr. Horton,

17   was the ultimate goal; in order to reinstate these claims,

18   we had to go through a process which, ultimately, yes, I

19   concede, has a negative effect on certain people who did not

20   exercise their constitutionally granted rights to file a

21   proof of claim.

22           But we did everything we could to make sure they

23   got notice.  Your Honor, we spent millions of dollars

24   towards that goal.

25           Moving on.  The second good faith factor, Your

1    Honor, is the imminent financial distress that the company

2    faced at filing.

3           As I mentioned, insolvency is not a prerequisite

4    here.  It's not a prerequisite to be insolvent in order to

5    commence a Chapter 11 case.  But it is clearly relevant in

6    terms of analyzing whether the case that was filed was

7    actually in good faith.  But it's very clear here.  This

8    debtor was on the verge of being insolvent on a cash flow

9    basis.

10           It's only source of cash was from EFH Corp.  EFH

11   Corp. was going to commence a Chapter 11 case.  It informed

12   the directors and officers.  They knew because they are

13   directors and officers of other entities that it was not

14   going to be able to continue to service those claims.

15           What do we hear in response to that?  The first

16   argument is is that it wasn't certain -- first, you hear,

17   I'm sorry.  The first thing you hear is that certain of the

18   non-debtors didn't file.  So, EFH Properties, for example,

19   we hear; EFH Properties didn't file so you could have stayed

20   out.

21           But Your Honor heard the countervailing concerns

22   that the directors and the officers at EFH Properties were

23   considering, including the fact that the commencement of a

24   case for EFH Properties in April of 2014 would have

25   accelerated the 365(d)(4) deadline.  It would have triggered

1    potential tax indemnification claims associated with

2    unwinding the leverage lease transaction.

3          The reference to the automatic stay, in that

4    context, was, of course, because lenders in a leverage lease

5    are really lenders to the underlying landlord not to EFH

6    Properties.  So, it would have been a huge chunk of

7    litigation about whether we could extend the automatic stay

8    to that.  I won't get too much into that.

9          And last, but very relevant for this prong that

10   we're talking about, insolvency, is EFH Properties was not a

11   cash user.  It was cash flow solvent.  It had its own cash.

12   It was, in effect, a flow-thru vehicle, as we discussed at

13   the TCEH confirmation hearing.

14         Your Honor, there was also no guarantee, contrary

15   to the discussion -- or to the statements made in the

16   opening and the arguments made in the reply, that EFH Corp.

17   could obtain relief from this Court to continue to make

18   payments to the EECI debtors, the LSGT debtors.

19         Your Honor, there's absolutely nothing in the

20   record to support a notion that these were critical venders

21   that a doctrine of necessity would otherwise extend to that.

22   Likewise, there's nothing in the record to support the

23   notion that the EECI and LSGT debtors could have obtained

24   relief from the automatic stay to bring a cause of action

25   against EFH Corp.

1          Instead, what you heard, Your Honor, is that the

2    debtors realized any type of relief similar to that would

3    have faced a very significant battle.  And Your Honor is

4    very aware of what happened when we were litigating the

5    inter-company claims with Mr. Shore and others; it was not

6    an easy task.  Even a joint administration motion was

7    objected to on the first day.

8          Your Honor, the next argument we hear from the

9    plaintiffs -- from the asbestos plaintiffs in response to

10   the imminent financial distress is that the fact that the

11   reorganized EFH has an ability to satisfy those claim post-

12   effective date.  So, now, that equals bad faith.

13         Well, I'd submit, Your Honor, that the ability of

14   the EFH debtors to reinstate these claims after significant

15   negotiations over the last two and a half years is

16   completely irrelevant to whether the debtors had good faith

17   in commencing the cases in December -- or in April of 2014.

18         In a good faith analysis, the appropriate time to

19   evaluate solvency should be at the time of filing not the

20   post-petition emergence and, ultimately, what the debtors

21   are able to negotiate.  This is borne out by the cases like

22   In re Combustion and Engineering.

23         The purpose of Chapter 11 is to "facilitating the

24   reorganization and rehabilitation of the debtor as an

25   economically viable entity."  It's not to mandate that the

1    debtors emerge insolvent which is, in effect, the standard

2    that the objecting asbestos holders would want us to do.

3           The asbestos objectors are simply wrong to assume

4    that the debtors wouldn't have been able to secure the

5    current treatment under the -- of the inter-company claims

6    and of the asbestos claims without the benefit of this

7    overall enterprise restructuring.

8           In fact, as we stand here today, the plan that's

9    on file, unfortunately, shows that creditors of EFH Corp.

10   are likely to receive cents on the dollar; probably ten

11   cents maybe a little bit north of that, after the allowance

12   of the make whole claims.

13          In contrast, the inter-company claims are

14   receiving a hundred cents on the dollar.  They're being

15   reinstated.  It's a recognition of the efforts of

16   Mr. Horton and Mr. Moldovan and the rest of the team to

17   maximize the value of these estates.

18          The third prong that we articulated in support of

19   good faith, Your Honor, is the legitimate and independent

20   purposes for the filing.

21          Your Honor heard testimony about the

22   deconsolidation tax.  I don't want to spend a lot of time on

23   it.  I think it's pretty clear that that was a risk that all

24   of the debtors faced but it was especially acute for debtors

25   who were C-corps in the first instance.  There was no

1     option.  If this thing deconsolidated, they were on the hook

2     for the tax.

3              But, more importantly, spend just a moment on

4     slide -- I believe it's slide 15.  The goal here was to

5     maximize the value of these inter-company claims.  And, as I

6     just said, we did exactly that.  The debtors have negotiated

7     for the reinstatement for those inter-company claims.

8              And the filing not only allowed for the

9     negotiation of the reinstatement of those inter-company

10    claims, it actually allowed for there to be representation

11    of an official committee of unsecured creditors who did

12    represent the interests of the unmanifested asbestos

13    claimants.  And, ultimately, the fruits of those efforts was

14    the settlement agreement that I referenced in the opening

15    which requires the debtors, for any plan proposed by the

16    debtors, to reinstate the inter-company claims, to reinstate

17    the asbestos claims.  To abandon that would open up the

18    whole -- the whole negotiation that we had with the official

19    committee.

20              In short, Your Honor, I think these two pieces of

21    testimony really sum up, and I'm not going to read it, but,

22    suffice it to say, I think the testimony was very clear that

23    there was a perfectly valid reason for why these debtors

24    commenced Chapter 11 cases.

25              So, let's turn to the arguments that the asbestos

1    objectors offer to try and counter this third reason for

2    good faith.

3              The first assertion is that the debtors only filed

4    to evade litigation.  But the testimony was clear that the

5    establishment of a bar date and the discharge of all of the

6    asbestos claims was not the primary consideration for the

7    filing.  Indeed, it was not one of the primary

8    considerations for the filing you heard from Mr. Horton.

9              So, the purpose was not to evade asbestos

10   liabilities.  The purpose was to maximize the value of the

11   enterprise.

12             The cases that are cited by the asbestos

13   objectors, including SGL Carbon, Integrated Telecom,

14   Liberate -- I don't know if I'm saying that correctly, and

15   Mem'l Corp. are all in opposite and we briefed these and we

16   will brief it again in the post-trial briefing.

17             But, suffice it to say, each of these cases, I'll

18   set Mem'l aside for a second, the SGL Carbon, Integrated

19   Telecom and Liberate were each cases where the debtors were

20   highly solvent.  The actual entity that was being dismissed

21   was highly solvent.  In one case, they sought to address

22   antitrust claims that could have potentially -- lied against

23   the debtor but could have potentially been asserted.  A

24   highly solvent, no cash flow problem whatsoever.

25             Another case, Integrated Telecom and Liberate,

1    502(b)(6).  So, they filed to try and take advantage of the

2    cap on landlord claims.  But, again, they were highly

3    solvent.  They didn't have the cash flow insolvency problem

4    that the LSGT debtors have here.

5            They weren't trying -- and, also, it's incredibly

6    important to know we don't have a solvent parent.  We have

7    EFH Corp.  And, unfortunately, that entity is not solvent

8    right now.  And, I think -- so, each of these cases are

9    inapplicable on their face.

10           Mem'l Corp.'s a bit of a different set of facts.

11   There, there was two defunct subsidiaries.  They filed

12   purely to preserve -- or to try and cabin the claims down

13   and protect their solvent parent and keep that entity out of

14   Chapter 11.  Ultimately, the Court determined, and I think

15   appropriately, that these -- that that case and those

16   subsidiaries, they were not -- there was really like a two-

17   party dispute, which is simply not what we have here where

18   we have many, many claimants and we have many, many

19   creditors up at EFH and the Chapter 11 filings were

20   critically necessary to address those issues.

21           Your Honor, the second argument we hear against

22   the legitimate and independent purpose for the filing is

23   that reinstatement was always contemplated.

24           The LSGT debtors, reinstatement was not a foregone

25   conclusion.  It was the product of significant negotiations.

1    You saw one term sheet come over, which the debtors were not

2    a party to that term sheet, but it was a term sheet between

3    our purchaser now, NextEra, and the -- I'm sorry, and

4    certain of the asbestos claimants, about a 524(g)

5    injunction.  Lots of negotiations went on.  For a number of

6    reasons, that term sheet never really saw the light of day.

7            But that's beyond the scope of the testimony.

8    Suffice it to say, there was a lot of back and forth and it

9    wasn't without that back and forth and without the

10   extraordinary efforts of Mr. Horton and Mr. Moldovan, Mr. --

11   Ms. Dore and Mr. Keglevic, that we were able to convince to

12   NextEra, and certain of the other bidders, to reinstate the

13   claims.

14           But we -- so, what we did, in effect, Your Honor,

15   was we needed the Chapter 11 because of the insolvency.  We

16   filed the Chapter 11.  We used the tools that were available

17   in Chapter 11.  And it goes without saying that if you look

18   at Federal Rule of Bankruptcy Procedure 3003(c)(3); we heard

19   about this in the bar date context, it's not optional.

20           Once you're in, if it's a valid Chapter 11, which

21   we submit it is, you establish a bar date.  That's what the

22   Rule says.

23           Reinstatement was only achieved with all of these

24   negotiations with the establishment of the bar date.

25           Argument number three, Your Honor, is that

1    dismissal only means no bar date.

2            And where am I at?  I lost my spot.

3            But it's simply incorrect.  You heard from

4    Mr. Horton that dismissal of the LSGT debtor cases triggers

5    an immediate option for NextEra to terminate the plan

6    support agreement.  That crosses directly into the merger

7    agreement and gives NextEra -- or gives NextEra the right to

8    terminate the merger agreement and any cause and effect

9    arising therefrom, I'm not going to characterize what the

10   result of that would be.  Suffice it to say, I'm sure

11   somebody would assert that there's a $275 million claim

12   payable at that point in time.

13           So, dismissal, Your Honor, is not a free lunch and

14   we'd submit that the -- they are simply wrong on that point.

15           And argument number four, Your Honor, was about

16   the operating companies.  And I addressed this at the very

17   outset.  It's just wrong on the law to say that a non-

18   operating company is, therefore, bad faith.  If you don't

19   have any employees, you can't file.

20           I think the presence of all of these debtors --

21   the presence of all of these creditors demonstrates the need

22   for Chapter 11 in these circumstances and demonstrates that

23   these cases were commenced in good faith.

24           Your Honor, I'll just end on this.  Timeliness.

25           I walked through, at the very beginning, and even

1    if Your Honor doesn't go to the latches argument, I think it

2    informs the underlying motivation behind this motion to

3    dismiss.  And I don't think it can be ignored.

4            We spent two and a half years in these Chapter 11

5    cases.  We spent millions of dollars establishing an

6    asbestos bar date.  Never a mention of bad faith.  Not once.

7    Not once, despite all of these different indications or

8    opportunities for the asbestos claimants to come forward.

9            We heard from Ms. Kelleher; my clients weren't

10   manifested at that time.  But we developed an asbestos

11   noticing program that was aimed at unmanifested claimants.

12   So, Your Honor, I would submit, as I will submit, if I ever

13   have to come back and argue about the effect of the bar

14   date, that they did receive appropriate notice.

15           The fact that they did not file a claim does not

16   mean they did not receive appropriate constitutional --

17   appropriate and sufficient constitutional notice.

18           Your Honor, it's not unheard of to apply a latches

19   type argument.  I am not going to burden this too much.

20   But, suffice it to say, I think the facts very much fit in

21   line with what happened in Mirant and in Mirant, parties sat

22   on their hands for a long period of time and then, at the

23   end of the case, they decided it was time to move for a

24   dismissal.

25           And the Court appropriately called them out on

1   that.  Appropriately called them out and denied that request

2   as untimely.

3           So, in conclusion, Your Honor, I think the record

4   is pretty clear that they waited too long.  But, even though

5   they waited too long, if we address this head-on, the facts

6   are in the favor of the LSGT debtors.  Chapter 11 was

7   required for these debtors to obtain a breathing spell, to

8   allow them to continue to fund -- or to allow them to take

9   an opportunity to negotiate for the value of those inter-

10  company claims; to negotiate for how asbestos claims were

11  going to be dealt with going forward and to avoid the

12  possibility of billions of dollars of deconsolidation taxes.

13          Dismissal of the LSGT debtors does nothing other

14  than reopen a carefully negotiated transaction with NextEra

15  and send the debtors back to the drawing board once again.

16          Accordingly, Your Honor, the asbestos debtors

17  respectfully request that the motion be denied.

18          THE COURT:  Thank you, Mr. Husnick.

19          MR. HUSNICK:  May I reserve just five minutes for

20  rebuttal?

21          THE COURT:  We'll see.

22          THE COURT:  Ms. Kelleher.

23          MR. HUSNICK:  Thanks.

24          MS. KELLEHER:  Good afternoon, Your Honor.

25          Oh, I just left something.  One moment.

Page 200

1          (Pause)

2               MS. KELLEHER:  Just a few points, some of which I,

3     too, went through in my preliminary opening so I don't want

4     to flog a dead horse but the burden, of course, is on the

5     debtors as I believe everybody agrees.  And we don't think

6     the debtors have met that burden here.

7               This is a burden of demonstrating that the

8     bankruptcy petitions for the asbestos debtors were filed in

9     good faith and that hasn't been demonstrated.  You've got to

10    show two things.  The debtors have to show two things.

11              One is that there is financial distress and we'll

12    talk about that in a minute.  The other is that there is a

13    valid reorganizational purpose.  And we have not suggested

14    that it is not possible for an entity that is not an

15    operating concern to be able to file Chapter 11.  It's just

16    that the Third Circuit law is clear that if you are not an

17    operating concern, you are not trying to preserve an

18    operating concern, a going concern, and, therefore, that --

19    the desire to preserve a going concern can't constitute your

20    valid reorganizational purpose.

21              So, you have to turn to the other -- the other

22    issue which is whether or not the purpose of the bankruptcy

23    was, indeed, to maximize the value of the estate for

24    creditors; whether it was going to capture value or preserve

25    value that would not otherwise be available and could not be

1    made available, could not be captured, outside of

2    bankruptcy.

3              And, typically, that's the situation in what -- in

4    which what the debtors are seeking to do is deal with what

5    the Third Circuit has referred to as the problem of

6    distribution that bankruptcy seeks to deal with.  It's the

7    situation in which you're overrun by liabilities.  You've

8    got a limited pool of assets and you're trying to figure out

9    how to divvy up those assets in an equitable manner to all

10   of these creditors.

11             It doesn't mean, again, that you must be insolvent

12   because there are circumstances under which -- under which

13   debtors have been able to file in good faith under Chapter

14   11, even when they're not literally insolvent but it's

15   situations in which they are, like in the Johns Manville's

16   case where they're so totally overrun by all of these claims

17   against them that they're simply unable to deal with

18   anything else in the business other than trying to litigate

19   and, therefore, they file in Chapter 11 with a restructuring

20   purpose; with a reorganizational purpose that they want to

21   do something to make sure that they can get out from that

22   overhang of all of those.

23             And that's what we're missing here.  And I'll come

24   to that.

25             With respect to the financial distress, we've seen

1    two issues that have been cited.  One is the tax claims,

2    that there were these -- this potential for these

3    overwhelming deconsolidated tax claims and I submit, as I

4    submitted, that that really was quite a speculative thing.

5    I mean, it -- if, at some point, those tax claims -- excuse

6    me, the tax liabilities had, in a fact, come into reality,

7    then, at that point, there would be financial distress.

8             But it certainly was the case, and I think

9    everyone would acknowledge, that EFH, the parent, had every

10   incentive to prevent that from happening and was motivated,

11   indeed, to prevent it from happening.

12            So, I -- there's certainly -- it certainly doesn't

13   signify the kind of immediate financial distress that the

14   Third Circuit has said must be demonstrated in order to

15   demonstrate that you're appropriately filing for Chapter 11

16   protection.

17            So, the valid reorganizational purpose, as I said,

18   must be that you're seeking to maximize the value of the

19   estate for the benefit of the creditors.  And we've got two

20   possibilities that we've heard some discussion of.  And that

21   was to deal with these tax issues.

22            Mr. Horton has already agreed that there was

23   really no need to be in bankruptcy in order to come -- be

24   part of some holistic solution to deal with the tax issues.

25   And, indeed, there wasn't even a debt at that point.

1           So, really what it seems to come down to is that

2    there's this argument being made that the inter-company

3    receivables being reinstated; that that was the purpose of

4    filing, I suppose; that was to maximize the value of the

5    estate because we would come up to some situation in which

6    the inter-company receivables would be reinstated.

7           That is that -- the argument is that by filing for

8    bankruptcy, this asset -- because from the perspective of

9    the asbestos debtors, of course, the inter-company

10   receivables are an asset they have.  It's a claim that

11   they've got against EFH.  But going bankrupt, filing for

12   bankruptcy, doesn't give you some legal leg up on the inter-

13   company receivables.

14          It's not like when you're restructuring your

15   debts, you file for bankruptcy, you're able to pull them

16   together and you're able to do various things with the debts

17   in order to make sure, for example, that you don't have the

18   run on the courthouse.  That you can consolidate the debts,

19   determine how you're going to structure them and who's going

20   to get what, in an equitable fashion.

21          This is -- so, the only way that this bankruptcy

22   of the asbestos debtors had -- was going to maximize the

23   value of the estate, they're saying is because, from a

24   holistic view, we're supposed to look at the entire EFH

25   bankruptcy and what the debtors are really talking about

1    there is then what would have happened with the EFH

2    bankruptcy; whether EFH would have been able to reinstate

3    those debts.

4            And, I submit, respectfully, that the negotiation

5    with respect to the inter-company receivables is something

6    that could have taken place, clearly, without these entities

7    filing for bankruptcy.  And it's because of this -- these

8    entities are assets.  They're wholly owned subsidiaries of

9    EFH.

10           And what we're being told is that -- it seems that

11   what we're being told is that the -- there were indications

12   from potential bidders that they wouldn't maybe reinstate

13   these inter-company receivables because they would only do

14   so if the asbestos claims were discharged to the extent

15   permitted by law.  But then we're told, at the same time,

16   that that wasn't an important factor.

17           Well, if that wasn't an important factor, then

18   what difference would it have made to any bidder with

19   respect to whether the inter-company receivables would have

20   been reinstated?  We've got a bald assertion that there's no

21   scenario under which they could have been reinstated.  But

22   that's one that's questionable because if EFH was going to

23   be purchased, it was going to go along with its assets.  It

24   was -- its wholly owned subsidiaries were going to be

25   purchased along with it.

1            And EFH was very motivated that those inter-

2    company receivables be reinstated because if they were not,

3    EFH would be subject to a claim of veil piercing for having

4    siphoned the assets off.  You can't create a situation in

5    which you're pretending, on the one hand, that a corporation

6    is completely separate and is liable for its own, you know,

7    asbestos liabilities, in this case, and is, on the other

8    hand, we're going to take the assets out of it.

9            If you do that, you're going to have to pay the

10   assets back if you don't want to be subject to veil piercing

11   claims.  So, they had real motivation to do that.

12           And, it's not -- I'd submit that the debtors have

13   not demonstrated that filing for bankruptcy is what was

14   necessary, as I said, in order to negotiate a resolution to

15   those inter-company receivables.

16           I just want to -- so, what we really need -- what

17   we have to see, what the debtors need to show is that there

18   was a valid reorganizational purpose; that there was some

19   attempt to restructure debts.  And that's not what was going

20   on here.

21           The debtors say; well, we're in financial distress

22   because we couldn't get any assets -- we couldn't get any

23   money funded to us.  We couldn't get any money coming down

24   from EFH by virtue of the inter-company loan so we couldn't

25   defend against asbestos claims.

1            I have questioned whether that's really the case

2    because, as I've suggested, there could have been a request

3    that the Court allow at least a sufficient amount of assets

4    to have attorneys settle these claims or write letters to

5    defer the asbestos claimants from seeking to pursue their

6    claims.

7            We do know, and have in testimony, that there was

8    never a single claim that went to trial.  So, they were,

9    generally, settled.  They were resolved.  Apparently, it was

10   by settlement.  But that was never explored and it -- and we

11   heard testimony that they, the directors of the asbestos

12   debtors, did not think that that was likely something that

13   would be possible.

14           So, if they were in a situation where they're

15   saying they have financial distress and the question is

16   what's the valid reorganizational purpose because they

17   haven't -- what they did is they entered into bankruptcy and

18   there was no restructuring.  There was nothing.  Everything

19   was -- you just had a bar date and then everything passed

20   through.

21           So, we haven't seen any reorganizational purpose.

22   We've only seen that the intent was to have a bar date and

23   whatever claims were discharged by virtue of the bar date

24   would be discharged.  And the effect, of course, is that the

25   value of the entities, these asbestos debtors, would be

1      increased accordingly.

2                Just to respond to some of the points that my

3      colleague made.

4                In support of a 524(g), of course, we would like a

5      524(g) plan.  But -- and, frankly, if what the asbestos

6      debtors had done is come into Court and said; we are in

7      financial distress and they demonstrated that they were in

8      financial distress because you've got asbestos claimants

9      clamoring and pushing to push them into default, if they're

10     overwhelmed by their asbestos liabilities, that would have

11     been an appropriate reorganization purpose, would be to

12     propose a 524(g) plan.

13                But we don't have that here.  They didn't have any

14     restructuring proposed.  And, even to propose that, as I

15     said, they would have had to have demonstrated that they

16     were, indeed, in financial distress.

17                With respect to the subjective versus objective

18     intent, subjective intent is -- we've cited in our briefs,

19     the relevant language from the Third Circuit; subjective

20     intent is, certainly, a factor that the Court will look at s

21     that, for instance, if you've gotten, as we've got some

22     cases, a smoking gun where somebody says; well, the only

23     reason we ever did this was because we wanted to mess with

24     this particular debtor.  That's going to be something the

25     Court's going to look at.

1           But the Third Circuit has been very clear that it

2    is a matter, generally, of objective intent and whether or

3    not there is a valid reorganizational purpose is something

4    that the Court is to determine.  It doesn't turn on whether

5    or not the directors subjectively thought that there was.

6           So, just to make another point with respect to

7    this issue of the concept being that in order to get the

8    inter-company loans reinstated, the asbestos debtors had to

9    then -- they had to then have a bar date and get rid of

10   their claims because they -- we're told that bidders -- one

11   of the reasons that they entered into bankruptcy was to have

12   a bar date because bidders were asking for it.  That they

13   were seeking certainty.

14          And it's just a minor point there which is that a

15   bar date cannot provide a certainty with respect to the

16   amount -- the aggregate amount of asbestos liability, in

17   this case or in any other case.  And it's for very obvious

18   reasons.  One is that the -- when there's a bar date and

19   asbestos claims are asserted, there is no allowance of those

20   claims.

21          And, indeed, there's no indication that the

22   debtors ever considered going through allowance proceedings

23   because that would simply take years.  Asbestos claimants

24   are entitled to jury trial rights and the only way you can

25   determine with certainty the aggregate amount of the

1    asbestos claims would be to liquidate each and every one of

2    those claims.  And that wasn't possible.

3         So, certainty can't be achieved because you don't

4    know the value of the individual claims that are already

5    manifesting and you, certainly, don't know the value of the

6    unmanifested claims.

7         Here, we've got several unmanifested claimants who

8    filed claims out of an abundance of caution even though they

9    are not yet ill.  But we don't know what the total value of

10   those claims are.  And it's not something that can be

11   determined.

12        The only thing that the bar date could do would be

13   to reduce whatever that amount, ultimately, is determined to

14   be.

15        And, so, the way in which the bidders got some

16   certainty or some comfort with the level of those claims is

17   by doing what they did; which was due diligence.  They

18   wanted to -- they asked many questions about how much the

19   claims were and what the historical claims were -- excuse

20   me, what the historical claims were and you've seen it,

21   there's questions in the exhibits that have been -- that --

22   in the exhibits that were put into evidence.

23        But you can't blame the bidders for asking if you

24   can get the claims discharged because they're taking those

25   claims on.  You can't blame them for doing it.  But that

1     doesn't make it a valid reorganizational purpose.  The fact

2     that they -- that bidders wanted -- what these claims to be

3     discharged any more than it would make it a valid

4     reorganization purpose to file for Chapter 11 to get a 363-

5     sale free and clear because a bidder wants that.  That is

6     not a valid reorganizational purpose.

7              So, in closing, I'd like to just address, once

8     again, and we will certainly address in our papers, the

9     argument that there's latches here.  Again, there is not the

10    -- the idea that because there was a notice program and some

11    unmanifested claimants sought -- Mr. Jones and Mr. Heinzmann

12    have said in their declarations that they were unaware of

13    this bankruptcy.  They were unaware of the bar date and

14    Mr. Heinzmann, indeed, became aware of it just very

15    recently, just prior to the filing of this instant motion.

16    So, I don't think that latches can be laid at his feet.

17              And I will leave it at that.

18              THE COURT:  All right.

19              MS. KELLEHER:  Thank you.

20              THE COURT:  Thank you.  Mr. Glueckstein.

21              MR. GLUECKSTEIN:  Thank you, Your Honor.  Good

22    afternoon.  Just very briefly, Brian Glueckstein from

23    Sullivan & Cromwell on behalf of the official E-side

24    committee that includes EFH, EFIH, ECI and EFIH.

25              And I raise today, Your Honor, a very limited

1   issue.  I just want to make sure the record of these

2   proceedings is clear and complete on two points that were

3   raised this morning that relate to the official committee.

4          First, Your Honor, this morning, counsel for the

5   movants asserted purported conflicts of interest with

6   respect to the EFH committee in connection with asbestos

7   claimants.

8          I just want to be sure the record is clear that

9   the EFH committee has addressed this issue in its prior

10  pleadings, including at docket 4883, and disagree with the

11  generalized statements that were made on the record today.

12         Consistent with the Court's rulings in these cases

13  with respect to unmanifested claims, the committee, at all

14  times, has discharged it duties to all constituents,

15  including asbestos creditors of the EECI and EFH.

16         Second, Your Honor, the debtors reference and it

17  was at issue a bit today the committee's settlement that

18  this Court approved.

19         The EFH committee negotiated and, ultimately,

20  obtained a settlement last year that requires full

21  reinstatement of all asbestos claims against EECI as well as

22  inter-company receivables in favor of the asbestos debtors.

23  This was a critical term of a broader settlement that was

24  approved by this Court following trial.

25         The committee's settlement, including

1    reinstatement of the claims and receivables, has held,

2    despite a number of developments, including the testimony

3    from Mr. Horton about the reluctance of NextEra to assume

4    those liabilities in a case where EFH unsecured creditors

5    are now facing very significant impairment.

6              Notwithstanding the EFH committee settlement, the

7    committee continues to be fully engaged and discharges its

8    duties to all constituents as issues continue to arise in

9    these cases related to asbestos and otherwise.

10              I just want the record to be clear, Your Honor,

11    that the EFH committee settlement, including treatment of

12    asbestos claims, remains in full force and effect and the

13    EFH committee continues to honor the terms of that

14    settlement.

15              Thank you.

16              THE COURT:  Thank you, Mr. Glueckstein.

17              Mr. Husnick, any final words?

18              MR. HUSNICK:  Nothing further, Your Honor.  Thank

19    you.

20              THE COURT:  Okay.  All right.

21              Well, thank you very much.  I -- like I said, I'm

22    going to take the matter under advisement and request that

23    simultaneous briefs, no longer than 20 pages, be submitted

24    by Friday at 4 p.m. and you'll get a decision within the

25    mandated timeframe in the Code.  So -- very good.

Page 213

1          Thank you.  We're adjourned.

2          UNIDENTIFIED SPEAKER:  Your Honor, I'm not sure

3   we -- do we see him again?  I was going to say Merry

4   Christmas but I'm not sure if -- we do see you next week.

5   So, next week.

6          THE COURT:  Oh, no, you can't -- (indiscernible)

7   only days in the case.  I can't go a week without seeing

8   you.

9      (Whereupon these proceedings were concluded at 3:17

10   p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                    T E S T I M O N Y

4

5     WITNESS                EXAM BY              PAGE    LINE

6     Anthony Horton         Mr. McKane            33      22

7     Anthony Horton         Mr. Hogan             70       1

8     Kristopher Moldovan    Mr. Ganter           113      10

9     Kristopher Moldovan    Mr. Hogan            139      21

10    Michael Hunter         Mr. Hogan            164      13

11

12                    E X H I B I T S

13    For the Debtors:

14    NO.         DESCRIPTION                 ID.    EVID.

15    ---         Declaration of Anthony Horton       38

16    DX-2        ---                                 67

17    DX- 9       ---                                 67

18    DX-30       ---                                 67

19    DX-42       ---                                 67

20    DX-91       ---                                 67

21    DX-104      ---                                 67

22    DX-105      ---                                 67

23    DX-110      ---                                 67

24    DX-135      ---                                 67

25    DX-223      ---                                 67

1                    I N D E X, cont'd

2

3                    E X H I B I T S

4

5   NO.          DESCRIPTION                    ID.    EVID.

6   For the Debtors:

7   DX-226       ---                                    67

8   DX-227       ---                                    67

9   DX-228       ---                                    67

10  DX-3         ---                                    68

11  Dem.         Demonstrative aid              ---     69

12   HORTON1

13  D.I. 1    Petition (Judicial notice)               69

14   (EFH)

15  D.I. 1    Petition (Judicial notice)               69

16   (EE Holdings)

17  D.I. 1    Petition (Judicial notice)               69

18   (EECI)

19  D.I. 1    Petition (Judicial notice)               69

20   (LSGT Gas)

21  D.I. 1    Petition (Judicial notice)               69

22   (LSGT Gas SACROC, Inc.)

23  1791      Docket entry (Judicial notice)           69

24  2570      Docket entry (Judicial notice)           69

25  4883      Docket entry (Judicial notice)           69

1                          I N D E X, cont'd

2

3                        E X H I B I T S

4

5    NO.         DESCRIPTION                      ID.    EVID.

6    For the Debtors:

7    5072       Docket entry (Judicial notice)           69

8    6610       Docket entry (Judicial notice)           69

9    7090-1     Docket entry (Judicial notice)           69

10   7151       Docket entry (Judicial notice)           69

11   10074      Docket entry (Judicial notice)           69

12              Declaration of Kristopher Moldovan       138

13   DX-133     ---                                      133

14   D-DIR-     Declaration of Michael Hunter            163

15   HUNTER

16   DX-107     ---                                      163

17   DX-108     ---                                      163

18   DX-109     ---                                      163

19   DX-120     ---                                      163

20   DX-249     ---                                      163

21   DX-259     ---                                      163

22   DX-288     ---                                      163

23   DX-289     ---                                      163

24

25

Page 217

1                          I N D E X, cont'd

2

3                          E X H I B I T S

4

5    NO.          DESCRIPTION                        ID.    EVID.

6    For the Movants:

7    D.I. 505    Docket entry - original RSA                175

8                (Judicial notice)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 218

1                    C E R T I F I C A T I O N

2

3    We ,Lisa Beck, Jamie Gallagher and Penny Skaw certify that

4    the foregoing transcript is a true and accurate record of

5    the proceedings.

6    Lisa Beck    Digitally signed by Lisa Beck
                  DN: cn=Lisa Beck, o=Veritext, ou,
                  email=digital@veritext.com, c=US
7    _____Date: 2016.12.06 16:12:38 -05'00'

8    Lisa Beck (CET**D-486)

9    AAERT Certified Electronic Transcriber

10   Pamela A. Skaw    Digitally signed by Pamela A. Skaw
                       DN: cn=Pamela A. Skaw, o=Veritext,
                       ou, email=digital@veritext.com, c=US
11   _____Date: 2016.12.06 16:13:05 -05'00'

12   Pamela A. Skaw

13   Jamie Gallagher    Digitally signed by Jamie Gallagher
                        DN: cn=Jamie Gallagher, o=Veritext,
                        ou, email=digital@veritext.com, c=US
14   _____Date: 2016.12.06 16:13:41 -05'00'

15   Jamie Gallagher

16

17   Veritext Legal Solutions

18   330 Old Country Road

19   Suite 300

20   Mineola, NY 11501

21

22   Date:  December 6, 2016

23

24

25