**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| | ) |
| In re: | )    Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | )    Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | )    (Jointly Administered) |
| | ) |
| | )    **Re: D.I. 10074, 10075, 10076, 10249, 10273,** |
| | )    **10274, 10304, 10305, 10306** |

**DEBTORS' POST-HEARING MEMORANDUM IN OPPOSITION TO THE**
**MOTION TO DISMISS THE CHAPTER 11 PETITIONS OF THE LSGT DEBTORS**

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the Debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**PRELIMINARY STATEMENT** ............................................................. 1

**ARGUMENT** ....................................................................................... 3

**I.    The LSGT Debtors Had No Realistic or Responsible Alternative to Filing for Bankruptcy.** ......................................................................... 3

    A.    The LSGT Debtors Were Cash Flow Insolvent at the Time of Filing. ................... 3

    B.    There Was Material Risk that the LSGT Debtors Would Not Have Access to Funds On Account of Their Intercompany Receivables Once EFH Corp. Filed. .................................................. 5

**II.    The Evidence Demonstrates that the LSGT Debtors Filed for Legitimate Reorganizational Purposes.** ................................................................ 6

    A.    Courts Consider the Totality of the Facts and Circumstances to Determine if the Debtor Had a Valid Reorganizational Purpose in Filing. ............................ 6

    B.    The LSGT Debtors' Participation in the Enterprise-Wide Restructuring Efforts Was Necessary and Advantageous for the LSGT Debtors. ..................... 10

    C.    The LSGT Debtors Filed in Good Faith to Maximize the Value of the Intercompany Claims for the Benefit of the Creditors of the LSGT Debtors. ................................................. 11

    D.    Addressing a Potential Value-Destroying Tax Bill was a Legitimate Restructuring Purpose for the LSGT Debtors. ................................................ 13

    E.    The Record Belies the Contention that the LSGT Debtors Filed to Evade Asbestos Liabilities. ....................................................... 15

    F.    The LSGT Debtors Sought a Bar Date for Asbestos Claims as Part of a Comprehensive Restructuring Plan That Maximized Value for the LSGT Debtors. ................................................... 16

**III.    The Motion Is Untimely and a Last Resort by Counsel to the Asbestos Objectors.** ........................................................................ 19

**CONCLUSION** .................................................................................. 20

i

# TABLE OF AUTHORITIES

**Cases**

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 LaSalle St. P'ship*,
  526 U.S. 434 (1999) ................................................................................................ 7

*In re 15375 Mem'l Corp. v. Bepco, L.P.*,
  589 F.3d 605 (3d Cir. 2009) ............................................................................. 9, 16

*In re Clinton Centrifuge, Inc.*,
  72 B.R. 900 (Bankr. E.D. Pa. 1987) ..................................................................... 7

*In re Downey Fin. Corp.*,
  428 B.R. 595 (Bankr. D. Del. 2010) ..................................................................... 6

*In re Energy Future Holdings Corp.*,
  522 B.R. 520 (Bankr. D. Del. 2015) ................................................................... 16

*In re Integrated Telecom Express, Inc.*,
  384 F.3d 108 (3d Cir. 2004) ......................................................................... 6, 7, 8

*In re JER/Jameson Mezz Borrower II, LLC*,
  461 B.R. 293 (Bankr. D. Del. 2011) ..................................................................... 6

*In re Liberate Techs.*,
  314 B.R. 206 (Bankr. N.D. Cal. 2004) ................................................................. 8

*In re Mirant Corp.*,
  2005 WL 2148362 (Bankr. N.D. Tex. Jan. 26, 2005) ........................................ 19

*In re Paradigm Elizabeth, LLC*,
  2015 WL 435067 (Bankr. D. N.J. Feb. 2, 2015) .................................................. 7

*In re SGL Carbon Corp.*,
  200 F.3d 154 (3d Cir. 1999) ......................................................................... 3, 7, 8

*Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*,
  896 F.2d 54 (3d Cir. 1990) ................................................................................... 5

**Statutes**

11 U.S.C. 524(g)(1)(a) .............................................................................................. 2

**Rules**

Fed. R. Bankr. P. 3003(c) ....................................................................................... 16

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this post-hearing memorandum in opposition to the *Motion of Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann to Dismiss Chapter 11 Petitions of Asbestos Debtors EECI, Inc., EEC Holdings Inc., LSGT SACROC, Inc., and LSGT Gas Co. LLC Pursuant to 11 U.S.C. § 1112(b)* [D.I. 10074] and accompanying memorandum of law [D.I. 10075] (the "Motion") filed by Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann (collectively, the "Asbestos Objectors").[2]

## **PRELIMINARY STATEMENT**

"[O]f course, we would like a 524(g) plan."
— *Leslie Kelleher, counsel for the Asbestos Objectors*[3]

1.      In a telling moment of candor during closing arguments, counsel for the Asbestos Objectors acknowledged the desire to have this Court establish a section 524(g) trust in these cases.    Counsel's admission confirms what the Debtors have known all along—the true motivation behind the Asbestos Objectors' untimely and unsupported motion to dismiss is not a sincere belief that the LSGT Debtors[4] lacked good faith in filing for bankruptcy.

---

[2]     The Debtors incorporate the arguments made in the *Opposition of Energy Future Holdings Corp., et al., to the Motion of Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann to Dismiss Chapter 11 Petitions of Asbestos Debtor EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Co. LLC Pursuant to 11 U.S.C. § 1112(b)* [D.I. 10249] (the "Opposition Brief") and the *Surreply of Energy Future Holdings Corp., et al., to the Motion of Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann to Dismiss Chapter 11 Petitions of Asbestos Debtor EECI, Inc., EEC Holdings, Inc., LSGT SACROC, Inc., and LSGT Gas Co. LLC Pursuant to 11 U.S.C. § 1112(b)* [D.I. 10304] (the "Surreply").

Capitalized terms used but not defined herein shall be given the meanings ascribed to them in the Surreply, the Opposition Brief, or the *Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9612] (the "Plan"), as applicable.

[3]     12/5/2016 Hr'g Tr. at 207:4-5 (Kelleher Closing Argument).

[4]     "LSGT Debtors" means LSGT Gas Company LLC ("LSGT Gas"), LSGT SACROC, Inc. ("LSGT SACROC"), EEC Holdings, Inc. ("EEC Holdings"), and EECI, Inc. ("EECI").

1

2.    A section 524(g) trust, of course, requires the LSGT entities to file for bankruptcy,[5] and the Asbestos Objectors were—for more than two and a half years—happy to have the LSGT Debtors in these cases.  Indeed, Ms. Fenicle and Mr. Fahy requested a committee to represent the EFH unsecured creditors, were appointed to that committee, vigorously litigated the asbestos bar date, and objected to each plan of reorganization presented for confirmation— burning millions of dollars of estate resources, all without whispering the notion of a bad-faith filing.

3.    Notably, as late as this summer, certain of the Asbestos Objectors tried to persuade NextEra Energy, Inc. ("NextEra") to support a plan establishing a section 524(g) trust, rather than a bar date, for these Debtors.[6]  When NextEra decided not to do so, counsel to the Asbestos Objectors made this last-ditch attempt to uproot the bar date by seeking to dismiss the LSGT Debtors for a bad-faith filing.   In so doing, the Asbestos Objectors ignore, mischaracterize, or obfuscate facts supporting the LSGT Debtors' good-faith filing and the consequences of dismissal.[7]

4.    The uncontroverted evidence establishes that the LSGT Debtors had an undeniable need for chapter 11 protection (i) to avoid imminent cash flow insolvency by obtaining a breathing spell from creditor actions and preserving access to their sole source of liquidity to settle and defend asbestos-related claims, (ii) to participate in negotiations to structure a transaction that avoided joint and several liability for potentially billions of dollars in

---

[5]    *See* 11 U.S.C. 524(g)(1)(a) ("After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue . . . an injunction in accordance with this subsection to supplement the injunctive effect of [the] discharge.").

[6]    *See* 12/5/2016 Hr'g Tr. at 101:11-103:20 (Horton).

[7]    As reflected in the **Appendix**, the uncontroverted evidence demonstrates the inaccuracy of the allegations littered throughout the Asbestos Objectors' papers and statements made before the Court.

deconsolidation taxes, and (iii) to permit them to negotiate with the other Debtors, their stakeholders, and potential purchasers for a value-maximizing restructuring transaction.

5.    The uncontroverted evidence also demonstrates that, by participating in the restructuring, the LSGT Debtors are maximizing the value of their estates with a plan providing for full reinstatement of the intercompany claims that comprise their only significant assets—backed by a solvent, reorganized parent company with a $12 billion-plus equity cushion.

6.    The LSGT Debtors' actions and considerations in deciding to file for bankruptcy and since the filings are the the the epitome of good faith, and the Court should deny the Motion.

## ARGUMENT

**I.    The LSGT Debtors Had No Realistic or Responsible Alternative to Filing for Bankruptcy.**

### A.    The LSGT Debtors Were Cash Flow Insolvent at the Time of Filing.

7.    The impending bankruptcy filing of the other Debtors in April 2014—most notably, EFH Corp.—posed an imminent financial threat to the LSGT Debtors.  Although courts do not require that a debtor be insolvent, financial distress is an indicator of good faith.  *See, e.g.*, *In re SGL Carbon Corp.*, 200 F.3d 154, 164 (3d Cir. 1999) ("Although a debtor need not be in extremis in order to file [a Chapter 11] petition, it must, at least, face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future.").

8.    The LSGT Debtors "were negative free cash flow entities"; with "no ongoing operations . . . other than having the assets of intercompany receivables and paying for the cost of defending claims, and paying out those claims"; and "[t]heir sole source of funding was from an insolvent parent."[8]   In fact, EECI "has no cash and ***doesn't even have its own bank***

---

[8]    12/5/2016 Hr'g Tr. at 45:20-22, 109:24-110:5 (Horton).

*account*."[9]  As a result, the LSGT Debtors relied entirely on their receivable claim against EFH Corp. to fund settlement and defense of their asbestos liabilities.[10]  When asbestos-related costs were incurred, EFH Corp. paid the expense, and the intercompany balance between EFH Corp. and LSGT Gas (and, in turn, the payable from LSGT Gas to EECI) was reduced accordingly.[11]

9.    The Asbestos Objectors do not contest that the LSGT Debtors incurred material asbestos-related expenses each year.[12]  Nor do the Asbestos Objectors contest that if EFH Corp. filed for bankruptcy and the LSGT Debtors did not, the LSGT Debtors would have continued to incur asbestos-related costs, which EFH Corp. would have needed court approval to fund.[13]

10.    Instead, the Asbestos Objectors argue that any financial distress was speculative because in a scenario in which the LSGT Debtors did not file, (a) the LSGT Debtors "could" have sought that Court approval and (b) "why wouldn't the asbestos claimants be willing to have their claims liquidated and settled and forego collecting on the settlements until the EFH bankruptcy was resolved and EFH emerged."[14]  As the evidence demonstrates, however, the LSGT Debtors rightly identified, evaluated, and rejected the uncertainty and risk of pursuing the the Asbestos Objectors' suggested strategies.

---

[9]    12/5/2016 Hr'g Tr. at 119:12-13 (Moldovan) (emphasis added).

[10]    *See id.* at 119:15-19 (Moldovan) ("So, to the extent a payment would be made, whether it be made on a claim or to a representative or counsel or whatever cost we were incurring, EFH Corp. would fund that expense and then there would be book entries at LSGT Gas Company and EECI, Inc.").

[11]    *See id.*

[12]    *See* D-DIR Hunter ¶ 13 ("In the three years before the Petition Date, the annual amounts [were] $1.2 million, $1.6 million, and $3.8 million in 2011, 2012, and 2013, respectively."); *see* 12/5/2016 Hr'g Tr. at 119:5-6 (Moldovan) (testifying that the average annual cost to the LSGT Debtors associated with asbestos defense was "in the neighborhood of two to three million per year").

[13]    *See* 12/5/2016 Hr'g Tr. at 125:16-22 (Moldovan) (stating that EECI "had no cash and it was incurring two to three million dollars in expenses and . . . I recall believing that there was a substantial risk that it would not be able to get any cash from any of the debtors, which is where all the cash sat.  And, therefore, it would be incurring obligations for which it could not pay").

[14]    12/5/2016 Hr'g Tr. at 26:17-27:22 (Kelleher Opening Statement).

**B.      There Was Material Risk that the LSGT Debtors Would Not Have Access to Funds On Account of Their Intercompany Receivables Once EFH Corp. Filed.**

11.      If the LSGT Debtors had not filed for chapter 11, a motion to authorize EFH Corp. to fund the defense and settlement costs associated with legacy litigation brought against them would have faced stiff creditor resistance and a material chance of failure.

12.      The LSGT entities would have been affiliated creditors seeking to have their unsecured claims satisfied ahead, and at the expense, of EFH Corp.'s other general unsecured creditors.  In other words—in a case initially so hostile that even a joint administration motion was contested—the non-filing LSGT entities would have sought priority treatment over other similarly situated creditors, in violation of "a fundamental policy of bankruptcy law" that there be "equality among creditors."  *See Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54, 57 (3d Cir. 1990).

13.      Setting aside the irony of the Asbestos Objectors' assertion that the LSGT Debtors were cash-strapped enough to justify lifting the automatic stay of other Debtors to pay their legacy litigation costs, but not financially distressed enough to justify their own bankruptcy filings,[15] the directors and manager of the LSGT Debtors understood the risk of not filing.[16] Instead of accepting that risk, the LSGT Debtors chose to file for bankruptcy, in part, to utilize the protection of the automatic stay to obtain "breathing room" to maximize the value of their estates while evaluating their restructuring options.[17]

---

[15]   *See id.* at 205:21-206:6 (Kelleher Closing Argument).

[16]   *See id.* at 127:24-128:2 (Moldovan) ("I just thought it would be very difficult for any creditor to allow money to go to one unsecured—you know, for other unsecured creditors allow money to leave the system to this particular unsecured creditor.").

[17]   *See* D-DIR Moldovan ¶¶ 11-12; D-DIR Horton ¶ 6; 12/5/2016 Hr'g Tr. at 46:7-11 (Horton); 12/5/2016 Hr'g Tr. at 125:10-128:2 (Moldovan) ("Again, it was to put a pause on the cases while a determination with a holistic solution was arrived at and remove the cash flow negative part of EECI allowed us to come up with a solution

14.     The Asbestos Objectors' second proposed alternative would have the LSGT Debtors allow claimants to liquidate their claim and hope they would forgo collecting until EFH Corp. emerged.[18]  *First*, it is unclear how an ***unmanifested*** asbestos claim could be "liquidated" outside of the bankruptcy process.   *Second*, nothing in the record—or in the professional experience of the Debtors and their advisors—suggests that a disparate group of plaintiffs and their lawyers would patiently wait years to receive payment.   *Third*, even if those plaintiffs and their lawyers waited, asking the Debtors to dedicate employees and funds to litigate asbestos claims across the country in the middle of their extraordinarily complex chapter 11 reorganization would cause great prejudice to their estates by draining EFH Corp.'s limited cash position.  *See In re Downey Fin. Corp.*, 428 B.R. 595, 608-09 (Bankr. D. Del. 2010) (applying three-prong balancing test to section 362(d)(1)'s cause standard, including analyzing whether lifting stay will cause any great prejudice to either bankrupt estate or debtor).[19]

## II.     The Evidence Demonstrates that the LSGT Debtors Filed for Legitimate Reorganizational Purposes.

### A.     Courts Consider the Totality of the Facts and Circumstances to Determine if the Debtor Had a Valid Reorganizational Purpose in Filing.

15.     In determining whether a debtor has filed a chapter 11 petition in good faith, a court "must examine the '***totality of facts and circumstances***[,]'" *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) (emphasis added),[20] to see if the debtor had a

---

which, you know, I feel like the solution that we did come up with has vastly increased the benefit to the EECI creditors.").

[18]    *See* 12/5/2016 Hr'g Tr. at 27:8-13 (Kelleher Opening Statement); Reply at 4 n.5.

[19]    Had the LSGT Debtors not filed, they could reasonably expect a tide of filings against not only EECI but also the other three LSGT Debtors.

[20]    This court has recognized that the filing of affiliates is included in the totality of the facts and circumstances.  *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 301 (Bankr. D. Del. 2011) ("The Court concludes that it ***does not have to have blinders on*** and ignore events subsequent to the Mezz II filing, ***particularly the filing of its affiliates*** within ten days of its own bankruptcy filing.") (emphases added).

"*valid reorganizational purpose*," *SGL Carbon*, 200 F.3d at 163 (emphasis added). Accordingly, "as long as a debtor is 'motivated by plausible, legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure to hinder creditors, bad faith is not present in a chapter 11 case.'" *In re Paradigm Elizabeth, LLC*, 2015 WL 435067, *3 (Bankr. D. N.J. Feb. 2, 2015) (quoting *In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 905 (Bankr. E.D. Pa. 1987)).  Seeking to "maximiz[e] property available to satisfy creditors" is a valid reorganizational purpose.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 LaSalle St. P'ship*, 526 U.S. 434, 435 (1999); *Integrated Telecom*, 384 F.3d at 120 (stating the question is "whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern *or* maximizing the value of the debtor's estate") (emphasis added).[21]

16.     The Asbestos Objectors' unfounded theory is that EFH Corp.—the LSGT Debtors' "controlling parent"—filed the LSGT Debtors for bankruptcy out of self-interest and for its own benefit.[22]  In support, they rely on a series of wholly distinguishable cases in which a finding of bad faith was upheld.

17.     As an initial matter, the uncontroverted evidence shows that the LSGT Debtors made their own decision to file,[23] and acted independently in doing so.[24]

---

[21]   This flatly contradicts the Asbestos Objectors' argument that "what we have to see, what the debtors need to show is that there was . . . some attempt to restructure debts."  12/5/2016 Hr'g Tr. at 205:16-19 (Kelleher Closing Statement).

[22]   Motion at 1, 6.

[23]   DX091 Apr. 25, 2014 Minutes of Meeting of EECI Board [EFH06449434 at EFH06449593]; 12/5/2016 Hr'g Tr. at 123:21-124:1 (Moldovan) ("[T]he overall purpose was to have a formal minuted discussion about our decision, you know, it was clear that there was going to be a decision forthcoming in the next few days and we had a formal meeting to discuss, you know, whether it was – to discuss the appropriateness of filing EECI, in particular, for Chapter 11 protection."); DX091 Apr. 28, 2014 Unanimous Written Consents of LSGT Gas, EEC Holdings, and LSGT SACROC [EFH06449434]; 12/5/2016 Hr'g Tr. at 42:12-19 (Horton) ("With regards to the other debtors, I was the sole manager, the sole director for those entities. I clearly didn't need to have a meeting with myself.  I'd had the conversations at EECI.  I applied the same rationale and fundamentals to those entities upon – and also upon having other conversations with my legal counsel.  And ultimately, I made the decision that we should file those entities.").

18.     Nonetheless, three of the four cases cited by the Asbestos Objectors were single-debtor cases, and none of the four is remotely similar to this case.  In *SGL Carbon*, the debtor was highly solvent and had a highly solvent non-debtor parent.  200 F.3d at 163.  In *Liberate*, the debtor had enough unrestricted cash to pay all of its liabilities.  *In re Liberate Techs.*, 314 B.R. 206, 209-10 (Bankr. N.D. Cal. 2004).  And, in *Integrated Telecom*, the debtor had enough cash to have paid its total liabilities four times over.  384 F.3d at 115.

19.     In other words, in each of these cases, the debtors could not have maximized property available to satisfy creditors because the creditors in those cases were already going to be satisfied in full.  The same is not true here.  As indicated above, the LSGT Debtors "sole source of funding was from an insolvent parent,"[25] and they relied entirely on their intercompany receivable claim against EFH Corp. to fund the settlement and defense of their asbestos liabilities.[26]  Thus, in contrast to *SGL Carbon*, *Liberate*, and *Integrated Telecom*, the LSGT Debtors would not have been able to satisfy their creditors at all in the short term, and, as unsecured creditors of EFH Corp., they had no certainty that they would have been able to provide a material recovery to their creditors in the long-term.  The LSGT Debtors needed to address their cash flow and balance sheet issues by maximizing the value of their estates, and the Bankruptcy Code provided the necessary tools to do it.

---

[24]   *See* 12/5/2016 Hr'g Tr. at 150:3-5 (Moldovan) ("Nobody had -- not one time did anyone -- did anyone at EFH Corp. or any of the co-CROs speak directly to me and tell me what I had to do."); *id.* at 84:10-14 (Horton) ("Q: [D]id you have a concern that you could lose your job if you went against the advice of the co-CROs as to how to handle the filing of the asbestos debtors? A: Absolutely not.").

[25]   12/5/2016 Hr'g Tr. at 45:21-22 (Horton).

[26]   *See id.* at 119:15-19 (Moldovan) ("So, to the extent a payment would be made, whether it be made on a claim or to a representative or counsel or whatever cost we were incurring, EFH Corp. would fund that expense and then there would be book entries at LSGT Gas Company and EECI, Inc.").

20.     Although a multi-debtor case, *Memorial* is also distinguishable on a number of grounds.  *See In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605 (3d Cir. 2009).  *First*, the *Memorial* debtors were not part of an enterprise-wide restructuring.  *Id*. at 609-10.  Both of the debtors there were non-operating entities, and the other, operating members of the corporate family did not file.  *Id*.  Here, the LSGT Debtors are a necessary part of an enterprise-wide restructuring effort.[27]  *Second*, the *Memorial* debtors did not have viable intercompany claims against the parent, *15375 Mem'l*, 589 F.3d at 611,[28] whereas here, LSGT Gas Company LLC possesses a $560 million intercompany claim against EFH Corp.[29]  In fact, the *Memorial* debtors' only significant asset, and only means of satisfying creditor claims, was insurance policies.  *15375 Mem'l*, 589 F.3d at 621.  Thus the bankruptcy petition could not have maximized value available to those debtors' creditors because the bankruptcy process could not increase the value of insurance proceeds; instead, the bankruptcy filing diminished those debtors' estates through the buildup of administration costs.  *Id*. at 624.  *Third*, in contrast to the Debtors' ongoing restructuring, *Memorial* was in effect a two-party dispute—one party held $320 million of the $330 million in claims against the debtors.  *Id*. at 620-21.  *Fourth*, the timing of the petition demonstrated that the *Memorial* debtors filed merely as a litigation tactic.  *Id*. at 625.  The debtors filed two months before their trial with the primary claimant, and very soon after the primary claimant made it clear that it intended to go after the debtors' parent under a veil-piercing theory.  *Id*.  Thus, not only was there no way for the bankruptcy process to increase

---

[27]   *See infra* at Section II.B.

[28]   Memorial's vice president, who was in charge of marshalling the debtor's assets, did not believe that Memorial's claims against its parents were viable.  *Id.* at 610-11.  He also had testified that pursuing those claims would jeopardize his job.  *Id*. at 611.

[29]   *See* 12/5/2016 Hr'g Tr. at 116:21-117:7 (Moldovan).

recoveries available to creditors, but the subsidiaries in *Memorial* were also blatantly using the process to protect a solvent parent.

21.     The LSGT Debtors are not asking this Court to break from precedent.  Rather, the evidence overwhelmingly demonstrates that the LSGT Debtors were financially distressed and decided to file chapter 11 petitions for a valid reorganizational purpose.  At the time of the LSGT Debtors' filing, it was clear that the bankruptcy toolbox could be utilized to maximize creditor recovery, and that is exactly what these Debtors have done.

**B.     The LSGT Debtors' Participation in the Enterprise-Wide Restructuring Efforts Was Necessary and Advantageous for the LSGT Debtors.**

22.     The LSGT Debtors' participation in enterprise-wide restructuring efforts was advantageous both for the EFH enterprise as a whole and for the LSGT Debtors specifically. The EFH bankruptcy filing was the result of a drastic downturn in the energy market that left the Debtors unable to service approximately $42 billion in liabilities.  As pre-filing restructuring efforts faltered, it became increasingly likely that the Debtors would need to restructure under chapter 11 and to deconsolidate the E-Side and T-Side entities.[30]  The LSGT Debtors' chapter 11 petitions allowed the Debtors to take a holistic approach to the E-Side restructuring, and allowed the LSGT Debtors to participate in that approach.[31]

23.     The LSGT Debtors benefitted from participating in the coordinated efforts to restructure the enterprise.  Because EECI relied on its intercompany payable from LSGT Gas and LSGT Gas's intercompany payable from EFH Corp. to fund its asbestos expenses,[32] the

---

[30]   *See* 12/5/2016 Hr'g Tr. at 38:19-39:15 (Horton).

[31]   *Id.* at 39:16-19 (Horton); *id.* at 128:10-16 (Moldovan) ("And, our belief at the time was that to be part of a holistic solution; to be approving plans that are being proposed by the co-CROs; to have the co-CROs represent not just the other parties but also the [LSGT] debtors; to have K&E represent . . . these debtors, it was just a seat at the table to make sure that whatever plan was being filed was in the best interests of EECI.").

[32]   *See id.* at 119:15-19 (Moldovan).

LSGT Debtors had a vested interest in ensuring that their insolvent parent was rehabilitated into a "well capitalized entity" that could meet its obligations to the LSGT Debtors.[33]  As EECI director Kristopher Moldovan explained, if the LSGT Debtors "were not in bankruptcy, [and thus] part of a holistic solution, . . . that finding a plan sponsor to agree whether that plan sponsor be a third party purchaser or the existing creditors, to find somebody to agree to reinstate those claims . . . including the post-petition interest accrual, . . . I can't think of a scenario where we could have been able to do that."[34]

24.    In addition, the LSGT Debtors' creditors, including manifested and unmanifested asbestos claimants, benefitted from protections available through the enterprise-wide restructuring process, such as representation by the Official Committee of Unsecured Creditors of EFH Corp and its subsidiaries, including EECI (the "EFH Committee").[35]

**C.    The LSGT Debtors Filed in Good Faith to Maximize the Value of the Intercompany Claims for the Benefit of the Creditors of the LSGT Debtors.**

25.    As the uncontroverted evidence shows, by filing for bankruptcy, the LSGT Debtors sought to maintain access to, and maximize the value of, the intercompany receivable from EFH Corp.—effectively the sole source of funds to cover their asbestos liabilities.[36] Preserving the value of their sole material asset was without a doubt a legitimate restructuring

---

[33]    *See id.* at 51:6-25 (Horton) ("We decided . . . to have a receivable from LSGT Gas that was to a . . . restructured E[FH Corp.] that was no longer insolvent but rather [a] restructured, well capitalized entity."); *id.* at 65:22-25 ("we focused solely on . . . providing a receivable to a very well capitalized restructured parent").

[34]    *Id.* at 151:22-152:7 (Moldovan).

[35]    *See Notice of Appointment of Committee of Unsecured Creditors* [D.I. 2570].

[36]    *See* DX091 Apr. 25, 2014 Minutes of Meeting of EECI [EFH06449434 at EFH06449593] (reflecting that, among the factors for filing, the directors considered "that EECI may lose access to funds to satisfy EECI's ongoing obligations, including obligations related to settling or defending asbestos litigation"); 12/5/2016 Hr'g Tr. at 52:9-11 (Horton) ("Q: And was one of your goals for the restructuring strategy of the LSGT debtors to unimpair those [receivables]?   A: Absolutely."); D-DIR Horton ¶ 7 ("I understood that filing EECI for bankruptcy would help preserve its then-impaired intercompany obligations . . . and ensure future funding for any ongoing obligations.").

purpose. Absent filing, as an unsecured creditor of EFH Corp., the LSGT Debtors stood to recover a mere fraction of the value of their unsecured intercompany claims against EFH Corp.[37] And, indeed, the results of the LSGT Debtors' participation in the bankruptcy process prove that the LSGT Debtors made the correct choice in deciding to file.

26.     Specifically, the LSGT Debtors' participation resulted in full reinstatement of both the intercompany claims and the asbestos claims, even though other EFH Debtor intercompany claims are being canceled and released without any distribution.[38] Pursuant to a November 23, 2015 settlement with the EFH Committee (of which Asbestos Objectors Fenicle and Fahy are members), the Debtors must reinstate preserved asbestos claims and related intercompany claims under any plan they propose.[39] Because the intercompany claims will be fully reinstated, including post-petition interest, the amounts due on the LSGT Debtors' intercompany claims *will be even larger* at emergence.[40] Furthermore, the proposed merger agreement will rehabilitate the LSGT Debtors' insolvent parent, EFH Corp., into a solvent,

---

[37]  *See* 12/5/2016 Hr'g Tr. at 52:5-8 (Horton) ("From my perspective looking at the situation of EFH [Corp.], the parent, and its financial condition and it being insolvent, from my perspective, [the LSGT Debtors' intercompany] receivables were impaired."); *id.* at 126:18-128:2 (Moldovan) ("I just thought it would be very difficult for . . . other unsecured creditors [to] allow money to leave the system to this particular unsecured creditor."); Plan, Art. III(B)(9) (Class A9 General Unsecured Claims Against EFH Corp. are impaired and receive a pro rata share of the EFH Creditor Recovery Pool). For example, under the recovery waterfall proposed in the current Plan (a result not foreseeable in May 2014), as an EFH unsecured creditor, LSGT Gas would recover roughly 10 cents on the dollar for its claim, or about $56 million dollars, which in turn would impair the other LSGT Debtors' intercompany claims.

[38]  *See* Plan, Art. III(B)(3), (13), (14).

[39]  *Notice of Settlement Among Debtors, EFH Committee, EFH Notes Trustee, Plan Sponsors, Consenting TCEH First Lien Creditors, and TCEH Committee* [D.I. 7090] at Ex. A, Settlement & Support Agreement, Section 6.

[40]  *See* 12/5/2016 Hr'g Tr. at 118:4-10 (Moldovan) (upon reinstatement, "the post-petition interest will be accrued as it would have—as it would at [the applicable interest] rates and, so, that all of these amounts would be, in some cases, substantially increased by the amount of post-petition interest."); *id.* at 133:24-134:2 (Moldovan) ("They're—the LSGT claim is getting reinstated in full; is getting post-petition interest, which adds another $84 million to the claim. EECI's claim is being reinstated in full. It's getting another $33 million in claims.").

reorganized entity with $12 billion of equity interest in the enterprise.[41] Thus, the LSGT Debtors will receive the best possible treatment for themselves and their creditors because of their participation in the restructuring process.[42]

### D. Addressing a Potential Value-Destroying Tax Bill was a Legitimate Restructuring Purpose for the LSGT Debtors.

27.    The evidence established that, at the time of filing, the Directors of the LSGT Debtors were deeply concerned about the risk that the LSGT Debtors could become jointly and severally liable for a multi-billion dollar deconsolidation tax if the TCEH Debtors were separated from the EFH/EFIH Debtors.[43] To ensure a "seat at the table" for the LSGT Debtors in a global resolution of deconsolidation tax issues—and an opportunity for the Directors of the LSGT Debtors to approve or reject a proposed plan of reorganization—the Directors of the LSGT Debtors viewed filing for bankruptcy as necessary.[44]

28.    The Asbestos Objectors argue that any tax liability was speculative, and that the Debtors "had every incentive to prevent that from happening and [were] motivated . . . to prevent it from happening."[45] While the Debtors worked hard to avoid a massive deconsolidation tax bill—and ultimately expect to be successful—the uncontroverted evidence shows that, at the

---

[41]    *See id.* at 134:3-14 (Moldovan).

[42]    *Id.* at 133:24-134:14 (Moldovan) ("And, so, from my perspective this was a great—***this is a homerun for EECI*** because it now has a larger pool against a plan sponsor that will—has agreed not to put any debt between it and the asset that it's buying. . . . So, it, in my view, increased the value of this estate.") (emphasis added).

[43]    *See id.* at 128:6-16 (Moldovan); *id.* at 46:14-24 (Horton).

The Asbestos Objectors' focus on certain TCEH Corp. subsidiaries "checking the box" is misplaced. *See* 12/5/2016 Hr'g Tr. at 85:3-86:2 (Horton). The LSGT Debtors aside from LSGT Gas Co. LLC were already corporations at the time of filing, and would have been jointly and severally liable for a deconsolidation tax regardless of whether any T-Side entities "checked the box."

[44]    *See id.* at 124:21-24 (Moldovan) ("And, so, we talked about being part of a holistic solution where we would have, for lack of a better phrase, a seat at the table or ability to approve any plan that was voted or that was proposed to be filed.").

[45]    *Id.* at 202:9-11 (Kelleher Closing Argument).

time the LSGT Debtors filed for bankruptcy in April 2014, no one could predict this outcome with any confidence.[46]  The Debtors' avoidance of deconsolidation tax—following two and a half years of struggle—required receipt of a private letter ruling from the IRS and negotiation and confirmation of a plan of reorganization that allowed the separation of the TCEH Debtors in a tax-free manner.  This hard-fought success cannot form the basis of an argument that the LSGT Debtors filed for bankruptcy in bad faith in 2014.

29.     The Asbestos Objectors further contend that even if the risk existed, the LSGT Debtors did not need to file for bankruptcy to participate in a resolution of tax issues.  Specifically, the Asbestos Objectors point to EFH Properties, a corporation that was not filed for bankruptcy.[47]  But, as Mr. Moldovan explained, EFH Properties' situation was very different from the LSGT Debtors' situation.  While EFH Properties faced the same risk of deconsolidation tax liability, the Debtors had to balance that risk against factors weighing against filing, including:

- the possibility of accelerating a large tax indemnity claim;

- starting the clock on the Debtors' time to accept or reject the master lease on Energy Plaza under section 365(d)(4); and

- if the lease was rejected (or deemed rejected), the requirement that EFH Properties and its subtenants surrender the building.[48]

30.     In light of these countervailing concerns, the Debtors made the "extremely difficult" decision not to file EFH Properties for bankruptcy in April 2014, despite the

---

[46]  *See id.* at 124:13-20 (Moldovan) ("And, then, we were also discussing the fact that EECI was a corporation and that, you know, taxes have always been a huge issue in this case and, you know, it took a PLR to get over the hump that this ended up being treated the way it was for tax purposes. But there was always a big risk that there would be . . . deconsolidation-related tax obligations and that, as a corporation, it would be jointly and severally liable.").

[47]  *See* Reply at 8.

[48]  *See* 12/5/2016 Hr'g Tr. at 129:6-130:17 (Moldovan).

deconsolidation tax risk.[49]  As Mr. Moldovan testified, the Debtors reevaluated their decision continually into 2015, when the treatment of EFH Properties under the plan of reorganization took shape.[50]  Importantly, throughout its time in restructuring limbo, EFH Properties was able to function because it was a cash flow-positive entity.[51]  The LSGT Debtors, on the other hand, faced imminent cash flow insolvency in the absence of a filing and had none of the countervailing concerns of EFH Properties weighing against filing.  As such, the Directors of the LSGT Debtors determined that filing was a necessary course of action.

### E.    The Record Belies the Contention that the LSGT Debtors Filed to Evade Asbestos Liabilities.

31.    Although it is the primary thesis of Asbestos Objectors' Motion, they can point to no evidence that the LSGT Debtors filed in a bad faith effort to evade their asbestos liabilities. To the contrary, as Mr. Moldovan and Mr. Horton testified, discharging asbestos liabilities did not factor into their decision to file the LSGT Debtors' for chapter 11.[52]  Mr. Moldovan spoke unequivocally:

> I can tell you that it never came up, that ***it never crossed my mind*** that the purpose of filing for bankruptcy was to discharge any rightful claim that any asbestos debtor had.  That was never discussed.  That was never—you know, that would not have been something that would have been one of my priorities.[53]

32.    The post-filing implementation of an asbestos bar date and proposed discharge of claims not timely preserved thereby—one of the many protections afforded under the

---

[49]    *Id.* at 129:10 (Moldovan).

[50]    *Id.* at 130:10-17 (Moldovan).

[51]    *Id.* at 130:6-9  (Moldovan) ("And, then, finally, EFH Properties had a lot of cash . . . .  We had done projections. [I]t's been cash flow positive since we filed for the other companies for bankruptcy.").

[52]    *See id.* at 131:12-132:2, 158:21-25 (Moldovan); *id.* at 65:8-66:2 (Horton).

[53]    *Id.* at 131:22-132:2 (Moldovan) (emphasis added).

Bankruptcy Rules[54]—does not negate the LSGT Debtors' good faith filing in April 2014. As the Asbestos Objectors themselves admit, a discharge of claims is merely "a consequential benefit of an otherwise good faith filing."[55] Indeed, the Debtors' post-filing commitment to reinstate all timely filed asbestos claims and the related intercompany claims, as discussed further below, can hardly be construed as an attempt to evade liabilities.

### F. The LSGT Debtors Sought a Bar Date for Asbestos Claims as Part of a Comprehensive Restructuring Plan That Maximized Value for the LSGT Debtors.

33. Reinstatement of the LSGT Debtors' intercompany claims and asbestos liabilities represents the value-maximizing outcome of including those entities in the restructuring process—just as the LSGT Debtors had intended.[56] Without the protections of the bankruptcy process—including the asbestos bar date—there is no evidence that the Debtors would be able to reinstate the LSGT Debtors' intercompany claims and preserve their alleged asbestos liabilities.

34. *First*, the record demonstrates that the Debtors sought an asbestos bar date due to potential investor concerns about the LSGT Debtors' open-ended asbestos liabilities.[57]

---

[54] *See In re Energy Future Holdings Corp.*, 522 B.R. 520, 538 (Bankr. D. Del. 2015) ("The PI Law Firms argue that a bar date for the Unmanifested Claims is not required and that the only way to deal with those claims is through a channeling injunction under section 524(g) of the Bankruptcy Code. The plain meaning of the Bankruptcy Code and Rules, however, lead to the opposite conclusion.") (citing Fed. R. Bankr. P. 3003(c) ("The court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed.")).

[55] Motion at 15 (quoting *15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 620 (3d Cir. 2009)) (internal quotation marks omitted).

[56] *See* 12/5/2016 Hr'g Tr. at 150:15-151:8 (Moldovan) ("I thought that [filing] was going to maximize the value of EECI. I thought it was the appropriate thing to do at the time. . . . I knew there were asbestos claimants. I just was trying to maximize the value of the estate to whoever ultimately was approved as having claims against that value."); D-DIR Horton ¶ 13 ("In short, the LSGT Debtors' financial situation will be significantly improved following consummation of the Plan and Merger Agreement.").

[57] *See* 10/1/2015 Keglevic Dep. Tr. at 331:13-21 ("[T]here was a benefit in seeking a bar date simply because of the bid process that we were running and the fact that the potential bidders were asking us for the best possible estimate we had with respect to what the asbestos claims would be, and without a bar date, it is very difficult to give them a tangible estimate for asbestos."); D-DIR Horton ¶ 14 ("During this [Oncor marketing] process,

Responding to those concerns, the Debtors sought an asbestos bar date, not to limit the LSGT Debtors' liabilities, but to **_identify_** them, in order to provide a higher degree of certainty to bidders.[58]  *Second*, "[e]ven with the Asbestos Bar Date in place, . . . the Debtors still had to engage in significant negotiations with NextEra and other potential purchasers to convince them to reinstate the asbestos-related claims against the LSGT Debtors in the current Plan."[59]  The fact that NextEra ultimately agreed to reinstate the asbestos liabilities and the intercompany receivables, despite its reluctance, proves that the LSGT Debtors' participation in the global bankruptcy process could and did provide adequate reassurance.[60]  *Third*, if anything, EFH Corp. expended leverage by asking bidders to assume the asbestos liabilities.  For example, the $100 million asbestos escrow set aside in the Merger Agreement would otherwise go to other unsecured creditors of EFH.[61]

---

potentially interested parties repeatedly expressed both a concern about reinstating asbestos liabilities, and a desire for the Debtors to quantify the potential exposure of the LSGT Debtors.").

[58]   *See* 12/5/2016 Hr'g Tr. at 53:21-54:4 (Horton) ("I can recall at least two bidders both who we signed a transactions with, the Hunt[s] and NextEra, being adamant about filing for a bar date. . . . They wanted greater certainty.  They wanted more insight to the magnitude.  They wanted to quantify what these potential liabilities could be.").

[59]   D-DIR Horton ¶ 17.  *See also id.* ("[A]s late as July 17, 2016—less than two weeks before the Debtors and NextEra executed the NextEra Merger Agreement and Plan—the treatment of claims and interests related to asbestos, including the reinstatement of those interests at the LSGT Debtors was subject to further negotiation and diligence."); 12/5/2016 Hr'g Tr. at 58:2-61:12 (Horton); DX222 June 16, 2016 Email from S. Dore to C. Sieving [EFH06522696] ("we are really struggling with the thought of taking uncapped asbestos liability for claims and fact patterns we have very little visibility into); DX106 June 18, 2016 Email from C. Sieving to S. Dore, A. Calder [EFH06436044].

[60]   12/5/2016 Hr'g Tr. at 61:13-63:7 (Horton) (testifying that the Debtors were able to achieve reinstatement of the LSGT Debtors' asbestos liabilities and related intercompany claims as a result of: (i) establishing an asbestos bar date, (ii) engaging in intensive due diligence and negations with NextEra, (iii) setting aside $100 million of NextEra's purchase price in an escrow account to be used for paying post-emergence asbestos liabilities, and (iv) working with Aon Risk and Ankura to analyze and estimate the LSGT Debtors' asbestos liabilities).

[61]   *See, e.g.*, DX003 *Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I.9584] at Ex. 1, July 29, 2016 Amended Merger Agreement (releasing $150 million from the asbestos escrow pursuant to settlement with Fidelity, which increased EFH general unsecured creditors' recoveries).

35.      Accordingly, contrary to the Asbestos Objectors' assertions, the Debtors' efforts to convince bidders for Oncor to reinstate the LSGT Debtors' properly preserved asbestos liabilities inured to the benefit of the LSGT Debtors and their creditors, not EFH Corp.[62]  In any event, this enterprise-wide restructuring process is not a zero-sum game.  The Debtors, their creditors, and the Court have worked diligently to maximize value for all of the estates.

36.      Finally, while the Asbestos Objectors assert that "[t]he only impact dismissal will have is that asbestos claims will not be discharged,"[63] the record shows otherwise.  Dismissal of the LSGT Debtors' chapter 11 cases would trigger NextEra's termination rights under the Plan Support Agreement and, consequently, the Merger Agreement.[64]  And, as Mr. Horton testified, he has no reason to believe that NextEra would waive its termination rights under those documents and maintain the favorable treatment of the LSGT entities and their creditors.[65]  Finally, dismissal may affect the Debtors' November 23, 2015 settlement with the EFH Committee, which requires reinstatement of preserved asbestos claims and related intercompany receivables.[66]  In short, dismissal of the LSGT Debtors could derail the entire EFH reorganization—and reduce recoveries for the LSGT Debtors and their creditors in the process.

---

[62]   Without a shred of evidence, the Asbestos Objectors also speculate that EFH Corp. only sought to reinstate the intercompany claims in order to avoid veil-piercing by asbestos claimants.  *See* 12/5/2016 Hr'g Tr. at 205:1-11 (Kelleher Closing Argument).  Even so, the post-filing reinstatement of intercompany claims has no bearing on the LSGT Debtors' good faith decision to file for bankruptcy in April 2014.

[63]   Reply at 20.

[64]   DX003 *Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry into and Performance Under Plan Support Agreement* [D.I.9584] at Exs. 1, 2, PSA and Merger Agreement; 12/5/2016 Hr'g Tr. at 66:11-25 (Horton) (testifying that dismissal "would allow NextEra to terminate the PSA which would also allow them to terminate the merger agreement).

[65]   *See* 12/5/2016 Hr'g Tr. at 67:1-4 (Horton).

[66]   *See id.* at 211:19-212:5 (Glueckstein Closing Statement).

**III.    The Motion Is Untimely and a Last Resort by Counsel to the Asbestos Objectors.**

37.    The Court should also apply the doctrine of laches to the Motion.  *See, e.g.*, *In re Mirant Corp.*, 2005 WL 2148362 at *11 (Bankr. N.D. Tex. Jan. 26, 2005) (applying doctrine of laches to motion to dismiss debtors for bad-faith filing where (i) there was a delay asserting the claim, (ii) there was no excuse for the delay, and (iii) the delay resulted in undue prejudice).

38.    *First*, there was unquestionably a delay, and the Asbestos Objectors do not argue otherwise.  *Second*, there is no excuse for that delay.  The Asbestos Objectors have been extremely active in these chapter 11 cases.  For two-plus years, counsel to the Asbestos Objectors tried everything in their play book.  They objected to the Debtors' motion to set a bar date, sought appointment of an unmanifested claims representative, persisted in appealing a confirmation order for a defunct plan that did not impair them, and sought leave to file a class proof of claim, among other actions.[67]

39.    The Asbestos Objectors assert two unavailing excuses for their delay.  They contend that movants John H. Jones and David Heinzmann, who allegedly manifested asbestos-related injury after the bar date, "certainly cannot be faulted for not having acted earlier."[68]  But there is no evidence in the record about Mr. Jones or Mr. Heinzmann and what they knew about these cases and when.  In any event, counsel to the Asbestos Objectors should not be permitted to absolve their tactical delays by expanding their client roster.  The Asbestos Objectors next

---

[67]    *See Objection of Certain Asbestos Claimants to the Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Setting Bar Dates for Filing Non-Customer Proofs of Claim and Requests for Payment Under Section 503(B)(9) of the Bankruptcy Code, (B) Approving the Form of and Manner for Filing Non-Customer Proofs of Claim and Requests for Payment Under Section 503(B)(9) of the Bankruptcy Code, and (C) Approving Notice Thereof* [D.I. 1791]; *Motion of Charlotte Liberda and Curtis Liberda to Appoint Legal Representative* [D.I. 5072]; *Trial Brief and Omnibus Objection of Fencile and Fahy to (I) Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement and (II) Confirmation of the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al.* [D.I. 6610]; *Motion for Application of Fed. R. Bankr. P. 7023 to this Proceeding and to Certify a Class Pursuant to FRCP Rule 23* [D.I. 7151].

[68]    *See* Reply at 19.

argue the Debtors caused the delay by opposing the appointment of a legal representative "of future, Unmanifested Asbestos Claimants."[69]  The Debtors cannot be faulted for opposing an appointment that the U.S. Trustee denied.  Regardless, the Debtors opposed that appointment *15 months* ago.[70]  The true reason behind the delay was illuminated at the hearing:  counsel to the Asbestos Objectors were happy to have the LSGT Debtors in bankruptcy, as long as a section 524(g) trust was on the table.[71]

40.     *Third*, the Debtors and their estates have been unduly prejudiced by the delay. The efforts to set an asbestos bar date, and the extensive litigation that followed, would not have occurred but for the presence of the LSGT Debtors in these chapter 11 cases.  Instead of timely bringing a motion to dismiss, the Asbestos Objectors challenged—and collaterally attacked—the asbestos bar bate on numerous grounds, waiting to file the Motion until the likelihood of securing a section 524(g) trust was undeniably remote.  Their inexcusable delay directly caused the Debtors to expend millions of dollars—and the Court to devote significant resources—on issues related to the LSGT Debtors, all to the detriment of the Court, the Debtors, and creditor recoveries.

## CONCLUSION

41.     For the reasons set forth herein, the Debtors respectfully request that the Court deny the Motion.

*[Remainder of page intentionally left blank]*

---

[69]   *See id.*

[70]   *See Objection of Energy Future Holdings Corp., et al., to the Motion of Charlotte Liberda and Curtis Liberda to Appoint Legal Representative and Joinder of Shirley Fenicle, as Successor-in-Interest to the Estate of George Fenicle, and David William Fahy to the Motion of Charlotte and Curtis Liberda to Appoint Legal Representative*, dated August 4, 2015 [D.I. 5209].

[71]   *See* 12/5/2016 Hr'g Tr. at 207:4-5 (Kelleher Closing Argument) ("[O]f course, we would like a 524(g) plan.").

Wilmington, Delaware
Dated: December 9, 2016

/s/ Joseph C. Barsalona II

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
Joseph C. Barsalona II (No. 6102)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:        collins@rlf.com
              defranceschi@rlf.com
              madron@rlf.com
              barsalona@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        edward.sassower@kirkland.com
              stephen.hessler@kirkland.com
              brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              marc.kieselstein@kirkland.com
              chad.husnick@kirkland.com
              steven.serajeddini@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

# APPENDIX

## Asbestos Objectors' False Assertions

| Asbestos Objectors' Assertion | Trial Record |
|---|---|
| "They did not even make the decision to file the Chapter 11 petitions.  Rather, that decision was made by their controlling parent, EFH Corp."  Motion at 1.<br><br>"Without meeting for debate or discussion, the boards of each of the Asbestos Debtors signed an 'Omnibus Written Consent in Lieu of a Meeting', dated as of April 28, 2014 – the date before the Petition Date – adopting the recommendation of EFH Corp's co-CROs that they file for bankruptcy."  Motion at 6. | DX091, April 25, 2014 Minutes of Meeting of EECI Board. [EFH06449434 at EFH06449593].<br><br>DX091, Unanimous Written Consents of LSGT Gas, EEC Holdings, and LSGT SACROC [EFH06449434 at 06449607].<br><br>"On April 25th of 2014, Mr. Moldovan and I had a formal meeting along with our legal counsel, Mr. Chad Husnick, Mr. Anthony Sexton.  And we talked specifically about filing the LSGT debtors."  12/5/2016 Hr'g Tr. at 42:5-8 (Horton).<br><br>"[T]he overall purpose was to have a formal minuted discussion about our decision, you know, it was clear that there was going to be a decision forthcoming in the next few days and we had a formal meeting to discuss, you know, whether it was – to discuss the appropriateness of filing EECI, in particular, for Chapter 11 protection."  12/5/2016 Hr'g Tr. at 123:21-124:1 (Moldovan).<br><br>"Q: Before we go through those a little more closely, first, can you tell us, was this new information to you . . . as of April 25th, 2014? A: No. And these are things that we had been discussing leading up to this meeting." 12/5/2016 Hr'g Tr. at 125:5-9 (Moldovan).<br><br>"With regards to the other debtors, I was the sole manager, the sole director for those entities. I clearly didn't need to have a meeting with myself.  I'd had the conversations at EECI.  I applied the same rationale and fundamentals to those entities upon – and also upon having other conversations with my legal counsel.  And ultimately, I made the decision |

| Asbestos Objectors' Assertion | Trial Record |
|---|---|
| | that we should file those entities." 12/5/2016 Hr'g Tr. at 42:12-19 (Horton). |
| "What they were going to do was just file for bankruptcy, pass through all claims for which proofs of claim were filed and discharge claims for which proofs of claim were not filed including unmanifested claims. . . . And that was the plan from the beginning."  12/5/2016 Hr'g Tr. at 30:2-8 (Kelleher Opening Statement).<br><br>"By the same token, the Asbestos Debtors' desire to shed their future asbestos liabilities in order to make their corporate parent more attractive to potential purchasers is not a valid reorganizational purpose."  Motion at 15.<br><br>"Rather than maximizing the value of the estates for the benefit of the creditors, the only impact of the bankruptcies would be to reduce creditors' recoveries by discharging the claims of unselfconscious, unaware, and unrepresented Unmanifested Asbestos Claimants."  Motion at 15. | "I can tell you that it never came up, that it never crossed my mind that the purpose of filing for bankruptcy was to discharge any rightful claim that any asbestos debtor had. That was never discussed.  That was never – you know, that would not have been something that would have been one of my priorities."  12/5/2016 Hr'g Tr. at 131:22-132:2 (Moldovan).<br><br>"As the director, we focused solely on reinstating the claims, having the claims assumed, reinstating the intercompany receivables between and amongst the entities and providing a receivable to a very well capitalized restructured parent and the set aside of the $100 million of – for the purpose of the asbestos claimants solely."  12/5/2016 Hr'g Tr. at 65:21-66:3 (Horton). |
| "The only impact dismissal will have is that asbestos claims will not be discharged."  Reply at 20. | "[T]here's a condition precedent in the plan support agreement that would allow NextEra to terminate the PSA which would also allow them to terminate the merger agreement." 12/5/2016 Hr'g Tr. at 66:23-25 (Horton). |
| "Funding the obligations would cause no hardship to EFH Corp.: historically, the Asbestos Debtors have paid no more than $3 million annually to resolve asbestos claims." Reply at 6. | "EECI's asbestos obligations and related defense costs have totaled approximately $12.5 million since 2004.  In the three years before the Petition Date, the annual amounts grew: $1.2 million, $1.6 million, and **3.8 million** in 2011, 2012, and 2013, respectively."  D-DIR Hunter ¶ 13 (emphasis added). |
| "Contrary to the Debtors' assertions, the EFH Committee does not, and cannot, represent future, Unmanifested Asbestos Claimants." Reply at 19 n. 28. | D.I. 2570 (Notice of Appointment of Committee of Unsecured Creditors) |
| "You know, EFH owes LSGT $1.7 billion." | "I'm aware that . . . [the Debtors' liquidation |

| Asbestos Objectors' Assertion | Trial Record |
|---|---|
| 12/5/2016 Hr'g Tr. at 26:24-25 (Kelleher Opening Statement).<br><br>"That is a small fraction of EFH Corp.'s admittedly valid intercompany obligations to the Asbestos Debtors, which, according to the Debtors' expert, totals $2.7 billion."  Reply at 6. | analysis expert, John Stuart] referenced a number in the books and records of $1.7 billion. . . . I do not believe that that accurately represents a claim that that company—that LSGT Gas would have against EFH Corp." 12/5/2016 Hr'g Tr. at 140:12-22 (Moldovan).<br><br>"LSGT Gas has a receivable from EFH Corp. for $560 million as of that date . . . ." 12/5/2016 Hr'g Tr. at 36:10-11 (Horton).<br><br>DX133, Select Intercompany Balances as of June 30, 2015 [EFH06448281] (showing EFH Corp. owing LSGT Gas Company LLC $560.36 million).<br><br>D-DEM Horton 1 (showing EFH Corp. owing LSGT Gas Company LLC $560 million).<br><br>"They're—the LSGT claim is getting reinstated in full; is getting post-petition interest, which adds another $84 million to the claim.  EECI's claim is being reinstated in full. It's getting another $33 million in claims." 12/5/2016 Hr'g Tr. at 133:24-134:2 (Moldovan). |