1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    Case No. 14-10979-css

5    - - - - - - - - - - - - - - - - - - - -x

6

7    In the Matter of:

8

9    ENERGY FUTURE HOLDINGS CORP., et al.,

10

11              Debtors.

12

13   - - - - - - - - - - - - - - - - - - - -x

14

15              United States Bankruptcy Court

16              824 Market Street North, 3rd Floor

17              Wilmington, Delaware

18

19              December 13 2016

20              10:08 AM

21

22   B E F O R E:

23   HON. CHRISTOPHER S. SONTCHI

24   U.S. BANKRUPTCY JUDGE

25   ECR:  LESLIE MURIN

1   14-10979-css Energy Future Holdings Corp., et al.

2   Ch 11

3

4   HEARING re Debtors' Third Omnibus (Non-Substantive)

5   Objection to (No Supporting Documentation) Customer Claims

6   Pursuant to Section 502(B) of the Bankruptcy Code,

7   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

8   Rule 3007-1

9

10  HEARING re Debtors' Fourth Omnibus (Substantive) Objection

11  to Certain Substantive Duplicate and no Liability Claims

12  Pursuant to Section 502(B) of the Bankruptcy Code,

13  Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

14  Rule 3007-1

15

16  HEARING re Debtors' Sixth Omnibus (Non-Substantive)

17  Objection to (Insufficient Documentation) Claims Pursuant to

18  Section 502(B) of the Bankruptcy Code, Bankruptcy

19  Rules 3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1

20

21  HEARING re Debtors' Seventh Omnibus (Substantive) Objection

22  to Certain no Liability Claims Pursuant to Section 502(B) of

23  the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007,

24  and Local Bankruptcy Rule 3007-1 [D.I. 3218]

25

1    HEARING re Debtors' Eighth Omnibus (Non-Substantive)

2    Objection to (Insufficient Documentation) Claims Pursuant to

3    Section 502(B) of the Bankruptcy Code, Bankruptcy Rules

4    3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

5    3381]

6

7    HEARING re Debtors' Tenth Omnibus (Substantive) Objection to

8    (Certain No Liability) Claims Pursuant to Section 502(B) of

9    the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007,

10   and Local Bankruptcy Rule 3007-1 [D.I. 3473]

11

12   HEARING re Debtors' Thirteenth Omnibus (Non-Substantive)

13   Objection to (Insufficient Documentation) Claims Pursuant to

14   Section 502(B) of the Bankruptcy Code, Bankruptcy Rules

15   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

16   4003]

17

18   HEARING re Debtors' Fifteenth Omnibus (Non-Substantive)

19   Objection to (Insufficient Documentation) Claims Pursuant to

20   Section 502(B) of the Bankruptcy Code, Bankruptcy Rules

21   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

22   4052]

23

24

25

1    HEARING re Debtors' Sixteenth Omnibus (Non-Substantive)

2    Objection to (Insufficient Documentation, Amended, and Wrong

3    Debtor) Claims Pursuant to Section 502(B) of the Bankruptcy

4    Code, Bankruptcy Rules 3001, 3003, and 3007, and Local

5    Bankruptcy Rule 3007-1 [D.I. 4782]

6

7    HEARING re Debtors' Seventeenth Omnibus (Substantive)

8    Objection to (Substantive Duplicate, No Liability, and No

9    Claim Asserted) Claims Pursuant to Section 502(B) of the

10   Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and

11   Local Bankruptcy Rule 3007-1 [D.I. 4784]

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Beck

1  A P P E A R A N C E S :

2  KIRKLAND & ELLIS LLP

3      Attorneys for Debtors and Debtors-in-Possession

4      601 Lexington Avenue

5      New York, NY 10022

6

7  BY:  REBECCA B. CHAIKIN, ESQ.

8      NATASHA HWANGPO, ESQ. (TELEPHONICALLY)

9      APARMA YENAMANDRA, ESQ. (TELEPHONICALLY)

10

11  KIRKLAND & ELLIS LLP

12      Attorneys for Debtors and Debtors-in-Possession

13      555 California Street

14      San Francisco, CA 94104

15

16  BY:  JUSTIN SOWA, ESQ.

17

18  KIRKLAND & ELLIS LLP

19      Attorneys for Debtors and Debtors-in-Possession

20      655 Fifteenth Street, N.W.

21      Washington, DC 20005

22

23  BY:  BRYAN M. STEPHANY, ESQ.

24

25

Page 6

1    RICHARDS LAYTON & FINGER, P.C.

2         Co-Counsel to Debtors and Debtors-in-Possession

3         One Rodney Square

4         920 North King Street

5         Wilmington, DE 19801

6

7    BY:  JASON M. MADRON, ESQ.

8         DANIEL DEFRANCESCHI, ESQ.

9

10   AKIN GUMP STRAUSS HAUER & FELD LLP

11        Attorneys for Ad Hoc Committee of Unsecured Noteholders

12        One Bryant Park

13        Bank of America Tower

14        New York, NY 10036

15

16   BY:  CATHERINE EISENHUT, ESQ.

17        (TELEPHONICALLY)

18

19   BAKER BOTTS LLP

20        Attorneys for Hunt Utility Services

21        2001 Ross Avenue

22        Dallas, TX 75201

23

24   BY:  NOAH M. SCHOTTENSTEIN, ESQ.

25        (TELEPHONICALLY)

Page 7

1

2    CHADBOURNE & PARKE LLP

3         Attorneys for NextEra

4         350 South Grand Avenue

5         32nd Floor

6         Los Angeles, CA 90071

7

8    BY:  ERIC C. DAUCHER, ESQ.

9         (TELEPHONICALLY)

10

11   JONES DAY

12        Attorneys for Oncor Electric Delivery Holdings

13        77 West Wacker Drive

14        Chicago, IL 60601

15

16   BY:  JOSEPH A. FLORCZAK, ESQ.

17        (TELEPHONICALLY)

18

19   KLEHR HARRISON HARVEY BRANZBURG LLP

20        Attorneys for UMB Bank, N.A., Indenture Trustee

21        919 N. Market Street

22        Suite 1000

23        Wilmington, DE 19801

24

25   BY:  RAYMOND H. LEMISCH, ESQ.

Page 8

```
 1

 2   KRAMER LEVIN NAFTALIS & FRANKEL LLP

 3        Attorneys for Second Lien Trustee

 4        1177 Avenue of the Americas

 5        New York, NY 10036

 6

 7   BY:  MEGAN M. WASSON, ESQ.

 8        (TELEPHONICALLY)

 9

10   MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP

11        Attorneys for the Official Committee of Unsecured

12         Creditors

13        1105 North Market Street

14        15th floor

15        Wilmington, DE 19801

16

17   BY:  MARK A. FINK, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25
```

1    PAUL WEISS RIFKIND WHARTON & GARRISON LLP

2         Attorneys for the Steering Committee of TCEH First Lien

3          Lenders

4         1285 Avenue of the Americas

5         New York, NY 10019

6

7    BY:  KELLIE CAIRNS, ESQ.

8         (TELEPHONICALLY)

9

10   POTTER ANDERSON & CORROON LLP

11        Attorneys for Deutsche Bank New York

12        Hercules Plaza

13        1313 North Market Street

14        6th Floor

15        Wilmington, DE 19801

16

17   BY:  R. STEPHEN MCNEILL, ESQ.

18

19   SHEARMAN & STERLING LLP

20        Attorneys for Deutsche Bank

21        599 Lexington Avenue

22        New York, NY 10022

23

24   BY:  NED S. SCHODEK, ESQ.

25        (TELEPHONICALLY)

1

2    SULLIVAN & CROMWELL LLP

3          Attorneys for E-Side Committee

4          125 Broad Street

5          New York, NY 10004

6

7    BY:   ALEXA J. KRANZLEY, ESQ.

8          (TELEPHONICALLY)

9

10   ALSO APPEARING TELEPHONICALLY PRO SE CLAIMANTS:

11   WAYNE M. ENGLISH, Claimant

12          4849 Bluecap Court

13          Mesquite, TX 75181

14          (TELEPHONICALLY)

15

16   MARILYN BELL, Claimant

17          16795 County Road 26

18          Tyler, TX 75707

19          (TELEPHONICALLY)

20

21

22

23

24

25

```
 1                     P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              THE COURT:  Please be seated.
 4         (Pause)
 5              THE COURT:  Good morning.
 6              MS. CHAIKIN:  Good morning, Your Honor.  For the
 7    record, Rebecca Chaikin from Kirkland & Ellis, counsel to
 8    the debtors.  It's an honor to be before you again for the
 9    second of the two hearings that we're having to adjudicate
10    the debtors' remaining objections to contested proofs of
11    claims.  And again, to be clear, none of the claims that are
12    at issue today are related to asbestos issues.
13              For today's hearing, at Your Honor's request, we
14    will plan to follow the same process that we did at the
15    first hearing last month.  For the benefit of the creditors
16    who are joining us by telephone today, I'm happy to walk
17    through that process again so everyone knows what to expect.
18              THE COURT:  Yes, please.
19              MS. CHAIKIN:  So the debtors will begin with a
20    short opening presentation including direct testimony from
21    the two declarants who supported our reply brief which was
22    filed back in October.  The first is Ms. Sinead Soesbe,
23    senior counsel at Vistra General Corporate Services,
24    formerly EFH Corporate Services.  She generally oversaw the
25    claims administration process as it relates to the pro se
```

1   claimants.

2          My second witness, who I believe is actually going

3   first, Mr. Daniel McKillop, he's a senior manager of

4   Customer Advocacy Services at TXU Energy.  Mr. McKillop

5   oversaw TXU's efforts to adjust claims related to customer

6   accounts.

7          And a quick correction, Ms. Soesbe is, in fact,

8   going first.

9          We also have with us today Mr. Steven Kotarba,

10  managing director at Alvarez & Marsal.  He was the declarant

11  in support of the omnibus objections that the debtors filed

12  and is here should the need for him to testify arise.

13          After the debtors' opening presentation, each of

14  the claimants will have the opportunity to respond and

15  present any argument he or she may have.  And I understand

16  that there are no claimants with us in the courtroom but

17  there are two that are signed up to participate by

18  telephone.

19          The debtors again respectfully request for

20  reserved time at the end of all the claimant presentations

21  for any rebuttal, if necessary, and for a short closing

22  presentation.  And if that is acceptable, we can begin.

23          THE COURT:  Yes.

24          MS. CHAIKIN:  Your Honor, as you know, over 10,000

25  non-asbestos proofs of claim were filed in these cases.  And

1    during the past two years, the debtors filed objections to

2    over half of those claims.  That's more than 5500 claims in

3    43 omnibus objections.  And today, it just means that only

4    30 claimants remain and 10 of those are with non-pro se

5    claimants with 20 pro se claimants remaining.  And this is a

6    testament to the debtors' commitment both to consensual

7    resolution and to accurately reconciling claims.  As Your

8    Honor has seen throughout these cases, the debtors only

9    bring claim disputes to your door when we are at an impasse

10   where the debtors believe that the facts and the law are

11   firmly on their side.

12           Today is no different.  The claimants who filed

13   the contested pro se claims before us have been unable to

14   demonstrate a valid claim against the debtors.  Meanwhile,

15   the debtors have done everything that they can think of to

16   reasonably diligence these claims.  And in every case, the

17   debtors could find nothing to support the existence of a

18   liability owed by the debtors to the claimants.  This lack

19   of evidence to support often inadequately described claims

20   compels the debtors to maintain and prosecute their

21   objection.

22           To be entitled to an allowed claim, the claimant

23   must need certain evidentiary standards in a burden shifting

24   test.  Many of the contested pro se claimants do not even

25   meet the initial burden to allege facts sufficient to

1    support a claim against the debtors.  In several instances,

2    the claim has yet to even identify the claim they are

3    attempting to assert.

4           The claimants who have made relatively specific

5    statements about their claims do not provide any supporting

6    evidence let alone sufficient evidence to prove a valid

7    claim by a preponderance which is their ultimate burden.

8    While some of the claims and formal responses appended

9    documents to their papers, as far as the debtors could

10   discern, none of those documents actually demonstrated a

11   claim against the debtors.

12          For example, several claimants attached papers but

13   did not, on their face, relate to the debtors.  For example,

14   an invoice or a mineral lease from an unrelated third party.

15   And looking at these papers, it is impossible to even infer

16   what the claimant thinks their claim against the debtors

17   might be.

18          By contrast, the debtors have made all reasonable

19   efforts and often have gone above and beyond to investigate

20   and evaluate the validity of each contested claim.  The

21   result of these exercises is, in every case, a clear absence

22   of any valid, legal liability against the debtors.

23          Let's just take a couple minutes to walk Your

24   Honor and the claimants joining us today through the claims

25   reconciliation process.  The debtors describe those in some

1    detail in their omnibus reply and our declarants will speak

2    to this process in more detail in just a few moments.

3            The bar date, as set by Your Honor, was October

4    27th, 2014.  And as proofs of claim were filed, the debtors'

5    advisors reviewed and categorized the claims to help

6    organize the diligence process.  As part of this review, the

7    debtors identified approximately 3500 customer claims.  Of

8    these, the debtors identified approximately 200 claims where

9    the debtors felt that there was enough detail to warrant

10   reaching out to the claimant to discuss their account.  When

11   the debtors saw that there was, in fact, an issue with a

12   customer's account, the customer service representative who

13   reached out, resolved the issue in accordance with the

14   customer's program relief that Your Honor entered in the

15   early months of these Chapter 11 cases.  Importantly,

16   throughout these cases, valid customer issues have been

17   addressed and remedied through this relief in the ordinary

18   course of business.

19           Claims from this group of 200 that you're seeing

20   that were not resolved, along with claims that were blank or

21   included insufficient details, were slated for inclusion in

22   an omnibus objection.  And at the end of 2014, the debtors

23   filed their first omnibus objection to claims and continued

24   to file objections through the beginning part of this year

25   when we filed our 43rd.

1            Over the course of that period, the debtors

2     objected to approximately five and a half thousand claims

3     largely to disallow the claims but, in many cases, also to

4     modify the claim to match the debtors' records.  The vast

5     majority of those claimants did not respond to the

6     objection.  But among those who did are approximately 190

7     pro se claimants who filed letters or other items on the

8     docket, sent letters or e-mails to the debtors' bankruptcy

9     counsel or who had left voicemails or sent e-mails to

10    dedicated hotline numbers or e-mail addresses.  The debtors'

11    bankruptcy counsel attempted to contact every single one of

12    those 190 claimants.

13            In many cases, the claimant was simply looking for

14    an explanation of the papers they received or even what a

15    claim is.  And, of course, the debtors provided that

16    explanation.  Others had made specific allegations that were

17    unconnected to the debtors, but when counsel explained that

18    the company's position was that there was no connection

19    between their claim and the debtors, the claimant understood

20    and agreed that they did not hold a claim.  And still others

21    had discreet questions about employee benefits or similar

22    issues that the debtors were able to answer to the

23    claimant's satisfaction.  So approximately 118 claims were

24    resolved by this first layer of outreach.

25            The remaining claimants, nearly 50, indicated in

1    some way that they were asserting an issue with their

2    customer account.  As Mr. McKillop will describe, the TXT

3    customer service team reviewed the customer account for each

4    of these claimants and attempted to contact them to discuss

5    their claims.  And 16 claims were resolved through this

6    process.

7              The remaining 72 pro se claims, they each asserted

8    a noncustomer-related claim.  As Ms. Soesbe will describe,

9    the debtors appropriately diligence each of those claims and

10   concluded either that it did not relate to the debtors in

11   these Chapter 11 cases or they did not assert a valid

12   liability of any of the debtors.

13             As the discussions with claimants wound down

14   earlier this year, the debtors requested that the Court

15   implement a schedule and certain procedures to organize the

16   adjudication of the dozens of pro se claims that were named

17   unresolved.  On August 15th, Your Honor entered an order

18   setting that protocol.  And among the provisions were

19   requirements that claimants must file a formal response on

20   the docket if they had not already done so and return a

21   questionnaire to let the debtors know whether they wish to

22   participate in one of these hearings and, if so, which one

23   and in person or by telephone.  Both of those items were due

24   on September 19th.

25             The protocol also provided that if a pro se

1   claimant did not file a timely formal response, their claim

2   would be disallowed and expunged from the register.

3   However, a number of claimants did not file a formal

4   response but they did return a questionnaire.  In keeping

5   with their policy throughout these cases to be as

6   accommodating as possible to unrepresented claimants, the

7   debtors decided that they would request that Your Honor

8   enter orders disallowing only those claims where the

9   claimant had never filed a formal response and they did not

10  enter or send in a questionnaire.  Your Honor entered those

11  orders at the end of September disallowing 12 claims.

12          And then, last month, we held our first pro se

13  claims hearing on November 8th.  And following that hearing,

14  Your Honor entered orders disallowing the 24 claims that

15  were up at that hearing.  Now we have 20 claims that remain,

16  all of which are being addressed at today's hearing.  I have

17  a reference list, if that would be helpful, that lists the

18  names of the claimants, the proof of claim number, the

19  asserted amount and priority of the claim, the debtors'

20  objection and basis for objection, the docket entry number

21  for any response that the claimant may have filed and it all

22  corresponds in the left-hand column to the tab numbers that

23  were in the binders that the debtors provided in advance of

24  the last hearing.

25          (Pause)

1              UNIDENTIFIED CALLER:  Hello?

2              UNIDENTIFIED CALLER:  Hello?

3              THE COURT:  Yes?  May I help you?

4              UNIDENTIFIED CALLER:  Oh.  I thought I lost

5    connection.

6              THE COURT:  Oh, no.  You're still on the line.

7              MS. CHAIKIN:  And with that, Your Honor, unless

8    you have any questions, I can yield the podium to my

9    colleague, Mr. Justin Sowa for direct.

10             THE COURT:  Thank you.

11             And let's try to make sure we speak into the

12   microphone so that people on the telephone can hear us --

13             Did someone just -- did I just see a stroke flash

14   or am I --

15             MS. CHAIKIN:  It was a strange (indiscernible).

16             THE COURT:  It was a strange -- okay.

17             MR. SOWA:  We just added some pyrotechnics to it

18   to spice things up today.

19             Your Honor, for the record, Justin Sowa, Kirkland

20   & Ellis, on behalf of the debtors.

21             At this time, the debtors would call our first

22   witness, Ms. Sinead Soesbe.

23             THE COURT:  All right.

24             Ms. Soesbe, I know you testified before but we're

25   going to swear you in again.

1          THE CLERK:  Please remain standing and raise your

2     right hand.

3          (Witness sworn)

4          THE CLERK:  Please state and spell your name for

5     the record?

6          THE WITNESS:  Sinead Soesbe, S-I-N-E-A-D,

7     S-O-E-S-B-E.

8          THE CLERK:  Thank you.

9          MR. SOWA:  And, Your Honor, we've prepared binders

10    of the materials that will be referenced in Ms. Soesbe's

11    testimony.  If I may approach?

12         THE COURT:  Yes.  I have a set here.

13         (Pause)

14         THE COURT:  You don't need one over -- yeah.  One

15    for Leslie, that's right.

16    DIRECT EXAMINATION

17    BY MR. SOWA:

18    Q    Ms. Soesbe, who's your current employer?

19    A    Vistra Energy Corporate Services Company.

20    Q    And that entity used to be known as EFH Corporate

21    Services, is that correct?

22    A    That is correct.

23    Q    And Vistra Energy Corp., that was previously known as

24    TCEH Corp., correct?

25    A    Correct.

1    Q    Now prior to TCEH Corp.'s emergence from bankruptcy,

2    who was your employer?

3    A    EFH Corporate Services Company.

4    Q    And what's your current job title?

5    A    Senior counsel.

6    Q    And was that your job counsel at EFH Corporate Services

7    also?

8    A    It was.

9    Q    And what are your responsibilities as senior counsel?

10   A    I am senior counsel for commercial disputes, litigation

11   and claims.

12   Q    Would you please give the Court a brief overview of

13   your educational and professional background?

14   A    Sure.  I have an undergraduate degree from the

15   University of Texas at Austin.  And I also have a

16   jurisdoctorate from the University of Texas at Austin.

17   Q    And how long have you been employed at Vistra Corporate

18   Services/EFH Corporate Services?

19   A    Since 2009.

20   Q    And where did you work before then?

21   A    I worked for a law firm called Locke Lord.

22   Q    So this morning, I'd like to discuss the steps that the

23   debtors have taken to analyze and reconcile claims filed in

24   the Chapter 11 cases.  Specifically, regarding claims before

25   the Court today which are what we refer to as pro se claims.

1   Is that okay?

2   A    Yes.

3   Q    So in your role as senior counsel, have you been

4   involved in the claims reconciliation process?

5   A    I have.

6   Q    And what's your involvement been?

7   A    I oversaw the process from a legal perspective.

8   Q    Did you prepare a declaration in support of the

9   debtors' reply with respect to these claims?

10  A    Yes.

11  Q    There should be a binder in front of you.  Can you

12  please turn to tab 1?

13  A    Okay.

14  Q    Is this your declaration?

15  A    It is.

16  Q    And is everything in this declaration true and accurate

17  to the best of your knowledge?

18  A    It is.

19        MR. SOWA:  Your Honor, we will seek to move the

20  declaration into evidence but I'm going to wait until the

21  end of our direct testimony and move everything in at once

22  if that works for you.

23        THE COURT:  Okay.

24

25  BY MR. SOWA:

1    Q    Ms. Soesbe, did you have any demonstratives prepared to

2    assist your testimony today?

3    A    Yes.

4    Q    Can you turn to tab 2 in your binder?

5    A    Yes.

6    Q    And then flip to the page labeled at the bottom,

7    D-DEM-SOESBE1.

8    A    Okay.

9    Q    Do you recognize this demonstrative?

10   A    I do.  This is a timeline that supports the process for

11   the claims.

12   Q    And so, looking at this timeline, it appears that the

13   reconciliation process has been going on for about two

14   years, is that accurate?

15   A    That is correct.

16   Q    And now let's look at the next page of tab 2, which is

17   labeled D-DEM-SOESBE2.  Do you recognize this demonstrative?

18   A    Yes.  This demonstrative shows how many claims were

19   filed and how they've been whittled down through objections

20   until they've gotten to the 20 that are still remaining

21   today.

22   Q    Okay.  Leave that on the screen but let's turn to tab 3

23   in your binder.

24   A    Okay.

25   Q    This document's been labeled Exhibit DX-1.  Do you

1    recognize this document?

2    A    Yes.  This is the notice for noncustomer proofs of

3    claim.  That's the bar date for those notices.

4    Q    So were claimants in the Chapter 11 cases given notice

5    of the requirement that they file a proof of claim in order

6    to preserve their claims?

7    A    They were given notice.

8    Q    And does this document describe that notice?

9    A    Yes.  It gives them a date by which they have to send a

10   proof of claim.  It gives them a sample form.  It tells them

11   where to mail it.

12   Q    About how many non-asbestos claims were filed in the

13   Chapter 11 cases?

14   A    10,000.

15   Q    So what were the first steps that the debtors took to

16   try to get their hands around these 10,000 claims?

17   A    The first step we took were working with our outside

18   advisors, Alvarez & Marsal and Epiq, to do a first cull and

19   look through the claims.  And they categorized them based on

20   what was on a claim form, if there was anything; and put

21   them into different categories so that we could get through

22   looking at them a little bit more easily.

23   Q    And just to be clear, you mentioned Alvarez & Marsal

24   and Epiq.  Can you just describe what those entities' role

25   in the restructuring was?

1   A    Those are entities, outside entities, that we hired to

2   help us and get through this claims process.  They're

3   bankruptcy advisors for the company.

4   Q    So as the debtors began to develop a system to evaluate

5   these claims, did you have any goals in mind?

6   A    Yes.  There were two goals.  We wanted to -- since

7   there were so many claims, we wanted to get through them as

8   efficiently as possible with the least amount of time, if

9   possible, on burden on the company.  But we also wanted to

10  make sure that we addressed any valid claims and were able

11  to resolve those.

12  Q    So out of the 10,000 claims, non-asbestos claims, how

13  many did the debtors object to?

14  A    5500.

15  Q    And how did the debtors determine which 5500 to object

16  to.

17  A    Going back to that process that I described a little

18  while ago, we had categorized the claims.  We put them in

19  groups based on what was on the proof of claim form and we

20  objected to them based on those categories.

21  Q    Now were some of these claims filed by customers of the

22  debtors' operating companies, like TXU Energy?

23  A    Yes.

24  Q    Do you know about how many?

25  A    About 3500.

1   Q    Okay.  So did the debtors inform their customers that

2   they would have to take certain steps to preserve their

3   claim?

4   A    Yes, we did.

5   Q    Now turn to tab 4 in your binder.

6   A    Okay.

7   Q    This document is labeled Exhibit DX-2.  Do you

8   recognize this document?

9   A    Yes, I do.  This is a notice to customers of the bar

10  date and giving them notice that they need to file a proof

11  of claim.

12  Q    And are there any attachments to this notice?

13  A    Yes.  Near the end, there is a proof of claim form.

14  And that's Exhibit 3 to Exhibit A.

15  Q    And this was sent to all of TXU Energy's customers?

16  A    It was sent to current and former customers.

17  Q    Okay.  Now for the claims that were returned on this

18  form, can you just describe what sorts of claims were

19  received?

20  A    The vast majority of the claims that we got back on

21  this form had very little information on them.  Sometimes

22  they would simply say "overcharged", "high rate", "I'm owed

23  my deposit back", something like that.  Sometimes there was

24  really nothing on there.

25  Q    Did all of them, on their face, seem to relate to

1    customer account issues?

2    A    No.   There were some that were clearly relating to

3    other entities.   Some people referenced their AT&T bills,

4    for example.

5    Q    So what steps did the debtors take to address these

6    customer claims?

7    A    For these claims, after they were classified as

8    customer claims, we took them internally.   And there was a

9    group at TXU Energy that, in the normal course, handles

10   customer claims.   And we went to that group and we had them

11   help us investigate these claims.

12   Q    And if following that investigation there was no

13   resolution reached with the claimant, what steps would the

14   debtors take?

15   A    If there was no resolution, we went back to outside

16   counsel and our bankruptcy advisors and we worked with them

17   on objecting to those claims.

18   Q    So did you personally review those objections before

19   they were filed?

20   A    I did.

21   Q    And when a claim was objected to, was the claimant

22   provided with notice of the objection?

23   A    Yes.

24   Q    If you could turn to tab 5 in your binder.

25   A    Okay.

```
 1   Q    This is a document labeled DX-3.  Do you recognize this
 2   document?
 3   A    Yes.  This is an example of notice to one of our
 4   objections to customer claims.  And this document gives the
 5   customer notice of when objection must be filed and when a
 6   hearing will take place.
 7   Q    So does this put out instructions to the claimant
 8   regarding how to respond to the objection?
 9   A    It does.
10   Q    So if no response to the objection was received, what
11   would happen to that particular claim?
12   A    My understand that if no response was received that
13   that claim would be discharged.
14   Q    So of the responses that the debtors did receive, do
15   you know how many were sent by pro se claimants?
16   A    190, I believe?
17   Q    Consistent with the demonstrative?
18   A    Yes.
19   Q    So setting aside for now the customer account claims,
20   which Mr. McKillop will describe, can you just describe what
21   sorts of other categories of pro se claims were included in
22   this 190 that were objected to?
23   A    Sure.  There were a number of them that seemed to
24   relate to mineral leases that were unrelated to any of our
25   entities.  There were some claims that referenced class
```

1    actions that seemed to be a mistake.  There were claims that

2    referenced other entities that were not affiliated.  And

3    there were -- with any of our entities.  And then there were

4    a few that seemed to be employment claims but, again, not

5    related to this bankruptcy or to any of our entities.

6    Q    So what steps did the debtors take upon receiving a

7    response from a pro se claimant?

8    A    We looked at the type of claim it was.  So, for

9    example, if it was a mineral lease claim, I would take that

10   to the appropriate department and do an investigation and

11   see if we could find anything related to the claim.

12   Q    And did you involve outside counsel in this process?

13   A    Yes.  And outside counsel worked with us.  And they

14   were also communicating directly with the claimants.

15   Q    And you were kept informed of outside counsel's

16   outreach efforts?

17   A    Yes.

18   Q    Did you ever personally speak to any of these pro se

19   claimants?

20   A    I did.

21   Q    So let's talk through each category that you just

22   described.  First, what steps did you take to look into the

23   claims that appeared to be asserted against nondebtor

24   entities?

25   A    So when I got a claim like that, I would go through and

1    look at all of the entities that were listed.  Sometimes

2    there was one, sometimes there were numerous ones.  And I

3    would review records that I had about our historical

4    entities.  I would also go to our corporate secretary group

5    to see if they were aware of any affiliation with any of the

6    listed entities in the claim.  And usually -- and none --

7    they were -- we weren't able to find any connection usually.

8    Q    And with regard to claims that purported to relate to

9    class actions, what steps did you take to look into those?

10   A    As in-house litigation counsel for the company, if

11   there was a class action pending against the company, I

12   would be responsible for it.  So I checked my records and I

13   checked the legal department records to see if there was a

14   class action that appeared to be related to the claims.  And

15   in the cases where that was listed, I wasn't able to find

16   any connection.

17   Q    And finally, claims that related to oil, gas and

18   mineral leases?

19   A    For the mineral lease claims, I went to our real estate

20   group and the Royalties Mineral Lease group.  And they have

21   a system that they can check.  And they checked for the

22   claim, the location and were unable to find any connections.

23   Q    So in general, would you describe these diligence and

24   outreach efforts as successful?

25   A    Yes.

1    Q    So let's turn today -- to today's claims.  Did debtors

2    provide notice of today's hearing to the pro se claimants?

3    A    Yes, they did.

4    Q    So let's look at tab 6, which is labeled DX-4, and also

5    tab 7, labeled DX-5.

6    A    Okay.

7    Q    Do you recognize these two documents?

8    A    These two documents provide notice of the pro se

9    hearings.

10   Q    And what's the difference between tab 5 and tab 6?

11   A    Tab 6 --

12   Q    Or -- sorry -- 6 and 7.

13   A    Yeah.  Tab 6 went to customers that had already filed a

14   formal response and informed them that they were not

15   required to file anything else.  And tab 7 went to claimants

16   who had not filed a formal response and it explained that

17   there was a deadline to file a response or to send in a

18   questionnaire.  And they had to do one or the other of those

19   in order to participate in the hearing today.

20   Q    So how many pro se claims are still in dispute?

21   A    Twenty.

22   Q    And are you aware of any evidence of or support for a

23   claim against any debtor raised by the claims under

24   consideration today?

25   A    I am not.

1    Q    And are you aware of any additional reasonable steps

2    the debtors could have taken to look into these claims?

3    A    I am not aware of any.

4            MR. SOWA:  Thank you.  I have nothing further.

5            THE COURT:  All right.  Does anyone in the court

6    wish to cross-examine the witness?

7            MR. ENGLISH:  Yeah.  This is Wayne English --

8            THE COURT:  Yes.

9            MR. ENGLISH:  -- a creditor.

10           THE COURT:  Yes, Mr. English?

11           MR. ENGLISH:  First, I would like to ask -- excuse

12   me -- the witness what year did she graduate from the law

13   school.

14           THE WITNESS:  2000.

15   CROSS-EXAMINATION

16   BY MR. ENGLISH:

17   Q    Okay.  Are you aware of, in Texas law, the doctrine of

18   mitigation of damages?

19   A    Yes, of course.

20   Q    And on the proof of claim, what is the date your claim

21   is to be active to be properly filed a proof of claim?

22   A    I could not hear your question.  Could you repeat it?

23   Q    Yeah.  When you -- on the proof of claim, what date is

24   your claim is to be active for a creditor to file a proof of

25   claim?

1    A     I do not understand your question.

2    Q     Is the -- when you file a proof of claim, is the date

3    of the bankruptcy filing the date your claim needs to be

4    active to file the proof of claim?

5    A     I do not know the answer to that question as it's

6    phrased.  I'm sorry.

7    Q     Okay.  Let me read the statement on the final page of

8    the proof of claim.  It says "A claim is the creditor's

9    right to receive payment for a debt owed by the debtor on

10   the date of the bankruptcy filing.  See 11 U.S. Code 1015."

11           So the question is what date does your claim have

12   to be active to file the proof of claim?

13   A     I think the document probably speaks for itself.

14   Q     Okay.  Then out of the -- I have $100,000 of the TXU

15   bond, 6.5 percent, due on 11/15/2034.  I held them on the

16   date of the petition, which was 4/29/14.  What was my proof

17   of -- what would be my debt that was owed by the company on

18   the date of the bankruptcy filing?

19           MR. SOWA:  Your Honor, I'm just going to object to

20   this being outside the scope of Ms. Soesbe's testimony as a

21   fact witness regarding the reconciliation process.  But I'm

22   willing to let her attempt to answer it if she knows.

23           THE COURT:  You may answer the question.

24           THE WITNESS:  Could you repeat your question?

25   BY MR. ENGLISH:

```
 1   Q    Yes.  I have -- own $100,000 of the TXU bonds, 6.55

 2   percent, due on 11/15/2034.  On the date of bankruptcy

 3   filing, I continued to hold those.  What would have been --

 4   on the date of the bankruptcy filing, how much was I owed

 5   from -- as a claim against the debtors?

 6   A    I'm unfamiliar with your claim so I don't have an

 7   answer for you.

 8           MR. ENGLISH:  Your Honor, can somebody hand her my

 9   creditor's response?

10           THE COURT:  Well --

11           MR. ENGLISH:  Is it an exhibit that you presented

12   her?

13           THE COURT:  Let me look at -- hang on for a

14   minute.

15           MR. ENGLISH:  It's in the binder.

16           THE COURT:  Give me a moment.  Just a second.  I

17   have to find my notebook here.

18           MR. SOWA:  It's tab 43 in the big binder.

19       (Pause)

20           THE COURT:  The only thing you provided the Court

21   with, with your proof of claim, Mr. English, is Ameritrade

22   confirmation notice of your sale date in July of 2014.

23           MR. ENGLISH:  Yeah.

24           THE COURT:  So --

25           MR. ENGLISH:  The creditor's response.  My -- I
```

1    had a two-page document.

2          THE COURT:  Your response?  Oh.  Hang on.  Maybe

3    I'm looking at the wrong page.  No.  That's all I have for

4    you.  You say you filed something different?

5          MR. SOWA:  It should be behind it in the binder,

6    Your Honor.

7          THE COURT:  Oh, I see.  Never mind.  I apologize.

8    It was behind this blue sheet here.  Let me look.

9       (Pause)

10          THE COURT:  Well, what you say here is that you

11    had $100,000 in face amount of TXU corporate bonds, 6.55

12    percent, due 11/15/2034.  You sold those in September of

13    2014 for $75,420 and you bought a proof of claim for the

14    difference between 100,000 and 75,420 which is $24,580.

15          MR. ENGLISH:  Correct.  I was asking the witness

16    on the date of the bankruptcy filing, what was my proof of

17    claim, the value, based on the value of the bond or based on

18    the debt of the bond.

19          THE COURT:  Well, that would depend -- I don't

20    think she can answer that question because it depends on the

21    value of the bonds on the petition date which becomes a

22    complicated question.  We're talking about the trading value

23    of the bonds?  Are we talking about some sort of formal

24    valuation process to figure out the assets of the debtors'

25    estate on April 20th, 2014?  So --

```
 1              MR. ENGLISH:  Well, no.  The 100,000 was the debt
 2     of TXU.  I owned the debt at TXU on the date of bankruptcy
 3     filing.  So my question to the witness is, if I had 100,000
 4     of TXU bonds, how much was I owed on the date of the
 5     bankruptcy filing.
 6              THE COURT:  It's a complicated question because --
 7              MR. ENGLISH:  Well, it's not the value.  It's --
 8              THE COURT:  All right.  You don't want to know
 9     value.  All right.  So you're talking about -- all right.
10     Well, you -- I mean, I'll answer your question for you.
11     $100,000.
12              MR. ENGLISH:  Okay.  And I asked the witness if
13     she was familiar --
14              THE COURT:  Assuming you were current on all
15     interest.  I don't know -- were you getting interest on a
16     going concern basis under these bonds or was it simply the
17     bonds would be there with the coupon in 2034?
18              MR. ENGLISH:  Yeah.  It was an ongoing interest --
19              THE COURT:  Okay.
20              MR. ENGLISH:  -- which they didn't pay in May
21     because they filed bankruptcy on the 29th.
22              THE COURT:  Okay.
23              MR. ENGLISH:  Okay.  So then the question to the
24     witness is, she said she was familiar with mitigation of
25     damages.
```

1    BY MR. ENGLISH:

2    Q    So subsequent to the filing of bankruptcy on April

3    29th, 2014, as the gentleman stated, I sold the bond on

4    September 2nd, 2014 for $75,420.  Pursuant to mitigation of

5    damages statute or common law in Texas, what is the amount

6    of damages I was still owed.

7    A    You're asking me a legal question not a factual

8    question and I can't answer it.

9    Q    Well, it's factual.  It's -- you know, the bonds were

10   100,000.  I sold them for 75.  How much was I owed.

11          THE COURT:  No.  It is a legal question, sir.  I

12   mean, it's based on the facts of what you were owed and

13   what --

14          MR. ENGLISH:  I must (indiscernible) because I

15   think this is a factual question.

16          THE COURT:  Well, I --

17          MR. ENGLISH:  How much was --

18          MR. ENGLISH:  I can formally object.

19          THE COURT:  I know it's difficult because you're

20   on the phone but you're talking to the judge.  So I'm the

21   one who's been speaking most recently.  So --

22          MR. ENGLISH:  Oh.  I'm sorry, Your Honor.  I

23   thought you were the lawyer.

24          THE COURT:  No.  That's all right.  I used to be.

25   No.  It is a legal question so I'm going to sustain the

1      objection.

2              MR. ENGLISH:  Okay.  Then I'd like to ask the

3      witness --

4      BY MR. ENGLISH:

5      Q    The amount of your claim is based on the amount of

6      money you were owed on the date of the bankruptcy filing,

7      correct?

8      A    I'd refer you back to the document.  It speaks for

9      itself.

10     Q    Okay.  Now in my --

11             MR. ENGLISH:  Was -- did she -- was she able to

12     get -- did somebody hand her my creditor response?

13             THE WITNESS:  I have it.

14             THE COURT:  Well, she -- you're asking -- this is

15     the judge again.  You're asking a lot of questions that

16     really go to the legal arguments in your claim.  So Ms.

17     Soesbe isn't a legal expert as she's presented in court.

18     She's a fact witness as to what the debtors did in

19     connection with the process of figuring out whether you owed

20     -- whether they owed you any money or not.  So I think, to a

21     certain extent, you're trying to get ahead of yourself

22     because this is a legal argument that you want to make in

23     support of your claim.

24             MR. ENGLISH:  But she just said she graduated from

25     the University of Texas Law School, so I figured she would

1    be familiar with the Texas law.  And --

2              THE COURT:  Well, I'm sure she's --

3              MR. ENGLISH:  I mean, that's --

4              THE COURT:  I'm sure she's familiar with Texas law

5    but that's what she's been offered up to the Court by the

6    debtors to testify about.

7              MR. ENGLISH:  Okay.  No further questions.

8              THE COURT:  All right.  Thank you, Mr. English.

9              Any other questions?

10             All right.  Any redirect?

11             MR. SOWA:  No, Your Honor.

12             THE COURT:  Okay.  Thank you, Ms. Soesbe.

13             THE WITNESS:  Thank you.

14        (Witness excused)

15             MR. SOWA:  Your Honor, the debtors call their

16   second witness, Dan McKillop.

17             THE CLERK:  Please raise your right hand.

18        (Witness sworn)

19             THE CLERK:  Please state and spell your name for

20   the record.

21             THE WITNESS:  Dan McKillop.  It's spelled D-A-N,

22   M-C-K-I-L-L-O-P.

23             MR. SOWA:  And, Your Honor, I have a binder for

24   Mr. McKillop.  This one is identical to the last one.  So --

25             THE COURT:  All right.  I have one.

1          MR. SOWA:  Okay.  I just need to give the witness

2     one.

3          THE COURT:  Okay.

4          MR. SOWA:  If I may approach?

5     DIRECT EXAMINATION

6     BY MR. SOWA:

7     Q    Mr. McKillop, who is your current employer?

8     A    TXU Energy is.

9     Q    And what does TXU Energy do?

10    A    TXU Energy is a retail electric provider.

11    Q    And what's your job title?

12    A    Senior manager and customer advocacy services.

13    Q    And what are you responsibilities and senior manager

14    and customer advocacy services?

15    A    I lead the department's customer escalation teams.

16    Q    And what does that mean?

17    A    If customers, after speaking with a service

18    representative, feel that their issue hasn't been resolved,

19    they have an opportunity to escalate their concern and speak

20    with the -- you know, speak with another group to further

21    discuss that issue and work to resolve their claim.

22    Q    So prior to the separation of the entity that used to

23    be called TCEH Corp. from Energy Future Holdings, were you

24    still employed by TXU Energy?

25    A    I was.

```
1    Q     And what was your title at that time?

2    A     Senior manager and contact center operations.

3    Q     Were your responsibilities basically the same?

4    A     Primarily, yes.

5    Q     Okay.  Mr. McKillop, can you give the Court a brief

6    overview of your educational and professional background?

7    A     Sure.  I completed a management certificate program

8    from the University of Illinois at Chicago.  Spent the last

9    seven years with TXU Energy in various management roles

10   within its customer operations organization.  Prior to

11   joining TXU Energy, I was with Verizon and the predecessor

12   company, GTE, for 25 years, and most recently as director of

13   internet operations where I had responsibility for providing

14   customer support to Verizon's small to medium size business

15   customers in the areas of customer service, website

16   development and paid search advertising.

17   Q     Mr. McKillop, this morning, I'd like to cover with you

18   the steps the debtors took to analyze and resolve claims

19   filed by customers of TXU Energy and, specifically, the

20   steps the debtors took from a customer service perspective.

21   Is that okay?

22   A     Yes.

23   Q     Did you prepare a declaration in support of the

24   debtors' reply with respect to the claims at issue today?

25   A     Yes.
```

1   Q    Could you please turn to tab 1 of your binder?

2   A    Yes.

3   Q    Do you recognize this document?

4   A    I do.

5   Q    And what do you recognize it to be?

6   A    I recognize it to be the declaration I submitted on

7   behalf of TXU.

8   Q    And is everything within that declaration true and

9   accurate to the best of your knowledge?

10  A    It is.

11  Q    So, Mr. McKillop, in the course of your professional

12  duties at TXU Energy, did you become familiar with TXU

13  Energy's processes for addressing customer complaints?

14  A    Yes.

15  Q    Can you describe those processes?

16  A    Sure.  TXU Energy provides customers access to speak

17  with a representative 24 hours a day, 7 days a week, 365

18  days a year.  In addition to providing access to speak with

19  a representative, customers can also chat online with a

20  service representative.  They can e-mail us as well as self-

21  serve on our txu.com website.

22      If a customer is not satisfied with the resolution,

23  they can ask to speak with a supervisor or an escalation

24  agent to further discuss their issue.  And in addition, we

25  have an office of the president which is another avenue for

1    customers choosing to escalate their issue or concern to a

2    TXU executive or customers that send an e-mail to TXU

3    Energy's executive mail address.

4        All these teams and avenues are able to respond to

5    customer inquiries related to payment processing, payment

6    arrangements, billing inquiries, to name just a few.  We are

7    in a very competitive business and we strive to satisfy all

8    of our customers.

9    Q    So if you can imagine a scenario where a customer calls

10   in and complains that they were overcharged on their bill,

11   what steps would your team take to address that complaint?

12   A    We would typically ask the customer some additional

13   questions to make sure that we're clear on what the

14   customer's concern is.  And based on what that concern is,

15   we would review the customer's account, review plan

16   information, prior bills, billing history and review that

17   with the customer and explain what's occurred and ultimately

18   resolve their issue.

19   Q    Now turning to the restructuring process, you

20   understand that TXU Energy was, until a couple months ago, a

21   debtor in the Chapter 11 proceedings in this court?

22   A    Yes.

23   Q    And do you generally understand that to preserve a

24   right to seek recovery from a company in bankruptcy, a

25   creditor needs to take certain steps?

1   A     Yes, I am.

2   Q     And do you know what some of those steps are?

3   A     Yes.  To preserve the claim, the customer must file a

4   proof of claim.

5   Q     And so did TXU Energy alert its customers to the fact

6   that they would need to file a proof of claim if they wanted

7   to preserve a claim against the debtor?

8   A     Yes.  Yes, they did.  Custom forms were sent to current

9   and former TXU Energy customers.

10  Q     And are you familiar with proofs of claim that were

11  filed by customers of TXU Energy?

12  A     Yes.

13  Q     Did you participate in the review and reconciliation of

14  those claims?

15  A     I did.

16  Q     What was role in that process?

17  A     I was the point of contacts with -- point of contact

18  within TXU Energy for the customer claims review process.  I

19  oversaw the process interacted with our internal customer

20  service teams as well as interfaced with counsel and

21  advisors.

22  Q     Mr. McKillop, did you have any demonstratives prepared

23  to assist your testimony today?

24  A     Yes.

25  Q     Can you please turn to tab 2 in the binder in front of

1    you?  And then turn to the second page which is labeled

2    D-DEM-MCKILLOP1.  Do you recognize this demonstrative?

3    A    Yes.  It's the timeline of our diligence efforts.

4    Q    So looking at the time period indicated on the

5    demonstrative as late 2014 where it says "Pre-Objection

6    Customer Service Outreach", what were the debtors doing in

7    that time period with regard to customer claims?

8    A    We worked to develop a process for reconciling customer

9    claims.

10   Q    So what was the first step in that process?

11   A    The first step was to determine what claims were

12   actually customer claims?

13   Q    And how did you go about doing that?

14   A    Epiq took a first level review to identify claims that

15   were customer account-related.  There were some claims that

16   current and former customers clearly indicated they felt

17   there was an issue, either is or was an issue with their

18   account, most frequently that they were overbilled.

19         There were also a large number of claims that were

20   submitted utilizing the customer proof of claim form that

21   did not contain a lot of information, so it was difficult to

22   understand if the customer was actually asserting a claim in

23   connection with their customer account.

24         There were also a number of claims that were submitted

25   on the customer proof of claim form that had asserted claims

1   unrelated to customer accounts.  And, in general, there was

2   just a large number of complaints that were submitted with

3   little or no information.

4   Q    So about how many customer proofs of claim did Epiq

5   identify?

6   A    Roughly 3500.

7   Q    So looking at the next page in tab 2, labeled D-DEM-

8   MCKILLOP2.  Do you recognize this demonstrative?

9   A    I do.  It is the summary of customer claims and our

10  diligence efforts before objecting.

11  Q    So did Epiq subdivide those 3500 customer claims in any

12  way?

13  A    They did.  The claims were divided into two groups, the

14  first group being the claims that there was an identifiable

15  reason for the claim where the customer provided some amount

16  of information that would let us further review their

17  account.  In the second group of claims, again, where --

18  claims where there was little or no information that was

19  provided making it difficult to understand what the customer

20  was asserting or whether they were indicating they had a

21  claim at all.

22  Q    So why were the claims split up in that manner?

23  A    It would not be cost-effective for us to reach out to

24  3500 current and former customers that submitted a claim.

25  So we did work with Epiq to triage and pick the ones where

1    there appeared to be a legitimate -- potentially legitimate

2    complaint.

3    Q    And so after performing that triage, what was the next

4    step?

5    A    After performing the triage, we would review the

6    customer account.  We would reach out to the customer.  We

7    would make three attempts to speak with the customer to

8    review their claim.  If we were unable to reach the

9    customer, we would leave a voicemail with contact

10   information for them to respond back.

11   Q    And I take it that was for the claims that were deemed

12   actionable where there was some information?

13   A    Yes, that's correct.

14   Q    Now who are the team members conducting that stated

15   outreach?

16   A    It was primarily our office of the president team that,

17   again, handles executive escalations and media inquiries.

18   Q    So if your team was able to make contact with these

19   customers, what would they do?

20   A    Based on the information that was provided by the

21   customer, we would review the account.  We would reach out

22   to the customer.  So, for example, if a customer indicated

23   that they felt they were charged an incorrect rate, we would

24   review the customer's account, identify service plans they

25   were on, review their billing information.  And after doing

1    that, we would ask the customer if they were satisfied that

2    their issue was resolved or that there were no issues.  And

3    if the customer indicated they were in agreement, we would

4    ask if the customer would be willing to withdraw their

5    claim.  And then we would provide the results of our

6    outreach efforts to counsel and our bankruptcy advisors.

7    Q    So you described reviewing the customer's account or

8    walking the customer through their account.  What sort of

9    information is contained in the customer's account?

10   A    There's quite a bit of information.  There's

11   information with regard to various service plans the

12   customer was on while with TXU Energy in terms of service

13   agreements that were sent to customers, your rights as a

14   customer documentation, billing history and bill images of

15   customer bills as well as documentation around any

16   interaction that the customer had had with TXU's customer

17   service team.

18   Q    So about how many claims did your customer service team

19   look into?

20   A    It was about 200.

21   Q    So why did you go through this whole process?  What was

22   -- what were TXU Energy's goals?

23   A    We wanted to certainly understand what specifically the

24   customer felt their issue and, you know, take any action

25   that we could to resolve their issue.  If we did identify an

1   issue that we could address under our customer programs, we

2   would certainly do that.  Bottom line, again, if there was

3   an issue that we could work to resolve, we would do it.

4   Q     And did you view this process as different from your

5   ordinary course of business customer support process?

6   A     No.  It's essentially the same process.

7   Q     And so what was the outcome of this round of diligence

8   and outreach?

9   A     For roughly half of the customer claimants, we were

10  able to resolve the claim to the customer satisfaction.

11  Q     And how did you resolve the claims?

12  A     Again, by asking the customer if they would agree to

13  withdraw their claim and the customer indicating that they

14  would agree to withdraw the claim.

15  Q     So does that mean that a hundred claimants withdrew

16  their claims?

17  A     While 100 customers indicated that they would withdraw

18  their claim, many of the claimants never took the formal

19  steps required to withdraw their claim with Epiq so these

20  claims were included in an omnibus objection to close the

21  loop.

22  Q     So we've been discussing the claims where there was

23  sufficient information to take further steps.  What happened

24  to the claims where there was not any actionable

25  information?

1   A    We asked our bankruptcy advisors to draft an objection

2   to those claims.

3   Q    And did you review and approve those objections?

4   A    Yes.

5   Q    And do you know if those objections were, in fact,

6   filed?

7   A    They were.

8   Q    Were the customer claimants provided with notice that

9   their claims were being objected to?

10  A    Yes.  I reviewed draft custom notices and cover letters

11  that were sent before each objection.

12  Q    And were the customers given instructions regarding how

13  to respond to the objections?

14  A    Yes.

15  Q    So if we can turn back to D-DEM-MCKILLOP1, your

16  timeline, when did your team next become involved in the

17  claims reconciliation process?

18  A    After the first round objections, I understand some

19  customer claimants provided a response.  Where those

20  responses provided additional information that my team could

21  potentially address, we conducted another round of diligence

22  and outreach.

23  Q    Is this the period labeled "Early 2015" on the

24  timeline?

25  A    Yes, it is.

1    Q    So roughly, how many claims were diligence by your team

2    in this stage of the process?

3    A    It was, I believe, about 50.

4    Q    And were those 50 the same claimants whose claims you

5    had researched before the objections were filed?

6    A    There may have been some overlap but, for the most

7    part, these were claims that were deemed unactionable in the

8    first round of -- in the first round.  And customers

9    provided additional information in response to the objection

10   that would allow us to provide additional information for us

11   to review their accounts.

12   Q    And so what steps did you take to attempt to resolve

13   these 50 claims?

14   A    Yeah.  Again, very similar or the same that we did in

15   the pre-objection phase.  We would review the customer

16   account.  We would reach out to the customer and explain

17   primarily typically how the billing system works.  And if

18   the customer was satisfied, again, we would look to withdraw

19   that claim.  Again, if there were issues that we could

20   address under our customer programs that were identified, we

21   would certainly do that.  Again, customers for our company

22   and like others are the lifeline -- the lifeblood of our

23   business.  Customers have a choice in Texas.  They can

24   choose another provider.  And we pride ourselves on customer

25   service.  The bankruptcy didn't change that.  If there was

1   anything that we could do to resolve an issue for our

2   customer, we would do it.

3   Q     Did you keep notes or maintain a tracking sheet to keep

4   track of your team's outreach efforts?

5   A     Yes.

6   Q     Can you turn to tab 3 in your binder?

7   A     Yes.

8   Q     Do you recognize this?  It's a document labeled Exhibit

9   DX-6.

10  A     Yes.  This is the spreadsheet that I maintained with

11  the assistance of counsel to track the outreach efforts for

12  the customers that had filed a claim.

13  Q     So working from this, let's walk through a couple

14  examples to demonstrate to the Court how your process

15  worked.  Let's look at row 8 of your spreadsheet, which is

16  proof of claim number 4011.  Do you see that?

17  A     Yes.

18  Q     And now if you look at the "Comments" filed to the

19  right-hand side of the page, without reading the customer's

20  name, can you read the first sentence of that notes field?

21  A     Sure.  "In review of customer's account, it was

22  determined that the customer did not get rolled over to the

23  lower price month-to-month plan after her term contract

24  expired."

25  Q     And so, in general, how would your team have reached

1    that conclusion?

2    A    In general, when we were researching the customer's

3    account, we would take a look at the various service plan

4    that the customer was on and the time frames that the

5    customer would have been on those plans.  Compared that to

6    the customer's bills.  And, in this case, we identified that

7    there was an error that resulted in the customer being

8    overcharged.

9    Q    So now let's walk through the specifics.  Starting at

10   tab 4, which is DX-7, can you describe this document?

11   A    Yes.  Tab 4 is the electricity facts labels for the

12   plan that was about to expire.

13        If I can proceed to tab 5?

14   Q    Yeah.  But first, does this facts label show the price

15   essentially that the customer would have been charged?

16   A    Yeah.  So what this indicates is that the term plan

17   that the customer was on with the TXU Energy Texas Choice 24

18   plan.  And if you see out to the right and across from where

19   it says "Electricity Price" on the left, the -- this plan

20   was at a rate of 15.9 cents per kilowatt hour was the energy

21   charge.

22   Q    Okay.  So then turn in to tab 5, which is Exhibit DX-8.

23   Can you describe this document, please?

24   A    Yeah.  So tab 5 is a template of the term expiration

25   notice that would have been sent to the customer.  It also

1    includes an offer for the customer to renew or sign up for

2    another term plan, in this case the Texas Choice 24 plan.

3    In this instance, the customer did not choose to renew.  And

4    the customer did not contact us.  So if you look down into

5    the third paragraph, you see Bermuda says "If you decide

6    this term plan isn't for you or you take no other action,

7    your service will automatically continue on a month-to-month

8    TXU Energy plan."  And so, because this customer did not

9    contact us, the customer was rolled over to a TXU Energy

10   month-to-month plan.

11   Q    And just to be clear, DX-8 is a form letter.  But I

12   take it that the customer we're discussing would have

13   received a copy of this with all the identifying information

14   filled out, correct?

15   A    That is correct, yes.

16   Q    Okay.  So turning to tab 6, which is DX-9.

17   A    So tab 6 is the electricity facts label for the TXU

18   Energy Texas Choice plan which is the month-to-month plan

19   that the customer should have been rolled over to.  And as

20   you can see, that plan has an energy charge of 13.4 cents

21   per kilowatt hour.

22   Q    And that's lower than the prior page.

23   A    Yes.

24   Q    -- the customer (indiscernible), correct?  So then if

25   we turn to tab  7, which is DX-10, we see an electricity

1    bill.

2    A    So, yes, under tab 7, this would be the final

3    electricity bill that the customer would have billed on or

4    should have billed on or did bill on under her Texas Choice

5    24-month term plan at the 15.9 cent per kilowatt hour rate.

6    Q    Okay.  So then tab 8, DX-11, is another electricity

7    bill dated about a month later than tab 7.  And what does

8    this bill show?

9    A    Yeah.  So this bill represents the first bill where the

10   Texas Choice month-to-month plan should have taken effect.

11   But as you can see on the back page of the customer invoice,

12   the customer continued to bill on a TXU Energy Texas Choice

13   24 at the 15.9 cent per kilowatt rate.

14   Q    Which, again, is a higher rate than this person should

15   have been charged at that time.

16   A    That is correct.

17   Q    And then turning to the next tab, tab 9, Exhibit DX-12.

18   A    Yes.

19   Q    This bill is from about a year after DX-11.  And what

20   does it show?

21   A    Yeah.  So this is the final bill for this customer.

22   The customer elected to choose another service provider.

23   This is the customer's final bill.  And as you can see, the

24   customer continued, in her final bill, to bill at the higher

25   rate of 15.9 cents per kilowatt hour on the previous Texas

1    Choice 24 term plan.

2    Q    And so after conducting that review, what did your team

3    conclude about this customer?

4    A    So what was concluded about the customer is that the

5    customer was overcharged the difference between the 15.9

6    cent per kilowatt hour rate and the 13.4 cent per kilowatt

7    hour rate.  So the customer was overbilled 2.5 cents per

8    kilowatt hour.  So we calculated the amount of the

9    overpayment by taking the 2.5 percent (sic) per kilowatt

10   hour and multiplying it by the customer usage over the time

11   period in question.

12   Q    And was that amount refunded to the customer?

13   A    Yes, it was.

14   Q    And was your team able to contact this customer to

15   explain all of this?

16   A    We did make several attempts to reach the customer but

17   were unsuccessful in those attempts.  We did leave

18   information for the customer to contact us but we never

19   heard back from the customer.

20   Q    But the refund was nonetheless issued?

21   A    The credit was applied to the customer's account and a

22   refund check was issued.

23   Q    Okay.  Now turning back to your spreadsheet at tab 3,

24   let's look at row 34, which is proof of claim number 3289.

25   Are you there?

1   A    Getting there.

2   Q    Okay.

3   A    Okay.

4   Q    Now, again, without revealing this customer's name, can

5   you read the entry in the "Notes" column to the right edge

6   of the page?

7   A    "In reviewing the account, there is no indication of

8   the customer being charged more than the service plan it

9   rolled on.  There are no discrepancies in the service,

10  contract, pricing or billing.  Reviewed account with

11  customer and she agreed to withdraw claim.

12  Q    So this is an example of a claim where you reviewed the

13  account and found no issues and then the customer

14  subsequently agreed to withdraw, correct?

15  A    Yes, that's correct.

16  Q    All right.  So let's walk through how you got there.

17  If we can start at tab 10, which is DX-13, can you describe

18  this document?

19  A    Sure.  This is the service plan that the customer was

20  on at the point in time that the review began and prior to

21  the customer contacting TXU to sign up for a new term plan.

22  Q    And what was the rate for this plan?

23  A    The rate for this plan was 13 cents per kilowatt hour.

24  Q    Now taking the next three documents --

25  A    Yes.

1    Q    -- tabs 11, 12 and 13 which, for the record, are DX-14,

2    15 and 16, there is a letter, a fact label and a bill.  Can

3    you explain what these three documents demonstrate?

4    A    Yes.  Again, the customer had contacted TXU to sign up

5    for a new term plan.  So behind tab 11 is the welcome letter

6    to that customer that also, with this packet of information,

7    the customer would have received their terms of service

8    agreement, your rights as a customer document and the

9    electricity facts label for the plan that the customer

10   selected.  That electricity facts label, you can see behind

11   tab 12, the customer agreed to sign up for the TXU Energy

12   Texas Choice 24 plan.  And the energy rate for that plan was

13   10.537 cents per kilowatt hour.

14   Q    And that's DX-15.

15   A    Yes.  DX-15.

16   Q    Okay.

17   A    And then behind tab 13, Exhibit DX-016, if you turn to

18   the back page, you'll see that this customer's new plan took

19   effect April 6th.  So you'll see where the customer

20   continued to bill on the TXU Energy Texas Choice 24 plan for

21   two days of the billing cycle from 4/4 to 4/5.  And that's

22   where you see the energy charge of 13 cents per kilowatt

23   hour for the 33 kilowatt hours of usage.  And then 4/6

24   through the end of the billing period, you'll see the new

25   rate for the new term plan that the customer agreed to being

1    charged at 10.537 cents per kilowatt hour.

2    Q    And then if we turn to the next three tabs, which are

3    Exhibits DX-17, 18 and 19, we have another set of letter,

4    electricity facts label and the electricity bill.  Can you

5    explain what these demonstrate?

6    A    Yes.  So similar to what we just reviewed, the customer

7    contacted TXU Energy again to sign up for another term plan.

8    So we have a similar series of documents:  the welcome

9    letter that was sent to the customer, DX-017; and we move

10   behind tab 15 and Exhibit DX-018 would be the electricity

11   facts label for the plan the customer selected, which was

12   the Texas Choice 12 which had an energy charge of 8.2 cents

13   per kilowatt hour; and turning behind tab 16, Exhibit

14   DX-019 is the customer's first bill where the new term plan

15   was effective.  And you can see the plan change in the case

16   TXU Energy Texas Choice 12.  And you can see that the

17   customer was billed 8.2 cents per kilowatt hour.

18   Q    And then we have three more exhibits, DX-20, 21 and 22.

19   What do these three show?

20   A    Yes.  Again, similar to the previous scenario, the

21   customer contacted TXU Energy again to sign up on a

22   subsequent term plan.  Behind tab 17, Exhibit DX-020, again,

23   is the welcome letter; behind tab 18, Exhibit DX-021, is the

24   electricity facts label for the plan that the customer

25   selected to enroll on, which was the TXU Energy Texas Choice

1    12 with 100 percent wind.  And that had an energy charge of

2    8.7 cents per kilowatt hour.  And behind tab 19, Exhibit

3    DX-022, you can see that this is the first bill for the

4    customer's new term plan as indicated.  You can see it

5    indicates TXU Energy Texas Choice 12 with 100 percent wind.

6    And it had an energy charge of 8.7 cents per kilowatt hour.

7    Q    Now did a member of your team speak to this customer?

8    A    Yes.  We were able to speak to the customer and explain

9    the results of the account review.

10   Q    And I take it that was a similar process to what she

11   just did now?

12   A    Yes.

13   Q    And then the customer agreed to withdraw their claim

14   (indiscernible)?

15   A    The customer did agree that there were no issues with

16   the account and agreed to withdraw the claim.

17   Q    So looking back to your timeline, it appears that

18   discussions with customers continued well into this year.

19   Is that true?

20   A    Yes.  As recently as October, we were speaking with

21   some of the claimants in an effort to resolve as many of the

22   claims as possible.

23   Q    So out of the 50 or so claims that you began looking

24   into following the objection, do you know how many were

25   resolved?

1    A    Sixteen.

2    Q    And why were you unable to resolve the remainder?

3    A    Either because we weren't able to reach the customer.

4    Some customers chose not to speak with us.  When we were

5    able to speak with a customer and review the account, we

6    were unable to come to an agreement.  Some of the customers

7    just felt for whatever reason there was something wrong.

8    Q    And then some of those were resolved at the first pro

9    se claims hearing, correct?

10   A    Yes.

11   Q    And the remainder are all under consideration today?

12   A    Yes.

13   Q    Mr. McKillop, do you have a sense of how much time your

14   team dedicated in both pre- and post-objection time periods

15   to diligence and outreach on these claims?

16   A    We didn't ask the team to track the time but we did

17   extend a great deal of time and effort to research and

18   respond to the customers with regard to the claims.

19   Q    And based on your review and your team's review of the

20   company's books and records, the customer accounts and your

21   communications with the claimants, were you able to identify

22   any basis for a claim against TXU with regard to the claims

23   under consideration today?

24   A    No.

25           MR. SOWA:  Okay.  I will pass the witness if

1    anyone would like to cross.

2              THE COURT:  Does anyone have any questions for Mr.

3    McKillop?

4              MR. ENGLISH:  Wayne English, creditor.  No, Your

5    Honor.

6              THE COURT:  Thank you, Mr. English.  Anyone else?

7              All right.  Thank you, Mr. McKillop.  You may be

8    seated.

9         (Witness excused)

10             MR. SOWA:  Your Honor, we have no more witnesses.

11   We do intend to move in several declarations of Mr. Steven

12   Kotarba of Alvarez & Marsal.  Mr. Kotarba is in the

13   courtroom and available for questioning if anyone would like

14   to.  But we have no questions for him.

15             THE COURT:  And you may proceed.

16             Oh, I'm sorry.  Does anyone have any questions for

17   Mr. Kotarba?

18             MR. ENGLISH:  Wayne English, creditor.  Who's Mr.

19   Kotarba?

20             THE COURT:  Mr. Kotarba is the person who signed

21   the declaration in connection with the original objection to

22   your proof of claim.

23             MR. ENGLISH:  No questions.

24             THE COURT:  Thank you.

25             MR. SOWA:  Okay.  Your Honor, at this time, we

1      would move some materials into the record.

2                  THE COURT:  Okay.

3                  MR. SOWA:  I have a list.  It might be easiest to

4      give it to you up front so you can read along.

5                  THE COURT:  All right.  Thank you.

6                  MR. SOWA:  So first, we'd like to move in the

7      October 21st, 2016 declarations of Daniel McKillop and

8      Sinead Soesbe, which accompanied the reply.  Those are at

9      docket numbers D.I. 9914 and D.I. 9915.

10                 And we would additionally move in the declarations

11     of Steven Kotarba in support of the 3rd, 4th, 6th, 7th, 8th,

12     10th, 13th, 15th, 16th and 17th omnibus objections.  Those

13     are docket numbers 2993, 2995, 3213, 3219, 3382, 3474,

14     40004, 4053, 4783 and 4785.

15                 We would also move in the exhibits that were

16     referenced during the direct testimony, which were Debtors'

17     Exhibits DX-1 through DX-22; demonstratives that were

18     referenced during direct testimony, which are

19     D-DEM-MCKILLOP1 and 2 and D-DEM-SOESBE1 and 2.

20                 And then we would ask the Court to take judicial

21     notice of a number of filings on the docket.  The first set

22     are the proofs of claim that were filed by the claimants for

23     consideration today.  Those are proofs of claim numbers 428,

24     669, 844, 1423, 1499, 1520, 1868, 2191, 2226, 2345, 2686,

25     2701, 2730, 2891, 3368, 4599, 5630, 7659, 9800, 9867, 9922

1    and 9923.

2          The next set of docketed items are the responses

3    by the claimants filed on the docket.  And those are docket

4    numbers 3164, 3171, 3386, 3388, 3498, 3578, 3636, 4088,

5    4114, 4152, 4206, 4411, 4882, 4896, 4897, 4942 and 4943.

6          And then finally, the debtors' omnibus objections

7    that are relevant to the claims up for consideration today,

8    which are at docket numbers 2992, 2994, 3212, 3218, 3381,

9    3473, 4003, 4052, 4782 and 4784.

10          THE COURT:  All right.  The Court will admit into

11    evidence Mr. McKillop's declaration of October 21.  That's

12    docket item 9914; Ms. Soesbe's declaration which is docket

13    item 9915; and the various declarations of Mr. Kotarba that

14    were just referenced on the record.

15          Exhibits DX-1 through 22 are admitted into

16    evidence.  The demonstratives of Mr. McKillop and Mr. Soesbe

17    aren't entered into evidence but they're made part of the

18    record.

19          And the Court will take judicial notice of the

20    proofs of claim, docketed responses and omnibus objections

21    that were just put on the record.

22        (Declaration of Daniel McKillop dated 10/21/16 received

23    in evidence)

24        (Declaration of Ms. Sinead Soesbe received in evidence)

25        (Various declarations of Steven Kotarba in support of

Page 65

1    omnibus objections received in evidence)

2        (Exhibits DX-1 through 22 received in evidence)

3        (Demonstratives of Mr. McKillop and Mr. Soesbe made a

4    part of the record)

5        (Court will take judicial notice of the proofs of

6    claim, docketed responses and omnibus objections)

7            MR. SOWA:  Thank you, Your Honor.  That concludes

8    are direct presentation.  At this time, I believe there are

9    -- yes.  There are two claimants on the line.  There is

10   Marilyn Bell and Mr. English who we've heard from.  So at

11   this time, we can open the line for these claimants --

12           THE COURT:  All right.  We'll hear from Mr. --

13           MR. SOWA:  -- to make a statement.

14           THE COURT:  Thank you.  We'll hear from Mr.

15   English first.

16           Mr. English, this is your opportunity to argue

17   your case before the Court.  And this is the judge speaking

18   right now.

19           MR. ENGLISH:  Wayne English, creditor.

20           First, I'm going to actually ask for a motion for

21   a directed verdict.  They have not presented any evidence

22   that controverted my allegation of mitigation of damages.

23   The witness stated that Texas does follow mitigation of

24   damages.  I would like to direct the Court's attention to a

25   case in the Delaware court in 2011.  It's In re Orion

1    Refinery Corporation.  It says "Upholding the bankruptcy

2    court decision that the creditor failed to mitigate damages

3    as required by applicable state law".  And my claim had

4    $100,000 of the bond.  I held them subsequent to the

5    bankruptcy filing.  The price was fluctuated on the bonds

6    from 20 cents up to 75.  When they got to 75, to mitigate

7    damages, I sold them.  And then I followed up with a claim

8    prior to the bar date for $24,580.

9            THE COURT:  All right.  This is -- well, is there

10   a response?

11           MS. CHAIKIN:  Yes, Your Honor.  Again, Rebecca

12   Chaikin with Kirkland & Ellis, counsel for the debtors.

13           Your Honor, the debtors believe that Mr. English

14   misunderstands the law.  First, I would note that the bond

15   in question are EFH Legacy note series R and the indenture

16   Section 111 provides that these bonds are governed by New

17   York law.  And so whatever Mr. English has referenced about

18   Texas law is unfortunately irrelevant to the question here.

19           I'd note that Mr. English is asking for the

20   difference between the face value of his bond and the price

21   at which he sold them in October 2014.  However, while Mr.

22   English has referred generally to mitigation law, Mr.

23   English pointed to no specific authority, neither the

24   indenture or the officer certificate governing the notes nor

25   any statute or case law that supports his read of the law

1    that he is entitled to damages for a sale of his securities

2    at a loss.  Even the case that Mr. English pointed to just

3    now, Orion, stated that damages of mitigation come into play

4    when it's provided for under the state law.

5            Debtors, in contrast, have reviewed the governing

6    documents, the law, and we found nothing to support this

7    contention that damages arise when the only issue is that a

8    security holder sold their securities at a loss.

9            And following from that, because mitigation of

10   damages can only occur when there are damages that do arise,

11   the question of mitigation is irrelevant here.

12           Ultimately, Mr. English sold his bonds and upon

13   that sale, the debtors' obligation with respect to the bonds

14   transferred to the purchaser of the bonds.  At the time Mr.

15   English filed his proof of claim, he simply no longer had a

16   claim against the debtors.

17           THE COURT:  Thank you.

18           MS. CHAIKIN:  Thank you.

19           THE COURT:  Mr. English, would you like to

20   respond?

21           MR. ENGLISH:  Yes.  Your Honor, first I would like

22   to point out the -- again, when I asked the witness

23   previously on the three pages of the proof of claim, it

24   clearly states a claim is a creditor's right to receive

25   payment for a debt owed by the debtors on the date of the

1     bankruptcy filing.  And it cites 11 U.S. Code 1015.

2             At that time, I was owed $100,000 from the debtor.

3     Okay?  And the fluctuation in the price of bonds -- I saw an

4     opportunity to mitigate my damages.  Pursuant to Texas

5     law -- I purchased the bonds in Texas, the debtors are based

6     in Texas and I cited in my case one specific case, Allen v.

7     American General Finance, that the mitigation of damages

8     doctrine is an affirmative defense that requires an injured

9     party following a breach to exercise reasonable care to

10    minimize the damages if it can be done with slight expense

11    and reasonable effort.

12            I also cited a bankruptcy case in Texas, In re

13    Perry, 423 B.R. 215, that in that case -- it was, again, an

14    adversarial proceeding, that they took $3.8 million out of a

15    partnership account and paid the debt while the case was in

16    litigation.  And then the judge awarded the mitigation of

17    damages to pay them back.

18            Also, I would like to show that, you know,

19    claimants are required to mitigate damages in bankruptcy

20    proceedings.  And, for example, suppliers who are a party to

21    a contract with the debtor are entitled to assert a claim

22    for damages that are measured by application of

23    nonbankruptcy law if the debtor rejects the contract.

24            There's also the non-breaching party is required

25    to make a good faith effort to mitigate damages.  A supplier

1    of product to the debtor, for example, is required to make a

2    good faith effort to find another buyer for its products and

3    a purchaser of goods from the debtor is required to make

4    good faith efforts to find a replacement source for those

5    goods.

6            Also, it's well known throughout bankruptcy and

7    foreclosure proceedings that can mitigate on the

8    foreclosure.  Also, in lawsuits having to do with sanctions

9    and violation of the automatic stay, the debtor is required

10   to mitigate damages.

11           When I -- and again, I would like to reiterate

12   that they have produced no evidence and I actually had filed

13   some interrogatories and production of documents with them

14   and they have produced no document and they have produced no

15   evidence of me not mitigating the damages.

16           I didn't file for the 100,000 that I was due on

17   the date of the bankruptcy.  I was able to mitigate the

18   damages by selling the bonds on September 2nd, 2014.

19           I also have not received, you know, obviously, any

20   interest from the payment that was due in May of 2014 and

21   subsequent to them.

22           Now I invested $100,000 in the bonds and I have

23   held them over six years.  So I -- in actuality, I helped

24   the debtors by lowering their amount.  But I would like to

25   mention that they have not produced any evidence to dispute

1    my mitigation of damages.  And I believe that's a

2    preponderance of the evidence.

3              That's all.

4              THE COURT:  Thank you, sir.  Any further comment

5    from counsel?

6              MS. CHAIKIN:  Your Honor, I would state imply that

7    (indiscernible) shares of bonds were unsecured.  And there

8    is no breach here under the law, the various examples cited

9    by Mr. English.  None of them deal with a sale of

10   securities.  They all deal with situations where there is a

11   breach.  There are damages that arise under the applicable

12   law in those six scenarios.

13             Had Mr. English retained his bond, he would

14   receive the treatment provided for the EFH Legacy notes

15   under the plan but that is not the case here.  He sold his

16   bonds and no longer holds a claim.

17             THE COURT:  All right.  Let me --

18             MR. ENGLISH:  Your Honor, I'd like to say one

19   thing.  I think a default is a breach.

20             THE COURT:  Okay.  So I'm going to rule now and I

21   am going to sustain the claim objection.  And that's what

22   because it's very important to understand here that the

23   bond, although contractual in nature and subject to a

24   contractual indenture, are securities.  And under the

25   indenture and under the securities laws, the obligations

Page 71

1  runs with the bond.  And once the bond is sold, you no

2  longer hold the bond or no longer are a creditor of the

3  debtors.

4            Now on the petition date, but not you, the bond,

5  okay, it's paid to the bondholder but the bond was owed,

6  say, $100,00 face amount and they did default by going into

7  bankruptcy.  However, the right to payment is linked to the

8  bond.  And once the bond is sold, there is no longer a right

9  to payment.

10            Mitigation of damages does not apply in a purchase

11  and sale of securities because damages don't apply in the

12  purchase and sale of securities.  Unless you can show some

13  other things which you have not (indiscernible) place

14  asserted here, some sort of fraud or some other securities

15  violation.  The fact is that these debtors were insolvent

16  when they filed bankruptcy.  And their unsecured bonds have

17  risen and fallen in value over the life of this case.  If

18  you were still a bondholder today, you would have what's

19  called an EFH Legacy note claim, I think it's in Class A4,

20  and the plan that's currently before the Court is probably

21  going to pay about 10 cents on the dollar.  So you've

22  actually done -- I know it's not a hundred, but you actually

23  did extremely well here by selling the bonds at 75 cents on

24  the dollar.  If the person you purchased -- the person you

25  sold the bonds to still holds those bonds, they've taken a

1    phenomenal loss as well, and the value of that bond has

2    declined quite a bit over the life of the case.

3              I would point out, by the way, that if you would

4    have sold the bonds that say 105 cents on the dollar, and

5    bonds do often trade above par value when they're in the

6    money and interest rate is high enough, you wouldn't owe the

7    debtor a refund for your profit.  You wouldn't be cutting

8    this debtor a check for that extra five cents if you had

9    sold that at 105 cents, just like they don't have to cut you

10   a check if you sell at 75 cents for your loss.

11             It's unfortunate that you had a loss.  It's

12   unfortunate that many, many, many creditors have held off

13   this year including secured creditors who have collateral

14   who have lost tens of billions of dollars.  So it's an

15   unfortunate situation for all the creditors.  But the

16   reality is that you're talking about the purchase and sale

17   of securities.  You take on the risk as an investor that the

18   value of your investment will rise or fall.  The debtors'

19   sole obligation is to pay the amount or the principal amount

20   of the bond to a person who holds the bond at the time the

21   bond is due and to pay interest to the person who holds the

22   bond when that interest is due.  However, by filing

23   bankruptcy and by operation of the automatic stay, they --

24   or the obligation to pay that interest is (indiscernible)

25   pending ultimate decision about what happens under the plan

1    of reorganization.

2            So you just don't have a claim against the

3    debtors.  Mitigation of damages is completely inapplicable

4    because we're talking about the purchase or sale of a

5    security and damages, contract damages, simply don't arise.

6            So for those reasons, I'm going to sustain the

7    objection to your claim and I know it's cold comfort but you

8    made a very smart investment decision in the summer of 2014

9    by selling at what you did sell because if you still owned

10   it today, your pain would be tens of thousands of dollars

11   worse.  So I complement you on your investment savvy in the

12   summer of 2014.  And unfortunately, that's the best that the

13   law will allow you to recover.

14           MR. ENGLISH:  Thank you.

15           THE COURT:  You're welcome.

16           Now I think we also have on the phone Ms. Marilyn

17   Bell.

18           Ms. Bell, are you on there?

19           MS. BELL:  Yes, I am.

20           THE COURT:  All right.  I've looked at your

21   documents.  And you filed a proof of claim saying that

22   you've been a customer of TXU since the 80s and you've got a

23   claim, I think you said, for $6,000 and that's pretty much

24   all we have.

25           So can you tell me why the debtors owe you $6,000?

1          MS. BELL:  Okay.  First thing, the -- my deal kept

2    going up and down with the old plans and new plans.  Okay.

3    I did not receive a phone call from TXU explaining to me on

4    the old deals that I had.  I just continued to pay the bill

5    because I didn't want to change services with another

6    company.  And that's the reason I'm saying I had went over

7    the plan.  Each plan and the kilowatts was up high, then I

8    keep it for 12 months, then I went off to (indiscernible)

9    another one that was longer.  But it was just more -- the

10   less that the bill kept going up and up, up and down, you

11   know.  It was never a stable thing.  And that's one of the

12   reasons I filed the claim.

13          THE COURT:  Okay.  Now did you own one of these

14   contracts, you know, for a term plan of some sort or did you

15   just pay sort of on a month-to-month, whatever the charge

16   was, the charge was.

17          MS. BELL:  I had month-to-month.  Then I went

18   (indiscernible) month-to-month.  Then I also went back and

19   got it as a term, 12 months and above.  Right now, I'm in a

20   plan for 18 months that I'm in.  The plan before that, I was

21   12 months and the plan before that, it was a month-to-month

22   basis.

23          THE COURT:  Okay.  Now do you have -- I understand

24   that the price of the kilowatt hour has gone up and down.

25   But was there any point where you -- I believe you had said

1    -- you had agreed to their price and then they charged you a

2    different price?  Or was it simply the fact that these

3    prices seem to jump all over the place?

4             MS. BELL:  They jump all over the place and I have

5    to pay them.

6             THE COURT:  All right.  Any response?

7             I'm sorry.  Is there anything else you want to

8    say, Ms. Bell?

9             MS. BELL:  No.

10            THE COURT:  Okay.  Thank you.  Counsel?

11            MS. CHAIKIN:  Thank you, Your Honor.

12            In connection with prosecuting the objection to

13   Ms. Bell's claim, Mr. McKillop and the TXU team did review

14   her account and they looked at deposit information, account

15   information, billing information and they found no issues

16   with the account.  Nothing popped to indicate that she was

17   charged anything other than the appropriate rate.

18   Therefore, without finding any issues in the customer

19   account, we see no evidence that proves a claim against the

20   debtors in these cases.

21            THE COURT:  Okay.  Can you address this -- you

22   know, this idea that there's some sort of damages here

23   because the price of the kilowatt hours kept changing?

24            MS. CHAIKIN:  While I'm not an expert in energy

25   pricing, it's my understanding that prices change both based

1    on usage but also certain of the plans offered by the

2    debtors are tied to different rates.  I know that there's a

3    plan that's tied to a gas rate.  So if the baseline for what

4    the price of energy is, is a number that fluctuates, then

5    the price for (indiscernible) will also fluctuate.

6            THE COURT:  Okay.  Yeah.  That's -- Ms. Bell,

7    that's the answer.  And it's frustrating as a consumer; I

8    know as a consumer of electricity myself.  The reality is

9    that the price of electricity goes up and down and they've

10   seen dramatic changes over the years, some very, very high

11   and then some actually recently very, very low over the

12   last, say, seven years or so because the price of natural

13   gas has come down so much.  The kilowatt hours charges have

14   fluctuated as a result.  And you, because of the -- on a

15   month-to-month basis, they move based on the price of energy

16   as it fluctuates.  And of course, this is all relegated to a

17   certain extent at a baseline by the Public Utility

18   Commission.  But -- (indiscernible) there's a piece of this

19   price.  But prices go up and down on a month-to-month basis.

20           The prices on the contract you lock into will lock

21   in a price but only for a specific amount of time.  And it's

22   really -- the way Texas has set this up, it's -- I'm not a

23   fan of it but it's the one, Texas.  It really puts the

24   consumer in a situation where the consumer has to expend a

25   lot of time and resources trying to figure out what the best

1    price is and also when deciding price, you also say, you

2    know, it's one thing to get a low price but if the service

3    stinks, maybe it's not worth it.  Maybe you pay for a little

4    bit of a higher price for the electricity because you want a

5    good customer service experience.  But it's kind of on the

6    consumer to shop around and figure out what the cheapest

7    price is.  And there's no evidence that the debtors didn't

8    do anything other than charge you with what they normally

9    were charging anybody else on a month-to-month basis or

10   anybody else that was in the plan you were in.  And they

11   entered the process of making sure their records matched up

12   what they believed the appropriate amount was.  So I don't

13   have any reason to award you any kind of claim or any

14   damages here because although the price has gone up and

15   down, that's just the way the market operates in the Texas

16   utility market.  And you were charged according to whatever

17   kilowatt hour was in play at the time you were charged.

18            MS. BELL:  Okay.  Okay.  I understand.

19            THE COURT:  Okay.  So, you know, going forward,

20   you know, it's kind of a decision you'll have to make like

21   all of us make when you decide what to pay for something and

22   maybe do a little research and find a cheaper price or maybe

23   this is the cheapest price.  I don't know.  But

24   unfortunately, the way the law is set up, that's put the

25   onus on us to try to be smart consumers and find what we can

1    at the cheapest price we can if that's what we're worried

2    about.

3           So I wish you all the best and thank you for being

4    very patient.  I know it's been a long call.

5           MS. BELL:  Okay.

6           THE COURT:  You're welcome.

7           MS. BELL:  Thank you.

8           THE COURT:  You're welcome.

9           All right.  So I'll overrule Ms. Bell's

10   objection -- or claim.  Sustain the objection to proof of

11   claim.

12          MS. CHAIKIN:  Thank you very much, Your Honor.

13          Very briefly with respect to the other 18 claims

14   where we have not heard offerings from the claimant, I just

15   want to provide a brief closing.

16          As we heard today, and as described in detail both

17   in the debtors' papers and from our two witnesses, the

18   debtors have taken the claims administration reconciliation

19   process extremely seriously.  The debtors' employees and

20   their advisors have collectively spent hundreds of hours

21   carefully reconciling and diligencing the claims and

22   patiently speaking with the claimants, sometimes multiple

23   times.

24          As you heard from Mr. McKillop, this is a customer

25   driven business.  But the debtors also have a responsibility

1    both under the law and to their stakeholders to object to

2    invalid claims.  The debtors' omnibus objections thus far

3    have resulted in the clearing or modification of over 5300

4    claims and the removal of $179 billion from the claims

5    register.  The fact that so few disputed claims remain at

6    this point just goes to show that the debtors have applied

7    their case law and commitment to consensus to the claims

8    administration process as well.  And these 18 remaining

9    claims represent the very few instances where there is

10   intractable dispute whether because we cannot make contact

11   with the claimant or simply because we cannot agree.

12            Ultimately, the debtors believe that there is no

13   evidence of an allowable claim against the debtors in any of

14   these claims.  The lack of evidence persists despite the

15   debtors' painstaking efforts to review their books and

16   records and to solicit information from the claimants.  It

17   also persists after the claimants have had as many as 20

18   months to gather support for their claims.

19            After all of that, the absence of reliable factual

20   or legal support for any of the contested pro se claims

21   requires that these claims be disallowed.

22            Thank you.

23            THE COURT:  Thank you.  Based on the record, based

24   on -- including the proofs of claim themselves, the claim

25   objections, the arguments of counsel, the evidence put on

1    the record today, the Court will sustain all of the claim

2    objections in front of the Court today.  And I'm prepared to

3    sign an order if you have one.

4              MS. CHAIKIN:  Yes, we do.

5              THE COURT:  Please approach.

6              MS. CHAIKIN:  If I can hand these up?

7              THE COURT:  Yes.

8              THE COURT:  All right.  I'm --

9              MS. CHAIKIN:  There are so many.

10             THE COURT:  That's okay.  I'm not going to do it

11   in court here and make you waste your time but I'll sign

12   these as soon as I'm back in the office.

13             Anything further for today?

14             MS. CHAIKIN:  Thank you, Your Honor.  No.  That

15   concludes our hearing.

16             THE COURT:  All right.  Thank you very much.  I'll

17   see some of you tomorrow at 10 a.m.?

18             UNIDENTIFIED SPEAKER:  Yes, Your Honor.

19             THE COURT:  Very good.  We're adjourned.

20        (Whereupon, these proceedings were concluded at 11:47

21   a.m.)

22

23

24

25

Page 81

```
 1                       I N D E X

 2

 3                  T E S T I M O N Y

 4

 5   WITNESS                EXAM BY              PAGE    LINE

 6   Sinead Soesbe          Mr. Sowa             20      16

 7   Sinead Soesbe          Mr. English          32      15

 8   Daniel McKillop        Mr. Sowa             40       5

 9

10                  E X H I B I T S

11

12   For the Debtors:

13   NO.        DESCRIPTION                  ID.    EVID.

14              Declaration of Daniel McKillop       64

15               dated 10/21/16

16              Declaration of Sinead Soesbe         64

17              Various declarations of Steven       64

18               Kotarba in support of omnibus

19               objections

20   DX-1       Notice for noncustomer proofs of     64

21               claim

22   DX-2       Notice to customers of the bar date  64

23   DX-3       Example of notice to objections to   64

24               customer claims

25
```

Page 82

1                    I N D E X, cont'd

2

3                    E X H I B I T S

4

5    For the Debtors:

6    NO.        DESCRIPTION                        ID.    EVID.

7    DX-4       Notice of the pro se hearings sent         64

8               to claimants who filed a formal

9               response

10   DX-5       Notice of the pro se hearings sent         64

11              to claimants who did not file a

12              formal response

13   DX-6       Spreadsheet to track outreach              64

14              efforts for the customers that

15              had filed a claim

16   DX-7       Electricity facts labels                   64

17   DX-8       Template of the term expiration            64

18              notice sent to customer

19   DX-9       Electricity facts label for TXU            64

20              Energy Texas Choice

21              month-to-month plan

22   DX-10      Electricity bill                           64

23   DX-11      Another electricity bill dated             64

24              a month later

25

Page 83

1                       I N D E X, cont'd

2

3                       E X H I B I T S

4

5    For the Debtors:

6    NO.        DESCRIPTION                          ID.    EVID.

7    DX-12      Bill dated one year after DX-11              64

8    DX-13      Service plan of sample customer              64

9    DX-14      Welcome letter                               64

10   DX-15      Electricity fact label                       64

11   DX-16      Electricity bill                             64

12   DX-17      Welcome letter                               64

13   DX-18      Electricity fact label                       64

14   DX-19      Electricity bill                             64

15   DX-20      Welcome letter                               64

16   DX-21      Electricity fact label                       64

17   DX-22      Electricity bill                             64

18

19                   J U D I C I A L   N O T I C E

20

21   DESCRIPTION
                                                     PAGE

22   Proofs of claim                                         64

23   Docketed responses from claimants                       64

24   Debtors' omnibus objections to claims                   64

25

Page 84

1                    I N D E X, cont'd

2

3                     R U L I N G S

4

5    DESCRIPTION

                                        PAGE    LINE

6    Debtors' omnibus objection to claims sustained    70      21

7    Debtors' omnibus objection to claims sustained    78       9

8    All remaining objections for consideration    80       1

9      before Court at this hearing sustained

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3     I, Lisa Beck, certify that the foregoing transcript is a

4     true and accurate record of the proceedings.

5     **Lisa Beck**

Digitally signed by Lisa Beck
DN: cn=Lisa Beck, o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2016.12.14 16:24:19 -05'00'

6     _____

7     Lisa Beck (CET**D-486)

8     AAERT Certified Electronic Transcriber

9

10

11    Veritext Legal Solutions

12    330 Old Country Road

13    Suite 300

14    Mineola, NY 11501

15

16    Date:  December 14, 2016

17

18

19

20

21

22

23

24

25