will not be construed as accepting any deficiencies in CONTRACTOR's insurance or relieve CONTRACTOR of any obligations set forth herein. In addition, CONTRACTOR will require each of its subcontractors to provide adequate insurance. Any deficiencies in the insurance to be provided by subcontractors will be the responsibility of CONTRACTOR.

F)    Certificates of insurance must show Energy Future Holdings Corp. and its direct and indirect subsidiaries as the certificate holder, and as an additional insured (including completed operations) as respects all of the required coverages except workers' compensation. Workers' compensation shall include Energy Future Holdings Corp. and its direct and indirect subsidiaries as an alternate employer. All of the required coverages must provide a waiver of subrogation in favor of the certificate holder.

G)    CONTRACTOR agrees to report to the manager of the claims department of the COMPANY in writing as soon as practical all instances of damage to the Work and all accidents or occurrences which may result in injuries to any person, including death, and any property damage, arising out of the performance of the Work.

H)    If the insurance obligations or coverage required in this Agreement exceed the maximum limits permitted by law or are determined to be invalid, illegal, unenforceable, or in conflict with the law of any court of competent jurisdiction, then this Agreement will be deemed amended so as to conform with the applicable law, including, if the coverage exceeds legal limits, to only require CONTRACTOR to provide insurance to the maximum extent allowed by law. The validity, legality, and enforceability of the remaining obligations and terms of coverage required in this Agreement shall not be affected or impaired, and will remain in full force and effect.

I)    The requirements contained herein as to the types and limits of all insurance to be maintained by CONTRACTOR are not intended to and will not, in any manner, limit or qualify the liabilities and obligations assumed by CONTRACTOR under this Agreement

14

**ATTACHMENT NO. 4**
**STANDARD TERMS AND CONDITIONS PLST03**
**STANDARD TERMS AND CONDITIONS**
**PLST03**

15

## INDEPENDENT CONTRACTOR RELATIONSHIP

CONTRACTOR will act as and be deemed to be an independent contractor. Neither CONTRACTOR nor any of its employees will act as, nor be deemed to be, an agent or employee of COMPANY. CONTRACTOR will have the sole right to control and directly supervise the method, manner and details of the Work.

## MATERIALS, EQUIPMENT AND LABOR

CONTRACTOR will provide and furnish all material, labor, services, supervision, tools, apparatus, conveyances, equipment and incidental expenses required to complete the Work, except for those specifically mentioned in this Agreement to be provided by COMPANY. All materials and equipment incorporated into any Work under this Agreement will be new and of the most suitable grade unless otherwise specified.

CONTRACTOR will be solely responsible for the proper storage, transportation and disposal of any product or waste, other than sandblasting waste, used or generated in connection with the Work in accordance with all applicable Environmental Laws. CONTRACTOR will dispose of all waste materials, other than sandblasting waste, at an off-site disposal facility approved for such waste materials pursuant to applicable Environmental Laws and will complete and sign all waste manifests as the generator of such waste. COMPANY will be responsible for the storage, transportation and disposal of any sandblasting waste generated during the performance of the Work.

## ASSIGNMENT

CONTRACTOR will not assign, transfer or otherwise dispose of any of its obligations or duties without the prior written approval of COMPANY. Any assignment or transfer made without the express written approval of COMPANY will be null and void.

## SUBCONTRACTING

CONTRACTOR will not subcontract for any of the Work without the prior approval of COMPANY and CONTRACTOR will not be relieved of any duty or liability relating to any Work by reason of subcontracting. There will be no contractual relationship between COMPANY and any subcontractor by virtue of this Agreement.

## BINDING ON SUCCESSORS AND ASSIGNS

This Agreement will inure to the benefit of and be binding upon the undersigned parties and entities, and their respective legal representatives, successors and approved assigns.

## STANDARDS AND CODES

Whenever reference is made in this Agreement to standards or codes in accordance with which Work is to be performed or tested, the edition or revision of the standards of codes current on the Effective Date will apply, unless otherwise expressly stated. In case of conflict between any referenced standards and codes and any documents attached to and incorporated into this Agreement, the Agreement documents will govern.

## CONDITIONS AFFECTING WORK

CONTRACTOR will investigate and acquaint itself with the conditions affecting the Work, including but not limited to those related to the transportation, disposal, handling and storage of materials and waste; availability of labor, water, electric power and roads; the uncertainties of weather, river stages or similar physical conditions at the site; the conformation and condition of the ground; and the character of equipment and facilities needed preliminary to and during prosecution of the Work. CONTRACTOR has

16

satisfied itself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered. CONTRACTOR's failure to acquaint itself with any conditions affecting the Work or any available related information will not relieve it from responsibility for properly estimating the difficulty or cost of successfully performing the Work.

COMPANY is not responsible for any conclusions or interpretations made by CONTRACTOR from the information made available by COMPANY, other than information contained in this Agreement. CONTRACTOR will draw its own conclusions from its review of any and all data and information provided by COMPANY.

CONTRACTOR assumes full responsibility for investigating conditions and determining the existence and magnitude of any hazards to the physical well-being of property of CONTRACTOR, the employees, agents, and servants of CONTRACTOR, or any other person or entity who is or may become involved in the performance of Work, and any and all other persons in the vicinity of the Work. CONTRACTOR will advise all of the above-specified persons or entities of any hazards relating to Work, and will ensure that those persons or entities are advised of and fully understand the nature of the hazards and safety precautions that can be taken to eliminate or minimize dangers relating to the hazards.

CONTRACTOR will use its best efforts to ensure that the Work is performed so as to minimize any adverse impact upon natural resources and the environment and will use best industry practices in this regard at all times.

CONTRACTOR will immediately notify COMPANY as soon as CONTRACTOR has reason to believe that CONTRACTOR, or any employee or other person performing the Work, is not or may not be performing the Work in compliance with applicable Environmental Laws. CONTRACTOR will provide COMPANY with written notice to COMPANY of such actual or potential non-compliance within three (3) days following the discovery thereof. CONTRACTOR will take immediate steps to ensure compliance with all applicable Environmental Laws and will, if directed by COMPANY, cease all Work until authorized by COMPANY to resume the Work.

CHANGES IN WORK

COMPANY may by written notice, make changes in, additions to, or deletions from the Work. If any change significantly increases the time required to perform the Work, an equitable adjustment will be made in the schedule for the performance and completion of the Work. If the Work is being performed on a fixed price basis, and if any change significantly increases or decreases the cost to CONTRACTOR of performing the Work, then an equitable adjustment will be made in the price. The compensation rates for the Work will not be changed.

In order to receive an equitable adjustment in price or schedule, CONTRACTOR must provide a written request for that adjustment within five (5) working days after receiving COMPANY's notice of a change in the Work. CONTRACTOR will continue to perform the changed Work prior to or pending Agreement on an equitable adjustment and will not halt or delay performance of the Work because of any failure to reach an Agreement on an adjustment.

ENVIRONMENTAL

In the event that CONTRACTOR discovers during the performance of the Work any substance at the Work Site that is not the subject of the Work or has not otherwise been identified by COMPANY for CONTRACTOR, which substance CONTRACTOR has reason to believe is or may be a Hazardous Substance that (i) has been or may be released or spilled into the soil, surface water, or groundwater or in a building or structure, or (ii) consists of asbestos-containing materials, lead-based paint, batteries, thermostats, lighting equipment, or equipment containing polychlorinated biphenyls, CONTRACTOR will immediately stop Work and notify COMPANY of the discovery. CONTRACTOR will not resume the Work until receiving authorization from COMPANY to do so.

Contract No. A1893710

The term "Hazardous Substance" means any product, waste, emission or substance defined, listed or designated as a hazardous or toxic substance, hazardous waste, hazardous material or pollutant by or pursuant to any Environmental Law and includes, but is not limited to, any petroleum-based product, substance or waste, including any additives associated therewith, pesticides, fertilizers, solvents, polychlorinated biphenyls, mercury, lead, lead-based paint, asbestos-containing material or explosives.

CONTRACTOR will immediately notify COMPANY in the event of a spill or release of any material which CONTRACTOR knows or has reason to believe is a Hazardous Substance, whether onto the ground, into any body of water, a storm or sanitary sewer, or the air, or anywhere on property owned or controlled by COMPANY, including within any building or structure. CONTRACTOR will be solely responsible, as may be required by applicable Environmental Laws, for, in consultation with COMPANY, (i) notifying the appropriate governmental agencies of such spill or release caused or permitted by the acts or omissions of CONTRACTOR and (ii) for the cleanup and remediation of such spill or release.

## FORCE MAJEURE

If either party becomes unable, either wholly or in part, by an event of Force Majeure, to fulfill its obligations under this Agreement, the obligations affected by the event of Force Majeure will be suspended only during the continuance of that inability. The party so affected will give written notice of the existence, extent and nature of the Force Majeure to the other party within forty-eight (48) hours after the occurrence of the event. The party so affected will remedy its inability as soon as possible. Failure to give notice will result in the continuance of the affected party's obligation regardless of the extent of any existing Force Majeure.

The term "Force Majeure" as used in this Agreement means acts of God (except as excluded herein), strikes, lockouts, or other industrial disturbances, acts of public enemies, wars, blockades, insurrections, riots, epidemics, earthquakes, fires, priority allocations of pipe or other materials or orders, restraints or prohibitions by any court, board, department, commission or agency of the United States or of any States, any arrests and restraints, civil disturbances, explosions and inability despite reasonable diligence to obtain materials essential to the Work. Rain, snow, ice or other adverse weather conditions will not be considered events of Force Majeure.

## SUSPENSION FOR CAUSE

In addition to the other remedies provided COMPANY in this Agreement, COMPANY has the right to order the temporary suspension of any Work when it determines, in its sole discretion, that performance of the Work is not being conducted in a safe manner, the specified quality of the Work is not being met, or the Work is not otherwise being performed in accordance with the requirements of this Agreement.

If any unsatisfactory condition of a portion of any Work performed hereunder is brought to CONTRACTOR's attention, and is corrected by CONTRACTOR to COMPANY's complete satisfaction, COMPANY will authorize resumption of the Work. Should CONTRACTOR fail to promptly correct the unsatisfactory condition to COMPANY's complete satisfaction, CONTRACTOR will be considered in breach of this Agreement.

If circumstances are brought to COMPANY's attention that indicate CONTRACTOR's delay in performance of the Work, or any other fact giving COMPANY reasonable apprehension of CONTRACTOR's ability to perform the Work, COMPANY may, at its discretion, withhold payment which may be due CONTRACTOR until such time as CONTRACTOR demonstrates its willingness and ability to complete the Work in strict accordance with this Agreement.

If any suspension of Work significantly increases the time required for the performance of the Work, an equitable adjustment may, in COMPANY's sole discretion, be made in the performance obligations. In no event, however, will any suspension be the basis for any claim or cause of action by CONTRACTOR or CONTRACTOR's employees, agents, or subcontractors against COMPANY.

18

Contract No. A1893710

## TERMINATION

COMPANY may terminate this Agreement, in whole or in part, at any time, at its sole discretion, by providing written notice of termination to CONTRACTOR. The notice of termination will specify the effective date of any termination, and the Work or any part of the Work to be terminated, or alternatively, that this Agreement is terminated in its entirety.

CONTRACTOR will discontinue Work in accordance with COMPANY's termination instructions. Upon receiving notice of termination, CONTRACTOR will place no further orders, or enter into further subcontracts for services, materials or equipment related to the terminated Work. In addition, CONTRACTOR will delay or terminate all existing orders and subcontracts, insofar as those orders and subcontracts relate to the performance of the Work terminated.

In the event this Agreement or the Work is terminated, COMPANY's only liability will be to pay CONTRACTOR the unpaid balance due CONTRACTOR for Work actually performed.

There will be deducted from any unpaid balance due CONTRACTOR the amounts of all claims of COMPANY against CONTRACTOR, including, but not limited to, claims on account of defect in materials and workmanship.

## TERMINATION FOR DEFAULT

If a petition in bankruptcy should be filed by CONTRACTOR, or if CONTRACTOR should make a general assignment for the benefit of creditors, or if a receiver should be appointed due to the insolvency of CONTRACTOR, or if CONTRACTOR should refuse or fail to supply enough properly skilled workmen or proper equipment, materials or services or should fail to make prompt payment to subcontractors, or to pay promptly for materials or labor, or disregard laws, ordinances or the instruction of COMPANY's Contract Coordinator, or if CONTRACTOR should refuse or fail to abide by the Agreement Construction Schedule or otherwise violate any provisions of the Agreement, then COMPANY, upon a determination by COMPANY's Contract Coordinator that sufficient cause exists to justify such action, may, without prejudice to any other right or remedy available to it after giving CONTRACTOR seven (7) days' written notice, terminate the Agreement and take possession of the Work Site. In the event of such a termination, COMPANY may use all or part of CONTRACTOR's equipment and materials and may finish the Work by whatever method COMPANY may deem expedient. In such event, CONTRACTOR will not be entitled to receive any further payment hereunder until the Work is finished. If the unpaid balance of the Agreement Price will exceed the expense of finishing the Work, including compensation of COMPANY's Contract Coordinator, other COMPANY personnel, third party engineering companies, or other contractors for additional services, such excess will be paid to CONTRACTOR. If the expense of finishing the Work will exceed such unpaid balance, CONTRACTOR will pay the difference to COMPANY within fifteen (15) days of receiving an invoice for same. The expenses incurred by COMPANY herein, and the damage incurred through CONTRACTOR's default, will be determined by COMPANY's Contract Coordinator, in its sole discretion, and such determination will be binding as between the parties.

In the event of a termination under the provisions of this Article, CONTRACTOR will transfer and assign to COMPANY, in accordance with COMPANY's instructions, all Work, all construction records, reports, permits, data and information, other materials (including all COMPANY-supplied materials), supplies, Work in progress and other goods for which CONTRACTOR is entitled to receive reimbursement hereunder, and any and all plans, drawings, sketches, specifications, and information in connection with the Work, and will take such action as may be necessary to secure COMPANY, at COMPANY's sole election, the rights of CONTRACTOR under any or all orders and subcontracts made in connection with the Work.

In the event that COMPANY so directs or authorizes, CONTRACTOR will sell at a price approved by COMPANY, or retain at a mutually agreeable price, any such materials, supplies, Work in progress, or other goods as referred to in the preceding paragraph. In any event, COMPANY will receive any and all records, plans, drawings, data, permits, specifications, sketches, reports, or other information relating to

19

the Work. The proceeds of any such sale or the agreed price will be paid or credited to COMPANY in such manner as COMPANY may direct so as to reduce the amount payable by COMPANY under this Article.

## INSPECTORS

A thorough inspection of all Work performed, including, but not limited to Work being performed at location(s) of subcontracted Work, and all materials furnished may be made by inspectors designated by COMPANY's Contract Coordinator to determine if the Work is being performed in strict compliance with this Agreement. Neither COMPANY's Contract Coordinator nor COMPANY's inspectors have any power or authority to waive any of the provisions of this Agreement or any obligations of CONTRACTOR under this Agreement.

## FINAL INSPECTION AND ACCEPTANCE

CONTRACTOR will notify COMPANY in writing when it considers all Work complete and ready for final acceptance. COMPANY, with CONTRACTOR's cooperation, may conduct such inspections and tests to satisfy itself that the Work conforms to all of the requirements of this Agreement. If the Work is acceptable, COMPANY will within a reasonable time, notify CONTRACTOR in writing of its Final Acceptance of the Work and authorize CONTRACTOR to issue its final invoice.

If all or part of the Work is not complete or is unacceptable, COMPANY will notify CONTRACTOR of the incomplete or unacceptable Work, and CONTRACTOR will, at its sole expense, complete or correct the Work so that the Work conforms to all of the requirements of this Agreement.

## WARRANTY

CONTRACTOR agrees and warrants that its employees, agents and subcontractors will perform the Work in a good and workmanlike manner, in accordance with high professional standards, with a level of care, skill, knowledge and judgement required or reasonably expected of firms or persons performing comparable services, and in strict accordance with this Agreement, including but not limited to, all specifications made a part of this Agreement. Further, CONTRACTOR warrants that all Work will be free from defects in design, materials and workmanship for a period of twelve (12) months from the date of Final Acceptance by COMPANY of all Work, except where specific Work items have been specified to have a longer warranty.

Upon oral or written notice from COMPANY that any of the Work performed by CONTRACTOR fails to conform to any of the above-specified warranties, CONTRACTOR will, at no additional cost to COMPANY, properly remedy the failure and reperform any Work necessary so that the Work conforms to those warranties. CONTRACTOR further warrants any and all corrected or reperformed Work to be free from defects in design, materials and workmanship for a period of twelve (12) months following acceptance by COMPANY of the corrected or reperformed Work. Nothing herein will limit the rights and remedies that may be available to COMPANY at law or in equity.

## BACKCHARGE

If COMPANY discovers defective or nonconforming Work, it may, after notifying CONTRACTOR to correct the defective or nonconforming Work and upon CONTRACTOR's refusal or failure to proceed with corrective action in a reasonable time, perform the redesign, repair, rework or replacement of the defective or nonconforming Work by the most expeditious means available and backcharge CONTRACTOR for all costs incurred.

COMPANY may either separately invoice, or deduct from any payments due CONTRACTOR, the costs for any backcharge. The performance of backcharge work by COMPANY or COMPANY's representative will not relieve CONTRACTOR of any of its responsibilities under this Agreement.

20

Contract No. A1893710

## RECORDS AND RIGHTS TO AUDIT

CONTRACTOR will keep accurate and complete books of accounts, records, documents and other evidence related to the charges for and performance of any Work, including CONTRACTOR's compliance with Environmental Laws related to the Work ("Records"), and of any change or modification to the charges. COMPANY or COMPANY's Contract Coordinator may inspect those records at any time during normal business hours.

All Records required for an audit and inspection will be made available at the offices of CONTRACTOR, at all reasonable times, for inspection, audit or reproduction, until three (3) years from date of final payment for any Work. COMPANY will bear the expenses incurred by it in supporting any such inspection or audit; provided, however, that should any audit or investigation produce evidence that CONTRACTOR has knowingly overstated charges or units of measure upon which charges are based, or provided gifts, gratuities or other benefits to employees of COMPANY in violation of the Business Ethics provisions of this Agreement, CONTRACTOR will be liable to COMPANY for actual damages, including cost of audit and investigation.

## BUSINESS ETHICS

CONTRACTOR represents and warrants that neither it nor any person or entity associated in any manner with CONTRACTOR will:

1) Provide or offer any compensation or benefit of any type, including any gift or gratuity, other than advertising mementos of nominal value or reasonable business meals and business entertainment, to any COMPANY employee;

2) To the best of CONTRACTOR's knowledge, maintain or establish any undisclosed business affiliation that could constitute or give the appearance of a conflict with the interests of COMPANY; or

3) Except to the extent expressly provided for in this Agreement, attempt to act on behalf of or, in any manner, seek to represent COMPANY.

If, during the term of this Agreement, CONTRACTOR knows or becomes aware of any facts or circumstances contrary to the representations and the warranties above, CONTRACTOR will immediately notify COMPANY and provide sufficient information for COMPANY to take appropriate protective or corrective actions. CONTRACTOR further agrees to cooperate fully in any investigation undertaken by COMPANY.

CONTRACTOR, if requested by COMPANY, agrees to require its employees to execute an ethics/nondisclosure agreement at any time.

## CONTRACTOR'S RESPONSIBILITY FOR WORK

CONTRACTOR will care for and maintain both the partially completed and finished Work until final acceptance by COMPANY. Acceptance of portions of the Work made for the purpose of determining partial payments will not constitute Final Acceptance of any portion of the Work.

## WORK SITE PERMITS AND LICENSES

Subject to the following two paragraphs, CONTRACTOR will obtain, prior to the commencement of the Work, and provide to COMPANY upon request, all permits, licenses and governmental authorizations, at its sole expense, required for the performance of the Work. CONTRACTOR will be solely responsible for maintaining compliance with such permits, licenses and governmental authorizations.

In the event that a storm water discharge permit is required for the performance of the Work, (i)

21

CONTRACTOR will be responsible for filing a Notice of Intent with respect to the Work, in addition to any Notice of Intent that COMPANY may be required to file, and (ii) CONTRACTOR will coordinate with COMPANY in the preparation and execution of a Storm Water Pollution Prevention Plan for the Work Site.

In the event that the performance of the Work involves the handling or abatement of asbestos-containing materials, CONTRACTOR will coordinate with COMPANY in the preparation and filing of all required notification forms.

## ACCESS

Should CONTRACTOR desire access to the Work Site over any land not controlled by COMPANY, it will, at its sole expense, obtain all proper permits or written permission necessary for that access.

## HAULING AND OPERATING PERMITS

CONTRACTOR will obtain all hauling and other operating permits and licenses required for the performance of the Work and will pay all related charges and fees. CONTRACTOR will also give all notices (other than COMPANY's Notice of Intent) necessary and incidental to the lawful performance of the Work.

## COMPANY FACILITIES

CONTRACTOR will not use COMPANY's sanitary facilities, changehouses, shops, parks, storage buildings, tools, equipment or other facilities unless so directed by COMPANY. CONTRACTOR will not discharge, without COMPANY's prior written authorization, any product or waste used or generated in connection with the Work through any (i) COMPANY-permitted outfall, (ii) COMPANY-owned or operated pollution control equipment, or (iii) storm or sanitary sewer located at or in the vicinity of the Work Site. Any request for authorization to discharge will include, at a minimum, either a copy of the Material Safety Data Sheet for the product or a written description of the waste, including a list of the constituents of the waste and the relative concentrations thereof.

## COLLATERAL WORK

COMPANY and other contractors may be working at the Work Site. COMPANY reserves the right to coordinate the performance of CONTRACTOR's Work with the work of others. CONTRACTOR will cooperate with and will not delay, impede or otherwise impair the work of others. COMPANY does not guarantee CONTRACTOR continuous uninterrupted access to the Work Site, but will provide such access as good construction practices will allow, considering the other activities in the area.

## PROTECTION OF PROPERTY AND PERSONS

CONTRACTOR will protect the Work (whether completed or in progress), materials, equipment, adjacent property, natural resources and the public from any damage or danger relating to the Work, and will be responsible for any damage, loss or injury due to its actions or neglect. CONTRACTOR will take reasonable precaution to prevent any accident in connection with the performance of the Work and will put up and maintain sufficient barriers, lights and/or other necessary precautions.

## PROTECTION OF HIGHWAYS AND RAILROADS

CONTRACTOR will make suitable arrangements with governmental authorities and railroads for the construction of all structures, whether underneath or over roads, railroads or rights-of-way to protect the public from accident or delay. CONTRACTOR will repair, at its own expense, to the satisfaction of the governmental authorities or other owners, all roads, railroads and bridges that may be damaged by, or given undue wear due to the Work.

Contract No. A1893710

## CLEANING UP

CONTRACTOR will at all times keep the Work Site free of waste materials or rubbish caused by the Work. After completing the Work, CONTRACTOR will remove all its waste materials, rubbish, tools, supplies, equipment and surplus materials from and about the Work Site.

If CONTRACTOR fails to keep the Work Site clean or to clean up after completing the Work, COMPANY may do so and charge all costs of cleaning up to CONTRACTOR. Those costs may be deducted from the final payment to CONTRACTOR.

## CONFLICT OF INTEREST

CONTRACTOR will not engage in any activity that will adversely affect or impair its ability to perform the Work in an independent and reliable manner. CONTRACTOR warrants that it has no professional or contractual obligations that will conflict with its performance of any Work.

## PROTECTION AGAINST LIENS AND ENCUMBRANCES

CONTRACTOR will not at any time permit any lien, attachment or other encumbrance ("Encumbrance") by any person or persons whosoever or by reason of any claim or demand against CONTRACTOR to be placed or remain on the property of COMPANY, including, but not limited to, the Work Site upon which Work is being performed or equipment and materials that are being furnished. To prevent an Encumbrance from being placed on the property of COMPANY, CONTRACTOR will furnish during the progress of any Work, as requested from time to time, verified statements showing CONTRACTOR's total outstanding indebtedness in connection with the Work.

If CONTRACTOR allows any indebtedness to accrue to subcontractors or others and fails to pay or discharge that indebtedness within five (5) days after demand, then COMPANY may withhold any money due CONTRACTOR until that indebtedness is paid or pay the indebtedness and apply that amount against the money due CONTRACTOR.

If CONTRACTOR allows any Encumbrances, whether valid or invalid to be placed on the property of COMPANY, any and all claims or demands for payment to CONTRACTOR will be denied by COMPANY until the Encumbrance is removed. If the Encumbrance is not removed immediately, COMPANY may pay that claim or demand and deduct the amount paid, together with all related expenses, including attorneys' fees, from any further payment due CONTRACTOR, or at COMPANY's election, CONTRACTOR will, upon demand, reimburse COMPANY for the amount paid and all related expenses. Any payment made in good faith by COMPANY will be binding on CONTRACTOR.

## TAXES

CONTRACTOR will comply with all federal, state, or municipal laws, rules and regulations regarding taxes and the payment of taxes, until the Work has been completed, including, without limitation, social security, state unemployment insurance, gross receipts taxes, withholding taxes, and income tax. CONTRACTOR will furnish, upon request by COMPANY, satisfactory evidence of its compliance.

## WAIVER OF CONSEQUENTIAL DAMAGES

Neither party will be liable to the other in contract, tort, or on any other basis, for any consequential damages of any nature, including, but not limited to, lost profits or revenues, loss of customer goodwill, business interruption costs, overhead costs, lost profits, costs of capital, or loss of use of money. Consequential damage also includes attorneys' fees, except as otherwise specifically provided for, in this Agreement and it is expressly understood that this paragraph will be subjugated to, and will not limit or otherwise affect in any manner, CONTRACTOR's obligations to indemnify and hold harmless COMPANY as provided for in the Indemnity and Intellectual Property provisions of this Agreement or CONTRACTOR's obligation as provided for in the Warranty provision of this Agreement.

23

Contract No. A1893710

## INDEMNIFICATION

CONTRACTOR agrees to and will defend, protect, indemnify and hold harmless COMPANY Group from and against all claims, losses, expenses, attorneys' fees, damages, demands, judgments, causes of action, suits, and liability in tort, contract, or any other basis and of every kind and character whatsoever (hereinafter in this and the following paragraphs collectively referred to as "CLAIMS"), for personal injury, death, or property damage of any member of CONTRACTOR Group, arising out of or incident to or related in any way to, directly or indirectly, this Agreement, or the Work, services, or materials to be performed or supplied thereunder, or to any activities of any member of CONTRACTOR Group while on any premises actually or allegedly owned, controlled, or operated by COMPANY, including, but not limited to, CLAIMS arising out of or resulting from (1) any condition of the premises, (2) separate operations being conducted on the premises, or (3) the imperfection or defective condition, whether latent or patent, of any material or equipment sold, supplied, or furnished by COMPANY; and further, IT IS THE EXPRESS INTENT OF THE PARTIES THAT, FOR THE PURPOSES OF THIS PARAGRAPH, CLAIMS, AND CONTRACTOR'S OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE, BUT NOT BE LIMITED TO, CLAIMS ARISING OUT OF OR RESULTING FROM COMPANY GROUP'S SOLE OR CONCURRENT (1) NEGLIGENCE, (2) STRICT LIABILITY, OR (3) OTHER FAULT OF ANY NATURE.

For all CLAIMS except those for personal injury, death, or property damage of any member of CONTRACTOR GROUP within the scope of the preceding paragraph, CONTRACTOR agrees to and will defend, protect, indemnify, and hold harmless COMPANY Group from and against any and all CLAIMS arising out of or incident to or related in any way to, directly or indirectly, this Agreement, or the Work, services, or materials to be performed or supplied thereunder, or to any activities of any member of CONTRACTOR Group while on any premises actually or allegedly owned, controlled, or operated by COMPANY, including, but not limited to, CLAIMS arising out of or resulting from (1) any condition of the premises, or (2) separate operations being conducted on the premises, or (3) the imperfection or defective condition, whether latent or patent, of any material or equipment sold, supplied, or furnished by COMPANY; and further, IT IS THE EXPRESS INTENT OF THE PARTIES THAT, FOR THE PURPOSES OF THIS PARAGRAPH, CLAIMS, AND CONTRACTOR'S OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE, BUT NOT BE LIMITED TO, CLAIMS ARISING OUT OF OR RESULTING FROM COMPANY GROUP'S CONCURRENT (1) NEGLIGENCE, (2) STRICT LIABILITY, OR (3) OTHER FAULT OF ANY NATURE.

To the extent necessary to permit COMPANY to enforce any term, clause, or condition of this Agreement, CONTRACTOR agrees that with respect to any CLAIMS brought against COMPANY Group, CONTRACTOR will and does hereby waive as to COMPANY Group any defense it may have by virtue of the workers' compensation laws of any state.

In the event that any of the terms or provisions of this INDEMNIFICATION section are determined to be invalid, illegal, unenforceable or in conflict with the law of any court of competition jurisdiction, the validity, legality and enforceability of the remaining terms and provisions shall not in any way be affected or impaired, and remain in full force and effect.

## INTELLECTUAL PROPERTY

CONTRACTOR will obtain permission to use any and all intellectual property that may be required in order for CONTRACTOR to perform the Work. This permission will include all necessary licenses and other governmental approvals.

CONTRACTOR will hold harmless and indemnify COMPANY Group from and against, and at COMPANY's option, defend COMPANY Group against, any and all fines, penalties, losses, liabilities, damages, claims and costs (including reasonable attorneys' fees and court costs), arising out of or incurred as a result, directly and indirectly, of any alleged or actual infringement or violation of any right, or alleged right, relating to intellectual property, including, but not limited to, patent, copyright or trade

24

Contract No. A1893710

secret.

In addition, if any claim is brought alleging infringement or the violation of any intellectual property right, CONTRACTOR will avoid any further possible infringement of the intellectual property right, and will seek to resolve the claim in consultation with COMPANY, either by means of alternative arrangements for the Services, or by obtaining permission to use the intellectual property in question.

## COMPLIANCE WITH LAWS

CONTRACTOR represents that it is knowledgeable of and will comply with all federal, state, and local laws, rules, decrees, orders, regulations, by-laws, ordinances and codes that may, in any manner, affect the conduct of the Work, including all Environmental Laws. In this regard, any conduct on the Work Site, that is in violation of any federal, state, or local enactment, as specified above, is also a breach of this Agreement.

The term "Environmental Laws" will mean any and all laws, statutes, ordinances, rules, regulations, orders, interpretations, or guidance of any federal, state or local government or regulatory agency, as may now or hereafter be in effect, pertaining to human health, safety, or the environment, including, but not limited to, the following statutes and any applicable state or local equivalents thereof and any rules and regulations promulgated pursuant thereto: the Federal Clean Air Act, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), the Federal Water Pollution Control Act, the Resource Conservation and Recovery Act of 1976, the Safe Drinking Water Act, the Toxic Substances Control Act, the Emergency Planning and Community Right-to-Know Act, the Oil Pollution Act of 1990, the National Environmental Policy Act, the Hazardous Materials Transportation Act, the Atomic Energy Act, the Federal Insecticide, Fungicide and Rodenticide Act, and the Occupational Safety and Health Act of 1990, all as have been or may be amended from time to time.

CONTRACTOR will promptly notify COMPANY in writing upon receipt of notice of any of the following matters, whether occurring during or subsequent to the performance of the Work; (i) any enforcement, cleanup, removal, Potentially Responsible Party (PRP) notice or other governmental or regulatory action or investigation instituted or threatened against CONTRACTOR pursuant to any Environmental Laws arising out of or related to the performance of the Work; (ii) any claim made or threatened by any person against COMPANY for damages, contribution, cost recovery, compensation, losses or injury arising out of the performance of the Work or the use, disposal or release of Hazardous Substances at the Work Site; or (iii) any report made by CONTRACTOR to a governmental agency with respect to Hazardous Substances spilled, released or deposited on or removed from the Work Site.

CONTRACTOR will not enter into any settlement agreement, consent decree, or other compromise with respect to any claims relating to the performance of the Work without first notifying COMPANY of CONTRACTOR's intention to do so and affording COMPANY ample opportunity to appear, intervene, or otherwise appropriately assert and protect COMPANY's interests with respect thereto.

CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any and all federal, state, and local antidiscrimination statutes, including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Equal Pay Act of 1963; the Age Discrimination in Employment Act of 1967, as amended; the Energy Reorganization Act of 1974; the Texas Commission on Human Rights Act; the Americans with Disabilities Act; and the Older Workers Benefit Protection Act of 1990. CONTRACTOR will promptly advise COMPANY of any action required to be initiated by COMPANY in order to comply with those statutes.

CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any federal, state, or local statutes relating to compensation or wage and hour considerations, including, but not limited to, the Federal Fair Labor Standards Act, and the Texas Minimum Wage Act of 1970, and the Texas Pay Act, as well as any and all other federal statutes impacting, directly or indirectly, CONTRACTOR's employees.

25

If fines, penalties or legal costs are assessed against COMPANY by any court or governmental agency due to CONTRACTOR Group's failure to so comply, or if the Work of CONTRACTOR, or any part thereof, is delayed or stopped by any court or governmental agency, due to CONTRACTOR Group's failure to comply with its obligations, CONTRACTOR will indemnify and hold harmless COMPANY from and against any and all fines, penalties, losses, liabilities, damages, claims, and costs (including reasonable attorneys' fees and court costs) arising out of or incurred as a result, directly or indirectly, of that failure.

## PROPRIETARY INFORMATION

Without the written consent of COMPANY, CONTRACTOR will not divulge to any third party, including any affiliate of COMPANY (excepting, as appropriate, only EFH Corporate Services Company for purposes relating to this Agreement), any information obtained from or through COMPANY that relates to the technical or business activities of COMPANY (including, without limitation, information pertaining to any customer or COMPANY), or is otherwise developed by CONTRACTOR in connection with its performance of the Work, unless: (1) the information is known to CONTRACTOR prior to obtaining it from COMPANY; (2) the information is, at the time of disclosure by CONTRACTOR, then in the public domain; or (3) the information is obtained by CONTRACTOR from a third party who did not receive it directly or indirectly from COMPANY and who has no obligation of secrecy with respect to that information. THIS PROVISION WILL NOT RESTRICT IN ANY MANNER WHATSOEVER THE REPORTING OF ENVIRONMENTAL OR SAFETY-RELATED CONCERNS to the appropriate governmental authorities in accordance with applicable law.

If so requested by COMPANY, CONTRACTOR further agrees to require its employees to execute a nondisclosure agreement prior to performing any services under this Agreement.

## RIGHTS TO DATA

All designs, drawings, calculations, computer codes, plans, specifications, data and any and all other information developed, created or produced by employees, agents or subcontractors of CONTRACTOR, pursuant to or relating, directly or indirectly, to the Work, will become the property of COMPANY when so developed, created, or produced, and notwithstanding any property designations contained therein, COMPANY will have the right to use or sell that information without limitation. At COMPANY's request, those designs, drawings, calculations, computer codes, plans, specifications, data, and any and all other information, will be delivered to COMPANY.

## TITLE AND RIGHT

Nothing in this Agreement will vest CONTRACTOR with any right of property in materials used after they have been attached to or incorporated into the Work, nor materials for which CONTRACTOR has received full or partial payment. All those materials, upon being so attached, incorporated or paid for, will become the property of COMPANY.  Any gravel, sand, stone, minerals, timber or other materials excavated, uncovered, developed or obtained in the Work, or on any land belonging to COMPANY may be used, in the performance of the Work, provided such materials meet the requirements of this Agreement.  Any objects or natural materials or animals excavated or exposed that may have historical significance or constitute a threatened or endangered species must be brought to the attention of COMPANY.

## REMOVAL OF PERSONNEL

COMPANY may, at its sole discretion, and for whatever reason it deems appropriate, remove any person from the Work Site, and the person will not again be employed on the Work without the express written consent of COMPANY.

## GOVERNING LAW

THIS AGREEMENT IS GOVERNED BY AND WILL BE CONSTRUED IN ACCORDANCE WITH LAWS

OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF TEXAS. THE PARTIES MUTUALLY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS IN DALLAS COUNTY, TEXAS AND AGREE THAT ANY ACTION, SUIT OR PROCEEDING CONCERNING, RELATED TO OR ARISING OUT OF THIS AGREEMENT AND THE NEGOTIATION OF THIS AGREEMENT WILL BE BROUGHT ONLY IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS AND THE PARTIES AGREE THAT THEY WILL NOT RAISE ANY DEFENSE OR OBJECTION OR FILE ANY MOTION BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, INCONVENIENCE OF THE FORUM OR THE LIKE IN ANY CASE FILED IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS. THE PARTIES MUTUALLY AGREE THAT THIS AGREEMENT IS A "MAJOR TRANSACTION" WITHIN THE MEANING OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE § 15.020 AND AS SUCH AGREE THAT ANY ACTION OR SUIT ARISING FROM THIS AGREEMENT WILL BE BROUGHT IN DALLAS COUNTY, TEXAS, AND VENUE WILL BE IN DALLAS COUNTY, DALLAS, TEXAS.

THE PARTIES AGREE THAT THE PROVISIONS OF ARTICLE 2 OF THE UNIFORM COMMERCIAL CODE (AS CONTAINED IN THE TEXAS BUSINESS AND COMMERCE CODE) SHALL APPLY TO THE AGREEMENT AND ALL TRANSACTIONS THEREUNDER, IRRESPECTIVE OF WHETHER SUCH TRANSACTIONS ARE DEEMED TO BE A SALE OF GOODS OR THE PROVIDING OF A SERVICE; HOWEVER, IN THE EVENT OF A CONFLICT, THE TERMS AND PROVISIONS OF THE AGREEMENT SHALL CONTROL OVER THOSE CONTAINED IN THE UCC. NOTWITHSTANDING THE FOREGOING, THE PARTIES ACKNOWLEDGE AND AGREE THAT ALL IMPLIED RIGHTS RELATING TO FINANCIAL ASSURANCES ARISING FROM SECTION 2.609 OF THE UNIFORM COMMERCIAL CODE (AS CONTAINED IN THE TEXAS BUSINESS AND COMMERCE CODE) OR APPLICABLE CASE LAW APPLYING SIMILAR DOCTRINES, ARE HEREBY WAIVED.

## NON-WAIVER OF RIGHTS

A waiver by either party of any breach of this Agreement or the failure of either party to enforce any of the articles or other provisions of this Agreement will not in any way affect, limit or waive that party's right to enforce and compel strict compliance with the same or other articles or provisions.

## SURVIVAL

Neither the completion of any Work nor any termination or cancellation of this Agreement will relieve CONTRACTOR of any obligations under this Agreement that by their nature survive the completion of the Work, including, but not limited to, all warranties and obligations of indemnity.

## SEVERABILITY

In the event any provision of this Agreement is held to be void, unlawful or otherwise unenforceable, that provision will be severed from the remainder of the Agreement and replaced automatically by a provision containing terms as nearly like the void, unlawful, or unenforceable provision as possible; and the Agreement, as so modified, will continue to be in full force and effect.

## PUBLICITY

No information relating to this Agreement will be released for publication, advertising or any other purpose without the prior written approval of COMPANY. CONTRACTOR is expressly prohibited from using COMPANY's name in any publication, advertising, or promotion.

## SMALL BUSINESS CONCERNS

Contract No. A1893710

If the value of any Work is Ten Thousand Dollars ($10,000.00) or more and CONTRACTOR intends to subcontract for the performance of any portion of that Work, CONTRACTOR will make ever effort to ensure that small business concerns owned and controlled by socially and economically disadvantaged individuals will have the maximum practicable opportunity to participate in the performance of contracts, implementing Section 211 of Public Law 95-507.

If the value of any Work is Five-Hundred Thousand Dollars ($500,000) or more and CONTRACTOR intends to subcontract for the performance of any portion of that Work, CONTRACTOR (except small business concerns referred to in the preceding paragraph) will adopt a plan in accordance with the requirements of Section 637 of Title 15 of the United States Code.

## IMMIGRATION

CONTRACTOR will fully comply with all applicable requirements of the Immigration Reform and Control Act of 1986 ("IRCA"), as well as all regulations issued pursuant to IRCA or otherwise enforced by the Immigration and Naturalization Service, for or with respect to any of CONTRACTOR's employees, or other persons, performing any portion of the Work. In particular but without limitation, CONTRACTOR acknowledges and represents that: (a) to the fullest extent required by IRCA or such regulations, it has properly completed (or, prior to their performance of any portion of the Work, will properly complete) the Employment Eligibility Verification Form, I-9, for each such employee or person; and (b) all such employees or persons are, and will remain while performing any portion of the Work, otherwise legally authorized to work in the United States.

Contract No. A1893710

## ATTACHMENT NO. 5
## BROWZ REGISTRATION FORM

Browz registration requirement to advance workplace compliance.
As part of Luminant's commitment of reducing jobsite risk through safety, health and environmental solutions, Luminant has partnered with Browz LLC (Browz), a leading provider of contractor compliance and risk management software and services.

Browz provides tools that reveal compliance, enabling its clients to shift their focus toward managing their contracts and contractors more effectively. Engaging Browz is yet another step in ensuring the operational and environmental excellence and safe performance of Luminant's extensive generating fleet and mining operations.

Browz completed registration is a requirement for conducting business with Luminant. Those vendors that are not currently registered in Browz will need to fill out the attached "Contractor Safety & Health Information Form" information and submit it along with any bid offerings.

About Browz:
Browz helps buyers and suppliers exchange critical compliance information by using technology that leads to risk reductions, cost savings, and more secure business relationships. Both buyers and suppliers want to do business in a responsible manner and safe environment. The Browz solution levels the playing field for suppliers while protecting all participants. www.browz.com

How to Register with Browz:
1. Access the Browz website at http://register.browz.com
2. On this web page, enter your designated Key/Browz ID: <<Browz Id >> in the first box provided.
3. Enter your designated Browz Code: <<Code>> in the second box provided.
4. Click the blue "Submit" button.
5. Click on "Begin Registration".
6. Follow the instructions given in the next steps.

During the registration process, you will be prompted to create a unique Org ID, Username and Password. Please remember this information, as it will be required to access your company's information in the future.

There is a $695.00 annual registration fee payable directly to Browz.

For additional assistance or clarification concerning the Browz process, contact:
   Browz Client Services (888) 276-9952

As a condition of this Contract, Contractor agrees to register with Browz and provide those necessary documents requested by Browz to be deemed in compliance with the Browz application. As a minimum, requested documents will be related to safety and health (i.e., regulatory required training, certifications, safety plans, safe and secure workplace practices, etc.), OSHA and MSHA injury rates and Experience Modification Rate (EMR) and other important business data requested by Browz through the registration process. Contractor agrees to maintain the identified documentation for the life of the contract.

Registration and compliance shall be completed within thirty (30) days of the effective date of the Contract. Noncompliance with these requirements shall be grounds for withholding payment of outstanding invoices or termination of the Contract.

THE REVIEW OF THE FOREGOING INFORMATION BY BROWZ OR BY COMPANY OR THE APPROVAL OF CONTRACTOR'S REGISTRATION WITH BROWZ ARE NOT APPROVALS OF CONTRACTOR'S DOCUMENTS, DATA, SAFETY AND HEALTH TRAINING, CERTIFICATIONS, SAFETY PLANS, SAFE OR SECURE WORKPLACE PRACTICES OR OTHER MATTERS SUBMITTED TO BROWZ OR COMPANY. REVIEW OF CONTRACTOR'S INFORMATION OR APPROVAL OF

29

Contract No. A1893710

CONTRACTOR'S REGISTRATION SHALL NOT DIMINISH CONTRACTOR'S RESPONSIBILITIES OR OBLIGATIONS OR WAIVE COMPANY'S RIGHTS WITH RESPECT TO SUCH MATTERS UNDER THE AGREEMENT.  CONTRACTOR AGREES THAT IT SHALL NOT ASSERT THAT THE REVIEW AND APPROVAL OF CONTRACTOR'S INFORMATION OR THE APPROVAL OF CONTRACTOR'S REGISTRATION ARE OR WERE AN APPROVAL OF SUCH MATTERS BY COMPANY OR BROWZ.

**REVISED BID FORM**
**LUMINANT POWER - AX AREA LANDFILL**
**PART 2 - AX HAUL ROAD**

| Bid Item | Description | Estimated Quantity | Units | Unit Price | Total Cost |
|---|---|---|---|---|---|
| L | Mobilization | 1 | LS | $ 15,000.00 | $15,000 |
| M | Site Preparation | 1 | LS | $ 12,000.00 | $12,000 |
| | Haul Road Improvements | | | | |
| N1 | Roadway Excavation and Grading | 105,000 | CY | $ 1.50 | $157,500 |
| N2 | Compacted Subgrade | 5,000 | CY | $ 1.75 | $8,750 |
| N3 | Lime for Stabilization | 800 | TON | $ 142.50 | $114,000 |
| N4 | Stabilized Base | 11,000 | CY | $ 5.00 | $55,000 |
| N5 | Roadbase | 23,000 | SY | $ 16.50 | $379,500 |
| N6 | Stockpiling of Excess Roadway Excavation Soil | 78,000 | CY | $ 0.85 | $66,300 |
| O | Vegetative Soil Placement | 5,000 | CY | $ 3.00 | $15,000 |
| | Vegetation Establishment | | | | |
| P1 | Vegetation — Flat Surfaces and Slopes Less Than 4(H) to 1(V) | 3 | ACRE | $ 2,600.00 | $7,500 |
| P2 | Vegetation — Slopes Greater Than or Equal to 4(H) to 1(V) | 1 | ACRE | $ 7,500.00 | $7,500 |
| Q | Demobilization and Site Decommissioning | 1 | LS | $ 5,000.00 | $5,000 |
| | | | | **TOTAL CONTRACT PRICE:** | **$843,050** |

**OWNER'S OPTION AND ALTERNATE PAY ITEMS (DO NOT INCLUDE IN TOTAL)**

| Bid Item | Description | Estimated Quantity | Units | Unit Price | Total Cost |
|---|---|---|---|---|---|
| R | Payment and Performance Bond | 1 | LS | $ 15,000.00 | $15,000 |

**Notes**
1) LS - Lump Sum
2) CY - Cubic Yards
3) SF - Square Feet
4) NA - Not Applicable
5) SY - Square Yards
6) LF - Linear Foot

Contract No. A1893710

## *POST PRE-BID QUESTIONS AND ANSWERS*

<u>Question</u>: *Do the top of dike elevations on Sheet C1 represent the "top of roadbase" or "top of select fill/dike fill"?*

<u>Response</u>: The top of dike elevations on Sheet C1 represent "top of roadbase" elevations.

<u>Question</u>: *The finished elevation for the Foundation Soil/Top of Liner Subgrade along the western side shows to be 488. The inside bottom toe of the permanent dike along the west side shows to be elevation 490. Can elevations be added to the details on Sheets C2 & C3 to clarify transitions, toe elevations, top of dike elevations, etc.?*

<u>Response</u>: Sheet C1 has been revised to clarify foundation soil/top of liner elevations along the permanent dikes (see attached).

<u>Question</u>: *Is vegetation establishment/erosion mat required on the back side of the temporary dike between the temporary dike and existing ground?*

<u>Response</u>: Yes. In accordance with Section 3.3 of Specification Section 01100 -- Erosion control fabric shall be installed following completion of final grading activities in the following disturbed earth areas unless otherwise approved by the ENGINEER:

1. All exterior slopes 4(H) to I(V) and steeper; and

2. All drainage channels and swales.

<u>Question</u>: *The Erosion Control Fabric spec (Item 2.2 A. on page 1100-2) calls for North American Green S150 or approved equal. Which is what I think they would want. However, the additional specifications include some items that are not met by NAGS150. Can you clarify that North American Green S150, or a true equivalent, is acceptable?*

<u>Response</u>: North American Green S150 (or equivalent) is acceptable for erosion control fabric.

<u>Question</u>: *I never received a response back from the engineer regarding the size and style of silt fence that I inquired about at the pre-bid. If I could please get clarification on the size 18", 24", or 30"? As well as whether it is reinforced? I would greatly appreciate it.*

<u>Response</u>: Silt fencing is described in Section 01100 of the specifications. Since filter fabric is to be installed in a minimum 6 inch deep trench along the upstream side of the fence, the minimum silt fence size is 24 inches.

<u>Question</u>: *I understand Luminant wants the contractor to furnish the testing verification for this project. They did not say whether you or the testing firm will be responsible for filling out and submitting the paperwork to the state. Is either Luminant or their engineering consultant going to certify the paperwork to the State of Texas?*

<u>Response</u>: Luminant will be responsible for all communications and submittals to the TCEQ.

31

97

Contract No. A1893710

Question: *Will the testing firm be responsible for any surveying or locating where the samples were obtained or the tests were performed? On several projects of this kind, Luminant has required the contractor provide state coordinates and elevations for all sampling and testing performed.*

Response: Sample and test locations will be field measured and referenced to a surveyed 100 ft X 100 ft grid system (grid surveyed by CONTRACTOR) across the construction area.

Question: *In the specifications the select fill is required to be placed in 8" maximum loose lifts and compacted to 6" maximum compacted lifts. At 90% of a standard proctor, an 8" loose lift will be hard to achieve without compacting at 95% of a standard proctor. Will Luminant accept more than a 6" compacted lift as long as it is compacted to at least 90% of the standard proctor? If not, it may require a compaction closer to 95% of the proctor or reducing the thickness of the loose lift. The same question goes for the flexible material.*

Response: Select fill is to be placed in 8" maximum loose lifts and compacted to 6" maximum compacted lifts. The resulting density must be greater than 90% standard proctor. Standard proctor results greater than 90% are acceptable.

Question: *The protective soil layer has a requirement for the C value and Fe value obtained from the direct shear. The specifications say this layer is not to be compacted. It is our opinion these values may not be able to be obtained from non-compacted soil. Would Luminant or the consultant respond. We may need a compacted amount to achieve the desired results. This may be something they want the testing firm to remold in the lab and not the field.*

Response: Protective soil shall be placed in one 18 inch lift without damaging the underlying liner or other materials. Testing on soil to be used for protective soil shall be performed in the lab on a remolded sample compacted to a minimum of 90% standard proctor for comparison to the specification requirements.

Question: *We use the normal Unified Classification Chart to classify materials. This is very similar to the one in the ASTM book the specifications refer. In other words, we normally would classify a (CL) material as a silty clay or sandy clay. We would not normally use words like "lean" or "fat", etc. Is this acceptable to Luminant or do we need to go strictly by the proposed specification? This is not a big problem, but it will required some extra testing not listed in the specifications, especially for the base material.*

Response: Soils shall be classified in accordance with ASTM D2487. CONTRACTOR shall perform all testing required for classification under this standard.

32

98

Contract No. A1893710

*Question: In section 2400 of the Project Specifications, it states that the frequency of material laboratory conformance testing is to be 1 test per roll of Gundseal material. On a project of this size, this will be a very expensive cost to added into the project. Also, this is in addition to manufacturing quality control testing. On similar projects of this scope, material frequency is usually around 1 test per 100,000 Square Feet of material. Is there any way this section of the specification could be amended to a smaller, less expensive frequency?*

Response: Specification Section 2400 shall be revised as follows:

The testing requirements of Section 2400 3.3.B shall be performed by the MANUFACTURER prior to shipment of the GSGCL to the site. Specification 2400 Section 3.3.B shall be revised to read as follows:

B.    CQA Testing.

    1.    The following laboratory CQA tests shall be conducted on GSGCL samples by the MANUFACTURER:

| Property | ASTM Method | Unit | Test Frequency |
|---|---|---|---|
| Bentonite Loading | D5993 | lb/ft$^2$ | 1 per 40,000 ft$^2$ of GSGCL area |
| Bentonite Moisture Content | D2216 | % | 1 per 40,000 ft$^2$ of GSGCL area |
| Geomembrane Thickness | D5199 | mil | 1 per roll of geomembrane liner used to produce the GSGCL |
| Hydraulic Conductivity | D5887/E96 | cm/sec | 2 per Project |

    2.    Reported values shall be the average of 5 specimens taken from the sample.

The specifications also require testing of the GSGCL by the INSTALLER. As specified in Section 2400 3.2.G.2.b (Page 2400-8), the INSTALLER shall verify that the deployed GSGCL has a typical moisture content value of 25% during installation and soil covering activities. This shall be accomplished as follows:

    1)    Bentonite moisture content testing shall be conducted by the INSTALLER at a frequency of 1 sample per 100,000 ft$^2$ of GSGCL to be placed.

    2)    Several days prior to scheduled deployment of each 100,000 ft$^2$ portion of GSGCL, select one GSGCL roll to serve as the representative test roll. Unwrap the roll of GSGCL selected

33

for testing and cut out a minimum of 5 specimens of the GSGCL. Note: INSTALLER shall immediately rewrap the GSGCL after the test specimens have been collected to prevent exposure and premature hydration of the GSGCL roll.

3) Send the specimens to a geotechnical laboratory for moisture content analysis using ASTM Method D2216. The reported moisture content value shall be the average of the moisture contents of the 5 specimens. Note that the GSGCL cannot be deployed until the test results have been obtained from the laboratory and verified by the OWNER or ENGINEER.

Once OWNER or ENGINEER has verified that the GSGCL has a typical moisture content value of 25%, the GSGCL can be deployed.

One additional specification change associated with the GSGCL – Section 2400 3.2.D.7 (Page 2400-7) states that supplemental bentonite shall be applied at all seams. This requirement is deleted. No supplemental granular bentonite is required for the GSGCL seams.

Question: *The only other question I have: is there a need for full time CQA during foundation soil grading. The specifications only require that you place it in 12 inch lifts and compact it, but there is no testing requirements. So is a CQA tech need to verify that the material is placed correctly??*

Response: Per Section 2300 3.3.B - Foundation soil in fill areas shall be placed and compacted in lifts, with a maximum loose lift thickness of 12 inches. Each fill lift shall be compacted using a minimum of four passes of the compactor. A pass is defined as one trip across the lift surface. There is no target maximum density requirement for fill applications of foundation soil.

The CONTRACTOR is responsible for completing all work to the satisfaction of the OWNER and ENGINEER in accordance with the plans and specifications. CONTRACTOR shall determine the resources necessary to achieve this objective and include all costs in the applicable bid items.

Question: *Can you clarify how the components of the temporary dikes will be paid for? It appears that the quantities for the Select Fill, GSGCL, and Protective Soil for the temporary dikes are included in Bid Items D1, H3 and I respectively. However, the description of work for the temporary dikes (H5) mentions these items are to be included in the Linear Foot price.*

Response: As described for Item H5 - This item shall be full compensation for all work involved in constructing the temporary dikes and future GSGCL tie-ins, including soil placement and compaction, GSGCL installation and, testing and incidentals; and any other activities necessary to complete the Work. Payment for this item will be on a unit per liner foot basis of temporary dike and future GSGCL tie-in. Final pay quantities for bid items for Select Fill, GSGCL and Protective Soil will not include the portion of these materials included in the temporary dikes and future GSGCL tie-ins.

34

Contract No. A1893710

Also, CONTRACTORS are reminded that quantities provided by OWNER on the Bid Form spreadsheets are estimates based on existing information and actual quantities may be significantly more or less than the estimated quantity shown on the spreadsheet. Actual quantities will be determined by OWNER through comparison of pre-construction and post-construction topographic surveys and field measurements by OWNER's representative. CONTRACTOR is responsible for performing pre-construction and post-construction topographic surveys.

BID FORM MODIFICATIONS

Several of the Contractor Questions made us realize that some of the quantities listed on the Bid Form Spreadsheets overlapped and were not representative estimates. As a result, we have updated the Bid Form Spreadsheets to include revised estimated quantities for several items.

In addition, we realized that we had neglected to include an item on the Haul Road Bid Form to compensate the CONTRACTOR for stockpiling excess soil excavated during haul road construction. The Haul Road bid form has been revised to include a new item (Item N6) that is described as follows:

*[N6] Stockpiling of Excess Roadway Excavation Soil. OWNER anticipates that excess soil will be excavated under Item N1 to achieve the lines, grades and elevations for the Haul Road at the Site. The excess soil will be stockpiled in the area designated on the drawings and as required by OWNER. Payment for this item will be on a unit price per cubic yard of soil stockpiled as measured by topographic survey after all other filling activities have been completed to the satisfaction of the OWNER.*

35

101

**STEPHEN SAKONCHICK II, P.C.**
6502 Canon Wren Drive
Austin, Texas 78746
-----
Telephone (512) 329-0375
Facsimile (512) 329-0376 697-2859
email sakon@flash.net

Dear Sir or Madame:

Please file the enclosed original and return a file stamped Copy in
the enclosed self addressed stamped envelope.

*on the first 2 pages*

     Thank you for your attention to this matter

                              Stephen Sakonchick, II
                              SBN 17525500



Tab D

**Jacob Gonzales**, on October 19, 2016, was sworn in and testified (Gonzales Dep. 5:3-9, 5:16-18, 6:4-6):

He worked for Luminant Power for 32 years and was a project engineer prior to retiring and about 10 years prior to retiring (Gonzales Dep. 6:12-16, 8:7-15).

As a project engineer he was responsible for following a project through all of its various stages, from cradle to grave (Gonzales Dep. 8:7-11:16).

This involved the work up for the technical specifications (Gonzales Dep. 13:21-14:4).

He was the project coordinator (project engineer) for Sandow under the Contracts (Gonzales Dep. 16:5-19).

The AX pit and haul road constructed by Ranger was necessary for the operation of the Sandow 5 generating unit to dispose of ash generated during the generation of electricity hauled to the pit in dump trucks along the haul road (Gonzales Dep. 17:1-19:20, 20:20-22).

The scope of work under the Contracts included excavation, grading, earth work, providing road base, a liner for the Ax pit, grubbing, and vegetation (Gonzales Dep. 76:3-77:13).

He was also the project engineer for Sandow on the prior capping of the A1 pit, where Luminant/Sandow saved money by allowing natural vegetation to substitute for new seeding (Gonzales Dep. 9:9-23, 126:1-19).

In August 2013, Ranger was complete with the work under the Contracts except for the vegetation, and the AX pit and haul road were ready for use (Gonzales Dep. 28:18-20, 29:18-30:1).

He remembers first hearing about the possibility of a Luminant/Sandow bankruptcy sometime in November or December 2013 (Gonzales Dep. 41:18-23, 48:3-18, 49:4-20).

In December 2013, in subsequent discussion between January 1 and August 28, 2014, he had conversations with Nathan Ziehr of Ranger in reference to Ranger's vegetation subcontractor, where Mr. Ziehr told him that subcontractor had concerns about being paid because of the bankruptcy rumors (Gonzales Dep. 50:11-51:20).

Ranger itself, did not express concerns about being paid (Gonzales Dep. 102:17-24).

In those conversations, Mr. Ziehr of Ranger told him Ranger was having trouble finding alternative seeding contractors because of

the booming Austin economy where these contractors would come from and also finding ones that would work for Luminant/Sandow because of the bankruptcy talk (Gonzales Dep. 51:4-20, 52:8-12, 56:20-57:11, 59:11-22, 61:2-9).

Luminant/Sandow never told Ranger it was terminated from the vegetation work under the Contracts (Gonzales Dep. 54:4-22).

Ranger never said it was not coming to do the vegetation but Sandow continually tried to get a schedule going over the 10 month period before the vegetation was complete (Gonzales Dep. 47:21-48:2, 145:6-147:11).

The AX pit is an addition to the property, without which the Sandow 5 generating plant would be unable to operate, and the haul road is an addition that makes such operation easier (Gonzales Dep. 77:14-78:23).

Both the AX pit and the haul road are capital improvements (Gonzales Dep. 79:8-80:15, 81:23-82:5).

Luminant/Sandow saved money by using the native vegetation in areas not seeded (Gonzales Dep. 91:12-16).

He understands that Luminant/Sandow has a retainage account set out for retainage held by it (Gonzales Dep. 105:16-106:1).

The retainage is actually money that has already been earned by Ranger (Gonzales Dep. 106:13-18).

He considered the Contracts complete when the seeding (vegetation) was done in the summer of 2014 (Gonzales Dep. 108:12-14).

Ranger completed the Contracts, according to their terms except for the September 2, 2013 completion date under the Contracts (Gonzales Dep. 145:11-147:20).

105

**David Watkins**, on October 19, 2016, was sworn in and testified (Watkins Dep. 5:15-17):

He has been a Senior Procurement Specialist with Luminant Generation since May 2013 (Watkins Dep. 12:14-20).

He was substituted for Mark Jenkins on the Contracts as Contract Administrator and got involved with the Contracts in August 2013 (Watkins Dep. 13:11-14:2).

His job as Contract Administrator was to manage the Contracts while the Contract Coordinator, Jacob Gonzales handled the day to day work (Watkins Dep. 15:2-12).

He has been a Contract Administrator in 1999 (Watkins Dep. 15:25-16:15).

Both Sandow Contracts have the same technical specifications (Watkins Dep. 18:13-18, 19:3-9, 12-14, 21:5-7).

The scope of work under the technical specifications includes excavation, clearing, removal, disposal of vegetation, stripping, stockpiling, grading, construction of perimeter dikes, and placement of stockpiled vegetation soil (Watkins Dep. 21:22-22:21).

Luminant Generation administers contracts for Sandow (Watkins Dep. 26:20-27:4).

He was aware of talk at Luminant before a February 2013 Wall Street Journal article of a possible bankruptcy filing  (Watkins Dep. 28:21-30:9).

In August 2013 Ranger was complete with its work under the contracts except for the vegetation  (Watkins Dep. 33:11-20, 35:22-36:3).

He would have been aware of and passed on any termination of Ranger under the Contracts and he never informed or threatened Ranger with termination of the Contracts  (Watkins Dep. 34:3-35:6).

He had phone conversations with Nathan Ziehr between August 2013 and June 2014.  Close to the end of 2013, he discussed with Mr. Ziehr, Mr. Ziehr's concern about Ranger's subcontractor getting paid for the vegetation work with the looming bankruptcy and not knowing when it would occur.  He had several conversations with Mr. Ziehr on that same subject through May 2014 (Watkins Dep. 47:16-50:7, 55:20-56:14).

He thinks it is reasonable for a contractor, when a bankruptcy is filed, to get assurance of payment before they continue work (Watkins Dep. 59:22-60:2).

Ranger had previously incurred a substantial amount of retainage on the Contracts (roughly $292,000) as of August 2013 (Watkins Dep. 62:7-24).

Ranger never told him it was complete on the Contracts until the vegetation went in and never said it would not complete the vegetation (Watkins Dep. 64:6-11, 64:23-65:7).

In addition, Sandow never told Ranger the Contracts were terminated (Watkins Dep. 65:8-11).

By holding back the retainage on the Contracts, Sandow was acknowledging that the Contracts had not been finished without the vegetation  (Watkins Dep. 64:12-22, 79:8-11).

He was aware that by waiting to do the vegetation, there was less vegetation to do because of natural vegetation (Watkins Dep. 65:25-66:3).

There is nothing in the Contracts about the contingency of Sandow filing for bankruptcy and the actual filing of the bankruptcy was a first for him  (Watkins Dep. 79:22-80:15, 120:14-121:9).

During all of his conversations with Mr. Ziehr between September 2013 and April 28, 2014, with Mr. Ziehr asking for an assurance of payment for the vegetation work, he could not provide any assurance of payment (Watkins Dep. 139:22-140:23, 142:2-143:3, 145:20-146:4).

**Patrick Behling**, on October 17, 2016, was sworn in and testified (Behling Dep. 6:6-8, 6:16-18):

He is the engineer of record for the Contracts, assisted by Matt Sutherland, and familiar with the Contracts and technical specifications that accompany them (the same technical specifications apply to both Contracts) (Behling Dep. 11:5-21, 13:5-6, 13:11-18, 20:3-16, and Exhibits 3 and 44).

Exhibit 45 is an aerial view of the work done under the Contracts (Behling Dep. 14:14-21, 21:15-21, and Exhibit 45).

The pictures contained in Exhibit 46 reflect the state of the natural vegetation in October 2013 (Behling Dep. 16:10-12, 17:18-18:10).

On a prior project involving both he and Ranger, the A1 cell, the natural vegetation was used rather than planting vegetation as called for under the contract resulting in a significant savings to Sandow (Behling Dep. 9:2-11, 18:11-25).

Jacob Gonzales worked for Luminant/Sandow and was responsible for the work under the Contracts for them and David Watkins was the contracts person for Luminant/Sandow (Behling Dep. 21:3-14).

The scope of work under the Contracts, which are unit priced contracts, as described in the technical specifications includes mobilization (common to all such contracts), construction of earthen dikes, construction of the landfill with a liner and a ramp to access it, construction of an access road and culvert, all involving site preparation, excavation, grubbing, grading, removal and replacement of vegetative soil, road base and revegetation disturbed areas (Behling Dep. 21:23-37:22).

He reviews and approves the pay applications (Behling Dep. 37:23-38:4).

Exhibits 5 and 6 are the pay applications for retainage through August 2013, but both show the work is not yet complete (Behling Dep. 38:9-39:10, and Exhibits 5 and 6).

All of Ranger's work under the Contracts was complete in August 2013 except for the vegetation (Behling Dep. 40:13-16).

He understood BMP Specialties was on board as Ranger's vegetation subcontractor in August 2013 (Behling Dep. 40:10-23, 132:7-16).

At the time he understood that, because of the vegetation requirement, the Contracts would not be completed by the September 2, 2013 completion date (Behling Dep. 42:2-43:8, 44:17-23).

108

Between August 2013 and June 2014, Ranger never informed him they would not come out and complete the vegetation work under the Contracts or abandon the Contracts, and between those same dates, Sandow never terminated Ranger under the Contracts, and Ranger always communicated it would complete the work under the Contracts (Behling Dep. 45:6-25, 61:10-14, 68:13-69:13, 70:9-16, 96:19-97:12, 151:24-152:9).

He discussed the possibility of a Luminant/Sandow bankruptcy with Nathan Ziehr before the actual bankruptcy filing (Behling Dep. 127:6-128:4).

Ranger also never said they would not complete the Contracts because Luminant/Sandow would be filing for bankruptcy (Behling Dep. 60:16-21).

Ranger did ask for assurances it would be paid for the remaining work under the Contracts after the April 29, 2014 bankruptcy filings (Behling Dep. 76:9-77:19).

The Mine Safety and Health Administration, MSHA, required all persons working on the site to go through 40 hours of training, and Luminant/Sandow also had their own requirements for several hours of training (Behling Dep. 50:13-51:19).

Over the 10 month period after Ranger substantially completed the work under the Contracts, it repeatedly said it was scheduling the work, but then did not do it until June 2014 (Behling Dep. 108:17-21, 151:18-152:9).

The delay in installing the vegetation resulted in a net savings to Sandow under the Contracts (Behling Dep. 92:3-19).

Ranger was paid for the vegetation work under the terms of the Contracts (Behling Dep. 97:21-98:5, 159:1-160:12, 161:6-10, and Exhibit 47).

**Nathan Ziehr**, on October 18, 2016, was sworn in and testified (Ziehr Dep. 4:6-8, 4:14-16).

He is and has been a project manager since August 2009 and, since early 2016, a vice president for Ranger (Ziehr Dep. 7:7-17, 10:1-9).

He was the project manager for the Contracts (Ziehr Dep. 10:13-11:9).

He is aware of discussions between him and Luminant/Sandow extending the September 2, 2013 completion date under the Contracts and being past the September 2, 2013 completion date under the Contracts was not an issue (Ziehr Dep. 20:14-16, 21:19-24, 23:4-15, 25:18-24, 26:6-12, 145:1-19, 147:17-148:10).

The work under the Contracts was performed on an expedited basis (Ziehr Dep. 68:10-17, 69:16-70:21).

The work under the contracts was substantially complete by August 2013, the cell and haul road were functional, and the only remaining item was the cosmetics of the vegetation (Ziehr Dep. 151:19-152:5).

Ranger billed for its retainage as of August 2013 at a time where it had completed all of the phases of the work under the Contracts except for vegetation (Ziehr Dep. 27:2-18, 39:4-10). He would only have sent the request for retainage when he did as the result of a conversation with the project engineer, Pat Behling (Ziehr Dep. 108:12-21).

All of his representations regarding the start of work on the vegetation came from Mr. Collins of BMP, and he passed on what he was told by BMP (Ziehr Dep. 89:10-21, 119:20-120:12).

Ranger does not have the option to do the vegetation work since it lacks the tools, material and specialized personnel to do that work, which is why Ranger always subcontracts it (Ziehr Dep. 90:10-25).

Ranger uses BMP for seeding (vegetation) and had identified BMP as a subcontractor for the vegetation work under the Contracts (Ziehr Dep. 45:5-21, 65:13-19, 144:19-25).

At the time Ranger entered into the Contracts, Ranger was not concerned it would be paid for its work (Ziehr Dep. 142:23-143:6). In October 2013, a Wall Street Journal article that made a lot of people working for Luminant (Sandow) anxious about payment (Ziehr Dep. 143:7-17).

It was difficult trying to convince a subcontractor, here BMP, to

come out to work with an impending bankruptcy and uncertainty of being paid (Ziehr Dep. 124:7-125:21, 128:13-18, 129:15-19, 140:21-142:16, 161:13-162:20).

Ranger, at some point attempted to find other subcontractors to do the vegetation work under the Contracts, but the umbrella shadowing the job was that any minute there could be a bankruptcy (Ziehr Dep. 46:10-24, 49:7-23, 50:6-11, 128:13-18).

He spoke with David Watkins and Jacob Gonzales about having trouble getting a subcontractor to do the vegetation because of the potential for a bankruptcy filing (Ziehr Dep. 57:23-59:19).

In early 2014, he assured BMP that Ranger would pay BMP whether or not Sandow paid Ranger (Ziehr Dep. 59:25-60:11, 133:6-23, 162:10-20).

Neither Mr. Watkins nor Mr. Gonzales could not provide assurances that Ranger would be paid for the vegetation work (Ziehr Dep. 60:12-24).

The engineer, Pat Behling was also concerned about sending a representative to this job because of fear of not being paid (Ziehr Dep. 60:25-61:12).

Ranger was actively doing hundreds of thousands of dollars of work on another Luminant project at this time on work Ranger could perform (Ziehr Dep. 131:3-132:10).

Ranger had done another cell for Sandow, the A1 cell where natural vegetation was used in lieu of revegetation (Ziehr Dep. 150:5-151:4).

After the bankruptcy filing, Ranger requested and received an assurance of being paid for the vegetation (Ziehr Dep. 163:3-164:22).

The vegetation work was completed and approved by the project engineer and then Luminant/Sandow (Ziehr Dep. 164:23-165:6).

Ranger never told the project engineer or Luminant/Sandow they would not come back to complete the vegetation (Ziehr Dep. 184:18-21).

On two occasions he told The Project engineer and Sandow Ranger would like assurance of payment, but it was not required to complete the vegetation (Ziehr Dep. 185:7-186:3).

The request for assurance was more for BMP (Ziehr Dep. 186:13-18).

**Chris Collins**, on October 18, 2016, was sworn in and testified

8

111

(Collins Dep. 4:6-8):

He is and has been the owner of BMP Specialists since 2004, which is an environmental contractor specializing in erosion control, with 45 employees (Collins Dep. 4:17-25, 9:12-13).

Ranger makes up 8-10 percent of his business (Collins Dep. 8:2-4).

He was the vegetation subcontractor for Ranger under the Contracts and operated under a simple proposal and invoice system (Collins Dep. 9:18-24, 19:11-24, 20:12-15).

He was aware that the vegetation work under the Contracts required MSHA training (Collins Dep. 26:20-27:9).

He trained six or seven men, but he delayed getting them trained since he was busy and it required pulling these men from work. He had them certified as of January 27, 2014 (Collins Dep. 34:1-24, 43:2-4).

Between October 2013 and March 2014, he (BMP Specialists) had a concern about a Sandow bankruptcy and whether he would get paid for the vegetation work (Collins Dep. 65:15-23, 67:11-16). By November 2013 he had discussions with Ranger about the potential for a Luminant bankruptcy and was concerned about getting paid for the vegetation work (Collins Dep. 37:8-19). His exposure was roughly $100,000 (Collins Dep. 66:16-67:3).

Even if Ranger had provided assurance of payment he was still concerned since it might also take six months or a year to get paid (Collins Dep. 38:8-39:5, 43:23-44:16).

Other than the bankruptcy possibility, there was nothing else preventing him from coming out to do the vegetation work between September 2013 and June 2014 (Collins Dep. 71:6-11).

His vendors wanted to be paid for the materials for the vegetation work before he was paid for it (Collins Dep. 72:21-73:9).

After the bankruptcy filing he was still concerned about getting paid for the vegetation work (Collins Dep. 68:14-16). As it was, it took him six months to get paid for the vegetation work (Collins Dep. 59:12-13).

Did not want to tell Ranger he would not do the job since he did a lot of work with Ranger, however, he really did not want to do it. (Collins Dep. 45:13-16, 58:25-59:5).

He found out about the possible Luminant bankruptcy in the news, saw about it in the Wall Street Journal, and it was also know through his suppliers (Collins Dep. 64:2-15).

**Brad McKenzie**, on October 17, 2016, was sworn in and testified (McKenzie Dep. 4:6-8):

He is the Controller for Ranger, a limited partnership and vice president of finance for its general partner (McKenzie Dep. 4:6-8, 4:15-17, 7:7-10, 7:20-22, 8:1-3).

Ranger became aware that Sandow had a potential to file bankruptcy by October 2013 and before that as the result of articles in the Wall Street Journal (McKenzie Dep. 18:23-19:22).

Ranger did not consider halting work on the Sandow vegetation because of the bankruptcy  (McKenzie Dep. 21:20-24).

Ranger understood that Luminant and Sandow were affiliated companies and if one filed for bankruptcy, so would the other (McKenzie Dep. 26:7-12).

He believes there was an extension on the completion date of the Sandow project (McKenzie Dep. 31:17-24).

The Ranger lien affidavit was filed before the vegetation was complete (McKenzie Dep. 37:5-10).

Ranger had not abandoned the work remaining required by the Contracts (McKenzie Dep. 40:13-18).

Nathan Ziehr has a responsibility to worry about the credit worthiness of a client (McKenzie Dep. 62:15-25).

If he thought Ranger would be paid retainage before the job was 100% complete, Ranger would apply for it (McKenzie Dep. 78:1-13).

As of the bankruptcy filing on April 29, 2014 Ranger did not believe the contracts had been completed (McKenzie Dep. 79:18-21).

Bankruptcy was not a concern for Ranger as far as completing the Luminant and Sandow projects it had underway (McKenzie Dep. 80:6-8).

Ranger was doing a job for Luminant on which it did 4 to 5 million in work between October 2013 and April 29, 2014 (McKenzie Dep. 80:12-23).

Ranger had not filed a lien affidavit prior to the bankruptcy because the work on the Sandow project was not complete (McKenzie Dep. 82:11-22).

The lien affidavit on the Sandow project was filed as a result of the Sandow bankruptcy (McKenzie Dep. 92:11-23).

Tab E

## Page 1

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                          ) Chapter 11
                                )
ENERGY FUTURE HOLDINGS          ) Case No. 14-10979 (CSS)
CORP., et al.,                  )
                                )
          Debtors              ) (Jointly Administered)
_____)

Sandow Power Company LLC        )
                                )
v.                              )
                                ) Contested Matter
Ranger Excavating LP            )

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

JACOB GONZALES

OCTOBER 19, 2016

VOLUME 1

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF JACOB GONZALES,

produced as a witness at the instance of the RANGER

EXCAVATING LP, and duly sworn, was taken in the

above-styled and numbered cause on October 19, 2016,

from 1:35 a.m. to 5:21 p.m., before Terri Garcia, CSR in

and for the State of Texas, reported by machine

shorthand, at the law offices of Okon Hannagan PLLC, 750

North St. Paul Street, Suite 1800, Dallas, Texas 75201,

pursuant to the Federal Rules of Civil Procedure.

## Page 2

A P P E A R A N C E S

FOR SANDOW POWER COMPANY LLC:

   MS. MELANIE OKON
   Okon Hannagan PLLC
   750 North St. Paul Street
   Suite 1800
   Dallas, Texas  75201
   Phone: (214) 396-9650
   mokon@okonhannagan.com

FOR RANGER EXCAVATING LP:

   MR. STEPHEN SAKONCHICK, II
   Stephen Sakonchick II, P.C.
   6502 Canon Wren Drive
   Austin, Texas  78746
   Phone: (512) 329-0375
   Fax: (512) 697-2859
   sakon@flash.net

ALSO PRESENT:
   MR. MIKE INCE, Videographer
   MS. ASHLIE ALAMAN, In-house counsel for Luminant

## Page 3

INDEX

                                                  PAGE

Appearances...........................................  2

JACOB GONZALES
     Examination by Mr. Sakonchick.................... 5
     Examination by Ms. Okon..........................115
     Examination by Mr. Sakonchick....................138
     Examination by Ms. Okon..........................167
     Examination by Mr. Sakonchick....................167

Signature and Changes.................................169

Reporter's Certificate................................171

                    EXHIBITS

NO.  DESCRIPTION                               PAGE

(Previously marked)

3    Contract For Services For Construct AX Fly  12
     Ash Disposal Haulroad By And Between Ranger
     Excavating And Sandow Power Company LLC

5    Application for Payment                     28

6    Application for Payment                     28

9    E-mails                                     82

12   E-mails                                     84

17   E-mails                                     84

21   E-mails                                     87

22   E-mails                                     90

23   E-mails                                     95

26   E-mails                                     96

27   E-mails                                    102

28   E-mails                                    103

## Page 4

33   Daily Field Records                        134

38   Application for Payment with                64
     Continuation Sheets attached

39   Application for Payment with                64
     Continuation Sheets attached

40   E-mails                                    161

41   E-mails                                    119

42   Notice of Deposition and Subpoena          75
     Duces Tecum to Patrick Behling

44   AX Area Landfill Scope of Work             14
     And Technical Specifications

45   Google Earth photo                         33

46   E-mail with photos attached                35

47   E-mails                                    94

48   Job Labor Report                           72

49   E-mails with Applications for              73
     Payment and Continuation Sheets
     attached

(Gonzales Exhibits)

50   Notice of Deposition and Subpoena          5
     Duces Tecum to Jacob Gonzales

## Page 5

1        P R O C E E D I N G S

2        (Exhibit No. 50 was marked.)

3        THE VIDEOGRAPHER:  We are on the record.

4  Today's date is October 19th, 2016.  It is 1:35 p.m.

5  This is the video deposition of Jacob Gonzales regarding

6  Energy Future Holdings Corporation, et al., Debtors,

7  Chapter 11, Case No. 14-10979 (CSS).  This case is filed

8  in the United States Bankruptcy Court for the District

9  of Delaware.

10        Will counsel please make their appearances

11 for the record.

12        MR. SAKONCHICK:  Steve Sakonchick, II for

13 Ranger Excavating LP.

14        MS. OKON:  Melanie Okon for Sandow Power

15 Company, LLC.

16                JACOB GONZALES

17 having been first duly sworn, testified as follows:

18                EXAMINATION

19 BY MR. SAKONCHICK:

20    Q.  Mr. Gonzales, I'm going to hand you what I've

21 marked as Exhibit 50.  Have you seen that before today?

22    A.  Yes.

23    Q.  Have you had the opportunity to go through

24 whatever records you had from your prior employment and

25 see if any of those records that are listed there were

## Page 6

1  in your possession?

2    A.  I don't have any records from my prior

3  employment.

4    Q.  Okay.  Let's start from the beginning.  Please

5  state your full name for the record.

6    A.  My name's Jacob David Gonzales.

7    Q.  What's your educational background?

8    A.  I have a bachelor's in civil engineering from

9  Texas A&M.

10    Q.  And what year would you have graduated?

11    A.  I graduated in 1981.

12    Q.  Okay.  And just before your retirement, who was

13 your employer?

14    A.  I worked for Luminant Power.

15    Q.  And how long had you been with Luminant Power?

16    A.  32 years.

17    Q.  All right.  Now, it would have been through

18 different permutations of names, but it's the same

19 company?

20    A.  Well, I started with Texas Power & Light which

21 was substation and transmission, so I didn't get into

22 power until after two years after I started with the

23 company.

24    Q.  And what year would it have been?

25    A.  '84.

## Page 7

1    Q.  Okay.

2    A.  It was a reorganization of the company in '84

3  when all the operating companies combined, Dallas Power

4  & Light, Texas Power & Light, Texas Electric Service;

5  and when they combined, I changed jobs from transmission

6  and substation to generation and been in generation ever

7  since.

8    Q.  All right.  And what was the exact name of the

9  company you worked for before you re -- re -- retired?

10    A.  Luminant Power.

11    Q.  Luminant Power?  Because I've heard Luminant

12 Mining, Luminant Generation.

13    A.  Well --

14        MS. OKON:  For the record, I think Luminant

15 Power's probably like a d/b/a.  I don't think that's the

16 formal name.

17    Q.  (BY MR. SAKONCHICK)  If I refer to Luminant

18 today, will you agree that I'm referring to any of the

19 Luminant entities?

20    A.  Okay.

21    Q.  And if I refer to Sandow, I'm referring to

22 Sandow Power Company LLP [sic].

23    A.  Okay.

24    Q.  And sometimes I may just refer to Luminant and

25 thinking about Sandow at the same time.

## Page 8

1    A.  Okay.

2    Q.  All right.  They're all related entities,

3  correct?

4    A.  Yes, they are.

5    Q.  And why don't you tell me what your position

6  was with Luminant Power before you retired.

7    A.  I was a project engineer prior to retiring.

8    Q.  Would that be a project manager?

9    A.  Yes.

10    Q.  In the contracts, I think it's referred to as a

11 project manager, isn't it?

12    A.  Okay.

13    Q.  And how -- and you'd had that position how

14 long?

15    A.  Probably about ten years.

16    Q.  All right.  What did that entail?

17    A.  I was responsible for following a project, we

18 called it, from cradle to grave.  When a power plant had

19 an issue or a need, engineering would step in.  I was a

20 part of engineering.  And we would develop a solution or

21 a scope of work and prepare cost estimates,

22 justification for the work based on input from the plant

23 and engineering analysis, preliminary engineering.  Once

24 that project -- it was then submitted for approval or

25 for consideration in the budget.  If it was approved, we

Page 9

1  would take that project and develop it further, more
2  detailed estimates, more detailed engineering and
3  ultimately a -- final design would be prepared,
4  including drawings and specifications either in-house or
5  through a consultant, which we would have secured.
6          At that point, we would solicit competitive
7  bids for that work, and once the -- and then during the
8  bidding process, we supported the effort answering
9  whatever technical questions or scope questions that may
10 have arisen in that process.  Our procurement department
11 would have solicited bids.  From a commercial
12 standpoint, they managed that part of the project.
13         Once the bids were received, we did a
14 technical evaluation, they made a recommendation for
15 award.  We would secure all of the approval.  I secured
16 the approval by routing it based on its dollar value
17 that determined what level of approval was needed and
18 prepared whatever work authorization or capital funding
19 was necessary for the project and then issued
20 requisitions for a commercial contract to be prepared by
21 procurement and routed it for approval.
22         Procurement would -- once it was approved,
23 would then repair the contract documents, including
24 resolving whatever commercial issues that may have been
25 identified during the bid process.  They would resolve

Page 10

1  those with the contractor and -- and execute a contract.
2          At that point, we would work, meet with the
3  contractor and develop a plan for execution, which
4  included when the move-in would occur, where they would
5  park their vehicles and so forth, all those
6  construction-type details.  The quality control plan,
7  the environmental plan, the safety and health plan, all
8  those would be developed and reviewed.  The construction
9  would commence.
10         And in this particular project and many
11 projects, I secured QA/QC services through an outside
12 party.  We did not have expertise in-house to monitor a
13 civil project or a civil environmental project so we
14 hired outside services.  They provided day-to-day
15 supervision and monitoring.  They supervised the quality
16 control program, testing program, and they acted on
17 Luminant's behalf to administer our safety program.  And
18 they kept daily records and -- and answered a lot of
19 field questions.  Occasionally, they would need to
20 resolve to refer to me to get some questions answered,
21 you know, when it was a matter of turning left or
22 turning right, we would make the call or I would make
23 the call on which way to go with the project.
24         They kept records of activity, how many
25 people were on-site, what kind of equipment was on-site,

Page 11

1  how much work was done, as-builts, you know, some -- if
2  there was any deviation from the specification or the
3  drawings, they recorded that.  Quality control testing,
4  they administered that.  And they also, on a monthly
5  basis, reviewed whatever quant -- this was a lump sum --
6  I mean, this was a unit-price contract so they reviewed
7  the -- the request for payment from the contractor and
8  would make a recommendation to me whether we should
9  approve and pay that partial estimate.  We made those
10 payments monthly.
11         And then at the conclusion of the project,
12 they did the final measurement so that we could do a
13 true-up for payment.  If there was additional work that
14 was identified that needed to be done, we would prepare
15 whatever change orders were necessary to do the extra
16 work, if any.
17         If there was an accident, they monitored
18 or -- or administered the safety program and would
19 assist in identifying, you know, what the causes were
20 and whatever investigation was necessary and whatever
21 corrections might be necessary for either a near-miss or
22 for an actual -- a reportable incident.
23         At the conclusion of the project, they
24 prepared a complete submittal of the -- the work.  It
25 was called a Liner Quality Report.  It was a document

Page 12

1  that was required by the TCEQ, the Texas Commission on
2  Environmental Quality.  Since this was an environmental
3  project, we need to maintain records that demonstrate
4  that the work was done in accordance with state
5  requirements, that the line of integrity was -- met the
6  requirements of law to -- to protect the environment.
7          And so this was a document that all the --
8  all quality control, all the testing so that we could --
9  if -- if anything ever happened at some future date, we
10 would be able to demonstrate to the regulators that the
11 job was designed properly and was constructed in
12 accordance with the specifications and the drawings.
13 And they would bind that all up into a report and submit
14 to Luminant for recordkeeping, which they did in this
15 project.  We have copies of it in environmental
16 services.
17    Q.  All right.  Let me show you what we've marked
18 as exhibit -- we -- we got your full name for the
19 record, didn't we?
20    A.  I believe so.
21    Q.  All right.  Exhibit 3.  You've been referring
22 to these projects.  And in front of you is a book and if
23 you flip to Tab No. 3, and you'll see a yellow -- or
24 a -- a green divider there.  And there are two contracts
25 under this exhibit, and the first one is for the ash

Page 17

1    Q.  And what's an ash fly pit used for?

2    A.  The Sandow plant burns coal as a fuel.  The --

3  when -- at the conclusion of burning coal, there is an

4  as -- ash residue.  It is the noncombustible component

5  of coal.  It's minerals, silica, aluminum and iron

6  predominately.  They don't burn and so there's an ash

7  left over, much like in your fireplace at home.  You

8  burn wood, there's always an ash residue.  There's two

9  types of ash.  The heavier ash settles to the bottom of

10  the boiler, we call it bottom ash.  The lighter ash is

11  carried up the flue.  It's captured in the precipitator.

12         There's also another byproduct from the

13  combustion.  We have pollution control equipment.  It's

14  a scrubber where we take limestone, which is calcium

15  carbonate, and it reacts with the SO2, the sulfur that's

16  produced when you burn coal under -- to meet emission

17  limits.  We have to capture that SO2 and we use the

18  scrubber.  It forms -- it reacts with the SO2 that's in

19  the hot gasses and forms calcium carbonate, which is

20  gypsum, which is like what these walls are made of.

21  It's a synthetic gypsum.  This is probably from a mined

22  gypsum.  And that material also has -- the -- the ash --

23  so the fly ash, the bottom ash and the gypsum, which is

24  many -- you know, maybe a million tons, million and a

25  half tons, two million in the case of Martin Lake.  It's

Page 18

1  a lot of material that you -- you have to dispose of.

2  You just can't dump it on the ground.  It contains heavy

3  metals which can be -- they're regulated and you cannot

4  allow them to enter the groundwater of the state, so you

5  have to build a landfill.  And the TCEQ, the Texas

6  Commission on Environmental Quality has established

7  requirements for the landfills.  We call it a pit, but

8  it's basically a solid waste landfill.  I think the --

9  the term that environmentals use, it's an industrial

10  solid waste as opposed to a municipal solid waste like

11  you would -- like accepts garbage.  So we have to build

12  a landfill to receive this material.  The plant is in

13  operation for many, many years, 30 or 40 years, and so

14  rather than build one giant landfill to receive the

15  total capac -- the total byproducts produced, we build

16  it in segments, you know, that will typically last a

17  year to 18 months.  So you -- we make that investment as

18  the plant is operating so that you can spread the cost.

19    Q.  Would a -- we've gone over this with the other

20  engineer, and as I understand it, you have some

21  excavation which you clear out for the ash fly pit, you

22  put a line -- you put a liner down -- well, after you

23  prepare the -- the subgrade, you put a liner down, you

24  put some earth on top of it, you build dikes to

25  retain -- or --

Page 19

1    A.  Contain.

2    Q.  -- contain the -- the -- the ash?

3    A.  Uh-huh.

4    Q.  And --

5    A.  Run -- and runoff as well.

6    Q.  And you have a haulroad to access it?

7    A.  Correct.  The -- the material is transported

8  from the plant to the landfill by really, really large

9  dump trucks.

10    Q.  Are you familiar with Sandow 5?

11    A.  Yes, I am.

12    Q.  What is Sandow 5?

13    A.  Sandow 5 is a fluidized bed boiler designed

14  different than the -- than all of the other boilers that

15  we have, but it's basically the same function.  It burns

16  coal to produce the heat that converts water to steam

17  and steam drives the generator.

18    Q.  And creates electricity?

19    A.  And creates electricity.  That's the -- it's a

20  lot of work to get to the "makes electricity".

21    Q.  And the Sandow 5 property is actually on a

22  Alcoa lease property, isn't it?

23    A.  As I understand it, yes.

24    Q.  Have you ever look -- had an opportunity to

25  look at the leases for the -- for the Sandow 5?

Page 20

1    A.  I don't know that I ever have.  I've seen pa --

2  a page here or a page there if I had a question about

3  a -- a specific issue on -- on a project, you know,

4  some -- someone in legal would have made a copy of the

5  page and said this covers that.  But as far as the whole

6  document, I've never -- I've never seen a copy of it,

7  much less read it.

8    Q.  All right.  So some of the Luminant Generation

9  is done by property on which Luminant owns the property,

10  and some is on property which they lease, correct?

11    A.  I believe that's correct.

12    Q.  And the particular property that we're talking

13  about on the contracts that are Exhibit 3 are on a lease

14  which is now between Sandow and Alcoa?

15    A.  That's correct.

16    Q.  And I think originally it was with a different

17  company, but through assignment, Sandow is the one who

18  actually has it now.

19    A.  Yes.

20    Q.  And that's why they call the generation plant

21  Sandow 5?

22    A.  Correct.  It's the fifth unit out there.

23    Q.  Now, let's talk about the ash pit.  There's

24  a -- how many -- well, let me ask this.  How many

25  projects have you done with Ranger Excavating?

Page 25

1    On the liner, we're very concerned about
2 vegetation because it protects -- on the cap, I should
3 say.  On the cap, we're very concerned about vegetation
4 because it -- it protects the integrity of the liner.
5 You don't want ruts and, you know, exposing ash, so I
6 really don't think we would have waived any seeding
7 requirements on the cap.  It would have been in drainage
8 areas or other disturbed areas that were, you know,
9 ancillary to the --
10    Q.  How about -- how about the dikes?
11    A.  The dikes are important, but -- but they're
12 fairly -- they're not a very steep slope.  There were
13 some areas that had pretty good coverage.  It wouldn't
14 surprise me at all if we would have waived the
15 requirement to seed.
16    Q.  So for the borrowed areas, you didn't have to
17 go back and reseed?
18    A.  Portions of it, we didn't.
19    Q.  Portions of it.  And except for the cap, areas
20 around the fly cell --
21    A.  The exterior of the dike, yeah.
22    Q.  Volunteer vegetation would have been
23 sufficient?
24    A.  Could have been.
25    MS. OKON:  I just want to make sure -- I

Page 26

1 thought he said on the borrowed, you had to seed.
2    A.  No, we -- they wanted it seeded.  Alcoa said
3 they needed to have -- says, you can borrow the
4 material, take materials, you're not really borrowing it
5 because you never bring it back, but the material that
6 you take, you've disturbed it now so they're -- they
7 were concerned about erosion and there are also
8 requirements that you cannot have sediment enter creeks
9 and rivers and lakes and so we have to -- you've got to
10 put seeding.  You have to establish vegetation.  And
11 there were some areas that -- that Alcoa said, you don't
12 need to seed over here, but over here you do because --
13    MS. OKON:  Sorry.
14    A.  -- we didn't have good coverage, but that was
15 at Alcoa's discretion.  And what we did on the cap, we
16 have to meet the -- the state requirements and they're
17 pretty stringent, you know.  I don't think we would have
18 waived those areas.
19    Q.  (BY MR. SAKONCHICK)  And that's be -- and
20 that's why the liner's required?
21    A.  Yes, to -- to protect -- it -- it keeps the --
22 the metals that are in the ash from leaching into the
23 groundwater.
24    Q.  Let 's look at Exhibit 3, Page 208.  It'd be --
25 no, it's -- it's the first one.

Page 27

1    A.  Where -- oh, I -- I see it.
2    Q.  It's in the lower right-hand corner.
3    A.  I see the pages now.  I was looking at the
4 original page numbering.
5    Q.  Now, this is a u -- what they call a unit price
6 contract?
7    A.  Yes, sir.
8    Q.  And what does unit price contract usually
9 denote?
10    A.  It means that you provided an initial estimate
11 of the qua -- of the quantities for different work
12 categories and that at the conclu -- you survey the land
13 before the project starts, the work is conducted and
14 then a final survey is done.  So it's -- you have two
15 planes that you've surveyed and you -- the difference
16 between the two is what you've either added or removed
17 or maybe a plant area, so many acres or square feet or
18 square yards, and you bid the document on an assumed
19 quantity so that they -- to establish unit price, but
20 payment is made on a measured quantity.  They're usually
21 pretty close.
22    Q.  Depends how good the engineer is?
23    A.  Well, it depends on how good the survey is.
24 The surveys can vary somewhat.  You know, it's -- take a
25 rod and you put it on the ground, if it's on top of a

Page 28

1 rock, it's up here; if it's in a gully, it's down here,
2 so there's those kind of discrepancies.
3    Q.  And the same thing took place on the ash pit?
4    A.  Yes, sir.
5    Q.  And that's looking at Ranger 51 on that
6 contract?
7    A.  Yes, sir.  Same thing.  And I believe they were
8 the same cate -- well, the categories are very similar,
9 they're not identical, obviously.
10    Q.  And both had categories for vegetation?
11    A.  Yes, sir.
12    Q.  And it was a per-acre price?
13    A.  Correct.
14    Q.  And the determination of how much was whether
15 it was considered flat or slopes greater than a certain
16 amount?
17    A.  Correct.
18    Q.  Now, Ranger, in August 2013, were they complete
19 with the project except for the vegetation?
20    A.  I believe so.  That sounds right.
21    Q.  Looking at Exhibit 5 and 6.
22    A.  Is that Tabs 5 and 6?
23    Q.  Yes, Tabs 5 and 6.
24    A.  Okay.
25    Q.  Have you seen these before?

Page 29

1    A.  Yes.

2    Q.  And they were -- they're both applications for

3  payment for the retainage on the haulroad and the ash

4  fly pit?

5    A.  I believe so.

6    Q.  And the retainage --

7    A.  You said 5 and 6?

8    Q.  Yes.

9    A.  Okay.  Yeah, they're the same.  One's for the

10  road, one's for the landfill.

11    Q.  Yeah, I think 5 is for the -- the landfill?

12    A.  Right.  Zone 1.

13    Q.  And the haulroad is No. 6?

14    A.  Yes.

15    Q.  And both those show that there's some work yet

16  to be done, they don't show a hundred percent complete?

17    A.  Correct.

18    Q.  And there would be substantial completion at

19  that point in time?

20    A.  Yes.

21    Q.  And from August 2013, was the haulroad and the

22  ash pit ready for use?

23    A.  Yes.

24    Q.  Vegetation wasn't required for the use of the

25  haulroad or the ash pit?

Page 30

1    A.  Correct.

2    Q.  Was a haulroad used -- when was the first time

3  the haulroad was used after Ranger completed its work?

4    A.  The haulroad, we didn't -- let me -- if I could

5  explain, that landfill, AX, was not used until probably

6  2015.  It was originally planned to be used much sooner,

7  but A1, the first landfill, was reconfigured so that we

8  could stack the ash higher.  The reason for that is AX

9  is much further away, so it's a longer haul, costs more

10  money.  It's all driven by fuel.  These trucks drive an

11  extra ten miles, a lot of trucks every day, 365, it's

12  a -- it adds up to a significant amount of money.  And

13  the -- we figured out we could stack the ash taller, got

14  approval from the TCEQ, and so we were able to defer or

15  delay the use of -- of AX for, I think, almost two

16  years.

17    Q.  But it was ready for use in August --

18    A.  It was ready.  Now, there's also -- AX has a --

19  that south end of AX had a very deep hole.  I mean,

20  150 feet deep.  It was a mine.  They didn't -- they

21  didn't reclaim the mine back in those days.  This was

22  mined probably in the '70s.  It's -- was not reclaimed

23  so we had to fill that hole in.  And there's still --

24  it's going to probably take 10 or 15 years to fill it

25  in.  So we were using ash from Unit 4 to fill that.  And

Page 31

1  so those trucks were using the haulroad to drive to the

2  bottom of AX, dump the bottom ash and there was another

3  ramp they could -- so they were making a loop.

4  Initially, it would go down a ramp and then come back up

5  the same ramp.

6    Q.  When you're talking about AX, you're talking

7  about the fly pit that was constructed under --

8        (Simultaneously speaking.)

9    A.  The AX -- I mean, the -- the future area.  This

10  is AX Cell 1, it's going to be about twenty cells

11  ultimately.  This was just for the very first one.  And

12  so the area -- the -- almost half the landfills, it's a

13  deep valley.  I mean, it's -- you look like you're on

14  the edge of Grand Canyon and we have to fill that in,

15  and it takes many, many years to fill it in.

16    Q.  Have they been --

17    A.  And so they drove ash down and deposited it

18  there.

19    Q.  All right.  So even though it's not scheduled

20  for use till 2016 or --

21    A.  Or beyond.

22    Q.  -- or 2015, they've actually been using it in

23  order to fill in the deeper parts of the -- the area?

24    A.  Right.  Correct.

25    Q.  So it has been used?

Page 32

1    A.  Yes.

2    Q.  When were they first doing that?

3    A.  I -- I don't -- I don't know when that was --

4  that's a plant -- that's part of operations, not part of

5  construction.

6    Q.  Okay.

7    A.  And so I wasn't involved in -- in doing that.

8    Q.  You don't know when it was -- you -- you've

9  been out to that area, though, since --

10    A.  Oh, yeah.

11    Q.  -- the contract?

12    A.  Yeah, we've been hauling ash out there since

13  before Cell 1 was even constructed, I said, because we

14  had -- we needed to -- to fill that in, and so we didn't

15  want to waste any opportunity to use Unit 4 bottom ash.

16    Q.  So you don't know sitting here today whether

17  any ash was placed in fly pit, the AX fly pit in 2013?

18    A.  Oh, we did not put any -- we did not dispose of

19  any ash in Cell 1 in 2013.  That --

20    Q.  Even in the deepest part of the hole?

21    A.  That's not disposal.  That's -- the -- this was

22  Unit 4 bottom ash, which is a -- it's not considered a

23  waste.  It's a beneficial use, so that -- you can just

24  put it on the ground.  You don't have to -- it doesn't

25  have to go in a landfill like Unit 5's material does.

Page 41

1    A.  Well, it probably -- you know, I didn't --
2  if -- if I heard anything of -- that I would have had
3  any confidence in, it wouldn't have been until, like,
4  2014 whenever it actually happened.
5    Q.  All right.  And by -- so with the Wall Street
6  Journal article in February 2013, that may not have been
7  a turning point for you to become aware of the potential
8  for a bankruptcy filing?
9    A.  I -- I probably heard people talking about it.
10  I never read the article.  And I -- I don't have any
11  information to -- to put any kind of value in that
12  article.  I mean, it would have just been an article and
13  I -- I couldn't have disputed it, I couldn't have agreed
14  with it.  I didn't have any information to say, yeah,
15  that's -- that's the way the company's going or no, it's
16  not going to happen.  I -- would have just been an
17  article in the paper to me.
18    Q.  Did you have any of the contractors that worked
19  under your supervision bring that up?
20    A.  The first I remember hearing about it would --
21  would have been this project, the Ranger project, and I
22  seem to remember that happened in, like, December of
23  '13.
24    Q.  And we've already established that except for
25  the vegetation, Ranger was done in August 2013?

Page 42

1    A.  The landfill was -- yes.
2    Q.  Except for the vegetation, everything else in
3  the project was complete?
4    A.  Everything else was complete.  I -- I didn't --
5  the project is -- wasn't complete because it was a
6  requirement of the TCEQ that we have vegetation
7  established on the project.  So --
8    Q.  I'm not -- I'm not questioning the need --
9    A.  So as far as I was concerned, it wasn't done.
10    Q.  All right.  I'm not questioning the need for
11  it.
12    A.  Right.
13    Q.  What I'm just trying to establish is facts
14  about times and dates.  Now, let's just -- let's assume
15  Ranger reads the Wall Street Journal article, they would
16  have known in February 2013 of the bankruptcy filing.
17  Yet they completed the project by August 2013, correct,
18  or substantially completed except for --
19    A.  Substantially.
20    Q.  -- the vegetation?
21    A.  Substantially.
22    Q.  And were you -- how many subcontractors were
23  you aware of that Ranger used out there?
24    A.  Only the seeding -- I didn't hear about any
25  issues -- and there weren't that many subs on this

Page 43

1  project, but I don't remember hearing any concerns that
2  Ranger may have run into with their subs except for the
3  seeding contractor, and that wasn't until, like, a
4  December kind of a time frame.
5    Q.  All right.  The -- the liner, did Ranger use a
6  subcontractor for the liner?
7    A.  Yes, there was a -- the manufacturer.  And I
8  think the manufacturer had a licensed installer that
9  installed it.
10    Q.  And that's a specialty kind of item?
11    A.  Yes.
12    Q.  So other than the liner subcontractor and the
13  vegetation subcontractor, you're not aware of any other
14  subcontractor Ranger's used on these two jobs?
15    A.  I don't know of any other subs.  They had -- we
16  brought in rock for the road and things like that, but
17  that was just deliveries.  They -- they didn't use
18  somebody else to build the road, so they were suppliers,
19  not really --
20    Q.  Let's talk about subcontractors, not vendors.
21    A.  Okay.  I -- I don't know of any other subs.
22    Q.  Okay.  And as we established already, Ranger
23  substantially completed their work in August 2013, even
24  though they might have known about the bankruptcy as
25  early as February of 2013?

Page 44

1    MS. OKON:  Objection, calls for
2  speculation.
3    Q.  (BY MR. SAKONCHICK)  I mean, if -- if -- if
4  Ranger knew about the bankruptcy in February 2013, they
5  cer -- certainly didn't stop them from doing their work?
6    A.  Well, the Wall Street -- no, it didn't.
7    Q.  Okay.  And after that, the vegetation and any
8  talk about bankruptcy or getting paid, was that an issue
9  brought up by their vegetation contractor and not
10  necessarily Ranger?
11    A.  I never talked to the vegetation contractor.
12  It came to me through a conversation I had with Nathan.
13    Q.  Do you know who the vegetation contractor was?
14    A.  I -- I don't remember the name of the --
15    Q.  BMP Specialties [sic]?
16    A.  That sounds -- that sounds right.
17    Q.  And BMP, have you worked with them before?
18    A.  Not -- not directly, no.
19    Q.  So they would have only -- you've only known
20  them through this project?
21    A.  I think that we have -- they have done work for
22  Luminant in the mining side of our business who used a
23  lot of -- of seeding contractors because of the nature
24  of their work.  But that -- I -- I seem to remember
25  hearing their name before in that -- in that area.  But

Page 45

I've never -- I've never hired a seeding contractor
directly.  Any ones that I've ever had were subs on
contractors that I had --

Q.  All right.  And that's --

A.  -- primary contracts with.

Q.  -- BMP Specialists, not specialties, so I --

A.  Specialists?  Okay.

Q.  Now, let's talk about the period from August 1,
2013 to December 31, 2013.

A.  Okay.

Q.  Did you have discussions directly with Ranger
personnel --

A.  Yes.

Q.  -- during that period?

A.  Yes.

Q.  Who would you have had discussions with during
that --

A.  Nathan Ziehr.

Q.  Would you have talked to Gary Ballard at all?

A.  No.

Q.  All right.  And what discussions would you have
had with Nathan during that period?  And try to give me
a month.

A.  Well, it would have been probably at least once
a month every month.  I do cost projections on all of my

Page 46

projects.  We have a system, the cost has to be entered
and updated that projects when we're going to spend
money by month and how much we expect to spend.  Our
financial -- all of that -- for every project that's
entered and all that rolls up in our F&A.  Our finance
people use that to -- to secure funds for the company.
So we had to do a projection every month.

So every month, it's, like, the fifth or
sixth business day, just prior to that, I would have
called -- either called Nathan directly or contacted him
through Pat or e-mailed him if we couldn't get together
on the phone and say, when are you going to do the work,
when's it going to be finished?  And I knew the duration
of the work was fairly short so if he said, we're going
to do it next week, I would have projected all of the
money to be spent in that month, whichever particular
month we would have been talking about.  So I -- because
they hadn't done the work, I kept having to push those
dollars out.

Also, as you got closer into December, I
would have had -- I would have talked to them more
frequently because we didn't have any money budgeted for
2014.  The money for the project was to be -- was
budgeted to be spent in 2013.  So if the dollars are at
risk for not being spent, I need to let the power plant

Page 47

know as soon as possible because they manage all of the
projects.  They could have -- they would have needed to
take some dollars in 2014 and, you know, manage them so
that if this money's going to be spent -- if -- if the
seeding is going to happen in 2014, they need to
accelerate some other expenditures from '14 into '13 to
offset that cost.

And they had a little more -- they had
somewhat -- some flexibility because they buy a lot of
materials and so they could have accelerated purchasing
some items by purchasing them in 2013 rather than pur --
purchasing in '14.  But at some point, you run out of
things and -- that you can move and that means the
plant's going to have to give up some projects.  They
don't -- obviously don't want to give up projects.
They're trying to make electricity.

And so as we got closer and closer into --
into the -- in -- in the -- to the end of the year, I
would have had more frequent discussions either with
Nathan or with Pat to get the work completed.

Q.  All right.  I want to talk about oral
discussions now, oral communications, not any e-mails
that may have been sent out.  Do you recall for that
same period, from August 1, 2013 through December 31st,
2013, did Ranger ever say it was not going to come out

Page 48

and do the vegetation?

A.  No.

Q.  Did Ranger ever have discussions with you about
their subcontractor needing some assurances he would be
paid because of the threat of a bankruptcy?

MS. OKON:  Objection, vague and ambiguous.
Are you talking during that time period?

MR. SAKONCHICK:  Yes.

MS. OKON:  Okay.

A.  I -- I don't know that the -- I would say they
were -- I -- I think they had the -- as I recall, Nathan
would have told me that the contractors were concerned
about being paid.  They never expressed that -- the
contractors -- or subcontractors never expressed that
concern directly to me.

Q.  (BY MR. SAKONCHICK)  It would have only been
through Nathan then?

A.  Through Nathan, yeah.

Q.  And would it --

A.  And if -- and any assurances he wanted, I would
have -- I -- I would have referred him to -- we were
instructed those kind of questions went to procurement.
David Watkins was the representative on this project, so
that kind of question, I would have told Nathan, I -- I
can't give you any assurance or not give you assurance.

Page 49

1  I -- I don't -- I don't have any direction.  You need to
2  talk to David about that kind of stuff.  I -- I can't
3  give you anything.
4       Q.  Now, you said you were given direction on what
5  to reply.  So with a -- a threat of a potential
6  bankruptcy, did your supervisors or somebody within
7  Luminant come down and give you either written or oral
8  direction on what to tell contractors if they asked?
9       A.  Yes.  We were told, refer them to purchasing.
10      Q.  Okay.  And who told you that?
11      A.  You know, I don't -- it could have been my
12  manager or he could have forwarded an e-mail from
13  whoever was over purchasing at the time.  That -- I
14  don't -- I don't remember specifically.
15      Q.  When would you have received that direction?
16      A.  Well, obviously, it was prior to December since
17  the question was coming up in December.  La -- late in
18  the -- in the fourth quarter of -- of '14.
19      Q.  So sometime November, December of 2013?
20      A.  Oh, probably.
21      Q.  And did you get -- from the time period of
22  January 1 through April 28th, 2014, did you get any
23  further direction on that issue?
24      A.  No.  No, I didn't get -- I didn't have any -- I
25  mean, up until the filing, the -- the direction I had

Page 50

1  was any questions concerning bankruptcy were to be
2  referred to purchasing.  We weren't given -- I was never
3  given a script, so to speak, of -- of responses.  I
4  never had a statement that I was supposed to recite.  It
5  was just I don't know, call purchasing.
6       Q.  Other than Ranger, did you have -- during the
7  time period April 1 -- I mean, August 1, 2013 through
8  December 31st, 2013, did you have any other contractors
9  raise the issue with you?
10      A.  No.
11      Q.  And when it was raised with you by Ranger, it
12  was in relationship to the vegetation contractor?
13      A.  Correct.
14      Q.  Ranger didn't say, I need some assurance I'm
15  going to get paid.  They were just talking about their
16  contractor getting paid?
17      A.  Correct.  I don't re -- I don't remember Ranger
18  ever expressing a concern about being paid.
19      Q.  All right.  And it was just -- so it was just
20  on behalf of their con -- subcontractor that they were
21  expressing those concerns?
22      A.  That's what I remember, yes.
23      Q.  And that was through Mr. Ziehr?
24      A.  Yes.
25      Q.  From the time period January 1 through

Page 51

1  August 28, 2014, did you have similar conversations with
2  Mr. Ziehr?
3       A.  Yes.
4       Q.  And what were the nature of those
5  conversations?
6       A.  The -- there was -- there were two areas
7  that -- two aspects that -- that Nathan raised, maybe
8  three.  The -- the -- they were -- because Austin --
9  the -- the -- these sub -- these subcontractors come out
10  of central Texas, the Austin area.  I mean, Sandow's a
11  remote location.  There's not a big demand for this kind
12  of work in -- in Sandow or Rockdale, Texas.  So we bring
13  in seeding contractors out of central Texas, out of
14  Austin.  Austin has a booming economy, so there was a
15  big, big demand for that kind of work.  Ranger expressed
16  to me that he was having a hard time, one, finding
17  seeding contractors that were available to do the work,
18  and he was having a hard time finding contractors that
19  wanted to do work for Luminant because of the
20  bankruptcy.
21      Q.  And so he's -- Mr. Ziehr specifically told you
22  he was looking for other contractors because his initial
23  contractor had concerns about being paid?
24      A.  You know, I -- I don't remember if BMP was the
25  initial contractor to be honest with you.  That may have

Page 52

1  been somebody they found later.  I -- I don't remember
2  who the original --
3       Q.  Yeah.
4       A.  Probably in the bid documents, it maybe
5  identified who the sub was.
6       Q.  Well, let's just assume that there is a
7  subcontractor out there that you're talking about in
8  2013 that has an issue.  When was the first time
9  Mr. Ziehr told you he was looking for alternative
10  contractors?
11      A.  Would have been in -- probably in December of
12  '13.  I remember having that conversation in December.
13      Q.  Do you know whether Ranger itself has the
14  capability to do the seeding?
15      A.  They would have had to rent some equipment.
16  It's not high-tech, but they don't ord -- from my
17  understanding, they don't ordinarily have that equipment
18  in -- in-house.
19      Q.  So they would have -- they were re -- relying
20  on a subcontractor to do that work?
21      A.  Right.
22      Q.  And Ranger knew that it wasn't going to get its
23  retainage until that vegetation was done?
24           MS. OKON:  Objection, calls for
25  speculation.

Page 53

1    Q. (BY MR. SAKONCHICK)  Do you unders -- did

2  Ranger expect to get its retainage before the vegetation

3  was done?

4              MS. OKON:  Objection, calls for

5  speculation.  You can go --

6              MR. SAKONCHICK:  No --

7              MS. OKON:  -- ahead and answer even though

8  I object.

9              MR. SAKONCHICK:  I asked him did Ranger.

10  It's a question.  He's --

11             (Simultaneously speaking.)

12             MS. OKON:  He can't know what Ranger is

13  expecting, so I'm going to object on speculation.

14    **A. Ranger requested the retention.  That's what**

15  **that document that --**

16    Q. (BY MR. SAKONCHICK)  Okay.

17    **A. -- September of '13, that's what -- that's what**

18  **that invoice is from.**

19    Q. All right.  That -- that's Exhibit 5 and 6,

20  correct?

21    **A. Yes.**

22    Q. And do you know whether or not Mr. Behling had

23  any input in asking Ranger to submit those?

24    **A. If he did, he would have received that**

25  **direction from me.  I would have told Pat, hey, tell**

Page 54

1  **Ranger to submit it, but I don't -- I didn't tell Pat**

2  **to -- I didn't request it.  That's not -- ordinarily, we**

3  **don't release retention until the job's complete.**

4    Q. And in this case, why wasn't the retention paid

5  to Ranger prior to the bankruptcy filing?

6    **A. Because the work wasn't done.**

7    Q. Okay.  And with the work not being done,

8  Luminant didn't believe the contract was complete?

9    **A. That's correct.**

10    Q. Until the contract was complete, they weren't

11  going to pay the retainage?

12    **A. Correct.**

13    Q. Now, in looking at the contracts, they both

14  have a termination date of September 2nd, 2013?

15    **A. Yes.**

16    Q. And on that, Ranger went by the termination

17  date?

18    **A. Yes.**

19    Q. Did Luminant or Sandow ever communicate in

20  writing or otherwise to Ranger that it was terminated

21  from the -- completing the work?

22    **A. No.**

23    Q. Did Ranger ever communicate to Sandow and

24  Luminant it was abandoning the work and it would not

25  complete the contract?

Page 55

1    **A. Nathan told me they were considering it.  They**

2  **never -- they never did.  He told --**

3    Q. Okay.

4    **A. -- me, we're thinking about not doing the**

5  **seeding, just giving that up.**

6    Q. And if he had given that up, what would it have

7  en -- entailed?

8              MS. OKON:  Objection, vague and ambiguous.

9    Q. (BY MR. SAKONCHICK)  Go ahead.

10    **A. I would have had to get purchasing involved to**

11  **deal with that.  I -- I don't know the ram -- I've never**

12  **had a contractor quit on me before.**

13    Q. Would any purchasing person run up against the

14  same problems that Mr. Ziehr and Ranger were running

15  into in trying to find a seeding contractor come out and

16  work there?

17             MS. OKON:  Objection, calls for

18  speculation.

19    Q. (BY MR. SAKONCHICK)  Have you had any -- go

20  ahead and answer if you know.

21    **A. I don't know.  The mining company does a lot of**

22  **work with seeding contractors.  Whether that gives us**

23  **some added influence on getting contractors to do work**

24  **with us, you would think so, but I don't -- I don't know**

25  **that for certain.**

Page 56

1    Q. Okay.  So we do know from your testimony that

2  Ranger, as of December 2013, was actively looking for a

3  substitute subcontractor?

4              MS. OKON:  Objection, misrepresents the

5  testimony.  He said that that's what Mr. Ziehr

6  represented to him.  He did not testify to that fact.

7    **A. I'm confused now.**

8    Q. (BY MR. SAKONCHICK)  Well, so am I, but I...

9              MS. OKON:  He never testified that in his

10  personal knowledge that Ranger could not find a seeding

11  company.  He testified that Mr. Ziehr told him that.

12             THE WITNESS:  That's correct.

13    Q. (BY MR. SAKONCHICK)  All right.  So number one,

14  we know that Mr. Ziehr was actively looking for a

15  substitute seeding contractor because he told you he was

16  having trouble with his original subcontractor because

17  of the Luminant bankruptcy?

18             MS. OKON:  Objection, compound, calls for

19  speculation.

20    Q. (BY MR. SAKONCHICK)  All right.  Let's break it

21  down.  In December 2013, you had conversations with

22  Mr. Ziehr?

23    **A. Yes.**

24    Q. And in those conversations with Mr. Ziehr, you

25  discussed -- Mr. Ziehr -- or Mr. Ziehr told you that he

Page 57

1 was actively looking for alternate seeding
2 subcontractors to complete the vegetation?
3      A.  Yes, he did.
4      Q.  And he told you he was having trouble finding
5 seeding contractors because of the potential for a
6 Luminant bankruptcy?
7      A.  That was one reason.  The other was they --
8 they were busy.  There was just too much work because of
9 the booming economy in Austin, the construction.  They
10 just didn't have time to -- to come all the way out to
11 Rockdale and take on another project.
12      Q.  And in addition to that, any other seeding
13 contractor from central Texas would have had to come
14 out -- would have had to complete MSHA training?
15           MS. OKON:  Objection, calls for
16 speculation.
17      Q.  (BY MR. SAKONCHICK)  Would anybody be allowed
18 on the mine site without training under MSHA?
19      A.  There is some training required for anybody
20 that comes on the site.  There's Alcoa training, there's
21 Luminant training and there's some MSHA training.
22 There's different levels of MSHA training.
23           The work site is OSHA.  So to do the work,
24 they don't -- it doesn't require that they be MSHA
25 trained.  However, since they're driving through the

Page 58

1 mine to get to the work site, there's some nominal -- I
2 think it's, like, a 20- or 30-minute program that they
3 do at the guard house.  It's pretty -- it's not
4 significant.
5      Q.  If Ranger testified it had to go through MSHA
6 training in the 24 hours for the initial and eight hours
7 on the annual in order to do work out there, would they
8 be incorrect?
9      A.  I believe so.  But Ranger did work for the
10 mining company, so they would have had to have that
11 training anyway for the work that they did in the mining
12 company.
13      Q.  Or at least the same -- if -- if they were
14 using the same people?
15      A.  Right.  Right.
16      Q.  And a subcontractor coming out who hadn't been
17 out on a mine before would have to complete Alcoa
18 training --
19      A.  Luminant training.
20      Q.  -- Luminant training and then some form of OSHA
21 or MS -- MSHA training?
22      A.  Correct.  There's -- there's another piece of
23 that.  I mentioned the borrow area.  The borrow area is
24 in the mine so they -- they would have had to have the
25 MSHA training to get to the borrow area.

Page 59

1      Q.  All right.  So where the con --
2      A.  But the seeding contractor -- well, yeah, he
3 would have gone to the borrow area too, so yeah.
4      Q.  So the seeding contractor would have had to
5 have MSHA training?
6      A.  You know, I'm not an expert in that.  I
7 really -- I really don't know how to answer that.
8           MS. OKON:  So we've gone a little over an
9 hour, so whenever you get to a point we can take a
10 break.
11      Q.  (BY MR. SAKONCHICK)  As of December 2013,
12 Mr. Ziehr was telling you then, I'm having trouble with
13 my original subcontractor because of the potential for
14 bankruptcy, correct?
15      A.  Yes.
16      Q.  And that I have been unable to locate
17 substitute contractors because of the potential for
18 bankruptcy and they're busy?
19      A.  Correct.
20      Q.  Did you have any reason to believe he wasn't
21 telling you an accurate statement?
22      A.  No.
23           MR. SAKONCHICK:  All right.  We'll stop
24 here and pick it up.
25           THE VIDEOGRAPHER:  We are off the record at

Page 60

1 2:42 p.m.
2           (Break taken from 2:42 p.m. to 2:57 p.m.)
3           THE VIDEOGRAPHER:  We are back on the
4 record at 2:57 p.m.  This is File 2.
5      Q.  (BY MR. SAKONCHICK)  Mr. Gonzales, we were
6 talking before the break about conversations we had --
7 you had with Mr. Ziehr from August 2013 to
8 December 31st, 2013 and the December conversation about
9 him trying to get substitute subcontractors?
10      A.  Yes.
11      Q.  Let's talk about now, January 1 through
12 April 28th, 2014.  And you have had a discussion or
13 communication with Mr. Ziehr every month from January to
14 April?
15      A.  Yes, at least.
16      Q.  And you would have had phone discussions with
17 him every month during that period?
18      A.  I would have tried to contact him by phone, and
19 if not, we would have communicated by e-mail, either
20 directly or through Pat Behling.
21      Q.  Okay.  And in January through April, was
22 Mr. Ziehr -- or Ranger having the same issues in getting
23 a subcontractor out to the job site to do the vegetation
24 that it was having, he conveyed to you in December 2013?
25           MS. OKON:  Objection, vague and ambiguous,

Page 73

1   Exhibit 49 would reflect those -- -- wouldn't reflect

2   those hours because they don't bill by the hour?

3       **A.  Correct.**

4       Q.  But it would -- it would probably be the

5   demobilization and the true-up, the plus or minuses

6   coming out to what the net is?

7           MS. OKON:  Wait for a question.  I don't

8   know if you're asking him a question.

9           MR. SAKONCHICK:  Well, I did ask him.

10      Q.  (BY MR. SAKONCHICK)  I said the Exhibit 49, the

11  two pay apps shown for August -- August 1 to August 31,

12  206 -- 2013 -- no, that's Exhibit 49, not 48.

13      **A.  Okay.**

14      Q.  Now look at the exhibit.  Tho -- those pay apps

15  would reflect the true-up?

16          MS. OKON:  I'm going to object for

17  speculation.  I'm going to instruct you not to answer

18  questions about a document we didn't create and we don't

19  have all the versions of.

20      Q.  (BY MR. SAKONCHICK)  All right.  Does it look

21  to be that they tried -- the -- there's -- there's some

22  pluses and minuses there?

23          MS. OKON:  Are you asking him if he sees

24  pluses and minuses?

25          (Simultaneously speaking.)

Page 74

1           THE WITNESS:  Do you have readers?  I need

2   some readers.

3           MS. OKON:  I don't have any, sorry.

4       **A.  If -- if I looked at these -- it's hard to see.**

5           MS. OKON:  And so what's your question,

6   Mr. Sakonchick?

7       Q.  (BY MR. SAKONCHICK)  Is that what he would

8   refer to as the true-up?

9       **A.  Some of it is true-up.**

10          MS. OKON:  And I'm going to object as

11  speculation.

12      **A.  I can't -- probably.  I don't know how to**

13  **answer that without looking.  If I can look at what**

14  **the -- you'd have to go back and see how do these totals**

15  **match up in prior months to understand whether they were**

16  **true-ups or not.**

17      Q.  (BY MR. SAKONCHICK)  All right.  Would there be

18  any reason why in August, a pay app submitted in

19  August -- we already know that the retainage invoices

20  were submitted separately, they were Pay Apps 10 and 7.

21      **A.  Right.**

22      Q.  And these are 6 and 9.  So they would likely be

23  in at the end of work except for the vegetation, likely

24  be the true-ups that you talked about?

25          MS. OKON:  Objection, calls for

Page 75

1   speculation.

2       **A.  I -- I don't know.**

3       Q.  (BY MR. SAKONCHICK)  Okay.

4       **A.  I don't -- I don't know what they were**

5   **invoicing.  I don't know what the work was for.**

6       Q.  But, certainly, from the hours that they

7   reflect being out on the job site, it -- it -- it

8   wouldn't necessarily show in the hours?

9       **A.  The only way you could tell from looking at**

10  **hours is if you can look at what the work was.  If it**

11  **was for scrapers, which is used to excavate, that would**

12  **probably be a true-up because you don't use a scraper at**

13  **the very end of a job, that's used earlier in the job.**

14  **So if they're correcting, in their hours would reflect**

15  **that kind of equipment, yeah.**

16          **If it's a water truck, water truck's used**

17  **from day one till the day you leave so I -- I wouldn't**

18  **know if that was a true-up or not.  So you probably**

19  **could get some sense of it if you looked into it closer.**

20      Q.  Okay.  Fair enough.

21      **A.  I -- I -- I'd have to get some glasses or get a**

22  **bigger print so -- and spend some time on it before I**

23  **could tell you what I really thought of that.**

24      Q.  Let's look at Exhibit 42.  And you're familiar

25  with Exhibit 42 having been a contract engineer on this

Page 76

1   job?

2       **A.  Let me see what it is first.**

3       Q.  42 are the tech specs.

4       **A.  Oh, okay.**

5       Q.  Oops.  I accidentally --

6           MS. OKON:  I think that's 44.

7       Q.  (BY MR. SAKONCHICK)  Or 44.  Excuse me.

8       **A.  44?**

9       Q.  Yeah, that's the big --

10      **A.  The technical specs, yes.**

11      Q.  There we go.

12      **A.  Okay.**

13      Q.  And as you go through the tech specs, have you

14  reviewed these before?

15      **A.  Oh, yeah.**

16      Q.  They -- the work includes both for the road and

17  the AX fly pit, includes excavation?

18      **A.  Yes.**

19      Q.  Includes grading?

20      **A.  Uh-huh.**

21      Q.  Includes earth work?

22      **A.  Yes.**

23      Q.  And that was a yes to the grading too?

24      **A.  Yes.**

25      Q.  You were mid swallow.

Page 77

1    A.  I'm sorry.

2    Q.  It includes providing road base?

3    A.  For the road, yes.  There was -- oh, and the

4  landfill as well.

5    Q.  And provides for the landfill a liner?

6    A.  Yes.

7    Q.  And it includes grubbing?

8    A.  Yes.

9    Q.  And it includes vegetation?

10   A.  Yes.

11   Q.  And all of those are elements of the job that

12  are reflected in Exhibit 44?

13   A.  Correct.

14   Q.  Would the haulroad be considered an addition to

15  the site?

16        MS. OKON:  Objection, calls for a legal

17  conclusion --

18   Q.  (BY MR. SAKONCHICK)  As you un -- as you

19  understand the word addition.

20        MS. OKON:  I'm going to object as vague and

21  ambiguous and calls for a legal conclusion.

22   Q.  (BY MR. SAKONCHICK)  You can still answer it.

23  Is it, to your knowledge, the haulroad, an addition --

24   A.  Yes.

25   Q.  -- to the job --

Page 78

1        MS. OKON:  Same objection.

2    Q.  (BY MR. SAKONCHICK)  -- an addition to the job

3  site?

4        MS. OKON:  Same objection.

5    Q.  (BY MR. SAKONCHICK)  You can answer.

6    A.  Yes.

7    Q.  Is the fly pit, the ash fly pit, an addition to

8  the property?

9        MS. OKON:  Objection, calls for a legal

10  conclusion, vague and ambiguous.

11   A.  I -- yes.

12   Q.  (BY MR. SAKONCHICK)  Without the use of the

13  haulroad or the fly pit, would the San -- would the

14  Sandow 5 be able to operate?

15   A.  No.

16   Q.  So in order for the power plant to run and

17  generate electricity as an end product, you require the

18  haulroad and the ash fly pit?

19   A.  You could probably manage without the haulroad.

20  You can't go without the landfill.

21   Q.  Haulroad makes it a lot easier, though, doesn't

22  it?

23   A.  Correct.  It's an all-weather operation.

24   Q.  There's some dispute as to whether or not these

25  would be considered improvements to the property.  Would

Page 79

1  you consider them, in your understanding of the word

2  improvement, an improvement?

3    A.  Well, from my ex --

4        MS. OKON:  Let -- let him finish and then

5  I'm going to make an objection and then you can answer.

6        THE WITNESS:  Okay.

7        MS. OKON:  Okay.

8    Q.  (BY MR. SAKONCHICK)  Your understanding of the

9  word improvement, is the haulroad an improvement to the

10  property?

11        MS. OKON:  Objection, calls for a legal

12  conclusion.

13   Q.  (BY MR. SAKONCHICK)  Go ahead.

14   A.  Yes.

15   Q.  In your understanding of the word improvement,

16  is the ash fly pit an improvement to the property?

17        MS. OKON:  Objection, calls for a legal

18  conclusion.

19   A.  Yes.

20   Q.  (BY MR. SAKONCHICK)  And why would you say

21  that?

22   A.  Because they are funded with our capital rather

23  than our O&M budget, so my ex -- from my experience,

24  only additions to the property are funded as a capital

25  improvement project.  If it's just maintenance activity,

Page 80

1  part of operations, that's not part of the capital

2  budget.  And that -- my experience predates the

3  competitive world that we live in.  Back in the

4  regulated world, it was very important to distinguish

5  between capital and O&M projects so that's -- that's my

6  background.

7    Q.  Let's go --

8    A.  So my background is if it's capital, it's an

9  improvement.

10   Q.  Let's look at Exhibit 5 and 6.  And, certainly,

11  the total amount of the fly -- the ash fly pit is

12  $3.4 million?

13   A.  Yes, sir.

14   Q.  So that's a capital improvement?

15   A.  As I understand it, yeah.

16   Q.  And you understand that Luminant or Sandow

17  treats it that way on their books and records?

18        MS. OKON:  Objection, calls for

19  speculation.

20   A.  It was funded that way.  I -- I don't know

21  what -- any more than that.

22   Q.  (BY MR. SAKONCHICK)  All right.  And by funded

23  that way, you mean that's how they put it on their books

24  and records in order to pay for it?

25        MS. OKON:  Objection, calls for

Page 81

1 speculation.

2    A.  The -- the -- the fact that it's funded that

3 way means that when I request approval for the project,

4 I have a process to follow for capital projects and a

5 different process to follow for O&M projects.  This one,

6 I had to follow -- I had to get a work -- a WA, work

7 authorization, which is only required for -- for capital

8 and a -- a handful of O&M projects.

9    Q.  (BY MR. SAKONCHICK)  And what do you anticipate

10 the useful life of the landfill to be?

11    A.  The landfill or this --

12    Q.  The --

13    A.  -- cell?

14    Q.  The -- the cell.  The cell.

15    A.  Eighteen months.

16    Q.  Eighteen months is all -- it'll be filled up?

17    A.  Well, it -- it -- it's going to be full of ash

18 in 18 months.  The landfill will protect the environment

19 in perpetuity.

20    Q.  All right.  And looking at --

21    A.  We don't use it after it's full.  It's just

22 there.

23    Q.  The haulroad, would that -- the total on that

24 contract was 860 -- roughly $870,000?

25    A.  Okay.  Yes, I agree.

Page 82

1    Q.  And would that also be considered a capital

2 improvement?

3    A.  Yes.

4    Q.  Funded the same way as the ash fly pit?

5    A.  Yes.

6    Q.  Why don't you go turn to Exhibit No. 9.  Would

7 this have been one of the routine communications you

8 would have made with Mr. Ziehr about the vegetation?

9    A.  Yeah.  This actually was the e-mail from me to

10 Pat, and then I let Pat contact Nathan.

11    Q.  And as you previously testified, if you

12 couldn't get Nathan on the phone, you'd e-mail Pat?

13    A.  Yeah, and I also tried -- I knew whether Pat

14 was going to be on-site, whether he was going to be

15 meeting with Nathan on the project questions.  So

16 sometimes it was easier to just let -- instead of me try

17 to contact Nathan -- I -- I try real hard to -- to have

18 a single point of contact between any of the groups I

19 work with, and so I don't want a bunch of people

20 bombarding Nathan or Pat or anybody else with questions.

21 If I can limit it so I -- there were times I would just

22 let Pat contact him because he had to talk to Nathan

23 about something else, a submittal or a -- some other

24 question, an invoice, who knows what, so I would have

25 let -- so -- so there were times I did not call Nathan

Page 83

1 directly.  I just went to Pat first.  Other times, I did

2 pick up the phone and call Nathan direct.

3    Q.  All right.  Now, here on Exhibit 9, you're

4 asking for when the vegetation's going in and Mr. Ziehr

5 answers first week of December?

6    A.  Yes.

7    Q.  Do you have any reason to doubt that he

8 believed at the time that it was going to occur in

9 December?

10    A.  Yeah.  I had reason to doubt it because he'd

11 been -- I'd been getting similar direction from Nathan

12 since August.

13    Q.  Okay.

14    A.  Two weeks, we'll be finished in two weeks,

15 we'll be here next week, week after, so...

16    Q.  Do you know where he was getting these dates

17 from?

18            MS. OKON:  Objection, calls for

19 speculation.

20    A.  No.  No.  Unless he -- unless he put something

21 in the e-mail, I wouldn't have known.

22    Q.  (BY MR. SAKONCHICK)  If Mr. Ziehr testified

23 that every time he answered one of these, he would get

24 that information from BMP Specialists, would you have

25 any reason to disbelieve him?

Page 84

1    A.  No.

2            MS. OKON:  Objection, calls for

3 speculation.

4    Q.  (BY MR. SAKONCHICK)  Let's look at Exhibit 12,

5 Page 2.  Now, aside from the frustration I'm sure you

6 were suffering and from Ranger's point of view they were

7 suffering the same frustration in not getting this done,

8 the communication from Pat to Nathan reflects that Jacob

9 was asking for your schedule on the vegetation.  He

10 wants it completed as soon as you can.  He won't release

11 any more retainage until it is done.  Do you see that?

12    A.  Yeah, I'm not sure why he said any more

13 retainage.  We didn't really see any retainage.

14    Q.  Okay.

15    A.  So that's Pat's word, not mine.

16    Q.  And the retainage that is being referred to

17 there is the retainage as reflected on Exhibit 5 and 6?

18    A.  Yeah.

19    Q.  Now, on Exhibit 17, again you asked for the

20 status of the seeding, and he says it's not complete,

21 but he talks about consideration for accepting it as is.

22 Do you see that?

23    A.  Uh-huh.

24    Q.  You need to answer verbally, sir.

25    A.  I'm sorry.

Page 89

1    Q.  All right.  So they were talking about in some
2  of the e-mails a D6 dozer, bringing it out --
3    A.  Right.
4    Q.  -- stripping off the vegetation in order to
5  replant it?
6    A.  And they wanted us to pay for that.  We -- we
7  did not.
8    Q.  All right.  So you would -- you would have been
9  just making it clear that they weren't going to get any
10 more than $7500 an acre?
11   A.  Which was the bid item for that work, yes, bid
12 price.
13   Q.  Now -- and that's at the last sentence.  It
14 says, if you have to get a dozer out there to remove the
15 volunteer vegetation and grade out the existing erosion
16 rills, that is a -- that is in the $7500 an acre?
17   A.  Correct.
18   Q.  So you were just making sure they understood
19 that that's all you were getting, is the per-acre price?
20   A.  Correct.
21   Q.  And there's some discussion there, Luminant is
22 pretty close to hiring someone else to do this work and
23 back-charging.  Would you have passed that on?
24   A.  It's possible Pat and I could have had a
25 discussion about that.

Page 90

1    Q.  Did you actually take any steps toward finding
2  a substitute contractor and back-charging?
3    A.  I had a conversation with David Watkins about
4  that.  We did not take it beyond -- it would have been
5  hey, David, I'm -- what -- what would it take to make
6  this happen, what are the issues?  I was just probably
7  feeling him out, trying to get prepared in the event we
8  decided to do that.
9    Q.  All right.
10   A.  But as far as making phone calls and getting
11 quotes, no, we didn't do anything like that.
12   Q.  And since Ranger had not done the vegetation,
13 it had not been paid for the vegetation?
14   A.  Correct.
15   Q.  And any back-charge would have only been for
16 the amount that it cost Luminant or Sandow to do the
17 work in excess of the contract amount?
18   A.  Correct.
19   Q.  Let's look at Exhibit 22.  Or not -- yeah, 22.
20 And look at the bottom portion of the e-mail,
21 March 25th, 2014, 4:59, from Matt Sutherland.  Attached
22 is a figure.  It shows the areas that need to be
23 vegetated and matted?
24   A.  Uh-huh.
25   Q.  And you see the attachment?

Page 91

1    A.  Yes, sir.
2    Q.  This didn't come out until March of 2014,
3  correct?
4    A.  I believe that's correct.  I don't see a date
5  on the sketch, but if it was attached to that e-mail,
6  then that's when it would have come out.
7    Q.  And on that area to be vegetated and matted, is
8  that significantly less than what originally would have
9  been done if Ranger seeded and matted in
10 September 2014 -- or 2013?
11   A.  Significant, no.  This looks pretty close.
12   Q.  Did Luminant save money in using existing
13 vegetation for some of the -- instead of reseeding and
14 matting?
15   A.  Sure.  We didn't pay for any area that wasn't
16 seeded.
17   Q.  And --
18   A.  We only paid Ranger for the actual areas
19 seeded.
20   Q.  And that was less than the total that was
21 originally intended to be seeded?
22   A.  I don't know for certain, but I -- I believe it
23 was.  I -- I mean, it's real easy to tell if you just
24 look at the quantities on the invoice versus the
25 quantities in the bid.  I just don't remember the

Page 92

1  quantities off the top of my head.
2    Q.  Well, let's look at Exhibit 38 and 39.  Start
3  with 39.  Total contract amount is 869,932.
4    A.  Okay.
5    Q.  Amount placed to date 832,882.
6    A.  Okay.
7    Q.  So that's a difference of $37,000?
8          MS. OKON:  Objection, vague and ambiguous.
9    Q.  (BY MR. SAKONCHICK)  I mean, it's math,
10 correct?
11         MS. OKON:  I think you're misreading the
12 document.
13   Q.  (BY MR. SAKONCHICK)  Would that have been part
14 of the -- the savings that would have occurred as of the
15 result of the existing vegetation?
16   A.  Some of it might have been in that true-up that
17 we saw in that other document.
18   Q.  The true-up is on a different --
19         (Simultaneously speaking.)
20   A.  I don't -- but what I'm saying is, I don't know
21 if this 869,932 includes the true-up or not.  The total
22 contract -- I mean, I'm sorry, the amount placed to
23 date, the 832,882, I don't know if that includes the
24 true-up or not.
25   Q.  (BY MR. SAKONCHICK)  Well, did you look at

Page 101

1    Q.   Okay.  Do you know whether other contractors
2  working under you have not been paid their total amount
3  due?
4    A.   Yes.
5    Q.   Who?
6    A.   PB&W.
7    Q.   And why didn't they get paid their full amount
8  due?
9         MS. OKON:  Objection, calls for
10  speculation.
11    A.   I -- I don't know.
12    Q.   (BY MR. SAKONCHICK)  Anybody else?
13    A.   I -- I'm really -- I would assume that there
14  are others, but no one has expressed that to me.
15    Q.   Okay.  Now, was there -- as a result of the
16  actual bankruptcy filing on April 29th, 2014, was there
17  discussion about whether work should be completed on
18  this job because of the bankruptcy filing?
19         MS. OKON:  Objection, calls for
20  speculation.
21    A.   The only -- the only instruction that we were
22  given in how the bankruptcy impacted our work was it
23  didn't impact it.  Business as usual as far as we were
24  concerned in my role.
25    Q.   All right.

Page 102

1    A.   And that was not just this project, it was all
2  of my projects, just keep going like you're going, don't
3  change anything.
4    Q.   Was there --
5    A.   And that was the case before the bankruptcy and
6  after the bankruptcy.
7    Q.   Was there any --
8    A.   Or after -- yeah.
9    Q.   Do you recall whether there was any discussion
10  that Ranger or its subcontractor brought to your
11  attention about wanting to have some assurance in
12  getting paid as a result of the bankruptcy filing?
13    A.   No, because I didn't have those kinds of
14  discussions with Ranger.  I referred them to our
15  procurement.  I couldn't make those promises because I
16  didn't -- I didn't have any inside information on it.
17    Q.   At any time during August 1, 2013 to
18  December 31st, 2013, did Ranger ask you for some
19  assurances that they'd get paid?
20    A.   No.
21    Q.   From January 1, 2014 till April 28th, 2014, did
22  Ranger ask you for any assurances that it would be paid?
23    A.   No.  I -- I didn't -- I don't remember those --
24  I don't remember that ever being an issue.
25    Q.   Go to Exhibit 27.  Tell me what that is.

Page 103

1    A.   It's an e-mail from Pat Behling to me.  The
2  first e-mail was May the 7th, 2014, 1:09 p.m., saying
3  that Matt Sutherland, an employee with PB&W, had spoken
4  with Ranger and they -- Ranger did not want to work on
5  the vegetation unless they got something in writing from
6  Luminant stating that they would be paid for the work,
7  claiming that Luminant owes them more than a million
8  dollars for work at other mines.  I have no knowledge of
9  that.  And that they need to be assured that work
10  performed after the bankruptcy will be paid.
11    Q.   So this is only -- they wanted some assurance
12  that after the bankruptcy was filed, there'd be money to
13  pay them?
14    A.   Yeah, which is surprising because at this
15  point, bankruptcy had already happened so it's happened.
16    Q.   Why wouldn't they be concerned about whether or
17  not the bankruptcy would affect whether they would get
18  paid for any work?
19    A.   I don't understand the bankruptcy law to --
20  to -- to answer that.
21    Q.   Now, look at Exhibit 28.
22    A.   And -- and you notice that I also said talk to
23  David.
24    Q.   Yeah.
25    A.   That was what we were told and that's what we

Page 104

1  did, talk to David, David being in procurement.
2    Q.   Now, looking at Exhibit 28.
3    A.   Yep, it's an e-mail from David Watkins to
4  Nathan Ziehr.
5    Q.   And what's the date of it?
6    A.   Dated May the 7th, 4:27, so it was the same
7  day.
8    Q.   All right.  About a few hours later?
9    A.   Few hours later.  I guess Pat must have called
10  David or David told -- Pat told Nathan to call David,
11  which he apparently did.
12    Q.   And what's attached to that?
13    A.   It's -- it is the news release from EFH
14  announcing the -- the bankruptcy.
15    Q.   Also stating that there is money to pay
16  postpetition work?
17    A.   Okay.
18    Q.   Well, look at it.
19    A.   Well, I don't know what that means, but okay.
20    Q.   Look at the title there.  First -- Energy
21  Future Holdings Receives Court Approval of First Day
22  Motions Supporting Continuation of Normal Operations.
23    A.   Okay.
24         MS. OKON:  Okay.  Make sure there's a -- I
25  want to make sure there's a question so that you're

Page 105

1 answering something.

2           THE WITNESS:  Okay.

3      Q.  (BY MR. SAKONCHICK)  And you saw that?

4      A.  I see it.

5      Q.  And there's another copy of this that follows,

6 only it's face up rather than sideways.

7      A.  Now you tell me.

8      Q.  Now, you do some of the pay applications, you

9 review them, you have budgeting concerns, those sorts of

10 things.  The retainage that was owed Luminant as

11 reflected on Exhibits 5 and 6 --

12     A.  That Luminant owed Ranger.

13     Q.  Oh, excuse me.  Luminant owed Ranger, you're

14 correct.  I'm getting tired.  That Luminant owed Ranger

15 and it hasn't paid, when that retainage is reflected on

16 a pay app, is -- does Luminant have any accounting where

17 they set that money aside or reflect it on their books

18 to show that it's separately accounted for?

19           MS. OKON:  Objection, calls for

20 speculation.

21     A.  My understanding is that there is a retainage

22 account created for those funds.  It's automatic today.

23 Not too many years ago, I had the form I actually had to

24 fill out to have that account created, but our

25 accounting systems do it automatically, I don't have to

Page 106

1 do that form anymore.

2      Q.  (BY MR. SAKONCHICK)  All right.

3      A.  Otherwise, I would have been -- they would have

4 never known.

5      Q.  So to your knowledge, the retainage was

6 segregated from Luminant's other funds?

7      A.  I don't know if it was cash flow like an

8 account that money was put into it, but it was from a --

9 from a -- on the books, it was shown to be in a

10 retainage account.

11     Q.  All right.

12     A.  I guess two, one for each project.

13     Q.  Because, actually, Ranger would have earned

14 that money at the time they submitted the pay

15 application, but under the contract, ten percent was

16 retained?

17     A.  Correct.  They -- the work -- the work that

18 that retainage represented had been completed.

19     Q.  And it was completed way back in August 2013?

20     A.  Correct.  It was held -- withheld with each

21 invoice.  It wasn't withheld at once.  It was -- with

22 every invoice, ten percent was withheld.

23     Q.  And you would actually have seen documents that

24 reflected a separate accounting for the retainage?

25     A.  Not anymore, no.  Once it's created, I nev --

Page 107

1 as far as I'm concerned, it gets -- the -- the only way

2 I know is that when I see an invoice amount -- I guess

3 the statements that you see that Ranger submits, it

4 shows the retainage.  We didn't do that.  That was

5 Ranger's books that I was looking at.  I don't have -- I

6 don't see it.

7      Q.  Were you --

8      A.  On all my cost projections and everything where

9 I'm tracking the cost of the project, it's -- it's all

10 been paid.  It's -- I mean, it's all accounted for.  I

11 don't have to have a separate line item for retainage.

12 As far as the budget and everything's concerned, it's --

13 it's already money spent.

14     Q.  All right.  What I guess what I'm trying to

15 clarify is, there is either a separate accounting by

16 Luminant for that retainage, in other words, they show

17 it as a line item somewhere as money that's not theirs,

18 they owe to somebody else, or there's a separate bank

19 account escrowed for the purpose of retainage.

20           MS. OKON:  Objection, calls for

21 speculation.

22     A.  I don't really know how those retainage

23 accounts are treated.  I don't know -- I don't know what

24 they do with it.

25     Q.  (BY MR. SAKONCHICK)  But you --

Page 108

1      A.  I -- I -- I know that we must do something with

2 it.  Otherwise, we wouldn't have created them, but I

3 really don't know -- I mean, that's an accounting

4 question that I -- I don't...

5      Q.  When -- when did you stop using the form you

6 referred to?

7      A.  Probably in 2010, thereabouts.

8      Q.  All right.  So none of the re -- you wouldn't

9 have had to fill out one of those forms for the

10 retainage on the -- these two jobs?

11     A.  Correct.

12     Q.  When did you consider the two contracts

13 complete?

14     A.  When the seeding was done in summer of 2014.

15     Q.  And if the seeding was shown complete not later

16 than July 1, 2014, that's when you -- you would consider

17 the contract complete?

18     A.  That's when I issued an inservice report, yes.

19     Q.  Have you ever seen certificates of completion?

20     A.  I'm familiar with them.  I don't know that I've

21 ever seen one on any of my projects.

22     Q.  Do you know whether the law requires a

23 certificate of completion on a job like this?

24     A.  No, I don't.  I don't believe that it does.  If

25 it does, I nev -- I never was instructed to complete

Page 109

1  one.  We have an inservice report that's -- and I --
2  this was accounting, so I don't understand the issues.
3  I -- I know that we have to support it.  We do an
4  inservice report which releases -- which identifies
5  work -- takes it out of being construction work in
6  progress and puts it in -- on the books, so to speak.
7  Back when we were a regulated monopoly, that was pretty
8  important.  It seems less important today.  I don't
9  really understand why.
10     Q.  If I told you that Ranger did work on the
11 Liberty Mine for the mining -- one of the mining
12 companies right up until the bankruptcy filing and it
13 received a certificate of completion on its work, would
14 that reflect that some of the mining contracts are
15 treated -- are -- are done differently than your
16 contracts?
17         MS. OKON:  Objection, calls for
18 speculation.
19     Q.  (BY MR. SAKONCHICK)  I'm going to represent to
20 you that there was a certificate of completion given on
21 the Liberty Mine job showing that job -- the work was
22 complete.
23     A.  It --
24         MS. OKON:  I -- I'm going to object, facts
25 not in evidence and calls for speculation.

Page 110

1      Q.  (BY MR. SAKONCHICK)  So if -- if Liberty Mine
2  does that, you're not aware of it, or the mining company
3  does that, you're not aware of it?
4      A.  I -- I've -- I've never had a project in the
5  mine --
6      Q.  And you're --
7      A.  -- that I had to do something.  I've never had
8  a project in the mine, period, so I don't know.
9      Q.  All right.  So none of your contracts that
10 you've done, your construction contracts, you issue a
11 certificate of completion?
12     A.  Correct.  What -- it may -- it may be that
13 their certificate of completion is the same thing as
14 what we call a inservice report.  I -- I don't know.
15     Q.  What would you have done -- what would you have
16 filled out to send to Luminant to show that the work was
17 complete, an inservice report?
18     A.  An inservice report.
19     Q.  And who would have that?
20     A.  Our accounting people.
21     Q.  What would it say?
22     A.  It's a very simple document.  It's only got a
23 project number, the title, the location of the plant,
24 the person filling it out and the date it was placed in
25 service.  It does have some additional fields that I

Page 111

1  don't typically use, but it -- like, if there's any
2  equipment that has to be retired as a result of the
3  project.  For example, if you're replacing a
4  transformer, you got to take the old transformer off the
5  books when you put the new transformer in the books.
6  You have to account for that.
7      Q.  And when would the in --
8      A.  But I don't ever -- I mean, I don't have --
9  I've never had that on my projects.
10     Q.  What month and year would the inservice report
11 have been filled out on the two contracts that are
12 Exhibit 3?
13     A.  Probably would have filled it out in August,
14 but it would have been placed into service July 31st, I
15 would assume.  It's just a simple spreadsheet, it's one
16 page.
17     Q.  And after that, are you considered done with
18 the job?
19     A.  I'm -- as -- as far as the construction, yes.
20 I'm not done.  I've got paperwork to follow up, I've got
21 invoices to pay, I've got files to clean up and put into
22 the archives and as-builts to collect from my AE, so
23 there's more things that have to be done.
24     Q.  How long does it normally take Luminant or
25 Ran -- or Sandow to pay their invoices?

Page 112

1          MS. OKON:  Objection, calls for
2  speculation.
3      A.  Contractually, we're supposed to pay them
4  within 60 days after the invoice is accepted.  Keep in
5  mind that's not necessarily 60 days from when the
6  contractor submits it because if they -- we find an
7  error or we if we disagree, for example, they're
8  submitting that they completed work on a work item that
9  we know they didn't, they didn't -- said they did
10 excavation, say, hey, you didn't do any excavation, then
11 we'd make them res -- correct the invoice and resubmit
12 it.  That resets the clock on the 60 days.  And
13 sometimes it -- it can take a while before you agree on
14 the invoice amount.  It may take a month.
15     Q.  All right.  Let's look at ex --
16     A.  That's happened before.
17     Q.  Exhibit 38 and 39 are both dated 7/17/14,
18 correct?
19     A.  That's when they were -- that's when Nathan
20 submitted it, yes.
21     Q.  Now, look at Exhibit 47.  This is dated
22 November 21, 2014.
23     A.  Hold on one second.  I got some of these out of
24 order.  Dated?
25     Q.  The top e-mail, the last e-mail at the top of

Page 125

1  confirmed?

2  **A.  Right.**

3  Q.  Let's turn to the next page, Ranger 000232.

4  **A.  Okay.**

5  Q.  Did you check back on February 17th, 2014 about

6  the work?

7  **A.  Yes.  I sent an e-mail to Nathan and copied**

8  **Pat.**

9  Q.  And what did Mr. Ziehr respond to you?

10 **A.  He's -- I -- I said, is the work -- if it's not**

11 **complete, when will it be conducted.  Nathan says, it's**

12 **not complete unless there's consideration to accept as**

13 **is, which that's not completing work, that's -- and he**

14 **said, it looks great, says, we anticipate having all the**

15 **grass mat and fertilizer in stock by the week of March**

16 **the 3rd.**

17 Q.  Okay.  So Mr. Ziehr was encouraging you just to

18 accept the work as is, correct?

19 **A.  Yes.**

20       MR. SAKONCHICK:  Object, leading.

21 Q.  (BY MS. OKON)  Did you mi -- understand

22 Mr. Ziehr to be telling you that Ranger did not want to

23 come out and finish the work?

24       MR. SAKONCHICK:  Object, leading.

25 **A.  Not -- not from this e-mail, I didn't...**

Page 126

1  Q.  (BY MS. OKON)  Had you had other situations

2  with Ranger where they encouraged you to just accept

3  work as completed without finishing vegetation?

4  **A.  Yes.**

5  Q.  Okay.  What -- what other experiences had you

6  had where Ranger encouraged you to not have them come

7  finish vegetation?

8  **A.  There were portions of the construction of A1,**

9  **Landfill A1 Cell 2 that we had considerable amount of**

10 **natural vegetation, and we elected not to -- not to seed**

11 **those areas.**

12 Q.  And was that something that was motivated by

13 you or motivated by Ranger?

14 **A.  It was -- I would say it was a mutually agreed.**

15 **There was no benefit to Ranger.  I mean, it was a**

16 **pass-through cost for them.  The benefit was to**

17 **Luminant.  We didn't have to pay for work.**

18 Q.  And that was on the prior project?

19 **A.  That was on the prior project.**

20 Q.  Okay.  And so now on February 20th, 2014, did

21 you consider accepting the project as is?

22 **A.  Portions of it were accepted as is.  Not all of**

23 **the work.**

24 Q.  Did work start the week of March 3rd?

25 **A.  No, it did not.**

Page 127

1  Q.  On -- on any of these instances where work is

2  not going forward as it's being projected to you, is

3  Ranger taking the initiative to call you and let you

4  know there's a delay?

5  **A.  No.**

6  Q.  How are you finding out there's a delay?

7  **A.  I have to call and ask or send e-mails and ask.**

8  Q.  If you'll turn with me to the next page, which

9  is Ranger 000233.  Did you check back on March 6th,

10 2014?

11 **A.  Yes.**

12 Q.  And what is the response from Mr. Ziehr on

13 March 11th, 2014?

14 **A.  Well, my question went to Pat Behling and then**

15 **Pat forwarded that request on to Nathan, and Pat pointed**

16 **out to Nathan there are many -- this was in, I guess, a**

17 **comment or a reply to Nathan's suggestion that we not**

18 **seed.  Pat pointed out, there are many areas that need**

19 **to be addressed, primarily the permanent -- primarily**

20 **the slopes of the permanent dikes and so Nathan replied,**

21 **I will call you soon.  I have just engaged our seeding**

22 **mat sub to get mobilized and get me a schedule and he'll**

23 **call with dates when he receives them.  So he didn't --**

24 **he didn't commit to a -- a date.**

25 Q.  Were you surprised to -- to have him

Page 128

1  communicate that he had just engaged their seeding and

2  matting sub?

3  **A.  Yeah, because in other e-mails, he says, we --**

4  **we're expecting fertilizer to be delivered and mats to**

5  **be delivered and so...  unless they're buying them from**

6  **different vendors, which I don't think they were.**

7  Q.  And by this time --

8  **A.  It -- it doesn't make sense.**

9        MR. SAKONCHICK:  Objection, speculation.

10 Q.  (BY MS. OKON)  And in November or December, had

11 you had discussions with Mr. Ziehr about his vegetation

12 subcontractor?

13 **A.  About whether -- no, not really.**

14 Q.  Is -- is -- had Mr. Ziehr in that time frame

15 told you he was concerned about getting his sub -- his

16 subcontractor paid?

17 **A.  Not in November.**

18 Q.  Okay.  If you'll turn with me to the next page,

19 Ranger 000239, do you see that there's an e-mail from

20 Mr. Behling to Mr. Ziehr dated March 24th, 2014?

21 **A.  Yes.**

22 Q.  Do you see at the end, Mr. Behling says, we

23 really need to get this done ASAP?

24 **A.  Yes.**

25 Q.  What is Mr. Ziehr's response?

Jacob Gonzales

Page 145

1    Q.  But Ranger would have an incentive to complete

2  the work in order to get its $292,000?

3    **A.  Yes.**

4            MS. OKON:  Objection, calls for

5  speculation.

6    Q.  (BY MR. SAKONCHICK)  And we already established

7  that the amount of the erosion -- or -- or the

8  vegetation work was significantly less than the total

9  amount of retainage?

10   **A.  Correct.**

11   Q.  And there's nothing in any of the

12 communications that you've discussed with Ms. Okon

13 today, the e-mail communications, where Ranger says

14 we're not coming out?

15   **A.  Right.  That's not in any of the e-mail**

16 **communications.**

17   Q.  Matter of fact, every one of those

18 communications, even though they proved not to follow

19 through, every one of those communications says we're

20 coming, we're coming, we're coming, we're coming, we're

21 coming, correct?

22   **A.  Yes.**

23   Q.  And they said that in October, correct?

24   **A.  Yes.**

25   Q.  December?

Page 146

1    **A.  Yes.**

2    Q.  January?

3    **A.  Yes.**

4    Q.  February?

5    **A.  Yes.**

6    Q.  March?

7    **A.  Yes.**

8    Q.  April?

9    **A.  Yes.**

10   Q.  May?

11   **A.  Yes.**

12   Q.  And June?

13   **A.  Well, they were already there in June.**

14   Q.  They came in in June.  So from October 2013

15 through May 2014, they've always came out and says,

16 we're coming, we're coming, we're coming, we're coming?

17   **A.  They actually started in September.**

18   Q.  Okay.

19   **A.  They said in two weeks, which would have been**

20 **October.**

21   Q.  All right.  So from September 2013 --

22   **A.  Yes, sir.**

23   Q.  -- through May 2014, they always said we're

24 coming?

25   **A.  Yes, sir.**

Page 147

1    Q.  So their -- their statements orally always said

2  they were coming out?

3    **A.  Correct.**

4    Q.  To complete the work?

5    **A.  Yes.**

6    Q.  And their written communications always said

7  we're coming out to complete the work?

8    **A.  Yes.**

9    Q.  And ultimately they did come out and complete

10 the work?

11   **A.  Yes, they did.**

12   Q.  And they've completed the contract according to

13 its terms except for the termination date?

14   **A.  Yes.**

15   Q.  So everything else from start to finish, cradle

16 to grave as you would say, from the start of the job to

17 the finish of the job, they completed the contract and

18 the only term that was technically violated was the

19 September 2nd, 2013 termination date?

20   **A.  Correct.**

21   Q.  You said something about PBW [sic] not getting

22 paid in full on this project.  Why would PBW not get

23 paid on this project?

24   **A.  I don't know why.  That's what PB&W told me.**

25 **They -- Pat told me they had a significant amount of**

Page 148

1  **money at risk because of the bankruptcy and I -- I can**

2  **only assume that they must have other projects besides**

3  **this one.**

4    Q.  So you don't know whether he was -- when he

5  said he's got money at risk, it had anything to do with

6  this project?

7    **A.  Correct.**

8    Q.  Because Mr. Berndt would have been paid

9  postpetition on supervised and vegetation?

10   **A.  I assume so.**

11   Q.  And other than e-mail communications, there

12 was -- and -- and a couple of meetings, there was no

13 real work done on the site from August 2013 till May

14 2014?

15   **A.  There would have been a handful of site visits**

16 **to inspect the silt fence or to inspect the vegetation**

17 **that we would have had to compensate for that.**

18   Q.  And would there have been any reason for him to

19 have submitted those invoices prior to April?

20   **A.  They submit -- you know, I -- I don't recall,**

21 **but they typically submitted their invoices monthly.  So**

22 **if they made a site visit or made phone calls or had**

23 **meetings, I would have received an invoice from PBW.  It**

24 **would have been a small one, but I would have received**

25 **an invoice.**

Page 161

1  except for the AX fly pit?

2      A.  Yes, this is for the -- this is for the

3  landfill and the other one was for the haulroad.

4      Q.  Now, we talked about -- going to Exhibit 40 and

5  I believe 49.

6      A.  Okay.

7      Q.  Now, you see a reference on both of those to

8  Carolyn Gordon?

9      A.  Yes.

10     Q.  Would she be in the accounting area?

11         MS. OKON:  Objection, calls for

12  speculation.

13     A.  I don't know Carolyn Gordon.

14     Q.  (BY MR. SAKONCHICK)  Okay.

15     A.  It's probab -- looking at the text, I'm

16  guessing she's probably in accounts payable.

17     Q.  Looking at 49, those are payment applications

18  and I think we referred to them as possibly the

19  true-ups.

20     A.  Okay.

21     Q.  Would copies of all those go to you first or go

22  to accounting?

23     A.  They come to me first.

24     Q.  All right.  So you would have seen all the

25  accounts -- all the payment applications before they

Page 162

1  went to your accounting people?

2      A.  Yes.  I'm -- I'm the one that submitted them.

3  Well, they get submitted electronically and they might

4  go to accounting in parallel, like accounting -- AP gets

5  a copy at the same time I do, but AP doesn't do anything

6  with it.  I'm the one that initiates any action when

7  I -- my first -- my approval is the first action on

8  that.

9      Q.  And in your electronic file, do you maintain a

10  copy of all of the payment applications for both

11  contracts on Exhibit 3?

12         MS. OKON:  Objection, vague and ambiguous,

13  calls for speculation only because I can't tell if

14  you're asking him did he at the time he was with the

15  company or is it still there.

16     Q.  (BY MR. SAKONCHICK)  Well --

17     A.  Not in my files, I didn't.  I may have kept the

18  pay apps just for convenience, but the official copy of

19  the pay apps is in accounting's archive system, not --

20     Q.  (BY MR. SAKONCHICK)  Did you --

21     A.  -- not mine.

22     Q.  In other words, you'd get the original pay

23  application?

24     A.  Yes.

25     Q.  You wouldn't keep an electronic copy?

Page 163

1      A.  I -- I might for convenience, for pro -- so I

2  can do cost projections later.

3      Q.  Did you do -- did you do a -- on this job,

4  while you were working at the company, did you retain

5  the payment applications?

6      A.  I believe so.

7      Q.  So whoever now has possession of your

8  electronic file has possession of all those pay

9  applications?

10         MS. OKON:  Objection, compound, calls for

11  speculation.

12     A.  They should.

13     Q.  (BY MR. SAKONCHICK)  All right.  And this would

14  go back to your records people?

15     A.  Yes.

16     Q.  And you said that after you dealt with it, you

17  sent them off to accounts payable?

18     A.  The -- no, the -- they went through an approval

19  process.

20     Q.  Okay.

21     A.  And ultimately went to accounts payable.

22     Q.  Who would approve them after you?

23     A.  Depending on the magni -- the dollar magnitude

24  of the invoice, it would go first to my boss, my

25  manager, he would forward it to the people at the site,

Page 164

1  and it usually ended up with that first person at the

2  site.  But if it was -- some of these invoices may have

3  been for several hundred thousand dollars, but they were

4  more -- and I don't remember the authorization limits,

5  but they could have gone to the plant manager for final

6  approval.  Liner was very expensive.  I mean, it was --

7  just the liner may be well over a million dollars and it

8  typically was delivered in a couple of weeks so we'd get

9  an -- an invoice for a million, million and a half

10  dollars.  That -- of that magnitude it would go all the

11  way, I believe, to Steve Horn, senior VP for -- or CEO

12  of the company.

13     Q.  All right.  So --

14     A.  So -- so it depends on the magnitude of the

15  invoice.

16     Q.  Is that where the original went, the track of

17  the orig -- originally is what you just described?

18     A.  Well, these are all electronic, so, yes.  I

19  mean, there's not an original paper copy anywhere.

20     Q.  And so the original transferred and every one

21  of those people may still have copies if they have a

22  retention?

23         MS. OKON:  Objection, calls for

24  speculation, compound.

25     A.  I don't know that they -- it -- the -- the

Page 165

1  software would -- they would get a notice that said you
2  have an invoice.  They would -- they would look at it.
3  The -- the pay app was an attachment.  I doubt any of
4  them opened the attachment.  It would have been
5  meaningless.  I mean, this paper doesn't mean much to
6  you.  Can you imagine these guys, they get dozens of
7  these a day.  I doubt any of them opened the attachment.
8  They would just look at what was it, how much was it
9  for, and they would either approve it or have -- if they
10 had questions, they would re -- reject it.
11     Q.  (BY MR. SAKONCHICK)  And when does it go to
12 accounting?
13     A.  When all of that approval process is done.
14     Q.  So it leaves your hands, go through an approval
15 process and then goes to accounting; and from there,
16 accounting pays it?
17     A.  If everything's -- there's some checks done and
18 if everything checks out, it's -- it's -- I assume
19 that's what happens.
20     Q.  So in your records you've got a copy of the pay
21 apps and what you retained --
22     A.  Yes.
23     Q.  -- while you were working here?
24     A.  Right.
25     Q.  And there's a copy of the pay apps at accounts

Page 166

1  payable?
2      A.  Yes.
3          MS. OKON:  Objection, calls for
4  speculation.
5      A.  I -- I assume that there is.
6      Q.  (BY MR. SAKONCHICK)  Have you heard of any
7  reason that's -- that's where the account -- that's
8  where it goes last?
9          MS. OKON:  Objection, calls for
10 speculation.
11     A.  I -- I was told I didn't need to worry about
12 saving these because the software does it.
13     Q.  (BY MR. SAKONCHICK)  Okay.
14     A.  I did save them because I -- they were useful
15 to me.
16     Q.  But it's fair to say that Luminant/Sandow has a
17 copy or one of the Luminant/Sandow companies or Energy
18 Future Holdings has a copy?
19         MS. OKON:  Objection, calls for
20 speculation.
21     Q.  (BY MR. SAKONCHICK)  You have no reason to
22 disbelieve that they wouldn't have a copy?
23         MS. OKON:  Objection, calls for
24 speculation.
25     A.  Correct.

Page 167

1      Q.  (BY MR. SAKONCHICK)  Because they have to have
2  it to pay the check?
3          MS. OKON:  Objection, vague and ambiguous,
4  calls for speculation.
5      A.  Yes.
6          MR. SAKONCHICK:  All right.  Pass the
7  witness.
8               FURTHER EXAMINATION
9  BY MS. OKON:
10     Q.  Do you know whether PB&W had with -- retainage
11 withheld from their payments on this project?
12     A.  I don't -- no, they did not.  We don't keep
13 retainage on services contracts.
14     Q.  Now, there was a question from Mr. Sakonchick
15 where I think he phrased it as other than a technical
16 breach of the scheduled provision of this contract or
17 something to that effect.  Do you consider an
18 approximately ten-month delay in coming on-site a
19 technical breach of the -- of the schedule?
20     A.  No.
21         MS. OKON:  Pass the witness.
22               FURTHER EXAMINATION
23 BY MR. SAKONCHICK:
24     Q.  Looking at September the 2nd, that is the
25 only -- September 2nd termination date, September 2nd,

Page 168

1  2013, that is the only provision that you're aware of
2  that Ranger would have had a default under?
3          MS. OKON:  Objection, misrepresents the
4  contract, best evidence rule.
5      A.  Yes.
6      Q.  (BY MR. SAKONCHICK)  And that default was never
7  declared by Ranger -- Sandow/Luminant?
8      A.  Correct.
9          MR. SAKONCHICK:  Thank you.
10         MS. OKON:  You're done.
11         THE VIDEOGRAPHER:  We are off the record at
12 5:21 p.m.
13         (End of proceedings at 5:21 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Jacob Gonzales

171

1          UNITED STATES BANKRUPTCY COURT
              FOR THE DISTRICT OF DELAWARE
2
   In re:                    ) Chapter 11
3                            )
   ENERGY FUTURE HOLDINGS     )
4  CORP., et al.,            ) Case No. 14-10979 (CSS)
                             )
5          Debtors            ) (Jointly Administered)
6  _____

7  Sandow Power Company LLC   )
                             )
8  v.                         )
                             )  Contested Matter
9  Ranger Excavating LP       )

10              REPORTER'S CERTIFICATION

11           DEPOSITION OF JACOB GONZALES

12                OCTOBER 19, 2016

13

14      I, Terri Garcia, Certified Shorthand Reporter in

15  and for the State of Texas, hereby certify to the

16  following:

17      That the witness, JACOB GONZALES, was duly sworn by

18  the officer and that the transcript of the oral

19  deposition is a true record of the testimony given by

20  the witness;

21      That the deposition transcript was submitted on

22  _____ to the witness or to the attorney

23  for the witness for examination, signature and return to

24  me by _____;

25      That the amount of time used by each party at the

Jacob Gonzales

**172**

1   deposition is as follows:

2   MR. STEPHEN SAKONCHICK, II.....02 HOUR(S):47 MINUTE(S)
    MS. MELANIE OKON.....00 HOUR(S):27 MINUTE(S)

3

4       That pursuant to information given to the

5   deposition officer at the time said testimony was taken,

6   the following includes counsel for all parties of

7   record:

8   FOR SANDOW POWER COMPANY LLC:

9       MS. MELANIE OKON
        Okon Hannagan PLLC
10      750 North St. Paul Street
        Suite 1800
11      Dallas, Texas  75201
        Phone: (214) 396-9650
12      mokon@okonhannagan.com

13

    FOR RANGER EXCAVATING LP:
14
        MR. STEPHEN SAKONCHICK, II
15      Stephen Sakonchick II, P.C.
        6502 Canon Wren Drive
16      Austin, Texas  78746
        Phone: (512) 329-0375
17      sakon@flash.net

18

19      That $_____ is the deposition officer's

20  charges to RANGER EXCAVATING LP for preparing the

21  original deposition transcript and any copies of

22  exhibits;

23      I further certify that I am neither counsel for,

24  related to, nor employed by any of the parties or

25  attorneys in the action in which this proceeding was

Jacob Gonzales

**173**

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

      Certified to by me this 5th day of November, 2016.

Terri Garcia, Texas CSR 6581
Expiration Date:  12/31/2016
DepoTexas
Firm Registration No. #459
6500 Greenville Avenue, Suite 445
Dallas, Texas  75206
(214) 373-4977

Tab F

## Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
               FOR THE DISTRICT OF DELAWARE
 2
    In re:                    ) Chapter 11
 3                            )
    ENERGY FUTURE HOLDINGS    ) Case No. 14-10979 (CSS)
 4  CORP., et al.,           )
                             )
 5          Debtors          ) (Jointly Administered)
                             )
 6  _____
                             )
 7  Sandow Power Company LLC  )
                             )
 8  v.                       )  Contested Matter
                             )
 9  Ranger Excavating LP      )

10       -----------------------------------

11       ORAL AND VIDEOTAPED DEPOSITION OF

12                   DAVID WATKINS

13                OCTOBER 19, 2016

14                    VOLUME 1

15       -----------------------------------

16

17      ORAL AND VIDEOTAPED DEPOSITION OF DAVID WATKINS,

18  produced as a witness at the instance of RANGER

19  EXCAVATING LP, and duly sworn, was taken in the

20  above-styled and numbered cause on October 19, 2016,

21  from 9:33 a.m. to 1:04 p.m., before Terri Garcia, CSR in

22  and for the State of Texas, reported by machine

23  shorthand, at the law offices of Okon Hannagan PLLC, 750

24  North St. Paul Street, Suite 1800, Dallas, Texas 75201,

25  pursuant to the Federal Rules of Civil Procedure.
```

## Page 2

```
 1              A P P E A R A N C E S

 2  FOR SANDOW POWER COMPANY LLC:

 3      MS. MELANIE OKON
        Okon Hannagan PLLC
 4      750 North St. Paul Street
        Suite 1800
 5      Dallas, Texas  75201
        Phone: (214) 396-9650
 6      mokon@okonhannagan.com

 7
    FOR RANGER EXCAVATING LP:
 8
        MR. STEPHEN SAKONCHICK, II
 9      Stephen Sakonchick II, P.C.
        6502 Canon Wren Drive
10      Austin, Texas  78746
        Phone: (512) 329-0375
11      sakon@flash.net

12  ALSO PRESENT:

13      MR. MIKE INCE, Videographer
        MS. ASHLIE ALAMAN, In-house counsel for Luminant
14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1                        INDEX

 2                                              PAGE

 3  Appearances.........................................  2

 4  DAVID WATKINS
        Examination by Mr. Sakonchick.................... 5
 5      Examination by Ms. Okon..........................97
        Examination by Mr. Sakonchick...................114
 6
    Signature and Changes...............................152
 7
    Reporter's Certificate..............................154
 8

 9                      EXHIBITS

10  NO.  DESCRIPTION                              PAGE

11  (Previously Marked)

12  3    Contract For Services For Construct AX Fly   18
        Ash Disposal Haulroad By And Between Ranger
13      Excavating And Sandow Power Company LLC

14  5    Application for Payment                      62

15  6    Application for Payment                      62

16  16   E-mails                                      99

17  20   E-mails                                      60

18  26   E-mails                                     121

19  27   E-mails                                     101

20  28   E-mails                                      72

21  32   E-mails                                      83

22  38   Application for Payment with                 65
        Continuation Sheets attached
23
    39   Application for Payment with                 65
24      Continuation Sheets attached

25  41   E-mails                                     103
```

## Page 4

```
 1  44   AX Area Landfill Scope of Work               19
        And Technical Specifications
 2

 3  (Watkins Exhibits)

 4  49A  Notice of Deposition and Subpoena             5
        Duces Tecum to David Watkins
```

```
 5  REPORTER'S NOTE:  Per agreement of counsel, Exhibit 49
    was remarked after the deposition as 49A since
 6  Exhibit 49 had been previously marked in another
    deposition.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1    P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We are on the record.
3  Today's date is October 19th, 2016.  It is 9:33 a.m.
4  This is the video deposition of David Watkins in regards
5  to Energy Future Holdings Corporation, et al.,
6  Chapter 11, Case No. 14-10979 (CSS).  This case is filed
7  in the United States Bankruptcy Court for the District
8  of Delaware.
9        Will counsel please make their appearances
10 for the record.
11       MR. SAKONCHICK:  Steve Sakonchick, II for
12 Ranger Excavating LP.
13       MS. OKON:  Melanie Okon for Sandow Power
14 Company.
15             DAVID WATKINS
16 having been first duly sworn, testified as follows:
17             EXAMINATION
18 BY MR. SAKONCHICK:
19    Q.  Mr. Watkins, good morning.  My name is Steve
20 Sakonchick and before today, we've never met, have we?
21    **A.  No, we haven't.**
22    Q.  We haven't even talked on the phone, have we?
23    **A.  No, we haven't.**
24       **(Exhibit No. 49 was marked.)**
25    Q.  I'm going to show you what we're going to mark

Page 6

1  as Exhibit 49.  It's the notice of your deposition.
2  Have you seen that before today?
3     **A.  No, I haven't.**
4     Q.  It requests that you bring some documents with
5  you.  Have you seen the subpoena duces tecum at the
6  bottom and a list?
7     **A.  I'm sorry, so what?**
8     Q.  There's a list of documents that I requested
9  you bring.  Have you brought any documents with you
10 today?
11    **A.  No, I haven't.**
12    Q.  All right.  And you say you've never -- your --
13 your attorney never showed you that before today?
14    **A.  No.  I don't recall seeing it.**
15    Q.  Mr. Watkins, please tell me your --
16    **A.  We talked about...**
17       MS. OKON:  I've advised him obviously not
18 to talk about conversations with counsel.  I will
19 represent to you we have talked about all of those
20 documents and I have gathered from him what he has,
21 so...
22    **A.  Yeah, we did talk about them.**
23    Q.  (BY MR. SAKONCHICK)  Mr. Watkins, will you
24 please state your full name for the record.
25    **A.  David Lynn Watkins.**

Page 7

1     Q.  And what's your educational background, sir?
2     **A.  I have a BS in civil engineering from Texas**
3  **Tech and a master's in business from Stephen F. Austin.**
4     Q.  And have you ever had your deposition taken
5  before?
6     **A.  Yes.  Not for this, but yes, I have before.**
7     Q.  How many times?
8     **A.  Two times that I recall.**
9     Q.  How recently?
10    **A.  Oh, it's been five, six years.**
11    Q.  What was the nature of the dispute in those
12 depositions?
13    **A.  It was a project -- the first one was for some**
14 **facilities that we were looking at building at one of**
15 **our mine sites.  The second was for a project where the**
16 **contractor did not fulfill their -- their obligations.**
17    Q.  Who was your employer?
18       MS. OKON:  At the time of the cases?  Is
19 that what you're asking?
20       MR. SAKONCHICK:  No.
21    Q.  (BY MR. SAKONCHICK)  Who was your employer --
22 who's your employer now, today?
23    **A.  Well, it was Energy Future Holdings.  It's now**
24 **TCEH.**
25    Q.  And how long were you working for Energy Future

Page 8

1  Holdings?
2     **A.  They bought -- took the company private about**
3  **2007, so since then.**
4     Q.  Were you working for the predecessor company?
5     **A.  Yes, I was.**
6     Q.  And what was that?
7     **A.  It would have been Luminant Mining Company at**
8  **the time.**
9     Q.  And prior to 2007, did you hold the same
10 position for several years?
11    **A.  Yes, from -- yes, from '99.**
12    Q.  Let me ask --
13    **A.  Okay.**
14    Q.  -- how long have you been working generally for
15 the same company, whether it's been pre-buyout or post
16 buyout or post --
17    **A.  Since 9 -- since 1980.**
18    Q.  All right.  So, basically, you've been working
19 for the same outfit, maybe it's changed hands a couple
20 times, but you've been working for the same outfit for
21 36 years?
22    **A.  Basically.  There was a five-year time period**
23 **where we were outsourced and I worked for Capgemini.**
24    Q.  Okay.
25    **A.  But then I came back in about five, six years**

Page 9

1  ago into the company.
2      Q.  Five, six years ago?
3      A.  Yes.
4      Q.  All right.
5      A.  But I -- but I was -- Capgemini was an
6  outsource -- they outsourced that group, supply chain,
7  and I was part of that.
8      Q.  All right.  And starting in 1980, why don't you
9  tell me what your job duties have been.
10     A.  At that time?
11     Q.  Well, from 1980 to now, what have your job
12 duties been, your titles, your various jobs?
13     A.  I was staff engineer, senior engineer.
14 Classified as a senior engineer, I had different
15 functions.  I mean, I worked in operations, I worked in
16 maintenance at the mining company, then came to Dallas
17 in 1993 as an engineer, a senior engineer, working on
18 projects, and that was with the mining company.  Then in
19 1998, moved to supply chain and I've been in supply
20 chain since then, supporting mining and generation
21 projects.
22     Q.  Energy Future -- be fair to say that Energy
23 Future Holdings and the predecessor companies all fairly
24 well did the same thing?
25         MS. OKON:  Objection, vague and ambiguous.

Page 10

1      Q.  (BY MR. SAKONCHICK)  Did -- Energy Future
2  Holdings bought out a existing company, correct?
3      A.  They took the company private, yes.
4      Q.  And was that something like TXU Generation?
5      A.  It would -- had that name at one time, TXU
6  Generation.  That was one part of the company, yes.
7      Q.  All right.  And Energy Future Holdings and the
8  pre-buyout company both operated mines, correct?
9          MS. OKON:  Objection, calls for
10 speculation.
11     Q.  (BY MR. SAKONCHICK)  Do you understand what
12 Energy Future Holdings basically did or -- or what kind
13 of businesses they operated?
14         MS. OKON:  Objection, vague and ambiguous.
15     Q.  (BY MR. SAKONCHICK)  Are you aware that Energy
16 Future Holdings operated mines under subsidiaries?
17     A.  Prior to owning us?  Prior to take -- prior to
18 when they owned us, I don't know what they did.
19     Q.  All right.  2007 to 2016, Energy Future
20 Holdings owned the -- what the -- what the buyout
21 company was.  They had a number of subsidiaries,
22 correct?  Or are you even familiar with the
23 subsidiaries?
24     A.  I'm familiar with Luminant Generation -- well,
25 it was -- Luminant Generation, which is the -- the power

Page 11

1  generation side of the company, and then there was TXU
2  Energy, which is the cells, then Oncor was the delivery
3  part of the company.  Those are the three groups that
4  I'm familiar with.
5      Q.  Would it be a fair characterization that what
6  they essentially do is they generate electricity, they
7  operate coal, fire generation units, they mine their own
8  lignite or coal for firing those generation units, and
9  then they deliver the electricity to the ultimate
10 customer?
11     A.  That would --
12         MS. OKON:  Objection, calls for
13 speculation, vague and ambiguous.
14     Q.  (BY MR. SAKONCHICK)  Do you unders -- would
15 that be a fair characterization in your mind?
16     A.  Part of it.  There's more that they did than
17 that.  We -- we don't generate all of our fuel.  We -- I
18 mean, we buy coal from the Powder River Basin, so parts
19 of what you're saying are correct, but not completely
20 correct.
21     Q.  All right.  So they have more businesses than
22 what I described?
23     A.  No, not more businesses.  We just -- we don't
24 generate all of our own fuel, which is what you were
25 saying.  We had lignite mines, which we do have lignite

Page 12

1  mines, but we also bought fuel from other -- other
2  companies, other sectors.
3      Q.  The questions I'm going to ask you today are
4  going to be while you were employed by Energy Future
5  Holdings.  Were you employed by the company Energy
6  Future Holdings, Inc. or was it another company that
7  actually signed your paycheck?
8      A.  It was actually Luminant Generation that
9  signed --
10     Q.  Luminant --
11     A.  -- my paycheck.
12     Q.  -- Generation?
13     A.  Yes.
14     Q.  So you were -- you were employed by Luminant
15 Generation for how long?
16     A.  I had been -- since May of 2013 is when I moved
17 over to Luminant Generation.
18     Q.  And what was your job title at Luminant
19 Generation?
20     A.  Senior procurement specialist.
21     Q.  And what is that?
22     A.  I -- I -- I work with suppliers -- I work --
23 well, I work with people within our company mainly on
24 the generation side to get suppliers, purchase
25 equipment, get suppliers to provide services at the

Page 13

1  sites and then purchase of equipment or parts or
2  materials to support the plants, the generation plants.
3      Q.  Did your -- in December -- in December of 2013,
4  was that still your job title?
5      A.  Yes.
6      Q.  You were involved in a series of contracts
7  between Ranger and Luminant and Ranger and Sandow; is
8  that correct?
9          MS. OKON:  Objection, vague and ambiguous.
10     A.  Involved in a number or just...
11     Q.  (BY MR. SAKONCHICK)  You're -- are you aware
12 that Sandow Power Company LLC had a contract with Ranger
13 to do construction in East Texas?
14     A.  Yes.
15     Q.  All right.  What was your job function related
16 to that contract?
17     A.  I was brought in late on that contract.  I'm --
18 I was contract administrator at the end, but I -- I
19 wasn't originally involved with the earlier work that
20 was done on that project.
21     Q.  What month and year would you have come on
22 board on that project?
23     A.  It would have been -- I got involved probably
24 August of 2013.
25     Q.  All right.  And who would have been there

Page 14

1  before -- who would have had that job before you?
2      A.  Mark Jenkins.
3      Q.  And did Mark -- is Mark Jenkins still with --
4      A.  No, he's not, no, he's not.
5      Q.  He's left the firm?
6      A.  Yes, he --
7      Q.  Or left the company?
8      A.  Yes, he has.
9      Q.  And did you take over that contract as a result
10 of Mr. Jenkins leaving the company?
11     A.  Yes.
12     Q.  What did you do to familiarize yourself with
13 that -- that contract or contracts?
14     A.  I became more familiar with it, of course, in
15 August of 2013.  I -- I'm fairly familiar with it.  I
16 mean, I read through it and saw the scope of work and
17 other components or parts, details of the contract.
18     Q.  So when you took over the job, you made
19 yourself familiar with the contractual provisions and
20 the scope of work and the technical specifications?
21     A.  Not the --
22         MS. OKON:  Objection, compound.
23     A.  I'm familiar with it well enough to do what I
24 needed to do whenever I became involved with it.  I -- I
25 don't do the technical specifications.  I mean, I can

Page 15

1  read through them, but I don't prepare those.
2      Q.  (BY MR. SAKONCHICK)  As a contract
3  administrator, what was your function?
4      A.  Just to manage the contract if there were
5  issues at a higher level, basically.  It's just -- I --
6  I don't get involved with the details of the day-to-day
7  work.
8      Q.  Who does?
9      A.  The contract coordinator.
10     Q.  And who is that?
11     A.  That would have been Jacob Gonzales here in
12 Dallas.
13     Q.  Would you have ever gone out to the job site
14 itself?
15     A.  No, not -- no, I wouldn't.
16     Q.  Did you ever go out to the job site?
17     A.  I've been out to the area, but no, I've never
18 been to the job site specific.
19     Q.  In August 2013, you took over contract
20 administrator, did you leave your job in procurement at
21 that time or had you been contract administrator on
22 other jobs?
23     A.  No, I had been contract administrator on other
24 jobs.
25     Q.  When other -- when did you start becoming a

Page 16

1  contract administrator?
2      A.  Oh, in 1999, various contracts that I've been
3  involved with.
4      Q.  So when you said you also had a job as
5  procurement, was that in addition to or did you move
6  from job to job?  Did you do -- you do some contract
7  administration, then do procurement, then back to
8  contract administration, what was the series?
9      A.  It's -- basically, I -- a lot of that is part
10 of the responsibilities of the position that I'm in.  I
11 mean, we would get involved with the bid process of the
12 order and issuance of the contract and then contract
13 administrator through the term of the work.
14     Q.  And you've been doing this since '99?
15     A.  Yes.
16     Q.  Were you a contract administrator on other
17 projects in which Ranger Excavating was a contractor?
18     A.  Yes, there were a couple.
19     Q.  And what were those projects?
20     A.  They were mining projects.  They did some
21 construction work at the Turlington Mine.  I believe
22 that's the main one.  I can't recall if I had done some
23 others, but it was for the construction of an area prior
24 to mining operations starting.  There was a haulroad and
25 detention ponds.  Just basically site preparation for

Page 21

1      A.  Oh, a landfill or...

2      Q.  Landfill?

3      A.  Right.  I mean, it's AX, it says here AX area

4  landfill.

5      Q.  And then so both of the contracts have the same

6  technical specifications?

7      A.  Yes.  This talks about -- I mean, it talks

8  about the tolerances and site work that would be

9  required for both, look back and see.

10     Q.  In your job as contract administrator, is it

11  required that you be an engineer?

12     A.  No.

13     Q.  But you have an engineering background and a

14  master's degree?

15     A.  Yes.

16            MS. OKON:  Objection, vague and ambiguous.

17  His master's is not in engineering.

18     A.  It's not in engineering.

19     Q.  (BY MR. SAKONCHICK)  But he -- but you've got a

20  master's degree in business?

21     A.  Yes.

22     Q.  Let's look at the technical specifications.

23  And you would have reviewed these in August 2013?

24     A.  Generally, I don't review technical

25  specifications.  This work was already in progress so it

Page 22

1  wouldn't -- wouldn't have done me any good to review

2  technical specifications.

3      Q.  Did you flip through and become familiar with

4  them?

5      A.  No, I really didn't look at them in detail.

6      Q.  Did you look at them generally?

7      A.  I mean, I saw that they were included as an

8  attachment, but no, I did not read through them in

9  detail.

10     Q.  Okay.

11     A.  In general terms, yes, I'm aware of it.

12     Q.  Well, let's go through them a little bit.  Go

13  to Page I1.  And it's AX Landfill Cell No. 1.

14     A.  Uh-huh.

15     Q.  And the scope of work there includes site

16  preparation, which includes excavation, clearing,

17  removal, disposal of vegetation, stripping, stockpiling,

18  assist in vegetative soil, grading, construction of

19  perimeter dikes, placement of stockpile vegetation cell.

20  You see that?

21     A.  Yes.

22     Q.  Now, all of those include the elements of

23  excavation, don't they?

24            MS. OKON:  Objection --

25     Q.  (BY MR. SAKONCHICK)  Or some of them include

Page 23

1  the elements of excavation?

2            MS. OKON:  Objection, calls for

3  speculation.

4      A.  I mean, it's mentioned among others, among

5  other work, excavation.

6      Q.  (BY MR. SAKONCHICK)  Well, Part 1, it describes

7  there now the AX landfill and the -- the description of

8  the type of work there.  That's fairly general, isn't

9  it?

10            MS. OKON:  Objection, vague and ambiguous.

11     A.  It's an overview of the work to be performed.

12     Q.  (BY MR. SAKONCHICK)  And the same thing in the

13  AX haulroad?

14            MS. OKON:  Objection, vague and ambiguous.

15     A.  I mean, it's -- again, it's a -- it's an

16  overview.  It doesn't have detail.

17     Q.  (BY MR. SAKONCHICK)  And the detail actually

18  follows in the technical specification, doesn't it?

19     A.  (No audible response.)

20     Q.  Let's go to Page 21.  And it talks about the

21  elements of the job.  You're -- are you familiar with

22  the elements of a construction job such as the ones

23  described in the contract?

24            MS. OKON:  Objection, vague and ambiguous.

25     A.  No.  I don't put together the technical

Page 24

1  specifications.  I would know general information, but

2  I -- the specifics, I'm not...

3      Q.  (BY MR. SAKONCHICK)  But you're an engineer and

4  you know how to read these, don't you?

5      A.  I do, but I rely on -- others would have

6  prepared these documents.  I'm not prepare --

7      Q.  I'm not asking you whether you prepared them;

8  I'm asking what they say.  And as a contract

9  administrator, you might be required to read the

10  technical specifications in order to determine what work

11  had to be done; is that correct?

12     A.  No.  No, I wouldn't have to have been familiar

13  with -- there's people that are managing this work in

14  the field.  They're the ones that should be familiar

15  with the technical specs.

16     Q.  Well, what exactly do you do as a contract

17  administrator?

18     A.  I just -- if there's issues that come up,

19  they --

20     Q.  What -- what kind of --

21     A.  -- might contact me.

22     Q.  -- issues?

23            MS. OKON:  And just if you would, Steve,

24  let him go ahead and finish --

25            MR. SAKONCHICK:  Yeah.

Page 25

MS. OKON:  -- his answer, please.

    A.  If there's issues that come up, they might contact me.  If -- nonperformance might be one.  If there's work scope that's added, they would contact me to revise the agreement to address those changes.  It's just -- administrator is -- we -- we don't get down into the details of the work.  There's people out in the field that are managing the day-to-day work.

    Q.  (BY MR. SAKONCHICK)  Do you review the pay applications?

    A.  No.  Those -- those are done by the engineer and the site and then the accounts payable group processes them.  They might contact me if -- what I was doing was managing -- as a contract administrator or a buyer, you might have to revise the purchase order that we have in our system to pay invoices, so that would have been -- I -- I don't approve invoices, and I don't approve -- I'm just not involved at that -- at that level.

    Q.  Tell me what you recall doing on that contract, the two contracts that we described, between August 2013 and July 2014.  What would have been your general duties?

    A.  Just if the -- if there were issues with the agreement, I -- I would have been contacted.  It's --

Page 26

    Q.  Go ahead.  Finish.

    A.  No, I -- I mean, that's basically it.  If there were issues with the contract, I would have been contacted.

    Q.  Were there any issues with the contracts between August 2013 and August 2014?

    A.  Not with the contract per se.  I was contacted about the vegetation and seeding because that had not been completed, had not been performed yet.

    Q.  All right.  And what did you understand what that issue was?

    A.  Ranger wasn't coming out to do the work.

    Q.  Do you know whether or not Ranger does that work?

    A.  In the agreement, they were -- that was their responsibility to have that done --

    Q.  Okay.

    A.  -- whether it's through them or it's a sub -- through a subcontractor.

    Q.  Now, having worked for Luminant Generation during the -- you were actually employed by Luminant Generation while you were administrating the contracts, correct?

    A.  Yes.

    Q.  And why would they be administrating contracts

Page 27

for Sandow Power Company?

    A.  We administer contracts for Sandow Power Company, Luminant Generation, the different company entities.  We, as buyers or contracts procurement specialists, I mean, we -- we are contract administrators.  It's --

    Q.  To the best of your knowledge, does Luminant Generation have all the contract administrators for any of the EF -- Energy Future Holdings projects?

    A.  No.

            MS. OKON:  Objection, calls for speculation.

    A.  No.

    Q.  (BY MR. SAKONCHICK)  You don't know or you don't -- they -- they aren't?

    A.  No, they aren't.

    Q.  All right.  So somewhere in the Energy Future Holdings group would be companies that are doing other contract administration?

            MS. OKON:  Objection, vague and ambiguous.

    A.  Could you repeat, please?

    Q.  (BY MR. SAKONCHICK)  In -- besides Luminant Generation, there are other companies within the Energy Future Holdings group that does contract administration?

    A.  Well, there's -- yes, there's contract

Page 28

administrators and contracts in other parts, other section -- sections of the company, other company entities.

    Q.  When you refer to company en --

    A.  Luminant Generation, Sandow Power Company's a separate entity which is what this is, there's Luminant Mining.  They have different contracts.  There's -- the IT group has different contracts.

    Q.  Let me ask it this way.  If there were some contracts for construction in the mining area, whether it be Liberty Mine or some other mines, would they be administered by Luminant Generation or someone --

    A.  No, that would be Luminant Mining.

    Q.  All right.  And did you do contract administration for Luminant Mining?

    A.  Yes, before I came over to Luminant Generation.

    Q.  All right.  So there -- depending on whether they were could depend on who the contract administrator was?

    A.  That's correct.

    Q.  Now, were you aware of the Wall Street Journal article that came out related to the possibility of energer -- Energy Future Holdings filing for bankruptcy?

    A.  There probably were multiple articles that came out.  I -- I'm not familiar with any specific one.  I

David Watkins                                                    8 (29 - 32)

---

Page 29

1  mean, it was -- there was news for a while about that,

2  not just the Wall Street Journal.

3      Q.  Well, in a company like Energy Future Holdings

4  and you're working at the time for Luminant Generation,

5  would the fact that they're thinking of filing

6  bankruptcy be talk among the company employees?

7      A.  Yes.

8      Q.  And when do you first remember talking about

9  the potential for either EFH or Luminant Generation or

10  some of the companies filing for bankruptcy?

11          MS. OKON:  And, David, before you answer

12  this, I want to instruct you do not disclose any

13  conversations that came from company attorneys or the

14  legal group.

15          THE WITNESS:  Okay.

16      A.  So re -- repeat the question.  I'm sorry.

17      Q.  (BY MR. SAKONCHICK)  When would you have first

18  begun talking with other employ -- well, let's say when

19  would -- when did you first become aware that Energy

20  Future Holdings might consider bankruptcy?

21      A.  I -- I could not give you a specific date.  It

22  was -- I mean, it was rumored for a year, two years.  It

23  was a long time that it was rumored.

24      Q.  All right.  And on February -- on February 8th,

25  2013, there's an article in the Wall Street Journal,

---

Page 30

1  Texas power giant could be split up, and it discusses

2  the potential for bankruptcy.  Would February 2013 be a

3  time in which you would have been aware that the

4  possibility of bankruptcy was looming with Energy Future

5  Holdings?

6      A.  Not specifically.  There were so many -- I

7  mean, there was talk long before that of possible

8  bankruptcy filing.  I mean, it was rumored for quite a

9  while.

10      Q.  After February 2013, did you ever receive calls

11  from any of the companies which you had contracts with

12  asking about whether they were going to get paid,

13  whether the contract was going to be fulfilled?

14      A.  February 2013, I don't recall any that early.

15  I mean, later, possibly, but not -- I -- I -- that's

16  been a while.  I -- I don't recall.

17      Q.  When would you have first started getting calls

18  from some of the contractors or people working for

19  Luminant about the bankruptcy --

20      A.  I --

21      Q.  -- or the potential for bankruptcy?

22      A.  I don't recall.  It's...

23      Q.  When you took over the contracts that we're

24  talking about today, had you had conversation with

25  Ranger at all about the potential for filing bank --

---

Page 31

1  Luminant filing bankruptcy or Sandow filing bankruptcy?

2      A.  Not -- not the summer of 2013, no.

3      Q.  Did you ever have trouble with your contractors

4  hiring subs because the subs wouldn't work for them with

5  the potential for bankruptcy?

6      A.  No.

7      Q.  Did that -- it never came to your attention?

8      A.  Not -- I mean, if you're talking specifically

9  about Ranger, it was later in 2013 that they were

10  asking.

11      Q.  And about what time?

12      A.  But I've never -- I had -- I con -- I don't

13  recall any other -- any other contractors -- I mean,

14  most of them self-performed.  Some would have some

15  subcontractors, but I never had any ask me for

16  confirmation of payment so they could pay their

17  subcontractors.

18      Q.  If I told you on these contracts that Ranger

19  performed all the work except for the liner on the ash

20  fly pit and the vegetation work, would that refresh your

21  recollection about Ranger subcontractors?

22          MS. OKON:  Objection, vague and ambiguous.

23      Q.  (BY MR. SAKONCHICK)  Would you get a list of

24  their subcontractors?

25      A.  No.  We normally don't.

---

Page 32

1      Q.  Do you have to approve their subcontractors?

2      A.  We have the right to do that, but as a contract

3  administrator, I -- no, I never reviewed -- normally, I

4  would not review who their subcontractors were.  We --

5  we would ask for subcontractor information on some of

6  the work, but I don't re -- well, I wasn't involved with

7  this one up front so I -- I don't know what they might

8  have asked about for subcontractors.

9      Q.  From February 2013 when an article came out,

10  did you -- between that time and August 2013, are you

11  aware whether Ranger ever called in and asked questions

12  about the bankruptcy --

13          MS. OKON:  Objection --

14      Q.  (BY MR. SAKONCHICK)  -- or the potential for

15  bankruptcy?

16          MS. OKON:  Objection, compound and vague

17  and ambiguous.  And for the record, I want to say he

18  didn't see that article that you're referring to.

19          MR. SAKONCHICK:  I don't care whether he

20  saw the article.  I'm asking for time frame.

21          MS. OKON:  Okay.

22      Q.  (BY MR. SAKONCHICK)  We're talking about the

23  time frame now between February 2013 or February 8th,

24  2013, so that's early February --

25      A.  Uh-huh.

---

Page 33

1  Q. -- through the end of August 204 -- 13.

2  A. '13?

3  Q. At any time during that period, did you hear or

4  receive any calls -- hear about Ranger being concerned

5  about bankruptcy of the Luminant companies or Sandow?

6  A. No, not that I recall.

7  Q. Did they ever stop work on the project between

8  that time or during that period of time?

9  A. They finished, from what I recall, and it was

10 around August of 2013 when they finished the work.

11 Q. All right. So in August 2013, it would be fair

12 that -- to say that Ranger was complete with the

13 contract except for the vegetation?

14 A. Yes.

15 Q. And even though this article came out in

16 February 2013, Ranger never stopped doing work, they

17 went through them, completed the project except for the

18 vegetation by August 2013?

19 A. With the exception of the vegetation seeding,

20 yes.

21 Q. Okay. Do you know whether the weather caused

22 any problems with the going out and seeding during that

23 period of time?

24 A. I don't specifically recall. I -- I -- I do --

25 I mean, it -- it was a hot summer, if I recall, which

Page 34

1  may have -- may have made it more difficult, possibly.

2  But I -- no, I...

3  Q. Under the terms of contract, if you were --

4  if -- if Sandow was going to give a notice of

5  termination on the contract, would that come down

6  through you?

7  A. It would come from me, yes. But I would --

8  there would have been directives to do that. I wouldn't

9  do it on my own accord.

10 Q. All right. Do you recall that the vegetation

11 work was finally complete at the end of June 2013, maybe

12 early 20 -- July 2013 -- or excuse me, 2014? Let me

13 rephrase the question so it's clear.

14        Do you recall that the vegetation on these

15 contracts was completed by early July 2014?

16 A. It was around that time they came back and did

17 the vegetation.

18 Q. And the vegetation would have been done after

19 the actual bankruptcy filing of Energy Future Holdings

20 and all its subsidiaries?

21 A. That's correct.

22 Q. And the bankruptcy would have been filed on

23 April 29th, 2014?

24 A. Yes, that's correct.

25 Q. Now, from the time that you were on as contract

Page 35

1  administrator, did you ever inform -- until the time

2  that they finished the vegetation, did you ever inform

3  Ranger they were terminated?

4  A. No.

5  Q. Did you ever threaten them with termination?

6  A. No.

7  Q. Going back, let's look at the contracts. Going

8  to the Ranger page, 180, in the -- you see there the

9  effective date and the agreement will commence on the

10 effective date and will terminate on September 2nd,

11 2013, you see that?

12 A. Yes.

13 Q. And in the schedule, it has the same dates,

14 commence work by December 4th, 2012, complete by

15 December 2nd, 2013?

16 A. Yes.

17 Q. You've previously testified that they were

18 substantially complete on the job as of August 2013.

19 The only thing remaining was vegetation?

20        MS. OKON: Objection, vague and ambiguous,

21 compound.

22 Q. (BY MR. SAKONCHICK) You've previously

23 testified that Ranger was substantially complete on both

24 contracts by August 2013, correct?

25 A. Yes.

Page 36

1  Q. And the only thing that remained to be done was

2  the vegetation?

3  A. Yes.

4  Q. Do you know whether or not Sandow or any of the

5  Luminant companies had access to or were actually using

6  the haulroad as of August 2013?

7  A. I don't know.

8  Q. Who would know that?

9  A. The Sandow side, the personnel there would

10 know.

11 Q. Do you have any contacts that would know down

12 there?

13 A. Yes, there's a couple there that would know.

14 Q. Who --

15 A. Jacob Gonzales probably would know too.

16 Q. All right. We'll ask that of Jacob then. And

17 look at the next contract. And go to Ranger 45. And

18 the terms of agreement and schedule are the same,

19 correct?

20 A. Yes.

21 Q. Now, when we look at these contracts, are these

22 contracts negotiated or are they given by

23 Luminant/Sandow and say, here's what you need to sign if

24 you want to work for us?

25        MS. OKON: Objection, calls for

Page 45

1  and --

2           MS. OKON:  And I have a right to object and

3  that's the way it works.

4      Q.  (BY MR. SAKONCHICK)  It would be an unusual

5  circumstance, then, for a company to go past the

6  termination date and not be allowed to finish the work?

7           MS. OKON:  Objection, compound.

8      A.  It would be an unusual circumstance?

9      Q.  (BY MR. SAKONCHICK)  Yes.

10     A.  Not necessarily.  I -- I'm just trying to

11  think -- recall any specific examples.

12     Q.  Well, certainly, in -- in administrating

13  hundreds of contracts, they can't all be finished by the

14  original termination date, correct?

15     A.  Most of them.  I -- I don't -- I'm just trying

16  to recall any that -- that it was critical -- I mean,

17  there were -- I have -- I remember one in particular,

18  but it was -- it -- it was for mining activities to

19  occur, we had to have a certain amount of work done.

20  They had to -- it was a pipeline relocation.  And the

21  timing of that was critical so that mining activities

22  could continue.  And we -- we -- we did -- we had to

23  work closely with that contractor because they went

24  beyond the date and we had to work closely with them to

25  get the work done within the time frame needed.

Page 46

1      Q.  But you never terminated that contractor, did

2  you?

3      A.  No.  But there was a fair amount of work to be

4  done still on that.  I mean, it was critical that they

5  get that work done.

6      Q.  If a certif -- you familiar with certificates

7  of completion?

8      A.  Yes.

9      Q.  Who issues those, contract administrator or

10  project manager?

11     A.  Sometimes they're included in contracts and

12  sometimes they're not.  It would be -- typically, if

13  there were a certificate of completion, the supplier

14  would provide that to the company and that would usually

15  be done so the payment could be made.

16     Q.  Do you know whether or not there's a

17  requirement in Texas for a owner to provide a

18  certificate of completion to the contractor?

19     A.  No.

20     Q.  So what you're telling me is that to your

21  knowledge, Luminant nor Sandow are in the habit of just

22  generating automatically a certificate of completion and

23  issuing it to the contractor once he's finished?

24     A.  No, there's not one -- typically, there's not.

25     Q.  Now, what involvement would you have had on

Page 47

1  these contracts from August 2013 -- or let me ask you

2  this way.  Between August 2013 and June of 2014, how

3  much direct communication did you have with Ranger?

4      A.  Not that much.  We were trying to get the

5  vegetation done and -- but I wasn't contacted about that

6  immediately.  It was probably October, November that I

7  was contacted about the vegetation.

8      Q.  And who contacted you?

9      A.  It would have been Jacob Gonzales.  They were

10  trying to get the vegetation completed, and he -- and

11  I -- I don't recall specifics, but I wasn't -- I wasn't

12  contacted immediately about the vegetation.  It would

13  have been --

14     Q.  Would you have --

15     A.  -- a few months later.

16     Q.  Oh, excuse me.  Okay.  Would you have had any

17  phone conversations with Ranger between August 2013 and

18  let's say June of 2014?

19     A.  Yes, I re -- I recall -- I had talked to Nathan

20  a couple of times.

21     Q.  When was the first time in that time frame?

22     A.  I don't recall the exact date.  It was prob --

23  well -- I'm just speculating if I try to --

24     Q.  Give me a month and year or even fall.

25     A.  It was fall.  It was fall of 2013.

Page 48

1      Q.  And what took place in that conversation?

2      A.  I was trying to get Ranger to come out and --

3  vegetation was not done and we was trying to get them to

4  come out and complete the vegetation and the seeding.

5      Q.  And what did Nathan say?

6      A.  The times that I talked to him from -- from

7  when I started talking to him until it was actually

8  done, there was concern about getting paid for the work,

9  there were different -- and there were different reasons

10  for delays that were brought up.  I know I -- one of the

11  biggest things probably was concern about the

12  subcontractor getting paid with the looming bankruptcy

13  and not knowing when that was going to occur.

14     Q.  And this was in the fall of 2013?

15     A.  I don't remember the bankruptcy coming up then

16  specifically, but it -- it was close to the end of the

17  year, if not earlier.

18     Q.  And the conversations that you would have

19  had -- and we're talking about Nathan Ziehr, correct?

20     A.  Yes, that's correct.

21     Q.  And he's employed by Ranger?

22     A.  Yes.

23     Q.  And the conversation you had with Mr. Ziehr

24  about getting paid, he wasn't asking about Ranger

25  getting paid, he was asking about his sub -- being able

Page 49

1  to pay his subcontractor, correct?

2      A.  Well, he was -- he was asking about getting

3  paid so they could pay the sub -- they didn't want the

4  subcontractor to come out and do the work and not be

5  able to pay them.

6      Q.  Did he mention that he might be having trouble

7  finding some contractors to come out because of the

8  Luminant bankruptcy or pending bank [sic]?

9      A.  He had mentioned that the one subcontractor

10  they were planning to use was concerned about getting

11  paid, and they wanted some kind of guarantee or just

12  confirmation that the subcontractor would be paid.

13      Q.  Mr. Ziehr tell you whether he'd gone out and

14  Ranger had tried to find substitute contractors but

15  could find none because of the threat of bankruptcy?

16      A.  I don't recall that specifically.  I just

17  recall one sub that he was bringing up, and I don't

18  recall -- and I don't -- I don't think he even said the

19  name of the sub, but he just said the subcontractor was

20  concerned about getting paid and they were asking for

21  confirmation that they would be paid if they did the

22  work.

23      Q.  Okay.  And what was the next conversation you

24  recall having with somebody from Ranger?

25      A.  Well, I -- we had several conversations about

Page 50

1  that, but --

2      Q.  But was that -- when you say several

3  conversations, you would have had several conversations

4  in the fall of 2013 or several during the period from

5  August 2013 to June 2014?

6      A.  It would have been probably September, October

7  through April -- well, probably into May of 2014.

8      Q.  All right.  Let's concentrate on the

9  September/October conversations.  What were -- in

10  September/October, were there discussions about whether

11  or not his sub would get paid?

12      A.  I don't recall that that early.

13      Q.  All right.  What were the conversations that

14  you had in September and October of 2013?

15      A.  Was just trying to get the vegetation done and

16  just asking about dates when that might be done.  And I

17  was -- I recall several times Nathan saying, well, we're

18  going to -- we're working on getting them out there in

19  the next week, two weeks or in the near future, never

20  did -- never could really pin down a date that they were

21  going to come out and do the -- the -- the

22  revegetation -- or the vegetation.

23      Q.  Did Ranger indicate that Ranger wasn't the one

24  trying to -- it wasn't trying to stall things, but it

25  was trouble getting the subcontractor out?

Page 51

1      A.  I'm trying to recall -- because I -- I wasn't

2  absolutely sure until later that it was a sub that they

3  were trying to get out there.  Say that again.  I'm

4  sorry.

5      Q.  In September/October --

6      A.  Uh-huh.

7      Q.  -- was your conversation with Nathan that

8  Ranger doesn't have trou -- Ranger wants to get the work

9  done, but they're having trouble getting their

10  subcontractor out there?

11      A.  I don't know that that specifically came up

12  that way.  I -- I do recall, though -- I was just having

13  trouble getting Ranger to commit to come do the

14  vegetation.  When I talked to them -- and this happened

15  several times.  They would talk like they were -- you

16  know, they were going to do it, but then nothing would

17  happen.

18      Q.  Well, several times.  Let's -- let's pin down.

19  You say you had some discussions September/October.  To

20  the best of your recollection, tell me what those

21  conversations were, what -- what that subject matter

22  was.

23      A.  I was just asking them when they were going to

24  come do the vegetation specifically.  I mean, that's all

25  that I recall.

Page 52

1      Q.  All right.  And you say later in the fall, so

2  that'd be more November?

3      A.  Probably November, December.

4      Q.  And he mentioned at that point in time that his

5  contractor was dragging his feet because of the

6  bankruptcy?

7          MS. OKON:  Objection --

8      Q.  (BY MR. SAKONCHICK)  Or the Lum -- the

9  potential for bankruptcy?

10          MS. OKON:  Objection, mischaracterizes his

11  prior testimony.

12      A.  No, they just wasn't -- the -- I don't -- they

13  were just concerned about getting paid if they did the

14  work.

15      Q.  (BY MR. SAKONCHICK)  All right.  And was Nathan

16  talking about his concern for Ranger getting paid or his

17  sub getting paid?  In other words, Ranger has to get

18  paid in order to pay his sub, correct?

19          MS. OKON:  Objection, compound.

20      Q.  (BY MR. SAKONCHICK)  Let me ask it -- in -- in

21  order for Ranger to pay his subcontractor, it has to be

22  paid on the work from Sandow?

23          MS. OKON:  Objection, calls for

24  speculation.

25      A.  Not necessarily.  I mean, they could pay for

## Page 53

1 the work before we pay them.

2     Q. (BY MR. SAKONCHICK) But then Ranger would have

3 to be out on a job that it might not get paid on if

4 Luminant filed for bankruptcy or Sandow filed for

5 bankruptcy; is that correct?

6         MS. OKON: Objection, calls for

7 speculation.

8     A. It -- it -- possibly. But it's -- we didn't

9 know when the bankruptcy was going to occur. It could

10 have happened a year later.

11     Q. (BY MR. SAKONCHICK) And it could have happened

12 a year before, correct?

13     A. Right.

14     Q. I mean, they were talking about this issue --

15 I -- I talked about the article in February 2013.

16     A. Right.

17     Q. And you indicated that there's been rumors

18 internally well before that?

19     A. Oh, not just internally. I mean, you would --

20 you could read it in newspapers. I mean, there was talk

21 about it for a while. Not -- I don't recall the exact

22 start of the talk, but it was talked about for a while.

23     Q. What do you understand the cause -- what --

24 what would cause the filing of a bankruptcy?

25         MS. OKON: Objection, calls for

## Page 54

1 speculation.

2     Q. (BY MR. SAKONCHICK) Do you understand why a

3 bankruptcy was being talked about?

4         MS. OKON: Objection, calls for

5 speculation.

6         MR. SAKONCHICK: I'm asking if he knows.

7         MS. OKON: I know.

8         MR. SAKONCHICK: How can he speculate if

9 I -- he hadn't -- hadn't even answered the question?

10         MS. OKON: I'm just stating my objection

11 for the record. I think it calls for speculation.

12     Q. (BY MR. SAKONCHICK) Go ahead.

13     A. So do I understand why...

14     Q. Do you understand why there -- Luminant or the

15 Luminant companies or Energy Future Holdings, why there

16 was talk about bankruptcy?

17         MS. OKON: Objection, calls for

18 speculation.

19     A. Why there was talk about it, because there

20 were -- I'm -- there were monies owed, we were paying

21 interest on -- on monies that were outstanding and -- I

22 mean, that was the talk, that...

23     Q. (BY MR. SAKONCHICK) Was it an -- do you re --

24 do you know whether it was an issue between the bond

25 holders and the company?

## Page 55

1         MS. OKON: Objection, calls for

2 speculation.

3     A. No, I don't know specifics.

4     Q. (BY MR. SAKONCHICK) You just know it was a

5 debt issue?

6         MS. OKON: Objection, vague and ambiguous.

7     A. In general terms, yes, but I -- I don't know

8 the details.

9     Q. (BY MR. SAKONCHICK) All right. I mentioned

10 February 2013, you said it was well before that.

11     A. Well, I don't know --

12     Q. Try to give me the first time -- first month

13 and year or even season that you would have thought that

14 those discussions were starting to roam the halls of --

15     A. Oh, I -- I don't recall specific dates.

16 It's -- I mean, it -- it -- it was looming for a while and

17 it -- there was talk about it for -- for a while, and I

18 don't recall specific dates. I mean, 2013 is when there

19 was more talk.

20     Q. All right. Now, you talked about having your

21 conversation with Nathan in September/October. You

22 talked with him again in November, around November.

23 When was the next time you would have talked to somebody

24 from Ranger?

25     A. I probably talked -- I -- probably once a

## Page 56

1 month. I -- I -- I don't remember.

2     Q. Was that by phone call?

3     A. Yes.

4     Q. And was the conversation basically the same

5 each time?

6     A. I changed a little bit. The -- the -- the

7 discussion about the subcontractor being paid came up

8 more after January 1, 2014, just because we kept trying

9 to get them to come back out and do the vegetation work

10 and they kept saying, we're going to do it, and then --

11 then there were no actions.

12     Q. All your conversations with Ranger, were they

13 with -- with Nathan Ziehr?

14     A. Yes.

15     Q. You didn't have a conversation with anybody

16 else at Ranger?

17     A. Not that I recall.

18     Q. All right. Did you have e-mail communications

19 with anybody else at Ranger other than Mr. Ziehr?

20     A. No. And I don't even -- I don't remember

21 e-mails per se. Just, I remember conver -- phone

22 conversations.

23         MS. OKON: Whenever you get to a point, I

24 want to take a break, and at the break, I'm going to

25 order lunch if you guys want to place a lunch order too.

Page 57

1    MR. SAKONCHICK:  All right.  Thank you.
2 Where -- were you going to the deli?
3    MS. OKON:  There's a -- we -- we have some
4 options, we can talk about them.  There's a place
5 Southpaw's that has, like, sandwiches and wraps and
6 salads --
7    MR. SAKONCHICK:  Okay.
8    MS. OKON:  -- and things like that.
9    MR. SAKONCHICK:  Okay.  Thank you.  You
10 want to take a break?
11    THE WITNESS:  Sure, that's fine.
12    MS. OKON:  I'll have her bring the menus
13 in.
14    THE VIDEOGRAPHER:  We are off the record at
15 10:37 a.m.
16    (Break taken from 10:37 a.m. to 10:54 a.m.)
17    THE VIDEOGRAPHER:  We are back on the
18 record at 10:54 a.m.  This is File 2.
19    Q.  (BY MR. SAKONCHICK)  Mr. Watkins, you
20 understand here that you're testifying under oath?
21    A.  Yes.
22    Q.  And that the proceed -- that the court
23 reporter's going to take this down and transcribe it and
24 it can be used in court?
25    A.  Yes.

Page 58

1    Q.  And while we're using it in court, I want you
2 to understand that I'm going to ask you some questions
3 which I'm going to -- it's going to take some thought.
4 You may have to think about it.  She may object, but do
5 you understand even though she objects, you need to
6 answer the question?
7    A.  Yes.
8    Q.  Now, we were talking about discussions with
9 Nathan Ziehr and we -- we got through September,
10 October, November, and you said just about every month
11 thereafter, you would have had discussions with him
12 about vegetation?
13    A.  Yes.
14    Q.  And that would have included January, February,
15 March, correct?
16    A.  Yes.
17    Q.  Would the discussions during that period of
18 time involve anything other than completing the
19 vegetation?
20    A.  No, no.
21    Q.  All right.  Did you -- some of the e-mails
22 start to show that in March, they -- it was -- it was
23 going to happen and it was actually starting to
24 mobilize.  Do you remember in March or April the
25 movement started getting out there to get the -- get the

Page 59

1 vegetation in?
2    A.  No.  I don't remember it that early, because I
3 remember having conversation -- he was concerned about
4 getting paid, and I remember having conversation after
5 bankruptcy filing -- actually, I think it was in --
6 there may have been e-mail documentation where he was
7 wanting some kind of assurance that they would get paid
8 after bankruptcy was filed.
9    Q.  Well, let's talk about before bankruptcy was
10 filed.  During all your discussions with Mr. Ziehr, was
11 he discussing Ranger's concern about getting paid
12 because of their subcontractor's concern?
13    MS. OKON:  Objection, asked and answered.
14    A.  From what I recall, he wanted to make sure that
15 they would -- they would be paid, the subcontractor,
16 which, to me, Ranger had that responsibility to assure
17 them that they would get paid.  That's -- if we were
18 paying Ranger, that shouldn't keep them from paying --
19 or if we were paying or not paying Ranger, that
20 shouldn't keep them from paying their subcontractor if
21 they had them do work for them.
22    Q.  (BY MR. SAKONCHICK)  If you -- would you think
23 it'd be reasonable for a contractor, when a bankruptcy
24 has been filed, to get assurances of payment before they
25 continued?

Page 60

1    A.  Yes, it would be reasonable.  There were
2 several others that asked the same question.
3    Q.  And before the bankruptcy, you said it could
4 have been filed any time, correct?  You -- it -- it had
5 been pending, then rumors for over a year?
6    A.  Yes.
7    Q.  Before it was actually filed?
8    A.  Yes.
9    Q.  And you didn't think Ranger had any legitimate
10 concerns expressed by their contractor that they might
11 not get paid as things got closer and closer to the
12 actual filing date?
13    MS. OKON:  Objection, compound and vague
14 and ambiguous.
15    Q.  (BY MR. SAKONCHICK)  Go ahead and answer.
16    A.  Yes, it's reasonable.  That's...
17    Q.  Let's look at Exhibit 20.  I want you to
18 briefly scan those.
19    A.  Okay.
20    Q.  Does this refresh your recollection that in
21 March, late March 2014, it appeared that the vegetation
22 was actually going to be -- finally be done?
23    MS. OKON:  Objection, calls for
24 speculation.
25    A.  They're talking about meeting, but we had

Page 61

1  talked about getting the vegetation done for a while, so
2  there -- there was concern of when and if they would
3  actually do the vegetation.
4      Q.  (BY MR. SAKONCHICK)  The vegetation actually
5  didn't go in till aft -- after April 29th, correct?
6      A.  As far as I know, yes, it --
7      Q.  Okay.
8      A.  -- was after that.
9      Q.  And do you recall if there were any discussions
10 as to whether Ranger would have to bring out a dozer to
11 scrape off the existing vegetation?
12     A.  No.  I don't recall that.  From what I -- from
13 what I had been told, and this is hearsay, but they had
14 taken all their equipment off site.
15     Q.  Well, Ranger had taken all its equipment off
16 site, but it wasn't -- did you understand that Ranger
17 wasn't going to be the one doing the vegetation?
18     A.  Later, I did.  I -- I knew that they were
19 planning to bring in a subcontractor and that -- that
20 was a discussion I had with Nathan.
21     Q.  Would that have been in September, October,
22 2013?
23     A.  I don't recall if he brought up the
24 subcontractor then.  I know it was brought up later, but
25 I don't recall if it was brought up that early.

Page 62

1      Q.  How about November 2013?
2      A.  Possibly that early, but I -- I just remember
3  us talking about getting the vegetation done.  I don't
4  recall discussing the some -- subcontractor to do the
5  work until closer to the time it was done -- well, after
6  the first of the year, probably, first of 2014.
7      Q.  Let's look at Exhibits 5 and 6.  Now,
8  Exhibits 5 and 6, have you seen these before?
9      A.  Yes, I have.
10     Q.  And what are they?
11     A.  They're application for payment.
12     Q.  And what are they asking for payment of?
13     A.  Retainage.
14     Q.  And that would be retainage that would have
15 been incurred prior to August 2014 -- or excuse me,
16 August 2013?
17     A.  Yes, that's right.
18     Q.  So Ranger had been working on that project for
19 some eight or nine months, and had incurred substantial
20 amount of retainage due to them, correct?
21     A.  Yes, ten percent.
22     Q.  And here we're talking between the two of
23 roughly $292,000?
24     A.  Yes.
25     Q.  Is it unusual for a contractor to submit for

Page 63

1  retainage when they were substantially complete?
2          MS. OKON:  Objection, vague and ambiguous.
3      A.  But yes, it is unusual.  We don't usually --
4  they don't submit for retainage until they're done with
5  everything.
6      Q.  (BY MR. SAKONCHICK)  Okay.  Now, looking at
7  Exhibit No. 5, it shows percent complete, 98.98 percent
8  but not -- they're not a hundred percent complete,
9  correct?
10     A.  Yes.
11     Q.  And they're not representing by making this pay
12 application for the retainage that they're complete?
13     A.  That's the way that we were taking it, yes.
14 They were saying that they were done, but they weren't.
15     Q.  Well, they were -- they're not saying they're
16 done in the application, correct?
17     A.  No, but it's implying that.
18     Q.  Well, why is it implying that?  Do you know who
19 asked them to file the application for retainage?
20         MS. OKON:  Objection, compound.
21     A.  No, I don't.
22     Q.  (BY MR. SAKONCHICK)  Do you know -- do you know
23 who Pat Behling is?
24     A.  Yes, I know Pat.
25     Q.  If Pat Behling told them to submit this for

Page 64

1  payment, would that be unusual?
2      A.  Yes, it would.
3      Q.  In Exhibit 6 there, Ranger is showing they're
4  still only 93.1 percent complete?
5      A.  Yes.
6      Q.  And at any time, did Ranger tell you they were
7  complete on the job before the actual vegetation went
8  in?
9      A.  I don't recall them stating that.  I -- the
10 conversations I had that I remember were just to get the
11 vegetation done.
12     Q.  Did you ever tell Nathan in your phone
13 conversations with him that he wasn't going to get any
14 retainage until the vegetation went in?
15     A.  That's why we were holding the retainage.
16     Q.  All right.  And by holding the retainage, you
17 were acknowledging that the contract had not yet been
18 finished?
19     A.  We -- we wanted to get the vegetation done.  We
20 were -- yes, I mean, basically, I guess you're right.
21 We -- they did not have the work completed, therefore,
22 we were retaining 10 percent until that was done.
23     Q.  And Ranger -- did Ranger ever tell you it was
24 not going to come out and complete the vegetation?
25     A.  No, they never did state that, but they --

Page 65

1  every time we would talk to them, they would say yes,
2  we're going to, but nobody showed up.
3      Q.  Okay.  So between August 2013 and the ultimate
4  completion of the vegetation in -- by July 2014, Ranger
5  never said it wasn't going to finish and complete both
6  contracts?
7      A.  That's correct.
8      Q.  And during that same period of time, Sandow or
9  Luminant never told Ranger its contracts were
10  terminated?
11      A.  That's correct.
12      Q.  And in looking at Exhibits 5 and 6, any work
13  done on the vegetation would be in addition to these
14  sums; is that correct?
15      A.  Yes, that's right.
16      Q.  And the same go -- let's go...  Let's go to
17  Exhibit 38 and 39.  And what are these?  Have you seen
18  these documents before?
19      A.  Yes, I have.
20      Q.  And are these the applications for payment for
21  both the haulroad and the ash fly pit for the
22  vegetation?
23      A.  It looks like on Item No. F1, they subtracted
24  out some monies for vegetation --
25      Q.  Well, were you aware that at -- by waiting to

Page 66

1  do the vegetation, that they had to do less because the
2  natural vegetation was acceptable in some areas?
3      A.  Yes, I was aware.
4      Q.  And do you understand that there is actually
5  from the original bid --
6      A.  Yes, because we had to wait so long for them to
7  come back.
8      Q.  But the benefit was Sandow at the end of the
9  day saved tens of thousands of dollars by not having to
10  vegetate areas which were --
11      A.  I don't know if it was --
12      Q.  -- natural vegetation?
13      A.  I don't know if it was tens of thousands.  I --
14  I know there was some reduction in cost, but it wasn't
15  planned that way.
16      Q.  Well, look at -- look at Exhibit 39.  And do
17  you see the total contract amount is 869,932?
18      A.  Yes.
19      Q.  And you see the amount placed to date was
20  832,882?
21      A.  Yes.
22      Q.  And that's a difference of some $37,000?
23      A.  Yes.
24      Q.  And as of the date of Exhibit 39, Ranger shows
25  it's a hundred percent complete?

Page 67

1      A.  That's what they're showing on this, yes.
2      Q.  Do you have any reason to dispute that after
3  the vegetation went in, Ranger was a hundred percent
4  complete?
5      A.  (No audible response.)
6      Q.  Let me ask it another way.  Was Ranger a
7  hundred percent complete when vegetation went in on both
8  contracts?
9      A.  Yes, they were complete.  And I'm sorry.  When
10  I was looking at these, I didn't realize these were -- I
11  was thinking these were 2013 for some reason; they're
12  2014.  They were after the vegetation.  Okay.
13      Q.  And these are -- Exhibits 38 and 39 are
14  requests for payment for the vegetation?
15      A.  Yes.
16      Q.  And you can see there from the total contract
17  amount to the amount placed to date that there was
18  actually a reduction of 37,000 that Sandow would have
19  saved as a result of that extra vegetation going in?
20          MS. OKON:  Objection, vague, misleading,
21  misstates the evidence.
22      A.  I would have to look at the totals, but I mean,
23  I'm seeing the deduct of 12,500 for the landfill and the
24  deduct of 7,500 for the haulroad.
25      Q.  (BY MR. SAKONCHICK)  Were these unit and place

Page 68

1  contracts or unit contracts?
2      A.  Some are.  There were unit pricing.  When I
3  went through here, looks like most -- yeah, they have
4  unit pricing.
5      Q.  And in the unit pricing would it -- would you
6  be able to tell from there whether or not there was less
7  acreage that they actually had to do because the -- you
8  wouldn't -- you wouldn't necessarily show it in the
9  detail, would you?  That they had to do 40 acres, but
10  they only had to do ten because of the existing
11  vegetation, would that be reflected there?
12          MS. OKON:  Objection, calls for
13  speculation.
14      A.  I -- I'd just have to look at it in detail
15  to -- to understand.
16      Q.  (BY MR. SAKONCHICK)  Well, we'll ask you to do
17  that during the break.  But do you recall --
18      A.  I mean, I'd have to look at previous documents
19  to even try to -- I -- I can't look at one pay up and...
20          MS. OKON:  And for the record, he's
21  testified that he wasn't involved in approving the pay
22  applications.
23          MR. SAKONCHICK:  I understand that.
24      Q.  (BY MR. SAKONCHICK)  Do -- do you recall any
25  discussions with Jacob or Nathan about the cost savings

Page 73

1    A.  It's --

2             MS. OKON:  Objection, vague and ambiguous.

3    Did you ask him if that was the only communication he

4    would have?

5    Q.  (BY MR. SAKONCHICK)  Does he recall whether

6    this is the only e-mail he had sent to Mr. Ziehr during

7    the period from August 2013 till July 2014?

8    A.  It's the only one I had a copy of.  We -- we

9    have a 90-day retention on our e-mails and some I'll

10   keep and some I don't and I just -- I happened to have

11   this one.

12   Q.  All right.  And what was the purpose of sending

13   this e-mail?

14   A.  Nathan was asking for confirmation that if work

15   was performed after the bankruptcy filing date, that

16   they would be paid.

17   Q.  All right.

18   A.  So I sent him a news release which was

19   basically stating work that was April 29th and after

20   would be paid.

21   Q.  And you're -- you're talking about April 29,

22   2014?

23   A.  Yes.

24   Q.  Which is the actual date of the filing of the

25   bankruptcy?

Page 74

1    A.  Yes.

2    Q.  And your e-mail goes out on May 7, 2014?

3    A.  Yes.

4    Q.  And where did you get the attachment?

5    A.  It was a -- says FDM news release.

6    Q.  Is that something that would have been sent to

7    you as a contract administrator?

8    A.  This was a -- no, it wasn't sent to me, but it

9    was -- I can't recall if it was our company that had put

10   this out or if it was -- I mean, it was -- it's got

11   Energy Future Holdings at the top for immediate release.

12   Now, if I recall, this was something that they had

13   provided to us to provide to suppliers that were

14   concerned about payment after --

15   Q.  "They" being whom?

16   A.  The company, just for ongoing business,

17   continued business.

18   Q.  So somehow this got cycled to you from somebody

19   within the company?

20   A.  I don't know that they cycled it to me, but it

21   was provided.  That wasn't something that was a private

22   document.

23   Q.  Did you send that to a number of contractors?

24   A.  I had sent it to a couple of others, I recall.

25   Q.  How many contracts were you actually

Page 75

1    administering in -- as of April 29, 2014?

2    A.  I couldn't tell you the exact number.  Probably

3    70, 80, somewhere in that range.  They're not -- but

4    they wouldn't be all for specific projects like this.

5    Some are for longer term for contractors or suppliers to

6    come out on a as-needed basis to perform services.

7    Q.  All right.  How many construction contracts

8    such as this were you administering as of April 29th,

9    2014?

10   A.  I don't recall the exact number.  There were

11   probably, I would guess, around ten, somewhere in that

12   area, because it was during outage season at some of the

13   power plants.  So we had contractors doing specific

14   defined project work like this during the spring of 2014

15   and it impacted some of their work.  I say impacted

16   their work, the payment of invoices during the

17   bankruptcy filing time period.

18   Q.  Do you recall having discussions with Mr. Ziehr

19   prior to the filing of the bankruptcy about retainage

20   and getting paid retainage?

21   A.  Well, yes, they had submitted the invoices on

22   retainage and --

23   Q.  Well, do you recall having a discussion with

24   him?  You never talked with Mr. Ziehr face to face, did

25   you?

Page 76

1    A.  No.

2    Q.  It was always on the telephone?

3    A.  It was all on the phone.

4    Q.  And you didn't communicate with him by e-mail

5    either except for this one time?

6    A.  I -- that's the only one I have documentation

7    of.

8    Q.  And so during your phone conversations prior to

9    April 29th, did you ever have any discussions with

10   Mr. Ziehr about retainage?

11   A.  Well, they had filed the invoice and I -- yes,

12   it would have been in the fall of 2013, and -- because I

13   know they were wanting to get paid for the retention.

14   But the conversation that I recall is we weren't going

15   to pay until vegetation was done.

16   Q.  Do you know how Luminant accounts for

17   retainage?

18             MS. OKON:  Objection, calls for

19   speculation.

20             MR. SAKONCHICK:  I'm asking if he knows.

21             MS. OKON:  I'm going to object.

22             MR. SAKONCHICK:  How is that speculation?

23             MS. OKON:  Because if he gives you an

24   answer and he doesn't actually know and he thinks he

25   knows, it's still speculation so I'm going to object, it

Page 77

1  calls for speculation.

2  Q.  (BY MR. SAKONCHICK)  Do you know how they

3  account for retainage?

4  **A.  Well, our IP group -- I mean, if -- if there's**

5  **retainage and an agreement, they withhold ten percent of**

6  **each invoice payment.**

7  Q.  All right.  When they say withhold, do you know

8  whether they set that money aside or whether they just

9  keep it and don't pay it?

10  MS. OKON:  Objection, calls for

11  speculation.

12  **A.  No, they -- I -- I -- I really -- I mean, they**

13  **don't just keep it and not -- I mean, they're -- it's --**

14  **it's -- it's money that's held until the work's**

15  **completed.**

16  Q.  (BY MR. SAKONCHICK)  All right.  That's an

17  important concept, I think, if it's held.  But to your

18  knowledge, do they actually separately account for it or

19  set it aside or...

20  **A.  I don't know.**

21  MS. OKON:  Objection, calls for

22  speculation.

23  **A.  I'm not -- yeah, I don't -- really, I'm not**

24  **familiar with the mechanics of how they do it.  I -- I'm**

25  **not.**

Page 78

1  Q.  (BY MR. SAKONCHICK)  When you're administrating

2  a contract like this, are you using more of your MBA

3  skills or your engineering skills?

4  **A.  Probably neither.  It's just intuitive.  I**

5  **mean, just working with suppliers over the years,**

6  **just -- it's -- it's relationships.  It's not...**

7  Q.  Do you -- how many of your contract

8  administrators are engineers?

9  **A.  Probably -- right now, I know I'm the only one.**

10  Q.  All right.  So a contract administrator, a -- a

11  requirement for the job is not being an engineer?

12  **A.  That's correct.**

13  Q.  Just a bonus?

14  **A.  That depends on how you look at it, but, yes,**

15  **to me, it's a bonus.**

16  Q.  So it's your testimony today that during the

17  time frame from August 2013 through July 2014, Ranger

18  never abandoned its contracts?

19  MS. OKON:  Objection, calls for a legal

20  conclusion.

21  **A.  I -- I -- I don't know if they -- I don't know**

22  **what their intent was.  For all practical purposes, we**

23  **were starting to wonder if they had abandoned because by**

24  **the time the work was actually finally done, there**

25  **was -- it was, like, a ten-month lapse in time.**

Page 79

1  Q.  (BY MR. SAKONCHICK)  But as we already

2  established, Ranger never said it was not going to

3  complete the contracts?

4  **A.  Well, complete the vegetation, yes.**

5  Q.  And that -- the vegetation was a requirement to

6  complete the contracts?

7  **A.  It was in the original contract, yes.  Yes.**

8  Q.  So without doing the vegetation, the contracts

9  were not complete?

10  **A.  Yes.  That's why we were holding the retention**

11  **until the vegetation was done.**

12  Q.  If Luminant or Sandow were going to have -- did

13  you recall whether or not there was any discussions

14  internally about hiring somebody else to do the

15  vegetation on the contracts?

16  **A.  No.  No.  We -- we wanted the vegetation to be**

17  **completed by Ranger.  I mean, that was a part of the**

18  **original agreement, and we were keeping -- and we were**

19  **staying in touch with them and they were telling us that**

20  **they were going to do it, but it -- we were starting to**

21  **wonder if they were actually going to do it.**

22  Q.  Looking at the contracts that are Exhibit 3,

23  are these -- are you familiar with that type of

24  contract?  Is it fairly standard with Luminant and

25  Sandow?

Page 80

1  **A.  Exhibit 3?  That's standard, yes.**

2  Q.  All right.

3  **A.  For a construction project like this, yes.**

4  Q.  So you're familiar with the contract and its

5  provisions?

6  **A.  Pretty well.**

7  Q.  Is there any provision in that contract that

8  you're aware of that talks about the contingency of the

9  company, not the contractor, filing for bankruptcy?

10  **A.  No.  I don't -- I don't recall anything about**

11  **bankruptcy.**

12  Q.  So the looming bankruptcy or the actual filing

13  of the bankruptcy would be a first under the -- your

14  dealing with these types of contracts?

15  **A.  Yes.**

16  Q.  Have you ever back-charged -- or who makes the

17  decision if a back charge is going to be made under a

18  contract?

19  **A.  I mean, usually, out in the field, they**

20  **would -- if -- if they feel like it's warranted, they**

21  **would come -- I mean, I -- I would pro -- I would get**

22  **involved eventually, but there would also be**

23  **consultation with the attorneys to see if it's a valid**

24  **back charge or a valid charge.**

25  Q.  Well, then I guess did you ever back-charge a

Page 81

1  contractor under a contract that you administered?

2      A.  I don't know of any.  There were -- I mean,

3  there was a couple that had charged us or wanted to

4  charge us for work, which they -- they failed to perform

5  properly, but we never -- I -- I don't recall any that

6  we back-charged a supplier.

7      Q.  If somebody talked to Ranger about Luminant

8  thinking about hiring somebody else to do the

9  vegetation and back-charging them, would you have ever

10  heard that type of conversation or any type of

11  discussion?

12      A.  Yes.

13      Q.  All right.  Who did you hear it from?

14      A.  Oh, no, I didn't hear anybody.  I use -- I

15  thought you were asking would I have been involved if

16  there was discussion --

17      Q.  Oh --

18          (Simultaneously speaking.)

19      Q.  (BY MR. SAKONCHICK)  All right.

20      A.  But there --

21      Q.  So you -- so if there was going to be

22  discussion about back-charging, you would have been part

23  of that discussion.

24      A.  If it were serious, yes.

25      Q.  Would completing the vegetation and

Page 82

1  back-charging Ranger be considered serious?

2      A.  Yes, if -- yeah, if -- if we were actually

3  going down that path, yes.

4      Q.  And Ranger hadn't been paid for the vegetation,

5  had it?

6          MS. OKON:  Objection, vague --

7      Q.  (BY MR. SAKONCHICK)  Until it --

8          MS. OKON:  -- and ambiguous.

9      Q.  (BY MR. SAKONCHICK)  Hadn't been paid for the

10  vegetation until it was actually done?

11      A.  That's correct.

12      Q.  So the contract didn't provide for Ranger to be

13  paid for the vegetation until it completed the work?

14      A.  Well, until they performed the vegetation.

15      Q.  And if Luminant/Sandow is going to hire

16  somebody else to do the work, the only responsibility

17  for Ranger on a back-charge would be if it cost more

18  than what was in the contract?

19      A.  Yes, that's reasonable.

20      Q.  Is that what the contract provides for?

21      A.  There is language for -- yes, there is some

22  language in the agreement --

23      Q.  But the responsibility would only be if --

24  if -- if Luminant/Sandow had to pay more than what the

25  original contract provided for?

Page 83

1      A.  Yes, that...

2      Q.  And Luminant/Sandow had a contract provision in

3  its contracts that allowed it to go out and complete the

4  work on the vegetation with another contractor?

5      A.  If -- yeah, if Ranger never came back to do the

6  work, yes, we had the right to do that.

7      Q.  That never occurred, though, did it?

8          MS. OKON:  Objection, vague and ambiguous.

9      Q.  (BY MR. SAKONCHICK)  Did that ever occur?

10          MS. OKON:  Objection, vague and ambiguous.

11      A.  For us to go out on and find someone else?

12      Q.  (BY MR. SAKONCHICK)  Correct.

13      A.  No, it never got to that point.

14      Q.  All right.

15          MR. SAKONCHICK:  Let's take a break for a

16  couple minutes.  I'll wind up and see if I have anything

17  else.

18          MS. OKON:  Okay.

19          THE VIDEOGRAPHER:  We are off the record at

20  11:31 a.m.

21          (Break taken from 11:31 a.m. to 11:47 a.m.)

22          THE VIDEOGRAPHER:  We are back on the

23  record at 11:47 a.m.

24      Q.  (BY MR. SAKONCHICK)  Now, Mr. Watkins, please

25  turn to Exhibit 32 and look at the last page.  Now, I

Page 84

1  know you said you can't recall any other e-mails on this

2  other than the one that you sent with the news release,

3  and I'm not trying to trick you here, but I found this

4  one.  May 30th, 2014, what was the subject matter that

5  you sent this e-mail to Nathan about?

6      A.  It says response Sandow/Alcoa lease.

7      Q.  And what is the comment there on retention?

8      A.  The payment of the retention that has been held

9  has been contingent upon the vegetation being completed.

10      Q.  All right.  So you're telling Mr. Ziehr in this

11  e-mail that one of the reasons we're not paying

12  retention is you're not done with the contract, the

13  vegetation's not in?

14      A.  Well, they weren't done with the vegetation.

15  They were done with everything else, but it had taken --

16  well, we've been trying to come out and do the vegeta --

17  trying to get them to come out and do the vegetation

18  since September of 2013.

19      Q.  But what you're telling them is that you're not

20  getting your retention because you're not done with the

21  vegetation?

22      A.  Yes, we were holding the retention to try to

23  get them to come back out.

24      Q.  Did you know that May 30th, 2014, that the

25  retention was now a bankruptcy claim?

Page 117

1          MS. OKON:  Objection, calls for
2     speculation.
3          A.  I mean, I don't know what his intent was, but
4     I -- I mean, it -- the flavor of those e-mails is we
5     kept getting put off.
6          Q.  (BY MR. SAKONCHICK)  I understand that.
7          A.  Yes.
8          Q.  But --
9          A.  And I don't know what -- I don't know who --
10    you know, he has people that he reports to.  I don't
11    know what they were telling him to say.  I -- it is
12    speculation, anything that I would say, really.
13         Q.  You did have con -- communications with
14    Mr. Ziehr and his wanting -- wanting to get assurances
15    because of a subcontractor?
16         A.  Yes.  Some of the communications were that.
17         Q.  And the only subcontractor that Ranger had on
18    that job at that time was the vegetation contractor?
19         A.  Well, I -- that was what was lacking to be
20    completed, yes, the vegetation.
21         Q.  Right.  So there'd be no other subcontractors
22    you'd be aware of that he'd be talking about?
23         A.  No.
24         Q.  And when he communicated to these various
25    people when you went through these and he says I'm two

Page 118

1     weeks, whatever, you don't know whether or not he's just
2     passing on what his subcontractor's telling him?
3          A.  No.
4          Q.  And if Mr. Ziehr testified that in every one of
5     these communications, that was what his subcontractor
6     was reporting to him, he would be being truthful at that
7     time in those communications?
8          MS. OKON:  Objection, calls for
9     speculation.
10         Q.  (BY MR. SAKONCHICK)  Correct?
11         A.  As far as I know.
12         Q.  And in all your communications with Mr. Ziehr
13    between September 2013 and April 2014, did you -- did
14    Mr. Ziehr, when he communicated with you, appear to be
15    truthful with whatever he was communicating to you?
16         A.  It appeared to be, but I -- but it -- it's like
17    somebody telling you I'm going to pay you your water
18    bill and they keep saying they're going to do that.  I
19    mean, it comes to a -- after a while, you start
20    wondering if it's actually going to occur.
21         Q.  But you have no reason to disbelieve that
22    Mr. Ziehr was telling you what he believed at that time?
23         MS. OKON:  Objection, calls for
24    speculation.
25         A.  I mean, I -- I -- I'm -- I don't have a close

Page 119

1     relationship with him other than what we had through
2     these -- these exchanges, but I mean, I -- yeah, I had
3     no reason to not think that they were eventually going
4     to come out, but we were wondering if they were going to
5     come out.
6          Q.  (BY MR. SAKONCHICK)  No, that's not there --
7     let me -- I know you've answered the question.  In each
8     one of those communications you had with Mr. Ziehr, on
9     any of those communications, do you think he was
10    intentionally misleading you?
11         MS. OKON:  Objection, calls for
12    speculation.
13         A.  No.  I don't have any -- no.
14         Q.  (BY MR. SAKONCHICK)  And in those discussions,
15    you kept telling Mr. Ziehr no vegetation, no retainage?
16         A.  Well, we wouldn't have that every discussion.
17    But, yes, I had told him, yes, until the vegetation's
18    done, retention's being held.
19         Q.  All right.  And he understood that?
20         A.  Yes.
21         Q.  And the assurances that he was looking for were
22    assurances of payment of future work, not work already
23    completed, being the vegetation?
24         A.  It was -- yes, for the vegetation.
25         Q.  And, again, he referred to concerns his

Page 120

1     subcontractor was expressing?
2          MS. OKON:  Objection, vague and ambiguous.
3          A.  A couple of the times, not every time.  I mean,
4     earlier on, he was just wanting assurance of payment.
5     But then the talk about the subcontractor came up later.
6     I don't remember it initially.  Initially, it was just
7     getting payment for the vegetation, then he started
8     talking about the subcontractor, the subcontractor's
9     concern.
10         Q.  (BY MR. SAKONCHICK)  Ms. Okon asked you whether
11    you had had any other jobs that had actually taken that
12    many representations to get finished, correct?
13         A.  Yes.
14         Q.  How many jobs have you had like that where
15    bankruptcy was looming over your -- over the company
16    that had actually engaged the contractor?
17         A.  None.
18         Q.  So this was an unusual circumstance for you in
19    your 27 years of contract administration, you didn't --
20         A.  Well, I haven't had 27 years.
21         Q.  Well, 1990 --
22         A.  I've had 12 years -- well, I've had 15 years,
23    '99, so...
24         Q.  All right, '99, so we're talking about --
25         A.  Yeah.

Page 121

1     Q. -- 16, 17 years?

2     A. Yeah.

3     Q. And at the time, you would have had 14 years

4 contract administration?

5     A. Right.

6     Q. During that period of time, you never had a

7 circumstance where bankruptcy was looming over the

8 company that you represented as the engaging entity?

9     A. That's correct, none of us had.

10     Q. So that was an unusual circumstance?

11     A. Bankruptcy, for us at the -- yes, it's -- it's

12 becoming much more commonplace, but for us, yes.

13     Q. Please turn to Exhibit 27. Oh, let me go back

14 one. Actually, go to Exhibit 26. And it talks about

15 Gary finally getting his machine we've been waiting for

16 and mobilization will start Monday of next week; is that

17 correct?

18     A. Yes.

19     Q. What's the date of that?

20     A. April 28th.

21     Q. What happened the next day?

22     A. The bankruptcy filing.

23     Q. That certainly changed things, didn't it?

24         MS. OKON: Objection, calls for

25 speculation, vague and ambiguous.

Page 122

1     A. I -- I'm not sure if I understand how that

2 changed things.

3     Q. (BY MR. SAKONCHICK) On April 29th, 2014, was

4 it relatively chaotic at Luminant as a result of the

5 bankruptcy filing?

6     A. I -- I don't recall. I mean...

7     Q. Well, let's say April 29th would be a Sunday --

8 well, let me see, April 28th is a Monday --

9     A. It would have been a Tuesday.

10     Q. Would have been a Tuesday. Once the

11 bankruptcy -- did you have any knowledge that the

12 bankruptcy was going to be filed before it was filed?

13     A. No. No, we -- we were all anxious to know when

14 it was going to be -- nobody -- I mean, it was kept very

15 quiet.

16     Q. Were you and the other employees that you

17 talked to, was it a surprise that they had ultimately

18 filed the bankruptcy on April 29th?

19     A. I don't know that I would -- I mean, we didn't

20 know what date it would occur. I mean, we knew it was

21 going to happen, from what we were told, sooner or

22 later, but...

23     Q. How long did you know it was going to happen?

24     A. I didn't really know when it was going to

25 hap -- I mean, there was talk about it, like I said,

Page 123

1 probably 2013, early on or I -- I mean, it was talked

2 about for a long time.

3     Q. Was there increase --

4     A. And work continued during that whole time. We

5 paid suppliers during that whole time.

6     Q. Was it -- was there increased chatter about the

7 filing just before April 29th?

8     A. No, not really, no.

9     Q. What was work like in your offices after --

10 well, the 29th is a Tuesday. From -- from that Tuesday

11 to Friday, what was work like?

12     A. A lot of it was like business as usual. I

13 mean, there were a few calls, but we weren't flooded

14 with calls about it.

15     Q. How many of your construction contracts called

16 up that week and said, what's going on, am I going to

17 get my money?

18     A. I -- I don't recall if I even had any that week

19 that called. I mean, over time -- I mean, you had

20 filings by suppliers for -- you know, for payment,

21 trying to get payment prior to when we emerged from

22 bankruptcy because there was anticipation as to how much

23 they would get paid, but...

24     Q. Would it be reasonable for the work to be

25 performed on the vegetation to be delayed a bit as a

Page 124

1 result of the bankruptcy filing and determination as to

2 whether or not they could get paid because of the

3 bankruptcy?

4         MS. OKON: Objection, calls for a legal

5 conclusion.

6     A. Can you state that again?

7     Q. (BY MR. SAKONCHICK) Sure.

8     A. It was just...

9     Q. The bankruptcy occurred on April 29th.

10     A. Right.

11     Q. And on April 29th, it would probably take a few

12 days for everybody to become aware that the bankruptcy

13 had been filed. That's a fair characterization, isn't

14 it?

15     A. Yes.

16     Q. And so if Ranger was ready to mobilize

17 equipment onto the site the following Monday and they

18 knew about the bankruptcy, would you consider it

19 unreasonable for them to delay mobilizing that equipment

20 until they figured out what was going to be the result

21 of the bankruptcy?

22     A. I -- I don't know. I mean, we didn't even know

23 if it was going to be filed on the 29th.

24     Q. I'm saying after --

25     A. On Monday, the 28th, we wouldn't have known.

Page 137

1    filing.

2        A.  I -- I -- I'm not sure if I understand really

3    what...  I mean, yes, there are other suppliers that

4    haven't been paid.

5        Q.  Are there other suppliers who will -- that you

6    understand will not get their entire claim paid?

7                MS. OKON:  Objection, calls for

8    speculation.

9        A.  That will not get their --

10       Q.  (BY MR. SAKONCHICK)  Have you had a discussion

11   with any of your vendors saying, I'm not going to get

12   all my money for what I supplied you before the

13   bankruptcy?

14       A.  No.  I mean, but it's -- when you go through a

15   bankruptcy, there -- there are some payments that aren't

16   made.  I -- I'm not following.

17       Q.  Okay.  Let me follow up on that.  Is it your

18   understanding that as a result of the Luminant

19   bankruptcy, some creditors are not going to get paid all

20   the money they're due?

21       A.  Yes.

22       Q.  Do you think that's fair?

23               MS. OKON:  Objection, calls for

24   speculation.

25       Q.  (BY MR. SAKONCHICK)  Go ahead and answer.

Page 138

1        A.  Well, do you?  I mean --

2        Q.  Well, I'm asking you.

3        A.  -- it's not fair for anybody to not get paid,

4    but...

5        Q.  Do you think it's fair for Ranger not to get

6    its retainage on the Sandow contracts?

7        A.  I don't -- I don't think that it's my place to

8    say that it's fair or not.

9        Q.  But you were trying to make representations to

10   Mr. Ziehr between September 2013 and April 2014, telling

11   him, do the work, you'll get paid, didn't you?

12               MS. OKON:  Ob -- objection, misstates facts

13   in evidence.

14       Q.  (BY MR. SAKONCHICK)  Didn't you tell him when

15   he was asking for assurances of getting paid that, yes,

16   do the work, you'll get paid, didn't you make those

17   assurances to him?

18       A.  No, I told him we're hurting -- we're -- we're

19   holding retention until you perform the vegetation.

20       Q.  Okay.  But you told him, once he performed

21   vegetation, he'd be paid?

22       A.  No, I -- I didn't directly say that to him.  I

23   said the retention is being held until you do the

24   vegetation.

25       Q.  And the implication of that is, you do the

Page 139

1    vegetation, you'll get your retainage?

2        A.  Normal circumstances, you would.

3        Q.  Now, he's asked you for assurances that

4    Luminant or Sandow is going to be able to pay them,

5    correct?

6        A.  Uh-huh, right.

7        Q.  Did you give him those assurances?

8        A.  I said --

9                MS. OKON:  Objection, vague and ambiguous.

10   At what time period?  Pre -- before or after the

11   bankruptcy filing?

12       Q.  (BY MR. SAKONCHICK)  Before the bankruptcy, did

13   you give him those -- in -- in your conversations

14   between September 2013 and April 2014, did you provide

15   Mr. Ziehr assurances that once they performed all their

16   work, they would be paid?

17               MS. OKON:  Prior to the bankruptcy filing

18   on April 29th.

19               MR. SAKONCHICK:  I -- I just said --

20               MS. OKON:  You said through April.

21               MR. SAKONCHICK:  -- April.

22       Q.  (BY MR. SAKONCHICK)  All right.  From September

23   1st through April 28th, 2014, in all your conversations

24   with Mr. Ziehr about his wanting assurance of getting

25   paid, did you give him those assurances?

Page 140

1        A.  I -- I mean, I can't assure payment of

2    anything, but I -- I did tell him we're holding the

3    retention until the vegetation's done.

4        Q.  And in re --

5        A.  I --

6        Q.  And in ref -- reference to his subcontractor,

7    didn't you testify previously that you told him if he

8    does the work, he'll get paid?

9                MS. OKON:  Ob --

10       A.  That was after -- I mean, that was after the

11   bankruptcy filing.

12       Q.  (BY MR. SAKONCHICK)  All right.

13       A.  I could not assure him of anything before --

14   before --

15       Q.  What kind of assurances was Mr. Ziehr asking

16   you for, then, before the bankruptcy?

17       A.  He was asking if they would get paid for the

18   vegetation work.

19       Q.  Okay.  And what did you tell him?

20       A.  I -- I mean, I -- I -- I couldn't give him any

21   assurance before the --

22       Q.  Did you tell him --

23       A.  -- bankruptcy was filed.

24       Q.  -- I can't tell you whether he would get paid?

25       A.  I -- I don't recall.  I don't...

Page 141

1    Q.  If you couldn't tell Mr. Ziehr that if he did
2  the vegetation work, he would get paid, wouldn't his
3  subcontractor have a legitimate concern about doing the
4  work?
5    A.  I...
6    Q.  If I asked you to do work for me -- or
7  you're -- you're working for Luminant Generation, you do
8  your work, at the end of day, you expect to get a
9  paycheck, don't you?
10    A.  You would expect to.
11    Q.  Okay.  If you didn't get a paycheck, what would
12  you -- what would you consider?
13        MS. OKON:  Objection, vague and ambiguous.
14    Q.  (BY MR. SAKONCHICK)  If you didn't get a
15  paycheck at the end of the week for the work that you
16  performed, would you consider that unfair?
17    A.  Yes.
18    Q.  And I'm trying to get at -- I know you can't
19  think exactly word for word what those conversations
20  were.  But what I'm asking you and I'm trying to get
21  a -- a feel for is you were -- Mr. Ziehr was asking you
22  for some sort of assurance that because of the noise
23  about the bankruptcy filing or the potential for a
24  bankruptcy filing, that his subcontractor would get paid
25  if it did the vegetation.  Is that accurate?

Page 142

1    A.  Yes.
2    Q.  Now, what I'm trying to get at is, what,
3  exactly, to the best of your recollection, you responded
4  to him?
5        MS. OKON:  Objection, asked and answered.
6    A.  I mean, I -- I wasn't -- I -- I can't give
7  assurance that they're going to be paid.  I -- I mean, I
8  didn't know what the timing of the bankruptcy was going
9  to be.
10    Q.  (BY MR. SAKONCHICK)  What did you tell him?
11  I'm not asking you what you thought.  What did you tell
12  him?
13    A.  I don't remember what I told him.
14    Q.  All right.  You said you --
15    A.  I would not -- I -- I -- I -- I can't assure --
16  I mean, I can't assure that they would be paid for
17  anything.
18    Q.  Why is that?
19    A.  It's just the way it is.
20    Q.  So between September 1, 2013 and April 28,
21  2014, you would have not been able to provide Mr. Ziehr
22  with assurances that if they came out and did the
23  vegetation, that his subcontractor would be paid?
24        MS. OKON:  Objection, compound and vague
25  and ambiguous.

Page 143

1    A.  No, I -- I couldn't assure any other supplier
2  if they came out and performed work that they would be
3  paid.
4    Q.  (BY MR. SAKONCHICK)  Why is that?  Why couldn't
5  you give them those assurances?
6    A.  You can send me electricity.  How could you --
7  I mean, are you going to assure them that you're going
8  to pay for the electricity you consumed?  I mean, it's
9  just -- it applies over the whole realm of everything,
10  what you're trying to get me to respond to.
11    Q.  Well, the reason -- was it a fair
12  characterization that the reason that Mr. Ziehr was
13  asking you about assurances of payment was about all the
14  press about the potential for Luminant filing a
15  bankruptcy?  Is that fair?
16    A.  I -- I don't know.  I don't know what -- I
17  mean, we had heard talk of that for a long time.
18    Q.  No, you're not focussing on my question.  Let
19  me try to be more precise.  Your conversation with
20  Mr. Ziehr between September 1, 2013 and April 28,
21  2014 -- got that time frame in, correct?
22    A.  (Nodding.)
23    Q.  -- you're talking to him about the vegetation,
24  and he's -- you've -- he's asked you -- you -- you --
25  you've testified that he asked you about assurances

Page 144

1  for -- that he'd get paid?
2    A.  Uh-huh.
3    Q.  You need to answer verbally, yes or no or --
4  the court reporter can't take down an uh-huh.
5        So he's -- he's asked you for assurances
6  that his subcontract -- whether he and his subcontractor
7  would be paid if they did the vegetation.
8        MS. OKON:  Objection, asked and answered.
9    Q.  (BY MR. SAKONCHICK)  Correct?
10    A.  I could not -- I could not answer him
11  whether -- I could not assure --
12    Q.  I'm not asking you whether you -- you're -- he
13  asked you that question, though, didn't he?
14    A.  Yes, he asked.
15    Q.  All right.  And in asking you that question,
16  did he discuss at all the risk that he felt because of
17  the press information on a potential Luminant
18  bankruptcy?
19    A.  He was concerned about the bankruptcy filing,
20  yes.
21    Q.  And he expressed that to you?
22    A.  Yes.
23    Q.  And did he ask you for some assurance that he
24  would be paid if his subcontractor did the vegetation
25  work?

Page 145

1    A.  He may have, but I would not -- if he asked, I
2  would not be able to give him any assurance.
3    Q.  Well, I think you said you did -- he was asking
4  for assurances of payment.
5    A.  Yes, he -- yeah, we've already talked about
6  that.
7    Q.  Okay.
8    A.  Yes, he was asking about assurance of payment.
9    Q.  And the assurance of payment he was asking for
10 included the payment for a subcontractor for the
11 vegetation work?
12        MS. OKON:  Objection, asked and answered.
13        MR. SAKONCHICK:  You wanted to do this step
14 by step and not be compound question.  It's going to be
15 step by step.
16        MS. OKON:  You've been asking the same
17 questions for 30 minutes, but...
18        MR. SAKONCHICK:  Yeah.  Well, it's going to
19 continue then.
20    Q.  (BY MR. SAKONCHICK)  He did discuss with you
21 among the times that he talked about getting paid, it
22 did come up about whether he'd be paid for a
23 subcontractor to do the vegetation work?
24    A.  Yes, he asked if they would be paid to do the
25 vegetation.

Page 146

1    Q.  What did you tell him about -- in response to
2  his request for insurance -- assurances, to the best of
3  your recollection, what did you respond to him?
4    A.  I could not give assurance.
5    Q.  So you would have told him in your
6  conversations from September 1, 2013 to April 28, 2014,
7  I can't assure you'll be paid for that work?
8        MS. OKON:  Objection, vague, compound.
9    A.  I mean, under normal circumstances, they would
10 have been paid.
11    Q.  (BY MR. SAKONCHICK)  But we're taking about the
12 time frame between September 1, 2013, April 28, 2014,
13 step one.  Step two is we know about the press has been
14 talking about Luminant --
15    A.  Which was even before September 1.
16    Q.  I understand, but I'll -- I'm -- I'm just
17 talking about this one time frame.
18    A.  Okay.
19    Q.  There's discussions about Luminant filing for
20 bankruptcy and Mr. Ziehr asked you for assurance of
21 payment and you're telling him at that point in time, I
22 cannot assure you'll be paid if you perform the work.
23 Is that what you told him?
24    A.  No.  I don't recall those exact words.
25    Q.  Is --

Page 147

1    A.  But I -- I -- I would not have been able to
2  give him assurance.  I -- I mean...
3    Q.  I'm not asking what you could do or not.  He
4  asked you the question, I want to know to the best of
5  your recollection what your response was.
6    A.  I -- I don't remember the exact thing I said to
7  him.
8    Q.  I'm not exactly for the -- to the best of your
9  recollection, what was the general nature of the
10 discussion that you told -- your part of the discussion?
11 I'm trying to get -- you told us what Mr. Ziehr was
12 telling you.  Now, I want you to tell me what you were
13 talking to Mr. Ziehr about.
14    A.  I -- I would just -- I would have said -- I
15 mean, under normal conversation, I'd have said, you
16 know, you -- you should be paid.  But I -- I couldn't
17 guarantee payment.  I -- I could not assure him that
18 they would be paid.
19    Q.  And that's what you told him?
20    A.  In general terms.  I mean, I don't --
21    Q.  Okay.
22    A.  -- I don't know that I said it exactly that
23 way.
24    Q.  I don't want exact words.  But generally, you
25 told him under normal circumstances, I know you'd be

Page 148

1  paid, but because of the potential --
2    A.  No, I would not have said it that way.  Just
3  would have said, you know, normal circumstances, yes,
4  we --
5    Q.  Well, let's read back what your answer was to
6  that question.
7        (Simultaneously speaking.)
8        MS. OKON:  Okay.  I'm --
9    A.  Well, you've asked --
10        MS. OKON:  -- going to ask you to stop --
11   A.  -- me so --
12        MS. OKON:  -- cutting him off.
13   A.  -- many times, I -- I can't remember
14 exactly how I state things to you, so...
15    Q.  (BY MR. SAKONCHICK)  I'm trying to get at the
16 general --
17   A.  I -- I understand --
18    Q.  -- discussion.  I don't --
19   A.  -- and -- and I --
20    Q.  -- want word for word.
21   A.  Yeah.  And -- and that's what I'm saying.  I
22 could not give you word for word anyway.  I -- it's
23 been, what --
24        MS. OKON:  And I'm going to object.
25   A.  -- three years?

David Watkins

154

1          UNITED STATES BANKRUPTCY COURT
              FOR THE DISTRICT OF DELAWARE
2

In re:                    ) Chapter 11
3                         )
ENERGY FUTURE HOLDINGS     )
4    CORP., et al.,        ) Case No. 14-10979 (CSS)
                          )
5          Debtors        ) (Jointly Administered)

6    _____

7    Sandow Power Company LLC    )
                                )
8    v.                         )
                                )  Contested Matter
9    Ranger Excavating LP        )

10             REPORTER'S CERTIFICATION

11           DEPOSITION OF DAVID WATKINS

12               OCTOBER 19, 2016

13

14       I, Terri Garcia, Certified Shorthand Reporter in

15   and for the State of Texas, hereby certify to the

16   following:

17       That the witness, DAVID WATKINS, was duly sworn by

18   the officer and that the transcript of the oral

19   deposition is a true record of the testimony given by

20   the witness;

21       That the deposition transcript was submitted on

22   _____ to the witness or to the attorney

23   for the witness for examination, signature and return to

24   me by _____;

25       That the amount of time used by each party at the

David Watkins

**155**

1   deposition is as follows:

2   MR. STEPHEN SAKONCHICK, II.....02 HOUR(S):34 MINUTE(S)
    MS. MELANIE OKON.....00 HOUR(S):19 MINUTE(S)

3

4        That pursuant to information given to the

5   deposition officer at the time said testimony was taken,

6   the following includes counsel for all parties of

7   record:

8   FOR SANDOW POWER COMPANY LLC:

9        MS. MELANIE OKON
         Okon Hannagan PLLC
10       750 North St. Paul Street
         Suite 1800
11       Dallas, Texas  75201
         Phone: (214) 396-9650
12       mokon@okonhannagan.com

13

        FOR RANGER EXCAVATING LP:
14
         MR. STEPHEN SAKONCHICK, II
15       Stephen Sakonchick II, P.C.
         6502 Canon Wren Drive
16       Austin, Texas  78746
         Phone: (512) 329-0375
17       Fax: (512) 697-2859
         sakon@flash.net
18

19       That $_____ is the deposition officer's

20  charges to RANGER EXCAVATING LP for preparing the

21  original deposition transcript and any copies of

22  exhibits;

23       I further certify that I am neither counsel for,

24  related to, nor employed by any of the parties or

25  attorneys in the action in which this proceeding was

David Watkins

**156**

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

      Certified to by me this 6th day of November, 2016.

_____
Terri Garcia, Texas CSR 6581
Expiration Date:  12/31/2016
DepoTexas
Firm Registration No. #459
6500 Greenville Avenue, Suite 445
Dallas, Texas  75206
(214) 373-4977

Tab G

## Page 1

1  UNITED STATES BANKRUPTCY COURT

2  FOR THE DISTRICT OF DELAWARE

3  IN RE:              )  Chapter 11
                       )
4  ENERGY FUTURE HOLDINGS  )  CASE NO. 14-10979 (CSS)
   CORP., et al.,      )
5                       )
          Debtors,     )  (Jointly Administered)
6  _____)
                       )
7  SANDOW POWER COMPANY, LLC )
                       )
8  vs.                 )  Contested Matter
                       )
9  RANGER EXCAVATING, LP  )
10  _____)

11  ORAL AND VIDEOTAPED DEPOSITION OF

12  PATRICK BEHLING

13  October 17, 2016

14

15  ORAL AND VIDEOTAPED DEPOSITION OF BRAD MCKENZIE,

16  produced as a witness at the instance of the Debtors and

17  duly sworn, was taken in the above-styled and numbered

18  cause on October 17, 2016, from 12:59 p.m. to 4:34 p.m.,

19  before Amy M. Clark, Certified Shorthand Reporter in and

20  for the State of Texas, reported by computerized

21  stenotype machine at the offices of Ranger Excavating,

22  5222 Thunder Creek Road, Austin, Texas 78759, pursuant

23  to the Federal Rules of Civil Procedure and the provisions

24  stated on the record or attached hereto.

25

## Page 2

1  APPEARANCES

2

3  FOR DEBTORS AND DEBTORS IN POSSESSION:

4     Ms. Melanie K. Okon
      Okon Hannagan, PLLC
5     750 N. St Paul Street
      Suite 1800
6     Dallas, Texas 75201
      Telephone: (214)396-9650
7     Fax:  (469)909-6115
      E-mail: mokon@okonhannagan.com
8

9  FOR RESPONDENT RANGER EXCAVATING, LP:

10    Mr. Stephen Sakonchick, II
      6502 Canon Wren Drive
11    Austin, Texas 78746
      Telephone: (512)329-0375
12    Fax:  (512)697-2859
      E-mail: sakon@flash.net

13

14  ALSO PRESENT:

15    Ms. Ashley Alaman - In-house Counsel for Luminant
      Lindsey Thomas -Videographer

16

17

18

19

20

21

22

23

24

25

## Page 3

2  INDEX

3                                         PAGE

4  Appearances .......................................2

5  PATRICK BEHLING

6  Examination by Mr. Sakonchick ....................6
   Examination by Ms. Okon ........................98
7  Further Examination by Mr. Sakonchick ..........155
   Signature Page .................................165
8  Court Reporter's Certificate ...................167

9  EXHIBITS

10  EXHIBIT          DESCRIPTION          PAGE

11  Exhibit 4    Email from Pat Behling to        40
                 Nathan Ziehr, Matthew
12               Sutherland, 08/7/13

13  Exhibit 8    Email from Nathan Ziehr to       43
                 Matthew Sutherland, 10/9/13
14
15  Exhibit 9    Email from Nathan Ziehr to Pat   46
                 Behling, 11/7/13

16  Exhibit 11   Email from Nathan Ziehr to Pat   47
                 Behling, 1/13/14
17
18  Exhibit 12   Email from Nathan Ziehr          50
                 to Chris Collins, 1/8/14

19  Exhibit 13   Email from Chris Collins to      54
                 Nathan Ziehr, 1/20/14
20
21  Exhibit 14   Email from Nathan Ziehr to Pat   55
                 Behling, 1/20/14

22  Exhibit 15   Email from Nathan Ziehr to Pat   55
                 Behling, 1/27/14
23
24  Exhibit 16   Email from Nathan Ziehr to Pat   55
                 Behling, 2/10/14

25

## Page 4

1  EXHIBITS (cont.)

2  EXHIBIT          DESCRIPTION          PAGE

3  Exhibit 17   Email from Nathan Ziehr to       56
                 Jacob Gonzales, 4/20/14
4
   Exhibit 18   Email from Nathan Ziehr to Pat   58
5                Behling, 3/11/14

6  Exhibit 20   Email from Chris Collins to      60
                 Nathan Ziehr, 3/20/14
7
8  Exhibit 21   Email from Nathan Ziehr to Pat   62
                 Behling, 3/24/14

9  Exhibit 22   Email from Chris Collins to      69
                 Nathan Ziehr, 3/26/14
10
11  Exhibit 23   Email from Jacob Gonzales to     72
                 Nathan Ziehr, 3/26/14

12  Exhibit 24   Email from Nathan Ziehr to       73
                 Matthew Sutherland, 4/2/14
13
14  Exhibit 25   Email from Nathan Ziehr to Pat   74
                 Behling, 4/8/14

15  Exhibit 26   Email from Nathan Ziehr to Pat   76
                 Behling, 4/28/14
16
17  Exhibit 28   Email from David Watkins to      77
                 Nathan Ziehr, 5/7/14

18  Exhibit 29   Email from Nathan Ziehr to       84
                 Matthew Sutherland, 5/19/14
19
20  Exhibit 30   Email from Nathan Ziehr to       85
                 Matthew Sutherland and Pat
                 Behling, 5/30/14
21
22  Exhibit 31   Email from Chris Collins to      88
                 Nathan Ziehr, 6/4/14

23  Exhibit 32   Email from Nathan Ziehr to Pat   149
                 Behling, Matthew Sutherland,
24               and Steve Berndt, 6/5/14

25

## Page 5

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 35 | Email from Pat Behling to Nathan Ziehr, 6/19/14 | 89 |
| Exhibit 39 | Pay application, 7/31/14, A1893758 | 91 |
| Exhibit 42 | Deposition notice | 9 |
| Exhibit 43 | Engineering design drawings, Cell No. 1 | 10 |
| Exhibit 44 | Scope of work and technical specifications | 13 |
| Exhibit 45 | Google Earth map | 14 |
| Exhibit 46 | Email from Chris Collins to Nathan Ziehr, 10/9/13 | 16 |
| Exhibit 47 | Email from David Watkins to Bobbie Holstine, Carolyn Gordon, and Nathan Ziehr, 11/11/14 | 90 |

## Page 6

1    THE VIDEOGRAPHER:  Here begins the
2  deposition of Patrick Behling.  Today's date is October
3  17th, 2016.  The time is 12:59.
4    Will the court reporter please swear in
5  the witness.
6    PATRICK BEHLING,
7  having been first duly sworn, testified as follows:
8    EXAMINATION
9  QUESTIONS BY MR. SAKONCHICK
10   Q.   Mr. Behling, my name is Steve Sakonchick.
11        And before today, we've never met; is that
12  correct?
13   A.   No, sir.
14   Q.   And before today, we've never even spoken?
15   A.   No.
16   Q.   Mr. Behling, please state your professional --
17  well, your full name for the record.
18   A.   Patrick Joseph Behling.
19   Q.   And give me your educational background.
20   A.   I have a bachelor of engineering in civil
21  engineering from the University of Dayton in Dayton,
22  Ohio.  I have a master's of environmental engineering
23  from Manhattan College in Riverdale, New York.
24   Q.   And what professional certifications do you
25  hold in Texas?

## Page 7

1    A.   Licensed civil engineer.
2    Q.   And who do you work for?
3    A.   Pastor, Behling & Wheeler.  I'm a principal
4  engineer there.
5    Q.   Okay.  And what does Pastor, Wheeling, Behling
6  do?
7    A.   Pastor, Wheeling & Behling, we're environmental
8  consultants.  We -- myself and two of my partners are
9  engineers; my other two partners are geologists.  We --
10  we do environmental -- offer environmental consulting
11  services to the regulated industries.
12   Q.   All right.  We're going to use some shortcuts
13  today, if it's all right with you.  When we refer to
14  PBW, we'll be referring to Pastor, Behling & Wheeler; is
15  that acceptable?
16   A.   Sure.
17   Q.   And if we refer to Sandow, we refer to Sandow
18  Energy Company, LLC.
19   A.   Sure.
20   Q.   And if we refer to Luminant Mining, we'll be
21  referring to Luminant Mining Company, LLC.
22        MS. OKON:  Steve, Sandow Power Company,
23  LLC, not Sandow Energy Company.
24        MR. SAKONCHICK:  Okay.  Sandow Power
25  Company, LLC.  My bad.

## Page 8

1    Q.   (By Mr. Sakonchick) And Luminant could refer to
2  just any one of the various Luminant entities.
3    A.   Yes, sir.
4    Q.   And you do understand that there are several
5  companies that have Luminant in the name?
6    A.   I -- I do, yes.
7    Q.   Now, speaking of Luminant and Sandow, how many
8  projects have you worked for them?
9    A.   At the Sandow facility in particular?
10   Q.   Well -- no.  In either Sandow or Luminant.
11   A.   In various capacities, dozens of projects.  I
12  mean, we've -- I -- I began practicing engineering in
13  Texas in 1994, and Luminant's predecessor company, Texas
14  Utilities and TXU, I began working for them in '94.  So
15  I've worked for Luminant since that time.
16   Q.   And how many projects have you done for Sandow
17  Power Company, LLC?
18   A.   Oh, I guess on the order of six or seven.
19   Q.   And, in fact, the project that we're talking
20  about today is the AX area Cell No. 1, and the haul road
21  associated with --
22   A.   It's AX area, which is how it's referred to
23  but, yes, that is the project --
24   Q.   All right.
25   A.   -- that is my understanding that we're

Page 9

1  discussing.

2      Q.    That's not the first AX cell that you

3  constructed or were involved in, correct?

4      A.    Well, that's the first cell in the AX area, but

5  there's -- there are -- there's another landfill area at

6  Sandow that's called the A1 area where we -- we built a

7  design and constructed two similar landfill cells there.

8      Q.    And did Ranger do one or both of those?

9      A.    Did Ranger do both of those?  They did -- they

10  did not do the first one.  I believe they did the second

11  one, and then the first cell here at AX Landfill.

12      Q.    I'm going to show you what I've marked as

13  Exhibit No. 42.

14              (Exhibit 42 marked.)

15      Q.    (By Mr. Sakonchick) Why don't you tell me what

16  that is?

17              MS. OKON:  Do you have another copy?

18              MR. SAKONCHICK:  Yep.  It's the deposition

19  notice.

20              MS. OKON:  Okay.

21              MR. SAKONCHICK:  Actually, I've only got

22  the one copy.

23              MS. OKON:  Okay.

24      A.    This is the notice of deposition that I

25  received for this matter.

Page 10

1      Q.    (By Mr. Sakonchick) Now, I requested you bring

2  certain documents with you.

3              Did you have certain documents that

4  qualify for those categories that you brought today?

5      A.    I brought them with me, but it is also my

6  understanding that those have been provided to the -- to

7  the entities as well.

8      Q.    All right.  During the first break, I'd like

9  you to pull those out and give me an opportunity to look

10  through them --

11      A.    Okay.

12      Q.    -- if it's all right.

13      A.    No problem.

14      Q.    I'm going to show you --

15              Let me get this all together, what I'm

16  marking as Exhibit 43.

17              (Exhibit 43 marked.)

18      Q.    (By Mr. Sakonchick) Why don't you tell me what

19  this is.

20              (Handing out exhibits.)

21      A.    These are the engineering design drawings for

22  the construction of Cell No. 1 at the AX area landfill.

23      Q.    (By Mr. Sakonchick) Did you prepare these or

24  your firm prepared them?

25      A.    My firm prepared them, and I am the engineer of

Page 11

1  record for these.

2      Q.    And this would be related to the AX Cell No. 1

3  and the haul road?

4      A.    Yes.

5      Q.    Why don't you look at your -- that book in

6  front of you there, and go to Exhibit No. 3.

7      A.    (Witness complies.)

8      Q.    We're going to be talking today about these two

9  contracts in particular.  Exhibit No. 3 is in two parts.

10              The first part is the contract regarding

11  the construction of the haul road, and the second one,

12  about halfway down the marker is, is for the

13  construction of the AX, AX fly ash disposal pit Cell

14  No. 1?

15      A.    (Nodding.)

16      Q.    Okay.  Are you familiar with both these

17  contracts?

18      A.    I'm familiar with them.

19              But as a point of clarification, the

20  contracts were developed and entered into between Ranger

21  and Luminant or Sandow Power, whatever.

22      Q.    But what you have reviewed these contracts as

23  part of your employed?

24      A.    Only the technical specification portions of

25  them.

Page 12

1      Q.    All right.  Flip through the first contract,

2  and tell me what portions you would have been familiar

3  with prior to commencement of work.

4      A.    (Witness complies.)  The -- so the -- the

5  contract -- I'm assuming in here the contract refers to

6  the technical specifications in some fashion.  But this

7  is the -- this is the business contract between

8  Luminant, Sandow Power, and Ranger, which is something

9  that Luminant negotiated and prepared directly with

10  Ranger.

11      Q.    All right.  And those -- you're actually

12  referring to both contracts?

13      A.    I believe so.  I mean, I thought it was just

14  the haul road contract.

15      Q.    And if you refer to page 6 of the contract.

16      A.    Which one?  The haul road?

17      Q.    We'll start with the haul road first.

18              It refers to technical specifications

19  dated September 17, 2012.

20      A.    Okay.  So those would be the -- the technical

21  specification that I prepared, PBW prepared, and also

22  the associated drawings that are referenced below those.

23      Q.    All right.  And looking at the next one, which

24  is 00048, the next contract -- this is actually page 6

25  of the next contract, too.

Page 13

1   A.   (Witness looking through document.)  Okay.

2   Q.   That refers to the same document, doesn't it?

3   A.   Yes.  The same technical specifications and the

4   drawings.

5   Q.   I'm going to show you what I've marked as

6   Exhibit 44.

7              (Exhibit 44 marked.)

8              MR. SAKONCHICK:  Here comes the rubber

9   band.

10             (Handing out exhibits.)

11  Q.   (By Mr. Sakonchick) And tell me if those are

12  the technical specifications that you're referring to.

13             MS. OKON:  Do you have a copy of those?

14             MR. SAKONCHICK:  Yeah.  Just trying to

15  find which one's not marked up.

16  A.   Yes.  I just wanted to make sure that these

17  were the -- the ones that I sealed.  But, yes, these are

18  the technical specifications.

19             MR. SAKONCHICK:  Oh.

20             (Retrieving documents.)

21             MS. OKON:  Thank you.

22             MR. SAKONCHICK:  For purposes of today,

23  I'd like to have an agreement with counsel that we

24  use --

25  Q.   (By Mr. Sakonchick) As far as the

Page 14

1   specifications are concerned, what is Appendix A?

2   A.   Appendix A is a summary of the soil boring log

3   information for geotechnical samples that were done

4   prior to the start of this project to provide soil

5   information for the contractor.

6              MR. SAKONCHICK:  Since I don't believe

7   we'll be needing these, we don't seem to be interested

8   in soil borings, if we can agree that we'll just leave

9   Appendix A off of the contract?

10             MS. OKON:  I agree.

11             (Mr. Sakonchick setting document aside.)

12             (Brief pause as Mr. Sakonchick organizes

13             documents.)

14  Q.   (By Mr. Sakonchick) Now, I'm also gonna mark as

15  Exhibit 47 -- 45.

16             (Exhibit 45 marked.)

17  Q.   (By Mr. Sakonchick) And ask you if you can

18  identify this.

19             (Handing out exhibits.)

20  A.   This is an aerial photo of the AX area showing

21  the approximate extent of AX Cell 1 and the haul road.

22  Q.   (By Mr. Sakonchick) Can you see AX Cell 2 there

23  at all?

24  A.   AX Cell 2?

25  Q.   Yes.

Page 15

1   A.   No.

2   Q.   Okay.  AX Cell -- or AX Cell 2, would that have

3   been completed by January 2012?

4   A.   A- -- AX Cell 2?

5   Q.   Yes.

6   A.   No.  We -- we just recently completed that

7   project.  That would have been completed in 2016.

8   Q.   All right.  Which one did Ranger work on, the

9   other AX cells.

10  A.   There's only -- this is the only one of the AX

11  cells --

12  Q.   Right.

13  A.   -- AX Cell 1.

14             Now, there was another landfill, and they

15  finished the Cell 2 on that landfill.

16  Q.   All right.

17  A.   That's called A1 Landfill.

18  Q.   A1 Landfill.

19             And that would have been Ranger?

20  A.   Yes.  There was another contractor for the

21  first one, and I'm -- I'm pretty sure Ranger did the

22  second one.

23  Q.   And the -- is that within -- are you familiar

24  with the lease between Sandow and Alcoa, or at least

25  generally?

Page 16

1   A.   I -- I know of it.  I don't know the specific

2   requirements.

3   Q.   Do you know if the first cell that Ranger

4   worked on, whether it was on the lease property or off

5   the lease property?

6   A.   I believe it was not on a lease property, but I

7   can't be certain of that.

8   Q.   Okay.

9   A.   It's in a different part of the area.

10  Q.   I want to show you what I'll mark as

11  Exhibit 46.

12             (Exhibit 46 marked.)

13             (Handing out exhibits.)

14  Q.   (By Mr. Sakonchick) Now, this seems to be a

15  email between Nathan Ziehr and Chris Collins dated

16  October 29th, 2013.

17  A.   Okay.  Chris Collins, who -- who would that be?

18  Q.   Chris Collins, BMP, BMP Specialists.

19             Are you familiar with them?

20  A.   They are the -- the subcontractor to -- they --

21  they were the entity that finished the -- finished

22  the -- the erosion-protect control.

23             MS. OKON:  Steve, just for the record,

24  have you produced those?

25             MR. SAKONCHICK:  Yep.

Page 17

1    Q.   (By Mr. Sakonchick) And you see the date on
2    that email, October 9th, 2013?
3        A.   Uh-huh.
4        Q.   And it's got two exhibits attached, two JPEGs?
5        A.   Uh-huh.
6        Q.   You need to answer verbally, sir.
7        A.   Oh, I'm sorry.  Yes, I do.
8        Q.   And Chris Collins, you see there, at BMP
9    Specialists -- and I think you identified BMP Specialist
10   as the person who actually did the vegetation work,
11   correct?
12       A.   I do.
13       Q.   Well, I asked you correct?
14       A.   I'm sorry.  Yes.  Correct.
15       Q.   And it's between Nathan Ziehr at Ranger and
16   Chris Collins at BMP Specialists, correct?
17       A.   Yes.
18       Q.   Now, looking at the photographs that are
19   attached, can you identify those?
20       A.   Those appear to be photos taken along the haul
21   road adjacent to AX Landfill Cell No. 1.
22       Q.   Now, do you recall in October 2013 at that --
23   the -- I guess you referred to it volunteer vegetation?
24       A.   This -- as shown in this --
25       Q.   Yes.

Page 18

1        A.   -- in this photo?
2             That's what this is, volunteer -- appears
3    to be, volunteer vegetation.
4        Q.   And that's what grows naturally without having
5    to do any planting.
6        A.   Correct.
7        Q.   And the pictures that you see, was that the
8    state of the volunteer vegetation as of October 2013?
9        A.   I do not directly recall, but assuming these
10   pictures -- photos are correct, yes.
11       Q.   All right.  Have you -- as -- as -- yo, as an
12   engineer, and Ranger in the past used the natural
13   vegetation rather than complete the contract as required
14   by planting vegetation?
15       A.   Yes.  The only thing that's missing from these,
16   though, there's no erosion-control fabric, which are
17   required prior to any type of vegetation.
18       Q.   In fact, on the prior project that Ranger
19   worked on with Sandow, the A1 cell, the volunteer
20   vegetation was allowed to remain rather than having to
21   plant grass pursuant to the contract.
22       A.   With the erosion-control fabric, yes.
23       Q.   And that resulted in a significant savings to
24   Sandow.
25       A.   Yes.

Page 19

1        Q.   And the cost of the vegetation.
2        A.   Yes.
3        Q.   So there is a history of Ranger and Sandow and
4    PPW [sic] allowing volunteer vegetation to remain in
5    place in lieu of planting vegetation in accordance with
6    the contract?
7        A.   As long as the erosion-control fabric was
8    placed.
9        Q.   Okay.
10       A.   Which was it was not here.
11       Q.   Okay.  But the erosion-control fabric is a lot
12   simpler to perform rather than just revegetate the
13   entire area, correct?
14       A.   A lot simpler.  I'm not sure I understand the
15   question.
16       Q.   Well, there's less work involved in putting the
17   fabric down than there is in having the natural
18   vegetation removed and new grass put in?
19       A.   You'd have to do that in order to put the
20   erosion-control fabric down, yes.
21            MS. OKON:  I think this is inadvertent.
22   But see you give -- give him a little more time to
23   finish his answer.
24            MR. SAKONCHICK:  Sure.
25            (Brief pause as Mr. Sakonchick organizes

Page 20

1    documents.)
2            MR. SAKONCHICK:  I keep losing my notes.
3        Q.   (By Mr. Sakonchick) What were the
4    responsibilities -- what was your responsibility on the
5    contracts for the ash fly pit and the haul road?
6        A.   My personal responsibility?
7        Q.   Yes.
8        A.   I was the engineer of record, so I was
9    responsible for ensuring that the -- that the facility
10   was constructed in accordance with the design drawings
11   and specifications.
12       Q.   All right.  And what were the position
13   responsibilities of Matt Sutherland?
14       A.   He was my assistant.  He did -- basically
15   assisted me with -- with tracking down things, whatever
16   was -- was required to do that task.
17       Q.   Who would have been on site more, you or
18   Mr. Sutherland?
19       A.   I'm not sure.  I -- it would be close to equal.
20       Q.   And Mr. Sutherland worked for PBW?
21       A.   He did.
22       Q.   And how about Mr. Berndt?
23       A.   Steve Berndt was our on-site quality control
24   technician.  He was on the site throughout the
25   construction.

Page 21

1    Q.   And that -- again, he works for PBW?

2    A.   Yes.

3    Q.   And how about Jacob Gonzalez?

4    A.   Jacob Gonzalez worked for Luminant or Sandow

5    Power or whatever, but a Luminant company.  He was -- he

6    was my client.  He was who -- who was responsible for

7    the work on Luminant's.

8    Q.   And how often was Mr. Gonzalez on the site?

9    A.   Not -- not -- nowhere near as often as

10   Mr. Berndt or myself.  I can't tell you how many times,

11   but he was there several times.

12   Q.   And how about Dave Watkins?

13   A.   David Watkins is a contracts person, and I

14   don't believe he was on the site very often at all.

15   Q.   Now, looking at Exhibit 45, and looking at the

16   area outlined in yellow, is -- that's the ash fly pit,

17   right?

18   A.   That's Cell No. 1, yes.

19   Q.   Cell No. 1.

20        And the area in purple would be the haul

21   road?

22   A.   Yes.

23   Q.   Now, let's look at the technical

24   specifications.

25        Now, your firm would have prepared these

Page 22

1    technical specifications, correct?

2    A.   Yes.

3    Q.   And let's talk about the elements that went

4    into the ash fly pit.

5        MS. OKON:  Steve, are they all

6    highlighted, or do I have yours?

7        MR. SAKONCHICK:  His is not highlighted.

8        MS. OKON:  It's fine for me to have this

9    version (holding up document)?

10       MR. SAKONCHICK:  Yeah.

11       MS. OKON:  Okay.

12       MR. SAKONCHICK:  I thought I'd cleared

13   them out, but, apparently, I hadn't done that.

14   Q.   (By Mr. Sakonchick) Now, the scope of work

15   starts at page double I 1, correct?

16   A.   Yes.

17   Q.   And the AX Landfill cell, which is the ash fly

18   pit.

19   A.   Yes.

20   Q.   And the elements of that work constitute

21   mobilization.

22        Now, mobilization, does it entail anything

23   more than just bringing the equipment to the site?

24   A.   I'm not sure I understand the question.

25   Q.   Mobilization.

Page 23

1    A.   Yes.

2    Q.   Okay.  It's an element of the construction.

3    A.   Yes.

4    Q.   And what does it involve other than just

5    hauling equipment to the site as far as Ranger was

6    concerned?

7    A.   It is a catchall for -- this was a -- this was

8    a unit-price contract.  So most of the pay items were

9    based on an actual measurement of -- of a unit of

10   measure, square footage, linear feet, things like that.

11        Mobilization is a -- is a catchall for

12   costs associated with the contractor that aren't covered

13   by unit prices.  Providing an office trailer, getting

14   the equipment to the site, developing plans that are --

15   that are talked about, traffic plans, health and safety

16   plans.  So that's a separate pay item to those cover --

17   cover administrative issues.

18   Q.   And is that pretty common with all construction

19   contracts of this size?

20   A.   It's very common for the ones we do, and I

21   believe it's common for -- for all contracts, yes.

22   Q.   And site preparation, what was involved in the

23   site preparation?

24   A.   That's a -- an item to prepare the area to

25   start construction.  This was a -- this was an area of

Page 24

1    a -- a former mine spoil area that had vegetation on it,

2    things like that, that needed to be scraped off and --

3    and prepared in order to start the construction.

4    Q.   So that would have had excavation involved?

5    A.   Yes.  Because they were supposed to stockpile

6    the -- I'll call it vegetative soil based on the topsoil

7    that would be the growth medium for the -- the

8    vegetation.

9    Q.   So they would have scraped off the first top

10   layer through excavation?

11   A.   Yes.

12   Q.   Or grubbing?

13   A.   Yes.

14   Q.   And now the category page 2 is foundation soil.

15        What does that involve?

16   A.   Foundation soil is the overall grading of a

17   site to the general lines and grades on the plans.

18   That could be excavation.  It could be -- getting the --

19   the -- putting the filling areas that were below the

20   target elevations, and if there was any excess soil

21   removed or any of these.

22        These -- these are -- these are -- our

23   pits, for want of a better term, they're actually

24   landfill cells, but they're excavated below existing

25   grade.  So -- so the material was -- had to be removed

Page 25

1  and -- and moved around to achieve the design.
2      Q.    And that would be what you referred to as
3  grading and excavation?
4      A.    Yes.
5      Q.    And both took place in this part of the
6  contract?
7      A.    Yes.
8      Q.    The next part is permanent dike construction.
9            What's entailed in that?
10     A.    These landfills are partially below and
11 partially above grade.  The -- at -- at the ground
12 surface, an earthen dike is constructed around the
13 perimeter of the landfill cell, and that's what these --
14 that pay item is for.
15     Q.    And all of the items except for the
16 mobilization we've talked about so far, included
17 excavation, grading, earthwork?
18     A.    All of the items, yes.  Yes.  Yes.
19     Q.    And among that is just grubbing, too?
20     A.    Yes.
21     Q.    Now, the next item is vegetative soil
22 placement.
23           What is this?
24     A.    That would be the soil that had been stripped
25 off and stockpiled in the previous item, the site

Page 26

1  preparation item.  That would be -- so this is a very
2  large cell.
3            The interior portions of the cell don't
4  require vegetation, but the exterior portions of the
5  dikes and areas that are disturbed through the
6  construction outside of the interior portions have to
7  have vegetation established on.
8            That vegetative soil is what was stripped
9  off at the beginning, stockpiled, and then placed back
10 to grow that as a growth medium for the vegetation.
11     Q.    Right.
12           But this would be outside of the cell
13 itself?
14     A.    Along the exterior, yes.
15     Q.    So looking at this picture that we're looking
16 at, Exhibit 45, the boundaries in heavy yellow would
17 have been where that excess soil placement would have
18 been?
19     A.    The boundaries in heavy yellow as well as
20 similar areas along the haul road, as well.
21     Q.    Okay.  And you see some yellow along the haul
22 road inside the purple?
23     A.    I do.
24     Q.    Okay.  And that would be the area where some of
25 that dirt was placed?

Page 27

1      A.    I'll say yes, but the scale is tough to tell.
2            But it's basically similar -- any -- any
3  disturbed soil areas that's going to be made exposed, we
4  need to be revegetated or have a road constructed on
5  them.
6      Q.    Looking at Exhibit 46.
7      A.    (Witness complies.)
8      Q.    Does this reflect some of the areas where that
9  vegetative soil would be placed?
10     A.    Yes.
11     Q.    So the excess soil would come out of the cell,
12 and they would have built these -- that's not one of the
13 dikes, though?
14     A.    It is.
15     Q.    It is one of the dikes.
16     A.    That's part of the perimeter dike, yes.
17     Q.    And a perimeter dike is somewhat of a hill
18 created by the excess soil?
19     A.    It's engineered.  It's placed in a controlled
20 fashion, but, yes.
21     Q.    Vegetation establishment.  Now, this is here in
22 Item F.
23           When is this done?
24     A.    This is the -- the ultimate -- at the
25 completion of the project, once the vegetative soil has

Page 28

1  been placed and the vegetation is established to provide
2  erosion control on the area.
3      Q.    Okay.  Now, everything else has been sort of in
4  order except for the vegetation establishment; that's
5  sort of out of order.
6            Because that's the last thing you do on
7  the job?
8      A.    It is.
9      Q.    Now, let's go the G, access ramp construction.
10           That's part of the -- that's the next
11 element that you have in this specification, correct?
12     A.    Yes.
13     Q.    And, again, we're still dealing with the ash
14 fly pit?
15     A.    Yes.
16     Q.    And what is involved in the access ramp
17 construction?
18     A.    The access ramp is -- is designed to allow
19 operation of the cell.  The cell is above and below
20 grade.  So the trucks, large trucks that are going to
21 convey the fly ash into the cell have to come up to the
22 top of -- the embankment, the dike around it, and then
23 the go into the cell and place it.  That access ramp is
24 what is used to -- to allow the trucks for it to do
25 that.

Page 29

1    Q.   In crude terms, it's a road?

2    A.   It's a ramp, yeah, a road.

3    Q.   It has to be excavated, graded?

4    A.   That one was fill.  I mean, the earthwork is

5  required, yes.

6    Q.   All right.  So it would be grading earthwork,

7  some type of road construction?

8    A.   To construct that, yes.

9    Q.   And you're talking G1, the earthwork, and G2,

10  road base.

11         So you would have had road base placed in

12  that area?

13    A.   On the surface, yes.

14    Q.   And road base is a particular type of rock for

15  better purpose?

16    A.   It's -- it's graded, crushed rock, yes.  The

17  specifications determine -- or define what that entails,

18  but, yes.

19    Q.   And that wasn't there naturally, that had to be

20  brought in?

21    A.   Correct.

22    Q.   And Ranger would have to supply the road base?

23    A.   Correct.

24    Q.   Culvert crossing?

25    A.   The -- the ramp itself crossed over an existing

Page 30

1  drainage feature, so there had to be a culvert placed

2  under the -- the -- at -- near the base of the ramp

3  where it tied into an existing road to allow storm water

4  drainage to pass under the ramp.

5    Q.   It's somewhat of a bridge?

6    A.   It's a buried pipe, but, yes, it's a -- it's

7  a -- it's a pathway for running water underneath the

8  ramp.

9    Q.   And the culvert would have to be purchased?

10    A.   Purchased, yes.

11    Q.   And placed?

12    A.   Yes.

13    Q.   And both those were done by Ranger?

14    A.   Yes.

15    Q.   And, in fact, all the elements of this that

16  we've described so far have been performed by Ranger?

17    A.   Yes.

18         There -- there were subcontractors used on

19  some of these items, but I don't believe that we've

20  touched on the subcontractors items yet.

21    Q.   Okay.  Well, the vegetative -- the ultimate

22  vegetation --

23    A.   Right.

24    Q.   -- was done by a subcontractor, right?

25    A.   Yes.

Page 31

1    Q.   And I think we'll go to the next item, which is

2  H, and that would have been a subcontractor.

3    A.   Yes.

4    Q.   What goes into the liner construction?

5    A.   So this is a -- this is a waste landfill, so

6  a -- a low-permeability liner's required by the -- by

7  the TCEQ to construct the landfill.

8         So this pay item includes all the steps

9  required for that.  There was a 2-foot processed soil

10  layer that -- 2-foot thick that was placed on top of the

11  foundation soil grades.  And then a HTPE bentonite.

12  It's called a geomembrane-supported geosynthetic clay

13  liner was placed on top of the prepared subgrade.

14    Q.   And that's a -- sort of a speciality item,

15  isn't it --

16    A.   It is.

17    Q.   -- the liner?

18    A.   Yeah.

19    Q.   And that was done by a specific subcontractor?

20    A.   It was.

21    Q.   And that's a line -- the elements of which

22  include grading in order to put it down, and then actual

23  installation of the liner?

24    A.   Yes.  I'm not sure -- I believe the

25  subcontractor only did the liner, but -- but, yes.

Page 32

1    Q.   But Ranger would have prepared -- done all the

2  earthwork required for the liner to be put in?

3    A.   Yes.

4    Q.   Then hired the subcontractor to put the liner

5  in?

6    A.   Yes.

7    Q.   And the liner was then -- was it covered over,

8  or was it --

9    A.   It was.  There was a -- in another pay item

10  that is further on in the document for protective soil.

11    Q.   And that would be Sections H1, H2, H3, H4, H5,

12  all dealing with liner on pages double I 4 and double I

13  5?

14    A.   Yes.

15    Q.   And that pretty much takes us through -- well,

16  you have the protective soil placement.

17         What is that item?

18    A.   That material was a -- was a layer that's

19  placed on top of the geomembrane-supported geosynthetic

20  clay liner to protect it during operations.  That would

21  have been a -- used from on-site fill material generated

22  as part of the discussion -- the -- the construction.

23    Q.   And demobilization?

24    A.   Similar to mobilization, these are

25  administrative-related cost to -- for the contractor

## Page 33

1  that would not be covered under the -- individual

2  pay items of the previous payout.

3      Q.   Now, on August 2013, Ranger would have been

4  done with everything but the vegetation, correct?

5      A.   Yes.

6      Q.   And if they demobilized, was any of the

7  equipment that they would have demobilized needed to do

8  the vegetation in August 2013?

9      A.   Some equipment would have been used.  I -- I

10 don't know which specific pieces of equipment would have

11 been required.

12     Q.   But BMP could have brought their own equipment

13 out?

14     A.   Yes.

15     Q.   And, ultimately, BMP did bring some of their

16 own equipment out?

17     A.   That's my understanding, yes, based on the

18 record.

19     Q.   So with a demobilization by Ranger, they just

20 took their equipment off the site?

21     A.   That's what the demobilization item -- pay item

22 is for.

23     Q.   Now, we talked about the ash fly pit and the

24 elements of which we've described as excavation,

25 correct?

## Page 34

1      A.   Yes.

2      Q.   Grading?

3      A.   Yes.

4      Q.   Earthwork?

5      A.   Yes.

6      Q.   Road base?

7      A.   Yes.

8      Q.   The liner?

9      A.   Yes.

10     Q.   Culvert?

11     A.   Yes.

12     Q.   Includes grubbing?

13     A.   Yes.

14     Q.   And then ultimate [sic] vegetation?

15     A.   Yes.

16     Q.   Let's talk about the AX haul road.  That'll be

17 starting at double I 6.

18          A lot of the same elements are -- in the

19 haul road are in the -- that were in the ash fly pit.

20     A.   Yes.

21     Q.   So we talk about mobilization, but they should

22 have already been mobilized out there.

23     A.   They had a separate pay item to mobilize any

24 specialty equipment for the haul road, yes.

25     Q.   And the site preparation would have involved

## Page 35

1  construction, excavation, earthwork, and the same type

2  of vegetation -- removal of vegetative soil and storing

3  it?

4      A.   Of -- to prepare for the work, yes.

5      Q.   And the haul road improvements themself would

6  have been constructing a road?

7      A.   Yes.

8      Q.   And it would have involved road base and -- or

9  sub grades and stabilization and road base?

10     A.   Using lime, yes.

11     Q.   And then at the very end, vegitative soil

12 placement?

13     A.   On areas outside of the road base, yes.

14     Q.   Okay.  Now, as we get on into the

15 specifications, what we just talked about are the

16 general elements, correct?

17     A.   The -- the scope of work and pay items

18 description, yes.

19     Q.   As we get into the rest of this contract before

20 the soil borings, it just goes into more detail about

21 the specifics, how each specific element is to be

22 performed.

23     A.   Yes.  And to make sure that the materials that

24 are to be supplied meet what the design requirements

25 were.

## Page 36

1      Q.   And those are the specifications for the liner?

2      A.   Yes.

3      Q.   Specification for the culvert?

4      A.   Yes.

5      Q.   More detailed specification as to the

6  dimensions and type of excavation be done for the ash

7  fly pit?

8      A.   The compactions requirements, yes.

9      Q.   And the same for the haul road?

10     A.   Yes.

11     Q.   But we've covered all the general categories in

12 what we just talked about as far as the elements of the

13 job?

14     A.   The general pay item categories, yes.

15     Q.   The general pay item categories are nothing

16 more than the construction, actual construction and

17 bringing it into certain categories so that they can be

18 paid?

19     A.   Correct.

20     Q.   Now, you referred to this contract as a -- let

21 me -- I'm not going to use the correct word.

22          But each element is paid separately,

23 correct?

24     A.   Yes.

25     Q.   What did you describe that -- what did you call

Patrick Behling

Page 37

1  that?

2     A.   As each element paid separately?

3     Q.   Well, you said the method that's -- that this

4  was bid on.  It was bid on --

5     A.   A unit, unit price basis.

6     Q.   Unit price basis.

7     A.   With some lump some items in there, but -- but,

8  by far and away, the majority of the work was on a unit

9  price basis.

10    Q.   Right.

11         So by unit price basis, this means that

12 dependent on how many loads of dirt they took out or how

13 many acres they vegetated, it was all based upon certain

14 units?

15    A.   It is measured in the field via survey.

16    Q.   Okay.  And it was -- the unit price is

17 dependent on -- it's a fixed price dependent -- but the

18 only variable is the units?

19    A.   Correct.

20    Q.   And of course the units time the price gives

21 you the ultimate pay application amount?

22    A.   Correct.

23    Q.   And this was done on pay applications, correct?

24    A.   On pay applications between the contractor and

25 Luminant, yes.

Page 38

1     Q.   Right.

2          And did you have to review and approve the

3  various pay applications?

4     A.   I did.

5     Q.   So you were familiar with all the pay

6  application?

7     A.   I don't know them by rote, but, yes, I'm

8  familiar with going through them.

9     Q.   Let's go to Exhibits 5 and 6.

10    A.   (Witness complies.)

11    Q.   And dealing with -- do you recognize these pay

12 applications?

13    A.   This is the format that was used during this

14 project, yes.

15    Q.   All right.  Now, pay application on Exhibit 5

16 is Pay Application No. 10?

17    A.   Yes.

18    Q.   And the pay application's for retainage up to

19 that point in time, correct?

20    A.   Yes.

21    Q.   And the work performed shows that it's

22 incomplete, it's not a hundred percent complete?

23    A.   Correct.

24    Q.   And looking at the dollar amount, it's probably

25 about 35, 36,000 dollars shy of completing as far as

Page 39

1  total contract versus amount placed to date?

2     A.   Yes.

3     Q.   Looking at Exhibit 6, it's Pay Application

4  No. 7, again, it's for retainage, correct?

5     A.   It's -- that one's for retainage for the haul

6  road, yes.

7     Q.   Okay.  And it shows that it's not complete.

8     A.   Correct.

9     Q.   But they're billing for retainage.

10    A.   Correct.

11    Q.   Is this -- this isn't the first time this has

12 happened where a contractor looks to get paid before the

13 contract's complete.

14         MS. OKON:  Objection; vague and ambiguous.

15 Calls for speculation.

16    Q.   (By Mr. Sakonchick) Have you -- in your

17 experience in the dozens that you've done for Luminant,

18 has Luminant ever paid retainage before the completion

19 of the contract?

20    A.   I don't recall that happening.

21    Q.   Okay.  But, certainly, the submission of Pay

22 Applications 5 and 6 looking for retainage was not an

23 indication that Ranger thought the job was complete?

24         MS. OKON:  Objection; calls for

25 speculation.

Page 40

1     Q.   (By Mr. Sakonchick) Did you believe that by

2  submitting these pay applications that Ranger thought

3  the ash fly pit and the haul road were complete?

4     A.   I can't speak to what Ranger thought.  The --

5  the project wasn't complete.

6          (Exhibit 4 marked.)

7     Q.   (By Mr. Sakonchick) Okay.  Let's go to Exhibit

8  No. 4.

9     A.   (Witness complies.)

10    Q.   Now, this communication is in August 27th,

11 2013.

12    A.   Yes.

13    Q.   So Ranger would have probably been complete

14 with the primary work, except for vegetation at this

15 point?

16    A.   Yes.

17    Q.   And there's some discussion between you and

18 Nathan Ziehr and BMP about the nature of the fertilizer

19 to be put in.

20    A.   Yes.

21    Q.   So BMP, at this point in time, is already on

22 board as the vegetation subcontractor for Ranger?

23    A.   I'd -- that's my understanding, yes.

24         Ranger was responsible for their

25 subcontractors --

Page 41

1    Q.   Correct.

2    A.   -- so I'm not sure who they were going to use.

3    Q.   Let's go to Exhibit No. 7.

4    A.   (Witness complies.)

5    Q.   And looking at the last page of that exhibit.

6         And there's some discussion there about

7    whether to do the vegetation in August; is that correct?

8    A.   Yes.

9    Q.   And did you agree with the estimation that it

10   was probably not a good idea to install the vegetation

11   at that point in time?

12   A.   Yes.  It was too hot for vegetation.

13   Q.   And in the page before that, you actually state

14   that.

15   A.   I assume I did, yes.

16   Q.   And you talk about the vegetation in the fall.

17   A.   Yeah.

18        MS. OKON:   Just for the record, I don't

19   want you assuming anything.  So if you need to take time

20   and read it, you are able to do that.

21        THE WITNESS:   Okay.

22   A.   Yes, I did.  And, yes, I recommend that they do

23   the vegetation in fall.

24   Q.   (By Mr. Sakonchick) Now, looking at -- let's go

25   back to Exhibit No. 3 real quickly.

Page 42

1    A.   (Witness complies.)  Which portion?

2    Q.   Exhibit No. 3, the first portion, and talk

3    about the schedule.

4    A.   What page is that?

5    Q.   Page 3.

6         MS. OKON:   What exhibit are we on?  The

7    contract?

8         MR. SAKONCHICK:   3, page 3.  It's Ranger

9    000180.

10   A.   I see it.

11   Q.   (By Mr. Sakonchick) First of all, the terms of

12   the agreement shows the contract is going to terminate

13   on September 22nd, 2013, correct?

14   A.   That's what it says, yes.

15   Q.   And it says the schedule for the work is

16   before -- between December 4th, 2012 and September 2nd

17   2013.

18   A.   That's what it says, yes.

19   Q.   And look at the next contract, and it contains

20   the same terms, which is the haul road.

21   A.   Yes, it does.

22   Q.   All right.  So we've looked at both contracts

23   for the ash fly pit and the haul road, and they both

24   have those same terms.

25   A.   Yes.

Page 43

1    Q.   All right.  When looking at Exhibit No. 7, when

2    you're discussing this with Nathan Ziehr of Ranger,

3    you're -- understand that it's going to go past

4    September 2nd, correct?

5    A.   Yes.

6    Q.   And you're fully in agreement with that?

7    A.   Yes.  It was not appropriate to establish the

8    vegetation at the time.

9    Q.   Now, looking again at Exhibit 7, who's Ben

10   Pelky?

11   A.   I have no idea.

12   Q.   Okay.  Then the first two pages of Exhibit 7 go

13   through -- from September 16 to October 1st, correct?

14   A.   Yes.

15   Q.   And you're not a party to any of those?

16   A.   No, I'm not.

17   Q.   Let's look at Exhibit 8.

18        (Exhibit 8 marked.)

19   A.   (Witness complies.)

20   Q.   (By Mr. Sakonchick) And have you seen any of

21   these email -- this email stream or a portion of it?

22   A.   I do.

23        These are among the documents that I

24   brought with me.

25   Q.   Okay.  And in October, it refers to some

Page 44

1    discussions with Gary and Chris at the AX Landfill site

2    itself, and that refers to the ash fly pit, correct?

3    A.   Yes.

4    Q.   And they're talking about getting out there the

5    next week or two.

6         MS. OKON:   Objection; vague and ambiguous.

7    Q.   (By Mr. Sakonchick) Looking at this October

8    9th, this second one, what does it say as far as the

9    first paragraph?

10        You can paraphrase.

11   A.   It says, we'll get erosion taken care of when

12   we meet -- or when we mat.  We'll tell you the dates

13   when we'll be there to work.

14   Q.   And they're talking about doing it in a couple

15   of weeks.

16   A.   Yes.

17   Q.   And so you'll understand it's already going to

18   go at least into mid October?

19   A.   Yes.

20   Q.   And there's nothing there to indicate that

21   Ranger is concerned about bankruptcy or that they're not

22   going to come out and do the work?

23   A.   We never had any discussions of that, no.

24   Q.   Matter of fact, from the time that -- in

25   August, when they completed the primary work, through

Page 45

1  June -- in August of 2013 through June 2014, did Ranger
2  ever say they were not going to come out and complete
3  the work?
4         MS. OKON:  Objection; compound and assumes
5  facts not in evidence.
6      Q.   (By Mr. Sakonchick) Did Ranger inform you at
7  any time between August 2013 and June 2014 that they
8  weren't going to come out and complete the work on the
9  contracts?
10     A.   No.
11     Q.   And the only work to be done on both contracts
12  was the revegetation --
13     A.   Yes.
14     Q.   -- or vegetation?
15     A.   Vegetation, yes.
16          Including the erosion-control fabric,
17  which is part of that pay item.
18     Q.   And at any time during that same period, did
19  Sandow ever say you're terminated?
20     A.   To Pastor, Behling & Wheeler?
21     Q.   To Ranger.
22     A.   Not that I'm aware of, no.
23     Q.   And, certainly, PBW never said you're
24  terminated?
25     A.   No.

Page 46

1      Q.   So the work that was performed in June and July
2  of 2014 was performed under the terms of the original
3  contracts that are attached as Exhibit 3?
4         MS. OKON:  Objection; calls for
5  speculation and calls for a legal conclusion.
6      Q.   (By Mr. Sakonchick) You understand that work
7  was performed on the vegetation?
8      A.   Yes.
9      Q.   It was performed in June and July of 2014.
10     A.   Yes.
11     Q.   And it was done under the terms of the
12  contracts attached as Exhibit 3.
13         MS. OKON:  Objection; calls for a legal
14  conclusion.
15     Q.   (By Mr. Sakonchick) You can answer.
16         MS. OKON:  I also object and calls for
17  speculation.
18     Q.   (By Mr. Sakonchick) You can answer.
19     A.   I focused on the technical requirements of the
20  contract.  There was -- the work was done in accordance
21  with the technical specifications.  I have no input on
22  the contractual requirement.
23     Q.   We'll get to that.
24          Looking at Exhibit 9.
25          (Exhibit 9 marked.)

Page 47

1      A.   (Witness complies.)
2      Q.   (By Mr. Sakonchick) Looks like this is a
3  communication first between Jacob Gonzalez on behalf of
4  Luminant Sandow and you wanting to know when the
5  vegetation's going in.
6      A.   Yes.
7      Q.   And then a communication from you to Mr. Ziehr
8  stating where are we going with this.
9      A.   Yes.
10     Q.   And he says, first week of December.
11     A.   Yes.
12     Q.   And, again, no indication that they were never
13  going to come out there -- Ranger was never going to
14  come out there and not perform vegetation?
15     A.   No.
16     Q.   Looking at Exhibit No. 11.
17          (Exhibit 11 marked.)
18     A.   (Witness complies.)
19     Q.   (By Mr. Sakonchick) This is in January, early
20  January 2014.
21          Apparently, the revegetation didn't taken
22  place in December, correct?
23     A.   Correct.
24     Q.   Do you know why it didn't take place in
25  December?

Page 48

1      A.   I do not know.
2      Q.   Okay.  A communication between you and
3  Mr. Ziehr about asking when the vegetation's going in.
4      A.   Correct.
5      Q.   And there's a comment there that he wants it
6  completed as soon as he can.  He won't release any more
7  retainage until it is done.
8      A.   Yes.
9      Q.   And the retainage he's referring to is the
10  retainage that we've looked at in Exhibits 5 and 6.
11     A.   I believe so, yes.
12     Q.   Okay.  And it's clear here -- or what was made
13  clear to you by Jacob Gonzalez was that Luminant Sandow
14  would not pay the retainage until the vegetation work
15  was complete.
16     A.   Until that project was completed, yes.
17     Q.   And do you know if there was any other
18  contracts on the project other than the two we looked at
19  as Exhibit 3?
20         MS. OKON:  Objection; calls for
21  speculation.
22     Q.   (By Mr. Sakonchick) Go ahead and answer.
23     A.   I'm not aware of any other contracts.
24     Q.   And you were the one charged with the
25  administrating it?

## Page 49

1    MS. OKON:  Objection; vague and ambiguous.
2    Q.   (By Mr. Sakonchick) Administrating the
3    contracts as far as making sure that the technical
4    specifications completed under the terms of that
5    contract?
6    **A.   The technical specification and engineering**
7    **work, yes.**
8    Q.   And all these communications that we're talking
9    about now dealt with the technical specifications under
10   the contracts in Exhibit 3, both of them for the ash fly
11   pit and the haul road?
12   MS. OKON:  Objection; vague and ambiguous
13   and compound.
14   Q.   (By Mr. Sakonchick) Let me break it down.
15        We have been discussing the revegetation,
16   correct?
17   **A.   Yes.**
18   Q.   And the revegetation has some specific elements
19   of it under the scope of work and technical
20   specifications dated September 17, 2012, which we've
21   marked as Exhibit 44.
22   **A.   Yes.**
23   Q.   And you make sure that all the work performed,
24   that the project is done in accordance with that
25   Exhibit 44.

## Page 50

1    **A.   Yes.**
2    Q.   And the erosion -- or the vegetative work that
3    you were going to be supervising was also under that
4    Exhibit 44.
5    **A.   The technical requirements were, yes.**
6    Q.   And we've already established that Exhibit 44
7    was part and parcel of both the contracts that were in
8    Exhibit 3.
9    **A.   Yes.**
10   Q.   Now, let's look at Exhibit No. 12.
11        (Exhibit 12 marked.)
12   **A.   (Witness complies.)**
13   Q.   (By Mr. Sakonchick) Now, Exhibit No. 12 talks
14   about mine certification and recertification.
15   **A.   Yes.**
16   Q.   What is that?
17   **A.   The -- the project was completed in an area**
18   **that to be to -- in order to access the project, you had**
19   **to go through an area regulated by the Mine Safety and**
20   **Health Administration, MSHA, and there were certain --**
21   **there were certain training requirements to access those**
22   **areas.**
23   Q.   And how long is that training?
24   **A.   There are various levels of training for that,**
25   **but, typically, 40 hours.  There could -- there are also**

## Page 51

1    **some clarifications that are less than that.**
2    Q.   All right.  And does that have to be renewed
3    annually?
4    **A.   Yes.**
5    Q.   Did Luminant Sandow also have their own
6    requirements for training?
7    **A.   The Sandow plant, yes.  They -- they had**
8    **site-specific training requirements for any personnel**
9    **who were going to access their facility.**
10   Q.   And this would have included work on the ash
11   fly pit or the haul road?
12   MS. OKON:  Objection; calls for
13   speculation.
14   Q.   (By Mr. Sakonchick) Did Sandow require anybody
15   coming out to work on the ash fly pit or the haul road
16   be certified in accordance with their training schedule?
17   **A.   Luminant did, yes.**
18   Q.   And Luminant did for the Sandow project?
19   **A.   Yes.**
20   Q.   And how long was that training?
21   **A.   That is a -- is less than a day.  It's on the**
22   **order of several hours.**
23   Q.   Okay.  Now, here you see BMP -- Chris Collins
24   of BMP Specialists is talking to Nathan Ziehr about
25   having to get his guys mine certified and recertified.

## Page 52

1    **A.   Yes.**
2    Q.   That would have been a requirement for him --
3    for BMP Specialists to actually set foot on the site in
4    order to do the vegetation?
5    **A.   That would have been a Luminant requirement,**
6    **yes.**
7    Q.   Yeah.
8        And this would have required anywhere
9    upwards of a week's worth of training plus Luminant's
10   own training?
11   **A.   Yes.**
12   Q.   This would have been a week's worth of MSHA
13   training.
14        Mine Safety --
15   **A.   Health Administration.**
16   Q.   And if we refer to MSHA today, that's what we'd
17   be referring to?
18   **A.   Yes.**
19   Q.   That training, and it also talks about the
20   Luminant training.
21   **A.   Yes.**
22   Q.   And that takes time.
23        MS. OKON:  Objection.
24   Q.   (By Mr. Sakonchick) 40 hours takes time.
25   **A.   It does.**

Page 53

1    And I -- I have to clarify -- I sometimes
2  get MSHA confused with OSHA training.  MSHA may be 24
3  hours as opposed to 40 hours, but it's still multiple
4  days of training.
5    Q.    Okay.  And you still see there's a discussion
6  about having to get his guys trained?
7    A.    I see that, yes.
8    Q.    And that would have caused some sort of delay
9  in getting the project started, correct?
10        MS. OKON:  Objection; vague and ambiguous.
11  Compound.  Calls for speculation.
12    Q.    (By Mr. Sakonchick) Yeah, if his people were
13  not trained, it would cost some time for him to bring
14  his people out there until he got them trained?
15    A.    To satisfy the Luminant requirements, yes.
16    Q.    Okay.  And this discussion's going on early
17  January 2014.
18    A.    Yes.
19        I was not copied on this, but that's what
20  the date of the email is.
21    Q.    Did you understand and sometime in January 2014
22  that one of the reasons the vegetation wasn't going in
23  was certification of some of the employees?
24    A.    I don't recall.  There may be an email to that
25  effect, but this was -- I never saw this email that I

Page 54

1  recall.
2        (Exhibit 13 marked.)
3    Q.    (By Mr. Sakonchick) And looking at Exhibit
4  No. 13, the second page is your email asking about the
5  schedule for the vegetation.
6    A.    Yes.
7    Q.    And as of this time, the vegetation was not
8  performed either on the ash fly pit or the haul road?
9    A.    Yes -- correct.
10    Q.    And the next one talks about January 20th,
11  about them coming in.  And they're refreshing the
12  certification, and they're hoping to mobilize the
13  following week.
14        MS. OKON:  Objection; calls for
15  speculation.
16    Q.    (By Mr. Sakonchick) Go ahead and paraphrase.
17    A.    It -- it indicates --
18        THE WITNESS:  Go ahead.  Sorry.
19        MS. OKON:  Are you asking him to
20  paraphrase emails written by other people?
21    Q.    (By Mr. Sakonchick) Do you understand that it
22  appears there from the email that certification is still
23  the reason for delay and their starting work?
24        MS. OKON:  I'm going to object.  Calls for
25  speculation.

Page 55

1    Q.    (By Mr. Sakonchick) Does the email indicate to
2  you that certification is causing -- or that the people
3  have -- that BMP's people have to get recertified?
4    A.    Recognizing that I didn't see this email,
5  that's what it appears to read, yes.
6        (Exhibit 14 marked.)
7    Q.    (By Mr. Sakonchick) And looking at Exhibit 14,
8  it looks like there in January 20th, he's telling you
9  maybe another two weeks.
10    A.    Yes.
11    Q.    And this is between you and Nathan Ziehr.
12    A.    Yes.
13        (Exhibit 15 marked.)
14    Q.    (By Mr. Sakonchick) Exhibit 15, they're talking
15  about -- again, talking about the dates to start it.
16        And it's -- we're talking -- the email's
17  dated January 27th, but they have no exact date for you
18  yet.
19    A.    Correct.
20        (Exhibit 16 marked.)
21    Q.    (By Mr. Sakonchick) All right.  What is
22  Exhibit 16?
23    A.    Exhibit 16 is an email from February 10th
24  between Nathan Ziehr and myself.
25    Q.    All right.  And there's some discussion about

Page 56

1  payment.
2        MS. OKON:  Objection; vague and ambiguous.
3    Q.    (By Mr. Sakonchick) Is there some discussion
4  about payment in the email?
5        MS. OKON:  Objection; vague and ambiguous.
6    A.    Yes.
7    Q.    (By Mr. Sakonchick) What did you understand
8  that to be?
9    A.    This was Nathan telling me about his attempts
10  to achieve -- obtain payment from Luminant.
11    Q.    And what payment is he trying to obtain?  Was
12  there any payment due other than the retainage?
13    A.    Payment for the vegetation work that had still
14  yet to be completed, yes.
15    Q.    But there's nothing in that email that says
16  he's not gonna do -- he's not gonna complete the
17  contract work?
18    A.    Huh-huh.
19        MS. OKON:  Objection; calls for
20  speculation.
21    Q.    (By Mr. Sakonchick) There's nothing in that
22  email that says he's not going to complete the contract?
23    A.    There's not.
24        (Exhibit 17 marked.)
25    Q.    (By Mr. Sakonchick) Now, let's go to

Patrick Behling

Page 57

1  Exhibit 17.

2  And, again, an email from Jake to you

3  about the seeding?

4  **A.   17 is actually an email from Jake to Nathan**

5  **that I'm copied on, yes.**

6  Q.   Okay.  And at this point in time, is there any

7  indication from Luminant or Sandow that they're gonna

8  terminate Ranger from the work?

9  **A.   I'm not aware of any.**

10  Q.   And is there any indication that you had from

11  Ranger that Ranger wasn't going to complete the work?

12  MS. OKON:  Objection; vague and ambiguous.

13  Q.   (By Mr. Sakonchick) Is there any indication in

14  that email that Ranger's not going to complete the work?

15  **A.   There's no indication, no.**

16  Q.   But there is some discussion about maybe

17  accepting it as is, correct?

18  **A.   From Ranger's part, yes.**

19  Q.   And going back to Exhibit 46, if this is what

20  it looked like in October, there might be more

21  vegetation on it by March.

22  MS. OKON:  Objection; calls for

23  speculation.

24  **A.   (Witness looking through documents.)  It is**

25  **entirely possible, but, again, there's no**

Page 58

1  **erosion-control matter.**

2  Q.   (By Mr. Sakonchick) But you were out there in

3  March, correct?

4  **A.   I was out there in March?**

5  Q.   Were you out on the site in March?

6  **A.   That, I don't recall, in all honesty.  It's**

7  **possible, but I don't recall.**

8  Q.   Were you out there in February?

9  **A.   No.  I don't believe so.**

10  Q.   Were you out there in April?

11  **A.   No.**

12  Q.   Was Mr. Sutherland out there in February,

13  March, or April?

14  **A.   No.  There was no work going on.**

15  Q.   Was anybody from PBR -- PBW there?

16  **A.   No.  Mr. Berndt was not there either.**

17  **(Exhibit 18 marked.)**

18  Q.   (By Mr. Sakonchick) Let's look at Exhibit 18.

19  Now, refers to you first email, and, of

20  course, you got to read this in reverse.

21  And it's from Jake Gonzalez of Luminant

22  Sandow to you asking if the seeding work has been done

23  yet, correct?

24  **A.   That's correct.**

25  Q.   And what did you -- then you sent an email to

Page 59

1  Nathan Ziehr.

2  **A.   Oh, okay.  I went out to Sandow, AX last week.**

3  Q.   So you were out in Sandow sometime in early

4  March 2014.

5  **A.   But -- based on this email, yes.**

6  Q.   Do you recall the state of the vegetation at

7  that time?

8  **A.   I don't recall it.  But based on the statement**

9  **in the email, there were areas that needed to be**

10  **addressed.**

11  Q.   And what did you mean by areas that needed to

12  be addressed?

13  **A.   Adequate vegetation was not on the -- these --**

14  **these areas, and there were no erosion-control fabric.**

15  Q.   Okay.  And he tells you that he is just in --

16  Nathan Ziehr responds that he's got his people again

17  scheduled to come in and will provide you dates.

18  **A.   That's correct.**

19  MS. OKON:  Objection; vague and ambiguous.

20  Misstates the statements in the email.

21  Q.   (By Mr. Sakonchick) All right.  Email states

22  what it states, correct?

23  **A.   Yes.**

24  Q.   Okay.  And he says -- Nathan says, I have

25  just -- I have just engaged our seeding matting sub to

Page 60

1  get mobilized and get me a schedule.

2  **A.   That's what the email says, yes.**

3  Q.   When I hit those gates, you will have them.

4  **A.   Yes.**

5  Q.   Looking at Exhibit 19.

6  Have you ever seen any of this -- these

7  emails before -- well, you -- the first email would have

8  been yours, actually, on page 2, correct?

9  **A.   Yes.**

10  **That was my email to -- to Nathan Ziehr**

11  **discussing the -- the start date for the vegetation.**

12  **But I had not seen the others.**

13  Q.   All right.  And there's no response to you from

14  them?

15  **A.   Not here, no.  Not showing.**

16  Q.   Did anybody from Ranger ever tell you that they

17  weren't gonna come out and complete the contract because

18  of the -- maybe Luminant Sandow would be filing

19  bankruptcy?

20  **A.   Did they tell me they weren't because of the**

21  **bankruptcy filing, no.**

22  **(Exhibit 20 marked.)**

23  Q.   (By Mr. Sakonchick) Look at Exhibit 20.

24  Now, it looks like you're copied on that

25  stream of emails.

Page 61

1    A.    Up until email -- the email from Nathan
2  Ziehr -- oh, I'm copied on that, as well.  Oh, yes.  I'm
3  sorry.  I'm copied on all of them.
4    Q.    And, actually, you're talking about scheduling
5  a meeting to go out there and talk about the scope of
6  the work --
7    A.    Yes.
8    Q.    -- on the revegetation?
9    A.    Yes.
10    Q.    So on March 20th, 2014, Ranger's still telling
11  you that they're gonna complete the work.
12    A.    Yes.
13    Q.    And by that, they mean the vegetation?
14    A.    Yes.
15    Q.    And that's the vegetation called for under the
16  contract for the fly pit and the haul road?
17    A.    The technical specifications, yes.
18    Q.    And they fall under the terms of the contracts?
19    A.    Yes.
20          MS. OKON:  Objection; vague and ambiguous.
21    Q.    (By Mr. Sakonchick) They're -- the technical
22  specifications we're referring to, we previously marked
23  as Exhibit 44, correct?
24    A.    Yes.
25    Q.    And they are attached to and part of the

Page 62

1  contracts that are Exhibit 3?
2    A.    That is my understanding, yes.
3    Q.    And they actually referred to -- we pointed out
4  to you where it was actually shown as an attachment.
5    A.    As part of the contract, yes.
6          (Exhibit 21 marked.)
7    Q.    (By Mr. Sakonchick) Let's go to Exhibit 21.
8          All right.  And tell me what Exhibit 21
9  is.
10    A.    It's a -- a series of emails from myself to
11  Nathan Ziehr at Ranger discussing the vegetation
12  schedule.  It appears that Matt Sutherland, on behalf of
13  PBW, met with Ranger representatives and the vegetation
14  subcontractor to identify what needed to be done.
15    Q.    Now, what -- what do you mean by the second
16  paragraph there?
17    A.    The paragraph that begins Luminant is upset?
18    Q.    Yes.
19    A.    Luminant -- Jacob Gonzalez had indicated to me
20  that -- recognizing that we've been discussing getting
21  the vegetation done since the previous fall, that it was
22  taking so long to complete.
23    Q.    All right.  What is the -- you indicate there
24  they have indicated they will not pay anything for
25  vegetating the slopes other than this 7,500-acre bid

Page 63

1  price.
2    A.    Correct.
3    Q.    Do you see that?
4          And that's the bid price that was in the
5  contract that's Exhibit 3 for the ash fly pit and --
6    A.    That unit price, yes.
7    Q.    Yeah.
8          But it's referring back to the contracts
9  that are in Exhibit 3.
10    A.    Yes.
11    Q.    And that's the ash fly pit contract and the
12  haul road contract.
13    A.    Yes.
14    Q.    And there -- indication there that even though
15  it's March 2014, as far as Mr. Gonzalez is concerned,
16  they're still operating under the terms of the contract
17  because he wants that bid price.
18          MS. OKON:  Objection; calls for
19  speculation.
20    A.    I don't know what Mr. Gonzalez was thinking,
21  but that is the same bid price from the original
22  contract.
23    Q.    (By Mr. Sakonchick) Well, it talks about
24  Luminant is upset, and it says they.
25          By referring to they and Luminant, are you

Page 64

1  referring to Jacob Gonzalez?
2    A.    As my Luminant representative, yes.
3    Q.    Okay.  And he -- Jacob Gonzalez was telling you
4  they weren't going to pay anything more than the
5  original bid price.
6    A.    Yes.
7    Q.    And that's the bid price in Exhibit 3, the
8  contracts that we've just been referring to?
9    A.    Yes.
10    Q.    And, basically, what they're saying is, if you
11  have to get a dozer out there to do the working now,
12  it's not our problem; you're going to have to absorb
13  that cost.
14    A.    The bid price would not be changed, so, yes.
15    Q.    Now, why was a -- if the vegetation had been
16  done in the fall, would a bulldozer have been required?
17    A.    Probably not.  I can't recall the exact
18  conditions of the dikes then.  There may have been some
19  minor grading needed to be done on the dikes.
20    Q.    What was the purpose of bringing out the dozer?
21    A.    To grade the dikes and fix the areas of erosion
22  that had occurred in the area.
23    Q.    Also, it was required work to just scrape off
24  the volunteer vegetation, correct?
25    A.    So that you could access the -- the area and

Page 65

1  put down the erosion-control mat and fix the eroded
2  areas.
3      Q.   And had the volunteering vegetation not grown
4  up in the interim, between August and March, they would
5  not have required a dozer to scrape it off?
6          MS. OKON:  Objection; compound.  Vague and
7  ambiguous.
8      Q.   (By Mr. Sakonchick) The dozer was used to
9  scrape off existing vegetation in order to put the mat
10  and seed down, correct?
11     A.   That, and then, also, to grade the areas of
12  erosion of the soils.
13     Q.   But the dozer was used for the purpose --
14         MS. OKON:  And --
15     Q.   (By Mr. Sakonchick) One of the purpose was
16  scraping.
17         MS. OKON:  Steve, for the record, I feel
18  like you're cutting him off at the end of his answers
19  when he's talking about the erosion control, and I'd
20  like for you to let him finish those answers.
21     Q.   (By Mr. Sakonchick) In addition to doing some
22  of the corrective excavation or grading, they needed to
23  go out there and scrape off the existing vegetation to
24  put the mat and grass down.
25     A.   Yes.

Page 66

1      Q.   And that was part of the revegetation that's
2  required by the contract specification, Exhibit 44.
3      A.   Yes.
4      Q.   And it appears you had some discussion with
5  Jacob Gonzalez about having someone else do the work.
6      A.   Jacob had indicated that they were -- they
7  were, for want of a better term, losing patience; they
8  wanted the job to be finished.
9      Q.   Okay.
10     A.   I have no idea if Luminant had spoken to
11  anybody.  But . . .
12     Q.   But he's talking about having -- Mr. Gonzalez
13  would have told you that there may be some consideration
14  of hiring somebody else and then back charging Ranger.
15     A.   Based on this email, yes.
16     Q.   What does back charging mean?
17     A.   Back charging is a term where a client hires a
18  third party to do work that they're under contract with
19  for another entity to do, and then billing that other
20  entity for that work.
21     Q.   All right.  So by back charging, Mr. Gonzalez
22  was referring to the original two contracts as
23  Exhibit 3.  He'd have to back charge under those
24  contracts.
25         MS. OKON:  Objection; compound.  Calls for

Page 67

1  speculation.
2      Q.   (By Mr. Sakonchick) Do you know what contracts
3  he would have been back charging?
4      A.   The only contracts appropriate or that my
5  understanding was for these were those -- are the -- is
6  those contracts from 2012.  I don't know what the back
7  charging provisions are in there.
8      Q.   Okay.  Let's look at them.  Let's look at
9  Exhibit 3.
10         Let's look at Exhibit 3, the first
11  contract for the ash fly -- which is the first one, the
12  haul road or the ash fly pit -- for the haul road, and
13  look at Ranger 197, which is page 20.
14     A.   Yes, sir.
15     Q.   And there's a back charge provision there,
16  correct?
17     A.   Yes.
18     Q.   And would you know of any other back charge
19  provision that Mr. Gonzalez would have been referring
20  to?
21         MS. OKON:  Objection; calls for
22  speculation.
23     A.   I -- I would be unaware that that --
24     Q.   (By Mr. Sakonchick) Okay.  But it was your
25  perception in Mr. Gonzalez's talking about back

Page 68

1  charging, he was talking about back charging under this
2  contract?
3      A.   That was my perception, yes.
4      Q.   You know of no other contract he would have
5  been back charging under?
6      A.   I'm not aware of any.
7      Q.   Except for the ash fly pit?
8      A.   For the work, yes.
9      Q.   And looking at the ash fly pit contract, again,
10  looking at page 20, which is Ranger 63, there's same or
11  similar provision as to back charging.
12     A.   It appears to be the same, yes.
13     Q.   Looking at the first contract, page 19 -- we
14  were just on page 20, so now we're looking at page 19.
15         There's some description of termination,
16  contract termination and termination for default.
17     A.   I see those terms, yes.
18     Q.   To your knowledge, had Luminant Sandow
19  terminated the contract -- this contract we're looking
20  at for the haul road?
21     A.   I have no knowledge that that happened.
22     Q.   That -- well, let me -- I'll rephrase because I
23  want to get a date in there.
24         Is there any -- have you gotten any
25  indication or do you have any acknowledge that the

Page 69

1  contract, which is for the haul road attached to Exhibit
2  3, was terminated before the completion of the
3  vegetation in June and July 2014?
4  **A.   I -- I never saw any indication that it was**
5  **terminated.**
6  Q.   And that same question as to the contract for
7  the ash fly pit.  And this would be page 19 of that
8  contract.
9  **A.   Again, I never received any indication that the**
10 **contract was terminated by Luminant.**
11 Q.   So -- and that goes for both contracts, both
12 the ash fly pit and the haul road?
13 **A.   Yes.**
14            **(Brief pause as Mr. Sakonchick looks**
15            **through documents.)**
16            **(Exhibit 22 marked.)**
17            MR. SAKONCHICK:  Can we substitute for
18 Exhibit 22 the color version?  (Holding up document.)
19            MS. OKON:  What was 20- -- yeah, I'm sure
20 we can.  Let's see.  Yeah.  Let me see.  I -- I'll
21 confirm it's same.
22            (Mr. Sakonchick handing document to
23            Ms. Okon.)
24            MS. OKON:  And mine is slightly different.
25 Wait 22?  22, I have -- mine starts with a Chris Collins

Page 70

1  email.
2            MR. SAKONCHICK:  That's 21.  Where'd I
3  just see that?  Oh, well, this is part of . . .
4            MS. OKON:  Yeah.  So we might just have to
5  mark it as a new one because mine has more on it than
6  yours has.
7            MR. SAKONCHICK:  Uh-huh.
8            MS. OKON:  I think we have been going a
9  little more than an hour.  So whenever you get to a
10 place where you can --
11           MR. SAKONCHICK:  No.  This is good.  Let's
12 take a break.
13           THE VIDEOGRAPHER:  Off the record at 2:21
14 p.m.
15           (Recess from 2:21 p.m. to 2:27 p.m.)
16           THE VIDEOGRAPHER:  Back on the record.
17 This marks the beginning of Tape No. 2.  Time is 2:27.
18 Q.   (By Mr. Sakonchick) Mr. Behling, before we took
19 a break, I substituted a page in Exhibit 22, the page
20 being the actual drawing, which the original was in
21 black and white, and I had a color one.
22           And can you tell me what that picture is?
23 **A.   That designates areas that we instructed Ranger**
24 **were necessary to have the erosion-control matting and**
25 **vegetation placed at the AX Landfill and the haul road.**

Page 71

1  Q.   All right.  And the only -- other than the
2  transmission of that, there's just some discussion in
3  Exhibit 22 about having BMP contact Mr. Sutherland
4  directly.
5            MS. OKON:  Objection; vague and ambiguous.
6  **A.   That's what the email indicates, yes.**
7  Q.   (By Mr. Sakonchick) And looking at the exhibit,
8  the picture, there's a red area which shows sloped area
9  to be vegetated and matted, 7.2 acres.
10 **A.   Yes.**
11 Q.   The sloped areas.
12           Would that be the dikes?
13 **A.   The permanent diked area, yes, around the AX**
14 **cell, and then also the portions of the sloped area**
15 **along the haul road.**
16 Q.   Okay.  Were the portions along the haul road
17 built up, or were they just a natural slope?
18 **A.   None of them were natural.  They would have**
19 **been cut or built up.  And I believe in these areas**
20 **along the haul road, they were cut.**
21 Q.   So it would have been similar to the dike,
22 except not as done according to technical specification
23 as the dike?
24 **A.   Well, it was still -- well, it wasn't**
25 **constructed in accordance with the -- as the same as the**

Page 72

1  **dikes; they would have been cut.  But they were both**
2  **required to have the matting and the vegetation.**
3  Q.   Okay.  And looking at total drainage area to be
4  vegetated and matted, 2 acres.
5  **A.   That's the the -- the green portion, those are**
6  **drainage features because specifications require matting**
7  **for drainage features and -- and then sloped area, as**
8  **well.**
9            **(Exhibit 23 marked.)**
10 Q.   (By Mr. Sakonchick) All right.  Let's go to
11 Exhibit 23.
12           Now Exhibit 23 is an email from Mr. Ziehr
13 to Jacob Gonzales and you, correct?
14 **A.   The -- the initial email is, yes.**
15 Q.   Okay.  And the second email is just
16 Mr. Gonzalez saying thanks Nathan?
17 **A.   Yes.**
18 Q.   And in -- in that email, he's talking about
19 brushing off the slope of the dozer.
20 **A.   Yes.**
21 Q.   And by brushing off the slope of the dozer,
22 he's referring to scraping off the existing vegetation?
23 **A.   And fixing the erosion damage, yes.**
24 Q.   And why don't you go ahead and read the
25 second-to-the-last paragraph where, I apologize.

Page 73

1    A.   I apologize for all the delay with this work
2   item and how long it has taken us to get to this point,
3   but I fully intend to take this project to its ultimate
4   completion.
5    Q.   And by project, he's talking about ash fly pit
6   and the haul road?
7    A.   That's my understanding, yes.
8    Q.   And the vegetation as to those two items?
9    A.   The outstanding items needed to be completed,
10  yes.
11   Q.   So he's certainly not saying he's not going to
12  do the work, he's committing to do it?
13   A.   The words say is going to -- fully intend to
14  take this project to its ultimate completion.
15   Q.   And Mr. Ziehr represents Ranger?
16   A.   Yes.
17           (Exhibit 24 marked.)
18   Q.   (By Mr. Sakonchick) All right.  Exhibit 24.
19           Now, Exhibit 23 refers to the dozer, and
20  Exhibit 24 refers to a specific D6 dozer, correct?
21   A.   It says a D6 dozer, yes.
22   Q.   And trying to get one scheduled in.
23   A.   Yes.
24   Q.   What's a D6 dozer?
25   A.   It's a -- D6 refers to the size of the -- of

Page 74

1   the bulldozer.  It's a track-driven bulldozer.
2    Q.   How large is it, comparatively?  I mean, if
3   it's a D6, are there D5s and D7s?
4    A.   There are -- there are D4s, which are smaller;
5   and they're larger than six.  It's a -- it's not a small
6   piece of equipment.
7    Q.   It's a good-sized piece of equipment?
8    A.   Yes.
9    Q.   So they're only talking about getting one
10  scheduled here on April 2nd, 2014?
11   A.   Based on this email, yes.
12           (Exhibit 25 marked.)
13   Q.   (By Mr. Sakonchick) And Exhibit 25 reflects
14  that they've gotten the machine they were looking for.
15          MS. OKON:  Objection; vague and ambiguous.
16   A.   By reading the email, yes.
17   Q.   (By Mr. Sakonchick) Now, looking at the email
18  to you from Nathan Ziehr at the bottom on April 7th.
19  And he's -- he's talking about Gary.
20           Now, Gary works for Ranger, correct?
21   A.   Gary was the superintendent for Ranger at the
22  site.
23   Q.   Okay.
24   A.   I don't recall his last name, but I believe
25  that's who it is.

Page 75

1    Q.   So, effectively, Ranger has the equipment, and
2   he needs some time for its operators to get recertified.
3           MS. OKON:  Objection; calls for
4   speculation.
5    Q.   (By Mr. Sakonchick) Well, looking at the email,
6   what does it say?
7    A.   That's what the email says.  The operators take
8   a MSHA refresher course.
9    Q.   All right.  So that caused somewhat of delay,
10  correct?
11          MS. OKON:  Objection; calls for a legal
12  conclusion.
13   Q.   (By Mr. Sakonchick) Does the --
14          MS. OKON:  Calls for speculation.
15   Q.   (By Mr. Sakonchick) Does the refresher course
16  take time?
17   A.   Yes.
18   Q.   About how many hours?
19   A.   It's an eight-hour refresher.
20   Q.   All right.  So he's telling you on April 7th
21  his people have to have the MSHA, M-S-H-A, refresher
22  course.
23   A.   Yes.  Via the email.
24   Q.   And that caused -- he telling you that's going
25  to take him a few days.

Page 76

1    A.   He says two weeks.
2           (Exhibit 26 marked.)
3    Q.   (By Mr. Sakonchick) All right.  Now
4   Exhibit 26 --
5    A.   (Witness complies.)
6    Q.   -- indicates they finally got the machine and
7   they're ready to go.
8    A.   Yes.
9    Q.   And he's starting Monday the following week.
10   A.   That's what the email says.
11   Q.   So Monday, April 28th -- let me see.  We're
12  talking about starting about May 5th.
13   A.   I don't have my calendar, but, yes,
14  approximately.
15   Q.   And he's tell you he's going to be out there
16  May 5th, 2014.
17   A.   Monday next week, yes.
18   Q.   And do you know when the bankruptcy was filed
19  for Luminant companies?
20   A.   I don't recall, to be honest.
21   Q.   If I told you April 29th, 2014, would that
22  refresh your recollection?
23   A.   April 2014 sounds right, yes.
24   Q.   Well, let's assume that April 29th is the
25  correct day.

## Page 77

1    So this email would have been sent the day
2  before the bankruptcy filing.
3    A.   If that's the correct date, yes.
4    Q.   Now, the email on May 7th, which is Exhibit 27,
5  now we're talking about a period in time after the
6  bankruptcy was filed.
7    A.   Assuming April 29th is the date, yes.
8    Q.   Okay.  And you said you recall that it was
9  sometime in April.
10   A.   I do recall that, yes.
11   Q.   So May 2014 would have been after the -- after
12 the bankruptcy filing.
13   A.   Yes.
14   Q.   And they're talking about now it's
15 post-petition, we need some sort of assurance we're
16 gonna get paid.
17   A.   That was the -- the -- the information that --
18 that Nathan communicated to me -- or to Matt Sutherland.
19 Excuse me.
20        (Exhibit 28 marked.)
21   Q.   (By Mr. Sakonchick) Now, let's look at
22 Exhibit 28.
23        Now, Mr. Watkins or Nathan -- yeah,
24 Mr. Watkins sends Nathan Ziehr a news release about the
25 bankruptcy filing.

## Page 78

1    A.   That's what it says, yes.
2    Q.   Did you receive a copy of that?
3    A.   I -- not via this email.  But as a creditor to
4  Luminant, I did, yes.
5    Q.   All right.  What jobs were you working on for
6  Luminant at time of the bankruptcy filing?
7    A.   Numerous jobs.  We -- we work for Luminant
8  mining.  We worked for the Luminant power plants in
9  addition to Sandow on environmental-related work.  I.
10       Don't know specific jobs, but it was
11 probably 10, a dozen jobs at the time.
12   Q.   All right.  Did your firm file mechanic's liens
13 on any of those jobs?
14   A.   No, we did not.
15   Q.   Did you ever determine whether or not you could
16 have filed liens on those jobs?
17   A.   We did not.  We con- -- we had -- we consulted
18 an attorney regarding the bankruptcy.  But, I can't
19 recall if we ever asked him that particular question,
20 no.
21       MS. OKON:  And I -- you know, your counsel
22 probably doesn't want you talking about specifics of
23 your conversation.
24   A.   I'm sure.  Right.
25   Q.   (By Mr. Sakonchick) But it's fair to say that

## Page 79

1  your firm, PBW, did not file a lien to perfect its
2  interest in --
3    A.   We did not file a lien.
4    Q.   And about how much money was PBW owed at the
5  date of filing?
6    A.   70,000, along those lines.
7    Q.   All right.  So PBW filed a lien for 70,000
8  dollars?
9        MS. OKON:  Objection; characterizes his
10 testimony.
11   Q.   (By Mr. Sakonchick) Did PBW file a lien?
12   A.   We've filed a claim --
13   Q.   A claim?
14   A.   -- not a lien.
15   Q.   All right.  My misuse in terms.
16       PB- -- PBW filed a claim in the bankruptcy
17 proceeding?
18   A.   Yes.
19   Q.   You recall that it would have been about
20 70,000?
21   A.   I think so.  And if I'm wrong on that, I'm sure
22 it's a matter of record.
23   Q.   All right.  Have you had discussions internally
24 about how PBW was being treated under the bankruptcy
25 plan?

## Page 80

1    A.   Did we like it?  No.
2    Q.   No.
3        Did you have discussions about how you
4  were being treated?
5    A.   As part of the strategy of -- of project --
6  projecting if we were going to get any of the funds in,
7  sure.
8    Q.   Okay.  Was it your concern at all in the spring
9  of 2014 about sending your people out on a project they
10 might not get paid on?
11   A.   Were we concerned, sure.  We worked for
12 Luminant for more than 20 years, so we didn't stop
13 working.
14   Q.   Okay.  Did you have discussions internally
15 about filing for bankruptcy and -- about Luminant filing
16 for bankruptcy and there being some -- let me ask it
17 this way:  Before the actual bankruptcy filing, did your
18 firm discuss, other than with an attorney, the prospect
19 of Luminant companies filing for bankruptcy?
20   A.   Based on information in the public, yes, news
21 articles, things like that.
22   Q.   When did that -- when did those discussions
23 start?
24   A.   The months prior to the actual filing.
25   Q.   So with the months that preceded later before

## Page 81

1  the bankruptcy filing, this was something sort of

2  hanging over PBW's head?

3           MS. OKON:  Objection; vague and ambiguous.

4      Q.   (By Mr. Sakonchick) Was it something of a

5  concern to PBW?

6      **A.   Luminant is one of our largest clients, yes.**

7      Q.   And do you know how you're going to be treated

8  in the bankruptcy?

9      **A.   We have -- yes.  We -- we -- I don't recall the**

10  **exact terminology, but we have -- we settled with --**

11  **with Luminant, our claim --**

12     Q.   And from --

13     **A.   -- as one of the many unsecured creditors.**

14     Q.   For how much?

15     **A.   13,000 dollars.**

16     Q.   And was that paid as unsecured or secured

17  claim?

18     **A.   That, I don't know, to be honest.  Because**

19  **it -- we -- we had to renegotiate our contract with**

20  **Luminant as part of the that.  So if that makes it an**

21  **assumed contract, I don't know.**

22     Q.   To your knowledge, PBW was not treated as a

23  secured creditor?

24     **A.   Absolutely not.**

25     Q.   And your unsecured claim was paid 13,000 of the

## Page 82

1  70,000?

2      **A.   Again, that 13,000 I know; the 70,000 would be**

3  **a matter of record.**

4      Q.   So that would have paid you somewhere about

5  18-and-a-half percent?

6           MS. OKON:  Objection; calls for

7  speculation.

8      Q.   (By Mr. Sakonchick) Assuming that you were paid

9  70,000 -- on a 70,000 dollar claim, you were paid

10  13,000, you were paid about 18-and-a-half percent.

11          Want to use the math?

12     **A.   No.  If that's the math, I'm not going to**

13  **dispute that.  Sure.**

14     Q.   All right.  Just dividing 70 into 13, I come

15  out with .1857.  So . . .

16          (Showing witness phone.)

17     **A.   I agree with that, assuming the 70's correct.**

18     Q.   Do you know what the classification of your

19  claim is?

20     **A.   I do not.  I -- unsecured.  Are there further**

21  **classification beyond that?  I don't know.**

22     Q.   Who would know at your firm?

23     **A.   My -- my partner Eric Pastor probably was**

24  **the -- the -- was the primary person involved with that.**

25  **Of course, we retained counsel; they would know.  Those**

## Page 83

1  records are at the firm if -- I'm sure.

2      Q.   Would you agree to provide us with --

3           MS. OKON:  I'm -- go ahead.  Go ahead and

4  finish, and then I'll object.

5      Q.   (By Mr. Sakonchick) Would you agree to provide

6  us with a copy of the final agreement between you and

7  Luminant --

8           MS. OKON:  I'm going to --

9      Q.   (By Mr. Sakonchick) -- as far as your payment?

10          MS. OKON:  I'm going to object to the

11  extent you're asking him to produce documents outside of

12  a formal discovery request.  And I honestly don't really

13  see the relevance of the questions --

14          MR. SAKONCHICK:  I'm not asking him to

15  produce a document.

16     **A.   I'm not sure why that's relevant.  I have**

17  **nothing to hide.  If I'm directed to --**

18     Q.   (By Mr. Sakonchick) No.  You're not going to

19  hide --

20          MS. OKON:  I'm just going to tell you, you

21  don't have any obligation sitting here to agree to that.

22  And you're welcome to go back and talk to your people at

23  PBW before you make that agreement.

24     **A.   Okay.  I'd prefer to do that.  I'm one -- I'm**

25  **one of five partners.**

## Page 84

1      Q.   (By Mr. Sakonchick) Okay.

2           (Brief pause as Mr. Sakonchick looks at

3           documents.)

4           (Exhibit 29 marked.)

5      Q.   (By Mr. Sakonchick) Look at Exhibit No. 29.

6           The first two emails, May 19th, 2014,

7  would be two post-bankruptcy filings emails, correct?

8      **A.   Yes.**

9           MS. OKON:  Objection.

10          Did you say the first two on 00041 are

11  post-bankruptcy or pre-bankruptcy?

12          MR. SAKONCHICK:  Post-bankruptcy.

13          MS. OKON:  Are you talking about the April

14  7th?

15          MR. SAKONCHICK:  I'm talking about the May

16  19th.

17          THE WITNESS:  You said first on the page.

18          MS. OKON:  So you mean first on the page,

19  not first in time.

20          THE WITNESS:  Yeah.  That's how I

21  interpreted the question.  I'm sorry.

22     Q.   (By Mr. Sakonchick) Those are both discussions

23  post-bankruptcy filing?

24     **A.   Yes.  The first two on the page.**

25     Q.   And here Matt is asking for another update on

Page 85

1    the AX cell vegetation.

2        **A.    Yes.**

3            **(Exhibit 30 marked.)**

4        Q.    (By Mr. Sakonchick) All right.  Look at

5    Exhibit 30, and look at the bottom of the page.

6            And Mr. Watkins talking to Mr. Ziehr about

7    the payment.  The retention has been held contention

8    upon vegetation being compute -- completed; do you see

9    that?

10       **A.    I do see that.**

11       Q.    And that email is May 30th, 2014.

12       **A.    That's what it's dated, yes.**

13       Q.    And he's sort of complaining about the

14   vegetation and not having been done before that.

15       **A.    Yes.**

16       Q.    And the retention he's talking about, would it

17   be any retention other than the retention shown on

18   Exhibits 5 and 6?

19       **A.    The question is, is it anything other than**

20   **that?**

21       Q.    Yeah.

22            Is the retention that he's referring to

23   there, do you know whether it's anything other than

24   Exhibits 5 and 6?

25            MS. OKON:  Objection; calls for

Page 86

1    speculation.

2        Q.    (By Mr. Sakonchick) Go ahead and answer.

3        **A.    I -- I -- I don't know what the retention he's**

4    **referring to.**

5        Q.    All right.  But do you -- are you -- were you

6    aware of any other retention due Ranger on the AX fly

7    pit or the haul road we've been discussing today, other

8    than the retention on those two contracts, which are

9    Exhibit 3?

10       **A.    No.**

11       Q.    And those are reflected as -- in Exhibits 5 and

12   6.

13       **A.    I'm assuming that is correct, yes.**

14       Q.    Well, go ahead and look.

15       **A.    Exhibit 5 is retainage on the cell wall.**

16   **Exhibit 6 is retainage on the haul road.**

17       Q.    And the next communication is Mr. Ziehr and

18   Mr. Watkins informing him, we are not forgetting or

19   ignoring this need.

20       **A.    That's what it says, yes.**

21       Q.    So he's indicating to Mr. Watkins and

22   Mr. Gonzales that they're gonna complete the work.

23       **A.    That's what it appears to say, yes.**

24       Q.    And in the next email, he talks about

25   mobilizing June 9th.

Page 87

1        **A.    That's what it says, yes.**

2        Q.    Tell me what Exhibit 33 is.

3        **A.    33?**

4        Q.    Yep.

5        **A.    This is a daily field record that's completed**

6    **on a daily basis by our on-site representative, Steve**

7    **Berndt.**

8        Q.    All right.  And on the first page reflects the

9    week of June 9th, the mobilization for the reveg- -- or

10   for the vegetation.

11            MS. OKON:  Objection; mischaracterizations

12   the evidence.

13       Q.    (By Mr. Sakonchick) Go ahead and read it.

14       **A.    On June 9th, it says, arrived --**

15       Q.    Well, not read it word for word.

16       **A.    Oh.**

17       Q.    Go ahead and read it to yourself, and then tell

18   me -- summarize it for me.

19            MS. OKON:  Objection; vague and ambiguous.

20   Calls for narrative.

21            MR. SAKONCHICK:  Calls for him to read it?

22            MS. OKON:  Calls for a narrative.

23       Q.    (By Mr. Sakonchick) In fact, there, don't they

24   talk about coming onto the site, some rain delay, but

25   the dozer being mobilized?

Page 88

1            MS. OKON:  Objection; compound.  Vague and

2    ambiguous.

3        Q.    (By Mr. Sakonchick) You can answer.

4        **A.    That's the start, the mobilizing to the site to**

5    **start the vegetation.**

6        Q.    Okay.  And it's starting the week of June 9th.

7        **A.    Yes.**

8            **(Exhibit 31 marked.)**

9        Q.    (By Mr. Sakonchick) Looking at Exhibit 31.

10            Well, this is the email you weren't copied

11   on, so you wouldn't have known about that.

12       **A.    Yeah.  I don't see my signature.**

13       Q.    Let's look at page -- the second page.

14       **A.    Of Exhibit 31?**

15       Q.    32.

16       **A.    (Witness complies.)**

17       Q.    Now, this is the same email we've talked about

18   before, but it's May 30th, 2014, which is

19   post-bankruptcy filing.

20       **A.    Yes.**

21       Q.    And, again, it's Mr. Watkins talking to him

22   about holding back the retention until the contract's

23   complete.

24       **A.    That -- that's what the email says, yes.**

25       Q.    And regarding section is the Sandow/Alcoa

Page 89

1   lease.

2       A.   Under subject, yes.

3       Q.   Do you know if Alcoa had any input into the

4   type of vegetation that went on the site?

5       A.   Didn't have any -- any input to me or PBW.  I

6   don't know if they had any input to Luminant.

7       Q.   In other words, they didn't come out and say we

8   don't like the looks of the volunteer vegetation, we

9   want it scraped off and grass planted?

10          MS. OKON:  Objection; calls for

11  speculation.

12      A.   They've not come and ever communicated that to

13  me.

14          (Exhibit 35 marked.)

15      Q.   (By Mr. Sakonchick) Okay.  And look at

16  Exhibit 35.

17          It's an email from you to Nathan Ziehr

18  talking about the fact that you believe the work is

19  progressing well.

20          MS. OKON:  Objection; vague and ambiguous.

21      Q.   (By Mr. Sakonchick) What does the email

22  provide?

23      A.   It's a qualitative update on the -- on the

24  erosion-control work.

25      Q.   And you're happy with it?

Page 90

1       A.   Yes.

2       Q.   And the erosion-control work is the correction

3   of any erosion and the revegetation -- or vegetation.

4       A.   And placing of the erosion-control mats.  And,

5   in this instance, cleaning out the sediment that had

6   washed into the culvert because of the lack of

7   vegetation.

8           (Exhibit 47 marked.)

9       Q.   (By Mr. Sakonchick) I'm going to show you what

10  I've marked as Exhibit 48.

11          MS. OKON:  Did we have a 47?

12          MR. SAKONCHICK:  Oh, yeah.  We were going

13  to do the picture.  I forgot we changed them.

14          (Remarking exhibit.)

15      Q.   (By Mr. Sakonchick) Now, who goes out and

16  measures the quantities?

17      A.   We have the contractor measure those.  They

18  survey them.

19      Q.   And do you approve the quantities?

20      A.   Yes.

21      Q.   Now, look at Exhibit 38.

22      A.   I see it.

23      Q.   Now, there's the estimate for the total amount

24  of the vegetation.

25      A.   Yes.

Page 91

1       Q.   And the only work referred to on this pay

2   application will be the revegetation at the cell.

3       A.   With the erosion-control mat, yes.

4           (Exhibit 39 marked.)

5       Q.   (By Mr. Sakonchick) And looking at Exhibit 39,

6   that'd be the same type of information, except for the

7   haul road.

8       A.   Yes.

9       Q.   And the documents that are attached to those

10  pay applications are just the breakdown of the

11  quantities?

12      A.   Yes.  And the -- and the previous quantities

13  that were paid for the various items, yes.

14      Q.   And that's the unit quantities?

15      A.   Yes.

16      Q.   Because you said it was a unit contract.

17      A.   Yes.

18      Q.   Now, on the Exhibit 47 --

19      A.   That's the one you just gave me.  Okay.

20      Q.   Yeah.

21          -- go to the second-to-last page.

22      A.   Yes.

23      Q.   And there's some discussion there about

24  reducing the amount of one of the contract amounts

25  because of -- because less work was done.

Page 92

1       A.   I have not seen this before, but that's what it

2   appears to say, yes.

3       Q.   All right.  So in other words, by waiting for

4   the vegetation to get done between August and June and

5   July of -- August of 2013 and June and July of August of

6   2014, Sandow actually saved some money on the

7   vegetation?

8       A.   The quantity of vegetation necessary -- of

9   vegetation work necessary was reduced during that

10  period, yes.

11      Q.   And it would have been reduced by the volunteer

12  vegetation?

13      A.   I'll say yes, because we -- we looked -- the

14  areas that were reduced were did not have excessive

15  erosion problems.

16      Q.   So, actually, by waiting they actually saved

17  some money, by waiting, Sandow actually saved some

18  money?

19      A.   That's what these numbers show, yes.

20      Q.   And the difference there is what, about 15,000?

21      A.   Correct amount -- yes.

22      Q.   Do you have any reason to dispute those

23  figures?

24      A.   I -- I do not.  Although, I was not a party to

25  the reduction.  So . . .

Page 93

1    Q.   At the Sandow work site, was there a gated
2  entrance or an entrance which somebody sat as a guard?
3    A.   Yes.
4    Q.   And was a sign-in sheet required?  Were people
5  required to sign in as they entered the facility?
6         MS. OKON:  Objection; vague and ambiguous.
7    Q.   (By Mr. Sakonchick) You said there was a guard.
8    A.   My understanding was there was a guard.
9    Q.   When you -- when you went on the site at the
10 Sandow, either at the ash fly pit or the haul road, on
11 the work site, did you have to sign in?
12   A.   I did not.
13        We -- we'd be out there periodically.
14 There was a dedicated access to that site.  We signed in
15 by virtual of the records of the meetings we were out
16 there.  Mr. Berndt accessed the site every day.
17        But, you know, there was a watchman, I
18 suppose, sitting at the -- at the gate, but there was no
19 sign-in.  To access the Luminant facility, I had to get
20 a authorization, had to get a badge.
21   Q.   Right.
22        What do you characterize is a Luminant
23 facility versus what we talked about the ash pit and
24 haul road?
25   A.   To access the power plant, which includes the

Page 94

1  ash pit and the haul road and the rest of the facility,
2  I -- I went to the guard shack and got a -- a badge.
3  Because I was a periodic visitor, I did that every time
4  I came.  People that were there on a regular basis had
5  dedicated badges.
6    Q.   Was it typical for Sandow at the end of the
7  construction to issue a certificate of completion for
8  Luminant?
9    A.   I'm not sure I'm aware of a certificate of
10 completion.
11        As far as a -- to the contractor?
12   Q.   Correct.
13        In other words, there's a requirement for
14 the owner to give a certificate -- or somebody to give a
15 certificate of completion to the contractor at the end
16 of the job.
17   A.   I -- I have no knowledge of that.  That would
18 not have been -- that would have been outside of my
19 expertise.
20   Q.   Outside of what you do?
21   A.   Yes.
22   Q.   Let's go to Exhibit 3.
23   A.   (Witness complies.)
24   Q.   Now, Exhibit 3, the first contract is the haul
25 road, correct?

Page 95

1    A.   Yes.
2    Q.   Go to page 208, Ranger 208.
3    A.   (Witness complies.)  Yes.
4    Q.   And you indicated these were done as a
5  unit-price basis?
6    A.   For all of the items other than items
7  identified by LS, which are lump sum.
8    Q.   All right.  So what we're looking at here on
9  Exhibit 28, that's a copy of the amount of money to be
10 paid under the contract for each one of these listed
11 items?
12   A.   I believe that that is Ranger's bid form for
13 this, the haul road part of the project with the
14 quantities to be confirmed post-construction.
15   Q.   All right.  But it's included in there as part
16 of the contract?
17   A.   It -- it is, yes.
18   Q.   And talk about the area for vegetative
19 establishment.  They talk about how much per acre
20 they're going to pay for flat surface versus sloped
21 surfaces.
22   A.   Yes.
23   Q.   Let's look at the second contract.
24   A.   (Witness complies.)
25        MS. OKON:  I think it's 000051.

Page 96

1        MR. SAKONCHICK:  Yeah.  It's earlier than
2  the other one.
3    Q.   (By Mr. Sakonchick) Again, looking at page 51
4  of the ash fly pit contract, which is Exhibit 3, that's
5  the same type of unit pricing that we talked about on
6  the prior contract.
7    A.   Yes, with estimated quantities.
8    Q.   And LS is a fixed lump sum, and then, of
9  course, it's whether it's cubic yards or square yards --
10   A.   Acres, yes.
11   Q.   -- per acres.
12   A.   Yes.
13   Q.   Now, having reviewed all of the emails that we
14 just went through from August 2013 through the
15 completion of the vegetation, did Ranger ever abandon
16 the vegetation portions of the contracts?
17        MS. OKON:  Objection; calls for legal
18 conclusion.
19   Q.   (By Mr. Sakonchick) What do you understand
20 abandonment to be?
21   A.   There was no evidence to say that Ranger
22 terminated their work on the vegetation.
23   Q.   Or just left the site not willing to come back?
24        MS. OKON:  Objection; calls for
25 speculation.

Page 97

1  Q.  (By Mr. Sakonchick) Is there anything that
2  you're aware of in any of your communications with
3  Ranger which indicated that they weren't going to come
4  back and complete the vegetation from August 2013 to
5  July 2014?
6      A.  No indication.
7      Q.  Was there any indication from Luminant Sandow
8  between that same period that they were going to -- that
9  they did terminate Ranger's contracts for the ash fly
10 pit and the haul road?
11     A.  I'm -- I'm not aware of any evidence they
12 terminated the contract.
13     Q.  In fact, the vegetation, to the best of your
14 knowledge, was paid for under the terms and bid prices
15 set out in the contracts?
16         MS. OKON:  Objection; calls for legal
17 conclusion.  Compound.
18     Q.  (By Mr. Sakonchick) Well, let's talk about --
19 we just went through the unit pricing, correct?
20     A.  Yes.
21     Q.  And we saw from the emails that Luminant Sandow
22 was requiring Ranger to live up to those materials and
23 unit pricing set out in the contracts.
24     A.  Yes.  The emails indicate that.
25     Q.  Okay.  And that even included the work that was

Page 98

1  done post-petition?
2      A.  Yes.
3      Q.  And by post-petition, we're talking about
4  post-bankruptcy filing.
5      A.  Yes.
6         MR. SAKONCHICK:  Pass the witness.
7         MS. OKON:  Can I go a little longer before
8  we take a break.
9         THE WITNESS:  Sure.
10              EXAMINATION
11 QUESTIONS BY MS. OKON
12     Q.  How long have you been employed by PBW?
13     A.  We founded PBW in April of 2002.
14     Q.  Are you an employee of Sandow Power Company?
15     A.  No.
16     Q.  Are you an employee of any Luminant affiliate?
17     A.  No.
18     Q.  Have you ever been an employed by either Sandow
19 or any Luminant affiliate?
20     A.  No.
21     Q.  Okay.  So do you have the authority to make
22 amendments to the contract between Sandow and Ranger?
23     A.  No.
24     Q.  So if we go back to Exhibit No. 3,
25 Mr. Sakonchick asked you some questions about a couple

Page 99

1  of those provision.  So if you'll turn with me to
2  Exhibit 3, page 3 of the ash disposal haul road
3  contract.
4         Do you see where it says, terms of the
5  agreement?
6      A.  Yes.
7      Q.  And you see where it says, this agreement will
8  commence on its effective date and will terminate on
9  September 2nd, 2013, unless terminated earlier pursuant
10 to its other provisions.  This agreement may only be
11 extended or modified by written agreement signed by both
12 parties.
13         Did I read that correctly?
14     A.  That's what it says, yes.
15     Q.  Okay.  So then if we look at the schedule
16 paragraph below that, it says, contractor will begin the
17 work by December 4th, 2012 and complete it by December
18 2nd, 2013.
19         Did I read that correctly?
20     A.  Yes.
21     Q.  Did you ever have authority to modify either of
22 those provisions?
23     A.  No.
24     Q.  In your mind, did you ever modify or agree to
25 modify those provisions with Ranger?

Page 100

1      A.  No.
2      Q.  Okay.  So Mr. Sakonchick asked you some
3  questions about when we it -- when it got to August of
4  2013, Ranger indicated to you that it was too hot to do
5  the seeding, correct?
6      A.  That's correct.
7      Q.  And as an environmental engineer, did you agree
8  at that time that it was too hot to the seedling?
9      A.  Yes.
10     Q.  By making that agreement with Sandow, did you
11 mean, in any way, to excuse the fact that they weren't
12 completing on time under the contract?
13     A.  I made an agreement with Luminant -- I mean
14 with Ranger.
15     Q.  Okay.  Did I say that wrong?  I'm sorry.  Let
16 me restate that question.  Thank you.
17     A.  Sure.
18     Q.  So whenever you agreed with Sandow in August of
19 2013 that it was too hot to do the seeding, did you
20 intend, in any way, to modify the legal obligations
21 between Sandow and Ranger?
22     A.  No.
23     Q.  Why is it important to have erosion control and
24 matting and vegetation on a project like this one?
25     A.  Because if you don't, fine soils get washed off

Page 125

1    Q.   Did they give you any explanation for why that
2  didn't happen, that you can recall?
3    A.   No.
4    Q.   Okay.  So if we turn now to Exhibit No. 16, on
5  February 10th, Mr. Ziehr sends you an email, correct?
6    A.   Yes.
7    Q.   Now, according to what he told you last time,
8  the work should be done by now, correct?
9    A.   Based on those -- those schedules or the
10  estimated schedule, yes.
11    Q.   Or at least should be well under progress?
12    A.   Yes, under progress.
13    Q.   What does Mr. Ziehr tell you on February 10th?
14    A.   I am in discussions about our final seeding
15  work with Luminant for Sandow.  I talked to Jacob, but
16  he passed me off to another person.  I'm trying to get a
17  feeling for where we are going to be at for payment and
18  how that will work before we proceed.
19    Q.   Okay.  So during Mr. Sakonchick's questioning
20  of you, I think he asked you something to the effect of
21  did Ranger ever indicate to you that they weren't going
22  to do the work; do you remember those questions?
23    A.   Yes.
24    Q.   Okay.  So what did you understand Mr. Ziehr to
25  mean when he tells you, I am trying to get a feeling for

Page 126

1  where we are going to be at for payment and how that
2  will work before we proceed?
3    A.   There's no definitive indication that they're
4  not going to do the work, but it -- it certainly looks
5  like there is other financial reasons that they're
6  considering for -- based on before they schedule the
7  work.
8    Q.   Okay.  And they haven't scheduled the work
9  since last time that they talked to you, correct?
10    A.   They talked about the schedule, but the work
11  didn't actually start.
12    Q.   Right.
13         And they aren't giving you any reason
14  other than payment assurance for why that work did not
15  get scheduled and done, correct?
16    A.   Correct.  Although they're not actually saying
17  that's the reason, but that's it.
18         MR. SAKONCHICK:  We're going to object to
19  speculation.
20    Q.   (By Ms. Okon) What did you understand Mr. Ziehr
21  to mean when he told you before we proceed?
22         MR. SAKONCHICK:  Calls for speculation.
23    Q.   (By Ms. Okon) You can go ahead and answer.
24    A.   My -- that -- if you -- you -- you read that
25  email, you think that they're going to look at financial

Page 127

1  considerations of payment before they decide to proceed.
2    Q.   Do you remember any phone calls or -- or -- or
3  communications with anyone from Ranger around this time
4  about payment?
5    A.   No.
6    Q.   Do you remember ever having any conversations
7  with anyone at Ranger about the potential for Luminant
8  or Sandow to file bankruptcy?
9    A.   Yes.  I remember having -- we had Ranger --
10  Nathan and I at least had one conversation.  He wanted
11  to make sure that -- that I was aware about some of the
12  information in the -- in the public press about the --
13  the speculation about -- about bankruptcy.
14    Q.   Okay.  So this conversation occurred before
15  Luminant filed for bankruptcy, correct?
16    A.   Yes.  But I don't know when it occurred, but
17  yes.
18    Q.   Okay.  And what did Mr. Ziehr communicate to
19  you about the potential for bankruptcy?
20    A.   Just are you seeing this?  Just making sure
21  you're in the loop.
22         I also may have called him on occasion
23  to -- to -- once or twice to talk about that because
24  there were numerous articles in the -- in the press
25  about the speculation.

Page 128

1    Q.   And did Mr. Ziehr communicate to you that
2  Ranger was concerned about that possibility?
3    A.   We were both concerned as -- as -- as
4  creditors, sure.
5    Q.   And then Mr. Ziehr says, as soon as I hear
6  something, you will be one of the first people to know.
7         Did I read that correct?
8    A.   Yes.
9    Q.   And so did you take from that that you were not
10  going to hear about scheduling the project until
11  Mr. Ziehr got back to you after talking with Sandow?
12         MR. SAKONCHICK:  Calls for speculation;
13  objection.
14    A.   I just assumed he would let me know, just as in
15  previous emails, when the schedule would be, not why,
16  but just here -- when the schedule would be.
17    Q.   (By Ms. Okon) And so if you'll turn with me to
18  Exhibit No. 17.
19         On February 17, did Mr. Gonzalez email
20  Mr. Ziehr and copy you and ask about status?
21    A.   Yes.
22    Q.   And what did Mr. Ziehr respond to Mr. Gonzalez?
23    A.   With a -- with a proposal to accept the
24  volunteer vegetation as being -- and completing the
25  project with the volunteer vegetation.

Page 145

1  between April 8th and now April 25th when you're -- or
2  April 28th when you're checking back?
3      A.   No.
4      Q.   Okay.  So another three weeks has passed?
5      A.   Correct.
6      Q.   And what is the response that you got?
7      A.   Gary finally got his machine he's been waiting
8  for -- waiting on.  In our meeting today, he scheduled
9  the mobilization and start for Monday next week.
10     Q.   Okay.  Now, in the last email on April 7th,
11 Mr. Ziehr had told you Gary has the equipment.
12     A.   That's what the email said, yes.
13     Q.   Okay.  And now Ranger's telling you that Gary
14 just got the equipment, correct?
15     A.   That's what the email says, yes.
16     Q.   Did you ever get any explanation for that
17 inconsistency?
18     A.   No.
19     Q.   And when we were talking about -- well, up
20 until this time, the equipment that's been referenced
21 has always been a D6 dozer, correct?
22     A.   Yes.
23     Q.   And -- and he's saying mobilization's going to
24 start in a week, correct?
25     A.   In this email, yes.

Page 146

1      Q.   So roughly May 5th.
2      A.   Yes.
3      Q.   Did you hear from Ranger at any time in the
4  next week?
5      A.   No.
6      Q.   What's the next contact you had with Ranger, to
7  your memory?
8      A.   That would be on May -- no, let me see.  Let's
9  see.
10     Q.   If you look at Exhibit 27.
11     A.   27.  (Witness looking at document.)
12          That was when -- Exhibit 27 was a summary
13 of the conversation with Mr. Sutherland and Nathan.
14 Nathan -- I mean, Mr. Sutherland had contacted Nathan
15 regarding the vegetation.
16     Q.   Okay.  So Ranger reaches out to Matt on May
17 7th, correct?
18     A.   Or Matt possibly reached out to -- to Ranger.
19 I'm not sure who did the reaching out.
20     Q.   Okay.  And what did Ranger or Nathan indicate
21 to Mr. Sutherland?
22     A.   Ranger does not want to start working on the
23 Sandow vegetation unless they get something in writing
24 from Luminant stating that Ranger will be paid for the
25 work.

Page 147

1      Q.   Okay.  So before when Mr. Sakonchick was asking
2  you did Ranger ever make any indication that they
3  weren't going to the work, here they are indicating they
4  didn't want to do the work without assurance of payment?
5          MR. SAKONCHICK:  You're misrepresenting
6  the question.  I asked about pre-bankruptcy.
7      Q.   (By Ms. Okon)  Okay.  Well, let me just ask you
8  the question then.
9          At any time, did Ranger ever indicate that
10 they would not do the work under the contracts without
11 further assurances?
12     A.   This was the -- the -- the indication of that
13 post-bankruptcy, yes.
14     Q.   And before there had been the more vague
15 reference of, before we proceed, we need some assurance,
16 correct?
17     A.   That's the only reference, yes.
18     Q.   So they had the one pre -- pre-bankruptcy that
19 said before we proceed, we need some more information,
20 correct?
21     A.   Correct.
22     Q.   And now post-bankruptcy, it's more explicit,
23 correct?
24     A.   Based on this email, yes.
25     Q.   And so what did you do to respond to Mr. --

Page 148

1      A.   I forward this on to -- to Jacob Gonzalez.
2      Q.   Okay.  So if you'll turn with me to Exhibit 29.
3          Does anyone from PBW reach out to Ranger
4  on May 19th?
5      A.   On May 19th, yes.  Matt Sutherland contacted
6  Ranger.
7      Q.   Okay.  And that is almost two weeks after your
8  last -- their last conversation, correct?
9      A.   Correct.
10     Q.   Do -- Mr. Ziehr's response is that Gary said he
11 called to update you; do you see that?
12     A.   I do.
13     Q.   Do you remember what Gary said?
14     A.   I believe he's responding to Matt on that, and
15 I was copied on it.  But I -- so I have no -- no memory
16 whatever of what the response was.
17     Q.   Okay.
18     A.   I do know the work hasn't been done yet at this
19 point.  So . . .
20     Q.   So it looks like, then, you get copied on an
21 email chain -- if you go to Exhibit No. 30 -- on May
22 30th, 2014; do you see that?
23     A.   I do.
24     Q.   And what does Mr. Ziehr say on the email that
25 he copies you on?

Page 149

1    A.    The initial email is -- is an email from David
2    Watkins.  And then Nathan -- Nathan responds to me and
3    says, it's finally happening.  See the highlighted
4    mobilization date below.
5    Q.    And what mobilization date are you given on May
6    30th, 2014?
7    A.    June 9th.
8    Q.    And when Mr. Ziehr gives you that date, he
9    says, it has taken a bit to get the assurance we needed
10   on payment, but we are moving forward.
11         Did I read that correctly?
12   A.    You did.
13   Q.    And okay.  So Mr. Ziehr is, at least, in his
14   email to you making the connection between delaying the
15   work and payment?
16   A.    I guess that's.  That's not -- that's not my
17   concern.
18              (Exhibit 32 marked.)
19   Q.    (By Mr. Sakonchick) Okay.  So now I want to go
20   to Exhibit No. 32.
21         And if you look at the second email from
22   the top --
23   A.    Uh-huh.
24   Q.    -- on page 1, that's an email from you [sic] to
25   Mr. Ziehr [sic] and others, correct?

Page 150

1    A.    Yes.
2    Q.    And what are you communicating in that email?
3    A.    That the field people, Steve Berndt from PBW
4    and Gary from Ranger talked about the work is scheduled
5    to start on Monday.  He's not getting a dozer out there
6    to grade the wooded areas and strip the vegetations
7    prior to putting down the mat.  And that was contrary to
8    everything we'd discussed at this point.
9    Q.    And did you understand from what you heard that
10   there was going to be no equipment out there to do the
11   work?
12   A.    Yes.  That -- that was -- that was clear.
13   Q.    And so then what did Mr. Ziehr respond?
14   A.    He said there would be a smaller piece of
15   equipment out there to do the regrading.
16   Q.    And was that acceptable?
17   A.    Yes.
18   Q.    Okay.  So, now, if we go to Exhibit No. 33,
19   these are Steve Berndt's field notes, correct?
20   A.    Yes.
21   Q.    I want you to look with me on the first page of
22   Exhibit 33 to June 19th, 2014.
23   A.    Yes.
24   Q.    I'm going to read it, and then I'm going to ask
25   you if I read it correctly.

Page 151

1         Arrived site 10:15 --
2         MR. SAKONCHICK:  Object.  The document
3    speaks for itself.
4    Q.    (By Ms. Okon)  Okay.  Well, read the entry for
5    6/9/2015, please.
6    A.    2014?
7    Q.    2014.
8    A.    Arrived site 10:15.  Met Chris Collins and
9    Alonso at gate.  Got both trucks inspected and drove out
10   to the site, AX Landfill.  Drainage ditches don't look
11   too bad.  Worst area is the point -- the point on the
12   south side of the haul road.  Left the site after
13   talking to Joey Wright -- that's a Luminant employee --
14   about Luminant contractor training.
15   Q.    Okay.  So was any actual work done on June 9th,
16   2014?
17   A.    Based on that description, no.
18   Q.    Okay.  So there were some questions that
19   Mr. Sakonchick asked you about did Ranger ever tell you
20   they weren't going to finish the job; do you remember
21   those?
22   A.    Tell me they're not going to the finish the
23   job?  Yes, I remember the questions.
24   Q.    Okay.  And Ranger never told you they weren't
25   going to finish the job, correct?

Page 152

1    A.    They never said in those words, no.
2    Q.    Okay.  Did their actions throughout the project
3    indicate to you that they were diligent in completing
4    the work?
5         MR. SAKONCHICK:  Calls for speculation;
6    objection.
7    A.    Diligent, no.  Again, no -- no indication that
8    they weren't going to do the work, but it certainly
9    wasn't done in a timely fashion.
10   Q.    (By Ms. Okon) And when you say no indication,
11   that's no verbal indication.
12   A.    Correct.
13   Q.    They certainly gave you estimated date, after
14   estimated date, after estimated date, and then didn't
15   show up, correct?
16   A.    Correct.
17   Q.    Have you ever been on a project where a
18   contractor delayed almost a year before coming out and
19   finishing the project?
20         MR. SAKONCHICK:  Objection.  We're talking
21   about nine or 10 months, not a year.
22   Q.    (By Ms. Okon) You can go ahead and answer.
23   A.    It unusual for that to be -- to be the case for
24   sure.
25   Q.    Okay.  And if we back up, can you remember

Page 157

1    A.    That's my understanding, yes.

2    Q.    Okay.  And what was the nature of those

3  discussions?

4    A.    To go over this pending deposition, the

5  requested documentation, how much of that was -- was

6  made available, items like that.

7    Q.    Okay.  Did you go over the exhibits as you did

8  today, describing --

9    A.    Oh, God, not in that detail, no.

10   Q.    Okay.  But you did go through the exhibits and

11 talk about these?

12   A.    No.  We -- we -- based on -- as listed in

13 the -- in the request for information, the -- it was, do

14 you have this information, the sign-in sheets, whatever?

15 Do you have this information, communications things like

16 that?

17   Q.    All right.  She asked you about if fertilizer

18 was available, whether Ranger could get paid for that.

19        Looking at what we had talked about

20 earlier on the -- I guess it was the bid form, which is

21 part of the contract.

22   A.    Yes.

23   Q.    That doesn't provide for any partially payment

24 other than a per-acre completion cost, correct?

25        MS. OKON:  Objection; calls for legal

Page 158

1  conclusion.

2    Q.    (By Ms. Okon) Look at P1 on Exhibit 3, page

3  208.

4    A.    I see it.

5    Q.    And vegetation there is per acre, correct?

6    A.    On the bid form it is.  On the -- the payment

7  request forms -- and I don't know what contractually

8  drove this -- the pay items are broken into material and

9  labor.

10   Q.    Where are the pay items broken out into

11 material and labor?

12   A.    Not in this.  But in the -- for example, I

13 can't remember what exhibit it is.  If you look at

14 the --

15        MS. OKON:  5 and 6 are the pay apps.

16   A.    The pay items for -- the applications for

17 payments, I should say.  Each of the unit prices are

18 broken into -- I assume at Luminant's request --

19 materials and labor.

20   Q.    (By Mr. Sakonchick) So the issue items that --

21 on -- paid on a per-acre basis would be itemized like

22 that?

23   A.    Itemized into -- broken down into materials and

24 labor.  And I don't know why, but that's what

25 Luminant -- how Luminant does those.

Page 159

1    Q.    Okay.  Certainly, by its actions, Luminant and

2  Sandow acted as if the contract was still in place after

3  September 2nd, 2013, correct?

4        MS. OKON:  Objection; calls for a legal

5  conclusion.

6    A.    I can't speak to contractual requirements, but

7  the project was moving forward under the requirements of

8  the existing contract.

9    Q.    (By Mr. Sakonchick) Okay.  There's nothing you

10 saw in any of the emails we talked about where Luminant

11 Sandow terminated the contract?

12   A.    No.

13   Q.    And we already discussed the payment for the

14 vegetation was pursuant to the contracts, Exhibit 3.

15        MS. OKON:  Objection; calls for

16 speculation.  Calls for a legal conclusion.

17   Q.    Let's go to Exhibit 47.

18   A.    I'm there.

19   Q.    Talking about David Watkins's communications

20 with Nathan Ziehr.

21        And all the items are being costed out in

22 accordance with contract, and he actually referred to

23 the contract number.

24   A.    Yes.

25   Q.    And they're being paid to Ranger in accordance

Page 160

1  with that contract number?

2        MS. OKON:  Objection; vague and ambiguous.

3    A.    The document -- the -- the email refers to the

4  contract and the -- the unit price is in the contract.

5    Q.    (By Mr. Sakonchick) And 1893710 is the contract

6  that's attached as Exhibit 3, correct?

7    A.    Let me check to verify quickly.

8        189370, yes.

9    Q.    And that's the same number on the contract for

10 the haul road as it is for the Ash pit.  Two different

11 contracts, but one contract number?

12   A.    That's what is listed, yes.

13   Q.    And look at Exhibit 47, they're paying in

14 accordance that contract.

15        MS. OKON:  Objection; vague and ambiguous.

16 Calls for a legal conclusion.

17   Q.    (By Mr. Sakonchick) The contract number

18 referred to in that email is the same that we just

19 discussed in the two contracts in Exhibit 3.

20   A.    Referenced in the email, yes.

21        MR. SAKONCHICK:  Help me out, Melanie,

22 what's the number for the payouts, the final payouts.

23        MS. OKON:  They're in order, date order,

24 essentially.  So . . .

25        MR. SAKONCHICK:  No.  Just flipping

Patrick Behling

167

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

IN RE:                      )   Chapter 11
                            )
ENERGY FUTURE HOLDINGS      )   CASE NO. 14-10979 (CSS)
CORP., et al.,              )
                            )
        Debtors,            )   (Jointly Administered)
                            )
_____
                            )
SANDOW POWER COMPANY, LLC   )
                            )
vs.                         )   Contested Matter
                            )
RANGER EXCAVATING, LP       )

REPORTER'S CERTIFICATE

ORAL AND VIDEOTAPED DEPOSITION OF PATRICK BEHLING

October 17, 2016

I, Amy M. Clark, Certified Shorthand Reporter in and
for the State of Texas, hereby certify to the following:

That the witness, PATRICK BEHLING, was duly sworn
and that the transcript of the deposition is a true
record of the testimony given by the witness;

That the deposition transcript was duly submitted on
_____ to the witness or to the attorney for
the witness for examination, signature, and return to me
by _____.

That pursuant to information given to the deposition
officer at the time said testimony was taken, the
following includes all parties of record and the amount

Patrick Behling

**168**

1   of time used by each party at the time of the

2   deposition:

3        Stephen Sakonchick (2h13m)
              Attorney for Respondent
4        Melanie K. Okon (1h03m)
              Attorney for Debtors

5

6        That a copy of this certificate was served on all

7   parties shown herein.

8

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties in the

11  action in which this proceeding was taken, and further

12  that I am not financially or otherwise interested in the

13  outcome of this action.

14        Certified to by me on this 2nd day of

15  November, 2016.

16

17  _____

18  Amy M. Clark, CSR
    Texas CSR 8753
19  Expiration:  12/31/2016
    DepoTexas - Austin
20  Firm No.: 17
    805 W. 10th Street, Suite 400
21  Austin, Texas 78701
    512-478-2752

22

23

24

25

Tab H

**2**

```
1         APPEARANCES
2
3   FOR DEBTORS AND DEBTORS IN POSSESSION:
4     Ms. Melanie K. Okon
      Okon Hannagan, PLLC
5     750 N. St Paul Street
      Suite 1800
6     Dallas, Texas 75201
      Telephone: (214)396-9650
7     Fax: (469)909-6115
      E-mail: mokon@okonhannagan.com
8
    FOR RESPONDENT RANGER EXCAVATING, LP:
9
      Mr. Stephen Sakonchick, II
10    6502 Canon Wren Drive
      Austin, Texas 78746
11    Telephone: (512)329-0375
      Fax: (512)697-2859
12    E-mail: sakon@flash.net
13
    ALSO PRESENT:
14
      Ms. Ashley Alaman - In-house Counsel for Luminant
15    Lindsey Thomas -Videographer
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1
2              INDEX
3                       PAGE
4   Appearances ......................................2
5   NATHAN ZIEHR
6   Examination by Ms. Okon ...........................4
    Examination by Mr. Sakonchick ...................142
7   Further Examination by Ms. Okon .................175
    Further Examination by Mr. Sakonchick ...........184
8   Further Examination by Ms. Okon .................185
    Further Examination by Mr. Sakonchick ...........186
9   Signature Page ..................................187
    Court Reporter's Certificate ....................189
10
11            EXHIBITS
12
13  EXHIBIT      DESCRIPTION        PAGE
14  Exhibit 41   Email from Nathan Ziehr to Pat   137
                 Behling, 5/30/14
15
    Exhibit 48   Labor report         55
16
    Exhibit 49   Email from Bobbie Holstine to   169
17               Nathan Ziehr, 9/25/13
18
19
20
21
22
23
24
25
```

**4**

```
1          THE VIDEOGRAPHER:  Here begins the
2   deposition of Nathan Ziehr.  Today's date is October
3   18th, 2016.  The time is 9:59.
4          Will the court reporter please swear in
5   the witness.
6              NATHAN ZIEHR,
7   having been first duly sworn, testified as follows:
8              EXAMINATION
9   QUESTIONS BY MS. OKON
10    Q.  Good morning.  My name is Melanie Okon, and I'm
11  here today representing Sandow Power Company.
12        Do you understand that?
13    A.  Yes.
14    Q.  Will you please state your full name for the
15  record?
16    A.  Nathaniel Mark Ziehr.
17    Q.  And what is your date of birth?
18    A.  1/16/1987.
19    Q.  Have you ever given your deposition before?
20    A.  Yes.
21    Q.  How many times have you given a deposition
22  prior to today?
23    A.  One.
24    Q.  And how long ago was that.
25    A.  A couple months.
```

**5**

```
1     Q.  What was the general subject matter of that
2   matter?
3     A.  Construction-related.
4     Q.  And was that in the capacity -- were you in a
5   capacity on behalf of Ranger Excavating?
6     A.  Yes, I was.
7     Q.  Did that matter involve any claims of delay in
8   the performance of work?
9     A.  It was regarding a separate project with a
10  separate circumstance that I guess doesn't really
11  pertain to this site.
12    Q.  Okay.  Was the -- was the opposing party
13  claiming that Ranger had delayed in the performance of
14  Ranger's work in that matter?
15    A.  The opposing party was claiming that they
16  supplemented our work.
17    Q.  Okay.  Who was that opposing party?
18    A.  Austin Construction.
19    Q.  Have you ever given testimony at a trial or
20  arbitration or hearing?
21    A.  No.
22    Q.  You may already be familiar with kind of how
23  depositions work, since you gave one recently, but I'll
24  go through just a couple of points.
25        There's a court reporter here who's taking
```

2 (Pages 2 to 5)

10

1    A.  Uh-huh.
2    Q.  And in August of 2009, what position did you
3    take?
4    A.  **Project manager.**
5    Q.  How long did you serve as a project manager?
6    A.  **Until earlier this year.**
7    Q.  Okay.  So in early 2016, you were giving the
8    title of vice president?
9    A.  **Yes.**
10   Q.  Okay.  So during the Sandow project, you were a
11   project manager during that time?
12   A.  **Yes, ma'am.**
13   Q.  Okay.  And what were the basic functions of
14   your job as project manager, specifically related to the
15   Sandow project?
16   A.  **Coordinate with my superintendent, coordinate**
17   **with the customer, help with the allocation, initial**
18   **allocation of equipment, help coordinate subcontractor**
19   **activity, and I -- just basic day-to-day correspondence**
20   **with my superintendent.**
21   Q.  Was part of your role, did it entail being
22   familiar with the terms of the contract between Ranger
23   and Sandow?
24   A.  **Yes.**
25   Q.  If a question came up about what was

11

1    contractually required of Ranger on the Sandow project,
2    what person within Ranger would be -- would be the
3    person to look at that?
4    A.  **For scope-related items, myself.  For**
5    **contractual terminology or verbiage, probably Mark**
6    **McKenzie or Bobbie Holstine.**
7    Q.  Okay.
8    A.  **But scope, the project manager's role at Ranger**
9    **is to help manage and dictate the scope.**
10   Q.  Okay.  Did you ever have an occasion on the
11   Sandow project where you felt like you needed to bring
12   in Mark McKenzie or Bobbie Holstine to look at the
13   contract?
14   A.  **It's possible.**
15   Q.  Sitting here today, can you recall any time
16   during the Sandow project where you called in Mark
17   McKenzie or Bobbie Holstine to look at the contract?
18   A.  **Not a specific day; but, again, it's -- it's**
19   **possible.**
20   Q.  Okay.  And I just have to ask -- sometimes the
21   questions seem very similar, but I need to make sure I
22   get the information I'm looking for.
23        While you might not remember a specific
24   day that you asked for assistance, sitting here today,
25   can you remember a topic that came up on the Sandow

12

1    project where you had to ask for assistance from either
2    Mark McKenzie or Bobbie Holstine or someone else on the
3    contract?
4    A.  **Yes.  Pay apps.  Bobbie Holstine does our pay**
5    **payment applications.  Pay apps is short for that.**
6        **I would frequently discuss with her**
7    **timing, frequency, how, what, when, dollars, retainage.**
8    **She's the expert at that; I'm not.**
9        **My expertise is in the scope of work and**
10   **not the -- not the accounting of the work.**
11   Q.  Okay.  Okay.  So we'll come back to that in a
12   second.
13        Other than issues related to pay
14   applications that you would reach out to Bobbie Holstine
15   about, were there any other topics that, sitting here
16   today, you remember asking for assistance about with
17   regard to the Sandow project?
18   A.  **I honestly don't remember.**
19   Q.  Okay.  Let's turn to Exhibit No. 1 in the book.
20        Have you ever seen Exhibit No. 1 before?
21   A.  **No, I have not.**
22   Q.  Okay.  Do you understand that you are
23   testifying here today as a corporate representative for
24   Ranger Excavating?
25   A.  **Yes.**

13

1    Q.  Okay.  And if you'll turn to the last page of
2    Exhibit No. 1.
3    A.  **(Witness complies.)**
4    Q.  It's kind of the back page.
5        Do you see where it says Exhibit A?
6        I think you have to flip that page over.
7    There you go.
8        Have you ever looked at these topics
9    before?
10   A.  **I haven't looked at these topics.  I have**
11   **talked to my attorney about them.**
12   Q.  And just as a general rule today, I'm not going
13   to intentionally ask you about the substance of any
14   conversations you've had with your attorney, because
15   those are privileged.
16        So what I'll do is, I'll walk through
17   these topics, and make sure we are in agreement on what
18   you are -- are testifying about as the corporate
19   representative.
20        So if we look at Topic No. 1, the timing
21   of the work Ranger performed on the project at issue.
22        It's my understanding you are the
23   corporate representative to talk about the timing of any
24   actual work that was performed on the project; is that
25   your understanding?

4  (Pages 10 to 13)

## 18

1    Gary.
2        Q.   But he shouldn't have any first-hand knowledge
3    of that from being on site?
4        A.   Nope.
5        Q.   Okay. Did Mr. Lyons work on other projects for
6    Luminant companies?
7        A.   Yes.
8        Q.   Okay. Is there anyone other than yourself that
9    you believe would have knowledge of the reasons and
10   causes for any delays in Rangers' performance of work on
11   the Sandow project?
12       A.   Gary Ballard, Chris Collins, Pat Behling, Matt
13   Sutherland, Jacob Gonzalez, Steve Berndt. That's
14   probably it.
15       Q.   Have you spoken to Mr. Collins in the last
16   couple of months?
17       A.   Yes.
18       Q.   Okay. How many times have you talked to
19   Mr. Collins in the last couple of months?
20       A.   Oh, we engage on a frequent basis because he is
21   a subcontractor that provides services we need on
22   multiple projects.
23       Q.   Have you talked to Mr. Collins in the last
24   couple of months about the Sandow project?
25       A.   Yes.

## 19

1        Q.   Okay. And what conversations have you and
2    Mr. Collins had about the Sandow project?
3        A.   Hey, you're going to be deposed, FYI, heads up.
4        Q.   Did you-all go back through some of the history
5    of the project together?
6        A.   We tried to recreate some mental memories, but
7    we're both pretty -- we've done a lot of projects since
8    then, so it's difficult.
9        Q.   Do you remember any of the specific mental
10   memories that you-all tried to recreate?
11       A.   Nothing specific.
12       Q.   Did you-all have any written communications
13   with each other about the Sandow project in the last
14   couple of months?
15       A.   Not that I'm aware of.
16       Q.   Any text messages or emails?
17       A.   Do not think so.
18       Q.   Have you talked to Matt Sutherland in the last
19   couple of months about the Sandow project?
20       A.   No, ma'am.
21       Q.   And you've already said you have not talked to
22   Mr. Ballard in over a year, correct?
23       A.   Nope.
24       Q.   And just for the record; is that correct?
25       A.   Yes.

## 20

1        Q.   Okay. So if you'll turn to Exhibit No. 3 with
2    me, please.
3            So I'm going to represent to you Exhibit
4    No. 3 is in two parts. The first part is the contract
5    for the ash disposal haul road between Ranger and
6    Sandow. And then I don't know if yours is marked where
7    there's a -- do you have a Post-it note marking it?
8        A.   Yes.
9        Q.   So -- then that second part is the contract for
10   the disposal pit cell.
11       A.   Uh-huh.
12       Q.   Do you see that?
13       A.   I do.
14       Q.   Have you seen both of the contracts before that
15   are Exhibit 3?
16       A.   Yes.
17       Q.   Okay. So I'm going to walk through a couple of
18   the terms with you.
19            So if you'll turn to page 3 of the -- the
20   first contract.
21            Do you see that there is a paragraph
22   titled Terms of Agreement?
23       A.   (Witness looking through document.)
24       Q.   At the bottom, it's Ranger 000180.
25       A.   Yes, I see terms of agreement.

## 21

1        Q.   Okay. Do you see where it says, this agreement
2    will commence on its effective date and will terminate
3    on September 2nd, 2013. Unless terminated earlier
4    pursuant to its other provisions, this agreement may
5    only be extended or modified by written agreement signed
6    by both parties.
7            Did I read that correctly?
8        A.   Yes.
9        Q.   Are you aware of any written agreements
10   extending or modifying this contract?
11       A.   No, I'm not.
12       Q.   And then if you'll turn with me to the page 3
13   of the ask- -- ash disposal pit cell contract, which is
14   marked Ranger 000045.
15       A.   (Witness complies.)
16       Q.   Do you see that same terms of agreement
17   provision?
18       A.   Yes, I do.
19       Q.   Are you aware of any written agreement
20   extending or modifying the ash disposal pit cell
21   agreement?
22       A.   The only correspondence we would have would be
23   email correspondence post that September 2nd date where
24   Luminant was engaging us for work on the contract.
25       Q.   Okay.

6  (Pages 18 to 21)

22

1    MS. OKON: Okay. For the record --
2    **A. But no written agreement saying extension past**
3    **September 2.**
4    Q. (By Ms. Okon) Okay. So you're not contending
5    there's a written agreement between the parties
6    extending the ash disposal pit cell agreement?
7    **A. That's correct.**
8    Q. Okay. And then if you look -- I guess since
9    we're on this contract, we can stick on the ash disposal
10   cell pit contract.
11       Do you see the next paragraph down is
12   titled Schedule?
13   **A. Yes.**
14   Q. And it says, contractor will begin the work by
15   December 1st, 2012 and complete it by September 2nd,
16   2013.
17       Did I read that sentence correctly?
18   **A. Yes.**
19   Q. And if you turn back to the haul road contract,
20   Ranger 000180, do you see that same schedule provision?
21   **A. Which page? I'm sorry.**
22   Q. 000180. It's the third page of the first
23   contract.
24   **A. Oh, okay. Yes.**
25   Q. Okay. Do you agree that the two contracts

23

1    are -- are substantially similar in all the terms,
2    except for scope of work?
3    **A. Yes, they appear to have similarities.**
4    Q. Are you aware of any agreements between
5    Luminant and Ranger -- and Ranger modifying the schedule
6    provision of either the haul road or the ash disposal
7    pit contracts?
8    **A. Yeah.**
9    **On frequent occasions, we would discuss**
10   **schedule and components of the schedule with the**
11   **company's contract coordinator, which I believe is**
12   **Pastor, Behling & Wheeler. So we would frequently**
13   **discuss scheduling with them.**
14   Q. So --
15   **A. Site meetings and electronic correspondence.**
16   Q. Okay. So let's break that out for a second.
17       What you're referring to is emails that
18   will -- I think we'll go through today between Ranger
19   and PBW, correct?
20   **A. Yes.**
21   Q. And when we talk about PBW -- PBW, we're
22   talking about Pastor, Behling Wheeler, correct?
23   **A. Yes.**
24   Q. Okay. So let's take a minute, and if you'll
25   turn to the first page of the haul road contract.

24

1    Do you see that there's some definitions
2    there?
3    **A. Yes.**
4    Q. Okay. Do you see where it talks about the
5    contract coordinator?
6    **A. Yes.**
7    Q. And it says, the term contract coordinator
8    means a representative of each party named in this
9    agreement to act in matters relating to performance of
10   this agreement as it is written.
11       Actions of the contract coordinators
12   regarding the day-to-day interaction between the
13   operations of the parties, the issuance and approval of
14   invoices, the issuance and approval of procedures,
15   drawings, schedules, and documents of any tape, and any
16   other decision made in managing this agreement will not
17   operate as a waiver or compromise of any provision of
18   this agreement.
19       Did I read that correctly?
20   **A. Yes.**
21   Q. And who was the contract coordinator for Sandow
22   on this project; do you know?
23   **A. I -- Pastor, Behling & Wheeler.**
24   Q. And if you look at Ranger 000182.
25   **A. (Witness complies.)**

25

1    Q. Do you see at the bottom of that page who
2    Sandow's contract coordinator was?
3    **A. Jacob Gonzalez.**
4    Q. Okay. Who was Sandow's contract administrator?
5    **A. Mark Jenkins.**
6    Q. Okay. And I -- and -- and at some point, I'll
7    represent to you I think Mark Jenkins was replaced by
8    David Watkins.
9        And so do you agree with me that PBW was
10   neither Sandow's contract coordinator or contract
11   administrator under the contracts?
12   **A. Yes.**
13   Q. Do you contend that Jacob Gon- -- that either
14   Jacob Gonzalez, Mark Jenkins, or David Watkins ever
15   agreed to any modifications of the term or schedule of
16   the agreements?
17   **A. Nothing in writing.**
18   Q. Okay. Do you contend that any of those
19   individuals -- Jacob Gonzalez, Mark Jenkins, or David
20   Watkins -- ever orally agreed to modify or extend the
21   schedule or term of the agreement?
22   **A. Jacob Gonzalez and I absolutely had oral**
23   **conversation where we discussed work activities after**
24   **the September 2nd date.**
25   Q. Okay. And when you -- when you say discussed

**7  (Pages 22 to 25)**

## 26

1  work activities, that was where you-all would give
2  schedules, and Mr. Gonzalez would say understood,
3  correct?
4      A.  Yes.  We would talk about coordinating the next
5  item, and he would say whatever.
6      Q.  Did Mr. Gonzalez ever say, I excuse you for
7  being late under the contract?
8      A.  It's possible.
9      Q.  Do you remember Mr. Gonzalez ever telling you
10  that he excused Ranger from being late under the
11  contract?
12     A.  It's possible.
13     Q.  But sitting here today, can you remember him
14  actually saying that to you?
15     A.  I don't know for sure.
16     Q.  So sitting here today, you do not have a memory
17  of Mr. Gonzalez saying that to you, correct?
18     A.  We talked a lot about schedule.  I honestly
19  don't know.
20     Q.  Okay.  So sitting here today, you can't say
21  that you remember him saying that, correct?
22     A.  I don't know.
23     Q.  Who -- who issued the pay applications to
24  Sandow on Ranger's behalf?
25     A.  I created them; Bobbie Holstine administrated

## 27

1  sending them.
2      Q.  And if you'll turn with me for a second to
3  Exhibit No. 5.
4      A.  (Witness complies.)
5      Q.  Who signed the pay applications?
6      A.  That is my digital signature.
7      Q.  Okay.  Did you authorize your digital signature
8  to be put on Exhibit No. 5?
9      A.  Yes, I suppose I authorized myself.  Yes.
10     Q.  And then if you'll look at Exhibit No. 6,
11  that's another application for payment submitted by
12  Ranger, correct?
13     A.  Yes, ma'am.
14     Q.  And is that your signature on Exhibit No. 6?
15     A.  (Nodding.) Yes, it is.
16     Q.  And did you authorize your signature to be
17  placed on Exhibit No. 6?
18     A.  Yes, I did.
19     Q.  Okay.  And if you'll turn with me to Exhibit
20  No. 38.
21     A.  (Witness complies.)
22     Q.  Is that another application for payment
23  submitted by Ranger to Sandow?
24     A.  Yes, it is.
25     Q.  And is that your digital signature on Exhibit

## 28

1  No. 38?
2      A.  Yes, it is.
3      Q.  And did you authorize your signature to be
4  placed on Exhibit No. 38?
5      A.  Yes, I did.
6      Q.  Okay.  One more.  If you'll turn to Exhibit
7  No. 39.
8          Is that another application for payment
9  issued by Ranger to Sandow?
10     A.  Yes, it is.
11     Q.  And is that your digital signature on Exhibit
12  No. 39?
13     A.  Yes, it is.
14     Q.  And did you authorize your signature to be
15  placed on Exhibit No. 39?
16     A.  Yes, I did.
17     Q.  Okay.  If you'll go back to Exhibits 5 and 6.
18          Those two are applications for payment
19  related to work performed during August of 2013 -- well,
20  let me rephrase that.
21          5 and 6 are applications for payment that
22  indicated estimate period from August 1st, 2013 to
23  August 31st, 2013, correct?
24     A.  Yes.  That's the payment period.
25     Q.  Okay.  And Exhibit No. 5 is for the landfill

## 29

1  cell, and Exhibit 6 is for the haul road, correct?
2      A.  Yes.
3      Q.  But if you look at those pay applications, the
4  continuation sheets show that there was no work actually
5  performed by Ranger during August of 2013, correct?
6      A.  There was nothing on the payment application
7  for work that doesn't necessarily -- work wasn't
8  happening on the job.
9      Q.  Well, you're not billing for any work performed
10  during August, correct?
11     A.  Happens a lot, where you do work and there's
12  nothing to bill for it.
13     Q.  Okay.  And explain that to me.
14          Why -- how could you do work and there's
15  nothing to bill for?
16     A.  Maybe you billed for it in a previous month,
17  maybe you're fixing something.  There's all sorts of
18  reasons why you would be doing an activity, potentially
19  have already billed for it, or have no item to bill for.
20  But it's a common occurrence.
21          So, yeah, for something to have a zero on
22  a payment application would mean that there's no work
23  isn't true.
24     Q.  So let's talk -- let's break that down and talk
25  about that for a second.

8  (Pages 26 to 29)

38

1   and we tried to limit these things from August of 2013
2   through July 2014. I can -- I mean, there are a series
3   of emails we can recreate and we can find them.
4        MS. OKON: I a hundred percent disagree.
5   We never had that agreement. I may have had --
6        MR. SAKONCHICK: No. We did have that
7   agreement because we agreed we weren't going to get into
8   all the work that occurred in the year-and-a-half
9   before --
10       MS. OKON: I disagree. We limited in our
11  email that went to the topics. I never made an
12  agreement that I wouldn't ask for information prior to
13  August of 2013.
14       MR. SAKONCHICK: Well, I disagree with
15  that.
16       MS. OKON: Well, let's take a break, and
17  then you can find me that agreement, and then we can
18  address it.
19       MR. SAKONCHICK: Well, no. I'm going to
20  have to go through a series of emails that we've had for
21  the last six month.
22       MS. OKON: Then I'm going to ask my
23  questions, and you can object if you want, but I never
24  made that agreement.
25   Q.  (By Ms. Okon) Okay. Let's go back to Exhibit

39

1   No. 3, and we can go back to Ranger 000180, where we
2   were looking at the term in the schedule.
3    A.  Yes, ma'am.
4    Q.  Did Ranger complete its work by September 2nd,
5   2013?
6    A.  We completed the entirety of the cell. The
7   cell was fully functional for the purpose of the work
8   that we were hired to do. There was natural vegetation
9   that had grown by September 2nd. Essentially, the total
10  scope of work was fully functional by September 2nd.
11   Q.  So as of September 2nd, 2013, did Ranger
12  consider itself complete?
13   A.  We -- it -- it depends on how you describe
14  that.
15       So there was an open debate and open
16  discussion that occurred between September and when we
17  finally did a reseeding and matting. Natural growth of
18  vegetation had occurred prior to September 2nd.
19       And on a previous project with the same
20  engineer, we had established the fact that they wanted
21  to keep the dollars for the seeding and the matting on a
22  portion of the cell and not spend those dollars. And
23  the job was essentially done in the same fashion here,
24  natural growth of vegetation grew. And we were giving
25  them the opportunity to let them decide if they wanted

40

1   to keep that or not.
2    Q.  Okay. So when did Ranger demobilize,
3   initially, from this project?
4    A.  Well, so with an earthwork operation, multiple
5   types of equipment come in and out frequently for
6   whatever types of activities you need to do.
7        So the last day of the last machine -- I
8   don't know the date, specifically -- but a
9   demobilization effort takes a long time for an earthwork
10  operation. So it doesn't happen in an instance. It's
11  not like one minute you're there, and one minute you're
12  not.
13   Q.  Can you tell me approximately when Ranger
14  demobilized from the Sandow project, initially?
15   A.  I don't know the date exactly. But
16  approximately -- I'm not sure. I don't know a date, so
17  I would have to make something up to tell you, which I
18  don't want to do.
19   Q.  Do you know a month when -- when Ranger
20  demobilized?
21   A.  It's possible the last month was August. But,
22  again, even for me, demobilization doesn't necessarily
23  stay strict to equipment only. You know, our
24  superintendent is there actively managing some other
25  aspect of the work, that doesn't mean that we're

41

1   demobilized. We may still be active there.
2    Q.  Okay. Can you tell me approximately when
3   Ranger removed its equipment from this project
4   initially?
5    A.  I do not know.
6    Q.  Do you have a month?
7    A.  There is -- I could go back historically and
8   try and find the record. I don't know the exact time
9   frame. I'm sorry. Somewhere -- somewhere between --
10  and, again, demobilization takes a while. So, I mean,
11  it could have been between July, August, September.
12  It's somewhere in that ballpark.
13   Q.  So the best estimate you can give me for when
14  Ranger initially removed its equipment from this project
15  is sometime between July and September 2013?
16   A.  Sometime in that time frame.
17   Q.  Okay. So at that time, did Ranger think it was
18  entirely possible that Ranger would never come back out
19  and do the seeding and vegetation?
20   A.  We weren't sure.
21   Q.  Okay.
22   A.  It was unknown. Because we were in open
23  discussions with our customer to try and determine what
24  was best for them, how could they save money. I mean,
25  we had a really wonderful relationship with this client,

42

1  and we built a previous project with them, which we were
2  very proud of, and they were, too. It functioned really
3  very well. And because that operation was going so
4  quickly, they needed our help to build another cell as
5  fast as possible. So we did, and we executed the work
6  very well.
7       And they had the opportunity, in an open
8  discussion with us, to just see if they wanted to keep
9  it. I think, for them, there was other -- and I don't
10 know all their circumstances. But there are other
11 circumstances with lease agreements and other
12 individuals that they were working with that -- I think
13 that they had to fulfill.
14      If it would have been, I believe, on their
15 own terms, other huge portions of this cell, they saved
16 17-plus acres of -- of revegetating and -- and matting
17 because natural growth had taken on.
18      So they used, I think where they could,
19 the dollars, and they saved the money when they could.
20 So we were certainly an ally to them at the time.
21      Q. Okay. So with regard to this project,
22 Luminant -- or Ran- -- or sorry. With regard to this
23 project, Sandow never raised the notion with you-all
24 about should we just let vegetation naturally occur,
25 that was a conversation Ranger raised with Sandow,

43

1  correct?
2       A. I don't remember the specifics of how it was
3  raised. It could have been an open dialogue between
4  both of us. I'm not sure.
5       Q. But what you know is at the time you
6  demobilized in sometime between July and September of
7  2013 --
8       A. (Nodding.)
9       Q. -- you thought that it was in Sandow's best
10 interests to potentially forego the seeding and
11 vegetation work in your scope of work?
12      A. Well, I don't know about their best interests,
13 but I was just trying to give them an idea to save
14 money.
15      Q. Okay.
16      A. Because we care about them as a client. We
17 just want to make sure that what they get is what they
18 want. So we were just trying to do something that would
19 offer them some savings, and they could save some money
20 and use what happened naturally, which they did before,
21 and it seemed to work well.
22      Q. So sometime in between July and September 2013
23 when you demobilized, you know, A, there had been
24 projects before where you've never done this seeding and
25 vegetation work; and, B, that may very well happen in

44

1  this project, and you may never come back out there,
2  correct?
3       A. Both. Yeah. Possible. It's possible.
4       Q. Okay.
5       A. But that doesn't mean that if they demanded us
6  to come back or sent us a written notice or something,
7  it doesn't mean that we wouldn't. We are more than
8  happy to -- you know, this contract is not a lump sum;
9  it's paid on a measured quantity in place. So every
10 measurement of each quantity, the smaller we can make it
11 for them, the better for them.
12      Q. Okay.
13      A. So if measured quantity ends up being zero,
14 then that item on the payment application is zero, and
15 there's no value associated with it on the contract.
16 And, essentially, it would carry zero retainage. It
17 would carry no value. So anything that we can make a
18 zero for them is better for them.
19      Q. Okay. And let's talk about that for a second.
20      Most of the work on this project Ranger
21 did itself, correct?
22      A. On a percentage basis, yes. We are the most.
23      Q. You only had two subcontractors on this
24 project, correct?
25      A. I believe that is correct.

45

1       Q. One subcontractor did the liner.
2       A. Yes, ma'am.
3       Q. And the other subcontractor is BMP, correct?
4       A. Yes, ma'am.
5       Q. And BMP is the subcontractor who did the
6  seeding and vegetation, correct?
7       A. Additionally, they did initial erosion control.
8  So they were the first activity on-site doing initial
9  silt fence, any initial erosion control that captures
10 the stormwater from running off.
11      Q. When you engaged them to do the initial work on
12 the silt fence, did their subcontract also include the
13 vegetation and seeding at the end?
14      A. Yes.
15      Q. Okay. So when you engaged them at the
16 beginning of the project, they were already engaged to
17 do the vegetation and the matting for the end?
18      A. They were involved, but there was -- I mean, we
19 use them for seeding. We've tried to use other people
20 for seeding. So, yes, they had given me a quote that
21 included it all; yes, ma'am.
22      Q. Okay. But your subcontract that you had signed
23 with them, did it include in its scope of work also the
24 seeding and vegetation?
25      A. I don't -- I don't -- I honestly don't -- I

12 (Pages 42 to 45)

46

1  think we had a quote from them.
2      Q. Okay. So you don't know whether they were
3  already contracted at the beginning of the project to do
4  the seeding and vegetation or if you contracted newly at
5  the end?
6      A. We did -- I think we just worked with them off
7  of a quote.
8      Q. Okay.
9      A. That's all.
10     Q. Okay. Did you feel like at the beginning of
11  the project they were bound by their quote to do the
12  seeding and vegetation at what was in their quote?
13     A. I know we certainly -- we're not the type of
14  people to, you know, have somebody do one thing and then
15  take another scope from them and give it to somebody
16  else.
17         Now, if we're in dire straits -- and at
18  some point on this job, we did try to reach out to
19  anybody who would try to come out to the site. We tried
20  anyone local, anyone in the area, but a lot of people
21  had anxiety about the overwhelming umbrella that was
22  shadowing this job, which was there was a huge news
23  article that dropped a bomb on the fact that, seemed
24  like, at any minute there could be a bankruptcy.
25     Q. Okay.

47

1      A. So we had not only a difficult time at some
2  point to try to get -- once Sandow and the team wanted
3  us to go back and reseed and remat these slopes, once
4  they determined -- anyway, it took multiple weeks to get
5  to this point. But once we determined which area they
6  wanted to do this, once we got there, then -- I mean, we
7  tried to reach out to anyone local. We tried to reach
8  out to anybody who would want to come out there, but it
9  was not easy.
10     Q. Okay. So let's talk about that.
11         Ranger did not learn of a potential for
12  bankruptcy on behalf of Luminant or Sandow until October
13  2013, correct?
14     A. You know, Will is a -- he -- Will is another
15  project manager, and he always knows -- seems like he
16  knows all sorts of information. He also worked with
17  Luminant on other projects.
18         And I -- I don't remember when. I don't
19  know the exact timing. But at some point, there was
20  a -- you know, knowledge that there's potentially
21  something going to happen, but we didn't know for sure.
22  We don't know anything for sure.
23         MS. OKON: I'm going to object as
24  nonresponsive.
25     Q. (By Ms. Okon) When did Ranger, to your

48

1  knowledge, first become aware there was potential for
2  bankruptcy on behalf of Luminant or Sandow?
3      A. Don't know the date.
4      Q. Okay. I'm going to represent to you that Brad
5  McKenzie testified yesterday that he first discovered
6  the potential for bankruptcy in October of 2013.
7      A. Okay.
8      Q. Do you remember how you first learned of the
9  potential for bankruptcy?
10     A. It would have been from Will, but I don't know
11  the date.
12     Q. Okay. And that's Will Lyons?
13     A. Yes, ma'am.
14     Q. Okay. And so if we want to know when Will may
15  have told you about it, we'd have to ask Will?
16     A. (Nodding.)
17     Q. Okay. What did you do when Mr. Lyons told you
18  there was a potential for bankruptcy?
19     A. Nothing.
20     Q. Did you tell someone else at Ranger?
21     A. I don't know.
22     Q. Did you talk to Mark McKenzie about that?
23     A. Will would have done that, not me.
24         MS. OKON: I'm going --
25     Q. (By Ms. Okon) Okay. So you did not?

49

1      A. I don't know.
2      Q. Okay. Did you talk to Brad McKenzie about
3  that?
4      A. I don't know.
5      Q. Did you talk to Bobbie Holstine about that?
6      A. I don't know.
7      Q. Who did you reach out locally to once you
8  discovered that to see if they would do the seeding and
9  vegetation work?
10     A. Gary Ballard drove around Rockdale and these
11  surrounding areas asking multiple local contractors. I
12  don't know their names. He reported back to me,
13  essentially, saying that nobody wants to come try.
14     Q. Okay. So did you personally go in any of those
15  calls or contacts with Mr. Ballard?
16     A. I -- it's hard to remember, but I think I might
17  have talked to one or two of them on the phone to
18  encourage them that, you know, we would certainly pay,
19  and don't worry about it. You know, we're happy --
20  we'll do our part. You know, we don't want you to --
21  Luminant was a good customer for us, so we just wanted
22  to make a good showing and do what we could. So I --
23  it's possible.
24         THE WITNESS: Did I talk to you . . .
25     Q. (By Ms. Okon) Do you actually have a memory of

13  (Pages 46 to 49)

Nathan Ziehr

50

1 calling anyone?
2    A. That's a foggy memory I have, but it's
3 possible.
4    Q. And, you know, in some sense, everything's
5 possible, right?
6       Do you have a memory of calling anyone to
7 see if you could get them on board to get them to do
8 seeding and vegetation?
9    A. Yes. There's a memory in my head that --
10 telling me that I did try to call at least one or two
11 or, maybe even a few. Yeah.
12    Q. And who did you call?
13    A. I'm sorry. I don't know.
14    Q. What did they say to you?
15    A. I'm sorry. I don't remember.
16    Q. Okay. And anything else other than what you've
17 just told me would just be things that Mr. Ballard
18 reported to you?
19    A. Yes, ma'am.
20    Q. And if we wanted to have had first-hand
21 knowledge of those events, we'd have to ask Mr. Ballard?
22    A. Yes, ma'am.
23    Q. All right. Let's talk for a second about how
24 it works when you hire subcontractors.
25    A. Yes, ma'am.

51

1    Q. And let's talk specifically about your
2 relationship with BMP related to the Sandow job.
3    A. Yes, ma'am.
4    Q. Okay. When you retained BMP to do work for the
5 Sandow job, you would essentially bill BMP's charges
6 plus 10 percent to Luminant, correct?
7    A. I'm not -- that's not true.
8    Q. Okay.
9    A. We -- there's no set markup or -- you know, we
10 had a bid item for each type of activity they would do;
11 sometimes not even a bid item. So, I mean, we would --
12 I think that if we're talking specifically about seeding
13 and matting, there was something by the acre. So I --
14 and I think matting is priced by the square yard,
15 seeding is by the acre, and then there's -- there's
16 items that are subsidiary to them, like watering and
17 other things. So there's -- you know, there's not one
18 set markup.
19    Q. Okay. So let's look at Exhibits 38 and 39.
20    A. Yes.
21    Q. Or -- yeah 38 and 39.
22    A. Yes, ma'am.
23    Q. Those are the applications for payment that
24 Ranger submitted for the veg- -- the seeding and
25 vegetation work, correct?

52

1    A. Yes, ma'am.
2    Q. Okay. So looking at Exhibit 38, Ranger billed
3 Luminant 41,800 dollars for vegetation and seeding work
4 on a landfill cell, correct?
5    A. Yes. And it looked like they saved 12,500 on
6 the flat surfaces; that's good.
7       MS. OKON: I'm going to object to the
8 nonresponsive portion of that answers.
9    Q. (By Ms. Okon) And if we look at Exhibit No. 39,
10 it looks like Ranger billed Sandow 22,950 dollars for
11 vegetation, seeding work related to the haul road; is
12 that correct?
13    A. Yes, ma'am.
14    Q. Okay. Do you know of that approximately --
15 that's approximately 64, 65,000 dollars total, correct,
16 for those two applications?
17    A. Yes.
18    Q. Of that approximately 65,000 dollars, how much
19 did Ranger have to pay to BMP?
20    A. I don't know.
21    Q. Do you know in order of magnitude?
22    A. Yeah.
23    Q. How would we find that out?
24    A. Probably an invoice record somewhere.
25    Q. Okay. So there should be an invoice from BMP

53

1 to Ranger for that far work?
2    A. Yeah.
3    Q. Okay. And there also should be a payment from
4 Ranger to BMP for that work?
5    A. Yeah.
6    Q. Would you agree with me that when you have a
7 subcontractor, a significant portion of the billing goes
8 directly to the subcontractor?
9    A. Yeah.
10    Q. Okay. And so for doing the seeding and
11 vegetation work on the project -- overall, how big of a
12 contract was this between Sandow and Ranger?
13    A. Couple million dollars.
14    Q. Actually, if you'll look at --
15    A. Three -- 3, 4.
16    Q. 3,451,355 dollars and 80 cents, correct? That
17 was the total?
18    A. That was just the --
19    Q. That's just for the land cell?
20    A. Yes.
21    Q. Okay.
22    A. And then there's the road as well.
23    Q. And how much was the total value of the haul
24 road contract?
25    A. 800 plus.

**14 (Pages 50 to 53)**

Nathan Ziehr

## 58

1  you remember that?
2      A.  Yes.
3      Q.  Okay.  Did you talk to anybody at Sandow or
4  Luminant when those concerns were raised for you?
5      A.  It is possible.  I don't remember.  It's
6  possible that I talked to -- actually, I can tell you
7  this definitively, I do remember positively talking to
8  David Watkins about it at some point.  I don't remember
9  the time frame.  I also remember definitively talking to
10  Pat Behling about it.
11          (Ms. Alaman sneezes.)
12          MS. ALAMAN:  Excuse me.
13      A.  On more than one occasion.
14          THE WITNESS:  Bless you.
15          (Ms. Alaman sneezes.)
16          MS. ALAMAN:  Excuse me.
17          THE WITNESS:  Bless you.
18      A.  And it's also very possible I talked to Jacob
19  Gonzalez about this as well.
20      Q.  (By Ms. Okon)  Okay.  So especially since I
21  interrupted that testimony, let me go back over this.
22          You know at some point you talked to David
23  Watkins from Luminant about the potential of bankruptcy.
24      A.  Yes.
25      Q.  You know that at some point you talked to Pat

## 59

1  Behling at PBW about the potential for bankruptcy.
2      A.  Yes.
3      Q.  And then you believe you also talked to Jacob
4  Gonzalez from Luminant Sandow multiple times about the
5  bankruptcy.
6      A.  Him, probably one time; but Pat Behling, more
7  than one time.
8      Q.  Okay.  Do you remember the substance of any of
9  those conversations?
10      A.  Generally, the substance was our subcontractor
11  has a concern.  They just want to make sure that they're
12  gonna come out here and be compensated for the work that
13  they do.  So we were trying to be a voice for our
14  subcontractor trying to give them some assurance that
15  they would be compensated by Luminant through us for
16  their work.
17      Q.  And the subcontractor you were talking about
18  was BMP, correct?
19      A.  Yes, ma'am.
20      Q.  Okay.  And the contract that BMP had was with
21  Ranger, correct?
22      A.  Yes, ma'am.
23      Q.  And then Ranger had contract with Sandow.
24      A.  Yes, ma'am.
25      Q.  Did you assure BMP that Ranger would pay BMP

## 60

1  whether or not Sandow paid Ranger?
2      A.  At some point, it came to that moment where I
3  did.
4      Q.  Okay.
5      A.  I said, listen, regardless of anything,
6  Ranger's worked with BMP for years, we will make sure to
7  make you whole.
8      Q.  Do you remember when you gave BMP that
9  assurance?
10      A.  Sometime in 2014, maybe first couple months,
11  maybe.
12      Q.  Now, when you raised these concerns with
13  Mr. Watkins, do you have any memory of what
14  Mr. Watkins's response was?
15      A.  I do remember that Luminant representatives did
16  not have a clear answer themselves.  They -- it seemed
17  like they were in the dark.  They didn't know enough
18  information to provide us any assurances.  They did
19  their best to try to help explain what they knew, but it
20  definitely seemed like they did not know more than I
21  think any article, news article would tell us.
22      Q.  And does that go for both Mr. Watkins and
23  Mr. Gonzalez?
24      A.  Yes.
25      Q.  And what about Mr. Behling, do you remember

## 61

1  anything specific about what his response was?
2      A.  I do remember one moment -- and I don't know
3  why I've latched onto this.  But I do remember him
4  telling me a couple of times that he had anxiety sending
5  his representative, Steve Berndt --
6      Q.  Berndt.
7      A.  -- out there for fear of not being able to be
8  compensated for the time that Steve spends out there.
9          So I remember him saying to me, you know,
10  I -- trying to limit the amount of time I sent him out
11  there so his exposure was less.  So he was -- it seemed
12  like he was intentionally trying to be careful.
13      Q.  Now, you got your degree in business and
14  economics, correct?
15      A.  Yes, ma'am.
16      Q.  In your studies, did you-all do any study of
17  bankruptcy or bankruptcy procedure?
18      A.  I don't remember bankruptcy study in my
19  studies.  It's -- I know what bankruptcy is.  I
20  understand some small aspects of it, but I don't
21  remember a specific study.
22      Q.  Okay.  So at the time these concerns were being
23  raised, what did you understand about the bankruptcy
24  process?
25      A.  I know the two terms Chapter 11, Chapter 7.  I

**16 (Pages 58 to 61)**

62

1  know the terms secured and unsecured creditor. And
2  that's, generally, about — I also know there's
3  potentially post-petition funding. That's probably
4  the —
5      Q. Okay.
6      A. — limit of my knowledge.
7      Q. So let's talk about that for a second.
8          So at the time these bankruptcy concerns
9  were being raised —
10     A. Uh-huh.
11     Q. — you weren't an expert in bankruptcy,
12 correct?
13     A. Definitely not.
14     Q. Okay. But what you did know was that once a
15 debtor filed a bankruptcy petition, then there could be
16 funding for work done after the failing?
17     A. I was definitely educated on that a lot closer
18 to the actual bankruptcy. I think right after is where
19 I understood more of — of that, not prior.
20     Q. Okay. So you're saying prior to Luminant
21 filing bankruptcy, you did not understand anything about
22 post-petition.
23     A. No. That all came after, I believe. I believe
24 that's right. That I learned sort of how that process
25 would unfold. Because I remember trying to ask the

63

1  Luminant guys just how it would work, what happens if
2  you go bankrupt, what does that mean for us as a
3  contractor on your project.
4      Q. Okay. And did any of the Luminant people ever
5  have discussions with you about post-petition funding?
6      A. Just not sure. It's possible. But I honestly
7  don't remember perfectly.
8      Q. Okay. And then at the time that you first had
9  these concerns about bankruptcy arise, did you, at that
10 time, know the difference between a secured and
11 unsecured creditor?
12     A. Yes. I knew what those terms meant.
13     Q. Okay. And what was your understanding of what
14 those terms meant?
15     A. One gets paid first; one gets paid second.
16     Q. Okay.
17     A. One has some assurance of payment; one, there
18 is no assurance.
19     Q. Okay. So which — what was your understanding
20 as to which type of creditor got paid first?
21     A. Secured.
22     Q. Okay. And did you, at that time, understand
23 whether there was any way that Ranger could make itself
24 a secured creditor?
25         MR. SAKONCHICK: Objection.

64

1          Don't answer anything that resulted from
2  the discussions that you may have had with me or any
3  emails you may have read from me.
4      A. I don't know.
5      Q. (By Ms. Okon) Okay. Do you remember what the
6  time period was when you first got brought into
7  discussions with legal counsel or had any discussions
8  with legal counsel passed on to you?
9      A. I don't know the time frame, but I hope the
10 email dialogue would show that exact time frame.
11     Q. Okay. Are you related to anybody else in the
12 company?
13     A. Yes.
14     Q. Who are you related to?
15     A. I am the son-in-law of Mark McKenzie.
16     Q. Okay. So you are married to Mark McKenzie's
17 daughter?
18     A. Yes.
19     Q. Okay. So, if we can, let's turn to Exhibit
20 No. 7.
21     A. (Witness complies.)
22     Q. What is Exhibit No. 7?
23     A. An email from Chris Collins to me regarding
24 Sandow.
25     Q. Okay. And so you're looking at the latest

65

1  email in the chain, correct, on October 1st?
2      A. Yes.
3      Q. So let's go back to Ranger 000219, which is the
4  beginning of the email train — chain — chain.
5      A. Yes, ma'am.
6      Q. So this conversation starts with an email from
7  Mr. Collins to you about the type of fertilizer,
8  correct?
9      A. Yes.
10     Q. Okay. And then you forward Mr. Collins' email
11 on to Mr. Behling and Mr. Sutherland at PBW, correct?
12     A. Yes.
13     Q. Now, Mr. Collins' email is August 6th, 2013,
14 correct?
15     A. Yes.
16     Q. At that time, had Ranger already identified BMP
17 as a subcontractor who would do the seeding and
18 vegetation work?
19     A. Yes.
20     Q. Okay. One of the things that you conveyed to
21 Mr. Behling and Mr. Sutherland is, according to the
22 local experts we have corresponded with, it would be ill
23 advised to try to plant anything now.
24         Is that what you were communicating?
25     A. That is what I wrote.

17 (Pages 62 to 65)

78

1    A. Correct.
2    Q. Okay. Now, let's talk about you -- you
3    reference that you think the scope of the Luminant or
4    Sandow project changed.
5         Are you simply saying that as time went on
6    more volunteer vegetation came in, and that potentially
7    reduced the amount of area that needed to be planted and
8    seeded?
9    A. Definitely not.
10   Q. Okay.
11   A. So the areas were adapted from multiple
12   reasons. There was a stockpile area that was --
13   essentially, it grew as the project went on. There were
14   changes to the several grades that dictated that.
15        The haul road had to adapt the slopes into
16   an area because the grades of the tie-in that we were
17   doing had to be adjusted up because they had dumped more
18   bottom ash into that area. So the tie-in grades had to
19   all be pushed up.
20        So the scope was actively adapting
21   throughout the course of the project and after the job
22   with erosion and just what needed to be done to get the
23   final product to the customer.
24   Q. Now, the erosion was occurring because we
25   didn't have the matting and the seeding and vegetation

79

1    done, correct?
2    A. Not necessarily. I -- I mean, erosion can be a
3    cause of a substantial rain event that no matting or
4    seeding could maintain. Erosion is -- it's a -- it's a
5    function of -- of weather.
6    Q. Do you agree that erosion is certainly worst
7    when you don't have matting, seeding, and vegetation
8    done.
9    A. Only if there's a substantial rain.
10   Q. And if you have erosion, does that indicate to
11   you there was a substantial rain?
12   A. Yes.
13   Q. Okay. Are you testifying that between August
14   7th, 2013 and September 17, 2013, there were material
15   scope changes to the seeding and vegetation work that
16   was going to be done at the Sandow project?
17   A. It is very possible.
18   Q. Do you remember, sitting here today, any
19   material scope changes that occurred to the seeding and
20   vegetation portion of the Sandow job between August 7th
21   of 2013 and September 17 of 2013?
22   A. They were -- yeah. I -- it's -- did they not
23   change? They asked about the fertilizer type or
24   fertilizer quantity. It's possible.
25   Q. Who recommended there be a change in the type

80

1    of fertilizer?
2    A. Grace.
3    Q. BMP?
4    A. Yes.
5    Q. Your subcontractor?
6    A. Yes.
7    Q. So the change in fertilizer was not initiated
8    by Sandow, was it?
9    A. Nope.
10   Q. That was initiated by your subcontractor,
11   correct?
12   A. Yes.
13   Q. Okay. Did the Lazy Nine project have a
14   completion date associated with that contract?
15   A. Yes.
16   Q. Okay. What was the completion date that was
17   associated with the Lazy Nine project?
18   A. I do not know that date.
19   Q. Okay. Do you know whether you completed that
20   Lazy Nine project on time?
21   A. I do not know.
22   Q. Okay. So then Mr. Collins responds to you on
23   September 17, end of September, beginning of October
24   would be good.
25        And he's responding to your question about

81

1    both projects, correct?
2    A. Yes.
3    Q. Do you know whether BMP had capacity to do both
4    the Lazy Nine project and the Sandow project at the same
5    time?
6    A. I do not know their capacity.
7    Q. Okay. So why is it that you do not respond to
8    his email until October 1st, 2013?
9    A. It's possible we had a phone call, or it's
10   possible that I had other correspondence that I tended
11   to. This is not the only project I managed. So . . .
12   Q. Sitting here today, can you give us any
13   definitive reason why, then, you wait two weeks to
14   respond to Mr. Collins' email?
15   A. I am not sure why it took me two weeks.
16   Q. Did you do -- okay.
17        And when Mr. Collins tells you that BMP
18   can do this work end of September, beginning of October,
19   he doesn't mention anything about having to get people
20   certified -- training, certified, or anything like that,
21   correct?
22   A. Correct.
23   Q. He doesn't mention any problems with getting
24   equipment at that time, correct?
25   A. Correct.

86

1    A.  Yes.
2    Q.  Okay.  So Gary Ballard is representing to
3    you -- I'm sorry -- Mr. Collins is representing to you
4    that he's spoken with your superintendent --
5    superintendent Gary Ballard, and that they should be
6    able to do it starting next Wednesday.
7    A.  Yes.
8    Q.  And that would have been approximately October
9    7th.
10   A.  Yes.
11   Q.  Who ordered material for the vegetation work,
12   Ranger or BMP?
13   A.  BMP.
14   Q.  Let's go to Exhibit No. 8.
15   A.  (Witness complies.)
16   Q.  Now, if you go back to the beginning email on
17   Exhibit 8, which is page 4, it starts with, Matt
18   Sutherland from PBW contacting you and asking you for an
19   update on the vegetation; do you see that?
20   A.  Yes.
21   Q.  Is this the first communication between Ranger
22   and PBW since you-all suggested four to six weeks on
23   August 7th of 2013?
24   A.  I'm certain we corresponded between those time
25   frames that are not represented here.

88

1    Q.  All right.  So the next email we see is from
2    Mr. Sutherland to you dated September 30th, 2013; do you
3    see that?
4    A.  Yes.
5    Q.  Were there any conversations between you and
6    anyone at PBW or Sandow or Luminant between September
7    18th, 2013 and September 30th, 2013 about vegetation?
8    A.  It's very possible.  I don't know.
9    Q.  Okay.  You can't --
10   A.  Don't recall.
11   Q.  You don't remember specifically --
12   A.  No.
13   Q.  -- today?
14   A.  I mean, we talked very frequently.
15   Q.  And, again, Matt Sutherland is asking you for
16   an update on the vegetation, correct?
17   A.  Yes.  Yes.
18   Q.  And based on the last correspondence we had
19   from you saying beginning of October, Ranger should be
20   ready to start, correct?
21   A.  Yes.
22   Q.  And what do you respond to Mr. Sutherland?
23   A.  I wrote in the email, actually, yes, we are
24   ordering a grass mat.  As soon as that arrives, we are
25   going to dive right into the seeding.

87

1    Q.  Okay.  What communications did you have with
2    PBW or Sandow or Luminant between August 7th, 2013 and
3    September 17, 2013 related to vegetation?
4    A.  Probably multiple phone calls.  I don't know.
5    Q.  What were the substance of any of those
6    communications that you say occurred between August 7th,
7    2013 and September 17, 2013 about vegetation?
8    A.  I'm not sure.  I don't remember exact
9    substance.  It would probably just be in general about
10   the topics that Chris brought up maybe about the
11   fertilizer, maybe about areas.
12   Q.  You don't really know, sitting here today?
13   A.  No.
14   Q.  So what we know is on September 17, 2013, PBW
15   asked for an update, correct?
16   A.  Yes.
17   Q.  And what is your response?
18   A.  I wrote in the following email, beginning of
19   next month.
20   Q.  Which would have been beginning of October,
21   correct?
22   A.  Yes.
23   Q.  And that lines up with your conversations with
24   Mr. Collins, correct?
25   A.  Yes.

89

1    Q.  Why hadn't Ranger ordered grass mat prior to
2    October 1st of 2013?
3    A.  I -- that was a BMP item to order.
4    Q.  How did you know that BMP had not ordered grass
5    mat?
6    A.  Probably with a phone call.  They probably
7    called and said they're ordering.  This -- this email's
8    literally probably a dictation of something told to me
9    by BMP.
10   Q.  Okay.  Because the last correspondence from BMP
11   is, we'll be ready to go beginning of October, correct?
12   A.  Yeah.  And it's -- I -- I kid you not, I mean,
13   I -- I don't just make these things up.  It's probably a
14   phone call from Chris telling me the exact thing to
15   write here.  When I get an email from Matt or Pat, I
16   almost always would turn around and call, because I
17   don't know the update without asking them.  You know,
18   they're -- is their work.  They're the subcontractor
19   doing the matting and seeding, so I have to ask them.
20   So I turn around and I either email them or call them.
21   So this is probably a dictation directly from BMP.
22   Q.  Okay.  So let's talk about that.
23        Ranger was the general contractor on this
24   work, correct?
25   A.  Yes.

Nathan Ziehr

90

1    Q.  Ranger's the one who had the contract with
2    Sandow, correct?
3    A.  Yes.
4    Q.  Rangers the one who had contractual obligations
5    to Sandow, correct?
6    A.  Yes.
7    Q.  Ranger's the one who had an obligation to meet
8    a schedule under the contract, correct?
9    A.  Yes.
10   Q.  Ranger has the option to either do the work
11   itself or subcontract for the work, correct?
12   A.  We don't have the option to do it ourselves.
13   We don't have the capacity to seed.
14   Q.  And what do you mean the capacity?
15   A.  We don't have the tools, the materials, the
16   labor specific to that.  We do not have the capacity to
17   seed.  That's why we subcontracted the order.
18   Q.  But you could, if you chose, hire the people to
19   do it, buy the equipment you needed, and do it yourself,
20   correct?
21   A.  No.  We would have always subcontracted this
22   work.
23   Q.  Okay.  Why?
24   A.  Because it takes a specialized person to do
25   this type of work.

91

1    Q.  Okay.  Well, in the -- in the contract with
2    Luminant, you're responsible for it whether you do it
3    yourself or your hire somebody else, correct?
4    A.  Yes.
5    Q.  And it is not a defense under the contract that
6    I'm having trouble managing my subcontractor, is it?
7         MR. SAKONCHICK:  Objection; assumes facts
8    not in evidence.  You haven't pointed out any specific
9    area of the contract.
10   A.  I don't know if that's in the contract.
11   Q.  (By Ms. Okon) Okay.  You don't know whether,
12   under the contract, you had an obligation to manage your
13   subcontractors?
14   A.  I don't remember reading that in the
15   subcontract.
16   Q.  Okay.  Did you feel like you had an obligation
17   as the general contractor to ensure that your
18   subcontractors were going to do the work timely?
19   A.  Yes.  I tried.  I definitely did.
20   Q.  So what did you do prior to October 1st of 2013
21   to make sure that BMP had ordered all the necessary
22   supplies?
23   A.  Just probably general communication with them,
24   trying to do what I could to make sure they have that.
25   I -- I don't know all of these ins and out of their

92

1    business, so I don't know all the right questions to as
2    always.  Sometimes I learn each day.  So I probably just
3    didn't know that they had to have all -- all these
4    fertilizers.  I just probably didn't understand as well
5    as I should have.
6    Q.  Okay.  Well, matting was specifically part of
7    the scope of work, correct?
8    A.  Potentially.  There were other areas that
9    didn't need to be matted.
10   Q.  Okay.  But the contract specifically called out
11   matting as something you-all needed to provide, correct?
12   A.  But, again, matting changed.  Multiple times,
13   matting changed from one type of mat to another type of
14   mat.
15   Q.  Where -- what -- what are you talking about?
16   A.  There is -- they asked for one type of mat, and
17   there's another type of mat that was later on delivered
18   and installed, I think, in July.  So I think the mat --
19   Q.  Sorry.  Didn't mean to cut you off.
20   A.  There was one type of mat that was specified in
21   the contract, and I think another type of mat was
22   actually installed at the end of the day.
23   Q.  Okay.  So what type of mat was originally
24   specified?
25   A.  I don't have the specification in front of me.

93

1    Q.  Okay.  If you will look at Exhibit No. 44.  I
2    believe that is the technical specification for the
3    project.
4    A.  And there might be an email that discusses that
5    in this record, hopefully.
6    Q.  So I think 44 is probably one of the loose ones
7    in the back, exhibit 44.
8    A.  Yes. (Witness looking for exhibit.)
9         Somewhere there is an email I think that
10   talks about the matting change.
11   Q.  Well, my question's really different.
12        My -- my first question is:  What type of
13   mat was originally specified?
14   A.  (Witness looking through exhibits.)  I'm not
15   sure exactly where it's at in the spec.
16   Q.  Okay.  So if you'll look with me to the last
17   page of the technical specifications, about maybe --
18   maybe helpful to look -- go to the third-to-last page.
19   It's at the bottom, 02900, dash, 1.
20   A.  Yes.
21   Q.  Is that the specification related to
22   vegetation?
23   A.  Yeah.  Yes, it is.
24   Q.  And then if you look at the last page -- you
25   correct me if I'm wrong -- is the reference at the top

**24 (Pages 90 to 93)**

Nathan Ziehr

## 106

1  so this might be coded here because something's been
2  brought to the site.
3      Q.  Well, you'd have to have a flatbed to move
4  equipment off, correct?
5      A.  That's correct --
6      Q.  We don't see anybody on-site August 9th, 2013,
7  other than some one-off meetings that we know
8  Mr. Ballard attended, correct?
9      A.  And it may not be bringing equipment.  It may
10  be bringing material, but I'm not sure what.
11      Q.  But, I guess, my point is, you would need
12  laborers to demobilize, correct, or operators?
13      A.  Not totally.  If you're just taking the piece
14  of equipment off, I think the haul truck driver can get
15  on the piece of equipment, put it onto the haul truck
16  and take it away.  You don't need -- you don't
17  necessarily need an operator or laborer to do that.  It
18  would just be the haul truck driver.  So you would see
19  the haul truck driver's coding there.
20      Q.  Isn't there cleanup associated with
21  demobilization?
22      A.  I -- what do you mean by -- define
23  demobilization.
24      Q.  Well, how do you define demobilization?
25      A.  Demobilization would be the last person on the

## 107

1  site.
2      Q.  Okay.  When you guy removed all of your
3  equipment initially from this project, did you do any
4  cleanup?
5      A.  More than likely.
6      Q.  Okay.  And would that have required some kind
7  of laborers or --
8      A.  Yeah.  More than likely.
9      Q.  And so the fact that we don't see anybody on
10  here after August 9th of 2013 indicates that
11  demobilization had occurred by that time.
12      A.  Yes.  By that time we should be totally
13  demobilized.
14      Q.  Okay.  Let's go to Exhibits 5 and 6.
15      A.  (Witness complies.)
16      Q.  These are dated September 10th, 2013, correct?
17      A.  That is when I signed them, yes.
18      Q.  Okay.  And if you go to Exhibit 3, which are
19  the contracts, under the contracts, Ranger's not
20  entitled to invoice for retainage until 60 days after
21  Ranger has completed all work; do you agree with that?
22      A.  That is what the contract says.
23      Q.  Well, take a look at Exhibit 3 for me, and --
24  and -- and you could look on Ranger 000180.
25      A.  (Witness complies.)

## 108

1      Q.  Can you read for me the last little paragraph
2  of page 3 that starts with 10 percent?
3      A.  10 percent of each payment to contractor will
4  be retained by the company toward the discharge of any
5  claims or liens until 60 days after contractor has
6  completed all work and the following requirements have
7  been met as determined by the company and in its sole
8  discretion.
9      Q.  Okay.  So you agree with me that retainage
10  can't be billed until all work is completed?
11      A.  Yes.
12      Q.  Okay.  And so when you signed or authorized
13  your signature to be placed on Exhibits 5 and 6, did you
14  consider all work to be completed?
15      A.  The only way I would have sent a retainage bill
16  is with the conversation with Pastor, Behling & Wheeler
17  because they were the ones who approved all our
18  invoices.  And then from there, they took them to
19  Luminant.  So the only way I would have sent this is if
20  I would have had a verbal conversation with Pat Behling
21  saying we should send this.
22          MS. OKON:  Objection; nonresponsive.
23      Q.  (By Ms. Okon) PBW never approved Exhibits 5 or
24  6, did they?
25      A.  I don't know.

## 109

1      Q.  Okay.  As of September 10th, 2013 when you
2  authorized your signature to be placed on Exhibits 5 and
3  6, did you consider all work to be complete under the
4  project?
5      A.  If they didn't decide to do the final seeding,
6  then, yes, it would have been completed.
7          MS. OKON:  I'm going to object as
8  nonresponsive.
9      Q.  (By Ms. Okon) As of September 10th, 2013 when
10  you authorized your signature to be placed on Exhibits 5
11  and 6, did you consider all work to be completed on the
12  project?
13      A.  Only after a conversation with Pat Behling
14  would I have considered that, and I believe I only sent
15  this after a conversation with them.
16          MS. OKON:  I'll going to object as
17  nonresponsive.
18      Q.  (By Ms. Okon) I'm asking you a yes or no
19  question.
20          As of September 10th, 2013 when you
21  authorized your signature to be placed on Exhibits 5 and
22  6, did you consider all work to be complete under the
23  project?
24      A.  Seeding was still a possibility.  So if they
25  still wanted to seed, then, no, it would not have

**28  (Pages 106 to 109)**

110

1  totally been done. And there are many instances in our
2  company where we would submit for retainage before a job
3  is done, many instances.
4          MS. OKON: Okay. I'm going to object to
5  nonresponsive.
6      Q. (By Ms. Okon) Do you remember any conversation
7  with PBW where they told you to submit Exhibits 5 and 6?
8      A. Yes. I think that's the only way I would have
9  done it.
10     Q. Okay. Tell me what conversation you remember.
11     A. We are substantially complete, can we submit
12  retainage?
13     Q. And is that a conversation you had with Pat
14  Behling?
15     A. I believe we had that conversation.
16     Q. Okay. So you believe you said, we
17  substantially complete, can we submit retainage?
18     A. I don't know word for word. I -- it's three
19  years ago.
20     Q. Right.
21     A. I honestly don't know word for word.
22     Q. And I'm not trying to get word for word.
23          Are you testifying that you believe what
24  you, generally, said to Mr. Behling was, hey, we're
25  substantial complete with this project, can we submit

111

1  for retainage?
2      A. I believe that's the gist of what the
3  conversation would have probably been.
4      Q. Okay. And what -- what do you -- what do you
5  claim that Mr. Behling responded to you?
6      A. I don't know. The only way a retainage bill
7  would have come is -- every single one of the invoices
8  and pay apps that I put together was through a
9  conversation first to talk about quantities and make
10  sure they agreed and they approved, and then we would
11  send it on. So this was only generated probably after a
12  conversation.
13     Q. Okay. Well, there were no quantities to be
14  approved in Exhibits 5 or 6, were there?
15     A. Just completion.
16     Q. Okay. And those quantities, it was only for
17  retainage, correct?
18     A. And only for retainage on the items that were
19  complete.
20     Q. Right.
21          And -- and those items had been invoiced
22  in prior pay applications, correct?
23     A. Yep.
24     Q. And in those prior applications, the -- the
25  amounts and measurements had already been established,

112

1  correct?
2      A. I think there were some final adjustments
3  because you do your best to estimate, and there was --
4  there was a final adjustment, actually, done in August
5  where there were some additions and subtractions. We
6  actually had to redo the August invoice, I think,
7  multiple times based on conversations with Pat, and
8  those came from final quantity adjustments.
9      Q. Okay. Show me in Exhibits 5 and/or 6 where
10  there are any adjustments to amounts that had been billed
11  prior.
12     A. They wouldn't be here. They would be in
13  previously submitted payment applications.
14     Q. Okay. Which would have had to have been
15  submitted prior to September 10th --
16     A. Yes.
17     Q. -- 2006- -- 2013?
18     A. Yes.
19     Q. Okay. So by the time we get to issuing payment
20  applications that we see in 5 and 6 for retainage, any
21  negotiations about amounts have already occurred in pay
22  applications, correct?
23     A. Yeah. But I kind of remember now there was
24  even adjustments as far as October, I believe. I would
25  need to go pull all the -- I have all the payment

113

1  applications in a folder. I would just need to pull it
2  and look.
3          But the end, you can see the dates that
4  adjustments were made and probably when it was
5  submitted. But, yeah, it was submitted multiple times.
6  I remember.
7      Q. Okay. So do you need to look at those
8  documents to answer these questions?
9      A. Yeah. To have exact dates and times for you,
10  yeah, I could -- and I have it.
11     Q. Okay.
12     A. We can definitely produce that.
13     Q. Okay. All right. So then at the next break,
14  we'll do that, and then I'll come back to this.
15          Okay. So let's go to Exhibit No. 9.
16     A. (Witness complies.)
17     Q. So now we are to November 7th, 2013; do you see
18  that?
19     A. Yes.
20     Q. Okay. And you see below an email you're not on
21  where Jacob Gonzalez is asking Pat Behling about status;
22  do you see that?
23     A. Yes.
24     Q. And then Pat Behling reaches out to you and
25  asks about an update on the schedule, correct?

29 (Pages 110 to 113)
209

Nathan Ziehr

## 122

1   A.  Sorry about that.  Yes.  January 2nd.

2   Q.  Okay.  So, again, work has not gone forward the

3   first week of December, as you communicated in the last

4   email we looked at, correct?

5   A.  Yes.

6   Q.  Why hasn't it happened?

7   A.  I don't know the answer.

8   Q.  Okay.  Are you aware of any communications that

9   you've had with anyone from PBW or Sandow from your last

10  communication to now these communications on January

11  2nd?

12  A.  It's very likely we had communication, but I

13  don't have any date recollection or anything.

14  Q.  Okay.  So Mr. Behling emails you the morning of

15  January 2nd, 2014, and he says, Jacob was asking what

16  your schedule was for finishing the vegetation at Sandow

17  AX Landfill.  He wants it completed as soon as you can.

18  He won't release any more retainage until it is done.

19      Did I read that correctly?

20  A.  Yes.

21  Q.  And what did you respond?

22  A.  I am working on getting some guys trained to go

23  out there for this.  Timing is about two weeks away, and

24  it should be about two weeks worth of install.

25  Q.  Who were your working on getting trained as of

## 123

1   January 3rd, 2014?

2   A.  This is probably verbatim what BMP told me.  So

3   it's probably BMP's guys getting trained.

4   Q.  So we are now four months past when this work

5   is supposed to be completed under the contract, correct?

6   A.  Yes.

7   Q.  Why aren't their guys trained?

8   A.  Don't know.

9   Q.  So at this point you're saying you're gonna

10  start in about two weeks, and it should be done about

11  two weeks after that, correct?

12  A.  Yes.

13  Q.  So we should see Ranger starting around January

14  17 and finishing around the end of January.

15  A.  Yeah.

16  Q.  Correct?

17      Why don't you tell Mr. Behling that you

18  don't think it's a good idea to be seeding in January

19  when it's cold?

20  A.  Because we probably had that conversation

21  already.

22  Q.  So you think you'd already had that

23  conversation with Mr. Behling?

24  A.  Yes.

25  Q.  And you said it's too cold, and he said, do it

## 124

1   any way?

2   A.  No.  He probably -- I mean, he probably would

3   agree with us.  If you asked him the optimal times to

4   seed, he would have said, you know, spring and fall, not

5   winter and summer.  I mean, I think he would definitely

6   agree.

7   Q.  Do you specifically remembering these

8   communications, or are you speculating that maybe they

9   happened?

10  A.  I mean, we're talking three years ago.  I'm

11  positive we -- it's not like we just went around

12  ignoring this.  We were always talking to them.  We were

13  always communicating with them.  So, yes, I'm certain we

14  had communication, positively.

15  Q.  Okay.

16  A.  I don't know exactly what it said, but

17  absolutely was communicating with them.  And my fullest

18  intent was always to give them what they needed at the

19  end of the day.  I didn't want them to spend any money

20  they didn't have to because they experienced this

21  before.  Before, they did -- they chose to save the

22  dollars, and we -- all we tried to do was encourage them

23  to think about it.

24      And it appears that they wanted to go out

25  and do the vegetation, which is totally fine, which we

## 125

1   then had the role of trying to convince a subcontractor

2   to go expend a lot of cost when they certainly knew the

3   news that was published all over multiple publications

4   saying there's an impending bankruptcy coming.  And it

5   was extremely difficult to try to convince someone to

6   go -- I mean, imagine yourself, say, please go spend

7   60-some-odd thousand dollars, and we're not sure if

8   we're going to be able to pay you.

9       But at some point you'll see, as we go

10  through these correspondences, that I essentially tell

11  my subcontractor, Ranger is -- no matter what, we're

12  going to pay you.  We're going take care of you.

13  Everything is irrelevant at this point.  I want you to

14  go do it because I care about my customer.  And you'll

15  see me say that, multiple time, that I care about my

16  customer.  I care about the final product.

17      But it was very difficult to get somebody

18  to engage with a customer that had an impending

19  bankruptcy.  I mean, it's not that hard to understand

20  that concept.  We tried local people, and it was very

21  difficult.

22  Q.  Okay.  So you're saying, we're going to see

23  after this some communications where you say bankruptcy

24  irrelevant and all of that to BMP, correct?

25  A.  Should be.

32  (Pages 122 to 125)

126

1    Q.  But at this point, you haven't done that yet,
2    correct?
3    A.  Yeah.
4    Q.  That's correct?
5    A.  That's correct.
6    Q.  And at this point, you still think the best
7    option is don't do the vegetation?
8    A.  It could be in their best interest.
9    Q.  Okay.  And that's happened before?
10   A.  That's happened before.
11   Q.  And it saved everybody money?
12   A.  Yes.
13         MR. SAKONCHICK:  I'm going to point out
14   here that you had scheduled Mr. Ziehr from 1:00 o'clock
15   till 3:00 o'clock.  We have been out at this for three
16   hours.  I do still have some time for cross-examination,
17   and you have another witness coming in at 3:00.
18         MS. OKON:  And in response, I'll point
19   out, we always talked about this being a rolling
20   schedule and moving people around as is.
21         MR. SAKONCHICK:  We did.  And it's a
22   rolling schedule because your -- the witness that you
23   were supposed bring this morning didn't show up.
24         MS. OKON:  I wasn't supposed to bring that
25   witness.  I didn't notice that witness.  I do not have

127

1    control over that witness.
2          MR. SAKONCHICK:  You arranged for him to
3    show up.  You arranged for him to come today instead of
4    yesterday.
5          MS. OKON:  I helped make arrangements.
6    You made the choice not to send a subpoena, not me.  I
7    have nothing to do with Mr. Sutherland.  He's not my
8    witness.
9          MR. SAKONCHICK:  You told me he was going
10   to be here.
11         MS. OKON:  And I passed on what he said to
12   me, and I'm happy to show those -- the correspondence to
13   you.
14         Second, I'd like to point out on the
15   record, that you-all are the ones who took a 30-minute
16   break this morning in the middle of the deposition.
17         MR. SAKONCHICK:  Because you were asking
18   questions, the scope of which including discovery that
19   hasn't been answered yet.
20         MS. OKON:  Well, your objection's on the
21   record, and I'm going to continue now.
22   Q.  (By Ms. Okon) Okay.  Let's go to --
23         MR. SAKONCHICK:  You can speed it up a
24   bit.  You're just hashing this thing and beating a dead
25   horse.

128

1          MS. OKON:  In your opinion.
2    Q.  (By Ms. Okon) Okay.  Exhibit No. 12.
3          So let's look at Exhibit No. 12.
4          These are more updated communications; do
5    you see that?
6    A.  Yes.
7    Q.  All right.  And in Exhibit No. 12, you guys are
8    still talking about getting people trained and
9    certified, correct?
10   A.  Chris is asking me is Alex -- and Alex used to
11   be a prior employer of Ranger.  Is it something Alex can
12   do, and can Alex help us get re-mine certified.
13   Q.  So you guys still don't have people trained and
14   ready to go, correct?
15   A.  Yes.  BMP does not, correct.
16   Q.  And you don't have anybody else, correct?
17   A.  That's right.  Nobody else would want to touch
18   it.
19   Q.  All right.  So now let's go to Exhibit
20   No. 14 -- well, we can probably skip that.  Let's go to
21   Exhibit No. 13.
22   A.  13?
23   Q.  Yeah.
24   A.  (Witness complies.)
25   Q.  So if you go to the second page of Exhibit

129

1    No. 13, it starts with an email from Pat Behling to you;
2    do you see that?
3    A.  Yes.
4    Q.  And he's asking about the schedule, correct?
5    A.  Yes.
6    Q.  And you forward that to Chris Collins, and you
7    say, I need to tell them something.
8    A.  Yes.
9    Q.  What do -- what are you meaning whenever you
10   say that?
11   A.  I've got to give them an update.
12   Q.  Okay.
13   A.  They're asking for an update.  I need to tell
14   them something.
15   Q.  Okay.  And are you feeling frustrated with
16   Mr. Collins?
17   A.  Sure.  You know, it's hard to motivate somebody
18   to go spend money, and they're uncertain they're going
19   to get paid.
20   Q.  Okay.  And so, ultimately, Chris tells you it's
21   going to be two weeks, correct, if you look at page 1?
22   A.  Two weeks.  Yep.
23   Q.  Okay.  So let's go to Exhibit No. 16.
24   A.  (Witness complies.)
25   Q.  Exhibit 16 is an email from you to Pat Behling

33 (Pages 126 to 129)

130

1  dated February 10th, 2014, correct?
2  **A. Yes.**
3  Q. So now we're five -- five months past the
4  schedule of the contract, correct?
5  **A. Yes.**
6  Q. And you say, Pat, I'm in discussions about our
7  final seeding work for Luminant Sandow. I talked to
8  Jacob, and he passed me off to another person. I am
9  trying to get a feeling for where we are going to be at
10  for payment and how that will work before we proceed.
11      Did I read that correctly?
12  **A. Yes.**
13  Q. Now, at this point, Sandow isn't behind on any
14  payments to you, correct?
15  **A. Correct.**
16  Q. Okay. They haven't missed a payment?
17  **A. Except the retainage payment.**
18  Q. Which isn't due yet, correct?
19  **A. I guess 60 days after we completed. Yes, it**
20  **technically would have been due.**
21  Q. Okay. And how -- and is that because you're
22  considering yourself complete in August?
23  **A. Yeah. I mean, if they would have accepted it**
24  **with the vegetation that grew, then yes. Yes.**
25  Q. Okay. Now, the person that Jacob passed you

131

1  off to, was that David Watkins?
2  **A. Oh, that's probably it. Yes.**
3  Q. Okay. And then you're saying, I want to know
4  about payment before we proceed.
5  **A. Yes.**
6  Q. Correct?
7      And so what you're saying is, I don't want
8  to send anybody out there until I get some assurance
9  that I'm gonna get paid, correct?
10  **A. Yeah. I'm trying to get myself some assurance.**
11  **But keep in mind, Ranger is actively**
12  **working on other Luminant work. We are doing hundreds**
13  **of thousands of dollars of work each month on other**
14  **Luminant projects. So we just want some assurances for**
15  **our subcontractor because he's asking me for those**
16  **assurances.**
17  **So that's all -- all I'm trying to do here**
18  **is provide my subcontractor with some assurance. But**
19  **please keep in mind, that actively at this time, Ranger**
20  **is carrying on full force on other Luminant projects**
21  **that had worked to do. This one was just about a scope**
22  **that was or wasn't to be.**
23  Q. Okay. So you have -- you had other significant
24  jobs for Luminant at this time, correct?
25  **A. Yes.**

132

1      Q. That had a lot more money at issue this one,
2  correct?
3      **A. A lot more activity going on, correct.**
4      Q. And more money at stake, correct?
5      **A. More activity, more money.**
6      Q. Okay. And you're continuing to perform in
7  those jobs despite this looming threat of bankruptcy,
8  correct?
9      **A. Yes. We were trying to do our best for our**
10  **client.**
11      Q. And the difference is, in this one, you really
12  considered your scope pretty much done, correct?
13      **A. Yes. The vegetation had grown.**
14      Q. Okay. All right. So let's go to Exhibit 17.
15          And in Exhibit 17, there's an email from
16  you to Jacob Gonzalez February 20th; do you see that?
17      **A. Yes.**
18      Q. And then you're conveying that to Jacob, you're
19  saying -- he's saying, vegetation's not complete,
20  correct?
21      **A. Yes.**
22      Q. And you're saying, it's not complete, unless
23  there is consideration to accept it as this, which it
24  looks great, exclamation point, exclamation point,
25  correct?

133

1      **A. Yes.**
2      Q. And so you certainly think that the volunteer
3  vegetation that's grown up is sufficient, correct?
4      **A. Looks great.**
5      Q. Okay. Let's go to Exhibit 19.
6          Okay. Again, we have an email from Pat
7  Behling -- well, I guess these are old emails.
8          When we get up to the -- kind of the top
9  of the page, there's an email from you to Chris dated
10  March 11th, 2014 at 10 a.m.; do you see that?
11      **A. I'm sorry. I'm going to jump to Exhibit 19.**
12      **Yes.**
13      Q. Okay. And you say, Chris, this is on. The
14  bankruptcy issues are irrelevant now.
15          Did I read that correctly?
16      **A. Yes.**
17      Q. Why were the bankruptcy issues irrelevant now?
18      **A. I'm just basically saying, look, at this point,**
19  **these guys clearly want to move past what has grown. It**
20  **seems obvious that they just want to redo it, which is**
21  **fine. Totally their choice. And so I basically was**
22  **telling them, look, I'm -- I'm willing to pay you**
23  **regardless of what happens.**
24      Q. Okay.
25      **A. Ranger is gonna be the big person here, and no**

**34  (Pages 130 to 133)**

## 138

1   that the project can start next week, correct?
2       A.   Yes.
3       Q.   And that has not happened, correct?
4       A.   Yes.
5       Q.   All right. So then the next -- if you'll go to
6   Ranger 000220, which is the next email chain.
7       A.   (Witness complies.) Yes.
8           Lot of zeros.
9       Q.   You're promising another date, correct?
10      A.   I'm providing information that was provided to
11  me.
12      Q.   Do you agree that there were multiple dates
13  given for when work would start that did not occur?
14      A.   Absolutely.
15      Q.   And would you agree for most of those there's
16  no real explanation as to why that didn't happened?
17      A.   They never asked for an explanation.
18      Q.   Okay. And they only explanations that I've
19  heard of are the need to get people certified and/or not
20  having materials ready.
21          Are you aware of any other reasons that
22  work wasn't occurring?
23          MR. SAKONCHICK:   You're misrepresenting
24  his prior testimony. He also said the bankruptcy was an
25  issue.

## 139

1           MS. OKON:   Well, I'm asking him a question
2   which he can testify to. So you can either object, and
3   I'll rephrase.
4           MR. SAKONCHICK:   I'm objecting to the way
5   you categorized his prior -- prior testimony.
6       Q.   (By Ms. Okon) Okay. Tell me what factors, in
7   your mind, prevented Ranger from doing work on the
8   vegetation?
9       A.   Ranger was always happy to help our customer
10  complete the project. We, first, tried as studiously as
11  we could to remind the customer of the successes we had
12  in the past and how we could save them money. And then
13  we tried to not let them waste any money by trying to do
14  something in bad weather.
15          And then once we had come to the
16  conclusion that they wanted to spend the money
17  regardless -- and it may have been for reasons that we
18  don't know. It may have been for a reason they had an
19  obligation to a leaser or somebody that they were
20  working with. But, you know, they decided to -- to do
21  portions of work, and not all. You know, we didn't go
22  reseed the whole cell. We just did pieces of it.
23          We pushed as hard as we could to engage
24  our subcontractor as fast as we could under the
25  circumstances that they were anxious and, rightfully,

## 140

1   just that they didn't know if they were going to get
2   paid.
3           I was trying to do my best as a steward
4   for both parties to give my customer what they wanted
5   and to try to get the subcontractor working for me some
6   assurance that he would be paid for their work.
7           So it was juggling a lot of different
8   emotions and personalities and timing and weather and
9   all sorts of -- bankruptcy. I mean, it was just a mess
10  of a -- of a situation that we were just trying to do
11  our best to guide through to the finish. And along the
12  way -- and I don't I think we ever lost sight of trying
13  to do what was best for our customer.
14          MS. OKON:   I'm going to object as
15  nonresponsive.
16          MR. SAKONCHICK:   Which part?
17          MS. OKON:   The nonresponsive parts.
18          MR. SAKONCHICK:   Which part?
19          MS. OKON:   I think that I've satisfied my
20  obligation under the rules.
21      Q.   (By Ms. Okon) So are you saying that the
22  biggest delay, in your opinion, was caused by the fact
23  that you were trying to save Sandow money by convincing
24  them they don't need to do the vegetation?
25      A.   I'm not saying that.

## 141

1       Q.   Is that a major factor?
2       A.   It was a factor, not a -- not the only factor.
3       Q.   Okay.
4       A.   I mean, I think the last thing -- the whole
5   last few minutes of what I explained was it was a
6   combination of multiple factors.
7           And, like I said, I mean, for any
8   person -- I mean, to -- to say, please go spend, you
9   know, 60,000 dollars, which is -- like you -- like we
10  could to remind the customer of this
11  contract. But 60,000 dollars to somebody, it's a lot of
12  money. And so to say to somebody, please go spend
13  60,000 dollars, and I'm not sure -- I'm just not sure --
14  we're potentially going to go bankrupt, I'm just not
15  sure if we're going to pay you. That's hard.
16          But if you remember, Ranger, as a company,
17  we, at the end of the day, we finished the job, we
18  finished the project. We made sure it was done, and we
19  made sure it was done professionally. We took pictures,
20  and we made sure that our customer was happy at the
21  event end of the day, and we also tried to take care of
22  the person who worked for us.
23          So at the end of the day, we really do
24  care. I was willing to extend myself, it sounds like
25  60-plus thousand dollars, just to make sure that the

**36 (Pages 138 to 141)**

142

1  person who was working for me was okay, even if I
2  didn't, at that point, have an assurance. I later
3  pushed for it because I felt like it was necessary for
4  everybody.
5      But, you know, I -- I don't think we did a
6  poor job. I don't think Pat Behling would say that. I
7  don't think that Jacob would say that. I think that
8  this project had a very unfortunate, looming cloud that
9  hit it at the wrong time, and it made it very difficult
10  for everybody.
11      They didn't know what to do because the
12  Luminant people didn't know what to tell us to do. They
13  honestly didn't. We would ask, and they said, we're
14  just not sure. And that's a very hard thing for
15  somebody to understand when they're about to go spend a
16  lot of money.
17      MS. OKON: I'm going to object as
18  nonresponsive.
19      I'm going to go ahead and pass the
20  witness.
21      EXAMINATION
22  QUESTIONS BY MR. SAKONCHICK
23  Q. Mr. Ziehr, let's look at Exhibit 3.
24      Both of these contracts at the time they
25  were entered into, what was your consideration of

143

1  Luminant's financial capabilities?
2  A. Fine.
3  Q. In other words, was it a concern for Ranger at
4  the time they entered into this contract whether or not
5  they'd be paid by Luminant Sandow?
6  A. No.
7  Q. Did things change sometime around October 2013?
8  A. Yes.
9  Q. And was that as a result of the communications
10  that came out regarding the potential for bankruptcy?
11      MS. OKON: Objection; leading.
12  Q. (By Mr. Sakonchick) All right. What -- what --
13  what occurred in October 2013 that may have changed
14  things?
15  A. There was a Wall Street Journal article that
16  was published that made a lot of people working for
17  Luminant anxious about payment.
18  Q. You're testifying about how many years ago?
19  A. Three.
20  Q. How many jobs have you done since then?
21  A. Maybe a 150 or 180.
22  Q. Now, did you review some of your material
23  before testifying today?
24  A. A little bit.
25  Q. What were the -- what part of the delay in

144

1  getting BMP to come out there was caused by the
2  bankruptcy or the potential for bankruptcy on Sandow
3  Luminant?
4  A. We would have to ask Chris Collins that
5  directly. I'm not sure. But I -- he voiced to me need
6  numerous times significant concern about it. It
7  probably played a pretty big role for him.
8      MS. OKON: Objection; speculation.
9  Q. (By Mr. Sakonchick) When you say probably
10  played a big role for him, what made you think that?
11  A. Just verbal communication with him on
12  occasional basis asking me for assurance, if we would be
13  paid, and I never knew what to tell him. Eventually, I
14  just had to tell him, look, we'll pay it.
15  Q. I think we've already established that Ranger
16  did all the work other than the liner and the
17  vegetation, correct?
18  A. Yes.
19  Q. Does Ranger have the capability to do the
20  vegetation required under the contracts that are
21  Exhibit 3?
22      MS. OKON: Objection; vague and ambiguous.
23  A. No, we do not have the capability to do the
24  seeding or do we have the guys trained with the right
25  expertise to do the seeding.

145

1  Q. (By Mr. Sakonchick) Now, it was pointed out to
2  you that under contracts -- I mean both contracts in
3  Exhibit 3, the termination date was September 2, 2013.
4  A. Yes.
5  Q. Did either Jacob Gonzalez or David Watkins
6  subsequently treat the contract as terminated?
7  A. No.
8  Q. What made you think that they didn't treat it
9  as terminated?
10  A. They were constantly communicating with me in
11  emails or corresponding to me with emails, numerous
12  phone calls. I mean, they would make the comment that
13  we need to complete the contract and correspondence. So
14  that would lead me to believe they felt like something
15  wasn't done.
16  Q. Now, when you refer to the emails, were
17  referring to the emails that Ms. Okon went through in
18  detail earlier in this deposition, correct?
19  A. Yes.
20  Q. What made you think that Pat Behling didn't
21  think the contract was complete --
22      MS. OKON: Objection; calls for spec- --
23  Q. (By Mr. Sakonchick) -- September 2013?
24      MS. OKON: Objection; calls for
25  speculation.

**37 (Pages 142 to 145)**

146

1  A.  It was continuous communication.  Going back to
2  the email, looked like almost on a biweekly basis and
3  phone calls and meetings on site.  We went to multiple
4  meetings on site with them.  If they felt like we were
5  terminated, I -- I don't believe they would have
6  continued to engage us like we were working for them.
7  Q.  (By Mr. Sakonchick) Did PBW -- well, let's get
8  our definitions today.
9      We have been referring to BMP today -- or
10  BPM [sic].
11  A.  PBM.
12  Q.  When we refer to BPM [sic], who do you
13  understand we're referring to?
14  A.  It is BMP.  BMP is the company owned by Chris
15  Collins.
16  Q.  No, not BMP.  I'm talking about the engineering
17  firm?
18  A.  PBW, Pastor, Behling & Wheeler.  They're the
19  engineering firm on the project.
20  Q.  Okay.  So when we refer today to --
21  A.  PBW.
22  Q.  -- PBW, we're referring to that firm?
23  A.  Yes.
24  Q.  And when we're referring to BMP, who were you
25  referring to?

147

1  A.  BMP Specialists, which is the erosion control
2  subcontractor.
3  Q.  All right.  And what's Chris Collins'
4  relationship to BMP?
5  A.  I believe he's the owner of BMP.
6  Q.  How big a company is BMP?
7  A.  I don't know.
8  Q.  And when we refer to Sandow today, we referred
9  to the entity which entered into the con- -- two
10  contracts that are Exhibit 3 with Ranger?
11  A.  Yes.
12  Q.  Was Sandow's representative's conduct from
13  August 2013 through July 2014 of the effect that the
14  contract was not complete until the vegetation was in?
15  A.  They were definitely corresponding with us in
16  that regard.
17  Q.  Let me -- let me rephrase that.
18      The course of conduct by Jacob Gonzalez
19  and David Watkins, did it indicate to you that the
20  contract was not complete until the vegetation had been
21  put in as required under the contract?
22      MS. OKON:  Objection; compound.
23  A.  Yes.
24  Q.  (By Mr. Sakonchick) Did Jacob Gonzalez or David
25  Watkins ever tell you or communicate to you or write to

148

1  you that Ranger was past the termination date under the
2  contracts?
3  A.  Never.
4  Q.  Did PBW ever correspond or communicate with you
5  in any manner that Ranger was past the termination date
6  under the contracts?
7  A.  No.  I think the reason they -- they didn't is
8  obvious.  We had a really good working relationship.  At
9  the end of the day, they cared about us; we cared about
10  them.
11  Q.  Why didn't Ranger get paid its retainage -- if
12  it was billed on September 10th, why didn't it get paid
13  its retainage 60 days thereafter?
14      MS. OKON:  Objection; calls for
15  speculation.
16  A.  Don't know.
17  Q.  (By Mr. Sakonchick) Was it because the contract
18  wasn't complete at that time?
19      MS. OKON:  Objection; leading.
20  Q.  (By Mr. Sakonchick) Let me rephrase.
21      Was the contract complete 60 days after
22  you billed for the retainage in September 10th, 2013?
23  A.  There was still seeding.  They asked us to do
24  it.
25      THE REPORTER:  I'm sorry.  Can you repeat

149

1  the last part of that, sir.
2      THE WITNESS:  They asked us to do it.
3      THE REPORTER:  Thank you.
4  Q.  (By Mr. Sakonchick) What does a contract
5  administrator do?
6  A.  Administer the contract.
7  Q.  Do you know the difference between contract
8  administrator and a project manager?
9  A.  No.
10  Q.  In fact, let's go to Exhibit 47.
11  A.  (Witness complies.)
12      MS. OKON:  You said Exhibit 7?
13      MR. SAKONCHICK:  47.
14      MS. OKON:  47.
15      MR. SAKONCHICK:  Yeah.  Third page.
16  Q.  (By Mr. Sakonchick) Was Ranger paid for the
17  vegetation under the contract terms on Exhibit 3?
18      MS. OKON:  Objection; vague and ambiguous.
19  A.  Yes.
20  Q.  (By Mr. Sakonchick) And is that reflected in
21  page 3 of Exhibit 47?
22  A.  Yes.
23  Q.  In fact, doesn't it reflect there that you're
24  only going to be paid what's provided for in the
25  contract?

38  (Pages 146 to 149)

158

1  A. Yes.
2  Q. And what does that involve?
3  A. Stripping the initial vegetation, the initial
4  grass, the initial organic matter.
5  Q. Do you store that anywhere?
6  A. Yes. You stockpile it.
7  Q. And what do you do with it later?
8  A. You respread it back on the slopes that get
9  finished, and then you respread the organic matter in
10  order to intend to regrow the organic matter that's in
11  the soil.
12  Q. We call that the volunteer vegetation?
13  A. Yes.
14  Q. And was that complete in August 2013?
15  A. Yes.
16  Q. And looking at Exhibit 22 again, is the amount
17  of vegetation they're asking for here significantly less
18  than the vegetation they requested in Exhibits 43 and
19  44?
20  A. Substantially less.
21  Q. And what was the cause of the difference?
22  A. Absolutely what they decided to do was to take
23  the volunteer vegetation that had grown natively and not
24  spend those dollars. And they -- again, I don't know
25  their whole history, but there's probably some force

159

1  making them redo it along this haul road. And my
2  assumption would be it has something to do with a lease
3  agreement with Alcoa, but we are not privy to that
4  information. It's just what I would assume based on
5  what I heard.
6      MS. OKON: Objection; speculation.
7  Q. (By Mr. Sakonchick) There was some emails
8  talking about Gary Ballard having to break loose a D6
9  dozer; do you recall that?
10  A. Yes.
11  Q. From the records that you've been able to look
12  at at Ranger, did Ranger ever actually show bringing out
13  equipment to do the revegetation?
14  A. No.
15  Q. Who would have supplied all the equipment for
16  the revegetation?
17  A. BMP.
18  Q. So after Ranger demobilized in August 2013, it
19  never remobilized?
20  A. That's correct.
21  Q. Its subcontractor mobilized?
22  A. That's correct.
23  Q. Looking at Exhibit 3 again.
24  A. (Witness complies.)
25  Q. There was an area that they were talking about

160

1  your obligation for subcontractors; do you recall where
2  that is?
3  A. (Witness looking through exhibits.)
4      MS. OKON: Ranger 000193 in the first
5  contract.
6      MR. SAKONCHICK: That's not 193.
7  Q. (By Mr. Sakonchick) You went over with Ms. Okon
8  the responsibility that you, as contractor, had to make
9  sure that your subcontractors appeared on time, correct?
10  A. Yes.
11  Q. Was there anything in the contract -- matter of
12  fact, there's also a section of the contract that deals
13  with whether or not Ranger should file for bankruptcy;
14  is that correct?
15  A. I'm not sure.
16  Q. Let's find that.
17      Look at 000196.
18  A. (Witness complies.) Yes.
19  Q. You see where your termination for default
20  refers to a bankruptcy filing by the contractor?
21  A. Yes.
22  Q. Do you recall if there's anything in the
23  contract that deals with whether there's a bankruptcy
24  filing by the company?
25  A. I -- reask the question.

161

1  Q. I say do you recall if there's anything in
2  either of the contracts that deal with the bankruptcy of
3  the company, which would be Sandow Luminant?
4  A. I don't recall.
5  Q. From October 2013 on, was the potential for
6  Luminant Sandow filing the bankruptcy almost at any time
7  a concern of Ranger and BMP?
8      MS. OKON: Objection; leading. Calls for
9  speculation.
10  A. Yes, it was a concern from . . .
11  Q. (By Mr. Sakonchick) Well, let me rephrase it to
12  meet her objection.
13      What was the bankruptcy impact on Ranger
14  and BMP after the October 2013 articles came out?
15      MS. OKON: Objection; calls for
16  speculation.
17  A. It impacted significantly trying to get BMP or
18  rather any person to come to the job. Ranger did all we
19  could to try to finish the work we had and -- and keep
20  in good graces.
21  Q. (By Mr. Sakonchick) Did BMP mention the
22  bankruptcy being a problem with their coming out in
23  October 2013?
24  A. They voiced concerns.
25  Q. Did they voice concerns in November 2013?

162

1    A. Yes.
2    Q. Did they voice concerns in December 2013?
3    A. Yes.
4    Q. Did BMP voice concerns in January 2014?
5    A. Yes.
6    Q. Did they voice concerns in February 2014?
7    A. Yes.
8    Q. Did BMP voice concerns in March 2014?
9    A. Yes.
10   Q. Did they voice concerns after you guaranteed
11   they would be paid whether or not there was a bankruptcy
12   filing?
13   A. Probably not.
14   Q. Was the fact that there was really some
15   movement toward getting the vegetation in in March and
16   April of 2014 the result of certain assurances given to
17   BMP?
18   A. Yes.
19   Q. And those assurances were given by Ranger?
20   A. Yes.
21   Q. Looking at Exhibit 26.
22   A. (Witness complies.)
23   Q. This email went out in April 28, 2014, correct?
24   A. Yes.
25   Q. Were you aware that the Luminant Sandow

163

1    companies all filed for bankruptcy on April 29th, 2014?
2    A. I didn't know the exact date.
3    Q. Once the Luminant Sandow companies did file for
4    bankruptcy, did that sort of change things?
5    A. Yes.
6    Q. Looking at Exhibit 27.
7    A. (Witness complies.)
8    Q. Some discussion there about wanting assurances
9    for payment.
10   Are these assurances as a result of the
11   bankruptcy filing?
12   A. Yes.
13   Q. Was there some concern as to whether or not
14   Luminant Sandow could pay for work after they filed for
15   bankruptcy?
16   MS. OKON: Objection; leading.
17   Q. (By Mr. Sakonchick) Did Ranger know whether or
18   not Luminant Sandow could pay for work after they filed
19   for bankruptcy?
20   A. We did not know until we were told by Luminant.
21   Q. And who did you obtain that information from?
22   A. I believe David Watkins.
23   Q. Do you recall whether that was in an email or
24   voice communication?
25   A. I think first started with voice communication,

164

1    and then I believe he sent me an email with a letter
2    attached explaining the procedures going forward, I
3    believe.
4    Q. All right. What was the nature of your voice
5    communication?
6    A. We heard that y'all went bankrupt, could you
7    please help us understand how we will be paid going
8    forward.
9    Q. All right. And let's turn to Exhibit 28.
10   Is this the assurance that you received by
11   David Watkins that you re- -- just referred to?
12   A. Yes.
13   Q. And attached to it is a news release about
14   first day motions in the bankruptcy and supporting
15   continuation of normal operations.
16   A. Yes.
17   Q. And in it, it describes about getting paid for
18   post-petition work.
19   A. Yes.
20   Q. Was that basis upon which the work was
21   ultimately completed and paid for?
22   A. Yes.
23   Q. Once the vegetation was installed, was it
24   approved by Luminant Sandow?
25   A. Yes.

165

1    Q. Who would have approved it?
2    A. First Pastor, Behling & Wheeler and then
3    Luminant.
4    Q. And when we refer to Luminant today, you're
5    also using that as Luminant and Sandow together?
6    A. Yes.
7    MS. OKON: Whenever you get to a place, we
8    need to take a break.
9    MR. SAKONCHICK: As good as any.
10   MS. OKON: Okay. Maybe now is a good time
11   to take the payout file that was discussed.
12   MR. SAKONCHICK: I don't know whether
13   we're going to do that or wait for the response to
14   discovery.
15   Let me see the payout file. You know what
16   we're talking about?
17   THE WITNESS: Yeah.
18   THE VIDEOGRAPHER: Going off the record.
19   Time is 2:45.
20   (Recess from 2:45 p.m. to 3:17 p.m.)
21   THE VIDEOGRAPHER: Back on the record.
22   Time is 3:17.
23   Q. (By Mr. Sakonchick) Now, looking again at
24   Exhibit 48.
25   THE VIDEOGRAPHER: Steve, can you put your

42  (Pages 162 to 165)

**189**

1              UNITED STATES BANKRUPTCY COURT

2               FOR THE DISTRICT OF DELAWARE

3    IN RE:                    )    Chapter 11
                               )
4    ENERGY FUTURE HOLDINGS    )    CASE NO. 14-10979 (CSS)
     CORP., et al.,            )
5                              )
              Debtors,         )    (Jointly Administered)
6                              )
     _____)
7                              )
     SANDOW POWER COMPANY, LLC )
8                              )
     vs.                       )    Contested Matter
9                              )
     RANGER EXCAVATING, LP     )
10

11              REPORTER'S CERTIFICATE

12   ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF NATHAN ZIEHR

13                  October 18, 2016

14        I, Amy M. Clark, Certified Shorthand Reporter in and

15   for the State of Texas, hereby certify to the following:

16        That the witness, NATHAN ZIEHR, was duly sworn and

17   that the transcript of the deposition is a true record

18   of the testimony given by the witness;

19        That the deposition transcript was duly submitted on

20   November 7      to the witness or to the attorney for

21   the witness for examination, signature, and return to me

22   by December 7       .

23        That pursuant to information given to the deposition

24   officer at the time said testimony was taken, the

25   following includes all parties of record and the amount

Nathan Ziehr

190

1    of time used by each party at the time of the

2    deposition:

3         Melanie K. Okon (2h53m)
               Attorney for Debtors

4         Stephen Sakonchick (0h50m)
               Attorney for Respondent

5

6         That a copy of this certificate was served on all

7    parties shown herein on _____ and filed

8    with the Clerk.

9         I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties in the

11   action in which this proceeding was taken, and further

12   that I am not financially or otherwise interested in the

13   outcome of this action.

14        Certified to by me on this 3rd day of

15   November, 2016.

16

17   _____

18   Amy M. Clark, CSR
     Texas CSR 8753

19   Expiration:  12/31/2016
     DepoTexas - Austin

20   Firm No. 17
     1016 La Posada, Suite 294

21   Austin, Texas 78752
     512-478-2752

22

23

24

25

Tab I

**2**

```
1              APPEARANCES
2
3   FOR DEBTORS AND DEBTORS IN POSSESSION:
4      Ms. Melanie K. Okon
       Okon Hannagan, PLLC
5      750 N. St Paul Street
       Suite 1800
6      Dallas, Texas 75201
       Telephone: (214)396-9650
7      Fax: (469)909-6115
       E-mail: mokon@okonhannagan.com
8
    FOR RESPONDENT RANGER EXCAVATING, LP:
9
10     Mr. Stephen Sakonchick, II
       6502 Canon Wren Drive
       Austin, Texas 78746
11     Telephone: (512)329-0375
       Fax: (512)697-2859
12     E-mail: sakon@flash.net
13
    ALSO PRESENT:
14
       Ms. Ashley Alaman - In-house Counsel for Luminant
15     Lindsey Thomas -Videographer
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1          THE VIDEOGRAPHER: Here begins the
2   deposition of Chris Collins. Today's date is October
3   18th, 2016. The time is 3:47.
4          Will the court reporter please swear in
5   the witness.
6              CHRIS COLLINS,
7   having been first duly sworn, testified as follows:
8              EXAMINATION
9   QUESTIONS BY MS. OKON
10    Q.  Hi.  My name is Melanie Okon, and I'm here
11  today representing Sandow Power Company; do you
12  understand that?
13    A.  Yes, ma'am.
14    Q.  Can you please state your name for the record.
15    A.  Christopher Raymond Collins.
16    Q.  And who do you work for?
17    A.  I'm the owner of BMP Specialists.
18    Q.  And how long have you been the owner of BMP
19  Specialists?
20    A.  Since 2004.
21    Q.  And what does BMP specialists do?
22    A.  We are [sic] environmental contractor.
23    Q.  And do you have a specialty within
24  environmental contracting?
25    A.  Erosion control.
```

**3**

```
1
2              INDEX
3                           PAGE
4   Appearances .........................2
5   CHRIS COLLINS
6   Examination by Ms. Okon ...........................4
    Examination by Mr. Sakonchick ...................63
7   Further Examination by Ms. Okon .................71
    Signature Page ..................................76
8   Court Reporter's Certificate ....................78
9
10             EXHIBITS
11
12  EXHIBIT      DESCRIPTION          PAGE
13  Exhibit 2    Notice of deposition      10
14  Exhibit 37   Email from Chris Collins to    55
                 Nathan Ziehr, 7/1/14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
1     Q.  Have you ever given a deposition before?
2     A.  No, ma'am.
3     Q.  Okay.  Have you ever testified in court or in
4   an arbitration before?
5     A.  No, ma'am.
6     Q.  Okay.  So I'm going to tell you a few things
7   about the process today that may help it go a little
8   more smoothly.
9     A.  Okay.
10    Q.  One is that, to the left, we have the court
11  reporter.  And her job is to type down everything that
12  you say or I say or Mr. Sakonchick says or anyone says
13  while we're on the record.
14    A.  Okay.
15    Q.  And at the end of today, she'll put together a
16  book which you'll have the opportunity to review and
17  make any corrections that you think are necessary.
18    A.  Sure.
19    Q.  Well, also, I should mention there's a
20  videographer here today, and so you're also being
21  videotaped.
22    A.  Okay.
23    Q.  And either the videotape or the written
24  transcript can be used in court in this matter just as
25  if you were there in person; do you understand that?
```

2 (Pages 2 to 5)

Chris Collins

**6**

1    A.  Yes, ma'am.

2    Q.  Okay.  Because we have the court reporter

3    trying to take everything down, there's a few things we

4    do in a deposition that we don't do in normal

5    conversation.

6        One is that we have to be more careful to

7    try to let the other person speaking finish before we

8    start speaking, and that way we're not running over each

9    other in the transcript.

10    A.  Okay.

11    Q.  The second thing is, it's important to use

12    verbal responses, like yes or no, rather than uh-huhs or

13    huh-huhs or shaking the head.

14    A.  Sure.

15    Q.  And so from time to time, Mr. Sakonchick or I

16    might remind you to say yes or no.  And we're not trying

17    to be rude, we just want to make sure the answer's

18    clear.

19        I may from time to time ask you questions

20    that you don't understand.  Of course, I've worded them

21    poorly.  If that happens, please let me know, and I'll

22    rephrase that in a way that you understand.

23    A.  Okay.

24    Q.  And then if you need to take a break at any

25    time, you're welcome to do that, just let us know.  The

**7**

1    only thing I ask is that if I've already asked a

2    question, then -- answer that question --

3    A.  Sure.

4    Q.  -- before we break.

5        Has BMP been in the business of doing

6    erosion control since 2004?

7    A.  Yes, ma'am.

8    Q.  And for those people who aren't in your

9    industry, what is erosion control?

10    A.  Protecting the soil from -- from runoff.

11    Q.  By runoff, do you mean water?

12    A.  Or silt or dirt.

13    Q.  And why is that important?

14    A.  For the environment.

15    Q.  And how is that important for the environment?

16    A.  Don't pollute the waters.

17    Q.  Okay.  So if you don't have good erosion

18    control, one of the things that can happen is dirt can

19    run off into the water?

20    A.  Correct.

21    Q.  Do you do business with a company called Ranger

22    Excavating?

23    A.  I do.

24    Q.  How long have you done business with Ranger

25    Excavating?

**8**

1    A.  Probably six years.

2    Q.  And what portion of BMP's business does Ranger

3    make up?

4    A.  Say 8 to 10 percent.

5    Q.  Do you currently have projects for Ranger?

6    A.  I do.

7    Q.  And how many projects do you currently have

8    going for Ranger?

9    A.  Ten to 12.

10    Q.  Do you do any work directly for Luminant or

11    Sandow that you know of?

12    A.  Yes.

13    Q.  What work do you do directly for Luminant or

14    Sandow?

15    A.  It's the mine out at -- in -- past Manor, Three

16    Oaks Mine.

17    Q.  Okay.  And that work, are you directly

18    contracting with Luminant?

19    A.  Correct.

20    Q.  Okay.  And what percentage of your business

21    would you say Luminant is?

22    A.  One.

23    Q.  And how many projects do you have currently

24    going for Luminant?

25    A.  Zero.

**9**

1    Q.  When was the last project you did for Luminant?

2    A.  Probably two years ago.

3    Q.  Did any of the bankruptcy proceedings affect

4    you?

5    A.  No.

6    Q.  Now, I know you said you're the owner of BMP.

7        Do you have another specific title at the

8    company?

9    A.  No.

10    Q.  Do you actually go out on sites yourself?

11    A.  Correct.

12    Q.  How many employees do you have?

13    A.  Forty-five.

14    Q.  So when does a project merit you personally

15    coming out as opposed to one of your employees?

16    A.  It all depends on the project site and the

17    customer.

18    Q.  Okay.  Do you remember a project between Ranger

19    and Sandow related to a haul road and an ash disposal

20    pit?

21    A.  Yes, ma'am.

22    Q.  And do you understand that that's the project

23    we're here about today?

24    A.  Yes, ma'am.

25    Q.  Okay.  You have a binder of exhibits in front

**3  (Pages 6 to 9)**