## 18

1  Q. Okay. So if you stay on Exhibit No. 7, and you
2  look on page 2 of the email chain, it looks like on
3  September 16th Mr. Ziehr asks you, when is time for
4  Sandow and for Lazy 9; do you see that?
5  A. Uh-huh.
6  Q. And what did you --
7  A. Yes, ma'am.
8  Q. What did you respond?
9  A. End of September, beginning of October would be
10 good; temperatures starting to fall.
11 Q. So in September of 2013, it was your opinion
12 that end of September, beginning of October you could do
13 vegetation for both the Sandow project and the Lazy 9
14 pond project; is that right?
15 A. Correct.
16 Q. Okay. So Mr. Ziehr responds to you on October
17 1st, and he says, I am agreeable this adjusted proposal
18 for the Luminant Sandow project; do you see that part?
19 A. I do.
20 Q. Do you know what he's talking about when he
21 talks about an adjusted proposal?
22 A. I sent him a quote for the project, and he
23 modified it.
24 Q. Okay. Okay. And so what he's talking about is
25 your pricing for the project?

## 19

1  A. Correct.
2  Q. Okay. You were the subcontractor who did the
3  silt fence and some other work early in the project,
4  correct?
5  A. Some miscellaneous 911s. I didn't do the
6  initial install. I don't even know even if there was an
7  initial install. But when they had some issues, we went
8  out there three, possibly four times.
9  Q. Okay. Do you know what time frame that was?
10 A. Probably a year before this.
11 Q. Okay. Did you sign some kind of contract with
12 Ranger?
13 A. I did not.
14 Q. Okay. Did you ever, at any time, sign a
15 contract with Ranger?
16 A. Different projects that I had -- I honestly
17 don't think I had.
18 Q. Okay. So, at least, in October of 2013, you
19 had sent some adjusted quote over and --
20 A. No. I sent a proposal over. I didn't; my
21 estimator did.
22 Q. Okay.
23 A. And then he modified the proposal and sent it
24 back to me.
25 Q. Okay. So Ben Pelky is your estimator, correct?

## 20

1  A. Correct.
2  Q. And he had created a proposal --
3  A. Correct.
4  Q. -- which you sent to Mr. Ziehr?
5  A. He did.
6  Q. Okay. Mr. Pelky sent it to Mr. Ziehr.
7  Mr. Ziehr adjusted it, and sent it back to you.
8  A. Correct.
9  Q. Okay. And did you accept that adjusted
10 proposal?
11 A. I did.
12 Q. Okay. So as of October 1st, 2013, do you feel
13 like you have a deal with Ranger to do the vegetation
14 work for the Sandow project?
15 A. I do.
16 Q. Okay. Then Mr. Ziehr says, this engineer is
17 super easygoing, and the project should be effortlessly
18 accomplishable.
19      Do you know what engineer he's referring
20 to?
21 A. The -- I assume Matt and the other gentleman.
22 Q. And Pat Behling?
23 A. Yeah.
24 Q. Okay. So then on that same day, if you go up
25 in the email, Mr. Ziehr asks you when can you start; do

## 21

1  you see that?
2  A. I do.
3  Q. And you -- you respond that you're meeting with
4  Gary next Wednesday to look at it and material has been
5  ordered; do you see that part?
6  A. I do.
7  Q. Is the Gary you're referring to Gary Ballard,
8  who worked for Ranger?
9  A. I am.
10 Q. And what material had you ordered as of October
11 1st, 2013?
12 A. I do not recall. I assume the Curlex and the
13 fertilizer.
14 Q. Okay. At the time that you agreed on October
15 1st or thereabout to do the vegetation work for Ranger,
16 did you understand that there were certain materials
17 that were going to have to be ordered?
18 A. Say that one more time.
19 Q. So as of October 1st, 2013, you believed you
20 had a deal with Ranger to do the vegetation work
21 correct?
22 A. Correct.
23 Q. Did you understand at that time that you would
24 have to order certain materials in order to do the
25 vegetation work?

6 (Pages 18 to 21)

**22**

1  A. I do.
2  Q. And what materials did understand you would
3  have to order?
4  A. I assumed it'd be fertilizers and the Curlex
5  and the seed.
6  Q. Okay. And are those items that usually have a
7  long lead time?
8  A. Depends.
9  Q. And what does that depend on?
10  A. On supply and demand.
11  Q. Okay. You ordered, at least, some of those
12  materials on October 1st, 2013, correct?
13  A. Yes, ma'am.
14  Q. And you can't say today which materials you
15  ordered on that day?
16  A. No, ma'am.
17  Q. Is there a reason you would only order some of
18  the materials and not others?
19  A. Possibility. I mean, it depends. If -- if
20  some manufacturer had it in stock -- or not a
21  manufacturer, a supplier whatnot.
22       But it's a phone call saying, hey, I'm
23  going to need this stuff delivered out there. It's not
24  initiating the stuff to actually go.
25  Q. Okay. Okay. Do you typically have problems

**23**

1  getting fertilizer and matting and seeding?
2  A. Sometimes.
3  Q. Okay. And in what instances have you had
4  problems?
5  A. Depends on if they have it or if they have to
6  make it.
7  Q. Okay. So when you start a job, do you try to
8  do any investigation into how readily available the
9  materials are gonna be?
10  A. Or -- I mean, jobs are so crazy. You just
11  sometimes step away at the last minute.
12  Q. Okay. So you say to Mr. Ziehr on October 1st,
13  2013, we could start next week as soon as everything
14  comes in. The fertilizer specified is the most oddball
15  thing.
16       Did I read that right?
17  A. It is.
18  Q. Okay. So, apparently, you're expecting to be
19  ready to start the next week; is that right?
20  A. If everything comes in.
21  Q. Okay. And your comment about the fertilizer,
22  is that just you thought the ratio was odd?
23  A. No. The -- the -- the fertilizer that was
24  specified was odd.
25  Q. And what was odd about it?

**24**

1  A. The fertilizer goes by like 15/15/15 or 20 -- I
2  don't know what this one was specified, but that
3  fertilizer was odd.
4  Q. Does this refresh your recollection as to
5  whether or not your ordered the fertilizer at that time?
6  A. No, ma'am.
7  Q. So four to six weeks after August 7th, 2013,
8  when Mr. Ziehr sent the email would have been
9  approximately September 7th to September 21st is what
10  you guys were projecting the weather to cool down enough
11  to do the vegetation, correct?
12  A. Correct.
13  Q. And then October 1st, you're saying next week;
14  is that right?
15  A. Correct.
16  Q. Do you know why the work didn't start September
17  14th?
18  A. I remember meeting with Gary, and they -- there
19  were some work that had be done. I met with Gary and
20  Matt and a Luminant employee probably four times out
21  there.
22  Q. Was the Luminant employee Jacob Gonzalez?
23  A. I have no idea.
24  Q. Okay.
25  A. I could not pick him up.

**25**

1  Q. So you're saying prior to October 1st, 2013,
2  you believe there were about four meetings on-site?
3  A. No. After.
4  Q. After.
5       Because I want to talk about before
6  October 1st.
7  A. Okay.
8  Q. Do you know why this project wasn't started
9  around September 14th when the weather cooled down?
10  A. No.
11  Q. Okay. Do you remember anybody from Ranger
12  contacting you?
13  A. Well, on October 1st, he said the proposal's
14  agreed, so I wouldn't start before then.
15  Q. Okay. So September 17th, you said end of
16  September, beginning of October would be good, and then
17  you don't get contacted again until October 1st; is that
18  right?
19  A. From -- from this email. There was several
20  phone conversations that I cannot recall being three
21  years.
22  Q. Okay. Do you remember any reason you couldn't
23  have started earlier had Ranger contacted you earlier?
24  A. We were pretty slammed at the time.
25  Q. Okay.

**7 (Pages 22 to 25)**

**26**

1    A.  And the temperature -- I don't know what the
2  temperature -- I can't really remember what the
3  temperature back in 2013.
4    Q.  Okay.  As of October 1st, you know you're
5  projecting you can do it the next week, correct?
6    A.  Correct.  If everything comes in.  I mean, you
7  got a lot of factors in there.
8    Q.  And are you talking about both the Sandow
9  project and the Lazy 9 pond project?
10    A.  At that time, that would be the Luminant
11  project.  If I meet -- Gary wasn't in charge of the Lazy
12  9.
13    Q.  Okay.  So Gary didn't do Lazy 9?
14    A.  Correct.
15    Q.  So the fact that you met with Gary --
16    A.  Correct.
17    Q.  -- meant you were talking about the Sandow
18  project?
19    A.  Correct.
20    Q.  Okay.  Did you know at that time that workers
21  on the site would have to be MSHA trained?
22    A.  Yes.
23    Q.  Okay.  Is that something unusual for your
24  workers?
25    A.  We -- yes, it is.  We were -- we were doing a

**27**

1  lot of mine work, and then it kind of dropped off.
2    Q.  Okay.
3    A.  And then we hadn't done a whole lot of mine
4  work.
5    Q.  So in October 2013, did you think getting
6  workers that were MSHA trained would be a problem for
7  you?
8    A.  I didn't really think about it, to be honest
9  with you.
10    Q.  Okay.  As of October 1st, 2013, when you're
11  saying we can come out and do it next week, did you have
12  workers that you could have sent out there who were MSHA
13  trained?
14    A.  I do- -- I can't recall.
15    Q.  Okay.  And you don't know whether you would
16  have checked on that or not?
17    A.  No.
18    Q.  Okay.  Let's go to Exhibit No. 8.
19    A.  8?
20    Q.  Yes.
21    A.  (Witness complies.)
22    Q.  Do you know whether or not you were available
23  and ready to start work on the Sandow project on or
24  about October 7th?
25    A.  I do not.

**28**

1    Q.  All right.  So let's look at Exhibit No. 8.
2    And on page 3, about the middle of the
3  page, there's an email from Mr. Ziehr to you dated
4  October 17, 2013; and he's asking you for a date for
5  Sandow; do you see that?
6    A.  I go back here to the -- what is the first
7  email?  Page 4?
8    Q.  The first emails -- the emails start on page 4,
9  which I don't think you're on any of them until we get
10  to the middle of page 3.
11    A.  Yeah.
12    Q.  Okay.  So let me just make sure I understand
13  this.
14    When you do a vegetation project like the
15  one you were going to go do for Sandow, what's the order of
16  the work that you do?  What's the first thing you do?
17    A.  We would seed it.
18    Q.  And then what would you do?
19    A.  We would mat it.
20    Q.  And then what would you do?
21    A.  That's it.
22    Q.  Okay.  Let's talk about seeding it.
23    Do you fertilize before you seed it?
24    A.  No.  That's afterwards.
25    Q.  Okay.  So when you seed it, what -- what does

**29**

1  that mean?  What do you have to do to seed it?
2    A.  This -- I don't know if I actually saw the
3  project yet.  I think it was just plans.  Depending on
4  this slope, if you could hydromulch it, if you could
5  drill seed it.
6    Q.  So is hydromulching one way to seed?
7    A.  It is.
8    Q.  And the other thing you said, I think, was dry
9  seed.
10    A.  Drill seed.
11    Q.  Drill seed.
12    And what does drill seed mean?
13    A.  That's like with a farm tractor.
14    Q.  So the first you do is go out on the site and
15  come up with a plan, is that right?
16    A.  Correct.
17    Q.  Okay.  Do you know when you first did that for
18  the Sandow project?
19    A.  I think it would have been October when I
20  met -- I guess met with Gary.
21    Q.  Is that something you would want to do before
22  you submit a bid?
23    A.  If I did that, I would never get a job.
24    Q.  All right.  So you think you did that sometime
25  in October.

34

1  Q. Okay. How many guys did you need to get
2  trained?
3  A. I think we trained six or seven.
4  Q. Okay. And when did that training happen?
5  A. I have no idea. I'd have look it up.
6  Q. Do you know if it happened about this time in
7  October of 2013?
8  A. No, ma'am.
9  Q. You don't know?
10  A. No.
11  Q. Okay. Do you know of any reason why would you
12  would delay -- would have delayed getting guys trained
13  in October of 2013?
14  A. Because we were busy, and it takes a day, and
15  pulling six or seven guys.
16  Q. Oh. So you say it takes a day to get them
17  trained?
18  A. Correct.
19  Q. Is that because it's refresher training?
20  A. Correct.
21  Q. Okay. So the guys you needed to get trained,
22  it would have taken a day to get them trained?
23  A. I think it's an eight -- eight- to 10-hour
24  class for a refresher.
25  Q. Okay. Did you start the job a week after this

35

1  email?
2  A. I did not.
3  Q. Do you remember why not?
4  A. I do not recall. I believe there was some work
5  that had to be done.
6  Q. What kind of work?
7  A. Some drainage work or something -- wait a
8  minute -- (reading document.)
9  Q. I'll represent to you I don't think any work
10  was done on the project at all in October of 2013.
11  A. But I think some work needed to be done.
12  Q. I'm going to represent to you that there was no
13  work done from October until when you did the vegetation
14  work in June and July.
15  A. Correct. I ended up doing it all.
16  Q. Okay. So you ended up doing the drainage work?
17  A. Correct.
18  Q. All right. So it's your memory that the
19  drainage work was first identified in October of 2013?
20  A. It did.
21  Q. And was that drainage work necessitated because
22  of erosion that had occurred?
23  A. It does.
24  Q. And what did you have to do to remedy the
25  erosion?

36

1  A. It was tractor work that needed to be done.
2  Q. And was there a reason that you couldn't do
3  that drainage work in October of 2013?
4  A. I didn't want to do it.
5  Q. Okay. Did you tell Ranger you didn't want to
6  do it?
7  A. I'm sure I did.
8  Q. Okay. So do you have any information as to why
9  Ranger didn't get someone else to do it?
10  A. It's not my business.
11  Q. Okay. And so I take from that, you don't know.
12  A. No.
13  Q. Okay. Let's go to Exhibit No. 12.
14      Do you see that this email is from January
15  of 2014?
16  A. It is.
17  Q. Do you remember any conversations with -- with
18  Ranger or Sandow or PBW between October of 2013 and
19  January of 2014 about this project?
20  A. I do not.
21  Q. Okay. Would you have any notes or anything
22  that would reflect anything like that?
23  A. Just these emails.
24  Q. Okay. So to your memory, sitting here today,
25  you didn't have any communication with anybody between

37

1  October of 2000- -- those emails October 2013 and now
2  this email in January of 2014?
3  A. Oh, I'm sure we had conversations.
4  Q. Okay.
5  A. Phone conversation.
6  Q. And do you remember any of those?
7  A. I do not.
8  Q. Okay. And do you remember any reasons why work
9  didn't occur in November or December on this project?
10  A. I think about this time here the bankruptcy was
11  coming up.
12  Q. Okay. And did you have conversations with
13  Ranger about the potential for Luminant to file
14  bankruptcy?
15  A. Most definitely.
16  Q. Okay. And what conversations were you having?
17  A. If we're going to get paid.
18  Q. Okay. And what was Ranger saying?
19  A. They didn't know.
20  Q. Okay. Did you have any conversations with
21  anybody from Sandow or Luminant?
22  A. No.
23  Q. Okay. Did Ranger, during that time period,
24  ever assure you that Ranger would pay you whether or not
25  it got paid by Luminant?

10  (Pages 34 to 37)

Chris Collins

38

1    A.  I think later in -- later on in the year it
2    did.
3    Q.  Okay.  But prior -- prior to this time in
4    October and November, were you getting any assurance
5    from Ranger that you would be paid?
6    A.  It wasn't -- I don't think it was an issue.
7    Q.  What do you mean?
8    A.  I mean, I don't think -- I can't remember when
9    the bankruptcy came up.  But I know that it came up, and
10   we were definitely concerned.
11   Q.  Okay.  And your concern was getting paid,
12   right?
13   A.  Correct.
14   Q.  So if at any time Ranger had assured you,
15   you're going to get paid by us, if no one else, then
16   that no longer would be a concern for you, correct?
17   A.  No.  It's still a concern.
18   Q.  Why's that?
19   A.  You might get paid, but it might be six months
20   down the road, it might be a year down the road.
21   Q.  Okay.  But if Ranger had said to you,
22   regardless of what happens with Luminant, we're going to
23   make sure you get paid on time.
24   A.  Not on time.  I mean, get paid.
25   Q.  My -- my question to you is:  If Ranger had

39

1    said to you, we are going to commit to you we are going
2    to pay you on time, regardless of what happens in the
3    bankruptcy, would that have alleviated any concern for
4    you?
5    A.  No.
6    Q.  Why not?
7    A.  Because it's -- Nathan doesn't cut the checks;
8    Mark does.  So I mean . . .
9    Q.  Okay.  If Mark McKenzie at Ranger had said to
10   you, regardless of what happens with Luminant in the
11   bankruptcy, Ranger's going to pay you on time, would
12   that have alleviated your concerns?
13   A.  If Mark called me, yes; but he didn't.
14   Q.  Okay.  But if he had done that, then you would
15   have been good?
16   A.  Yes.
17   Q.  All right.  So let's look at Exhibit No. 12.
18   A.  What number?
19   Q.  12.  I think you may already be there.
20        Do you see on the first page -- it's the
21   bottom of the first page of Exhibit No. 12, going to the
22   second page, it looks like -- actually, the second page
23   of Exhibit 12, I guess, is where it starts.
24        Nathan emails you Thursday, January 2nd,
25   and says, what is your schedule; do you see that?

40

1    A.  I'm reading it now.  (Witness reads document.
2        I do.
3    Q.  Okay.  And the response is, I need to get some
4    guys mine certified and recertify.  Is this something
5    Alex can do, or do I need to find outside source?
6        Did I read that correctly?
7    A.  You did.
8    Q.  So as of January, you had not yet gotten the
9    guys mine certified; is that right?
10   A.  Correct.
11   Q.  And is that because you were waiting on
12   assurance of payment?
13   A.  I don't -- I don't recall.
14   Q.  Okay.  Do you remember any reason?
15   A.  I do not recall.
16   Q.  Okay.  Did you ultimately use Alex to certify
17   or recertify your guys?
18   A.  I believe I did.
19   Q.  And do you know when that happened?
20   A.  I would have to look it up.
21   Q.  Okay.  All right.  Let's go to Exhibit No. 13,
22   which is kind of a strange exhibit.
23        So if you look at the second page of
24   Exhibit No. 13, you see an email from Nathan to you
25   dated January 20th, 2014, that says, I need to tell them

41

1    something; do you see that?
2    A.  I do.
3    Q.  And he's forwarding an email to him from PBW
4    asking about the schedule; do you see that?
5    A.  I do.
6    Q.  Had you and Nathan been having conversations
7    about this time about a schedule for getting out there
8    to do the vegetation work?
9    A.  We did.
10   Q.  And what conversations had you guys been havin
11   about this job?
12   A.  Phone conversations?
13   Q.  Yeah.  Any conversation.
14   A.  I really don't recall any phone conversations.
15   I mean, it's been three years ago.
16   Q.  Right.
17        But so sitting here today, do you know --
18   A.  I do not.
19   Q.  -- what kind of conversation you guys had?
20   A.  I have none.
21   Q.  And so you respond, Alex is coming this
22   Saturday and Sunday to refresh the certifications.  We
23   can mobilize next week; do you see that?
24   A.  I do.
25   Q.  And -- and Nathan asked you, and how long for

**42**

1    the operations, and you respond, two weeks; do you see
2    that?
3        A.  I do.
4        Q.  And so if -- if that happens, what you guys are
5    talking about, then this project should be done in
6    February, correct?
7        A.  Correct.
8        Q.  The project did not get done in February,
9    correct?
10       A.  Correct.
11       Q.  Do you know why?
12       A.  I do not.
13       Q.  Okay.  Do you --
14           So let's go to Exhibit No. 19.
15           So do you see the first email in this
16   chain that goes on to page 2, has an email from PBW
17   asking Nathan, when are you guys going to start the
18   project?
19       A.  I do.
20       Q.  And Nathan forwards that email on to you.
21       A.  Correct.
22       Q.  And you respond, Alex came last weekend, just
23   need to meet out there with Gary to reconfirm scope.
24   Ready to mobilize after that.
25           Did I read that correctly?

**43**

1        A.  Correct.
2        Q.  So as of January 27th, 2014, you have your guys
3    trained and certified, correct?
4        A.  Correct.
5        Q.  All right.  And you say, you're ready to come
6    out the next week.
7        A.  Correct.
8        Q.  Do you know why that didn't happen in the next
9    week?
10       A.  I do not.
11       Q.  Okay.  Now this email chain jumps forward a
12   bit.
13           And do you see that there's a gap here
14   between January 27th and March 11th?
15       A.  Correct.
16       Q.  Do you know whether there are any
17   communications between you and Nathan about this project
18   between January 27th and March 11th?
19       A.  I do not recall.
20       Q.  Do you have any memory of why this work wasn't
21   completed during that time?
22       A.  I do not recall.
23       Q.  Okay.  On March 11th, you get an email from
24   Nathan that says, Chris, this is on.  The bankruptcy
25   issues are irrelevant now.  We need to give them a

**44**

1    schedule and get mobilized as soon as possible.
2           Did I read that correctly?
3        A.  You did.
4        Q.  Do you know -- do you have any memory of what
5    Mr. Ziehr meant when he said the bankruptcy issues are
6    irrelevant now?
7        A.  Them in bankruptcy?
8        Q.  Yes.
9           Okay.  But why were they irrelevant now?
10       A.  Because we were concerned about getting paid.
11       Q.  Okay.  And so do you -- as of March 11th, 2014,
12   were you still concerned about getting paid?
13       A.  Most definitely.
14       Q.  So did you agree that the bankruptcy issues
15   were irrelevant?
16       A.  No.
17       Q.  At this time, had Nathan said to you, we're
18   going to assure payment, Ranger is?
19       A.  I don't recall.
20       Q.  Okay.  So do you have any idea what Mr. Ziehr
21   meant when he said the bankruptcy issues are irrelevant
22   now?
23       A.  Basically, it says -- he's saying the
24   bankruptcy issues are irrelevant.  To me, they are.
25       Q.  Okay.  So they were still relevant to you?

**45**

1        A.  Yes, ma'am.
2        Q.  Okay.  You respond, joy.  I'll call you
3    tomorrow to come up with a game plan.
4           Did I read that correctly?
5        A.  You did.
6        Q.  And so when you said, joy, you were being
7    sarcastic, correct?
8        A.  Correct.
9        Q.  Because you weren't happy about that?
10       A.  Correct.
11       Q.  And why weren't you happy about that?
12       A.  I was concerned about getting paid.
13       Q.  Why didn't you just tell Ranger, we're not
14   going to do this job?
15       A.  Because I do a lot of work for them.  I mean,
16   we're -- we're a team; we get work done.
17       Q.  Okay.  So when you're telling him, I can
18   mobilize next week, I could mobilize in two week, did
19   you mean that you could do that?
20       A.  Possibility.  I mean, it depends on schedule,
21   weather.  There's a lot of other factors than reading
22   these little emails that you're reading me.
23       Q.  But Ranger's a good customer of yours, correct?
24       A.  Very good.
25       Q.  And if they had said to you, hey, you need to

**12  (Pages 42 to 45)**

46

1  get out here and do this, you would have done it,
2  correct?
3      A. Correct.
4      Q. Okay. Let's go to Exhibit No. 20.
5          So I think you first entered this chain on
6  the second page of the document, which is Ranger 000237,
7  when Nathan emails -- or copies you on something -- oh,
8  wait, you've been there before.
9          So this starts with an email from Nathan
10 to somebody, we can't tell, that says, when could you
11 guys meet out on-site with our seeding guy, and that's
12 next week, to point out the hot spot areas you want us
13 to address, we all would like to get the project
14 buttoned up; you see that?
15     A. I do.
16     Q. And that's March 13th, 2014.
17         So it's a couple of days after the email
18 where he tells you, hey, we're gonna do this, right?
19     A. It is.
20     Q. And then there's some emails about scheduling.
21         And if you go the first page, it looks
22 like it ultimately gets scheduled for 8 a.m. on a
23 Friday.
24     A. To meet out there, correct.
25     Q. To meet on-site.

47

1          And you say, 10/4, I'll be there.
2          Do you see that?
3          I think that's the very first -- last
4  email in the chain, first one on the page.
5      A. Correct.
6      Q. Do you recall attending a meeting on-site in
7  March of 2014?
8      A. That particular meeting, no, but I remember
9  meeting out there several times.
10     Q. Okay. At this point, you have guys trained and
11 certified, correct?
12     A. Correct.
13     Q. Do you know whether you have the materials that
14 you needed?
15     A. I do not recall.
16     Q. I'm sorry?
17     A. I don't recall, no.
18     Q. Okay. Do you remember whenever it said --
19 there was a point where you had ordered some fertilizer,
20 correct?
21     A. Correct.
22     Q. And then you needed more?
23     A. Correct.
24     Q. Do you remember if that fertilizer came in?
25     A. I don't recall.

48

1      Q. Okay. All right. Let's go to Exhibit No. 21.
2          So the first email that's Exhibit 21 is an
3  email from Pat Behling to Nathan Ziehr copying Matt
4  Sutherland. And it says, hey, Nathan, Matt just fill me
5  in on the meeting with Gary and your vegetation sub on
6  Friday out at Sandow AX. It looks like the sub was
7  saying that he didn't want to put the erosion mat down
8  on the slopes unless the existing volunteer vegetation
9  was scraped off. I agree. That will also address the
10 erosion rills in many areas, but Matt and Gary was
11 talking about remob cost for a dozer, et cetera, to do
12 that.
13         Did I read that correctly?
14     A. You did.
15     Q. Do you remember raising a concern about needin
16 to scrape off the volunteer vegetation?
17     A. I do.
18     Q. And what was your concern?
19     A. You couldn't put the matting down.
20     Q. Okay. And what are the erosion rills that he's
21 talking about?
22     A. They would have been rills where it would hav
23 eroded.
24     Q. Okay. Did you agree that the erosion rills
25 needed to be addressed?

49

1      A. That wasn't my scope.
2      Q. Okay. But you're -- you're an expert in
3  erosion, correct?
4      A. Oh, correct. Yes.
5      Q. And so whether -- even though it wasn't your
6  scope, did you agree that someone needed to address the
7  erosion rills?
8      A. Yes.
9      Q. And that's where you're talking about you
10 didn't want to be the guy out there with a dozer
11 scraping off the volunteer vegetation?
12     A. Correct.
13     Q. You wanted someone else to do that?
14     A. Correct.
15     Q. Okay. And you told Ranger that at the time,
16 correct?
17     A. I didn't volunteer to do it.
18     Q. Okay. All right. You never told them that you
19 would do that part?
20     A. Correct.
21     Q. Okay. Okay. So let's go to Exhibit No. 22.
22     A. Okay.
23     Q. Okay. Do you see this chain starts with Matt
24 Sutherland forwarding to Nathan Ziehr a figure showing
25 the areas that need to be vegetated and matted.

13 (Pages 46 to 49)

## 58

1  kind of obscure. But it's -- this is not the type of
2  seed that the engineer -- this is -- these are weeds,
3  basically.
4    Q.  Okay.
5    A.  Bless you.
6    Q.  Do you remember whether you had an opinion back
7  in October of 2013 regarding whether or not the
8  vegetation work needed to be done?
9    A.  I'm sure I had an opinion. I mean, I -- I
10 don't recall. I mean, it's just been a while. I don't
11 recall even if we needed to do it or not.
12   Q.  Okay. So sitting here today, you don't know
13 whether -- whether you thought seeding -- whether you
14 thought vegetation work needed to be done or didn't need
15 to be done as of October of 2013?
16   A.  It's not my call.
17   Q.  Okay. And I understand it's not your call.
18   A.  Yeah.
19   Q.  But I'm asking, do you remember whether you had
20 an opinion?
21   A.  I don't remember that. I -- I can't remember
22 one way or another if this was sufficient or if it
23 wasn't. I was very concerned about getting paid, put it
24 that way.
25   Q.  Okay. You really didn't want to do this job?

## 59

1    A.  Correct.
2    Q.  Okay. And did you tell Ranger you didn't
3  really want to do this job?
4    A.  I mean, I'm sure he -- in a direct way, no;
5  indirect, yes.
6    Q.  Do you know whether he tried to find somebody
7  else to do the job?
8    A.  I have no idea.
9    Q.  Okay. Did he ever tell you he was trying to
10 get somebody else to do it?
11   A.  No.
12   Q.  Okay. Did you get paid for the work?
13   A.  Six months later.
14   Q.  Okay. Did you get paid in full?
15   A.  No.
16       You have my retainage.
17   Q.  Okay. So you've been paid everything except
18 for retainage, correct?
19   A.  Correct.
20   Q.  All right. Now, as of October 9th or -- or
21 before you did the work, you weren't owed any money on
22 this project, correct?
23   A.  No.
24   Q.  Is that not -- it's not correct, or it is
25 correct?

## 60

1    A.  No, I was not owed any money.
2    Q.  Okay.
3        MS. OKON:  I think we're going to take a
4  break.
5        THE VIDEOGRAPHER:  Going off the record.
6  The time is 4:44.
7        (Recess from 4:44 p.m. to 4:51 p.m.)
8        THE VIDEOGRAPHER:  Back on the record.
9  Time is 4:51.
10   Q.  (By Ms. Okon) Mr. Collins, pretty soon before
11 we broke, you said something about Sandow having your
12 retainage, and I want to talk to you for a minute about
13 that.
14   A.  Okay.
15   Q.  Are you talking about retainage for vegetation
16 work or retainage for the silt fence and other things
17 you did at the beginning of the project?
18   A.  I'm 99 percent sure it's for the vegetation
19 work.
20   Q.  Okay. Do you understand that you did that
21 vegetation work after Luminant filed for bankruptcy?
22   A.  I did not.
23   Q.  Okay. Yeah. I'm going to represent to you
24 that Luminant filed for bankruptcy April 29th, 2014.
25       And you did the vegetation work in June

## 61

1  and July of 2014, correct?
2    A.  Correct.
3    Q.  And so I'm also going to represent to you that
4  Luminant did not withhold funds post-petition.
5        Have you been told by somebody that
6  Luminant retained funds for work that was done after the
7  bankruptcy filing?
8        MR. SAKONCHICK:  There was retainage.
9    Q.  (By Ms. Okon) Well, let's forget my
10 representation for a second.
11       Were you told by somebody that Luminant
12 withheld funds post-bankruptcy?
13   A.  No, I wasn't -- I wasn't a part of any of that.
14   Q.  Okay. You have been not been paid your full
15 amount due by Ranger, correct?
16   A.  Correct.
17   Q.  And your understanding is that Luminant has
18 retained 10 percent from Ranger; is that correct?
19   A.  I'm assuming.
20   Q.  Okay. And did anyone from Ranger tell you
21 that?
22   A.  No.
23   Q.  Okay. You just assumed that?
24   A.  Correct.
25   Q.  Okay. Second, I want to talk to you for a

62

1    second about the drainage work.
2         I understand you really didn't want to do
3    any of the vegetation work, but it seems like you
4    especially didn't want to do the drainage work; is that
5    an accurate understanding?
6    A.  Correct.
7    Q.  And why did you not want to do the drainage
8    work?
9    A.  It would tie up too many resources.
10   Q.  Okay.  Ultimately, you did the drainage work,
11   correct?
12   A.  Correct.
13   Q.  And so you brought in your own skidsteer to do
14   that?
15   A.  Correct.
16   Q.  When was that decision made that you would do
17   the drainage work?
18   A.  I don't recall.
19   Q.  Okay.  Do you remember why that decision was
20   made?
21   A.  Why it was made?
22   Q.  Yeah.
23   A.  Because we finally needed to get it done.
24   Q.  Okay.  And did Ranger tell you they didn't have
25   the resources to do it?

63

1    A.  They may have.
2    Q.  Do you remember?
3    A.  I don't.
4    Q.  Okay.  You just remember you had to do it?
5    A.  Correct.
6         MS. OKON:  Pass the witness.
7              EXAMINATION
8    QUESTIONS BY MR. SAKONCHICK
9    Q.  Mr. Collins, you testified today that we do
10   have an email trail of a meeting on October 9, 2013 and
11   another one on March 20th, 2014.
12   A.  Yes, I recall that.
13   Q.  And you said you recall being out there another
14   one or two more times.
15   A.  Yes, sir.
16   Q.  You don't know was it between October 20th and
17   March 20th?
18   A.  Possibly one time between then and maybe one
19   time after.
20   Q.  Okay.  If I represent to you that in October
21   2013, there was a Wall Street Journal article out about
22   the Luminant companies and Sandow possibly filing for
23   bankruptcy, would that refresh your recollection about
24   time frame in which you found out about the potential
25   bankruptcy?

64

1    A.  Possibility; yes, sir.
2    Q.  How would you have found out about the
3    potential bankruptcy?
4    A.  It was in the news.
5    Q.  Okay.  Do you read the Wall Street Journal?
6    A.  Yes, sir.
7    Q.  Would you have seen it in the Wall Street
8    Journal?
9    A.  Yes, sir.
10   Q.  And so you would have found out independently
11   of anybody telling you from Ranger?
12   A.  It was known through my suppliers, too, that
13   also supplied Luminant.  But I'm not saying -- I think
14   remember hearing it first from my supplier who also
15   sells to Luminant.
16   Q.  Okay.  Would you have had trouble having a
17   supplier extend you credit on a job that you were going
18   to do for Sandow --
19        MS. OKON:  Objection.
20   Q.  (By Mr. Sakonchick) -- after the bankruptcy was
21   announced in?
22        MS. OKON:  Objection; calls for
23   speculation.  Vague and ambiguous.
24   Q.  (By Mr. Sakonchick) Did you have any problems
25   with certain vendors wanting to extend credit to you for

65

1    work you were going to perform on the Sandow job?
2    A.  Everybody was nervous.
3         MS. OKON:  Objection; nonresponsive.
4    A.  Even suppliers.
5         MS. OKON:  Objection; nonresponsive.
6    Q.  (By Mr. Sakonchick) What suppliers -- are you
7    talking about your vendors and suppliers?
8    A.  Yes, sir.
9    Q.  How many projects have you done since June
10   2014?
11   A.  Thousands.
12   Q.  So sitting here today and trying to remember
13   what happened in 2013 and 2014 is not easy?
14   A.  Yes, sir.
15   Q.  Would it be a fair characterization that
16   between October 2013 and March 2014, BMP had a concern
17   about Luminant's bankruptcy?
18   A.  Yes, sir.
19   Q.  And why was that?
20   A.  Nobody wanted to works -- nobody wants to work
21   for free.
22   Q.  Were you concerned about getting paid?
23   A.  Yes, sir.
24   Q.  If Mr. Ziehr represented that -- when we went
25   through some of these emails -- that he got information,

66

1    was passing on information from you, would that have
2    been a result of telephone calls between you and
3    Mr. Ziehr?
4              MS. OKON: Objection; compound. Vague and
5    ambiguous. Calls for speculation.
6        Q. (By Mr. Sakonchick) All right. Forget it.
7              Did Ranger ever tell you between September
8    2013 and July of 2014, don't come out and do the Sandow
9    job?
10       A. No, sir.
11       Q. Between that same period of time, did Ranger
12   continually try to get you to come out and do the
13   vegetation on that job?
14             MS. OKON: Objection.
15       A. Yes, sir.
16       Q. (By Mr. Sakonchick) What would have been BMPs
17   exposure, had it gone on and done that job and Sandow
18   filed bankruptcy?
19             MS. OKON: Objection; calls for
20   speculation.
21       A. Dollar amount?
22       Q. (By Mr. Sakonchick) Yes.
23       A. It was roughly a hundred grand.
24       Q. And what did you base that on?
25       A. The estimate, the -- the bid.

67

1        Q. And was that based upon the plans and
2    specifications you were provided?
3        A. Yes, sir; and visual.
4        Q. As you she -- Ms. Okon walked you through the
5    emails, they were talking about times where they were
6    going to have you come out in October and then January
7    and then March.
8              Was there anything that Ranger did that
9    prevented you from coming out during those time frames?
10       A. Not that I recall.
11       Q. Would it be a fair characterization that
12   between September 2013 and June 2014, Luminant's
13   bankruptcy was a major concern of yours of finishing the
14   Sandow job?
15             MS. OKON: Objection; leading.
16       A. Yes. Yes, sir.
17       Q. (By Mr. Sakonchick) Please turn to Exhibit 27.
18       A. (Witness complies.)
19       Q. Now, Ms. Okon asked you were there anything that
20   prevented you from coming out from March 2014 until June
21   2014.
22             And you were -- you don't recall being
23   aware of anything; is that your answer?
24       A. Yes, sir.
25       Q. Were you aware that Luminant had filed

68

1    bankruptcy or Sandow had filed bankruptcy on April 29th,
2    2014?
3        A. I'm sure I was aware of the date. I don't
4    recall.
5        Q. How would you have found out?
6        A. Coming out.
7        Q. All right. Would the filing of that bankruptcy
8    have prevented you from coming out until things got
9    straightened out?
10             MS. OKON: Objection; vague and ambiguous.
11       A. Yes, sir.
12       Q. (By Mr. Sakonchick) All right. Let me rephrase
13   it to address her objection.
14             After the bankruptcy filing, what would
15   have been your concerns of completing the Sandow job?
16       A. Getting paid.
17       Q. And how was that resolved after the bankruptcy?
18       A. Rephrase the question.
19       Q. How was that resolved after the bankruptcy
20   about you getting paid that you ultimately went out and
21   did the work?
22       A. I mean, I don't understand what you're trying
23   to say, how did it get resolved.
24       Q. Well, you were concerned about getting paid
25   after the bankruptcy filing.

69

1        A. Correct.
2        Q. You ultimately did the work.
3        A. (Nodding.)
4        Q. What changed to make you come out and do the
5    work?
6        A. I gave in.
7        Q. Did you receive any sort of assurance from
8    Ranger and Luminant that you were -- there were
9    provisions to pay you post-petition?
10       A. No, sir; I wasn't aware of any.
11       Q. Looking at Exhibit 20.
12             At some point in time, in the emails that
13   we were discussing, Mr. Ziehr tells you that the
14   bankruptcy is now irrelevant.
15             Do you recall that?
16       A. Yes, sir.
17       Q. Did Mr. Ziehr represent -- make any
18   representation to you about getting paid, even though
19   Luminant wouldn't pay?
20             MS. OKON: Objection; vague and ambiguous.
21       A. I don't recall.
22       Q. (By Mr. Sakonchick) At some point in time, did
23   Ranger inform you that Ranger would pay you even if
24   there was a bankruptcy filing?
25       A. I believe there was a -- there was a phone

18 (Pages 66 to 69)

Chris Collins

70

1     call. It wasn't an email, but it was a phone call.
2         Q. And who was that from?
3         A. Nathan.
4         Q. All right. Did you tell him to have Mark call
5     you?
6         A. No.
7         Q. Did you accept what he said on face value?
8         A. Correct.
9         Q. Were you prepared after that to go out and
10    finish the job?
11        A. (Nodding.) Still had concerns.
12        Q. Okay. Look at Exhibit 28.
13        A. (Witness complies.)
14        Q. It's an email from David Watkins to Nathan
15    Ziehr, and there's a news release attached to it talking
16    about basically getting paid post-petition.
17           Have you ever seen this email or that news
18    release?
19        A. Not that I recall. No, sir; I don't recall.
20        Q. BMP, did they actually complete all the work at
21    the job site for the vegetation?
22        A. Yes, sir.
23        Q. Was it approved by the engineer?
24        A. They loved it.
25        Q. And they -- so everybody was happy with it?

71

1         A. Extremely happy.
2         Q. Okay. And you would have completed that work
3     sometime in July 2014?
4         A. It would be finished in June of '14, the end of
5     June.
6         Q. Other than bankruptcy, what else would have
7     prevented you from coming out to do the job between
8     September 2013 and July -- or June 2014?
9         A. Nothing.
10        Q. Just bankruptcy?
11        A. Yes, sir.
12           MR. SAKONCHICK: Pass the witness.
13           FURTHER EXAMINATION
14    QUESTIONS BY MS. OKON
15        Q. Okay. I think you just testified that you
16    believe you finished the vegetation work in June of
17    2014.
18           So I'd like you to turn to Exhibit No. 33.
19           MR. SAKONCHICK: I don't think that's what
20    he testified.
21        Q. (By Ms. Okon) When do you think you finished
22    the vegetation work on the project?
23        A. I think it was June of '14.
24        Q. Couldn't it have been July of 2014?
25        A. I don't recall. I'd have to look and see.

72

1         Q. So if you look at Exhibit 33 with me.
2         A. Where is that email that I sent that said
3     finished?
4         Q. Oh, that's a really good point.
5            Okay. That should be No. 37.
6         A. July 1st, 7:00 o'clock.
7         Q. Do you know if there was any work that had to
8     be done after you were done with your work on the
9     project?
10        A. Not that I recall.
11        Q. Do you know if there was any clean up or
12    anything like that?
13        A. No idea.
14        Q. Okay. Did you do any work on the vegetation
15    prior to June of 2014?
16        A. No, ma'am.
17        Q. Okay. So while you may have had visits --
18    visits to the site, you never actually did any work,
19    correct?
20        A. Correct.
21        Q. Did you ever have any suppliers or vendors
22    refuse to extend you credit on this Sandow job?
23        A. Refuse, no. Concerned, yes.
24        Q. Okay. But you never had trouble getting
25    materials because of the bankruptcy, correct?

73

1         A. Troubles, yes.
2         Q. What kind of trouble did you have?
3         A. Vendors are concerned.
4         Q. Okay. So they may have complained a little
5     bit, but they didn't withhold material from you,
6     correct?
7         A. I had to pay them --
8         Q. Okay.
9         A. -- before Luminant paid me.
10        Q. Okay. So there were no delays in getting
11    materials caused by the bankruptcy, correct?
12        A. Not that I recall.
13        Q. Who was your contract with, Ranger or Sandow?
14        A. Ranger.
15        Q. Okay. And so who had an obligation to pay you,
16    Ranger or Sandow?
17        A. Sandow pays Ranger; Ranger pays me.
18           MS. OKON: Okay. I'm going to object as
19    nonresponsive.
20        Q. (By Ms. Okon) Who had a contractual obligation
21    to pay you, Ranger or Sandow?
22        A. There wasn't a contract.
23        Q. Okay. Who accepted your invoice and accepted
24    your bid?
25        A. Ranger.

19  (Pages 70 to 73)

Chris Collins

74

1    Q. Okay. And who had the obligation to pay you?
2    A. Ranger.
3    Q. Okay. And so whatever happened between Sandow
4    and Ranger, it was Ranger who had the obligation to pay
5    you, correct?
6    A. That sounds right. But, typically, Ranger gets
7    paid, we get paid.
8    Q. Okay. But you didn't have any contract that
9    said they don't have to pay you until they get paid,
10   correct?
11   A. No. It's understood. It -- this is
12   construction. It's . . .
13   Q. Well, and there are contracts that go both
14   ways. There are contracts that say you have to wait to
15   get paid, and there are contracts that say you don't.
16          You didn't have a contract, did you?
17   A. Correct.
18   Q. Okay. But Ranger's a good client of yours,
19   correct?
20   A. Correct.
21   Q. And so you were going to do whatever they
22   ultimately wanted to do?
23   A. Correct.
24   Q. Okay. And at any time, had you gotten
25   assurance from Mark McKenzie that they were going to

75

1    take care of you regardless of the bankruptcy, you would
2    have been out there?
3    A. Correct.
4    Q. All right.
5          MS. OKON: I'll pass the witness.
6          MR. SAKONCHICK: Nothing further.
7          THE VIDEOGRAPHER: This concludes the
8    deposition of Chris Collins. Going off the record. The
9    time is now 5:07.
10          (Proceedings concluded at 5:07 p.m.)

76

1                CHANGES AND SIGNATURE
2    PAGE LINE CHANGE          REASON
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

77

1    I, CHRIS COLLINS, have read the foregoing deposition
2    and hereby affix my signature that same is true and
3    correct, except as noted above.
4
5          _____
6          CHRIS COLLINS
7
8    THE STATE OF _____)
9    COUNTY OF _____)
10
11   Before me, _____, on this day
12   personally appeared CHRIS COLLINS, known to me or proved
13   to me on the oath of _____ or through
14   _____ (description of identity card
15   or other document) to be the person whose name is
16   subscribed to the foregoing instrument and acknowledged
17   to me that he/she executed the same for the purpose and
18   consideration therein expressed.
19   Given under my hand and seal of office on this _____
20   day of _____, _____.
21
22
23          _____
24          NOTARY PUBLIC IN AND FOR
25          THE STATE OF _____
     My Commission Expires: _____

20  (Pages 74 to 77)

78

1               UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE

3      IN RE:                    )   Chapter 11
                                 )
4      ENERGY FUTURE HOLDINGS     )   CASE NO. 14-10979 (CSS)
       CORP., et al.,            )
5                                 )
                Debtors,         )   (Jointly Administered)
6                                 )
_____
7                                 )
       SANDOW POWER COMPANY, LLC )
8                                 )
       vs.                        )   Contested Matter
9                                 )
       RANGER EXCAVATING, LP     )
10

11                  REPORTER'S CERTIFICATE

12       ORAL AND VIDEOTAPED DEPOSITION OF CHRIS COLLINS

13                     October 18, 2016

14      I, Amy M. Clark, Certified Shorthand Reporter in and

15   for the State of Texas, hereby certify to the following:

16       That the witness, CHRIS COLLINS, was duly sworn and

17   that the transcript of the deposition is a true record

18   of the testimony given by the witness;

19       That the deposition transcript was duly submitted on

20   _ November 7, 2016 to the witness or to the attorney for

21   the witness for examination, signature, and return to me

22   by December 7, 2016.

23       That pursuant to information given to the deposition

24   officer at the time said testimony was taken, the

25   following includes all parties of record and the amount

1    of time used by each party at the time of the

2    deposition:

3         Melanie K. Okon (1h04m)
              Attorney for Debtors
4         Stephen Sakonchick (0h11m)
              Attorney for Respondents

5

6         That a copy of this certificate was served on all

7    parties shown herein on _____ and filed

8    with the Clerk.

9         I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties in the

11   action in which this proceeding was taken, and further

12   that I am not financially or otherwise interested in the

13   outcome of this action.

14        Certified to by me on this 3rd day of

15   November, 2016.

16

17                          _____

18                          Amy M. Clark, CSR
                            Texas CSR 8753
19                          Expiration:  12/31/2016
                            DepoTexas - Austin
20                          Firm No. 17
                            1016 La Posada, Suite 294
21                          Austin, Texas 78752
                            512-478-2752
22

23

24

25

Tab J

Brad McKenzie

**2**

1        APPEARANCES
2
3    FOR DEBTORS AND DEBTORS IN POSSESSION:
4    Ms. Melanie K. Okon
     Okon Hannagan, PLLC
5    750 N. St Paul Street
     Suite 1800
6    Dallas, Texas 75201
     Telephone: (214)396-9650
7    Fax: (469)909-6115
     E-mail: mokon@okonhannagan.com
8
     FOR RESPONDENT RANGER EXCAVATING, LP:
9
     Mr. Stephen Sakonchick, II
10   6502 Canon Wren Drive
     Austin, Texas 78746
11   Telephone: (512)329-0375
     Fax: (512)697-2859
12   E-mail: sakon@flash.net
13
     ALSO PRESENT:
14
     Ms. Ashley Alaman - In-house Counsel for Luminant
15   Lindsey Thomas -Videographer
16
17
18
19
20
21
22
23
24
25

**3**

## INDEX

                                    PAGE
Appearances .......................................2
BRAD MCKENZIE
Examination by Ms. Okon ......................4
Examination by Mr. Sakonchick ...............77
Further Examination by Ms. Okon ...........89
Signature Page ...................................95
Court Reporter's Certificate ....................97
            EXHIBITS
EXHIBIT    DESCRIPTION        PAGE
Exhibit 1    Notice              13
Exhibit 3    Contract for services,     29
             construct AX fly ash disposal
             haul road
Exhibit 5    Pay Application, 8/31/13,   46
             A1893710

Exhibit 6    Application for payment,    52
             8/31/13, A1893758
Exhibit 7    Email from Chris Collins to  35
             Nathan Ziehr, 10/1/13

Exhibit 19   Email from Chris Collins to  60
             Nathan Ziehr, 3/13/14
Exhibit 27   Email from Jacob Gonzales to  67
             David Watkins, 5/7/14

Exhibit 33   Project report, 6/9/14    81

Exhibit 34   Affidavit, 6/9/14      8

Exhibit 38   Application for payment,    54
             7/31/14

**4**

1        THE VIDEOGRAPHER:  Here begins the
2    deposition of Brad McKenzie.  Today's date is October
3    17th, 2016.  The time is 9:40.
4        Will the court reporter please swear in
5    the witness.
6        BRAD MCKENZIE,
7    having been first duly sworn, testified as follows:
8        EXAMINATION
9    QUESTIONS BY MS. OKON
10   Q.  Good morning.
11   A.  Hi.
12   Q.  My name is Melanie Okon.  And I'm here
13   representing Sandow today; do you understand that?
14   A.  Yes.
15   Q.  Can you please state your full name for the
16   record?
17   A.  Brad McKenzie.
18   Q.  Mr. McKenzie, have you ever given your
19   deposition before?
20   A.  Yes.
21   Q.  About how many times have you given your
22   deposition prior to today?
23   A.  Oh, at least twice.  Two or three times.
24   Q.  Okay.  And how long ago was the last time you
25   gave your deposition?

**5**

1    A.  Like two to three years ago.
2    Q.  Okay.  Have you ever testified at a trial or
3    arbitration or hearing before?
4    A.  Yes.
5    Q.  About how many times have you actually
6    testified in a trial or arbitration or hearing?
7    A.  At least once at a trial, and I think once at
8    a -- like, an arbitration or mediation.
9    Q.  Okay.  And how long ago was the last time you
10   gave testimony in a trial or arbitration or hearing?
11   A.  Probably three or four years ago.
12   Q.  Do you understand that you are under oath here
13   today?
14   A.  Yes.
15   Q.  Do you understand that there's a court reporter
16   taking down everything that you say or I say or anyone
17   says on the record?
18   A.  Yes.
19   Q.  Do you understand that you're being videotaped?
20   A.  Yes.
21   Q.  And do you understand that your testimony that
22   you give today can be read back or played back in video
23   format at the hearing of this case before the court,
24   just as if you were there in person?
25   A.  Yes.

**2 (Pages 2 to 5)**

236

Brad McKenzie

**6**

1    Q.  You may already be familiar with some of these
2    background rules, but I'm going to go through a few of
3    them that will just make our record more clear and make
4    it go easier today.
5        A.  Okay.
6        Q.  Because the court reporter is trying to take
7    down everything we're saying, it's best if we wait for
8    the other person to completely finish talking before we
9    begin, even if we know what the end of the sentence is
10   going to be; is that okay?
11       A.  Yes.
12       Q.  You're doing well with this.  Yeses and nos
13   need to be given rather than uh-huhs or huh-uh.  And if
14   that happens, Mr. Sakonchick or I may remind you to give
15   a yes or a no.  And no one's trying to be rude; we're
16   just trying to make the record clear.
17          Is that okay?
18       A.  Yes.
19       Q.  If at any time you want to take a break, just
20   let me know.  I just ask that you answer whatever
21   question I've already asked, and then we can take a
22   break; is that agreeable?
23       A.  Yes.
24       Q.  If I ever ask you a question that you don't
25   answer, will you please let me know, and I'll rephrase

**7**

1    that as best I can.
2        A.  Yes.
3        Q.  Where do you work?
4        A.  Ranger Excavating.
5        Q.  Are you an employee of Ranger Excavating?
6        A.  Yes.
7        Q.  How long have you worked at Ranger Excavating?
8        A.  Since 2003, so about 13 years.
9        Q.  And what is your title at Ranger Excavating?
10       A.  I am the controller.
11       Q.  And how long have you held that position?
12       A.  As -- as long as I've been here, so 13 years.
13       Q.  Do you work any place else?
14       A.  No -- currently?
15       Q.  Yes.
16       A.  No.
17       Q.  Have you worked any place else during -- since
18   2013?
19       A.  Oh, while I was here, no.  Correct.  No.
20       Q.  What is McKenzie Interests, Inc.?
21       A.  The general partner of Ranger Excavating
22   Limited Partnership.
23       Q.  And do you hold a position with McKenzie
24   Interests, Inc.?
25       A.  Yes.

**8**

1    Q.  And what position do you hold for McKenzie
2    Interests, Inc.?
3        A.  I'm the vice president of finance.
4        Q.  Is that -- are you an employee of McKenzie
5    Interests, Inc.?
6        A.  No.
7        Q.  Do you receive a salary from McKenzie
8    Interests, Inc.?
9        A.  No.
10       Q.  I'm gonna direct you to what's been marked as
11   Exhibit No. 34 in your binder.
12          (Exhibit 34 marked.)
13       A.  (Witness complies.)
14       Q.  (By Ms. Okon) And if you will turn to the third
15   page of that exhibit, starting at Ranger 000120; do you
16   recognize that document?
17          Are you on Exhibit 34?
18       A.  Yes.
19       Q.  I think -- okay.  And do you recognize that
20   document?
21       A.  Have I seen it before and read it and . . .
22       Q.  Yes.
23       A.  Yes.
24       Q.  And if you turn to page 000121, is that your
25   signature contained on that document?

**9**

1        A.  Yes.
2        Q.  Okay.  What is that document?
3        A.  It is a lien -- not a lien, hang on, affidavit.
4        Q.  Okay.  And did you read that affidavit before
5    signing?
6        A.  Yes.
7        Q.  Is -- in paragraph No. 1, would you read the
8    first sentence?
9        A.  My name is Brad McKenzie --
10          That one?
11       Q.  Yes.
12       A.  -- and I am the vice president of McKenzie
13   Interests, Inc., the general partner of Ranger
14   Excavating, LP, claimant.
15          I have personal knowledge of the facts set
16   forth below and am competent and authorized to make this
17   affidavit.
18       Q.  Okay.  And this is a lien affidavit that was
19   being filed on behalf of Ranger Excavating, correct?
20       A.  Yes.
21       Q.  Is there a reason you identified yourself as
22   the vice president of McKenzie Interests, rather than
23   the controller for Ranger Excavating?
24       A.  No. (Shaking head.)
25       Q.  Because at the time you signed this lien

30

1  have been Nathan and Bobbie that would have looked at it
2  in more detail.
3      Q.  If you'll look to me -- with me to the page
4  Ranger 000184.
5      A.  (Witness complies.)
6      Q.  Did you sign this contract on behalf of Ranger?
7      A.  No.
8      Q.  Whose signature is that?
9      A.  Mark --
10     Q.  Oh, okay.
11     A.  -- McKenzie.
12     Q.  Mark McKenzie.  Okay.
13         Did you-all understand at Ranger that the
14  term of this agreement was supposed to be -- or that
15  this contract was supposed to be completed by September
16  2nd, 2013 at the time it was signed?
17     A.  Yes.
18     Q.  Okay.  And, for the record, the contract we're
19  looking at right now is for the ash disposal haul road;
20  do you see that?
21     A.  Yes.
22     Q.  And then if you go about halfway through this
23  exhibit -- both contracts are part of this exhibit.  So
24  if you go about halfway through, it starts with the
25  contract for the fly ash disposal pit where it starts at

31

1  Ranger 43; do you see that?
2      A.  Yes.
3      Q.  If you want, we can mark that, if that makes it
4  easier for you.
5          Do you agree that these contracts are
6  substantially identical when it comes to the provisions
7  in them?
8      A.  Probably.  Without looking at them, yes.
9      Q.  And so, for example, if you go to contract for
10  the ash disposal pit, and you go to page 3 of that
11  contract, which is Ranger 00045, do you see the same
12  terms of agreement paragraph that we just read?
13     A.  Yes.
14     Q.  Okay.  Now, if you'll go back to the haul road
15  contract.
16     A.  (Witness complies.)
17     Q.  Are you aware of any agreements between the
18  parties that extended or modified the end date of the
19  contract that was September 2nd, 2013?
20     A.  I think Nathan had something, but I don't know
21  off the top of my head.
22     Q.  Is it your understanding that this contract was
23  extended?
24     A.  Yes.
25     Q.  Okay.  And have you ever seen something that

32

1  you believe is an extension of this contract?
2      A.  I've not seen it in writing.
3      Q.  Okay.  And do you agree that, under the
4  contract, any modifications had to be by written
5  agreement?
6      A.  Yes.
7      Q.  Okay.  If we go down to the next paragraph
8  titled Schedule, do you see it says, contractor will
9  begin the work by December 4th, 2012 and complete it b
10  September 2nd, 2013?
11     A.  Yes.
12     Q.  And so at the time that Mr. Mark McKenzie
13  signed this contract, did Ranger understand that the
14  work was supposed to be completed by September 2nd,
15  2013?
16     A.  Yes.
17     Q.  Do you agree that matting and vegetation was
18  part of the work that was supposed to be completed by
19  September 2nd, 2013?
20     A.  Yes.
21     Q.  Now, if we go down to the provision that says
22  invoices and payment.  And it's actually kind of the
23  last paragraph of that provision -- well, let's just
24  start at the beginning.
25         The first sentence says, contractor will

33

1  at the end of each calendar month in which the work is
2  performed and prior to the 10th day of the following
3  month submit to company invoices based on work completed
4  during the prior month; did I read that correctly?
5      A.  Yes.
6      Q.  Okay.  And in this provision, contractor is
7  Ranger, correct?
8      A.  Correct.
9      Q.  And company is Sandow?
10     A.  Correct.
11     Q.  And so the parties agree that Ranger would
12  invoice Sandow each month that it performed work,
13  correct?
14     A.  Correct.
15     Q.  And to your knowledge, did Ranger do that?
16     A.  Yes.
17     Q.  Okay.  Were you involved in submitting invoices
18  to Sandow.
19     A.  Not directly.
20     Q.  Okay.  Was that Mr. Ziehr would do the pay
21  applications?
22     A.  Correct.
23     Q.  Would you review those or have any involvement
24  with those prior to them being submitted to Sandow?
25     A.  No.

9 (Pages 30 to 33)

38

1    pit project, correct?
2    A.  Correct.
3         MR. SAKONCHICK: Actually, that's not
4    correct.
5         THE WITNESS: (Unintelligible response.)
6    Q.  (By Ms. Okon) Tell me what the difference is
7    between the two affidavits you signed.
8         MR. SAKONCHICK: We're going to object.
9         Are you talking about the same lien
10   affidavit?
11        One's got a file stamp; one doesn't.
12   A.  Yeah.
13   Q.  (By Ms. Okon) So you signed only one lien
14   affidavit?
15   A.  Could I have a second.
16   Q.  Sure.
17        MR. SAKONCHICK: You're talking about just
18   on the Sandow?
19        MS. OKON: I'm talking about on the Sandow
20   project.
21        MR. SAKONCHICK: Because he signed another
22   affidavit on the Luminant.
23   A.  Yeah.  Actually, I think this was just the same
24   lien --
25   Q.  (By Ms. Okon) Okay.

39

1    A.  -- two copies.
2    Q.  (By Ms. Okon) Then let's look at -- let's look
3    at -- I guess it doesn't matter which one we look at.
4         Let's look at Ranger 000127 --
5    A.  Okay.
6    Q.  -- of that exhibit?
7    A.  Okay.
8    Q.  That's your signature, correct?
9    A.  Correct.
10   Q.  And so this lien affidavit, then, covers
11   Ranger's work on both the haul road and the disposal
12   pit; is that right?
13   A.  Yes.
14   Q.  Okay.  And this -- at this time, you did not
15   know whether the vegetating -- vegetation and matting
16   work had even begun, correct?
17   A.  Right.
18   Q.  At the time you signed this lien affidavit, did
19   you have an understanding as to what the timing
20   requirements were for filing a lien affidavit under
21   Texas law?
22   A.  Yes.
23   Q.  What was your understanding of when the lien
24   affidavit had to be filed under Texas law?
25   A.  I believe within 60 days of completion of the

40

1    work.
2    Q.  Okay.  Your under -- okay.
3         Your understanding was it had to be filed
4    within 60 days of completion of the work; is that right?
5    A.  Correct.
6    Q.  Okay.  Were you aware at that time whether an
7    abandonment of the work could affect the time line?
8    A.  Can you repeat that again?
9    Q.  Yes.
10        At the time you signed this lien affidavit
11   on June 9th --
12   A.  Uh-huh.
13   Q.  -- did you understand that if Ranger had
14   abandoned the work, that could affect the time line for
15   filing the lien?
16   A.  I understand if -- if Ranger had abandoned,
17   that would have impacted the lien, but Ranger had not
18   abandoned.
19        Is that -- was I aware of the fact of
20   abandoning the projects impacts the lien?
21        MS. OKON: For the record, I'm going to
22   object as nonresponsive.
23   Q.  (By Ms. Okon) I'll reask my question.
24   A.  Okay.
25   Q.  At the time you signed this lien affidavit on

41

1    June 9th of 2014 --
2    A.  Okay.
3    Q.  -- did you understand that if Ranger had
4    abandoned the work, that could affect the timing for
5    filing the lien?
6    A.  If -- yes.  Correct.
7    Q.  Okay.  And so you understood, as of June 9th,
8    2014, it was important that Ranger had not abandoned the
9    work?
10   A.  Correct.
11   Q.  Okay.  And at the time you signed the lien
12   affidavit on June 9th, did you know that had it -- it
13   had been almost a year since Ranger had done any work o
14   site?
15   A.  Ten months, nine months, 10 months.  I don't
16   know exactly how long.
17   Q.  Okay.
18   A.  Roughly a year.  Within two months, yes.
19   Q.  And you knew that at the time you were signing
20   this lien affidavit on June 9th, correct?
21   A.  Yes.
22   Q.  Okay.  Did you do any inquiry as to why Ranger
23   had not been on site in almost a year at the time you
24   were filing your lien affidavit?
25   A.  Yes.  I talked to Nathan -- well, I talked to

**11 (Pages 38 to 41)**

Brad McKenzie

**62**

1  possible; did I read that correctly?
2  **A.  Yes.**
3  Q.  Do you know what Mr. Ziehr meant on March 11th
4  of 2014 when he said the bankruptcy issues are
5  irrelevant now?
6  **A.  No.**
7  Q.  Do you remember having conversations with
8  Mr. Ziehr in March of 2014 about bankruptcy issues
9  related to Sandow?
10  **A.  No.**
11  Q.  Was it within Mr. Ziehr's scope of his job
12  duties to be concerned about things like whether a
13  customer was going to file for bankruptcy?
14  **A.  Can you say that again?  I'm sorry.**
15  Q.  Mr. Ziehr was a project manager, correct?
16  **A.  Correct.**
17  Q.  His job is to manage the project, correct?
18  **A.  Correct.**
19  Q.  He's not -- he's not the controller, correct?
20  **A.  Correct.**
21  Q.  He's not this CFO.
22  **A.  Correct.**
23  Q.  Is it his responsibility to be worrying about
24  the credit-worthiness of a customer?
25  **A.  Yeah.  In some way, yes.**

**63**

1  Q.  Okay.  And how so?
2  **A.  I mean, if -- he would not want to do work for**
3  **a company that would not pay him.**
4  Q.  Okay.  And so would those -- if he had concerns
5  about whether Ranger was going to get paid, is that
6  something that he handles on his own, or is that
7  something that you're supposed to be involved in?
8  **A.  I would probably be involved in that.**
9  Q.  Okay.  Because you're the controller, correct?
10  **A.  Correct.  (Nodding.)**
11  Q.  And you're in a better position than Mr. Ziehr
12  to access the credit-worthiness of a customer; would you
13  agree?
14  **A.  Probably, yes.**
15  Q.  Okay.  And is it strange that Mr. Ziehr is
16  having bankruptcy concerns that he's not sharing with
17  you?
18  **A.  Is it strange?  No.  Or -- say that -- I'm**
19  **sorry.**
20  Q.  Would -- are you surprised -- would you be
21  surprised if Mr. Ziehr was having bankruptcy concerns
22  that he wasn't discussing with you?
23  **A.  Oh, yes.  Yes.  I see what you're saying.**
24  Q.  Okay.  And that's unusual, correct?
25  **A.  Yes.**

**64**

1  Q.  But it's your testimony that you were not
2  involved with any conversations with Mr. Ziehr in March
3  of 2014 about bankruptcy issues, correct?
4  **A.  I mean, I don't recall.  The -- we very well**
5  **could have.  I -- I don't recall what this issue would**
6  **have been.**
7  Q.  Okay.  And you don't recall in March 2014
8  Ranger coming to the conclusion that bankruptcy issues
9  were now irrelevant, correct?
10  **A.  Correct.**
11  MS. OKON:  You want to go ahead and take a
12  break?  We have been going a little over an hour.
13  MR. SAKONCHICK:  (Nodding.)
14  THE VIDEOGRAPHER:  Going off the record.
15  Time now is 10:54.
16  (Recess from 10:54 a.m. to 11:04 a.m.)
17  THE VIDEOGRAPHER:  Back on the record.
18  The time is 11:04.
19  Q.  (By Ms. Okon)  All right.  Mr. McKenzie, I want
20  to go back for a minute to Exhibits 5 and 6, which were
21  the pay apps from August of 2013.
22  **A.  Okay.**
23  Q.  Okay.  First of all, one of the things we
24  talked about with these is, there was no work done in
25  August of 2013, correct?

**65**

1  **A.  Correct.**
2  Q.  So that's why when we saw the -- when we saw
3  the next pay app, it started from September 1st,
4  correct, of 2013?
5  **A.  Correct.**
6  Q.  But there was actually no work done in August
7  either, correct?
8  **A.  Per these pay apps, correct.**
9  Q.  Okay.  Now, when I asked you why Ranger would
10  submit applications for payment that they weren't
11  entitled to submit under the contracts, I believe you
12  said we wanted to get as much retainage as we could; is
13  that correct?  Was that the reason?
14  **A.  Yes.**
15  Q.  Okay.  Is that typical for Ranger to bill out
16  for retainage before it's due under a contract?
17  **A.  I think we've probably billed out before, yeah.**
18  Q.  Okay.  Is that -- is that every now and then
19  you do it under extreme circumstances, or you would
20  routinely bill our for retainers that wasn't due under
21  the contract yet?
22  **A.  Probably every now -- now and again.**
23  Q.  Okay.  And would that be -- would that be
24  because of certain situations that were occurring, or
25  when would you -- when would Ranger think it was okay to

240

78

1    Q. When you look at Exhibit 5, does it show that
2    the work is complete on that pay application?
3    A. No.
4    Q. If you thought you could be paid retainage
5    prior to a hundred percent completion, would you apply
6    for it?
7    A. Yes.
8    Q. The same question as to Exhibit No. 6: Does
9    that show that the work has been complete?
10   A. No.
11   Q. And would you apply for retainage on that job,
12   if you thought it would be paid?
13   A. Yes.
14   Q. Looking -- keeping a finger at No. 5 and going
15   to Exhibit 34, and looking at the lien claim
16   affidavit -- and let's use the one that's file stamped.
17   So we're gonna look at 00127.
18   A. Okay.
19   Q. Looking at the sums on the second page
20   N00128 --
21   A. Uh-huh. Okay.
22   Q. -- looking at Exhibit 5, you see the amount of
23   retainage due at that time is 211,605.58?
24   A. Yes.
25   Q. Is that the exact amount that's put on the lien

79

1    claim that's attached as Exhibit 34?
2    A. Yes.
3    Q. Looking at Exhibit 6, you see the retainage
4    there due is 80,993?
5    A. Yes.
6    Q. And is that the same amount as in Exhibit 34?
7    A. Yes.
8    Q. As far as Ranger was concerned, as of the
9    filing of the bankruptcy petition on August 29th,
10   2014 --
11        MS. ALAMAN: Object. April.
12        MR. SAKONCHICK: Oh, April. Excuse me.
13   Q. (By Mr. Sakonchick) As far as Ranger was
14   concerned -- and when we're talking about Ranger, we're
15   talking about Ranger Excavating, LP, which is the
16   claimant here, correct?
17   A. Correct.
18   Q. As far as Ranger was concerned, as of April
19   29th, 2014, had either one of these contracts, either
20   the haul road or the AX cell been completed?
21   A. No.
22   Q. And if it wasn't completed under the contract,
23   I think you've already testified that the retainage
24   would not be due?
25   A. Correct.

80

1    Q. Are you aware of a another Luminant Sandow
2    project on which the existing vegetation was accepted as
3    is?
4    A. Not really. I think Nathan would know that
5    better than I would.
6    Q. Was bankruptcy an issue for Ranger as far as
7    completing the Luminant projects or the Sandow project?
8    A. No.
9    Q. In fact, was there another project you heard
10   Ranger was doing for Luminant Mining at the same time?
11        MS. OKON: Objection; leading.
12   Q. (By Mr. Sakonchick) Describe to me the other
13   contract that was pending as of the date of the filing.
14   A. We were doing a job at another Luminant
15   facility.
16   Q. And from October 2013 through April 29th, 2014,
17   how much work was completed on that project?
18   A. Ballpark, we probably had 4 to 5 million
19   dollars worth of work done. Ranger performed the work.
20   Q. And was the -- in fact, was there a final pay
21   application still pending as of the date of the final on
22   April 29th, 2014?
23   A. I believe so.
24   Q. As a result of the pay apps in Exhibits No. 5
25   and 6, was that retainage paid?

81

1    A. No.
2    Q. Looking at a -- you'd previously testified that
3    to the best of your recollection, the work that was
4    performed on the vegetation occurred in July.
5        Was that what you were testifying to?
6        MS. OKON: Objection; mischaracterize
7    prior testimony.
8    Q. (By Mr. Sakonchick) Do you recall testifying as
9    to whether or not the vegetation was done in July 2014?
10   A. Yes.
11        (Exhibit 33 marked.)
12   Q. (By Mr. Sakonchick) Looking at Exhibit 33, can
13   you see whether or not that testimony was correct?
14   A. Yes, I can see that, and that was not correct.
15   We were actually --
16   Q. And --
17   A. Go ahead.
18   Q. When -- when else was work performed?
19   A. In June of 2014.
20   Q. And what is exact -- what is Exhibit 33?
21   A. PBW, like, daily inspection reports.
22   Q. And who prepared those?
23   A. I assume PBW.
24   Q. And does it show Ranger or its subcontractor on
25   the job during that month?

21 (Pages 78 to 81)

82

1    A.  Yes.  Month of June, yes, 2014.
2         THE REPORTER:  I'm sorry.  Did you say '14
3    or '13?
4         THE WITNESS:  2014.
5         THE REPORTER:  Thank you.
6    Q.  (By Mr. Sakonchick) At the time that the lien
7    was filed, which is attached as Exhibit 34, was the work
8    complete?
9         MS. OKON:  Objection; calls for
10   speculation.
11   Q.  (By Mr. Sakonchick) To your knowledge, was the
12   work complete, the work on the contract?
13   A.  As of June 9th, 2014?
14   Q.  Yeah.
15   A.  No.
16   Q.  Do you ever see whether there are certificates
17   of completion on Luminant jobs?
18   A.  No.
19   Q.  Why didn't Ranger file a mechanic's lien in --
20   within 60 days after the pay applications as Exhibits 5
21   and 6 were filed?
22   A.  Because the project was not completed.
23   Q.  Looking at Exhibit 38 -- and 38 is the -- is
24   another pay application for the Ax Landfill.
25        And when does that show -- does that show

83

1    that the work was a hundred percent complete?
2    A.  Yeah.  Actually, more than a hundred percent,
3    but, yes.
4    Q.  And is there a date that it shows being
5    complete?
6    A.  July 31st, 2014.
7    Q.  Well, that's the date of the pay application.
8         What's the date --
9    A.  Oh.
10   Q.  -- that it was submitted?
11   A.  I'm sorry.  July 17th, 2014.
12   Q.  And that -- would that have been when the work
13   would have been completed?
14   A.  Yes.
15   Q.  And the same questions for Application No. 39.
16   This is for the haul road.
17        Was the work completed as of this pay
18   application?
19   A.  Yes.
20   Q.  And what's -- what date does it show the work
21   was complete?
22   A.  July 17, 2014.
23   Q.  And the pay application is dated when?
24   A.  July 17, 2014.
25   Q.  And, again, looking at Exhibit 33, it shows

84

1    work being performed related to that pay application?
2    A.  Correct.
3    Q.  On the work that Ranger did for Sandow on the
4    contracts that are Exhibit No. 3, can you tell me
5    whether --
6         MS. OKON:  Exhibit No. 3?
7         MR. SAKONCHICK:  Yeah.
8    Q.  (By Mr. Sakonchick) Did Ranger do -- we know it
9    didn't do vegetation itself.
10        Did it do all the other work other than
11   the vegetation on this contract?
12        MS. OKON:  Objection; calls for
13   speculation.
14        You testified he doesn't know about the
15   actual work that was performed, that that would be his
16   answer.
17        MR. SAKONCHICK:  He can testify whether he
18   knew there were -- there were subcontractors on the job
19   because he has to pay them.
20        MS. OKON:  I'm going to object to
21   speculation if you ask him whether all the other work
22   other than that was complete.
23   Q.  (By Mr. Sakonchick) The work on the contracts
24   in Exhibit 3, did Ranger actually perform that work?
25        MS. OKON:  Objection; calls for

85

1    speculation.
2    Q.  (By Mr. Sakonchick) You can go ahead and
3    answer.
4    A.  No.
5    Q.  What -- did you have subcontractor -- did
6    Ranger have subcontractors on that job?
7    A.  Yes.
8    Q.  On both jobs?
9    A.  Yes.
10   Q.  What were the subcontractors?
11   A.  BMP, and then we had a liner subcontractor who
12   I can't recall the name.  Nathan can tell you that.
13   Q.  All right.  But other than the liner contract
14   and the vegetation, Ranger would have completed all the
15   work itself?
16   A.  I believe so.
17   Q.  And from -- you would be the one who would see
18   the bills for any subcontractors, correct?
19   A.  Yes.
20   Q.  And you don't recall any other subcontractors
21   for which paperwork was submitted to you other than the
22   liner or PBW?
23   A.  Not that I recall.
24   Q.  When we were discussing -- or you were
25   discussing with Ms. Okon Exhibit 27, those were all

22  (Pages 82 to 85)

97

1              UNITED STATES BANKRUPTCY COURT

2               FOR THE DISTRICT OF DELAWARE

3    IN RE:                    )   Chapter 11
                               )
4    ENERGY FUTURE HOLDINGS     )   CASE NO. 14-10979 (CSS)
     CORP., et al.,            )
5                               )
            Debtors,           )   (Jointly Administered)
6                               )
     ─────────────────────────
7                               )
     SANDOW POWER COMPANY, LLC )
8                               )
     vs.                        )   Contested Matter
9                               )
     RANGER EXCAVATING, LP      )
10

11              REPORTER'S CERTIFICATE

12    ORAL AND VIDEOTAPED DEPOSITION OF BRAD MCKENZIE

13                 October 17, 2016

14       I, Amy M. Clark, Certified Shorthand Reporter in and

15    for the State of Texas, hereby certify to the following:

16       That the witness, BRAD MCKENZIE, was duly sworn and

17    that the transcript of the deposition is a true record

18    of the testimony given by the witness;

19       That the deposition transcript was duly submitted on

20    November 4, 2016 to the witness or to the attorney for

21    the witness for examination, signature, and return to me

22    by December 5, 2016 .

23       That pursuant to information given to the deposition

24    officer at the time said testimony was taken, the

25    following includes all parties of record and the amount

98

1    of time used by each party at the time of the

2    deposition:

3        Melanie K. Okon (1h26m)
             Attorney for Debtors
4        Stephen Sakonchick, II (0h16m)
             Attorney for Respondent

5

6        That a copy of this certificate was served on all

7    parties shown herein on _____ and filed

8    with the Clerk.

9        I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties in the

11   action in which this proceeding was taken, and further

12   that I am not financially or otherwise interested in the

13   outcome of this action.

14       Certified to by me on this 2nd day of

15   November, 2016.

16

17   _____

18                 Amy M. Clark, CSR
                   Texas CSR 8753
19                 Expiration:  12/31/2016
                   DepoTexas - Austin
20                 Firm No. 17
                   1016 La Posada, Suite 294
21                 Austin, Texas 78752
                   512-478-2752

22

23

24

25

Tab K



121380

Ranger
of div. 1
DEC 0 5 2012
Excavating

**CONTRACT FOR SERVICES**

**FOR**

**CONSTRUCT AX FLY ASH DISPOSAL HAULROAD**

**BY AND BETWEEN**

**RANGER EXCAVATING**

**AND**

**SANDOW POWER COMPANY LLC**

**DATED DECEMBER 4, 2012**

**NO. A1893758**

EXHIBIT  F

EXHIBIT  3
WIT: Sandow
DATE: 10-11-16
AMY M. CLARK, CSR

RANGER 000178

Contract No. A1885710

**EFFECTIVE DATE**

December 4, 2012

**PARTIES**

COMPANY

Sandow Power Company LLC, a Texas Organization

CONTRACTOR

Ranger Excavating, L.P., a Texas Limited Partnership

**PURPOSE**

The purpose of this Agreement is to provide for the performance of the Work described in the Scope of Work provision below, for and in consideration of the mutual obligations set forth in this Agreement.

**DEFINITIONS**

COMPANY Group

The term "COMPANY Group" means COMPANY, its parent corporation, Energy Future Holdings Corp., and all subsidiaries and affiliates of Energy Future Holdings Corp., and all officers, directors, shareholders, associates, related firms and entities, employees, servants and agents of both COMPANY and each such subsidiary or affiliate.

CONTRACTOR GROUP

The term "CONTRACTOR Group" means CONTRACTOR, all subcontractors of any tier employed by CONTRACTOR, and all affiliated or related firms and entities, officers, directors, partners, limited partners, shareholders, associates, employees, servants and agents of each.

Work

The term "Work" means all labor, materials, equipment, transportation, facilities or services necessary to perform the Scope of Work described in this Agreement.

Work Site

The term "Work Site" means location(s) where the Work will be performed.

Contract Coordinator

The term "Contract Coordinator" means a representative of each party named in this Agreement to act in matters relating to performance of this Agreement as it is written. Actions of the Contract Coordinators regarding the day-to-day interaction between the operations of the parties, the issuance and approval of invoices, the issuance and approval of procedures, drawings, schedules and documents of any type, and other decisions made in managing this Agreement will not operate as a waiver or compromise of any provision of this Agreement.

Contract Administrator

2

RANGER 000179

247

Contract No. A1998710

The term "Contract Administrator" means a representative(s) of each party named in this Agreement to act in matters relating to the revision of contract language, the adjustment of compensation or time, and the resolution of issues regarding the meaning of contract language. Actions of COMPANY's Contract Administrator include initiating, negotiating and issuing supplements or amendments to this Agreement, as required; receiving required notices; providing answers to CONTRACTOR concerning questions of contract interpretation and negotiating resolutions/settlements to disputes that may arise concerning this Agreement.

## SCOPE OF WORK

CONTRACTOR will be responsible for the supply of any and all materials, equipment, supervision and labor required for the full and complete performance of the following Work found as an attachment to this document titled "AX Area Landfill Cell No. 1 Scope of Work and Technical Specification" dated September 17, 2012, this contract is specific to the work referenced in Part 2 – AX Haul Road and made a part of the bid. All drawings referenced in this specification are also made a part of this agreement.

## TERMS OF AGREEMENT

This Agreement will commence on its Effective Date and will terminate on September 2, 2013, unless terminated earlier pursuant to its other provisions. This Agreement may only be extended or modified by written agreement signed by both parties.

## SCHEDULE

CONTRACTOR will begin the Work by December 4, 2012 and complete it by September 2, 2013. The Work will be scheduled through the direction of COMPANY's Contract Coordinator.

## COMPENSATION

As full compensation for the satisfactory performance by CONTRACTOR of this Agreement, COMPANY will compensate CONTRACTOR in accordance with the rate(s) or price(s) contained in the attachment to this Agreement titled "CONTRACTOR Unit Price Sheet."

All compensation paid to CONTRACTOR excludes applicable State Sales and Use Tax.

## INVOICES AND PAYMENT

CONTRACTOR will, at the end of each calendar month in which the Work is performed, and prior to the tenth (10th) day of the following month, submit to COMPANY invoices based on Work completed during the prior month. Invoices will reference this Agreement by number and contain sufficient detail, as may be requested by COMPANY, to support all charges and reimbursements of expenses.

Payment will be made within sixty (60) days of receipt and approval of each invoice. Should a discrepancy or conflict arise, the disputed portion of the invoice will not be paid until the parties resolve such discrepancy or conflict to their mutual satisfaction.

Ten percent (10%) of each payment to CONTRACTOR will be retained by COMPANY toward the discharge of any claims or liens until sixty (60) days after CONTRACTOR has completed all Work and the following requirements have been met, as determined by COMPANY, in its sole discretion:

A.     Final Acceptance of all Work by COMPANY and cleanup of the Work Site; and

3

RANGER 000180

248

Contract No. A1669710

B.    Receipt by COMPANY from CONTRACTOR of the Contractor's Release and Indemnity Agreement attached hereto stating that CONTRACTOR has paid all taxes and has satisfied all claims against it, including, but not limited to, claims for labor, materials, equipment, services and supplies provided in connection with the Work.

All invoices will be sent via email to ap.invoices@luminant.com.

**SALES/USE TAX**

COMPANY will provide CONTRACTOR with a Texas Direct Pay Exemption Certificate which will negate the necessity of CONTRACTOR's obligation to collect Texas sales and use taxes from the COMPANY.  A Sandow Power Company LLC Texas Direct Pay Exemption Certificate No. 3-30-1667560-8 is attached and made a part of this Agreement.

"All incorporated materials purchased by CONTRACTOR which become part of the permanent realty of COMPANY shall be purchased on the basis of resale by CONTRACTOR."

**WORK SITE**

The Work will be performed at the following location(s):

Sandow Steam Electric Station, Rockdale, TX

**WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS**

CONTRACTOR will obtain from COMPANY's Contract Coordinator prior to commencing Work the specific Work Site Safety, Security and other related rules and procedures, if any, applicable to the particular job or Work Site.  These specific rules and procedures are incorporated fully into this Agreement by this reference.

In addition to complying with those specific rules and procedures CONTRACTOR agrees to comply with the rules and procedures contained in the attachment to this Agreement titled "Work Site Safety, Security, Alcohol, Drugs and Weapons."

**BROWZ**

As a condition of this Contract, Contractor agrees to register with Browz and provide those necessary documents requested by Browz to be deemed in compliance with the Browz application.  As a minimum, requested documents will be related to safety and health (i.e., regulatory required training, certifications, safety plans, safe and secure workplace practices, etc.), OSHA and MSHA injury rates and Experience Modification Rate (EMR) and other important business data requested by Browz through the registration process.  Contractor agrees to maintain the identified documentation for the life of the contract.

Registration and compliance shall be completed within thirty (30) days of the effective date of the Contract.  Noncompliance with these requirements shall be grounds for withholding payment of outstanding invoices or termination of the Contract.

THE REVIEW OF THE FOREGOING INFORMATION BY BROWZ OR BY COMPANY OR THE APPROVAL OF CONTRACTOR'S REGISTRATION WITH BROWZ ARE NOT APPROVALS OF CONTRACTOR'S DOCUMENTS, DATA, SAFETY AND HEALTH TRAINING, CERTIFICATIONS, SAFETY PLANS, SAFE OR SECURE WORKPLACE PRACTICES OR OTHER MATTERS SUBMITTED

4

RANGER 000181

249

Contract No. A1899710

TO BROWZ OR COMPANY. REVIEW OF CONTRACTOR'S INFORMATION OR APPROVAL OF CONTRACTOR'S REGISTRATION SHALL NOT DIMINISH CONTRACTOR'S RESPONSIBILITIES OR OBLIGATIONS OR WAIVE COMPANY'S RIGHTS WITH RESPECT TO SUCH MATTERS UNDER THE AGREEMENT.  CONTRACTOR AGREES THAT IT SHALL NOT ASSERT THAT THE REVIEW AND APPROVAL OF CONTRACTOR'S INFORMATION OR THE APPROVAL OF CONTRACTOR'S REGISTRATION ARE OR WERE AN APPROVAL OF SUCH MATTERS BY COMPANY OR BROWZ.

**INSURANCE**

CONTRACTOR will, at its sole expense, purchase and maintain, and require its subcontractors to purchase and maintain, during the term of this Agreement, insurance policies with substantial and sound insurers, having coverage of the types and in the amounts specified in the attachment to this Agreement titled "Contractor's Insurance Requirements" submitted by CONTRACTOR prior to the execution of this Agreement.

**TERMS AND CONDITIONS**

The parties will comply with the terms and conditions of this Agreement and the attachment to this Agreement titled "Standard Terms and Conditions PLST03."

**NOTICES**

All notices from one party to the other will be deemed to have been delivered if hand delivered or sent by United States certified mail, return receipt requested, postage prepaid, as follows:

If to CONTRACTOR:

Ranger Excavating
8222 Thunder Creek Rd. Suite 51
Austin, TX 78758
Attention: Nathan Ziehr
(512) 391-8851

If to COMPANY:

Sandow Power Company LLC
1601 Bryan St. 21st Floor
Dallas, Texas 75201-3411
Attention: Mark Jenkins

COMPANY's Contract Coordinator is Jacob Gonzales, phone (214) 875-8057.

CONTRACTOR's Contract Coordinator is Nathan Ziehr, phone (512) 391-8851.

COMPANY's Contract Administrator is Mark Jenkins, phone (214) 875-8837.

CONTRACTOR's Contract Administrator is Nathan Ziehr, phone (512) 391-8851.

5

RANGER 000182

250

Contract No. A1666710

## ATTACHMENTS

The following attachments are incorporated into this Agreement:

1. Direct Payment Exemption Certificate
2. Work Site Safety, Security, Alcohol, Drugs and Weapons
3. Contractor's Insurance Requirements
4. Standard Terms & Conditions PLST08
5. Broxz Registration Form
6. Technical Specification titled "AX Area Landfill Cell No. 1 Scope of Work and Technical Specification" dated September 17, 2012 specifically the work scope in Part 2 – AX Haul Road
   a. Associated Drawings
      i. Cell No. 1 Plans (C1) Revised 10/22/12
      ii. Miscellaneous Details (C2)
      iii. Miscellaneous Details (C3)
      iv. Haul Road Plan, Profile, and Section (C4)
      v. Cover Sheet and Index (G1)
      vi. Location Map (G2)
7. CONTRACTOR Unit Price Sheet
8. Post Pre-Bid Questions and Answers

## AMENDMENTS

Except as otherwise provided in this Agreement, no changes, modifications, amendments or supplements or any other provisions will be valid unless agreed to in writing and signed by the parties.

## ENTIRETY OF AGREEMENT

This Agreement constitutes the full, complete, and entire understanding, agreement, and arrangement of and between the parties hereto with respect to the subject matter hereof and supersedes any and all prior oral and written understandings, agreements and arrangements between them.   The Parties hereto have entered into this Agreement voluntarily and for valuable consideration, and not by reasons of any fraud, duress, undue influence or mistakes. Each of the Parties acknowledges that it/he has read this Agreement and that it/he fully knows, understands, and appreciates this Agreement and executes this Agreement voluntarily and of its/his own free will and by executing this Agreement signifies its/his assent to and willingness to be bound by its terms. IN SIGNING THIS AGREEMENT, EACH PARTY ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN JUDGMENT.  NO PARTY IS RELYING ON, OR OR BEING INDUCED TO EXECUTE THIS AGREEMENT BY ANY STATEMENTS, REPRESENTATIONS, AGREEMENTS OR PROMISES, ORAL OR WRITTEN, MADE BY ANY OTHER PARTY, THEIR AGENTS, EMPLOYEES, SERVANTS OR ATTORNEYS, OR ANYONE ELSE, OTHER THAN THE STATEMENTS EXPRESSLY WRITTEN IN THIS AGREEMENT. EXCEPT AS TO THE STATEMENTS EXPRESSLY WRITTEN IN THIS AGREEMENT, THE PARTIES SPECIFICALLY AND INTENTIONALLY WAIVE ANY CLAIMS FOR FRAUDULENT INDUCEMENT AGAINST ANY OTHER PARTY, INCLUDING ITS AGENTS, EMPLOYEES, SERVANTS, OR ASSIGNS, TO THIS AGREEMENT.

8

RANGER 000183

Contract No. A1686710

The parties have signed this Contract acknowledging their agreement to its provisions as of the Effective Date.

Ranger Excavating

By: _____
Signed: Mark McKain, President
of McKenzie Interests, Inc.
Gp of Ranger Excavating, L.P.

Name: _____

Title: _____

Date: _____12/13·12_____

Sandow Power Company LLC

By: _____
Signature

Name: Mark Jenkins

Title: Sr. Procurement Specialist

Date: November 30, 2012

By: _____
Signature

Name: Jinn Berardi

Title: Sr Sourcing Manager

Date: 12.21.12

By: _____
Signature

Name: Colin Carrell

Title: Director – Supply Chain

Date: 12/21/12

7

Contract No. A1003710

ATTACHMENT NO. 1
DIRECT PAYMENT EXEMPTION *CERTIFICATE*
State of Texas
Direct Payment Exemption Certificate
Limited Sales, Excise, and Use Tax

Direct payment authorization number:    3-20-1007000-0 Sandow Power Company LLC

Sandow Power Company LLC hereby claim exemption from the payment of state, city, county, SPD, MTA and/or CTD sales and/or use taxes upon its purchase of taxable items and/or services from:

CONTRACTOR:       Ranger Excavating, LP
Address:          8222 Thunder Creek Rd. Suite B1
City, State, Zip:   Austin, TX 78799

Description of items and/or services purchased under Contract No. A1003758:

    CONSTRUCT AX FLY ASH DISPOSAL HAULROAD

This certificate will remain in effect until the expiration date of the above contract.

This certificate does not cover:

A.    Purchase of taxable items and/or services to be resold.
B.    Sales or rental to any purchaser other than the permit holder.
C.    Sales or rental of motor vehicles subject to the motor vehicle sales and use tax (Chapter 152) and
      interstate motor carrier sales and use tax (Chapter 157).
D.    Nontaxable services or materials/supplies used or consumed by a provider of a nontaxable
      service.
E.    Lump-sum new construction projects to improve real property.

CONTRACTOR agrees not to permit others (including its contractors and repairmen) to use this direct payment authorization to purchase material tax free.

COMPANY agrees to accrue and pay the tax to the Comptroller of Public Accounts as required by statute.

        Permit holder:   Sandow Power Company LLC

Authorized Signature/Date: _____ 12/19/12

8

Contract No. A1008710

## ATTACHMENT NO. 2
## WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

**A.   SAFETY**

1.      CONTRACTOR agrees that any safety related assistance or initiatives undertaken by COMPANY will not relieve CONTRACTOR from responsibility for the implementation of, and compliance with, safe working practices, as developed from their own experience, or as imposed by law or regulation, and will not in any way, affect the responsibilities resting with CONTRACTOR under the provisions of any agreement to which these policies are attached and to meet all safety requirements as specified by the Occupational Safety & Health Administration (OSHA), the Mine Safety Health Administration (MSHA), the Department of Transportation (DOT) and any other applicable state or federal safety and health laws or regulations.

2.      In the event that a material safety data sheet (hereinafter "MSDS"), warning label, or other documentation concerning the use of hazardous chemicals at the Work Site or any other property owned or controlled by COMPANY or any of its affiliates (collectively, together with the Work Site, "COMPANY Properties"), applies to any materials or equipment provided by CONTRACTOR as an aspect of the Work, such documentation will be provided by CONTRACTOR to COMPANY prior to the commencement of any such Work.

3.      CONTRACTOR will provide information to COMPANY regarding hazardous chemicals and/or consumable products that contain constituents listed in 40 CFR 372.65 used at any COMPANY Property. CONTRACTOR will report the amount of such material carried on and off the site, the amount actually used and the manner of use. CONTRACTOR will provide the maximum quantity of the material stored on site at any one time and if a waste material was collected, where it was disposed of (location name and address). CONTRACTOR will provide information on the amount of material used for the previous calendar year by the first of February.

4.      CONTRACTOR will provide for the duration of the term of any agreement to which these policies are attached, at its sole expense, adequate first aid facilities for members of CONTRACTOR Group.

5.      CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group performing Work at any COMPANY Property are required to view COMPANY's "CONTRACTOR/Visitor Safety Orientation" video, when applicable, and to read and adhere to COMPANY's "CONTRACTOR/Visitor Safety Booklet" prior to performing any Work any COMPANY Property.

6.      CONTRACTOR acknowledges and agrees that all members of the CONTRACTOR'S Group performing Work at the Work Site have received the required safety, health and environmental training in accordance with appropriate state and federal laws and regulations, and CONTRACTOR shall have documentation of training for each member of such CONTRACTOR Group available for review at the Work Site.

7.      Prior to entering the Work Site, CONTRACTOR is required to prepare a CONTRACTOR's Safety Health Program in accordance with state and federal laws and regulations and shall have a hard copy of such program in CONTRACTOR's possession and available for review when performing Work at the Work Site.

8.      CONTRACTOR acknowledges and agrees that, except as otherwise expressly authorized in writing by COMPANY's designated safety representative, appropriate protective equipment will be worn by any member of CONTRACTOR Group while on any COMPANY Property.  In addition, when any member of CONTRACTOR Group is performing Work which may expose that person to potential

9

RANGER 000186

Contract No. A1666710

hazards, CONTRACTOR acknowledges and agrees that such person will wear appropriate clothing specific to and adequate for that exposure.

9.     CONTRACTOR will take all reasonable precautions to prevent any accident in connection with the performance of Work, including, but not limited to, putting up and maintaining sufficient barriers and lights.

10.    CONTRACTOR will report to COMPANY all accidents involving personal injuries (including death) and damage to property occurring directly or indirectly as a result of the Work performed by CONTRACTOR hereunder immediately, but in no event, no later than 24 hours after the occurrence of any such accident. Any accident or incident occurring directly or indirectly as a result of the Work which CONTRACTOR must report to a regulatory agency (e.g. OSHA, MSHA, TCEQ) must also be reported to COMPANY immediately following notification to the regulatory agency.

B.     SECURITY

1.     COMPANY may supply such site security as it deems necessary and may specify to CONTRACTOR such additional security precautions and procedures at any COMPANY Property as, in COMPANY's opinion, are reasonably necessary for the safety and security of COMPANY's personnel and property.

2.     Security by COMPANY at COMPANY Properties, if any, will not provide personal policing of the materials, tools and equipment of CONTRACTOR Group.  CONTRACTOR will assume sole responsibility for safeguarding such materials, tools and equipment.

3.     It will be the affirmative duty of CONTRACTOR to ensure that CONTRACTOR Group assists in carrying out all security measures, to include reporting all information or knowledge of matters adversely affecting security to COMPANY's designated security personnel.

4.     COMPANY reserves the right to exclude any of CONTRACTOR's employees from any COMPANY Property by denial of access, suspension or revocation of access authorization, preemptory expulsion, or by any other means, without notice or cause. Former COMPANY employees, and any of CONTRACTOR's employees who previously have been excluded from any COMPANY Property, may be brought onto COMPANY property or facilities only if prior approval from COMPANY is obtained.

5.     COMPANY measures may also include investigations, whether by COMPANY or law enforcement officials.  CONTRACTOR agrees to cooperate in such investigations and understands that COMPANY reserves the right to require anyone in CONTRACTOR Group to authorize appropriate agencies to release his or her criminal records to CONTRACTOR as a condition of either initial or continued permission for access to any COMPANY Property.  Investigations may include searches of CONTRACTOR Group.  Such searches may include searches of facilities assigned to CONTRACTOR Group, search of all COMPANY Property areas and property at such COMPANY Property areas, searches of including, but not limited to, offices, lockers, desks, lunch boxes, packages and motor vehicles (regardless of ownership).  Without limiting the foregoing, CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group, to the extent that COMPANY reasonably determines that such members require security badge access prior to entering onto any COMPANY Property, shall be required to comply with COMPANY's standard security badge requirements, including without limitation a background check to be performed by COMPANY.

10

Contract No. A1888710

B.    CONTRACTOR agrees to instruct its employees in the details of COMPANY's work site security policies and measures, both as specified herein and as hereinafter provided by COMPANY to CONTRACTOR.

C.    ALCOHOLIC BEVERAGES, DRUGS AND WEAPONS

CONTRACTOR will inform all members of CONTRACTOR Group, who may be involved in the performance of any Work, of the following COMPANY rules, relating to alcoholic beverages, drugs and weapons, with which all employees are expected to comply:

1.    Bringing, attempting to bring, possessing, using or being under the influence of intoxicants, drugs, or narcotics while on any COMPANY Property, including, but not limited to parking areas, is prohibited. Possessing alcoholic beverages in sealed containers is permitted, however, in designated parking areas owned or controlled by Oncor Electric Delivery Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC, Generation Development Company LLC, Sandow Power Company LLC and EFH Corporate Services Company, but not parking areas owned or controlled by Luminant Mining Company LLC, Luminant Big Brown Mining Company LLC and Oak Grove Mining Company LLC.

2.    Drugs prescribed by a licensed physician, for an individual working on any COMPANY Property, which could affect the employee's job performance, or non prescription drugs which could affect the employee's job performance, are allowed on any COMPANY Property only if they have been previously cleared by the employee's supervisor. Any employee taking such medication must inform his or her supervisor of the medication and dosage being taken.

3.    Bringing, attempting to bring, possessing or using firearms, whether classified as legal or illegal, while on any COMPANY Property, including but not limited to buildings, parking areas, recreation facilities, equipment and vehicles, is prohibited.  Use or possession of firearms for specific situations is permitted if approved by function or higher level management of COMPANY.

4.    Off the job involvement with intoxicants, drugs, or narcotics, which adversely affects COMPANY's business, to include impairing the employee's ability to perform his job, or the public trust in the safe operation of COMPANY is prohibited.

5.    Any conduct on any COMPANY Property which is in violation of any state or federal law or regulation is considered a violation of these rules and a breach of any agreement to which these policies are attached.

6.    CONTRACTOR is responsible for the compliance of CONTRACTOR Group with the above specified rules.

7.    In order to enforce these rules, all individuals with access to any COMPANY Property as well as the vehicles, offices, lockers and any personal belongings of such individuals on any COMPANY Property are subject to search by COMPANY and its agents, to include security representatives appointed or employed by COMPANY.  Individuals may be required to take a blood, urinalysis or Breathalyzer test, or submit to other recognized investigatory tests or procedures as are deemed appropriate or necessary by COMPANY in the investigation of a violation of these rules.

8.    The refusal, on the part of any of CONTRACTOR Group, to submit immediately to a search of his or her person and/or property, or to be tested, whether by blood test, urinalysis, Breathalyzer or other recognized investigatory test or procedure, after being requested to do so, will be considered a violation of COMPANY rules.

11

RANGER 000188

256

Contract No. A1889710

8.    Violations of these rules may be cause for denial of access to any COMPANY Property.

12

RANGER 000189

257

Contract No. A1888710

**ATTACHMENT NO. 3**
**CONTRACTORS INSURANCE REQUIREMENTS**
Block D General Requirements ($5 Million Total Liability Limits)

CONTRACTOR will, at its own expense, maintain in force throughout the period of this document or agreement, or as otherwise specified, and until released by COMPANY the following minimum insurance coverages, with insurers acceptable to COMPANY.

1) Workers' Compensation and Employers' Liability Insurance, providing statutory benefits in accordance with the laws and regulations of the State of Texas or state of jurisdiction as applicable. The minimum limits for the employers' liability insurance will be five hundred thousand dollars ($500,000) bodily injury each accident, five hundred thousand dollars ($500,000) each employee bodily injury by disease, five hundred thousand dollars ($500,000) policy limit bodily injury by disease.

2) Commercial General Liability Insurance, including bodily injury and property damage, personal and advertising injury, contractual liability, and including products and completed operations coverage continuing for three (3) years after Final Acceptance, or completion of the Work, whichever is later, with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury, including death and property damage.

3) Automobile Liability Insurance for coverage of owned, non-owned and hired autos, trailers or semi-trailers with a minimum combined single limit of one million dollars ($1,000,000) per accident for bodily injury, including death, and property damage.

4) Excess Liability Insurance over and above the employers' liability, commercial general liability and automobile liability insurance coverage, with a minimum limit of two million dollars ($2,000,000) per occurrence. Coverage must replace exhausted aggregate limits under the coverages referenced in #1 (employers' liability), and #3 above. Coverage must continue for three (3) years after Final Acceptance, or completion of the Work, whichever is later.

**ADDITIONAL PROVISIONS:**

A) The required limits of insurance can be satisfied by any combination of primary and excess coverage.

B) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies will contain provisions that specify that the policies are primary as respects to COMPANY and will apply without consideration for other policies separately carried by COMPANY. The policies shall also include standard severability provisions that state each insured is provided coverage as though a separate policy had been issued to each, except with respects to limits of insurance, and that only one deductible (if applicable) will apply per occurrence regardless of the number of insureds involved in the occurrence. CONTRACTOR will be responsible for any deductibles or retentions.

C) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies, if written on a claims-made basis, will be maintained in full force and effect for three (3) years after Final Acceptance or completion of the Work, whichever is later.

D) All policies must be issued by carriers having an A.M. Best's rating of "A-" or better, and an A.M. Best's financial size category of "VIII" or better, or Standard & Poor Insurance Solvency Review of "A-" or better. If requested in writing by COMPANY, CONTRACTOR will make available to COMPANY a certified copy of any or all insurance policies or endorsements required of CONTRACTOR.

E) Prior to commencement of Work, CONTRACTOR will provide to COMPANY certificates of insurance evidencing the coverage required herein. COMPANY's review of certificates or policies

13

RANGER 000190

Contract No. A1893710

will not be construed as accepting any deficiencies in CONTRACTOR's insurance or relieve CONTRACTOR of any obligations set forth herein. In addition, CONTRACTOR will require each of its subcontractors to provide adequate insurance. Any deficiencies in the insurance to be provided by subcontractors will be the responsibility of CONTRACTOR.

F)  Certificates of insurance must show Energy Future Holdings Corp. and its direct and indirect subsidiaries as the certificate holder, and as an additional insured (including completed operations) as respects all of the required coverages except workers' compensation. Workers' compensation shall include Energy Future Holdings Corp. and its direct and indirect subsidiaries as an alternate employer. All of the required coverages must provide a waiver of subrogation in favor of the certificate holder.

G)  CONTRACTOR agrees to report to the manager of the claims department of the COMPANY in writing as soon as practical all instances of damage to the Work and all accidents or occurrences which may result in injuries to any person, including death, and any property damage, arising out of the performance of the Work.

H)  If the insurance obligations or coverage required in this Agreement exceed the maximum limits permitted by law or are determined to be invalid, illegal, unenforceable, or in conflict with the law of any court of competent jurisdiction, then this Agreement will be deemed amended so as to conform with the applicable law, including, if the coverage exceeds legal limits, to only require CONTRACTOR to provide insurance to the maximum extent allowed by law. The validity, legality, and enforceability of the remaining obligations and terms of coverage required in this Agreement shall not be affected or impaired, and will remain in full force and effect.

I)  The requirements contained herein as to the types and limits of all insurance to be maintained by CONTRACTOR are not intended to and will not, in any manner, limit or qualify the liabilities and obligations assumed by CONTRACTOR under this Agreement

14

RANGER 000191

259

**ATTACHMENT NO. 4**
**STANDARD TERMS AND CONDITIONS PLST03**
**STANDARD TERMS AND CONDITIONS**
**PLST03**

15

RANGER 000192

260

Contract No. A1883710

## INDEPENDENT CONTRACTOR RELATIONSHIP

CONTRACTOR will act as and be deemed to be an independent contractor. Neither CONTRACTOR nor any of its employees will act as, nor be deemed to be, an agent or employee of COMPANY. CONTRACTOR will have the sole right to control and directly supervise the method, manner and details of the Work.

## MATERIALS, EQUIPMENT AND LABOR

CONTRACTOR will provide and furnish all material, labor, services, supervision, tools, apparatus, conveyances, equipment and incidental expenses required to complete the Work, except for those specifically mentioned in this Agreement to be provided by COMPANY. All materials and equipment incorporated into any Work under this Agreement will be new and of the most suitable grade unless otherwise specified.

CONTRACTOR will be solely responsible for the proper storage, transportation and disposal of any product or waste, other than scrutinizing waste, used or generated in connection with the Work in accordance with all applicable Environmental Laws. CONTRACTOR will dispose of all waste materials, other than scrutinizing waste, at an off-site disposal facility approved for such waste materials pursuant to applicable Environmental Laws and will complete and sign all waste manifests as the generator of such waste. COMPANY will be responsible for the storage, transportation and disposal of any scrutinizing waste generated during the performance of the Work.

## ASSIGNMENT

CONTRACTOR will not assign, transfer or otherwise dispose of any of its obligations or duties without the prior written approval of COMPANY. Any assignment or transfer made without the express written approval of COMPANY will be null and void.

## SUBCONTRACTING

CONTRACTOR will not subcontract for any of the Work without the prior approval of COMPANY and CONTRACTOR will not be relieved of any duty or liability relating to any Work by reason of subcontracting. There will be no contractual relationship between COMPANY and any subcontractor by virtue of this Agreement.

## BINDING ON SUCCESSORS AND ASSIGNS

This Agreement will inure to the benefit of and be binding upon the undersigned parties and entities, and their respective legal representatives, successors and approved assigns.

## STANDARDS AND CODES

Whenever reference is made in this Agreement to standards or codes in accordance with which Work is to be performed or tested, the edition or revision of the standards of codes current on the Effective Date will apply, unless otherwise expressly stated. In case of conflict between any referenced standards and codes and any documents attached to and incorporated into this Agreement, the Agreement documents will govern.

## CONDITIONS AFFECTING WORK

CONTRACTOR will investigate and acquaint itself with the conditions affecting the Work, including but not limited to those related to the transportation, disposal, handling and storage of materials and waste; availability of labor, water, electric power and roads; the uncertainties of weather, river stages or similar physical conditions at the site; the conformation and condition of the ground; and the character of equipment and facilities needed preliminary to and during prosecution of the Work. CONTRACTOR has

16

RANGER 000193

261

Contract No. A1000710

satisfied itself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered. CONTRACTOR's failure to acquaint itself with any conditions affecting the Work or any available related information will not relieve it from responsibility for properly estimating the difficulty or cost of successfully performing the Work.

COMPANY is not responsible for any conclusions or interpretations made by CONTRACTOR from the information made available by COMPANY, other than information contained in or referenced in this Agreement. CONTRACTOR will draw its own conclusions from its review of any and all data and information provided by COMPANY.

CONTRACTOR assumes full responsibility for investigating conditions and determining the existence and magnitude of any hazards to the physical well-being of property of CONTRACTOR, its employees, agents, and servants of CONTRACTOR, or any other person or entity who is or may become involved in the performance of Work, and any and all other persons in the vicinity of the Work. CONTRACTOR will advise all of the above-specified persons or entities of any hazards relating to Work, and will ensure that those persons or entities are advised of and fully understand the nature of the hazards and safety precautions that can be taken to eliminate or minimize dangers relating to the hazards.

CONTRACTOR will use its best efforts to ensure that the Work is performed so as to minimize any adverse impact upon natural resources and the environment and will use best industry practices in this regard at all times.

CONTRACTOR will immediately notify COMPANY as soon as CONTRACTOR has reason to believe that CONTRACTOR, or any employee or other person performing the Work, is not or may not be performing the Work in compliance with applicable Environmental Laws. CONTRACTOR will provide COMPANY with written notice to COMPANY of such actual or potential non-compliance within three (3) days following the discovery thereof. CONTRACTOR will take immediate steps to ensure compliance with all applicable Environmental Laws and will, if directed by COMPANY, cease all Work until authorized by COMPANY to resume the Work.

## CHANGES IN WORK

COMPANY may by written notice, make changes in, additions to, or deletions from the Work. If any change significantly increases the time required to perform the Work, an equitable adjustment will be made in the schedule for the performance and completion of the Work. If the Work is being performed on a fixed price basis, and if any change significantly increases or decreases the cost to CONTRACTOR of performing the Work, then an equitable adjustment will be made in the price. The compensation rates for the Work will not be changed.

In order to receive an equitable adjustment in price or schedule, CONTRACTOR must provide a written request for that adjustment within five (5) working days after receiving COMPANY's notice of a change in the Work. CONTRACTOR will continue to perform the changed Work prior to or pending Agreement on an equitable adjustment and will not halt or delay performance of the Work because of any failure to reach an Agreement on an adjustment.

## ENVIRONMENTAL

In the event that CONTRACTOR discovers during the performance of the Work any substance at the Work Site that is not the subject of the Work or has not otherwise been identified by COMPANY for CONTRACTOR, which substance CONTRACTOR has reason to believe is or may be a Hazardous Substance that (i) has been or may be released or spilled into the soil, surface water, or groundwater or in a building or structure, or (ii) consists of asbestos-containing materials, lead-based paint, batteries, thermostats, lighting equipment, or equipment containing polychlorinated biphenyls, CONTRACTOR will immediately stop Work and notify COMPANY of the discovery. CONTRACTOR will not resume the Work until receiving authorization from COMPANY to do so.

17

RANGER 000194    262

Contract No. A1803710

The term "Hazardous Substance" means any product, waste, emission or substance defined, listed or designated as a hazardous or toxic substance, hazardous waste, hazardous material or pollutant by or pursuant to any Environmental Law and includes, but is not limited to, any petroleum-based product, substance or waste, including any additives associated therewith, pesticides, fertilizers, solvents, polychlorinated biphenyls, mercury, lead, lead-based paint, asbestos-containing material or explosives.

CONTRACTOR will immediately notify COMPANY in the event of a spill or release of any material which CONTRACTOR knows or has reason to believe is a Hazardous Substance, whether onto the ground, into any body of water, a storm or sanitary sewer, or the air, or anywhere on property owned or controlled by COMPANY, including within any building or structure. CONTRACTOR will be solely responsible, as may be required by applicable Environmental Laws, for, in consultation with COMPANY, (i) notifying the appropriate governmental agencies of such spill or release caused or permitted by the acts or omissions of CONTRACTOR and (ii) for the cleanup and remediation of such spill or release.

## FORCE MAJEURE

If either party becomes unable, either wholly or in part, by an event of Force Majeure, to fulfill its obligations under this Agreement, the obligations affected by the event of Force Majeure will be suspended only during the continuance of that inability. The party so affected will give written notice of the existence, extent and nature of the Force Majeure to the other party within forty-eight (48) hours after the occurrence of the event. The party so affected will remedy its inability as soon as possible. Failure to give notice will result in the continuance of the affected party's obligation regardless of the extent of any existing Force Majeure.

The term "Force Majeure" as used in this Agreement means acts of God (except as embodied herein), strikes, lockouts, or other industrial disturbances, acts of public enemies, wars, blockades, insurrections, riots, epidemics, earthquakes, fires, priority allocations of pipe or other materials or orders, restraints or prohibitions by any court, board, department, commission or agency of the United States or of any States, any arrests and restraints, civil disturbances, explosions and inability despite reasonable diligence to obtain materials essential to the Work. Rain, snow, ice or other adverse weather conditions will not be considered events of Force Majeure.

## SUSPENSION FOR CAUSE

In addition to the other remedies provided COMPANY in this Agreement, COMPANY has the right to order the temporary suspension of any Work when it determines, in its sole discretion, that performance of the Work is not being conducted in a safe manner, the specified quality of the Work is not being met, or the Work is not otherwise being performed in accordance with the requirements of this Agreement.

If any unsatisfactory condition of a portion of the Work performed hereunder is brought to CONTRACTOR's attention, and is corrected by CONTRACTOR to COMPANY's complete satisfaction, COMPANY will authorize resumption of the Work. Should CONTRACTOR fail to promptly correct the unsatisfactory condition to COMPANY's complete satisfaction, CONTRACTOR will be considered in breach of this Agreement.

If circumstances are brought to COMPANY's attention that indicate CONTRACTOR's delay in performance of the Work, or any other fact giving COMPANY reasonable apprehension of CONTRACTOR's ability to perform the Work, COMPANY may, at its discretion, withhold payment which may be due CONTRACTOR until such time as CONTRACTOR demonstrates its willingness and ability to complete the Work in strict accordance with this Agreement.

If any suspension of Work significantly increases the time required for the performance of the Work, an equitable adjustment may, in COMPANY's sole discretion, be made in the performance obligations. In no event, however, will any suspension be the basis for any claim or cause of action by CONTRACTOR or CONTRACTOR's employees, agents, or subcontractors against COMPANY.

18

Contract No. A1869710

## TERMINATION

COMPANY may terminate this Agreement, in whole or in part, at any time, at its sole discretion, by providing written notice of termination to CONTRACTOR. The notice of termination will specify the effective date of any termination, and the Work or any part of the Work to be terminated, or alternatively, that this Agreement is terminated in its entirety.

CONTRACTOR will discontinue Work in accordance with COMPANY's termination instructions. Upon receiving notice of termination, CONTRACTOR will place no further orders, or enter into further subcontracts for services, materials or equipment related to the terminated Work. In addition, CONTRACTOR will delay or terminate all existing orders and subcontracts, insofar as those orders and subcontracts relate to the performance of the Work terminated.

In the event this Agreement or the Work is terminated, COMPANY's only liability will be to pay CONTRACTOR the unpaid balance due CONTRACTOR for Work actually performed.

There will be deducted from any unpaid balance due CONTRACTOR the amounts of all claims of COMPANY against CONTRACTOR, including, but not limited to, claims on account of defect in materials and workmanship.

## TERMINATION FOR DEFAULT

If a petition in bankruptcy should be filed by CONTRACTOR, or if CONTRACTOR should make a general assignment for the benefit of creditors, or if a receiver should be appointed due to the insolvency of CONTRACTOR, or if CONTRACTOR should refuse or fail to supply enough properly skilled workmen or proper equipment, materials or services or should fail to make prompt payment to subcontractors, or to pay promptly for materials or labor, or disregard laws, ordinances or the instruction of COMPANY's Contract Coordinator, or if CONTRACTOR should refuse or fail to abide by the Agreement Construction Schedule or otherwise violate any provisions of the Agreement, then COMPANY, upon a determination by COMPANY's Contract Coordinator that sufficient cause exists to justify such action, may, without prejudice to any other right or remedy available to it after giving CONTRACTOR seven (7) days' written notice, terminate the Agreement and take possession of the Work Site. In the event of such a termination, COMPANY may use all or part of CONTRACTOR's equipment and materials and may finish the Work by whatever method COMPANY may deem expedient. In such event, CONTRACTOR will not be entitled to receive any further payment hereunder until the Work is finished. If the unpaid balance of the Agreement Price will exceed the expense of finishing the Work, including compensation of COMPANY's Contract Coordinator, other COMPANY personnel, third party engineering companies, or other contractors for additional services, such excess will be paid to CONTRACTOR. If the expense of finishing the Work will exceed such unpaid balance, CONTRACTOR will pay the difference to COMPANY within fifteen (15) days of receiving an invoice for same. The expenses incurred by COMPANY herein, and the damage incurred through CONTRACTOR's default, will be determined by COMPANY's Contract Coordinator, in its sole discretion, and such determination will be binding as between the parties.

In the event of a termination under the provisions of this Article, CONTRACTOR will transfer and assign to COMPANY, in accordance with COMPANY's instructions, all Work, all construction records, reports, permits, data and information, other materials (including all COMPANY-supplied materials), supplies, Work in progress and other goods for which CONTRACTOR is entitled to receive reimbursement hereunder, and any and all plans, drawings, sketches, specifications, and information in connection with the Work, and will take such action as may be necessary to assure COMPANY, at COMPANY's sole election, the rights of CONTRACTOR under any or all orders and subcontracts made in connection with the Work.

In the event that COMPANY so directs or authorizes, CONTRACTOR will sell at a price approved by COMPANY, or retain at a mutually agreeable price, any such materials, supplies, Work in progress, or other goods as referred to in the preceding paragraph. In any event, COMPANY will receive any and all records, plans, drawings, data, permits, specifications, sketches, reports, or other information relating to

18

RANGER 000196

264

Contract No. A1883710

the Work.  The proceeds of any such sale or the agreed price will be paid or credited to COMPANY in such manner as COMPANY may direct so as to reduce the amount payable by COMPANY under this Article.

## INSPECTORS

A thorough inspection of all Work performed, including, but not limited to Work being performed at location(s) of subcontracted Work, and all materials furnished may be made by inspectors designated by COMPANY's Contract Coordinator to determine if the Work is being performed in strict compliance with this Agreement.  Neither COMPANY's Contract Coordinator nor COMPANY's Inspectors have any power or authority to waive any of the provisions of this Agreement or any obligations of CONTRACTOR under this Agreement.

## FINAL INSPECTION AND ACCEPTANCE

CONTRACTOR will notify COMPANY in writing when it considers all Work complete and ready for final acceptance.  COMPANY, with CONTRACTOR's cooperation, may conduct such inspections and tests to satisfy itself that the Work conforms to all of the requirements of this Agreement.  If the Work is acceptable, COMPANY will within a reasonable time, notify CONTRACTOR in writing of its Final Acceptance of the Work and authorize CONTRACTOR to issue its final invoice.

If all or part of the Work is not complete or is unacceptable, COMPANY will notify CONTRACTOR of the incomplete or unacceptable Work, and CONTRACTOR will, at its sole expense, complete or correct the Work so that the Work conforms to all of the requirements of this Agreement.

## WARRANTY

CONTRACTOR agrees and warrants that its employees, agents and subcontractors will perform the Work in a good and workmanlike manner, in accordance with high professional standards, with a level of care, skill, knowledge and judgement required or reasonably expected of firms or persons performing comparable services, and in strict accordance with this Agreement, including but not limited to, all specifications made a part of this Agreement.  Further, CONTRACTOR warrants that all Work will be free from defects in design, materials and workmanship for a period of twelve (12) months from the date of Final Acceptance by COMPANY of all Work, except where specific Work items have been specified to have a longer warranty.

Upon oral or written notice from COMPANY that any of the Work performed by CONTRACTOR fails to conform to any of the above-specified warranties, CONTRACTOR will, at no additional cost to COMPANY, properly remedy the failure and reperform any Work necessary so that the Work conforms to those warranties.  CONTRACTOR further warrants any and all corrected or reperformed Work to be free from defects in design, materials and workmanship for a period of twelve (12) months following acceptance by COMPANY of the corrected or reperformed Work.  Nothing herein will limit the rights and remedies that may be available to COMPANY at law or in equity.

## BACKCHARGE

If COMPANY discovers defective or nonconforming Work, it may, after notifying CONTRACTOR to correct the defective or nonconforming Work and upon CONTRACTOR's refusal or failure to proceed with corrective action in a reasonable time, perform the redesign, repair, rework or replacement of the defective or nonconforming Work by the most expeditious means available and backcharge CONTRACTOR for all costs incurred.

COMPANY may either separately invoice, or deduct from any payments due CONTRACTOR, the costs for any backcharge.  The performance of backcharge work by COMPANY or COMPANY's representative will not relieve CONTRACTOR of any of its responsibilities under this Agreement.

20

Contract No. A1000710

## RECORDS AND RIGHTS TO AUDIT

CONTRACTOR will keep accurate and complete books of accounts, records, documents and other evidence related to the charges for and performance of any Work, including CONTRACTOR's compliance with Environmental Laws related to the Work ("Records"), and of any charge or modification to the charges. COMPANY or COMPANY's Contract Coordinator may inspect these records at any time during normal business hours.

All Records required for an audit and inspection will be made available at the offices of CONTRACTOR, at all reasonable times, for inspection, audit or reproduction, until three (3) years from date of final payment for any Work. COMPANY will bear the expenses incurred by it in supporting any such inspection or audit; provided, however, that should any audit or investigation produce evidence that CONTRACTOR has knowingly overstated charges or units of measure upon which charges are based, or provided gifts, gratuities or other benefits to employees of COMPANY in violation of the Business Ethics provisions of this Agreement, CONTRACTOR will be liable to COMPANY for actual damages, including cost of audit and investigation.

## BUSINESS ETHICS

CONTRACTOR represents and warrants that neither it nor any person or entity associated in any manner with CONTRACTOR will:

1)  Provide or offer any compensation or benefit of any type, including any gift or gratuity, other than advertising mementos of nominal value or reasonable business meals and business entertainment, to any COMPANY employee;

2)  To the best of CONTRACTOR's knowledge, maintain or establish any undisclosed business affiliation that could constitute or give the appearance of a conflict with the interests of COMPANY; or

3)  Except to the extent expressly provided for in this Agreement, attempt to act on behalf of or, in any manner, seek to represent COMPANY.

If, during the term of this Agreement, CONTRACTOR knows or becomes aware of any facts or circumstances contrary to the representations and the warranties above, CONTRACTOR will immediately notify COMPANY and provide sufficient information for COMPANY to take appropriate protective or corrective actions. CONTRACTOR further agrees to cooperate fully in any investigation undertaken by COMPANY.

CONTRACTOR, if requested by COMPANY, agrees to require its employees to execute an ethics/nondisclosure agreement at any time.

## CONTRACTOR'S RESPONSIBILITY FOR WORK

CONTRACTOR will care for and maintain both the partially completed and finished Work until final acceptance by COMPANY. Acceptance of portions of the Work made for the purpose of determining partial payments will not constitute Final Acceptance of any portion of the Work.

## WORK SITE PERMITS AND LICENSES

Subject to the following two paragraphs, CONTRACTOR will obtain, prior to the commencement of the Work, and provide to COMPANY upon request, all permits, licenses and governmental authorizations, at its sole expense, required for the performance of the Work. CONTRACTOR will be solely responsible for maintaining compliance with such permits, licenses and governmental authorizations.

In the event that a storm water discharge permit is required for the performance of the Work, (i)

21

RANGER 000198

256

Contract No. A1893710

CONTRACTOR will be responsible for filing a Notice of Intent with respect to the Work. In addition to any Notice of Intent that COMPANY may be required to file, and (ii) CONTRACTOR will coordinate with COMPANY in the preparation and execution of a Storm Water Pollution Prevention Plan for the Work Site.

In the event that the performance of the Work involves the handling or abatement of asbestos-containing materials, CONTRACTOR will coordinate with COMPANY in the preparation and filing of all required notification forms.

## ACCESS

Should CONTRACTOR desire access to the Work Site over any land not controlled by COMPANY, it will, at its sole expense, obtain all proper permits or written permission necessary for that access.

## HAULING AND OPERATING PERMITS

CONTRACTOR will obtain all hauling and other operating permits and licenses required for the performance of the Work and will pay all related charges and fees. CONTRACTOR will also give all notices (other than COMPANY's Notice of Intent) necessary and incidental to the lawful performance of the Work.

## COMPANY FACILITIES

CONTRACTOR will not use COMPANY's sanitary facilities, changehouses, shops, parks, storage buildings, tools, equipment or other facilities unless as directed by COMPANY. CONTRACTOR will not discharge, without COMPANY's prior written authorization, any product or waste used or generated in connection with the Work through any (i) COMPANY-permitted outfall, (ii) COMPANY-owned or operated pollution control equipment, or (iii) storm or sanitary sewer located at or in the vicinity of the Work Site. Any request for authorization to discharge will include, at a minimum, either a copy of the Material Safety Data Sheet for the product or a written description of the waste, including a list of the constituents of the waste and the relative concentrations thereof.

## COLLATERAL WORK

COMPANY and other contractors may be working at the Work Site. COMPANY reserves the right to coordinate the performance of CONTRACTOR's Work with the work of others. CONTRACTOR will cooperate with and will not delay, impede or otherwise impair the work of others. COMPANY does not guarantee CONTRACTOR continuous uninterrupted access to the Work Site, but will provide such access as good construction practices will allow, considering the other activities in the area.

## PROTECTION OF PROPERTY AND PERSONS

CONTRACTOR will protect the Work (whether completed or in progress), materials, equipment, adjacent property, natural resources and the public from any damage or danger relating to the Work, and will be responsible for any damage, loss or injury due to its actions or neglect. CONTRACTOR will take reasonable precaution to prevent any accident in connection with the performance of the Work and will put up and maintain sufficient barriers, lights and/or other necessary precautions.

## PROTECTION OF HIGHWAYS AND RAILROADS

CONTRACTOR will make suitable arrangements with governmental authorities and railroads for the construction of all structures, whether underneath or over roads, railroads or rights-of-way to protect the public from accident or delay. CONTRACTOR will repair, at its own expense, to the satisfaction of the governmental authorities or other owners, all roads, railroads and bridges that may be damaged by, or given undue wear due to the Work.

22

RANGER 000199

257

Contract No. A1893710

## CLEANING UP

CONTRACTOR will at all times keep the Work Site free of waste materials or rubbish caused by the Work. After completing the Work, CONTRACTOR will remove all its waste materials, rubbish, tools, supplies, equipment and surplus materials from and about the Work Site.

If CONTRACTOR fails to keep the Work Site clean or to clean up after completing the Work, COMPANY may do so and charge all costs of cleaning up to CONTRACTOR. Those costs may be deducted from the final payment to CONTRACTOR.

## CONFLICT OF INTEREST

CONTRACTOR will not engage in any activity that will adversely affect or impair its ability to perform the Work in an independent and reliable manner. CONTRACTOR warrants that it has no professional or contractual obligations that will conflict with its performance of any Work.

## PROTECTION AGAINST LIENS AND ENCUMBRANCES

CONTRACTOR will not at any time permit any lien, attachment or other encumbrance ("Encumbrance") by any person or persons whosoever or by reason of any claim or demand against CONTRACTOR to be placed or remain on the property of COMPANY, including, but not limited to, the Work Site upon which Work is being performed or equipment and materials that are being furnished. To prevent an Encumbrance from being placed on the property of COMPANY, CONTRACTOR will furnish during the progress of any Work, as requested from time to time, verified statements showing CONTRACTOR's total outstanding indebtedness in connection with the Work.

If CONTRACTOR allows any indebtedness to accrue to subcontractors or others and fails to pay or discharge that indebtedness within five (5) days after demand, then COMPANY may withhold any money due CONTRACTOR until that indebtedness is paid or pay the indebtedness and apply that amount against the money due CONTRACTOR.

If CONTRACTOR allows any Encumbrance, whether valid or invalid to be placed on the property of COMPANY, any and all claims or demands for payment to CONTRACTOR will be denied by COMPANY until the Encumbrance is removed. If the Encumbrance is not removed immediately, COMPANY may pay that claim or demand and deduct the amount paid, together with all related expenses, including attorneys' fees, from any further payment due CONTRACTOR, or at COMPANY's election, CONTRACTOR will, upon demand, reimburse COMPANY for the amount paid and all related expenses. Any payment made in good faith by COMPANY will be binding on CONTRACTOR.

## TAXES

CONTRACTOR will comply with all federal, state, or municipal laws, rules and regulations regarding taxes and the payment of taxes, until the Work has been completed, including, without limitation, social security, state unemployment insurance, gross receipts taxes, withholding taxes, and income tax. CONTRACTOR will furnish, upon request by COMPANY, satisfactory evidence of its compliance.

## WAIVER OF CONSEQUENTIAL DAMAGES

Neither party will be liable to the other in contract, tort, or on any other basis, for any consequential damages of any nature, including, but not limited to, lost profits or revenues, loss of customer goodwill, business interruption costs, overhead costs, lost profits, costs of capital, or loss of use of money. Consequential damage also includes attorneys' fees, except as otherwise specifically provided for, in this Agreement and it is expressly understood that this paragraph will be subrogated to, and will not limit or otherwise affect in any manner, CONTRACTOR's obligations to indemnify and hold harmless COMPANY as provided for in the Indemnity and Intellectual Property provisions of this Agreement or CONTRACTOR's obligation as provided for in the Warranty provision of this Agreement.

23

RANGER 000200

258

Contract No. A1893710

## INDEMNIFICATION

CONTRACTOR agrees to and will defend, protect, indemnify and hold harmless COMPANY Group from and against all claims, losses, expenses, attorneys' fees, damages, demands, judgments, causes of action, suits, and liability in tort, contract, or any other basis and of every kind and character whatsoever (hereinafter in this and the following paragraphs collectively referred to as "CLAIMS"), for personal injury, death, or property damage of any member of CONTRACTOR Group, arising out of or incident to or related in any way to, directly or indirectly, this Agreement, or the Work, services, or materials to be performed or supplied thereunder, or to any activities of any member of CONTRACTOR Group while on any premises actually or allegedly owned, controlled, or operated by COMPANY, including, but not limited to, CLAIMS arising out of or resulting from (1) any condition of the premises, (2) separate operations being conducted on the premises, or (3) the imperfection or defective condition, whether latent or patent, of any material or equipment sold, supplied, or furnished by COMPANY; and further, IT IS THE EXPRESS INTENT OF THE PARTIES THAT, FOR THE PURPOSES OF THIS PARAGRAPH, CLAIMS, AND CONTRACTOR'S OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE, BUT NOT BE LIMITED TO, CLAIMS ARISING OUT OF OR RESULTING FROM COMPANY GROUP'S SOLE OR CONCURRENT (1) NEGLIGENCE, (2) STRICT LIABILITY, OR (3) OTHER FAULT OF ANY NATURE.

For all CLAIMS except those for personal injury, death, or property damage of any member of CONTRACTOR GROUP within the scope of the preceding paragraph, CONTRACTOR agrees to and will defend, protect, indemnify, and hold harmless COMPANY Group from and against any and all CLAIMS arising out of or incident to or related in any way to, directly or indirectly, this Agreement, or the Work, services, or materials to be performed or supplied thereunder, or to any activities of any member of CONTRACTOR Group while on any premises actually or allegedly owned, controlled, or operated by COMPANY, including, but not limited to, CLAIMS arising out of or resulting from (1) any condition of the premises, or (2) separate operations being conducted on the premises, or (3) the imperfection or defective condition, whether latent or patent, of any material or equipment sold, supplied, or furnished by COMPANY; and further, IT IS THE EXPRESS INTENT OF THE PARTIES THAT, FOR THE PURPOSES OF THIS PARAGRAPH, CLAIMS, AND CONTRACTOR'S OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE, BUT NOT BE LIMITED TO, CLAIMS ARISING OUT OF OR RESULTING FROM COMPANY GROUP'S CONCURRENT (1) NEGLIGENCE, (2) STRICT LIABILITY, OR (3) OTHER FAULT OF ANY NATURE.

To the extent necessary to permit COMPANY to enforce any term, clause, or condition of this Agreement, CONTRACTOR agrees that with respect to any CLAIMS brought against COMPANY Group, CONTRACTOR will and does hereby waive as to COMPANY Group any defense it may have by virtue of the workers' compensation laws of any state.

In the event that any of the terms or provisions of this INDEMNIFICATION section are determined to be invalid, illegal, unenforceable or in conflict with the law of any court of competition jurisdiction, the validity, legality and enforceability of the remaining terms and provisions shall not in any way be affected or impaired, and remain in full force and effect.

## INTELLECTUAL PROPERTY

CONTRACTOR will obtain permission to use any and all intellectual property that may be required in order for CONTRACTOR to perform the Work. This permission will include all necessary licenses and other governmental approvals.

CONTRACTOR will hold harmless and indemnify COMPANY Group from and against, and at COMPANY's option, defend COMPANY Group against, any and all fines, penalties, losses, liabilities, damages, claims and costs (including reasonable attorneys' fees and court costs), arising out of or incurred as a result, directly and indirectly, of any alleged or actual infringement or violation of any right, or alleged right, relating to intellectual property, including, but not limited to, patent, copyright or trade

24

Contract No. A1893710

secret.

In addition, if any claim is brought alleging infringement or the violation of any intellectual property right, CONTRACTOR will avoid any further possible infringement of the intellectual property right, and will seek to resolve the claim in consultation with COMPANY, either by means of alternative arrangements for the Services, or by obtaining permission to use the intellectual property in question.

## COMPLIANCE WITH LAWS

CONTRACTOR represents that it is knowledgeable of and will comply with all federal, state, and local laws, rules, decrees, orders, regulations, by-laws, ordinances and codes that may, in any manner, affect the conduct of the Work, including all Environmental Laws. In this regard, any conduct on the Work Site, that is in violation of any federal, state, or local enactment, as specified above, is also a breach of this Agreement.

The term "Environmental Laws" will mean any and all laws, statutes, ordinances, rules, regulations, orders, interpretations, or guidance of any federal, state or local government or regulatory agency, as may now or hereafter be in effect, pertaining to human health, safety, or the environment, including, but not limited to, the following statutes and any applicable state or local equivalents thereof and any rules and regulations promulgated pursuant thereto: the Federal Clean Air Act, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), the Federal Water Pollution Control Act, the Resource Conservation and Recovery Act of 1976, the Safe Drinking Water Act, the Toxic Substances Control Act, the Emergency Planning and Community Right-to-Know Act, the Oil Pollution Act of 1990, the National Environmental Policy Act, the Hazardous Materials Transportation Act, the Atomic Energy Act, the Federal Insecticide, Fungicide and Rodenticide Act, and the Occupational Safety and Health Act of 1990, all as have been or may be amended from time to time.

CONTRACTOR will promptly notify COMPANY in writing upon receipt of notice of any of the following matters, whether occurring during or subsequent to the performance of the Work; (i) any enforcement, cleanup, removal, Potentially Responsible Party (PRP) notice or other governmental or regulatory action or investigation instituted or threatened against CONTRACTOR pursuant to any Environmental Laws arising out of or related to the performance of the Work; (ii) any claim made or threatened by any person against COMPANY for damages, contribution, cost recovery, compensation, losses or injury arising out of the performance of the Work or the use, disposal or release of Hazardous Substances at the Work Site; or (iii) any report made by CONTRACTOR to a governmental agency with respect to Hazardous Substances spilled, released or deposited on or removed from the Work Site.

CONTRACTOR will not enter into any settlement agreement, consent decree, or other compromise with respect to any claims relating to the performance of the Work without first notifying COMPANY of CONTRACTOR's intention to do so and affording COMPANY ample opportunity to appear, intervene, or otherwise appropriately assert and protect COMPANY's interests with respect thereto.

CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any and all federal, state, and local antidiscrimination statutes, including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Equal Pay Act of 1963; the Age Discrimination in Employment Act of 1967, as amended; the Energy Reorganization Act of 1974; the Texas Commission on Human Rights Act; the Americans with Disabilities Act; and the Older Workers Benefit Protection Act of 1990. CONTRACTOR will promptly advise COMPANY of any action required to be initiated by COMPANY in order to comply with those statutes.

CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any federal, state, or local statutes relating to compensation or wage and hour considerations, including, but not limited to, the Federal Fair Labor Standards Act, and the Texas Minimum Wage Act of 1970, and the Texas Pay Act, as well as any and all other federal statutes impacting, directly or indirectly, CONTRACTOR's employees.

25

RANGER 000202

260

If fines, penalties or legal costs are assessed against COMPANY by any court or governmental agency due to CONTRACTOR Group's failure to so comply, or if the Work of CONTRACTOR, or any part thereof, is delayed or stopped by any court or governmental agency, due to CONTRACTOR Group's failure to comply with its obligations, CONTRACTOR will indemnify and hold harmless COMPANY from and against any and all fines, penalties, losses, liabilities, damages, claims, and costs (including reasonable attorneys' fees and court costs) arising out of or incurred as a result, directly or indirectly, of that failure.

## PROPRIETARY INFORMATION

Without the written consent of COMPANY, CONTRACTOR will not divulge to any third party, including any affiliate of COMPANY (excepting, as appropriate, only EFH Corporate Services Company for purposes relating to this Agreement), any information obtained from or through COMPANY that relates to the technical or business activities of COMPANY (including, without limitation, information pertaining to any customer or COMPANY), or is otherwise developed by CONTRACTOR in connection with its performance of the Work, unless: (1) the information is known to CONTRACTOR prior to obtaining it from COMPANY; (2) the information is, at the time of disclosure by CONTRACTOR, then in the public domain; or (3) the information is obtained by CONTRACTOR from a third party who did not receive it directly or indirectly from COMPANY and who has no obligation of secrecy with respect to that information. THIS PROVISION WILL NOT RESTRICT IN ANY MANNER WHATSOEVER THE REPORTING OF ENVIRONMENTAL OR SAFETY-RELATED CONCERNS to the appropriate governmental authorities in accordance with applicable law.

If so requested by COMPANY, CONTRACTOR further agrees to require its employees to execute a nondisclosure agreement prior to performing any services under this Agreement.

## RIGHTS TO DATA

All designs, drawings, calculations, computer codes, plans, specifications, data and any and all other information developed, created or produced by employees, agents or subcontractors of CONTRACTOR, pursuant to or relating, directly or indirectly, to the Work, will become the property of COMPANY when so developed, created, or produced, and notwithstanding any property designations contained therein, COMPANY will have the right to use or sell that information without limitation. At COMPANY's request, those designs, drawings, calculations, computer codes, plans, specifications, data, and any and all other information, will be delivered to COMPANY.

## TITLE AND RIGHT

Nothing in this Agreement will vest CONTRACTOR with any right of property in materials used after they have been attached to or incorporated into the Work, nor materials for which CONTRACTOR has received full or partial payment. All those materials, upon being so attached, incorporated or paid for, will become the property of COMPANY. Any gravel, sand, stone, minerals, timber or other materials excavated, uncovered, developed or obtained in the Work, or on any land belonging to COMPANY may be used, in the performance of the Work, provided such materials meet the requirements of this Agreement. Any objects or natural materials or animals excavated or exposed that may have historical significance or constitute a threatened or endangered species must be brought to the attention of COMPANY.

## REMOVAL OF PERSONNEL

COMPANY may, at its sole discretion, and for whatever reason it deems appropriate, remove any person from the Work Site, and the person will not again be employed on the Work without the express written consent of COMPANY.

## GOVERNING LAW

THIS AGREEMENT IS GOVERNED BY AND WILL BE CONSTRUED IN ACCORDANCE WITH LAWS

26

Contract No. A1663710

OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW
PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION)
THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN
THE STATE OF TEXAS. THE PARTIES MUTUALLY CONSENT TO THE EXCLUSIVE JURISDICTION
OF THE FEDERAL AND STATE COURTS IN DALLAS COUNTY, TEXAS AND AGREE THAT ANY
ACTION, SUIT OR PROCEEDING CONCERNING, RELATED TO OR ARISING OUT OF THIS
AGREEMENT AND THE NEGOTIATION OF THIS AGREEMENT WILL BE BROUGHT ONLY IN A
FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS AND THE PARTIES AGREE THAT THEY
WILL NOT RAISE ANY DEFENSE OR OBJECTION OR FILE ANY MOTION BASED ON LACK OF
PERSONAL JURISDICTION, IMPROPER VENUE, INCONVENIENCE OF THE FORUM OR THE LIKE
IN ANY CASE FILED IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS. THE PARTIES
MUTUALLY AGREE THAT THIS AGREEMENT IS A "MAJOR TRANSACTION" WITHIN THE MEANING
OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE § 15.020 AND AS SUCH AGREE THAT ANY
ACTION OR SUIT ARISING FROM THIS AGREEMENT WILL BE BROUGHT IN DALLAS COUNTY,
TEXAS, AND VENUE WILL BE IN DALLAS COUNTY, DALLAS, TEXAS.

THE PARTIES AGREE THAT THE PROVISIONS OF ARTICLE 2 OF THE UNIFORM COMMERCIAL
CODE (AS CONTAINED IN THE TEXAS BUSINESS AND COMMERCE CODE) SHALL APPLY TO THE
AGREEMENT AND ALL TRANSACTIONS THEREUNDER, IRRESPECTIVE OF WHETHER SUCH
TRANSACTIONS ARE DEEMED TO BE A SALE OF GOODS OR THE PROVIDING OF A SERVICE;
HOWEVER, IN THE EVENT OF A CONFLICT, THE TERMS AND PROVISIONS OF THE AGREEMENT
SHALL CONTROL OVER THOSE CONTAINED IN THE UCC.   NOTWITHSTANDING THE
FOREGOING, THE PARTIES ACKNOWLEDGE AND AGREE THAT ALL IMPLIED RIGHTS RELATING
TO FINANCIAL ASSURANCES ARISING FROM SECTION 2.609 OF THE UNIFORM COMMERCIAL
CODE (AS CONTAINED IN THE TEXAS BUSINESS AND COMMERCE CODE) OR APPLICABLE CASE
LAW APPLYING SIMILAR DOCTRINES, ARE HEREBY WAIVED.

### NON-WAIVER OF RIGHTS

A waiver by either party of any breach of this Agreement or the failure of either party to enforce any of the
articles or other provisions of this Agreement will not in any way affect, limit or waive that party's right to
enforce and compel strict compliance with the same or other articles or provisions.

### SURVIVAL

Neither the completion of any Work nor any termination or cancellation of this Agreement will relieve
CONTRACTOR of any obligations under this Agreement that by their nature survive the completion of the
Work, including, but not limited to, all warranties and obligations of indemnity.

### SEVERABILITY

In the event any provision of this Agreement is held to be void, unlawful or otherwise unenforceable, that
provision will be severed from the remainder of the Agreement and replaced automatically by a provision
containing terms as nearly like the void, unlawful, or unenforceable provision as possible; and the
Agreement, as so modified, will continue to be in full force and effect.

### PUBLICITY

No information relating to this Agreement will be released for publication, advertising or any other purpose
without the prior written approval of COMPANY.  CONTRACTOR is expressly prohibited from using
COMPANY's name in any publication, advertising, or promotion.

### SMALL BUSINESS CONCERNS

27

Contract No. A1838710

If the value of any Work is Ten Thousand Dollars ($10,000.00) or more and CONTRACTOR intends to subcontract for the performance of any portion of that Work, CONTRACTOR will make ever effort to ensure that small business concerns owned and controlled by socially and economically disadvantaged individuals will have the maximum practicable opportunity to participate in the performance of contracts, implementing Section 211 of Public Law 95-507.

If the value of any Work is Five-Hundred Thousand Dollars ($500,000) or more and CONTRACTOR intends to subcontract for the performance of any portion of that Work, CONTRACTOR (except small business concerns referred to in the preceding paragraph) will adopt a plan in accordance with the requirements of Section 637 of Title 15 of the United States Code.

**IMMIGRATION**

CONTRACTOR will fully comply with all applicable requirements of the Immigration Reform and Control Act of 1986 ("IRCA"), as well as all regulations issued pursuant to IRCA or otherwise enforced by the Immigration and Naturalization Service, for or with respect to any of CONTRACTOR's employees, or other persons, performing any portion of the Work.  In particular but without limitation, CONTRACTOR acknowledges and represents that:  (a) to the fullest extent required by IRCA or such regulations, it has properly completed (or, prior to their performance of any portion of the Work, will properly complete) the Employment Eligibility Verification Form, I-9, for each such employee or person; and (b) all such employees or persons are, and will remain while performing any portion of the Work, otherwise legally authorized to work in the United States.

RANGER 000205

263

Contract No. A1883710

## ATTACHMENT NO. 5
### BROWZ REGISTRATION FORM

Browz registration requirement to advance workplace compliance.
As part of Luminant's commitment of reducing jobsite risk through safety, health and environmental solutions, Luminant has partnered with Browz LLC (Browz), a leading provider of contractor compliance and risk management software and services.

Browz provides tools that reveal compliance, enabling its clients to shift their focus toward managing their contracts and contractors more effectively. Engaging Browz is yet another step in ensuring the operational and environmental excellence and safe performance of Luminant's extensive generating fleet and mining operations.

Browz completed registration is a requirement for conducting business with Luminant. Those vendors that are not currently registered in Browz will need to fill out the attached "Contractor Safety & Health Information Form" information and submit it along with any bid offerings.

About Browz:
Browz helps buyers and suppliers exchange critical compliance information by using technology that leads to risk reductions, cost savings, and more secure business relationships. Both buyers and suppliers want to do business in a responsible manner and safe environment. The Browz solution levels the playing field for suppliers while protecting all participants. www.browz.com

How to Register with Browz:
1. Access the Browz website at http://register.browz.com
2. On this web page, enter your designated Key/Browz ID: <<Browz Id >> in the first box provided.
3. Enter your designated Browz Code: <<Code>> in the second box provided.
4. Click the blue "Submit" button.
5. Click on "Begin Registration".
6. Follow the instructions given in the next steps.

During the registration process, you will be prompted to create a unique Org ID, Username and Password. Please remember this information, as it will be required to access your company's information in the future.

There is a $995.00 annual registration fee payable directly to Browz.

For additional assistance or clarification concerning the Browz process, contact:
    Browz Client Services (888) 276-8882

As a condition of this Contract, Contractor agrees to register with Browz and provide those necessary documents requested by Browz to be deemed in compliance with the Browz application.  As a minimum, requested documents will be related to safety and health (i.e., regulatory required training, certifications, safety plans, safe and secure workplace practices, etc.), OSHA and MSHA injury rates and Experience Modification Rate (EMR) and other important business data requested by Browz through the registration process.  Contractor agrees to maintain the identified documentation for the life of the contract.

Registration and compliance shall be completed within thirty (30) days of the effective date of the Contract.  Noncompliance with these requirements shall be grounds for withholding payment of outstanding invoices or termination of the Contract.

THE REVIEW OF THE FOREGOING INFORMATION BY BROWZ OR BY COMPANY OR THE APPROVAL OF CONTRACTOR'S REGISTRATION WITH BROWZ ARE NOT APPROVALS OF CONTRACTOR'S DOCUMENTS, DATA, SAFETY AND HEALTH TRAINING, CERTIFICATIONS, SAFETY PLANS, SAFE OR SECURE WORKPLACE PRACTICES OR OTHER MATTERS SUBMITTED TO BROWZ OR COMPANY. REVIEW OF CONTRACTOR'S INFORMATION OR APPROVAL OF

28

Contract No. A1888710

CONTRACTOR'S REGISTRATION SHALL NOT DIMINISH CONTRACTOR'S RESPONSIBILITIES OR OBLIGATIONS OR WAIVE COMPANY'S RIGHTS WITH RESPECT TO SUCH MATTERS UNDER THE AGREEMENT. CONTRACTOR AGREES THAT IT SHALL NOT ASSERT THAT THE REVIEW AND APPROVAL OF CONTRACTOR'S INFORMATION OR THE APPROVAL OF CONTRACTOR'S REGISTRATION ARE OR WERE AN APPROVAL OF SUCH MATTERS BY COMPANY OR BROWZ.

30

REVISED BID FORM
LUMINANT POWER – AK AREA LANDFILL
PART 2 – AK HAUL ROAD

| Bid Item | Description | Estimated Quantity | Units | Unit Price | Total Cost |
|---|---|---|---|---|---|
|  |  | 1 | LS |  |  |
|  |  | 1 | LS |  |  |
| N1 | Roadway Excavation and Grading | 105,000 | CY | $ 1.50 |  |
| N2 | Controlled Subgrade | 8,050 | CY | $ 1.75 |  |
| N3 | Lime for Stabilization | 800 | TON | $ 140.00 |  |
| N4 | Stabilized Base | 11,050 | CY | $ 6.50 |  |
| N5 | Roadbase | 22,500 | SY | $ 16.50 |  |
| N6 | Installation of Roadway Excavation Soil | 70,000 | CY | $ 2.45 |  |
| O |  | 1,000 | CY | $ 3.50 |  |
| P1 | Vegetation – Flat Surfaces and Slopes Less Than 4(H) to 1(V) | 3 | ACRE | $ 3,500.00 |  |
| P2 | Vegetation – Slopes (Steeper Than or Equal to 4(H) to 1(V) | 1 | ACRE | $ 7,500.00 |  |
|  |  | 1 | LS |  |  |

OWNER'S OPTION AND ALTERNATE PAY ITEMS (DO NOT INCLUDE IN TOTAL)

| Bid Item | Description | Estimated Quantity | Units | Unit Price | Total Cost |
|---|---|---|---|---|---|
|  |  | 1 | LS |  |  |

Notes
1) LS - Lump Sum
2) CY - Cubic Yards
3) SF - Square Feet
4) NA - Not Applicable
5) SY - Square Yards
6) LF - Linear Feet

RANGER 000208

266

Contract No. A1893710

**POST PRE-BID QUESTIONS AND ANSWERS**

**Question:** Do the top of dike elevations on Sheet C1 represent the "top of roadbase" or "top of select fill/tie fill"?

**Response:** The top of dike elevations on Sheet C1 represent "top of roadbase" elevations.

**Question:** The finished elevation for the Foundation Soil/Top of Liner Subgrade along the western side shows to be 489. The inside bottom toe of the permanent dike along the west side shows to be elevation 490. Can elevations be added to the details on Sheets C2 & C3 to clarify transitions, toe elevations, top of dike elevations, etc.?

**Response:** Sheet C1 has been revised to clarify foundation soil/top of liner elevations along the permanent dikes (see attached).

**Question:** Is vegetation establishment/erosion mat required on the back side of the temporary dike between the temporary dike and existing ground?

**Response:** Yes. In accordance with Section 3.3 of Specification Section 01100 – Erosion control fabric shall be installed following completion of final grading activities in the following disturbed earth areas unless otherwise approved by the ENGINEER:

1. All exterior slopes 4(H) to 1(V) and steeper; and

2. All drainage channels and swales.

**Question:** The Erosion Control Fabric spec (Item 2.2 A. on page 1100-3) calls for North American Green S150 or approved equal. Which is what I think they would want. However, the additional specifications include some items that are not met by NAGS150. Can you clarify that North American Green S150, or a true equivalent, is acceptable?

**Response:** North American Green S150 (or equivalent) is acceptable for erosion control fabric.

**Question:** I never received a response back from the engineer regarding the size and style of silt fence that I inquired about at the pre-bid. If I could please get clarification on the size 18", 24", or 30"? As well as whether it is reinforced? I would greatly appreciate it.

**Response:** Silt fencing is described in Section 01100 of the specifications. Since filter fabric is to be installed in a minimum 6 inch deep trench along the upstream side of the fence, the minimum silt fence size is 24 inches.

**Question:** I understand Luminant wants the contractor to furnish the testing verification for this project. They did not say whether you or the testing firm will be responsible for filling out and submitting the paperwork to the state. Is either Luminant or their engineering consultant going to certify the paperwork to the State of Texas?

**Response:** Luminant will be responsible for all communications and submittals to the TCEQ.

31

RANGER 000209

267

Contract No. A1893710

**Question:** *Will the testing firm be responsible for any surveying or locating where the samples were obtained or the tests were performed? On several projects of this kind, Luminent has required the contractor provide state coordinates and elevations for all sampling and testing performed.*

**Response:** Sample and test locations will be field measured and referenced to a surveyed 100 ft X 100 ft grid system (grid surveyed by CONTRACTOR) across the construction area.

**Question:** *In the specifications the select fill is required to be placed in 8" maximum loose lifts and compacted to 6" maximum compacted lifts. At 90% of a standard proctor, an 8" loose lift will be hard to achieve without compacting at 95% of a standard proctor. Will Luminent accept more than a 6" compacted lift as long as it is compacted to at least 90% of the standard proctor? If not, it may require a compaction closer to 95% of the proctor or reducing the thickness of the loose lift. The same question goes for the flexible material.*

**Response:** Select fill is to be placed in 8" maximum loose lifts and compacted to 6" maximum compacted lifts. The resulting density must be greater than 90% standard proctor. Standard proctor results greater than 90% are acceptable.

**Question:** *The protective soil layer has a requirement for the C value and Fe value obtained from the direct shear. The specifications say this layer is not to be compacted. It is our opinion these values may not be able to be obtained from non-compacted soil. Would Luminent or the consultant respond. We may need a compacted amount to achieve the desired results. This may be something they want the testing firm to remold in the lab and not the field.*

**Response:** Protective soil shall be placed in one 18 inch lift without damaging the underlying liner or other materials. Testing on soil to be used for protective soil shall be performed in the lab on a remolded sample compacted to a minimum of 90% standard proctor for comparison to the specification requirements.

**Question:** *We use the normal Unified Classification Chart to classify materials. This is very similar to the one in the ASTM book the specifications refer. In other words, we normally would classify a (CL) material as a silty clay or sandy clay. We would not normally use words like "lean" or "fat", etc. Is this acceptable to Luminent or do we need to go strictly by the proposed specification? This is not a big problem, but it will required some extra testing not listed in the specifications, especially for the base material.*

**Response:** Soils shall be classified in accordance with ASTM D2487. CONTRACTOR shall perform all testing required for classification under this standard.

32

Contract No. A1883710

Question: In section 2400 of the Project Specifications, it states that the frequency of material laboratory conformance testing is to be 1 test per roll of Gundseal material. On a project of this size, this will be a very expensive cost to added into the project. Also, this is in addition to manufacturing quality control testing. On similar projects of this scope, material frequency is usually around 1 test per 100,000 Square Feet of material. Is there any way this section of the specification could be amended to a smaller, less expensive frequency?

Response:  Specification Section 2400 shall be revised as follows:

The testing requirements of Section 2400 3.3.B shall be performed by the MANUFACTURER prior to shipment of the GSGCL to the site.  Specification 2400 Section 3.3.B shall be revised to read as follows:

B.    CQA Testing.

1.    The following laboratory CQA tests shall be conducted on GSGCL samples by the MANUFACTURER:

| Property | ASTM Method | Unit | Test Frequency |
|---|---|---|---|
| Bentonite Loading | D5993 | lb/ft² | 1 per 40,000 ft² of GSGCL area |
| Bentonite Moisture Content | D2216 | % | 1 per 40,000 ft² of GSGCL area |
| Geomembrane Thickness | D5199 | mil | 1 per roll of geomembrane liner used to produce the GSGCL |
| Hydraulic Conductivity | D5887/E96 | cm/sec | 2 per Project |

2.    Reported values shall be the average of 5 specimens taken from the sample.

The specifications also require testing of the GSGCL by the INSTALLER.  As specified in Section 2400 3.2.G.2.b (Page 2400-8), the INSTALLER shall verify that the deployed GSGCL has a typical moisture content value of 25% during installation and soil covering activities.  This shall be accomplished as follows:

1)    Bentonite moisture content testing shall be conducted by the INSTALLER at a frequency of 1 sample per 100,000 ft² of GSGCL to be placed.

2)    Several days prior to scheduled deployment of each 100,000 ft² portion of GSGCL, select one GSGCL roll to serve as the representative test roll.  Unwrap the roll of GSGCL selected

33

Contract No. A1998710

for testing and set out a minimum of 5 specimens of the GSGCL. Note: INSTALLER shall immediately rewrap the GSGCL after the test specimens have been collected to prevent exposure and premature hydration of the GSGCL roll.

3) Send the specimens to a geotechnical laboratory for moisture content analysis using ASTM Method D2216. The reported moisture content value shall be the average of the moisture contents of the 5 specimens. Note that the GSGCL cannot be deployed until the test results have been obtained from the laboratory and verified by the OWNER or ENGINEER.

Once OWNER or ENGINEER has verified that the GSGCL has a typical moisture content value of 28%, the GSGCL can be deployed.

One additional specification change associated with the GSGCL – Section 2400 3.2.D.7 (Page 2400-7) states that supplemental bentonite shall be applied at all seams. This requirement is deleted. No supplemental granular bentonite is required for the GSGCL seams.

*Question: This only other question I have: is there a need for full time CQA during foundation soil grading. The specifications only require that you place it in 12 inch lifts and compact it, but there is no testing requirements. So is a CQA task need to verify that the material is placed correctly??*

*Response:* Per Section 2300 3.3.B - Foundation soil in fill areas shall be placed and compacted in lifts, with a maximum loose lift thickness of 12 inches. Each fill lift shall be compacted using a minimum of four passes of the compactor. A pass is defined as one trip across the lift surface. There is no target maximum density requirement for fill applications of foundation soil.

The CONTRACTOR is responsible for completing all work to the satisfaction of the OWNER and ENGINEER in accordance with the plans and specifications. CONTRACTOR shall determine the resources necessary to achieve this objective and include all costs in the applicable bid items.

*Question: Can you clarify how the components of the temporary dikes will be paid for? It appears that the quantities for the Select Fill, GSGCL, and Protective Soil for the temporary dikes are included in Bid Items D1, H3 and I respectively. However, the description of work for the temporary dikes (H5) mentions these items are to be included in the Linear Foot price.*

*Response:* As described for Item H5 - This item shall be full compensation for all work involved in constructing the temporary dikes and future GSGCL tie-ins, including soil placement and compaction; GSGCL installation and, testing and incidentals; and any other activities necessary to complete the Work. Payment for this item will be on a unit per linear foot basis of temporary dike and future GSGCL tie-in. Final pay quantities for bid items Select Fill, GSGCL and Protective Soil will not include the portion of these materials included in the temporary dikes and future GSGCL tie-ins.

34



Also, CONTRACTORS are reminded that quantities provided by OWNER on the Bid Form spreadsheets are <u>estimates</u> based on existing information and <u>actual quantities may be significantly more or less than the estimated quantity shown on the spreadsheet</u>. Actual quantities will be determined by OWNER through comparison of pre-construction and post-construction topographic surveys and field measurements by OWNER's representative. CONTRACTOR is responsible for performing pre-construction and post-construction topographic surveys.

**<u>BID FORM MODIFICATIONS</u>**

Several of the Contractor Questions made us realize that some of the quantities listed on the Bid Form Spreadsheets overlapped and were not representative estimates. As a result, we have updated the Bid Form Spreadsheets to include revised estimated quantities for several items.

In addition, we realized that we had neglected to include an item on the Haul Road Bid Form to compensate the CONTRACTOR for stockpiling excess soil excavated during haul road construction. The Haul Road bid form has been revised to include a new item (item N6) that is described as follows:

*[N6] Stockpiling of Excess Roadway Excavation Soil.* *OWNER anticipates that excess soil will be excavated under item N1 to achieve the lines, grades and elevations for the Haul Road at the Site. The excess soil will be stockpiled in the area designated on the drawings and as required by OWNER. Payment for this item will be on a unit price per cubic yard of soil stockpiled as measured by topographic survey after all other filling activities have been completed to the satisfaction of the OWNER.*

1213.

# CONTRACT FOR SERVICES

## FOR

## CONSTRUCT AX FLY ASH DISPOSAL PIT CELL 1

## BY AND BETWEEN

## RANGER EXCAVATING

## AND

## SANDOW POWER COMPANY LLC

## DATED NOVEMBER 30, 2012

### NO. A1893710

RANGER 000043

Contract No. A1893710

**EFFECTIVE DATE**

December 1, 2012

**PARTIES**

>   **COMPANY**
>
>   Sandow Power Company LLC, a Texas Organization
>
>   **CONTRACTOR**
>
>   Ranger Excavating, L.P., a Texas Limited Partnership

**PURPOSE**

The purpose of this Agreement is to provide for the performance of the Work described in the Scope of Work provision below, for and in consideration of the mutual obligations set forth in this Agreement.

**DEFINITIONS**

>   **COMPANY Group**
>
>   The term "COMPANY Group" means COMPANY, its parent corporation, Energy Future Holdings Corp., and all subsidiaries and affiliates of Energy Future Holdings Corp., and all officers, directors, shareholders, associates, related firms and entities, employees, servants and agents of both COMPANY and each such subsidiary or affiliate.
>
>   **CONTRACTOR GROUP**
>
>   The term "CONTRACTOR Group" means CONTRACTOR, all subcontractors of any tier employed by CONTRACTOR, and all affiliated or related firms and entities, officers, directors, partners, limited partners, shareholders, associates, employees, servants and agents of each.
>
>   **Work**
>
>   The term "Work" means all labor, materials, equipment, transportation, facilities or services necessary to perform the Scope of Work described in this Agreement.
>
>   **Work Site**
>
>   The term "Work Site" means location(s) where the Work will be performed.
>
>   **Contractor Coordinator**
>
>   The term "Contract Coordinator" means a representative of each party named in this Agreement to act in matters relating to performance of this Agreement as it is written. Actions of the Contract Coordinators regarding the day-to-day interaction between the operations of the parties, the issuance and approval of invoices, the issuance and approval of procedures, drawings, schedules and documents of any type, and other decisions made in managing this Agreement will not operate as a waiver or compromise of any provision of this Agreement.
>
>   **Contract Administrator**

2

RANGER 000044

273

Contract No. A1893710

The term "Contract Administrator" means a representative(s) of each party named in this Agreement to act in matters relating to the revision of contract language, the adjustment of compensation or time, and the resolution of issues regarding the meaning of contract language. Actions of COMPANY's Contract Administrator include initiating, negotiating and issuing supplements or amendments to this Agreement, as required; receiving required notices; providing answers to CONTRACTOR concerning questions of contract interpretation and negotiating resolutions/settlements to disputes that may arise concerning this Agreement.

## SCOPE OF WORK

CONTRACTOR will be responsible for the supply of any and all materials, equipment, supervision and labor required for the full and complete performance of the following Work found as an attachment to this document titled "AX Area Landfill Cell No. 1 Scope of Work and Technical Specification" dated September 17, 2012, this contract is specific to the work referenced in Part 1 – AX Landfill Cell No. 1 and made a part of the bid. All drawings referenced in this specification are also made a part of this agreement.

## TERMS OF AGREEMENT

This Agreement will commence on its Effective Date and will terminate on September 2, 2013, unless terminated earlier pursuant to its other provisions. This Agreement may only be extended or modified by written agreement signed by both parties.

## SCHEDULE

CONTRACTOR will begin the Work by December 1, 2012 and complete it by September 2, 2013. The Work will be scheduled through the direction of COMPANY's Contract Coordinator.

## COMPENSATION

As full compensation for the satisfactory performance by CONTRACTOR of this Agreement, COMPANY will compensate CONTRACTOR in accordance with the rate(s) or price(s) contained in the attachment to this Agreement titled "CONTRACTOR Unit Price Sheet."

All compensation paid to CONTRACTOR excludes applicable State Sales and Use Tax.

## INVOICES AND PAYMENT

CONTRACTOR will, at the end of each calendar month in which the Work is performed, and prior to the tenth (10th) of the following month, submit to COMPANY invoices based on Work completed during the prior month. Invoices will reference this Agreement by number and contain sufficient detail, as may be requested by COMPANY, to support all charges and reimbursements of expenses.

Payment will be made within sixty (60) days of receipt and approval of each invoice. Should a discrepancy or conflict arise, the disputed portion of the invoice will not be paid until the parties resolve such discrepancy or conflict to their mutual satisfaction.

With the exception of invoice number 1 for the synthetic liner material (which retainage will not be held), ten percent (10%) of each payment to CONTRACTOR will be retained by COMPANY toward the discharge of any claims or liens until sixty (60) days after CONTRACTOR has completed all Work and the following requirements have been met, as determined by COMPANY, in its sole discretion:

3

A. Final Acceptance of all Work by COMPANY and cleanup of the Work Site; and

B. Receipt by COMPANY from CONTRACTOR of the Contractor's Release and Indemnity Agreement attached hereto stating that CONTRACTOR has paid all taxes and has satisfied all claims against it, including, but not limited to, claims for labor, materials, equipment, services and supplies provided in connection with the Work.

All invoices will be sent via email to ap.invoicing@luminant.com

**SALES/USE TAX**

COMPANY will provide CONTRACTOR with a Texas Direct Pay Exemption Certificate which will negate the necessity of CONTRACTOR's obligation to collect Texas sales and use taxes from the COMPANY. A Sandow Power Company LLC Texas Direct Pay Exemption Certificate No. 3-20-1997560-9 is attached and made a part of this Agreement.

"All incorporated materials purchased by CONTRACTOR which become part of the permanent realty of COMPANY shall be purchased on the basis of resale by CONTRACTOR."

**WORK SITE**

The Work will be performed at the following location(s):

Sandow Steam Electric Station, Rockdale, TX

**WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS**

CONTRACTOR will obtain from COMPANY's Contract Coordinator prior to commencing Work the specific Work Site Safety, Security and other related rules and procedures, if any, applicable to the particular job or Work Site. Those specific rules and procedures are incorporated fully into this Agreement by this reference.

In addition to complying with those specific rules and procedures CONTRACTOR agrees to comply with the rules and procedures contained in the attachment to this Agreement titled "Work Site Safety, Security, Alcohol, Drugs and Weapons."

**BROWZ**

As a condition of this Contract, Contractor agrees to register with Browz and provide those necessary documents requested by Browz to be deemed in compliance with the Browz application. As a minimum, requested documents will be related to safety and health (i.e., regulatory required training, certifications, safety plans, safe and secure workplace practices, etc.), OSHA and MSHA injury rates and Experience Modification Rate (EMR) and other important business data requested by Browz through the registration process. Contractor agrees to maintain the identified documentation for the life of the contract.

Registration and compliance shall be completed within thirty (30) days of the effective date of the Contract. Noncompliance with these requirements shall be grounds for withholding payment of outstanding invoices or termination of the Contract.

**THE REVIEW OF THE FOREGOING INFORMATION BY BROWZ OR BY COMPANY OR THE APPROVAL OF CONTRACTOR'S REGISTRATION WITH BROWZ ARE NOT APPROVALS OF**

4

CONTRACTOR'S DOCUMENTS, DATA, SAFETY AND HEALTH TRAINING, CERTIFICATIONS, SAFETY PLANS, SAFE OR SECURE WORKPLACE PRACTICES OR OTHER MATTERS SUBMITTED TO BROWZ OR COMPANY. REVIEW OF CONTRACTOR'S INFORMATION OR APPROVAL OF CONTRACTOR'S REGISTRATION SHALL NOT DIMINISH CONTRACTOR'S RESPONSIBILITIES OR OBLIGATIONS OR WAIVE COMPANY'S RIGHTS WITH RESPECT TO SUCH MATTERS UNDER THE AGREEMENT. CONTRACTOR AGREES THAT IT SHALL NOT ASSERT THAT THE REVIEW AND APPROVAL OF CONTRACTOR'S INFORMATION OR THE APPROVAL OF CONTRACTOR'S REGISTRATION ARE OR WERE AN APPROVAL OF SUCH MATTERS BY COMPANY OR BROWZ.

## INSURANCE

CONTRACTOR will, at its sole expense, purchase and maintain, and require its subcontractors to purchase and maintain, during the term of this Agreement, insurance policies with substantial and sound insurers, having coverage of the types and in the amounts specified in the attachment to this Agreement titled "Contractor's Insurance Requirements" submitted by CONTRACTOR prior to the execution of this Agreement.

## TERMS AND CONDITIONS

The parties will comply with the terms and conditions of this Agreement and the attachment to this Agreement titled "Standard Terms and Conditions PLST03."

## NOTICES

All notices from one party to the other will be deemed to have been delivered if hand delivered or sent by United States certified mail, return receipt requested, postage prepaid, as follows:

If to CONTRACTOR:

Ranger Excavating
5222 Thunder Creek Rd. Suite B1
Austin, TX 78759
Attention: Nathan Ziehr
(512) 331-5551

If to COMPANY:

Sandow Power Company LLC
1601 Bryan St. 21st Floor
Dallas, Texas  75201-3411
Attention: Mark Jenkins

COMPANY's Contract Coordinator is Jacob Gonzales, phone (214) 875-8057.

CONTRACTOR's Contract Coordinator is Nathan Ziehr, phone (512) 331-5551.

COMPANY's Contract Administrator is Mark Jenkins, phone (214) 875-8637.

CONTRACTOR's Contract Administrator is Nathan Ziehr, phone (512) 331-5551.

RANGER 000047

276

Contract No. A1893710

## ATTACHMENTS

The following attachments are incorporated into this Agreement:

1. Direct Payment Exemption Certificate
2. Work Site Safety, Security, Alcohol, Drugs and Weapons
3. Contractor's Insurance Requirements
4. Standard Terms & Conditions PLST03
5. Browz Registration Form
6. Technical Specification titled "AX Area Landfill Cell No. 1 Scope of Work and Technical Specification" dated September 17, 2012 specifically the work scope in Part 1 – AX Landfill Cell No. 1
   a. Associated Drawings
      i. Cell No. 1 Plans (C1) Revised 10/22/12
      ii. Miscellaneous Details (C2)
      iii. Miscellaneous Details (C3)
      iv. Haul Road Plan, Profile, and Section (C4)
      v. Cover Sheet and Index (G1)
      vi. Location Map (G2)
7. CONTRACTOR Unit Price Sheet
8. Post Pre-Bid Questions and Answers

## AMENDMENTS

Except as otherwise provided in this Agreement, no changes, modifications, amendments or supplements or any other provisions will be valid unless agreed to in writing and signed by the parties.

## ENTIRETY OF AGREEMENT

This Agreement constitutes the full, complete, and entire understanding, agreement, and arrangement of and between the parties hereto with respect to the subject matter hereof and supersedes any and all prior oral and written understandings, agreements and arrangements between them. The Parties hereto have entered into this Agreement voluntarily and for valuable consideration, and not by reasons of any fraud, duress, undue influence or mistakes. Each of the Parties acknowledges that it/he has read this Agreement and that it/he fully knows, understands, and appreciates this Agreement and executes this Agreement voluntarily and of its/his own free will and by executing this Agreement signifies its/his assent to and willingness to be bound by its terms. IN SIGNING THIS AGREEMENT, EACH PARTY ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN JUDGMENT. NO PARTY IS RELYING ON, ON OR BEING INDUCED TO EXECUTE THIS AGREEMENT BY ANY STATEMENTS, REPRESENTATIONS, AGREEMENTS OR PROMISES, ORAL OR WRITTEN, MADE BY ANY OTHER PARTY, THEIR AGENTS, EMPLOYEES, SERVANTS OR ATTORNEYS, OR ANYONE ELSE, OTHER THAN THE STATEMENTS EXPRESSLY WRITTEN IN THIS AGREEMENT. EXCEPT AS TO THE STATEMENTS EXPRESSLY WRITTEN IN THIS AGREEMENT, THE PARTIES SPECIFICALLY AND INTENTIONALLY WAIVE ANY CLAIMS FOR FRAUDULENT INDUCEMENT AGAINST ANY OTHER PARTY, INCLUDING ITS AGENTS, EMPLOYEES, SERVANTS, OR ASSIGNS, TO THIS AGREEMENT.

6

Contract No. A1893710

The parties have signed this Contract acknowledging their agreement to its provisions as of the Effective Date.

Ranger Excavating

By: _____
Signature    Mark McKenzie, President
             of McKenzie Interests, Inc.
             G.P. of Ranger Excavating, L.P.

Name: _____

Title: _____

Date:    12.17.12

Sandow Power Company LLC

By: _____
Signature

Name:  Mark Jenkins

Title:  Sr. Procurement Specialist

Date:  November 30, 2012

By: _____
Signature

Name:  Jign Berard:

Title:  Sr Sourcing Manager

Date:  12/21/12

By: _____
Signature

Name:  COLIN CARRELL

Title:  DIRECTOR - SUPPLY CHAIN

Date:  12/21/12

7

RANGER 000049

278

Contract No. A1893710

**ATTACHMENT NO. 1**
**DIRECT PAYMENT EXEMPTION CERTIFICATE**
State of Texas
Direct Payment Exemption Certificate
Limited Sales, Excise, and Use Tax

Direct payment authorization number:    3-20-1997560-9 Sandow Power Company LLC

Sandow Power Company LLC hereby claim exemption from the payment of state, city, county, SPD, MTA and/or CTD sales and/or use taxes upon its purchase of taxable items and/or services from:

CONTRACTOR:        Ranger Excavating, LP
Address:           5222 Thunder Creek Rd. Suite B1
City, State, Zip:  Austin, TX 78759

Description of items and/or services purchased under Contract No. A1893710:

CONSTRUCT AX FLY ASH DISPOSAL PIT CELL 1

This certificate will remain in effect until the expiration date of the above contract.

This certificate does not cover:

A.   Purchase of taxable items and/or services to be resold.
B.   Sales or rental to any purchaser other than the permit holder.
C.   Sales or rental of motor vehicles subject to the motor vehicle sales and use tax (Chapter 152) and interstate motor carrier sales and use tax (Chapter 157).
D.   Nontaxable services or materials/supplies used or consumed by a provider of a nontaxable service.
E.   Lump-sum new construction projects to improve real property.

CONTRACTOR agrees not to permit others (including its contractors and repairmen) to use this direct payment authorization to purchase material tax free.

COMPANY agrees to accrue and pay the tax to the Comptroller of Public Accounts as required by statute.

Permit holder:   Sandow Power Company LLC

Authorized Signature/Date:   _M Jaul_   12/19/12

8

**BID FORM**
**LUMINANT POWER - AX AREA LANDFILL**
**PART 1 - AX LANDFILL CELL NO. 1**

| Bid Item | Description | Estimated Quantity | Units | Unit Price | Total Cost |
|---|---|---|---|---|---|
| A | Mobilization | 1 | LS | $ 120,000.00 | $120,000 |
| B | Site Preparation | 1 | LS | $ 50,000.00 | $50,000 |
| | **Foundation Soil** | | | | |
| C1 | Excavation | 430,000 | CY | $ 1.75 | $752,500 |
| C2 | Foundation Soil Grading | 185,000 | CY | $ 0.75 | $138,750 |
| C3 | Stockpiling of Excess Foundation Soil | 80,000 | CY | $ 0.65 | $51,000 |
| | **Perimeter Dike Construction** | | | | |
| D1 | Earthwork and Grading | 70,000 | CY | $ 1.00 | $70,000 |
| D2 | Roadbase | 6,000 | SY | $ 9.25 | $74,000 |
| E | Vegetative Soil Placement | 10,000 | CY | $ 3.00 | $30,000 |
| | **Vegetation Establishment** | | | | |
| F1 | Vegetation – Flat Surfaces and Slopes Less Than 4(H) to 1(V) | 5 | ACRE | $ 2,500.00 | $12,500 |
| F2 | Vegetation – Slopes Greater Than or Equal to 4(H) to 1(V) | 5 | ACRE | $ 7,500.00 | $37,500 |
| | **Access Ramp Construction** | | | | |
| G1 | Earthwork | 25,000 | CY | $ 0.90 | $22,500 |
| G2 | Roadbase | 3,000 | SY | $ 9.25 | $27,750 |
| G3 | Culvert Crossing | 1 | LS | $ 25,000.00 | $25,000 |
| | **Liner System** | | | | |
| H1 | Liner Subgrade | 120,000 | CY | $ 2.10 | $252,000 |
| H2 | GSGCL - Flat Surfaces and Slopes Less Than 4(H) to 1(V) | 1,500,000 | SF | $ 0.80 | $1,200,000 |
| H3 | GSGCL - Slopes Greater Than or Equal to 4(H) to 1(V) | 70,000 | SF | $ 1.00 | $70,000 |
| H4 | Anchor Trench Excavation and Backfill | 2,200 | LF | $ 3.00 | $6,600 |
| H5 | Temporary Dike and Future GSGCL Tie-In | 3,400 | LF | $ 48.00 | $163,200 |
| I | Protective Soil Placement | 80,000 | CY | $ 2.40 | $192,000 |
| J | Demobilization and Site Decommissioning | 1 | LS | $ 5,000.00 | $5,000 |
| | | | | **TOTAL CONTRACT PRICE:** | $3,299,800 |

**OWNER'S OPTION AND ALTERNATE PAY ITEMS (DO NOT INCLUDE IN TOTAL)**

| Bid Item | Description | Estimated Quantity | Units | Unit Price | Total Cost |
|---|---|---|---|---|---|
| K | Payment and Performance Bond | 1 | LS | $ 45,000.00 | $45,000 |

**Notes**
1) LS - Lump Sum
2) CY - Cubic Yards
3) SF - Square Feet
4) NA - Not Applicable
5) SY - Square Yards
6) LF - Linear Foot

## ATTACHMENT NO. 2
## WORK SITE SAFETY, SECURITY, ALCOHOL DRUGS AND WEAPONS

**A.    SAFETY**

1.    CONTRACTOR agrees that any safety related assistance or initiatives undertaken by COMPANY will not relieve CONTRACTOR from responsibility for the implementation of, and compliance with, safe working practices, as developed from their own experience, or as imposed by law or regulation, and will not in any way, affect the responsibilities resting with CONTRACTOR under the provisions of any agreement to which these policies are attached and to meet all safety requirements as specified by the Occupational Safety & Health Administration (OSHA), the Mine Safety Health Administration (MSHA), the Department of Transportation (DOT) and any other applicable state or federal safety and health laws or regulations.

2.    In the event that a material safety data sheet (hereinafter "MSDS"), warning label, or other documentation concerning the use of hazardous chemicals at the Work Site or any other property owned or controlled by COMPANY or any of its affiliates (collectively, together with the Work Site, "COMPANY Properties"), applies to any materials or equipment provided by CONTRACTOR as an aspect of the Work, such documentation will be provided by CONTRACTOR to COMPANY prior to the commencement of any such Work.

3.    CONTRACTOR will provide information to COMPANY regarding hazardous chemicals and/or consumable products that contain constituents listed in 40 CFR 372.65 used at any COMPANY Property. CONTRACTOR will report the amount of such material carried on and off the site, the amount actually used and the manner of use. CONTRACTOR will provide the maximum quantity of the material stored on site at any one time and if a waste material was collected, where it was disposed of (location name and address). CONTRACTOR will provide information on the amount of material used for the previous calendar year by the first of February.

4.    CONTRACTOR will provide for the duration of the term of any agreement to which these policies are attached, at its sole expense, adequate first aid facilities for members of CONTRACTOR Group.

5.    CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group performing Work at any COMPANY Property are required to view COMPANY's "CONTRACTOR/Visitor Safety Orientation" video, when applicable, and to read and adhere to COMPANY's "CONTRACTOR/Visitor Safety Booklet" prior to performing any Work any COMPANY Property.

6.    CONTRACTOR acknowledges and agrees that all members of the CONTRACTORS Group performing Work at the Work Site have received the required safety, health and environmental training in accordance with appropriate state and federal laws and regulations, and CONTRACTOR shall have documentation of training for each member of such CONTRACTOR Group available for review at the Work Site.

7.    Prior to entering the Work Site, CONTRACTOR is required to prepare a CONTRACTOR's Safety Health Program in accordance with state and federal laws and regulations and shall have a hard copy of such program in CONTRACTOR's possession and available for review when performing Work at the Work Site.

8.    CONTRACTOR acknowledges and agrees that, except as otherwise expressly authorized in writing by COMPANY's designated safety representative, appropriate protective equipment will be worn by any member of CONTRACTOR Group while on any COMPANY Property. In addition, when any member of CONTRACTOR Group is performing Work which may expose that person to potential

9

Contract No. A1893710

hazards, CONTRACTOR acknowledges and agrees that such person will wear appropriate clothing specific to and adequate for that exposure.

9.      CONTRACTOR will take all reasonable precautions to prevent any accident in connection with the performance of Work, including, but not limited to, putting up and maintaining sufficient barriers and lights.

10.     CONTRACTOR will report to COMPANY all accidents involving personal injuries (including death) and damage to property occurring directly or indirectly as a result of the Work performed by CONTRACTOR hereunder immediately, but in no event, no later than 24 hours after the occurrence of any such accident. Any accident or incident occurring directly or indirectly as a result of the Work which CONTRACTOR must report to a regulatory agency (e.g. OSHA, MSHA, TCEQ) must also be reported to COMPANY immediately following notification to the regulatory agency.

B.      SECURITY

1.      COMPANY may supply such site security as it deems necessary and may specify to CONTRACTOR such additional security precautions and procedures at any COMPANY Property as, in COMPANY's opinion, are reasonably necessary for the safety and security of COMPANY's personnel and property.

2.      Security by COMPANY at COMPANY Properties, if any, will not provide personal policing of the materials, tools and equipment of CONTRACTOR Group. CONTRACTOR will assume sole responsibility for safeguarding such materials, tools and equipment.

3.      It will be the affirmative duty of CONTRACTOR to ensure that CONTRACTOR Group assists in carrying out all security measures, to include reporting all information or knowledge of matters adversely affecting security to COMPANY's designated security personnel.

4.      COMPANY reserves the right to exclude any of CONTRACTOR's employees from any COMPANY Property by denial of access, suspension or revocation of access authorization, preemptory expulsion, or by any other means, without notice or cause. Former COMPANY employees, and any of CONTRACTOR's employees who previously have been excluded from any COMPANY Property, may be brought onto COMPANY property or facilities only if prior approval from COMPANY is obtained.

5.      COMPANY measures may also include investigations, whether by COMPANY or law enforcement officials. CONTRACTOR agrees to cooperate in such investigations and understands that COMPANY reserves the right to require anyone in CONTRACTOR Group to authorize appropriate agencies to release his or her criminal records to CONTRACTOR as a condition of either initial or continued permission for access to any COMPANY Property. Investigations may include searches of CONTRACTOR Group. Such searches may include searches of facilities assigned to CONTRACTOR Group, search of all COMPANY Property areas and property at such COMPANY Property areas, searches of including, but not limited to, offices, lockers, desks, lunch boxes, packages and motor vehicles (regardless of ownership). Without limiting the foregoing, CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group, to the extent that COMPANY reasonably determines that such members require security badge access prior to entering onto any COMPANY Property, shall be required to comply with COMPANY's standard security badge requirements, including without limitation a background check to be performed by COMPANY.

10

Contract No. A1893710

6.    CONTRACTOR agrees to instruct its employees in the details of COMPANY's work site security policies and measures, both as specified herein and as hereinafter provided by COMPANY to CONTRACTOR.

C.    ALCOHOLIC BEVERAGES, DRUGS AND WEAPONS

CONTRACTOR will inform all members of CONTRACTOR Group, who may be involved in the performance of any Work, of the following COMPANY rules, relating to alcoholic beverages, drugs and weapons, with which all employees are expected to comply:

1.    Bringing, attempting to bring, possessing, using or being under the influence of intoxicants, drugs, or narcotics while on any COMPANY Property, including, but not limited to parking areas, is prohibited. Possessing alcoholic beverages in sealed containers is permitted, however, in designated parking areas owned or controlled by Oncor Electric Delivery Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC, Generation Development Company LLC, Sandow Power Company LLC and EFH Corporate Services Company, but not parking areas owned or controlled by Luminant Mining Company LLC, Luminant Big Brown Mining Company LLC and Oak Grove Mining Company LLC.

2.    Drugs prescribed by a licensed physician, for an individual working on any COMPANY Property, which could affect the employee's job performance, or non prescription drugs which could affect the employee's job performance, are allowed on any COMPANY Property only if they have been previously cleared by the employee's supervisor. Any employee taking such medication must inform his or her supervisor of the medication and dosage being taken.

3.    Bringing, attempting to bring, possessing or using firearms, whether classified as legal or illegal, while on any COMPANY Property, including but not limited to buildings, parking areas, recreation facilities, equipment and vehicles, is prohibited. Use or possession of firearms for specific situations is permitted if approved by function or higher level management of COMPANY.

4.    Off the job involvement with intoxicants, drugs, or narcotics, which adversely affects COMPANY's business, to include impairing the employee's ability to perform his job, or the public trust in the safe operation of COMPANY is prohibited.

5.    Any conduct on any COMPANY Property which is in violation of any state or federal law or regulation is considered a violation of these rules and a breach of any agreement to which these policies are attached.

6.    CONTRACTOR is responsible for the compliance of CONTRACTOR Group with the above specified rules.

7.    In order to enforce these rules, all individuals with access to any COMPANY Property as well as the vehicles, offices, lockers and any personal belongings of such individuals on any COMPANY Property are subject to search by COMPANY and its agents, to include security representatives appointed or employed by COMPANY. Individuals may be required to take a blood, urinalysis or Breathalyzer test, or submit to other recognized investigatory tests or procedures as are deemed appropriate or necessary by COMPANY in the investigation of a violation of these rules.

8.    The refusal, on the part of any of CONTRACTOR Group, to submit immediately to a search of his or her person and/or property, or to be tested, whether by blood test, urinalysis, Breathalyzer or other recognized investigatory test or procedure, after being requested to do so, will be considered a violation of COMPANY rules.

11

RANGER 000054

283

Contract No. A1893710

9.    Violations of these rules may be cause for denial of access to any COMPANY Property.

RANGER 000055      284

Contract No. A1893710

## ATTACHMENT NO. 3
## CONTRACTORS INSURANCE REQUIREMENTS
### Block D General Requirements ($3 Million Total Liability Limits)

CONTRACTOR will, at its own expense, maintain in force throughout the period of this document or agreement, or as otherwise specified, and until released by COMPANY the following minimum insurance coverages, with insurers acceptable to COMPANY.

1) Workers' Compensation and Employers' Liability Insurance, providing statutory benefits in accordance with the laws and regulations of the State of Texas or state of jurisdiction as applicable. The minimum limits for the employers' liability insurance will be five hundred thousand dollars ($500,000) bodily injury each accident, five hundred thousand dollars ($500,000) each employee bodily injury by disease, five hundred thousand dollars ($500,000) policy limit bodily injury by disease.

2) Commercial General Liability Insurance, including bodily injury and property damage, personal and advertising injury, contractual liability, and including products and completed operations coverage continuing for three (3) years after Final Acceptance, or completion of the Work, whichever is later, with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury, including death and property damage.

3) Automobile Liability Insurance for coverage of owned, non-owned and hired autos, trailers or semi-trailers with a minimum combined single limit of one million dollars ($1,000,000) per accident for bodily injury, including death, and property damage.

4) Excess Liability Insurance over and above the employers' liability, commercial general liability and automobile liability insurance coverage, with a minimum limit of two million dollars ($2,000,000) per occurrence. Coverage must replace exhausted aggregate limits under the coverages referenced in #1 (employers' liability), and #2 above. Coverage must continue for three (3) years after Final Acceptance, or completion of the Work, whichever is later.

### ADDITIONAL PROVISIONS:

A) The required limits of insurance can be satisfied by any combination of primary and excess coverage.

B) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies will contain provisions that specify that the policies are primary as respects to COMPANY and will apply without consideration for other policies separately carried By COMPANY. The policies shall also include standard severability provisions that state each insured is provided coverage as though a separate policy had been issued to each, except with respects to limits of insurance, and that only one deductible (if applicable) will apply per occurrence regardless of the number of insureds involved in the occurrence. CONTRACTOR will be responsible for any deductibles or retentions.

C) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies, if written on a claims-made basis, will be maintained in full force and effect for three (3) years after Final Acceptance or completion of the Work, whichever is later.

D) All policies must be issued by carriers having an A.M. Best's rating of "A-" or better, and an A.M. Best's financial size category of "VIII" or better, or Standard & Poor Insurance Solvency Review of "A-" or better. If requested in writing by COMPANY, CONTRACTOR will make available to COMPANY a certified copy of any or all insurance policies or endorsements required of CONTRACTOR.

E) Prior to commencement of Work, CONTRACTOR will provide to COMPANY certificates of insurance evidencing the coverage required herein. COMPANY's review of certificates or policies

13

RANGER 000056

285