will not be construed as accepting any deficiencies in CONTRACTOR's insurance or relieve CONTRACTOR of any obligations set forth herein. In addition, CONTRACTOR will require each of its subcontractors to provide adequate insurance. Any deficiencies in the insurance to be provided by subcontractors will be the responsibility of CONTRACTOR.

F)  Certificates of insurance must show Energy Future Holdings Corp. and its direct and indirect subsidiaries as the certificate holder, and as an additional insured (including completed operations) as respects all of the required coverages except workers' compensation. Workers' compensation shall include Energy Future Holdings Corp. and its direct and indirect subsidiaries as an alternate employer. All of the required coverages must provide a waiver of subrogation in favor of the certificate holder.

G)  CONTRACTOR agrees to report to the manager of the claims department of the COMPANY in writing as soon as practical all instances of damage to the Work and all accidents or occurrences which may result in injuries to any person, including death, and any property damage, arising out of the performance of the Work.

H)  If the insurance obligations or coverage required in this Agreement exceed the maximum limits permitted by law or are determined to be invalid, illegal, unenforceable, or in conflict with the law of any court of competent jurisdiction, then this Agreement will be deemed amended so as to conform with the applicable law, including, if the coverage exceeds legal limits, to only require CONTRACTOR to provide insurance to the maximum extent allowed by law. The validity, legality, and enforceability of the remaining obligations and terms of coverage required in this Agreement shall not be affected or impaired, and will remain in full force and effect.

I)  The requirements contained herein as to the types and limits of all insurance to be maintained by CONTRACTOR are not intended to and will not, in any manner, limit or qualify the liabilities and obligations assumed by CONTRACTOR under this Agreement

RANGER 000057

286

**ATTACHMENT NO. 4**
**STANDARD TERMS AND CONDITIONS PLST03**
**STANDARD TERMS AND CONDITIONS**
**PLST03**

15

## INDEPENDENT CONTRACTOR RELATIONSHIP

CONTRACTOR will act as and be deemed to be an independent contractor. Neither CONTRACTOR nor any of its employees will act as, nor be deemed to be, an agent or employee of COMPANY. CONTRACTOR will have the sole right to control and directly supervise the method, manner and details of the Work.

## MATERIALS, EQUIPMENT AND LABOR

CONTRACTOR will provide and furnish all material, labor, services, supervision, tools, apparatus, conveyances, equipment and incidental expenses required to complete the Work, except for those specifically mentioned in this Agreement to be provided by COMPANY. All materials and equipment incorporated into any Work under this Agreement will be new and of the most suitable grade unless otherwise specified.

CONTRACTOR will be solely responsible for the proper storage, transportation and disposal of any product or waste, other than sandblasting waste, used or generated in connection with the Work in accordance with all applicable Environmental Laws. CONTRACTOR will dispose of all waste materials, other than sandblasting waste, at an off-site disposal facility approved for such waste materials pursuant to applicable Environmental Laws and will complete and sign all waste manifests as the generator of such waste. COMPANY will be responsible for the storage, transportation and disposal of any sandblasting waste generated during the performance of the Work.

## ASSIGNMENT

CONTRACTOR will not assign, transfer or otherwise dispose of any of its obligations or duties without the prior written approval of COMPANY. Any assignment or transfer made without the express written approval of COMPANY will be null and void.

## SUBCONTRACTING

CONTRACTOR will not subcontract for any of the Work without the prior approval of COMPANY and CONTRACTOR will not be relieved of any duty or liability relating to any Work by reason of subcontracting. There will be no contractual relationship between COMPANY and any subcontractor by virtue of this Agreement.

## BINDING ON SUCCESSORS AND ASSIGNS

This Agreement will inure to the benefit of and be binding upon the undersigned parties and entities, and their respective legal representatives, successors and approved assigns.

## STANDARDS AND CODES

Whenever reference is made in this Agreement to standards or codes in accordance with which Work is to be performed or tested, the edition or revision of the standards or codes current on the Effective Date will apply, unless otherwise expressly stated. In case of conflict between any referenced standards and codes and any documents attached to and incorporated into this Agreement, the Agreement documents will govern.

## CONDITIONS AFFECTING WORK

CONTRACTOR will investigate and acquaint itself with the conditions affecting the Work, including but not limited to those related to the transportation, disposal, handling and storage of materials and waste; availability of labor, water, electric power and roads; the uncertainties of weather, river stages or similar physical conditions at the site; the conformation and condition of the ground; and the character of equipment and facilities needed preliminary to and during prosecution of the Work. CONTRACTOR has

16

RANGER 000059

satisfied itself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered. CONTRACTOR's failure to acquaint itself with any conditions affecting the Work or any available related information will not relieve it from responsibility for properly estimating the difficulty or cost of successfully performing the Work.

COMPANY is not responsible for any conclusions or interpretations made by CONTRACTOR from the information made available by COMPANY, other than information contained in or referenced in this Agreement. CONTRACTOR will draw its own conclusions from its review of any and all data and information provided by COMPANY.

CONTRACTOR assumes full responsibility for investigating conditions and determining the existence and magnitude of any hazards to the physical well-being of property of CONTRACTOR, the employees, agents, and servants of CONTRACTOR, or any other person or entity who is or may become involved in the performance of Work, and any and all other persons in the vicinity of the Work. CONTRACTOR will advise all of the above-specified persons or entities of any hazards relating to Work, and will ensure that those persons or entities are advised of and fully understand the nature of the hazards and safety precautions that can be taken to eliminate or minimize dangers relating to the hazards.

CONTRACTOR will use its best efforts to ensure that the Work is performed so as to minimize any adverse impact upon natural resources and the environment and will use best industry practices in this regard at all times.

CONTRACTOR will immediately notify COMPANY as soon as CONTRACTOR has reason to believe that CONTRACTOR, or any employee or other person performing the Work, is not or may not be performing the Work in compliance with applicable Environmental Laws. CONTRACTOR will provide COMPANY with written notice to COMPANY of such actual or potential non-compliance within three (3) days following the discovery thereof. CONTRACTOR will take immediate steps to ensure compliance with all applicable Environmental Laws and will, if directed by COMPANY, cease all Work until authorized by COMPANY to resume the Work.

**CHANGES IN WORK**

COMPANY may by written notice, make changes in, additions to, or deletions from the Work. If any change significantly increases the time required to perform the Work, an equitable adjustment will be made in the schedule for the performance and completion of the Work. If the Work is being performed on a fixed price basis, and if any change significantly increases or decreases the cost to CONTRACTOR of performing the Work, then an equitable adjustment will be made in the price. The compensation rates for performing the Work will not be changed.

In order to receive an equitable adjustment in price or schedule, CONTRACTOR must provide a written request for that adjustment within five (5) working days after receiving COMPANY's notice of a change in the Work. CONTRACTOR will continue to perform the changed Work prior to or pending Agreement on an equitable adjustment and will not halt or delay performance of the Work because of any failure to reach an Agreement on an adjustment.

**ENVIRONMENTAL**

In the event that CONTRACTOR discovers during the performance of the Work any substance at the Work Site that is not the subject of the Work or has not otherwise been identified by COMPANY for CONTRACTOR, which substance CONTRACTOR has reason to believe is or may be a Hazardous Substance that (i) has been or may be released or spilled into the soil, surface water, or groundwater or in a building or structure, or (ii) consists of asbestos-containing materials, lead-based paint, batteries, thermostats, lighting equipment, or equipment containing polychlorinated biphenyls, CONTRACTOR will immediately stop Work and notify COMPANY of the discovery. CONTRACTOR will not resume the Work until receiving authorization from COMPANY to do so.

17

Contract No. A1893710

The term "Hazardous Substance" means any product, waste, emission or substance defined, listed or designated as a hazardous or toxic substance, hazardous waste, hazardous material or pollutant by or pursuant to any Environmental Law and includes, but is not limited to, any petroleum-based product, substance or waste, including any additives associated therewith, pesticides, fertilizers, solvents, polychlorinated biphenyls, mercury, lead, lead-based paint, asbestos-containing material or explosives.

CONTRACTOR will immediately notify COMPANY in the event of a spill or release of any material which CONTRACTOR knows or has reason to believe is a Hazardous Substance, whether onto the ground, into any body of water, a storm or sanitary sewer, or the air, or anywhere on property owned or controlled by COMPANY, including within any building or structure. CONTRACTOR will be solely responsible, as may be required by applicable Environmental Laws, for, in consultation with COMPANY, (i) notifying the appropriate governmental agencies of such spill or release caused or permitted by the acts or omissions of CONTRACTOR and (ii) for the cleanup and remediation of such spill or release.

FORCE MAJEURE

If either party becomes unable, either wholly or in part, by an event of Force Majeure, to fulfill its obligations under this Agreement, the obligations affected by the event of Force Majeure will be suspended only during the continuance of that inability. The party so affected will give written notice of the existence, extent and nature of the Force Majeure to the other party within forty-eight (48) hours after the occurrence of the event. The party so affected will remedy its inability as soon as possible. Failure to give notice will result in the continuance of the affected party's obligation regardless of the extent of any existing Force Majeure.

The term "Force Majeure" as used in this Agreement means acts of God (except as excluded herein), strikes, lockouts, or other industrial disturbances, acts of public enemies, wars, blockades, insurrections, riots, epidemics, earthquakes, fires, priority allocations of pipe or other materials or orders, restraints or prohibitions by any court, board, department, commission or agency of the United States or of any States, any arrests and restraints, civil disturbances, explosions and inability despite reasonable diligence to obtain materials essential to the Work. Rain, snow, ice or other adverse weather conditions will not be considered events of Force Majeure.

SUSPENSION FOR CAUSE

In addition to the other remedies provided COMPANY in this Agreement, COMPANY has the right to order the temporary suspension of any Work when it determines, in its sole discretion, that performance of the Work is not being conducted in a safe manner, the specified quality of the Work is not being met, or the Work is not otherwise being performed in accordance with the requirements of this Agreement.

If any unsatisfactory condition of a portion of any Work performed hereunder is brought to CONTRACTOR's attention, and is corrected by CONTRACTOR to COMPANY's complete satisfaction, COMPANY will authorize resumption of the Work. Should CONTRACTOR fail to promptly correct the unsatisfactory condition to COMPANY's complete satisfaction, CONTRACTOR will be considered in breach of this Agreement.

If circumstances are brought to COMPANY's attention that indicate CONTRACTOR's delay in performance of the Work, or any other fact giving COMPANY reasonable apprehension of CONTRACTOR's ability to perform the Work, COMPANY may, at its discretion, withhold payment which may be due CONTRACTOR until such time as CONTRACTOR demonstrates its willingness and ability to complete the Work in strict accordance with this Agreement.

If any suspension of Work significantly increases the time required for the performance of the Work, an equitable adjustment may, in COMPANY's sole discretion, be made in the performance obligations. In no event, however, will any suspension be the basis for any claim or cause of action by CONTRACTOR or CONTRACTOR's employees, agents, or subcontractors against COMPANY.

18

Contract No. A1893710

## TERMINATION

COMPANY may terminate this Agreement, in whole or in part, at any time, at its sole discretion, by providing written notice of termination to CONTRACTOR. The notice of termination will specify the effective date of any termination, and the Work or any part of the Work to be terminated, or alternatively, that this Agreement is terminated in its entirety.

CONTRACTOR will discontinue Work in accordance with COMPANY's termination instructions. Upon receiving notice of termination, CONTRACTOR will place no further orders, or enter into further subcontracts for services, materials or services or should fail to make prompt payment to subcontractors, or to subcontracts relate to the performance of the Work terminated.

In the event this Agreement or the Work is terminated, COMPANY's only liability will be to pay CONTRACTOR the unpaid balance due CONTRACTOR for Work actually performed.

There will be deducted from any unpaid balance due CONTRACTOR the amounts of all claims of COMPANY against CONTRACTOR, including, but not limited to, claims on account of defect in materials and workmanship.

## TERMINATION FOR DEFAULT

If a petition in bankruptcy should be filed by CONTRACTOR, or if CONTRACTOR should make a general assignment for the benefit of creditors, or if a receiver should be appointed due to the insolvency of CONTRACTOR, or if CONTRACTOR should refuse or fail to supply enough properly skilled workmen or proper equipment, materials or services or should fail to make prompt payment to subcontractors, or to pay promptly for materials or labor, or disregard laws, ordinances or the instruction of COMPANY's Contract Coordinator, or if CONTRACTOR should refuse or fail to abide by the Agreement Construction Schedule or otherwise violate any provisions of the Agreement, then COMPANY, upon a determination by COMPANY's Contract Coordinator that sufficient cause exists to justify such action, may, without prejudice to any other right or remedy available to it after giving CONTRACTOR seven (7) days' written notice, terminate the Agreement and take possession of the Work Site. In the event of such a termination, COMPANY may use all or part of CONTRACTOR's equipment and materials and may finish the Work by whatever method COMPANY may deem expedient. In such event, CONTRACTOR will not be entitled to receive any further payment hereunder until the Work is finished. If the unpaid balance of the Agreement Price will exceed the expense of finishing the Work, including compensation of COMPANY's Contract Coordinator, other COMPANY personnel, third party engineering companies, or other contractors for additional services, such excess will be paid to CONTRACTOR. If the expense of finishing the Work will exceed such unpaid balance, CONTRACTOR will pay the difference to COMPANY within fifteen (15) days of receiving an invoice for same. The expenses incurred by COMPANY herein, and the damage incurred through CONTRACTOR's default, will be determined by COMPANY's Contract Coordinator, in its sole discretion, and such determination will be binding as between the parties.

In the event of a termination under the provisions of this Article, CONTRACTOR will transfer and assign to COMPANY, in accordance with COMPANY's instructions, all Work, all construction records, reports, permits, data and information, other materials (including all COMPANY-supplied materials), supplies, Work in progress and other goods for which CONTRACTOR is entitled to receive reimbursement hereunder, and any and all plans, drawings, sketches, specifications, and information in connection with the Work, and will take such action as may be necessary to secure COMPANY, at COMPANY's sole election, the rights of CONTRACTOR under any or all orders and subcontracts made in connection with the Work.

In the event that COMPANY so directs or authorizes, CONTRACTOR will sell at a price approved by COMPANY, or retain at a mutually agreeable price, any such materials, supplies, Work in progress, or other goods as referred to in the preceding paragraph. In any event, COMPANY will receive any and all records, plans, drawings, data, permits, specifications, sketches, reports, or other information relating to

19

Contract No. A1893710

the Work. The proceeds of any such sale or the agreed price will be paid or credited to COMPANY in such manner as COMPANY may direct so as to reduce the amount payable by COMPANY under this Article.

## INSPECTORS

A thorough inspection of all Work performed, including, but not limited to Work being performed at location(s) of subcontracted Work, and all materials furnished may be made by inspectors designated by COMPANY's Contract Coordinator to determine if the Work is being performed in strict compliance with this Agreement. Neither COMPANY's Contract Coordinator nor COMPANY's Inspectors have any power or authority to waive any of the provisions of this Agreement or any obligations of CONTRACTOR under this Agreement.

## FINAL INSPECTION AND ACCEPTANCE

CONTRACTOR will notify COMPANY in writing when it considers all Work complete and ready for final acceptance. COMPANY, with CONTRACTOR's cooperation, may conduct such inspections and tests to satisfy itself that the Work conforms to all of the requirements of this Agreement. If the Work is acceptable, COMPANY will within a reasonable time, notify CONTRACTOR in writing of its Final Acceptance of the Work and authorize CONTRACTOR to issue its final invoice.

If all or part of the Work is not complete or is unacceptable, COMPANY will notify CONTRACTOR of the incomplete or unacceptable Work, and CONTRACTOR will, at its sole expense, complete or correct the Work so that the Work conforms to all of the requirements of this Agreement.

## WARRANTY

CONTRACTOR agrees and warrants that its employees, agents and subcontractors will perform the Work in a good and workmanlike manner, in accordance with high professional standards, with a level of care, skill, knowledge and judgement required or reasonably expected of firms or persons performing comparable services, and in strict accordance with this Agreement, including but not limited to, all specifications made a part of this Agreement. Further, CONTRACTOR warrants that all Work will be free from defects in design, materials and workmanship for a period of twelve (12) months from the date of Final Acceptance by COMPANY of all Work, except where specific Work items have been specified to have a longer warranty.

Upon oral or written notice from COMPANY that any of the Work performed by CONTRACTOR fails to conform to any of the above-specified warranties, CONTRACTOR will, at no additional cost to COMPANY, properly remedy the failure and reperform any Work necessary so that the Work conforms to those warranties. CONTRACTOR further warrants any and all corrected or reperformed Work to be free from defects in design, materials and workmanship for a period of twelve (12) months following acceptance by COMPANY of the corrected or reperformed Work. Nothing herein will limit the rights and remedies that may be available to COMPANY at law or in equity.

## BACKCHARGE

If COMPANY discovers defective or nonconforming Work, it may, after notifying CONTRACTOR to correct the defective or nonconforming Work and upon CONTRACTOR's refusal or failure to proceed with corrective action in a reasonable time, perform the redesign, repair, rework or replacement of the defective or nonconforming Work by the most expeditious means available and backcharge CONTRACTOR for all costs incurred.

COMPANY may either separately invoice, or deduct from any payments due CONTRACTOR, the costs for any backcharge. The performance of backcharge work by COMPANY or COMPANY's representative will not relieve CONTRACTOR of any of its responsibilities under this Agreement.

RANGER 000063

292

Contract No. A1893710

## RECORDS AND RIGHTS TO AUDIT

CONTRACTOR will keep accurate and complete books of accounts, records, documents and other evidence related to the charges for and performance of any Work, including CONTRACTOR's compliance with Environmental Laws related to the Work ("Records"), and of any change or modification to the charges. COMPANY or COMPANY's Contract Coordinator may inspect those records at any time during normal business hours.

All Records required for an audit and inspection will be made available at the offices of CONTRACTOR, at all reasonable times, for inspection, audit or reproduction, until three (3) years from date of final payment for any Work. COMPANY will bear the expenses incurred by it in supporting any such inspection or audit; provided, however, that should any audit or investigation produce evidence that CONTRACTOR has knowingly overstated charges or units of measure upon which charges are based, or provided gifts, gratuities or other benefits to employees of COMPANY in violation of the Business Ethics provisions of this Agreement, CONTRACTOR will be liable to COMPANY for actual damages, including cost of audit and investigation.

## BUSINESS ETHICS

CONTRACTOR represents and warrants that neither it nor any person or entity associated in any manner with CONTRACTOR will:

1)  Provide or offer any compensation or benefit of any type, including any gift or gratuity, other than advertising mementos of nominal value or reasonable business meals and business entertainment, to any COMPANY employee;

2)  To the best of CONTRACTOR's knowledge, maintain or establish any undisclosed business affiliation that could constitute or give the appearance of a conflict with the interests of COMPANY; or

3)  Except to the extent expressly provided for in this Agreement, attempt to act on behalf of or, in any manner, seek to represent COMPANY.

If, during the term of this Agreement, CONTRACTOR knows or becomes aware of any facts or circumstances contrary to the representations and the warranties above, CONTRACTOR will immediately notify COMPANY and provide sufficient information for COMPANY to take appropriate protective or corrective actions. CONTRACTOR further agrees to cooperate fully in any investigation undertaken by COMPANY.

CONTRACTOR, if requested by COMPANY, agrees to require its employees to execute an ethics/nondisclosure agreement at any time.

## CONTRACTOR'S RESPONSIBILITY FOR WORK

CONTRACTOR will care for and maintain both the partially completed and finished Work until final acceptance by COMPANY. Acceptance of portions of the Work made for the purpose of determining partial payments will not constitute Final Acceptance of any portion of the Work.

## WORK SITE PERMITS AND LICENSES

Subject to the following two paragraphs, CONTRACTOR will obtain, prior to the commencement of the Work, and provide to COMPANY upon request, all permits, licenses and governmental authorizations, at its sole expense, required for the performance of the Work. CONTRACTOR will be solely responsible for maintaining compliance with such permits, licenses and governmental authorizations.

In the event that a storm water discharge permit is required for the performance of the Work, (i)

21

RANGER 000064

293

CONTRACTOR will be responsible for filing a Notice of Intent with respect to the Work, in addition to any Notice of Intent that COMPANY may be required to file, and (ii) CONTRACTOR will coordinate with COMPANY in the preparation and execution of a Storm Water Pollution Prevention Plan for the Work Site.

In the event that the performance of the Work involves the handling or abatement of asbestos-containing materials, CONTRACTOR will coordinate with COMPANY in the preparation and filing of all required notification forms.

## ACCESS

Should CONTRACTOR desire access to the Work Site over any land not controlled by COMPANY, it will, at its sole expense, obtain all proper permits or written permission necessary for that access.

## HAULING AND OPERATING PERMITS

CONTRACTOR will obtain all hauling and other operating permits and licenses required for the performance of the Work and will pay all related charges and fees. CONTRACTOR will also give all notices (other than COMPANY's Notice of Intent) necessary and incidental to the lawful performance of the Work.

## COMPANY FACILITIES

CONTRACTOR will not use COMPANY's sanitary facilities, changehouses, shops, parks, storage buildings, tools, equipment or other facilities unless so directed by COMPANY. CONTRACTOR will not discharge, without COMPANY's prior written authorization, any product or waste used or generated in connection with the Work through any (i) COMPANY-permitted outfall, (ii) COMPANY-owned or operated pollution control equipment, or (iii) storm or sanitary sewer located at or in the vicinity of the Work Site. Any request for authorization to discharge will include, at a minimum, either a copy of the Material Safety Data Sheet for the product or a written description of the waste, including a list of the constituents of the waste and the relative concentrations thereof.

## COLLATERAL WORK

COMPANY and other contractors may be working at the Work Site. COMPANY reserves the right to coordinate the performance of CONTRACTOR's Work with the work of others. CONTRACTOR will cooperate with and will not delay, impede or otherwise impair the work of others. COMPANY does not guarantee CONTRACTOR continuous uninterrupted access to the Work Site, but will provide such access as good construction practices will allow, considering the other activities in the area.

## PROTECTION OF PROPERTY AND PERSONS

CONTRACTOR will protect the Work (whether completed or in progress), materials, equipment, adjacent property, natural resources and the public from any damage or danger relating to the Work, and will be responsible for any damage, loss or injury due to its actions or neglect. CONTRACTOR will take reasonable precaution to prevent any accident in connection with the performance of the Work and will put up and maintain sufficient barriers, lights and/or other necessary precautions.

## PROTECTION OF HIGHWAYS AND RAILROADS

CONTRACTOR will make suitable arrangements with governmental authorities and railroads for the construction of all structures, whether underneath or over roads, railroads or rights-of-way to protect the public from accident or delay. CONTRACTOR will repair, at its own expense, to the satisfaction of the governmental authorities or other owners, all roads, railroads and bridges that may be damaged by, or given undue wear due to the Work.

RANGER 000065      294

## CLEANING UP

CONTRACTOR will at all times keep the Work Site free of waste materials or rubbish caused by the Work. After completing the Work, CONTRACTOR will remove all its waste materials, rubbish, tools, supplies, equipment and surplus materials from and about the Work Site.

If CONTRACTOR fails to keep the Work Site clean or to clean up after completing the Work, COMPANY may do so and charge all costs of cleaning up to CONTRACTOR. Those costs may be deducted from the final payment to CONTRACTOR.

## CONFLICT OF INTEREST

CONTRACTOR will not engage in any activity that will adversely affect or impair its ability to perform the Work in an independent and reliable manner. CONTRACTOR warrants that it has no professional or contractual obligations that will conflict with its performance of any Work.

## PROTECTION AGAINST LIENS AND ENCUMBRANCES

CONTRACTOR will not at any time permit any lien, attachment or other encumbrance ("Encumbrance") by any person or persons whosoever or by reason of any claim or demand against CONTRACTOR to be placed or remain on the property of COMPANY, including, but not limited to, the Work Site upon which Work is being performed or equipment and materials that are being furnished. To prevent an Encumbrance from being placed on the property of COMPANY, CONTRACTOR will furnish during the progress of any Work, as requested from time to time, verified statements showing CONTRACTOR's total outstanding indebtedness in connection with the Work.

If CONTRACTOR allows any indebtedness to accrue to subcontractors or others and fails to pay or discharge that indebtedness within five (5) days after demand, then COMPANY may withhold any money due CONTRACTOR until that indebtedness is paid or pay the indebtedness and apply that amount against the money due CONTRACTOR.

If CONTRACTOR allows any Encumbrances, whether valid or invalid to be placed on the property of COMPANY, any and all claims or demands for payment to CONTRACTOR will be denied by COMPANY until the Encumbrance is removed. If the Encumbrance is not removed immediately, COMPANY may pay that claim or demand and deduct the amount paid, together with all related expenses, including attorneys' fees, from any further payment due CONTRACTOR, or at COMPANY's election, CONTRACTOR will, upon demand, reimburse COMPANY for the amount paid and all related expenses. Any payment made in good faith by COMPANY will be binding on CONTRACTOR.

## TAXES

CONTRACTOR will comply with all federal, state, or municipal laws, rules and regulations regarding taxes and the payment of taxes, until the Work has been completed, including, without limitation, social security, state unemployment insurance, gross receipts taxes, withholding taxes, and income tax. CONTRACTOR will furnish, upon request by COMPANY, satisfactory evidence of its compliance.

## WAIVER OF CONSEQUENTIAL DAMAGES

Neither party will be liable to the other in contract, tort, or on any other basis, for any consequential damages of any nature, including, but not limited to, lost profits or revenues, loss of customer goodwill, business interruption costs, overhead costs, lost profits, costs of capital, or loss of use of money. Consequential damage also includes attorneys' fees, except as otherwise specifically provided for, in this Agreement and it is expressly understood that this paragraph will be subjugated to, and will not limit or otherwise affect in any manner, CONTRACTOR's obligations to indemnify and hold harmless COMPANY as provided for in the Indemnity and Intellectual Property provisions of this Agreement or CONTRACTOR's obligation as provided for in the Warranty provision of this Agreement.

23

RANGER 000066

Contract No. A1893710

## INDEMNIFICATION

CONTRACTOR agrees to and will defend, protect, indemnify and hold harmless COMPANY Group from and against all claims, losses, expenses, attorneys' fees, damages, demands, judgments, causes of action, suits, and liability in tort, contract, or any other basis and of every kind and character whatsoever (hereinafter in this and the following paragraphs collectively referred to as "CLAIMS"), for personal injury, death, or property damage of any member of CONTRACTOR Group, arising out of or incident to or related in any way to, directly or indirectly, this Agreement, or the Work, services, or materials to be performed or supplied thereunder, or to any activities of any member of CONTRACTOR Group while on any premises actually or allegedly owned, controlled, or operated by COMPANY, including, but not limited to, CLAIMS arising out of or resulting from (1) any condition of the premises, (2) separate operations being conducted on the premises, or (3) the imperfection or defective condition, whether latent or patent, of any material or equipment sold, supplied, or furnished by COMPANY; and further, IT IS THE EXPRESS INTENT OF THE PARTIES THAT, FOR THE PURPOSES OF THIS PARAGRAPH, CLAIMS, AND CONTRACTOR'S OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE, BUT NOT BE LIMITED TO, CLAIMS ARISING OUT OF OR RESULTING FROM COMPANY GROUP'S SOLE OR CONCURRENT (1) NEGLIGENCE, (2) STRICT LIABILITY, OR (3) OTHER FAULT OF ANY NATURE.

For all CLAIMS except those for personal injury, death, or property damage of any member of CONTRACTOR GROUP within the scope of the preceding paragraph, CONTRACTOR agrees to and will defend, protect, indemnify, and hold harmless COMPANY Group from and against any and all CLAIMS arising out of or incident to or related in any way to, directly or indirectly, this Agreement, or the Work, services, or materials to be performed or supplied thereunder, or to any activities of any member of CONTRACTOR Group while on any premises actually or allegedly owned, controlled, or operated by COMPANY, including, but not limited to, CLAIMS arising out of or resulting from (1) any condition of the premises, or (2) separate operations being conducted on the premises, or (3) the imperfection or defective condition, whether latent or patent, of any material or equipment sold, supplied, or furnished by COMPANY; and further, IT IS THE EXPRESS INTENT OF THE PARTIES THAT, FOR THE PURPOSES OF THIS PARAGRAPH, CLAIMS, AND CONTRACTOR'S OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE, BUT NOT LIMITED TO, CLAIMS ARISING OUT OF OR RESULTING FROM COMPANY GROUP'S CONCURRENT (1) NEGLIGENCE, (2) STRICT LIABILITY, OR (3) OTHER FAULT OF ANY NATURE.

To the extent necessary to permit COMPANY to enforce any term, clause, or condition of this Agreement, CONTRACTOR agrees that with respect to any CLAIMS brought against COMPANY Group, CONTRACTOR will and does hereby waive as to COMPANY Group any defense it may have by virtue of the workers' compensation laws of any state.

In the event that any of the terms or provisions of this INDEMNIFICATION section are determined to be invalid, illegal, unenforceable or in conflict with the law of any court of competition jurisdiction, the validity, legality and enforceability of the remaining terms and provisions shall not in any way be affected or impaired, and remain in full force and effect.

## INTELLECTUAL PROPERTY

CONTRACTOR will obtain permission to use any and all intellectual property that may be required in order for CONTRACTOR to perform the Work. This permission will include all necessary licenses and other governmental approvals.

CONTRACTOR will hold harmless and indemnify COMPANY Group from and against, and at COMPANY's option, defend COMPANY Group against, any and all fines, penalties, losses, liabilities, damages, claims and costs (including reasonable attorneys' fees and court costs), arising out of or incurred as a result, directly and indirectly, of any alleged or actual infringement or violation of any right, or alleged right, relating to intellectual property, including, but not limited to, patent, copyright or trade

24

Contract No. A1893710

secret.

In addition, if any claim is brought alleging infringement or the violation of any intellectual property right, CONTRACTOR will avoid any further possible infringement of the intellectual property right, and will seek to resolve the claim in consultation with COMPANY, either by means of alternative arrangements for the Services, or by obtaining permission to use the intellectual property in question.

## COMPLIANCE WITH LAWS

CONTRACTOR represents that it is knowledgeable of and will comply with all federal, state, and local laws, rules, decrees, orders, regulations, by-laws, ordinances and codes that may, in any manner, affect the conduct of the Work, including all Environmental Laws. In this regard, any conduct on the Work Site, that is in violation of any federal, state, or local enactment, as specified above, is also a breach of this Agreement.

The term "Environmental Laws" will mean any and all laws, statutes, ordinances, rules, regulations, orders, interpretations, or guidance of any federal, state or local government or regulatory agency, as may now or hereafter be in effect, pertaining to human health, safety, or the environment, including, but not limited to, the following statutes and any applicable state or local equivalents thereof and any rules and regulations promulgated pursuant thereto: the Federal Clean Air Act, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), the Federal Water Pollution Control Act, the Resource Conservation and Recovery Act of 1976, the Safe Drinking Water Act, the Toxic Substances Control Act, the Emergency Planning and Community Right-to-Know Act, the Oil Pollution Act of 1990, the National Environmental Policy Act, the Hazardous Materials Transportation Act, the Atomic Energy Act, the Federal Insecticide, Fungicide and Rodenticide Act, and the Occupational Safety and Health Act of 1990, all as have been or may be amended from time to time.

CONTRACTOR will promptly notify COMPANY in writing upon receipt of notice of any of the following matters, whether occurring during or subsequent to the performance of the Work; (i) any enforcement, cleanup, removal, Potentially Responsible Party (PRP) notice or other governmental or regulatory action or investigation instituted or threatened against CONTRACTOR pursuant to any Environmental Laws arising out of or related to the performance of the Work; (ii) any claim made or threatened by any person against COMPANY for damages, contribution, cost recovery, compensation, losses or injury arising out of the performance of the Work or the use, disposal or release of Hazardous Substances at the Work Site; or (iii) any report made by CONTRACTOR to a governmental agency with respect to Hazardous Substances spilled, released or deposited on or removed from the Work Site.

CONTRACTOR will not enter into any settlement agreement, consent decree, or other compromise with respect to any claims relating to the performance of the Work without first notifying COMPANY of CONTRACTOR's intention to do so and affording COMPANY ample opportunity to appear, intervene, or otherwise appropriately assert and protect COMPANY's interests with respect thereto.

CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any and all federal, state, and local antidiscrimination statutes, including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Equal Pay Act of 1963; the Age Discrimination in Employment Act of 1967, as amended; the Energy Reorganization Act of 1974; the Texas Commission on Human Rights Act; the Americans with Disabilities Act; and the Older Workers Benefit Protection Act of 1990. CONTRACTOR will promptly advise COMPANY of any action required to be initiated by COMPANY in order to comply with those statutes.

CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any federal, state, or local statutes relating to compensation or wage and hour considerations, including, but not limited to, the Federal Fair Labor Standards Act, and the Texas Minimum Wage Act of 1970, and the Texas Pay Act, as well as any and all other federal statutes impacting, directly or indirectly, CONTRACTOR's employees.

25

RANGER 000068

297

Contract No. A1893710

If fines, penalties or legal costs are assessed against COMPANY by any court or governmental agency due to CONTRACTOR Group's failure to so comply, or if the Work of CONTRACTOR, or any part thereof, is delayed or stopped by any court or governmental agency, due to CONTRACTOR Group's failure to comply with its obligations, CONTRACTOR will indemnify and hold harmless COMPANY from and against any and all fines, penalties, losses, liabilities, damages, claims, and costs (including reasonable attorneys' fees and court costs) arising out of or incurred as a result, directly or indirectly, of that failure.

## PROPRIETARY INFORMATION

Without the written consent of COMPANY, CONTRACTOR will not divulge to any third party, including any affiliate of COMPANY (excepting, as appropriate, only EFH Corporate Services Company for purposes relating to this Agreement), any information obtained from or through COMPANY that relates to the technical or business activities of COMPANY (including, without limitation, information pertaining to any customer or COMPANY), or is otherwise developed by CONTRACTOR in connection with its performance of the Work, unless: (1) the information is known to CONTRACTOR prior to obtaining it from COMPANY; (2) the information is, at the time of disclosure by CONTRACTOR, then in the public domain; or (3) the information is obtained by CONTRACTOR from a third party who did not receive it directly or indirectly from COMPANY and who has no obligation of secrecy with respect to that information. THIS PROVISION WILL NOT RESTRICT IN ANY MANNER WHATSOEVER THE REPORTING OF ENVIRONMENTAL OR SAFETY-RELATED CONCERNS to the appropriate governmental authorities in accordance with applicable law.

If so requested by COMPANY, CONTRACTOR further agrees to require its employees to execute a nondisclosure agreement prior to performing any services under this Agreement.

## RIGHTS TO DATA

All designs, drawings, calculations, computer codes, plans, specifications, data and any and all other information developed, created or produced by employees, agents or subcontractors of CONTRACTOR, pursuant to or relating, directly or indirectly, to the Work, will become the property of COMPANY when so developed, created, or produced, and notwithstanding any property designations contained therein, COMPANY will have the right to use or sell that information without limitation. At COMPANY's request, those designs, drawings, calculations, computer codes, plans, specifications, data, and any and all other information, will be delivered to COMPANY.

## TITLE AND RIGHT

Nothing in this Agreement will vest CONTRACTOR with any right of property in materials used after they have been attached to or incorporated into the Work, nor materials for which CONTRACTOR has received full or partial payment. All those materials, upon being so attached, incorporated or paid for, will become the property of COMPANY. Any gravel, sand, stone, minerals, timber or other materials excavated, uncovered, developed or obtained in the Work, or on any land belonging to COMPANY may be used, in the performance of the Work, provided such materials meet the requirements of this Agreement. Any objects or natural materials or animals excavated or exposed that may have historical significance or constitute a threatened or endangered species must be brought to the attention of COMPANY.

## REMOVAL OF PERSONNEL

COMPANY may, at its sole discretion, and for whatever reason it deems appropriate, remove any person from the Work Site, and the person will not again be employed on the Work without the express written consent of COMPANY.

## GOVERNING LAW

THIS AGREEMENT IS GOVERNED BY AND WILL BE CONSTRUED IN ACCORDANCE WITH LAWS

RANGER 000069        298

OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF TEXAS. THE PARTIES MUTUALLY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS IN DALLAS COUNTY, TEXAS AND AGREE THAT ANY ACTION, SUIT OR PROCEEDING CONCERNING, RELATED TO OR ARISING OUT OF THIS AGREEMENT AND THE NEGOTIATION OF THIS AGREEMENT WILL BE BROUGHT ONLY IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS AND THE PARTIES AGREE THAT THEY WILL NOT RAISE ANY DEFENSE OR OBJECTION OR FILE ANY MOTION BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, INCONVENIENCE OF THE FORUM OR THE LIKE IN ANY CASE FILED IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS. THE PARTIES MUTUALLY AGREE THAT THIS AGREEMENT IS A "MAJOR TRANSACTION" WITHIN THE MEANING OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE § 15.020 AND AS SUCH AGREE THAT ANY ACTION OR SUIT ARISING FROM THIS AGREEMENT WILL BE BROUGHT IN DALLAS COUNTY, TEXAS, AND VENUE WILL BE IN DALLAS COUNTY, DALLAS, TEXAS.

THE PARTIES AGREE THAT THE PROVISIONS OF ARTICLE 2 OF THE UNIFORM COMMERCIAL CODE (AS CONTAINED IN THE TEXAS BUSINESS AND COMMERCE CODE) SHALL APPLY TO THE AGREEMENT AND ALL TRANSACTIONS THEREUNDER, IRRESPECTIVE OF WHETHER SUCH TRANSACTIONS ARE DEEMED TO BE A SALE OF GOODS OR THE PROVIDING OF A SERVICE; HOWEVER, IN THE EVENT OF A CONFLICT, THE TERMS AND PROVISIONS OF THE AGREEMENT SHALL CONTROL OVER THOSE CONTAINED IN THE UCC.    NOTWITHSTANDING THE FOREGOING, THE PARTIES ACKNOWLEDGE AND AGREE THAT ALL IMPLIED RIGHTS RELATING TO FINANCIAL ASSURANCES ARISING FROM SECTION 2.609 OF THE UNIFORM COMMERCIAL CODE (AS CONTAINED IN THE TEXAS BUSINESS AND COMMERCE CODE) OR APPLICABLE CASE LAW APPLYING SIMILAR DOCTRINES, ARE HEREBY WAIVED.

## NON-WAIVER OF RIGHTS

A waiver by either party of any breach of this Agreement or the failure of either party to enforce any of the articles or other provisions of this Agreement will not in any way affect, limit or waive that party's right to enforce and compel strict compliance with the same or other articles or provisions.

## SURVIVAL

Neither the completion of any Work nor any termination or cancellation of this Agreement will relieve CONTRACTOR of any obligations under this Agreement that by their nature survive the completion of the Work, including, but not limited to, all warranties and obligations of indemnity.

## SEVERABILITY

In the event any provision of this Agreement is held to be void, unlawful or otherwise unenforceable, that provision will be severed from the remainder of the Agreement and replaced automatically by a provision containing terms as nearly like the void, unlawful, or unenforceable provision as possible; and the Agreement, as so modified, will continue to be in full force and effect.

## PUBLICITY

No information relating to this Agreement will be released for publication, advertising or any other purpose without the prior written approval of COMPANY.    CONTRACTOR is expressly prohibited from using COMPANY's name in any publication, advertising, or promotion.

## SMALL BUSINESS CONCERNS

RANGER 000070

299

Contract No. A1893710

If the value of any Work is Ten Thousand Dollars ($10,000.00) or more and CONTRACTOR intends to subcontract for the performance of any portion of that Work, CONTRACTOR will make ever effort to ensure that small business concerns owned and controlled by socially and economically disadvantaged individuals will have the maximum practicable opportunity to participate in the performance of contracts, implementing Section 211 of Public Law 95-507.

If the value of any Work is Five-Hundred Thousand Dollars ($500,000) or more and CONTRACTOR intends to subcontract for the performance of any portion of that Work, CONTRACTOR (except small business concerns referred to in the preceding paragraph) will adopt a plan in accordance with the requirements of Section 637 of Title 15 of the United States Code.

## IMMIGRATION

CONTRACTOR will fully comply with all applicable requirements of the Immigration Reform and Control Act of 1986 ("IRCA"), as well as all regulations issued pursuant to IRCA or otherwise enforced by the Immigration and Naturalization Service, for or with respect to any of CONTRACTOR's employees, or other persons, performing any portion of the Work. In particular but without limitation, CONTRACTOR acknowledges and represents that: (a) to the fullest extent required by IRCA or such regulations, it has properly completed (or, prior to their performance of any portion of the Work, will properly complete) the Employment Eligibility Verification Form, I-9, for each such employee or person; and (b) all such employees or persons are, and will remain while performing any portion of the Work, otherwise legally authorized to work in the United States.

28

RANGER 000071    300

## ATTACHMENT NO. 5
## BROWZ REGISTRATION FORM

Browz registration requirement to advance workplace compliance.
As part of Luminant's commitment of reducing jobsite risk through safety, health and environmental solutions, Luminant has partnered with Browz LLC (Browz), a leading provider of contractor compliance and risk management software and services.

Browz provides tools that reveal compliance, enabling its clients to shift their focus toward managing their contracts and contractors more effectively. Engaging Browz is yet another step in ensuring the operational and environmental excellence and safe performance of Luminant's extensive generating fleet and mining operations.

Browz completed registration is a requirement for conducting business with Luminant. Those vendors that are not currently registered in Browz will need to fill out the attached "Contractor Safety & Health Information Form" information and submit it along with any bid offerings.

About Browz:
Browz helps buyers and suppliers exchange critical compliance information by using technology that leads to risk reductions, cost savings, and more secure business relationships. Both buyers and suppliers want to do business in a responsible manner and safe environment. The Browz solution levels the playing field for suppliers while protecting all participants. www.browz.com

How to Register with Browz:
1. Access the Browz website at http://register.browz.com
2. On this web page, enter your designated Key/Browz ID: <<Browz Id >> in the first box provided.
3. Enter your designated Browz Code: <<Code>> in the second box provided.
4. Click the blue "Submit" button.
5. Click on "Begin Registration".
6. Follow the instructions given in the next steps.

During the registration process, you will be prompted to create a unique Org ID, Username and Password. Please remember this information, as it will be required to access your company's information in the future.

There is a $695.00 annual registration fee payable directly to Browz.

For additional assistance or clarification concerning the Browz process, contact:
    Browz Client Services (888) 276-9952

As a condition of this Contract, Contractor agrees to register with Browz and provide those necessary documents requested by Browz to be deemed in compliance with the Browz application. As a minimum, requested documents will be related to safety and health (i.e., regulatory required training, certifications, safety plans, safe and secure workplace practices, etc.). OSHA and MSHA injury rates and Experience Modification Rate (EMR) and other important business data requested by Browz through the registration process. Contractor agrees to maintain the identified documentation for the life of the contract.

Registration and compliance shall be completed within thirty (30) days of the effective date of the Contract. Noncompliance with these requirements shall be grounds for withholding payment of outstanding invoices or termination of the Contract.

THE REVIEW OF THE FOREGOING INFORMATION BY BROWZ OR BY COMPANY OR THE APPROVAL OF CONTRACTOR'S REGISTRATION WITH BROWZ ARE NOT APPROVALS OF CONTRACTOR'S DOCUMENTS, DATA, SAFETY AND HEALTH TRAINING, CERTIFICATIONS, SAFETY PLANS, SAFE OR SECURE WORKPLACE PRACTICES OR OTHER MATTERS SUBMITTED TO BROWZ OR COMPANY. REVIEW OF CONTRACTOR'S INFORMATION OR APPROVAL OF

29

Contract No. A1693710

CONTRACTOR'S REGISTRATION SHALL NOT DIMINISH CONTRACTOR'S RESPONSIBILITIES OR OBLIGATIONS OR WAIVE COMPANY'S RIGHTS WITH RESPECT TO SUCH MATTERS UNDER THE AGREEMENT. CONTRACTOR AGREES THAT IT SHALL NOT ASSERT THAT THE REVIEW AND APPROVAL OF CONTRACTOR'S INFORMATION OR THE APPROVAL OF CONTRACTOR'S REGISTRATION ARE OR WERE AN APPROVAL OF SUCH MATTERS BY COMPANY OR BROWZ.

30

RANGER 000073

302

## POST PRE-BID QUESTIONS AND ANSWERS

Question: *Do the top of dike elevations on Sheet C1 represent the "top of roadbase" or "top of select fill/dike fill"?*

Response: The top of dike elevations on Sheet C1 represent "top of roadbase" elevations.

Question: *The finished elevation for the Foundation Soil/Top of Liner Subgrade along the western side shows to be 488. The inside bottom toe of the permanent dike along the west side shows to be elevation 490. Can elevations be added to the details on Sheets C2 & C3 to clarify transitions, toe elevations, top of dike elevations, etc.?*

Response: Sheet C1 has been revised to clarify foundation soil/top of liner elevations along the permanent dikes (see attached).

Question: *Is vegetation establishment/erosion mat required on the back side of the temporary dike between the temporary dike and existing ground?*

Response: Yes. In accordance with Section 3.3 of Specification Section 01100 – Erosion control fabric shall be installed following completion of final grading activities in the following disturbed earth areas unless otherwise approved by the ENGINEER:

1. All exterior slopes 4(H) to I(V) and steeper; and

2. All drainage channels and swales.

Question: *The Erosion Control Fabric spec (item 2.2 A. on page 1100-2) calls for North American Green S150 or approved equal. Which is what I think they would want. However, the additional specifications include some items that are not met by NAGS150. Can you clarify that North American Green S150, or a true equivalent, is acceptable?*

Response: North American Green S150 (or equivalent) is acceptable for erosion control fabric.

Question: *I never received a response back from the engineer regarding the size and style of silt fence that I inquired about at the pre-bid. If I could please get clarification on the size 18", 24", or 30"? As well as whether it is reinforced? I would greatly appreciate it.*

Response: Silt fencing is described in Section 01100 of the specifications. Since filter fabric is to be installed in a minimum 6 inch deep trench along the upstream side of the fence, the minimum silt fence size is 24 inches.

Question: *I understand Luminant wants the contractor to furnish the testing verification for this project. They did not say whether you or the testing firm will be responsible for filling out and submitting the paperwork to the state. Is either Luminant or their engineering consultant going to certify the paperwork to the State of Texas?*

Response: Luminant will be responsible for all communications and submittals to the TCEQ.

31

303

Contract No. A1893710

Question: *Will the testing firm be responsible for any surveying or locating where the samples were obtained or the tests were performed? On several projects of this kind, Luminent has required the contractor provide state coordinates and elevations for all sampling and testing performed.*

Response: Sample and test locations will be field measured and referenced to a surveyed 100 ft X 100 ft grid system (grid surveyed by CONTRACTOR) across the construction area.

Question: *In the specifications the select fill is required to be placed in 8" maximum loose lifts and compacted to 6" maximum compacted lifts. At 90% of a standard proctor, an 8" loose lift will be hard to achieve without compacting at 95% of a standard proctor. Will Luminent accept more than a 6" compacted lift as long as it is compacted to at least 90% of the standard proctor? If not, it may require a compaction closer to 95% of the proctor or reducing the thickness of the loose lift. The same question goes for the flexible material.*

Response: Select fill is to be placed in 8" maximum loose lifts and compacted to 6" maximum compacted lifts. The resulting density must be greater than 90% standard proctor. Standard proctor results greater than 90% are acceptable.

Question: *The protective soil layer has a requirement for the C value and Fe value obtained from the direct shear. The specifications say this layer is not to be compacted. It is our opinion these values may not be able to be obtained from non-compacted soil. Would Luminant or the consultant respond. We may need a compacted amount to achieve the desired results. This may be something they want the testing firm to remold in the lab and not the field.*

Response: Protective soil shall be placed in one 18 inch lift without damaging the underlying liner or other materials. Testing on soil to be used for protective soil shall be performed in the lab on a remolded sample compacted to a minimum of 90% standard proctor for comparison to the specification requirements.

Question: *We use the normal Unified Classification Chart to classify materials. This is very similar to the one in the ASTM book the specifications refer. In other words, we normally would classify a (CL) material as a silty clay or sandy clay. We would not normally use words like "lean" or "fat", etc. Is this acceptable to Luminent or do we need to go strictly by the proposed specification? This is not a big problem, but it will required some extra testing not listed in the specifications, especially for the base material.*

Response: Soils shall be classified in accordance with ASTM D2487. CONTRACTOR shall perform all testing required for classification under this standard.

32

Contract No. A1893710

Question: *In section 2400 of the Project Specifications, it states that the frequency of material laboratory conformance testing is to be 1 test per roll of Gundseal material. On a project of this size, this will be a very expensive cost to added into the project. Also, this is in addition to manufacturing quality control testing. On similar projects of this scope, material frequency is usually around 1 test per 100,000 Square Feet of material. Is there any way this section of the specification could be amended to a smaller, less expensive frequency?*

Response: Specification Section 2400 shall be revised as follows:

The testing requirements of Section 2400 3.3.B shall be performed by the MANUFACTURER prior to shipment of the GSGCL to the site. Specification 2400 Section 3.3.B shall be revised to read as follows:

B.    CQA Testing.

1.    The following laboratory CQA tests shall be conducted on GSGCL samples by the MANUFACTURER:

| Property | ASTM Method | Unit | Test Frequency |
|---|---|---|---|
| Bentonite Loading | D5993 | lb/ft$^2$ | 1 per 40,000 ft$^2$ of GSGCL area |
| Bentonite Moisture Content | D2216 | % | 1 per 40,000 ft$^2$ of GSGCL area |
| Geomembrane Thickness | D5199 | mil | 1 per roll of geomembrane liner used to produce the GSGCL |
| Hydraulic Conductivity | D5887/E96 | cm/sec | 2 per Project |

2.    Reported values shall be the average of 5 specimens taken from the sample.

The specifications also require testing of the GSGCL by the INSTALLER. As specified in Section 2400 3.2.G.2.b (Page 2400-8), the INSTALLER shall verify that the deployed GSGCL has a typical moisture content value of 25% during installation and soil covering activities. This shall be accomplished as follows:

1)    Bentonite moisture content testing shall be conducted by the INSTALLER at a frequency of 1 sample per 100,000 ft$^2$ of GSGCL to be placed.

2)    Several days prior to scheduled deployment of each 100,000 ft$^2$ portion of GSGCL, select one GSGCL roll to serve as the representative test roll. Unwrap the roll of GSGCL selected

33

for testing and cut out a minimum of 5 specimens of the GSGCL. Note: INSTALLER shall immediately rewrap the GSGCL after the test specimens have been collected to prevent exposure and premature hydration of the GSGCL roll.

3) Send the specimens to a geotechnical laboratory for moisture content analysis using ASTM Method D2216. The reported moisture content value shall be the average of the moisture contents of the 5 specimens. Note that the GSGCL cannot be deployed until the test results have been obtained from the laboratory and verified by the OWNER or ENGINEER.

Once OWNER or ENGINEER has verified that the GSGCL has a typical moisture content value of 25%, the GSGCL can be deployed.

One additional specification change associated with the GSGCL – Section 2400 3.2.D.7 (Page 2400-7) states that supplemental bentonite shall be applied at all seams. This requirement is deleted. No supplemental granular bentonite is required for the GSGCL seams.

Question: The only other question I have: is there a need for full time CQA during foundation soil grading. The specifications only require that you place it in 12 inch lifts and compact it, but there is no testing requirements. So is a CQA tech need to verify that the material is placed correctly??

Response: Per Section 2300 3.3.B - Foundation soil in fill areas shall be placed and compacted in lifts, with a maximum loose lift thickness of 12 inches. Each fill lift shall be compacted using a minimum of four passes of the compactor. A pass is defined as one trip across the lift surface. There is no target maximum density requirement for fill applications of foundation soil.

The CONTRACTOR is responsible for completing all work to the satisfaction of the OWNER and ENGINEER in accordance with the plans and specifications. CONTRACTOR shall determine the resources necessary to achieve this objective and include all costs in the applicable bid items.

Question: Can you clarify how the components of the temporary dikes will be paid for? It appears that the quantities for the Select Fill, GSGCL, and Protective Soil for the temporary dikes are included in Bid Items D1, H3 and I respectively. However, the description of work for the temporary dikes (H5) mentions these items are to be included in the Linear Foot price.

Response: As described for Item H5 - This item shall be full compensation for all work involved in constructing the temporary dikes and future GSGCL tie-ins, including soil placement and compaction, GSGCL installation and, testing and incidentals; and any other activities necessary to complete the Work. Payment for this item will be on a unit per liner foot basis of temporary dike and future GSGCL tie-in. Final pay quantities for bid items for Select Fill, GSGCL and Protective Soil will not include the portion of these materials included in the temporary dikes and future GSGCL tie-ins.

34

RANGER 000077

Contract No. A1893710

Also, CONTRACTORS are reminded that quantities provided by OWNER on the Bid Form spreadsheets are estimates based on existing information and actual quantities may be significantly more or less than the estimated quantity shown on the spreadsheet. Actual quantities will be determined by OWNER through comparison of pre-construction and post-construction topographic surveys and field measurements by OWNER's representative. CONTRACTOR is responsible for performing pre-construction and post-construction topographic surveys.

## BID FORM MODIFICATIONS

Several of the Contractor Questions made us realize that some of the quantities listed on the Bid Form Spreadsheets overlapped and were not representative estimates. As a result, we have updated the Bid Form Spreadsheets to include revised estimated quantities for several items.

In addition, we realized that we had neglected to include an item on the Haul Road Bid Form to compensate the CONTRACTOR for stockpiling excess soil excavated during haul road construction. The Haul Road bid form has been revised to include a new item (Item N6) that is described as follows:

*[N6] Stockpiling of Excess Roadway Excavation Soil. OWNER anticipates that excess soil will be excavated under Item N1 to achieve the lines, grades and elevations for the Haul Road at the Site. The excess soil will be stockpiled in the area designated on the drawings and as required by OWNER. Payment for this item will be on a unit price per cubic yard of soil stockpiled as measured by topographic survey after all other filling activities have been completed to the satisfaction of the OWNER.*

35

APPLICATION FOR PAYMENT

**Date:** August 31, 2013

**Project:** Luminant Sandow AX Landfill Cell 1  CONTRACT #: A1893710

**Contractor:** Ranger Excavating, LP
5222 Thunder Creek Rd Suite B1
Austin, Texas 78759

**Owner:** Luminant
Lincoln Plaza 500 N. Akard
Dallas, TX 75201

| | | | |
|---|---|---|---|
| **Monthly Estimate No.:** | #10 - RETAINAGE | **Estimate Period:** | 8/1/2013-8/31/2013 |
| **Contract Amount:** | $3,345,300.00 | **Contract Date:** | 12/1/2012 |
| **Plus Approved Change Orders:** | $99,496.20 | **Start Date:** | TBD |
| **Total Contract Amount:** | $3,444,796.20 | **Contract Time:** | 275 Days |
| **Amount Placed-To-Date:** | $3,409,555.80 | **Plus Approved Time Extensions:** | 0 Days |
| **Material on Hand but Not In-Place:** | $0.00 | **Total Contract Time:** | 275 Days |
| **Total:** | $3,409,555.80 | **Original Substantial Completion Date:** | 9/2/2013 |
| **Less 10% Retainage** | $0.00 | **Original Final Completion Date:** | 9/2/2013 |
| **Balance:** | $3,409,555.80 | **Revised Final Completion Date:** | 9/2/2013 |
| **Less Amounts on Previous Estimates:** | $3,197,950.22 | **Days to Date:** | 0 Days |
| | | **Percent Time Used:** | 0.0% |
| **TOTAL AMOUNT DUE THIS ESTIMATE:** | **$211,605.58** | **Percent Complete:** | 98.98% |

**SUBMITTED BY:**

Ranger Excavating LP

9/10/2013

Nathan Ziehr                        Date
Project Manager

**RECOMMENDED FOR APPROVAL:**

Pastor, Behling & Wheeler, LLC

Patrick J. Behling, P.E.            Date
Project Manager & Engineer

**APPROVED:**

Luminant

Jacob Gonzales                      Date
Contract Coordinator

Luminant

Mark Jenkins
Contract Adminstrator



EXHIBIT 5
WIT: Sandow
DATE: 10-17-16
AMY M. CLARK, CSR

RANGER 000001

**CONTINUATION SHEET**

AIA DOCUMENT G703    ge 1 of 2

NUATION t Ranger Excavating, L P
OCUMENT G703 AMENDED
CATION AND CERTIFICATION FOR PAYMENT

Job Name: **Luminant Sandow AX Landfill Cell 1**

APPLICAT-ON NO.    #10 - RETA
APPLICATION DATE    8/
PERIOD TO    8/1/2013-8/:

RANGER 000002

| ITEM NO. | DESCRIPTION OF WORK | QTY & UNIT UNIT | QTY & UNIT QUANTITY | UNIT PRICE | SCHEDULED VALUE | WORK COMPLETED PREVIOUS QTY | WORK COMPLETED QTY THIS PERIOD | WORK COMPLETED TOTAL THIS PERIOD | % THIS PERIOD | TOTAL COMPLETED TO DATE | % TO DATE | BALA REMA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | Mobilization | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ 120,000.00 | $ 120,000.00 | 1.00 | - | $ - | 0% | $ 120,000.00 | 100% | |
| B | Site Preparation | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ 50,000.00 | $ 50,000.00 | 1.00 | - | $ - | 0% | $ 50,000.00 | 100% | |
| C1 | Foundation Soil Excavation | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 430,000 | $ 1.75 | $ 752,500.00 | 444,674.00 | - | $ - | 0% | $ 778,179.50 | 103% | |
| C2 | Foundation Soil Grading | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 185,000 | $ 0.75 | $ 138,750.00 | 171,213.00 | - | $ - | 0% | $ 128,409.78 | 93% | |
| C3 | Stockpiling of Excess Foundation Soil | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 60,000 | $ 0.85 | $ 51,000.00 | 68,227.00 | - | $ - | 0% | $ 57,992.95 | 114% | |
| | Perimeter Dike Construction | | | | | | | | | | | |
| D1 | Earthwork and Grading | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 70,000 | $ 1.00 | $ 70,000.00 | 57,108.00 | - | $ - | 0% | $ 57,108.00 | 82% | |
| D2 | Roadbase Placement | | | | | | | | | | | |
| | Material | SY | 8,000 | $ 2.00 | $ 16,000.00 | 8,411.00 | - | | | | | |
| | Labor & Equipment | SY | 8,000 | $ 7.25 | $ 58,000.00 | 8,411.00 | - | | | | | |
| | TOTAL | | | $ 9.25 | $ 74,000.00 | | | $ - | 0% | $ 77,801.75 | 105% | |
| E | Vegetative Soil Placement Vegetative Soil Placement | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 10,000 | $ 3.00 | $ 30,000.00 | 28,895.00 | - | $ - | 0% | $ 86,985.00 | 287% | |
| | Vegetation Establishment | | | | | | | | | | | |
| F1 | Vegetation – Flat Surfaces and Slopes Less Than 4:1 | | | | | | | | | | | |
| | Material | AC | 5 | $ 758.00 | $ 3,790.00 | | | | | | | |
| | Labor & Equipment | AC | 5 | $ 1,742.00 | $ 8,710.00 | | | | | | | |
| | TOTAL | | | $ 2,500.00 | $ 12,500.00 | | | $ - | 0% | $ - | 0% | |
| F2 | Vegetation – Slopes Greater Than or Equal to 4:1 | | | | | | | | | | | |
| | Material | AC | 5 | $ 2,800.00 | $ 14,000.00 | | | | | | | |
| | Labor & Equipment | AC | 5 | $ 4,700.00 | $ 23,500.00 | | | | | | | |
| | TOTAL | | | $ 7,500.00 | $ 37,500.00 | | | $ - | 0% | $ - | 0% | |
| | Access Ramp Construction | | | | | | | | | | | |
| G1 | Earthwork and Grading | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 25,000 | $ 0.90 | $ 22,500.00 | 25,000.00 | - | $ - | 0% | $ 22,500.00 | 100% | |
| G2 | Roadbase Placement | | | | | | | | | | | |
| | Material | SY | 3,000 | $ 2.00 | $ 6,000.00 | 2,975.00 | | | | | | |
| | Labor & Equipment | SY | 3,000 | $ 7.25 | $ 21,750.00 | 2,975.00 | | | | | | |
| | TOTAL | | | $ 9.25 | $ 27,750.00 | | | $ - | 0% | $ 27,518.75 | 99% | |
| G3 | Culvert Capping | | | | | | | | | | | |
| | Material | LS | 1 | $ 10,000.00 | $ 10,000.00 | 1.00 | - | | | | | |
| | Labor & Equipment | LS | 1 | $ 15,000.00 | $ 15,000.00 | 1.00 | - | | | | | |
| | TOTAL | | | $ 25,000.00 | $ 25,000.00 | | | $ - | 0% | $ 25,000.00 | 100% | |
| | Liner System | | | | | | | | | | | |
| H1 | Liner Subgrade | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 120,000 | $ 2.10 | $ 252,000.00 | 120,921.00 | - | $ - | 0% | $ 253,834.10 | 101% | |
| H2 | GEOCL - Flat Surfaces and Slopes Less Than 4:1 | | | | | | | | | | | |
| | Material | SF | 1,500,000 | $ 0.75 | $ 1,125,000.00 | 1,422,813.00 | - | | | | | |
| | Labor & Equipment | SF | 1,500,000 | $ 0.05 | $ 75,000.00 | 1,422,813.00 | - | | | | | |
| | TOTAL | | | $ 0.80 | $ 1,200,000.00 | | | $ - | 0% | $ 1,138,090.40 | 95% | |
| H3 | GEOCL - Slopes Greater Than or Equal to 4:1 | | | | | | | | | | | |
| | Material | SF | 70,000 | $ 0.95 | $ 66,500.00 | 71,545.00 | - | | | | | |
| | Labor & Equipment | SF | 70,000 | $ 0.05 | $ 3,500.00 | 71,545.00 | - | | | | | |
| | TOTAL | | | $ 1.00 | $ 70,000.00 | | | $ - | 0% | $ 71,545.00 | 102% | |
| H4 | Anchor Trench Excavation and Backfill | | | | | | | | | | | |

309

# CONTINUATION SHEET

AIA DOCUMENT G703    e 2 of 2

UATION & Ranger Excavating, L P
CUMENT G703 AMENDED
ATION AND CERTIFICATION FOR PAYMENT          Job Name.  Luminant Sendow AX Landfill Call 1

| APPLICATION NO | #10 - RETAI |
| APPLICATION DATE | 8/31 |
| PERIOD TO | 8/1/2013 8/31 |

| A | C | D | | E | F | G | | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EM IO | DESCRIPTION OF WORK | QTY & UNIT | | UNIT PRICE | SCHEDULED VALUE | PREVIOUS QTY | WORK COMPLETED QTY THIS PER OD | TOTAL THIS PERIOD | % THIS PERIOD | TOTAL COMPLETED TO DATE | % TO DATE | BALAN REMAIN |
| | | UNIT | QUANTITY | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | LF | 2,200 | $ 3.00 | $ 6,600.00 | 2,694.00 | - | $ - | 0% | $ 8,082.00 | 122% | |
| 5 | Temporary Dike and Future GBGCL Tie-in | | | | | | | | | | | |
| | Material | LF | 3,400 | $ 30.00 | $ 102,000.00 | 3,035.00 | | | | | | |
| | Labor & Equipment | LF | 3,400 | $ 18.00 | $ 61,200.00 | 3,035.00 | | | | | | |
| | TOTAL | | | $ 48.00 | $ 163,200.00 | | | $ - | 0% | $ 145,680.00 | 89% | |
| I | Protective Soil Placement | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 80,000 | $ 2.40 | $ 192,000.00 | 88,426.00 | - | $ - | 0% | $ 212,222.40 | 111% | |
| J | Demobilization and Site Decommissioning | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ 5,000.00 | $ 5,000.00 | 1.00 | - | $ - | 0% | $ 5,000.00 | 100% | |
| K | Payment and Performance Bond | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ 45,000.00 | $ 45,000.00 | 1.00 | - | $ - | 0% | $ 45,000.00 | 100% | |
| | CO#001 - T&M - Demuching of Unsuitable Material | LS | 1 | $ 9,005.00 | $ 9,005.00 | 1.00 | - | $ - | 0% | $ 9,005.00 | 100% | |
| | CO#002 - Clay Borrow | LS | 1 | $ 90,491.20 | $ 90,491.20 | 1.00 | - | $ - | 3% | $ 90,491.20 | 100% | |
| | | | | TOTAL | $3,444,798.20 | | | | 0% | $3,409,955.80 | 98.98% | $50,0 |

RANGER 000003

APPLICATION FOR PAYMENT

OCT 2 3 2013

| | | | |
|---|---|---|---|
| **Date:** | August 31, 2013 | | |
| **Project:** | Luminant Sandow AX Haul Road | CONTRACT #: A1893758 | |
| **Contractor:** | Ranger Excavating, LP 5222 Thunder Creek Rd Suite B1 Austin, Texas 78759 | **Owner:** | Luminant Lincoln Plaza 500 N. Akard Dallas, TX 75201 |

| | | | | |
|---|---|---|---|---|
| **Monthly Estimate No.:** | #7 - RETAINAGE | **Estimate Period:** | | 8/1/2013-8/31/2013 |
| **Contract Amount:** | $858,050.00 | **Contract Date:** | | 12/1/2012 |
| **Plus Approved Change Orders:** | $11,882.50 | **Start Date:** | | TBD |
| **Total Contract Amount:** | $869,932.50 | **Contract Time:** | 275 | Days |
| **Amount Placed-To-Date:** | $809,930.05 | **Plus Approved Time Extensions:** | 0 | Days |
| **Material on Hand but Not In-Place:** | $0.00 | **Total Contract Time:** | 275 | Days |
| **Total:** | $809,930.05 | **Original Substantial Completion Date:** | | 9/2/2013 |
| **Less 10% Retainage** | $0.00 | **Original Final Completion Date:** | | 9/2/2013 |
| **Balance:** | $809,930.05 | **Revised Final Completion Date:** | | 9/2/2013 |
| **Less Amounts on Previous Estimates:** | $728,937.05 | **Days to Date:** | 0 Days | |
| | | **Percent Time Used:** | | 0.0% |
| **TOTAL AMOUNT DUE THIS ESTIMATE:** | $80,993.00 | **Percent Complete:** | | 93.10% |

**SUBMITTED BY:**

Ranger Excavating LP

9/10/2013

Nathan Ziehr          Date
Project Manager

**RECOMMENDED FOR APPROVAL:**

Pastor, Behling & Wheeler, LLC

Patrick J. Behling, P.E.          Date
Project Manager & Engineer

**APPROVED:**

Luminant

Jacob Gonzales          Date
Contract Coordinator

Luminant

Mark Jenkins          Date
Contract Adminstrator

EXHIBIT 6
WIT: Sandow
DATE: 10-17-16
AMY M. CLARK, CSR

RANGER 000004

CONTINUATION SHEET

ATION Ranger Excavating, L.P
CUMENT G703 AMENDED
ATION AND CERTIFICATION FOR PAYMENT          Job Name: Luminant Sandow AX Haul Road



APPLICATION NO        #7 RET
APPLICATION DATE        &
PERIOD TO        8/1/2013-8

RANGER 000005

| A | C | D | | | E | F | G | | | H | I | J | K | BAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ITEM NO | DESCRIPTION OF WORK | QTY & UNIT | | | UNIT PRICE | SCHEDULED VALUE | WORK COMPLETED | | | TOTAL THIS PERIOD | % THIS PERIOD | TOTAL COMPLETED TO DATE | % TO DATE | BAL REM |
| | | UNIT | QUANTITY | | | | PREVIOUS QTY | QTY THIS PERIOD | | | | | | |
| L | Mobilization | | | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ | 15,000.00 | $ 15,000.00 | 1.00 | | | $    - | 0% | $ 15,000.00 | 100% | |
| M | Site Preparation | | | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ | 12,000.00 | $ 12,000.00 | 1.00 | | | $    - | 0% | $ 12,000.00 | 100% | |
| | Haul Road Improvements | | | | | | | | | | | | | |
| N1 | Excavation | | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 105,000 | $ | 1.50 | $ 157,500.00 | 90,935.00 | - | | $    - | 0% | $ 136,404.00 | 87% | |
| N2 | Compacted Subgrade | | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 5,000 | $ | 1.75 | $ 8,750.00 | 588.00 | - | | $    - | 0% | $ 1,029.00 | 12% | |
| N3 | Lime for Stabilization | | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | TON | 800 | $ | 142.50 | $ 114,000.00 | 788.00 | - | | $    - | 0% | $ 112,290.00 | 99% | |
| N4 | Stabilized Base | | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 11,000 | $ | 5.00 | $ 55,000.00 | 10,375.00 | - | | $    - | 0% | $ 51,875.00 | 94% | |
| N5 | Roadbase Placement | | | | | | | | | | | | | |
| | Material | SY | 23,000 | $ | 4.60 | $ 105,800.00 | 21,775.00 | - | | | | | | |
| | Labor & Equipment | SY | 23,000 | $ | 11.90 | $ 273,700.00 | 21,775.00 | - | | | | | | |
| | TOTAL | | | $ | 16.50 | $ 379,500.00 | | | | $    - | 0% | $ 359,287.50 | 95% | |
| N6 | Stockpiling of Excess from Haul Road | | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 78,000 | $ | 0.85 | $ 66,300.00 | 74,973.00 | - | | $    - | 0% | $ 63,727.05 | 96% | |
| O | Vegetative Soil Placement | | | | | | | | | | | | | |
| | Vegetative Soil Placement | | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 5,000 | $ | 3.00 | $ 15,000.00 | 5,895.00 | - | | $    - | 0% | $ 17,685.00 | 118% | |
| P1 | Vegetation Establishment | | | | | | | | | | | | | |
| | Vegetation – Flat Surfaces and Slopes Less Than 4:1 | | | | | | | | | | | | | |
| | Material | AC | 3 | $ | 758.00 | $ 2,274.00 | | | | | | | | |
| | Labor & Equipment | AC | 3 | $ | 1,742.00 | $ 5,226.00 | | | | | | | | |
| | TOTAL | | | $ | 2,500.00 | $ 7,500.00 | | | | $    - | 0% | $    - | 0% | |
| P2 | Vegetation – Slopes Greater Than or Equal to 4:1 | | | | | | | | | | | | | |
| | Material | AC | 1 | $ | 2,800.00 | $ 2,800.00 | | | | | | | | |
| | Labor & Equipment | AC | 1 | $ | 4,700.00 | $ 4,700.00 | | | | | | | | |
| | TOTAL | | | $ | 7,500.00 | $ 7,500.00 | | | | $    - | 0% | $    - | 0% | |
| Q | Demobilization and Site Decommissioning | | | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ | 5,000.00 | $ 5,000.00 | 1.00 | - | | $    - | 0% | $ 5,000.00 | 100% | |
| R | Payment and Performance Bond | | | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ | 15,000.00 | $ 15,000.00 | 1.00 | | | $    - | 0% | $ 15,000.00 | 100% | |
| | CO#001 - T&M - Bottom Ash Removal from Haul Road | LS | 1 | $ | 11,882.50 | $ 11,882.50 | 1.00 | - | | $    - | 0% | $ 11,882.50 | 100% | |
| | | | | | TOTAL | $869,932.50 | | | | | 0% | $801,180.05 | 92.10% | $1 |

AIA DOCUMENT G703   CONTINUATION SHEET FOR G702   1992 EDITION   AIA ©1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE  N W WASHINGTON, D C  20006-5292

Exhibit - LSAX HaulRoad - 007 - RETAINAGE - 08August - Payment Application - G703-1992

## Nathan Ziehr

| | |
|---|---|
| om: | Gonzales, Jacob <Jacob.Gonzales@luminant.com> |
| Sent: | Wednesday, March 26, 2014 12:54 PM |
| To: | Nathan Ziehr |
| Subject: | RE: Vegetation Work |

Thanks Nathan.

Jake

**From:** Nathan Ziehr [mailto:nathan.ziehr@rangerexcavating.com]
**Sent:** Wednesday, March 26, 2014 12:53 PM
**To:** Gonzales, Jacob; pat.behling@pbwllc.com
**Subject:** Vegetation Work

I have now coordinated with everyone involved. Gary's marching orders are to get the slope brushed off with a dozer (which we expect will take week) and then BMP, our seeding sub, will deploy seed and matting (which we expect will take another week).

Gary is going to try to get machines there sometime next week.  BMP is set up for the following week to start.

apologize for all the delay with this work item and how long it has taken us to get to this point, but I fully intend to take this project to its ultimate completion.
If you have any questions do not hesitate to ask.  Thanks for all your consideration and help this far.

*Nathan Ziehr*
Project Manager | RANGER Excavating, LP
(512) 331-5551

Confidentiality Notice: This email message, including any attachments, contains or may contain confidential information intended only for the addressee. If you are not an intended recipient of this message, be advised that any reading, dissemination, forwarding, printing, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by reply message and delete this email message and any attachments from your system.



EXHIBIT 23
WIT: Sandow
DATE: 10-17-16
AMY M. CLARK, CSR

1

## APPLICATION FOR PAYMENT

**Date:** July 31, 2014

**Project:** Luminant Sandow AX Landfill Cell 1  CONTRACT #: A1893 710

**Contractor:** Ranger Excavating, LP
5222 Thunder Creek Rd Suite B1
Austin, Texas 78759

**Owner:** Luminant
Lincoln Plaza 500 N. Akard
Dallas, TX 75201

| | | | |
|---|---|---|---|
| **Monthly Estimate No.:** | #11 | **Estimate Period:** | 9/1/2013-7/31/2014 |
| **Contract Amount:** | $3,345,300.00 | **Contract Date:** | 12/1/2012 |
| **Plus Approved Change Orders:** | $99,496.20 | **Start Date:** | TBD |
| **Total Contract Amount:** | $3,444,796.20 | **Contract Time:** | 275 Days |
| **Amount Placed-To-Date:** | $3,451,355.80 | **Plus Approved Time Extensions:** | 0 Days |
| **Material on Hand but Not In-Place:** | $0.00 | **Total Contract Time:** | 275 Days |
| **Total:** | $3,451,355.80 | **Original Substantial Completion Date:** | 9/2/2013 |
| **Less 10% Retainage** | $0.00 | **Original Final Completion Date:** | 9/2/2013 |
| **Balance:** | $3,451,355.80 | **Revised Final Completion Date:** | 9/2/2013 |
| **Less Amounts on Previous Estimates:** | $3,409,555.80 | **Days to Date:** | 0 Days |
| | | **Percent Time Used:** | 0.0% |
| **TOTAL AMOUNT DUE THIS ESTIMATE:** | $41,800.00 | **Percent Complete:** | 100.00% |

**SUBMITTED BY:**

Ranger Excavating LP

_____  7/17/2014
Nathan Ziehr                    Date
Project Manager

**RECOMMENDED FOR APPROVAL:**

Pastor, Behling & Wheeler, LLC

_____  07/17/14
Patrick J. Behling, P.E.        Date
Project Manager & Engineer

**APPROVED:**

Luminant

_____  Date
Jacob Gonzales
Contract Coordinator

Luminant

_____  Date
Mark Jenkins
Contract Administrator



EXHIBIT 38
WIT: Sandow
DATE: 10·17·16
AMY M. CLARK, CSR

RANGER 000009        314

# CONTINUATION SHEET

AIA DOCUMENT G703    Page 1 ... ..

CONTINUATION : Ranger Excavating, L.P.
AIA DOCUMENT G703 AMENDED
APPLICATION AND CERTIFICATION FOR PAYMENT

Job Name:  Luminant Sandow AX Landfill Cell 1



APPLICATION NO    : 11
APPLICATION DATE    : 3.3 .2015
PERIOD TO:    01 2015/31.01.2015

| A | C | D | | E | F | G | | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ITEM NO | DESCRIPTION OF WORK | QTY & UNIT | | UNIT PRICE | SCHEDULED VALUE | WORK COMPLETED | | | % THIS PERIOD | TOTAL COMPLETED TO DATE | % TO DATE | BALANCE REMAINING |
| | | UNIT | QUANTITY | | | PREVIOUS QTY | QTY THIS PERIOD | TOTAL THIS PERIOD | | | | |
| A | Mobilization | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ 120,000.00 | $ 120,000.00 | 1.00 | - | $ - | 0% | $ 120,000.00 | 100% | $0 |
| B | Site Preparation | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ 50,000.00 | $ 50,000.00 | 1.00 | - | $ - | 0% | $ 50,000.00 | 100% | $0 |
| | Foundation Soil | | | | | | | | | | | |
| C1 | Excavation | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 430,000 | $ 1.75 | 752,500.00 | 444,674.00 | - | $ - | 0% | $ 778,179.50 | 103% | $0 |
| C2 | Foundation Soil Grading | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 185,000 | $ 0.75 | 138,750.00 | 171,213.00 | - | $ - | 0% | $ 128,409.75 | 93% | $0 |
| C3 | Stockpiling of Excess Foundation Soil | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 60,000 | $ 0.85 | 51,000.00 | 88,227.00 | - | $ - | 0% | $ 57,992.95 | 114% | $0 |
| | Perimeter Dike Construction | | | | | | | | | | | |
| D1 | Earthwork and Grading | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 70,000 | $ 1.00 | 70,000.00 | 57,108.00 | - | $ - | 0% | $ 57,108.00 | 82% | $0 |
| D2 | Roadbase Placement | | | | | | | | | | | |
| | Material | SY | 8,000 | $ 2.00 | 16,000.00 | 8,411.00 | - | | | | | |
| | Labor & Equipment | SY | 8,000 | $ 7.25 | 58,000.00 | 8,411.00 | - | | | | | |
| | TOTAL | | | $ 9.25 | $ 74,000.00 | | | $ - | 0% | $ 77,801.75 | 106% | $0 |
| | Vegetative Soil Placement | | | | | | | | | | | |
| E | Vegetative Soil Placement | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 10,000 | $ 3.00 | 30,000.00 | 28,695.00 | - | $ - | 0% | $ 85,185.00 | 287% | $0 |
| | Vegetation Establishment | | | | | | | | | | | |
| F1 | Vegetation – Flat Surfaces and Slopes Less Than 4:1 | | | | | | | | | | | |
| | Material | AC | 5 | $ 758.00 | 3,790.00 | 16.00 | | | | | | |
| | Labor & Equipment | AC | 5 | $ 1,742.00 | 8,710.00 | 16.00 | | | | | | |
| | TOTAL | | | $ 2,500.00 | 12,500.00 | | | $ (12,500.00) | -100% | $ (12,500.00) | -100% | $0 |
| F2 | Vegetation – Slopes Greater Than or Equal to 4:1 | | | | | | | | | | | |
| | Material | AC | 5 | $ 2,800.00 | 14,000.00 | 7.24 | | | | | | |
| | Labor & Equipment | AC | 5 | $ 4,700.00 | 23,500.00 | 7.24 | | | | | | |
| | TOTAL | | | $ 7,500.00 | 37,500.00 | | | $ 54,300.00 | 145% | $ 54,300.00 | 145% | $0 |
| | Access Ramp Construction | | | | | | | | | | | |
| G1 | Earthwork and Grading | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 25,000 | $ 0.90 | 22,500.00 | 25,000.00 | - | $ - | 0% | $ 22,500.00 | 100% | $0 |
| G2 | Roadbase Placement | | | | | | | | | | | |
| | Material | SY | 3,000 | $ 2.00 | 6,000.00 | 2,975.00 | - | | | | | |
| | Labor & Equipment | SY | 3,000 | $ 7.25 | 21,750.00 | 2,975.00 | - | | | | | |
| | TOTAL | | | $ 9.25 | 27,750.00 | | | $ - | 0% | $ 27,518.75 | 99% | $0 |
| G3 | Culvert Crossing | | | | | | | | | | | |
| | Material | LS | 1 | $ 10,000.00 | 10,000.00 | 1.00 | - | | | | | |
| | Labor & Equipment | LS | 1 | $ 15,000.00 | 15,000.00 | 1.00 | - | | | | | |
| | TOTAL | | | $ 25,000.00 | 25,000.00 | | | $ - | 0% | $ 25,000.00 | 100% | $0 |
| | Liner System | | | | | | | | | | | |
| H1 | Liner Subgrade | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 120,000 | $ 2.10 | 252,000.00 | 170,921.00 | - | $ - | 0% | $ 263,834.10 | 101% | $0 |
| H2 | GBGCL - Flat Surfaces and Slopes Less Than 4:1 | | | | | | | | | | | |
| | Material | SF | 1,500,000 | $ 0.75 | 1,125,000.00 | 1,422,613.00 | - | | | | | |
| | Labor & Equipment | SF | 1,500,000 | $ 0.05 | 75,000.00 | 1,422,613.00 | - | | | | | |
| | TOTAL | | | $ 0.80 | 1,200,000.00 | | | $ - | 0% | $ 1,138,083.40 | 95% | $0 |
| H3 | GBGCL - Slopes Greater Than or Equal to 4:1 | | | | | | | | | | | |
| | Material | SF | 70,000 | $ 0.85 | 60,500.00 | 71,545.00 | - | | | | | |
| | Labor & Equipment | SF | 70,000 | $ 0.05 | 3,500.00 | 71,645.00 | - | | | | | |
| | TOTAL | | | $ 1.00 | 70,000.00 | | | $ - | 0% | $ 71,545.00 | 102% | $0 |
| H4 | Anchor Trench Excavation and Backfill | | | | | | | | | | | |

RANGER 000010

AIA DOCUMENT G703  CONTINUATION SHEET FOR 3702  1992 EDITION  AIA  ©1995
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292

Exhibit - LSAX Cell1 - 011 - 07July - Payment ApplicationG703-1992

## CONTINUATION SHEET

AIA DOCUMENT G703    Page 2 of 2

CONTINUATION : Ranger Excavating, L.P
AIA DOCUMENT G703 AMENDED
APPLICATION AND CERTIFICATION FOR PAYMENT

Job Name:  Luminant Sandow AX Landfill Cell 1

APPLICATION NO.    #11
APPLICATION DATE
PERIOD TO

| A | C | D | | E | F | G | | | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | QTY & UNIT | | UNIT PRICE | SCHEDULED VALUE | WORK COMPLETED | | | | % THIS PERIOD | TOTAL COMPLETED TO DATE | % TO DATE | BALANCE REMAINING |
| | | UNIT | QUANTITY | | | PREVIOUS QTY | QTY THIS PERIOD | TOTAL THIS PERIOD | | | | | |
| | TOTAL (Labor & Equipment Only) | LF | 2,200 | $ 3.00 | $ 6,600.00 | 2,694.00 | | $ - | | 0% | $ 8,082.00 | 122% | $0 |
| H | Temporary Dike and Future GSCL Toe-a | | | | | | | | | | | | |
| | Material | LF | 3,400 | $ 30.00 | $ 102,000.00 | 3,035.00 | | | | | | | |
| | Labor & Equipment | LF | 3,400 | $ 18.00 | $ 61,200.00 | 3,035.00 | | | | | | | |
| | TOTAL | | | $ 48.00 | $ 163,200.00 | | | $ - | | 0% | $ 145,680.00 | 89% | $0 |
| | Protective Soil Placement | | | | | | | | | | | | |
| I | Protective Soil Placement | CY | 80,000 | $ 2.40 | $ 192,000.00 | 88,426.00 | | $ - | | 0% | $ 212,222.40 | 111% | $0 |
| | TOTAL (Labor & Equipment Only) | | | | | | | | | | | | |
| J | Demobilization and Site Decommissioning | LS | 1 | $ 5,000.00 | $ 5,000.00 | 1.00 | | $ - | | 0% | $ 5,000.00 | 100% | $0 |
| | TOTAL | | | | | | | | | | | | |
| K | Payment and Performance Bond | LS | - | $ 45,000.00 | $ 45,000.00 | 1.00 | | $ - | | 0% | $ 45,000.00 | 100% | $0 |
| | TOTAL | | | | | | | | | | | | |
| | CO#001 - T&M - Demucking of Unsuitable Material | LS | 1 | $ 9,005.00 | $ 9,005.00 | 1.00 | | $ - | | 0% | $ 9,005.00 | 100% | $0 |
| | CO#002 - Clay Borrow | LS | 1 | $ 90,491.20 | $ 90,491.20 | 1.00 | | $ - | | 0% | $ 90,491.20 | 100% | $0 |
| | | | | | TOTAL | $3,464,780.30 | | | $41,800.00 | | 1% | $3,451,355.80 | 100.00% | |

RANGER 000011

AIA DOCUMENT G703  CONTINUATION SHEET FOR G702  1992 EDITION  AIA  G703F
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W. , WASHINGTON D.C. 20006-5292

Exhibit - LSAX Cell 1 - 011 - 07 July - Payment Application G703-1992

## APPLICATION FOR PAYMENT

**Date:** July 31, 2014

**Project:** Luminant Sandow AX Haul Road

**Contractor:** Ranger Excavating, LP
5222 Thunder Creek Rd Suite B1
Austin, Texas 78759

CONTRACT #: A1893 758

**Owner:** Luminant
Lincoln Plaza 500 N. Akard
Dallas, TX 75201

| | | | |
|---|---|---|---|
| **Monthly Estimate No.:** | #8 | **Estimate Period:** | 9/1/2013-7/31/2014 |
| **Contract Amount:** | $858,050.00 | **Contract Date:** | 12/1/2012 |
| **Plus Approved Change Orders:** | $11,882.50 | **Start Date:** | TBD |
| **Total Contract Amount:** | $869,932.50 | **Contract Time:** | 275 Days |
| **Amount Placed-To-Date:** | $832,882.50 | **Plus Approved Time Extensions:** | 0 Days |
| **Material on Hand but Not In-Place:** | $0.00 | **Total Contract Time:** | 275 Days |
| **Total:** | $832,882.50 | **Original Substantial Completion Date:** | 9/2/2013 |
| **Less 10% Retainage** | $0.00 | **Original Final Completion Date:** | 9/2/2013 |
| **Balance:** | $832,882.50 | **Revised Final Completion Date:** | 9/2/2013 |
| **Less Amounts on Previous Estimates:** | $809,932.50 | **Days to Date:** | 0 Days |
| | | **Percent Time Used:** | 0.0% |
| **TOTAL AMOUNT DUE THIS ESTIMATE:** | $22,950.00 | **Percent Complete:** | 100.00% |

**SUBMITTED BY:**

Ranger Excavating LP

7/17/2014

Nathan Ziehr                    Date
Project Manager

**RECOMMENDED FOR APPROVAL:**

Pastor, Behling & Wheeler, LLC

07/17/14

Patrick J. Behling, P.E.        Date
Project Manager & Engineer

**APPROVED:**

Luminant

_____
Jacob Gonzales              Date
Contract Coordinator

Luminant

_____
Mark Jenkins                Date
Contract Administrator

EXHIBIT 39
WIT: Sandow
DATE: 10-17-16
AMY M. CLARK, CSR

RANGER 000012

317

## CONTINUATION SHEET

AIA DOCUMENT G703    Page 1 of 1

CONTINUATION Sheet Ranger Excavating, L P
AIA DOCUMENT G703 AMENDED
APPLICATION AND CERTIFICATION FOR PAYMENT

Job Name: Luminant Sandow AX Haul Road

APPLICATION NO
APPLICATION DATE:
PERIOD TO.

| A | C | C | | E | F | G | WORK COMPLETED | | H | J | | | BALANCE REMAINING |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ITEM NO | DESCRIPTION OF WORK | QTY & UNIT | | UNIT PRICE | SCHEDULED VALUE | PREVIOUS QTY | QTY THIS PERIOD | | TOTAL THIS PERIOD | % THIS PERIOD | TOTAL COMPLETED TO DATE | % TO DATE | |
| | | UNIT | QUANTITY | | | | | | | | | | |
| L | Mobilization | | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ 15,000.00 | $ 15,000.00 | 1.00 | | | $ | 0% | $ 15,000.00 | 100% | $0 |
| M | Site Preparation | | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ 12,000.00 | $ 12,000.00 | 1.00 | | | $ - | 0% | $ 12,000.00 | 100% | $0 |
| | Haul Road Improvements | | | | | | | | | | | | |
| N1 | Excavation | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 105,000 | $ 1.50 | $ 157,500.00 | 105,000.00 | | - | $ - | 0% | $ 157,500.00 | 100% | $0 |
| N2 | Compacted Subgrade | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 5,000 | $ 1.75 | $ 8,750.00 | 5,588.00 | | - | $ - | 0% | $ 9,779.00 | 112% | $0 |
| N3 | Lime for Stabilization | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | TON | 800 | $ 142.50 | $ 114,000.00 | 788.00 | | - | $ - | 0% | $ 112,290.00 | 98% | $0 |
| N4 | Stabilized Base | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 11,000 | $ 5.00 | $ 55,000.00 | *1,000.00 | | - | $ - | 0% | $ 55,000.00 | 100% | $0 |
| N5 | Roadbase Placement | | | | | | | | | | | | |
| | Material | SY | 23,000 | $ 4.63 | $ 106,600.00 | 20,200.00 | | - | | | | | |
| | Labor & Equipment | SY | 23,000 | $ 11.90 | $ 273,700.00 | 20,200.00 | | - | | | | | |
| | TOTAL | | | $ 16.53 | $ 378,900.00 | | | - | $ - | 0% | $ 333,300.00 | 88% | $0 |
| N6 | Stockpiling of Excess from Haul Road | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 70,000 | $ 0.95 | $ 66,300.00 | 78,000.00 | | - | $ - | 0% | $ 66,300.00 | 100% | $0 |
| O | Vegetative Soil Placement | | | | | | | | | | | | |
| | TOTAL (Labor & Equipment Only) | CY | 5,000 | $ 3.00 | $ 15,000.00 | 9,627.00 | | - | $ - | 0% | $ 10,981.00 | 113% | $0 |
| P1 | Vegetation Establishment | | | | | | | | | | | | |
| | Vegetation – Flat Surfaces and Slopes Less Than 4:1 | | | | | | | | | | | | |
| | Material | AC | 3 | $ 758.00 | $ 2,274.00 | (3.00) | | | | | | | |
| | Labor & Equipment | AC | 3 | $ 1,742.00 | $ 5,226.00 | (3.00) | | | | | | | |
| | TOTAL | | | $ 2,500.00 | $ 7,500.00 | | | | $ (7,500.00) | -100% | $ (7,500.00) | -100% | $0 |
| P2 | Vegetation – Slopes Greater Than or Equal to 4:1 | | | | | | | | | | | | |
| | Material | AC | 1 | $ 2,800.00 | $ 2,800.00 | 4.05 | | | | | | | |
| | Labor & Equipment | AC | 1 | $ 4,700.00 | $ 4,700.00 | 4.05 | | | | | | | |
| | TOTAL | | | $ 7,500.00 | $ 7,500.00 | | | | $ 30,450.00 | 406% | $ 30,450.00 | 406% | $0 |
| Q | Demobilization and Site Decommissioning | | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ 5,000.00 | $ 5,000.00 | 1.00 | | - | $ - | 0% | $ 5,000.00 | 100% | $0 |
| R | Payment and Performance Bond | | | | | | | | | | | | |
| | TOTAL | LS | 1 | $ 15,000.00 | $ 15,000.00 | 1.00 | | - | $ - | 0% | $ 15,000.00 | 100% | $0 |
| CO001 - T&M | Bottom Ash Removal from Haul Road | LS | 1 | $ 11,882.50 | $ 11,882.50 | 1.00 | | - | $ - | 0% | $ *1,882.50 | *00% | $0 |
| | | | | | TOTAL | $569,932.50 | | | | $22,950.00 | 3% | $837,882.50 | 100.00% | |

RANGER 000013

Exhibit - LSAX HaulRoad - 008 - 07July - Payment Application - revised G703-1992

**AX AREA LANDFILL**
**CELL NO. 1**
**SCOPE OF WORK AND TECHNICAL SPECIFICATIONS**

**SEPTEMBER 17, 2012**



EXHIBIT 44
WIT: Sandau
DATE: 10-17-16
AMY M. CLARK, CSR

September 17, 2012

## I.    SCOPE OF WORK

This specification outlines the scope of work for the construction of AX Landfill Cell No. 1 (the "Site").  CONTRACTOR will furnish (unless otherwise excepted), all supervision, labor, materials, tools, equipment, office, loading, unloading, hauling, storing, taxes, insurance and all other items necessary to complete the Work described on the drawings and in these specifications.

Contractor will participate in Lean Construction activities with the Company on as needed basis.

The Work consists of two Parts generally described as follows:

## PART 1 – AX LANDFILL CELL NO. 1

- Mobilization, including performance of a pre-construction condition verification and hazard survey, development of a Site-specific Health and Safety Plan, development of a Construction Storm Water Pollution Prevention Plan, development of an Erosion Control Plan, development of a Dust Control Plan, and development of a Traffic Plan;
- Maintenance of temporary erosion control and dust control measures;
- Site Preparation, including clearing/removal/disposal of existing vegetation and stripping/stockpiling of existing vegetative soil;
- Grading and preparation of Foundation Soil at the Site, including transport and placement of soil;
- Construction of perimeter dikes around Cell No. 1, including excavation, transport and placement of soil;
- Placement of stockpiled vegetative soil, and establishment of vegetation on surfaces to be vegetated;
- Placement of a landfill liner system in Cell No. 1, as defined in these specifications and described on the drawings; and
- All other actions necessary to meet the requirements of the drawings and specifications, including all required submittals.

## PART 2 – AX HAUL ROAD

- Mobilization, including performance of a pre-construction condition verification and hazard survey, development of a Site-specific Health and Safety Plan, development of a Construction Storm Water Pollution Prevention Plan, development of an Erosion Control Plan, development of a Dust Control Plan, and development of a Traffic Plan;
- Maintenance of temporary erosion control and dust control measures;
- Construction of a haul road into the AX pit, including excavation, transport, chemically stabilizing  and placement of soils;
- All other actions necessary to meet the requirements of the drawings and specifications, including all required submittals.

CONTRACTOR shall also comply with the following general requirements during performance of the Work:

- CONTRACTOR shall perform a Hazard Survey and shall verify existing elevations, dimensions, structure locations, utility locations and all other existing Site conditions prior to initiating construction.  Existing information shown on the drawings has been

September 17, 2012

obtained from available records and is not guaranteed to be correct or complete. Existing information is shown for the convenience of the CONTRACTOR and any failure by the CONTRACTOR to verify existing conditions will not relieve him from the responsibility of completing the Work at no additional cost to the OWNER.

- CONTRACTOR shall explore ahead of his activities to determine the exact location of existing structures and utilities. Existing structures and utilities not designated for removal shall be supported and protected from injury by the CONTRACTOR. If existing structures or utilities not designated for removal are damaged or injured, the structures or utilities shall be restored immediately by the CONTRACTOR at no additional cost to the OWNER.

- All CONTRACTOR vehicles must be clean before leaving the borrow area and before leaving the Site to avoid spillage of material on haul routes. CONTRACTOR is responsible for cleaning up all material spills on haul routes, public roads and private roads.

- Access to the Site may be affected by adverse weather. CONTRACTOR will be responsible for maintaining access to the Site at all times.

321

September 17, 2012

## II.    BASIS OF PAYMENT

CONTRACTOR will use the attached Bid Form spreadsheets to submit its bid for Part 1 and Part 2 of the Work described on the drawings and in these specifications.  A lump sum or unit price figure will be entered for each item to cover all costs associated with that item.  The total contract price will be the total price to complete Part 1 and Part 2 of the Work described on the drawings and in these specifications.  CONTRACTOR is required to enter a bid for every item shown on the Bid Form Spreadsheets.

Quantities provided by OWNER on the Bid Form spreadsheets are estimates based on existing information and actual quantities may be significantly more or less than the estimated quantity shown on the spreadsheet.  Actual quantities will be determined by OWNER through comparison of pre-construction and post-construction topographic surveys and field measurements by OWNER's representative.  All quantities measured using linear feet, square feet, cubic yards or similar units represent in-place quantities as determined by the OWNER surveys. CONTRACTOR is responsible for performing pre-construction and post-construction topographical surveys. OWNER reserves the right to perform additional surveys and field measurements as necessary throughout the course of the Work.

Before submitting its bid, CONTRACTOR will become familiar with the Work, the Site and all factors affecting performance of the Work.  CONTRACTOR will inspect the Site and completely inform itself relative to construction hazards, existing elevations, dimensions, structure locations, utility locations, routes for transportation of materials, and all other existing site conditions.  CONTRACTOR will carefully correlate its observations with the requirements of the drawings and specifications and otherwise satisfy itself regarding the expense and difficulties involved with performance of the Work.  The submission of a bid by the CONTRACTOR will constitute a representation of compliance with these requirements.  There will be no subsequent financial adjustment for lack of such familiarization.

## PART 1 – AX LANDFILL CELL NO. 1

### [A]    Mobilization
Under this item, CONTRACTOR will complete all preparatory activities required to comply with OWNER requirements prior to beginning any onsite activity.  Work to be completed under this item includes: performance of a pre-construction condition verification and hazard survey, development of a Site-specific Health and Safety Plan, development of a Construction Storm Water Pollution Prevention Plan, development of an Erosion Control Plan, development of a Dust Control Plan and development of a Traffic Plan.  Also included under this item are all costs associated with Temporary Erosion Control and Dust Control until the Work is completed.

CONTRACTOR will provide a lump sum bid for this item.

### [B]    Site Preparation
Under this item, CONTRACTOR will complete all work associated with preparing the Work area for earthwork and related construction activities.  Work to be completed under this item includes: clearing/removal/disposal of existing vegetation and stripping/stockpiling of existing vegetative soil in the area designated on the drawings and as required by OWNER, and the restoration of the stockpile area.

CONTRACTOR will provide a lump sum bid for this item.

September 17, 2012

**[C]   Foundation Soil**

CONTRACTOR will excavate and grade foundation soil at Cell No. 1 to achieve the foundation soil elevations, lines and grades shown on the drawings and described in the specifications. Work to be completed under this item will consist of the following bid items. CONTRACTOR will provide a unit price bid for each item.

- **[C1]    Excavation.**  Under this item CONTRACTOR will complete all work associated with excavation of soils to achieve the foundation soil lines, grades and elevations at the Site.   Soil excavated under this item will be used as fill for foundation soil areas (Item C2), construction of the perimeter dikes (Item D), construction of the access ramp (Item E), construction of the temporary dikes (Item H5), and protective soil on sloped surfaces (Item I2).

   Payment for this item will be on a unit price per cubic yard of foundation soil cut volume as measured by topographic survey.

- **[C2]    Foundation Soil Grading.**  Under this item CONTRACTOR will complete all work associated with filling and grading to achieve the foundation soil lines, grades and elevations at the Site.  The source of the fill will be the soil excavated under Item C1.

   Payment for this item will be on a unit price per cubic yard of foundation soil fill as measured by topographic survey.

- **[C3]    Stockpiling of Excess Foundation Soil.**  OWNER anticipates that excess soil will be excavated under Item C1 to achieve the foundation soil lines, grades and elevations at the Site.  The excess soil will be stockpiled in the area designated on the drawings and as required by OWNER.

   Payment for this item will be on a unit price per cubic yard of the soil stockpiles as measured by topographic survey after all other filling activities have been completed to the satisfaction of the OWNER.

**[D]   Perimeter Dike Construction**

CONTRACTOR will construct perimeter dikes around Cell No. 1 to the required lines, grades and elevations.  CONTRACTOR will construct the dikes using soil cut during foundation construction.   Work to be completed under this item will consist of the following bid items. CONTRACTOR will provide a unit price bid for each item.

- **[D1]    Earthwork and Grading.**  Under this item CONTRACTOR will complete all work associated with dike construction using foundation soil excavated under Item C1, including: transportation, placement and compaction of the soil to construct the dikes, testing and all other work associated with construction of the perimeter dikes, with the exception of road base placement (see Item D2) and vegetative soil and vegetation establishment (see Items E and F).

   Payment for this item will be on a unit per cubic yard basis of in place, compacted material in the dikes, as measured by topographic survey.

September 17, 2012

- **[D2]    Road Base Placement.** Under this item CONTRACTOR will complete all work associated with supply and placement of road base on the top of the dike, including supply and placement of geotextile.

    Payment for this item will be on a unit per square yard basis of road base surface area, as measured by topographic survey.

## [E]    Vegetative Soil Placement
Under this item, CONTRACTOR will place vegetative soil on surfaces that are to be vegetated. CONTRACTOR shall use the stockpiled vegetative soil generated during Site Preparation for this application. This item includes placement and grading of vegetative soil and any other activities necessary to complete the Work.

Payment for this item will be on a unit per cubic yard basis of in place, vegetative soil, as measured by topographic survey. CONTRACTOR will provide a unit price bid for this item.

## [F]    Vegetation Establishment
CONTRACTOR will establish vegetation on surfaces that are to be vegetated, following completion of vegetative soil placement. Vegetation will be established on flat areas and sloped areas greater than 4(H) to 1(V) as defined in the specifications. CONTRACTOR will provide a separate unit price for establishment of vegetation on flat and sloped areas. Permanent vegetation must be established in accordance with the requirements of the specifications no later than the date specified by OWNER.

- **[F1]    Vegetation – Flat Surfaces and Slopes Less Than 4(H) to 1(V).** Under this item CONTRACTOR will establish vegetation on flat surfaces and slopes less than 4(H) to 1(V). This item shall be full compensation for all work involved in establishing vegetation on flat surfaces and slopes less than 4(H) to 1(V) as shown on the drawings and described in the specifications, including seeding, straw or hay mulch, supplemental watering, and any other activities necessary to complete the Work.

    Payment for this item will be on a unit per acre of established vegetation, as measured by topographic survey.

- **[F2]    Vegetation – Slopes Greater Than or Equal to 4(H) to 1(V).** Under this item CONTRACTOR will establish vegetation on slopes greater than 4(H) to 1(V). This item shall be full compensation for all work involved in establishing vegetation on slopes greater than 4(H) to 1(V) as shown on the drawings and described in the specifications, including seeding, erosion control fabric, supplemental watering, and any other activities necessary to complete the Work.

    Payment for this item will be on a unit per acre of established vegetation, as measured by topographic survey.

## [G]    Access Ramp Construction
CONTRACTOR will construct an access ramp as defined in these specifications and described on the drawings. CONTRACTOR will construct the access ramp using soil cut during foundation excavation (Item C1). Work to be completed under this item will consist of the following bid items. CONTRACTOR will provide a unit price bid for each item.

324

September 17, 2012

- **[G1]    Earthwork.** Under this item CONTRACTOR will complete all work associated with access ramp construction using select fill soil from the Site, including; excavation, transportation, placement and compaction of the soil to construct the access ramp, testing and all other work associated with construction of the access ramp, with the exception of road base placement (see Item G2) and vegetative soil and vegetation (see Items E and F).

  Payment for this item will be on a unit per cubic yard basis of in place, compacted material in the access ramp, as measured by topographic survey.

- **[G2]    Road Base.** Under this item CONTRACTOR will complete all work associated with supply and placement of road base on the top of the access ramp, including supply and placement of geotextile.

  Payment for this item will be on a unit per square yard basis of road base surface area, as measured by topographic survey.

- **[G3]    Culvert Crossing.** Under this item CONTRACTOR will complete all work associated with installation of culverts beneath the access ramp, including supply and placement of culverts and appurtenances, trenching, pipe bedding and related activities.

  Payment for this item will be on a lump sum basis.

## [H]    Liner System Installation

CONTRACTOR will install a liner system in Cell No. 1.  CONTRACTOR will install a liner system as defined in these specifications and described on the drawings.  Work to be completed under this item will consist of the following bid items.  CONTRACTOR will provide a unit price bid for each item.

- **[H1]    Liner Subgrade.** Liner subgrade consists of the uppermost 2 feet of the foundation soil and shall be constructed to the elevations, lines and grades shown on the drawings.  CONTRACT will complete all work associated with construction of the liner subgrade under this Item, including excavation, placement and compaction of the soil to construct the liner subgrade and testing.  Payment for this item will be on a unit per cubic yard basis of in place, compacted liner subgrade, as measured by topographic survey.

- **[H2]    Geomembrane Supported Geosynthetic Clay Liner (GSGCL) – Flat Surfaces and Slopes Less Than 4(H) to 1(V).** CONTRACTOR will supply, test and install a Geomembrane Supported Geosynthetic Clay Liner (GSGCL) on flat surfaces and slopes less than 4(H) to 1(V) as defined in the specifications.  This item shall be full compensation for all work involved in performing complete GSGCL installation on flat surfaces and slopes less than 4(H) to 1(V) as shown on the drawings and described in the specifications, including seaming, labor, material, tools, equipment, excess GSGCL (wastage), GSGCL in anchor trenches, testing and incidentals.

  Payment for this item will be on a unit per square foot basis of the net GSGCL area, as measured by topographic survey.  Net GSGCL area is defined as the surface area covered by the liner, as measured parallel to the surface of the liner from the inside face of the perimeter anchor trenches.

II-4

September 17, 2012

- **[H3]    Geomembrane Supported Geosynthetic Clay Liner (GSGCL) – Slopes Greater Than or Equal to 4(H) to 1(V).** CONTRACTOR will supply, test and install a Geomembrane Supported Geosynthetic Clay Liner (GSGCL) on slopes greater than or equal to 4(H) to 1(V) as defined in the specifications. This item shall be full compensation for all work involved in performing complete GSGCL installation on slopes greater than or equal to 4(H) to 1(V) as shown on the drawings and described in the specifications, including seaming, labor, material, tools, equipment, excess GSGCL (wastage), GSGCL in anchor trenches, testing and incidentals.

  Payment for this item will be on a unit per square foot basis of the net GSGCL area, as measured by topographic survey. Net GSGCL area is defined as the surface area covered by the liner, as measured parallel to the surface of the liner from the inside face of the perimeter anchor trenches.

- **[H4]    GSGCL Anchor Trench Excavation and Backfill.** Under this item, CONTRACTOR will excavate and backfill perimeter anchor trenches for the GSGCL as shown on the drawings and described in the specifications. This item shall be full compensation for all work involved in excavating and backfilling the perimeter anchor trenches.

  Payment for this item will be on a unit per linear foot of anchor trench, as measured by topographic survey.

- **[H5]    Temporary Dike and Future GSGCL Tie-In.** Under this item, CONTRACTOR will construct temporary dikes and future GSGCL tie-ins as shown on the drawings and described in the specifications. This item shall be full compensation for all work involved in constructing the temporary dikes and future GSGCL tie-ins, including soil placement and compaction, GSGCL installation and, testing and incidentals; and any other activities necessary to complete the Work.

  Payment for this item will be on a unit per liner foot basis of temporary dike and future GSGCL tie-in. CONTRACTOR will provide a unit price bid for this item.

## [I]    Protective Soil Placement

Under this item, CONTRACTOR will place protective soil from OWNER-designated areas on top of the liner system to the required lines, grades and elevations. Under this item CONTRACTOR will place select fill borrow soil from the OWNER-designated area as protective soil. This item shall be full compensation for all work involved in placement of protective soil as shown on the drawings and described in the specifications, including all activities necessary to complete the Work.

Payment for this item will be on a unit per cubic yard basis of in place protective soil, as measured by topographic survey.

## [J]    Demobilization and Site Decommissioning

Upon completion of Part 1 of the Work, all CONTRACTOR equipment will be promptly removed from the Site. All temporary improvements, including stakes, piles, erosion controls and other markers or obstructions placed by or for CONTRACTOR will be promptly removed. Staging areas will be restored to pre-construction conditions. Temporary facilities will be dismantled and entirely removed. All erosion control fence and other controls necessary to protect environmentally sensitive areas in the vicinity of the Work will be removed. CONTRACTOR will

326

September 17, 2012

restore any damage that its operations may have caused to existing roads, bridges, culverts and other areas affected by its activities. CONTRACTOR will also complete a post-construction topographic survey.

CONTRACTOR will provide a lump sum bid for this item.

**[K]    Payment and Performance Bond**
At OWNER's discretion, CONTRACTOR may be required to provide a payment and performance bond for Part 1 of the Work.

CONTRACTOR will provide a lump sum bid for this item.

## PART 2 – AX HAUL ROAD

**[L]    Mobilization**
Under this item, CONTRACTOR will complete all preparatory activities required to comply with OWNER requirements prior to beginning any onsite activity.  Work to be completed under this item includes: performance of a pre-construction condition verification and hazard survey, development of a Site-specific Health and Safety Plan, development of a Construction Storm Water Pollution Prevention Plan, development of an Erosion Control Plan, development of a Dust Control Plan and development of a Traffic Plan.  Also included under this item are all costs associated with Temporary Erosion Control and Dust Control until the Work is completed.

CONTRACTOR will provide a lump sum bid for this item.

**[M]   Site Preparation**
Under this item, CONTRACTOR will complete all work associated with preparing the Work area for earthwork and related construction activities.  Work to be completed under this item includes: clearing/removal/disposal of existing vegetation and stripping/stockpiling of existing vegetative soil in the area designated on the drawings and as required by OWNER, and the restoration of the stockpile area.

CONTRACTOR will provide a lump sum bid for this item.

**[N]   Haul Road Improvements**
CONTRACTOR will construct a haul road from the main haul road to the bottom of the AX-Pit as defined in these specifications and described on the drawings.  CONTRACTOR will construct the haul road using soil excavated during haul road construction.  Work to be completed under this item will consist of the following bid items. CONTRACTOR will provide a unit price bid for each item.

- **[N1]    Roadway Excavation and Grading.**  Under this item CONTRACTOR will complete all work associated with excavation of soils along the alignment of the haul road, temporarily stockpiling the soils for use during haul road construction, and grading of the haul road area.

  Payment for this item will be on a unit per cubic yard basis of soil <u>cut volume</u> as measured by topographic survey.

- **[N2]    Compacted Subgrade.**  Under this item CONTRACTOR will complete all work associated with construction of compacted subgrade using soils excavated under Item

September 17, 2012

N1, including: placement and compaction of the soil to construct the compacted subgrade, testing, and all other work associated with construction of the compacted subgrade.

Payment for this item will be on a unit per cubic yard basis of in-place compacted subgrade as measured by topographic survey.

- **[N3]    Lime for Stabilization.**  Under this item CONTRACTOR will complete all work associated with supplying lime for use in construction of the stabilized subbase, including: purchase, transportation, and unloading/storage at the Site.

    Payment for this item will be on a unit per ton basis of lime supplied as measured by delivery tickets.

- **[N4]    Stabilized Base.**  Under this item CONTRACTOR will complete all work associated with construction of stabilized base using soils excavated under Item N1 and lime provided under Item N3, including:  placement of soil, incorporation of lime, compaction of the stabilized soil, testing, and all other work associated with construction of the stabilized base.

    Payment for this item will be on a unit per cubic yard basis of in-place stabilized base as measured by topographic survey.

- **[N5]    Road Base.**  Under this item CONTRACTOR will complete all work associated with supply and placement of road base on the surface of the haul road.

    Payment for this item will be on a unit per square yard basis of road base surface area, as measured by topographic survey.

## [O]  Vegetative Soil Placement

Under this item, CONTRACTOR will place vegetative soil on surfaces that are to be vegetated. CONTRACTOR shall use the stockpiled vegetative soil generated during Site Preparation for AX Landfill Cell No. 1 for this application.  This item includes placement and grading of vegetative soil and any other activities necessary to complete the Work.

Payment for this item will be on a unit per cubic yard basis of in place, vegetative soil, as measured by topographic survey.  CONTRACTOR will provide a unit price bid for this item.

September 17, 2012

**[P] Vegetation Establishment**

CONTRACTOR will establish vegetation on surfaces that are to be vegetated, following completion of vegetative soil placement. Vegetation will be established on flat areas and sloped areas greater than 4(H) to 1(V) as defined in the specifications. CONTRACTOR will provide a separate unit price for establishment of vegetation on flat and sloped areas. Permanent vegetation must be established in accordance with the requirements of the specifications no later than the date specified by OWNER.

- **[P1]    Vegetation – Flat Surfaces and Slopes Less Than 4(H) to 1(V)**. Under this item CONTRACTOR will establish vegetation on flat surfaces and slopes less than 4(H) to 1(V). This item shall be full compensation for all work involved in establishing vegetation on flat surfaces and slopes less than 4(H) to 1(V) as shown on the drawings and described in the specifications, including seeding, straw or hay mulch, supplemental watering, and any other activities necessary to complete the Work.

  Payment for this item will be on a unit per acre of established vegetation, as measured by topographic survey.

- **[P2]    Vegetation – Slopes Greater Than or Equal to 4(H) to 1(V)**. Under this item CONTRACTOR will establish vegetation on slopes greater than 4(H) to 1(V). This item shall be full compensation for all work involved in establishing vegetation on slopes greater than 4(H) to 1(V) as shown on the drawings and described in the specifications, including seeding, erosion control fabric, supplemental watering, and any other activities necessary to complete the Work.

  Payment for this item will be on a unit per acre of established vegetation, as measured by topographic survey.

**[Q]    Demobilization and Site Decommissioning**

Upon completion of Part 2 of the Work, all CONTRACTOR equipment will be promptly removed from the Site. All temporary improvements, including stakes, piles, erosion controls and other markers or obstructions placed by or for CONTRACTOR will be promptly removed. Staging areas will be restored to pre-construction conditions. Temporary facilities will be dismantled and entirely removed. All erosion control fence and other controls necessary to protect environmentally sensitive areas in the vicinity of the Work will be removed. CONTRACTOR will restore any damage that its operations may have caused to existing roads, bridges, culverts and other areas affected by its activities. CONTRACTOR will also complete a post-construction topographic survey.

CONTRACTOR will provide a lump sum bid for this item.

**[R]    Payment and Performance Bond**

At OWNER's discretion, CONTRACTOR may be required to provide a payment and performance bond for Part 2 of the Work.

CONTRACTOR will provide a lump sum bid for this item.

329

## III.    EXISTING SITE SOIL CHARACTERISTICS

OWNER has performed geotechnical investigations at the Site.  Soil boring logs prepared based on data collected as part of the investigations are attached as Appendix A to these specifications.  This information is provided for the convenience of the CONTRACTOR and any failure by the CONTRACTOR to verify existing conditions will not relieve him from the responsibility of completing the Work.

## IV.    SCHEDULE

The Work shall be initiated and completed by the dates specified by the OWNER.  The CONTRACTOR shall research historical weather conditions to determine conditions that can be expected at the Site and during the timeframe stipulated for the Work.  CONTRACTOR is advised that there will be some days or periods of time when weather conditions are not favorable to perform work.  CONTRACTOR shall schedule work and resources such that all work is completed on or before the completion date specified by the OWNER despite weather conditions encountered.

A schedule for project completion shall be submitted by CONTRACTOR with the CONTRACTOR's bid.

September 17, 2012

## V.    TECHNICAL SPECIFICATIONS

Division 1 – General Requirements
  Section 01100 – Erosion and Sedimentation Control
  Section 01200 – Dust Control

Division 2 – Sitework
  Section 02200 – Site Preparation
  Section 02300 – Earthwork
  Section 02400 – Geomembrane Supported Geosynthetic Clay Liner
  Section 02500 – Corrugated Metal Pipe
  Section 02600 – Geotextile
  Section 02900 – Vegetation



**THE SEAL APPEARING ON THIS DOCUMENT WAS AUTHORIZED BY PATRICK J. BEHLING, P.E. NO. 79872 ON SEPTEMBER 17, 2012**

332

**DIVISION 1**

**GENERAL REQUIREMENTS**

September 17, 2012

## SECTION 01100

## EROSION AND SEDIMENTATION CONTROL

## PART 1 - GENERAL

### 1.1    DESCRIPTION

A    This Section consists of furnishing, placing, and maintaining erosion and sedimentation control measures as shown on the Drawings, as directed by the ENGINEER, and where necessary to reduce sediment content of runoff prior to establishment of permanent vegetation.

### 1.2    PERFORMANCE REQUIREMENTS

A.    CONTRACTOR shall provide erosion and sedimentation control measures to control erosion and sediment runoff in any location where erosion and sediment runoff is likely to occur and as required by the ENGINEER  Erosion and sedimentation control measures shall remain in place until removal is approved by the ENGINEER.

B.    Clearing and stripping of vegetation, regrading and other construction activities shall be conducted in a manner to minimize erosion. Existing drainage patterns and vegetation shall be protected and retained to the greatest extent practicable.

C.    The size and duration of exposure of disturbed areas shall be kept to a minimum and all disturbed soil shall be stabilized as quickly as practicable. Diversion channels/berms shall be located upstream from disturbed areas to minimize the amount of run-on to the disturbed areas.

D.    In the event that erosion and sedimentation control measures used by CONTRACTOR prove to be inadequate as determined by ENGINEER, CONTRACTOR shall be required to adjust his operations to the extent necessary to control sedimentation and shall repair areas impacted by sedimentation as directed by ENGINEER at no additional cost to OWNER

### 1.3    SUBMITTALS

A.    CONTRACTOR shall submit the following to ENGINEER a minimum of 14 days prior to initiating field activities:

1    A copy of the construction Storm Water Pollution Prevention Plan (SWPPP) developed for the Work.

2    An installation schedule for erosion and sedimentation control measures. This schedule shall cover all ground disturbance activities including material staging areas and planned excavation and grading areas.

3.    Certification that all proposed erosion and sedimentation control products comply with the requirements of these specifications.

## PART 2 - PRODUCTS

### 2.1    SILT FENCE

A.    Silt fence fabric material shall be a woven geotextile conforming to the following requirements:

| Physical Property | Test Method | Requirement |
|---|---|---|
| Tensile Strength, lb. | ASTM D4632 | 100 Minimum |
| Elongation @ Yield, % | ASTM D4632 | 10-40 |

334

September 17, 2012

| Physical Property | Test Method | Requirement |
|---|---|---|
| Trapezoidal Tear, N (lb.) | ASTM D4533 | 50 Minimum |
| Apparent Opening Size | ASTM D4751 | 20-50 |
| Permittivity, 1/sec | ASTM D4491 | 0 1 Minimum |
| UV Stability, 500 hr. | ASTM D4355 | 80 Minimum |

B.    Posts shall be essentially straight wood or steel posts with a minimum length of 48 inches. Soft wood posts must be at least 3 in in diameter or nominal 2 x 4 in. Hardwood posts must have a minimum cross-section of 1-1/2 x 1-1/2 inches. T- or L-shaped steel posts must have a minimum weight of 1.3 pounds per foot.

## 2.2    EROSION CONTROL FABRIC

A    Erosion Control Fabric shall be North American Green S150 or ENGINEER-approved equal.

B.    Erosion control fabric blanket shall have a minimum width of 6 feet. The fabric mat shall be machine-produced of 100 percent coconut fiber with colored line or thread along outer edges to indicate material overlap limits and shall have a minimum weight of 0.50lb /sq.yd.

C.    The top and bottom cover of the fabric shall be heavy-weight polypropylene netting with ultraviolet additives to delay breakdown. The mesh size shall be a minimum of 0 625 inch by 0.625 inch.

D.    The blanket and top/bottom covers shall be sown together on 1 5 inch center at 50 stitches per roll width with UV stable polypropylene thread.

E.    Erosion Control Fabric shall be installed using 6-in. wooden stakes or metal staples of sufficient material quality, cross-section, and strength to anchor the erosion control blanket against loads imposed by surface runoff and sediment.

## 2.3    HAY BALES

A.    Hay bales may be obtained from local sources and shall weigh 40 to 120 pounds per bale  Only grain hay bales, free of noxious weeds, shall be used  Bales shall be tightly and securely bound with wire to provide a stable bale and to extend the functional life of the bale to the extent practicable. Bales shall be free from rot and mold.

B    Stakes for hay bales shall be wooden stakes or metal rebar of sufficient material quality, cross-section, and strength to secure the hay bales

## 2.4    TEMPORARY VEGETATION

A.    Temporary Vegetation shall be applied on areas left exposed for greater than 30 days. CONTRACTOR shall use temporary vegetation seed mixture and application rate as specified in Section 02900, "Vegetation," or CONTRACTOR may alternatively submit proposed temporary vegetation seed mix and application rate to ENGINEER for approval no later than 7 days prior to use.

B.    Mulch shall be applied after temporary vegetation seeding at a rate of 1 5 tons/acre for straw mulch, or at the rate recommended by the manufacturer if wood fiber mulch is used. CONTRACTOR shall ensure that mulch does not redistribute after application. CONTRACTOR shall reapply mulch as necessary to maintain uniform coverage. Straw mulch shall include dry oat or wheat straw, native hay, or chopped corn stalks. The mulch shall be free from weeds and foreign matter detrimental to plant life. Wood fiber mulch shall include approved wood cellulose fiber in chip form and be free of ingredients that could inhibit germination and growth.

335

## PART 3 - EXECUTION

### 3.1    GENERAL

A.    <u>Delivery, Storage, and Handling</u>.  Product delivery, storage and handling shall comply with manufacturer's recommendations.  All erosion and sedimentation control products shall be delivered in manufacturer's wrapping and shall be stored in a manner to prevent damage.  Damaged or unsuitable products shall be promptly removed from the job site and replaced with products meeting these specifications.

B    All erosion and sedimentation control measures shall be installed in accordance with manufacturer's recommendations and approved by the ENGINEER prior to initiating any clearing, demolition or construction activities.

C.    <u>Cut Areas</u>   Establish an erosion control line (hay bales or filter fabric) at toe of slope in all cut areas prior to beginning cut operations.

D.    <u>Fill Areas</u>.  Establish an erosion control line (hay bales or filter fabric) approximately 10 feet from toe of slope of proposed fill areas prior to beginning fill operations

E.    <u>Stockpiles</u>.  Sides of soil stockpiles shall have a maximum slope of 2:1   All stockpiles shall be surrounded by a sediment barrier (hay bales or filter fabric) unless other wise approved by the ENGINEER.  All stockpiles left bare for more than 30 days shall be stabilized with temporary vegetation and/or mulch.

### 3.2    SILT FENCE

A    Silt fence shall be installed along the downstream perimeter of all disturbed areas to intercept sediment from sheet flow

B.    Posts shall be embedded into the ground at least 18 inches deep and shall be spaced a maximum of 8 feet apart.

C    Filter fabric shall be installed by digging a 6 inch wide by 6 inch deep trench along the upstream side of the fence.  Place approximately 6 to 8 inches of the fabric in the trench and backfill the trench.

D.    Unless otherwise shown on the Drawings, attach the wire mesh to wooden posts with staples, or to steel posts with T-clips, in at least 4 places equally spaced.  Sewn vertical pockets may be used to attach wire mesh or fabric to end posts.

E.    Fasten the fabric to the top strand of the reinforcement by rings or cord every 15 inches or less.  Locate fabric splices at a fence post with a minimum overlap of 6 inches attached in at least 4 places equally spaced  Do not locate fabric splices in concentrated flow areas.

### 3.3    EROSION CONTROL FABRIC

A.    Erosion control fabric shall be installed following completion of final grading activities in the following disturbed earth areas unless otherwise approved by the ENGINEER:

1    All exterior slopes 4(H) to I(V) and steeper; and
2    All drainage channels and swales

B.    Erosion control fabric shall be anchored at the top of the slope using an anchor trench and shall be rolled down the slope so as to maintain tension to preclude folds and wrinkles  Any folds or wrinkles shall be removed by hand.

C    The erosion control fabric anchor trench shall be 6 inches wide by 6 inches deep.  The trench fabric shall be connected to the vertical face of the trench using stakes or staples spaced at 12 inches on center.  The trench shall be backfilled and compacted upon completion of stapling.

D.    Successive erosion control fabric panels shall be overlapped in such a manner that the upstream and upslope panel is placed over the downstream and downslope panel. Panels shall overlap a minimum of 6 inches at end joints and on sideslopes.

E.    Stake or staple through both panels with stakes/staples driven flush with the soil surface. Stake/staple spacing shall be in accordance with manufacturer's recommendations.

## 3.4    HAY BALES

A.    Hay bales shall be installed to form water stops, filtration dams, diversions, etc. as required for erosion and sedimentation control. On sloping terrain, hay bales may be used to trap sediment until vegetation has become established.

B.    Place bales lengthwise with ends tight, abutting one another  Install bales with bindings located on the sides

C    Entrench hay bales a minimum of 4 inches and backfill. Place backfill on the upstream side of the bales.

D.    Secure the bale in place with two stakes per bale and insert straw in voids between bales.

## 3.5    MAINTENANCE

A.    All erosion and sedimentation controls shall be maintained in a structurally sound and functional manner.  All erosion and sedimentation controls shall be inspected at least on a weekly basis, immediately after each rainfall and daily during prolonged rainfall.

B    Any damaged or deteriorating systems shall be replaced immediately upon discovery or as directed by ENGINEER

C    Sediment deposits shall be removed when the deposit reaches 1/3 the height of the fence or sooner to provide a functional and stable system.  Sediment retained by sedimentation and erosion control systems shall be removed by CONTRACTOR and may be used on the project as fill as approved by ENGINEER.

D.    Areas where temporary vegetation or mulch has been applied shall be inspected to ensure proper growth and coverage. Temporary vegetation or mulch shall be reapplied as necessary to minimize erosion.

## 3.6    REMOVAL

A    Erosion and sedimentation controls shall remain in-place until the ENGINEER directs their removal. Upon removal CONTRACTOR shall dispose of any sediment accumulations, dress the area to the satisfaction of ENGINEER, and shall vegetate all bare areas in accordance with the Contract Documents. Temporary erosion control blanket materials specified are biodegradable and will remain in place after establishment of permanent vegetation.

++END OF SECTION++

September 17, 2012

## SECTION 01200

## DUST CONTROL

## PART 1 - GENERAL

### 1.1    DESCRIPTION

A.    This Section consists of performance of dust control measures as necessary to prevent fugitive dust during construction activities or as directed by the ENGINEER.

### 1.2    PERFORMANCE REQUIREMENTS

A    CONTRACTOR shall implement all necessary dust control measures to prevent fugitive dust during all construction activities.

B.    The need for dust control measures will be based on visual observation of airborne dust CONTRACTOR shall implement dust control measures on a regular basis throughout the duration of the work unless other wise authorized by the ENGINEER. CONTRACTOR shall adjust operations and/or dust controls as necessary, at no additional cost to OWNER, if directed by ENGINEER to mitigate dust.

### 1.3    SUBMITTALS

A    CONTRACTOR shall submit the following to ENGINEER a minimum of 5 days prior to initiating dust control measures:

1.    Source of dust control water;
2.    List of dust control equipment; and
3    Manufacturer specification sheets and material safety data sheets (MSDS) for chemical additives used for dust control.

## PART 2 - PRODUCTS

### 2.1    WATER

A.    Water used for dust control need not be potable, but must not be contaminated.  Proposed source of dust control water must be approved by ENGINEER prior to initiating dust control measures.

### 2.2    CHEMICAL ADDITIVES

A.    Chemical additives shall be incorporated into dust control measures only if approved by the ENGINEER.

B.    Calcium Chloride for dust control shall conform to the requirements of ASTM D98, Type 1 or Type 2.

C.    Alternative chemical additives for dust control may be used if approved by the ENGINEER

### 2.3    EQUIPMENT

A.    Dust control water shall be applied using tank trucks equipped with water cannon capable of delivering water through either front- or rear-mounted nozzles  Tank trucks shall be of sufficient size and mobility and carry a sufficient quantity of water to control dust generated by CONTRACTOR's activities.

338

B.      More than one water tank truck may be required during construction activities to sufficiently suppress dust

## PART 3 - EXECUTION

### 3.1     IMPLEMENTATION OF DUST CONTROL MEASURES

A.      Vehicular traffic in disturbed areas shall be limited to the extent practicable. Construction vehicles shall maintain low speeds to minimize the amount of dust created. Adequate freeboard in loaded trucks shall be maintained to prevent spillage during operations. Roadway surfaces shall be kept free of spilled/tracked soil.

B.      Soil stockpiles shall be graded and shaped to minimize surface area.  Water or covers shall be applied to stockpiles as needed to control dust.

C.      Apply dust control water uniformly over roads and disturbed areas from trucks capable of uniform distribution   Provide suitable devices for positive shut-off and for regulating flow of water.

D.      Apply calcium chloride or other chemical additives at locations only when directed by ENGINEER Spread calcium chloride or other chemical additives by approved devices and methods for uniform distribution.

E.      Dust control water and/or chemical additives shall be applied so as to limit and/or prevent formation of standing water and mud;  over spray of chemical dust suppressants in areas adjacent to surface water bodies or sensitive habitats; and/or flushing of materials off of the work area.

++END OF SECTION++

September 17, 2012

**DIVISION 2**

**SITE WORK**

September 17, 2012

## SECTION 02200

## SITE PREPARATION

## PART 1 - GENERAL

### 1.1    DESCRIPTION

A.    This Section consists of all work associated with clearing and preparing the landfill area, haul road area and other work areas for earthwork and other construction activities, including removal of existing vegetation and verification of existing site conditions.

### 1.2    EXISTING SITE CONDITIONS

A.    CONTRACTOR shall verify that existing topographic conditions in the Work Area as shown on the Drawings are an accurate representation of existing site conditions prior to initiating construction activities.

B.    If CONTRACTOR contends that existing topographic conditions are different from that shown on the Drawings, Contractor shall submit survey data from a Texas-registered land surveyor to document actual topographic conditions, and shall identify with such submission additional work required which was not accounted for in CONTRACTOR's bid.  There shall be no opportunity for a Claim for extra work due to differing topographic conditions once stripping or excavation work has started.

C.    Existing site improvements (utilities, monitoring wells, and similar items) shall be located and protected by CONTRACTOR before CONTRACTOR begins clearing operations.

### 1.3    SUBMITTALS

A.    CONTRACTOR shall submit name and address of disposal facility proposed for management of trash and rubbish generated in connection with site preparation at least 5 days prior to beginning clearing operations.

## PART 2 - PRODUCTS

NOT USED

## PART 3 - EXECUTION

### 3.1    CLEARING

A.    Clearing shall consist of the cutting, shredding, and stockpiling of all trees and shrubs and the stripping of all grass and similar surface vegetation within the limits of the landfill and borrow areas.  Clearing shall be limited to the areas required to perform the work.

B.    CONTRACTOR shall segregate material removed as part of clearing from soils to be incorporated into subsequent earthwork activities.

### 3.2    VEGETATIVE SOIL STRIPPING AND STOCKPILING

A.    After completion of clearing activities, CONTRACTOR shall strip the uppermost approximately 12 inches of existing vegetative soil from the cleared areas.  Material identified as vegetative soil shall be subject to ENGINEER's approval.

September 17, 2012

B.    CONTRACTOR shall stockpile stripped vegetative soil in the work area in a location acceptable to the ENGINEER.

## 3.3    DISPOSAL OF BRUSH AND OTHER VEGETATIVE MATERIAL

A.    CONTRACTOR shall burn brush and other vegetative materials generated during site clearing, unless otherwise approved by the ENGINEER.

B.    CONTRACTOR shall burn brush and other vegetative material in accordance with the requirements of TCEQ Publication RG-049 "Outdoor Burning in Texas", as modified to comply with OWNER requirements.  Specific requirements for burning of brush and other vegetative material include, but are not limited to, the following:

    1.    Commence or continue burning only when the wind direction and other weather conditions are such that the smoke and other pollutants will not present a hazard to any public road, landing strip, or water body or have an adverse effect on any off-site structure.

    2.    Don't start burning unless weather conditions are such that the smoke will dissipate (winds of at least 6 miles per hour; no temperature inversions) while still allowing the fire to be contained and controlled (winds no faster than 23 miles per hour).

    3.    Post someone to flag traffic if at any time the burning causes or may tend to cause smoke to blow onto or across a road or highway.

    4.    Begin burning no earlier than one hour after sunrise, end it the same day and no later than one hour before sunset, and make sure that a responsible party is present while the burn is active and the fire is progressing.

    5.    At the end of the burn, extinguish isolated residual fires or smoldering objects if the smoke they produce can be a nuisance or a traffic hazard.

C.    CONTRACTOR will be responsible for controlling fires in compliance with all Federal, State, and Local laws and regulations. The securing of necessary burning permits shall be the responsibility of the CONTRACTOR.  All burning shall be under the constant care of competent watchmen. All materials resulting from clearing and grubbing operations and disposed of by burning on the site shall be thoroughly and completely reduced to ashes.

D.    CONTRACTOR shall be responsible for providing a suitable location (subject to ENGINEER and OWNER approval) for off-site disposal of cleared material not burned on-site.  Once ENGINEER and OWNER have approved the disposal location, CONTRACTOR shall transport and dispose the material in accordance with all applicable regulations.

++END OF SECTION++

September 17, 2012

## SECTION 02300

## EARTHWORK

## PART 1 - GENERAL

### 1.1 DESCRIPTION

A.    This Section consists of all activities associated with earthwork construction, including, but not necessarily limited to:

    1.    Excavation, loading, transportation, unloading and stockpiling of borrow soil from OWNER-designated locations;

    2.    Placement, compaction, and grading of various earthen materials;

    3.    Haul road construction;

    4.    Ditch grading; and

    5.    All other activities required to complete earthwork construction as shown on the Drawings, specified herein and or required by the ENGINEER.

### 1.2 REFERENCES

A.    American Society of Testing Materials (ASTM) Standards/Publications (Latest version):

| | |
|---|---|
| C33 | Standard Specification for Concrete Aggregates |
| D422 | Method of Particle Size Analysis of Soils |
| D698 | Laboratory Compaction Characteristics of Soil Using Standard Effort (12,400 ft-lbf/ft$^3$) |
| D1557 | Laboratory Compaction Characteristics of Soil Using Modified Effort (56,000 ft-lbf/ft$^3$) |
| D1587 | Standard Practice for Thin-walled Tube Sampling of Soils |
| D2487 | Classification of Soils for Engineering Purposes |
| D2922 | Density of Soil In Place by Nuclear Density Gage |
| D3080 | Standard Test Method for Direct Shear Test of Soils Under Consolidated Drained Conditions |
| D4318 | Liquid Limit, Plastic Limit and Plasticity Index of Soils |
| D5084 | Standard Test Methods for Measurement of Hydraulic Conductivity of Saturated Porous Materials Using a Flexible Wall Permeameter |
| D6938 | Standard Test Method for In-Place Density and Water Content of Soil and Soil-Aggregate by Nuclear Methods (Shallow Depth) |

### 1.3 DEFINITIONS

A.    Foundation Soil:    Existing soil in the work area that remains after clearing and stripping of existing vegetative soil.

B.      Select Fill:              Soil material suitable for use as fill for dike construction or beneath haul
                                  road subgrade.

C.      General Fill:             Any non-classified soil deemed suitable by the ENGINEER.

D.      Liner Subgrade:           Soil complying with the specified requirements located immediately
                                  beneath the geomembrane supported geosynthetic clay liner (GSGCL).

E.      Haul Road Subgrade:       Soil complying with specified requirements underlying haul road surface
                                  course, either compacted fill soils or existing native soils.

F.      Protective Soil:          Soil located immediately above any geomembrane or geosynthetic clay
                                  liner.

G.      Vegetative Soil:          Growth medium used along with any necessary admixtures to support
                                  vegetation.

H.      Haul Road
        Sub-Base Soil:            Stabilized subgrade soils that extend to the top of the existing native
                                  soils

I.      Road Base:                Granular material placed on the surface of haul roads, access roads and
                                  other areas designated on the Drawings, identified in the Specifications
                                  or required by the ENGINEER.

J.      Rip Rap:                  Stone armor material used in drainage features for erosion control and
                                  energy dissipation.

## 1.4    SUBMITTALS

A.      CONTRACTOR shall identify all earthwork material suppliers and shall submit written verification
        from his material suppliers that all earthwork materials to be used for the work comply with the
        requirements of this Section.

B       CONTRACTOR shall submit copies of all geotechnical laboratory reports within 10 working days
        after sample collection.

## 1.5    QUALITY CONTROL

A.      CONTRACTOR shall perform construction surveys, as needed, to ensure that the lines and
        grades of all excavations, embankments, ditches, pipe trenches, pipe inverts, and graded
        surfaces are in accordance with the drawings and specifications.

B.      OWNER or ENGINEER may perform pre-construction and post-construction topographic surveys
        of the work area and related areas and may perform additional quality assurance surveys.
        CONTRACTOR shall coordinate his activities with OWNER's or ENGINEER's surveyor and
        provide safe access to all excavation areas for survey and/or verification sampling activities.

## 1.6    TESTING

A       The number and type of testing required for each type of earthwork shall be as specified in the
        specific section related to the type of earthwork.

B.      OWNER or ENGINEER will select the locations for all tests   Tests performed at locations not
        approved by the OWNER or ENGINEER will not be accepted

C.      All undisturbed earthwork samples shall be collected using a thin-walled sampler complying with

ASTM D1587. The length of the sampler shall be suitable for collection of an undisturbed sample over the specified sampling interval.

D.  Unless otherwise specified, testing shall be performed in accordance with the following methods:

1.  Soil classification shall be performed using ASTM D2487. Liquid Limits, Plastic Limits and Plasticity Indices shall be determined using ASTM D4318.

2.  Moisture-Density Relationships shall be determined using ASTM D698. unless otherwise directed by ENGINEER. ASTM D1557 may be used only where specified.

3.  In-place density and moisture content shall be determined using ASTM D6938 (Nuclear Density Gage). Other methods for determining in-place density and moisture may not be used unless approved by the ENGINEER.

4.  Hydraulic conductivity shall be determined using ASTM D5084.

5.  Direct shear testing shall be performed in accordance with ASTM D3040.

## 1.7  TOLERANCES

A.  Grades and slopes of all earthwork shall be straight and true. Unless otherwise specified, CONTRACTOR shall complete all earthwork within the dimensional tolerances presented below.

B.  Elevation Tolerances:

| | | |
|---|---|---|
| 1. | Foundation Soil Surface: | plus 0.2 foot, minus 0 0 foot. |
| 2. | Liner Subgrade Surface: | plus 0 1 foot, minus 0.0 foot. |
| 3. | Haul Road: | plus 0.1 foot, minus 0.0 foot. |
| 4. | All Other Surfaces: | plus 0.1 foot, minus 0 0 foot. |

C.  Thickness Tolerances:

| | | |
|---|---|---|
| 1 | Liner Subgrade: | plus 0.2 foot, minus 0.0 foot. |
| 2 | Protective Soil: | plus 0.2 foot, minus 0.0 foot. |
| 3 | Haul Road: | plus 0 2 foot, minus 0.0 foot. |
| 4. | All Other Surfaces: | plus 0 1 foot, minus 0.0 foot. |

D.  Grade Tolerances:  All grades/slopes shall be completed within

| | | |
|---|---|---|
| 1 | Foundation Soil Surface: | plus or minus 0 2 percent of design slope. |
| 2 | Drainage Features: | plus or minus 0.1 percent of design slope. |
| 3. | Haul Road: | plus or minus 0 1 percent of design slope. |
| 4. | All Other Surfaces: | plus or minus 0.1 percent of design slope. |

E  Horizontal Coordinates and/or Earthwork Dimensions.    plus or minus 0.5 feet

## 1.8  UTILITIES

A.  OWNER will attempt to deactivate electrical and other utilities in areas to be excavated; however, CONTRACTOR shall be ultimately responsible for ensuring that no energized equipment or utilities are present prior to initiating excavation activities  If CONTRACTOR identifies energized or active equipment or utilities, CONTRACTOR shall cease work and notify ENGINEER so that the equipment/utilities may be deactivated. CONTRACTOR shall again check the equipment and utilities to ensure they are deactivated prior to proceeding with excavation activities.

B  CONTRACTOR shall note that underground and aboveground utilities may be located in the area of the Work. CONTRACTOR shall be ultimately responsible for protecting the utilities during

345

earthwork and related activities.

## 1.9 EARTHWORK SAFETY

A. As discussed in other areas of these specifications, CONTRACTOR shall be fully responsible for the health and safety of all personnel in the work area, at all times, and shall take all necessary precautions to protect personnel.

B. In addition to general health and safety responsibilities, CONTRACTOR shall be fully responsible for complying with all applicable OSHA and related regulations regarding earthwork, including, but not limited to, the requirements of 40 CFR Part 126.

## PART 2 - PRODUCTS

## 2.1 FOUNDATION SOIL

A. Foundation soil shall consist of existing soil in the work area that remains after clearing and stripping of existing vegetative soil.

## 2.2 SELECT FILL

A. Select fill shall consist of soil excavated during foundation soil grading. CONTRACTOR shall be responsible for loading, transporting, placement and compaction of select fill.

B. Bed Ash shall not be used for Select Fill unless authorized in writing by the OWNER.

C Select fill shall classify as CH, CL or SC using ASTM D2487, shall have a plasticity index between 15 and 40, and shall be free of roots, brush, sod, or other perishable materials and debris.

## 2.3 GENERAL FILL

A. General fill shall be any non-classified soil deemed suitable by the ENGINEER. General fill shall be free of trash, rubbish or other deleterious substances. The maximum particle size of general fill shall be 6 inches.

## 2.4 LINER SUBGRADE

A. Liner Subgrade shall consist of soil excavated from the site during foundation grading. Bed Ash shall not be used for Liner Subgrade. CONTRACTOR shall be responsible for loading, transporting, placement and compaction of Liner Subgrade

B. Liner Subgrade shall classify as CH or CL using ASTM D2487 and shall contain no organic material, sticks, or other deleterious material.

C. Liner Subgrade shall conform to the following:

1. Liquid Limit (LL) greater than or equal to 30.

2. Plasticity Index (PI) greater than or equal to 15.

3 Hydraulic Conductivity no more permeable than $5 \times 10^{-5}$ cm/sec by ASTM D5084 at 90 percent maximum dry density as determined by ASTM D698 (Standard Proctor).

## 2.5 PROTECTIVE SOIL

A. Protective soil may consist of select fill as specified herein and approved by the ENGINEER.

September 17, 2012

B.   Protective soil shall classify as CL or SC using ASTM D2487and shall contain no material larger than 3 inch diameter.  Particles larger than 1 inch shall be subrounded to rounded.

C.   Protective soil for slopes equal to or greater than 10(H) to 1(V) shall be select fill conforming to the following minimum requirements:

    1.     Cohesion (c):   1 0 psı
    2      Friction Angle:  23 degrees
    3      Unit Weight:    110 pounds/cubic foot

## 2.6   VEGETATIVE SOIL

A.   Vegetative soıl shall consist of soil stripped from the work area and stockpiled by the CONTRACTOR.  Vegetative soil shall be free of deleterious material, materials toxıc to plant growth, noxious weed seeds, rhizomes, roots, subsoil, rocks, or other debris.

## 2.7   HAUL ROAD SUBGRADE

A.   Haul Road Subgrade shall consist of excavated soils in areas of proposed fill or of existıng soils in areas of proposed cut.  Bed Ash shall not be used for Haul Road Subgrade.

## 2.8   HYDRATED LIME

A   Hydrated Lime shall be a dry powdered material consisting of calcıum hydroxide.

B.   Hydrated lime shall be Type A conformıng to TXDOT Material Specification DMS-6350.  CONTRACTOR shall provide ENGINEER with test data for one sample of hydrated lime that confirms that the material complies with the chemical and physical specıfications of TXDOT DMS-6350.

C.   Hydrated lime shall be supplied from a supplier included on the latest TXDOT approved Material Produced List (MPL).  CONTRACTOR shall submit to ENGINEER proof that the supplier ıs on the TXDOT list.

## 2.9   STABILIZED SUB-BASE

A.   Haul Road Sub-Base soil will consist of chemically stabilized select fill or chemically stabilized existıng native soils approved by the ENGINEER.

September 17, 2012

## 2.10  ROAD BASE

A.    Road base shall consist of crushed stone, free of mud, clay, vegetation or other debris, conforming to the requirements of TXDOT Item 248, Type A (Grade I).  Size Gradation shall comply with the following:

| U.S. Sieve Size | Percent Passing |
|---|---|
| 2.5 inch | - |
| 1.75 inch | 100 |
| .875 inch | 65 to 90 |
| .375 inch | 50 to 70 |
| No. 4 | 35 to 55 |
| No. 40 | 15 to 30 |
| No. 200 | 0 |

B.    Road Base shall conform to the following:

1.    Liquid Limit (LL) less than or equal to 35.

2.    Plasticity Index (PI) less than or equal to 10.

## 2.11  RIPRAP

A.    Riprap shall be clean, well-graded durable natural stone with a minimum specific gravity of 2.4.  Unless other wise approved by the ENGINEER, riprap shall comply with the following:

1.    No deleterious material, noxious weed seeds, roots, subsoil, or other debris shall be present.

2.    Riprap shall consist of stone conforming to the following gradation:

| Stone Weight (pounds) | Percent Lighter Than |
|---|---|
| 700 | 100 |
| 300 | 50 to 100 |
| 150 | 15 to 50 |
| 45 | 0 to 15 |

3.    Stones shall be at least 3 inches in their least dimension.  The breadth or thickness of each stone shall not be less than one-third the length of the stone.

338

## PART 3 - EXECUTION

### 3.1    GENERAL

A.    All earthwork shall be completed to the lines and grades shown on the Drawings and as required by the ENGINEER.

B.    CONTRACTOR shall not place material in the presence of water unless approved by the ENGINEER.  Saturated areas shall be dewatered by CONTRACTOR as specified herein prior to initiating earthwork activities.  CONTRACTOR shall remove all saturated soils, muck, organic matter and other materials not suitable for compaction or proof-rolling from dewatered areas prior to placing fill materials.

C.    All proof rolling shall be performed as follows unless another method is approved by the ENGINEER:

1.    Proof rolling equipment shall consist of not less than four pneumatic tired wheels, arranged so that the wheels carry approximately equal loads when operating on unequal surfaces. Proof rolling equipment may be self-propelled or towed by a suitable tractor

2.    Proof rolling equipment shall have a rolling width of 8 to 10 feet and shall be capable of operating under various contact pressures.

3    Contact pressure of proof rolling equipment shall be a minimum of 2000 pounds per square foot.

4.    A minimum of two passes with the proof rolling equipment shall be completed across the entire foundation soil surface

5.    Any area shown to be unstable or non-uniform after proof rolling shall be recompacted and/or reworked until proof rolled to the satisfaction of the ENGINEER.

D    Compaction of all materials shall be performed with an appropriately heavy, properly ballasted penetrating-foot compactor.  A minimum of four passes of the compactor shall be performed on each material lift regardless of whether the lift complies with specified density requirements within less than four passes.

E.    When target compaction/density is specified using ASTM D698 (Standard Proctor), the minimum weight of the compacting equipment shall be 1500 pounds per linear foot of drum length

F.    The daily work area shall extend a distance no greater than necessary to maintain moist conditions and continuous operations   Desiccation and crusting of the lift surface shall be avoided as much as possible.

G.    Water added to soils shall be clean and shall not have come into contact with waste or any objectionable material.  Source of water shall be approved by ENGINEER prior to application.

H.    Unless otherwise specified or approved by the ENGINEER, the maximum clod size in each lift prior to compaction shall be 2 inches in diameter.  Clod size shall be reduced through discing, pulverizing or similar methods   Unless otherwise approved by the ENGINEER, a minimum of 4 passes with discing or pulverizing equipment shall be made across each lift prior to beginning compaction.  A pass is defined as one trip across the lift surface.  Passes shall be made at alternating right angles across the lift surface.

I.    Finished, compacted lifts of all material shall be sprayed with clean water as necessary to prevent drying and desiccation.

J.    At the end of each construction day's activities, completed lifts shall be sealed by rolling with a

rubber-tired or smooth drum roller  Prior to resuming placement of overlying material, the surface of the previous lift shall be scarified to a minimum depth of 2 inches.

## 3.2    DEWATERING

A.    CONTRACTOR shall note that some of the work may be performed in areas exhibiting saturated conditions at and below the groundwater table.  CONTRACTOR shall not place material in the presence of water unless approved by the ENGINEER.

B.    CONTRACTOR shall dewater the work area using pumps or other method approved by the ENGINEER.  Dewatering measures shall be implemented by the time the excavation reaches the water level in order to maintain the integrity of the in-situ material.  Dewatering water shall be discharged in accordance with OWNER and ENGINEER requirements in a manner that minimizes erosion and other disturbances to existing drainage features and adjacent areas

C.    All dewatering system components, including cofferdams, pumps, piping and related equipment shall be removed by the CONTRACTOR at the completion of the work.

## 3.3    FOUNDATION SOIL

A.    Foundation soil areas to be cut shall be excavated using appropriate excavating equipment.  Foundation soil removed during excavation shall be temporarily stockpiled for use as fill in other foundation soil areas.  After cut areas have been excavated to the required lines and grades, the soil surface shall be proof rolled as specified in this Section.

B.    Foundation soil areas to be filled shall first be proof rolled as specified in this Section   Foundation soil in fill areas shall be placed and compacted in lifts, with a maximum loose lift thickness of 12 inches.  Each fill lift shall be compacted using a minimum of four passes of the compactor.  A pass is defined as one trip across the lift surface.  There is no target maximum density requirement for fill applications of foundation soil.

C    After completion of the foundation soil, but before beginning installation of the overlying materials, CONTRACTOR shall survey the finished elevations of the foundation soil to ensure that the top of the foundation soil is at the grades and elevations specified on the Drawings   There shall be a minimum of one survey point for every 10,000 square feet of foundation soil surface area.

## 3.4    SELECT FILL

A.    Select fill shall be placed and compacted in lifts.  Maximum loose lift thickness shall be 8 inches.  Maximum compacted lift thickness shall be 6 inches.

B.    Prior to compaction, the moisture content of the select fill shall be no greater than plus 3 percent of the optimum moisture content as determined by ASTM D698 (Standard Proctor).  If the moisture content is above the specified maximum, select fill shall be pulverized, disced or similarly reworked to air dry the material and decrease the moisture content

C    Each select fill lift shall be compacted to a minimum of 90 percent maximum dry density as determined by ASTM D698 (Standard Proctor).  Material with densities less than the specified density shall be recompacted and/or reworked as necessary to achieve the specified density.

D.    Each lift shall be thoroughly compacted and shall satisfy all moisture and density requirements before a subsequent lift is placed.

E.    CONTRACTOR shall test select fill as specified herein:

1.    One moisture density relationship test in accordance with ASTM D698 (Standard Proctor) shall be performed for every 50,000 cubic yards placed.

340

2.  One in-place density test in accordance with ASTM D6938 shall be performed for every 20,000 square feet of surface area for each lift.  Surface area shall be measured in the horizontal plane.

3.  One soil classification in accordance with ASTM D2487 shall be performed for every 50,000 cubic yards placed.

4.  Plasticity Index (PI) shall be included in the soil classification.  One moisture-density relationship test in accordance with ASTM D698 (Standard Proctor) shall be performed any time a PI change greater than 10 is observed in the soil classification tests.

F.  After completion of the select fill, but before beginning installation of the overlying materials, Contractor shall survey the finished elevations of the select fill to ensure that the top of the select fill is at the grades and elevations specified on the Drawings.  There shall be a minimum of one survey point for every 5,000 square feet of select fill surface area.

## 3.5   SELECT FILL ON STEEP SLOPES

A.  Steep slopes are defined as surfaces with slopes steeper than 5 horizontal to 1 vertical.

B   Construction of select fill on steep slopes shall comply with all other requirements for select fill, in addition to those specified herein.

C.  Select fill shall be placed and compacted in benched, horizontal lifts.  Maximum loose lift thickness shall be 8 inches.  Maximum compacted lift thickness shall be 6 inches

D.  Lifts shall be placed and compacted horizontally (benched parallel to the toe of the slope) rather than vertically (up and down the slope).  Each lift shall be wide enough to permit passage of compacting equipment.

E   Lifts shall extend horizontally beyond the required final elevations of select fill to permit grading back to the required slopes after compaction and testing.

F.  After each lift has been compacted, tested and accepted by the Engineer, Contractor shall grade the slope to the required elevations

## 3.6   LINER SUBGRADE

A.  Liner Subgrade shall be placed and compacted in lifts. Maximum loose lift thickness shall be 8 inches. Maximum compacted lift thickness shall be 6 inches.  A total of 4 lifts will be placed to construct the 2'-0" Liner Subgrade thickness

B   Prior to compaction of each of the first three lifts, CONTRACTOR shall manually remove all visible rock 3 inches or greater in size from the lift.  After the visible rocks have been removed, CONTRACTOR shall compact each lift as discussed below.

C.  Prior to compaction of the fourth lift, CONTRACTOR shall use a rake, pulverizer or similar attachment to remove or reduce in size all rock 3 inches or greater from the lift.  The rake, pulverizer or similar attachment shall be passed across the entire lift surface to the full depth of the lift.  After the rocks have been removed or reduced in size to less than 3 inches, CONTRACTOR shall compact the lift as discussed below.

D.  Prior to compaction of each lift, the moisture content of the Liner Subgrade shall be no greater than plus 3 percent of the optimum moisture content as determined by ASTM D698 (Standard Proctor)    If the moisture content is above the specified maximum, Liner Subgrade shall be pulverized, disced or similarly reworked to air dry the material and decrease the moisture content.

E.    Each lift shall be compacted to a minimum of 90 percent maximum dry density as determined by ASTM D698 (Standard Proctor). Material with densities less than the specified density shall be recompacted and/or reworked as necessary to achieve the specified density.

F.    Each lift shall be thoroughly compacted and shall satisfy all specified requirements before a subsequent lift is placed.

G.    After the fourth lift has been compacted and tested, the surface of the Liner Subgrade shall be rolled and sealed with a smooth drum roller. A minimum of four passes of the roller shall be performed on the Liner Subgrade. A pass is defined as one trip across the entire Liner Subgrade surface.

H.    CONTRACTOR shall test Liner Subgrade as specified herein:

    1.    One moisture density relationship test in accordance with ASTM D698 (Standard Proctor) shall be performed for every 50,000 cubic yards placed.

    2.    One in-place density test in accordance with ASTM D6938 shall be performed for every 20,000 square feet of surface area for each lift. Surface area shall be measured in the horizontal plane.

    3.    One soil classification in accordance with ASTM D2487 shall be performed for every 50,000 cubic yards placed

    4.    Plasticity Index (PI) shall be included in the soil classification One moisture-density relationship test in accordance with ASTM D698 (Standard Proctor) shall be performed any time a PI change greater than 10 is observed in the soil classification tests.

    5    One hydraulic conductivity test by ASTM D5084 for every 50,000 cubic yards of Liner Subgrade. Each test shall be performed on a composite Liner Subgrade sample collected from the Liner Subgrade stockpile as approved by ENGINEER. The composite sample shall be compacted to 90 percent maximum dry density as determined by ASTM D698 (Standard Proctor) prior to performing the hydraulic conductivity test.

I.    After completion of the Liner Subgrade, but before beginning installation of the overlying materials, Contractor shall survey the finished elevations of the Liner Subgrade to ensure that the top of the Liner Subgrade is at the grades and elevations specified on the Drawings. There shall be a minimum of one survey point for every 10,000 square feet of Liner Subgrade surface area.

## 3.7    PROTECTIVE SOIL

A.    Protective Soil shall be placed in accordance with the requirements of Section 02400 of these Specifications and as specified herein Protective Soil shall not be placed until the underlying materials have been approved by the ENGINEER.

B.    Protective Soil shall be placed in one 18 inch lift without damaging the underlying liner or other materials. Protective soil shall be tracked in and smoothed out using tracked equipment No direct compactive effort shall be used on protective soil.

C.    CONTRACTOR shall test Protective Soil as specified herein:

    1.    One direct shear test in accordance with ASTM D3080 shall be performed for every 20,000 cubic yards placed

    2.    One soil classification in accordance with ASTM D2487 shall be performed for every 20,000 cubic yards placed.

E.    After completion of the Protective Soil layer, CONTRACTOR shall survey the finished elevations

342

September 17, 2012

of the Protective Soil to ensure that the top of the protective soil is at the grades and elevations specified on the Drawings. There shall be a minimum of one survey point for every 10,000 square feet of Protective Soil surface area.

**3.8    VEGETATIVE SOIL**

A.    Vegetative Soil shall not be placed until the underlying soil has been approved by the ENGINEER.

B.    Vegetative Soil shall be placed in one 12 inch lift without damaging the underlying soil. Vegetative Soil shall be tracked in and smoothed out using tracked equipment. No direct compactive effort shall be used on vegetative soil.

C.    After completion of the Vegetative Soil layer, CONTRACTOR shall survey the finished elevations of the Vegetative Soil to ensure that the top of the protective soil is at the grades and elevations specified on the Drawings. There shall be a minimum of one survey point for every 10,000 square feet of Vegetative Soil surface area.

**3.9    HAUL ROAD SUBGRADE**

A.    All loose material present at the Haul Road Subgrade elevation along the alignment of the proposed haul road section shall be excavated and removed.

B.    All exposed Haul Road Subgrade soils should be proof rolled to identify any areas of weak subgrade soils. Proof-rolling should be conducted with equipment that has a loaded gross vehicle weight of at least 25 tons.

C.    Any soft or weak spots or areas of organic materials or pumping soils, such as wet silts or fine sands, should be removed to firm ground and replaced with compacted select fill.

D.    The final subgrade section should be processed and moisture conditioned adjusted as necessary to a depth of eight (8) inches to provide an adequate foundation for the haul road section.

E.    The Subgrade soils should be compacted to a minimum dry density corresponding to 92% of the maximum density determined under ASTM D1557 (Modified Proctor) at 1% to 3% above the optimum moisture content (OMC).

F.    CONTRACTOR shall test Haul Road Subgrade as specified herein

    1.    One moisture density relationship test in accordance with ASTM D1557 (Modified Proctor) shall be performed for every 300 linear feet placed

    2.    One in-place density test in accordance with ASTM D6938 shall be performed for every 300 linear feet of surface area for each lift. Surface area shall be measured in the horizontal plane.

    3.    One soil classification in accordance with ASTM D2487 shall be performed for every 300 linear feet placed.

    4.    Plasticity Index (PI) shall be included in the soil classification. One moisture-density relationship test in accordance with ASTM D698 (Standard Proctor) shall be performed any time a PI change greater than 10 is observed in the soil classification tests.

**3.10    HAUL ROAD SUB-BASE**

A.  Haul Road Sub-Base soils with a PI of 10 or greater shall be stabilized with hydrated lime. Hydrated lime shall be applied at a rate of six (6) percent by dry soil weight unless otherwise approved by the ENGINEER. Specific optimum lime series tests shall be performed by CONTRACTOR prior to construction to confirm the percentage of lime required.

B.  Hydrated Lime stabilization procedures shall be in accordance with the Texas Department of Transportation Standard Specifications for Construction and Maintenance of Highways, Streets, and Bridges (SSCMHSB) (June 1, 2004) State Department of Highway Item 260, Lime Treatment For Material Used As Subgrade (Road Mixed), Type A Treatment specifications.

C.  Modifications to Type A Treatment specifications should include a minimum of 48 hours of tempering time before final mixing, a minimum of 60% of lime/soil mixture passing a No. 4 sieve before compaction, and a restriction against the use of carbide or byproduct lime.

D.  Haul Road Sub-Base soils with a PI < 10 shall be stabilized with Type I Portland cement at a rate of five (5) percent by dry soil weight.

E.  The chemically stabilized Haul Road Sub-Base shall be placed in loose lifts with a maximum thickness of 8 inches and compacted to a minimum density corresponding to 95% of the maximum dry density in the referenced Modified Proctor Moisture-Density Test (ASTM D 1557) at moisture contents in the range of 1% below to 3% above the optimum moisture content, inclusive.

F.  The total in-place thickness of the Haul Road Sub-Base soil will be 16 inches.

G.  CONTRACTOR shall test Haul Road Sub-Base as specified herein:

   1.  One moisture density relationship test in accordance with ASTM D1557 (Modified Proctor) shall be performed for every 300 linear feet placed.

   2.  One in-place density test in accordance with ASTM D6938 shall be performed for every 300 linear feet of surface area for each lift. Surface area shall be measured in the horizontal plane.

   3.  One soil classification in accordance with ASTM D2487 shall be performed for every 300 linear feet placed.

   4.  Plasticity Index (PI) shall be included in the soil classification. One moisture-density relationship test in accordance with ASTM D698 (Standard Proctor) shall be performed any time a PI change greater than 10 is observed in the soil classification tests.

## 3.11  ROAD BASE – HAUL ROAD

A.  Road Base shall be placed on the AX haul road and as required by the ENGINEER.

C.  Road Base for the haul road shall be placed in loose lifts with a maximum thickness of 8 inches and compacted to a minimum density corresponding to 95% of the maximum dry density in the referenced Modified Proctor Moisture-Density Test (ASTM D 1557) at moisture contents in the range of 1% below to 3% above the optimum moisture content, inclusive.

D.  The total in-place thickness of the Road Base on the haul road will be 16 inches.

D.  After completion of the road base, but before beginning installation of the overlying materials, CONTRACTOR shall survey the finished elevations of the road base to ensure that the top of the road base is at the grades and elevations specified on the Drawings. There shall be a minimum of one survey point for every 5,000 square feet of road base surface area.

G.  CONTRACTOR shall test Road Base placed on the haul road as specified herein:

1. One moisture density relationship test in accordance with ASTM D1557 (Modified Proctor) shall be performed for every 300 linear feet placed.

2. One in-place density test in accordance with ASTM D6938 shall be performed for every 300 linear feet of surface area for each lift. Surface area shall be measured in the horizontal plane.

3. One soil classification in accordance with ASTM D2487 shall be performed for every 300 linear feet placed.

4. Plasticity Index (PI) shall be included in the soil classification. One moisture-density relationship test in accordance with ASTM D698 (Standard Proctor) shall be performed any time a PI change greater than 10 is observed in the soil classification tests.

## 3.12   ROAD BASE – OTHER LOCATIONS

B.   Road Base shall be placed on access ramps, on the top of the dike and as required by the ENGINEER.

C.   Geotextile shall be placed beneath all Road Base in accordance with Section 2600 of these specifications.

C.   Road Base shall be placed and compacted in lifts, with a maximum loose lift thickness of 8 inches. Each fill lift shall be compacted using a minimum of four passes of the compactor. A pass is defined as one trip across the lift surface. There is no target maximum density requirement for road base.

D.   After completion of the road base, but before beginning installation of the overlying materials, CONTRACTOR shall survey the finished elevations of the road base to ensure that the top of the road base is at the grades and elevations specified on the Drawings. There shall be a minimum of one survey point for every 5,000 square feet of road base surface area.

## 3.13   RIPRAP

A.   Riprap shall be placed on geotextile conforming to the requirements of Section 02600 of these specifications. Place geotextile with the length running up and down the slope. Ensure geotextile has a minimum overlap of 2 feet at all seams.

B.   Riprap shall be placed in such manner as to produce a well graded mass of rock with the minimum practicable percentage of voids, and shall be constructed within a tolerance of plus 4 inches or minus 2 inches from the lines and grades shown on the Drawings. Placement shall begin at the bottom of the area to be covered and continue up slope. Subsequent loads of material shall be placed against previously placed material in such a manner as to ensure a relatively homogenous mass. Open joints shall be filled with spalls or small rocks. Rocks shall be arranged to present a uniform finished top surface such that the variation between tops of adjacent rocks shall not exceed 3 inches.

C.   No stone shall be dropped through air from a height greater than 3 feet on top of the geotextile. The larger stones shall be well distributed and the entire mass of stones in their final position shall be roughly graded to conform to the gradation specified in this specification. The finished riprap shall be free from objectionable pockets of small stones and clusters of larger stones. Placing riprap by dumping into chutes or by similar methods likely to cause segregation of the various sizes will not be permitted. Placing riprap by dumping it at the top of the slope and pushing it down the slope will not be permitted. Rearranging of individual stones will be required to the extent necessary to obtain a well-graded distribution of stone sizes as specified above.

++END OF SECTION++

September 17, 2012

## SECTION 02400

## GEOMEMBRANE SUPPORTED GEOSYNTHETIC CLAY LINER

### PART 1 - GENERAL

### 1.1    DESCRIPTION

A.    This section shall govern work associated with furnishing and installing geomembrane supported geosynthetic clay liner (GSGCL), including, but not limited to, layout, placement, seaming, patching and testing.

### 1.2    REFERENCES

A.    American Society of Testing Materials (ASTM) Standards/Publications (Latest version):

| | |
|---|---|
| D 638 | Standard Test Method for Tensile Properties of Plastics |
| D 1004 | Test Method for Initial Tear Resistance of Plastic or Film Sheeting |
| D 1238 | Standard Test Method for Flow Rates of Thermoplastics by Extrusion Plastometer |
| D 1505 | Test Method for Density of Plastics by the Density-Gradient Technique |
| D 1603 | Test Method for Carbon Black in Olefin Plastics |
| D 2216 | Test Method for Laboratory Determination of Water (Moisture) Content of Soil, Rock, and Soil-aggregate Mixtures |
| D 3895 | Standard Test Method for Oxidative-Induction Time of Polyolefins by Differential Scanning Calorimetry |
| D 4354 | Standard Practice for Sampling of Geosynthetics for Testing |
| D 4632 | Standard Test Method for Grab Breaking Load and Elongation of Geotextiles |
| D 4643 | Standard Test Method for Determination of Water (Moisture) Content of Soil by the Microwave Oven Method |
| D 4759 | Standard of Practice for Determining the Specification Conformance of Geosynthetics |
| D 4833 | Standard Test Method for Index Puncture Resistance of Geotextiles, Geomembranes and Other Related Products. |
| D 5084 | Test Method for Measurement of Hydraulic Conductivity of Saturated Porous Materials Using a Flexible Wall Permeameter |
| D 5199 | Measuring Nominal Thickness of Geotextiles and Geomembranes |
| D 5261 | Standard Test Method for Measuring Mass Per Unit Area of Geotextiles |
| D 5321 | Standard Test Method for Determining the Coefficient of Soil and Geosynthetic or Geosynthetic and Geosynthetic Friction by the Direct Shear Method |

02400 - 1

| D 5397 | Standard Test Method for Evaluation of Stress Crack Resistance of Polyolefin Geomembranes Using Notched Constant Tensile Load Test |
| D 5596 | Standard Test Method for Microscopic Evaluation of the Dispersion of Carbon Black in Polyolefin Geosynthetics |
| D 5887 | Test Method for Measurement of Index Flux through Saturated Geosynthetic Clay Liner Using Flexible Wall Permeameter |
| D 5888 | Identification, Storage, and Handling of Geosynthetic Clay Liners |
| D 5889 | Standard Practice for Quality Control of Geosynthetic Clay Liners |
| D 5890 | Test Method for Swell Index of Clay Mineral Component of Geosynthetic Clay Liners |
| D 5891 | Standard Test Method for Fluid Loss of Clay Component of Geosynthetic Clay Liners |
| D 5993 | Standard Test Method for Measuring Mass Per Unit Area of Geosynthetic Clay Liners |
| D 5994 | Standard Test Method for Measuring Core Thickness of Textured Geomembranes |
| D 6102 | Standard Guide for Installation of Geosynthetic Clay Liners |
| D 6243 | Standard Test Method for Determining the Coefficient of Soil and GCL or Geosynthetic and GCL Friction by the Direct Shear Method |
| D 6392 | Standard Test Method for Determining the Integrity of Nonreinforced Geomembrane Seams Produced Using Thermo-Fusion Methods |
| D 6496 | Standard Test Method for Determining Average Bonding Peel Strength Between the Top and Bottom Layers of Needle-Punched Geosynthetic Clay Liners |
| D 6693 | Standard Test Method for Determining Tensile Properties of Nonreinforced Polyethylene and Nonreinforced Flexible Polypropylene Geomembranes |
| D 6768 | Standard Test Method for Tensile Strength of Geosynthetic Clay Liners |
| E 96 | Standard Test Methods for Water Vapor Transmission of Materials |

## 1.3    DEFINITIONS

A.    Bentonite - Clay soils comprised primarily of sodium montmorillonite, characterized by high swelling potential and low hydraulic conductivity

B.    Geomembrane - An essentially impermeable flexible membrane liner of high-density polyethylene (HDPE).

C.    Geomembrane Supported Geosynthetic Clay Liner (GSGCL) - Liner material consisting of a layer of granular bentonite affixed to a high density polyethylene (HDPE) geomembrane liner

D.     INSTALLER -Party responsible for liner installation, including handling, transporting, storing, deploying, protecting, sampling, patching damaged liner and temporary restraining against wind and thermal/solar expansion.

E.     Liner – Manufactured low permeability barrier consisting of GSGCL.

F.     Lot - Group of consecutively numbered rolls from the same manufacturing line.

G.     MANUFACTURER - Party responsible for the production and quality of the liner.

H.     Overlap - The width of material of a liner panel in contact with an adjacent liner panel    The overlap distance is measured perpendicular from the overlying edge of one panel to the underlying edge of the other.

I.     Net Lined Area: The surface area covered by the liner, as measured parallel to the surface of the liner from the inside face of the perimeter anchor trenches.

**1.4    SUBMITTALS**

A.     CONTRACTOR shall submit the following product information at least 10 days prior to delivery:

    1    Liner.  Certification stating that the liner meets the product requirements of this specification and copies of quality control tests performed by MANUFACTURER.

    2.    Bentonite:  Certification stating that the bentonite meets the product requirements of this specification and copies of quality control tests performed by MANUFACTURER.

B.     CONTRACTOR shall submit the name of the INSTALLER at least 3 weeks prior to installation, including resume of installation supervisor to be assigned to the project and a list of liner projects completed by INSTALLER.

C.     CONTRACTOR shall submit a Quality Control Plan and Installation Procedures at least 3 weeks prior to installation.  The information shall include a list of quality control tests performed and typical testing frequencies, recommended installation procedures, and panel layout drawing identifying panels and overlaps.

D.     CONTRACTOR shall submit the following upon completion of the liner installation:

    1.    Certification from the INSTALLER stating that the liner has been installed in accordance with the Drawings and Specifications

    2.    As-built record drawings showing field-measured locations of all panels, seams, repairs, patches and test samples

    3.    Test reports verifying that the GSGCL has been installed in accordance with the specified requirements.

**1.5    QUALIFICATIONS**

A.     INSTALLER must have experience installing GSGCL liners on at least 5 projects and have installed a minimum of 2,000,000 square feet of GSGCL.

B.     MANUFACTURER may serve as the INSTALLER or may use an outside INSTALLER that has been approved and certified by MANUFACTURER

September 17, 2012

## 1.6    QUALITY CONTROL

A.    CONTRACTOR is responsible for the overall quality of the installed liner. CONTRACTOR shall maintain quality control over suppliers, manufacturers, products, services, site conditions, and workmanship, to produce Work of specified quality.

B.    CONTRACTOR shall perform construction surveys, as needed, to ensure that the location and grades of all liner installations are in accordance with the design requirements.

C.    ENGINEER may perform periodic quality assurance monitoring above and beyond that specified herein  CONTRACTOR shall cooperate, as required, in quality assurance monitoring.

## 1.7    WARRANTY

A    GSGCL material shall be warranted by the MANUFACTURER on a pro-rata basis against defects for a period of 5 years from the date of acceptance by the OWNER.

B    GSGCL installation shall be warranted by the INSTALLER against defects in workmanship for a period of 1 year from the date of acceptance by the OWNER

## PART 2 - PRODUCTS

## 2.1    GSGCL PRODUCT STANDARD

A.    GSGCL shall be Type "Gundseal" as manufactured by Gundle/SLT Environmental, Inc  (GSE) of Houston, Texas; Type "Bentomat CLT" as manufactured by CETCO Lining Technologies of Arlington Heights, Illinois; or ENGINEER-approved equivalent.

B.    Unless other wise approved by the ENGINEER, 30 mil smooth GSGCL shall be installed on flat surfaces and slopes less than 4(H) to I(V) and 30 mil textured GSGCL shall be installed on slopes 4(H) to I(V) and steeper.

C.    <u>GSGCL Material Properties</u>

    1.    <u>Bentonite</u>  Bentonite shall be granular clay with a minimum average 80 percent sodium montmorillonite content and shall comply with the following.

| Property | ASTM Method | Unit | Minimum Average Values |
|---|---|---|---|
| Free Swell | D5890 | mL/2g | >24 |
| Fluid Loss | D5891 | mL | <18 |

    2.    <u>Geomembrane</u>.  Geomembrane for GSGCL shall be high density polyethylene (HDPE) and shall comply with the following.

a.    30 mil Smooth Geomembrane

| Property | ASTM Method | Unit | Minimum Average Values |
|---|---|---|---|
| Thickness | D5199 | mil | 30 |
| Density | D1505 | g/cm$^3$ | 0.94 |
| Tensile Break Strength | D6693 | lb/in | 114 |
| Tensile Strength | D6768 | lb/in | 63 |
| Elongation at Break | D6693 | % | 700 |
| Puncture Resistance | D4833 | lb | 54 |

b.    30 mil Textured Geomembrane

| Property | ASTM Method | Unit | Minimum Average Values |
|---|---|---|---|
| Thickness | D5994 | mil | 30 |
| Density | D1505 | g/cm$^3$ | 0.94 |
| Tensile Break Strength | D6693 | lb/in | 66 |
| Tensile Strength | D6768 | lb/in | 63 |
| Elongation at Break | D6693 | % | 100 |
| Puncture Resistance | D4833 | lb | 65 |

3.    GSGCL    The finished GSGCL shall comply with the following:

| Property | ASTM Method | Unit | Minimum Average Values |
|---|---|---|---|
| Bentonite Mass/Area | D5993 | lb/ft$^2$ | >0 75 |
| Effective Hydraulic Conductivity | D5887/E96 | m/sec | <4X10$^{-14}$ |

D.    A 24-inch (2 foot) overlap guideline shall be imprinted on one edge of the GSGCL to be placed upward in the field as a means for providing quality assurance of the overlap dimension during installation.  The guidelines shall be printed in easily visible, non-toxic ink.

## 2.2    LINER PACKING AND LABELING

A.    All liners shall be wrapped around a structurally sound core than can support the weight of the liner.  Liners shall be supplied in rolls wrapped in relatively impermeable and opaque protective covers and marked or tagged with the following information·

1.    MANUFACTURER's name
2.    product identification
3.    lot or batch number
4.    roll number
5.    roll dimensions

## 2.3    LINER MANUFACTURING QUALITY CONTROL

A.    All liners shall be subjected to quality control and conformance testing to assure that the materials provided meet the specified requirements. Where possible, sampling shall be performed on sacrificial portions of the material to minimize repair of sampled locations.

B.    All materials shall be tested in accordance with MANUFACTURER's quality control program and as specified herein. The MANUFACTURER shall perform the testing  Samples not satisfying the requirements of these specifications shall result in the rejection of the applicable rolls.  At CONTRACTOR's expense, additional testing of individual rolls may be performed to more closely identify the non-complying rolls and/or to qualify individual rolls.

# PART 3 - EXECUTION

## 3.1    DELIVERY, STORAGE and HANDLING

A.    Deliver material to the job site only after ENGINEER/OWNER accepts required submittals.

B.    Comply with MANUFACTURER'S recommendations regarding product protection.  Maintain product clean and free of damage.

C.    Liner shall be covered with a waterproof, tight-fitting plastic protective covering resistant to ultraviolet degradation.  Damage to protective covering shall be repaired immediately.  Repairs shall be such that the liner is protected from moisture or other deleterious conditions.

D.    Deliver product to the job site in MANUFACTURER's original packaging, with labels intact and legible  Maintain packaged materials with seals unbroken and labels intact until time of use. Promptly remove damaged or unsuitable products from the job site and promptly replace with products meeting the required specifications.

E.    Comply with MANUFACTURER's recommendations when hauling, unloading, deploying, and installing liner.  Do not fold liner.  Inspect for defects before installing.

## 3.2    GSGCL INSTALLATION

A.    GSGCL installation shall conform to ASTM D 6102 unless otherwise specified.

B    All INSTALLER personnel are required to comply with OWNER's Health and Safety requirements, including use of steel-toed footwear and other protective gear.  Steel-toed footwear and other protective gear required under OWNER's Health and Safety requirements shall be used at all times unless otherwise approved in writing by OWNER

C    Liner Subgrade

1.    Liner subgrade shall be prepared as specified in Section 2300-Earthwork of these Specifications.

2.    Liner subgrade shall be inspected and accepted by the MANUFACTURER prior to placement of the GSGCL.

D.    GSGCL Placement

1    Once the liner subgrade is accepted by the MANUFACTURER, GSGCL rolls shall be delivered to the working area in their original packaging. Immediately prior to deployment, the packaging shall be carefully removed without damaging the GSGCL.

2.    GSGCL shall be placed on the Subgrade such that the geomembrane side of the GSGCL is on top.

3.    GSGCL anchor trenches shall have rounded edges or the edges shall be cushioned with geotextile.

4.    Equipment used to deploy the GSGCL must be track or rubber tired with 40 psi maximum ground pressure. Equipment shall not cause rutting of the liner subgrade surface, shall not make sharp turns, and shall not be driven over the GSGCL, unless proper demonstration of GSGCL survivability and approval by the MANUFACTURER has been obtained. CONTRACTOR shall repair and/or replace any damage to the liner subgrade or the GSGCL to the satisfaction of the MANUFACTURER and ENGINEER.

5.    Care shall be taken to minimize the extent to which the GSGCL is dragged across the liner subgrade in order to avoid damage to the GSGCL. A temporary geosynthetic slip sheet or rub sheet may be placed on the liner subgrade, as necessary, to reduce friction damage during placement. Care shall be taken to not entrap objects or moisture beneath the GSGCL.

6.    Individual deployed GSGCL rolls/panels shall be placed so that overlapping edges are parallel to the direction of the slope  The minimum dimension of the longitudinal overlap shall be 24 inches. End-of-roll overlapped seams shall be similarly constructed, with a minimum overlap of 24 inches in all directions. Do not sew or use mechanical connections to hold the panels together.  Seams at the ends of the panels shall be constructed such that they are shingled in the direction of the grade to prevent the potential for runoff flow to enter the overlap zone  End-of-roll seams shall be placed a minimum of 3 ft. from the toe or crest of areas with a 4(H): 1(V) slope or steeper.

7.    Supplemental bentonite shall be applied at a minimum rate of 0.25 lb/LF at all GSGCL seams, unless otherwise approved by MANUFACTURER and ENGINEER.

8.    GSGCL shall be placed and maintained flat on the appropriate subgrade, with no wrinkles or folds, especially at the exposed edges of the panels.

9.    On side slopes, the GSGCL shall first be anchored securely at the top of the slope as shown on the Drawings and required by the ENGINEER, and then deployed down the slope in a controlled continuous manner. The GSGCL shall extend continuously from the top to the toe of the slope unless otherwise directed by the ENGINEER.

10    During windy conditions, the GSGCL edges shall be weighted down, if necessary, with a sufficient number of filled sandbags or underlying soil material to prevent damage to the GSGCL

11    The GSGCL material shall be cut with a sharp utility knife with a hook blade, or other MANUFACTURER approved device  Do not damage adjacent or underlying materials while cutting the GSGCL.

12    Do not install GSGCL during periods of rain or in areas of ponded water or unusually moist soils unless otherwise authorized by the MANUFACTURER and ENGINEER

E.   GSGCL Defects and Damage Repair

1     If the GSGCL is defective or damaged (torn, punctured, perforated, etc.) during
      installation, CONTRACTOR shall repair the damaged area by cutting a patch to fit over
      the area. The patch shall be obtained from a new roll and shall be cut to size such that a
      minimum overlap of 24 inches is achieved around all of the damaged area. The patch
      shall be placed with the bentonite side down  Adhesion tape may be used to hold the
      patch in place, while cover soil is being placed.

F.   Protective Soil Placement

1.    Protective Soil shall be placed as specified in Section 02300 of these Specifications and
      as specified herein

2.    If the bentonite in the GSGCL becomes hydrated before the Protective Soil layer is
      placed, the bentonite shall be tested and replaced, as necessary, to meet the specified
      maximum allowable moisture contents specified herein.

3.    Liner Subgrade Moisture Conditions.  Placement of Protective Soil shall incorporate the
      moisture conditions of the liner subgrade as follows:

      a.   If the Subgrade is relatively dry (approaching the "wilting point" moisture content),
           GSGCL shall be covered with Protective Soil within 5 days.

      b.   If the Subgrade is damp to moist (approaching the "field capacity" moisture content),
           GSGCL shall be covered with Protective Soil within 3 days.

      c.   If the Subgrade is moist to wet (approaching saturation), GSGCL shall be covered
           with Protective Soil prior to the end of the day following GSGCL placement.

G.   GSGCL INSTALLER Requirements

1.    INSTALLER Responsibilities

      a.   Field quality control shall be the responsibility of INSTALLER. INSTALLER shall
           document that the installation is performed in accordance with MANUFACTURER's
           requirements and as specified herein

      b.   Field construction quality assurance (CQA) shall be the responsibility of INSTALLER.
           CQA consists of inspections, field-testing, laboratory testing, and record keeping.

2.    INSTALLER Verification.  During installation, INSTALLER shall inspect and verify that the
      following activities are performed in accordance with the specifications:

      a.   Material Storage and Handling. Verify that the material is delivered, stored and
           handled, in accordance with MANUFACTURER's requirements and as specified
           herein

      b   Bentonite Moisture Content. Verify that deployed GSGCL has a moisture content less
          than the maximum allowed by the specifications.  The bentonite coating of the
          GSGCL shall have a typical moisture content value of 25% during installation and soil
          covering activities.  The bentonite can be air-dried or sun-dried just prior to
          installation if necessary for localized areas of elevated bentonite moisture or
          hydration.  Hydrated areas of bentonite should be covered with a GSGCL patch or
          removed

c.  Liner Subgrade.  Verify that the liner subgrade is relatively smooth and uniform and free of any objects greater than ¾-inches.  For isolated areas where the subgrade surface is questionable in regard to preventing damage to an overlying geosynthetic material, an alternative for reducing potential material damage may include deployment of a nonwoven needle-punched geotextile cushion between the subgrade and the GSGCL, if approved by the ENGINEER.

d.  Overlapped Seams.  Verify that the material is installed and aligned with the specified overlap distance.

e   Repairs and Patches.  Verify that the installed material is not damaged. For isolated areas where the geomembrane backing is punctured or torn, or where the bentonite coating has been dislodged during installation, the area should be patched as specified in this section.

f.  Dislodging of the Bentonite Coating.  Verify that the GSGCL is deployed and covered in a manner that does not scrape or dislodge the bentonite coating.  In areas where the bentonite coating has been scraped or dislodged, bentonite shall be replaced by patching the effected area   For dislodged bentonite at roll edges resulting from material handling, the overlap distance should be increased to account for the bentonite loss.

g   Debris in the Overlapped Seams.  Verify that no soil or other debris migrates into Liner overlap seams.

h.  Material Wrinkles and Fishmouths.  Verify that the deployed GSGCL does not contain wrinkles or fishmouths. Wrinkles that cannot be pulled out manually shall be patched or cut out and the area subsequently patched

i.   Material Anchorage at Slopes  Verify the material is properly anchored adjacent to slopes in accordance with the project design details.

j.   Bentonite Protection Prior to Protective Soil Placement.  The exposed perimeter panel edges of the GSGCL shall be protected against water pooling and subsequently flowing below the liner.  This shall be accomplished by confirming that the perimeter of the deployed GSGCL lies flat and in intimate contact with the subgrade. Alternately, temporary ballast, such as sandbags or soil, may be placed on top of the GSGCL in areas to prevent material bridging over the Subgrade.

3.     Protective Soil Placement   During Protective Soil placement, INSTALLER shall inspect and verify the following:

a   Material Inspection.  Inspect each panel of GSGCL placed before the GSGCL is covered.

b.  Protective Soil Cover Operations. Verify that GSGCL is covered with Protective Soil in accordance with the specifications

c.  Soil Placement Operations. Verify that the soil spreading operations are performed in accordance with the specifications and do not cause damage to the GSGCL system

September 17, 2012

## 3.3    GSGCL CQA TESTING

A.    <u>CQA Sample Collection - General</u>.  The INSTALLER shall collect CQA samples for testing as follows:

1    Samples shall be collected in accordance with MANUFACTURER's requirements and as specified herein.

2.    Each CQA sample shall be a minimum of 2 feet long and run the entire width of the GSGCL roll.

3.    INSTALLER shall mark the roll number and machine direction on each sample

B.    <u>CQA Testing</u>.

1.    The following laboratory CQA tests shall be conducted on samples that pass field testing:

| Property | ASTM Method | Unit | Test Frequency |
|---|---|---|---|
| Bentonite Loading | D5993 | lb/ft$^2$ | 1 per liner roll |
| Bentonite Moisture Content | D2216 | % | 1 per liner roll |
| Geomembrane Thickness | D5199 | mil | 1 per liner roll |
| Hydraulic Conductivity | D5887/E96 | cm/sec | 2 per Project |

2.    Reported values shall be the average of 5 specimens taken from the sample.

## 3.4    GSGCL ACCEPTANCE

A.    CONTRACTOR shall retain ownership and responsibility of the GSGCL until acceptance by the ENGINEER.

B.    ENGINEER will accept GSGCL installation when:

1    The installation is complete as determined by ENGINEER.

2.    All required submittals and documentation have been received and approved by ENGINEER.

3.    Test reports verifying that the GSGCL has been installed in accordance with specified requirements have been received and approved by ENGINEER.

4.    CONTRACTOR provides ENGINEER with as-built record drawings of the panel layout and seam locations with reference numbers for test locations

5.    Written certification documents have been received and approved by ENGINEER.

++END OF SECTION++

## SECTION 02500

## CORRUGATED METAL PIPE

### PART 1 GENERAL

### 1.1    REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to within the text by the basic designation only.

A.    American Association of State Highway and Transportation Officials ( AASHTO) Standards/Publications (Latest version)

| | |
|---|---|
| M36 | Standard Specification for Corrugated Steel Pipe, Metallic-Coated, for Sewers and Drains |
| M218 | Standard Specification for Steel Sheet, Zinc-Coated (Galvanized), for Corrugated Steel Pipe |
| M245 | Standard Specification for Corrugated Steel Pipe, Polymer-Precoated, for Sewers and Drains |
| Section 12 | Buried Structures and Tunnel Liners |
| Section 26 | Metal Culverts |

B.    American Society of Testing Materials (ASTM) Standards/Publications (Latest version)

| | |
|---|---|
| A929 | Specification for Steel Sheet, Metallic-Coated by the Hot-Dip Process for Corrugated Steel Pipe |
| A762 | Standard Specification for Corrugated Steel Pipe, Polymer Precoated for Sewers and Drains |
| A760 | Standard Specification for Corrugated Steel Pipe, Metallic-Coated for Sewers and Drains |
| A796 | Standard Practice for Structural Design of Corrugated Steel Pipe, Pipe-Arches, and Arches for Storm and Sanitary Sewers and Other Buried Applications |
| A798 | Standard Practice for Installing Factory-Made Corrugated Steel Pipe for Sewers and Other Applications |

### 1.2    SUBMITTALS

A.    Certification.  The CONTRACTOR shall submit certification from the pipe supplier that the pipe complies with the referenced publications and specifications.

### 1.3    DELIVERY, STORAGE, AND HANDLING

A.    Materials delivered to site shall be inspected for damage, unloaded, and stored with a minimum of handling. Materials shall be stored and handled in accordance with NCSPA's (National Corrugated Steel Pipe Association) recommendations.  Materials shall not be stored directly on the ground. The inside of pipes and fittings shall be kept free of dirt and debris.

B.    Materials shall be handled in a manner that ensures delivery to the trench in sound, undamaged condition. Pipe shall be carried to the trench, not dragged.

## PART 2 PRODUCTS

### 2.1    MATERIALS

A.    Corrugated Metal Pipe and Fittings

1    Corrugated metal pipe and fittings shall be factory fabricated pipe  Type "SmoothCor Pipe" as manufactured by Contech Construction Products Inc. or ENGINEER-approved equivalent.

2.    The galvanized steel coils shall conform to the applicable requirements off AASHTO M 218 or ASTM A 929

3.    Pipe and fittings shall be manufactured in accordance with requirements of AASHTO M36 and ASTM A760, Type IA. Pipe and fittings shall have a full circular cross section, with an outer corrugated pipe wall and a smooth inner wall.

4.    All pipe and fittings shall be certified through the AASHTO National Transportation Product Evaluation Program (NTPEP) Third Party Certification program

5.    One-piece steel connecting bands will be used to connect sections of CMP.  The bands will be placed to overlap each section of pipe equally   The corrugations on the band must fit into the corrugations of each pipe.

B.    Joints

1.    Pipe shall be joined together using One-piece steel connecting bands will be used to connect sections of CMP.  The bands will be placed to overlap each section of pipe equally.  The corrugations on the band must fit into the corrugations of each pipe conforming to the NCSPA Installation Manual for Corrugated Steel Pipes and ASTM A798.

C.    Gaskets

1    Rubber Gaskets for precoated galvanized pipe shall conform to the requirements of ASTM D 1056 and be installed conforming to the NCSPA Installation Manual for Corrugated Steel Pipes.

D.    Pipe Bedding and Embedment

1.    Pipe bedding and embedment shall be angular crushed gravel or crushed limestone, free of mud, clay, vegetation or other debris, conforming to ASTM C33 for stone quality

2.    Pipe bedding and embedment shall meet the requirements of ASTM A798 Class IA material with the following size gradation:

| U.S Sieve Size | Percent Passing |
|---|---|
| 1 5 inch | 100 |
| No  4 | 0 to 50 |
| No. 200 | 0 to 5 |

3.    Atterberg limits for the pipe bedding and embedment shall be non-plastic

## PART 3 EXECUTION

### 3.1    GENERAL

A.    Pipe shall be installed as shown on the drawings and specified herein.  CONTRACTOR shall take special precautions in excavating and backfilling trenches to avoid any movement of the pipe or damage to the joints.

B.    Pipe installation shall be in accordance with ASTM A798, "Standard Practice for Installing Factory-Made Corrugated Steel Pipe for Sewers and Other Applications" in addition to the NCSPA Installation Manual for Corrugated Steel Pipes.

C.    CONTRACTOR personnel involved in pipe installation shall be certified by the pipe manufacturer prior to installing pipe.

### 3.2    TRENCHING

A.    All trench excavation shall be performed in accordance with Federal and State regulations, including applicable OSHA requirements. The trench shall be excavated as recommended by the manufacturer of the pipe to be installed.

B     Trench walls shall be sloped or supported in conformance with generally accepted standards of safety, including TXDOT Standard Specifications for Construction and Maintenance of Highways, Streets and Bridges Item 402, Trench Excavation Protection and Item 403, Temporary Special Shoring Trench walls below the top of the pipe shall be sloped, or made vertical.  Trench walls more than 4 feet high shall be shored, cut back to a stable slope, or provided with equivalent means of protection for employees who may be exposed to moving ground or cave in. Trench walls which are cut back shall be excavated to at least the angle of repose of the soil. Special attention shall be given to slopes which may be adversely affected by weather or moisture content.

C.    Trench width shall be in accordance with ASTM A798 and shall be sufficient to ensure working room to properly and safely place and compact haunching and other backfill materials. Minimum trench width shall not be less than 1.25 times the pipe outside diameter plus 12 inches, (1 25 x O.D  + 12").  On multiple pipe barrel runs the clear distance between pipes shall be 0.50 times the pipe diameter, (½ x Diameter).

D     The bottoms of trenches shall be accurately graded to provide uniform bearing and support for the bottom quadrant of each section of the pipe. Stones of 3 inches or greater in any dimension, or as recommended by the pipe manufacturer, whichever is smaller, shall be removed to avoid point bearing.

### 3.3    PIPE BEDDING

A.    The pipe bedding surface for the pipe shall provide a firm foundation of uniform density throughout the entire length of the pipe   Bell holes and depressions for joints shall be not more than the length, depth, and width required for properly making the particular type of joint

B.    A minimum of 6" of pipe bedding shall be provided at the base of the trench prior to pipe placement   Pipe bedding shall be compacted to a minimum 90% Standard Proctor Density per ASTM D698

### 3.4    PIPE INSTALLATION

A.    Unless otherwise authorized, start the laying of pipe on the bedding at the outlet end with the spigot or tongue end pointing downstream, and proceed toward the inlet end with the abutting

sections properly matched, true to the established lines and grades. Fit, match, and lay the pipe to form a smooth, uniform conduit.

B.    Lower sections of pipe into the trench without damaging the pipe or disturbing the bedding and the sides of the trench. Carefully clean the ends of the pipe before the pipe is placed. Prevent the earth or bedding material from entering the pipe as it is laid.

C.    Remove and re-lay, without extra compensation, pipe that is not in alignment or that shows excessive settlement after laying.

D    Lay multiple lines of pipe with the centerlines of the individual barrels parallel.

## 3.5    JOINTING

A.    Joints shall be installed such that the connection of pipe sections will form a continuous line free from irregularities in the flow line.

B.    Joints shall be completed in accordance with pipe manufacturer's instructions.

## 3.6    EMBEDMENT

A.    After the pipe has been placed in the trench, embedment shall be placed from the top of the pipe bedding up to approximately ¾ of the pipe diameter.

B.    Embedment shall be placed in 6 inch maximum lifts and shall be worked around the pipe by hand to provide maximum support.  Embedment shall be compacted to a minimum 90% Standard Proctor Density per ASTM D698 (Standard Proctor).

C.    Embedment shall be placed and consolidated under the pipe haunches (the area of the pipe between the springline and the bottom of the pipe) to provide adequate side support to the pipe. CONTRACTOR shall exercise proper control to avoid vertical and horizontal displacement of the pipe from proper alignment.

## 3.7    BACKFILLING

A.    After the pipe embedment has been properly placed, select fill conforming to the requirements of Section 2300 of these specifications shall be placed above the pipe embedment   The backfill shall be brought up evenly for the full length of pipe.

B    Select fill shall be placed and compacted in lifts.  Maximum loose lift thickness shall be 8 inches. Maximum compacted lift thickness shall be 6 inches.

C.    Each select fill lift shall be compacted to a minimum of 90 percent maximum dry density as determined by ASTM D698 (Standard Proctor).  Material with densities less than the specified density shall be recompacted and/or reworked as necessary to achieve the specified density.

++ END OF SECTION ++

## SECTION 02600

## GEOTEXTILE

## PART 1 – GENERAL

### 1.1    DESCRIPTION

A.    This section shall govern work associated with furnishing and installing geotextile including, but not limited to, layout, installation, and testing.

### 1.2    REFERENCES

A.    American Society of Testing Materials (ASTM) Standards/Publications (Latest version):

| | |
|---|---|
| D3776 | Test Method for Mass per Unit Area (weight) of Woven Fabric |
| D3786 | Test Method for Hydraulic Bursting Strength of Knitted Goods and Non-woven Fabrics |
| D3787 | Test Method for Hydraulic Bursting Strength of Knitted Goods and Non-woven Fabrics, Diaphragm Bursting Strength Test |
| D4354 | Standard Practice for Sampling Geosynthetics for Testing |
| D4355 | Test Method for Deterioration of Geotextiles by Exposure to Light, Moisture and Heat in a Xenon Arc Type Apparatus |
| D4491 | Test Method for Water Permeability of Geotextiles by Permittivity |
| D4533 | Test Method for Trapezoid Tearing Strength of Geotextiles |
| D4595 | Test Method for Tensile Properties by the Wide-width Strip Method |
| D4632 | Test Method for Breaking Load and Elongation of Geotextiles (Grab Method) |
| D4751 | Test Method for Determining Apparent Opening Size of Geotextile |
| D4833 | Test Method for Index Puncture Resistance of Geotextiles, Geomembranes, and Related Products |
| D5199 | Test Method for Measuring Nominal Thickness of Geotextiles and Geomembranes |

### 1.3    SUBMITTALS

A.    At least 14 days prior to installation of the geotextile, CONTRACTOR shall submit for approval the following information:

1.    Manufacturer's Literature.  Submit manufacturer's literature for proposed geotextile, including catalog cut sheets, material samples and, written instructions for delivery, storage, handling, installation, seaming, and repair.

2.    Manufacturer Certification.  Written certification from the manufacturer that the geotextile complies with the requirements of these specifications and is appropriate for the intended application.

September 17, 2012

**PART 2 - PRODUCTS**

**2.1     GEOTEXTILE**

A.      Geotextile shall be non-woven, continuous or staple filament, needle-punched polypropylene or polyester suitable for AASHTO M-288 Class 2 applications.  Yarn shall be oriented into a stable network that maintains its structure during handling, installation, and long-term service.

B.      Geotextile shall be uniform in color, density, and other physical properties and free of foreign inclusions or other defects.

C       Geotextile shall be nominal 6 oz per square yard and shall conform to the following minimum average roll values for the properties listed:

| Property | ASTM | Unit | Minimum Values |
|---|---|---|---|
| Fabric Thickness | D4355 | % Retained | 70 |
| Grab Tensile Strength | D4632 | lbs | 160 |
| Trapezoid Tear Strength | D4533 | lbs | 65 |
| Puncture Resistance | D4833 | lbs | 90 |
| Permittivity | D4491 | $\text{sec}^{-1}$ | 1.5 |
| Apparent Opening Size | D4751 | mm | 0.21 |

**PART 3 - EXECUTION**

**3.1     DELIVERY, STORAGE and HANDLING**

A.      Comply with the manufacturer's recommendations regarding product handling and protection.

B       Deliver products to the job site in their manufacturer's original packaging, with labels intact and legible.

C.      Maintain packaged materials with seals unbroken and labels intact until time of use.  Maintain in a manner that keeps product clean, dry and free of damage.  Promptly remove damaged or unsuitable products from the job site and promptly replace with products meeting the required specifications.

D.      Comply with manufacturer's recommendations when hauling, unloading, deploying, and installing geotextile.  Inspect for defects before installing.

**3.2     GEOTEXTILE INSTALLATION**

A.      Extend geotextile into anchor trenches as shown in the Drawings.  Roll geotextile down the slope in such a manner as to maintain tension to preclude folds and wrinkles.  Remove any folds or wrinkles by hand

B       Ballast geotextile during deployment.  Remove ballast immediately prior to covering geotextile with succeeding construction layer.

C       During installation, do no entrap rocks, dust, or moisture that could damage geotextile or cause clogging.

D.     Schedule deployment activities so geotextile is exposed to direct sunlight for no more than 5 days, unless geotextile is ultraviolet-light stabilized.

E.     Overlap geotextile 2 feet minimum at all seams.

F.     Inspect geotextile and repair holes or tears.  Patch using the same geotextile, with minimum overlap of 2 feet in all directions.

++END OF SECTION++

## SECTION 02900

## VEGETATION

## PART 1 – GENERAL

### 1.1    SUMMARY

A.    This Section describes the requirements for vegetation establishment in areas disturbed during construction activities.

### 1.2    SUBMITTALS

A.    CONTRACTOR shall submit information regarding proposed seed, fertilizer, mulch, tackifier and any other materials to be used to establish vegetation at least 10 days prior to delivery.

## PART 2 – PRODUCTS

### 2.1    SEED SUPPLIERS

A.    Seed suppliers must provide labeling of variety, purity, and germination.  The supplier must satisfy State of Texas seed quality laws.  The OWNER must approve seed supplier.

### 2.2    SEED DELIVERY, STORAGE, AND HANDLING

A.    Grass seed mixture shall be delivered in sealed containers.  Seed in damaged packaging will not be accepted.  CONTRACTOR shall provide seed mixture in containers showing the percentage of each species in the seed mix, year of production, net weight, date of packaging, name and address of supplier, percent of weed seed content, and guaranteed percentage of purity and germination.

B.    Fertilizer shall be delivered in appropriate waterproof containers showing weight, chemical analysis, and name of manufacturer.

### 2.3    SEED MIXTURE

A.    Seed mixture shall be appropriate for the season in which it is planted and shall be approved by the ENGINEER prior to placement.

B.    Seed shall be hulled, extra-fine grade, treated with fungicide, and shall have a germination and purity that will produce, after allowance for Federal Seed Act tolerances, a pure live seed (PLS) content of not less than 85 percent.  Seed shall be labeled in accordance with U.S. Department of Agriculture rules and regulations.

C.    Unless otherwise approved by the Engineer, vegetation seed mixture shall consist of the following grasses at the application rates specified:

| Grass Species | Application Rate (pounds PLS per acre) |
|---|---|
| Gulf Rye | 30 |
| Common Bermudagrass | 20 |
| Total: | 50 |

D.    Alternative seed mixtures may be submitted in writing to the ENGINEER and must be approved by the ENGINEER prior to seed application.

## 2.4    ACCESSORIES

A.    Mulching materials shall consist of dry oat, wheat, or Bermuda straw, free from weeds and foreign matter detrimental to plant life. Native hay or chopped cornstalks are acceptable  Also acceptable is approved chip-form wood cellulose fiber that is free of ingredients that could inhibit growth or germination.

B.    Compost, if used as an organic admixture, shall be applied per TXDOT Special Specification; Item 1027 "Furnishing and Placing Compost." Compost application is optional and subject to the approval of the ENGINEER, which must be obtained at least 10 days prior to use.

C.    Fertilizer shall be applied to vegetative soil layer material and shall be inorganic chemical fertilizer consisting of 20-5-5 fertilizer applied at 200 pounds per acre.

D.    Stakes shall be softwood lumber, chisel pointed

E.    Water shall be from fresh water sources and shall be free from soil, acids, alkalis, salt, or any other substance injurious to growth of grass.

## PART 3 – EXECUTION

## 3.1    INSPECTION OF VEGETATIVE SOIL

A.    CONTRACTOR shall verify that vegetative soil and areas disturbed during construction activities are ready to receive the work covered by this section.

## 3.2    FERTILIZER

A.    All fertilizer shall be applied in accordance with manufacturer's instructions.

B.    Manure, if used, may be applied at a rate of up to 10 tons/acre. Manure application is optional subject to the approval of the ENGINEER, which must be obtained at least 10 days prior to use.

C    Pre-planting fertilizer shall be mixed thoroughly into the upper 3 in. of vegetative-soil layer prior to applying seed.

## 3.3    SEEDING

A.    Drill seed application is acceptable for slopes equal to or flatter than 4(H):1(V).

B.    Seed shall be applied evenly by broadcast or hydroseed application at the rate specified in this Section. Adjustment to rate shall be made for variations in seed purity and germination to achieve the PLS equivalent rate. Hydroseeding is acceptable as a broadcast method of seeding and fertilizing. If dry broadcasting is done, seeds must be raked into the upper soil surface and seed must be applied at half of the specified broadcast rate. Designated areas for erosion control may not be seeded in excess of that which can be covered with erosion control material on the same day.

C.    CONTRACTOR shall not sow immediately following rain, when ground is too dry, or during windy periods.

## 3.4    SEED PROTECTION/EROSION CONTROL

A.    Straw/hay mulch shall be applied to all seeded areas, with slopes less than 4(H) to 1(V), within 24 hours after seeding operations  Straw or hay mulch shall be applied at a rate of approximately

364

September 17, 2012

150 pounds per 1000 square feet (6,500 pounds per acre) and crimped in place. Cellulose fiber mulch shall be applied at a rate of approximately 75 pounds per 1,000 square feet (3,200 pounds per acre).

B.   Seeded sloped areas shall be covered with erosion control fabric on all exterior slopes of 4(H) to I(V) and steeper; and in all drainage channels and swales in accordance with Section 1300, "Erosion and Sedimentation Control."

## 3.5   IRRIGATION

A.   CONTRACTOR shall irrigate seeded areas if and as necessary to comply with the Uniform Grass Coverage (UGC) requirements of this Section.

B.   Irrigation may be performed by water truck or by temporary irrigation system. If a temporary irrigation system is used, CONTRACTOR shall remove temporary irrigation system once OWNER has accepted vegetated areas.

C.   Irrigation shall be performed for a minimum of thirty days after initial planting and for as long as necessary to establish UGC across the entire seeded area.

## 3.6   ESTABLISHMENT AND ACCEPTANCE OF PERMANENT VEGETATION

A.   It shall be solely the CONTRACTOR's responsibility to establish UGC across all application areas, regardless of unseasonable climatic conditions or other adverse conditions affecting planting operations and growth of vegetation.

B.   Uniform Grass Coverage (UGC) shall be defined as a uniform stand of the specified grass with not less than 12 growing plants per square foot of seeded areas.

C.   OWNER will consider application areas acceptable only when:

1.   A statistically significant number of randomly sampled plots have an average of 12 growing plants per square foot.

2.   A minimum of one mowing has been performed in the seeded areas.

3.   UGC has been deemed to have been achieved by the OWNER.

D.   Any application areas, which are not determined to be acceptable by the OWNER, shall be replanted, refertilized, and reirrigated at no additional cost to the OWNER.

E.   The life and satisfactory condition of all plants (including grass) shall be guaranteed by CONTRACTOR for a period of up to one calendar year after written notice of first acceptance of vegetation by OWNER. The guarantee period shall include one complete growing season and dormant period.

++END OF SECTION++



EXHIBIT 45
WIT: Sandow
DATE: 10-17-16
AMY M. CLARK, CSR

365

## Nathan Ziehr

| | |
|---|---|
| **From:** | Chris Collins <CCollins@bmpspecialist.com> |
| **Sent:** | Wednesday, October 09, 2013 11:32 AM |
| **To:** | Nathan Ziehr |
| **Subject:** | Pix |
| **Attachments:** | photo 1.JPG; ATT00001.txt; photo 2.JPG; ATT00002.txt |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

EXHIBIT 46
WIT: Sandow
DATE: 10-17-16
AMY M. CLARK, CSR

366





368

## Nathan Ziehr

| | |
|---|---|
| **From:** | Watkins, David <David.Watkins@luminant.com> |
| **Sent:** | Friday, November 21, 2014 1:33 PM |
| **To:** | Bobbie Holstine; Gordon, Carolyn; Nathan Ziehr |
| **Cc:** | Gonzales, Jacob |
| **Subject:** | RE: Contract/Purchase Order Invoices - A1893710 and A1893758 |
| **Attachments:** | Contract A1893710 Invoice.pdf; Contract A1893758 Invoice AX Haul Road Application for Payment 8 - July 2014.pdf |

Bobbie/Nathan,

On the two invoices that you submitted for the re-vegetation/seeding, can you provide the documented dates that the work was done? To be able to pay the invoices as post-petition (after bankruptcy filing date of 4/29/14), our AP group is asking for documentation showing that the work was performed after 4/29/14. Your invoices do not state when the re-vegetation work was done. Any documentation that you can provide showing the dates of the work, will expedite and ensure payment of the invoices.

Regards,

*David Watkins*

*Office phone: 214-875-9303*
*Fax: 214-875-8909*
*Cell phone: 214-470-3432*
*Email: david.watkins@luminant.com*

Luminant Supply Chain
1601 Bryan Street, 21st Floor
Dallas, Texas 75201

**From:** Bobbie Holstine [mailto:bobbie.holstine@rangerexcavating.com]
**Sent:** Tuesday, November 18, 2014 8:20 AM
**To:** Gordon, Carolyn; Watkins, David; 'Nathan Ziehr'
**Subject:** RE: Contract/Purchase Order Invoices - A1893710 and A1893758

Thank you.

**From:** Gordon, Carolyn [mailto:Carolyn.Gordon@energyfutureholdings.com]
**Sent:** Tuesday, November 18, 2014 8:17 AM
**To:** Bobbie Holstine; Watkins, David; 'Nathan Ziehr'
**Subject:** RE: Contract/Purchase Order Invoices - A1893710 and A1893758

Yes, I have both. The other has to be scanned to our system before I can process. I will be done today also.

Thank You,

Carolyn Gordon
Accounts Payable Coordinator

1



EXHIBIT 47
WIT: Sandow
DATE: 10-17-16
AMY M. CLARK, CSR

369

Shared Services | 1601 Bryan Street | 3rd floor | Dallas, TX 75201  214-812-3023

**From:** Bobbie Holstine [mailto:bobbie.holstine@rangerexcavating.com]
**Sent:** Tuesday, November 18, 2014 8:15 AM
**To:** Gordon, Carolyn; Watkins, David; 'Nathan Ziehr'
**Subject:** RE: Contract/Purchase Order Invoices - A1893710 and A1893758

Carolyn,

Do you have both invoices? Below you mention only applying the one to line 8. The other invoice should be applied to line 11.

Let me know if you need anything else

David,

Thank you for your clarification

Thanks,

Bobbie

**From:** Gordon, Carolyn [mailto:Carolyn.Gordon@energyfuturehoidings.com]
**Sent:** Tuesday, November 18, 2014 7:52 AM
**To:** Watkins, David; bobbie.holstine@rangerexcavating com; Nathan Ziehr
**Subject:** RE: Contract/Purchase Order Invoices - A1893710 and A1893758

Hi,

I will apply to line 8 and attach the email for backup.   Somewhere on the invoice it should have had a quantity of 8,360.00 @5.00  or at least indicate which PO line the amount should be applied towards.

L8 description on PO is N4 Stabilized Base, Haul Road Improvement.   Invoice's description shows under Vegetation Establishment- not matching to description on PO.

Thank You,

Carolyn Gordon
Accounts Payable Coordinator
Shared Services | 1601 Bryan Street | 3rd floor | Dallas, TX 75201  214-812-3023

**From:** Watkins, David
**Sent:** Tuesday, November 18, 2014 7:34 AM
**To:** bobbie.holstine@rangerexcavating.com; Nathan Ziehr
**Cc:** Gordon, Carolyn
**Subject:** FW: Contract/Purchase Order Invoices - A1893710 and A1893758

Bobbie,

Below I had described how you should submit for payment of the attached invoices.

Carolyn,

2

370

Please see below for instructions on how the invoices should be processed.  If we need to set up a call with Ranger, I can do that.

Regards,

**David Watkins**

**Office phone: 214-875-9303**
**Fax: 214-875-8909**
**Cell phone: 214-470-3432**
**Email:** david.watkins@luminant.com

Luminant Supply Chain
1601 Bryan Street, 21st Floor
Dallas, Texas 75201


**From:** Watkins, David
**Sent:** Monday, November 10, 2014 1:19 PM
**To:** Nathan Ziehr; 'bobbie.holstine@rangerexcavating.com'
**Cc:** Gonzales, Jacob
**Subject:** Contract/Purchase Order Invoices - A1893710 and A1893758

Nathan,

I have revised both contracts/POs per our discussion with the exception that on the Contract/PO A1893710 the invoice amount of $57,025.00 was incorrect.  The cost of the vegetation was reduced through the agreement of both parties and the amount was revised to be $41,800.00.  This was due to the fact that some vegetation had already been established naturally due to the long period of time that elapsed from the completion of the work until the vegetation work was actually performed.  The number that we discussed over the phone this morning was $57,025.00 + $22,950.00 = $79,975.00.  The correct amount is $41,800.00 + $22,950.00 = $64,750.00.

Please submit your invoices as shown below to ap.invoicing@luminant.com.  Please copy me when you send the invoices to AP.  After you submit the invoices, I will be following up with our AP group to get the invoices processes as soon as possible.

Contract/PO A1893710 - #11, submit it per the attached Application for Payment but state in the invoice that it is to be paid/processed against **line 8 of the PO**.

Contract/PO A1893758 - #8, submit it per the attached Application for Payment but state in the invoice that it is to be paid/processed against **line 3 of the PO**.

Regards,

**David Watkins**

**Office phone: 214-875-9303**
**Fax: 214-875-8909**
**Cell phone: 214-470-3432**
**Email:** david.watkins@luminant.com

Luminant Supply Chain

3

1601 Bryan Street, 21st Floor
Dallas, Texas 75201

Confidentiality Notice: This email message, including any attachments, contains or may contain confidential information intended only for the addressee. If you are not an intended recipient of this message, be advised that any reading, dissemination, forwarding, printing, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by reply message and delete this email message and any attachments from your system.
Confidentiality Notice: This email message, including any attachments, contains or may contain confidential information intended only for the addressee. If you are not an intended recipient of this message, be advised that any reading, dissemination, forwarding, printing, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by reply message and delete this email message and any attachments from your system.
Confidentiality Notice: This email message, including any attachments, contains or may contain confidential information intended only for the addressee. If you are not an intended recipient of this message, be advised that any reading, dissemination, forwarding, printing, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by reply message and delete this email message and any attachments from your system.

Tab L

**Texas Statutes**

**Property Code**

**Title 5. Exempt Property And Liens**

**Subtitle B. Liens**

**Chapter 53. Mechanic's, Contractor's, Or Materialman's Lien**

**Subchapter A. General Provisions**

*Current through the 84th Regular Session*

§ 53.001. Definitions

In this chapter:

(1)

"Contract price" means the cost to the owner for any part of construction or repair performed under an original contract.

(2)

"Improvement" includes:

(A)

abutting sidewalks and streets and utilities in or on those sidewalks and streets;

(B)

clearing, grubbing, draining, or fencing of land;

(C)

wells, cisterns, tanks, reservoirs, or artificial lakes or pools made for supplying or storing water;

(D)

pumps, siphons, and windmills or other machinery or apparatuses used for raising water for stock, domestic use, or irrigation; and

(E)

planting orchard trees, grubbing out orchards and replacing trees, and pruning of orchard trees.

(3)

"Labor" means labor used in the direct prosecution of the work.

(4)

"Material" means all or part of:

(A)

the material, machinery, fixtures, or tools incorporated into the work, consumed in the direct prosecution of the work, or ordered and delivered for incorporation or consumption;

(B)

rent at a reasonable rate and actual running repairs at a reasonable cost for construction equipment used or reasonably required and delivered for use in the direct prosecution of the work at the site of the construction or repair; or

(C)

power, water, fuel, and lubricants consumed or ordered and delivered for consumption in the direct prosecution of the work.

(5)

"Mechanic's lien" means the lien provided by this chapter.

(6)

"Original contract" means an agreement to which an owner is a party either directly or by implication of law.

(7)

"Original contractor" means a person contracting with an owner either directly or through the owner's agent.

(8)

"Residence" means a single-family house, duplex, triplex, or quadruplex or a unit in a multiunit structure used for residential purposes that is:

(A)

owned by one or more adult persons; and

(B)

used or intended to be used as a dwelling by one of the owners.

(9)

"Residential construction contract" means a contract between an owner and a contractor in which the contractor agrees to construct or repair the owner's residence, including improvements appurtenant to the residence.

(10)

"Residential construction project" means a project for the construction or repair of a new or existing residence, including improvements appurtenant to the residence, as provided by a residential construction contract.

(11)

"Retainage" means an amount representing part of a contract payment that is not required to be paid to the claimant within the month following the month in which labor is performed, material is furnished, or specially fabricated material is delivered. The term does not include retainage under Subchapter E.

(12)

"Specially fabricated material" means material fabricated for use as a component of the construction or repair so as to be reasonably unsuitable for use elsewhere.

(13)

"Subcontractor" means a person who has furnished labor or materials to fulfill an obligation to an original contractor or to a subcontractor to perform all or part of the work required by an original contract.

(14)

"Work" means any part of construction or repair performed under an original contract.

(15)

"Completion" of an original contract means the actual completion of the work, including any extras or change orders reasonably required or contemplated under the original contract, other than warranty work or replacement or repair of the work performed under the contract.

**Cite as Tex. Prop. Code § 53.001**

**History.** Amended By Acts 1999, 76th Leg., ch. 889, Sec. 1, eff. Sept. 1, 1999.

Amended by Acts 1997, 75th Leg., ch. 526, Sec. 2, eff. Sept. 1, 1997

Acts 1983, 68th Leg., p. 3533, ch. 576, Sec. 1, eff. Jan. 1, 1984.

Texas Statutes

**Property Code**

**Title 5. Exempt Property And Liens**

**Subtitle B. Liens**

**Chapter 53. Mechanic's, Contractor's, Or Materialman's Lien**

**Subchapter B. Persons Entitled To Lien; Subject Property**

*Current through the 84th Regular Session*

### § 53.021. Persons Entitled To Lien

(a)

 A person has a lien if:

(1)

 the person labors, specially fabricates material, or furnishes labor or materials for construction or repair in this state of:

(A)

 a house, building, or improvement;

(B)

 a levee or embankment to be erected for the reclamation of overflow land along a river or creek; or

(C)

 a railroad; and

(2)

 the person labors, specially fabricates the material, or furnishes the labor or materials under or by virtue of a contract with the owner or the owner's agent, trustee, receiver, contractor, or subcontractor.

(b)

 A person who specially fabricates material has a lien even if the material is not delivered.

(c)

 An architect, engineer, or surveyor who prepares a plan or plat under or by virtue of a written contract with the owner or the owner's agent, trustee, or receiver in connection with the actual or proposed design, construction, or repair of improvements on real property or the location of the boundaries of real property has a lien on the property.

(d)

 A person who provides labor, plant material, or other supplies for the installation of landscaping for a house, building, or improvement, including the construction of a retention pond, retaining wall, berm, irrigation system, fountain, or other similar installation, under or by virtue of a written contract with the owner or the owner's agent, contractor, subcontractor, trustee, or receiver has a lien on the property.

(e)

 A person who performs labor as part of, or who furnishes labor or materials for, the demolition of a structure on real property under or by virtue of a written contract with the owner of the property or the owner's agent, trustee, receiver, contractor, or subcontractor has a lien on the property.

 **Cite as Tex. Prop. Code § 53.021**

**History.** Amended By Acts 2011, 82nd Leg., R.S., Ch. 271, Sec. 1, eff. January 1, 2012.

Amended By Acts 2003, 78th Leg., ch. 410, Sec. 1, eff. Sept. 1, 2003.

Amended By Acts 1999, 76th Leg., ch. 896, Sec. 1, eff. Sept. 1, 1999

Amended By Acts 1995, 74th Leg., ch. 851, Sec. 1, 6, eff. Sept. 1, 1995

Amended By Acts 1991, 72nd Leg., ch. 16, Sec. 16.01, eff. Aug. 26, 1991

Amended by Acts 1989, 71st Leg., ch. 395, Sec. 1, eff. Sept. 1, 1989

Amended By Acts 1989, 71st Leg., ch. 1138, Sec. 1, eff. Sept. 1, 1989

Acts 1983, 68th Leg., p. 3535, ch. 576, Sec. 1, eff. Jan. 1, 1984.

**Texas Statutes**

**Property Code**

**Title 5. Exempt Property And Liens**

**Subtitle B. Liens**

**Chapter 53. Mechanic's, Contractor's, Or Materialman's Lien**

**Subchapter C. Procedure For Perfecting Lien**

*Current through the 84th Regular Session*

**§ 53.051. Necessary Procedures**

To perfect the lien, a person must comply with this subchapter.

**Cite as Tex. Prop. Code § 53.051**

**History.** Acts 1983, 68th Leg., p. 3538, ch. 576, Sec. 1, eff. Jan. 1, 1984.

**Texas Statutes**

**Property Code**

**Title 5. Exempt Property And Liens**

**Subtitle B. Liens**

**Chapter 53. Mechanic's, Contractor's, Or Materialman's Lien**

**Subchapter C. Procedure For Perfecting Lien**

*Current through the 84th Regular Session*

**§ 53.052. Filing Of Affidavit**

(a)

Except as provided by Subsection (b), the person claiming the lien must file an affidavit with the county clerk of the county in which the property is located or into which the railroad extends not later than the 15th day of the fourth calendar month after the day on which the indebtedness accrues.

(b)

A person claiming a lien arising from a residential construction project must file an affidavit with the county clerk of the county in which the property is located not later than the 15th day of the third calendar month after the day on which the indebtedness accrues.

(c)

The county clerk shall record the affidavit in records kept for that purpose and shall index and cross-index the affidavit in the names of the claimant, the original contractor, and the owner. Failure of the county clerk to properly record or index a filed affidavit does not invalidate the lien.

Cite as Tex. Prop. Code § 53.052

**History.** Amended By Acts 1997, 75th Leg., ch. 526, Sec. 5, eff. Sept. 1, 1997.

Amended by Acts 1989, 71st Leg., ch. 1138, Sec. 4, eff. Sept. 1, 1989

Acts 1983, 68th Leg., p. 3538, ch. 576, Sec. 1, eff. Jan. 1, 1984.

**Texas Statutes**

**Property Code**

**Title 5. Exempt Property And Liens**

**Subtitle B. Liens**

**Chapter 53. Mechanic's, Contractor's, Or Materialman's Lien**

**Subchapter C. Procedure For Perfecting Lien**

*Current through the 84th Regular Session*

§ 53.053. Accrual Of Indebtedness

(a)

For purposes of Section 53.052, indebtedness accrues on a contract under which a plan or plat is prepared, labor was performed, materials furnished, or specially fabricated materials are to be furnished in accordance with this section.

(b)

Indebtedness to an original contractor accrues:

(1)

on the last day of the month in which a written declaration by the original contractor or the owner is received by the other party to the original contract stating that the original contract has been terminated; or

(2)

on the last day of the month in which the original contract has been completed, finally settled, or abandoned.

(c)

Indebtedness to a subcontractor, or to any person not covered by Subsection (b) or (d), who has furnished labor or material to an original contractor or to another subcontractor accrues on the last day of the last month in which the labor was performed or the material furnished.

(d)

Indebtedness for specially fabricated material accrues:

(1)

on the last day of the last month in which materials were

delivered;

(2)

on the last day of the last month in which delivery of the last of the material would normally have been required at the job site; or

(3)

on the last day of the month of any material breach or termination of the original contract by the owner or contractor or of the subcontract under which the specially fabricated material was furnished.

(e)

A claim for retainage accrues on the earliest of the last day of the month in which all work called for by the contract between the owner and the original contractor has been completed, finally settled, terminated, or abandoned.

Cite as Tex. Prop. Code § 53.053

**History.** Amended By Acts 2011, 82nd Leg., R.S., Ch. 499, Sec. 1, eff. September 1, 2011.

Amended By Acts 1995, 74th Leg., ch. 851, Sec. 3, eff. Sept. 1, 1995.

Amended by Acts 1989, 71st Leg., ch. 1138, Sec. 5, eff. Sept. 1, 1989

Acts 1983, 68th Leg., p. 3539, ch. 576, Sec. 1, eff. Jan. 1, 1984.

**Texas Statutes**

**Property Code**

**Title 5. Exempt Property And Liens**

**Subtitle B. Liens**

**Chapter 53. Mechanic's, Contractor's, Or Materialman's Lien**

**Subchapter C. Procedure For Perfecting Lien**

*Current through the 84th Regular Session*

**§ 53.054. Contents Of Affidavit**

(a)

 The affidavit must be signed by the person claiming the lien or by another person on the claimant's behalf and must contain substantially:

(1)

 a sworn statement of the amount of the claim;

(2)

 the name and last known address of the owner or reputed owner;

(3)

 a general statement of the kind of work done and materials furnished by the claimant and, for a claimant other than an original contractor, a statement of each month in which the work was done and materials furnished for which payment is requested;

(4)

 the name and last known address of the person by whom the claimant was employed or to whom the claimant furnished the materials or labor;

(5)

 the name and last known address of the original contractor;

(6)

 a description, legally sufficient for identification, of the property sought to be charged with the lien;

(7)

 the claimant's name, mailing address, and, if different, physical address; and

(8)

 for a claimant other than an original contractor, a statement identifying the date each notice of the claim was sent to the owner and the method by which the notice was sent.

(b)

 The claimant may attach to the affidavit a copy of any applicable written agreement or contract and a copy of each notice sent to the owner.

(c)

 The affidavit is not required to set forth individual items of work done or material furnished or specially fabricated. The affidavit may use any abbreviations or symbols customary in the trade.

 **Cite as Tex. Prop. Code § 53.054**

**History.** Amended By Acts 1997, 75th Leg., ch. 526, Sec. 6, eff. Sept. 1, 1997.

Amended by Acts 1989, 71st Leg., ch. 1138, Sec. 6, eff. Sept. 1, 1989

Acts 1983, 68th Leg., p. 3540, ch. 576, Sec. 1, eff. Jan. 1, 1984.

**Texas Statutes**

**Property Code**

**Title 5. Exempt Property And Liens**

**Subtitle B. Liens**

**Chapter 53. Mechanic's, Contractor's, Or Materialman's Lien**

**Subchapter C. Procedure For Perfecting Lien**

*Current through the 84th Regular Session*

**§ 53.055. Notice Of Filed Affidavit**

(a)

A person who files an affidavit must send a copy of the affidavit by registered or certified mail to the owner or reputed owner at the owner's last known business or residence address not later than the fifth day after the date the affidavit is filed with the county clerk.

(b)

If the person is not an original contractor, the person must also send a copy of the affidavit to the original contractor at the original contractor's last known business or residence address within the same period.

**Cite as Tex. Prop. Code § 53.055**

**History.** Amended By Acts 1999, 76th Leg., ch. 889, Sec. 2, eff. Sept. 1, 1999.

Amended By Acts 1997, 75th Leg., ch. 526, Sec. 7, eff. Sept. 1, 1997

Amended By Acts 1993, 73rd Leg., ch. 48, Sec. 7, eff. Sept. 1, 1993

Amended by Acts 1989, 71st Leg., ch. 1138, Sec. 7, eff. Sept. 1, 1989

Acts 1983, 68th Leg., p. 3540, ch. 576, Sec. 1, eff. Jan. 1, 1984.

**Texas Statutes**

**Property Code**

**Title 5. Exempt Property And Liens**

**Subtitle B. Liens**

**Chapter 53. Mechanic's, Contractor's, Or Materialman's Lien**

**Subchapter G. Release And Foreclosure; Action On Claim**

*Current through the 84th Regular Session*

### § 53.156. Costs And Attorney's Fees

 In any proceeding to foreclose a lien or to enforce a claim against a bond issued under Subchapter H, I, or J or in any proceeding to declare that any lien or claim is invalid or unenforceable in whole or in part, the court shall award costs and reasonable attorney's fees as are equitable and just. With respect to a lien or claim arising out of a residential construction contract, the court is not required to order the property owner to pay costs and attorney's fees under this section.

 Cite as Tex. Prop. Code § 53.156

**History.** Amended By Acts 2011, 82nd Leg., R.S., Ch. 51, Sec. 1, eff. September 1, 2011.

Amended by Acts 1989, 71st Leg., ch. 1138, Sec. 22, eff. Sept. 1, 1989.

Added by Acts 1984, 68th Leg., 2nd C.S., ch. 18, Sec. 4(a), eff. Oct. 2, 1984.