# EXHIBIT 15

Page 1

1

2      UNITED STATES BANKRUPTCY COURT

3        FOR THE DISTRICT OF DELAWARE

4   ---------------------------------------x

5   In Re:

6   Energy Future Holdings Corporation,

7   et al.,

8                              Debtors.

9

10  Chapter 11

11  Case No. 14-10979

12  Jointly Administered

13  ---------------------------------------x

14

15          DEPOSITION OF STACEY DORÉ

16              New York, New York

17              September 28, 2015

18

19

20  Reported by:

21  MARY F. BOWMAN, RPR, CRR

22  JOB NO. 98268

23

24

25

1                S. Doré

2  entity associated with the old Ebasco

3  entity, and I think it is called like EECI,

4  if I am not mistaken.

5           So there is some asbestos

6  liability, whatever the name of that,

7  proper name of that entity is, there are

8  some asbestos liabilities there.  And also

9  some asbestos liabilities in the Luminant

10 Generation entity in TCEH.

11      Q.    At which Luminant company?

12      A.    Well, it may be -- I can't

13 remember if we have been sued at multiple

14 ones.  So it is possible that it is

15 Luminant Generation, Big Brown Power

16 Company, San Dow Power Company, those were

17 the -- those are the ones I would think

18 most likely to have been defendants in the

19 past.  I just don't recall for certain.

20      Q.    Now, with whom have you discussed

21 the question of the asbestos liabilities at

22 the company?

23      A.    Ever?  Or limited to a certain

24 time period?

25      Q.    Well, let's say since the

1                    S. Doré

2  bankruptcy was filed.

3      A.   I've discussed asbestos

4  liabilities with numerous parties at the

5  company.  Those individuals that sit on the

6  board of the entity I referred to, which

7  I'm not positive the name of it is EECI,

8  but something to that effect, to members of

9  my own team who directly deal with those

10 cases.  I think that generally would sum up

11 those of the company that I have spoken to.

12     Q.   And who was it specifically by

13 name that you recall talking to?

14     A.   Tony Horton and Kris Moldovan and

15 on my team, Andy Wright and Mike Hunter --

16 not Andy Wright, I'm sorry, Dan Kelly.

17     Q.   By whom are they employed?

18     A.   I'm so used to -- they are

19 employed by EFH Corporate Services Company.

20     Q.   Who made the decision about which

21 of the EFH companies should be put into

22 bankruptcy?

23     A.   Well, ultimately it was the

24 boards of the various debtor entities who

25 made that decision, but certainly my co-CRO

1                     S. Doré

2 and I made a recommendation and the boards

3 typically went along with that

4 recommendation.

5     Q.   With respect to the individual

6 companies, did their boards conclude that

7 those companies were themselves insolvent?

8     A.   I don't think they made that

9 conclusion in every case.  In other words,

10 some may have -- some entities --

11     Q.   For example, I am sorry, go

12 ahead.

13     A.   I would say some entities may

14 have drawn that conclusion and others may

15 not have.  I don't know which ones would be

16 which at this point.

17     Q.   Do you know why the board of EECI

18 decided to file as a Chapter 11 debtor?

19     A.   I do.

20     Q.   And why is that in?

21     A.   Because as part of the RSA, the

22 discussions among the RSA parties and in

23 particular the discussions with the PIK

24 holders and Fidelity, who at the time were

25 going to take ownership of EFH, had a

1                    S. Doré

2    desire to put those entities in and that

3    became part of the deal.

4         Q.   Do you know why they desired to

5    do that?

6         A.   Well, I think they wanted to have

7    the option to deal with those liabilities

8    in the bankruptcy.

9         Q.   Do you know whether EECI was

10   itself insolvent?

11        A.   I don't know.

12        Q.   Had you reviewed the schedules of

13   assets and liabilities filed on behalf of

14   all of the debtors at the beginning of the

15   bankruptcy 2014?

16        A.   No.

17        Q.   Had you reviewed any of them?

18        A.   I probably reviewed parts of them

19   before they were filed, but I would not

20   have been the one primarily responsible for

21   that review.

22        Q.   Who would be?

23        A.   It probably varies by entity.  I

24   don't really recall at this point.

25        Q.   Do you know if some decision was

1                     S. Doré

2    made at the level of yourself and your

3    co-CRO about what efforts were to be made

4    to make sure that those statements were

5    current?

6         A.    Yeah, we had -- yes, I should

7    say.  We had a, if I recall correctly, this

8    has been a year and a half ago now, but we

9    had a process by which those SOFAs and

10   schedules were reviewed internally at the

11   company and with our advisors at A&M and

12   Kirkland and, again, I was not personally

13   involved in that process, but I know there

14   was a process in place to ensure that they

15   were accurate.

16        Q.    By accurate, do you also mean

17   current and up to date?

18        A.    Whatever the requirements of the

19   bankruptcy process were, were the ones that

20   we would have met.  I don't know as of what

21   date they would have had to be current, but

22   whatever the requirements were, our view

23   was we were meeting them.

24        Q.    All right. And was it your

25   understanding that the statements of assets