# EXHIBIT 2

**Expert Declaration of Professor Jack Williams**
**(Redacted Version)**

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |

## EXPERT DECLARATION OF
## PROFESSOR JACK F. WILLIAMS, PhD, JD, CIRA, CDBV

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## TABLE OF CONTENTS

I.     Introduction ....................................................................................................... 3
       A.   Qualifications ......................................................................................... 3
       B.   Fees/Invoices ......................................................................................... 5
II.    Background ........................................................................................................ 6
III.   Overview of NOLs and Limitations on Their Use ............................................ 10
       A.   Overview of the Net Operating Loss Carryback and Carryforward ......... 10
       B.   IRC Section 108 –Reduction of Net Operating Losses by CODI ............. 11
       C.   IRC Section 382 – Limitations on Use of Net Operating Losses.............. 15
       D.   Net Unrealized Built in Gains & Losses ................................................. 16
       E.   Bankruptcy Exceptions to Section 382 ................................................... 18
            1.   The L5 Exception........................................................................... 18
            2.   The L6 Exception........................................................................... 19
IV.    Opinions ............................................................................................................ 20
       A.   Howard's Analysis ................................................................................. 20
       B.   Summary of Methodology to Value NOLs ............................................... 23
       C.   The NOLs Have Value Even After an Ownership Change....................... 24
       D.   Information Missing from Disclosure Statement to Calculate the Value of NOLs .. 24
       E.   Conclusion............................................................................................. 25

## LIST OF DEMONSTRATIVES

Demonstrative 1.    Figure 2 from the Howard Declaration ......................................... 8
Demonstrative 2.    Update of Howard Figure 2.......................................................... 23

1.      Nixon Peabody LLP ("<u>Nixon Peabody</u>"), counsel to American Stock Transfer & Trust Company, LLC as successor trustee to the Bank of New York Mellon Trust Company, N.A. (in such capacity, the "<u>EFH Indenture Trustee</u>") under the indentures for certain notes issued by Energy Future Holdings Corp. ("<u>EFH Corp.</u>") retained Baker Tilly Virchow Krause, LLP ("<u>Baker Tilly</u>") on behalf of the EFH Indenture Trustee to provide financial advisory and valuation services in the above captioned matters (the "<u>Bankruptcy Cases</u>").

2.      In addition to previous testimony I have given in these Bankruptcy Cases, the EFH Indenture Trustee and Nixon Peabody have asked that I determine the value of the certain tax attributes, mainly in the form of net operating losses, carryforwards, and carrybacks (collectively, the "<u>NOLs</u>") of EFH Corp.

## I.      INTRODUCTION

### A.    QUALIFICATIONS

3.      I am a Practice Leader and Principal at Baker Tilly, a national public accounting, tax, and consulting firm.  At Baker Tilly, I provide services in commercial and bankruptcy litigation support (including tax issues and the assessment and determination of the value of claims and causes of action) and distressed business consulting (including financial advisory services, distressed business valuation, investigation of intercompany transactions, bankruptcy tax advisory services, section 363 sales, and negotiating and drafting plans of reorganization).  I further provide services in the distressed mergers and acquisitions area with a focus on high-tech, information technologies, and energy companies related to intellectual property valuations and claims assessment, merger litigation, appraisal rights, due diligence, accounting treatment and disputes, and tax consequences of proposed transactions

4.      Prior to joining Baker Tilly, I was a Senior Managing Director and National Practice Co-Leader — Litigation and Investigative Services at Mesirow Financial Consulting,

LLC ("MFC").  Prior to joining MFC, I was a Director and the National Director — Special Situations (Consulting) of BDO USA f/k/a BDO Seidman, LLP, then the sixth largest public accounting firm in the US, for approximately eleven years.  In that capacity, I served as a forensic, bankruptcy, and tax accountant and advisor, a financial advisor, and on attest services teams.  I headed bankruptcy tax advisory services engagements, ASC 852 (formerly SOP 90-7) engagements regarding accounting for business organizations operating in, and emerging from, bankruptcy reorganization proceedings, intellectual property tax and valuation advisory services, and due diligence assignments with an emphasis on intellectual property.

5.      I entered academia in July 1991, and I am now a tenured Full Professor at Georgia State University ("GSU") College of Law and in its Center for Middle East Studies.  As a Full Professor, I teach and conduct research in accounting and finance, bankruptcy and insolvency taxation, business reorganizations, corporate finance, corporate governance, distressed business valuations, intellectual property, mergers and acquisitions, sports and entertainment law, securitizations, statistics, and taxation.  Many of my courses are taught for credit in both the GSU College of Law and the College of Business at the graduate levels.

6.      I have been an Instructor in the Internal Revenue Service ("IRS") Office of Chief Counsel/New York University School of Law Continuing Professional Education program where I have taught Bankruptcy Accounting and Taxation and Advanced Business Bankruptcy Taxation to IRS Chief Counsel attorneys and agents, state and local tax attorneys and accountants, Federal Deposit Insurance Corporation ("FDIC") attorneys and investigators, and Department of Justice attorneys and accountants across the United States.

7.      In 2001, I was named by the American Bankruptcy Institute ("ABI") as the Inaugural Robert M.  Zinman Scholar in Residence ("Zinman Resident Scholar").  In 2008, the

ABI invited me to serve a second, extended term as the Zinman Resident Scholar.  Additionally, from 2004 to present, I have been the Inaugural Resident Scholar of the Association of Insolvency and Restructuring Advisors ("AIRA"), formerly the Association of Insolvency Accountants.

8.      I am a Certified Insolvency and Restructuring Advisor ("CIRA").   I also hold the Certificate in Distressed Business Valuations ("CDBV").  Both certifications involve annual continuing professional education requirements, with a particular emphasis on accounting, economics, taxation, valuation, bankruptcy, and insolvency subjects.   Moreover, the certifications impose various relevant ethical duties directly applicable when I conduct myself as a consulting or testifying expert in an effort to assist the trier of fact.

9.      I am the former Dean of the Faculty of the American Board of Certification, the organization responsible for the certification of attorneys in the areas of Business Bankruptcy, Consumer Bankruptcy, and Creditors' Rights.   I have served as Chair of the American Bankruptcy Institute - Bankruptcy Taxation Committee.  I have also served as the Tax Adviser to the National Bankruptcy Review Commission ("NBRC") and as Chair of the *Ad Hoc* Tax Advisory Committee to the NBRC.  I have testified before the US House and Senate committees on pending bankruptcy, accounting, and tax legislation.

10.      I have been qualified as an expert and have testified in federal bankruptcy court, federal district court, and state court.

**B.      FEES/INVOICES**

11.      Baker Tilly is compensated for my time at $950 per hour and the time of Baker Tilly's professionals expended in these Bankruptcy Cases under my direction and supervision at

hourly rates ranging from $160 to $950 per hour.  Compensation to Baker Tilly is not contingent in any way upon the outcome of the matters upon which I have been asked to opine.

## II.    BACKGROUND

12.    On April 29, 2014 (the "Petition Date"), Energy Future Holdings Corp. ("EFH Corp.") and 70 of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code") in the District of Delaware.

13.    On the Petition Date, EFH was a privately-held energy company with a portfolio of competitive and regulated energy businesses, based in Dallas, Texas.[2]  EFH Corp. operated the following primary business units:

- Competitive Electricity Market Activities: includes electricity generation, mining, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales conducted through Texas Competitive Electric Holdings Company LLC ("TCEH") and its direct subsidiaries ("T-Side");[3]

- Rate-Regulated Electricity Transmission and Distribution: services are provided through EFH Corp. indirect subsidiary, Oncor Holdings ("Oncor") to retail providers of electricity that sell electricity to parties including, but not limited to, electricity distribution companies and municipalities ("E-Side").

14.    On August 5, 2016, the Debtors filed the *Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 9199] ("T-Side Plan").

---

[2] Substantially all of the stock of EFH Corp. is held by Texas Energy Future Holdings Limited Partnership. *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., In Support of First Day Motions* filed Apr. 29, 2014 ("Keglevic Initial Declaration") at ¶1.  Energy Future Holdings "About Us" https://www.energyfutureholdings.com/about-us/our-companies/.

[3] As discussed herein below, all T-Side operations have been spun-off.

15.     One of the requirements of the T-Side Plan was that the separation of the E-Side and the T-Side be done in such a way that the new owners of the T-Side received a step-up in tax basis for some of the T-Side assets.[4]  This step-up is as a result of the recognition of gain by EFH Corp.  As a result, this transaction impacted the E-Side Debtors as well because the Debtors, and certain non-Debtor affiliates, were either members of an affiliated group or disregarded entities for federal income tax purposes and treated as a single taxpayer (the "EFH Group").[5]

16.     Because of federal tax issues surrounding the spin-off of the T-Side, the Debtors had significant communications with the IRS.  These negotiations culminated with the issuance of a private letter ruling by the IRS on or about July 28, 2016 (the "Private Letter Ruling").[6]

17.     On or about August 14, 2016, the T-Side Debtors submitted the *Declaration of Carla A. Howard in Support of Confirmation of the Third Amended Plan of Reorganization* (the "Howard Declaration"),[7] in which she employed an abbreviated method to calculate the value of the NOLs remaining after the spin-off of the T-Side, such method I will refer to as the "Howard Method" as shown below:

---

[4] Dep. of Paul Keglevic, June 27, 2016, 102:18-104-3 (indicating that the T-Side would not consent to a transaction that did not affect a step-up in tax basis of its assets).

[5] Fifth E-Side Disclosure Statement at 174.

[6] 2016 IRS Private Letter Ruling [EFH06374939], DX343

[7] At that time, Ms. Howard was the Senior Vice President and General Tax Counsel, Energy Future Holdings Corp.

**Demonstrative 1.  Figure 2 from the Howard Declaration[8]**
*($ in Million)*



Figure 2: E-Side CODI and NOL Valuation

|  | (in millions) |
|---|---|
| Projected NOL assuming all Debtors Emerge 12/31/16 | 8,328 |
| *Less*:  Taxable Gain in Preferred Stock Sale | (5,860) |
| *NOLs Remaining After Spin-Off* | 2,468 |
| *Less*:  Projected E-Side CODI[1] | (1259.00) |
| *Surviving NOLs* | 1,209.00 |
| Tax Rate | 35.43% |
| *Potential Tax Savings* | 428.3487 |
| NPV factor, 6% Discount Rate[2] | 89.12% |
| *NPV of NOLs* | *381.7511* |

[1] Based on EVR analysis of distributable value of current NEE bid.
[2] Assumes (a) no 382 limits because of NUBIG/Notice 2003-65;
      (b) LRP allocated taxable income from Oncor starting in 2017.

18.      As shown above, Ms. Howard estimated that EFH had approximately $8.3 billion of NOLs, that approximately $5.9 billion of those NOLs would be used as a result of the transactions contemplated under the T-Side Plan, leaving approximately $2.5 billion after the T-Side Plan Effective Date.  Then, approximately $1.3 billion was projected to be used to satisfy cancellation of debt income ("CODI") resulting from the proposed E-Side transaction.  Ms. Howard, therefore, estimated that $1.2 billion of NOLs were expected to "survive" the T-Side transactions (the "Surviving NOLs").  Ms. Howard estimated that these Surviving NOLS would have a net present value ("NPV") of approximately $381.8 million[9] after the then-anticipated effective date of the T-Side Plan and assuming all Debtors emerge December 31, 2016.[10]

19.      On August 16, 2016, the Debtors filed their *Notice of Filing of Revised "Form of Tax Matters Agreement by and among Energy Future Holdings Corp., Energy Future*

---

[8] Howard Declaration at 11.  As noted in her figure, Ms. Howard assumes that EFH Corp., as a stand-alone company or consolidated group, or any acquirer, will be able to use the surviving EFH NOLs without any limitation.     *See also, Declaration of Paul Keglevic in Support of Confirmation of the Third Amended Plan of Reorganization* dated August 13, 2014 (the "Keglevic Declaration") at 14, Figure 2.

[9] Howard Declaration at 11.  In his testimony on August 17, 2016, Mr. Keglevic testified that the applicable tax rate should be 35.49%, not 35.43% as stated in both the Keglevic Declaration and the Howard Declaration.  Hr'g Tr. 124:17-24.  This change in tax rate would have minimal impact on his analysis.  *Id.*

[10] Howard Declaration at 11; Keglevic Declaration at 14.

*Intermediate Holding Company LLC, EFIH Finance Inc. And [Reorganized TCEH]"* [Docket No. 9305] (the "Tax Matters Agreement").[11]

20.     On August 29, 2016, the Court entered its *Order Confirming the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the TCEH Debtors and EFH Shared Services Debtors* [Docket No. 9421] (the "TCEH Confirmation Order").

21.     The T-Side Debtors filed their *Notice of Entry of TCEH Confirmation Order and Occurrence Of TCEH Effective Date* [Docket No. 9742] ("Effective Date Notice") announcing that, pursuant to the TCEH Confirmation Order, the confirmed plan as to the T-Side Debtors became effective as of October 3, 2016 (the "TCEH Effective Date").

22.     As of the TCEH Effective Date, "TCEH spun off from the Debtors to form a standalone reorganized entity, Reorganized TCEH, and certain tax attributes of the EFH Group were substantially used to provide Reorganized TCEH with a step-up in tax basis in certain of its assets, valued at approximately $1.0 billion."[12]

23.     Thus, as of the TCEH Effective Date, EFH Corp. no longer held the T-Side operations and was left with an ownership interest in Oncor, the sole remaining operating entity.

24.     On December 1, 2016, the Debtors filed their *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 10290] (the "Fifth E-Side Plan") and their *Disclosure Statement*

---

[11] I note that the document filed on August 16, 2016, states that it is a form of an agreement [Docket No. 9305] and not a fully executed agreement.  The Tax Matters Agreement was intended to become effective on the TCEH Effective Date, and the TCEH Confirmation Order provides that the Tax Matters Agreement became binding on the Debtors and relevant parties-in-interest [TCEH Confirmation Order at ¶ 94].  The Fifth E-Side Disclosure Statement provides that "[t]he Tax Matters Agreement will be attached as **Exhibit G** to this Disclosure Statement and will be provided to Holders of Class B6 Claims pursuant to the Solicitation Procedures."  Fifth E-Side Disclosure Statement at 15.  However, no Exhibit G was attached to the filed Fifth E-Side Disclosure Statement.  I have not seen a finalized, executed Tax Matters Agreement.

[12] Fifth E-Side Disclosure Statement at 14.

*for the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al.,*
*Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH*
*Debtors* [Docket No. 10293] (the "Fifth E-Side Disclosure Statement").

25.     As applied to the E-Side, the focus of the Fifth E-Side Plan is on the merger of
EFH with NextEra Energy, Inc. ("NextEra").  The merger will be effectuated by NextEra
organizing a single member Limited Liability Company ("LLC"); thereafter the LLC and EFH
will merge, with the LLC being the survivor (the "Merged Entity").  For federal income tax
purposes, the merger will be treated as a reorganization under IRC Section 368(a)(1)(A) or
368(a)(1)(G)."[13]

### III.     OVERVIEW OF NOLS AND LIMITATIONS ON THEIR USE

**A.     OVERVIEW OF THE NET OPERATING LOSS CARRYBACK AND CARRYFORWARD**

26.     NOLs are creatures of statute.  They are a reflection of the annualized nature of
income tax accounting, and Congress' attempt to ameliorate the harshness of a black letter rule.
Generally, a business reports its taxable income on an annual basis, with revenues reduced by
deductible expenses and losses.  When a corporation's annual gross income is less than its
deductible expenses and losses, the result is a loss for that tax year, or an NOL.  Title 26 of the
United States Code (the "Internal Revenue Code" or "IRC") permits a corporation to offset
future (or past, in the case of a carryback) taxable income by an NOL generated in a previous or
subsequent tax year.[14]  Such use of that NOL reduces the tax liability of the corporation.[15]  The
basic rules for using an NOL are:

---

[13] Fifth E-Side Disclosure Statement at 173.

[14] IRC §172.

[15] This analysis does not address the alternative minimum tax ("AMT") regime, which could result in an AMT in the year of the use of the NOL.

a.  Carry the NOL back to the preceding two tax years[16] and apply it against taxable income, which can generate an immediate tax refund.[17]

b.  Carry the NOL forward for the next twenty years and apply it against taxable income, which reduces the amount of taxable income in those years.

c.  After twenty years, any remaining NOL expires and cannot be used by the taxpayer.

## B.    IRC SECTION 108 – REDUCTION OF NET OPERATING LOSSES BY CODI

27.    Federal income tax issues often arise in the course of contemplating the restructuring of debt.  For example, the release of debt by a creditor, the write down of indebtedness often to the fair market value of any collateral, the exchange of equity for debt, and the transfer of property in complete or partial satisfaction of indebtedness are all potential triggering tax events that may generate CODI or gain (or loss).  The savings realized by a taxpayer from the material modification, reduction, or total discharge of a bona fide debt may be income for tax purposes.[18]  The Supreme Court established this principle in *United States v. Kirby Lumber Co.*[19]  In *Kirby,* the corporate taxpayer purchased its own bonds at a discount on the open market.  The Court held that the taxpayer realized income to the extent the issue price for the bonds exceeded the price paid for the reacquisition of those bonds.[20]  IRC section

---

[16] In some instances, the carryback period can be longer (IRC § 172).

[17] You can waive a carry back and immediately proceed to the carry forward alternative.

[18] *See United States v. Kirby Lumber Co.*, 284 U.S. 1, 2-3 (1931) (finding gross income where taxpayer bought back some of its own bonds at lower price than that at which bonds were issued).  For a more detailed discussion of the treatment of CODI, see Paul H. Asofsky, *Discharge Indebtedness Income in Bankruptcy After the Bankruptcy Tax Act of 1980,* 27 ST. LOUIS U. L.J. 583 (1983); Boris I. Bittker & Barton H. Thompson, Jr., *Income From the Discharge of Indebtedness: The Progeny of United States v. Kirby Lumber* Co., 66 CAL. L. REV. 1159 (1978); Fred T. Witt, Jr. & William H. Lyons, *An Examination of the Tax Consequences of Discharge of Indebtedness,* 10 VA. TAX. REV. 1 (1990).

[19] 284 U.S. 1 (1931).

[20] *Id.* at 3.  The Supreme Court explained:

As a result of its dealings [the taxpayer] made available $137,531.30 [in] assets previously offset by the obligation of bonds now extinct. We see nothing to be gained by the discussion of judicial definitions. The... [taxpayer] has realized within the year an accession to income, if we take the words in their plain popular meaning, as they should be taken here.  (Citations omitted).

61(a)(12) provides that gross income includes "income from the discharge of indebtedness."[21] Authorities have provided that CODI may result from complete or partial forgiveness of indebtedness,[22] the modification of the terms of indebtedness,[23] or the foreclosure of property subject to recourse debt.[24] Generally, upon discharge of indebtedness, a taxpayer realizes income in an amount equal to the difference between the amount due on the obligation and the amount paid for the obligation's discharge.[25]

28.    IRC Section 108 provides that a taxpayer's gross income shall not include amounts realized from the discharge of indebtedness when:

    a.    the discharge occurs in a title 11 case;[26]

    b.    the debtor is insolvent immediately before the discharge (but only to the extent of such insolvency);[27]

    c.    the indebtedness is considered "qualified farm indebtedness;"[28]

    d.    the indebtedness is considered "qualified real property indebtedness;[29] or

---

[21] IRC § 61(a)(12).

[22] *See Commissioner v. Jacobson*, 336 U.S. 28, 38-40 & n.7 (1949) (holding repurchase of secured bonds at prices below that at which they were sold generated gain attributable to taxpayer's income).

[23] *See Stackhouse v. United States*, 441 F.2d 465, 469 (5th Cir. 1971) (stating modification of partnership's debt is considered a pro rata distribution of money to each partner, creating income to partners individually). *But see* IRC § 108(e)(5). Under §108(e)(5), the modification of a purchase-money debt will not produce income where the reduction does not occur in a title 11 case or when the taxpayer is insolvent. *Id.*

[24] Rev. Rul. 90-16, 1990-1 C.B. 12, 13.

[25] Different rules apply where obligations have been issued at a discount. *See* IRC §108(e)(3); *see also* William Tatlock, *Discharge of Indebtedness, Bankruptcy and Insolvency,* Tax Mgmt. (BNA) No. 466-2d, at A-9.

[26] IRC § 108(a)(1)(A). Thus, it is imperative that any CODI occur pursuant to a court order or confirmed plan. Michael G. Frankel, *Tax Planning for Troubled Real Estate and Partnership Transactions-Part I,* 19 J. REAL EST. TAX'N 285, 290 (1992). The BTA defines a title 11 case as a federal bankruptcy case brought under title 11. *See* IRC § 108(d)(2). In addition, the taxpayer must be under the court's jurisdiction, and the discharge must be either granted by the court or pursuant to a court-approved plan.

[27] IRC § 108(a)(l)(B). The Bankruptcy Tax Act of 1980 states that other than those exceptions specifically provided in IRC § 108(e), there is no other insolvency exception to the rule that gross income includes debt discharge income. *Id.* § 108(e)(1).

[28] *Id.* § 108(a)(1)(C).

[29] *Id.* § 108(a)(1)(D). The insolvency exclusion takes precedence over the qualified farm or real property indebtedness exclusions (but not the qualified principal residence exclusion unless a taxpayer elects otherwise), and the title 11 bankruptcy exclusion takes precedence over all others. *Id.* § 108(a)(2).

    e. the indebtedness is considered qualified principal residence indebtedness that is discharged before January 1, 2015. [30]

29.    However, there are consequences when CODI is excluded from income. Title 11 debtors, insolvent taxpayers, and taxpayers with qualified farm indebtedness are given a choice of such consequences to provide broader flexibility and a more robust fresh start. In accordance with IRC sections 108 and 1017, taxpayers may apply the amount of CODI against certain statutorily delineated tax attributes, such as NOLs,[31] or elect to apply any portion of CODI to reduce the basis of "depreciable property" or a combination of both (IRC section 108(b) attribute reduction).[32] This choice allows taxpayers the flexibility of accounting for CODI in a manner most favorable to their business plan and their own tax positions.[33]

30.    Assuming the bankruptcy exception in IRC section 108(a)(1)(A) applies, the method of IRC section 108(b) attribute reduction is for the most part similar to that for the insolvency exception. A taxpayer must (1) reduce tax attributes in the order delineated in IRC section 108(b), (2) elect first to reduce basis in depreciable property pursuant to IRC section 108(b)(5), or (3) employ a combination of the two approaches. However, unlike the insolvency exception, the bankruptcy exception is not limited to the extent a taxpayer is insolvent.

31.    The exclusion of CODI is not cost-free. To the extent CODI is excluded under IRC section 108(a), the CODI must be used to reduce enumerated tax attributes listed in IRC

---

[30] *Id.* § 108(a)(1)(E) and (h).

[31] *Id.* § 108(b). Provision is made for the potential reduction of certain tax attributes and the order in which they may be reduced is set out. *Id.* § 108(b)(2)(A)-(G).

[32] *Id.* § 108(b)(5).

[33] For example, it would be advantageous for a taxpayer to reduce NOLs where it believes that they will end up being "wasted" due to lack of income. S REP. NO. 1035, reprinted in 1980 U.S.C.C.A.N. at 7025.

section 108(b)(2) including NOL's.[34]   IRC Section 108(b)(2) lists the tax attributes to be reduced, which must be done in the following order:

    a.   net operating losses for the taxable year of discharge and any net operating loss carryover;

    b.   any carryover of general business tax credits under IRC section 38;

    c.   any minimum tax credits under IRC section 53(b) as of the tax year immediately following the taxable year of discharge;

    d.   any net capital-losses for the taxable year of discharge and any capital loss carryovers;

    e.   basis in all the taxpayer's property;

    f.   any passive activity loss or credit carryover under IRC section 469(b) for the taxable year of discharge; and

    g.   any foreign tax credit carryovers.[35]

32.    IRC section 108(b)(4) contains ordering rules by which attributes are reduced. Attribute reduction is made after determining any tax for the tax year of discharge in question.[36] Carryovers reduce CODI dollar for dollar.  Credits reduce CODI 33 1/3 cents for every dollar of CODI.[37]  For net operating losses and capital loss carryovers, the reduction is applied first to the loss occurring during the taxable year of the discharge and subsequently to carryovers in the sequence in which such carryovers arose.[38]  For credits, the reduction is applied in the order the credits would have been applied against tax liability,[39] without regard to any income limitations on the use of the credits.[40]

---

[34] IRC § 108(b)(1).

[35] IRC § 108(b)(2).

[36] IRC § 108(b)(4)(A).

[37] IRC § 108(b)(3)(B).

[38] IRC § 108(b)(4)(B).

[39] IRC § 108(b)(4)(C).

[40] H.R. REP. NO. 833, S. REP. No. 1035, *reprinted in* 1980 U.S.C.C.A.N. at 7028.

33.     In summary, CODI may absorb any NOLs dollar for dollar even where the bankruptcy or insolvency exceptions under IRC section 108 applies.  If a debtor corporation were to undergo an ownership change, as that term is understood under applicable tax law, the use of any NOLs remaining after such absorption may be limited going forward.

## C.     IRC SECTION 382 – LIMITATIONS ON USE OF NET OPERATING LOSSES

34.     Because an NOL can be used directly to reduce the amount of taxable income, it can be a valuable asset.  However, the IRC seeks to prevent, or at least dissuade, the trafficking in "Loss Corporations" (a corporation with NOLs), that is, the purchase and sale of corporations solely because they own NOLs.  The IRC seeks to accomplish this task primarily through IRC section 382.[41]  IRC section 382 generally requires a coupling of substantially the same owners to a continuity of the business for a taxpayer corporation to use an NOL to reduce taxable income. Both "ownership" and "continuity of business" requirements are defined terms that bring with them a plethora of IRC sections, IRS regulations, and rulings.[42]

35.     When there has been an "ownership change" in a corporation (as defined in IRC section 382(g)), the use of pre-change NOL carryovers to offset post-change taxable income is generally limited to an annual limitation pursuant to IRC section 382(a) and (b) (the "Annual Limitation" or the "382 Limitation").  This Annual Limitation is equal to the fair market value of the equity of the corporation, valued immediately before the ownership change date, multiplied by the long term tax exempt rate (published monthly by the IRS).

---

[41] Mark S. Scarberry, *et al.*, BUSINESS REORGANIZATION IN BANKRUPTCY at 925 (4th ed. 2012) ("The 'section 382 limitation' minimizes the effect of tax considerations on investors' decisions to acquire 'loss corporations' (corporations that have NOL carryovers) by placing a limit on the use of NOL carryovers.").

[42] These rules, among others, are known as the NOL limitation rules under IRC § 382 and corresponding regulations.

36.     Pursuant to IRC section 382(g), an ownership change occurs if the percentage of stock[43] of the Loss Corporation owned by one or more "five percent shareholders" has increased by more than 50 percentage points relative to the lowest percentage of stock of the old Loss Corporation owned by those "five percent shareholders" during the testing period (generally three years).

37.     Under the transaction proposed in the Fifth E-Side Plan, the Debtors assert that an ownership change will occur, resulting in the triggering of the Annual Limitation, notwithstanding a continuation of the business.  Nevertheless, the Howard Method contemplates that the Annual Limitation, as augmented under certain rules described below, will not adversely affect the value of the EFH NOLs.

### D.     NET UNREALIZED BUILT IN GAINS & LOSSES

38.     Under IRC section 382(h)(1)(A), a corporation may be able to increase the use of pre-change NOLs beyond the Annual Limitation when it recognizes the gain on certain assets, generally within five years of the ownership change, that had net unrealized built-in gains ("NUBIG"s) at the time of the ownership change.[44]  There are also special rules for net unrealized built-in losses ("NUBIL"s)[45] that should be considered.  Under section 382(h), NUBILs recognized the first five years after an ownership change are generally subject to the same Annual Limitation as pre-change NOLs.

39.     Thus, the Annual Limitation is generally increased by the timely recognition of pre-change built in gains but only for the year in which recognized.  In 2003, the IRS issued *Internal Revenue Notice 2003-65 - Built-in Gains and Losses Under Section 382(h)* ("Notice

---

[43] Stock includes common and preferred and could include options and warrants.

[44] When recognized, such built in gains are referred to as "RBIG"s.

[45] When recognized, such built in losses are referred to as "RBIL"s

2003-65")[46] to address questions regarding section 382 and built in gains and losses.  Notice 2003-65 discusses two alternative methods ("safe harbors") for the identification of built-in items for purposes of IRC section 382(h): (a) the "1374 Approach," and (b) the "338 Approach."[47]

40.    The 1374 Approach follows the methodology in IRC section 1374 and its regulations.[48]  "[N]et built-in gain and net-built in loss are determined as the net amount of gain or loss that would be recognized in a hypothetical sale of all of the corporation's assets (including goodwill) immediately before the ownership change to a third party that assumed all of its liabilities."[49]

41.    The 338 Approach generally follows the methodology employed after making an IRC section 338 election for a hypothetical purchase.[50]  Thus, a taxpayer "identifies built-in gain and loss items by comparing the corporation's actual items of income and loss during the recognition period with what they would have been if a Code § 338 election had been made for a hypothetical purchase of all the stock on the change date …."[51]

42.    EFH Corp. has a "negative basis" in its Oncor holdings, *i.e.*, its indirect ownership of the partnership which holds the Oncor businesses.[52]  This could mean that there is a NUBIG at EFH.[53]

---

[46] https://www.irs.gov/irb/2003-40_IRB/ar17.html.

[47] Gordon D. Henderson and Stuart J. Goldring, TAX PLANNING FOR TROUBLED CORPORATIONS § 508.4.3, at 288 (ed. 2015).

[48] *Id.*

[49] *Id.*

[50] *Id.* at 289

[51] *Id.*

[52] *See* Oct. 2, 2014 Omnibus Tax Memorandum [D.I. 2296].

[53] *See* Howard Declaration at 11 (Figure 2 - note 2) ("Assumes (a) no 382 limits because of NUBIG/Notice 2003-65").

E.    **BANKRUPTCY EXCEPTIONS TO SECTION 382**

43.    Taxpayers in bankruptcy or in similar proceedings may be eligible to employ two special rules found in IRC sections 382(l)(5) ("L5 Exception") and 382(l)(6) ("L6 Exception") in addressing the use of pre-change NOLs to shelter post-change income where an ownership change has occurred.

1.    **The L5 Exception**

44.    The Annual Limitation on use of NOL's does not apply if the requirements of the L5 Exception are met; that is, if the corporation is under the jurisdiction of a court in a title 11 or similar case and the pre-change shareholders and "qualified creditors" own at least 50% of the value of the post-change equity in the corporation.  Qualified creditors are generally creditors who owned their debts for at least eighteen months before the filing of the title 11 case or whose debts arose in the ordinary course of business, (commonly known as "old and cold" creditors).[54]

45.    Although there is no Annual Limitation under the L5 Exception, the Loss Corporation must reduce its NOLs by the amount of the interest deducted on debts converted into stock for the three-year period preceding the taxable year in which the ownership change occurs and in the current year prior to the ownership change.[55]  The L5 Exception states that:

> If, during the 2-year period immediately following an ownership change to which this paragraph applies, an ownership change of the new loss corporation occurs, this paragraph shall not apply and the section 382 limitation with respect to the 2nd ownership change for any post-change year ending after the change date of the 2nd ownership change shall be zero.[56]

46.    Thus, if a corporation anticipates that a second ownership change may occur within the two year period following a first ownership change which is governed by IRC section

---

[54] IRC § 382(l)(5)(E); Treasury Regulation § 1.382-9(d)
[55] IRC § 382(l)(5)(B)
[56] IRC § 382(i)(5)(D)

382(l)(5), the corporation should carefully consider electing out of the L5 Exception to avoid the harsh zero Annual Limitation result.   If a corporation elects out of the L5 Exception, it may fall within the L6 Exception.

47.    The Fifth E-Side Disclosure Statement states that the Debtors do not intend to proceed under the L5 Exception;[57] thus, the Debtors will affirmatively elect to proceed under the L6 Exception.

### 2.    **The L6 Exception**

48.    Under the L6 Exception, the calculation of the Annual Limitation is the same as if the ownership change occurred outside of bankruptcy with one notable exception.  The debtor corporation may calculate the Annual Limitation based on the lower of (a) the value of the equity in the corporation *after* an ownership change has occurred, or (b) the pre-ownership change asset value.[58]  This is opposed to the non-bankruptcy requirement of determining the value *immediately before* the ownership change occurs.  Thus, a corporation is permitted to use the the value of the equity of the corporation *after* the debt was exchanged for stock upon emergence.[59]

> In cases where a large part of the outstanding debt is exchanged for stock, the value of the equity of the reorganized corporation will be much larger than it was before the reorganization; often it is negative before the reorganization.  As a result of this increase in value, more of the value of the NOLs may be preserved under the section 382 limitation than by using the § 382(l)(5) exception.[60]

---

[57] Fifth E-Side Disclosure Statement at 175-60 ("There is a bankruptcy-related exception to these rules under Section 82(l)(5) of the IRC if certain requirements can be satisfied.  If Section 382(l)(5) applies, and a subsequent ownership change occurs within two years, the annual limitation is zero.  Corporations can elect not to apply Section 382(l)(5); the Debtors currently anticipate that they will elect not to apply Section 382(l)(5) even if Section 382(l)(5) could potentially apply.  Moreover, the Debtors do not believe Section 382(l)(5) is applicable to the Merger.").

[58] IRC § 382(l)(6); Treas. Reg. §1.382-9(j).

[59] Treas. Reg. §1.382-9 Special rules under section 382 for corporations under the jurisdiction of a court in a title 11 or similar case.

[60] Mark S. Scarberry, *et al.*, BUSINESS REORGANIZATION IN BANKRUPTCY at 927 (4th ed. 2012).

# IV.    OPINIONS

## A.    HOWARD'S ANALYSIS

49.    If I were to adopt Ms. Howard's abbreviated methodology, as requested by Nixon Peabody, to estimate the value of the NOLs available to the E-Side, I would initially update that analysis based on additional information presently available to me.

50.    However, neither the Fifth E-Side Disclosure Statement nor documents provided to me subsequently contain the necessary information to provide a more precise computation of the value of the EFH NOLs.[61]

51.    On or around September 30, 2016, subsequent to the Howard Declaration, the Debtors revised the estimated NOLs as of December 31, 2016, to ▮▮▮▮▮▮▮. However, this estimate does not include make-whole payments and still assumes an effective date for the Fifth E-Side Plan of December 31, 2016, which will not be met.[62]  These same documents produced in discovery revised the taxable gain as a result of the T-Side Plan on the TCEH Effective Date to ▮▮▮▮[63]

52.    Neither the Fifth E-Side Disclosure Statement nor any documents provided to me through discovery have presented a revised calculation of projected E-Side CODI.[64]   Since the

---

[61] Fifth E-Side Disclosure Statement at 174 ("The Debtors currently project that, as of December 31, 2016 (and assuming, for illustrative purposes only, that the EFH and TCEH Effective Dates occur on December 31, 2016), the EFH Group will have approximately $8.3 billion of NOLs."). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ An additional portion of these NOLs are expected to be subject to attribute reduction rules under section 108 of the IRC. Remaining NOLs will be subject to section 382 of the IRC (as discussed below).

[62] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[63] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[64] See Howard Declaration at 11 (Figure 2 - note 1).  Her calculations were based on "EVR analysis of distributable value of current NEE bid" which has since changed.  No revised "EVR analysis of distributable value" was provided in the Fifth E-Side Disclosure Statement.

date of the Howard Declaration, NextEra increased its bid by $300 million.[65]  It is, therefore, reasonable to assume that the estimated amount of CODI may change to account for the adjustment in the bid price.  Other facts that could affect the calculation of E-Side CODI, none of which were identified or discussed in the Fifth E-Side Disclosure Statement, include: (a) changes in the estimated recovery amounts on claims and liabilities for other reasons (such as negotiated claims settlements);[66] (b) discharge of claims for no consideration; (c) claims subject to bona fide dispute, and other potential exclusions to the realization of CODI; (d) another increase or decrease in NextEra's bid; or (e) an analysis prepared by the Debtors that shows how Notice 2003-65 was applied to create RBIGs that would increase the Annual Limitation amount.

53.     For illustrative purposes only, I have assumed the revised CODI estimate to be the difference between Ms. Howard's amount of $1,259 million and the increase in the NextEra bid of $300 million, or $959 million.[67]  The Debtors should have a more complete estimate of the projected CODI at this stage in the Bankruptcy Cases.

54.     The "Tax Rate" that Ms. Howard used in her analysis may be stale.  Further, it includes the impact of the T-Side operations that was distributed to the T-Side first lien creditors,

---

[65] Fifth E-Side Disclosure Statement at 9.

[66] This could occur because of a change in the fair market value of stock, property, or amount of cash used to satisfy the claims or amounts paid.

[67] I note that this $300 million purchase price increase does not include or take into account certain adjustments to holdbacks that may increase the distributable value available under the Fifth E-Side Plan as discussed at the September 19, 2016 hearing, or its effect on the calculation of estimated CODI.  *See* Hr'g Tr. 14:1-23 ("Second, NextEra has agreed to release approximately $150 million from the holdback that would have been established under the merger agreement, to pay asbestos claims after the effective date.  That doesn't change the reinstatement of asbestos claims; they're still being reinstated at the reorganized Debtors, but NextEra, on its own balance sheet, had set aside $250 million of [] purchase price into this escrow, they're going to drop that down to 100 million, releasing an additional 150 of the purchase price.  Net/net the result is an additional $450 million of distributable value, a significant increase in recoveries for the EFH Legacy notes and the TC[E]H intercompany claim, the $750 million intercompany claim.  And when I say significant, I mean it virtually quadrupled the recoveries of the EFH unsecured creditors.").

and may not consider the appropriate tax rate from the perspective of the reorganization and merger of EFH and NextEra.

55.    Ms. Howard assumed that the Annual Limitation would not apply because of "NUBIG/Notice 2003-65; LRP allocated taxable income from Oncor starting in 2017."[68]   In other words, Ms. Howard assumed that the Annual Limitation did not apply based on the provisions of Notice 2003-65[69] and projected income allocable to Oncor starting in 2017.[70] However, the Fifth E-Side Disclosure Statement indicates that IRC section 382 *will* apply.[71]   As discussed further below, the Debtors have disclosed insufficient information to prepare a fulsome analysis under IRC section 382.    However, below is an updated calculation of the Howard Analysis using information currently available:

---

[68] Howard Declaration at 11 (Figure 2).

[69] https://www.irs.gov/irb/2003-40_IRB/ar17.html.

[70] *See* Howard Declaration at 11 (figure 2), note 2.

[71] Fifth E-Side Disclosure Statement at 175 ("Following the EFH Effective Date, the Debtors anticipate that any remaining NOLs and certain other tax attributes, potentially including depreciation deductions (collectively, the 'Pre-Change Losses') may be subject to limitation or elimination under sections 382 and 383 of the IRC (to the extent such Pre-Change Losses are not eliminated pursuant to section 108 of the IRC) as a result of an 'ownership change' of Reorganized EFH… As a result, the Debtors currently anticipate that the Reorganized Debtors' use of their Pre-Change Losses" will be subject to limitation.").



**B.    SUMMARY OF METHODOLOGY TO VALUE NOLS**

56.    A more robust approach and methodology to estimate the value of the NOLs requires additional information that could lead to a different value.  I would need an updated and accurate analysis of all tax attributes and attribute reductions (after the TCEH Effective Date) acquired by the Merged Entity, including those tax attributes of NextEra and EFH, apply the appropriate reductions (such as CODI), calculate the Annual Limitations, if any (such as under IRC section 382), and then apply the tax attributes to the projected future taxable income of the Merged Entity over the expected lives of the attributes.  I would then perform a comprehensive analysis of the Merged Entity's expected tax rate to calculate the expected cash tax savings from the use of such attributes into the future.  Lastly, I would calculate the present value of such cash tax savings using a discount rate determined by appropriate standards and methodologies.

---

[72] ███████████████████████████████████████

[73] ████████████████████████████████████████████████████████

[74] Howard Declaration at 11 (figure 2) less $300 million to account for the increase in NextEra's bid.

[75] On August 17, 2016, Mr. Keglevic testified that the applicable tax rate should be 35.49%, not 35.43% as stated in both the Keglevic Declaration and the Howard Declaration.  Hr'g Tr. 124:17-24.

[76] Assumes same discount rate and recovery periods as Howard Declaration at 11 (figure 2).

**C.    THE NOLS HAVE VALUE EVEN AFTER AN OWNERSHIP CHANGE**

57.    As the Debtors have previously testified during the T-Side Confirmation Hearing and have acknowledged in the Fifth E-Side Disclosure Statement, even after an ownership change as that term is understood under applicable tax law and contemplated in the Fifth E-Side Plan, the Surviving NOLs have substantial value.

58.    Assuming the Annual Limitation applies, the Fifth E-Side Disclosure Statement does not provide enough information to determine the amount of the Annual Limitation. Specifically, I do not know how Ms. Howard determined that the Annual Limitation amount under IRC section 382(l)(6) and Treasury Regulation section 1.382-9 would not apply; nor do I know how Ms. Howard applied Notice 2003-65 to compute the RBIG amount that could potentially augment, or eliminate, the Annual Limitation.

**D.    INFORMATION MISSING FROM DISCLOSURE STATEMENT TO CALCULATE THE VALUE OF NOLS**

59.    I have been asked by Nixon Peabody to provide an analysis of the value of the NOLs using an appropriate methodology or methodologies.  There is insufficient information provided in the Fifth E-Side Disclosure Statement and in subsequent discovery made available to me to apply the more robust methodologies that an expert would typically use in valuing the NOLs.  To apply the more robust methodologies to estimate the value of the NOLs, the Debtor should disclose the following information:

    a.    updated projected EFH NOLs as of the new emergence date;

    b.    actual taxable gain to be recognized as a result of the Preferred Stock Sale in 2016 (T-side gain);

    c.    projected EFH CODI;

    d.    analysis of tax attributes at NextEra;

    e.    previous ownership change calculations at both NextEra and EFH;

    f.  "value" of EFH for purposes of calculating the Annual Limitation under IRC section 382(l)(6) (including application of Notice 2003-65);

    g.  pro forma taxable income and tax of combined EFH/NextEra after merger for at least five years,

    h.  cost of capital and expected return on investment, and

    i.  estimated applicable tax rate of the combined Oncor/NextEra taxpayer.

**E.**    **CONCLUSION**

60.    For the reasons outlined above, I have insufficient information to provide an opinion based on the application of a robust methodology customarily used by tax experts in the field, certainly in preparation of taking a position on a federal income tax return. However, in absence of and subject to the data/information discussed above, Ms. Howard's and Mr. Keglevic's Declarations and testimony before the Court, along with information made available to me, provide a reasonable application of the rules, in these circumstances, which demonstrates that the EFH NOLs have a present value of approximately ███████ To date, I have not seen anything in Ms. Howard's and Mr. Keglevic's determination of the NOLs that seems unreasonable; however, such calculations should be updated with the information described above.

Pursuant to 28 U.S.C. section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

_____
Jack F. Williams
Principal
Baker Tilly Virchow Krause, LLP

Dated:  December 27, 2016