## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
| *Debtors.* | ) | (Jointly Administered) |
| | ) | Related to D.I. No. 10446, |
| | ) | 10447[1] |

## OBJECTION OF DELAWARE TRUST COMPANY AND CERTAIN HOLDERS OF EFIH FIRST LIEN NOTES TO DISCLOSURE STATEMENT FOR THE SIXTH AMENDED JOINT PLAN OF REORGANIZATION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AS IT APPLIES TO THE EFH DEBTORS AND EFIH DEBTORS

Pursuant to 11 U.S.C. § 1125 and the Supplemental Order Approving the Revised

Schedule For The EFH/EFIH Confirmation Proceedings dated December 7, 2016 [D.I.

10327], Delaware Trust Company, as indenture and collateral trustee ("First Lien

Trustee") for the first-lien notes ("Notes") issued by Energy Future Intermediate Holding

Company LLC and EFIH Finance Inc. (together, "EFIH"), and certain holders of the

Notes[2] (the "First Lien Noteholders", and together with the First Lien Trustee, the "First

Lien Creditors"), submit this Objection to the proposed Disclosure Statement

("Disclosure Statement")[3] for the Debtors' Sixth Amended Joint Plan of Reorganization

---

[1] Unless otherwise specified, references to docket entries refer to entries in the above-captioned bankruptcy case, No. 14-10979, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

[2] The First Lien Noteholders consist of (or are funds or accounts managed or advised by) BlueMountain Capital Management, LLC; Cyrus Capital Partners L.P.; Halcyon Asset Management LLC; Stone Lion Capital Partners L.P.; Serengeti Asset Management LP; and VR Advisory Services Ltd.

[3] D.I. 10447, as it may be further amended and modified. Citations to the Disclosure Statement in this Objection are to the blackline version (D.I. 10447).

As It Applies to the EFH Debtors and EFIH Debtors (the "Plan")[4].  In support of this Objection, the First Lien Creditors state as follows:

**Introduction**

1.    The First Lien Creditors did not expect to file this objection.  Following the Third Circuit's decision last month holding that EFIH is obligated under the applicable indentures to pay the make-whole claims of the holders of the EFIH First Lien Notes and the EFIH Second Lien Notes, the First Lien Creditors, at the request of the Debtors, entered into discussions with EFIH and an ad hoc group of  holders of Second Lien Notes (the "Second Lien Creditors") regarding a potential, final settlement of the make-whole litigation.  After several weeks of negotiations, the First Lien Creditors, along with the Second Lien Creditors, had agreed, subject to finalizing documentation, to execute a plan support agreement with the Debtors that had been intended to document an agreement that the parties had reached—and that the EFH/EFIH Debtors' respective boards approved—on December 16, 2016.  *See* Disclosure Statement at 13; Energy Future Holdings Corp. Form 8-K (Dec. 16, 2016).[5]

2.    Under that agreement, subject to specified terms and conditions, and notwithstanding their victory in the Third Circuit, the First Lien Creditors and Second Lien Creditors would have settled their make-whole claims at less than the full amount of those claims (the "EFIH First Lien Settlement" and "EFIH Second Lien Settlement"), and they would have supported a revised Alternative E-Side Plan, to be filed by the Debtors, providing for the payment of the EFIH First Lien Note Claims and EFIH Second Lien

---

[4] D.I. 10453, as it may be further amended and modified.

[5] Available at https://www.sec.gov/Archives/edgar/data/1023291/000119312516797538/ d318563d8k.htm.

Note Claims at the discounted levels in accordance with the EFIH First Lien Settlement and EFIH Second Lien Settlement.  Furthermore, as part of the EFIH First Lien Settlement and EFIH Second Lien Settlement, the First Lien Creditors and the Second Lien Creditors would have agreed to accept lower percentage settlements of, and payment on, their make-whole claims if the junior EFIH Unsecured Creditors in Class B6, including the PIK Noteholders, had voted to accept the plan, thereby paving the way for a fully consensual plan and providing for a substantially greater recovery for the PIK Noteholders and other Class B6 Creditors than they would otherwise obtain under the absolute priority rule.  *See* Disclosure Statement at 12-13.

3.    However, yesterday—the day on which objections to the Disclosure Statement were originally due—the Debtors filed a revised Disclosure Statement publicly disclosing for the first time that the EFH/EFIH Debtors' respective boards have approved an entirely different proposal by an ad hoc committee of PIK Noteholders representing approximately 60% of the aggregate principal amount of PIK Notes, in which the Debtors would enter into a plan support agreement with the PIK Noteholders if holders of at least 66 and 2/3% of the aggregate principal amount of the PIK Notes join the plan support agreement (the "PIK Proposal").  *See* Disclosure Statement at 14-16.  Counsel for the Debtors had advised counsel for the First Lien Creditors and the Second Lien Creditors of the boards' approval of the PIK Proposal only a day earlier.  It now appears that the Debtors had been privately working  on such a proposal from the very date on which they had made their public announcement of the "agreement-in-principle" for a very different plan that they had reached with the EFIH First Lien Creditors and the EFIH Second Lien Creditors.  *See* Disclosure Statement at 14.

4.    Under the PIK Proposal, the make-whole claims would not be settled.  To the extent that the Debtors ever signed plan support agreements with the EFIH First Lien Creditors and the EFIH Second Lien Creditors providing for those settlements,  the Debtors would exercise "fiduciary-outs" and walk away from the settlements.

5.    Instead, the make-whole litigation would be continued under the oversight of a "Makewhole Litigation Oversight Committee" appointed by the PIK Noteholders; the make-whole claims would not be paid on the effective date of the plan; the liens on EFIH's interests in Oncor that secure the EFIH First Lien Notes and Second Lien Notes would nevertheless be released; and an unspecified amount of cash would be held in escrow to pay any make-whole claims of the First Lien Creditors and the Second Lien Creditors, together with interest thereon and fees and expenses incurred after the plan's effective date, that are allowed after the effective date, with no recourse for the EFIH First Lien and Second Lien Creditors to reorganized EFIH if the cash escrow proves to be insufficient.  *See* Disclosure Statement at 14-16.  If the EFIH First Lien Creditors and/or the EFIH Second Lien Creditors voted to reject this alternative plan, the Debtors would seek to cram up the plan over their dissents.  In any event, the Debtors' directors and officers would obtain broad releases (and related exculpation).

6.    Because the Debtors filed the Disclosure Statement only yesterday, the First Lien Creditors have not had an opportunity to review the Disclosure Statement or the PIK Proposal carefully.  However, leaving aside potential objections the First Lien Creditors may have to confirmation of any plan premised on the PIK Proposal—which the First Lien Creditors will not make here, but which they will assert, as necessary, at the appropriate stage of these proceedings—the Disclosure Statement does not appear to

provide adequate disclosure of the terms of the PIK Proposal.  Counsel for EFIH agreed

to extend the deadline to file objections to the Disclosure Statement from yesterday at

2pm until 4pm (Eastern time) today, on December 29, 2016.  Accordingly, the First Lien

Creditors file this objection to the Disclosure Statement and reserve all rights to

supplement this Objection based on their on-going review of the Disclosure Statement.

**Discussion**

7.      The Bankruptcy Code requires that:

> [a]n acceptance or rejection of a plan may not be solicited
> after the commencement of a case under this title from a
> holder of a claim or interest with respect to such claim or
> interest, unless, at the time of or before such solicitation,
> there is transmitted to such holder the plan or a summary of
> the plan, and a written disclosure statement approved, after
> notice and a hearing, by the court as containing adequate
> information.

11 U.S.C. § 1125(b).  "Adequate Information" is "information of a kind, and in sufficient

detail, as far as is reasonably practicable in light of the nature and history of the debtor

that would enable a hypothetical reasonable investor typical of claims or interests in the

relevant class to make an informed judgment about the plan ... ." 11 U.S.C. § 1125(a)(1).

8.      Courts in this circuit have recognized that a disclosure statement

containing adequate information plays a pivotal role in the reorganization of a debtor.

*See, e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337

F.3d 314, 322 (3d Cir. 2003). "The importance of full disclosure is underlaid by the

reliance placed upon the disclosure statement by the creditors and the court." *Oneida*

*Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1998).  Any

disclosure statement must, therefore, contain "'sufficient financial and operating

information to enable each participant to make an "informed" judgment whether to

approve or reject the proposed plan.'" *In re Civitella*, 15 B.R. 206, 208 (Bankr. E.D. Pa.

1981); *see also In re Autobacs Strauss, Inc.,* 473 B.R. 525, 584 (Bankr. D. Del. 2012)

(disclosure statement must contain information that is "reasonably practicable [to permit

an] informed judgment" by holders of claims or interests entitled to vote on the plan).

9.      The Disclosure Statement fails to provide "adequate information" about

the PIK Proposal.  As noted, the PIK Proposal essentially provides for continued

litigation of the make-whole appeals after the plan's effective date, but the plan would

release the liens securing those claims on the effective date and give the First Lien

Creditors and the Second Lien Creditors replacement liens on an unspecified sum of cash

held in escrow (the "<u>EFIH Claims Reserve</u>") pending the ultimate outcome of the

litigation, with no recourse against Reorganized EFIH if the escrow proves insufficient to

pay all Allowed EFIH First Lien Note Claims and Allowed EFIH Second Lien Note

Claims in full.  *See* Disclosure Statement at 14-16.  The disclosure regarding the EFIH

Claims Reserve is deficient in numerous respects.

10.      *First*, the Disclosure Statement states that the Debtors will place cash from

the Merger Sub Cash Amount (the contribution from NextEra) and/or cash on hand at

EFIH in the EFIH Claims Reserve in an amount equal to the "maximum amount that

could ultimately be Allowed as of the EFH Effective Date in respect of the EFIH First

Lien Makewhole Claims and EFIH Second Lien Makewhole Claims based on the

EFH/EFIH Debtors' books and records, determined in consultation with the EFIH PIK

Group, or as ordered by the Bankruptcy Court."  *See* Disclosure Statement at 14.  There

is no disclosure of how much that "maximum amount" is, what the Debtors' "books and

records" show, and what "consultation" there may have already been with the EFIH PIK

Group—a group that obviously has every incentive to minimize the EFIH Claims Reserve rather than ensure that it truly provides adequate funds to pay the EFIH First Lien Makewhole Claims and the EFIH Second Lien Makewhole Claims in full if and when, notwithstanding the Third Circuit's controlling decision, all further possible challenges to them that the Debtors or the PIK Noteholders may conjure up have been exhausted.

11.     The First Lien Creditors' make-whole claim as of the plan effective date consists of both the amount of the 'Applicable Premium' that came due on the date of redemption—June 19, 2014—and all interest (including Additional Interest and interest on interest) accruing since then through the plan's effective date (whenever that may be), all as provided in the applicable indentures and notes.  There is no disclosure of what the "Debtors' books and records" reflect about any of those amounts, or how they are calculated (do they include interest, at what rate of interest, what method of compounding, etc.), nor how the "consultation with the PIK Group" has already affected or may in the future affect any of those amounts.  Without any disclosure to assess whether the PIK Proposal plan would truly reserve the "maximum amount" of the make-whole claims that may be allowed, the holders of the EFIH First Lien Notes cannot make an informed judgment about the whether to accept or reject any such plan.

12.     *Second*, the Disclosure Statement states that the Debtors will also place in the EFIH Claims Reserve cash equal to "the EFH/EFIH Debtors' good-faith estimate, determined in consultation with the EFIH PIK Group (or in an amount ordered by the Bankruptcy Court) of Additional Interest and interest on interest accruing on account of the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims for a

period of no less than three years, until such time such claims may become Allowed and

are paid in full, in Cash." *See* Disclosure Statement at 14. Again, there is no disclosure

of how much that amount is or how the period of "no less than three years" was chosen.

The Disclosure Statement fails to provide any disclosure of the dollar amount of the

Debtors' "good-faith estimate," nor how it will be determined (what rate of interest, what

method of compounding, etc.), nor how "consultation with the EFIH PIK Group" may

affect that amount.

13.    Similarly, there is no disclosure of the basis for selecting a period of "no

less than three years." Did the Debtors perform any analysis of the typical length of time

to obtain final non-appealable orders in litigation over claims like these? Have the PIKs

agreed that, if the litigation of the EFIH First Lien Makewhole Claims and EFIH Second

Lien Makewhole Claims remains outstanding after three years, they will top up—by the

amount needed to ensure payment in full of all such Claims—the EFIH Clams Reserve

out of their own funds, or waive any right further to dispute those Claims? The

Disclosure Statements provides no answers to these critical questions. There is no

disclosure of whether, or how, the plan would provide for the payment of any interest that

accrues beyond three years on any EFIH First Lien Makewhole Claims and EFIH Second

Lien Makewhole Claims that might be allowed thereafter.

14.    Moreover, the Disclosure Statement states that "the EFIH Claims Reserve

shall be established for a period of no more than three years (unless otherwise ordered by

the Bankruptcy Court)." *See id.* That suggests that the EFIH Claims Reserve might be

established for a shorter period and in a dollar amount that covers only the interest that

will accrue in such shorter period. How short could that period be? Who will decide

this, and based on what criteria?  Again, the Disclosure Statement provides no answers, other than perhaps to suggest that, unless the Court orders otherwise, this critical decision will be left to the unfettered discretion of the Debtors and the PIKs.

15.    *Third*, the Disclosure Statement states that the Debtors will place in the EFIH Claims Reserve cash in an amount equal to "the EFH/EFIH Debtors' good-faith estimate, determined in consultation with the EFIH PIK Group (or in an amount ordered by the Bankruptcy Court), of post-EFH Effective Date fees that may be Allowed under the EFIH First Lien Notes or EFIH Second Lien Notes."  *See* Disclosure Statement at 14. Here, too, there is no disclosure of the dollar amount of the Debtors' "good-faith estimate" of the post-EFH Effective Date fees, nor of how that amount will be determined, or whether interest that accrues on such amounts (and the pre-Effective Date fees), at the rates specified in the relevant indentures and notes, will be paid.

16.    *Fourth*, the Disclosure Statement fails to provide adequate disclosure of whether the PIK Proposal would provide for a distribution to holders of the PIK Notes on the plan effective date.  It is not entirely clear, but the Disclosure Statement suggests that the PIK Noteholders may receive a distribution on the effective date.  *See* Disclosure Statement at 16 ("Timing Class B6 Distribution"); *id.*at 23 ("Holders of Allowed Class B6 Claims may receive a distribution on the EFH Effective Date ….").  If the PIK Proposal contemplates that the junior PIK Noteholders may receive a distribution (including receiving any future installments of the, or retaining any previously made, Charging Lien Advance), even though the more senior, secured First Lien Creditors and Second Lien Creditors will not be paid in full on the effective date—and may never be paid in full if the EFIH Claims Reserve is insufficient—there should be clear disclosure

of that fact and how that construct somehow comports with the Bankruptcy Code.  And there should be further disclosure of whether the PIK Noteholders are prepared to guarantee out of their own funds payment in full of all Claims of the EFIH First Lien Creditors and the EFIH Second Lien Creditors that are ultimately allowed by final order.

17.    *Fifth*, the Disclosure Statement also fails to provide adequate disclosure of how the recoveries of the PIK Noteholders and other Class B6 unsecured creditors could be affected if the Makewhole Litigation Oversight Committee pursues litigation of the make-whole claims after the plan's effective date—perhaps for years—and, consistent with the Third Circuit's decision, ultimately loses.  *See* Disclosure Statement at 16, 21, 27.  Among other things, interest will continue to accrue on the make-whole claims until they are paid in full, in cash, and that on-going interest accrual may reduce the ultimate recoveries of Class B6 holders, perhaps substantially.  Although the Disclosure Statement (p.27) estimates a recovery to Class B6 if the make-whole claims are allowed with three years of interest, there is no disclosure of how that estimate was determined (the dollar amount of the make-whole claims, the rate of interest, the method of compounding, etc.), nor any disclosure of how recoveries could be affected if different assumptions are used or if the litigation continues beyond three years.  Furthermore, it is unclear whether that estimate takes into account the costs of continued litigation for three years (or more), including the fees and expenses of the the First Lien Creditors and Second Lien Creditors, the EFH Plan Administrator Board, and the Makewhole Litigation Oversight Committee—all of which would be funded by the estate under the PIK Proposal, further reducing the recoveries to Class B6 creditors.

18.     There should be clear disclosure of how potential recoveries may be affected in order for the holders of Class B6 unsecured claims—as well as EFIH First Lien Creditors and EFIH Second Lien Creditors— to make a truly informed judgment about whether to accept or reject any plan premised on the PIK Proposal.  *See In re Williams*, No. 87-4-0093, 1992 WL 521537, at *3 (D. Md. Sept. 1, 1992) ("Debtors apparently assume that because they assert the claims are not legitimate, that's that, and no further analysis need be done.  However, a disclosure statement must include an examination of what effect, if any, there will be to the Debtors' proposed plan if disputed claims are allowed.") *aff'd*, 998 F.2d 1012 (4th Cir. 1993) (unpublished).

19.     *Sixth,* the PIK Proposal apparently contemplates that the professional fees and other expenses that the EFIH First Lien Creditors have incurred or will incur in the future will be subject to some review process.  The Disclosure Statement needs to disclose, with clarity, what that process will be, who will be on the review committee (representatives of the PIK Noteholders?), what the timing will be, and whether interest will be paid for the continued delay in the payment of the many millions of dollars in fees and costs that the EFIH First Lien Creditors have incurred in these proceedings defending their make-whole claims all the way to the Third Circuit.

20.     *Seventh*, the Disclosure Statement fails to disclose that the PIK Noteholders have, throughout these Chapter 11 Cases, asserted their own claims for make-whole amounts, arguing that they were perfectly valid.  For example, after they asserted such claims in a Proof of Claim and the Debtors filed an objection, the PIK Noteholders (through their indenture trustee) responded as follows:

> Section 3.07 of the PIK Indenture unambiguously provides that PIK Noteholders are entitled to payment of a call premium if, following

a bankruptcy-triggered acceleration, the EFIH Debtors repay or
"call" the PIK Notes prior to certain dates set forth therein. While
the EFIH Debtors have not yet repaid the PIK Notes, they seek to
confirm a plan of reorganization that proposes to repay the PIK
Notes during the time period set forth in section 3.07(d) of the PIK
Indenture. Specifically, section 3.07(d) of the PIK Indenture
provides that if the EFIH Debtors repay the PIK Notes after the first
call date but prior to maturity, they must pay specified "redemption
prices" or call premiums provides that the EFIH Debtors remain
liable not only for principal and accrued interest, but also for any
additional "premium" and "other monetary obligations" (emphasis
added) that may be owed on the PIK Notes. Thus, notwithstanding
their bankruptcy filing, the EFIH Debtors remain liable for the call
premium if they repay the PIK Notes during the time period set forth
in section 3.07(d) of the PIK Indenture.[6]

The Disclosure Statement should disclose this fact, acknowledging that it may estop the

PIK Noteholders or any entity created under the plan to act on their behalf from

challenging the make-whole claims of the EFIH First Lien Creditors and the EFIH

Second Lien Creditors.  Disclosure is required to explain to parties who are being asked

to proceed down this unchartered course and vote for the plan how this creation of a new

oversight board (populated with the same constituents) somehow rehabilitates the PIK

Noteholders from their trustee's own quite clear position that the make-whole claims

were valid.[7]

21.    *Eighth*, the Disclosure Statement needs to provide clear and unambiguous

disclosure regarding the effect of the PIK Proposal, if it is embodied in a confirmed plan,

on various rights of the EFIH First Lien Creditors.  For example, the EFIH First Lien

Creditors have the benefit of an inter-creditor agreement with the EFIH Second Lien

---

[6] D.I. 5788, at 2 (¶ 1).

[7] To be sure, the PIK Noteholders' trustee suggested that there were some differences in
the langauge of the indentures for their notes and the EFIH Second Lien Notes, as
compared to that in the indentures for the EFIH First Lien Notes.  But the Third Circuit
has now held that those differences are immaterial.

Creditors, and they have pending litigation seeking to recover any amounts they do not

recover from the Debtors instead from any distribution to the EFIH Second Lien

Creditors.  Similarly, they have rights under the indentures for the EFIH First Lien Notes

(and the notes themselves) to payment of interest, fees, and indemnification.  The

Disclosure Statement needs to be clear on the effect of any plan on these rights from and

after the Effective Date.  If these rights are to be impaired in any way while senior classes

of secured creditors may reject the plan and junior, unsecured creditors receive any

distribution, some disclosure is required how the Debtors intend to comply with the

Bankruptcy Code.

22.    *Ninth*, the Disclosure Statement notes that the requisite dollar amount of

PIK Noteholders has not yet agreed to the PIK Proposal for the Debtors to proceed with

that proposal.  The Disclosure Statement must clarify what the Debtors intend to do if the

PIK Noteholders do not agree (by the date of the hearing on the Disclosure Statement or

thereafter) in the requisite dollar amount to the PIK Proposal or, in that event, what the

Debtors intend to do if the EFIH First Lien Creditors and the EFIH Second Lien

Creditors are no longer willing to execute plan support agreements for the alternative

plan that had largely been negotiated by them with the Debtors, in light of the Debtors'

about-face in the negotiations.  In this regard, NextEra currently can terminate its own

plan support agreement if confirmation of an Alternative E-Side Plan (as defined therein)

is not obtained by February 15, 2017.

### Conclusion and Reservation of Rights

23.    The Disclosure Statement should not be approved unless it is amended to

cure the disclosure deficiencies noted above and any additional deficiencies that the

Second Lien Creditors identify that apply as well to the EFIH First Lien Creditors.  To the extent that such revisions will require some time and will delay the confirmation proceedings, this a problem entirely of the Debtors' own making as a result of their decision at the eleventh hour, after reaching an agreement in principle with the EFIH First Lien Creditors and the EFIH Second Lien Creditors, to back out of that agreement and "pivot" to a purportedly less "complex" alternative.

24.    The First Lien Creditors reserve all rights to supplement this Objection with any additional objections they may have following further review of the Disclosure Statement that the Debtors filed yesterday.

Dated:  December 29, 2016

COLE SCHOTZ P.C.

*/s/ J. Kate Stickles*
Norman L. Pernick (DE No. 2290)          Warren A. Usatine
J. Kate Stickles (DE No. 2917)           Court Plaza North
500 Delaware Avenue, Suite 1410          25 Main Street
Wilmington, DE  19801                     Hackensack, NJ 07602
Telephone:  302-652-3131                  Telephone: 201-489-3000
Facsimile:  302-652-3117                  Facsimile: 201-489-1536
npernick@coleschotz.com                   wusatine@coleschotz.com
kstickles@coleschotz.com

*Counsel for Delaware Trust Company as trustee*

WILMER CUTLER PICKERING HALE AND DORR LLP
Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile:  212-230-8888
Philip.Anker@wilmerhale.com

ROPES & GRAY LLP
Keith H. Wofford                         D. Ross Martin
Mark Somerstein                          Andrew Devore
1211 Avenue of the Americas              800 Boylston Street, Prudential Tower
New York, NY 10036-8704                  Boston, MA  02199-3600
Telephone: 212-596-9000                  Telephone: 617-951-7000
Facsimile:  212-596-9090                 Facsimile: 617-951-7050
Keith.Wofford@ropesgray.com              Ross.Martin@ropesgray.com
Mark.Somerstein@ropesgray.com            Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP
James H. Millar                          Todd C. Schiltz
1177 Avenue of the Americas              222 Delaware Ave, Suite 1410
41st Floor                               Wilmington, DE 19801-1612
New York, NY 10036-2714                  Telephone: 302-467-4200
Telephone:  212-248-3264                 Facsimile: 302-467-4201
Facsimile:   212-248-3141                Todd.Schiltz@dbr.com
James.Millar@dbr.com

*Counsel for Delaware Trust Company as trustee and the above-referenced First Lien Noteholders*

15