IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS | ) | Case No. 14-10979 (CSS) |
| CORP., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Related Case Nos.: 14-10992, |
| | ) | 14-10990, 14-11039 and 14-11012 |
| | ) | Related D.I. 10074 |

## OPINION[1]

Before the Court is the *Motion of Shirley Fenicle, David William Fahy, John H. Jones,*
*and David Heinzmann to Dismiss Chapter 11 Petitions of LSGT Debtors EECI, Inc., EEC*
*Holdings, Inc., LSGT Sacroc, Inc. and LSGT Gas Co. LLC* (D.I. 10074 and 10075) (the
"Motion" filed, collectively, by the "Asbestos Movants"), and the response and replies
thereto (D.I. 10249, 10273, and 10304). The Motion seeks dismissal of four of the above-
captioned debtors' cases (as defined in more detail below, the "LSGT Debtors").

## INTRODUCTION

Thirty-one months after the filing of these Chapter 11 cases in April 2014 and on
the eve of the third confirmation hearing in these cases, several persons asserting
asbestos-related claims against the LSGT Debtors have brought a motion to dismiss the
LSGT Debtors' cases as having been **filed in bad faith**. The motion to dismiss, however,
is based upon events that transpired **after the petition date**. The crux of the movants'

---

[1] The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Bank.
P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014.

complaint is that the plan of reorganization currently before the Court provides (as did the plan confirmed in December 2015 that was subsequently rendered void for unrelated reasons) for the discharge of unmanifested asbestos claims where the claimant did not timely file a proof of claim under a bar date order approved in 2015 – a scenario that was not contemplated until July 2014 at the earliest.

The evidence clearly establishes that based on the totality of the circumstances the LSGT Debtors' bankruptcy petitions were filed in good faith because the filing was for a valid bankruptcy purpose and not as a litigation tactic. The LSGT Debtors' bankruptcy was filed for three primary purposes. First, they were filed to avoid immediate cash flow insolvency. The LSGT Debtors' primary assets were intercompany claims against EFH Corp., a company that was clearly going to file bankruptcy. The LSGT Debtors' primary liabilities were the costs of defending and settling asbestos related litigation. The imposition of the automatic stay in EFH Corp.'s bankruptcy was going to cut off the LSGT Debtors' sole source of liquidity. At the same time, absent their own automatic stay, the LSGT Debtors would have continued to incur expenses related to asbestos litigation. In short, absent their own bankruptcy filing, the LSGT Debtors would have been immediately cash flow insolvent upon EFH Corp.'s bankruptcy filing.

Second, the Debtors as a whole were facing the prospect of a huge $6.5 billion deconsolidation tax for which three of the LSGT Debtors would have been jointly and severally liable. As part of the Debtors' reorganization strategy for the enterprise as a whole, it was hoped that the tax could be avoided. However, to avoid the tax would

require obtaining a private letter ruling from the IRS and extensive negotiations among the Debtors and their numerous creditor constituencies. The LSGT Debtors believed that their best hope for avoiding a tax bill that would have greatly impaired their asbestos creditors was to file bankruptcy in order to participate directly in the solution to the $6.5 billion tax problem.

Third, the LSGT Debtors filed bankruptcy in the hope of negotiating a resolution in bankruptcy that would maximize both the value of their assets and the recovery on their asbestos related claims. Although irrelevant to the question of whether the LSGT Debtors **filed** their cases in good faith, subsequent events have proven the strategy successful. In December 2015, the Debtors reached a settlement with one of its official committees of unsecured creditors that requires any plan of the Debtors to provide for the reinstatement of the LSGT Debtors' intercompany claims amongst each other and against EFH Corp. as well as the asbestos related claims for which a timely proof of claim was filed. The plan currently before the Court and scheduled for confirmation in February 2017 provides just that, even though EFH Corp.'s other unsecured creditors are impaired to the tune of ten cents on the dollar and all other intercompany claims are being discharged.

There can be no question that the LSGT Debtors' decision to file bankruptcy was in good faith and subsequent events have proven the decision to have been correct. Furthermore, the Motion is barred as untimely by the doctrine of laches. Thus, the Court will deny the Motion.

## JURISDICTION

This Court has subject matter jurisdiction over the LSGT Debtors pursuant to 28 U.S.C. §§ 157 and 1334. Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date (as defined below) pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## FACTUAL BACKGROUND

Energy Future Holdings Corp. ("EFH Corp.") and 69 of its direct and indirect subsidiaries (collectively, the "Debtors"), including LSGT Gas Co. LLC ("LSGT Gas"), EEC Holdings, Inc. ("EEC Holdings"), EECI, Inc. ("EECI"), and LSGT Sacroc, Inc. ("Sacroc," and together with LSGT Gas, EEC Holdings, and EECI, the "LSGT Debtors"), filed petitions under Chapter 11 of the United States Bankruptcy Code on April 29, 2014 (the "Petition Date"). The Debtors' bankruptcies were consolidated for procedural purposes only and have been jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015 and Local Bankruptcy Rule 1015-1.

## A.    Procedural Background of the Motion

Thirty-one months after the Petition Date, the Asbestos Movants filed the Motion under section 1112(b) of the United States Bankruptcy Code (the "Bankruptcy Code"). The Court held an evidentiary hearing on the Motion on December 5, 2016.[2] Thereafter, the Court requested post-trial briefing from the parties.[3] This is the Court's Opinion on the Motion, pursuant to section 1112(b)(3) of the Bankruptcy Code.

---

[2] *See* Transcript of Hearing (Dec. 5, 2016) (D.I. 10324) (citations to the record at this hearing are hereinafter referred to as "12/5/2016 Hr'g Tr. page:line").

[3] *See* D.I. 1352 and 10353.

**B.    Background of the LSGT Debtors**

In October 2007, the Debtors adopted its current organizational structure in a privatization transaction of TXU Corp., EFH Corp.'s predecessor. The LSGT Debtors are successors to certain entities acquired through the 1996 merger of TXU Corp. and ENSERCH Corporation ("Enserch").

Enserch was an integrated natural gas company with operations in natural gas distribution and transmission, oil and gas exploration and production, oil-field services, and engineering and construction. LSGT Gas was previously the primary Enserch natural gas distribution and transmission business unit, and EEC Holdings and EECI related to Enserch's engineering and construction businesses.

**C.    Intercompany Claims**

As of the Petition Date, and as detailed in the below chart, the Debtors' books and records reflect a $560 million payable owed to LSGT Gas by EFH Corp., and approximately $990 million in payables owed to Sacroc, EECI, and EEC Holdings by LSGT Gas. The LSGT Debtors' primary assets and liabilities have been in the form of these intercompany receivables, certain residual pension obligations, and asbestos liabilities.



## D. Asbestos Claims

The LSGT Debtors' alleged asbestos liabilities primarily arise from certain discontinued operations of Ebasco Services Incorporated ("Ebasco"). Enserch owned Ebasco from 1976 to 1993. Ebasco was an engineering, construction, and consulting firm that designed, constructed, or performed maintenance at power plants during a time when the utility industry used asbestos-containing materials.

In 1993, United Engineers & Constructors, Inc. and Raytheon Engineers & Constructors, Inc. (together, "Raytheon") entered into an Asset Purchase Agreement to acquire certain of Ebasco's assets. Section 13.1 of the Asset Purchase Agreement required Enserch and Ebasco to indemnify Raytheon for "any and all losses" arising from their previous operations prior to the sale. Enserch formed an indirect subsidiary, Enserch E&C, Inc. to acquire the retained assets, claims, and liabilities in connection with the sale of Ebasco, including the indemnity obligation. Following a name change, Enserch E&C, Inc. became EECI. While claimants in the Debtors' chapter 11 cases filed proofs of claim alleging asbestos-related liabilities against other LSGT Debtors and EFH Corp., the

Debtors believe that EECI holds the substantial majority of the LSGT Debtors' potential asbestos liability arising from the discontinued Ebasco operations.

EECI's asbestos obligations and related defense costs have totaled approximately $12.5 million since 2004. In the three years before the Petition Date, the annual amounts grew: $1.2 million, $1.6 million, and $3.8 million in 2011, 2012, and 2013, respectively.

In November 2015, the Court approved a settlement between the Debtors and the EFH Committee,[4] which requires that any plan proposed by the Debtors reinstate preserved asbestos claims as well as the LSGT Debtors' intercompany claims against each other and EFH Corp.[5]

E.     **Bankruptcy Decision and Petition Date Status of the LSGT Debtors**

Prior to the Petition Date, the officers and directors/managers of the LGST Debtors, Mr. Anthony Horton[6] and Mr. Kristopher E. Moldovan,[7] attended two formal

---

[4] In October 2014, the Office of the United States Trustee (the "U.S. Trustee") appointed a committee of unsecured creditors (the "EFH Committee") to represent the interests of Energy Future Holdings Corp.; Energy Future Intermediate Holding Company, LLC; EFIH Finance, Inc.; and EECI. *See* D.I. 2570. The EFH Committee represents the interests of the unsecured creditors of the aforementioned debtors and no others. The members of the EFH Committee are: Brown & Zhou, LLC; Peter Tinkham; Shirley Fenicle, as successor-in-interest to the Estate of George Fenicle; and David William Fahy; and American Stock Transfer & Trust Company, LLC. *See* D.I. 8955 (*Third Amended Notice of Appointment of Committee of Unsecured Creditors*). Since its inception, Ms. Fenicle and Mr. Fahy, two of the Asbestos Movants, have sat on the EFH Committee. *See* D.I. 2570, 3313, 3404 and 8955.

[5] *See Notice of Settlement Among Debtors, EFH Committee, EFH Notes Trustee, Plan Sponsors, Consenting TCEH First Lien Creditors, and TCEH Committee* [D.I. 7090] at Exh. A, Settlement & Support Agreement, by and among the Debtors and the EFH Committee, §6.

[6] Mr. Horton is President, Treasurer, and Director of EECI, EEC Holdings, and Sacroc; and President, Treasurer, and Manager of LSGT Gas. D-Dir Horton at ¶2.

[7] Mr. Moldovan was Director of EECI from February 3, 2014 through October 3, 2016. D-Dir Moldovan at ¶ 2.

meetings[8] and had numerous informal discussions[9] regarding whether each of the LSGT Debtors should file for bankruptcy. Among the items Messrs. Horton and Moldovan discussed were the fact that: (i) as a result of the impending bankruptcy filing of the other Debtors, the LSGT Debtors would likely lose access to funds to satisfy its ongoing obligations related to defending and settling asbestos litigation; (ii) EECI, EEC Holdings and Sacroc, as corporations, could be liable for deconsolidation-related tax obligations resulting from a restructuring of the other Debtors; (iii) filing for bankruptcy would give the LSGT Debtors the benefit of the automatic stay; and (iv) the chapter 11 process could provide a forum for addressing all claims against the LSGT Debtors.[10] On April 28, 2014, Messrs. Horton and Moldovan formally approved the filing of the LSGT Debtors' bankruptcy petitions.[11]

---

[8] Mr. Moldovan testified that approximately two months prior to the Petition Date, Mr. Moldovan and Mr. Horton

> attended a presentation in Dallas for the Directors of the Boards of the subsidiary Debtors. At this meeting, counsel from Kirkland & Ellis LLP ("K&E"), the Debtors' bankruptcy counsel, explained the roles and responsibilities that Directors would have with regard to the decision to file the various Debtors for bankruptcy, and the ongoing duties of the Directors through the restructuring process. At that meeting, [Mr. Moldovan] was afforded an opportunity to ask pointed and detailed questions to several senior bankruptcy attorneys from K&E.

D-Dir Moldovan at ¶ 9. *See also* D-Dir Horton at ¶ 5.

Immediately prior to the Petition Date, on April 25, 2014, EECI had a formal board meeting to address whether or not to file for bankruptcy. D-Dir Horton at ¶ 10; D-Dir Moldovan at ¶ 6; DX091A.

[9] D-Dir Moldovan at ¶ 9 ("The Board of EECI – myself and Anthony Horton – met formally on two occasions, and on many others over the course of the restructuring.").

[10] *Declaration of Kristopher E. Moldovan in Support of the Opposition of Energy Future Holdings Corp. et al. to the Motion of Shirley Fenicle, David William Fahy, John H. Jones, and David Heinzmann to Dismiss Chapter 11 Petitions of LSGT Debtors EECI, Inc., EEC Holdings, Inc., LSGT Sacroc, Inc., and LSGT Gas Co., LLC* (the "Moldovan Declaration"), at ¶ 11.

[11] DX033 (Omnibus Written Consent [ ] In Lieu of a Meeting of the Boards of Directors and Boards of Managers of EFH Finance (No.2) Holdings Company, EFH FS Holding Company, EEC Holdings, Inc.,

According to the LSGT Debtors' Schedules, the LSGT Debtors had the following assets on the Petition Date:

| Debtor | Personal Property Assets | Accounts Receivable |
|---|---|---|
| LSGT Gas[13] | Interest in insurance policies; accounts receivable in the approximate amount of $560 million; ownership interests in incorporated businesses; and other personal property in the approximate amount of approximately $1.01 million | The accounts receivable were from (i) Debtor EFH Corporate Services Co., (ii) Debtor Energy Future Holdings Corp., and (iii) a non-debtor foreign subsidiary of EFH Humphreys & Glasgow Ltd. |
| LSGT Sacroc[14] | Interest in insurance policies and accounts receivable in the approximate amount of $502 million | The accounts receivable are from LSGT Gas. |
| EEC Holdings[15] | Interest in insurance policies; ownership interests in incorporated businesses.; interest and accounts receivable in the approximate amount of $404 million | The accounts receivable are from LSGT Gas. |
| EECI[16] | Interest in insurance policies and accounts receivable in the approximate amount of $84 million | The accounts receivable are from LSGT Gas. |

## F.    Asbestos Bar Date for Unmanifested Claims

In July 2014, all of the Debtors sought bar dates for claims,[17] including asbestos claims.   Following litigation, the Court issued an Opinion in which it held that the

---

LSGT Sacroc, Inc. and LSGT Gas Company LLC); DX034 (Written Consent in Lieu of a Meeting of the Board of Directors of EECI, Inc.).

[12]  No real property assets were listed for any of the LSGT Debtors.

[13]  *See* D.I. 1272.

[14]  *See* D.I. 1276.

[15]  *See* D.I. 1250.

[16]  *See* D.I. 1269.

[17]  D.I. 1682.

Debtors could establish a bar date for all asbestos claims, including unmanifested claims.[18]  Thereafter, the Debtors engaged in extensive negotiations over the form and manner of notice of the bar date to be provided to potential asbestos claimants, including potential unmanifested asbestos claimants.[19]  The extensive noticing plan was approved by the  Court on July 30, 2015,[20] and December 14, 2015 at 5:00 pm (prevailing Eastern Time) was established as the final date and time for all persons and entities holding or asserting an asbestos-related claim against the Debtors to file proofs of claim in these chapter 11 cases (the "Asbestos Bar Date").  No appeal was filed from the Opinion and Order establishing the Asbestos Bar Date, which is now a final order.

### G.    Plan Negotiations and Confirmation Hearings

The proposed plan of reorganization (the "Plan") that is currently on file with the Court reinstates the Legacy General Unsecured Claims Against the EFH Debtors (as defined in the Plan) and reinstates the intercompany claims between and among the LSGT Debtors and EFH Corp.[21]  NextEra, the Plan sponsor, is a large, publicly-traded, investment-grade company with a market capitalization of approximately $60 billion. Following emergence, NextEra has committed that Reorganized EFH Corp./EFIH will hold no debt above Oncor, the non-debtor public utility that constitutes the primary

---

[18] *In re Energy Future Holdings Corp.*, 522 B.R. 520 (Bankr. D. Del. 2015).

[19] *See* DX091C (Minutes of a Joint Meeting of Board of Directors for EECI and LSGT Gas, Apr. 7, 2015) (The purpose of the meeting was to update the boards of EECI and LSGT Gas on the restructuring and to "discuss the status of setting a bar date for asbestos-related claims" and the notice plan related thereto.).

[20] D.I. 5171 (the "Asbestos Bar Date Order").

[21] D.I. 9612, Art. III(B)(3), (13).

assets of those debtors. The Debtors assert that the LSGT Debtors' financial situation will be improved following consummation of the Plan and Merger Agreement, and Reorganized EFH Corp. will have the financial wherewithal to fund any potential asbestos liabilities against the LSGT Debtors.

The Plan provides that the LSGT Debtors will remain separate corporate entities, wholly-owned by reorganized EFH Corp., which, in turn, will be wholly owned by NextEra, Inc.[22] All Legacy General Unsecured Claims, including Asbestos Claims (Class A3) against the LSGT Debtors will also be reinstated pursuant to the proposed Plan.[23] However, if an Asbestos claimant did not file a proof of claim on or before the Asbestos Bar Date then their claim will be discharged under the terms of the proposed Plan.[24] This treatment is consistent with that in the plan previously confirmed by the Court in December 2015 (that was subsequently rendered void for unrelated reasons). Confirmation of the current plan is scheduled for February 2017.

Although the proposed Plan provides the above-discussed treatment, reinstatement of intercompany claims and asbestos claims was never a forgone conclusion. Indeed, on the Petition Date, the Debtors filed a restructuring support agreement (the "RSA"), which was silent on the treatment of the intercompany claims.[25]

---

[22] *See* Plan, Art. III(B)(15)(b) ("Interests in the EFH Debtors Other Than EFH Corp. shall be at the option of the EFH Debtors with the consent of the Plan Sponsor, either: (i) Reinstated; or (ii) canceled and released without any distribution on account of such Interests; *provided, however,* that Interests in Debtors LSGT Gas Company LLC, EECI, Inc., EEC Holdings, Inc., and LSGT SACROC, Inc. shall be Reinstated.").

[23] *See* Plan, Art. III(B)(3).

[24] *See* Plan, Art. VIII.

[25] *See* D.I. 5005-2, Restructuring Support Agreement at 70.

Furthermore, the Court heard testimony concerning the marketing process for the Oncor assets whereby interested parties, including NextEra, repeatedly expressed concern about reinstating asbestos liabilities, especially unquantified liabilities.[26]

## DISCUSSION

**A.    The LSGT Debtors' Cases Were Filed in Good Faith**

Chapter 11 bankruptcy petitions are

> subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish good faith. Whether the good faith requirement has been satisfied is a fact intensive inquiry in which the court must examine the totality of facts and circumstances and determine where a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive. We focus on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage.[27]

---

[26] 12/5/2016 Hr'g Tr. 53:18-54:4 (Horton).  At the trial on the Motion, Mr. Horton testified as follows:

> Q: . . . And did the debtors' potential acquirers make any requests with respect to quantifying the potential exposure presented by the asbestos liabilities?
>
> A. I can recall at least two bidders both who we signed a transaction with, the Hunt and NextEra, being adamant about filing for a bar date.
>
> Q. And what is your understanding of why the bidders wanted a bar date as it related to potential claims for these debtors?
>
> A. They wanted greater certainty. They wanted more insight to the magnitude. They wanted to quantify what these potential liabilities could be.

12/5/2016 Hr'g Tr. 53:18-54:4.  *See also id.* at 93:19-94:2 (Horton); 98:16-99:15 (Horton); 135:8-13 (Moldovan).

[27] *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (citations, modifications, internal quotation marks and footnotes omitted).

The burden of proving that the LSGT Debtors' petitions were filed in good faith is on the Debtors.[28]  The good faith analysis ultimately is based on the totality of facts and circumstances, thus "the subjective intent of the debtor may play a role in a court's determination of good faith."[29]  In other words, the Court focuses on whether there is "a valid bankruptcy purpose and whether the filing was made as a litigation tactic is not intended to limit consideration of other facts and circumstances.  Indeed, no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith."[30]

A party filing for Chapter 11 bankruptcy may prove that its petition served a valid bankruptcy purpose by showing that the petition "preserved a going concern or maximized the value of the debtor's estate. . . . To say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy."[31]  Courts demand more than the desire to stay pending litigation with the automatic stay.[32]

Here, the Debtors assert there were several reasons why the LSGT Debtors filed for bankruptcy protection.  First, the LSGT Debtors' *only* means of funding the payment

---

[28] *Id.* at 619 (citation omitted).

[29] *Id.* 618 n. 8 (citation, modifications and internal quotations marks omitted).

[30] *Id.* (citation, modifications and internal quotations marks omitted).

[31] *Id.* at 619 (citations, modifications, internal quotation marks and footnote omitted).

[32] *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.),* 384 F.3d 108, 128 (3d Cir. 2004) (*quoting In re HBA E., Inc.,* 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988) ("'The protection of the automatic stay is not *per se* a valid justification for a Chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing.  A perceived need for the automatic stay, without more  cannot convert a bad faith filing to a good faith one.'").

of their asbestos liabilities was through LSGT Gas's intercompany claim against EFH Corp., a company that was clearly going to file bankruptcy. At the same time, absent their own automatic stay, the LSGT Debtors would have continued to incur expenses related to asbestos litigation. In short, absent their own bankruptcy filing, the LSGT Debtors would have been immediately cash flow insolvent upon EFH Corp.'s bankruptcy filing. Second, the Debtors' pre-filing tax arrangement, under certain reorganization scenarios, could have left three of the LSGT Debtors, which are C-corporations, jointly and severally liable for billions of dollars in deconsolidation tax. Third, bankruptcy could provide a forum for permanently addressing all claims against the LSGT Debtors to the benefit of the creditors.[33]

### i.    The LSGT Debtors Had No Source of Funding

The fact that the LSGT Debtors would be cash flow insolvent with no source of funding upon the bankruptcy filing of EFH Corp. is the most persuasive factor regarding whether the LSGT Debtors had a valid bankruptcy purpose in filing bankruptcy. On the Petition Date, the LSGT Debtors' main assets were unsecured intercompany claims – there was no other source of funding to satisfy the asbestos claims and the other liabilities of the LSGT Debtors.[34] Because of the automatic stay in favor of EFH Corp. upon its own filing, the LSGT Debtors would lose the ability to receive cash payments from EFH Corp. on account of the unsecured intercompany claims. At the same time, unless the LSGT

---

[33] *See* DX091A (EECI, Inc.'s Minutes of the Board of Directors Meeting, Apr. 25, 2014).

[34] 12/5/2016 Hr'g Tr. at 45:21-22 (Horton).

Debtors filed bankruptcy and obtained their own automatic stay, asbestos claims against them would continue to be liquidated and costs of defending the asbestos claims would continue to accrue. Thus, because of EFH Corp.'s bankruptcy, the LSGT Debtors would not have been able to satisfy their creditors at all in the short term and, absent their own bankruptcy and automatic stay they would have been immediately cash flow insolvent. Furthermore, the LSGT Debtors claims against EFH Corp. are unsecured. Thus, as of the Petition Date, there was no certainty whether the LSGT Debtors would ever be able to provide a material recovery to their creditors in the long-term.

By filing for bankruptcy, the LSGT Debtors avoided becoming cash flow insolvent in the short-term. Moreover, they preserved their claims against EFH Corp. and had a seat at the table in negotiating the terms of payment on the intercompany claims against EFH Corp. – their sole source of funding to pay their own creditors – that would determine their long-term solvency.

The Asbestos Movants compare the LSGT Debtors' cases to those in *15375 Memorial Corp. v. Bepco, L.P.*[35] (hereinafter "*Memorial*"). In *Memorial*, the debtors, both non-operating companies, filed for bankruptcy two months before litigation with their largest claimant. The only assets held by the *Memorial* debtors were insurance policies and a handful of claims for cash.[36] The *Memorial* debtors' largest creditor and plaintiff in the approaching state court litigation challenged the *Memorial* debtors' bankruptcy

---

[35]  589 F.3d 605 (3d Cir. 2009).

[36]  *Id.* at 515.

15

petitions for lack of good faith,[37] which was determined to be a successful challenge by the Third Circuit.[38]

The Court does not agree that the case *sub judice* and *Memorial* are comparable – any similarities stop after noting that the *Memorial* debtors and the LSGT Debtors are both non-operating entities.  First, the *Memorial* debtors were not part of an enterprise-wide restructuring.[39]  In *Memorial*, only the non-operating entities filed bankruptcy while the operating member did not.[40]  Here, the LSGT Debtors are part of an enterprise-wide restructuring of $42 billion in debt that will preserve the ongoing business of the Debtors. Many of the "good faith" cases involve single debtors,[41] rather than a large complex multi-debtor restructuring; however, as held by Judge Walrath in *In re JER/Jameson Mezz Borrower II, LLC*, the Court must consider the Debtors "holistically" to determine if there is a "realistic possibility" of rehabilitation of the LSGT Debtors.[42]

Second, the *Memorial* debtors did not have viable intercompany claims against the parent,[43] rather the only assets it had available to satisfy claims were the proceeds of

_____

[37] *Id.* at 611-612.

[38] *Id.* at 626.

[39] *Id.* at 609-10.

[40] *Id.*

[41] *See, e.g., In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 112 (3d Cir. 2004) (debtors had approximately four times as many assets as liabilities and filed solely to take advantage of Bankruptcy Code provision limiting damages resulting from the termination of a lease); *In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999) (the debtor was a highly solvent and had a highly solvent non-debtor parent); *In re Liberate Techs.*, 314 B.R. 206, 210 (Bankr. N.D. Cal. 2004) ("Debtor's cash thus exceeds its liabilities by $45 to $153 million.").

[42] *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 301 (Bankr. D. Del. 2011) (granting the motion to dismiss the case).

[43] *Memorial*, 589 F.3d at 611.

16

insurance policies.[44]  *Memorial*'s bankruptcy could not have maximized value to the *Memorial* debtors' creditors because the bankruptcy process could not increase the value of the insurance proceeds; instead, the bankruptcy filing diminished value to creditors due to the cost of administering the estates.[45]  Here, LSGT Gas has viable unsecured claims against EFH Corp. in the amount of $560 million.  Furthermore, the LSGT Debtors could not have waited to defend and/or to litigate asbestos claims without their own automatic stay until EFH Corp. paid out on any such intercompany claims, as the LSGT Debtors had no other source of cash other than their claims against EFH Corp. as of the Petition Date.  As a result, the LSGT Debtors would have been cash flow insolvent.

Third, *Memorial* was in effect a two-party dispute – one creditor held $320 million of the $330 million in claims against the *Memorial* debtors.[46]  In the case *sub judice* there are tens of thousands of asbestos claimants,[47] including unmanifested asbestos claimants, as well as post-employment benefit obligations against the LSGT Debtors.

Fourth, the timing of the *Memorial* debtors' petitions demonstrated that they filed bankruptcy as a litigation tactic, only two months before trial with their largest claimant.[48]  Here, there is no such evidence.  The timing of the filing was related to the insolvency of the entire enterprise not by some asbestos-related litigation schedule.  Thus, the cases *sub judice* are distinguishable from *Memorial*.

---

[44] *Id.* at 621.

[45] *Id.* at 624.

[46] *Id.* at 620-21.

[47] *See* 12/5/2016 Hr'g Tr. 156:10-14 (Moldovan).

[48] *Memorial*, 589 F.3d at 625.

The Asbestos Movants also argue that the LSGT Debtors' impending cash flow insolvency was, in fact, easily remediable. The Asbestos Movants suggest that the LSGT Debtors could have taken other steps, other than filing for bankruptcy to achieve access to EFH Corp.'s cash: (i) court approval to fund the litigation costs and/or (ii) modification of the automatic stay to allow the intercompany claim.

The Asbestos Movants are correct that had the LSGT Debtors not filed bankruptcy, the LSGT Debtors could have sought court approval to lift the automatic stay on their intercompany claims against EFH Corp. and to compel payment of those claims. Of course, immediate payment of these intercompany claims on a dollar-for-dollar basis - when the other general unsecured creditors of EFH Corp. had to await confirmation of a plan for payment with no guarantee of being paid in full - might have been problematic. Indeed, there is no doubt in the Court's mind that EFH Corp.'s other unsecured creditors would have contested any such motion. But, that aside, the LSGT Debtors would have had to meet two rather stringent tests to compel payment: the balancing test in order to lift the stay as well as the "necessity of payment doctrine."

In order to modify or to lift the automatic stay, the Court would have to determine that the LSGT Debtors' were likely to succeed on a claim under the "doctrine of necessity."[49] Under the "doctrine of necessity," a debtor may pay a pre-petition creditors

---

[49] *In re Downey Fin. Corp.*, 428 B.R. 595, 608–09 (Bankr. D. Del. 2010) ("Courts conduct a 'fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay.' This Court has adopted a three-prong to determine whether to grant relief from the stay: 1. Whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay; 2. Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and 3. The probability of the creditor prevailing on the merits" (citations, footnotes, and internal modifications omitted)).

when such creditor "'will not supply services or material essential to the conduct of the business until [its] pre-reorganization claims shall have been paid.'"[50] The Third Circuit has explained that a "necessity of payment" rule is intended to benefit all parties and is applicable when such payment is critical to the Debtors' reorganization.[51] In the case *sub judice*, the LSGT Debtors do not supply services or materials essential for EFH Corp.'s business – in fact, the LSGT Debtors are non-operating business units that do not supply any services or materials whatsoever to EFH Corp. The LSGT Debtors exist to handle the settlement and defense of various legacy liabilities, primarily asbestos claims. While such settlement and defense is important – it is not, in fact, essential to the operations of EFH Corp. As such, had the LSGT Debtors not filed for bankruptcy, it would have been very unlikely that the Court would have modified the automatic stay to fund litigation costs by allowing immediate payment on LSGT Gas's intercompany claim against EFH Corp. based on the necessity of payment doctrine.

### ii.    Avoidance of a Potential Deconsolidated Tax Liability

At the time of the bankruptcy filings, Messrs. Horton and Moldovan were concerned about the risk that the LSGT Debtors could become jointly and severally liable for a multi-billion dollar deconsolidation tax if the TCEH Debtors were separated from the EFH/EFIH Debtors.[52] They believed that their participation in the plan process,

---

[50] *Matter of Lehigh & N. E. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (*quoting In re Penn Central Transportation Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972)).

[51] *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (*citing In re Fin. News Network Inc.*, 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991)); *Matter of Lehigh & N. E. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981).

[52] 12/5/2016 Hr'g Tr. 128:6-16 (Moldovan); 46:14-24 (Horton).

including the ability to accept or reject any plan proposals, might protect the LSGT Debtors from incurring the deconsolidation tax liability.[53]

The Asbestos Movants make two arguments in response: (i) EFH Properties Company ("EFH Properties") did not file bankruptcy but nonetheless joined in the ultimate tax settlement, and the LSGT Debtors could have done the same without filing bankruptcy;[54] and (ii) the Debtors were motivated to avoid the deconsolidated tax liability.[55]

The Asbestos Movants point to the fact that EFH Properties did not file bankruptcy. However, as the evidence showed at the TCEH Debtors' confirmation trial and at the hearing on December 5, 2016, EFH Properties was in a much different position than the LSGT Debtors. While EFH Properties faced the same risk of deconsolidation tax liability, the Debtors also had to consider the following factors, which weighed against EFH Properties filing bankruptcy: (i) the possibility of accelerating a large tax indemnity claim; (ii) starting the clock on the Debtors' time to accept or reject the master lease on Energy Plaza under section 365(d)(4); and (iii) if the master lease was rejected (or deemed rejected) the requirement that EFH Properties and its subtenants surrender the building.[56] Balancing these factors, EFH Properties did not file for bankruptcy despite the

---

[53] 12/5/2016 Hr'g Tr. at 124:21-24 (Moldovan).

[54] *See* Reply in Support of Motion (D.I. 10273) at p. 8 ("[T]he LSGT Debtors did not have to be in bankruptcy to participate in any resolution of the tax issues . . . ").

[55] 12/5/2016 Hr'g Tr. 202:9-11 (Kelleher Closing Argument).

[56] 12/5/2016 Hr'g Tr. at 129:6-130:17 (Moldovan) and Transcript of TCEH Confirmation Trial (Aug. 18, 2016) (D.I. 9345) at 18:6-32:4 (Moldovan).

deconsolidation tax risk.  It is also important to note, EFH Properties was a cash flow positive entity[57] yet the LSGT Debtors, without access to EFH Corp.'s cash and without the automatic stay, were cash flow insolvent.

Without having the considerations against filing for bankruptcy such as those faced by EFH Properties, the LSGT Debtors' consideration of the deconsolidated tax liability weighed the potential of bearing the full brunt of the deconsolidated tax liability versus the preservation of negotiations on an enterprise basis, as well as negotiations over any proposed plan[58] treatment of any potential deconsolidated tax liability.

Furthermore, as of the Petition Date, regardless of the fact that the Debtors were highly motivated to avoid billions of dollars in taxes, no one could have predicted the outcome of the tax issues, which required 2½ years of intense negotiations.  Eventually, in June 2016, the IRS issued a private letter ruling, which ultimately led to negotiation and confirmation of a plan of reorganization that allowed the separation of the TCEH Debtors on a tax-free basis, avoiding approximately $6.5 billion in tax liability.  Resolution of the potential deconsolidated tax liability could not have been known as of the Petition Date.

---

[57] 12/5/2016 Hr'g Tr. at 130:6-9 (Moldovan).

[58] *Id*. at 124:21-24 (Moldovan) "[W]e talked about being part of a holistic solution where we would have, for lack of a better phrase, a seat at the table or ability to approve any plan that was votes or that was proposed to be filed.").

### iii.    The Cases Were Not Filed to Evade Asbestos Liabilities

The LSGT Debtors filed bankruptcy in the hope of negotiating a resolution in bankruptcy that would maximize both the value of their assets and the recovery on their asbestos related claims.  Mr. Moldovan testified that, although addressing claims against EECI was an important factor in determining whether to file EECI's bankruptcy petitions, it was not as important as the other factors considered by EECI's board.  Rather, it was "part of the holistic solution" to maximize the LSGT Debtors' assets to satisfy is asbestos claims.[59]

The Asbestos Movants counter that the LSGT Debtors' primary reason for filing for bankruptcy was to evade their asbestos liabilities.  However, at trial, Mr. Moldovan and Mr. Horton testified that discharging asbestos liabilities was not factored into their decision to file the LSGT Debtors for chapter 11.[60]  Mr. Horton testified that conversations about an Asbestos Bar Date first began **after the RSA terminated in July 2014.**[61]

---

[59]  12/5/2015 Hr'g Tr. 131:16-21.

[60]  12/5/2016 Hr'g Tr. at 131:12-132:2, 158:21-25 (Moldovan); 65:8-66:2 (Horton).  Mr. Moldovan testified:

> I can tell you that it never came up, that it never crossed my mind that the purpose of the filing for bankruptcy was to discharge any rightful claim that any asbestos debtor had.  That was never discussed.  That was never – you know, that would not have been something that would have been one of my priorities.

12/5/2016 Hr'g Tr. 131:22-132:2 (Moldovan).

[61]  12/5/2016 Hr'g Tr. 98:16-99:5.  More specifically, Mr. Horton testified as follows:

> A.  As I recall in 2014, we began having conversations and hearing from bidders that they were not comfortable with the due diligence that they had gone through for quantifying the potential magnitude of the asbestos claims and we began to here [sic] quite adamantly from them that they wanted a bar date.
>
> Q.  OK

Similarly, Mr. Moldovan testified that, **after the Petition Date**, the LSGT Debtors began to consider an asbestos bar date as a "path to getting a plan sponsor . . . to purchase EFH [Corp.] and, ultimately, as path towards getting the claims of the [A]sbestos [D]ebtors reinstated and have them be *more valuable*."[62] Mr. Horton testified:

> The sole purpose of the bar date was to help the potential buyers become more comfortable with these asbestos liabilities and to quantify the potential risk and to persuade them to take on these liabilities to reinstate the receivables. That was the sole purpose behind setting a bar date.[63]

As the Asbestos Bar Date was not contemplated until **after the Petition Date**, the LSGT Debtors' petitions were not filed for litigation advantage or as a tactical maneuver to evade asbestos liability. In fact, with the benefit of hindsight, the Debtors' post-filing commitment to reinstate all timely filed asbestos claims and the related intercompany claims, with post-petition interest, is further evidence that the Debtors did not and are not attempting to evade asbestos liabilities.

Furthermore, there is no evidence in the record to suggest that if the LSGT Debtors had not moved to establish a bar date that the Debtors would still have been able to

---

THE COURT: Can you be specific about the timing? More specific about the timing?

THE WITNESS: I'll try, Your Honor. It was more - it was after the termination of the RSA, which I think was in July of 2014.

THE COURT: July 2014.

THE WITNESS: And so we were in conversations in July and August of 2014 that would begin those requests from the bidders.

*Id.* at 98:16 - 99:5.

[62] 12/5/2016 Hr'g Tr. 135:6-13.

[63] 12/5/2016 Hr'g Tr. 56:24-57:4.

reinstate LSGT Gas' intercompany claim against EFH Corp. In fact, the record shows just the opposite. The record is replete with testimony that potential investors were concerned about the LSGT Debtors' open-ended asbestos liabilities.[64] It appears that the LSGT Debtors sought the Asbestos Bar Date in order to identify the asbestos claims and provide a higher degree of certainty of the LGST Debtors' liabilities to potential purchasers.[65] The LSGT Debtors presented evidence at the trial of NextEra's extensive due diligence into the asbestos claims and the tenuous negotiations leading up to NextEra allowing for reinstatement of the asbestos claims in its bid, even with the Asbestos Bar Date in place.[66] The fact that NextEra ultimately agreed to reinstate the asbestos liabilities and the intercompany claims is evidence that the Asbestos Bar Date, in fact, provided adequate information as to the scope of the asbestos claims.

B.      **The Motion is Barred by the Doctrine of Laches**

Although section 1112(b) places no time limitations on the filing of a motion to dismiss, a bankruptcy court may exercise its discretion to deny a motion to dismiss as untimely based on the doctrine of laches.[67] "For laches to apply, the following factors

---

[64] *See* 10/1/2015 Keglevic Dep. Tr. at 331:13-21; D-DIR Horton ¶ 14; 12/5/2016 Hr'g Tr. at 50:21-54:4 (Horton).

[65] 12/5/2016 Hr'g Tr. at 53:21-54:4 (Horton).

[66] *See, e.g.* DX222; D-Dir Horton ¶ 17; 12/5/2016 Hr'g Tr. at 58:2-61:12; DX106.

[67] *In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *11 (Bankr. N.D. Tex. Jan. 26, 2005) (*citing In re Shea & Gould*, 214 B.R. 739, 749 (Bankr.S.D.N.Y.1997); In re I.D. Craig Serv. Corp., 118 B.R. 335, 338 (Bankr.W.D.Pa.1990) (where board of directors of debtor waited over one year to seek dismissal of case based on debtor's president's lack of authority to file for relief, court held that laches required denial of the motion)).

24

must be shown: (1) delay in assertion of a claim; (2) the delay is inexcusable; and (3) undue prejudice results from the delay." [68] Each factor exists in this case.

### i.    Delay

Here, the Asbestos Movants waited 31 months into extremely complex cases to assert this Motion. The Asbestos Movants are not new to this case. Indeed, two of them, Shirley Fenicle and William Fahy, have been extremely active in these cases since their appointment to the EFH Committee in 2014.[69] Asbestos claimants have objected to the Debtors' motion to set a bar date, sought appointment of an unmanifested claims representative, appealed the now-defunct confirmation order, and have sought leave to file a class proof of claim.[70]

### ii.    Inexcusable Delay

The Asbestos Movants have argued that movants John H. Jones and David Heinzmann, who (allegedly) manifested asbestos-related injuries after the bar date, should not be faulted for not having acted earlier. However, at the trial, the Asbestos Movants did not present any evidence about Mr. Jones or Mr. Heinzmann and what they know about these cases and when. As a result, the Asbestos Movants have left the Court with an incomplete factual record to rule in make a finding of "excuse" based on this argument. The Asbestos Movants also argue that Debtors caused the delay by opposing

---

[68] *In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362 at *11 (*citing Geyen v. Marsh.* 775 F.2d 1303, 1310 (5th Cir.1985); *Mut. Life Ins. Co. of N.Y. v. Bohart (In re Bohart)*, 743 F.2d 313, 325 (5th Cir.1984)).

[69] *See, supra*, n. 4.

[70] *See* D.I. 1791, 5072, 6610, and 7151.

the appointment of a legal representative of future, Unmanifested Asbestos Claimants. The Court notes that the U.S. Trustee denied appointment of a legal representative. Furthermore, such request and argument was 15 month ago[71] and does not explain the further delay.

### iii.    Undue Prejudice and the Effects of Dismissal

The Asbestos Movants assert that there is only one effect of dismissal of these cases: removal of the Asbestos Bar Date for unmanifested claimants, if any, who did not file proofs of claim. The Court disagrees. Dismissal of the LSGT Debtors could also have a much larger effect. For example, dismissal of the LSGT Debtors could trigger NextEra's termination rights under the Plan Support Agreement and the Merger Agreement.[72] This would trigger a $275 million break-up fee to NextEra that would significantly reduce recoveries to EFH Corp.'s general unsecured claimants, which would also then include the $560 million intercompany claim of LSGT Gas. Furthermore, dismissal may also affect the Debtors' November 23, 2015, settlement with the EFH Committee, which requires reinstatement of preserved asbestos claims and related intercompany receivables. In other words, dismissal of these cases could "dismantle" the entire EFH Corp. reorganization and significantly reduce recoveries for all asbestos claimants. The road to reorganization in these cases has been arduous and the current plan before the

---

[71] *See* D.I. 5209.

[72] DX003 *Order (a) Authorizing Entry into Merger Agreement, (b) Approving Termination Fee, and (c) Authorizing Entry into and Performance Under the Plan Support Agreement* [D.I. 9384] at Exhs. 1, 2, PSA and Merger Agreement; 12/5/2016 Hr'g Tr. at 66:11-25 (Horton).

Court is tenuous. In many ways, one could consider the Debtors' restructuring to be a house of cards and removing its very foundation could be devastating for the very claimants the Asbestos Movants claim they are trying to protect.

Thus, there is undue prejudice to the Debtors resulting from the Asbestos Debtors bringing this Motion 31 months after the Petition Date. This leads the Court to ask why are the Asbestos Movants attempting to dismiss these cases when dismissal could very well result in asbestos claimants receiving far less than currently provided in the proposed plan. The Court can only assume that this is another collateral attack on the Asbestos Bar Date Order, which is a final non-appealable order.[73] The only guaranteed consequence of dismissal would be the inapplicability of the Asbestos Bar Date and this Court's Opinion,[74] which the Asbestos Movants did not appeal, at the expense of the holders of preserved asbestos claims against the LSGT Debtors - claimants who would receive a small fraction of what they could receive if LSGT Gas's intercompany claims against EFH Corp. are not reinstated. The Court, if not the Asbestos Movants, is very much aware of the potential cost to such asbestos claimants.

---

[73] *In re Visteon Corp.*, 579 F. App'x 121, 125 (3d Cir. 2014) ("It is clear that any party contesting an unfavorable order or judgment below must file an appeal. A party which does not appeal a decision by a district court cannot receive relief with respect to that decision. . . . A party that makes a considered choice not to appeal . . . cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong." (citations, internal quotations marks and modifications omitted)).

[74] *In re Energy Future Holdings Corp.*, 522 B.R. 520 (Bankr. D. Del. 2015).

## CONCLUSION

As discussed above, the Court finds that, based on the totality of the circumstances the LSGT Debtors' bankruptcy petitions were filed in good faith for a valid bankruptcy purpose. Furthermore, the Court finds that the Motion is barred by the doctrine of laches. Thus, the Court will deny the Motion.

An order will be entered.

Dated: December 19, 2016

_____
Christopher S. Sontchi
United States Bankruptcy Judge