# EXHIBIT 3

**Petition for Rehearing or Rehearing *En Banc* for Appellees**
***Del. Trust Co. v. Energy Future Intermediate Holding Co. LLC***
**No. 16-1351 (3d Cir.)**

No. 16-1351

# In the United States Court of Appeals for the Third Circuit

IN RE: ENERGY FUTURE HOLDINGS CORP., *et al.*,

*Debtors.*

DELAWARE TRUST COMPANY, AS INDENTURE TRUSTEE,

*Appellant,*

v.

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, ET AL.,

*Appellees.*

On Appeal from the U.S. District Court for the District of Delaware
No. 1:15-cv-00620 (The Hon. Richard G. Andrews)

## PETITION FOR REHEARING OR REHEARING *EN BANC* FOR APPELLEES

Mark D. Collins
Daniel J. DeFranceschi
Jason M. Madron
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

Paul D. Clement
Michael A. Petrino
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Additional counsel on following page*

December 15, 2016

Edward O. Sassower, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C.
Andrew R. McGaan, P.C.
Chad J. Husnick
Steven N. Serajeddini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Counsel for Appellees*

Case 14-10979-CSS    Doc 10633-3    Filed 01/11/17    Page 4 of 68

## CERTIFICATE OF BELIEF THAT REHEARING OR REHEARING *EN BANC* IS WARRANTED

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves a question of exceptional importance, *viz.*, whether New York law requires an indenture to use express language in order to make an additional premium payable when the debt is redeemed after acceleration.

December 15, 2016

*/s/ Andrew R. McGaan*
Andrew R. McGaan

Case: 14-10979-CSS   Doc 10633-3   Filed 01/11/17   Page 5 of 68

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ...................................................................................... 1

BACKGROUND ........................................................................................ 3

REASONS FOR GRANTING REHEARING OR REHEARING *EN BANC* ................................................................................................ 8

I.    The Panel's Decision Departs From Existing New York Law And Conflicts With Other Courts. ............................................... 9

II.   This Court Should Grant Rehearing to Certify The Determinative State-Law Issue To The New York Court Of Appeals. ................. 16

III.  At A Minimum, The Court Should Hold This Petition Until The Second Circuit Decides *MPM*. ......................................................... 18

CONCLUSION ........................................................................................ 19

RLF1 16223161v.1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re AMR Corp.*,
    730 F.3d 88 (2d Cir. 2013) .............................................................. 14, 15

*In re Energy Future Holdings Corp.*,
    527 B.R. 178 (Bankr. D. Del. 2015) .......................................... 3, 4, 6, 7

*In re Energy Future Holdings Corp.*,
    539 B.R. 723 (Bankr. D. Del. 2015) ...................................................... 6

*In re Energy Future Holdings Corp.*,
    Nos. 15-1011, 15-1014, 15-1015, 2016 WL 1451045 (D.
    Del. Nov. 17, 2016) ............................................................................... 7

*In re MPM Silicones, L.L.C.*,
    No. 15-1682 (2d Cir. argued Nov. 9, 2016) ....................... 8 - 11, 16 - 20

*In re MPM Silicones, LLC*,
    531 B.R. 321 (S.D.N.Y. 2015), *appeal filed*, No. 15-1682
    (2d Cir.) ............................................................................... 9, 11, 13, 16

*In re S. Side House, LLC*,
    451 B.R. 248 (Bankr. E.D.N.Y. 2011), *aff'd*, 2012 WL
    273119 (E.D.N.Y. Jan. 30, 2012) .............................................. 5, 10, 14

*In re Solutia Inc.*,
    379 B.R. 473 (Bankr. S.D.N.Y. 2007) .............................................. 10, 11

*Mitchell Partners, LP v. Irex Corp.*,
    660 F.3d 709 (3d Cir. 2011) ............................................................. 9, 16

*NML Capital v. Argentina*,
    952 N.E.2d 482 (N.Y. 2011) ............................................................ 12, 13

*Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*,
    816 N.Y.S.2d 831 (N.Y. Sup. Ct. 2006) ........................... 6, 9, 11, 13, 14

iii

## Constitutional Authorities

U.S. Const. art. I, §8, cl. 4 ..........................................................................9

## Other Authorities

http://www.uscourts.gov/report-name/bankruptcy-filings.....................18

iv

## INTRODUCTION

Until the panel's decision in this case, all courts—including state and federal courts in New York—agreed that under New York law, a borrower that repays accelerated debt is not required to pay an additional premium unless the governing contract says so explicitly. Under this clear-statement rule, if the parties to a debt instrument want to require an additional premium even after acceleration of the debt, their contract must provide for that premium in express terms.

The panel's decision, however, deprived this clear-statement rule of its clarity. It accepted that the standard clear-statement rule applies if the contract describes the additional premium as a "prepayment" premium. But if the contract instead uses the term "redemption," then the panel adopted the opposite rule: the premium *will* apply even after acceleration, unless the debtor can show it should *not*.

That is no small tweak to New York law. In the multi-billion-dollar bankruptcy at issue here, it means appellees may owe some *$900 million* in premiums that the bankruptcy court and district court both held inapplicable. And for thousands of other contracts it may leave the parties with a deal dramatically different from the one they thought they bargained for if they end up in this Circuit.

The panel's decision leaves the law on this vitally important issue in a regrettable state of confusion.  As the panel acknowledged, its decision conflicts with case law from the Southern District of New York, which recently applied New York's usual clear-statement rule without distinguishing between premiums for "prepayment" and "redemption," and held, under a contract materially identical to those here, that a debtor was *not* required to pay additional premiums after accelerating its debt.  The result is that the two most popular districts in the nation for chapter 11 bankruptcy filings—the District of Delaware and the Southern District of New York—now take opposite approaches on this crucial and recurring issue of New York law.  This state of affairs is untenable.

To the extent this Court may have concerns with parties purposely engineering defaults to avoid paying premiums, that concern can be addressed directly without departing from the consensus clear-statement rule.  Indeed, the bankruptcy court here squarely addressed and rejected the argument that appellants had improperly manipulated the bankruptcy laws.

Whatever the panel's rationale for its novel rule, the resulting conflict over this exceptionally important issue of New York law is not

2

Case 14-10979-CSS    Doc 10333-2    Filed 01/11/17    Page 10 of 68

sustainable.    There needs to be a uniform approach to this critical question, and only one court can provide it.    Accordingly, appellants respectfully request that this Court grant rehearing and certify this determinative issue to the New York Court of Appeals.    At a minimum, the Court should hold this petition until the Second Circuit has issued its pending decision addressing this same issue, which will shed valuable light on the question and may well confirm that rehearing or certification is warranted here.    The Second and Third Circuits cannot have fundamentally different approaches to this critical issue of New York law.

## BACKGROUND

Appellees (together, EFIH) are subsidiaries of Energy Future Holdings Corp. (EFH), the largest electric power company in Texas.    In late 2012, EFH and EFIH encountered serious financial difficulties, and launched extensive efforts to stave off bankruptcy by pursuing various restructuring strategies.    *See In re Energy Future Holdings Corp.*, 527 B.R. 178, 187 (Bankr. D. Del. 2015).    Those efforts were unsuccessful. In April 2014, facing a "severe liquidity crisis," EFH and EFIH sought chapter 11 bankruptcy protection.    *Id.* at 196.

Case 14-1079-CSS    Doc 10633-8    Filed 01/10/17    Page 11 of 68

The EFH bankruptcy was the largest operating chapter 11 case ever filed in Delaware, involving over $40 billion in debt. That debt included the notes held by appellants here: some $4 billion secured by a first-priority lien on EFIH's assets (the First Lien Notes), and some $2 billion secured by a second-priority lien (the Second Lien Notes). *See* Op.6-7. Those notes contain automatic acceleration clauses providing that if EFIH files a bankruptcy petition, the outstanding debt will become "due and payable immediately." Op.7-8. As a result, when EFIH entered bankruptcy, it became obligated to pay its creditors the full amount due on these notes. Accordingly, after obtaining refinancing, EFIH paid off the First Lien Notes and, with cash on hand, a portion of the Second Lien Notes. Op.9-10.[1]

Appellants objected, and filed two adversary proceedings (one brought by holders of the First Lien Notes and one by holders of the Second Lien Notes). In appellants' view, it was not enough for EFIH to pay off the principal and accrued interest on the notes; they should also have to pay an additional premium to compensate appellants for having the loans repaid early. Appellants relied on the optional redemption

---

[1] A portion of the Second Lien Notes remains unpaid, but no party has suggested that this affects the analysis of the relevant issues.

4

clauses in the notes, which provide that at any time before a specified date, EFIH "may redeem all or a part of the Notes at a redemption price equal to 100% of the principal amount of the Notes redeemed <u>plus</u> the Applicable Premium ... and accrued and unpaid interest." Op.7 (quoting First Lien Notes, and noting "essentially identical" provision in Second Lien Notes).[2]

Appellants also argued that EFIH should be liable for that premium under New York's intentional default doctrine. Under that doctrine, "[e]ven in the absence of an express agreement, prepayment consideration may be awarded [if] the borrower defaulted intentionally in order to avoid a prepayment penalty." *In re S. Side House, LLC*, 451 B.R. 248, 268 (Bankr. E.D.N.Y. 2011), *aff'd*, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012); *see also* Op.24 n.3. Appellants contended that EFIH filed for bankruptcy not because of its liquidity issues, but just to default and accelerate its debt and so avoid the premium that would otherwise be due for an optional early redemption. *EFH*, 527 B.R. at 187.

---

[2] It is undisputed that the date of the first lien repayment and second lien partial repayment predated the dates specified in each indenture's redemption clauses.

The bankruptcy court rejected appellants' arguments. In two well-reasoned opinions, it explained the then-unanimous view that New York law does not apply a "make-whole, prepayment premium" upon acceleration without "express language" in the note to that effect. *Id.* at 192 (citing, *inter alia*, *Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831 (N.Y. Sup. Ct. 2006)); *see also In re Energy Future Holdings Corp.*, 539 B.R. 723, 728 (Bankr. D. Del. 2015). Because the optional redemption provisions here contained no "clear and unambiguous language that a make-whole premium . . . is due . . . following a bankruptcy acceleration," the bankruptcy court held that premium did not apply. *EFH*, 527 B.R. at 193-94; *see EFH*, 539 B.R. at 733.

The bankruptcy court also held that EFIH was not liable under the intentional default doctrine, because "overwhelming evidence" showed that EFIH filed bankruptcy in order to resolve its existing financial crisis, and not to intentionally default and avoid the make-whole premium. *EFH*, 527 B.R. at 196. Indeed, the court concluded that appellants' intentional default argument "stretches the bounds of credulity." *Id.*

Case 14-10979-CSS    Doc 10633-3    Filed 01/13/17    Page 14 of 68

Appellants appealed the interpretation of the optional redemption provisions, but did not preserve their credulity-straining intentional default argument.  The district court affirmed, relying on the same rule that New York law requires "express language" in the indenture for a make-whole premium to apply after acceleration.  *In re Energy Future Holdings Corp.*, Nos. 15-1011, 15-1014, 15-1015, 2016 WL 1451045, at *3 (D. Del. Nov. 17, 2016).

A panel of this Court reversed.  The panel recognized that federal bankruptcy courts in New York applying New York law have consistently required express language to enforce a prepayment or make-whole premium after acceleration.  Op.23-25.  But the panel rejected that uniform rule, holding instead that New York law would only require express language to enforce the premium if the note used the term "prepayment" to describe the circumstances triggering the premium.  *Id.* at 25.  For notes using the term "redemption," the panel *inverted* the usual rule; it held that in such cases, New York law would place the burden on the *debtor* to show that the premium should *not* apply upon acceleration.  *Id.* at 26-27.  The panel cited no case from any New York court—or indeed from any court—relying on this distinction between "prepayment" and "redemption."

7

Case 14-10979-CSS    Doc 10633-28    Filed 01/11/17    Page 15 of 68

The same issue of New York law presented here was recently decided in the opposite direction in a bankruptcy case from the Southern District of New York. That decision is now the subject of a pending appeal before the Second Circuit. *See In re MPM Silicones, L.L.C.*, No. 15-1682 (2d Cir. argued Nov. 9, 2016). Oral argument in the Second Circuit appeal occurred several days before the panel's decision in this case. The parties to that appeal subsequently filed Rule 28(j) letters addressing the panel's decision. In those letters, the *MPM* appellees emphasized the conflict between the panel's decision in this case and Second Circuit precedent, and the *MPM* appellants acknowledged that the circumstances in both cases were "identical." *MPM*, No. 15-1682, Dkts. 244, 245, 247 (2d Cir.).

## REASONS FOR GRANTING REHEARING OR REHEARING *EN BANC*

This case presents an exceptionally important issue that arises repeatedly in multi-billion-dollar bankruptcy cases: whether New York law requires express contractual language in order for a make-whole premium to apply after acceleration of debt. That issue, moreover, is now the subject of a split between the two jurisdictions that handle the most chapter 11 cases in the Nation. Only the New York Court of Appeals can finally resolve that issue. And until it does so, the panel's

decision in this case means that federal courts cannot ensure that indentures under New York law will be treated uniformly in federal bankruptcy proceedings—undermining the basic purpose of Congress' "uniform laws on the subject of Bankruptcies." U.S. Const. art. I, §8, cl. 4. Under these circumstances, this Court should grant rehearing and certify the critical state-law issue to the New York Court of Appeals. *Cf. Mitchell Partners, LP v. Irex Corp.*, 660 F.3d 709 (3d Cir. 2011) (granting rehearing and certifying issue). At the very least, this Court should take the prudent course of holding this petition until the Second Circuit has had an opportunity to rule in *MPM*, and consider at that point whether further action is warranted to resolve the tension over this significant and frequently recurring question of law.

## I. THE PANEL'S DECISION DEPARTS FROM EXISTING NEW YORK LAW AND CONFLICTS WITH OTHER COURTS.

As the panel recognized, the basic rule of New York law here is straightforward: "If parties want to mandate a 'prepayment' premium following acceleration, they must clearly state it in their agreement." Op.24. This rule has been consistently applied by numerous state and federal courts in New York. *See, e.g.*, *Nw. Mut.*, 816 N.Y.S.2d at 838; *In re MPM Silicones, LLC*, 531 B.R. 321 (S.D.N.Y. 2015), *appeal filed*, No.

15-1682 (2d Cir.); *S. Side*, 451 B.R. at 268; *In re Solutia Inc.*, 379 B.R. 473, 488 (Bankr. S.D.N.Y. 2007).

The panel accepted that settled rule for cases in which the relevant indenture describes the premium as a "prepayment" premium. But it held that rule did not apply here, because the contract "avoid[ed] the word 'prepayment' and us[ed] the term 'redemption'" instead. Op.25. That choice of wording, the panel held, reverses the usual presumption. Instead of requiring the lender to identify express language making the premium applicable after acceleration, the panel held that the debtor must point to language showing that the premium is *not* applicable. *Id.* at 26-27.

That novel holding will create serious confusion in this area. The panel cited no case, from New York or any other jurisdiction, supporting its surprising distinction between premiums for "prepayment" and premiums for "redemption." In fact, as the panel acknowledged, that distinction cannot be squared with the existing caselaw in this area— especially the recent *MPM* decision from the District Court for the Southern District of New York, which the panel explicitly rejected. Op.20, 24-25.

In *MPM*, which arose from the bankruptcy of one of the world's largest silicone producers, the district court considered indentures worth $1.35 billion with provisions "nearly identical" to those at issue here.  Op.24.  Applying the rule from *Northwestern Mutual* and its progeny, the court concluded that, under New York law, these indentures did not require payment of a make-whole premium when the debt was redeemed after acceleration, because they did not "clearly and unambiguously call for the payment of the make-whole premium" in such circumstances.  *MPM*, 531 B.R. at 336.  Like the precedent it followed (and the decisions below in this case), *MPM* applied the same rule to all such premiums regardless of the terms used to describe them. *See, e.g.*, *Nw. Mut.*, 816 N.Y.S.2d at 836 (citing "substantial authority which requires an explicit agreement to allow a premium after acceleration"); *Solutia*, 379 B.R. at 488 (noting the "explicitness that would be expected in a typical post-acceleration yield-maintenance clause").

The panel's unique distinction between contracts using the term "prepayment" and those using the term "redemption" thus risks unwarranted confusion in an area where the rules must be clear.  As the panel tacitly recognized, such premiums by any name serve the

11

same function.  *See* Op.25 (acknowledging that "the make-whole is in substance a prepayment premium").  And given that no court until now has rested on the distinction that the panel drew, there is no reason to think that the many notes now in circulation—governed by New York law—would have been drafted with that distinction in mind.  If New York law is to be construed to recognize that distinction, such a substantial decision should be made by the New York Court of Appeals.  Indeed, it is critical that the rule be uniform, because the result cannot be different to the tune of hundreds of millions of dollars based on the happenstance of where the bankruptcy action is filed.

The panel explained its decision in part by relying on *NML Capital v. Argentina*, 952 N.E.2d 482 (N.Y. 2011), but that case does not control here.  *NML Capital* did not involve a make-whole premium, and so it does not address the central issue in this case.  The decision stands only for the uncontroversial principle that under New York law "the consequences of acceleration of the debt depend on the language chosen by the parties in the pertinent loan agreement," and "other terms of the contract not necessarily impacted by acceleration" remain enforceable after acceleration.  *Id.* at 492.  The issue presented in this case, however, is the antecedent question of how to interpret "the language

12

Case 14-10979-CSS     Doc 10633-3     Filed 01/11/17     Page 20 of 68

chosen by the parties"—in particular, how to interpret an optional redemption provision with no express language regarding acceleration. Because redemption is "necessarily impacted by acceleration," see *MPM*, 531 B.R. at 336-37, the principles laid out in *NML Capital* do not answer the question here—as numerous courts have implicitly recognized in repeatedly reaching a result contrary to the panel's decision notwithstanding *NML Capital*.[3]

To the extent that the panel reached its decision from a concern that borrowers like EFIH might intentionally default to avoid a premium for early redemption, *see* Op.8, 15-16, that concern is misguided. New York law already protects against that potential problem through its intentional default doctrine, under which borrowers who intentionally default can be required to pay a premium on redemption even without an express agreement. *See* Op.24 n.3; *S. Side*, 451 B.R. at 269; *Nw. Mut.*, 816 N.Y.S.2d at 836, 839. That rule provides the necessary safety valve to prevent borrowers from abusing an automatic acceleration provision to evade a make-whole premium.

---

[3] Insofar as *NML Capital* is relevant, it indirectly approved the usual rule—rejected by the panel here—that express language is required, for it favorably cited the New York case establishing that principle. 952 N.E.2d at 492 (citing *Nw. Mut.*).

In this case, however, neither that doctrine nor its rationale applies; as the bankruptcy court found (and appellants did not even bother to appeal), EFIH entered bankruptcy here based on its dire financial circumstances, not on any desire to avoid a premium.[4]

The panel's decision is also in tension with precedent from the Second Circuit—tension that may soon ripen into outright conflict. The lead Second Circuit case is *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013). Like the notes here, the notes in *AMR Corp.* provided for an additional premium to become due upon voluntary "redemption" before the maturity date. 730 F.3d at 94. The Second Circuit, however, did not concentrate its analysis on that "redemption" label. Instead, as the panel recognized, the Second Circuit "focused on [the] indenture's acceleration provision to determine whether a make-whole was due." Op.17.

To be sure, in *AMR Corp.*, the acceleration provision specified "for the avoidance of doubt" that the additional premium would not automatically become due upon default. 730 F.3d at 99-100. That

---

[4] Because appellants did not challenge the bankruptcy court's holding on intentional default, the parties did not discuss that doctrine in their briefing. To the extent that the risk of intentional default may have influenced the panel's decision, rehearing is warranted to fully address the relevant law.

contractual language made the case easy, as the panel pointed out, because the acceleration provision expressly stated ("for the avoidance of doubt") that the additional premium would not become due when the debt was accelerated. *See* Op.18. But even if the panel and the Second Circuit would have reached the same result on those facts, the reasoning of *AMR Corp.* demonstrates a broader difference in approach. For the Second Circuit, unlike the panel, whether or not a premium is due on acceleration does not depend on whether the agreement uses the term "prepayment" or "redemption." Rather, it depends on what the acceleration clause says about whether the premium will be due. *AMR Corp.*, 730 F.3d at 99-100. Under the panel's decision, by contrast, the "prepayment" or "redemption" label will often be dispositive.

The pending Second Circuit appeal in *MPM* is likely to make the extent of this tension unmistakable. As explained above, the district court in *MPM* considered provisions nearly identical to those here— using the term "redemption," and without any reference to a premium in the acceleration provision—and nevertheless applied the standard clear-statement rule to hold that no additional premium was due. 531 B.R. at 336. If that decision is affirmed, it will demonstrate beyond peradventure that the Second Circuit and this Court have taken

irreconcilable approaches to an issue of New York law that demands uniformity.

## II. THIS COURT SHOULD GRANT REHEARING TO CERTIFY THE DETERMINATIVE STATE-LAW ISSUE TO THE NEW YORK COURT OF APPEALS.

For the foregoing reasons, the Court should rehear this case and should certify the question to the New York Court of Appeals.[5] The New York Court of Appeals permits certification of any "determinative questions of New York law … for which no controlling precedent of the Court of Appeals exists." 22 N.Y.C.R.R. 500.27(a); *see* Third Circuit Local Rules 110.1 (authorizing certification); *Mitchell Partners*, 660 F.3d 709 (granting rehearing and certifying issue). Those requirements are met in this case, and certification is plainly warranted.

The state-law issue here has significant real-world consequences. Acceleration clauses and optional repayment clauses are common features of business indentures and appear in thousands of instruments. The amounts involved can likewise be substantial: In this case alone, the underlying loans reached over $6 billion, and the total premiums potentially at issue are worth some $900 million.

---

[5] Indeed, the holders of the Second Lien Notes supported certification of this issue in their principal brief on the merits. No. 16-1926, Appellants' Br. 29 n.10.

16

Case 14-10979-CSS    Doc 10633-3    Filed 01/11/17    Page 24 of 68

No. 16-1351, JA211.  In *MPM*, the underlying loans are worth $1.35 billion, and the premiums at issue are worth some $170 million.  Given the large number of corporate indentures drafted under New York law that contain both acceleration clauses and optional redemption provisions, and the many other cases in which the issue has already arisen, it is no exaggeration to call this a multi-billion-dollar question.

And the question's importance goes beyond its direct financial impact.  The panel's decision will upend the expectations of parties whose indentures will now be construed based on terminological distinctions that, based on then-unanimous case law, none anticipated as having any significance.  The effects on bankruptcy proceedings are significant:  whether a make-whole provision applies *vel non* after acceleration can drive the entire course of a restructuring, leading debtors and creditors to make different choices about how (or even whether) a company should be reorganized.  This is not an issue on which ongoing uncertainty can be tolerated.

The issue is all the more pressing in light of the courts that now have divergent views over the determinative state-law issue.  Last year, the two districts with the most chapter 11 filings in the country were the District of Delaware and the Southern District of New York.

RLF1 16223161v.1

Admin. Office of the U.S. Courts, Table F-2 (Sept. 30, 2016), *available at* http://www.uscourts.gov/report-name/bankruptcy-filings.   As things stand, unless the Court rehears this case or the Second Circuit in *MPM* adopts the panel's novel reasoning, those two districts will be left with conflicting guidance on the vital issue in this case—an issue that will inevitably continue to arise in important bankruptcy cases in those courts.  Certification provides the best method to ensure that New York law will be applied consistently in the two jurisdictions in which this question is most likely to arise.

## III.   AT A MINIMUM, THE COURT SHOULD HOLD THIS PETITION UNTIL THE SECOND CIRCUIT DECIDES *MPM*.

At the very least, this Court should take the prudent course of holding this petition until the Second Circuit decides *MPM*.  At that point, this Court will be even better positioned to determine whether rehearing or certification is necessary.  If the Second Circuit affirms in *MPM*, this Court can then either rehear this case with the benefit of the Second Circuit's analysis, or else certify the question directly to the New York Court of Appeals for final determination.  Even if the Second Circuit reverses or vacates in *MPM*, its reasoning on the state-law issue may nonetheless conflict with the panel's analysis here, warranting

RLF1 16223161v.1

Case 14-10979-CSS   Doc 10633-3   Filed 01/11/17   Page 26 of 68

reconsideration by the Court. And the Second Circuit may well itself certify that issue to the New York Court of Appeals.

In all events, given the pending *MPM* decision, there is nothing to recommend outright denying this petition and issuing the mandate. Should the Court do so, and the Second Circuit in *MPM* later reach a different result or certify the issue to New York's highest court, it will be too late in the day for appellees here to reap any benefit. In the meantime, negotiations and settlements with creditors and other interested parties over the plan of reorganization and other bankruptcy-related matters, shaped largely by the panel's decision here permitting appellants to recover some $900 million, will have reached an advanced and likely irreversible stage. The far better course, if the Court does not see fit to grant rehearing and certify now, is to hold the petition until *MPM*—which addresses the same important issue of New York law—is decided.

## CONCLUSION

For the foregoing reasons, this Court should grant rehearing or rehearing *en banc* and certify the determinative state-law issue underlying the panel's decision to the New York Court of Appeals.

RLF1 16223161v.1

Alternatively, the panel should hold this petition until the Second Circuit's decision in *MPM*.

December 15, 2016

Respectfully submitted,

*/s/ Jason M. Madron*

Paul D. Clement
Michael A. Petrino
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Mark D. Collins
Daniel J. DeFranceschi
Jason M. Madron
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C.
Andrew R. McGaan, P.C.
Chad J. Husnick
Steven N. Serajeddini
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Edward O. Sassower, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Counsel for Appellees*

20

## MOTION FOR CERTIFICATION

Pursuant to Third Circuit Local Rules 110.1, this Court is authorized to certify to a state supreme court "questions arising under the laws of that state which will control the outcome of a case pending in federal court." Because the panel's opinion was based on an interpretation of New York regarding an issue New York's highest court has not addressed, EFIH respectfully requests this Court to certify the question whether New York law requires an indenture to use express language in order to make an additional premium payable when the debt is redeemed after acceleration.

December 15, 2016

*/s/ Andrew R. McGaan*
Andrew R. McGaan

21

Case 1-10970-CSS   Doc 12633-3   Filed 01/11/17   Page 29 of 68

## Combined Certifications

**Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:** This brief complies with the type-volume limitation of Fed. R. App. P. 35(b) because this petition does not exceed 3,900 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, in 14-point Times New Roman.

**Bar Membership**: Pursuant to Third Circuit LAR 28.3(d) and 46.1(e), I hereby certify that Andrew R. McGaan and I are members of the bar of this Court.

RLF1 16223161v.1

**Service**:  I hereby certify that on December 15, 2016, this Petition was

filed with the Clerk of the Court for the United States Court of Appeals

for the Third Circuit using the appellate CM/ECF, and that service will

be accomplished by the appellate CM/ECF system.

/s/ Jason M. Madron

Jason M. Madron
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

23

Case 14-10979-CSS   Doc 10633-2   Filed 01/11/17   Page 31 of 68

# **EXHIBIT**

Opinion

Judgment

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-1351

_____

In re: ENERGY FUTURE HOLDINGS CORP.,
a/k/a TXU Corp. a/k/a TXU Corp a/k/a/ Texas Utilities, et al.,

Debtors

DELAWARE TRUST COMPANY,
f/k/a CSC Trust Company of Delaware, as Indenture Trustee,

Appellant

v.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC; EFIH FINANCE INC.;
AD HOC COMMITTEE OF EFIH UNSECURED
NOTEHOLDERS

_____

Case 14-10979-CSS   Doc 10633-2   Filed 01/11/17   Page 33 of 68

————————————

Nos. 16-1926, 16-1927 & 16-1928

————————————

In re: ENERGY FUTURE HOLDINGS CORP.,
a/k/a TXU Corp. a/k/a TXU Corp a/k/a Texas Utilities, et al.,

Debtors

COMPUTER TRUST COMPANY, NA &
COMPUTERSHARE TRUST COMPANY OF CANADA,

Appellants

v.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC; EFIH FINANCE INC.

————————————

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action Nos. 1-15-cv-00620, 1-15-cv-01011,
1-15-cv-01014 & 1-15-cv-01015)
District Judge: Honorable Richard G. Andrews

————————————

2

Argued September 27, 2016

Before: AMBRO, SMITH, [*]
and FISHER, <u>Circuit Judges</u>

(Opinion filed November 17, 2016)

Philip D. Anker, Esquire   *(Argued)*
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY   10007

Danielle Spinelli, Esquire
Joel Millar, Esquire
David Gringer, Esquire
Isley Gostin, Esquire
Wilmer Cutler Pickering Hale and Door LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006

James H. Millar, Esquire
Drinker Biddle & Reath
1177 Avenue of the Americas, 41st Floor
New York, NY   10036

---

[*] Honorable D. Brooks Smith, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on October 1, 2016.

Todd C. Shiltz, Esquire
Drinker Biddle & Reath LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE  19801-1612

Norman L. Pernick, Esquire
J. Kate Stickles, Esquire
Cole Schotz PC
500 Delaware Avenue, Suite 1410
Wilmington, DE    19801

Counsel for Appellant Delaware Trust Company

Daniel J. DeFranceschi, Esquire
Jason M. Madron, Esquire
Mark D. Collins, Esquire
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE   19801

Andrew R. McGaan, Esquire   *(Argued)*
James H.M. Sprayregen, Esquire
Marc Kieselstein, Esquire
Chad J. Husnick, Esquire
Steven N. Serajeddini, Esquire
Kirkland & Ellis
300 North LaSalle Street, Suite 2400
Chicago, IL   60654

Edward O. Sassower, Esquire
Kirkland & Ellis LLP
601 Lexington Avenue

4

New York, NY  10022

Michael A. Petrino, Esquire
Kirkland & Ellis
655 15th Street, N.W., Suite 1200
Washington, DC   20005

> Counsel for Appellees
> Energy Future Intermediate Holding Company LLC;
> EFIH Finance Inc.

Joshua K. Brody, Esquire
Gregory A. Horowitz, Esquire   *(Argued)*
Thomas M. Mayer, Esquire
Jeffrey S. Trachtman, Esquire
Kramer Levin Natfalis & Frankel
1177 Avenue of the Americas
New York, NY   10032

Laura D. Jones, Esquire
James E. O'Neill, III, Esquire
Robert J. Feinstein, Esquire
Pachulski Stang Ziehl & Jones
919 North Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE  19801

Stephanie Wickouski, Esquire
Bryan Cave LLP
1290 Avenue of the Americas
New York, NY  10104-3300

        Counsel for Appellants
        Computershare Trust Company, N.A.;
        Computershare Trust Company of Canada

---

## OPINION OF THE COURT

---

Ambro, <u>Circuit Judge</u>

We address what happens when one provision of an indenture for money loaned provides that the debt is accelerated if the debtor files for bankruptcy and while in bankruptcy it opts to redeem that debt when another indenture provision provides for a redemption premium. Does the premium, meant to give the lenders the interest yield they expect, fall away because the full principal amount is now due and the noteholders are barred from rescinding the acceleration of debt? We hold no.

## I. BACKGROUND

### A. The Notes

Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (collectively, "EFIH") borrowed in 2010 approximately $4 billion at a 10% interest rate by issuing Notes due in 2020 and secured by a first-priority lien

on their assets (the "First Lien Notes"). To protect (at least in part) the lenders' anticipated interest-rate yield, the Indenture governing the loan (the "First Lien Indenture") provides in § 3.07, captioned "Optional Redemption," that "[a]t any time prior to December 1, 2015, [EFIH] may redeem all or a part of the Notes at a redemption price equal to 100% of the principal amount of the Notes redeemed <u>plus</u> the Applicable Premium . . . and accrued and unpaid interest" (emphasis in original). "Applicable Premium" is what we shall call the make-whole, or yield-protection, contractual substitute for interest lost on Notes redeemed before their expected due date.

The First Lien Indenture contains an acceleration provision in § 6.02 that makes "all outstanding Notes . . . due and payable immediately" if EFIH files a bankruptcy petition. The same provision also gives the First Lien Noteholders the right to "rescind any acceleration [of] the Notes and its consequences[.]"

EFIH borrowed funds again in 2011 and 2012 by issuing two sets of Notes secured by a second-priority lien on its assets (the "Second Lien Notes"). As with the First Lien Noteholders, EFIH promised to pay holders of the Second Lien Notes (the "Second Lien Noteholders") a make-whole premium—in a provision essentially identical to the one quoted above—if it chose to redeem the Second Lien Notes, at its option, on or before a date certain (May 15, 2016 for Second Lien Notes set to mature in 2021 and March 1, 2017 for those maturing in 2022).

The Indenture for the Second Lien Notes (the "Second Lien Indenture") contains an acceleration provision different from § 6.02 of the First Lien Indenture: if EFIH files a bankruptcy petition, "all principal of *and premium, if any*, interest . . .[,] and *any other monetary obligations* on the

outstanding Notes shall be due and payable immediately[.]"
Second Lien Indenture § 6.02 (emphases added). Like
the First Lien Noteholders, the Second Lien Noteholders have the
right to "rescind any acceleration [of] the Notes and its
consequences" under § 6.02.

## B. Refinancing the First Lien Notes

When market interest rates went down, EFIH
considered refinancing the Notes. Refinancing outside of
bankruptcy would have required it to pay the make-whole
premium. *See In re Energy Future Holdings Corp.*, 527 B.R.
178, 188 (Bankr. D. Del. 2015). By filing for bankruptcy,
however, EFIH believed it might avoid the premium. So on
November 1, 2013, it filed an 8-K form with the Securities
and Exchange Commission "disclosing [its] proposal
[whereby] . . . EFIH would file for bankruptcy and refinance
the Notes without paying any make-whole amount." *Id.*
(internal quotation marks omitted).

Six months later, on April 29, 2014, EFIH and other
members of its corporate family filed Chapter 11 bankruptcy
petitions in the Bankruptcy Court for the District of
Delaware. Once in bankruptcy, EFIH sought to "take
advantage of highly favorable debt market conditions to
refinance," beginning with the First Lien Notes. *Id.* at 189. It
asked the Bankruptcy Court for leave to borrow funds to pay
them off and to offer a settlement to any of its First Lien
Noteholders who agreed to waive their right to the make-
whole. *Id.* at 182, 189.

Fearing loss of the income stream EFIH had promised,
the Trustee for the First Lien Noteholders—Delaware Trust
Company—filed an adversary proceeding on May 15, 2014.
It sought a declaration that refinancing the First Lien Notes
would trigger the make-whole premium.

EFIH's bankruptcy filing caused the "[First Lien] Notes [to] be[come] due and payable immediately" under Indenture § 6.02, subject to the right of their holders to rescind acceleration. So the Trustee also requested a declaration that it could rescind the First Lien Notes' acceleration without violating the automatic stay of creditors' acts to enforce their remedies once bankruptcy occurs, 11 U.S.C. § 362. However, should the stay apply, the Trustee asked the Court to lift it.

When the Bankruptcy Court did not act, on June 4, 2014, the holders of a majority of the principal amount of the First Lien Notes sent a notice to EFIH rescinding acceleration, contingent on relief from the automatic stay. Two days later, the Bankruptcy Court granted EFIH's motion to refinance. It ruled, however, that the refinancing would not prejudice the First Lien Noteholders' rights in the pending adversary proceeding.

On June 19, 2014, EFIH paid off the First Lien Notes and refinanced the debt at a much lower interest rate of 4.25%, saving "an estimated $13 million in interest per month." *In re Energy Future Holdings Corp.*, 527 B.R. at 189. This of course disadvantaged the First Lien Noteholders, who had contracted to receive interest at 10% until the Notes' full maturity in 2020. EFIH did not compensate the loss set by contract by paying the make-whole, which would have been approximately $431 million.

## C. Refinancing the Second Lien Notes

Shortly after entering bankruptcy, EFIH declared in an SEC 8-K filing that it "reserve[d] the right to . . . redeem . . . some or all of the outstanding . . . Second Lien Notes" but asserted that it "[wa]s under no obligation to do so." *See In Re Energy Future Holdings Corp.*, No. 14-50363 (Bankr. D.

Case 14-10979-CSS    Doc 10623-2    Filed 01/11/17    Page 41 of 68

Del.), Docket Entry 181, A-222. Aware of this, as well as the First Lien Noteholders' predicament, the Trustees for the Second Lien Noteholders—Computershare Trust Company, N.A. and Computershare Trust Company of Canada—filed their own adversary proceeding on June 16, 2014.

Like the First Lien Trustee, the Second Lien Trustees sought a declaration that EFIH would have to pay the make-whole if it chose to refinance the Second Lien Notes. The Second Lien Noteholders also issued a notice rescinding acceleration of that debt and requested retroactive relief from the automatic stay so that the rescission could take effect.

With the Bankruptcy Court's permission, EFIH refinanced a portion of the Second Lien Notes on March 10, 2015—again without paying the yield-protection amount.

### D. First Lien Make-Whole Litigation

Nine months after granting leave to refinance the First Lien Notes, the Bankruptcy Court considered whether EFIH had to pay the make-whole. *In re Energy Future Holdings Corp.*, 527 B.R. at 191-95. The holding was that it did not. *Id.*

Although EFIH's obligation to pay the make-whole appears in § 3.07 of the First Lien Indenture, the Court focused its reasoning on the acceleration provision in § 6.02. Because it took effect when EFIH entered bankruptcy but made no mention of the make-whole, the Court concluded that none was due. [1]

---

[1] For the purpose of determining EFIH's duty to pay any make-whole, the Bankruptcy Court assumed that it was "solvent and able to pay all allowed claims of [its] creditors in

10

It further held that the automatic stay prevented the First Lien Noteholders' attempt to rescind the Notes' acceleration. *Id.* at 197. Finally, after trial in 2015, it denied the Trustee's motion to lift the stay retroactively "to a date on or before June 19, 2014, to allow the Trustee to . . . decelerate the Notes." *In re Energy Future Holdings Corp.,* 533 B.R. 106, 116 (Bankr. D. Del. 2015).

These rulings put the First Lien Noteholders in a Catch-22. When EFIH filed for bankruptcy, the maturity of its debt accelerated. This, according to the Bankruptcy Court, cut off the First Lien Noteholders' right to yield-protection. Rescission of the acceleration would have restored that right. But rescission was blocked by the automatic stay, which the Court refused to lift.

The District Court for the District of Delaware affirmed the Bankruptcy Court's rulings in February 2016. *In re Energy Future Holdings Corp.*, No. CV 15-620 RGA, 2016 WL 627343, at *1–3 (D. Del. Feb. 16, 2016).

### E. Second Lien Make-Whole Litigation

The Second Lien Noteholders fared no better than the First Lien Noteholders. Six months after EFIH refinanced a portion of the Second Lien Notes, the Court considered the Second Lien Noteholders' entitlement to the make-whole. In construing the Second Lien Indenture's provisions, the Court adopted its findings and conclusions from the make-whole litigation for the First Lien Noteholders. After rejecting arguments based on the few differences between the First and

---

full." *In re Energy Future Holdings Corp.*, 527 B.R. at 183. We do the same. Because we do not have any briefing on the matter even without that assumption, we do not consider whether insolvency might have affected EFIH's obligations.

11

Second Lien Indentures' texts, the Court held that the Second Lien Noteholders also were not entitled to yield-protection. *In re Energy Future Holdings Corp.*, 539 B.R. 723, 733 (Bankr. D. Del. 2015). The District Court again affirmed. *In re: Energy Future Holdings Corp.*, No. CV 15-1011-RGA, 2016 WL 1451045, at *4 (D. Del. Apr. 12, 2016).

\*     \*     \*     \*     \*

The First and Second Lien Trustees brought appeals on behalf of their respective Noteholders, which we consolidated. They argue the Bankruptcy and District Courts erred by holding that the Indentures did not require payment of the make-whole when EFIH redeemed the Notes after their maturity had accelerated.

## II. JURISDICTION AND GOVERNING LAW

We have jurisdiction to hear appeals from the Bankruptcy and District Courts in this Circuit under 28 U.S.C. §§ 158 and 1291. Statutory construction and contract interpretation are legal questions reviewed anew by us. The contracts at issue—the Indentures that control the Notes—are governed by New York law. First Lien Indenture § 13.08; Second Lien Indenture § 13.08.

"When interpreting state law, we follow a state's highest court; if that state's highest court has not provided guidance, we are charged with predicting how that court would resolve the issue." *Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011). "To do so, we must take into consideration: (1) what that court has said in related areas; (2) the decisional law of the state intermediate courts; (3) federal cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issue." *Id.*

12

Here we look to the New York Court of Appeals, which has held that "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (internal citations and quotation marks omitted). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* "It is the role of the courts to enforce the agreement made by the parties—not to add, excise or distort the meaning of the terms they chose to include, thereby creating a new contract under the guise of construction." *NML Capital v. Republic of Argentina*, 952 N.E.2d 482, 489–90 (N.Y. 2011). "Adherence to these principles is particularly appropriate in a case like this involving interpretation of documents drafted by sophisticated, counseled parties and involving the loan of substantial sums of money." *Id.*

## III. ANALYSIS

### A. The First Lien Indenture

Although both Indentures contains many provisions, this case centers on the words of but two: §§ 3.07 and 6.02.[2] The former, noted earlier as titled "Optional Redemption," states when the make-whole is due: "At any time prior to December 1, 2015, the Issuer may redeem all or a part of the

---

[2] In Sections A and B, we refer for convenience to the First Lien Indenture simply as the "Indenture." Likewise, we mean the First Lien Notes and First Lien Noteholders when we refer to "the Notes" or "the Noteholders" in these Sections. Thereafter the two terms mean all debt instruments and their holders under both the First Lien and Second Lien Indentures, which themselves may be referred to collectively as the "Indentures."

13

Notes at a redemption price equal to 100% of the principal amount of the Notes redeemed <u>plus</u> the Applicable Premium [*i.e.*, the make-whole] . . . and accrued and unpaid interest" (emphasis in original). Indenture § 3.07. The premium decreases annually on a sliding scale between December 1, 2015 and November 30, 2018. From December 1, 2018 until the Notes' maturity date in 2020, the Notes may be optionally redeemed without payment of a premium. *See* Indenture §§ 1.01 (defining "Applicable Premium" and providing formula for its application) & 3.07(d) (setting premium amount for redemptions after December 1, 2015).

Section 6.02 provides that on the filing of a bankruptcy petition by EFIH "all outstanding Notes shall be due and payable immediately without further action or notice." Indenture § 6.02; *see also id.* § 6.01 (defining bankruptcy as an event of default).

Any duty to pay the make-whole comes from § 3.07. It leaves us with three questions: was there a redemption; was it optional; and if yes to both, did it occur before December 1, 2015?

Section 3.07 does not define "redemption." As a redemption "usu[ally] refers to the repurchase of a bond before maturity," Black's Law Dictionary 1390 (9th ed. 2009), EFIH contends that we should limit the term to mean only repayments of debt that pre-date the debt's maturity. Section 6.02 accelerated the Notes' maturity to the date EFIH entered bankruptcy—April 29, 2014. It refinanced the Notes several weeks later. Thus it argues that its post-maturity refinancing was not a redemption.

But contrary to that position, New York and federal courts deem "redemption" to include both pre- and post-maturity repayments of debt. *See e.g.*, *Chesapeake Energy*

14

*Corp. v. Bank of N.Y. Mellon*, 773 F.3d 110, 116 (2d Cir. 2014) (in interpreting New York law, to "redeem" is to "repay[] . . . a debt security . . . at or before maturity" (quoting *Barron's Dictionary of Finance and Investment Terms* 587 (8th ed. 2010)); *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 388 (3d Cir. 2012) (discussing regulations permitting bondholders to "present . . . long-matured savings bond[s] for redemption"); *Fed. Nat'l Mortg. Ass'n v. Miller*, 473 N.Y.S.2d 743, 744 (N.Y. Sup. Ct. 1984) ("debtor may redeem" mortgage by "pay[ing] . . . accelerated debt"); *see also* N.Y. U.C.C. § 9-623, Official Comment No. 2 ("To redeem the collateral . . . of a secured obligation [that] has been accelerated, it would be necessary to tender the entire balance."). Accordingly, EFIH's June 19, 2014 refinancing was a "redemption" within the meaning of § 3.07.

Whether the redemption was "[o]ptional" is next up. EFIH argues that refinancing the Notes was not optional because § 6.02 made them "due and payable immediately without further action or notice" once it was in bankruptcy. EFIH, however, filed for Chapter 11 protection voluntarily. Once there, it had the option, per its plan of reorganization, to reinstate the accelerated Notes' original maturity date under Bankruptcy Code § 1124(2) rather than paying them off immediately. It chose not to do so, and instead followed the path laid out six months before in its SEC 8-K filing.

EFIH contends nonetheless that any redemption was mandatory rather than optional. But this contention does not match the facts. Indeed "a chapter 11 debtor that has the capacity to refinance secured debt on better terms . . . is in the same position within bankruptcy as it would be outside bankruptcy, and cannot reasonably assert that its repayment of debt is not 'voluntary.'" Scott K. Charles & Emil A.

Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 537, 552 (2007).

Events leading up to the post-petition financing on June 19, 2014 demonstrate that the redemption was very much at EFIH's option. To repeat, months before its Chapter 11 filing EFIH announced its plan to redeem the Notes before their stated maturity date. *In re Energy Future Holdings Corp.*, 527 B.R. at 189. And after filing for bankruptcy, it produced another 8‑K stating that it may, "but [wa]s under no obligation" to, redeem the similarly situated Second Lien Notes. *In Re Energy Future Holdings Corp.*, No. 14-50363 (Bankr. D. Del.), Docket Entry 181, A-222.

The irony is that the Noteholders did not want to be paid back on June 19, 2014. They attempted to rescind the Notes' acceleration on June 4, 2014, but were blocked by the automatic stay. *In re Energy Future Holdings Corp.*, 533 B.R. at 108. When EFIH redeemed the Notes, it did so "on a non-consensual basis," that is, over the Noteholders' objection. J.A. 1214. Logic leaves no doubt this redemption of the Notes was "[o]ptional" under § 3.07.

And, only to close the loop, all this occurred before December 1, 2015. Hence § 3.07 on its face requires that EFIH pay the Noteholders the yield-protection payment.

### B. The Relationship Between §§ 3.07 And 6.02 (Or Whether § 6.02, Once Triggered, Annuls § 3.07)

At oral argument, EFIH's counsel described §§ 3.07 and 6.02 as "different pathways" that we must choose between. Only the latter is relevant, the argument goes, because it addresses post-maturity payment more specifically than § 3.07, and specific contract provisions govern over

16

more general ones. *See Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956).

It is not obvious why EFIH believes § 6.02 addresses the consequences of the June 2014 redemption more specifically than § 3.07 or why we must choose between them. The two sections simply address different things: § 6.02 causes the maturity of EFIH's debt to accelerate on its bankruptcy, and § 3.07 causes a make-whole to become due when there is an optional redemption before December 1, 2015. Rather than "different pathways," together they form the map to guide the parties through a post-acceleration redemption. In any event, § 3.07 is the only provision that specifically addresses redemptions.

To support its position, EFIH looks primarily to *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013). It focused on an indenture's acceleration provision to determine whether a make-whole was due. Crucially, however, that provision addressed outright whether a make-whole would be due following acceleration.

> "[I]f an Event of Default referred to in . . . Section 4.01(g) [*i.e.*, the voluntary filing of a bankruptcy petition] . . . shall have occurred and be continuing, then and in every such case the unpaid principal amount of the Equipment Notes then outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder **(but for the avoidance of doubt, without Make–Whole Amount)**, shall immediately and without further act become due and payable without presentment, demand, protest or notice, all of which are hereby waived.

*Id.* at 99 (emphasis added).

*AMR* is the easy case; just follow the text. The litigants took a route suggested by the New York Court of Appeals in *NML Capital v. Republic of Argentina*: parties that want obligations to cease when accelerated should say so in their agreement. 952 N.E.2d at 490 ("Had Argentina intended that its responsibility to pay interest twice a year cease upon maturity, it could easily have clarified that intent in any number of ways.").

In our case, § 6.02 makes no mention of the make-whole. EFIH argues that this silence saps § 3.07's effect. On a general note, that reading would cross cords with our duty to "give full meaning and effect to all of [the Indenture's] provisions." *Chesapeake Energy Corp.*, 773 F.3d at 113-14 (internal quotation marks omitted). "Contracts are . . . to be interpreted to avoid inconsistencies and to give meaning to all [their] terms." *Barrow v. Lawrence United Corp.,* 146 A.D.2d 15, 18 (N.Y. App. Div. 1989). More specifically, EFIH's interpretation conflicts with the New York Court of Appeals' statement that "[w]hile it is understood that acceleration advances the maturity date of the debt," there is no "rule of New York law declaring that other terms of the contract not necessarily impacted by acceleration . . . automatically cease to be enforceable after acceleration." *NML Capital*, 952 N.E.2d at 492. Accordingly, § 3.07 stands on its own, unswayed by the Indenture's other provisions.

EFIH alternatively argues that §§ 6.02 and 3.07 are in conflict, so that only one may apply to the June 2014 redemption. Subsection 3.07(e) prescribes detailed notice procedures for EFIH to follow before redeeming the Notes, while § 6.02 makes the Notes "due and payable immediately without further action or notice." If the notice procedures were not followed, no redemption could follow. Yet EFIH

offers no reason why it could not have complied with § 3.07(e)'s notice procedures. In any event, it cannot use its own failure to notify to absolve its duty to pay the make-whole. Any conflict between the two provisions in this instance is illusory.

We know no reason why we should choose between §§ 3.07 and 6.02 when both plainly apply. By its own terms, § 3.07 governs the optional redemption embedded in the refinancing and requires payment of the make-whole. It surpasses strange to hold that silence in § 6.02 supersedes § 3.07's simple script.

## C. The Second Lien Indenture's Additional Language

As mentioned above, the Second Lien Indenture's acceleration provision contains words not present in the First Lien Indenture. These additions make explicit in the Second Lien Indenture the link between acceleration under §6.02 and the make-whole for an optional redemption per § 3.07. While for the First Lien Indenture these concepts are without cross-reference and separate, in the Second Lien Indenture they are tied together. Sections 3.07 and 6.02 are not merely compatible but complementary. In any event, the result is the same no matter the Indenture—there were optional redemptions before a date certain, thereby triggering make-whole premiums.

When EFIH filed its bankruptcy petition, Second Lien Indenture § 6.02 caused "all principal of and *premium, if any*, interest . . . [,] and any other monetary obligations on the outstanding [Second Lien] Notes [to] be[come] due and payable immediately" (emphasis added). Compare First Lien Indenture § 6.02 ("all outstanding Notes shall be due and payable immediately"). The words "premium, if any," are

19

most naturally read to reference § 3.07's "Applicable Premium"—that is, the make-whole.

The most EFIH musters is that the Second Lien Indenture could have been even more specific by replacing "premium, if any," with "a premium owed under section 3.07" or "Applicable Premium or other premium owed as if repayment under this section were an Optional Redemption under section 3.07." EFIH's Br. at 24-25. But we see no reason to demand such exactness. Indeed, EFIH has not suggested any other "premium" the drafters could have had in mind.

True, in a case called *Momentive*, the Bankruptcy Court for the Southern District of New York held the words "premium, if any," were not specific enough to require payment of a make-whole in similar circumstances. *In re MPM Silicones, LLC*, No. 14-22503-RDD, 2014 WL 4436335, at *13 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015) ("*Momentive*"). We believe, however, the result in *Momentive* conflicts with that indenture's text and fails to honor the parties' bargain. For these and additional reasons discussed below, we find it unpersuasive.

By including the words "premium, if any," in its acceleration provision, the Second Lien Indenture leaves no doubt that §§ 3.07 and 6.02 work together. The latter is explicit that a premium is in play, and the only relevant premium provision is the former. Thus both remained applicable following bankruptcy, and, pursuant to the agreement struck with the Second Lien Noteholders, they are entitled to the make-whole.

Case 14-10979-CSS   Doc 10633-3   Filed 01/11/17   Page 52 of 68

## D. The Effect of Acceleration on Make-Whole Provisions

Notwithstanding the result dictated by § 3.07's text in both Indentures, EFIH asserts that it should not have to pay the make-whole because § 6.02 caused the Notes' maturity to accelerate before it paid them off. Citing a New York trial court opinion, *Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 836 (N.Y. Sup. Ct. 2006) ("*Northwestern*"), it argues that courts must close their eyes to make-whole provisions once a debt's maturity has accelerated.

In interpreting laws of a state, we need not follow the judgments of its trial courts. *See MRL Dev. I, LLC v. Whitecap Inv. Corp.*, 823 F.3d 195, 203 (3d Cir. 2016) ("The Superior Court of the Virgin Islands . . . is not the highest court of the Territory or even an intermediate appellate court, but rather a trial court. Accordingly, we are not bound by Superior Court decisions" (internal brackets, citations, and quotation marks omitted)). But even if we were inclined to do so here, EFIH's interpretation of *Northwestern* conflicts with the pronouncements of New York's highest court, which we follow on questions of New York law. *See Illinois Nat. Ins. Co.*, 653 F.3d at 231.

As we noted above, the New York Court of Appeals stated unequivocally in *NML Capital v. Republic of Argentina* that "[w]hile it is understood that acceleration advances the maturity date of the debt, [it was] unaware of any rule of New York law declaring that other terms of the contract not necessarily impacted by acceleration . . . automatically cease to be enforceable after acceleration." 952 N.E.2d at 492. Put

21

differently, contract terms like § 3.07 that are applicable before acceleration remain so afterward.

In *NML Capital*, New York's highest Court answered several questions certified to it by the U.S. Court of Appeals for the Second Circuit. *Id.* at 486. Among them was "whether Argentina's obligation to make [certain contractually established interest] payments to bondholders continued after maturity or acceleration of the indebtedness[.]" *Id.* at 486. Argentina contended that, after the maturity of its debt had accelerated, bondholders were entitled only to their principal and any accrued interest. *Id.* at 490. Acceleration, it argued, terminated its duty to make biannual interest payments mandated by the bond documents. *Id.* at 487.

In rejecting those assertions, the New York Court of Appeals held that "in New York the consequences of acceleration of the debt depend on the language chosen by the parties in the pertinent loan agreement." *Id.* at 492. "Had Argentina . . . intended that its responsibility to pay interest twice a year cease upon maturity, it could easily have clarified that intent in any number of ways." *Id.* at 490. For example, the bond documents could have specified that the payment "obligation continued 'until' the maturity date" or could have provided "that interest payments were to be made until the principal was due, thereby referring back to the loan maturity date." *Id.* However, because the bond language that Argentina pay biannual interest payments made no reference to acceleration or maturity, it remained effective following the bonds' acceleration. *Id.* at 493. The takeaway for us is that § 3.07 applies no less following acceleration of the Notes' maturity than it would to a pre-acceleration redemption.

Despite the New York Court of Appeals' holding in *NML Capital* and still riding the *Northwestern* horse, EFIH contends that we should decline to require payment of the

make-whole because the trial court declared that a "prepayment premium will not be enforced under default circumstances in the absence of a clause which so states[.]" *Northwestern*, 816 N.Y.S.2d at 836. It held that a mortgage lender who chose to foreclose following default was not entitled to a "prepayment premium" because foreclosure had advanced the debt's maturity date. *Id.* "[P]repayment is a payment *before* maturity[,]" but after foreclosure prepayment is impossible as the debt has become due and payable immediately. *Id.* at 837 (emphasis in original). According to EFIH, *Northwestern* sets a rule that, unless an agreement clearly provides for it, no make-whole payment is due after a note's acceleration.

No doubt prepayment premiums are the price of "an option voluntarily to prepay the loan and terminate the mortgage before the maturity." *In re S. Side House, LLC*, 451 B.R. 248, 267 (Bankr. E.D.N.Y. 2011), *aff'd sub nom*, *U.S. Bank Nat. Ass'n v. S. Side House, LLC*, No. 11-CV-4135 ARR, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012); *accord Northwestern*, 816 N.Y.S.2d at 836. "[A]cceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity[,]" and logically the option to prepay can no longer be exercised after maturity. *Matter of LHD Realty Corp.*, 726 F.2d 327, 330–31 (7th Cir. 1984); *D.I.S., LLC v. Sagos*, 832 N.Y.S.2d 581, 582 (N.Y. App. Div. 2007) ("prepayment" penalty did not apply to tender of mortgage principal and interest following acceleration because post-acceleration payments are not "prepayments").

Unlike prepayment, however, "redemption" of "a debt security" may occur "*at* or before maturity." *Chesapeake Energy Corp.*, 773 F.3d at 116 (emphasis added). Thus, while a premium contingent on "prepayment" could not take effect

after the debt's maturity,[3] a premium tied to a "redemption" would be unaffected by acceleration of a debt's maturity.

Our understanding of New York law is that it follows a logical path: prepayments cannot occur when payment is now due by acceleration of the debt's maturity. If parties want to mandate a "prepayment" premium following acceleration, they must clearly state it in their agreement. This is the *Northwestern* rule.

Recently, however, bankruptcy courts, including the Bankruptcy Court here, have stretched *Northwestern* beyond its language and applied its clear-statement rule to yield-protection payments not styled as prepayment premiums. In the *Momentive* case we mentioned in our discussion of the Second Lien Indenture, a Bankruptcy Court considered language similar to that of both Indentures and nearly identical to the text of the Second Lien Indenture. Like the Indentures here, the *Momentive* indenture required payment of a make-whole on optional redemptions occurring before a particular date. *Momentive*, 2014 WL 4436335, at *13. The Court, however, disallowed the lenders' claim for a make-whole, declaring it "well-settled law in New York" that a make-whole, like a prepayment premium, will only be due on a default and acceleration "when a clear and unambiguous clause calls" for it. *Momentive*, 2014 WL 4436335, at *12-*13 (citing *Northwestern*). The Delaware Bankruptcy Court followed the same line, declining to enforce the make-whole provision because "an indenture must contain express

---

[3] Even though a debtor cannot prepay what is already due, courts have enforced prepayment premiums after acceleration when the debtor has intentionally defaulted in order to avoid the premium. *See e.g., In re S. Side House, LLC*, 451 B.R. at 269; *Northwestern*, 816 N.Y.S.2d at 836.

language requiring payment of a prepayment premium upon
acceleration; otherwise, it is not owed." *In re Energy Future
Holdings Corp.*, 527 B.R. at 192 (construing First Lien
Indenture); *accord In re Energy Future Holdings Corp.*, 539
B.R. at 733 (construing Second Lien Indenture).

By denying the make-whole after the Notes'
acceleration, the Bankruptcy Court pushed the *Northwestern*
rule beyond its language and underlying policy concerns.
First, its application of the rule is off point because § 3.07 in
the Indentures does not use the word "prepayment."
*Northwestern* responds, in part, to the linguistic paradox
created by the idea of a *pre*payment following acceleration.
"Once the maturity date is accelerated to the present, it is no
longer possible to prepay the debt before maturity."
*Northwestern*, 816 N.Y.S.2d at 834. That is why, if parties
want a "prepayment" premium to survive acceleration and
maturity, they must clearly state it.

The Indentures here present no linguistic tension to
resolve. Nothing in § 6.02 negates the premium § 3.07
requires if an optional redemption occurs before a stated date.
Acceleration here has no bearing on whether and when the
make-whole is due.

EFIH argues that, even though § 3.07 does not use the
word "prepayment," the make-whole is in substance a
prepayment premium, and thus the *Northwestern* rule should
apply. But we must give effect to the "words and phrases" the
parties chose. *Chesapeake Energy Corp.*, 773 F.3d at 113–14;
*NML Capital*, 952 N.E.2d at 489–90. By avoiding the word
"prepayment" and using the term "redemption," they decided
that the make-whole would apply without regard to the Notes'
maturity.

25

Moreover, beneath the *Northwestern* holding was a policy concern that lenders should not be permitted "to recover prepayment premiums after default and acceleration in order to preserve an income stream . . . absent any 'voluntary' prepayment." *Northwestern*, 816 N.Y.S.2d at 836. There the mortgagee seeking the prepayment premium had elected to foreclose in order to recoup its investment immediately. *Id.* at 833. Ordinarily, by electing to accelerate the debt, a lender forgoes its right to a stream of payments in favor of immediate repayment. *Matter of LHD Realty Corp.*, 726 F.2d at 331 & n.4. The *Northwestern* Judge was concerned that lenders should not be able to seek immediate repayment and pile on by also receiving a premium. Here, by contrast, the Noteholders did not seek immediate payment. EFIH voluntarily redeemed the Notes over the Noteholders' objection. Hence even the policy guiding *Northwestern* does not reach this case.

Finally, to repeat what we said at the outset, by declining to enforce § 3.07 after acceleration, the Bankruptcy Court ran afoul of New York authority by failing to enforce a contract provision—§ 3.07—not affected by acceleration. *NML Capital*, 952 N.E.2d at 492. To reach its conclusion, it followed *Momentive*, which described "automatic acceleration clauses" as "negating" the effect of make-whole redemption provisions. *Momentive*, 2014 WL 4436335, at *14. That is not what *NML Capital* tells us.

EFIH answers that the Noteholders should have taken note of bankruptcy courts' novel application of *Northwestern* and insisted on clearer language in the Indenture. *See e.g., In re Anchor Resolution Corp.*, 221 B.R. 330, 334 (Bankr. D. Del. 1998) ("If the maturity of any Series B Note shall be accelerated . . . [,] there shall become due and payable . . . as compensation to the holders . . . a premium equal to the Make-Whole Amount."). But this puts the burden backward;

if EFIH wanted its duty to pay the make-whole on optional redemption to terminate on acceleration of its debt, it needed to make clear that § 6.02 trumps § 3.07. *See NML Capital*, 952 N.E.2d at 490. The burden to make that showing is with EFIH. To place it on the Noteholders for EFIH's decision to redeem the Notes is a bridge too far.

*     *     *     *     *

Our "primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp.*, 773 F.3d at 113–14. The language of the First Lien Indenture requires EFIH to pay a make-whole if it redeems the First Lien Notes at its option before December 1, 2015, and the Second Lien Indenture requires the same for redemptions of Second Lien Notes before May 15, 2016 or March 1, 2017 (depending on the initial maturity date of the particular debt instruments). EFIH redeemed the First Lien Notes at its option on June 19, 2014 and redeemed a portion of the Second Lien Notes on March 10, 2015. Redemptions, not prepayments, occurred here, they were at the election of EFIH, and they occurred before the respective dates noted. Statements of New York law by its highest Court and the federal Circuit Court in New York reinforce our conclusion that EFIH must pay the make-whole per the Indenture language before us.[4]

---

[4] Because we hold that the Noteholders are entitled to the make-whole, we do not reach the Trustees' alternative arguments that the Bankruptcy Court should have lifted the automatic stay to permit rescission of the Notes' acceleration or that the Court should have allowed the Noteholders a contingent claim for the make-whole or a claim for contract damages.

27

Case 14-10979-CSS   Doc 10633-3   Filed 01/14/17   Page 59 of 68

The judgments of the District Court are reversed with instructions to remand to the Bankruptcy Court for further proceedings consistent with this opinion. Any future appeals shall return to this panel.

28

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

─────────────

No. 16-1351

─────────────

In re: ENERGY FUTURE HOLDINGS CORP.,
a/k/a TXU Corp. a/k/a TXU Corp a/k/a Texas Utilities, et al.,

Debtors

DELAWARE TRUST COMPANY,
f/k/a CSC Trust Company of Delaware, as Indenture Trustee,

Appellant

v.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC; EFIH FINANCE INC.;
AD HOC COMMITTEE OF EFIH UNSECURED
NOTEHOLDERS

─────────────

Nos. 16-1926, 16-1927 & 16-1928

─────────────

In re: ENERGY FUTURE HOLDINGS CORP.,
a/k/a TXU Corp. a/k/a TXU Corp a/k/a Texas Utilities, et al.,

Debtors

COMPUTER TRUST COMPANY, NA &
COMPUTERSHARE TRUST COMPANY OF CANADA,

Appellants

v.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC; EFIH FINANCE INC.

––––––––––––––––––

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action Nos. 1-15-cv-00620, 1-15-cv-01011,
1-15-cv-01014 & 1-15-cv-01015)
District Judge: Honorable Richard G. Andrews

––––––––––––––––––

Argued September 27, 2016

Before: AMBRO, SMITH,[*] and FISHER, <u>Circuit Judges</u>

**<u>JUDGMENT</u>**

These causes came on to be heard on the record before the United States District

Court for the District of Delaware and were argued on September 27, 2016.

On consideration whereof, IT IS ORDERED AND ADJUDGED by this Court that

the judgments of the District Court dated February 16, 2016 and April 12, 2016, are

hereby reversed and remanded to the District Court for further proceedings consistent

with this opinion.  Costs taxed against Appellees Energy Future Intermediate Holding

––––––––––––––––––––––––––

[*] Honorable D. Brooks Smith, United States Circuit Judge for the Third Circuit, assumed
Chief Judge status on October 1, 2016.

Company LLC and EFIH Finance Inc. All of the above in accordance with the opinion of

this Court.

Attest:


s/ Marcia M. Waldron
Clerk

Dated: November 17, 2016

OFFICE OF THE CLERK

**MARCIA M. WALDRON**
**CLERK**



Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Cᴏᴜʀᴛ ᴏғ Aᴘᴘᴇᴀʟs

FOR THE THIRD CIRCUIT
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE
215-597-2995

November 17, 2016

Philip D. Anker, Esq.
Wilmer Cutler Pickering Hale and Dorr
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Joshua K. Brody, Esq.
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10032

Daniel J. DeFranceschi, Esq.
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE 19801

Gregory A. Horowitz, Esq.
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10032

Laura D. Jones, Esq.
Pachulski Stang Ziehl & Jones
919 North Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE 19801

Jason M. Madron, Esq.
Richards Layton & Finger
920 North King Street

One Rodney Square
Wilmington, DE 19801

Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10032

Andrew R. McGaan, Esq.
Kirkland & Ellis
300 North LaSalle Street
Suite 2400
Chicago, IL 60654

James H. Millar
Drinker Biddle & Reath
1177 Avenue of the Americas
41st Floor
New York, NY 10036

James E. O'Neill III, Esq.
Pachulski Stang Ziehl & Jones
919 North Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE 19801

Norman L. Pernick, Esq.
Cole Schotz
500 Delaware Avenue
Suite 1410
Wilmington, DE 19801

Michael A. Petrino, Esq.
Kirkland & Ellis
655 15th Street, N.W.
Suite 1200
Washington, DC 20005

J. Kate Stickles, Esq.
Cole Schotz
500 Delaware Avenue
Suite 1410
Wilmington, DE 19801

Jeffrey S. Trachtman, Esq.
Kramer Levin Naftalis & Frankel

1177 Avenue of the Americas
New York, NY 10032


RE: In re: Energy Future Holdings, et al
Case Number: 16-1351
District Case Number: 1-15-cv-00620


ENTRY OF JUDGMENT

Today, **November 17, 2016** the Court entered its judgment in the above-captioned matter
pursuant to Fed. R. App. P. 36.

If you wish to seek review of the Court's decision, you may file a petition for rehearing. The
procedures for filing a petition for rehearing are set forth in Fed. R. App. P. 35 and 40, 3rd Cir.
LAR 35 and 40, and summarized below.

Time for Filing:
14 days after entry of judgment.
45 days after entry of judgment in a civil case if the United States is a party.

Page Limits:
15 pages

Attachments:
A copy of the panel's opinion and judgment only. No other attachments are permitted without
first obtaining leave from the Court.

Unless the petition specifies that the petition seeks only panel rehearing, the petition will be
construed as requesting both panel and en banc rehearing. If separate petitions for panel
rehearing and rehearing en banc are submitted, they will be treated as a single document and will
be subject to a combined 15 page limit. If only panel rehearing is sought, the Court's rules do not
provide for the subsequent filing of a petition for rehearing en banc in the event that the petition
seeking only panel rehearing is denied.

A party who is entitled to costs pursuant to Fed.R.App.P. 39 must file an itemized and verified
bill of costs within 14 days from the entry of judgment. The bill of costs must be submitted on
the proper form which is available on the court's website.

A mandate will be issued at the appropriate time in accordance with the Fed.R.App.P. 41.

Please consult the Rules of the Supreme Court of the United States regarding the timing and
requirements for filing a petition for writ of certiorari.

Very truly yours,

*Marcia M. W*

Marcia M. Waldron,
Clerk

By:
/s/Marianne, Case Manager
267-299-4911

No. 16-1351

# In The United States Court Of Appeals
## for the Third Circuit

In re:  ENERGY FUTURE HOLDINGS CORP., *et al.*,

*Debtors.*

DELAWARE TRUST COMPANY, as Indenture Trustee,

*Appellant,*

v.

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, *et al.,*

*Appellees.*

On Appeal from the United States District Court for the District of Delaware,
No. 15-620 (Hon. Richard G. Andrews, J.)

---

## CERTIFICATE OF SERVICE

I, Jason M. Madron, Esquire, hereby certify that on this 15th day December, 2016 I caused a true and correct copy of the foregoing **Petition for Rehearing or Rehearing *En Banc* for Appellees** to be served on the parties on the attached list and in the manner indicated thereon.

*/s/ Jason M. Madron*
Jason M. Madron

Service List for **DELAWARE TRUST COMPANY, as INDENTURE TRUSTEE v. ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC,** *et al.*

**Third Circuit Court of Appeals, Appeal No. 16-1351**

**VIA HAND DELIVERY:**

Laura Davis Jones
PACHULSKI STANG ZIEHL
   & JONES LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
ljones@pszyjw.com

**VIA HAND DELIVERY:**

Norman L. Pernick
J. Kate Stickles
COLE, SCHOTZ, MEISEL, FORMAN
   & LEONARD, P.A.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
npernick@coleschotz.com
kstickles@coleschotz.com

**VIA U.S. FIRST CLASS MAIL:**

Philip D. Anker
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
philip.anker@wilmerhale.com

Warren A. Usatine
COLE, SCHOTZ, MEISEL, FORMAN
   & LEONARD, P.A.
25 Main Street
Hackensack, NJ 07601
wusatine@coleschotz.com

Thomas Moers Mayer
Joshua Brody
KRAMER LEVIN NAFTALIS
   & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
tmayer@kramerlevin.com
jbrody@kramerlevin.com

**VIA U.S. FIRST CLASS MAIL:**

Dennis L. Jenkins
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
dennis.jenkins@wilmerhale.com