**<u>EXHIBIT 1</u> to <u>EXHIBIT A</u>**

**Sale Agreement**

**ASSET PURCHASE AGREEMENT**

**by and among**

**PRAIRIE STATE GENERATING COMPANY, LLC,**

**GENERATION DEVELOPMENT COMPANY LLC**

**and**

**LUMINANT GENERATION COMPANY LLC**

**dated January 5, 2017**

**TABLE OF CONTENTS**

1.   DEFINITIONS AND RULES OF INTERPRETATION ........................................ 2
    1.1   Definitions ........................................................................................................ 2
    1.2   Table of Definitions ......................................................................................... 4
    1.3   Exhibits ............................................................................................................ 5
    1.4   Interpretation .................................................................................................... 5
    1.5   Headings ........................................................................................................... 6
    1.6   Conflicts in Documentation ............................................................................. 6
2.   Purchase and Sale ....................................................................................................... 6
    2.1   Purchase and Sale ............................................................................................. 6
    2.2   Purchase Price ................................................................................................... 6
    2.3   Closing Consideration ...................................................................................... 7
    2.4   Closing .............................................................................................................. 7
    2.5   Taxes ................................................................................................................. 7
    2.6   Risk of Loss ...................................................................................................... 7
3.   REPRESENTATIONS AND WARRANTIES OF SELLER ......................................... 7
    3.1   Organization, Standing and Qualification ........................................................ 8
    3.2   Due Authorization; Enforceability ................................................................... 8
    3.3   No Conflict ....................................................................................................... 8
    3.4   No Suits, Proceedings ...................................................................................... 8
    3.5   No Executory Contracts ................................................................................... 8
    3.6   Warranties ......................................................................................................... 9
    3.7   Buyer Scope ...................................................................................................... 9
4.   REPRESENTATIONS AND WARRANTIES OF BUYER ......................................... 9
    4.1   Organization, Standing and Qualification ........................................................ 9
    4.2   Due Authorization; Enforceability ................................................................... 9
    4.3   No Conflict ..................................................................................................... 10
    4.4   No Suits, Proceedings .................................................................................... 10
    4.5   Buyer's Investigation and Reliance ............................................................... 10
    4.6   Financing ........................................................................................................ 11
5.   REPRESENTATIONS AND WARRANTIES OF LUMINANT ............................... 11
    5.1   Organization, Standing and Qualification ...................................................... 11
    5.2   Due Authorization; Enforceability ................................................................. 11
    5.3   No Conflict ..................................................................................................... 11
    5.4   No Suits, Proceedings .................................................................................... 11
    5.5   Houston Warehouse ....................................................................................... 12
    5.6   Monticello Yard ............................................................................................. 12
    5.7   Buyer Scope .................................................................................................... 12
6.   INTERIM COVENANTS .......................................................................................... 12
    6.1   Conduct of Business ....................................................................................... 12
    6.2   Access to the Houston Warehouse ................................................................. 12
    6.3   Approval Order ............................................................................................... 13
    6.4   Access to Claim and Notice Records .............................................................. 13

| | | |
|---|---|---|
| 6.5 | Consents and Filings; Further Assurances | 13 |
| 7. | CONDITIONS TO CLOSING | 13 |
| 7.1 | General Conditions | 13 |
| 7.2 | Conditions to Obligations of Seller | 13 |
| 7.3 | Conditions to Obligations of Buyer | 14 |
| 7.4 | Conditions to Obligations of Luminant | 15 |
| 8. | POST-CLOSING COVENANTS | 16 |
| 8.1 | Houston Warehouse | 16 |
| 8.2 | Monticello Yard | 17 |
| 8.3 | Property Insurance | 18 |
| 8.4 | Salvage Scope | 18 |
| 9. | NONSURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS; INDEMNIFICATION; RELEASE OF SELLER | 19 |
| 9.1 | Nonsurvival of Representations, Warranties and Covenants | 19 |
| 9.2 | Indemnification | 19 |
| 9.3 | Sale Free and Clear | 19 |
| 9.4 | Release of Seller | 20 |
| 10. | TERMINATION | 20 |
| 10.1 | Termination | 20 |
| 10.2 | Effect of Termination | 21 |
| 11. | MISCELLANEOUS | 21 |
| 11.1 | Fees and Expenses | 21 |
| 11.2 | Severability | 21 |
| 11.3 | Governing Law | 21 |
| 11.4 | Submission to Jurisdiction | 22 |
| 11.5 | No Oral Modification | 22 |
| 11.6 | Notice | 22 |
| 11.7 | Confidentiality | 23 |
| 11.8 | Announcements; Publications | 24 |
| 11.9 | Personal Liability | 24 |
| 11.10 | Parties in Interest | 24 |
| 11.11 | Further Assurances | 24 |
| 11.12 | Assignment; Binding on Successors, Etc | 24 |
| 11.13 | Entire Agreement | 25 |
| 11.14 | Enforcement | 25 |
| 11.15 | Payments | 25 |
| 11.16 | Counterparts | 25 |
| 11.17 | Time is of the Essence | 26 |

**Exhibit A** – Form of Approval Order
**Exhibit B** – Form of Bill of Sale
**Exhibit C** – Buyer Scope
**Exhibit D** – Form of Side Letter

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of January 5, 2017 (the "**Effective Date**") by and among Prairie State Generating Company, LLC, a Delaware limited liability company ("**Buyer**"), Generation Development Company LLC, a Delaware limited liability company ("**Seller**"), and Luminant Generation Company LLC, a Texas limited liability company ("**Luminant**").  Each party to this Agreement is sometimes individually referred to herein as a "**Party**" and all parties to this Agreement are sometimes collectively referred to herein as the "**Parties**".

## RECITALS

A.      Seller previously entered into an Original Purchase Order (as defined herein) with respect to the purchase and sale of certain equipment and services, including coal-fired boilers for Seller's reference plant program.

B.      On April 29, 2014, Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (as defined herein) which is pending as case no. 14-11017 (CSS) in the Bankruptcy Court (as defined herein).

C.      On April 29, 2014, Luminant filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code as case no. 14-10979 (CSS) in the Bankruptcy Court.  Following entry of an order by the Bankruptcy Court, confirming the plan of reorganization (the "**Plan**") as it relates to Luminant and certain of its affiliates and subsidiaries, and the satisfaction of certain conditions precedent to emergence as set forth in the Plan, Luminant emerged from bankruptcy on October 3, 2016.

D.      Seller currently owns and has stored and maintained certain parts and equipment acquired pursuant to the Original Purchase Order (the "**Boiler**") in part at a warehouse leased by Luminant and located at the Greensport Industrial Park, Building 3F, South Bay, in the City of Houston, County of Harris, State of Texas (the "**Houston Warehouse**"), as more fully described in the Lease, and in part at the Monticello operating facility owned by Luminant and located in Rusk County, Texas (the "**Monticello Yard**").

E.      Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Buyer Scope (as defined herein), and in connection therewith, Buyer and Luminant are each willing to undertake certain obligations relating thereto, all upon the terms and subject to the conditions set forth herein.

F.      Seller's ability to consummate the transactions contemplated herein is subject to, among other things, the entry of the Approval Order (as defined herein) under, *inter alia*, Section 363 of the Bankruptcy Code, as further set forth herein.

## AGREEMENT

In consideration of the sums to be paid herein and of the covenants and agreements set forth herein, and intending to be legally bound hereby, the Parties agree as follows:

## 1.    DEFINITIONS AND RULES OF INTERPRETATION

1.1    <u>Definitions</u>.  For the purposes of this Agreement, the following terms shall have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such first Person.  Solely for the purposes of this definition, "**control**", including the terms "**controlled by**" and "**under common control with**", means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.  For the avoidance of doubt, Luminant and Seller shall not be deemed Affiliates for purposes of this Agreement.

"**Applicable Laws**" means and includes any applicable statute, license, law, rule, regulation, code, ordinance, judgment, decree, writ, legal requirement, order or the like, of any national, federal, provincial, state or local court or other Governmental Authority, and the written interpretations thereof, including any statute, law, rule, regulation, code, ordinance, judgment, decree, writ, order or the like, regulating, relating to or imposing liability or standards of conduct concerning any obligation under this Agreement.

"**Approval Order**" means an order duly entered by the Bankruptcy Court substantially in the form attached hereto as <u>Exhibit A</u>.

"**Bankruptcy Case**" means the bankruptcy case commenced by Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Bankruptcy Case or any other court having jurisdiction over the Bankruptcy Case, including, to the extent of the withdrawal of any reference under 28 U.S. § 157, the United States District Court for the District of Delaware.

"**Bill of Sale**" means a bill of sale substantially in the form attached hereto as <u>Exhibit B</u>.

"**Business Day**" means any day that is not a Saturday, a Sunday or another day on which banks are required or authorized by Applicable Laws to be closed in Dallas, Texas.

"**Buyer Material Adverse Effect**" means any event, change, occurrence or effect that would prevent, materially delay or materially impede the performance by Buyer of its obligations under this Agreement or the Bill of Sale or the consummation of the transactions contemplated hereby or thereby.

"**Buyer Scope**" means all of Seller's right, title and interest in and to the following enumerated assets, as they exist at the time of the Closing:

1. all of the component parts of the Boiler located in the Houston Warehouse (the "**Houston Storage Scope**") set forth in Exhibit C; and

2. all of the component parts of the Boiler located in the Monticello Yard (the "**Monticello Storage Scope**") set forth in Exhibit C.

"**Claim**" shall have the meaning ascribed to it in Section 101(5) of the Bankruptcy Code, including any successor or vicarious liabilities of any kind or character, whether known or unknown as of the Closing Date, then existing or thereafter arising, whether fixed or contingent, with respect to the Seller or against Seller or any of its predecessors or affiliates or any other third party whatsoever arising at any time, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Buyer Scope prior to the Closing Date.

"**Dollars**" or "**$**" means United States dollars.

"**Final Order**" means an order entered by a court of competent jurisdiction as to which the time for appellate review has expired without any party having sought such review or the determination of any such review by the affirmance of such order.

"**Governmental Authority**" means any applicable national, federal, state, provincial and local governments and all agencies, authorities, departments, instrumentalities, courts, corporations, other authorities lawfully exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or other subdivisions of any of the foregoing having or claiming a regulatory interest in or jurisdiction over the Parties.  For the avoidance of doubt, "**Governmental Authority**" includes the Bankruptcy Court.

"**Lien**" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including any conditional sale or title retention arrangement, any capitalized lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"**Interest**" shall mean any interest of a Person other than Seller in and to, or related to, any of the Buyer Scope to the fullest extent referred to in Section 363(f) of the Bankruptcy Code other than a Claim or Lien, including any option, right, claim of successor liability, ownership or other property interest of any type, voting or other restrictions, right-of-way, covenant, condition, leasehold, license, easement, encroachment, restriction, other third-party right or title defect or encumbrance of any nature whatsoever, whether legal or equitable in nature, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated and whether contractual, statutory or common law in origin.

"**Losses**" means, collectively, any actual and reasonable documented out-of-pocket losses, damages, liabilities, deficiencies, claims, interest, awards, judgments, penalties, costs and expenses (including reasonable attorneys' fees, costs and other out-of-pocket expenses incurred in investigating, preparing or defending the foregoing).

"**Luminant Material Adverse Effect**" means any event, change, occurrence or effect that would prevent, materially delay or materially impede the performance by Luminant of its obligations under this Agreement or the consummation of the transactions contemplated hereby.

"**Original Purchase Order**" means that certain Purchase Order No. 25270-000-POA-MBPX-00001, with respect to the Buyer Scope executed by Seller and the original equipment manufacturer (The Babcock & Wilcox Company), as modified or amended from time to time.

"**Person**" means an individual, corporation, company, voluntary association, partnership, incorporated organization, trust, limited liability company or any other entity or organization, including any Governmental Authority.

"**Related Parties**" means, with respect to any Person, all subsidiaries, Affiliates and officers, directors, shareholders, associates, related firms or entities, employees, servants and agents of such Person, any subsidiary of such Person and any Affiliate of such Person.  For the avoidance of doubt, Luminant and Seller shall not be deemed Related Parties for purposes of this Agreement.

"**Representatives**" means, with respect to any Person, the officers, directors, principals, employees, agents, attorneys, auditors, advisors, bankers and other representatives of such Person.

"**Salvage Scope**" means and includes any Buyer Scope components that (i) remain at the Houston Warehouse after October 30, 2017, (ii) remain at the Monticello Yard after December 31, 2020, (iii) are identified by Buyer in writing prior to June 30, 2017 pursuant to Section 8.4(b) as components that Buyer does not intend to remove from the Houston Warehouse, (iv) are identified by Buyer in writing at any time prior to December 31, 2020 pursuant to Section 8.4(c) as components at the Monticello Yard that Buyer does not intend to remove from the Monticello Yard and (v) are otherwise identified as Salvage Scope in a written notice from Buyer to Luminant.

"**Seller Material Adverse Effect**" means any event, change, occurrence or effect that would prevent, materially delay or materially impede the performance by Seller of its obligations under this Agreement or the Bill of Sale or the consummation of the transactions contemplated hereby or thereby.

"**Storage Scope**" means the obligations of Luminant with respect to the storage of the Monticello Storage Scope and Houston Storage Scope after Closing.

1.2     Table of Definitions.  The following terms have the meanings set forth in the Sections referenced below:

| **Definition** | **Location** | | |
|---|---|---|---|
| Agreement | Preamble | Buyer | Preamble |
| Boiler | Recitals | Closing | 2.4 |
| | | Closing Date | 2.4 |

| | | | |
|---|---|---|---|
| Effective Date | Preamble | Monticello Storage | |
| Houston Landlord | 5.5 | Scope | 'Buyer Scope' Definition |
| Houston Storage | | Monticello Yard | Recitals |
| Scope | 'Buyer Scope' Definition | Parties | Preamble |
| Houston Warehouse | Recitals | Party | Preamble |
| Lease | 5.5 | Plan | Recitals |
| Lease Date | 8.1(b) | Purchase Price | 2.2 |
| Luminant | Preamble | Seller | Preamble |
| Milestone Payment | 2.2 | Termination Date | 10.1(e) |

     1.3    <u>Exhibits</u>.  This Agreement includes any Exhibits annexed hereto and any reference in this Agreement to an "Exhibit" by letter designation or title shall mean one of the Exhibits identified in the table of contents and such reference shall indicate such Exhibit herein.

     1.4    <u>Interpretation</u>.

          (a)    Terms defined in a given number, tense or form shall have the corresponding meaning when used in this Agreement with initial capitals in another number, tense or form.  The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

          (b)    The terms such as "hereof," "herein," "hereto," "hereinafter" and other terms of like import are not limited in applicability to the specific provision within which such references are set forth but instead refer to this Agreement taken as a whole.

          (c)    When a reference is made in this Agreement to an Article, Section or subsection, such reference is to an Article, Section or subsection to this Agreement unless otherwise specified.

          (d)    The word "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the words "without limitation," and unless otherwise specified shall not be deemed limited by the specific enumeration of items, but shall be deemed without limitation.  The term "or" is not exclusive.

          (e)    The word "will" shall be construed to have the same meaning of the word "shall."

          (f)    A reference to any Party to this Agreement or any party to any other agreement or document shall include such Party's or party's predecessors, successors and permitted assigns.

          (g)    Reference to any Applicable Law means such Applicable Law as amended, modified, codified, replaced or reenacted, and all rules and regulations promulgated thereunder.

(h)     Reference to days shall mean calendar days unless otherwise specified.

(i)     Each Party acknowledges that it and each other Party has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement. The Parties have participated jointly in the negotiation and drafting of this Agreement. Any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof.

1.5     Headings.  All headings or captions contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

1.6     Conflicts in Documentation.  This Agreement, including any Exhibit hereto, shall be taken as mutually explanatory.  If a Party becomes aware of an express conflict within the provisions of this Agreement, including any Exhibit hereto, that Party shall immediately notify the other Parties of such conflict, and the Parties shall reasonably and mutually determine which conflicting provision shall govern.

## 2.    PURCHASE AND SALE

2.1     Purchase and Sale of the Buyer Scope.  Upon the terms and subject to the conditions of this Agreement, at the Closing (as herein defined), Seller shall sell, assign, transfer, convey and deliver to Buyer all of Seller's right, title and interest as of the Closing Date (as herein defined) in and to the Buyer Scope, and Buyer shall purchase, acquire, accept and pay for the Buyer Scope.

2.2     Purchase Price. The purchase price for the Buyer Scope is Four Million Dollars ($4,000,000.00) (the "**Purchase Price**"), which shall be paid by Buyer to Seller in installments as follows (each a "**Milestone Payment**"):

(a)     One Million Five Hundred Thousand Dollars ($1,500,000.00) payable on or before the Closing Date;

(b)     One Million Dollars ($1,000,000.00) payable on or before January 31, 2018;

(c)     Seven Hundred Fifty Thousand Dollars ($750,000.00) payable on or before January 31, 2019;

(d)     Five Hundred Thousand Dollars ($500,000.00) payable on or before December 31, 2019; and

(e)     Two Hundred Fifty Thousand Dollars ($250,000.00) payable on or before December 31, 2020.

Buyer may, at its sole election, pre-pay in whole or in part any of the Purchase Price without penalty or discount. If Buyer elects to pre-pay in part any of the Purchase Price, the amount of

such pre-payment shall be deducted from the next succeeding Milestone Payment with a positive outstanding balance. If a Milestone Payment is not paid in full by its respective due date, the outstanding balance of such late Milestone Payment shall bear interest from the due date at a rate equal to ten percent (10%) per annum and the amount of such interest shall be added to the outstanding balance of such late Milestone Payment.

2.3    Closing Consideration.    In consideration for the sale, assignment, transfer, conveyance and delivery of the Buyer Scope to Buyer, at the Closing, Buyer shall (a) pay to Seller by wire transfer an amount equal to the initial Milestone Payment in immediately available funds and (b) pay all transfer, sales or use taxes associated with the transactions contemplated herein (if any). At least two Business Days prior to the Closing Date, Seller shall designate in writing to Buyer the bank information necessary to effect the wire transfer referenced in Section 2.3(a). Nothing herein shall preclude Buyer from using a third party to transmit any payments due under this Agreement.

2.4    Closing.    The sale and purchase of the Buyer Scope contemplated by this Agreement (the "**Closing**") shall take place by electronic exchange of documents at 10:00 a.m. Central Time on the third (3rd) Business Day following the satisfaction or, to the extent permitted by Applicable Law, waiver of all conditions to the obligations of the parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date), or at such other place or at such other time or on such other date as the Parties may agree in writing. The day on which the Closing takes place is referred to as the "**Closing Date**".

2.5    Taxes.    All ad valorem personal property taxes with respect to the Buyer Scope that are attributable to or accrue before Closing shall be the sole responsibility of, and shall be paid by, Seller. All ad valorem personal property taxes with respect to the Buyer Scope that are attributable to or accrue on and after Closing shall be the sole responsibility of, and shall be paid by, Buyer. Buyer and Seller agree that the amount of such ad valorem personal property taxes may not be determined as of the Closing, and therefore, the Buyer and Seller acknowledge and agree to cooperate in good faith to determine the allocation of responsibility for such taxes as set forth in this Section 2.5, and to pay their respective allocated amount of such taxes when due and payable. Seller and Buyer acknowledge and agree that the sale of the Buyer Scope by Seller is an isolated and occasional sale and does not constitute a business of selling tangible personal property at retail. The Seller is not a person engaged in the business of selling tangible personal property, and the sale of the Buyer Scope is related to the sale of an asset no longer needed in Seller's business.

2.6    Risk of Loss.    At the Closing, possession, care, custody, control and risk of loss with respect to the Buyer Scope shall transfer from Seller to Buyer and neither Seller nor Luminant shall have any obligation to insure the Buyer Scope against casualty or risk of loss . After the Closing, Seller shall have no additional obligations to Buyer with respect to the Buyer Scope.

## 3.    REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to each of Buyer and Luminant as follows:

- 7 -

3.1    <u>Organization, Standing and Qualification</u>.    Seller is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware, and, subject to entry of the Approval Order, has full limited liability company power and authority to execute, deliver and perform its obligations hereunder and to engage in the business it presently conducts and contemplates conducting, and is and will be duly licensed or qualified to do business and in good standing under the laws of the State of Texas and in each other jurisdiction wherein the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified would have a Seller Material Adverse Effect.

3.2    <u>Due Authorization; Enforceability</u>.    This Agreement has been duly authorized, executed, and delivered by or on behalf of Seller and, subject to the entry of the Approval Order (as herein defined) by the Bankruptcy Court, is, upon execution and delivery and assuming due execution and delivery by each of the other Parties, the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general equitable principles.    Seller has delivered copies of all consents, corporate resolutions or other similar documentation reasonably acceptable to Buyer and Luminant demonstrating approval of the transactions contemplated herein by Seller's corporate authorities.

3.3    <u>No Conflict</u>.    The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby will not and do no conflict with or cause any default under: (a) its organizational documents; (b) any indenture, mortgage, chattel mortgage, deed of trust, lease, conditional sales contract, loan or credit arrangement or other agreement or instrument to which Seller is a Party or by which it or its properties may be bound or affected; or (c) any Applicable Laws; except, in the case of (b) or (c), for any conflicts or defaults that would not, individually or in the aggregate, reasonably be expected to have a Seller Material Adverse Effect or that arise as a result of any facts or circumstances relating to Buyer, Luminant or any of their Affiliates; <u>provided, however,</u> that notwithstanding the foregoing, the consummation of the transactions contemplated hereby is subject to the entry of the Approval Order by the Bankruptcy Court.

3.4    <u>No Suits, Proceedings</u>.    There are no actions, suits, proceedings, or investigations pending or, to Seller's knowledge, threatened against Seller at law or in equity before any court (United States or otherwise) or before any other Governmental Authority (whether or not covered by insurance) that individually or in the aggregate would reasonably be expected to have a Seller Material Adverse Effect.    Seller has no knowledge of any violation or default with respect to any order, writ, injunction, or any decree of any court or any Governmental Authority that may result in any such impairment; <u>provided, however,</u> that notwithstanding the foregoing, the consummation of the transactions contemplated hereby is subject to the entry of the Approval Order by the Bankruptcy Court.

3.5    <u>No Executory Contracts</u>.    Seller is not the beneficiary of any manufacturer's warranty or a party to any executory contract that relates to the Buyer Scope or the use of same.

3.6      Warranties. Subject to the entry of the Approval Order by the Bankruptcy Court, Seller has good and marketable title to the Buyer Scope, Seller's title thereto is free and clear of all Liens and Interests and, at Closing, shall be free and clear of all Liens, Claims and Interests. SUBJECT TO THE FOREGOING WARRANTIES AND REPRESENTATIONS AND THE WARRANTIES PROVIDED FOR IN THIS ARTICLE III, THIS SALE IS MADE WITHOUT WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED OR STATUTORY, AND ANY AND ALL OF THE BUYER SCOPE IS SOLD BY SELLER TO BUYER ON AN "AS IS, WHERE IS" BASIS, "WITH ALL FAULTS", AND WITHOUT RECOURSE, COVENANTS, REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS, IMPLIED OR STATUTORY.    SELLER EXPRESSLY DISCLAIMS AND NEGATES    ANY    EXPRESS,    IMPLIED    OR    STATUTORY    WARRANTIES    OF MERCHANTABILITY, ANY EXPRESS, IMPLIED OR STATUTORY WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, AND ANY AND ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, OF ANY KIND OR NATURE WHATSOEVER.

3.7      Buyer Scope.

(a)      To Seller's knowledge, as of the Effective Date and except for those component parts specifically identified on Exhibit C as not being included in the Buyer Scope, Exhibit C sets forth in all material respects the component parts of the Boiler located at the applicable sites.

(b)      Seller has provided to Buyer all documentation and evidence of Seller's title and ownership of the Buyer Scope and all material certifications in Seller's possession regarding the Buyer Scope.

## 4.      REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to each of Seller and Luminant as follows:

4.1      Organization, Standing and Qualification.  Buyer is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware, and has full limited liability company power and authority to execute, deliver and perform its obligations hereunder and to engage in the business it presently conducts and contemplates conducting, and is and will be duly licensed or qualified to do business and in good standing under the laws of each jurisdiction wherein the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified would have a Buyer Material Adverse Effect.

4.2      Due Authorization; Enforceability.  This Agreement has been duly authorized, executed, and delivered by or on behalf of Buyer and is, upon execution and delivery and assuming due execution and delivery by each of the other Parties, the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general equitable principles.  Buyer has delivered copies of all consents, corporate resolutions or other similar documentation reasonably acceptable to Seller

and Luminant demonstrating approval of the transactions contemplated herein by Buyer's corporate authorities.

4.3    No Conflict.   The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby will not and do not conflict with or cause any default under: (a) its organizational documents; (b) any indenture, mortgage, chattel mortgage, deed of trust, lease, conditional sales contract, loan or credit arrangement or other agreement or instrument to which Buyer is a Party or by which it or its properties may be bound or affected; or (c) any Applicable Laws; except, in the case of (b) or (c), for any conflicts or defaults that would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect or that arise as a result of any facts or circumstances relating to Seller, Luminant or any of their Affiliates.

4.4    No Suits, Proceedings.   There are no actions, suits, proceedings, or investigations pending or, to Buyer's knowledge, threatened against Buyer at law or in equity before any court (United States or otherwise) or before any other Governmental Authority (whether or not covered by insurance) that individually or in the aggregate would reasonably be expected to have a Buyer Material Adverse Effect.   Buyer has no knowledge of any violation or default with respect to any order, writ, injunction, or any decree of any court or any Governmental Authority that may result in any such impairment.

4.5    Buyer's Investigation and Reliance.   Buyer is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Buyer Scope and the transactions contemplated hereby, which investigation, review and analysis were conducted by Buyer together with its Representatives, including legal counsel, that it has engaged for such purpose.   Buyer acknowledges and admits that, as of the Closing, Buyer and its Representatives will have been provided with full and complete access to the Buyer Scope, the Houston Warehouse, the Monticello Yard and other information that they have requested in connection with their investigation of the Buyer Scope and the transactions contemplated hereby.   Except as expressly set forth herein, neither Seller nor any of its Affiliates or Representatives has made any representation or warranty, express or implied, as to the accuracy or completeness of any information concerning the Buyer Scope contained herein or made available in connection with Buyer's investigation of the foregoing, except as expressly set forth in this Agreement, and Seller and its Affiliates and Representatives expressly disclaim any and all liability that may be based on such information or errors therein or omissions therefrom.   Neither Luminant nor any of its Related Parties or Representatives has made any representation or warranty, express or implied, as to the Buyer Scope.   Buyer has not relied and is not relying on any statement, representation or warranty, oral or written, express or implied (including any representation or warranty as to merchantability or fitness for a particular purpose), made by Seller, Luminant or any of their respective Affiliates or Representatives, except as expressly set forth in Article III.   Neither Seller, Luminant nor any of their respective Affiliates or Representatives shall have any liability to Buyer or any of its Affiliates or Representatives resulting from the use of any information, documents or materials made available to Buyer, whether orally or in writing, in any due diligence discussions or in any other form in expectation of the transactions contemplated by this Agreement.   Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Buyer Scope on an "as is" and "where is" basis, except as expressly set forth in Article III.   Buyer

- 10 -

acknowledges and agrees that the representations and warranties in <u>Article III</u> are the result of arms' length negotiations between sophisticated parties and such representations and warranties are made, and Buyer is relying on such representations and warranties, solely for the purposes of (a) <u>Section 7.3(a)</u>, (b) rights to indemnification under <u>Article IX</u> and (c) <u>Section 10.1</u>.

4.6    <u>Financing</u>.  Buyer has sufficient funds to permit the Buyer to consummate the transactions contemplated by this Agreement and the Bill of Sale, and to pay all related fees and expenses.  Notwithstanding anything to the contrary contained herein, Buyer acknowledges and agrees that its obligations to consummate the transactions contemplated hereby are not contingent upon its ability to obtain any third party financing.

## 5.    REPRESENTATIONS AND WARRANTIES OF LUMINANT

Luminant hereby represents and warrants to each of Buyer and Seller as follows:

5.1    <u>Organization, Standing and Qualification</u>.  Luminant is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Texas, and has full limited liability company power and authority to execute, deliver and perform its obligations hereunder and to engage in the business it presently conducts and contemplates conducting, and is and will be duly licensed or qualified to do business and in good standing under the laws of the State of Texas and in each other jurisdiction wherein the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified would have a Luminant Material Adverse Effect.

5.2    <u>Due Authorization; Enforceability</u>.  This Agreement has been duly authorized, executed, and delivered by or on behalf of Luminant and is, upon execution and delivery and assuming due execution and delivery by each of the other Parties, the legal, valid, and binding obligation of Luminant, enforceable against Luminant in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general equitable principles.

5.3    <u>No Conflict</u>.  The execution, delivery and performance by Luminant of this Agreement and the consummation of the transactions contemplated hereby will not and do not conflict with or cause any default under: (a) its organizational documents; (b) any indenture, mortgage, chattel mortgage, deed of trust, lease, conditional sales contract, loan or credit arrangement or other agreement or instrument to which Luminant is a Party or by which it or its properties may be bound or affected; or (c) any Applicable Laws; except, in the case of (b) or (c), for any conflicts or defaults that would not, individually or in the aggregate, reasonably be expected to have a Luminant Material Adverse Effect or that arise as a result of any facts or circumstances relating to Buyer, Seller or any of their Affiliates.

5.4    <u>No Suits, Proceedings</u>.  There are no actions, suits, proceedings, or investigations pending or, to Luminant's knowledge, threatened against Luminant at law or in equity before any court (United States or otherwise) or before any other Governmental Authority (whether or not covered by insurance) that individually or in the aggregate would reasonably be expected to have a Luminant Material Adverse Effect.  Luminant has no knowledge of any violation or default

with respect to any order, writ, injunction, or any decree of any court or any Governmental Authority that may result in any such impairment.

5.5    <u>Houston Warehouse</u>.  Luminant is a party to that certain Building and Land Lease Agreement (as subsequently amended, the "**Lease**"), dated December 17, 2010, by and between Greensport/Ship Channel Partners, L.P. (the "**Houston Landlord**") and Luminant.  Luminant has delivered to Buyer and Seller a true and accurate copy of the Lease, together with all amendments thereto. The terms of the Lease provide that the current term expires on January 31, 2018.  As of the Effective Date, the Lease has been assumed by Luminant pursuant to Section 365 of the Bankruptcy Code, the Lease is in full force and effect, and Luminant is not in default under the Lease other than by the filing of Luminant's chapter 11 petition.

5.6    <u>Monticello Yard</u>.  As of the Effective Date, Luminant (or one of its Affiliates) has fee title to the Monticello Yard.

5.7    <u>Buyer Scope</u>.  As of the Effective Date, neither Luminant nor any of its Affiliates has any title or other ownership interest in or to the Buyer Scope.

## 6.    INTERIM COVENANTS

6.1    <u>Conduct of Business Prior to the Closing</u>.

(a)    Except as required by the Bankruptcy Code or arising out of the Bankruptcy Case or as otherwise required by Applicable Law, between the Effective Date and the Closing Date, unless Buyer shall otherwise provide its prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), (i) Seller shall use its commercially reasonable efforts to preserve in all material respects the present condition of the Buyer Scope and (ii) Seller shall not sell, transfer, encumber or otherwise dispose of any components of the Buyer Scope or any interest therein.

(b)    Between the Effective Date and the Closing Date, unless Buyer shall otherwise provide its prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), Luminant shall (i) fully and timely perform its obligations under the Lease, (ii) maintain the Lease in full force and effect and (iii) not amend or terminate the Lease.

6.2    <u>Access to the Houston Warehouse and the Monticello Yard</u>.  Between the Effective Date and the Closing, upon reasonable notice, Luminant shall afford Buyer and its Representatives reasonable access to the Houston Warehouse and the Monticello Yard in order to inspect the Buyer Scope and affix or attach a tag, marking or other non-permanent means of identification on the component parts of the Buyer Scope; <u>provided</u>, <u>however</u>, that any such access and tagging shall be conducted at Buyer's expense, during normal business hours and in such a manner as not unreasonably to interfere with the normal operations of Luminant; <u>provided</u>, <u>further</u>, that such affixation or attachment shall not damage the component parts of the Buyer Scope.  Buyer will comply with Luminant's standard safety and security protocols when accessing the Houston Warehouse and the Monticello Yard.

6.3    Approval Order.  Seller will deliver a true and accurate copy of the Approval Order to Buyer and Luminant within one (1) Business Day following the entry of the Approval Order by the Bankruptcy Court.

6.4    Access to Claim and Notice Records.  In order to permit Buyer to evaluate whether proper notice was given of the motion for entry of the Approval Order, Seller shall provide Buyer and its counsel reasonable access to its claims and other records regarding the Buyer Scope.  Seller shall also provide to Buyer all documentation and evidence of Seller's title and ownership of the Boiler and the Buyer Scope in Seller's possession and all material certifications in Seller's possession regarding the Buyer Scope.

6.5    Consents and Filings; Further Assurances.  Each of the Parties shall use all commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under Applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Bill of Sale as promptly as practicable, including to obtain from Governmental Authorities all consents, approvals, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Bill of Sale (including, for the avoidance of doubt, the entry of the Approval Order by the Bankruptcy Court).

7.    **CONDITIONS TO CLOSING**

7.1    General Conditions.  The respective obligations of Buyer, Seller and Luminant to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by Applicable Law, be waived in writing by each Party in its sole discretion (provided, that such waiver shall only be effective as to the obligations of such Party):

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Applicable Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, conditions, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(b)    The Approval Order shall have become a Final Order.

7.2    Conditions to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Seller in its sole discretion:

(a)    The representations and warranties of Buyer contained in Article IV shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Buyer Material Adverse Effect" set forth therein) as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Buyer Material Adverse Effect" set forth therein) as of such specified date.

- 13 -

Buyer shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it prior to or at the Closing. Seller shall have received from Buyer a certificate to the effect set forth in the preceding sentences, signed by a duly authorized officer thereof.

(b)     The representations and warranties of Luminant contained in <u>Article V</u> shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Luminant Material Adverse Effect" set forth therein) as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Luminant Material Adverse Effect" set forth therein) as of such specified date. Luminant shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it prior to or at the Closing. Seller shall have received from Luminant a certificate to the effect set forth in the preceding sentences, signed by a duly authorized officer thereof.

(c)     Seller shall have received an executed counterpart of the Bill of Sale signed by Buyer.

7.3     <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

(a)     The representations and warranties of Seller contained in <u>Article III</u> shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Seller Material Adverse Effect" set forth therein) as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Seller Material Adverse Effect" set forth therein) as of such specified date. Seller shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it prior to or at the Closing. Buyer shall have received from Seller a certificate to the effect set forth in the preceding sentences, signed by a duly authorized officer thereof.

(b)     The representations and warranties of Luminant contained in <u>Article V</u> shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Luminant Material Adverse Effect" set forth therein) as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Luminant Material Adverse Effect" set forth therein) as of such specified date. Luminant shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants required by this Agreement

- 14 -

to be performed or complied with by it prior to or at the Closing. Buyer shall have received from Luminant a certificate to the effect set forth in the preceding sentences, signed by a duly authorized officer thereof.

(c)     Luminant (or one of its Affiliates) shall have fee title to the Monticello Yard or, if Luminant (or one of its Affiliates) has sold, transferred or otherwise disposed of its interest in the Monticello Yard, the buyer or transferee in such sale, transfer or disposition has taken title to the Monticello Yard subject to the rights of the Buyer as set forth in this Agreement, and shall have assumed all of Luminant's obligations under this Agreement.

(d)     Buyer shall have received an executed counterpart of the Bill of Sale signed by Seller.

(e)     Buyer shall have received a letter signed by the Houston Landlord to the effect that: (i) the Lease is in full force and effect and Luminant is not in default thereunder; (ii) the execution, delivery and performance of this Agreement will not result in a default under the Lease; and (iii) Houston Landlord will provide notice to Buyer of any default by Luminant under the Lease within ten (10) days of the default.

7.4     Conditions to Obligations of Luminant.     The obligations of Luminant to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Luminant in its sole discretion:

(a)     The representations and warranties of Seller contained in Article III shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Seller Material Adverse Effect" set forth therein) as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Seller Material Adverse Effect" set forth therein) as of such specified date. Seller shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it prior to or at the Closing. Luminant shall have received from Seller a certificate to the effect set forth in the preceding sentences, signed by a duly authorized officer thereof.

(b)     The representations and warranties of Buyer contained in Article IV shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Buyer Material Adverse Effect" set forth therein) as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct in all material respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Buyer Material Adverse Effect" set forth therein) as of such specified date. Buyer shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it prior to or at the Closing. Luminant shall have received from Buyer a

certificate to the effect set forth in the preceding sentences, signed by a duly authorized officer thereof.

(c)    Luminant shall have received the Side Letter, in the form attached hereto as <u>Exhibit D</u>, duly executed by Energy Future Holdings Corp; provided, however, that the performance of the terms and conditions of either Luminant or Energy Future Holdings Corp. set forth in such Side Letter shall not be a condition precedent to Luminant's obligations set forth in this Agreement.

## 8.    POST-CLOSING COVENANTS

8.1    <u>Houston Warehouse.</u>

(a)    From the Closing Date until January 31, 2018, unless Buyer shall otherwise provide its prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) or there are no Buyer Scope components remaining in the Houston Warehouse, subject to the terms and conditions of the Lease, Luminant shall (i) fully and timely perform its obligations under the Lease, including the payment of any rents(s) under the Lease, (ii) maintain the Lease in full force and effect until the end of the current term of the Lease on January 31, 2018 (provided that Luminant shall not be responsible if the failure to maintain the Lease in full force and effect is a result of any acts or omissions of Buyer or its Related Parties or a breach of the Lease by the landlord to the Lease) and (iii) not amend the Lease until the end of the current term of the Lease on January 31, 2018.

(b)    Subject to <u>Section 8.1(a),</u> from the Closing Date until the earlier of (i) October 30, 2017 or (ii) the date provided in a written notice from Buyer to Luminant (the "**Lease Date**"), Luminant will permit Buyer to continue to store the Houston Storage Scope, free of charge, provided that Buyer will be responsible for the maintenance, security and risk of loss of the Houston Storage Scope.

(c)    Subject to <u>Section 8.1(a),</u> from the Closing Date until the Lease Date, upon reasonable notice, Luminant shall afford Buyer and its Representatives reasonable access to the Houston Warehouse necessary to enable Buyer to inspect, maintain and remove the Buyer Scope; provided, however, that any such access shall be conducted at Buyer's expense, during normal business hours and in such a manner as not unreasonably to interfere with the operations of Luminant.  Buyer will comply with Luminant's standard safety and security protocols and the terms of the Lease when accessing the Houston Warehouse and continuing to store the Houston Storage Scope.

(d)    Buyer shall perform all removal of the Buyer Scope that it intends to use from the Houston Warehouse prior to the Lease Date, with such costs of removal to be incurred by Buyer or, if incurred by Luminant, to be reimbursed by Buyer to Luminant, in accordance with the terms and conditions in this Agreement.  Buyer shall not permit any damage, nuisance, or waste to any areas or portions of the Houston Warehouse.  Upon completion of its removal of the Buyer Scope that it intends to use from the Houston Warehouse, Buyer shall leave the Houston Warehouse in as good a condition as existed on the Closing Date.  In particular, but without limitation, Buyer shall be responsible for the proper and lawful disposal of all waste

generated in connection with Buyer's removal of the Buyer Scope or Buyer's other activities at the Houston Warehouse. If any portion of the Houston Warehouse, including any improvements or personal property thereon, is damaged by reason of Buyer's removal of the Buyer Scope or Buyer's other activities at the Houston Warehouse, Buyer shall, at its sole cost and expense, repair all such damage and restore the portion of the Houston Warehouse, including such improvements or personal property thereon, to as good a condition as of the Closing Date.

     8.2    <u>Monticello Yard</u>.

     (a)    From the Closing Date until December 31, 2020, unless Buyer shall otherwise provide its prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) or there are no Buyer Scope components remaining in the Monticello Yard, Luminant shall not sell, transfer or otherwise dispose of any of its interest in the Monticello Yard; provided, however, that Luminant shall be permitted to sell, transfer or otherwise dispose of any of its interest in the Monticello Yard upon one hundred twenty (120) days prior written notice to Buyer if Luminant uses its commercially reasonable efforts to cause the buyer or transferee in such sale, transfer or disposition to assume Luminant's obligations under this Agreement in a written assumption agreement signed by the buyer or transferee in a form reasonably acceptable to Buyer whereby such buyer or transferee agrees to accept title to the Monticello Yard subject to Buyer's rights in and to the Monticello Yard as set forth in this Agreement. Upon the delivery of said written assumption agreement and the consummation of such sale, transfer or disposition, Luminant's obligations pursuant to this <u>Section 8.2</u> shall terminate.

     (b)    Unless Luminant's obligations pursuant to this <u>Section 8.2</u> are terminated as set forth in the last sentence of <u>Section 8.2(a)</u>, from the Closing Date until the earlier of (i) December 31, 2020 or (ii) the date provided in a written notice from Buyer to Luminant, Luminant will permit Buyer, or cause Buyer to be permitted, to continue storing the Monticello Storage Scope, free of charge, provided that Buyer will be responsible for the maintenance, security and risk of loss of the Monticello Storage Scope.

     (c)    Unless Luminant's obligations pursuant to this <u>Section 8.2</u> are terminated as set forth in the last sentence of <u>Section 8.2(a)</u>, from the Closing Date until December 31, 2020, upon reasonable notice, Luminant shall afford Buyer and its Representatives, or cause Buyer and its Representatives to be afforded, reasonable access to the Monticello Yard necessary to enable Buyer to inspect, maintain and remove the Monticello Storage Scope; <u>provided, however</u>, that any such access shall be conducted at Buyer's expense, during normal business hours and in such a manner as not unreasonably to interfere with the operations of Luminant. Buyer will comply with Luminant's standard safety and security protocols when accessing the Monticello Yard and continuing to store the Monticello Scope at the Monticello Yard.

     (d)    Buyer shall perform all removal of the Buyer Scope that it intends to use from the Monticello Yard prior to December 31, 2020, with such costs of removal to be incurred by Buyer or, if incurred by Luminant, to be reimbursed by Buyer to Luminant, in accordance with the terms and conditions in this Agreement. Buyer shall not permit any damage, nuisance, or waste to any areas or portions of the Monticello Yard. Upon completion of its removal of the Buyer Scope that it intends to use from the Monticello Yard, Buyer shall leave the Monticello

Yard in as good a condition as existed on the Closing Date. In particular, but without limitation, Buyer shall be responsible for the proper and lawful disposal of all waste generated in connection with its removal of the Buyer Scope or Buyer's other activities at the Monticello Yard. If any portion of the Monticello Yard, including any improvements or personal property thereon, is damaged by reason of Buyer's removal of the Buyer Scope or Buyer's other activities at the Monticello Yard, Buyer shall, at its sole cost and expense, repair all such damage and restore the portion of the Monticello Yard, including such improvements or personal property thereon, to as good a condition as of the Closing Date or, at Luminant's election, Buyer shall reimburse Luminant its reasonable costs for repairing the Monticello Yard.

     8.3    <u>Property Insurance</u>.

        (a)    Buyer shall maintain property insurance against loss of the Buyer Scope so as to protect its insurable interest upon transfer of title. Buyer shall also maintain general liability insurance with limits not less than Two Million Dollars ($2,000,000) per incident and which names Luminant as an additional insured. Both policies shall provide for a waiver of subrogation against Luminant.

     8.4    <u>Salvage Scope</u>.

        (a)    Buyer shall not remove any components of the Buyer Scope from the Houston Warehouse or the Monticello Yard that Buyer intends at the time of removal to sell for salvage value, it being understood that the intent of the Parties hereunder is for components that are to be sold for salvage value shall become Salvage Scope.

        (b)    For the Houston Warehouse, Buyer shall notify Seller and Luminant in writing no later than June 30, 2017 of the components of the Houston Storage Scope that Buyer does not intend to remove from the Houston Warehouse for its use, and Buyer will remove all other components by October 30, 2017 in accordance with <u>Section 8.1(d)</u>.

        (c)    For the Monticello Yard, as early as practicable, Buyer shall identify the Monticello Storage Scope that it does not intend to remove from the Monticello Yard for its use, and Buyer will remove any other components by December 31, 2020 in accordance with <u>Section 8.2(d)</u>.

        (d)    At such time as any portion of the Buyer Scope becomes Salvage Scope, all title, risk of loss, care, custody and control of such Salvage Scope shall be conveyed from Buyer to Luminant, free and clear of any and all liens, security interests or other encumbrances, and thereafter Buyer shall not have any liability, responsibility or obligation for the Salvage Scope. Buyer shall provide a bill of sale or other documentation to evidence the conveyance of the Salvage Scope to Luminant as may reasonably be requested by Luminant.

        (e)    Buyer may begin removing Buyer Scope from the Houston Warehouse or the Monticello Yard at any time after Closing, subject to the terms of this Agreement.

(f)    Luminant may begin removing, selling or salvaging any portion of the Salvage Scope from the Houston Warehouse or the Monticello Yard at any time after Closing, subject to the terms of this Agreement.

## 9.    NONSURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS; INDEMNIFICATION; RELEASE OF SELLER

9.1    <u>Nonsurvival of Representations, Warranties and Covenants</u>.   The respective representations, warranties and covenants of Seller, Buyer and Luminant contained in this Agreement and the Bill of Sale shall terminate at, and not survive, the Closing or the Termination Date; provided, that this <u>Section 9.1</u> shall not limit or terminate any covenant or agreement of the Parties that by its terms requires performance after the Closing.

9.2    <u>Indemnification; Exculpation</u>.

(a)    After the Closing, Luminant shall save, defend, indemnify, and hold harmless Buyer from and against any and all Losses to the extent arising out of, associated with or related to any acts, omissions or breaches of the Lease by Luminant or any of its Related Parties, including but not limited to any claim of lien asserted by Lessor against the Buyer Scope (excluding the Salvage Scope).  Luminant shall not indemnify, defend or hold harmless Buyer for any Losses judicially determined to have arisen from  Buyer's negligent acts or omissions.

(b)    Buyer shall save, defend, indemnify and hold harmless Seller, Luminant and their respective Representatives and Related Parties from and against any and all Losses to the extent arising out of, associated with or related to (i) the storage, maintenance or removal of the Buyer Storage Scope (other than rent payable under the Lease) or (ii) the storage, maintenance or removal of the Monticello Storage Scope, unless, in either case, the Losses are judicially determined to have arisen from Seller's or Luminant's negligent acts or omissions.  Nothing herein shall require Buyer to defend, indemnify or hold harmless Seller of Luminant or their respective Representatives and Related Parties from any act, event, conduct, or omission arising or occurring before the Effective Date.

(c)    Luminant shall not be liable to Buyer, Seller or their respective Representatives or Related Parties for any claim or Loss that arises out of, is associated with, or is related to (i) the storage, maintenance or removal of the Houston Storage Scope (other than Luminant's performance of its obligations under the Lease) or (ii) the storage, maintenance or removal of the Monticello Storage Scope; except that this <u>Section 9.2(c)</u> shall not be deemed to release any claim judicially determined to have arisen from Luminant's negligent acts or omissions.

9.3    <u>Sale Free and Clear</u>.  Seller acknowledges and agrees that, subject to the entry of the Approval Order, (a) the Buyer Scope shall be sold and transferred to Buyer at Closing, free and clear of all Liens, Claims and Interests against Seller or its Affiliates or created by Seller or its Affiliates and existing as of the Closing Date to the fullest extent permitted by Section 363(f) of the Bankruptcy Code, (b) Buyer is not a successor to Seller or its bankruptcy estate by reason of any theory of law or equity, and (c) Buyer shall not assume or in any way be responsible for any liability of Seller, any of its Affiliates and/or the bankruptcy estate.

9.4     Release of Seller.  For good and valuable consideration, the sufficiency of which is hereby acknowledged, upon the Closing, Buyer agrees, to the maximum extent allowed by Applicable Law, to release, waive, and discharge Seller, each of its Affiliates, parents, subsidiaries, members, partners, principals, shareholders, officers, directors, managers, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals, and any Person or entity seeking to exercise the rights of Seller's estate, including any successor to Seller or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code and Seller's property, from any and all claims, interests, obligations, debts, rights, suits, damages, demands, causes of action, remedies, and liabilities arising from or in connection with the transactions contemplated by this Agreement.

## 10.     TERMINATION

10.1     Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)     by written consent of Buyer, Seller and Luminant;

(b)     by Seller, if Seller is not in material breach of its obligations under this Agreement and either Buyer or Luminant breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.2 if the Closing were otherwise to occur on the date that written notice of such breach or failure to perform is delivered, (ii) cannot be or has not been cured within fifteen (15) days following delivery of written notice of such breach or failure to perform and (iii) has not been waived by Seller;

(c)     by Buyer, if Buyer is not in material breach of its obligations under this Agreement and either Seller or Luminant breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.3 if the Closing were otherwise to occur on the date that written notice of such breach or failure to perform is delivered, (ii) cannot be or has not been cured within fifteen (15) days following delivery of written notice of such breach or failure to perform and (iii) has not been waived by Buyer;

(d)     by Luminant, if Luminant is not in material breach of its obligations under this Agreement and either Buyer or Seller breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.4 if the Closing were otherwise to occur on the date that written notice of such breach or failure to perform is delivered, (ii) cannot be or has not been cured within fifteen (15) days following delivery of written notice of such breach or failure to perform and (iii) has not been waived by the Luminant;

(e)     by any of the Parties if the Closing shall not have occurred by February 15, 2017 (the "**Termination Date**"); provided, that the right to terminate this Agreement under this Section 10.1(e) shall not be available if the failure of the Party so requesting termination to

fulfill any obligation under this Agreement shall have been the cause of the failure of the Closing to occur on or prior to such date;

(f)    by any Party in the event that any Governmental Authority shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and nonappealable; provided, that the party so requesting termination shall have complied with Section 6.5; or

(g)    by Buyer, if there are component parts of the Boiler that are identified on Exhibit C as being located at the Houston Warehouse or the Monticello Yard but are absent from the Houston Warehouse or the Monticello Yard, and such absent component parts of the Buyer Scope have a replacement value in the spare parts market in excess of Five Hundred Thousand Dollars ($500,000) in the aggregate.

The Party seeking to terminate this Agreement pursuant to this Section 10.1 (other than Section 10.1(a)) shall give prompt written notice of such termination to the other Parties.

10.2    Effect of Termination.  In the event of termination of this Agreement as provided in Section 10.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (a) for the provisions of this Section 10.2 and Article XI and (b) that nothing herein shall relieve any Party from liability for any breach prior to the termination of this Agreement of (i) any covenant in this Agreement or (ii) any other agreement made as of the Effective Date or subsequent thereto pursuant to this Agreement.

## 11.    MISCELLANEOUS

11.1    Fees and Expenses.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the Bill of Sale and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.  In the event of termination of this Agreement, the obligation of each Party to pay its own expenses will be subject to any rights of such Party arising from a breach of this Agreement by any other Party.

11.2    Severability.  The invalidity or unenforceability of any portion or provision of this Agreement shall in no way affect the validity or enforceability of any other portion or provision hereof.  Any invalid or unenforceable portion or provision shall be deemed severed from this Agreement and the balance of this Agreement shall be construed and enforced as if this Agreement did not contain such invalid or unenforceable portion or provision.  If any such provision of this Agreement is so declared invalid, the Parties shall promptly negotiate in good faith new provisions to eliminate such invalidity and to restore this Agreement as near as possible to its original intent and effect.

11.3    Governing Law; Waiver of Jury Trial.  Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed, and construed in accordance with, by the internal laws of the State of Texas, excluding its conflict of

laws provisions. THE PARTIES ALSO EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. THE PARTIES EACH AGREE THAT IT WILL NOT FILE ANY MOTION OR ASSERT ANY DEFENSE IN ANY SUCH PROCEEDING THAT IS INCONSISTENT WITH THE FOREGOING AGREEMENTS, WAIVERS, CONSENTS OR STIPULATIONS.

11.4    <u>Submission to Jurisdiction</u>. Without limitation of any Party's right to appeal any order of the Bankruptcy Court, (x) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, other than a claim or dispute which involves solely Buyer and Luminant, and (y) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such legal action or proceeding; <u>provided</u>, <u>however</u>, that, each of the Parties irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement brought by (1) any Party or its successors or assigns brought after entry of a final decree closing the Bankruptcy Case or (2) which does not involve Seller shall be heard and determined in any Texas state or federal court sitting in Dallas County, Texas (or, if such court lacks subject matter jurisdiction, in any appropriate Dallas County state or federal court), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts in Texas as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

11.5    <u>No Oral Modification</u>. No oral or written amendment or modification of this Agreement or any extension or waiver by any officer, agent, or employee of any Party, either before or after execution of this Agreement, shall be of any force or effect unless such amendment, modification, extension or waiver is in writing and is signed by a duly authorized representative of the Party to be bound thereby.

11.6    <u>Notice</u>. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by facsimile or e mail, upon written confirmation of receipt by facsimile, e-mail or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a

recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

| | |
|---|---|
| If to Buyer: | Prairie State Generating Company, LLC<br>1739 New Marigold Road<br>Marissa, Illinois  62257<br>Attention: Tom Kordick, Vice President of Power Generation<br>Facsimile: (618) 295-1408 |
| | with a copy (which shall not constitute notice) to: |
| | Prairie State Generating Company, LLC<br>3872 County Highway 12<br>Marissa, Illinois  62257<br>Attention: General Counsel<br>Facsimile: (618) 824-6286 |
| If to Seller: | Generation Development Company LLC<br>1601 Bryan Street<br>Dallas, Texas  75201<br>Attention: General Counsel<br>Facsimile: (214) 812-6032 |
| | with a copy (which shall not constitute notice) to: |
| | Gibson, Dunn & Crutcher LLP<br>2100 McKinney Avenue<br>Dallas, Texas  75201<br>Attention: Robert B. Little<br>Facsimile: (214) 571-2924 |
| If to Luminant: | Luminant Generation Company LLC<br>1601 Bryan Street<br>Dallas, Texas  75201<br>Attention:  General Counsel<br>Facsimile: (214) 875-8660 |

11.7    Confidentiality.  The Parties agree that for a period of two (2) years after the Effective Date, none of the Parties shall reveal to any person (other than any of its directors, officers, employees, accountants, investment bankers, financial advisors, representatives, agents, legal counsel and other business advisors and consultants on a confidential need-to-know basis) any non-public information concerning this Agreement or the transaction contemplated herein;

provided, however, the Parties agree that information concerning this Agreement and the transaction contemplated hereby will be shared with NextEra Energy, Inc. (and its directors, officers, employees, accountants, investment bankers, financial advisors, representatives, agents, legal counsel and other business advisors and consultants on a confidential need-to-know basis); provided, further, the Parties agree that this Agreement and certain information concerning the transactions contemplated herein will be publicly available when filed with the Bankruptcy Court. Notwithstanding the foregoing, nothing herein will preclude any of the Parties from making any disclosures as it may deem necessary, based on the advice of its counsel, in order to comply with a subpoena, court order or other Applicable Law (including the timely public disclosure obligations arising under federal and state law); provided, however, that the disclosing Party will use commercially reasonable efforts to communicate to the other Parties its intention to make any such disclosure as promptly as is practicable after the determination has been made that disclosure is required.

11.8    Announcements; Publications.    The Parties shall not make any public announcement or publication concerning the obligations contained herein (i) without the written consent of the other Parties or (ii) unless required by Applicable Law or applicable securities exchange rule or regulation; provided, the Parties agree that this Agreement and certain information concerning the transactions contemplated herein will be publicly available when filed with the Bankruptcy Court.

11.9    Personal Liability.    This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect equityholder of any Party hereto or any Representative of any Party.

11.10    Parties in Interest.    This Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except with respect to the provisions of Article IX, which shall inure to the benefit of the Persons benefiting therefrom who are intended to be third-party beneficiaries thereof.

11.11    Further Assurances.    Each Party will each use reasonable efforts to implement the provisions of this Agreement, and for such purpose each, at the reasonable request of the other, will, without further consideration, promptly execute and deliver or cause to be executed and delivered to the other such assistance, or assignments, consents or other instruments in addition to those required by this Agreement, in form and substance satisfactory to the other, as the other may reasonably deem necessary or desirable to implement any provision of this Agreement.

11.12    Assignment; Binding on Successors, Etc.    Neither this Agreement nor any rights, duties or obligations hereunder may be assigned in whole or in part by any Party without the prior written consent of the other Parties and any such assignment attempted without such written consent shall be null and void; provided, that Luminant shall have the right to assign its obligations hereunder relating to the Monticello Storage Scope in connection with the sale, transfer or other disposition of its (or its Affiliate's) interest in the Monticello Yard to the purchaser or transferee of the Monticello Yard, subject to the assignee taking title to the

Monticello Yard subject to the rights of the Buyer as set forth in this Agreement and assuming all of Luminant's obligations under this Agreement. All of the rights, benefits, duties, liabilities and obligations of the Parties hereto shall inure to the benefit of and be binding upon their respective permitted successors and permitted assigns.

11.13    Entire Agreement.  (a) This Agreement supersedes all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the parties with respect to the subject matter hereof and thereof, and (b) this Agreement and any Exhibits hereto constitute the entire agreement between the Parties with respect to the obligations contacted herein, and there are no other agreements or commitments with respect to this Agreement except as set forth herein.  Neither this Agreement nor the Bill of Sale shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof. Notwithstanding any oral agreement or course of conduct of the Parties or their Representatives to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the Parties.

11.14    Enforcement.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each of the parties shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any Texas state or federal court sitting in Dallas County, Texas (or, if such court lacks subject matter jurisdiction, in any appropriate Texas state or federal court), this being in addition to any other remedy to which such Party is entitled at law or in equity.  Each of the Parties hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

11.15    Payments.  All payments to be made pursuant to this Agreement shall be paid in Dollars and shall be paid electronically via wire transfer in immediately available funds to an account designated by the appropriate Party.

11.16    Counterparts.  This Agreement may be executed in any number of counterparts, and any Party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become effective when each Party hereto shall have received a counterpart by facsimile or electronic mail hereof signed by the other Parties hereto.  The Parties agree that the delivery of this Agreement may be effected by means of an exchange of facsimile signatures with original copies to follow by mail or courier service.

11.17  <u>Time is of the Essence</u>.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the Effective Date.

BUYER:

PRAIRIE STATE GENERATING COMPANY, LLC

Name:  Don Gaston
Title:  President & CEO

*[Signatures continue on following page]*

SELLER:

GENERATION DEVELOPMENT COMPANY LLC

Name: Anthony R. Horton
Title: Chief Financial Officer and Treasurer


*[Signatures continue on following page]*

LUMINANT:

LUMINANT GENERATION COMPANY LLC

Name: Terry Nutt
Title: Senior Vice President

**EXHIBIT 1 to EXHIBIT A**

**Sale Agreement**

Exhibit B

Form of Bill of Sale

For value received, Generation Development Company LLC ("**Seller**") does hereby sell, transfer, and convey to Prairie State Generating Company LLC ("**Buyer**") all of Seller's right, title and interest in the Buyer Scope (as such term is defined in the Asset Purchase Agreement (the "**Asset Purchase Agreement**"), dated as of January 5, 2017, by and between Seller, Buyer and Luminant Generation Company LLC) and pursuant to the order of the United States Bankruptcy Court for the District of Delaware in the chapter 11 case captioned *In re Generation Development Company LLC*, case no. 14-11017 (CSS) dated [_____] [D.E. [_____]] (the "**Approval Order**"), which is incorporated herein by reference.

Seller hereby represents and warrants to Buyer that Seller hereby conveys to Buyer good and marketable title to the Buyer Scope free and clear of all liens and encumbrances. SUBJECT TO THE FOREGOING WARRANTIES AND THE REPRESENTATIONS AND WARRANTIES PROVIDED FOR IN ARTICLE III OF THE ASSET PURCHASE AGREEMENT AND THE PROVISIONS OF THE APPROVAL ORDER, THIS SALE IS MADE WITHOUT WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED OR STATUTORY, AND ANY AND ALL OF THE BUYER SCOPE DESCRIBED HEREIN IS SOLD BY SELLER TO BUYER ON AN "AS IS, WHERE IS" BASIS, "WITH ALL FAULTS", AND WITHOUT RECOURSE, COVENANTS, REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS, IMPLIED OR STATUTORY. SELLER EXPRESSLY DISCLAIMS AND NEGATES ANY EXPRESS, IMPLIED OR STATUTORY WARRANTIES OF MERCHANTABILITY, ANY EXPRESS, IMPLIED OR STATUTORY WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, AND ANY AND ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, OF ANY KIND OR NATURE WHATSOEVER.

Seller shall warrant and defend at Seller's cost and expense good title to the Buyer Scope consistent herewith. Seller's obligation to defend such title at its cost and expense shall survive the delivery of this Bill of Sale.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale on [_____], 2016.

SELLER:

GENERATION DEVELOPMENT COMPANY LLC

_____
Name: _____
Title: _____

Tab 1

Inventory of Components at the Monticello Yard

(All of the columns are printed on a single page.)









































