**EXHIBIT C(1)**

**Excerpted Ying Report**

**Expert Report**                                                          *Highly Confidential*

## Potential Escrow Account – Scenario 1 (EFIH 2L Principal Paid to Creditors)   *($ in millions)*

| | 4/30/17 | 4/30/18 | 4/30/19 | 4/30/20 |
|---|---|---|---|---|
| **Time From Emergence** | **Emergence** | **1 Year** | **2 Years** | **3 Years** |
| **EFIH 1st Lien Claim** | **$628** | **$690** | **$759** | **$835** |
| *Make Whole* | *432* | *432* | *432* | *432* |
| *Accrued Interest on MW* | *142* | *202* | *268* | *341* |
| *Professional Fees* | *40* | *40* | *40* | *40* |
| *Accrued Interest on Professional Fees* | *14* | *16* | *19* | *21* |
| **EFIH 2nd Lien Notes** | **$279** | **$311** | **$347** | **$388** |
| *Interest on Principal Amount* | *--* | *--* | *--* | *--* |
| *Make Whole Related to 3/11/15 Paydown* | *113* | *113* | *113* | *113* |
| *Accrued Interest on MW* | *32* | *50* | *71* | *94* |
| *Call Premium* | *99* | *99* | *99* | *99* |
| *Accrued Interest on Call Premium* | *--* | *12* | *26* | *42* |
| *Professional Fees* | *24* | *24* | *24* | *24* |
| *Accrued Interest on Professional Fees* | *10* | *12* | *14* | *16* |
| **Professional Fees (Post-Emergence)** | **$--** | **$30** | **$60** | **$90** |
| *1st Lien Professionals incl. Accrued Interest ($1.5mm / month)* | *--* | *18* | *36* | *54* |
| *2nd Lien Professionals incl. Accrued Interest ($1.0mm / month)* | *--* | *12* | *24* | *36* |
| *Asserted Trustee Indemnification Fees* | *--* | *--* | *--* | *--* |
| **All MWs, Call Premiums, Interest  & Professional Fees** | **$907** | **$1,031** | **$1,166** | **$1,313** |

**EXHIBIT C(2)**

**Analysis Regarding EFIH Claims Reserve**

**A. "Future Interest" Claims**.

The EFH/EFIH Debtors do not need to escrow any amounts in the EFIH Claims Reserve on account of alleged "Future Interest Claims"—*i.e.*, Claims for interest on distributions that will be made on account of the Plan to the EFIH Second Lien Notes Trustee, but potentially not distributed to Holders of EFIH Second Lien Note Claims (collectively, the "<u>EFIH Second Lien Holders</u>") upon receipt of the distributions by EFIH Second Lien Notes Trustee.  The EFH/EFIH Debtors do not believe that the EFIH Second Lien Holders are entitled to any recovery on account of such Future Interest Claims.  The only provisions in the EFIH Second Lien Note Indenture that may be relevant to the EFIH Second Lien Note Trustee's position, Section 12.01 and Section 12.02 (as described in greater detail below and attached as <u>Exhibit 1</u> hereto), are inapplicable.[1]

Section 12.02 of the EFIH Second Lien Note Indenture states that "[i]f the Trustee or Paying Agent is *unable* to apply any money or Government Securities *in accordance with Section 12.01* hereof by reason of legal proceeding or by reason of any order or judgement of any court or government authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred *pursuant to Section 12.01* hereof[.]"  Section 12.02, EFIH Second Lien Note Indenture.  This provision does not provide for the continued accrual of interest under the circumstances presented by these chapter 11 cases.

*First,* no "deposit" is going to, nor need, be made pursuant to Section 12.01—the distributions anticipated to be made to the EFIH Second Lien Notes Trustee on the EFH Effective Date would be made pursuant to the EFH Confirmation Order and the EFH/EFIH Debtors' confirmed Plan.  The EFIH Debtors are not seeking to be discharged from their obligations under Section 12.01 of the EFIH Second Lien Note Indenture, but rather by the operation of Section 1141 of the Bankruptcy Code.  Indeed, the EFIH Debtors' ability to be discharged from its obligations to the EFIH Second Lien Holders hinges on whether they can effectuate a plan of reorganization in compliance with the requirements of the Bankruptcy Code, not on whether they satisfy the requirements of either Sections 12.01(1) or 12.01(2) in the EFIH Second Lien Note Indenture.  Once the EFIH Debtors are discharged of their obligations to pay principal and accrued interest on the EFIH Second Lien Notes under the Plan pursuant to Section 1141 of the Bankruptcy Code, interest will cease to accrue on those claims.

*Second*, even if Section 12.02 does apply to payments made pursuant to a plan of reorganization, the provision would not require the reinstatement of the EFIH Second Lien Notes Indenture in this case.  There is no legal proceeding, order, or judgement that would make the 2L Trustee *unable* to apply the money distributed to it under the Plan.  The EFIH Second Lien

---

[1]    Section 8.07 contains similar language to Section 12.02, but as that section applies only to legal and covenant defeasance, it is inapplicable.  To the extent that this Court finds it relevant, the Debtors would reiterate the arguments made herein against the application of 12.02.

Trustee certainly may be ***unwilling*** to distribute Plan distributions to the EFIH Second Lien Holders as a result of the EFIH Intercreditor Litigation, but the ***unwillingness*** to make such distributions cannot be interpreted as the ***inability*** to make such distributions, to the detriment of the EFIH Debtors and their estates.

*Third*, there would be no need for the EFH/EFIH Debtors to escrow any amounts on account of the Future Interest Claims if Class B4 votes to reject the Plan, regardless of whether the EFIH Second Lien Notes Indenture calls for such accrual.   Under such circumstances, the Bankruptcy Court can direct the EFIH Second Lien Notes Trustee to distribute funds received under the Plan to the EFIH Second Lien Holders, notwithstanding any provision in the EFIH Collateral Trust Agreement that may suggest otherwise.   Indeed, the Bankruptcy Code expressly contemplates such result.   Section 1129(b) of the Bankruptcy Code expressly states that:

> ***Notwithstanding section 510(a) of this title***, **if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.**

Section 1129(b)(1), Bankruptcy Code (emphasis added).

Section 510(a) of the Bankruptcy Code governs the enforceability of subordination agreements—i.e., the EFIH Collateral Trust Agreement.[2]   In other words, the Bankruptcy Court may confirm a plan of reorganization *even if it does not comport with an applicable subordination agreement*.   This interpretation has been approved a court in this district.[3]

In *TCI 2 Holdings*, the court held that the plan of reorganization was confirmable even if it violated the otherwise applicable intercreditor agreement.   428 B.R. at 141.   In that case, the debtors' plan provided for payments to second lien creditors, despite provisions in the intercreditor agreement that arguably prohibited such payments.   *Id*. at 139.   However, the court found the intercreditor agreement to be inapplicable to the plan because of the plain language in section 1129(b)(1) of the Bankruptcy Code.   *Id*. at 141.   That court noted that:

---

[2]   Section 510(a) states:  "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."

[3]   *In re Tribune Co.*, 472 B.R. 223 (Bankr. D. Del. 2012).

> **"[t]he only logical reading of the term 'notwithstanding' in section 1129(b)(1) seems to be: 'Even though section 510(a) requires the enforceability of subordination agreement in a bankruptcy case to the same extent that agreement is enforceable under the nonbankruptcy law, if a nonconsensual plan meets all of the § 1129(a) and (b) requirements, the court "shall confirm the plan."' The phrase '[n]otwithstanding section 510(a) of this title' removes section 510(a) from the scope of 1129(a)(1), which requires compliance with 'the applicable provisions of this title' 11 U.S.C. § 1129(b)(1)."**

*In re TCI 2 Holdings, LLC*, 428 B.R. 117, 141 (Bankr. D.N.J. 2010).

Finding that the plan could be confirmed even if there were a breach, the court in *TCI 2 Holdings* declined to make a ruling with regard to the ongoing intercreditor litigation. However, the confirmation order preserved the issue:

> "Notwithstanding anything contained in this Order or the Plan to the contrary, nothing contained in this Order (including without limitation, paragraph 40 hereof ("Releases and Exculpations")) or the Plan shall constitute a release of the Second Lien Indenture Trustee, the collateral agent therefor, the holders of Second Lien Note Claims, the Backstop Parties, the members of the Ad Hoc Committee, or any of their respective direct or indirect subsidiaries, current and former directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants and attorneys and their respective partners, owners and members and all of their predecessors, successors and assigns, from any liability to the First Lien Lenders or the First Lien Collateral Agent(s) in connection with any breaches and/or violations of under the Intercreditor Agreement (as defined in the Final Cash Collateral Order)."

*In re TCI 2 Holdings, LLC, 09-13654* (JHW) (Bankr. D.N.J. May 7, 2010)

Accordingly, whether or not Future Interest Claims accrue as a result of the EFIH Collateral Trust Agreement is ultimately irrelevant in the Plan confirmation context. The Plan provides for distributions to the EFIH Second Lien Notes Trustee on the EFH Effective Date, and, under the applicable provisions of the Bankruptcy Code, this Court can direct the EFIH Second Lien Notes Trustee to make those distributions, notwithstanding any language in the EFIH Collateral Agreement to the contrary.

The EFIH Claims Reserve is intended to contain funds sufficient to satisfy any Allowed EFIH First Lien Note Claims. As a result, the EFH/EFIH Debtors intend to seek a ruling pursuant to the EFIH Confirmation Order directing the EFIH Second Lien Notes Trustee to distribute to Holders of Allowed EFIH Second Lien Note Claims, on a pro rata basis, any Plan distributions received on or after the EFH Effective Date promptly after receipt of such Plan distributions.

**B. Trustee Indemnification Claims**.

The EFH/EFIH Debtors do not need to escrow any amounts in the EFIH Claims Reserve on account of any Trustee Indemnification Claims. Trustee Indemnification Claims consist of Claims that the EFIH First Lien Notes Trustee and EFIH Second Lien Notes Trustee may assert

against the EFIH Debtors as a direct consequence of a Holder of an EFIH First Lien Note Claim or EFIH Second Lien Note Claim, as applicable, asserting a Claim against the applicable Indenture Trustee.  The Debtors are not aware of the EFIH First Lien Notes Trustee or the EFIH Second Lien Notes Trustee estimating any amounts on account of the Trustee Indemnification Claims.  Consequently, the Trustee Indemnification Claims are wholly contingent and unliquidated Claims.

A Holder of an EFIH First Lien Note Claim or EFIH Second Lien Note Claim cannot assert a Claim against the applicable Indenture Trustee (a prerequisite for a Trustee Indemnification Claim) because, under the Plan, each Holder of an Allowed EFIH First Lien Note Claim and Allowed EFIH Second Lien Note Claim will receive, up to the Allowed amount of its Claim, payment in full, in Cash.  Such Holders are impaired only because the Liens on the collateral securing the EFIH First Lien Note Claims and the EFIH Second Lien Note Claims are being released on the EFH Effective Date (and being replaced with Liens on the EFIH Claims Reserve).  In other words, while such Holders' legal and equitable rights may be impaired by the release of Liens, their economic rights are wholly protected by way of their treatment under the Plan (i.e., payment, in full, in Cash).  As a result, such Holders have no basis to assert a Claim against the applicable Indenture Trustee because any recovery stemming from such a Claim would constitute a double recovery.  Double recoveries are not permitted by the Bankruptcy Code or applicable case law.  "In bankruptcy, multiple recoveries for an identical injury are generally disallowed."  *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993); *see Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir. 1989) ("In instances where a party's claims are simply alternative theories seeking relief for the same injury, that party is not entitled to a separate compensatory damage award under each legal theory." (quotations omitted)); *see also In re Prudential of Florida Leasing, Inc.*, 478 F.3d 1291 (11th Cir. 2007) (holding that section 550 of the Bankruptcy Code setting forth the rule barring the trustee from taking more than a "single satisfaction" on account of the same avoided transfer limits the trustee to a single satisfaction); *In re Bean*, 251 B.R. 196, 205 (E.D.N.Y. 2000), *aff'd*, 252 F.3d 113 (2d Cir. 2001) (same).  Thus, because Holders will have no basis to assert a Claim against the applicable Indenture Trustee, there will be no basis for the Indenture Trustees to assert a Trustee Indemnification Claim against the EFIH Debtors.

Moreover, because the EFIH Claims Reserve will be sufficient to pay the maximum amount of any Holder's Allowed Claim, there is no basis for separately escrowing any additional amounts on account of potential, unliquidated Trustee Indemnification Claims.  To the extent any Holder of an EFIH First Lien Note Claim or EFIH Second Lien Note Claim seeks to assert a Claim that would result in a Trustee Indemnification Claim against the applicable Indenture Trustee, such assertion could only arise as a result of such Holder receiving a Cash recovery in an amount less than such Holder's Allowed Claim.  The Debtors are seeking a ruling in the EFH Confirmation Order that the EFIH Claims Reserve satisfies the "indubitable equivalent" standard under section 1129(b)(2) of the Bankruptcy Code (i.e., that the EFIH Claims Reserve is sufficient to satisfy all Allowed EFIH First Lien Note Claims and EFIH Second Lien Note Claims in full, in Cash).

As a result, if a Holder receives less than its Allowed Claim, in full, in Cash, then the maximum amount of any Trustee Indemnification Claim is the applicable Indenture Trustee's liability to Holders for the difference between (a) such Holder's Allowed Claim and (b) such

Holder's total Plan distribution. Any possible difference in those amounts will already be included in the EFIH Claims Reserve because it will be set at the maximum amount of such Holder's Allowed Claim. An example of this analysis is set forth below.

The EFH/EFIH Debtors are proposing to escrow approximately $773 million on account of EFIH First Lien Makewhole Claims, including interest for three years.

- **Scenario 1**. The EFIH First Lien Makewhole Claim is ultimately Allowed in the amount of $600 million (solely by way of example). The EFIH First Lien Notes Trustee receives a Plan distribution on account of the EFIH First Lien Makewhole Claims in the amount of $600 million. The EFIH First Lien Notes Trustee distributes the full $600 million on a pro rata basis to Holders of Allowed EFIH First Lien Note Claims. No Holder of an Allowed EFIH First Lien Note Claim could have a colorable Claim against its Indenture Trustee related to the EFIH First Lien Makewhole Claim. Thus, the applicable Indenture Trustee would not have a colorable Trustee Indemnification Claim against the EFIH Debtors.

- **Scenario 2**. The EFIH First Lien Makewhole Claim is ultimately Allowed in the amount of $600 million (solely by way of example). The EFIH Debtors or the EFH Plan Administrator Board fails to make a full distribution to the EFIH First Lien Notes Trustee, on account of such Allowed Claim. A Holder of an EFIH First Lien Note Claim asserts a Claim against the respective Indenture Trustee for the deficiency portion of its pro rata distribution of the $600 million Allowed Claim. The maximum amount of each such Trustee Indemnification Claim is the Indenture Trustee's liability to each Holder for each Holder's deficiency claim for its pro rata share of the $600 million Allowed Claim, and the maximum aggregate amount of Trustee Indemnification Claims would be $600 million (i.e., the full, Allowed Claim amount). In each case, each Holder's Claim and the resulting Trustee Indemnification Claim ripens *only if* such Holder does not receive its pro rata distribution of its Allowed Claim. Because the maximum amount of Allowed Claim will be funded into the EFIH Claims Reserve in the amount set forth in the EFH Confirmation Order, there is no scenario in which the EFIH Debtors could bear incremental liability on account of the Trustee Indemnification Claims.

Moreover, nothing in the Plan prevents any Holder of an EFIH First Lien Note Claim, EFIH Second Lien Note Claim, or the respective Indenture Trustees to argue that if any EFIH First Lien Note Claims or EFIH Second Lien Note Claims that are disallowed by Final Order, such parties should have an opportunity to be heard before any amounts are released from the EFIH Claims Reserve. The Plan also provides that the Bankruptcy Court will retain jurisdiction with respect to such requests. *See, e.g.*, Article XI(8), XI(12), Plan. In other words, to the extent a liquidated Trustee Indemnification Claim ever materializes, there (a) exists sufficient funds in the EFIH Claims Reserve to satisfy such Allowed Trustee Indemnification Claim and (b) exists an opportunity for the respective Holders and respective Indenture Trustees to request a recovery on account of such Claim before any funds are distributed from the EFIH Claims Reserve to the EFH/EFIH Distribution Account.

**C.  Reservation of Rights**

Nothing contained in this exhibit or otherwise is intended or shall be deemed a waiver of any right of the EFH/EFIH Debtors to provide further support, and additional arguments, against the inclusion of any Claim in the EFIH Claim Reserve.  This exhibit is being included in the Plan Supplement for sole purpose of providing full disclosure and notice to all parties-in-interest.

**EXHIBIT C(3)**

**Additional Disclosures Regarding Distributions to Holders of
Allowed Claims Against the EFH/EFIH Debtors**

The EFH/EFIH Debtors provide the following additional disclosures regarding the currently contemplated timing and composition of Plan distributions to Holders of Allowed Claims Against the EFH Debtors and Holders of Allowed Claims Against the EFIH Debtors. The EFH/EFIH Debtors believe the transaction set forth below reflects a structure that will satisfy the necessary "continuity of interest" tax requirements with respect to the Merger. However, as contemplated by the Plan and the Merger Agreement, the cash/stock allocation and certain mechanics set forth below remain subject to modification depending upon the rulings ultimately received from the IRS.

The Plan contemplates that Holders of Allowed Claims in Classes A4 through A12 will receive their Pro Rata share of the EFH Creditor Recovery Pool, subject to the TCEH Settlement Claim Turnover Distributions, as applicable. The Plan also defines the EFH Creditor Recovery Pool to generally consist of (a) Reorganized EFH Class A Common Stock which shall, at the Merger Closing, convert to the right to receive the NextEra Class A Common Stock Investment and (b) any Cash remaining in the EFH/EFIH Distribution Account after payment in full of Allowed Claims against the EFIH Debtors and Allowed Administrative Claims and Allowed Priority Claims against the EFH Debtors, *provided*, *however*, that Holders of Allowed EFH Non-Qualified Benefit Claims shall receive Cash, in each case on the specific terms set forth in the Plan and Merger Agreement.

Upon the occurrence of the Merger Effective Time and the EFH Effective Date:

- (a) Holders of Allowed Claims in Classes A4 through A12 (other than Allowed EFH Non-Qualified Benefit Plan Claims) will receive, in the aggregate, Reorganized EFH Class A Common Stock (which will convert to NextEra Class A Common Stock pursuant to the Merger) in an aggregate amount estimated to be approximately $120 million. That amount will vary based on the Cash on hand at the EFH Debtors as of the EFH Effective Date (after accounting for reduction for any Allowed Administrative Claims Against the EFH Debtors, Allowed Priority Claims Against the EFH Debtors, estimates of any Administrative Claims or Priority Claims Against the EFH Debtors that may become Allowed following the EFH Effective Date, such Cash on hand at the EFH Debtors as of the EFH Effective Date, and certain other adjustments provided for in the Merger Agreement, the "<u>Adjusted EFH Cash Amount</u>").[1]

---

[1]    In the event the Adjusted EFH Cash Amount declines materially below currently-estimated levels, the Debtors may need to engage in adjustments to this structure, including, potentially, decreasing the Reorganized EFH Class A Common Stock issued pursuant to this paragraph and increasing the Makewhole Stock Reserve noted below. Similarly, if the Adjusted EFH Cash Amount increases materially above currently-estimated levels, then the

- (b) Holders of Allowed EFH Non-Qualified Benefit Claims will receive the distributions contemplated under the Plan.

- (c) An amount of Cash equal to (x) the sum of (1) the Adjusted EFH Cash Amount and (2) an additional amount of Cash equal to the amount of any estimated Administrative Claims or Priority Claims against the EFH Debtors that may become Allowed following the EFH Effective Date, which amounts have been factored into the determination of the Adjusted EFH Cash Amount; *minus* (y) the sum of (1) the amount of Reorganized EFH Class A Common Stock to be issued pursuant to subclause (a) above and (2) the amount of Cash distributed to Holders of Allowed EFH Non-Qualified Benefit Claims pursuant to subclause (b) above will be set aside in the form of Cash in a segregated account within the EFH/EFIH Distribution Account from the amounts therein for the purposes of satisfying any additional Administrative Claims against the EFH Debtors and Priority Claims against the EFH Debtors that may become Allowed after the EFH Effective Date and making distributions to Holders of Allowed Claims in Classes A4 through A12, to the extent any Cash remains after satisfaction of all Administrative and Priority Claims against the EFH Debtors.

Any Cash remaining at the EFH Debtors as of the EFH Effective Date after accounting for (a)-(c) above will remain on the balance sheet of Reorganized EFH.

On the EFH Effective Date, Reorganized EFH Stock (currently estimated to be approximately $30-40 million, the exact amount to be determined consistent with the Merger Agreement) equal to the difference between (1) the Adjusted EFH Cash Amount and (2) the Reorganized EFH Class A Common Stock issued on the EFH Effective Date will be set aside in a segregated account within the EFH/EFIH Distribution Account for distribution following entry of a Final Order rendering the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims as Allowed Claims or entry of a Final Order disallowing such EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims (or other final resolution of such Claims pursuant to a settlement) (the "Makewhole Stock Reserve"). The Reorganized EFH Stock in the Makewhole Stock Reserve shall be converted into NextEra Common Stock upon the occurrence of the Merger Effective Time. For the avoidance of doubt, none of the EFIH First Lien Notes Trustee, the EFIH Second Lien Notes Trustee, or any Holders of EFIH First Lien Makewhole Claims or EFIH Second Lien Makewhole Claims shall have a Lien on the Makewhole Stock Reserve, and in no event shall the stock in the Makewhole Stock Reserve ever be distributed to such Trustees or Holders.[2]

---

amount of Reorganized EFH Class A Common Stock issued pursuant to this paragraph may be increased.

[2] The Debtors intend that a minimum of $151 million of total stock (as valued for federal income tax purposes) will be issued. The Debtors are still evaluating the exact mechanic that will be used to address a situation in which the Adjusted EFH Cash Amount declines below $151 million, or a situation in which there is a meaningful difference between the value of

Upon entry of a Final Order or settlement that results in there being no additional distributions to Holders of Claims against the EFH Debtors in excess of those described above (*e.g.*, entry or an order that sustains the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims, or a settlement of such claims in an amount that does not result in a payment in full in Cash to Holders of Allowed Class B5 and B6 Claims), Holders of Allowed Class B5 and B6 Claims shall receive the stock in the Makewhole Stock Reserve, as set forth above. Upon entry of a Final Order or settlement that results in there being additional distributions to Holders of Allowed Claims against the EFH Debtors in excess of those described above (*e.g.*, the entry of a Final Order disallowing the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims), each Holder of an Allowed Class B5 Claim and Allowed B6 Claim shall receive a 100% distribution in cash on account of its respective Allowed Class B5 Claim and Allowed B6 Claim and the stock in the Makewhole Stock Reserve shall be included in the EFH Creditor Recovery Pool for distribution to Holders of Allowed Claims in Classes A4 through A12 (other than Allowed EFH Non-Qualified Benefit Plan Claims).

---

the stock as measured for tax purposes and the value of the stock as provided by the Merger Agreement.