## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re | ) | Case No. 14-10979 (CSS) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | (Jointly Administered) |
| *Debtors*. | ) | Related to D.I. 10551 |
| | ) | |

## OBJECTION OF DELAWARE TRUST COMPANY,
## AS TRUSTEE FOR THE EFIH FIRST LIEN NOTES,
## TO CONFIRMATION OF
## <u>SEVENTH AMENDED JOINT PLAN OF REORGANIZATION</u>

<u>WILMER CUTLER PICKERING HALE AND DORR LLP</u>

Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile: 212-230-8888
Philip.Anker@wilmerhale.com

Joel Millar
David Gringer
Isley Gostin
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: 202-663-6000
Facsimile: 202-663-6363
Joel.Millar@wilmerhale.com
David.Gringer@wilmerhale.com
Isley.Gostin@wilmerhale.com

<u>ROPES & GRAY LLP</u>

Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile: 212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA  02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

<u>DRINKER BIDDLE & REATH LLP</u>

James H. Millar
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
Telephone: 212-248-3264
Facsimile: 212-248-3141
James.Millar@dbr.com

<u>COLE SCHOTZ P.C.</u>

Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: 302-652-3131
Facsimile: 302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile: 201-489-1536
wusatine@coleschotz.com

*Counsel for Delaware Trust Company*        Dated:  February 3, 2017

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................1

ARGUMENT ..........................................................................................5

I.     THE PLAN DOES NOT COMPLY WITH SECTION 1129(b)'S REQUIREMENTS FOR THE TREATMENT OF SECURED CLAIMS .............5

    A.    Because The Plan Strips The Liens Of The Trustee And Noteholders, The Plan Cannot Be Confirmed Unless It Provides The "Indubitable Equivalent" Of Their Secured Claims ............................5

    B.    The EFIH First Lien Claims Are Over-Secured .........................................8

    C.    The Debtors Propose To Grant Replacement Collateral—The EFIH Claims Reserve—Worth Only $1.3 Billion .......................................9

    D.    The Plan Does Not Provide The "Indubitable Equivalent" Of The First Lien Claims..................................................................................12

        1.    The EFIH Claims Reserve Is Inadequate ........................................12

            a.    The Proposed Reserve Amount Covers Interest On The Make-Whole Claims For Only Three Years...............12

            b.    The Proposed Reserve Amount Covers First-Lien and Second-Lien Fees and Expenses For Only Three Years........................................................................22

            c.    The EFIH Claims Reserve Must Cover The First Lien Trustee's Breach Claim And Stay In Place Until It Is Resolved (Or Reserve Additional Funds For The Second Lien Trustee's Future Interest Claim) .............................................................................22

            d.    The Proposed Reserve Amount Does Not Cover Compound Interest Calculated On A Daily Basis .............27

        2.    The EFIH Claims Reserve Should Be Increased And No Distributions Should Be Made To The PIK Noteholders On The Effective Date .......................................................................28

        3.    The Plan Lacks Protections For The EFIH Claims Reserve..........32

        4.    The Plan Shortchanges The First And Second Lien Noteholders While Paying The Fees Of The Unsecured PIK Notes Trustee And EFH Plan Administrator Board ......................34

        5.    The Plan Must Preserve The Agreements Governing The Notes For Claims Against EFIH And The Inter-Creditor Action.............................................................................................35

II.    THE PLAN IS NOT FEASIBLE...........................................................36

III.    THE PLAN INCLUDES ADDITIONAL PROVISIONS THAT DO NOT COMPLY WITH SECTION 1129'S REQUIREMENTS ....................................36

    A.    The Fee Review Process ..............................................................................36

    B.    The Plan Asserts An Improper "Blanket Objection" ..................................38

    C.    To The Extent The Plan Could Be Read To Deny Any Other Rights Of The Trustee And The Noteholders, It Cannot Be Confirmed ...................................................................................................38

        1.    Plan Injunction of claims against the Released Parties ..................38

        2.    Right to prosecute makewhole appeal or other claims-allowance litigation ........................................................................39

        3.    Exclusive jurisdiction.....................................................................39

        4.    Drafting issues ...............................................................................39

JOINDER IN EFIH SECOND LIEN TRUSTEE'S OBJECTION TO PLAN ..................40

RESERVATION OF RIGHTS .....................................................................................40

CONCLUSION.............................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 4 Front Petroleum*,
  345 B.R. 744 (Bankr. N.D. Okla. 2006) ....................................................................24

*In re Allegheny International, Inc.*,
  954 F.2d 167 (3d Cir. 1992)......................................................................................38

*In re Arnold & Baker Farms*,
  85 F.3d 1415 (9th Cir. 1996) ..................................................................................6, 7

*In re Azabu Buildings Co.*,
  2007 WL 1964306 (Bankr. D. Haw. 2007) ................................................................8

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010).......................................................................24

*In re Continental Airlines*,
  25 F.3d 120 (3d Cir. 1997).........................................................................................24

*In re Dynamic Brokers, Inc.*,
  293 B.R. 489 (B.A.P. 9th Cir. 2003)..........................................................................38

*In re Energy Future Holdings Corp.*,
  842 F.3d 247 (3d Cir. 2016).......................................................................................16

*In re Investment Co. of the Southwest, Inc.*,
  341 B.R. 298 (B.A.P. 10th Cir. 2006) .....................................................................6, 7

*In re Murel Holding Corp.*,
  75 F.2d 941 (2d Cir. 1935).........................................................................................7

*In re Philadelphia Newspapers, LLC*,
  599 F.3d 298 (3d Cir. 2010), *abrogated on other grounds by RadLAX Gateway*
  *Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065 (2012) .....................................6, 7

*In re Prime Motor Inns*,
  130 B.R. 610 (S.D. Fla. 1991) ...................................................................................24

*In re River East Plaza, LLC*,
  669 F.3d 826 (7th Cir. 2012) ......................................................................................6

*In re San Felipe @ Voss, Ltd.*,
  115 B.R. 526 (S.D. Tex. 1990) ...................................................................................7

*In re School Specialty, Inc.*,
   2013 WL 1838513 (Bankr. D. Del. 2013) .................................................................19

*In re Simmons*,
   765 F.2d 547 (5th Cir. 1985) ......................................................................................38

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ...........................................................................24

*In re Trico Marine Services, Inc.*,
   450 B.R. 474 (Bankr. D. Del. 2011) ..........................................................................19

*In re U.S. Mineral Products*,
   2005 WL 5898300 (Bankr. D. Del. 2005) ...................................................................8

*In re Wheeling-Pittsburgh Steel Corp.*,
   123 B.R. 18 (Bankr. W.D. Pa. 1990) ...........................................................................8

*Law v. Siegel*,
   134 S. Ct. 1188 (2014) ..............................................................................................19

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   132 S. Ct. 2065 (2012) ................................................................................................5

*Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*,
   549 U.S. 443 (2007) ..................................................................................................19

*United States v. Noland*,
   517 U.S. 535 (1996) ..................................................................................................19

## STATUTES, RULES, AND REGULATIONS

11 U.S.C.
   § 345..........................................................................................................................34
   § 501..........................................................................................................................38
   § 502(a) .....................................................................................................................38
   § 1127(a)-(b) .............................................................................................................31
   § 1129(a)(1) .........................................................................................................38, 39
   § 1129(a)(11) .............................................................................................................36
   § 1129(b)(2)(A)(i).......................................................................................................5
   § 1129(b)(2)(A)(iii).....................................................................................................5

3d Cir. Local Rules
   35.1............................................................................................................................15
   35.4............................................................................................................................15

Fed. R. App. P. 35(a) ......................................................................................................15

Fed. R. Bankr. P.
   3001(f)........................................................................................................38
   3007(a).......................................................................................................38

Sup. Ct. R.
   13.1...........................................................................................................16
   13.3...........................................................................................................16
   15.3...........................................................................................................16
   15.5...........................................................................................................16
   15.6...........................................................................................................16

UCC
   § 9-104 ....................................................................................................32
   § 9-106 ....................................................................................................32
   § 9-314(a) ................................................................................................32
   § 9-327 ....................................................................................................32
   § 9-328 ....................................................................................................32

## OTHER AUTHORITIES

Court Of Appeals Of The State Of New York, 2015 Annual Report Of The Clerk
   Of The Court, *available at*
   https://www.nycourts.gov/ctapps/news/annrpt/AnnRpt2015.pdf...............................16

Delaware Trust Company, indenture and collateral trustee ("Trustee" or "First Lien Trustee") for the first-lien notes ("Notes" or "First Lien Notes") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (together, "EFIH" or the "EFIH Debtors"), submits this objection (the "Objection") to the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., D.I. 10551 (the "Plan").[1]

## **PRELIMINARY STATEMENT**

The Plan cannot be confirmed because (among other defects) it fails to provide the Trustee and holders of the Notes (the "Noteholders" or "First Lien Noteholders") with the "indubitable equivalent" of their Secured Claims.

The Third Circuit has held that EFIH is contractually obligated to pay the Makewhole Claims of the First Lien Noteholders and the holders (the "Second Lien Noteholders") of the second-lien notes issued by EFIH (the "Second Lien Notes"). Today, those Makewhole Claims, together with the fees and expenses incurred in defending those Claims, all related Claims for damage and the like, and all interest accruing thereon, are over-secured by liens on EFIH's interest in Oncor. After repayment of the only senior Claim—the DIP facility—that collateral is worth some $4.3 billion.

The Plan replaces that collateral with something worth far less. Rather than pay the Makewhole Claims on the Effective Date, the Plan provides that a litigation vehicle controlled by holders of the unsecured "PIK" notes (the "PIK Noteholders") will continue the makewhole litigation indefinitely. The Makewhole Claims will be paid only after all objections have been exhausted and those Claims have been allowed by final, non-appealable orders. In the interim, the Plan releases the Noteholders' liens on EFIH's

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Plan.

interest in Oncor, disclaims any obligation by NextEra or the Reorganized Debtors to satisfy the Makewhole Claims, and provides a replacement lien only on a cash reserve— the EFIH Claims Reserve—that would be the sole source of recovery for any allowed Makewhole or other Claims in respect of the EFIH First Lien Notes.  The Debtors—at the insistence of the PIK Noteholders—propose to fund the EFIH Claims Reserve with only $1.313 billion (the "Proposed Reserve Amount") and to distribute the remaining $3 billion of the Noteholders' collateral to junior creditors on or soon after the Effective Date, including as much as $700 million or so to the PIK Noteholders.

The Plan does not provide the "indubitable equivalent" of the Noteholders' over-Secured Claims because it does not ensure payment in full of those Claims to the extent they are ultimately allowed.  The Proposed Reserve Amount reserves interest on the Makewhole Claims for only three years after the Effective Date.  The EFIH Claims Reserve will therefore almost surely be insufficient to pay, in full, all Claims under the Notes (the "First Lien Claims"), and all Claims under the Second Lien Notes ("Second Lien Claims"), if the litigation continues beyond three years.  Yet, the PIK Noteholders have refused to agree to terminate the litigation three years after the Effective Date.  If they are set on exhausting all remaining challenges to the Third Circuit's decision, "Phase Two" on remand, and appeals thereto, the litigation could easily drag on past three years.

The PIK Noteholders' desire to litigate EFIH's solvency and alleged bankruptcy-law defenses to the Makewhole Claims in Phase Two underscores the other principal problem with the EFIH Claims Reserve.  Even if EFIH's supposed insolvency provided grounds for disallowing the Makewhole Claim against EFIH (and it does not), it would not provide any basis for disallowing a claim by the First Lien Trustee or Noteholders

2

against the trustee for the Second Lien Notes (the "<u>Second Lien Trustee</u>") and the Second Lien Noteholders under the parties' inter-creditor agreement.  That agreement—the EFIH Collateral Trust Agreement—requires the Second Lien Trustee and Second Lien Noteholders to turn over any distributions they receive from the creditors' common collateral to the First Lien Trustee until all First Lien Claims, whether or not allowed against EFIH in bankruptcy, are paid in full.  Indeed, to further assure payment in full of the First Lien Claims, EFIH is a party to the Collateral Trust Agreement and obligated thereunder to refrain from making distribution to the Second Lien Trustee and Noteholders until the First Lien Notes are paid in full.  Yet, in violation of the Collateral Trust Agreement, EFIH proposes to distribute $2.2 billion to the Second Lien Trustee on the EFH Effective Date in principal and accrued interest on the Second Lien Notes.

Accordingly, the Plan must be clear that the EFIH Claims Reserve covers, not just the Makewhole Claim, but (if that Claim is disallowed) the First Lien Trustee's separate Claim against EFIH for breaching its obligation under the Collateral Trust Agreement to refrain from making any such distributions in respect of the Second Lien Notes (a "<u>Breach Claim</u>").  The Plan must likewise be clear that the EFIH Claims Reserve stays in place until the Breach Claim is resolved—and hence until *both* the makewhole and inter-creditor litigations are resolved.  That further reinforces the inadequacy of a three-year reserve.  And if either EFIH, or the Second Lien Trustee, does hold back distributions to the Second Lien Noteholders as required by the Collateral Trust Agreement, the Proposed Reserve Amount is again inadequate, because it does not reserve for the Second Lien Noteholders' Future Interest Claims that would accrue on the amount held back.

Because the Debtors recognized that their proposal for funding the EFIH Claims Reserve was suspect at best, they insisted in their negotiations with the PIK Noteholders that the Plan permit the Court to order the Debtors to fund the EFIH Claims Reserve in a greater amount.[2]  The PIK Noteholders agreed to support the Plan no matter how large a reserve the Court requires—even if the Court orders that no distributions can be made to them until all First and Second Lien Claims have either been paid in full, or disallowed by Final Order.[3]  And the Court can, of course, order that EFIH comply with its obligations under the Collateral Trust Agreement to withhold distributions to the Second Lien Noteholders until all allowed First Lien Claims have been paid, and direct it to add to the EFIH Claims Reserve the amount needed to cover the Future Interest Claims of the Second Lien Noteholders (and/or, if EFIH is determined to breach the Collateral Trust Agreement, the amount needed to cover the interest and fees accruing through resolution of, not just the Makewhole Claims, but also the First Lien Trustee's Breach Claim).

After repayment of the DIP facility and hold back (or repayment) of the $2.2 billion in Second Lien principal and interest, around $2.1 billion will remain.  At a minimum, the Court should order that all of that be placed in the EFIH Claims Reserve, and none distributed to the PIK Noteholders on the Effective Date.  It should also order that the EFIH Claims Reserve remain in place until all Claims of the First Lien Notes and Second Lien Notes, including any Breach Claim or Future Interest Claim, has been resolved by Final Order.  Deferring until a later date the consideration of various

---

[2] See Plan Art. I.A.161 (definition of "EFIH Claims Reserve"); Deposition of Paul Keglevic (Jan. 18, 2017) ("Keglevic Dep."), attached as Exhibit A to the Declaration of Philip Anker filed herewith ("2017 Anker Decl."), at 91:3-91:24.
[3] See Notice of Filing of that Certain Plan Support Agreement, D.I. 10530, Ex. A, § 7 & Schedule 1; Deposition of Anthony Horton (Jan. 20, 2017) ("Horton Dep."), attached as Exhibit B to the 2017 Anker Decl., at 92:8-93:3; Keglevic Dep. 61:25-63:20.

intramural disputes of the Claims (whether for reserve or allowance purposes) is the most prudent course for this Court and the Debtors' estates, if they really want to proceed with a streamlined confirmation hearing and do not want to endanger the transaction with NextEra.

The Plan also contains other objectionable provisions, many of which could be addressed by the proposed modifications set forth in Exhibit A hereto.  These proposed modifications would not, however, resolve the Trustee's objections to the EFIH Claims Reserve, which must be increased in amount, and remain in place until all EFIH First Lien Claims have been finally resolved, to provide the Noteholders with the "indubitable equivalent" of their over-Secured Claims.

## ARGUMENT

I.    **THE PLAN DOES NOT COMPLY WITH SECTION 1129(b)'S REQUIREMENTS FOR THE TREATMENT OF SECURED CLAIMS**

A.    **Because The Plan Strips The Liens Of The Trustee And Noteholders, The Plan Cannot Be Confirmed Unless It Provides The "Indubitable Equivalent" Of Their Secured Claims**

Where, as here, a plan allows the debtor to keep an over-secured creditor's collateral and to pay the secured creditor over time, the secured creditor generally must retain its lien on its collateral until it is paid in full.  *See* 11 U.S.C. § 1129(b)(2)(A)(i); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-2072 (2012). If, as here, the debtor seeks the extraordinary relief of stripping off an over-secured creditor's lien before paying its claim in full, *see* Plan Art. VIII.B (releasing liens securing First Lien Claims on Effective Date), the Bankruptcy Code mandates that the plan must ensure the secured creditor will realize the "indubitable equivalent" of its secured claim.  11 U.S.C. § 1129(b)(2)(A)(iii).

As the Third Circuit has explained, "[i]ndubitable means 'not open to question or doubt,' while equivalent means one that is 'equal in force or amount' or 'equal in value.' The Code fixes the relevant 'value' as that of the collateral.  Thus, the 'indubitable equivalent' under subsection (iii) is the unquestionable value of a lender's secured interest in the collateral."  *In re Phila. Newspapers, LLC*, 599 F.3d 298, 310 (3d Cir. 2010) (Fisher, J., majority opinion), *abrogated on other grounds by RadLAX*, 132 S. Ct. 2065; *accord id.* at 326 (Ambro, J., dissenting) ("'Indubitable equivalent' is not defined in the Code, but there can be no doubt that the secured creditor receives consideration equal to its claim in value or amount.").

Accordingly, where, as here, a debtor gives an over-secured creditor substitute collateral, that substitute must not increase the secured creditor's risk that it may become under-secured and not be paid in full.  The "substitute collateral [must] give[] the creditor an ample cushion against becoming undersecured," so that the substitute collateral "doesn't increase the risk of [the creditor] becoming undersecured in the future."  *In re River E. Plaza, LLC*, 669 F.3d 826, 831 (7th Cir. 2012).  In other words, where "'a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure."  *In re Arnold & Baker Farms*, 85 F.3d 1415, 1422-1423 (9th Cir. 1996).  "The indubitable equivalent standard requires both the absence of any reasonable doubt that the secured creditor will receive the payments to which it is entitled, and that the changes forced upon the objecting creditor are 'completely compensatory,' meaning the objecting creditor is fully compensated for the rights it is giving up."  *In re Inv. Co. of the Sw., Inc.*, 341 B.R. 298, 324 (B.A.P. 10th Cir. 2006).

Thus, a debtor's desire "to tap at least some portion of the equity that has built up in collateral to fund a plan" "cannot result in any reasonable possibility that a creditor will not be fully protected at all times until its claim is satisfied." *See id.* at 324-326. If any "scenario reasonably exists where the [substituted] collateral would not fully secure [the creditor's] debt," the plan does not satisfy the "indubitable equivalent" standard. *Id.* Instead, the court must "without a reasonable doubt conclude that [the secured creditor] will in fact remain oversecured until it is paid in full." *Id.*; *see Arnold & Baker Farms*, 85 F.3d at 1422-1423 (holding that plan giving over-secured creditor only part of its real-estate collateral did not provide "indubitable equivalent"; though bankruptcy court valued that portion in excess of creditor's claim, creditor was "forced to assume the risk of receiving less on the sale without being able to look to the remaining undistributed collateral for security").

As Judge Hand put it in *Murel*, the decision establishing the "indubitable equivalent" standard now embodied in the Code (*see Phila. Newspapers*, 599 F.3d at 310), an over-secured creditor must either "get [its] money or … the property" when the plan goes effective, or it must get a "substitute of the most indubitable equivalence" to that payment-in-full treatment. *In re Murel Holding Corp.*, 75 F.2d 941, 942-943 (2d Cir. 1935). A secured creditor cannot be forced to accept any substitute that puts it at risk of not being paid everything it is owed. And the "indubitable equivalent" standard requires that the substitute collateral be sufficient to ensure that the full amount of the secured creditor's asserted claim—even those amounts the debtor has challenged in pending litigation—will, if ultimately allowed, be paid in full. *See Inv. Co. of the Sw.*, 341 B.R. at 303-304, 324 n.83; *In re San Felipe @ Voss, Ltd.*, 115 B.R. 526, 531 (S.D. Tex. 1990); *In*

*re U.S. Mineral Prods.*, 2005 WL 5898300, at *12-13, *22 (Bankr. D. Del. 2005); *In re Azabu Bldgs. Co.*, 2007 WL 1964306, at *8 (Bankr. D. Haw. 2007); *In re Wheeling-Pittsburgh Steel Corp.*, 123 B.R. 18, 21-22 (Bankr. W.D. Pa. 1990).

### B.    The EFIH First Lien Claims Are Over-Secured

There is no dispute that, if the First Lien Claims were all allowed as of the Effective Date, EFIH would be able to pay them in full in cash.  The Trustee and Noteholders have asserted a Makewhole Claim of approximately $432 million that came due on June 19, 2014, when EFIH redeemed the Notes.  In accordance with the relevant indentures, they have also asserted a Claim for interest on the makewhole, at the contractual rate, from the redemption date until the makewhole is paid in full, as well as interest on such interest (i.e., compound interest).[4]  In addition, the Trustee has asserted a Claim for reimbursement of the fees and expenses incurred in enforcing the First Lien Note Indentures, Collateral Trust Agreement, and Pledge Agreement, together with related damage claims and/or interest thereon.[5]  If the Effective Date occurs on April 30, 2017, as the Debtors target, the Trustee estimates these Claims will total approximately $633 million.[6]

Today, these Claims are secured by first-priority liens on substantially all of EFIH's assets, including its interest in Oncor.[7]  That collateral is worth far more than the current amount of those Claims.  NextEra's acquisition of EFIH and its interest in Oncor

---

[4] *See* Supplemental Indenture Ex. A ("Notes"), attached as Exhibit E to Declaration of Philip Anker, D.I. 6602 ("2015 Anker Decl."), § 1.

[5] *See* EFIH First Lien Notes Indenture ("Indenture"), attached as Exhibit C to 2015 Anker Decl., § 7.07; Collateral Trust Agreement ("Collateral Trust Agreement"), attached as Exhibit A to 2015 Anker Decl., § 7.10, 7.11; Pledge Agreement ("Pledge Agreement"), attached as Exhibit B to 2015 Anker Decl., § 15.

[6] *See* Expert Report of Christopher J. Kearns (Jan. 25, 2017) ("Kearns Report"), attached as Exhibit H to Anker 2017 Decl., at 8-12.

[7] *See* Collateral Trust Agreement § 1.1 (definitions of "Parity Lien Obligations" and "Obligations"), § 2.1; Pledge Agreement § 1; Indenture § 10.04.

will generate approximately $9.8 billion for EFIH.[8]  After payment of the EFIH DIP

facility of approximately $5.5 billion, approximately $4.3 billion will remain.[9]  The

Trustee and Noteholders have priority over all other creditors to that $4.3 billion in

value.[10]  The Debtors admit there is more than sufficient value to pay all First Lien

Claims (and Second Lien Claims) in full on the Effective Date.[11]

> **C.**     **The Debtors Propose To Grant Replacement Collateral—The EFIH Claims Reserve—Worth Only $1.3 Billion**

Although the Bankruptcy Code requires that the Trustee and Noteholders be paid

in full, the Plan limits the source of recovery for such payment.  It would release the

Trustee's and Noteholders' liens on the Effective Date and would relieve Reorganized

EFIH and NextEra from any liability for Makewhole Claims.[12]  The only source of

recovery for such Claims would apparently be the EFIH Claims Reserve.[13]

The EFIH Claims Reserve is to be funded with cash from proceeds of the First

and Second Lien Trustees' collateral to pay any Makewhole Claims or other Claims of

the First and Second Lien Noteholders that are ultimately allowed.  *See* Plan Art. I.A.161.

The First and Second Lien Trustees will receive first and second-priority liens on the

EFIH Cash Reserve to secure the First and Second Lien Claims, respectively.[14]  The

amount of the EFIH Claims Reserve will be either (1) an amount agreed by the Debtors

and PIK Noteholders—who have every incentive to underfund the reserve, since they

will recover any value not allocated to the First and Second Lien Noteholders—or (2) any

---

[8] Horton Dep. 16:7-16:11; Keglevic Dep. 39:14-39:18.
[9] Horton Dep. 16:12-17:5; Keglevic Dep. 39:19-40:17.
[10] Keglevic Dep. 39:19-40:17, 49:15-49:19.
[11] Deposition of Andrew Wright (Jan. 26, 2017) ("Wright Dep."), attached as Exhibit C to the 2017 Anker Decl., at 31:7-31:12.
[12] *See* Plan Art. VIII.B; *id.* Art. VI.A; Wright Dep. 41:23-42:21.
[13] *See* Keglevic Dep. 54:8-54:14.
[14] *See* Plan Arts. III.B.19(b), III.B.20(b).

greater amount this Court may require.  *See* Plan Art. I.A.161.  Neither Reorganized

EFIH nor NextEra will have any obligation under any circumstances to contribute cash to

the EFIH Claims Reserve after the Effective Date.  *See id.*

Of the $4.3 billion in collateral value currently securing the First and Second Lien

Claims, the Debtors and PIK Noteholders propose to deposit only $1.313 billion in the

EFIH Claims Reserve and to distribute the remaining $3 billion to junior creditors—

including as much as $700 million to the PIK Noteholders.[15]  Specifically, EFIH plans to

distribute approximately $2.2 billion on the Effective Date to the Second Lien Trustee to

repay the outstanding principal and interest on the Second Lien Notes.[16]  EFIH will also

pay administrative expenses, currently estimated to be approximately $10 million for

EFIH.[17]  The Debtors will also fund $72 million ($2 million per month for three years) to

establish a "Post-Effective Date Administrative Account" to pay the post-Effective Date

fees and expenses of the EFH Plan Administrator Board and the MLOC (the estate's

post-Effective Date representatives) in continuing to challenge the Makewhole Claims.[18]

Finally, the Debtors propose to distribute the remaining balance, estimated to be around

$700 million or more, to the PIK Noteholders.[19]

While the PIK Noteholders will receive this distribution on or shortly after the

Effective Date, the Plan contemplates indefinite litigation over the Makewhole Claims.

The litigation will be pursued by the "EFH Plan Administrator Board," under the

supervision of a "Makewhole Litigation Oversight Committee" (the "<u>MLOC</u>"), which

---

[15] Excerpted Ying Report ("<u>Ying Report</u>"), Amended Plan Supplement, D.I. 10729 ("<u>Am. Plan Supp.</u>"), Ex. C(1); Horton Dep. 13:19-15:6, 17:2-17:9; Keglevic Dep. 40:18-41:8, 49:15-50:12.
[16] Horton Dep. 20:18-21:4; Keglevic Dep. 40:23-41:11; Am. Plan Supp., Ex. C(2).
[17] Am. Plan Supp., Ex. B.
[18] Plan Arts. I.A.339 (definition of "Post-Effective Date Administrative Account"), VII.K.1, VII.K.3; Am. Plan Supp., Ex. B.
[19] Horton Dep. 26:13-26:23, 34:7-36:11; Keglevic Dep. 43-44:2, 44:24-45:25.

will control decisions to litigate or settle the Makewhole Claims.  *See* Plan Art. VII.K.

The members of the MLOC will be the principal holders of the unsecured PIK Notes—

Avenue, GSO, York, and potentially Angelo Gordon.[20]

      The Plan provides that any Makewhole Claims allowed by Final Order, together

with all contractual interest (including interest on interest), must be paid in full in cash.

*See* Plan Art. III.B.19(b)(iv), (c).  It also provides that all reasonable and documented

fees and expenses, incurred before or after the Effective Date, allowed under section

506(b) (as to pre-effective date fees only) and under the applicable agreements, together

with contractual interest, must be paid in full in cash.  *Id.* Art. III.B.19(b)(iii), (c).

Finally, it provides that "any other Claims" allowed by Final Order—including

presumably the Trustee's Breach Claim if EFIH does not hold back distributions to the

Second Lien Noteholders—together with all contractual interest (including interest on

interest), must be paid in full in cash.  *Id.* Art. III.B.19(b)(iv), (c).  The Second Lien

Claims receive similar treatment.  *Id.* Art. III.B.20(b)(iii)-(iv), (c).

      As the litigation continues, however, the amount of the First Lien Claims (and

Second Lien claims) will increase over time, potentially by a substantial sum.  That is so

for at least three reasons.  *First*, interest will accrue on the Makewhole Claim (and on the

interest thereon) until the makewhole (and such interest) is paid in full.  Similarly, to the

extent that pre-Effective Date fees and expenses are not paid on the Effective Date,

interest will also accrue on such fees (and on the interest thereon) until such amounts are

paid in full.  *Second*, the Trustee will incur post-Effective Date fees and expenses in

connection with the litigation (as well as in the inter-creditor litigation).  *Third*, if EFIH

---

[20] *See* Stipulation of Facts attached as Exhibit D to the 2017 Anker Decl. ("PIK Stip.") at ¶ 1; Keglevic Dep. 67:10-69:3; Wright Dep. 69:4-69:7.

does not honor its obligation under the Collateral Trust Agreement to withhold distributions to the Second Lien Noteholders until all claims of the First Lien Noteholders have been paid in full, the Trustee will also have the Breach Claim for EFIH's default.

> **D.      The Plan Does Not Provide The "Indubitable Equivalent" Of The First Lien Claims**

Although the Trustee and Noteholders are over-secured today, the Debtors propose to drastically reduce their security, replacing their lien on $4.3 billion of value with a non-recourse lien on a fixed cash reserve of only $1.3 billion, while distributing the remaining $3 billion in value to junior creditors on or soon after the Effective Date. Meanwhile, the amount of the First and Second Lien Claims will increase the longer the PIK Noteholders continue litigating, as interest (accruing at more than $250,000 a day) and fees mount, thereby eroding their security position.  As described below, the First and Second Lien Claims could surpass the $1.3 billion mark less than two years after the Effective Date, and certainly by the third anniversary of the Effective Date, if the litigation has not been resolved by then, exposing the Noteholders to the risk that they will not be paid in full.  Unless this Court, at a minimum, requires the Debtors to fund the EFIH Claims Reserve with all remaining $2.1 billion in collateral proceeds (after repayment of the DIP facility and hold back of the $2.2 billion in Second Lien principal and interest)—with no distribution to the PIK Noteholders on the Effective Date—the Plan will not provide the "indubitable equivalent" of the Noteholders' Secured Claims.

> **1.      The EFIH Claims Reserve Is Inadequate**

> > **a.      The Proposed Reserve Amount Covers Interest On The Make-Whole Claims For Only Three Years**

The Plan provides that unless this Court orders otherwise, the EFIH Claims Reserve will be funded in an amount sufficient to pay contractual, compound interest on

the Makewhole Claims of the First Lien and Second Lien Notes for only three years after the Effective Date. *See* Plan Art. I.A.161 (definition of "EFIH Claims Reserve").

In proposing this limit, the EFIH board did not determine that three years was the longest possible timeframe for the Makewhole litigation. Rather, three years was the most the Debtors could negotiate with the PIKs, who will benefit from a shortfall in the EFIH Claims Reserve.[21] Yet, the Debtors admit that if the litigation lasts beyond three years, the Proposed Reserve Amount—which includes interest for only three years[22]—will almost assuredly be insufficient to pay the First and Second Lien Claims in full.[23]

The Debtors point to a selective review, prepared by Kirkland & Ellis, of other cases purporting to show that three years is sufficient.[24] That review does not withstand scrutiny. As described below, the Debtors' review demonstrates that the relief they are requesting from the Third Circuit—rehearing and certification to the New York Court of Appeals—could prolong the appellate proceedings by upwards of two years or more. And the Debtors do not account for additional paths the appeal could take, which could prolong it further.

***But the most significant defect in the Debtors' review is that it assumes that the PIK Noteholders will not commence "Phase Two" of the Makewhole litigation on remand—even though the PIK Noteholders have already pressed the Debtors to do so.***

---

[21] *See* Keglevic Dep. 92:15-93:19, 98:21-99:6 ("Q. The board did not determine what the longest realistic timeframe for litigation might be, did it? A. The board did not. The board – we relied on the fact – well, number one, the board was told that that's the most the PIKs, we could get them to do, and the other provisions of the deal, and the board then was told that that was a conservative estimate based on Kirkland's analysis."); Horton Dep. 89:25-92:7 ("Q. And the PIKs refused to agree to have a minimum period longer than three years; is that right? A. That's correct. Q. Okay. A. Unless the judge ordered otherwise.").

[22] *See* Disclosure Statement at 18; Ying Report at 12; Horton Dep. 51:12-55:11; Keglevic Dep. 58:12-58:16.

[23] *See* Keglevic Dep. 60:25-61:13, 85:7-86:3; Horton Dep. 53:3-55:11; Wright Dep. 68:16-69:3.

[24] *See* Am. Plan Supp., Ex. E.

13

If there is a Phase Two, and the PIK Noteholders continue to appeal and seek rehearing from all adverse decisions, the litigation could extend well beyond three years.  The Debtors' review simply disregards Phase Two altogether.

The Trustee and the Noteholders, of course, believe that any remaining challenges the PIK Noteholders may bring in Phase Two are without merit and that the Makewhole Claims will, consistent with the Third Circuit's controlling decision, be allowed.  Indeed, following the Third Circuit's decision, Debtors' counsel (Kirkland & Ellis) recommended, and the EFH/EFIH Debtors' respective boards of directors approved, an agreement in principle with the First Lien and Second Lien Noteholders to settle the First Lien Makewhole Claims at 97% and the Second Lien Makewhole Claims at 92% (or 94-95% and 85-87.5%, respectively, if the PIK Noteholders agreed to support a plan implementing those settlements).[25]  Moreover, even after the Debtors pivoted to the PIK deal, they still took the position that the proposed settlement was "certainly within the realm of a reasonable settlement range for the Make-whole Litigation."[26]

Likewise, the PIK Noteholders have asserted their own Makewhole Claims.  The principal holders of the PIK Notes—Avenue, GSO and York—voiced no objection when the Trustee for the PIK Notes (the "PIK Notes Trustee") filed a proof of claim asserting a Makewhole Claim on their behalf, and when the PIK Notes Trustee opposed the Debtors' objection to that Makewhole Claim, asserting (among other things) that:

> "Section 3.07 of the PIK Indenture unambiguously provides that the PIK Noteholders are entitled to payment of a call premium if, following a bankruptcy-triggered acceleration, the EFIH Debtors repay or 'call' the PIK Notes prior to certain dates set forth therein."

---

[25] *See* Disclosure Statement at 12-13; Energy Future Holdings Corp. Form 8-K (Dec. 16, 2016) ("EFH Form 8-K"), attached as Exhibit E to 2017 Anker Decl., at 2-4.

[26] *See* Debtors' Omnibus Reply, D.I. 10516, at 8; Keglevic Dep 17:19-18:11, 20:10-21:9, 23:3-24:15, 26:15-27:6; Horton Dep. 103:16-103:22.

*See* PIK Stip. ¶ 2 (quoting Response of UMB Bank, D.I. 5788, at 2).  Indeed, those same

holders (Avenue, GSO and York) will run the MLOC, and any post-Effective Date

challenges the MLOC asserts against the First and Second Lien Makewhole Claims may

therefore be met with arguments that the PIK Noteholders are estopped by their own

trustee's position that their Makewhole Claims were valid.

Nonetheless, regardless of the weakness of any remaining challenges to the First

and Second Lien Makewhole Claims, there is no assurance that the litigation will be

resolved within three years.  The PIK Noteholders have stipulated that "[e]ach of

Avenue, GSO and York is not prepared … to agree, to avoid any risk of a Shortfall, … to

drop any ongoing or further challenges to the … Makewhole Claims … by the third

anniversary of the EFH Effective Date."  PIK Stip. at ¶ 6(c); Horton Dep. 73:10-73:20,

74:5-75:25.  Rather, the PIK Noteholders have indicated to the Debtors that they "want to

keep all of their options open" as to all available challenges to the Makewhole Claims.

*See* Horton Dep. 97:4-99:4.

They might, for example, pursue the Debtors' pending petition for panel rehearing

or rehearing *en banc*.  *See* No. 16-1351 (3d Cir. Dec. 15, 2016).  In that petition, the

Debtors requested (for the first time) that the Third Circuit certify to the New York Court

of Appeals the question of contract interpretation that the Third Circuit decided, or in the

alternative, that it hold the petition until the Second Circuit decides *Momentive* (No. 15-

1682), which was argued in November 2016.

To be sure, the Third Circuit rarely grants petitions for rehearing, particularly

where (as here) the panel decision is unanimous.  *See* Fed. R. App. P. 35(a); 3d Cir. Local

Rules 35.1, 35.4; 3d Cir. IOP 9.3.  But even if the Third Circuit were to deny the petition,

the Debtors and the PIK Noteholders could file a petition for certiorari with the U.S. Supreme Court.  Indeed, the review that Kirkland performed for the EFIH Board assumes that the PIK Noteholders would so insist.  *See* Am. Plan Supp., Ex. E.  Even if a cert petition were denied, the four-month briefing schedule means a decision would likely come next term, in October 2017 or later.  *See* Sup. Ct. R. 13.1, 13.3, 15.3, 15.5, 15.6.

Moreover, though perhaps unlikely, the appeal could take other paths that would prolong the proceedings.  If *Momentive* were decided in a way contrary to the Third Circuit's decision while EFIH's petition for rehearing or cert were pending, and the Third Circuit were persuaded to certify the question to the New York Court of Appeals, an answer could take more than eight months (based on average times in 2015).[27] Moreover, if the outcome led the Third Circuit to reverse its ruling on contract interpretation, it would then need to reach the three additional, independent, grounds for reversal that the Trustee raised on appeal, but which the Third Circuit never reached.[28] Any decision on those grounds then could be subject to petitions by the losing party for rehearing in the Third Circuit and for certiorari in the Supreme Court.

Indeed, the Debtors' own review estimated that, even if the petitions for rehearing and certiorari are denied, it could take nearly nine months from the Third Circuit's decision (on average) for the appellate proceedings to conclude.[29]  And if rehearing were granted and the question certified to the New York Court of Appeals, the Debtors' review concluded that it could take one year and 8 months (on average)—or as much as *two*

---

[27] *See* Court Of Appeals Of The State Of New York, 2015 Annual Report Of The Clerk Of The Court, at 10, *available at* https://www.nycourts.gov/ctapps/news/annrpt/AnnRpt2015.pdf.  The Debtors' review is in accord.  *See* Am. Plan Supp., Ex. E (average time of 262 days).

[28] *See* Brief for Appellants, No. 16-1351 (3d Cir. May 9, 2016), at 34-59; *In re Energy Future Holdings Corp.*, 842 F.3d 247, 261 n.4 (3d Cir. 2016).

[29] *See* Am. Plan Supp., Ex. E.

years and 8 months—from the Third Circuit's decision before the proceedings would be resolved.[30]  And that assumes a petition for certiorari would be denied.[31]

But even if all remaining challenges the Debtors and PIK Noteholders might pursue in the Third Circuit and the Supreme Court are rejected, they could still bring additional challenges to the Makewhole Claims on remand in Phase Two of the makewhole litigation.  **Remarkably, the Debtors' analysis of the likely duration of the makewhole litigation fails to allot *any* time for Phase Two.**[32]

The Court bifurcated the makewhole litigation, with "Phase One" to "determine whether the EFIH Debtors are liable under applicable non-bankruptcy law for or on a Redemption Claim," and "Phase Two" to "determine (a) whether the EFIH Debtors are insolvent, and, if so, whether that insolvency gives rise to any defenses arising under the Bankruptcy Code in favor of the EFIH Debtors that bar or limit the amount of such a Redemption Claim," as well as to determine the amount of the Makewhole Claims if allowed.  *See* Bifurcation Order, No. 14-50363, D.I. 128, at 2.

The PIK Noteholders have given no indication that they are willing to forgo Phase Two (and, in any event, there will need to be at least that portion of Phase Two to liquidate the allowed amount of the Makewhole Claims, together with interest).[33]  In fact, after the Third Circuit issued its decision, the PIK Notes Trustee served a Rule 30(b)(6) deposition notice on the Debtors regarding "Proposed Phase 2 of the Makewhole Litigation."[34]  And hours after the Third Circuit issued its decision, counsel to the PIK

---

[30] *See id.*
[31] *See* Wright Dep. 79:11-79:25.
[32] *See* Am. Plan Supp., Ex. E; Wright Dep. 88:14-90:3.
[33] *See* Keglevic Dep. 73:12-73:17.
[34] *See* Notice of Rule 30(b)(6) Deposition of Debtors dated Dec. 22, 2016, attached as Exhibit F to 2017 Anker Decl.

Noteholders e-mailed Debtors' counsel asking, "[w]ould the company consider delaying confirmation to proceed with an expedited Phase 2 proceeding?"[35]  Debtors' counsel responded, "Phase 2 involves a lot of issues and will not be expedited."[36]

Phase Two could well present multiple issues.  One issue would be solvency, which could be quite time-consuming to resolve.  Indeed, the Debtors urged the Court to bifurcate the makewhole litigation precisely because "[d]iscovery and trial concerning solvency" "will be expensive and time consuming" and "is likely to significantly delay the adversary proceeding."[37]  In granting that request, the Court similarly observed that, while "the Trustee is entitled to discovery from the EFIH Debtors as to their valuation and solvency," "the Court is cognizant that such discovery would be immensely time consuming and expensive and would significantly delay resolution of the adversary proceeding."[38]  In addition to questions of fact, a dispute over solvency could present questions of law.  For example, as of what date is solvency to be determined (the Petition Date, the Effective Date, some other date)?

The PIK Noteholders also apparently intend to argue that bankruptcy law provides "defenses" to the Makewhole Claims.  For example, they might argue that the Claims should be disallowed as "unmatured interest" under §502(b)(2).  Or they might challenge the Makewhole Claims as "unreasonable" "charges" or "fees" under §506(b).  Or they might urge the Court to disallow the Claims pursuant to its "equitable" powers.

---

[35] See E-mail dated Nov. 17, 2016 from Mr. Alberino to Mr. Husnick, Bates No. EFH06584368, attached as Exhibit G to 2017 Anker Decl.

[36] See id.

[37] See Letter to The Honorable Christopher S. Sontchi from Andrew R. McGaan, P.C. in Contemplation of August 19, 2014 Teleconference Proposing Bifurcation of Makewhole Litigation, No. 14-50363, D.I. 108.

[38] See Opinion (Aug. 5, 2014), Adv. Pro. No. 14-50363, D.I. 105, at 23.

To be sure, all such challenges lack merit.  Courts in this District have held that Makewhole Claims "are in the nature of liquidated damages" that "fully mature at the time of breach" and "should not be disallowed as unmatured interest under Section 502(b)(2)."  *In re School Specialty, Inc.*, 2013 WL 1838513, at \*5 (Bankr. D. Del. 2013); *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 480-481 (Bankr. D. Del. 2011).  Courts have also held that makewhole payments calculated using a discount rate tied to U.S. Treasury securities rates, like the Makewhole Claims here, are "reasonable" under section 506(b).  *School Specialty*, 2013 WL 1838513, at \*4-\*5.  And the Supreme Court has held that whatever "equitable powers" bankruptcy courts retain, bankruptcy courts cannot disallow valid state-law claims that do not fall within one of the specified grounds for disallowance under §502(b).  *See Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-452 (2007); *see also United States v. Noland*, 517 U.S. 535, 540-541, 543 (1996); *Law v. Siegel*, 134 S. Ct. 1188, 1194, 1196 (2014).  Indeed, it is telling that the Debtors' analysis of the "scenarios reflecting the reasonably probable paths the Makewhole Litigation may take going forward" (Am. Plan Supp., Ex. E) did not give any consideration to Phase Two at all.[39]

But the PIK noteholders evidently do not concede these points.  Resolving these issues could therefore potentially require another round of fact and expert discovery, summary judgment briefing, argument, and if genuine issues of material fact existed (e.g., with respect to solvency), a trial.  Furthermore, the losing party could seek to pursue at least two levels of appellate review.  If there were a reversal and remand at either level, or a petition for rehearing or for certiorari, the proceedings could last even longer.  The Debtors seemingly contemplate that the PIK Noteholders will litigate

---

[39] *See* Wright Dep. 75:17-77:20, 84:24-85:13, 88:14-90:3.

aggressively to challenge the First and Second Lien Makewhole Claims; as noted, they propose to reserve (from the collateral of the First and Second Lien Notes) $2 million per month, or $72 million over three years, to fund those challenges.

As the preceding discussion illustrates, there are numerous paths the Makewhole litigation could take that could result in the litigation lasting beyond three years. Phase One has already lasted nearly three years. Even if the Third Circuit denies rehearing and the Supreme Court denies certiorari, it is not likely to be completed until the fourth quarter of this year (or later). And if the Third Circuit grants rehearing and certifies a question to the New York Court of Appeals, the Debtors' own review demonstrates that Phase One might not be completed until as long as two years and four months after the Effective Date (i.e., until August 2019)—or more than five years after it was commenced in April 2014. So even if Phase Two were to take no longer to complete than Phase One—and there is no assurance of that—Phase Two might not be completed until *four to seven* years after the Effective Date. Indeed, the Debtors concede that their review of the 'most likely scenarios' demonstrates that Phase One, alone, could last more than five years, and they acknowledge that Phase Two could go even longer (though they have done no analysis of the likely duration of Phase Two).[40]

Experience in other cases validates these concerns. In the *Dow Corning* bankruptcy, for example, litigation over post-petition interest has spanned more than a decade *after* the Sixth Circuit issued a decision reversing the bankruptcy court and

---

[40] *See* Wright Dep. 90:5-92:11 ("Q. Okay. So based on that example – A. Right. Q. – you've got two years and nine months already, plus potentially another two years and nine months just to get done phase one, right? A. It could happen that way, yes. Q. And have the Debtors done any analysis that demonstrates that phase two will be shorter than phase one? A. We've done no analysis either way. It could be shorter; it could be longer. I don't know. I'm not a litigator. I think there may be some possibilities that some of it could happen even in parallel, so ….").

remains ongoing. Dow Corning, a solvent debtor, objected to claims by unsecured noteholders for post-petition interest at the contract default rate. In 1999, the bankruptcy court ruled that they were entitled to interest at the contract rate (not the federal judgment rate); in 2001, the bankruptcy court ruled on summary judgment that the creditors were entitled only to the base contract rate, not the default rate; in 2004, the district court affirmed; in 2006, the Sixth Circuit reversed, holding that there is a presumption in solvent-debtor cases in favor of the default rate and remanded for proceedings consistent with its ruling; in 2007, the Supreme Court denied a petition for certiorari; in 2009, following mediation efforts, the parties moved for summary judgment; and in 2013, the district court denied summary judgment. There is no indication on the docket that the matter has been resolved yet, and the Trustee understands that the litigation is on-going.

In the *Bank of New England* bankruptcy, an inter-creditor litigation—in which senior creditors opposed a distribution to junior creditors before the senior creditors had been paid post-petition interest—lasted more than a decade, including two appeals to the First Circuit. Litigation in two other on-going makewhole disputes has already lasted nearly three years (*Momentive*, where disallowance of a makewhole is pending before the Second Circuit) or exceeded three years (*Chesapeake*, where the Second Circuit has stayed its mandate affirming allowance of a makewhole, pending the issuer's filing of a petition for certiorari). In the *Coudert Brothers* bankruptcy, the bankruptcy court's order disallowing a claim as time-barred was followed by more than six years of litigation, including two appeals to the Second Circuit, which reversed the bankruptcy court's orders both times. In the *GM* bankruptcy, avoidance-claim litigation against the debtor's lenders has been pending since 2009, and in the *Lyondell* and *Tribune* bankruptcies,

fraudulent-transfer litigation against the debtor's former shareholders has been pending since 2010 and 2011, respectively.  All three litigations are still ongoing, following various appellate proceedings.  Further details and citations for all of the foregoing cases, as well as for several others, are in the Appendix to this Objection.

In short, three years from the Effective Date is not sufficient.  There is no assurance that the litigation will be resolved by then, and the Debtors concede that Proposed Reserve Amount will not be sufficient to pay the First and Second Lien Claims in full if not.  That does not provide the "indubitable equivalent" of those over-Secured Claims.

### b.    The Proposed Reserve Amount Covers First-Lien and Second-Lien Fees and Expenses For Only Three Years

The Proposed Reserve Amount includes the Debtors' estimates of the fees and expenses that will be incurred by the First Lien Trustee and Noteholders ($1.5 million per month) and the Second Lien Trustee and Noteholders ($1.0 million per month) in the makewhole litigation for a period of only three years.[41]  If the litigation continues beyond three years (or if the Debtors' estimates of fees during the first three years is understated), the Proposed Reserve Amount could prove inadequate in this respect as well.

### c.    The EFIH Claims Reserve Must Cover The First Lien Trustee's Breach Claim And Stay In Place Until It Is Resolved (Or Reserve Additional Funds For The Second Lien Trustee's Future Interest Claim)

Section 2.4(c) of the Collateral Trust Agreement obligates EFIH to refrain from making any distributions to the Second Lien Trustee or Second Lien Noteholders until all

---

[41] *See* Ying Report at 12.

claims of the First Lien Trustee and First Lien Noteholders have been paid in full.[42]

Furthermore, section 2.4(d) obligates the Second Lien Trustee and Second Lien

Noteholders to hold any distributions they receive from EFIH in violation of section

2.4(c) in trust for the First Lien Noteholders and to remit such funds upon demand to the

First Lien Trustee.[43]    The First Lien Trustee has brought an action for turnover against the

Second Lien Trustee, which is before the District Court on appeal.    Although this Court

dismissed that inter-creditor action, the Court's holding that the First Lien Trustee was

not entitled to turnover because its Makewhole Claim was not "payable under the

documentation" does not appear to remain viable following the Third Circuit's decision

holding that EFIH owes such Claims under the applicable indentures.

The Plan provides for repayment of the $2.2 billion in principal and interest

owing on the Second Lien Notes.  *See* Plan Art. III.B.20(b)(i)-(ii), (c).  If EFIH holds

back distribution of that amount pursuant to section 2.4(c), or if EFIH violates section

2.4(c) but the Second Lien Trustee holds back such distribution from the Second Lien

Noteholders pursuant to section 2.4(d), then, in either case, the Second Lien Noteholders

may have a "Future Interest" Claim against EFIH for the contractual interest that will

accrue post-Effective Date on the held-back principal and interest (as set forth in the Plan

objection filed by the Second Lien Trustee).

---

[42] *See* Collateral Trust Agreement § 2.4(c) ("***At any time prior to the Discharge of Parity Lien Obligations*** and after (1) commencement of any Insolvency or Liquidation Proceeding in respect of EFIH … , *no payment of money (or the equivalent of money) shall be made from the proceeds of Collateral by EFIH to … any Junior Lien Representative or any holder of Junior Lien Obligations* with respect to Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations)" (emphasis added)).

[43] *See* Collateral Trust Agreement § 2.4(d) ("All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations in violation of Section 2.4(c) will be held by such Person in trust for the account of the holders of Parity Lien Obligations and remitted to any Parity Lien Representative upon demand by such Parity Lien Representative").

It appears, however, that the Debtors intend to distribute the $2.2 billion to the Second Lien Trustee on the Effective Date and to ask the Court to order the Second Lien Trustee to distribute those amounts to the Second Lien Noteholders.  *See* Plan Arts. IV.B.9, VI.A.; Am. Plan Supp., Ex. C(2).  The Debtors' request that the Court direct the Second Lien Trustee to distribute those amounts is improper.  The Second Lien Trustee is obligated under the inter-creditor agreement to hold all distributions it receives in trust for the First Lien Noteholders until they have been paid in full.[44]  There is no basis for this Court to direct one non-debtor to breach its contractual obligation to another.[45]  And if the Debtors seek to immunize the Second Lien Trustee from liability in the inter-creditor action, such relief would be an unlawful third-party release of claims by one non-debtor against another.  Indeed, the case on which the Debtors rely (*see* Am. Plan Supp., Ex. C(2)) so holds.[46]

Moreover, the relief the Debtors request would violate sections 2.4(c) and (d) of the Collateral Trust Agreement, and, if granted, would give rise to a Claim by the First Lien Trustee against EFIH for breach of that Agreement.[47]  In particular, if the First Lien Makewhole Claim were disallowed against EFIH, but allowed against the Second Lien

---

[44] *See* Collateral Trust Agreement § 2.4(d).

[45] *See In re Prime Motor Inns*, 130 B.R. 610, 614 (S.D. Fla. 1991); *In re 4 Front Petroleum*, 345 B.R. 744, 752 n.7 (Bankr. N.D. Okla. 2006).

[46] *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 139-142 (Bankr. D.N.J. 2010) (holding that even if §1129(b)(1) permits a cram-down plan to override §510(a) and distribute amounts to second-lien noteholders in violation of a subordination agreement, the plan could not release the first-lien noteholders' claim against the second-lien noteholders for breach of that agreement).

[47] That Claim would be a Secured Claim.  *See* Collateral Trust Agreement § 7.14.  Furthermore, the Debtors' argument for disputing the Future Interest Claim—that §1129(b)'s clause "[n]otwithstanding section 510(a)" authorizes the Court to confirm a plan that does not comply with a subordination agreement—has no application here.  Section 2.4(c) is a contractual obligation that *EFIH* owes directly to the First Lien Trustee, barring EFIH from distributing the collateral securing the First Lien Claims until those Claims have been paid in full; it is not a subordination agreement among creditors.  In any event, whether or not the Court could require specific performance of EFIH's obligation, the Trustee would have a claim against EFIH for damages.  *See In re Continental Airlines*, 25 F.3d 120, 132-136 (3d Cir. 1997); *In re Chemtura Corp.*, 439 B.R. 561, 604 (Bankr. S.D.N.Y. 2010).

Trustee in the inter-creditor action, and if the First Lien Trustee were unable (or had to

incur additional time and expense) to collect because the Second Lien Trustee had

already distributed the $2.2 billion to the Second Lien Noteholders, the First Lien Trustee

would have a Breach Claim against EFIH for the amount of the Makewhole Claim (plus

interest) that it could have recovered had EFIH performed in accordance with section

2.4(c) of the Collateral Trust Agreement.

This circumstance could arise if the PIK Noteholders were somehow to prevail in

Phase Two.  The issue in Phase Two is whether there are grounds under the Bankruptcy

Code to disallow a make-whole claim that is otherwise valid under state law.  In the

unlikely event the PIK Noteholders won on those grounds, that is precisely the

circumstance in which the First Lien Trustee may recover from the Second Lien Trustee

under the Collateral Trust Agreement.  A principal point of an inter-creditor agreement is

to allow the senior creditor to recover its claim from the junior creditor if the senior

creditor cannot recover its valid state-law claim from the debtor because of limitations

imposed by bankruptcy law.  The Collateral Trust Agreement provides just that.  It

permits the First Lien Trustee to recover against the Second Lien Trustee for claims that

are "payable under the documentation" governing the First Lien Notes, even if such

claims are not enforceable against the debtor under bankruptcy law.[48]

Thus, the EFIH Claims Reserve must cover the Breach Claim.  And the EFIH

Claims Reserve must *remain in place* until the Breach Claim is resolved.  In other words,

---

[48] *See* Collateral Trust Agreement §1.1 (definitions of "Parity Lien Obligations" and "Obligations"), § 2.4(c)-(d).  The Collateral Trust Agreement also requires that the distributions to be turned over are "from the proceeds of Collateral."  *See id.*  While the Second Lien Trustee might assert a technical argument that distributions under the Plan are not "proceeds of Collateral," on grounds that the NextEra transaction takes the form of a merger with EFH rather than a sale of EFIH's interest in Oncor, the Plan recognizes that the funds realized from the NextEra transaction are the proceeds of collateral.  It classifies the First and Second Lien Claims separately and gives them priority over the unsecured PIK Noteholders to those proceeds.

if the First Lien Makewhole (and other) Claims were disallowed against EFIH, the funds reserved for those Claims must remain in the EFIH Claims Reserve as a reserve for the First Lien Trustee's Breach Claim.  And those funds must stay in the EFIH Claims Reserve until the Breach Claim is resolved, which may not occur until *both* the makewhole litigation against EFIH *and* the inter-creditor litigation against the Second Lien Trustee are resolved, and the First Lien Trustee determines whether it can collect any judgment in the inter-creditor action.

That raises two issues.  First, the Plan's language must be clear.  It provides that the EFIH Claims Reserve covers both Makewhole Claims and "any other Claims relating to the EFIH First Lien Notes and the EFIH Second Lien Notes."  Plan Art. 1.A.161.  If it is not already clear, the Plan must be clear that those "Claims" include the Breach Claim. Furthermore, the Plan provides that the Trustee's lien on the EFIH Claims Reserve will be released, and the funds therein transferred to the EFH/EFIH Distribution Account, when all "Claims based upon or under the EFIH First Lien Notes and all Claims based upon or under the EFIH Second Lien Notes" have been allowed and paid in full, or disallowed.  Plan Art. VIII.B; *id.* III.B.19(b).  Again, if not already clear, the Plan must be clear that those "Claims" include the Breach Claim (and hence the lien and reserve will not be released until the Breach Claim is allowed and paid in full or disallowed).

Second, the amount funded in the EFIH Claims Reserve must be sufficient to cover interest and fees for the duration of *both* the makewhole litigation *and* the inter-creditor action.  Three years is plainly insufficient for that:  The inter-creditor action may be stayed pending the outcome of the makewhole litigation, since recovery by the First Lien Trustee in the makewhole ligation could moot the inter-creditor action.

Alternatively, if EFIH or the Second Lien Trustee honors its obligation under the Collateral Trust Agreement to hold back distributions, the Proposed Reserve Amount will again be inadequate because it does not include any reserve for the Second Lien Future Interest Claim that may accrue on the held-back amounts.[49]  While the Debtors dispute the Future Interest Claim, *see* Am. Plan Supp., Ex. C(2), that Claim has not been adjudicated, much less disallowed by Final Order, and the Debtors concede that if it is allowed, the Proposed Reserve Amount will be insufficient to pay all First and Second Lien Claims in full.[50]

### d.    The Proposed Reserve Amount Does Not Cover Compound Interest Calculated On A Daily Basis

The Proposed Reserve Amount does not reserve any amounts for the additional interest that would be owed if interest in respect of the First and Second Lien Claims compounds daily, rather than semi-annually.  In calculating the Proposed Reserve Amount, the Debtors assumed interest compounds on a semi-annual basis.[51]

While the First Lien Notes provide that scheduled interest payments are to be paid semi-annually,[52] they obligate EFIH in the event of default to "pay interest … on overdue principal and premium, if any, from time to time on demand at the interest rate on the Notes" and to "pay interest … on overdue installments of interest (without regard to any applicable grace period) from time to time on demand at the interest rate on the Notes," with interest "computed on the basis of a 360-day year comprised of twelve 30-day months."[53]

---

[49] *See* Ying Report at 12; Keglevic Dep. 59:9-60:13, 99:17-100:16; Horton Dep. 60:2-66:24.
[50] *See* Horton Dep. 60:2-66:24; Keglevic Dep. 59:9-60:24.
[51] *See* Horton Dep. 55:12-55:22; Keglevic Dep. 58:17-58:20.
[52] *See* Notes ¶ 1 ("The Issuer will pay interest semi-annually in arrears on June 1 and December 1 of each year.").
[53] *See* Notes ¶ 1.

Accordingly, the Trustee has asserted Claims for interest compounding on a daily basis.  The Plan provides that if the Makewhole Claims are allowed by Final Order, the Trustee and Noteholders will be entitled to interest thereon, including interest on interest "as calculated in accordance with the EFIH First Lien Notes" and any related agreements. *See* Plan Art. III.B.19(b)(iv); *see also id.* Art. III.B.19(b)(iii) (providing for interest on fees and expenses "to the extent provided by such notes, indenture, or agreements").

The Debtors acknowledge that if the Trustee and Noteholders are entitled to daily compounding, the Proposed Reserve Amount will likely be insufficient to pay all interest.[54]  Accordingly, those amounts must be reserved for as well.

### 2.    The EFIH Claims Reserve Should Be Increased And No Distributions Should Be Made To The PIK Noteholders On The Effective Date

The Proposed Reserve Amount of $1.313 billion is too low.  In addition to barring any distribution on the Second Lien Notes as the Collateral Trust Agreement requires, the Court should preclude EFIH from making distributions on the Effective Date to the PIK Noteholders.  As noted, of the $4.3 billion securing the First and Second Lien Claims, the Debtors propose to distribute on the Effective Date approximately $2.2 billion to the Second Lien Trustee, notwithstanding that doing so will be in direct violation of the EFIH Collateral Trust Agreement.  The Debtors propose to deposit only $1.3 billion of the remaining $2.1 billion into the EFIH Claims Reserve, and to distribute most of the remainder—$700 million or so—to the PIK Noteholders on the Effective Date.  The potential shortfall in the EFIH Claims Reserve could equal or exceed that amount.  Accordingly, at a minimum, the full $2.1 billion should be placed in the EFIH Claims Reserve on the Effective Date.

---

[54] *See* Horton Dep. 55:12-55:22; Keglevic Dep. 61:14-61:24.

The Proposed Reserve Amount will likely be insufficient to pay all Allowed First and Second Lien Claims in full if any of the Debtors' assumptions underlying the Proposed Reserve Amount proves incorrect.[55]  The two assumptions that most impact the adequacy of the Proposed Reserve Amount are (a) that the makewhole litigation and the inter-creditor action (on which the Breach Claim hinges) will be resolved within three years, and (b) that the Second Lien Trustee's Future Interest Claim will not be allowed. As discussed above, there is no assurance that either assumption will prove correct.

If the first assumption does not hold, then even if the Future Interest Claim were disallowed, the Proposed Reserve Amount would experience a shortfall if the makewhole litigation continues beyond three years.  In four years, the shortfall could exceed $200 million, and if in five years, it could be nearly $400 million.[56]

If the Future Interest Claim were allowed, and all outstanding principal on the Second Lien Notes were held back, the Proposed Reserve Amount would have a shortfall in less than *two* years after the Effective Date.[57]  The Debtors' expert calculates that after three years, there would be a shortfall of approximately $576 million—nearly the entire amount the Debtors propose to distribute to the PIK Noteholders on the Effective Date.[58] The Debtors acknowledge that if that calculation were carried out to four years, the First and Second Lien Claims would exceed $2.2 billion—more than the entire $2.1 billion remaining from the NextEra sale proceeds (after deducting the amount of the DIP facility and Second Lien principal and interest).[59]  While those calculations of the Future Interest Claim assume that all outstanding Second Lien principal is held back, if instead the

---

[55] *See* Kearns Report at 23-24.
[56] *See* Kearns Report at 24-25.
[57] *See* Kearns Report at 26-28.
[58] *See* Horton Dep. 62:7-66:24.
[59] *See* Horton Dep. 62:7-66:24.

amount held back is limited to the First Lien Makewhole Claim and interest thereon, the

total First and Second Lien Claims to be paid from the EFIH Claims Reserve will still

surpass the $2.1 billion mark within five years after the Effective Date.[60]

Accordingly, the Court should require that the full $2.1 billion be escrowed and

that none of it be distributed to the PIK Noteholders on the Effective Date.  As discussed

above, the PIK Noteholders have refused to agree to terminate the Makewhole litigation

three years after the Effective Date.  *See* PIK Stip. ¶ 6(c).  They have likewise refused to

cover any shortfall that results.  *Id.* ¶ 6(a)-(b) ("Avenue, GSO and York is not prepared in

connection with the Plan … to guarantee or back-stop … the Shortfall" or "to disgorge

any payments or distributions it receives under the Plan … to the extent necessary to

eliminate the Shortfall"); *see also* Horton Dep. 73:10-73:20, 74:5-75:25.  That is not

permissible.  The unsecured PIK Noteholders cannot shift the risk of a shortfall to the

over-secured First Lien Noteholders.  The collateral proceeds proposed to be paid to the

PIK Noteholders must be held back in the EFIH Claims Reserve to ensure the Trustee

and the Noteholders will remain fully protected and truly receive the "indubitable

equivalent" of their secured claims.

Nor can the Debtors cram down the Trustee and Noteholders with a Proposed

Reserve Amount of only $1.3 billion based on the notion, advanced by the Debtors, that

the Plan's retention-of-jurisdiction provisions would permit the Trustee and the

Noteholders to seek relief in this Court to prevent a shortfall, such as by halting the

---

[60] *See* Kearns Report at 27-28 (total claims exceed $2.4 billion in April 2022, five years after Effective Date); *cf. id.* at 26-27 (if full Second-Lien principal repayment is held back, total claims exceed $2.4 billion in April 2021, four years after Effective Date); Am. Plan Supp., Ex. C(2) at 7.

litigation or requiring additional funding.[61]  That notion turns the absolute priority rule on its head.  The risk of a shortfall should not be placed on secured creditors by requiring them to ask for their collateral back after it has been paid out to unsecured creditors; instead, the collateral should be held in reserve, and unsecured creditors should bear the burden of asking for its release if an unquestioned excess ever develops.

In any event, the Plan's retention-of-jurisdiction provision merely provides that the Court will retain jurisdiction to enter "such orders as may be necessary to execute, implement, or consummate the Plan" and to "resolve any cases … that may arise in connection with the Consummation, interpretation, or enforcement of the Plan."  *See* Plan Arts. XI.8, XI.12.  Normally, such provisions are understood to retain jurisdiction merely to enforce the terms of the Plan, not to modify them.  *Cf.* 11 U.S.C. § 1127(a)-(b).

While the Trustee reserves all rights to argue the point, the Debtors have not pointed to anything in the Plan providing that the Court must (or even may) require the PIK Noteholders or any other party to contribute additional funds to the EFIH Claims Reserve or dismiss any pending challenges to the Makewhole Claims.[62]  Nor is it clear that the Court could prohibit the EFH Plan Administrator Board or MLOC from pursuing their litigation rights, or that it would even have jurisdiction to do so if the litigation were pending before the District Court or Third Circuit at the time. Thus, there is at least a question whether the Plan's retention-of-jurisdiction provisions ensure that the Trustee and Noteholders will remain over-secured and never face the risk of non-payment.  And if there is any question, the Plan does not provide the indubitable equivalent.

---

[61] *See* Am. Plan Supp., Ex. C(2); Keglevic Dep. 50:25-54:14; Horton Dep. 40:5-41:5, 63:8-63:19, 65:13-65:24; Wright Dep. 121:13-126:3.

[62] *See* Wright Dep. 121:13-123:2.

Evidently recognizing as much, the principal PIK Noteholders, according to the

Debtors, had agreed, in concept, to a "top up or tap out" provision.[63]  As the Trustee

understands it, if the EFIH Claims Reserve were running low in the future, the First and

Second Lien Noteholders could ask this Court to require those PIK Noteholders to

increase the EFIH Claims Reserve out of their own funds or terminate any further

challenges to the Makewhole Claims.[64]  But despite repeated requests, the Debtors

provided no documentation establishing that there is any such agreement, let alone

evidencing its terms.[65]

### 3.    The Plan Lacks Protections For The EFIH Claims Reserve

At a minimum, the Plan should be modified to include the following protections:

*Perfected first-priority lien*.  The Plan grants the First Lien Trustee a first-priority

lien on the EFIH Claims Reserve (Plan Art. III.B.19(b)), but does not require that the lien

be perfected, that there be a control agreement, or that the financial institution holding the

EFIH Claims Reserve agree to waive lien or set-off rights with respect to the EFIH

Claims Reserve.[66]  If the First Lien Trustee does not have control of the EFIH Claims

Reserve, its lien may not be perfected under applicable law,[67] and the financial institution

holding the reserve could obtain a setoff right or lien senior to the Trustee's.[68]

Accordingly, the Plan should provide that the First Lien Trustee will be granted a

lien on the EFIH Claims Reserve (and all assets therein and proceeds thereof) pursuant to

---

[63] *See* Wright Dep. 52:11-54:6
[64] *See* Wright Dep. 52:11-55:3.
[65] As the First Lien Trustee was finalizing this Objection, the Debtors filed an additional Plan Supplement that, apparently, is intended to be the "top up or tap out" proposal.  Based on a quick review, it appears to be riddled with holes, but the Trustee has not had the time to analyze it with care, let alone the time to discuss it with counsel and EFIH First Lien Noteholders or to take discovery regarding it.  It will do so, and seek leave from the Court to address this additional Plan Supplement in a further submission.
[66] *See* Horton Dep. 127:9-128:2, 130:3-130:24; Wright Dep. 127:10-128:8.
[67] *See, e.g.*, UCC §§ 9-104, 9-106, 9-314(a), 9-327, 9-328.
[68] *See, e.g.*, UCC §§ 9-327, 9-328.

a control agreement (or by having the Claims Reserve maintained through the First Lien Trustee) and any other security agreements or arrangements necessary to ensure that the First Lien Trustee's lien will have first priority and be fully perfected.  It should also specify that no other entity (including any bank or securities intermediary) will obtain any lien or setoff right with respect to the EFIH Claims Reserve (aside from the subordinated lien granted under the Plan to the Second Lien Trustee).

_No other liens except junior lien for Second Lien Trustee_.  While the Plan provides that the First and Second Lien Trustees will be granted replacement liens on the EFIH Claims Reserve, it does not appear to bar additional liens on the EFIH Claims Reserve.  The Plan contains language suggesting that there could be additional liens.  *See* Plan Art. III.B.20(b) (providing that Second Lien Trustee will be granted a replacement lien "which Lien shall have priority over *all other Liens* on the EFIH Claims Reserve, except the Lien provided to the EFIH First Lien Notes Trustee" (emphasis added)).  These provisions should be modified to make clear that (1) no liens will be granted on the EFIH Claims Reserve except for the replacement liens granted to the First and Second Lien Trustees, and (2) the Second Lien Trustee's lien will be junior in all respects— including lien and payment priority—to the First Lien Trustee's lien, consistent with and subject to the Collateral Trust Agreement.

_Collateral Trust Agreement governs_.  The Plan does not appear to address the inter-creditor rights and obligations between the First Lien Trustee and First Lien Noteholders, on the one hand, and the Second Lien Trustee and Second Lien Noteholders, on the other, with respect to the EFIH Claims Reserve.  The Plan should provide that they will be governed by the Collateral Trust Agreement.

*Investment*.  The Plan provides that the EFIH Claims Reserve will be an interest-bearing account, but does not specify how the reserve funds will be invested or which entity will have control over investment decisions.  *See* Plan Arts. I.A.115, I.A.161 (definitions of "EFH/EFIH Distribution Account" and "EFIH Claims Reserve").  According to the Debtors, such investment decisions will be controlled by the EFH Plan Administrator Board, in its discretion.[69]  The Plan should provide that the EFIH Claims Reserve will be invested in Cash, in accordance with 11 U.S.C. § 345, and that investment decisions will be subject to the consent of the First Lien Trustee.

*No disbursements to other parties*.  The Plan does not restrict disbursements of funds from the EFIH Claims Reserve.  The Plan should prohibit any disbursements from the EFIH Claims Reserve except (1) to pay any allowed Claims of the First Lien Trustee and Noteholders, until all such Claims have been allowed and paid in full or disallowed; (2) thereafter to pay any allowed Second Lien Claims, until all Second Lien Claims have been allowed and paid in full or disallowed; and (3) only thereafter, to pay remaining creditors in accordance with the Plan.

**4.    The Plan Shortchanges The First And Second Lien Noteholders While Paying The Fees Of The Unsecured PIK Notes Trustee And EFH Plan Administrator Board**

The Plan contemplates that the fees and expenses of the First Lien Trustee will not be paid on the Effective Date (or paid only in part, subject to disgorgement), and may be held up in a lengthy "fee review process" before payment in full is finally made.  And if the EFIH Claims Reserve has a shortfall, they may never be paid.

Yet the Plan provides that the Debtors will pay *all* fees and expenses of the PIK Notes Trustee on the Effective Date, without any review of such fees, and such payment

---

[69] *See* Horton Dep. 126:3-126:19; Wright Dep. 126:14-126:21, 128:10-128:25.

will not be subject to disgorgement, even if the EFIH Claims Reserve has a shortfall.[70]

Furthermore, the Plan provides that the Trustee's and Noteholders' collateral will fund

the Post-Effective Date Administrative Account that will pay the post-Effective Date fees

and expenses of the EFH Plan Administrator Board in prosecuting challenges to the

Makewhole Claims.[71]  The First and Second Lien Trustees and Noteholders will have no

lien on this Post-Effective Date Administrative Account.[72]  Worse, the Plan provides that

if there is a shortfall in the Post-Effective Date Administrative Account, the EFH Plan

Administrator Board may pay its fees and expenses *out of the EFIH Claims Reserve*.[73]

In other words, the Plan uses the First and Second Lien Noteholders' collateral to

fund litigation *against them*—and gives the PIKs a $1.3 billion retainer (plus the

Effective-Date distribution)—while draining the EFIH Claims Reserve and increasing the

risk of a shortfall.  These provisions have no place in a Plan that purports to give the First

and Second Lien Noteholders the "indubitable equivalent" of their Secured Claims.

**5.      The Plan Must Preserve The Agreements Governing The Notes
For Claims Against EFIH And The Inter-Creditor Action**

The Plan provides that on the Effective Date, all notes, indentures, security

documents, and other documents evidencing the First and Second Lien Claims will be

"canceled" and "discharged," and that the "obligations of the Debtors or Reorganized

Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied

in full and discharged."  *See* Plan Art. IV.I.

---

[70] *See* Plan Art. I.A.159 (definition of "EFIH Base Payment Amount"), IV.R; Horton Dep. 30:10-33:22; Keglevic Dep. 48:21-49:14.
[71] *See* Plan Arts. I.A.339 (definition of "Post-Effective Date Administrative Account"), VII.K.3.
[72] *Id.*
[73] *See* Plan Art. VII.K.3; Horton Dep. 38:18-39:5.

35

The Plan must be clear that these agreements, including the EFIH First Lien Note

Indentures and Notes, continue in force post-Effective Date for purposes of establishing

and supporting the First Lien Claims.  The Plan also must be clear that the Collateral

Trust Agreement continues in force after the Effective Date for purposes of the inter-

creditor action and for purposes of establishing the Claims and rights of the First Lien

Trustee and Noteholders against EFIH, including any Breach Claim.  While the Plan

includes language that is evidently designed to accomplish that, *see* Plan Arts.

III.B.19(b), IV.I, the Trustee has proposed clarifying language in <u>Exhibit A</u> hereto.

## II.    THE PLAN IS NOT FEASIBLE

Section 1129 provides that a plan cannot be confirmed unless the Court finds that

"[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for

further financial reorganization, of the debtor or any successor to the debtor under the

plan."  11 U.S.C. § 1129(a)(11).  The Plan provides that all Allowed First Lien Claims

must be paid in full.  Yet, if the EFIH Claims Reserve is funded with only $1.313 billion,

it will be insufficient to ensure that those Claims will, in fact, be paid in full.

Accordingly, unless the Court orders that the Debtors increase the funding of the EFIH

Claims Reserve, the Plan is not feasible and cannot be confirmed for this reason as well.

## III.    THE PLAN INCLUDES ADDITIONAL PROVISIONS THAT DO NOT COMPLY WITH SECTION 1129'S REQUIREMENTS

### A.    The Fee Review Process

As noted, the Amended Plan Supplement proposes a lengthy process for

reviewing the fees and expenses of the Trustee and the Noteholders.  *See* Am. Plan Supp.,

Ex. D ((1) invoices for pre-Effective Date fees and expenses to be submitted within 45

days after the Effective Date; (2) 80% of fees and 100% of expenses to be paid within 15

business days after the Effective Date, subject to disgorgement; (3) objections to invoices to be asserted within 90 calendar days after receipt of such invoices (but no earlier than 90 days after entry of the Confirmation Order); and (4) any request for a court hearing to be filed no earlier than 30 days after any objection).  But the EFIH Debtors have had most of the Trustee's invoices for well over a year; have not filed any objection to them; and were prepared to pay 100% of those fees and expenses pursuant to the settlement they negotiated in December 2016—a settlement that (as noted above) the Debtors still believe is reasonable.

There is no valid reason for further delay in paying those fees; the primary motive appears to be to impair the secured creditors' ability to protect their rights, in some misguided effort to extract value from them.  The Trustee has filed a motion requesting immediate reimbursement of its fees and expenses as adequate protection and pursuant to section 506(b) of the Bankruptcy Code.[74]  That motion is set for hearing on March 28, 2017 (before the Debtors' projected emergence in April 2017).  The Debtors—or the PIK Noteholders—should not be permitted to substitute the Trustee's pending motion with a "fee review process" that would impose more delay.

Likewise, the fee review process provides excessive delay for the review of post-Effective Date fees.  There is no reason the EFH Plan Administrator Board needs 45 days after each monthly invoice to determine whether it has any objection to it.  Nor is there any reason the Trustee should have to wait 30 days before seeking relief from the Court.

---

[74] *See* Motion of Delaware Trust Company, As Trustee For The EFIH First Lien Notes, For An Order Directing Payment And Reimbursement of Certain Fees And Expenses, D.I. 10703 (Jan. 23, 2017).

B.     **The Plan Asserts An Improper "Blanket Objection"**

The Plan states that it "shall serve as the Debtors' objection to all other EFIH First

Lien Note Claims … under the respective indentures."  Plan Art. VII.A.  That provision

does not comply with section 1129(a)(1) and other Code provisions governing claims

allowance.  A timely proof of claim is deemed allowed unless a party objects in a written

objection asserting the basis for the objection.  11 U.S.C. §§ 501, 502(a); Fed. R. Bankr.

P. 3001(f), 3007(a); *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).  The

Plan cannot be used to circumvent that process.  *See In re Simmons*, 765 F.2d 547, 553

(5th Cir. 1985); *In re Dynamic Brokers, Inc.*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003).

C.     **To The Extent The Plan Could Be Read To Deny Any Other Rights
       Of The Trustee And The Noteholders, It Cannot Be Confirmed**

1.     **Plan Injunction of claims against the Released Parties**

The Plan provides that the First Lien Trustee and Noteholders are not Releasing

Parties granting releases in favor of the Released Parties, including the PIK Noteholders.

It also provides that nothing in the Plan prevents the First Lien Trustee and Noteholders

from seeking disgorgement of distributions to the PIK Noteholders if the EFIH Claims

Reserve has a shortfall.  *See* Plan Arts. I.A.360, I.A.361, VI.A (footnote 3), VIII.D.  But

the Plan's injunction provision provides that "all Entities that … hold Claims … that …

shall be discharged pursuant to Art. VIII.A"—the Debtors' bankruptcy discharge—"are

permanently enjoined, from and after the Effective Date, from taking any of the

following actions against, as applicable, the Debtors, the Reorganized Debtors, *or the

Released Parties:* (i) commencing … any action … with respect to any such claims …."

Plan Art. VIII.F (emphasis added).  To the extent that language might be read to enjoin

the First Lien Trustee and Noteholders from pursuing claims against the Released Parties,

including potential disgorgement claims against the PIK Noteholders, it would be an unlawful third-party release.  The Trustee has proposed clarifying language in <u>Exhibit A</u>.

### 2.    Right to prosecute makewhole appeal or other claims-allowance litigation

The Plan's definition of "Allowed" provides that "except as otherwise set forth herein," the Plan is not intended to impair any party's rights in an appeal from an order disallowing its Claim.  Plan Art. I.A.13.  The quoted language might be read to suggest that some unspecified provisions in the Plan do impair such rights.  If the Plan were so read to impair the Trustee's and Noteholders' statutory right to litigate the pending make-whole appeal (or the inter-creditor action)—notwithstanding all of the Plan's provisions that explicitly contemplate continued litigation of the appeal (and inter-creditor action) after the Effective Date—the Plan could not be confirmed.  *See* 11 U.S.C. § 1129(a)(1). The Trustee has proposed clarifying language in <u>Exhibit A</u>.

### 3.    Exclusive jurisdiction

The Plan provides that the Court will retain "exclusive" jurisdiction over claims-allowance and the Plan.  *See* Plan Art. XI.  To the extent the Plan's "exclusive" jurisdiction provision could be read to impair a party's right to seek the withdrawal of the reference or pursue an appeal, it is not permissible.  Proposed clarifying language is in <u>Exhibit A</u>.

### 4.    Drafting issues

The Plan contains a number of apparent drafting mistakes.  For example, it defines the term "Plan" as the *Fifth* amended plan, rather than the *Seventh* amended plan. The Trustee has endeavored to correct or clarify such errors in <u>Exhibit A</u>.  The Trustee will work with Debtors' counsel to address them in advance of the confirmation hearing.

## JOINDER IN EFIH SECOND LIEN TRUSTEE'S OBJECTION TO PLAN

The Trustee hereby joins in the objections asserted in the *EFIH Second Lien Trustee's Objection to Debtors' Plan of Reorganization*, filed contemporaneously herewith, to the extent the Second Lien Trustee's Objection addresses proposed terms of the Plan that also apply to the First Lien Trustee and Noteholders.

## RESERVATION OF RIGHTS

The Trustee reserves the right to supplement this Objection to the extent any further change to the Plan affects the rights of the Trustee and the Noteholders, including with respect to the Second Amended Plan Supplement.

In addition, while the Trustee has endeavored to propose language in Exhibit A to address many of its concerns about the Plan, the Trustee and Noteholders reserve the right to propose additional or different language to address those concerns based on their on-going review and based on consultation with the Second Lien Trustee, Second Lien Noteholders, and the Debtors.  The Trustee will coordinate with the Second Lien Trustee on Plan language and will seek to work with the Debtors in advance of the confirmation hearing to reach consensus on mutually satisfactory language where possible and to narrow the scope of the disputes to be heard at confirmation.

## CONCLUSION

The Court should deny confirmation of the Plan unless it is modified as set forth above and in Exhibit A.

Dated:  February 3, 2017

COLE SCHOTZ P.C.

 /s/ J. Kate Stickles
Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  302-652-3131
Facsimile:  302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile:  201-489-1536
wusatine@coleschotz.com

WILMER CUTLER PICKERING HALE AND DORR LLP

Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile:  212-230-8888
Philip.Anker@wilmerhale.com

Joel Millar
David Gringer
Isley Gostin
1875 Pennsylvania Avenue, NW
Washington, DC 2006
Telephone:  202-663-6000
Facsimile: 202-663-6363
Joel.Millar@wilmerhale.com
David.Gringer@wilmerhale.com
Isley.Gostin@wilmerhale.com

ROPES & GRAY LLP

Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile: 212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA  02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP

James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:  212-248-3141
James.Millar@dbr.com

*Counsel for Delaware Trust Company*