## Exhibit A

**Transcript of the January 18, 2017 Deposition of Paul Keglevic excerpts**

1              PAUL M. KEGLEVIC

2    UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

     ----------------------------------------x

4    In Re:

     Energy Future Holdings Corporation, et.,

5

                    Debtors.

6

     Chapter 11

7    Case No. 14-10979

     Jointly Administered

8

9    ----------------------------------------x

10

11        DEPOSITION OF PAUL M. KEGLEVIC

12             New York, New York

13              January 18, 2017

14

15

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 117928

1                    PAUL M. KEGLEVIC

2        Q.    And certainly the debtors would want

3    it to be completely true and accurate, correct?

4        A.    Sure, to the best of our ability.

5        Q.    Let me ask you to turn to page 21 of

6    211, if you look at the pages numbering at the

7    top of the page.

8        A.    Okay.

9        Q.    I want you to look at the paragraph

10   that is toward the bottom before -- the

11   paragraph before Key Terms of EFIH First Lien

12   Settlement and EFIH Second Lien Settlement, the

13   one that begins with the words "following

14   circulation"?

15       A.    Yes.

16       Q.    Do you see the last sentence of that

17   paragraph?

18       A.    Yes.

19       Q.    It reads, "The EFH/EFIH Debtors'

20   respective Boards approved the EFIH First Lien

21   Settlement and EFIH Second Lien Settlement on

22   December 16, 2016."

23            Is that a correct reading of the

24   statement?

25            MR. McKANE:  Are you asking him under

1                  PAUL M. KEGLEVIC

2      oath if you read it correctly?

3             MR. ANKER:  Mr. --

4             MR. McKANE:  Does it really matter?

5             MR. ANKER:  Well, you objected to

6      form, so I want to know whether the

7      statement that's set forth there is true and

8      accurate.  I'll ask it that way.

9             THE WITNESS:  Yes, and I believe

10     that's consistent with how I answered the

11     prior question.

12  BY MR. ANKER:

13     Q.    Okay.  And in fact, am I right the

14  boards of EFH and EFIH adopted resolutions

15  embodying their approval of the EFIH secured

16  settlement?

17            MR. McKANE:  Objection to form.

18     A.    Yes, they did.

19     Q.    Let's mark this as Exhibit number 3.

20  It's entitled Energy Future Holdings Corp. ('EFH

21  Corp.'), Energy Future Intermediate Holding

22  Company, LLC ('EFIH'), EFIH Finance, Inc.,

23  Minutes of Joint Meeting dated December 16,

24  2016.

25            (Keglevic Exhibit 3, Energy Future

1            PAUL M. KEGLEVIC

2       Holdings Corp. ('EFH Corp.'), Energy Future

3       Intermediate Holding Company, LLC ('EFIH'),

4       EFIH Finance, Inc., Minutes of Joint Meeting

5       dated December 16, 2016, marked for

6       identification, as of this date.)

7    BY MR. ANKER:

8       Q.    Do you recognize Exhibit No. 3, Mr.

9    Keglevic?

10      A.    I do.

11      Q.    Can you tell me what it is?

12      A.    It's joint resolutions approving the

13   settlement agreement between the EFIH, EFH and

14   the first and second lien secured holders at

15   EFIH.

16      Q.    And is it an accurate recitation with

17   respect to the board meeting on the 16th of

18   December, 2016?

19      A.    Well, it's not intended to be a

20   recitation of the board meeting.  It's not the

21   minutes.  It's -- it is the resolution that was

22   passed.

23      Q.    So let me ask you some specific

24   questions about it.  If I can ask you to turn to

25   page 2 of it.

1              PAUL M. KEGLEVIC

2         Do you see at the very top of the

3    page, after the "Redacted for Privilege"?

4    A.    Yes.

5    Q.    And do you see the sentence,

6    "Accordingly, Kirkland & Ellis recommended that

7    the Board approve the proposed settlement," do

8    you see that, sir?

9    A.    Yes.

10   Q.    Is it accurate that Kirkland & Ellis

11   recommended that the board approve the EFIH

12   secured settlement?

13   A.    Yes.

14   Q.    It goes on to say that, "Upon request

15   from members of the Board, David Ying of

16   Evercore also recommended that the Boards

17   approve the settlement."

18         Is that statement accurate?

19   A.    Yes.

20   Q.    And Kirkland & Ellis is the debtors'

21   principal bankruptcy counsel in this -- in the

22   bankruptcy case?

23   A.    They are.

24   Q.    And Evercore is the principal

25   financial advisors; is that right?

Case 14-10979-CSS   Doc 10761-1   Filed 02/03/17   Page 7 of 46

Page 21

PAUL M. KEGLEVIC

A.    They are.

Q.    And is it accurate that the board, to

the best of your knowledge, concluded that it

was desirable and in the best interests of EFIH,

its creditors and other parties in interest that

the company, that is, EFIH, enter into the EFIH

secured settlement?

A.    They did.

Q.    Now, I want to briefly review the

terms of that settlement.

Under that settlement, the first liens

would have received 95 percent or 97 percent of

their make-whole claims, depending on whether or

not the PIK holders ultimately voted to accept a

plan embodying the settlement, right?

A.    I'm trying to find it in the

disclosure statement so I can --

Q.    Sure.

A.    I know it was covered.

Q.    Let me suggest to you, Mr. Keglevic,

that you turn to page number 22 of 211.

A.    Yes, I'm there.

Q.    Okay.  And you'll see there's a chart

on page 22 of 211, and so we have a clean

1                    PAUL M. KEGLEVIC

2        A.    That's right.

3        Q.    And so that we're clear as to the

4   amount that is 95 percent of what or 97 percent

5   of what, it was the full principal amount of the

6   make-whole for the first and second liens plus

7   all interest through the effective date at the

8   contract rate, including interest on interest,

9   right?

10             MR. McKANE:  Objection to form.  The

11        document speaks for itself.

12        Q.    What is your understanding, Mr.

13   Keglevic?

14        A.    Yes, I believe that's right.

15        Q.    And similarly, the settlement, to your

16   understanding, provided for payment of 100

17   percent of the fees and expenses of the EFIH

18   first liens and EFIH second liens, correct?

19        A.    Yes.

20        Q.    And the boards of, to the best of your

21   knowledge -- let me ask a question of you.

22             Did you think there was anything

23   inappropriate about the EFIH first lien -- EFIH

24   secureds -- let me rephrase the question.

25             Did you think that the EFIH secured

1          PAUL M. KEGLEVIC

2    settlement was appropriate?

3          MR. McKANE:  Objection to form.  And

4    through what point of time?

5    Q.    At the point in time that you sought

6    its approval?

7          MR. McKANE:  There you go.

8    A.    Yes.

9    Q.    Did anyone on the board express a view

10   that it was inappropriate?

11   A.    No.

12   Q.    Did anyone in management for EFIH or

13   EFH express any questions about the

14   appropriateness of the settlement --

15   A.    No.

16   Q.    -- at the time it was approved?

17         And indeed, let me go to Mr. McKane's

18   interjection.  Even though the debtors have

19   pivoted to the PIKs' proposal, the EFIH and EFH

20   debtors still think the terms of the EFIH

21   settlement are certainly reasonable, right?

22         MR. McKANE:  Objection to form.

23   Q.    Can you answer me, Mr. Keglevic?

24   A.    Well, I think now that we have a

25   different proposal, it's reasonable as compared

1                    PAUL M. KEGLEVIC

2        Q.    So let me show you at the outset the

3   date of this document, which is January 3, 2017.

4             Do you see that, sir?

5        A.    Yes.

6        Q.    So that's after the debtors had

7   pivoted to the unsecured settlement, right?

8        A.    That's right.

9        Q.    Okay.  Let me turn your attention to

10  paragraph 15 on page 8.

11            Do you see paragraph 15, sir?

12       A.    Yes.

13       Q.    And I want you to look at the second

14  sentence.  I'll read it into the record.

15            "Although the EFIH Secured Creditor

16  Settlements were certainly within the range of a

17  reasonable settlement range" -- I'm sorry, I

18  misread that.  "Although the EFIH Secured

19  Creditor Settlements were certainly within the

20  realm of a reasonable settlement range for the

21  Make-whole Litigation pursuing a cram-down fight

22  out of choice, rather than necessity, carries

23  with it certain execution risk."

24            Do you see that statement?

25       A.    Yes.

1                      PAUL M. KEGLEVIC

2        Q.    Was that statement true and accurate

3   as the debtors views as of January 3, 2017?

4        A.    Yes, with the modifier, I think, to

5   your question "within the realm of a reasonable

6   settlement range."

7        Q.    Now, the debtors issued an 8-K at the

8   time of the entry into or the -- let me strike

9   that.

10            Is it accurate that the debtors in

11   December of 2016 issued an 8-K announcing their

12   agreement in principal to enter into the EFIH

13   secured settlement?

14        A.    Yes.

15        Q.    And do you recall that that 8-K

16   disclosed what the debtors understood to be the

17   PIKs' willingness to settle the make-whole

18   claims of the first liens and the second liens?

19            MR. McKANE:  Objection to form.

20        A.    I generally do, but I'm sure you -- if

21   you show it to me, I can refresh my

22   recollection.

23        Q.    Sure.

24            MR. ANKER:  This would be Exhibit No.

25   5, I believe.  It's the 8-K dated December

1                       PAUL M. KEGLEVIC

2           16, 2016.

3                   (Keglevic Exhibit 5, Energy Future

4           Holdings Corp. Form 8-K dated December 6,

5           2016, marked for identification, as of this

6           date.)

7    BY MR. ANKER:

8           Q.    Can you identify what is Exhibit 5,

9    Mr. Keglevic?

10          A.    As you described it, it's the 8-K

11   dated December 16, 2016.

12          Q.    And it announces the agreement in

13   principal, does it not, for the debtors to enter

14   into the EFIH secured settlement?

15          A.    It does.

16          Q.    Let me turn your attention to page 4.

17                Are you there, sir?

18          A.    I am.

19          Q.    And do you see the heading Discussions

20   with EFIH Unsecured Creditors?

21          A.    Yes.

22          Q.    And do you see that it says, "During

23   the negotiations with the restricted EFIH First

24   Lien Creditors and the Restricted EFIH Second

25   Lien Creditors, professionals for the Restricted

1             PAUL M. KEGLEVIC

2    EFIH Unsecured Creditors communicated to the

3    Debtors, the Restricted EFIH First Lien

4    Creditors, and the Restricted EFIH Second Lien

5    Creditors that the Restricted EFIH Unsecured

6    Creditors would be supportive of a settlement

7    consisting of an amendment or amendments to the

8    Agreement and Plan of Merger dated July 19,

9    2016, as amended, by and among NextEra Energy,

10   Inc., EFH Merger Co., LLC, EFIH and EFH Corp.

11   that would result in approximately $150 million

12   of additional distributable value under the

13   plan, as well as the following:  The EFIH First

14   Lien Noteholders would settle the EFIH First

15   Lien Make-whole Claims for 93 percent, with the

16   recovery on the remaining 7 percent to be used

17   to satisfy Allowed Claims (as defined in the

18   Plan) pursuant to the Amended Plan, and the EFIH

19   Second Lien Noteholders would settle the EFIH

20   Second Lien Make-whole Claims for 80 percent,

21   with the recovery on the remaining 20 percent to

22   be used to satisfy Allowed Claims pursuant to

23   the Amended Plan."

24           Do you see that, sir?

25   A.    Yes.

1                      PAUL M. KEGLEVIC

2        Q.     And is that an accurate statement of

3   the position as you understood it of the

4   restricted EFIH first lien creditors at the

5   time?

6        A.     I think you said EFIH --

7        Q.     I'm sorry.  If I misspoke, let me -- I

8   think I did misspeak.

9              MR. McKANE:  You did.

10        Q.     Thank you.

11              Was it an accurate statement of your

12   understanding of the position of the restricted

13   EFIH unsecured noteholders as of December 16,

14   2016?

15        A.     Yes, it was.

16        Q.     And just so that we're clear, the EFIH

17   first lien make-whole claims, calculated as they

18   were being, under the proposed secured

19   settlement would have been approximately how

20   much with an assumed effective date of April 30,

21   2017?

22        A.     I'm sorry.  I don't have that

23   information.  I don't recall the numbers, but

24   substantially short of $150 million, which is

25   the number we disclosed here.  So I --

1                    PAUL M. KEGLEVIC

2        Q.    And NextEra is not willing to pay that

3    $150 million, right?

4        A.    Correct.

5        Q.    Has anyone out there offered to beat

6    NextEra's price and offered an additional $150

7    million?

8        A.    No.

9        Q.    Now, the PIKs -- let's back up.

10            Exhibit 5 used the term "the

11    restricted EFIH unsecured noteholders."  Do you

12    know who that's a reference to?

13        A.    Yes.  It was York, Avenue --

14        Q.    GSO.

15        A.    -- and GSO.  And they owned about 60

16    percent of the total.

17        Q.    Of the total PIK debt?

18        A.    Of the total PIK debt.

19        Q.    And they have been major holders of

20    the PIK debt from the very outset of these

21    Chapter 11 cases, right?

22        A.    They have, generally, yes.

23        Q.    And their indenture trustee had

24    asserted a make-whole claim in these bankruptcy

25    cases, had it not?

1                    PAUL M. KEGLEVIC

2       Q.    And nor will it retain the liens that

3  the first liens and second liens currently have

4  on EFIH's interest in Oncor, right?

5       A.    Correct.  It replaces the secured lien

6  on Oncor with a secured lien on an escrow

7  account after payment of principal and accrued

8  interest.

9       Q.    And I want to see if I can focus on

10  the two different liens you mentioned:  One, the

11  existing lien on EFIH's interest in Oncor and,

12  secondly, the prospective lien on the escrow

13  account.

14          Am I right to understand that

15  NextEra's proposed transaction to acquire Oncor

16  implies an equity value for EFIH's interest in

17  Oncor of around $9.8 billion?

18       A.    That sounds about right.

19       Q.    And obviously I want to focus on my

20  clients for a moment.  One thing that's clearly

21  out of my clients is the DIP, right?

22       A.    Right.

23       Q.    And that DIP is about $5.4 billion,

24  right?

25       A.    I think we've increased it just

1                    PAUL M. KEGLEVIC

2     recently to 5.475, if I'm not mistaken, but...

3          Q.    Let's round to 5.5, okay?

4          A.    Okay.

5          Q.    Are you aware of any other debt that

6     has a lien on EFIH's interest in Oncor that is

7     senior to the lien of my clients?

8          A.    None -- just the DIP.

9          Q.    Okay.  So can we agree -- and I'm

10    happy to give you a calculator, but you do math

11    better than me -- 9.8 minus 5.5 is about $4.3

12    billion?

13         A.    That's correct.

14         Q.    So there's about $4.3 billion in value

15    securing my client's make-whole and other

16    disputed claims as of today, right?

17         A.    That's right.

18         Q.    Okay.  Now, the debtors aren't

19    proposing to put $4.3 billion into escrow to

20    secure my client's claims under the plan, are

21    they?

22         A.    They are not.

23         Q.    Okay.  And the reason for that is that

24    some of the $4.3 billion in cash, after payment

25    of the DIP, is going to be used to pay other

                    PAUL M. KEGLEVIC

1  claims on the effective date, right?

2     A.    Right.  It'll pay the second liens

3  and --

4     Q.    Okay.

5     A.    -- PIKs to the extent that the escrow

6  account doesn't equal or exceed their entire

7  potential waterfall distribution.

8     Q.    The second liens, for example, are

9  going to receive about $2.2 billion, right?

10    A.    Sounds about right.

11    Q.    I'm happy to show you the disclosure

12  statement.

13    A.    Fine.  I accept that.

14    Q.    Okay.  And you acknowledge, the

15  debtors acknowledge, the second liens are junior

16  to the first liens, right?

17    A.    Yes.

18    Q.    Are you aware that the collateral

19  trust agreement prohibits the debtors from

20  making any payment to the second liens, while in

21  bankruptcy, from the first liens' collateral

22  without the consent of the first liens?

23    A.    I'm not the expert in that provision.

24  You would probably have to talk to Andy Wright,

1                    PAUL M. KEGLEVIC

2    might need take place associated with the

3    appeal.

4        Q.     Well, am I right to understand that

5    the debtors propose to distribute approximately

6    $800 million to the PIK noteholders on the

7    effective date?

8        A.     Yes, that's generally correct.  I

9    don't have the numbers in front of me, but

10   assuming the numbers that I have seen that make

11   up the three-year escrow package, as I have

12   described it, I believe there would be, after

13   satisfying the escrow, about that amount left

14   over.

15       Q.     So that $800 million, if it were

16   distributed, proposed to be distributed --

17       A.     Actually, Mr. Anker, can I correct

18   myself?

19       Q.     Of course.

20       A.     That's a very specific calculation.

21   So I'm assuming the escrow account -- let me

22   just give the parameters -- is going to

23   approximate between 1.3 and 1.4 billion, and

24   whatever the remaining amounts are, that is what

25   the PIK holders would get subject, of course, to

1                   PAUL M. KEGLEVIC

2    Court approval.

3        Q.    Okay.

4        A.    So I just don't want to be too

5    specific without the numbers in front of me

6    about what the PIKs would get.

7        Q.    Sure.  Let me --

8              MR. ANKER:  Can we go off the record

9        one moment?

10             MR. McKANE:   Sure.

11             (Discussion off the record.)

12   BY MR. ANKER:

13       Q.    Mr. Keglevic, tell me what you, as of

14   today, understand the debtors are going to

15   propose be put into the EFIH claims for relief?

16       A.    As I said, I don't have the exact

17   number in front of me.  The schedules are being

18   updated and reviewed.  We are largely complete

19   with that process, but it is in excess of $1.3

20   billion, and I don't think it gets to $1.4

21   billion.  It's somewhere in the range that I

22   testified to earlier.

23       Q.    Okay.  And so let's do some math, and

24   I'm happy to give you a piece of paper or a

25   calculator, if you want.

1                   PAUL M. KEGLEVIC

2           I think what you testified to is the

3    NextEra merger implies an equity value of about

4    $9.8 billion for EFIH's interest in Oncor,

5    right?

6       A.    Right.

7       Q.    And 5. -- I'm sorry, 4.5 --

8             MR. McKANE:   5.5.

9       A.    No, you're --

10      Q.    I'm sorry.

11      A.    Can I walk you through it?

12      Q.    Sure.

13      A.    So if we do the 9.8 and subtract the

14   DIP loan, which is 5.5, that gives us 4.3.  Of

15   that number, we agreed 2.2 went to the second

16   lien notes.  So this is all before make-whole

17   consideration.

18           Those numbers would leave 2.1, if I

19   did the math correctly, available to pay the --

20   to fund the escrow, and the remaining amounts

21   going to the PIKs.  So, based on my testimony of

22   that 2.1, if 1.3 to 1.4, and the number is

23   somewhere in between that, goes into escrow,

24   that would leave somewhere between 700 and 800

25   million dollars to be distributed to the PIKs.

1                    PAUL M. KEGLEVIC

2    Ellis will remain counsel for the EFH plan

3    administrator board?

4          Let me rephrase that because it

5    doesn't exist today.

6       A.    Not my decision.

7       Q.    I'm sorry?

8       A.    It won't be my decision.

9       Q.    Do you have any understanding of the

10   expectation?

11      A.    I do not.  I have not talked -- I

12   don't think the board has been formed.

13      Q.    Okay.  Now, in addition, the plan

14   provides, does it not, for payment out of the

15   first liens' collateral of all of the

16   professional fees of the PIKs incurred through

17   the effective date?

18          MR. McKANE:  I object to the form of

19      that.  I don't think it says what you want

20      it to say.

21      Q.    Mr. Keglevic, am I correct that if the

22   plan is confirmed, the debtors are going to pay

23   100 percent of the professional fees of the PIKs

24   on the effective date?

25      A.    I believe that's right.

PAUL M. KEGLEVIC

1

2    Q.    And the debtors have contractually

3    bound themselves not to challenge one penny of

4    those fees, right?

5    A.    I think that's right.

6    Q.    And the plan provides that those fees

7    will not be subject to disgorgement, set-off,

8    recoupment of any kind, isn't that right?

9    A.    I believe that's correct.

10    Q.    And that's true even if the EFIH claim

11    reserve proves inadequate to a pay in fact the

12    allowed claims of the EFIH first liens and

13    second liens, right?

14    A.    That's correct.

15    Q.    So, at the end of the day -- let me

16    just try to look at the big picture -- today the

17    first liens have, in essence, approximately $4.3

18    billion securing their remaining claims, right?

19    A.    Yes.

20    Q.    And if the debtors' proposal goes

21    forward, that number will be reduced to about

22    1.3 to 1.4 billion, right?

23    A.    That's correct, but, you know, that's

24    still only one-half of the ledger.  It's not

25    that the secured first and second lien holders

1                    PAUL M. KEGLEVIC

2   to exercise their collateral could do that at no

3   cost.  You know, to go through a foreclosure

4   proceeding to satisfy the claims that they have

5   is not an insignificant matter that could have

6   substantial impacts on recoveries, it could have

7   substantial impacts on the NextEra deal, legal

8   costs, et cetera, but if we're just looking at

9   collateral as it stands today, just one side of

10  the equation, not both sides, including the

11  ability to exercise those liens, I would agree

12  with you.

13      Q.    Okay.  And would you also agree with

14  me that, under the proposed plan, the first

15  liens and the second liens will have no recourse

16  for payment of their claims if the reserve turns

17  out to be inadequate from any other source,

18  right?

19      A.    Well, I think --

20          MR. McKANE:  Objection to form.

21      Q.    Let me back up.

22          The first liens have claims against

23  the second liens under the intercreditor

24  agreement.  Let's put that aside.

25          Am I correct that the plan of

1                 PAUL M. KEGLEVIC

2    reorganization channels the -- any recovery as

3    against the debtors of the first liens and the

4    second liens to the EFIH claim reserve?

5         MR. McKANE:  Objection to form.

6         A.    Well, my understanding of your

7    question is, yes, the EFIH claim reserve is the

8    pool of funds that the EFIH first and second

9    liens have to draw against to satisfy their

10   claims, but one of the important elements is --

11   two important elements that we have in the

12   agreement that provide protection to the EFIH

13   first and second lien claims are that, number

14   one, if the court decides that the three years

15   is not adequate, the number of the pool can get

16   bigger.

17        Regardless of the size of the pool of

18   the claim reserve stays under the jurisdiction

19   of the court, so to the extent that those fund

20   are eaten away in a way that provides your

21   clients' concern -- and I'm sure, Mr. Anker, we

22   can rely on you to be monitoring that with a

23   great degree of diligence -- you have the

24   opportunity to go into court at that time and

25   ensure that those funds never get to the -- to

1                      PAUL M. KEGLEVIC

2  zero or to a point where you're concerned about

3  your recovery, and I think those were important

4  provisions to me and to our board as we approved

5  the settlement.

6       Q.    Well, let me make sure I understand

7  the second point, because I really don't.

8            Is there any provision of the plan

9  that I've missed in which anyone is guaranteeing

10 the adequacy of that reserve?

11      A.    There's not a guarantee, but there is

12 certainly recourse with the court if the funds

13 get below a level that indicate that there will

14 not be full recovery.

15      Q.    Has NextEra agreed that the

16 reorganized debtors will be obligated if there's

17 a shortfall?

18      A.    It has nothing to do with NextEra.

19      Q.    Can you answer my question?

20            Has NextEra agreed that there --

21      A.    No, NextEra has not agreed.

22      Q.    Do you know of any provision in the

23 plan that imposes any liability, contingent or

24 otherwise, on the reorganized debtors if there's

25 a shortfall?

1                   PAUL M. KEGLEVIC

2        A.    The plan provides an opportunity to go

3    to the Court and to make sure that those funds

4    remain sufficient down the road as the appeal

5    process takes place.  So that if the Court deems

6    that somewhere down the road that these funds

7    would be exhausted before payment of the claims,

8    the Court has, I believe -- and I'm not a

9    lawyer -- the jurisdiction to stop the appeal

10   activities, require bonds, or take some other

11   actions to make sure that your clients receive

12   their full claims.

13       Q.    Have the PIKs agreed that they will

14   backstop, to your knowledge -- let me rephrase

15   the question.

16             To the best of your knowledge, have

17   the PIKs agreed that, under any circumstances,

18   they will have liability if that escrow account

19   is drawn down and becomes inadequate?

20       A.    That's not a contractual liability

21   with the PIKs.  It's a process by which the

22   Court would have jurisdiction to get to the

23   outcome.

24       Q.    And you don't know what the Court

25   would do, do you, Mr. Keglevic?

PAUL M. KEGLEVIC

1

2      A.      No, but I assume it's a court of

3  equity and that they would look after the

4  interests of the first and second liens, as they

5  have throughout the case.

6      Q.      I want to focus about contractual

7  liability.

8          Is there any provision in the plan in

9  which anybody or any source, other than the EFIH

10  claim reserve, is assuming liability, contingent

11  or otherwise, for the payment of the EFIH first

12  lien and second lien claims?

13      A.      I'm not aware of any contractual

14  obligation.  I've described what is in the plan.

15      Q.      Let's go through your understanding as

16  things stand today of what sums -- let's back

17  up.

18          How did the debtors get to the 1.3 to

19  1.4 billion for the EFIH claims reserve?

20      A.      It was obviously -- well, the

21  three-year period itself, once you set the

22  period, the math takes care of itself.  So I

23  will answer just with respect to the period.

24          We asked Kirkland & Ellis to do

25  analysis of what the likely legal paths and to

1                    PAUL M. KEGLEVIC

2            MR. McKANE:  Because do you have Andy

3        on Friday, and that I think -- sorry, you

4        have him next week and you have Tony this

5        Friday, so it may be appropriate for another

6        witness since he isn't really the 30(b)(6)

7        on these topics.

8            MR. ANKER:  Okay.

9   BY MR. ANKER:

10      Q.    You went further in your answer, so

11  let me try to be precise of what I was asking.

12          The $1.3/1.4 billion is designed to

13  cover, one, the principal amount of make-whole

14  for the first and seconds and interest for

15  another three years, right?

16      A.    Correct.

17      Q.    And that's interest calculated at the

18  contract rate specified in the indentures,

19  compounded semi-annually, right?

20      A.    I believe that's correct.

21      Q.    And it's also designed to cover the

22  fees incurred by the first liens and the second

23  liens through the effective date, right?

24      A.    Correct.

25      Q.    And some projection of future fees?

1                    PAUL M. KEGLEVIC

2       A.      Yes; but you forgot -- I think the

3   assumptions assume that 80 percent of the fees

4   incurred at the effective date would be paid out

5   at the effective date and the remaining unpaid

6   fees would continue to accrue interest on them,

7   and then also the future fees would be in the --

8   were in the analysis, as I indicated.

9       Q.      Are you aware that the second liens

10  have asserted that they have something termed a

11  future interest claim?

12      A.      I have.

13      Q.      Is there any amount put in the reserve

14  in respect of the future interest claim?

15      A.      There is not, and it's because -- I

16  will just give you my finance guy answer:  That

17  we're required under the indenture to pay the

18  amount of principal and interest due.  That's

19  what we're going to do.  And the fact that the

20  second lien trustee does not distribute those

21  funds to the individual creditors and yet, even

22  though I have satisfied my obligations of paying

23  the debt in full at that date to the trustee, as

24  instructed, the notion that the interest would

25  continue to accrue makes no sense to me.

1              PAUL M. KEGLEVIC

2          So we strongly disagree with the

3     notion of that claim and have not included it in

4     the escrow amount.

5          Q.    But you're certainly not a lawyer, are

6     you, Mr. Keglevic?

7          A.    I am happy to say I am not, and so

8     obviously if that gets decided in a different

9     manner, as we started with earlier, the Court

10    has the ultimate jurisdiction to set the amount

11    of this reserve.  But it's not an allowed claim

12    at this stage so we did not include it.  We

13    included allowed claims in the 1.3 to 1.4.

14         Q.    I think this is purely a mathematical

15    proposition, but let me see if I have it right.

16         If the reserve is set on the effective

17    date and doesn't include any amount for future

18    interest claims, but later the future interest

19    claim post-effective date is held to be valid,

20    the reserve may well prove to be inadequate,

21    right?

22         MR. McKANE:  Objection to form.

23         A.    The reserve would be less than what

24    the three years would otherwise indicate.

25         Q.    Okay.  And if the reserve is set at

1                    PAUL M. KEGLEVIC

2    three years -- and I understand you think the

3    Court might be able to do something in the

4    future, but if the reserve were set at three

5    years, and the litigation went for more than

6    three years, the reserve could prove to be

7    inadequate, right, sir?

8         A.    Right, we -- certainly, I don't think

9    either of us can make a good -- lawyer or

10   non-lawyer can predict the future with a degree

11   of accuracy, so we did our best to look at

12   history and come up with what we believe to be a

13   reasonable timeframe.

14        Q.    And if it's determined in the future,

15   not as of the effective date, that the right way

16   to calculate interest is not compounding

17   semi-annually but compounding daily, the reserve

18   may prove inadequate, right?

19             MR. McKANE:  Objection to form.

20        A.    Who knows if the reserve may prove

21   inadequate, but certainly the reserve would have

22   been calculated differently and been a higher

23   calculation than the one we made.  The

24   assumptions would have changed.

25        Q.    Now, I think you said earlier that an

PAUL M. KEGLEVIC

1   important aspect of the plan is that the

2   Bankruptcy Court can require a larger reserve

3   than the 1.3 to 1.4 billion, right?

4       A.    Right.  We did not want to -- we

5   wanted to have as close to execution certainty

6   as we could, so we didn't want this to then blow

7   up the support agreement and then start all

8   over.  So it was a key element of our provision

9   that, regardless of the Court's decision, the

10  PIKs remained bound.

11      Q.    Let me make sure I understand that.

12            Imagine that the Court were to say

13  that not a penny can go to the PIKs and

14  everything that otherwise would go to the PIKs

15  has to be put into the claims reserve.  Are the

16  PIKs contractually bound still to support the

17  plan?

18            MR. McKANE:  Objection to form.

19      A.    My understanding is that they are.

20      Q.    And indeed, that was an important

21  aspect of the ultimate PIK proposal from the

22  debtors' standpoint, was it not?

23      A.    It was, and it was an item that we

24  pushed hard to get.

1                   PAUL M. KEGLEVIC

2         Q.    And indeed, you advised the EFH and

3    EFIH boards, before they voted to pivot to the

4    PIK proposal, that the PIKs may not receive any

5    distribution on the effective date, right?

6         A.    We certainly indicated that that was a

7    possibility associated with that provision,

8    albeit that we thought the position that we had

9    taken on three years was a reasonable one and

10   supportable.

11        Q.    And initially, the PIKs sought to

12   include a provision, did they not, in their

13   settlement that the reserve won't exceed a

14   billion-3?

15        A.    Yes, I believe that was part of the

16   negotiations at some point.

17        Q.    And the debtors pushed back, right?

18        A.    We did.

19        Q.    And refused to agree to that, right?

20        A.    We did.

21             MR. ANKER:  I do want to turn to the

22   length of the litigation.  You want to take

23   a couple-minute break and you can talk to

24   Mr. Wright?

25             MR. McKANE:  No.  Why don't we go off

1                    PAUL M. KEGLEVIC

2        A.    Yes, very quickly.

3        Q.    In fact, the debtors filed a first day

4    motion to refinance the first liens, right?

5        A.    Yes.

6        Q.    On April 29, 2014, right?

7        A.    Yes.

8        Q.    Have the debtors discussed with the

9    PIKs -- let's back up.

10            After the effective date, the

11   litigation will be controlled by a make-whole

12   litigation oversight committee, right?

13       A.    Right.

14       Q.    I'm going to use the abbreviation

15   MLOC.

16       A.    Please do.

17       Q.    I wish it came more easily off the

18   tongue.

19            The MLOC will have the right to direct

20   the litigation, right?

21       A.    Until the effective date.

22       Q.    After the effective date?

23       A.    I'm sorry, I get the two -- yes, after

24   the effective date.

25       Q.    And in fact, there's a provision in

1                    PAUL M. KEGLEVIC

2    the plan that says that the debtors or the plan

3    administrator board cannot settle the make-whole

4    litigation for less than 50 -- for more than 50

5    cents on the dollar without the approval of the

6    MLOC, right?

7         A.    Prior to the effective date.

8         Q.    After the effective date, does the

9    plan administrator board have any ability to

10   settle without the approval of the MLOC?

11        A.    Not at any percentage.

12        Q.    Okay.

13        A.    That's why I drew that distinction.

14        Q.    And so the MLOC will effectively be

15   the body that decides whether to settle or to

16   litigate, right?

17        A.    That's right.

18              MR. McKANE:  Objection to form.

19        Q.    And to litigate for how long, right?

20        A.    That's right, subject to unless the

21   Court steps in because of the adequacy of the

22   escrow issue.

23        Q.    Okay.  And the MLOC will consist of

24   whom?

25        A.    Basically, the PIKs.

1                         PAUL M. KEGLEVIC

2         Q.    Avenue, GSO, York, right?

3         A.    York, yes.

4         Q.    Now, have the debtors had any

5    discussions with the PIKs about their plans for

6    the litigation after the effective date?

7         A.    No.  I think it would be premature

8    because we don't know what's going to occur

9    between now and the effective date.

10        Q.    Okay.  You're aware that there's a

11   petition for rehearing that the debtors have

12   filed?

13        A.    I am.

14        Q.    The PIKs haven't said we're going to

15   direct you to drop that petition for rehearing,

16   have they?

17        A.    They have not.

18        Q.    You're aware that that petition for

19   rehearing asks that the Third Circuit certify

20   the underlying issues that the Third Circuit

21   decided to the New York Court of Appeals?

22        A.    I am.

23        Q.    Have the PIKs said that they want the

24   debtors to withdraw that request?

25        A.    They have not.

1                    PAUL M. KEGLEVIC

2    decision occurred in what has been called Phase

3    1 of the make-whole litigation?

4        A.    Yes, I believe you're referring to the

5    fact that solvency was assumed, and that would

6    have been the second phase.  If that's not it,

7    I'm not aware of it.

8        Q.    I think I know the answer to this

9    question because I think it's implicit in prior

10   answers, but I want a clear record, Mr.

11   Keglevic.

12            Have the PIKs in any way -- let me

13   rephrase that.  Have the debtors had any

14   discussion with the PIKs about whether the PIKs

15   are prepared to forgo any sort of Phase 2

16   proceeding, period?

17       A.    Not that I'm aware of.

18       Q.    Have you had any discussion, or anyone

19   from the debtors, to your knowledge, had any

20   discussions with anyone on behalf of the PIKs

21   regarding the length or the arguments or the

22   issues that might arise in a Phase 2?

23       A.    Not -- I have not heard the PIKs'

24   perspective on that.  Our legal counsel has

25   given us their perspective, which is, I'm sure,

1                    PAUL M. KEGLEVIC

2    provide for what I'm sure you're concerned about

3    is a free-rider situation.

4         Q.    Let me go back to my question, which,

5    with all due respect, I don't think you have

6    answered.

7              If the Court sets a reserve of three

8    years, and I understand the Court may set a

9    longer reserve, but if the Court sets a reserve

10   of three years, and the litigation goes for four

11   years, not three years, and there's not some

12   ability later to bring in new money, doesn't the

13   math work that there could be a shortfall of

14   approximately $200 million in the reserve?

15             MR. McKANE:  Object to the form,

16        incomplete hypothetical, and to the extent

17        you're asking him to do math, as we all have

18        agreed is the subject of financial experts

19        and were provided in expert reports and

20        therefore is an inappropriate opinion.

21        Q.    You may answer.

22        A.    Number one, and just to be clear, I

23   don't agree with the hypothetical, but if the

24   hypothetical is correct, of course, we

25   calculated the reserve on three years.  If it

1                    PAUL M. KEGLEVIC

2   goes four years, the reserve would not be

3   sufficient.

4        Q.    Thank you.

5             Have the debtors asked the PIKs to

6   agree contractually -- no ifs, no ands, no

7   buts -- that at the end of three years they will

8   either drop any further challenges to the

9   make-whole claims or, out of their own funds,

10  top up the reserve?

11       A.    All I can say is, in the negotiations,

12  this was the best deal we were able to get with

13  the protections that we've gotten.  Whether the

14  PIKs would agree to more than what the plan

15  support agreement says, at this point, I have no

16  basis of suggesting what they may or may not do.

17       Q.    I'm not asking what they may or may

18  not do in the future.  Let me rephrase the

19  question because I think you misunderstood it.

20       A.    I didn't.  I can answer it again.

21            I'm not aware specifically that we

22  asked that, but our intention and the design of

23  this approach was to make sure that the first

24  and second liens were paid and they had the

25  right amount of security.

1                    PAUL M. KEGLEVIC

2        A.    Right.

3        Q.    Let's just talk about the length of

4    the interest period.  A minimum of three years,

5    but as long as the Bankruptcy Court deemed

6    appropriate, right?

7        A.    That's what the agreement says,

8    correct.

9        Q.    And that was important to you, right?

10       A.    Yes, we didn't want to start all over

11   again.  We wanted a high degree of certainty

12   that we can have the NextEra deal go through.

13       Q.    So if Judge Sontchi were to determine

14   that more than three years of interest was

15   appropriate to fund the reserve, if he were to

16   determine, for example, that nothing should be

17   paid to the PIKs and all the money that

18   otherwise would go to the PIKs should be put in

19   reserve, the debtors don't dispute that that

20   would be reasonable, right?

21            MR. McKANE:  Objection to form.

22       A.    Well, we do dispute it's reasonable.

23   We believe three years is reasonable, but we are

24   bound by Judge Sontchi's decision.

25       Q.    And you don't think there's anything

1                      PAUL M. KEGLEVIC

2    wrong with being bound by Judge Sontchi's

3    decision, right?

4         A.    I, in fact, think we have been bound

5    by Judge Sontchi since April 28 on virtually all

6    matters.

7              MR. ANKER:   I'll pass the witness.

8    EXAMINATION BY

9    MR. HOROWITZ:

10        Q.    Good afternoon, Mr. Keglevic.   For the

11   record, Gregory Horowitz from Kramer Levin on

12   behalf of Computershare as indenture trustee for

13   the EFIH second lien notes.   That's the most

14   like a lawyer I'm going to sound like today.

15             I'm just going to ask you a few

16   questions.   First of all, I don't want to

17   belabor the three-year issue because I can

18   understand that that will largely be a matter

19   for argument before Judge Sontchi, but if I

20   understood your testimony, when the board

21   initially decided to set the reserve subject to

22   Judge Sontchi's review at three years, it did so

23   based on an analysis it was provided by

24   Kirkland, correct?

25        A.    Well, can I state it in my own terms?

1                    PAUL M. KEGLEVIC

2        Q.    Sure.

3        A.    I mean, obviously we negotiated with

4    the PIKs a deal, and the deal basically said we

5    could get to three years.  Right?  So we brought

6    to the board the negotiated deal.  The board

7    didn't set three years and then we go to the

8    PIKs and say take it or leave it; it was a

9    negotiated deal with the PIKs.

10            We explained to the board that we

11   thought it was reasonable based on work done by

12   Kirkland, and, you know, but had a provision

13   that if the judge found it not to be reasonable

14   and changed the amount, the agreement would

15   still be in effect.

16            So I just want to make sure that it's

17   the cart and the horse, that we -- the board did

18   not say three years and then, you know, we made

19   the PIKs take the deal.

20       Q.    Thank you.  That's helpful.

21            So, as between the debtors, Kirkland,

22   and the PIKs, who was the first one to throw out

23   three years as the time period?

24       A.    You know, once again, you know, who

25   went first in a negotiation is always an

                    PAUL M. KEGLEVIC

1

2  end?

3      A.    There certainly could be.  Again, I

4  have never seen the analysis to chart it.

5      Q.    And you said that there were two cases

6  that took longer, to your recollection?

7          MR. McKANE:  No.  No.

8      A.    That was a for instance.  I have not

9  seen any cases shorter or longer.  And like I

10 say, I guess the way I would love to revise,

11 because I shouldn't have used "on average," but

12 I'm a finance guy and I use terms like that,

13 they told us that based on their five-year

14 review, that three years was a conservative

15 estimate.

16     Q.    They did not --

17     A.    Whether they used averages or means,

18 modes, I don't know.

19     Q.    I just want to be clear.  Kirkland did

20 not advise -- that sounds bad.

21          The board did not determine what the

22 longest realistic timeframe for litigation might

23 be, did it?

24     A.    The board did not.  The board -- we

25 relied on the fact -- well, number one, the

PAUL M. KEGLEVIC

1   board was told that that's the most the PIKs, we

2   could get them to do, and the other provisions

3   of the deal, and the board then was told that

4   that was a conservative estimate based on

5   Kirkland's analysis.

6   Q.    The other area I wanted to ask you a

7   couple of questions about was the second lien

8   noteholders' claim, what has been referred to as

9   the future interest claim.

10          Do you remember you gave some

11  testimony about that?

12  A.    I do.

13  Q.    And if I understood, you testified

14  that the debtors have not -- are not taking

15  the -- withdrawn.  Let me try that again.

16          The debtors are taking the position

17  that there should not be a reserve for that

18  claim because it is not an allowed claim?

19  A.    That's one of the reasons, yes.

20  Q.    Okay.  Now, you do understand that the

21  make-whole claims, the first lien and the second

22  lien make-whole claims, are not as we sit here

23  today allowed claims?

24  A.    Yeah, I think the difference is that

1                    PAUL M. KEGLEVIC

2  at least it's been adjudicated by the Third

3  Circuit and a decision has come down, so, you

4  know, it has moved up the ladder toward an

5  allowed claim significantly more than a,

6  quote/unquote, future interest claim.

7            And then, also, I just disagree in

8  substance that we have to repay the amounts to

9  the trustee, who would normally distribute it to

10 the individual holders, but since the trustee

11 chooses not to distribute the monies, that the

12 interest keeps clicking and we can't satisfy our

13 obligation, to a finance guy, that's hard for me

14 to contemplate.  I don't know how we weave the

15 legal arguments around that point, but that's

16 the other point I make.

17    Q.    Is the term "defeasing bonds" -- is

18 that a phrase that's familiar to you?

19    A.    It is.

20    Q.    So do you understand that you're

21 taking the position that by turning the money

22 over to the -- withdrawn.

23            Let me start out.  First of all, you

24 understand that the first lien trustee is going

25 to be arguing to the court that the debtors