## Exhibit B

**Transcript of January 20, 2017 Deposition of Anthony Horton excerpts**

1                    ANTHONY HORTON

2   UNITED STATES BANKRUPTCY COURT

3   FOR THE DISTRICT OF DELAWARE

    ----------------------------------------x

4   In Re:

    Energy Future Holdings Corporation, et.,

5

                     Debtors.

6

    Chapter 11

7   Case No. 14-10979

    Jointly Administered

8

9   ----------------------------------------x

10

11          DEPOSITION OF ANTHONY HORTON

12              New York, New York

13              January 20, 2017

14

15

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 117929

1                    ANTHONY HORTON

2  understand the underlying principles of the

3  calculations, and in general, I think I'm in

4  agreement with the calculations and the numbers.

5       Q.    Okay.  Exhibit 2 shows two different

6  scenarios; is that right, sir?

7       A.    Yes.  One Scenario 1 and Scenario 2 as

8  an illustration of a potential for what we

9  consider a worst case.

10      Q.    And Scenario 1 is on page 2 of Exhibit

11  2?

12      A.    That is correct.

13      Q.    And Scenario 2 is shown on page 3 of

14  Exhibit 2, correct?

15      A.    That is correct.

16      Q.    And can I ask you to turn to Scenario

17  1, page 2 of Exhibit 2.

18      A.    Yes, sir.

19      Q.    You'll see at the bottom right-hand

20  column, there's a number 1313, and that's in

21  millions of dollars, right?

22      A.    That's correct.

23      Q.    So that's $1,313,000,000?

24      A.    That is correct.

25      Q.    What does that number represent, as

ANTHONY HORTON

1

2    you understand it?

3        A.    That would be the amount of funds that

4    would be escrowed in the claim reserve account

5    considering a three-year litigation window, if

6    you will, at emergence.

7        Q.    I want to drill into that a little bit

8    just to make sure we have a clear record.

9            You said that would be the amount of

10   funds that would be escrowed in the claim

11   reserve account.

12           By the claim reserve account, did you

13   mean the EFIH claims reserve as defined in the

14   plan?

15       A.    Yes, sir.

16       Q.    So that would be the amount of money

17   reserved to cover the various claims of the EFIH

18   first liens and second liens not paid on the

19   effective date of the plan?

20       A.    The potential claims, yes, sir.

21       Q.    And this assumes, Scenario 1 assumes,

22   as does Scenario 2, that the emergence date, the

23   effective date, will be April 30 of 2017,

24   correct?

25       A.    That is correct.

ANTHONY HORTON

1

2      Q.    Does Scenario 1 reflect the debtors'

3  proposal to the Court?

4      A.    Yeah, I would -- I would say that

5  that's where our proposal would be.  It's the

6  1313.

7      Q.    As I understand it -- and I'm not the

8  one testifying, tell me if I'm wrong -- there

9  are two sources of cash that will be available

10  to EFIH upon emergence, one being the proceeds

11  of the NextEra transaction and the other being

12  cash on-hand, right?

13      A.    That is correct.

14      Q.    And the overwhelming bulk of the

15  dollars is coming from the NextEra transaction,

16  right?

17      A.    That is correct.

18      Q.    How much cash on-hand does EFIH have

19  as of today, approximately?

20      A.    I don't know as of today.  As of the

21  effective date, we have a projection of roughly

22  $70 million.

23      Q.    I'm sorry, how much?

24      A.    $70 million.

25      Q.    Okay.

1                    ANTHONY HORTON

2       A.    It's a very small percentage, if

3  that's where you were going.

4       Q.    I'm not good enough to -- I need more

5  coffee to do it well in my head.

6       A.    I need a calculator, so...

7       Q.    I understand that the NextEra

8  transaction will generate for EFIH approximately

9  $9.8 billion.  Is that consistent with your

10  understanding?

11      A.    Approximately, yes.

12      Q.    And my understanding is that the first

13  lien DIP is projected as of April 30, 2017 to be

14  about $5.5 million?

15      A.    $5.475 billion, yes.

16      Q.    I said million.  My apologies.

17      A.    That's okay.

18      Q.    So if one rounds, it would say --

19      A.    5.5.

20      Q.    -- 5.5 billion.

21      A.    If you want to round to 5.5, that's

22  fine.

23           MR. McKANE:  What's $25 million

24      between friends.

25      Q.    Let's try not to talk over each other.

ANTHONY HORTON

1

2          So that means, after payment of the

3    first lien DIP, the remaining funds, 9.8 minus

4    5.5, leaves you with about $4.3 billion, right?

5          A.    That is correct.

6          Q.    And rather than escrow $4.3 billion,

7    the debtors are proposing to escrow $1.3

8    billion, right?

9          A.    That's correct.

10         Q.    And the extra $3 billion -- why don't

11   I ask you.  Approximately $3 billion will be

12   used under the debtors' proposal for what?

13         A.    Well, out of the $3 billion that

14   you're referring to, approximately $2.2 billion

15   will be sent to the indenture trustee directly,

16   second lien indenture trustee.  The remaining

17   amounts, there is some admin claims that will be

18   paid as well.  1.313 will go into claim reserve

19   account.  We'll have, if needed, funds set aside

20   for the make-whole litigation in an escrow

21   account as well.  I've seen numbers as 1.5, 2.5

22   million, kind of range of numbers that would be

23   per month that would be placed into that

24   account.  And the remainder would be placed into

25   an account for potential distribution to the

1                    ANTHONY HORTON

2      is intended to have the word "approximately"

3      in front of it, and I understand Mr.

4      Horton's answers to also implicitly include

5      the term "approximately," whether or not he

6      expressly says it.

7           MR. McKANE:  As long as everyone

8      recognizes it.  Like the numbers can move by

9      25, 30, 40 million if we keep doing this

10      math this way.

11           MR. ANKER:  I think I just made the

12      concession that you asked me to do, Mr.

13      McKane.  Let me go forward.

14           MR. McKANE:  Keep going.

15           MR. ANKER:  Okay.

16           MR. McKANE:  It's your record.

17  BY MR. ANKER:

18      Q.    Of the approximately $3 billion left,

19  I understand that the debtors propose to

20  distribute approximately $2.2 billion to the

21  indenture trustee for the EFIH second liens,

22  correct?

23      A.    That is correct.

24      Q.    That 2.2, however, is not to satisfy

25  their make-whole or future interest claims or

1                   ANTHONY HORTON

2    fees, correct?

3        A.    No, that is for their principal and

4    interest.

5        Q.    So post-petition --

6        A.    Accrued to that date.

7        Q.    Post-petition interest as well as

8    principal, right?

9        A.    That's correct.

10       Q.    And the post-petition interest is

11   approximately $475 million?

12       A.    Approximately.

13       Q.    So, once you take off that $2.2

14   billion, approximately, you're left with

15   approximately $800 million, right?

16       A.    Yes, that is correct.

17       Q.    And of that $800 million, I think you

18   said some of it was going to go to pay

19   administrative expense claims, right?

20       A.    That is correct.

21       Q.    And by that you mean administrative

22   expense claims that were incurred between the

23   petition date and the emergence date, right?

24       A.    That is correct.

25       Q.    And how much, approximately, do the

1                    ANTHONY HORTON

2  be -- those funds would be set aside for that

3  purpose.

4       Q.    So I take it no one has offered to do

5  this litigation for the Plan Administrator Board

6  pro bono, to your knowledge?

7       A.    I have no -- have been involved in no

8  discussions regarding who, when, and how this

9  litigation is going to be pursued.  It's clearly

10  the Make-whole Litigation Oversight Committee

11  has ultimate say of how that's going to work.

12  Okay?

13       Q.    So after deducting from the $3 billion

14  left after funding the EFIH claim reserve, the

15  approximately $2.2 billion paid to the second

16  liens, the admin expenses at 45 to 100 million

17  and a reserve of perhaps $72 million, that

18  leaves you, if I understand your testimony

19  earlier, with approximately $600 million

20  available to distribute to the PIKs?

21       A.    600, 650, depending on how the -- what

22  comes out of the working capital audit and the

23  professional fee audit.

24       Q.    Okay.  And the working capital audit

25  is an audit of the working capital of EFIH

ANTHONY HORTON

1
2     Q.    Mr. Horton, are you generally familiar
3  with Exhibit No. 3?
4     A.    Yes.
5     Q.    Can I ask you to look at page 19 of
6  133.  If you look at the top, the pagination on
7  the top of the pages.
8          Are you there, sir?
9     A.    I am.
10    Q.    Do you see a defined term, the EFH
11  Base Payment Amount?
12    A.    Which paragraph?
13    Q.    Number 159.
14    A.    I see.
15    Q.    And you see the EFH base payment
16  amount means "the represented accrued and unpaid
17  fees and expenses incurred as of the EFIH
18  Effective Date by the EFIH Unsecured Notes
19  Trustee (including all reasonable professional
20  fees and expenses)"; did I read that correctly?
21    A.    I do see that.
22    Q.    Now can I ask you to turn to page 89
23  of 133.
24    A.    Okay.
25    Q.    Do you see the letter R, Payment of

1              ANTHONY HORTON

2  Certain Fees?

3       A.    I do.

4       Q.    Do you see the one below that, Payment

5  of Fees of Certain Creditors of the EFIH

6  Debtors?

7       A.    Yes.

8       Q.    Now, I want you to look at the second

9  paragraph.  Let me read it.  Tell me if I'm

10 reading it correctly.

11            "On the EFH effective date, the EFH

12 Plan Administrator Board shall (a) pay no less

13 than the EFIH Base Payment Amount and (b) not

14 dispute that such EFIH Base Payment Amount

15 (including any fees owed to Centerview,

16 financial advisor to the EFH Unsecured Notes

17 Trustee, pursuant to the terms of Centerview's

18 engagement agreement with the EFIH Unsecured

19 Notes Trustee, including any fees owed upon

20 consummation of a 'Transaction' (as defined in

21 that certain original engagement letter, dated

22 March 10, 2015), are reasonable and allowed

23 claims under the EFIH Unsecured Notes

24 Indenture."

25            Did I read that correctly?

1                    ANTHONY HORTON

2            MR. McKANE:  I object to the extent

3       you don't read the last sentence of that

4       same paragraph.

5            MR. ANKER:  I'll get to the last

6       sentence.

7  BY MR. ANKER:

8       Q.    Did I read that correctly?

9       A.    I agree with you.  You did read it

10  correctly.

11      Q.    And then it says that, "The payment of

12  such amounts to the EFIH Unsecured Notes Trustee

13  in accordance with the terms of the EFIH

14  Unsecured Creditor Plan Support Agreement shall

15  not be subject to disgorgement, setoff,

16  recoupment, reduction or reallocation of any

17  kind and is without prejudice to the EFIH

18  Unsecured Notes Trustee's subsequent exercise of

19  any charging lien."

20            Did I read that correctly?

21      A.    That's correct.

22      Q.    And then the sentence Mr. McKane asked

23  that I read was, "The payment of the EFIH Base

24  Payment Amount shall be considered a 'charging

25  lien advance' pursuant to Section 6.12, 6.13,

<sup>1</sup>                    ANTHONY HORTON

<sup>2</sup> and 7.07 of the EFIH Unsecured Note Indentures."

<sup>3</sup>            Did I read that correctly?

<sup>4</sup> A.    Yes, sir, you did.

<sup>5</sup> Q.    Does the portions of Exhibit 3 that I

<sup>6</sup> have called to your attention refresh your

<sup>7</sup> recollection that the plan contemplates that the

<sup>8</sup> debtors will pay to the EFIH unsecured notes

<sup>9</sup> trustee on or about the effective date the

<sup>10</sup> professional -- unpaid professional fees and

<sup>11</sup> expenses incurred by counsel and financial

<sup>12</sup> advisors for the -- for UMB?

<sup>13</sup>            MR. McKANE:  Objection to form.

<sup>14</sup> A.    Yeah, my confusion is kind of in the

<sup>15</sup> way you phrased the question.

<sup>16</sup>            The debtors may take those funds that

<sup>17</sup> were otherwise going to the PIKs and pay those

<sup>18</sup> fees, and it will be charged against the

<sup>19</sup> proceeds that would otherwise go to the PIKs.

<sup>20</sup> So those are not coming out of the funds of the

<sup>21</sup> estate.  It's coming out of the funds that are

<sup>22</sup> owed to the PIKs.

<sup>23</sup>            Would you agree?

<sup>24</sup> Q.    Some day you'll get to take my

<sup>25</sup> deposition, but today is not that day.

1                    ANTHONY HORTON

2          MR. McKANE:  There will be a long line

3     of EFH personnel on that day.

4     A.     I would never want to do that, so...

5            Anyway, that's how I interpret it.

6     You'll get with the lawyers and get more detail.

7     Q.     So, Mr. Horton, after the working

8     capital audit and the professional fee audit are

9     performed, do I understand correctly that the

10    debtors then contemplate making a distribution

11    to the PIK noteholders?

12    A.     I think that's correct.

13    Q.     And that distribution, approximately,

14    as you sit here today, you expect to be in the

15    range of 600 to 650 million, am I right?

16    A.     Using the math that you and your

17    assumptions, yeah, roughly.  I haven't done the

18    exact calculations.  As we said, we haven't made

19    that determination at this point, but it --

20    again, I don't know what's going to happen with

21    the working capital audit, I don't know what's

22    going to happen with the professional fee audit,

23    so I can't give you that.

24    Q.     Okay.

25    A.     But in our -- the example and the

1                   ANTHONY HORTON

2    illustration that you and I were going through,

3    I will stipulate it's approximately $600

4    million.

5         Q.   Okay.  I didn't understand you to be

6    taking issue with any of my, quote/unquote,

7    assumptions as we were going through the math.

8             Did I misunderstand?

9             MR. McKANE:  Objection to form.

10        A.   Again, let me state again that we have

11   said over and over we don't know precisely.

12   There are a lot of variables in determining what

13   that distribution will be for the PIKs,

14   including the working capital audit, including

15   the professional fee audit.  Let's, if we set

16   that aside, and say, okay, look, it was all as

17   everyone expected, approximately 600, 650

18   million dollars, I'm fine with that.

19        Q.   Okay.  Let me just get a clear record.

20   I think I understand you, what you just said.

21            Let me ask you to assume that the

22   working capital audit and the professional fee

23   audit show that the working capital of EFIH at

24   emergence is precisely what was projected and

25   that the professional fees were precisely what

1                    ANTHONY HORTON

2    was projected.

3              If those two assumptions prove

4    accurate, the debtors project, approximately, to

5    distribute to the PIKs out of the proceeds paid

6    by NextEra somewhere in the ballpark of 600 to

7    maybe 650 million dollars; is that right?

8        A.    I would just add one more qualifier.

9    It also depends on the administrative claims as

10   well.  So, remove those variables, 600, 650, 700

11   million, somewhere in that range.

12       Q.    Okay.

13             THE WITNESS:  Can we take a quick

14       men's break?

15             MR. ANKER:  Sure.

16             (Recess; Time Noted:  9:43 a.m.)

17             (Time Noted: 9:49 a.m.)

18   BY MR. ANKER:

19       Q.    Mr. Horton, is there a timeframe in

20   which the working capital audit is expected to

21   be completed?

22       A.    I can't recall that off the top of my

23   head precisely.  I thought it was 30 to 60 days,

24   but I can't recall.  It's in this -- it's in the

25   documents and we can look it up.  I don't

1                       ANTHONY HORTON

2    per month projected for three years, $72 million

3    in total, to put aside less than that amount?

4         A.    I would believe that if it was

5    reasonable and they had done the analysis, yes.

6         Q.    Are you aware that there is a

7    provision in the plan that provides that if the

8    reserve for professional fees of the Plan

9    Administrator Board and Make-whole Litigation

10   Oversight Committee proves inadequate, that the

11   EFIH claims reserve can be invaded to pay those

12   fees?

13              MR. McKANE:   Objection to form.

14        A.    I'm not sure what you mean by

15   "invaded."

16        Q.    Charged word.   Let me try to ask the

17   question more neutrally.

18              Are you aware that there is a

19   provision in the plan that provides that if the

20   separate reserve for the professional fees of

21   the Plan Administrator Board and the Make-whole

22   Litigation Oversight Committee proves

23   inadequate, the Plan Administrator Board may

24   draw from the funds in the EFIH claim reserve to

25   satisfy the professional claims of the

1        ANTHONY HORTON

2   professionals representing the Plan

3   Administrator Board and the Management [sic]

4   Litigation Oversight Committee?

5        A.    I think that's correct.

6        Q.    So, as you understand the plan, the

7   Plan Administrator Board could decide to reserve

8   $1 for the professional fees of the Plan

9   Administrator Board and the management -- I keep

10  saying "management" -- and the Make-whole

11  Litigation Oversight Committee?

12           MR. McKANE:   MLOC.

13       Q.    -- MLOC, and then draw out of the EFIH

14  claim reserve to satisfy all fees in excess of

15  that $1 incurred by the EFH Plan Administrator

16  Board and MLOC?

17       A.    That's quite a hypothetical there.

18           I would, one, expect that they would

19  have reasonable estimates and have fiduciary

20  responsibilities, and putting in $1 for a

21  three-year litigation does not seem reasonable.

22  I also expect you, knowing you so well and your

23  professional capabilities, would go immediately

24  to the Court -- and the Court will retain

25  jurisdiction over this matter -- and object to

1                    ANTHONY HORTON

2    them putting $1 aside and taking funds out of

3    the claims reserve account in order to pay the

4    professional fees.

5        Q.    Mr. Horton, I understand you're not a

6    lawyer, and this, frankly, may be more in Mr.

7    Wright's purview, but are you aware of any

8    provision in the plan that enables the Court to

9    override the determination by the EFH Plan

10   Administrator Board as to the amount of the

11   reserve for the professional fees of the board

12   and MLOC?

13            MR. McKANE:  Object to the form of the

14       question.  It calls for a legal conclusion.

15       A.    As you stated, I am not a lawyer.

16   It's my understanding, if you looked at Article

17   XI of the plan, that the Court will retain

18   jurisdiction over the confirmation order itself,

19   and there's several, you know, items and

20   paragraphs within that article that provides

21   that the Court has jurisdiction over the

22   confirmation plan, confirmation order, and

23   there's sections within that.

24            I would suggest that you spend some

25   time with Mr. Wright on the exact paragraphs.  I

ANTHONY HORTON

1  
2    read through it.  It seems to me that you have a

3    lot of leeway there in terms of going to court

4    on this matter, but as you stated before, I'm

5    not a lawyer.

6        Q.    When I question Mr. Wright, I will be

7    sure to tell him that you told me to spend some

8    time with him on those paragraphs.

9        A.    He'll be fine.

10       Q.    Can I ask you to go back to what I

11   believe is Horton Exhibit 2.

12       A.    Yes, sir.

13       Q.    And can I ask you to turn to page 2,

14   which is Scenario 1.

15       A.    Yes, sir.

16       Q.    And I want to make sure I understand

17   this document, so let's go sort of almost

18   line-by-line.

19            Under EFIH First Lien Claim, there's

20   an entry Make-whole and it shows $432 million,

21   do you see that?

22       A.    Under the column 4/30/17 emergence

23   date, yes, I do.

24       Q.    And do I understand correctly that's

25   the principal amount of the make-whole that is

ANTHONY HORTON

1

2          It's impossible, but go ahead.

3     A.    My belief is that the $14 million is,

4  if it is not paid, these calculations represent

5  the interest on the professional fees, which

6  includes accrued interest on the professional

7  fees.  So it would be compounding off of the $14

8  million plus the 20 percent.

9     Q.    Okay.

10    A.    Is that clear?

11    Q.    Yes.

12          Have the debtors done an analysis

13  taking all the assumptions that are in Scenario

14  1 but running it out beyond 4/30/2020?

15    A.    I'm not aware of that analysis.

16    Q.    I want you to look at the very bottom

17  line, the one that's got a big box around it,

18  "All Make-wholes, Call Premiums, Interest &

19  Professionals Fees."  Do you see that?

20    A.    I do.

21    Q.    And as of April 30, '17, it's $907

22  million, do you see that?

23    A.    I do.

24    Q.    And that as of a year later, it's

25  $1,031,000,000, right?

ANTHONY HORTON

1

2    A.    That's correct.

3    Q.    And so that's an increase of, I'm

4   happy to give you a calculator, but of about

5   $124 million?

6    A.    That is correct.

7    Q.    Okay.  And then the next year, as of

8   April 30, 2019, it's $1,166,000,000, right?

9    A.    That's correct.

10    Q.    And that's an increase compared to

11   April 30, 2018 of about $135 million, right?

12    A.    That is correct.

13    Q.    And so it's a bigger increase from

14   April 30, '18 to April 30, '19 than from April

15   30, '17 to April 30, '18, right?

16    A.    Compounding is an exponential

17   calculation, so yes, of course.

18    Q.    And without going through the exact

19   math with you, between April 30 -- the increase

20   from April 30, '19 to April 30, '20 is also

21   greater than in either of the prior years,

22   right?

23    A.    That's correct.

24    Q.    And that increase is about $147

25   million, right?

1                    ANTHONY HORTON

2        A.    Yes, sir.

3        Q.    So if it turned out that the

4   litigation didn't last just three years but

5   lasted four years, it got resolved on April 30,

6   2021, and let's assume that the result of the

7   litigation is that the EFH first lien claims and

8   EFIH second lien claims prevail, the amount that

9   would then be owed to them, with all these other

10  assumptions, would be, ballpark, $160 million

11  more than the billion-313 shown as of April 30,

12  2023, right?

13            MR. McKANE:  Objection to form.

14  Incomplete hypothetical.

15       A.    It would be more.  I'll stipulate it

16  would be more.  Is it 160?  I don't know.  I

17  didn't do the calculation, but it's more.  Let's

18  say it's 150 to 160, some kind of range.

19       Q.    Okay.

20       A.    Okay.  I get your point.  It would be

21  more.

22       Q.    And then if it went two years beyond,

23  so now it's not resolved until April 30, 2021,

24  the increase would be two times 150 to 160, plus

25  some additional compounding, approximately?

1              ANTHONY HORTON

2          MR. McKANE:  If you want to do it two

3      years, it has to be April 30, 2022.

4      Q.    I'm sorry.  Let me ask the question

5  again.  And I actually do appreciate Mr.

6  McKane --

7          MR. McKANE:  As opposed to all the

8      other times, but I get it.

9          MR. ANKER:  There was no negative

10      pregnant in my question.

11  BY MR. ANKER:

12      Q.    Given the effect of compounding, the

13  claim will grow by a greater amount year after

14  year, right?

15      A.    I think we went through this.  It's a

16  compounding exponential calculation.  Yes, it

17  will be greater than it was the prior year.

18      Q.    Right.  So if the litigation were

19  resolved such that it were resolved on April 30,

20  2022, and the first liens and second liens

21  prevailed, and all the other assumptions built

22  into Scenario 1 proved accurate, the total

23  amount owed to the first and second liens would

24  be $300-350 million more than billion-313 shown

25  on page 2 of Exhibit 2, am I correct?

1                    ANTHONY HORTON

2          MR. McKANE:  Objection to form.

3      A.    I have not looked at your analysis.  I

4  know you're looking at a computer and doing some

5  type of calculation.

6      Q.    No, I --

7      A.    It doesn't matter.  Right?  In a

8  vacuum, yes, these numbers, if you're just

9  looking at this sheet, yes, if it went longer,

10  it's going to continue -- that bottom line is

11  going to continue to increase.

12      Q.    Okay.  Have the debtors done any

13  analysis otherwise consistent with Scenario 1

14  that calculated interest with compounding on a

15  daily rather than semiannual basis?

16      A.    No.

17      Q.    And even though you haven't done the

18  calculation, am I right that semi -- that daily

19  compounding would lead to a higher amount than

20  semiannual compounding?

21      A.    In principle, yes, it would.  And in

22  principle, principle, P-L-E.

23          MR. McKANE:  In theory.

24      A.    Yes.

25      Q.    I actually understood the "principle"

1                    ANTHONY HORTON

2        Q.    Now, if I understand correctly, the

3    assumption -- what changed assumptions are there

4    in Scenario 2 compared to Scenario 1?

5        A.    The change between Scenario 1 and

6    Scenario 2 is the assumption that the principal

7    on the and the interest on the second lien notes

8    is accruing because the indenture trustee, and I

9    know you guys have this intercreditor fight, but

10   there's a determination that that cannot be paid

11   to the second lien holders and therefore they're

12   accruing interest on their principal and

13   interest up through the emergence date and it

14   continues to grow.

15       Q.    Can you turn to page 1 of Exhibit 2.

16             Do you see the heading Intercreditor

17   Litigation?

18       A.    I do.

19       Q.    And do you see the second bullet under

20   Scenario 2, "Interest on the 2L principal

21   accrued from petition date through emergence is

22   paid out at emergence to creditors."

23             Did I read that correctly?

24       A.    You did.

25       Q.    My understanding, Mr. Horton, and tell

ANTHONY HORTON

1  me whether I'm mistaken, was that Scenario 2

2  assumed that the accrued interest through the

3  effective date owed to the 2Ls was paid on the

4  effective date, but that the principal balance

5  was not paid?

6       A.    I misspoke.  You're correct.

7       Q.    And so Scenario 2 then assumes that

8  interest continues to accrue at the contract

9  rate specified in the indentures and notes of

10  the second liens following the emergence date,

11  right?

12       A.    That's correct.

13       Q.    Again, on a semiannual compounding

14  basis?

15       A.    That's correct.

16       Q.    Okay.  And after three years on that

17  basis, the debtors project that the total amount

18  that would have to be paid to the first and

19  second liens approximates $1,889,000,000, am I

20  correctly understanding Scenario 2?

21       MR. McKANE:  Object to the form.  It's

22  not -- well, it's what would be in the

23  escrow account.  It's not saying it's

24  allowed yet.

1          ANTHONY HORTON

2          MR. ANKER:  Mr. McKane, please don't

3      testify, but I will reframe the question.

4          MR. McKANE:  I'm trying to help you.

5          MR. ANKER:  I appreciate that.

6   BY MR. ANKER:

7      Q.    If all of the assumptions underlying

8   Scenario 2 prove to be accurate and the

9   litigation resolved itself after three years,

10  the amount that would be payable to the first

11  and second liens would be $1,889,000,000,

12  correct?

13         MR. McKANE:  Objection to form.

14         Go ahead.

15     A.    The amount required to pay would be

16  1,889.

17     Q.    Million dollars?

18     A.    Billion.

19     Q.    $1,889,000,000?

20     A.    That's correct.

21     Q.    Okay.  And that is approximately $576

22  million more than is shown for Scenario 1 at a

23  comparable point in time, April 30, 2020; that

24  is, the difference between a billion-889 million

25  and a million-313 million, right?

ANTHONY HORTON

1

2      A.      That's correct.

3      Q.      And so that's not quite the entirety

4  of the proposed payout to the PIKs, the $600-700

5  million, but it's the lion's share of that

6  $600-700 million, right?

7      A.      That's correct.

8      Q.      And if you were to assume that the

9  litigation didn't get resolved on April 30, 2020

10  but instead got resolved on April 30, 2021, and

11  you simply took out -- you simply followed

12  Scenario 2 out for another year, the number

13  would be over $2,200,000,000, right?

14      A.      Yes, if you allowed it to continue to

15  go to -- the litigation to go and you hadn't

16  gone to court and stopped the litigation, and

17  went to the judge and said, hey, we're running

18  out of money here, yeah, that would have

19  occurred.  I would agree with that.

20      Q.      Okay.

21      A.      If that -- just to add to the entire

22  hypothetical.

23      Q.      Right.  So let me just make sure,

24  again, we have a clean record.

25              If you look at Scenario 2, at the end

1                    ANTHONY HORTON

2     of April 30, 2019, the total amount that would

3     be required to be paid to the first and second

4     liens would be a billion-523 million, right?

5         A.     That's correct.

6                MR. McKANE:  Objection to form.

7                Go ahead.

8         Q.     And at a year later, it's a

9     billion-889 million, right?

10        A.     That is correct.

11        Q.     So the difference between those two is

12    $366 million, right?

13        A.     That's correct.

14        Q.     Okay.  And given compounding --

15                MR. McKANE:  Just to clarify for the

16           record, this is the proposed escrow.  This

17           is not what is allowed or to be paid out.

18           This is just the proposed escrow.

19                MR. ANKER:  Mr. McKane, please.

20                MR. McKANE:  If you want to know what

21           the debtors' position is, and you have a

22           30(b)(6), and rather than like taking him

23           outside of the room and giving him

24           instruction and bringing him back, I just

25           want to be absolutely clear what the

ANTHONY HORTON

1

2      debtors' position is.  This is not allowed.

3      This is to be escrowed.

4  BY MR. ANKER:

5      Q.    Mr. Horton, I'm going to ask the

6  question again because your counsel keeps

7  interrupting.

8          Assume with me that at the end of the

9  day the EFIH first liens and EFIH second liens,

10  by court order, have allowed claims consistent

11  with every one of the assumptions set forth in

12  Scenario 2.

13          Is it accurate that the amount that

14  would be owed under those circumstances to the

15  EFIH first liens and the EFIH second liens, as

16  of April 30, 2020, would be $1,889,000,000?

17          MR. McKANE:  Objection to form.

18      A.    As I answered, I thought, earlier was,

19  yes, provided that you had not -- again, this is

20  a hypothetical that you're presenting -- that

21  you had not gone into court and told the Court,

22  look, we don't have enough funds in this escrow

23  account.  Therefore, it must not continue.  We

24  have to stop.  We don't have enough funds.

25      Q.    I'm going to come to that, I promise

ANTHONY HORTON

1   you.  So I will take that hypothetical.

2      A.    I understand.  I'm answering your

3   question.  You gave me a hypothetical.  Included

4   in that hypothetical, though, is that you have

5   not gone to court.

6      Q.    Fine.

7          And a year earlier, as of April 30,

8   2019, the amount was a billion-523 million,

9   right?

10         MR. McKANE:  Objection to form.  All

11     you're asking is what the number is, right?

12     A.    That was going to be my -- I don't

13  understand the question.  Are you asking me if

14  that's what's the number on the page?

15     Q.    Let me try to tell you where I'm going

16  to, okay?  And maybe you can help me.

17         I think that if you ran Scenario 2 out

18  for another year to April 30, 2021, then the

19  amount that would be shown in this bottom box,

20  All Make-wholes, Call Premiums, Interest &

21  Professional Fees, would be $380-400 million

22  more than the billion-889; is that about right?

23     A.    Mathematically, that is right.

24     Q.    Okay.  And so -- no further questions.

ANTHONY HORTON

1

2    agree to bind themselves to terminate any

3    litigation challenging the first lien and second

4    lien make-whole claims after three years from

5    the emergence date?

6        A.    Just to clarify, when you say "bind,"

7    what do you mean?

8        Q.    Let me rephrase the question.

9        A.    Okay.

10       Q.    Have the debtors had any conversations

11   with the PIKs as to whether the PIKs will

12   terminate any litigation challenging the first

13   lien and second lien make-whole claims after

14   three years from the emergence date?

15       A.    Other than -- we've had conversations.

16   We've asked.  At this point in time, they said

17   they are not willing to do that.  Conversations

18   were amongst counsel.  And they have agreed that

19   they would be bound by the Article XI that you

20   and I discussed earlier.

21       Q.    I think everyone is bound by the plan.

22            Have you ever heard the phrase "top

23   up" or "tap out"?

24       A.    I have.

25       Q.    Have you heard it in connection with

ANTHONY HORTON

1

the EFIH case and the set of issues we're

2   discussing today?

3

4       A.    Yes, sir.

5       Q.    Have the debtors had any discussion

6   with the PIKs about whether they -- let's back

7   up.

8            What do you understand "top up" or

9   "tap out" to mean?

10      A.    Well, that's been conversation we've

11  had amongst ourselves.  I've had no external

12  conversations with anyone regarding "top up,"

13  "tap out."

14           My understanding is, if you let me

15  finish answering the question, the "top up"

16  would be we would -- the funds were looking like

17  they were running low, litigation was going to

18  go longer, go to the PIKs, maybe it's the MLOC,

19  so you need to top up some dollars or terminate

20  the litigation.  And when I say --

21      Q.    So "top up" would be increase the

22  amount of the reserve, or "tap out" meaning stop

23  the litigation --

24      A.    Yes.

25      Q.    -- challenging the first and second

1          ANTHONY HORTON

2  liens?

3      A.    Yes, sir.

4      Q.    With that understanding of that

5  phrase, have the debtors had any conversations

6  with the PIKs about topping up or tapping out?

7      A.    Yes, through counsel.  The

8  professionals have had that conversation.  I've

9  had no personal conversations with --

10     Q.    Can you, as the 30(b)(6)

11 representative of the debtors, tell me the

12 substance of the conversations that counsel for

13 the debtors have had with counsel or other

14 representatives of the PIKs?

15     A.    Contextually speaking, the

16 conversation has been with the professionals,

17 between K&E and Akin, if -- if it looks as

18 though there's -- the funds are going to be

19 short, would you guys be willing to agree that

20 you either have to top up upon request or tap

21 out upon request.

22     Q.    And what has the response been from

23 Akin, from counsel for the PIKs?

24     A.    Not at this time, we're not willing to

25 do that.

ANTHONY HORTON

1

2      A.     My understanding is the -- as the

3  debtors, our conversations regarding the length,

4  and I'm assuming you're talking about the

5  potential length of litigation, has been with

6  our counsel, K&E, only.

7      Q.     Okay.  Are you aware of any --

8             MR. McKANE:  Hold on one second.  Are

9      you trying to not ask about the negotiations

10     with the PIKs?

11            MR. ANKER:  No, I'm going to.

12            MR. McKANE:  Because obviously that's

13     a -- he's thinking conversations.  He's

14     not thinking --

15            MR. ANKER:  Thank you, Mr. McKane.

16  BY MR. ANKER:

17     Q.     So let me try to make sure we have a

18  clean record.  To the extent that you or Mr.

19  Keglevic or anyone else who is a non-lawyer, any

20  director or any officer of the debtors has had a

21  conversation about the potential length of the

22  litigation, that conversation has been with your

23  own counsel, Kirkland & Ellis, correct?

24     A.     With Kirkland & Ellis, yes.

25     Q.     Has Kirkland & Ellis, to your

1                     ANTHONY HORTON

2    knowledge, or Mr. Wright, any other counsel

3    representing the debtors, had any discussions

4    with counsel for the PIKs regarding the

5    potential length of the litigation?

6        A.    In other words, how long it will last?

7        Q.    Or might last?

8        A.    Might last.  Yes.

9        Q.    Can you tell me about those

10   conversations.

11             MR. McKANE:  Yes.

12       A.    Yes, so my understanding is that

13   Kirkland has had conversations with the

14   professionals for the PIKs, and there was a lot

15   of back and forth about how long the litigation

16   might go on, and I think Kirkland & Ellis had

17   done some analysis on -- we commissioned them to

18   do some analysis for the debtors as to how long

19   they thought the litigation might last.

20             They came back with a, you know, a

21   study report.  I didn't see the report.  I just

22   heard some feedback from someone who was reading

23   the report and segments of the report to me, and

24   they came back with an average of three years.

25   We thought that was defendable and asked

1                    ANTHONY HORTON

2    Kirkland & Ellis to go forward with the PIKs'

3    counsel and, you know, to get three years, at

4    least.

5         Q.    Did the debtors seek to negotiate with

6    the PIKs for a minimum reserve that was longer

7    than three years?

8         A.    I'm sure that, as I recall, we were

9    pushing them.  You know, we didn't start with

10   three.

11        Q.    So where did you start with?

12        A.    I don't recall.  I don't know exactly

13   the number, but it was -- we talked about four,

14   five and, but again, it was not that's what we

15   believed we needed; it was that's just part of

16   the negotiating strategy.

17        Q.    So the debtors started the

18   negotiations proposing that the reserve provide

19   for interest for a period longer than three

20   years, correct?

21        A.    I don't know the exact years.  You

22   know, three years.

23        Q.    For longer than three?

24        A.    At least three years and possibly

25   longer.  Let me say it like that.

ANTHONY HORTON

1

2    Q.    And the PIKs refused to agree to have

3    a minimum period longer than three years; is

4    that right?

5    A.    That's correct.

6    Q.    Okay.

7    A.    Unless the judge ordered otherwise.

8    Q.    And I covered this with Mr. Keglevic,

9    but I'll ask it of you.  It was important to the

10   debtors that the agreement with the PIKs not

11   allow the PIKs to walk if the judge required a

12   reserve more than three years, correct?

13   A.    That's correct.

14   Q.    And your understanding is that if the

15   judge requires that 100 percent of what would

16   otherwise go to the PIKs be put into escrow, the

17   PIKs remained bound to their plan support

18   agreement, right?

19   A.    That's my understanding.

20   Q.    And that was an important feature of

21   the deal for the debtors, right?

22   A.    That is correct.

23   Q.    Because it reduces -- makes the plan

24   easier to confirm or reduces what sometimes we

25   call execution risk, right?

ANTHONY HORTON

1

2   A.    It lowers the execution risk, gives us

3   more certainty of closing the transaction.

4   Q.    Okay.  Do you know if the PIKs

5   provided to your counsel any analysis they did

6   of the likely length of the litigation?

7   A.    No, sir.

8   Q.    You don't know one way or the other?

9   A.    I don't know.  To answer the question,

10  no, I don't.

11  Q.    Were there any discussions with the

12  PIKs' representatives, including the Akin Gump

13  firm, regarding what plans they have for the

14  litigation?

15  A.    It's -- I don't know of any direct

16  conversations they had regarding litigation

17  strategy.

18  Q.    Well, I'm really not trying to get

19  into the litigation strategy.  Let me explain to

20  you, Mr. Horton, where I'm going so maybe you

21  can help me.

22        The Third Circuit has issued a

23  decision.  You're aware of it, right?

24  A.    Yes, sir.

25  Q.    And there's a petition for rehearing

1                        ANTHONY HORTON

2     rehearing that is pending should be withdrawn?

3          A.    Not that I'm aware of.

4          Q.    Have the debtors had any discussion

5     with the PIKs about whether, assuming the

6     petition for rehearing is denied, the MLOC will

7     direct a petition to be filed in the U.S.

8     Supreme Court seeking review of the Third

9     Circuit's decision?

10         A.    I know that there have been

11    discussions amongst the -- amongst K&E, Akin

12    about litigation strategies, and what I would

13    say generally coming out of those conversations

14    has been that the PIKs want to keep all of their

15    options open at this point in time.

16         Q.    Your last answer may be the same to

17    this question:  Have there been any discussions

18    with the PIKs or their counsel regarding

19    whether, if the Third Circuit decision becomes

20    final, they will continue to challenge the

21    make-whole claims?

22         A.    Again, I would say that a lot of

23    conversations regarding litigation strategy the

24    PIKs continue to want to keep all of their

25    options open.

1                    ANTHONY HORTON

2        Q.    And your understanding is they want to

3    keep their options open, for example, to

4    commence a Phase 2 of the make-whole litigation,

5    right?

6        A.    I don't know if it's specifically

7    Phase 2.  I would just say it encompasses all

8    options.

9        Q.    They want to keep, as you understand

10   it, all options on the table?

11       A.    There's a lot of uncertainty here, and

12   when there's uncertainty, options are very

13   valuable.

14       Q.    That's not my question.

15       A.    I just was clarifying.

16       Q.    I understand the value, theoretically,

17   of options or lack thereof.

18            Your understanding, based on the

19   communications the debtors have had with the

20   PIKs, is the PIKs want to keep all options as to

21   all potential challenges to the make-whole

22   claims available to them, right?

23       A.    Yes.

24       Q.    And they're not prepared today in

25   connection with the Bankruptcy Court's setting

ANTHONY HORTON

1  of the reserve to set any limits on those

2  options, as far as you know, correct?

3      A.    That's correct.

4      Q.    I just have a few followup questions,

5  Mr. Horton.

6          You mentioned earlier that Kirkland --

7  that the debtors asked Kirkland to commission a

8  study of the length of litigation.  When did the

9  debtors do that?

10     A.    I'm going to say -- let me think about

11 the timeline.

12         I think the -- clearly, we had some

13 conversations as early as November 18 at a board

14 meeting, the day after the Third Circuit ruling,

15 we had a board meeting the very next day, talked

16 about litigation strategy in that --

17         Do you want me to finish or --

18     Q.    Yes.

19     A.    You know, in that board meeting, as I

20 discussed earlier, they talked about litigation

21 strategy, length, potential length of time, so

22 forth.  Somewhere around -- we were actually in

23 a board meeting on December 16, and we were

24 looking to approve what I would call the 24-hour

1                    ANTHONY HORTON

2    BY MR. ANKER:

3        Q.    Was there any dissent at the board

4    meeting about approving the settlement with the

5    EFIH first liens and second liens.

6        A.    There was -- I would say there was

7    robust discussion.  I don't know that there was

8    dissent, but it was a robust discussion about,

9    look, we need to get this transaction closed.

10   There are milestones.  You know, I would just

11   say it was robust, informative discussion that

12   happened.  I don't know if there was dissent.

13       Q.    Was the board approval unanimous?

14       A.    I couldn't tell that.  I believe so,

15   but I can't tell you that for sure.

16       Q.    Did you recommend the settlement of

17   the EFH first liens and second liens to the

18   board?

19       A.    As part of management, I did, along --

20   it was primarily driven by clearly our

21   professionals and the CRO, Mr. Keglevic, but

22   certainly I supported it.

23       Q.    I'm just going to ask you about one

24   other document, Mr. Horton.

25            MR. ANKER:  Let's mark this as Horton

ANTHONY HORTON

1

2      A.     I think you are.

3      Q.     Okay.  Have there been any discussions

4 that you're aware of of how the funds in the

5 EFIH claim reserve will be invested?

6      A.     Very high-level, and my expectation it

7 will be in a risk-free money-market-type

8 account.

9      Q.     So an account that will earn modest,

10 if any, interest net of taxes, fees and charges,

11 right?

12      A.     It will earn whatever the risk-free --

13 close to risk-free rate as we possibly can get.

14           MR. McKANE:  A rate pursuant to --

15      consistent with the risk.

16      Q.     Who, as you understand the plan, gets

17 to decide how that money is invested?

18      A.     It would be my understanding that the

19 Plan Administrator Board decides that.

20      Q.     And is it your understanding that the

21 Plan Administrator Board will not include any

22 representative of the EFIH first liens or second

23 liens?

24      A.     I haven't had that level of

25 discussion, so I don't know.

1              ANTHONY HORTON

2      Q.    I understand you're not a lawyer, but

3   you've obviously been a treasurer.  You are

4   aware that for liens on bank accounts to be --

5   let's back up.

6           You are aware of what a control

7   agreement is with respect to a bank account?

8      A.    Generally, yes.

9      Q.    Okay.  Are you aware of any

10  discussion, plans, anything in any of these

11  documents that provides for a control agreement

12  to be put in place with respect to the EFIH

13  claim reserve in favor of the EFH first liens or

14  second liens?

15     A.    My understanding at this level and

16  what we have in the plan is that you would get a

17  lien on the funds that are in the escrow

18  account.  The details of that I'm sure are not

19  in the plan.

20     Q.    So I take it you have had no

21  discussions about whether there is contemplated

22  to be any control agreement of any kind?

23          MR. McKANE:  Setting aside discussions

24     with counsel?

25          MR. ANKER:  Yes.

1          ANTHONY HORTON

2          THE WITNESS:  No.

3  BY MR. ANKER:

4     Q.    I think I marked the plan as an

5  exhibit.  Can I ask you to look at it for a

6  moment.  I forget what exhibit number it is.

7          MR. McKANE:  3.

8     Q.    Exhibit 3, Mr. Horton.

9     A.    Yes.

10    Q.    Can I ask you to turn to page 65 of

11  133.

12    A.    Okay.

13    Q.    And you'll see that page 65 of 133 at

14  the top is a carryover of the section addressing

15  the treatment of the EFIH second lien note

16  claims, Class B4?

17    A.    Yes.

18    Q.    Do you see that, Mr. Horton?

19    A.    I do.  I'm reading on 64 of 133.  I

20  don't want to just take it out of context.  If

21  you don't mind, let me just read what you're...

22    Q.    No problem.

23          (Document review.)

24    A.    Okay.

25    Q.    If you can look at page 65 of 133, do

ANTHONY HORTON

1

2      A.     I'm not aware of it in the plan.

3      Q.     Are there any plans as to what

4  financial institution the account will be

5  maintained?

6      A.     I'm sure it will be one of good

7  standing.

8      Q.     Are you aware of any discussions of at

9  what financial institution the account will be

10  maintained?

11      A.     No.

12      Q.     Are you aware of any discussions as to

13  whether that financial institution will be

14  required to agree by contract to forgo any liens

15  and/or rights of setoff that it would have that

16  might have priority over the first liens and the

17  second liens?

18      A.     I'm not aware of those discussions on

19  this point.  I'm sure you'll get customary

20  perfected first and second liens.

21      Q.     Are you aware of anything in the plan

22  that requires that we get customary perfected

23  liens of any kind?

24      A.     I'm not aware of it.

25            MR. ANKER:  I have no further