## Exhibit C

**Transcript of January 26, 2017 Deposition of Andrew Wright excerpts**

1

2           UNITED STATES BANKRUPTCY COURT

3            FOR THE DISTRICT OF DELAWARE

4                    -    -    -

5  In Re:  Energy Future Holdings Corporation, et

6  al., Debtors.

7  Chapter 11

8  Case No. 14-10979

9  Jointly Administered

10                   -    -    -

11                January 26, 2017

12                   -    -    -

13      Oral deposition of ANDREW WRIGHT taken

14  pursuant to notice, held at the Law Offices of

15  Richards Layton & Finger, 920 N. King Street,

16  Suite 200, Wilmington, Delaware 19801,

17  commencing at 3:00 p.m., on the above date,

18  before Jennifer P. Miller, RPR, CCR, CRR, and

19  Notary Public for the Commonwealth of

20  Pennsylvania, State of Delaware and the State

21  of New Jersey.

22

23

24

25  JOB NO. 118632

1                    ANDREW WRIGHT

2         transaction closes, that will be the

3         case.  As of today, I don't know.

4    BY MR. ANKER:

5         Q.   Okay.  That's fair.  Let me rephrase

6    the question.

7                    Subject to the closing of the

8    NextEra transaction, it is clear that there is

9    sufficient economic value to pay all EFIH

10   First Lien claims and EFIH Second Lien claims,

11   correct?

12        A.   Yes.

13        Q.   Okay.  Now, Mr. Wright, you referred

14   earlier to a presentation by Kirkland & Ellis,

15   correct?

16        A.   Yes.

17        Q.   And that presentation was made to

18   the board of directors of EFIH and EFH?

19        A.   Well, if you'll show me the

20   presentation you're talking about --

21        Q.   Sure.

22        A.   -- I can tell you.

23             MR. ANKER:  Before getting you the

24        presentation, let me show you a different

25        document, if I could.

                        ANDREW WRIGHT

1

2       Q.    And the reason why any other claims,

3   like the PIK claims, don't have to be paid

4   ahead of it is because the PIKs don't have a

5   lien on the value of Oncor, right?

6       A.    When you say "paid ahead of it,"

7   please be more specific.

8       Q.    Sure.   Fair point.   Your

9   understanding is that the PIKs are junior in

10  right of payment out of the value of EFIH's

11  economic interest in Oncor to the EFIH First

12  Liens and Second Liens, correct?

13      A.    Yes.

14      Q.    And you understand that the Second

15  Liens are junior in right of payment to the

16  First Liens, right?

17      A.    Yes.

18      Q.    And that's because the EFIH First

19  Liens have a first lien and the EFIH Second

20  Liens have a junior second lien and the PIKs

21  have no lien at all, right?

22      A.    Correct.

23      Q.    Okay.   Now, it goes on to say, under

24  the terms of the plan, neither NextEra, Oncor

25  or any of the reorganized entities acquired by

1                        ANDREW WRIGHT

2    NextEra will be liable for the make-whole

3    claims; do you see that?

4         A.    Yes.

5         Q.    And that's consistent with the

6    Debtors' understanding of the plan, right?

7         A.    Yes.

8         Q.    So, if it turns out that the

9    litigation lasts for a period, and at the end

10   of the time the reserve is inadequate, under

11   this plan, the First Liens and the Second

12   Liens will have no recourse against NextEra,

13   right?

14        A.    Correct.

15        Q.    They'll have no recourse against

16   Oncor, right?

17        A.    Correct.

18        Q.    They'll have no recourse against any

19   of the reorganized entities, including

20   reorganized EFIH, right?

21        A.    Correct.

22             MR. ANKER:  Now, you had mentioned a

23        Kirkland & Ellis presentation.  And let

24        me mark that, what I think you're

25        referring to, and you can tell me if it's

1                    ANDREW WRIGHT

2  BY MR. ANKER:

3      Q.   Mr. Wright, have you had an

4  opportunity to confer with Mr. McKane

5  regarding your last answer?

6      A.   Yes.

7      Q.   Can you share with us what

8  Mr. McKane told you?

9      A.   Yes.  Can you read -- re-read the

10 question and I'll be happy to answer it fully?

11     Q.   I believe, Mr. Wright, you had

12 answered my question about what would happen

13 if a litigation went four years, provided an

14 incomplete hypothetical.

15               And I asked, quote, is the

16 reason why it's not a complete story that the

17 Debtors contend that we, the First Liens and

18 the Second Liens, might go back to the Court

19 before the expiration of the three years.

20               And you said, yes, I'm almost

21 certain that you would.

22               And I asked you, okay, is there

23 any other reason why my hypothetical was

24 incomplete?  And your answer was one word and

25 one syllable, no.

ANDREW WRIGHT

1

2          Do you want to now modify that

3    answer?

4        A.   Yes.  Well, I believe that you would

5    go back to the Court.

6              As you're well aware, the

7    concept here is that we put three years of

8    funds into the escrow.  And that you then also

9    have a backstop.  And when I mean "backstop,"

10   I mean that you have the right to go to the

11   Court at any time and ask the Court either --

12   for some appropriate remedy.

13             We have been discussing with

14   the PIKs over the last few days, maybe week or

15   so, and the PIKs and we have agreed in concept

16   that the PIKs will -- and we'll put this in a

17   plan supplement -- agree to top up or tap out.

18   So they -- they will agree that you will have

19   that remedy if at some point in the future you

20   and the Court agree that the claims reserve is

21   not appropriate.

22       Q.   Who is agreeing to top up and tap

23   out?

24       A.   The PIK holders.

25       Q.   All the PIK holders?

ANDREW WRIGHT

1

2     A.    The ad hoc committee of the PIK

3  holders, yes.  The parties to the PSA.

4     Q.    So Angelo Gordon, York, GSO and

5  Avenue?

6     A.    Correct.

7     Q.    And is there any writing that

8  embodies this?

9     A.    We expect that it will be part of a

10  plan supplement that will be filed shortly.

11     Q.    Is there any writing as of today?

12     A.    No, not that I'm aware of.

13     Q.    Are there any written documents that

14  embody this agreement?  Because none have been

15  produced to us.

16     A.    No, it is an agreement in concept,

17  I'm not aware of any.

18     Q.    Okay.  Is UMB a party to this?

19     A.    I don't know.

20     Q.    Are there any drafts of any writing

21  embodying it?

22     A.    I'm unaware of it.

23     Q.    When will this plan supplement be

24  filed?

25     A.    Shortly.

1                    ANDREW WRIGHT

2       Q.   Can you be more specific than that?

3       A.   Don't know.

4       Q.   Okay.  You're aware there's a

5  stipulation with the PIKs that we've worked

6  out, correct?

7       A.   No.

8            MR. ANKER:  Let's mark this as

9       Wright Exhibit No. 4.

10                  -   -   -

11                  (Whereupon, Exhibit 4 was

12       marked for identification.)

13                  -   -   -

14  BY MR. ANKER:

15      Q.   Have you seen what is Wright Exhibit

16  4 before just now?

17      A.   No.

18      Q.   Let me direct your attention to page

19  five of the document.

20      A.   Okay.

21      Q.   Do you see that this document is

22  signed on the 24th, it's dated the 24th of

23  2017 --

24      A.   Yes.

25      Q.   -- January 24th?

                    ANDREW WRIGHT

1

2       they will tap out; in other words, they

3       will end the litigation.

4  BY MR. ANKER:

5       Q.   I'm asking you to assume that the

6  Court doesn't order that or the funds that

7  signed are no longer around or that litigation

8  is pending in a federal court of appeals or a

9  district court and Judge Sontchi has no

10 jurisdiction to order that there be top up or

11 tap out.

12            Let's assume for purpose -- I

13 want to simply make sure I understand the

14 math.

15      A.   Uh-hum.

16      Q.   Assume that the top up or tap out

17 method -- mechanism doesn't work.  It is

18 right, is it not, as just a matter of simple

19 logic and math, that if the litigation lasts

20 more than three years, the reserve will be

21 inadequate if the top up or tap out mechanism

22 does not work?

23      A.   Your math is correct, if we put

24 three years of -- of reserve in and the

25 litigation lasts three years and one day and

1                    ANDREW WRIGHT

2   nothing else happens, yes, there will not be

3   enough money in the reserve.

4        Q.   And it's accurate that following the

5   effective date, the Debtors will not control

6   that litigation, the PIKs will, right?

7        A.   Effectively, yes.

8        Q.   Well, the plan gives the PIKs sole

9   discretion with respect to the conduct of that

10  litigation, right?

11       A.   Yes, the make-whole -- the

12  make-whole -- make-whole litigation oversight

13  committee.  MLOC is what I call it.  I don't

14  know a better nickname.

15       Q.   And the MLOC consists of the PIKs,

16  right?

17       A.   Well, consists -- it will consist as

18  of the effective date of the four PIKs that --

19  PIK groups that have signed the PSA.

20       Q.   York, Avenue, GSO and Angelo Gordon,

21  right?

22       A.   Correct.

23       Q.   And indeed, the plan directs the

24  Debtors following the effective date to bring

25  every possible objection they can to the

1                    ANDREW WRIGHT

2    three years was an appropriate -- was

3    appropriate measure, and counsel both at Akin

4    Gump and K & E went back and forth and that's

5    where we ended up.

6         Q.   Okay.  And in determining that, I'm

7    going to use your words, three years was an

8    appropriate measure --

9         A.   Yes.

10        Q.   -- did you or the EFIH board or EFH

11   management rely on any analysis other than the

12   one reflected in Exhibit 3?

13        A.   No, other than the flow chart, I

14   mentioned before.

15        Q.   Which is part of Exhibit 2, correct?

16        A.   Correct.

17        Q.   Let's take a look at Exhibit 3 if

18   you will.

19        A.   Sure.

20        Q.   And you'll see there's a first page

21   that says EFIH make-whole reserve aggregated

22   appellate data; do you see that?

23        A.   Yes.

24        Q.   And there then are a series of pages

25   that follow, pages two, three, four and five;

1                    ANDREW WRIGHT

2    do you see that?

3         A.   Yes.

4         Q.   And am I correct that pages two,

5    three, four, and five are the backup for the

6    summary set forth on page one?

7         A.   Yes.

8         Q.   And on page one, there are three

9    scenarios, correct?

10        A.   Yes.

11        Q.   Scenario one, scenario two and

12   scenario three, right?

13        A.   Yes.

14        Q.   And what are these scenarios

15   designed as you understand it to represent?

16        A.   Well, I think scenario one could

17   probably generically be called grant and

18   certify.  So, in other words, the Third

19   Circuit grants the rehearing request and it

20   certifies a question to the New York Court of

21   Appeals.

22                  I think scenario two, I've just

23   sort of called it grant, but with no

24   certification.  So it grants petition for

25   rehearing, the Third Circuit does, but it does

                    ANDREW WRIGHT

1  not certify a question to the New York Court

2  of Appeals.

3              And the third scenario is just

4  the denial scenario; in other words, the Third

5  Circuit denies the petition for rehearing.

6      Q.   Okay.  Who selected these three

7  scenarios?

8      A.   Those three scenarios were based on

9  the judgment and multiple discussions among

10 lawyers at K & E and myself.

11     Q.   Was there consideration of any other

12 scenarios other than these three?

13     A.   Of course.

14     Q.   What were the other scenarios

15 considered?

16     A.   I think you could probably come up

17 with a hundred different scenarios, but we --

18 we came up with these three because we thought

19 they were the most likely outcomes.

20     Q.   And am I right that in scenarios --

21 well, take scenario one.

22     A.   Yes.

23     Q.   And do you see the column that says

24 max?

1                    ANDREW WRIGHT

2    the matter.  We've actually got another four

3    and a half months, so the reserve is for three

4    years and four and a half months, but we can

5    take this at face value.

6         Q.   Well, step A is the amount of

7    days --

8         A.   In other words, this assumes that

9    the claims reserve is put in place on

10   October -- on April 30th of next year.

11        Q.   Okay.  Now, each of these three

12   scenarios ends with the Supreme Court denying

13   a petition for certiorari, correct?

14        A.   Yes.

15        Q.   Have the Debtors done any analysis

16   of what happens if the Supreme Court grants a

17   petition for cert?

18        A.   What do you mean by "analysis"?

19        Q.   Well, there's timing here, the

20   adequacy of the timing of the reserve.

21        A.   Right.

22        Q.   Have the Debtors done any timing

23   analysis assuming cert is granted?

24        A.   Well, if cert was granted,

25   obviously, it would add to the time.

1                      ANDREW WRIGHT

2   BY MR. ANKER:

3        Q.   And on C, the average time is 263

4   days, the meeting is 298; is that right?

5        A.   Yes, that's what it says.

6        Q.   And that data is taken from page two

7   of Exhibit 3, correct?

8        A.   Yes, it's the column with A and C at

9   the top of it, those two actions.

10       Q.   Right.  And on page two, there's a

11  listing of approximately a dozen cases, right?

12       A.   I'll take your word for it.

13       Q.   I said approximately, right,

14  Mr. Wright?

15       A.   Yes.

16       Q.   Of those dozen cases, in how many

17  had the panel reached only one of multiple

18  grounds argued by the prevailing side?

19       A.   We didn't slice and dice it that

20  way.

21       Q.   So the answer is you don't know,

22  right?

23       A.   I don't know.

24       Q.   Okay.  Have the Debtors done any

25  analysis of the likely time to completion were

ANDREW WRIGHT

1  panel rehearing or rehearing and bank granted

2  and there to be a remand to the Bankruptcy

3  Court for further evidentiary or other

4  proceedings?

5     A.   Not in this analysis.  But as I said

6  earlier, we viewed these three scenarios as

7  the most likely scenarios to play out here.

8              I will admit that you could

9  come up with other hypotheticals that could be

10 different than these three scenarios, but

11 these are the ones that we reasonably believed

12 are most likely to occur.

13    Q.   So the answer to my question is the

14 Debtors have done no analysis of the likely

15 time to completion for a remand, correct?

16          MR. MCKANE:  Objection to form.

17          THE WITNESS:  Say that -- please

18    repeat the question.

19 BY MR. ANKER:

20    Q.   Sure.  Have the Debtors done any

21 analysis of the likely amount of time to

22 completion of the process were the Third

23 Circuit to grant rehearing and then remand to

24 the Bankruptcy Court?

ANDREW WRIGHT

1  prepared to forego a phase two, are they?

2       A.   No, as I said before, we have not

3  discussed litigation paths or options,

4  strategy.

5       Q.   You're aware that on the very day

6  the Third Circuit issued its decision the PIKs

7  contacted Kirkland & Ellis, Akin Gump did, to

8  suggest that phase two proceed?

9       A.   I'm aware just because of Mr. Horton

10 and Mr. Keglevic's deposition that you showed

11 them an email between Chad Husnick and Scott

12 Alberino saying something about that, yes.

13      Q.   And have the Debtors performed any

14 analysis embodied in any of these three

15 scenarios or any other analysis of the likely

16 time to complete a phase two?

17          MR. MCKANE:  Objection to form.

18          THE WITNESS:  Well, we've had

19          discussions about it; but other than --

20          other than that, no, there's nothing in

21          writing that talks about -- in the same

22          way this has been prepared about what

23          phase two would look like.

24

25

1                    ANDREW WRIGHT

2    BY MR. ANKER:

3        Q.    So that I'm clear, scenario one sets

4    forth potential periods of time to the

5    completion of phase one, right?

6        A.    Yes.

7        Q.    Scenario two sets forth potential

8    periods of time to the completion of phase

9    one, right?

10        A.    A potential outcome, yes, of phase

11    one, yeah.

12        Q.    And scenario three sets forth

13    potential periods of time for the completion

14    of phase one, right?

15        A.    Correct.

16        Q.    And none of these three scenarios

17    have a single day for phase two, do they?

18        A.    No.

19        Q.    I asked my question in a negative

20    way and I want to make sure I got the answer

21    correctly.

22        A.    Okay.

23        Q.    Do any of these three scenarios

24    include any time period whatsoever for phase

25    two?

1                    ANDREW WRIGHT

2          MR. MCKANE:  Objection to form.

3          THE WITNESS:  No.

4    BY MR. ANKER:

5          Q.   Phase one has already taken just

6    under three years, right?

7          A.   I don't know the exact date that it

8    started.

9          Q.   Let me represent to you -- well, let

10   me ask a question.

11              Do you recall that the Debtors

12   filed for bankruptcy on April 29, 2014?

13         A.   Yes.

14         Q.   You do recall that the Debtors filed

15   on that very day a motion to refinance the EFH

16   First Lien debt?

17         A.   I don't recall if it was that day;

18   but if you said that, it was near that day, if

19   not on it, yes.

20         Q.   With that hopefully refreshing your

21   recollection, we are now two years and just

22   about nine months from April 29, 2014, right?

23         A.   I think you've counted it right,

24   yes.

25         Q.   And we're not done with phase one

1                         ANDREW WRIGHT

2    yet, right?

3         A.   Well, it depends on what you mean by

4    "phase one," but, yes, we're not done with --

5    with the appellate process.

6         Q.   Right, there's no final no longer

7    appealable order resolving phase one, right?

8         A.   Correct.

9         Q.   And you've got scenarios here where

10   phase one runs another -- up to another 978

11   days, right?

12        A.   Correct.

13        Q.   And phase two --

14        A.   Well, let me restate that?

15             We've got -- we've got an

16   example where the maximum was 978 days.  It

17   doesn't mean ours will take 978 days.  This is

18   just a representative sample of what's

19   happened in the Third Circuit with similar

20   appellate processes.

21        Q.   Okay.  So, based on that example --

22        A.   Right.

23        Q.   -- you've got two years and nine

24   months already, plus potentially another two

25   years and nine months just to get done phase

1                    ANDREW WRIGHT

2  one, right?

3       A.   It could happen that way, yes.

4       Q.   And have the Debtors done any

5  analysis that demonstrates that phase two will

6  be shorter than phase one?

7       A.   We've done no analysis either way.

8  It could be shorter; it could be longer.  I

9  don't know.  I'm not a litigator.  I think

10  there may be possibilities that some of it

11  could happen even in parallel, so...

12       Q.   You're aware that phase two would at

13  least in part entail a determination regarding

14  solvency, right?

15            MR. MCKANE:  Objection to form.

16            THE WITNESS:  Yes, that is the

17       primary issue as I understand it with

18       respect to phase two.

19  BY MR. ANKER:

20       Q.   Have the Debtors done any analysis

21  of what factual issues might come up in the

22  amount of time to resolve them regarding

23  determination of solvency?

24       A.   No.

25       Q.   Have Debtors done -- I'm sorry --

1                          ANDREW WRIGHT

2    in respect of any claim by the First Liens

3    against the Debtors for breach of Section

4    2.4C?

5         A.    No.   Because we're going to ask the

6    Court to issue an order that says we are

7    allowed to pay the Second Liens, and so there

8    will be no breach of the -- if the Court

9    grants that order, there will be no breach of

10   the collateral trust agreement.   We will be

11   doing so because the Court ordered us to do

12   so.

13        Q.    Okay.   Mr. Wright, you've obviously

14   testified today that there's now an agreement

15   in principle, though, it's not been

16   memorialized in any writing with the PIP so I

17   want you to put that aside.

18                  Did the Debtors contend that

19   there is any language in the plan as it

20   currently stands as of this instant in time

21   that authorizes the Court or gets the Court

22   the ability after the effective date if the

23   reserve proves inadequate to grant the First

24   Liens or the Second Liens any relief?

25        A.    Yes.

1                      ANDREW WRIGHT

2        Q.    What provision is that?

3        A.    I point you to Article 11, I

4   believe.  It's the jurisdiction provision.

5   Retention of jurisdiction, I guess it's page

6   119 of the plan, 121 of 133 of the -- at the

7   top.

8        Q.    Article 11, which begins on page 121

9   of 133?

10       A.    Yes.

11       Q.    And continues to page 122 of 133?

12       A.    Yes, sir.

13       Q.    Is there any other provision of the

14  plan that the Debtors contend gives -- would

15  give the Court authority if the EFIH claims

16  reserve proved inadequate to grant the First

17  Liens or Second Liens any relief?

18       A.    No.  But I believe there will also

19  be a similar provision in the confirmation

20  order itself.  As I understand it, those types

21  of provisions retention of jurisdiction are

22  boilerplate in plain confirmation orders.  It

23  was part of the T-side confirmation order, it

24  was part of the Hunt confirmation order, and I

25  have no reason to believe it won't be part of

1                    ANDREW WRIGHT

2      the confirmation order in the NextEra deal.

3          Q.   Is there any particular language in

4      Article 11 you would point me to that you

5      believe would give the Court the authority to

6      grant the First Liens or Second Liens relief

7      were the reserve proved inadequate?

8          A.   I think it's the -- it's the very

9      first sentence, notwithstanding the entry of

10     the confirmation order and the occurrence of

11     the effective date.  So this would be

12     something that happened after the effective

13     date.  On or after the effective date, the

14     Bankruptcy Court shall retain exclusive

15     jurisdiction over all matters arising out of

16     or related to the chapter 11 cases and the

17     plan.

18                    And I believe the claims

19     reserve is part of the chapter 11 cases, it's

20     part of the -- it's complicated by the plan.

21     This goes on, to the extent provided under

22     applicable law, and then it says including,

23     and I would read that to mean including

24     without limited to jurisdiction to, and it has

25     a -- what, 22 enumerated items.  It doesn't

1                    ANDREW WRIGHT

2    mean that's everything, it just means that's

3    what a bunch of lawyers tried to, you know,

4    detail out.

5                    So I think as a very technical

6    matter, all you need is the first four lines

7    of Article 11.  I think we could probably find

8    a couple of examples in the enumerated items

9    in which I believe the Court would be able to

10   give you a remedy that you seek.

11       Q.   Can you point me to those.

12       A.   I think I'd probably say number

13   eight and number 12, enter and implement such

14   orders as may be necessary to execute,

15   implement or consummate the plan.  I think

16   this would be implementing the plan.  And all

17   other agreements or documents created in

18   connection with the plan.

19                    If there are other things your

20   lien documents or anything else, including

21   injunctions.  So, in other words, the Court

22   could grant an injunction and tell the PIKs

23   that they must stop the litigation if they

24   don't top up the -- the reserve.

25                    I would read that very broadly.

1                    ANDREW WRIGHT

2   Number 12, resolve any cases, controversies,

3   suits, disputes, causes of action that may

4   arise in connection with the consummation or

5   interpretation or enforcement of the plan.  I

6   can go on there, but I -- my interpretation,

7   the Debtors' interpretation of this provision,

8   is meant to be very broad.

9        Q.   And I want to make sure I understand

10   your answer because my question was in the

11   absence of the agreement in principle that

12   hasn't yet been documented.

13        A.   Yes.

14        Q.   The Debtors believe that the

15   provisions that you just cited would give the

16   Court not jurisdiction, but the power to

17   order -- to give the First Liens or Second

18   Liens a remedy if the reserve proved

19   inadequate?

20        A.   I'm not sure I -- I think there's

21   much of a distinction between jurisdiction and

22   the power, but -- so I guess my answer to your

23   question is, yes, I believe that Court would

24   have the power to do that.

25                    There's a court of equity, it's

1                     ANDREW WRIGHT

2   my understanding the bankruptcy court is, and

3   it's almost -- it's a court of equity.

4        Q.   On the EFIH claims reserve, where

5   will that reserve be maintained?

6        A.   I'm not sure I understand your

7   question.

8        Q.   At what financial institution will

9   the reserve be maintained?

10        A.   It hasn't been determined yet.

11        Q.   And that will be determined by the

12   plan oversight?

13        A.   Plan administrator board, yes.

14        Q.   And who will be on the plan

15   administrator board?

16        A.   We're expected to announce tomorrow

17   that Tony Horton will comprise the plan

18   administrator board.

19        Q.   So he will be the one and only

20   member of the board?

21        A.   Yes.

22        Q.   Okay.  There is not contemplated to

23   be a representative of the First Liens or the

24   Second Liens on the plan administrator board?

25        A.   No.

1                    ANDREW WRIGHT

2      Q.   Okay.  Is there any language you can

3   point to me on the plan -- let me back up.

4                I didn't ask you this,

5   Mr. Wright.  I understand you're not a

6   bankruptcy lawyer by training.  Were you a

7   commercial lawyer or --

8      A.   I'm an M&A, securities, corporate

9   securities lawyer.

10     Q.   Are you aware generally that in

11  order to have a perfected lien on a bank

12  account, the secured creditor must have

13  control of the account?

14     A.   Yes.

15     Q.   And that one gets control either by

16  being the financial institution at which

17  that's holding the account or pursuant to a

18  control agreement executed by the debtor and

19  the financial institution?

20     A.   I'm familiar with the general

21  concept, yes.

22     Q.   Can you point me to any provision in

23  the plan that requires a control agreement

24  with respect to the EFIH claims reserve for

25  the benefit of the First or Second Liens?

1                    ANDREW WRIGHT

2        A.    I'm unaware of anything in the plans

3    specifically describing that.  But I think it

4    is the Debtors' intent that the First Liens

5    and the Second Liens will have a properly

6    perfected lien over the account, and whatever

7    legal requirements that that entails, we will

8    ensure that it's done.

9        Q.    Okay.  Does the plan -- strike that.

10               Will Mr. Horton be the one who

11   decides how the funds in the reserve will be

12   invested?

13       A.    I believe that will be part of his

14   responsibility, yes.

15       Q.    Is there anything in the plan that

16   you can point me to that provides any

17   limitations on Mr. Horton's discretion in that

18   regard?

19       A.    No.  But I suspect he will have an

20   effective fiduciary duty to manage that

21   properly.  And my expectation is, and I think

22   it's consistent with what Mr. Horton

23   testified, that it will be invested in some

24   sort of money market fund at a very

25   well-capitalized institution.