**<u>Exhibit H</u>**

**Expert Report of Christopher J. Kearns dated January 25, 2017**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., et al., | ) | Case No. 14-10979 (CSS) |
| | ) | |
| *Debtors,* | ) | (Joint Administered) |
| | ) | |

**EXPERT REPORT OF CHRISTOPHER J. KEARNS**

## I.    Introduction and Expert Qualifications

1.    I am a Managing Director and a member of Berkeley Research Group, LLC (d/b/a BRG Capstone) ("BRG"), a professional services firm with offices located at 810 Seventh Avenue, 41st Floor, New York, New York 10019.  I also am co-leader of BRG's corporate finance practice. BRG has been engaged by Wilmer Cutler Pickering Hale and Dorr LLP ("Counsel"), as counsel for Delaware Trust Company, as successor indenture trustee and collateral trustee (the "EFIH First Lien Notes Trustee") for the EFIH First Lien Notes issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. ("EFIH" or the "EFIH Debtors") under the EFIH First Lien Note Indentures and the EFIH Collateral Trust Agreement.[1]

2.    I was asked by Counsel to evaluate, calculate, determine, and comment on the matters set forth herein (the "Assignment"), all in connection with confirmation of the Plan.

3.    I am a Certified Public Accountant, a Certified Insolvency and Restructuring Advisor, a Certified Turnaround Professional, and a Certified Fraud Examiner.  I have over 35 years of financial experience as an auditor, corporate officer and, for approximately the past 25 years, as an advisor or crisis manager in bankruptcy and turnaround matters.

4.    Prior to joining BRG in June 2015, I was one of the founding members of Capstone Advisory Group, LLC ("Capstone"), a financial services consulting firm, founded in January 2004, which provided a vast array of services to businesses.  The services provided by Capstone included consultation in business turnaround and restructuring situations, workouts and reorganizations, bankruptcy matters, crisis management, transaction advisory and due diligence services, forensic accounting, valuation and

---

[1] Capitalized terms used but not defined herein have the meanings assigned to them in the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code (Dkt. 10564-2), as it may be amended or modified from time to time (the "Plan").

dispute resolution services.  Prior to co-founding Capstone, from 1991 to 2004, I was a senior managing director of FTI Consulting, Inc. ("FTI") (and predecessor firms) and was co-leader of FTI's New York office.  My experience and client assignments during that period were substantially similar to the assignments I performed at Capstone and now at BRG.

5.    Prior to 1991, I was employed by Bristol-Myers Squibb Company for approximately three years (including serving as Assistant Corporate Controller), and a major international public accounting firm for ten years in the mergers and acquisitions group, and in the audit practice.

6.    I have served as a principal financial advisor in numerous complex bankruptcies and restructurings.  I have also served as a testifying expert witness in matters concerning solvency, valuation, contract breach, lost profits and various financial/business issues in bankruptcy and restructuring.  In addition, I have served as a testifying expert in cases regarding make-whole call payments and no-call provisions under various indentures and credit agreements.  A copy of my curriculum vitae which, among other things, details my professional experience, case work, litigation-related assignments, expert testimony experience, and recent speaking engagements, is attached hereto as Exhibit B.

7.    Additionally, I have relied extensively on the knowledge and experience that I have gained through my consultancy and work experience including in the areas of business turnaround and restructuring situations, out-of-court workouts, bankruptcy matters, crisis management, transaction advisory and due diligence services and dispute resolution.

8.    In my role at BRG and Capstone, I (along with others at BRG and Capstone) have served as financial advisor to counsel to the EFIH First Lien Notes Trustee before and during the above-captioned chapter 11 cases.  In addition, I provided an expert report (dated January 12, 2015) and expert testimony in connection with the litigation in these chapter 11 cases regarding the EFIH First Lien Makewhole Claims.  I understand that my testimony was admitted over the objection of the EFIH Debtors, which objected to the admissibility of my testimony on relevance grounds.  I further understand that no objection was made on the basis of my qualifications.

9.   My current billing rate for this Assignment is $980 per hour.  I was assisted by others at BRG, who worked at my direction and under my supervision, and whose billing rates for this Assignment range between $415 and $920 per hour.   My and BRG's compensation for this Assignment is not contingent upon the outcome of this matter (that is, whether the Plan is or is not confirmed).

## II.    Summary of Assignment

10. I understand that, in accordance with the EFIH Unsecured Creditor Plan Support Agreement, the Plan provides for the establishment of a claims reserve (the "EFIH Claims Reserve") to pay, if Allowed, certain Claims of the Holders of the EFIH First Lien Notes and EFIH Second Lien Notes. The Plan defines "EFIH Claims Reserve" as:

> the interest-bearing account established on the EFH Effective Date pursuant to the EFIH Unsecured Creditor Plan Support Agreement, as applicable, using the Merger Sub Cash Amount and Cash on hand at EFIH as of the EFH Effective Date, and excluding in all instances, an amount equal to the value of Cash on hand at EFH Corp. as of the EFH Effective Date, which shall consist of (a) the maximum amount that could ultimately be Allowed as of the EFH Effective Date in respect of the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims, together with contractual interest thereon that has accrued or accrues through the EFH Effective Date (including Additional Interest and interest on interest) based on the EFH/EFIH Debtors' books and records, determined in consultation with the Initial Supporting Creditors, or as ordered by the Bankruptcy Court, (b) the EFH/EFIH Debtors' good-faith estimate, determined in consultation with the Initial Supporting Creditors (or in an amount ordered by the Bankruptcy Court) of all contractual interest (including Additional Interest and interest on interest) accruing or on account of the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims for a period of three years from the EFH Effective Date (or longer if ordered by the Bankruptcy Court), or until such time as such Claims may become Allowed and are paid in full, in Cash, (c) the pre-EFH Effective Date fees and expenses of the EFIH First Lien Notes Trustee and the EFIH Second Lien Notes Trustee (or Holders of EFIH First Lien Notes or Holders of EFIH Second Lien Notes) that may be Allowed under or on account of the EFIH First Lien Notes and the EFIH Second Lien Notes (together, if ordered by the Bankruptcy Court, with contractual interest thereon) that have not been paid on or by the EFH Effective Date, (d) the EFH/EFIH Debtors' good-faith estimate, determined in consultation with the Initial Supporting Creditors (or in an amount ordered by the Bankruptcy Court), of post-EFH Effective Date fees and expenses that may be Allowed under or on account of the EFIH

First Lien Notes or EFIH Second Lien Notes (together with, if ordered by the Bankruptcy Court, contractual interest on post-EFH Effective Date fees), and (e) any other Claims relating to the EFIH First Lien Notes and the EFIH Second Lien Notes (including the Trustee Indemnification Claims, the Future Interest Claims, and any Claims accruing prior to the EFH Effective Date that are not paid in full, in Cash, on the EFH Effective Date, together with contractual interest thereon, to the extent the EFH/EFIH Debtors, the Initial Supporting Creditors, the EFIH First Lien Notes Trustee, and the EFIH Second Lien Notes Trustee collectively agree to escrow amounts on account of one or more of such categories of Claims or the Bankruptcy Court otherwise enters an order requiring amounts on account of one or more of such categories of Claims to be escrowed; *provided*, *however*, that neither Reorganized EFIH nor the Plan Sponsor shall have any obligation to fund the EFIH Claims Reserve with Cash on hand after the EFH Effective Date and the EFIH Claims Reserve shall be funded solely using the Merger Sub Cash Amount and Cash on hand at EFIH immediately prior to the EFH Effective Date.  For the avoidance of doubt, no amount of Cash on hand at EFH Corp. shall be used to fund the EFIH Claims Reserve.[2]

11.  According to the Expert Report of David Ying dated January 20, 2017 (the "Ying Report"), the Debtors propose to deposit approximately $1.313 billion (the "Proposed Reserve") in the EFIH Claims Reserve on the EFH Effective Date.[3]  The EFIH Claims Reserve will be funded using a portion of the Merger Sub Cash Amount and Cash on hand at EFIH.[4]  I understand that the Debtors propose to use other Cash from the Merger Sub Cash Amount and Cash on hand at EFIH to make various payments under the Plan principally to parties other than the EFIH First Lien Notes Trustee and Holders of the EFIH First Lien

---

[2] Plan Art. I.A.161. As noted, the EFIH Claims Reserve is defined to be an "interest-bearing account."  I assume that, as I understand a witness for the Debtors has confirmed in deposition testimony, the funds in the EFIH Claims Reserve will be invested conservatively, as is common with accounts established by debtors in bankruptcy, in accordance with Section 345 of the Bankruptcy Code, and that any interest earned, net of any fees, taxes or other charges, will be relatively modest.  See Horton 1/20/2017 Deposition Transcript at 126:3-8.  For ease of calculation, I have not considered any net interest that may be earned in preparing my calculations and in offering my opinions in this Report.

[3] According to the Disclosure Statement for the Plan (Dkt. 10564) (the "Disclosure Statement"), the Debtors reserve the right to update their proposals of the amounts to be included in the EFIH Claims Reserve in an Amended Plan Supplement.  Disclosure Statement at 19.  Accordingly, I reserve the right to update the opinions offered in this Report based on additional information that the Debtors may provide.

[4] Disclosure Statement at 14, 16; Plan Art. IV.B.9.

Notes, including (unless the Bankruptcy Court orders otherwise) approximately $600 to $700 million to be funded into the EFIH Unsecured Creditor Cash Pool for distribution to Holders of Claims in Classes B5 and B6 (on or soon after the EFH Effective Date)[5] and an amount that could approximate $72 million to fund the Post-Effective Date Administrative Account, which will be used to pay for continued litigation challenges to the EFIH First Lien Makewhole Claims and the EFIH Second Lien Makewhole Claims (the "EFIH Makewhole Litigation").[6]  I further understand that, after repayment of the EFIH First Lien DIP Claims in the amount of approximately $5.475 billion, the remaining Cash from the Merger Sub Cash Amount and Cash on hand at EFIH that the Debtors propose to use for purposes other than to fund the EFIH Claims Reserve is anticipated to total approximately $3.0 billion.  Thus, of the approximately $4.3 billion that, after payment of the EFIH First Lien DIP Claims, would otherwise be available following the completion of the Merger to secure the EFIH First Lien Reserve Claims (as defined below), the Debtors propose to use approximately $3.0 billion for other purposes and to fund only approximately $1.3 billion (or approximately 30% of the $4.3 billion) into the EFIH Claims Reserve to secure the EFIH First Lien Reserve Claims (and the EFIH Second Lien Reserve Claims (as defined below)).[7]

12. Counsel has requested that I determine whether the Proposed Reserve to be deposited in the EFIH Claims Reserve on the EFH Effective Date will be sufficient to pay in full in Cash the Claims under the EFIH First Lien Notes and the Claims under the EFIH Second Lien Notes that are to be paid from the EFIH Claims Reserve if such Claims are Allowed.  For purposes of this Report, I do not offer any opinion on whether, as a legal matter, any particular Claims should or will be Allowed.  Rather, from

---

[5] Disclosure Statement at 15; Plan Art. I.A.207, 211, III.B.22, VI.A; Horton 1/20/2017 Deposition Transcript at 34:7-36:11; Keglevic 1/18/207 Deposition Transcript at 43:4-14.

[6] Disclosure Statement at 15; Plan Art. I.A.339, IV.B.9, VII.K.3.

[7] Keglevic Deposition Transcript 1/18/2017 at 38:20-41:8, 49:15-50:12; Horton 1/20/2017 Deposition Transcript at 13:19-19:15.

a financial standpoint, I determine whether the Proposed Reserve will be adequate to pay in full such Claims if they are Allowed.  For purposes of this Report, I assume that the EFH Effective Date will be April 30, 2017, which is the date the Debtors are projecting for the Plan, if confirmed, to go effective.[8]

13.  This analysis requires the following steps:

    a.  Calculate the amount of certain Claims under the EFIH First Lien Notes that, pursuant to the Plan, may be paid out of the EFIH Claims Reserve (the EFIH First Lien Reserve Claims, as defined below) over time;

    b.  Calculate the amount of certain Claims under the EFIH Second Lien Notes that, pursuant to the Plan, may be paid out of the EFIH Claims Reserve (the EFIH Second Lien Reserve Claims, as defined below) over time; and

    c.  Determine, based on the calculated amounts of the EFIH First Lien Reserve Claims and EFIH Second Lien Reserve Claims (together, the "EFIH Reserve Claims"), when and in what circumstances the Proposed Reserve likely will be exhausted.

14.  My conclusions are set forth in Section V of this Report.

## III.   EFIH First Lien Reserve Claims

15.  Below, I have calculated the amount of the following Claims that, pursuant to the Plan, are to be paid from the EFIH Claims Reserve if and to the extent such Claims are Allowed (collectively, the "EFIH First Lien Reserve Claims"):

    a.  EFIH First Lien Makewhole Claims as of June 19, 2014 (the "Redemption Date"), plus (a) interest thereon from the Redemption Date to the EFH Effective Date and (b) interest thereon post-EFH Effective Date;

---

[8] Disclosure Statement at 18.

b. Unpaid fees and expenses of the EFIH First Lien Notes Trustee (and its professionals) accrued or accruing before the EFH Effective Date (the "EFIH First Lien Pre-Effective Date Fees and Expenses"), plus (a) interest thereon from the Redemption Date to the EFH Effective Date and (b) interest thereon post-EFH Effective Date; and

c. Post-EFH Effective Date fees and expenses of the EFIH First Lien Notes Trustee and its professionals plus any interest thereon (the "EFIH First Lien Post-Effective Date Fees and Expenses").[9]

*EFIH First Lien Makewhole Claims*

16. I calculated the EFIH First Lien Makewhole Claim as approximately $432 million as of the Redemption Date.[10] The Debtors include this number in the Disclosure Statement,[11] and their professional financial advisor, Evercore, uses the same figure in its analysis.[12] I understand from Counsel

---

[9] This Report is without prejudice to the rights of the EFIH First Lien Notes Trustee and Holders of the EFIH First Lien Notes to assert any other rights or Claims under the EFIH First Lien Notes, the EFIH First Lien Note Indentures, the EFIH Collateral Trust Agreement, or any other applicable agreement. I understand that the EFIH First Lien Notes Trustee and/or Holders of the EFIH First Lien Notes may assert that EFIH and/or the EFIH Second Lien Notes Trustee will be in breach of the Collateral Trust Agreement if distributions are made to the EFIH Second Lien Notes Trustee and/or Holders of Claims under the EFIH Second Lien Notes before all Claims under the EFIH First Lien Notes are paid in full in Cash. I further understand that the EFIH First Lien Notes Trustee and/or Holders of the EFIH First Lien Notes may assert indemnification or other claims arising out of any holdback by the EFIH First Lien Notes Trustee for payment of fees and expenses. I offer no opinion on the legal merits of such Claims. My Report does not consider such Claims or the amount of Cash that would be required to be included in the EFIH Claims Reserve to cover such Claims. In this respect, my estimates of the required size of the EFIH Claims Reserve to ensure payment in full of all Claims under the EFIH First Lien Notes and all Claims under the EFIH Second Lien Notes may be conservative.

[10] For purposes of my expert report dated January 12, 2015, Counsel requested that I calculate the amount of the EFIH First Lien Makewhole Claims only for the EFIH First Lien 10% Notes and the EFIH First Lien 10.5% Notes, which is approximately $431 million as of the Redemption Date. The amount of the EFIH First Lien Makewhole Claims of $432 million includes an approximately $1 million Makewhole Claim, calculated using the same methodology, for the EFIH First Lien 6.875% Notes.

[11] Disclosure Statement at 18.

[12] Ying Report at 12.

that the EFIH First Lien Notes Trustee has asserted a claim for interest on the EFIH First Lien Makewhole Claims accruing at the contract rates specified in the EFIH First Lien Notes and EFIH First Lien Note Indentures until payment in full of the EFIH First Lien Makewhole Claims. I further understand that while the Debtors have calculated this interest using semi-annual compounding,[13] the EFIH First Lien Notes Trustee may assert that such interest compounds daily. I have calculated interest on the EFIH First Lien Makewhole Claims using both semi-annual compounding and daily compounding, from the Redemption Date to the EFH Effective Date, and, as requested by Counsel, on an annual basis thereafter through the eighth anniversary of the EFH Effective Date (April 30, 2025).

17.    As of the EFH Effective Date, the amount of the EFIH First Lien Makewhole Claims plus interest thereon at the contract rate is approximately $574 million if interest compounds semi-annually and $578 million if interest compounds daily. As shown in the chart below, these amounts increase, for example, to approximately $773 million and $785 million, depending on the method of compounding, as of the third anniversary of the EFH Effective Date (April 30, 2020), and to approximately $1.041 billion and $1.065 billion, depending on the method of compounding, as of the sixth anniversary of the EFH Effective Date (April 30, 2023).



---

[13] Ying Report at 11.

*EFIH First Lien Pre-Effective Date Fees and Expenses*

18.    I understand that, on the Redemption Date, the EFIH First Lien Notes Trustee withheld $40 million from distributions to the Holders of the EFIH 10% First Lien Notes and the EFIH 10.5% First Lien Notes, and $500,000 from distributions to the Holders of the EFIH 6.875% First Lien Notes, to provide a source of payment to satisfy the fees and expenses of the EFIH First Lien Notes Trustee and its professionals.    I understand from my review of the Ying Report and discussions with Counsel that the Debtors contemplate that 80% of the EFIH First Lien Pre-Effective Date Fees and Expenses will be paid from EFIH Claims Reserve on or shortly after the EFH Effective Date, but that (a) the remaining 20% of the EFIH First Lien Pre-Effective Date Fees and Expenses and (b) interest on all EFIH First Lien Pre-Effective Date Fees and Expenses (whether accruing before, on, or after the EFH Effective Date) may not be paid before the final resolution of the EFIH Makewhole Litigation (and any other challenges to the EFIH First Lien Reserve Claims).

19.    Counsel requested that I calculate interest at the contract rates specified in the EFIH First Lien Notes and the EFIH First Lien Note Indentures, using both semi-annual and daily compounding, accruing (a) from the Redemption Date to the EFH Effective Date on all EFIH First Lien Pre-Effective Date Fees and Expenses and (b) after the EFH Effective Date on (i) 20% of EFIH First Lien Pre-Effective Date Fees and Expenses and (ii) all interest that accrued from the Redemption Date to the EFH Effective Date.    Based on this approach, I calculated the amounts of the EFIH First Lien Pre-Effective Date Fees and Expenses and interest thereon as summarized in the table below.    (If and to the extent that the Debtors pay less than 80% of the EFIH First Lien Pre-Effective Date Fees and Expenses on the EFH Effective Date, the amount of interest accruing after the EFH Effective Date would increase accordingly.)

20. As of the EFH Effective Date, the amount of the EFIH First Lien Pre-Effective Date Fees and Expenses plus interest thereon is approximately $53.8 million if interest compounds semi-annually and $54.2 million if interest compounds daily (prior to the payment of 80% of the fees and expenses).    As shown in the chart below, the total amount that would need to be funded into the EFIH Claims Reserve to

10

pay all EFIH First Lien Pre-Effective Date Fees and Expenses (including the 80% to be paid on or shortly after the EFH Effective Date) and interest thereon at semi-annual and daily compounding, respectively, is, for example, approximately $61 million and $62 million as of the third anniversary of the EFH Effective Date (April 30, 2020), and approximately $71 million and $72 million as of the sixth anniversary of the EFH Effective Date (April 30, 2023).



### *EFIH First Lien Post-Effective Date Fees and Expenses*

21.  Counsel also requested that I calculate the EFIH First Lien Post-EFH Effective Date Fees and Expenses expected to be incurred by the EFIH First Lien Notes Trustee and its professionals in connection with the continued litigation of the EFIH First Lien Makewhole Claims and any interest thereon.  I understand from my review of the Ying Report that the Debtors estimate a monthly run rate of $1.5 million for the fees and expenses of the EFIH First Lien Notes Trustee and its professionals following the EFH Effective Date, including any interest thereon.[14]  Counsel has instructed me to use that estimate for purposes of this Report.

---

[14] Ying Report at 11.

22.  Based on these assumptions, I have calculated the EFIH First Lien Post-Effective Date Fees and Expenses and any interest thereon as summarized in the table below:

| | Effective Date | 4/30/18 | 4/30/19 | 4/30/20 | 4/30/21 | 4/30/22 | 4/30/23 | 4/30/24 | 4/30/25 |
|---|---|---|---|---|---|---|---|---|---|
| **EFIH First Lien Notes** | $       – | $   18 | $   36 | $   54 | $   72 | $   90 | $  108 | $  126 | $  144 |

### *Total EFIH First Lien Reserve Claims*

23.  The total amount of the EFIH First Lien Reserve Claims based on the calculations set forth above is shown in the chart below.



## IV.  **EFIH Second Lien Reserve Claims**

24.  I have been asked by counsel to calculate the amount of the following Claims that, pursuant to the Plan, are to be paid from the EFIH Claims Reserve if and to the extent such Claims are Allowed (collectively, the "EFIH Second Lien Reserve Claims"):

    a.  EFIH Second Lien Makewhole Claims plus (a) interest thereon from the Second Lien Partial Redemption Date (defined below) to the EFH Effective Date and (b) interest thereon post-EFH Effective Date;

b.  Unpaid fees and expenses of the EFIH Second Lien Notes Trustee (and its professionals) accrued or accruing before the EFH Effective Date (the "<u>EFIH Second Lien Pre-Effective Date Fees and Expenses</u>") plus (a) interest thereon from the date of each invoice to the EFH Effective Date and (b) interest thereon post-EFH Effective Date;

c.  Post-EFH Effective Date fees and expenses of the EFIH Second Lien Notes Trustee and its professionals plus any interest thereon (the "<u>EFIH Second Lien Post-Effective Date Fees and Expenses</u>"); and

d.  Claims related to any holdback by the EFIH Second Lien Notes Trustee, or the Debtors, from distributions of principal to Holders of EFIH Second Lien Notes on the EFH Effective Date ("<u>EFIH Second Lien Future Interest Claims</u>").

<em><u>EFIH Second Lien Makewhole Claims</u></em>

25.  The Debtors made a partial redemption of principal to Holders of the EFIH Second Lien Notes on or about March 11, 2015 (the "<u>Second Lien Partial Redemption Date</u>").[15]  I understand that the Debtors have determined that the amount of the EFIH Second Lien Makewhole Claims is $212 million.[16] This amount is comprised of (i) the makewhole amount as of the Second Lien Partial Redemption Date of $113 million, and (ii) the additional redemption premium of $99 million which will come due under the EFIH Second Lien Notes Indenture assuming the remaining EFIH Second Lien Notes are redeemed on the EFH Effective Date.[17]

---

[15] I understand that on March 11, 2015, the Debtors redeemed $445.5 million in principal and paid $289.5 million in interest to the Holders of the EFIH Second Lien Notes. Computershare Notice: Pro rata Partial Prepayment Distribution - EFIH 2nd Lien Notes dated March 11, 2015.

[16] Disclosure Statement at 18; Ying Report at 12.

[17] Ying Report at 12.

13

26. I understand that the EFIH Second Lien Notes Trustee has asserted a claim for interest on the EFIH Second Lien Makewhole Claims accruing at the contract rate specified in the EFIH Second Lien Note Indenture until payment in full of the EFIH Second Lien Makewhole Claims.

27. I was able to calculate, based on the information in the Rothschild Expert Report dated January 25, 2017 (the "Rothschild Report"), that the amount of the EFIH Second Lien Makewhole Claims plus interest thereon as of the EFH Effective Date is approximately $245 million if interest compounds semi-annually and approximately $266 million if interest compounds daily.

28. Counsel asked that I calculate interest on the EFIH Second Lien Makewhole Claims from the EFH Effective Date through the eighth anniversary of the EFH Effective Date (April 30, 2025). Consistent with my calculation of interest on the EFIH First Lien Makewhole Claims, I calculated interest on the EFIH Second Lien Makewhole Claims using both semi-annual compounding and daily compounding.

29. The amount of the EFIH Second Lien Makewhole Claims plus interest thereon through April 30, 2025 is shown in the chart below. As the chart shows, the amount of the EFIH Second Lien Makewhole Claims plus interest thereon at semi-annual and daily compounding, respectively, would be, for example, approximately $348 million and $383 million as of the third anniversary of the EFH Effective Date (April 30, 2020), and approximately $495 million and $550 million as of the sixth anniversary of the EFH Effective Date (April 30, 2023).



*EFIH Second Lien Pre-Effective Date Fees and Expenses*

30.    Counsel informed me that the EFIH Second Lien Notes Trustee is asserting a Claim for unpaid fees and expenses that it and its professionals have incurred (and will incur) from the date of each invoice to the EFH Effective Date. I understand that the EFH Second Lien Notes Trustee estimates that the amount of such fees and expenses that have not been reimbursed by the Debtors will be approximately $24 million on the EFH Effective Date.  I further understand that the EFIH Second Lien Notes Trustee's position is that interest accrues on the EFIH Second Lien Pre-Effective Date Fees and Expenses at 9% per annum (without compounding) from the dates the EFIH Second Lien Notes Trustee provided invoices to the Debtors, and that the amount of interest that will have accrued on such Claims as of the EFH Effective Date is approximately $2.5 million.

31.    I understand from my review of the Ying Report and discussions with Counsel that the Debtors contemplate that 80% of the EFIH Second Lien Pre-Effective Date Fees and Expenses will be paid from the EFIH Claims Reserve on or shortly after the EFH Effective Date, but that (a) the remaining 20% of the EFIH Second Lien Pre-Effective Date Fees and Expenses and (b) interest on all of the EFIH Second Lien Pre-Effective Date Fees and Expenses (whether accruing before, on, or after the EFH Effective Date) may not be paid before the final resolution of the EFIH Makewhole Litigation and any other challenges to the EFIH Second Lien Reserve Claims.

32.    Counsel requested that I calculate simple interest at 9% per annum after the EFH Effective Date on (i) the 20% of EFIH Second Lien Pre-Effective Date Fees and Expenses that will not be paid on the EFH Effective Date or shortly thereafter and (ii) the $2.5 million in interest that accrued or is accruing on the Second Lien Pre-Effective Date Fees and Expenses prior to the EFH Effective Date but that will not be paid on the EFH Effective Date or shortly thereafter.  Based on this approach, I calculated the amounts of the EFIH Second Lien Pre-Effective Date Fees and Expenses and interest thereon that would accrue as summarized in the table below.  (If and to the extent that the Debtors pay less than 80% of the EFIH Second

Lien Pre-Effective Date Fees and Expenses on the EFH Effective Date, the amount of interest accruing after the EFH Effective Date would increase accordingly).

33. Based on these assumptions, my calculation of the EFIH Second Lien Pre-Effective Date Fees and Expenses and interest thereon, using simple interest at 9% per annum, is shown in the following table. I understand that these amount are consistent with the amounts calculated by the financial advisors to the EFIH Second Lien Notes Trustee.



*EFIH Second Lien Post-Effective Date Fees and Expenses*

34. Counsel requested that I calculate the EFIH Second Lien Post-Effective Date Fees and Expenses expected to be incurred by the EFIH Second Lien Notes Trustee and its professionals in connection with the continued litigation of the EFIH First Lien Makewhole Claims and any interest thereon. I understand from the Ying Report that the Debtors estimate a monthly run rate of $1.0 million for the fees and expenses of the EFIH Second Lien Notes Trustee and its professionals following the EFH

Effective Date, including any interest thereon.[18]   Counsel has instructed me to use that estimate for purposes of this Report.

35.   Based on these assumptions, I have calculated the EFIH Second Lien Post-Effective Date Fees and Expenses and any interest thereon as summarized in the table below:

| | Effective Date | 4/30/18 | 4/30/19 | 4/30/20 | 4/30/21 | 4/30/22 | 4/30/23 | 4/30/24 | 4/30/25 |
|---|---|---|---|---|---|---|---|---|---|
| **EFIH Second Lien Notes** | $        - | $        12 | $        24 | $        36 | $        48 | $        60 | $        72 | $        84 | $        96 |

### *EFIH Second Lien Future Interest Claims*

36.   I understand from Counsel that the EFIH Second Lien Notes Trustee may have a claim related to the EFIH First Lien Intercreditor Action, in which the EFIH First Lien Notes Trustee has asserted Claims against the EFIH Second Lien Notes Trustee for turnover and other relief, and which is currently pending on appeal.[19]   In particular, I am informed by Counsel that, in connection with this pending litigation, the EFIH Second Lien Notes Trustee may determine to hold back some or all of the amounts it receives on the EFH Effective Date from distribution to Holders of the EFIH Second Lien Notes or that the EFIH Debtors may not be permitted to redeem the remaining principal balance of the EFIH Second Lien Notes (or pay the accrued interest thereon).  I also am advised that such a holdback of funds in any amount (the "Hold Back Amount") could result in a claim by the EFIH Second Lien Notes Trustee against EFIH in the amount of interest that would accrue on the Hold Back Amount from the EFH Effective Date.

37.   I understand from my review of the Ying Report and from discussions with Counsel that the Debtors have calculated the EFIH Second Lien Reserve Claims under two Scenarios.  Scenario 1 assumes that (a) on the EFH Effective Date, the Debtors redeem the full amount of approximately $1.711

---

[18] Ying Report at 12.

[19] *Delaware Trust Company, as Indenture Trustee v. Computershare Share Trust Company, N.A., et al,* No. 16-cv-461 (D. Del.).

billion in outstanding principal under the EFIH Second Lien Notes (and also pay the accrued interest of approximately $485 million, for a total of approximately $2.2 billion), and (b) the EFIH Second Lien Notes Trustee, in turn, promptly distributes all such monies to Holders of the EFIH Second Lien Notes or, even if the EFIH Second Notes Trustee establishes a holdback, the Debtors have no further obligation to pay interest on the principal balance of the EFIH Second Lien Notes.  In this scenario, the Ying Report submits that the EFIH Second Lien Notes would have no Future Interest Claims, but they may have a Claim for a "Call Premium" in the amount of approximately $99 million as a result of the redemption of the remaining principal balance of the EFIH Second Lien Notes on the EFH Effective Date.  Scenario 2 assumes that (a) the Debtors pay the EFIH Second Lien Notes Trustee the full $2.2 billion, but (b) the EFIH Second Lien Notes Trustee does *not* pay the Holders of the EFIH Second Lien Notes any portion of the principal balance on the EFIH Second Lien Notes, resulting in a Hold Back Amount of $1.711 billion.  In this scenario, the Ying Report assumes that interest on the principal balance would continue to accrue at the contract rates under the EFIH Second Lien Notes.

38. I offer no opinion as to whether, as a legal matter, any Future Interest Claim by the EFIH Second Lien Notes will be valid if the EFIH Second Lien Notes Trustee establishes a holdback (or the Debtors cannot pay some or all of the otherwise expected distribution of $2.2 billion to the EFIH Second Lien Notes Trustee on the EFH Effective Date).  I am calculating the amount of that potential Future Interest Claim.  To that end, Counsel informed me that the EFIH Second Lien Notes Trustee believes that the EFIH Second Lien Notes' potential Future Interest Claim can be calculated one of two ways: (i) using the methodology from the Ying Report described in Scenario 2 of that report;[20] or (ii) assuming that the

---

[20] I understand, based on the Rothschild Report, that the EFIH Second Lien Indenture Trustee is assuming that the Bankruptcy Court prohibits the Debtors from making any distribution to the EFIH Second Lien Notes Trustee on account of the $1.711 billion principal amount due and owing on the EFH Effective Date, which results in the same treatment assumed in Ying's Scenario 2.

Hold Back Amount for each annual period subsequent to the EFH Effective Date is equal to the amount of the EFIH First Lien Makewhole Claims plus interest thereon on each anniversary of the EFH Effective Date. As instructed by Counsel, I calculated the amount of the EFIH Second Lien Future Interest Claims using both methodologies for each of the eight years following the EFH Effective Date.[21]

39. The amounts from the Ying Report are shown in the chart below. As shown in the chart, the amount of the Second Lien Future Interest Claims would be, for example, approximately $717 million if interest compounds semi-annually and approximately $743 million if interest compounds daily, as of the third anniversary of the EFH Effective Date (April 30, 2020), and approximately $1.736 billion and $1.808 billion, depending on the method of compounding, as of the sixth anniversary of the EFH Effective Date (April 30, 2023).



---

[21] I understand the EFIH First Lien Notes Trustee may assert that no distribution—of either principal or accrued interest—may be made to the EFIH Second Lien Notes Trustee or Holders of the EFIH Second Lien Notes until all Claims under the EFIH First Lien Notes have been paid in full in Cash. If so, and if the Hold Back Amount were accordingly $2.2 billion, the amount of the EFIH Second Lien Future Interest Claims would be greater than the amounts shown herein, and a greater reserve would be required to ensure payment of such Claims. In this respect, my estimates of the required size of the EFIH Claims Reserve to ensure payment in full of all Claims under the EFIH First Lien Notes and all Claims EFIH Second Lien Notes may be conservative.

40. The alternative methodology proposed by the EFIH Second Lien Notes Trustee is shown in the chart below. As shown in the chart, the amount of the Second Lien Future Interest Claims would be, for example, approximately $333 million if interest compounds semi-annually and approximately $349 million if interest compounds daily, as of the third anniversary of the EFH Effective Date (April 30, 2020), and approximately $1.088 billion and $1.159 billion, depending on the method of compounding, as of the sixth anniversary of the EFH Effective Date (April 30, 2023).



*Total EFIH Second Lien Reserve Claims*

41.  The total amount of the EFIH Second Lien Reserve Claims if the EFIH Second Lien Future Interest Claims are calculated according to the Ying Report is shown in the chart below.[22]



42.  The total amount of the EFIH Second Lien Reserve Claims if the EFIH Second Lien Future Interest Claims are calculated in the alternative method proposed by the EFIH Second Lien Notes Trustee is shown in the chart below.[23]



---

[22] Because I am assuming here that the EFIH Second Lien Future Interest Claims are calculated according to the Ying Report, I have also calculated the "Call Premium" under the EFIH Second Lien Notes in accordance with Scenario 2 in the Ying Report.

[23] Because I am assuming here that the EFIH Second Lien Future Interest Claims are calculated according to the alternative method proposed by EFIH Second Lien Notes Trustee, I have also calculated the "Call Premium" under the EFIH Second Lien Notes in accordance with the alternative method proposed by EFIH Second Lien Notes Trustee in the Rothschild Report.

## V.    Conclusions

43.  The total amount of the EFIH Reserve Claims based on the calculations set forth above if the EFIH Second Lien Future Interest Claims are calculated according to the Ying Report is shown in the chart below.



44.  The total amount of the EFIH Reserve Claims based on the calculations set forth above if the EFIH Second Lien Future Interest Claims are calculated in the alternative method proposed by the EFIH Second Lien Notes Trustee is shown in the chart below.



45. I understand, based on my review of the Disclosure Statement, the Ying Report, certain schedules received from the Debtors' financial advisors,[24] and the transcripts of certain depositions,[25] that the Proposed Reserve of $1.313 billion is based on the following assumptions (among others):

a) Interest compounds semi-annually, rather than daily.

b) 80% of the EFIH First Lien Pre-Effective Date Fees and Expenses will be paid from the EFIH Claims Reserve on (or shortly after) the EFH Effective Date (such that interest will accrue post-Effective Date on only 20% of the EFIH First Lien Pre-Effective Date Fees and Expenses).

c) 80% of the EFIH Second Lien Pre-Effective Date Fees and Expenses will be paid from the EFIH Claims Reserve on (or shortly after) the EFH Effective Date (such that interest will accrue post-Effective Date on only 20% of the EFIH Second Lien Pre-Effective Date Fees and Expenses).

d) The EFIH First Lien Post-Effective Date Fees and Expenses plus any interest thereon ultimately Allowed will not exceed $1.5 million per month.

e) The EFIH Second Lien Post-Effective Date Fees and Expenses plus any interest thereon ultimately Allowed will not exceed $1 million per month.

f) The EFIH Makewhole Litigation will not continue more than three years after the EFH Effective Date.

g) The EFIH Second Lien Future Interest Claims will not be Allowed.

---

[24] Schedule entitled "Potential Disputed Make Whole Claims" received from Debtors' financial advisors on January 3, 2017

[25] Horton 1/20/2017 Deposition Transcript; Keglevic 1/18/2017 Deposition Transcript.

46. If any of those assumptions proves to be incorrect, the Proposed Reserve could be inadequate, potentially substantially so, to pay in full in Cash all EFIH Reserve Claims that may be Allowed.[26]

47. The two assumptions that most substantially affect whether the Proposed Reserve will be adequate are assumptions (f) (the EFIH Makewhole Litigation will not continue more than three years after the EFH Effective Date) and (g) (the EFIH Second Lien Future Interest Claims will not be Allowed).

48. The chart below shows the amount of Allowed EFIH Reserve Claims over eight years following the EFH Effective Date—and thus the amount that the Debtors would need to include in the EFIH Claims Reserve to enable all such Claims to be paid out of the EFIH Claims Reserve—if all EFIH Reserve Claims are Allowed subject to the Debtors' assumptions in paragraph 45 other than assumption (f). As the chart shows, in that scenario, the amount of the Allowed EFIH Reserve Claims will exceed the Proposed Reserve on the first day in the fourth year after the EFH Effective Date. By way of example, if the EFIH Makewhole Litigation lasts for five years from the EFH Effective Date and the Allowed EFIH Reserve Claims are therefore not paid until April 30, 2022 (and the EFIH First Lien Makewhole Claims and the EFIH Second Lien Makewhole Claims are Allowed and thus must be paid by April 30, 2022), the EFIH Claims Reserve will have a shortfall of approximately $385 million.

---

[26] The Debtors' proposed amount for the EFIH Claims Reserve also assumes that no Claims under the EFIH First Lien Notes or the EFIH Second Lien Notes other than the EFIH Reserve Claims (and Claims to be paid under the Plan in full on the EFH Effective Date) will be Allowed. If that assumption is incorrect, the EFIH Claims Reserve could likewise be inadequate.



49. The chart below shows the amount of Allowed EFIH Reserve Claims over three years following the EFH Effective Date—and thus the amount that the Debtors would need to include in the EFIH Claims Reserve to enable all such Claims to be paid out of the EFIH Claims Reserve—if all of the EFIH Reserve Claims are Allowed subject to the Debtors' assumptions in paragraph 45 other than assumption (g) (and if the EFIH Second Lien Future Interest Claims are calculated in accordance with the Ying Report and the EFIH First Lien Intercreditor Action is resolved at the same time as the EFIH Makewhole Action—i.e., three years after the EFH Effective Date). As the chart shows, in that scenario, the amount of the Allowed EFIH Reserve Claims will exceed the Proposed Reserve in the 15th month after the EFH Effective Date. By way of example, if the EFIH Second Lien Future Interest Claims (and the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims) are Allowed, then even if the EFIH Makewhole Litigation (and the EFIH First Lien Intercreditor Action) lasts only three years after the EFH Effective Date, at the end of those three years (on April 30, 2020), the EFIH Claims Reserve will have a shortfall of approximately $635 million.



50.  The chart below reflects the same analysis as the chart in paragraph 49, except it calculates the amount of the EFIH Second Lien Future Interest Claim using the alternative methodology suggested by the EFIH Second Lien Notes Trustee.



51.    The chart below shows the amount of Allowed EFIH Reserve Claims over eight years following the EFH Effective Date)—and thus the amount that the Debtors would need to include in the EFIH Claims Reserve to enable all such Claims to be paid out of the EFIH Claims Reserve—if all of the EFIH Reserve Claims are Allowed subject to the Debtors' assumptions in paragraph 45 other than both assumptions (f) and (g) (and if the EFIH Second Lien Future Interest Claims are calculated in accordance

with the Ying Report). As the chart shows, in that scenario, the amount of the Allowed EFIH Reserve Claims will exceed the Proposed Reserve in the 15th month after the EFH Effective Date. By way of example, if the EFIH Second Lien Future Interest Claims (and the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims) are Allowed, and the EFIH Makewhole Litigation (and the EFIH First Lien Intercreditor Action) lasts for five years from the EFH Effective Date (and the EFIH Reserve Claims are therefore paid on April 30, 2022), the EFIH Claims Reserve will have a shortfall of approximately $1.612 billion.



52. The chart below shows the same analysis as the chart in paragraph 51 except it calculates the amount of the EFIH Second Lien Future Interest Claim using the alternative methodology suggested by the EFIH Second Lien Notes Trustee.



## VI.    Right to Supplement

53. I reserve the right to supplement or amend my report based on any new information that
may come to my attention that is relevant to the opinions contained herein.

Respectfully submitted,

Christopher J. Kearns

New York, New York

January 25, 2017

## Exhibit A--List of Material Relied Upon

**Documents & Other Sources:**

1. Expert report of Christopher J. Kearns dated January 12, 2015 in re: Delaware Trustee Company, as Indenture Trustee vs. Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (Adversary Proceeding No. 14-50363 (CSS))
2. Evercore document entitled "Potential Disputed Make Whole Claims" provided by Debtors on or about January 3, 2017
3. Debtors' documents entitled "EFH/ EFIH Cash Build (as of 12/1/16)" and EFH / EFIH Cash Forecast (as of 12/1/16), received from Evercore on or around January 4, 2017
4. Expert Report of David Ying dated January 20, 2017
5. Transcript of Deposition of Paul M. Keglevic (Jan. 18, 2017)
6. Transcript of Deposition of Anthony Horton (Jan. 20, 2017)
7. Rothschild Expert Report dated January 25, 2017
8. Computershare Notice: Pro rata Partial Prepayment Distribution - EFIH 2nd Lien Notes dated March 11, 2015

**Court Filings:**

1. Dkt. 10564-2 – Seventh Amended Joint Plan of Reorganization of Energy Futures Holdings Corp., Et. Al., pursuant to Chapter 11 of the Bankruptcy Code
2. Dkt. 10564 – Amended Disclosure Statement for the Seventh Amended Joint Plan of Reorganization of Energy Futures Holdings Corp., Et. Al., pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors

**Christopher J. Kearns**

**Managing Director**
**Berkeley Research Group**
**810 Seventh Ave, Suite 4100**
**New York, NY 10019**
212-782-1409
CKearns@thinkbrg.com

**SUMMARY**

Mr. Kearns is a Managing Director in the restructuring practice of Berkeley Research Group ("BRG"). Prior to joining BRG in June 2015, he was a Member of the Firm and co-founder of Capstone Advisory Group, LLC ("Capstone," or the "Firm"). He is a CPA, a Certified Turnaround Professional, a Certified Insolvency and Restructuring Advisor, and a Certified Fraud Examiner. He specializes in providing financial restructuring advisory services and crisis management services in the troubled company environment. He has represented all parties-in-interest in various complex matters and has rendered expert testimony on various issues.

**PROFESSIONAL EXPERIENCE**

**Berkeley Research Group – June 2015 - Present**

Managing Director

**Capstone Advisory Group, LLC – January 2004 – May 2015**

Managing Member of the Firm

**FTI Consulting, Inc. (and predecessor firms) – 1991 – January 2004**

Senior Managing Director

At BRG, Capstone, FTI and predecessor firms, he has provided financial advisory and crisis management services in the troubled company environment. Assignments have included service as Chief Executive Officer, Chief Restructuring Officer, Responsible Officer, Receiver, and Trustee. Also he has rendered expert testimony in various jurisdictions on matters involving solvency, valuation, lost profits, liquidation and recovery analysis, and other issues regarding distressed situations. Sample assignments include:

- *Molycorp, Inc. (2015 – 2016)* – Financial advisor to the Official Committee of Unsecured Creditors in a Chapter 11 proceeding for a global rare earths and rare metals producer
- *Gleacher & Company, Inc. (2013 – present)* – Chief Executive and Chief Restructuring Officer for a publicly traded financial services business and broker dealer
- *Extended Stay Hotels (2009-2010)* – Financial advisor to the Operating Advisor in a $7 billion CMBS structure in a Chapter 11 proceeding for a hotel chain, including sale of the assets
- *Archstone (2009-2010)* – Financial advisor to major stakeholders for a large multi-family dwelling platform in major markets in connection with a debt for equity swap and related valuation
- *Nortel (ongoing)* – Financial advisor to the Unsecured Creditors Committee in a Chapter 11 proceeding for a multinational telecommunications company
- *MF Global (2011-2013)* – Financial advisor to the Statutory Creditors' Committee in a Chapter 11 proceeding for a failed multinational broker dealer

**Christopher J. Kearns**

**(continued)**

- *Dynegy Holdings LLC (2011-2013)* – Financial advisor to the Indenture Trustee, Roseton, and Danskammer
- *Eastman Kodak (2012-2013)* – Financial advisor to ad hoc noteholders on intellectual property matters
- *Energy Future Intermediate Holdings (2013-*present) – Financial advisory to ad hoc group of First Lien lenders to a holdco with a significant interest in a regulated electric transmission company
- *Centro Group (2007-2009)* – Financial advisor to US lenders (debt of approximately $2.2 billion) in connection with the restructuring of a multinational commercial real estate company
- *SemGroup (2008-2009)* – Financial advisor to Secured Lenders (aggregate indebtedness of nearly $3 billion) in a Chapter 11 proceeding for a company engaged in the transport, storage and distribution of petroleum products in the North American energy corridor
- *Calpine entities* (2005-2007) – Financial advisor to various ad hoc groups, including Calgen noteholders, CCFC noteholders, and Broad River/ Southpoint / Rockgen stakeholders
- *Mirant Corporation (2004-2006)* – Financial advisor to Unsecured Creditors Committee in Chapter 11 proceeding for a multinational energy company with generation capacity of 18,000 megawatts. Reorganization value upon emergence $11.5 to $12.0 billion
- *NRG Energy* (2002-2003) – Financial advisor to Global Lenders (aggregate indebtedness of over $3 billion) in a Chapter 11 proceeding for a multinational energy company
- *Xerox* (2002) – Financial advisor to the Lenders in connection with the successful restructuring of a $7 billion credit facility for this multinational company
- *Superior Essex Communications LLC (f/k/a Superior Telecommunications)* (2001-2002) – Financial advisor to the Lenders (debt of approximately $1 billion) in a Chapter 11 proceeding for a manufacturer of wire and cable
- *Schwinn/GT* (2001) - Financial advisor to the Debtor in a Chapter 11 proceeding for a manufacturer and distributor of bicycle and fitness products
- *Heilig-Meyers and The RoomStore* (2001-2005) – Financial advisor to the Debtors in a Chapter 11 proceeding for a furniture retailer
- *Starter Corporation* (1999) – Financial advisor to the Debtor in a Chapter 11 proceeding for an apparel and retail company

**Other restructuring and bankruptcy assignments include:**

- aaiPharmaceutical – Advisor to the Lenders
- Aerospace contractor – Advisor to the Lenders
- Advanced Glassfiber Yarns – Advisor to the Lenders
- Aircraft parts and maintenance company – Advisor to the Lenders
- Allied Holdings – Advisor to the Company and Lenders (separate matters)
- Altegrity Inc. – Advisor to Unsecured Creditors Committee

**Christopher J. Kearns**

**(continued)**

- American Asphalt – Advisor to the Lenders
- American Capital – Advisor to the Lenders
- APA Trucking – Advisor to the Company
- Biofuel company – Advisor to the Lenders
- Biotech company – Advisor to the Board of Directors
- Boscov's – Advisor to the Debtor
- Breitburn Energy Partners LP – Advisor to the Unsecured Creditors Committee
- Bridge and tunnel construction company – Advisor to the Lenders
- Buddy L, Inc. – Advisor to the Debtor and Trustee
- Building products company – Advisor to the Company
- Business development company – Advisor to the Lenders
- Caesars Entertainment Operating Company Inc. – Advisor to Ad Hoc Secured Noteholders
- Channel Master – Advisor to the Debtor
- Chemtura Corporation – Advisor to the Lenders
- Countrywide – Litigation consultant re: mortgage put backs
- Credit card company and private bank – Advisor to the Company
- Direct marketing company – Advisor to the Lenders
- Doral Financial Corporation – Advisor to the Unsecured Creditors Committee
- Downey – Litigation consultant and advisor to the Trustee
- G3K Display, LLC – Receiver
- Gas importer/retailer – Advisor to the Lenders
- Hovensa, Inc.- Advisor to the Unsecured Creditors Committee
- Kasper A.S.L. – Advisor to the Lenders
- KPNQwest – Advisor to the Lenders
- Magnum Hunter Resources Corporation – Advisor to the Unsecured Creditors Committee
- Marvel Avoidance Litigation Trust – Trustee
- Maxus Energy Corporation – Advisor to the Unsecured Creditors Committee
- Maxxim Medical – Advisor to the Lenders
- Midstates Petroleum Company, Inc. – Advisor to the Unsecured Creditors Committee
- Mid-stream oil and gas company – Advisor to Lenders
- Mid-stream oil and gas company – Advisor to Lenders
- Mid-stream gas company – Advisor to the Company
- Monet Group – Advisor to the Debtor
- Multinational bulk shipping company – Advisor to the Lenders
- Multinational manufacturer – Advisor to the Company
- New York Waterways – Advisor to the Company

**Christopher J. Kearns**

**(continued)**

- Nutritionals manufacturer – Advisor to the Company
- Pathnet – Advisor to the Debtor
- PCB manufacturer – Advisor to the Lenders
- Peabody Energy Corporation – Advisor to the Unsecured Creditors Committee
- Pharmaceutical company – Advisor to the Company
- Pharmaceutical company – Advisor to the Lenders
- Privately owned hotel chain – Advisor to the Lenders
- Privately owned pharmaceutical and contract research company - Lenders
- Puerto Rico Electric Power Authority – Advisor to Lender
- Quicksilver Resources Inc. – Advisor to the Unsecured Creditors Committee
- Real estate / hotel company – Advisor to the Noteholders
- Real estate / hotel company – Advisor to the CMBS Mezzanine Leader
- Real estate development company – Advisor to the Lenders
- Rhodia Inc. – Advisor to the Lenders
- Sabine Oil & Gas Corporation – Advisor to the Unsecured Creditors Committee
- Schein Pharmaceutical – Advisor to the Lenders
- Sharp International – Responsible Officer
- Singer Company – Advisor to the Unsecured Creditors Committee
- Sirius XM – Advisor to the Lenders
- SLM International – Advisor to the Company
- Spanish Broadcasting System, Inc. – Advisor to the Company
- Specialty chemicals company – Advisor to the Lenders
- Specialty chemical company – Advisor to the Lenders
- Spiegel – Advisor to the Lenders
- Sub-prime auto lender – Responsible Officer
- Sub-prime mortgage lender – Advisor to the Company
- Transportation company – Advisor to the Company
- Transportation company – Advisor to the Lenders
- Triangle Petroleum Corp. – Advisor to the Special Committee of the Board of Directors of the Parent Company
- The Winter Group – Chief Restructuring Officer
- Women's apparel manufacturer – Advisor to the Company

**Christopher J. Kearns**

**(continued)**

**Litigation related assignments / Expert testimony:**

− Arbitrator, American Arbitration Association

− Testimony (dates are approximate)

- 2016 and 2011: In re: Lyondell Litigation Trust v. Lyondell directors and officers, Blavatnik et al − solvency and valuation analysis, including issues related to alleged fraudulent transfer

- 2016: In re: Midstates Petroleum Petroleum Company, Inc. − evaluation of value allocation between encumbered and unencumbered assets and potential diminution in value

- 2016: In re: Sabine Oil & Gas Corporation − evaluation of potential claims and proposed settlement pursuant to the Debtors' proposed plan of reorganization

- 2015: In re: Quicksilver Resources, Inc. − evaluation of potential 506(c) claims

- 2015: In re: Energy Future Intermediate Holding Company LLC − make whole determination and analysis of reinvestment risk for senior secured noteholders

- 2014: Marblegate Asset Management, LLC et al v. Education Management Corp et al − analysis of available liquidity under various restructuring scenarios as directed by counsel

- 2014: In re: MPM Silicones et al (Momentive) − market efficiency, credit analysis and valuation in connection with a cram down of secured notes pursuant to a plan of reorganization; make whole determination and analysis for senior noteholders

- 2013: In re: Getty Marketing, Inc. v. Lukoil Americas Corporation et al − valuation analysis and determination of "reasonably equivalent value" in a fraudulent transfer matter

- 2013: In re: School Specialty, Inc. − make whole determination for the senior secured lender

- 2010: In re: Premier Entertainment Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) (Southern District of MS) − make whole / no call determination for noteholders including analysis of reinvestment risk

- 2009: In re: Lyondell Chemical Company, et al; Official Committee of Unsecured Creditors v. Citibank N.A., et al − solvency and valuation analysis, including issues related to alleged fraudulent transfer

- 2007: Phar-Mor v. McKesson − solvency and valuation analysis

- 2007: Northwestern Corporation − rebuttal on structured finance and restructuring related matters

- 2007: In re: Calpine Corporation (Southern District of NY) − solvency analysis and make whole / no call determination for certain noteholders

- 2006 and 2007: In re: Enron Securities Litigation − rebuttal on solvency and valuation matters

- 2005: Maxxim Medical, Inc. v. Professional Hospital Supply (Plaintiff − Middle District of Florida) − lost profits and business valuation

- 2001 and 2005: Heilig-Meyers and The RoomStore (Virginia) − KERP program, asset sales, business valuation, and for plan proponent

- 2001: Schwinn/GT (Colorado) − KERP program, liquidation analysis and creditor recoveries, sale of assets, and for plan proponent

- 2000: Monet Group (Delaware) − Sale of assets and for plan proponent

**Christopher J. Kearns**

**(continued)**

- 2000: Nature's Best Group Inc. v. Best Foods et al (Nassau County, NY State) – deposition testimony for defendant; lost profits and business valuation
- 1999: Starter Corp. (Delaware) – KERP program, liquidation and creditor recoveries analysis, and for plan proponent
- 1998: Fletcher et al v. Liggett Group Inc. (Defendant - Alabama) – business valuation, bankruptcy and restructuring recoveries, and intellectual property analysis
- 1995: Buddy L, Inc. (Delaware) – for Chapter 11 plan proponent

**Recent Speaking Engagements**

- 2016 – Beard Distressed Investing Conference, panelist
- 2016 – Diamond McCarthy webinar: *Managing Distress in the Energy Sector: Strategies and Alternatives*
- 2012 – Schulte Roth & Zabel LLP's Distressed Debt Investing Conference
- 2012 – ABI's 4th Annual Mid-Level Professional Development Program, panel discussion: *Protecting Privilege in a World of Rapid Communications and Shifting Alliances*
- 2010 – ABI's 2nd Annual Mid-Level Professional Development Program, panel discussion: *Negotiating for Results*
- 2010 – Cadwalader, Wickersham, & Taft LLP's Energy Investing Conference

**Bristol-Myers Company – 1988-1991**

**Assistant Controller: 1990-1991**

- Responsible for SEC reporting for the corporation and internal reporting and analysis for senior management
- Principal corporate financial interface with accounting and finance function for major divisions / subsidiaries
- Managed all corporate disbursements

**Director – Internal Audit: 1988-1990**

- Managed audits and special projects at corporate and multinational subsidiary levels for the Company's pharmaceutical, healthcare, and consumer products businesses

**Arthur Andersen & Company – 1978-1988**

**Manager: 1983-1988**

- Managed numerous audit engagements, including overall engagement responsibility for ITT Corporation, Grumman Corporation, and Signal Companies
- Advised major investment banks in connection with merger and acquisition structure and techniques

**Christopher J. Kearns**

**(continued)**

### BOARDS OF DIRECTORS

**Corporate**

- aaiPharmaceutical, Inc. 2006-2009
- Outsourcing Solutions, Inc. 2003-2005
- Supradur Company – 1992-1993

**Non-profit**

Leukemia and Lymphoma Society

- National Board of Representatives 2005 – 2010
- NY Chapter - Chairman Emeritus, past President and Trustee 1995- 2010
- Long Island Chapter Board of Trustees 2014 - present

Make-A-Wish Foundation of Metro New York – 1992-1994

Friends of Mercy Medical Center, Long Island NY – Past President and Executive Committee 2008 - 2014

### MEMBERSHIPS

- Turnaround Management Association
- Association of Certified Insolvency and Restructuring Advisors
- American Institute of Certified Public Accountants
- NY State Society of CPA's
- National Association of Certified Fraud Examiners

### EDUCATION AND PROFESSIONAL CERTIFICATIONS

- Iona College – BBA Accounting with honors 1978
- Certified Public Accountant
- Certified Turnaround Professional
- Certified Insolvency and Restructuring Advisor
- Certified Fraud Examiner

Exhibit C

**Illustrative EFIH Distributable Value Prior to Potential Reserve** *($s in millions)*

| | 4/30/17 | 4/30/18 | 4/30/19 | 4/30/20 | 4/30/21 | 4/30/22 | 4/30/23 | 4/30/24 | 4/30/25 |
|---|---|---|---|---|---|---|---|---|---|
| **Sources:** | | | | | | | | | |
| Nextera Purchase Price | $ 9,709 | $ 9,709 | $ 9,709 | $ 9,709 | $ 9,709 | $ 9,709 | $ 9,709 | $ 9,709 | $ 9,709 |
| EFIH Cash | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| Total Sources (Value Available for Distribution) | 9,776 | 9,776 | 9,776 | 9,776 | 9,776 | 9,776 | 9,776 | 9,776 | 9,776 |
| | | | | | | | | | |
| **Uses (1):** | | | | | | | | | |
| EFIH 1L DIP | (5,475) | (5,475) | (5,475) | (5,475) | (5,475) | (5,475) | (5,475) | (5,475) | (5,475) |
| EFIH 2L Principal & Interest | (2,196) | (2,196) | (2,196) | (2,196) | (2,196) | (2,196) | (2,196) | (2,196) | (2,196) |
| Debtor Professional Fees ($24 million annually) | - | (24) | (48) | (72) | (96) | (120) | (144) | (168) | (192) |
| Total Uses Prior to Reserve | (7,671) | (7,695) | (7,719) | (7,743) | (7,767) | (7,791) | (7,815) | (7,839) | (7,863) |
| | | | | | | | | | |
| **Distributable Value Prior to Reserve** | **$ 2,105** | **$ 2,081** | **$ 2,057** | **$ 2,033** | **$ 2,009** | **$ 1,985** | **$ 1,961** | **$ 1,937** | **$ 1,913** |

(1) Does not reflect $45-$100 million of potential additional administrative claims.  See Horton 1/20/17 Dep. Tr. 17:1-18, 21:17-22:8