**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------- x
In re:                                      :    Chapter 11
                                            :
ENERGY FUTURE HOLDINGS CORP., et al.,       :    Case No. 14-10979 (CSS)
                                            :
                    Debtors.                :    (Jointly Administered)
                                            :
------------------------------------------------------------- x    Related to Docket No. 10551
```

**EFIH SECOND LIEN TRUSTEE'S**
**OBJECTION TO DEBTORS' PLAN OF REORGANIZATION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ......................................................................................................... 6

I.  The Makewhole Settlements and PIK Proposal ................................................ 6

II.  Status of Pending Litigations ............................................................................ 7

III.  The EFIH Second Lien Note Claims and Plan Treatment ................................. 8

IV.  The EFIH Claims Reserve ................................................................................. 9

OBJECTION ............................................................................................................. 10

I.  The Debtors Cannot Cram-Down the EFIH Second Lien Notes ..................... 10

    A.  The Debtors Cannot Satisfy Section 1129(b) of the Bankruptcy Code ............... 10

    B.  The Debtors' Proposed EFIH Claims Reserve is Insufficient .............................. 12

    C.  Security Interest and Control Account for EFIH Claims Reserve ........................ 27

    D.  The Plan Must Provide the EFIH Second Lien Noteholders with a Lien on the EFH/EFIH Distribution Account ................................................................... 28

    E.  Payment of Post-Effective Date Debtor Professional Fees .................................. 29

II.  The EFIH Unsecured Notes Should Not Be Receiving an Advance Distribution and the Makewhole Litigation Oversight Committee Should not be Paid when the EFIH Claims Reserve is Not Fully Funded ..................................................................... 30

III.  The Process for Review and Payment of the EFIH Second Lien Trustee's Fees and Expenses is Inappropriate .......................................................................... 31

CONCLUSION .......................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Arnold & Baker Farms*,
  85 F.3d 1415 (9th Cir. 1996) ................................................29

*In re B.W. Alpha, Inc.*,
  100 B.R. 831 (Bankr. N.D. Tex. 1988)...................................26

*In re Cady*,
  No. 06-00502, 2007 WL 2215384 (Bankr. D. Idaho July 30, 2007) ......................................24

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ..............................11

*In re Investment Company of the Southwest, Inc.*,
  341 B.R. 298 (B.A.P. 10th Cir. 2006) ...................................25

*In re Murel Holding Corp.*,
  75 F.2d 941 (2d Cir. 1935).......................................................11

*In re Philadelphia Newspapers, LLC*,
  599 F.3d 298 (3d Cir. 2010) (*rev'd on other grounds*, *RadLAX*, 132 S. Ct. 2065) ......................................................................................11

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  132 S. Ct. 2065 (2012)...........................................................10

*In re San Felipe @ Voss, Ltd.*,
  115 B.R. 526 (S.D. Tex. 1990) ...............................................25

*In re Sugarleaf Timber, LLC*,
  529 B.R. 317 (M.D. Fla. 2015)...............................................25

*In re TCI 2 Holdings LLC*,
  428 B.R. 117 (Bankr. D. N.J. 2010) .......................................22

*In re Tribune Media Co.*,
  799 F.3d 272 (3d Cir. 2015)*(cert. denied)*136 S. Ct. 1459 (2016) .........................................22

*In re U.S. Mineral Prods. Co.*,
  No. 01-2471 (JKF), 2005 WL 5898300 (Bankr. D. Del. Nov. 29, 2005)..............................24

*In re Walat Farms, Inc.*,
  70 B.R. 330 (Bankr. E.D. Mich. 1987) ..................................26

*In re Wiersma*,
   227 F. App'x 603 (9th Cir. 2007) ...........................................................................................11

**Statutes**

11 U.S.C. § 506(b) ........................................................................................................................31

11 U.S.C. § 1129 .................................................................................................................4, 11, 26

**Other Authorities**

Fed. R. Bankr. P. 3001(f) .......................................................................................................13, 33

Fed. R. Bankr. P. 3007 ..................................................................................................................13

H.R. Rep. 95–595, 95th Cong., 2d Sess. (1977), reprinted in 1978 U.S.C.C.A.N.
   5963................................................................................................................................................11

Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacity as indenture trustee (the "**EFIH Second Lien Trustee**") for the EFIH Second Lien notes (the "**EFIH Second Lien Notes**" and the holders thereof, the "**EFIH Second Lien Noteholders**") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (collectively, "**EFIH**") pursuant to the Indenture dated as of April 25, 2011 (together with all supplements, amendments, and exhibits, the "**Indenture**") hereby submit this objection (the "**Objection**") to the *Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**") [Docket. No. 10551].[1]  In support of this Objection, the EFIH Second Lien Trustee respectfully submits the following:

## PRELIMINARY STATEMENT

1.      It is regrettable that the Debtors have decided to abandon a settlement of the Makewhole Claims they deemed to be reasonable (in light of the substantial cost and low likelihood of success of further litigation regarding claims that the Third Circuit has emphatically held to be valid).  They made this decision at the behest of the PIK Noteholders, and justified their decision on the grounds that the EFIH Second Lien Noteholders would not be harmed because they would be protected by a newly established EFIH Claims Reserve determined by this Court to be sufficient to cover all potential EFIH Second Lien Note Claims in any amount that may be owed at the conclusion of such litigation.  But it is clear from the Plan and Plan Supplement that the Debtors and PIK Noteholders have no intention of protecting all of the EFIH Second Lien Noteholders' rights.  Instead, they will be asking the Court to set the EFIH Claims

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan, the Disclosure Statement [Docket No. 10564] and the Amended Plan Supplement [Docket No. 10979].

Reserve at an unjustifiably low level in order to make an inappropriate distribution to the PIKs before the claims of the EFIH First and Second Lien Noteholders are finally determined.

2.      In order to satisfy the Debtors' stated and necessary goal to "minimize harm to the EFIH Second Lien Noteholders" (*see* Disclosure Statement [Docket No, 10564] at 16), the EFIH Claims Reserve must be sufficient to cover *all* potential claims relating to the EFIH Second Lien Notes.  The amount the Debtors propose to reserve is insufficient on its face for a number of reasons:

3.      <u>First</u>, litigation on the Makewhole Claims and related intercreditor and indemnification matters could very well take longer than the three years the Debtors ask this Court to conclude is the maximum possible.  The analysis presented by the Debtors to support this three year figure is manifestly wrong on its face, as it repeatedly and inexplicably assumes that the "Phase 2" proceedings, including all of the lengthy appeals that could follow, simply *do not exist* – and that all that remains is to wait for the outcome of further challenges to the Third Circuit's unanimous opinion.  This is, of course, pure hogwash: unless the Debtors and PIKs make some unanticipated dramatic announcement that they will forego Phase 2 completely (but for the necessary claim quantification), their regrettably chosen litigation path can mire all parties in years of further litigation on Phase 2 and its aftermath.  As shown below, it is easy to point to numerous cases in the world of bankruptcy litigation that have dragged on far longer than three years before final resolution.  If that happens here – and Debtors offer no reason why it could not – interest on the Makewhole Claims alone would eat up the maximum amount that can possibly be placed in the EFIH Claims Reserve, with no distribution to the PIKs.

4.      <u>Second</u>, the EFIH Claims Reserve fails to account for potential claims the EFIH Second Lien Noteholders have, including future interest accrual.  As discussed below, because

the EFIH First Lien Trustee has already sued the EFIH Second Lien Trustee in the Intercreditor Litigation (with which this Court is well familiar), until that dispute is finally resolved the EFIH Second Lien Trustee will hold back a substantial portion of any distribution made on account of the EFIH Second Lien Notes to cover any potential liability (the "**Holdback**").   Under the clear terms of the Indenture, in this circumstance the Holdback amount of the EFIH Second Lien Notes has *not* been satisfied, and the Debtors' obligation to pay interest on that amount continues.   The same result would follow in an even greater amount, if the Court agrees with the EFIH First Lien Trustee's contention that no distribution at all can be made to the EFIH Second Lien Noteholders until the Makewhole Claims are resolved.   In either event, the EFIH Second Lien Noteholders will have a valid claim for interest continuing to accrue on the amounts they do not receive on the Effective Date.   But the Debtors argue that *nothing* should be added to the EFIH Claims Reserve to cover the "**Future Interest Claim**."   This is wrong.   While the Debtors may dispute the EFIH Second Lien Noteholders' entitlement to this claim, at the very least it is subject to legitimate dispute and must be reserved for.   Nor could the need to do so be resolved by having this Court decide the Future Interest Claim (prematurely) in connection with Confirmation, as any such decision would of course be appealed by the losing side.   It is disingenuous for the Debtors to tell the Court that they are preserving the EFIH Second Lien Noteholders' appellate rights, yet refusing to reserve for the claims.[2]

5.      <u>Third</u>, the EFIH Claims Reserve must be sufficient to cover any other claims, including potential indemnification claims that may be asserted against the EFIH Claims Reserve as well as calculation of interest on a daily compounding basis (versus semi-annual compounding).   As with the Future Interest Claims, parties are advancing competing arguments

---

[2] Of course, the Debtors also ignore that the entirety of the Future Interest Claim would never have arisen had the Debtors honored the settlement they reached with the First and Second Lien Noteholders.

on this issue, and no decision by this Court at this point could establish the right answer with requisite finality.  Under such circumstances, the EFIH Claims Reserve must be set assuming the maximum possible amount will ultimately be allowed.

6.     The EFIH Second Lien Trustee expects that the EFIH Second Lien Note Class will vote to reject the Plan.  Unless the EFIH Claims Reserve is set at the maximum amount, the Debtors will be unable cram-down the proposed Plan treatment on the EFIH Second Lien Noteholders.  An underfunded EFIH Claims Reserve would impermissibly impose a risk that the EFIH Second Lien Noteholders would not collect the full amount of their secured claims, and therefore does not satisfy the indubitable equivalent standard under Section 1129(b)(2)(A)(iii).  In order to confirm the Plan, the EFIH Claims Reserve must be increased to the maximum possible amount.

7.     It is crucial to keep in mind that the PIK Noteholders have agreed to support the Plan regardless of how much cash the Court determines must be placed in the EFIH Claims Reserve – even if this means, as it must, that the PIKs can receive no distribution until all litigation is resolved.  That is the only way to make certain that the EFIH Second Lien Noteholders receive the full amount of their secured claims, and are not harmed by the Debtors' and PIK Noteholders' decision to pursue continued litigation.  It gives the PIK Noteholders exactly what they bargained for, and avoids the untenable possibility that secured creditors are not paid in full while unsecured creditors improperly receive and retain a distribution out of value that should be available to satisfy secured creditors.

8.     Specifically, the Debtors will have approximately $2.1 billion in cash on the Effective Date, but ask the Court to escrow only approximately $1.313 billion into the EFIH Claims Reserve.  After deducting amounts for post-effective fees for the Debtors (an issue

addressed below) and certain administrative expenses, the PIK Noteholders would receive distribution on the Effective Date of approximately 48%, leaving the EFIH Second Lien Noteholders exposed for all the deficiencies in the EFIH Claims Reserve, while guaranteeing the junior creditors a recovery.  After taking into account (i) the actual possible litigation outcomes and (ii) the additional claims asserted by the EFIH Second Lien Trustee and EFIH Second Lien Noteholders, the EFIH Claims Reserve should be increased to the full value available to distribute to EFIH creditors (the "**Distributable Value**").

9.      Less than 17 hours before the Plan objection deadline, the Debtors filed a Second Amended Plan Supplement that includes a term sheet explaining mechanisms in which the EFIH Claims Reserve can be increased or decreased post-Effective Date (the "**Claims Reserve Term Sheet**").  The Claims Reserve Term Sheet (which itself is subject to further documentation that has not been filed) contains significant changes to the EFIH Claims Reserve that, if approved, would impact the EFIH Second Lien Noteholders' rights.  Notwithstanding this last minute filing, the Debtors have refused to agree to an extension of the Objection deadline.  Accordingly, the EFIH Second Lien Trustee reserves the right to file a supplemental objection to the Second Amended Plan Supplement and any changes to the Plan related thereto addressing issues raised by this new and literally eleventh hour development.[3]

---

[3] When pressed this morning, the Debtors offered the EFIH First and Second Lien Trustees the ability to file supplemental objections on February 6, which is still insufficient time to take additional discovery and prepare an objection in response to the issues raised in the Second Amended Plan Supplement.

For several weeks, the EFIH First Lien Trustee and EFIH Second Lien Trustee worked constructively to avoid deposition of the PIK Noteholders that resulted in a stipulation of facts with three of the PIK Noteholders (the "**PIK Stipulation** ").  It appears that this late-filed Second Amended Plan Supplement directly conflicts with the PIK Stipulation and the EFIH Second Lien Trustee is entitled to additional discovery on the Second Amended Plan Supplement.  It is inappropriate for the Debtors to change factual premises for the confirmation hearing and still refuse to extend the objection deadline to allow other parties to respond.

10.    In addition to the problems with the EFIH Claims Reserve, numerous other provisions of the Plan put the EFIH Second Lien Noteholders at risk and/or inappropriately enhance the Debtors and PIK Noteholders litigation position.  As described in more detail below, these provisions include: (i) the Debtors' ability to invade the EFIH Claims Reserve if there is insufficient cash to pay the Debtors' fees, (ii) the failure of the Plan to perfect the EFIH Second Lien Noteholders' liens on the EFIH Claims Reserve through execution of an account control agreement, (iii) the failure to provide the EFIH Second Lien Noteholders with a lien on the EFH/EFIH Distribution Account, and (iv) the imposition of unfair requirements on the EFIH Second Lien Trustee's ability to receive payment of its allowed fees and expenses.  These provisions must also be corrected (and they are easily correctable) in order to confirm the Plan.

## BACKGROUND

**I.    The Makewhole Settlements and PIK Proposal**

11.    On December 19, 2016, the Debtors filed an 8-K announcing a settlement in principle on the Makewhole Claims with the EFIH First Lien Noteholders and EFIH Second Lien Noteholders (the "**Makewhole Settlements**").  The EFIH First Lien Noteholders agreed to settle their Makewhole Claim at: (i) a 95% recovery if the class of PIK Noteholders voted to accept the Plan and no PIK Noteholder objected to the Plan Support Agreement or Makewhole Settlements or (ii) a 97% recovery if the class of PIK Noteholders voted to reject the Plan or any PIK Noteholder objected to approval of the Plan Support Agreement or Makewhole Settlements.

12.    The EFIH Second Lien Noteholders agreed to settle their Makewhole Claim at: (i) an 87.5% recovery if the class of PIK Noteholders voted to accept the Plan and no PIK Noteholder objected to the Plan Support Agreement or Makewhole Settlements or (ii) a 92% recovery if the class of PIK Noteholders voted to reject the Plan or any PIK Noteholder objected

to approval of the Plan Support Agreement or Makewhole Settlements.  In addition, the Makewhole Settlements were to provide for the dismissal of the Intercreditor Litigation.

13.     The Debtors, the EFIH First Lien Noteholders and the EFIH Second Lien Noteholders negotiated a plan support agreement documenting the Makewhole Settlements over the course of the next two weeks.

14.     During this time, the Debtors were also negotiating an alternative proposal with the PIK Noteholders.  On December 27, 2016, the Board of Directors accepted a proposal from the PIK Noteholders (the "**PIK Proposal**"), under which, assuming the PIK Noteholders could obtain the requisite threshold amount, the Debtors would jettison the Makewhole Settlements and instead continue litigation of the Makewhole Claims under the direction of a Makewhole Litigation Oversight Committee (comprised of members of the PIK Noteholders).  The revised Plan would establish an escrow account for EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims (including interest for three years) and fees for EFIH First Lien Trustee and EFIH Second Lien Trustee.

## II.     Status of Pending Litigations

15.     *Makewhole Litigation.*  On November 17, 2016, the Third Circuit reversed the decisions of this Court and the District Court on the Makewhole Claims and held that the Makewhole Claims were due under the terms of the applicable indentures.  The Third Circuit remanded the matter to the bankruptcy court.  On December 15, 2016, the Debtors filed a petition for rehearing asking the Court to grant rehearing or rehearing *en banc* and certify the issue to the New York State Court of Appeals.  Alternatively, the Debtors requested that the Third Circuit hold the petition until the Second Circuit rules in *Momentive*.  Petition for Rehearing or Rehearing *En Banc* for Appellees at 18-19, *In re Energy Future Holdings Corp.*,

Nos. 16-1926, 16-1927, and 16-1928 (3d Cir. Dec. 15, 2016). The Third Circuit has not yet ruled on the petition for rehearing.

16.    *Intercreditor Litigation.*   On June 3, 2016, the Court granted the EFIH Second Lien Trustee's motion to dismiss the Intercreditor Litigation. The EFIH First Lien Trustee appealed to the district court where briefing has been completed. The matter is currently stayed pending the outcome of the Debtors' petition for rehearing on the Makewhole Claims.

17.    Both the EFIH Second Lien Trustee and the EFIH Second Lien Noteholders may have claims against the Debtors arising out of, or as a by-product of, the Intercreditor Litigation, including Future Interest Claims and Trustee Indemnification Claims (discussed in detail below). These claims would have been settled and released as part of the Makewhole Settlements.

### III.    The EFIH Second Lien Note Claims and Plan Treatment

18.    The Plan provides, in Article III.B.20, that the Allowed EFIH Second Lien Note Claims include the following amounts:

(i)    outstanding principal and accrued unpaid prepetition interest (including Additional Interest and interest on interest);

(ii)    accrued and unpaid post-petition interest (including Additional Interest and interest on interest) through the EFH Effective Date;

(iii)    reasonable and documented fees, expenses and indemnification claims, whether incurred or accruing before, on or after the EFH Effective Date (and interest thereon to the extent provide by such notes, indentures or agreements); and

(iv)    any other claims, including any Makewhole Claims, and interest thereon, of the EFIH Second Lien Notes Trustee or EFIH Second Lien Noteholders, if and to the extent such claims are allowed by a court of competent jurisdiction pursuant to a Final Order, whether entered before, on, or after the EFH Effective Date.

19.    The Plan provides for payment in full, in cash, of the Allowed amount of the EFIH Second Lien Note Claims (whether allowed pre- or post-Effective Date). *See* Article III.B.20 of the Plan. The Debtors will pay accrued principal and unpaid interest (including Additional

Interest and interest on interest) on the Effective Date.  The Debtors will then take a portion of the Merger Consideration and deposit it into the EFIH Claims Reserve for other claims relating to the EFIH First Lien Notes and EFIH Second Lien Notes.  The EFIH First Lien Notes will have a first priority lien on the EFIH Claims Reserve and the EFIH Second Lien Notes will have a second priority lien on the EFIH Claims Reserve.

## IV.    The EFIH Claims Reserve

20.    The Debtors propose to deposit funds in the EFIH Claims Reserve for (i) the EFIH First Lien and Second Lien Makewhole Claims as of the Effective Date (including accrued interest on such claims at the contract rate and compounded semi-annually); (ii) interest on the EFIH First Lien and Second Lien Makewhole Claims (at the contract rate and compounded semi-annually) for an additional three years post-Effective Date; (iii) accrued pre-Effective Date fees and expenses of the EFIH First Lien Trustee and EFIH Second Lien Trustee (and interest thereon at the contract rate); and (iv) post-Effective Date fees and expenses of the EFIH First Lien Trustee and EFIH Second Lien Trustee.  (This proposal is described as Scenario 1 in the Expert Report of David Ying (the "**Ying Report**"), excerpted as Exhibit C(1) in the Amended Plan Supplement).

21.    However, the Plan anticipates that the EFIH Claims Reserve can include other claims, such as Trustee Indemnification Claims and Future Interest Claims, to the extent the parties agree or the Bankruptcy Court enters an order requiring amounts on these claims to be escrowed.  *See* Article I.A.161 of the Plan.

22.    The Debtors acknowledge there is an alternative scenario where, if the principal portion of the distribution for the EFIH Second Lien Notes is held back as a result of the Intercreditor Litigation, the EFIH Second Lien Noteholders would assert a claim for future interest on any amounts held back (the "**Future Interest Claims**").  The financial implications

of this scenario are calculated as Scenario 2 of the Ying Report.  Scenario 1 and Scenario 2 of the Ying Report are attached hereto as **Exhibit 1**.  Unless ordered by the Court, however, the Debtors do not intend to include any amounts for Future Interest Claims in the EFIH Claims Reserve.

## OBJECTION

### I.    The Debtors Cannot Cram-Down the EFIH Second Lien Notes

#### A.    The Debtors Cannot Satisfy Section 1129(b) of the Bankruptcy Code

23.    The EFIH Second Lien Trustee expects that Class B4 (the EFIH Second Lien Note Claims) will vote to reject the Plan.  A debtor's plan may only be confirmed over the objection of a class of impaired claims if the plan is "fair and equitable" under 11 U.S.C. § 1129(b).

24.    Section 1129(b)(2)(A) of the Bankruptcy Code provides three ways in which a plan can be deemed fair and equitable with respect to secured claims.  Subsection (i) addresses when the secured creditor retains its liens, subsection (ii) addresses when there is a sale of the property free and clear of liens and subsection (iii) provides "for the realization by such holders of the indubitable equivalent of such claims."  11 U.S.C. § 1129(b)(2)(A)(i)-(iii).  The third prong "is a residual provision covering dispositions under all other plans."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2072 (2012).

25.    Neither sections 1129(b)(2)(A)(i) or (ii) of the Bankruptcy Code are applicable here: the liens securing the EFIH Second Lien Note Claims are being released and the collateral is not being sold.  If the EFIH Claims Reserve were set at the level proposed by the Debtors, they could not satisfy option (iii) either.  The EFIH Second Lien Noteholders would not receive the indubitable equivalent of their claims, because when their claims are finally determined, they

would only have allowed secured claims on a limited amount of cash that may not be sufficient to cover those claims.

26.     The standard for indubitable equivalence was first articulated by Judge Learned Hand in *In re Murel Holding Corp*, and then incorporated into § 1129(b)(2)(A)(iii) of the Bankruptcy Code.  *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935) (the relief accorded to the dissenting creditor must be "a substitute of the most indubitable equivalence"). The legislative history of § 1129(b)(2)(A) provides some insight into how Congress intended the indubitable equivalence standard to be applied:

> Abandonment of the collateral to the creditor would clearly satisfy indubitable equivalence, as would a lien on similar collateral. However, present cash payments less than the secured claim would not satisfy the standard because the creditor is deprived of an opportunity to gain from a future increase in value of the collateral. Unsecured notes as to the secured claim or equity securities of the debtor would not be the indubitable equivalent.

H.R. Rep. 95–595, 95th Cong., 2d Sess. (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6544.

27.     To satisfy the indubitable equivalent standard, the proposed plan treatment for the secured creditors must leave no doubt that the creditors are receiving value equal to their existing security interests.  See *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 310 (3d Cir. 2010) (*rev'd on other grounds*, *RadLAX*, 132 S. Ct. 2065); see also *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 915-16 (Bankr. W.D. Okla. 1996) ("Something is dubitable if it is open to doubt or question and, conversely, is indubitable if it is not open to any doubt. . . . In other words, is there any real doubt but that, as a matter of fact, the [creditor] will be paid in full?" (quoting from the 1981 edition of Webster's Unabridged Third International Dictionary)).  The proposed treatment must both "compensate for present value" and "insure the safety of the principal".  *In re Wiersma*, 227 F. App'x 603, 607 (9th Cir. 2007) ("To the extent a debtor seeks to alter the

collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure" (quoting *In re Arnold & Baker Farms*, 85 F.3d 1415, 1422 (9th Cir. 1996)).

28.     Under the Debtors' proposed EFIH Claims Reserve, the EFIH Second Lien Notes are impaired because the Plan strips the liens on the EFIH Second Lien Notes' collateral (the 80% equity interest in Oncor) and replaces it with a lien on an EFIH Claims Reserve that would *not* include all value otherwise subject to lien.  *See* Amended Plan Supplement, Exhibit C(2) at 6 ("[S]uch holders are impaired only because the liens on the collateral securing the. . .EFIH Second Lien Note Claims are being released on the EFH Effective Date (and being replaced with Liens on the EFIH Claims Reserve))."   The proposed EFIH Claims Reserve would be insufficient to cover the EFIH Second Lien Note Claims, if and when Allowed, and the EFIH Second Lien Noteholders would therefore face an impermissible collection risk.  The Plan does not satisfy the indubitable equivalent standard, and cannot be confirmed, unless and until the maximum amount is placed in the EFIH Claims Reserve.

**B.     The Debtors' Proposed EFIH Claims Reserve is Insufficient**

29.     The Plan provides that all EFIH Second Lien Note Claims, whenever Allowed, will be paid in full in cash.  The Debtors have repeatedly insisted that the EFIH Second Lien Noteholders' "economic rights are wholly protected by way of their treatment under the Plan (i.e., payment in full, in Cash)".  Amended Plan Supplement, Exhibit C(2) at 6.  *See also Debtors' Omnibus Reply to Disclosure Statement Objections* Docket No. 10516 at 3, 16 (the PIK Proposal "preserves the appellate rights of all interested parties in connection with the litigation of Makewhole Claims" and "minimizes harm to . . . holders of EFIH Second Lien Notes"); 1/3/17 *Hearing Tr.*, 14:4-9 ("[W]e agree that the PIK deal fully protects the first and second lien claims with a cash escrow that allows the EFH creditors to take their recovery, the cash on hand

at EFH to potentially see a recovery to the expense that the third parties' make whole decision is reversed and the make whole claims are ultimately disallowed by final order."); 1/4/17 *Hearing Tr.*, 22:3-14 ("We agreed, Your Honor, that the escrow will contain the maximum amount that could ultimately be allowed as a result of the make whole claims, the interest, and the fees allowed under the respective indentures, together with contractual rate of interest, additional rate of interest, and interest on interest.  We've also acknowledged that it is our intent, in their reasonable estimation, the Debtors intend in their reasonable estimation, that the EFIH claims reserve will be sufficient to satisfy all first lien note claims, second lien note claims in full, in cash, to the extent that those claims are allowed by final order.").

30.     But the Debtors' proposed Claims Reserve would not in fact provide a mechanism for payment in full of all EFIH Second Lien Note Claims.  As described below, the EFIH Claims Reserve (i) only accounts for the accrual of three years of interest (at the wrong rate of compounding); (ii) fails to include amounts for Future Interest Claims; and (iii) fails to include sufficient cushion for other claims relating to the EFIH Second Lien Notes (including Trustee Indemnification Claims).[4]  Attached as **Exhibit 2** is the Expert Report of Kevin Glodowski of Rothschild Inc. (the "**Rothschild Report**") showing potential scenarios for the EFIH Claims

---

[4]   It appears that the Debtors may be once again attempting to use the Plan as a deemed claims objection.  *See* Article VII.A of the Plan.  The EFIH Second Lien Trustee objected to this provision in connection with the Fourth Amended Plan.  The Debtors removed the provision as applied to the EFIH First Lien Notes and EFIH Second Lien Notes in the Fifth Amended Plan and the Sixth Amended Plan and inserted it back in the Seventh Amended Plan. As discussed throughout this Objection, in order to satisfy the indubitable equivalent standard the Debtors must increase the EFIH Claims Reserve to ensure there is sufficient value to pay all EFIH Second Lien Note Claims, whenever Allowed.  Therefore, EFIH Second Lien Trustee does not even understand the import of the "deemed claims" objection.  To the extent the Debtors actually seek to use the Plan as a deemed claims objection, the EFIH Second Lien Trustee incorporates all the arguments set forth in its objection to the Fourth Amended Plan, including that the Bankruptcy Rules do not permit the Debtors to object to claims via a mere sentence in the Plan, see Fed. R. Bankr. P. 3001(f), such a provision inappropriately seeks to shift the burden back to the creditor without specifying its issues with the claim, the provision runs afoul of the Debtors' own claim procedure process and Bankruptcy Rule 3007.  The Debtors should similarly not be able to use an estimation procedure described in Article VII of the Plan with regard to the non-adjudicated components of the EFIH Second Lien Note Claims.

Reserve including Future Interest Claims, extension of the time frame for litigation and daily compounding of interest.

      *(a)*                *Three Years is Insufficient*

      31.      The Debtors seek to escrow cash sufficient to pay interest on the Makewhole Claim for only three years after the Effective Date.  At deposition, the Debtors' representative Andrew Wright testified that they came up with this three year horizon through an analysis presented to the Board by Kirkland & Ellis of potential outcomes related to the ongoing makewhole litigation.  *See* Wright 1/26/17 Dep. 43:23-48:12[5] and January 20, 2017 Board Presentation at 21, 24 Bates Nos. EFH06598402 and EFH06598415 (attached hereto as **Exhibit 4**).  The appendix to the Board Presentation includes a flow chart of potential Makewhole Litigation outcomes depending on whether the Third Circuit grants the petition for hearing, if the matter is certified to the New York State Court of Appeals, and whether the Debtors or creditors seek further rehearing or file a petition for certiorari to the Supreme Court.  All of these scenarios recognize that if the Debtors are unsuccessful in these challenges to the Third Circuit panel's ruling (as is overwhelmingly likely) the case will be remanded back to Bankruptcy Court to continue with the long-awaited "Phase 2" – but, astonishingly, they all *stop there*.  The Amended Plan Supplement attaches a more detailed statistical analysis of the length of time for the three main appellate litigation scenarios, but again these contemplate only the time for potential panel or en banc rehearing, certification to and answer by New York State Court of Appeals and petition for cert to the Supreme Court.  Again, they simply assume Phase 2 out of existence.  *See* Amended Plan Supplement, Exhibit E.

      32.      The Debtors did not do any analysis of how long it will take for the Makewhole Claims to be fully resolved if the matter is remanded back to Bankruptcy Court and there are

---

[5] Excerpts of the Wright Deposition referenced in this Objection are attached hereto as **Exhibit 3**.

further proceedings following remand.  The EFIH Second Lien Trustee does not know if the

Debtors or Makewhole Litigation Oversight Committee (as directed by the PIK Noteholders)

will raise issues or arguments that require further discovery or an evidentiary hearing.  In a frank

email, Debtors' counsel explained to the counsel to the PIKs that it would be unrealistic to move

forward with Phase 2 before Confirmation because it "involves a lot of issues and will not be

expedited".  E-mail from Chad Husnick to Scott Alberino, Bates No.  EFH06584368 (attached

hereto as **Exhibit 5**).  And, of course, whatever the outcome of the Phase 2 proceedings before

this Court, the losing party is bound to appeal – and appeal again, and petition for rehearing, and

petition for certiorari, and pursue whatever other measures the considerable ingenuity of legal

counsel can devise.  The Debtors cannot use three years as an outside date given the additional

litigation that may ensue upon a remand – especially because the PIK Noteholders, once the

EFIH Claims reserve is limited in amount, will have no incentive to stop litigation based on any

rational cost-benefit analysis (and, as shown below, as the Plan is currently set up they would be

able to do so while paying lawyers out of the EFIH Second Lien Noteholders' funds).

33.     At deposition, Anthony Horton acknowledged that the PIK Noteholders want the

Debtors to maintain all possible litigation options, including proceeding with a Phase 2 trial on

solvency and litigating whether putative insolvency would be a defense to the Makewhole

Claims in light of the Third Circuit's decision.  Horton 1/20/17 Dep. 97:4-99:04.[6]  The initial

Noteholders party to the Plan Support Agreement have stipulated that they will not commit to

dropping ongoing or further challenges to the Makewhole Claims if the Makewhole Claims have

not been disallowed by Final Order by the third anniversary of the Effective Date.  *See* PIK

Stipulation at 4 (attached hereto as **Exhibit 7**).  It should be noted that the Second Amended Plan

---

[6] Excerpts of the Horton Deposition referenced in this Objection are attached as **Exhibit 6**.

Supplement filed last night indicates modifications to the Plan that appear to be inconsistent with this PIK Stipulation.

34.    It cannot fairly be disputed that any litigation, and particularly bankruptcy litigation, can drag on for many years.  Nor can it be denied that much of the duration of such proceedings can elapse long after trial work is over, as appeals and remands unfold.  Putatively scientific quantitative analysis such as the Debtors have presented is of limited use when trying to predict how long litigation might drag on, ever if it were not infected by the glaring error of forgetting to include everything that happens in Phase 2.  This is especially so because here the relevant question is not how long the litigation is *likely* to continue, or how long proceedings take *on average*, but rather what is *the worst case*, the maximum amount the litigation might last – because unless the EFIH Second Lien Noteholders are protected from that worst case, the indubitable equivalent standard cannot be satisfied.

35.    A more useful guide to what might happen in a worst case scenario is some of the vast experience in complex bankruptcy proceedings.  A survey of that vast experience readily uncovers numerous precedents shedding light on how very long cases of this sort can last.

- For example, in *Dow Corning*, a dispute over post-petition interest has lasted **17 years and is still pending,** including review by the District Court and the Sixth Circuit.  *In re Dow Corning Corp.*, Case No. 95-20512 (Bankr. E.D. Mich.).

- In *Bank of New England*, intercreditor litigation over the obligation of subordinated noteholders to turn over distributions on account of post-petition interest and the applicability of the "rule of explicitness" dragged on more than **10 years**, as decisions by the bankruptcy and District Courts were reversed by the First Circuit on two separate occasions, remanded for further proceedings, and then appealed back up to the First Circuit again.  *In re Bank of New England Corp.*, Case No. 91-10126 (Bankr. D. Mass.).

- In *GM*, litigation to avoid the secured lender's lien has lasted more than **seven years and is still ongoing.**  The bankruptcy court's original decision was appealed to the Second Circuit which certified to Delaware Supreme Court.  The matter has been remanded back to bankruptcy court, where further proceedings on liability are still ongoing. *In re GM*, Case No. 09-50026 (Bankr. S.D.N.Y.).

- The parties in *Coudert* litigated a claim allowance dispute for **6 years and 4 months**, including review by the District Court and the Second Circuit.  *In re Coudert Brothers*, Case No. 06-12226 (Bankr. S.D.N.Y.).

- In *Global Industries,* a dispute over plan confirmation lasted **5 years and 9 months**, including review by the District Court and the Third Circuit, and denial of certiorari to the Supreme Court.  *In re Global Indus. Tech.*, Case No. 02-21626 (Bankr. W.D. Pa.).

- Avoidance actions in *Lyondell*  **are still pending after 6 years**, including review by the District Court.  *In re Lyondell*, Case No. 09-10023 (Bankr. S.D.N.Y.).

- After more than **5 years, appeals are still pending** in *Lehman* over claim allowance and a lawsuit to return bonds.  *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y.).

- The court in *ASARCO* reviewed a fee dispute for **5 years and 4 months**, including review by the District Court, the Fifth Circuit, and granted certiorari to the Supreme Court.  *In re ASARCO LLC*, Case No. 05-21207 (Bankr. S.D. Tex.).

- In *Southeast Banking*, an intercreditor dispute relating to the "rule of explicitness," which presented solely issues of law, lasted **just under 5 years**, including review by the District Court and the Eleventh Circuit, and certification to the NY Court of Appeals.  In *re Southeast Banking Corp.*, Case No. 91-14561 (Bankr. S.D. Fla).

- A dispute over competing plans in *Tribune* has been ongoing for **just under 5 years**, and related litigation over plan distributions **is still ongoing**, including review by the District Court and the Third Circuit.  *In re Tribune Co.*, Case No. 08-13141 (Bankr. D. Del.).

- In *W.R. Grace*, litigation over post-petition interest rates lasted **5 years and 9 months**, including review by the District Court and the Third Circuit.  *In re W.R. Grace & Co.*, Case No. 01-01139 (Bankr. D. Del.).

- Parties in *Rash* litigated over the value of cash collateral for **5 years and 2 months**, including review by the District Court, the Fifth Circuit, and the Supreme Court.  *Associates Commercial Corp. v. Rash*, Case No. 92-10305 (Bankr. E.D. Tex.).

- In *Calpine*, a dispute over a no-call provision lasted **4 years and 6 months**, including District Court review.  *In re Calpine*, Case No. 05-60200 (Bankr. S.D.N.Y.).

36.    Of course, every litigation is unique; each presents its own special complexities, and has its own unexpected developments.  The course of the EFIH bankruptcy cases to date illustrates that proposition as well as any, and there is no reason whatsoever to think that the course of litigation on the Makewhole Claims and related issues that remain to come will be any

different.    As the cases above demonstrate, the unfortunate truth is that, as a result of the

Debtors' and PIKs' decision to abandon a reasonable settlement, protracted litigation could

easily continue well beyond three years from the Effective Date.    The EFIH Second Lien

Noteholders cannot, as a matter of law, be deprived of their ability to collect on their Makewhole

Claims (and the contract interest due thereon) because there are insufficient funds in the EFIH

Claims Reserve, all the while junior creditors (the PIK Noteholders) receive a distribution on the

Effective Date.[7]

37.    Moreover, the Debtors have stated that the Plan is intended to preserve all

appellate rights in the Makewhole Litigation.    *See Debtors' Omnibus Reply to Objections to

Disclosure Statement Motion*, [Docket No. 10516] ¶ 4.    The Plan cannot preserve the EFIH

Second Lien Noteholders' appellate rights if the EFIH Claims Reserve is not sufficiently

funded.[8]

38.    The PIK Noteholders have agreed to support the Plan even if the Court orders that

the EFIH Claims Reserve be funded for more than three years.    There is therefore not even a

cynical goal-oriented justification for the EFIH Second Lien Noteholders to bear any risk of

recovering less than the full amount of their secured claims, when the Plan can be confirmed by

increasing the EFIH Claims Reserve to include the full Distributable Value.

(b)    *The EFIH Claims Reserve Must Include Amounts for the Future Interest Claims*

---

[7] During deposition, Mr. Keglevic, Mr. Horton and Mr. Wright testified that if there are insufficient funds in the EFIH Claims Reserve but the litigation is ongoing at the end of three years, the EFIH Second Lien Trustee can run to court.  Keglevic 1/18/17 Dep. 51:17-52:05, 53:02-53:23, 84:17-85:03 (excerpts of the Keglevic Deposition attached hereto as **Exhibit 8**); Horton 1/20/17 Dep. 40:15-40:23; Wright 1/26/17 Dep. 123:03-17.  The Debtors point to the fact that the Court retains jurisdiction over plan related matters, but it is unclear if a bankruptcy court has jurisdiction to stop an appeal at the district court or Third Circuit.

[8] The Debtors are only proposing to fund post-Effective Date fees for the EFIH First Lien Trustee and EFIH Second Lien Trustee for three years.  The EFIH Claims Reserve must also be increased to account for additional post-Effective Date fees that may be incurred after three years.

39.     While the Debtors have calculated a scenario where the EFIH Second Lien Noteholders have Future Interest Claims, and the parties have agreed on how much must be reserved if these claims are considered, the Debtors are asking the Court not to escrow any amounts for Future Interest Claims in the EFIH Claims Reserve.

40.     There are two ways the EFIH Second Lien Noteholders may not receive the full principal distribution on the Effective Date and will have a claim against the Debtors for Future Interest.  First, the EFIH First Lien Trustee contends that the Debtors may not distribute any principal to the EFIH Second Lien Notes pursuant to the Collateral Trust Agreement. (*See* § 2.04(c) of the Collateral Trust Agreement).  Second, if such a distribution is made while the Intercreditor Litigation remains unresolved, in the exercise of its duties and in compliance with the EFIH Second Lien Indenture and section 2.04(d) of the Collateral Trust Agreement, the EFIH Second Lien Trustee will be unable to distribute a portion of the amount transferred to it to the EFIH Second Lien Noteholders pending the final resolution of the Intercreditor Litigation (the "**Holdback**").[9]

41.     In the first scenario, if the Debtors do not distribute any of the unpaid principal amount of the EFIH Second Lien Notes, the EFIH Second Lien Noteholders would have a Future Interest Claim of approximately $743 million after three years of litigation, and $1.056 billion after four years (each assuming daily compounding).[10]  *See* Rothschild Report at 9, 10.  In the second scenario, if the EFIH Second Lien Trustee maintains a Holdback, the EFIH Second Lien Noteholders would have a Future Interest Claim of approximately $551 million assuming the

---

[9] The EFIH Second Lien Trustee has not yet made a determination as to the appropriate Holdback amount.

[10] Using semi-annual compounding and assuming the Makewhole Litigation might take four years, the Future Interest Claim would equal approximately $717 million assuming a three-year reserve and $1.018 billion assuming a four-year reserve.  Rothschild Report at 8, 10.  While we believe the litigation could well take more than four years (for the reasons explained above), Rothschild did not calculate for longer time periods under this scenario because for any period beyond three years all Distributable Value must go into the EFIH Claims Reserve.

reserve is based on four years and the litigation takes that long, and $815 million assuming five years.[11]  *See* Rothschild Report at 9, 11.  Based on these figures, it is clear that the only way to ensure that there are sufficient funds to pay the Future Interest Claims (to the fullest extent possible in light of available value) is to place all Distributable Value in the EFIH Claims Reserve.

42.     The legal basis for the Holdback and the resulting Future Interest Claim is in the express language of the EFIH Second Lien Note Indenture, which provides that interest will continue accruing on the EFIH Second Lien Notes unless and until all principal is paid in full in accordance with the EFIH Second Lien Notes.  *See* EFIH Second Lien Note Indenture §§ 2.08; 4.01.  The Indenture further provides that:

> If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 12.01 hereof by reason of ***any legal proceeding*** or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's obligations under this Indenture and the Notes ***shall be revived and reinstated as though no deposit had occurred*** pursuant to Section 12.01 hereof . . . .

*Id.* § 12.02 (emphasis added).[12]  Because the EFIH Second Lien Trustee is unable to remit the full distribution of principal it receives from the Debtors to EFIH Second Lien Noteholders due to the pending Intercreditor Litigation, the amounts held back by the EFIH Second Lien Trustee

---

[11] Using semi-annual compounding, Future Interest Claims would equal approximately $522 million assuming four-years, and $768 million assuming five years under this scenario.  Rothschild Report at 8, 11.

The Rothschild Report assumes that if the EFIH Second Lien Trustee takes the Holdback and the EFIH Second Lien Noteholders receive the Future Interest Claims, they will not receive a call premium for the amount of the Holdback. If it were to be ultimately determined by Final Order that the EFIH Second Lien Noteholders were not entitled to Future Interest Claims, then the EFIH Second Lien Noteholders would be entitled to the call premium as of the Effective Date for the Holdback amount, with interest accruing at the contract rate.

[12] Section 12.02 is not the only basis for the EFIH Second Lien Trustee to maintain a Holdback and assert a Future Interest Claim.  *See* Sections 6.13 and 7.07 of the Indenture.

will be treated "as though no deposit had occurred" and the EFIH Second Lien Noteholders will continue to accrue interest (at the contract rate) on the amounts that cannot be distributed.

43.     Noting that there is currently no "order [] or judgement that would make the 2L Trustee *unable* to apply the money distributed to it under the Plan," the Debtors argue that the EFIH Second Lien Trustee is merely "unwilling" to maintain a Holdback, and therefore § 12.02 does not apply.  Amended Plan Supplement, Exhibit C(2) (emphasis in original).  This ignores the fact that § 12.02 refers to "any legal proceeding *or* . . . order or judgment"; (emphasis added), thus making it clear that no actual injunction is required for this provision to apply.   The Intercreditor Litigation, which asserts that under the Collateral Trust Agreement the EFIH Second Lien Trustee is obligated to hold funds in trust pending potential turnover to the First Lien Noteholders, is clearly a "legal proceeding" that would prevent any reasonable person in the EFIH Second Lien Trustee's position from distributing funds so long as the potential liability exists, regardless of whether an order or judgment currently exists.   Nonetheless, the Debtors apparently intend to ask the Court to include language in the Confirmation Order requiring the EFIH Second Lien Trustee to distribute promptly to the EFH Second Lien Noteholders any plan distributions received on or after the Effective Date – thereby exposing the EFIH Second Lien Trustee to a potential judgment against it in the Intercreditor Litigation with no funds to satisfy that judgment.  There is no basis to force the EFIH Second Lien Trustee into such an untenable situation.

44.     Nor could this untenable situation be avoided through any sort of "comfort language" the Debtors might propose to include in the Confirmation Order.  While the Debtors in the Plan Supplement cite cases in support of the proposition that the Court can order a distribution to EFIH Second Lien Noteholders notwithstanding the Collateral Trust Agreement,

those same cases make it clear that the subordinated creditors may nonetheless be held liable to turn over the amounts thus distributed.[13]  In *Tribune*, the Third Circuit held that the intercreditor dispute was not equitably mooted by the Plan, and remanded to allow a turnover action (with potential disgorgement) to continue.  *In re Tribune Media Co.*, 799 F.3d 272, 282-85 (3d Cir. 2015)*(cert. denied)*136 S. Ct. 1459 (2016).  In *TCI 2 Holdings*, the bankruptcy court expressly noted that in allowing the debtor to make a distribution to the subordinated creditor, it was not deciding whether the intercreditor agreement was violated.  *In re TCI 2 Holdings LLC*, 428 B.R. 117, 139-41 (Bankr. D. N.J. 2010).

45.     Even if this Court were to direct the EFIH Second Lien Trustee to make a distribution to EFIH Second Lien Noteholders, nothing could foreclose the possibility (however unlikely) that the EFIH First Lien Trustee might, if it fails to collect the EFIH First Lien Makewhole Claim from the Debtors, obtain a judgment in the Intercreditor Litigation against the EFIH Second Lien Trustee for that amount.  This puts the EFIH Second Lien Trustee at obvious risk of significant financial harm if it did not maintain a sufficient Holdback.  Faced with this liability, and based upon the requirements of section 2.4(d) of the Collateral Trust Agreement that it hold proceeds of collateral in trust for the EFIH First Lien Notes, the EFIH Second Lien Trustee would both be contractually required and obligated as a prudent trustee to exercise its right to take a Holdback.[14]

46.     To be sure, if the EFIH Second Lien Trustee complied with the Debtors' direction (or Court order) that it not take a Holdback but it suffered liability in the Intercreditor Litigation,

---

[13] The EFIH Second Lien Trustee takes no position on whether the Court can order distributions in violation of the Collateral Trust Agreement.

[14] The EFIH Second Lien Trustee believes that the proceeds it has and will receive are not proceeds of collateral pursuant to the Collateral Trust Agreement, but until there is a final non-appealable order dismissing the Intercreditor Litigation, it must still holds amounts it receives in trust for the EFIH First Lien Notes.

the EFIH Second Lien Trustee would have an indemnification claim against the Debtors.  *See* §

7.07 of the EFIH Second Lien Indenture ("[t]he Issuer and the Guarantors, jointly and severally,

shall indemnify the Trustee for, and hold the Trustee harmless against any and all loss, damage,

claims, liability, or expense (including attorneys' fees) . . . [and] the obligations of the Issuer

under this Section 7.07 shall survive the satisfaction and discharge of this Indenture.").  In fact, it

appears that the Debtors are further suggesting that the EFIH Second Lien Trustee should not

need to take a Holdback because, if it did incur a liability in the Intercreditor litigation, the same

dollars in the EFIH Claims Reserve for the EFIH First Lien Makewhole Claim would then be

available to pay the EFIH Second Lien Trustee's Indemnification Claim.  *See* Amended Plan

Supplement, Exhibit C(2).  Given that the Debtors have refused to acknowledge the EFIH

Second Lien Trustee's right to indemnification under such circumstances, the EFIH Second Lien

Trustee cannot be forced to take risk.  *See* Section 7.02(f) of the Indenture ("none of the

provisions in this Indenture shall require the Trustee to expend or risk its own funds or otherwise

to incur any liability, financial or otherwise, in performance of any of its duties hereunder, or in

the exercise of any of its rights or powers if it shall have reasonable grounds for believing that

repayment of such funds or indemnification satisfactory to it against such risk or liability is not

assured to it").

　　　　47.　　As an initial matter, in the Amended Plan Supplement the Debtors take an oddly

cramped view of the EFIH Second Lien Trustee's indemnification rights under the Indenture,

suggesting that Trustee Indemnification Claims only include claims that arise from claims by a

holder against its own indenture trustee.  To the contrary, a claim by one indenture trustee

against the other under the Collateral Trust Agreement is an equally valid basis for

indemnification, but this reality does not alter the fact that the Debtors appear prepared to dispute

their indemnification obligations.  *See* EFIH Second Lien Indenture §  7.07.  And indeed, when the question was put directly to him at deposition, Mr. Wright on behalf of the Debtors refused to acknowledge that the EFIH Second Lien Trustee would be entitled to indemnification if it suffered liability in the Intercreditor Litigation as a result of having made distribution to the EFIH Second Lien Noteholders.  Wright 1/26/17 Dep. 159:25-160:15.

48.    Still more fundamentally, notwithstanding any arguments the Debtors might make as to the merits of the EFIH Second Lien Trustee's decision to take a Holdback or the validity of the Future Interest Claim for present purposes, the Debtors must still escrow an amount for the Future Interest Claim in the EFIH Claims Reserve.  The Debtors have never filed a formal objection to these claims (despite these claims being raised in multiple pleadings in this Court), and the Plan provides that all other claims (whenever Allowed) will be paid in full in cash.  Even if the claim is disputed, the Debtors must still place a sufficient amount in the EFIH Claims Reserve for the Future Interest Claim in order to satisfy the indubitable equivalent standard.  *See In re Cady*, No. 06-00502, 2007 WL 2215384 (Bankr. D. Idaho July 30, 2007) (court found that notwithstanding a delay in payment and ability to foreclose, plan treatment that provided the creditor, who had a disputed claim for attorney fees, with a consensual lien on certain property satisfied the indubitable equivalent standard)*; In re U.S. Mineral Prods. Co.*, No. 01-2471 (JKF), 2005 WL 5898300 (Bankr. D. Del. Nov. 29, 2005) (although a portion of the secured claim was disputed, both parties stipulated that the claim could not exceed $70,000 and the court set aside that amount in a reserve which the creditor would have a lien on).

49.    Finally, the Court should not lose sight of the fact that the PIK Noteholders and the Debtors made a conscious decision to forego a settlement that would have resolved all of the issues in favor of more litigation.  This choice has the unfortunate consequence of creating

claims in addition to the Makewhole Claims, and the PIK Noteholders and the Debtors must live with these consequences.

(c)    *Other Claims Relating to the EFIH Second Lien Notes Must Be Preserved*

50.    The Plan requires that the EFIH Claims Reserve must include amounts appropriate to cover all EFIH Second Lien Noteholder claims (including Trustee Indemnification Claims).  By seeking to limit the EFIH Claims Reserve to the Makewhole Claims and fees, the Debtors are hampering the ability of the EFIH Second Lien Noteholders and EFIH Second Lien Trustee to collect on any such claims.

51.    The EFIH Second Lien Trustee acknowledges that the Trustee Indemnification Claims are currently unliquidated and, if an indemnification claim arises as a result of the Intercreditor Litigation, the amount initially reserved to cover the EFIH First Lien Makewhole Claim with interest should be sufficient to provide that indemnification.  Accordingly, other than requesting affirmation that the EFIH Claims Reserve remain available so long as potential indemnification claims exist, the EFIH Second Lien Trustee is not asking for an additional specific amount to be allocated for such claims in the EFIH Claims Reserve.  However, in order to provide the indubitable equivalent, the Plan should also maintain some level of equity cushion for the EFIH Second Lien Note Claims.  In the "dirt-for-debt" cases (where a secured creditor receives a lien on a replacement piece of property), courts assess whether the secured creditors maintain an equity cushion in determining whether the plan satisfies the indubitable equivalent standard.  *See In re Investment Company of the Southwest, Inc.*, 341 B.R. 298 (B.A.P. 10th Cir. 2006) (court found that indubitable equivalent standard would likely not be satisfied because the plan eliminated the prepetition equity cushion); *In re Sugarleaf Timber, LLC*, 529 B.R. 317 (M.D. Fla. 2015) (court found that equity cushion on top of the full asserted amount of the creditors' claim satisfied the indubitable equivalent standard); *See also In re San Felipe @ Voss,*

*Ltd.*, 115 B.R. 526, 531 (S.D. Tex. 1990) (21% equity cushion sufficient under Section 1129(b)(2)(A)(iiii)); *In re B.W. Alpha, Inc.*, 100 B.R. 831 (Bankr. N.D. Tex. 1988) (10% equity cushion insufficient); *see also In re Walat Farms, Inc.*, 70 B.R. 330 (Bankr. E.D. Mich. 1987) (16% equity cushion insufficient).  Here, the Debtors propose to give the EFIH Second Lien Noteholders no equity cushion (and as discussed above, there will likely be a deficiency assuming Future Interest Claims are allowed and/or the makewhole litigation takes longer than three years), and therefore the Plan does not satisfy Section 1129(b) because it does not provide the EFIH Second Lien Noteholders with the indubitable equivalent of their claims.  Increasing the EFIH Claims Reserve to include all Distributable Value will ensure that, to the extent any Distributable Value does exist beyond what is necessary to satisfy secured claims, there would be an appropriate cushion for additional claims relating to the EFIH Second Lien Notes and that the right to assert such other claims is not foreclosed (as the Plan already contemplates).

52.    Moreover, as described above, the Makewhole Settlements would have resulted in a full and complete resolution of all claims relating to the EFIH Second Lien Notes, including (upon dismissal of the Intercreditor Litigation), all Trustee Indemnification Claims.  Instead the Debtors and the PIK Noteholders chose to litigate the Makewhole Claims, thus exposing the Debtors to other potential claims.  Requiring the Debtors to increase the EFIH Claims Reserve to cover these claims gives the PIK Noteholders exactly what they bargained for.

*(d)    The EFIH Claims Reserve Must Use Daily Compounding*

53.    The Debtors calculated the amounts related to the Makewhole Claims and interest on overdue interest using only semi-annual compounding for accrued interest.  The EFIH Second Lien Trustee submits that it is more appropriate to use daily compounding for these calculations.

54.    The form of Note attached to the indenture provides that:

(1) INTEREST . . .  The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue premium and premium, if any, from time to time **on demand** at the interest rate on the Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (including Additional Interest, if any) (without regard to any applicable grace periods from time to time **on demand** at the interest rate on the Notes.  Interest will be computed on the basis of a 360-day year compromised of twelve 30-day months.

55.    The EFIH Second Lien Trustee has made a demand for interest on the Makewhole Claims, which the Debtors have failed to pay.  Nothing in the Indenture or the form of Note limits interest on the Makewhole Claims or interest on overdue interest to semi-annual compounding.  The Rothschild Report demonstrates the additional value that would need to be reserved for the EFIH Claims Reserve each year for both the EFIH First Lien Note Claims and EFIH Second Lien Note Claims using daily compounding.

56.    As discussed above, the Court should use the maximum amount that could be calculated for such claims, even if the Debtors dispute the entitlement to such claims.  Increasing the EFIH Claims Reserve to the full Distributable Value will ensure that the EFIH Second Lien Trustee will have a full and fair opportunity to pursue claims for daily compounding.

### C.    Security Interest and Control Account for EFIH Claims Reserve

57.    The Plan must provide for the recordation and perfection of a lien on the EFIH Claims Reserve as well as create a control account to ensure the funds are properly invested and the money is not used for any other purposes.[15]  Creating a lien on the EFIH Claims Reserve only provides the EFIH Second Lien Noteholders with the indubitable equivalent if it is a fully enforceable lien.  Absent proper perfection of the EFIH Second Lien Noteholders' lien on the EFIH Claims Reserve, the EFIH Second Lien Noteholders are clearly not receiving the

---

[15] The Plan already contemplates an escrow agreement to establish the Post-Effective Date Administrative Account and there is no reason a similar escrow agreement with control agreements cannot be put in place for the EFIH Claims Reserve.

indubitable equivalent.  Mr. Wright testified that "it is the Debtors' intent that the EFIH First Liens and the Second Lien will have a properly perfect lien over the account, and whatever legal requirements that that entails, we will ensure its' done." *See* Wright 1/26/17 Dep. 127:10-128:8. The Debtors should coordinate with the EFIH Second Lien Trustee in advance of Confirmation to discuss all the necessary requirements for perfection of the replacement liens.

> **D.    The Plan Must Provide the EFIH Second Lien Noteholders with a Lien on the EFH/EFIH Distribution Account**

58.    On the Effective Date, the Debtors will establish the EFH/EFIH Distribution Account, which will include cash on hand and the Merger Consideration from NextEra.  The Debtors will then create several sub-accounts, including the EFIH Claims Reserve (over which the EFIH First Lien Trustee and EFIH Second Lien Trustee have a lien) and the Post-Effective Date Administrative Account, which is designed to be sufficiently funded to satisfy reasonable and documented fees and expenses of (i) the Debtors and the EFH Plan Administrator Board and (ii) the Plan Sponsor, in an amount not to exceed $200,000.  In addition, there will still be other amounts remaining in the EFH/EFIH Distribution Account, including to satisfy the fees and expenses of the Makewhole Litigation Oversight Committee.

59.    As described above, there are scenarios when the EFIH Claims Reserve may not be sufficient to pay all the claims relating to the EFIH Second Lien Notes, even assuming the entire Merger Consideration is deposited into the EFIH Claims Reserve.  In addition, there are other contingent claims that are not ripe yet, including Trustee Indemnification Claims, for which no amount is being place in the EFIH Claims Reserve but must still have some source of payment if triggered.  This issue is particular to the EFIH Second Lien Noteholders who only have a second lien on the EFIH Claims Reserve and may be forced to bear any shortfall in favor of the EFIH First Lien Noteholders.

60.    As discussed above, the test for indubitable equivalent is whether there is any doubt the claim will be paid.  *Arnold & Baker Farms*, 85 F.3d 1415, 1422 (9th Cir. 1996).  The Plan must be amended to grant the EFIH Second Lien Noteholders a lien on the entirety of the EFH/EFIH Distribution Account (except for any EFH Cash).  In fact, the Fifth Amended Plan filed by the Debtors on December 1, 2016 granted the EFIH Second Lien Noteholders a lien on the EFH/EFIH Distribution Account and only in the Sixth Amended Plan (incorporating the settlement with certain PIK Noteholders) was the replacement lien limited to the EFIH Claims Reserve.  As with the EFIH Claims Reserve, a lien on the EFIH/EFIH Distribution Account must be recorded and perfected with an appropriate control agreement in place.

### E.    Payment of Post-Effective Date Debtor Professional Fees

61.    The Debtors intend to fund the Post-Effective Date Administrative Account with $72 million.  The vast majority of these funds will be used for the Debtors/Plan Administrator to continue litigating the Makewhole Claims against the EFIH First Lien Notes and EFIH Second Lien Notes.

62.    To the extent the EFIH Claims Reserve (as further funded) is deficient to satisfy all EFIH Second Lien Note Claims, the EFIH Second Lien Trustee should be able to access any funds remaining in the Post-Effective Date Administrative Account and/or seek disgorgement from counsel to the Debtors/Plan Administrator.  Upon emergence, the EFIH Second Lien Noteholders, as secured creditors, should not be forced to fund a litigation against themselves.[16]

63.    Conversely, the EFIH Claims Reserve should be a dedicated account for the sole benefit of the EFIH First Lien Noteholders and the EFIH Second Lien Noteholders and the Debtors should not have the ability to access funds in the EFIH Claims Reserve.  However, the

---

[16] After the Effective Date, there will no longer be a pending chapter 11 case where the secured creditors are forced to fund administrative costs.

Plan provides that the EFIH Claims Reserve may be used to satisfy fees and expenses of the EFIH Debtors, the Plan Administrator or the Plan Sponsor if there are insufficient funds in the Post-Effective Date Administrative Account. *See* Article VII.K.3 of the Plan. The Debtors and the PIK Noteholders have opted for litigation but have crafted a provision where, if litigation drags on, the EFIH Second Lien Noteholders will end up paying for it. This provision exposes the EFIH Second Lien Noteholders to risk of depletion of the value set aside for their claims (rendering the Plan unconfirmable for failure to satisfy the indubitable equivalent standard) and must be stricken.

## II.    The EFIH Unsecured Notes Should Not Be Receiving an Advance Distribution and the Makewhole Litigation Oversight Committee Should not be Paid when the EFIH Claims Reserve is Not Fully Funded

64.    The Plan contemplates that the fees and expenses of the EFIH Unsecured Notes Trustee will be paid on the Effective Date as a charging lien advance (the "**EFIH Base Payment Amount**"). A charging lien advance is only appropriate if funds are distributed to the noteholders. As discussed above, the entirety of distribution attributable to the EFIH Unsecured Noteholders should be held in the EFIH Claims Reserve until the EFIH Second Lien Note Claims (whenever Allowed), are paid in full.[17] The EFIH Second Lien Trustee does not object to the payment of the EFIH Unsecured Notes Trustee's fees and expenses, but rather objects to any advance distribution on account of the EFIH Unsecured Notes.

65.    The Plan also provides that the fees and expenses of the Makewhole Litigation Oversight Committee (comprised of certain PIK Noteholders) will be paid from the EFH/EFIH Distribution Account and that such fees and expenses are <u>not</u> subject to review by the Court or

---

[17] Again, striking the provision for payment of the EFIH Base Payment Amount on the Effective Date will not impact Plan confirmation as the PIK Noteholders and UMB agreed in their Plan Support Agreement that they would not have a termination right if the Bankruptcy Court found that the EFIH Base Payment Amount should not be paid on the EFH Effective Date. *See* § 7(l)(iii) of the PIK Plan Support Agreement.

the Fee Committee.  *See* Article VII.K.1 of the Plan.  This provision seeks to pay the fees and expenses of the PIK Noteholders to oversee the litigation of the Makewhole Claims against the EFIH First Lien Noteholders and EFIH Second Lien Noteholders.

66.    As discussed above, the EFIH Claims Reserve is underfunded because, among other reasons, it fails to include any amounts for Future Interest Claims and only includes interest on the Makewhole Claims for three years, when the litigation could very likely take longer.  The only reason the EFIH Second Lien Noteholders have these claims post-Effective Date is because the Debtors and the PIK Noteholders opted for a litigation path.  The Debtors should not be permitted to strip the EFIH Second Lien Noteholders of their original lien and deliver a portion of the plan consideration to a junior creditor when the secured creditor may receive a shortfall in payment.  All Distributable Value should be placed into the EFIH Claims Reserve until it is clear that the EFIH Second Lien Noteholders will receive payment in full for their claim.

### III.    The Process for Review and Payment of the EFIH Second Lien Trustee's Fees and Expenses is Inappropriate

67.    The EFIH Second Lien Notes are clearly oversecured and the fees and expenses of the EFIH Second Lien Trustee and its professionals are unquestionably included in the claim securing the EFIH Second Lien Notes under § 506(b) of the Bankruptcy Code and under the EFIH Second Lien Indenture.  *See* Article III.B.20 of the Plan.

68.    The Amended Plan Supplement (Exhibit D) includes a review process that creates both unnecessary delay and new (and unfair standards) for approval of such fees and expenses.

69.    The fee review process requires the EFIH Second Lien Trustee to submit its full invoices to a number of parties, including the Debtors/Plan Administrator Board and the Makewhole Litigation Oversight Committee, who have the opportunity to review and object to

the invoices.[18]  The PIK Noteholders on the Makewhole Litigation Oversight Committee (whose own fees currently are not subject to any review) should not have a right to review the fees and expenses of the EFIH Second Lien Trustee.  The Indenture requires the Issuer (here, EFIH) to pay the reasonable fees and expenses.  EFIH is capable of reviewing the fees and should not be permitted to allow junior creditors, who only have an interest in taking value away from the secured creditors, to review and comment on the reasonableness of such fees.

70.    The Debtors' proposed process also attempts to re-write the law on allowance of secured claims.  The process provides that within fifteen business days after the Effective Date, the Debtors will pay 80% of the requested fees and 100% of the requested expenses (which shall be subject to disgorgement).[19]  Then, (i) the Debtors/Reorganized EFIH and the Makewhole Litigation Oversight Committee have an extended period of time to review the fees and respond with a "compensation proposal," (ii) if the parties can come to an agreement on the "proposal", the EFIH Second Lien Trustee will file a report with the Court reflecting the agreement and request a hearing on such report, and (iii) if the parties cannot come to an agreement on such "proposal" within thirty days, the EFIH Second Lien Trustee can *then* request the Court to rule on the "proposal."  The EFIH Second Lien Trustee should not be subject to this newly created proposal process – the Debtors should review the fees and expenses for reasonableness, pay any fees that are not disputed and only have the Court ultimately decide whether such fees are reasonable if the parties cannot come to an agreement.  In addition, the Debtors appear to be trying to shift the burden on approval, by requiring that the Non-Retained Professional (i.e., the

---

[18] The EFIH Second Lien Trustee understands from the Debtors that it may submit redacted invoices and the Plan Supplement should therefore be revised to reflect this.

[19] The Plan Supplement bracketed the word "fifteen business days" and it is unclear if the Debtors are seeking to extend this time.

EFIH Second Lien Trustee) be required to seek the Court's approval, as opposed to the burden being on the objecting party (as required under Fed. R. Bankr. P. 3001(f)).

71.     In addition, the length of time for reviewing and ultimately paying fees can and should be much quicker.  The Debtors and the Makewhole Litigation Oversight Committee have ninety days to review and provide a proposal on pre-Effective Date fees and forty-five days to review and provide a proposal on post-Effective Date fees.  There is no reason for such a lengthy time to review and ultimately pay the reasonable fees and expenses following submission.  In January 2016, counsel to the EFIH Second Lien Trustee submitted detailed redacted invoices to counsel to the Debtors in accordance with the procedure accompanying the Original Confirmed Plan and the EFIH Second Lien Trustee is not aware of any objections to such invoices.  Since that time, counsel to the EFIH Second Lien Trustee has submitted periodic fee statements to counsel to the Debtors.

72.     The EFIH Second Lien Trustee also objects to the complete disparity between the review of fees of secured creditors (which is subject to the above lengthy and arduous process) and the lack of any proposed review of fees of the EFIH Unsecured Notes Trustee and PIK Noteholders.  The proposed EFIH Base Payment Amount (i.e., the fees and expenses of the EFIH Unsecured Notes Trustee expected to be paid on the Effective Date) will  not be subject to a fee review process.  *See* Article IV. R of the Plan and Plan Supplement Exhibit D (stating that the fee review process for non-retained professionals does not apply to charging lien advances to the EFIH Unsecured Notes Trustee).  In addition, the fees and expenses of the Makewhole Litigation Oversight Committee are not subject to review by the Court or the Fee Committee.  *See* Article VII.K.1 of the Plan.  This disparity is unjustified and highlights how the Debtors and PIK Noteholders are seeking to use leverage on review of fees as a litigation tactic.

**RERSERVATION OF RIGHTS**

73.    The EFIH Second Lien Trustee reserves all rights to file a supplemental objection to the Second Amended  Plan Supplement, any further amendments to the Plan and the proposed Confirmation Order.

**CONCLUSION**

WHEREFORE, for the reasons stated above, the EFIH Second Lien Trustee respectfully requests that the Court deny confirmation of the Plan unless appropriate modifications are made and grant such other relief as is just and proper.

Dated:  February 3, 2017

PACHULSKI STANG ZIEHL & JONES LLP

/s/ *Laura Davis Jones*
Laura Davis Jones
(Bar No. 2436)
Robert J. Feinstein
(NY Bar No.  RF-2836)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email: ljones@ pszjlaw.com
          rfeinstein@ pszjlaw.com

*- and -*

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Thomas Moers Mayer
Gregory A. Horowitz
Joshua K. Brody
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:   (212) 715-8000
Email: tmayer@kramerlevin.com
         ghorowitz@kramerlevin.com
         jbrody@kramerlevin.com

         *- and -*

BRYAN CAVE LLP

Stephanie Wickouski
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-1114
Facsimile: (212) 904-0514
Email: stephanie.wickouski@bryancave.com

*Counsel to the EFIH Second Lien Trustee*