# **EXHIBIT 3**

Page 1

1

2           UNITED STATES BANKRUPTCY COURT

3            FOR THE DISTRICT OF DELAWARE

4                      -  -  -

5   In Re:  Energy Future Holdings Corporation, et

6   al., Debtors.

7   Chapter 11

8   Case No. 14-10979

9   Jointly Administered

10                     -  -  -

11             January 26, 2017

12                     -  -  -

13       Oral deposition of ANDREW WRIGHT taken

14   pursuant to notice, held at the Law Offices of

15   Richards Layton & Finger, 920 N. King Street,

16   Suite 200, Wilmington, Delaware 19801,

17   commencing at 3:00 p.m., on the above date,

18   before Jennifer P. Miller, RPR, CCR, CRR, and

19   Notary Public for the Commonwealth of

20   Pennsylvania, State of Delaware and the State

21   of New Jersey.

22

23

24

25   JOB NO. 118632

1                      ANDREW WRIGHT
2        what you're referencing.
3               Let's mark this as Wright Exhibit
4        No. 3.
5                       - - -
6                   (Whereupon, Exhibit 3 was
7           marked for identification.)
8                       - - -
9               THE WITNESS:  I think I should
10        probably -- instead of calling it a
11        presentation, just call it an analysis.
12   BY MR. ANKER:
13        Q.   Okay.
14        A.   It wasn't something that was -- and
15   maybe you're going to ask me.  It was not --
16   this analysis was not presented to the board
17   in paper form.
18        Q.   Okay.  I appreciate the
19   clarification from you.  And if at any point
20   you want to correct, clarify, expand on,
21   modify a prior answer, feel free to do so.
22        A.   Okay.
23        Q.   Mr. Wright, can you identify what
24   has been marked as Wright Exhibit 3?
25        A.   Yes, this is an analysis that

1						ANDREW WRIGHT
2	Kirkland & Ellis prepared at my request with
3	respect to what I'll call a timing analysis
4	with respect to the appeal process that may or
5	may not happen in the make-whole litigation.
6		Q.	Why did you request that Kirkland
7	prepare what is Wright Exhibit 3?
8		A.	I think I'd say a couple of reasons.
9	One, I wanted to make sure that our board was
10	properly informed about how the make-whole
11	process, appellate process, could happen; and,
12	secondly, because I knew that we were going to
13	have to defend the board's decision to approve
14	the three-year claims reserve or the claims
15	reserve that was -- that's put in place with
16	respect to three years of interest and
17	interest on interest and that sort of thing.
18				So I think those are the two
19	primary reasons that we prepared it.
20		Q.	When did you request that Kirkland
21	prepare what is Wright Exhibit No. 3?
22		A.	We started talking about it shortly
23	after the make-whole decision came down.  I
24	don't have a precise date.
25		Q.	And by "the make-whole decision,"

1                    ANDREW WRIGHT
2  you mean the Third Circuit's decision?
3        A.   Yes.  So -- and that was
4  mid-November, I believe.  I don't know the
5  specific date.
6        Q.   I can represent to you it was
7  November 17th of 2016.
8        A.   Correct.  I believe that's correct.
9        Q.   And if I understood your testimony
10 earlier, Wright Exhibit 3 was not given to the
11 board of EFIH and EFH?
12       A.   No, it was not.
13       Q.   Was an oral presentation made to the
14 board consistent with Wright Exhibit 3?
15       A.   Yes.
16       Q.   Have the Debtors commissioned any
17 analysis of the likely time to complete the
18 make-whole litigation, other than Wright
19 Exhibit 3?
20            MR. MCKANE:  Objection to form.
21            THE WITNESS:  No.  I would
22       characterize this as the culmination of
23       that analysis.
24            I mean, from the moment we got the
25       make-whole decision, obviously there were

1                    ANDREW WRIGHT
2          many questions by many folks, including
3          myself and our board, Paul, Tony,
4          others -- I guess we're the management
5          team at this point -- about what is the
6          path forward.  And as you might imagine
7          at very early on, there was some
8          preliminary work done, and this I
9          would -- I would view as the sort of
10         culmination of all of that.
11   BY MR. ANKER:
12         Q.   Okay.  And I just want a clear
13   record.  By the word "this," this is the
14   culmination, you mean Wright Exhibit 3?
15         A.   Yes.
16         Q.   Okay.  Let me try to relieve
17   Mr. McKane's objection to form.
18              Has any other written analysis
19   been provided to the Debtors by Kirkland &
20   Ellis, Richards, Layton & Finger, anyone
21   regarding the likely time to complete the
22   make-whole litigation since November 17, 2016,
23   other than Wright Exhibit No. 3?
24         A.   Other than the flow chart that's
25   contained in Exhibit 2, the potential

1                    ANDREW WRIGHT
2    make-whole litigation outcomes, no.
3         Q.   Okay.  And is it fair to say that
4    you have relied --
5         A.   Or can I just back up and say, I'm
6    unaware of any others?
7         Q.   Okay.  That's fine.  I appreciate
8    the clarification.
9                    Is it accurate that you have
10   relied on the analysis that is embodied in
11   Wright Exhibit No. 3 in concluding that a
12   three-year interest reserve is appropriate?
13        A.   When you say "you," who do you mean?
14        Q.   I actually did mean in that "you,"
15   you personally.
16        A.   Yes.
17        Q.   Okay.  To the best of your
18   knowledge, is it fair to say that the Debtors
19   have relied on the analysis that is embodied
20   in Wright Exhibit No. 3 in concluding that a
21   three-year interest reserve is appropriate?
22             MR. MCKANE:  Objection to form.  Go
23        ahead.
24             THE WITNESS:  Yes.  As well as the
25        board of each of EFIH and EFH, yes.

1                    ANDREW WRIGHT
2    BY MR. ANKER:
3         Q.   The boards have relied on this
4    analysis; is what you're saying, right?
5         A.   Yes.
6         Q.   Okay.  You haven't personally
7    performed your own analysis of the likely
8    timing to complete the make-whole litigation,
9    have you?
10        A.   Other than overseeing and
11   supervising K & E's role in preparing this,
12   no.
13        Q.   Okay.  Now, let me just make sure I
14   understand what we mean by a three-year
15   reserve.
16             The Debtors are going -- are
17   proposing to the Court -- the Court may
18   disagree, but the Debtors are proposing to the
19   Court to put into the EFIH claims reserve an
20   amount of money that equals the make-whole
21   claims, including interest, of the First and
22   Second Liens as of the EFH effective date,
23   plus an additional three years of interest
24   thereon, right?
25        A.   Yes.

1                  ANDREW WRIGHT
2    the confirmation order in the NextEra deal.
3         Q.   Is there any particular language in
4    Article 11 you would point me to that you
5    believe would give the Court the authority to
6    grant the First Liens or Second Liens relief
7    were the reserve proved inadequate?
8         A.   I think it's the -- it's the very
9    first sentence, notwithstanding the entry of
10   the confirmation order and the occurrence of
11   the effective date.  So this would be
12   something that happened after the effective
13   date.  On or after the effective date, the
14   Bankruptcy Court shall retain exclusive
15   jurisdiction over all matters arising out of
16   or related to the chapter 11 cases and the
17   plan.
18                 And I believe the claims
19   reserve is part of the chapter 11 cases, it's
20   part of the -- it's complicated by the plan.
21   This goes on, to the extent provided under
22   applicable law, and then it says including,
23   and I would read that to mean including
24   without limited to jurisdiction to, and it has
25   a -- what, 22 enumerated items.  It doesn't

1                    ANDREW WRIGHT
2        Q.   Okay.  Is there any language you can
3   point to me on the plan -- let me back up.
4                I didn't ask you this,
5   Mr. Wright.  I understand you're not a
6   bankruptcy lawyer by training.  Were you a
7   commercial lawyer or --
8        A.   I'm an M&A, securities, corporate
9   securities lawyer.
10       Q.   Are you aware generally that in
11  order to have a perfected lien on a bank
12  account, the secured creditor must have
13  control of the account?
14       A.   Yes.
15       Q.   And that one gets control either by
16  being the financial institution at which
17  that's holding the account or pursuant to a
18  control agreement executed by the debtor and
19  the financial institution?
20       A.   I'm familiar with the general
21  concept, yes.
22       Q.   Can you point me to any provision in
23  the plan that requires a control agreement
24  with respect to the EFIH claims reserve for
25  the benefit of the First or Second Liens?

1              ANDREW WRIGHT

2        A.   I'm unaware of anything in the plans
3   specifically describing that.  But I think it
4   is the Debtors' intent that the First Liens
5   and the Second Liens will have a properly
6   perfected lien over the account, and whatever
7   legal requirements that that entails, we will
8   ensure that it's done.
9        Q.   Okay.  Does the plan -- strike that.
10              Will Mr. Horton be the one who
11   decides how the funds in the reserve will be
12   invested?
13        A.   I believe that will be part of his
14   responsibility, yes.
15        Q.   Is there anything in the plan that
16   you can point me to that provides any
17   limitations on Mr. Horton's discretion in that
18   regard?
19        A.   No.  But I suspect he will have an
20   effective fiduciary duty to manage that
21   properly.  And my expectation is, and I think
22   it's consistent with what Mr. Horton
23   testified, that it will be invested in some
24   sort of money market fund at a very
25   well-capitalized institution.

Page 159

1                    ANDREW WRIGHT

2   speak to that issue.  That as an issue for the

3   trustee at the end of the day.

4        Q.   Okay.  You're generally familiar

5   with the indemnification of the provisions and

6   the indenture identifying the Indenture

7   Trustee, right?

8        A.   Yes.

9        Q.   And let's look at that.  I'm going

10  to ask you to turn to Section 7.07, which is

11  on pages 111 running over to 112.

12                Do you see the second paragraph

13  of 7.077 provides that the issuer and the

14  guarantors jointly and severely shall

15  indemnify the trustee for and hold the trustee

16  harmless against any and all loss, damage,

17  claims, liability or expense, parens,

18  including attorney's fees, closed parens,

19  incurred by it in connection with the

20  acceptance or administration of this trust and

21  the performance of its duties hereunder.

22                That's as far as I need to go.

23  Do you see that?

24       A.   Yes.

25       Q.   And my question is, are the Debtors

1                    ANDREW WRIGHT

2  prepared to acknowledge that if the Indenture

3  Trustee distributed -- incurred liability in

4  the intercreditor liability as a result of

5  distributing funds to the 2L holders, that the

6  Debtors would be obligated to indemnify the

7  Indentured Trustee for that --

8       A.   No, I'm not willing to say that.

9                 We're in bankruptcy, the

10 Debtors are in bankruptcy, and this contract

11 is, and our actions are governed by not just

12 this contract, but the bankruptcy code and

13 what the bankruptcy judge -- how he interprets

14 that code.  So, no, I can't say that just

15 unilaterally.

16      Q.   Okay.  Are you familiar with any

17 provision of the bankruptcy code that allows

18 the Debtors get out of the contractual

19 indemnification obligation in its indenture?

20           MR. MCKANE:  Same instruction.

21           THE WITNESS:  As I said before, I'm

22     not a bankruptcy lawyer, so...

23 BY MR. HOROWITZ:

24      Q.   So you're not aware of that?

25      A.   I'm not aware of that.