**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 14-10979 (CSS) |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) (Jointly Administered) |
| | ) |
| Debtors. | ) **Re: D.I. 10551, 10760, 10762** |
| | ) <u>**Hearing Date**</u>**: February 14, 2017 at 10:00 a.m. (ET)** |
| | ) <u>**Response Deadline**</u>**: February 9, 2017** |

**STATEMENT IN SUPPORT OF CONFIRMATION AND
REPLY OF UMB BANK, N.A. TO CERTAIN OBJECTIONS TO
CONFIRMATION OF SEVENTH AMENDED JOINT PLAN OF
REORGANIZATION OF ENERGY FUTURE HOLDINGS CORP.,
*ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

UMB Bank, N.A., as Indenture Trustee (the "<u>Trustee</u>") for the unsecured 11.25%/12.25% Senior Toggle Notes Due 2018 (the "<u>PIK Notes</u>" and such holders, the "<u>PIK Noteholders</u>") and the 9.75% Senior Notes due 2019 (the "<u>Unexchanged Senior Notes</u>" and, together with the PIK Notes, the "<u>EFIH Unsecured Notes</u>"), by and through its undersigned counsel, files this statement in support of confirmation and reply to certain objections to confirmation (the "<u>Statement</u>") of the *Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10551] (as may be amended, the "<u>Plan</u>").

<u>**PRELIMINARY STATEMENT**</u>[1]

1.      The Plan should be confirmed.  The Trustee, pursuant to the direction of the Initial Supporting Creditors and consistent with the vote of Holders of Class B6 General Unsecured Claims to accept the Plan joins in, and adopts as its own, the Debtors' arguments in

---

[1] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meaning ascribed to them elsewhere in this Statement.  Capitalized terms used but not otherwise defined in the Statement shall have the meaning ascribed to them in the Plan, unless otherwise indicated.

support of confirmation set forth in the *Debtors' Memorandum of Law in Support of Confirmation of the Seventh Amended Joint Plan of Reorganization as it Applies to the EFH/EFIH Debtors* (the "Memorandum in Support of the Plan"), filed contemporaneously herewith.

2.      The Trustee writes separately to respond to certain arguments set forth in the objections of the EFIH First Lien Notes Trustee [D.I. 10760] (the "First Lien Objection") and the EFIH Second Lien Notes Trustee [D.I. 10760] (the "Second Lien Objection" and together, the "Secured Trustee Objections") regarding the EFIH Claims Reserve.[2]  As set forth below, the Debtors easily satisfy the cram down requirements set forth in section 1129(b)(2)(A)(iii) of the Code with respect to rejecting Classes B3 and B4.  The Plan guarantees that Holders of the EFIH First Lien Note Claims and the EFIH Second Lien Note Claims (the "First Lien Noteholders" and the "Second Lien Noteholders," respectively, and, together, the "Secured Noteholders") will realize the indubitable equivalent of their allowed secured claims, calculated as of the Effective Date of the Plan, by providing for payment in full in cash of their allowed secured claims. Furthermore, the creation of the EFIH Claims Reserve eliminates any risk of non-repayment on these claims by cash collateralizing the claims of Secured Noteholders in an amount equal to approximately 145% of the maximum aggregate amount of the Makewhole Claims asserted by the Secured Trustees (the "Secured Makewhole Claims") as of the Effective Date.

3.      The EFIH First Lien Notes Trustee's and the EFIH Second Lien Notes Trustee's (together, the "Secured Trustees") objections to the adequacy of the EFIH Claims Reserve is premised upon three faulty legal presumptions.  ***First***, the Secured Trustees presume that interest

---

[2] The Trustee does not respond herein to the United States Trustee's Objection, Response and Reservation of Rights [D.I. 10750] with respect to Article IV.R of the Plan as the Trustee Believes it relates to the Trustee insofar as such Objection has been resolved by the agreed clarification that the payment of the EFIH Base Payment Amount pursuant to that Article shall be considered an exercise of the Trustee's charging lien rights pursuant to the EFIH Unsecured Note Indentures.

on the Secured Makewhole Claims will continue to accrue at the applicable contract rate post-Effective Date until such claims are ultimately paid.  This presumption is incorrect as it is contrary to sections 506(b), 1129(b) and 1141(d) of the Bankruptcy Code.  **Second**, the Secured Trustees presume that the Debtors are prohibited from distributing approximately $2.1 billion in undisputed, unpaid principal and accrued interest to the Second Lien Noteholders given the pending (yet stayed) EFIH Intercreditor Litigation commenced by the EFIH First Lien Notes Trustee.  Again, the Secured Trustees ignore the law.  The Court is not required to enforce the EFIH Collateral Trust Agreement when utilizing section 1129(b) vis-a-vis rejecting classes and thus can, and should, distribute such amounts as soon as possible to the Second Lien Noteholders.  Furthermore, even if the distribution of principal and interest does not occur, the Second Lien Noteholders have no more right to post-Effective Date contractual interest on their undisputed principal and interest claims—the so-called Future Interest—than they do on their Secured Makewhole Claims.  Sections 506(b), 1129(b) and 1141(d) of the Bankruptcy Code cut off the Second Lien Noteholders' right to contractual rate interest on the Effective Date.  **Finally**, the Secured Trustees incorrectly contend that the Debtors are required to reserve for a series of tenuous and newly asserted claims in order to ensure payment of such claims when, and if, ultimately allowed by this Court.  Applicable case law demonstrates that the Debtors are under no legal obligation to reserve for such claims which are disputed, unliquidated, contingent and, in some instances, duplicative of the Secured Makewhole Claims which are already accounted for in the reserve.

4.    Despite the Secured Trustee Objections, it is incontrovertible that the Plan proposed by the Debtors ensures the payment in full, in cash, of the Secured Noteholders' Allowed Secured Claims as of the Effective Date of the Plan.  Accordingly, the Secured

Noteholders will realize the "indubitable equivalent" of their Allowed Secured Claims and the Plan, therefore, is fair and equitable to with respect to holders of claims in Classes B3 and B4.

## BACKGROUND

5.      On December 20, 2016, the Debtors filed a Form 8-K disclosing the terms of a settlement (the "Secured Settlement") reached with the EFIH First Lien Notes Trustee and the EFIH Second Lien Notes Trustee. *See* Energy Future Holdings Corp., Current Report (Form 8-K) (Dec. 20, 2016). Subsequently, certain of the PIK Noteholders (such holders, the "Initial Supporting Creditors") commenced negotiations with the Debtors and on, January 2, 2017, the Debtors, the Initial Supporting Creditors, and the Trustee (pursuant to the direction of the Initial Supporting Creditors) entered into the Plan Support Agreement (the "PIK PSA") whereby the Debtors agreed to pivot away from the Secured Settlement and instead seek confirmation of a plan incorporating the terms of the PIK PSA.

6.      On January 4, 2017, the Debtors filed the Plan incorporating the terms of the PIK PSA. The Plan provides that the disputed Secured Makewhole Claims asserted by the Secured Trustees will be escrowed in the EFIH Claims Reserve and that the Secured Trustees will have liens on the EFIH Claims Reserve. Plan Art. III.A.19, 20. The Plan further provides for the creation of a Makewhole Litigation Oversight Committee (the "MLOC"), which will be comprised of representatives appointed by the Initial Supporting Creditors and will be responsible for overseeing the litigation or settlement of the Secured Makewhole Claims. Plan Art. VII.K.

7.      As contemplated by the Plan, the EFIH Claims Reserve will include amounts on account of, among other things, (a) the maximum amount of Secured Makewhole Claims that could ultimately be Allowed, plus contractual interest (including Additional Interest and interest

on interest), (b) the Debtors' good-faith estimate of all contractual interest accruing on or on account of the Secured Makewhole Claims for three years after the Effective Date, (c) the pre-Effective Date fees and expenses of the Secured Trustees that may be Allowed, and (d) the Debtors' good-faith estimate of post-Effective Date fees and expenses that may be Allowed on account of the EFIH First Lien Notes and the EFIH Second Lien Notes.  Plan Art. I.A.161.

## REPLY TO OBJECTIONS

I.    **The Plan Provides the Holders of the EFIH First Lien Note Claims and EFIH Second Lien Note Claims with the Indubitable Equivalent of Their Allowed Secured Claims**

8.       The Secured Trustees raise three primary objections to the Plan.  ***First***, they argue that the Plan is not confirmable because it cancels their liens without providing them with the indubitable equivalent of their allowed secured claims.  ***Second***, they argue that the EFIH Claims Reserve is inadequate because it includes post-Effective Date interest and attorneys' fees and expenses for only three years.  ***Third***, they argue that the EFIH Claims Reserve is inadequate because it does not set aside any amounts related to other Claims, including Future Interest Claims, daily – rather than semi-annually – compounding interest, Trustee Indemnification Claims, and Breach Claims.  Each of these arguments is without merit, and the Plan should be confirmed as proposed.

A.    **The Plan Provides the Secured Noteholders with the Indubitable Equivalent of Their Allowed Secured Claims**

9.       In order to confirm the Plan over the objection of the Secured Trustees, the Plan must satisfy the "indubitable equivalent" standard under Bankruptcy Code section 1129(b)(2)(A)(iii).  A plan satisfies this standard by providing a secured creditor with the indubitable equivalent of its ***allowed secured claim*** as of the effective date.  Here, this test is easily satisfied because the Debtors are cash collateralizing the Secured Trustees' Maximum

Allowed Effective Date Claims[3] in amounts well in excess of 100 percent of such claims. Bankruptcy Code section 1129 simply does not require the Debtors to (i) ensure that an oversecured creditor will receive value in excess of its **allowed secured claim** as of the effective date or (ii) provide an oversecured creditor with a replacement lien on collateral that has the same value as its pre-confirmation collateral.

      (1)    <u>The Proposed EFIH Claims Reserve Not Only Satisfies, But Over-Collateralizes, the Amounts Necessary to Satisfy the "Indubitable Equivalent" Standard</u>

10.    As a general matter, in order to satisfy the indubitable equivalent standard found in Bankruptcy Code section 1129(b)(2)(A)(iii), a plan of reorganization must provide a secured creditor with "the unquestionable value of [its] secured interest in the collateral." *In re Phila. Newspapers, LLC*, 599 F.3d 298, 311 (3d Cir. 2010) ("[T]hese examples [of indubitable equivalent] focus on what is really at stake in secured credit: repayment of principal and the time value of money.") (citations omitted).   In other words, rather than provide an oversecured creditor with the full value of its collateral, the plan merely must provide that such creditor receive the present value of the total amount of its secured claim as of the Effective Date. *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 159-60 (Bankr. D.N.J. 2010); *see also In re LightSquared Inc.*, 513 B.R. 56, 93 (Bankr. S.D.N.Y. 2014) ("Courts generally will find the [indubitable equivalent] requirement satisfied where a plan both protects the creditor's principal and provides for the present value of the creditor's claim." (quoting *In re DBSD N. Am., Inc.*, 419 B.R. 179, 207 (Bankr. S.D.N.Y. 2009)).

11.    The Secured Trustees, nevertheless, take the position that in order to satisfy the

---

[3] The "<u>Maximum Allowed Effective Date Claims</u>" means the maximum amount that could ultimately be Allowed on account of the asserted Secured Makewhole Claims, pre-petition accrued interest and premiums and unpaid and accrued pre-petition professional fees, and expenses (including accrued interest), assuming an Effective Date of April 30, 2017, in the aggregate amount of $899 million.

indubitable equivalent standard, the EFIH Claims Reserve must necessarily account for **post-Effective Date** accrual of contractual interest on the Secured Makewhole Claims (including interest on interest and Additional Interest) and professional fees for an undetermined amount of time.  Thus, they argue, 100% of the distributable value must be included in the EFIH Claims Reserve.  This argument is flawed.  This Court must decide whether the EFIH Claims Reserve – a **cash** reserve of approximately $1.301 billion (**$402 million more** than the Maximum Allowed Effective Date Claims) – results in the Secured Noteholders realizing the indubitable equivalent of their Allowed secured claims as of the Effective Date.  The answer to that is, undoubtedly, **yes**.

12.     To reach this conclusion, the Court need only apply and accept a relatively straightforward legal proposition—that Bankruptcy Code section 506(b) awards oversecured creditors with postpetition interest and reasonable postpetition fees only until the effective date of the plan.  Supreme Court precedent holds that the right of an oversecured creditor to receive postpetition interest under Bankruptcy Code section 506(b) ceases upon confirmation of the plan.  *See Rake v. Wade*, 508 U.S. 464, 468 (1993); *see also* 4 Collier on Bankruptcy ¶ 506.04[2] (16th ed. 2016) (noting that section 506(b) "has no application to a secured creditor's entitlement to post-confirmation interest").[4]  In *Rake*, the Supreme Court determined that the "rights granted under Section 506(b) are relevant only until confirmation of the plan."  *Id.* at 468.  Thus, the Supreme Court held that "[s]ection 506(b) provides holders of oversecured claims with an unqualified right to postpetition interest . . . until a plan's confirmation date."  *Id.* at 464. Because *Rake* was a case filed under chapter 13 of the Bankruptcy Code, and these cases were filed under chapter 11, Bankruptcy Code section 506(b) likely should cease to allow postpetition

---

[4] Although *Rake* was filed under chapter 13 of the Bankruptcy Code, the Supreme Court's interpretation of Bankruptcy Code section 506(b) is equally applicable to cases filed under chapter 11.

interest and fees on the Effective Date rather than immediately at confirmation. *See In re S. Canaan Cellular Investments, Inc.*, 427 B.R. 44, 77 (Bankr. E.D. Pa. 2010) (noting that "[d]uring the postpetition, pre-effective date period, most courts will award interest under section 506(b) at the contract rate to an oversecured creditor . . . ."); *but see In re Weedling*, 205 F. App'x 955, 960 (3d Cir. 2006) (in a chapter 11 case, holding that secured creditor was not entitled to post-***confirmation*** (which would also include post-effective date) attorney's fees under Bankruptcy Code section 506(b)).

13.     On the Effective Date, the Debtors' obligations – including their obligations to pay interest and other fees – arising under the EFIH First Lien Note Indenture and Second Lien Note Indenture (together, the "Secured Indentures") will be discharged and the terms of the Plan will control. *See Plan Art. IV.I; see also* 11 U.S.C. §1141(d) (providing that "the confirmation of a plan discharges the debtor from any debt that arose before the date of such confirmation"); *In re Montgomery Ward Holding Corp.*, 306 B.R. 489, 494 (Bankr. D. Del. 2004) ("Once a plan is confirmed, a creditor's rights are governed exclusively by the terms of that plan.").

14.     Bankruptcy Code section 506(b) does not operate to add post-Effective Date interest, as well as other later-incurred fees and charges, to the Secured Trustees' Allowed Claims.  Accordingly, Bankruptcy Code section 1129(b)(2)(A)(iii) does not require the Debtors to provide the Secured Trustees and the Secured Noteholders with the indubitable equivalent of those amounts.  Nonetheless, the Debtors and the Initial Supporting Creditors have agreed to reserve, for purposes of confirmation, for ***all*** post-Effective Date contractual interest (including interest on interest and Additional Interest), as well as fees and expenses, accruing for three years following the Effective Date.  The EFIH Claims Reserve will reserve an amount that is 45% ***in excess*** of the Secured Trustees' Maximum Allowed Effective Date Claims.  Further, there is no

risk of non-repayment because, if the disputed Secured Makewhole Claims are eventually Allowed, they will be paid from amounts already set aside in the EFIH Claims Reserve. Similarly, there is no risk of the value of the collateral diminishing because the collateral consists of escrowed cash. The Plan therefore provides the indubitable equivalent of the Secured Trustees' Allowed Claims because it provides for a cash reserve, on which the Secured Trustees will be granted liens over, with a 45% cushion, and zero risk of non-payment.[5]

(2)    The Replacement Liens on the EFIH Claims Reserve Satisfies the "Indubitable Equivalent" Standard

15.    The Secured Trustees argue that the indubitable equivalent requirement cannot be satisfied unless they are granted replacement liens on collateral that has the same value as their pre-confirmation collateral. *See* First Lien Obj. at 12. While an oversecured creditor has a right to receive full payment on its allowed secured claim under the cramdown requirements (as discussed above), it has no right to demand to keep its collateral or to keep the same value of its collateral. *See River Road Hotel Partners v. Amalgamated Bank,* 651 F.3d 642, 650 (7th Cir. 2011) ("[W]here a creditor has a $100,000 lien on an asset worth $500,000, a reorganization plan will only give the creditor the indubitable equivalent of its claim if it gives something worth $100,000."); *In re Pacific Lumber Co.*, 584 F.3d 229, 247 (5th Cir. 2009) ("The Bankruptcy Code, however, does not protect a secured creditor's upside potential; it protects the 'allowed secured claim.'"); *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992) (stating that a creditor "is entitled to the preservation of so much of his security interest as is necessary to generously secure his claim, ***but to no more***. ***He may not paralyze the debtor and gratuitously thwart the other creditors by demanding superfluous security***") (emphasis added); *In re Temple Zion*, 125 B.R. 910, 922 (Bankr. E.D. Pa. 1992) ("Section 1129(b)(2)(A)(iii) requires that the

---

[5] As discussed *infra*, the Trustee expects that the MLOC or the Trustee, as applicable, will challenge the Secured Trustees' assertion that they are entitled to any post-Effective Date interest or fees and expenses.

secured creditor receive the 'indubitable equivalent' of its *claim*, not the 'indubitable equivalent' of its original collateral . . . A cash payment of [the secured creditor's claim] is unquestionably the equivalent or better of [the secured creditor's] retention of the full measure of its security interest in the Debtor's realty.") (emphasis in original).

16.     Rather, courts have recognized that granting a replacement lien on substitute collateral—as is being done here—appropriately satisfies the indubitable equivalent standard. *See, e.g.*, *In re River E. Plaza, LLC*, 669 F.3d 826, 831 (7th Cir. 2011) (noting that substituting collateral is "proper" for an oversecured creditor, given adequate protection, because existing liens can complicate restructuring efforts); *River Road Hotel Partners*, 651 F.3d at 652 n.8 (7th Cir. 2011) (noting that examples of what may constitute the indubitable equivalent in the congressional record included a replacement lien on similar collateral) (citations omitted).

17.     The Plan provides the Secured Trustees with first and second-priority liens, as applicable, on the EFIH Claims Reserve.  As noted above, the Debtors have agreed to fund the EFIH Claims Reserve with approximately $1.301 billion of the Merger Sub Cash and Cash on hand at EFIH.  After accounting for the Maximum Allowed Effective Date Claims, the EFIH Claims Reserve is over-collateralized and, upon the Effective Date, the equity cushion is projected to be approximately $402 million.  *See* Stipulation and Agreement, Feb. 6, 2017 [D.I. 10776].  This lien on "replacement" collateral—cash far in excess of the value of the Maximum Allowed Effective Date Claims—is more than sufficient to satisfy the indubitable equivalent requirement.

**B.     Reserving for Three Years of Ongoing Litigation is Conservative and Appropriate**

18.     The Secured Trustees object to the Plan on the basis that the EFIH Claims Reserve, which escrows funds on account of the Maximum Allowed Effective Date Claims, plus

an additional $402 million, is inadequate because it assumes that litigation with respect to those Claims continues for only three years from the Effective Date.  *See* First Lien Obj. at 12-22; Second Lien Obj. at 14-18.

19.     As the Court is aware, the Debtors and the Initial Supporting Creditors recently attempted to resolve this objection by agreeing to additional terms regarding the EFIH Claims Reserve, filed as part of an amended plan supplement and which was to be formalized in modifications to the Plan.  *See Second Amended Plan Supplement as it Relates to the EFH Debtors and EFIH Debtors for the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10752] (the "Second Amended Supplement").  Those terms would have provided (i) a mechanism—if it appeared that the litigation would outlast the three-year estimate and render the reserve inadequate—for the Secured Trustees or the Secured Noteholders (together, the "Secured Parties") to request an order from the Court increasing the EFIH Claims Reserve and (ii) that, if the MLOC was unwilling or unable to fund an increase to the EFIH Claims Reserve ordered by the Court, litigation with respect to the Secured Makewhole Claims would be terminated. Because the Secured Trustees apparently objected to the Second Amended Supplement, the Debtors withdrew it.  *See Letter from Mark McKane, P.C. to The Honorable Christopher S. Sontchi Responding to Joint Letter from EFIH First and Second Lien Trustee Concerning Second Amended Plan Supplement Filing,* Feb. 3, 2017 [D.I. 10758].  However, the Trustee and the Initial Supporting Creditors continue to believe that the mechanism set forth in the Second Amended Supplement, while not necessary or required to confirm the Plan, remains an efficient way to resolve many of the Secured Trustees' objections to the EFIH Claims Reserve.

20.     In any event, the Trustee believes that the Plan is confirmable as proposed, even

without the new terms agreed to by the Initial Supporting Creditors. Three years is an entirely reasonable and very conservative estimate of the time that could be required to litigate and liquidate the Secured Makewhole Claims. Further, the Court will have continuing jurisdiction over the EFIH Claims Reserve in the unlikely event that the litigation lasts more than three years. The Trustee agrees with, and joins in, the arguments set forth in the Debtors' Memorandum in Support of Confirmation justifying the three-year estimate.

### C.      The Debtors Are Not Required to Reserve the Full Face Amount of All Asserted Claims

21.     It is not necessary that the EFIH Claims Reserve include the full face amount of each and every possible claim that is, or may be, asserted by the Secured Trustees.[6]  As set forth above, the Secured Trustees are only entitled to the indubitable equivalent of their ***allowed secured claim*** – and nothing more.  Here, the Debtors propose to fund the EFIH Claims Reserve that reserves for not just disputed Secured Makewhole Claims but also for additional amounts that may continue to accrue (*i.e.*, post-Effective Date interest, interest on interest, Additional Interest, and interest on professional fees) for a period of ***three years***.  This is more than adequate and it is not necessary to reserve for any additional amounts or possible future claims, including Future Interest Claims, compounding interest calculated daily rather than semi-annually, Trustee Indemnification Claims, and Breach Claims.

---

[6] As a general rule, the Debtors are not required to set aside a claims reserve for disputed or contingent claims in the full face amount being claimed.  *See, e.g., Frito Lay Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 961 (2d Cir. 1993) (holding that the Bankruptcy Code did not require the reorganized debtor to "reserve fully for claims pending appeal"); *In re Oakwood Homes Corp.*, 329 B.R. 19, 22 (D. Del. 2005) (affirming bankruptcy court's determination to set a reserve at zero, notwithstanding creditor's claimed amount); *In re Abeinsa Holding, Inc.*, No. 16-10790, 2016 WL 7243517 at *7 (Bankr. D. Del. Dec. 14, 2016) (declining to require that a disputed claims reserve hold the full face amount of the claim, noting that to do so would be "highly unusual").

(1)    <u>The Debtors Should Not be Required to Reserve for Future Interest Claims and the Effective Date Payment to Holders of EFIH Second Lien Note Claims Should be Authorized</u>

22.    The Debtors do not need to reserve for Future Interest Claims in order to satisfy the indubitable equivalent standard and confirm the Plan.  The Future Interest Claims relate to interest that the Secured Trustees argue will continue to accrue on the unpaid principal and accrued interset of the EFIH Second Lien Note Claims because, they argue, either (i) the EFIH Second Lien Notes Trustee cannot make distributions of the principal amounts to its holders in light of the EFIH Intercreditor Litigation or (ii) the Debtors cannot make distributions on account of those Claims without violating the EFIH Collateral Trust Agreement.

23.    The Secured Trustees' arguments fail for at least four reasons:  (1) there can be no claim based on post-effective date accrual of contract rate interest because, pursuant to Bankruptcy Code section 506(b), interest on the principal amount of the EFIH Second Lien Note Claims will stop accruing at the Effective Date regardless of whether the Debtors make distributions to the EFIH Second Lien Notes Trustee or its Holders; (2) in any event, once the Debtors distribute the principal amount of the EFIH Second Lien Note Claims to the EFIH Second Lien Notes Trustee pursuant to the Plan, the Debtors' obligation to pay the principal and any interest accruing on the principal will be discharged under the Plan, Confirmation Order, and Bankruptcy Code; (3) even if the EFIH Second Lien Note Indenture controlled the discharge of that obligation (it does not), the Debtors' obligation to pay principal will be discharged because nothing renders the EFIH Second Lien Notes Trustee unable to make distributions to its Holders; and (4) the Court is not required to enforce a subordination agreement, such as the EFIH Collateral Trust Agreement, when confirming a Plan under Bankruptcy Code section 1129(b).

24.    *First*, the Secured Trustees' arguments regarding Future Interest Claims should be rejected because the Future Interest Claims will never accrue, even if the Debtors fail to make

distributions on account of the principal amount of the EFIH Second Lien Note Claims at the Effective Date.  Bankruptcy Code section 506(b) cuts off the entitlement if oversecured creditors to interest following the effective date of a plan.  *See* supra ¶13.  As discussed above, because Bankruptcy Code section 506(b) will no longer be in effect after the Effective Date, Holders of EFIH Second Lien Note Claims will not be entitled to additional interest after the Effective Date as part of their Allowed Claims.  Accordingly, there is no need for the EFIH Claims Reserve to include additional amounts on account of Future Interest Claims, which relate entirely to post-Effective Date interest on the principal of the EFIH Second Lien Notes.

25.    ***Second***, even if accrual of the Future Interest Claims were possible after the Effective Date, the Debtors' obligation to pay the principal on the EFIH Second Lien Notes will be discharged when such payment is made to the EFIH Second Lien Notes Trustee (or as otherwise directed by the Court) at the Effective Date.  Because distributions to the EFIH Second Lien Notes Trustee will be made pursuant to the terms of the Plan—not the terms of the EFIH Second Lien Note Indenture – the indenture provisions that the EFIH Second Lien Notes Trustee relies upon, *see* Second Lien Obj. at 27, is irrelevant.  Instead, the Bankruptcy Code discharges the Debtors of their obligation to pay principal and interest on the EFIH Second Lien Notes.  11 U.S.C. § 1141(d) (providing that "the confirmation of a plan discharges the debtor from any debt that arose before the date of such confirmation"); *see also* 11 U.S.C. 1123(a)((5)(F) (permitting the "cancellation or modification of any indenture" to provide adequate means for a plan's implementation).

26.    Thus, following the Effective Date, the confirmed Plan—not the EFIH Second Lien Note Indenture or the EFIH Collateral Trustee Agreement—will govern the creditors' rights.  *See In re Montgomery Ward Holding Corp.*, 306 B.R. 489, 494 (Bankr. D. Del. 2004)

("Once a plan is confirmed, a creditor's rights are governed exclusively by the terms of that plan."); *see also In re 785 Partners LLC*, 470 B.R. 126, 137 (Bankr. S.D.N.Y. 2012) ("[A]ll obligations and rights of the parties are extinguished and replaced by the plan.").  The Plan provides that, on the Effective Date, the holders of EFIH Second Lien Note Claims will receive, among other things, principal and accrued but unpaid pre- and postpetition interest.  Plan Art. III.B.20.  The Plan further provides that all pre-existing obligations under the EFIH Second Lien Note Indenture, as well as the EFIH Collateral Trust Agreement, will be extinguished.  Plan Art. IV.I. ("Notwithstanding the foregoing, the cancelation and discharge of the EFIH First Lien Note Indentures, the EFIH Second Lien Note Indenture, and the EFIH Collateral Trust Agreement shall be limited solely to the Debtors or Reorganized Debtors.").  Thus, upon the Debtors' payment of certain amounts to the EFIH Second Lien Notes Trustee, and the creation of the EFIH Claims Reserve funding the entire Maximum Allowed Effective Date Claims, the Debtors' obligations under the EFIH Second Lien Note Indenture have been discharged pursuant to the Plan, notwithstanding the terms of the EFIH Second Lien Note Indenture or the EFIH Collateral Trust Agreement.  There is no need to reserve funds for Future Interest Claims because such claims will never materialize.

27.     ***Third,*** even if this Court finds that the terms of the EFIH Second Lien Note Indenture controls whether the distribution made pursuant to the terms of the Plan discharges the Debtors' obligation, Section 12.02 of the EFIH Second Lien Note Indenture would not cause interest to continue to accrue on such amounts.  Section 12.02 provides that interest will accrue on amounts that the EFIH Second Lien Note Trustee is "***unable*** to apply" by "reason of any legal proceeding or by reason of any order or judgment of any court."  EFIH Second Lien Note Indenture § 12.02 (emphasis added).  As the Debtors have previously argued, there is a

difference between being "unable" and "unwilling" to distribute payments. *See Amended Plan Supplement as it Relates to the EFH and EFIH Debtors for the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, Ex. C(2) § A, Jan. 27, 2017 [D.I. 10729] (the "Amended Plan Supplement").

28.     The EFIH Intercreditor Litigation does not render the EFIH Second Lien Note Trustee ***unable*** to make distributions.  There is nothing to suggest the EFIH Second Lien Note Trustee is somehow barred from making distributions to holders of EFIH Second Lien Notes by the EFIH Intercreditor Litigation.  In fact, bankruptcy courts have previously approved plans that provided for the payment of proceeds to secured creditors subject to disgorgement pending later litigation.  *See, e.g.*, *In re Adelphia Commnc'ns Corp.*, 368 B.R. 140, 276 (Bankr. S.D.N.Y. 2007) (confirming chapter 11 plan that, as a result of certain settlements with bank lenders, provided for the payment in full of certain disputed claims subject to later disgorgement).  Thus, while it may be administratively inconvenient to claw back such amounts, the EFIH Second Lien Note Trustee has not shown that there is anything affirmatively barring it from distributing such amounts to holders of EFIH Second Lien Note Claims, subject to later disgorgement or other relief if necessary.

29.     ***Finally***, the EFIH Collateral Trust Agreement does not prevent the Debtors from making distributions on account of the EFIH Second Lien Note Claims pursuant to the Plan.  The EFIH Collateral Trust Agreement is a subordination agreement, and Bankruptcy Code section 1129(b)(1) permits a plan to be confirmed over the objection of creditors even if inconsistent with an applicable subordination agreement.  *See* 11 U.S.C. § 1129(b)(1) (stating that if the other requirements of that section are met, a plan may be confirmed "[n]otwithstanding section 510(a) of this title"); 11 U.S.C. § 510(a) (providing that subordination agreements are enforceable in

chapter 11).   Thus, when, as here, determining whether a plan is confirmable pursuant to Bankruptcy Code section 1129(b), the Court need not consider whether any aspect of the Plan violates a provision of a subordination agreement such as the EFIH Collateral Trust Agreement. *See In re Tribune Co.*, 472 B.R. 223, 241 (Bankr. D. Del. 2012), *vacated in part on other grounds*, 2014 WL 2797042 (D. Del. Jun. 18, 2014) (appeal pending) (stating that "the meaning of 'notwithstanding section 510(a) of this title' means that 1129(b) is applied without prevention or obstruction of any applicable subordination agreements"); *In re TCI 2 Holdings, LLC*, 428 B.R. at 141 (holding that plan that provided for distributions to second lien creditors despite provisions in intercreditor agreement arguably prohibiting such payments was confirmable under section 1129(b)(1)).

30.    Thus, the Debtors should be permitted to make distributions of principal and accrued interest on account of the EFIH Second Lien Note Claims on the Effective Date, and no additional funds need be escrowed on account of Future Interest Claims.   To hold otherwise would be inequitable because it would force the Debtors, and the Holders of EFIH General Unsecured Claims, to directly bear the costs of an ongoing EFIH Intercreditor Litigation to which neither the Debtors, nor any of their unsecured creditors, are parties.   The EFIH Intercreditor Litigation is an action between the Secured Trustees and only those two parties can determine whether to continue endlessly litigating or to settle their claims.   If the Court followed the Secured Trustees' interpretation of the Plan, the Second Lien Note Indenture, and the EFIH Collateral Trust Agreement, the Debtors and their unsecured creditors would be powerless to prevent the accrual of interest expense while the EFIH Intercreditor Litigation drags on, even if the Debtors distribute the principal and accrued interest on account of the EFIH Second Lien Note Claims.   Further, the Secured Trustees have every incentive to allow the EFIH Intercreditor

Litigation to drag out if they are assured that amounts that the Debtors have already distributed continue to accrue contract-rate interest while being held back at the sole discretion of the EFIH Second Lien Note Trustee.

> (2)     Interest Should be Calculated as Compounding Semi-Annually Rather Than Daily

31.     The Secured Trustees also argue that the EFIH Claims Reserve is inadequate because, while it provides a reserve for compounding interest, it calculates compounding interest semi-annually rather than daily.  As discussed above, the Secured Trustees are not entitled to contractual interest post-Effective Date because Bankruptcy Code section 506(b) ceases to be in effect.  In addition, the Secured Trustees wrongly argue that they are entitled to daily compounding on pre-Effective Date interest.  While the EFIH Second Lien Notes Trustee attempts to shift the burden of proof to the Debtors by arguing that nothing "limits" the compounding on interest, *see* Second Lien Obj. at 27, it is the claimant who bears the ultimate burden of establishing a valid claim by a preponderance of the evidence.  *In re Residential Capital, LLC*, 501 B.R. 624, 641 (Bankr. S.D.N.Y. 2013).

32.     Here, the Secured Trustees will not be able to carry that burden, as the terms of the Note are clear that all interest is compounded on a semi-annual basis.[7]  The face of the EFIH First Lien Notes and the EFIH Second Lien Notes (together, the "Notes") indicate that interest is due, in arrears, semi-annually.  *See* First Lien Note Indenture, p. A-2-3; Second Lien Note Indenture, p. A-3.  Per the plain language of the Notes, interest shall continue to accrue on overdue principal and premium, and on overdue interest, all "at the interest rate on the Notes."  Because interest on the Notes is payable "in arrears," amounts *not* paid are compounded semi-annually on each passing Interest Payment Date.  There is nothing in either Note that

---

[7] The Trustee and the PIK Noteholders reserve their rights (and the rights of the MLOC) to object to the allowance of daily compounding interest on the Secured Makewhole Claims.

suggests either a higher rate or a more frequent period of compounding.

33.     The Secured Trustees rely on the words "on demand," which they misinterpret to mean that they can simply "demand" to have their interest compounded daily.  In fact, the term relates only to when overdue interest is payable, and not when it is *due*.  The distinction between when a debt accrues (when it is "due") and when the obligation to pay it arises (when it is "payable") is material because compound interest relates to the compound accrual of debt.  As noted in *Themis Capital, LLC v. Democratic Republic of Congo*, the words "on demand" mean only that when the debtor owes interest on principal (or overdue principal, or a premium) and has not paid it, and when a demand for interest is made, the notes afford the delinquent debtor no grace period—the amounts are immediately payable.  35 F.Supp. 3d 457, 489 (S.D.N.Y. 2014) (overturned on other grounds).  The *Themis* court explicitly declined to "caret in" the concept that the amounts were *due* on demand.  This Court should likewise decline the Secured Trustees' invitation to read such a requirement into the Notes.

34.     On their face, the Notes call for semi-annual compounding, for both interest and all overdue amounts, at the rate stated on the face of the Notes.  The Secured Trustees are not entitled to interest calculated as compounding daily on either pre- or post-Effective Date amounts.

(3)     The Debtors Do Not Have to Reserve for Trustee Indemnification Claims

35.     The Secured Trustees have also previously indicated that the EFIH Claims Reserve must include amounts for so-called Trustee Indemnification Claims.  As the Debtors discussed in the Amended Plan Supplement, however, any Trustee Indemnification Claim is mutually exclusive of a full recovery by the Holders on their Secured Makewhole Claims.  Amended Plan Supplement, Exhibit C(2) § B.  Because such an indemnification claim is duplicative of the amounts that could otherwise be owed to the Secured Noteholders—any

effort to recover both the amount potentially owed and a Trustee Indemnification Claim would constitute an attempt at a double recovery, which is not allowed under the Code.  *Id.*[8]

36.    Indeed, the EFIH Second Lien Notes Trustee acknowledges that the EFIH Claims Reserve already includes amounts sufficient to pay any Trustee Indemnification Claim, admitting that "the amount initially reserved to cover the EFIH First Lien Makewhole Claim with interest should be sufficient to provide [for] indemnification."  Second Lien Objection at 25.  With respect to the EFIH Second Lien Notes Trustee's request concerning affirmation that the EFIH Claims Reserve remain available, such an affirmation is premature.  To the extent that a portion of any Secured Makewhole Claim is disallowed by Final Order, although the MLOC would argue that such reserved-for amounts be released and distributed to the EFIH Unsecured Creditors pursuant to the terms of the Plan, it is anticipated that the EFH Plan Administrator Board would seek an order from this Court prior to the EFH Plan Administrator Board (or the MLOC or the Trustee, as applicable) making such distributions.  The EFIH Second Lien Notes Trustee would be afforded a full opportunity *at that point* to argue that the funds should remain in the EFIH Claims Reserve.  Such an issue is currently unripe, and the Court should postpone any determination until the arguments are before it.

(4)    The Debtors Do Not Have to Reserve for the Breach Claim

37.    The EFIH Claims Reserve does not need to include any additional amounts for the EFIH First Lien Notes Trustee's hypothetical Breach Claim.   *First*, any reserve on account of the Breach Claim would be duplicative of amounts that will already be part of the EFIH Claims Reserve.  Here, the potential Breach Claim would only arise in the event that the EFIH First Lien Makewhole Claim is disallowed.  *See* First Lien Objection at 25 ("This circumstance could arise if the PIK Noteholders were somehow to prevail in Phase Two.").  In such a case,

---

[8] The Trustee hereby incorporates by reference the arguments set forth in the Amended Plan Supplement.

any potential amount owing for a Breach Claim could not be more than the amount previously reserved on account of the First Lien Makewhole Claim.

38.    **Second**, as with the amounts reserved in connection with the potential Trustee Indemnification Claims, it is too early to determine that they must be preserved in the EFIH Claims Reserve in the event of ***any*** subsequent litigation.  There are already adequate safeguards in the proposed process, whereby the EFH Plan Administrator Board, the MLOC, or the Trustee would need to make a request to this Court prior to releasing potentially available funds from the EFIH Claims Reserve.  The Court should also postpone this determination until there are actual arguments before it concerning the propriety of releasing such funds.

39.    **Lastly**, as discussed above, the Debtors will be paying the principal amount of the EFIH Second Lien Note Claims pursuant to the terms of the Plan, not the EFIH Second Lien Note Indenture or the EFIH Collateral Trust Agreement.  *See supra* ¶ 25.  As such, any so-called Breach Claim is not actionable and need not be reserved for.

## II.    The Class B5 and Class B6 Creditors are Entitled to a Partial Distribution on the Effective Date

40.    Following their argument that the EFIH Claims Reserve is inadequate, the Secured Trustees also argue that the EFIH Unsecured Creditors are not entitled to any distributions on the Effective Date, because, *inter alia*, such "advance" distributions (and related charging lien advance[9]) are not appropriate when the entire amount of remaining distributable value ($2.1 billion) should be reserved.  *See* First Lien Objection at 28-30.  This argument

---

[9] The Secured Trustees object to the fact that the Trustee will receive payments of its fees and expenses without undergoing the fee review process required of the Secured Parties.  The Trustee, at this juncture, will be asserting its charging lien against distributions that will be made to the EFIH Unsecured Noteholders on the Effective Date and, as such, is not required to undergo the fee review process being proposed for the Secured Parties.  Further, any objection by the Secured Trustees to the payment of the MLOC fees and expenses, and proposed review procedures, should be overruled.  There are appropriate mechanism proposed for the review of the MLOC fees and expenses; and such amounts will only be paid from funds remaining after the EFIH Claims Reserve and all other reserves/escrows are established under the Plan.

ignores the reality that, upon a finding by this Court that a reserve of $1.301 billion (or such other amount) is sufficient to provide the "indubitable equivalent" of the Allowed Secured Claims, there is no reasonable basis to withhold a partial distribution to the EFIH Unsecured Creditors on the Effective Date.  Rather, under the waterfall provided under the Plan, the EFIH Unsecured Creditors are entitled to a distribution of any unrestricted/unreserved for funds on the Effective Date.  To prevent distributions of these unreserved funds would amount to an additional *de facto* reserve in excess of the amounts required to be escrowed in the EFIH Claims Reserve.  It would be the equivalent of forcing the EFIH Unsecured Creditors to post a bond while the Secured Parties appeal this Court's ruling on the EFIH Claims Reserve.  This is not what the Bankruptcy Code or applicable law requires.  Rather, the EFIH Unsecured Creditors are entitled to receive a distribution, as soon as practicable, of any funds remaining after the escrows are set up under the Plan.

## III.    Certain Amounts that the Debtors Seek to Reserve Are Subject to Further Relief Post-Confirmation

41.    The Plan provides that the MLOC and/or the Trustee have the right to seek relief from the Court to facilitate distributions on behalf of the Holders of the Class B6 Claims.  *See* Plan VII.K(1).  While the Initial Supporting Creditors agreed to support establishment of the EFIH Claims Reserve for purposes of confirmation, neither the Trustee nor the Initial Supporting Creditors are prohibited from seeking a reduction of the EFIH Claims Reserve based upon objections to the alleged Claims (e.g., post-Effective Date contractual interest, etc.) that have been reserved for by the Debtors.

42.    The Trustee expects, shortly after confirmation, that the Trustee and/or the MLOC will seek an order of this Court (if not determined at confirmation) (i) determining the appropriate rate of post- Effective Date interest on the Secured Makewhole Claims, if any, (ii)

releasing funds from the EFIH Claims Reserve to the extent the Court sustains objections to the post- Effective Date interest claims asserted by the Secured Trustees, and (iii) directing the EFH Plan Administrators to distribute such released funds to EFIH Unsecured Creditors in accordance with the Plan.  A significant portion of the EFIH Claims Reserve is related to the Secured Trustees' assertion that they are entitled to receive post-Effective Date interest on the Secured Makewhole Claims at the applicable contractual rate.  If the Court determines that the applicable interest rate is the federal judgment rate given the fact the Secured Makewhole Claims are fully cash collateralized with zero risk of repayment, the EFIH Claims Reserve could be significantly reduced and distributions to unsecured creditors will be facilitated.

43.     In addition, as permitted by Section VII.K(1) of the Plan, the Trustee and the MLOC will seek, among other things,  (i) entry of an order finding that interest has not pre-Effective Date, and will not post-Effective Date, accrued on the unpaid fees and expenses of the Secured Parties and ordering that such interest reserved for in the EFIH Claims Reserve be released and distributed to the holders of EFIH Unsecured Claims pursuant to the terms of the Plan and (ii) if any Future Interest Claims, Indemnification Claims or such other claims are reserved for as part of the EFIH Claims Reserve before they are Allowed by Final Order, entry of an order finding that such claims should be disallowed and ordering that such reserved-for amounts be released from the EFIH Claims Reserve and distributed to the holders of EFIH Unsecured Notes Claims pursuant to the terms of the Plan.

44.     Furthermore, if the Court requires the Debtors to increase the amount of the proposed EFIH Claims Reserve as requested by the Secured Trustees without addressing the rate at which interest continues to accrue on the Secured Makewhole Claims and other Claims asserted by the Secured Trustees, the Trustee and/or the MLOC likely will file a motion seeking

entry of an order which, among other things, (i) authorizes and directs the EFH Plan Administrator Board to pay the disputed Secured Makewhole Claims to the applicable Secured Trustees subject to disgorgement pending the outcome of litigation regarding the Secured Makewhole Claims (the "Disputed Makewhole Payment") and (ii) finds that such Disputed Makewhole Payment cuts off the accrual of additional interest (i.e., post-Effective Date interest, interest on interest and Additional Interest) after distributions are made to the Secured Trustees.[10]

## IV.    The Trustee Adopts the Arguments Made by the Debtors

45.    Each of the objections to confirmation not addressed herein should be rejected for the reasons set forth in the Debtors' Memorandum in Support of the Plan.  The Trustee hereby adopts the arguments set forth in the Debtors' Memorandum in Support of the Plan.

---

[10] The Disputed Makewhole Payment will discharge the interest obligations arising thereafter because (i) the obligations under the Secured Indentures will have been discharged by the Plan (*see* 11 U.S.C. 1141(d), Plan Art. VIII.A) and (ii) the payments will be made pursuant to the terms of Plan.  *In re 785 Partners LLC*, 470 B.R. 126 (holding that, after confirmation, all payments made to secured creditor were made pursuant to terms of confirmed plan, not pre-existing loan documents).  Holders of First and Second Lien Note Claims would receive the indubitable equivalent of their Allowed Secured Claim, as required by the Bankruptcy Code, because they will have been paid in cash the maximum possible amount of what may potentially could be an Allowed Secured Makewhole Claim.  The only amounts subject to later disgorgement or such other relief would be those amounts later determined by the Court to not be part of the Allowed Secured Makewhole Claims

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth in this Statement, the Trustee respectfully

requests that the Court confirm the Plan.

Dated:  February 9, 2017
Wilmington, Delaware


**AKIN GUMP STRAUSS HAUER & FELD LLP**

Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone:    (212) 872-1000
Facsimile:    (212) 872-1002
Email:        idizengoff@akingump.com
              aqureshi@akingump.com

Scott L. Alberino (admitted *pro hac vice*)
Joanna F. Newdeck (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone:    (202) 887-4000
Facsimile:    (202) 887-4288
Email:        salberino@akingump.com
              jnewdeck@akingump.com

By:   *Raymond H. Lemisch*

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Raymond H. Lemisch (No. 4204)
919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193
E-mail: rlemisch@klehr.com


*-and-*


**FOLEY & LARDNER LLP**
Harold L. Kaplan (admitted *pro hac vice*)
Mark F. Hebbeln (admitted *pro hac vice*)
Lars A. Peterson (admitted *pro hac vice*)
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
Email: hkaplan@foley.com
       mhebbeln@foley.com
       lapeterson@foley.com


Barry G. Felder (admitted *pro hac vice*)
Jonathan H. Friedman (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-2329
E-mail: bgfelder@foley.com
        jfriedman@foley.com
*Co-Counsel for UMB BANK, N.A., as Trustee*