## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MEMORANDUM OF LAW
## IN SUPPORT OF CONFIRMATION OF THE SEVENTH AMENDED
## JOINT PLAN OF REORGANIZATION AS IT APPLIES TO THE EFH/EFIH DEBTORS

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 2

Brief Roadmap ........................................................................................................... 6

Background ................................................................................................................. 7

I.      The Original Plan. ............................................................................................ 7

II.     Development of Current Plan. ....................................................................... 10

      A.      Between May 1, 2016 and November 17, 2016, the EFH/EFIH Debtors Pushed Forward on a Path to Exit. .............................................. 10

      B.      The Makewhole Landscape Shifts, Necessitating Plan Modifications. ............................ 12

III.    Development of EFIH Claims Reserve Fail-Safe: "Top-Up Tap-Out" Structure ......................... 17

IV.    Overview of EFIH Claims Reserve Mechanics. ........................................... 18

      A.      Overview of Recovery and Distribution Mechanics. ....................... 18

      B.      Priority of Accounts Within EFH/EFIH Distribution Account ........ 19

      C.      Composition of Claims Accounted for in the EFIH Claims Reserve. .......... 21

V.      Confirmation Solicitation and Notification Process. ...................................... 26

      A.      Unimpaired and Deemed to Accept. ............................................... 26

      B.      Fully Impaired and Deemed to Reject. ........................................... 27

      C.      Subject to Reinstatement or Discharge and Deemed to Accept or Reject. ............... 28

VI.    Voting Results. ............................................................................................... 28

VII.   Modifications to the Plan. ............................................................................. 30

Argument .................................................................................................................. 31

I.      The Plan as it Relates to the EFH/EFIH Debtors Satisfies the Requirements to Confirm a Plan Under the Bankruptcy Code ................................... 32

      A.      The Plan as it Relates to the EFH/EFIH Debtors Fully Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)). ............... 32

      B.      The Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)). ............... 39

i

**TABLE OF CONTENTS (CONT'D)**

C.      The Debtors Proposed the Plan as it Relates to the EFH/EFIH Debtors in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)). ..........................40

D.      The Plan as it Relates to the EFH/EFIH Debtors Provides for Bankruptcy Court Approval of Certain Administrative Payments (Section 1129(a)(4)). ............................42

E.      The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement as it Relates to the EFH/EFIH Debtors (Section 1129(a)(5)).....................44

F.      The Plan as it Relates to the EFH/EFIH Debtors Does Not Provide for Any Rate Changes Requiring Governmental Approval (Section 1129(a)(6)). ................................46

G.      The Plan as it Relates to the EFH/EFIH Debtors Is In the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)). .......................................46

H.      The Plan as it Relates to the EFH/EFIH Debtors Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8)................................................47

I.      The Plan as it Relates to the EFH/EFIH Debtors Complies With Statutorily Mandated Treatment of Administrative and Priority Claims (Section 1129(a)(9))..........48

J.      At Least One Impaired Class of Claims Has Accepted the Plan as it Relates to the EFH/EFIH Debtors, Excluding the Acceptances of Insiders (Section 1129(a)(10))...............................................................................................48

K.      The Plan as it Relates to the EFH/EFIH Debtors Is Feasible (Section 1129(a)(11))..........................................................................................49

L.      The Plan as it Relates to the EFH/EFIH Debtors Provides For the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12))........................................54

M.      The Plan as it Relates to the EFH/EFIH Debtors Complies with Section 1129(a)(13) of the Bankruptcy Code. ....................................................................54

N.      Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan as it Relates to the EFH/EFIH Debtors. ..............................................55

O.      The Plan as it Relates to the EFH/EFIH Debtors Complies with Section 1129(b) of the Bankruptcy Code. ....................................................................................55

P.      The Plan as it Relates to the EFH/EFIH Debtors Complies with Sections 1129(c)-(e) of the Bankruptcy Code..........................................................................60

II.     The Discretionary Contents of the Plan as it Relates to the EFH/EFIH Debtors Are Appropriate. .............................................................................................................61

A.      The Debtor Releases in the Plan Related to the EFH/EFIH Debtors Are Appropriate. .............................................................................................................61

**TABLE OF CONTENTS (CONT'D)**

**Page**

B.    The Third-Party Releases in the Plan as They Relate to the EFH/EFIH Debtors are Appropriate. ...................................................................................... 63

C.    The Plan's Exculpation Provisions Are Appropriate as They Relate to the EFH/EFIH Debtors. ...................................................................................... 67

D.    The Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained In the Plan as it Relates to the EFH/EFIH Debtors. ........................................ 70

III.    The Bankruptcy Court Should Overrule the Objections to the Plan as it Relates to the EFH/EFIH Debtors. ...................................................................................... 71

A.    The Bankruptcy Court Should Overrule the EFIH First Lien Notes Trustee's and the EFIH Second Lien Notes Trustee's Objections. ........................................ 71

B.    The Proposed Fee Process for Review of 1L/2L Fees is Appropriate and Fair. ............. 101

C.    The Bankruptcy Court Should Overrule the Asbestos Objectors' Objection. ............... 103

D.    The U.S. Trustee's Objection Should be Overruled. ................................................... 111

Conclusion ...................................................................................................... 113

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 203 N. LaSalle St. Ltd. P'ship*,
190 B.R. 567 (Bankr. N.D. Ill. 1995) ................................................................. 46, 56, 59

*In re 222 Liberty Assocs.*,
108 B.R. 971 (Bankr. E.D. Pa. 1990) .......................................................................... 74

*In re 300 Washington St. LLC*,
528 B.R. 534 (Bankr. E.D.N.Y. 2015) ......................................................................... 61

*In re 4 Front Petroleum, Inc.*,
345 B.R. 744 (Bankr. N.D. Okla. 2006) ...................................................................... 96

*In re 785 Partners LLC*,
470 B.R. 126 (Bankr. S.D.N.Y. 2012) ......................................................................... 87

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ......................................................................... 46

*In re Adelphia Commc'ns Corp.*,
Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) ..................................... 50

*In re Adelphia Commc'ns Corp.*,
Case No. 02-41729, Adv. Pro. No. 03-4942 (Bankr. S.D.N.Y.) ................................. 82, 83

*In re Ahead Commc'ns Sys., Inc.*,
395 B.R. 512 (D. Conn. 2008) ..................................................................................... 37

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ....................................................................... 38, 45

*In re Ambanc La Mesa Ltd. P'ship*,
115 F.3d 650 (9th Cir. 1997) ...................................................................................... 56, 57

*In re AMR Corp.*,
Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) ...................................... 50

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006) ....................................................................................... 31

*In re Arnold & Baker Farms*,
85 F.3d 1415 (9th Cir. 1996) ...................................................................................... 73

*In re Arnold and Baker Farms*,
177 B.R. 648 (B.A.P. 9th Cir. 1994) .......................................................................... 76

## TABLE OF AUTHORITIES (CONT'D)

*In re ASARCO LLC*,
    No. 05-21207 (Bankr. S.D. Tex.) ................................................................ 82

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ............................................... 56, 57

*In re B.D. Int'l Disc. Corp.*,
    701 F.2d 1071 (2d Cir. 1983) ............................................................... 40

*In re Bank of New England Corp.*,
    No. 91-10126 (Bankr. D. Mass.) ........................................................... 84

*In re Big V. Holding Corp.*,
    267 B.R. 71 (Bankr. D. Del. 2001) ....................................................... 88

*In re Blitz U.S.A., Inc.*,
    Nos. 2007, 2008, 2005 & 2014, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) ......... 63

*In re Bonded Mailings, Inc.*,
    20 B.R. 781 (Bankr. E.D.N.Y. 1982) ................................................... 40

*In re Boston Generating LLC*,
    No. 10-14419, Adv. Pro. No. 12-01879 (Bankr. S.D.N.Y.) ..................... 83

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985) ................................................... 56

*In re Brice Rd. Devs., L.L.C.*,
    392 B.R. 274 (B.A.P. 6th Cir. 2008) ................................................... 49

*In re Bryant*,
    439 B.R. 724 (Bankr. E.D. Ark. 2010) ................................................ 74

*In re Burns & Roe Enters., Inc.*,
    No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ............... 31

*In re Busy Beaver Bldg. Centers, Inc.*,
    19 F.3d 833 (3d Cir. 1994) ................................................................ 101

*In re Cajun Elec. Power Coop., Inc.*,
    150 F.3d 503 (5th Cir. 1998) .............................................................. 42

*In re Calpine Corp.*,
    No. 05-60200 (Bankr. S.D.N.Y.) ........................................................ 82

*In re Century Glove, Inc.*,
    Civ. A Nos. 90-400-SLR & 90-401-SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993) ......... 46

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ......................................... 38, 45, 62

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Chemetron Corp. v. Jones,*
    72 F.3d 341 (3d Cir. 1995) .......................................................................................... 108

*In re Chemtura,*
    505 B.R. 427 (S.D.N.Y. 2015) ..................................................................................... 108

*In re Chemtura Corp.,*
    448 B.R. 635 (Bankr. S.D.N.Y. 2011) ........................................................................... 85

*Cherokee Nation v. United States,*
    270 U.S. 476 (1926) ............................................................................................... 98, 99

*In re Citadel Broad. Corp.,*
    Case No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010) ........................................ 50

*In re Coastal Broad. Sys., Inc.,*
    570 F. App'x 188 (3d Cir. 2014) .................................................................................... 33

*In re Congoleum Corp.,*
    No. 09-4371, 2010 WL 1850182 (D.N.J. May 7, 2010) ................................................ 42

*Connecticut v. Doehr,*
    501 U.S. 1 (1991) ............................................................................................... 106, 110

*In re Cont'l Airlines,*
    203 F.3d 203 (3d Cir. 2000) ..................................................................................... 63, 64

*In re Coram Healthcare Corp.,*
    315 B.R. 321 (Bankr. D. Del. 2004) .............................................................................. 33

*Corestates Bank, N.A. v. United Chemical Technologies, Inc.,*
    202 B.R. 33 (E.D. Pa. 1996) ......................................................................................... 57

*In re Croatan Surf Club, LLC,*
    No. 11-00194-8, 2011 WL 5909199 (Bankr. E.D.N.C. Oct. 25, 2011) ......................... 89

*In re DBSD N. Am.,*
    Case No. 09-13061 (REG) (Bankr. S.D.N.Y. July 5, 2011) ........................................... 50

*Devex Corp. v. Gen. Motors Corp.,*
    749 F.2d 1020 (3d Cir. 1984) ........................................................................................ 98

*In re Dow Corning Corp.,*
    No. 95-20512 (Bankr. E.D. Mich.) ................................................................................ 82

*In re Drexel Burnham Lambert Grp., Inc.,*
    960 F.2d 285 (2d Cir. 1992) .......................................................................................... 69

*In re Edison Mission Energy,*
    Case No. 12-49219 (JPC) (Bankr. N.D. Ill. Mar. 11, 2014) .......................................... 50

**TABLE OF AUTHORITIES (CONT'D)**

*In re Energy Future Holdings Corp.*,
    522 B.R. 520 (Bankr. D. Del. 2015) ........................................................................... 105

*In re Enron Corp.*,
    326 B.R. 497 (S.D.N.Y. 2005) .................................................................................... 69

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ........................................................................ 33, 63

*In re Foamex Int'l Inc.*,
    382 B.R. 867 (D. Del. 2008) ....................................................................................... 98

*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) .................................................................... 56

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ............................................................... 31, 32, 94

*In re Glob. Indus. Techs., Inc.*,
    No. 02-21626 (Bankr. W.D. Pa.) ................................................................................ 82

*In re Global Crossings, Ltd.*,
    Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Dec. 26, 2002) .................................... 50

*In re Global Safety Textiles Holdings LLC*,
    No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) .................. 31

*In re Goody's Family Clothing Inc.*,
    610 F.3d 812 (3d Cir. 2010) .................................................................................. 91, 92

*In re Granite Broadcasting Corp.*,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007) (Gropper, J.) ................................................. 59

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ............................................................................ 56

*In re Grossman's, Inc.*,
    607 F.3d 114 (3d Cir. 2010) ................................................................ 105, 107, 108, 109

*In re Hawaiian Telecom Commc'n, Inc.*,
    Case No. 08-02005 (Bankr. D. Haw. Dec. 30, 2009) ................................................ 50

*In re HSBC Bank USA, Nat. Ass'n v. Calpine Corp.*,
    No. 07 Civ 3088 (GBD), 2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) ................... 94

*Int'l Bhd. of Teamsters v. IML Freight, Inc.*,
    789 F.2d 1460 (10th Cir. 1986) .................................................................................. 86

*In re Inv. Co. of the Sw.*,
    341 B.R. 298 (B.A.P. 10th Cir. 2006) .................................................................. 73, 74

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re ION Media Networks, Inc.,*
419 B.R. 585 (Bankr. S.D.N.Y. 2009) ........................................................ 60

*In re Jacom Computer Servs., Inc.,*
280 B.R. 570 (Bankr. S.D.N.Y. 2002) ..................................................... 85, 86

*In re James Wilson Assocs.,*
965 F.2d 160 (7th Cir. 1992) .................................................................... 77

*In re JMO Wind Down Inc.,*
Case No. 16-10682 (BLS) (Bankr. D. Del Oct. 13, 2016) ........................... 86

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,*
987 F.2d 154 (3d Cir. 1993) ..................................................................... 33

*In re Johns-Manville Corp.,*
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ............................... 56, 57

*In re Journal Register Co.,*
407 B.R. 520 (Bankr. S.D.N.Y. 2009) ........................................................ 42

*In re Kaiser Aluminum Corp.,*
No. 02-10429(JKF), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006), *aff'd*, 343 B.R. 88 (D. Del. 2006) ................................................................................... 33

*Kane v. Johns-Manville Corp.,*
843 F.2d 636 (2d Cir. 1988) ..................................................................... 57

*In re Key3Media Grp., Inc.,*
336 B.R. 87 (Bankr. D. Del. 2005) ............................................................ 63

*In re Kosinski,*
409 B.R. 268 (Bankr. D. Mass. 2009) ........................................................ 98

*In re Lapworth,*
No. 97-34259DWS, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 3, 1998) ........... 39

*In re Laymon,*
958 F.2d 72 (5th Cir. 1992),
*cert. denied sub nom Crozier v. Bradford*, 506 U.S. 917 (1992) ................. 97, 98

*In re Lightsquared Inc.,*
513 B.R. 56 (Bankr. S.D.N.Y. 2014) ....................................................... 73, 76

*In re Lightsquared Inc.,*
Case No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) ......................... 50

*In re Lyondell Chem. Co.,*
No. 09-10023, Adv. Pro. No. 10-05525 (Bankr. S.D.N.Y.) ......................... 83

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) ........................................................................... 40

*In re Majestic Star Casino, LLC*,
    Case No. 09-14136 (KG) (Bankr. D. Del. Mar 10, 2011) ................................. 50

*In re Mariner Post-Acute Network, Inc.*,
    257 B.R. 723 (Bankr. D. Del. 2000)............................................................... 101

*In re Martin*,
    91 F.3d 389 (3d Cir. 1996) ............................................................................... 40

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ............................................................ 62

*In re Maxcom Telecommunicaciones, S.A.B. de C.V.*,
    Case No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013)............................. 50

*In re Mirant Corp.*,
    No. 03-46590DML11, 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007) ................................. 33

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007)............................................................................. 59

*In re Motors Liquidation Co.*,
    No. 09-50026, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y.) ............................ 82

*Mullane v. Cent. Hanover Bank & Trust*,
    339 U.S. 306 (1950) .......................................................................................... 9

*In re Murel Holding Corp.*,
    75 F.2d 941 (2d Cir. 1935)......................................................................... 74, 76

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984) ........................................................................................ 40

*Norgard v. Brush Wellman, Inc.*,
    No. 81899 2003 WL 21234940 (Ohio Ct. App. May 29, 2003) ....................... 88

*In re Philadelphia Newspapers, LLC*,
    599 F.3d 298 (3d Cir. 2010) .................................................................. 75, 91, 92

*In re Premier Int'l Holdings, Inc.*,
    No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010).......... 68

*In re Prime Motor Inns*,
    130 B.R. 610 (S.D. Fla. 1991).......................................................................... 96

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) ................................................................ 38, 68, 69

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Quigley Co., Inc.*,
377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ............................................... 34

*In re Rath Packing Co.*,
55 B.R. 528 (Bankr. N.D. Iowa 1985).......................................................... 61

*In re River East Plaza, LLC*,
669 F.3d 826 (7th Cir. 2011)....................................................................... 73

*River Road Hotel Partners, LLC v. Amalgamated Bank*,
651 F.3d 642 (7th Cir. 2011)................................................................. 75, 77

*Rourke v. Fred H. Thomas Assocs.*,
216 A.D.2d 717 (N.Y. App. Div. 1994) ...................................................... 98

*In re Sorenson Commc'ns, Inc.*,
Case No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) ......................... 50

*In re Sound Radio, Inc.*,
93 B.R. 849 (Bankr. D.N.J. 1988) ............................................................... 40

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010)............................................................ 64

*In re Spansion, Inc.*,
Case No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. Apr. 16, 2010) ......... 68

*In re Sparks*,
171 B.R. 860 (Bankr. N.D. Ill. 1994) .......................................................... 73

*In re Sun Country Dev., Inc.*,
764 F.2d 406 (5th Cir. 1985)....................................................................... 73

*In re T-H New Orleans Ltd. P'ship*,
116 F.3d 790 (5th Cir. 1997)....................................................................... 49

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010)............................................................. 90

*In re Temple Zion*,
125 B.R. 910 (Bankr. E.D. Pa. 1992) .......................................................... 77

*In re Terry Ltd. P'ship*,
27 F.3d 241 (7th Cir. 1994).................................................................... 97, 98

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
549 U.S. 443 (2007) .................................................................................... 97

*In re Trenton Ridge Inv'rs, LLC*,
461 B.R. 440 (Bankr. S.D. Ohio 2011) .................................................. 49, 57

## TABLE OF AUTHORITIES (CONT'D)

<u>Page(s)</u>

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) ................................................................. 50

*In re Tribune Co.*,
472 B.R. 223 (Bankr. D. Del. 2012), *vacated in part on other grounds*, No. 08-13141,
2014 WL 2797042 (D. Del. Jun. 18, 2014) ........................................................ 89

*In re Tribune Co.*,
476 B.R. 843 (Bankr. D. Del. 2012) ................................................................. 32

*In re Tribune Co. Fraudulent Conveyance Litig.*,
Case No. 11-2296 (S.D.N.Y. 2011) ................................................................. 83

*U.S. v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989) ...................................................................................... 91

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365 ................................................................................................ 76

*United States v. Reorganized CF & I Fabricators of Utah, Inc.*,
518 U.S. 213 (1996) ...................................................................................... 46

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) .................................................... 32, 34, 40, 52

*In re W.R. Grace & Co.*,
729 F.3d 311 (3d Cir. 2013) ..................................................................... 34, 49

*In re W.R. Grace & Co.*,
Case No. 01-01139 (Bankr. D. Del.) ............................................................... 83

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ........................................................ 62, 63, 67

*In re Wash. Mut., Inc.*,
461 B.R. 200 (Bankr. D. Del. 2011) ................................................................ 49

*In re Wash. Mut., Inc.*,
No. 08-12229 (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) ........................ 33

*Williams v. Placid Oil Co. (In re Placid Oil Co.)*,
753 F.3d 151 (5th Cir. 2014) ...................................................................... 108

*In re WorldCom, Inc.*,
No. 02-135333(AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ..................... 38

*Wright v. Owens Corning*,
679 F.3d 101 (3d Cir. 2012) ....................................................................... 108

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) .................................................................. 56, 62

**Statutes**

11 U.S.C. § 101(51D)(B) ................................................................................. 61

11 U.S.C. § 502(e) ........................................................................................... 95

11 U.S.C. § 509 ........................................................................................ 95, 96

11 U.S.C. § 1114(e) ........................................................................................ 54

11 U.S.C. § 1122(a) ........................................................................................ 32

11 U.S.C. § 1123(a) ............................................................................ 34, 35, 36

11 U.S.C. § 1123(b) ........................................................................................ 61

11 U.S.C. § 1125(b) ........................................................................................ 39

11 U.S.C. § 1126(f) ......................................................................................... 47

11 U.S.C. § 1126(c) ......................................................................................... 47

11 U.S.C. § 1126(g) ........................................................................................ 47

11 U.S.C. § 1127(a) ........................................................................................ 30

11 U.S.C. § 1129(a) ................................................................................. *passim*

11 U.S.C. § 1129(b) ................................................................................... 58, 59

11 U.S.C. § 1129(c) ........................................................................................ 60

N.Y. Gen. Oblig. Law § 5-527 ........................................................................ 98

**Rules**

Fed. R. Bankr. P. 3003(c) ............................................................................. 109

Fed. R. Bankr. P. 7023 ......................................................................... 105, 107

**Other Authorities**

7 Collier on Bankruptcy ¶ 1129.04[2] (16th ed.) ........................................... 58

Aswath Damodaran, DAMODARAN ON VALUATION 72 (2d ed. 2006) .................. 76

4 *Collier on Bankruptcy* ¶ 506.06 (16th ed. 2016) ......................................... 73

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

7 *Collier on Bankruptcy* ¶ 1129.03 (16th ed. 2016).................................................................94

7 *Collier on Bankruptcy* ¶ 1129.04 (16th ed. 2016).................................................................75

H.R. Rep. No. 95-595 ................................................................................................................39

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N.
    5936 .......................................................................................................................................32

S. Rep. No. 95-989.....................................................................................................................39

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N.
    5787 .......................................................................................................................................32

S. Rep. No. 95-989 (1978) .........................................................................................................37

The above-captioned debtors and debtors in possession file this memorandum of law (this "Brief") in support of confirmation of the *Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al.*, Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10551] (as modified, amended, or supplemented from time to time, the "Plan") as it relates to Energy Future Holdings Corp. ("EFH Corp."), its direct subsidiaries, Energy Future Intermediate Holdings Company, LLC and EFIH Finance Inc. (together, "EFIH"), and certain of their subsidiaries (collectively, and as defined in the Plan, the "EFH/EFIH Debtors").[2]    In support of confirmation of the Plan as it relates to the EFH/EFIH Debtors, and in response to the objections thereto (the "Objections" and, the parties raising the Objections, the "Objectors"),[3] the EFH/EFIH Debtors respectfully state as follows.[4]

---

[2]    Capitalized terms used but not defined in this Brief have the meanings ascribed to them in the Plan.

[3]    The following parties filed Objections:  (a) The United States Trustee (the "U.S. Trustee") [D.I. 10750]; (b) Delaware Trust Company, as indenture and collateral trustee for the first-lien notes issued by EFIH (the "EFIH First Lien Notes Trustee") [D.I. 10760]; (c) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacity as indenture trustee for the second-lien notes issued by EFIH (the "EFIH Second Lien Notes Trustee" and, together with the EFIH First Lien Notes Trustee, the "EFIH Secured Trustees") [D.I. 10762]; (d) Ad Hoc Group of TCEH Unsecured Noteholders (the "TCEH Unsecured Ad Hoc Group") [D.I. 10763]; (e) Shirley Fenicle, individually and as successor-in-interest to the Estate of George Fenicle, William Fahy, John H. Jones, and David Heinzmann (collectively, the "Asbestos Objectors") [D.I. 10756]; and (f) Somervell County, Somervell County Water Improvement District, Glen Rose ISD, Somervell Hospital District, Nolan County, Wes Texas Groundwater, Nolan County Hospital District, Sweetwater ISD, City of Sweetwater, Blackwell ISD (collectively, the "Taxing Units") [D.I. 10751].

The following party filed a joinder to the limited Objection filed by the TCEH Unsecured Ad Hoc Group: Law Debenture Trust Company of New York, as successor Indenture Trustee for the TCEH Unsecured Notes [D.I. 10763].

The following party filed a reservations of rights:  American Stock Transfer & Trust, as successor trustee for the EFH Unsecured Notes [D.I. 10754].

As set forth in the status chart, attached hereto as **Exhibit A**, the Debtors have resolved the Objections of Taxing Units.

[4]    The exhibits referenced herein are included as exhibits to the *Declaration of Jonathan F. Ganter, Esq. in Support of the Debtors' Memorandum of Law in Support of Confirmation of the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH/EFIH Debtors*, filed contemporaneously herewith.

## Preliminary Statement

1.      The Plan as it relates to the EFH/EFIH Debtors should be confirmed. Indeed, *no party*, save for the Asbestos Objectors who are repeating the same "due process" refrain that this Court has rejected time and again, is arguing that the Plan should not be confirmed. Furthermore, unlike the Plan confirmation hearing as it related to the TCEH Debtors, *no objecting party* or Class Impaired by the Plan is arguing that the EFH/EFIH Debtors failed to maximize the value of the EFH/EFIH Debtors' estates and the recoveries to EFH/EFIH stakeholders.

2.      As a result, and despite the voluminous papers filed, there are fundamentally only three bankruptcy-related issues standing between the EFH/EFIH Debtors and their long-trod path to chapter 11 exit. *First*, the EFIH Secured Trustees, on the one hand, and the EFH/EFIH Debtors and the Initial Supporting Creditors, on the other hand, disagree on the size and duration of the EFIH Claims Reserve. *Second*, the Asbestos Objectors are objecting to the Plan on the same "good faith" and "due process" grounds that have been addressed by this Court several times. *Third*, the TCEH Unsecured Ad Hoc Group has limited, narrowly-tailored objections to certain of the Plan provisions.[5]

3.      In a case that has grappled with competing stakeholder interests since its inception, it is no surprise that the vast majority of objectors are united in their insatiable desire for, quite simply, *more*. What are the EFIH Secured Creditors receiving? Cash. When are they receiving it? As soon as their Claims are Allowed. What is the source of their recovery? A segregated, interest-bearing account on which they will receive replacement Liens and, without prejudice to the rights the EFIH Secured Creditors have against the other under the EFIH

---

[5]      For the avoidance of doubt, the U.S. Trustee's Objection remains outstanding and is discussed in greater detail below.

2

Intercreditor Litigation. How much is being funded into the EFIH Claims Reserve? More than enough to satisfy all Claims that may become Allowed—and, in any event, the amount ordered by the Bankruptcy Court in the EFH Confirmation Order—including interest thereon (despite the EFH/EFIH Debtors' belief that contractual interest should not ultimately be Allowed on all the categories of asserted Claims), and with the preservation of the Bankruptcy Court's jurisdiction to further rule on, and make changes to, the EFIH Claims Reserve before and after the EFH Effective Date.

4.      And yet, this is not enough.  The EFIH Secured Trustees want the EFIH Claims Reserve to include distributions on account of future,  unliquidated, contingent Claims that (a) reflect amounts that are duplicative of the amounts already contemplated to be funded into the EFIH Claims Reserve (and, thus, constitute, at best, an unnecessarily over-stated cushion on potential EFIH Secured Creditor Claims); (b) effectively punish junior creditors while EFIH Secured Creditors pursue what are baseless claims; or (c) require the Court to ignore explicit provisions of the Bankruptcy Code and directly applicable case law as a predicate to Allowance of such Claims.  In addition to locking away an unknown amount of dollars to the EFIH Claims Reserve on account of such tenuous Claims, the EFIH Secured Trustees also request that the EFIH Claims Reserve accrue interest on such tenuous Claims for an infinite number of years.  In support of this latter proposition, the EFIH Secured Trustees cite a hand-picked assortment of cases, from courts around the country, involving factual and procedural postures completely unrelated to the issues at hand, to show that *some* bankruptcy litigation can take more than three years.

5.      One must wonder why the EFIH Secured Trustees are going to such extreme lengths to gorge the EFIH Claims Reserve with every last possible dollar of Plan recovery for an

undetermined number of years.  The answer, of course, lies in the very first sentence of the EFIH Second Lien Notes Objection:  "[i]t is regrettable that the Debtors have decided to abandon a settlement of the Makewhole Claims . . . they made this decision at the behest of the PIK Noteholders . . . ."[6]  Trying to force closure on the Makewhole Litigation by other means, the EFIH Secured Trustees seek to simply starve junior stakeholders of any distribution for a significant period of time.  The Bankruptcy Code neither requires nor permits this result.

6.      Pushing past the assertions of jilted oversecured creditors, the fact remains:  the EFIH Claims Reserve more than adequately protects the interests of the EFIH Secured Creditors by providing prompt satisfaction of any Allowed Claims in full, in Cash, for a period of three years (a generous period of time to resolve the Makewhole Litigation and, as applicable, the EFIH Intercreditor Litigation) and with this Court retaining jurisdiction to fashion a remedy should three years not suffice.  The EFIH Claims Reserve does not inequitably punish junior EFIH creditors by escrowing every last dollar of distributable value on account of spurious claims.  Yet, this is simply not enough for the EFIH Secured Trustees.

7.      Similarly, the EFH/EFIH Debtors have offered the Asbestos Objectors (a) Reinstatement of their Claims, in full, with no limits or caps imposed by the Plan on the recovery of any ultimately Allowed Claim (i.e., the very truest sense of Unimpairment) and (b) multiple opportunities to be heard on whether the Plan violates the due process rights of unmanifested asbestos claimants (i.e., there is little doubt the Asbestos Objectors have had an opportunity, however unsuccessfully, to make their due process arguments at least eight times in these chapter 11 cases).  Yet, this is simply not enough for the Asbestos Objectors.

---

[6]     EFIH Second Lien Notes Trustee Obj. ¶ 1.

8.      Finally, the TCEH Unsecured Ad Hoc Group filed a narrow objection to the third-party releases being provided to the Plan Sponsor.  In an effort to accommodate their once deal partner, the EFH/EFIH Debtors, with the support of the Plan Sponsor, agreed to carve out of the third-party release any claims related to the pursuit of regulatory approvals under the Hunt Plan.  In other words, the only possible claims the TCEH Unsecured Ad Hoc Group could ever possibly hope to bring against the Plan Sponsor (the party providing nearly $10 billion in consideration under the Plan) have already been carved out of the release.  Yet, this is simply not enough for the TCEH Unsecured Ad Hoc Group.

9.      In short, contrary to the sentiments of Leo Tolstoy, in this case, all of the EFH/EFIH Debtors' unhappy creditors are unhappy in the same way.[7]  Despite providing each dissenting creditor with a fair and measured result—immediate Cash for all Allowed Claims and a reserve for all future Claims that may reasonably become Allowed for the EFIH Secured Creditors, Reinstatement and multiple opportunities to be heard on the very same issue for the Asbestos Objectors, and a substantial Release carve-out at the request of the TCEH Unsecured Ad Hoc Group—each such dissenting creditor wants more.  Acutely aware of their fiduciary duty obligations to *all* stakeholders, the EFH/EFIH Debtors have worked to balance multiple, fiercely-competing interests.  The product of those efforts is the Plan.  For these reasons, as will be set forth in greater detail below and in the record at trial, the Court should overrule the Objections and confirm the Plan as it relates to the EFH/EFIH Debtors.

---

[7]      LEO TOLSTOY, ANNA KARENINA 1 (Richard Pevear & Larissa Volokhonsky trans., Penguin Books 2000) (1877) ("All happy families are alike; each unhappy family is unhappy in its own way.").

KE 45079065.28

## Brief Roadmap

| Argument | Location |
|---|---|
| Affirmative Case | ¶ 49 |
| Response to EFIH Secured Trustees Objections to Proposed Amount to Be Escrowed in the EFIH Claims Reserve | |
|  o Indubitable Equivalent | ¶ 134 |
|  o Length of Escrow Period | ¶ 147 |
|  o Future Interest Claims | ¶ 159 |
|  o Indemnification and Breach Claims | ¶ 173 |
|  o Claim for Daily Compounding of Interest | ¶ 176 |
| Response to EFIH Secured Trustees Objections to Other Plan Provisions | |
|  o Injunction Provision | ¶ 132 |
|  o Liens on the EFH Distribution Account | ¶ 39 |
|  o The Fee Review Process | ¶ 180 |
| Response to TCEH Unsecured Ad Hoc Group Objection to Third-Party Releases for the Plan Sponsor | ¶ 117 |
| Response to Asbestos Objectors | |
|  o Proposal in Good Faith | ¶ 185 |
|  o No Due Process Violation | ¶ 189 |
| Response to U.S. Trustee Objection to Payment of Fee and Expense Claims of Holders of EFH and EFIH Unsecured Notes Claims | ¶ 200 |

KE 45079065.28

**Background**

## I.    The Original Plan.

10.    The Debtors' restructuring journey began in mid-2012.  After three years of exploring every viable restructuring option, the EFH/EFIH Debtors and the TCEH Debtors, Hunt Consolidated, Inc., and certain co-investors (collectively, the "Hunt Consortium"), and virtually all significant TCEH stakeholders entered into a plan support agreement (the "Original PSA").[8]

11.    The Original PSA contemplated a merger sponsored by the Hunt Consortium and members of the TCEH Unsecured Ad Hoc Group (the "Hunt Merger"), pursuant to which EFIH's interest in Oncor Electric Delivery Company LLC ("Oncor") would be converted to a real estate investment trust (a "REIT").  The Bankruptcy Court approved the Debtors' entry into the Original PSA on September 18, 2015, and confirmed the plan of reorganization implementing the transactions contemplated by the Hunt Merger on December 9, 2015 [D.I. 6097, 7285] (the "Original Plan").

12.    In parallel with the Original Plan, the Debtors obtained Bankruptcy Court approval of an unprecedented settlement agreement that resolved billions of dollars in potential litigation related to three broad categories of prepetition claims:   (a) inter-Debtor Claims; (b) claims against the TCEH First Lien Creditors; and (c) claims against the Sponsors and against the Debtors' directors and officers (the "Settlement Agreement") [D.I. 7243].[9]   The Settlement Agreement remains binding on all parties.

---

[8]    The TCEH Debtors and EFH Shared Services Debtors emerged from chapter 11 on October 3, 2016 [D.I. 9742] (the "TCEH Effective Date").  The terms "TCEH Debtors" and "EFH Shared Services Debtors" shall refer to such entities as they existed prior to the TCEH Effective Date.  The terms "Reorganized TCEH" and "Reorganized EFH Shared Services Debtors" shall refer to such entities on and after the TCEH Effective Date.

[9]    Additional details regarding the expansive scope of prepetition claims settled and released by the Settlement Agreement are set forth in the *Motion of Energy Future Holdings Corp.*, et al., *to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter Into and Perform Under the Settlement Agreement* [D.I. 5249].

7

13.     Post-confirmation, the Debtors worked to effectuate the transactions contemplated by the Original Plan, including the Hunt Merger.   Under the Original PSA, the parties' obligations to support the Original Plan could terminate under certain circumstances on April 30, 2016 (the "Plan Support Outside Date") if all required regulatory approvals from the PUC had not been obtained by such date.  By March 2016, however, it became apparent that the regulatory conditions necessary to consummate the Hunt Merger might not all be obtained on the timeline set forth in the Original PSA.

14.     On March 24, 2016, the PUC entered an order regarding the Oncor change of control application submitted by the Hunt Consortium and Oncor (the "PUC Order").  The PUC Order did not include all of the approvals required to consummate the Hunt Merger, including with respect to the terms of the initial lease between Oncor AssetCo and OEDC (requiring a separate proceeding for such approval).[10]

15.     Because the PUC Order did not include all of the approvals required for consummation of the Original Plan and the Hunt Merger, the Plan Support Outside Date was not automatically extended.  On April 30, 2016, the investor parties that are party to the Original PSA indicated that they would not elect to extend the Plan Support Outside Date.  As a result, the TCEH First Lien Creditors delivered a Plan Support Termination Notice (as defined in the Original PSA) to the Debtors and the Required Investor Parties (as defined in the Original PSA), which caused the Original Plan to become null and void. Shortly thereafter, the EFH/EFIH Debtors terminated the agreement governing the Hunt Merger.

16.     Following the termination of the Hunt Merger agreement, the EFH/EFIH Debtors stood at a crossroads in their restructuring efforts.   While the Original PSA provided certain

---

[10]     *See, e.g.*, Ex. A, DX670 Mar. 24, 2016 PUC Order ¶ 191-92.

KE 45079065.28

Alternative Restructuring Terms governing the TCEH Debtors, that allowed the TCEH Debtors to quickly pivot to an alternative transaction, no such terms existed for the EFH/EFIH Debtors. Three primary considerations drove the EFH/EFIH Debtors' restructuring efforts following the termination of the Hunt Merger agreement. ***First***, because the Debtors had not yet obtained the private letter ruling from the Internal Revenue Service, and because of the expiration of statutory exclusivity, the TCEH First Lien Creditors had indicated their willingness to pursue a taxable separation of EFCH and the TCEH Debtors from EFH Corp. Such a taxable separation would, in light of the rulings ultimately received from the Internal Revenue Service, likely have triggered a massive tax obligation at EFH Corp. and a taxable separation of the EFIH Debtors from EFH Corp. (likely triggering another massive tax obligation). A double separation tax would unambiguously have a catastrophic effect on the value of the EFH Debtors and EFIH Debtors and had to be avoided at all costs. ***Second***, at various points in the EFH/EFIH Debtors' chapter 11 cases, different creditor constituencies had expressed an interest in purchasing EFH Corp.'s indirect economic interest in Oncor, but these expressions of interest had never coalesced into an actionable proposal, either because the parties could not agree on mutually acceptable financing terms, or because the parties' parochial interests left them irreparably divided. In other words, history had proven that in the absence of the EFH/EFIH Debtors putting forth a proposal to push parties to the negotiating table, creditor constituencies would continue to remain embroiled in conflict. ***Third***, years of formal and informal efforts to market EFH Corp.'s economic interests in Oncor in the face of fluctuating commodity prices provided key intelligence regarding the value potential purchasers ascribed to such economic interests. With these considerations in mind, the Debtors filed a revised chapter 11 plan on May 1, 2016 (within minutes of terminating the Hunt Merger agreement). With respect to the TCEH Debtors and the

EFH Shared Services Debtors, the Plan reflected the Alternative Restructuring Terms set forth in the Original PSA (as defined therein). With respect to the EFH/EFIH Debtors, the Plan contemplated either a standalone equitization or an investment by existing creditors and/or third-parties to purchase EFH's indirect economic interests in Oncor.

## II.    Development of Current Plan.

### A.    Between May 1, 2016 and November 17, 2016, the EFH/EFIH Debtors Pushed Forward on a Path to Exit.

17.    Earlier marketing efforts indicated which third-parties had the financial wherewithal and interest in purchasing EFH Corp.'s indirect economic interest in Oncor. As a result, substantially contemporaneously with the filing of the revised plan on May 1, 2016, the EFH/EFIH Debtors reached out to potential investors that had previously expressed an interest in Oncor. After contacting eighteen potential strategic and financial bidders, signing nondisclosure agreements with eight potential bidders, and engaging in extensive negotiations with three bidders, the boards of directors and managers of EFH Corp. and EFIH approved the execution of the Merger Agreement and the PSA with the Plan Sponsor on July 28, 2016 (the "NEE Merger Agreement" and the "NEE PSA," respectively).[11] Eight days later, the EFH/EFIH Debtors filed a revised plan and related disclosure statement reflecting the deal with the Plan Sponsor [D.I. 9199, 9200, respectively]. Following execution of the NEE Merger Agreement and NEE PSA, the EFH/EFIH Debtors continued to engage in negotiations with the Plan Sponsor to ensure that the NEE Merger Agreement provided a value-maximizing transaction to the EFH/EFIH Debtors' estates. These discussions were productive and, on September 18, 2016, the Plan Sponsor agreed to increase its purchase price by $300 million to approximately $4.4 billion (for a total

---

[11]    For more information regarding the Oncor marketing process, see the *Motion of the EFH/EFIH Debtors for Order (A) Authorizing Entry into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9190].

contribution of approximately $9.8 billion, after accounting for the satisfaction of obligations under the EFIH First Lien DIP Facility) and decrease the amount of the funds in the Merger Sub Cash Account deposited into the Asbestos Account (as defined in the NEE Merger Agreement) by $150 million to $100 million.[12]   As a result of this additional distributable value for the benefit of the EFH/EFIH Debtors' creditor constituencies, certain funds and accounts advised by Fidelity Management & Research Company ("Fidelity") became party to the NEE PSA.  Fidelity is the largest single Holder of EFH unsecured Claims and a significant holder of EFIH Second Lien Note Claims.[13]

18.    With the support of Fidelity in hand, the Bankruptcy Court entered an order on September 19, 2016 [D.I. 9584] authorizing the EFH/EFIH Debtors' entry into the NEE Merger Agreement and the NEE PSA.   Importantly, the Bankruptcy Court approved a $275 million termination fee as an administrative expense claim in the event of certain termination events under the NEE Merger Agreement (the "Termination Fee").[14]   That same day, the Bankruptcy Court entered an order [D.I. 9585] (the "EFH/EFIH Disclosure Statement Order") approving the *Amended Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Energy*

---

[12]   "*Merger Sub Account*" means a segregated, restricted account, and invested and disbursed in accordance with that certain escrow agreement, dated as of the EFH Effective Date, between Merger Sub and U.S. Bank National Association, and used solely to satisfy Allowed Legacy General Unsecured Claims Against the EFH Debtors that are based on asbestos claims and related costs, including court costs, expert witness costs, attorneys' fees, the cost to procure insurance and all other related costs from time to time during the fifty year term of the escrow agreement and, to the extent any balance (including accrued interest, if any) remains at the end of such term, such balance shall only be paid over to a charity specified in accordance with the terms of such escrow agreement.  Plan, Art. I.A.280.

[13]   Following entry of the EFH Confirmation Order, but prior to the EFH Effective Date, the EFH/EFIH Debtors have agreed to file a motion seeking to satisfy Fidelity's reasonable and documented accrued and unpaid fees and expenses from the Petition Date under section 503(b) of the Bankruptcy Code.  All parties in interest will have an opportunity to be heard in connection with such motion.

[14]   NEE Merger Agreement § 8.5(b).  In the event the Termination Fee is triggered, all parties have reserved their rights regarding the allocation of the Termination Fee to the EFH Debtors, on the one hand, and the EFIH Debtors, on the other hand.

*Future Holdings Corp.,* et al*., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9616] (the

"Prior Disclosure Statement") and authorizing the EFH/EFIH Debtors to solicit votes to accept

or reject the *Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et

al*., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 9612] (the "Prior Plan") from Holders

of Claims and Interests against the EFH/EFIH Debtors who are entitled to vote (the "Prior Plan

Solicitation").   Among other key terms, the Prior Plan required that (a) the EFIH First Lien

Makewhole Claims and EFIH Second Lien Makewhole Claims (collectively, the "Makewhole

Claims") be Disallowed Makewhole Claims (*i.e.*, that the order that had been issued by the

Bankruptcy Court disallowing such Claims not be stayed, reversed, or remanded on appeal as of

the EFH Effective Date) as a condition to the occurrence of the EFH Effective Date (the

"Makewhole Condition Precedent") and (b) if the Plan Sponsor determines to waive the

Makewhole Condition Precedent (which it could do, in its sole discretion), the Plan Sponsor

would have to pay in full, in Cash, any Allowed Makewhole Claims without reducing recoveries

to Holders of Allowed Class B6 Claims (the "PIK Top-Up").[15]

**B.    The Makewhole Landscape Shifts, Necessitating Plan Modifications.**

19.    On November 17, 2016, just three weeks before the hearing to consider

confirmation of the Prior Plan (the "EFH Confirmation Hearing") was scheduled to commence,

the United States Court of Appeals for the Third Circuit (the "Third Circuit") issued an opinion

regarding the Makewhole Claims (the "Makewhole Opinion").   As a result of the Makewhole

Opinion, the Makewhole Claims were neither Disallowed Makewhole Claims nor Allowed

Makewhole Claims: in other words, the Makewhole Condition Precedent could no longer be

satisfied.   In light of the holding in the Makewhole Opinion, the EFH/EFIH Debtors determined

---

[15]    Prior Plan, Art. VI.A n.3.

to adjourn the EFH Confirmation Hearing to allow time to engage in further discussions with key creditor constituencies and the Plan Sponsor.[16]

20.     On November 30, 2016, the EFH/EFIH Debtors' chief restructuring officer and the EFH/EFIH Debtors' respective boards of directors approved, in an exercise of their respective fiduciary duties, a term sheet (the "CRO Term Sheet") for distribution to those Holders of EFIH First Lien Note Claims, Holders of EFIH Second Lien Note Claims, and Holders of EFIH Unsecured Note Claims that agreed to enter into confidentiality agreements temporarily restricting their ability to trade EFIH securities.  The CRO Term Sheet was intended to provide a framework for negotiations and to drive EFIH constituencies toward a consensual path forward.

21.     In the meantime, on December 1, 2016, the EFH/EFIH Debtors filed the *Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et. al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10290] and the *Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors* [D.I. 10293], deleting the Makewhole Condition Precedent and PIK Top-Up, and making certain other modifications.[17]  The EFH/EFIH Debtors also filed a motion seeking to re-solicit the votes of Holders of Class B6 Claims as a result of such modifications.

---

[16]    *See Notice Regarding Scheduling Order and Commencement of Plan Confirmation Proceedings* [D.I. 10235].

[17]    *See* EFH/EFIH Disclosure Statement § I.C.1.G ("Specifically, the Plan filed on December 1, 2016 was amended to reflect the following key changes:

- **Deletion of Makewhole Condition Precedent**.  The condition precedent to consummation of the Plan requiring the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims to be Disallowed Makewhole Claims is eliminated.

- **Limited Liens for the Benefit of the EFIH Secured Trustees**.  As set forth in Article III.B.19 and Article III.B.20 of the Plan, the EFIH Secured Trustees will be granted Liens on the EFH/EFIH Distribution

13

22.     Throughout December 2016, the EFH/EFIH Debtors actively negotiated with certain EFIH Secured Creditors,[18] an ad hoc group of approximately 60% of the aggregate, outstanding principal amount of the EFIH Unsecured Note Claims (the "PIK Group"), and the Plan Sponsor regarding the further pursuit of litigation regarding the Makewhole Claims (collectively, the "Makewhole Litigation") and the possible reallocation of consideration from the Plan Sponsor under the Plan.  The EFH/EFIH Debtors first reached an agreement in principle with certain of the EFIH Secured Creditors on December 14, 2016, subject to approval by the EFH/EFIH Debtors' respective boards of directors and the execution of acceptable documentation reflecting the agreed terms (the "EFIH Secured Creditor Settlements").  Among other things, the EFIH Secured Creditor Settlements provided for EFIH Secured Creditors to receive recoveries on account of their Makewhole Claims of between approximately 85 and 97 percent, depending on whether the plan reflecting the EFIH Secured Creditor Settlements was accepted by Holders of EFIH Unsecured Note Claims (and the timing of that support).[19]  The PIK Group was not on board for the settlements.  On December 16, 2016, the EFH/EFIH

---

Account, up to the asserted amount of their respective Makewhole Claims.  Such Liens will survive for the benefit of the respective Indenture Trustee until such time their respective Makewhole Claim has either been (a) Allowed, and paid in full, in Cash from the EFH/EFIH Distribution Account or (b) disallowed by Final Order.  The Lien will not extend to the value of any EFH cash included in the EFH/EFIH Distribution Account.

- **Elimination of PIK Top-Up**.  As set forth in Article VI.A. of the Plan, recoveries to Holders of Allowed Class B6 Claims may be reduced to first satisfy any Allowed EFIH First Lien Makewhole Claims or EFIH Second Lien Makewhole Claims.

- **Satisfaction of Allowed Makewhole Claims**.  As set forth in Article VI.A. of the Plan, any Allowed EFIH First Lien Makewhole Claims or Allowed EFIH Second Lien Makewhole Claims will be satisfied from the EFH/EFIH Distribution Account.").

[18]     "EFIH Secured Creditors" means, collectively, the EFIH Secured Trustees and Holders of EFIH First Lien Note Claims and EFIH Second Lien Note Claims.

[19]     For more information regarding the EFIH Secured Creditor Settlements, see the *Disclosure Statement for the Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors* [D.I. 10446], filed on December 28, 2016.

14

Debtors' respective boards of directors approved the EFIH Secured Creditor Settlements, subject to the explicit, undisputed understanding that execution of such settlements would not foreclose the EFH/EFIH Debtors' ability to continue exploring other viable paths to emergence.[20]

23.    Contemporaneously, the PIK Group approached the EFH/EFIH Debtors with an alternative proposal, which the EFH/EFIH Debtors recognized had the potential to better maximize value for the greatest number of their stakeholders (the "PIK Proposal").  The PIK Proposal had the benefits of (a) eliminating a "cramdown" fight with a significant EFIH stakeholder; (b) providing a 100% economic recovery to the EFIH First Lien Creditors and EFIH Second Lien Creditors; (c) allowing EFH Corp. creditors to realize the value of EFH Cash on hand as of the EFH Effective Date; and (d) preserving the appellate rights of all interested parties in connection with the Makewhole Litigation.

24.    The EFH/EFIH Debtors (through their respective boards of directors and managers) agreed to consider the PIK Proposal only if the PIK Group satisfied three key conditions:   (a) the PIK Group obtained support from at least 66.67% of the aggregate, outstanding principal amount of the EFIH Unsecured Note Claims; (b) the PIK Group ensured that none of the EFH/EFIH Debtors, their successors, or EFH Corp. stakeholders could be required to bear any of the costs of the ongoing Makewhole Litigation; and (c) the PIK Group provided ironclad assurances with respect to the escrowing of Oncor sales proceeds in an amount ultimately determined by this Court that would protect EFIH Secured Creditors in the event that their Makewhole Claims were ultimately Allowed.

25.    As December 2016 drew to a close, the EFIH Secured Creditor Settlements and the PIK Proposal all remained under negotiation.  Mindful of the fast-approaching Disclosure

---

[20]    Ex. B, DX112 Dec. 16, 2016 Minutes of Meeting of Joint Boards [EFH06592909].

Statement Hearing—set for January 4, 2017—and the milestone in the NEE PSA for obtaining an order confirming the Plan as it relates to the EFH/EFIH Debtors by February 22, 2017, the EFH/EFIH Debtors filed a revised plan and related disclosure statement reflecting both alternatives.[21] Soon thereafter, the PIK Group and the EFH/EFIH Debtors reached agreement on each of the EFH/EFIH Debtors' key conditions, and the PIK Group sought and obtained the support of over 66.67% of the aggregate, outstanding principal amount of the EFIH Unsecured Note Claims (collectively, the "Initial Supporting Creditors").  As a result, the EFH/EFIH Debtors and their respective boards of directors and managers determined to proceed with the PIK Proposal and, on January 3, 2017, the EFH/EFIH Debtors filed a revised plan and related disclosure statement, reflecting that selection.  In addition to Holders of Class B6 Claims, the EFH/EFIH Debtors determined to resolicit the votes of EFIH Secured Creditors in the hopes that such Holders would support a plan that provided 100% economic recovery on account of Allowed Claims.

26.    On January 4, 2017, the Bankruptcy Court entered an order [D.I. 10560] (the "Supplemental Disclosure Statement Order") approving the *Disclosure Statement for the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al*., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10533] (the "EFH/EFIH Disclosure Statement"), binding Holders of Claims and Interests, other than Holders of Claims in Class B3, Class B4, and Class B6 (the "Resolicitation Classes"), to the ballots such Holders submitted in connection with the Prior Plan Solicitation, and authorizing the EFH/EFIH Debtors to solicit votes to accept or reject the Plan from Holders of Claims and Interests in Class B3, Class B4, and Class B6 (the "Limited Resolicitation").

---

[21]    *See id.*; the *Sixth Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et. al*., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10453].

16

KE 45079065.28

27.     Following entry of the Supplemental Disclosure Statement Order, which established January 4, 2017 as the Resolicitation Voting Record Date and February 3, 2017 as the Resolicitation Voting Deadline, the EFH/EFIH Debtors undertook and completed the Limited Resolicitation.  Concurrently, the EFH/EFIH Debtors continued to seek ways to maximize and further improve the treatment and protections provided to all their creditor constituencies under the Plan.

## III.    Development of EFIH Claims Reserve Fail-Safe: "Top-Up Tap-Out" Structure.

28.     The EFH/EFIH Debtors included the Holders of Class B3 Claims and Holders of Class B4 Claims in the Limited Resolicitation (instead of seeking to preserve such Holders' votes to reject the Plan that were cast in connection with the Prior Plan Solicitation) in the hope that reason would prevail, and such Holders would vote to accept a Plan that provided payment in full, in Cash of Allowed Claims, significant replacement Liens, and limited legal impairment.

29.     At the same time, the EFIH Secured Trustees expressed a concern that the proposed three-year duration of the EFIH Claims Reserve combined with (a) the significant interest run rate on the asserted Makewhole Claims and (b) the potential, no matter how remote, that a court may, in the future, allow the Future Interest Claims and/or Trustee Indemnification Claims by Final Order (described below), created the risk that Holders of EFIH First Lien Note Claims and EFIH Second Lien Note Claims would not ultimately be paid in full on account of their Allowed Claims.

30.     In the spirit of alleviating such concerns and in the hopes of generating additional consensus, the Initial Supporting Creditors and the EFH/EFIH Debtors worked to develop additional safety valves in the EFIH Claims Reserve, as described in the second amended EFH Plan Supplement filed on February 2, 2017 [D.I. 10752] (the "Second Amended EFH Plan Supplement").  Colloquially known as "Top-Up Tap Out," these provisions required the

EFH/EFIH Debtors or EFH Plan Administrator Board and the Initial Supporting Creditors to provide periodic reporting to the EFIH First Lien Notes Trustee and the EFIH Second Lien Notes Trustee regarding the size of the EFIH Claims Reserve as compared to the size of Claims asserted against the EFIH Claims Reserve as of the date of comparison.  If, based on such periodic reporting, the EFIH Claims Reserve had fallen below a certain threshold, the EFIH First Lien Notes Trustee, the EFIH Second Lien Notes Trustee, or any Holder of EFIH First Lien Notes and EFIH Second Lien Notes could request a hearing with the Bankruptcy Court and entry of an order modifying the EFIH Claims Reserve.[22]  For reasons the Bankruptcy Court is aware of, the EFH/EFIH Debtors withdrew the Second Amended EFH Plan Supplement.  Nevertheless, the idea of augmenting the EFIH Claims Reserve long before there could be a deficit and/or terminating any remaining litigation (again, long before there would be a deficit) is an obvious one—and one that goes hand in hand with this Court's continuing retention of jurisdiction under the Plan and EFH Confirmation Order.

**IV.    Overview of EFIH Claims Reserve Mechanics.**

**A.    Overview of Recovery and Distribution Mechanics**.

31.    The Plan in its simplest form is a waterfall plan that distributes proceeds from the NEE Merger in accordance with the priority scheme set forth in the Bankruptcy Code.  The EFH/EFIH Distribution Account serves as the primary means of distributing consideration to Holders of Allowed Claims asserted against the ***EFIH*** Debtors. Holders of Allowed Claims

---

[22]    The Top-Up Tap-Out structure also provided clarity on two potential, post-confirmation pleadings that may be filed by parties other than the EFH/EFIH Debtors.  First, the Makewhole Litigation Oversight Committee may file a pleading seeking to reduce the size of the EFIH Claims Reserve or the duration of the EFIH Claims Reserve, in each case as compared to what is set forth in the EFH Confirmation Order.  Second, following the disallowance by Final Order of the Makewhole Claims, the Makewhole Litigation Oversight Committee may request that the funds previously set aside on account of such Makewhole Claims be distributed to Holders of EFIH unsecured Claims.  These are post-confirmation rights the Makewhole Litigation Oversight Committee has always had.  The rights of the EFIH Secured Creditors to challenge these pleadings are fully preserved.

asserted against the **EFH** Debtors will receive their Pro Rata distribution of the EFH Creditor Recovery Pool (excluding Holders of Allowed EFH Non-Qualified Benefit Claims, who will receive Cash on the EFH Effective Date on account of their Allowed Claims).[23]

32.    In other words, Holders of Allowed Claims against the **EFIH** Debtors are expected to receive a largely Cash recovery from the EFIH Claims Reserve and Holders of Allowed Unsecured Claims against the **EFH** Debtors are expected to receive a largely stock recovery in the form of Reorganized EFH Class A Common Stock (that will convert into NextEra Class A Common Stock upon the closing of the NextEra Merger), representing, at minimum, the value of Cash on hand at EFH Corp. as of the EFH Effective Date.

**B.    Priority of Accounts Within EFH/EFIH Distribution Account.**

33.    The EFIH Claims Reserve will be a segregated account within the EFH/EFIH Distribution Account.  As defined in the Plan, the EFH/EFIH Distribution Account consists of one or more interest-bearing escrow accounts, designated by EFH Corp. before the EFH Effective Date to hold (a) Cash consisting of (1) the Merger Sub Cash Amount, (2) the Cash distributed to satisfy Allowed EFH Non-Qualified Benefit Claims, (3) the EFIH Unsecured Creditor Cash Pool, and (4) any other amounts to be funded pursuant to the terms of the Plan or Merger Account and (b) Reorganized EFH stock (which will be exchanged for NextEra stock) approximately equal to the difference between the Cash on hand at EFH Corp. as of the EFH Effective Date (after accounting for reduction for, among other things, estimates of Administrative Claims and Priority Claims) and the Reorganized EFH Class A Common Stock

---

[23]    The EFH Creditor Recovery Pool consists of (a) the Reorganized EFH Class A Common Stock (which will convert into the right to receive NextEra Class A Common Stock) and (b) Cash remaining in the EFH/EFIH Distribution Account after satisfaction of Allowed Claims against EFIH Debtors and Allowed Administrative and Priority Claims asserted against the EFH Debtors, *provided*, *however*, that to the extent such Cash would cause a violation of certain continuity of interest requirements under the Internal Revenue Code and applicable provisions, Holders of Allowed Unsecured Claims asserted against the EFH Debtors will receive Reorganized EFH Class A Common Stock instead of Cash.

distributed on the EFH Effective Date (such stock segregated within the EFH/EFIH Distribution Account, the "Makewhole Stock Reserve").[24]

34.     The EFH/EFIH Debtors anticipate that in addition to the Makewhole Stock Reserve and the Limited EFH Cash Reserve (defined below), approximately six segregated accounts will be established within the EFH/EFIH Distribution Account, reflecting the following priority structure:[25]

---

[24]   The Debtors intend that a minimum of $151 million of Reorganized EFH stock will be issued in the aggregate, after accounting for the issuance to Holders of Claims against EFH Corp. and Makewhole Stock Reserve. Certain adjustments to the Makewhole Stock Reserve may be necessary to account for certain items that cannot be known until closer to the Effective Date, including (a) adjustments that may be necessary to account for differences between the value of the Reorganized EFH stock as determined for tax purposes, on one hand, and as determined pursuant to the Merger Agreement, on the other hand; (b) in the event adjusted Cash on hand at EFH Corp. declines under below anticipated levels, the Makewhole Stock Reserve may need to be increased to ensure that the total amount of Reorganized EFH common stock being issued is at least $151 million; and (c) any modifications or alterations that are necessary to satisfy applicable continuity of interest requirements in light of the rulings ultimately received from the Internal Revenue Service.  Second Amended EFH Plan Supplement, at Exhibit C3.

[25]   The number of accounts within the EFH/EFIH Distribution Account is being provided for illustrative purposes only and is subject to further modification consistent with the Plan and EFH Confirmation Order.

KE 45079065.28



**C.    Composition of Claims Accounted for in the EFIH Claims Reserve.**

**i.    Amounts and Claims to be Included in the EFIH Claims Reserve.**

35.    The EFH/EFIH Debtors propose to escrow $1.301 billion on account of EFIH Secured Creditors' Claims that are not anticipated to become Allowed before the EFH Effective Date.[26] Consistent with the terms of the Plan, this amount represents the aggregate present value of:

> a.    the value of the EFIH First Lien Makewhole Claims and the EFIH Second Lien Makewhole Claims, including interest on interest and Additional Interest at the contract rate for a period of three years;

---

[26]    *See Stipulation and Agreement* [D.I. 10776], at <u>Exhibit A</u> (showing that a $1.301 billion reserve will cover the EFIH Secured Creditors' claims in full assuming that all principal is paid on account of the EFIH Second Lien Notes on the EFH Effective Date, three years is sufficient, and semi-annual compounding).

    b. the pre-EFH Effective Date fees and expenses incurred by the EFIH Secured Creditors, including interest thereon at the contract rate (although the EFH/EFIH Debtors and the PIK Group reserve the right to argue at a later date that no interest should be permitted on the Secured Creditor Fees); and

    c. the EFH/EFIH Debtors' good faith—and generous—estimate of the post-EFH Effective Date fees and expenses to be incurred by the EFIH Secured Creditors for a period of three years, including interest thereon (although the EFH/EFIH Debtors and the PIK Group reserve the right to argue at a later date that no interest should be permitted on the Secured Creditor Fees).[27]

    **ii.**    **Amounts and Claims to be <u>Excluded</u> from the EFIH Claims Reserve.**

36.    As set forth in greater detail herein, the EFH/EFIH Debtors believe amounts on account of certain categories of asserted Claims do not need to be included in the EFIH Claims Reserve.[28]

    a. **Accrued EFIH Second Lien Principal and Interest**. The EFH/EFIH Debtors currently anticipate that the remaining principal on the EFIH Second Lien Notes, and interest that has accrued thereon as of the EFH Effective Date (collectively, the "<u>EFIH 2L Effective Date Payment</u>"), ***will be paid in full, in Cash on the EFH Effective Date*** (and, therefore, such amounts do not need to be accounted for in the EFIH Claims Reserve).

    b. **Future Interest Claims**. As described herein, the EFIH Second Lien Notes Trustee has asserted certain "Future Interest" Claims related to the EFIH Intercreditor Litigation. The EFIH Second Lien Notes Trustee asserts that the EFIH Collateral Trust Agreement prevents it from making any distributions it receives from the EFH/EFIH Debtors to Holders of EFIH Second Lien Note Claims unless and until the EFIH Intercreditor Litigation is fully and finally resolved or alternatively, the EFIH First Lien Notes Trustee agrees to not challenge such distribution as violating the EFIH Collateral Trust Agreement. Consequently, the EFIH Second Lien Notes Trustee argues that interest should continue to accrue on the outstanding EFIH second lien principal until such time distributions can be

---

[27]   *Id.*

[28]   The EFH/EFIH Debtors also believe that interest on the reasonable and documented fees and expenses incurred under the respective EFIH Secured Creditor indentures should not be Allowed. The EFH/EFIH Debtors have, however, agreed to escrow amounts on account of such interest in the EFIH Claims Reserve, and have reserved the right to argue at a later date that such interest has not accrued and should not be Allowed.

made to Holders of EFIH Second Lien Note Claims without violating the EFIH Collateral Trust Agreement.

In short, this requires the EFH/EFIH Debtors to either (1) escrow the EFIH 2L Effective Date Payment until the EFIH Intercreditor Litigation is resolved, and remain obligated to satisfy interest accruing on the principal until such time; (2) distribute the EFIH 2L Effective Date Payment to the EFIH Second Lien Notes Trustee on the EFH Effective Date but, again, include interest on the principal portion of such distribution until the EFIH Intercreditor Litigation is resolved; or (3) obtain a ruling in the EFH Confirmation Order (x) directing the EFIH Second Lien Notes Trustee to distribute the EFIH 2L Effective Date Payment to Holders of Allowed EFIH Second Lien Claims; and, in the alternative, (y) authorizing the EFH/EFIH Debtors or their designated Disbursing Agent to make a distribution of the EFIH 2L Effective Date Payment directly to Holders of Allowed EFIH Second Lien Note Claims.

c. **Trustee Indemnification Claims**.  The EFIH Second Lien Notes Trustee has demanded that the EFIH Claims Reserve include amounts on account of contingent, unliquidated "Trustee Indemnification Claims." These are Claims that either Indenture Trustee may assert against the EFIH Debtors for any loss, damage, claims, liabilities or expenses (including professional fees) incurred by the respective Indenture Trustee in connection with performance of their respective duties as trustees (including in connection with the Makewhole Claims, the EFIH Intercreditor Litigation, or taking any actions with regard to distributions), despite such distribution being indefeasibly paid by the EFH/EFIH Debtors.[29]

d. **"Breach" Claims**.  The EFIH First Lien Notes Trustee has demanded that the EFIH Claims Reserve include amounts on account of contingent, unliquidated "Breach" Claims.  These are Claims that the EFIH First Lien Notes Trustee believes it may have against EFIH under the EFIH Collateral Trust Agreement if EFIH makes distributions to the EFIH Second Lien Notes Trustee prior to the resolution of the EFIH Intercreditor Litigation.

37.    As will be set forth in greater detail herein, the EFH/EFIH Debtors believe that the EFIH Second Lien Notes Indenture, the Bankruptcy Code, and applicable law do not require the satisfaction of any alleged "Future Interest" Claims.  Moreover, the Trustee Indemnification Claims and Breach Claims are not only duplicative of each other, but also reflect (a) at best,

---

[29]    The EFIH First Lien Notes Trustee did not specifically mention alleged Trustee Indemnification Claims in its Objection.

KE 45079065.28

contingent amounts that can never exceed the amounts projected to be set aside in the EFIH Claims Reserve and (b) at worst, the EFH/EFIH Debtors' and junior constituencies funding the EFIH Secured Trustees' appeal of the EFH Confirmation Order and/or future orders disallowing these Claims.  In other words, the EFIH Claims Reserve contemplates acting as a source of recovery for all Allowed EFIH First Lien Note Claims and EFIH Second Lien Note Claims.  If all principal, interest, makewhole, and fee claims are paid in full, in their Allowed Amounts, there is no viable basis for a Trustee Indemnification Claim.

38.    Moreover, the "Breach" Claim asserted by the EFIH First Lien Notes Trustee appears to arise under one set of circumstances, where one or more EFIH First Lien Notes Claims have been disallowed by Final Order but one or more EFIH Second Lien Claims have not been disallowed by Final Order, and the EFIH First Lien Notes Trustee ends the EFIH Intercreditor Litigation.  Assuming, *arguendo*, that such a circumstance even exists given the overlap in legal issues affecting the Makewhole Litigation with respect to the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims, the EFIH First Lien Notes Trustee's argument nevertheless fails on several grounds discussed in greater detail below, including (a) the ability to go back to the Bankruptcy Court prior to any distributions to junior creditors from the EFIH Claims Reserve on account of ultimately disallowed EFIH First Lien Makewhole Claims; (b) the impropriety of punishing junior creditors to allow EFIH Secured Creditors to pursue unsound Claims (as discussed in greater detail below); and (c) the proposed ruling in the EFH Confirmation Order preserving the EFIH Intercreditor Litigation solely as between the EFIH Secured Creditors.

KE 45079065.28

### iii.    Amounts and Claims That <u>Cannot Be Included</u> in the EFIH Claims Reserve.

39.    Additionally, because the EFIH Secured Trustees will have a Lien on the EFIH Claims Reserve, certain amounts <u>cannot</u> be included in the EFIH Claims Reserve.  For these same reasons, the EFIH Secured Trustees cannot be granted a Lien on the entirety of the EFH/EFIH Distribution Account.  *First*, as described above, the EFH/EFIH Distribution Account includes amounts anticipated to be used to satisfy Allowed General Administrative Claims and Priority Tax Claims and wind-down costs asserted against the EFH/EFIH Debtors, including amounts that may be required to effectuate the transactions contemplated by the Merger post-closing.  Such Allowed Claims must be satisfied in full, in Cash, to confirm the Plan, effectuate the NEE Merger transaction, and allow the EFH/EFIH Debtors to emerge from chapter 11.  *Second*, the EFH/EFIH Distribution Account will—and must—include a segregated account holding Cash attributable to the value of Cash on hand at EFH Corp. as of the EFH Effective Date, less the value of the Reorganized EFH Class A Common Stock expected to be distributed on the EFH Effective Date, and less the distributions contemplated to be made to Holders of Allowed EFH Non-Qualified Benefit Claims as soon as practicable following the EFH Effective Date (the "<u>Limited EFH Cash Reserve</u>").[30]  No Holder of an EFIH Claim may have a Lien on any amounts attributable to the value of Cash on hand at EFH as of the EFH Effective Date.  *Third*, the EFH/EFIH Distribution Account will also include the Makewhole Stock Reserve.  The Makewhole Stock Reserve (and the stock therein) cannot be subject to being distributed to the EFIH Secured Creditors and cannot be subject to their liens—in other words, the stock in the

---

[30]    The Limited EFH Cash Reserve is described in greater detail in Exhibit C(3) of the *Amended Plan Supplement as it Relates to the EFH Debtors and EFIH Debtors for the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10729], filed on January 27, 2017 (the "<u>First Amended EFH Plan Supplement</u>").  For the avoidance of doubt, any Cash remaining at the EFH Debtors after accounting for such transactions will remain on the balance sheet of Reorganized EFH.

Makewhole Stock Reserve must ultimately be distributed to the unsecured creditors of either EFH Corp. or EFIH.  Any possibility that any such stock could ultimately be received by the EFIH Secured Creditors would likely lead to serious complications in the EFH/EFIH Debtors' efforts to obtain a private letter ruling regarding the NEE Merger and potentially put at serious risk the intended tax treatment of the NEE Merger in violation of this Court's prior Final Order approving the Tax Matters Agreement between the T-Side and the E-Side.  ***Fourth***, it would be highly inappropriate for the EFIH Secured Creditors to have a Lien on the Post-Effective Date Administrative Account, which governs the post-EFH Effective Date Makewhole Litigation costs incurred by the EFH Plan Administrator Board (and limited, related Plan Sponsor costs). Importantly, the Plan, as modified, does not allow the EFH Plan Administrator Board to access the EFIH Claims Reserve to satisfy any shortfalls in the Post-Effective Date Administrative Account: this bar more than adequately protects the EFIH Secured Creditors' interests.[31]

## V.    Confirmation Solicitation and Notification Process.

40.    As required by section 1126 of the Bankruptcy Code, via the Prior Plan Solicitation and the Limited Resolicitation, the EFH/EFIH Debtors solicited votes from the Holders of Claims or Interests in Impaired Classes receiving a recovery under the Plan, with all other Classes deemed to accept or reject the Plan as applicable.

### A.    Unimpaired and Deemed to Accept.

41.    Holders of Claims in the following Classes are Unimpaired and therefore were deemed to accept the Plan as it relates to the EFH/EFIH Debtors.  While the EFH/EFIH Debtors did not solicit votes from Holders of Claims in such Classes, the EFH/EFIH Debtors mailed them

---

[31]    The EFH/EFIH Debtors have modified the Plan to clarify this point.

a notice regarding the EFH Confirmation Hearing as required under the EFH/EFIH Disclosure Statement Order and the Supplemental Disclosure Statement Order.[32]

| Class | Claims and Interests | Status |
|---|---|---|
| Class A1 | Other Secured Claims Against the EFH Debtors | Unimpaired |
| Class A2 | Other Priority Claims Against the EFH Debtors | Unimpaired |
| Class A3 | Legacy General Unsecured Claims Against the EFH Debtors | Unimpaired |
| Class B1 | Other Secured Claims Against the EFIH Debtors | Unimpaired |
| Class B2 | Other Priority Claims Against the EFIH Debtors | Unimpaired |
| Class B9 | Interest in EFIH | Unimpaired |

**B.      Fully Impaired and Deemed to Reject.**

42.      Holders of Claims or Interests in the following Classes will not receive any recovery under the Plan and therefore were deemed to reject the Plan as it relates to the EFH/EFIH Debtors.  While the EFH/EFIH Debtors did not solicit votes from these stakeholders, the EFH/EFIH Debtors mailed them a notice regarding the EFH Confirmation Hearing as required under the EFH/EFIH Disclosure Statement Order and the Supplemental Disclosure Statement Order.[33]

| Class | Claims and Interests | Status |
|---|---|---|
| Class A14 | Non-EFH Debtor Intercompany Claims | Impaired |
| Class A16 | Interests in EFH Corp. | Impaired |
| Class B8 | Non-EFIH Debtor Intercompany Claims | Impaired |
| Class B10 | Interests in EFIH Finance | Impaired |

---

[32] *See Affidavit of Service of Solicitation Materials for the EFH/EFIH Debtors* [D.I. 10098], at <u>Exhibit 3</u>; *Affidavit of Service of Solicitation Materials for the EFH/EFIH Debtors* [D.I. 10769], at <u>Exhibit 1</u>.

[33] *See Affidavit of Service of Solicitation Materials for the EFH/EFIH Debtors* [D.I. 10098], at <u>Exhibit 4</u>; *Affidavit of Service of Solicitation Materials for the EFH/EFIH Debtors* [D.I. 10769], at <u>Exhibit 1</u>.

KE 45079065.28

C.      **Subject to Reinstatement or Discharge and Deemed to Accept or Reject.**

43.      With respect to inter-Debtor Claims and Interests between EFH/EFIH Debtors in the same "debt silo" (for example, Claims between one EFIH Debtor and another EFIH Debtor), the EFH/EFIH Debtors retained the ability to either reinstate or cancel and release such Claims on the EFH Effective Date to facilitate ordinary operations or the maintenance of existing organizational structures.  The EFH/EFIH Debtors holding these Claims and Interests are deemed to have accepted or rejected the Plan.  The EFH/EFIH Debtors were not required to solicit votes from the Debtors holding these Claims and Interests or serve such Debtors with any other type of notice in connection with solicitation.[34]  Notably, the intercompany claims held by the LSGT Debtors are being Reinstated.[35]

| Class | Claims and Interests | Status |
|-------|---------------------|--------|
| Class A13 | EFH Debtor Intercompany Claims | Unimpaired/ Impaired |
| Class A15 | Interests in EFH Debtors Other Than EFH Corp. | Unimpaired/ Impaired |
| Class B7 | EFIH Debtor Intercompany Claims | Unimpaired/ Impaired |

## VI.    Voting Results.

44.      The voting results, as reflected in the *Supplemental Declaration of Jane Sullivan on Behalf of Epiq Bankruptcy Solutions, LLC, Regarding Voting and Tabulation of Ballots Cast on the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp.,* et al.*, Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH/EFIH Debtors* (the "EFH/EFIH Voting Report"), filed contemporaneously herewith, are summarized in the

---

[34]   *Id.*

[35]   *See* Plan, Art. III.B.13.

following table (with ranges reflecting variance by individual Debtor, as set forth in greater

detail in the EFH/EFIH Voting Report):[36]

| Class | Claims and Interests | Percent of Number Accepting | Percent of Amount Accepting | Result |
|---|---|---|---|---|
| Class A4 | EFH Legacy Note Claims | Approximately 82% | Approximately 89% | Accepted |
| Class A5 | EFH Unexchanged Note Claims | Approximately 100% | Approximately 100% | Accepted |
| Class A6 | EFH LBO Note Primary Claims | Approximately 94% | Approximately 99% | Accepted |
| Class A7 | EFH Swap Claims | Approximately 100% | Approximately 100% | Accepted |
| Class A8 | EFH Non-Qualified Benefit Claims | Approximately 100% | Approximately 100% | Accepted |
| Class A9 | General Unsecured Claims Against EFH Corp. | Approximately 100% | Approximately 100% | Accepted |
| Class A10 | General Unsecured Claims Against the EFH Debtors Other Than EFH Corp. | No votes were returned in this Class except with respect to EFH Renewables Company LLC and Generation Development Company LLC (and in each such case, 100% of the Claims that voted, voted in favor of the Plan). | | |
| Class A12 | TCEH Settlement Claim | Approximately 100% | Approximately 100% | Accepted |
| Class B3 | EFIH First Lien Note Claims | Approximately 21% | Approximately 5% | Rejected |
| Class B4 | EFIH Second Lien Note Claims | Approximately 14% | Approximately 43% | Rejected |
| Class B5 | EFH LBO Note Guaranty Claims | Approximately 94% | Approximately 99% | Accepted |
| Class B6 | General Unsecured Claims Against the EFIH Debtors | Approximately 84% | Approximately 86% | Accepted |

45.    As set forth above and in the EFH/EFIH Voting Report, Classes A4, A5, A6, A7,

A8, A9, A12, B5, and B6 voted to accept the Plan as it relates to the EFH/EFIH Debtors,

exclusive of any acceptance by insiders.[37]  Thus, there is an impaired consenting class of non-

insider claims at each Debtor with a class of impaired Claims.  Accordingly, the Plan as it relates

---

[36]    Claims in Class A11 were paid in full, in Cash pursuant to paragraph 83 of the TCEH Confirmation Order.  As a result, Class A11 was not solicited in connection with the Plan as it relates to the EFH/EFIH Debtors.

[37]    *See* EFH/EFIH Voting Report, at Exhibit B, Exhibit C.

KE 45079065.28

to the EFH/EFIH Debtors satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

46.     Notwithstanding the rejection of the Plan by Classes B3 and B4 and the deemed rejection of the Plan by Classes A14, A16, B8, and B10, the Plan satisfies the "cramdown" requirements under section 1129(b) of the Bankruptcy Code, as described in more detail below, and is, therefore, confirmable.

**VII.    Modifications to the Plan.**

47.     As of the date hereof, the EFH/EFIH Debtors have finally resolved one of the six Objections; five Objections remain outstanding. In an effort to bridge the gap between the EFIH Secured Trustees and the Plan proponents, the EFH/EFIH Debtors expect to file a modified Plan reflecting the following changes:  (a) additional language regarding the replacement Liens being provided to the EFIH Secured Creditors on the EFIH Claims Reserve (including the documentation and perfection of such Liens); (b) additional language to clarify certain of the segregated accounts within the EFH/EFIH Distribution Account (including clarification regarding the limited circumstances in which the EFH/EFIH Debtors or the EFH Plan Administrator Board can access the EFIH Claims Reserve for the purposes of satisfying Administrative Claims, Priority Claims, and other winddown costs); and (c) the sequence of proposed Plan distributions following the EFH Effective Date.

48.     In preparing the modifications, the EFH/EFIH Debtors reviewed the Plan changes included in the EFIH First Lien Notes Trustee's Objection.  While certain of these modifications were the "technical modifications" touted by the EFIH First Lien Notes Trustee, others were wholly inappropriate substantive changes that the EFH/EFIH Debtors have repeatedly declined (*e.g.*, allowing claims that are clearly disputed).  None of the changes that will be reflected in the modified Plan, however, materially alter the treatment of Claims or Interests.  The Bankruptcy

30

Code provides that a plan proponent may modify a plan "at any time" before confirmation[38] and that all stakeholders that previously have accepted a plan should be deemed to have accepted such plan as modified where the changes to no adversely affect such stakeholders' treatment.[39] Courts routinely allow plan proponents to make nonmaterial changes to a plan, such as the ones here, without requiring the proponent to resolicit votes on the plan.[40]  Accordingly, the Debtors submit that no additional solicitation or disclosure is required and the modifications should be deemed accepted by the stakeholders that previously accepted the Plan.

## <u>Argument</u>

49.    This Brief is divided into three parts.  <u>Part I</u> establishes the Plan's compliance with each of the applicable requirements for confirmation.  <u>Part II</u> establishes that certain of the discretionary contents of the Plan, including the Plan's Releases, are appropriate and should be approved.  <u>Part III</u> establishes that the Objections to the Plan should be overruled.  For the reasons stated herein and in light of the evidentiary support to be offered at the EFH Confirmation Hearing, the EFH/EFIH Debtors respectfully request that the Bankruptcy Court find that the EFH/EFIH Debtors have satisfied their burden and confirm the Plan as it relates to the EFH/EFIH Debtors.

---

[38]    11 U.S.C. § 1127(a).

[39]    *Id.* § 1127(d).

[40]    *See, e.g.*, *In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (holding that nonmaterial modifications to a plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming a plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

## I.     The Plan as it Relates to the EFH/EFIH Debtors Satisfies the Requirements to Confirm a Plan Under the Bankruptcy Code.

50.     To confirm the Plan as it relates to the EFH/EFIH Debtors, the Bankruptcy Court must find that the EFH/EFIH Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[41]   As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.

### A.     The Plan as it Relates to the EFH/EFIH Debtors Fully Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

51.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[42]   The principal aim of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[43]   Accordingly, the determination of whether the Plan as it relates to the EFH/EFIH Debtors complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.

### i.     The Plan as it Relates to the EFH/EFIH Debtors Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

52.     Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other

---

[41]   *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 & n.15 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

[42]   11 U.S.C. § 1129(a)(1).

[43]   *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368; *see also Genesis Health*, 266 B.R. at 599 ("The legislative history reflects that the applicable provisions of chapter 11 includes sections such as section 1122 and 1123, governing classification and contents of plan." (internal quotation marks and alterations omitted)).

32

claims or interests of such class."[44]  Because claims only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining to classify claims together.[45]  Likewise, the Third Circuit has recognized that plan proponents may place similar claims into *different* classes so long as there is a reasonable basis to do so[46]—for example, where members of a class have different legal rights.[47]

53.    Here, each of the Claims or Interests in a particular Class with Claims against, or Interests in, the EFH/EFIH Debtors is substantially similar to the other Claims or Interests in such Class, and there is a reasonable basis for the separate classification of Claims among such Classes.  In general, the Plan's classification scheme follows the Debtors' capital structure.  The Plan first classifies Claims and Interests into four subcategories: subcategory A for the EFH Debtors and subcategory B for the EFIH Debtors, which represents the two primary "debt" silos governing the EFH/EFIH Debtors.  From there, Claims are generally categorized by priority, by

---

[44]    11 U.S.C. § 1122(a).

[45]    *See In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012) (recognizing that plan proponents have "discretion" in classifying claims under a plan of reorganization); *In re W.R. Grace & Co.*, 475 B.R. 34, 109-10 (D. Del. 2012) ("Plan proponents and bankruptcy courts have considerably broad discretion in deciding how to classify claims.").

[46]    *In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014) ("[A] corollary to that rule is that the 'grouping of similar claims in different classes' is permitted so long as the classification is 'reasonable.'" (quoting *In re Jersey Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987))); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (stating that "each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (stating that similar claims may be placed in separate classes so long as such classification is reasonable).

[47]    *See, e.g.*, *In re Wash. Mut., Inc.*, No. 08-12229 (MFW), 2012 WL 1563880, at *12 (Bankr. D. Del. Feb. 24, 2012) (permitting separate classification of notes issued by same issuer where each debenture had "slightly different legal rights"); *In re Kaiser Aluminum Corp.*, No. 02-10429(JKF), 2006 WL 616243, at *5-6 (Bankr. D. Del. Feb. 6, 2006) (permitting classification scheme after consideration of creditors' legal rights), *aff'd*, 343 B.R. 88 (D. Del. 2006); *In re Exide Techs.*, 303 B.R. 48, 79-80 (Bankr. D. Del. 2003) (stating that there may be a basis for separately classifying creditors of the same priority level); *see also In re Mirant Corp.*, No. 03-46590DML11, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007) (permitting separate classification because holders of claims had different legal interests in the debtor's estate).

Secured versus Unsecured status, by type, or based on unique factors associated with particular series of debt.[48]

54.     Because the Plan classifies Claims and Interests based upon their different rights and attributes, the Plan as it relates to the EFH/EFIH Debtors satisfies section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

> **ii.     The Plan as it Relates to the EFH/EFIH Debtors Satisfies the Seven Mandatory Plan Requirements of Sections 1123(a) of the Bankruptcy Code.**

55.     The seven applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of the treatment and classification of claims, the equal treatment of claims within classes, and the mechanics of implementing the plan.  The Plan as it relates to the EFH/EFIH Debtors satisfies each of these requirements.

56.     ***Specification of Classes, Impairment, and Treatment.***     The first three requirements of section 1123(a) are that the plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise nature of their treatment under the Plan.[49]  The Plan as it relates to the EFH/EFIH Debtors—in particular, Article III—satisfies these three requirements by setting forth these specifications in detail, and no party has asserted otherwise.[50]

57.     ***Equal Treatment.***  The fourth requirement of section 1123(a) is that the plan must "provide the same treatment for each claim or interest of a particular class."[51]  Courts in Delaware construe this provision to require "only approximate equality," not "precise

---

[48]     Plan, Art. III.A.

[49]     11 U.S.C. § 1123(a)(1)-(3).

[50]     Plan, Art. III.B.

[51]     11 U.S.C. § 1123(a)(4).

equality."[52]  Importantly, in analyzing equal treatment, courts examine whether particular class members "give up the same degree of consideration for their distribution under the plan."[53]

58.     Here, the Plan provides for identical treatment within each Class.  Accordingly, the Plan as it relates to the EFH/EFIH Debtors satisfies 1123(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

59.     ***Adequate Means for Implementation.***  The fifth requirement of 1123(a) is that a plan provide adequate means for its implementation.[54]  The Plan, together with the documents and forms of agreement included in the EFH Plan Supplement (including the NEE Merger Agreement), provides a detailed blueprint for the transactions that underlie the Plan as it relates to the EFH/EFIH Debtors.[55]

60.     The NEE Merger Agreement sets forth the means for implementation of the key transaction underlying the Plan as it relates to the EFH/EFIH Debtors:  the Merger.  In turn, (a) Article IV.B.9 of the Plan sets forth the means for implementation of the Merger and establishes the steps and mechanisms for using the consideration provided by the Merger and Cash on hand as of the EFH Effective Date to fund distributions to Holders of Allowed Claims against the EFH/EFIH Debtors and (b) Article III.B.19 and Article III.B.20 establish the Liens to be provided on the EFH Effective Date to the EFIH First Lien Notes Trustee and EFIH Second

---

[52]  *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (quoting *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)).

[53]  *W.R. Grace & Co.*, 475 B.R. at 121.

[54]  11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include:  retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.  *Id.*

[55]  *See Plan Supplement as it Relates to the EFH Debtors and EFIH Debtors for the Fourth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10101], filed on November 10, 2016 (the "EFH Plan Supplement"), at Exhibit G.

Lien Notes Trustee, respectively, on the EFIH Claims Reserve.[56] The Plan also describes the means for cancellation of existing securities and implementation of the key capital markets transactions underlying the Plan, including the issuance of the Reorganized EFH Common Stock (which will be converted into NextEra Common Stock). In addition to these core transactions, the Plan as it relates to the EFH/EFIH Debtors sets forth the other critical mechanics for emergence, such as the dissolution of certain subsidiaries, the establishment and termination of certain agreements, and the settlement of intercompany accounts.

61. The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents or forms of agreements included in the EFH Plan Supplement.[57] This includes, for example, certain amended and restated LLC agreements, the Oncor Letter Agreement (which sets forth the rights and obligations of the Plan Sponsor and certain Oncor entities in connection with the Merger transaction), and the Post-Closing Transition Services Agreement (which governs services provided by Reorganized TCEH to Reorganized EFH for a period of time following the EFH Effective Date). Pursuant to the TCEH Confirmation Order, the Interim Transition Services Agreement, the Separation Agreement, and the Tax Matters Agreement were approved as to all Debtors. Critically, no debt documents were filed in the EFH Plan Supplement because the Merger does not contemplate the incurrence of new funded debt at EFIH or EFH Corp. Thus, the Plan as it relates to EFH/EFIH Debtors satisfies section 1123(a)(5), and no party has asserted otherwise.

62. **_Non-Voting Stock._** The sixth requirement of section 1123(a) is that a plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance

---

[56] Plan, Art. IV.B.9, III.B19, III.B.20.

[57] EFH Plan Supplement, at <u>Exhibit A</u>, <u>Exhibit H</u>, <u>Exhibit I</u>.

KE 45079065.28

of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.[58]   As one court explained, this subsection "prevents the issuance of a class of stock without the *possibility* of exercising *any* vote."[59]   Its legislative history indicates that it is primarily meant to protect the interests of a debtor's prepetition creditors and stockholders receiving equity under the plan.[60]

63.   Here, the Plan as it relates to the EFH/EFIH Debtors provides that the New Organizational Documents of Reorganized EFH will prohibit the issuance of non-voting stock.[61] Thus, the Plan as it relates to the EFH/EFIH Debtors complies with the requirements of section 1123(a)(6), and no party has asserted otherwise.

64.   ***Selection of Officers and Directors.***   Finally, section 1123(a)(7) of the Bankruptcy Code requires that the plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[62]   The Plan provides that, on the Effective Time (as defined in the NEE Merger Agreement), the terms of the existing boards of directors of the EFH Debtors will expire and (a) the initial officers of the Surviving Company (as defined in the NEE Merger Agreement), as successor to EFH Corp. shall be the

---

[58]   *See* 11 U.S.C. § 1123(a)(6).

[59]   *In re Ahead Commc'ns Sys., Inc.*, 395 B.R. 512, 518 (D. Conn. 2008) (emphases added).

[60]   S. Rep. No. 95-989, at 10 (1978) ("As public investors are likely to be junior or subordinated creditors or stockholders, it is essential for them to have legislative assurance that their interests will be protected.").

[61]   *Amended Plan Supplement as it Relates to the EFH Debtors and EFIH Debtors for the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 10780], filed on February 7, 2017, at <u>Exhibit A</u>.

[62]   11 U.S.C. § 1123(a)(7).

officers of Merger Sub (at the Effective Time) and (b) the initial officers of Reorganized EFIH shall be appointed in accordance with the New Organizational Documents.[63]

65.    On November 11, 2016, the EFH Debtors filed additional disclosures regarding the New Boards of the Reorganized EFH Debtors and Reorganized EFIH Debtors.  Specifically, the EFH/EFIH Debtors disclosed (a) a list of ten individuals expected to serve as the officers of the Surviving Company and Reorganized EFIH and (b) the proposed directors to serve on behalf of the Reorganized LSGT Debtors and stated that the identity of any other directors, to the extent determined prior to the EFH Effective Date, would be identified prior to the EFH Effective Date.[64]  The EFH/EFIH Debtors anticipate that current directors and officers will serve after the EFH Confirmation Date until the Effective Time.[65]  In addition, in the First Amended EFH Plan Supplement, filed on January 27, 2017, the EFH/EFIH Debtors identified Mr. Anthony Horton (current Executive Vice President and Chief Financial Officer for the EFH/EFIH Debtors) as the member of the EFH Plan Administrator Board.[66]  Therefore, the Plan as it relates to the EFH/EFIH Debtors satisfies the requirements of sections 1123(a)(1)–(7) of the Bankruptcy Code, and no party has asserted otherwise.

---

[63]    Plan, Art. IV.L.

[64]    EFH Plan Supplement, at Exhibit E.

[65]    *Id; In re Charter Commc'ns*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the known directors."); *In re Am. Solar King Corp.,* 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

[66]    First Amended EFH Plan Supplement, at Exhibit F.

### B.   The Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

66.     Section 1129(a)(2) requires that the plan ***proponents*** comply with applicable provisions of the Bankruptcy Code.  Case law and legislative history indicate that this section principally reflects the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code,[67] which prohibits the solicitation of plan votes without a court-approved disclosure statement.[68]

67.     Here, the EFH/EFIH Debtors, as Plan proponents, have satisfied section 1125 of the Bankruptcy Code with respect to the EFH/EFIH Debtors.  The Bankruptcy Court approved the EFH/EFIH Disclosure Statement (on September 19, 2016 and January 4, 2017, as described above) as containing adequate information, and the EFH/EFIH Debtors solicited and tabulated votes on the Plan in accordance with the Solicitation Procedures approved by the Bankruptcy Court.  The EFH/EFIH Debtors also timely mailed the notices to non-voting creditors as described in the Solicitation Procedures.[69]   Accordingly, the Debtors have satisfied the requirements of section 1125 of the Bankruptcy Code and therefore have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code with respect to the Plan as it relates to the EFH/EFIH Debtors, and no party has asserted otherwise.

---

[67]  *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re WorldCom, Inc.*, No. 02-135333(AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) ("The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code."); *In re Lapworth*, No. 97-34259DWS, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 3, 1998) ("The legislative history of [section] 1129(a)(2) specifically identifies compliance with the disclosure requirements of [section] 1125 as a requirement of [section] 1129(a)(2)."); S. Rep. No. 95-989, at 126; H.R. Rep. No. 95-595 at 412.

[68]  11 U.S.C. § 1125(b).

[69]  *See Affidavit of Service of Solicitation Materials for the EFH/EFIH Debtors* [D.I. 10098], at <u>Exhibit 3</u> and <u>Exhibit 4</u>; *Affidavit of Service of Solicitation Materials for the EFH/EFIH Debtors* [D.I. 10769], at <u>Exhibit 1</u>.

C.    **The Debtors Proposed the Plan as it Relates to the EFH/EFIH Debtors in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

68.    The Bankruptcy Code requires that the proponent of a plan of reorganization propose the plan "in good faith and not by any means forbidden by law."[70]  In assessing the good faith standard, courts consider whether the plan: (1) fosters a result consistent with the objectives of the Bankruptcy Code; (2) has been proposed with honesty, good intentions, and a basis for expecting that the reorganization can be effectuated; and (3) exhibits a fundamental fairness in dealing with creditors.[71]

69.    Courts look to the reorganization plan itself to determine whether the plan seeks relief consistent with the Bankruptcy Code.[72]  To that end, the fundamental purpose of chapter 11 is to enable a company in financial distress to restructure its balance sheet, reorganize its business operations, and avoid the adverse economic effects associated with disposing of assets at their liquidation value.[73]  Minimizing litigation through compromise is likewise favored in bankruptcy.[74]

70.    Here, the Plan as it relates to the EFH/EFIH Debtors will shed over $10 billion in prepetition funded debt obligations using a combination of Cash and Reorganized EFH Common Stock (which will convert into NextEra Common Stock) and, importantly, without incurring new

---

[70]    11 U.S.C. § 1129(a)(3).

[71]    *W.R. Grace & Co.*, 475 B.R. at 87-88.

[72]    *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *see also In re Sound Radio, Inc.*, 93 B.R. 849, 854 (Bankr. D.N.J. 1988).

[73]    *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *see also In re B.D. Int'l Disc. Corp.*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start"); *In re Bonded Mailings, Inc.*, 20 B.R. 781, 785 (Bankr. E.D.N.Y. 1982) (holding Bankruptcy Code's policy of equitable distribution amongst creditors should not be thwarted by actions of a single creditor).

[74]    *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." (internal quotation marks and alterations omitted)).

40

funded debt as part of the reorganization efforts. It also preserves a settlement of billions of dollars of alleged prepetition claims arising out of various historical transactions and the extensively negotiated landmark Disinterested Director Settlement approved by the Bankruptcy Court in December 2015. Importantly, the Plan as it relates to the EFH/EFIH Debtors Reinstates Legacy General Unsecured Claims against the EFH Debtors and the Claims and Interests held by the LSGT Debtors. In other words, the Plan ensures that the Claims and Interests at the heart of the Asbestos Objectors' Objection are rendered Unimpaired. A more favorable result for the Asbestos Objectors is simply not possible. Effectuating these unprecedented and value maximizing transactions and settlements is the good-faith purpose of the Plan.

71.     In prosecuting these chapter 11 cases, the Debtors have left no stone unturned, and, indeed, have considered numerous alternatives, including, as described above, Project Olympus, a tax-free spin of Oncor, a tax-efficient spin of Oncor, an equitization of Claims asserted against the EFH/EFIH Debtors, a separation of the EFIH Debtors from EFH Corp. through a transaction under section 363 of the Bankruptcy Code, and everything in between. The end result comes after years of exploring all viable options for an EFH/EFIH Debtors' restructuring with existing creditor constituencies and third parties. The Debtors have thoroughly evaluated the resulting Restructuring Transactions and believe that the Plan, as it relates to the EFH/EFIH Debtors, will be consummated. Accordingly, the EFH/EFIH Debtors respectfully submit that the Plan as it relates to the EFH/EFIH Debtors satisfies section 1129(a)(3) of the Bankruptcy Code. The Asbestos Objectors assert that the Plan was not proposed in good faith. As set forth in greater detail below, the EFH/EFIH Debtors wholly disagree with such assertions (for many of the same reasons previously raised by such Claimants and previously dismissed by this Court).

KE 45079065.28

**D.    The Plan as it Relates to the EFH/EFIH Debtors Provides for Bankruptcy Court Approval of Certain Administrative Payments (Section 1129(a)(4)).**

72.    The Bankruptcy Code requires that professional fees and expenses related to the case and paid under the plan be approved by the court as reasonable or subject to approval of the court as reasonable.[75]   Whether a payment is reasonable is a case-by-case inquiry that turns on who makes the payment, who receives it, and the effect of such payments on the estate.[76]   As one court explained, as to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[77]

73.    Here, the professional fees and expenses related to the case and paid under the Plan primarily fall into six categories:  (a) fees and expenses paid under the EFIH First Lien DIP Order; (b) reasonable and documented fees allowed under section 506(b) of the Bankruptcy Code and the EFIH First Lien Note Indentures and EFIH Second Lien Note Indenture (collectively, the "Secured Creditor Fees"); (c) fees and expenses payable to the EFIH Notes Trustee and EFIH Unsecured Notes Trustee under the respective Indentures, in an exercise of the EFH Debtors' and EFIH Debtors' applicable business judgment; (d) fees and expenses satisfied pursuant to a "charging lien"; (e) reasonable and documented fees and expenses paid from the Post-Effective Date Administrative Account; and (f) fees and expenses paid to the Makewhole Litigation Oversight Committee.

---

[75]   11 U.S.C. § 1129(a)(4).

[76]   *In re Cajun Elec. Power Coop., Inc.*, 150 F.3d 503, 517 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."); *see also In re Congoleum Corp.*, No. 09-4371, 2010 WL 1850182, at *5 (D.N.J. May 7, 2010) (quoting same); *In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) ("The determination whether a payment is reasonable under § 1129(a)(4) requires an analysis of the issue of reasonableness based on the facts and circumstances of the payments.").

[77]   *Cajun Elec.*, 150 F.3d at 517.

74. *First*, the fees and expenses payable under the EFIH First Lien DIP Order are subject to pre-existing review procedures. All of the fees and expenses payable under the EFIH First Lien DIP Order must be reasonable and documented and, to the extent they are not, the EFIH Debtors will file an objection to such fees and expenses with the Bankruptcy Court.

75. *Second*, there is little doubt that the EFIH First Lien Note Claims and EFIH Second Lien Note Claims are oversecured. As a result, Holders of EFIH First Lien Note Claims and EFIH Second Lien Note Claims are entitled to their reasonable fees and expenses under section 506 of the Bankruptcy Code. In addition, in the First Amended EFH Plan Supplement filed on January 27, 2017, the EFH/EFIH Debtors disclosed a proposed timeline for reviewing and paying the reasonable and documented fees and expenses of the EFIH Secured Creditors (the "Payment Review Process" and the "Allowed Fees," respectively).[78] The Payment Review Process, as well as all of the Allowed Fees the EFH/EFIH Debtors ultimately satisfy under such Indentures, are all subject to the Bankruptcy Court's approval at the EFH Confirmation Hearing. The Payment Review Process allows the secured Indenture Trustees to recover compensation contemplated by the respective Indentures as quickly as reasonably practicable after the EFH Effective Date, while balancing (a) the fiduciary duty obligations of the EFH Plan Administrator Board to EFH Corp. and EFIH constituencies and (b) the interest of the Bankruptcy Court in ensuring only those fees that were reasonably incurred are ultimately Allowed.

76. *Third*, as discussed in greater detail below, the EFH Debtors and EFIH Debtors, in an exercise of their respective business judgment, are seeking to satisfy the reasonable and

---

[78] EFH Plan Supplement, at Exhibit D.

documented fees payable to the EFH Notes Trustee and the EFIH Unsecured Notes Trustee under the respective Indentures.[79]

77.     **Fourth**, the remaining categories of fees and expenses do not require any incremental funding by the EFH/EFIH Debtors.  Each of these categories of fees and expenses represent funds that would have otherwise been distributed to Holders of EFIH unsecured claims in the absence of the agreements set forth in the EFIH Unsecured Creditor Plan Support Agreement.

78.     Under the circumstances, given (a) the balance the Payment Review Process strikes among various competing interests, (b) the reasons set forth below regarding the EFH/EFIH Debtors' exercise of their business judgment in determining to pay the reasonable and documented fees of the EFH Notes Trustee and the EFIH Unsecured Notes Trustee under the respective Indentures, and (c) the funding of several categories of fees and expenses using funds that would have otherwise been distributed to Holders of EFIH unsecured Claims, the Bankruptcy Court should approve the provisions of the Plan that provide for payment of fees and expenses under the Plan as reasonable and find that the Plan (as it relates to the EFH/EFIH Debtors) satisfies section 1129(a)(4) of the Bankruptcy Code.

**E.     The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement as it Relates to the EFH/EFIH Debtors (Section 1129(a)(5)).**

79.     The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor

---

[79]     This Court previously authorized payment of approximately $5.5 million to the EFH Notes Trustee outside of a charging lien advance in connection with the Hunt Plan.  *See Order Approving Settlement Among Debtors, EFH Committee, EFH Notes Trustee, and Certain Other Parties* [D.I. 7143].

to the debtor under the plan.[80]   It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[81]   Lastly, it requires that the plan proponent have disclosed the identity of insiders to be retained by the reorganized debtor and the nature of their compensation.[82]   In construing section 1129(a)(5), courts have long made clear that, to the extent the debtor is unable to identify these individuals by name at the time of confirmation, the debtor nonetheless satisfies this requirement so long as directors will be appointed consistent with the company's organizational documents and applicable state and federal law.[83]

80.    As described in detail in Section I.A.ii of the Argument, *supra*, the EFH/EFIH Debtors have supplied all available information with respect to the identity of the directors and officers to serve on the Surviving Company Board and the Reorganized EFIH Board in the EFH Plan Supplement.[84]   The current directors and officers of the EFH/EFIH Debtors will serve until the Effective Time (as defined in the NEE Merger Agreement).   Additionally, the EFH/EFIH Debtors have (a) identified all of the individuals expected to serve as officers of the Surviving Company and Reorganized EFIH; and (b) the expected directors for the Reorganized LSGT Debtors, with any remaining directors determined prior to the EFH Effective Date to be identified prior to the EFH Effective Date.   In addition, in the EFH Plan Supplement filed on

---

[80]    11 U.S.C. § 1129(a)(5)(A)(i).

[81]    *Id.* § 1129(a)(5)(A)(ii).

[82]    *Id.* § 1129(a)(5)(B).

[83]    *Charter Commc'ns*, 419 B.R. at 260 n.30 ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors."); *Am. Solar King*, 90 B.R. at 815   ("The subsection does not (and cannot) compel the debtor to do the impossible, however.   If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

[84]    EFH Plan Supplement, at <u>Exhibit E</u>.

January 27, 2017, the EFH/EFIH Debtors identified Mr. Anthony Horton (current Executive Vice President and Chief Financial Officer for the EFH/EFIH Debtors) as the member of the EFH Plan Administrator Board.[85]   Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) with respect to the EFH/EFIH Debtors, and no party has asserted otherwise.

**F.      The Plan as it Relates to the EFH/EFIH Debtors Does Not Provide for Any Rate Changes Requiring Governmental Approval (Section 1129(a)(6)).**

81.      The Bankruptcy Code requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."[86]   The Plan as it relates to the EFH/EFIH Debtors is expressly conditioned on a number of regulatory approvals, but does not, however, provide for any rate changes that require the approval of the relevant regulatory agencies.   Thus, this provision of the Bankruptcy Code is inapplicable to the Plan as it relates to the EFH/EFIH Debtors, and no party has asserted otherwise.

**G.      The Plan as it Relates to the EFH/EFIH Debtors Is In the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).**

82.      The best interests of creditors test requires that, "[w]ith respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation.[87]   Where the plan provides for less than full recoveries on claims, a debtor generally satisfies the test by comparing

---

[85]      First Amended EFH Plan Supplement, at <u>Exhibit F</u>.

[86]      11 U.S.C. § 1129(a)(6).

[87]      *Id.* § 1129(a)(7).

recoveries in a hypothetical liquidation with the estimated recoveries under the plan of reorganization.[88]

83.    Here, the EFH Disclosure Statement includes a customary liquidation analysis,[89] which demonstrates that each Class of Claims against the EFH/EFIH Debtors will receive more under the Plan than it would in a hypothetical liquidation.  No party contests this analysis or conclusion.  Therefore, the Plan as it relates to the EFH/EFIH Debtors satisfies the best interests of creditors test.

**H.    The Plan as it Relates to the EFH/EFIH Debtors Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8).**

84.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept a plan or be unimpaired under a plan.[90]  As discussed above, Class B3 and Class B4 voted to reject the Plan and Classes A14, A16, B8, and B10 are deemed to have rejected the Plan, so the EFH/EFIH Debtors cannot satisfy section 1129(a)(8) of the Bankruptcy Code.  Nevertheless, the Plan may still be confirmed because, as set forth in Sections I.O and III.A of the Argument in this Brief, *infra*, the Debtors have satisfied the impaired consenting class requirement under section 1129(a)(10) and the requirements for cramdown under section 1129(b).

---

[88]    *See 203 N. LaSalle St. P'ship*, 526 U.S. at 442 n.13; *see also United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation"); *In re Century Glove, Inc.*, Civ. A Nos. 90-400-SLR & 90-401-SLR, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993).

[89]    EFH/EFIH Disclosure Statement, at <u>Exhibit E</u>.

[90]    11 U.S.C. § 1129(a)(8).  A class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than half in number of the claims in that class actually vote to accept the plan.  *Id.* § 1126(c).  A class that is not impaired under a plan, and the creditors in that class, are conclusively presumed to have accepted the plan.  *Id.* § 1126(f).  A class is deemed to have rejected a plan if the plan provides that the holders of claims or interests in that class do not receive or retain any property under the plan on account of such claims or interests.  *Id.* § 1126(g).

I.     **The Plan as it Relates to the EFH/EFIH Debtors Complies With Statutorily Mandated Treatment of Administrative and Priority Claims (Section 1129(a)(9)).**

85.     The Bankruptcy Code generally requires that claims entitled to administrative or other priority must be repaid in full in cash or receive certain other specified treatment.[91]   Here, the Plan generally provides that Allowed Administrative Claims and Other Priority Claims, including Priority Tax Claims, will be repaid in full, in cash or receive other treatment rendering them Unimpaired.[92]   Therefore, the Plan as it relates to the EFH/EFIH Debtors complies with section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

J.     **At Least One Impaired Class of Claims Has Accepted the Plan as it Relates to the EFH/EFIH Debtors, Excluding the Acceptances of Insiders (Section 1129(a)(10)).**

86.     Section 1129(a)(10) of the Bankruptcy Code provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.[93]   As detailed herein and in the EFH/EFIH Voting Report, all but two of the voting classes have accepted the Plan, exclusive of any acceptances by insiders.[94]   And, importantly, the Plan has been accepted by a Voting Class with respect to each Debtor, as illustrated by the chart included with the EFH/EFIH Voting Report.[95]   Therefore, the Plan as it relates to the EFH/EFIH Debtors satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

---

[91]   11 U.S.C. § 1129(a)(9).

[92]   *See* Plan, Art. II.A.1, III.B.2, III.B.18.

[93]   11 U.S.C. § 1129(a)(10).

[94]   *See* EFH/EFIH Voting Report, at Exhibit B.

[95]   *See* EFH/EFIH Voting Report, at Exhibit B.

KE 45079065.28

### K.   The Plan as it Relates to the EFH/EFIH Debtors Is Feasible (Section 1129(a)(11)).

87.    Feasibility refers to the Bankruptcy Code's requirement that plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . , unless such liquidation or reorganization is proposed in the plan."[96]   Under this standard, it is well-established that the success of the plan need only be "reasonably likely," not "guaranteed."[97]   Indeed, "a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility."[98]

#### i.    The Merger is Reasonably Likely to Close.

88.    There is no question that NextEra is incentivized to close the Merger.  A recurring theme raised by would-be objectors in connection with the hearing to approve the NEE Merger Agreement and NEE PSA was NextEra's persistent and ongoing interest in purchasing EFH Corp.'s indirect economic interest in Oncor.  The evidence on this point has been overwhelming and incontrovertible.  Among other things, NextEra submitted a preliminary term sheet to the EFH Debtors a mere 24 hours after termination of the Original Confirmed Plan, increased its bid by $110 million days before execution of the NEE Merger Agreement in an effort to make its bid more attractive than its closest competitor, and increased its cash consideration by yet another $300 million in an effort to buy peace at EFH Corp. by obtaining the support of the largest holder of EFH unsecured notes, Fidelity.  On the brink of consummation of the Plan that allows

---

[96]    11 U.S.C. § 1129(a)(11).

[97]    *In re W.R. Grace & Co.*, 729 F.3d 332, 348 (3d Cir. 2013); *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) ("All the bankruptcy court must find is that the plan offer 'a reasonable probability of success.'" (quoting *In re Landing Assoc., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993))).

[98]    *In re Brice Rd. Devs., L.L.C.*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008) (internal quotation marks omitted); *see also In re Wash. Mut., Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (quoting "low threshold of proof" standard); *In re Trenton Ridge Inv'rs, LLC*, 461 B.R. 440, 479 (Bankr. S.D. Ohio 2011) (same).

49

NextEra (an entity with a 90-year history in the electric utility industry and nearly $9 billion in commitments) to close a transaction that it has pursued for many years, there is no reason to doubt the likelihood of the Merger closing.

### ii.    Key Regulatory Approvals are Already in Process.

89.    The fact that a plan depends on regulatory and tax approvals does not change the statutory feasibility standard.  It is not clear that the requirements of section 1129(a)(11) apply to conditions precedent to the consummation of a Plan as it relates to the EFH/EFIH Debtors as opposed to the ability of the reorganized debtor to satisfy its obligations under the plan *after* consummation of the plan.  Nevertheless, to the extent pre-consummation requirements are to be considered in connection with the feasibility analysis, "[i]t is not at all unusual for consummation of a Chapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities, and courts have not typically held up confirmation of a plan to wait for issuance of such approvals."[99]  Numerous courts have approved chapter 11 plans that are conditioned on regulatory approvals, including state public utility commission approvals, FCC approvals, and FERC approvals.[100]  In the regulatory context, Delaware bankruptcy courts emphasize that the

---

[99]    *Indianapolis Downs,* 486 B.R. at 298.

[100]    *See, e.g., In re Lightsquared Inc.,* Case No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) [D.I. 2276] (Federal Communications Commission); *In re Sorenson Commc'ns, Inc.,* Case No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) [D.I. 180] (Federal Communications Commission); *In re Edison Mission Energy*, Case No. 12-49219 (JPC) (Bankr. N.D. Ill. Mar. 11, 2014) [D.I. 2206] (Federal Energy Regulatory Commission); *In re AMR Corp.,* Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) [D.I. 10367] (Federal Aviation Administration and Department of Transportation); *In re DBSD N. Am.,* Case No. 09-13061 (REG) (Bankr. S.D.N.Y. July 5, 2011) [D.I. 1159] (Federal Communications Commission); *In re Majestic Star Casino, LLC,* Case No. 09-14136 (KG) (Bankr. D. Del. Mar 10, 2011) [D.I. 1059] (State gaming regulators); *In re Citadel Broad. Corp.,* Case No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010) [D.I. 369] (Federal Communications Commission); *In re Hawaiian Telecom Commcn's, Inc.,* Case No. 08-02005 (Bankr. D. Haw. Dec. 30, 2009) [D.I. 1570] (Hawaii Public Utilities Commission and the Federal Communications Commission); *In re Maxcom Telecommunicaciones, S.A.B. de C.V.,* Case No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013) [D.I. 148] (the Mexican Government under Mexican telecommunications law); *In re Adelphia Commc'ns Corp.,* Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) (Federal Trade Commission); *In re Global Crossings, Ltd.,* Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Dec. 26, 2002) [D.I. 2586] (Federal Communications Commission).

likelihood of success need only be "reasonable" to show feasibility and have found plans feasible despite significant post-confirmation regulatory conditions.[101]

90.     Here, the occurrence of the EFH Effective Date is expressly conditioned on the EFH Debtors receiving all authorizations, consents, and regulatory approvals, including, most significantly, from the PUC, FERC, and the FCC, as applicable.  These regulatory processes are characteristic of Oncor's ring-fenced business operations and would be necessary in one form or another under virtually any plan of reorganization that involved EFH's indirect economic interest in Oncor.

91.     In addition, the process for obtaining each of the key regulatory approvals is already underway.   This is unsurprising, given the collective experience of the Debtors' regulatory advisors and, as applicable, Oncor, the Plan Sponsor, and each of its regulatory advisors.  Specifically, on October 31, 2016, NextEra and Oncor filed a joint application with the PUC, requesting approval of the Merger.  The PUC scheduled a hearing to consider the merits of the application for February 21, 2017 through February 24, 2017, with a ruling expected to be received by the end of April 2017.  Additionally, on January 25, 2017, FERC approved the NEE Merger transaction, finding that the transaction was consistent with the public interest.  Finally, NextEra and Oncor filed the required Hart-Scott-Rodino antitrust reports with the Department of Justice and the Federal Trade Commission and, on November 17, 2016, received notice that early termination of the waiting period had been granted.  The EFH/EFIH Debtors believe the Merger meets the regulatory requirements for approval and that they remain on track to achieving an EFH Effective Date by mid-2017.

---

[101]   *See Indianapolis Downs*, 486 B.R. at 299; *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

### iii.    Reorganized EFH Will Be Financially Sound.

92.    When assessing the feasibility of a reorganized company as a going concern, courts may assess various factors with respect to the commercial viability of the new entity, including capital structure, earning capacity, economic conditions, and management strength— although earning capacity is generally the most important metric.[102]

93.    The Plan as it relates to the EFH/EFIH Debtors is feasible.  First, and most significantly, the Plan will extinguish all funded debt at EFH Corp. and EFIH without imposing new funded debt obligations.  Aside from the fact that the Plan Sponsor has agreed to provide over $9 billion in consideration in connection with the Merger (and another $2 billion to purchase the minority interest), the Oncor projections further demonstrate that the EFH/EFIH Debtors will be able to satisfy all of their obligations under the Plan.[103]

94.    Moreover, NextEra, the ultimate parent of Reorganized EFH and Reorganized EFIH, has strong investment-grade credit ratings from multiple ratings agencies.[104]  With a market cap of $57.1 billion and nearly $9 billion in commitments, NextEra is a leader amongst its peers.  Accordingly, NextEra is well-positioned and incentivized, given its approximately $12 billion equity investment, to manage Reorganized EFH as a going-concern and the Plan as it relates to the EFH/EFIH Debtors satisfy the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

---

[102]    *W.R. Grace.*, 475 B.R. at 115  ("The bankruptcy court can consider a wide array of factors in determining a plan's feasibility, including assessment of the debtor's capital structure, the earning power of the business, economic conditions, and the ability of the corporation's management.  Most importantly, the debtor must provide the bankruptcy court with an estimate of its future earning capacity."  (citation omitted)); *see also Indianapolis Downs*, 486 B.R. at 298 (listing similar factors).

[103]    *See Amended Disclosure Statement for the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to the EFH Debtors and EFIH Debtors* [D.I. 10564] (the "EFH/EFIH Disclosure Statement"), at Exhibit D.

[104]    Ex. C, 11/8/16 Ying Dep. Tr. at 25:15-20; Ex. D, DX677 July 28, 2016 Energy Future Holdings Corp. SEC Form 8-K/A, at 3.

95.    Finally, and for the avoidance of doubt, if the Makewhole Claims become Allowed Claims, such Allowed Claims will be satisfied only from the EFIH Claims Reserve. None of the Reorganized EFH Debtors, Reorganized EFIH Debtors, nor the Plan Sponsor (or any of its related entities) will bear any liability with respect to such Allowed Claims.[105]  Therefore, the potential for such significant Claims becoming Allowed is irrelevant to an analysis of whether Reorganized EFH and Reorganized EFIH will be financially sound and, thus, to the feasibility of the Plan.  Despite this, the EFIH First Lien Notes Trustee asserts that "if the EFIH Claims Reserve is funded with only $1.301 billion, it will be insufficient to ensure" that Allowed EFIH First Lien Notes Claims will be paid in full and "*[a]ccordingly*, unless the Court orders that the Debtors increase the funding of the EFIH Claims Reserve, the Plan is not feasible and cannot be confirmed . . . ."[106]  Putting aside the very large assumption the EFIH First Lien Notes Trustee makes about the ultimate value of Allowed EFIH First Lien Notes Claims, which is addressed in Part III.A.ii of the Argument, *infra*, this argument is baldly conclusory.  Not only does the EFIH First Lien Notes Trustee offer no evidence that Reorganized EFIH will be adversely impacted should the Allowed EFIH First Lien Notes Claims grow beyond $1.301 billion, but it offers no explanation as to how such adverse impact could even be possible.  Indeed, because the Reorganized EFH/EFIH Debtors will take on no new debt post-emergence[107] and will bear no liability for post-Effective Date obligations in connection with the chapter 11

---

[105]    *See* Plan, Art. I.A.161 (". . . *provided*, *however*, that neither Reorganized EFIH nor the Plan Sponsor shall have any obligation to fund the EFIH Claims Reserve with Cash on hand after the EFH Effective Date and the EFIH Claims Reserve shall be funded solely using the Merger Sub Cash Amount and Cash on hand at EFIH immediately prior to the EFH Effective Date."); Ex. E, 1/26/17 Wright Dep. Tr. at 41:23-42:21.

[106]    EFIH First Lien Notes Trustee Obj. 36 (emphasis added).

[107]    *See* Ex. D, DX677 July 28, 2016 Energy Future Holdings Corp. SEC Form 8-K/A, at Exhibit E to Exhibit 10(b) ("[Parent]and its subsidiaries, other than Oncor, will not incur, guarantee, or pledge assets in respect of any new debt that is solely or almost entirely dependent on the revenues of Oncor without first seeking PUC approval."); *see also* Ex. F, 10/18/16 Horton Dep. at 50:13-16; Ex. G, 10/25/16 Hickson Dep. at 80:22-81:15.

cases,[108] this Plan is more feasible than the typical plan of reorganization (which usually contemplates at least the payment of post-emergence fees and expenses for professionals out of the reorganized entity's future cash flows).[109] Therefore, the Plan as it relates to the EFH/EFIH Debtors complies with section 1129(a)(11) of the Bankruptcy Code.

**L.    The Plan as it Relates to the EFH/EFIH Debtors Provides For the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

96.    The Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[110]  The Plan includes an express provision requiring payment of all fees under 28 U.S.C. § 1930.[111]  The Plan, therefore, as it applies to the EFH/EFIH Debtors, complies with section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

**M.    The Plan as it Relates to the EFH/EFIH Debtors Complies with Section 1129(a)(13) of the Bankruptcy Code.**

97.    The Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[112]  "Retiree benefits" is defined under section 1114(a) of the Bankruptcy Code as medical benefits.[113]

---

[108]    Plan, Art. II.A.161 (definition of "EFIH Claims Reserve").

[109]    *See, e.g.*, Third Amended Joint Chapter 11 Plan of Reorganization (as Modified) of Magnum Hunter Resources Corporation and its Debtor Affiliates at Art. II.B.2, *Magnum Hunter Resources Corporation*, et al., No. 15-12533 (Bankr. D. Del. April 17, 2016), ECF No. 1165 ("On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount, **which shall be funded by Reorganized MHRC**." (emphasis added)); Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code at Art. II.A.2.b, *Appleseed's Intermediate Holdings LLC*, et at., No. 11-10160 (Bankr. D. Del. April 11, 2011), ECF No. 638 (". . . from and after the Confirmation Date, **the Reorganized Debtors shall** . . . **pay** in Cash the reasonable legal, professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors through and including the Effective Date.").

[110]    11 U.S.C. § 1129(a)(12).

[111]    Plan, Art. XII.C.

[112]    11 U.S.C. § 1129(a)(13).

[113]    Section 1114(a) defines "retiree benefits" as: " . . . payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical,

54

Article IV.P of the Plan provides that on and after the EFH Effective Date, the payment of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue in accordance with applicable law.  Accordingly, the Plan as it applies to the EFH/EFIH Debtors satisfies section 1129(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

### N.    Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan as it Relates to the EFH/EFIH Debtors.

98.    A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan as it relates to the EFH/EFIH Debtors, and no party has asserted otherwise. Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan as it relates to the EFH/EFIH Debtors because the EFH/EFIH Debtors are not subject to any domestic support obligations.[114]  Section 1129(a)(15) is inapplicable because no EFH Debtor or EFIH Debtor is an "individual" as defined in the Bankruptcy Code.[115]  Section 1129(a)(16) is inapplicable because the Plan as it relates to the EFH/EFIH Debtors does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[116]

### O.    The Plan as it Relates to the EFH/EFIH Debtors Complies with Section 1129(b) of the Bankruptcy Code.

99.    Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) are satisfied.[117]

---

surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(e) (emphasis added).

[114]    *See* 11 U.S.C. § 1129(a)(14).

[115]    *See id.* § 1129(a)(15).

[116]    *See id.* § 1129(a)(16).

[117]    *See* 11 U.S.C. § 1129(b).

To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[118]

> ### i. The Plan as it Relates to the EFH/EFIH Debtors Does Not Unfairly Discriminate with Respect to Impaired Classes that have not Voted to Accept the Plan (Section 1129(b)(1)).

100.    The majority of the Impaired Classes of Claims entitled to vote on the Plan have voted in favor of the Plan.  However, Holders of Claims in Classes B3 and B4 voted to reject the Plan and Classes A14, A16, B8, and B10 are deemed to have rejected the Plan (collectively, the "Dissenting Classes").  Notwithstanding that the Plan has not been accepted by all Impaired Classes, *no party has objected on the basis that the Plan "discriminates unfairly."*

101.    The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[119]  Rather, courts typically examine the facts and circumstances of the particular case to determine whether a plan discriminates unfairly.[120]  Generally, courts have held that a plan is unfairly discriminatory in violation of section 1129(b) only if an impaired non-accepting class receives value that is materially inferior to that received by a class entitled to

---

[118]    *See* 11 U.S.C. § 1129(b)(1); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'").

[119]    *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established").

[120]    *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis …"); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

equal priority, absent a reasonable justification.[121]    "The appropriate inquiry focuses on discrimination among categories of creditors who hold similar legal claims against the debtor, *i.e.* 'Administrative Claims,' 'Secured Claims,' 'Priority Claims,' etc."[122]    A plan does not unfairly discriminate where it provides different treatment to classes that hold dissimilar claims or interests.[123]    Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for the disparate treatment.[124]    The unfair discrimination requirement, which involves a comparison of classes, is distinct from the equal treatment requirement of section 1123(a)(4), which involves a comparison of the treatment of claims within a particular class.

102.    The Plan as it relates to the EFH/EFIH Debtors does not unfairly discriminate against the Dissenting Classes because all similarly situated holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.

103.    ***Classes B3 and B4.*** Holders of Claims in Classes B3 and B4 are receiving payment of their Allowed Claims in full, in Cash, on the EFH Effective Date (or, if not yet Allowed as of the EFH Effective Date, on or as soon as reasonably practicable after the date

---

[121]    *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (noting that one of the "the hallmarks of the various tests" is "whether there is a reasonable basis for the discrimination…."); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[122]    *See Corestates Bank, N.A. v. United Chemical Technologies, Inc.*, 202 B.R. 33, 47 (E.D. Pa. 1996); *see also In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 495 (Bankr. S.D. Ohio 2011).

[123]    *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom., Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[124]    *Aztec Co.*, 107 B.R. at 590.

upon which their Claims become Allowed from the EFIH Claims Reserve).[125]   All other Allowed Secured Claims against the EFH/EFIH Debtors are also being satisfied in full on the EFH Effective Date.[126]   Therefore, these Classes are not receiving treatment that is inferior to that of other secured creditors—and no party has alleged otherwise.

104.   *Other Classes.*   The remaining Dissenting Classes, each of which was deemed to reject the Plan, consist entirely of inter-Debtor Claims or Interests in EFH or EFIH.   Importantly, the treatment of each such Class is largely consensual:   the Holder of each applicable Claim or Interest in such Classes is either an EFH Debtor or an EFIH Debtor, or, with respect to the Holders of Class A16 Claims, party to the Plan Support Agreement approved by the Bankruptcy Court in September 2015.   In addition, Classes A16 and B10 consist of equity interests, which are not similarly situated—legally or otherwise—to any other Class.   Therefore, the Plan does not discriminate unfairly with respect to the Dissenting Classes.

> **ii.    The Plan as it Relates to the EFH/EFIH Debtors Is Fair and Equitable.**

105.   The Plan as it relates to the EFH/EFIH Debtors is fair and equitable with respect to all Classes that have either voted to reject the Plan or that are deemed to reject the Plan.

106.   *Classes B3 and B4.*   With respect to the Holders of EFIH First Lien Note Claims and EFIH Second Lien Note Claims, the plan must provide the secured creditors with one of the three permissible treatments enumerated in section 1129(b)(2)(A) of the Bankruptcy Code in order to satisfy the "fair and equitable" standard:   (i) retention of liens and deferred cash payments equal to the present value of the allowed secured claims; (ii) in the event of a sale of the creditors' collateral free and clear of liens, replacement liens in the sale proceeds; or (iii) the

---

[125]   *See* Plan, Art. III.B.19, III.B.20, VI.A.

[126]   Plan, Art. III.B.1, III.B.17.

…

"indubitable equivalent" of the creditors' claims.[127]  Here, the EFIH Secured Creditors are being provided with payment in full, in Cash, promptly upon the Allowance of their claims and, to protect that treatment for any claims not Allowed as of the EFH Effective Date, replacement Liens (on the EFIH Claims Reserve) solely during the interim period before such Claims are either Allowed and paid in full, in Cash from the EFIH Claims Reserve or disallowed by Final Order.  Furthermore, the Plan explicitly provides for the Bankruptcy Court to retain jurisdiction after the EFH Effective Date to adjudicate any disputes or requests for relief in connection with the EFIH Claims Reserve.  While the EFIH First Lien Notes Trustee and the EFIH Second Lien Notes Trustee disagree, as explained in detail in Part III.A of the Argument, *infra*, these provisions comply with subsection (iii) of section 1129(b)(2)(A) and, in the event it is applicable to the replacement Liens, subsection (ii).

107.  ***Other Classes.***  For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule, which prohibits a junior creditor or equity holder from receiving recovery on account of its junior claims or interests until all senior creditors have received a full recovery on account of their senior claims.[128]

---

[127]  11 U.S.C. § 1129(b)(2)(A)(i)-(iii); 7 Collier on Bankruptcy ¶ 1129.04[2] (16th ed.).

[128]  11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also 203 N. LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative,  if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).   That latter condition is the core of what is known as the 'absolute priority rule.'") *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 463 (2d Cir. 2007) ("This provision codifies the judge-made 'absolute priority rule,' which provided that any plan of reorganization in which 'stockholders [a]re preferred before the creditor, [is] invalid.'" (quoting *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005))).

As a gate-keeping matter, the EFIH First Lien Notes Trustee argues that the proposed Top-Up Tap-Out structure "turns the absolute priority rule on its head" because it allows the EFIH Secured Creditors to haul the EFH Plan Administrator Board and the Initial Supporting Creditors back into the Bankruptcy Court in the event

108.    Of the remaining Dissenting Classes, Classes A16 and B10 are the most junior Classes at their respective silos and claims in more senior Classes are not being paid in full. Therefore, the absolute priority rule is satisfied as to such Classes.  As to Classes A14 and B8, the only Classes of Claims junior to these Classes that may receive any recovery under the Plan are Class A15 (Interests in EFH Debtors Other than EFH Corp.) and Class B9 (Interests in EFIH).  But to the extent these Classes receive any recovery at all, it is simply to maintain the Debtors' prepetition organizational structure for the administrative benefit of the Reorganized Debtors and has no economic substance.   Courts have recognized that such technical preservations for the purpose of corporate formalities do not violate the absolute priority rule.[129] Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

### P.    The Plan as it Relates to the EFH/EFIH Debtors Complies with Sections 1129(c)-(e) of the Bankruptcy Code.

109.    The Plan as it relates to the EFH/EFIH Debtors satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed plan of reorganization.[130]

110.    The Plan as it relates to the EFH/EFIH Debtors also complies with section 1129(d) because the primary purpose of the Plan is not to avoid taxes or securities laws.

---

the EFIH Claims Reserve falls below a prescribed level.  This argument turns the absolute priority rule on its head.  The absolute priority rule prevents junior creditors from receiving recoveries *in lieu* of such recoveries going to rightfully-entitled senior creditors.  It does not speak to the *chronology* of such payments.  *C.f. In re Granite Broadcasting Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (Gropper, J.) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be.").

[129]    *See In re ION Media Networks, Inc.*, 419 B.R. 585, 661 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

[130]    11 U.S.C. § 1129(c).

The primary purpose of the Plan as it relates to the EFH/EFIH Debtors is to restructure the EFH/EFIH Debtors' balance sheets by shedding tens of billions of dollars of funded debt through the execution of certain tax-efficient structures made possible by the Internal Revenue Code and the Private Letter Ruling.[131]

111.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case."[132]    Thus, the Plan as it relates to the EFH/EFIH Debtors satisfies the Bankruptcy Code's mandatory confirmation requirements.

## II.    The Discretionary Contents of the Plan as it Relates to the EFH/EFIH Debtors Are Appropriate.

112.    The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[133]

113.    For the reasons discussed below, the Bankruptcy Court should approve the Plan Releases and the other discretionary provisions of the Plan as it relates to the EFH/EFIH Debtors.

### A.    The Debtor Releases in the Plan Related to the EFH/EFIH Debtors Are Appropriate.

114.    Courts in Delaware and elsewhere generally analyze five factors when determining whether a debtor's release of non-debtors is appropriate, commonly known as the *Zenith* or *Master Mortgage* factors.    The analysis includes an inquiry into whether there is: "(1) an identity of interest between the debtor and non-debtor such that a suit against the non-

---

[131]    *See, e.g.*, *In re 300 Washington St. LLC*, 528 B.R. 534, 554 (Bankr. E.D.N.Y. 2015) ("A debtor may still benefit from avoidance of tax liabilities through its plan, provided that this is not the plan's primary purpose."); *In re Rath Packing Co.*, 55 B.R. 528, 536 (Bankr. N.D. Iowa 1985) ("[T]he Court holds 'the principal purpose' should be strictly construed and essentially means 'most important.'").

[132]    11 U.S.C. § 1129(e).    A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,566,050[]" (excluding debt owed to 1 or more affiliates or insiders)."    *Id.* § 101(51D)(B).

[133]    *Id.* § 1123(b)(1)-(6).

KE 45079065.28

debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan."[134]    These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[135]

115.    Here, the Bankruptcy Court may rely entirely on its findings in connection with the Settlement Agreement releases and the TCEH Confirmation Order.  All of the alleged legacy litigation claims arose prepetition, in connection with the Debtors' 2007 LBO, as well as its predecessor and successor transactions, including various Liability Management Program transactions.  The temporal scope of the postpetition claims that are covered by the releases—up to the EFH Effective Date rather than up to the earlier Settlement Agreement effective date—is therefore immaterial.

116.    An analysis of the *Master Mortgage* factors demonstrates that the releases of the Prepetition Sponsors and the Debtors' directors and officers should be approved.

      a.      ***First***, an identity of interest exists between the EFH Debtors and the Prepetition Sponsors as well as the EFH Debtors and the EFH Debtors' directors and officers because the EFH Debtors are required to indemnify each of the Sponsors and the directors and officers for any liability they incur as a result of any claims brought against the Prepetition Sponsors.[136]

---

[134]   *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) and *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)).

[135]   *Id.* (citing *Master Mortg.*, 168 B.R. at 935).

[136]   *See id.* at 347 (holding that an identity of interest existed between the directors/officers and the debtors where the debtors had to indemnify directors/officers for claims asserted against them); *Charter Commc'ns*, 419 B.R. at 259 (holding that "[t]he indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest"); *Master Mortg.*, 168 B.R. at 935 (noting that the identity of interest is "usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor").

b.    **Second**, the Prepetition Sponsors and directors and officers have made substantial contributions to the Plan as it relates to the EFH/EFIH Debtors. The Prepetition Sponsors consented to the allowance of the $700 million TCEH Settlement Claim, which primes their equity interests, and they transferred their residual equity interests to the TCEH unsecured creditors in the event of any topping bid.[137]    Beyond all this, the Prepetition Sponsors and the directors and officers have also made significant non-monetary contributions to this restructuring, including their participation in 141 board of directors and committee meetings in 2015, 2016, and 2017.[138]

c.    **Third**, the releases are essential to the Plan as it relates to the EFH/EFIH Debtors because they allow the EFH/EFIH Debtors to move forward with the restructuring without tackling lengthy and complex litigation against the Debtors' directors and officers.[139]

d.    **Fourth**, the Plan Releases have substantial support of the creditors entitled to vote on the Plan as it relates to the EFH/EFIH Debtors.

Accordingly, the Bankruptcy Court should approve the Debtor Releases, and no party has asserted otherwise.

**B.    The Third-Party Releases in the Plan as They Relate to the EFH/EFIH Debtors are Appropriate.**

117.    The Third Circuit has identified the factors necessary to approve nonconsensual third-party releases.    Specifically, the Third Circuit has explained that the "hallmarks" of permissible nonconsensual third-party releases would be "fairness, necessity to the

---

[137]    Even if the excess value at EFH Corp. is not ultimately realized, forgoing the *right* to this potential recovery was critical to enabling the global settlement that is integral to the Plan as it relates to the TCEH Debtors and EFH Shared Services Debtors. *See In re Blitz U.S.A., Inc.*, Nos. 2007, 2008, 2005 & 2014, 2014 WL 2582976, at *4 (Bankr. D. Del. Jan. 30, 2014) (holding that consideration provided by Wal-Mart constitutes a substantial contribution where part of the consideration included agreement to relinquish valuable insurance rights).

[138]    *See In re Exide Techs.*, 303 B.R. 48, 74 n.37 (Bankr. D. Del. 2003) (declining to hold that "the price of a release of officers, directors and others must always involve the contribution of tangible 'assets' or that efforts alone of officers and directors are never sufficient to warrant such a release.").

[139]    *See In re Key3Media Grp., Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005); *see Wash. Mut.*, 442 B.R. at 347 (holding the releases were reasonable because in light "of the complex and interrelated claims that the Debtors, JPMC and the FDIC have to virtually every asset in the Debtors' estates, it is hard to imagine what plan the Debtors could propose without the resolution of those claims first").

reorganization, and specific factual findings to support these conclusions."[140]   In so holding, the Third Circuit recognized that there was a split in the Circuits regarding the permissibility of nonconsensual third-party releases and that given such a divide, the Third Circuit would review nonconsensual third-party releases on a case-by-case basis.[141]   Delaware courts that have subsequently ruled on this issue have looked at, among other things, whether (a) the releasee has provided critical contribution to the debtor's plan and (b) whether the release is fair to the nonconsenting creditors (i.e., whether the nonconsenting creditor was compensated for their contributions).[142]   Further, interested parties have received sufficient notice of the releases.[143]

118.   Here, the factors identified by the Third Circuit counsel in favor of the nonconsensual third-party releases in the Plan as it relates to the EFH/EFIH Debtors.   ***The only Classes to reject the Plan—Class B3 and Class B4—are neither Released Parties nor Releasing Parties.***   Indeed, only one party objects to the third-party releases and such objection is to one limited aspect of the third-party releases.

119.   The TCEH Unsecured Ad Hoc Group objects to the proposed third-party release of the Plan Sponsor set forth in the Plan (the "Plan Sponsor Release") to preserve potential claims against NextEra and including its affiliates arising out of the regulatory approval process related to Hunt Plan.   However, any such potential claims are ***already explicitly excluded from***

---

[140]   *In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000).

[141]   *Id.* at 212.

[142]   *See In re Spansion, Inc.*, 426 B.R. 114, 145 (Bankr. D. Del. 2010) (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001) (describing the factual conclusions that may support nonconsensual third-party releases).

[143]   In both the Plan and EFH Disclosure Statement, the releases (as well as the injunction enforcing the releases) were conspicuously set off in **bold** font.  Moreover, in soliciting votes on the Plan, the EFH/EFIH Debtors sent ballots to all impaired stakeholders unambiguously providing in **bold** or all capital letters that stakeholders could vote for or against the Plan or abstain from voting and opt out of the third-party releases contained in the Plan as it relates to the EFH/EFIH Debtors.

*the Plan Sponsor Release provisions of the Plan*,[144] and the Debtors have already made changes to the proposed EFH Confirmation Order in the spirit of further mollifying the TCEH Unsecured Ad Hoc Group's concerns.[145]

120.     Given that any potential claims arising out of NextEra's actions in connection with the PUC approval process are already preserved, it is unclear what possible claims the TCEH Unsecured Ad Hoc Group are seeking to retain.  The TCEH Unsecured Ad Hoc Group's Objection specifically mentions the NextEra's filing of a *Statement of NextEra Energy, Inc. with Respect to Pending Confirmation Matters and Feasible Alternative Restructuring* [D.I. 7028] (the "Statement"), but, as this Court is aware, that statement was stricken almost immediately after it was filed.[146]  Moreover, the statement had no discernible effect on the regulatory proceedings or the bankruptcy proceedings.  At the time, it was already widely known that NextEra was willing to purchase Oncor, and it is highly unlikely that the PUC was unaware of this fact until NextEra filed the Statement.

---

[144]   The Plan's release provisions contain the following:

> **Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any claims or Causes of Action against the Plan Sponsor relating to the Debtors' pursuit of regulatory approvals under the Original Confirmed Plan or claims or Causes of Action that may be brought by the Plan Sponsor against another party who brings a claim or Cause of Action against the Plan Sponsor in connection with the Debtors' pursuit of regulatory approvals under the Original Confirmed Plan.**

*See* Plan, Art. VIII.D (emphasis in original).

[145]   The Debtors proposed to alter NextEra's good faith finding as follows:

> NextEra Energy, Inc., and its affiliates are good faith purchasers within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protections afforded to good faith purchasers to the fullest extent permitted under the Bankruptcy Code, ~~and otherwise have proceeded in good faith in all respects in connection with the Chapter 11 Cases and the transactions contemplated by the Merger Agreement~~.

[146]   *Order Granting Oral Motion to Strike Statement of NextEra Energy, Inc. with Respect to Pending Confirmation Matters and Feasible Alternative Restructuring* [D.I. 7066].

121.   Similarly, the TCEH Unsecured Ad Hoc Group objects to the exclusion of NextEra's subsidiary, Gexa Energy, L.P. ("Gexa"), but, again, the TCEH Unsecured Ad Hoc Group does not have any conceivable claim against Gexa relating to this restructuring.   Gexa participated in the PUC proceedings as a customer of Oncor,[147] and it was only one of many stakeholders that were opposed to the proposed REIT structure.[148]   The TCEH Unsecured Ad Hoc Group simply does not have a colorable claim against Gexa for exercising its legal right to participate in a proceeding, and arguing a widely held position therein.

122.   Moreover, despite the TCEH Unsecured Ad Hoc Group's assertions to the contrary, NextEra provided key financial and non-financial contributions to the Plan and the EFH/EFIH Debtors' path to exit.   *First*, and most fundamentally, NextEra is contributing nearly $10 billion in exchange for EFH Corp.'s indirect economic interest in Oncor.   This source of funding will provide virtually all of the value to be distributed to creditor constituencies under the Plan.   Reasonable purchasers want full releases when they purchase a company, and those releases constitute an important part of the consideration provided to any purchaser.

123.   *Second*, NextEra agreed to bind Merger Sub to the Tax Matters Agreement following the consummation of the Merger.   The negotiations with respect to the Tax Matters Agreement were significant and, in connection with those negotiations, NextEra agreed to significant concessions regarding its indirect ownership of Oncor following the Merger,

---

[147]   *See Gexa Energy, LP's Motion to Intervene* (Oct. 23 2015).

[148]   *See also Commission Staff's Post-Hearing Brief* at *9 (Jan. 28, 2016) ("The very nature of the REIT structure *requires ratepayers to bear unnecessary risks*, while *providing shareholders with multiple benefits* that do not exist for traditional utilities."); *The Alliance of Oncor Cities' Initial Post-Hearing Brief* at *2 (Jan. 28, 2016) ("It is seldom that the Commission is presented with the *unanimity of position* from the *array of stakeholders* representing disparate interest."); *Office of Public Utility Counsel's Post-Hearing Initial Brief* at *5 (Jan. 28, 2016)("Although the proposed Transaction provides *significant benefits to shareholders* . . . Purchasers have *not identified any quantifiable benefits for customers*."); *Texas Industrial Energy Consumers' Initial Brief* at *4 (Jan. 28, 2016) ("The *purported benefits* that have been alleged by the Purchasers are *nowhere near enough to overcome the material risks* and complexity this transaction will create.").

including agreeing to (a) refrain from undertaking certain kinds of M&A transactions with respect to its interest in Oncor for a period of time; and (b) refrain from taking other actions for a period of time that could put the tax treatment of the spin-off of Reorganized TCEH at risk, in each case, without either obtaining the consent of Reorganized TCEH or obtaining a private letter ruling or a "will"-level tax opinion to provide comfort with respect to such actions.[149] Merger Sub also agreed to accept the risk of liability with respect to certain "no-fault" situations in which the spin-off of Reorganized TCEH becomes taxable.[150]  In the same vein, NextEra provided certain key consents related to the Separation Agreement approved as to the EFH/EFIH Debtors pursuant to the TCEH Confirmation Order.

124.    Thus, the Debtors balanced NextEra's desire for full releases with the TCEH Unsecured Ad Hoc Group's concerns, and excluded the category of claims from the Plan's releases that the TCEH Unsecured Ad Hoc Group is most concerned about—*i.e.*, potential claims arising out of NextEra's involvement in the regulatory approval process.  Consequently, the Debtors' proposed releases are fair and necessary, and this Court should overrule the TCEH Unsecured Ad Hoc Group's Objection.

### C.    The Plan's Exculpation Provisions Are Appropriate as They Relate to the EFH/EFIH Debtors.

125.    Exculpation provisions that apply only to estate fiduciaries, and are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[151]  Unlike third-party

---

[149]    Tax Matters Agreement [D.I. 10564-8], at Art. VI § 6.01.

[150]    *Id.* at Art. II § 2.01(a).

[151]    *See Wash. Mut.*, 442 B.R. at 350-51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the EFH/EFIH Debtors' restructuring.[152]

126.    Here, the Plan's definition of Exculpated Parties includes the following estate fiduciaries:

> (a) the Debtors; (b) the Committees and each of their respective members; and (c) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.[153]

127.    The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the EFH/EFIH Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties. ***Indeed, no party has objected to the proposed exculpations set forth in the Plan***.

128.    Moreover, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Bankruptcy Court must reach in confirming the Plan as it relates to the EFH/EFIH Debtors.

---

[152]    *See PWS Holding*, 228 F.3d at 245 (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion, Inc.*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. Apr. 16, 2010) (same).

[153]    Plan, Art. I.A.227.

129.    *First*, as discussed above, this Court must find, under section 1129(a)(2), that the EFH/EFIH Debtors have complied with the applicable provisions of the Bankruptcy Code. Additionally, this Court must find, under section 1129(a)(3), that the plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the EFH/EFIH Debtors and, by extension, to the EFH/EFIH Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan as it relates to the EFH/EFIH Debtors was negotiated at arm's length and in good faith.  Here, as discussed above, the EFH/EFIH Debtors and their officers, directors, and professionals actively negotiated with holders of claims and interests across the Debtors' capital structure throughout these chapter 11 cases. Accordingly, the Bankruptcy Court's findings of good faith vis-à-vis the Debtors' chapter 11 cases should also extend to the Exculpated Parties.

130.    *Second*, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan as it relates to the EFH/EFIH Debtors that has paved the way for a successful reorganization of such Debtors, and likely would not have been so inclined to participate in the plan process without the promise of exculpation.  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.[154]  In addition, it is well established that the liability of statutory committees and their professionals under section 1103 of the Bankruptcy Code is limited to acts of gross negligence and willful misconduct, making their inclusion as Exculpated Parties entirely appropriate.[155]

---

[154]    *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[155]    *See PWS Holding*, 228 F.3d at 246-47 (holding that the appropriate standard of liability under section 1103 is "willful misconduct or *ultra vires* acts," and approving an exculpation of the creditors committee and its professionals subject only to liability for willful misconduct or gross negligence).

131.    The EFH/EFIH Debtors therefore request that this Court approve the Plan's exculpation provisions with respect to such Debtors and adopt the appropriate standard of liability for the Exculpated Parties with respect to such Debtors' chapter 11 cases.

**D.    The Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained In the Plan as it Relates to the EFH/EFIH Debtors.**

132.    The Plan's injunction provision as it relates to the EFH/EFIH Debtors simply provides the enforcement mechanism for the releases and exculpation provisions of the Plan. This injunction generally provides that all entities are permanently enjoined from prosecuting or otherwise pursuing claims released or exculpated under the Plan.[156]    The Plan's release and exculpation provisions as they relate to the EFH/EFIH Debtors would be substantially weakened without the injunction provision.    Moreover, the injunction provided in the Plan is consistent with other injunctions approved in this district.

133.    The EFIH First Lien Notes Trustee argues that there may be ambiguity in the Plan injunction provision, such that it could be read to somehow enjoin the EFIH First Lien Notes Trustee or the related Holders from prosecuting the EFIH Intercreditor Litigation against the EFIH Second Lien Notes Trustee.[157]    This concern is misplaced.    By its terms, the discharge provision only discharges Claims against the Debtors, not the "Released Parties," and the injunction provision only seeks to implement the discharge.    The language flagged by the EFIH First Lien Indenture Trustee that refers to "Released Parties" is followed by an "as applicable," making clear that the injunction provision does not import the discharge to non-Debtor

---

[156]    The Plan's injunction provision applies to the discharge of claims against and interests in the EFH/EFIH Debtors.    *See* Plan, Art. VIII.F.

[157]    *See* EFIH First Lien Notes Trustee Obj. 38-39.

entities.[158]  To the extent there is any lingering doubt regarding the ability of the EFIH First Lien

Notes Trustee or its Holders to pursue Claims against the EFIH Second Lien Notes Trustee or its

Holders in connection with the EFIH Intercreditor Litigation, the EFH/EFIH Debtors expect to

request a ruling in the EFH Confirmation Order specifically preserving such rights.

Accordingly, the Bankruptcy Court should overrule the EFIH First Lien Notes Trustee's

Objection to the injunction provisions.

## III.    The Bankruptcy Court Should Overrule the Objections to the Plan as it Relates to the EFH/EFIH Debtors.

### A.    The Bankruptcy Court Should Overrule the EFIH First Lien Notes Trustee's and the EFIH Second Lien Notes Trustee's Objections.

134.    The Plan is fair and equitable with respect to the EFIH Secured Creditors because

it provides the indubitable equivalent of their Claims under section 1129(b)(2)(A)(iii):  payment

in full, in Cash, promptly upon the Allowance of their Claims.  The only Claims that will ***not*** be

paid in full on the EFH Effective Date are Claims that have either merely been asserted, and not

yet Allowed, or Claims that are the subject of an active appeal—in either case, Claims against

the EFH/EFIH Debtors that are not yet payable and may never be payable.[159]  However, once

any such Claims do become Allowed, they will also be paid in full, and as soon as reasonably

practicable.  Importantly, the Claims are mutually exclusive—under no circumstances will the

EFH/EFIH Debtors have to pay ***both*** the Makewhole Claims ***and*** the Indemnification Claims

and/or Breach Claims.

---

[158]    *See* Plan, Art VIII.F ("[A]ll entities that have held, hold or may hold Claims or Interests that have been released . . . are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, ***as applicable***, the Debtors, the Reorganized Debtors, or the Released Parties . . .") (emphasis added).

[159]    *See* 4 Collier on Bankruptcy ¶ 502.01 (16th ed.) ("The Bankruptcy Code is keyed to allowable claims.  Holders of ***allowed claims may receive distributions*** in chapter 7 cases or under confirmed plans in chapter 9, 11, 12 and 13 cases.  A claim holder's rights with respect to a proposed plan are ***measured by the allowed amount*** of its claim under sections 943, ***1129(b)***, 1225 and 1325 of the Bankruptcy Code." (emphases added)).

71

135.    Full and prompt payment in Cash on the EFH Effective Date of any Claims that are Allowed as of the EFH Effective Date, together with the replacement Liens on the EFIH Claims Reserve to "bridge" until the remaining asserted Claims are liquidated and Allowed, satisfies the "fair and equitable" requirement with the respect to the EFIH Secured Creditors. Despite this, the EFIH First Lien Notes Trustee and the EFIH Second Lien Notes Trustee allege that the Plan is not "fair and equitable" with respect to certain of their Claims because the EFH/EFIH Debtors are not proposing to escrow sufficient funds in the EFH/EFIH Claims Reserve and posit an illogical world where either *both* the Makewhole Claims *and* the Indemnification Claims and Breach Claims could ultimately be paid or a world in which the EFH/EFIH Debtors and the EFH Plan Administrator Board comply with the rulings in the EFH Confirmation Order—and nonetheless remain liable for future, contingent, unliquidated claims for Future Interest.[160]   Importantly, neither the EFIH First Lien Notes Trustee nor the EFIH Second Lien Notes Trustee contend that this issue should bar confirmation of the Plan.  Rather, all parties agree that this disagreement is one that can—and will—be resolved by the Bankruptcy Court at the EFH Confirmation Hearing.[161]

    **i.**    **Prompt Payment In Full, In Cash of the EFIH Secured Creditors' Claims with Replacement Liens on the EFIH Claims Reserve Meets the "Indubitable Equivalent" Standard.**

136.    Section 1129(b)(2)(A)(iii) of the Bankruptcy Code allows confirmation of a plan over the objection of a class of secured creditors where the plan provides "for the realization by

---

[160]   EFIH First Lien Notes Trustee Obj. 12-34; EFIH Second Lien Notes Trustee Obj. ¶ 10-28.  The EFIH Second Lien Notes Trustee also asserts that Holders of EFIH Second Lien Notes should receive a Lien on the EFH/EFIH Distribution Account.  EFIH Second Lien Notes Trustee Obj. ¶ 28-30.  For the reasons addressed in Part IV.C.III of the Background, *supra*, such Lien cannot and should not be granted.

[161]   EFIH First Lien Notes Trustee Obj. 28 (stating that the reserve amount should be increased, but not calling for rejection of the EFIH Claims Reserve construct entirely); EFIH Second Lien Notes Trustee Obj. ¶ 8 (same).

such holders of the indubitable equivalent of such claims."[162]    Although "indubitable equivalent"
is not defined in the Bankruptcy Code, courts generally examine (a) whether the property granted
to the secured lender is completely compensatory and (b) the likelihood that the secured creditor
will actually be paid in full (*i.e.*, that the "safety" of the principal amount of the claim is
assured).[163]    Some courts have conflated these factors when evaluating whether substitute
collateral is completely compensatory.[164]    A debtor may provide a secured creditor with
alternative collateral "as long as it doesn't increase the risk of his becoming undersecured in the
future"—if the "risk profile" of the new collateral is the same or better than of the original, the
substitute collateral may be proper.[165]    Ultimately, to find an "indubitable equivalent" requires
that "there be no doubt that replacement recoveries are equal to existing security interests."[166]
Indeed, as long as a secured creditor is not left off in a worse position than the one they
bargained for, a debtor may substitute the entirety of the secured creditor's collateral.[167]

---

[162]    11 U.S.C. § 1129(b)(2)(A)(iii).

[163]    *See, e.g., In re Inv. Co. of the Sw.*, 341 B.R. 298, 324 (B.A.P. 10th Cir. 2006) (noting that collateral substitution requires a court to examine both the value of the substitute collateral and the risk imposed by that substitution); *In re Arnold & Baker Farms*, 85 F.3d 1415, 1422 (9th Cir. 1996) ("[I]n order for a partial distribution to constitute the most 'indubitable equivalence,' the partial distribution must insure the safety of or prevent jeopardy to the principal."); *In re Sun Country Dev., Inc.*, 764 F.2d 406, 409 (5th Cir. 1985) ("In *Murel*, 75 F.2d at 942, Judge Hand considered whether the substituted security was completely compensatory, and the likelihood that the secured creditor would be paid, in determining whether the plan of reorganization provided the secured creditor with the indubitable equivalent of his original security."); *In re Lightsquared Inc.*, 513 B.R. 56, 93 (Bankr. S.D.N.Y. 2014) (stating that "courts generally will find the requirement satisfied where a plan both protects the creditor's principal and provides for the present value of the creditor's claim"); *In re Sparks*, 171 B.R. 860, 866 (Bankr. N.D. Ill. 1994) (requiring that the indubitable equivalent test must "examine (1) whether the substituted security is completely compensatory and (2) the likelihood that the secured creditor will be paid").

[164]    *See Inv. Co. of the Sw.*, 341 B.R. at 319 ("[N]ew collateral with a value projected to be equal to, or even more than, the original collateral is not 'completely compensatory,' if the new collateral is so much riskier than the original collateral that there is a substantially greater likelihood that the secured creditor will not ultimately be paid.").

[165]    *In re River East Plaza, LLC*, 669 F.3d 826, 832-33 (7th Cir. 2011).

[166]    *Lightsquared*, 513 B.R. at 93.

[167]    4 *Collier on Bankruptcy* ¶ 506.06 (16th ed. 2016).

KE 45079065.28

137.    The Plan provides the indubitable equivalent of the EFIH Secured Creditors' Claims by (a) paying any Claims that are Allowed as of the EFH Effective Date in full, in Cash on the EFH Effective Date, (b) paying any Claims that are subsequently Allowed in full, in Cash on or as soon as reasonably practicable after the date such Claims are Allowed, and (c) ensuring that sufficient funds will be available to pay all subsequently Allowed Claims in full by escrowing ample funds in the EFIH Claims Reserve on the EFH Effective Date, by providing the EFIH Secured Creditors with a Lien on those funds and by this Court's continuing jurisdiction to ensure there is never a deficit in the EFIH Claims Reserve.[168]

138.    Though the EFIH First Lien Notes Trustee asserts that the Plan proposes to pay the EFIH Secured Creditors' Claims "over time,"[169] this distorts the nature of the treatment being provided to the EFIH Secured Creditors.  "Over time" is a phrase typically used to describe the repayment of a claim via ***periodic distributions*** over the course of years, even though that claim is Allowed as of the plan's effective date.[170]  By contrast, here, the EFIH Secured Creditors will "get [their] money," as Judge Learned Hand phrased it, as soon as their Claims are Allowed.[171] The ***Plan*** imposes no deferral on the payment of any part of their Claims that are, or become,

---

[168]    *See* Plan, Article III.B.19, Article III.B.20, Article VI.A. For the reasons stated herein, the EFH/EFIH Debtors satisfy section 1129(b)(2)(A)(iii) by providing the EFIH Secured Creditors with payment of their Allowed Claims in full, in cash, as promptly as possible and replacement Liens in the EFIH Claims Reserve to ensure that the EFIH Secured Creditors' Claims that are ineligible for payment on the EFH Effective Date remain oversecured until they are Allowed or Disallowed.  Additionally, to the extent that section 1129(b)(2)(A)(ii) applies, the EFH/EFIH Debtors have satisfied the requirements imposed by that subsection as well.

[169]    EFIH First Lien Notes Trustee Obj. 5 ("Where, as here, a plan allows the debtor to keep an over-secured creditor's collateral and to pay the secured creditor over time . . .").

[170]    *See, e.g.*, *Inv. Co. of the Sw.*, 341 B.R. 298, 319-20 (B.A.P. 10th Cir. 2006) (describing a plan in another case that provided that a "secured creditor would retain its lien and receive deferred cash payments totaling the ***allowed*** amount of its claim" as providing "full payment over time" (emphasis added)); *In re Bryant*, 439 B.R. 724, 728-29, 747 (Bankr. E.D. Ark. 2010) (noting that the debtors propose to pay part of a secured creditor's allowed claim in a lump sum up front, and the remainder of the allowed claim "over time"); *In re 222 Liberty Assocs.*, 108 B.R. 971, 991 (Bankr. E.D. Pa. 1990) ("The Sixth Plan proposes to pay . . . the remaining sixty (60%) percent of their ***allowed*** claims over time pursuant to a note." (emphasis added)).

[171]    *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2nd Cir. 1935).

Allowed.  In fact, it seeks to distribute billions of dollars of plan recovery on the EFH Effective Date on account of the EFIH Second Lien Notes principal and interest Claims.

139.    The proposed treatment of the EFIH Secured Creditors' Claims is completely compensatory because it provides for the prompt payment of their Allowed Secured Claims in full, in Cash.  It is undeniable that prompt payment of cash in U.S. dollars—the world's reserve currency—in the amount of a claim constitutes full satisfaction of that claim.[172]  Indeed, the only reason the EFIH Secured Creditors are considered impaired is because, though many of their Claims are contingent, unliquidated, and/or disputed and, therefore, will not be Allowed such that they may be satisfied on the EFH Effective Date, the EFIH Secured Creditors' existing Liens will be released on the EFH Effective Date, rather than upon payment of the Claims.

140.    Without the early release of their existing Liens, the EFIH Secured Creditors would be Unimpaired creditors who are deemed to accept the Plan.  It follows, of course, that the proposed treatment of payment in full, in Cash, as soon as practicable upon the Allowance of the Claims constitutes the indubitable equivalent of the EFIH Secured Creditors' Claims. Importantly, the "principal" amount of any Claims that are ultimately Allowed will include any interest that is Allowed, thereby ensuring satisfaction "in full" of Allowed Claims despite any delay of payment beyond the EFH Effective Date.  For example, if the Makewhole Claims are ultimately Allowed, the interest on interest and Additional Interest that has accrued from the Petition Date through the date of payment of such Allowed Claims will also be paid in full, in

---

[172]    *See, e.g.*, *River Road Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 650 (7th Cir. 2011) (stating that providing cash in the amount of a secured creditor's allowed claim would constitute "indubitable equivalent"); *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 309 (3d Cir. 2010) ("Because the proposed cash payout of the value of the collateral provided the secured lenders with the "indubitable equivalent" of their claims, the plan was confirmable under subsection (iii)."); *see also* 7 *Collier on Bankruptcy* ¶ 1129.04 (16th ed. 2016) ("The essence of [*Philadelphia Newspapers*] . . . is that cash received from an auction or private sale of collateral is the 'indubitable equivalent' of the value of the secured creditor's allowed secured claim.  As such, payment of such cash can satisfy (iii)'s indubitable equivalence requirement.").

Cash to the extent such Claims are Allowed.[173]  And, allowance of the Makewhole Claims would render moot or invalid most of the other categories of Claims that *only* exist, for what they are worth, in a world where no Makewhole Claims are disallowed by Final Order.

141.   The proposed treatment also protects the "safety" of full payment on account of the EFIH Secured Creditors' Allowed Claims by providing a replacement Lien on the EFIH Claims Reserve.  Unlike other forms of collateral, cash held in an interest-bearing account is virtually risk-free.[174]  As such, the Plan does not give rise to the same concerns that courts have raised when declining to find that proposed "substitute collateral" is completely compensatory.[175] In those cases, the debtors sought to supply their secured creditors with a lien on real or personal property in which there was a minimal or dubious equity cushion.[176]  That is not the case here.

142.   The Plan calls for the amount to be escrowed for the benefit of the EFIH Secured Creditors to reflect (a) a reasonable estimate of the maximum amount of the EFIH Secured

---

[173]  Plan, Art. III.B.19(b)(iv), Art. III.B.20(b)(iv).  The EFIH First Lien Notes Indenture Trustee and the EFIH Second Lien Notes Indenture Trustee believe that interest should accrue post-EFH Effective Date at the contractual rate of interest.  The EFH/EFIH Debtors reserve the right, however, to argue that the contract rate of interest is not appropriate for the post-EFH Effective Date time period.

[174]  *See In re LightSquared Inc.*, 513 B.R. 56, 93 (Bankr. S.D.N.Y. 2014) (noting that if a creditor had voted to reject a plan that proposed full payment in cash, its good faith in rejecting the proposed plan would be subject to "serious question"); Aswath Damodaran, DAMODARAN ON VALUATION 72 (2d ed. 2006) ("Investments in cash . . . have betas close to zero."); *see also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 378 (stating that the genesis of the indubitable equivalence analysis referred not to analyzing assured interest, but instead to jeopardized principal).  The interest borne by the account compensates for any inflation that may occur in the interim before the EFIH Secured Creditors are paid on account of Allowed Claims.  Otherwise, there is no "diminution in value" concern—unless a disbursement is made, every dollar escrowed today will be available to satisfy claims tomorrow.

[175]  As noted above, the EFH/EFIH Debtors intend to file a modified Plan that includes a provision that the EFIH Claims Reserve shall be invested in an account that complies with section 345 of the Bankruptcy Code.

[176]  *See, e.g., In re Arnold and Baker Farms*, 177 B.R. 648, 662 (B.A.P. 9th Cir. 1994) (holding that a partial distribution of collateral to a secured creditor was not "completely compensatory" because the creditor was forced to absorb the risk of a deflated sale price without recourse against remaining collateral, even though the valuation of partial collateral exceeded the secured claim); *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935) (holding that a plan which required a mortgagee with a ten percent equity cushion to forego amortization payments for ten years failed the test of indubitable equivalence because the small equity cushion and delay in payment created too great a risk that the creditor would not be paid in full).

Creditors' allowable Claims or (b) any other amount that the Bankruptcy Court decides is necessary to provide the EFIH Secured Creditors with the indubitable equivalent of their Claims. The EFIH Secured Trustees appear to contend that their replacement Liens must attach to collateral that has the same value as the as their existing collateral.[177] This is simply incorrect. Courts have acknowledged that in providing substitute collateral, a debtor need only ensure they do not increase the risk that the secured creditor will not receive payment of their principal.[178] Where, as here, a secured creditor is oversecured by a significant margin, a smaller cushion in their collateral can still afford that creditor the same degree of assurance of payment in full.  As the Seventh Circuit has explained, a secured creditor "is entitled to the preservation of so much of his security interest as is necessary to generously secure his claim, but to no more.  He may not paralyze the debtor and gratuitously thwart the other creditors by demanding superfluous security."[179]  While the EFIH Secured Creditors are entitled to—and will receive—replacement Liens on enough cash to cover the reasonably estimated maximum amount of their allowable claims, the EFIH Secured Trustees are seeking to divert hundreds of millions of additional dollars to the EFIH Claims Escrow.  Such "over-funding" of the EFIH Claims Reserve is unnecessary to provide the EFIH Secured Creditors with the indubitable equivalent of their Claims and is merely meant to punish Holders of EFIH Unsecured Note Claims.

---

[177]   EFIH First Lien Notes Trustee Obj. 18, EFIH Second Lien Notes Trustee Obj. ¶¶ 59-60.

[178]   *See, e.g.*, *River Road Hotel Partners v. Amalgamated Bank*, 651 F.3d 642 (7th Cir. 2011) (noting that a secured creditor's substitute collateral under a reorganization must provide value equal to the initial lien, not value equal to the initial collateral); *In re Temple Zion*, 125 B.R. 910, 922 (Bankr. E.D. Pa. 1992) (holding that confirmation under section 1129(b)(2)(A)(iii) need not provide a secured creditor need receive the indubitable equivalent of its original collateral, and approving plan provision which provided cash payment in replacement of the initial collateral).

[179]   *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992).

143.    The EFH/EFIH Debtors are confident that escrowing their proposed amount today will ensure that the EFIH Secured Creditors receive payment in full of their Claims upon Allowance in the future.  *This* is the point at the crux of the dispute.  The EFIH Secured Trustees do not object to the Plan's construct for the treatment of EFIH Secured Creditors' Claims, they simply disagree with the amount that must be escrowed to eliminate reasonable doubt that the EFIH Secured Creditors will actually be paid in full.  The EFH/EFIH Debtors propose to escrow an empirically based estimate of the maximum amount of the EFIH Secured Creditors' Claims, thereby enabling other creditors to receive today the value they will be receiving under the Plan, while the EFIH Secured Trustees insist that all of the Merger Sub Cash Amount be held back to account for scenarios that are highly unlikely or mutually exclusive.

144.    The battle cry of the EFIH Secured Trustees has been that the EFIH Claims Reserve fails to ensure they will remain oversecured for three primary reasons:  *First*, the proposed three-year duration of the EFIH Claims Reserve is inadequate in light of the ongoing Makewhole Litigation.[180]  *Second*, the EFH/EFIH Debtors are not seeking to escrow any amounts on account of Future Interest Claims or Breach Claims, or any additional amounts on account of Trustee Indemnification Claims.[181]  *Third*, the EFIH Secured Trustees disagree with

---

[180]   EFIH First Lien Notes Trustee Obj. 12-22; EFIH Second Lien Notes Trustee Obj. ¶¶ 31-38.

[181]   EFIH First Lien Notes Trustee Obj. 22-27; EFIH Second Lien Notes Trustee Obj. ¶¶ 39-52.  The EFH/EFIH Debtors surmise that the EFIH First Lien Notes Trustee has abandoned its argument that it would be unacceptable to escrow any amount less than all of the Merger Consideration and Cash at EFIH (after payment of structurally senior Claims) because there may be presently-unknown secured claims that could arise in the future.  Ex. H, 1/4/17 Disclosure Statement Hr'g Tr. at 26:4-10.  To the extent the EFIH First Lien Notes Trustee or the EFIH Second Lien Notes Trustee attempts to resurrect such argument, the EFH/EFIH Debtors reserve the right to argue that escrowing amounts on account of such claims is unnecessary because such "unknown unknowns" cannot exist at this stage of the chapter 11 cases.

the EFH/EFIH Debtors' proposed method for calculating interest on the Makewhole Claims and the Secured Creditor Fees.[182]

145.    The delta between the EFH/EFIH Debtors' proposal and what the EFH/EFIH Debtors understand to be the EFIH Secured Trustees' demand is stark after accounting for the EFIH Secured Trustees' arguments described above and, in greater detail, herein.  The following chart portrays this delta:

---

[182]    EFIH First Lien Notes Trustee Obj. 27-28; EFIH Second Lien Notes Trustee Obj. ¶¶ 53-56.



Note: All numbers reflect amounts that will be incurred if the Makewhole Litigation Lasts for 3 years. Analysis assumes the Bankruptcy Court prohibits the EFH/EFIH Debtors from making any distribution to the EFIH Second Lien Notes on the EFH Effective Date on account of the $1.7 billion principal amount outstanding.

146.    Each of the EFIH Secured Trustees' arguments should be rejected for the reasons set forth below and based on the evidence to be provided at the EFH Confirmation Hearing.

### ii.    Three Years is a Sufficient Escrow Period.

147.    A "look-forward" period of three years is appropriate given that the outside date on which the EFIH Secured Creditors' Claims may become Allowed is the date on which there is a Final Order with respect to their Makewhole Claims.  As described in detail in the First Amended EFH Plan Supplement, the EFH/EFIH Debtors performed an empirical analysis of the litigation scenarios the Debtors view as reasonably probable.[183]  The EFH/EFIH Debtors reviewed a comprehensive set of cases from the last five years and calculated the average, median, minimum, and maximum expected time for the Third Circuit, New York Court of Appeals, and United States Supreme Court (the "Supreme Court") to render the necessary decisions to reach a final order.

148.    Depending on which path the appeals take, the EFH/EFIH Debtors projected median times of 576, 543, and 245 days: roughly 1.6, 1.5, and 0.7 years.  The *maximum* expected time of the *longest* path is 978 days—roughly 2.7 years.  That unlikely scenario would require the Makewhole Litigation to go through all of five possible stages of appellate review and for each of those stages to take the *maximum* amount of time that stage has taken in *any case* in the applicable courts in the last five years.  Even if the Makewhole Litigation takes a sedate stroll through the federal and state courts, the amount the EFH/EFIH Debtors propose to escrow will be more than sufficient to cover the EFIH Secured Creditors' Claims that have accrued during that time.

---

[183]    First Amended EFH Plan Supplement, at Exhibit E.

KE 45079065.28

149.    The EFIH Secured Trustees nonetheless devote significant space in their Objections to attacking the Debtors' analysis.  Specifically, the EFIH Secured Trustees complain that the EFH/EFIH Debtors did not factor in the timing for "Phase Two" of the Makewhole Litigation.[184]

150.    The EFH/EFIH Debtors did not include projections for Phase Two of the Makewhole Litigation in their empirical analysis because, unsurprisingly, post-Makewhole solvency determinations do not comprise a statistically significant data set.  Nonetheless, the EFH/EFIH Debtors do not believe a decision to pursue Phase Two would render the three-year escrow insufficient.  As discussed below, Phase Two is likely to involve narrow legal issues requiring little fact development or discovery. In other words, the Bankruptcy Court can and should address critical threshold issues contemplated by Phase 1 and Phase 2 in parallel immediately: (a) is solvency relevant in determining whether an oversecured creditor is entitled to an otherwise enforceable makewhole claim and (b) if solvency is relevant, is the appropriate time to measure solvency the petition date or the effective date of the plan (in which case market value as determined by an already approved and consummated sale becomes the self-evident barometer by which solvency is measured).

151.    The EFIH Secured Trustees identified anecdotal, nationwide examples of bankruptcy-related litigations that—*from start to finish*—took more than three years.   The EFH/EFIH Debtors' empirical analysis of the *relevant* courts in light of the advanced procedural posture of *this* Makewhole Litigation (the Third Circuit, the New York Court of Appeals, and the Supreme Court) and the actions they may be asked to take (*i.e.*, certifying a question or ruling on a petition for rehearing en banc) reflects a more predictive approach than the EFIH Secured

---

[184]    EFIH First Lien Notes Trustee Obj. 13-20; EFIH Second Lien Notes Trustee Obj. ¶¶ 31-34.

KE 45079065.28

Trustees' cherry picking. In contrast to the EFH/EFIH Debtors' analysis, the cases cited by the EFIH Secured Trustees are of limited predictive value for at least five reasons.

152. ***First***, the Makewhole Litigation is at an advanced stage. All that remains in Phase 1 is a narrow legal question—one which a Third Circuit panel answered nearly three months ago. Importantly, the clock on the EFIH Claims Reserve does not start ticking until the EFH Effective Date occurs. Assuming an EFH Effective Date of April 30, 2017, the EFH/EFIH Debtors' petition for rehearing and certification will have been pending for 136 days. The cases cited by the EFIH Secured Trustees do not provide an apples-to-apples comparison because they calculate time from the first day of those cases.[185] It is irrelevant how long these cases took to reach a decision by a circuit court of appeal. We are already there. What matters is how long proceedings took ***after*** the circuit court issued its decision, and that is the focus of the EFH/EFIH Debtors' empirical analysis.

153. ***Second***, a closer examination of the EFIH Secured Trustees' cases reveals unusually long delays in many of those proceedings, ones the EFIH Secured Trustees should have—in fairness to the Bankruptcy Court—pointed out in their papers.[186] Reasonable delays are understandable and expected, but the Debtors understand that all parties to the Makewhole Litigation are incentivized to expeditiously move the litigation forward. In fact, if any party is

---

[185]   *See In re Motors Liquidation Co.*, No. 09-50026, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y.) (avoidance action has taken 7 years, 7 months, but ***5 years, 5 months ran from first filing to the Second Circuit's reversal***); *In re ASARCO LLC*, No. 05-21207 (Bankr. S.D. Tex.) (action took 5 years and 4 months, but ***less than 14 months passed between Fifth Circuit ruling and Supreme Court opinion***); *In re Glob. Indus. Techs., Inc.*, No. 02-21626 (Bankr. W.D. Pa.) (action took 6 years, 9 months to resolve, but ***4 years, 11 months ran from the first filing of the objection to the Third Circuit's reversal***).

[186]   *See, e.g., In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y.) (district court took 2 years and 10 months to issue opinion after hearing oral argument after parties jointly requested a deferral due to ongoing settlement talks [D.I. 58]); *In re Adelphia Commc'ns Corp.*, No. 02-41729, Adv. Pro. No. 03-4942 (Bankr. S.D.N.Y.) (bankruptcy court agreed not to resolve motion to dismiss until first resolving motions filed by other defendants, leading to effective stay of 4 years, 3 months); *In re Dow Corning Corp.*, No. 95-20512 (Bankr. E.D. Mich.) (district court twice took at least 3 years to rule on summary judgment motion, prompting joint petition for writ of mandamus to Sixth Circuit requesting ruling).

economically incented to delay, it is the EFIH Secured Creditors, due to the continued accrual of above-market interest.

154.    **Third**, some of the EFIH Secured Trustees' cases have not even reached the court of appeals, or have had no additional proceedings after a decision by the court of appeals.  As a result, these cases provide zero insight for the Bankruptcy Court into how long appellate rehearing proceedings may take, or how long proceedings take on remand.[187]

155.    **Fourth**, certain of the EFIH Secured Trustees' cases are flatly inapplicable.  The EFIH Second Lien Creditors cite generally to the *Lehman Brothers* case, the largest bankruptcy of all time, with more than 10 times as much debt as this case and operations and creditors on every continent.  On October 31, 2016, the trustee reported that of the more than ***134,000 claims*** administered in the case, only 427 remain pending.[188]  The Makewhole Litigation involves just ***two claims***.  Also, the EFIH Secured Trustees cite litigations involving fraudulent transfer claims, ignoring that any such potential claims—as well as the universe of any such claims that could be asserted against the Debtors—were settled in 2015.[189]

156.    **Fifth**, the fundamental issue in Phase Two is a straightforward legal question:  whether, under bankruptcy law, oversecured creditors of an insolvent estate are entitled to makewhole premiums.   Given all parties' stated interest in expediting these

---

[187]    *See, e.g., In re Boston Generating LLC*, No. 10-14419, Adv. Pro. No. 12-01879 (Bankr. S.D.N.Y.) (4 years, 5 months of proceedings, but no proceedings before district court or Second Circuit); *In re Lyondell Chem. Co.*, No. 09-10023, Adv. Pro. No. 10-05525 (Bankr. S.D.N.Y.) (6 years of proceedings before the bankruptcy court and district court, but no proceedings before the Second Circuit); *In re Lyondell Chem. Co.*, No. 09-10023, Adv. Pro. No. 10-4609 (Bankr. S.D.N.Y.) (same);  *In re W.R. Grace & Co.*, No. 01-01139 (Bankr. D. Del.) (claim for post-petition interest took 5 years, 8 months to reach the Third Circuit, but the Third Circuit granted the parties' motion to dismiss and proceedings ended).

[188]    *In re Lehman Brothers Inc.*, Case No. 08-01420 (SCC) (Bankr. S.D.N.Y. Oct. 31, 2016), ECF No. 13941.

[189]    *See In re Tribune Co. Fraudulent Conveyance Litig.*, No. 11-2296 (S.D.N.Y. 2011); *In re Adelphia Commc'ns Corp., No. 02-41729, Adv. Pro. No. 03-4942 (Bankr. S.D.N.Y.)*; *In re Lyondell Chem. Co.*, No. 09-10023, Adv. Pro. No. 10-05525 (Bankr. S.D.N.Y.).

KE 45079065.28

proceedings, the EFH/EFIH Debtors are hopeful that a stipulation to the relevant facts—that the EFIH Secured Creditors are oversecured, and that the EFIH Debtors are insolvent—is possible.    Accordingly, the EFIH Secured Trustees' reliance on cases with fact-heavy issues on remand is not persuasive.[190]    To the extent a Phase Two ruling is appealed, the EFH/EFIH Debtors' empirical analysis demonstrates any appeal should take, on average, under two years.

157.    **Finally**, it should be noted that certain of the Top-Up Tap-Out provisions directly spoke to the concerns regarding the length of the EFIH Claims Reserve:  the combination of reporting on the EFIH Claims Reserve amounts and the agreement by the EFH/EFIH Debtors, the EFH Plan Administrator Board, and the Makewhole Litigation Committee regarding the level of EFIH Claims Reserve that would validate a return to the Bankruptcy Court specifically addressed these concerns.    Again, the Top-Up Tap-Out structure is merely a suggestion on one way this Court can exercise its continuing jurisdiction to safeguard against future deficits in the EFIH Claims Reserve if the Makewhole Litigation takes longer than the empirical evidence suggests it will.

158.    Moreover, while the Debtors feel a three-year reserve is more than adequate, that amount will not be etched in stone.  The Plan provides that the Bankruptcy Court shall retain continuing jurisdiction to address the EFIH Claims Reserve post-EFH Effective Date.[191]    If the Debtors' estimate turns out to be flawed, or should the allowed claim values increase for any reason, threatening the adequacy of the EFIH Claims Reserve, the EFIH Secured Creditors will surely return to the Bankruptcy Court and seek an order increasing the value of the EFIH Claims

---

[190]    *See, e.g.*, *In re Bank of New England Corp.*, No. 91-10126 (Bankr. D. Mass.) (proceedings on remand involved the fact heavy issue of the parties' intentions in entering into a subordination agreement, and whether the parties intended for subordinated indebtedness to include post-petition interest).

[191]    *See* Plan, Art. XI.

Reserve or requiring the MLOC to terminate the Makewhole Litigation.  Under the Plan, the Bankruptcy Court will be well within its power to do so.

### iii.    No Amounts Should be Escrowed on Account of "Future Interest" Claims and the EFIH 2L Effective Date Payment Should be Authorized.

159.    The EFIH Second Lien Note Trustee asserts that the EFIH Claims Reserve must include funds escrowed on account of alleged "Future Interest Claims"—*i.e.*, Claims for interest on distributions that will indefeasibly be made under the Plan by the EFH/EFIH Debtors to the EFIH Second Lien Notes Trustee, but which the EFIH Second Lien Notes Trustee may decline to disburse to Holders of EFIH Second Lien Note Claims (collectively, the "<u>EFIH Second Lien Holders</u>") as a result of the ongoing EFIH Intercreditor Litigation.  Relatedly, the EFIH First Lien Notes Trustee asserts that the entirety of the EFIH 2L Effective Date Payment must be included in the EFIH Claims Reserve (accruing contractual interest at 12 percent) and not disbursed to Holders of EFIH Second Lien Notes until such time as the EFIH Intercreditor Litigation—to which the EFH/EFIH Debtors are not party—is fully and finally resolved.  The EFH/EFIH Debtors disagree on all counts.

160.    The EFIH Second Lien Holders are not entitled to any recovery on account of Future Interest Claims under the EFIH Second Lien Note Indenture, the Bankruptcy Code, or applicable case law.  As such, as part of adjudicating the issue of the reserve, the Bankruptcy Court is well within its power to estimate the asserted Future Interest Claims at $0 and decline to allocate funds on account of such claims to the EFIH Claims Reserve.  Bankruptcy Courts routinely apply section 502(c) of the Bankruptcy Code to estimate the appropriate allocation of funds to a reserve on account of contingent and/or unliquidated claims,[192] including estimating a

---

[192]    *See, e.g.*, *In re Chemtura Corp.*, 448 B.R. 635, 649 (Bankr. S.D.N.Y. 2011) (specifically noting that 502(c) is used in the context of estimating reserves); *In re Jacom Computer Servs., Inc.*, 280 B.R. 570, 571, 573 (Bankr.

disputed claim at $0 where that claim is determined to have little chance of success on the merits.[193]

161.    Moreover, the EFH/EFIH Debtors are requesting a ruling in the EFH Confirmation Order that the EFIH Intercreditor Litigation will be fully preserved as between the EFIH Secured Creditors.  The Bankruptcy Code does not require the EFH/EFIH Debtors to hold the EFIH 2L Effective Date Payment hostage until such time the EFIH Intercreditor Litigation is resolved.  In other words, if the EFH/EFIH Debtors determine to make the EFIH 2L Effective Date Payment on the EFH Effective Date to the EFIH Second Lien Notes Trustee, the ongoing EFIH Intercreditor Litigation should not serve as an obstacle to such Plan distribution.

162.    The EFIH Second Lien Note Trustee relies on sections 12.01 and 12.02 of the EFIH Second Lien Note Indenture, which provide in relevant part:

> If the Trustee or Paying Agent is ***unable*** to apply any money or Government Securities ***in accordance with Section 12.01*** hereof by reason of legal proceeding or by reason of any order or judgement of any court or government authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred ***pursuant to Section 12.01*** hereof . . . .[194]

This provision does not provide for the continued accrual of interest under the circumstances presented by these chapter 11 cases for several reasons.

---

S.D.N.Y. 2002) (granting motion of disbursing agent to estimate claims at zero for purposes of establishing an appropriate reserve).  Because section 502(c) states "[t]here shall be estimated," some courts have held estimation to be mandatory when the criteria of 502(c) are met.  *See, e.g., Int'l Bhd. of Teamsters v. IML Freight, Inc.*, 789 F.2d 1460, 1463 (10th Cir. 1986) ("502(c) requires that such unliquidated claims must be estimated for allowance if liquidation of the claim would unduly delay closing of the case.").

[193]    *See In re JMO Wind Down Inc.*, Case No. 16-10682 (BLS) (Bankr. D. Del Oct. 13, 2016) (order estimating disputed claim at $0.00 for purposes of establishing a reserve under plan); *Jacom Computer Servs.*, 280 B.R. at 573 (estimating claim at zero in order to estimate reserve).

[194]    EFIH Second Lien Note Indenture § 12.02 (emphases added).  Section 8.07 contains similar language to Section 12.02, but as that section applies only to legal and covenant defeasance, it is inapplicable. To the extent that this Court finds it relevant, the Debtors would reiterate the arguments made herein against the application of 12.02.

163.     *First*, no "deposit" will be—nor need be—made ***pursuant to Section 12.01***.  The distributions anticipated to be made to the EFIH Second Lien Notes Trustee on the EFH Effective Date will only be made pursuant to the EFH Confirmation Order and the Plan. The EFIH Debtors are not seeking to be discharged from their obligations by operation of Section 12.01 of the EFIH Second Lien Note Indenture, but rather under section 1141 of the Bankruptcy Code.   Indeed, the EFIH Debtors' ability to be discharged from their obligations to the EFIH Second Lien Holders hinges on whether they can effectuate a plan of reorganization in compliance with the requirements of the Bankruptcy Code, not on whether they satisfy the requirements of either Sections 12.01(1) or 12.01(2) of the EFIH Second Lien Note Indenture. Once the EFIH Debtors are discharged of their obligations to pay principal and accrued interest on the EFIH Second Lien Notes under the Plan and pursuant to section 1141 of the Bankruptcy Code, interest will cease to accrue on those claims, regardless of the provisions of the underlying Indentures.[195]   Indeed, plans that purport to do exactly that are routinely confirmed in this, and other, districts.[196]

164.     ***Second***, even if Section 12.02 applies to payments made pursuant to a plan of reorganization, the provision would not require reinstatement of the EFIH Debtors' obligations under the EFIH Second Lien Notes Indenture.  There is no legal proceeding, order, or judgment

---

[195]  *See In re 785 Partners LLC,* 470 B.R. 126 (Bankr. S.D.N.Y. 2012).  In *785 Partners*, the court refused to allow a late payment penalty claim to a oversecured creditor even though it would have been due under the applicable loan documents.  *Id*. at 138. That court noted that "the Debtor will never make a late payment of an amount due under the Loan Documents" because the loan documents and all other "obligations and rights of the parties are extinguished and replaced by the plan."  *Id*. at 137.

[196]  *See, e.g.*, *Magnum Hunter Resources Corporation*, et al., Case No. 15-12533 (KG) (Bankr. D. Del. April 17, 2016) [D.I. 1165] (the applicable plan distributions "shall be deemed completed when made to the Indenture Trustee[.]"); *Appleseed's Intermediate Holdings LLC,* et at., Case No. 11-10160 (KG) (Bankr. D. Del. April 11, 2011) [D.I. 638] (the applicable plan distributions "shall be deemed completed when made to the First Lien Agent"); *Neff Corp*., et al., No. 10-12610 (SCC) (Bankr. S.D.N.Y. September 20, 2010) [D.I. 444] (the applicable plan distributions were to "be deemed completed when made by the Purchaser or the Disbursing Agent (on behalf of the Purchaser) to the Indenture Trustee.").

that would make the Second Lien Notes Trustee ***unable*** to apply the money distributed to it under the Plan.  While the EFIH Second Lien Notes Trustee may be ***unwilling*** to disburse Plan distributions to the EFIH Second Lien Holders as a result of the EFIH Intercreditor Litigation, that unwillingness cannot be interpreted as an ***inability*** to make such disbursements to the detriment of the EFIH Debtors and their estates.  The term "unable" means to lack means or opportunity.[197]   "Ability is not defined by preference."[198]   While the EFIH Second Lien Notes Trustee may determine for any number of reasons that it would rather not make the distribution to its Holders, it certainly has the necessary means, opportunity, and power to effect a distribution.  Where provisions of a contract are clear, "courts must enforce those terms as written."[199]   The current situation does not fall within this provision of the Indentures and, therefore, the EFIH Second Lien Notes Trustee would be choosing to withhold the distribution, which does not trigger reinstatement of the Notes.

165.    ***Third***, so long as the EFH/EFIH Debtors act pursuant to and under the direction of the Bankruptcy Court's confirmation order, the EFH/EFIH Debtors will not be required to escrow any amounts on account of the Future Interest Claims, regardless of whether the EFIH Second Lien Notes Indenture calls for the accrual of Future Interest.  Under such circumstances, the Bankruptcy Court can either (a) direct the EFIH Second Lien Notes Trustee to distribute funds received pursuant to the Plan to the EFIH Second Lien Holders or (b) authorize the Disbursing Agent designated by the EFH/EFIH Debtors to distribute the funds under the Plan directly to the EFIH Second Lien Holders, notwithstanding any provision in the EFIH Collateral

---

[197]   *Norgard v. Brush Wellman, Inc.*, No. 81899 2003 WL 21234940, at *2 (Ohio Ct. App. May 29, 2003) ("The dictionary defines 'unable' as lacking the necessary power or resources.")

[198]   *Id.*

[199]   *In re Big V. Holding Corp.*, 267 B.R. 71, 91 (Bankr. D. Del. 2001).

Trust Agreement that may suggest otherwise, and make a finding that interest is cut off as of the

date of distribution under either scenario.  Indeed, ***the Bankruptcy Code expressly contemplates

this result***.  Section 1129(b) of the Bankruptcy Code expressly states:

> **Notwithstanding section 510(a) of this title**, if all of the
> applicable requirements of subsection (a) of this section other than
> paragraph (8) are met with respect to a plan, the court, on request
> of the proponent of the plan, shall confirm the plan
> notwithstanding the requirements of such paragraph if the plan
> does not discriminate unfairly, and is fair and equitable, with
> respect to each class of claims or interests that is impaired under,
> and has not accepted, the plan.[200]

166.    Section 510(a) of the Bankruptcy Code provides that subordination agreements—

such as the EFIH Collateral Trust Agreement—are enforceable in bankruptcy to the same extent

as under nonbankruptcy law.[201]   Therefore, section 1129(b) specifically allows a Bankruptcy

Court to confirm a plan of reorganization ***even if it does not comport with an applicable

subordination agreement***.   Judge Carey acknowledged this straightforward reading of section

1129(b) in *Tribune* in connection with holding that the plan of reorganization there could be

confirmed even if it did not fully comply with the applicable subordination agreement.[202]   As

Judge Carey noted, "the meaning of 'notwithstanding section 510(a) of this title' means that

1129(b) is applied without prevention or obstruction of any applicable subordination

agreements."[203]

---

[200]   11 U.S.C. § 1129(b)(1) (emphasis added).

[201]   11 U.S.C. § 510(a).

[202]   *In re Tribune Co.*, 472 B.R. 223, 241 (Bankr. D. Del. 2012), *vacated in part on other grounds*, No. 08-13141, 2014 WL 2797042 (D. Del. Jun. 18, 2014) (appeal pending); *see also In re Croatan Surf Club, LLC*, No. 11-00194-8, 2011 WL 5909199, at *2 (Bankr. E.D.N.C. Oct. 25, 2011) ("Therefore, a court can confirm a plan which disrupts bargained for priority, and thus is inconsistent with the terms of a subordination agreement, as long as it is fair and equitable and does not discriminate unfairly.").

[203]   *Tribune*, 472 B.R at 241.

KE 45079065.28

167.    Similarly, in *TCI 2 Holdings*, the court held that the plan of reorganization was confirmable even if it violated an otherwise applicable intercreditor agreement.[204]   In that case, the debtors' plan provided for payments to second lien creditors despite provisions in the intercreditor agreement that arguably prohibited such payments.[205]   However, the court found the intercreditor agreement to be inapplicable to the plan because of the plain language in section 1129(b)(1) of the Bankruptcy Code.[206]   That court noted that:

> [t]he only logical reading of the term 'notwithstanding' in section 1129(b)(1) seems to be: "**Even though section 510(a) requires the enforceability of subordination agreement in a bankruptcy case to the same extent that agreement is enforceable under the nonbankruptcy law, if a nonconsensual plan meets all of the § 1129(a) and (b) requirements, the court 'shall confirm the plan.'"** The phrase "[n]otwithstanding section 510(a) of this title" removes section 510(a) from the scope of 1129(a)(1), which requires compliance with "the applicable provisions of this title." 11 U.S.C. § 1129(b)(1).[207]

168.    Finding that the plan could be confirmed even if there were a breach of an intercreditor agreement, the court in *TCI 2 Holdings* declined to make a ruling with regard to the ongoing intercreditor litigation.   However, the confirmation order preserved the issue by including the following language:

> Notwithstanding anything contained in this Order or the Plan to the contrary, nothing contained in this Order (including without limitation, paragraph 40 hereof ("Releases and Exculpations")) or the Plan shall constitute a release of the Second Lien Indenture Trustee, the collateral agent therefor, the holders of Second Lien Note Claims, the Backstop Parties, the members of the Ad Hoc Committee, or any of their respective direct or indirect subsidiaries, current and former directors, officers, employees,

---

[204]   *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 141 (Bankr. D.N.J. 2010).

[205]   *Id*. at 139.

[206]   *Id*. at 141.

[207]   *Id*. (emphasis added).

affiliates, agents, financial advisors, investment bankers, professionals, accountants and attorneys and their respective partners, owners and members and all of their predecessors, successors and assigns, from any liability to the First Lien Lenders or the First Lien Collateral Agent(s) in connection with any breaches and/or violations of under the Intercreditor Agreement (as defined in the Final Cash Collateral Order).[208]

169.    The result in *TCI 2 Holdings* was mandated by the plain meaning of the statute. "***The plain meaning of legislation should be conclusive***, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"[209] "Generally, where the text of a statute is unambiguous, the statute should be enforced as written and ***"[o]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language***."[210] "Ultimately, we are left where we began—***where the statutory directive is clear we are bound to enforce that directive***. To the extent this holding permits a course of conduct not contemplated or not desirable under the Code, as the Lenders argue it does, it is the sole province of Congress to amend a statute that carries out by its plain language an undesirable end."[211]

170.    Section 1129(b) is unambiguous. In interpreting the meaning of "notwithstanding" in another section of the Bankruptcy Code, the Third Circuit found that "[i]t means 'in spite of' or 'without prevention or obstruction from or by.'"[212] It "is best understood

---

[208]    *In re TCI 2 Holdings, LLC*, et al., No. 09-13654, at *29 (JHW) (Bankr. D. N.J. May 7, 2010).

[209]    *U.S. v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242 (1989) (emphasis added) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571 (1982)).

[210]    *In re Philadelphia Newspapers, LLC,* 599 F.3d 298, 314 (3d Cir. 2010) (emphasis added) (quoting *United States v. Albertini,* 472 U.S. 675, 680 (1985)).

[211]    *Id*. at 317 (emphasis added).

[212]    *In re Goody's Family Clothing Inc.,* 610 F.3d 812, 817 (3d Cir. 2010).

as an exception to the general procedures. . . that ordinarily apply."[213]  In other words, "notwithstanding" in Section 1129(b) operates as an exception to the general procedures of 510(a) that ordinarily apply.  Indeed, any other interpretation would require reading notwithstanding out of the statute altogether.  This Court could arguably be justified to make such a departure from the clear language if, and only if, a party were to make "the most extraordinary showing of contrary intentions in the legislative history[,]" but that is a showing that no party can make here.[214]

171.    Accordingly, whether or not Future Interest accrues as a result of the EFIH Collateral Trust Agreement is ultimately irrelevant to the present question.  The Plan provides for payment on account of the EFIH Second Lien Notes to the EFIH Second Lien Notes Trustee on the EFH Effective Date and, under the applicable provisions of the Bankruptcy Code, this Court can authorize the EFH/EFIH Debtors to make their intended Plan distributions to the EFIH Second Lien Notes Trustee on the EFH Effective Date, notwithstanding the alleged enforceability of the EFIH Collateral Trust Agreement against EFIH, and make a finding that interest is cut off as of the date of distribution under either scenario.  Indeed, and it bears repeating, courts in this district and others have regularly included provisions in plan confirmation orders explicitly noting that a debtor's plan distribution obligations are deemed complete when made to an indenture trustee.[215]  And why not?  What more can a debtor do than indefeasibly pay an allowed claim in full and in cash? For the same reasons, and in the spirit of section 1129 of the Bankruptcy Code, this Court can further direct the EFIH Second Lien Notes

---

[213]   *Id.*

[214]   *Philadelphia Newspapers*, 599 F.3d at 314.

[215]   *See supra* note 196 and accompanying text.

93

Trustee to distribute those funds to the Holders, or, alternatively, authorize the EFH/EFIH

Debtors to make Plan distributions directly to Holders of Allowed EFIH Second Lien Note

Claims, in either case notwithstanding any language in the EFIH Collateral Agreement to the

contrary.

172.    Therefore, the EFH/EFIH Debtors assert that no funds need to be escrowed on

account of Future Interest and hereby request that the Bankruptcy Court (a) authorize the

EFH/EFIH Debtors to make the EFIH 2L Effective Date Payment on the EFH Effective Date and

(b) direct the EFIH Second Lien Notes Trustee to distribute promptly to Holders of Allowed

EFIH Second Lien Note Claims, on a *Pro Rata* basis, any Plan distributions it receives on or

after the EFH Effective Date or, in the alternative, authorize the EFH/EFIH Debtors to make

Plan distributions directly to Holders of Allowed EFIH Second Lien Note Claims, and make a

finding that interest is cut off as of the date of distribution under either scenario.

**iv.    No Separate Amounts Must Be Escrowed On Account of Contingent, Unliquidated Trustee Indemnification Claims or Breach Claims.**

**(A)    There is No Likely Scenario in Which Additional Amounts Have to Be Escrowed *Now* on Account of Future, Unliquidated, Contingent Breach Claims or Trustee Indemnification Claims.**

173.    The EFIH Second Lien Indenture Trustee asserts that additional funds must be

escrowed on account of potential Trustee Indemnification Claims[216]—*i.e.*, Claims that the EFIH

Second Lien Notes Trustee may assert against the EFIH Debtors for indemnification for liability

---

[216]    EFIH Second Lien Notes Trustee Obj. ¶¶ 5, 50-52.  While the EFIH First Lien Notes Trustee "acknowledges that . . . if an indemnification claim arises as a result of the Intercreditor Litigation, the amount initially reserved to cover the EFIH First Lien Makewhole Claim with interest should be sufficient to provide that indemnification," id. ¶ 51, the EFIH First Lien Notes Trustee opens its Objection by stating that "no decision by this Court could establish the right answer [with respect to other claims, including potential indemnification claims] with requisite finality.  Under such circumstances, the EFIH Claims Reserve must be set assuming the maximum possible amount will ultimately be allowed."  *Id.* ¶ 5  Given the lack of clarity as to the EFIH First Lien Notes Trustee's position, the EFH/EFIH Debtors must address the Trustee Indemnification Claims as if the EFIH First Lien Notes Trustee is requesting additional amounts be escrowed.  The EFIH First Lien Notes Trustee did not specifically assert any Trustee Indemnification Claims in its Objection.

94

incurred to a Holder of an EFIH Second Lien Note Claim, as applicable.  Additionally, the EFIH

First Lien Notes Trustee alleges that the EFIH Claims Reserve is required to allocate hundreds of

millions of dollars for its contingent and unliquidated "Breach" Claims against EFIH for

violation of the EFIH Collateral Trust Agreement.

174.    It should go without saying that a Holder of a Claim cannot receive a "premium"

over the allowed amount of its claim.[217]  In other words, expectation damages are not appropriate

where a Holder of a Claim has recovered the full amount of its allowed Claim.[218]  Viewed

through the lens of that fundamental bankruptcy principle, and as illustratively depicted below,

there is no currently conceivable scenario in which the EFH/EFIH Debtors must escrow

additional amounts on account of Trustee Indemnification or Breach Claims.

---

[217]  *See* 7 *Collier on Bankruptcy* ¶ 1129.03 (16th ed. 2016) ("The second major component of the "fair and equitable" requirement is that no creditor or interest holder be paid a 'premium' over the allowed amount of its claim.  Once the participant receives or retains property equal to its claim, it may receive no more." (citing *In re Evans Prods. Co.*, 65 B.R. 870, 873 (S.D. Fla. 1986) (holding that a plan should be confirmed if no specific debtor was to receive more than 100% of claims); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (noting that a senior class of creditors, under 1129 (b)(2), may not receive more than full compensation for its claims).

[218]  *See, e.g., In re HSBC Bank USA, Nat. Ass'n v. Calpine Corp.*, No. 07 Civ 3088 (GBD), 2010 WL 3835200, at *2, *6 (S.D.N.Y. Sept. 15, 2010) (denying trustee's claims for expectation damages and repayment premiums and noting that an oversecured claimant may only recover for reasonable fees, costs, or charges provided for under its agreement with the debtor on an allowed claim)).



Indeed, if the Trustee Indemnification Claims or the Breach Claims are ever Allowed at the maximum possible amount at the same time the EFIH Secured Creditors' other Claims are Allowed at the maximum amount, payment on account of both would result in a double recovery on account of the same liability—an occurrence the Bankruptcy Code attempts to prevent at every turn.[219]  As a double recovery would be impossible, a "double escrow" is unnecessary.

---

[219]  *See* 11 U.S.C. § 502(e) (safeguarding against double payment by disallowing an entity's claims for reimbursement or contribution to the extent the entity has asserted a right of subrogation under 11 U.S.C. § 509); 11 U.S.C. § 509 (disallowing an entity from receiving double payment on account of its subrogation rights where the underlying claim of the creditor has been allowed or disallowed, or the entity has already received payment from the debtor on account of the creditor's claim).

**(B)    The EFIH 2L Effective Date Repayment Should be Authorized.**

175.    The Plan proposes to distribute the EFIH 2L Effective Date Payment to the EFIH Second Lien Notes Trustee on the EFH Effective Date.  In response to this proposed payment, the EFIH First Lien Notes Trustee argues that it is improper for the Bankruptcy Court to approve this distribution as it would "direct one non-debtor to breach its contractual obligation to another."[220]  To support this point, the EFIH First Lien Notes Trustee cites to two bankruptcy court decisions.[221]  The proffered cases are either clearly distinguishable from the facts at hand,[222] or, in stark contradiction of the EFIH First Lien Notes Trustee's purported argument, stand for the notion that the Bankruptcy Court's consideration of a private contract between non-debtors should *not* be dispositive of its prescribed treatment of the estate.[223]  Moreover, the EFH/EFIH Debtors intend to seek a ruling in the EFH Confirmation Order that the EFIH Intercreditor Litigation is fully preserved as between the EFIH Secured Creditors—in other words, any Claims the EFIH First Lien Notes Trustee or its Holders have against the EFIH Second Lien Notes Trustee and its Holders under the EFIH Collateral Trust Agreement will not be impaired or modified by the EFH Confirmation Order.  In the absence of a more compelling reason to withhold over two billion dollars from Holders of EFIH Second Lien Note Claims (and punish junior creditors' recoveries while such withheld amounts accrue interest at 12 percent),

---

[220]    EFIH First Lien Notes Trustee Obj. 24.

[221]    *Id.* (citing *In re Prime Motor Inns*, 130 B.R. 610, 614 (S.D. Fla. 1991)); *In re 4 Front Petroleum, Inc.*, 345 B.R. 744, 752 n.7 (Bankr. N.D. Okla. 2006).

[222]    *See 4 Front Petroleum*, 345 B.R. at 752 n.7 (noting that "the Court is not aware of any provision of the Bankruptcy Code that authorizes officers and directors of a debtor in possession, or its professionals, to breach duties owed to non-debtor third parties").  This citation offers no support its stated proposition: that *the Court* may not direct the EFIH Second Lien Notes Trustee to distribute amounts to Holders of EFIH Second Lien Notes.

[223]    *See In re Prime Motor Inns*, 130 B.R. at 614 (determining the Bankruptcy Court lacked subject matter jurisdiction to enjoin distribution relating to an agreement to which the debtors were not parties).

the EFH/EFIH Debtors respectfully request the Court authorize the EFIH 2L Effective Date Repayment.

### v. Interest Should be Calculated Assuming Semi-Annual Compounding.[224]

176. Interest on the EFIH First Lien Notes and EFIH Second Lien Notes should be calculated assuming semi-annual compounding as provided for under the respective Indentures,[225] and not compounded daily as argued by the EFIH Secured Trustees.[226] When calculating interest, bankruptcy courts typically apply a "presumption of allowability" for the contracted-for default rate, provided that the rate is not unenforceable under applicable nonbankrupcty law.[227] Thus, the inquiry requires first, a determination of the applicable contract rate under non-bankruptcy law and second, a determination of whether the Bankruptcy Code alters the rights of the creditors.[228] Here, under the plain language of the Indentures, applicable New York law (which governs the Indentures),[229] and the Bankruptcy Code, interest on the EFIH

---

[224] For the avoidance of doubt, the EFH/EFIH Debtors, the Reorganized Debtors, the EFH Plan Administrator Board, the Initial Supporting Creditors, the Makewhole Litigation Oversight Committee and all other parties continue to reserve the right set forth in the Plan to challenge the interest rate that should apply to the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims on a post-EFH Effective Date basis. *See, e.g.*, Plan, Article III.B.19.b.(iv) (stating that the EFIH First Lien Note Claims are Allowed in an amount equal to the sum of, among other things, the amount of any other Claims and interest thereon "*if and to the extent such Claims are held to be allowed by a court of competent jurisdiction pursuant to a Final Order, whether entered before, on or after the EFH Effective Date.*").

[225] *See* Notes ¶ 1, *Interest*.

[226] EFIH First Lien Notes Trustee Obj. 27-28; EFIH Second Lien Notes Trustee Obj. ¶ 26-27.

[227] *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) (citations omitted); *see also In re Laymon*, 958 F.2d 72, 75 (5th Cir. 1992) (holding "that when an oversecured creditor's claim arises from a contract, the contract provides the rate of post-petition interest," subject to examination of "the equities involved in [the] bankruptcy proceeding"), *cert. denied sub nom Crozier v. Bradford*, 506 U.S. 917 (1992); *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994).

[228] *See id.*

[229] *See* Notes § 13.08 (stating that the New York law governs "the Indenture, the Notes, and the Guarantees").

KE 45079065.28

First Lien Notes and EFIH Second Lien Notes should be calculated on a semi-annual compounding basis.

177.    ***First***, the Indentures plainly state that the "Issuer will pay interest . . . *semi-annually* in arrears.[230]   Having cited no case law or statutory support to support an alternative reading of the plain language of the Indentures, the EFIH Secured Trustees have not met their burden to overcome the presumption in favor of interest calculated on a semi-annual basis.[231]   ***Second***, the argument that interest should compound daily is in contravention of applicable New York Law.  "Under New York law, compound interest is disfavored[232] and is not recoverable unless the governing documents expressly and specifically set forth an entitlement to compound interest."[233]   Further, although compound interest that is expressly provided for in an agreement is enforceable,[234] New York courts have stated that "compound interest cannot be implied into an agreement" as a matter of law.[235]   Here, the Indentures do not expressly provide for daily compound interest.[236]   Absent such an express provision, the EFH/EFIH Debtors respectfully

---

[230]   *See* Notes ¶ 1, *Interest* (emphasis added).

[231]   *See In re Laymon*, 958 F.2d at 75; *In re Terry Ltd.*, 27 F.3d at 243.

[232]   *See, e.g.*, *Rourke v. Fred H. Thomas Assocs.*, 216 A.D.2d 717, 718 (N.Y. App. Div. 1994).

[233]   *In re Foamex Int'l Inc.*, 382 B.R. 867, 870 (D. Del. 2008) (citing *In re Marfin Ready Mix Corp.*, 220 B.R. 148, 159 (Bankr. E.D.N.Y. 1998); *Gutman v. Savas*, 17 A.D.3d 278, 279 (N.Y. App. Div. 1st Dep't 2005); *In re City of New York*, 824 N.Y.S.2d 768 (N.Y. Sup. Ct. Aug. 24, 2006)); *see also In re Kosinski*, 409 B.R. 268, 271 (Bankr. D. Mass. 2009) (finding that "[t]he general rule . . . is that in the absence of statutory or express agreement by the parties, interest is presumed to be simple interest"); *see also*, *Cherokee Nation v. United States*, 270 U.S. 476, 490 (1926) ("The general rule, even as between private persons, is that, in the absence of a contract therefor or some statute, compound interest in not allowed to be computed upon a debt."); *Devex Corp. v. Gen. Motors Corp.*, 749 F.2d 1020, 1025 (3d Cir. 1984) (same).

[234]   N.Y. Gen. Oblig. Law § 5-527 (McKinney) (stating that "[a] loan or other agreement providing for compound interest shall be enforceable" under New York law).

[235]   *In re Foamex Intern.*, 382 B.R. at 870 (citing *Rourke*, 216 A.D.2d at 718).

[236]   *See* Notes ¶ 1, *Interest*.

request that the Bankruptcy Court should not impose such a rate over one that has been expressly agreed upon by the parties.[237]

178.    The District Court for the Southern District of New York addressed the exact same set of facts in *Themis Capital, LLC v. Democratic Republic of Congo*.  The parties in that case advocated for two competing interpretations of how to calculate default interest under a contract.[238]  Party A advocated for interest "coming due" at the end of the applicable overdue period (*i.e.*, in this case, semi-annually, as the EFIH First Lien Notes Trustee concedes is the time period set forth in the applicable Indenture).  Party B advocated for interest coming due "on demand."  The contract at issue, like the Indentures here, contemplated interest to be payable "on demand" but, like the Indentures here, did not set delineate the date or dates of such demand.   In ruling for Party A, the court noted that, "it would be a strange result to have such interest *accrue* monthly [*i.e.*, here, semi-annually], but to make it *due* only upon the creditors' demand."[239]  The Themis court refused to take that leap.

179.    The court went on to say that Party B's argument would require the court to read in the words "due and" before "payable on demand."[240]  Here, the Court is faced with virtually identical circumstances.  By the EFIH First Lien Notes Trustee's own Objection, the EFIH First Lien Notes obligate EFIH in the event of default to "pay interest . . . on overdue principal and premium, if any, from time to time on demand at the interest rate on the Notes" and to "pay interest . . . on overdue installments of interest . . . from time to time on demand at the interest

---

[237]   The EFH/EFIH Debtors note that the premise of the EFIH Secured Trustees' argument for daily compounding is that they "made a demand" for amounts payable under the respective Indentures every day following the first missed coupon date.  No such demand was ever actually made.

[238]   35 F. Supp. 3d 457 (S.D.N.Y. 2014), *rev'd on other grounds*, 626 F. App'x 346, 349 (2d Cir. 2015).

[239]   *Id.* at 488.

[240]   *Id.*

KE 45079065.28

rate on the Notes."[241]    The EFIH First Lien Notes Trustee does not—and cannot—cite to any language stating that the interest is *due* on demand or that "demands" are tied to any specific time period.    The EFH/EFIH Debtors urge the Court to follow New York law's hostility to compounding, the absence of necessary, overriding language, and the sound reasoning of the *Themis Capital* court and find that interest accrues and becomes due semi-annually, consistent with the language in the Indentures.

        **B.**      **The Proposed Fee Process for Review of 1L/2L Fees is Appropriate and Fair.**

        180.      The EFH/EFIH Debtors provide comprehensive detail regarding the process and timing for review and payment of the Fees and Expenses of Non-Retained Professionals (the "Proposed Fee Process") in Exhibit D to the First Amended Plan Supplement.    The EFH/EFIH Debtors respect the importance of prompt payment for the Fees and Expenses of Non-Retained Professionals and have developed the Proposed Fee Process with that priority in mind.

        181.      Specifically, the Proposed Fee Process provides for payment of ***80 percent*** of the fees and ***100 percent*** of the expenses submitted within ***fifteen business days*** following receipt of requests for both pre- and post-Effective Date Fees and Expenses.    Based on the estimates received by the EFH/EFIH Debtors, that is ***over $50 million to be paid within fifteen business days of the EFH Effective Date*** on account of pre-EFH Effective Date Fees and Expenses (assuming all pre-EFH Effective Date invoices are received by the EFH Effective Date).

        182.      Although the Proposed Fee Process makes prompt payment of Non-Retained Professional Fees and Expenses a priority, as fiduciaries of the Estate, the EFH/EFIH Debtors bear an obligation to create a fee review process that balances that speed with the necessary

---

[241]    *See* EFIH First Lien Notes Trustee Objection, ¶ 27.

diligence to ensure the Fees and Expenses are reasonable and allowable under applicable bankruptcy law. To this end, the Proposed Fee Process allows time for affected parties to review fee requests for pre- and post-Effective Date Fees and requires that such parties communicate a final compensation proposal within 90 days of receipt of pre-Effective Date fee requests and 45 days of receipt of post-Effective Date fee requests. In the interest of judicial economy, if a dispute arises, the EFH/EFIH Debtors have allotted 30 days for the parties to reach an agreement before seeking a ruling from the Bankruptcy Court.

183.    Ignoring the fiduciary obligations of the EFH/EFIH Debtors and the EFH Plan Administrator Board, the EFIH Secured Trustees object to what they perceive as an overly long process given that the EFH/EFIH Debtors have already been in possession of some of the invoices for some time. First, it bears highlighting, the EFH/EFIH Debtors are proposing a timeline for review that is significantly less onerous than the ones to which the EFH/EFIH Debtors own retained professionals adhere. Even putting that aside, however, whether fees are reasonable depends on the context in which they are sought.[242] To have reviewed and passed judgment on the Non-Retained Professional Fees and Expenses prior to the EFH Effective Date would have been premature. Furthermore, the Proposed Fee Process also addresses fees that have not yet been incurred—there can be no doubt that a process is warranted to govern the review of fees that will be provided to the EFH/EFIH Debtors going forward. Ultimately, the proposed periods for review and consensus-seeking represent a good faith estimate of the time necessary for various interested parties to conduct a sufficient review of voluminous invoices, including detailed narratives, that span 36 months. Any less time will jeopardize the EFH/EFIH

---

[242] *See In re Mariner Post-Acute Network, Inc.*, 257 B.R. 723, 731 (Bankr. D. Del. 2000) ("In any case in which the party seeks to receive an interim payment of fees, it must seek Court approval of the procedure in advance. The professional has the burden to show that the proposed procedure is appropriate in the context of each case."); *see also In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 851 (3d Cir. 1994) (observing that a context analysis is necessary to determine whether clerical fees may be compensable).

Debtors' ability to properly review and evaluate the fee requests and, thus, to comply with their fiduciary duties.

184.    In what appears to be an attempt to proffer evidence that there is no valid reason for the allotted time periods in the Proposed Fee Process, the EFIH First Lien Notes Trustee alerts the Bankruptcy Court that, in prior settlement negotiations, the EFH/EFIH Debtors were prepared to pay 100 percent of the EFIH Secured Creditors' accrued Fees and Expenses on the EFH Effective Date.[243]  This fact does not weigh on the fairness or appropriateness of the *current* Plan that does not have the support of the EFIH Secured Creditors.  As the EFIH Secured Trustees and their professionals are well aware, parties are often willing to make concessions in the context of a global settlement that are not appropriate in the absence of a settlement.

### C.    The Bankruptcy Court Should Overrule the Asbestos Objectors' Objection.

### i.    The Plan Was Proposed In Good Faith.

185.    Ignoring the evidence and the Bankruptcy Court's prior rulings in these chapter 11 cases, the Asbestos Objectors once again accuse EFH Corp. of "self-dealing" and continue to press their theme that there is "no valid reorganizational purpose for discharging" unpreserved unmanifested asbestos claims.[244]  As the record shows, however, the Debtors fought hard to achieve the value-maximizing results for the LSGT Debtors and their creditors—full reinstatement of their intercompany claims and preserved asbestos claims, and a solvent Reorganized EFH Corp.[245]  To achieve these results, the Debtors, among other things, (a) requested the Asbestos Bar Date to better understand the LSGT Debtors' potential asbestos

---

[243]    EFIH First Lien Notes Trustee Obj. 37.

[244]    Asbestos Objectors Obj. 35-36.

[245]    *See* the Bankruptcy Court's *Opinion* denying the Asbestos Objectors' motion to dismiss the chapter 11 petitions of the LSGT Debtors [D.I. 10414] (the "MTD Opinion"), at 3.

KE 45079065.28

liabilities and provide more certainty to E-Side bidders, (b) engaged in significant negotiations with NextEra and other potential purchasers to convince them to reinstate identified asbestos-related claims, and, if anything, (c) expended leverage by asking bidders to assume asbestos liabilities, including a $100 million set-aside in the Asbestos Escrow Account, which would otherwise go to other unsecured creditors of EFH Corp.

186.    It bears repeating: any other treatment of unmanifested asbestos claims would have had dire effects for all EFH and EFIH creditor constituencies.  There is no evidence that any bidder would have been willing to accept anything other than a discharge of unmanifested asbestos claims (which is not surprising given another potential bidder's anticipated disinclination to assume massive, contingent, unknown liabilities).  Even if such a mythical bidder exists, such a concession would have undoubtedly come at a material and significant cost, to the detriment of every other EFH Corp. and EFIH stakeholder.  The Asbestos Objectors' assertion that the discharge of unmanifested asbestos claims did not have a valid reorganizational purpose is simply unsupported by the extensive evidence already presented to the Court (and as will be presented to the Court).

187.    Moreover, the Asbestos Objectors' good faith arguments rest on a critical, flawed premise—that the LSGT Debtors and their creditors could recover 100 cents for their claims, even without the proposed discharge of claims not preserved in accordance with the Asbestos Bar Date.  As this Court has ruled, "the inapplicability of the Asbestos Bar Date and this Court's [January 2015] Opinion, which the Asbestos [Objectors] did not appeal, [would come] at the expense of the holders of preserved asbestos claims against the LSGT Debtors - claimants who

would receive a small fraction of what they could receive if LSGT Gas's intercompany claims against EFH Corp. are not reinstated."[246]

188.    Ultimately, not only is the discharge of unmanifested asbestos claims of individuals who chose not to file a proof of claim an integral part of the Debtors' enterprise-wide restructuring efforts, it is necessary to protect recoveries for claimants who exercised their right to file claims against the LSGT Debtors.

### ii.    The Discharge of Unmanifested Asbestos Claims Does Not Violate Due Process.

189.    The Asbestos Objectors also argue that the discharge of unmanifested claims violates the due process rights of unmanifested claimants who chose not to file proofs of claim. This is the same due process argument that has been raised and overruled on many occasions, including (1) litigation related to establishing an asbestos bar date, (2) the unsuccessful motion to appoint a separate legal representative for unmanifested asbestos claimants, (3) the unsuccessful disclosure statement objection raised in connection with the Hunt Plan, (4) the unsuccessful objection raised in connection with the global settlement agreement, (5) the unsuccessful objection raised in connection with the hearing to confirm the Hunt plan, (6) the unsuccessful motion to file a class proof of claim on behalf of all unmanifested claimants, (7) the unsuccessful objection raised in connection with a request to delay consideration of the Termination Fee and the NextEra Plan Support Agreement, and (8) the unsuccessful motion to dismiss the LSGT Debtors' chapter 11 cases for lack of good faith.

190.    In its 2015 published opinion—which no party appealed—this Court concluded that a discharge of unmanifested claims may be appropriate if an appropriate notice program is

---

[246]    *Id.* at 27 (citing *In re Energy Future Holdings Corp.*, 522 B.R. 520 (Bankr. D. Del. 2015)).

implemented.[247]  The Court specifically noted that under the Third Circuit standard set forth in *In re Grossman's, Inc.*, 607 F.3d 114 (3d Cir. 2010), unmanifested claims "may be discharged on a case by case basis under the totality of the circumstances."[248]  In June 2015, after eight months of collaboration with the EFH Committee, the Debtors developed and obtained Court approval of a notice plan (the "Notice Plan"), which was ultimately successfully executed.[249]

191.    The Court has ruled on several occasions that the Debtors' approved notice plan was "reasonably calculated to provide notice to unmanifested claimants," rejecting repeated collateral attacks on the Asbestos Bar Date and Notice Order (defined below) and should do so again here.[250]  In any event, as the Court has also ruled, individual claimants may bring a claim after the Asbestos Bar Date, arguing that the Debtors' notice plan was unconstitutional as-applied to their claim.[251]

---

[247]  *In re Energy Future Holdings Corp.*, 522 B.R. 520, 527 (Bankr. D. Del. 2015).

[248]  *Id.* at 530.

[249]  *See* Hr'g Tr. 116:5-6 Aug. 11, 2015 ("The E-side committee fought hard and long in connection with the details of the notice that went out."); *Order (A) Setting Bar Date for Filing Asbestos Proofs of Claim, (B) Approving the Form of and Manner for Filing Asbestos Proofs of Claim, and (C) Approving Notice Thereof* [D.I. 5171] (the "Asbestos Bar Date and Notice Order").

[250]  *See, e.g.*, Ex. I, 12/3/15 Hr'g Tr. at 57:16-22, 62:24-75; Ex. J, 9/19/16 Hr'g Tr. at 119:14-120:5; *Order Denying Motion of Charlotte Liberda and Curtis Liberda to Appoint Legal Representative* [D.I. 5265], (denying motion to appoint separate legal representation for unmanifested asbestos claimants); *Order (A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan, and (D) Approving the Manner and Forms of Notice and Other Related Documents* [D.I. 6131]; *Order (A) Authorizing Entry Into Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance Under Plan Support Agreement* [D.I. 9584];  Ex. K, 9/21/15 Hr.'g Tr. at 55:14-56:8; *Order Denying the Amended Motion for Application of Fed. R. Bankr. P. 7023 to this Proceeding and to Certify a Class Pursuant to FRCP Rule 23* [D.I. 7383]; Ex. L, 12/16/15 Hr'g Tr. at 83:11-21 (recognizing that to "certify[] a class solely for purposes of filing a proof of claim . . . would be in effect a collateral attack on what this Court has already done, which is set a bar date . . . and establish[] and approv[e] an elaborate noticing procedure that cost several million dollars designed to provide a notice as adequately as possible to as many possible claimants as possible.  None of those matters have been appealed, and they are final orders."); MTD Opinion at 27 ("The Court can only assume that this [motion to dismiss the LSGT Debtors' chapter 11 cases] is another collateral attack on the Asbestos Bar Date Order, which is a final non-appealable order.").

[251]  *See, e.g.*, Ex. J, 9/19/16 Hr'g Tr. at 119:23-120:3 ("[T]he rights of [unmanifested claimant] to come in and object to that discharge [on due process grounds] at a later date ***are fully preserved***." (emphasis added)).

192.    Nevertheless, the Asbestos Objectors contend that the Asbestos Bar Date and corresponding discharge of unpreserved Unmanifested Claims violate the Unmanifested Claimants' due process rights.  The Asbestos Objectors reason that Unmanifested Claimants could **never** receive notice of the existence and potential discharge of their claims in the bankruptcy process because they could not know when (if ever) they may manifest asbestos-related injuries, and may not have known they had contingent claims the chapter 11 cases.[252]  To the contrary, the Supreme Court and Third Circuit hold that, for unknown claimants, publication notice satisfies due process.

193.    As this Court has found on numerous occasions, the Unmanifested Claimants' due process rights are protected here.  In particular, (i) the fact that nearly 14,000 unmanifested proofs of claim were filed shows that Unmanifested Claimants are not incapable of receiving constitutionally adequate notice; (ii) the EFH Committee adequately represented the interests of Unmanifested Claimants in the Chapter 11 Cases; (iii) publication notice can suffice to provide notice to unknown claimants; and (iv) although *Mullane* provides the appropriate due process test here, the proposed discharge is also constitutional under *Connecticut v. Doehr*.

194.    **First**, notice to the Unmanifested Claimants clearly was not impossible.  The Asbestos Objectors rely heavily on *Covey* to argue that constitutionally sufficient notice to Unmanifested Claimants is futile because Unmanifested Claimants are functionally incompetent.[253]  The record proves otherwise.  As part of the Notice Plan, which the EFH Committee helped craft, the Debtors identified and sent direct notice to over 70,000 known or likely asbestos claimants and provided extensive publication notice for those they could not

---

[252]    Asbestos Objectors Obj. 14-17.

[253]    *Id.* at 16-17.

KE 45079065.28

directly reach.[254]  Even if the Unmanifested Claimants were unaware of their potential injuries, the notice announced: "**If you or a family member ever worked at a power plant, you could have been exposed to asbestos.  To keep your right to compensation if you become ill in the future (or have asbestos-related illness today), you <u>must</u> submit a claim by <u>December 14, 2015, at 5:00 p.m., prevailing Eastern Time</u>.**"[255]  Thus, whether or not the Unmanifested Claimants may have known of their Unmanifested Claims prior to receiving the Debtors' notice, having received this notice, they should have become aware of their claims and the measures necessary to protect them.  The Notice Plan was successful: nearly 14,000 Unmanifested Claims were filed with the Court, including nearly 10,000 Unmanifested Claims—like Ms. Fenicle's own claim—filed on the E-Side.

195.    *Second*, besides their misplaced reliance on *Covey*, Asbestos Objectors also cite to pre-*Grossman's* cases to argue that unmanifested claimants are "future claimants," who must be adequately represented throughout the bankruptcy process if their claims are to be resolved.[256]  In a word—*no*.  In *Grossman's*, the Third Circuit, sitting en banc, acknowledged that unmanifested claims could be discharged in bankruptcy, in accordance with the requirements of due process.[257]  The *Grossman's* court drew a line between the claims of *future* claimants who had not yet been exposed to asbestos and the claims of *unmanifested* claimants who had already been exposed to the debtor's conduct or product, but had not yet manifested any injuries, overruling *Frenville* (which treated unmanifested claims as future claims, exempting them from

---

[254]   *See Declaration of James Katchadurian in Support of Debtors' Objection to the Amended Motion for Application of Fed. R. Bankr. P. 7023 to this Proceedings and to Certify a Class Pursuant to FRCP 23* [D.I. 7292] ¶ 4.

[255]   *See* Asbestos Bar Date and Notice Order, at <u>Exhibit 4</u> (Publication Notice) (emphasis in original).

[256]   Asbestos Objectors Obj. 9 & n. 14 (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2014).

[257]   *In re Grossman's*, 607 F.3d at 127-128.

KE 45079065.28

bankruptcy discharge).[258]   Even so, the interests of unmanifested claimants were represented in

these chapter 11 cases by the EFH Committee, who, among other things, (i) "fought hard" to

craft a comprehensive Notice Plan designed to reach unmanifested claimants,[259] and (ii) secured

a settlement requiring the Debtors to reinstate the LSGT Debtors' intercompany claims and

asbestos liabilities under any plan they propose.[260]

196.   **Third**, even if the Debtors failed to reach every single potential claimant directly,

it does not follow that discharge of any Unmanifested Claims violates due process.  The standard

for determining whether a notice of the discharge of claims in bankruptcy satisfies the due

process rights of unknown claimants comes from the Supreme Court's decision in *Mullane* and

its progeny.  For decades courts have applied *Mullane* as the relevant test for due process before

discharging the claims of unknown claimants in bankruptcy.  Those cases held that publication

notice suffices so long as it is "reasonably calculated, under all the circumstances, to apprise

[unknown claimants] of the pendency of the action and afford them an opportunity to present

their objections."[261]   Here, as in *Mullane*, *In re Placid*, and *Chemtura*, the unknown

Unmanifested Claimants received clear publication and other constructive notice.

---

[258]   *Id.* at 121.

[259]   Ex. M, 8/11/15 Hr'g Tr. at 116:5-6.

[260]   *Notice of Settlement Among Debtors, EFH Committee, EFH Notes Trustee, Plan Sponsors, Consenting TCEH First Lien Creditors, and TCEH Committee* [D.I. 7090-1], § 6.

[261]   *Mullane v. Cent. Hanover Bank & Trust*, 339 U.S. 306, 314 (1950); *accord Chemetron Corp. v. Jones*, 72 F.3d 341, 348-49 (3d Cir. 1995) (applying *Mullane*'s "reasonably calculated" test and holding that publication notice of bar date was sufficient to satisfy the requirements of due process for unknown creditors); *Wright v. Owens Corning*, 679 F.3d 101, 107-08 (3d Cir. 2012) (applying *Mullane*); *In re Chemtura*, 505 B.R. 427, 430-31 (S.D.N.Y. 2015) (applying *Mullane* and holding that publication notice that informed unmanifested claimants of the existence and nature of their unmanifested claims provided sufficient process to allow for the subsequent discharge of those claims); *Williams v. Placid Oil Co. (In re Placid Oil Co.)*, 753 F.3d 151, 154-58 (5th Cir. 2014) (applying *Mullane* and holding that publication notice that did not even include asbestos-specific claim information was sufficient to discharge an unknown asbestos claimant's prepetition claims) ("We decline to articulate a new rule that would require more specific notice for unknown, potential asbestos claimants.").

197.    Asbestos Objectors' reliance on *Connecticut v. Doehr* is therefore misplaced. Yet, even under *Doehr*'s balancing of interests, the Plan's discharge of unpreserved Unmanifested Claims is constitutional here.[262]    ***First***, the interests that will be affected by the discharge in the Plan are a contingent interest—not all Unmanifested Claimants who did not preserve their claim will suffer an injury because only a portion of Unmanifested Claimants will ever manifest asbestos-related injury.    Those who do manifest and seek to bring a claim against the LSGT Debtors will have to show that they either preserved their claim or did not receive due process.

198.    ***Second***, the Asbestos Objectors' argument that even "temporary or partial impairments to property rights" warrant due process protection misses the mark.[263]    The fact that Unmanifested Claimants would have to make a showing that they have a valid claim against the LSGT Debtors is not itself a "deprivation" of the claim—it is part of any claimant's fundamental burden.    If they show that they did not receive due process, then the Confirmation Order could not have discharged their claims.[264]    Therefore, the risk of erroneous deprivation is non-existent.

199.    ***Third***, strong legislative policy and the Debtors' substantial interests are at stake. Asbestos Objectors ignore the mandate under the Federal Rules of Bankruptcy Procedure that a bankruptcy court "shall" set a bar date for claims.[265]    They also contend that, although "[i]n most bankruptcy cases, the bankruptcy goal of providing the debtors a fresh start will weigh heavily in

---

[262]    *Doehr* applied a balance of interests test to determine the process due before pre-judgment attachment of property, requiring consideration of: (1) the private interest that will be affected by the prejudgment measure, (2) the risk of erroneous deprivation, and (3) the interest of the party seeking prejudgment remedy, "with due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections."    *Connecticut v. Doehr*, 501 U.S. 1, 11 (1991).

[263]    Asbestos Objectors Obj. 19, 21.

[264]    *See In re Grossman's*, 607 F.3d at 127-128.

[265]    Fed. R. Bankr. P. 3003(c).

KE 45079065.28

favor of discharging claims for which proofs of claims were not filed," the LSGT Debtors "are not seeking to distribute their assets among their creditors in an equitable manner and get a fresh start."[266]  Yet, the record shows that identifying and diligencing the LSGT Debtors' asbestos liabilities was an important factor in NextEra's decision to take on those liabilities and agree to reinstate the intercompany claims that would fund satisfaction of those liabilities.  To upset the Plan's treatment of asbestos claims—a foundational aspect of the deal with NextEra—would jeopardize the enterprise-wide restructuring efforts and would be unfair to those asbestos claimants who *did* timely preserve their claims.  In light of the statutory scheme, bankruptcy policy, and the interests of the Debtors and other parties' in these proceedings, on the one hand, weighed against the ability of Unmanifested Claimants to bring an as-applied due process challenge if they someday manifest injuries, on the other, the Plan's proposed discharge of unpreserved unmanifested claims is constitutional.

### D.    The U.S. Trustee's Objection Should be Overruled.

200.    The U.S. Trustee's limited Objection relates to the provisions in the Plan that allow for Holders of EFH and EFIH unsecured Claims to receive distributions on account of reasonable and documented fees and expenses in addition to any "charging lien" distributions made under the respective Indentures.  The Objection should be overruled on both counts.

201.    With respect to EFIH unsecured Claims, the *only* circumstance in which such Holders would receive a recovery on account of fees and expenses is where such Holders are receiving a 100 percent recovery on account of their Claims.  The EFIH Debtors have determined in an exercise of their business judgment that the reasonable and documented fees incurred by Holders of EFIH unsecured Claims in addition to the "charging lien" should be

---

[266]   Asbestos Objectors Obj. 25.

KE 45079065.28

satisfied—subject to approval by the Bankruptcy Court (for amounts incurred pre-EFH Effective Date).  Over 66.67% of the Holders of EFIH unsecured Claims are party to the EFIH Unsecured Creditor Plan Support Agreement.  As part of their agreement to join hands with the EFH/EFIH Debtors and the Plan Sponsor, such Holders agreed to a settlement of their Claims, agreed to continue their support even if the EFH Confirmation Order requires every dollar of their Plan recovery to be escrowed, and agreed that none of the EFH/EFIH Debtors should bear the costs of the Makewhole Litigation on a post-EFH Effective Date basis.  Plus, even if the EFIH Unsecured Notes Trustee's fees and expenses were paid on top of the EFIH Unsecured Notes Claims, there is ample basis for approving additional reasonable and documented fees and expenses incurred by Holders of EFIH unsecured Claims *and*, in any event, such fees would only be satisfied after the completion of a stringent review and approval process.

202.    With respect to the EFH unsecured Claims, the EFH Unsecured Notes Trustee not only refrained from prosecuting any objections to Plan confirmation (even in the absence of a protective indemnity), all remaining Holders of Claims at EFH Corp.—many of whom are represented by sophisticated counsel—are either unaffected by such relief or have not objected to such relief.  There are nine Impaired Classes of Claims at EFH:  Classes A4, A5, A6, A7, A8, A9, A10, A11, and A12.  *Six* of these Classes are unaffected by the requested relief: (a) the EFH Notes Trustee serves as Indenture Trustee for Class A4 and Class A6; (b) Classes A5, A8, and A9 comprise the EFH Beneficiary Claims and, as a result, are expected to be paid in full through a combination of a Pro Rata distribution from the EFH Creditor Recovery Pool and TCEH Settlement Claim Turnover Distribution; and (c) Class A11 was paid in full, in Cash, pursuant to the TCEH Confirmation Order.  ***No Holder in any of the remaining Classes objected to payment of the EFH Indenture Trustee's Fees***:  (x) Class A7 consists of the EFH Swap Claims,

the vast majority of which have been settled pursuant to the *Order Establishing Procedures for the Liquidation by Third Parties of Claims on Account of Certain Hedging and Trading Arrangements* [D.I. 1957]; (y) the EFH/EFIH Debtors estimate that there are less than a dozen asserted Claims in Class A10; and (z) Reorganized TCEH is the only Holder of a Class A12 Claim.  Consequently, it is not surprising that no Holder of a Claim in Class A7, Class A10, or Class A12 has objected to the Plan.

203.    In light of the foregoing, the EFH/EFIH Debtors believe the provisions subject to the U.S. Trustee's objection are an appropriate exercise of the EFH/EFIH Debtors' business judgment.

## Conclusion

204.    For the reasons set forth herein, the Debtors respectfully request that this Court confirm the Plan as it relates to EFH/EFIH Debtors and enter the EFH Confirmation Order.

*[Remainder of page intentionally left blank.]*

KE 45079065.28

Dated: February 10, 2017
      Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
        defranceschi@rlf.com
        madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
        stephen.hessler@kirkland.com
        brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
        marc.kieselstein@kirkland.com
        chad.husnick@kirkland.com
        steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession