**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | ) Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) Case No. 14-10979 (CSS) |
| *Debtors.* | ) (Jointly Administered) |
|  | ) Related to D.I. 10551 |
|  | ) |

**SUPPLEMENTAL OBJECTION OF DELAWARE TRUST COMPANY,**
**AS TRUSTEE FOR THE EFIH FIRST LIEN NOTES,**
**TO CONFIRMATION OF**
**SEVENTH AMENDED JOINT PLAN OF REORGANIZATION**

WILMER CUTLER PICKERING HALE AND DORR LLP

Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile: 212-230-8888
Philip.Anker@wilmerhale.com

Joel Millar
David Gringer
Isley Gostin
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: 202-663-6000
Facsimile: 202-663-6363
Joel.Millar@wilmerhale.com
David.Gringer@wilmerhale.com
Isley.Gostin@wilmerhale.com


ROPES & GRAY LLP

Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile: 212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA 02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com


DRINKER BIDDLE & REATH LLP

James H. Millar
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
Telephone: 212-248-3264
Facsimile: 212-248-3141
James.Millar@dbr.com


COLE SCHOTZ P.C.

Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: 302-652-3131
Facsimile: 302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile: 201-489-1536
wusatine@coleschotz.com

*Counsel for Delaware Trust Company*          Dated: February 10, 2017

# **TABLE OF CONTENTS**

**Page**

BACKGROUND ............................................................................................................1

ARGUMENT ................................................................................................................2

I.     THE "TOP UP OR TAP OUT" PROPOSAL DOES NOT PROVIDE THE
INDUBITABLE EQUIVALENT OF PAYMENT IN FULL .................................2

II.    DISTRIBUTION TO THE SECOND LIEN NOTEHOLDERS VIOLATES
THE COLLATERAL TRUST AGREEMENT AND SHOULD BE
PROHIBITED, OR THE RESERVE MUST COVER THE FIRST LIEN
TRUSTEE'S RESULTING CLAIM AGAINST EFIH FOR BREACH...............12

JOINDER IN EFIH SECOND LIEN TRUSTEE'S SUPPLEMENTAL
OBJECTION TO PLAN ...............................................................................................19

RESERVATION OF RIGHTS .......................................................................................19

CONCLUSION.............................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re American Capital Equipment*, *Inc.*,
  405 B.R. 415 (Bankr. W.D. Pa. 2009), *aff'd*, 688 F.3d 145 (3d Cir. 2012)................16

*In re Continental Airlines*,
  203 F.3d 203 (3d Cir. 2000).........................................................................17

*In re Exide Technologies*,
  303 B.R. 48 (Bankr. D. Del. 2003) ...............................................................17

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001) .............................................................17

*In re Investment Co. of the Southwest, Inc.*,
  341 B.R. 298 (B.A.P. 10th Cir. 2006) ..........................................................10

*In re Pacific Lumber Co.*,
  584 F.3d 229 (5th Cir. 2009) .......................................................................10

**Docketed Cases**

*NML Capital, Ltd. v. Republic of Argentina*, No. 1:08-cv-06978 (S.D.N.Y.)...................16

**Statutes & Codes**

11 U.S.C. § 1129(a)(3).....................................................................................16

Trust Indenture Act § 317 ................................................................................16

**Other Authorities**

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ...............................10

John Lanchester, *Money Talks: Learning the Language of Finance*, The New Yorker
  (Aug. 4, 2014).............................................................................................14

Ted Kamman & Rory T. Hood, *With the Spotlight on the Financial Crisis, Regulatory
  Loopholes, and Hedge Funds, How Should Hedge Funds Comply with the Insider
  Trading Laws?*, 2009 Colum. Bus. L. Rev. 357 (2009)................................................14

*Who Owns the Assets,* BLACKROCK, https://www.blackrock.com/corporate/en-
  us/literature/whitepaper/viewpoint-who-owns-the-assets-may-2014.pdf....................14

Delaware Trust Company, indenture and collateral trustee ("Trustee" or "First Lien Trustee") for the first-lien notes ("Notes" or "First Lien Notes") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (together, "EFIH" or the "EFIH Debtors"), submits this supplemental objection (the "Supplemental Objection") to the Seventh Amended Joint Plan of Reorganization of Energy Future Holdings Corp., D.I. 10551 (the "Plan").[1]

## BACKGROUND

The Trustee filed its Objection to the Plan on February 3, 2017.  Late the prior evening, the Debtors had filed a Second Amended Plan Supplement,[2] negotiated between the Debtors and the PIK Noteholders, that proposed to revise the PIK Settlement to add a so-called "top up or tap out" provision to the Plan or Confirmation Order—i.e., a provision that purports to address a likely shortfall in the EFIH Claims Reserve through a mechanism for the Trustee to request additional funding for the Reserve or the termination of the makewhole litigation.  The Debtors abruptly withdrew the Second Amended Plan Supplement the next day after counsel for the Trustee and the Second Lien Trustee—neither of which had been consulted by the Debtors regarding the Supplement—wrote to the Court requesting additional time to consider and, if necessary, respond to this last-minute development.

As memorialized in the Pre-Trial Order, the Court permitted the Trustee and the Second Lien Trustee to file supplemental objections to the extent the Debtors'

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the *Objection of Delaware Trust Company, as Trustee for the EFIH First Lien Notes, to Confirmation of the Seventh Amended Joint Plan of Reorganization*, D.I. 10760 (the "Objection"), or if not defined therein, in the Plan.

[2] *See* Second Amended Plan Supplement, D.I. 10752, Exhibit A ("Second Plan Supplement").

confirmation brief nevertheless proposes or discusses possible revisions to the Plan (or

Confirmation Order) (i) to reflect any issues raised by the Second Amended Plan

Supplement (or otherwise addresses those issues) or (ii) that relate to the direction or

means of distribution on the Second Lien Notes.[3]

The Debtors' confirmation brief (D.I. 10795) ("Confirmation Brief") raises both

issues.  Accordingly, the Trustee submits this Supplemental Objection.  While the

Trustee also disagrees with many other contentions in the Debtors' confirmation brief and

the PIK Notes Trustee's statement in support of confirmation (D.I. 10794), the Trustee

will address those at the confirmation hearing and in any further briefing the Court may

permit.

## ARGUMENT

### I.    THE "TOP UP OR TAP OUT" PROPOSAL DOES NOT PROVIDE THE INDUBITABLE EQUIVALENT OF PAYMENT IN FULL

The Debtors argue that the "top up or tap out" proposal is one way to alleviate

their decision to underfund the EFIH Claims Reserve with $1.3 billion, an amount that,

by the Debtors' own admission, would cover interest for only three years.  *See*

Confirmation Brief at 17-18, 85.  It would not, even if the Debtors had not withdrawn it.

Two points merit consideration at the outset.  First, the Debtors' entire "top up or

tap up" scheme has it backwards.  The Trustee and Noteholders are over-secured

creditors entitled to the "indubitable equivalent" of payment in full, before the unsecured

PIK Noteholders receive anything.  As a matter of law, the burden cannot be placed on

the over-secured Trustee and Noteholders to ask for the return of their collateral after it is

improvidently distributed to junior unsecured creditors, with only vague assurances that

---

[3] *Joint Stipulated Final Pre-Trial Order*, D.I. 10787, ¶ 15.

there *might* be some potential remedy down the road for the resulting shortfall. Rather, the burden must be on the unsecured PIK Noteholders in the future to seek a release of funds held in reserve in the event that an unquestioned excess should ever develop.

Second, the Debtors do not seriously dispute that the EFIH Claims Reserve must cover all Claims that have been "asserted," even Claims that have been disputed (or that may be in the future) and thus have not yet been allowed. *See id.* at 71-72 (¶¶ 134-135). Indeed, the Debtors concede that this is the whole point of the Reserve; the Trustee's Claims that have already been allowed will be "paid in full in the EFH Effective Date" (*id.* at 71 (¶ 134)) and, thus, the very purpose of the EFIH Claims Reserve is to provide an escrow to cover those Claims that have been asserted, but not yet allowed or disallowed by Final Order. Yet, the Debtors and their PIK supporters repeatedly attempt to justify their decision to limit the funding of the EFIH Claims Reserve by casting aspersions on the merits of those Claims. The confirmation hearing is not the occasion to determine which Claims will ultimately be allowed following the completion of all appeals (particularly where, as here, there has been no objection, briefing, evidentiary hearing, and the like on the issues, as required under the Bankruptcy Code and Rules); rather, the Debtors must set a proper reserve that will provide the First and Second Lien Noteholders with the indubitable equivalent of their over-Secured Claims.[4] The indubitable equivalent standard requires that substitute collateral—the EFIH Claims Reserve here—be sufficient to ensure that the *full* amount of the secured creditor's asserted Claim will, if ultimately allowed in accordance with the Bankruptcy Code's claims-allowance process and due process, be paid in full. *See* Objection at 7 (citing

---

[4] Nor is the confirmation hearing the occasion to entertain any arguments to estimate claims for reserve purposes at a level below the amounts asserted, particularly where, again, the Debtors have failed to file a motion pursuant to section 502(c) of the Bankruptcy Code.

cases).  The Debtors cite **no** case in which a court held that the indubitable equivalent standard had been met, even though the substitute collateral was insufficient to cover an asserted claim, on the basis that it was unlikely to be allowed by final order.

Yet, the Debtors propose to reserve for only three years of interest even though the litigation could easily last more than three years.  As the Debtors themselves acknowledge, litigation is invariably uncertain and unpredictable, and contrary to the Debtors' suggestion, there are many examples of litigations that have continued for years after resolution of one part of the case on appeal—such as *Dow Corning*, where the litigation has lasted (and is still going on) more than ten years **after** the Sixth Circuit reversed a ruling on post-petition interest and remanded.  *See* Objection at 20-21 & Appendix.  Moreover, here, the Debtors acknowledge that Phase One alone could take as much as 2.7 years; that there will likely be a Phase Two; and that, leaving aside the time it takes to resolve Phase Two in this Court, appeals therefrom could approach, on average, another two years.  *See* Confirmation Brief at 81, 84-85.  And if there could be any doubt, the PIK Noteholders—who will control the MLOC and hence the prosecution of litigation challenging the Makewhole Claims—have categorically refused to agree to drop the litigation at the end of three years.  *See* PIK Stip., D.I.10761, ¶ 6(c) ("Each of Avenue, GSO and York is not prepared … to agree, to avoid any risk of a Shortfall, … to drop any ongoing or further challenges to the … Makewhole Claims … by the third anniversary of the EFH Effective Date.").  Indeed, it is evident from the PIK Note Trustee's supporting brief that the PIKs are likely to pursue Phase Two, and that they are likely to expand Phase Two to challenge not only liability, but also damages, including the amount of interest owed if the Makewhole Claims are allowed.  Thus, if anything,

Phase Two and completion of the Makewhole Litigation could take even longer than the Trustee contemplated when it filed its Objection.

The Debtors nevertheless contend that none of this matters because the "top up or tap out" mechanism suggests there might be some possibility for redress, and that this possibility is good enough.  *See* Confirmation Brief at 85.  The Debtors are wrong.  A "top up or tap out" mechanism that is not foolproof cannot provide the "indubitable equivalent" of payment in full.  The Debtors' proposed "top up or tap out" mechanism was anything but foolproof; it was chock full of holes.  That is true for at least seven reasons:

*First*, there is no "top up or tap out" mechanism in the Plan itself; the Debtors withdrew the Second Plan Supplement.  The Debtors cannot have it both ways.  A "top up or tap out" mechanism that has been withdrawn and that is not part of the Plan cannot possibly provide the indubitable equivalent of payment in full.

*Second*, even if it had not been withdrawn, the "top up or tap out" mechanism, as proposed by the Debtors, could be invoked in only two limited circumstances: (1) when a *Final Order* is entered allowing any non-Makewhole Claim, like the First Lien Trustee's Breach Claim under the Collateral Trust Agreement, or the Second Lien Future Interest Claim, or (2) 90 days before the third anniversary of the Effective Date.  *See* Second Plan Supplement at 2-4.  In any other circumstance, if the First or Second Lien Trustees or Noteholders requested an order requiring a "top up or tap out" to avoid a shortfall in the EFIH Claims Reserve, the Second Plan Supplement provided that the Court's order "shall not be binding" on the PIK Noteholders, the Debtors, the MLOC or the EFH Plan Administrator Board.  *See id.* at 4.

*Third*, even in the limited circumstances in which the "top up or tap out" mechanism could be invoked, the trigger was set substantially too low to ensure there could be no shortfall.

For example, the mechanism was triggered by allowance of a Breach Claim or Future Interest Claim only after a ***Final Order*** was entered allowing the Claim.  *See* Second Plan Supplement at 2, 4.  Thus, even if the Claim were allowed by this Court or on appeal, there would be no opportunity to seek a top up until the PIKs or EFH Plan Administrator Board had exhausted all avenues of appeal.  By then, it could well be too late.  As the Trustee explained in the Objection, any Breach Claim against EFIH for breach of EFIH's obligation under the Collateral Trust Agreement to hold back Second Lien distributions will likely not be finally resolved until ***after*** the makewhole litigation has been resolved.  *See* Objection at 22-27.  The same could be true for the Future Interest Claim of the Second Liens.  In that event, the PIK Noteholders could elect to "tap out" rather than "top up," at a time when "tap out" would be meaningless (since the makewhole litigation would have already come to an end in any event) and a shortfall already existed.

Similarly, the "top up or tap out" mechanism was triggered only when the amount of the First and Second Lien Claims exceeded 90% of the funds in the EFIH Claims Reserve.  *See* Second Plan Supplement at 4.  But the Second Plan Supplement provided that the amount of the First and Second Lien Claims was to be calculated ***as of the date of the comparison***.  *See id.* at 2-3.  In other words, all interest, fees and other Claims that would accrue after the date of comparison through a final resolution of the litigation would be disregarded in testing the sufficiency of the reserve.  If, for example, the

comparison were done at a time when any Phase Two proceeding were still years away from a final resolution, the then-current amount of the First and Second Lien Claims might fall under the 90% threshold (say 85%), yet the total amount of the First and Second Lien Claims that could ultimately be allowed at the end of the litigation, including all interest and fees accruing through that time, could well exceed the current funding of the EFIH Claims Reserve (say 120%).  In that case, there could be an existing shortfall, yet no ability to seek relief under the "top up or tap out" provision.

*Fourth*, even in the limited circumstances in which the "top up or tap out" mechanism was triggered, ***there was not, in fact, any obligation for the PIKs to top up or tap out***.  All the provision said was that when the mechanism was triggered, the Debtors and the PIK Noteholders agreed that the First and Second Lien Trustees and Noteholders could "***request*** a hearing and entry of an order providing additional relief with respect to the EFIH Claims Reserve."  *See* Second Plan Supplement at 4 (emphasis added).  There was nothing in the provision requiring that any relief be granted.  Nor was there even anything requiring the PIK Noteholders, the EFH Plan Administrator Board, or the MLOC to consent to such relief, or barring them from opposing such relief.  To the contrary, the PIK Noteholders have stipulated that they are ***not*** prepared to guarantee any shortfall in the EFIH Claims Reserve, or to drop the litigation at the end of three years to avoid a shortfall.  *See* PIK Stip. ¶ 6.  So the PIK Noteholders plainly were not agreeing to top up or tap out; they were simply agreeing (at least before the Second Plan Supplement was withdrawn) that the Trustee and Noteholders could ***ask*** for that relief (something they could have done anyway).

*Fifth*, an obligation to "top up" is only as good as the credit standing behind it. Yet the "top up" part of the "top up or tap out" mechanism was illusory. Like the Plan, the mechanism provided that NextEra and Reorganized EFIH would not be liable to fund any top-up order. *See* Second Plan Supplement at 4. Moreover, the Plan Supplement provided that **the PIK Trustee and the PIK Noteholders** also would **not** have any liability to fund any top-up order. *See id.* at 4-5 ("If the EFIH Claims Reserve Increase Order requires additional funding into the EFIH Claims Reserve … the source of such funding shall be at the sole option of the [MLOC], *provided, however, that* … none of the EFH/EFIH Debtors, the EFH Plan Administrator Board, … *EFIH Unsecured Notes Trustee or any Holders of the … EFIH Unsecured Notes* shall have any liability related to such funding obligations;" (emphasis added)). So there was no evident source of funding for any "top up" order. The Plan Supplement suggested that the MLOC could "seek" to disgorge distributions to the PIK Noteholders, but it also suggested that the PIK Noteholders had to "consent to such action," unless a disgorgement order was entered—yet it was unclear what basis existed for a disgorgement order given the provision, just cited, that the PIK Noteholders would not have any liability to top up. *See id.* at 5. And, if a disgorgement order were entered, the Plan Supplement provided that this alone would alleviate any requirement that the MLOC "tap out"—even if the PIKs were failing to "disgorge."

**Sixth,** the "tap out" part of the mechanism was equally deficient. As noted, it did not require termination of the litigation so long as this Court had entered a disgorgement order, *see* Second Plan Supplement at 5, even though there was no assurance that the PIK Noteholders would comply with such an order and top up. For example, they could

appeal the order, be unable to pay, or no longer exist if they had been dissolved in the interim. (As discussed below, the sorts of hedge funds that own the PIK Notes come and go all the time.)

Moreover, even if triggered, the "tap out" provision simply required the EFH Plan Administrator Board to terminate the makewhole litigation. *See id.* But the Plan provides that the MLOC "shall have an independent right to litigate and settle the [Makewhole Claims], which shall not be subject to the consent of the EFH Plan Administrator Board," Plan Art. VII.K.3, and the "tap out" provision did not say the *MLOC* must stop litigating. In any event, the "tap out" mechanism was hardly "Fail-Safe," as the Debtors claim. This Court might not even have jurisdiction to enforce it if the litigation were on appeal in the District Court or Third Circuit at the time. And, in any event, even a real "tap out" requirement would be an empty remedy if, at that time, the Trustee and Noteholders had lost in Phase Two but were pursuing an appeal. There would be no "top up" to cover the shortfall that would result from the continued accrual of interest and fees while the Trustee and Noteholders sought to vindicate their Claims on appeal (as happened with Phase One), yet the "tap out" would not require the EFH Plan Administrator Board (and the MLOC) to agree that the First and Second Lien Makewhole Claims (plus contractual interest) would be immediately allowed and paid.

*Seventh*, not only did the "top up or tap out" mechanism fail to provide any meaningful "top up" protection, but it also contained many "drain down" provisions that allowed the PIK Noteholders to *reduce* the funding and duration of the EFIH Claims Reserve. For example, it provided that if the Makewhole Claims were disallowed, the MLOC could seek immediate release of the funds in the EFIH Claims Reserve to the PIK

Noteholders.  But even if the First Lien Makewhole Claim were disallowed against EFIH, the First Lien Trustee and Noteholders would still have a Breach Claim against EFIH if EFIH distributes $2.2 billion in principal and interest to the Second Lien Noteholders (as it proposes) in breach of its obligation under section 2.4(c) of the Collateral Trust Agreement to hold back those distributions until the First Lien Note Claims have been paid in full.  *See* Objection at 22-27.  Thus, the funds in the EFIH Claims Reserve must remain, even after any Makewhole Claim is disallowed, until final resolution of the Breach Claim.  *See id.*

The "top up or tap out" mechanism also provided that the PIK Noteholders could "drain down" the Reserve by seeking the release of the amounts reserved for contractual interest upon entry of an order immediately following confirmation, ***even before the completion of any appeals and the entry of a Final Order adjudicating to final resolution the allowance of such Claims***.

In any event, all of this is beside the point.  The law is clear that an unsecured obligation is not the indubitable equivalent of a secured claim.[5]  At best, that is all the "top up or tap out" mechanism could be—an unsecured, highly contingent and qualified "obligation" to pay additional money into the EFIH Claims Reserve in the future.  The PIKs have not offered to secure any supposed "top up" requirement with a lien on any property.  Moreover, the top-up "obligation" here was an obligation of some unspecified

---

[5] *See, e.g.*, *In re Pac. Lumber Co.*, 584 F.3d 229, 246 (5th Cir. 2009) ("Nor are unsecured notes or equity securities sufficient to constitute the 'indubitable equivalent' of secured claims."); *In re Inv. Co. of the Sw., Inc.*, 341 B.R. 298, 324 (B.A.P. 10th Cir. 2006) ("[T]rading its first lien … for … a totally unsecured interest … is not the indubitable equivalent of its claim."); H.R. Rep. No. 95-595 (1977) ("Unsecured notes as to the secured claim or equity securities of the debtor would not be the indubitable equivalent."), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6544.

obligor—all we know, from the terms of the Plan Supplement, is who the obligor will ***not***

be:  the Debtors, NextEra, the PIK Trustee or the PIK Noteholders.

This is not remotely the indubitable equivalent of payment in full of a Secured

Claim.  The Debtors fail to cite a single case in which any court has ever held that the

indubitable equivalent standard is satisfied by a replacement lien on substitute collateral

that itself has insufficient value to ensure payment in full of an over-secured claim,

simply because it is accompanied by a wholly ***unsecured*** obligation to increase—"top

up"—the collateral in the future (much less an unsecured obligation that is of such

questionable enforceability, as that proposed here).

Simply put, the $700 million or more of the Trustee's and Noteholders' collateral

that the PIK Noteholders seek to receive on the Effective Date should be held in the EFIH

Claims Reserve until ***all*** First Lien Claims have been resolved by Final Order, to ensure

the Trustee and Noteholders truly receive the indubitable equivalent of their over-Secured

Claims, as the Bankruptcy Code requires.   That will not "gorge" or "starve" the PIK

Noteholders, as the Debtors' over-heated rhetoric suggests.  *See* Confirmation Brief at 3-

4 (¶ 5).  The money will remain in reserve so that if the EFIH First Lien and Second Lien

Claims are ultimately not allowed, it will be available to be distributed to the PIK

Noteholders.  By keeping the money in reserve in the interim, the Court will simply

ensure that the status quo is maintained and that the funds remain available to pay

whichever group of creditors—EFIH's secured or unsecured creditors—are ultimately

held, by Final Order, to be entitled to those proceeds.

11

**II.    DISTRIBUTION TO THE SECOND LIEN NOTEHOLDERS VIOLATES THE COLLATERAL TRUST AGREEMENT AND SHOULD BE PROHIBITED, OR THE RESERVE MUST COVER THE FIRST LIEN TRUSTEE'S RESULTING CLAIM AGAINST EFIH FOR BREACH**

The Debtors argue that there will be no Future Interest Claim, and hence no need to reserve for it in the EFIH Claims Reserve, because they will seek to distribute the $2.2 billion in principal and accrued interest owing on the Second Lien Notes to the Second Lien Noteholders on the Effective Date. They propose to do so either by (1) distributing those amounts to the Second Lien Trustee and requesting that the Court order the Second Lien Trustee to distribute those amounts to the Second Lien Noteholders, or (2) distributing those amounts "directly" to the Second Lien Noteholders through another paying agent or registered holder of the Second Lien Notes. *See* Confirmation Brief at 86-94; *see also* Proposed Confirmation Order, D.I. 10793, at ¶¶ 134-136.

The Second Lien Trustee will address the problems with the Debtors' arguments regarding their Future Interest Claim.  But in any event, the Debtors' effort to engineer a distribution scheme that prevents a hold-back of the Second Lien distributions—in an attempt to defeat the Future Interest Claim—is in direct violation of the Collateral Trust Agreement.

The Debtors' breach of the Collateral Trust Agreement is twofold.  First, the Collateral Trust Agreement obligates ***EFIH itself*** to hold back distributions to the Second Lien Noteholders until all First Lien Claims have been paid in full.  *See* Collateral Trust Agreement § 2.4(c).  Second, the Collateral Trust Agreement and Second Lien Indenture specify that, after EFIH files for bankruptcy, the Second Lien Trustee is the "Paying Agent" for the Second Lien Notes and obligate the Second Lien Trustee, acting in that capacity, to hold back any distributions it receives from EFIH until all First Lien Claims

have been paid in full.  *See id.* § 2.4(d); Second Lien Indenture § 2.04.  By seeking to make distributions directly to the Second Lien Noteholders, the Debtors are asking for authority to breach the hold-back obligations under both provisions.  If the Debtors are permitted to do that, the First Lien Trustee will most certainly have a Claim against EFIH for breach of the Collateral Trust Agreement.

This is not a mere theoretical possibility.  It is virtually certain.  In this regard, the Debtors fundamentally misunderstand the First Lien Trustee's Breach Claim.  *See* Confirmation Brief at 24, 97.  The First Lien Trustee's concern is not that its legal rights in the Inter-Creditor Action against the Second Lien Trustee will be impaired; the Plan is clear that the First Lien Trustee's rights in the Inter-Creditor Action against the Second-Lien Trustee are preserved.  Rather, the First Lien Trustee's concern is that it is entitled to hold ***EFIH*** directly liable.  If EFIH has already distributed the $2.2 billion to the Second Lien Noteholders and the EFIH Claims Reserve is insufficient to satisfy that liability, and if the First Lien Trustee is left with recourse only against the Second Lien Noteholders (or the Second Lien Trustee), it could face severe collection risks.

The very circumstance in which the Debtors posit that the First Lien Trustee's Makewhole Claim may be disallowed against EFIH—a loss in Phase Two—is precisely the circumstance in which the First Lien Trustee will almost surely have a valid claim against the Second Lien Trustee in the Inter-Creditor Action, and a Breach Claim against EFIH, if EFIH makes distributions directly to the Second Lien Noteholders as it proposes to do.  The Debtors acknowledge that the Third Circuit has already decided the question in Phase One, namely, whether the Makewhole Claim is payable under the First Lien Indenture.  *See* Confirmation Brief at 83 (¶ 152).  And they acknowledge that the

question in Phase Two is whether EFIH has a defense "under bankruptcy law" to payment of that valid state-law claim. *See id.* at 84 (¶ 156). Thus, in the unlikely event that the First Lien Trustee were to lose Phase Two, it would likely prevail in the Inter-Creditor Action, because its claim against the Second Lien Trustee turns, not on whether EFIH may have a bankruptcy-law defense to paying that Claim, but rather merely on whether the Makewhole Claim is "payable under the documentation" (Collateral Trust Agreement § 1.1 (definitions of "Parity Lien Obligations" and "Obligations"), § 2.4(c)-(d))—and the Third Circuit has already essentially decided that question in holding that the Makewhole Claim is payable under the First Lien Indenture.

But, in that event, if neither EFIH nor the Second Lien Trustee had held back any of the $2.2 billion that EFIH proposes to distribute directly to the Second Lien Noteholders, the First Lien Trustee almost surely will face severe difficulties collecting any judgment. Many holders of high-yield notes like the EFIH Second Lien Notes are investment funds.[6] Many are organized in offshore jurisdictions, and many have limited lifespans before they distribute any remaining assets to investors and dissolve.[7] The notion that the First Lien Trustee could collect a judgment in the Inter-Creditor Action years down the road from numerous holders located around the world (even assuming

---

[6] *See Who Owns the Assets,* BLACKROCK, https://www.blackrock.com/corporate/en-us/literature/whitepaper/viewpoint-who-owns-the-assets-may-2014.pdf (last visited January 5, 2015) (at the end of 2013, high-yield debt in the U.S. was held as follows: high-yield mutual funds 28.1%; investment grade funds 5.9%; equity and income funds 3.5%; hedge funds, banks and others 3.5%; U.S. insurance companies 22.9%; and U.S. pension funds 22.0%).

[7] *See* John Lanchester, *Money Talks:  Learning the Language of Finance*, The New Yorker (Aug. 4, 2014) ("Most hedge funds fail: their average life span is about five years. Out of an estimated seventy-two hundred hedge funds in existence at the end of 2010, seven hundred and seventy-five failed or closed in 2011, as did eight hundred and seventy-three in 2012, and nine hundred and four in 2013. This implies that, within three years, around a third of all funds disappeared. The over-all number did not decrease, however, because hope springs eternal, and new funds are constantly being launched."); Ted Kamman & Rory T. Hood, *With the Spotlight on the Financial Crisis, Regulatory Loopholes, and Hedge Funds, How Should Hedge Funds Comply with the Insider Trading Laws?*, 2009 Colum. Bus. L. Rev. 357, 439 (2009) ("Many hedge funds are accustomed to . . . using offshore entities for tax reasons.").

those parties can be located and added as defendants subject to this Court's jurisdiction), some or many of which may no longer exist or have the means to pay, is fanciful.

It is precisely to avoid such collection problems that the Collateral Trust Agreement obligates EFIH to hold back distributions to the Second Lien Noteholders and, as a second layer of protection, obligates the Second Lien Trustee to do the same if EFIH breaches that obligation. EFIH's proposal to make distributions directly to the Second Lien Noteholders, either by compelling the Second Lien Trustee to breach its own obligation or going around the Second Lien Trustee, would eviscerate both of these protections and plainly violate the Collateral Trust Agreement. Accordingly, the Court should (1) prohibit EFIH from violating the Collateral Trust Agreement, or (2) recognize that the Trustee and Noteholders will have a Claim for breach of the Collateral Trust Agreement and that the EFIH Claims Reserve must cover that Breach Claim, including the interest and fees that will accrue until the Breach Claim is finally resolved.

To the extent EFIH asks this Court to direct the Second Lien Trustee to distribute amounts received from EFIH to the Second Lien Holders in breach of the Second Lien Trustee's obligation under section 2.4(d) of the Collateral Trust Agreement, there is no basis in the Bankruptcy Code for a bankruptcy court to compel one non-debtor to breach its contractual obligation to another non-debtor. *See* Objection at 24 & n.45. While EFIH seeks to distinguish on factually immaterial grounds the cases the Trustee cited on this issue, it does not even purport to cite a single case holding that a bankruptcy court can require one non-debtor to breach its contractual obligations to another. To the extent EFIH instead seeks to make distributions "directly" to the Second Lien Noteholders through a paying agent or registered holder for the Notes, that agent or registered holder

will similarly take on obligations as a holder of the Second Lien Notes under section

2.4(d) of the Collateral Trust Agreement, and will likewise be in breach if it does not hold

the funds in trust for the First Lien Trustee.

Moreover, any attempt to go around the Second Lien Trustee may violate the

Trust Indenture Act, including its provisions giving the Second Lien Trustee the statutory

right, following default, "to recover judgment, in its own name and as trustee of an

express trust."[8]  Indeed, it is worth noting that, in the recent widely-followed Argentina

debt case, the district court enjoined Argentina from circumventing the ratable payment

requirements in the relevant indentures by making payment directly to preferred

bondholders.  The court made the injunction also applicable to the registered holder and

any clearing organization, paying agent or indenture trustee, barring any of them from

assisting Argentina in violating the terms of the indenture.[9]  And, while Argentina was

not in bankruptcy whereas EFIH is, that distinction should not matter.  In bankruptcy, no

plan can be confirmed if it has been proposed "by any means forbidden by law."  11

U.S.C. § 1129(a)(3); *In re Am. Capital Equip.*, *Inc.*, 405 B.R. 415 (Bankr. W.D. Pa.

2009) (holding that Chapter 11 plan incorporating settlement between debtor and

---

[8] *See* Trust Indenture Act § 317 ("SPECIAL POWERS OF TRUSTEE; DUTIES OF PAYING AGENTS SEC. 317. (a) The indenture trustee shall be authorized— (1) in the case of a default in payment of the principal of any indenture security, when and as the same shall become due and payable, or in the case of a default in payment of the interest on any such security, when and as the same shall become due and payable and the continuance of such default for such period as may be prescribed in such indenture, to recover judgment, in its own name and as trustee of an express trust, against the obligor upon the indenture securities for the whole amount of such principal and interest remaining unpaid; and (2) to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of such trustee and of the indenture security holders allowed in any judicial proceedings relative to the obligor upon the indenture securities, its creditors, or its property. (b) Each paying agent shall hold in trust for the benefit of the indenture security holders or the indenture trustee all sums held by such paying agent for the payment of the principal of or interest on the indenture securities, and shall give to such trustee notice of any default by any obligor upon the indenture securities in the making of any such payment.").

[9] *See* Amended February 23, 2012 Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 1:08-cv-06978, D.I. 425, at ¶ 2(a)-(f) (S.D.N.Y. Nov. 21, 2012), attached hereto as <u>Exhibit A</u>.

asbestos-liability claimants that provided for impermissible assignment under

Pennsylvania law could not be confirmed), *aff'd*, 688 F.3d 145 (3d Cir. 2012).

This is not the Debtors' first attempt to go around the Second Lien Trustee and

make distributions directly to the Second Lien Noteholders.  In 2014, the Debtors made

the same proposal as part of the second-lien settlement (which the Debtors later

abandoned).  The First Lien Trustee objected and added Epiq, DTC, and Cede in the

Inter-Creditor Action as additional parties liable under section 2.4(d) of the Collateral

Trust Agreement to the extent they did not hold back any distributions that EFIH sought

to make directly to the Second Lien Noteholders through them instead of going through

the Second Lien Trustee.[10]  The Debtors subsequently withdrew the proposed settlement,

and the First Lien Trustee dropped Epiq, DTC and Cede from its complaint in the Inter-

Creditor Action.  But if the Debtors now seek to revive their failed scheme, the Plan

cannot release or exculpate any registered holder or paying agent that participates in it

from any liability to the First Lien Trustee under the Collateral Trust Agreement.[11]  If any

registered holder or paying agent receives distributions on behalf of the Second Lien

Noteholders and fails to hold those funds in trust for the First Lien Trustee and

Noteholders, that holder or paying agent will itself face potential liability under the

Collateral Trust Agreement, and the Plan cannot insulate it from such potential liability.

---

[10] *See* Objection of CSC Trust Company of Delaware, as Indenture Trustee and Collateral Trustee, to Debtors' (a) Motion to Approve Second Lien Post-Petition Financing, Redeem Second Lien Notes, and Determine Secured Claim and (B) Motion to Approve Certain EFIH Settlements, D.I. 1068, at 8-12 & Ex. A (Complaint in Inter-Creditor Action naming Computershare, Epiq, DTC and Cede as defendants).

[11] *See, e.g.*, *In re Continental Airlines*, 203 F.3d 203, 214-17 (3d Cir. 2000); *In re Exide Techs.*, 303 B.R. 48, 75 (Bankr. D. Del. 2003) ("[N]on-consensual releases may be approved only in an 'extraordinary' case if all of the following four factors are present: (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releases have provided a critical financial contribution to the Debtors' plan; (iii) the releases' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting [parties], i.e., whether the non-consenting [parties] received reasonable compensation in exchange for the release." (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001)).

In any event, if EFIH is permitted to engineer a breach of sections 2.4(c) and 2.4(d) of the Collateral Trust Agreement, the First Lien Trustee will have a Breach Claim against EFIH itself, and the EFIH Claims Reserve must therefore cover that Claim. Here, again, the Debtors misapprehend the Trustee's point. The Trustee does not seek a "double recovery." *See* Confirmation Brief at 96. It seeks a single satisfaction.

The Debtors are wrong in asserting that the amounts they have reserved for the First Lien Trustee's Claims are already sufficient to provide that single satisfaction. The key issue here is ***timing***. The Debtors have reserved for only three years of interest. But the Breach Claim may not be resolved until after three years—indeed, long after that time. And the Reserve must include an amount sufficient to pay all contractual interest that will accrue until the Breach Claim is finally resolved.

That may not occur until there is a final resolution of the Inter-Creditor Action, since the amount of damages for a Breach Claim could turn on the amount of any judgment that the Trustee obtains in the Inter-Creditor Action. The Inter-Creditor Action, in turn, may well not be resolved until ***after*** the makewhole litigation is resolved. In this regard, the Inter-Creditor Action could be stayed (in this Court or on appeal) pending resolution of the makewhole litigation, since a ruling in favor of the First Lien Trustee against EFIH could moot the Inter-Creditor Action. It may end up moving forward only if and when EFIH prevails in Phase Two of the makewhole litigation.

Thus, the Reserve must be funded in an amount sufficient to pay all contractual interest and fees that would accrue through completion of, not only the remainder of Phase One and any Phase Two proceedings in the makewhole litigation (including as the PIK Noteholders apparently intend to expand Phase Two, to include damage issues as

well as liability), but also the additional time it may take thereafter to litigate the Inter-

Creditor Action to a final judgment.  For the reasons set forth more fully in the Trustee's

Objection, a reserve for only three years of interest plainly is insufficient for that.

In the end, the twists and turns that the makewhole litigation, the Inter-Creditor

Action and any litigation over the Breach Claim may take are inherently uncertain.  But

that is the point.  The EFIH Claims Reserve must provide the EFIH First and Second

Lien Noteholders the "indubitable equivalent" of payment in full.  Given all the

uncertainty, the sufficiency of the Reserve will most assuredly be in doubt if it is funded

with interest for only three years.[12]

## JOINDER IN EFIH SECOND LIEN TRUSTEE'S SUPPLEMENTAL OBJECTION TO PLAN

The Trustee hereby joins in the objections asserted in the *EFIH Second Lien*

*Trustee's Supplemental Objection to Debtors' Plan of Reorganization*, filed

contemporaneously herewith, to the extent the Second Lien Trustee's Supplemental

Objection addresses proposed terms of the Plan that also apply to the First Lien Trustee

and Noteholders.

## RESERVATION OF RIGHTS

The Trustee reserves the right to supplement this Supplemental Objection to the

extent any further change to the Plan affects the rights of the Trustee and the Noteholders.

---

[12] The PIK Notes Trustee argues that the EFIH Claims Reserve, as proposed by the Debtors, is adequate because, they say, the First and Second Lien Noteholders will not be entitled to contractual interest after the EFH Effective Date.  It is telling that the Debtors do not join this argument and have themselves proposed to fund the EFIH Claims Reserve with three years of contractual interest running after the Plan goes effective.  The PIK Trustee is wrong.  But, as discussed, the confirmation hearing is not the occasion for this Court to adjudicate the allowance or disallowance of any Claims.  The only relevance of the PIK Notes Trustee's argument is that, as noted, it simply underscores how extensive further proceedings are likely to be before all the Claims of the EFIH First and Second Lien Notes have been resolved by Final Order.

## **CONCLUSION**

The Court should deny confirmation of the Plan unless it is modified as set forth above and in the Objection.

Dated:  February 10, 2017

COLE SCHOTZ P.C.

 /s/ J. Kate Stickles                            Warren A. Usatine
Norman L. Pernick (Bar No. 2290)         Court Plaza North
J. Kate Stickles (Bar No. 2917)            25 Main Street
500 Delaware Avenue, Suite 1410      Hackensack, NJ 07602
Wilmington, DE  19801                 Telephone: 201-489-3000
Telephone: 302-652-3131            Facsimile:  201-489-1536
Facsimile:  302-652-3117            wusatine@coleschotz.com
npernick@coleschotz.com
kstickles@coleschotz.com

WILMER CUTLER PICKERING HALE AND DORR LLP
Philip D. Anker                     Joel Millar
7 World Trade Center               David Gringer
250 Greenwich Street               Isley Gostin
New York, NY 10007                1875 Pennsylvania Avenue, NW
Telephone: 212-230-8800           Washington, DC 2006
Facsimile:  212-230-8888           Telephone:  202-663-6000
Philip.Anker@wilmerhale.com      Facsimile: 202-663-6363
                                     Joel.Millar@wilmerhale.com
                                     David.Gringer@wilmerhale.com
                                     Isley.Gostin@wilmerhale.com

ROPES & GRAY LLP
Keith H. Wofford                  D. Ross Martin
Mark Somerstein                Andrew Devore
1211 Avenue of the Americas      800 Boylston Street, Prudential Tower
New York, NY 10036-8704        Boston, MA  02199-3600
Telephone: 212-596-9000           Telephone: 617-951-7000
Facsimile:  212-596-9090           Facsimile: 617-951-7050
Keith.Wofford@ropesgray.com    Ross.Martin@ropesgray.com
Mark.Somerstein@ropesgray.com  Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:  212-248-3141
James.Millar@dbr.com

*Counsel for Delaware Trust Company*