## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Objection Deadline: March 9, 2017 at 4:00 p.m.** |

### SUMMARY COVER SHEET TO THE EIGHTH INTERIM FEE APPLICATION OF FILSINGER ENERGY PARTNERS, ENERGY CONSULTANTS FOR THE DEBTORS AND DEBTORS IN POSSESSION, FOR THE PERIOD FROM SEPTEMBER 1, 2016 THROUGH AND INCLUDING DECEMBER 31, 2016

In accordance with the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), Filsinger Energy Partners ("FEP"), energy consultant for the above-captioned debtors and debtors in possession (collectively, the "Debtors"), submits this summary (this "Summary") of fees and expenses sought as actual, reasonable, and necessary in the fee application to which this Summary is attached (the "Fee Application")[2] for the period from September 1, 2016 through December 31, 2016 (the "Fee Period").

FEP submits the Fee Application as an interim fee application in accordance with the *Order Establishing Procedures For Interim Compensation And Reimbursement Of Expenses For Professionals* (D.I. 2066) (the "Interim Compensation Order"), which permits FEP to file interim fee applications at 120 day intervals.

| *General Information* | |
|---|---|
| Name of Applicant: | Filsinger Energy Partners |
| Authorized to Provide Services to: | Energy Futures Holdings Corp., *et al.* Debtors and Debtors-in-Possession |

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]    Capitalized terms used but not otherwise defined in this Summary shall have the meanings ascribed to such terms in the Fee Application.

| | |
|---|---|
| Petition Date: | April 29, 2014 |
| Date of Retention [D.I. 2057]: | September 16, 2014<br>(Effective as of April 29, 2014) |

### *Summary of Fees and Expenses Sought in the Fee Application*

| | |
|---|---|
| Period for Which Compensation and Reimbursement is Sought in the Fee Application: | September 1, 2016 through December 31, 2016 |
| Voluntary Fee Waiver and Expense Reduction in this Fee Period: | Reduced fees by $0 and expenses by $0 |
| Amount of Compensation Sought as Actual, Reasonable, and Necessary for the Fee Period: | $371,041.50 |
| Amount of Expense Reimbursement Sought as Actual, Reasonable, and Necessary for the Fee Period: | $5,946.09 |
| Total Compensation and Expense Reimbursement Requested for the Fee Period: | $376,987.59 |

### *Rate Increases Applicable to the Fee Period*

| | |
|---|---|
| Total Amount of Compensation Sought for the Fee Period, Calculated Using Rates as of the Date of Retention: | $367,604.00 |
| Total Compensation Sought in this Fee Period Resulting from Rate Increases: | $3,437.50 |

| Summary of Past Requests for Compensation and Prior Payments | |
|---|---|
| Total Amount of Compensation Previously Requested Pursuant to the Interim Compensation Order to Date:[3] | $28,178,884.00 |
| Total Amount of Expense Reimbursement Previously Requested Pursuant to the Interim Compensation Order to Date:[4] | $1,239,098.73 |
| Total Compensation Approved Pursuant to the Interim Compensation Order to Date:[5] | $23,346,232.25 |
| Total Amount of Expense Reimbursement Approved Pursuant to the Interim Compensation Order to Date:[6] | $1,079,399.22 |
| Total Allowed Compensation Paid to Date:[7] | $27,124,161.05 |
| Total Allowed Expenses Paid to Date:[8] | $1,236,801.94 |
| Compensation Sought in this Application Already Paid Pursuant to the Interim Compensation Order But Not Yet Allowed: | $296,833.20 |
| Expenses Sought In This Application Already Paid Pursuant to the Interim Compensation Order But Not Yet Allowed: | $5,946.09 |

**Prior Interim and Monthly Fee Requests Filed[9]**

---

[3]    Amount shown reflects all prior interim and monthly fee requests.

[4]    Amount shown reflects all prior interim and monthly expense reimbursement requests.

[5]    Amount shown reflects fees approved in prior interim application periods.

[6]    Amount shown reflects expense reimbursement approved in prior interim application periods.

[7]    Amount shown includes all fees paid in prior periods, as well as fees paid for this Fee Period reflecting 20% holdback.

[8]    Amount shown includes all expense reimbursements paid in prior periods, as well as 100% of expenses for this Fee Period that have been paid.

[9]    Reflects monthly fee statements filed since the previous interim fee application period.

| Type | Period Covered | Fees Requested | Expenses Requested | Fees Paid[10] | Expenses Paid |
|---|---|---|---|---|---|
| 1st Interim[11] | 4/29/14 - 8/31/14 | $3,798,436.00 | $192,989.61 | $3,736,612.00 | $191,972.15 |
| 2nd Interim[11] | 9/1/14 – 12/31/14 | $4,193,033.25 | $195,125.66 | $4,147,845.50 | $194,982.71 |
| 3rd Interim[11] | 1/1/15 – 4/30/15 | $4,850,141.25 | $213,956.56 | $4,850,141.25 | $213,939.61 |
| 4th Interim[11] | 5/1/15 – 8/31/15 | $4,747,724.00 | $212,781.66 | $4,744,855.00 | $212,781.66 |
| 5th Interim[11] | 9/1/15 – 12/31/15 | $3,507,023.50 | $145,320.24 | $3,506,663.50 | $145,320.24 |
| 6th Interim[11] | 1/1/16 – 4/30/16 | $2,360,115.00 | $120,687.80 | $2,360,115.00 | $120,402.85 |
| Monthly[12] | 5/1/16 – 5/31/16 | $1,123,862.00 | $43,819.62 | $899,089.60 | $43,819.62 |
| Monthly[12] | 6/1/16 – 6/30/16 | $1,123,018.00 | $40,231.73 | $898,414.40 | $39,397.25 |
| Monthly[12] | 7/1/16 – 7/31/16 | $1,146,796.00 | $42,814.45 | $917,436.80 | $42,814.45 |
| Monthly[12] | 8/1/16 - 8/31/16 | $957,693.50 | $25,425.31 | $766,154.80 | $25,425.31 |
| Monthly[12] | 9/1/16 – 9/30/16 | $333,464.50 | $5,916.09 | $266,771.60 | $5,916.09 |
| Monthly[12] | 10/1/16 – 10/30/16 | $30,513.00 | $30.00 | $24,410.40 | $30.00 |
| Monthly[12] | 11/1/16 – 11/30/16 | $7,064.00 | $0 | $5,651.20 | $0 |
| Monthly[13] | 12/1/16 – 12/31/16 | $0 | $0 | $0 | $0 |
| **TOTAL** | | **$28,178,884.00** | **$1,239,098.73** | **$27,124,161.05** | **$1,236,801.94** |

---

[10]   Fees paid for monthly fee statements reflect 80% of the total requested fees for monthly statements.

[11]   Fees and expenses paid are lower than requested, reflecting agreed-upon reductions with the Fee Committee.

[12]   Reflects Monthly Fee Statements filed for the seventh & eighth interim periods where 80% of fees and 100% of expenses have been paid.

[13]   A December 2016 Monthly Fee Statement was not filed; there were no fees or expenses for the month.

Date:   February 15, 2017                          _/s/ Todd W. Filsinger_
        Denver, Colorado                    Todd W. Filsinger
                                            as Senior Managing Director
                                            Filsinger Energy Partners


Filsinger Energy Partners
290 Fillmore St, Ste 4
Denver, CO 80206
Phone: 303-974-5884

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Objection Deadline: March 9, 2017 at 4:00 p.m.** |

**EIGHTH INTERIM FEE APPLICATION OF
FILSINGER ENERGY PARTNERS, ENERGY CONSULTANT
FOR THE DEBTORS AND DEBTORS IN POSSESSION, FOR THE PERIOD FROM
SEPTEMBER 1, 2016 THROUGH AND INCLUDING DECEMBER 31, 2016**

Filsinger Energy Partners (collectively, "FEP"), energy consultant to the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby submits its interim fee application (the "Fee Application") for allowance of compensation for professional services provided in the amount of $371,041.50 and reimbursement of actual and necessary expenses in the amount of $5,946.09 that FEP incurred for the period from September 1, 2016 through December 31, 2016 (the "Fee Period").  In support of this Fee Application, FEP submits the declaration of Todd W. Filsinger, Senior Managing Director at FEP, which is attached hereto as **Exhibit A** and incorporated by reference.  In further support of this Fee Application, FEP respectfully states as follows.

**Jurisdiction**

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 327, 330, and 331 of chapter 11 of title 11 of the United States Code, (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the *Order Authorizing The Debtors To Retain And Employ Filsinger Energy Partners As Energy Consultant Effective Nunc Pro Tunc To The Petition Date,* dated September 16, 2014 [D.I. 2057] (the "Retention Order"), the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals,* dated September 16, 2014 [D.I. 2066] (the "Interim Compensation Order"), the *Stipulation and Order Appointing a Fee Committee* [D.I. 1896] (the "Fee Committee Order"), and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Background

4.      On April 29, 2014, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On May 1, 2014, the Court entered an order [D.I. 287] authorizing the joint administration and procedural consolidation of the Debtors' chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No entity has requested the appointment of a trustee or examiner in these chapter 11 cases.  On May 13, 2014, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [D.I. 420].

5.      On September 16, 2014, the Court entered the Interim Compensation Order, which sets forth the procedures for interim compensation and reimbursement of expenses for all

professionals in these cases.

6.      On May 29, 2014, the Debtors filed their *Application of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to Retain and Employ Filsinger Energy Partners as Energy Consultant Effective Nunc Pro Tunc to the Petition Date* [D.I. 650] (the "Application").

7.      On September 16, 2014, the Court entered the *Order Authorizing The Debtors To Retain And Employ Filsinger Energy Partners As Energy Consultant Effective Nunc Pro Tunc To The Petition Date* [D.I. 2057] (the "Retention Order"), attached hereto as **Exhibit B** and incorporated by reference.  The Retention Order authorizes the Debtors to compensate and reimburse FEP in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Interim Compensation Order.  The Retention Order also authorizes the Debtors to compensate FEP at FEP's hourly rates charged for services of this type and to reimburse FEP for FEP's actual and necessary out-of-pocket expenses incurred, subject to application to this Court.  The particular terms of FEP's engagement are detailed in the engagement letter by and between FEP and the Debtors, effective as of December 4, 2012 and attached hereto as **Exhibit B**.

8.      The Retention Order authorizes FEP to provide the following services consistent with and in furtherance of the services enumerated above and as described in the Application:

a.      Analyzing the Debtors' financial forecast for business strengths, weaknesses, and risks from the perspective of the Debtors' principal objective of maximizing enterprise value;

b.      Provide forecasts of commodity prices, including fuel prices, electric supply and demand conditions, transmission constraints, hydro generation conditions, emissions allowance costs, and new construction metrics; and

c.      Reviewing and analyzing compensation metrics.

## Disinterestedness of FEP

9.     To the best of the Debtors' knowledge and as disclosed in the *Declaration of Todd W. Filsinger in Support of the Debtors' Application for the Entry of an Order Authorizing the Retention and Employment of Filsinger Energy Partners as Energy Consultants for the Debtors and Debtors in Possession Effective Nunc Pro Tunc to the Effective Date* [D.I. 650-3] and the *Second Supplemental Declaration of Todd Filsinger in Support of the Application of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to Retain and Employ Filsinger Energy Partners as Energy Consultant Effective Nunc Pro Tunc to the Petition Date* [D.I. 2725], the *Third Supplemental Declaration of Todd Filsinger in Support of the Application of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to Retain and Employ Filsinger Energy Partners as Energy Consultant Effective Nunc Pro Tunc to the Petition Date* [D.I. 4328], the *Fourth Supplemental Declaration of Todd Filsinger in Support of the Application of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to Retain and Employ Filsinger Energy Partners as Energy Consultant Effective Nunc Pro Tunc to the Petition Date* [D.I. 5748], the *Fifth Supplemental Declaration of Todd Filsinger in Support of the Application of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to Retain and Employ Filsinger Energy Partners as Energy Consultant Effective Nunc Pro Tunc to the Petition Date* [D.I. 7249], and the *Sixth Supplemental Declaration of Todd Filsinger in Support of the Application of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to Retain and Employ Filsinger Energy Partners as Energy Consultant Effective Nunc Pro Tunc to the Petition Date* [D.I. 8874] (collectively, the "FEP Declarations"), (a) FEP is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and does not hold or represent an interest adverse to the Debtors' estates

and (b) FEP has no connection to the Debtors, their creditors, or other parties in interest, except as may be disclosed in the FEP Declarations.

10.    FEP may have in the past represented, may currently represent, and likely in the future will represent parties in interest in connection with matters unrelated to the Debtors in these chapter 11 cases.  In the FEP Declarations, FEP disclosed its connections to parties in interest that it has been able to ascertain using its reasonable efforts.  FEP will update the FEP Declarations, as appropriate, if FEP becomes aware of relevant and material new information.

11.    FEP performed the services for which it is seeking compensation on behalf of the Debtors and their estates, and not on behalf of any committee, creditor, or other entity.

12.    Except to the extent of the advance payments paid to FEP that FEP previously disclosed to this Court in the FEP Declarations, FEP has received no payment and no promises for payment from any source other than the Debtors for services provided or to be provided in any capacity whatsoever in connection with these chapter 11 cases.

13.    Pursuant to Bankruptcy Rule 2016(b), FEP has not shared, nor has FEP agreed to share (a) any compensation it has received or may receive with another party or person other than with the members of FEP or (b) any compensation another person or party has received or may receive.

### Summary of Compliance with Interim Compensation Order

14.    This Fee Application has been prepared in accordance with the Interim Compensation Order.

15.    FEP seeks interim compensation for professional services rendered to the Debtors during the Fee Period in the amount of $371,041.50 and reimbursement of actual and necessary expenses incurred in connection with providing such services in the amount of $5,946.09. During the Fee Period, FEP professionals expended a total of 630.10 hours for which

compensation is requested.

## **Fees and Expenses Incurred During Fee Period**

**A.      Customary Billing Disclosures**.

16.      FEP's hourly rates are set at a level designed to compensate FEP fairly for the work of its consultants and support staff and to cover fixed and routine expenses.  Hourly rates vary with the experience and seniority of the individuals assigned.  These hourly rates are subject to periodic adjustments to reflect economic and other conditions and are consistent with the rates charged elsewhere.

17.      The hourly rates and corresponding rate structure utilized by FEP in these chapter 11 cases are equivalent to the hourly rates and corresponding rate structure currently used by FEP for similar complex energy restructuring and litigation assignments, whether in court or otherwise, regardless of whether a fee application is required.  The rates and rate structure reflect that such restructuring, litigation and other complex matters typically involve great complexity, high stakes, and severe time pressures.

18.      For the convenience of the Court and all parties in interest, attached hereto as **Exhibit C** is a summary of blended hourly rates for timekeepers who billed to the Debtors during the Fee Period.

**B.      Fees Incurred During Fee Period**.

19.      In the ordinary course of FEP's practice, FEP maintains computerized records of the time expended to render the professional services required by the Debtors and their estates. For the convenience of the Court and all parties in interest, attached hereto as **Exhibit D** is a summary of fees incurred and hours expended during the Fee Period, setting forth the following information:

●      The name of each consultant for whose work on these chapter 11 cases

compensation is sought;

- Each consultant's title;

- The aggregate time expended and fees billed by each consultant during the Fee Period;

- The hourly billing rate for each consultant at FEP's current billing rates;

- The blended hourly rate for the period;

- Rate increases since the inception of the case including the calculation of total compensation requested using rates as of the First Interim Application.

20.     To provide a meaningful summary of FEP's services rendered on behalf of the Debtors and their estates, FEP has established, in accordance with its internal billing procedures, certain subject project categories (each, a "Project Category") in connection with these chapter 11 cases. A schedule setting forth a description of the Project Categories utilized in this case, the number of hours expended by FEP consultants by Project Category, and the aggregate fees associated with each Project Category is attached hereto as **Exhibit F**.

21.     In addition, FEP's computerized records of time expended providing professional services to the Debtors and their estates are attached hereto as **Exhibit G**.

**C.      Expenses Incurred During Fee Period**.

22.     In the ordinary course of FEP's practice, FEP maintains a record of expenses incurred to render the professional services required by the Debtors and their estates and for which reimbursement is sought.

23.     For the convenience of the Court and all parties in interest, attached hereto as **Exhibit E** is a summary for the Fee Period, setting forth the total amount of reimbursement sought with respect to each category of expenses for which FEP is seeking reimbursement.

24.     In addition, FEP's computerized records of expenses incurred during the Fee Period in the rendition of professional services to the Debtors and their estates are attached as

**Exhibit H**.

25.     In accordance with paragraph 2(b) of the Interim Compensation Order, FEP proposes the following allocation of the fees and expenses sought in this fee application among (1) EFH Corp., (2) EFIH, and (3) the TCEH debtors:

| Direct Benefit Fees:  $366,903.59 | |
|---|---|
| (comprised of $360,957.50 fees plus $5,946.09 expenses) | |
| **Debtor(s)** | **Amount Sought to be Paid** |
| EFH Corp. | $42,980.91 |
| EFIH | $141,330.64 |
| TCEH Debtors | $182,592.04 |
| *Totals:* | **$366,903.59** |

| Collective Benefit Fees: $10,084.00 | |
|---|---|
| (comprised of $10,084.00 fees plus $0 expenses) | |
| **Debtor(s)** | **Amount Sought to be Paid** |
| EFH Corp. | $1,758.93 |
| EFIH | $5,554.86 |
| TCEH Debtors | $2,770.21 |
| *Totals:* | **$10,084.00** |
| *Grand Total:* | **$376,987.59** |

### Summary of Professional Services Rendered During the Fee Period

26.     During the Fee Period, FEP provided extensive and important professional

services to the Debtors in connection with these chapter 11 cases. These services were often performed under severe time constraints and were necessary to address a multitude of critical issues both unique to these chapter 11 cases and typically faced by large, energy company debtors in similar cases of this magnitude and complexity.

27.     The following is a summary, by Project Category, of the most significant professional services provided by FEP during the Fee Period. This information summarizes the detailed time records included in **Exhibit G**. This summary is organized in accordance with FEP's internal system of Project Category numbers. The detailed descriptions demonstrate that FEP was heavily involved in performing services for the Debtors on a daily basis, often including night and weekend work, to meet the needs of the Debtors' estates in these chapter 11 cases. The methodology described below regarding the various analyses are based on FEP's initial approach. FEP reserves the right to modify and change this approach as necessary through the bankruptcy process.

## Summary Overview of Services

FEP has been retained by the Debtors to assist the Debtors and their advisors in the development of a going-forward business plan, evaluate the Debtors' ongoing businesses and processes, and analyze the Debtors' ongoing performance. FEP is conducting due diligence with respect to the Debtors and their assets in order to project cash flows, assess asset and company values, evaluate the Debtors' financial forecasts, provide forecasts of commodity prices, and evaluate the Debtors' incentive compensation metrics.

A significant portion of this support involved the development of comprehensive forecasts of projected operations and cash flows for each Debtors' individual assets and business units. These forecasts supported FEP's evaluation and assessment of the Debtors' long-range

forecasting process and compensation metrics.

FEP's power-generating asset modeling serves as the foundation for much of the analysis that FEP is preparing in its role as energy consultant on this case.  As part of this modeling effort, FEP is projecting wholesale electric market power prices using an approach that FEP has consistently applied to evaluate multiple types of electric generating assets and asset portfolios. This approach includes the use of several complex and detailed models and a significant amount of data to represent the power markets of Texas and the United States.  The approach and the types of models used are widely accepted and commonly relied upon in the energy industry to forecast market conditions.  The central components include the simulation of power plant dispatch operations and the forecasting of capacity additions and retirements.

FEP's methodology relies on an iterative process of power plant dispatch and capacity simulation.  FEP's fundamental model, AURORAxmp licensed from EPIS Inc., is an hour-by-hour chronological production cost-based dispatch model.  AURORAxmp simulates the behavior of the power market and the corresponding dispatch decisions.  AURORAxmp requires a detailed modeling approach to represent the hour-by-hour interaction of supply and demand to determine how frequently and how profitably power plant units dispatch.  Within AURORAxmp, each and every generating unit in the pertinent transmission areas are modeled individually, taking into account the unit-specific cost and operating characteristics.  FEP must therefore research and develop unit-specific data for each generator in the markets.

The second part of FEP's iterative approach relies on a proprietary capacity model developed by FEP called FCAP.  FCAP is used to determine the total compensation required in the market to retain a sufficient amount of capacity to meet reliability requirements of the system.  FCAP uses the output from AURORAxmp, as well as additional fixed cost data that

FEP prepares for every generator in the market.  FCAP then simulates the economic decisions market participants would make to add or retire capacity given the performance and profitability of the plants.  In simulating these decisions, FCAP incorporates historically-demonstrated market inefficiencies that may result in cyclical periods of over- and under-development of generating capacity.  The generator addition and retirement decisions modeled by FCAP are then reintroduced to AURORAxmp to determine the incremental impact on generator dispatch and profitability.

The ultimate result of the iterative calculations of AURORAxmp and FCAP is a wholesale electric market price forecast.  To develop this price forecast, there are multiple assumptions that FEP must develop, review, input to the models, and validate through a quality assurance review process.  Some examples of assumptions used in the models are:

- Load projections
- Existing supply
- Projected new generator additions
- Power transfer and transmission capabilities between regions
- Reserve margins required to maintain electric system reliability
- Environmental regulations
- Natural gas prices
- Coal prices
- Historical price volatility
- Capital costs for new generator construction

For each and every generating unit there are multiple unit characteristics that are specific to the unit.  Among these characteristics are:

- Unit type
- Capacity
- Heat rate

- Operating constraints
- Retrofits
- Emission rates
- Fuel type
- Fuel costs
- Outage rates

For each assumption, FEP must perform research across multiple documents, benchmark them against proprietary knowledge, and determine the most appropriate assumption for input to the models.    FEP consults numerous documents in determining the non-Debtor-specific assumptions in this analysis.

After the assumptions have been uploaded and quality assured, the models are run.  These models are iterative and must be run multiple times in order to capture the capacity transfers, economic retirements, and new build plan.    The wholesale electric market pricing and operational results from the models must also be compared across FEP's models, historical pricing and operations, and forward market prices.

The resulting wholesale power price forecast is then used to drive FEP's proprietary stochastic dispatch model, FGEN.  FGEN is used to provide more-refined dispatch, operational, and cash flow forecasts of specific, individual generating units.  In this case, FEP has utilized FGEN to forecast the operation of the Debtors' power generating units.

FGEN forecasts theoretical market price trajectories, including the stochastic effects of price volatility and mean-reverting jump diffusion processes to project possible unit dispatch and revenues based on the market prices derived in AURORAxmp and FCAP.

In addition to the wholesale modeling approaches described above, FEP has relied on its proprietary retail models to forecast the operations of the Debtors' retail operations.  FEP's approach to retail forecasting utilizes linear and non-linear multi-variate regression techniques to

relate consumer decisions to price and non-price variables, including historical retail price evolution, brand recognition and market share, competitive positioning, marketing spend, and relevant macro-economic conditions. Commodity and delivery costs are derived from the wholesale commodity forecasts produced in FEP's wholesale forecasting process described above, historical and projected execution costs, and relevant transmission and distribution charges while incorporating the hedging programs employed by the Debtors. FEP's retail modeling relies on its research and expectations regarding the current and future state of market regulation, consumer acceptance and participation in the market, and competitive intensity among market participants.

FEP's retail modeling approach results in projections of the Debtors' retail customer portfolio mix, margins per customer, residential and non-residential customer counts and sales volumes, and relative market shares.

### Summary of Services by Project Category

(a)     Project Category 1: Long Range Forecast

This matter includes modeling, analysis, due diligence and independent assessment of the Debtors' long-range planning process and derivation of long-term EBITDA and cash flow forecasts.

FEP efforts included independent modeling of the Debtors' power-generating assets and retail operations as of specific points in time that the Debtors selected to generate its long-term plans: August 2014, October 2014, December 2014, July 2015, and December 2015. FEP utilized its fundamental and stochastic market models, as well as its research on the Electric Reliability Council of Texas ("ERCOT") market conditions and the specific operating characteristics of all power-generating assets within the region, including operating characteristics such as:

- Generating unit heat rate
- Planned outage schedules
- Operational and seasonal de-rates of the generation units
- Emissions characteristics by emission type – NOx, SO2, Mercury, Carbon etc.
- Energy commodity prices
- Plant operating costs and capital expenditures
- Customer attrition rates for both the residential, commercial and industrial business segments
- Customer margin analysis for all segments
- Customer acquisition costs
- Customer retention costs
- Analysis of the margins of competitors

The results of FEP's analyses have been used to independently evaluate and assess the Debtors' long-range planning process and cash flow projections.

This matter also includes review and evaluation of the Debtors' internal models and processes that support the Debtors' long-range plans.

(b)     Project Category 2: Metric Analysis

This matter includes modeling, analysis, due diligence and independent assessment of the compensation metrics utilized by the Debtors within their incentive compensation plans.

FEP utilized its fundamental and stochastic cash flow projection models to evaluate and assess the metrics in the Debtors' Insider and non-Insider incentive compensation plans. Additionally, FEP researched, gathered and processed data to evaluate each compensation metric against energy industry standards, utilizing FEP's own databases of market participants, plant operations, company performance and market conditions, as well as data provided by the Debtors.   These analyses ultimately supported the declaration and testimony of the Senior Managing Partner of FEP regarding the Debtors' motion to continue Insider Compensation

Programs for the following metrics:

- Luminant Management EBITDA

- Non-Summer availability of Coal-fired units

- Summer availability of Coal-fired units

- Availability of Nuclear-fired units

- Luminant operating & maintenance and selling, general and administrative expenses

- Coal fuel costs

- Luminant capital expenditures

- TXU Energy Management EBITDA

- TXU Energy total costs and capital expenditures

- Contribution Margin by sector

- Residential customer count

- Customer satisfaction percentages

- Average days sales outstanding

- Energizing events success

- Level of customer complaints

- Key systems availability percentage

- Competitive Management EBITDA

- Luminant scorecard multiplier

- TXU energy scorecard multiplier

- Competitive total spend

- Business services costs

(c)    <u>Project Category 3: Generation Analysis</u>

This matter includes forward-looking modeling and analysis of the Debtors' power-generating assets, including analysis of the operating characteristics, outage schedules, fuel consumption, dispatch and operating and maintenance expenses individually for each of the coal-fired, nuclear-fired and natural gas-fired generating units that the Debtors own and operate.

FEP also validated operating characteristics for each individual and unique generation unit.   These operating characteristics support modeling input assumptions for both the fundamental price forecasting process via AURORAxmp, as well as FEP's stochastic dispatch and cash flow model, FGEN.   In preparing the input data for this model, FEP researched and compiled data, uploaded the data into FGEN, ran the models through an iterative process, and prepared the analysis of the model results. FEP utilized data provided by the Debtors, as well as market and other independent information developed and researched by FEP.

FEP developed specific models to capture the unique aspects of some of the Debtors' assets. These plant-specific models capture the unique operating characteristics and constraints of the Debtors' assets.

Finally, FEP supported the evaluation of potential power plant acquisitions by the Debtors. These evaluations included modeling of the specific generating units that were subject to the acquisitions, as well the operating outlook of the assets.

(d)    Project Category 4: Retail Analysis

This matter includes forward-looking modeling and analysis of the Debtors' retail business, including analysis of its customer portfolios, margins and operating costs.   This analysis includes residential, commercial and industrial business segments including the direct and indirect impacts of customer acquisition and retention profiles, customer margin analysis, analysis of the weather on customer load and behavior, energy commodity prices, bad debt cycles, marketing cost effects, and customer switching tendencies.

FEP's efforts included extensive diligence and data collection regarding the Debtors' historical retail operations, marketing efforts, pricing strategies and competitive positioning. This data and diligence supported FEP's independent modeling of the Debtors' retail business and projections thereof.

(e)    Project Category 5: Commodity Analysis

This matter includes forward-looking modeling and analysis of power, natural gas, coal, nuclear and environmental markets and prices. The Debtors participate in some of the most volatile commodity price markets in the world, and this task strives to derive the various migration paths that commodity prices may exhibit in the future.  Various high, low and expected commodity price paths were evaluated to determine the best expectation of future performance for the market in which the Debtors operate.  Additionally, this matter includes analysis of the Debtors' risk management position and hedging and trading activities.

FEP utilized its fundamental market model, as well as its own market research, to analyze and project the future prices of power and the other commodities indicated previously. These commodity analyses supported FEP's modeling of the Debtors' assets as they relate to the long-range and short-range forecasts, as well as deriving the range of performance levels that can be expected from the Debtors' portfolio.

(f)    Project Category 6: Competitor Analysis

Analysis of the retail and wholesale competitors to the Debtors, including the competitors' historical financial filings, industry outlooks and relative competitive positions. This matter also includes review of competitive metrics and positions of specific plants, retail plans, operating costs and organizational structures relative to those of the Debtors.

This matter includes extensive competitor research and data compilation, as well as performing analyses of the Debtors' retail and wholesale operations in comparison to this research.

(g)    Project Category 7: EBITDA Projection

This matter includes the analysis and consolidation of the Debtors' EBITDA and other financial projections resulting from the diverse modeling and analysis efforts undertaken by FEP

regarding the Debtors' wholesale and retail operations. This work was undertaken for each long range plan that the Debtors utilized for internal and external purposes, including the May 2014, August 2014, October 2014, December 2014, July 2015, and December 2015 long range planning processes.  The results from the other modeling and analysis efforts were compiled to build a consolidated EBITDA model. This model was then sensitized and parameterized to further analyze the potential variability of the Debtors' financial projections.

(h)    Project Category 8: Environmental Analysis

This matter includes analysis and modeling of existing and potential environmental regulations, including the impacts of these regulations on power plant operations, wholesale energy markets, commodity markets and retail operations. This matter also includes analysis of the environmental controls that are or may be necessary at the Debtors' plants.  This task requires the modeling of complex regulations regarding federal and state rules for each of the generating units for items such as: air permit limits and potential operating constraints, NOx controls and trading allowance constraints, SO2 controls and trading allowance constraints, mercury controls and constraints, and potential greenhouse gas regulations or legislation that could alter the productivity of the generation fleet.  All of these issues must be analyzed and incorporated into the Debtors' operations and expectations as well as considered for each of generating assets within the entire ERCOT market.

(i)    Project Category 9: Short-Range Forecast

This matter includes modeling, analysis, due diligence and independent assessment of the Debtors' short-term planning and budgeting process and results. This matter includes analysis of the Debtors' monthly "X+Y" actual performance plus balance of year projections and the sensitivity of those projections to changing short-term market conditions.

Since the Debtors operate their businesses within a very volatile market and operating

environment, these short-term projections concentrate on changes to the following:

- Market prices of energy commodities including coal, natural gas and power
- The magnitude of commodity price risk susceptible to market forces
- Generating unit heat rate
- Planned outage schedules
- Operational and seasonal de-rates of the generation units
- Emissions characteristics by emission type – NOx, SO2, mercury, carbon, etc.
- Plant operating costs and capital expenditures
- Customer attrition rates for both the residential, commercial and industrial business segments
- Customer margin analysis for all segments
- Customer acquisition costs
- Customer retention costs

(j)     Project Category 10: Capital Projects

This matter includes review and analysis of the planned, proposed and potential capital projects associated with power plant, mining, and retail operations.  FEP evaluated these projects to assess their impact on the Debtors' financial and operational outlook of cash flows and operational capability.  For example, the level of capital expended at the generation facilities and the mines directly impacts the operational performance of the generating units and the cost of fuel consumed by the generation process.

FEP analyzed various types of capital expenditures within this task, such as:

- Nuclear fuel procurement
- Nuclear fuel conversion
- Nuclear fuel enrichment
- Building nuclear fuel assemblies
- Maintenance of the coal and natural gas boilers
- Maintenance of the piping and valves processing the steam flow from the boiler to the generation turbine

- Maintenance of the generation turbine
- Maintenance of the power switchyard
- Expansion, additions or maintenance of the environmental equipment utilized to process the flue gas stream
- Costs to open new mining locations
- Costs to deploy draglines at the appropriate locations
- Costs to optimally recover the maximum amount of lignite reserves for the lowest costs
- Costs for new equipment
- Retirement or salvage costs related to mining equipment
- IT hardware and software costs attributable to supporting the wholesale and retail operations

(k)    Project Category 11: Wholesale Operations

This matter focuses on the analysis of the ERCOT market and its impacts on the Debtors' operations.  It includes review and analysis of supply and demand forecasts published by ERCOT, review and analysis of regulations or permits governed by the Texas Commission of Environmental Quality, and review and analysis of regulations promulgated by the Occupational Health & Safety Administration, the Mining Safety & Health Administration and the Nuclear Regulatory Commission.  Additionally, this task reviews and analyzes the nature of how competitors are hedging their power generation portfolios, proposals for new generation and tracking the status of the likelihood and timing of actual commercial operations for the potential facilities based on permit application, permit acceptance, transmission intertie agreements, project financing, ground breaking and construction updates.

All of these external considerations are factored into the projections for the Debtors' power plant operations, including outage schedules, planned and forced outage rates, maintenance plans and operating and maintenance expenses. FEP evaluated these plans and

schedules to assess their impact on the Debtors' financial and operational outlook.

(l)      Project Category 12: Retail Operations

This matter includes review and analysis of the Debtors' retail operations, including customer-responsive activities, retail plan development and customer experience activities. FEP evaluated the Debtors' ongoing marketing activities, product pricing strategies, competitive positioning and monthly performance.

This matter includes evaluation of competitive activities in the ERCOT retail market, including the review and analysis of new or revised rulings undertaken by the Public Utility Commission of Texas, review and analysis of the activities and performance levels of other retail energy providers in Texas, analysis of the Power to Choose web pricing tool for energy delivery which is accessible to all retail customers in the state, and the review and analysis of information available from other public sources related to the Texas market for retail energy providers.

(m)     Project Category 13: T&D Operations

This matter includes review and analysis of the transmission and distribution ("T&D") activities of the Debtor, as well as the impact that changes executed by other Texas T&D providers have on the Debtors' wholesale and retail businesses.

This task focuses on the operations of the Debtor's T&D subsidiary, which is not a party to this chapter 11 restructuring, plus the effects that non-Debtor T&D companies have on the Debtors' wholesale and retail operations. For the Debtors' T&D subsidiary, the review and analysis concentrated on understanding the potential range of cash flows to support the potential valuation of this subsidiary.   These cash flows could be impacted materially by capital expenditure levels, rate case actions at the Public Utilities Commission, or operational needs. Any mandated changes to the operational performance of the Debtors' T&D subsidiary are likely to have an effect of the Debtors' non-regulated retail business.   For the other Texas T&D

companies, FEP researched and analyzed the impacts of T&D outages on the Debtors' retail customers, as well as the responses of those retail customers to T&D events. FEP also researched the impacts of T&D billing practices on the Debtors' retail operations.

(n)    Project Category 14: Data Collection & Diligence

This matter includes site visits, meetings, document reviews and other tasks associated with gathering and examining information and data received from the Debtors. The following is a sample list of the myriad of information that has been collected from the Debtors as well as third party sources:

- Lignite mining plans and related cost estimates
- Costs of procuring and delivering Powder River Basin coal to the generating facilities
- Generation unit characteristics including operating heat rates, outage schedules, fuel derates, emission production levels, emission extraction rates, etc.
- Unit operating cost information
- Unit capital costs
- Organizational support costs
- Hedging and trading strategy implementation and development
- Retail customer retention rates and trends
- Customer contribution margins by type of customer
- Hedging strategies related to the retail portfolio
- T&D rates and the underlying rate base
- Actual and potential changes to the wholesale or retail market rules or structures in ERCOT

Additionally this matter includes preparation and production of data in response to data requests from third parties in this Case.

(o)    Project Category 15: Reports

This matter includes the development, review and publication of reports supporting the

Debtors' operations, FEP analyses and court filings. These reports include Debtor reports and reports developed by FEP.

(p)      <u>Project Category 16: Hearings</u>

This matter includes preparation, attendance and participation in depositions and hearings supporting the Debtors' chapter 11 case.

(q)      <u>Project Category 17: On-Site Diligence</u>

This matter includes diligence, meetings, and data collection at the Debtors' offices and sites. The following is a sample list of the myriad of information that has been collected from the Debtors from on-site meetings:

- Actual operational performance levels
- Lignite mining strategies and related cost estimates
- Costs of procuring and delivering Powder River basin coal to the generating facilities
- Generation unit characteristics and performance levels
- Optional environmental compliance plans
- Potential generation development opportunities
- Unit operating cost information
- Unit capital costs
- Organizational support costs and human resource strategies
- Hedging and trading strategies
- Potential retail energy provider acquisitions
- Retail customer retention rates and trends
- Customer contribution margins by type of customer
- Hedging strategies related to the retail portfolio
- T&D rates and the underlying rate base
- Actual and potential changes to the wholesale or retail market rules or structures in ERCOT

(r)     <u>Project Category 18: Project Management</u>

This matter includes managing the project risks, issues and tasks to ensure that deadlines are met. Management of FEP's team members ensures that the combined efforts have been coordinated to produce the required analyses, reports, projections and various model results.

This matter includes efforts to define deliverables, set and monitor deadlines, coordinate and assign appropriate resources, skill-set and experience, and prepare timely analyses to support the Debtors' needs. This matter also includes the project managers' discussions with the Debtors on the nature of the work and tasks.

(s)     <u>Project Category 19: Project Administration</u>

This matter includes time spent by FEP professionals on a variety of tasks that were necessary for the smooth and efficient administration of services related to the Debtors' chapter 11 cases. This matter also includes compilation of project data, high level reviews of analysis processes, preparation for meetings, and managing data and records retention and filing.

(t)     <u>Project Category 20: T&D Forecast</u>

This matter includes diligence and evaluation of the Debtor's T&D subsidiary, which is not a party to this chapter 11 restructuring, supporting FEP's financial and operational forecasts of the T&D subsidiary.  The analyses concentrated on understanding the potential range of cash flows to support the potential valuation of this subsidiary.  These cash flows could be impacted materially by capital expenditure levels, rate case actions at the Public Utilities Commission, or operational needs.  Any mandated changes to the operational performance of the Debtors' T&D subsidiary are likely to have an effect of the Debtors' non-regulated retail business.

(u)     <u>Project Category 21: Fee Objection Discussion & Litigation</u>

This matter includes discussions and preparation of responses to fee objections and communications received from the fee committee.

(v)    <u>Project Category 22: Fee Applications</u>

This matter includes the preparation, review and compilation of the supporting data and documentation of interim fee applications and the monthly budget process.

(w)    <u>Project Category 23: Business Services Analysis</u>

This matter includes analysis of the Debtors' costs and related underlying service levels for the functions which reside at the EFH Corporate level of the business, and are then allocated down into the functional business units.  The departments included at the EFH Corporate level are as follows:

- Corporate CFO
- Employee Benefits
- Corporate Controller
- Corporate Planning
- Internal Audit & SOX Compliance
- Treasury
- Corporate Tax
- Risk Management
- Information Technology
- Corporate Legal
- External Affairs
- Corporate Development & Strategy
- Facilities & Real Estate Services
- Human Resources
- Supply Chain

FEP's efforts include diligence and data collection regarding the Debtors' historical cost structures and allocation methods, as well as diligence around future cost programs and allocation methodologies. This data and diligence supported FEP's independent modeling of the Debtors' cash flows.

(x)    <u>Project Category 24: Retail Margins</u>

This matter includes forward-looking modeling and analysis of the Debtors' retail businesses, specifically focused on the Debtors' retail pricing strategies and ultimate product

margins. This analysis includes residential, commercial and industrial business segments including the impacts of the Debtors' retail margins on historical and future customer acquisitions and retention.

FEP's efforts included extensive diligence and data collection regarding the Debtors' historical retail pricing strategies and competitive positioning. This data and diligence supported FEP's independent modeling of the Debtors' retail business and projections thereof.

(y)     Project Category 25: T&D Market Research

This matter includes evaluation of competitor performance, performance metrics, and strategies for regulated transmission and/or distribution utilities, including the comparative review of other ERCOT transmission and distribution utilities, and other utilities within the U.S. Further, this matter includes analysis of the impacts of new or revised rulings and rate case proceedings undertaken by the Public Utility Commission of Texas, and the review and analysis of financial statements, quarterly analyst reports, databases of utility information from the Federal Energy Regulatory Commission, and other publically available sources of utility information and performance metrics.

(z)     Project Category 26: Wholesale Market Research

This matter includes evaluation of competitor performance, performance metrics, and strategies for other independent and utility owned power generation companies in the U.S. These analyses focus on the drivers of ERCOT real-time, day-ahead and forward power price formation (including demand and supply factors within the ERCOT market), price formation related to the fuel commodities of natural gas and coal (including fuel transportation charges for these commodities), and analyses related to price formation of the menu of emission charges that a power generation company faces. Further, this matter includes analysis of competitor perspectives and public strategies related to potential changes in regulations, or competitor

reactions to already deployed regulatory matters.  Public perspectives related to the demand and supply elements of the U.S. energy commodity markets are a key work stream within this task.

(aa)    Project Category 27: Retail Market Research

This matter includes evaluation of competitive activities in the ERCOT retail market, including the comparative review and analysis of the marketing activities, retail product offerings, and pricing of other retail energy providers in Texas.  Further, this matter includes analysis of the impacts of new or revised rulings undertaken by the Public Utility Commission of Texas, analysis of the Power to Choose web pricing tool for energy delivery which is accessible to all retail customers in the state, and the review and analysis of information available from other public sources related to the Texas market for retail energy providers.

(bb)    Project Category 28: Performance Analysis

This matter includes the review and analysis of actual financial and non-financial operational metrics across the Debtors' businesses against the Debtors' own and FEP's independent forecasts and other market indicators.

(cc)    Project Category 29: Sales, General & Administrative Analysis

This matter includes historical review and forward-looking modeling and analysis of the Debtors' sales, general and administrative ("SG&A") operations and expenses.  This analysis includes all areas of the Debtors' businesses, including their wholesale, retail and T&D activities.

FEP's efforts included extensive diligence and data collection regarding the Debtors' historical SG&A expenses, as well as the Debtors' projections of future SG&A expenses. Additionally, FEP conducted extensive diligence and analysis to benchmark the Debtors' SG&A expenses against comparable business entities and competitors.

This data and diligence supported FEP's independent modeling of the Debtors' businesses and projections thereof.

(dd)    <u>Project Category 30: Portfolio Analysis</u>

This matter includes analysis of the Debtors' portfolios of energy commodity positions, retail customers, and the related effects of these retail customers on the Oncor transmission and distribution operations. The energy commodity positions consist of the summation of the natural generation positions (including power and fuel commodities) and all currently executed transactions.  These open commodity positions are managed on a daily basis by the Luminant Energy staff.

The retail customer portfolios may include large commercial and industrial, small and medium business, and residential portfolios, among others. FEP's analysis of these portfolios include review of the historical portfolio mixes of customers and the financial results and impacts of the evolution of these portfolios over time. This matter also includes FEP's projection of the future balance of each of the portfolios and the potential financial impacts thereof.

In addition to the retail portfolios, this matter includes detailed analysis and evaluation of the impacts of consumer portfolios on the operations of the Debtors' T&D subsidiary and wholesale operations.

(ee)    <u>Project Category 31: Oncor Revenue Analysis</u>

This matter includes analysis of the Debtors' revenue projections for the transmission and distribution subsidiary, as well as the derivation of future projections of Oncor revenues.  The revenue analysis for a regulated transmission and distribution entity such as Oncor relates to deriving the returns attributable to capital expenditure levels that are included in the regulated rate base, as well as costs that pass through to regulated customers.  These factors combine to project the underlying revenue steam of the utility.  Further analysis is done to compare the historical and projected revenues to short and long term projections of customer, premise and market growth rates.

(ff)    Project Category 32: Oncor Capital Structure

This matter includes analysis of the Debtors' capital structure for the transmission and distribution subsidiary.   Various alternatives related to the potential tax structure of the transmission and distribution assets have been considered which would ultimately alter the capital structure of the Oncor entity, as well as the related cost of capital profile for the go-forward entity.

(gg)    Project Category 33: Regulatory Analysis

This matter includes analysis of the multitude of proposed rulings, orders, or mandates, whether state, federal or local, that are proffered by regulatory agencies.   Each of the EFH subsidiaries faces unique current regulatory challenges for rulings already enacted, and will continue to face additional regulatory challenges in the future.   For example, the following is an exemplary listing (not all inclusive) of regulatory agencies that directly affect the results of operations of the EFH entities:

- Environmental Protection Agency
- North American Electric Reliability Council
- Federal Energy Regulatory Committee
- Electric Reliability Council of Texas
- Public Utility Commission of Texas
- Texas Commission on Environmental Quality

(hh)    Project Category 34: Claims & Settlement Issues

This matter includes FEP's analyses, support and litigation assistance work regarding third party claims against the Debtors' estate. FEP's efforts included extensive diligence, data collection and analysis of the claims, including modeling of various future or historical market scenarios or insight into regulatory actions that can materially affect the value of the claim. Additionally, FEP provided support to the Debtors and the Debtors' advisors and counsel during discussions and considerations of potential settlements or litigation actions of such claims.

(ii)      Project Category 35: Property Tax Analysis

This matter includes FEP's analyses, support, appraisals, and litigation assistance work related to property tax assessments, claims, negotiations and litigation. FEP's efforts included extensive diligence, data collection, analysis and appraisal of Debtors' assets that are subject to property tax issues. Additionally, FEP provided support to the Debtors and the Debtors' advisors and counsel during discussions and considerations of potential settlements or litigation actions of such issues.

(jj)      Project Category 36: Analysis of Competitive Portfolios

This matter includes FEP's analyses and development of financial and operational forecasts related to power generating facilities owned by entities that are not affiliated with the Debtors.  This work was conducted on behalf of and at the request of the Debtors and the Debtors' advisors.

**Reasonable and Necessary Services Provided by FEP**

28.      The foregoing professional services provided by FEP on behalf of the Debtors during the Fee Period were reasonable, necessary, and appropriate to the administration of these chapter 11 cases and related matters.

29.      The services were performed by consultants from FEP.  FEP is widely recognized for its energy industry expertise, including in the areas of due diligence, asset valuation, market forecasting, litigation support, risk management and independent engineering.  FEP's consultants have provided advisory services in numerous bankruptcy and restructuring cases, including those of Mirant, NRG, Calpine, and Entegra.  Overall, FEP brings a particularly high level of skill and expertise to these cases, which inured to the benefit of the Debtors and all stakeholders.

**Actual and Necessary Expenses Incurred by FEP**

30.     As set forth in **Exhibit H** attached hereto, and as summarized in **Exhibit E** attached hereto, FEP has incurred a total of $5,946.09 in expenses on behalf of the Debtors in providing professional consulting services during the Fee Period.  Expenses were incurred for air travel, ground transportation, accommodations, meals, and computerized research.  All out-of-pocket expenses were charged at cost.

31.     The actual expenses incurred in providing professional services were necessary, reasonable and justified under the circumstances to serve the needs of the Debtors in these chapter 11 cases.

**FEP's Requested Compensation and Reimbursement Should be Allowed**

32.     Section 331 of the Bankruptcy Code provides for interim compensation of professionals and incorporates the substantive standards of section 330 of the Bankruptcy Code to govern the Court's award of such compensation.  Section 330 of the Bankruptcy Code provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual necessary services rendered . . . and reimbursement for actual, necessary expenses."  11 U.S.C. § 330(a)(1).  Section 330 also sets forth the criteria for the award of such compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded, the court should consider the nature, extent, and the value of such services, taking into account all relevant factors, including—
>
> (a)     the time spent on such services;
>
> (b)     the rates charged for such services;
>
> (c)     whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (d)     whether the services were performed within a reasonable amount of time commensurate with the

           complexity, importance, and nature of the problem, issue, or task addressed; and

(e)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

33.    FEP respectfully submits that the services for which it seeks compensation in this Fee Application were, at the time rendered, necessary for and beneficial to the Debtors and their estates and were rendered to protect and preserve the Debtors' estates. FEP further believes that it performed the services for the Debtors economically, effectively, and efficiently, and the results obtained benefited not only the Debtors, but also the Debtors' estates and the Debtors' constituents. FEP further submits that the compensation requested herein is reasonable in light of the nature, extent, and value of such services to the Debtors, their estates, and all parties in interest.

34.    The hourly rates and corresponding rate structure utilized by FEP in these chapter 11 cases are equivalent to the hourly rates and corresponding rate structure currently used by FEP for similar complex energy restructuring and litigation assignments, whether in court or otherwise, regardless of whether a fee application is required. The rates and rate structure reflect that such restructuring, litigation and other complex matters typically involve great complexity, high stakes, and severe time pressures – all of which are present in these chapter 11 cases.

35.    Moreover, FEP's hourly rates are set at a level designed to compensate FEP fairly for the work of its consultants and to cover certain fixed and routine overhead expenses. Hourly rates vary with the experience and seniority of the individuals assigned. These hourly rates are subject to periodic adjustments to reflect economic and other conditions and are consistent with the rates charged elsewhere.

36.     In sum, FEP respectfully submits that the professional services provided by FEP on behalf of the Debtors and their estates during these chapter 11 cases were necessary and appropriate given the complexity of these chapter 11 cases, the time expended by FEP, the nature and extent of FEP's services provided, the value of FEP's services, and the cost of comparable services outside of bankruptcy, all of which are relevant factors set forth in section 330 of the Bankruptcy Code.  Accordingly, FEP respectfully submits that approval of the compensation sought herein is warranted and should be approved.

### Reservation of Rights and Notice

37.     It is possible that some professional time expended or expenses incurred during the Fee Period are not reflected in the Fee Application.  FEP reserves the right to include such amounts in future fee applications.  In addition, the Debtors have provided notice of this Fee Application to:  (a) the U.S. Trustee; (b) those persons who have formally appeared and requested service in these cases pursuant to Bankruptcy Rule 2002; (c) counsel to the Committee; and (d) all other entities set forth in the Debtors' Master Service List (collectively, the "Notice Parties").  Pursuant to the Interim Compensation Order, any party, other than the Notice Parties, that wishes to object to the Fee Application, must file its objection with the Court, with a copy to Chambers and serve it on the affected professional and the Notice Parties so that it is **actually** **received** on or before **March 9, 2017 at 4:00 p.m. (Eastern Standard Time)**.

### No Prior Request

38.     No prior application for the relief requested herein has been made to this or any other court.

WHEREFORE, FEP respectfully requests that the Court enter an order (a) allowing and awarding FEP interim compensation for professional services provided during the Fee Period in the amount of $371,041.50 and reimbursement of actual, reasonable and necessary expenses incurred in the Fee Period in the amount of $5,946.09; (b) authorizing and directing the Debtors to remit payment to FEP for such fees and expenses; and (c) granting such other relief as is appropriate under the circumstances.

Date:   February 15, 2017
        Denver, Colorado

_/s/ Todd W. Filsinger_
Todd W. Filsinger
as Senior Managing Director
Filsinger Energy Partners

Filsinger Energy Partners
290 Fillmore St, Ste 4
Denver, CO 80206
Phone: 303-974-5884

34