**Exhibit B**

**Retention Order and Engagement Letter**



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Re: 650, 2034, 2035 |

## ORDER AUTHORIZING THE DEBTORS TO RETAIN AND EMPLOY FILSINGER ENERGY PARTNERS AS ENERGY CONSULTANT EFFECTIVE *NUNC PRO TUNC* TO THE PETITION DATE

Upon the application (the "Application")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") authorizing the Debtors to retain and employ Filsinger Energy Partners ("FEP") as energy consultants effective *nunc pro tunc* to the Petition Date, all as more fully set forth in the Application, the Filsinger Declaration, and the *Supplemental Declaration of Todd Filsinger in Support of the Application of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to Retain and Employ Filsinger Energy Partners as Energy Consultant Effective* Nunc Pro Tunc *to the Petition Date* [D.I. 2034] (the "Supplemental Filsinger Declaration"); and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Application, the Filsinger Declaration, and the Supplemental Filsinger Declaration, as applicable.

Court having found that venue of this case and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Application (as modified herein) is in the best interests of the Debtors' estates, their creditors, and other Parties-in-Interest; and the Court having found that the Debtors provided appropriate notice of the Application and the opportunity for a hearing on the Application under the circumstances; and the Court having reviewed the Application and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Application, the Filsinger Declaration, the Supplemental Filsinger Declaration, and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Application is granted to the extent provided herein, effective *nunc pro tunc* to the Petition Date.

2. To the extent the Application, the Filsinger Declaration, the Supplemental Filsinger Declaration, or the Engagement Letter is inconsistent with the Order, the terms of this Order shall govern.

3. The Debtors are authorized pursuant to sections 327(a), 328, and 330 of the Bankruptcy Code to employ and retain FEP as the Debtors' energy consultant in accordance with the terms and conditions set forth in the Application and in the Engagement Letter attached hereto as **Exhibit 1**, subject to the terms of this Order.[3]

---

[3] As reflected in **Exhibit 1**, the Debtors have redacted certain provisions of the executed Engagement Letter. The Debtors and FEP shall not be obligated or authorized to honor their obligations under such redacted provisions and as described in such redacted provisions.

4. FEP shall use reasonable efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these chapter 11 cases.

5. The indemnification provisions in the Engagement Letter are approved, subject to the following modifications, applicable during the pendency of these cases:

(a) FEP shall not be entitled to indemnification, contribution, or reimbursement pursuant to the Engagement Letter for services other than those described in the Engagement Letter, unless such services and indemnification therefor are approved by the Bankruptcy Court;

(b) the Debtors shall have no obligation to indemnify FEP, or provide contribution or reimbursement to FEP, for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from FEP's gross negligence or willful misconduct; (ii) for a contractual dispute in which the Debtors allege the breach of FEP's contractual obligations unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by the Court, after notice and a hearing to be a claim or expense for which FEP should not receive indemnity, contribution or reimbursement under the terms of the Engagement Letter as modified by this Order; and

(c) if, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these chapter 11 cases, FEP believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Engagement Letter (as modified by this Order), including without limitation the advancement of defense costs, FEP must file an application therefor in this Court, and the Debtors may not pay any such amounts to FEP before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by FEP for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify FEP. All Parties-In-Interest shall retain the right to object to any demand by FEP for indemnification, contribution or reimbursement.

6. Pursuant to the terms of the Engagement Letter, FEP is entitled to reimbursement by the Debtors for reasonable expenses incurred in connection with the performance of its

3

engagement under the Engagement Letter, including, without limitation, the reasonable fees, disbursements and other charges of FEP's counsel (which counsel shall not be required to be retained pursuant to section 327 of the Bankruptcy Code or otherwise), in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, any applicable orders of this Court and (to the extent applicable) the Fee Guidelines promulgated by the Office of the United States Trustee; *provided however*, that FEP shall not seek reimbursement for any services provided by FEP's counsel to the Debtors; *provided further*, that FEP may only seek reimbursement for services in connection with retention and fee application preparation, except as otherwise provided herein with respect to claims for indemnification; *provided further*, that FEP shall submit the invoices of FEP's counsel together with any application seeking allowance of reimbursement for the fees, disbursements, and other charges of its counsel.

7.  FEP is authorized without further order of the Court to reserve and apply amounts from the retainer that FEP earned prepetition in accordance with the Engagement Letter (the "Retainer") that would otherwise be applied toward payment of postpetition fees and expenses (the "Postpetition Fees and Expenses") as are necessary and appropriate to compensate and reimburse FEP for fees or expenses accrued on or prior to the Petition Date (the "Prepetition Fees and Expenses") consistent with its ordinary course billing practices. FEP shall apply the remaining portion(s) of the Retainer to satisfy the payment of the Prepetition Fees and Expenses before the entry of an order approving any portion of FEP's first interim application (the "First Interim Fee Application") for payment of Postpetition Fees and Expenses. FEP currently estimates that the remaining amount of the Retainer is approximately $170,022.93 and that the Prepetition Fees and Expenses total approximately $0. In advance of the hearing on the First

4

Interim Fee Application, FEP shall disclose the amount of the Retainer (if any) that remains after applying the Retainer to the Prepetition Fees and Expenses. Thereafter, FEP shall apply the remaining amount of the Retainer (if any) to satisfy the payment of Postpetition Fees and Expenses approved pursuant to the order granting the First Interim Fee Application. The Retainer shall not be replenished postpetition.

8. FEP will file fee applications for interim and final allowance of compensation and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of the Bankruptcy Code; *provided, however*, that FEP shall be compensated in accordance with the terms of the Engagement Letter and subject to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the guidelines established by the U.S. Trustee, and any other applicable orders of the Court.

9. FEP is hereby authorized to keep reasonably detailed time records in half-hour increments and will submit, with any interim or final fee application, together with the time records, a narrative summary, by project category, of services rendered and will identify each professional rendering services, the category of services rendered and the amount of compensation requested.

10. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

11. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

12. Notwithstanding any provision to the contrary in this Application, the Filsinger Declaration, the Supplemental Filsinger Declaration, or the Engagement Letter, the Court shall

retain jurisdiction to hear and to determine all matters arising from or related to implementation of this Order.

Wilmington, Delaware
Dated: __9/16__, 2014

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

6

# EXHIBIT 1
**Engagement Letter**



**FILSINGER ENERGY**
P A R T N E R S

Stacey Doré  
General Counsel  
Energy Future Competitive Holdings  
Texas Competitive Electric Holdings  
stacey.dore@energyfutureholdings.com

December 4, 2012

**RE: Consulting Services**

Ms. Doré,

Filsinger Energy Partners ("FEP") has prepared the following engagement letter to dictate the terms of the Consulting Services requested by Energy Future Competitive Holdings and Texas Competitive Electric Holdings ("EFCH/TCH"). FEP will conduct various analyses and due diligence at the direction of Kirkland & Ellis LLP ("K&E") and EFCH/TCH. This work may include market analyses, EBITDA projections, reviews and analyses of compensation metrics, asset valuations, restructuring support, litigation and expert witness support among other areas, as requested by EFCH/TCH and K&E.

**Commercial Terms**

FEP will conduct the project on a time and materials ("T&M") basis with the labor rates shown in the table (see Rate Table). Expenses will be billed as incurred. Expenses will include modeling fees and any third party expenses. FEP will invoice an initial retainer of $200,000 payable upon EFCH/TCH's approval to begin work. T&M and associated expenses will be billed monthly thereafter. Invoices will be due within 30 days of receipt.

**Rate Table (subject to adjustment biannually)**

| Title | Hourly Rate |
|---|---|
| Managing Director | $720 |
| Director | $525-$620 |
| Managing Consultant | $405-$475 |
| Consultant | $330-$390 |
| Analyst | $225-$275 |
| Assistant Analyst | $180 |

www.filsingerenergy.com

303.884.5948

25 S ELM STREET,  
DENVER CO 80246



### Additional Terms

This Engagement Letter, together with the Standard Terms and Conditions (attached hereto) make up the entire understanding and agreement between the Parties (collectively, the "Agreement") and shall govern the transaction between the FEP and EFCH/TCH. All capitalized used herein shall have the same meaning as set forth in the Standard Terms and Conditions.

### Confidentiality

This agreement is subject the confidentiality provisions as outlined in Section 5 in additional terms attached hereto.

### Summary

If you are in agreement with this Engagement Letter, please sign and date below. If you have any questions please do not hesitate to contact me directly at (303) 884-5948.

Sincerely,

*Todd Filsinger*

Todd Filsinger


Accepted:                                              Accepted:

*Stacey H. Dore*                                       *Todd Filsinger*

Stacey Dore                                            Filsinger Energy Partners

Date: 12-7-12                                          Date: 12/04/2012

2



### AGREEMENT FOR INDEPENDENT CONTRACTOR CONSULTING SERVICES

This AGREEMENT ("Agreement") is made this 29th day of November, 2012 by and between: (i.) FILSINGER ENERGY PARTNERS Inc., ("FEP"); and (ii.) Energy Future Competitive Holdings and Texas Competitive Electric Holdings ("EFCH/TCH" or "the Client"). Client and FEP may be referred to herein as a "Party" or "Parties" as the context dictates.

The Client desires FEP, as an independent contractor, to perform certain work and professional services as outlined in the Engagement Letter (hereinafter referred to as the "Engagement Letter", which Engagement Letter is attached hereto and incorporated herein by reference) dated November 29, 2012 (hereinafter all work, professional services and/or materials provided by FEP to the Client shall be referred to as the "Work"). Client and FEP hereby agree that any such Work FEP commits to provide shall be provided pursuant to the following general terms and conditions:

1. **BILLING AND PAYMENT.** FEP shall be paid an initial $200,000 retainer and on a time and materials basis as outlined in the Engagement Letter. FEP shall provide itemized invoices for its hourly fees and accrued expenses on a monthly basis. Client will pay FEP undisputed invoices within 30 days of its receipt of FEP's invoice. If Client disputes an invoice, it will notify FEP in writing within 30 days of its receipt of the invoice as to the nature of the dispute, and the parties will then work together to resolve the dispute. If Client does not notify FEP of a disputed invoice within the 30 days of date of its receipt of the invoice, the invoice will deemed accepted by Client and payable within the 30 day time frame set forth above. Expenses will include modeling fees as incurred. Meals and miscellaneous expenses will be billed as incurred at cost.

2. **TERM.** This Agreement shall be effective as of the date first written above, and shall continue in effect thereafter unless terminated pursuant to the terms of this Section 2. Either Party may terminate this Agreement for any or no reason upon 30 days advance written notice to the other Party. If either Party violates any of the terms hereof or otherwise breaches this Agreement, or, subject to any restrictions imposed by applicable law, the non-breaching Party may immediately terminate this Agreement upon written notice and such termination shall be effective as of the date of the written termination notice. Either Party may also terminate, for its convenience, any specific Work hereunder immediately upon notice to the other, in which case FEP shall be entitled to payment for the portion of Work completed hereunder at the time of such termination and any expenses incurred prior to notice of termination as well as any other expenses that FEP is not able to cancel upon such termination, and Client shall be entitled to receive the Work which has been generated by FEP through the termination date. Time is of the essence in this Agreement. If either party terminates this Agreement, such termination shall not affect the accrued rights of FEP to receive the amounts due FEP through the termination date, or the accrued rights of Client to receive the Work generated by FEP through the termination date, and this provision shall survive any termination of this Agreement.

3. **CONDUCT OF ACTIVITIES.** All parties to this Agreement shall, and shall cause their subcontractors (and the employees and agents of any of them) to, conduct their activities hereunder in accordance with all applicable governmental laws, rules, and regulations and good standard industry practices, and in a professional manner in accordance with the terms of this Agreement.

4. **FORECASTS AND RECOMMENDATIONS CONCERNING THE WORK.** All forecasts and recommendations made by FEP for this scope of Work are based on the information available and certain analysis, and are made in good faith. However, forecasts are not a representation, undertaking or warranty as to outcome or achievable results and Client hereby acknowledges and agrees that FEP is not making any representations or warranties concerning FEP's work (other than as expressly set forth in Section 3 above with respect to the conduct of its activities), and it is not providing either an expressed or implied warranty for the Work, and all such representations or warranties, either express or implied, are forever waived by Client. In addition, Client acknowledges and agrees that FEP is not guaranteeing, or promising, that certain forecasts or recommendations by FEP with respect to the Work will take place or occur; and Client agrees that it will not hold FEP to any such guarantees or promises concerning the Work.



5. **CONFIDENTIALITY.** The Parties acknowledge that in performing Work hereunder, each may have access to, and may provide the other with information and/or documentation which constitutes confidential information ("Confidential Information"). Confidential Information includes, but is not limited to, any non-public information about customers or potential customers, regardless of whether it is personally identifiable or anonymous information, business and marketing plans, employee information, systems, manuals, policies and procedures, products and services, including the disclosure of the engagements covered under this Agreement. Both parties agree not to disclose this Agreement to any third party without the written consent of the other party.

Both Parties agree now and at all times in the future that all such Confidential Information shall be held in strict confidence and disclosed only to those employees or agents whose duties reasonably require access to such information. If receiving Party proposes to disclose Confidential Information, including the engagements covered under this Agreement, to a third party in order to perform under the Agreement or otherwise, the receiving Party must first obtain the consent of the disclosing Party to make such disclosure and enter into a confidentiality agreement with such third party under which that third party would be restricted from disclosing, using or duplicating such Confidential Information in a manner consistent with the terms of this Section 5. Receiving Party may use such Confidential Information only in connection with its performance under this Agreement. Receiving Party shall protect such Confidential Information using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use or disclosure of such Confidential Information as receiving Party uses to protect its own confidential information. Confidential Information shall be returned to the disclosing Party or destroyed upon disclosing Party's request once the Work contemplated by this Agreement has been completed or upon termination of this Agreement. Upon the destruction or return of the Confidential Information the receiving Party agrees to certify, in writing, that all of the Confidential Information has either been destroyed or surrendered to the disclosing Party. Unless otherwise required by law, receiving Party will thereafter purge all systems under the control of receiving Party of all Confidential Information.

Receiving Party shall establish and maintain commercially reasonable policies and procedures to ensure compliance with this Section 5. Such policies and procedures shall include administrative, technical, and physical safeguards that are commensurate with the scope of the Work and the sensitivity of the Confidential Information. Receiving Party's policies will ensure the security and confidentiality of Confidential Information, protect against any anticipated threats or hazards to the security or integrity of such information, and protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to disclosing Party. Receiving Party shall notify disclosing Party within two (2) business days of any incident of unauthorized access to the Confidential Information or breach of the confidentiality obligations set forth herein, and the actions that receiving Party is taking to prevent any further breach. For the avoidance of doubt, the receiving Party shall obtain the disclosing Party's prior written approval of any oral or written notice or other communication proposed to be made to persons and entities affected by such breach. In the event of such breach, the receiving Party shall solely bear all costs and expenses incurred in notifying persons and entities affected by such breach, and shall offer one (1) year of free credit monitoring service to the affected persons and entities. Upon request, receiving Party shall also provide reasonable evidence that receiving Party maintains adequate security controls, such as test results through an independent audit report or third party vulnerability or risk assessment.

Receiving Party acknowledges that the unauthorized use or disclosure of any such Confidential Information is likely to cause irreparable injury to disclosing Party for which there is no adequate remedy at law. Accordingly, receiving Party hereby consents to the entry of injunctive relief against it to prevent or remedy any breach of the confidentiality obligation described herein without disclosing Party being required to post bond. Receiving Party agrees to permit disclosing Party and their appropriate regulatory auditors to audit receiving Party's compliance with this Section 5, and with all applicable laws and regulations, during regular business hours upon reasonable notice to receiving Party.

The foregoing restrictions shall not apply to any such Confidential Information that is: (a) known by the Receiving Party at the time of disclosure or publicly known or becomes publicly known through no fault of the Receiving Party; (b) received from a third party that is free to disclose the information to the Receiving Party; (c) independently developed by the Receiving Party without the use of information received from the Disclosing Party; (d) communicated to a third Party with the express prior written consent of the Disclosing Party; or (e) lawfully required to be disclosed to any governmental agency or is otherwise required to be disclosed by law, provided that

4



before making such disclosure the Receiving Party shall give the Disclosing Party reasonable opportunity to object or ensure confidential treatment of the information.

In the course of the retention, FEP may be called upon to provide information, prepare studies or reports, participate in meetings, review materials, and undertake other tasks for the Client's in-house counsel or for Kirkland & Ellis LLP ("K&E") as counsel to EFCH/TCH. The Parties intend that FEP's work, opinions, conclusions and communications will be covered by the attorney-client privilege and attorney work product rule to the extent provided by law, and FEP agrees to do all things necessary to preserve those privileges.

6.      **INDEPENDENT CONTRACTOR/NON EXCLUSIVE NATURE OF AGREEMENT.** FEP shall be deemed to be and shall be an independent contractor. The parties understand and acknowledge that FEP, its subcontractors, and its and their employees are not agents or employees of the Client and have no authority to obligate or bind Client in any way. FEP further agrees and acknowledges that FEP, its subcontractors, and its and their employees, are not eligible for Client's employee benefit programs. FEP further understands and acknowledges that (as between FEP and Client) FEP is fully and solely responsible for all taxes, assessments, penalties, fines, and interest relating to wages and benefits paid to its (or its subcontractors') employees under this Agreement, pursuant to all federal, state and local laws, including required withholding from wages of employees, regardless of the characterization of those employees by the parties, administrative agencies, or the courts. Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or similar relationship between the Parties. The Parties agree and acknowledge that this Agreement is non-exclusive in nature and FEP may and shall perform other similar work for other entities or groups or individuals, in the sole and absolute discretion of FEP. If FEP is unable to perform any Work contemplated herein by an act beyond FEP's reasonable control, FEP will immediately give notice to the Client, and such delay in Work shall not be deemed a breach of this Agreement; provided that the foregoing shall not otherwise limit any right of Client to terminate the Agreement or the Work pursuant to its rights under Section 2 above.

7.      **LIMITATION OF LIABILITY.**

8.      **USE OF THE WORK.** Client shall not assert any claim against FEP for injury, damage or loss sustained by the Client which may result from the Client's use of the Work. Client further agrees that information contained in all forecasts, recommendations, reports and other documentation prepared by FEP with respect to the Work shall not be disclosed by Client to third parties in any manner that would identify FEP as the source of such information, and in the event that Client breaches this obligation and FEP is identified as the source of the Work and any claims arise as a result of the Work, Client agrees to indemnify FEP against any and all third party claims regarding the Work, which indemnification includes attorney's fees and costs

Reports and other documents generated, or obtained by FEP, in the course of its work on this matter will be the property of EFCH/TCH. If authored by FEP, they will be considered "Works Made For Hire" and all right, title and interest in such works is hereby assigned to EFCH/TCH.

9.      **NO CONFLICT.** FEP agrees that, while the matter is still active, neither FEP nor anyone assisting FEP will engage in any activities that are adverse to the interests of EFCH/TCH or K&E's representation of EFCH/TCH in this matter.

10.     **FINANCIAL ADVANTAGE.** FEP undertakes that it will not, and will procure that any person acting on

5



its behalf in connection with this retention (including, without limitation employees, affiliates and agents) does not:

- offer, promise or give any financial or other advantage to any person with the intention of influencing a person (who need not be the recipient of the advantage) to perform his or her function improperly, or where the acceptance of such advantage would itself be, or might be seen to be, improper; or

- offer, promise or give any financial or other advantage to a foreign public official (or to any other person at the request of, or with the acquiescence of, a foreign public official) with the intention of influencing that official in the performance of his or her public functions,

in either case with a view to obtaining or retaining business or any form of commercial advantage either for K&E or for EFCH/TCH in connection with this retention.

11. **General Provisions.**

   (a)  Governing Law; Venue.

   (b)  Entire Agreement. Together with each scope of Work, the Engagement Letter, this Agreement constitutes the entire agreement and understanding of the Parties with respect to the subject matter hereof and may not be modified, altered or amended except in a writing executed by both Parties to this Agreement. To the extent the terms of any scope of Work, Engagement Letter conflict with this Agreement, the terms of this Agreement shall govern. No amendment to this Agreement shall be valid unless made in writing and signed by authorized representatives of both Parties. This Agreement is intended to be solely for the benefit of FEP and Client and their respective successors and permitted assigns and is not intended to and shall not confer any rights or benefits on any third party not a signatory hereto.

   (c)  Headings. Headings in this Agreement are for convenience only and will not be considered in the interpretation of this Agreement.

   (d)  Notices. Any notice or written communication required or permitted to be given by a Party hereunder will be made by hand delivery, facsimile transmission (with confirmation), or overnight delivery with a corresponding email at the address specified in the first paragraph hereof, or at such other addresses as the Party may specify in writing. Any such notice or written communication will be considered to have been received on the date of hand delivery or transmission by facsimile or the next business day after sent by overnight delivery service.

   (e)  Severability/Enforceability. If any provision of this Agreement is declared invalid or unenforceable by a court of competent jurisdiction, then the parties agree that the remainder of this Agreement shall remain in in full force and effect. No delay on the part of any Party in the exercise of any rights or remedies shall operate as a waiver thereof, and no single or partial exercise by any Party of any remedies shall preclude other and further exercise thereof, or the exercise of any other right or remedy. The waiver of any breach of condition or condition of this Agreement by either Party shall not constitute a precedent in the future enforcement of any terms and conditions of this Agreement. No waiver shall be valid unless in writing and signed by an authorized officer of FEP in the case of FEP or by Client in the case of Client.

6



(f) <u>Assignment</u>. FEP may not assign this Agreement or any rights or obligations hereunder to any party without the prior written consent of Client. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of both Parties and their respective successors and permitted assigns.

(g) <u>Ownership of Information</u>. FEP agrees that all reports, recommendations, specifications, data or other information prepared or furnished by FEP to Client hereunder shall be property of Client and may be used by Client as the Client deems appropriate.

(h) <u>Counterparts and Copies</u>. This Agreement may be executed in separate counterparts and upon execution by all parties such counterparts will constitute one and the same instrument. The Parties further agree that electronic scans, photocopies or faxed copies of this Agreement and the signatures herein shall be as valid and effective as originals.

7