1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                        :

                                  :   Chapter 11

6   ENERGY FUTURE HOLDINGS CORP.  :

    et al.,                       :   Case No. 14-10979 (CSS)

7                                 :

              Debtors.            :   (Jointly Administered)

8   _____:

9

10                              United States Bankruptcy Court

11                              824 North Market Street

12                              Wilmington, Delaware

13                              February 14, 2017

14                              1:37 p.m. - 2:38 p.m.

15

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER J. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN

1    HEARING re Seventh Amended Joint Plan of Reorganization of

2    Energy Future Holdings Corp., et al., Pursuant to Chapter 11

3    of the Bankruptcy Code [Solicitation Version] [D.I. 10551;

4    filed January 4, 2017]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   AKIN GUMP STRAUSS HAUER & FELD LLP

4        Attorneys for UMB Bank, N.A. Indenture Trustee

5

6   BY:   SCOTT L. ALBERINO

7         CATHERINE EISENHUT

8         ABID QURESHI

9

10  BIELLI & KLAUDER LLC

11        Attorney for EFH Corp

12

13  BY:   DAVID M. KLAUDER

14

15  CHADBOURNE & PARKE LLP

16        Attorney for NextEra Energy

17

18  BY:   ROBIN D. BALL

19

20  COLE SCHOTZ P.C.

21        Attorneys for Delaware Trust Company as Indenture

22

23  BY:   NORMAN L. PERNICK

24

25

1   CROSS & SIMON LLC

2         Attorneys for Fidelity

3

4   BY:  MICHAEL J. JOYCE

5

6   FOLEY & LARDNER LLP

7         Attorneys for UMB Bank, N.A. Indenture

8

9   BY:  MARK F. HEBBEIN

10

11  FOLEY & LARDNER LLP

12        Attorneys for UMB Bank, N.A. Indenture

13

14  BY:  HAROLD KAPLAN

15

16  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

17        Attorneys for Fidelity

18

19  BY:  ALYSSA AIN

20

21  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

22        Attorneys for Fidelity

23

24  BY:  GARY L. KAPLAN

25

1   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

2        Attorneys for Fidelity

3

4   BY:  MATTHEW ROOSE

5

6   HOGAN MCDANIEL

7        Attorneys for Contrarian Capital

8

9   BY:  DANIEL K HOGAN

10

11  KLEHR HARRISON HARVEY BRANZBURG LLP

12        Attorney for UMB Bank, N.A.

13

14  BY:  RAYMOND H. LEMISCH

15

16  KRAMER LEVIN NAFTALIS & FRANKEL LLP

17        Attorneys for Second Lien Indenture Trustee

18

19  BY:  JOSHUA BRODY

20

21  KRAMER LEVIN NAFTALIS & FRANKEL LLP

22        Attorneys for Second Lien Indenture Trustee

23

24  BY:  GREGORY HOROWITZ

25

1   LANDIS RATH & COBB

2        Attorneys for NextEra Energy

3

4   BY:  MATTHEW B. MCGUIRE

5

6   MONTGOMERY, MCCRACKEN, WALKER & RHOADS

7        Attorneys for E-Side Committee

8

9   BY:  DAVIS LEE WRIGHT

10

11  MORRIS JAMES LLP

12       Attorney for Law Debenture of New York, Indenture

13       Trustee

14

15  BY:  STEPHEN MILLER

16

17  NIXON PEABODY

18       Attorneys for AST as EFH Indenture Trustee

19

20  BY:  RICHARD PEDONE

21

22  PACHULSKI STANG ZIEHL & JONES

23       Attorneys for Second Lien Indenture Trustee

24

25  BY:  LAURA DAVIS JONES

1    PATTERSON BELKNAP

2         Attorney for Law Debenture of New York, Indenture

3         Trustee

4

5    BY:  BRIAN GUINEY

6

7    POTTER ANDERSON & CORROON LLP

8         Attorney for Deutsche Bank New York,  Agent to DIP

9         Financing

10

11   BY:  R. STEPHEN MCNEILL

12

13   PROSKAUER ROSE LLP

14        Co-Counsel to Energy Future Holdings Corp.

15

16   BY:  MARK K. THOMAS

17

18   PROSKAUER ROSE LLP

19        Co-Counsel to Energy Future Holdings Corp.

20

21   BY:  PETER YOUNG

22

23

24

25

1   RICHARDS, LAYTON & FINGER, P.A.

2        Attorneys for the Debtor

3

4   BY:  DANIEL DEFRANCHESCHI

5        JASON M. MADRON

6

7   SHEARMAN & STERLING LLP

8        Attorney for Deutsche Bank New York,  Agent to DIP

9        Financing

10

11  BY:  NED S. SCHODEK

12

13  STEVENS & LEE PC

14       Co-Counsel to Energy Future Intermediate Holding

15       Company LLC

16

17  BY:  JOSEPH H. HUTSON, JR.

18

19  SULLIVAN & CROMWELL, LLP

20       Attorneys for Unsecured Creditors Committee

21

22  BY:  BRIAN GLUECKSTEIN

23

24

25

```
1    VENABLE LLP

2         Attorneys for PIMCO

3

4    BY:  JAMIE EDMONSON

5

6    VENABLE LLP

7         Attorneys for PIMCO

8

9    BY:  JEFFREY S. SABIN

10

11   WHITE & CASE LLP

12        Attorneys for Ad Hoc group of TCEH Unsecured

13        Noteholders

14

15   BY:  J. CHRISTOPHER SHORE

16

17   WILMER CUTLER PICKERING HALE & DORR LLP

18        Attorneys for Delaware Trust, EFIH First Lien Indenture

19

20   BY:  PHIL ANKER

21

22   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

23        Counsel to Ad Hoc Committee Of TCEH First Liens

24

25   BY:  JACOB A. ADLERSTEIN (TELEPHONICALLY)
```

1    PERKINS COIE, LLP

2         Attorney for Delaware Trust Company

3

4    BY:  TINA MOSS (TELEPHONICALLY)

5

6    ALSO APPEARING TELEPHONICALLY:

7    KELLIE CAIMS

8    ZACHARY LANIER

9    JON PRUCHANSKY

10   FNOAH M. SCHOTTENSTEIN

11   DANIEL HUNG

12   HOWARD SEIFE

13   JOSH W. BRANT

14   PHILIP A. GELSTON

15   PEG A. BRICKLEY

16   LARS A. PETERSON

17   MEGAN WASSON

18   MARK A. FINK

19   TODD M. GOREN

20   ERIK SCHNEIDER

21   ASHLEY F. BARTRAM

22   CATHERINE NORMAN

23   ANGELO THALASSINOS

24   ARLENE R. ALVES

25   ELAN DANIELS

1    MARK HEER

2    LAUREN BITZIN

3    MARK A. CODY

4    BARRY FELDER

5    MARK FLANNAGAN

6    ERICA GOODSTEIN

7    NATASHA HWANGPO

8    HAL F. MORRIS

9    MEREDITH PFISTER

10   FREDRIC SOSNICK

11   ANDREW M. THAU

12   AMER TIWANA

13   CARL TULLSON

14   MATTHEW UNDERWOOD

15   TAMARA VAN HEEL

16   BRADY C. WILLIAMSON

17   JULIA M. WINTERS

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2              CLERK:  All rise.  Please be seated.

3              THE COURT:  Good afternoon.

4              MR. HUSNICK:  Good afternoon, Your Honor.  Chad

5    Husnick, Marc Kieselstein, Mark McKane, from Kirkland &

6    Ellis on behalf of the Debtors.  I'd be remiss if I didn't

7    also mention Ms. Aparna Yenamandra.  She's the one that sat

8    with me, because I went from what was a 70 page deck down to

9    around 20, so thank you.

10             Why did I do that?  Your Honor, after nearly three

11   years in Chapter 11, we extended pre-petition negotiations,

12   three deals, two confirmation hearings, four disclosure

13   statement hearings.  We think we're on the one-yard line and

14   we're ready to go.

15             Other than the asbestos objectors, who I'll talk

16   about in a moment, who are pursuing objections that we've

17   previously addressed, and will address again, no one sitting

18   here today is saying that the plan should not be confirmed.

19   On Valentine's Day, we've come together, we have delivered a

20   nearly consensual deal.

21             THE COURT:  Rachel, will you get some roses and

22   set them down right there, so I can stop hearing about this?

23             MR. HUSNICK:  I'm going to discuss, before we get

24   into the substance of opening argument, a couple of

25   resolutions that have come together that I think will make

1   everybody's day today a lot easier.

2          The first set of resolutions is with respect to

3   the EFIH first lien and second lien creditor constituencies.

4   As we discussed on the record yesterday, Your Honor, the

5   Debtors have reached agreement in principle, with the

6   holders of approximately 72 percent of the EFIH first lien

7   lend -- liens, more than two thirds of the EFIH PIK

8   noteholders.

9          And as of this morning, more than 50 percent of

10  the EFIH second liens have joined in on settlement terms

11  that I'll discuss in a moment.  We've also recently heard

12  that Fidelity, the largest EFIH second lien noteholder is

13  supportive of the settlement agreements.

14         This brings the level of EFIH second lien support

15  to more than 90 percent of that constituency.  This is yet

16  another example of Fidelity's continued support of the

17  Debtor's restructuring efforts.

18         At a high level, the settlement terms are as

19  follows: the first lien settlement, 95 percent of the make-

20  whole will be paid in full in cash.  And the 100 percent of

21  the interest accruing on that make-whole at the contract

22  rate through the date of repayment.

23         100 percent of the accrued and unpaid interest and

24  interest on the interest at the contract rate through the

25  date of repayment will be paid.  And 100 percent of the fees

1    and expenses will be paid on the effective date.  That's for

2    the first liens.

3              Similarly, on the second liens, we've reached an

4    agreement on the make-whole settlement.  87.5 percent of the

5    make-whole amount, and 100 percent of the interest at the

6    contract rate on that amount through the date of repayment

7    will be paid in full in cash.

8              100 percent of the unpaid principle, that's the

9    pre-petitioned principle in accrued and unpaid interest on

10   that amount through the date of repayment will be paid on

11   the effective date.  And 100 percent of the fees and

12   expenses of the second lien-indentured trustee will be paid

13   on the effective date.

14             This settlement resolves the inter-creditor

15   dispute between the first EFIH first lien and EFIH second

16   lien indentured trustees, and brings global peace and on

17   that front.  That assumes, of course, that those settlements

18   are approved and we'll request from Your Honor a hearing

19   date in mid-March for that motion, which we would file

20   pursuant to a separate motion.

21             The Debtors are working cooperatively with the

22   EFIH first liens, second liens and PIK noteholders to paper

23   in the agreement in principle to settle.  And toward that

24   end, the Debtors circulated late last night a revised draft

25   of the plan, a revised draft of the confirmation order, and

1    a term sheet that would be--we would envision being signed

2    by each of the parties to the agreement. And that would then

3    be attached as an exhibit to the confirmation order, making

4    clear that all the parties are bound to pursue approval of

5    that settlement agreement.

6              The settlement and finalized and approved will

7    moot out all of the issues raised by the EFIH first liens

8    and second liens about the EFIH claims reserve, that is

9    because the claims in the settlement amount will not be

10   reserved, they will be paid on the effective date.

11             Therefore, the Debtors, with the support of the

12   PIKs, the first lien steering committee and the second lien

13   steering committee are asking the Court to defer to another

14   day if the settlement doesn't get finalized or approved.

15             All of the issues regarding the size,

16   administration, duration of the EFIH claims reserve, and all

17   other issues regarding the reserve, for example, whether or

18   not there'd be a top-up or tap-out.  That should be a

19   restricted term in this court.  I'm going to call it

20   (indiscernible).

21             Whether under -- and under what circumstances the

22   PIK's could ask for a reserve to be reduced, and what is

23   required to be maintained in the reserve to ensure

24   continuous satisfaction of the indubitable equivalent

25   standard.

1           Specifically in the event the EFIH second lien

2    settlement falls through, but the EFIH first lien settlement

3    is approved, the Debtors will not contest distribution

4    through the EFIH indenture trustee, and the second lien

5    indenture trustees -- the second lien indenture trustee --

6    and the second lien indentured trustee's right to take a

7    holdback from that amount.

8           But that amount will appropriately reflect a much

9    smaller potential inter-creditor dispute between the EFIH

10   first lien indentured trustee and the EFIH second lien

11   indentured trustee.  That would be the spread between 95

12   percent of the make-whole and 100 percent of the make-whole,

13   plus interest, plus fees.

14          But that much smaller nut would be the subject of

15   the dispute, and therefore, the Debtors would forego the

16   argument in that circumstance that the distribution should

17   be made around the indentured trustee.

18          Solely in the very unlikely event that both the

19   EFIH first lien and second lien settlements were to fall

20   through.  The Debtors reserve the right to move forward with

21   their request that the Court either direct the EFIH

22   indentured trustee not to hold back amounts, or to

23   distribute the amounts through the depository trust

24   corporation.

25          Understanding that the EFIH indentured trustee

1    will strongly object to any approach along those lines.  The

2    parties have also agree to defer consideration of the

3    Debtor's proposed fee and expense reimbursement provisions.

4    If the first lien and second lien settlements are approved,

5    100 percent of those fees and expenses will be paid on the

6    effective date of the plan.

7            In the unlikely event that settlement is not

8    approved, the fees and expenses issues will be addressed in

9    connection with the claims reserve disputes.  Everyone's

10   rights on these issues will be, and are fully preserved

11   through the confirmation order.

12           In the unlikely event that we need the Court to

13   decide these issues at a later date, because the settlement

14   falls apart, the Debtors will work with the PIK noteholders,

15   the first liens and the second liens and the Court to

16   schedule a hearing for argument and presentation of evidence

17   on these issues, in advance of the effective date, would be

18   our desire.

19           The parties are working on a mutually acceptable

20   confirmation order, and we will make all of these

21   reservational rights very clear in that order.  Until and

22   unless the settlements with the EFIH first lien and second

23   liens have been approved and the settled first EFIH first

24   lien and second lien claims have been paid, or until the

25   Court has ordered otherwise, no distribution will be made to

1    the EFIH PIKs or the EFIH second liens for principle and

2    interest.

3            That means that even in the unlikely event that

4    the effective date were to occur prior to Your Honor's

5    making a decision on the claims resolution or the approval

6    of the settlement agreements, so prior to an anticipated

7    hearing on that first lien, second lien settlement, no money

8    will be distributed to stakeholders pending resolution of

9    that claim reserve issue.

10           That settlement, Your Honor, drops away, I believe

11   probably 90 percent of what we were going to address over

12   the next four days.  And you can -- not yet.  There is one

13   other settlement I wanted to bring to the Court's attention,

14   and that is with the TCEH ad hoc group.  Now you can pop it

15   up, please.

16           On Slide 3, Your Honor, of the presentation just

17   to discuss quickly, we had reached a resolution with the

18   TCEH ad hoc group and the plan sponsor NextEra on a revised

19   version of the carve out from the third party release

20   provision.

21           While there's a lot of blue on the page, it's

22   actually quite simple.  There's two issues that are

23   addressed here.  One is making clear that NextEra, or the

24   plan sponsor, includes NextEra subsidiaries, one of the

25   subsidiaries you heard about in the papers, and that was the

1   subject of a potential asserted claim by the TCEH ad hoc

2   group.

3        Second change is as to the scope.  The original

4   release address of the scope is being just the PUCT

5   regulatory process and any claims arising in connection with

6   that.  Now, the scope is broader to the pursuit of approval

7   of the transaction generally under the original hunt plan.

8   So it's a -- it's a slightly broader scope.  This

9   resolution, again, drops away that dispute and makes this a

10   much more consensual hearing.

11        Unless anyone wants to add anything on those two

12   settlement resolutions, I can go through the rest of the

13   presentation.

14        THE COURT:  Does anyone wish to be heard in

15   connection with the EFIH settlement or the ad hoc

16   settlement?  No?  All right, let's proceed.

17        MR. HUSNICK:  Great.  Thanks, Your Honor.  So

18   we're here today, as I said, for a confirmation of the plan

19   for the EFH and EFIH Debtors.  We believe, and it's helpful

20   to discuss before we get too far in, what exactly are we

21   seeking now that we've knocked out some of these objections.

22        So we are seeking, as we say here on Slide 4,

23   confirmation of a plan that reflects the transactions

24   embodied in the NextEra merger agreement.  We're also

25   seeking that the approval, Your Honor's approval, now that

1    we have an agreement with the first and second liens, that

2    the idea of a claim reserve is sufficient to satisfy the

3    indubitable equivalent standard.  And now that we have this

4    settlement, that's uncontested.

5            The Debtors are seeking approval of all of the

6    other provisions in the plan, as they will be modified by

7    the settlements over the next 24 to 48 hours.  And that

8    includes the modified release provision that we just

9    discussed, the Debtor release provision, the exculpation

10   provision, and the injunction provision.

11           The Debtors are seeking an order from the Court

12   and findings in that order from the Court that the plan

13   sponsor has acted in good faith, and has not colluded

14   throughout this -- or in connection with the transaction

15   that's being proved here today in the NextEra merger

16   agreement.

17           As I said on these last three bullets, we are not

18   seeking the host of findings that we had asked for in the

19   confirmation order and we'll file with Your Honor a revised

20   confirmation order.  We believe, Your Honor, that

21   confirmation is a -- is worth it, and is very clear that we

22   satisfy the standards.

23           We'll put evidence on for Mr. Keglevic, that this

24   is the best, indeed only available actionable alternative

25   after four years of out-of-court and in-court restructuring

1    efforts.

2              The reserve issues are reserved for another day.

3    This resolution, this plan will bring finality and closure

4    to the EFH Debtors', the EFIH Debtors' Chapter 11 cases.

5    This, Your Honor, I'd submit, is a textbook example of what

6    Chapter 11's all about.

7              Things haven't gone our way at every step of these

8    Chapter 11 cases, but ultimately, we move, we come back

9    together, and ultimately, this level of compromise, as we

10   stand here today, even though we have a couple of contested

11   issues, I submit it is a textbook example of what it should

12   look like to restructure a company.

13             The plan here achieves several goals that

14   correlate quite nicely with the Chapter 11 goals.  We

15   preserve the TCEH tax-free spin transaction, and that is,

16   the tax-free sale of EFIH, or EFH Corps indirect economic

17   interests in Encore.

18             This is important as Your Honor may remember to

19   the TCEH side of the business, which has now emerged from

20   Chapter 11 as Vistra.  This was the most favorable

21   transaction, but as Your Honor knows, it was the only

22   transaction that accomplished that goal.

23             It avoids the tax Armageddon.  You're going to

24   hear about that from Mr. Keglevic, although not quite as

25   much as we did the last time, because I think everybody's

1    got their head around that issue now.

2            It delivers a clean and de-levered balance sheet

3    to the reorganized EFH and EFIH Debtors.  Mr. Horton will

4    testify that there is no post-effective date obligations

5    imposed on reorganized EFH, reorganized EFIH or the plan

6    sponsor.  Though, those obligations will all be satisfied

7    out of the proceeds from the sale to NextEra.  No new debt

8    will be incurred by these reorganized Debtors at emergence

9    or through the plan.

10           Key regulatory approvals -- you're going to hear

11   from Mr. Wright in the testimony that key regulatory

12   approvals are already underway or have been received.  So we

13   are confident that we have -- it bolsters our case for

14   feasibility.  You'll also hear from Mr. Ying on feasibility.

15           Ultimately, Your Honor, and the last bullet on the

16   page, this at one point let into the rest of the 60 slides,

17   but we can simply say here, I don't think anybody's

18   objecting, Your Honor, to claims reserve, as proposed,

19   satisfies the indubitable equivalent standard.

20           Your Honor, we set out the treatment of each of

21   the classes.  This is, as I said, at the disclosure

22   statement hearing, a quintessential waterfall plan.  We

23   believe the plan satisfies the 1129 standards, and I'm going

24   to spare everyone in the courtroom from walking through all

25   of the standards.

1           We set forth on the next couple of slides for Your

2    Honor's convenience how we'd satisfy and which witness will

3    testify about which requirements either in the written

4    direct or in live testimony.  Suffice it to say, we believe

5    the issues are largely uncontested, as you can see, for

6    example, the TCEH ad hoc group objection has fallen away.

7           I think we're literally down to 1129(a)(4) with

8    the US Trustee objection, and 1129(a)(3) with the asbestos

9    claimants objection.

10          Flipping ahead to the voting results.  Not

11   surprisingly, we have overwhelming support from the voting

12   results -- that's every single voting class at EFH.  Those

13   classes have previously voted in favor of the plan, and Your

14   Honor, at the disclosure statement hearing, found that those

15   -- or ruled that those parties are bound to their previously

16   casted votes.  And no party has filed an objection in

17   connection with confirmation on that particular issue.

18          That leaves us to EFIH.  At the time that we filed

19   the voting report, the voting report reflected that Class

20   B6, that is the EFIH PIK noteholders voted to accept the

21   plan, and that Class B3 and B4, that is the EFIH first lien

22   noteholders and the EFIH second lien noteholders

23   respectively voted to reject the plan.

24          However, as a result of the settlement agreement

25   that I've discussed at the beginning, we believe that the

1    holders in those two classes that represent the overwhelming

2    holdings in those two classes will agree to change their

3    vote as a result of and in connection with the entry of the

4    confirmation order.

5              We will include findings on that effect, when

6    those votes flip.  I'm going to update you on the closing

7    presentation exactly how that shakes out, as we work through

8    just getting signature pages.  But I expect that both of

9    those classes will accept the plan in very, very large

10   numbers.

11             Where does that leave us?  I've already talked

12   about resolution of the secured creditors, and resolution of

13   the TCEH ad hoc group.  So we're at what's left.  The

14   asbestos objectors, they raised the very same due process

15   and good faith objections that the Court has already

16   addressed.

17             The US Trustee, for its part, has objected to the

18   payment of the non-charging lien fees and expenses incurred

19   by the EFH note trustee and the EFIH unsecured notes

20   trustee.  My understanding, Your Honor, and it's not

21   reflected in full on the slides, is that the settlement

22   agreement with the EFIH first lien and second lien and PIKs

23   will likely render moot, the dispute about whether the EFIH

24   indentured trustee is entitled to non-charging lien fees and

25   expenses.

1          We will discuss that with Mr. Schepacarter offline

2     and in closing, and hopefully we'll have a full resolution

3     for Your Honor on that point.  But it does leave

4     (indiscernible) the dispute between the EFH indentured

5     trustee and the US Trustee, so I'll address that briefly in

6     what evidence we're going to provide.

7          Your Honor, the objection from the asbestos

8     debtors, once again, focuses on two issues -- good faith and

9     due process.  And these are both aimed at a very narrow

10    category of claims, un-manifested asbestos claims.

11         Importantly, you're going to hear from Mr. Horton,

12    that the timeliest filed asbestos claims are being

13    reinstated under this plan.  This is no different than the

14    plan that we did with the Hunts, back in, I don't even

15    remember when that was, last year.

16         But it's no different.  And the very same

17    objections on good faith and due process grounds were raised

18    at that time and rejected by Your Honor.  But just to go

19    through a little bit more detail, what are we going to hear

20    from the witnesses?

21         Mr. Horton is going to testify, as he did in

22    connection with the motion to dismiss, that establishing --

23    that we established a bar date to alert claimants, and it

24    was established in connection with the Debtor's efforts to

25    market the indirect economic interests in Encore, held by

1    the EFIH Debtor.

2            He's also going to testify that we negotiated with

3    NextEra and other bidders for the reinstatement of the

4    timely filed asbestos claims, and he's going to testify that

5    we requested that all bidders reinstate the asbestos

6    liabilities, because that, Your Honor, was the best result

7    for the timely filed asbestos claims.

8            Rightly, he's going to testify that he also worked

9    very hard with bidders, especially NextEra, to ensure that

10   the inter-company claims between the LSGT debtors that were

11   the subject of the motion to dismiss, were reinstated in

12   order to support an EFH payment obligation down to those

13   entities, and ensure that the plan was feasible going

14   forward.

15           Your Honor, any other treatment of the objectors

16   or the asbestos claims would've led to very dire effects,

17   not just for the EFH and EFIH creditors, but for the

18   asbestos claimants, for the timely filed asbestos claimants.

19   The evidence is going to show there were no other bidders,

20   there were no other bidders willing to take all of the

21   asbestos liabilities, including some unknown, unquantified

22   amount of un-manifested asbestos liabilities.

23           Your Honor, you're going to hear from Mr. Wright

24   about there not being any alternative bidders.  You're going

25   to hear from Mr. Horton about there not being any

1    alternative bidders.  You're going to hear from Mr. Wright

2    about exploring the alternatives for addressing the

3    company's asbestos liabilities.

4           What did that include?  Well, one, Your Honor, one

5    point, Your Honor, you're going to hear about from a term

6    sheet exchanged between NextEra and the asbestos claimants.

7    And what is that term sheet saying?  Well, it had

8    contemplated in there, a 524(g) injunction.

9           And you're going to hear from Mr. Wright, that he

10   promptly called the Debtor's counsel and the Debtor's other

11   advisors and walked through exactly what it would take to

12   get a 524(g) injunction, and exactly what the procedural

13   steps, how long it would take.

14          Frankly, I could tell you, Your Honor, I don't

15   know how long it would've take -- it would've been a long

16   time.  It would've been very expensive.  And you're going to

17   hear from Mr. Wright, that ultimately, the Debtors

18   determined that it was not the right path to pursue.  And

19   you're going to hear from Mr. Hickson, that NextEra decided

20   that was not the right path to pursue.

21          And ultimately, it became -- reinstatement became

22   the only path that the Debtors were willing to agree to, and

23   that NextEra ultimately agreed to, to move forward.

24          There's this flawed notion, Your Honor, that

25   you're going to hear about in argument that somehow, the

1    LSGT Debtors could recover 100 cents for their claims.  And

2    they're going to talk about a $2.7 billion inter-company

3    claim up against EFH.

4           You're going to hear in testimony from Mr.

5    Stewart, that that $2.7 billion claim is just incorrect.

6    It's misreading certain elements of the liquidation analysis

7    and taking it out of context.  And Mr. Stewart will explain

8    that to Your Honor.

9           Ultimately, what it's going to come down to is

10   that those inter-company claims were just unsecured claims

11   against the EFH.  They would've received the same treatment

12   that other unsecured Creditors at EFH are receiving, and you

13   can see from the disclosure statement that the recovery on

14   account of those claims is far less than 100 cents, which is

15   what their promise here in the plan, that we've proposed

16   today.

17          On the due process front, Your Honor, I think I

18   talked a lot about due process.  But suffice it to say,

19   pursuant to Your Honor's January 2015 opinion, we believe on

20   a prospective basis, we've provided sufficient due process

21   to establish the bar date and to discharge the un-manifested

22   asbestos claimant, consistent with the Third Circuit's

23   decision in Grossman's and other decisions since then,

24   including Chemtura, which is a lower court decision, the

25   ability to discharge claims for exposure, where there's an

1    exposed, but un-manifested (indiscernible).

2           Ultimately, Your Honor, we believe that the

3    Court's prior rulings on this front should govern.  As

4    you've said in the prior confirmation hearing, that

5    continues to hold true today, that retroactive or backward

6    looking due process rights are preserved.  And that is

7    exactly what was contemplated in Grossman's and what has

8    been contemplated under the Malouin case from the Supreme

9    Court.

10          Turning to the objection of the United States

11   Trustee.  As I said, Your Honor, the US Trustee's objection

12   is very narrow.  It focuses on the non-charging lien fees

13   and expenses.  And suffice it to say, we're going to put on

14   the record through Mr. Wright, and I'm going to focus here

15   on the EFH unsecured's notes indentured trustee.

16          You're going to hear from Mr. Wright, that the

17   Court's previous findings in connection with the

18   confirmation of the Hunt plan, that the payment was

19   appropriate outside of a charging in advance.

20          There, Your Honor, I think made a finding that

21   they had made a substantial contribution in that context.

22   And therefore, a chunk of that fee and expense has already

23   been approved.

24          You also are going to hear from Mr. Wright that

25   there is an agreement of the US -- or of the EFH notes

1    indentured trustee, not to object to confirmation of the

2    plan, and to stand down on the confirmation.  And that has

3    happened and that is why we're here today with a relatively

4    consensual plan.

5              Lastly, you're going to hear that all of the

6    stakeholders who are potentially affected economically

7    affected by this relief have either voted in favor of the

8    plan or not objected to confirmation of the claim.

9              This provision is not a provision that popped into

10   the plan on the overnight.  This provision has been in the -

11   - every draft of the plan since we filed it, after

12   termination of the prior Hunt plan.

13             Overall, Your Honor, I think that will lead to

14   approval.  And I'll argue that the legal standard in closing

15   argument, but suffice it to say, the Debtors believe it's

16   appropriate to approve an authorized payment of these fees.

17             In conclusion, while the witness testimony, Your

18   Honor, you're going to hear over the next 24 to 48 hours

19   will be helpful.  And my litigators are going to shudder at

20   this.  I actually think the more important part to form the

21   context for this confirmation hearing is Your Honor's

22   experience over the last two and three quarter years.

23             It provides even more information about the

24   importance of confirmation, leading up to the trial, you've

25   presided over many trials and contested hearings in this

1    case alone.  You've listened to many status reports from Mr.

2    Sassower or Mr. Kieselstein and myself, about how much

3    progress we've made.

4              You've heard about many settlement agreements, and

5    you've ruled on many contested issues.  So Your Honor no

6    doubt knows that the Debtors have consistently tried,

7    through all of these cases, to negotiate with objecting

8    parties to narrow issues, and come to you with only that

9    which needs to be addressed in a contested manner.  And once

10   again, we've accomplished that goal.

11             Unfortunately, the asbestos has been a small issue

12   that has taken up an inordinate amount of time in these

13   Chapter 11 cases.  But the Debtors just have a fundamental

14   disagreement with the asbestos plaintiff's bar about how un-

15   manifested asbestos claims can be treated in bankruptcy.

16             The Court has already resolved these issues, this

17   disagreement, so the Court can rely on its prior rulings in

18   overruling the objection.  As for the US Trustee objection,

19   we completely understand the position of the United States

20   Trustee's office.

21             Once again, however, we have a disagreement with

22   the US Trustee about the standard for paying such fees, and

23   we'll ask Your Honor to adjudicate that dispute.

24   Accordingly, upon resolving those two issues, Your Honor, we

25   believe that the evidence will show overwhelmingly, that the

1   Debtors have carried their burden under Section 1129 of the

2   Bankruptcy Code to satisfy those requirements and confirm

3   the plan, and that all objections to confirmation should be

4   overruled.  Thank you.

5              THE COURT:  Thank you.  Yes?

6              MR. BALL:  Good afternoon, Your Honor, Robin Ball

7   from Chadbourne & Parke for plan sponsor NextEra Energy.

8   We're pleased to confirm that as Mr. Husnick stated, that we

9   have reached an agreement with the T-side unsecured

10  noteholder ad hoc group on revised terms for their release

11  that was the subject of their objection.

12             We appreciate the efforts of the Debtors in

13  reaching that resolution, and while we were of the view that

14  we met the standards applicable to approval of the release

15  that was in the plan, we take comfort from the fact that we

16  believe the underlying claims that were at issue are

17  unfounded and are pleased with the upticks to agree to the

18  language that's outlined by Mr. Husnick and his

19  presentation.

20             We support the Debtor's application for

21  confirmation of the plan.  And I won't repeat Mr. Husnick's

22  arguments, which were much shorter than we originally

23  anticipated, but I won't repeat any of them, in any case.

24             We do want to briefly emphasize a couple of points

25  for the Court here this afternoon.  The findings sought in

1    connection with confirmation include first, findings that

2    NextEra entered into this transaction in good faith, and is

3    therefore, entitled to the protection supported under

4    Bankruptcy Code Section 363(m).

5         And second findings in accordance with Section

6    363(n), that the price here was not controlled by any

7    agreement among potential bidders.  The evidence that has

8    been and will be presented to the Court, including, as Mr.

9    Husnick outlined, the testimony of NextEra's lead business

10   negotiator, Mark Hickson, will clearly show that the

11   proposed transaction in which my client will acquire

12   reorganized EFH and EFIH and it's interest in Encore, is the

13   product of a robust arms length negotiation, that the

14   parties have negotiated and entered into the transaction in

15   good faith.

16        In fact, none of the objections to the plan filed

17   here contends otherwise, or for that matter, disputes that

18   the requisite findings under Sections 363(m) and (n) are

19   appropriate.

20        The evidence will show that the Debtors conducted

21   a robust sales process, and that the pushed NextEra

22   throughout negotiations to maximize the value that would be

23   realized for the estate.  There was no agreement between or

24   arrangement between NextEra and any of its affiliates, with

25   any of the creditors that reduced, suppressed the price

1   negotiated.

2          The price was not controlled by any agreement

3   between NextEra or affiliates with any bidder or potential

4   bidder.  The Debtor solicited interest broadly on a number

5   of occasions here.  So some have said that this is, if not

6   the most marketed asset ever, at least among the most

7   marketed assets ever.

8          And as the Debtors have pointed out in the course

9   of negotiations in 2016, NextEra was not the only bidder

10  here, and there was another bidder actively and

11  competitively engaged until virtually the moment that the

12  merger agreement was executed in late July of last year.

13         The Debtors negotiated increases from the purchase

14  price that NextEra's initial offer.  And ultimately,

15  NextEra's offer exceeded that of other bidders.  Even after

16  the merger agreement was entered into in late July, the

17  Debtors continued to look for more value from NextEra.

18         And in conjunction with efforts to develop

19  creditor support for the plan, that persuaded NextEra to

20  further increase its offer.  We think it's telling that

21  despite the fiduciary out provisions in the party's

22  agreements, no other bidder came forward with a better offer

23  than NextEra's.

24         So under the terms of the transactions before the

25  Court, my client will be contributing approximately $9.8

1    billion here, including $4.4 billion in cash and stock, and

2    the repayment of the $5.4 billion EFIH first lien DIP

3    financing facility.

4         The support NextEra's contributed for the plan is

5    not limited to that financial support.  It has support in

6    both the T-side portion of the plan and the E-side portion

7    of the plan in a variety of ways.  And that includes the

8    agreement to acquire the asbestos subsidiaries reinstatement

9    in full of timely filed asbestos claims against those

10   entities.

11        That was not something we did.  It's something we

12   did reluctantly, but it was a necessity impressed upon us by

13   the Debtors.  And we also agreed to reinstatement of

14   intercompany claims by those entities against EFH and

15   against each other.

16        There was a reference to the asbestos --

17   consideration of an asbestos trust.  We considered that, but

18   the evidence will be that we concluded that it was going to

19   take too much time, that it was not really a viable

20   alternative, and that at the end of the day, we were

21   agreeing -- willing to agree to reinstatement of plans that

22   were -- claims that were timely filed, but not to

23   reinstatement of claims that were not timely filed under the

24   bar date.

25        In conclusion, we joined in the Debtor's request

1    that the court confirmed the plan is proposed.  NextEra

2    supports the entry of the confirmation order and looks

3    forward to completion of the proceedings for the PUCT.  As I

4    believe the Court is aware, the PUCT hearing on this matter

5    is scheduled for next week, for the dates February 21st

6    through the 24th.

7          And under the applicable statutory deadline, as we

8    understand it, the PUCT is required to rule by April the

9    28th.  Ultimately, of course, NextEra looks forward to

10   completing this transaction and to helping bring these

11   lengthy proceedings to a close.  Thank you.

12         THE COURT:  Thank you, Mr. Ball.  Mr. Gluckstein?

13         MR. GLUCKENSTEIN:  Good afternoon, Your Honor.

14   For the record, Brian Gluckstein of Sullivan & Cromwell for

15   the E-side Creditor's Committee, which, as the Court knows,

16   is the Official Unsecured Creditor's Committee of the EFIH,

17   EFH, EECI and EFIH Finance.

18         As the Court gets ready to hear evidence on a very

19   discreet of issues raised in the remaining objections to the

20   Debtor's plan, the Committee wants to provide the Court

21   briefly its perspective.

22         Under the circumstances, the E-side Committee

23   submits that the plan should be confirmed and distributions

24   made to unsecured creditors.  The Committee would certainly

25   prefer a paid in full plan for all unsecured creditors of

1   these Debtors, as have been promised along the way.

2            The E-side Committee's positions and the

3   fluctuations in distributable value to unsecured creditors

4   at both EFH and EFIH are well documented in the record

5   before this Court.  The Committee has worked diligently at

6   all times since its appointment, to ensure the devalue of

7   the E-side Debtor's assets and distributions to those

8   Debtors unsecured creditors were maximized.

9            But recognizing the impact of the Third Circuit's

10  make-whole litigation decision, and the long history of the

11  Encore sale process.  The E-side Committee believes that it

12  is imperative to maximize the remaining value of the E-side

13  Debtor's estates by closing the NextEra transaction, and

14  proceeding to distribute its proceeds, along with the

15  remaining cash on-hand at EFH to creditors as soon as

16  possible.

17           The plan currently contemplates the EFH cash being

18  the only source of distributable value to EFH Unsecured

19  Creditors on the effective date.  Continued delay would

20  cause further cash burn to the direct detriment of EFH

21  Creditors, while the denial of confirmation would likely

22  imperil the EFH Creditor recoveries entirely.

23           (indiscernible) confirmation and closing of the

24  NextEra transaction on the current schedule is value

25  maximizing and will permit the Creditors to see long overdue

1    distributions.

2         The proposed plan implements the terms of the E-

3    side Committee settlement approved by this Court in November

4    of 2015.  Since that time, the E-side Committee has

5    continued to discharge its fiduciary obligations, while

6    seeking to ensure that the benefits of that settlement are

7    realized by its constituents.

8         Based on current projections, this plan will still

9    provide 100 percent recoveries to certain classes of the EFH

10   Creditors benefiting from contractual subordination.  Also,

11   reinstating asbestos claims against the asbestos debtors and

12   those entities receivables.

13        Importantly, the other classes at EFH and EFIH

14   unsecured creditors all voted to accept this plan.  And

15   statements in support, in favor of confirmation were filed

16   by the Creditors with voting control of the unsecured

17   classes at those Debtors who are most adversely affected by

18   recent developments in the Third Circuit make-whole

19   decision.

20        In this context, Your Honor, the E-side Committee

21   joins in requesting that the Court confirm the Debtor's plan

22   of reorganization.  Thank you.

23        THE COURT:  Thank you.  Mr. Pedone?

24        MR. PEDONE:  Good afternoon, Your Honor, Richard

25   Pedone for the EFH indentured trustee, American Stock

1    Transfer.  Your Honor, I rise in -- to respond to the United

2    States Trustee's objection.

3         Well, the issues presented by the objection are

4    largely legal, there are key facts, which this Court can

5    take notice of, and which will be formally introduced into

6    evidence during the trial that, I believe, would lead to the

7    resolution on a legal issue we have agreement.

8         The US Trustee does not object to the allowance of

9    the fees at the priority level and direct payment, if this

10   Court makes a finding of substantial contribution.  We

11   believe that the evidence will show that such a finding

12   could be made, and we hope that the Court makes that

13   finding.

14        Your Honor, the -- but alternatively, even if the

15   Court were not to make a substantial contribution finding,

16   based upon the efforts of the indentured trustee in these

17   cases, the actual efforts to move the cases forward and

18   bring them to a resolution, we believe that the fees should

19   be allowed and paid, as agreed to by the parties for two

20   other reasons.

21        First, as Mr. Husnick pointed out, this is the

22   compromise that was agreed upon by the parties, and all

23   creditors who could be adversely impacted voted in favor of

24   this provision.

25        Your Honor, there's one small Creditor that was

1    not a planned proponent, but it's actually the largest plan

2    proponent, one of the Debtors that subsequently came to hold

3    the TCEH unsecured claim against the EFH, that negotiated

4    this provision, put it in the plan and participated in

5    putting it forward.

6           In these circumstances, all other creditors at

7    EFH, largely the bond creditors, who are (indiscernible),

8    will benefit from the provision.  So we believe that the

9    party's agreement should be honored.

10          Second, Your Honor, we believe, as I noted, that

11   the record will show that the EFH indentured trustee did in

12   fact make a substantial contribution to these cases.  As the

13   Court noted, at the December confirmation hearing in 2015,

14   the Court made such a finding.

15          So what we're -- already, for the first half of

16   the case, is what we're dealing with are the fees and

17   expenses for the second half of the case.  This Court

18   witnessed the vigorous opposition to the plan on the other

19   side, and an attempt to obtain value for the NOLs at EFH.

20   There were findings made with regard to whether or not

21   response to that litigation with regard to the fact that

22   there may be substantial values in those NOLs.

23          As that argument continued throughout the fall and

24   various forms of litigation and the merger agreement was

25   filed, we opposed the merger agreement, and we're preparing

1    to litigate whether it should be improved.  The largest

2    creditor, Fidelity, then participated significantly in

3    negotiations, we believe using that leverage, which resulted

4    in a significant increase in the purchase price.

5          And there's a connection there, from which the

6    Court could make such a finding.  Both Courts, the Third

7    Circuit make-whole decision ultimately adversely impacted

8    the outcome.  The increased value did flow, at least

9    indirectly, from those efforts, we believe.

10          Finally, Your Honor, these cases are unique in

11   terms of the role of an indentured trustee.  We've argued at

12   a couple of points that an indentured trustee is actual and

13   necessary in a case.

14          And while we have disagreements with the Debtors

15   and the US Trustee, whether or not, as a general rule, that

16   legal proposition should also -- should always stand.  In

17   these cases in particular, we believe that the facts are

18   born out, that in fact, there was a need for an indentured

19   trustee.

20          Your Honor, these Debtors, at least one point

21   during the cases, filed a plan which they retained the

22   option of reinstating the debt at EFH, as a way of avoiding

23   certain make-whole payments.  Reinstatement simply would not

24   be possible, and that optionality would not have been

25   preserved, if these Debtors went through these cases without

1    an indentured trustee in place.

2            And we know, until the Third Circuit decision, in

3    the summer, there was always the possibility that you

4    could've again, found the need for reinstatement as being an

5    option.

6            So Your Honor, on the specific circumstances of

7    these cases, we think that the Court's separate from a

8    direct substantial contribution finding, could find that the

9    services of an indentured trustee were actual and necessary,

10   and thus, allow the payment in accordance with the

11   settlement.  And we hope that the Court will make such a

12   finding.  Thank you.

13           THE COURT:  Thank you, Mr. Pedone.  Mr.

14   Schepacarter?

15           RS:  Good afternoon, Your Honor.

16           THE COURT:  Good afternoon.

17           RS:  Richard Schepacarter for the United States

18   Trustee.  It appears, Your Honor, that we have sort of one

19   loan remaining issue, and that would be the issue with the

20   EFH indentured Trustee.  Basically, what we would say is

21   that absent some revisions to the plan or holdings that Your

22   Honor had made earlier in this case, the plan should not be

23   confirmed as written.

24           I want to bring Your Honor up to speed on the EFIH

25   indentured trustee.  It now appears that the fees and

1    expenses of that Trustee will be paid pursuant to its

2    charging lien.  It's also my understanding that there's been

3    information and language in the proposed form of order that

4    would solidify that aspect.  So it looks like that issue has

5    been resolved with them.

6         However, with respect to the EFH Trustee, they

7    find themselves at a little bit different position, even

8    though they have the ability to exercise their charging

9    lien, they don't have the wherewithal, basically in this

10   case at this point, to be able to do that.

11        Akin to other plans that have been proposed in

12   this case, basically, the plan is to pay those fees and

13   expenses out of, I believe it's the distribution account in

14   this case, that's going to be established.

15        The problem here that we're faced with is that it

16   provides for the payment of those fees without specifying

17   the legal basis or justification for the payments under the

18   code, and runs contrary to prior rulings in this case.

19        Article 4, Section (indiscernible) of the plan

20   provides for the payment of these fees.  The EFH Trustee in

21   his reply to our objection basically asserts three arguments

22   to support the payment of those fees in this case, and I'll

23   address them (indiscernible).

24        The first issue or the first point that they tried

25   to make is that the payments to the EFH indentured trustee

1    were part of a series of compromises and agreements that

2    were embodied in the plan.  In other words, basically, we

3    made a deal and nobody objected to it.  The second one is

4    that they made a substantial contribution in this case,

5    which has been ongoing and continuing, given the status of

6    the case.

7           And the third one is that the services of

8    indentured trustee were actual and necessary because of the

9    complexity of the cases and the desire of the Debtors to

10   maintain the possibility of reinstating certain of the EFH

11   notes, so that the fees and expenses of the EFH indentured

12   trustee are really Section 503(b)(1)(a) type fees in this

13   case.

14          As I addressed the first point, even if the

15   parties made such a deal, they cannot contract around the

16   provisions of the Bankruptcy Code.  As this Court accurately

17   stated in December of 2015, and I think it's in the December

18   3rd, 2015 transcript, at Page 34, Lines 11 to 23, Your Honor

19   stated that, quote, "While it is true that the payment of

20   professional fees is a negotiated part of the settlement,

21   the parties cannot contract around the Bankruptcy Code, even

22   under Rule 9019."

23          Importantly, these claims are not being paid in

24   connection with an allowed claim, such as that of a secured

25   creditor, nor out of the charging lien asserted by an

Page 45

1   indentured trustee from the allowed claim of its

2   noteholders.  Rather, the professional fees are being paid

3   to ad hoc committees and creditors and indentured trustees

4   by the Debtor, TCEH, as an independent (indiscernible),

5   allowed administrative expenses.  As such, it must be

6   authorized by the Bankruptcy Code.

7           These plan provisions, even if the EFH indentured

8   trustee and other parties have agreed to them, cannot

9   override the statutory requirements of Section 503.  The

10  Code, three sections 503(b)(3), (b)(4) and (b)(5) regulates

11  both professional compensation and administrative expenses

12  paid from the estate.  In a comprehensive way, the parties

13  are not free to rewrite.

14          The Bankruptcy Code is meant to be a comprehensive

15  federal scheme that is designed to govern the bankruptcy

16  process.  Although flexibility is necessary, this federal

17  scheme cannot remain comprehensive, if the parties and the

18  Courts are free to tweak the law to fit their preferences in

19  each case.

20          Section 503(b) would be undermined, if it could be

21  bypassed through consent.  A professional could evade its

22  burden to make detailed showings required under Section

23  503(b)(3), (b)(4) and (b)(5), if payment depended on nothing

24  more than consent and agreement.

25          As to the Trustee's, indentured trustee's second

1    point, absent effective utilization of their charging lien,

2    the EFH note indentured trustee paid professional fees

3    related to fees which compensation is governed by, as the --

4    as I've stated before, Sections 503(b)(3), (4) and (5).

5            Although such professionals may be eligible to be

6    compensated from the bankruptcy estate, that section imposes

7    detailed requirements that must be met before approval on

8    payment, including the filing of a request for payment of

9    fees, notice in hearing before the Court, a showing that the

10   fees were actual and necessary, a showing that the

11   indentured trustee in this case made a substantial

12   contribution to the bankruptcy case, and a finding that the

13   Court, that any -- a finding by the Court, that any

14   compensation paid to an attorney or, in this case, the

15   indentured trustee is reasonable.

16           Such parties, like the payment under Sections

17   503(b) is not automatic, but depends upon the party's

18   ability to show that the fees were actual and necessary to

19   preserve the value of the estate.

20           Here, the plan is (indiscernible) on the legal

21   justification that authorizes the payment of such fees, or

22   whether the subject professionals are required to, and could

23   otherwise satisfy Section 503(b).

24           The professionals in this case and the indentured

25   trustee must prove that they have made a substantial

1    contribution to the bankruptcy case.  For example, they must

2    prove that, among other things, the benefit received by the

3    estate is more than just incidental to the indentured

4    trustee's self-interest, because Creditors are presumed to

5    act in their own self interest, unless they -- unless and

6    until they satisfy the Court that their efforts have

7    transcended self-protection, and otherwise directly and

8    materially contributed to the reorganization.

9         In this case, this Court previously ruled on this

10   issue in December 3rd of 2013, stating that, quote, "Courts

11   have found that a Creditor or an ad hoc committee of

12   creditors is entitled to payment of its professional fees

13   and expenses by virtue of making a substantial contribution

14   to the bankruptcy case."  And it cited the Davis v. Elliot

15   Management, Lehman Brothers' case.

16        "But the Court must make an independent

17   determination as to the existence of substantial

18   contribution, and whether the fees and expenses are

19   reasonable.  It cannot defer to the Debtor's judgment."

20   That's also on, I believe, Page 35 and 36, Lines 16 through

21   25, and then Line 1.

22        The fact that the payments of such professional

23   fees are proposed as part of a Chapter 11 plan does not

24   relieve the third party professional of their obligation to

25   comply with the requirements of Section 503, which is the

1   sole source of authority to pay post-petition professional

2   fees on an administrative basis.

3           As cited in our objection, the Lehman Court

4   rejected an attempt by certain committee members to

5   circumvent Section 503(b)(4) by seeking payment under a

6   permissive plan provision that purported to pay third party

7   professional fees without regard to whether they could be

8   authorized under Section 503.

9           As that Court explained, plans only pay claims and

10  administrative expenses and professional fee expenses are

11  either administrative expenses or not.  And, if the latter,

12  they cannot be paid under a plan.  Indeed, the Lehman Court

13  recognized that any contrary result could lead to serious

14  mischief, since it would allow plan proponents to distribute

15  the estate's assets, without regard to the Bankruptcy Code's

16  priority scheme.

17          The Lehman Court's reasoning applies with equal

18  force here.  Like the fees at issue in Lehman, third party

19  professional fees are either administrative expenses or not.

20  Because the third party professionals seek to enjoin -- I'm

21  sorry -- seek to enjoy the benefits of administrative

22  priority under Section 503, the sole possible statutory

23  provision allowing them to be paid, they must also comply

24  with the disclosure obligations and substantive limitations

25  imposed by that section.

1          This leads me to the indentured trustee's third

2     point, which I'll agree, that they're administrative

3     expenses.  But as such, these administrative expenses are

4     governed by the more specific section 503(b)(3), (b)(4) and

5     (b)(5), and not the more general Section 503(b)(1)(a), the

6     actual necessary cost and expenses of preserving the estate.

7          In conclusion, Your Honor, we respectfully submit

8     that the Court should not approve the plan at this point,

9     unless the plan and proposed confirmation order are amended

10    and revised to set forth the legal basis for a factual basis

11    for such payments, clarify the professionals, subject to

12    Sections 503(b)(3) and (b)(4) and (b)(5), such as the

13    indentured trustee, shall be compensated only to the extent

14    such compensation is authorized and approved and awarded

15    under such sections.

16          And also, lastly, to provide the parties seeking

17    such fees to either have satisfied the requirements of that

18    section, and having made a substantial contribution, as well

19    as the fact that the parties in interest, including the

20    United States Trustee, would have the opportunity to review

21    those fees and comment or object to such fees, if the Court

22    were to award them under Section 503(b)(3) and (b)(4) and

23    (b)(5).  Thank you, Your Honor.

24          THE COURT:  Thank you.  Mr. Hogan?

25          MR. HOGAN:  Thank you, Your Honor.  Happy

1    Valentine's Day as well.  I'll be brief, Your Honor.

2                THE COURT:  Okay.

3                MR. HOGAN:  May it please the Court, Daniel Hogan

4    of Hogan McDaniel on behalf of Shirley Fenicle and David

5    William Fahey, John H. Jones and David Heinzmann, or as I

6    refer to them, the asbestos objectors.

7                I would like to thank the Court for its indulgence

8    in allowing me to create a record.  That's what we're here

9    to do, Your Honor.  The due process issues surrounding the

10   treatment of the claims of persons who have not suffered

11   cognizable injuries caused by the pre-petition exposure to

12   the Debtor's asbestos (indiscernible) products, before the

13   bar date set in each case, but who have since suffered or

14   will suffer injuries in the future.  And I refer to them as

15   un-manifested asbestos claimants.

16               We are cognizant of the Court's prior rulings in

17   this case, including but not limited to, the interlocutory

18   ruling regarding to the establishment of the bar date, the

19   denial of the appointment of a futures claims

20   representative, the confirmation of the Hunt plan, including

21   the Court's rulings on our prior due process objections, as

22   well as the Court's rulings on the motion to dismiss the

23   LSGT Debtor's Chapter 11 cases for a lack of good faith in

24   filing the petitions.

25               We have worked constructively with the Debtor,

1    Your Honor, to reach agreement on the designation of the

2    record with regard to that hearing and the motion to

3    dismiss, as well as joint deposition designations, and the

4    evidence that we will present, all in an effort to

5    streamline the confirmation hearing and to help focus the

6    issues.

7            Your Honor, we do not object to any other part of

8    the plan, other than the provision that would discharge the

9    claims of un-manifested asbestos claimants, for whom which

10   no proof of claim was filed.

11           As set forth in our objection, it is our position

12   that such claimants cannot be provided constitutionally

13   adequate notice.  And because there is no separate legal

14   representative appointed to represent their interest, and

15   because there is no provision made to have their claims

16   compensated, and no other safeguards of their rights

17   adopted, their claims cannot be discharged.  That's our

18   position.

19           The plan contemplates the reinstatement of all

20   asbestos claims for which proof of claims have been filed,

21   and the (indiscernible) statement of intercompany loans for

22   the asbestos Debtors.

23           The amount owed by EFH to the asbestos Debtors is

24   by the Debtor's own reckoning, more than sufficient to pay

25   the asbestos claims, even if no future un-manifested claims

1    are discharged.

2            The only reason the discharge claims here is to

3    reduce the asbestos Debtor's liabilities, and must increase

4    the overall value and the value of the controlling parent,

5    EFH.  This is not a valid purpose from our position, and the

6    plan, insofar as it purports to discharge these claims,

7    violates due process and is in bad faith and cannot be

8    confirmed.  Thank you.

9            THE COURT:  Thank you, Mr. Hogan.  Mr. Shore?

10           MR. SHORE:  This is two in two days.  Chris Shore

11   from White & Case on behalf of the TCEH ad hoc bondholder

12   group.  If I'm counting right, the ad hoc group first

13   appeared in this case 1,022 days ago, and I think this is

14   our last.

15           There are not many of us on this side of the

16   podium who were there on those first day cases, when we

17   spent most of our time fighting about the nomenclature,

18   whether it was going to be TCEH or (indiscernible) or the T-

19   side or the E-side.  But of course, Your Honor and your

20   staff were here on the first day and all 1,022 days since.

21           To all of you, I'll thank you, again, sincerely,

22   for all your diligence in all of the hearings you've had to

23   sit through, some momentous, some, actually, probably most,

24   extremely tedious, and in addressing, I think now 11,000 or

25   just about 11,000 docket entries, but maybe more so for

1    letting all of us advocates come forward and try to maneuver

2    for a deal that works for our clients.

3            With respect to the ad hoc group, we got the deal.

4    We picked up the ball on our one-yard line and ran 99 yards

5    to pick up Mr. Husnick's example.  We did fall down on the

6    goal line.  Obviously, that resulted in the unfortunate

7    effect of keeping the case on the Court's docket for another

8    year and keeping Your Honor too busy.  We're sorry for that.

9            It also had material adverse effects on all of the

10   T-side unsecured creditors, all of the T-side secured

11   parties, the PIKs, the EFH creditors, all of whom were going

12   to get paid par plus accrued, and the estates, which are now

13   having to bear the cost of the make-wholes.

14           In our objection, we noted our concerns about how

15   we got here, and for us, the issue has always been whether

16   we just slipped on the goal line, it happens, or whether

17   someone off at the sidelines, put out a foot and tripped us.

18           Following the Debtor's termination of our deal,

19   we've attempted to stay back and out of the fray, while

20   others took their shot at their deal, and we haven't pressed

21   any issues in front of the Court.  In fact, we had always

22   intended just to stay back, while NextEra took that shot,

23   and hopefully consummates this deal and gets the main case

24   off Your Honor's docket.

25           But as drafted, the plan and the confirmation

1   order required us to come forward for a limited purpose.  As

2   Mr. Husnick mentioned, we've now fixed our issues and can

3   withdraw our objection.  Mr. Husnick did not mention that

4   the confirmation order had originally contained a finding

5   that NextEra had acted in good faith in all respects in

6   these cases.

7           NextEra previously agreed to pair that back.  The

8   363 finding being made in the confirmation order applies to

9   NextEra's purchases of Debtor assets, not that to their

10  conduct, if any, with respect to other parties' purchases,

11  such as our contemplated purchase.

12          In other words, the Court is not being asked in

13  the confirmation order to bless conduct of NextEra with

14  respect to approvals of the Hunt plan, if in fact they had

15  any role in that process.

16          Second, as Mr. Husnick did mention, we had

17  concerns with respect to the scope of the releases, but

18  we've now fixed them, and we've signed off on the language.

19  With that, we can withdraw our objection, and with the

20  Court's permission, the Ad Hoc Group will not participate

21  further in the confirmation proceedings.

22          We don't need our limited appearance for that

23  anymore, and we'll just reserve our issues for a later date.

24  I suspect then, that if we come back, it will not be in the

25  main case at all.  So again, I thank Your Honor and staff

1    for all 1,022 days.

2            THE COURT:  Thank you, Mr. Shore.

3            MR. MCKANE:  Good afternoon, Your Honor, Mark

4    McKane of Kirkland & Ellis.  Yesterday, at the final pre-

5    trial conference, you had asked for a compilation of

6    stipulations just for you and your staff.  We have those and

7    wanted to provide those to you, your staff at this time.

8            THE COURT:  Okay, thank you.

9            MR. MCKANE:  And then, beyond that, we're prepared

10   to put on evidence starting at 10 o'clock tomorrow morning.

11           THE COURT:  All right, thank you very much.

12           MR. MCKANE:  May I approach?

13           THE COURT:  Yes.  All right, thank you for your

14   opening arguments.  And we will start tomorrow at 10 with

15   the presentation of evidence.  I would like to have a

16   chambers conference at 9:30, just as we've done in the past,

17   to make sure everyone's on board with how the day is going

18   to proceed and I'll see you then.  Have a good evening.

19           MAN:  Thank you, Your Honor.

20           MAN:  Thank you, Your Honor.

21

22                        * * * * *

23

24

25

1                C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5      Sonya

6      Ledanski Hyde

7

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde,
o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2017.02.15 16:31:25 -05'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  February 15, 2017