Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                          :

                                      :    Chapter 11

6    ENERGY FUTURE HOLDINGS CORP.  :

     et al.,                          :    Case No. 14-10979 (CSS)

7                                     :

             Debtors.                 :    (Jointly Administered)

8    _____:

9

10                              United States Bankruptcy Court

11                              824 North Market Street

12                              Wilmington, Delaware

13                              February 16, 2017

14                              10:7 a.m. - 4:25 p.m.

15

16

17

18

19

20

21    B E F O R E :

22    HON CHRISTOPHER J. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:  LESLIE MURIN

1    HEARING re Seventh Amended Joint Plan of Reorganization of

2    Energy Future Holdings Corp., et al., Pursuant to Chapter 11

3    of the Bankruptcy Code [Solicitation Version] [D.I. 10551;

4    filed January 4, 2017]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1  A P P E A R A N C E S :

2

3  PACHULSKI STANG ZIEHL & JONES

4      Attorneys for Second Lien Indenture Trustee

5

6  BY:  LAURA DAVIS JONES

7

8  KRAMER LEVIN NAFTALIS & FRANKEL LLP

9      Attorneys for Second Lien Indenture Trustee

10

11  BY:  JOSHUA BRODY

12      GREGORY HOROWITZ

13

14  LANDIS RATH & COBB

15      Attorneys for NextEra Energy

16

17  BY:  MATTHEW B. MCGUIRE

18

19  CHADBOURNE & PARKE LLP

20      Attorney for NextEra Energy

21

22  BY:  ROBIN D. BALL

23      HOWARD SEIFE

24

25

1   SULLIVAN & CROMWELL, LLP

2          Attorneys for Unsecured Creditors Committee

3

4   BY:  BRIAN GLUECKSTEIN

5

6   RICHARDS, LAYTON & FINGER, P.A.

7          Attorneys for the Debtor

8

9   BY:  DANIEL DEFRANCHESCHI

10         JASON M. MADRON

11

12  NIXON PEABODY

13         Attorneys for AST as EFH Indenture Trustee

14

15  BY:  RICHARD PEDONE

16

17  KIRKLAND & ELLIS LLP

18         Attorneys for the Debtors

19

20  BY:  JUSTIN SOWA

21         MARK MCKANE

22         MARC KIESELSTEIN

23         BRYAN M. STEPHANY

24         MARK MENZIES

25

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorney for the U.S. Trustee

3

4   BY:  RICHARD L. SCHEPACARTER

5

6   KLEHR HARRISON HARVEY BRANZBURG LLP

7        Attorney for UMB Bank, N.A.

8

9   BY:  RAYMOND H. LEMISCH

10

11  BIELLI & KLAUDER LLC

12       Attorney for EFH Corp

13

14  BY:  DAVID M. KLAUDER

15

16  PROSKAUER ROSE LLP

17       Co-Counsel to Energy Future Holdings Corp.

18

19  BY:  MARK K. THOMAS

20       PETER YOUNG

21

22  MONTGOMERY, MCCRACKEN, WALKER & RHOADS

23       Attorneys for E-Side Committee

24

25  BY:  DAVIS LEE WRIGHT

1    VENABLE LLP

2         Attorneys for PIMCO

3

4    BY:  JAMIE EDMONSON

5         JEFFREY S. SABIN

6

7    POTTER ANDERSON & CORROON LLP

8         Attorney for Deutsche Bank New York,  Agent to DIP

9         Financing

10

11   BY:  R. STEPHEN MCNEILL

12

13   AKIN GUMP STRAUSS HAUER & FELD LLP

14        Attorneys for UMB Bank, N.A. Indenture Trustee

15

16   BY:  SCOTT L. ALBERINO

17        CATHERINE EISENHUT

18        ABID QURESHI

19

20   HOGAN MCDANIEL

21        Attorneys for Contrarian Capital

22

23   BY:  DANIEL K HOGAN

24

25

1   ALSO APPEARING TELEPHONICALLY:

2

3   JACOB A. ADLERSTEIN

4   ALYSA AIN

5   ARLENE R. ALVES

6   ASHLEY F. BARTRAM

7   PEG A. BRICKLEY

8   KELLIE CAIRNS

9   MARK A. CODY

10  BARRY FELDER

11  GIANCLAUDIO FINIZIO

12  MARK A. FINK

13  MICHAEL FIRESTEIN

14  MARK FLANNAGAN

15  JOSEPH A. FLORCZAK

16  PHILIP A. GELSTON

17  BRIAN GLUECKSTEIN

18  ALEXIS GOLD

19  ERICA GOODSTEIN

20  TODD M. GOREN

21  TAYLOR B. HARRISON

22  MARK HEER

23  CHAD J. HUSNICK

24  NATASHA HWANGPO

25  ZACHARY LANIER

1    HAL F. MORRIS

2    TINA MOSS

3    CATHERINE NORMAN

4    RICHARD PEDONE

5    LARS A. PETERSON

6    MEREDITH PFISTER

7    JON PRUCHANSKY

8    ERIK SCHNEIDER

9    NED S. SCHRODEK

10   NOAH M. SCHOTTENSTEIN

11   FREDRIC SOSNICK

12   ANGELO THALASSINOS

13   ANDREW M. THAU

14   MARK K. THOMAS

15   AMER TIWANA

16   CARL TULLSON

17   MATTHEW UNDERWOOD

18   MEGAN WASSON

19   JULIA M. WINTERS

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.  Please be seated.

3              MR. BALL:  Good morning, Your Honor.  Robin Ball

4     from Chadbourne & Parke for Plan Sponsor NextEra Energy.

5     Your Honor, at this time, we'd like to call Mark Hickson to

6     the stand.

7              THE COURT:  All right.  Mr. Hickson, I don't know,

8     there you are.

9              MR. HICKSON:  Good morning, Your Honor.

10             THE COURT:  Good morning.  Please take the stand

11    and remain standing, if you would.

12             CLERK:  Please raise your right hand.  Do you

13    affirm you're going to tell the truth, the whole truth, and

14    nothing but the truth, to the best of your knowledge?

15             MR. HICKSON:  I do.

16             CLERK:  Please state and spell your name for the

17    record.

18             MR. HICKSON:  Mark Hickson, M-a-r-k

19    H-i-c-k-s-o-n.

20             CLERK:  Thank you.

21             (WITNESS SWORN IN)

22             THE COURT:  Please be seated, sir.

23             MR. BALL:  And, Your Honor, we have provided for

24    the Court and for your staff copies of customary witness

25    binder.

1          THE COURT:  Yes.

2          MR. BALL:  Inside the front cover of the binder is

3   a yellow page with the exhibits that we will move in at the

4   end of Mr. Hickson's testimony.

5          THE COURT:  Okay.  Can you try to keep your voice

6   a little bit, though.  I'm losing you.

7          MR. BALL:  I will, Your Honor.

8          THE COURT:  Thank you.

9          MR. BALL:  And, Mr. Hickson, you should have a

10  binder on the stand that says, M. Hickson Witness Binder.

11  There may be two, so look for the one that says M. Hickson

12  Witness Binder.

13          MR. HICKSON:  I do.

14          MR. BALL:  Okay.

15              DIRECT EXAMINATION OF MARK HICKSON

16  BY ROBIN BALL:

17  Q    All right.  Good morning, Mr. Hickson.  Would you

18  please state your name for the record?

19  A    Mark Hickson.

20  Q    And by whom are you employed, Mr. Hickson?

21  A    NextEra Energy.

22  Q    And when did you join NextEra?

23  A    In May of 2012.

24  Q    And what position and/or positions do you hold with

25  NextEra?

1   A    I am Executive Vice President of Corporate Development

2   and Strategy for NextEra, and I'm also Vice President of

3   Corporate Development and Strategy for our other publicly

4   traded company NextEra Energy Partners.

5   Q    And where were you employed before you joined NextEra?

6   A    I was at Merrill Lynch & Company in New York, where I

7   was Managing Director and Global Head of Merges and

8   Acquisitions for Utility Companies.

9   Q    And can you describe briefly your educational

10  background starting with college?

11  A    Yes.  I have a Bachelor's of Science Degree in

12  Aerospace Engineering from Texas A&M University, and I have

13  a Master's in Business Administration from Columbia

14  University.

15  Q    Okay.  And Mr. Hickson, did you provide a Declaration

16  in anticipation of this hearing?

17  A    I did.

18  Q    And, sir, please would you turn in your binder to the

19  tab that's labeled DIR-Hickson, and let me know when you

20  have that.

21  A    Okay, I do.

22  Q    Do you recognize this document, sir?

23  A    I do.

24  Q    And what is it?

25  A    It is my Declaration.

1    Q    Okay.  And, sir, to the best of your knowledge, are the

2    statements made and the information contained in your

3    Declaration true and accurate?

4    A    Yes.

5         MR. BALL:  Your Honor, we would move Mr. Hickson's

6    Declaration into evidence at this time.

7         MR. HOGAN:  No objection, Your Honor.

8         THE COURT:  It's admitted.

9    Q    Mr. Hickson, I know you addressed this in some detail

10   in your Declaration, but can you briefly describe NextEra

11   and its business?

12   A    Yes.  NextEra Energy is a publicly traded company.  It

13   is primarily comprised of two businesses: one is Florida

14   Power & Light, which is the largest utility in the State of

15   Florida, serves about 60 percent of the customers in the

16   state, and it also makes up about two-thirds of NextEra

17   Energy; the other third of our business is primarily

18   renewable energy, so wind and solar electricity.

19   Q    And...

20        THE COURT:  Is that generation?

21        MR. HICKSON:  Yes, wind and solar generation, yes,

22   wholesale.

23   Q    And generally, sir, what are your responsibilities as

24   Executive Vice President for Corporate Development and

25   Strategy, Quality, and Integration?

1    A    So I'm primarily responsible for strategic planning

2    across our various business units across the company, as

3    well as any acquisitions, as well as asset sales I get

4    involved in.  And if we're doing acquisitions and there's a

5    need for integration, I typically lead our integration

6    efforts.

7    Q    Okay.  And were you involved in the negotiations

8    between NextEra and the Debtors that resulted in the merger

9    agreement and related agreements with EFH and EFIH?

10   A    Yes, I was.

11   Q    And who led those negotiations for NextEra?

12   A    Myself, along with our General Counsel, Charlie

13   Sieving.

14   Q    And did you play the same role for the various related

15   agreements that NextEra entered into with EFH and EFIH?

16   A    Yes, I did.

17   Q    And for amendments to the merger agreement and the

18   other related agreements?

19   A    Yes, I did.

20   Q    And, Mr. Hickson, do you understand that one of the

21   issues before the Court in this proceeding is whether

22   NextEra entered into this transaction in good faith?

23   A    Yes, I do.

24   Q    And as part of that determination, the Court will look

25   at whether the negotiations leading to the agreements were

1   arm's length or were, instead, collusive.

2   A    Yes, I understand that.

3   Q    And as a lead negotiation for NextEra, what is your

4   perspective on that issue?  What were the negotiations with

5   the Debtors arm's length negotiations?

6   A    Absolutely.  I think during the entire time that

7   NextEra has been involved in the process of pursuing EFH and

8   its primary subsidiary, Oncor.  The negotiations have been

9   very much arm's length.  There's been points in time where

10  we've been told that the process was very competitive.  And,

11  although we didn't have independent information, we didn't

12  have -- also didn't have any reason to refute those

13  statements.  And so as a result, through the entire process,

14  there was significant negotiation -- contentious negotiation

15  not only on price, but also on terms of various agreements.

16  Q    And so, are there particular aspects of the transaction

17  that you think reflect the arm's length of the negotiations?

18  A    I do.  I think broadly speaking, price was obviously a

19  very significant component, as well as closing conditions,

20  termination provisions, and the fiduciary out.  There was a

21  significant focus by the Debtor on having -- as well as the

22  creditors -- on having closing certainty.  So the closing

23  conditions, the termination provisions, and the fiduciary

24  out were heavily negotiated.  And in addition to that, there

25  was a fair amount of discussion about asbestos terms and

1    things of that nature.

2    Q    Okay.  I'll come back in a moment to the negotiations

3    with the Debtors, but I want to ask a few questions about

4    other parties.  Was the price that NextEra negotiated by any

5    agreement between NextEra or its affiliates with any other

6    bidder or potential bidder?

7    A    No, it was not.

8    Q    Was the price reduced or suppressed in any manner by

9    any arrangement involving NextEra or any of its affiliates

10   and any of the Debtor's creditors?

11   A    No, it was not.

12   Q    Okay, let's turn back to your negotiations with the

13   Debtors.  When did NextEra first attempt to negotiate a deal

14   with the Debtors?

15   A    We made an unsolicited offer in June of 2014.  That was

16   our first time that we made an offer to the Debtors.  We

17   made a subsequent offer in July of 2014.  Subsequent to that

18   offer, we had about a month of pretty intense negotiations

19   with the company.  But, unfortunately, those negotiations

20   did not result in an agreement around a transaction.

21   Q    Okay.  And did the Debtors then pursue an auction

22   process?

23   A    Yes, they did.  They -- our initial discussions with

24   them terminated at the end of August of 2014.  And for the

25   balance of 2014, the Debtors prepared for an auction

1    process, which they conducted in the first half of 2015.

2    Q    Did NextEra participate in that process?

3    A    Yes, we did.

4    Q    And did you ultimately have further negotiations with

5    the Debtors pursuant to the auction -- the results of the

6    auction process?

7    A    Yes, we did.  We submitted a final bid in the April of

8    2015 timeframe, and we had discussions with the Debtor in

9    the May and June timeframe.  Again, very spirited

10   negotiations; but, unfortunately, in June of -- the middle

11   of June of 2015, those discussions did not result in

12   agreements.

13   Q    What resulted in your inability to reach an agreement?

14   What were the...

15   A    I think primarily our inability to hold our price.  The

16   way we have financed this transaction, there is a debt

17   component to the transaction.  And we had never intended to

18   put in protection for the interest rate associated with the

19   debt that we anticipated being a part of the financing of

20   this transaction until signing.  So we were always subject

21   to interest rate volatility.  And in the middle of June,

22   interest rates moved quite meaningfully, and we were unable

23   to maintain our price.

24   Q    Were the Debtors unwilling to accept the price that

25   NextEra was able to offer at that juncture?

1   A    Yes.  They terminated discussions with us in the middle

2   of June.

3   Q    And the Debtors, to your understanding, then pursued a

4   different transaction with the Ovation entities involving a

5   REIT structure; you're aware of that?

6   A    Yes, I am aware of that.

7   Q    And after that other deal died, did you reengage with

8   the Debtors?

9   A    Yes, we did.  I think the Ovation transaction was

10  terminated on May 1 of 2016, and we tried to reengage with

11  the Debtor pretty shortly thereafter.  We had submitted a

12  letter on May 2 of 2016, again, expressing our interest in a

13  transaction with the company.

14  Q    All right.  Mr. Hickson, let me ask you to look at the

15  tab in your binder that's marked NX-013.  Do you see it?

16  A    I do.

17  Q    And can you tell me what that document is?

18  A    This is an agreement and plan and merger between

19  NextEra Energy, EFH Merger Co., EFH ...

20  Q    Are you in NX-13?

21  A    I'm sorry, you said?

22  Q    NX-13, 013.

23  A    Oh, it's 13, I'm sorry.  I thought you said NX-01,

24  apologies.  Yes.  This is the bid letter that we submitted

25  on May 2 of 2016.

1   Q    Okay.  And in that letter, what financial consideration

2   were you offering to pay?

3   A    We offered $3.5 billion purchase price, but we also

4   offered to repay the existing $5.4 billion first lien DIP

5   facility that is currently outstanding.

6   Q    And so the $3.5 billion, was that in cash and stock?

7   A    It was a combin- -- it was substantially cash that was

8   going to be received by the creditors.  And it was going to

9   be a small component -- stock component -- primarily to

10  satisfy the tax-free nature of the transaction.

11  Q    So the total compensation you were offering at that

12  juncture was roughly $8.8 billion?

13  A    $8.9 billion, yes.

14  Q    And did the Debtors accept that bid?

15  A    No, they did not.  They, in fact, the Debtor told us

16  that, based on our proposal that we put forward on May 2nd,

17  that they didn't think it made sense to continue

18  discussions.

19  Q    And did you -- how did you respond?

20  A    We responded by subsequently submitting another offer

21  letter.  And that subsequent offer letter had a bid value of

22  $3.8 billion, so we moved up about $300 million from the

23  $3.5 billion.  And we continued to indicate our willingness

24  to repay the $5.4 billion first lien DIP facility in full.

25  Q    And did further negotiations with the Debtors ensue?

1   A     Yes.  After that point, I think we submitted the

2   subsequent bid letter in the mid-May timeframe, and we had

3   discussions with the Debtors from mid-May through the end of

4   July when we signed a definitive agreement.

5   Q     All right.

6   A     And those discussions involved due diligence,

7   negotiations around agreements, things of that nature.

8   Q     All right.  Mr. Hickson, let me ask you to look at

9   what's been marked as NX-1, which is where I think you were

10  previous, NX-001.

11  A     Yup.

12  Q     And can you tell me what that document is?

13  A     This is the agreement and plan and merger between

14  NextEra Energy, EFH Merger Co., EFIH, and EFH.

15  Q     Okay.  And in that, you entered into that agreement

16  with the Debtors on July 29th; is that right, of 2016?

17  A     That is correct.

18  Q     And in that agreement, did you -- had you further

19  increased the price that you were agreeing to pay?

20  A     Yes, we did.  So the -- as I indicated, the second bid

21  letter that we submitted in the middle of May of 2016 had a

22  bid value of 3.8, plus the 5.4 repayment.  This agreement

23  contemplated a bid value of approximately 4.1 billion.  And

24  in addition to that, we indicated -- we agreed, as part of

25  this agreement, to repay in full in cash the 5.4 billion

1    first lien DIP.

2    Q    And just a follow through on that.  Could I ask you to

3    look at Page 15 of Exhibit NX-1, and particularly at Section

4    1.7A?

5    A    Page 15 at the bottom.

6    Q    At the bottom, at the bottom of the page.

7    A    Okay.

8    Q    And does Section 1.7A reflect the increased price you

9    were just referencing?

10   A    It does.  Down toward the bottom of Section 1.7A, the

11   final sentence before you get to I: Merger settle cash

12   amount for approximately 4.1 billion.

13   Q    And on the preceding page, the Section 1.3 reference

14   your repayment of the DIP financing facility?

15   A    Yes, it does, Section 1.3.

16   Q    Okay.  Following your entry into the merger agreement

17   at the end of July, did you later enter into an amendment to

18   the agreement in September of 2016?

19   A    Yes, we did.

20   Q    And let me ask you to look at what's been marked as

21   Exhibit NX-002 in your binder.

22   A    Okay.

23   Q    Can you tell me what that document is?

24   A    This is amendment number one to the agreement in plan

25   and merger.

1    Q    And does that reflect -- did you reach an agreement

2    reflected in that amendment to further increase the price

3    that you were paying?

4    A    We did.  We increased the price from about 4.1 billion

5    to about 4.4 billion, as part of this amendment to this

6    merger agreement.

7    Q    And is that reflected in Section 2A of the merger -- of

8    the amendment?

9    A    Yes, it is.

10   Q    And how did that come about?  You had already reached

11   an agreement on the -- a merger agreement.  You'd reached an

12   agreement on price.  How did it come about that you'd

13   further increased the price at this juncture?

14   A    You know, I think, as I mentioned before, from the time

15   we submitted our bid on May 2nd, we had continual

16   negotiations with the company.  And the tone of those

17   negotiations with the company was always in interest in

18   having us provide more value to the estate.  So we went from

19   3.5 at the beginning of May to 3.8 in the middle of May,

20   signed a deal at 4.1 billion on July 29th.  Even after we

21   signed those agreements, the company continued to stress

22   importance for us to show additional value for the estate,

23   particularly leading up to the PSA and merger approval,

24   which was September 19 of 2016.

25   Q    And was one of the considerations that they raised with

1   you the need to gain creditor's support for the plan?

2   A    Yes, they did.

3   Q    And was that an aspect of the rationale for increasing

4   the price at this juncture?

5   A    Yes.   In addition to discussions that we had with the

6   company from July 29th to September 19th, we also had

7   discussions with Fidelity.   And, similar to the interests of

8   the company, Fidelity had an interest in us providing more

9   value, an interest in NextEra providing more value to the

10  estate.   And we thought it -- at the time, we thought it was

11  very important to get Fidelity on board and have them

12  support our transaction.   And so, the combination of the

13  discussion -- of discussions with EFH, as well as

14  discussions with Fidelity, were the primary reasons why we

15  increased our bid from 4.1 to 4.4 billion in the mid-

16  September timeframe.

17  Q    Mr. Hickson, I want to switch to a slightly -- to a

18  related topic, which is, you mentioned earlier that one of

19  the topics in the negotiations with the Debtors were -- it

20  was the asbestos liabilities.   Do you recall that?

21  A    Yes, I do.

22  Q    All right.   And there -- I want to ask you some

23  questions about the EFH subsidiaries that are sometimes

24  referred to as the LSGT debtors or the asbestos subs or

25  subsidiaries.   If I do that, will you understand that I'm

1    referring to EFH's subsidiary, LSGT Gas Company, LLC, and

2    the three subsidiaries of LSGT Gas -- LSGT SACROC, Inc., HBC

3    Holdings, Inc., and EECI, Inc.?

4    A    Yes, I do.

5    Q    Okay.  And you understand those to be entities as to

6    (indiscernible) an issue as to legacy asbestos liabilities?

7    A    Yes, I do.

8    Q    Is NextEra itself assuming the asbestos liabilities

9    associated with those entities under the merger agreement?

10   A    No, we're not.  We are acquiring EFH through a merger,

11   and EFH prior to and post-merger will continue to have

12   ownership of the four asbestos subs.

13   Q    Was it a foregone conclusion from NextEra's perspective

14   that the four asbestos subs would actually be included in

15   the transaction?

16   A    No, not at all.  And, in fact, when we submitted our

17   proposals in May of 2016, we had an express intent not to

18   acquire any entities, other than EFH, EFIH, and its

19   subsidiaries, Oncor and Oncor Holdings.

20   Q    Okay.  And let's just look at that.  Can you look back

21   at Exhibit NX-13, which I believe you identified as your

22   original May 2, 2016 letter.

23   A    Yes.

24   Q    And can you look for me at the last page of that

25   document, the very last page?

Page 24

1    A     Page 18?

2    Q     That's correct.

3    A     Yes, I'm there.

4    Q     And 18 in the middle of the page.  And can you read for

5    me Paragraph 17 and tell me what is meant by that?

6    A     Yes.  This is an attachment to the bid letter that we

7    submitted.  It was Exhibit A and the exhibit was titled,

8    obligations to be included in any plan of reorganization

9    that we were to enter into with the company, with the

10   Debtors.  And Item 17 says: "The only subsidiary of the

11   reorganized EFH will be reorganized EFIH.  All other

12   subsidiaries of EFH shall be disposed of, wound down, or

13   liquidated."

14   Q     Was that provision intended to exclude the asbestos

15   subsidiaries from the transaction?

16   A     Yes, it was.

17   Q     How did the Debtors react to that aspect of the

18   proposal?

19   A     Not positively at all.  The Debtors, from the time we

20   submitted our subsequent proposal in the mid-May timeframe

21   where we increased our price to about 3.8 billion.  From the

22   mid-May time to the end of June, we had a number of

23   discussions with the Debtors where we repeatedly indicated

24   our desire not to have the asbestos subsidiaries be a part

25   of our transaction.  And in response to that, the Debtor

1    continued to insist that the only real way forward was for

2    us to contemplate a transaction that did involve EFH

3    continuing to be the owner of the four asbestos

4    subsidiaries.

5    Q    Did the Debtors reference in an earlier settlement

6    agreement they had entered into that affected the asbestos

7    liabilities?

8    A    Yes, they did.  They mentioned the settlement agreement

9    that was entered into in December of 2015.  They talked

10   about the fact that that the -- some elements of that

11   settlement agreement involved the reinstatement of asbestos

12   liabilities.  And they indicated that our transaction

13   structure where we did not have the four subs be part of our

14   transaction was inconsistent with that settlement agreement

15   and would cause them to have to blow up parts of that

16   settlement agreement, which they were very much not willing

17   to do.

18   Q    Did NextEra then in the June/July timeframe consider

19   some other alternative approaches to dealing with the

20   asbestos subs?

21   A    Yes, we did.  You know, our starting position was, you

22   know, we didn't envision a transaction where post-closing

23   those four subs were -- continue to be subsidiaries of EFH.

24   And so once we reached the conclusion that our transaction

25   had to involve the four asbestos subs, we moved into looking

1    at the next best thing, at least in our mind, to not taking

2    the subs at all and that involved an asbestos trust.  And

3    I'm not an expert in asbestos trusts, but from our

4    standpoint, we thought that if we could set up some type of

5    trust whereby some assets were put into the trust to satisfy

6    asbestos claims, that was the next best thing, from our

7    perspective, to not taking the four subs at all as part of

8    our transaction.

9    Q    Was that because it would segregate the liabilities

10   from any NextEra entity going forward?

11   A    That was our understanding, yes.

12   Q    And did you have a view about how timely or how quickly

13   it could be done at that juncture?

14   A    Well, we spent, you know, a couple of weeks in the

15   late-June/early-July timeframe, and we very quickly

16   determined that doing the trust would be problematic from a

17   timing perspective.  There would be all -- it would require

18   actions on the part of the Debtor to, again, have to amend

19   parts of the settlement agreement, which would take some

20   time, and then setting up the trust and the process around

21   setting up the trust would also take some time.  And we just

22   could not get comfortable with the timing and the certainty

23   of timing.

24       And as I mentioned to you before, we had always had the

25   intention -- once we signed a definitive agreement with EFH,

1    we had the intention to protect certain aspects of our

2    financing.  And with the uncertainty around the timing of

3    the trust, we quickly determined that the trust -- pursuing

4    the trust would not allow us to be able to protect ourselves

5    from a financing standpoint with a level of certainty that

6    we were hoping for at the time that we started looking at

7    the trust.

8    Q    When you talk about protecting yourself, are you

9    referring to hedging the transactions?

10   A    Yes.  We do have, as a part of our financing for this

11   transaction, a portion of our financing is going to involve

12   financing with debt.  And we always had the intention of

13   putting in some form of interest rate hedging to protect

14   ourselves from a financing standpoint.

15   Q    During the period, I think you said a couple of weeks,

16   where you were looking at it, did you add the possibility of

17   an asbestos trust?  Did you have conversations with the

18   asbestos objectors and exchange term sheets with the

19   asbestos objectors and the Debtors about what such a

20   transaction might look like?

21   A    Yes, we did.

22   Q    But ultimately, didn't NextEra itself conclude that the

23   transaction is not liable in that form?

24   A    We did.  And primarily from a timing standpoint, we

25   just -- we couldn't see how it would make sense.  And so,

1    timing and uncertainty, we moved on past the asbestos trust.

2    Q    Did NextEra ultimately agree to inclusion of the

3    asbestos subsidiaries in the transaction and to the

4    reinstatement of timely submitted asbestos claims, rather

5    than their discharge in bankruptcy?

6    A    Yes, we did.

7    Q    And were there provisions in the merger agreement that

8    you entered into in July of 2016 that attempted to contain

9    some protections for NextEra in connection with those

10   liabilities?

11   A    Yeah.  We -- the way we structured our transaction on

12   July 29th is we set up an escrow agreement.  Once we

13   determined that the four asbestos subs were going to be a

14   part of our transaction and that a trust was not doable, we

15   immediately became focused on the ongoing earnings impact of

16   any continued asbestos liabilities over time.  And so, we

17   started to focus on this concept of setting up an escrow

18   agreement.  Which, it's our view that the escrow agreement

19   will allow us to avoid some of the ongoing earnings issues

20   from the standpoint of our earnings post-closing of the

21   transaction and not having the continued asbestos claims and

22   costs run through our income statement.

23   Q    Was an alternative that you considered simply reducing

24   the purchase price by an amount instead of putting funds in

25   escrow?

1    A    Yes, we did.

2    Q    And was there a benefit to NextEra of structuring it

3    instead as leaving the purchase price as is and placing

4    funds in escrow?

5    A    Yes.  As I mentioned, it's an accounting benefit to

6    setting aside funds in escrow and having those funds be

7    deemed to be part of the purchase price is more earnings

8    friendly to NextEra.

9    Q    But are those funds intended to, in fact, pay asbestos

10   claims related to those four entities, related to four

11   asbestos subs?

12   A    Yes, they are.

13   Q    And the escrow that you initially established in -- or

14   provided for in the merger agreement, what was the size of

15   that escrow that you proposed at that point?

16   A    $250 million.

17   Q    And can you explain how you got to that number?

18   A    Yes.  From the late-June timeframe to late-July, that

19   was really when we started to come to grips with the fact

20   that we were going to contemplate a transaction that

21   involved the four asbestos subs, so we really commenced due

22   diligence in earnest around the asbestos liabilities.  And

23   through work that was being done by Chadbourne, we also

24   hired -- we had some -- I think Chadbourne had hired someone

25   to take a look at the asbestos.  And through those

1    conversations, we arrived at what we considered to be a

2    preliminary number of 250 million, a relatively conservative

3    number of $250 million.

4    Q    Were you comfortable that you had completed diligence

5    on the items at that point?

6    A    We were reasonably comfortable that we had completed

7    diligence based on the information that we had.  But through

8    conversations with EFH, we felt like that there was a

9    possibility that they may have an expert or consultant that

10   had more of an ability to evaluate the asbestos claims than

11   we did.  But just given where we were in July and the fact

12   that we were full speed ahead on the entire transaction and

13   all the general due diligence that was going on, we really

14   didn't have time to kind of work one-on-one with EFH, so we

15   felt good about our number.  We felt like our $250 million

16   number of was a conservative number and that was the number

17   we initially used on July 29th.

18   Q    And in amendment number one to the merger agreement,

19   did you agree to alter the size of the escrow?

20   A    Yes, we did.

21   Q    And if you'll look at that in NX-2, did you agree to

22   reduce the number to $100 million?

23   A    Yes, we did.

24   Q    And can you explain how that came about?  How did you

25   decide that 100 million was an acceptable number?

1   A    Yes.  As I mentioned, we -- after we signed the

2   agreement on July 29th, we had further conversations with

3   EFH.  EFH felt like that they could show us how conservative

4   that our $250 million number was, and so we spent some time

5   with EFH and Aon.  And through that process and the report

6   that Aon produced, as well as some conversations that Aon

7   had with a few insurance brokers, all of those conversations

8   informed us and confirmed for us that our $250 million

9   amount was conservative.  And, as a result of that process,

10  leading up to September 19th, we, as part of our increasing

11  our purchase price and getting Fidelity on board -- as I

12  mentioned before, increasing our price from 4.1 to 4.4

13  million -- we made the decision to reduce the escrow from

14  250 million down to 100 million.

15  Q    Now, just to be clear.  Is the amount escrowed a cap on

16  the asbestos liabilities of the asbestos subs in your

17  understanding?

18  A    That my understanding is it is not, to the extent that

19  the claims have been timely filed.

20  Q    Okay.  And you understand that claims that were not

21  timely filed are not being reinstated, correct?

22  A    I do.

23  Q    And would it be fair to say, based on your testimony so

24  far, that NextEra was not enthused about acquiring the

25  asbestos subs with even the timely filed asbestos claims

1    being reinstated?

2    A    That is correct.  That is correct.

3    Q    And what would your view be about acquiring the

4    asbestos subs with all claims, timely filed or not,

5    reinstated?

6    A    That's not something that we ever contemplated or had

7    an interest in doing.

8    Q    Is it important to NextEra that those claims which are

9    not timely filed be discharged?

10   A    Yes, it is.

11   Q    And why is it important to you?

12   A    Well, from our standpoint, the report that Aon did and

13   the analysis that we did formed the basis for our escrow

14   amounts, and those amounts are based on -- only based on

15   timely filed asbestos claims.

16   Q    And were the other analyses that you've already --

17   you've engaged in also based on timely filed -- on claims

18   that were not timely filed being barred?

19   A    Yes.

20            MR. BALL:  I have no further questions.  I'll pass

21   the witness.  Oh, first let me -- forget the exhibits.  Your

22   Honor, at this time, we would move into evidence the

23   following NextEra exhibits.  And if it's all right, I will -

24   - there are a number of them in order, so I will list them,

25   the range.  First, Exhibits NX-1 through NX-3, and then NX-

1    13 through NX-51, then NX-53 through NX-55, NX-57, NX-58,

2    NX-60, and NX-61.

3              THE COURT:  Any objection?

4              MR. HOGAN:  No objection, Your Honor.

5              MR. BALL:  Thank you, Your Honor.

6              THE COURT:  They're admitted without objection.

7         [EXHIBITS NX-1 THROUGH NX-3, NX-13 THROUGH NX-51, NX-53

8    THROUGH NX-55, NX-57, NX-58, NX-60, NX-61 ADMITTED INTO

9    EVIDENCE]

10   CROSS-EXAMINATION BY DANIEL HOGAN:

11   Q    Good morning, Mr. Hickson.

12   A    Good morning.

13   Q    Daniel Hogan on behalf of the asbestos objectors.  You

14   have binders from us as well.  Your Honor, I believe I

15   provided you with one as well, as well as your staff and the

16   Debtors.  I ask you to get that in front of you, if you

17   would, Mr. Hickson.

18   A    Okay.

19   Q    Let me know when you're ready.

20   A    I am.

21   Q    Okay, thank you.  I want to start first talking about

22   the May bid area, just so you have an understanding where

23   the focus is.  NextEra made a bid to purchase EFH on May 2,

24   2016, as you've testified, and that's the day after the

25   Debtors filed a new plan.  If you would, take a look at

1     what's labeled in that binder as NX-13.

2     A    Okay.

3     Q    And you've earlier referenced the last paragraph of

4     this, which is Paragraph 17, which says that the only

5     subsidiaries that NextEra will take are those of EFH -- or

6     reorganized EFH and the reorganized EFIH, and that all other

7     subsidiaries will be disposed of, run down, or liquidated,

8     correct?

9     A    Yeah.  I, for some reason, my NX-13 only has one page.

10    Q    So what I'd ask you to do, if you would, go to the

11    other binder and look at the NX-13.

12              MR. HOGAN:  Your Honor, is yours the same way?

13              THE COURT:  Yes.

14              MR. HOGAN:  My apologies.  It is, however, in the

15    other binder.

16              THE COURT:  Okay.

17    A    Go back to the other one?  Okay.

18    Q    If you would then, so you agree with that language, and

19    that means that those asbestos debtors weren't going to

20    initially be acquired by NextEra, agreed?

21    A    Correct.

22    Q    If you would, flip back to the page before and,

23    specifically, Paragraph 9, which provides that the plan of

24    reorganization shall comply with the alternative

25    restructuring support obligations as set forth in 6A and 6B

1    of the settlement and support agreement dated as of November

2    23, 2015.  Do you see that paragraph?

3    A    I do.

4    Q    And isn't that the -- that agreement that you were

5    talking about in your direct testimony?

6    A    Yes.

7    Q    Isn't that a conflict of those two provisions?

8            MR. BALL:  Objection, calls for legal conclusions.

9            THE COURT:  Overruled.

10   A    You would have to point me to the -- you'd have to

11   remind me of Section 6A and 6B.

12   Q    If you would, and I don't have a copy of the binder,

13   Your Honor, but if you would look at Tab -- in my binder,

14   Tab 1 -- 7131.  Hopefully, that contains the entirety of

15   that Order; if not, I've got an issue.

16           THE COURT:  Looks like it does.

17   Q    Mr. Hickson, do you see that Tab 7131, BI-7131?

18   A    I do.

19   Q    And if you would, look at Section 6A of that, which is

20   on Page 9 of Exhibit 1, which is the actual agreement.

21   A    Let's see, using the page numbers at the top?

22   Q    17 of 41.

23   A    Okay.

24   Q    This is, in fact, the settlement and support agreement

25   that you were testifying to on direct, is it not?

1    A    Yes.

2    Q    Okay.  And 6A provides that subject to the entry of an

3    approval order, the Debtors and the consenting TCH first

4    lien creditors has agreed not to propose an alternative

5    restructuring for EFH.  Then goes on to say that in I, the

6    applicable legacy general unsecured claims are reinstated,

7    and that in the case of any applicable legacy general

8    unsecured claims that is also asserted whether a proof of

9    claim or otherwise as a proof of claim against TCH, such

10   claims may be treated, estimated, and discharged.  It then

11   goes on to say in II, that legacy intercompany claims are

12   reinstated.  Do you see that?

13   A    I do.

14   Q    And so, my question is, in looking at this now, is

15   there a conflict between Paragraph 9 and Paragraph 17 with

16   regard to the treatment of the asbestos debtors?

17   A    I'm not a legal person, but there potentially is.  But

18   we certainly called out specifically the Item 17 for a

19   reason, because we didn't have an interest in taking the

20   asbestos subs.

21   Q    Well, the construct of the deal, as it turned out to

22   be, is that there'd be a merger of reorganized EFH with the

23   NextEra merger sub; is that correct?

24   A    That is correct.

25   Q    And that the merger sub would then be responsible for

1    all the liabilities of reorganized EFH; is that correct?

2    A    The merger sub would be -- would inherit the

3    liabilities of reorganized EFH, yes.

4    Q    As well as the asbestos subsidiaries.

5    A    Well, it will have -- it will own -- it will have

6    ownership interest in the asbestos subs, but it's going to

7    inherit the liabilities of the reorganized EFH.

8    Q    And does that inheritance include liabilities based on

9    a veil piercing or a fraudulent conveyance theory, if you

10   know?

11            MR. BALL:  Objection, calls for a legal

12   conclusion.

13   A    I am not aware.

14            THE COURT:  Okay.  Usually, you wait until I rule

15   on the objection.

16            MR. HICKSON:  I'm sorry.

17            THE COURT:  It's all right.  I'm actually going to

18   sustain the objection and strike the answer.

19   Q    You would agree that the merger agreement was heavily

20   negotiated between yourself and you -- I mean, NextEra and

21   EFH, would you not, heavily negotiated agreement?

22   A    Yes, it was.

23   Q    And the May bid term sheet included provisions stating

24   that the reorganized plan, the reorganization plan would

25   comply with that EFH committee's settlement agreement; isn't

1    that ultimately the way it worked out?

2              MR. BALL:  Objection, vague.

3              THE COURT:  Overruled.

4    Q    I'll ask you, if the reorganization -- I'm sorry, the

5    May bid term sheet included a provision that the

6    reorganization plan would comply with that EFH committee's

7    settlement agreement.  I'm just asking if that's your

8    understanding.

9    A    Can you point me to it; can you remind --

10   Q    Sure.

11   A    -- what you're referring to?

12   Q    Well, again, in NX-13, it's Provision 9 of Exhibit A.

13   A    Okay.

14   Q    And then in the revised bid, which is NX-14, if you

15   again look at Exhibit A, it's in there as well.  Again,

16   under Paragraph 9, and that would be NX-14.

17   A    Yup, I see it.  And we also have -- we also continue to

18   have Paragraph 17 in the subsequent bid.

19   Q    Understood.  Let's turn, if we could, to the June due

20   diligence period.  Now, NextEra understood, I think that you

21   testified, that these asbestos liabilities were an issue and

22   that was something that NextEra had to take a hard look at

23   in the limited period of time that they had; isn't that a

24   fair statement?

25   A    Yes.

1    Q    And NextEra understood generally that asbestos-related

2    illnesses have long latency periods; is that a fair

3    statement?

4    A    I'm not an asbestos expert, so I...

5    Q    I'm just asking what your understanding is of what

6    NextEra understood the issues surrounding asbestos illnesses

7    were.

8    A    We have experts on our team that do asbestos, but I

9    can't answer that question.

10   Q    You testified that NextEra was concerned that there's a

11   possibility -- or strike that.  NextEra -- you testified

12   that NextEra indicated that when -- to not speak out of turn

13   -- that it was important that the agreement, the merger

14   agreement, that (indiscernible) asbestos claims for which a

15   proof of claim was not filed would be barred; did you not?

16   A    Yes.

17   Q    Okay.  And the reason that NextEra wanted that

18   condition contained in the merger agreement was what?

19   A    Well, it was -- it's consistent with our desire to not

20   have the four asbestos subs be a part of the transaction.

21   We went from there to the trust because that was the next

22   best thing, and we went from there to having a bar date.

23   Q    Would it be fair to say that NextEra would prefer that

24   the asbestos liabilities that it was inheriting from EFH

25   would be as low as possible?

1    A    We -- the only thing that I can say is that we made an

2    assessment.  We had some folks we hired who made an

3    assessment of the asbestos liabilities, given the

4    information that was provided to us and due diligence and

5    given the asbestos bar date.  And on that basis, we made an

6    estimate of the asbestos liabilities, and we used that

7    estimate to set the amount in escrow.

8    Q    And, in fact, you reduced the escrow from 250 to $100

9    million at some point after the initial execution of the

10   merger agreement; isn't that correct?

11   A    Yes, we did.

12   Q    Okay.  And would you agree that that's indicative of

13   the fact that NextEra got comfortable with the reduction and

14   set aside for asbestos liabilities?

15   A    Yes, I do.

16   Q    And would it be fair to say that NextEra wanted to have

17   as many asbestos claims as possible discharged?

18   A    Seems like a fair statement.

19   Q    Would it be fair to say that the lower the liability,

20   the higher the value of the asbestos debtors and their

21   parents, EFH, in post-confirmation NextEra; is that a fair

22   statement?

23   A    We -- that's not the way we looked at it.

24   Q    Let's break it down, if we could.  You've already

25   agreed that the lower the liability, the higher the value of

Page 41

1    the asbestos debtors.

2    A    I didn't say that.

3    Q    Okay.  Do you agree with that statement?

4    A    I do -- I do not.

5    Q    Okay.

6    A    We valued everything independently.

7    Q    Would you agree that the lower the asbestos

8    liabilities, the more NextEra would be willing to pay for

9    EFH?

10   A    No.

11   Q    So if the asbestos liabilities were a factor higher

12   than they -- you determined them to be, that wouldn't have

13   impacted the price that NextEra would agree to pay for EFH.

14   A    No.  We value EFH separately from the -- the asbestos

15   was a separate exercise.

16   Q    Separate exercise from what?

17   A    So we did the valuation of EFH, and then we had our

18   asbestos experts kind of give us a number that we used to

19   determine how much to set aside for escrow.

20   Q    Okay.  So let me just make sure I understand your

21   context.  What you're telling me is you looked at EFH and

22   you determined what the value you thought you would pay for

23   EFH -- you being NextEra, agreed?

24   A    Mm-hmm.

25   Q    And you independently looked at the asbestos debtors

1    and determined what the asbestos liability was likely to be

2    for that portion of -- or for the asbestos debtors, we'll

3    call them.

4    A    Yes.

5    Q    Okay.  And so you're telling me that the value of those

6    asbestos claims didn't inform you on the overall value that

7    you would pay for EFH.

8    A    No.

9    Q    Okay.  And explain why it is that that isn't the case.

10   A    So we, using the asbestos experts, we came up with a

11   forecast of costs associated with the asbestos claims.  And

12   our focus was really to remove those costs from our income

13   statement, from our financials, and that's why we set up the

14   -- we set up the escrow the way we did.  And so when we had

15   a number of 250 million, it was associated with a stream of

16   costs that would potentially run through our financials.

17   And we got a new estimate that was associated with a new set

18   of costs, and we reduced the amount consistent with that.

19   Q    And that was done through your due diligence process

20   that NextEra went through; is that correct?

21   A    Yes.

22   Q    Okay.  And you agree that NextEra was seeking some

23   certainty with regard to the amount of those liabilities

24   through that due diligence process.

25   A    I think certainty is a strong word.  We were looking

1    for an estimate that we were comfortable with that would

2    form the basis for the escrow amount.

3    Q    If you would, I'd ask you in my binder to turn to

4    what's Tab A, it's 96.

5    A    Okay.

6    Q    And midway down the -- well, not midway, but quarter

7    way down the page, there's a -- on June 16, 2016 at 12:47

8    PM, Charles Sieving wrote.  You see that?

9    A    I see a 12:37.  AX-096?

10   Q    AX-096, it's a quarter of the way down -- not even --

11   it's above the Christy Rivera section of the email.

12   A    Okay, I see it.

13   Q    You see it?

14   A    Mm-hmm.

15   Q    And he writes:  Meredith -- Stacy and Meredith working

16   on compiling the omnibus due diligence that you requested

17   yesterday.  But since we are really struggling with the

18   thought of taking uncapped asbestos liabilities for claims

19   and fact patterns that we have very little visibility into,

20   I had Christy send this request separately and would

21   appreciate it, as it is critical, if there is any chance to

22   take an uncapped liability like this in the fact of what

23   looks like thousands and thousands of claims.  We really

24   need some help on this.  Thank you, Charlie.  Do you see

25   that?

Page 44

1    A    Yes, I do.

2    Q    And is that demonstrative of the due diligence that

3    NextEra was undertaking in that regard?

4    A    I mean, we were trying to get our arms around the

5    liabilities.

6    Q    Okay.  And it's fair to say NextEra was also concerned

7    about the potential liability at EFH for asbestos

8    liabilities of its subs on a veil piercing or similar

9    theory; isn't that correct?

10   A    Well we were -- we were certainly concerned about all

11   potential asbestos liabilities, without getting specific

12   into any one of them.

13   Q    If you would, look at AX-93 then, please?

14   A    Okay.

15   Q    This is a June 13th, 2016 email from Christy Rivera to

16   Emily Greer, et al.  And I'd ask you to look at the one,

17   two, three, fourth bullet point.  It reads, "Please provide

18   information relating to the maintenance of corporate

19   formalities, separating this between EFH and the asbestos

20   subs, including lists of overlapping D&O's (and the times

21   served for each D&O at each entity), dividend activity,

22   copies of corporate minute books for the asbestos subs, list

23   of bank accounts maintained by the asbestos subs and related

24   bank accounts and county records of the subs."

25             Then there's a separate bullet point below that

1    that reads, "Please provide any analysis of insolvency of

2    the asbestos subs prepared by EFH" -- or I'm sorry, "after

3    EFH acquired the asbestos subs."

4            And then finally, the next bullet point reads,

5    "Please provide a list of affiliate transactions between the

6    asbestos subs on the one hand and EFH on the other hand."

7        Do you see that?

8    A    Yes, I do.

9    Q    And that's, again, consistent with the due diligence

10   that you were undertaking; is that correct?

11   A    Yes.

12           THE COURT:  I'm sorry, I didn't hear you.

13           MR. HICKSON:  Yes.  Sorry.

14           THE COURT:  Thank you.

15   Q    If you would, then turn to AX-94, please, which is a

16   June 14th email from Emily Greer to Christy Rivera.

17           MR. BALL:  I think it's Geier.

18           MR. HOGAN:  Geier.  My apologies.

19           THE COURT:  Which number, Mr. Hogan?

20           MR. HOGAN:  94.

21           THE COURT:  94?

22           MR. HOGAN:  AX-94, Your Honor.

23           THE COURT:  Thank you, Your Honor.

24   Q    And that first bullet point reads, in part, "Please

25   provide the ledger level information about what makes up the

1    intercompany claims that we've been talking about."  And

2    then a little further on, "Are these transfers based on

3    asset dispositions by the asbestos subs and money being

4    upstreamed?"  Do you see that question?

5    A    I'm sorry, I may not be in the -- AX-94?

6    Q    AX-94.

7    A    Um hmm.

8    Q    It reads, "All, please see additional responses below."

9    A    I see that.

10   Q    And then it's the first bullet point.  If you --

11   A    Yep.  Okay.  I see it.

12   Q    And I read that correctly?

13   A    Yes, I see that.

14   Q    And I read that correctly then?

15   A    Can you just read it one more time, because when you

16   read it I -- I hadn't found the page.

17   Q    Sure, no problem.  And let me know if I'm going too

18   fast.  I apologize.  In part it reads, "Please provide the

19   ledger level information about what makes up the

20   intercompany claims that we have been talking about."  And

21   then a little further on it says, "Are these transfers all

22   based on asset dispositions by the asbestos subs and money

23   being upstreamed?"

24   A    Yes, I see that.

25   Q    And what does that mean to you?  What is NextEra

1    looking at there?  What are they trying to get their arms

2    around, if anything?

3              MR. BALL:  I'm going to object, to the extent it

4    calls for the disclosure of attorney/client communications.

5              THE COURT:  All right, please don't disclose any

6    attorney/client communications in answering the question.

7              MR. HICKSON:  Okay.

8              THE COURT:  You can certainly answer yes, no, if -

9    - or more fully, if you can do so consistently with

10   preserving privilege.

11             MR. HICKSON:  Yeah, I think it was just our -- it

12   seems like this question was an attempt to get a sense for

13   the dispositions up to the Parent relative to the amount of

14   the intercompany claims.

15   Q    And did NextEra ultimately get comfortable with that

16   issue?

17   A    I think so.

18   Q    Did it do the due diligence necessary to understand

19   what assets were sold, what the proceeds of those asset

20   sales were and then the booking of those proceeds into the

21   asbestos debtors?

22   A    I don't know how much of that information that we --

23   that we had, that's why I kind of said I think so.  I think

24   there was a process where we asked these types of questions.

25   As to whether we were successful in obtaining all of the

1    information related to our requests, I don't know.

2    Q    Okay.  But at the end of the day, if this plan is

3    confirmed, NextEra's going to take merger sub and these

4    assets and these assets, whatever they are, are going to go

5    into the merger sub, are they not?

6    A    That is correct.

7    Q    And you're telling me that NextEra doesn't know exactly

8    what's going to be going into that merger sub for the four

9    asbestos vendors?  Is that what you're telling me?  Just so

10   I understand.

11   A    We don't -- we certainly don't know exactly.  We have -

12   - we have estimates based on reports, we have estimates of

13   liabilities, we have estimates of -- of intercompany claims,

14   but I wish -- I wish we knew exactly.

15   Q    And when do you expect that NextEra's going to find out

16   exactly what it's getting for that benefit of --

17   A    Probably --

18   Q    -- the bargain.

19   A    -- over time.  I think that --

20           THE COURT:  And I think you're talking past each

21   other.  Mr. Hogan, you're talking about assets, he's talking

22   about liabilities.

23           MR. HOGAN:  Well, I'm actually talking about both,

24   Your Honor.  So I'll clarify it, so --

25           THE COURT:  Well, what assets do the asbestos

1    debtors have other than intercompany claims?

2              MR. HOGAN:  They have intercompany claims, they

3    have those.  And they -- then they have asbestos

4    liabilities.  And I would --

5              THE COURT:  Um hmm.

6              MR. HOGAN:  -- I'm trying to find out if they

7    know, with specificity, exactly what the amount of the

8    intercompany claims are that are going into the merger sub.

9              MR. HICKSON:  We have, as I mentioned before, we

10   have -- we have conducted due diligence, we -- the

11   information that we obtained on the intercompany claims, we

12   haven't done a separate independent analysis, to my

13   knowledge.  And so we are using the information that was

14   provided to us by EFH for the intercompany claims, which are

15   the asset for the asbestos subs as well as the asbestos

16   liabilities.  And all of those are estimates, from our

17   standpoint.  And once we close the transaction over time

18   we're going to know whether those estimates prove to be

19   correct, as is the case for everything else that we're

20   buying in the context of this transaction.

21   Q    Okay.  And just so I understand, when you say the

22   estimates, we talked earlier about the estimation of what

23   the asbestos liabilities are.  But are you separately saying

24   that there's an estimation of the intercompany claims that

25   are the assets that are going into those and that NextEra

1    doesn't know what those are at this time, that just to have

2    an estimation; is that what you're saying?

3    A    Well, with the information that is -- was provided to

4    us by EFH, right, are intercompany claims amounts, and we

5    have -- we have no basis -- we have no better information

6    for those intercompany claims amounts, but they are

7    estimates of the claims, in my opinion -- the intercompany

8    claims.

9    Q    Okay.  And so you're saying that it's only over time,

10   after the closing, that NextEra's going to have a more

11   complete picture of what the value of those intercompany

12   claims are?

13   A    Correct.

14   Q    And what is it, over time, that will inform you as to

15   what the value of those assets are?

16   A    You know, I don't know.

17   Q    If you would, please turn to AX-99 in your binder.

18   A    Okay.

19   Q    This is a June 16th, 2016 email.  Are you there?

20   A    Yes, I'm there.

21   Q    Okay.  And it's from Christy Rivera to Emily Geier?

22   A    It's really tiny writing, so.

23   Q    Yeah, I could pass you my glasses, because I need them

24   as well.  But, I'll read it to you and then your counsel can

25   --

1    A    Are you at the top of the page?

2    Q    Yes, sir.  Now, halfway through the first sentence --

3    well, it says, "Thank you for this information -- thanks for

4    this information.  We have the following follow-up

5    questions."  And then this is the part I'm really interested

6    in.  "We have a lot of open questions on issues relating to

7    the potential asbestos exposure and the intercompany

8    relation between EFH and the asbestos subs.  And we

9    appreciate you providing this information as soon as

10   possible."  Do you see that?

11   A    Yes, I do.

12   Q    And then down below, at Question 4, it reads, "K&E,"

13   which I take to be Kirkland & Ellis, "needs to please start

14   reviewing the proofs of claims filed directly against EFH

15   Corp, as soon as possible.  How many are duplicates, what

16   theories of liability are asserted in the proof of claim,

17   were related proofs of claims filed directly against the

18   asbestos subs?"  Do you see that quote?  Did I read that

19   correctly?

20   A    Yes, I do.

21   Q    Okay.  And if you would go to 97 now, if you would, to

22   AX-97.

23   A    Okay.

24   Q    And this is a June 16th email from William -- or from

25   Patrick William to various individuals.

1   A    Yes.

2   Q    And if you would, look at what is labeled, at the

3   bottom, 193.  It's bolded, I guess.  Do you see that, where

4   it says "operations and regulatory?"

5   A    I do.

6   Q    And it says, "Please provide information relating to

7   the maintenance of corporate formalities, separating this

8   between the asbestos subs, including list of D&O."  And then

9   (indiscernible), "and the times served for each D&O at

10  entity, dividend activity, copies of corporate minute books

11  and asbestos subs, list of bank accounts maintained by the

12  asbestos subs and related bank accounts and accounting

13  records of the subs."  Do you see that?

14  A    I do.  Barely.  I'm --

15  Q    Yeah, same here.

16  A    Yeah.

17  Q    And then I would ask you to look at AX-102.  Let me

18  know when you're there.

19  A    I'm there.

20  Q    Okay.  Again, an email from Christy Rivera to a number

21  of people, including Emily Geier.  And if you would, look at

22  Paragraph Number 2.  "Please provide any communications from

23  any of the asbestos claimants, or their representatives,

24  regarding their views on the size of intercompany claims

25  held by the asbestos subs (against EFH Corp and each other).

1     Please also provide any communications from any asbestos

2     claimants discussing the basis for any alter ego or direct

3     liability claims against EFH Corp."  Do you see that?

4     A     Yes, I do.

5     Q     Do you know if that information was provided?

6     A     I do not.  We -- you know, we probably had not so great

7     of a hit rate on answers to question around asbestos,

8     probably during the entire three to four-month period, so we

9     had a lot of good questions but I'm not sure that we got a

10    lot of -- always got a lot of good answers.  It's not that

11    we felt that EFH was being evasive, it's just some of the

12    information didn't exist.

13    Q     If I could, let's turn to the issue of the discussions

14    of this 524(g) exploration that I think you testified to

15    about in your direct.  I believe you testified that in early

16    July -- well, actually I think you testified that in mid-

17    June you started discussing the concept, potentially, of a

18    524(g).

19    A     It was probably more late June, but yes.

20    Q     Late June?

21    A     Um hmm.

22    Q     And then in early July you and others at NextEra had

23    discussions with Steve Kazan, an asbestos attorney, who

24    represents some of the asbestos claimants about a possible

25    524(g); is that correct?

1    A    That is correct.

2    Q    If you would, look at AX-104.

3    A    I'm there.

4    Q    Okay.

5              MR. BALL:  And Your Honor, on this exhibit we had

6    a 408 objection, which we're withdrawing on the

7    understanding and agreement that disclosure is not a waiver

8    as to any other 408 objections we may have.

9              THE COURT:  All right.

10              MR. BALL:  Just for the record, which I understand

11    Mr. Hogan is amenable to.

12              MR. HOGAN:  That's correct, Your Honor.  May I

13    proceed?

14              THE COURT:  Yes, of course.

15              MR. HOGAN:  Thank you.

16    Q    Mr. Hickson, if you would, you see that email.  You're

17    actually copied on the email; isn't that correct?

18    A    Yes, I am.

19    Q    And do you remember receiving this email?  Is that a

20    yes?

21    A    I don't recall, but I'm copied, so I have no reason to

22    dispute the fact that I received this email.

23    Q    Okay.  Now NextEra understood -- and tell me if I'm

24    wrong on this, but is it fair to say that NextEra understood

25    that with a 524(g) the amount the asbestos debtors and EFH

1   would pay for the asbestos liabilities would in fact be

2   certain?

3   A    We did feel like it would provide certainty relative to

4   the situation that we're in here.  As to whether it was

5   absolute certainty, you know, I think of -- more of relative

6   certainty.  And relative to the situation we're in now,

7   where timely filed asbestos claims get reinstated in full

8   and we have to satisfy those claims over time through the

9   escrow agreement, this certainly appeared to be a more

10  certain alternative for us.

11  Q    Meaning the construct that is currently in place, the

12  merger agreement and the escrow --

13  A    That is correct.

14  Q    Right.  And it gave NextEra more certainty, in part,

15  because it dispensed with all those claims that had not been

16  timely filed; is that correct?

17  A    Yeah.  It gave us a mechanism to put assets in a trust

18  and have the asbestos claims look to the trust for

19  satisfaction, so that part of it gave us relative certain,

20  relative to the situation we're in now.

21  Q    Let me be a gentleman for a minute and just make sure -

22  - help you clean up your testimony there, because I think

23  you said something about a trust.  There is no trust, right?

24  It's an escrow agreement and the trust -- NextEra decided

25  not to go down that right, isn't that a fair statement of --

1    A     That is correct.

2    Q     -- what happened?  Okay.  So in fact the escrow

3    agreement is not, in fact, a trust agreement; isn't that

4    correct?

5    A     That is correct.

6    Q     Okay.  Just so we're clear on that.  If you would, in

7    looking at this email you see that there was some discussion

8    about the mechanics of the potential 524(g) trust, that

9    ultimately wasn't agreed to; is that correct?

10   A     Yes, I do.

11   Q     And is it also true -- do you remember reviewing this

12   term sheet in any capacity?

13   A     I probably saw -- yeah, I probably reviewed this.  It's

14   -- I haven't seen it probably in six or seven months, but

15   yes.

16   Q     And you understand that this included provisions for

17   the appointment of a future claims representative, a claims

18   estimation process and the funding of a 524(g) trust; is

19   that correct?

20   A     Yes.

21   Q     If you would, turn to Tab 105.

22           MR. BALL:  And Your Honor, with respect to this

23   exhibit, we had a similar agreement when it was used

24   yesterday about the use of Exhibit 105 not being a waiver as

25   to any other 408 objections.

1           MR. HOGAN:  That's correct, Your Honor.

2           THE COURT:  Okay.  That's fine.  I'm boggled how

3     you think 408 covers these communications, but --

4           MR. HOGAN:  I tend to agree, Your Honor, but in

5     any event.

6     Q    Do you recognize this email, AX-105, Mr. Hickson?

7     A    I don't know that I recognize the email.  I don't think

8     I'm copied on it, am I?

9     Q    I don't believe you were copied on it.  No, sir.  But I

10    just wanted to see if you were aware of the fact that the --

11    really it goes to show how it was that EFH came to be

12    informed about the 524(g) prospect.  Do you understand that

13    to be the case?

14    A    Reading this email, it appears to be the case.

15    Q    Do you know if NextEra, independent of this, sent a

16    term sheet to EFH, this term sheet?

17    A    I don't recall.

18    Q    Would it be fair to say that NextEra understood that if

19    a 524(g) plan were adopted that all asbestos claims would be

20    channeled to a trust?

21    A    That was my understanding, yes.

22    Q    And that that included unmanifested claims that would

23    otherwise be discharged, because they didn't file the proof

24    of claim?

25    A    I'm not sure, I think so, but I'm not sure.

1    Q    Would it be fair to say that NextEra agreed to propose

2    this plan to EFH?

3    A    It's certainly something that we explore for a time.

4    And I think if we got to a point, if NextEra had gotten to a

5    point where we got comfortable with proceeding down the path

6    of the trust in a way that didn't cause us timing concerns,

7    I could see how we might have wanted to propose that to the

8    Debtor.

9    Q    Now, do you know -- can you tell me, from your

10   knowledge, if you know what EFH said in response to this

11   proposal?

12   A    I think from EFH's perspective, they -- because they've

13   been -- more familiar with the trust and the issues around

14   it.  They more quickly concluded, than we did, the issues

15   around moving away from the settlement agreement that they

16   had a pursuing something like the trust.  And so we looked

17   at it a little bit independently of EFH, for a couple of

18   weeks' time, and we reached a similar conclusion.

19   Q    Now, did you discuss this possibility of a 524(g) plan

20   with anybody at EFH?

21   A    Myself personally?

22   Q    Yes, sir.

23   A    I don't think so.

24   Q    And were you aware of any discussions or were you

25   present at any discussions between NextEra and EFH regarding

1    the proposal to use a 524(g) plan?

2    A    I don't -- I don't think so.  I think the only

3    conversations I recall being involved in were conversations

4    with Quasim.

5    Q    Did you speak with Mr. Kazan?

6    A    I think I was on maybe a conference call or two in the

7    summer of last year with him.

8    Q    So did anyone at EFH express the view to you that a

9    524(g) would cost more than the merger plan that was in

10   place?

11   A    No.

12   Q    And did anyone at EFH discuss with you the untimeliness

13   of going about this structure, as opposed to the merger

14   agreement?

15   A    I think in the June/July timeframe we had some

16   discussions as to how pursuing the trust would impact the

17   overall timing.  I think we had some -- I don't know that I

18   had those conversations, but I could someone -- some folks

19   at Chadbourne on our legal team having conversations with

20   Kirkland, maybe Christy, maybe someone else at Chadbourne

21   having discussions to confirm our understanding of the

22   issues surrounding the timing of pursuing a trust.

23   Q    But you weren't privy to those conversations?

24   A    I don't think so.

25   Q    And you may have covered this, but just so the record's

1    clear, what was the final rationale for why NextEra decided

2    not to pursue the 524(g) claim; if you know?

3    A    So primarily around the uncertainty of timing of having

4    to move away from a settlement agreement and moving towards

5    setting up the trust and all that -- all that setting up a

6    trust entails.  So we viewed there to be a fair amount of

7    uncertainty associated with opting out of portions or having

8    EFH opt out of portions of the settlement agreement.  And I

9    think that was kind of the gating item of actually moving

10   forward and pursuing the trust after that.

11            And so we just didn't get -- we couldn't get a

12   feel, on our side, for what that time line looked like,

13   relative to sticking with the settlement agreement and going

14   with reinstatement of timely filed asbestos claims.

15   Q    Now, did anyone at EFH tell you that the 524(g) plan

16   was not a path that they wanted to pursue?

17   A    No, I didn't -- I didn't have any conversations with

18   anyone at EFH directly about that.  I just -- again, they --

19   the conversations I had with EFH were around the fact that

20   they had the settlement agreement and they had an interest

21   in continuing to have that settlement agreement in place in

22   full.

23   Q    And so when we -- when I juxtapose the merger agreement

24   versus this potential 524(g) plan, I just want to

25   understand, you can disagree with me or agree with me, I

1    just want to understand your position.  Are you telling me

2    that with the merger agreement that's in place, will the

3    aggregate asbestos liabilities be higher or lower than they

4    would be with a 524(g)?

5    A    I don't know the answer to that.

6    Q    If we could, let's just quickly turn to the July due

7    diligence period, and ask you to look at Tab, in my binder,

8    DX-243.

9    A    Okay.

10   Q    And let me know when you're there.

11   A    I'm there.

12   Q    Okay.  That's a July 8th email from Charlie Sieving to

13   Stacey Dore, which I believe you're cc'd on?

14   A    Yes, I am.

15   Q    And this is in the later stages, fair enough -- fair

16   statement, of the due diligence that NE was undertaking?

17   A    I'd say it's probably somewhere in the beginning to the

18   middle, if you -- if you think about the fact that we had

19   taken the position, until pretty much the end of June, that

20   we were envisioning a transaction that didn't involve the

21   four asbestos subs, so -- and this is dated July 8th, so

22   this is probably in the -- in the early innings, on a

23   relative basis, relative to just asbestos.

24   Q    Well, yeah, that's what I'm focused on, obviously, is

25   just the absolutely.

1    A    Yeah.

2    Q    If you were to just, you know, characterize for me just

3    what the range -- just so I have an understanding about the

4    range of due diligence was, if I said that it appeared, from

5    our perspective, that the due diligence started in the

6    asbestos issues sometime in mid-June of 2016, and likely

7    concluded, when?

8    A    Well, I think it concluded probably August, September.

9    Q    In fact after the merger agreement was signed?

10   A    Correct.

11   Q    Okay.  So back to 243, DX-243, if you would.  The third

12   bullet point reads, "If you have any update on the

13   absolutely work and timing (I think what you will find is

14   there will be a ginormous ranges in the claims estimation

15   amount with very little certainty around what the top end

16   is)."  Do you see that?

17   A    I do.

18   Q    Do you know what that means?

19             MR. BALL:  Object to the extent it calls for

20   disclosure of any attorney/client communications.

21             MR. HICKSON:  I'm not seeking any.

22             MR. BALL:  Mr. Sieving is --

23             THE COURT:  Wait a minute.  Wait.  It's an email

24   from you to them, there's no attorney/client privilege.

25             MR. BALL:  It's from Mr. -- Mr. Sieving is the

1    general counsel, and I just want the --

2              THE COURT:  Yeah, but --

3              MR. BALL:  -- issue is it as to whether he's under

4    --

5              THE COURT:  But he's -- no, wait, no.  He's

6    sending it to the EFH people, there's no attorney/client

7    privilege.

8              MR. BALL:  If Mr. Sieving -- I just don't want him

9    disclosing any conversation he had with Mr. Sieving about

10   what Mr. Sieving meant, that's my objection.

11             THE COURT:  All right.  Do you remember the

12   question?  I don't.

13             MR. HOGAN:  Neither do I, honestly, at this point.

14   I'll look again, Your Honor.  Hold on.

15   Q    Do you understanding what was meant by that statement?

16   A    You're referring to the third bullet and you've read

17   the third bullet, and you were asking me to interpret what

18   he meant by the third bullet.

19   Q    That's correct.  You were cc'ed on that email.  So

20   specifically, "You will find that's a wide -- there will be

21   a ginormous range in the claims estimation amount with very

22   little certainty on what the top end is."

23   A    Yeah, I think it's -- I think Charlie was just

24   referring to the fact that a number of claims had been filed

25   and the claim amount alleged was -- it was all over the

1    place, depending on the filing.  And if you took each

2    claimed amount at the -- associated with the filing, you can

3    get to some really large numbers.

4    Q    But that didn't include the unmanifested absolutely

5    claims for which an asbestos proof of claim had not been

6    filed?  Is that a fair statement?

7    A    That is my understanding.

8    Q    Okay.  Turn, if you would, to DX-385, which is the next

9    tab.  This is, again, another email dated July 11th, 2016

10   from Charles Sieving to Andy Wright.  And there's a series

11   of questions regarding asbestos.  Do you see that?

12   A    Yes, I do.

13   Q    And again, if you would, look at the first bullet

14   point.  "What work analysis have you done on the

15   approximately 30,000 proof of claims filed in these

16   bankruptcy cases to derive your value establish?"

17   A    Yes, I see that.

18   Q    And the next bullet point, "Have you retained experts

19   to assist you in this analysis (for manifested or

20   unmanifested)?  Can they share any of their findings?"

21   A    Yes --

22   Q    Do you understand that?

23   A    -- I see that.

24   Q    Okay.  And this is all pursuant to the arm's length

25   transaction that you were negotiating with them at that

1    point; is that correct?

2    A    That is correct.

3    Q    If you would, turn to the next tab, which is AX-101.

4    And this is July 18th email from Christy Rivera to Emily

5    Geier, again regarding due diligence issues in the bar date

6    notice.  Do you see that email?

7    A    I do.

8    Q    And if you would, that has an attachment to it, on the

9    next page of that exhibit, which reads, "Corporate documents

10   and information for asbestos due diligence."  Do you see

11   that page, sir?

12   A    Yes, I do.

13   Q    Okay.  And do you see Lines Number 3 and 4 and I guess

14   at this point NextEra's looking for asbestos claim lawyer

15   communications regarding the basis of any alter ego claims

16   against EFH?

17   A    Yes, I see that in 3.

18   Q    Right.  And then lists of suits -- and 4, lists of

19   suits against EFH alleging alter ego liability and copies of

20   related pleadings, including complaints, motion to dismiss

21   briefing, summary judgment briefing and order -- and any

22   order/judgments.  Do you see that?

23   A    Yes, I do.

24   Q    Do you understand what NextEra's looking for here?

25   Would you understand what it is that is driving that --

1    those due diligence questions?

2           MR. BALL:  Object to the extent it calls for

3    disclosure of any attorney/client communications.

4           THE COURT:  You can answer.

5           MR. HICKSON:  Yeah, I think -- I think -- and

6    these questions are focused on the potential that EFH could

7    be deemed to be the alter ego of the four asbestos

8    substance.

9    Q    Did NextEra ever fully get its arms around that issue,

10   to your knowledge?

11   A    You know, I think we made some progress on it.  I'm not

12   -- I'm not sure that we're a hundred percent there, but I

13   think we made a fair -- a fair amount of progress on it.

14   Q    And is it fair to say, given what you told me about

15   what NextEra understands the assets that will be going into

16   the merger sub and the liabilities that go with them, the

17   liability sub, whether in fact those alter ego claims are

18   something to be concerned about, post-effective merger?

19          MR. BALL:  Object to the extent it calls for a

20   legal conclusion.

21          THE COURT:  Overruled.

22          MR. HICKSON:  I don't know the answer to that.

23   Q    Okay.  If you would, turn to DX-529, please?  This is

24   another email, July 22nd, 2016.  Let me know when you're

25   there.  Are you there?

1    A    I am.

2    Q    Thanks.  And I see that on the second line of the two,

3    I see that you're actually -- this email was directed to

4    you.  Do you see your name there?

5    A    I do.

6    Q    Okay.

7    A    I do.

8    Q    Good.  Thank you.  And then Paragraph 6, and Roman

9    Numeral -- well it's -- there's then a subset F wherein

10   NextEra is looking for more detailed definitions of asbestos

11   liability under the Raytheon claims.  And then Roman Number

12   I believe VI, where NextEra noted the treatment of claims

13   interest related to asbestos including reinstatement of

14   asbestos sub interests subject to further negotiations and

15   diligence.

16            Is that that same issue that we were just talking

17   about, that I was talking about in terms of NextEra trying

18   to understand what it was getting in the merger subs and

19   that there would be still ongoing negotiations and due

20   diligence relative to those assets and liabilities that were

21   going into those subs?

22   A    It seems like this is just indicating that we have

23   further negotiation and due diligence related to the

24   treatment of claims and interests related to asbestos.

25   Q    Including reinstatement of the asbestos subs interest;

1    is that a fair statement?

2    A    Yes.

3    Q    So would it be fair to say that the scope of liability

4    for these asbestos liabilities affected the amount that you

5    were willing to keep in escrow?

6    A    I'm sorry, say that one more time.

7    Q    The scope of liability that you determined, through

8    your due diligence, affected and almost dictated, to some

9    extent, the amount of money that you would -- that NextEra

10   would hold in that escrow?

11   A    The amount of money that we determined to put in escrow

12   was based on primarily on the Aon report that was given to

13   us in the -- in the August timeframe.  And it took -- that

14   Aon report took into account timely filed asbestos claims.

15   Q    And so I think we're in agreement that the Aon report,

16   from NextEra's perspective, quantified, to some extent, the

17   scope of liability; would you agree?

18   A    It quantified the scope of potential asbestos

19   liabilities and claims related to timely filed claims prior

20   to the bar date.

21   Q    But it didn't include claims that hadn't been filed by

22   the timely bar date; is that your understanding?

23   A    Yes.

24          THE COURT:  All right. I'm going to interrupt

25   right here.  Can we please take a five minute recess?  I

1    expect you're close to the end, but --

2              MR. HOGAN:  I am, but that's fine, Your Honor.

3    Absolutely.

4              THE COURT:  Yeah.  Yeah, just a --

5              MR. HOGAN:  Your courtroom.

6              THE COURT:  -- short recess.

7              MR. HOGAN:  Thank you.

8         (Recess)

9              CLERK:  All rise.

10             THE COURT:  Please be seated.  Thank you for your

11   patience.

12             MR. HOGAN:  Thank you, Your Honor.  May I proceed?

13             THE COURT:  Yes.

14   Q    Mr. Hickson, thank you for your time.

15             MR. HOGAN:  Your Honor, I actually don't have any

16   more questions.  I would, however, look to move in certain

17   items from my cross into the record.  Those would be as

18   follows, AX-93, AX-94, AX-95, AX-96, AX-97, AX-98, AX-99,

19   AX-100, AX-101, AX-102, AX-104, and then to the extent that

20   they're not already in the record, Your Honor, the other

21   parties exhibits, DX-243, DX-385, DX-529, NX-013, NX-014, I

22   believe those are both in, and NX-51.

23             And then finally, Your Honor, I'd just ask the

24   Court to take judicial notice of Docket 7131, which is that

25   settlement agreement that I utilized in my cross

Page 70

```
1    examination.
2              THE COURT:  Okay.  Any objection?
3              MR. BALL:  No objection, Your Honor, except to
4    note the proviso we discussed earlier with respect to NEX-
5    104.
6         (Asbestos Claimant's Exhibits AX-93 through AX-102, AX-
7    104 admitted into evidence)
8         (Debtor's Exhibits DX-243, DX-385, DX-529 admitted into
9    evidence)
10        (NextEra Energy's Exhibits NX-013, NX-014, NX-51
11   admitted into evidence)
12             THE COURT:  Okay.
13             MR. MCKANE:  No objection from the Debtors.
14             THE COURT:  All right.  They're admitted and the
15   Court takes judicial notice of the settlement agreement.
16             MR. HOGAN:  Thank you, Your Honor.  And I provided
17   your staff with a copy of that as well.
18             THE COURT:  Thank you very much.
19             MR. BALL:  I have just a couple of redirect, Your
20   Honor.
21             THE COURT:  Okay.
22             MR. BALL:  Could I have the demonstrative?
23                     REDIRECT EXAMINATION
24   BY MR. BALL:
25   Q    Mr. Hickson, on the screen is a demonstrative used with
```

1    Mr. Horton and I believe Mr. Keglevic, which depicts

2    intercompany claims by the asbestos debtors against each

3    other and against EFH.  Have you seen this before?

4    A    Yes, I have.

5    Q    And are you aware, from your interactions with the

6    Debtors that their position is, and if the -- what they told

7    you is that there's a $560 million intercompany claim by

8    LSGT Gas Company against EFH Corp?

9    A    Yes, I am -- I am aware.

10   Q    And are you aware also that there -- that that amount

11   is subject to interest since the filing -- the date of the

12   filing of the petition in this case?

13   A    I know there's been a discussion about that, yes.

14   Q    All right.  And do you have any information suggesting

15   that the $560 million number is not correct?

16   A    I do not.

17   Q    Okay.  Thank you, Mr. Hickson.

18          MR. HOGAN:  Just briefly, Your Honor, on this

19   issue only?

20          THE COURT:  Okay.

21                  RECROSS EXAMINATION

22   BY MR. HOGAN:

23   Q    So you understand that there's this $560 million claim,

24   correct?  And you understand that there's interest

25   attributable to that claim; is that correct?

1   A    There's been discussion about the interest, yes.

2   Q    And were you party to those discussions?

3   A    I don't think so.

4   Q    Then how is it that you know that there were

5   discussions?

6   A    Because my counsel told me that there were discussions.

7   Q    And did your counsel tell you what the result of those

8   discussions were on the treatment of that $560 million

9   claim?

10           MR. BALL:  Objection --

11           MR. HICKSON:  On the --

12           MR. BALL:  -- in that it calls for --

13           MR. HICKSON:  -- on the interest?  I'm sorry.

14           MR. BALL:  Objection to the extent it calls for

15   disclosure of attorney/client communications.

16           THE COURT:  He's asking him what the result of the

17   negotiations you had with third parties --

18           MR. BALL:  That --

19           THE COURT:  -- that's not privileged.  Overruled.

20           MR. HICKSON:  I do not know.

21   Q    And you don't, in fact, know what the result of those

22   interest calculations are, do you?

23   A    I do not.

24   Q    And so is it -- it's your testimony then that NextEra

25   doesn't really know what's going into that merger sub

1    relative to that $560 million claim?

2    A    Well, we think it's 560; that's what we've booked, but

3    that's the part where I say it's a little bit uncertain.

4    It's an estimate.

5    Q    It's an estimate, or the Debtors have it on their books

6    as $560, as of the --

7    A    They have it on --

8    Q    -- petition date?

9    A    -- their books and we've been using -- we're using that

10   as an estimate.

11   Q    With an understanding that there's been an additional

12   accrual of interest that will manifest on the effective

13   date?

14   A    We're basically booking the 560.

15   Q    And what happens to the interest then?

16   A    I don't know.

17   Q    Does NextEra know what happens to that interest?

18   A    Well, we're hoping that it's -- it ends up being 560 at

19   the close.

20            THE COURT:  All right.  So turns out asbestos

21   liabilities exceed a hundred million dollars and they're

22   being asserted against the asbestos debtors, so the asbestos

23   debtors say a hundred million is gone, I need 50 more

24   million to pay these liabilities.  EFH pay up because I have

25   a $500 million intercompany claim.  What I'm hearing you say

1    is you may or may not pay that?

2              MR. HICKSON:  No, that's not what I'm saying.

3              THE COURT:  All right.

4              MR. HICKSON:  Sorry, Your Honor.  So let me be

5    clear.  I'm saying that there's a question as to whether the

6    560 is more than 560, but if the claim ends up being 150

7    instead of 100, we would pay the 50.

8    Q    And what happens if the claim beings end up -- ends up,

9    the claims against that asset, end up being more than 560,

10   what happens there?

11   A    Well, we -- if it is -- if it is determined that the

12   intercompany claim is higher than what we think it is, I

13   would -- I would assume that we would have -- we would be

14   required to pay the additional amounts, but I'm not sure.

15   Q    And when is it -- when is this time period -- or is

16   there a day certain when NextEra will all of a sudden become

17   informed about what the amount of that asset is?

18   A    Well, we're hoping to do it in and around the closing

19   of the transaction.

20   Q    And is there still some component of negotiation that's

21   got to go -- that has to be completed relative to that

22   interest treatment?

23   A    Component -- what do you mean by a component --

24   Q    I'm asking --

25   A    -- of negotiation?

1   Q    -- if the negotiations with regard to determining how

2   much money goes into that pot, if those negotiations are

3   completed.

4   A    I'm not aware of whether they are or they aren't.  Like

5   I said, I think we've been focused on -- our estimate is

6   that the number is 560.

7   Q    So if it's $100 million --

8   A    Um hmm.

9   Q    -- and the escrow is set aside for $100 million and

10  NextEra sees it at 560, let's just use your hypothetical for

11  purposes of this conversation --

12  A    Um hmm.

13  Q    -- $100 million gets used to pay the asbestos claims.

14  Under your construct, there's $460 million that's still

15  available, correct?

16  A    Correct.

17  Q    Where does that go?

18  A    Where does what?

19  Q    Where does -- what happens to the 460?

20  A    You mean to the extent someone has -- we've used a

21  hundred and there's additional 50 --

22  Q    You've -- no, under this hypothetical, you've used the

23  hundred, you've satisfied all of the claims that are

24  possibly assertable against the merger sub, what happens to

25  the balance of the 460, under the construct that we've just

1    discussed?

2    A    I think it just remains being an intercompany claim.

3    Q    And for whose benefit does that sit there?  Does it sit

4    there for EFH?

5    A    It sits -- who --

6    Q    Well --

7    A    Well you say whose benefit --

8    Q    -- my question is probably inartful.  What I'm getting

9    at is there's 460 left after the spending of a hundred

10   million dollars for the asbestos claims, correct?

11   A    Correct.

12   Q    And that money is an asset; would you not agree?

13   A    For the asbestos sub.

14   Q    For the asbestos sub?

15   A    Um hmm.

16   Q    And that money just stays on the books at that point;

17   is that correct?

18   A    Yes.

19   Q    And at some point -- now that money's already been --

20   it's already been moved out; isn't that correct?  It's in --

21   just an intercompany claim at this point, so it's not as if

22   there's $460 million sitting in a bank account, or 450

23   sitting in a bank account, is there?

24   A    It's an intercompany claim.

25   Q    Right.  And so if there's not actually an accessible

1    pocket of money to reach in to to get that; is that a fair

2    statement?

3    A    It's just an intercompany claim.

4    Q    Right.  And so to the extent that it -- that the

5    asbestos claims exceed a hundred million dollars, then

6    there's going to have to be some transfer of additional

7    funds to satisfy claims in excess of a hundred million

8    dollars, because that's the agreement; isn't that correct?

9    A    That is correct.

10   Q    And where would those proceeds come from?

11   A    It could come from a variety of places.  We could --

12   NextEra could choose to put more money in escrow, NextEra

13   could provide funds to EFH, EF -- I'm sorry, merger sub

14   which is EFH post-closing of the transaction.  Merger sub

15   could get its own funds in some form or fashion.  So it's a

16   variety of places that the money could come from.

17   Q    Okay.  And then finally, just to back to the point

18   relative to the interest, that whole construct that we just

19   discussed assumes that it's 560 and no more.

20   A    Um hmm.

21   Q    And your testimony is, is that it hasn't yet been

22   determined, as between EFH and NextEra, about what will

23   happen to the interest component and whether that will be

24   booked as an intercompany claim as well; is that a fair

25   statement?

1    A    Well, I think our assumption is that it's 560.

2    Q    I understand that.

3    A    That the total amount --

4    Q    But the --

5    A    -- is 560, so there's effectively no interest.

6    Q    Oh, I see.

7    A    Yeah.

8    Q    Okay.  So just so I'm clear on that, the Debtors have

9    negotiated, with NextEra, that 560 will be put into that --

10   will be booked at NextEra, at the merger sub at 560 and no

11   more?

12   A    Well, I don't know if it's we actually negotiated with

13   EFH, but again, as I mentioned before, the intercompany

14   claims are estimates, and the estimate that we're using is

15   560.

16   Q    Thank you.

17           MR. HOGAN:  No more questions, Your Honor.

18           THE COURT:  Mr. Ball?

19           MR. BALL:  No further questions, Your Honor.

20           THE COURT:  All right. Thank you, Mr. Hickson.

21           MR. HICKSON:  Thank you.

22           THE COURT:  You may step down.

23           MR. MCKANE:  Your Honor, can I just confer on

24   terms of timing with --

25           THE COURT:  Yes.

1        (Counsel confer)

2              MR. MCKANE:  Yeah, I think based on the estimates

3    we've received on cross examination that we would be

4    finished with direct and cross by approximately 1 o'clock.

5    Is it acceptable for us to call our next witness?

6              THE COURT:  Yes.

7              MR. HICKSON:  The Debtors call Mr. Andy Wright.

8              THE COURT:  All right. Mr. Wright, if you would

9    please take the stand and remain standing.

10             CLERK:  Please raise your right hand.  Do you

11   affirm your word that you will tell the truth, the whole

12   truth and nothing but the truth to the best of your

13   knowledge and ability?

14             MR. WRIGHT:  I will.

15             CLERK:  Please state and spell your name for the

16   record.

17             MR. WRIGHT:  Andrew Wright, A-N-D-R-E-W W-R-I-G-H-

18   T.

19             CLERK:  Thank you.

20                       DIRECT EXAMINATION

21   BY MR. MCKANE:

22   Q    I still believe it's morning, so good morning, Mr.

23   Wright.

24   A    Oh, good morning.

25             THE COURT:  It's morning somewhere.

1          MR. MCKANE:  Right.

2          THE COURT:  Right?

3          MR. MCKANE:  Morning in Dallas.

4          MR. WRIGHT:  I wish it was 5 o'clock somewhere,

5    but yeah.

6    Q    Mr. Wright, will you please identify your current

7    positions for the Debtors?

8    A    I am currently executive vice president, general

9    counsel and corporate secretary for each of the Debtors.

10   Q    For each of the remaining E-side Debtors?

11   A    Yes.

12   Q    And sir, how long have you held that position -- those

13   positions?

14   A    Since the T-side emergence, so October 3rd of last

15   year.

16   Q    And what positions did you hold at the Debtors and

17   their predecessors, prior to October of 2016?

18   A    I was vice president and deputy general counsel.

19   Q    And how long have you been with EFH?

20   A    Since the summer of 2004.

21   Q    And what did you do before joining EFH?

22   A    I was an attorney with Vinson & Elkins in Dallas, Texas

23   and London, England.  I was in the corporate securities and

24   M&A group.

25   Q    Okay.  And is it fair to call you an M&A lawyer?

1    A    I'm a bit more of a generalist these days, and maybe

2    more of a bankruptcy lawyer, but -- than I wanted to be, but

3    I -- yes, my expertise is an M&A lawyer.

4    Q    All right.  And sir, did you prepare a declaration in

5    anticipation of your testimony today?

6    A    Yes.

7    Q    And do you have --

8              MR. MCKANE:  May I approach with a witness binder,

9    Your Honor?

10             THE COURT:  Yes.  Thank you.

11             MR. WRIGHT:  Thank you.

12   Q    And Mr. Wright, could you turn to the first tab of your

13   witness binder?

14   A    Yes.

15   Q    And do you recognize what has been marked as

16   DDIRWRIGHT_R?

17   A    Yes, I do.

18   Q    Is that the declaration that you signed on February

19   12th of this year?

20   A    It is.

21   Q    And is it true and accurate to the best of your

22   knowledge?

23   A    It is.

24             MR. MCKANE:  Your Honor, we'd move DDIRWRIGHT_

25   into evidence as Mr. Wright's declaration.

1          MR. HOGAN:   No objection, Your Honor.

2          THE COURT:   It's admitted.

3          MR. MCKANE:   Thank you.

4     (Debtor's Exhibit DDIRWRIGHT_ admitted into evidence)

5     Q    And Mr. Wright, before we go any further, you were in

6     the courtroom for Mr. Hickson's testimony, correct?

7     A    Yes.

8     Q    And you heard his description of the transaction at a

9     high level?

10    A    Yes.

11    Q    And you heard him make references to the fact that to

12    execute the transaction NextEra's going to be raising some

13    debt?

14    A    Yes, they will.

15    Q    What is your understanding of whether there will be

16    debt imposed on any of the current E-side Debtors as part of

17    this transaction?

18    A    My understanding is that NextEra is raising the debt

19    for the purchase price, I think about it upstairs, at the

20    NextEra Parent level at one of their financing subsidiaries

21    above the Debtors, so both EFH and EFIH will not have any

22    funded debt post-emergence.

23    Q    And your understanding is when EFH merges into merger

24    sub that merger sub will not have funded debt, post-

25    emergence?

1    A    Correct.

2    Q    And sir, when did you -- let's stop back for a second.

3    When did you first become involved in the Debtors'

4    restructuring efforts?

5    A    I've been involved since day one.

6    Q    And --

7    A    April of 2014, and even earlier than that when we were

8    planning for bankruptcy.

9    Q    And those planning efforts went back as far as 2012?

10   A    Correct.

11   Q    Can you give the Court just a high level overview of

12   the role that you played in the -- on some of the issues

13   that you've been involved with since 2012?

14   A    Sure.  At a high level, I've been involved in each of

15   the plans, the disclosure statements, I was highly involved,

16   because of my M&A background, in both the Hunt transaction,

17   the merger agreement there, as long -- as well as the

18   NextEra merger agreement.  I've been highly involved in each

19   of the financing arrangements, the DIPs that have been put

20   in place as part of the restructuring.  And I'm the primary

21   -- I was the primary SEC lawyer for the company and so I was

22   highly involved with all the public disclosures that we made

23   with respect to the restructuring efforts.

24   Q    And sir, are you also involved in the regulatory

25   efforts to obtain approvals from necessary state and federal

1    agencies?

2    A    Absolutely.  Both on the E-side, and I was as well on

3    the T-side.  So I think it's fair to characterize my

4    involvement as touching almost every aspect of the

5    restructuring efforts.

6    Q    And through touching all these efforts have you worked

7    closely with the Debtors' legal and financial advisors in

8    furtherance of the restructuring?

9    A    Absolutely.

10   Q    All right.  I want to talk about the current plan.

11   Were you directly involved in the Debtors' negotiations with

12   NextEra that ultimately led to the merger agreement and

13   plan?

14   A    Yes.

15   Q    And can you briefly describe your involvement, you

16   know, with regards to negotiating with NextEra, post-

17   termination of the Hunt plan?

18   A    Yes.  Consistent with Mr. Hickson's testimony we --

19   from the moment that NextEra made a revised offer to us, I

20   was involved in that -- in the transaction.  Whether it was

21   part of the diligence efforts, just broadly, not only just

22   asbestos but generally the diligence effort; I've been

23   involved in the regulatory effort; certainly highly involved

24   in the negotiation of the merger agreement itself; I didn't

25   have the pen, but certainly looked over the shoulder of

1    Kirkland & Ellis and our other outside counsel as they had

2    the pen on the merger agreement.  I was involved, I believe,

3    in -- I can't say every negotiating session, but most every

4    negotiating session.  I was involved in numerous phone

5    calls, conference calls, meeting -- in person meetings, both

6    in Dallas, Houston, New York.  Highly involved I guess I

7    would suggest.

8    Q    And so did that high level investment also extend to

9    the work related to the asbestos related claims?

10   A    Yes.

11   Q    And can you briefly, before getting to the due

12   diligence associated with the NextEra deal here, can you

13   just give the Court a sense of what due diligence had

14   occurred in the early time period, in '14 and '15, as the

15   Debtors tried to market Oncor.

16   A    Sure, just in broad scope, after the RSA terminated and

17   we started the bidding process, the diligence efforts, not

18   just on behalf of NextEra, but other bidders was very

19   extensive.  The purchase -- the indirect purchase of Oncor

20   is a huge M&A deal; it's almost, you know, 18, $19 billion

21   transactions.  There is a multi-faceted diligence that any

22   particular bidder would want to do with respect to a

23   purchase that -- of that size.

24          We set up a data room.  That data room covered the

25   gamut, whether it was asbestos issues, labor issues,

1    environmental issues, HR issue, this -- all the sorts of --

2    regulatory issues, the things that any potential buyer would

3    want to look at when they were thinking about doing an M&A

4    transaction for a regulated utility.

5    Q    All right.  And focusing specifically on this

6    transaction, so the post-Hunt termination, were you directly

7    involved in the due diligence efforts for this transaction,

8    including the additional asbestos due diligence?

9    A    Yes.

10   Q    And can you briefly give the Court -- I think the

11   Court's already seen some sense of the due diligence from

12   testimony earlier and exhibits earlier today, but can you

13   give the Court your perspective regarding the extent of the

14   asbestos-related due diligence that NextEra undertook this

15   year, 2016.

16   A    I would describe it as very, very thorough.  Just to

17   give a little context, and I know Mr. Hickson did so at the

18   beginning or in his testimony, but it was the Debtor's

19   position from the very beginning that any bidder, including

20   NextEra, must acquire the asbestos subsidiaries and, as Mr.

21   Hickson said in his testimony, it was NextEra's position, at

22   least at the very beginning, that they were not going to

23   acquire the asbestos subsidiaries.

24   Once it became evident that we were at an impasse and we

25   weren't willing to move off of our point that they must

1    acquire the asbestos entities, the level of diligence that

2    they wanted to do, I would call, really, extraordinary.  And

3    we were inundated almost daily with additional questions

4    from NextEra and their outside counsel about the asbestos

5    entities and various questions related thereto.

6    Q    And as a parallel work stream to that due diligence

7    effort, were you aware of an effort by the Debtors to

8    evaluate whether there was insurance available to cover

9    asbestos liabilities?

10   A    Yes.  I guess I'd characterize the diligence effort as

11   twofold.  One was just a legal due diligence, of which some

12   of those emails that were referenced in Mr. Hickson

13   testimony were part of.  There were many more, as I recall.

14   But the other part of the diligence was what I characterize

15   as evaluation exercise that was led by Mr. Horton.  Part of

16   that exercise was the Aon analysis that was done.  You know,

17   the two efforts are intertwined, but I would -- in my world,

18   I thought about it as two separate efforts.  I sort of,

19   along with Ms. Doré, our general counsel at the time, led

20   the legal due diligence effort, and Mr. Horton led the

21   valuation effort, the insurance effort.

22   Q    Mr. Wright, I'd like to turn specifically to the

23   negotiations regarding the handling of asbestos claims and

24   plan treatment.  Were you involved in those negotiations

25   directly?

1    A    Yes.

2    Q    What was your involvement?

3    A    As I said, I've been involved in the plan negotiations

4    on almost every issue, and asbestos was one of those issues.

5    Q    And just what is your understanding of the treatment of

6    the asbestos Debtors under the plan?

7    A    That all timely filed asbestos claims will be

8    reinstated.

9    Q    All right.  And based on your involvement with the

10   overall restructuring efforts, were you aware of any

11   alternative bidders that were willing to either assume or

12   reinstate all of the asbestos related liabilities without a

13   bar date or a discharge of unfiled, unmanifested claims.

14   A    No.

15   Q    Sir, I want to pause a second because there may have

16   been some confusion earlier about the intercompany

17   liabilities in the intercompany claims.

18   A    Mm hmm.

19   Q    And I'm going to put up on the screen Demonstrative 1

20   from 40, just kind of so we can all orient ourselves on

21   this.  You know, when you talk about reinstating the

22   intercompany claims, the intercompany receivables, what is

23   your understanding of what the Debtors are doing by

24   reinstating those intercompany claims?

25   A    My understanding is that each of the claims that is

1    represented by the gray bar here will be reinstated.  So,

2    for instance, just to take the 560, there is a payable of

3    $560 million from EFH Corp to LSGT Gas Company, LLC, which

4    would be a receivable on its book, and that claim will be

5    reinstated.

6    Q    So, that's a $560 million obligation of EFH, right?

7    A    Correct.

8    Q    And that $560 million obligation, is as of the petition

9    date?

10   A    Yes.

11   Q    And sir, if it your understanding under the plan for

12   the Debtors to reinstate those obligations, they have to

13   true up those prepetition amounts for all interest that has

14   been accruing during the course of the bankruptcy?

15   A    Yes.

16   Q    All right.  And therefore, what is your understanding

17   of, you know, at closing, will that $560 million increase by

18   the amount of interest owed?

19   A    Yes, it will.

20   Q    All right.  And as part of the due diligence efforts,

21   as it relates to the LSGT Debtors, was there due diligence

22   about the strength or viability of those intercompany

23   receivables?

24   A    Yes.  There were certainly lots of questions asked

25   about that.

1    Q    And did the Debtors reach a determination as to whether

2    that receivable was good and valid?

3    A    Yes.

4    Q    What is the Debtors' determination?

5    A    That it is good and valid.

6    Q    And so, you know, if the closing hypothetically would

7    be April 30th of this year, what would happen as that

8    relates to a true up of the amount of that receivable as of

9    that date?

10   A    Well, consistent with Mr. Keglevic and Mr. Horton's

11   testimony a day or two ago, we'll have to determine the

12   amount of post-filing interest that has properly accrued on

13   the $560 million.  I'm not the numbers guy, so I don't know

14   the amount.  But there will be some amount of interests that

15   will accrue on that $560 million intercompany payable from

16   Corp to LSGT Gas.

17   Q    All right.  Mr. Wright, I'd like to turn to another

18   topic.

19   A    Okay.

20   Q    And that specifically relates to a 524(g) trust.  Are

21   you familiar with that term?

22   A    Yes.

23   Q    All right.  And during the negotiations with NextEra,

24   was there ever a discussion of a 524(g) trust?

25   A    Yes.  Assisted with Mr. Hickson's testimony,

1    sometime...  I believe the first time we heard about it was

2    early July of 2016.

3    Q    All right.  And you said the first time you heard about

4    it from NextEra?

5    A    Correct.

6    Q    All right.  And prior to July of last year, that

7    would've been the subject of discussions internally with

8    (indiscernible).

9    A    Yes, yes.

10   Q    All right.  Can you describe your discussions and

11   evaluation without disclosing privilege of the 524(g) trust?

12   A    Yes.  So, as I said earlier, the context from early in

13   the negotiations with NextEra was that we wanted them to

14   take the asbestos subs, and consistent with what Mr. Hickson

15   testified to this morning, they did not want to take them.

16   I don't know that I'd say that we were quite at an impasse,

17   but we had a disagreement.  It was one of the major issues

18   that we disagreed in in the context of the larger merger

19   negotiation.

20          I think we both went back to our corners a bit to

21   think about, well, how could we bridge this gap that we had.

22   And one idea that NextEra had was this 524(g) trust.  And as

23   I said, in early July of 2016, they raised that possibility

24   with us.

25   Q    Right.  And it was your understanding that they had had

1    discussions with counsel for some of the asbestos claimants

2    specifically on that issue?

3    A    We learned that at that time, yes.

4    Q    And did the Debtors independently evaluate the

5    possibility of a 524(g) trust in July of 2016?

6    A    Absolutely.  As soon as we received a proposal and the

7    term sheet from NextEra we huddled with our financial and

8    legal advisors.  I'll admit neither Stacy nor I were experts

9    in 524(g) trusts and we needed to get smarter about how the

10   work, so we huddled with our outside counsel and K&E and got

11   smarter.

12   Q    Right.  And then what was the takeaway, the conclusion,

13   from the Debtors' restructuring and management team

14   regarding the viability of a 524(g) trust in this

15   circumstance?

16   A    Well, after much, I would say, a really thorough

17   investigation of all the issues, I think the bottom line

18   from the Debtor's perspective was that implementation of a

19   trust was going to take too long and it was not going to --

20   at the time, NextEra was telling us that they wanted to

21   close the transaction by the end of the year in 2016.  After

22   much discussion with K&E and outside counsel, well, counsel

23   at K&E, we learned that that was just not doable, the time

24   considerations, as well as it would implicate what we had

25   previously settled and, you know, some of the terms of the

1    settlement agreement, and we weren't willing to, in effect,

2    go there.  And fairly quickly, we came to that realization

3    and we told NextEra that.  And I think, consistent with Mr.

4    Hickson's testimony this morning, we convinced them that

5    that wasn't a viable alternative for what they want to do

6    either.

7    Q    You referenced a settlement agreement in your

8    testimony.  Are you referring to the settlement agreement

9    that was reached with the E-side Committee?

10   A    Correct.

11   Q    Yeah, in addition to the settlement agreement and the

12   time duration and constraints, can you specifically explain

13   to the Court the concerns that it relates to the duration of

14   these cases and the impact on EFH-level cash, as long as

15   these cases proceed?

16   A    Yes, absolutely.  I mean, I think it goes hand-in-hand.

17   If the cases -- if implementing the trust was going to take

18   a significant amount more time, in effect, one of the knock-

19   on effects of taking more time is that we were going to burn

20   more cash.  The longer these cases have gone on, the cash at

21   EFH and EFIH has continued to dwindle, and that was

22   certainly a consideration of ours, the knock-on effect of

23   the longer time and bankruptcy in order to implement the

24   trust.

25   Q    And sir, are you familiar, after almost three years of

1    being in bankruptcy, of the phrase of being administratively

2    insolvent?

3    A    Yes, I've heard of that.

4    Q    Was it a conclusion that the Debtors were potentially

5    at risk of having EFH being administratively insolvent if

6    these cases take too long?

7    A    If it takes too long, absolutely.

8    Q    Separate from your assessment and the Debtors'

9    assessment regarding a 524(g) trust, what was your

10   understanding of what NextEra was doing after sending across

11   this term sheet in early July of this year, regarding

12   evaluating a 524(g) trust?

13   A    Well, I think, as with any negotiation, they heard our

14   position with respect to that alternative, and I think --

15   they have to speak for themselves, but I think they came to

16   the conclusion it didn't work with respect to the timeframe

17   that they wanted to try to complete the transaction on.  And

18   fairly quickly, they moved to, I think, and intensified

19   diligence effort to try to get their arms around if they had

20   to acquire the asbestos entities, what that really meant to

21   them.

22   Q    You mentioned that NextEra had an interest in

23   potentially closing the transaction by year end 2016.

24   A    Correct.

25   Q    Could you explain to the Court how that could

1   potentially be possible with a PUCT process in addition to

2   the core process?

3   A    Sure.  The PUC process, which I think most people have

4   thought about as part of the E-side, is really the long pole

5   in the tent.  The PUC has 180 days statutorily from the date

6   that the change of control application is filed in Austin to

7   render a determination.  And from very early on in the

8   discussions with next era, they wanted to make that filing

9   with the PUC basically the day of or maybe the day after we

10  signed the merger agreement.  The merger agreement, as we

11  all know, was signed in late July.  Within a day or two,

12  their expectation, at least early in the negotiation, was

13  that they would make that filing then very shortly

14  thereafter.  That would allow both PUC process and the

15  confirmation process to run in parallel.  And assuming that

16  the PUC stuck to their 180-day calendar, that that would

17  allow for emergence sometime late in 2016, early 2017.

18  Q    Mr. Wright, I'd like to change subjects, and in

19  particular, cover some terms of the plan.

20  A    Okay.

21  Q    And just for the record, could you identify the second

22  tab of your binder, which is DX-681?

23  A    Yes.  This is the Seventh Amended Joint Plan of

24  Reorganization of the E-side Debtors.

25  Q    And so, is it fair to say you have reviewed and are

1    generally familiar with the terms of this plan?

2    A    Yes.

3    Q    Are you familiar with the classification and treatment

4    of claims under the plan?

5    A    I am.

6    Q    And are you familiar with what are Class B3 and B4

7    claims in interest?

8    A    I am.

9    Q    What are those claims?

10   A    The Class B3 claims are the EFIH first lien claims, and

11   the Class B4 claims are the EFIH second lien claims.

12   Q    And what is the treatment of Class B3 and B4 claims

13   under the plan?

14   A    That any allowed Class B3 and B4 claims will be paid in

15   full and in cash.

16   Q    And so, what is your understanding of the pending

17   settlements in fact on the treatment of Class B3 and B4

18   claims?

19   A    My understanding is that, assuming the settlement

20   agreement is approved by this Court, that the B3 claims will

21   be paid out at 95 cents on the dollar, and the B4 claims,

22   the second lien claims, will be paid out at 87.5 cents on

23   the dollar.

24   Q    Right.  And those percentages apply to the make whole

25   with certain interest rate calculations as well?

1    A    Yes.

2    Q    And sir, if I referred to the B3 and B4 claims as the

3    secured creditor claims, or the EFIH secured creditor

4    claims, would you know what I'm talking about?

5    A    Yes.

6    Q    All right.  Are the EFIH secured creditor claims

7    impaired or unimpaired?

8    A    They are impaired.

9    Q    And why are they impaired?

10   A    There impaired because the plan provides that the liens

11   that they currently enjoy are being removed upon the

12   effective date.

13   Q    And what does the plan provide to the EFIH secured

14   creditors in exchange for their liens being removed?  Are

15   they receiving replacement liens?

16   A    Well, they're receiving three things.  They're

17   receiving proceeds from a claims reserve.  They are getting

18   a replacement lien in the sense that they will have a lean

19   over that claims reserve.  And the third is the Bankruptcy

20   Court will retain their jurisdiction with respect to that

21   claims reserve.

22   Q    And all of that would apply only in the circumstance in

23   which the settlement is not approved, correct?

24   A    Correct.

25   Q    All right.  And are you familiar with the concept in

1    the Bankruptcy Code of indubitable equivalent?

2    A    Yes.

3    Q    And what is your understanding of that requirement?

4    A    Well, with respect to secured claims, if you're going

5    to remove a lien from the secured claim, you must -- the

6    Code provides, as I understand it, that those claimholders

7    must receive the indubitable equivalent of those claims.

8    Q    And is it your view that the plan provides for the

9    indubitable equivalent of the secured creditors' claims, as

10   determined by the Court?

11   A    Yes.

12   Q    Sir, I'd like to cover just a few 1129-related factors

13   and issues.

14   A    Okay.

15   Q    And I apologize in advance.  First, let's talk about

16   one of your favorite subjects, fees.  Does the plan provide

17   for the payment of the United States Trustee's fees, as

18   required under 28 USC 1930?

19   A    It does.

20   Q    And sir, are you familiar with how the plan handles for

21   the payment of professional fees and expenses?

22   A    Yes.

23   Q    How does the plan address professional fees and

24   expenses?

25   A    Well, it does so by categories, and I guess I'd go one

1   by one.  The first, the retained professionals, the Debtors'

2   retained professionals are paid their reasonable fees and

3   expenses after a review by the committee and then final

4   approval by this Court.

5   Q    All right.  So, let's pause for a second and talk about

6   the review process under which retained professionals --

7   actually before I go there, I want to talk about that the

8   fee today and your own internal review.  But let's establish

9   what other fees go through that process, okay?

10  A    Okay.

11  Q    You mentioned retained professionals, but what non-

12  retained professionals?  How are their fees reviewed and

13  what does the plan provide for non-retained professionals?

14  A    Well, it depends on which category of non-retained

15  professionals.

16  Q    Let's talk about the EFIH secured creditors.

17  A    So, the EFIH secured creditors, assuming the settlement

18  agreement is approved, 100% of their fees will be paid on

19  the effective date.  If the settlement agreement is not

20  approved, the plan provides a detailed review process with

21  respect to those fees and a timing mechanism for the payment

22  of those fees.

23  Q    All right.  And what about the -- strike that.  How

24  does the plan provide for the payment of fees and expenses

25  for the EFIH unsecured creditors' professionals?

Page 100

1   A    The EFIH unsecured professionals will be paid -- if the

2   settlement agreement is not approved, they'll be paid

3   pursuant to their charging lien.  If the settlement

4   agreement is approved, their fees will come out of the

5   recoveries of the PICS and it'll be a negotiation between

6   the PICS and their own professionals.

7   Q    And sir, how does the plan provide for the payment of

8   fees and expenses relating to professionals for the EFH

9   unsecured notes trustee?

10          THE COURT:  Let me interrupt you for a minute.

11   So, the --

12          MR. MCKANE:  Sure.

13          THE COURT:  So, the EFIH unsecured creditor

14   professionals, those fees are not going through the Fee

15   Committee?

16          MR. WRIGHT:  No, that is not my understanding.

17          MR. MCKANE:  Because they're coming out of the

18   charging lien?

19          MR. WRIGHT:  Correct.

20          THE COURT:  I thought you said they were coming

21   out of the charging lien if the plan was -- excuse me --

22   they were coming out of the charging lien if the settlement

23   was not approved?

24          MR. WRIGHT:  Not approved.

25          MR. MCKANE:  Not approved.

1           THE COURT:  But what if the settlement is

2    approved?  Is it still coming out of the charging lien?

3           MR. WRIGHT:  No.  My understanding is that it will

4    be a negot- -- it will come out of the recoveries from the

5    PIC Creditors and they will negotiate specifically with

6    their professionals about how much fees they will pay them.

7           THE COURT:  Isn't that the charging lien?

8           MR. WRIGHT:  No, but it's coming out of the

9    charging lien.  It's another way of saying coming out of the

10   charging lien.  Your Honor, even after three years, it's,

11   you know, I don't need to qualify Mr. Wright as an expert.

12   I can represent that it comes out of the charging lien

13   either way.

14          THE COURT:  Okay.

15          MR. MCKANE:  Sorry about that.

16          MR. WRIGHT:  Sorry, I --

17   Q    Let's talk about one that, like, I think the folks over

18   here are particularly focused on, which is the EFH unsecured

19   note trustee.  So, up at the parent --

20   A    Yes.

21   Q    -- the indentured trustee at EFH, how does the plan

22   propose to pay their professionals?

23   A    Their reasonable fees will be paid after review by the

24   Fee Committee and approval by this Court.

25   Q    All right.  Now, retained professionals reviewed by the

1    Fee Committee, payment by the EFH indentured trustee,

2    reviewed by professionals, reviewed by the Fee Committee,

3    can you explain to the Court the process and what the Fee

4    Committee undergoes as they review this?  That'd be all

5    fees.

6    A    Well, I'd say there is a two-step process.  There's not

7    only the Fee Committee, but there is an internal review

8    process that we have at EFH that we've had since the very

9    beginning of these cases, just like we do with any of our

10   outside lawyers.  We review those fees first.  We take a

11   hard look at them and we press back where we think

12   appropriate.

13        But then there is -- as I've come to learn as part

14   of the bankruptcy cases, there is a mechanism the bankruptcy

15   court puts in place called the Fee Committee, and that Fee

16   Committee, one of which the members of the Fee Committee is

17   a person from EFH.  She's now on the Vistra side of the

18   house, or the T-side.  Cecily Gooch is a member of the Fee

19   Committee.  And that Fee Committee goes through a very

20   thorough and exhaustive review of each of the fees that are

21   submitted that is required to go through the Fee Committee.

22   Q    Yeah.  And just to be clear for the record, it's fees

23   and expenses?

24   A    Absolutely.

25   Q    And based on -- and you've observed the Fee Committee's

1   process in addition to the Debtors' internal process?

2   A    Yes.

3   Q    And have you reached a conclusion regarding the

4   thoroughness or robust review of the Fee Committee?

5   A    I would say that it's very thorough and robust.

6   Q    And then, after the Fee Committee responds, what

7   happens with regard to fees before they're presented to the

8   Court?  Is there negotiation?

9   A    My understanding is that the Fee Committee very often

10  will, in effect, negotiate some of the fees and expenses

11  with the various law firms.  There is a back and forth

12  between the Fee Committee and the firms.  Most often, there

13  is a resolution, as I understand, between the firms and the

14  Fee Committee so that they can jointly walk in and ask the

15  Court for approval of those fees.  From time to time, the

16  firms, as I've observed, have not agreed with the Fee

17  Committee and the Fee Committee has come in with their

18  proposal to the Court and the firm will have their own

19  proposal and let the Court decide it.

20  Q    So, in essence, there are three levels of review?

21  Internal review by the Debtors, review by the Fee Committee,

22  and ultimately, approval by the Court?

23  A    Yes.

24  Q    All right.  Mr. Wright, with regards to the EFH

25  indenture trustee and their professionals' fees and

1    expenses, do you have an understanding as to why the Debtors

2    are paying the fees and expenses -- are proposing to pay the

3    fees and expenses of these professionals above any charging

4    lien assessment?

5    A    I do.

6    Q    And what is your understanding as to why the Debtors

7    are proposing to do that?

8    A    I think it's twofold.  One is we believe they are

9    reasonable because the indenture trustee has been very

10   helpful in pushing the plan forward and getting this across

11   the finish line.  I think the second reason is that no EFH

12   unsecured creditor that would be affected by the payment of

13   these fees has objected to the payment of those fees.

14   Q    All right.  At the EFH level, separate and apart from

15   the noteholders, the largest creditor is who?  Who holds the

16   --

17   A    TCEH.

18   Q    And TCEH first liens hold a $700 million claim,

19   correct?

20   A    Correct.

21   Q    And they have not objected?

22   A    No.

23   Q    All right.  Let's shift gears briefly.  I want to ask

24   you some very straightforward questions about retiree

25   benefits.  Are you familiar with how the plan treats retiree

1   benefits for those employees post-EFH confirmation?

2   A    Yes.

3   Q    How does the plan treat those benefits?

4   A    To the extent provided therein, the Debtors will remain

5   obligated for those obligations.

6   Q    All right.  And I'd like to ask you some questions

7   about regulatory filings.

8   A    Okay.

9   Q    Are you involved in the Debtor's efforts to obtain

10  various regulatory approvals?

11  A    Yes, I am.

12  Q    And what approvals, authorizations and rulings have the

13  Debtors sought?

14  A    Well, there's been a number of them.  The Public

15  Utility Commission of Texas must approve the transaction;

16  the FERC, Federal Energy Regulatory Commission; the FCC, the

17  Federal Communication Commission; we need a supplemental

18  private letter ruling from the IRS.

19  Q    Do you --

20  A    I feel like I'm missing one.

21  Q    Well, do you need Hart-Scott-Rodino approval?

22  A    Yes, we need the Department of Justice under the HSR

23  Act to approve, or to approve the transaction.

24  Q    And what is the status of the Debtors' efforts to get

25  approval under the PUCT?

1    A    Well, the PUC filing was made jointly by NextEra and

2    Oncor in late October of last year.  There's been a lot of

3    work between then and now with respect to the PUC process.

4    Just most recently, both depositions and what in that

5    process is called RFI's, Requests for Information, has just

6    wrapped up and completed.

7              Next Tuesday, the hearing on the merits in front

8    of the Public Utility Commission will occur.  It's scheduled

9    to occur from Tuesday to Friday of next week.

10             And then what I expect to happen is over the

11   course of March and April at the open meetings of the Public

12   Utility Commission, they will continue to debate the issues.

13   And I do expect, by their statutory deadline, which is late

14   April of this year, that they will render a decision with

15   respect to the application.

16   Q    And Sir, this is not the first time you've seen a PUC

17   approval process as it relates to a company with which

18   you've been employed?

19   A    No.

20   Q    In fact, you were employed before the LBO process with

21   the --

22   A    Yes.

23   Q    -- predecessors?

24   A    Yes.

25   Q    What is the status of the staff's position currently as

1    it relates to the PUC approval process?

2    A    Well, in the PUC process, there's been a number of

3    intervenors.  Also, the staff of the Commission itself has

4    been part of the process.  And each of the intervenors, as

5    well as the staff, has filed position papers with respect to

6    various issues in the case.

7    Q    And to the extent that they take positions that are

8    based -- currently disagree with all or part of the

9    transaction, is that unusual in your experience?

10   A    No, it is not unusual at all at this point in the

11   process.  In effect, there is -- I would characterize it as

12   active negotiations still ongoing between Oncor and NextEra

13   with the intervenors, and that's to be expected as we enter

14   the next phase of the process.

15   Q    All right.  And you expect that process to conclude by

16   late April?

17   A    Yes, I do.

18   Q    What is the Debtors' status with regard to FERC

19   approval?

20   A    We have obtained the FERC approval.  That happened in

21   January of this year.

22   Q    And what's the status with regards to Department of

23   Justice approval under HSR review?

24   A    So, the early waiting period expired in November of

25   this year, so that requirement is behind us as well.

1    Q    And what about the approval from the FCC?

2    A    We just recently filed, about a week ago, the FCC

3    applications.  It's a rather administerial application.  I

4    expect that to be received in the coming weeks.

5    Q    And what is the status of seeking a private letter

6    ruling from the IRS?

7    A    So, at the Court knows, in connection with the T-side

8    emergence, the IRS issued a private letter ruling.  And as

9    part of this transaction, we need a supplement to that

10   private letter ruling.  Late last year we filed the

11   application for that supplement, and during the course of

12   the last couple of months, we've supplemented the supplement

13   with additional information.  Our understanding is that it's

14   still on track with the IRS and we believe that in the next

15   -- sometime this spring, we will receive the supplemental

16   private letter ruling from the IRS.

17   Q    One final area I have to cover with you, Mr. Wright.

18   A    Okay.

19   Q    During the post-Hunt plan negotiations, are you aware

20   of another bidder that was actively involved in the process?

21   A    I'm aware of numerous bidders that were involved in the

22   process, yes.

23   Q    And then I believe Mr. Ying testified, you know, in his

24   written direct all about that whole (indiscernible) process.

25   In particular, was there a bidder -- we'll call them Bidder

1    Number 2 -- that ultimately made multiple offers as it

2    relates to the acquisition of the E-side Debtors?

3    A    Yes.  There was a very active bidder in the process and

4    we were heavily...  We had heavily negotiated parts of the

5    transactions with them, yes.

6    Q    All right.  In your experience as an M&A lawyer, and in

7    particular as it relates to the selling of Oncor, is

8    maintaining the confidentiality of the bidders important to

9    the Debtors?

10   A    It's important to the Debtors and it's also very

11   important to the bidders.  It's important to the process in

12   general.  That's the way public M&A works.  There very well

13   may be leaks from time to time, but those leaks are most

14   often not acknowledged, even if they're true or not true.

15   And public M&A is done at a very high level confidentially,

16   and that's the way it's done best.  And if we expect to

17   receive highest values in public M&A deals, that's really

18   the only way you can go about it.

19   Q    Right.  And to the extent -- and not that we're

20   suggesting in any way this will happen -- but to the extent

21   that the NextEra transaction did not close, would we be back

22   in the market marketing Oncor?

23   A    That would be one of the alternative paths that we'd

24   have to go down.  Yes.

25   Q    And do you believe -- do you have a view as to whether

1    the Debtors would experience harm, material harm, to the

2    extent that the identity of the bidders were disclosed

3    publicly, you know, in the event we had to go market Oncor

4    again.

5    A    I do.

6              MR. MCKANE:  Your Honor, at this time, I do not

7    have any additional questions for Mr. Wright.  I do have a

8    whole series of exhibits that I need to move into evidence.

9              THE COURT:  All right.

10             MR. MCKANE:  Specifically, there are two exhibits

11   that I expressly referenced, and Your Honor, may I approach

12   with the list?

13             THE COURT:  Yes.  Thank you.  Oh, lots.  Have we

14   moved the Declaration in yet?

15             MR. MCKANE:  I believe we did.

16             THE COURT:  Okay.

17             MR. MCKANE:  But we'll do it again, just in case.

18             THE COURT:  Okay.

19             MR. MCKANE:  So, the Debtors move into evidence

20   the written Declaration, 00:56:28 DDIRWright_R, as well as

21   the two exhibits referenced therein, DX-3 and DX-19.

22             THE COURT:  They're admitted.

23        (Debtors' Exhibits DDIRWright_R, DX-3 and DX-19

24   admitted into evidence.

25             MR. MCKANE:  And Your Honor, we ask that you take

1    judicial notice of a series of DX numbers.  These are prior

2    plan versions, disclosure statements, plan supplements, the

3    asbestos objector's Motion to Dismiss and related pleadings,

4    as well as prior Court orders, including orders confirming

5    earlier plans, scheduling orders, and the like.  So, we ask

6    that you take judicial notice of DX-5, 6, 7, 8, 9, 10, 11,

7    13, 14, 15, 16, 17, 18, 21, 23, 24, 25, 27, 28, 30, 31, 32,

8    33, 34, 35, 36, 39, 40, 41, 42, 43, 44, 45, 48, 49, 52, 53,

9    56, 58, 59, 60, 61, 62, 64, 65, 66, 67, 69, 70, 73, 74, 75,

10   76, 77, 78, 81 and 89.

11           MR. HOGAN:  No objection, Your Honor.

12           THE COURT:  The Court takes judicial notice of

13   those exhibits.

14           MR. MCKANE:  Thank you, Your Honor.  And with

15   that, we pass the witness.

16           THE COURT:  All right.  Mr. Schepacarter.

17           MR. SCHEPACARTER:  Thank you, Mr. Hogan.  Mr.

18   Hogan has allowed me to go first.  I only have a couple

19   questions for Mr. Wright.

20                CROSS-EXAMINATION OF MR. WRIGHT

21   BY MR. SCHEPACARTER:

22   Q    Good afternoon, Mr. Wright.

23   A    Good afternoon.

24   Q    Richard Schepacarter for the United States Trustee.

25   Mr. McKane asked you a series of questions regarding the Fee

1   Committee's review of basically the fees that it's been

2   presented within this case.  And you're kind of well aware

3   of that, correct?

4   A    Correct.

5   Q    And basically, your knowledge for that is through Ms.

6   Gooch, who was actually the member of the Fee Committee for

7   the Debtors?

8   A    Correct.

9   Q    Now, you're also aware that in addition to the retained

10  professionals, such as Kirkland & Ellis and some of the

11  other firms that have been retained as well as some of the

12  Creditor Committees, that the Fee Committee reviewed those

13  fees and expenses?

14  A    I am.

15  Q    Okay.  And you may also be aware, or should be aware,

16  of the fact that back in December of 2015, this Court

17  ordered, basically, through the confirmation of that plan

18  and through the approval of the settlement agreement, that

19  the Fee Committee would review the fees of what we'll call

20  non-retained -- I'll call them non-retained T-side

21  professionals, such as White & Case and some of those other

22  types of professionals.  Are you aware of that as well?

23  A    I'll take your word for it.  I don't know it off the

24  top of my head, but yes.

25  Q    Okay.  All right.  And with respect to that review, the

1    Fee Committee basically performed that same type of a review

2    for those professionals, as well as it had done for the

3    retained professionals, correct?

4    A    I would expect that would've been the case, yes.

5    Q    Okay.  And if you know, are you aware of the fact that

6    some of those professionals -- I'll call them the 503(b)

7    professionals -- that some of those applications, to the

8    extent that they were applications, but some of those fees

9    have been approved by the Fee Committee, had been reviewed

10   and approved by the Fee Committee, and also approved by the

11   Court?

12   A    I believe that's correct.

13   Q    Okay.  No further questions, Your Honor.  Thank you.

14            THE COURT:  Thank you.  Mr. Hogan?

15            MR. HOGAN:  Thank you, Your Honor.

16               CROSS-EXAMINATION OF MR. WRIGHT

17   BY MR. HOGAN:

18   Q    Good afternoon, Mr. Wright.

19   A    Good afternoon.

20   Q    Let me just start by asking, had you been here for the

21   entirety of the confirmation hearing this week?

22   A    I have.

23   Q    And so, you've heard all of the testimony by all the

24   various witnesses relative to the questions that I've asked

25   of those witnesses?  Fair statement?

1   A    I have, yes.

2   Q    Thank you.  Your Declaration; you wrote your

3   Declaration?

4   A    I oversaw the preparation of my Declaration.

5   Q    And in your Declaration, in the outset, you talk, of

6   course, about your role.  You've been there since at least -

7   - at EFH since, it appears, since April of 2012.

8   A    Yes.  I started to work at EFH's predecessor, TXU, in

9   the summer of 2004.

10   Q    And it's fair to say, again, from your Declaration in

11   Paragraph 3, that you participated in the development of the

12   Debtors' plan of reorganization and the transactions related

13   thereto?  Is that a fair statement?

14   A    Yes.

15   Q    And in going through the discovery and reviewing the

16   Debtors' records relative to the corporate governance

17   issues, you were involved in those, in the corporate

18   governance aspects of this case?  Is that a fair statement?

19   A    I've been involved in the corporate governance issues,

20   yes.

21   Q    And it's also fair to say that your name is replete

22   over board minutes, here on the inner circle in terms of

23   receiving the restructuring update and all of those aspects

24   of the case?  Is that a fair statement?

25   A    I don't know if I'd call it the inner circle, but I've

1    been heavily involved in almost every aspect of the

2    restructuring that.

3    Q    Right.  In fact, you were what, Vice-President and

4    Deputy General Counsel of EFH Corp. up until the time Stacey

5    Doré left, and then you became General Counsel?  Fair

6    statement?

7    A    Yes.

8    Q    Would it be fair to characterize your involvement in

9    the creation of the plan and the treatment of claims as

10   having been one of the architects?

11   A    I don't know that I'd characterize it as being an

12   architect, but I was part of the team that developed it.

13   Q    And in fact, I found it interesting that in your

14   Declaration, on Page 12, Paragraph 23, just the

15   characterization of the language that says, "The plan

16   provides a detailed blueprint for the transactions as set

17   forth herein, and therefore provides adequate means for the

18   plan's implementation."  Do you see that?

19   A    Yes, I see that.

20   Q    Can you tell me what's meant by a blueprint?

21   A    It just means an outline.  It sets forth the mechanics

22   of how the plan -- the terms of the plan and then the

23   mechanics of how to implement it.

24   Q    And those implementations are really the related

25   transactions thereto, are they not?

1   A     Correct.

2   Q     Right.  That would include, of course, the merger with

3   NextEra as one of those transactions?

4   A     That's one of the material transactions to the plan,

5   yes.

6   Q     Right.  And if we go back in time over the pendency of

7   this case, it would also include probably the Hunt plan,

8   that (indiscernible) didn't work out?

9   A     Yes, that was a material transaction at one point in

10   these cases, yes.

11   Q     Certainly.  And as well as probably the various RSAs

12   and PSAs that accompany those transactions?

13   A     Absolutely.

14   Q     Probably also the whole bar date issue?  Fair

15   statement?

16   A     I'd say that was one issue, yes.

17   Q     And then maybe even the motions and the gyrations

18   relative to the attempt to appoint a future claims rep?

19   Would that be one as well?

20   A     That's been an issue.  I don't -- it's been one of many

21   issues in this case.

22   Q     But just back to 23, blueprint, from my perspective,

23   that seems to imply an intent to maybe replicate the

24   structure at some future point.  Is there any plan to do

25   that that you're aware of?

1    A     I'm not sure I understand what you mean by replicate

2    the structure.  What structure are you talking about?

3    Q     Well, the structure is the blueprint.  I mean, from --

4    and I'm not trying to be pejorative.  I'm just trying to

5    understand.  But a blueprint is something you utilize to

6    build something, is it not?

7    A     I don't -- in an architectural sense?

8    Q     Yes.

9    A     I guess that, yes, maybe.  I'm not sure that the choice

10   of that word is being used in that architectural sense in

11   which that you'd have a set of house plans and then you'd

12   replicate that in some development, you know, with 100

13   different houses.  That's not what I'm trying to mean when I

14   say that here.

15   Q     Okay.  I just wanted to understand.  In fact, is

16   blueprint, is that a word that you utilized in creating this

17   Declaration, or is that something that you just approved?

18   A     Look, it's in my Declaration, and what I meant by that,

19   it just means the means by which the plan is implemented and

20   executed.  Nothing more, nothing less.

21   Q     Okay.  Now, if I were to juxtapose that the Hunt plan,

22   as we've called it, with what we'll call the NextEra plan --

23   A     Okay.

24   Q     -- and you have a general sense of those two plans in

25   your mind, I'm sure?

1    A    Yes.

2    Q    If we could focus on the treatment of asbestos

3    claimants, for whom a properly filed proof of claim was

4    filed, has there been any difference or any change in the

5    plan as between the Hunt plan and the NextEra plan, as it

6    relates to those claims?

7    A    Sitting here today, I don't know off the top of my

8    head.  If you could show me the language, I'd be happy to

9    try to parse it out, but...

10   Q    Would you agree, generally, that there likely hasn't

11   been a change in the treatment of those claims?

12   A    I think that's true.

13   Q    So, what changed between December of 2015 and the

14   summer of 2016 with regard to the need to estimate asbestos

15   claims?  What changed?

16   A    I'm not sure I understand your question.

17   Q    Okay.  Well, let's break it down.  In November and

18   December of 2015, you were obviously involved in the

19   creation of the plan --

20   A    Yes.

21   Q    -- and was there an estimation done at that point to

22   try to wrap your arms around what the asbestos liability

23   was?

24   A    By the Debtors?

25   Q    By anybody.

1   A    I can't speak for the Hunts and their group.  They

2   asked questions, just like any other bidder did, about the

3   asbestos liabilities and we answered them to the best of our

4   ability.  They didn't seem as focused on them as NextEra

5   ultimately was.  But we had an estimate internally at the

6   company.  It was baked into our financial statements.  I

7   mean, we had a historical run rate of about $2 million a

8   year of payment four asbestos claims, and our accountants

9   and we were very comfortable with the $14 million reserve we

10  had booked on our balance sheet.  In effect, I would

11  characterize that as our estimate at the time.

12  Q    And I imagine that you'd be of the position that the

13  bar date order helped focus for you what that liability was?

14  Is that a fair statement?

15  A    No, I don't think so at all.  I think our historical

16  run rate, along with discussions with our accountants,

17  focused us on that, and that's how we got comfortable with

18  the $14 million that we had booked on our financial

19  statements.

20  Q    Did you hear any of Mr. Horton's testimony about how

21  the bar date brought some certainty to the nature and extent

22  of the asbestos claims that would be asserted against EFH?

23  A    Well, the bar date obviously set a date by which the,

24  you know, a certain number of claims could be brought, yes.

25  Q    And in fact, the hope there was to create some

1    certainty with regard to the number of claims?  Is that a

2    fair statement?

3    A    I don't know that I'd characterize it that way.  I

4    think in some ways, we kicked a hornets' nest.  I mean,

5    before the bar date was set, there were very few claims that

6    were presented to the company.  And after the bar date was

7    set, the claims came out of the woodwork from everywhere.

8    Q    Do you regret having set the bar date?

9    A    No.

10   Q    Now, during your direct testimony, you testified about

11   the Debtors' position about whoever it the bidder was would

12   have to acquire the asbestos subsidiaries.  Isn't that your

13   statement?

14   A    Yes, that was our position.

15   Q    And the treatment of asbestos claims, as I asked you

16   earlier, between 2015 and 2016, didn't change with regard to

17   how those asbestos claims were going to be handled.  They

18   did not change.  Isn't that correct?

19   A    As I said before, I don't have the two plans right here

20   in front of me, but I think at a high level, they were

21   consistent between the two, yes.

22   Q    And they were consistent, really, with regard to the

23   treatment of unmanifested claims specifically.  Isn't that

24   correct?  And by that, I mean for those persons who had an

25   unmanifested claim and asserted a claim by the bar date,

1    those claims would be allowed claims subject to later

2    approval.  Is that a fair statement?

3    A    Correct.

4    Q    And for those individuals who had an unmanifested

5    claim, but who didn't assert a claim by the bar date, those

6    claims would be barred pursuant to the bar date.  Is that --

7    A    Correct.

8    Q    -- your understanding?

9    A    Correct.

10   Q    And with regard to the intercompany liabilities, I

11   believe you testified that there would be reinstated

12   receivables, there'd be a true up of interest, and that at

13   closing, the $560 million, together with whatever that true

14   up in interest would be, would be booked at the merger sub.

15   Is that your testimony?

16   A    It would be booked at merger sub?  I don't think that's

17   my testimony.  I think the intercompany payables and

18   receivables that was reflected in the chart by the gray bars

19   would be reinstated at -- so, for instance, there would be a

20   $560 million intercompany payable from EFH to LSGT Gas, $560

21   million, plus whatever accrued interest.  That intercompany

22   payable will be reinstated.

23   Q    Right.  And I did miss characterize your language.  I'm

24   sorry.  You said it would be trued up, I believe you

25   testified on your --

1   A    Trued up -- whatever amount of accrued interest will be

2   added to the $560 million.

3   Q    And the Debtor hasn't undertaken that calculation yet.

4   Is that your understanding?

5   A    That's my understanding.

6   Q    Okay.  Now, with regard to the corporate records of

7   EFH.

8   A    Okay.

9   Q    In going through those corporate records, I noticed

10  that whenever there was a major decision that had to be made

11  relative to this reorganization, for instance, the bar date,

12  there was a discussion during the corporate meetings and

13  reflected in the minutes that showed that these were the

14  discussions.  They were fairly important discussions, the

15  bar date being one, the merger with NextEra.  It's replete

16  with discussions about the mergers and how it was going to

17  happen and what the outstanding issues are.  And you saw me

18  go through with some of the other witnesses some of those

19  various minutes.  Do you recall that?

20  A    Yes.

21  Q    Okay.  And the one thing that I noticed in going

22  through all those various minutes, from May of 2016 through

23  until today, or whenever the last minutes were produced,

24  there was never a mention of the whole 524(g) issue.  And

25  can you explain to me why that is?

1    A     Well, as I said early on, as soon as NextEra brought

2    that alternative, if you want to call it that, to our

3    attention, we talked with K&E about it and fairly quickly

4    came to the conclusion it didn't work.  And so, it was one

5    thing that we considered, but pretty quickly, you know, put

6    to the side as something that we thought from both parties'

7    perspective was unworkable.

8              In terms of board minutes and board presentations,

9    we don't, as a matter of course, put every put and take,

10   give and take, to our board.  That's just not the way -- at

11   a sophisticated board, that's just not the way things

12   happen.  So, it's not surprising to me at all that in the

13   board minutes or the board materials that the notion of a

14   524(g) trust was not mentioned.

15   Q     (indiscernible)

16   A     There's hundreds, probably thousands, of puts and takes

17   as part of the NextEra transaction, and we didn't go through

18   every hundred or those thousand puts and takes with our

19   board.  It's just not the way it works.

20   Q     Okay.  Thank you.  Now, you testified that, you know,

21   obviously, the 524(g) was discussed and quickly set aside --

22   A     Correct.

23   Q     -- as being -- as taking too long, I think your

24   characterization in your testimony was.  Is that a fair

25   statement?  It's going to take too long?

```
1    A    Well, I think it's really three elements.  I think it's
2    that the implementation of the trust was going to be
3    difficult procedure really, it would take a long time.  I
4    think the consequence of it taking a long time was that
5    there was going to be a tremendous amount of cash burn in
6    the case.  And I think that the third element of it was that
7    it could very well upset the settlement agreement that we
8    had previously negotiated and agreed.  And if we were going
9    to renegotiate that, that was going to take additional time.
10   And that wasn't -- we didn't feel like that was in our best
11   interests, and certainly NextEra when we spoke with them
12   about those issues, they didn't feel like that within their
13   best interests either.
14   Q    And did you explore with the Committee whether they had
15   an appetite for revisiting that issue, the EFH Unsecured
16   Creditors' Committee?
17   A    Personally, I did not.
18   Q    With whom did you discuss the possibility of the 524(g)
19   plan?
20   A    Our legal advisors at Kirkland & Ellis.
21   Q    Anyone else?
22   A    I did not.
23   Q    Did you speak with NextEra about the issue?
24   A    Yes.
25   Q    Who at NextEra did you speak with?
```

1   A    I would've spoke to Charlie Sieving, the General

2   Counsel at NextEra.

3   Q    But you didn't speak with Mr. Hickson?

4   A    I don't recall speaking with Mr. Hickson about it.

5   Q    Did you speak with anyone else at EFH about it?

6   A    Yes.  I would've spoken with my boss, Stacey Doré,

7   about it.

8   Q    And what was said during those discussions?

9            MR. MCKANE:  I object, Your Honor, to the extent

10  that he can answer the question without divulging attorney-

11  client communications.  He can, but -- so, I just ask that

12  he do it at a high level.

13           MR. HOGAN:  Okay.

14           THE COURT:  I agree.

15  A    It's consistent with what we previously discussed, that

16  it was going to take a lot of time.  There was a lot of

17  procedural hurdles to it.  What might be the knock on

18  effects to it; how might it affect the settlement agreement

19  that was currently in place.

20  Q    And did you discuss with her the necessity for the

21  appointment of a futures representative if such a structure

22  was going to be implemented?

23  A    I don't recall that discussion.  We may have, but I

24  don't recall.

25  Q    And did you discuss the requirements of a trust being

Page 126

1    established to pay such claims if that construct was

2    pursued?

3    A    Yes, generally, we did.

4    Q    Did you discuss how the trust would potentially be

5    funded?

6    A    I don't recall.

7    Q    Do you remember if anyone expressed the view that it

8    would cost more for such a plan?

9    A    No, I don't recall that.

10   Q    Did anyone at EFH express the view that the aggregate

11   asbestos liabilities would be higher if those claims were

12   discharged because they would be channeled through plan?

13   A    No.

14   Q    What about anybody at NextEra?  Did they express that

15   view that the aggregate asbestos liabilities would be

16   higher?

17   A    Not that I'm aware of.

18   Q    Did anyone express the view that the amount could

19   exceed $250 million?

20   A    You say anyone?

21   Q    Anyone at EFH?

22   A    No.  We never believed that.

23   Q    And what about at NextEra?  Did anyone there speak to

24   that?

25   A    I'm not aware of that.

1    Q    Ultimately, obviously, EFH decided not to pursue the

2    524(g) plan.  Isn't that correct?

3    A    Correct.

4    Q    And did EFH tell you it was not the path that they

5    wanted to pursue?

6    A    When you say EFH tell me...

7    Q    Did anybody at EFH tell you that, ultimately, that's

8    not the plan we want to pursue?

9    A    Well, look, I guess in a sense, Stacey Doré told me

10   that.  She was my boss.  I think, you know, we worked very

11   collaboratively together, so it was in some ways a joint

12   decision.  But ultimately, she's the boss, so she got to

13   make that decision.

14   Q    And so, ultimately, EFH proceeded instead with a plan

15   which allowed the unmanifested claims, for which a proof of

16   claim wasn't filed, would ultimately be discharged.  Isn't

17   that correct?

18   A    Can you -- I'm sorry.  I'm confused about the question.

19   Q    No problem.  Isn't it true that ultimately, EFH pursued

20   a plan by which unmanifested asbestos claimants or claims

21   for which a proof of claim was not filed would be

22   discharged?  Isn't that the structure now?

23   A    Claims that were not timely filed, yes.

24   Q    And that ultimately, the aggregate asbestos liabilities

25   would be less because of that construct?

Page 128

1    A    No.  I don't think so.

2            MR. SCHEPACARTER:  I have no further questions,

3    Your Honor.

4            THE COURT:  Thank you.  Redirect?

5            MR. MCKANE:  No redirect, Your Honor.

6            THE COURT:  All right.  Thank you, Mr. Wright.

7            MR. WRIGHT:  Thank you.

8            THE COURT:  Mr. Hogan, are there any documents you

9    want in evidence?

10           MR. HOGAN:  Oh, yes.  My apologies, Your Honor.  I

11   have just a few items.  Your Honor, if I could move into

12   evidence the following from the live cross, AX-78, AX-81,

13   AX-82, AX-83, AX-84, AX-85, AX-85, 86, 87, 88, 89, 90, 91,

14   92, AX-103, AX-106, AX-107 and AX-112.

15           MR. MCKANE:  No objection, Your Honor.

16           THE COURT:  They're admitted.

17        (Exhibits AX-78, AX-81, AX-82, AX-83, AX-84, AX-85, AX-

18   85, 86, 87, 88, 89, 90, 91, 92, AX-103, AX-106, AX-107 and

19   AX-112 Admitted into Evidence)

20           MR. HOGAN:  Permission to approach, Your Honor?

21           THE COURT:  Yes.

22           MR. HOGAN:  Thank you.

23           MR. MCKANE:  I apologize, Your Honor, for the

24   noise.  Your Honor, if you're willing to indulge us for five

25   to 10 more minutes --

1           THE COURT:  Yes, of course.

2           MR. MCKANE:  -- before the lunch break, we believe

3     that we have resolved the confidentiality issue, and

4     specifically, there are 13 exhibits that we propose to

5     address the confidentiality issue that I raised with Mr.

6     Wright regarding Bidder 2.  And specifically, there are --

7     these include two exhibits that also are -- excuse me --

8     four exhibits that are also cross-listed and have been moved

9     in by the asbestos objectors.  The proposal is to replace

10    the existing exhibits with redacted exhibits that redact

11    solely the identity of that bidder.  And I understand that -

12    - well, counsel for the asbestos objectors would like to

13    make a statement, but they do not oppose the (indiscernible)

14    proposal at this time.  I also understand that the EFH

15    Committee supports that proposal.  The United State

16    Trustee's Office supports that proposal.  The EFH Indenture

17    Trustee supports that proposal as well, and I'm grateful for

18    that.

19          THE COURT:  Okay.  Mr. Hogan?

20          MR. HOGAN:  Thank you, Your Honor.  Looking merely

21    to preserve our right to argue the issue that the ceiling

22    obviously at the next level won't -- we won't be committed

23    to anything.  And so, that's really the issue, Your Honor.

24    So long as we understand that these documents in their

25    entirety aren't under seal, but only that which was redacted

Page 130

1    is under seal, and that the balance of the documents remain

2    unsealed, then we're in agreement with the structure as

3    outlined.

4            THE COURT:  All right.  That's my understanding of

5    what's occurring.

6            MR. MCKANE:  That's right, Your Honor.  And may I

7    approach with the chart that will reflect those changes and

8    we will look at (indiscernible) replacement?

9            THE COURT:  Yes.  So, let's identify those

10   exhibits that will be redacted, just for the record.

11           MR. MCKANE:  Absolutely, Your Honor.

12           THE COURT:  And I love hearing you say numbers, so

13   just...

14           MR. MCKANE:  It's the hardest thing I do.

15           THE COURT:  You've been perfect so far.

16           MR. MCKANE:  Yeah.

17           THE COURT:  I'm going to jinx you.

18           MR. MCKANE:  All right.  So, the following

19   Debtors' exhibits will be replaced with redacted versions of

20   those exhibits that solely redact the identity of Bidder

21   Number 2.  DX-127, DX-128, DX-129, DX-133, 134, 135, 137,

22   152 and 154.  The following exhibits are also Debtors'

23   exhibits that have been cross-listed and moved into evidence

24   by the asbestos objectors.  These will also be replaced.

25   DX-142, which is also AX-110; DX-150, which is also AX-108;

1    DX-151, which is also listed as AX-109; and DX-153, which is

2    AX-103.

3              THE COURT:  Okay.

4              MR. MCKANE:  And (indiscernible) with an

5    underscore R to reflect the redact status.

6              THE COURT:  Excellent.  That's fine.

7              MR. MCKANE:  With that, Your Honor.  We believe

8    there's no further evidence to presented in the contested

9    portion of this hearing.  And what I'm saying is, Your

10   Honor, we'll be filing a revised proof --

11             THE COURT:  Yes.

12             MR. MCKANE:  -- proof of revised plan, which will

13   be the Eighth Amended Plan of Reorganization.  We will also

14   be filing a confirmation order, which we believe will also

15   be supported by and approved and (indiscernible) by the EFIH

16   secured creditors and the PICS as well.  And we're prepared

17   to come -- to proceed with tomorrow's hearing, which is a

18   walkthrough of those provisions and that plan and that

19   order.  And I can make this representation now.  None of the

20   contested provisions that have been addressed during the

21   course of this proceeding will change between the revised

22   Seventh Amended Plan that's currently on file, and the

23   Eighth Amended Plan that we'll be filing tonight.

24             THE COURT:  Okay.  I understand.  All right.  So,

25   subject to simply receiving the amended plan, which doesn't

1    affect the asbestos objectors and the confirmation order,

2    the Court will close the record.  Okay?

3            And my proposal would be to reconvene at 3:00 p.m.

4    for closing arguments. Is that acceptable?

5            MR. MCKANE Yes, Your Honor.

6            THE COURT:  All right. That's what we'll do.

7         (Recess)

8            CLERK:  All rise.

9            THE COURT:  Please be seated.  Oh, good a deck.

10           MR. MCKANE:  Good afternoon, Your Honor, Mark

11   McKane of Kirkland & Ellis on behalf of the Debtors.  And it

12   wouldn't be a hearing without a PowerPoint presentation.

13           THE COURT:  Absolutely.

14           MR. MCKANE:  Your Honor, before we begin, I'd like

15   to extend a very sincere and heartfelt thank you on behalf

16   of the Debtors and their professionals to you, to Mr.

17   Werkheiser, to your entire staff, as well as your families

18   for really three years of your time and energies helping me

19   get the Debtors through this reconstruction process and this

20   bankruptcy.  And we are incredibly grateful for all of your

21   work to help get the Debtors in a position to be able to

22   present this case and this plan for approval hopefully for

23   the last time.  So thank you very much.

24           THE COURT:  You're welcome.

25           MR. MCKANE:  And we're here, Your Honor, on the

1    plan confirmation for EFH and EFIH.  Specifically, the

2    level's set where we are.  This plan has overwhelming

3    support.  All voting classes at EFH and EFIH either voted or

4    agreed to change their vote to accept the plan.  The

5    indenture trustees on behalf of EFIH first lien and second

6    lien noteholders...  Sorry.  The trustees on behalf of their

7    notes and a majority of the respective noteholders support

8    the plan, the EFH noteholders -- note trustee supports the

9    plan; the EFH committee supports the plan based on Mr.

10   Glueckstein's statement on opening, and it reflects the

11   committee's settlement that was approved in 2015.

12           We think ultimately Mr. Keglevic said it best:

13   This transaction with NextEra represents the highest and

14   best offer of the Debtor's interest in Oncor and absolutely

15   maximizes the value of the EFH and EFIH estates.

16           Just quickly establishing our affirmative case

17   through 1129.  We had established through the presentation

18   over the last few days that the plan satisfies all of the

19   necessarily 1129 efforts -- elements, excuse me.  With

20   regards to 1129(a)(1), the CCH ad hoc group objection has

21   been resolved and our evidence has been put forward through

22   Mr. Wright.  Looking through all the other ones that were

23   potentially objected -- 1129(a)(4), the plan does complicate

24   phase one document and professional fees and expenses will

25   be satisfied.  Mr. Wright explained how that would happen

1    today.

2              As to the other ones that are objected by a

3    potential party...going through to 1129(a)(11)on

4    feasibility, the EFIH first lien indenture trustee's

5    objection has been resolved, and we have the testimony

6    through Mr. Wright, Mr. Ying, and Mr. Keglevic on that

7    point.

8              Finally, Your Honor, as to 1129(b) on cramdown

9    requirements, no party is actively pursuing the cramdown

10   objection at this time based on the settlement that we have

11   reached, and to the extent that the cramdown requirements

12   apply, the plan satisfies the indubitable equivalent

13   standard because the Court will set the amount and/or

14   duration of the claims reserve as needed, depending on you

15   ruling on the pending settlement.

16             That's all the required provisions of the plan.

17   As to the discretionary contents of the plan, they are 100

18   percent uncontested.  No one is contesting the Debtor's

19   releases, third party releases, the exculpation, the

20   injunction, or the NextEra good faith finding.  And the

21   voting results are absolutely unequivocal.  Ms. Sullivan's

22   voting tabulation shows that all classes of claims at BFH

23   have voted to support the plan and all classes of claims

24   entitled to vote for the plan at EFIH have or will vote to

25   accept the plan.

1            And consistent with the settlements announced this

2    week, the initial holders of Classes B3 and B4 will change

3    their votes resulting in acceptance at those two classes.

4            THE COURT:  Do we know when that's going to occur?

5            MR. MCKANE:  Your Honor, that's going to happen --

6    it would be built into the confirmation order, right?  And

7    we are refiling that 8th amended plan and that order

8    tonight.  We are on time for that.

9            THE COURT:  Oh.  Okay.

10           MR. MCKANE:  Turning to the objections.  First,

11   the asbestos objection.  Your Honor, they challenge us on

12   two fronts.  They say that we have not proposed the plan in

13   good faith and that we've deprived unmanifest asbestos

14   claims of due process.  Your Honor, these allegations are

15   meritless and should be overruled.  The trial record is --

16   the Debtors have fought very hard to achieve value

17   maximizing results for the LSGT Debtors and their creditors.

18           The Debtors negotiated to preserve and identify

19   the asbestos claims and reinstate the LSGT intercompany

20   receivables.  And as the Court has ruled multiple times, the

21   setting of a bar date for these unmanifested asbestos claims

22   in these circumstances in these cases satisfies due process.

23           Let's go through them.  As to good faith, the

24   Debtor's Chapter 11 cases were not driven by the LSGT

25   Debtor's asbestos liabilities.  The Debtor's asbestos

1    liabilities are limited.  This is not an asbestos case

2    despite the over-allocated amount of time that we've dealt

3    with asbestos issues.

4           The asbestos liabilities arise from discontinued

5    operations.  The Debtor's never manufactured or sold

6    asbestos and the historical spend on these types of claims

7    has been low.  Mr. Horton and Mr. Wright both confirmed that

8    it was $2 million per year.  Ultimately, however, Your

9    Honor, the LSGT debtors were in a cash flow negative

10   situation as of the petition date.  Their intercompany

11   assets -- their only assets, excuse me, were the

12   intercompany claims which were again insolvent parent.  And

13   they filed for bankruptcy.

14          The plan achieves the LSGT debtors' restructuring

15   purpose.  The plan addresses the specific issues that LSGT

16   debtor identified in filing for Chapter 11 in April of 2014.

17   First, as it relates to cash flow insolvency, the plan

18   reinstates the intercompany claims of LSGT debtors and

19   ensures against, Your Honor, a solvent reorganized EFH.

20          Second, as it relates to a potential

21   deconsolidation task, which is another rationale for filing,

22   the solution is that the plan structure avoids the tax

23   (indiscernible).  We've done a tax-free spin on the T side,

24   we have a tax-free transaction on the E side.

25          Third, we've maximized the value of the LSGT

1   debtors' assets to protect the asbestos creditors.  This

2   plan implements the settlement with the EFH committee by

3   reinstating those intercompany claims and properly -- and

4   allows to reinstate the claims of properly preserved

5   asbestos claims.

6        The plan ensures post emergence funding for

7   preserved claims. We've seen this chart many times.  The

8   amounts are not in dispute.  The basis for these amounts

9   have been well-established.  We established them in the

10  motion to dismiss hearing in December, we've incorporated

11  those component of the record here.  The LSGT Gas Company

12  LLC receivable to EFH is solid.  It has been established by

13  the record.  It is $560 million as of the petition date, and

14  it will be updated to account for the interest that accrues

15  as of emergence.  And that will be resolved.  Our target

16  emergence date is April 30th of this year, and there will be

17  additional interest established on that 560.

18       The asbestos objectors suggested in their

19  opposition that the receivables were worth 2.7 million.

20  There is no evidence in the record of that.  And as Mr.

21  Stewart testified, their assertion is flat wrong, and not

22  appropriate or even reasonable to rely on a liquidation

23  analysis to attempt to value the intercompany receivables.

24       Perhaps more importantly, the funding far exceeds

25  the Debtor's potential asbestos liabilities.  The Debtor's

1    post emergency liabilities are forecasted to be at a net

2    present value of $36.4 million.  That was Dr. Vasquez's

3    opinion and analysis that we heard yesterday.  His

4    methodology is unimpeachable.  It is the go to standard for

5    evaluating asbestos liabilities.  And, in fact, his forecast

6    is arguably overstated because it did not eliminate any

7    potential liability on account of the asbestos bar date.

8    That exchange between Your Honor and Dr. Vasquez was

9    critically important.  The bar date is a nonissue in terms

10   of that forecast.  So, what we know is we have more than

11   $560 million in assets at the LSGT gas level, and we have at

12   most a forecast of $360 million net present value in

13   potential -- sorry?

14          MAN 1: 36.

15          MR. MCKANE:  36.  I apologize.  $36.4 million in

16   potential liabilities.  Furthermore, the plan sets aside

17   $100 million for payment of asbestos liabilities.  So when

18   reorganized EFH or merger (indiscernible) needs to draw on

19   cash, there's money set aside to be directed down to the

20   LSGT debtors for satisfaction of those claims. But as we've

21   all heard many times, that is just an accounting exercise to

22   get these liabilities off the books so as to not impact the

23   valuation of EFH.  And, more importantly, it's not a cap.

24   There is full liability there from the receivable of 560

25   plus interest to satisfy those claims, whatever they result

1    to be.

2              In short, the Debtors preserve the liabilities and

3    they represent just a fraction of the amount of the assets.

4    But this result from this (indiscernible) is not a foregone

5    conclusion.  As we've already stated in the settlement with

6    EFH the Debtors agreed to reinstate preserved asbestos

7    claims in full.  All right, that's Section 6A that we saw

8    today.

9              What's remarkable here, Your Honor, is that

10   Fenicle and Fahy, two members of that committee are

11   jeopardizing the recoveries for those asbestos claimants,

12   who like them have properly preserved their claims. Ms. Fahy

13   is an unmanifested asbestos claimant.  She filed a proof of

14   claim.  But yet they are jeopardizing this great result by

15   opposing her.

16             And what is their alternative?  I think it was

17   very helpful to hear Mr. Stewart make clear that as a

18   general unsecured creditor at EFH, the LSGT debtors would

19   recover only 7-1/2 percent of their claims had the

20   intercompany claims not be reinstated.  And it's simple

21   math, You Honor, right?  If there's $750 million in notes up

22   at EFH and you have a $750 million claim because of the

23   intercompany settlement, and you and to it another 560 in

24   receivables, you have approximately $2 billion.  We have

25   $156 million in cash as of right now at EFH.

1            So if you add that money to the denominator,

2     you're looking at a recovery of, approximately, 7-1/2 cents.

3     We're talking 100-cent dollar recoveries for all preserved

4     asbestos claims, when if they were treated as the equivalent

5     of a general unsecured claim, they'd get 7-1/2 percent.

6     This is an excellent result.

7            As to the asbestos bar date, it was a necessary

8     but not sufficient risk condition for the bidders.  The

9     Debtors sought the bar date as part of their efforts to

10    reinstate the asbestos claims. Mr. Horton explained that as

11    well.  But, nonetheless, it was a step in the process.

12    NextEra resisted taking the LSGT debtors thereafter.

13           We heard that today.  Mr. Wright testified this

14    morning, it was the Debtors' position that any bidder must

15    acquire the LSGT debtors.  And we heard it from Mr. Hickson.

16    Mr. Hickson made a claim -- it was not at all a foregone

17    conclusion that NextEra would take the Debtors, and

18    initially they had expressed intent not to acquire any

19    entity other than EFH, EFIH, and its subsidiary Oncor

20    Holdings.

21           That's reflected in the letter that John Young

22    received from NextEra from Jim Robo, the Chairman and CEO of

23    NextEra Energy.  We saw that on that last page.  All other

24    subsidiaries of EFH shall be disposed of, wound down, and

25    liquidated.  And to the extent that there was any ambiguity

1    as it relates to that schedule, I think Mr. Hickson was

2    absolutely clear about in his testimony -- they did not want

3    to take anything other than the Oncor line of entities.

4    And, Your Honor, that's not unusual.

5          If you step back for a second, the reason these

6    Debtors have these asbestos entities with discontinued

7    operations is when they went to sell these assets, the buyer

8    said, "I'm not going to take them" and left them with us.

9    That's why we have them now.  And ultimately the testimony

10   has been that every bidder that we interacted with did not -

11   - or excuse me, was unwilling to take uncapped asbestos

12   liabilities without some sense of perspective as to what

13   those values were.

14         How do we know that NextEra needed additional

15   assurances?  It's in the record from the documents.  For

16   (indiscernible) is DX-384.  It's an email exchange between

17   Charlie Sieving, the general counsel of NextEra, and Stacey

18   Doré, the general counsel of EFH, on June 16th of 2016.  We

19   heard it during -- we saw this during Mr. Horton's

20   testimony.  Not surprisingly, EF -- NextEra is really

21   struggling with the thought of taking uncapped asbestos

22   liability for claims with fact patterns that they have

23   little visibility into.  That was absolutely the position as

24   of June.

25         GX-244, which is also during the same time period,

1    reinforces that point.  Again, from Mr. Sieving to Ms. Doré.

2    "I don't think we're going to get comfortable on 30K, 30,000

3    uncapped asbestos liabilities and, frankly, I don't think

4    any sane strategic normally would either." These are not

5    unusual positions to take.  And yet the Debtors have been

6    able to get NextEra to reinstate these liabilities.

7              Your Honor, this plan benefits these Debtors'

8    estates.  We got them comfortable through additional

9    diligence, the Aon risk report, and the asbestos escrow.

10   We've heard multiple times from these objectors that somehow

11   going down this path with this plan benefits EFH.  I don't

12   understand how agreeing to have -- reorganize EFH to take on

13   additional liabilities through a $560 million payable is a

14   benefit, and the record doesn't support that either.

15             What we heard is that the Debtors expended

16   significant leverage to secure the reinstatement of these

17   intercompany claims and preserve those liabilities.  Paul

18   Keglevic specifically referenced this in deposition

19   testimony that had been designated in this case.  Obviously

20   to the extent that there is no reserve, we would've provided

21   higher distributable value and benefits to the estate.  But

22   the plan was always to have the claims adjudicated -- that

23   any claims that are adjudicated and required to be paid

24   would be paid.

25             In other words, EFH Corp and reorganized EFH Corp

1    does not benefit from this reinstatement.  They're taking on

2    additional liability through this receivable.  But we as the

3    Debtors have been able to get the buyer to take on that

4    liability.  It's exactly what you want in a refreshing

5    process.  They're getting paid 100 cents on the dollar for

6    all allowed claims. And there's no doubt, not surprisingly,

7    Mr. Horton agrees the results of the LSGT debtors absolutely

8    improved through this restructuring process.

9           The asbestos objectors' focus on a 524G trust,

10   frankly, it's myopic and it's misplaced.  The Debtors

11   rejected the concept of a 524G trust, they didn't consider

12   it in the best interests of their estate.  Mr. Wright

13   understood that a 524G trust would result in delay of

14   emergence in creating the risk of administrative insolvency

15   as the EFH cash drained.  These Debtors cannot sit in

16   bankruptcy forever.  We have draining assets at EFH.  That's

17   the cash on hand.

18          Ms. Doré testified about this in the earlier

19   confirmation proceedings; her successor, Mr. Wright,

20   testified about it here.  It is just a fact, right?  Mr.

21   Keglevic said it in his own plain manner: "Time and expense

22   are not our friends." Right?  The Debtors did not pursue the

23   asbestos objectors term sheet with NextEra because it would

24   delay emergence, right?  You heard the testimony.  NextEra

25   wanted to close this transaction either in late '16 or early

1    '17.  Their plan was to sign up a deal, file the PUCT

2    application, have parallel proceedings between this plan of

3    reorganization and this Court, and the PFCT process in

4    Austin, Texas, and close this transaction as quickly as

5    possible.  That was their goal.

6           A 254G trust does not work with that time table.

7    And in any event, that was not just the Debtors' conclusion;

8    that was NextEra's conclusion.  As Mr. Hickson testified

9    earlier today, quote, "We very quickly determined it would

10   be problematic from a timing perspective to set up an

11   asbestos trust." They had their own reasons and perfectly

12   legitimate reasons from a buyer.  They were going to do

13   financing.  They didn't want to be exposed to interest rate

14   risk during the period of time between when they signed up

15   the deal and when they closed the deal.  They didn't want to

16   be exposed for a period of time.  And we have seen interest

17   rates move since June.  That's a legitimate justification

18   from a purchaser perspective that independently corroborates

19   the Debtor's perspective, which is we can't sit here and go

20   down that path.

21          Ultimately, Your Honor, the Debtors' business

22   judgment was a reasonable one.  A 524G trust is not required

23   to address asbestos claims. You found that earlier in these

24   cases.  And the Debtors determined that pursuing a 524G

25   trust was not viable.  That trust would unduly delay

1    emergence as the cash dwindled and it would jeopardize

2    aspects of the Debtors' settlement with EFH.  As Mr. Wright

3    said earlier today, "We couldn't go there." And he also

4    confirmed that "No alternative bidder was willing to assume

5    or reinstate all asbestos related liabilities without a bar

6    date or a discharge." The path we chose was reasonable, it's

7    fully allowed under the Code, it provides an excellent

8    result of 100-cent payout for all allowed asbestos claims,

9    and there's no obligation to go down the path the asbestos

10   objectors want.

11           Now, turning to due process.  The plan satisfies

12   the requirements for due process for unmanifested asbestos

13   claimants.  We all have our view on Grossman.  Grossman

14   allows for unmanifested asbestos claims to be dischargeable

15   in bankruptcy consistent with due process.  Future asbestos

16   claims, which I do recognize Dr. Vasquez talked about future

17   claims, that created some confusion.  I think it was

18   clarified fairly clearly.  This is not Grossman future

19   asbestos claims; this was his calculation of those claims

20   that were pending as of the petition date and all claims

21   that were pending after the petition date, he refused future

22   claims.

23           No one is suggesting that in our plan of

24   reorganization future asbestos claims which are not

25   considered claims under Section 1015 of the Bankruptcy Code

1    are subject to this plan or affected by this plan.  This

2    plan addressed manifested and unmanifested claims. Those are

3    present claims and that's what this client arrived for.

4            The correct standard or review for evaluating the

5    due process is Mullane.  Publication notice satisfies due

6    process for unknown claimants as long as it's reasonably

7    calculated under all circumstances to apprise unknown

8    claimants of the pendency of the action and afford them an

9    opportunity to present their objections.  Courts have

10   consistently applied the Mullane standard to discharges of

11   claims of unknown creditors.  And we provide this authority,

12   as you've seen before, You Honor.

13           The notice plan in connection with the asbestos

14   bar dates was a success.  Contrary to the asbestos

15   objectors' assertions, the notice to unmanifested claimants

16   is not impossible.  Nearly 10,000 unmanifested

17   (indiscernible) claim were filed against East Side debtors,

18   and even if an unmanifested claimant was unaware of the

19   exposure, the receipts of the asbestos bar date notice

20   itself alerted recipients of their potential claims and the

21   stuff necessary to preserve them.

22           The asbestos objectors' analogy to Covey is

23   offensive, right?  The people who work at these plants are

24   not the equivalent of mentally incompetent people.  They can

25   read the notice and evaluate the notice.

1           Let's look at what the notice said.  It was a

2      legal notice that's DX-68.  "If you or a family member ever

3      worked at a power plant, you could have been exposed to

4      asbestos." It was sent to employees and contractors.  It

5      went on.  "How could this affect me?" "You also could have

6      been exposed by coming into contact with another person who

7      worked at a power plant.  For example, if asbestos was

8      brought home on your spouse or parents' clothing." "What if

9      I do nothing?" "If you do not submit a claim and later

10     develop asbestos related disease, you will not be eligible

11     for compensation." This is the notice that is being

12     challenged here.

13          Your Honor, there was a colloquy between Dr.

14     Vasquez and counsel for the asbestos objectors yesterday in

15     cross-examination -- where there was a debate about what

16     would be appropriate or somehow identify whether you had

17     asbestos and whether you're unmanifested.  What were the

18     questions?  Did you ever work at a power plant?  Are you the

19     spouse of a person who worked at a power plant?  Are you the

20     child of a person who worked at a power plant?  That's

21     exactly what we talked about with the notice.  The notice

22     went out to anyone we could identify.  We also did a

23     publication notice, and the information contained in that

24     notice enabled an individual to make a decision as to

25     whether to file proof of claim, and 10,000 people -- 10,000

Page 148

1   claims were filed.

2            Your Honor, the asbestos objectors have received

3   due process.  There are four asbestos objectors: Fenicle and

4   Fahy, their claims are preserved and will be reinstated.

5   They're not subject to the discharge.  In Class 83, their

6   claims are -- they have no grounds on which to state an

7   objection.

8            The other two objectors, Jones and Heinzmann, all

9   we have is unverified attorney argument as to who they are.

10  They've never offered any evidence that they received a due

11  process.  There's been no attempt to file a proof of claim.

12  We know nothing about them in terms of who they actually are

13  and what their situation is.  But ultimately, we provided

14  due process on the front end and Your Honor provides due

15  process on the back end.  The claimants may bring an as

16  applied due process challenge if they ever manifest a

17  disease.

18            So, to the extent that there is someone who has

19  unmanifested asbestos claims that later materialize, they

20  could come forward at that point in time and assert that

21  they did not receive sufficient due process because they

22  were unaware of these proceedings.  This Court has

23  consistently ruled that a specific claimant may do exactly

24  that.  Right?  And contrary to the asbestos objectors'

25  protest, that is not a deprivation.  Access to the Court is

1   here.  That's not a deprivation; that's a right.  And it's

2   part of a claimant's fundamental burden to establish that

3   they have what will be an allowed claim against these

4   Debtors.

5            If a claimant can show that they didn't receive

6   due process, then a confirmation order could not have

7   discharged their claim.  That was Your Honor's ruling based

8   on Grossman, and that's exactly right.

9            So, what do we fall down to?  Your Honor, this is

10  just another collateral attack on the bar date order.

11  They've repeatedly raised these arguments and you've

12  rejected them repeatedly.  We've seen this no less than

13  seven times.  From the bar date motion to the motion to

14  appoint a legal representative for unmanifested claimants,

15  to the disclosure statement for the Hunt, to the

16  confirmation hearing for the Hunt plan, to the motion to

17  follow a class claim, to the PSA merger agreement motion,

18  and then finally the motion to dismiss hearing in December.

19           Your Honor, the asbestos objectors' quixotic quest

20  to defeat the bar date must end.  The Debtors, NextEra, and

21  other bidders relied on the finality of the bar date

22  throughout these restructuring efforts and this plan fully

23  satisfies their due process rights.

24           Turning briefly to the United States Trustee

25  objection, Your Honor, we believe that the payment of the

1    EFH notes Trustee's fees is appropriate.  The Trustee's

2    objections to (indiscernible) claimant for fees and expenses

3    incurred -- we asked that it be overruled.  Specifically,

4    Article 4V1 of the plan provides for holders of EFH and

5    EFI's unsecured claims to receive distributions on account

6    of reasonable and documented fees and expenses outside of

7    the charging lane distribution.

8              The EFIH indenture trustee has resolved its -- you

9    know, its issues with the United States Trustee.

10   Importantly, the fees and expenses will be subject to fee

11   committee review.

12             Your Honor, we believe that this was a pretty

13   irrational decision based on the Debtors' business judgment.

14   As Mr. Wright testified, the Debtors determined in their

15   judgment to pay the fees in light of the circumstances.  The

16   notes trustee refrained from objecting further to the plan.

17   The Court had previously approved the payment of these fees

18   outside the charging lane in confirmation with the Hunt

19   plan, and we believe that there is an element of creditor

20   democracy here.  That the EFH voting classes have accepted

21   the plan, and we step back and say, who's ox is being gored

22   here, to the extent that there's an issue?  It's the holder

23   of the $700 million intercompany claim, and they are not

24   objecting.  They're not here.

25             So, ultimately, from our perspective, this is a

1   statutory interpretation question and I'll frame it as best

2   I understand it.  And here I really miss Mr. Husnick.  We

3   view this as an exercise of the Debtor's ability to use

4   property of the estate under 363B1.  We understand.  We know

5   the language in 503(b)(3) and (4).  503(b)(3) and (4), this

6   is not debatable whether -- it's the specific trumping the

7   generally, which is I think how ultimately the United States

8   Trustee would frame the issue.

9          We view this as being ordered to do something

10  versus being allowed to do something so the laws can meet

11  the standard.  And, specifically, it is -- 503(b) says

12  (indiscernible) if the EFIH indenture trustee can establish

13  a substantial contribution claim -- I brought a copy, too --

14  as we read the code, 503(b) says, "After notice and hearing,

15  there shall be allowed administrative expenses, comma, other

16  than claims allowed under Section 502F of this title

17  including..." And then it continues.

18         And then on the next page in Section 3 it refers

19  to actual necessary expenses, and then if you go down

20  further to, I believe, D, it's the reference to an indenture

21  trustee making a substantial contribution.  And four

22  includes reasonable compensation for those professionals.

23         So if you link 503(b)(3) and (4) as a whole, as we

24  read it, it is if the indenture trustee establishes its own

25  case for substantial contribution, if you get reasonable

1    fees and expenses for professionals paid, even over our

2    objection, they put on their case, they establish their case

3    and if the Court finds that they've done so, regardless of

4    what the Debtor thinks, they get paid as an administrative

5    expense.

6            Our view is under 363B1, that doesn't foreclose

7    the Debtor as part of an effort to -- you know, as part of a

8    reasonable restructuring effort to agree affirmatively to

9    pay certain fees so long as we're advancing a proper

10   restructuring purpose and it's a reasonable exercise of our

11   business judgment and a reasonable use of property of the

12   estate.

13           THE COURT:  And what's the limiting principle on

14   363B?  Can you decide to pay whoever you want whatever you

15   want regardless of, say, 327, 328, or 330 of the Code with

16   regard to Kirkland's fees?  I mean, wouldn't that be great?

17           MR. MCKANE:  I'm not allowed to say no to that.

18   No, Your Honor, I understand that you have to read the Code

19   as a whole.  Undeniably so.  I think the point of a 363B1 is

20   simply that so long as we are advancing reasonable -- and

21   you may say that we have to put on a tougher case.  You have

22   to meet your burden as it relates to B1.  We think we have,

23   and you may conclude otherwise.

24           But so long as we think we are structuring --

25   especially in the context of a settlement -- that we can

1    advance that argument (indiscernible).  I recognize that --

2    retain professionals, that is specific.  Right?

3    Specifically as it relates to us having established that,

4    you know, that we've satisfied all the elements necessary to

5    be retained as a professional on the case.  That would be a

6    very specific restriction on the Debtors' requirement.

7            I think here what we're highlighting is a

8    distinction between 503(b) as it relates to what the secured

9    creditor can do as opposed to what we can do.  Obviously,

10   other elements -- other provisions of the code can't put

11   conditions and limits on what we can do under 363B.  It's

12   not absolute.

13           THE COURT:  Assuming that I don't buy the 363B1

14   argument, what's the evidence, if any, in the record that

15   would support a finding of a substantial contribution?

16           MR. MCKANE:  Your Honor, with that I would allow

17   Mr. Pedone to put on that argument.  He will walk you

18   through the evidence that has been entered into the record

19   on substantial contribution.  We view that as -- we have not

20   agreed to advance that argument for him.  That he has to

21   advance it himself.

22           THE COURT:  Okay, fair enough.

23           MR. MCKANE:  Thank you, Your Honor.  And I don't

24   want to end on a down note.  Because, Your Honor, when you

25   step back and look at where we are and all the efforts that

1   have gone through, the amount of consensus that we have, the

2   number of voting classes that support us, the satisfaction

3   of the standards and what we're down to in these cases --

4   you know, it's an undeniable success.  We know it's taken an

5   incredible amount of effort to get here, but after three

6   years of exploring, developing, and pursuing alternatives,

7   this plan offers the best value maximizing path forward to

8   emergence for the EFH and EFIH Debtors, and we ask that the

9   Court confirm the plan.

10          THE COURT:  All right, thank you.

11          MR. MCKANE:  Thank you, Your Honor.  Mr. Ball?

12          MR. BALL:  Thank you, Your Honor.  Good afternoon.

13   I'm Robin Ball from Chadbourne & Parke, for plan sponsor

14   NextEra Energy.  We support confirmation of the plan and

15   join with Mr. McKane's arguments here today.  The evidence

16   that has been presented to the Court has been consistently

17   and entirely consist with and supported by confirmation of

18   the plan and of the requested good faith finding.

19          As to the asbestos claims, there's no reason to

20   doubt that between the asbestos escrow and the reinstated

21   $560 million receivable, the intercompany claim against EFH,

22   there will be more than adequate funds to satisfy the

23   reinstated asbestos claims. And to avoid any confusion on

24   the issue, NextEra agrees that the post-petition interest

25   will be due on those amounts in accordance with the terms of

Page 155

1    the governing agreements.

2              In any case, the claimants on the reinstated

3    claims will be far better off under the plans Mr. McKane

4    referenced with the reinstated intercompany claim against a

5    strongly solvent EFH backing up (indiscernible) asbestos

6    liabilities.  And, accordingly, we ask that the plan be

7    confirmed.  Thank you.

8              THE COURT:  Thank you, Mr. Ball?  Anyone else in

9    favor -- Mr. Pedone?

10             MR. PEDONE:  Your Honor, may I approach with a

11   couple of slides?

12             THE COURT:  Yes,  yes.  Thank you.

13             MR. PEDONE:  Your honor, Richard Pedone for the

14   EFH indenture trustee American Stock Transfer.  Your Honor,

15   there are three reasons that we believe -- and I'm rising in

16   response to the United States Trustee's objection to the

17   plan.  And actually first, I'd like to thank Your Honor and

18   your staff for your tremendous effort, courtesy, and

19   professionalism put into these cases over the past nearly

20   three years.  We greatly appreciate it and it's been a

21   pleasure to practice here.

22             Your Honor, we believe there are three reasons

23   that the fees can be paid in the manner provided for in the

24   plan, which is in effect as an administrative priority

25   status, both being done pursuant to a settlement.  It is

1    coming ahead of general unsecured creditors.

2            First, Your Honor, and as I'll go into more

3    detail, we do believe that we've made a substantial

4    contribution to these cases.  The Court already found for

5    the first half of these cases roughly through December 2015,

6    that a substantial contribution was made.  We believe a

7    similar finding could be made for the second half of the

8    cases.

9            Second, Your Honor, to pay them in that priority

10   would be to honor the settlement.  And, in fact, it's not

11   just the settlement as I'll discuss that's voted upon by the

12   largest impacted holder; if we look at that TCEH settlement

13   claim, that claim is, in fact, a plan proponents claim, and

14   it was the plan proponent that TCEH debtors who, in fact,

15   negotiated this provision put it into the plan.  And while

16   the beneficial interest of that claim is now held by a

17   secured creditor vote group that designated the vote, this

18   is a provision for payment of the fees negotiated by the

19   plan proponent most adversely affected.  There's one other

20   creditor, as the voting record shows, that is impacted but

21   they, in fact, voted for the plan as well.

22            And, finally, Your Honor, we have the argument

23   outlined in our brief and presented earlier in these cases

24   that the services of an indenture trustee are, in fact,

25   actual and necessary.  And notably, the U.S. Trustee in his

1    opening arguments agreed that they were actual and

2    necessary.  We had a disagreement over whether or not the

3    specific provisions are what you turn to to decide whether

4    payment is made or whether you could also make payment

5    pursuant to 503(b)(1).  (indiscernible) that argument.

6            And, Your Honor, as I noted, this Court has

7    already found that for the first half of these cases through

8    December 2015, the fees and expense of the EFH indenture

9    trustee are entitled to administrative priority.  At issue

10   now are the fees and expenses incurred after that date.

11   Your Honor, I handed up two slides.  The first slide

12   outlines a series of the events that occurred in this case

13   that we believe illustrate the contribution made.  And, Your

14   Honor, there's certain of these events and hearing

15   transcript I refer to are officially admitted in the record.

16   On the back end of the slide, the final slide is a series of

17   end notes referring to other items in the Court's docket

18   that we believe the Court could refer to.  And, of course,

19   the Court also in determining whether or not a substantial

20   contribution was made, can look on its own observations.

21           Your Honor, the EFH holders in this particular

22   fidelity only agreed to support the plan that's before you,

23   and it only became consensual after a series of lengthy

24   battles.  As we know, there was a plan confirmed in these

25   cases and then there was a termination event for that plan.

1    And the series -- the Debtors then went through filing a

2    series of other plans of reorganization that were contested.

3            The turning point in these cases in which the

4    consensus broke out with EFH credit or support really

5    occurred in September following the parties preparing to

6    litigate over the merger agreement, and in particular, the

7    breakup fee contained within that merger agreement.

8            At that time, which immediately followed the

9    August confirmation hearing, the creditors, including the

10   EFH trustee did not believe that the consideration to be

11   paid was sufficient.  The Court will recall that in the

12   August confirmation hearing for the T side plan, we

13   vigorously contested that there were NOLs that needed to be

14   paid -- that compensation should be paid for those NOLs.

15   And in response to the efforts of the EFH indenture trustee,

16   which was the only party putting forward that effort, this

17   Court found that the NOLs could have value but, more

18   importantly, the Debtors in their board decks during the

19   period of litigation and actually at the trial transcript.

20   At the trial, we had testimony, direct evidence from Mr.

21   Keglevic and Ms. Howard that the retained NOLs could have

22   value of up to $380 million.

23           Your Honor, then move forward to September, and

24   you have negotiations being taken as we're preparing to

25   litigate the series of plans that were filed in the merger

1   agreement -- you have negotiations over potential purchase

2   price increase.  And it culminates in Fidelity agreeing to

3   support the plan of reorganization and agreeing to issue a

4   direction to the EFH indenture trustee to stand down from

5   further litigation related to the plan at the time of a

6   purchase price increase of, approximately, $400 million.

7   Slightly more than the value of the NOLs that the Debtors

8   had testified might, in fact, be there.

9           Your Honor, that was the turning point, and I

10  think that that is, if you have to look back at the record

11  and say, what is the manifestation of the efforts the DFH

12  indenture trustee put in, the leverage created on behalf of

13  creditors leading to that price increase was generated

14  throughout the cases and certainly at the hearing.  You

15  heard NextEra say that they believe that they wanted

16  Fidelity's support, and that was why they increased the

17  purchase price.  And if that NOL issue had not been

18  resolved, put to rest with creditor votes, or creditor votes

19  were obtained with the increased purchase price, this

20  hearing would probably still be going on.  It would be quite

21  a bit longer.

22          But consensus broke out in part because of the

23  leverage that was created, Your Honor.  And I think if this

24  Court were to choose to make a finding of a substantial

25  contribution that's, in fact, a concrete event that's in the

1    record that you could point to and say that the leverage

2    built up to that.  And then, Your Honor, you heard the

3    testimony of Mr. Wright saying today with regard to his view

4    of the efforts of the EFH indenture trustee and bringing us

5    to a consensual plan today.  That's also in the record.

6           Your Honor, Mr. McKane noted the Debtors' election

7    under Section 363 to exercise its discretion to pay.  And

8    that's certainly one avenue for which the Court could

9    determine that the payment could be made.  But I don't think

10   that you need to get there, because as I've noted and as the

11   slide indicates, there is evidence in the record of a

12   substantial contribution.  But more importantly, I actually

13   think that the settlement -- the authority for payment here

14   can come out of 9019 and the plan process itself in that

15   they -- it's a very unusual situation.  Every impacted

16   creditor, every last impacted creditor in this settlement

17   cast a vote for the plan.  So there's one smaller holder

18   that voted -- one smaller creditor that voted that I believe

19   held a swap plan -- claim that voted affirmatively.  And

20   then there's the T-side claim.

21          So, unlike the cases that the U.S. Trustee cited

22   where those cases discussed that it's not sufficient that a

23   class voted for a settlement, and you can't just look to the

24   settlement, here you have a situation where the voting

25   record results show that every impacted creditor had

1    actually affirmatively cast the vote.  And that makes this

2    essentially a settlement, a resolution of a variety of

3    issues.  It was quite the bundle of issues compromised in

4    the plan -- but the creditors voted for to get this across

5    the line.

6            And I believe that in these circumstances where

7    the creditors actually -- all of the adversely impacted

8    creditors actually took the affirmative act and voted for

9    the plan continuing the provision, the Court could rely on

10   9019 in the essentially creditor democracy process.

11           Finally, Your Honor, the third reason that we

12   believe that this Court can make the finding that the fees

13   should be paid is the need for the services of an indenture

14   trustee.  And this I unique in these cases.  And I know the

15   U.S. Trustee does not support such a finding.  But, in fact,

16   here -- and the Debtors aren't putting forward this finding

17   -- in fact, here the services of the indenture trustee were

18   needed.  Unusually in these cases the debtors at various

19   points sought to reinstate and reserve their right to

20   reinstate the indentures.  I'd submit that under the Trust

21   Indenture Act and applicable securities laws, that would've

22   been an impossibility if you didn't have an indenture

23   trustee in place.

24           And, also, Your Honor referred the Court to the

25   testimony of Mr. Horton in the hearing transcript, which was

1    in exhibit, where he was asked -- and the question relates

2    to a time period on the eve of the bankruptcy when the

3    Debtors were seeking out successor trustees, came to my

4    client, American Stock Transfer, and said, "We'd like you to

5    serve as a trustee in these cases." And the question relates

6    to the paperwork that was being executed at that time.  You

7    can read it more fully in the transcript.

8           But the question put to Mr. Horton was, at trial,

9    "At that time you signed these documents, you had an

10   understanding that EFH Corp in fact, needed an indenture

11   trustee in the bankruptcy proceedings, didn't you?"  Mr.

12   Horton's answer was, "Generally speaking, yes."  And you, in

13   fact, as was shown in the history of the case when they

14   sought to reinstate the debt, these Debtors did in fact

15   need, and in fact make use of the fact that they had an

16   indenture trustee in place in these cases, and that makes

17   this case distinct on the facts from many other cases,

18   although I do believe the argument can be made you do always

19   need an indenture trustee in place, but on these particular

20   facts, it's distinct.

21          Your Honor, in conclusion, what I'd like to argue

22   is that the, for lack of a better word, cleanest argument on

23   the facts and the law in this case, where there's agreement,

24   and I believe the U.S.  trustee is in fact, in agreement,

25   that a finding of substantial contribution, if it could be

1    made by the Court, and it's up to the Court to make that

2    finding, such a finding of substantial contribution would

3    resolve the issue without turning to the other two perhaps

4    more legally-difficult alternatives for paying EFH indenture

5    trustees in the priority provided in the plan.

6            And the alternative, Your Honor, we'd submit, that

7    as part of a settlement, the payment should be made to

8    respect the wishes of the creditors in the compromise

9    embodied in the plan.  And then the third alternative, Your

10   Honor, would be that the services of an indenture trustee

11   were, in fact, needed in these cases.  Thank you.

12           THE COURT:  Thank you, Mr. Pedone.  Mr.

13   Schepacarter.

14           MR. SCHEPACARTER:  Thank you, Your Honor.  Again,

15   I thank Mr. Hogan for deferring to me, allowing me to go.

16   But I promised him he could have as much time as he wanted

17   at the end, so --

18           THE COURT:  Okay.

19           MR. SCHEPACARTER:  Your Honor, as we stated in our

20   opening argument, our remaining objection is to the fees

21   basically of the EFH indenture trustee.  The EFIH indenture

22   trustee is being paid according to the charging lane in any

23   event, so that we don't have an issue remaining with them.

24           Basically, the three arguments, and I think we've

25   kind of narrowed it down, are the payments of the -- I'm

1    just going to say indenture trustee, for lack of confusion -

2    - the indenture trustee are subject to what they said

3    basically in this case is negotiated settlement, or what

4    I've heard now is creditor democracy, it's a new term that

5    I've just found today.  And the parties basically don't

6    dispute the fees, and the payment of the fees under the

7    plan.

8            The second argument, which I think is probably

9    their strongest, is that they made a substantial

10   contribution in the case, that it's been ongoing and

11   continuing throughout the case, bringing the case to the

12   confirmation hearing today.

13           The third one is that the services of the

14   indenture trustee for EFH Corp were so actual and necessary,

15   because of the complexity of the cases, and the desire of

16   the Debtors to maintain the possibility of reinstating

17   certain notes, EFH notes, so that basically the fees and

18   expenses can be styled as 503(b)(1)(a)-type expenses, which

19   are necessary, and basically for the prospect of

20   administrative -- basically, administrative expenses from

21   the get-go.

22           As for the first point, the basic premise is, and

23   I think I've heard it from all sides, is that they sort of

24   can settle or contract to pay these fees under 363, and we

25   maintain that you cannot -- and we said in our objection,

1    you cannot contract, settle, or vote around the Bankruptcy

2    Code.  As Your Honor said in the December 3rd hearing, and

3    I'm going to quote from the transcript, which I think has

4    been moved into evidence as AST-2, "While it is true that

5    the payment of the professional fees is a negotiated part of

6    the settlement, the parties cannot contract around the

7    Bankruptcy Code, even under Rule 9019.

8           Importantly, these claims are not being paid in

9    connection with allowed claims such as (indiscernible)

10   secured creditor, nor out of the charging lien asserted by

11   an indenture trustee from the allowed claim of its

12   noteholders.  Rather, the professional fees are being paid

13   to ad hoc committees, and creditors, and indenture trustees

14   by the Debtor, TCEH, as an independent allowed

15   administrative expense.  As such, it must be authorized by

16   the Bankruptcy Code."

17          Now, the testimony of Mr. Wright today, he

18   basically said two things, basically that the fees are

19   reasonable, and I think he was a little bit ahead of his

20   skis on that, and I think he really meant that the actions

21   of the indenture trustee were reasonable, and that basically

22   no E-side creditors have objected.  Although his testimony

23   may be credible, I don't think it advances that position at

24   all.  And even if it does, I think there was a citation to

25   an order that basically E-side settlement, or the EFH

1    indenture trustee, and I think the E-side committee

2    settlement, where they basically in that agreement,

3    basically have agreed to pay these fees.

4              But in Paragraph 9 of that settlement order, it

5    states basically that notwithstanding anything to the

6    contrary in this settlement order, or the agreement, this

7    settlement order shall not constitute this Court's approval

8    of any amounts payable by the Debtors or their estates on

9    account of professional fees and expenses incurred by the

10   EFH notes trustee, which amounts, if any, shall be allowed

11   or otherwise authorized and paid by the Debtors or their

12   estates, only in connection with the plan, including through

13   the charging lien under EFH notes indenture, or further

14   order of this Court.  And I think that was at Docket Number

15   7143.

16             These provisions, despite agreement, despite no

17   objection, and despite the Debtor's invocation of Section

18   363 in the business judgment rule, cannot and do not

19   override the specific statutory requirements of Section 503.

20   The Bankruptcy Code, and I think I've stated this before, is

21   a comprehensive federal scheme designed to govern the

22   bankruptcy process.  Although flexibility is necessary, this

23   federal scheme cannot remain comprehensive of parties and

24   courts are free to treat the law to fit their preferences in

25   each case.

1          Sections 503(b)(3) through (b)(5) regulate

2     professional compensation and administrative expenses paid

3     from the estate in a comprehensive way that parties are not

4     free to rewrite.  Section 503(b) would be undermined if it

5     could be bypassed through consent, and professionals could

6     evade their burden to make the detailed showings required

7     under Sections 503(b) through (b)(5) if payment depended on

8     nothing more than agreement between the parties.

9          As to the indenture trustee's third argument,

10    basically the 503(b)(1)(a) argument, that its fees and

11    expenses are actual and necessary costs of preserving the

12    estate -- and they basically maintain that because they say,

13    "Hey, the parties had to maintain compliance with the Trust

14    Indenture Act, they had to maintain the reinstatement option

15    under the alternative plan, and it was better than not that

16    the Debtor thought it better to have an indenture trustee in

17    this case."

18          I've read the testimony, and I don't controvert

19    what it says, that that was AST-1, which is the Horton

20    testimony from back in November, I think, of 2015.  But I

21    kind of take that testimony as basically a question of, do

22    you want an indenture trustee?  And Mr. Horton saying,

23    "Yeah, sure, why not?  We'll take one.  It's fine, but we'll

24    have indenture trustee."  However, this argument is defeated

25    --

1           THE COURT:  Well, it may be actually necessary to

2    have an indenture trustee.  That's not to say it's actual

3    and necessary that the indenture trustee hire Mr. Pedone.  I

4    mean, if you need an indenture trustee to comply with the

5    Trust Indenture Act, so be it.  Indenture trustees don't

6    have to go out and hire third party legal counsel in order

7    to perform their duties under the Trust Indenture Act, or

8    (indiscernible) indenture trustees.

9           MR. SCHEPACARTER:  Exactly, exactly, correct.  And

10   I agree with that, Your Honor.  Because basically what I

11   think they were getting at was basically that the indenture

12   trustee had to be there.  So there's only a small little

13   microcosm of things that the trustee had to do, the

14   indenture trustee had to do just to comply with the

15   Indenture Trustee Act.  But there's a panoply of the other

16   things that the trustee has done in the case, I don't think

17   necessarily relate to that issue.  And I agree with Your

18   Honor's point on that.

19           There's no doubt that the indenture trustee's fees

20   are administrative expenses, and I think that's what we

21   agree on.  But these fees are governed by the more specific

22   section of Section 503(b)(3), (b)(4), and (b)(5), and not

23   the more general section of 503(b)(1)(a).  I cannot

24   articulate the rule of statutory interpretation known as

25   ejusdem generis, any better than Justice Scalia did in the

1    Rad LAX Gateway Hotel case, where he stated that a well-

2    established canon of statutory interpretation succinctly

3    captures the problem.  It is a commonplace of statutory

4    construction that the specific govern the general.  That is

5    particular true where as in Section 1129(b)(2)(a), and that

6    was the section they were dealing with, Congress enacted a

7    comprehensive scheme, and has deliberately targeted specific

8    problems with specific solutions.

9            The general-specific canon is perhaps most

10   frequently applied to statutes in which a general permission

11   or a prohibition is contradicted by a specific prohibition

12   or permission.  To eliminate the contradiction, the specific

13   provision is construed as an exception to the general one,

14   but the canon has full application as well to statutes such

15   as the one here, in which a general authorization, and more

16   limited specific authorization exist side by side.

17           Lastly, and I think most relevant here is the

18   application of 503(b)(3)(d) through (b)(5), which

19   specifically statutorily governs the fee request here.

20   Section 503 imposes detailed requirements that must be met,

21   and I've gone through them before, but I'll just hit the

22   highlight here, which is basically that the creditor must

23   show not only that the fees -- that the fees and expenses

24   were actual and necessary, but also must show that it has

25   made a substantial contribution to the case, and also that

1    the fees are reasonable.

2           Although the plan is silent as to the application

3    of Section 503(b)(3)(d), and (b)(4) and (b)(5), it is clear

4    that this professional, like other similarly-situated

5    professionals, are subject to 503(b).  The professionals

6    must satisfy the requirements that they've made not only a

7    substantial contribution in the case, more specifically,

8    that they rendered more than just an incidental benefit to

9    the estate, transcended by the party's self-interest, and

10   directly and materially contributed to the reorganization.

11          Your Honor previously stated again at that

12   December hearing that Courts have found that a creditor or

13   an ad hoc committee of creditors is entitled to payment of

14   its professional fees and expenses by virtue of making a

15   substantial contribution to the bankruptcy case.  But the

16   Court must make an independent determination as to the

17   existence of the substantial contribution, and whether the

18   fees and expenses are reasonable.  It cannot defer to the

19   Debtor's judgment.

20          The fact that the payment of such professional

21   fees are proposed as part of a Chapter 11 plan does not

22   relieve the third-party professionals of their obligations

23   to comply with the requirements of Section 503(b), which is

24   the sole source of authority to pay their post-petition

25   professional fees on an administrative basis.  As stated

1   earlier, and in our objection, plans pay only claims and

2   administrative expenses, and the professional's fees are

3   either administrative expenses are not, and if they're the

4   latter, they cannot be paid under a plan.  But because these

5   professionals seek to enjoy the benefits of the

6   administrative priority under Section 503, they must comply

7   with the obligations and limitations imposed by that

8   section.

9          In concert with that statutory construct, Your

10  Honor, again I'm citing from the December 3rd transcript,

11  Your Honor stated that it is appropriate and more prudent to

12  require compliance to Section 1129(a)(4) and 503 of the

13  Bankruptcy Code.  The professional fees may be evaluated as

14  a substantial contribution claim under 503(b)(3)(d) and

15  (b)(4) of the Code.  As with the payment of professional

16  fees under the settlement agreement, the record clearly

17  supporters a finding that the parties, covered by Article

18  4(r) of the plan, Section 2.7(b) of the settlement

19  agreement, Section 2.4 of the Fidelity settlement, and

20  Section 2(c)(6) of the EFH committee settlement, that all

21  provided substantial contribution to the case, justifying

22  the payment of their professional fees and expenses.  But

23  the Court at this time cannot make a finding of

24  reasonableness.

25          And this leads me to my very last point.  The case

1    law, and the legal standards in the Court's prior ruling in

2    this case, as well as the evidence that has been produced

3    that is relevant, comes to the inescapable conclusions that

4    Sections 503(b)(3), (b)(4), and (b)(5) all apply here.  The

5    indenture trustee must comply with and satisfy those

6    specific code sections, and make a showing of substantial

7    contribution.  And if the Court finds that the substantial

8    contribution showing has been made under the applicable law,

9    the fees and expense shall be reviewed for reasonableness as

10   contemplated by the plan, which (indiscernible) review

11   process in this plan is substantially similar, if not the

12   same as the process that was employed to review the fees and

13   expenses of the non-retained Section 503(b) T-side unsecured

14   professionals that took place earlier in this case.  Other

15   than that, I have nothing more to add, Your Honor.

16            THE COURT:  Thank you.  Thank you, Mr.

17   Schepacarter.  Mr. Hogan?

18            MR. HOGAN:  Good afternoon, Your Honor.

19            THE COURT:  Good afternoon.

20            MR. HOGAN:  Daniel Hogan, on behalf of the

21   asbestos objectors.  It's been said before, Your Honor, but

22   my sincere gratitude for you to allow me to stand before

23   you, and to create this record yet again.  I understand, and

24   your indulgence is greatly appreciated, as is that of your

25   staff.  Your Honor, tens of thousands of workers have been

1    exposed to Debtor's asbestos, and the families of those

2    workers have been exposed as well.  The Debtors sold their

3    asbestos assets, and their parent, EFH, borrowed all the

4    proceeds of those sales.

5              Now, we don't agree with the Debtor's calculation

6    of the amount of the inter-company loans.  We think it's

7    higher than what has been articulated.  But even the Debtors

8    concede that the $560 million was owed by EFH to LSGT on the

9    petition date, and because interest has been accruing, the

10   amount is substantially higher now.

11             We also don't agree with the Debtor's estimate of

12   the aggregate asbestos liabilities, and the Debtors have

13   stipulated that it will not be binding if in the future,

14   there are further proceedings on that issue.  But the

15   Debtors contend that the liability is only approximately $36

16   million, for both pending and future claims, even if no

17   claims are discharged, a small percentage of the money EFH

18   borrowed from the asbestos Debtors.  And when the Hunt plan

19   was confirmed, the Debtors assured that it wouldn't matter

20   how many claims were filed, that they would be paid.  Yet

21   EFH wants to have the asbestos Debtors discharge

22   unmanifested claims, so that EFH could obtain a windfall.

23             Now, according to the Debtors, when EFH went into

24   bankruptcy, the asbestos Debtors were rendered insolvent,

25   and were driven into bankruptcy themselves by their asbestos

1   liabilities.  While there's only one document called the

2   plan, Your Honor, each of the Debtors have their own

3   bankruptcy case, and the plan must be considered separately

4   for each Debtor.  As it relates to the asbestos Debtors, the

5   plan provide that they will emerge from bankruptcy looking

6   much as they did before.  They will be wholly-owned

7   subsidiaries of EFH, they will be merged with the

8   (indiscernible) subsidiary, their primary asset will be

9   inter-company claims, and their primary liabilities will be

10  asbestos claims.

11          Only, there's one major difference.  Under the

12  plan, claims for which a proof of claim was not filed by the

13  bar date would purportedly be discharged, including

14  unmanifested asbestos claims.  Plus, the asbestos Debtors

15  would emerge having shed large numbers of unmanifested

16  asbestos liabilities, without having to pay any money to the

17  holders of those claims.  And for each dollar that they

18  (indiscernible) to pay to their asbestos victims, it's a

19  dollar in the pocket of the parent EFH, and ultimately the

20  new parent, NextEra.

21          Now, in Mr. Husnick's opening, he said that the

22  Debtors have a fundamental disagreement with the asbestos

23  objectors regarding whether the asbestos Debtors can shed

24  their future liabilities in this way.  But I would submit,

25  Your Honor, that this agreement is not just with us.  It's

1   with Congress, the Third Circuit, as well as the Supreme

2   Court.  The asbestos objectors recognize that the bar date

3   order, the order confirming the now-defunct Hunt plan, that

4   this Court expressed the option that unmanifested asbestos

5   claimants are quote, "unknown", end quote, claimants, unless

6   the Supreme Court's decision in Mullane can provide

7   constitutionally adequate notice through publication.

8           But those orders are not final orders, Your Honor.

9   The bar date order did not purport to discharge claims.  And

10  the District Court has ruled that the confirmation order,

11  the Hunt confirmation order, was rendered non-final by

12  subsequent events.  Your Honor must now make a final ruling

13  on this issue.  It must, I ask the Court's indulgence, for

14  me to make one last attempt to convince you that our

15  position is appropriate.

16          The unmanifested asbestos claimants are not just

17  unknown, like the claimants in Mullane, they're un-self-

18  conscious and un-identifiable, even to themselves.  They do

19  not know that in the future, they will suffer injury from

20  exposure to Debtor's asbestos.  The kind of notice that is

21  sufficient for most people is not adequate here.  The

22  unmanifested asbestos claimants are analogous to incompetent

23  persons, whom, as the Supreme Court reconvened in Covey,

24  cannot make informed decisions, even if they see a notice.

25  Plus in the absence of a legal representative, no form of

Page 176

1    purported notice is satisfactory, to satisfy the

2    requirements of due process.

3             The Supreme Court in Amchem also recognized it is

4    not possible to provide constitutionally-adequate notice to

5    unmanifested asbestos claimants, a group that is quote,

6    "amorphous and un-self-conscious", end quote.  But even if

7    an unmanifested claim had saw the bar date notice, because

8    the claimant had not yet suffered injury, he or she would

9    not have the information or foresight needed to decide

10   intelligently whether to file a claim.  Moreover, there will

11   be unmanifested claimants do not ever see the notice, and

12   others who will not even know their exposure.

13            Now, the Debtor's point to the number of proof of

14   claims that were filed by persons who were exposed, but have

15   not manifested in asbestos-related injury.  I believe the

16   testimony, according to Mr. Vasquez, was 8495.  Now, the

17   Debtors argue that those claims show that the unmanifested

18   claimings were given adequate notice.  If anything, however,

19   those numbers illustrate the point that the Supreme Court

20   made in Amchem.  The Debtors sent notices to 70,000 exposed

21   workings in the Debtor's know -- that the Debtors know of,

22   and there will be tens of thousands of additional claimants

23   who have had secondary exposure, and those who will have

24   (indiscernible) claims when their loved ones potentially die

25   from asbestos-related illnesses.  Yet only 20,298 unique

Page 177

1   claims were filed in total, including only 8495 unmanifested

2   claims.

3          Why didn't all the exposed persons who saw the

4   notice file claims?  Because as the Supreme Court has

5   recognized, they have not suffered injury, and therefore

6   they do not have the information or foresight necessary to

7   make an intelligent decision.  As a matter of law, they have

8   not been given constitutionally-adequate notice.

9   Recognizing this fact, the Third Circuit has clearly

10  instructed in (indiscernible), and in Combustion Engineering

11  that when the interest of unmanifested asbestos claimants

12  will be affected in bankruptcy, due process requires that

13  they have a legal representative appointed by the Court.  In

14  Amchem, the Supreme Court clearly instructed that legal

15  representative for unmanifested asbestos claimants must be

16  separate from the fiduciary representing the interests of

17  current claimants, because of the diverse interests of those

18  groups.

19          But the Debtors in this case vigorously oppose the

20  appointment of a separate legal representative, and has

21  persuaded the Court that there is no need, because the

22  bankruptcy was not asbestos-driven, and that a legal

23  representative would cost too much.  The asbestos Debtors

24  have now changed their story on this point, however.  They

25  now contend that the asbestos Debtors were forced into

1    bankruptcy because they were cash-insolvent, and they could

2    not pay their asbestos liabilities as they came due.  When

3    it enacted 524(g) of the code, Congress specifically

4    recognized that unmanifested asbestos victims are uniquely

5    situated, and require special protection.

6            The statute clearly sets out that where a Debtor

7    wishes to discharge future unmanifested asbestos claims, it

8    must comply with certain requirements.  Those include that a

9    legal representative be appointed for future claimants, and

10   that a trustee set up to pay pending and future claims.  And

11   as the Third Circuit recognized in combustion engineering,

12   those requirements are intended to protect the due process

13   rights of the absent, unmanifested claimants who, quote, "do

14   not have a voice", end quote, in the reorganizing

15   proceeding.

16           We do not contend that the asbestos Debtors were

17   required to adopt the 524(g), we're not.  That is their

18   choice.  And the Courts do not -- and this Court does not

19   have to decide whether a 524(g) is the only way to discharge

20   future asbestos claims.  What we do contend is that in these

21   cases, where the asbestos Debtors know that workers exposed

22   to their asbestos will continue to fall ill for decades,

23   they do not choose to discharge the claims of those absent

24   and unidentified claimants without a legal representative,

25   without any compensation, and without any other adequate

1   safeguard of the claimant's rights.  And EFH may not

2   discharge any such future unmanifested claims, that may be

3   unassisted on a veil-piercing, or successor liability

4   theory, or the like.

5           And we have set forth in our brief that this

6   charge of claims here does not comport with the due process

7   under the test, as set forth by the Supreme Court in

8   Connecticut v.  Doehr.  Now, I'm not going to go through the

9   test here, Your Honor, and I don't want to belabor the

10  point, but I would like to address some of Debtor's

11  arguments in response.

12          First, at Paragraph 197 of the Debtor's reply

13  brief, the Debtors contend that because the unmanifested

14  claims are contingent claims, the private interest that is

15  affected by the discharge is minimal.  If every person who

16  will fall ill in the future will have a claim against the

17  Debtor under state law, and every person who did not file a

18  proof of claim in this bankruptcy case will be deprived of

19  their right to sue on that claim, that those Debtors cannot

20  be identified now does not make their interest any less

21  significant.  Rather, as Congress and the Supreme Court have

22  recognized, it means that the Court must be even more

23  vigilant when their rights -- to ensure that their rights

24  are protected.

25          The second point, Your Honor, in Paragraph 198,

Page 180

1    the Debtors argue that the confirmation order by this Court

2    discharging a claim would not deprive the claimant of this

3    claim, because he could come back to this Court and have his

4    claim reinstated, if he satisfies the burden of doing so.

5    Plus, they say, there is no discharge to being with.  This

6    is simply wrong.  The order discharging the claims is in

7    effect until the subsequent order is entered, permitting the

8    assertion of that claim.  If a claimant went directly to

9    State Court to sue, he would face an order to show cause for

10   a contempt action in this Court.  This is a clear

11   deprivation of the right to file suit.

12          Third, the Debtors assert that there's a strong

13   bankruptcy policy in setting a bar date.  But the bar date

14   does not result in the discharge of claims.  It is just a

15   procedural step.  It is the plan, and it's the Court's order

16   confirming the plan that would result in the discharge.  And

17   I know I'm preaching to the choir here, I know you

18   understand that, but I need to make the point.  We disagree

19   that that the bar date should be set for unmanifested

20   claimants, obviously.

21          Indeed, the Courts have regularly held that bar

22   dates for asbestos claims, both unmanifested and manifested

23   are not required, and that no such bar dates have been set

24   in the vast majority of asbestos cases.  In a few cases in

25   which the asbestos bar dates were set, such as Grace and

1    Bondex, they had no effect, and asbestos claims were not

2    discharged.  Regardless, we are not objecting here to the

3    bar date order.  Our objection is with the plan, and it is

4    the plan provisions that would discharge these unmanifested

5    claims.

6              Finally, the Debtors argue that the treatment of

7    asbestos claims, and the discharge of unmanifested claims

8    for which no proof of claims were filed is a foundation of

9    the deal with NextEra.  EFH argues that reinstating the

10   inter-company loans ensures that more assets are available

11   to the asbestos Debtors' creditors, and (indiscernible)

12   NextEra would agree to reinstate those loans only if the

13   unmanifested claims are discharged.  But the asbestos

14   Debtors cannot treat one group of creditors in order to

15   favor another, particularly when the creditors whose

16   interests are being sacrificed are absent and unrepresented.

17   And if the asbestos Debtors cannot trample in -- and the

18   asbestos Debtors cannot trample the due process rights of

19   unmanifested claimants to make EFH more attractive to

20   another buyer.

21             The asbestos debtors' plans, considered alone,

22   clearly cannot be confirmed.  It does not become confirmable

23   simple because the parent is also in bankruptcy, and

24   discharging the unmanifested claim is in that parent's best

25   interest.  In any event, EFH's dire prediction that the deal

1  will blow up of the claims are not discharge must be taken

2  with a grain of salt.  The Debtors managed to work things

3  out with NextEra in the aftermath of the Third Circuit's

4  decision on the make-whole claims, they should be able to do

5  the same here.

6          Both NextEra and EFH had their eyes wide open the

7  whole time when they did this deal.  We heard the testimony.

8  They were well aware of the due process issues, and they

9  decided to see if they could proceed with discharging these

10  claims.  They took a calculated risk.  They cannot hold this

11  Court hostage to that decision.  It bears noting, Your

12  Honor, contrary to the Debtor's assertion that NextEra

13  insisted on the discharge of the claims, the evidence shows

14  that NextEra actually proposed the 524(g) in July of 2016.

15          In fact, we elicited testimony from Mr. Horton

16  that the boards of the asbestos Debtors did not even

17  consider the proposal, even though they owed a fiduciary

18  duty to their creditors.  Rather, EFH, the controlling

19  parent, made the decision to reject the proposal out of

20  hand.  EFH told NextEra it did not want a 524(g) plan, and

21  it would cost less to discharge the unmanifested claims.

22          So, even though both EFH and NextEra were fully

23  aware of the constitutional challenge to the discharge, they

24  decided to proceed with it anyway.  I recognize that this

25  Court has found that the asbestos Debtors filed the petition

1    in the filing, and that filing was not in bad faith.  And as

2    this Court knows, the asbestos objectors have appeared that

3    ruling.  But even if that ruling were to stand, it doesn't

4    govern here.  As the Third Circuit instructed it in American

5    Capital Equipment, a bankruptcy case which is filed and

6    proceeds in good faith may nevertheless result in a plan

7    that does not fairly achieve a result that is consistent

8    with the objective and purposes of the Bankruptcy Code.

9    That is, even if the petitions are filed in good faith, the

10   plan could nevertheless be proposed in bad faith.

11           Here, the asbestos debtors' plan would sacrifice

12   the interest of unmanifested asbestos victims, a group which

13   Congress, the Supreme Court, and the Third Circuit have

14   recognized are uniquely situated, and require special

15   protections of their due process rights, and the plan would

16   sacrifice the interest of those claimants in order to

17   increase the value of equity.  Your Honor, we submit that

18   this is inconsistent with the objectives and purposes of the

19   code.  It is fundamentally unfair to the unmanifested

20   asbestos creditors who did not file a proof of claim, and it

21   is the epitome of bad faith.  Thank you.

22           THE COURT:  Thank you, Mr. Hogan.

23           MR. PEDONE:  Your Honor, may I respond very

24   briefly to a colloquy between you and Mr. Schepacarter

25   (indiscernible) in his argument?

1        THE COURT:  Yes.

2        MR. PEDONE:  Thank you.  Your Honor, Richard

3    Pedone, on behalf of EFH indenture trustee.  Your Honor, I'd

4    just like to briefly note that Section 315(c) of the Trust

5    Indenture Act sets out the following in event of default,

6    which this bankruptcy of course is, under the indentures.

7    The indenture trustee is required to act as a prudent

8    person.  And the Court made a comment with regard to what an

9    indenture trustee would be required to do or not do, with

10   regard to remaining counsel.  I'd submit that the touchstone

11   for totaling the fees and expense that an indenture trustee

12   would be entitled to under an indenture, is actually you

13   begin with what the indenture says, and the indenture

14   provides that part of the payment to an indenture trustee

15   would be fees and expenses reasonably incurred.  So again,

16   we come back to what would be reasonable incurred by an

17   indenture trustee.

18       But I guess my primary point, Your Honor, is to

19   emphasize what I stated in my closing, which I believe that

20   the best way to do deal with this, if the Court is willing

21   to, is to find that we, in fact, made a substantial

22   contribution, and hope that the Court does so.  Thank you.

23       THE COURT:  Okay.  Thank you, Mr. Pedone.  Mr.

24   McKane?

25       MR. MCKANE:  Thank you, Your Honor.  Just a few

1    points in response to Mr. Hogan, and I'll take them in the

2    order in which he presented his argument.  First, the notion

3    that he LSGT Debtors are in the same position that they were

4    when they filed this case is fundamentally refused by the

5    record.  While they may have inter-company receivables up

6    the EFH, the value of the receivables, and the ability to

7    reinstate those claims places the LSGT Debtors on

8    dramatically different footing, under this plan, than where

9    they were on April 28th, 2014.  That is uncontestable, under

10   the facts that have been presented in this case.

11          Second, what I heard is that no form of notice,

12   none, could possibly satisfy due process.  And if that's

13   their position, then they need to go talk to the Third

14   Circuit, because Grossman made clear that unmanifested

15   creditors could receive due process.  The question is, how

16   much.  And what they're saying is, if you take Grossman's

17   and Mulaney, and put them together, it's impossible.  No

18   form of notice could be together.  And the only way that

19   they get that is that they have to change the law.  That is

20   not the law as it currently exists.

21          Three, we were waiting for this, finally in

22   closing argument, on the plan of confirmation, we hear that

23   the bar date is not a final order, right?  We know that they

24   have a problem on appeal on this issue, they know they have

25   a problem on appeal with this issue.  But the bar date was

1    plain.  It specifically said parties who do not file a proof

2    of claim will not be considered creditors, hard stop.  That

3    is a final order.  We'll address it on appeal as necessary.

4    The discharge here is separate and distinct from that,

5    right.  The final order on a bar date is one that there is

6    no additional subsequent event, subsequent fact, subsequent

7    efforts by the Debtors that are necessary.  Once they appeal

8    the bar date, everything that they have done thereafter is a

9    collateral attack.

10           Fourth, I recognize this as zealous advocacy, but

11   the continual blurring of future claims and unmanifested

12   claims is not unintentional.  The case law that has been

13   presented to Your Honor and referenced draws a clear

14   distinction after Grossman's between future claimants, with

15   future exposure, and unmanifested claimants for prior

16   exposure.  The notion of a legal representative applies to a

17   future claimant, not an unmanifested claimant.  They had

18   four representatives that they represented, they had an EFH

19   committee, they had legal representation.

20           Five, to an extent that they -- anyone comes

21   forward and needs to seek relief, they will be seeking

22   relief from the bar date order, for failing to file a proof

23   of claim on time, as required.  And the due process that

24   they have challenged, that they will be putting forward, is

25   whether there was sufficient due process presented to them

1    in advance of failing to meet that date.  That will be the

2    challenge that a claimant will have to come forward with, if

3    they're unmanifested, and they didn't file proof of claim,

4    and they later manifest an injury.  It will be an attack on

5    the bar date order, not the plan of confirmation order.  The

6    challenge with doing numbers is that you lose count of your

7    numbers.  I think I'm on six.

8            THE COURT:  I think you're on six.  Go with F.

9            MR. MCKANE:  Let's go six.  The argument that the

10   Debtors and NextEra were able work around the Third Circuit

11   make-whole ruling so they can work around this is difficult

12   for us to fathom.  And I say that because yes, we were able

13   to work it out with NextEra, with regards to the Third

14   Circuit ruling.  And how did we do that?  Remove the

15   condition precedent that said we had to have your appeal,

16   your arguments stand on appeal.  We took out the language

17   that said that NextEra would ever be liable for the make-

18   whole rulings if there was a reversal and a change after

19   closing.  And NextEra put in nothing, nothing more.  Right?

20           We removed the footnote from the EFIH PIKs that

21   said that they would be topped up.  Everything that we had

22   to do to fix the plan after the Third Circuit make-whole

23   ruling was to make them economically neutral, and it

24   ultimately came to the detriment of other creditors.  So the

25   notion that we could put this Humpty Dumpty back together

Page 188

1    again, if we had a reversal here, is not established by the

2    fact that we were able to fix this plan after the make-whole

3    ruling.

4              And finally, Your Honor, as it relates to the

5    evidence regarding whether somehow EFH took actions

6    inconsistent with the interest of LSGT Debtors, the record

7    is replete, and full -- excuse me, not replete, full of

8    evidence that the LSGT Debtors evaluated what was in their

9    interest, they concluded that reinstatement was the path to

10   go.  Yes, the LSGT Debtors rely on the same restructuring

11   team as the EFH Debtors.  And you heard Mr. Wright testify

12   today as to the efforts to evaluate whether a 524(g) trust

13   made sense.  They concluded it didn't, for very clear and

14   obvious reasons, and they moved forward.  I don't think

15   there's any --

16             THE COURT:  Is Mr. Wright general counsel to the

17   asbestos debtors as well?

18             MR. MCKANE:  Mr. Wright is the chief legal officer

19   for every remaining Debtor, that's right.  And Your Honor,

20   with that, we fully resect how Mr. Hogan has protested

21   himself.  HE recognizes the challenges here.  But

22   ultimately, arguments must end, and then we're prepared to

23   take this quest as long as he wants to go.  But this order,

24   this confirmation order, this plan is absolutely

25   confirmable.  His issues, we respect them, we acknowledge

1    what they are.  They're clearly a constitutional due process

2    challenge.  They relate to the bar date order, and we will

3    address them in this Court, and in any other Court as

4    needed.  Thank you, your honor.

5              THE COURT:  Thank you.

6              MR. HOGAN:  Nothing further, Your Honor.

7              THE COURT:  All right, thank you very much for

8    your closing arguments.  The Court will consider them, and

9    consider the objections over the evening, and we'll

10   reconvene tomorrow at 10:00 AM to go through the amendments

11   to the plan, and the proposed confirmation order, and at

12   that time, I will also rule on the satisfaction -- well, I

13   can say it now, I mean, the 1129 standards are met.  The

14   issues are discreet, and I think the only contested issues

15   left for me that I will deal with tomorrow are the objection

16   of the U.S. trustee to the payment of EFH indenture

17   trustee's fees.  Obviously, Mr. Hogan's clients' objection,

18   in connection with the asbestos objectors.

19              Then, of course, if any issues arise in connection

20   with changes that have been negotiated over the two last two

21   days, and two nights, in the wee hours, I will call balls

22   and strikes, or make any comments as necessary, once I

23   actually see the language.  So I'll deal with those

24   tomorrow.

25              And we'll do that at 10:00, and if we could have

1    our normal pre-chambers meeting at 9:30 to see where we are

2    in connection with panning the rest of the day, that would

3    be great.  So we're adjourned until tomorrow.

4                        * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 191

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

     Ledanski Hyde

7

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o,
ou, email=digital1@veritext.com,
c=US
Date: 2017.02.17 16:17:27 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 17, 2017