Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4   In re:                        :

                                 :   Chapter 11

5   ENERGY FUTURE HOLDINGS        :

    CORP., et al.,                :   Case No. 14-10979(CSS)

6                                 :

            Debtors.              :   (Jointly Administered)

7   _____ :

8

9

10

11

12                          United States Bankruptcy Court

13                          824 North Market Street

14                          Wilmington, Delaware

15

16                          February 17, 2017

17                          10:08 AM to 11:25 AM

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCEHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

1    HEARING re E-Side Confirmation

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sheila Orms and Jamie Gallagher

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS LLP

3          Attorney for the Debtors

4          300 North LaSalle

5          Chicago, IL 60654

6

7    BY:  CHAD HUSNICK, ESQ.

8

9    KIRKLAND & ELLIS LLP

10         Attorney for the Debtors

11         555 California Street

12         San Francisco, CA 94104

13

14   BY:  MARK MCKANE, ESQ.

15

16   KIRKLAND & ELLIS LLP

17         Attorney for the Debtors

18         601 Lexington Ave

19         New York, NY 10022

20

21   BY:  APARNA YENAMANDRA, ESQ.

22

23

24

25

1   POTTER ANDERSON CARROON LLP

2       Attorney for Deutsche Bank New York

3       1313 North Market Street

4       6th Floor

5       Wilmington, DE 19801

6

7   BY:  R. STEPHEN MCNEILL, ESQ.

8

9   PACHULSKI STANG ZIEHL & JONES LLP

10      Attorney for EFIH Second Lien Noteholder

11      919 North Market Street

12      17th Floor

13      Wilmington, DE 19801

14

15  BY:  LAURA DAVIS JONES, ESQ.

16

17  SULLIVAN & CROMWELL LLP

18      Attorney for E-Side Committee

19      125 Broad Street

20      New York, NY 10004

21

22  BY:  VERONICA IP, ESQ.

23      BRIAN GLUECKSTEIN, ESQ.

24

25

1    MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

2         Attorney for E-Side Committee

3         1105 North Market Street

4         15th Floor

5         Wilmington, DE 19801

6

7    BY:  DAVIS LEE WRIGHT, ESQ.

8

9    KLEHR HARRISON HARVEY BRANZBURG LLP

10        Attorney for UMB Bank, Indenture Trustee

11        919 North Market Street

12        Suite 1000

13        Wilmington, DE 19801

14

15   BY:  RAYMOND H. LEMISCH, ESQ.

16

17   PROSKAUER ROSE LLP

18        Attorney for EFH Corp.

19        70 West Madison

20        Suite 3800

21        Chicago, IL 60602

22

23   BY:  PETER YOUNG, ESQ.

24

25

```
1    PROSKAUER ROSE LLP

2         Attorney for EFH Corp.

3         2049 Century Park East

4         Los Angeles, CA 90067

5

6    BY:  MICHAEL FIRESTEIN, ESQ.

7

8    HOGAN MCDANIEL

9         Attorney for Fenicle, Fahy, Jones & Hainzmann

10        1311 Delaware Avenue

11        Wilmington, DE 19806

12

13   BY:  DANIEL K. HOGAN, ESQ.

14

15   UNITED STATES DEPARTMENT OF JUSTICE

16        Attorney for U.S. Trustee

17        844 King Street

18        Suite 2207

19        Wilmington, DE 19801

20

21   BY:  RICHARD L. SCHEPACARTER, ESQ.

22

23

24

25
```

```
 1   CHADBOURNE & PARKE LLP
 2         Attorney for NextEra
 3         1301 Avenue of the Americas
 4         New York, NY 10019
 5
 6   BY:  HOWARD SEIFE, ESQ.
 7         ERIC DAUCHER, ESQ.
 8
 9   CHADBOURNE & PARKE LLP
10         Attorney for NextEra
11         350 South Grand Avenue
12         32nd Floor
13         Los Angeles, CA 90071
14
15   BY:  ROBIN BALL, ESQ.
16
17   LANDIS RATH & COBB LLP
18         Attorney for NextEra
19         919 Market Street
20         Suite 1800
21         Wilmington, DE 19801
22
23   BY:  MATTHEW MCGUIRE, ESQ.
24
25
```

```
 1   FOLEY & LARDNER LLP
 2        Attorneys for UMB Bank, N.A.
 3        321 North Clark Street
 4        Suite 2800
 5        Chicago, IL 60654
 6
 7   BY:  MARK HEBBELN, ESQ.
 8        HAROLD KAPLAN, ESQ.
 9
10   COLE SCHOTZ P.C.
11        Attorney for Deutsche Bank New York
12        500 Delaware Avenue
13        Suite 1410
14        Wilmington, DE 19801
15
16   BY:  NORMAN PERNICK, ESQ.
17
18   AKIN GUMP STRAUSS HAUER & FELD, LLP
19        Attorney for UMB Bank, NA
20        1333 New Hampshire Avenue, NW
21        Washington, DC 20036
22
23   BY:  SCOTT ALBERINO, ESQ.
24
25
```

1  AKIN GUMP STRAUSS HAUER & FELD, LLP

2        Attorneys for UMB Bank, NA

3        One Bryant Park

4        Bank of America Tower

5        New York, NY 10036

6

7  BY:  ABID QURESHI, ESQ.

8        CATHERINE EISENHUT, ESQ.

9

10  WILMER CUTLER PICKERING HALE AND DORR, LLP

11        Attorney for EFIG IL Trustee

12        7 World Trade Center

13        250 Greenwich Street

14        New York, NY 10007

15

16  BY:  PHILIP ANKER, ESQ.

17

18  BIELLI & KLAUDER, LLC

19        Attorney for EFH Corp.

20        1204 N. King Street

21        Wilmington, DE 19801

22

23  BY:  CORY STEPHENSON, ESQ.

24

25

```
                                                    Page 10
1    KRAMER LEVIN NAFTALIS & FRANKEL LLP

2         Attorney for 2nd lien indenture trustee

3         1177 Avenue of the Americas

4         New York, NY 10036

5

6    BY:  GREGORY HOROWITZ, ESQ.

7

8    SHEARMAN & STERLING, LLP

9         Attorney for Deutsche Bank New York

10        599 Lexington Avenue

11        New York, NY 10022

12

13   BY:  NED SCHODEK, ESQ.

14

15   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

16        Attorney for Adhoc Committee of TCEH first lien

17        creditors

18        1285 Avenue of the Americas

19        New York, NY 10019

20

21   BY:  JACOB ADLERSTEIN, ESQ.

22

23

24

25
```

1   BAYARD, PA

2        Attorney for Delaware Trust Company

3        222 Delaware Avenue

4        Suite 900

5        Wilmington, DE 19899

6

7   BY:  GIANCLAUDIO FINIZIO, ESQ.

8

9   PERKINS COIE LLP

10        Attorney for Delaware Trust Company

11        30 Rockefeller Plaza

12        22nd Floor

13        New York, NY 10112

14

15   BY:  TINA MOSS, ESQ.

16

17   NIXON PEABODY LLP

18        Attorney for American Stock Transfer

19        100 Summer Street

20        Boston, MA 02110

21

22   BY:  RICHARD PEDONE, ESQ.

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. MCKANE:  Good morning, Your Honor.  For the

5     record, Mark McKane of Kirkland & Ellis on behalf of the

6     Debtors.

7              Your Honor, just a brief update on the activities

8     over the last 18 hours or so.  Yesterday evening at Docket

9     entry 10848, the debtors filed the latest form of plan and

10    order.  The clean plan was attached as Exhibit A-1.  The

11    claim order was Exhibit B-2 and the term sheet and the

12    settlement term sheet was Exhibit 3.

13             What the debtors propose to do with regards to the

14    settlement agreement is as follows.  First of all, the

15    settlement agreement is finalized.  We have -- it has been

16    reviewed and approved by the first lien -- steering

17    committee of the first liens, the steering committee of the

18    second liens and the PIKs.

19             What the debtors propose to do is to file by

20    motion for approval of the settlement agreement tonight.  We

21    will be filing the settlement agreement as the prospective

22    holders by collecting signature pages and given the notice

23    program that we're going to be putting forward, which is

24    going to be extensive, we would ask Your Honor if you could

25    hear us potentially on May -- excuse me, March 28th when we

1  have our omnibus date for March, with an objection deadline

2  of the 21st.

3          THE COURT:  Okay.  That scheduling is fine.

4          MR. MCKANE:  Thank you, Your Honor.  With that, I

5  believe Mr. Horowitz would want to make a clarification with

6  regards to the fact that he -- the second liens do not have

7  specific signature pages right now as it relates to the

8  order.

9          THE COURT:  Okay.

10          MR. HOROWITZ:  Good morning, Your Honor, Gregory

11  Horowitz from Kramer Levin on behalf of the EFIH second lien

12  notes trustee.

13          As Mr. McKane just said, we do not -- are not yet

14  in a position to tell you that we have signed and released

15  signature pages from the requisite more than 50 percent of

16  our holders.  But we have been in touch with holders of more

17  than 85 percent of the second lien notes.  All of the

18  holders that we have been in touch with are supportive of

19  the settlement, the economic terms of the settlement.  We

20  have not heard from any holders who have any objections or

21  concerns with dissent from the settlement.

22          We're just working out some mechanical details

23  with regard to the direction which we hope and expect to

24  have resolved within the next few days, certainly before the

25  settlement agreement objection deadline.

1          So we expect to be able to go forward with the

2     settlement, Your Honor.  And unless you have any questions

3     on that, I just wanted to make one other statement with

4     regard to the plan confirmation issues.

5          As Your Honor knows, the second lien trustee did

6     file an objection to the plan.  While it was captioned as an

7     objection, really the gist of our issue, Your Honor, was

8     ensuring that the claims reserved that was to be set up

9     under the plan before amendment would be set at an adequate

10    level.

11         We always took the position that if it was set at

12    the appropriate level, which we had maintained was all

13    distributable value, that the plan would satisfy indubitable

14    equivalent under the plan as amended to accommodate the

15    settlements.

16         That issue will only come before Your Honor in the

17    hopefully very unlikely event that the settlement agreements

18    -- the settlement agreement as to either the first's or the

19    second's falls through, given that Your Honor will retain

20    under those circumstances the power to set the claims

21    reserve at the appropriate level.  We agree that this plan

22    does satisfy the indubitable equivalent standard.

23         THE COURT:  Okay.  Very good, thank you, Mr.

24    Horowitz.  Mr. Anker.

25         MR. ANKER:  Good morning, Your Honor, Phillip

1    Anker, Wilmer Cutler Pickering Hale & Dore for Delaware

2    Trust as the EFIH first lien indentured trustee and an ad

3    hoc group of first lien holders.

4            I'm pleased to report that we have signatures that

5    I expect to be released today on the settlement agreement

6    for more than 50 percent of the first lien holders.  There

7    are a series of what I term crossover holders, holders of

8    first lien that also hold second lien notes, all of whom are

9    also supportive of the settlement, and if and when the

10   issues with the direction letter with respect to the second

11   lien trustee are resolved, I expect that they will then

12   release.  And unless they're selling or something changes in

13   the interim, I think that will bring first liens signed on

14   parties to somewhere in the vicinity of 88 percent.

15           So, in any event, we are able to sign and release

16   today.  There were a handful of changes to the settlement

17   agreement that were back and forth e-mails, and I understand

18   the debtor and all other parties have agreed to.  I note

19   that our settlement in the very unlikely event, I accept Mr.

20   Horowitz's representation of the second lien settlement, is

21   likely to get on board.

22           But in the unlikely event that it doesn't happen

23   the way the documents are written, our settlement can go

24   forward independent of the second lien settlement, and also

25   the hopefully unlikely event that if Your Honor confirms the

1    plan, the plan isn't consummated, our settlement is also

2    evergreen.  And so the claims will be allowed and continue

3    to accrue interest at the contract rates thereafter until

4    paid.

5              So I believe that we are able to release today,

6    and I will not speak for counsel for the PIKs, but I believe

7    they are and I think that allows the first lien settlement

8    to go forward as of today.  And there is a provision for

9    signatures to be added and parties to sign on to the deal I

10   think at any point going forward so we do hope and expect

11   the number to increase.

12             Finally, on the plan I echo Mr. Horwitz's

13   comments.  Our principal objection, and it was filed as an

14   objection to the plan, was that we didn't think the reserve

15   was adequate to give us the indubitable equivalent as it is

16   currently written essentially everything will go into the

17   reserve until either the settlements go forward and we are

18   paid, or if in the event that Your Honor doesn't approve the

19   settlement, that Your Honor makes a determination of the

20   adequacy of the reserve, and all of our rights, all of the

21   2L's rights, and all of the debtor's and everyone else's

22   rights are preserved to argue about what that reserve should

23   constitute.

24             So under those circumstances where the current

25   plan preserves everyone's rights with respect to that

1    reserve and everything goes in the interim, we too believe

2    that that is adequate to satisfy the indubitable equivalent

3    standard as of now.  Thank you, Your Honor.

4              THE COURT:  Thank you.  Mr. Anker, any further

5    comment related to that?

6         (No response)

7              THE COURT:  Mr. Alberino?

8              MR. ALBERINO:  Good morning, Your Honor, Scott

9    Alberino from Akin Gump on behalf of UMB.

10             Your Honor, very brief comments.  As Mr. Anker

11   said, the PIK holders that signed onto the plan support with

12   the company, we hold approximately 70 percent of the PIK,

13   are prepared to release signatures as well, alongside Mr.

14   Anker's clients on the settlement.

15             So we expect to be back here on March 28th and

16   hopefully get the settlement approved.

17             THE COURT:  Okay.  Excellent, thank you.

18             Well, let me turn then to rulings on the

19   objections to confirmation that remain outstanding.  So as a

20   preliminary comment, the first and second lien classes I

21   believe the votes that are still in play are votes to reject

22   the plan.

23             So the Court is required to make a finding for

24   confirmation that the cram down provisions are satisfied

25   with regard to those two claims, two classes.

1          So based on the settlement of the plan objections,

2     which is then based on the settlement/preservation of

3     rights, so we'll either have a settlement of the first and

4     second liens that will be approved by the Court, or we'll

5     have a trial over what the reserve is.  And all rights are

6     specifically and expressly reserved in connection with

7     whatever trial that will be.

8          And NextEra and the plan proponents, NextEra, the

9     debtors, the 1L's, the 2L's have agreed that they -- and the

10    PIKs that whatever the Court ultimately rules, if required

11    to rule on what the reserves should be, will be binding.  I

12    find that the plan as proposed satisfies the indubitable

13    equivalent standard, and as a result, is fair and equitable

14    to the 1L's and 2L's and the cram down standard is met.  And

15    that that is based on both -- is based on the settlement of

16    the plan objections which in turn is based on the settlement

17    of the claims, which in turn is based on a preservation, a

18    full preservation of the ability to litigate what the

19    appropriate reserve will be in the case that settlements are

20    not ultimately approved or agreed to.

21          So we'll get that out of the way.  That leaves the

22    objections of the Office of the U.S. Trustee and the

23    asbestos debtors.  I'd like to deal with the Office of the

24    U.S. Trustee objection first, it's frankly simpler, easier

25    to deal with.

1          So the objection there is to the payment of the

2     attorney's fees and expenses of the EFH indentured trustee

3     represented by Mr. Padoni and his firm.  And the basis there

4     has to deal with really I think what standard will govern

5     those payments.  And importantly the payment of those fees

6     is not coming out of the charging lien, as it is with the

7     EFIH unsecured indentured trustee payments.

8          It is coming separate from whatever payment those

9     creditors are going to receive under the waterfall under the

10    plan, which is approximately ten cents on the dollar, give

11    or take is my understanding.

12         So the -- a variety of legal theories have been

13    presented to the Court to justify those payments.  The

14    debtors rely on 363(b), and say this is an exercise of the

15    debtor's business judgment to use property outside the

16    ordinary course of business, to make these payments really

17    relying on the fact that this is a settlement of both

18    reaching back to December 2015, as well as a recent

19    settlement, I guess, although not technically approved under

20    9019 of objections or potential objections to this plan.

21         The other way it's been put forward is forgetting

22    that, that the indentured trustee has -- and its lawyers

23    have provided a substantial contribution to the progress of

24    these estates, and thus are entitled to an administrative

25    claim for that substantial contribution under 503.

1            The other theories are that 503(b)(1) is satisfied

2     because the existence of an indentured trustee and their

3     lawyers in this instance was an actual and necessary expense

4     of the debtor's case.

5            So where I come down on this is not to reject the

6     arguments under 363, or the actual and necessary argument,

7     but to avoid making a decision on the 363 and the actual and

8     necessary argument.  Because I find that based on my

9     experience in the case, as well as the specific record that

10    was not challenged and not an overly thick record, but a

11    record as to substantial contribution that was not

12    specifically challenged by the Office of the U.S. Trustee.

13           Like I found with the last plan that was confirmed

14    in December of 2015, I believe that the indentured trustee

15    for the EFH noteholders has provided a substantial

16    contribution to the debtor's estate that would justify a

17    payment of administrative expense claim for those fees and

18    expenses.

19           As I did previously, I'm not making a finding on

20    reasonableness.  The reasonableness of those fees will be

21    determined in the future by the Court after review by the

22    fee committee.

23           But the basis for the contribution I am finding

24    exists.  And I've already found through December of 2015, so

25    we're really focused on what happened in 2016 in this case.

1    And there was substantial litigation by the indentured

2    trustee of a variety of issues.  Ultimately, that litigation

3    led to I believe substantially led to an increase of

4    distributable value to the estates of approximately $400

5    million.

6            That was and is a contribution to the debtor's

7    estate that is specifically came from the vetting of the

8    plan and the plan process and the PIK process that went on

9    in really starting in -- starting before May of 2016, but in

10   earnest from May 2016 all the way through September 2016.

11           And then, of course, clean-up afterwards, in

12   particular after the development of the make whole

13   litigation.

14           Now, the make whole litigation in November of 2016

15   and specifically the 3rd Circuit's ruling ultimately has led

16   to a situation where that distributable value will not inure

17   to the benefit of the EFH unsecured creditors.  And will

18   actually end up benefitting the -- maybe the second liens,

19   but most probably actually benefitting the PIK noteholders.

20           But that doesn't mean -- that's just the virtue of

21   the legal rulings and the waterfall.  That doesn't mean that

22   there wasn't a contribution by the indentured trustee to the

23   estate as a whole, although it ultimately is not going to

24   inure -- unfortunately, to the benefit of those creditors.

25           But that certainly isn't the fault of no one,

1    other than the appellants who were successful with the 3rd

2    Circuit and the 3rd Circuit.  So the Court will, of course,

3    follow and is happy to follow the direction of the appellate

4    court in following up on the -- how this case has proceeded.

5           So I find there's a substantial contribution.  I

6    don't reject, but I ignore the alternative arguments,

7    because I don't want to make -- frankly make law one way or

8    the other on those arguments, I don't have to.

9           And as a result I'll overrule the objection,

10   solely on the basis that I find there's a substantial

11   contribution, the reasonableness of which will be determined

12   under the review procedures which will run through the fee

13   committee.

14          That leads the Court to the objection of the

15   asbestos objectors as they've become known, Ms. Benna

16   Goldman Stahee (ph) and oh, two other objectors who don't --

17   whose names and I apologize don't jump to my mind,

18   represented by Mr. Hogan.

19          MR. HOGAN:  Your Honor, Daniel Hogan on behalf of

20   Fanake Fahee Jones (ph) and Hinzman (ph).

21          THE COURT:  Thank you.

22          MR. HOGAN:  You're welcome.

23          THE COURT:  So Mr. Jones and Mr. Hinzman.

24          This is a serious issue and I think Mr. Husnick

25   (ph) who is a consummate professional misspoke in his

1    opening argument when he said it was a minor issue or a

2    small issue.  I think what he meant is that when you look at

3    $42 billion of ultimate debt when we started and about $18

4    billion of big picture deal money if you include all that's

5    going on downstream at Encore, that we were talking about

6    claims that were running at $2 million a year including

7    attorney's fees pre-petition.

8            So the dollar figures are not driving this case.

9    However, they are significant.  They're significant to

10   NextEra.  If they weren't, they wouldn't be insisting on

11   reinstating only preserved claims, if they felt they were

12   insignificant, it would be neither here nor there.  So those

13   numbers are important.

14           More importantly, they are significant to the

15   persons who ultimately may have been injured by exposure to

16   asbestos by predecessors to the current debtors, for which

17   the debtors, now NextEra through the assumption and

18   reinstatement will be liable.

19           I had an experience very early in my career, I was

20   brand new at my law firm.  And some of the people, some of

21   the lawyers in my firm represented a defendant in numerous

22   asbestos suits, the firm that had made brake liners that

23   contained asbestos.

24           And I really never worked heavily on the case;

25   however, or the cases, however, I was tasked to attend a

1   deposition of a mesothelioma victim and this occurred, it

2   was a videotape -- I don't know if it was videotaped

3   actually it may have been that long ago that it wasn't

4   videotaped but it was certainly recorded.

5          And it occurred in the living room of this

6   gentleman's home where he was on a hospital bed, on the

7   verge of death.  And about 20 lawyers crowded in to the

8   living room in order to attend this deposition.

9          And that has always stayed with me really

10  throughout my adult life to bring home the seriousness of

11  these issues.  These are real people, who have really been

12  injured.  And certainly some will die as a result of this

13  exposure of a very terrible, there are no unterrible cancers

14  I suppose, but a very terrible cancer if it's mesothelioma.

15  Other lung cancers and even if not developing cancer will

16  suffer the physical limitations of pleura thickening or

17  asbestosis, so I take it very, very seriously.

18         And I have taken it very seriously throughout the

19  cases.  But I have a limited role, it was not the Court's

20  decision or exercise of the Court's business judgment to

21  seek a bar date.  It's not the Court's exercise of my own

22  preferences or business judgment to seek to only reinstate

23  those claims that are properly preserved under the bar date.

24         My job in this context is to see what the debtor's

25  business judgment and the other parties involved in the

1    debtors plan, specifically NextEra, they make a decision and

2    it's my job to say is that decision consistent with the law,

3    is it consistent with due process, and is it in good faith.

4         One of my colleagues yesterday asked me if I had

5    any regrets in connection with how this case was handled

6    over the last three years, and I truly don't.  I don't

7    regret any of the decisions I've made, even those that have

8    proven to be reversed or wrong.

9         If I have a regret it's not that I approve the bar

10   date, but that the debtors asked for one in the first place.

11   Because it will adversely affect clients of Mr. Hogan and

12   others who have manifested injury -- or will manifest injury

13   based on prepetition exposure who have not filed proofs of

14   claim and those at least from a preliminary perspective,

15   those claims will be barred.

16        It's also led to a lot of litigation and a lot of

17   expense and a $2 million noticing program.  So it was not an

18   insignificant action in this case.

19        But I don't regret my decision in January of 2015

20   finding that the bar date was appropriate, and finding that

21   it was consistent with 3rd Circuit law in Grossman's and

22   Supreme Court law governing exercise of due process and

23   noticing.  And I don't regret approving the noticing

24   procedures later that year that were ultimately worked out.

25        There have been -- this issue has arisen numerous

1    times in the context of the initial bar date motion

2    approving the noticing procedures, objecting to confirmation

3    in 2015, in the motion to appoint a claims representative or

4    a class representative, in the motion to file a proof of

5    claim that would apply to all unmanifested claimants, and

6    the motion to dismiss the cases as having been filed in bad

7    faith, and now in the objection to this plan based on due

8    process and lack of good faith.

9            And I have ruled numerous times and repeatedly on

10   these issues, and I am not going to go through the process

11   of walking through each and every ruling that I've

12   previously made.

13           I believe that the record that I've made in my

14   written opinions, in my oral rulings on these issues is

15   exhaustive and I will incorporate them in making this

16   ruling.

17           I do want to make a couple of specific points,

18   however.  And one of those sort of deals with whether we're

19   talking about an objection here today to the bar date motion

20   and the bar date itself, which has already been set and was

21   not appealed, or whether we're talking about the discharge

22   of those claims.

23           And this came out in oral argument, and Mr. McKane

24   responded to Mr. Hogan's argument, and stated that they were

25   not objecting to the bar date, that they were objecting to

1    discharge.

2              I think that the two work in tandem, but are also

3    independent.  In the future if a currently unmanifested

4    claimant develops an injury, that claimant will have the

5    ability to come back to this court or to another court and

6    seek relief from the bar date.

7              And really not from the discharge injunction

8    because one follows from the other.  You need release from

9    the bar date to file a claim that will be allowed, and once

10   you have that, the discharge and injunction no longer apply

11   to you, your claim is reinstated.  The discharge also kicks

12   in if you don't -- if you didn't file a claim.

13             So I think that what we're really talking about,

14   if you're talking about injury or due process problem for

15   unmanifested claimants, we're talking about the effect to

16   the bar date and the discharge really only kicks in if they

17   haven't filed a claim.

18             So it does work in tandem, and I certainly am

19   addressing the merits of the argument that the discharge is

20   a violation of due process and means that the plan was filed

21   in good faith.  And -- but however, I really think that the

22   ultimate problem that's -- that continues to exist for the

23   unmanifested claimants who didn't file proofs of claim is

24   the bar date itself.

25             So perhaps it's a distinction without a

1  difference, but I think it's an important distinction.  And

2  what I see in the future happening is that someone who has

3  manifested injury in the future who didn't file a proof of

4  claim will seek relief from the bar date, whether that

5  occurs here or in another court is a matter for a future

6  day.  And that'll be dealt with.  And once that's dealt with

7  really the discharge falls away because the claims are

8  reinstated.

9           It would be different, for example, if -- I think

10  the discharge would be more important if we were in a

11  situation say where the claims were not being reinstated,

12  that the intercompany 500 and something million dollar claim

13  was the basis for funding the LGST debtors distribution,

14  which I think the evidence indicates about $40 million

15  available, maybe the claims come in north of the 34 million

16  or so estimated by Dr. Vasquez, and you were talking about

17  claims that were going to get paid less than a hundred cents

18  on the dollar.

19           Then we would have a discharge argument maybe

20  which is that claims being paid less than a hundred cents on

21  the dollar, you allow claims that are allowed, even though

22  there is no claim, but they're allowed after the Court

23  relieves the creditor from the bar date, would still

24  nonetheless be discharged in that they would be receiving

25  less than a hundred cents on the dollar, and they wouldn't

1    have the ability to go for that shortfall against -- in the

2    future against the debtors.  That's really where discharge

3    sort of kicks in.

4            But the reality is, once allowed they're going to

5    be treated under the plan in a way that reinstates them.  So

6    I wanted to deal with that specifically.

7            The other subject I wanted to specifically address

8    is the good faith argument.  Again the Court has previously

9    ruled that these cases were filed in good faith and that's

10   been appealed.  And I think Mr. Hogan correctly says, a case

11   that's filed in good faith can nonetheless -- a debtor that

12   filed a case in good faith can nonetheless propose a plan

13   that's not in good faith.

14           I believe however in these specific circumstances

15   that for the exact same reasons that the Court ruled that

16   the plan -- that the cases had been filed in good faith,

17   that the plan as it applies to the asbestos debtors is also

18   proposed in good faith.

19           And there's additional evidence that indicates

20   that -- how these cases developed, you know, the issues

21   there were, you know, you had the LGST debtors that were

22   cash flow insolvent on the petition date because of the

23   automatic stay and the nature of their unsecured claim

24   against EFH.

25           You had the issue of how those claims, asbestos

1   claims would be treated, whether they would maybe be

2   reinstated, maybe not be reinstated, would they receive a

3   distribution that might be certainly less than a hundred

4   cents on the dollar.

5           The overhang of the potential liability for taxes

6   which would arguably be priority claims that would trump

7   asbestos unsecured tort claims and would possibly take away

8   any value that could possibly flow to the asbestos

9   claimants.  A very important issue.

10          Those are the issues on the petition date and the

11  issues that drove the directors and managers of the asbestos

12  debtors to file the cases in the first place.

13          How they developed post-petition and how they

14  developed into the plan that's in front of the Court, I

15  think are -- the evidence there is a clear indication that

16  the plan today is proposed in good faith.

17          This plan is not designed to avoid asbestos

18  liabilities.  There is strong evidence that NextEra's

19  willingness to reinstate properly preserved claims, it

20  specifically includes in that decision to not to limit that

21  liability in such a way as to not include claims that were

22  not filed.  In other words, they're willingness to accept

23  the claims that they did is based in part on the fact that

24  there is a bar date in place that limits the universe of

25  claims to the various numbers, but approximately 26,000

1    claims, with duplicates maybe it's lower, but we'll just use

2    26,000 claims, that sort of defined universe and I think

3    it's about 10,000 unmanifested claims that were filed.

4         This case, in my mind, is an absolute terrific

5    result for the vast majority of asbestos claimants.  Those

6    claims are being fully reinstated.  The intercompany claims

7    that fund those claims are being reinstated, and the company

8    against which that claim that funds those asbestos claims is

9    going to emerge extremely solvent, with billions of dollars

10   in equity, a hundred million dollars is being specifically

11   escrowed to pay those claims.

12        That is a terrific result.  It is not a terrific

13   result for unmanifested claimants who did not file a proof

14   of claim.  For them, it's a terrible result.  But the

15   debtors in proposing this plan and NextEra proposing this

16   plan I think appropriately looked at the bigger picture, and

17   did the best they could in developing a plan that covered as

18   many claimants as possible in a way that was as beneficial

19   to those claimants as possible.

20        I wish that the parties had agreed to pay all

21   asbestos claims, to reinstate all asbestos claims, even

22   those who did not file a proof of claim.  They did not.  But

23   that does not mean the plan was not proposed in good faith.

24        With regard to due process, the Court has again

25   gone through this extensively in the past.  I believe that

1    what has occurred is completely consistent with the Court's

2    ruling in Grossman's and that the notice and due process

3    concerns are consistent with Supreme Court and 3rd Circuit

4    law in what constitutes appropriate notice.  I'm not going

5    to go through an extensive debate about that again, I've

6    already dealt with that.

7            So for other reasons I've set forth, I will

8    overrule the asbestos objector's objection.  I certainly

9    expect that this decision will be appealed.  That is fine

10   with me, not that you care if it's fine with me, but it's

11   fine with me.  And ultimately the appellate courts will

12   decide what they decide and I won't say I never mind be

13   reversed, but I have to say in particular, I wouldn't

14   necessarily being reversed on this issue.  But that's for

15   the appellate courts and they will make their decision as

16   they deem appropriate.

17           So that I believe clears the brush with regard to

18   confirmation.  As I said yesterday, all the 1129 standards

19   have been met.  And subject to going through the changes to

20   the plan and confirmation order which we're about to do, the

21   Court is going to confirm the plan.

22           So let's turn to the changes.

23           MS. YENAMANDRA:  Thank you, Your Honor.  Aparna

24   Yenamandra from Kirkland & Ellis on behalf of the debtors.

25           We have redlines for Your Honor and your staff

1    that were filed yesterday, as well as the significantly

2    fewer change pages that were filed this morning, right

3    before the hearing started.  If I may approach.

4              THE COURT:  Yes.

5         (Pause)

6              THE COURT:  Thank you.

7              MS. YENAMANDRA:  So I'll start by saying the

8    redlines look worse than they actually are, and that is a

9    function of locking (indiscernible) in a room for two days.

10             So I'm happy to flip through the changes we've

11   flagged, as Your Honor will note, the ones that we think are

12   particularly important to walk through.

13             As Mr. Anker previewed all of the changes

14   generally are designed to implement one of four sort of core

15   principles of the make whole settlement and the larger

16   NextEra transaction.

17             The first is, of course, trying to balance the

18   fact that we are asking for a confirmation order today

19   without knowing whether the settlement approval order on the

20   make whole settlement will be approved.

21             So the vast majority of changes are designed to

22   sort of cover all of the different possible iterations of

23   the world.  And so at a very high level, what they do is

24   say, if the settlement approval order is entered before the

25   effective date, then the first lien claims and second lien

1   claims that are allowed pursuant to the make whole

2   settlement will be funded on the effective date from the

3   EFH/EFIH's distribution account which is sort of our master

4   pool of distributions.

5            Junior creditors will then get funded after the

6   first and second lien claims have been paid in full in cash

7   in the amount set forth in the settlement agreement.

8            That's the version of the world one and preferred

9   version.  Version two is if we've gotten to the effective

10  date and the settlement approval order is still outstanding,

11  in that version of the world, as Mr. Anker said, we fund the

12  EFIH claims reserve, which is the reserve designed for the

13  first and the seconds and upon which they have replacement

14  liens.

15           And virtually every dollar we can possibly put in

16  that reserve, there's a very small category of carve-outs

17  which are primarily amounts that (indiscernible) holders,

18  because they're admin or priority claims, and a small

19  category of professional fees, as well as any amounts that

20  are entitled to go back to the plan sponsor following an

21  audit of the Bucks (ph) post-closing.

22           All of that will go in the first and second lien

23  reserve.  And then one of two things happens.  We either get

24  the settlement approval order entered, in which case we

25  satisfy the first and second lien claims pursuant to the

1    settlement order from this claims reserve, and again junior

2    distributions go out to junior holders, subject to the post

3    closing audit I mentioned earlier.

4            Alternatively, the settlement approval order is

5    denied, in that case, as Your Honor noted, everybody comes

6    back to fight about the size of the reserve, the duration of

7    the reserve, the segregated accounts within the reserve, the

8    priorities of those segregated accounts and who gets a lien

9    on what.  Everybody's rights are reserved as to that

10   hearing, which can again, to be very clear, happen after the

11   effective date if it needs to.

12           That's sort of the bulk of the changes.  What this

13   means for the PIK distributions, of course, is that in the,

14   what I'll call version 2 of the world, the PIKs will get a

15   distribution following either entry of the settlement

16   approval order, again subject to the post-closing audit, or

17   entry of the reserve order, in accordance with whatever Your

18   Honor sets forth in the reserve order.

19           That's for principal one that's reflected in these

20   docs.  Principal two, and you'll see that this reiterated

21   throughout the docs in virtually identical language is that

22   we needed to make absolutely clear that there will be no

23   liability for the -- any of the reorganized debtors.

24           And I think Mr. Husnick touched upon this in one

25   of the few opening dep slides I wrote that he didn't cut,

1    and what he said in there is that ensuring there's a clean

2    balance sheet, that the post emergence is very important, so

3    that language is in here as well.

4              And that flows through a couple of provisions on

5    the release of liens and the cancelation of security

6    agreements indentures.

7              Principal 3, very related is that we wanted to

8    make sure that the -- nothing from a bankruptcy perspective

9    could delay the effective day as far as possible, and again

10   that speaks to all these multiple iterations that we've

11   worked into the plan, based on whether the settlement is

12   approved at all, or approved before and after the effective

13   date.

14             And then finally in the hopes that we would get to

15   this point today, nothing in any of these 500 pages of

16   documents touches anything related to asbestos claims or

17   anything related to the EFH notes, trustee's fees and

18   expenses.  So this -- everything Your Honor said in his

19   ruling is preserved in these redlines.

20             So I'll stop there and ask if Your Honor would

21   like us to go through the confirmation order redline.

22   Everything in the plan is just sort of designed to match

23   what's in the confirmation order.  I'm happy to go through

24   both.

25             THE COURT:  Well, why don't you run through both

1    for me just so we have a complete record.

2              MS. YENAMANDRA:  Sure.

3              THE COURT:  Since it's only about -- looks like

4    only about ten tabs in each.

5              MS. YENAMANDRA:  Yep.  So if we start with the

6    bulkier redline, this is what we filed yesterday and it's a

7    redline against the previously filed version.

8              THE COURT:  Looking at the plan, right?

9              MS. YENAMANDRA:  Yes.

10             THE COURT:  Okay.

11             MS. YENAMANDRA:  So, Your Honor, the first flag is

12   on page 14.

13             THE COURT:  Yes.

14             MS. YENAMANDRA:  That is revising the definition

15   of EFH/EFIH distribution account.  And what this makes clear

16   is that regardless of what version of the world we're in,

17   the plan sponsor will fund what it has agreed to fund into

18   the EFH/EFIH's distribution account.  And the segregated

19   funds within that including most significantly the EFIH

20   claim reserve will be funded based on whether we're in

21   version one of the world or version two of the world.

22             THE COURT:  Okay.

23             MS. YENAMANDRA:  Which takes us right into the

24   change on page 17, which is modifying the definition of EFIH

25   claims reserve.

1              THE COURT:  Okay.

2              MS. YENAMANDRA:  And what you'll see there is

3     where -- if the settlement approval order hasn't been

4     entered by the effective date, we are putting every dollar

5     into Ms. Rangburn (ph) and Mr. Brody's reserve with the --

6     subject to the carve-outs and subclauses A through C.

7              THE COURT:  Okay.  All right.

8              MS. YENAMANDRA:  That takes us to pages 35 and 36

9     where it's the same comment.  What we've done there is

10    modify the definition of released parties and releasing

11    parties to make clear that if the settlement approval order

12    is entered, the first lien notes trustee and its holders and

13    second lien notes trustee and its holders will be released

14    parties and releasing parties pursuant to the settlement

15    agreement, and then released parties and releasing parties

16    as to each other, pursuant to the confirmation order.  And

17    that second caveat is necessary in light of the

18    intercreditor litigation.

19             THE COURT:  Okay.

20             MS. YENAMANDRA:  I believe that takes us to page

21    67.

22             THE COURT:  Right.

23             MS. YENAMANDRA:  And the language on 67, what it

24    says in short is that, again, if the -- for inversion two of

25    the world and the settlement approval order is outstanding

1    by the time you get to the effective date, this locks us

2    distributions to junior holders subject to the carve outs

3    described herein until either the settlement approval order

4    is entered or the reserve order is entered.

5              THE COURT:  Okay.

6              MS. YENAMANDRA:  The changes on page 69, these are

7    all the details on the replacement liens being granted to

8    the EFIH first lien notes trustee on the EFIH claims reserve

9    in version two of the world where we have gone effective and

10   the settlement approval order has been entered.

11             THE COURT:  All right.

12             MS. YENAMANDRA:  The EFIH second liens have

13   identical language, except of course, their lien is a second

14   priority subordinated lien to the first trustee.

15             THE COURT:  Right.

16             MS. YENAMANDRA:  That takes us to pages 83 and 84.

17   And this section of the plan speaks to -- I can't come up

18   with a better phrase, so what I'll call the sausage making

19   of how the funds will flow through into the various EFH

20   EFI's distribution counts.  And what this says is that the

21   merger sub-cash amount, which is the NextEra contribution,

22   as well as EFIH cash, get deposited into this master pool of

23   distribution on the effective date.  And sub-distributions

24   go into the EFIH claims reserve based on, again, whether

25   we're in version 1 or version 2 of (indiscernible).

1          THE COURT:  Okay.

2          MS. YENAMANDRA:  The changes on page 90 and 91,

3    which go to the cancellation of existing securities and

4    agreements, these changes are designed to pick up a couple

5    key points.  One is that to the extent there's anything in

6    the settlement approval order and that modifies the extent

7    to which the indentures are in place, what's in the

8    settlement approval order will govern if it's entered.  This

9    also makes clear that the cancellation of existing

10   securities and agreements comes with two important caveats.

11   They stay in place for the enumerated purposes listed in one

12   through five.  So for example, they'll stay in place to

13   allow the indenture trustee to act as disbursing agent.  And

14   any two, any cancellation of the existing securities and

15   agreements, of course, does not discharge the debtors from

16   their obligation to make distributions on account of allowed

17   claims.  And that's that without prejudice language you see

18   at the bottom of 90.

19          THE COURT:  Okay.

20          MS. YENAMANDRA:  Almost there.

21          THE COURT:  You've been busy.

22          MS. YENAMANDRA:  Page 102, again, is very similar

23   to the sausage making provisions on the previous pages and

24   speaks to the funds flow in each of the two (indiscernible).

25          THE COURT:  All right.

1            MS. YENAMANDRA:   Page 114 is the release of liens

2     provision.  And what this provision says, and again, this

3     goes to one of the principles Mr. Husnick mentioned in his

4     opening arguments is that the liens on the existing

5     collateral are released as of the effective date, which the

6     exception of a very small category of other secured claims.

7     With that being said, the first and the seconds will get

8     their replacement liens on the EFIH claims reserve if the

9     settlement approval order isn't entered.

10            THE COURT:  Okay.

11            MS. YENAMANDRA:  Is not entered, correct, not

12    entered.  And that takes us to 116 and 117, which have some

13    smaller changes and incorporate the negotiated settlement of

14    the TCEH unsecured adhoc group's objection to the

15    (indiscernible).

16            THE COURT:  Okay.

17            MS. YENAMANDRA:  I'm happy to go through the

18    significantly smaller redline that was filed this morning,

19    which should be a little bit faster.

20            THE COURT:  Yeah, let's do that.

21            MS. YENAMANDRA:  Page 38 is a definition of

22    settlement approval order.  And this new language is

23    designed to pick up what I'll call version 1-A of the world

24    which is that the settlement approval order is entered as to

25    the first liens and not the second liens.

1              THE COURT:  Okay.

2              MS. YENAMANDRA:  Page 65, the modifications there

3    pick up the very small category of carve-outs to all of the

4    funds going into the first and second lien reserve on the

5    effective date.  So a good example is a post-closing audit.

6              THE COURT:  Okay.

7              MS. YENAMANDRA:  Page 66 is the language that

8    applies to the junior creditors.  And what this language

9    essentially says is that if we're in version two of the

10   world, again, every possible dollar has gone into the first

11   and second lien reserve, which effectively locks up junior

12   distributions.  If there's a subsequent settlement approval

13   order, the previously locked up funds are released after

14   payment in full in cash to the first and second lien claims

15   allowed under the settlement agreement.  And again, subject

16   to the post-closing audit.  Alternatively, if the reserve

17   order is entered then, of course, in compliance with the

18   reserve order, to the extent Your Honor lets junior

19   distributions go out, those distributions will go out as

20   well.

21             THE COURT:  Okay.

22             MS. YENAMANDRA:  Those are the same changes that

23   are incorporated on page 82.

24             THE COURT:  All right.

25             MS. YENAMANDRA:  And then finally the changes on

1   93 into 94 reflect the agreement between the pick trustee

2   and the U.S. trustee on the EFIH unsecured note trustee's

3   professional fees and just make it clear that their payments

4   are considered charging lien advances under the applicable

5   indentures and it addresses the timing of those payments as

6   they apply in version one and version two of the world.

7            THE COURT:  All right.

8            MS. YENAMANDRA:  That is the plan.

9            THE COURT:  Okay.  Return to the order?

10            MS. YENAMANDRA:  Yeah.  If Your Honor is ready, I

11   think this will be a little bit faster.

12            THE COURT:  All right.

13            MS. YENAMANDRA:  Page 16 of the order --

14            THE COURT:  I'm in no hurry.  It's been three

15   years.  We'll take our time.

16            MS. YENAMANDRA:  Fair enough.  I'm ready if you

17   are.  So the first change on page 16, this is the language I

18   think Your Honor referenced in his ruling about the current

19   rejecting votes of the first and second lien creditors being

20   changed to accepting votes to the extent they've agreed to

21   support the settlement and subject to the settlement

22   approval order getting entered.

23            THE COURT:  Okay.

24            MS. YENAMANDRA:  Page 35 is the language we put in

25   hoping Your Honor would find that the plan satisfied to the

1    equivalent standard.

2              THE COURT:  Okay.

3              MS. YENAMANDRA:  Page 48 tracks the revisions to

4    releasing party and release party in the plan and again

5    makes clear that the firsts and the seconds, the trustees

6    and the holders are not released parties or releasing

7    parties as to the debtors and other parties unless they --

8    unless the settlement approval order is entered and aren't

9    released parties or releasing parties as to each other,

10   except as set forth in the confirmation order.

11             THE COURT:  Okay.

12             MS. YENAMANDRA:  Page 55 is the second of three

13   pages on the release of liens provision.  And this again

14   mirrors what we discussed in the plan, which is that the

15   liens on the existing collateral are released on the

16   effective date.  And then the liens on the EFIH, the

17   replacement first and second liens on the EFIH claims

18   reserve that are granted if the settlement approval order is

19   not entered as of the effective date stay in place until one

20   of a few things happen: until the settlement approval order

21   is entered and funds go out in accordance with that; or

22   until the reserve order is entered and we modify the

23   distribution count in -- pursuant to whatever terms are in

24   the reserve order.

25             THE COURT:  All right.

1          MS. YENAMANDRA:  Page 58 is one of five pages on

2     the cancellation of existing securities and agreements.  And

3     we applied to this particular page again to emphasize that

4     the security agreements and indentures are cancelled on the

5     effective date of the plan subject to two important caveats.

6     One being that they are in place for the reasons listed in 1

7     through 5 in the whole, including for example the indenture

8     trustee to act as disbursing agent.  And two, to make

9     absolutely clear for the avoidance of doubt that the

10    cancellation of these security agreements does not prejudice

11    the rights of any holders of a capital a Allowed claim to

12    receive their -- the distributions to which they're

13    entitled.

14          THE COURT:  Okay.

15          MS. YENAMANDRA:  Paragraph 69, the original --

16    well, original is a misleading term in this case.  The plan

17    that we had filed in advance of confirmation and prior to

18    the make whole settlement had a series of provisions on the

19    process for reviewing the fees and expenses under 506(b) and

20    the fees and expenses of the make whole litigation oversight

21    committee.

22          What we've done here is essentially say if the

23    settlement approval order is entered, the fees and expenses

24    under 506(b) are covered by the settlement agreement.  So

25    they'll be funded and satisfied in full in cash as set forth

1    in the settlement agreement.  If the settlement approval

2    order is not entered, then one of the litany of things we

3    will be fighting about at the reserve hearing is what the

4    proper standard of review is and what the timing on review

5    and payment is.

6              THE COURT:  Okay.

7              MS. YENAMANDRA:  Page 76 is the administration of

8    the EFH/EFIH distribution account.  This paragraph, again,

9    is designed to make clear what happens in version one and

10   version two of the world and again make clear that

11   notwithstanding whatever versions of the world we're in, to

12   the extent the plan sponsor is entitled to any funds from

13   the distribution account on account of the post-closing

14   audit, they will receive those funds.

15             Pages 78 to 81 are the descriptions of the -- of

16   version one and version two of the world and how they affect

17   the timing of the EFIH claims reserve funding and the size

18   of the funding.

19             THE COURT:  All right.

20             MS. YENAMANDRA:  Paragraph 82 describes the EFIH

21   settlement agreement and makes clear that the settlement

22   agreement is binding upon all parties, including the

23   debtors.  And it's binding on all parties as of when we swap

24   signature pages, not as of when the settlement approval

25   order is entered.

1           THE COURT:  Okay.

2           MS. YENAMANDRA:  I'll also note there that if the

3    settlement approval order is entered, then the adequate

4    protection motion filed by the first liens will be

5    (indiscernible) withdrawn.  This is also the paragraph that

6    effectuates the vote change.

7           THE COURT:  All right.

8           MS. YENAMANDRA:  And that takes us to paragraphs

9    145, 146, and 147.  145 and 146 -- apologies, 145 is what

10   we'll call the secured creditors reservation of rights.  And

11   what these paragraphs essentially boil down to is that the

12   settlement approval order is not entered.  Everybody is

13   coming back and fighting about the reserve order.  I think

14   they're telling me it's my time.

15          THE COURT:  I see you, Rachel.  Just keep going

16   until we hear an announcement.

17          MS. YENAMANDRA:  Paragraph 146 is what I'll call

18   the pick reservation of rights.  That essentially says that

19   the picks will have the right to seek at the reserve hearing

20   the ability to get distributions in that first reserve order

21   and if -- following that reserve order, nothing prejudices

22   their right to seek further reductions in the claims reserve

23   or duration of the claims reserve.

24          And then finally in paragraph 147 is a lot of

25   words, but it's designed to basically say two things.  One

1   is that if the EFH effective date does not occur and it

2   cannot occur, then the provisions set forth in the

3   confirmation order obviously become null and void.  That

4   being said, the settlement agreement is intended to be

5   evergreen.  So if the effective date doesn't occur, we are

6   all -- everybody a party to the settlement agreement

7   continues to be bound until the settlement approval order is

8   either entered or denied.

9              THE COURT:  Okay.

10             MS. YENAMANDRA:  Which takes us to the very few

11  changes in this morning's filing to the confirmation order.

12  The first being on page 56.  This is just a technical

13  modification.  The initial drafting inadvertently suggested

14  that holders of the EFIH first lien DIP claims were subject

15  to the settlement agreement.  They are not party to it.  So

16  we've just modified the ordering of the phrases to make that

17  clear.

18             THE COURT:  All right.

19             MS. YENAMANDRA:  And then the change on 83 is

20  reaffirming the evergreen nature of EFIH settlement

21  agreement.

22             THE COURT:  Okay.  Thank you.  Does anyone wish to

23  be heard in connection with the confirmation order?

24  Mr. Anker?

25             MR. ANKER:  Thank you, Your Honor.

1    Ms. Yenamandra, I hope I pronounced it correctly.

2              MS. YENAMANDRA:  Yes.

3              MR. ANKER:  I did.  Boy, that's a first.  I

4    actually butcher names routinely.  Her explanation I thought

5    was pretty much spot on.  I just rise to make -- add two

6    points.  First, in the provisions, both in the confirmation

7    order and the plan on cancellation of securities where

8    Ms. Yenamandra noted there were some carve-outs, another

9    carve-out that is quite important to us, were our settlement

10   not to go through, is that the various agreements, the

11   indenture, the collateral trust agreement, the security

12   documents all remain in place for purposes of establishing

13   or supporting our claim.  So we wanted an argument down the

14   road that we're unsecured or we don't have any rights under

15   any indenture and that would apply to the 2L's as well.

16              Second, in our collective view to cover every

17   possibility in the world, there are I believe provisions in

18   the plan and the confirmation order, and there will be in

19   the settlement agreement that say the following.  If our

20   settlement, that is the 1L, goes through but the second lien

21   settlement does not go through, the first L's rights vis-à-

22   vis the second lienholders under the inter-creditor

23   litigation remain in place, but we agree to reduce the

24   amount that we would seek from the second liens to the five

25   percent difference between our getting paid 95 cents on the

1     dollar from the debtor upon that payment to the 100 cents on

2     the dollar plus interest and fees associated therewith.  And

3     we would then not be a releasing party to the second liens.

4     We would be able to continue the litigation against the

5     second liens to the extent of that five percent unless and

6     until the second liens end up settling their make whole

7     dispute with Your Honor's approval.  So I just rise to make

8     those two clarifications.

9               THE COURT:  All right.  Thank you, Mr. Anker.  Mr.

10    Horowitz?

11              MR. HOROWITZ:  Thank you, Your Honor.  Just

12    because Mr. Anker mentioned it, I just wanted to make it

13    clear on the record that the second lienholders would

14    reserve their rights to make any available arguments with

15    regard to the relevance of the first lien settlement to

16    inter-creditor liabilities beyond merely that the amount of

17    the claim is reduced, whether the possibility that the

18    firsts have settled their claim against the --

19              THE COURT:  Right.

20              MR. HOROWITZ:  -- debtors and amounts to a waiver

21    of their ability to go after --

22              THE COURT:  Understood.

23              MR. HOROWITZ:  -- the second lienholders.  And I'm

24    sorry, what was the second point that you made?

25              MR. ANKER:  That we were reserving our right --

1    not reserving.  That the cancellation of our indenture, your

2    indenture, and our relative --

3              MR. HOROWITZ:  I don't need to say anything about

4    that.

5              THE COURT:  Okay.

6              MR. HOROWITZ:  Thank you, Your Honor.

7              MR. ANKER:  It doesn't affect our -- establishing

8    our (indiscernible).

9              MR. HOROWITZ:  Yes, I'm sorry, Your Honor.  The

10   other point I just wanted to make to reiterate what was said

11   yesterday is that not -- given the first's agreement that

12   the amount that they would seek would at the very least be

13   limited to that five percent increment, the debtors have

14   also agreed that in the circumstance where the first's

15   settlement is approved but the second settlement does not go

16   through, the possibility of a direct distribution to DTC or

17   directing the second lien indenture trustee will be off the

18   table and we will not have to litigate over that.

19             THE COURT:  All right.  Let me hear that that's

20   agreed.

21             MS. YENAMANDRA:  Yes, Your Honor.

22             THE COURT:  Okay.

23             MR. HOROWITZ:  Thank you.

24             THE COURT:  Yes, sir.

25             MR. DAUCHER:  Good morning, Your Honor.  Eric

1    Daucher from Chadbourne & Parke on behalf of the plan

2    sponsor, NextEra Energy.

3              We've participated in heavy negotiations over the

4    last few days on the plan and the confirmation order.  We've

5    reviewed and approved all of the final changes and are happy

6    to support entry of the confirmation order on that basis.  I

7    think we fully agree with the debtors that the changes to

8    the confirmation order in the plan look much worse than they

9    are.  And so we just really want to highlight two points

10   about what those changes are really doing.

11             They are integrating the possibility of the

12   settlement agreement that we all hope is ultimately signed

13   up and ultimately approved into the plan without making the

14   plan dependent on that settlement agreement in any way.

15   That means that the plan can go effective regardless of

16   whether the settlement agreement comes together and that the

17   plan sponsor and the reorganized debtors have no liability

18   whatsoever on the make whole claims and the other claims

19   that are being settled regardless of whether the settlement

20   is ultimately approved.

21             And on that basis, we are very happy to support

22   entry of the confirmation order.

23             THE COURT:  All right.  Thank you.  Mr. Pedone?

24             MR. PEDONE:  Your Honor, Richard Pedone on behalf

25   of American Stock Transfer, the EFH indenture trustee.

1           I just note that the form of confirmation order

2     that has been submitted does need a paragraph or two

3     inserted into it to address the Court's findings today

4     concerning substantial contribution.  There were similar

5     paragraphs in the prior plan that was entered and I think

6     both Mr. Schepacarter and myself believe that inserting a

7     few sentences will make things easier down the road.  So

8     we'll work with the debtors to get that done quickly.

9     Today.  Within the next 20 minutes will be fine with me.

10    Thank you, Your Honor.

11          THE COURT:  All right.  You're welcome.  Anyone

12    else?

13          MS. YENAMANDRA:  Aparna Yenamandra, Kirkland &

14    Ellis, on behalf of the debtors.

15          As you heard from my bosses, we are very eager to

16    get this entered.  So -- and as Your Honor knows, we have a

17    strict no typo policy at Kirkland, so we will -- what I

18    propose if it works for you is we'll do one more run of the

19    confirmation order, fix any typos, tick and tie anything to

20    reflect the spirit of the deal, work with Mr. Pedone on his

21    language, and then we'll file it later today under

22    certification of counsel.

23          THE COURT:  That's fine.

24          MS. YENAMANDRA:  Thank you.

25          THE COURT:  Sooner rather than later because --

1          MS. YENAMANDRA:  Absolutely.

2          THE COURT:  -- it's a three day weekend and I'd

3    like to turn it into a three and a half day weekend if at

4    all possible.  So that would be great.

5          MS. YENAMANDRA:  Absolutely understand.  We will

6    get it on file ASAP.

7          THE COURT:  All right.  All right, very good.

8          MS. YENAMANDRA:  Thank you again.

9          THE COURT:  Okay.  Subject to any -- fixing any

10   typos and the language -- review of the language relating to

11   the substantial contribution ruling the Court has made, I am

12   going to very pleased to sign the confirmation order when I

13   receive it under certification of counsel.

14          I kind of feel like the case came in with a bang,

15   and to a certain extent it's an end with a whimper.  We had

16   a lot of really interesting hearings along the way and due

17   to a lot of tremendously hard work by the lawyers and the

18   parties, the issues have continued to be narrowed, and

19   narrowed, and narrowed to the point where we had issues to

20   deal with this morning that are significant but narrow.  And

21   are in a position to confirm our third plan in this case and

22   hopefully our last.

23          I just want to take a minute to say that there

24   will be further hearings in this case obviously, but this is

25   a watershed moment to say the least.  And it's really been

1    the privilege of my professional career, both as an attorney

2    and as a Judge, to oversee this case over the last two and a

3    half years or so.  The lawyering has been simply outstanding

4    and that goes for the Kirkland team, the Richards team, the

5    committee lawyers, the adhoc committee lawyers, the various

6    indenture trustees.  I mean, really across the board.  I'm

7    reluctant to name names because I'll forget people, but the

8    lawyering has just been really a privilege to witness.  And

9    I can't tell you how many -- I've run through a whole series

10   of law clerks in this case, but I can't tell you how many

11   times I've come back to talk to my law clerks about just the

12   nuts and bolts of the lawyering that's been going on in

13   Court and drawing their attention to, you know, some of just

14   really excellent advocacy that's occurred and excellent

15   negotiation and resolution that's occurred.

16          So I want to thank you guys for doing your job in

17   such an extraordinary way to make my job in some ways very,

18   very hard, which is when you've got great lawyers working on

19   either side of an issue, it puts the Court in the difficult

20   decision of having make a call on what can be a really

21   difficult decision to make.  But I gave -- I reluctantly and

22   probably foolishly gave -- agreed to give a talk about EFH

23   in October or maybe it was November of last year, and in

24   doing that, I actually went back and looked at what I had --

25   my little piece and what I accomplished or not accomplished

1    in the case.  And it was -- I ran the numbers and it was 11

2    opinions, which constitutes 332 pages.  Now, Judge Shannon

3    would tell you that he would have done that in like five

4    pages and that I overwrite everything, but it is what it is.

5    574 footnotes.  20 appeals, that was as of November.  And in

6    the exercise of hubris, I actually said zero reversals and

7    literally three days later, the Third Circuit issued its

8    decision in the make whole claim.  So one reversal so far,

9    but not to say the least, not a small one.

10           But it's really been an extraordinary journey for

11   me and I thank you all.  And I also want to -- one last

12   shout out to the debtor's management team.  In my

13   experience, this is the best management team I have ever

14   dealt with in Chapter 11.  Mr. Keglevic, Ms. Dore,

15   Mr. Wright, the directors that I dealt with, the independent

16   directors, Ms. Williamson.  The others, I apologize, I'm not

17   going to name everybody.

18           Now, we could disagree or agree on some of the

19   decisions they made on the merits and maybe some of the

20   tactics.  I'm sure there were some sharp elbows along the

21   way, but it was a particularly interesting and pleasurable

22   to have such extraordinary management on a case.  A lot of

23   times, you know, companies come into Chapter 11 and they

24   haven't always had the best management and that's one of the

25   reasons they're here.  This management did everything

1   possible to deal with an impossible capital structure.  A

2   decision was made, totally legitimate at the time, a

3   decision that was made based on assumptions that proved not

4   to be true to put the kind of debt that was put on the

5   company.  And they worked very, very hard to save the

6   company for a long time and to reorganize the company.  And

7   it's a shame that two people aren't here today to sort of

8   take joy in the confirmation.  One of them is Ms. Dore and

9   the other is Mr. Husnick, who's not here for personal

10  reasons and worked, I know, very, very hard on the case from

11  day one.

12          All right, so I'm done saying nice things about

13  people.  It won't happen again.  And unless there's anything

14  further, we're adjourned and I'll await the order under

15  certification.  Thank you.

16      (Chorus of thank you)

17      (Whereupon these proceedings were concluded at 11:25

18  AM)

19

20

21

22

23

24

25

Page 58

1                        C E R T I F I C A T I O N S

2

3    We, Sheila Orms and Jamie Gallagher, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Shelia G. Orms    Digitally signed by Shelia G. Orms
                       DN: cn=Shelia G. Orms, o=Veritext,
                       ou, email=digital@veritext.com, c=US
7    _____    Date: 2017.02.20 16:26:45 -05'00'

8    SHEILA ORMS, APPROVED TRANSCRIPTIONIST

9    Jamie Gallagher    Digitally signed by Jamie Gallagher
                        DN: cn=Jamie Gallagher, o=Veritext,
                        ou, email=digital@veritext.com, c=US
10   _____    Date: 2017.02.20 16:27:07 -05'00'

11   JAMIE GALLGHER

12

13   Date:  February 20, 2017

14

15

16

17   Veritext Legal Solutions

18   330 Old Country Road

19   Suite 300

20   Mineola, NY 11501

21

22

23

24

25