Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                        :

                                  :    Chapter 11

6   ENERGY FUTURE HOLDINGS        :

    CORP., et al.,                :    Case No. 14-10979(CSS)

7                                 :

              Debtors.            :    (Jointly Administered)

8   _____ :

9

10

11

12

13                          United States Bankruptcy Court

14                          824 North Market Street

15                          Wilmington, Delaware

16

17                          February 15, 2017

18                          10:07 AM – 3:46 PM

19

20

21  B E F O R E :

22  HON CHRISTOPHER S. SONTCEHI

23  U.S. BANKRUPTCY JUDGE

24

25  ECR OPERATOR:  LESLIE MURIN

1    HEARING re Seventh Amended Joint Plan of Reorganization of

2    Energy Future Holdings Corp., et al., Pursuant to Chapter 11

3    of the Bankruptcy Code [Solicitation Version][D.I. 10551;

4    filed January 4, 2017]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South and Sheila Orms

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3        Attorney for the Debtors

4

5    BY:  CHAD HUSNICK, ESQ.

6        MARK MCKANE, ESQ.

7        BARACK ECHOLS, ESQ.

8        MARC KIESELSTEIN, ESQ.

9        MICHAEL ESSER, ESQ.

10        JONATHAN GANTER, ESQ.

11        ANNA TERTERYAN, ESQ.

12        JUSTIN SOWA, ESQ.

13        MCCLAIN THOMPSON, ESQ.

14

15    RICHARDS, LAYTON & FINGER

16        Attorneys for the Debtors

17

18    BY:  DANIEL J. DEFRANCESCHI, ESQ.

19        JASON MADRON, ESQ.

20

21    POTTER ANDERSON CARROON LLP

22        Attorney for Deutsche Bank New York

23

24    BY:  R. STEPHEN MCNEILL, ESQ.

25

Page 4

```
1   VENABLE, LLP
2        Attorneys for Pimco
3
4   BY:  JEFFREY S. SABIN, ESQ.
5        JAMIE EDMONSON, ESQ.
6
7   PACHULSKI STANG ZIEHL & JONES
8        Attorney for EFIH Second Lien Noteholder
9
10  BY:  LAURA DAVIS JONES, ESQ.
11
12  SULLIVAN & CROMWELL
13        Attorney for E-Side Committee
14
15  BY:  BRIAN GLUECKSTEIN, ESQ.
16
17  NIXON PEABODY
18        Attorney for AST as EFH Indenture Trustee
19
20  BY:  RICHARD PEDONE, ESQ.
21
22  MONTGOMERY MCCRACKEN WALKER & RHOADS LLP
23        Attorney for E-Side Committee
24
25  BY:  DAVIS LEE WRIGHT, ESQ.
```

1   KLEHR HARRISON HARVEY BRANZBURG LLP

2        Attorney for UMB Bank, Indenture Trustee

3

4   BY:  RAYMOND H. LEMISCH, ESQ.

5

6   PROSKAUER ROSE

7        Attorneys for EFH Corp.

8

9   BY:  PETER YOUNG, ESQ.

10       MARK THOMAS, ESQ.

11

12  HOGAN MCDANIEL

13       Attorney for Fenicle, Fahy, Jones & Hainzmann

14

15  BY:  DANIEL K. HOGAN, ESQ.

16

17  FRIED FRANK

18       Attorneys for Fidelity

19

20  BY:  GARY KAPLAN, ESQ.

21       MATT ROOSE, ESQ.

22

23

24

25

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorney for U.S. Trustee

3

4   BY:  RICHARD L. SCHEPACARTER, ESQ.

5

6   CHADBORNE & PARKE

7        Attorneys for NextEra

8

9   BY:  HOWARD SEIFE, ESQ.

10       ROBIN BALL, ESQ.

11

12  LANDIS RATH & COBB

13       Attorney for NextEra

14

15  BY:  MATTHEW MCGUIRE, ESQ.

16

17  O'KELLY & ERNST, LLC

18       Attorney for Fidelity

19

20  BY:  MICHAEL JOYCE, ESQ.

21

22

23

24

25

1    FOLEY & LARDNER

2         Attorneys for UMB Bank, N.A.

3

4    BY:  MARK HEBBELN, ESQ.

5         HAROLD KAPLAN, ESQ.

6

7    COLE SCHOTZ P.C.

8         Attorney for Deutsche Bank New York

9

10   BY:  J. KATE STICKLES, ESQ.

11

12   NIXON PEABODY

13        Attorney for EFH Indenture Trustee

14

15   BY:  MORGAN NIGHAN, ESQ.

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4         (A chorus of good morning)

5              THE COURT:  You may proceed.

6              MR. HUSNICK:  Good morning, Your Honor.  Chad

7    Husnick with Kirkland & Ellis here on behalf of the debtors.

8    I'm joined by my partners this morning, Mr. Mark McKane,

9    Mr. Mark Kieselstein, and Mr. Barack Echols who will be

10   presenting the debtors' case.

11             Your Honor, I just want to take a brief moment, we

12   are joined here by our normal folks who join us in the

13   courtroom, Mr. Keglevic and Mr. Wright, that is the CEO of

14   EFH and the GC or general counsel of EFH, but I also wanted

15   to introduce to the Court someone who has not joined us

16   before but wanted to come down and see the proceedings

17   today, and that's the chairman of our board, that is Energy

18   Future Holdings Corporation, Mr. Donald Evans, and he's

19   seated next to Mr. Wright.

20             THE COURT:  Welcome, sir.

21             MR. HUSNICK:  Your Honor, with that I just wanted

22   to give a brief update to the Court and then we'll quickly

23   move to the case in chief.

24             Your Honor, we continue to move forward with the

25   parties, the PICs, the EFIH first liens, the EFIH second

1    liens, undocumenting the deal, in fact we have a draft in

2    session starting in a little under 45 minutes to an hour,

3    and hopefully we will get those drafts completed as quickly

4    as possible and filed on the docket for Your Honor's review.

5            In addition I wanted to state on the record that

6    the debtors filed a short amendment to the plan supplement

7    yesterday, that's attempt Docket I.D. 10827, revising the

8    cure amount on the tax sharing agreement between Energy

9    Future Holdings Corporation and Oncor Electric Delivery

10   Holdings Company, Oncor Electric Texas Transmission

11   Investment LLC, and Oncor Management Investment LLC.  This

12   agreement is more commonly known in the -- within the

13   courtroom as the Oncor tax sharing agreement and has been on

14   the list of assumed contracts since the very first plan

15   supplement filing that we did.

16           The purpose of this filing was the update the cure

17   amount under that contract, and the cure amount to that

18   contract is $134,979,783.  That payment will be made on the

19   effective date pursuant to the terms of the plan.

20           As stated in the plan supplement the actual cure

21   amount could be adjusted depending upon the date of

22   emergence, and the adjustment would reflect Oncor's

23   projected or actual taxable income or loss, so that number

24   could fluctuate a little bit.  So any ultimate cure payments

25   will reflect those adjustments.

1                With that, Your Honor, I will cede the podium to

2    Mr. McKane.

3                THE COURT:  Okay.

4                MR. HUSNICK:  Thank you.

5                MR. MCKANE:  Good morning, Your Honor.

6                THE COURT:  Good morning.

7                MR. MCKANE:  Your Honor, the debtors call their

8    first witness, Mr. Paul Keglevic.

9                THE COURT:  Mr. Keglevic, I think you know the

10   way.  Please remain standing for your affirmation.

11               THE CLERK:  Please raise your right hand.

12                    PAUL KEGLEVIC, WITNESS, SWORN

13               THE CLERK:  Please state and spell your name for

14   the record.

15               THE WITNESS:  It's Paul, P-A-U-L, Keglevic,

16   K-E-G-L-E-V-I-C.

17               THE CLERK:  Thank you.

18               MR. MCKANE:  And, Your Honor, as has been our

19   practice in the courtroom we do have a witness binder for

20   Mr. Keglevic and we have one for Your Honor.  I have one for

21   Your Honor and two for your staff as well.

22               THE COURT:  Okay.  I don't have those yet.  Thank

23   you.

24                         DIRECT EXAMINATION

25   BY MR. MCKANE:

1    Q     Good morning, Mr. Keglevic.

2    A     Good morning.

3    Q     Sir, can you please state your positions that you hold

4    for Energy Future Holdings?

5    A     I am currently the chief executive officer, the chief

6    restructuring officer, and the chief accounting officer of

7    Energy Future Holdings.

8    Q     And sir, if you could turn to the binder that's been

9    presented to you, that's your witness binder.

10   A     Yes.

11   Q     Turn to the first tab, sir.  Do you see a document

12   that's designated D-DIR Keglevic_R?

13   A     I do.

14   Q     Sir, do you recognize this as a revised redacted form

15   of the declaration you filed on -- you signed on

16   February 10th of this year?

17   A     Yes, it is.

18   Q     And sir, is this declaration, as redacted, true and

19   accurate to the best of your knowledge?

20   A     It is.

21          MR. MCKANE:  Your Honor, I move into evidence

22   D-DIR_Keglevic as redacted.

23          THE COURT:  Any objection.

24          MR. HOGAN:  No, sir.

25          THE COURT:  It's admitted.

1          (Debtors' Exhibit No. D-DIR_Keglevic admitted)

2               MR. MCKANE:  All right.

3     BY MR. MCKANE:

4     Q    Mr. Keglevic, I have no further questions for you.

5               THE COURT:  All right.

6               MR. MCKANE:  At the time I'd like to move a series

7     of documents into evidence.

8               THE COURT:  All right.

9               MR. MCKANE:  Thank you.  And I understand none of

10    those are objected to, but obviously I'll provide a list

11    again to opposing counsel.  They previously received this

12    list earlier on, I believe on Friday, we identified all the

13    documents that we'd be moving into evidence this week.

14              THE COURT:  Okay.

15              MR. MCKANE:  May I approach, Your Honor?

16              THE COURT:  Yes.  Thank you.

17              MR. MCKANE:  Your Honor, at this time the debtors

18    move into evidence the following exhibits.  DX-1, 12, 26,

19    29, 37, 38, 46, 47, 50, 63, 88, 109, 110, 111, 113, 114,

20    115, 116, 117, 118, 119, 123, 124, 125, 132, 133, 134, 135,

21    137, 152, 153, 154, 155, 156, 157, 173, 185, 187, 225, 490,

22    494, 504, 506, 513, 514, 542, 552, 553, 556, 557, 564, 569,

23    571, 573, 631, 670, and 679.  Those are all exhibits that

24    were specifically referenced in Mr. Keglevic's written

25    direct.

1                THE COURT:  Any objection?

2                MR. HOGAN:  No, Your Honor.

3                THE COURT:  Their admitted.

4          (Debtors' Exhibit Nos. DX-1, 12, 26, 29, 37, 38, 46,

5     47, 50, 63, 88, 109, 110, 111, 113, 114, 115, 116, 117, 118,

6     119, 123, 124, 125, 132, 133, 134, 135, 137, 152, 153, 154,

7     155, 156, 157, 173, 185, 187, 225, 490, 494, 504, 506, 513,

8     514, 542, 552, 553, 556, 557, 564, 569, 571, 573, 631, 670,

9     and 679 were admitted)

10               MR. MCKANE:  All right.  Your Honor, we also move

11    into evidence the following exhibits.  They were also

12    previously disclosed to opposing counsel as part of our case

13    in chief, and these reflected on page 2.  DX-108, 120, 121,

14    122, 126, 127, 128, 129, 130, 131, 136, 138, 139, 140, 141,

15    142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 158, 159,

16    160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171,

17    172, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184,

18    186, 188, 224, 226, 228, 659, 660, 661, 662, 663, 664, and,

19    Your Honor, the last exhibit which was filed on Monday,

20    February 13 at Docket 180115 is the revised seventh amended

21    plan and that is Exhibit No. 681.

22               THE COURT:  Any objection?

23               MR. HOGAN:  No, Your Honor.

24               THE COURT:  They're admitted.

25          (Debtors' Exhibit Nos. DX-108, 120, 121, 122, 126, 127,

1    128, 129, 130, 131, 136, 138, 139, 140, 141, 142, 143, 144,

2    145, 146, 147, 148, 149, 150, 151, 158, 159, 160, 161, 162,

3    163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 174, 175,

4    176, 177, 178, 179, 180, 181, 182, 183, 184, 186, 188, 224,

5    226, 228, 659, 660, 661, 662, 663, 664, 681 were admitted)

6            MR. MCKANE:  And finally, Your Honor, before we

7    pass the witness we ask the Court to take judicial notice of

8    the following filings in the case, these are petitions for

9    Chapter 11 (indiscernible) and schedules.  They are

10   specifically DX-83, 84, 85, 86, 87, 91, 92, 93, 94, 95, 96,

11   97, 98, 99, 101, 102, 105, and 106.

12           THE COURT:  Any objection?

13           MR. HOGAN:  No, Your Honor.

14           THE COURT:  All right.  The Court takes judicial

15   notice of those documents.

16           MR. MCKANE:  And with that, Your Honor, we pass

17   the witness.

18           THE COURT:  Very good.  Mr. Hogan?

19           MR. HOGAN:  Thank you, Your Honor.  Daniel Hogan

20   on behalf -- of Hogan Daniel on behalf of the asbestos

21   objectors.

22                    CROSS-EXAMINATION

23   BY MR. HOGAN:

24   Q    Good morning, Mr. Keglevic.  How are you today?

25   A    Good morning, Mr. Hogan.  I'm fine, thank you.

1   Q    Good.  If you could I'd ask you to direct yourself to

2   your declaration that's in your binder.  Specifically

3   paragraph 6.  Just a couple discrete questions for you if

4   you don't mind.

5   A    Sure.

6   Q    Look at the last sentence of paragraph 6, I just want

7   to make sure I understand something.  It says that the

8   merger sub will acquire assets and liabilities of the

9   reorganized EFH in exchange for a contribution of cash and

10  stock.  And my question to you is, does that include the

11  asbestos debtors?

12  A    Yes, because the asbestos debtors' intercompany

13  receivables will be reinstated as part of the plan.

14  Q    But  my question -- I just want to make -- so the

15  asbestos debtors are separate entities, correct?

16  A    Correct.

17  Q    And those separate entities are going to be merged into

18  merger sub pursuant to the provisions of plan in the merger

19  settlement agreement; isn't that right?

20  A    Yes.  EFH owns those entities, as EFH gets merged in

21  their subsidiaries get merged in as well.

22  Q    And so just so I'm clear then, the merger sub will then

23  own those entities?

24  A    Yes, that's my understanding.

25  Q    Okay.  Thank you.

1          THE COURT:  But they'll remain separate entities;

2     is that correct?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.

5     BY MR. HOGAN:

6     Q    Okay.  If I could let's turn to the issue of plan

7     negotiations.  At some point, and I know you talk about

8     negotiations starting in Roman numeral II, paragraph 11 of

9     your declaration, I'd ask you to turn generally to that

10    area.

11         But at some point NextEra suggested to the debtors a

12    plan under which unmanifested asbestos claims would be

13    reinstated, specifically claims that had not filed a claim

14    by the bar date; isn't that correct?

15    A    I think NextEra had sent us a proposed term sheet where

16    -- and I'm not a legal expert -- but that there was going to

17    be some type of channeling approach taken contrary to the

18    approach we ultimately took in the plan.  Upon receipt of

19    that counsel -- external counsel and Mr. Wright, we had a

20    discussion with NextEra and we thought the expense and time

21    associated with that approach would be burdensome on the

22    estates and was not in the estates' best interest.  We also

23    convinced NextEra at that time that that approach could

24    significantly slow down the time frame in which they'd be

25    able to acquire reorganized EFH.

1         So that concept, while in existence for a period of

2    time and a term sheet, was very quickly taken out of

3    existence and never pursued.

4    Q    Okay.  And just for the record and just so we have

5    clarity, this initial approach from NextEra was when?

6    A    I don't recall, but I think it was in the summer of

7    2016.

8    Q    If I told you it was some time in early July would that

9    comport with your general understanding?

10   A    Yes, that sounds about right.

11   Q    Now prior to July of 2016 had there been any discussion

12   of a 524(g) or this channeling injunction I think you

13   referred to it as?

14   A    Not that I recall.  We -- very early on in the case I

15   was advised by counsel both internal and external that these

16   liabilities were very difficult to discharge or to treat in

17   the -- with a channeling injunction.  Obviously time and

18   expense were not our friends in the case from an estate

19   standpoint or from a purchaser standpoint and therefore we

20   -- you know, we never pursued that concept in any real

21   fashion, and in fact I had forgotten all about it until such

22   time as was, you know, mentioned in the NextEra letter.

23   Q    Do you recall the confirmation hearing and the

24   processes surrounding the confirmation hearing in 2015?

25   A    Yes, generally.

Page 18

1    Q    And you were involved in those were you not?

2    A    I was.

3    Q    And do you remember any discussion at that time about a

4    524(g) possibility?

5    A    I don't.  I don't think I was questioned on it.

6    Q    If I could let me direct your attention to paragraph 17

7    of your written direct.  And it says that generally as of

8    July 21st, 2016 EFH was still negotiating four key points,

9    including the treatment of asbestos liabilities.  Do you see

10   that?

11   A    Yes.

12   Q    Could you tell us what was being negotiated at that

13   point in time relative to asbestos?

14   A    Well fundamentally it was the assumption of the

15   liability and whether NextEra would in fact assume the

16   liability through the reinstatement of the intercompany

17   claims as we discussed earlier.

18   Q    Okay.

19   A    And then also NextEra had a concept of a $250 million

20   reserve, which wasn't a cap to how much asbestos would be

21   paid, but it was effectively an accounting conveyance where

22   some of their proceeds would be set aside for the sole

23   purpose of satisfying asbestos.  We thought that amount was

24   unusually high given the history where we're paying

25   $2 million a month of asbestos claims, we had a $14 million

1   reserve on our books, and so we thought that was, you know,

2   too high.

3        And then it depends on what time frame, but then there

4   was also -- you know, those were the two primary issues, but

5   there was also the discussion, you know, of a bar date, you

6   know, and how many claims, you know, were coming in and that

7   and the examination of the underlying, et cetera.

8   Q    And this was in July 2016?

9   A    July 2016 we had received, you know, the -- we had the

10  bar date and we had the claims but it was, you know, 25,000

11  claims of which 10,000 I believe were for -- and I'll get

12  the term wrong --

13  Q    Unmanifested?

14  A    -- unmanifested claims.  Obviously that number worried

15  NextEra.  And you know, as a public company taking a -- you

16  know, even that amount of claims that hadn't been

17  actuarially, you know, calculated was worrisome for them,

18  and you know, so it all tied together with whether they

19  would take it, how much they'd have to set aside, and what

20  the real liability probably was associated with those

21  claims.

22  Q    Real issues in other words?

23  A    Yeah, significant issues.

24  Q    And okay, so let's parse that a little bit of what you

25  said.

1       The 250 -- the $250 million you're referring to, that

2    would be what, a hold back of the proceeds that NextEra

3    would pay effectively, right?  Those funds couldn't be used

4    for anything else.

5    A    That's correct.

6    Q    And I know it's been reduced to $100 million, so I'm

7    not trying to mischaracterize it.  But initially it was

8    250 million, it was essentially a hold back of the monies

9    that NextEra would pay for the interest in EFH and

10   ultimately Oncor, correct?

11   A    That's correct.

12   Q    And those monies would be escrowed?

13   A    Correct.

14   Q    Now, at that point in time when those asbestos issues

15   were being discussed was there any discussion about how to

16   deal with the unmanifested asbestos claims that were barred

17   by the bar date?

18   A    Not that I recall.  I think there was reliance on the

19   bar date as effectively cutting off the population to the

20   25,000 claims that were submitted to us.

21   Q    Meaning that those 25 claims were properly asserted but

22   anything that wasn't properly asserted by the bar date would

23   be barred, to your understanding?

24   A    Yeah, I think you misspoke.  You said 25, 25,000.

25   Q    Excuse me, 25,000.

1   A    But I agree with every else that you said.  Yes, and

2   obviously that was important to a purchaser and a public

3   company like NextEra because they wanted a -- something an

4   actuary could put, you know, as good an estimate as possible

5   on and understand how much they were assuming as part of the

6   transaction.

7   Q    Okay.  And so to the -- do you understand that the

8   purpose of the discussion of a 524(g) channeling injunction

9   was to potentially deal with the unmanifested asbestos

10  claims that had not been asserted by the bar date?

11  A    I -- look, I'm not the lawyer so I'm not the expert in

12  that, but I understand that that's part -- that was part of

13  the discussion.  But like I said, we did not pursue that for

14  the reasons of time and the fact that it was, you know,

15  likely to be controversial in the case and slow down the

16  purchase, so it was abandoned very quickly.

17  Q    Again in July of 2016?

18  A    Yes.

19  Q    So as of July 27th, 2016 NextEra agreed to assume the

20  existing asbestos liabilities into escrow $250 million for

21  those liabilities; isn't that correct?

22  A    Yes.

23  Q    Okay.  Now in those discussions regarding the treatment

24  of the asbestos claims and this issue of the 524(g) did EFH

25  have any discussions with NextEra regarding the possibility

1      of losing the appeals relative to the issue of the due

2      process treatment of the unmanifested asbestos claimants who

3      were barred by the bar date?

4      A    We may have, if we did I did not participate in those

5      and am not the witness to ask.

6      Q    That's fine.  Thank you.

7           If you could I'd like to direct your attention to

8      paragraph 7 of your declaration.  And this really gets to --

9      you know, there's no disagreement, we understand that the

10     $250 million escrow had been reduced through subsequent

11     negotiations with NextEra to $100 million, correct?

12     A    That's correct.

13     Q    And we understand that that exists.  But I want to just

14     make sure I understand.  Can you explain to me how the

15     escrow works, if you know?

16     A    I'm not the expert in how it works.  I think -- but I

17     mean generally speaking that it would be the dollars used

18     first to pay claims associated with asbestos by reorganized

19     EFH, but it does not represent a cap.  To the extent the

20     claims were beyond that amount it would be paid out of

21     general corporate funds of reorganized EFH up to the amount

22     of, you know, the intercompany receivables.

23     Q    And do those intercompany receivables exceed the

24     $100 million to your knowledge?

25     A    Yes, there's a $560 million intercompany receivable

1   from reorganized EFH down to LSGT, which is the owner of all

2   the -- you know, the top entity of all the asbestos

3   subsidiaries, as I know you well know, Mr. Hogan.

4   Q     Thank you.

5   A     I don't mean to suggest you don't know about EECI

6   Holdings, EECI, and SacRock (ph), yes.

7   Q     No offense taken.

8   A     Okay.

9   Q     Back to the escrow.  How was it controlled, if you

10  understand my question.  Where does it sit?  Who maintains

11  it, managers it, to your knowledge?

12  A     To my knowledge it's within reorganized EFH and managed

13  by, you know, the management and the board of -- will be the

14  reorganized management board of EFH.

15  Q     Okay.  And how will it be accessible by asbestos

16  claimants to the extent that they have a validly asserted

17  claim in and they liquidate their claim in either state

18  court or federal court, if you know?

19  A     I don't know that it'll be directly against the escrow

20  or they'll just, you know, draw the escrow and pay out the

21  claimant.  So I don't know how the claimant and the escrow

22  account tie.  I know that the plan calls for them to use

23  those funds first to pay those claims, but how the

24  interaction between the claimant and the escrow, I'm not

25  familiar with that procedure.

1    Q    Now there's I think what a plan administrator as

2    pursuant to the terms of the plan; isn't that correct?

3    A    I believe so.

4    Q    And is that Mr. Horton who's been designated to be that

5    plan administrator; is that correct?

6    A    Yes, Mr. Horton is that plan administrator.  So he will

7    probably have more knowledge as might Mr. Wright.

8    Q    In your declaration generally you speak about being

9    involved in the negotiations and interfacing various

10   creditor constituencies in an effort to formulate the plan

11   and get to a place where you have a consensual plan.  And my

12   question there is, what efforts were made to discuss these

13   asbestos issues with the asbestos objectors, if any?

14   A    I know and I -- that the asbestos -- I don't know if it

15   was the representatives, you know, your firm or others

16   attended some of the general meetings we had, and I know

17   that they obviously were not supportive of getting a bar

18   date.  And you know, I know some other discussions took

19   place, but I was generally informed about those discussions

20   and that point of view from, you know, counsel to the case,

21   you know, generally Kirkland & Ellis.

22        I did not have many -- I mean I think I had some

23   introductions and some meetings and I was in some meetings

24   but not where we went in depth on asbestos and what the

25   asbestos claimants were interested in, although I believe

1    that represented -- my understanding I think is a fair

2    understanding of what they wanted.

3    Q    Okay.  And specifically with regard to this July 2016

4    time period, was there any discussion there to your

5    knowledge with asbestos creditors about treatment of those

6    claims or potentially the 524(g) to your knowledge?

7    A    If it was it was not by me.

8    Q    All right.  Do you know if EFH encouraged NextEra to

9    talk to the asbestos objectors or anyone affiliated

10   therewith?

11   A    I had no discussion with NextEra about their

12   discussions potential or otherwise with the asbestos

13   claimants, just simply about the $250 million and the size

14   of the escrow.

15            MR. HOGAN:  Your Honor, I have no other questions

16   for this witness.

17            THE COURT:  Okay.

18            MR. HOGAN:  I would like to however move a few

19   documents into the record if I could.

20            THE COURT:  Very good.

21            MR. HOGAN:  And these are all of course listed on

22   our exhibit list.  It's AX-54, AX-108, AX-109, AX-110, and

23   AX-111.

24            THE COURT:  Any objection?

25            MR. MCKANE:  Your Honor, can I have one moment to

1   confer with Mr. Hogan on one of the exhibits?

2            THE COURT:  Yes.

3        (Pause)

4            MR. MCKANE:  Your Honor, after conferring with

5   Mr. Hogan my understanding is he's agreed to hold off on the

6   introduction of Exhibit 108 until a later point in time.

7   And with that the debtor has no objections to these

8   exhibits.

9            MR. HOGAN:  That's correct, Your Honor.

10           THE COURT:  Very good.  Subject to that removal of

11  108 for the present purposes those other -- those documents

12  are admitted without objection.

13       (Asbestos Objectors' Exhibit Nos. AX-54, 109, 110, and

14  111 were admitted)

15           MR. HOGAN:  Thank you, Your Honor.

16           THE COURT:  Any other cross-examination of

17  Mr. Keglevic?

18           All right.  Any redirect, Mr. McKane?

19           MR. MCKANE:  Your Honor, just a few questions for

20  Mr. Keglevic.  And it's just for my clarification.

21                    REDIRECT EXAMINATION

22  BY MR. MCKANE:

23  Q   Mr. Keglevic, you were asked a series of questions

24  about the treatment of asbestos liabilities and specifically

25  under the plan, and I believe in response to a question

1   regarding paragraph 117 you stated that they were going to

2   -- there was going to be an assumption of those liabilities

3   by NextEra through the reinstatement of the liabilities.

4   Can you explain further what you meant by that?

5   A    Well if I said assumption by NextEra I misspoke,

6   because it is effectively -- there will be a reinstatement

7   of the intercompany accounts that exist between EFH, LSGT,

8   EECI Holdings, EECI, and LSGT SacRock.  Those accounts that

9   exist today will be updated based on a calculation of

10  intercompany interest as of the filing date and they will be

11  continued as will those entities be a part of reorganized

12  EFH.

13      Reorganized EFH will be capitalized with as it exist,

14  you know, today $10 billon of equity and we'll have no debt.

15  That's part of an affirmative agreement that they have with

16  the Texas PUCT.  And then when NextEra, they've already

17  agreed to acquire the minority interest for a couple billion

18  dollars more, so that entity will ultimately have $12

19  billion of credit support that'll support obviously their

20  obligations with respect to those reinstated amounts.

21  That's what I meant.

22  Q    All right.  And so if I understand your testimony

23  correctly the corporate structure underlying EFH as it

24  relates to the LSGT debtors will remain?

25  A    Yes.

1    Q    And the assets and liabilities as reflected by

2    potential asbestos claims and intercompany receivables will

3    remain?

4    A    They will remain.  And I think -- you know, I say

5    reinstated, but effectively what exists today updated for

6    interest will remain and will be part of the ongoing entity,

7    reorganized EFH.

8    Q    All right.  And sir, you said there's a claim asserted

9    directly against EFH from an asbestos claimant, that claim

10   would remain against reorganized EFH?

11   A    Yes.

12   Q    And with regards to the $100 million set aside, sir,

13   can -- I think you mentioned this, it's not a cap in any way

14   as it relates to the receivable obligation?

15   A    That's right.  It's an accounting conveyance.  An

16   amount is being set aside, but since we are reinstating the

17   intercompany receivables and the EFH, the top level parent

18   has a payable to LSGT of $560 million, that ultimately more

19   clearly reflects if there is a cap that cap.

20   Q    All right.  The limited --

21   A    Not the $100 million.

22   Q    Thank you, Mr. Keglevic.

23             MR. MCKANE:  Your Honor, we have no further

24   questions for Mr. Keglevic at this time.

25             MR. HOGAN:  Just one issue.

1            THE COURT:  Yes, Mr. Hogan.

2            MR. HOGAN:  Thank you.

3                    RECROSS-EXAMINATION

4    BY MR. HOGAN:

5    Q    This $560 million claim effectively, do you know what

6    the present value of that claim will be as of the effective

7    date?

8    A    I don't.  $560 million was the amount at the date we

9    filed, but those claims have interest that accrue to them.

10   It's a complicated calculation and we will update that at

11   the effective date of the closing.

12        So those amounts will have grown by virtue of that

13   interest since we filed on April was it 29th, 2014.  So

14   it'll have, you know, virtually the two years of -- or three

15   years of interest that'll attach thereto, Mr. Hogan, so

16   it'll be higher than those amounts.

17   Q    And what rate would that interest accrue at?

18   A    It's calculated, there's two rates that go into the

19   calculation.  One is a LIBOR plus as I understand it, I

20   think 60 or 65 rate, but then there's a money pool operation

21   that has a higher rate of interest, and different claims

22   accrue different interest in the operation of the money

23   pool.  I think Mr. Mullivan (ph) went through that in his

24   prior testimony and it is way above my comprehension.

25   Mr. Horton might have a little more details on it, but it's

1    very -- it's a very detailed calculation, but I think has

2    been put in the evidence before.

3          So I apologize, I don't have those exact numbers --

4    Q    That's fine.

5    A    -- but they will accrue interest.

6    Q    One last question.  The interest rate on the money

7    pool, is that the 10.875 percent interest rate?

8    A    Yes.

9          MR. HOGAN:  Thank you, Your Honor.  No more

10   questions.

11         THE COURT:  You're welcome.

12         MR. MCKANE:  Your Honor, we have no more questions

13   for Mr. Keglevic.

14         THE COURT:  All right.  Thank you, Mr. Keglevic,

15   you may step down.

16         THE WITNESS:  Thank you, Your Honor, and thank you

17   for all your work during the case and your staff, we

18   appreciate it very much.

19         THE COURT:  You're very welcome.

20         MR. MCKANE:  Your Honor, I'll cede the podium to

21   my partner, Mr. Barack Echols.

22         THE COURT:  Okay.  Very good.  Mr. Echols, hello.

23         MR. ECHOLS:  Good morning, Your Honor.  Barack

24   Echols on behalf of the debtors, Kirkland & Ellis.

25         Your Honor, the next witness the debtors are

1    calling is Mr. David Ying, a senior managing director at

2    Evercore and the debtors' financial advisor.

3              I'm happy to advise Your Honor that this witness

4    is being called without objection.  In an effort to

5    continued cooperation with the asbestos objectors and to

6    streamline the trial we've been advised that there will be

7    no cross-examination.

8              Accordingly we would intend to introduce and move

9    into evidence Mr. Ying's written declaration that's been

10   served on all parties and there are no objections.

11             As the Court requested we have Mr. Ying on the

12   CourtCall line and available to the Court.

13             We and he would like to thank you very much for

14   making this accommodation to him given his international

15   travel this afternoon.

16             THE COURT:  Uh-huh.

17             MR. ECHOLS:  If you have no questions for

18   Mr. Ying, Your Honor, may I approach and provide you with a

19   copy of the written direct?

20             THE COURT:  Yes, please.  Thank you.

21             MR. ECHOLS:  Your Honor, at this time the debtors

22   would respectfully move into evidence Mr. Ying's

23   declaration, which is in your binder at D-DIR_Ying.

24             THE COURT:  Any objection?

25             MR. HOGAN:  No, sir.

1            THE COURT:  It's admitted.

2       (Debtors' Exhibit No. D-DIR_Ying was admitted)

3            MR. ECHOLS:  Similarly, Your Honor, we've

4   identified a number of the exhibits that Mr. Ying cites in

5   his declaration at this time.  There have been no objections

6   filed to them as well and I'm like to identify those,

7   please, for the record and move those into evidence.

8            THE COURT:  Okay.

9            MR. ECHOLS:  Those exhibits are DX-080, DX-459,

10  460, 461, 462, 463, 464, and 465.

11           THE COURT:  Any objection?

12           MR. HOGAN:  I just need to confer with counsel for

13  a moment.

14           THE COURT:  Yes.

15       (Pause)

16           THE COURT:  Any objection, Mr. Hogan?

17           MR. HOGAN:  No, sir.

18           THE COURT:  All right.  They're admitted without

19  objection.

20       (Debtors' Exhibit Nos. DX-080, 459, 460, 461, 462, 463,

21  464, and 465 were admitted)

22           MR. ECHOLS:  Thank you, Your Honor.

23           THE COURT:  All right.

24           MR. HOGAN:  Your Honor, I would just like to move

25  into evidence AX-117, which is Mr. Ying's updated expert

1    report of January 20th, 2017.

2              THE COURT:  Any objection?

3              MR. ECHOLS:  No objection, Your Honor.

4              THE COURT:  It's admitted.

5         (Asbestos Objectors' Exhibit No. AX-117 was admitted)

6              MR. HOGAN:  Thank you.

7              THE COURT:  All right.  Thank you, Mr. Ying.  If

8    you can hear me on the phone you are excused and may proceed

9    and hope you have safe travels.

10             MR. YING:  Thank you, very much, Your Honor.

11             THE COURT:  You're welcome.

12             MR. MCKANE:  Your Honor, moving right along, the

13   debtors call their next witness, Mr. Tony Horton to the

14   stand.

15             THE COURT:  All right.  Very good.  Mr. Horton,

16   please take the stand and remain standing.

17             THE CLERK:  Please raise your right hand.

18                  ANTHONY HORTON, WITNESS, SWORN

19             THE CLERK:  Please state and spell your name for

20   the record.

21             THE WITNESS:  Anthony Horton.  Last name is

22   H-O-R-T-O-N.

23             THE CLERK:  Thank you.

24             THE COURT:  Thank you.

25                          DIRECT EXAMINATION

1    BY MR. MCKANE:

2    Q    Good morning, Mr. Horton.

3    A    Good morning.

4    Q    Would you please state your -- the current positions

5    you hold for the debtors, the E-Side debtors?

6    A    Yes, I am currently the CFO, executive vice president,

7    and treasurer of EFH and EFIH.

8    Q    And sir, how long have you held those positions?

9    A    Since October 2016.  Prior to that I was the treasurer

10   -- senior vice president and treasurer of EFH, EFIH, EFCH,

11   and TCEH.

12   Q    And sir, are you familiar with debtor entities that we

13   sometimes refer colloquially as the LSGT debtors or the

14   asbestos debtors?

15   A    I am.

16   Q    And sir, specifically do you understand those to be

17   LSGT Gas Company LLC, LSGT SacRock, Inc., EEC Holdings,

18   Inc., and EECI?

19   A    I do.

20   Q    And do you hold any positions with those LSGT debtors?

21   A    Yes, sir, I do.  I am the president and treasurer of

22   each one of those entities.  I am the manager for LSGT Gas,

23   I am the director of EECI, EEC Holdings, and LSGT SacRock.

24   Q    And sir, is the distinction between being a manager and

25   a director simply recognition of the governance of the --

1    based on the fact that one is a C Corp. and one is an LLC?

2    A    Yeah, that's correct.

3    Q    All right.  And sir, how long have you held those

4    positions as president, manager, and director?

5    A    Since 2014.

6    Q    And sir, do you hold the same positions you hold today

7    with the LSGT debtors when we filed the Chapter 11 petitions

8    in 2014?

9    A    Yes, sir, I do.

10   Q    And sir, did you prepare a declaration in anticipation

11   of today's hearing?

12   A    I did.

13   Q    And sir, can you turn to tab 1 of your witness binder

14   that's in front of you?

15            THE COURT:  It's actually tab 2, I think.

16            MR. MCKANE:  Tab 2, you're absolutely right.  I

17   apologize, Your Honor.

18            THE WITNESS:  Yes, sir.

19   BY MR. MCKANE:

20   Q    And sir, do you recognize the document that is D-DIR

21   Horton_R?

22   A    Yes.

23   Q    And sir, is this a redacted version of the declaration

24   that you signed on Friday, February 10th?

25   A    It is.

1    Q    And is it true and accurate to the best of your

2    knowledge?

3    A    Yes, sir.

4         MR. MCKANE:  Your Honor, I'd like to move D-DIR

5    Horton_R into evidence.  That's his declaration.

6         MR. HOGAN:  No objection, Your Honor.

7         THE COURT:  It's admitted.

8    (Debtors' Exhibit No. D-DIR Horton_R was admitted)

9    BY MR. MCKANE:

10   Q    All right.  Mr. Horton, I briefly want to discuss the

11   LSGT debtors, and to do that did you prepare a demonstrative

12   aid today to discuss the corporate structure of these

13   debtors?

14   A    I did.

15   Q    And is that behind tab 1 of your binder?

16   A    It is.

17   Q    All right.

18         MR. MCKANE:  And if we could publish that to --

19   the first page.

20   BY MR. MCKANE:

21   Q    Mr. Horton, using the demonstrative aid as needed, can

22   you explain the corporate structure of the LSGT debtors as

23   they sit within EFH?

24   A    I can.  LSGT Gas Company LLC is a direct subsidiary of

25   EFH.  EEC Holdings and LSGT SacRock, Inc. is -- are direct

1    subsidiaries of LSGT Gas.  And EECI, Inc. is a direct

2    subsidiary of EEC Holdings, Inc.

3    Q    All right.  And sir, do you see the arrows flowing up

4    of various claims amounts?

5    A    I do.

6    Q    What does that represent?

7    A    That represents the intercompany receivables and

8    payables amongst the entities.

9    Q    And what is the as of date for the calculation of those

10   amounts for those intercompany receivables and payables?

11   A    April 29th, 2014.

12   Q    And sir, just for the record can you identify the

13   various amounts and to whom -- which entities are owed those

14   amounts?

15   A    LSGT Gas company has a receivable from EFH Corp. of

16   $560 million.  EEC Holdings has a $404 million receivable

17   from LSGT Gas Company LLC.  EECI, Inc. also has a receivable

18   from Lonestar Gas Company of $84 million.  And LSGT SacRock

19   has a receivable of $502 million.

20   Q    And for the record when you refer to Lonestar Gas

21   you're referring to LSGT Gas?

22   A    LSGT Gas, yes, sir.

23   Q    All right.  And sir, do you have an understanding of

24   how the plan of reorganization proposes to treat these

25   intercompany payables and receivables?

1    A    I do.

2    Q    And how -- what is your understanding of the plan's

3    proposal?

4    A    The plan's proposal is for these entities to be

5    attained or retained by the buyer, restructured EFH.  These

6    receivables will be reinstated along with the asbestos

7    liabilities.

8    Q    And sir, do the values as reflected on this chart

9    reflect postpetition interest?

10   A    It does not.

11   Q    Can you explain how postpetition interest will be

12   calculated for these claim amounts?

13   A    Yes.  The postpetition interest will be calculated, as

14   Mr. Keglevic said earlier, there's an intercompany money

15   pool amount of 10 and 7/8th, for a portion of it the 560-

16   going to EFH.  There is an amount of LIBOR plus 60 basis

17   points.

18   Q    And what is the genesis of the LIBOR plus 60 basis

19   points calculation that's not in the money pool?

20   A    It's related to a specific note that was executed

21   between LSGT Gas Company and EFH at the time we sold Atmus

22   (ph), Lonestar Gas at that point in time to Atmus.

23   Q    Okay.  And sir, do the LSGT debtors have assets or

24   liabilities in addition to these intercompany payables and

25   receivables?

1    A    So these are discontinued operations, so you can see

2    here their assets, the liabilities are related to the

3    asbestos claims.

4    Q    Okay.  All right.  And as a discontinued operation they

5    don't generate income or have other material assets?

6    A    That's correct.

7    Q    All right.  Sir, let's turn to the efforts to

8    restructure the LSGT debtors.  Are you aware that certain

9    holders of asbestos claims, the asbestos objectors have

10   alleged that the plan as put forth for these debtors has not

11   been proposed in good faith?

12   A    Yes, sir, I'm aware of that.

13   Q    All right.  I'll get through the process of

14   restructuring in a minute, but let's just go back to the

15   point in time when these debtors filed for bankruptcy, okay?

16        Was the discharging of unmanifested asbestos claims a

17   significant consideration regarding the decision to file

18   these debtors for bankruptcy?

19   A    No, they were not.

20   Q    All right.  In December you testified at length about

21   the decision to file for bankruptcy.  Let's -- you filed

22   them for bankruptcy.  Walk us through your efforts to

23   maximize the value of these estates, the LSGT debtor

24   estates, from the point in time that they filed for

25   bankruptcy going forward.  What was your thinking as the

1    director?

2    A    Our thinking at that point in time was to find a buyer

3    that would actually take on these entities that would allow

4    us to reinstate these intercompany receivables and payables

5    amongst the entities and to be able to reinstate the

6    asbestos claims.

7    Q    All right.  And you said find a buyer.  An external

8    buyer to sell these assets?

9    A    An external buyer, yes.

10    Q    All right.  And did you interact with the buyers with

11    regards to efforts to quantify the potential exposure?

12    A    I did.

13    Q    And what -- and as part of your efforts to market Oncor

14    and restructure these debtors what feedback did you get from

15    third-party bidders or buyers -- potential buyers about the

16    asbestos liabilities?

17    A    I would say that shortly after we terminated the RSA,

18    which was in July of 2014, we began having interactions with

19    buyers and debtors, and effectively what they were

20    continuing to try to do was quantify what is the amount of

21    these potential claims.  And they've continuously asked for

22    setting a bar date.

23    Q    All right.  And was NextEra one of the bidders that in

24    2014 requested that the debtors set a bar date?

25    A    Yes.

1  Q    And did the debtors ultimately seek an approved court

2  approval for a bar date?

3  A    Yes, we did.

4  Q    And did the boards of the LSGT debtors consider the

5  notice requirements in connection with the decision to set a

6  bar date?

7  A    Yes.  As I recall there was an opinion from the Court

8  in January '15 that it was going to be the allowance of a

9  bar date, and we met as a -- as board members and as

10  directors, I think it was on April 7th of 2015, we had a

11  discussion, it was myself, Chris Mullivan who is the co-

12  director of EECI, Inc., Chad Husnick attended a meeting as

13  well, and we had in-depth conversations about the notice

14  process and what it meant to set the bar date.  So that was

15  the basic process.

16  Q    And why as the director and manager were you focused on

17  the notice requirement?

18  A    We wanted to ensure and I personally wanted to ensure

19  as well that we were providing adequate notice to any

20  potential claimants.

21  Q    And did you believe that you developed a sufficient

22  notice program?

23  A    I believe we did.  I think it was successful.  I think

24  as Mr. Keglevic mentioned, it's 25,000 claims against EFH

25  and LSGT debtors, and of those 10,000 were unmanifested

Page 42

1    claims.  So I believe that it was successful.

2    Q    As a director and manager of these LSGT debtors was the

3    decision to establish a bar date motivated by a desire to

4    discharge unmanifested asbestos claims?

5    A    No, sir.

6    Q    What was your thinking?

7    A    Again, as part of the marketing process and

8    negotiations with potential buyers, external buyers, bidders

9    for the company we had requests -- continuous requests that

10   a bar date be set.

11   Q    Okay.  And sir, you mentioned that one of those

12   requests came from NextEra.  Were you directly involved in

13   negotiations with NextEra about the potential acquisition?

14   A    I was.  As the business lead of course we had the co-

15   CROs and the legal team, but as the business lead I was

16   directly involved in conversations with NextEra.

17   Q    And who was one of your counterparts at NextEra on

18   those issues?

19   A    Predominantly Mark Hickson (ph).

20   Q    And sir, did the establishment of a bar date for

21   asbestos liability get NextEra comfortable with the decision

22   to reinstate those asbestos liabilities?

23   A    At the time that NextEra came -- got back into the

24   process was after the termination of the Hunt transaction in

25   May of 2016.  We had results from the bar date, and while I

1   think it was a sufficient step in educating and informing

2   NextEra, I would not say that they became comfortable with

3   the asbestos liabilities and the potential magnitude of the

4   liabilities.

5   Q    Yeah, Mr. Horton, you raise a good point.  Let's just

6   kind of establish for the record and for the Court the

7   timeline, all right?  The bar date for the asbestos

8   liabilities was in December of 20 --

9   A    '15.

10  Q    -- 15, correct?

11  A    That is correct.

12  Q    All right.  And then NextEra resurfaced after the Hunt

13  plan was terminated at the end of April of 2015, correct?

14  A    That is correct.

15  Q    All right.  So with that framework can you clarify your

16  answer as to when you were engaging with NextEra in May/June

17  of 2016 what they state of play was as it relates to

18  reinstating asbestos liabilities?

19  A    At that point in time they were very concerned again

20  about the magnitude of the claims that had come through the

21  bar date so we continued to try to work with them through

22  traditional due diligence, giving them access to the history

23  of the claims, access to Mike Conner (ph), who was our

24  expert in this area, and tried to just intensify the amount

25  of what I would consider the traditional due diligence in

1   this -- with regards to these claims.

2   Q    All right.  Well let's unpack that for a moment.  Did

3   that traditional due diligence include materials related to

4   the historical liabilities that these debtors have incurred

5   relating to asbestos liabilities?

6   A    That's correct.

7   Q    And you've referred to Mr. Hunter as your internal

8   expert.  Is he the claims manager who directly was involved

9   with handling asbestos liabilities for EFH?

10  A    Yes, sir.

11  Q    And sir, approximately how long has Mr. Hunter been

12  with the company?

13  A    It was Thomas Edison, I think Mr. Hunter -- I don't

14  know, probably 30 years would be my guess.

15  Q    All right.  Thank you, Mr. Horton.

16       At this point in time in May and June when you were

17  negotiating with NextEra I'd ask you that you -- I want to

18  refer to a particular exhibit that's in your binder.  Could

19  you turn to what's been marked as DX-384?  Are you there,

20  sir?

21  A    I am.

22  Q    And for the record DX-384 is an email between -- it's

23  an email string between Ms. Dore and Mr. Sething (ph) dated

24  June 16th of 2016.

25  A    I do see that, sir.

1   Q    All right.  And Mr. Horton, at the time that you were

2   negotiating with Mr. Hickson where there was another point

3   of contact on the legal side between Mr. Sething and

4   Ms. Dore?

5   A    That is correct.

6   Q    And just for the record, Ms. Dore was the general

7   counsel of EFH at the time, right?

8   A    That is correct.

9   Q    And what's Mr. Sething's role?

10  A    I'm sorry?

11  Q    Mr. Sething's role at NextEra?

12  A    General counsel as I understand it.

13  Q    All right.  And if I could direct your attention to the

14  second email, the one from Mr. Sething where he states in

15  part:

16          "Stacey, Meredith is working on compiling the

17       omnibus diligence request that you suggested yesterday,

18       but since we're really struggling with  the fall of

19       taking uncapped asbestos liability for claims and fact

20       patterns we have little visibility into I had Christy

21       send this request separately to accelerate it as it is

22       critical if there is any chance that we take uncapped

23       liability like this in the face it will look like

24       thousands and thousands of claims."

25          Do you see that, sir?

1    A    I do.

2    Q    Was a similar communication conveyed to you by

3    Mr. Hickson about NextEra's concerns with regards to taking

4    on asbestos liability in May and June of 2016?

5    A    Yes, there was.

6    Q    Okay.

7    A    And in fact he told me that they are not taking the

8    asbestos liabilities or the asbestos entities.

9    Q    All right.  And sir, if you could turn to the tab in

10   your binder immediately presiding it, DX-244.  Are you

11   there, sir?

12   A    Yes, sir.

13   Q    And for the record this is an email exchange again

14   between Mr. Sething and Ms. Dore again in that June time

15   period, and I want to direct you to the top email of that

16   string.  Midway in that paragraph Mr. Sething's

17   communication to Ms. Dore specifically where he says:

18           "I don't think we're going to get comfortable on

19        30K uncapped asbestos claims (and don't think any

20        (indiscernible) strategic knowingly would either), but

21        we're close to have been our proposal where we might be

22        willing to have the claims be reinstated."

23        Do you see that, sir?

24   A    I do.

25   Q    And is that consistent with Mr. Hickson's

1    communications to you at this time regarding NextEra's

2    concerns?

3    A    Yes, it was.  And again, as I stated before, their

4    position was they were not going to take the entities or

5    take the -- take on the liabilities, but they were

6    continuing to do work.

7    Q    All right.  Now Mr. Sething says we're close to having

8    a proposal where we might be willing to have the claims

9    reinstated.  What did -- what do you understand that to

10   mean?

11   A    I'm not exactly sure what he meant at that point in

12   time.  In retrospect I would assume that they were looking

13   at the escrow approach, but I don't know specifically what

14   he was referring to.

15   Q    Ultimately after additional diligence and negotiations

16   was NextEra willing to reinstate the asbestos liabilities at

17   the asbestos entities?

18   A    Yes, they were.  I would say around July -- into July

19   around July 27th they developed or came up with a concept

20   that they would put $250 million in escrow for the sole

21   benefit, as I understand it, for the asbestos claimants.

22   Q    All right.  All right.  At this time in addition to the

23   diligence that you did, right, did the debtors take

24   additional steps with regards to any actuarial efforts or

25   expert driven efforts to try to place brackets around the

1   size of these claims?

2   A    Yes, we did.  Given, you know, the history that we had

3   seen with the 2- to $3 million per year, the $14 million

4   reserve, we became concerned that there was an overstatement

5   of the amount of the asbestos claim, so I, along with K&E,

6   we hired experts, brought them in to do actuarial analysis

7   and actuarial studies, I hired AON Risk who performed an

8   analysis for the company.  Ultimately I asked them to go out

9   and see if they could actually secure an insurance policy

10  for $250 million for the asbestos claims.

11      Alongside this -- alongside that particular study in

12  parallel K&E had Ankura running the statistical and

13  actuarial analysis regarding asbestos amounts.  And so we

14  did actually run additional.

15  Q    You mentioned the work AON Risk did and it was, you

16  know, potentially might lead to the purchase of an insurance

17  policy?

18  A    That is correct.

19  Q    Did -- ultimately were you able to price an insurance

20  policy based on the work of AON Risk?

21  A    I was.

22  Q    And approximately what was the price of that insurance

23  policy that would cover all the asbestos liability?

24  A    It was 145- to -- excuse me -- 145- to $150 million.

25  Q    All right.  And in addition to an insurance policy was

1   there also -- you said there was an evaluation by another

2   set of experts as well?

3   A    That is correct.

4   Q    And was that the Ankura Consulting Group and

5   Dr. Vasquez?

6   A    Yes, sir.

7   Q    Earlier in your testimony you mentioned as part of the

8   due diligence a couple numbers.  Specifically two to three

9   million a year.  What was two to three million a year?

10  A    That was the historical asbestos amounts that we were

11  -- claims that we were paying on an annual -- again on an

12  annual basis.

13  Q    So in other words the actual out of pocket run rate for

14  asbestos costs for the companies?

15  A    Yeah, it included the claims as well as the legal

16  defense costs.

17  Q    So all claims -- the total out of pocket, not just the

18  satisfaction of claims but also defense costs?

19  A    That's correct.

20  Q    And sir, you mentioned $14 million as well.  What is

21  the $14 million?

22  A    That was the reserve amount that the accountants had

23  used as calculations of a reserve for accounting purposes.

24  Q    So specifically on the books and records of the debtors

25  $14 million was reflected to -- for the contingent liability

1    for these reserves?

2    A    That's correct.

3    Q    I mean for these liabilities, excuse me.

4    A    That's correct.

5    Q    All right.  All right.  Now you mentioned that the

6    original proposed set aside was $250 million.  Was that

7    number ultimately reduced by NextEra after further

8    discussions with the debtors?

9    A    Yes, that amount was reduced after the original signing

10   from 250 million to $100 million.

11   Q    And what impact did that have on distributable value to

12   other EFH creditors?

13   A    That increased the distributable value from -- by an

14   additional $150 million.

15   Q    All right.  And now I recognize you can't get in

16   NextEra's head, but based on your interactions with them

17   what is your understanding of what drove the reduction of

18   the set aside from $250 million to $100 million?

19   A    It's my perspective that it was based upon the

20   actuarial analysis that was done, the study that I had

21   shared with them from AON Risk, the ability for us to

22   actually go out and get an insurance policy in a range of

23   145- to $150 million for 250 million of coverage.

24   Q    And sir, was there another bidder that was -- you were

25   negotiating with at this time as well?

1   A    There was.

2   Q    All right.  And without disclosing the name of that

3   bidder was that you bidder also evaluating these asbestos

4   liabilities as well?

5   A    Yes, they were.

6   Q    All right.  Sir, do you believe the plan that's

7   currently before the Court maximizes the value of the LSGT

8   debtors' estates?

9   A    I do.

10  Q    And how does it do so?

11  A    From -- just, you know, from an economic perspective

12  before they -- before we had the plan you had a negative

13  free cash flow entity, the LSGT debtors, with a receivable

14  to an insolvent parent.  With the new -- with the plan --

15  with a new buyer coming in taking over restructured EFH with

16  $12.2 billion ultimately of equity the reinstatement of the

17  receivables and also the reinstatement of timely filed

18  claims I think they are in a very good position.

19  Q    All right.  And I just want to make sure the record --

20  and you were referring to where you were, the receivable

21  from your perspective was to an insolvent entity as of the

22  petition date?

23  A    Yes.  The receivable from LSGT Gas to EFH was to an

24  insolvent entity.

25  Q    Right.  And that's the $560 million intercompany

1    receivable?

2    A    That's correct.

3    Q    All right.  And your view as to the feasibility and

4    solvency of EFH -- reorganized EFH post-emergence?

5    A    It's $12.2 billion of equity with no underlying debt or

6    other liabilities other than the liability that they have to

7    LSGT debtors.

8    Q    All right.  So from your -- from a financial

9    perspective how have -- has the LSGT debtors position

10   improved through this plan of reorganization?

11   A    Absolutely.

12   Q    All right.

13            MR. MCKANE:  Your Honor, I have no further

14   questions for this witness at this time.  I do have a series

15   of exhibits that I'd like to move into evidence.

16            THE COURT:  Okay.

17            MR. MCKANE:  And these are all materials that we

18   previously provided opposing counsel, but I also have a copy

19   at this time.

20            THE COURT:  Okay.

21            MR. MCKANE:  May I approach?

22            THE COURT:  Yes.  Thank you.

23            MR. MCKANE:  Your Honor, the debtors move in the

24   following exhibits that are specifically referenced in

25   Mr. Horton's written declaration.  DX-2, 4, 248, 298, 390,

1    and 668.

2            THE COURT:  Any objection?

3            MR. HOGAN:  No objection, Your Honor.

4            THE COURT:  They're admitted.

5        (Debtors' Exhibit Nos. DX-2, 4, 248, 298, 390, and 668

6    were admitted)

7            MR. MCKANE:  Your Honor, the debtors move into

8    evidence the following exhibits that were specifically

9    referenced as part of the live examination.  DX-244 and 384.

10            MR. HOGAN:  No objection.

11            THE COURT:  They're admitted.

12        (Debtors' Exhibit Nos. DX-244 and 384 were admitted)

13            MR. MCKANE:  Your Honor, we'd ask that the

14    demonstrative used by Mr. Horton not be introduced into

15    evidence but be part of the record.

16            MR. HOGAN:  No objection.

17            THE COURT:  It's part of the record.

18            MR. MCKANE:  And, Your Honor, finally the -- we

19    move these additional exhibits into evidence as stand-alone

20    pieces of the debtors' case in chief.  DX-234, 235, 236,

21    238, 240, 241, 289, 290, 291, 293, 294, 295, 296, 304, 306,

22    344, 345, 348, 367, 370, 371, 372, 373, 374, 375, 376, 377,

23    378, 379, 380, 381, 382, 383, 402, 403, 404, 405, 418, 419,

24    420, 421, 422, 423, 424, 425, 426, 427, 428, 478, 479, 480,

25    481, 482, 483, 484, 485, 487, 488, 489, 491, 501, 505, 510,

1    511, 515, 516, 517, and 519.

2          MR. HOGAN:  No objection, Your Honor.

3          THE COURT:  They're admitted.

4        (Debtors' Exhibit Nos. DX-234, 235, 236, 238, 240, 241,

5    289, 290, 291, 293, 294, 295, 296, 304, 306, 344, 345, 348,

6    367, 370, 371, 372, 373, 374, 375, 376, 377, 378, 379, 380,

7    381, 382, 383, 402, 403, 404, 405, 418, 419, 420, 421, 422,

8    423, 424, 425, 426, 427, 428, 478, 479, 480, 481, 482, 483,

9    484, 485, 487, 488, 489, 491, 501, 505, 510, 511, 515, 516,

10   517, and 519 were admitted)

11         MR. MCKANE:  Your Honor, we pass the witness.

12         THE COURT:  All right.  Mr. Hogan, can we take a

13   little short say five-minute recess --

14         MR. HOGAN:  Certainly.

15         THE COURT:  -- and then we'll have your cross.

16         MR. HOGAN:  Your Honor, could I just ask one

17   question.  I'm going to be utilizing some of those binders

18   with this witness and I just want -- I'll deal with it when

19   we come back, but I want to approach.

20         THE COURT:  Okay.

21         MR. HOGAN:  Thank you.

22         THE COURT:  That's fine.

23       (Recessed at 11:08 a.m.; reconvened at 11:17 a.m.)

24         THE CLERK:  All rise.

25         THE COURT:  Please be seated.

1          MR. HOGAN:  May I proceed, Your Honor?

2          THE COURT:  Yes, you may.

3          MR. HOGAN:  Thank you.

4                    CROSS-EXAMINATION

5    BY MR. HOGAN:

6    Q    Good morning, Mr. Horton.

7    A    Good morning.

8    Q    I just want to cover a couple topics from your direct

9    testimony.

10        You had testified that you are -- I'm getting old so I

11   got to go to -- president and treasurer of each of the

12   asbestos debtors I understand and that you're also the sole

13   manager of LSGT Gas, and the director of EECI Holdings,

14   EECI, and LSGT SacRock, and you held those positions in

15   April 2014 when the petitions were filed; isn't that

16   correct?

17   A    That is correct.

18   Q    Okay.  And you are also the sole director of EEC

19   Holdings and LSGT SacRock and the sole director of LSGT Gas,

20   and you were the sole director and manager of those entities

21   when the petitions were filed as well; isn't that correct?

22   A    That is correct.

23   Q    In April of 2014 through October 2016 when the T-Side

24   of the plan was confirmed or August when it was confirmed

25   Mr. Molten (ph) was also a director of EECI; isn't that

1    correct?

2    A     That is correct.

3    Q     And then at that point you became the sole director of

4    EECI, correct?

5    A     That's correct.

6    Q     And are you still the sole director?

7    A     Yes, sir.

8    Q     Now we talked a little bit or you did on your direct

9    about the hearing on December 5th and you discussed at that

10   time your understanding of your fiduciary duties as a member

11   of the board of those entities with respect to the decision

12   to file bankruptcy, I'm sure you remember the hearing.

13   A     I do indeed.

14   Q     What do you understand your fiduciary duties to be as a

15   member of the board of those entities after they filed for

16   bankruptcy?

17   A     To act in good faith for those specific entities and to

18   maximize the value specifically for those entities

19   themselves.

20   Q     And when did you come to that understanding?

21   A     I think just in general I understood that having served

22   on boards before.  Also we had a meeting, as I discussed in

23   my testimony back in December, we had a meeting a couple of

24   months prior to the filing in April.  We had a broad meeting

25   for -- that K&E conducted for directors, managers of all the

1    subsidiaries for -- within the system.  And in that meeting

2    they discussed our fiduciary responsibilities leading up to

3    bankruptcy and our fiduciary responsibilities if an entity

4    was indeed filed for bankruptcy.

5    Q    And those -- that was before the petition date; is that

6    correct?

7    A    That is correct, sir.

8    Q    Okay.  So did you ever discuss with anybody about how

9    -- any advisors about how your fiduciary duties would change

10   after the filing for bankruptcy?

11   A    Again, that was part of the discussion we had in the --

12   approximately February of 2014 time frame.

13   Q    Now you understand that upon filing your duties then

14   ran to the creditors of the various entities?  Do you

15   understand that to be the case?

16   A    It's my understanding that we had fiduciary

17   responsibility to the estates and those particular entities

18   and not to any particular individual creditor.

19   Q    Let's turn if we could to the bar date issue, okay?  I

20   believe you state in your declaration that the debtors

21   sought the asbestos bar date, and I believe you testified to

22   this as well, in an effort to provide some certainty with

23   regard to the potential -- to the scope of the potential

24   liabilities to acquirers such as NextEra; is that correct?

25   A    Yeah.  I think what I testified to is that we -- the

1    bidders were requesting a bar date so that they could get

2    more certainty as to the potential claims and the magnitude

3    of the dollars of the claims.

4    Q    Well isn't it true that the bar date does not provide

5    certainty as to the amount of the aggregate asbestos

6    liabilities?

7    A    I would agree with that in general.

8    Q    And even after the bar date the debtors are still not

9    able to state with certainty what those liabilities are;

10   isn't that correct?

11   A    We have actuarial studies as I discussed from AON Risk

12   and Ankura and the expected values, you know, on a nominal

13   basis and a discounted basis.  Do we know precisely?  No, I

14   don't think anyone knows precisely.  We have a statistical

15   analysis from the experts and you can talk to them about it.

16   But we have a general idea that we feel comfortable about

17   from the studies -- from the experts.

18   Q    Effectively a range; isn't it true?  It's a range and

19   not a fast number?

20   A    Well again, you need to talk to the experts.

21   Q    Understood.

22   A    They're expected values, so there's an expected value,

23   and of course around any expected value you're going to have

24   a range.

25   Q    And those expert -- those reports that you reference

1    are both the AON report and then the Ankura report; is that

2    correct?

3    A    Yeah, Ankura report, yes, sir.

4    Q    And you would agree that those reports are in fact

5    estimations are they not?

6    A    Yes, it is an analysis, an actuarial analysis of the

7    potential claims.

8    Q    But they do not provide a definitive calculation of the

9    liabilities; isn't that correct?

10   A    I would say that's correct.

11   Q    Okay.  Let's talk about the plan.  You're familiar with

12   the plan of reorganization?

13   A    Yes, sir.

14   Q    And I understand that there's certain provisions of the

15   plan that are currently being reworked but they don't relate

16   to any of our issues with regard to asbestos liabilities; is

17   that correct?

18   A    I believe that's true.

19   Q    Now if you would take a look at your declaration and

20   specifically paragraph 34.

21   A    Do you mind directing me to where you --

22   Q    Well do you have --

23   A    I have the binder you gave me.

24   Q    And you don't have the debtors' binder there?

25   A    Somebody took it I think.

1           MR. HOGAN:  My apologies.

2           THE WITNESS:  Thank you.

3           MR. HOGAN:  Thank you.

4    BY MR. HOGAN:

5    Q     Let me know when you're there.

6    A     You referred to my declaration.  I'm sorry.

7    Q     Yes, sir.  The February 10th declaration, paragraph 34,

8    it's on page 15.

9    A     Yes, sir.  Paragraph 34?

10   Q     Yes, sir.

11   A     Okay.

12   Q     And you state there in I think the fifth line where you

13   say:

14           "While it is true the debtors sought and received

15        a bankruptcy court approved for bar date -- a bar date

16        for all asbestos-related claims manifested and

17        unmanifested and that the plan discharges asbestos

18        related claims that were not properly preserved."

19        Is that your -- that's your understanding about how the

20   plan works together with the bar date order?  Is that your

21   understanding?

22   A     Yes, sir.

23   Q     And you understand that it's the plan that provides for

24   the discharge of those claims; is that correct?

25   A     That's correct.

1    Q    And that as such the discharge is not an automatic

2    effect of the plan -- or of the bar date; is that correct?

3              MR. MCKANE:  Objection, Your Honor.  Actually

4    calls for a legal conclusion.

5              MR. HOGAN:  I'm just asking for his understanding

6    about how the plan works together with the bar date order,

7    Your Honor.

8              THE COURT:  I'll overrule the objection, to the

9    extent you understand.

10             THE WITNESS:  I'm sorry, sir?

11             THE COURT:  To the extent you understand the

12   question and have a belief you can answer.

13             THE WITNESS:  It's my understanding that a bar

14   date was set, and as part of the bar date we were -- got

15   claims for manifested and unmanifested -- not to be

16   redundant -- claims.  And the plan, as it states, is -- was

17   to discharge any asbestos claims that were not timely --

18   were not filed on a timely basis.

19   BY MR. HOGAN:

20   Q    And that would include a -- someone with a manifested

21   claim, someone with an actual illness, as well as someone

22   who has an unmanifested illness, would you agree?

23   A    I would agree.

24   Q    And you understand that if debtors and NextEra agreed

25   the plan could provide that unmanifested asbestos claims for

1   which a proof of claim were not filed could be reinstated

2   assuming that the debtors and NextEra agreed to that

3   construct.  Is that a fair statement?

4   A    It's a hypothetical question.  I don't believe that

5   NextEra would agree to that based on the conversations I had

6   with them throughout the negotiations.  But in your

7   theoretical hypothetical question, yes.

8   Q    Okay.  I appreciate your answer.

9        And to the extent that those unmanifested asbestos

10  claims for which a claim wasn't filed by the bar date or

11  reinstated the estimations that you relied upon, that being

12  AON and Ankura, would be much high every; isn't that

13  correct?

14  A    I want to be respectful to your question, but you're

15  asking me to -- I've answered one hypothetical question and

16  now we're going to another hypothetical analysis.  I don't

17  know.  You said much greater.  I don't know.

18  Q    Thank you.

19       You're aware that NextEra suggested or discussed with

20  the debtors the possibility of considering a plan that

21  included a 524(g) channeling injunction are you not?

22  A    I'm aware that -- and again, it's from the email --

23  you're refreshing my memory by showing me some email

24  exchanges, put in front of me a term sheet.  I'm aware that

25  there was a conversation about that topic, so.

1   Q    If you could turn to AX-105 in the bigger binder that I

2   had given you and not in the debtors' binder.

3   A    AX, my apologies.

4   Q    105.  You're fine.

5   A    Thank you.  Yes, sir.

6   Q    And is this the email that you were just referring to

7   in your testimony?

8   A    Yes.

9          THE COURT:  Okay.  Hang on just a sec.

10         MR. HOGAN:  Yes, sir.

11         THE COURT:  I'm not up to speed.  I pulled the

12  wrong document.

13      (Pause)

14         THE COURT:  All right.  Now I'm here.  Thank you.

15         MR. HOGAN:  No problem, Your Honor.

16         THE COURT:  Would you repeat the question, please.

17         MR. HOGAN:  Well --

18         THE COURT:  I didn't hear the question.

19         MR. HOGAN:  You're fine, Your Honor.

20         What I said to him was I asked if this was the

21  email that he was referring to that -- when I asked him the

22  question about any discussions with NextEra about the

23  524(g).

24         THE COURT:  Okay.

25  BY MR. HOGAN:

1    Q    Now, in looking back at your testimony from

2    December 5th I asked you about this, you may recall, that's

3    I believe what you had stated in terms of how you understood

4    this email to be germane, and in that testimony I'll quote

5    you stated:

6              "That I would assume that I may have glanced at

7         this and said what do you guys think and it died.  So I

8         don't know what the outcome was, why we didn't do it,

9         why it worked, why it didn't work."

10             MR. MCKANE:  Objection, Your Honor.  I don't think

11   it's -- I think it's improper impeachment because I don't

12   think he's said anything inconsistent with that today.  This

13   is -- he's just reading prior testimony from a deposition.

14             MR. HOGAN:  Well, Your Honor, that's exactly

15   right, and -- but it goes to my next question, it goes to

16   the question.  I'm just setting the stage.  And the question

17   would be, Your Honor, has his recollection been refreshed

18   since that hearing?  That's all.

19             THE COURT:  Refreshed as to what?  I don't think

20   you've asked the predicate question.

21             MR. HOGAN:  Well the predicate question is --

22             THE COURT:  And maybe I missed it.

23             MR. HOGAN:  I showed him the email.

24             THE COURT:  Yes.

25             MR. HOGAN:  He said he -- he says he recalls

1   seeing it.

2              THE COURT:  Right.

3              MR. HOGAN:  We talked about what he said at the

4   hearing in December 5th.  And I'm asking him now has his

5   recollection changed between that hearing and now about what

6   was done with this email and how it was resolved.

7              THE COURT:  All right.  I'll allow that.

8              THE WITNESS:  My answer remains the same.

9   BY MR. HOGAN:

10  Q    So you did not participate in the decision about

11  whether to adopt a 524(g) for the asbestos debtors; is that

12  correct?

13  A    No, sir.

14  Q    No, sir it's not correct, or no, sir it is?  I know

15  it's tricky.

16  A    Yes, sir --

17  Q    But you did not participate --

18  A    -- you're correct and I did not -- I was not involved

19  in the discussions, the evaluation of whether the channeling

20  injunction, whether or not that was a viable option or not.

21  Q    Okay.  And that's correct even though you were a member

22  of the board of each of these debtors and owed a fiduciary

23  duty to the creditors; isn't that correct?

24  A    That's correct.

25  Q    Okay.  Would it be fair too say that the decision

1   whether to -- how to manage this 524(g) issue or the

2   decision not to go down that route was in fact made by EFH?

3   A    That decision was made as part of the overall deal

4   team, which included our general counsel, our deputy general

5   counsel, outside counsel, instructed them to look at it, and

6   ultimately with their conversations decided it was not

7   workable.

8   Q    And you weren't privy to those discussions?

9   A    I wouldn't say I was not privy to those discussions, I

10  was not involved in the decisions.  What I was involved in

11  was the ultimate decision that this did not work.

12  Q    Is it fair to say that you were told that the decision

13  was that they weren't going to use a 524(g)?

14  A    Yes, that's fair.

15  Q    Okay.  Let's turn to the negotiations with NextEra and

16  the escrow issue if I could.  Again, turning to the

17  December 5th hearing I asked you about the $100 million

18  escrow and I asked you specifically for whose benefit that

19  money was set aside, and I'm just going to read from the

20  transcript, and if I'm -- if it's incorrect or doesn't

21  purport with your understanding please let me know.  That on

22  page 107 at lines 17 to 108-2, and as an aside this is

23  included in my designation, the question read, "To whose

24  benefit does the $100 million inure?"  And your answer,

25  "It's to the benefit of the sole benefit of claimants."

1   Question, "It's not to the benefit of NextEra?"  Answer,

2   "$100 million?"  Question, "Yes."  Answer, "No."  Question,

3   "And why not?"  Answer, "It's set aside for the sole purpose

4   of asbestos claims."  Do you recall that testimony?

5   A    I do.

6   Q    Now in your February declaration you state that the

7   escrow is -- and this is on page 26 of your declaration.

8          MR. MCKANE:  Need a paragraph.

9   BY MR. HOGAN:

10  Q    I'm sorry, paragraph 26, excuse me.

11  A    We're going back to which tab?

12  Q    To the declaration in the debtors' binder, yes, sir.

13  You now state that, "The escrow is 'simply an accounting

14  mechanism for the benefit of NextEra.'"  And so my question

15  to you is, is you now understand your previous testimony to

16  be an error; is that correct?

17  A    No, sir.

18         MR. MCKANE:  Objection, Your Honor, it's improper

19  impeachment.  Under the rule of completeness he needs to

20  read in the sentence preceding that where it says:

21          "NextEra has agreed to set aside 100 million of

22       its EFH, EFIH purchase price to satisfy 'asbestos

23       claims and related costs.'"

24       Without that it's improper impeachment.

25         MR. HOGAN:  I have no problem with that, Your

1    Honor.  I agree that that language should be included.  My

2    apologies.

3    BY MR. HOGAN:

4    Q    But nevertheless I need to understand.  It's simply an

5    accounting mechanism for the benefit of NextEra; is that

6    correct?

7    A    No, sir.  Now there is a benefit to NextEra for the

8    escrow itself, the construct of the escrow, and it is an

9    accounting benefit the construct of the escrow in having the

10   money in that escrow account.  The money that's in the

11   escrow account, the cash, the dollars, are for the benefit

12   for claim -- to pay claims associated with asbestos

13   claimants.

14            THE COURT:  Is the accounting benefit -- I mean

15   simply they get to keep the soft balance sheet?

16            THE WITNESS:  Yes, sir.  That's the benefit of the

17   escrow construct.  The cash that's within the escrow is for

18   the benefit of the asbestos claims.  I don't see the

19   inconsistency.

20            MR. HOGAN:  Thank you.

21   BY MR. HOGAN:

22   Q    Now the amount of the escrow is obviously a point of

23   negotiation with NextEra; is that correct?

24   A    Yes, sir.

25   Q    And initially it was the $250 million and then it was

1    reduced at some point to $100 million; is that correct?

2    A     That is correct.

3    Q     And is it fair to say that the lower the aggregate

4    asbestos liabilities the lower the amount that NextEra would

5    demand to be held in escrow?  Is that a fair statement?

6    A     If you don't mind repeating that, please.

7    Q     Sure.  The lower the aggregate asbestos liabilities the

8    lower the amount that NextEra would have demanded be held in

9    escrow; is that correct?

10   A     I don't know.  You -- I would have to have numbers.

11   You have a --

12   Q     Okay.

13   A     -- hypothetical --

14   Q     Okay.

15   A     -- a set of numbers --

16   Q     Sure.

17   A     -- you want to run through this?

18   Q     Absolutely.

19   A     Okay.

20   Q     So initially the aggregate amount that would be placed

21   in the escrow was $250 million, correct?

22   A     That is correct.

23   Q     And then I believe you testified that you shared the

24   AON report with NextEra; is that correct?

25   A     That is correct.

1   Q    And you were doing that to get them comfortable with

2   the amount of money that would be held in escrow to deal

3   with these asbestos liabilities; is that correct?

4   A    We began that to give them a better view and to the

5   potential amounts of the claims, also to determine whether

6   or not we could get insurance for the $250 million at a

7   lower cash cost, if you will.  That was the purpose of

8   sharing the study with NextEra.

9   Q    And is it fair to say that as a result of sharing that

10  study with NextEra that the $250 million was reduced to

11  $100 million?

12  A    I don't know if it was a direct result.  I think it was

13  a result of the overall negotiations, the competitive

14  process, and then the analysis that was performed -- the

15  actuarial analysis that was performed, plus the feedback

16  that they had gotten from the underwriter willing to

17  underwrite the $250 million of asbestos claims.  I think all

18  of that together potentially made NextEra comfortable.  But

19  you would need to ask them specifically.

20  Q    And I'll have that opportunity.  Thank you.

21       But my question again then would be, is the lower those

22  overall liabilities the lower the amount NextEra would

23  demand to hold in escrow; is that a fair statement?  I'm

24  asking you.  You can say no, you can say yes, it's your

25  call.

1    A    It seems logical to me.

2    Q    Did EFH seek to persuade NextEra to reduce the escrow

3    amount?

4    A    No, it was not direct where we were in a situation

5    where we were asking NextEra to reduce the escrow amount.

6    Again, the process was for us to try to inform NextEra just

7    like they were wanting to be informed by the bar date we

8    were trying to provide again additional due diligence, more

9    information so NextEra could understand -- have a better

10   understanding of what the potential claim amounts were.

11       We ultimately were looking for an opportunity.  We put

12   it in the merge agreement to if we could find an insurance

13   policy that was acceptable to NextEra in their sole

14   discretion as to whether it was acceptable or not to

15   potentially release some of the dollars if we could get it

16   insured at a lower rate -- at a lower amount.

17   Q    And to the extent that some of the $250 million escrow

18   were released where would that money be released to?

19   A    It's released as part of the overall distributable

20   value.

21   Q    So it would be potentially distributable to other

22   creditors?

23   A    Yes.

24   Q    And would that provide a benefit to EFH?

25   A    I don't know.  EFH the estate or --

1    Q    EFH the estate.

2    A    I don't think so.

3    Q    Now you understand that NextEra had been provided with

4    the AON information and the other due diligence information

5    that the debtor had provided to them, correct?

6    A    That is correct.

7    Q    And is it your position that that information helped

8    persuade NextEra that the asbestos liabilities were lower

9    than they had previously believed?

10    A    I think it was informative to them, yes.

11    Q    Thank you.

12         Let me just turn to your knowledge about a couple

13    issues and then I think I'll be done.

14         Are you aware that asbestos illnesses have a long

15    latency period?

16    A    I'm not aware specifically.

17    Q    And are you aware that persons who are exposed to

18    asbestos but who have not fallen ill and cannot know whether

19    they will fall ill at some point?  Are you familiar with

20    that understanding?

21    A    I'd ask you to -- you're asking me a medical question

22    and --

23    Q    No, I'm just asking you if you understand that people

24    that are exposed to asbestos and have not yet fallen ill

25    cannot know whether or not they will fall ill.  That's

1    really what I'm asking you.

2    A    I don't know today whether I'm going to --

3              MR. MCKANE:  Objection, Your Honor, I think it

4    lacks foundation.  I think it assumes facts that have not

5    been presented into evidence.  And he hasn't established

6    whether this witness has this global understanding of the

7    illness.

8              MR. HOGAN:  I'll withdraw the question, Your

9    Honor.

10   BY MR. HOGAN:

11   Q    You understand under the plan that the claims of such

12   persons, unmanifested asbestos claimants who have not filed

13   a claim by the bar date will be discharged?  Is that your

14   understanding of how the plan works together with the bar

15   date order?

16   A    Yes, sir.

17   Q    And so if individuals fall ill they no longer have a

18   right to go to state court or to sue the asbestos debtors in

19   state court because of that construct; is that correct?

20   A    I'm not a lawyer.

21   Q    Okay.  Do you believe that that is an excellent outcome

22   for those creditors?  I think you used that term in your

23   declaration.

24   A    I think for the LSGT debtors I think we have a very

25   good outcome for the LSGT debtors as a whole.  We have a

1  restructured EFH that will have $12.2 billion approximately

2  of equity, we have reinstatement of the intercompany

3  receivables, we have reinstatement of the asbestos claims.

4  Compared to where they were and where we started, which was

5  with an insolvent parent and effectively a negative value

6  estate, the LSGT estate I think that it was a very good

7  outcome.

8  Q    Okay.  Just a couple more things.

9       You testified about the value of the LSGT estate.  As

10 of the effective date do you know what the value of the LSGT

11 debtors' estates will be?

12 A    I think Mr. Keglevic testified earlier that we -- the

13 value of the estate is related to the intercompany

14 receivables, and we will need to update those amounts.  We

15 will update those amounts at emergence.  But it's -- you

16 have 560-, so 560 million plus the other amounts on a going

17 forward basis updated.

18 Q    But you -- so you're telling me and you're telling the

19 Court that you haven't calculated what the value of the LSGT

20 debtors' estates will be as of the effective date?

21 A    I am not -- I don't have that exact math in front of

22 me, but it is much greater than the negative amount that we

23 had prior to filing.

24 Q    Do you have any idea about what the -- that value will

25 be?

1    A    It's at least $560 million.

2    Q    It's at least $560 million together with some interest

3    component that you can't speak to.  Is that a fair

4    statement?

5    A    The interest will be calculated at a postpetition at 10

6    and 7/8th, part of it will be a LIBOR plus 60.

7              MR. HOGAN:  One more moment, Your Honor, and I

8    think I'll be done.

9         (Pause)

10   BY MR. HOGAN:

11   Q    Thank you, Mr. Horton.

12   A    Thank you, Mr. Hogan.

13             MR. HOGAN:  No more questions, Your Honor.

14             THE COURT:  Okay.  Thank you.  Any other cross of

15   Mr. Horton?  Any redirect?

16             MR. MCKANE:  Yes, Your Honor, just a few

17   questions --

18             THE COURT:  Okay.

19             MR. MCKANE:  -- for Mr. Horton.

20                       REDIRECT EXAMINATION

21   BY MR. MCKANE:

22   Q    Mr. Horton, at the start of the cross-examination I

23   believe Mr. Hogan asked you a series of questions about the

24   bar date and whether that was sufficient to provide

25   certainty regarding the amount of the asbestos liability.

1   Do you recall that?

2   A    Yes, sir.

3   Q    Was the bar date a necessary but not sufficient

4   condition to getting NextEra comfortable with reinstating

5   these asbestos liabilities?

6   A    I would characterize it as that.  It was necessary for

7   NextEra to get comfortable with potentially taking on the

8   asbestos entities, reinstating the claims.  It wasn't

9   sufficient enough as we discussed, we did additional due

10  diligence and engaged professionals on studies -- actuarial

11  studies to try to get them more comfortable.

12  Q    Mr. Horton, a second issue that you were asked on

13  cross-examination related to the proposal for a channeling

14  injunction and whether that was -- rose to the level of you

15  as a director or manager of the LSGT debtors.  Do you recall

16  that?

17  A    I do.

18  Q    Sir, as a director and manager of those debtors do you

19  rely on your management team and outside professionals to

20  aid you in making decisions?

21  A    We -- as a director, as an officer often we delegate

22  responsibility to professionals to do an analysis and come

23  to conclusions, yes, sir.

24  Q    And do you have an understanding as to, you know, what

25  set of professionals and officers looked into and evaluated

1   the channeling injunction?

2   A    The general counsel of EFH, Stacey Dore, the deputy

3   general counsel of EFH and EFHI, Andy Wright, K&E as our

4   outside counsel and professionals were all delegated that

5   responsibility.

6   Q    All right.  And just I believe one other set of

7   questions, sir.

8        You were asked about the evolution of the negotiations

9   from NextEra and how they evolved from a proposal of setting

10  aside $250 million to a proposal of setting aside $100

11  million.  Do you recall that?

12  A    Yes, sir.

13  Q    And ultimately there was a proposal -- or a version

14  along those lines.  You were asked a series of questions

15  about what happens to the differential, that $150 million.

16  Do you recall that?

17  A    Yes, sir.

18  Q    And did that $150 million revert back to NextEra or did

19  that become additional distributable value to the estates?

20  A    Additional distributable value to the estates.

21  Q    All right.  You were specifically asked a question by

22  Mr. Hogan about whether any of that additional distributable

23  value was for the benefit of EFH creditors.  Do you recall

24  that?

25  A    That's correct.

1   Q    Sir, based on where we are right now, based on the

2   projected recoveries right now for this plan of

3   reorganization, is any of that -- are the EFH creditors

4   getting anything more than the cash on hand at EFH?

5   A    No, sir.

6   Q    And so what happens to any of that residual value,

7   where does it go, the $150 million?

8   A    It's to the EFIH creditors.

9   Q    All right.

10          MR. MCKANE:  We have no further questions.

11          MR. HOGAN:  Your Honor, I have no further

12   questions for this witness.

13          I have a few matters I'd like to move into

14   evidence, and aside from that I have no more questions for

15   this witness.

16          THE COURT:  Okay.  Why don't you stay at the stand

17   in case something comes up in connection with what Mr. Hogan

18   is going to put in --

19          THE WITNESS:  Sure.

20          THE COURT:  -- the record and then we'll dismiss

21   you.

22          MR. HOGAN:  It shouldn't be an issue, Your Honor.

23   AX-105, AX-113, and AX-115.

24          MR. MCKANE:  Your Honor, may I have a minute to

25   confer with regards to AX-105?

1          THE COURT:  Yes.

2          MR. MCKANE:  There's a lingering issue here.

3     (Pause)

4          MR. MCKANE:  All right.  Your Honor, we do not

5     object to the admission of 105.  The issue just for the

6     clear record for the Court was whether -- 105 attaches a

7     term sheet --

8          THE COURT:  Uh-huh.

9          MR. MCKANE:  -- that was forwarded internally and

10    that was received by -- came via NextEra from the asbestos

11    objectors.

12         We understand that the admission of this email and

13    this term sheet will not constitute a waiver under Rule 408

14    as it relates to the admissibility of other term sheets.

15    And with that understanding we do not object to the

16    admission of 105.

17         MR. HOGAN:  That's a correct recitation of our

18    agreement, Your Honor.  And with your permission I'd like to

19    approach your clerk.

20         THE COURT:  Please.  All right.  It's admitted,

21    all the documents moved, all three exhibits.

22    (Asbestos Objectors' Exhibit Nos. AX-105, 113, and 115

23    were admitted)

24         MR. HOGAN:  Thank you, Your Honor.

25         THE COURT:  Mr. Horton, thank you very much.  You

1    may step down.

2              THE WITNESS:  Thank you.

3              THE COURT:  You're welcome.

4              MR. MCKANE:  Your Honor, the debtors are moving

5    swiftly through their case.  Our next witness is Ms. Jane

6    Sullivan.  My understanding is Ms. Sullivan remains in Judge

7    Walrath's courtroom, and while I recognize it's just a few

8    minutes before noon, if it was acceptable to Your Honor we

9    could break for lunch now.

10             THE COURT:  Okay.  That's fine.  Yes, of course.

11   We'll plan to reconvene at 1:00 sharp, and if Ms. Sullivan

12   is still with Judge Walrath we'll have to work around that.

13             MR. MCKANE:  Exactly right, Your Honor.  If she's

14   not available we'll call our next witness thereafter.

15             THE COURT:  All right.  Very good.  All right.

16   We're adjourned for lunch until 1:00.

17        (Recessed at 11:51 a.m., reconvened at 1:02 p.m.

18             THE CLERK:  All rise.

19             THE COURT:  Please be seated.  Don't break

20   anything over there.  Enthusiastic law clerks.  All right.

21   Yes, proceed.

22             MR. GANTER:  Your Honor, Jonathan Ganter from

23   Kirkland & Ellis on behalf of the debtors.

24             Your Honor, at this time, the debtors would like

25   to introduce the written direct of Jane Sullivan.  Ms.

1    Sullivan is an Executive Vice-President at Epiq Bankruptcy

2    Solutions and leads their solicitation team.

3           Her declaration describes the solicitation and

4    voting processes for the debtors' plan of reorganization.

5    Ms. Sullivan's declaration was filed on the docket at DI-

6    10791 on February 9th.  Pursuant to the disclosure statement

7    order and the supplemental disclosure statement order which

8    was dated January 4th, 2017.

9           Ms. Sullivan's declaration was served on all

10   parties on February 1st.  As has been the practice before,

11   we prepared binders both for Mr. Hogan and for the Court.

12   May I approach?

13          THE COURT:  Yes.

14          MR. HOGAN:  Thank you.

15          THE COURT:  Thank you.

16      (Pause)

17          MR. GANTER:  Your Honor, in her declaration Ms.

18   Sullivan describes the creditor classes entitled to vote.

19   Epiq's processes for receiving and reviewing ballots, and

20   the tabulation of the ballots cast by holders of claims in

21   the voting classes.

22          Ms. Sullivan's declaration also includes three

23   exhibits.  Exhibit A is a schedule of the voting classes.

24   Exhibit B shows the results of the voting by each voting

25   class.  And Exhibit C is a report of the ballots that were

1    excluded and the reasons therein.

2             Your Honor, at this time the debtors would

3    respectfully move into evidence Ms. Sullivan's declaration,

4    which is labeled D DIR-Sullivan.

5             THE COURT:  Any objection?

6             MR. HOGAN:  No, sir.

7             THE COURT:  It's admitted.

8    *    (Debtors' Exhibit No. D DIR_Sullivan admitted)

9             MR. GANTER:  And, Your Honor, Ms. Sullivan is

10   present in the courtroom if you -- if Your Honor has any

11   questions.

12            THE COURT:  I don't -- I do have a question about

13   process, but first let me ask, does anyone wish to cross-

14   examine the witness?

15            MR. HOGAN:  No, sir.

16            THE COURT:  Okay.  What's the status of the

17   switching the 1L and 2L votes and how is that going to be

18   handled?

19            MR. MCKANE:  Your Honor, Mark McKane on behalf of

20   the debtors.  My understanding is the negotiations are

21   ongoing and as to the documentation of the plan and the

22   order, and to the extent that those votes are switched, that

23   those will also be addressed in the filings that will happen

24   tonight.

25            THE COURT:  Okay.  Very good, thank you.  I have

1    no questions.

2             MR. GANTER:  Thank you, Your Honor.  At this point

3    I'll cede the podium to my partner, Lisa Esayian to present

4    the debtors' next witness.

5             THE COURT:  Thank you.  Ms. Sullivan is excused,

6    if she so desires or she can hang around, it's up to her.

7             MS. ESAYIAN:  Good morning, Your Honor, Lisa

8    Esayian from Kirkland & Ellis on behalf of the debtors.  The

9    debtors' next witness is Dr. Thomas Vasquez.  With the

10   Court's permission we'll call Dr. Vasquez to the stand at

11   this time, and then I'll distribute the binders and green

12   sheets.

13            THE COURT:  Very good, thank you.  Dr. Vasquez.

14            Please take the stand and remain standing.

15            THE CLERK:  Please raise your right hand.

16               THOMAS VASQUEZ, WITNESS, SWORN

17            THE CLERK:  Please state and spell your name for

18   the record.

19            THE WITNESS:  Thomas Vasquez, T-H-O-M-A-S, last

20   name V as in Victor, A-S-Q-U-E-Z.

21            THE CLERK:  Thank you.

22            THE COURT:  Please be seated, Mr. Vasquez.  I

23   believe that chair is adjustable, you might -- you are a

24   very tall person and might be able to slide it down some.

25            THE WITNESS:  This is perfect.

1           THE COURT:  Okay.  Very good.

2           MS. ESAYIAN:  Your Honor, in addition to Mr.

3    Vasquez' height, he has a little bit of a knee issue today

4    so if -- I would ask him to just let us know if he needs a

5    break at some point --

6           THE COURT:  Of course.

7           MS. ESAYIAN:  -- to attend to his knee.

8           THE COURT:  Of course.

9           MS. ESAYIAN:  With that, Your Honor, we do have

10   the customer and green sheets and binders if I may approach.

11          THE COURT:  Please.

12                   DIRECT EXAMINATION

13   BY MS. ESAYIAN:

14   Q    Good morning, Dr. Vasquez.

15   A    Good afternoon.

16   Q    Good afternoon.  Would you state your name for the

17   record please?

18   A    Thomas Vasquez.

19   Q    What company do you work for?

20   A    Ankura Consulting Group, A-n-k-u-r-a.

21   Q    What is your position with Ankura Consulting Group?

22   A    I'm a senior managing director.

23   Q    Were you asked to provide an expert opinion in

24   connection with these confirmation proceedings?

25   A    Yes, I was.

1    Q    Expert opinion for the E-side EFH debtors?

2    A    Yes, I was.

3    Q    And did you prepare that expert report?

4    A    Yes, I did.

5    Q    What is the date of your report?

6    A    October of 2016.

7    Q    Could you turn to tab 3 in your binder?

8    A    Yes.

9    Q    Is that your expert report?

10   A    Yes, it is.

11   Q    And it shows the date is October 21, 2016; is that

12   correct?

13   A    That's correct.

14   Q    Just in a general matter to orient us for this

15   examination, what is the -- what is your report about?

16   A    It's really an estimate of a cost of resolving all

17   asbestos bodily injury claims against the company pending

18   and future.

19   Q    And when you say the company, you're referring to the

20   E-side of the company?

21   A    E-side EFH.

22   Q    Just to avoid any confusion, separately did you also

23   prepare a T-side report?

24   A    Yes, I did.

25   Q    And that's not at issue today.  Today you're talking

1    about your E-side report.

2    A    That's correct.

3    Q    Okay.  Dr. Vasquez, did you also recently prepare a

4    declaration in anticipation of your testimony today?

5    A    Yes, I did.

6    Q    Does your declaration describe the same opinions as

7    your expert report?

8    A    Yes, it does.

9    Q    And could you turn to the tab in your binder labeled --

10   well, it's the second tab and it's labeled D DIR-Vasquez.

11   A    Yes.

12   Q    And if you could let us know, is this your declaration?

13   A    Yes, it is.

14   Q    Is the information contained in the declaration true

15   and accurate to the best of your knowledge?

16   A    Yes.

17   Q    Now, Dr. Vasquez, before you get to your opinions and

18   your work in this case, could you briefly describe your

19   educational background?

20   A    I have a Ph.D. in economics from Clark University in

21   1972.

22   Q    And a bachelor's as well?

23   A    A bachelor's degree from State University of New York

24   at Potsdam and an MA from Clark University.

25   Q    Could you also give us a relatively short summary of

1   your professional experience?

2   A     Sure.  After receiving the Ph.D. in 1972, I was at the

3   U.S. Treasury Department, Office of the Secretary, Office of

4   Tax Analysis.  And from there I was at the Ways and Means

5   Committee, Joint Committee, Tax Committee of the U.S.

6   Congress, back to the Treasury after a short stint on

7   Capitol Hill, established my own firm in 19 -- my own

8   consulting firm in 1983.  Sold that firm to KPMG Pete

9   Marwick where I went in as a partner in 1988.  I was a board

10  member, the chairman of the firm's strategic planning

11  committee.

12       Left in 199 -- well, in 1994, took over a new group

13  that was formed in KPMG that involved investment banking,

14  turnaround bankruptcy, expert witness testimony and

15  valuation.  So it was a newly formed group that I ran for

16  about three years and then left and became a CEO of a market

17  research firm in Connecticut called Inglovich (ph) and then

18  joined a company called ARPC which we then sold to Encura

19  (ph) last March.

20       My work in, you know, in the early days involved

21  everything from developing economic models for developing

22  countries, worked in just about every country in Latin

23  America, Egypt, Pakistan, Taiwan, Saipan, a number of

24  foreign countries developing these economic models.

25       I did privatization work in eastern Europe for a couple

1   of years as part of this process, and I'm here today, so.

2   Q    Is it fair to say, Dr. Vasquez, that in more recent

3   years your work has focused on economic forecasting but

4   particularly with respect to mass tort claims and asbestos?

5   A    In 1991, I worked on the National Gypsum bankruptcy

6   case where I developed a procedure to forecast future

7   asbestos related claims.  And I don't mean this is an

8   arrogant way but virtually everyone uses that method today

9   and it's the method that I used both in the T-side and the

10  E-side which is of issue today.

11       And because of, I guess I'll describe it as the huge

12  demand for asbestos forecasting, through the '90s and early

13  2000s, I continued to do that work and pretty much focused

14  on asbestos through 2006 or 2007.

15       More recently I've now changed my focus in mass tort to

16  things like the Gulf Oil spill, I worked on with Ken

17  Flamberg, the NFL concussion settlement, but those sorts of

18  mass torts has been my focus for the last few years.

19  Q    The method that you describe that is commonly used in

20  many cases, does that method have a name?

21  A    It's called the KPMG Nicholson method because I was at

22  KPMG at the time.

23  Q    And that method is described in more detail in your

24  declaration?

25  A    In the declaration and in great detail in the report.

1   Q    And did you, in fact, use that same method in your

2   analysis for this case?

3   A    Exactly the same method.

4   Q    All right.  And we'll get to that.

5        Could you just briefly tell the Court and the

6   participants a little bit about your -- not the subject

7   matter, but have you testified in asbestos bankruptcy cases,

8   roughly how many times, and for what parties in those cases?

9   A    A lot of times I can remember, and I think the -- I've

10  testified on both sides, I've testified, you know, for the

11  debtor, unsecured creditor's committee, futures claims

12  representative, so I've touched all the bases, I don't think

13  I've ever testified for the current claimants, asbestos

14  claimants but for every other group.

15  Q    And are those types of engagements that you've had in

16  asbestos bankruptcy cases also described in more detail in

17  your declaration?

18  A    They're listed.  I don't think it's not in detail, but

19  they're all provided.

20  Q    They're identified in the declaration?

21  A    Yes.

22  Q    Have you always been accepted as a forecasting expert

23  in each case where you were offered as such an expert?

24  A    Yes.

25  Q    Now, talking about this case, when did the debtors

1    retain you and Ankura Consulting?

2    A     In June of 2016.

3    Q     What were you and Ankura retained to do?

4    A     To forecast the -- as the title of the report suggests,

5    to forecast the total cost, indemnity and defense, to

6    resolve all pending and future claims against the company.

7    Q     In the -- and did you, in fact, develop such a

8    forecast?

9    A     Yes, I did.

10   Q     And that's the subject matter of your testimony in your

11   expert report.

12   A     That's correct.

13   Q     Did you prepare some demonstratives, Dr. Vasquez, to

14   assist your testimony today?

15   A     Yes, I did.

16   Q     Could you turn to tab, I think it's the first tab in

17   your binder labeled D-DEM Vasquez 1?

18   A     Yes.

19   Q     Are these the demonstratives that you prepared to

20   assist your testimony?

21   A     Yes, they are.

22   Q     Could you turn to the first -- the slide marked number

23   1 in your demonstratives?

24   A     Yes.

25   Q     Which is the next page after the cover.

1    A    Yeah, I have it.

2    Q    Dr. Vasquez, does this slide lay out on a basic level

3    the methodology that you used to develop your forecast of

4    both pending and future claims for the E-side for this case?

5    A    I think as all slides, these need a bit of an

6    elaboration.  The model, the procedure that we had talked

7    about that I developed in '91 is what endless would call an

8    epidemiological model.  And by that what they mean is, it is

9    a model that's designed to forecast the epidemiology of

10   exposure to asbestos.  So it forecasts how many

11   mesothelioma, the incidents of mesothelioma until the last

12   incidence of that disease is gone.

13   Q    And, Dr. Vasquez, that's for the incidents of

14   mesothelioma in the entire population, correct?

15   A    Yeah.  The model starts with a forecast of the total

16   incidents of the disease in the U.S., mesothelioma, lung

17   cancer, and then by an alternative method other cancer and

18   non-malignant diseases.  But the underlying forecast is

19   mesothelioma and lung cancer.

20       And it's all done based on an ingenious study done by

21   Dr. Nicholson back in the late '70s.  He was at Mt. Sinai at

22   the time and he compiled a long involved list of what

23   individuals, how many individuals worked in various

24   industries, how much exposure to asbestos, how long they

25   were exposed to asbestos, what their age was, all the

1   demographics that you need to understand the exposed

2   population.

3       He then with -- in concert with the federal government

4   developed an agreed upon set of hazard functions.  The

5   hazard functions being nothing other than a way to relay the

6   exposure to asbestos to if and when you contract the

7   disease.  And those hazard functions have been used for the

8   last 25, 30 years.

9       He first did that, like I said, in mid to late '70s, it

10  got revised a bit in 1982.  And then when I did my work in

11  '91, I used that as the fundamental foundation of what I was

12  doing.

13      The issue is, if we know how many people contract one

14  of these diseases, how many of them will sue EFH, how many

15  will sue Owens-Corning, what is the, what we call a

16  propensity to sue.  Not everyone will sue everyone, because

17  ultimately you have to establish proof to get paid and get

18  compensated.

19      But the whole notion of this is this is based on how

20  many people get sick, die from a certain disease, or are

21  impaired from a certain disease.

22      So there was certain modifications we made to age

23  distribution, but there was a number modification that

24  needed to be made to Dr. Nicholson's original work.  Because

25  we began to get data from SEER, Survey Epidemiological

1    something Results.

2         And they would count and tell us how many mesothelioma

3    deaths there were.  And Nicholson's original methodology

4    went very, very close, started to get off track, so we made

5    some modifications that we used in 1981.  And it's those

6    modifications that are currently used by virtually everyone

7    today.

8         And I apologize for the length of that.  But I think

9    it's important to have that foundation to then begin to

10   understand what I mean by analyzing historical experience

11   and pending claims and PLC claims.  That there's this

12   underlying model that forecasted the incidence of disease,

13   and now you know what percent of those will file a claim

14   against a specific company.

15        And you do that by looking at historical experience.

16   So if you can imagine this model that has this number, I'm

17   just going to talk about mesothelioma, and we have the

18   number of mesotheliomas in the U.S. in the last three or

19   four years, it averages maybe 26, 2,700 mesothelioma deaths

20   a year.

21        We know how many filed a claim against EFH.  We have

22   that information, it's very hard.  So I divided.  I take the

23   number of claims that filed against EFH divided by, let's

24   call it for this purpose, 2,700 total mesothelioma deaths,

25   and I say okay, 4 percent of every single mesothelioma in

1    the U.S. in the last three years filed a claim against EFH.

2    Q    And is that the first point listed on your slide number

3    2, is that the claim filing of propensity to sue?

4    A    Yeah, I apologize, I wasn't quite following this in

5    order.

6    Q    No problem, that's -- we're just orienting.

7    A    But that's right, that's the computation of propensity.

8    So that tells me how many claims will be filed.  But we know

9    that not every claim gets paid.  And EFH, and we'll get to

10   this detail in a bit, but well over 90 percent of the claims

11   get dismissed.  So we're maybe paying 5 or 6 percent of the

12   claims.

13       So I looked historically to see how many claims were

14   dismissed.  And depending on what the data tells me, I may

15   look it by plaintiff law firm, because sometimes it's very

16   different, you might have one plaintiff law firm that is

17   filing, let's just call it, low quality claims and none of

18   them have been paid, and others are filing are filing high

19   quality claims and almost all of those get paid.  So it

20   makes sense to look at plaintiff law firm and look at their

21   characteristics.

22       But all of that gets into the dismissal rate.  If I

23   start out with here's the incidents of mesothelioma, here's

24   how many will file a claim against EFH, and then here's how

25   many will get paid.  And all of that, those second and third

1    steps are all done by looking at EFH actual data, right.

2         We then get to average indemnity.  And, you know, we

3    know, well, we don't quite know, but we think the

4    mesothelioma claims in total are probably paid something in

5    8 to $10 million range.

6    Q    And, Dr. Vasquez, does indemnity mean the amount paid

7    for a settlement for an asbestos claim?

8    A    Well, in my world it's a settlement or a verdict.

9    Q    Okay.

10   A    But in virtually 99.9 percent of the cases, it's a

11   settlement.

12   Q    Okay.

13   A    And so, you know, you have asbestos victims filing

14   against 50, 100, 200 companies.  So they don't get $10

15   million from every company, they get a share based on kind

16   of negotiations in the past, based on what their relative

17   exposure is and so forth.

18        The average for EFH for mesothelioma claim over the

19   past three years has been about $121,000.  And we use

20   $125,000 so -- or $121,000 I look to the historical

21   experience, I say we're paying $121,000, I then take that

22   dollar amount and inflate it by inflation so it's not

23   declining in real terms over time, and that's what I used to

24   value claims over time.

25        The last step -- and once I've done that, so now I have

1   mesothelioma by year, I have how many will be filed, how

2   many will be paid, $121,000 each one inflated, I then do

3   that calculation for every single year, add across all

4   years, and I get the total dollar amount of indemnity that

5   will be paid to mesothelioma victims.

6   Q    And when you're talking about years, you're talking

7   about years out into the future.

8   A    The model, and I apologize, I probably went too

9   quickly.  What the model does, is it forecasts a number of

10  mesothelioma deaths every single year, and in this case

11  going from 2014 all the ways to the last occupationally

12  exposed asbestos victim contracts mesothelioma, which is

13  about the year 2050.

14  Q    Okay.  And, Dr. Vasquez, did you also include defense

15  costs in your forecast?

16  A    Yeah.  The last step is defense cost and in this

17  particular case, which is quite unusual EFH stores and

18  maintains defense cost by claimant.  So I'm able to look by

19  claimant, and I can look to see how much was paid for a

20  mesothelioma claim, how much was paid for a lung cancer

21  claim and so forth.  And I do that by year and by disease

22  type across the entire forecast period.  All of that then

23  gets added to a total defense cost.

24  Q    And if I'm -- and if we're looking at slide 2, you did

25  these calculations for both pending claims and POC claims.

1    A    Right.  I mean, the pending claims are relatively easy

2    to do, right, you have the claims sitting in front of you,

3    you have allegations of what their disease is, so it's

4    really valuing the claims that you're seeing.

5        The POC claims are, you know, the future claims if you

6    will, you don't know how many there will be, and you don't

7    know what disease types will be, so that's part of the

8    forecasts that I've been describing.

9    Q    And what -- and if you go to slide 2 of your -- the

10   slide numbered 2, what are the two basics, could you just

11   briefly tell us the two basic sources of information that

12   you looked at to form your opinion?

13   A    Yeah, and we talked a bit about historical findings.

14   The company maintains a database that has, you know, it's

15   maintaining in order to kind of monitor and control the

16   litigation process in part, and in part for financial

17   reporting purposes.  But it's maintaining this database in

18   the normal course of business and it has a great deal of

19   information on it.  It's got administrative issues about

20   when it was filed and when it was resolved.  It's got the

21   type of disease that's alleged by the claimant.  It's got --

22   when it was exposed and some notion of duration, although

23   that's not always complete.  And then how it was resolved,

24   you know, was it dismissed, was it paid, and if it was paid,

25   how much.  So a great deal of information.

1      Then the POC claimant database, again an electronic

2  database compiled for purposes of the bankruptcy court, it

3  has information, I mean, it has the claimant name and

4  address and the date that it was filed.  It has some

5  questions related to the presence or non-presence at an EFH

6  plant, and then it's got something called indemnity

7  demanded, which is a, you know, generally a -- you know, a

8  $5 billion or something, it's not a number that you would

9  quite use for anything.  But it would have a value in there.

10      Which you don't know what disease it is, you don't know

11  the variable information on age, it's a very limited

12  database is what I'm suggesting.

13  Q    All right.  So you used the historical claim

14  information to determine the cost for the pending claims and

15  the future claims and did you then develop a forecast of the

16  cost to resolve the pending claims and the future claims?

17  A    On the next page, on page 3 is a summary, both in

18  nominal terms and present value terms.  There's two

19  scenarios and I'll describe the scenarios in the next slide

20  or two.

21      But I think the focus in my mind should be on scenario

22  1, it's the scenario that I give the most weight to.  If we

23  look at scenario 1, there's two columns of numbers, one

24  labeled nominal and the other labeled net present value.

25      The nominal amounts are exactly what they say they are,

1   they're in dollars of that year.  So if I'm looking at 2020,

2   they're in 2020 dollars.

3       Net present value I think most likely everyone's

4   familiar with it, is just discounting those nominal dollars

5   back to the petition date to sometime in 2014.

6       I split this four ways.  I split it first of all

7   pending versus future claims.  And keep in mind pending

8   claims are not only claims that are in inventory at the time

9   of the petition date.

10  Q    When you say inventory, you mean already received by

11  the company as of the petition date.

12  A    Received but not yet resolved.

13  Q    Okay.

14  A    And defense costs.  So I split it pending claims,

15  future claims and then for both pending claims and future

16  claims I split it between indemnity and defense cost.

17      So if we look at, you know, the very first column

18  labeled nominal and I look down at the bottom for the total

19  category, the grand total indemnity and defense is $49.7

20  million.  It has an NPV of $36.4 million.

21      And that is split $5.7 million for pending claims.  I'm

22  now looking at the very first column under scenario 1

23  nominal, up in the top pending claims, indemnity 3.7,

24  defense 2.0 for grand total $5.7 million.

25      Future claims is where the bulk of cost is.  21.9 of

1    indemnity, 22.1 of defense, for a grand total of 44.0.

2        The kind of significant thing to look at, is that a

3    great deal of cost is defense costs.  So this is not a case

4    where claims are being filed and the overwhelming majority

5    are being paid.  Because if you saw that world, you would

6    see indemnity costs far outstripping defense costs.

7        This is a case where it's heavily litigated.  There are

8    -- there's as I said before, a very high dismissal rate.

9    And so you're spending a great deal of money defending cases

10   that ultimately did not ever get paid.

11   Q    And could you briefly tell us what the bottom line is

12   for scenario 2 and then we'll go to explaining why there are

13   two different scenarios.

14   A    Sure.  Nominal, an increase from 49.7 which is what we

15   had under scenario 1 to 72.6, and NPV of $54 million.  So

16   it's -- excuse me, you know, a little bit less than 50

17   percent increase in cost.

18   Q    And then does your next slide, slide number 4 explain

19   why there are two scenarios?

20   A    There is one plaintiff law firm, I said at the very

21   beginning when we look at claims like dismissal rates, we

22   look to plaintiff law firms to see whether there is a wide

23   disparity in dismissal rates or whether all the plaintiff

24   law firms are providing more or less equal quality claims.

25       And when we did that, one plaintiff law firm in

1    particular stood out, we call it firm X in these tables for

2    confidentiality reasons.  That firm, I may be getting ahead,

3    but that firm accounts for -- I am getting ahead, accounts

4    for 80 percent of the filings over the last three years.

5    Q    And is that reflected on your next slide, slide 5?

6    A    I should stick to my next slide, I'm sorry.

7    Q    We can do 4 and 5 together.

8    A    It's kind of useful, only in the sense that firm X

9    really does stand out.  So I'm looking at slide 5.  And firm

10   X accounts for 80 percent of the filings against the

11   companies over the last three years.

12        It's filed 570 claims since 2008.  450, 80 percent of

13   them have been resolved to date.  So this is not a case

14   where one or two have been resolved, this is a case where

15   you have a pretty massive experience.  So 80 percent have

16   been resolved.  Every single one of the claims was

17   dismissed.

18        So the issue then for forecasting is do I really want

19   to treat him -- treat the filings by the firm as a real

20   filing or not.  I have to count them in the sense that for

21   estimated defense costs, even though they may be dismissed,

22   I still have some cost of processing, so I keep track of it

23   for that reason, but I don't attribute any indemnity to the

24   claims filed by firm X.

25        That defines scenario 1.  I assume that firm X never

1    has a compensable claim.  So we go to scenario 2.  Scenario

2    2 says that, you know, even though we've resolved 80 percent

3    all dismissed, maybe there's some value left in the

4    remaining 20 percent.

5         So what I do is I -- and this is pretty arbitrary but

6    it's done as more of a sensitivity analysis to understand

7    the dollars that are at stake.  And I say, look, if I look

8    at the remaining unresolved inventory for firm X and I

9    assume in spite of its history I assume instead that they

10   will actually have paid claims, and they will have paid

11   claims at the same rate as all the other plaintiff law firms

12   that have patent claims.  Which means about 30 percent of

13   their claims would actually be paid.

14        So I assume for their inventory, again even though a

15   hundred percent dismissed in the past, 30 percent are going

16   to get paid.  I then said, what do I do with the future

17   claims.

18        And what I do for future claims is I weighed them the

19   entire treatment of their historical claims and apply that

20   payment percent to every claim they file in the future.

21   It's a short way of -- the short version of this is that I

22   allow for some quality increase and for claims over time to

23   see what happens.

24        And that's this increase that we see going from

25   scenario 1 to scenario 2, an NPV increase of what $18

1    million on the 36.  So about a 50 percent increase if I

2    altered that treatment.

3    Q    And your opinion as stated in your declaration and as

4    you mentioned earlier is that scenario 1 is the more likely

5    scenario; is that right?

6    A    Yes, it is.  I mean -- yes.

7    Q    And then you walked us through earlier the parameters

8    that you used to calculate the forecast and if you -- you

9    have a slide that also walks us through in the concreteness

10   of the forecasts you did here?

11   A    If you look at slide 6, you know, every disease type

12   has its own set of forecasting parameters, again based on

13   the incidents forecast and based on what's happened

14   historically.

15       The propensity to sue for mesothelioma 4.59 percent.

16   So if we go back to my 2,700 and use the mesothelioma

17   deaths, 4.59 percent of those will file against the company.

18       The zero pay rate I labeled here, the dismissal rate

19   for mesothelioma, 93.24 percent.  Now that calculation

20   includes firm X, so it gets bumped up because of firm X.

21       Average positive paid indemnity I mentioned $421,000,

22   right.  And we go to lung cancer, much smaller propensity to

23   sue, .15 percent.  0 pay rate a little bit less, so only

24   about 87 percent get dismissed instead of 93 percent.  And a

25   reduction in the average amount of indemnity, 97,000 instead

1    of 121,000 for mesothelioma.

2         Other cancer and nominally almost don't matter, there's

3    so few.  The numbers are in here, but if you look at non-

4    malignant, a hundred percent of them have been dismissed

5    over time, over the last three years.

6         So those are the parameters that are used in the

7    forecast.  And again, I start with this incidence model that

8    gives me mesothelioma, gives me lung cancer, I then apply

9    these propensity to sue, I then apply the 0 pay rate, I then

10   multiply it by positive indemnity and it produces a number.

11        I add across all years and I add across all disease

12   types.

13   Q    And then, Dr. Vasquez, does your last slide, slide

14   number 8 capture the way in which the defense costs, pending

15   and future claim defense costs are added up?

16   A    Yeah.  The average defense costs are very, very

17   intuitive in this sense, that you expect that you're going

18   to be willing to spend a lot more on defense for high value

19   claims.  So if you look at mesothelioma to get the high

20   value, you expect defense to be higher.  And you look at

21   this table under resolved, and you can see that meso is

22   higher than lung, which is higher than other and so forth.

23        But, in addition to that, it also depends on what

24   resolution occurs.  So if the case is dismissed, right, all

25   else equal, you're going to spend a significantly less

1    amount on defense costs and if it -- than if you ultimately

2    settle.

3         And again, I'd just focus on the very top line for

4    mesothelioma.  The zero pay or dismissal on average are

5    paying about $3,800 per claim on defense costs.  But if it's

6    a mesothelioma and it goes to settlement and you're paying,

7    then the average defense costs about $85,000.

8         So it's a very kind of intuitive result.  And in almost

9    these precise relationships hold in every case where I have

10   defense costs by claimant.  There's very, very few cases

11   where I have the quality of data that I got from EFH.  This

12   is very, very unusual.  But in every case that I have it,

13   these relationships and these percentages and their relative

14   values are very, very close.

15   Q    Dr. Vasquez, I'd just like to touch on one more area

16   quickly.  You've been speaking about the historical claim

17   experience of EFH and how you reviewed the company's

18   historical claim data.  Did you also review the proofs of

19   claim that were filed in this bankruptcy case?

20   A    Yes, I did.

21   Q    And does your forecast account for the proofs of claim

22   that were filed in this bankruptcy case?

23   A    Yes.

24   Q    And can you explain to us how your forecast accounts

25   for them?

1    A    The way that I put together the -- and again, let's

2    bifurcate this pending and future, so when we're talking

3    about POC claims or filings, they're all future claims, you

4    know, they're not part of the inventory, they're not part of

5    the pending claims.

6         What I did was to forecast a future that simply says

7    whatever was filed historically, the propensity to sue, the

8    dismissal rate, every characteristics of historical filings

9    are going to continue in the future all relative to the

10   incidents forecast from the model that I've described

11   earlier.

12        So it doesn't rely on POC filings.  It just simply says

13   that I believe -- it's as though if someone asked me the

14   question which I normally get asked in bankruptcy court

15   which is, assume that the defendant remains solvent for the

16   next 50 years, what is the total liability, indemnity and

17   defense that would face that defendant over time.  And

18   that's the question that I answered here.

19   Q    And is that customarily the way that you would perform

20   a forecast in a case where there are proofs of claim?

21   A    Absolutely.

22   Q    Okay.  And, Dr. Vasquez, just in conclusion, does your

23   declaration at the end of it in paragraphs 46 and 47

24   summarize in brief form your bottom line opinions?

25   A    I know the answer is yes, I just feel compelled to

1    look --

2    Q    Absolutely.

3    A    -- before I answer the question.

4         Yes, they do.

5    Q    Great.

6         MS. ESAYIAN:  Thank you very much, Dr. Vasquez,

7    and at this time I would just request that we move into

8    evidence his declaration and the three exhibits referenced

9    in his declaration which are DX-433, DX-435, DX-436 and in

10   accordance with what we've been doing in this case, I would

11   ask that the demonstratives not be moved into evidence but

12   included in the record.

13        THE COURT:  Any objection?

14        MR. HOGAN:  No objection.

15        THE COURT:  All right.  Those documents are

16   admitted or referenced in the record as appropriate.

17        (Debtors' Exhibit Nos. DX-433, 435, and 436 were

18   admitted)

19        MS. ESAYIAN:  Thank you and I'll pass the witness

20   to Mr. Hogan.

21        MR. HOGAN:  Thank you.

22        THE COURT:  All right.

23                    CROSS-EXAMINATION

24   BY MR. HOGAN:

25   Q    Good afternoon, sir, how are you doing today?

1    A    Fine, thank you.

2    Q    Good.  I want to start just touch on some of your

3    previous work in bankruptcy I believe you testified to in

4    your direct examination.

5         So you've provided estimations of aggregate asbestos

6    liabilities in numerous bankruptcies I think I heard you

7    say; isn't that correct?

8    A    Yes.

9    Q    In any of those bankruptcies, if you know, did the plan

10   purport to discharge future claims of persons who were

11   exposed to debtors' asbestos but who had not yet manifested

12   an interest?

13   A    I don't believe so.

14   Q    In each of those cases, isn't it true that a trust was

15   established to pay the claims of -- the asbestos claims both

16   current and future?

17   A    I don't think there was a trust in every case, but I

18   can't give you the name of a specific one where it wasn't,

19   but.

20   Q    The lion share in your mind had a trust?

21   A    Certainly more than half, absolutely.

22   Q    Can you think of one that didn't have a trust?

23   A    No, if I could I would tell you up front.

24   Q    Thank you, that's fine.

25        And what about future claims in those other cases, were

1    they discharged if you know?

2    A    I'm trying to understand the difference between this

3    question and the one you just asked, and I have a feeling

4    I'm misinterpreting something.

5    Q    Okay.  Your report and your declaration define future

6    claims as what?

7    A    As what, I'm sorry?

8    Q    Define for me what your understanding is of future

9    claims as you have used the term in your report and

10   declaration.

11   A    Sure.  It's any claim that is filed or would have been

12   filed post-petition.

13   Q    And so would that include then claims that wouldn't or

14   weren't filed post-petition?

15            MS. ESAYIAN:  Objection to the form of the

16   question, Your Honor.  It's quite confusing.

17            MR. HOGAN:  I'll rephrase it.

18            THE WITNESS:  I'm sorry.

19   BY MR. HOGAN:

20   Q    What I'm trying -- what I'm driving at is, does your

21   definition of future claims include unmanifested asbestos

22   claims for which no proof of claim was filed?

23   A    Yes.

24   Q    After those other cases that you were involved in, in

25   those cases you understand that typically a representative

Page 110

1    was appointed by the Court for future claimants.  Is that a

2    fair statement?

3    A    I mean it's similar to the question before.  I mean, I

4    am reasonably certain that there was a case or two where

5    there was not a futures representative, but I can't recall

6    offhand and it's clearly less than half.

7    Q    You understand the role of an FCR in those type cases?

8    A    I'm sure I don't understand the entire role, no.

9    Q    But do you have a general understanding of what a

10   future claims representative is charged with doing?

11   A    Yes, I think that's fair.

12   Q    And would it be fair to say that they're charged with

13   representing the interests of both unmanifested claimants,

14   meaning those who were exposed but have not yet manifested

15   an illness, and those persons who had not yet been exposed

16   but maybe exposed in the future; isn't that correct?

17             MS. ESAYIAN:  Objection to the relevance, and also

18   to the -- calls for a legal conclusion vis-à-vis the

19   Bankruptcy Code and the requirements for a future claims

20   representative.

21             THE COURT:  Overruled.

22             THE WITNESS:  The -- I mean, I think the reason

23   I'm struggling is -- in answering is solely the legal part

24   of the question.  If I could just say it the way I

25   understand it and then --

Page 111

1    BY MR. HOGAN:

2    Q    Please.

3    A    Okay.  I view, as I define futures claims to you a few

4    minutes ago.  That any claim that is filed after the

5    petition date is what is in my forecast.  And in my naïve

6    way of thinking about things, I thought that that's who the

7    futures rep would be representing.

8            THE COURT:  So when you think about or use the

9    term future claims or future claims representative, you're

10   not focused on the date of exposure, you're not focused on

11   the day of manifestation of illness, you're simply focused

12   on the day somebody asserts a claim against the company.

13           THE WITNESS:  That's exactly right.

14   BY MR. HOGAN:

15   Q    Isn't it true that in each of the bankruptcies that you

16   list on page 3 of your declaration, a trust was established

17   for future claims as you have used the term?  And you can

18   take a look at your declaration please.

19   A    In paragraph --

20   Q    Three.

21   A    Oh, page 3 or paragraph 3, sir?

22   Q    I'm sorry.  Let me make sure I'm clear.  I'm sorry on

23   page 3 --

24   A    Okay.

25   Q    -- you list -- I'm sorry page 2, paragraph 4 I believe.

Page 112

1    A    Yes, uh-huh.

2    Q    And so your answer is that in each of those cases a

3    trust was established?

4    A    I don't think so.

5    Q    Could you direct me --

6    A    Nor do they -- I'm sorry.

7    Q    Just direct me which case if you know.

8    A    I thought Olga Bay Norton there was not.  So of the --

9    I'm just not sure offhand about Dana, and Keiser-Gypsum is

10   just in the process now so there's -- I don't know what will

11   happen there.  BondX I believe, especially the products, I

12   believe there was and Halliburton there was.

13   Q    Do you understand what I mean when I use the term

14   524(g)?

15   A    Yes, I do.

16   Q    In a 524(g) plan both callings of future claims as

17   you've used the term are channeled to a trust; is that

18   correct?

19   A    What are the two types, I'm not sure?

20   Q    Claims that are -- they're claims that are filed after

21   the petition date and then claims for people who have not

22   yet been exposed but who will be exposed in the future.

23   A    Oh, I see.  Yes.  I mean, there's -- they're

24   potentially the second category list, that's right.

25   Q    And isn't it true that the trust resolves those claims

1    generally by settlement process, if you know?

2    A    Let me put it in a precise way that I think I won't get

3    wrong, okay.

4    Q    Okay.

5    A    I'm not -- I'm just not overly comfortable using the

6    word settlement here, but they certainly resolve claims

7    using the trust distribution procedure as provided by the

8    Court.

9    Q    Thank you.  Now, are you aware of any case involving a

10   debtor that has forecasted asbestos liabilities in the

11   millions of dollars in which a bar date was imposed on

12   future unmanifested asbestos claimants in which the plan

13   purported to discharge such claims for which no POC or proof

14   of claim was filed without compensation, are you familiar

15   with any case that does that?

16            MS. ESAYIAN:  Objection to the form of the

17   question.

18            THE COURT:  Overruled.

19            THE WITNESS:  And I apologize, the reason I'm

20   stumbling is that I don't pay a great deal of attention to

21   how my forecast is used after I've completed it and, you

22   know, I think that in Olga Bay Norton they just retained --

23   there was no discharge of asbestos.  You know, all I'm doing

24   is speculating.  I don't know the answer to your question.

25   BY MR. HOGAN:

1    Q    Please don't speculate, if you don't know, that's fine.

2    A    I'm trying not to, fair enough.

3    Q    Thank you.

4         When did you first become aware of the EFH bankruptcy?

5    A    I guess it would've been June of 2016.

6    Q    And are you aware that the debtors are attempting to

7    discharge future claims in this case?

8              MS. ESAYIAN:  Objection to the form and to the

9    extent that it calls for a legal conclusion.

10             THE WITNESS:  I --

11             MS. ESAYIAN:  And also the question of whether Mr.

12   Hogan and Dr. Vasquez are using future claims in the same

13   way.

14             THE COURT:  Yeah, that's my concern.  I'm not sure

15   we have an agreement on what future claims is.

16             MR. HOGAN:  Let's circle back to that then.

17   BY MR. HOGAN:

18   Q    In your report again and in your declaration, your

19   definition of a future claim is what?

20   A    Any claim filed or would have been filed after the

21   petition date.

22   Q    And would that include both individuals who have been

23   exposed to asbestos prepetition but who have not manifested

24   a claim as well as individuals who have not yet been exposed

25   to asbestos, and therefore haven't manifested a claim?

1   A     Yeah, I'm still struggling the same way I did before.

2   Unambiguously, the first part we're in agreement.  The

3   second part we're not in disagreement in a conceptual sense,

4   it's just that in a practical sense how many of those there

5   are is so small that the methodology doesn't spend a great

6   deal of time focusing on it.

7   Q     And so just so I understand your -- the second part of

8   your answer there, are you telling me that your methodology

9   doesn't reflect the input of the type of claims that are

10  from an exposure that occurs after the petition date?

11  A     Well, I mean, I'm going to -- I should probably make

12  you ask that question again.  But I do understand what

13  you're asking and I apologize.

14        The methodology forecasts out into the future would

15  include that second component, I'm not saying it excludes

16  the second component.  I'm just saying that is generally

17  very, very small, certainly very, very small relative to

18  those exposed in the past.  By past, I mean exposed

19  prepetition.

20              THE COURT:  Would your definition of future claims

21  include claims where they were not pending on the petition

22  date, and a proof of claim was filed?

23              THE WITNESS:  I'm sorry they were not what?

24              THE COURT:  Not pending on the petition date, so

25  nobody had filed a lawsuit or anything like that.

```
 1                THE WITNESS:  Right.

 2                THE COURT:  But they subsequent to the petition

 3      date they filed a proof of claim.  Are those future claims

 4      as you define them?

 5                THE WITNESS:  Yes.

 6                THE COURT:  Okay.  That's very helpful I think

 7      because those aren't being discharged.

 8                MR. HOGAN:  To the extent they filed a proof of

 9      claim, I would agree, Your Honor.

10                THE COURT:  Right.

11      BY MR. HOGAN:

12      Q    Let's turn if we could to the purposes of your

13      estimations.  When you provided estimations of aggregate

14      asbestos liabilities, sometimes you have estimated what the

15      debtors' liabilities would be in the tort system in the

16      absence of bankruptcy; isn't that correct?

17      A    Did you say sometimes?

18      Q    Yeah, I said sometimes.

19      A    Always.

20      Q    Always.  And so that is the kind of estimation that

21      you're providing here then, wouldn't you agree?

22      A    That's correct.

23      Q    On some other occasions, have you estimated how much a

24      trust in a 524(g) organization plan would need to have in

25      order to pay all claims that will be asserted against it?
```

1    A    I'm going to bifurcate the question.  In the bankruptcy

2    setting prior to 524(g) I'm estimating, actually never the

3    defense, I'm solely estimating the indemnity cost associated

4    resolving all pending, in my definition, future claims.

5         After the trust has been established, there's one, two,

6    three, four, five, probably six or seven trusts that I

7    consult with on an ongoing basis.  And for those trusts, so

8    this is not in the bankruptcy setting but for the trust

9    after they've been established, I will every year re-

10   evaluate claim filings, re-evaluate the forecast of

11   liability and re-evaluate the so-called tayman (ph) percent

12   that the trust uses to decide on how many cents on the

13   dollar to pay for claims.

14        But I don't do -- those are completely bifurcated

15   functions.  I don't -- I've never done that in a bankruptcy

16   setting and unless I misunderstood your question, I thought

17   that's what you were asking.

18   Q    Well, let me be a little more specific.  What I was

19   asking was in a 524(g) setting, have you ever been called on

20   to estimate the amount of funds needed to initially fund the

21   trust?

22   A    I'm really struggling with that question, I apologize.

23   And it's why I tried to bifurcate into these sets.  In the

24   bankruptcy setting, so when the 524(g) is being set up, if

25   you will, I am never asked the question how much money do I

1    need in the 524(g) trust to pay off all future claims.  I am

2    asked this other question, this other question being, if the

3    defendant stayed in the tort system, what is his liability

4    going forward, and that's a -- and it sounds like you're

5    saying that's a different question than how much do I need

6    for the 524(g) and if you're not I apologize that I'm

7    misinterpreting your question, but.

8    Q    Okay.

9    A    I'm not sure if I helped or not.

10   Q    So you're saying you've never forecasted how much a

11   trust would need to take into account, is that what I'm

12   understanding?

13   A    Well, I apologize --

14   Q    I'm just trying to understand.

15   A    -- I'm doing this so poorly.

16        I have numerous times estimated how much a trust needs,

17   after the trust has been established and I've been hired as

18   a consultant for the trust.

19   Q    Understood.

20   A    I have never done that in a bankruptcy setting.  I've

21   never been asked that question in a bankruptcy setting, and

22   it's not clear to me that the answer would be any different

23   if I was asked it that way, but I've never been engaged

24   to --

25   Q    Fair enough.

Page 119

1    A    -- do that.

2    Q    Are you familiar with the concept known as the trust

3    effect?

4    A    Yes.

5    Q    Can you explain what that is?

6    A    In -- if we go back to the trust established from

7    bankruptcies in the 2000s to 2003/2004 period, Owens-Corning

8    and Fiberboard of the world, there was an estimate done at

9    the time with the concept that I described which is the

10   defendant remains in the tort system.

11        They then set up a 524(g) trust and there was many,

12   many more claims filed against the trust than was estimated

13   had the entity remained in the tort system.  And that's

14   what's been labeled this bump-up, if you will.

15   Q    Do you know what causes the trust effect?

16   A    Oh, anybody does.  There's anecdotal guesses.

17   Q    If I were to surmise that maybe it was the publicity

18   surrounding the bankruptcy, would that be one of the guesses

19   that you've heard bantered around?

20   A    You could guess it, but it wouldn't be a very good one.

21   I didn't mean that the way it came out, I apologize.

22            THE COURT:  No, it was good, I liked it.  Can you

23   -- I lost -- frankly lost concentration a little bit there.

24   So could you explain again what the trust effect is?  I want

25   to make sure I understand it.

1        THE WITNESS:  Sure.  Let's say that you're sitting

2    in the bankruptcy setting and you've been asked to forecast

3    how many claims will be filed and the amount of indemnity

4    that would have been paid had the entity stayed in the tort

5    system instead of filing bankruptcy.

6        And so you have a couple of things that are going

7    on.  One, is that especially for these bankruptcies that I

8    was talking about that really started in 2000, 2001, 2002,

9    they didn't emerge for eight, nine, ten years.  And so you

10   expect that when the trust opens up, you're going to get

11   this enormous flood of claims that occur over this eight or

12   nine year period as the entity was sitting in bankruptcy.

13   Because all of those are just accumulating until the trust

14   opens its doors and then you get this huge flood of claims.

15       That is part of what -- the question is about this

16   surge and a 524(g) trust that instead of having this nice

17   smooth pattern that we see, you're going to see this huge

18   dump of ten years' worth of claims all at once, all right.

19   But I think it's fair to say that for those trusts, it

20   wouldn't beyond that.  So even if you estimate all those ten

21   years, and you say all right, it's all going to be -- hit

22   the trust in the eleventh year when its opens its doors,

23   there was still more claims that were being filed than that.

24       A lot of those claims were -- you know, I would

25   normally call them junk, but let's call them low quality

Page 121

1    claims and so they end up being dismissed and not paid by

2    the trust.  There's anecdotal evidence that in some cases

3    these 524(g) trusts are paying claims in a different way

4    than when the entity was in the tort system.

5            The trust clearly pays a different amount per

6    claim than when it was in the tort system.  So there's like

7    40 different things going on all at once, and no one to this

8    date has ever been able to kind of separate those pieces

9    out, but they all contribute to this thing that everyone has

10   labeled as one item, and called it -- what'd you call it?

11           MR. HOGAN:  The trust effect.

12           THE WITNESS:  The trust effect.  And there's

13   really -- there's not a trust effect in that sense, I mean,

14   it gets thrown around that way, but there's all of these

15   things that you've got to account for first.

16           And I can tell you, we spent an enormous amount of

17   time trying to understand what that trust effect is because

18   we're opening up trusts all the time, and there no longer is

19   a trust effect, by the way.  We've now -- I think in the

20   last three trusts, we've estimated the number of claims that

21   come in very, very closely.

22           But unambiguously and I'm agreeing with you, for

23   those trusts back in the early 2000s there was this huge

24   increase, but it was due to multiple, multiple causes, not

25   kind of that there was a trust established and therefore

1   there's an announcement effect.  I think all of that is

2   suspect.

3              THE COURT:  Thank you.

4   BY MR. HOGAN:

5   Q    Thank you.  Would it be fair to say that the

6   plaintiff's firms as a group having become more conscious

7   about the possibility that there have been exposure to

8   asbestos for which the trust predecessor was responsible

9   would also give rise to that potential trust effect?

10  A    I'm sorry, I went --

11  Q    What I'm asking is simply, is it fair the plaintiff's

12  firms that bring these cases, assert these cases against the

13  trust, their understanding or comprehension that this trust

14  has been created might give rise to some of the uptake in

15  claims that makes up the trust effect.

16  A    I fundamentally just do not absolutely believe that.  I

17  think there was an argument again going back eight, nine,

18  ten years that there was an announcement effect.  But after

19  all the bankruptcies that have occurred, after all the

20  advertising that we see on TV, for lung cancer, for

21  mesothelioma, just on and on, I don't know if you get it

22  here or not, but in Manhattan it's every day.

23       The notion that there's still room for an announcement

24  effect I think is just -- makes no sense to me.

25  Q    Now, your firm as I understand it, advised some of

1    these 524(g) trusts; is that correct?

2    A    I do personally as well, right.

3    Q    And as I understand it, your partner, Tom Florence is

4    an executive director of some of those trusts as well.

5    A    That's correct.

6    Q    And I think you testified earlier that you provide

7    trusts with claim forecasts fairly regularly.

8    A    That's correct.

9    Q    And the purpose of those forecasts is to adjust the

10   payouts, I think you said?

11   A    I think it's -- I mean, that's clearly one reason, but

12   I mean it's broader than that.  There's cash flow issues,

13   even if there's enough money in the trust, do I have to

14   worry about putting into a more liquid account because I

15   know that I'm going to have to pay claims in another couple

16   of months, so there's cash flow issues.  There's issues

17   about control of the process and control of costs, there's

18   issues about the forecast and therefore the payment percent.

19   But there's -- I think we do a pretty broad set of

20   consulting.

21   Q    Would it be fair to say that one of the issues is

22   making sure that there's enough money left in the trust to

23   pay claims that would be asserted in the future?

24   A    Absolutely.

25   Q    And I take it you understand that such reviews are also

1    required by certain provisions of the Bankruptcy Code

2    relative to 524(g), isn't that a fair statement, or do you

3    not understand that?

4    A    No, I understood the question, I just don't have an

5    answer, sorry.

6    Q    We talked briefly about the TVP that are typical in

7    these 524 trust settings, where you have the trust

8    distribution procedures, and they largely control how the

9    trust is going to function post effective date in the

10   bankruptcy, fair statement to your knowledge?

11   A    Well, function is a pretty broad word.  I mean, I don't

12   think it describes how it's going to function.  It does

13   describe the mechanics of processing and valuing claims.

14   Q    And the purpose of that is to ensure that all the

15   claimants, including future claimants are treated fairly.

16   Wouldn't that be one of its primary considerations?

17   A    I mean I'm only struggling with the word primary.

18   Q    Okay.  If I take primary out then --

19   A    Then I agree.

20   Q    So the fair treatment of future claims is a primary

21   consideration or sorry a consideration.

22   A    I think, yeah, I mean, you know, there's -- I mean I

23   think of it a little bit broader.  I think of it as

24   equitable treatment and whether that equitable treatment

25   means one mesothelioma claimant to another within the same

1    year or one mesothelioma claimant this year relative to five

2    years from now, which would make it a future, there's equity

3    in the treatment of claimants.

4    Q    And I think you used the word fairly, and that's a

5    fair.

6    A    Yeah, as any comments, I (indiscernible) the other

7    word, but.

8    Q    And would it be appropriate for me if I asked you if

9    those were protections of the due process rights of those

10   unmanifested asbestos claimants?

11           MS. ESAYIAN:  Objection, calls for a legal

12   conclusion.

13           THE COURT:  That one I'll sustain.

14           THE WITNESS:  I'm sorry?

15           THE COURT:  I sustained the objection so you don't

16   need to -- I'm sorry, I was leaning back I apologize.

17           MR. HOGAN:  Thank you, Your Honor, I didn't hear

18   either.

19           THE COURT:  I apologize.

20           MR. HOGAN:  No problem.

21   BY MR. HOGAN:

22   Q    Would you agree with me that if the forecast indicates

23   and this is in a 524(g) setting that the money is being paid

24   out of the trust too quickly, and there's a danger that the

25   trust may not be able to pay future claims in substantially

1    the same manner, the trust will adjust the amount its paying

2    of those claims.  Would you agree?

3                MS. ESAYIAN:  Objection, calls for speculation and

4    a legal conclusion.

5                THE COURT:  Overruled, if you know.

6                THE WITNESS:  I think that's a completely accurate

7    way to describe it.  I mean all of the TVPs have in it the

8    so-called MAP, maximum annual payment.  So that's an

9    automatic mechanism that guarantees that the most recent

10   percent payment calculation can't be eroded by an enormous

11   filing and payment in a single year, because the MAP

12   controls that.  And that, therefore, gives the trustees and

13   the TAC and all the participants to re-evaluate and see

14   whether or not a new forecast is needed.

15               So I think there's an automatic mechanism, there's

16   not a concern, it's automatically dealt with.

17   BY MR. HOGAN:

18   Q    Okay.  Thank you.

19        Now, you testified you made these estimates for the

20   trust post creation of the 524(g) trust, so post creation.

21   And is it fair to say that in the estimates that you made

22   for those trusts that you took into account the trust

23   effect, when you made those estimations for those other

24   trusts?

25   A    In any trust I've done I've never had to do that, but

1    I'm aware of, as I said before, I'm aware of people calling

2    it a trust effect.

3    Q    And do you consider that effect to be a permanent

4    effect or a temporary effect, if you can distinguish?

5    A    I mean, I don't think that with the exception of the

6    anecdotes that I was describing that people have agreed on

7    how to parcel out what you're calling the trust effect.

8         Unambiguously as I was describing before, part of it is

9    one time, the ten year build-up of unfiled claims is a one-

10   time event.

11        The only other thing that I would say and again

12   anecdotally because I have not worked on a trust where your

13   so-called trust effect has held.  But I do know that in most

14   trusts now that the payment percent seems to be creeping up

15   a bit, and that would be kind of soft evidence that it was a

16   temporary effect, not a permanent one.

17   Q    Let's turn if we could to the estimation that you made

18   of the E-side liabilities.  Okay.  Your estimation in this

19   case is of aggregate asbestos liabilities as of the petition

20   date; is that correct?

21   A    That's correct.

22   Q    And you understand that there's -- obviously we've gone

23   over it, there's no trust being established in this case,

24   correct?  You understand that?

25   A    I think that's right.

1    Q     And what do you understand the purpose of your

2    estimation to be, the purpose of it?

3    A     Let me give you a naïve answer I think, but I thought

4    every bankruptcy had to have one.

5    Q     Fair enough.  Do you understand that the debtors have

6    agreed that it is being presented to show feasibility and

7    that the plan is being proposed in good faith.  Do you

8    understand that?

9    A     No.

10   Q     Okay.  Do you understand that the estimation is being

11   used to demonstrate the asbestos debtors will have enough

12   assets to pay their claims?

13   A     I really don't know what it's being used for or how

14   it's being used.

15   Q     Okay.  Let's talk about the pending claims.  If you

16   would, take a look at your report, which I believe you have

17   up there.  And if you would, let's go to page 3 of your

18   report.

19   A     Yes.

20   Q     And the third paragraph you note approximately 900

21   claims have been filed against the E-side debtors

22   prepetition and that 550 have been resolved, and so there

23   are 350 that have not been resolved; is that correct?

24   A     Yes.  Yes.

25   Q     And then on page 4, there are the pending claims that

1   you refer to and I believe the table on page 4, and those

2   are total costs resolving all pending and future asbestos

3   related claims against the E-side; is that correct?

4   A    I'm not sure what the question was.

5   Q    Well, I'm just asking you if that's what that table

6   does.  This table is for the pending claims, and so what I'm

7   driving at, is that the 350?

8   A    This table is for pending and future claims.

9   Q    Okay.  Right.  But then you break it out by both,

10   right?

11   A    Yes, yes.

12   Q    And so what I'm asking is, is that pending claims is

13   for the 350, I just want to try to get some clarity on how

14   your report works.  Right?  You follow where I'm at?

15   A    Yeah, so I just want to make sure I understand.

16   There's 900 filed, 550 settled, so you're saying there's 350

17   remaining and --

18   Q    And then table --

19   A    I'm sorry.

20   Q    No, I was just going to say Table S-1 has a breakdown

21   and there's a section for pending claims.

22   A    Yes.

23   Q    And so my question is, is that -- that represents the

24   350?

25   A    Yes, that's correct.

1    Q     If you would, look at your report at page 25.  And

2    again this is relative to I believe pending claims.  You

3    report or note that there's 20,298 unique POCs filed; is

4    that correct?

5    A     Yes, that's correct.

6    Q     And I believe 11,803 for manifested claims and 8,495

7    were for exposure only claims, meaning no illness had

8    manifested; is that correct?

9    A     That's correct.

10   Q     You did not examine the 11,803 proof of claims for the

11   manifested claims and attempt to determine whether they were

12   valid, did you?

13   A     No.

14   Q     And the report at 25, you say that there's only none of

15   the manifested claimant claims to have worked at an included

16   plan.  By that you mean one of the plants on the ECI list,

17   is that correct, or do you know?

18   A     I'm not sure what the term is, but I was provided a

19   list of plants that I think is in an index to my report.

20   Q     Right.  And so that doesn't mean that the 11,802 did

21   not work at one of those plants, does it?  It doesn't mean

22   that, it just means that you didn't identify one of the

23   plants.  Isn't that a correct statement?

24   A     No, I don't think so.  But maybe let me just describe

25   what it is.

1    Q    Sure.

2    A    On the POC form, there is a question about whether

3    you've ever worked at an included plant is the word.  And

4    you answer that true or false.  And so anyone who answered

5    that false I put in that box, there's 11,802 of them that

6    said false, so.

7    Q    But you never looked at those proof of claims.

8    A    I didn't what?

9    Q    You did not look at the proof of claims.

10   A    Let me just try to construct how I'm saying this

11   poorly.  I have an electronic proof of claim file, I was

12   also provided PDFs for that electronic file.  In the normal

13   course of things I am not going to go through and review

14   every single PDF file to see whether it matches what's on

15   the electronic file.  But I do kind of a random draw, so

16   I'll go through and I'll look at a few here, a few there.

17   And every one that I looked at was done appropriately and

18   correctly.

19       So that gave me comfort that the electronic file, the

20   POC claims that I have is reasonably accurate.  I then on

21   the electronic file have a column for every single one of

22   the POC claimants, and that column is the answer to the

23   question did you work at an included plant.

24       I either have a true or a false there.  If I have a

25   true, which is what happened here on the manifested, one of

1    those guys said true.  Everyone else said false.  So the

2    thing I'm struggling with is that you seem to be implying

3    that I didn't review the POC claims and I may be

4    misunderstanding you.

5    Q    You're following -- your explanation is actually

6    helpful in understanding what the process was that you went

7    through in order to understand the one versus the other

8    11,802 claims.  I appreciate that.

9         If you would, look at your declaration, paragraph 37

10   there you say that you -- your forecast was not premised on

11   the information contained in the asbestos POC for three

12   reasons.  I think one of the reasons --

13   A    I'm sorry if you could just bear with me for one

14   second.

15   Q    Certainly, my apologies.

16   A    My fingers work pretty slow.

17   Q    Page 12 of your declaration and it's at the bottom of

18   that page.

19   A    Okay.

20   Q    You state that your forecast was not premised on the

21   information contained in the asbestos POCs for three

22   reasons.  You list some of the other reasons and I think one

23   of the reasons you list is that you did not rely on the POCs

24   because among other things, they contain limited

25   information.  That's correct?

1    A    That's correct.

2    Q    Now, we talked a little bit about the bar date in this

3    case.  Does a bar date assist you or an expert in your field

4    in helping to arrive at an estimate that is more certain, if

5    you know?

6    A    I've never thought of it, I don't know.

7    Q    So a bar date doesn't inform you in terms of -- it

8    doesn't impact your estimate in any way, shape, or form?

9    A    Not with what I'm being asked to do.  I mean, if I'm

10   being asked to estimate what the future asbestos experience

11   on the companies under the presumption that it remains

12   solvent, I'm not sure how that affects what I did.

13   Q    Okay.  Thank you.  Let's move to your forecast and

14   future claims if we could.

15   A    But can I just ask you a question --

16   Q    Well --

17   A    -- when you -- no, well let me --

18             THE COURT:  Actually you don't get to ask the

19   questions.

20             THE WITNESS:  I got confused at the beginning and

21   I --

22             THE COURT:  You'd like to clarify a previous

23   answer?

24             THE WITNESS:  And I'd like to clarify something if

25   I could.

1           THE COURT:  Okay.

2           THE WITNESS:  Which is, when the questions begin

3   when you're talking about pending claims and then we went

4   from pending claims to the POC forms and I know that we've

5   discussed my definition of pending claim and future claims,

6   you know, quite a bit so far, but you understand I don't

7   treat POC claims as a pending claim, right?

8   BY MR. HOGAN:

9   Q    How do you great POCs?

10  A    I don't deal with them, but if I was -- if there was --

11  they would fall into my future claim bucket.  They're future

12  claims, they're not pending claims.  And I apologize for the

13  lateness of making it clear, but we were having the

14  discussion about whether the pending claim, what is a future

15  claim, and then the way you did that jump, I didn't have an

16  opportunity to try to understand what you were saying.  But

17  POC claims are future claims.

18          THE COURT:  Well, is it possible that someone who

19  has a pending claim also filed a proof of claim?

20          THE WITNESS:  We took all of them out --

21          THE COURT:  Oh, you did?

22          THE WITNESS:  -- so there was no duplication.  So

23  there was I think 87 of them or a number like that, and so

24  we looked through the POCs, the overwhelming majority did

25  not file a POC, but there were the 87 or thereabouts, those

1    were taken out and treated as a duplicate, if you will, for

2    this.

3              So I have a complete bifurcation of pending

4    claims, and then non-duplicated, non-pending POC claims

5    which are future.

6    BY MR. HOGAN:

7    Q    Let me just make sure I understand if I could break --

8    unpack that if it were.

9         So you're telling me that there's 87 claims for which

10   proof of claims were filed, let me just ask the question and

11   if you disagree with the construct we'll break it down again

12   some more.

13   A    All right.

14   Q    But you're telling me that there's individuals who had

15   asserted claims prepetition that there were either lawsuits

16   or the debtors knew about who filed proofs of claims and you

17   pulled those out and treated those as pending claims because

18   the debtor already had those on their books, is that what

19   you're telling me?

20   A    That's correct.

21   Q    Okay.  And that to the extent somebody filed a proof of

22   claim that didn't manifest itself anywhere in the debtors'

23   records as having already been asserted, those are treated

24   as future claims.

25   A    So you're treating the word manifested in a different

1    way than --

2    Q    Yeah, that was unfortunate on my part.

3    A    Okay.

4    Q    What I mean is asserted claims as opposed to

5    manifested, that's probably a better characterization.

6    A    Right.  But I do have this bright line between pending

7    claims and future claims, and in order to maintain that

8    bright line, I -- it's not that I -- and first of all the 87

9    we've got to be careful, it could be 79, but it's a number

10   in that area.

11   Q    Understood.

12   A    And all that I'm saying is that I do not want them ever

13   counted as a POC claim, because I've accounted for them as a

14   pending claim.  And I valued them as a pending claim.

15            THE COURT:  Right, otherwise you'd have

16   duplication.

17            THE WITNESS:  Exactly right.

18            THE COURT:  Mr. Hogan, can we take a recess?

19            MR. HOGAN:  Certainly, Your Honor.

20            THE COURT:  Say about five minutes.

21       (Recessed at 2:26 p.m.; reconvened 2:38 p.m.)

22            THE CLERK:  All rise.

23            THE COURT:  Please be seated.  You're fine down

24   there, please be seated.  You don't need to rise again when

25   I come in.

1          THE WITNESS:  Okay.  That's fine.

2          MR. HOGAN:  May I proceed?

3          THE COURT:  Yes.

4          MR. HOGAN:  Thank you.

5    BY MR. HOGAN:

6    Q    Mr. Vasquez, if we could let's turn to the issue of

7    your forecast of future claims.  In forecasting future

8    claims you considered the propensity to sue as I understand

9    it, and you base that number on what people -- how people

10   have sued in the past.  Fair statement?

11   A    Yes.

12   Q    But not everybody sues every party responsible for

13   their asbestos related injuries.  Is that a fair statement?

14   A    I mean that seems to me that has to be right, but I

15   don't know that for a fact.

16   Q    Isn't it fair to say that a lot of people probably

17   wouldn't want to sue in the last few months of their lives

18   when they're suffering from asbestos related illnesses that

19   they don't want to deal with a lawsuit.  Is that something

20   that you would consider?

21   A    I think I do consider it.  I mean, I guess what you're

22   describing is that there is a lag induced by pain and

23   suffering and just not wanting to deal with a lawsuit.  And

24   if that's true, then all of these, let's say mesothelioma

25   instead of filing this year file two years from now, so I

1    capture all of them.  So it seems to me that my forecast

2    includes precisely that delay.

3    Q    If you would, in your report on page 10, go to that.

4    In paragraph 2 or really the first full paragraph of the

5    report, you say that there are two circumstances where

6    recent years may not be the best representation of the

7    future.

8        Do you see that?

9    A    Yes, I do.

10   Q    And you say one is where there was a short term change

11   in the litigation environment.  The short-term effects of a

12   filing search.  Do you see that language?

13   A    Yes, I do.

14   Q    What is a filing search?

15   A    I suppose -- well, first of all a filing search is a

16   filing search, so I assume you're asking me what it means.

17   Q    Yes, sir.

18   A    Or how it comes about.

19   Q    First, what it is.

20   A    I look at a pattern of filings against the company and

21   it's smoothly marching along, increasing asymptotically or

22   decreasing asymptotically but it's smooth.  I look at one

23   year, and all of a sudden twice the number of claims are

24   filed.  And then it comes back down to a total trend.

25       The issue becomes do I want to assume that that surge

1    occurs in the future continues at the surge trend throughout

2    the entire forecast period, or do I treat it as a single one

3    time event.

4         So I hope that helped.  I'm not sure.

5    Q    Have you looked at what causes filing surge?

6    A    The biggest cause is that you have a plaintiff law firm

7    that says, you know, I've got a big inventory of claims and

8    I'm going to file them all against defendant X next week,

9    happens one time, and then it's gone away.  The second is

10   you have a change a nexus program in an estate, and you have

11   to have everything filed by the end of the month or you face

12   more onerous rules, so you get a surge in claims.

13        There must be more examples, but those are two that

14   come to mind.

15   Q    What about a 524(g), the creation of a trust, would

16   that give rise to a filing surge?

17   A    Is this the same question as the trust bump or

18   whatever, I forget what you called it.

19   Q    The trust effect.

20   A    The trust effect is that --

21   Q    No, I don't think so, unless you tell me that it is.

22   I'm just trying to understand.

23   A    No, I'm trying to -- I don't understand that question

24   I'm sorry.

25   Q    Well, I'm asking is have you seen instances where

1    524(g) trust creation gives rise to a filing surge?

2    A    No.

3    Q    In this instance, did the bar date give rise to a

4    filing surge?

5    A    All I can tell you and I think there's a table in the

6    report that looks like claims and it's pretty smooth through

7    the end of '14.  So I guess is the answer is no.

8    Q    And that's to the end of '14.  Do you know when the bar

9    date was set?

10   A    I thought it was some time in '15, but I don't know.

11   Q    If I told you it was December 14th of 2015, would that

12   help you to undemand whether or not the bar date gave rise

13   to a filing surge?

14   A    Now what was the -- I know I'm not supposed to ask you

15   questions.  The -- I forget, I just can't recall what the

16   petition date is.  But clearly before the bar date.

17   Q    I think it was in April of 2014 that the petitions were

18   filed.  Would that help you?

19   A    I would still go back to the fact that it looks to me

20   like the filings are pretty stable over the last, say four

21   years.

22   Q    Did you consider whether or not the bar date would

23   increase the propensity to sue?

24   A    No.

25   Q    That's because I didn't see any indication in your

1    report that it had.  It's when that the publicity of a

2    notice program will tend to increase claims in mass tort

3    bankruptcies; is that correct?

4    A    I haven't seen that effect, no.

5    Q    Are you familiar with the Robbins bankruptcy case,

6    Dalton Shield case?

7    A    That was before my time.

8    Q    Now, there were 21,000 unique proof of claims filed in

9    this case as your testimony elicited earlier.

10   A    There was 20 -- how many?

11   Q    Approximately 21,000 unique proof of claims.

12   A    I think that's about right, yes.

13   Q    And I know you talked about examining some using your

14   system to examine some of the proofs of claim, so

15   specifically did you examine the proofs of claims to

16   determine what percentage of persons with asbestos diseases

17   have now filed against the debtors?

18   A    I'm sorry I don't understand.

19   Q    Did you examine the proofs of claims to determine what

20   percentage of persons with current asbestos disease have

21   filed against the debtors?  Did you determine that

22   percentage?

23   A    I'm not just following the question.  You mean -- are

24   you asking whether or not I look at the proof of claim

25   forms, and if they allege that they have a disease, do what,

```
 1   assume -- divide that by incidence, I'm not sure what you're

 2   asking me.

 3   Q    That's exactly what I'm asking you.

 4   A    So divide that number by incidents and treat that as a

 5   propensity to sue.

 6   Q    Yes.

 7   A    No, I did not.

 8   Q    Did you consider whether the bar date publicity

 9   increased awareness that EECI would be responsible, that

10   they were responsible for the Avaskal (ph) liabilities and

11   whereas they were unaware of that successor before the

12   notice program, did you consider that?

13   A    I'm pretty sure the answer to that is no.

14   Q    Let's look at some of your assumptions.  If you would,

15   look at your report at page 13.

16   A    Yes.

17   Q    You describe the methodology for your estimation at

18   that point, correct?

19   A    Yes.

20   Q    You did not consider the number of people who had been

21   exposed to debtors' asbestos; is that correct?

22          MS. ESAYIAN:  Objection to the form of the

23   question.

24          THE WITNESS:  I think that --

25          THE COURT:  Overruled, go ahead.
```

1          THE WITNESS:  Yeah.  I think that the methodology

2     doesn't ignore it at all.  It says that I look historically

3     at what was filed as a percent of U.S. incidents, and then I

4     look to see what the dismissal rate is.

5          The net of those gives me compensable claims.  And

6     that count historically is how many file claims that were

7     paid in that year that were exposed to the company's

8     activities.

9     BY MR. HOGAN:

10    Q    If you had the number of people that had been exposed

11    to debtors' -- say information was available to you, would

12    you have utilized it in the creation of your report?

13    A    I think it's a -- you know, in the past if we go back

14    like in the 15, 20 years there were a few analysts that

15    tried to make the Nicholson approach specific to a company.

16    And what I mean by that is instead of including a U.S.

17    incident for mesothelioma and lung cancer, they said let's

18    try to create mesothelioma and lung cancer solely for the

19    people we know worked at a plant some time.  And it worked

20    miserably.

21         And the reason that it works miserably is that people

22    don't work in one plant for their entire life.  They work at

23    this plant, that plant, and this plant.  And so it's their

24    accumulation of all of that asbestos exposure over their

25    work environment that determines if and when they get an

1    asbestos disease.

2         And then the tort system parcels out which defendant

3    should pay and to proportion out, if you will, the exposure

4    facts that you're asking about.

5    Q    So there's really no way to know how many people were

6    exposed, is there?

7    A    I don't know why you would want to know that.

8    Q    But there's no way that you know to determine what the

9    number is, is there?

10   A    I mean you can define who was exposed, right, you can

11   define -- it seems to me, and I'm describing this poorly.

12   There's two separate issues that are being discussed here.

13        The first issue is, can you define who has ever been

14   exposed to a company's activities.  The answer to that is of

15   course yes, you get all the vendors, you do whatever you do

16   and you can find out who may be exposed.

17        That becomes a separate issue from who will file and

18   who will be paid and how much they'll get paid.  And that's

19   the bifurcation that I'm making that the analysts 20 years

20   ago who tried to go this route of identifying everyone that

21   worked for a company and use that as a way like Nicholson

22   does, never worked.  And it doesn't work for the very

23   intuitive obvious reason that you do not accumulate all your

24   asbestos exposure in one place.  You accumulate it over a

25   broad set of places.

1        And so that's why you need the broad set of U.S.

2    exposure in order to do a forecast that's reasonably

3    accurate.  But I don't want to confuse those two issues, I

4    don't want to confuse the issue of identification of who may

5    have been exposed with the identification and in valuing of

6    those people who file a claim and get paid, and how much

7    they get paid.

8    Q    But you would agree that the identification of those

9    who had filed is a subset of those who were exposed.

10   A    I'm sorry you have to say that again.

11   Q    You would agree that the identity of those who would

12   file is a subset inherently of those who have been exposed.

13   A    I'd be surprised if that was the case, that I would

14   suspect it's more of -- mostly separate sets, but a lot of

15   overlapping.

16   Q    And in fact, isn't it likely that there are people out

17   there who were exposed, who don't even know that they were

18   exposed.  Is that a fair statement?

19   A    I mean, that's a -- depending on what your question is.

20   If you ask someone, did you inhale an asbestos fiber,

21   they're not going to know.  Right.  If you ask someone were

22   you ever at the plant, did you work at the plant, did you

23   deliver at the plant, they know that.

24   Q    Did you -- were you married to somebody who worked at a

25   plant, questions like that?

1    A    I'm sorry, say it again.

2    Q    I was just adding to your universe of people.

3    A    Oh, you -- I thought you were asking me if I was

4    married to somebody.

5    Q    No, I was asking -- I'm sorry.  I'm asking if that

6    would be included in that universe of people, someone who in

7    addition may having worked there, exposed, or delivered

8    there, a wife --

9    A    There's unambiguously a handful, that's a pejorative

10   way of saying it, unambiguously there are a limited number

11   of these quote secondary claims where, you know, the fellow

12   works at the plant, his coveralls are coated with asbestos,

13   they bring it home, wash it, and they're exposed, and they

14   get mesothelioma.  That absolutely happens, I don't mean to

15   demean it at all, I mean, it happens.

16        It's just that in the scheme of things if we're talking

17   about, you know, tens of thousands of people filing claims,

18   it's really small.

19   Q    And so if I told you that there were potentially

20   children or spouses of workers who were exposed and unaware

21   of their spouse's exposure, that would be within that subset

22   you just described.

23   A    I think we're talking past one another again, so I want

24   to make this clear.  That daughter, that son, that wife,

25   would know if you ask them.  That their husband walked home

1   with clothes that was covered with asbestos.

2       If you ask the other question, did you suck in an

3   asbestos fiber, they don't know the answer to that.  So it

4   depends on what question you're asking them, I'm beating

5   this to death, I apologize.

6   Q    No, you're fine.  So you did not consider the number of

7   people who would develop asbestos related injuries in the

8   future caused by debtors' asbestos; is that correct?

9   A    That is absolutely wrong.

10  Q    It's wrong.

11  A    It's wrong.

12  Q    And explain why if you could.

13  A    I don't know how to explain it different than I did, so

14  I apologize if I'm using the same way to describe it.

15      But ultimately I can observe someone who filed a claim

16  against a company and got paid.  That person was exposed,

17  assuming the whole system works --

18  Q    Sure.

19  A    -- that person was exposed to asbestos at the plant,

20  recognized by the company, an amount was paid.

21      So I know how many people were exposed at the company I

22  can reverse engineer how many people must have been exposed

23  at the company just by looking at the number.  I mean, the

24  methodology starts with U.S. incidents absolutely agreeing

25  that people are exposed through their work life at multiple,

1    multiple locations, companies, for whatever reason the

2    asbestos industry has decided that this claim will be filed

3    against EFH.

4        It then goes through the process and discovery to

5    produce evidence, and if it's paid, it's proof that he was

6    exposed at the plant.  So I know the answer to that, right.

7    Q    Can you tell me what the probability is that someone

8    who is exposed will be -- will fall ill in the future, can

9    you tell me that probability?

10   A    It is -- it depends on -- I can tell you what it

11   depends on and then you have to give me all the numbers and

12   I can look at the equations.  But it depends on the age of

13   the individual, the year since he was first exposed, the

14   intensity of the exposure, the duration of the exposure.

15       You give me all four of those things, and then I can

16   compute for you what his probability will be of getting

17   mesothelioma that year.  If you ask me then what is his

18   probability over his entire lifetime, I couldn't do it here,

19   but basically you have to stack it up against his chance of

20   getting hit by a bus before he contracts mesothelioma.

21   Q    Okay.

22   A    That's a crude way of saying it.  But you apply normal

23   mortality to this group of individuals including EFH people,

24   and if you look at them today, you know, even the POC form

25   has very limited information, right.  And it only has

1    information on age for about 10 percent of the people.  But

2    if you do a tabulation of that, the people filing POC forms

3    are about 68 years old.  And that includes not just

4    mesothelioma, but includes non-malignants and all that.

5         So if I just look at mesothelioma, which is where all

6    the money is going, and I can identify the POC forms,

7    they're probably 80 years old on average, right.  In the

8    general population, they're about 78, 79 years old.

9         Here, it looks like they're probably older, 80, 81 or

10   so.  And so when I apply normal mortality to an 81 year old,

11   what is the chances that he's going to die from normal

12   mortality before he get mesothelioma and it's really high.

13   I mean that's -- so this population as it gets older and

14   older and older has a less and less chance of becoming a

15   viable eligible claim.

16   Q    But some of those people they may not be diagnosed for

17   another ten years.  Isn't that a fair statement?

18   A    Absolutely.

19   Q    And you assume that the claims will continue at least

20   through until 2050; isn't that correct?

21   A    The 2050 is -- I mean the answer -- first of all, the

22   direct answer is yes, it goes through 2050.  But you have to

23   be, it seems quite careful with using that number.  Because

24   by the time you hit, you know, 2030, you know 2035, you're

25   talking about a half of a person, three-tenths of a person,

1    the numbers get so small that they're almost disappearing,

2    but they don't completely disappear until 2050, all right.

3         Because in our model you've got to be a hundred years

4    old before we finally force death upon you, if you will.

5    Okay.  So most of this stuff is really in the next 10 years,

6    12 years, after that it doesn't matter much.

7    Q    And some of the people that will fall ill in the future

8    will have claims based on their parents wrongful death may,

9    in fact, be children as well, isn't that correct, isn't that

10   a fair statement?

11   A    Yeah, I mean, we're -- I would, of course, agree with

12   you that that will occur.  The only issue is the probability

13   is so small, it's -- the count of people is so small, but

14   conceptually you're completely right.

15   Q    If you would, look at your declaration on page or

16   paragraph 36.

17   A    Yes.

18   Q    And you state that your forecast assumes that all

19   claimants who could have filed proof of claims did so and

20   thereby preserved their claims.  That is the forecast

21   assumes that all claimants with compensable pending and

22   future asbestos related bodily injury claims against the E-

23   side debtors filed proof of claims.  Is that a fair

24   statement?

25   A    I mean ultimately because of the methodology that I

1    implemented, which is what you pointed out earlier wasn't

2    dependent on POC filings, that my forecast assumes everyone

3    would file, so it's -- so the 36 million of present value is

4    that everyone files a claim or everyone that's eligible gets

5    paid, sorry.

6    Q    Did you also assume that all persons who have a loss of

7    consortium or other similar claims would file POCs or did

8    file POCs I should say?

9    A    I mean, I think the -- what I described holds for your

10   children, your spouses, your -- all that.

11   Q    And why did you make the assumption that all claims had

12   been filed, just so I understand.

13   A    I didn't -- it's not -- I don't think it's the right

14   way to -- this isn't fair, it's not the right way to ask the

15   question which isn't fair at all, right.

16        It's because of what I did and what I was asked to do

17   was tell me what it would cost to resolve all future claims,

18   pending and future claims, and that's what I did.

19        Then layered over here some place is POC, bar date, and

20   that's in the sense kind of independent of what I did.  I

21   did a normal forecast for a bankruptcy, or a common forecast

22   for a bankruptcy.

23   Q    Do you think it's a reasonable assumption, a realistic

24   assumption to note -- you know, your assumption that all

25   claims have been filed, is that a realistic assumption?

1    A    We really need to drop this word assumption because it

2    implies that somehow I used it in a way that I did a

3    forecast, and so the term assumption doesn't quite work

4    here.

5         But if you're asking me whether or not I think that

6    everyone is likely to have filed a POC form at the bar date

7    that will ever have an eligible payable claim, I mean, there

8    has to be someone out there who did not file, that will

9    manifest disease and has not filed a POC claim with the bar

10   date, seems to me.

11   Q    You qualify that as one or more than one, just so I

12   understand.

13   A    I'd be willing to agree to one, but if I could get past

14   that, I don't think so.  I mean, I didn't look at it, I

15   don't know.  I don't know the mechanics.  I know so little

16   about the mechanics and the implementation of the mailing

17   notice or whatever was done that it would just be a guess.

18   Q    Okay.

19   A    But I couldn't imagine not agreeing to one.

20   Q    Did you write your declaration or was it written and

21   submitted to you such that you could understand it and agree

22   to it.  I'm just trying to understand the mechanics of how

23   that came to be.

24   A    No, I mean, first of all the declaration is basically

25   based on my report, which I completely wrote.  And then I

1    did not write every word in here, I certainly reviewed part

2    of it, part of it was done by my staff, and some part of it

3    was not.

4    Q    Well, you took slight issue with my use of the word the

5    assumption, and the only reason I draw your attention to it

6    because that's the language that was used in your

7    declaration.

8    A    Yeah, the --

9    Q    It says that you assume that all claimants with

10   compensable pending future asbestos related bodily injury

11   claims against E-side, debtors, filed proof of claims.

12   A    Here's the distinction I'm drawing, and I agree you're

13   making a good point.  There's a distinction between making

14   an assumption that affects your forecast, and doing a

15   forecast and then saying in order for my forecast to hold

16   true, this is assumption must hold.

17        And so that's what the term assumption means in here,

18   not that it was the basis for my forecast.  It was simply

19   that this was a consequence of the forecast that I did.

20   Q    Thank you.

21        THE COURT:  Isn't it true all you're saying is

22   that when you forecast future claims, you paid zero

23   attention to the bar date, and that the bar date necessarily

24   probably excludes at least one, maybe more people who would

25   file a future claim but didn't file a proof of claim.

1           So the universe of numbers must be less, which

2    means your calculation of future claims necessarily

3    overestimates ultimate liability because some people will

4    have not filed a proof of claim who would otherwise have

5    filed a claim, so that number must be a little bit lower.  I

6    think that's what this says but maybe I'm wrong.

7           THE WITNESS:  Yes, it does.  Yes, it absolutely.

8    That's precisely what it says.

9           THE COURT:  Okay.

10          THE WITNESS:  You know, there's -- and it's

11   probably not even worth the discussion, but as you pointed

12   out earlier on, if you believe in this announcement effect,

13   which I don't, but if you did, then the fact that you get a

14   notice likely attracted a few more people, another one or

15   two or whatever the number is that would have not filed

16   before.

17          So if you think holistically about the number of

18   people whose claims are going to be resolved and as a result

19   of all of these actions, I mean probably not very good.

20          THE COURT:  Might be a wash.

21          THE WITNESS:  Might be a wash.

22   BY MR. HOGAN:

23   Q    Would you expect that all persons then, based on what

24   you just said, would you expect that all persons who were

25   exposed to debtors' asbestos would file a proof of claim,

1    even though at that time, they had no asbestos related

2    illness?

3    A    I apologize, I missed the beginning so I missed the

4    question I think.

5    Q    Would you expect that all persons who were exposed to

6    debtors' asbestos, that they would file a proof of claim

7    even though at the bar date or prior to the bar date, they

8    had no asbestos related illnesses that were manifested?

9    A    I don't know, thousands of them did though.

10   Q    I'm sorry?

11   A    Thousands of them did.

12   Q    But would you expect all of them to is my question.

13   A    I don't know who all are, but all I'm saying is

14   something like 8,000 of them did not have a manifested

15   disease and filed a POC.

16   Q    And I would agree that we don't know who all of them

17   are.  If we did, I probably wouldn't be having, you know,

18   these questions with you.

19   A    That's true, that's true.

20   Q    Okay.  But you would agree that some subset of persons

21   who were exposed to the debtors' asbestos products and who

22   did not manifest prior to the bar date did not file a proof

23   of claim by the bar date.

24   A    Unless I misunderstand your question, aren't we back to

25   my answer of I would agree to one, but nothing more?

1    Q    And that's predicated on, just so I understand the one.

2    A    Just because I think one has to happen.

3    Q    And so if I told you that there were two that I know

4    of, would that -- doesn't that change your calculus in any

5    way?

6    A    No, it doesn't.

7    Q    Is that a factor of two at that point?

8    A    No, I don't mean to -- if I sound flippant, I don't

9    mean to.  I'm trying to say in an unartful way is that I

10   don't know, but there has to be someone.

11   Q    And you're aware that the debtors have stated they sent

12   their notice to approximately 70,000 known or likely

13   claimants?

14   A    I don't think I've ever seen that number.

15   Q    And you realize that 70,000 proof of claims weren't

16   filed though obviously; is that correct?

17   A    No, but you know, given the question that you asked me

18   before about probability of getting mesothelioma, at the end

19   of the day in my forecast, I have 101 mesotheliomas that

20   will be paid.  So when we begin talking about, you know,

21   70,000 mailings or 60,000 whatever that number is, and

22   20,000 come back, relative to the 101 mesotheliomas, that

23   tells you nothing.

24           MR. HOGAN:  I have no further questions, Your

25   Honor.

1           THE COURT:  Does anyone else wish to cross-examine

2    the witness?

3        (No response)

4           THE COURT:  Okay.  Any redirect?

5           MS. ESAYIAN:  No, Your Honor.

6           THE COURT:  All right.  Thank you, Doctor.

7           THE WITNESS:  Thank you.

8        (Pause)

9           MR. HOGAN:  Your Honor, I some exhibits I'd like

10   to admit into evidence based on my cross.  I've handed a

11   sheet up to your staff.

12          THE COURT:  Okay.

13          MR. HOGAN:  AX-76, AX-79, AX-80, AX-113 and AX-

14   115.

15          THE COURT:  Any objection?

16          MS. ESAYIAN:  No objection to the admission, just

17   a notation that AX-79 is a detailed listing of the

18   prepetition claims history that identifies claimant's

19   specific information, and if it's going to be filed into the

20   record, we would ask that it be filed under seal.  We would

21   ask permission for it being filed under seal.

22          MR. HOGAN:  We had a previous agreement on this

23   issue.  We dealt with prior -- to the start of confirmation

24   and we're in agreement that it contains PII and it's

25   appropriate that it remain under seal, Your Honor.

1          THE COURT:  All right.  Those documents are

2    admitted.  AX-79 is admitted under seal.

3          (Asbestos Objectors' Exhibit Nos. AX-76, 79, 80, 113,

4    and 115 were admitted)

5          MR. HOGAN:  Thank you, Your Honor.

6          MR. STEPHANY:  For the record, Your Honor, Bryan

7    Stephany, Kirkland & Ellis, on behalf of the debtors.  The

8    debtors' next witness is Mr. John Stuart and we call him to

9    the stand.

10          THE COURT:  Mr. Stuart, if you'd take the stand,

11    please, and remain standing for your affirmation.

12          THE CLERK:  Please raise your right hand.

13                    JOHN STUART, WITNESS, SWORN

14          THE CLERK:  Please state and spell your name for

15    the record.

16          THE WITNESS:  John Stuart, J-O-H-N, S-T-U-A-R-T.

17          THE CLERK:  Thank you.

18          MR. STEPHANY:  And, Your Honor, as has been the

19    practice, we prepared a witness binder if I may approach.

20          THE COURT:  Yes.  Thank you.

21                    DIRECT EXAMINATION

22    BY MR. STEPHANY:

23    Q    Good afternoon, Mr. Stuart.

24    A    Good afternoon.

25    Q    Can you tell us where you work?

1    A    I work for Alvarez and Marsal.

2    Q    And what's your title there?

3    A    I'm a managing director.

4    Q    Were you asked to provide an expert opinion in

5    connection with these E-side confirmation proceedings?

6    A    I was.

7    Q    And did you, in fact, prepare an expert report?

8    A    I did.

9    Q    What was the subject matter of that?

10   A    I prepared a liquidation analysis in connection with

11   satisfying the best interest of the creditor's test.

12   Q    And did you also prepare a declaration in anticipation

13   of your testimony here today?

14   A    Yes, I did.

15   Q    And is that the same subject matter as your expert

16   report?

17   A    Yes, it was.

18   Q    Can you please turn in your witness binder to a tab

19   labeled D DIR-Stuart?

20   A    Okay.

21   Q    Do you recognize that?

22   A    Yes, I do.

23   Q    And can you tell us what that is?

24   A    This is my declaration.

25   Q    And is the information contained in your declaration

1   true and accurate to the best of your knowledge?

2   A     Yes, it is.

3   Q     And it's being made in support of a plan of

4   reorganization?

5   A     Yes, it is.

6   Q     Does your declaration include a summary of your

7   background and qualifications?

8   A     Yes, it does.

9   Q     I won't go through those in detail here today, but I do

10  want to briefly discuss your work and experience on these

11  cases in particular.

12        How long have you worked with EFH and its affiliates?

13  A     Approximately three and a half years.

14  Q     And during that time, have you prepared a number of

15  liquidation analyses?

16  A     I have.

17  Q     Have you also prepared multiple expert reports during

18  that time?

19  A     Yes, I have.

20  Q     Do you recall how many?

21  A     I believe I prepared approximately four expert reports

22  related to the liquidation analyses and I prepared one

23  expert report related to the corporate services spin-off.

24  Q     Going back to your declaration, does your declaration

25  include a summary of your assumptions and methodology for

1    the liquidation analysis that you performed?

2    A    Yes, it does.

3    Q    I won't go through that analysis or the methodology in

4    detail, but I do want to briefly address some of the

5    assertions that the asbestos objectors have made, with

6    respect to your analysis.

7         First, I'd like to show you a portion or a statement

8    from the asbestos objectors reply brief in support of the

9    motion to dismiss the LSGT debtors.

10             MR. STEPHANY:  Docket entry 10274 at page 6, with

11   permission, Your Honor, if we could publish that.

12   Q    We've got a cut out here and I direct your attention to

13   the highlighted sentence here that says "that is a small

14   fraction of EFH Corp's admittedly valid intercompany

15   obligations to the asbestos debtors, which according to the

16   debtors' expert totals 2.7 billion."

17        And then there's a footnote 11 that corresponds to your

18   October 21st, 2016 expert report at page 17; is that

19   accurate?

20   A    Seems to be accurate, yes.

21   Q    Is the statement, the assertion there concerning the

22   value of the intercompany obligations to the asbestos

23   debtors, is that an accurate understanding or reading of

24   your report?

25   A    No, it is not.

1    Q    Okay.  I want to talk about why that's not accurate,

2    but before I do, did you prepare a demonstrative to aid in

3    your testimony and explanation in this point?

4    A    Yes, I did.

5    Q    Okay.  Could you please turn in your binder to -- let

6    me take that, Dan -- to DEM-Stuart 1.  Do you recognize

7    that?

8    A    Yes, I do.

9    Q    And is that demonstrative that you prepared to aid in

10   your testimony?

11   A    Yes, it is.

12            MR. STEPHANY:  Permission to publish, Your Honor.

13            THE COURT:  Yes.

14   BY MR. STEPHANY:

15   Q    Can you describe for the Court what's depicted in D

16   DEM-Stuart 1?

17   A    Now, this is page out of my expert report that I

18   believe was ultimately used to reference the values 2.7

19   billion and the objector's pleading.

20       What I've done here though is highlight in particular

21   the four asbestos objector entities, legal entities, as well

22   as a truncation, but ultimately the value that populate

23   they're above zero with respect to intercompany and other

24   asset categories, such as investments.

25   Q    Okay.  Do you have an understanding or an idea how the

1    asbestos objectors arrived at the assertion that this page

2    and particularly these columns somehow reflect a value of

3    intercompany claims or intercompany amounts of 2.7 billion?

4    A    I think their math is simply the sum of the total

5    category.  If you take the far right column of the

6    highlighted entities and sum that, that's the math that I

7    have assumed that they are using in this 2.7.

8         As you can see walking from left to right, that number

9    is comprised of a number of different asset categories

10   including intercompany investments and tax assets.

11        What the pleading and the language in the objector's

12   pleading fails to do is track the report which goes on with

13   subsequent pages to effectively eliminate these categories,

14   as I don't believe that they have meaningful value in a

15   liquidation.

16   Q    I just want to unpack that a little bit.  The page

17   that's excerpted here indeed Stuart 1 from your expert

18   report is a page reflecting asset categories on an entity

19   basis; is that correct?

20   A    That's correct.

21   Q    Does it at all reflect liabilities?

22   A    It does not.

23   Q    Okay.  And can you explain why it would not be

24   appropriate to just sum the totals in those columns to reach

25   an aggregate value for any one of those columns?

1   A    Sure.  So there are a couple of things to point out

2   here that again I ultimately adjusted as part of my

3   analysis.  For instance, if you look at the 951.5 million at

4   LSGT Gas Company, that is a book entry that has zero value

5   in my opinion, it is simply a book entry that illustrates

6   LSGT Gas' shareholders' equity and some of its down-line

7   subsidiaries.  It's not meant to have any tangible value in

8   the liquidation, so I ultimately excluded.

9        Additionally, we exclude the intercompany claims as

10  part of the liquidation analyses.  They are not additive to

11  the EFH debtors in terms of recovery since the intercompany

12  claims that go across debtors or into the T-side debtors or

13  into the EFHI debtors have now been settled, so these

14  intercompany claims are all intra-EFH debtors and would have

15  no value in a liquidation.

16  Q    Thank you.

17        MR. STEPHANY:  You can take that down.

18  Q    Next, I would like to ask you about a statement from

19  the asbestos objectors confirmation brief, the plan

20  objection at Docket entry 10756, pages 3 to 4.

21        The last line of page 3 talks about the value of the

22  intercompany receivables.  And it says that "they have

23  increased significantly post-petition as interest continues

24  to accrue."  Footnote 9, and at footnote 9, again refers to

25  page 17 of your October 21st, 2016 report.

1      Is that statement an accurate reflection or

2   understanding of the information presented in your expert

3   report?

4   A    I don't believe it's accurate to the extent that it's

5   referencing my report as something that contributes to the

6   statement that the intercompany balance has risen over time.

7   Q    Did your liquidation analysis attempt to show any

8   interest accrual on those intercompany balances?

9   A    It did not.

10            MR. STEPHANY:  If you'd take that down.

11  Q    And I just want to turn back to your declaration.  What

12  was the conclusion of your liquidation analysis in

13  connection with these E-side confirmation proceedings?

14  A    I believe that the liquidation analysis satisfies the

15  best interests of the creditors test and insomuch as the

16  plan provides higher and better value.

17            MR. STEPHANY:  Your Honor, we'll pass the witness

18  at this time.

19            THE COURT:  Okay.

20            MR. STEPHANY:  Or I apologize, we have a

21  (indiscernible).  May I approach?

22            THE COURT:  Yes.  Thank you.

23            MR. STEPHANY:  Your Honor, at this time, the

24  debtors would ask to move into evidence the written direct

25  found in the witness binder at D DIR-Stuart, as well as the

Page 166

1    exhibits referenced therein, DX-22, DX-51, and we'd also

2    like to make D DEN-Stuart 1 part of the record.

3            THE COURT:  Any objection?

4            MR. HOGAN:  No objection, Your Honor.

5            THE COURT:  All right.  The direct and DX-22 and

6    51 are admitted without objection and the demonstrative is

7    part of the record.

8        (Debtors' Exhibit Nos. DX-22 and 51 were admitted)

9                    CROSS-EXAMINATION

10   BY MR. HOGAN:

11   Q    Good afternoon, Mr. Stuart.

12   A    Good afternoon.

13   Q    You understand the asbestos debtors to be separate

14   legal entities from EFH?

15   A    My understanding is that the asbestos debtors are one

16   in the same of what people called the LSGT debtors, or the

17   parent company LSGT and certain of its downline

18   subsidiaries.

19   Q    And so do you understand that the asbestos debtors,

20   those four asbestos entities, in fact, filed separate

21   bankruptcy cases, and their petitions are separate from

22   EFH's bankruptcy petition, do you understand that?

23   A    I am aware there are separate petitions.

24   Q    And you're also aware that the cases have not been

25   substantially consolidated, is that my understanding as

1   well, or do you not have an understanding of that?

2   A    I'm not sure specifically, but I think that is correct.

3   Q    Now, did you prepare a separate liquidation analysis

4   for the asbestos debtors?

5   A    We prepared liquidation analysis for each of the EFH

6   debtors, so yes.

7   Q    But you prepared a separate liquidation analysis for

8   each entity, is my question.

9   A    Yes, I did.

10   Q    Okay.  And your asset chart on page 17 of your report,

11   if you would look at that, please.

12            THE COURT:  Which report?  I have two.

13            MR. HOGAN:  My apologies, Your Honor.

14            MR. STEPHANY:  October 21st report.

15            MR. HOGAN:  Yeah, I'm sorry, the January 20th

16   report, Your Honor.

17            THE COURT:  Okay.

18            MR. HOGAN:  I have it as AX-116 in the asbestos

19   objector's binder.

20            THE COURT:  That's fine, what page?

21            MR. HOGAN:  Page 17, Your Honor.

22            THE COURT:  Thank you, Mr. Hogan.

23   BY MR. HOGAN:

24   Q    And let me know when you're there.

25   A    I'm there.

1    Q    The print's pretty small.

2    A    Yeah, I apologize.

3    Q    No problem.

4         So this is an overview of the asset and liability

5    mapping process for EFH, correct, and do you have here a

6    line that reads E&S LSGT Gas Company LLC, do you see that

7    line?

8    A    I do.

9    Q    Okay.  And you've got different columns for tax,

10   assets, I think the first number that appears is for tax

11   assets of 180.3, and then you've got interco, what is that?

12   A    Intercompany shorthand.

13   Q    And is that intercompany claims?

14   A    Intercompany assets.

15   Q    Intercompany assets, and what does that mean, if you

16   could explain, what are intercompany assets?

17   A    It's essentially a receivable from another legal entity

18   within the corporate structure.

19   Q    Okay.  And that number is tiny, but it looks like 569.2

20   or 568.2 potentially.

21   A    That's correct.

22   Q    And do we know who that receivable -- that's a

23   receivable in favor of LSGT Gas Co and that's payable by

24   whom, do you know?

25   A    I think the substantial amount of that balance I think

Page 169

1    this Court has heard that I believe 560 or approximately 560

2    million of that balance is related to a receivable that LSGT

3    Gas has from EFH Corp.

4    Q    And do you know that that -- do you know independently

5    whether that is for money that was borrowed from LSGT Gas Co

6    by EFH, is that what that is, if you know?

7    A    I don't know the specific origin.  I believe part of it

8    comes from a money pool and part of it may come from

9    promissory notes, historical promissory notes.

10   Q    And does this chart, or does this table also show that

11   LSGT in turn owes money to other asbestos debtors?

12   A    You couldn't see this from this specific chart, because

13   it's an asset representation, but I do know and I believe

14   that as part of the Horton demonstrative, you can see that

15   the assets, that certain of the other LSGT Gas entities or

16   LSGT asbestos entities have on their balance sheet as

17   intercompany assets are effectively receivables, that those

18   entities have against LSGT Gas Company.

19   Q    Okay.  And if we look at page 18, which is the next

20   page, and we look at those entities, those four specific

21   asbestos debtor entities, that being EECI, LSGT Gas Co, EECI

22   Holdings, Inc. and LSGT SacRock, Inc., do you see that they

23   have zero balances?

24   A    That's correct.

25   Q    And why is that?  Is that because everything is at the

1    parent?

2    A    We excluded the -- certain of the categories on the

3    previous page that had balance, for instance, the tax assets

4    which we don't believe are going to have value in the

5    liquidation, in addition the intercompany and investment

6    assets that I believe I've explained.

7        That with respect to the investments line, that's

8    simply a bookkeeping entity -- I'm sorry, a bookkeeping

9    entry that is not expected to have value in a liquidation.

10       The intercompany assets are left pocket/right pocket

11   among the EFH debtors, we chose to exclude those because

12   they do not enhance the value to EFH debtors, insomuch as

13   they're able to reach beyond the EFH debtors and pull value

14   in in a liquidation.

15   Q    And if we look at your executive summary report on page

16   13, and we see Class A13 EFH Debtor intercompany claims,

17   they get zeroes, that's on intercompany loans; is that

18   correct?

19   A    It's zero because they were excluded in the

20   denominator, they did not have a value in the denominator.

21   To the extent that they were added to the denominator for

22   EFH Corp, for instance, for the $560 million, that would

23   have the impact of reducing the recoveries to all of the EFH

24   creditors that I believe the back of the envelope math that

25   I did is that recoveries would go from approximately 10

1    percent down to 7 and a half percent if that had been

2    included in the denominator.

3    Q    Okay.  And then if we look at the liquidation analysis

4    support the EFH waterfall summary on page 23, again we see

5    that that -- those intercompany claims that turns out to be

6    zero; is that correct, Class 13, A13?

7    A    Zero insomuch as they had been excluded, yes.

8    Q    So why doesn't LSGT get the same percentage recovery

9    from EFH as the other unsecured creditors of EFH if you

10   know?

11   A    Well, again the way I had looked at intercompany is

12   intercompany is I think an important point when the

13   intercompanies go across the various debtors.  In this

14   particular case, the intercompany claims across the debtors,

15   and again when I say across the debtors, I'm referring to

16   going into the T-side debtors or going into the EFIH have

17   all been settled.

18       And so therefore, the intra EFH intercompany claims

19   just shift money left to right.  If I had included the $560

20   million intercompany claim that EFH Corp owes E&S which is

21   LSGT Gas, the blended recoveries would go down to about 7

22   and a half percent, that $560 million would receive $40

23   million of recovery on a routable basis, which is still far

24   less than what it's receiving as part of a reinstated note.

25   Q    So you treat the claims against the asbestos debtors as

1    though they're claims against EFH, is that a fair statement?

2    A    Can you repeat that question?

3    Q    Yes.  Do you treat the claims, intercompany claims that

4    are against the asbestos debtors as though they're claims

5    against EFH?

6    A    I'm not sure I'm following that particular question.

7    Q    Well, in looking at how -- at your liquidation analysis

8    it appears that you looked at those claims and treated them,

9    pursuant to this settlement arrangement that you mentioned,

10   and said that those claims would be treated as if they were

11   consolidated, as I understand it.  On a consolidated basis;

12   isn't that right?

13   A    We've excluded the intercompany claims within the EFH

14   debtors.

15   Q    Now, your report indicates a note that says "the

16   intercompany balance are eliminated because they are

17   settled."  That's at your declaration on paragraph 19, yeah,

18   I believe at page 19.  Or I'm sorry, your declaration at

19   paragraph 19, if you would look at that please.

20        You say "For EFH debtors, recovery of the amounts owed

21   --"

22   A    I'm sorry, which paragraph did you say?

23   Q    Paragraph 19, page 5 of your declaration.

24   A    Okay.  Thank you.

25   Q    Let me know when you're there.

1    A     I'm there.

2    Q     "For EFH debtors, recovery of the amounts owed to

3    certain debtors and non-debtors was eliminated along with

4    intercompany claims because a) prepayment agreement

5    intercompany claims had been settled, and b) the transfer of

6    EFH corporate services to TCEH eliminated the majority of

7    the remaining EFH debtor.  The EFH debtor post settlement

8    agreement intercompany claims."  Is that your understanding?

9    A     That's my understanding with respect to the claims that

10   went across the debtors with respect to the claims again

11   that went and among the EFH debtors, we excluded them

12   because they were not additive to the overall recovery.

13   Q     Do you have an understanding of the value of the

14   intercompany obligations as was highlighted during your

15   direct examination?  There was some testimony about $2.7

16   billion and how that was inaccurate, and how there's

17   actually a much lower number, and I believe you may have

18   testified to the $560 million number, are you familiar with

19   that number?

20   A     I'm familiar with that number.

21   Q     Okay.  And are you familiar with what the present value

22   or what the value of that will be as of the effective date

23   of the plan, do you have that information?

24   A     My testimony would be similar to Mr. Keglevic's and Mr.

25   Horton's in that I understand there to be some interest

1   calculated on that, so it is north of the 560, by how much I

2   don't know.

3   Q    And so you haven't ran those calculations?

4   A    I have not.

5        MR. HOGAN:  No further questions, thank you.

6        Oh, Your Honor, if I could I would like to admit a

7   few items into evidence if I could.  That would be AX-114

8   and AX-116.

9        THE COURT:  Any objection?

10       MR. STEPHANY:  No objection, Your Honor.

11       THE COURT:  They're admitted.

12       (Asbestos Objectors' Exhibit Nos. AX-114 and 116 were

13   admitted)

14       MR. HOGAN:  May I approach and give them to your

15   staff?

16       THE COURT:  Yes, please, thank you.

17       Redirect?

18       MR. STEPHANY:  Very briefly, Your Honor.

19       THE COURT:  Okay.

20                    REDIRECT EXAMINATION

21   BY MR. STEPHANY:

22   Q    Again for the record Bryan Stephany, Kirkland & Ellis

23   on behalf of the debtors.

24       Mr. Stuart, Mr. Hogan asked you whether you conducted a

25   separate liquidation analysis for each debtor, and I believe

1    you said that you did; is that correct?

2    A    That's correct.

3    Q    For each of those analyses, for the LSGT debtors, do

4    they each satisfy the best interests of creditors?

5    A    I believe they do, yes.

6    Q    You were also asked questions about the intercompany

7    receivables for the LSGT debtors.  And you mentioned the

8    impact if you accounted for the one intercompany receivable

9    that goes outside of those four LSGT debtors, the 560.

10        If you ascribe value to that 560 million, would the

11   treatment of the LSGT debtors still satisfy the best

12   interest of creditors' test?

13   A    Yeah, and I believe my testimony, I took that into

14   account when deciding to exclude the intercompany balances.

15   Ultimately if you added the 560 into the denominator of the

16   EFH Corp waterfall, it would have the impact of increasing

17   the claims by approximately 560 from 1.5 to over 2 billion.

18        That would have the result, impact of taking the

19   recoveries from 10 percent down to 7 and a half percent,

20   proximately the impact of that 7 and a half percent on the

21   560 would -- that $560 million intercompany claim would

22   receive approximately 40 million, which again is far less

23   than the value received as part of a reinstated intercompany

24   note.

25             MR. STEPHANY:  Thank you.  That's all I have.

1          THE COURT:  Thank you.  You may step down.

2          MR. ESSER:  Good afternoon, Your Honor.  Mike

3     Esser, Kirkland & Ellis for the debtors.

4          At this point, Your Honor, we'd like to move a few

5     items from the December 5, 2016 motion to dismiss hearing

6     into the record here.

7          In accordance with paragraph 3 of the initial

8     pretrial order, DI 10766, the debtors and the asbestos

9     objectors have worked cooperatively to designate portions of

10    that record, in an effort to streamline the evidentiary

11    presentation here.

12         I'm pleased to report that through diligent

13    efforts, the debtors and the asbestos objectors reached

14    agreement on the contents of a joint record designation

15    yesterday.

16         Your Honor, if I may approach, I have binders and

17    green sheets for the Court and your staff.

18         THE COURT:  All right.  Thank you.

19         MR. ESSER:  Your Honor, the final agreed upon

20    record designations include the following materials from the

21    record, from the December 5th, 2016 hearing.

22         Designated portions of the hearing transcript

23    itself, designations of the asbestos objectors are in

24    yellow, designations of the debtors are in blue.  The

25    written directs of Tony Horton, Chris Mullivan and Mike

1   Hunter.  Mr. Horton's demonstratives, deposition

2   designations and exhibits admitted into evidence.

3            One point on that, given that we're incorporating

4   exhibits from another hearing which had their own DX numbers

5   from that hearing we worked with the asbestos objectors to

6   identify those exhibits in the easiest way possible, to

7   avoid any confusion, we decided to identify those exhibits

8   with the DX number reference applicable to this hearing.

9            So at the exhibits tab of your binder, we have

10  provided a chart that lists the exhibits admitted at the

11  prior hearing, their prior DX number and the corresponding

12  DX number applicable to this hearing.

13           Your Honor, there is a green sheet tucked into the

14  sleeve of the designation binder, and at this point I will

15  read each item into the record and move for their admission.

16           THE COURT:  Okay.

17           MR. ESSER:  Your Honor, we move for the admission

18  of the written D DREX, D DIIR -- DIR Horton, D DIR Hunter,

19  and D DIR Mullivan all submitted in connection with the LSGT

20  motion to dismiss hearing.

21           THE COURT:  Okay.

22           MR. HOGAN:  No objection.

23           THE COURT:  It's admitted.

24       (Debtors' Exhibit Nos. DIR Horton, Hunter and Mullivan

25  were admitted)

1           MR. ESSER:  Your Honor, we ask that you accept

2    into the record for demonstrative purposes, the

3    demonstratives, D DEM-Horton 1 and D DEM-Horton 2 submitted

4    in connection with the LSGT motion to dismiss hearing.

5           MR. HOGAN:  Your Honor, we've already stipulated

6    to all of this so I wouldn't have a basis for an objection

7    to any of these.

8           THE COURT:  All right.  Very good, so they're part

9    of the record.

10      (Debtors' Exhibit Nos. DEM-Horton 1 and DEM-Horton 2

11   were admitted)

12          MR. ESSER:  Okay.  Your Honor, we also move for

13   the admission of the following DX numbers.  These DX numbers

14   refer to exhibits submitted in support of this confirmation

15   hearing.

16          DX-026, DX-029, DX-068, DX-100, DX-103, DX-104,

17   DX-125, DX-243, DX-244, DX-245, DX-246, DX-247, DX-248, DX-

18   258, DX-285, DX-292, DX-298, DX-384, DX-384, DX-386, DX-387,

19   DX-388, DX-407, DX-433, DX-529, DX-674 and DX-675.

20          THE COURT:  They're admitted.

21      (Debtors' Exhibit Nos. DX-026, 29, 068, 100, 103, 104,

22   125, 243, 244, 245, 246, 247, 248, 258, 285, 292, 298, 384,

23   384, 386, 387, 388, 407, 433, 529, 674, and 675 were

24   admitted)

25          MR. ESSER:  And, Your Honor, we ask that you take

Page 179

1    judicial notice of the following filings, again these DX

2    numbers refer to exhibits submitted in support of claim

3    confirmation.  DX-020, DX-054, DX-055, DX-057, DX-071, DX-

4    072, DX-082, and DX-090.

5            THE COURT:  Court takes judicial notice of those

6    documents.

7            MR. ESSER:  Finally, Your Honor, we ask that you

8    accept into the record the agreed designations from the

9    following transcripts.  The December 5, 2016 hearing

10   transcript itself, the September 28, 2015 Stacey Dore

11   deposition transcript, the September 25, 2015 Donald Evans

12   deposition transcript, the October 25, 2016 Mark Hickson

13   deposition transcript, the October 18, 2016 Anthony Horton

14   deposition transcript, the October 19, 2016 Mike Hunter

15   deposition transcript, the October 1, 2015 Paul Keglevic

16   deposition transcript, the October 13, 2016 Paul Keglevic

17   deposition transcript, the October 18, 2016 Christopher

18   Mullivan deposition transcript, the September 30, 2015 Billy

19   Williamson deposition transcript, and finally the October

20   19, 2016 Andy Wright deposition transcript.

21           THE COURT:  Okay.

22           MR. ESSER:  Specifically the designated portions

23   of those transcripts, Your Honor.

24           THE COURT:  All right.  Those designated portions

25   of the transcripts identified are admitted into the record.

1          MS. ESAYIAN:  Thank you, Your Honor.  With that, I

2     cede the podium to my partner, Mark McKane.

3          THE COURT:  All right.

4     (Pause)

5          MR. HOGAN:  Your Honor, I just ask the Court to

6     take judicial notice of the asbestos objectors Exhibits AX-

7     001 and I won't read every number between 001 and the end of

8     it, but just so the Court has clarity through AX-059, those

9     are all docket entries, okay.

10          Then AX-60 through 63 which are again judicial

11     notice, Moody's Public Utility Manual in two instances, and

12     then two 10K's.

13          And then finally, Your Honor, AX-64 through AX-72

14     which are the proof of claims that have been filed by my

15     clients.  And then finally AX-63, which is a Market News

16     article on energy futures historic news.  Thank you, Your

17     Honor.

18          THE COURT:  Very good, the Court takes judicial

19     notice of those documents.

20          MS. NYHAM:  Good afternoon, Your Honor, Morgan

21     Nyham from Nixon Kennedy on behalf of American Stock

22     Transfer the EFH indentured trustee.

23          THE COURT:  Yes.

24          MS. NYHAM:  At this time we're seeking to move a

25     series of exhibits into evidence.  We served a list of these

1    exhibits on all participating parties on Friday of last

2    week, and we've received no objection.

3              THE COURT:  Okay.

4              MS. NYHAM:  For the record the EFH indentured

5    trustee moves into evidence Exhibits AST 1 through 24 and

6    ask that they be admitted.

7              THE COURT:  Okay.  Do I have those somewhere?

8              MS. NYHAM:  I do and I provided a list to your

9    clerk, I have additional copies if anyone needs one?

10             THE COURT:  Any objection?

11        (No response)

12             THE COURT:  They're admitted.

13        (EFH Indentured Trustee Exhibit Nos. AST 1 through 24

14   were admitted)

15             MS. NYHAM:  Thank you.

16             MR. MCKANE:  Your Honor, for the record Mark

17   McKane of Kirkland & Ellis for the debtors.

18             That concludes I think what we attempted to

19   achieve for today.  What that means is we only have two

20   remaining witnesses, I believe identified by any parties,

21   and that would be Hickson on behalf of NextEra and then Mr.

22   Wright for EFH.  We are within 15 minutes of our internal

23   forecast of where we would be, so that's excellent news.

24             And so I think realistically we could finish

25   tomorrow and most likely before lunch.

1          THE COURT:  Okay.  Very good.  All right.  Let's

2    adjourn for the day then and we'll reconvene tomorrow at 10

3    a.m., and if you can be available at 9:30 just for what will

4    probably be an extremely brief meeting to make sure that

5    we're all lined up, and we'll talk about when closings

6    should be.  We'll do that tomorrow morning.

7          MR. MCKANE:  Very good, thank you, Your Honor.

8          THE COURT:  You're welcome.  We'll adjourn until

9    tomorrow.

10        (Proceedings recessed at 3:46 p.m., to reconvene at

11   10:00 a.m., February 16, 2017)

12                         * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 183

1                          I N D E X

2

3    WITNESSES              EXAM BY                    PAGE

4    Paul Keglevic          Mr. McKane                  10

5                           Mr. Hogan                   14

6                           Mr. McKane                  26

7                           Mr. Hogan                   29

8

9    Anthony Horton         Mr. McKane                  33

10                          Mr. Hogan                   55

11                          Mr. McKane                  75

12

13   Thomas Vasquez         Ms. Esayian                 84

14                          Mr. Hogan                  107

15

16   John Stuart            Mr. Stephany               158

17                          Mr. Hogan                  166

18                          Mr. Stephany               174

19

20

21

22

23

24

25

Page 184

1                    E X H I B I T S

2    PARTY              NO.                              EVID.

3    Debtors':

4    D-DIR_Keglevic                                        12

5    D-DIR_Ying                                            32

6    D-DIR Horton_R                                        36

7    D-DIR_Sullivan                                        82

8    D-DIR_Horton, Hunter, and Mullivan                  177

9    DEM-Horton 1 and DEM-Horton 2                       178

10

11   DX:  1, 12, 26, 29, 37, 38, 46, 47, 50, 63, 88,

12   109, 110, 111, 113, 114, 115, 116, 117, 118, 119,

13   123, 124, 125, 132, 133, 134, 135, 137, 152, 153,

14   154, 155, 156, 157, 173, 185, 187, 225, 490, 494,

15   504, 506, 513, 514, 542, 552, 553, 556, 557, 564,

16   569, 571, 573, 631, 670, and 679                     13

17

18   DX:  108, 120, 121, 122, 126, 127, 128, 129, 130,

19   131, 136, 138, 139, 140, 141, 142, 143, 144, 145,

20   146, 147, 148, 149, 150, 151, 158, 159, 160, 161,

21   162, 163, 164, 165, 166, 167, 168, 169, 170, 171,

22   172, 174, 175, 176, 177, 178, 179, 180, 181, 182,

23   183, 184, 186, 188, 224, 226, 228, 659, 660, 661,

24   662, 663, 664, and 681                               13

25

1    DX:  080, DX-459, 460, 461, 462, 463, 464, and 465      32

2

3    DX:  2, 4, 248, 298, 390, and 668                        53

4    DX:  244, 384                                            53

5

6    DX:  234, 235, 236, 238, 240, 241, 289, 290, 291,

7    293, 294, 295, 296, 304, 306, 344, 345, 348, 367,

8    370, 371, 372, 373, 374, 375, 376, 377, 378, 379,

9    370, 381, 382, 388, 402, 403, 404, 405, 418, 419,

10   420, 421, 422, 423, 424, 425, 426, 427, 428, 478,

11   479, 480, 481, 482, 483, 484, 485, 487, 488, 489,

12   491, 501, 505, 510, 511, 515, 516, 517, and 519         54

13

14   DX:  433, 435, and 436                                  107

15

16   DX:  22 and 51                                          166

17

18   DX:  026, 29, 068, 100, 103, 104, 125, 243, 244,

19   245, 246, 247, 248, 258, 285, 292, 298, 384, 384,

20   386, 387, 388, 407, 433, 529, 674, and 675              178

21

22   Asbestos Objectors':

23

24   AX:  54, 109, 110, and 111                              26

25

Page 186

1    AX:  117                                                  33

2

3    AX:  105, 113, and 115                                    79

4

5    AX:  76, 79, 80, 113, and 115                            158

6

7    AX:  114 and 116                                         174

8

9    EFH Indenture Trustee:

10   AST 1 through 24                                         181

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3     We, Dawn South and Sheila Orms, certify that the foregoing

4     transcript is a true and accurate record of the proceedings.

5     **Dawn South**
      Digitally signed by Dawn South
      DN: cn=Dawn South, o, ou,
      email=digital1@veritext.com, c=US
6     _____
      Date: 2017.02.17 12:28:45 -05'00'

7     Dawn South

8     AAERT Certified Electronic Transcriber CET**D-408
      **Sheila Orms**
      Digitally signed by Sheila Orms
      DN: cn=Sheila Orms, o, ou,
      email=digital1@veritext.com, c=US
9     _____
      Date: 2017.02.17 12:29:24 -05'00'

10    Sheila Orms

11    Authorized Transcriptionist

12

13

14

      Date:  February 17, 2017

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501