# EXHIBIT 5

Page 1

1  UNITED STATES BANKRUPTCY COURT
2  DISTRICT OF DELAWARE
3
4
5  In re:                    :
                             :  Chapter 11
6  ENERGY FUTURE HOLDINGS CORP. :
   et al.,                   :  Case No. 14-10979 (CSS)
7                             :
       Debtors.              :  (Jointly Administered)
8  _____:
9
10              United States Bankruptcy Court
11              824 North Market Street
12              Wilmington, Delaware
13              February 16, 2017
14              10:7 a.m. - 4:25 p.m.
15
16
17
18
19
20
21  B E F O R E :
22  HON CHRISTOPHER J. SONTCHI
23  U.S. BANKRUPTCY JUDGE
24
25  ECRO OPERATOR:  LESLIE MURIN

Page 2

1  HEARING re Seventh Amended Joint Plan of Reorganization of
2  Energy Future Holdings Corp., et al., Pursuant to Chapter 11
3  of the Bankruptcy Code [Solicitation Version] [D.I. 10551;
4  filed January 4, 2017]
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by:  Sonya Ledanski Hyde

Page 3

1  A P P E A R A N C E S :
2
3  PACHULSKI STANG ZIEHL & JONES
4     Attorneys for Second Lien Indenture Trustee
5
6  BY:  LAURA DAVIS JONES
7
8  KRAMER LEVIN NAFTALIS & FRANKEL LLP
9     Attorneys for Second Lien Indenture Trustee
10
11 BY:  JOSHUA BRODY
12      GREGORY HOROWITZ
13
14 LANDIS RATH & COBB
15    Attorneys for NextEra Energy
16
17 BY:  MATTHEW B. MCGUIRE
18
19 CHADBOURNE & PARKE LLP
20    Attorney for NextEra Energy
21
22 BY:  ROBIN D. BALL
23      HOWARD SEIFE
24
25

Page 4

1  SULLIVAN & CROMWELL, LLP
2     Attorneys for Unsecured Creditors Committee
3
4  BY:  BRIAN GLUECKSTEIN
5
6  RICHARDS, LAYTON & FINGER, P.A.
7     Attorneys for the Debtor
8
9  BY:  DANIEL DEFRANCHESCHI
10      JASON M. MADRON
11
12 NIXON PEABODY
13    Attorneys for AST as EFH Indenture Trustee
14
15 BY:  RICHARD PEDONE
16
17 KIRKLAND & ELLIS LLP
18    Attorneys for the Debtors
19
20 BY:  JUSTIN SOWA
21     MARK MCKANE
22     MARC KIESELSTEIN
23     BRYAN M. STEPHANY
24     MARK MENZIES
25

Page 21

1  Q   And does that reflect -- did you reach an agreement
2  reflected in that amendment to further increase the price
3  that you were paying?
4  A   We did.  We increased the price from about 4.1 billion
5  to about 4.4 billion, as part of this amendment to this
6  merger agreement.
7  Q   And is that reflected in Section 2A of the merger -- of
8  the amendment?
9  A   Yes, it is.
10 Q   And how did that come about?  You had already reached
11 an agreement on the -- a merger agreement.  You'd reached an
12 agreement on price.  How did it come about that you'd
13 further increased the price at this juncture?
14 A   You know, I think, as I mentioned before, from the time
15 we submitted our bid on May 2nd, we had continual
16 negotiations with the company.  And the tone of those
17 negotiations with the company was always in interest in
18 having us provide more value to the estate.  So we went from
19 3.5 at the beginning of May to 3.8 in the middle of May,
20 signed a deal at 4.1 billion on July 29th.  Even after we
21 signed those agreements, the company continued to stress
22 importance for us to show additional value for the estate,
23 particularly leading up to the PSA and merger approval,
24 which was September 19 of 2016.
25 Q   And was one of the considerations that they raised with

Page 22

1  you the need to gain creditor's support for the plan?
2  A   Yes, they did.
3  Q   And was that an aspect of the rationale for increasing
4  the price at this juncture?
5  A   Yes.  In addition to discussions that we had with the
6  company from July 29th to September 19th, we also had
7  discussions with Fidelity.  And, similar to the interests of
8  the company, Fidelity had an interest in us providing more
9  value, an interest in NextEra providing more value to the
10 estate.  And we thought it -- at the time, we thought it was
11 very important to get Fidelity on board and have them
12 support our transaction.  And so, the combination of the
13 discussion -- of discussions with EFH, as well as
14 discussions with Fidelity, were the primary reasons why we
15 increased our bid from 4.1 to 4.4 billion in the mid-
16 September timeframe.
17 Q   Mr. Hickson, I want to switch to a slightly -- to a
18 related topic, which is, you mentioned earlier that one of
19 the topics in the negotiations with the Debtors were -- it
20 was the asbestos liabilities.  Do you recall that?
21 A   Yes, I do.
22 Q   All right.  And there -- I want to ask you some
23 questions about the EFH subsidiaries that are sometimes
24 referred to as the LSGT debtors or the asbestos subs or
25 subsidiaries.  If I do that, will you understand that I'm

Page 23

1  referring to EFH's subsidiary, LSGT Gas Company, LLC, and
2  the three subsidiaries of LSGT Gas -- LSGT SACROC, Inc., HBC
3  Holdings, Inc., and EECI, Inc.?
4  A   Yes, I do.
5  Q   Okay.  And you understand those to be entities as to
6  (indiscernible) an issue as to legacy asbestos liabilities?
7  A   Yes, I do.
8  Q   Is NextEra itself assuming the asbestos liabilities
9  associated with those entities under the merger agreement?
10 A   No, we're not.  We are acquiring EFH through a merger,
11 and EFH prior to and post-merger will continue to have
12 ownership of the four asbestos subs.
13 Q   Was it a foregone conclusion from NextEra's perspective
14 that the four asbestos subs would actually be included in
15 the transaction?
16 A   No, not at all.  And, in fact, when we submitted our
17 proposals in May of 2016, we had an express intent not to
18 acquire any entities, other than EFH, EFIH, and its
19 subsidiaries, Oncor and Oncor Holdings.
20 Q   Okay.  And let's just look at that.  Can you look back
21 at Exhibit NX-13, which I believe you identified as your
22 original May 2, 2016 letter.
23 A   Yes.
24 Q   And can you look for me at the last page of that
25 document, the very last page?

Page 24

1  A   Page 18?
2  Q   That's correct.
3  A   Yes, I'm there.
4  Q   And 18 in the middle of the page.  And can you read for
5  me Paragraph 17 and tell me what is meant by that?
6  A   Yes.  This is an attachment to the bid letter that we
7  submitted.  It was Exhibit A and the exhibit was titled,
8  obligations to be included in any plan of reorganization
9  that we were to enter into with the company, with the
10 Debtors.  And Item 17 says: "The only subsidiary of the
11 reorganized EFH will be reorganized EFIH.  All other
12 subsidiaries of EFH shall be disposed of, wound down, or
13 liquidated."
14 Q   Was that provision intended to exclude the asbestos
15 subsidiaries from the transaction?
16 A   Yes, it was.
17 Q   How did the Debtors react to that aspect of the
18 proposal?
19 A   Not positively at all.  The Debtors, from the time we
20 submitted our subsequent proposal in the mid-May timeframe
21 where we increased our price to about 3.8 billion.  From the
22 mid-May time to the end of June, we had a number of
23 discussions with the Debtors where we repeatedly indicated
24 our desire not to have the asbestos subsidiaries be a part
25 of our transaction.  And in response to that, the Debtor