# EXHIBIT 6

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------ X
In re:                                             :   Chapter 11
                                                   :
Energy Future Holdings, Inc., *et al.*,            :   Case No. 14-10979 (CSS)
                                                   :
                Debtors.              :   (Jointly Administered)
                                                   :
------------------------------------------------------------ X

**DECLARATION OF MARK HICKSON IN SUPPORT OF CONFIRMATION
OF THE SEVENTH AMENDED JOINT PLAN OF REORGANIZATION**

Pursuant to 28 U.S.C. § 1746, I, Mark Hickson, hereby declare as follows under penalty of perjury:

1.  I make this declaration in support of the Debtors' Seventh Amended Joint Plan of Reorganization (the "Plan").

2.  I am Executive Vice President, Corporate Development, Strategy, Quality and Integration, of NextEra Energy, Inc. ("NEE").  I hold a bachelor's degree in Aerospace Engineering from Texas A&M, and a master's degree in Business from Columbia University.  I joined NEE in 2012; before that, I was employed as a Managing Director-Global Mergers & Acquisitions by Merrill Lynch & Co., Inc. in New York, New York.

3.  NEE is a leading clean-energy company with approximately 45,900 megawatts of generating capacity (which includes megawatts associated with NextEra Energy Partners, L.P. ("NEP"), NEE's publicly traded subsidiary) and approximately 14,700 employees in 30 states in the U.S. and four provinces in Canada as of year-end 2016.  NEE's principal subsidiaries are Florida Power & Light Company ("FPL"), which serves approximately 4.9 million customer accounts in Florida and is one of the largest rate-regulated electric utilities in the U.S., and NextEra Energy Resources, LLC, which, together with its affiliated entities, is the world's largest generator of renewable energy from the wind and sun.  In Texas, NextEra provides power generation and electricity services to residences and businesses; it owns Lone Star Transmission, a rate-regulated transmission utility, and Gexa, an electric retail provider with more than 150,000 customers.  In addition, through NEP, NEE provides natural gas transportation services in Texas.

4.  NEE is a publicly traded company listed on the New York Stock Exchange (NYSE:NEE).  As of December 31, 2016, NEE had a market capitalization of approximately $55.9 billion, and an enterprise value of approximately $86.4 billion.  NextEra is supported by a

strong balance sheet and possesses an Issuer Rating of 'Baa1' from Moody's and an Issuer Rating of 'A-' from both Standard & Poor's and Fitch.

5. I, along with NEE General Counsel Charles Sieving, led the negotiations for NEE with the Debtors that resulted in the July 29, 2016 Agreement and Plan of Merger by and among NEE, EFH Merger Co., LLC, Energy Future Intermediate Holding Company LLC and Energy Future Holdings Corp. (the "Merger Agreement"),[1] the September 18, 2016 Amendment No. 1 to the Merger Agreement ("Amendment No. 1"),[2] the September 19, 2016 Amended and Restated Plan Support Agreement ("PSA"),[3] and the December 1, 2016 Limited Forbearance Agreement ("Forbearance Agreement").[4] I, along with our legal and financial advisors, was intimately involved in negotiating the transaction.

6. Those negotiations were time-consuming and arm's-length, and included spirited negotiations concerning not only price-related terms, but a host of other terms and conditions. Further, the Debtors advised us throughout negotiations that we were not the only bidder; indeed, even after we entered into the Merger Agreement, in view of that Agreement's "fiduciary out" provision, NEE understood that there remained the risk of other competing bids. Moreover, not only were the negotiations with the Debtors arm's-length, but the price negotiated was not controlled by any agreement between NEE or its affiliates and any potential bidders, nor was the price reduced or suppressed in any manner by any arrangement involving NEE or its affiliates and any of the Debtors' creditors. To the contrary, the Debtors' creditors at every turn pushed NEE to deliver more value.

---

[1] See NX001 (Merger Agreement and Exhibit E thereto).

[2] See NX002 (Amendment No. 1).

[3] See NX054 (PSA).

[4] See NX057 at EFH06582576 (Limited Forbearance Agreement).

3

7. NEE first publicly expressed interest in entering into a transaction with the Debtors to acquire their interest in Oncor Electric Delivery Company LLC ("Oncor") in June 2014. Our initial efforts to negotiate a deal with the Debtors failed. The Debtors suspended negotiations with NEE in 2014 to pursue an auction process. NEE participated in that process, but the Debtors placed the ensuing negotiations with NEE on hold for almost two months while the Debtors pursued an alternative transaction with certain TCEH creditors. In June 2015, after the Debtors reengaged with NEE, the parties could not agree on a purchase price.[5] Debtors subsequently entered into an agreement with Ovation Acquisition I, LLC and Ovation Acquisition II, LLC.

8. After that transaction failed to receive regulatory approval acceptable to the participants, the Debtors and NEE began the negotiations which led to the Merger Agreement. On May 2, 2016, NEE submitted a new bid letter, offering to pay $3.5 billion in cash and stock, and to refinance the $5.4 billion EFIH first lien debtor-in-possession financing facility upon closing.[6] EFH representatives contacted us, stating that the $8.9 billion offered was inadequate. On May 18, 2016, NEE submitted a revised bid letter, increasing the cash/stock component of the consideration by $281 million to $3.781 billion.[7] The parties embarked on further negotiations, exchanging a series of draft merger agreements which reflect further give and take

---

[5] Market conditions had shifted, so that NEE could not maintain its bid at the same value, and Debtors were unwilling to proceed based on the reduced bid amount.

[6] See NX013 (Letter of May 2, 2016, from NEE CEO J. Robo to EFH President and CEO J. Young, enclosing proposed Term Sheet). NEE further offered to advance $2.0 billion of the $3.5 billion immediately (with Bankruptcy Court approval) through a second lien debtor-in-possession financing facility, which facility would also be refinanced at closing.

[7] See NX014 (Letter of May 18, 2016, from NEE CEO J. Robo to EFH President and CEO J. Young, enclosing proposed Term Sheet).

on pricing-related and other terms.[8] In the July 29, 2016 Merger Agreement, the cash/stock portion of the consideration package had increased to $4.096 billion.[9]

9. Other price-related terms that were the subject of substantial negotiations included, among other things: the possible need to increase the amount of the first lien DIP financing, and allocation of the fees and costs of such refinancing, with the parties ultimately agreeing on a cost-sharing arrangement; responsibility for interest accruing after a future date (sometimes referred to as a "ticking fee"), with the parties eventually agreeing that, if the only condition to closing not satisfied or waived as of January 1, 2017, was the PUCT approval requirement, NEE would pay 50% of interest accruing thereafter on the DIP Facility and EFIH Second Lien Notes; and the treatment of asbestos liabilities and possible insurance for those liabilities (discussed further below).[10]

10. The treatment of the asbestos liabilities associated with the four "asbestos subsidiaries," LSGT Gas Co., LLC, LSGT SACROC, Inc., EEC Holdings, Inc., and EECI, Inc., was a heavily negotiated issue. NEE's May 2016 bid letters proposed to exclude the asbestos subsidiaries from the transaction.[11] In ensuing drafts, Debtors pushed for inclusion of the asbestos subsidiaries among the assets NEE was to acquire. NEE continued to push for exclusion. However, due to Debtors' continued insistence that inclusion was necessary as a result of Debtors agreement in the November 23, 2015 "Committee Settlement" to provisions

---

[8] *See* NX015-NX050 (email communications among NEE, EFH, and their respective advisors reflecting merger agreement negotiations).

[9] *See* NX001 at 15, § 1.7(a) (Merger Agreement).

[10] *See* NX001 at 15-16, § 1.7(a) (Merger Agreement); NX038 at NEE_0042508-09 (Email of July 27, 2016, from K&E's J. Pitts to C&P and NEE, and attached redline to draft Merger Agreement); NX046 at NEE_0013803-04 and NEE_0013844-45 (Email of July 28, 2016, from K&E's J. Pitts to C&P and NEE, and attached redline to draft Merger Agreement).

[11] *See* NX013 at NEE_0033230 and NX014 at NEE_06337352 (providing that "[a]ll other subsidiaries of EFH shall be disposed of, wound down or liquidated").

requiring that the asbestos liabilities would "ride through" the bankruptcy, NEE reluctantly indicated that it would conduct diligence on the issue. Eventually, in the Merger Agreement (and after substantial diligence), NEE agreed to inclusion of the asbestos subsidiaries, but required that $250 million of the cash/stock component of the consideration be placed in escrow for use in payment of asbestos claims (subject to modification if it proved possible to purchase insurance coverage acceptable to NEE, as set forth in the Merger Agreement); based on our review of diligence materials and discussions with counsel and their consultants through July, we concluded that $250 million likely was a conservative level for this escrow, but appropriate under the circumstances.[12]

11.     After the Merger Agreement was signed in July, Debtors continued to work to increase amounts available to pay creditors. In conjunction with a plan support agreement with Fidelity, on September 18, 2016 in Amendment No. 1, NEE agreed to increase the purchase price by an additional $300 million, for a total of $4.396 billion, which, together with the refinancing of the $5.4 billion EFIH first lien DIP facility, increased NEE's offer to $9.796 billion.[13] In addition, the Debtors provided further information, particularly a new analysis performed by actuaries at Aon Risk Solutions,[14] which persuaded us that the escrowed amount reasonably could be lowered to $100 million, and we agreed to this adjustment in Amendment No. 1, thereby making an additional $150 million available for distribution to creditors.[15]

---

[12]   See NX001 at 17, § 1.7(c) (Merger Agreement).

[13]   See NX002 at 1, § 2.A (Amendment No. 1).

[14]   See NX051 (Email of August 11, 2016, from EFH's A. Horton to NEE's M. Hickson and attached Aon Risk Solutions report titled "Estimation of EECI, Inc. Asbestos Liabilities").

[15]   See NX002 at ¶ 2(B) (Amendment No. 1).

12. The agreements between the Debtors and NEE related to the EFIH First Liens' and Second Liens' "makewhole" claims also reflect the good-faith, arms'-length nature of the parties' dealings.

13. When NEE entered into the Merger Agreement, the makewhole claims had been disallowed by this Court in a decision affirmed by the District Court, and the First Liens' and Second Liens' appeal was pending before the Third Circuit. In negotiations with the Debtors, NEE originally sought to include a condition to effectiveness of the Plan (and therefore to closing) requiring that the decision disallowing the makewhole claims be final and non-appealable.[16] Ultimately, however, as a result of negotiations with the Debtors, this condition was revised so that it required only that the EFIH First Lien and Second Lien makewhole claims remain Disallowed Makewhole Claims as of the Plan Effective date.[17] The claims would remain Disallowed Makewhole Claims if this Court's disallowance order had not been stayed, reversed, or remanded on appeal.[18] Consequently, while the claims remained pending before the Third Circuit, this condition was satisfied. In the event that all other conditions to closing (including conditions to Plan effectiveness) had been satisfied or waived, then NEE would have been obligated to close, notwithstanding the pendency of the appeal and the possibility that the claims could later be allowed. Further, the Plan at that juncture (the Fourth Amended Plan) contemplated that the First Lien Makewhole Claims and the Second Lien Makewhole Claims would be paid in full, in cash, if they were allowed pursuant to a final,

---

[16] *See, e.g.*, NX018 at NEE_0036720, Article I.A., ¶ 62 (Email of June 10, 2016, from C&P's A. Rosenblatt to K&E, and attached redline to draft plan).

[17] *See* NX003 (Fourth Amended Plan) at 109, Art. IX.D.10 (conditions precedent to EFH Effective Date); *id.* at 9, Art. I.A.67 (definition of "Disallowed Makewhole Claim").

[18] *Id.*

non-appealable order (either before or after the Effective Date).[19] If these claims were finally allowed after the Effective Date, they would have become obligations of Reorganized EFIH (then owned by NEE).

14.     On the other hand, the Fourth Amended Plan contemplated that, if the Third Circuit were to reverse this Court's order before the Plan effective date, NEE would have no obligation to close. NEE (and only NEE) had the right to waive this condition to Plan effectiveness and closing.[20] If, NEE were to waive these conditions, then the First Lien and Second Lien claims would be obligations of EFIH (rather than Reorganized EFIH) and would be paid in the same manner as other First Lien and Second Lien claims against EFIH, with the notable exception that the recoveries of Class B6 (*i.e.*, EFIH's unsecured PIK noteholders) would not be reduced.[21]

15.     On November 17, 2016, as the parties were preparing for a confirmation hearing scheduled to begin December 1, 2016, the Third Circuit issued a decision reversing this Court's order disallowing the makewhole claims, so that they were no longer Disallowed Makewhole Claims. Thus, a condition precedent to the ultimate effectiveness of the Plan could not be satisfied.

16.     NEE declined requests that it waive this condition precedent, but immediately entered into negotiations with the Debtors regarding potential amendments to the Plan that would

---

[19] *See* NX003 (Fourth Amended Plan) at 58-59, Art. III.B.19(b)(iv) and (c) (Class B3 - EFIH First Lien Note Claims); *id.* at 59-60, Art. III.B.20(b)(iv) and (c) (Class B4 - EFIH Second Lien Note Claims). PIK makewhole claims, in contrast, simply were not allowed and were discharged under the Plan. *See id.* at 60, Art. III.B.22(b)(iv). This treatment of the PIK makewhole claims continues in the current Seventh Amended Plan. *See* NX055 at Art. III.B.22(b) (Seventh Amended Plan).

[20] *See* NX003 (Fourth Amended Plan) at 109-110, Art. IX.E (Waiver of Conditions).

[21] *See* NX003 (Fourth Amended Plan) at 89 n.3, Art. VI.A.

allow the transaction to move forward. Debtors sought and obtained an adjournment of the scheduled confirmation hearing in order to negotiate a resolution of the Plan's treatment of the makewhole claims that would permit the transaction to proceed. NEE rebuffed requests from Debtors and the PIKs that it increase its purchase price. But despite the adverse economic impact of the presidential election on utilities and of rising interest rates, NEE continued to be committed to the transaction, and entered into the Limited Forbearance Agreement with the Debtors, agreeing to forbear from exercising its right to terminate the transaction if the Plan was not confirmed by December 15, 2016 (which termination would have resulted in the $275 million termination fee being payable to NEE) until February 22, 2017 (subject to certain interim milestones, such as Disclosure Statement approval, being met).[22] The Debtors and NEE agreed to a revised Plan (the Fifth Amended Plan, filed with the Court on December 1, 2016).[23] Under the revised Plan, responsibility for the makewhole claims rests with unsecured creditors of EFH and EFIH, and Reorganized EFIH in no event has any liability for the makewhole claims (regardless of the timing of the ultimate allowance).[24] These features continue through to the Seventh Amended Plan now before the Court (the terms of which NEE has approved).[25]

17.     The release contained in the Plan is of critical importance to NEE. NEE insisted on such a release throughout the negotiation process. The existing terms of the release are the product of careful negotiation. In short, NEE views approval of the existing releases to be essential.

---

[22] *See* NX057 (EFH06582576) (Limited Forbearance Agreement), §§ 1 and 2. The agreement initially specified that the period would end February 15, instead of February 22, 2017, but that date was amended when the Court scheduled the confirmation hearing to begin on February 14, 2017. *See* NX058 (EFH06582573) (email chain documenting amendment).

[23] NX057 at EFH06582582-707 (Fifth Amended Plan).

[24] NX057 at EFF06582673, Art. VI.A (Fifth Amended Plan).

[25] NX055 at Art. VI.A (Seventh Amended Plan).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 11th day of February, 2017

_____
Mark Hickson

10