# EXHIBIT 7

Page 1

1  UNITED STATES BANKRUPTCY COURT
2  DISTRICT OF DELAWARE
3
4  In re:                        :
                                 :  Chapter 11
5  ENERGY FUTURE HOLDINGS        :
   CORP., et al.,                :  Case No. 14-10979(CSS)
6                                :
       Debtors.                  :  (Jointly Administered)
7  _____ :
8
9
10
11
12         United States Bankruptcy Court
13         824 North Market Street
14         Wilmington, Delaware
15
16         February 17, 2017
17         10:08 AM to 11:25 AM
18
19
20
21  B E F O R E :
22  HON CHRISTOPHER S. SONTCEHI
23  U.S. BANKRUPTCY JUDGE
24
25  ECR OPERATOR:  LESLIE MURIN

Page 2

1  HEARING re E-Side Confirmation
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by:  Sheila Orms and Jamie Gallagher

Page 3

1  A P P E A R A N C E S :
2  KIRKLAND & ELLIS LLP
3      Attorney for the Debtors
4      300 North LaSalle
5      Chicago, IL 60654
6
7  BY:  CHAD HUSNICK, ESQ.
8
9  KIRKLAND & ELLIS LLP
10     Attorney for the Debtors
11     555 California Street
12     San Francisco, CA 94104
13
14 BY:  MARK MCKANE, ESQ.
15
16 KIRKLAND & ELLIS LLP
17     Attorney for the Debtors
18     601 Lexington Ave
19     New York, NY 10022
20
21 BY:  APARNA YENAMANDRA, ESQ.
22
23
24
25

Page 4

1  POTTER ANDERSON CARROON LLP
2      Attorney for Deutsche Bank New York
3      1313 North Market Street
4      6th Floor
5      Wilmington, DE 19801
6
7  BY:  R. STEPHEN MCNEILL, ESQ.
8
9  PACHULSKI STANG ZIEHL & JONES LLP
10     Attorney for EFIH Second Lien Noteholder
11     919 North Market Street
12     17th Floor
13     Wilmington, DE 19801
14
15 BY:  LAURA DAVIS JONES, ESQ.
16
17 SULLIVAN & CROMWELL LLP
18     Attorney for E-Side Committee
19     125 Broad Street
20     New York, NY 10004
21
22 BY:  VERONICA IP, ESQ.
23     BRIAN GLUECKSTEIN, ESQ.
24
25

Page 17

 1  reserve and everything goes in the interim, we too believe
 2  that that is adequate to satisfy the indubitable equivalent
 3  standard as of now.  Thank you, Your Honor.
 4         THE COURT:  Thank you.  Mr. Anker, any further
 5  comment related to that?
 6     (No response)
 7         THE COURT:  Mr. Alberino?
 8         MR. ALBERINO:  Good morning, Your Honor, Scott
 9  Alberino from Akin Gump on behalf of UMB.
10         Your Honor, very brief comments.  As Mr. Anker
11  said, the PIK holders that signed onto the plan support with
12  the company, we hold approximately 70 percent of the PIK,
13  are prepared to release signatures as well, alongside Mr.
14  Anker's clients on the settlement.
15         So we expect to be back here on March 28th and
16  hopefully get the settlement approved.
17         THE COURT:  Okay.  Excellent, thank you.
18         Well, let me turn then to rulings on the
19  objections to confirmation that remain outstanding.  So as a
20  preliminary comment, the first and second lien classes I
21  believe the votes that are still in play are votes to reject
22  the plan.
23         So the Court is required to make a finding for
24  confirmation that the cram down provisions are satisfied
25  with regard to those two claims, two classes.

Page 18

 1         So based on the settlement of the plan objections,
 2  which is then based on the settlement/preservation of
 3  rights, so we'll either have a settlement of the first and
 4  second liens that will be approved by the Court, or we'll
 5  have a trial over what the reserve is.  And all rights are
 6  specifically and expressly reserved in connection with
 7  whatever trial that will be.
 8         And NextEra and the plan proponents, NextEra, the
 9  debtors, the 1L's, the 2L's have agreed that they -- and the
10  PIKs that whatever the Court ultimately rules, if required
11  to rule on what the reserves should be, will be binding.  I
12  find that the plan as proposed satisfies the indubitable
13  equivalent standard, and as a result, is fair and equitable
14  to the 1L's and 2L's and the cram down standard is met.  And
15  that that is based on both -- is based on the settlement of
16  the plan objections which in turn is based on the settlement
17  of the claims, which in turn is based on a preservation, a
18  full preservation of the ability to litigate what the
19  appropriate reserve will be in the case that settlements are
20  not ultimately approved or agreed to.
21         So we'll get that out of the way.  That leaves the
22  objections of the Office of the U.S. Trustee and the
23  asbestos debtors.  I'd like to deal with the Office of the
24  U.S. Trustee objection first, it's frankly simpler, easier
25  to deal with.

Page 19

 1         So the objection there is to the payment of the
 2  attorney's fees and expenses of the EFH indentured trustee
 3  represented by Mr. Padoni and his firm.  And the basis there
 4  has to deal with really I think what standard will govern
 5  those payments.  And importantly the payment of those fees
 6  is not coming out of the charging lien, as it is with the
 7  EFIH unsecured indentured trustee payments.
 8         It is coming separate from whatever payment those
 9  creditors are going to receive under the waterfall under the
10  plan, which is approximately ten cents on the dollar, give
11  or take is my understanding.
12         So the -- a variety of legal theories have been
13  presented to the Court to justify those payments.  The
14  debtors rely on 363(b), and say this is an exercise of the
15  debtor's business judgment to use property outside the
16  ordinary course of business, to make these payments really
17  relying on the fact that this is a settlement of both
18  reaching back to December 2015, as well as a recent
19  settlement, I guess, although not technically approved under
20  9019 of objections or potential objections to this plan.
21         The other way it's been put forward is forgetting
22  that, that the indentured trustee has -- and its lawyers
23  have provided a substantial contribution to the progress of
24  these estates, and thus are entitled to an administrative
25  claim for that substantial contribution under 503.

Page 20

 1         The other theories are that 503(b)(1) is satisfied
 2  because the existence of an indentured trustee and their
 3  lawyers in this instance was an actual and necessary expense
 4  of the debtor's case.
 5         So where I come down on this is not to reject the
 6  arguments under 363, or the actual and necessary argument,
 7  but to avoid making a decision on the 363 and the actual and
 8  necessary argument.  Because I find that based on my
 9  experience in the case, as well as the specific record that
10  was not challenged and not an overly thick record, but a
11  record as to substantial contribution that was not
12  specifically challenged by the Office of the U.S. Trustee.
13         ==Like I found with the last plan that was confirmed==
14  ==in December of 2015, I believe that the indentured trustee==
15  ==for the EFH noteholders has provided a substantial==
16  ==contribution to the debtor's estate that would justify a==
17  ==payment of administrative expense claim for those fees and==
18  ==expenses.==
19         As I did previously, I'm not making a finding on
20  reasonableness.  The reasonableness of those fees will be
21  determined in the future by the Court after review by the
22  fee committee.
23         ==But the basis for the contribution I am finding==
24  ==exists.  And I've already found through December of 2015, so==
25  ==we're really focused on what happened in 2016 in this case.==

Page 21

1  ==And there was substantial litigation by the indentured==
2  ==trustee of a variety of issues.  Ultimately, that litigation==
3  ==led to I believe substantially led to an increase of==
4  ==distributable value to the estates of approximately $400==
5  ==million.==
6       That was and is a contribution to the debtor's
7  estate that is specifically came from the vetting of the
8  plan and the plan process and the PIK process that went on
9  in really starting in -- starting before May of 2016, but in
10 earnest from May 2016 all the way through September 2016.
11      And then, of course, clean-up afterwards, in
12 particular after the development of the make whole
13 litigation.
14      Now, the make whole litigation in November of 2016
15 and specifically the 3rd Circuit's ruling ultimately has led
16 to a situation where that distributable value will not inure
17 to the benefit of the EFH unsecured creditors.  And will
18 actually end up benefitting the -- maybe the second liens,
19 but most probably actually benefitting the PIK noteholders.
20      But that doesn't mean -- that's just the virtue of
21 ==the legal rulings and the waterfall.  That doesn't mean that==
22 ==there wasn't a contribution by the indentured trustee to the==
23 ==estate as a whole, although it ultimately is not going to==
24 ==inure -- unfortunately, to the benefit of those creditors.==
25      But that certainly isn't the fault of no one,

Page 22

1  other than the appellants who were successful with the 3rd
2  Circuit and the 3rd Circuit.  So the Court will, of course,
3  follow and is happy to follow the direction of the appellate
4  court in following up on the -- how this case has proceeded.
5       So I find there's a substantial contribution.  I
6  don't reject, but I ignore the alternative arguments,
7  because I don't want to make -- frankly make law one way or
8  the other on those arguments, I don't have to.
9       And as a result I'll overrule the objection,
10 solely on the basis that I find there's a substantial
11 contribution, the reasonableness of which will be determined
12 under the review procedures which will run through the fee
13 committee.
14      That leads the Court to the objection of the
15 asbestos objectors as they've become known, Ms. Benna
16 Goldman Stahee (ph) and oh, two other objectors who don't --
17 whose names and I apologize don't jump to my mind,
18 represented by Mr. Hogan.
19      MR. HOGAN:  Your Honor, Daniel Hogan on behalf of
20 Fanake Fahee Jones (ph) and Hinzman (ph).
21      THE COURT:  Thank you.
22      MR. HOGAN:  You're welcome.
23      THE COURT:  So Mr. Jones and Mr. Hinzman.
24      This is a serious issue and I think Mr. Husnick
25 (ph) who is a consummate professional misspoke in his

Page 23

1  opening argument when he said it was a minor issue or a
2  small issue.  I think what he meant is that when you look at
3  $42 billion of ultimate debt when we started and about $18
4  billion of big picture deal money if you include all that's
5  going on downstream at Encore, that we were talking about
6  claims that were running at $2 million a year including
7  attorney's fees pre-petition.
8       So the dollar figures are not driving this case.
9  However, they are significant.  They're significant to
10 NextEra.  If they weren't, they wouldn't be insisting on
11 reinstating only preserved claims, if they felt they were
12 insignificant, it would be neither here nor there.  So those
13 numbers are important.
14      More importantly, they are significant to the
15 persons who ultimately may have been injured by exposure to
16 asbestos by predecessors to the current debtors, for which
17 the debtors, now NextEra through the assumption and
18 reinstatement will be liable.
19      I had an experience very early in my career, I was
20 brand new at my law firm.  And some of the people, some of
21 the lawyers in my firm represented a defendant in numerous
22 asbestos suits, the firm that had made brake liners that
23 contained asbestos.
24      And I really never worked heavily on the case;
25 however, or the cases, however, I was tasked to attend a

Page 24

1  deposition of a mesothelioma victim and this occurred, it
2  was a videotape -- I don't know if it was videotaped
3  actually it may have been that long ago that it wasn't
4  videotaped but it was certainly recorded.
5       And it occurred in the living room of this
6  gentleman's home where he was on a hospital bed, on the
7  verge of death.  And about 20 lawyers crowded in to the
8  living room in order to attend this deposition.
9       And that has always stayed with me really
10 throughout my adult life to bring home the seriousness of
11 these issues.  These are real people, who have really been
12 injured.  And certainly some will die as a result of this
13 exposure of a very terrible, there are no unterrible cancers
14 I suppose, but a very terrible cancer if it's mesothelioma.
15 Other lung cancers and even if not developing cancer will
16 suffer the physical limitations of pleura thickening or
17 asbestosis, so I take it very, very seriously.
18      And I have taken it very seriously throughout the
19 cases.  But I have a limited role, it was not the Court's
20 decision or exercise of the Court's business judgment to
21 seek a bar date.  It's not the Court's exercise of my own
22 preferences or business judgment to seek to only reinstate
23 those claims that are properly preserved under the bar date.
24      My job in this context is to see what the debtor's
25 business judgment and the other parties involved in the