1   UNITED STATES BANKRUPTCY COURT
2   DISTRICT OF DELAWARE
3
4
5   In re:                          :
                                    :   Chapter 11
6   ENERGY FUTURE HOLDINGS CORP., :
    et al.,                         :   Case No. 14-10979 (CSS)
7                                   :
            Debtors.                :   (Jointly Administered)
8   _____:
                                    :
9   DELAWARE TRUST COMPANY, as      :
    TCEH First Lien Indenture       :
10  Trustee,                        :
                                    :
11          Plaintiff,              :
                                    :
12      v.                          :   Adv. Proc. No.
                                    :   15-51239 (CSS)
13  WILMINGTON TRUST, N.A., as      :
    First Lien Collateral Agent     :
14  And First Lien Administrative :
    Agent,                          :
15                                  :
            Defendants.             :
16                                  :
                                    :
17  MORGAN STANLEY CAPITAL GROUP    :
    INC., J. ARON & COMPANY, and    :
18  TITAN INVESTMENT HOLDINGS LP, :
                                    :
19          Defendants.             :
                                    :
20  _____:
21
22
23
24
25

1                    United States Bankruptcy Court

2                    824 North Market Street

3                    Wilmington, Delaware

4                    April 26, 2017

5                    10:08 a.m. - 11:58 a.m.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN

1   HEARING re Motion of Delaware Trust Company, as TCEH First

2   Lien Indenture Trustee, to Partially Vacate Judgment

3   Pursuant to Fed. R. Bankr. P. 9024 and Fed R. Civ. P. 60(b)

4   [Adv. D.I. 122; filed June 1, 2016]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   SEWARD & KISSEL LLP

4       Attorneys for Wilmington Trust NA-First Lien Agent

5

6   BY:  MARK KOTWICK

7

8   O'MELVENY & MYERS LLP

9       Attorneys for the Trustee, Wilmington Trust

10

11   BY:  DANIEL SHAMAH

12

13   STEVENS & LEE

14       Attorneys for the Trustee, Wilmington Trust

15

16   BY:  JOSEPH H. HUSTON, JR.

17

18   CADWALADER, WICKERSHAM & TAFT LLP

19       Attorneys for Morgan Stanley

20

21   BY:  MARK ELLENBERG

22

23

24

25

1   BAYARD, P.A.

2        Attorneys for Delaware Trust Company as Indentured

3        Trustee

4

5   BY:  GIANCLAUDIO FINIZIO

6

7   PERKINS COIE LLP

8        Attorneys for Delaware Trust Company as Indentured

9        Trustee

10

11  BY:  TINA N. MOSS

12

13  KOBRE & KIM

14        Attorneys for Delaware Trust Company as Indentured

15        Trustee

16

17  BY:  JEREMY C. HOLLEMBEAK

18        MICHAEL S. KIM

19

20  DLA PIPER LLP

21        Attorneys for Morgan Stanley Capital Group Inc.

22

23  BY:  ASHLEY ALTSCHULER

24

25

```
 1    COZEN O'CONNOR

 2         Attorneys for J. Aron

 3

 4    BY:  SIMON E. FRASER

 5

 6    ROSS ARONSTAM & MORITZ LLP

 7         Attorneys for Titan

 8

 9    BY:  NICHOLAS D. MOZAL

10

11    CLEARY GOTTLIEB STERN & HAMILTON LLP

12         Attorneys for J. Aron

13

14    BY:  TOM MOLONEY

15

16    WEIL, GOTSHAL & MANGES LLP

17         Attorneys for Titan Investment Holdings LP

18

19    BY:  SALVATORE A. ROMANELLO

20

21    RICHARDS, LAYTON & FINGER, P.A.

22         Attorneys for Vistra Entergy f/k/a Reorganized TCEH

23

24    BY:  JASON M. MADRON

25
```

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. FINIZIO:  Good morning, Your Honor.

5    GianClaudio Finizio with Bayard, on behalf of Delaware Trust

6    Company as the TCEH First Lien Indenture Trustee.  Your

7    Honor, we're here today for oral argument in connection with

8    the Indenture Trustee's 60(b) motion.  And I would propose,

9    Your Honor, that we proceed with putting on our

10   presentation, unless Your Honor has a different --

11             THE COURT:  No, that's fine.

12             MR. FINIZIO:  Has something different in mind.

13   So, I'm here with my co-counsel, Mr. Michael Kim of Kobre &

14   Kim, that's going to put on the presentation.

15             THE COURT:  Very good.

16             MR. FINIZIO:  Thank you, Your Honor.

17             THE COURT:  Mr. Kim, welcome back.

18             MR. KIM:  Thank you, Your Honor.  Your Honor, may

19   I approach and give you two things?  One, which is a binder

20   of documents that you really don't want to read unless you

21   absolutely have to, and then the PowerPoint that I made that

22   is more of a user-friendly version of some of the points.

23             THE COURT:  Yes, please.  Do you have a copy you

24   could give Ms. (indiscernible) as well?

25             MR. KIM:  I think so.

1            THE COURT:  I like your picture on the front, but

2    that is not Wilmington's skyline.  (Laughter)  If we were

3    only so lucky.

4            MR. KIM:  Judge.  I think maybe the new factual

5    development since the last time we were here, obviously, is

6    the new plan.  So, I thought it would be helpful to go

7    through at least my understanding of how they reduce what is

8    a very complicated transaction to at least the key legally

9    relevant components.

10           And I believe that, once Your Honor sees the

11   factual context, it will become clear that what is actually

12   happening is that the collateral of my client became

13   proceeds, and that essentially the reason it became proceeds

14   is there was a sale or disposition of that collateral.  And

15   I think, once one comes to that conclusion, it's actually a

16   very simple step to arrive, essentially, to the ultimate

17   conclusion, which is that, essentially, collateral has been

18   sold and disposed of, and that the liens have been

19   extinguished, and therefore the 4.1 distributions of the --

20   in the Creditor Agreement that we have insisted on is

21   exactly the way that the proceeds should be divided up.

22           So, I would first ask Your Honor to turn to the

23   diagrams beginning at Page 20 of the PowerPoint.

24           THE COURT:  Wait.

25           MR. KIM:  Oh, I guess the PowerPoint stuff is just

1      the diagrams, okay.  That makes it even easier.  Okay.  So,

2      Page 1 of the PowerPoint.

3                THE COURT:  Okay.

4                MR. KIM:  Okay.  So, for the new plan, for the

5      very first two steps, what we have is we have the First Lien

6      Creditors having claims and liens on the red boxes, which is

7      really, essentially, their collateral.  And then we have

8      reorganized TCEH having been formed.

9                Now, when one goes to the next diagram, there is a

10     contribution by TCEH of the first lien collateral to

11     Reorganized TCEH.  And then 100 percent of Reorganized TCEH

12     is basically being put under TCEH, therefore resulting in

13     the next diagram, which is Step D.  And so, in Step D, we

14     have essentially Reorganized TCEH interposed between TCEH

15     and the first lien collateral, and a preferred stock

16     exchange -- stock entity created.

17               So, so far, Your Honor, I think what essentially

18     has happened is simply the interposition of corporate

19     entities in -- sandwiched in between what was still

20     collateral, what are still collateral, subject to claims and

21     liens.  So, no sale, no disposition yet.

22               But then, when one goes to the next diagram, this

23     is the preferred stock sale, which is Step D of the new plan

24     spinoff.  For various reasons, what ended up happening in

25     this transaction is that third-party investors ended up

1    buying into Reorganized TCEH at a preferred stock level.

2           So, what ends up happening is that there is a sale

3    and disposition of the collateral, such that, if one goes to

4    Step E -- and I guess it makes sense to look at Step E and

5    Step F side-by-side; you can just put them side-by-side --

6    functionally, what happens is that third-party investors end

7    up buying into a preferred stock position, such that the

8    collateral that used to be there ends up being split.  And

9    it ends up being split and now owned not by the original

10   Debtor, TCEH, but by, on the one hand, Reorganized TCEH,

11   and, on the other hand, the preferred stock entity.

12          So, what does this mean?  I think what it means is

13   that what the parties to the transaction all told the

14   Internal Revenue Service, and what the Internal Revenue

15   Service concluded, is, as a matter of fact, substantively

16   what is happening, which is that the collateral has been

17   sold or disposed of, such that it is proper under the tax

18   laws to step up the basis, I believe by more than $5.6

19   billion.

20          And so, you have the Creditors, the First Lien

21   Creditors that used to just have claims and liens on

22   collateral that used to be owned by the Debtor.  At the end

23   of the transaction, they have lost their claims and liens.

24   They've voluntarily given them up in exchange for what they

25   get under the new plan.  The old collateral no longer has

1    claims or liens on it.  And then the old collateral is now

2    owned by different legal entities, which are also now

3    partially owned by completely new people as well.

4             So, the next diagram essentially just summarizes

5    what the corporate -- the New Plan Spinoff: Following

6    Consummation, what that -- what it looks like after the new

7    plan has been consummated, which is what I just mentioned.

8             Now, I know that one of the tasks that all the

9    parties have urged upon the Court is to compare this with

10   Momentive.  And I believe various arguments have been put as

11   to how it's similar, not similar.  So, I thought it would be

12   useful to walk through what was happening in Momentive with

13   what has happened here.

14            Now, before we move to Momentive, the next chart,

15   essentially -- I've tried to basically move all of these

16   colorful globes into every possible combination that I could

17   before moving on to Momentive.  The next chart basically

18   summarizes what happens before and after.  And what has

19   happened here is what's called a G Reorganization, a

20   reorganization that causes a step-up basis because, in

21   substance, there was a sale or disposition of the

22   collateral.

23            And so, the key features being that the collateral

24   is no longer owned by the Debtor, the collateral is now co-

25   owned -- or is owned by other legal entities that have other

1    owners in it, and, most importantly, the claims and liens

2    have been extinguished.

3              So, when one steps back from all of the legalese

4    and all the complications in this case and looks at,

5    substantively, what has happened, it is that Secured

6    Creditors that used to have collateral on which they had

7    liens at the very beginning of the transaction, at the end

8    of the transaction, they no longer have liens on anything.

9    The collateral that they used to have has been now disbursed

10   to new owners.  And other owners have come into the picture.

11             And, in exchange for all that, the Secured

12   Creditors went along with this transaction.  They gave up

13   their claims; they gave up their liens; they gave up their

14   collateral.  In exchange for that are basically what they

15   get under the plan.

16             Now, let's take a look at what happened in

17   Momentive, which is the next slide.  What happened in

18   Momentive is quite different.  In Momentive, you have the

19   collateral still owned by the same owner before and after.

20             And you can look at Momentive in -- from two

21   perspectives.  You can look at it from the First Lien

22   Creditors' perspective, which is really, in Momentive, what

23   was happening is the First Lien Creditors were arguing that,

24   as a result of the transaction, not only should they be able

25   to keep the liens on the same collateral that they had

1     before, but that they should now have liens on stock that

2     was received by Second Lien Creditors.

3          And you can see why the Court rejected that latter

4     position, because, in Momentive, unlike our transaction,

5     what was happening was an E Recapitalization.  In other

6     words, there was no sale or disposition of the collateral.

7     It was simply staying in place, with the same claims and

8     with the same liens.  So, unlike what happened to my client

9     here, which is they lost the liens, they lost the liens on

10    the collateral, and that the collateral ended up being sold

11    and disposed of, in Momentive, the collateral really ended

12    up staying in place.

13          And so, I think, from the perspective of an

14    analogous party, which is the First Liens, we have

15    completely different things going on.  And then, of course,

16    from the perspective of the Second Lien Creditors, what had

17    happened for the Second Lien Creditors is that they used to

18    have collateral, but then they just got securities in

19    exchange.

20          But I think what had -- what can get a little bit

21    confusing here is trying to interpret Momentive as having

22    some type of bizarre rule that says, "If you have -- if

23    you're a Secured Creditor in the beginning, and then you

24    have securities at the end, you have stock at the end,

25    somehow there is some type of magical rule that says that

1    that's not a sale or disposition."  But clearly that's not

2    what Momentive says.

3            What Momentive really turned on was the fact that

4    the First Liens that were insisting on having liens on the

5    securities received by the Second Lien Creditors in fact had

6    not had their collateral sold or disposed of.  In fact,

7    everything had stayed exactly the same.

8            So, I think -- I'm not going to go through all of

9    the different diagrams that I've prepared.  But I think the

10   next two diagrams, I think, you can kind of look at at your

11   own leisure.  It really illustrates this concept that the

12   key difference between Momentive and what happened in the

13   new plan really couldn't be more clear, because I think the

14   fact that it is a totally different type of transaction, a G

15   Reorganization and an E Recapitalization, is in fact a

16   reflection of the actual economic substance of what was

17   happening.

18           In Momentive, it really was the recapitalization.

19   It was not being sold to a third party.  And the claims and

20   liens were still in place on the same collateral.  Here,

21   what's clear is that you have my client that, in the

22   beginning, had claims and liens on a piece of collateral,

23   and, at the end of the transaction, the collateral is gone.

24   It's in the hands of new owners with even third-party

25   owners.  Their claims and liens are gone.  And then what

1    they've got is what they got under the plan.  So --

2              THE COURT:  So, let me interrupt you for a second.

3              MR. KIM:  Yes.

4              THE COURT:  Let me make sure I understand the

5    transaction as you're describing it.

6              MR. KIM:  Sure.

7              THE COURT:  So, the third-party investors on your

8    chart, they actually only own preferred stock, correct?

9              MR. KIM:  Correct.

10             THE COURT:  So, the common stock of the preferred

11   stock entity is owned by Reorganized TCEH?

12             MR. KIM:  Correct, which is also a new owner.

13             THE COURT:  Which --

14             MR. KIM:  It's not the Debtor.

15             THE COURT:  Well, it was -- it's the -- it's not a

16   new owner.  It's the new intermediate -- I guess it's a new

17   owner in that it's the new intermediate entity that was

18   formed.

19             MR. KIM:  Right.

20             THE COURT:  Okay.  But, so -- but it all -- what

21   significance, if any, do you give to the fact that, at the

22   end of the day, even with the third-party investors owning

23   some preferred stock, owning the preferred stock, that the

24   entire entity structure remains under the control of

25   Reorganized -- or Reorganized TCEH, and is the same tax

1    filing group, at the end of the day?  Do you -- how do you

2    deal with the argument that, since it's all still part of

3    the same group, it's really just a reorganization, not a

4    sale?

5              MR. KIM:  Okay.  So --

6              THE COURT:  If that made any sense.

7              MR. KIM:  Yes.

8              THE COURT:  And, if it didn't, I apologize.

9              MR. KIM:  Yes, no, no, I absolutely understand

10   what the Court is getting at.  And I think it has no legal

11   significance.  I think this is the same as if a Secured

12   Creditor basically just bought assets out of a bankruptcy

13   and just became this new owner.

14              I think the key question here is, for purposes of

15   determining does 4.1 apply -- and, for 4.1 to apply, it has

16   to be the proceeds of collateral -- the key question is:

17   has the collateral been sold?  And I think, here, it's not

18   just that the things have just gotten shuffled around, and

19   you have Secured Creditors still having liens on something

20   that, you know, you may determine was still just the same

21   collateral; it never got sold.

22              Here, I think you really can start and stop at the

23   very beginning, which is that the claims and liens are gone.

24   They're no longer Secured Creditors.

25              THE COURT:  All right.  So, under that analysis,

1    this whole sort of fancy footwork with the preferred stock

2    entity really doesn't matter.  Your point is that, at the

3    end of the day, there are no longer any liens on this

4    entity, and that the old lien holders own the stock in the

5    reorganized entity.  And that's all that I need to worry

6    about, and that makes it a sale.

7            But wasn't that what we had before, in effect,

8    that I've ruled wasn't a sale?  The liens, again, were being

9    -- remind me, if I'm wrong -- if I'm wrong, tell me I'm

10   wrong.  But the liens were being extinguished back under the

11   old plan.  And I said that didn't matter, because I drew the

12   analogy to Momentive.  And, at least back in March of 2016,

13   the fact that the liens were being extinguished was not a

14   factor that the Court viewed as being determinative.

15           MR. KIM:  That's correct.  So, I agree with you:

16   the simple fact that liens are being extinguished itself is

17   not sufficient to say it's proceeds of collateral.

18           THE COURT:  Okay.

19           MR. KIM:  Because then you have to look at what

20   else is happening in the transaction.

21           THE COURT:  Right.

22           MR. KIM:  And I think what's happening in the

23   transaction is that the fact that these two new entities,

24   the preferred stock entity and Vistra Energy, now own what

25   used to be the old collateral, it's not simply just a

1    recapitalization and just shifting things around.

2    Basically, what happened, in substance, was that the

3    collateral actually was sold, such that the government, the

4    IRS, has determined a step-up is appropriate.

5            And I think, you know, look, all of this stuff is

6    abstract.  There's actually no physical object doing

7    anything.  But, as a matter of law, it wasn't just that they

8    got a private letter ruling and is now saying, "Well, just

9    because a private letter ruling says it's a sale or

10   disposition, it is."  In fact, the parties acted as if it's

11   a sale or disposition.

12           There was a Separation Agreement.  These have been

13   filed, I think, in this Court's docket, a Separation

14   Agreement and an Assumption and Assignment Agreement,

15   executed concurrent with this transaction, which has all of

16   the features of what would be happening if a business -- if

17   a collateral is actually being sold.

18           So, for example, two, I think, observations Your

19   Honor had made about the old -- hypothetical old plan --

20   obviously, it didn't actually get consummated, so the Court

21   didn't have an actual transaction to dig into.  But, on the

22   hypothetical old plan, I think Your Honor had observed, on

23   Page 26 of your first opinion, that this is not akin to a

24   foreclosure because there were no deficiency claims.

25           But, in the new plan, there actually is a

1    deficiency claim.  In the new plan, under Article 3(b)(30),

2    there is a Class C4 First Lien Deficiency Claim, which is

3    allowed and then waived under Article 4(b)(11).

4              Another observation Your Honor had made is that,

5    under the hypothetical old plan, that nothing in the old

6    plan states that the Reorganized TCEH is purchasing the

7    collateral.  The Reorganized TCEH is not a third-party

8    purchaser, and there is not an economic event that would

9    create that sort of relationship.  That was on Page 31 of

10   Your Honor's opinion.

11             That observation would not be factually correct if

12   it were made with respect to the new plan, because the very

13   documentation of the new plan, as well as the fact that it's

14   not only documented as a sale of the collateral, so that the

15   parties took the position to the IRS that the actual

16   collateral was being sold, there actually also is a third-

17   party purchaser.  And, you know, I think, whether it's

18   preferred or common stock doesn't make a difference with

19   respect to the fact that there is an economic event that has

20   been represented and understood by the participants, and by

21   the tax authorities, as an actual sale or disposition

22   involving a third party.

23             So, I think even just those two illustrations show

24   that the new plan actually is quite different.  And it is

25   not simply a matter of the liens being extinguished, because

1    I do recognize, obviously, looking at the Second Lien

2    Holders in Momentive, that, if all that happened is that you

3    are losing your claims and liens, and getting stock in

4    return -- I think the Court was observing that doesn't mean

5    that you got proceeds of collateral.  You have to actually

6    lose your collateral for that to count.

7            Here, if you look at what the First Lien Holders

8    were in the beginning of the transaction and at the end, you

9    see they actually have lost not only their claims and liens

10   but also their collateral, because, even though they now own

11   shares in entities that now indirectly own a percentage of

12   the collateral -- because now you have, you know, preferred

13   stockholders as well -- in effect, to get there, the

14   collateral itself had to be sold to new legal owners, and

15   had to be documented as such and represented as such.

16           So, really, I guess, you know, all this is

17   abstraction on abstraction.  But I think it does matter how

18   the parties to the transaction have characterized it.  And

19   it does matter that they have constructed all of the

20   agreements one would associate with an actual sale or

21   disposition of assets.

22           Now, I think the question of, you know, is what is

23   happening in the third -- in the new plan proceeds of

24   collateral, or is collateral essentially being liquidated or

25   being sold, I think is actually answered directly by the

1    various agreements that are in the binder, which I will not

2    ask you to look at, as well as in the plan itself.

3              So, I'll just give Your Honor some cites, just to

4    help, when you're writing your opinion, find some other

5    relevant pages in these very lengthy documents.

6              So, on the question of, is what is happening in

7    the plan -- is what is being distributed under the plan

8    collateral, I think, as Your Honor knows, the First Lien

9    Creditors get three things under the plan.  They get the

10   stock distribution, they get a cash distribution, and a TRA

11   distribution.

12             The -- as far as the spinoff transaction goes, the

13   plan, at Article 4(b)(2)(a), and also under Article

14   1(a)(52), basically it states that TCEH contributed all of

15   its interest in the subsidiaries, i.e. the collateral, to

16   Reorganized TCEH, in exchange for which TCEH received a

17   consideration ultimately distributed to the First Lien

18   Creditors.

19             So, I think the plan itself explicitly

20   contemplates that what has happened here is that TCEH

21   contributed its collateral, and that what it's getting in

22   exchange is not it's getting something because it

23   extinguished its liens; it's getting something in exchange

24   because it contributed its collateral to a new owner.

25             The term "collateral and proceeds" is defined at

1    several parts of all of the relevant agreements that the

2    Creditors have signed amongst themselves, including in the

3    Security Agreement, Section 2A, which defines "collateral"

4    to include all proceeds and products.  Security Agreement

5    1.1 and Pledge Agreement Section 2A and 2C refer to proceeds

6    as being any consideration from the sale, exchange, or other

7    disposition of collateral.  And the Pledge Agreement, at

8    Section 2 -- at Page -- or at Paragraph 2, says, "Pledge

9    Shares includes any other subsidiary directly held by any

10   pledger in the future."

11          So, I think, with respect to the stock

12   distribution, and really I guess all the distributions under

13   the plan from the section I read, it's clear that what is

14   being received is in exchange for the First Liens having

15   given up the collateral itself to a new owner.

16          And, as Your Honor knows, in the cash collateral

17   order, there was -- there were also explicit references to

18   the fact that, essentially, what was being -- what was

19   essentially being stipulated to is that the cash on hand

20   constituted first lien collateral, and that "proceeds"

21   includes all cash received by or held on behalf of the

22   Collateral Agent.  So, there was an explicit agreement that

23   that was proceeds of collateral.

24          And finally, as far as the TRA distributions, in

25   the plan, Section 1A375, there are rights to receive

1    payments under the Tax Receivable Agreement.  And I think

2    that is clearly falling within --

3              THE COURT:  I'm here.  I'm sorry.

4              MR. KIM:  I thought that the --

5              THE COURT:  It's a little warm up here, so I'm

6    trying to increase the fan.  So, I apologize.

7              MR. KIM:  Oh.  I thought, if I read one more

8    section number, Your Honor would just lie down there until I

9    finished.  (Laughter)

10             THE COURT:  I just keeled over, yes.  Okay.  Call

11   the paramedics.  (Laughter)

12             MR. KIM:  But the Security Agreement, at Section

13   1, and the Pledge Agreement, at Section 2C, both demonstrate

14   clearly that TRA rights distributions all fall within the

15   definition of "proceeds."  In the Securities -- Security

16   Agreement, it says "proceeds" includes value received as a

17   consequence of the possession of any collateral.  In the

18   Pledge Agreement, it's "proceeds" includes other amounts

19   payable or under -- or in connection with any of the

20   collateral.

21             So, I think the plan itself -- I gave you some of

22   the section numbers earlier.  The Disclosure Statement also

23   explicitly recognizes that the first lien collateral is

24   being transferred to the Reorganized TCEH.  And it says --

25   I'm quoting -- "in exchange for the consideration described

1    in the distributions that the First Liens are getting."

2           So, I think the concept that, you know, the First

3    Liens have given up the collateral itself, and not merely

4    the liens, is actually just explicitly discussed in the plan

5    and the Disclosure Statement.  And then the concept that

6    what they're getting in exchange or in connection with is

7    proceeds can be easily arrived at by the fact that all of

8    these different agreements that define the word "proceeds"

9    really ends up encompassing a very wide range of any value

10   you get as a result of, essentially, disposing of your

11   collateral.

12          So, I think, once one arrives at the conclusion

13   that what has happened in the new plan is that proceeds of

14   collateral have been paid out, then one gets to the

15   question:  well, how does 4.1 apply at that point?  And I

16   would submit, Your Honor, that the preamble to 4.1 is the

17   portion that has the phraseology of "received by the

18   Collateral Agent," the exercise of remedies.

19          I don't believe the Court really has to deal with

20   those issues.  I'll show you why, even if you analyze it

21   under the preamble, I think you still get to the same

22   conclusion.  But I think, once you conclude that the plan is

23   proceeds of collateral, I think you really just get to the

24   fact that it has to be distributed under 4.1.

25          And I think the fact is that, once you decide it's

1    proceeds of collateral, various sections of the different

2    agreements that the parties have signed essentially mandate

3    that 4.1 should apply.  So, I'll just give you the section

4    numbers, and you can lie down if you want to when I'm done.

5    There's only a few of them.  It's the Credit Agreement 11.4,

6    Pledge Agreement 12B, and Security Agreement 5.4, and the

7    Intercreditor Agreement 4.2.

8              These all deal with different types of value, such

9    as cash or other value that can be distributed.  And,

10   basically, all these sections say that 4.1 should apply.  It

11   uses slightly different phraseology.  I believe, actually,

12   there's a slide that's in the deck that -- where I've

13   summarized them.

14             It basically uses phraseology such as, "shall be

15   applied in accordance with 4.1."  In the order -- in the

16   Security Agreement, it says that it should be distributed in

17   the order specified in 4.1, which obviously suggests that --

18   makes clear that's the non-preamble part.  Pledge Agreement

19   12B says, "In the manner specified in 4.1."

20             So, I think that, once you decide it's proceeds of

21   collateral, it's clear it's received by the Collateral

22   Agent, regardless of how the value actually travels, because

23   the plan itself, in Article 4(e)(4), actually just

24   explicitly says, "Whatever is being distributed under the

25   plan is being received by the Collateral Agent."  So, I

1    think that's really a nonissue.

2            And I think the concept that, once you have value

3    coming out of the plan that's proceeds of collateral, that

4    somehow that can end up being sprayed all over the place

5    with no actual manner of distribution, the careful manner of

6    distribution that the parties have laid out in 4.1, I think,

7    just doesn't comport with common sense, because, under that

8    reading, essentially what is being suggested is that some

9    types of value, such as, I think, cash coming out of the

10   cash collateral order, would follow 4.1.

11           But then, if you concluded that even those being

12   paid under the plan that the Collateral Agent was not

13   exercising a remedy, then it would just -- you would just

14   bypass the entire careful scheme that all the parties had

15   agreed to with multiple references to the fact that this is

16   intended to apply in bankruptcy.  So, obviously, the parties

17   who signed the Agreement understand, in bankruptcy, often

18   it's distributed according to a plan.

19           So, I think, while you can torture the English

20   language and start saying things like, "Well, when it -- you

21   know, when the Credit Agreement says, 'shall be applied in

22   accordance with Section 4.1,'" what you could then start

23   making yourself think is, "Well, you can then go to the

24   preamble and say, well, the Collateral Agent didn't exercise

25   a remedy; it's just getting stuff under the plan.  So,

1    therefore, the distribution scheme doesn't apply."

2            And yet, I guess, then, under the Security

3    Agreement 5.4, a separate stream of value, that says, "in

4    the order specified in 4.1."  So, I guess for anything

5    that's deemed distributed under the Security Agreement, then

6    you skip the preamble; it doesn't matter if the Collateral

7    Agent exercised the remedy.  And that actually goes under

8    4.1.

9            I think it just doesn't make any sense.  I think

10   it's clear, just from a common sense point of view, that,

11   once value is being paid as a result of the collateral

12   essentially being sold or disposed of, that the parties have

13   said multiple times they want 4.1 to apply, in bankruptcy or

14   not.

15           THE COURT:  So, I mean, isn't that argument

16   reading the exercise of remedies requirement out of 4.1?

17   Aren't you saying, "Well, common sense indicates that, if

18   it's a distribution, it must be an exercise of remedies,"

19   but doesn't actually follow through by trying to track the

20   language on what an exercise of remedies would be?

21           MR. KIM:  Well, I think there are really two ways

22   of looking at that.  I think the "exercise of remedies"

23   phraseology could be in there because, if it's not in

24   bankruptcy, you could have situations where a Collateral

25   Agent went and sued somebody and actually got money out of

1    it.

2            But I think it's also clear that the phrase

3    "exercise of remedies," as we have illustrated in our

4    briefing, is actually also quite broadly defined.  It also

5    even includes literally just receiving money on account of

6    the collateral.  It doesn't -- even though it probably

7    should have been written in a way that's more intuitive,

8    because "exercise of remedies" does sound like you're

9    actually going and, like, doing something to somebody, or

10   hitting somebody over the head and taking their wallet.  But

11   once, actually, you look at exactly how it's defined, it

12   actually even includes just actually just receiving money on

13   account of the collateral.

14           And I said earlier that, even if one actually

15   feels like you have to get through the preamble in every

16   circumstance, I think the conditions have been satisfied,

17   because what happened in the new plan is that the Collateral

18   Agent is signing the Plan Support Agreement.  And what the

19   Collateral Agent is doing in signing the Plan Support

20   Agreement is it is actually giving up its claims and liens,

21   its collateral.  And it is also agreeing not to undertake

22   any actions that would interfere with the plan.

23           And I think that's classic.  It's what one would

24   do if one were, say, settling a lawsuit, is basically giving

25   up things, giving up things of value, and then agreeing not

1     to undertake any actions inconsistent with the Settlement

2     Agreement.

3               And I don't think anybody would say, if there were

4     a situation where the Collateral Agent felt that it had a

5     cause of action on behalf of its creditor constituencies

6     against the target, and, you know, that target said, you

7     know, "You're right; I'll pay you money; here, let's

8     settle," that the signing of a settlement agreement, somehow

9     that's not a sufficient exercise of remedy such that, even

10    though the Collateral Agent received the money in exchange

11    for giving away things of value, that somehow that doesn't

12    fall under the 4.1 scheme because the Collateral Agent

13    should have gone and done something, I guess, more

14    aggressive than just settling a lawsuit.

15              So, I think that even the signing of a plan

16    support agreement and the receipt of value is sufficient.

17    And if one gets into kind of a metaphysical of, you know,

18    how active does a Collateral Agent have to be to have

19    exercised remedies, I think that, you know, the metaphysical

20    question is answered simply by the fact that "exercise of

21    remedies" is defined simply as even receiving value on

22    account of the collateral.  So, you can actually just

23    literally lie there and do nothing, and have somebody put

24    money in your hand, and that's an exercise of remedies.

25              But, you know, there is a whole list of things

1    that the Collateral Agent did do, as Your Honor knows.  It's

2    detailed in our brief, not only the filing of a proof of

3    claim, but appearances in multiple Court conferences,

4    joining in briefings.

5         But I think, ultimately, if Your Honor is looking

6    for something active, other than filing a proof of claim

7    that it did, that really was the trigger and the proximate

8    cause and a substantial act, really, because it really gave

9    up all of the things that it has a fiduciary duty to

10   protect, to get value in exchange.  I think that's the

11   signing of the Plan Support Agreement.  And it's clear it

12   did it at the direction -- the plan actually just says

13   explicitly it did it at its direction.

14        So, my colleague, Jeremy Hollembeak, would address

15   the "due and payable" argument.  But, if Your Honor has

16   further questions on these concepts, I'd be very happy to

17   try to address them.

18        THE COURT:  No, thank you.  Thank you, Mr. Kim.

19        MR. KIM:  Okay, thank you.

20        MR. HOLLEMBEAK:  Good afternoon, Your Honor.  For

21   the record, Jeremy Hollembeak of Kobre & Kim for the

22   Plaintiff, Indenture Trustee, TCEH First Lien Indenture

23   Trustee.  I really just want to make two points, and of

24   course answer any questions that the Court has on what

25   happens, assuming you agree that the proceeds -- that the

1    plan distributions are proceeds and have to flow through 4.1

2    of the Intercreditor agreement.

3            The first of them is, before we get into the

4    contract language, the rule of explicitness.  There is a

5    well-developed body of case law that has looked at

6    specifically the issue of when creditors can contractually

7    agree amongst themselves, prior to a bankruptcy, about

8    whether or not the post-petition interest that might accrue

9    but not be allowable in a future bankruptcy will be taken

10   into account amongst themselves, and not against the Estate

11   -- it's not a Debtor issue -- but amongst themselves.

12           It's been -- there's a Third Circuit case that

13   started it in, I think, the 1970s.  And I can find the cite

14   for you; it's in our papers.  But it's been developed

15   through the years.  And, just for a good history of it, I

16   would suggest the Court look at Judge Gropper's decision in

17   the KB Discovery case.  That's at 496 BR 330.  That's from

18   four years ago now.

19           But if you look at those decisions, they all hinge

20   upon whether or not the contractual agreement between the

21   parties says that the interest will be taken into account,

22   whether or not it's allowed or allowable in a bankruptcy

23   proceeding.  That's the key phrase.  There's different ways

24   you can exchange words, but, at the end of the day, that's

25   the key phrase that puts a contracting creditor on notice

1    that, if there is a bankruptcy by the common obligor, the

2    other creditor that it's contracting with may sue some of

3    the -- some of its recovery to cover a post-petition

4    interest that was not allowable against the estate.

5              And that's language that's not just in the

6    agreement that these parties reached, it's in it multiple

7    times.  If you look at Paragraph 3 of the ICA, Section 4.1

8    Waterfall, that's what this is centered on.  That's where

9    the language "due and payable" is, and I'll talk about that

10   in a minute.  It says that the allocation should be based

11   upon the secured obligations that are due and payable with

12   respect to the security documents.

13             "Secured Obligations" is a defined term.  And, if

14   you go to the definition -- it's in the Intercreditor

15   Agreement -- it itself says twice the phrase, "whether or

16   not allowed or allowable in an insolvency proceeding," when

17   referring to interest that's accruing under the security

18   documents on all of the first lien credit.  So, that's the

19   notes indenture, the Credit Agreement, the hedge, the swap.

20             In addition, it really refers to it indirectly a

21   third time, because the last sentence of the definition that

22   these parties chose for Secured Obligations says, you know,

23   notwithstanding anything else, just for the avoidance of

24   doubt, Secured Obligations includes post-petition interest.

25   And Post-Petition Interest is a defined term.  If you go to

1    the definition of Post-Petition Interest in the

2    Intercreditor Agreement, it also says Post-Petition Interest

3    is interest that accrues after a bankruptcy filing, whether

4    or not it's allowed or allowable in that proceeding.

5            So, in our view, it's very clear that the rule of

6    explicitness, even if it applied here, we've met it.  We

7    don't even think that we have to meet a higher burden.  This

8    is not a subordination agreement; this is a pro rata

9    distribution that the parties and the unitranche facility

10   agreed to among themselves how they would divide up the

11   proceeds of their collateral if post-petition interest

12   wasn't allowed.  But, even if we had to meet the rule of

13   explicitness, we've met it multiple times.

14           That takes us, then, to looking specifically at

15   the contract language.  The waterfall in question in 4.1 of

16   the ICA has four paragraphs.  The first two don't matter.

17   The real contest here is regarding the third one, but the

18   fourth one matters under the arguments that have been

19   submitted by the other side.  This is set forth in the --

20   one of the last slides of the presentation that was handed

21   up.  The title of the page there is, "Due and Payable."

22           If you look -- let's look first at the fourth

23   paragraph, which starts, "Last."  It says, "Last, the

24   balance, if any, after all of the Secured Obligations have

25   been indefeasibly paid in full, in cash, to the loan parties

1    or otherwise required by law."  So, to get a payment under

2    the fourth paragraph of the waterfall, all of the Secured

3    Obligations must have been paid in full.

4              And, again, if you go back to the definition of

5    Secured Obligations, it includes post-petition interest,

6    whether or not allowed or allowable.  So, that post-petition

7    interest that's not allowed must be paid before you get to

8    this fourth paragraph.

9              Let's go back to the third paragraph, then.  Third

10   paragraph says, "Third, the proceeds will be allocated on a

11   pro rata basis to the payment of, without duplication, all

12   principal and other amounts due and -- then due and payable

13   in respect to the Secured Obligations."  It's our contention

14   that post-petition interest falls squarely within that

15   paragraph, and should be accounted for in allocation under

16   that paragraph.

17             The argument submitted by the other side is that,

18   basically, the phrase "then due and payable," or even just

19   the word "payable," somehow is a qualification on the --

20   which kind of Secured Obligations get used as the metric to

21   allocate distributions under this paragraph.  While I agree

22   that it's a qualification, it's because the definition of

23   Secured Obligations includes contingent events.  It

24   includes, you know, any amount now due or due in the future,

25   any interest now due or due in the future.

1              So, the "then due and payable" cuts off the

2     future.  You know, we don't -- we're not seeking to scoop

3     payments for post-petition interest that would be allowed if

4     there had been no, you know, confirmation and consummation

5     of the T-side plan into perpetuity, right?  We're just

6     seeking the amounts that we're -- that became due and

7     payable up until the point that the Debtor got its discharge

8     under 1141 of the Bankruptcy Code.

9              Their reading would suggest that, if it's not

10    payable under the third paragraph, it has to be paid before

11    the fourth paragraph, there must be some, you know, paid by

12    implication or somehow between those paragraphs.  But I

13    would suggest that the plain meaning here is that "due and

14    payable" cannot mean what they say that it means, because

15    where would the allowed -- the disallowed post-petition

16    interest be paid under this waterfall?  It wouldn't.  It

17    would just fall through the cracks, I guess.  And that

18    really just doesn't comport with the plain meaning of the

19    contract.

20             And the -- you know, these are -- the

21    Intercreditor Agreement and the Security Agreement, the

22    Pledge Agreement, they're all part of the same transaction.

23    They're integrated documents.  They have integration clauses

24    within them.  They all refer to each other, and they say it

25    all has to be construed consistently.  That's Hornbook New

1    York law.

2            If you look, in particular, at several of the

3    provisions in certain of these documents, I think they make

4    really clear -- if you go to the slide just before this one,

5    on the bottom there, this is Section 3 of the Pledge

6    Agreement.  It says, "Security for the obligations:  this

7    Pledge Agreement secures the payment of all amounts that

8    constitute part of the first lien obligations and that would

9    be owed by any of the Credit Parties to any of the First

10   Lien Secured Parties under the credit documents, but for the

11   fact that they are unenforceable or not allowable due to the

12   existence of a bankruptcy, reorganization, or similar

13   proceeding."

14           So, it makes very clear that we, the Noteholders,

15   were secured prior to the effectiveness of the plan.  The

16   security that we had up until that point was to secure our

17   payment for post-petition interest, even though it wasn't an

18   allowable claim against the Bankruptcy Estate.

19           Their contention is that somehow, you know, we

20   lost the collateral under the plan, and we didn't get a pro

21   rata distribution based upon what was secured at that time.

22   And I would submit to Your Honor that that's just not a

23   valid reading of these contracts.  Does Your Honor have any

24   questions?

25           THE COURT:  I do not.

1           MR. HOLLEMBEAK:  Thank you.

2           THE COURT:  Sorry, I'm just making a note.  Just

3     give me a second... Yes, sorry.

4           MR. ALTSCHULER:  Yes, Your Honor.  May it please

5     the Court, Ashley Altschuler, DLA Piper, Wilmington,

6     Delaware, on behalf of Co-Intervener Defendant Morgan

7     Stanley Capital Group, Inc.  With me today is Mr. Mark

8     Ellenberg from the Cadwalader, Wickersham & Taft firm, as

9     well as Tom Curtin from the same firm.  With the Court's

10    permission, presenting arguments on behalf of Morgan

11    Stanley, as well as the other Co-Intervener Defendants, will

12    be Mr. Ellenberg.

13          THE COURT:  Very good.  Thank you.

14          MR. ALTSCHULER:  Thank you.

15          MR. ELLENBERG:  If the Court please, Mark

16    Ellenberg, Cadwalader, on behalf of Morgan Stanley.  Your

17    Honor, much as I would like Mr. Moloney to be my partner,

18    he's actually with Cleary Gottlieb.

19          And, Your Honor, as last time, just in a different

20    order, I will start out by addressing the issues that Your

21    Honor decided in your prior opinion, specifically whether

22    Section 4.1 of the Intercreditor Agreement applies to the

23    distributions under the plan, under the new plan as well as

24    the old plan.  And Mr. Moloney will address the "due and

25    payable" issue, which relates to what would happen if 4.1

1    somehow was found to apply.

2                THE COURT:  Okay.

3                MR. ELLENBERG:  Obviously, we don't believe it

4    does.  So, Your Honor, there is only one new argument before

5    the Court this morning.  And that argument is that the sale

6    of a relatively minor amount of preferred stock, which

7    triggers a stepped-up basis on some but not all of the

8    assets of the Debtors, constitutes a sale of collateral for

9    purposes of Section 4.1.

10               And there are two very significant problems with

11   this argument.  The first is that it could have been made

12   before, because the old plan provided for the exact same

13   sale of preferred stock, and it provided it for the exact

14   same reason, which was to utilize the NOLs of the Debtors.

15   And, indeed, the intent to achieve stepped-up basis through

16   this kind of transaction was set forth in the first day

17   affidavits filed by the Debtors in this case.

18               So, this was always the plan.  And there is

19   absolutely no difference between the plan that was before

20   Your Honor when Your Honor ruled on this matter and the plan

21   that was ultimately confirmed and went effective.  Both of

22   them provided for the exact same stepped-up basis through

23   the sale of preferred stock.

24               To be more specific on that, Your Honor, in the

25   Sixth Amended Plan, there is a definition of Preferred Stock

1    Sale.  I believe it's Definition 280.  And then, in the

2    Disclosure Statement, starting on Page 223, there's a

3    discussion of the Reorganized TCEH spinoff, starts with the

4    discussion of the divisive G Reorganization, then has an

5    entire section on the preferred stock sale, starts on Page

6    223, runs on to 224, and includes the statement, "This sale

7    will cause Reorganized TCEH's contribution of the

8    contributed TCEH assets to be taxable, because Reorganized

9    TCEH will not have control of the preferred stock entity for

10   purposes of Section 351 of the Internal Revenue Code."

11           Okay, this is from the old plan, Your Honor, not

12   from the new plan.  The provisions of the new plan are

13   materially identical.  You did not hear Mr. Kim say one

14   thing about how the old plan different from the new plan on

15   this point.  And so, this is an argument that they either

16   didn't make because they didn't see it or that they did see

17   but they chose not to make.  It really doesn't matter.  The

18   point is:  they could have made it and they didn't.

19           The second problem with the argument before the

20   Court today, Your Honor, is that it has no merit.  The

21   preferred stock sale is just that, and it is not a sale of

22   any of the collateral, let alone all of the collateral.

23           Now, Your Honor, because the argument could have

24   been made before, it really should be barred.  Longstanding

25   principles of finality and judicial economy suggest that a

1    litigant gets only one bite of the apple.  And, had DTC

2    filed a 60(b) motion based on the ground that they thought

3    up a new argument based on the preferred stock sale, clearly

4    you wouldn't have granted that motion.  You would have

5    denied it out of hand.

6            Instead, they obtained this hearing, and scuttled

7    a fully briefed and scheduled argument before the District

8    Court on appeal, on very different grounds.  For example, in

9    a letter to you of November 13th -- I'm sorry, November

10   15th, 2016, on Page 3, after discussing how there were

11   material differences between the old plan and the new plan

12   that had to be in the record and that they had to have the

13   opportunity to argue, they gave an example.

14           "In particular" -- and I'm now quoting -- "In

15   particular, under the old plan, all claims against the TCEH

16   Debtors were canceled before substantially all of TCEH's

17   assets were transferred to Reorganized TCEH."  Skipping one

18   sentence, which is immaterial, "By contrast, under the new

19   plan, the claims against the TCEH Debtors had not yet been

20   canceled at the time TCEH transferred its assets to

21   Reorganized TCEH."

22           Those are the kinds of arguments they were

23   suggesting that they would make in order to get a 60(b)(5)

24   order granted.  This argument, this specific argument, does

25   not appear anywhere in their brief.  You didn't hear Mr. Ki

1    make it today.  And you will search their briefs in the

2    supplemental briefing up and down for one example where they

3    try to point out a difference between the old plan and the

4    new plan.  There is not a single one.  All they do is raise

5    this one argument, and it's an argument that they could have

6    and should have raised before.

7              Now, Your Honor, if we have to get to the merits

8    of this argument, clearly it has none.  The essence of the

9    argument is very simple, and so simple that the flaws in it

10   just jump off the page.  What they're essentially saying is

11   that, since every sale triggers a stepped-up basis, every

12   transaction that triggers a stepped-up basis must be a sale.

13   Obviously, there is a serious flaw in that logic.

14             The sale of preferred stock is really not a sale

15   at all.  And first of all, as Your Honor noted, all the

16   equity of all the entities created by the new plan that will

17   fit under reorganized TCEH are either owned by reorganized

18   TCEH or ultimately by the secured creditors.

19             And that includes the equity of the SPV that sells

20   the preferred stock, okay?  It all ends up in terms of

21   ownership with the reorganized TCEH or the secured

22   creditors.  Indeed, the vast bulk of the IRS letter ruling,

23   which is relied on so heavily by DTC, is that the spinoff is

24   a tax-free G reorganization.

25             And the reason the IRS concludes it's a tax-free G

1    reorganization is that there is a continuity of interest,

2    and that continuity of interest occurs because the secured -

3    - prepetition secured creditors end up being the owners of

4    these spun-off TCEH entities, or in other words, the owners

5    of the reorganized TCEH.  That's the exact opposite of a

6    sale of collateral.

7            Now Mr. Kim actually misspoke a bit.  He said

8    there was a stepped up basis here because there was a G

9    reorg.  Actually, that's not right.  A G reorg, by

10   definition, is tax free.  You only get to a G reorg is if

11   you have a continuity of interest, which is exactly what the

12   IRS found, and the vast bulk of that letter ruling is

13   devoted to that point.

14           The reason there is a stepped up basis for a

15   portion of the collateral has nothing to do with the fact

16   that it's a G reorg.  It has to do with the fact that

17   preferred stock is sold.

18           In the world of the Internal Revenue Code, that is

19   a change of control, not of ownership.  Mr. Kim, when he was

20   talking about, I believe Slide 6, yes, Slide 6, which

21   relates to Step F, he talked about there being a split of

22   ownership of the collateral, okay.  That's not correct.

23           There was a split of control, and that is what

24   caused the stepped up basis for purposes of the IRS rules.

25   Ownership is united under reorganized TCEH.  And the other

1    thing that Slide 6 makes absolutely clear is that it's only

2    a part of the collateral that goes over to the preferred

3    stock entity or the SPV that settles the preferred stock.

4            UCE has another triangle there that says,

5    "Remaining first lien collateral," which is directly under

6    reorganized TCEH.  They don't even attempt to account for

7    that collateral or come up with any theory about how a sale

8    has occurred there.

9            But the fact again, Your Honor, is there is no

10   economic sale with respect to a single piece of collateral.

11   There is a technical change of control under very remote IRS

12   rules, and that leads to a technical stepped up basis.

13           In the real world, it has nothing to do with the

14   economics of a sale.  And from the point of view of the

15   first lien creditors, Momentive still applies here with full

16   force because their rights are in no way affected by that

17   preferred stock sale.  Their collateral is in no way

18   affected by that preferred stock sale.

19           And indeed, Your Honor, if we look at Slide 8,

20   that Mr. Kim handed up to you, the chart comparing the

21   differences between TCEH and Momentive.

22           THE COURT:  Yes.

23           MR. ELLENBERG:  Point one relates to new entities

24   being formed versus new entities not being formed.  As Your

25   Honor already noted, that's an argument they made the last

1   time.  Your Honor has already ruled against them on that

2   point.

3          Two, first lien, first lender lien is canceled,

4   versus first lender lien survive.  Again, that's an old

5   argument, Your Honor.  They made it the last time.  It's

6   addressed from your opinion.  Three, indicia of sale or

7   disposition.  This is the only new argument in the case,

8   Your Honor.

9          It could've been made before.  It should've -- and

10  it should've been made before, if they were going to make

11  it.  But if we're going to consider it, you can see that it

12  is limited entirely to the fact that there's a stepped up

13  basis.

14         And again, here, they correctly say that the tax

15  free G reorg -- that the G reorg is tax free, just like the

16  tax free E reorg in Momentive.  So the only difference is

17  the stepped up basis and the consummation of NOL's.

18         That has nothing to do with the theory and the

19  ruling of Momentive and why Momentive should apply here.

20  Your Honor addressed Momentive in your prior opinion.  You

21  addressed it on Page 25.  You addressed it again on Page 31.

22  Well, what Your Honor said about Momentive in those two

23  parts of your opinion applied equally to this new plan as

24  they do the old plan.

25         Even taking into account the new focus on the step

1    up and basis, because the focus of the core to Momentive,

2    and Your Honor's focus was not on tax implications.  It was

3    on the implications to the first lien creditors and whether

4    what they were receiving was something they had a lien on or

5    something that they did not have a lien on.

6            And the fact remains that what they're receiving

7    under the new plan, just as the old plan, was not something

8    that they had a lien on.  And that's your discussion at Page

9    25.  And it is echoed again on Page 31.

10           And so, nothing about the new focus on the

11   preferred stock sale, which was equally present at the time

12   you rendered your last opinion as it is now, should have any

13   bearing on whether Momentive applies here.

14           I'd like to speak for a minute, Your Honor, about

15   the recent US Bank case.  I mention it because DTC made a

16   big deal of it in their reply brief.  I notice, perhaps not

17   surprisingly, that Mr. Kim did not mention it at all in his

18   argument, nor did Mr. Hollembeak.

19           But just to be clear, the US Bank case has

20   absolutely no applicability to the issues that Your Honor

21   has already decided, specifically whether Section 4.1 of

22   this waterfall in this case applies.

23           Apart from the fact that there were differences

24   between the intercreditor agreements, US Bank was a Chapter

25   7 case.  It involved a Trustee surrendering collateral to

1    secured creditors, okay?  And everyone agreed that the

2    intercreditor agreement applied in that case.

3              And of course, because the trustee surrendered the

4    collateral, the automatic stay no longer applied to it, the

5    stay only applies to property of the estate.  Once the

6    Trustee surrenders it and it's no longer in the estate, the

7    stay doesn't apply.  They were then free to exercise their

8    remedies under state law.

9              If that happened to happen in this case, you know,

10   we might well agree that Section 4.1 apply.  But that's a

11   completely different fact pattern from what's going on here.

12   Here, you have a Chapter 11 Debtor retaining the collateral

13   and making distributions to secured creditors under the

14   plan.

15             And again, Your Honor, I think the Momentive rule

16   could be even broader and simpler, which is that

17   distributions under a plan to a secured creditor are simply

18   a payment to that creditor.  And it doesn't really matter

19   what the source of that distributions were.  Okay?

20             Your Honor, if I borrow money from a bank and buy

21   a house, then I get a third year fixed rate mortgage and I

22   pay that off over 30 years, well, they haven't gotten the

23   proceeds in the collateral they just got made.

24             And if I refinance that loan five years in and the

25   new loan gives me proceeds to pay off the old loan, they

1   haven't gotten the proceeds of their collateral, they've

2   just gotten paid.  And if I sell that and pay off the loan

3   with the proceeds of the sale, Your Honor, they still

4   haven't gotten the proceeds of the collateral, they've just

5   been paid in accordance with the terms of their loan.  Okay?

6            So distributions by a Chapter 11 Debtor under a

7   plan are just payments, and that's all we have here.  And in

8   any event, even if Your Honor does not want to extend

9   momentum, as far as I suggest it could be extended, it

10  clearly applies on all fours to this case.

11           Your Honor, even if a sale did occur, the other

12  elements, three other elements of Section 4.1 have to be

13  satisfied.  Mr. Kim surprisingly said, "Well, they really

14  don't.  You can just get there when it's a concluded sale."

15  I think Your Honor already understands that that would in

16  fact gut Section 4.1 and write the other three elements out

17  of it.

18           And all the other arguments on these points they

19  make in their brief are simply rehashes of arguments this

20  Court has already heard and decided.  And it -- at the end

21  of the day, Your Honor, what was true at the last argument

22  remains true today.

23           The appearance of the collateral agent in this

24  case had absolutely no impact on the outcome.  It had no

25  impact on anything.  The proof of claim was both unnecessary

1    and achieved nothing.  No remedies were ever exercised in

2    any way.  And nothing the collateral agent did changed a

3    single aspect of this case or a single provision of the

4    plan.

5            THE COURT:  What about the signing of the PSA?

6            MR. ELLENBERG:  Your Honor, that's an old

7    argument.  You addressed it the last time.  They signed it

8    in a limited capacity for a limited purpose.  It's not the

9    exercise for remedy.  It's -- when a creditor votes for a

10   plan, is it exercising a remedy?

11           THE COURT:  Mm hmm.

12           MR. ELLENBERG:  I mean, it's nonsense.  Payments

13   under a plan are just payments.  They're not the exercise of

14   a remedy.

15           THE COURT:  Mm hmm.

16           MR. ELLENBERG:  Mr. Kim said again today as he

17   said the last time, "Well, Your Honor, if they're -- if the

18   creditors are receiving payments, there's chaos, if the

19   intercreditor agreement doesn't apply.  Instead, you can't

20   just spray around proceeds."

21           Well, we're not just spraying it around, and

22   there's a clear guidepost as to how to distribute it.  It's

23   called the plan or reorganization.  Secured creditors

24   receive distributions under plans of reorganization all the

25   time.  You don't need an intercreditor agreement to do that.

1          When you need an intercreditor agreement is when a

2     collateral agent has exercised remedies and gets proceeds or

3     gets the collateral in kind, like in US Bank, and then has

4     to do something with it.  And then, he has to be guided by

5     how the party's going to do it.

6          This is different.  We're getting distributions

7     under a plan.  There is no chaos.  The plan tells us how to

8     distribute it.  The Bankruptcy Code tells us how to

9     distribute it.

10          I think the only thing I'd like to address at this

11     point, Your Honor, is the order that we -- that should

12     properly come out of this proceeding.  I think where we are

13     procedurally is that following Your Honor's indication of a

14     substantial issue under Rule 8008, there was a remand for,

15     quote, "further proceedings," so I think we're here in

16     further proceedings.

17          I believe, I think everyone believes, that this

18     was their opportunity to identify differences between the

19     old plan and the new plan that are material to the issues

20     that were decided by the Court in this case and that were

21     presented in this case.

22          I think it's clear that they failed to identify

23     any material distinctions between the two plans.  And

24     therefore, Your Honor, in effect, you would be reaffirming

25     your prior order, dismissing their complaint on our motion

1    to dismiss, but making clear that the new plan was part of

2    the record and it was considered, and that they had their

3    full opportunity to identify differences that were material

4    to the outcome.  Clearly, they have not.  Thank you.

5              THE COURT:  Thank you, Mr. Ellenberg.  Mr.

6    Moloney?

7              MR. MOLONEY:  Yes, Your Honor.  And I too have a

8    brief little handout that's more --

9              THE COURT:  All right.

10             MR. MOLONEY:  If I can approach the bench, please?

11             THE COURT:  Yes, please.

12             MR. MOLONEY:  Thank you.

13             THE COURT:  Thank you.

14             MR. MOLONEY:  For the record, it's Tom Moloney on

15   behalf of J. Aron.  And since this is baseball season, I'm

16   reminded a bit of Yogi Berra's statement that this is déjà

17   vu all over again.  Nevertheless, with the Court's

18   indulgence, I'm going to address your argument, which you

19   didn't reach last time --

20             THE COURT:  Right.

21             MR. MOLONEY:  And assuming that you want to have a

22   more complete record.  And in that regard, I --

23             THE COURT:  To use a technical term, I ducked last

24   time.

25             MR. MOLONEY:  Right.  And I assume you don't want

1    us to go back again, so and if you want to deal with it this

2    time or not.  But --

3              THE COURT:  Well, if Mr. Kim's right, that there

4    has been changes or an argument that I should look at that

5    changed the announcements that I made before, which was 4.1

6    was not applicable, then I might have to get to your

7    argument.

8              MR. MOLONEY:  Right.

9              THE COURT:  So absolutely, glad to hear it.  And

10   since I didn't decide it before, I'm not sure it would be,

11   you know, something that's -- that I can't think about now,

12   based on a re-argument --

13             MR. MOLONEY:  Yeah, I think Your Honor could

14   decide and you could decide --

15             THE COURT:  I can decide it fresh, yeah.

16             MR. MOLONEY:  Yeah.  And so, as I said the last

17   time, I really think this is an argument that's answered

18   just by looking at the documents.  There are all the

19   documents.  It doesn't really require very much analysis.

20             And to put this dispute in context again, nothing

21   has left changed on this issue since the last time you heard

22   the argument.  The third amended joint plan, which is in Tab

23   5, continues to have the language refocused on before at

24   Page 93, which says, and I think this is relevant to some of

25   their arguments, "Unless otherwise specifically provided for

1    in a plan or the confirmation order," and it wasn't, "and

2    notwithstanding any documents that governed the Debtor's

3    pre-petitioned funded indebtedness to the contrary."

4            "Post-petition interest and/or default interest

5    shall not accrue or be paid on any claims."  So that's

6    pretty clear.  And we have the situation of a confirmed plan

7    that's a matter of federal law, has extinguished any state

8    law or contractual right to purchase interest, even if they

9    had such a right, which I'll show you they don't have, it's

10   gone under the plan as a matter of supreme federal law.

11           And we also have the unfortunate news in Tab 6

12   that unlike the 54, 59.4 percent payout of principle, of the

13   last plan, the estimate of the current plan, if you look at

14   Page 15 in Tab 6, is that Creditors in this category of TCEH

15   first lien secured claims are estimated will receive 41

16   percent of the principle amount of their claims.

17           So essentially, what they're saying is, look, the

18   41 percent principle amount, which creditors are getting

19   this amount, should be lower for some creditors in this

20   category and higher for some other creditors based on

21   interest payments that the Debtor's not making.

22           That's, in essence, the argument to make, which

23   is, I would submit, is somewhat a counterintuitive argument

24   among pari passu creditors, and doesn't flow from the

25   agreements as we walk through them.

1          And that's why I'm going to walk through Tab 1,

2    which is the credit agreement, and point you to Tab 2 and

3    Tab 3, which I know Your Honor doesn't want to deal with

4    parol evidence, but I don't believe that these documents

5    would qualify as parol evidence, because they're all part of

6    the single transaction that we're dealing with here,

7    particularly, they did not become parties to the

8    intercreditor agreement, except through the accession

9    agreement, which is Tab 3.

10          So they don't have any rights under this

11   agreement, except as a result of the accession agreement.

12   And the offer memorandum was issued before the accession

13   agreement, so these are all part and parcel of one story,

14   one operating agreement.

15          We cited authority view to Gordon decision by the

16   2nd Circuit, 254 F2d 811 812, which is a 1958 decision at

17   footnote 15 of our opening brief in this matter, which was

18   October 9, 2015.  And that in turn cites New York Law and

19   other Second Circuit Law for this general principle, that

20   when you have a single transaction, all the operative

21   documents may be considered, and it's not a violation of

22   parol evidence.

23          So with that category, before I get into the

24   specific agreements, I want to deal with one, what I think

25   is a straw man argument, which is that we're arguing that

1    bankruptcy -- there's more in the brief.  We didn't hear it

2    this morning, but that bankruptcy somehow interfered with

3    their contractual rights.  And the parties do not intend for

4    bankruptcy to affect their economic rights.

5           It wasn't the bankruptcy that did that, Your

6    Honor.  What we have here is, we have a shared interest in

7    collateral that turned out not to be enough.  And we have a

8    Debtor, who is insolvent.  And so, it's economic fact, not a

9    legal fact of bankruptcy.  The economic fact is their rights

10   in the collateral did not support their upshot claim to

11   interest, which is what interest is.

12          The collateral was not there, so they didn't earn

13   any interest.  So effectively, what we're saying is, this

14   intercreditor agreement was not an (indiscernible) document.

15   It doesn't -- wasn't put here to create rights and value

16   that doesn't exist.

17          There was nothing to distribute because there was

18   economically nothing to exist.  And so, I think that's the

19   big philosophical point.  That's totally rational.  They're

20   saying the argument is irrational.  That is totally

21   rational.

22          So now getting into the specifics.  In Tab 1, if

23   you go to Page 15, you'll see that this was intended to be a

24   pari passu agreement.  And of course, that's a Latin meaning

25   that parties have an equal step or an equal footing, which

1   is we're all supposed to be in this together and be treated

2   the same.

3           So that 41 percent distribution is what everyone

4   is supposed to be getting.  That's what we agreed to, quite

5   clearly in Section 2.  Then, we go onto 4.1, and it's

6   undisputed that we're all in the third priority.  And so,

7   the key point here, and I really didn't understand either of

8   the arguments that were made this morning.

9           The first one, I didn't understand and the second

10  one, I didn't understand, because according to rebuts on the

11  argument we made, we didn't make the arguments that they

12  were rebutting.  The argument -- the key point here is that

13  the rule of explicitness applies when you have a structural

14  priority to figure out whether or not post-petition interest

15  was included within the items that are being prioritized.

16          If you don't have a structural priority, if you

17  have no structured priority at all, you never get to this

18  rule of explicitness, and you've already failed.  If you

19  don't have a system where it says I don't (indiscernible)

20  take ahead of you, then I'll have to figure out what is it

21  I'm entitled to take ahead of you.

22          The rule of explicitness says, well, I agree, you

23  know, interest gets paid before principle.  Well, what kind

24  of interest?  Does it include post-petition interest?

25  Senior creditors get paid before junior creditors.  Well,

1    does that include post-petition interest?

2           If you don't have a structural priority, you never

3    get to the question of what's included.  So the absence of a

4    structural priority defeats them entirely under the rule of

5    explicitness before we even get to the definitional

6    sections.  So we never understood why they would rely on

7    that argument.

8           And as to the fourth, the last category, all that

9    says in the last category, it says, "The balance, which goes

10   to the Debtor, if for some reason, after we've got our

11   distribution in the third category," which didn't happen

12   here, so this is purely academic.  We don't have to really

13   figure out what happens in the fourth category because we

14   don't get paid any extra money to be leftover to the

15   Debtors.

16          We didn't get all the money that was due and

17   payable to us.  We only got 41 percent of the money due and

18   payable to us.  We just saw that.  So we're not in the last

19   category.  But if we got paid 100 percent and we got paid

20   post-petition interest, and for some reason we got extra

21   money, that, we would pay over to the Debtor.

22          If there is no -- if we don't get -- if we only

23   get paid 41 cents to the dollar, the post-petition interest

24   does not get paid in the fourth category, we never said

25   otherwise.  This is just available there, if, for example,

1   which could've happened in this case, if there had been a

2   distribution through junior lienors, and somebody wanted to

3   argue, wait a second, that is subject to our intercreditor

4   agreement, which we have.  And they have to turn it over to

5   us.  Where would that get distributed?

6           That would get distributed in the fourth category.

7   I think that's what the point of it was.  If, for some

8   reason, we had actually foreclosed on the collateral and we

9   sold it from whatever was necessary to satisfy all the

10  obligations of (indiscernible), that would also fit into the

11  fourth category.  That's what the fourth category's for.

12  It's not for the payment of post-petition interest when

13  there is none.  So we're not arguing that whatsoever.

14          So and now, the key part about this language in

15  this category, it's talked about pro rata payment of all

16  principle and other amounts then due and payable in respect

17  to the secured obligations.  So it's not -- it doesn't say

18  just pro rata payment of the secured obligations, which is

19  what they would like.

20          That's what the US Bank case said, basically.  It

21  picked up all of the obligations on the financing documents.

22  So this says, "Only the due and payable portions."  So let's

23  look at some good obligations.  Look at that definition on

24  Page 13.  And we see that definition is an extremely broad

25  definition.

1            It picks up any obligation basically arising in

2    this loan document, whether it was contingent, now existing,

3    mature, due or a reliable claim.  A reliable claim is picked

4    up in the definition here.  And it's repeated again in the

5    definition in post-petition interests.

6            So they drafted this thing, this clause extremely

7    broadly, but they didn't pick up in what gets paid in 4.1

8    obligations that are unmature, that are contingent, that are

9    not due, or that are not allowable.  They didn't pick those

10   up in 4.1, third priority.  They only picked up the due and

11   payable portion of the obligations here in 4.1.

12           And how do you know what amount that's going to

13   be?  Well, you look in 4.3, and if this -- the

14   (indiscernible) had to make the representation required in

15   4.3, which is the amount of what was due, and this, we

16   highlighted on Page 20, I think this is very important, Your

17   Honor, they'd have to certify the amount that would be

18   presently due and owing.

19           Now how do we know -- could they have made a

20   certification in this case, an honest certification that

21   included post-petition interest.  I would say they could

22   not, and the reason I would say they could not is that we

23   look at their indenture.  And that's in Tab 4.

24           Now if we look at Page 69 of their indenture, and

25   we look at Section 4.01, which is the -- 4.01, which is

1    actually what they're entitled to be paid under the notes,

2    this is the operative language.  And we looked at a lot of

3    things, but this is what they're actually held to paid.

4            It says, "The insurer shall pay interest,

5    including post-petition interest in any proceeding under any

6    bankruptcy law on -- overdue principle at the rate equal to

7    the debt applicable interest rate or notes to the extent

8    lawful.  It's for paying interest, including post-petition

9    interest in any proceeding on the bankruptcy law on overdue

10   installment of interest, if any, without regard to any

11   applicable grace period.  At the same rate, to the extent

12   lawful."

13           Well, you just saw, federal law has now said there

14   is no lawful payment of post-petition interest in this case

15   because there is no post-petition interest.  It's been

16   eliminated.  So they have not -- they could not have made

17   the certification that was due here under our own indenture.

18           They also couldn't (indiscernible) that

19   certification under common sense because it's quite clear

20   that no amount of interest is due and payable here or due

21   and long from the Debtor here.  The Debtor doesn't have the

22   money.  This plan provided its discharge from interest.

23           Their indenture says they can't collect it.  So

24   there's no way that any interest is due and owing to these

25   people.  There's no way they can satisfy this obligation.

1    Now so why do we have this broader definition?

2            I think the reason we have the broader definition

3    of obligations is because the people who wrote this

4    anticipated that there's a possibility of having the junior

5    debt we did in fact have.  And you don't need to look to

6    extrinsic evidence to find that.

7            If you look at 7.9, which is on Page 43, they

8    specifically authorized the collateral agent to enter into

9    an agreement such as the one it in fact did, with junior

10   debt.  And if you look at the definition of discharge and

11   indebtedness on Page 6, going right back to the beginning,

12   sorry to jump around on you, but --

13           THE COURT:  Which tab am I on now?

14           MR. MOLONEY:  We're in Tab 1.  We're in the

15   intercreditor agreement.

16           THE COURT:  Okay.

17           MR. MOLONEY:  Sorry.  If you look at discharge

18   obligations, and you look at the D category, the obligations

19   only get discharged when you're paying full in cash.  All

20   other secured obligations are then due and payable, or

21   otherwise accrued.

22           The otherwise accrued language is the new language

23   to pick up the fact that you could accrue obligations under

24   another document, such as an intercreditor agreement with

25   another party.  So this is all from the model indenture, as

1    Judge Bass noted in her opinion, in US Bank.

2           And it's all designed to accommodate what in fact

3    happened here.  It was not designed to create some priority

4    or structural priority between the first lien holders.  And

5    how do we know that?  We know that because the agreement

6    explicitly says so. It says so in 9.17, which is on Page 40,

7    where it says, "(indiscernible) this provision solely to

8    define relative rights."  This provision says you ignore

9    headings.  What does it say?

10          It says, "The provisions of this agreement are,

11   and are intended for the purpose of defining the relative

12   rights of secured parties."  So this is an agreement just to

13   define relative rights of parties vis-à-vis the Debtor.

14   It's not to define their rights vis-à-vis each other.

15          And in fact, the Kingsboro opinion, which was the

16   Second Circuit decision that they rely on, it cited 514 F.2d

17   400 1975, focused on language like this, and finding in a

18   ruling, explicitness was not satisfied in the agreement.

19   The Court analyzed in that case, because they said, look,

20   there's no structure of priorities here.  They're just

21   defining rights vis-à-vis what the Debtor's giving to them.

22          So this agreement operates very clearly.  Whatever

23   you give in -- whatever basis you have, and you get money

24   in, you give it out on the same basis.  So if you get

25   principle, if you have principle, you get interest, you give

1    out interest, you don't go through this alchemization

2    process that they're arguing for here.

3              Now the last point I would like to make, Your

4    Honor, is -- deals with what their argument about what

5    intention was.  What was the intention of the parties that

6    entered into this agreement?

7              And I do think in this regard, the offering

8    memorandum has got to be the definition of what their

9    client's intention is, because this is what they were told

10   before they signed the agreement.

11             And if you look at the offering memorandum, which

12   is Tab 2, and we look at the first excerpt we have in the

13   offering memorandum, on the first page I have there, that

14   they're told they're going to write equally in payment with

15   all future and existing senior debt.  And Page 9, this equal

16   treatment is repeated.

17             Jumping up ahead to Page 23, which I think is

18   extremely important, it says, "Notes and the guarantee will

19   be secured on a first priority basis only to the extent of

20   the value of the assets that have been granted a security

21   for the notes, and the guarantee of the notes.  And there

22   may be insufficient proceeds to satisfy amounts owed under

23   the notes and related guarantees."

24             So this is both ways.  This is the point I made to

25   you before, that they were told basically, their rights are

1    going to be defined by the value of the collateral.  And

2    they're told about it again on Page 24, when they're

3    explicitly told, if you could turn to the next page, that in

4    the event of the bankruptcy, a similar proceeding is

5    commenced by or against this, if at the time of the filing,

6    the value of the collateral is less than the amount of

7    principle and accrued and unpaid interest of their notes and

8    other debts secured by lienings and collateral that are

9    equal and gradable with the liens securing the notes --

10   that's us -- interest rates cease to accrue on their notes

11   thereafter.  That's what happened.

12            So on Page 55, they're again told that the

13   Bankruptcy Code makes only the payment and a accrual, a

14   post-petition interest, cost and attorneys feeds to a

15   secured creditor, and Debtor's bankruptcy case, to the

16   extent the value of the collateral is determined by the

17   bankruptcy court, to exceed the aggregate outstanding

18   principle amount at maturity of the obligations secured by

19   the collateral, including any obligations secured on a

20   priority basis.

21            So they're explicitly told that their rights are

22   going to be defined by the collateral here.  They're sharing

23   collateral with other parties equally and ratably.  There's

24   nothing in here that says they -- that we -- your rights are

25   going to be the same, irrespective of a bankruptcy.

1          This is an interesting fantasy that you're hearing

2     this morning, but it has no bearing in the agreements.  It

3     has no bearing on what the people were told when they signed

4     this document.  Thank you, Your Honor.

5          THE COURT:  Thank you, sir.  Can we take a short

6     recess and then I'll hear from Titan, correct?  Yeah.  We'll

7     take a very short recess, three or four minutes.

8        (Recess)

9          THE COURT:  Okay.

10          MR. ROMANELLO:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MR. ROMANELLO:  Salvatore Romanello on behalf of

13     Titan Investment Holdings.  Your Honor, in order for the

14     plaintiffs to win here, they'd have to clear four hurdles,

15     and I'm not going to repeat what Mr. Ellenberg and Mr.

16     Maloney have argued.  We agree with all of their arguments.

17          Three of those hurdles are in the preamble.  And

18     what we've heard is, they want the Court to ignore the

19     preamble.  Of course they do.  Because they can't win unless

20     you ignore it.  It's clear from the preamble the plan

21     distributions are not subject to this waterfall.

22          They also have to overcome the due and payable

23     argument.  And then, there's an overlay on all of that, Your

24     Honor.  The overlay is the rule of explicitness.  I heard

25     Mr. Hollembeak said that creditors can agree whether post-

1    petition interest may not be allowable.

2         That's not the rule of explicitness.  It's the

3    exact opposite.  Creditors have to agree for it to be

4    allowable.  And for them to agree to allow post-petition

5    interests, the agreement must do so clearly, explicitly,

6    unambiguously.

7         So how do they try to meet that rule?  They tell

8    you -- they cite to a bunch of provisions in their deck, and

9    they avoid 4.1.  Well, 4.1 is the most important provision.

10   And what they also ignore is 4.3B, which refers to 4.1, and

11   what happens when the collateral agent obtains the monies

12   and it defines what's owing by the borrower, not by the

13   creditors.

14        So we submit, Your Honor, that they cannot meet

15   the rule of explicitness, and that the rule applies.  It's

16   not just between junior and senior creditors.  And that's

17   evident from the US Bank case, which we cited in our brief,

18   in our sur-reply brief.

19        And just one quote from that case, Your Honor, and

20   they refer to the Southeast Two case, which is the leading

21   case, Court of Appeals, New York State.  And the Court in US

22   Bank notes, at Page 8 that, "The Southeast Two holding does

23   not cabin itself to protecting only junior creditor

24   expectations, but the legitimate expectations of any party,

25   that absent an explicit agreement to the contrary interest

1    stops accruing on the date of the petition."

2             There is not an explicit agreement to the

3    contrary.  You can't find it in 4.1.  You can't find it in

4    4.3.  It's the exact opposite.  That's all we have for Your

5    Honor.

6             THE COURT:  Thank you.  Mr. Kim?

7             MR. KIM: Rebuttal?

8             THE COURT:  Yes.

9             MR. KIM:  Thank you, Judge.  I think just two

10   points.  I think first, for the few different arguments that

11   plan distributions or plan distributions, that they don't

12   fall under the preamble, the 4.1, but I think as I mentioned

13   in my opening argument, if Your Honor finds that what is

14   happening in the plan or that proceeds of collateral are

15   being paid out, then even under the preamble, the 4.1, the

16   collateral agent actually is basically receiving value that

17   satisfies the preamble to 4.1, because the plan in Article 4

18   -- E4 just explicitly says that to the extent distributions

19   are considered collateral or its proceeds, they are being

20   paid to the collateral agent.  So that satisfies one of the

21   prongs.

22            And then, the intercreditor agreement, 3.1C4

23   states that, "Even acceptance of the collateral in full or

24   partial satisfaction of the secured obligations constitutes

25   an exercise of a remedy."  And we've cited in our brief

1   other examples of exercise of remedies.

2           So we return to the question of is what is

3   happening proceeds of collateral being paid out?  And here,

4   I think the intermediate steps do matter.  I think the

5   position of the interveners is that -- is urging the Court

6   to interpret Momentive to say if a creditor ends up with his

7   own collateral in his hands at the end of whatever

8   transaction happens, then by definition, that creditor did

9   not get proceeds of collateral.

10           But I don't think that's right.  And the reason

11   that that's not right is imagine a scenario where a Debtor

12   has collateral of a secured creditor, it's sold in the 363

13   sale.  The proceeds of that sale end up being paid to that

14   secured creditor.

15           But it just happens that that same secured

16   creditor comes and bids in the 363 sale and buys his own

17   collateral back at whatever price.  What you have at the end

18   is, you have this same secured creditor is actually just

19   holding his collateral.

20           He's gotten money that was a plan distribution

21   from the bankruptcy estate, that was really proceeds in this

22   collateral.  He no longer had the collateral at the time it

23   was sold, but I guess in the legal fiction almost

24   simultaneously, he ended up with his collateral back in his

25   hand.

1           There would be no legal basis to say to that

2    secured creditor, you didn't get proceeds of collateral,

3    just because you still have it in your hand, because the

4    intermediate steps do matter.  And I think I'll just leave

5    Your Honor just with one slide, which is the slide that

6    says, "Differences between TCEH and Momentive

7    restructurings."  Unfortunately, these do not have page

8    numbers, but it's --

9           MAN:  It's Number 8.

10          MR. KIM:  I can't see it on mine.  But if it's

11   Number 8, it's Number 8.

12          THE COURT:  Which one are we talking about here?

13          MR. KIM:  It says, "Differences between TCEH and

14   Momentive Restructurings."

15          THE COURT:  Hang on.  Oh yes, the chart, the

16   table.

17          MR. KIM:  Yes, Your Honor.  Right.

18          THE COURT:  Yes.

19          MR. KIM:  So, do you have it in front of you?

20          THE COURT:  I do.

21          MR. KIM:  So I think looking at the lower left

22   hand corner and the lower right hand corner, I think the

23   intermediate steps do matter, because even though they, in a

24   sense, the secured creditor has the collateral at the end,

25   in the way that, you know, one is defining it as, well, it's

1    in a -- the secured creditor ends up owning entities that

2    indirectly now co-own certain assets.

3            I'm not here arguing just because there's a

4    preferred stock sale, you should find there is a sale or a

5    disposition.  What I am saying is that if you look at how

6    the parties to the transaction treated what was actually

7    going on, there's all the indicia of an actual sale or

8    disposition.

9            It wasn't just that they said it, and they did,

10   that it was a sale with a disposition, they ended up having

11   all of the features of net operating losses being consumed,

12   a basis step-up happening, taxable gain being recognized, a

13   tax free G reorganization, which is just defined as a

14   transfer of assets by one corporation to another, and, of

15   course, the separation agreement and the assumption of the

16   assignment agreement, which are all of the actual features

17   of collateral being essentially sold or disposed of.

18           So I think it is not right to say, just because

19   the secured creditors are still in the structure, and that

20   the old collateral, even though transformed, is still in the

21   structure, that automatically it's not proceeds of

22   collateral.

23           I think all of the indicia of an actual sale or

24   disposition are there.  And so, for all of those reasons,

25   we'd urge the Court to find that proceeds of collateral in

1    fact are being paid out.

2            THE COURT:  Thank you.

3            MR. KIM:  Thank you.

4            THE COURT:  Mr. Hollembeak?

5            MR. HOLLEMBEAK:  Thank you for the indulgence,

6    Your Honor.  Just a couple of quick points.  Again, Jeremy

7    Hollembeak of Kobre & Kim.

8            THE COURT:  Oh, Hollembeak, I apologize.  I

9    mispronounced your name.  I apologize.  Go ahead.

10           MR. HOLLEMBEAK:  I just wanted to respond to a

11   couple of things that were said by opposing counsel.  First,

12   Mr. Moloney pointed you to a provision of the plan and

13   suggested that the due and payable issue was somehow

14   resolved by the plan.

15           I can tell you I was there.  It's totally

16   antithetical to the settlement that was hard fought to carve

17   this dispute, which existed at the time of the first plan,

18   including the due and payable issue entirely out of the

19   plan.

20           And if Your Honor wants language in the plan that

21   preserves the issue, Article 8, Paragraph D is the releases

22   by holders of claims and interests.  And about halfway

23   through the paragraph, there's a sentence, "Notwithstanding,

24   anything to the contrary, the releases do not affect any of

25   the claims and (indiscernible) of action in this adversary

1      proceeding, which is a defined term in the plan."

2             So the plan did not resolve any of these issues.

3      It preserved them.  Second of all, you know, this is a New

4      York contract case, and New York contracts doesn't look at

5      the documents.  I understand Mr. Moloney has pointed out the

6      offering memorandum.

7             We would say that it just was warning these

8      noteholders that they may not get paid by the Debtor that

9      had nothing to do with their intercreditor relationship that

10     they were entering into at the same time.  But don't just

11     take my word for it, that's what the contracts say.

12            The accession agreement in the J. Aron materials

13     makes the first lien noteholders holders of additional

14     secured obligations.  The definition of additional first

15     lien obligations, which these entities were becoming, is set

16     forth in the security and the pledge agreement.

17            It's an identical definition.  Those agreements

18     were entered into in 2009, two years before the notes were

19     issued.  And it's in our chart on the very last page.  So

20     this is what the noteholders bought into, to become

21     additional first lien obligation is defined as all advances

22     to and debts, liabilities, covenants, whatever, arising

23     under the additional first lien agreement, which would be

24     the first lien notes indentured, including interest and fees

25     that accrue after the commencement by or against any

1    guarantor or any affiliate thereof of any bankruptcy

2    proceeding, regardless of whether such interest and fees are

3    allowed the claims under such bankruptcy.

4           So once again, you see that language.  That is the

5    language.  The idea that you should interpret due and

6    payable to mean payable by the Debtor in a bankruptcy

7    because it's an allowed claim is antithetical not just to

8    the clauses that we've pointed Your Honor to, but if you

9    look at the inventive default provisions in the credit

10   agreement and in the notes indentured, both say that upon

11   the filing of a bankruptcy, all principle and interests due

12   -- becomes immediately due and payable, even though everyone

13   who entered into that contract knows that when someone files

14   for bankruptcy, even if ultimately in the case, they may pay

15   it, it's not payable on that date.

16          But they used the phrase due and payable.  It's a

17   term of art.  It doesn't mean due means one thing and

18   payable means some additional qualification.  It means due

19   and payable under the documents.

20          Mr. Moloney pointed to the definition of discharge

21   of indebtedness.  This is in Tab 1 of their binder.  He read

22   you Paragraph D that was convenient, but if you just go to

23   Paragraph A of the same definition, it spells out that

24   discharge of secured obligations means discharge of the

25   outstanding principle reimbursement obligations, iii,

1    interest, including all interest, that is accruing,

2    including post-petition interest.  And that's, again, the

3    defined term that is also in the definitions of the same

4    agreement that says whether or not interest is accruing

5    whether or not it's allowed or allowable.

6             And finally, it's -- I find it contradictory, what

7    Mr. Moloney said about the rule of explicitness, that it

8    only applies when there's a structural seniority or

9    subordination, and Mr. Romanello quotes you the US

10   (indiscernible) case, which says it applies to any creditor

11   in any situation.

12            But if Your Honor wants to look at language in an

13   agreement that would not require the accounting of post-

14   petition interest, it should look at Footnote 10 of the US

15   Bank decision that cites Tribune, where the language in the

16   contract in Tribune provided interest accruing after the

17   filing of a petition initiating any proceeding pursuant to

18   any federal bankruptcy law.  But only to the extent allowed

19   or permitted to the holder of such indebtedness of the

20   company against the insolvency estate of the company in such

21   a proceeding.

22            That's what these documents could've said, but

23   they don't say that.  So for all these reasons, Your Honor,

24   I ask to be granted the relief in our motion.  Thank you.

25            THE COURT:  Thank you, Mr. Hollembeak.  All right.

Page 74

1    Any surrebuttal or comment from the interveners.  I hear

2    none.  Okay.  Thank you very much for your argument.  The

3    Court will obviously take the matter under advisement and

4    issue its opinion as soon as possible, I think probably a

5    relatively short order, so we can move the case back to

6    Judge Andrews.  Thank you very much.  We're adjourned.

7

8                        *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya
    Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o,
ou, email=digital1@veritext.com,
c=US
Date: 2017.04.27 16:17:15 -04'00'

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  April 27, 2017