### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| ENERGY FUTURE | ) |
| HOLDINGS CORP., *et al.*, | ) Case No. 14-10979 (CSS) |
| | ) |
| *Debtors.* | ) (Jointly Administered) |
| | ) |

| | |
|---|---|
| ELLIOTT ASSOCIATES, L.P., | ) |
| ELLIOTT INTERNATIONAL, L.P., | ) |
| and THE LIVERPOOL LIMITED | ) |
| PARTNERSHIPS, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| ENERGY FUTURE INTERMEDIATE | ) |
| HOLDING COMPANY LLC, EFIH FINANCE | ) |
| INC., ENERGY FUTURE HOLDINGS CORP., | ) |
| EBASCO SERVICES OF CANADA LIMITED, | ) |
| EEC HOLDINGS, INC., EECI, INC., EFH | ) Adversary Proceeding |
| AUSTRALIA (NO. 2) HOLDINGS COMPANY, | ) No. 17-_____ |
| EFH FINANCE (NO. 2) HOLDINGS | ) |
| COMPANY, EFH FS HOLDINGS COMPANY, | ) |
| EFH RENEWABLES COMPANY LLC, | ) |
| GENERATION DEVELOPMENT COMPANY | ) |
| LLC, LSGT GAS COMPANY LLC, LSGT | ) |
| SACROC, INC., NCA DEVELOPMENT | ) |
| COMPANY LLC, TXU RECEIVABLES | ) |
| COMPANY, as Debtors and Debtors in | ) |
| Possession, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Elliott   Associates, L.P., Elliott International, L.P. and The Liverpool Limited

Partnership (collectively, "Elliott," the "Elliott Funds" or the "Plaintiffs"), by their

undersigned counsel, hereby allege for their Complaint for Declaratory Relief against Defendants Energy Future Intermediate Holding Company LLC ("EFIH"), EFIH Finance Inc. ("EFIH Finance"), Energy Future Holdings Corp. ("EFH"), Ebasco Services of Canada Limited, EEC Holdings, Inc., EECI, Inc., EFH Australia (No. 2) Holdings Company, EFH Finance (No. 2) Holdings Company, EFH FS Holdings Company, EFH Renewables Company LLC, Generation Development Company LLC, LSGT Gas Company LLC, LSGT SACROC, Inc., NCA Development Company LLC, and TXU Receivables Company as debtors and debtors in possession (collectively, the "Defendants" or the "Debtors"), as follows:[1]

## PRELIMINARY STATEMENT

In February 2017, this Court confirmed the Eighth Plan of reorganization filed in these cases (the "Eighth Plan") [D.I. 10853]. The effectiveness of the Eighth Plan was predicated on NextEra Energy, Inc. ("NextEra") acquiring (via merger with EFH) the 80% ownership stake that EFH indirectly holds in Oncor Electric Delivery Company LLC ("Oncor"), the primary electricity transmission company in Texas (the "NextEra Transaction"). The price was approximately $18.7 billion total enterprise value or $12.2 billion total equity value for Oncor. Because Oncor is a regulated utility, that transaction required approval of the Public Utility Commission of Texas (the "PUCT"). By order dated April 13, 2017 (the "PUCT Final Order"), the PUCT formally denied the joint application of NextEra and Oncor to approve the NextEra Transaction (the "NextEra/Oncor Application"). In so doing, the PUCT found that the NextEra Transaction was "not in the public interest under Public Utility Regulatory Act ("PURA") §§ 14.101, 39.262(m), and 39.915(b)."

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Amended PIK PSA (as defined below), or otherwise in the Eighth Plan (each of the foregoing capitalized terms as defined below).

As of the filing of this Complaint, the NextEra Transaction cannot be consummated. The PUCT Final Order prohibits its closing. As a result, the Eighth Plan cannot go effective. Moreover, although NextEra has filed a motion for Rehearing (without its co-applicant Oncor) seeking to reverse the PUCT Final Order (the "Rehearing Request"), the Rehearing Request provides creditors with cold comfort – the findings of the PUCT make clear that, absent a dramatic change in the status quo, there is a substantial risk that the NextEra Transaction will not close. Even if it were to close, NextEra will likely not be willing to close on the current agreed-upon merger price or in a reasonable amount of time.

The precarious state of the NextEra Transaction means that creditors and the Debtors must immediately consider and pursue other restructuring alternatives that will enable the Debtors to exit these Chapter 11 cases (the "Cases") as soon as possible. Although the Debtors said as much at the April 17, 2017 status conference, their actions have been inconsistent with their words (and in fact, precisely to the contrary). Indeed, despite NextEra's Chief Executive Officer's unambiguous and emphatic announcement to NextEra's shareholders that NextEra is not prepared to close the NextEra Transaction on the agreed upon price, the Debtors have steadfastly refused to permit Elliott, EFIH's largest creditor, to begin negotiating sorely needed financing and restructuring alternatives with third parties today. Instead, the Debtors have attempted to maintain exclusive and vise-like control of the Cases despite exclusivity lapsing over 16 months ago. They have done so under the guise of a January 2017 Plan Support Agreement (the "PIK PSA"),[2] including a purported

---

[2] That certain Plan Support Agreement is dated as of January 2, 2017 (the "Original PIK PSA"), was amended by that Amendment to the Plan Support Agreement dated as of January 19, 2017 (the "Amended PIK PSA,"), and was by and among (a) the Debtors, (b) UMB Bank, N.A., as the indenture trustee for the EFIH Unsecured Notes (the "PIK Notes Trustee", and (c) certain holders of PIK Notes who at the time beneficially owned approximately 66 2/3% of the PIK Notes. A true and correct copy of the Original PIK PSA is attached as Exhibit A to the Declaration of Erin R. Fay Filed in Connection with the (I) Verified Complaint for Declaratory and Injunctive Relief and (II) The Elliott Funds' Motion in Support for a Preliminary Injunction (the

amendment that was heretofore neither disclosed nor publicly available. The amendment effectively concealed from this Court changes to the Original PIK PSA. Elliott is not and never was a party to either the Original PIK PSA or the Amended PIK PSA.

Consequently, Elliott is compelled to bring this action seeking declaratory and injunctive relief with respect to the purported continued applicability of the recently revealed Amended PIK PSA and its alleged restrictions on Elliott's actions as a creditor in these Cases. Additionally, because of the great and undeniable urgency to move these Cases forward given the substantial closing risk created by the PUCT Final Order, Elliott has contemporaneously moved this Court for a preliminary injunction to prevent the Debtors from interfering with the exercise of Elliott's fundamental statutory creditor rights to (i) propose alternative financings, (ii) formulate and prosecute alternative plans of reorganization, (iii) oppose relief that the Debtors may seek, and (iv) discuss all of the foregoing with other parties.

## JURISDICTION AND VENUE

1.      Jurisdiction exists over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 because (i) certain of the counts herein arise in the Debtors' Cases pending in the United States Bankruptcy Court for the District of Delaware, jointly administered under the case of *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS), and (ii) other counts arise under the Bankruptcy Code. Alternatively, this adversary proceeding is related to these Cases.

---

"Declaration"), filed contemporaneously herewith. References to the Exhibits in this Complaint refer to the Exhibits contained in the Declaration. A true and correct copy of the Amended PIK PSA is attached as Exhibit B. The term "PIK PSA" will be used when there is no material difference between the Original PIK PSA and the Amended PIK PSA.

2.      The statutory predicates for relief are 28 U.S.C. § 2201, sections 105(a), 105(d), 1121, 1125, 1126, 1129(c) and 1141 of title 11 to the United States Code, sections §§ 101 et seq. (the "Bankruptcy Code").  This action also requires that this Court interpret the Confirmation Order (as defined below), and make findings with respect to which it retained jurisdiction in such Confirmation Order.

3.      Counts I – III asserted herein are non-core matters, or alternatively are core matters for which final judgment may not be entered other than by an Article III court. However, pursuant to 28 U.S.C. § 157(c)(2), Elliott consents to the Bankruptcy Court's entry of final judgment, order and decrees with respect to the relief sought therein.  Elliott does not consent to the entry of final orders by the Bankruptcy Court to the extent that any party asserts counterclaims, cross claims, or third party claims against Elliott.  Count IV is a core matter with respect to which this Court may enter final judgment.

4.      Venue in this district is proper pursuant to 28 U.S.C. § 1409(a) because (i) the Cases are pending in this District before this Court, and (ii) none of the exceptions set forth in 28 U.S.C. § 1409 applies to this Action.

**THE PARTIES**

5.      Plaintiff Elliott Associates, L.P. is a private investment limited partnership organized in Delaware.  Elliott Associates, L.P. is a creditor in the Case in respect of its beneficial ownership (securities entitlements) of EFIH First Lien Notes due 2020 (CUSIPs 29269QAA5, 29269QAK3 & U29197AG2) (the "First Lien Notes") and of the 11.75% senior secured second lien notes due March 1, 2022 (such 11.75% notes, together with the 11.0% senior secured second lien notes due October 1, 2021, the "Second Lien Notes").

6.     Plaintiff Elliott International, L.P. is an exempted limited partnership organized under the laws of the Cayman Islands. Elliott International, L.P. is a creditor in the Cases in respect of its beneficial ownership (securities entitlements) of First Lien and Second Lien Notes and of the 11.25%/12.25% senior unsecured notes due December 1, 2018 (the "PIK Notes").

7.     Plaintiff The Liverpool Limited Partnership is an exempted limited partnership organized under the laws of Bermuda. The Liverpool Limited Partnership is a creditor in the Cases in respect of its beneficial ownership (securities entitlements) of Second Lien Notes and PIK Notes.

8.     Together, the Plaintiffs are the beneficial owners (securities entitlements) of approximately (a) $782 million of the original principal amount of the First Lien Notes, (b) $921 million of the original principal amount of the Second Lien Notes and (c) $1.162 billion of the original principal amount of the PIK Notes.

9.     Defendant Energy Future Intermediate Holding Company LLC ("EFIH") is a Delaware limited liability company, and is a debtor and debtor in possession in these Cases. EFIH is the owner and/or beneficial owner of $1.282 billion of original principal amount of the EFH Legacy Notes. EFIH is a party to the Original PIK PSA. EFIH is an issuer of PIK Notes, First Lien Notes and Second Lien Notes.

10.     Defendant EFIH Finance Inc. ("EFIH Finance") is a Delaware corporation, and is a debtor and debtor in possession in these Cases. EFIH Finance is a party to the Original PIK PSA and the Amended PIK PSA. EFIH is a co-issuer of PIK Notes, First Lien Notes and Second Lien Notes.

11.    Defendant Energy Future Holdings Corp. ("EFH") is a Texas corporation, and a debtor and debtor in possession in these Cases.  EFH owns all of the equity interests in EFIH and EFIH Finance.  EFH is a party to the Original PIK PSA and the Amended PIK PSA.  EFH is not an obligor on the PIK Notes, First Lien Notes and Second Lien Notes.

12.    Defendants EBASCO Services of Canada Limited, EEC Holdings, Inc., EECI, Inc., EFH Australia (No. 2) Holdings Company, EFH Finance (No. 2) Holdings Company, EFH FS Holding Company, EFH Renewables Company LLC, Generation Development Company LLC, LSGT Gas Company, LSGT SACROC, Inc., NCA Development Company LLC, and TXU Receivables Company are all debtors and debtors in possession in these Cases (the "Miscellaneous Debtors").  The Miscellaneous Debtors are all parties to the Original PIK PSA and Amended PIK PSA, but on information and belief are not obligors on the EFIH financing debt.

## FACTUAL ALLEGATIONS

*The Cases and the Eighth Plan*

13.    On April 29, 2014 (the "Petition Date"), the Defendants and certain related entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Cases remain pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

14.    Since the Petition Date, the Debtors have filed and prosecuted numerous proposed plans of reorganization for EFH, EFIH and EFIH Finance.  The Eighth Plan was confirmed by order dated February 17, 2017 (the "Confirmation Order"). (D.I. 10859).  The consummation of the Eighth Plan is conditioned upon NextEra acquiring an approximately 80% interest in Oncor indirectly held by EFH, with resulting expected merger proceeds

payable to EFIH based upon a total enterprise value of Oncor of $18.7 billion, or total equity value of Oncor of $12.2 billion. (Ex. Eighth Plan §§ IX.D.8-9; 11); (Ex. C) (Ex. G)

15.     Following the confirmation hearing and entry of the Confirmation Order, the PUCT denied the NextEra/Oncor Application to approve the NextEra Transaction pursuant to the PUCT Final Order. (Ex. C) The closing of the NextEra Transaction is a condition precedent to the Effective Date of the Eighth Plan. Upon information and belief, the closing of the NextEra Transaction was the basis on which the Supporting Creditors entered into the PIK PSA shortly before confirmation.

16.     To date, the professional fees and expenses of the Debtors' restructuring efforts have been reported to exceed $1.3 billion. Total administrative costs for the estates and various committee professionals alone have exceeded $450 million. In addition to these professional fees, the Debtors have and will continue to incur and be required to ultimately pay substantial interest, fees and costs with respect to their existing DIP financing facility, the First Lien Notes and the Second Lien Notes.

17.     The Debtors' existing DIP financing facility (the "DIP Facility") presently matures on June 30, 2017. Approximately $5.475 billion is outstanding under the DIP Facility. (Monthly Operating Report for the Period from February 1, 2017 to February 28, 2017 [D.I. 11200] at 16) The Debtors pay monthly cash interest on that facility of approximately $20 million. The Debtors have the option of extending the DIP financing facility to December 30, 2017. (Ex. E) The fee to extend the maturity date is 0.25% of the outstanding amount of the commitments and loans outstanding, or at least $13.6875 million (the "DIP Extension Fee"). (Ex. E at 3).

18.     At present, the First Lien Notes and Second Lien Notes continue to accrue interest. The monthly accrual of interest on the First and Second Lien Notes is approximately $30 million.  This continually compounding accrual negatively impacts and erodes PIK Note recoveries very substantially on a dollar-for-dollar basis.

19.     At a status conference held on April 17, 2017, the Debtors advised the Court that (i) further modifications likely will need to be made to the Eighth Plan, which modifications would require resolicitation and (ii) the Debtors likely will need to exercise their option to extend the current maturity date of the existing DIP financing from June 30, 2017 to December 30, 2017.  (Ex. E at 16:9-18, 17:8-18:1)  In response, the Court expressed concerns about the costs and expenses of remaining in bankruptcy, stating that the sustainability of the Cases is not indefinite and cannot run indefinitely.  (Id. at 21:10-11).

20.     Absent the granting of the Rehearing Request and removal by the PUCT of the existing limitations on Oncor's board composition and access to dividends, NextEra will not close and will not pay the agreed-upon merger price on which the Eighth Plan and the PIK PSA were based.  Indeed, as NextEra's CEO made abundantly clear on April 21, 2017, "We can't pay $18.7 billion for a utility that we can't run and we can't control the board and we can't have access to dividends.  And it's just bad business to do anything other than that." (Ex. F at 13)  On the other hand, if in consideration of the PUCT's posture, NextEra modifies the NextEra Transaction to reduce the purchase price payable to the Debtors' estates and then obtains PUCT approval for a modified transaction, the EFH Effective Date similarly will not and cannot occur on the terms required by the Eighth Plan.

21.     If the NextEra Transaction does not close, there is no alternative transaction available that will enable the Debtors' estates to obtain the same value. The Debtors have

shopped their assets and NextEra was the highest bidder. The Debtors are not going to receive higher bids from other potential acquirers because the merger agreement with NextEra prohibits the Debtors from soliciting such bids. The agreement goes so far as to prohibit the Debtors from engaging with a bidder even to the extent that a bid was received on an unsolicited basis. As a result, after the payment of continuing interest and fee accruals to secured creditors, fees payable to the current lenders under the existing DIP Facility, and other continuing significant administrative expenses, the holders of the PIK Notes simply will not receive the distributions as and to the extent set forth in the Eighth Plan or contemplated by the PIK PSA. Worse, absent a sufficiently developed alternative transaction or reorganization plan supported by creditors, the Debtors will remain mired in these extraordinarily expensive Cases. Now in their fourth year (six years considering their pre-bankruptcy efforts), the Debtors have already explored and exhausted numerous options for exit, including a sale, and face further protracted proceedings with creditor recoveries rapidly diminishing daily. The rate at which secured claims accrue far outstrips the rate at which Oncor generates profits. Given the regulated and highly predictable nature of Oncor's earnings stream, this situation is not going to change – recoveries to the unsecured creditors of the estates will thus continue to be diminished (and will ultimately be eliminated) with each passing day as a result of this imbalance. NextEra may have time, but the estates' creditors do not.

*The Post-Petition Plan Support Agreements*

22.    Upon information and belief, the Debtors have entered into three post-petition plan support agreements. The first plan was with the TCEH creditors (the "TCEH PSA"). (D.I. 5247; D.I. 6097). The second plan support agreement was among the Debtors, NextEra

and Fidelity Management and Research Corp. ("Fidelity"), a major creditor and party in interest in the Cases (the "Fidelity PSA"), which is dated September 19, 2016.  (D.I. 9584-4)  Both the TCEH PSA and the Fidelity PSA required Bankruptcy Court approval, which the Debtors ultimately sought and obtained.  Importantly, the Fidelity PSA also required Fidelity to take certain actions and to refrain from taking certain other actions in respect of all claims and interests that Fidelity holds against the Debtors.

23.    The third post-petition plan support agreement the Debtors entered into was the PIK PSA.  The PIK PSA is unlike the Fidelity PSA and the TCEH PSA in a number of key respects.  First, the PIK PSA was never approved by this Court; in fact, this Court's approval for the PIK PSA has never even been sought.  Inexplicably, the Debtors failed to publicly disclose the Amended PIK PSA and make it available to the Bankruptcy Court.  The Debtors also failed to advise this Court, creditors or entities trading in the security entitlements to the PIK Notes that according to the stated terms of the amended agreement court approval was no longer a necessary condition to effectiveness nor a condition permitting termination of the PIK PSA.  Indeed, upon information and belief, the first time the undisclosed and not publicly available Amended PIK PSA will be made available to this Court and creditors is upon the filing of the exhibits to this Complaint. (Ex. B)  A second key difference between the PIK PSA and the Fidelity and TCEH PSAs is that unlike the Fidelity and TCEH PSAs, the PIK PSA does not require signatories to take certain actions and refrain from taking other actions in respect of all claims and interests that such signatories hold against the Debtors.

*The Undisclosed Amended PIK PSA*

24.     On January 2, 2017, the Debtors entered into the Original PIK PSA. (Ex. A) The Original PIK PSA required the Debtors to move for Bankruptcy Court approval of that agreement. (Id. § 4.02(a)(i)) The Original PIK PSA also provided that a majority of the Supporting Creditors could terminate the Original PIK PSA if the Bankruptcy Court did not approve that agreement on or before February 5, 2017. (Id. at § 8.01(i))   All of the Defendants were signatories to the Original PIK PSA.

25.     The Debtors posted a copy of the Original PIK PSA on the Bankruptcy Court docket by attaching it to a "Notice of Filing."  (D.I. 10530).  The Debtors never filed a motion seeking approval of the Original PIK PSA.  The Bankruptcy Court has never entered an order approving the Original PIK PSA.  Elliott was not a signatory to the Original PIK PSA, has never joined in that plan support agreement, and was never requested to sign a joinder to it by any trading counterparty.

26.     Upon information and belief, the Supporting Creditors and the Defendants entered into the Original PIK PSA in reliance on the NextEra Transaction closing in a relatively short period of time after confirmation and their receiving the projected recoveries provided in the Eighth Plan.  In that regard, the PIK PSA (i) was entered into after the filing of the NextEra/Oncor Application, and (ii) expressly provides that Supporting Creditors had a termination right if required governmental approvals were not obtained. (Exs. A, B § 8.01(d)).  In connection with the approval of the Make-Whole Settlement, the Debtors provided holders of PIK Notes and others notice of expected recoveries assuming consummation of the Eighth Plan on April 30, 2017.  (D.I. 11043, Ex. A)

27.    The Debtors and the Supporting Creditors purportedly amended the Original PIK PSA by entering into the Amended PIK PSA.  (Ex. B)  The Amended PIK PSA is dated January 19, 2017.  The Amended PIK PSA removed the requirement that the Bankruptcy Court approve the PIK PSA.  That Amended PIK PSA also purportedly removed the right of the majority Supporting Creditors to terminate the PIK PSA, if Bankruptcy Court approval was not obtained on or before February 5, 2017.  None of this was presented to the Court or known by the creditors or holders of PIK Notes (other than the Supporting Creditors) at the time.  In fact, although the Amended PIK PSA is dated as of January 19, 2017, the Debtors never filed a motion to approve the Amended PIK PSA, nor did the Bankruptcy Court enter an order approving the Amended PIK PSA.  In the nearly three months that have passed since the Amended PIK PSA was presumably signed, neither the Debtors nor any other party to the Amended PIK PSA have posted a copy of the Amended PIK PSA on the Bankruptcy Court docket, effectively concealing its substance (including the facts that (i) a termination right had been removed and (ii) Bankruptcy Court approval was purportedly no longer a required condition to effectiveness as to the Debtors).

28.    On February 13, 2017, the day before the commencement of the confirmation hearing, the Debtors filed an amended version of the then-current plan (the "February 13 Plan Filing").  (D.I. 10816)  That amended plan changed the definition of "EFIH Unsecured Creditor Plan Support Agreement" by referring not only to the January 2, 2017 plan support agreement (*i.e.*, the Original PIK PSA), but also to the undisclosed January 19, 2017 amendment to the agreement (*i.e.* the Amended PIK PSA). (Id. at 21)  Even on that date, the Debtors did not file a copy of the Amended PIK PSA on the docket.  Nor did the Debtors make any other reference to the Amended PIK PSA in connection with plan confirmation.

Upon information and belief, the February 13 Plan Filing is the sole reference to the undisclosed Amended PIK PSA in these Cases.

29.    The Confirmation Order contains extensive recitals, including a recital regarding the "EFIH Unsecured Creditor Plan Support Agreement." That recital in the Confirmation Order refers only to the Original PIK PSA, and makes no mention of the Amended PIK PSA that had not been placed on the Bankruptcy Court docket.

30.    Similar to the Original PIK PSA, Elliott is not a signatory to the Amended PIK PSA, did not sign a joinder to it and has not been asked by any trading counterparty to sign the Amended PIK PSA.

31.    All of the Defendants were signatories to the Amended PIK PSA. Upon information and belief, the Amended PIK PSA has not otherwise been disclosed and was not available in the public domain until it was filed as an Exhibit to this Complaint.

***Elliott's Purchases of Securities Entitlements in the First Lien, Second Lien and PIK Notes***

32.    Upon information and belief, Elliott is the largest creditor in these Cases. Elliott currently owns significant amounts of all three levels of prepetition debt at EFIH: (i) over two-thirds of the unsecured PIK Notes, (ii) over one-third of the Second Lien Notes, and (iii) over one-third of the First Lien Notes.

33.    Elliott purchased its current holdings of securities entitlements in the First Lien Notes and Second Lien Notes between October 2016 and May 2017.

34.    Elliott purchased its current holdings of securities entitlements in PIK Notes on various dates between October 2016 and May 2017. Prior to the Debtors' entry into the Original PIK PSA, Elliott had purchased an aggregate original principal amount of approximately $121 million of PIK Notes.

35.     Section 4.04 of the PIK PSA contains various covenants regarding the transfer of PIK Notes held by Supporting Creditors (the "PSA PIK Notes").  (Exs. A, B)  Those covenants include a requirement that a Supporting Creditor may only transfer its PSA PIK Notes to another Supporting Creditor or obtain a joinder (a "Transfer Agreement") from any purchaser of the PSA PIK Notes that is not a Supporting Creditor.  (Id. § 4.04(a)(ii))  The PIK PSA expressly permits Supporting Creditors to sell or transfer their PSA PIK Notes through "Marketmakers" who are not required to sign a Transfer Agreement. (Id. § 4.04(c))  The PIK PSA did not insist that the Marketmakers either (i) execute Transfer Agreements or (ii) establish procedures governing and distinguishing between the trading of PSA PIK Notes and PIK Notes that were not once held by Supporting Creditors (the "Non-PSA PIK Notes").  (Exs. A, B § 4.04(c))

36.     All of Elliott's purchases of PIK Notes were from Marketmakers.   The Marketmakers did not advise Elliott whether they were selling PSA PIK Notes or Non-PSA PIK Notes.  No Marketmaker has ever requested that Elliott execute or deliver a Transfer Agreement.  Elliott was never advised as to the existence of the PIK PSA or that the PIK Notes might have been previously held by a Supporting Creditor.  There was no difference in price between PSA PIK Notes and Non-PSA PIK Notes in any of those transactions.

37.     In circumstances in which certain security entitlements are subject to restrictions, such as a plan support agreement, there is normally a price difference.  Security entitlements subject to a plan support agreement are usually traded at a discount to the security entitlements that are not subject to a plan support agreement.  Additionally, Marketmakers advise purchasers whether the security entitlements are subject to a plan

support agreement.  Neither of those was the case with respect to the PIK Notes that Elliott purchased.

38.    No Supporting Creditor has ever requested that Elliott sign a Transfer Agreement.  Elliott paid value for all of its purchases of security entitlements in the PIK Notes.  Elliott has not executed and delivered any Transfer Agreement to the Debtors. Elliott's only basis for believing it currently holds some notes that were at some prior point PSA PIK Notes is that it holds more than two-thirds of the PIK Notes.

39.    Upon information and belief, the Debtors have known that numerous sales of PSA PIK Notes have occurred with respect to which the Debtors, Supporting Creditors, and the Marketmakers have not obtained any Transfer Agreements.  The Debtors and the Supporting Creditors knowingly and willingly entered into the PIK PSA that: (i) contemplated that Transfer Agreements might not be obtained from purchasers of PSA PIK Notes; (ii) permitted Marketmakers to sell PIK Notes without advising a purchaser whether or not those PIK Notes were PSA PIK Notes; and (iii) did not seek Bankruptcy Court approval of the remedy set forth in section 4.04(e) of the PIK PSA (the "Voidness Provision") that the Debtors seek to  invoke, contending that a transfer was automatically and retroactively void in the event that PSA PIK Notes were traded without a Transfer Agreement.

40.    Although Elliott has been unable to confirm, Elliott now believes, based on the amount of its current holdings, Elliott has purchased some notes that were originally PSA PIK Notes.

41.    To the extent that there is uncertainty regarding the applicability of the Voidness Provision of the PIK PSA to any transaction, such uncertainty in turn creates

uncertainty regarding the beneficial ownership of the PIK notes. This is highly relevant should a plan of reorganization need to be solicited or the Eighth Plan resolicited, as the Debtors have acknowledged is likely.

***The Make-Whole Settlement and Agreed-upon Creditor Recoveries***

42.     Prior to confirmation of the Eighth Plan, these Cases witnessed substantial litigation concerning whether the First Lien Notes and Second Lien Notes had allowable claims for so-called "make-whole" amounts. On November 17, 2016, the United States Court of Appeals for the Third Circuit issued a decision favorable to the allowance of the make-whole claims and remanded the associated adversary proceeding for further determinations regarding the allowance of the First Lien Notes make-whole amounts and Second Lien Notes make-whole amounts. After entering into the PIK PSA, the Supporting Creditors and the holders of First Lien Notes and Second Lien Notes reached a settlement of the make-whole disputes (the "Make-Whole Settlement"). On March 24, 2017, the Bankruptcy Court approved the Make-Whole Settlement, pursuant to which the First Lien Notes and the Second Lien Notes received substantial secured claims in respect of make-whole amounts, fees, disputed interest, and in the case of the Second Lien Notes, remaining unpaid principal amounts. (D.I. 11048) The Make-Whole Settlement fixed the amounts that the holders of the First Lien Notes and Second Lien Notes would receive as distributions and those distributions are not conditioned on the Eighth Plan becoming effective. (Id.)

43.     As of the Petition Date, the First Lien Notes were outstanding in the aggregate principal amount of $3.985 billion. The First Lien Notes were oversecured and under the Make-Whole Settlement accrue significant incremental interest, as well as entitlements to reimbursement of substantial professional fees and other costs with every passing month.

44.    As of the Petition Date, the Second Lien Notes were outstanding in the aggregate principal amount of $2.156 billion.  The Second Lien Notes are oversecured and under the make-whole settlement accrue significant incremental interest, as well as entitlements to reimbursement of substantial professional fees and other costs with every passing month.

45.    As a result of the Make-Whole Settlement, the PIK PSA, and the Eighth Plan, the Debtors publicly estimated that distributions to holders of PIK Notes would be $1.335 billion (equating to approximately 78% of the PIK Notes related claims or 82% of the principal amount of the PIK Notes), assuming that the Eighth Plan would become effective on April 30, 2017 (subject to deduction pursuant to the EFIH Unsecured Notes Trustee's charging lien). (D.I. No. 11043, Ex. A).  If that recovery is not provided to the holders of the PIK Notes under the Eighth Plan or any amendment thereto, then the PIK PSA is terminable by creditors then holding a majority of the PSA PIK Notes.  Each day that passes, the PIK Notes recovery is meaningfully diminished.

**The PUCT Proceedings and NextEra's Repeated Direct Requests for at least $500 million in Creditor Concessions and Purchase Price Reductions**

46.    On March 30, 2017, the PUCT held an open meeting regarding the NextEra Transaction.  (Ex. H)  At that time, the commission expressed significant concerns regarding the terms of the NextEra Transaction and its impact on the public interest.  (Id.).  Indeed, all three Commissioners made clear that NextEra's stated "deal killers" (i.e., NextEra's requests regarding board governance and the access to dividends), were likely also "deal killers" to the Commissioners' approval of the NextEra Transaction.  (Id. at 20-21, 24-25, and 27)

47.    Seeing the handwriting on the wall, NextEra subsequently reached out to significant holders of the Debtors' institutional debt.  NextEra suggested that it wanted to

pursue a strategy that would provide its ratepayer constituents, the so-called "intervenors" (the "Intervenors"), specifically Texas Industrial Energy Consumers ("TIEC") and Texas Coalition of Cities For Utility Issues ("Cities"), "tangible and quantifiable benefits."  The view was that these "tangible and quantifiable benefits" in the form of rate relief along with certain governance tweaks would counterbalance other governance relaxation provisions NextEra was asking for in its change of control application and, on balance, would gain the support of the Intervenors in this case to drive a settlement across key interested parties.  This settlement would then be presented to the PUCT for approval of what would essentially become a non-contested case in front of the PUCT.  However, NextEra would only take these actions, if the institutional debt holders, including Elliott, were willing to formally commit to contribute financially to the modified transaction (thereby reducing the value of the NextEra Transaction to a level beneath that stipulated by the PIK PSA).

48.     On April 5, 2017, a meeting among NextEra and certain large holders of the Debtors' institutional debt, including Elliott, was held in New York.  At that meeting, NextEra set forth its strategy to issue a press release with a large "headline" number of additional financial benefits (rate relief) for the Intervenors that would be spread out over multiple years.  NextEra wanted to issue this press release prior to the scheduled April 13, 2017 open meeting of the PUCT, at which meeting NextEra anticipated that the PUCT would deny the NextEra/Oncor Application.  NextEra expressed the hope that the press release would pressure the PUCT to delay any action until later in April – the end of the original statutory 180-day deadline for the PUCT to issue its final order – providing NextEra with more time to garner greater support for the NextEra Transaction from a variety of constituencies.

49.     It readily became apparent that the entire purpose of the New York meeting was for NextEra to place the large institutional debt holders in a position of duress, forcing them to make a Hobbesian choice – provide financial concessions or purchase price reductions of at least $500 million (*more than 37% of their anticipated plan consideration*) or face the $275 million termination fee (the "Termination Fee"), the costs and expense of further interest accruals, not to mention the additional professional fees associated with a nine-to-twelve month delay caused by trying to close an alternative transaction or reorganization plan.  As NextEra purported to see it, the request for no less than $500 million in incremental financial concessions from the institutional debt holders was simple math. Absent a closing of the NextEra Transaction, both secured and unsecured creditors would suffer: NextEra's representative expressed confidence that NextEra had negotiated an agreement that gave NextEra tremendous leverage and left the Debtors and their creditors over a barrel. As NextEra saw it, so long as NextEra would continue to go through the motions of pursuing the acquisition (viable or not), the estates would remain perpetually bound to NextEra and in order to escape would have to pay the $275 million Termination Fee. NextEra noted that in addition, interest would continue to accrue on the First Lien and Second Lien Notes and additional professional and other fees would be incurred, including the payment of the DIP Extension Fee, before any alternative could be consummated.  In that regard, NextEra made it perfectly clear that it believed the creditors would necessarily lose $275 million as a result of the Termination Fee.  NextEra would never terminate the NextEra Transaction and would take whatever steps were necessary, no matter how unlikely to succeed on any Rehearing requests or appeals, to keep that deal "alive" until such time as the Debtors were sufficiently fatigued that they would be willing to pay the Termination Fee to

escape from the ill-fated Transaction.[3] NextEra completely rejected any discussions regarding its entitlement to, or a reduction of, the $275 million Termination Fee, making it clear that it was a sacrosanct and central point of focus for the NextEra board and chief executive.

50.    No agreement was reached at the April 5, 2017 meeting, but NextEra's requests for creditor recovery concessions did not end there.  Both before and after the issuance of the Final PUCT Order on April 13, 2017, NextEra contacted Elliott, and upon information and belief, other large holders of institutional debt, seeking to garner support for substantial reductions in creditor distributions, to make concessions to the Intervenors. NextEra also inquired about a possible stake in an alternative plan of reorganization pursuant to which the holders of PIK Notes would convert their debt to equity in a reorganized company.

51.    As set forth above, on April 13, 2017, the PUCT entered the PUCT Final Order denying the NextEra/Oncor Application. Since then, NextEra has continued to make clear that the conditions that most concerned the PUCT are non-negotiable. For example, on April 21, 2017, eight days after the PUCT denied the NextEra/Oncor Application, the Chief Executive Officer of NextEra publicly stated: "[O]bviously, we can't pay $18.7 billion for a

---

[3] The Termination Fee was approved by the Bankruptcy Court on September 19, 2016. See Order (A) Authorizing Entry Into and Merger Agreement, (B) Approving Termination Fee, and (C) Authorizing Entry Into and Performance under Plan Support Agreement [D.I. 9584].  Subsequent to the approval of the Termination Fee, the Court considered concerns expressed by the PUCT regarding the payment of the Termination Fee brought to the attention of the Court by NextEra and the Debtors' counsel.  While it was correctly pointed out that the Termination Fee would not be payable if NextEra terminated the Merger Agreement, nowhere does it appear, nor was it placed on the record, that there was no outside date for closing the NextEra Transaction, that neither EFH nor EFIH could terminate the NextEra Merger Agreement if PUCT Approval was not obtained, and that if both EFH and EFIH agreed to terminate the Merger Agreement because the PUCT failed to approve the NextEra Transaction, NextEra would be entitled to receive $275 million, despite having provided the Debtors' estates no actual or necessary benefit as required by section 503(b) of the Bankruptcy Code and the Third Circuit's decision in Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.2d 527, 535 (3d Cir. 1999).

utility that we can't run and we can't control the board and we can't have access to dividends. And it's just bad business to do anything other than that. And so you can expect that we will not be accepting any conditions that would have -- that would not allow us to appoint the majority of the board or have access to the dividends." (Ex. F)

52.    Additionally, on May 8, 2017, NextEra, acting alone, filed its Rehearing Request. (Ex. G)  In the Rehearing Request, NextEra challenges not only the standards applied by the Commission to deny the NextEra/Oncor Application, but also numerous factual findings.  NextEra asserts that the PUCT Final Order is "unprecedented" and represents "an expansion of power that exceeds the limits set by the Legislature and the bounds of the Commission's own precedent." (Id. at 1)  The Rehearing Request further states that the Commission "re-define[d] the public interest" standard to deny the NextEra Transaction "on an unlawful *ad hoc* basis." (Id.).

53.    Despite the challenges, however, the fundamental and irreconcilable differences between the PUCT and NextEra remain the same.  NextEra insists that the PUCT erred in not approving the Transaction without the governance and dividend limitations the PUCT found were not in the public interest under the particular circumstances.  So, even if the Rehearing Request were granted, the likelihood that the NextEra Transaction would close without the governance and dividend conditions that the PUCT maintains are necessary for the public interest is at best remote.

54.    Under PUCT procedures, a public hearing on the Rehearing Request is scheduled to be held on May 18, 2017 (Ex. L).  A decision on the Rehearing Request will be made no later than June 7, 2017 under the 55-day statutory deadline for a Motion for Rehearing, which began on April 13, 2017, when the final order was issued.  NextEra fully

understood that an extension of the deadline would harm creditors by creating uncertainty and imposing significant additional costs on the Debtors' estates, including the likely payment of the DIP Extension Fee.  Nevertheless, and in keeping with its privately stated goal of leveraging the Debtors and their creditors, NextEra requested "that the Commission extend the period for acting on the [Rehearing Request] *to the maximum extent allowed by law*." (Ex. [G] at 7) (emphasis added), thereby requesting that the PUCT not decide the Rehearing Request until July 22, 2017, the last day of the additional 45-day statutory period the PUCT may take to decide a motion for rehearing.

***Elliott's Unique Position in EFIH and the Debtors' Opposition to Elliott's Pursuit of Alternative Financings and Restructuring Plans***

55.    Upon information and belief, Elliott is the largest creditor in these Cases. Elliott owns significant amounts of all three levels of prepetition debt at EFIH: (i) over two-thirds of the unsecured PIK Notes, (ii) over one-third of the Second Lien Notes, and (iii) over one-third of the First Lien Notes.

56.    Given the significant uncertainty that now exists with respect to the rejected NextEra Transaction and the very substantial probability that it will not close, it is time for both the Debtors as fiduciaries and the estates' creditors to work to develop and advance contingency plans. Creditors (including Elliott) should not be frozen out from creating alternative potential pathways in order to promote the maximization of the estates' value.

57.    As is the case with the estates' other creditors, Elliott wants these Cases to move forward.  Unfortunately, it is now clear that there is an overwhelming likelihood that the path forward for these Cases does not lead towards any transaction with NextEra given the PUCT's concerns and NextEra's pointed and unambiguous refusal to accept conditions that the PUCT believes are fundamental to the public interest.  Great energy and effort on the

part of all stakeholders and the Debtors and their advisors have gone into the attempt to consummate the NextEra Transaction.  Simply from a human standpoint the substantial inertia around the current plan is understandable and the prospect of continuing to hold out hope for the best against all odds is no doubt seductive.  The fact, however, is that these Cases must not continue to remain inert.  The ongoing costs of continuing to fund and administer these Cases are extraordinary.  The Cases must be brought to a conclusion as soon as possible or else significant stakeholder value will be squandered.

58.    Elliott's large and overlapping ownership in EFIH places Elliott in a unique position to help create an alternative exit path for these Cases.  With its broad debt holdings and financial wherewithal, Elliott is prepared to (i) move forward expeditiously with financing proposals that address the continuing and ever increasing significant interest accruals and (ii) lay the groundwork for an alternative plan of reorganization, including alternative plans of reorganization that involve converting significant amounts of debt to equity as will likely be required.  Elliott has advised the Debtors that it will work cooperatively with them on these matters, but also sought the freedom to work with third parties.  The Debtors would not agree.

59.    Elliott's efforts to pursue alternative financing and restructuring transactions have been stymied by the Debtors.  The Debtors have sought to impede and threaten Elliott's rightful activity to address this situation, seeking to block any exercise by Elliott of its basic creditor rights.  The Debtors' resistance is based on the terms of the PIK PSA.

***Disputes regarding the PIK PSA are Impeding Progress in these Cases and Risks Creditor Recoveries***

60.    Despite the lack of Bankruptcy Court approval for the PIK PSA, the Debtors now contend that the Amended PIK PSA places wide-ranging limitations Elliott's ability to

exercise its rights as a creditor.  This is so even though Elliott (i) has never signed or joined the PIK PSA, (ii) has PIK claims predating the PIK PSA's existence, (iii) only recently received the undisclosed Amended PIK PSA, (iv) has First Lien Notes and Second Lien Notes independent of its PIK Notes, and (v) who seeks to push forward in an effort to achieve a global resolution of these Cases.

61.    The Debtors have asserted that Elliott would violate the PIK PSA by even speaking with other creditors, potential plan funders or partners about ways to bring the Cases to a successful conclusion. Elliott has been unsuccessful in its repeated attempts to resolve its differences with the Debtors consensually.

62.    Initially, Elliott wanted to engage in negotiations with the Debtors regarding the possibility of terminating and/or amending the PIK PSA.  At that time, Elliott had obtained a copy of the Original PIK PSA from the Court filings.  Before such negotiations could proceed, the Debtors requested Elliott to sign a Transfer Agreement.  At that point, Elliott first learned that the Amended PIK PSA (without the termination provision) existed and also that the Debtors wanted Elliott to join the Amended PIK PSA.  Elliott was unwilling to do so, but nonetheless continued to pursue a consensual resolution with the Debtors.

63.    Subsequently, on April 28, 2017, Elliott (via counsel) sent a letter to the Debtors regarding certain of the disputes set forth in this Complaint (the "PIK PSA Clarification Letter").  (Ex. I)

64.    On May 1, 2017, Elliott (via counsel) sent an email to the Debtors asking them to confirm that Elliott could engage in discussions with third parties, without regard to the PIK PSA, because (among other reasons) Elliott owns First Lien Notes and Second Lien

Notes.  The Debtors responded in an email that did not give that confirmation, and reserved rights of the Debtors to contend that Elliott would be violating the PIK PSA.  (Ex. J)

65.    Despite the above exchanges, the Debtors' financial advisors and executives advised Elliott that they would be in New York and would like to hear Elliott's ideas regarding possible DIP financing in light of the upcoming June 30, 2017 existing maturity date under the Debtors' existing DIP financing facility.  While Elliott was prepared to meet, that meeting did not occur.

66.    Indeed, although Elliott has offered to work with the Debtors on possible DIP financing that would lower costs, Elliott was rebuffed.  (Ex. K)  Despite the June 30, 2017 maturity and the potential for lost opportunities, the Debtors merely offered a limited "unilateral waiver" to allow Elliott to submit a proposal to the Debtors alone, but still maintained that all other actions by Elliott (which in the Debtors' view includes objecting to any DIP financing) were governed, and thus forbidden, by the restrictive covenants of the PIK PSA.

67.    Similarly, Elliott has proposed to work with the Debtors on an alternative plan.  But the Debtors have indicated that they will only do so through a similar limited "unilateral waiver" of certain covenants in the PIK PSA, leaving Elliott facing the threat of Debtor action under several other restrictive covenants.  The framework built by the Debtors – where Elliott is treated as if it were a defaulting borrower seeking a limited waiver and forbearance and threatened with suit if it steps beyond the Debtors' selected bounds – plainly is completely counterproductive, detrimental and anathema to moving these Cases forward.

68.    The limited "unilateral waiver" of conditions proposed by the Debtors is entirely inapplicable to Elliott as a holder of First Lien Notes and Second Lien Notes.  It

simply did not resolve the threat of litigation surrounding the ambiguity of the restrictive

covenants and the application of the terms of the PIK PSA.

69.     Those restrictive covenants imposed on a Supporting Creditor by section

4.01(a) of the Amended PIK PSA include, but are not limited to:

> a. The Supporting Creditor is barred from directly or indirectly soliciting, initiating, encouraging, or knowingly inducing or knowingly facilitating any "Competing Transaction" or any proposal reasonably expected to lead to a Competing Transaction;

> b. The Supporting Creditor is barred from directly or indirectly participating in any discussions or negotiations with any other entity in any way regarding any "Competing Transaction" or any proposal reasonably expected to lead to a Competing Transaction; and

> c. The Supporting Creditor is required to provide the EFH/EFIH Debtors with any written proposal or a written or oral description of any unwritten proposal (and any supplement or modification of any such proposal) it receives, including the identity of the party making such proposal and the transaction structure, terms, and conditions proposed by such party, relating to a Competing Transaction.

(*See* Exs. A, B § 4.01(a))

70.     Remarkably, the Debtors have taken this position with their largest creditor,

even though the Cases are over three years old and the Debtors' exclusive rights to file a plan

and solicit acceptances expired over 16 months and 11 plans of reorganization ago.[4]

71.     The Debtors' position regarding the PIK PSA is wrong for a number of

reasons, including:

> a. the PIK PSA as an initial matter applies only to those who signed it, or joined it by signing a Transfer Agreement;

---

[4] Exclusivity expired when the Debtors' fifth amended plan of reorganization was on file. Since then the Debtors filed a sixth amended plan [D.I. 7241] and restarted numbering their plans. [D.I. 8356, 8421, 8745, 9321, 9374, 9612, 10290, 10453, 10551, 10853].

b. any enforcement of the PIK PSA against non-signatories depends on this Court approving the Voidness Provision (defined below) in a manner that would bind third party purchasers of PSA PIK Notes regardless of the circumstances of their acquisition, which Court approval did not happen;

c. even if the PIK PSA applied to Elliott's holdings of PIK Notes, by its terms, it does not apply to Elliott's holdings of First Lien Notes and Second Lien Notes, and thus does not bar Elliott from exercising the basic creditor rights it has with respect to those claims; and

d. even if the PIK PSA were binding on Elliott with respect to every tranche of securities it holds, the only plan that Elliott is bound to support is one that contains the economic treatment in the Eighth Plan—it does not paralyze Elliott, requiring it to wait forever for a distribution that likely will not be made and refrain from negotiating alternatives in the face substantial risk to the agreed upon distributions.

72.    As a consequence, Elliott's efforts to move these Cases forward towards a global solution have been thwarted.  This Court is called upon to decide whether the PIK PSA prevents Elliott from (i) discussing, negotiating or proposing with any person a money-saving (and therefore value-enhancing) global DIP financing facility, including convertible DIP financing, subject to the Debtors' rights (a) to accept or reject proposed DIP financing and (b) to oppose any such transactions in this Court (the "DIP Financing Proposal") and (ii) filing an alternative Chapter 11 plan of reorganization that could move towards confirmation now, to provide an immediate exit when the Court determines that the NextEra Transaction will not be consummated.  The Debtors have insisted that Elliott is prohibited from each of the foregoing activities (and from other actions as well) by the PIK PSA.

73.    What is more surprising is that the Debtors have taken this position despite knowing that the Eighth Plan is at substantial risk of not being consummated on its current terms and that they are rapidly approaching the June 30, 2017 maturity date on the current DIP financing.  Under such circumstances, the recovery to unsecured creditors under any proposed modification to the Eighth Plan, including the distributions to the holders of PIK

Notes, will be lower.  The distribution will be lower because unsecured creditors will receive less of the merger consideration ultimately paid if they are offered anything at all.  The assets available for distribution also will be depleted by continued significant interest accruals, DIP financing fees, and professional fees.

74.    Consequently, Elliott has filed this Complaint and contemporaneously therewith a motion for a preliminary injunction to allow Elliott to (i) proceed immediately with third parties and the Debtors regarding a global DIP Financing Proposal, (ii) discuss, negotiate and propose with any person an alternative plan or transaction subject to the Debtors' rights to oppose any plan or transaction in this Court (an "Alternative Transaction"), on a reasonable time frame, and (iii) undertake those actions without risk that doing so will be a violation of Elliott's obligations.  Final relief is also sought for declarations regarding the parties' asserted contractual rights, rights under the Uniform Commercial Code (as applicable in every possible jurisdiction relevant to this Complaint), the Confirmation Order and the effect of certain provisions of the Bankruptcy Code.

## COUNT I

**(Declaratory Judgment that Elliott Proposing DIP Financing,
and Alternative Transaction, as Holder of First Lien Notes
and Second Lien Notes, Would Not Be A Breach of the PIK PSA,
To the Extent the PIK PSA is Applicable to Elliott)**

75.    Plaintiffs restate and reallege all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

76.    The very first operative paragraph of the PIK PSA provides that (the "PIK-Notes-Only Provision"):

> For the avoidance of doubt, each Supporting Creditor and the
> PIK Notes Trustee (collectively, the "Supporting PIK Parties")
> shall be bound by and subject to the provisions herein only as a
> holder or trustee of the EFIH Unsecured Note Claims, in
> respect of which it is signing this Agreement (as indicated on
> its signature page to this Agreement) and any reference to
> Claims with respect to an obligation of a Supporting Creditor
> only refers, respectively, to its EFIH Unsecured Note Claims
> whether or not it uses those terms.

(Exs. A, B at 1)

77.    This limitation on the applicability of the PIK PSA to holdings of PIK Notes

is repeated in various other sections of the PIK PSA. (Id. at §§ 4.01(a), 4.04(a))

78.    Elliott has informed the Debtors that it is a substantial beneficial owner of

First Lien Notes and Second Lien Notes.  Elliott contends that the PIK-Notes-Only Provision

does not preclude or otherwise limit its actions as the beneficial owner of the First Lien and

Second Lien Notes to take any and all actions in connection with the Cases without

breaching the PIK PSA, including (a) making a DIP Financing Proposal and (b) proposing

and prosecuting an Alternative Transaction, and in all situations is free to discuss these topics

with the Debtors, creditors, third parties, including third party financing sources.

79.    The Debtors have refused to confirm that Elliott as a holder of First Lien

Notes and Second Lien Notes may take the actions set forth in (a) or (b) above, among

others, and to communicate with third parties, including existing lenders, creditors and other

parties, without regard to the limits (if any) of the PIK PSA.

80.    An actual, justiciable controversy exists between the Plaintiffs and the

Defendants regarding the contractual interpretation of the PIK PSA and what, if any, the

limitations it places on Elliott as a creditor in these Cases.  The Debtors have been unwilling

to confirm that they agree with Elliot's interpretation of the PIK PSA, despite repeated

requests.    The Debtors first stated that they reserve rights and remedies should Elliott communicate with third parties or do anything beyond sending a single debtor in possession financing proposal to the Debtors.  While the Debtors have been prepared to provide limited waivers under the PIK PSA to permit Elliott to have discussions with third parties, those limited waivers (i) presume the applicability of the PIK PSA, (ii) limit Elliott's ability to pursue alternatives to those supported by the Debtors, and (iii) fail to acknowledge that there are no limitations on Elliott as a holder of First Lien Notes and Second Lien Notes.  These restrictions are impeding Elliott's efforts to move these Cases forward and are not warranted by the PIK PSA, any other contractual or statutory limitation, or the present facts and circumstances of these Cases.

81.    This Court should declare that the contractual covenants in the PIK PSA do not apply to Elliott's actions concerning the Cases so long as Elliott is the beneficial owner of First Lien Notes or Second Lien Notes.  It should also declare that, even if Elliott were bound by the PIK PSA, Elliott would not be in breach of the PIK PSA by discussing and proposing (a) a DIP Financing Proposal or (b) an Alternative Transaction.  Finally, this Court should also declare that Elliott would not be in breach of the PIK PSA by having discussions regarding a DIP Financing Proposal or an Alternative Transaction with creditors, other parties in interest, or third party financing sources; provided, however, that such declaration would not prevent any party in interest from contesting any such actions on the basis of any applicable bankruptcy or nonbankruptcy law independent of the contractual terms of the PIK PSA.

## COUNT II

**(Declaratory Judgment that either the Voidness Provision of
the PIK PSA Is Unenforceable and therefore Elliott is the Beneficial Owner
of PSA PIK Notes under Applicable Nonbankruptcy Law,
or Alternatively Elliott Is Not Bound by the PIK PSA)**

82.     Plaintiffs restate and reallege all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

83.     To have any obligations under the PIK PSA, an entity must have either signed the PIK PSA or signed a Transfer Agreement.

84.     Elliott is not a signatory to the PIK PSA or to a Transfer Agreement.

85.     Elliott is not a party to the PIK PSA and is not in privity with the Debtors or any Supporting Creditor with respect to any PIK PSA.

86.     Section 4.04(e) of the PIK PSA purports to address the consequences of a Supporting Creditor's failure to obtain a Transfer Agreement in connection with that Supporting Creditor's sale of PSA PIK Notes.  That section provides that "[a]ny Transfer made in violation of this Section 4.04 shall be void *ab initio* . . . ." (Id. § 4.04(e))

87.     The Debtors have advised Elliott that the Debtors will seek to have this Court enforce the Voidness Provision, despite the fact that this Court never approved that provision with respect to the transfer of the PSA PIK Notes.

88.     Elliott contends that the Court may not declare that any of its purchases of PSA PIK Notes from Marketmakers is void *ab initio*.

89.     This Court has never approved the Voidness Provision with respect to a transfer of the PSA PIK Notes.

90.     To the extent that this Court has approved the Voidness Provision, this Court (a) did not have jurisdiction to enter such an order, which did not affect the assets of, or

claims against, any of the Debtors' estates, (b) did not have statutory or constitutional authority to enter such an order, but could only have made proposed findings of fact and conclusions of law, and no order approving the Voidness Provision has been entered by an Article III court, (c) was not moved by the Debtors or any other party for such relief, and thus had no record upon which to grant such relief, and (d) did not make sufficient findings of fact or conclusions of law that would support such an order. Neither Elliott, nor any other potential purchaser of PSA PIK Notes, had adequate notice and opportunity to be heard regarding such an order. Neither Elliott nor any other potential purchaser of PSA PIK Notes consented to this Court's entry of final orders with respect to such an order or voluntarily waived the arguments above. For the same reasons, this Court may not now approve the Voidness Provision and void Elliott's purchase of any PSA PIK Notes retroactively.

91.     The Voidness Provision is inoperative, illegal, invalid and unenforceable as to Elliott. As such, the Voidness Provision must be severed from the PIK PSA, under Section 10.15 of the PIK PSA, if and to the extent that the Bankruptcy Court determines that Elliott is bound to any of the other terms of the PIK PSA.

92.     Alternatively, if the Voidness Provision is determined to be enforceable with respect to any purchases of PSA PIK Notes by Elliott, the Debtors cannot then assert that Elliott is limited by the restrictive covenants or any other terms of the PIK PSA. Application of the Voidness Provision would make Elliott's purchases of the PSA PIK Notes void *ab initio.* As a consequence, Elliott would be the beneficial holder only of First Lien Notes, Second Lien Notes and Non-PSA PIK Notes. In that circumstance, neither the PIK PSA nor any other contract or rule of law prevents Elliott from discussing any matter in these Cases with any party in interest or third party, filing a plan, or taking any other action.

93.    An actual, justiciable controversy exists between the Plaintiffs and the Defendants regarding the application and enforceability of the Voidness Provision against Elliott because Elliott did not sign the PIK PSA or a Transfer Agreement.  Additionally, an actual, justiciable controversy exists as to the consequences of the application of the Voidness Provision in the event that the Bankruptcy Court determines that the Voidness Provisions is enforceable with respect to any purchases of PSA PIK Notes by Elliott.

94.    This Court should make a declaration that the Voidness Provision is of no force and effect as to Elliott and that Elliott's purchases of PSA PIK Notes from Marketmakers are valid under applicable nonbankruptcy law.  Failing that, and in the alternative, this Court should at a minimum make a declaration that if the Voidness Provision is valid and enforceable as to Elliott's purchases of PSA PIK Notes despite it not having signed the PIK PSA or a Transfer Agreement, as a result of those purchases being void *ab initio,* Elliott does not hold PSA PIK Notes and is not bound by the PIK PSA in any manner.

## COUNT III

**(Declaratory Judgment that the Covenants and Restrictions
of the PIK PSA are not Binding on Elliott,
Because of UCC Section 8-502, or Alternatively that Elliott
Is Only Bound to the Original PIK PSA)**

95.    Plaintiffs restate and reallege all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

96.    The Uniform Commercial Code provides that purchasers of securities entitlements take free and clear of nearly all prior contractual rights and adverse claims. UCC Section 8-502 is in effect in all possibly relevant jurisdictions to the facts and circumstances of this Complaint.  Only an "adverse claim" (a property right, not a mere

contractual right) of which there is notice as strictly defined in Section 8-105, can apply to a securities entitlement after purchase.

97.    The provisions of the PIK PSA are mere contractual rights and do not rise to the status of adverse claims within the meaning of that term in UCC Article 8.

98.    Even if the contractual rights in either the Original PIK PSA or the Amended PIK PSA were an adverse claim, Elliott did not have notice, as defined by UCC 8-105, of any such adverse claim on the securities entitlements to PSA PIK Notes that it purchased.

99.    It was reasonable to read the PIK PSA Notice of Filing as requiring Court Approval for the Voidness Provision in the Original PIK PSA to be enforceable.  No Court approval was ever obtained.  The Amended PIK PSA was undisclosed and not publicly available.

100.    Even if it were possible for the original contractual parties to the PIK PSA to bind a subsequent transaction with a third party that the Bankruptcy Court would enforce, the contract alone could not do so unless and until there was Bankruptcy Court approval.

101.    An actual, justiciable controversy exists between the Plaintiffs and the Defendants with regard to whether, as to any security entitlements that Elliott purchased in PSA PIK Notes, Elliott is subject to any provisions of either the Original PIK PSA or the Amended PIK PSA, or whether under UCC Section 8-502, as applicable in all potential relevant jurisdictions (New York, Delaware and Texas), the restrictions in the Original PIK PSA  or the Amended PIK PSA are or are not adverse claims on any PSA PIK Notes purchased by Elliott from Marketmakers.

102.    This Court should declare that by operation of UCC Section 8-502, Elliott is not subject to the Original PIK PSA or the Amended PIK PSA and that none of the

restrictions or covenants in either the Original PIK PSA or the Amended PIK PSA are adverse claims encumbering the PSA PIK Notes held by Elliott.

103.    Alternatively, if this Court determines that the restrictions or covenants in the Original PIK PSA or the Amended PIK PSA are adverse claims, Elliott contends that it was not provided notice as strictly defined in UCC Section 8-105 of such adverse claim.    In addition, Elliott contends that even if the Court determines that Elliott had such notice, that notice was of the Original PIK PSA, not the Amended PIK PSA.

104.    The Debtors have sought to enforce the terms of the Amended PIK PSA against Elliott.

105.    If and to the extent that this Court determines that the restrictions and covenants set forth in the Original PIK PSA or the Amended PIK PSA are adverse claims on Elliott's security entitlements to the PSA PIK Notes it owns, an actual, justiciable controversy exists between the Plaintiffs and the Defendants with regard to whether (i) Elliott had proper notice of any such adverse claim and (ii) if Elliot had proper notice, which PIK PSA would apply.

106.    This Court should declare that even if the PIK PSA contractual provisions were adverse claims, Elliott did not have adequate notice of such adverse claims as required by UCC Section 8-105, and consequently any PSA PIK Notes owned by Elliott are not subject to the contractual provisions of either the Original PIK PSA or the Amended PIK PSA.    Failing that, this Court should declare that to the extent that any PSA PIK Notes owned by Elliott were subject to an adverse claim, the adverse claims are those set forth in the Original PIK PSA.    The Original PIK PSA, however, is not extant, and consequently, no

such adverse interest continues to restrict or limit Elliott's conduct or activity with respect to any PIK Notes it owns.

## COUNT IV

**(Declaratory Judgment Pursuant to Paragraph 150 of the Confirmation Order, that the EFH Effective Date Shall Not and Cannot Occur on the Terms Contemplated by the Eighth Plan, that Such Plan Is No Longer Operative and that the Bankruptcy Court May Confirm Another Chapter 11 Plan)**

107.    Plaintiffs restate and reallege all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

108.    The EFH Effective Date under the Eighth Plan has not occurred.

109.    Under Bankruptcy Code section 1129(c), the Bankruptcy Court may enter only one confirmation order.

110.    The Eighth Plan provides that it is void if the conditions to effectiveness have not occurred before February 17, 2018, one year after entry of the Confirmation Order. (Eighth Plan § IX.F.)  The closing of the NextEra Transaction is a condition precedent to the Effective Date of the Eight Plan (Id. § IX.E.11).

111.    Section VV and Paragraph 150 of the Confirmation Order provide as follows:

**VV. Effect of Non-Occurrence of EFH Effective Date.**

150. If a condition to the occurrence of the EFH Effective Date does not occur, and is not otherwise waived, and it is determined that the EFH Effective Date shall not and cannot occur on the terms contemplated by the Plan and the EFH Confirmation Order, the provisions set forth in the EFH Confirmation Order shall not be binding on any party; provided, however, that the non-occurrence of the EFH Effective Date shall not affect (i) the relief granted in the Settlement Approval Order, whether the Settlement Approval Order is entered before, on, or after the EFH Effective Date or (ii) the EFH/EFIH Debtors' obligation to seek approval of the EFIH Settlement Agreement as set forth in paragraph 131 of

this EFH Confirmation Order and as set forth in the EFIH Settlement Agreement.

112.    Pursuant to paragraph 150 of the Confirmation Order, the Bankruptcy Court retained jurisdiction to declare or determine that "the EFH Effective Date shall not and cannot occur on the terms contemplated by the Plan."

113.    In the event that the Bankruptcy Court makes that "determination," that same paragraph provides that the "Confirmation Order shall not be binding on any party."

114.    Elliott contends that the EFH Effective Date will not and cannot occur on the terms contemplated by the Eighth Plan and the NextEra Transaction.

115.    The Debtors contend that the Eighth Plan can and will be consummated on the terms contemplated by the NextEra Transaction.

116.    An actual, justiciable controversy exists between the Plaintiffs and the Defendants with regard to whether (i) the Court may determine that EFH Effective Date will not and cannot occur on the terms set forth in the Eighth Plan and (ii) the Court may enter a confirmation order with respect to a plan of reorganization other than the Eighth Plan.  This Court should declare that (i) the EFH Effective Date has not and cannot occur on the terms set forth in the Eighth Plan, (ii) pursuant to paragraph 150 of the Confirmation Order the Eighth Plan is not binding on any party, and (iii) the Court is free to enter an order confirming any Alternative Transaction that, the Debtors or some other party in interest .that satisfies the requirements of Bankruptcy Code section 1129.

**WHEREFORE,** the Plaintiffs request that upon a final determination by this Court, judgment be entered in its favor and against the Defendants, as follows:

A.    A permanent injunction preventing the Debtors from taking any action, direct or indirect, to invoke or use the PIK PSA to prevent Elliott from taking any action concerning these Chapter 11 Cases; and

B.    Declarations as to the rights of the parties to this Adversary Proceeding with respect to the Court set forth in this Complaint as follows:

**a. Count I:**

    i. Declaring that the PIK PSA does not apply to Elliott's actions concerning the Cases so long as Elliott is the beneficial owner of First Lien Notes or Second Lien Notes; or in the alternative,

    ii. Declaring that, even if Elliott were bound by the PIK PSA, Elliott would not be in breach of the PIK PSA by discussing and proposing (a) a DIP Financing Proposal and (b) an Alternative Transaction with creditors, other parties in interest, and third party financing sources; provided, however, that nothing shall prohibit any party in interest from contesting any such actions on the basis of any applicable bankruptcy or nonbankruptcy law independent of the contractual terms of the PIK PSA.

**b. Count II:**

    i. Declaring that the Voidness Provision is of no force and effect as to Elliott and that Elliott's purchases of PSA PIK Notes from Marketmakers are valid under applicable nonbankruptcy law; or in the alternative,

    ii. Declaring to the extent that the Voidness Provision is valid and enforceable as to Elliott's purchases of PSA PIK Notes, despite Elliott not signing the PIK PSA or a Transfer Agreement, after application of the Voidness Provision, Elliott does not hold PSA PIK Notes and is not bound by the PIK PSA in any manner.

**c. Count III:**

    i. Declaring that by operation of UCC Section 8-502, Elliott is not subject to the Original PIK PSA or the Amended PIK PSA and that none of the restrictions in either PIK PSA are adverse claims encumbering any PSA PIK Notes held by Elliott; or in the alternative:

ii. Declaring that even if the restrictions in the Original PIK PSA or the Amended PIK PSA, either (a) none of those restrictions applies to any PSA PIK Notes that Elliott owns because Elliott did not have the notice required by USS Section 8-105; or (b) the only restrictions that could apply to the PSA PIK Notes that Elliott owns are the restrictions in the Original PIK PSA, but any such restrictions and limitations no longer exist because that agreement was amended without any disclosure or proper notice.

d. **Count IV:**    Declaring that that (i) the EFH Effective Date has not and cannot occur on the terms set forth in the Eighth Plan, (ii) pursuant to paragraph 150 of the Confirmation Order the Eighth Plan is not binding on any party, and (iii) the Court is free to enter an order confirming any Alternative Transaction that satisfies the requirements of Bankruptcy Code section 1129.

*[Remainder of Page Intentionally Left Blank]*

Dated:  May 11, 2017

BAYARD, P.A.

*/s/ Erin R. Fay*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:scousins@bayardlaw.com
        efay@bayardlaw.com
          emiller@bayardlaw.com


    --and--

ROPES & GRAY LLP
Keith H. Wofford
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile:  212-596-9090
Keith.Wofford@ropesgray.com
Gregg.Galardi@ropesgray.com
Jonathan.Agudelo@ropesgray.com
Ross.Martin@ropesgray.com

*Counsel for the Elliott Funds*

## VERIFICATION

I, Jeff Rosenbaum declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that:

1. I am a portfolio manager of Elliott Management Corporation, which provides investment advisory services to the Elliott Funds.

2. I am authorized to make this verification on behalf of the Elliott Funds.

3. I have read the Verified Complaint for Declaratory and Injunctive Relief (the "Complaint") in this action.

4. I verify the Complaint on behalf of the Elliott Funds.

_____
Jeff Rosenbaum