Page 1

```
 1    UNITED STATES BANKRUPTCY COURT

 2    DISTRICT OF DELAWARE

 3

 4    In re:                        :
                                    :    Chapter 11
 5    ENERGY FUTURE HOLDINGS         :
      CORP., et al.,                :    Case No. 14-10979
 6                                  :
              Debtors.             :    (Jointly Administered)
 7    _____:
                                    :
 8    ELLIOTT ASSOCIATES, L.P.       :
      et al.,                       :
 9                                  :
              Plaintiffs,          :
10                                  :    Adv. Proc. No. 17-50479
         v.                         :
11                                  :
                                    :
12    ENERGY FUTURE INTERMEDIATE     :
      HOLDING COMPANY LLC, et al.,  :
13                                  :
              Defendants.          :
14    _____:

15

16                                   United States Bankruptcy Court

17                                   824 North Market Street

18                                   Wilmington, Delaware

19                                   May 19, 2017

20                                   2:01 p.m. - 2:41 p.m.

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:   LESLIE MURIN
```

1    HEARING re Discovery Dispute

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   KIRKLAND & ELLIS LLP

4        Attorneys for the Debtors

5

6   BY:  MARK MCKANE (TELEPHONICALLY)

7

8   ROPES & GRAY, LLP

9        Attorneys for the Plaintiffs, Elliott Associates

10

11   BY:  PETER L. WELSH (TELEPHONICALLY)

12

13   ALSO PRESENT TELEPHONICALLY:

14

15   ARLENE R. ALVES

16   JOSH W. BRANT

17   PEG A. BRICKLEY

18   CHRISTOPHER L. CARTER

19   ALLISTER CHAN

20   DANIEL DEFRANCESCHI

21   MARK A. FINK

22   ISLEY M. GOSTIN

23   MARK F. HEBBELN

24   CHAD J. HUSNICK

25   HAROLD KAPLAN

1   MARC KIESELSTEIN

2   RAYMOND LEMISCH

3   JASON M. MADRON

4   KATY PAPE

5   RICHARD PEDRONE

6   NORMAN PERNICK

7   NED S. SCHODEK

8   ANDREW M. THAU

9   AMER TIWANA

10  APARNA YENAMANDRA

11  PETER YOUNG

12  MARK A. CODY

13  JONATHAN AGUDELO

14  ROBIN D. BALL

15  SANDRA HORWITZ

16  JEFFREY S. SABIN

17  JOSEPH A. FLORCZAK

18  SCOTT L. ALBERINO

19  JOSHUA BRODY

20  CHRIS CARTY

21  MARIA CHUTCHIAN

22  SCOTT D. COUSINS

23  ERIC C. DAUCHER

24  GRENVILLE DAY

25  JAMIE EDMONSON

1   GREGG M. GALARDI

2   BRIAN GLUCKSTEIN

3   EVAN T. MILLER

4   ABID QURESHI

5   HOWARD SEIFE

6   MEGAN WASSON

7   STEPHANIE S. WICKOUSKI

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2            THE COURT:  Good afternoon, everybody.  This is

3       Judge Sontchi and this is the discovery conference in the

4       Elliot adversary proceeding.  We have three pages, four

5       pages, I don't know, seven, lots of pages of people on the

6       phone today.  So, I would ask that you mute your phones

7       unless you are speaking, and of course, please identify

8       yourself each time you speak for the record.  And I'll turn

9       it over to the Debtors to start.

10           MR. MCKANE:  Thank you, Your Honor.  It's Mark

11      McKane of Kirkland & Ellis on behalf of the Debtors.  And

12      then with me today are my partners, Mark Kieselstein and

13      Chad Husnick.  First, we want to thank you and your staff

14      for making yourselves available on the expedited timing

15      here.

16           Your Honor, we're here on a limited but an

17      important discovery dispute in connection with Elliott's

18      Motion for a Preliminary Injunction.  The Debtors would like

19      to recognize the constructive nature of our efforts to date

20      with Elliott.  I think as both of our letter briefs lay out,

21      we have worked constructively over the last 24 to 48 hours

22      to try to streamline and narrow the issues.  That includes

23      two very extended meet and confer sessions with all parties,

24      and then a more detailed technical discussion about even

25      search terms last night, spending in total over four hours.

1          There is one kind of core issue that's being

2     presented today, Your Honor, and for the purposes of the

3     Preliminary Injunction Motion solely, does Elliott have a

4     basis to pursue documents and communications internal to the

5     Debtors and with NextEra regarding the NextEra merger and

6     its likelihood of closing.  This is specifically their

7     request and both parties submitted to discover what Exhibit

8     A (indiscernible) letters.  That paragraph -- it's Requests

9     Number 16 through 24.

10          And for three reasons we do not believe that this

11    is -- we're seeking a protective order, Your Honor, so as to

12    avoid having to go through the burdensome effort of

13    reviewing and producing these materials, especially on the

14    expedited timetable that we're under, which is we would have

15    to produce documents within a week.

16          Specifically, we don't think that the materials

17    that are being sought here are directly relevant to the

18    issues raised by the Plaintiffs in the Preliminary

19    Injunction.  Second, we think the overwhelming -- and I mean

20    overwhelming nature of the (indiscernible) responsive

21    materials would be privileged and/or work product.  And to

22    the extent that it is covered in any limited communications

23    that we've had with NextEra, that would be picked up by the

24    Common Interest Doctrine, which covers an extension of both

25    the privilege and work product, in particular settings.

1          And then third, to the extent that there are non-

2     privileged materials, you know, that Elliott wants to put

3     forward as it relates to the status of the NextEra merger,

4     frankly, those are already in the public records and

5     therefore, they don't need those materials from us.

6          So, starting with relevance, Your Honor, this is a

7     corrugating issue that I really think the Elliott team has

8     glossed over in their materials. As it relates to the PIK

9     PSA, the enforceability of that agreement is not tethered to

10    whether the NextEra merger is viable or has been terminated.

11    Parties to the PIK PSA and their successors and assigns are

12    bound to that agreement even if the NextEra merger

13    terminates.

14         The enforceability of the PSA is dependent simply

15    on the projected recoveries to the PIK noteholders.  And

16    specifically, Your Honor, we direct your attention to

17    Section 8.01 of the PIK PSA, which we quote in our letter,

18    which highlights that the 40 creditors do not have

19    termination rights if the merger agreement -- and that's the

20    merger agreement with NextEra -- is terminated in accordance

21    with its terms and the Debtors pursue an alternative

22    restructuring that preserves the PIK settlement, which you

23    know, we all thought in shorthand is 80 cents on the dollar.

24         And therefore, you know, and in particular as it

25    relates to the PI Motion itself, when you go back to the

1    Elliott complaint, while they raise a question about the

2    status of the NextEra merger in their complaint, that is not

3    one of the counts on which they have moved for a preliminary

4    injunction.  Those allegations are all tied to Count 4 of

5    their complaint.  They are not seeking a preliminary

6    injunction as it relates to Count 4.  So, where does Elliott

7    pivot, because it obviously -- their issues that they're

8    raising they aren't really tethered to the actual

9    contractual issues they're raising.

10           They say it goes to harm.  And there we struggle,

11   Your Honor, because the status of the NextEra agreement

12   isn't linked to is there harm.  To the extent the Court

13   finds that Elliott is bound by the PIK PSA, that parties to

14   the PSA and (indiscernible) have agreed that any breach of

15   that agreement by a party would be irreparable harm.  And

16   so, as you're weighing the potential harm here, it's hard to

17   see how this would be relevant in that circumstance because

18   we've already agreed that it would be irreparable harm.

19           Now, I think when you start to delve into the

20   issue more in terms of the actual requests, and by actual

21   and how we -- what our interactions have been with NextEra,

22   it gets more stark as to why we believe a protective order

23   is necessary.  And in particular, Your Honor, if you look at

24   their synthesized requests, which they highlight, I believe,

25   on Page 1 of their letter and then they try to bring it down

1    even more starkly on Page 2, what they're really going for

2    as it relates to the work of the Debtors internally and with

3    NextEra, and you look through the actual requests and the

4    materials they're seeking, they would only highlight why

5    these materials are protected from discovery.

6            First, on looking just at Page 1 of their letter,

7    they highlight the likelihood an actual or anticipated

8    effect of closing or selling the closed, the NextEra

9    transaction.  Your Honor, when you step back and remember

10   who the Debtors are to this point, we are solely holding

11   companies, right?  It's EFH and EFIH and their affiliated

12   Debtors.  We have three employees, Mr. Keglevic, Mr. Horton

13   and Mr. Wright.  Our sole purpose and function has been to

14   ensure that we get regulatory approval and emerge from

15   bankruptcy.  Our evaluation of the likelihood of closing is

16   absolutely privileged material and work product internally.

17   And I don't think they can take a position otherwise.

18           As it relates to the second issue that they're

19   looking for, modifications on the terms of a merger

20   agreement on potential recovery under the A plan.  Your

21   Honor, here -- and to be clear, we have laid out the

22   positions with Elliott.  We appreciate that they don't have

23   the perspective of -- we have lived these issues.  But we

24   have very good visibility into what exists and what does not

25   exist, not just because of some due diligence exercise on a

1    cold record looking back into history, but we've lived it

2    and we have checked, not just internally with our own team,

3    but with the management team and with the other advisors.

4           We have not negotiated revised terms of the merger

5    agreement with NextEra.  We have not done that.  In fact,

6    just looking at the efforts we've taken with NextEra, our

7    efforts have been to support the existing merger agreement.

8    Look no further than the Motion for Rehearing filed by

9    NextEra and the immediate brief filed by the Debtors.

10          We are not suggesting that there's some tweaked or

11    modified version of the merger agreement that the PUCT

12    should consider.  NextEra has full-throatedly taken the

13    position that the PUCT got it wrong and that they need to

14    revisit their analysis.  And as an amicus, the Debtors have

15    come forward and articulated their concerns and their

16    perspective on the analysis provided by the PUC.

17          To the extent that there is any analysis about

18    what may need to be done internally and on a go forward

19    basis, again, that is legal analysis driven by what we may

20    need to evaluate from our structuring perspective on a go

21    forward basis.

22          And Your Honor, as it relates to what it may take

23    to resolve the Public Utilities Commission hearing, we have

24    had interactions with NextEra on that issue, but not in the

25    form of a term sheet.  Our understanding of what NextEra may

1    think it may take to resolve that issue with the Public

2    Utilities Commission and our discussions with them, which

3    are privileged legal discussions shared through our common

4    legal interests, to evaluate what the spillover implications

5    might be, this goes no further than, Your Honor, what Mr.

6    Husnick highlighted in April when he was before you and he

7    gave you a status update, which is to the extent that

8    NextEra is able to resolve its issues as the applicant, with

9    intervenors to the Public Utility Commission application, if

10   they're able to do that, there may be knock-on effects as it

11   relates to the existing plan that's being confirmed.

12            And as Mr. Husnick noted at that time, to the

13   extent that that were to happen and NextEra were able to

14   reach that, we may have to come back to Your Honor and we

15   would acknowledge that we may need to resolicit certain

16   creditor constituencies, for example, the (indiscernible),

17   even the PIKs, if the recoveries weren't consistent with the

18   projected recoveries of 80 cents on the dollar.

19            Our discussions have not been done on a term sheet

20   basis and anyway, it's not a negotiation.  It's been a

21   strategy as we've with NextEra to evaluate to evaluate and

22   aid them as we need to under our obligations.  And I think

23   we need to because, Your Honor, we have specific contractual

24   obligations to aid and support them.  When they ask and they

25   challenge what is the legal interest we have here, as

1    opposed to a general commercial interest, I think that is

2    kind of the crux of the argument that's being pushed forward

3    in front of Your Honor.  And even if you look at the cases

4    that Elliott cites, they cite general commercial cases

5    arising out of transactions that do not have a regulatory or

6    legal overlay.  Those are wholly distinguishable from what

7    we are dealing with here.  None of them are restructuring

8    related cases.  None of them have a regulatory overlay that

9    we have here.

10           Here, we have a merger agreement that the parties

11   entered into with a specific cooperation provision -- it's

12   Section 6.3(a)(1) -- that compels the Debtors and NextEra to

13   work together to use their reasonable best efforts to take

14   all steps that are necessary to secure regulatory approval.

15           We also have other agreements with NextEra,

16   specifically the NextEra Fidelity PSA, which binds the

17   Debtors and NextEra to take all reasonable steps to retain

18   regulatory and other third-party approvals.  And then that,

19   Your Honor, is Section 4.802(a)(6) of the NextEra Fidelity

20   PSA.  And, Your Honor, we have your confirmation order where

21   we have to do all the stuff necessary to make the plan

22   executable and have those for closing.

23           So, when we look at whether these are of legal

24   interest that we're protecting as opposed to commercial

25   interests, there absolutely is a core legal interest that we

1    are pursuing.  Our discussions with NextEra about what it

2    may take to address the Public Utility Commission's order

3    are all in the form of an effort to resolve a pending

4    regulatory matter.  That has to be covered by the common

5    legal interest.

6            There's no doubt we have a unity of interest that

7    is based on the merger agreement.  And the question as to

8    whether it's commercial or legal in nature, you need to look

9    no further than the regulatory overlay that we're dealing

10   with.

11           Now, Your Honor, turning to other issues that they

12   have sought discovery on, specifically related to the

13   transaction.  They have been very focused, Your Honor, on

14   the termination fee, and any discussions that we have had

15   with NextEra as it relates to whether that termination fee

16   of $275,000 is payable and under which circumstances.  This

17   analysis is relatively straightforward as well.

18           Internally, Your Honor, our analysis of that issue

19   of whether the termination fee is payable and under what

20   circumstances, undeniably, unquestionably privileged

21   communications and attorney work product.

22           As to whether we've had any interactions with

23   NextEra on that issue, we have told Elliott this, Your

24   Honor, we told them this orally, we put it in writing, we

25   have assiduously avoided that exact issue.  We have done

1    that because we have a shared purpose in getting the

2    existing merger furthered.  We did not want to engage on and

3    NextEra does not want to engage with that right now because

4    we are actively working together to try to have the PGT

5    revisit the existing order.

6              There are two other buckets, Your Honor, that it

7    appears that they're focused on.  There was an April 5th,

8    2017 meeting between next year and large holders of

9    institutional debt, including Elliott.  Your Honor, we were

10   not involved with that.  That is a NextEra issue.  We

11   understand they may have caused discovery on NextEra on

12   that, but we do not have materials as it relates to that

13   meeting.  We were not consulted in advance of that meeting.

14   And that is something that NextEra has dealt with them.  So,

15   that's not something that we've had interactions with them

16   on in terms of discussions or planning in advance.

17             The other one, Your Honor, is financial or

18   structuring alternatives to the NextEra transaction.  Again,

19   internally, our efforts to evaluate potential alternatives

20   are unquestionably privileged and attorney work product.

21   And to the extent that we've had discussions with NextEra,

22   they're very limited.  And they really center on a financial

23   issue, and that is the DIP financing.

24             The DIP financing we mentioned last Friday, we had

25   discussed with NextEra that proposed DIP financing.  We've

1   held off on filing that motion, Your Honor, as we work with

2   creditors to evaluate DIP possibilities.  But Your Honor --

3   and I mean, I try to be careful about this -- we see no way

4   how the DIP financing is somehow relevant to the issues that

5   are being put forward in the Preliminary Injunction Motion.

6        And as Elliott knows very well, based on our

7   efforts to work with them, this proposed DIP financing does

8   not have any type of equity conversion that would, you know,

9   maybe be at odds with or inconsistent with the existing

10  merger agreement.  Your Honor, we do not believe that we

11  have had the type of, you know, the issues they've been

12  trying to get at, have you re-engaged and have you at arm's

13  length with NextEra regarding an alternative to the NextEra

14  agreement.  And what we tried to explain to Elliott is that

15  we have not.  We still have a unity of interest, legal

16  interests, in pursuing the existing merger that we're

17  pursuing.

18       And Your Honor, those are the core issues that

19  they raise, and I think I've addressed the privilege issues,

20  having to answer more on that as relates to their fallback

21  issues of, well, you know, maybe if you just did some

22  searches and did some high-level reviews and reengaged with

23  us to address those issues, I think it's important to

24  appreciate what we're dealing with now as opposed to what

25  we're dealing with for the entire litigation.

1          You know, Your Honor entered a schedule on Monday

2    consistent with the parties' proposal and it is, as I

3    referenced last Friday, as expedited as we can make it.  We

4    are dealing with a compressed time period with one week to

5    produce documents and briefing -- our briefing is due as

6    early -- is due on June 4th.  The areas -- based on our

7    knowledge and our efforts and in order to basically to

8    reaffirm what we believe is true is true, to go through the

9    cost burden and exercise of reviewing people -- materials

10   that we feel very strongly are going to be covered

11   internally by privilege and through the limited materials

12   that would go across lines to NextEra would be picked up by

13   the common interest.  We think there is no justification for

14   that burden or that cost.

15          As it relates to our privilege law, again, taking

16   it in steps, we're going to the preliminary injunction

17   hearing on this expedited schedule?  We're not objecting to

18   do a privilege law, you know, consistent with how we've done

19   privilege laws, you know, in the bankruptcy generally, for

20   the litigation.  We're just saying that that is not

21   something that is not something that we think we should be

22   burdened on doing in the less than one month we have now and

23   the hearing.

24          So, no mistake about what we're -- what our

25   position is as to a privilege law.  We understand, you know,

1    that to the extent they are privileged materials, they will

2    need to be logged.  The question is is that part of this

3    expedited proceeding as well.

4            And then finally, Your Honor, it comes back to the

5    extent that they want to argue that they're being harmed

6    because they believe that the NextEra merger agreement is

7    dead on arrival and that they have all the materials they

8    need from the public record of what's already out there to

9    make those arguments.  We're not saying they can't make

10   their arguments.  They can -- any argument they want and

11   we'll respond.  But the issue as to whether -- you know, for

12   the preliminary injunction, we don't provide a basis for

13   them to try to pierce into our privileged and work product

14   efforts and our efforts with NextEra to get the existing

15   agreement through, both by Your Honor and then by the

16   regulators as well.

17           Your Honor, with that, I obviously would like to

18   rebut or respond to anything that Elliott has, but I am also

19   happy to answer any questions you may have.

20           THE COURT:  All right.  I have no questions, Mr.

21   McKane.  Thank you.

22           MR. MCKANE:  Thank you.

23           THE COURT:  Would the Plaintiff like to be heard?

24           MR. WELSH:  Yes, please, Your Honor.  Good

25   afternoon, Your Honor.  Peter Welsh from Ropes & Gray for

1    Elliott Associates.

2              Your Honor, I first like to begin by reiterating a

3    couple of points that Mr. McKane made.  First of all, we

4    also think Your Honor and your Clerks and your staff for

5    making Your Honor available this afternoon on very short

6    timing.  We certainly appreciate it and know that these

7    exercises do place a burden on the Court and its staff, and

8    we very much appreciate Your Honor making time for us.

9              Secondly, I'd also like to reiterate Mr. McKane's

10   representations at the beginning of his presentation that

11   the discussion between the Debtors and Elliott over the last

12   few days have been significantly productive and cooperative.

13             As for Elliott's defensive discovery, we have

14   resolved whatever issues were raised and we do have a

15   protocol for producing Elliott's documents to the Debtors.

16   We're finalizing some search terms, but don't anticipate any

17   issues there.  So, the defensive part of the Elliott

18   discovery exercises is locked and loaded, Your Honor.

19             On the offensive discovery, Mr. McKane is correct,

20   and certainly it's reflected in our mutual briefing, Your

21   Honor, that there is this one issue outstanding with regard

22   to the discoverability of documents concerning the

23   likelihood of closing the NextEra transaction, the

24   consequences of the NextEra transaction failing to close,

25   and the potential alternatives to the NextEra transaction.

1         I do want to reiterate, although I think it is

2    fairly clear from Mr. McKane's presentation, that we are not

3    looking for all documents concerning the NextEra

4    transaction.  We appreciate that would be overbroad.  We

5    don't want all documents concerning the NextEra transaction,

6    particularly on this timeframe, and we are not seeking

7    those.  We really are focused on the viability of the

8    NextEra transaction and potential alternatives thereto.

9         And Your Honor, the Debtors, as Mr. McKane

10   indicated, are disputing our right to take discovery of

11   those subjects on three principal grounds, relative

12   privilege and work product and for -- Your Honor, we believe

13   that each objection raised by the Debtors' here is entirely

14   without merit.

15        On the relevance objection, Your Honor, as we've

16   explained to Debtors' counsel, the documents we're seeking

17   are clearly relevant to both irreparable harm and the

18   balance of the equities.  We fully anticipate that at the

19   preliminary injunction hearing on June 12th we will hear

20   from the Debtors that even if we prevail on our attempt to

21   show a substantial likelihood of success on the merits,

22   we're not entitled to a preliminary injunction because we

23   cannot show irreparable harm or that the balance of equity

24   tips in Elliott's favor.  And we fully expect to hear that a

25   part of the reason why we cannot establish those two prongs

1    according to the Debtors, is because of the pendency of the

2    NextEra transaction and/or the possibility of some unknown,

3    unspecified alternatives to the NextEra transaction.  That

4    is what the Debtors argued at the end of their briefing

5    prior to the status conference that Your Honor held last

6    week.  That is what the Debtors have argued very briefly in

7    the brief they filed for this hearing, Your Honor.

8            Irreparable harm and balance of equities are

9    clearly relevant to a motion for preliminary injunction, and

10   the documents we're seeking are clearly relevant to those

11   two prongs.  The Debtors respond that they are nonetheless

12   not relevant, really for two reasons.  One, the Debtors

13   argue that the PIK PSA allegedly binds Elliott, even if the

14   NextEra transaction is no longer pending and not viable, as

15   long as there is some potentially viable alternative

16   transaction that will return the same recovery to creditors.

17           First, we obviously dispute that the PIK PSA is

18   binding on Elliott.  Secondly, and more importantly, that

19   argument goes to the likelihood of success on the merits

20   prong, not to irreparable harm or the balance of the

21   equities.

22           On irreparable harm and the balance of the

23   equities, Your Honor, the Debtors argue that the issue is

24   not relevant, the issue of the NextEra transaction, and it's

25   likely closing is not relevant because the PIK PSA has an

1    equitable remedies provision in it that provides that any

2    breach equals irreparable harm.  And so, if we have breached

3    the PSA, then that is per se irreparable harm.  That

4    argument, of course, completely ignores the possibility that

5    Elliott prevails in establishing a likelihood of success on

6    the merits.  That argument presumes that the Debtors prevail

7    on the issue of likelihood of success on the merits.

8              If Elliott prevails on likelihood of success on

9    the merits, as we fully expect to, we also must show that

10   absent the entry of a preliminary injunction, we will be

11   irreparably harmed.  And absent a preliminary injunction,

12   the balance of equities or entry of a preliminary

13   injunction, in the event of the entry of a preliminary

14   injunction and balance of equities, tip in Elliott's favor

15   rather than the Debtors' favor.  And the Debtors again have

16   made clear that they will dispute that we've been

17   irreparably harmed or that the balance of equities tip in

18   our favor, and that they will dispute that on the basis of

19   the pendency of the NextEra transaction or potential

20   alternatives to the NextEra transaction.  That is precisely

21   why we need discovery into those issues.

22             As for privilege and work product, Your Honor, the

23   Debtors contend, as Mr. McKane made very clear, that all

24   documents we are seeking are either privileged and work

25   product or they are in the public domain.  That clearly

1    cannot be the case, Your Honor.  The Debtors and NextEra are

2    commercial counterparties to an arm's length transaction.

3    That arm's length transaction has a very elaborate contract

4    that governs the arm's length transaction.  That arm's-

5    length transaction is in jeopardy and NextEra and the

6    Debtors are clearly at arm's length and clearly have

7    divergent interests with respect to that transaction under

8    the current circumstances.

9           While there may be a common interest, there may be

10   a common interest and to some extent likely is a common

11   interest with respect to prosecuting the PUCT petition and

12   legal strategy around prosecuting the PUCT petition, that

13   does not make all documents relating to the likelihood of

14   the NextEra transaction closing or alternatives thereto

15   privileged and work product.

16          And just to pause and make clear for a moment,

17   Your Honor, we are not looking for a legal analysis.  We are

18   not looking for Debtors' counsel's analysis.  We are not

19   looking for hard-core work product or for attorney-client

20   privilege material.  But we believe, Your Honor, that

21   nowhere near a substantial majority of the documents we're

22   seeking are -- you know, fall into that category.

23          There are clearly divergent interests here between

24   the Debtors and NextEra, first with respect to the

25   implications of PUCT denial or potential PUCT denial on the

1    merger transaction with respect to renegotiating the merger

2    transaction or exploring alternative structures, terms and

3    the like in the merger transaction.

4              And Mr. McKane said, or at least I heard him to

5    say, there have been no negotiations concerning terms of the

6    merger transaction.  We are also clearly looking for

7    communications, discussions, between and among the parties

8    with respect to potential alternatives to the transaction,

9    potential alternative terms, potential alternative concepts,

10   business discussions of alternatives to the transaction.

11   We're not simply looking for negotiations of merger

12   transaction terms or merger agreement terms.

13             Their interests are clearly divergent with respect

14   to potential termination of the merger agreement with a

15   claim for a break fee in respect to that potential

16   termination.  There is also clearly no privilege or work

17   product protection with respect to communications with third

18   parties, including Oncor, including the interveners,

19   including other sponsors of potential backup options,

20   including other third parties.

21             Your Honor, the Debtors Your Honor's decision from

22   Leslie Controls for the proposition with adverse interests

23   can nonetheless still have a common interest.  And

24   importantly, Your Honor, in quoting Your Honor's holding

25   from Leslie Controls, the Debtors clip the quote and omit

1    the most important part of the passage that they are citing

2    to from Your Honor's decision.  And the rest of the quote,

3    which the Debtors don't cite in their briefing, after noting

4    that Leslie Controls stands for the proposition that parties

5    with adverse interests can nonetheless have a common legal

6    interest.

7            Your Honor went on and said as following, "When

8    the interests of the parties diverge to some extent, the

9    Common Interest Doctrine applies only insofar as their

10   interests are in fact identical.  Communications relating to

11   matters as to which they hold opposing interest lose any

12   privilege."  Your Honor, that's precisely the circumstances

13   we confront here and that's precisely why there is no common

14   legal interest here and why there is no work product

15   protection here with at BC substantial portion of the

16   documents we are seeking with respect to the NextEra

17   transaction.

18           A couple of final points, Your Honor, on points

19   Mr. McKane raised.  First, this notion that's in their

20   briefing and that Mr. McKane articulated during his

21   presentation, that we all should trust the Debtors, they've

22   lived through this case for a long time, they know what the

23   documents say, they know what's out there.  That's obviously

24   problematic, Your Honor.  The purpose of discovery is to

25   permit adverse parties to actually review the documents and

1    facts for themselves and draw their own conclusions.

2            I'm certainly not suggesting we have any distrust

3    for the Debtors or Debtors' counsel at this point, but the

4    purpose of discovery in an adversarial system is for parties

5    on the other side of the "v." to be permitted to look at

6    documents and information and draw their own conclusions

7    about what those documents and what that information shows.

8            Lastly, with respect to burden, the burden

9    argument is problematic for two reasons, Your Honor.  First,

10   it's essentially a bootstrapping argument.  Debtors argue

11   that because the documents are not relevant, because the

12   documents are privileged and work product protected,

13   therefore, it's burdensome for them to go and pull those

14   documents and engage with Elliott in a discussion or confer

15   with respect to those documents, review those documents, or

16   produce those documents.  That's obviously bootstrapping.

17   The documents are relevant.  They are not work product

18   protected to at least some extent.  They are likely not work

19   product or privileged.  And in that case, it is not

20   therefore burdensome for the Debtors to go review, collect,

21   review and produce those documents.

22            As to any argument that it's independently

23   burdensome, leaving aside the bootstrapping argument, any

24   suggestion that it's independently burdensome fails because,

25   Your Honor, the Debtors have simply failed to make any

1    showing of independent burden with respect to those

2    documents.  They haven't articulated with the volume of

3    those documents looks like, how burdensome or time-consuming

4    it would be for them to collect and review them, and indeed,

5    they have declined to engage with us in a dialogue around

6    search terms, what the output of those search terms would

7    be, whether different search terms might yield a less

8    burdensome volume of documents, or other ways to make it not

9    independently burdensome on the Debtors.

10           So, the burdensome argument, Your Honor, has to

11   fail because the Debtors have just not made any independent,

12   non-bootstrapping showing as to why our request with respect

13   to those categories of documents is burdensome.

14           With that, Your Honor, I'll pause and ask if your

15   honor has any questions.  And otherwise, that concludes my

16   presentation.

17           THE COURT:  I do not.  Thank you, Mr. Welsh.

18           MR. MCKANE:  Your Honor, may I briefly respond to

19   a couple issues?

20           THE COURT:  Yes, Mr. McKane.

21           MR. MCKANE:  Thank you, Your Honor.  Your Honor,

22   one of the things that we're struggling with on this issue

23   of irreparable harm is I truly believe at times we're just

24   talking past Elliott on this.  And one of the things that we

25   have raised, why would there be no irreparable harm, why is

1    there no irreparable harm?  And they quote our letter to you

2    from last week about why there's no harm between now and the

3    hearing.

4            The reason that there's no harm isn't simply the

5    fact that the NextEra agreement is still pending and has not

6    been determined.  It's because, as we referenced last week

7    in the quoted -- in the waiver that we've offered them, they

8    have not been prohibited from doing anything that they truly

9    want to do move forward, and we have actually been working

10   with them.  The reason why there's no irreparable harm is

11   that reflected waiver, we don't believe they will be able to

12   identify a party with whom they want to speak, when all they

13   need to do is get a joinder to an NDA, with an existing

14   creditor and they can engage.

15           We have been working while -- well, as you can

16   imagine, Mr. Welsh and I have spent a lot of time together

17   over the last couple of days.  There's always a parallel

18   effort.  Mr. Kieselstein and Mr. Husnick have been engaging

19   with Mr. Galardi on moving forward on a constructive

20   restructuring path.  And on that path, the reason that

21   Elliott will not be able to establish irreparable harm for a

22   preliminary injunction is because, you know, to the extent

23   the PSA applies and they are bound by it -- which we

24   absolutely believe is true as the successor and assign,

25   there is no doubt in our minds about it -- is that

1    nonetheless, we have been working with them to try to be

2    constructive as well.  So that's one of the core -- that's

3    the core reason why it's irreparable harm, not because we

4    have to get into the tea leaf reading of whether the NextEra

5    transaction will survive or not.

6            And beyond that, Your Honor, no one is going to

7    tell you, I don't think with any level of credibility, that

8    an 80-cent plan is off the table.  Never going to happen.  I

9    don't think Elliott would ever tell you that.  And in fact,

10   I think that the parties would be willing to stipulate that

11   it remains possible that there is an 80-cent plan that can

12   be available to big creditors.  Right?  No one is going to

13   take that issue off the table.  And so, if you're evaluating

14   irreparable harm, the real question is going to be how are

15   they being harmed right now as you evaluate the issues on

16   June 12th.

17           And then, Your Honor, as it relates to simply the

18   other issue I think that Mr. Welsh has really been

19   highlighting is that somehow there's a divergence in those

20   interests.  The two subcategories, the materials where there

21   could be a divergence of interests, could be to the extent

22   that we are at arm's length negotiating an issue with

23   NextEra.  And that would be a renegotiation of the merger or

24   an amendment to the merger in category number 1 or category

25   number 2, whether we are at (indiscernible) with them about

1     a break fee about a break fee.  And what we have

2     specifically said is we have not engaged with NextEra on

3     either of those issues.  For the joint interests in pursuing

4     the existing merger agreement with the regulators and our

5     joint legal interests in doing that, both NextEra and the

6     Debtors have agreed to table that issue and not engage with

7     it at this time.

8              So, while there may be an argument that there is a

9     -- there could have been a theoretical divergence, we

10    haven't engaged on those issues yet.  And so, that's -- you

11    know, when we address what is going to be the burden of

12    going through these materials and producing them over seven

13    days, and I think about what could possibly exist that would

14    not fall into these categories, we -- you know, and not

15    already publicly available, we believe -- that's why we

16    believe the burden significantly outweighs any potential

17    limited probative value that would exist here.

18              THE COURT:  Okay.

19              MR. MCKANE:  And then that's all, Your Honor.

20              THE COURT:  Thank you, Mr. McKane.

21              MR. WELSH:  Your Honor, may I just very briefly

22    respond to each of those points?

23              THE COURT:  Yes, briefly.

24              MR. WELSH:  Your Honor, whatever waiver offers

25    have been made and whatever parallel discussions may or may

1   not be happening, the Debtors are still trying to enforce

2   the PSA against Elliott.  And we're seeking injunctive

3   relief to permit us to explore alternative options.  And as

4   part of seeking injunctive relief, irreparable harm and the

5   balance of equities are clearly relevant.  And the Debtors

6   have made clear that the pendency of the NextEra transaction

7   or potential alternatives to the NextEra transaction are

8   relevant to irreparable harm and the balance of the

9   equities.

10          So, whatever the, you know, other paths look like

11  here, they're still trying to enforce the PSA against us.

12  We're still on injunctive -- our injunction litigation and

13  those issues are still highly relevant.

14          As to the no there there argument, that's what

15  discovery is for.  I mean, that's what discovery in an

16  adversary process is for.  And we're asking to take

17  discovery of subjects that are clearly relevant to the

18  issues we're litigating on the current posture of this case.

19  And we respectfully request Your Honor to grant our request

20  to take discovery of those topics.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.  Okay, thank you very much

23  for your presentations.  I am going to find in favor of the

24  Debtors on the issues that are presented to me today.  I'll

25  be brief because I basically agree wholeheartedly and

1    completely with the Debtors' presentation.  More

2    specifically, I think that there's a real issue as to

3    relevance.  But overriding that, in my mind, is the fact

4    that I am virtually certain that everything, or the vast

5    bulk of what would have to be produced, is privileged

6    material subject to the Common Interest Doctrine.

7              And as a result, requiring the Debtors in an

8    expedited preliminary injunction litigation to go through

9    the process of reviewing tens of thousands of pages of

10   documents, to find tens of thousands of pages of privileged

11   documents is really out of proportion to the issues that are

12   before the Court in a preliminary injunction, and the burden

13   on the parties.

14             I think there would be a significant burden to

15   produce these documents.  This transaction goes back months.

16   It's highly complicated.  It involves both a confirmation

17   hearing and a Public Utility Commission of Texas proceeding.

18   And to delve into trying to produce documents with regard to

19   that transaction in such a short period of time would be

20   highly burdensome, in all likelihood not relevant, and even

21   if relevant, covered by privilege and the Common Interest

22   Doctrine.

23             So, if those three -- that three-legged stool, for

24   me is so sort of overwhelming that it makes, at least in the

25   context of preliminary injunction, just a sort of a bridge

```
 1    too far with regard to seeking discovery at this time.

 2            With regard to whether a privilege log ultimately

 3    has to be delivered, I'm ordering now that the

 4    (indiscernible) don't need to be produced.  So, obviously,

 5    no privilege of the log needs to be produced.  To the extent

 6    in the future documents are produced that are being withheld

 7    because of privilege and possibly privilege and the Common

 8    Interest Doctrine, some sort of log will be necessary, but

 9    certainly none is necessary at this time, given the schedule

10    we're on.

11            So, I'm going to deny the discovery request,

12    orally grant the Debtors' request for a protective order,

13    and not allow the discovery to go forward in connection with

14    the preliminary injunction.

15            Anything further for today?

16            MR. MCKANE:  This is Mark McKane for the Debtors.

17    No, Your Honor.  Thank you for your time.  We appreciate it.

18            THE COURT:  You're welcome.

19            MR. WELSH:  Nothing further from Elliott, Your

20    Honor.  Thank you for your time, Your Honor.

21            THE COURT:  You're welcome, Mr. Welsh.  All right,

22    very good.  We are adjourned.  Have a good day.

23            MR. WELSH:  Thank you.

24            MR. MCKANE:  Thank you, Your Honor.

25                        * * * * *
```

Page 34

1                              I N D E X

2

3                              RULINGS

4    DESCRIPTION                              PAGE        LINE

5

6    Motion for Discovery, Denied              33          11

7

8    Motion for Protective Order, Granted      33          11

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 35

1                   C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya Ledanski Hyde

    Digitally signed by Sonya Ledanski
    Hyde
    DN: cn=Sonya Ledanski Hyde, o, ou,
    email=digital1@veritext.com, c=US
    Date: 2017.05.23 14:29:15 -04'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 23, 2017