## EXHIBIT 1

**EFIH First Lien DIP Credit Agreement**

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of June [_], 2017

among

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC and EFIH FINANCE INC.,**
as the Co-Borrowers,

**The Several Lenders
from Time to Time Parties Hereto,**

**CITIBANK, N.A.,**
as Administrative Agent and Collateral Agent,

**[____],**
as Co-Syndication Agents,

**[____],**
as Co-Documentation Agents,

**CITIGROUP GLOBAL MARKETS INC.,
MORGAN STANLEY SENIOR FUNDING, INC.,
RBC CAPITAL MARKETS[1], and
BARCLAYS BANK PLC**
as Joint Lead Arrangers and Joint Bookrunners

and

**[____],**
as Co-Managers

---

[1]    RBC Capital Markets is a marketing name for the capital markets activities of Royal Bank of Canada and its affiliates.

# TABLE OF CONTENTS

**Page**

Section 1.        Definitions. ................................................................................... 2

    1.1.      Defined Terms ................................................................................ 2
    1.2.      Other Interpretive Provisions........................................................ 41
    1.3.      Accounting Terms .......................................................................... 42
    1.4.      Rounding ........................................................................................ 42
    1.5.      References to Agreements, Laws, Etc. ......................................... 42
    1.6.      Times of Day .................................................................................. 42
    1.7.      Timing of Payment of Performance ............................................. 43
    1.8.      Currency Equivalents Generally ................................................... 43
    1.9.      Classification of Loans and Borrowings....................................... 43
    1.10.     Hedging Agreements ..................................................................... 43

Section 2.        Amount and Terms of Credit......................................................... 43

    2.1.      Commitments.................................................................................. 43
    2.2.      Maximum Number of Borrowings ............................................... 44
    2.3.      Notice of Borrowing...................................................................... 44
    2.4.      Disbursement of Funds ................................................................. 45
    2.5.      Repayment of Loans; Evidence of Debt...................................... 46
    2.6.      Conversions and Continuations ................................................... 46
    2.7.      Interest ............................................................................................ 47
    2.8.      Interest Periods .............................................................................. 48
    2.9.      Increased Costs, Illegality, Etc. ................................................... 49
    2.10.     Compensation ................................................................................ 50
    2.11.     Change of Lending Office ............................................................ 50
    2.12.     Notice of Certain Costs................................................................. 51
    2.13.     Second Lien DIP Facility.............................................................. 51
    2.14.     [Reserved]....................................................................................... 52
    2.15.     Defaulting Lenders ........................................................................ 52

Section 3.        Fees................................................................................................... 52

    3.1.      Fees................................................................................................... 52

Section 4.        Payments.......................................................................................... 53

    4.1.      Voluntary Prepayments ................................................................. 53
    4.2.      Mandatory Prepayments ............................................................... 53
    4.3.      Method and Place of Payment ..................................................... 54
    4.4.      Net Payments ................................................................................. 55
    4.5.      Computations of Interest and Fees .............................................. 58
    4.6.      Limit on Rate of Interest............................................................... 58

Section 5.        Conditions Precedent to Term Borrowing.................................. 58

    5.1.      Conditions Precedent to Initial Term Loan Borrowing ...................... 58

5.2.    Conditions Precedent to Delayed Draw Term Borrowing .................................. 61

Section 6.    Representations, Warranties and Agreements ..................................... 62

6.1.    Corporate Status; Compliance with Laws ........................................... 62
6.2.    Corporate Power and Authority ........................................................ 62
6.3.    No Violation ................................................................................. 62
6.4.    Litigation .................................................................................... 63
6.5.    Margin Regulations ....................................................................... 63
6.6.    Governmental Approvals ................................................................ 63
6.7.    Investment Company Act ................................................................ 63
6.8.    True and Complete Disclosure ........................................................ 63
6.9.    Financial Condition; Projections; Material Adverse Effect ................... 63
6.10.   Tax Matters ................................................................................. 64
6.11.   Compliance with ERISA ................................................................ 64
6.12.   Subsidiaries ................................................................................. 65
6.13.   Intellectual Property ...................................................................... 65
6.14.   Environmental Laws ...................................................................... 65
6.15.   Properties .................................................................................... 65
6.16.   DIP Order ................................................................................... 66
6.17.   Status of Obligations; Perfection and Priority of Security
        Interests ...................................................................................... 66
6.18.   Insurance ..................................................................................... 66
6.19.   Labor Matters .............................................................................. 66
6.20.   Sanctioned Persons; Anti-Corruption Laws; Patriot Act ..................... 66

Section 7.    Affirmative Covenants .......................................................................... 67

7.1.    Information Covenants .................................................................... 67
7.2.    Books, Records and Inspections ...................................................... 70
7.3.    Maintenance of Insurance ............................................................... 71
7.4.    Payment of Taxes ......................................................................... 71
7.5.    Consolidated Corporate Franchises .................................................. 72
7.6.    Compliance with Statutes, Regulations, Etc. ..................................... 72
7.7.    ERISA ........................................................................................ 72
7.8.    Maintenance of Properties .............................................................. 73
7.9.    Transactions with Affiliates ............................................................ 73
7.10.   End of Fiscal Years; Fiscal Quarters ................................................ 74
7.11.   Additional Guarantors and Grantors ................................................ 74
7.12.   Pledge of Additional Stock and Evidence of Indebtedness ................... 74
7.13.   Further Assurances ........................................................................ 75
7.14.   Bankruptcy Matters ....................................................................... 75
7.15.   Reserved ..................................................................................... 76
7.16.   Use of Proceeds ............................................................................ 76

Section 8.    Negative Covenants ............................................................................. 76

8.1.    Limitation on Indebtedness ............................................................. 76
8.2.    Limitation on Liens ....................................................................... 80
8.3.    Limitation on Fundamental Changes ................................................ 82
8.4.    Limitation on Sale of Assets ........................................................... 83

| | | |
|---|---|---|
| 8.5. | Limitation on Investments | 86 |
| 8.6. | Limitation on Dividends | 89 |
| 8.7. | Limitation on Prepaying Indebtedness | 93 |
| 8.8. | Limitations on Sale Leasebacks | 93 |
| 8.9. | Liquidity Covenant | 93 |
| 8.10. | Changes in Business | 93 |
| 8.11. | Bankruptcy Provisions | 93 |
| 8.12. | Affiliate Value Transfers | 93 |

Section 9.    Events of Default .............................................................................. 93

| | | |
|---|---|---|
| 9.1. | Payments | 93 |
| 9.2. | Representations, Etc. | 93 |
| 9.3. | Covenants | 93 |
| 9.4. | Default Under Other Agreements | 94 |
| 9.5. | ERISA | 94 |
| 9.6. | Credit Documents | 94 |
| 9.7. | Judgments | 95 |
| 9.8. | Hedging Agreements | 95 |
| 9.9. | Change of Control | 95 |
| 9.10. | Matters Related to the Cases | 95 |
| 9.11. | Automatic Stay | 96 |
| 9.12. | Status of Orders | 96 |
| 9.13. | Confirmation of Plan | 96 |
| 9.14. | Application of Proceeds | 96 |

Section 10.    The Agents ...................................................................................... 98

| | | |
|---|---|---|
| 10.1. | Appointment | 98 |
| 10.2. | Delegation of Duties | 98 |
| 10.3. | Exculpatory Provisions | 98 |
| 10.4. | Reliance by Agents | 100 |
| 10.5. | Notice of Default | 100 |
| 10.6. | Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders | 100 |
| 10.7. | Indemnification | 101 |
| 10.8. | Agents in its Individual Capacities | 102 |
| 10.9. | Successor Agents | 103 |
| 10.10. | Withholding Tax | 104 |
| 10.11. | Trust Indenture Act | 104 |
| 10.12. | Security Documents and Guarantee | 104 |

Section 11.    Miscellaneous ................................................................................. 105

| | | |
|---|---|---|
| 11.1. | Amendments, Waivers and Releases | 105 |
| 11.2. | Notices | 107 |
| 11.3. | No Waiver; Cumulative Remedies | 108 |
| 11.4. | Survival of Representations and Warranties | 108 |
| 11.5. | Payment of Expenses; Indemnification | 108 |
| 11.6. | Successors and Assigns; Participations and Assignments | 109 |
| 11.7. | Replacements of Lenders under Certain Circumstances | 113 |

11.8.      Adjustments; Set-off ................................................................................ 114
11.9.      Counterparts .......................................................................................... 114
11.10.     Severability ........................................................................................... 114
11.11.     INTEGRATION ................................................................................... 114
11.12.     GOVERNING LAW .............................................................................. 115
11.13.     Submission to Jurisdiction; Waivers ...................................................... 115
11.14.     Acknowledgments ................................................................................. 115
11.15.     WAIVERS OF JURY TRIAL ................................................................ 116
11.16.     Confidentiality ...................................................................................... 116
11.17.     Direct Website Communications ............................................................ 117
11.18.     USA PATRIOT Act ............................................................................... 118
11.19.     Payments Set Aside .............................................................................. 118
11.20.     Separateness .......................................................................................... 119
11.21.     Keepwell ............................................................................................... 119

Section 12.          Security ................................................................................................. 119

   12.1.       Security ................................................................................................. 119

SCHEDULES

Schedule 1.1(a)        Commitments
Schedule 1.1(b)        Excluded Subsidiaries
Schedule 1.1(c)        Unrestricted Subsidiaries
Schedule 1.1(d)        First Day Orders

Schedule 6.4           Litigation
Schedule 6.12          Subsidiaries
Schedule 6.15          Property
Schedule 7.9           Closing Date Affiliate Transactions
Schedule 8.1           Closing Date Indebtedness
Schedule 8.2           Closing Date Liens
Schedule 8.4           Scheduled Dispositions
Schedule 8.5           Closing Date Investments
Schedule 11.2          Notice Addresses

EXHIBITS

Exhibit A        Form of Notice of Borrowing
Exhibit B        Form of Guarantee
Exhibit C        Form of Pledge Agreement
Exhibit D        Form of Security Agreement
Exhibit E        Form of Credit Party Closing Certificate
Exhibit F        Form of Assignment and Acceptance
Exhibit G        Form of Promissory Note (Term Loans)
Exhibit H        Form of Non-U.S. Lender Certification
Exhibit I        Initial Budget
Exhibit J        Form of DIP Order
Exhibit K        Form of Budget Notice

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of June [___], 2017, among ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, a Delaware limited liability company and a debtor and debtor-in-possession ("**EFIH**") and EFIH FINANCE INC., a Delaware corporation and a debtor and debtor-in-possession ("**EFIH FINANCE**" and together with EFIH, each a "**Co-Borrower**" and collectively, the "**Co-Borrowers**" or the "**Borrower**") in a case pending under chapter 11 of the Bankruptcy Code, the lending institutions from time to time parties hereto (each a "**Lender**" and, collectively, the "**Lenders**"), CITIBANK, N.A., as Administrative Agent and Collateral Agent and CITIGROUP GLOBAL MARKETS INC., MORGAN STANLEY SENIOR FUNDING, INC., RBC CAPITAL MARKETS and BARCLAYS BANK PLC  as Joint Lead Arrangers and Joint Bookrunners.

## RECITALS:

WHEREAS, capitalized terms used and not defined in the preamble and these recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, on April 29, 2014 (the "**Petition Date**"), the Borrower and each of the other Guarantors as of the Closing Date filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code ("**Chapter 11**") in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having exclusive jurisdiction over the Case from time to time and any Federal appellate court thereof, the "**Bankruptcy Court**") and commenced cases numbered 14-11001 and 14-11008 respectively (each, a "**Case**" and, collectively, the "**Cases**"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on June 19, 2014, the Borrower entered into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Existing DIP Credit Agreement**") with each of the lenders party thereto and Deutsche Bank AG New York Branch, as administrative agent and collateral agent, in respect of term loans in an aggregate principal amount of $5,475,000,000;

WHEREAS, on the date hereof, the Borrower has elected to refinance the Existing DIP Credit Agreement;

WHEREAS, in connection with the foregoing, the Borrower has requested that the Lenders extend credit to the Borrower in the form of (a) $5,475,000,000 in aggregate principal amount of Initial Term Loans to be funded on the Closing Date, and (b) $825,000,000 in aggregate principal amount of commitments to make Delayed Draw Term Loans; and

WHEREAS, the Lenders are willing to make available to the Borrower such loans and facilities upon the terms and subject to satisfaction (or waiver) of the conditions set forth herein;

## AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

SECTION 1.    <u>Definitions</u>.

1.1.    <u>Defined Terms</u>.

(a)        As used herein, the following terms shall have the meanings specified in this <u>Section 1.1</u> unless the context otherwise requires:

"**ABR**" shall mean for any day a fluctuating rate per annum equal to the greatest of (a) the Federal Funds Effective Rate <u>plus</u> 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its "prime rate," and (c) the LIBOR Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) <u>plus</u> 1.00%; provided that, for the avoidance of doubt, for purposes of calculating the LIBOR Rate pursuant to clause (c), the LIBOR Rate for any day shall be based on the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on such day by reference to the ICE Benchmark Administration (or any successor organization) LIBOR Rate (the "**Relevant LIBOR Rate**") for deposits in Dollars (as published by Reuters or any other commonly available source providing quotations of the Relevant LIBOR Rate as designated by the Administrative Agent) for a period equal to one-month.  The "prime rate" is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  If the Administrative Agent is unable to ascertain the Federal Funds Effective Rate due to its inability to obtain sufficient quotations in accordance with the definition thereof, after notice is provided to the Borrower, the ABR shall be determined without regard to clause (a) above until the circumstances giving rise to such inability no longer exist.  Any change in the ABR due to a change in such rate announced by the Administrative Agent or in the Federal Funds Effective Rate shall take effect at the opening of business on the day specified in the public announcement of such change or on the effective date of such change in the Federal Funds Effective Rate or the Relevant LIBOR Rate, as applicable.

"**ABR Loan**" shall mean each Loan bearing interest based on the ABR.

"**Acceptable Reinvestment Commitment**" shall mean a binding commitment of the Borrower or any Restricted Subsidiary entered into at any time prior to the end of the Reinvestment Period to reinvest the proceeds of a Prepayment Event.

"**Acceptable Reorganization Plan**" shall mean a Reorganization Plan that in form and substance reasonably satisfactory to the Administrative Agent and provides for, among other things, the payment in full in cash of the Obligations outstanding under the Credit Documents (other than Contingent Obligations) on or prior to the earlier of the Plan Effective Date or substantial consummation of such Reorganization Plan.

"**Administrative Agent**" shall mean Citibank, N.A., as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent pursuant to <u>Section 10</u>.

"**Administrative Agent's Office**" shall mean the Administrative Agent's address and, as appropriate, account as set forth on <u>Schedule 11.2</u>, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"**Administrative Questionnaire**" shall have the meaning provided in <u>Section 11.6(b)(ii)(D)</u>.

"**Advisors**" shall mean legal counsel advising the Agents, the Lenders and their Related Parties in connection with their participation in the Cases, limited in the case of legal counsel to one primary counsel for the Agents (as of the Closing Date, Shearman & Sterling LLP, Morgan, Lewis & Bockius LLP (as legal counsel for _____), Venable LLP (as legal counsel for _____) and, if necessary, one firm of regulatory counsel and/or one firm of local counsel in each appropriate jurisdiction and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Borrower of such conflict and thereafter, after receipt of the consent of the Borrower (which consent shall not be unreasonably withheld or delayed), retains its own counsel, another firm of counsel for such affected Person).

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. The terms "controlling" and "controlled" shall have meanings correlative thereto.

"**Affiliate Value Transfer**" shall mean any Investment made in reliance on Section 8.5(c), 8.5(g), 8.5(h), 8.5(i), 8.5(k), 8.5(l), 8.5(m), 8.5(p), 8.5(q), 8.5(t), 9.5(u), 8.5(z), or 8.5(bb), any Disposition made in reliance on Section 8.4(b), or 8.4(g), or any distribution made in reliance on Section 8.6(m), in each case made by the Borrower or any Restricted Subsidiary to an Affiliate thereof (other than the Borrower and the Restricted Subsidiaries), excluding payments, transfers or Dispositions to such Affiliates pursuant to the Transition Services Agreement or the Tax Sharing Agreements, or in connection with the Spin-Off.

"**Agent Parties**" shall have the meaning provided in Section 11.17(d).

"**Agents**" shall mean the Administrative Agent, the Collateral Agent, the Co-Syndication Agents, each Joint Lead Arranger and Joint Bookrunner, the Co-Documentation Agents, and the Co-Managers.

"**Agreement**" shall mean this Senior Secured Superpriority Debtor-in-Possession Credit Agreement.

"**Annual Operating Forecast**" shall mean the approved annual business plan and projected operating budget of the Borrower delivered pursuant to clause (5) of the definition of "Maturity Date" or Section 7.1(d).

"**Applicable ABR Margin**" shall mean at any date, with respect to each ABR Loan, 2.00% *per annum*; *provided* that such margin shall be automatically increased to (i) 2.25% *per annum* on the date that is 30 days after the Closing Date if Refreshed Ratings have not been obtained by such date, (ii) 2.50% *per annum* on the date that is 60 days after the Closing Date if Refreshed Ratings have not been obtained by such date and (iii) 2.75% *per annum* on the date that is 90 days after the Closing Date if Refreshed Ratings have not been obtained by such date, and shall continue to be 2.75% *per annum* at all times thereafter until Refreshed Ratings have been obtained.

"**Applicable Amount**" shall mean, at any time (the "**Applicable Amount Reference Time**"), an amount (which amount may not in any event be less than zero (0)) equal to the sum, without duplication, of:

(i)      50% of Cumulative Consolidated Net Income of the Borrower and the Restricted Subsidiaries for the period from the first day of the first fiscal quarter commencing after the Closing Date until the last day of the then most recent fiscal quarter or fiscal year, as applicable, for which Section 7.1 Financials have been delivered;

(ii)      to the extent not (A) already included in the calculation of Consolidated Net Income of the Borrower and the Restricted Subsidiaries or (B) already reflected as a return of capital or deemed reduction in the amount of such Investment, the aggregate JV Distribution Amount received by the Borrower or any Restricted Subsidiary during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Amount Reference Time;

(iii)      to the extent not (A) already included in the calculation of Consolidated Net Income or (B) already reflected as a return of capital or deemed reduction in the amount of any such Investment, the aggregate amount of all cash repayments of principal received by the Borrower or any Restricted Subsidiary from any Minority Investments or Unrestricted Subsidiaries during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Amount Reference Time in respect of loans made by the Borrower or any Restricted Subsidiary to such Minority Investments or Unrestricted Subsidiaries; and

(iv)      to the extent not (A) already included in the calculation of Consolidated Net Income of the Borrower and the Restricted Subsidiaries, (B) already reflected as a return of capital or deemed reduction in the amount of such Investment, or (C) applied to prepay the Loans in accordance with Section 4.2(a), the aggregate amount of all Net Cash Proceeds received by the Borrower or any Restricted Subsidiary in connection with the sale, transfer or other disposition of its ownership interest in any Minority Investments or in any Unrestricted Subsidiary during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Amount Reference Time;

minus (b) the sum, without duplication of:

(i)      the aggregate amount of Investments made pursuant to Section 8.5(g)(ii)(y), 8.5(h)(iii), 8.5(i)(y) or 8.5(u)(y) following the Closing Date and prior to the Applicable Amount Reference Time; and

(ii)      the aggregate amount of prepayments pursuant to Section 8.7 following the Closing Date and prior to the Applicable Amount Reference Time.

Notwithstanding the foregoing, in making any calculation or other determination under this Agreement involving the Applicable Amount, if the Applicable Amount at such time is less than zero, then the Applicable Amount shall be deemed to be zero for purposes of such calculation or determination.

"**Applicable Equity Amount**" shall mean, at any time (the "**Applicable Equity Amount Reference Time**"), an amount equal to, without duplication, (a) the amount of any capital contributions made in cash to, or any proceeds of an equity issuance received by the Borrower during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Equity Amount Reference Time, including proceeds from the issuance of Stock or Stock Equivalents of Borrower or any direct or indirect parent of Borrower (to the extent the proceeds of any

such issuance are contributed to the Borrower), but excluding all proceeds from the issuance of Disqualified Stock

minus (b) the sum, without duplication, of:

> (i)    the aggregate amount of Investments made pursuant to Section 8.5(g)(ii)(x), 8.5(h)(ii), 8.5(i)(x) or 8.5(u)(x) following the Closing Date and prior to the Applicable Equity Amount Reference Time; and

> (ii)    the aggregate amount of dividends pursuant to Section 8.6(c)(y) following the Closing Date and prior to the Applicable Equity Amount Reference Time.

"**Applicable Laws**" shall mean, as to any Person, any law (including common law), statute, regulation, ordinance, rule, order, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority (including the PUCT and ERCOT), in each case applicable to or binding on such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"**Applicable LIBOR Margin**" shall mean at any date, with respect to each LIBOR Loan, 3.00% *per annum*; *provided* that such margin shall be automatically increased to (i) 3.25% *per annum* on the date that is 30 days after the Closing Date if Refreshed Ratings have not been obtained by such date, (ii) 3.50% *per annum* on the date that is 60 days after the Closing Date if Refreshed Ratings have not been obtained by such date and (iii) 3.75% *per annum* on the date that is 90 days after the Closing Date if Refreshed Ratings have not been obtained by such date, and shall continue to be 3.75% *per annum* at all times thereafter until Refreshed Ratings have been obtained.

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale Prepayment Event**" shall mean (i) any Disposition of any business units, assets or other property of the Borrower and the Restricted Subsidiaries not in the ordinary course of business (including any Disposition of any Stock or Stock Equivalents of any Subsidiary of the Borrower owned by the Borrower or any Restricted Subsidiary) and (ii) the dividends and distributions of cash proceeds to the Borrower by any Oncor Subsidiary of Net Cash Proceeds from a Disposition by such Oncor Subsidiary. Notwithstanding the foregoing, the term "Asset Sale Prepayment Event" shall not include any transaction permitted by Section 8.4 (other than transactions permitted by Section 8.4(b), Section 8.4(i), Section 8.4(j), Section 8.4(n) and Section 8.4(o), which shall constitute Asset Sale Prepayment Events).

"**Assignment and Acceptance**" shall mean an assignment and acceptance substantially in the form of Exhibit F, or such other form as may be approved by the Administrative Agent

"**Authorized Officer**" shall mean the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Treasurer, the Assistant Treasurer, the Controller, any Senior Vice President, with respect to certain limited liability companies or partnerships that do not have officers, any manager, managing member or general partner thereof, any other senior officer of the Borrower or any other Credit Party designated as such in writing to the Administrative Agent by the Borrower or any other Credit Party, as applicable, and, with respect to any document (other than the solvency certificate) delivered on the Closing Date, the Secretary or the Assistant Secretary of any Credit

Party. Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"**Avoidance Actions**" shall mean the Credit Parties' claims and causes of action under chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (but excluding causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code).

"**Bankruptcy Code**" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" shall have the meaning assigned in the Recitals hereto.

"**Benefited Lender**" shall have the meaning provided in Section 11.8(a).

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Bona Fide DIP Refinancing**" shall mean the incurrence by the Borrower (or any parent company thereof) of any Indebtedness (A) the proceeds of which are used to refinance (or that otherwise refinances) the Obligations in full (including by way of amending the Credit Documents) and (B) that has a scheduled maturity date that is later than June 30, 2018 (but in no event shall a straight "exit financing" constitute a Bona Fide DIP Refinancing).

"**Borrower**" shall have the meaning provided in the preamble to this Agreement.

"**Borrowing**" shall mean and include the incurrence of one Type of Loan on a given date having a single Maturity Date and in the case of LIBOR Loans, the same Interest Period (provided that ABR Loans incurred pursuant to Section 2.9(b) shall be considered part of any related Borrowing of LIBOR Loans).

"**Budget**" shall mean the Borrower and the Guarantors' consolidated budget attached hereto as Exhibit I (the "**Initial Budget**") setting forth a statement of cash sources and uses of all free cash flow for the next full 3 calendar months of the EFIH Debtors following the Closing Date, broken down month by month, including the anticipated uses of the Term Loan Facility in such detail as provided in Exhibit I, and after such initial 3 calendar month period, at the end of each fiscal quarter (or, at the election of the Borrower, at the end of each calendar month or such other earlier period as may be agreed), an updated 3 month statement of the matters set forth above for the subsequent 3 month period in similar detail, in each case certified as to its reasonableness when made by an Authorized Officer of the Borrower in the form of Exhibit K.

For the avoidance of doubt, no Budget shall constitute a cap or limitation on the amount of "Professional Fees" (as defined in the DIP Order) payable by the EFIH Debtors.

"**Building**" shall mean a building or structure with at least two walls and a roof, any such building or structure in the course of construction, or any manufactured mobile home affixed to a permanent foundation.

"**Business Day**" shall mean any day excluding Saturday, Sunday and any other day on which banking institutions in New York City are authorized by law or other governmental actions to close, and, if such day relates to (a) any interest rate settings as to a LIBOR Loan, (b) any fundings, disbursements, settlements and payments in respect of any such LIBOR Loan, or (c) any other dealings pursuant to this Agreement in respect of any such LIBOR Loan, such day shall be a day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"**Capital Expenditures**" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of the Borrower.

"**Capital Lease**" shall mean, as applied to the Borrower and the Restricted Subsidiaries, any lease of any property (whether real, personal or mixed) by the Borrower or any Restricted Subsidiary as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of the Borrower; provided, however, that, notwithstanding anything to the contrary in this Agreement or in any other Credit Document, any leases that were not capital leases when entered into but are recharacterized as capital leases due to a change in accounting rules after the Closing Date shall for all purposes of this agreement not be treated as Capital Leases.

"**Capitalized Lease Obligations**" shall mean, as applied to the Borrower and the Restricted Subsidiaries at the time any determination is to be made, the amount of the liability in respect of a Capital Lease that would at such time be required to be capitalized and reflected as a liability on the balance sheet (excluding the footnotes thereto) of the Borrower in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such Capital Lease prior to the first date upon which such Capital Lease may be prepaid by the lessee without payment of a penalty; provided, however, that, notwithstanding anything to the contrary in this Agreement or in any other Credit Document, any obligations that were not required to be included on the balance sheet of the Borrower as capital lease obligations when incurred but are recharacterized as capital lease obligations due to a change in accounting rules after the Closing Date shall for all purposes of this Agreement not be treated as Capitalized Lease Obligations.

"**Carve Out**" shall have the meaning assigned to such term in the DIP Order.

"**Case**" and "**Cases**" shall each have the meaning assigned in the Recitals hereto.

"**Cash Management Agreement**" shall mean any agreement or arrangement to provide Cash Management Services.

"**Cash Management Bank**" shall mean any Person that either (x) at the time it enters into a Cash Management Agreement or provides Cash Management Services or (y) on the Closing Date, is a Lender or an Affiliate of a Lender, in its capacity as a party to such Cash Management Agreement or a provider of such Cash Management Services.

"**Cash Management Obligations**" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank in connection with, or in respect of, any Cash Management Services or under any Cash Management Agreement.

"**Cash Management Order**" shall mean that certain Order (A) Authorizing the Debtors To (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Overnight Investment Accounts, (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims, and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority, as such order or orders may be extended, amended, supplemented or modified in a manner satisfactory to the Administrative Agent.

"**Cash Management Services**" shall mean treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer (including automated clearing house fund transfer services) and other cash management services.

"**Change in Law**" shall mean (a) the adoption of any Applicable Law after the Closing Date, (b) any change in any Applicable Law or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any party with any guideline, request, directive or order issued or made after the Closing Date by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law); provided, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" shall mean and be deemed to have occurred if, at any time, (a) Parent shall cease to own directly 100% of the Stock and Stock Equivalents of the Borrower or (b) there is a sale, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Oncor Subsidiaries, taken as a whole.

"**Closing Date**" shall mean June __, 2017.

"**Closing Date Refinancing**" shall mean the repayment in full (or, if applicable, the termination, discharge or defeasance (or arrangements reasonably satisfactory to the Administrative Agent for the termination, discharge or defeasance)) of all outstanding Indebtedness of the Borrower under the Existing DIP Credit Agreement and the release and termination of all of the security interests securing such Indebtedness.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time. Section references to the Code are to the Code, as in effect on the Closing Date, and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"**Co-Borrower**" or "**Co-Borrowers**" shall have the meaning provided in the preamble to this Agreement.

["**Co-Documentation Agents**" shall mean [_____], as documentation agents for the Lenders under this Agreement and the other Credit Documents.]

"**Co-Managers**" shall mean [_____], as co-managers for the Lenders under this Agreement and the other Credit Documents.

["**Co-Syndication Agents**" shall mean [_____], as syndication agents for the Lenders under this Agreement and the other Credit Documents.]

"**Collateral**" shall mean all property pledged, mortgaged or purported to be pledged or mortgaged pursuant to the Security Documents and excluding in all events "Excluded Collateral".

"**Collateral Agent**" shall mean, Citibank, N.A., in its capacity as collateral agent for the Secured Parties under this Agreement and the Security Documents, or any successor collateral agent appointed pursuant hereto.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. 1 et seq.), as amended from time to time, and any successor statute.

"**Communications**" shall have the meaning provided in Section 11.17(a).

"**Confidential Information**" shall have the meaning provided in Section 11.16.

"**Consolidated Net Income**" shall mean, for any period, the net income (loss) of the Borrower and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

      (a)      any after-tax effect of extraordinary losses and gains for such period,

      (b)      Transaction Expenses,

      (c)      the cumulative effect of a change in accounting principles during such period,

      (d)      any after-tax effect of income (or loss) from disposed, abandoned or discontinued operations and any net after-tax gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations,

      (e)      any after-tax effect of gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments other than in the ordinary course of business, as determined in good faith by the Borrower,

      (f)      any income (or loss) during such period of any Person that is an Unrestricted Subsidiary, and any income (or loss) during such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; provided that the Consolidated Net Income of the Borrower and the Restricted Subsidiaries shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash (or to the extent converted into cash) to the Borrower or any Restricted Subsidiary during such period,

      (g)      solely for the purpose of determining the Applicable Amount, any income (or loss) during such period of any Restricted Subsidiary (other than any Credit Party) to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its net income is not at the date of determination wholly permitted without any prior governmental approval or an order of the Bankruptcy Court (which has not been obtained) or, directly or indirectly, by the operation of the terms of its Organizational Documents or any agreement, instrument or Applicable Law applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived (in each case, other than restrictions pursuant to this Agreement); provided that Consolidated Net Income of the Borrower and the Restricted Subsidiaries will be increased by the amount of dividends or other distributions or other payments

actually paid in cash (or to the extent converted into cash) to the Borrower or any Restricted Subsidiary during such period, to the extent not already included therein,

      (h)     effects of all adjustments (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries) in the Borrower's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to the Transactions or any consummated acquisition whether consummated before or after the Closing Date or the amortization or write-off of any amounts thereof, net of taxes,

      (i)     any net after-tax effect of income (or loss) for such period attributable to the early extinguishment of Indebtedness (other than Hedging Obligations, but including, for the avoidance of doubt, debt exchange transactions),

      (j)     any net after-tax effect of any unrealized income (or loss) for such period attributable to Hedging Obligations or other derivative instruments,

      (k)     any impairment charge or asset write-off or write-down including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets and investments in debt and equity securities to the extent relating to changes in commodity prices, in each case pursuant to GAAP to the extent offset by gains from Hedging Obligations,

      (l)     any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights, and any cash charges associated with the rollover, acceleration or payout of Stock or Stock Equivalents by management of the Borrower or any of its direct or indirect parent companies in connection with the Transactions, and

      (m)     accruals and reserves established or adjusted within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP or changes as a result of adoption of or modification of accounting policies during such period.

      "**Consolidated Total Assets**" shall mean, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption), after intercompany eliminations, on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries at such date.

      "**Contingent Obligation**" shall mean indemnification Obligations and other similar contingent Obligations for which no claim has been made in writing.

      "**Contractual Requirement**" shall have the meaning provided in Section 6.3.

      "**Credit Documents**" shall mean this Agreement, the Guarantee, the Security Documents, any intercreditor agreement entered into in connection with the Second Lien DIP Facility (as provided in Section 2.13(g)) and any promissory notes issued by the Borrower hereunder.

      "**Credit Event**" shall mean and include the making (but not the conversion or continuation) of a Loan.

      "**Credit Party**" shall mean the Borrower and each of the Subsidiary Guarantors, if any.

"**Cumulative Consolidated Net Income**" shall mean, for any period, Consolidated Net Income for such period, taken as a single accounting period. Cumulative Consolidated Net Income may be a positive or negative amount.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Applicable Laws of the United States or other applicable jurisdictions from time to time in effect.

"**Default**" shall mean, any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"**Default Rate**" shall have the meaning provided in Section 2.7(c).

"**Defaulting Lender**" shall mean any Lender with respect to which a Lender Default is in effect.

"**Deferred Net Cash Proceeds**" shall have the meaning provided such term in the definition of "Net Cash Proceeds".

"**Deferred Net Cash Proceeds Payment Date**" shall have the meaning provided such term in the definition of "Net Cash Proceeds".

"**Delayed Draw Term Loan**" shall have the meaning provided in Section 2.1(b).

"**Delayed Draw Term Loan Commitment**" shall mean, (a) with respect to each Lender that is a Lender on the date hereof, the amount set forth opposite such Lender's name on and after the Closing Date, on Schedule 1.1(a) as such Lender's "Delayed Draw Term Loan Commitment", and (b) in the case of any Lender that becomes a Lender after the date hereof, the amount specified as such Lender's "Delayed Draw Term Loan Commitment" in the Assignment and Acceptance pursuant to which such Lender assumed a portion of the Total Delayed Draw Term Loan Commitment, in each case as the same may be changed from time to time pursuant to the terms hereof (including, without limitation, a reduction to reflect a Borrowing using a portion of such Lender's Delayed Draw Term Loan Commitment). The initial aggregate amount of all Delayed Draw Term Loan Commitments as of the date hereof is $825,000,000.

"**Delayed Draw Term Loan Commitment Percentage**" shall mean at any time, for each Lender, the percentage obtained by dividing (a) such Lender's Delayed Draw Term Loan Commitment, by (b) the Total Delayed Draw Term Loan Commitment, subject to adjustment as provided in Section 2.15; provided, that at any time when the Delayed Draw Term Loan Commitment shall have been terminated, each Lender's Delayed Draw Term Loan Commitment Percentage shall be its Delayed Draw Term Loan Commitment Percentage as in effect immediately prior to such termination.

"**Delayed Draw Term Loan Commitment Termination Date**" means the earliest to occur of: (a) September [___][2], 2017, (b) the date on which all Delayed Draw Term Loans provided for

---

[2]    To be 90 days after the Closing Date.

herein have been borrowed and (c) the date on which the Total Delayed Draw Term Loan Commitment shall terminate in accordance with the provisions of this Agreement.

"**Delayed Draw Term Loan Facility**" shall mean the facility providing for the Delayed Draw Term Loans.

"**Designated Non-Cash Consideration**" shall mean the fair market value of non-cash consideration received by the Borrower or any Restricted Subsidiary in connection with a Disposition pursuant to Section 8.4(b) that is designated as Designated Non-Cash Consideration pursuant to a certificate of an Authorized Officer of the Borrower, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within 180 days following the consummation of the applicable Disposition).

"**DIP Financing Motion**" shall mean the motion of EFIH, in form and substance reasonably satisfactory to the Administrative Agent seeking, among other things, entry of DIP Order.

"**DIP Order**" shall mean a final order of the Bankruptcy Court entered in the Cases in form and substance satisfactory to the Administrative Agent and the Majority Initial Lender entered upon the DIP Financing Motion, authorizing and approving on a final basis, among other things, the borrowing by the Borrower of the full amount of the Term Loan Facility (which shall in any case approve the entirety of the Total Term Loan Commitment) and the Closing Date Refinancing, as such order or orders may be extended, amended, supplemented or modified in a manner satisfactory to the Administrative Agent and the Majority Initial Lender.

"**Disclosure Statement**" shall mean a Disclosure Statement that is in form and substance reasonably satisfactory to the Administrative Agent (provided, however, that with respect to provisions of the Disclosure Statement that relate to the payment of the Term Loan Facility, such provisions must be in form and substance satisfactory to the Administrative Agent).

"**Disposition**" shall have the meaning provided in Section 8.4.

"**Disqualified Institutions**" shall mean (a) any company engaged principally in the business of energy or power generation and/or transmission and identified in writing to the Administrative Agent by the Borrower from time to time, (b) any company whose principal business is that of an energy or power merchant and identified in writing to the Administrative Agent by the Borrower from time to time, (c) any Person identified in writing to the Administrative Agent by the Borrower on or prior to the launch of the general syndication of the initial Loans (including any such Person's affiliates that are clearly identifiable on the basis of such affiliates' names) and (d) any Defaulting Lender. The list of all Disqualified Institutions shall be made available to all Lenders by posting such list to the Platform. Upon the identification in writing by the Borrower to the Administrative Agent of any additional Disqualified Institutions pursuant to clause (a) or (b) above, the Administrative Agent shall promptly post such addition to the list to the Platform; provided that any additional Person so identified shall not be deemed a Disqualified Institution until such time as such addition to the list is posted to the Platform.

"**Disqualified Stock**" shall mean, with respect to any Person, any Stock or Stock Equivalents of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Stock or Stock Equivalents that is not Disqualified Stock), other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale event or similar event shall be subject to the prior

repayment in full of the Loans and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations and the termination of all amounts of the Total Commitments), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale event or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations and the termination of all amounts of the Total Commitments), in whole or in part, in each case prior to the date that is ninety-one (91) days after the Latest Maturity Date; provided that if such Stock or Stock Equivalents are issued to any plan for the benefit of employees of the Borrower or any of its Subsidiaries or by any such plan to such employees, such Stock or Stock Equivalents shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower (or any direct or indirect parent company thereof) or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; provided, further, that any Stock or Stock Equivalents held by any present or former employee, officer, director, manager or consultant, of the Borrower, any of its Subsidiaries or any of its direct or indirect parent companies or any other entity in which the Borrower or any Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Borrower, in each case pursuant to any stockholders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any of its Subsidiaries.

"**Dividends**" or "**dividends**" shall have the meaning provided in Section 8.6.

"**Dollars**" and "**$**" shall mean dollars in lawful currency of the United States of America.

"**Domestic Subsidiary**" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"**EFIH**" shall have the meaning provided in the preamble to this Agreement.

"**EFIH Debtors**" shall mean the Borrower and the Guarantors.

"**EFIH First Lien Makewhole Claims**" shall have the meaning given to such term in that certain Eighth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al, pursuant to Chapter 11 of the Bankruptcy Code, confirmed on February 17, 2017.

"**EFIH Second Lien Makewhole Claims**" shall have the meaning given to such term in that certain Eighth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al, pursuant to Chapter 11 of the Bankruptcy Code, confirmed on February 17, 2017.

"**Employee Benefit Plan**" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA), other than a Foreign Plan, that is maintained or contributed to by Parent, Borrower or any Subsidiary (or, with respect to an employee benefit plan subject to Title IV of ERISA, any ERISA Affiliate).

"**Engagement Letter**" shall mean the engagement letter, dated June [ ], 2017, among the Borrower and the Joint Lead Arrangers.

"**Environmental Claims**" shall mean any and all actions, suits, proceedings, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, violation or potential responsibility or investigation (other than reports prepared by or on behalf of Parent, the Borrower or any other Subsidiary of Parent (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of Real Estate) or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereinafter, "**Claims**"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief relating to the presence, release or threatened release into the environment of Hazardous Materials or arising from alleged injury or threat of injury to human health or safety (to the extent relating to human exposure to Hazardous Materials), or to the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"**Environmental Law**" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or, with respect to any post-Closing Date requirements of the Credit Documents, hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or to human health or safety (to the extent relating to human exposure to Hazardous Materials), or Hazardous Materials.

"**ERCOT**" shall mean the Electric Reliability Council of Texas or any other entity succeeding thereto.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time. Section references to ERISA are to ERISA as in effect on the Closing Date and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) that together with the Borrower or any Subsidiary of the Borrower would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**Event of Default**" shall have the meaning provided in <u>Section 9</u>.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, and rules and regulations promulgated thereunder.

"**Exchange Rate**" shall mean on any day, with respect to any currency, the rate at which such currency may be exchanged into another currency, which shall be the Historical Exchange Rate on the immediately prior day as determined by OANDA Corporation and made available on its website at http://www.oanda.com/convert/fxhistory; <u>provided,</u> that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if at the time of any such determination, for any reason, no such rate is being quoted.

"**Excluded Collateral**" shall mean (a) Excluded Stock and Stock Equivalents, (b) Excluded Subsidiaries, (c) (i) property or assets subject to capital leases or purchase money

14

obligations, (ii) other arrangements described in Section 8.1(f) to the extent subject to a Lien, in each case permitted by this Agreement, and the terms of the Indebtedness secured by such Lien prohibit assignment of, or granting of a security interest in, the applicable Credit Party's rights and interests therein (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other Applicable Law), provided, that immediately upon the repayment of all Indebtedness secured by such Lien, such property shall no longer constitute "Excluded Collateral" and such Credit Party shall be deemed to have granted a security interest in all the rights and interests with respect to such property or assets pursuant to the applicable Credit Documents, (iii) any assets as to which the Collateral Agent and the Borrower have reasonably determined (after giving effect to the effectiveness of the DIP Order) that the costs or other consequences (including adverse tax consequences) of providing a security interest in such assets is excessive in view of the benefits to be gained thereby by the Lenders, (iv) any property that would otherwise constitute Collateral to the extent (and only to the extent) that the grant of a security interest therein or perfection of a Lien thereon pursuant to the applicable Credit Documents would violate any Applicable Law or regulation (including regulations adopted by Federal Energy Regulatory Commission and/or the Nuclear Regulatory Commission) applicable to such property, and (v) the Borrower's Avoidance Actions (other than, upon the entry of the DIP Order, proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise) and (d) any Real Property Improvement until such time as the Agents shall have received all applicable Flood Insurance Documents. "Excluded Collateral" shall not in any event include the Stock or Stock Equivalents issued by Oncor and held by any Credit Party.

"**Excluded Stock and Stock Equivalents**" shall mean (i) any Stock or Stock Equivalents with respect to which, in the reasonable judgment of the Collateral Agent (confirmed in writing by notice to the Borrower and the Administrative Agent), the cost or other consequences (including any adverse tax or accounting consequences) of pledging such Stock or Stock Equivalents in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (ii) solely in the case of any pledge of Voting Stock of any Foreign Subsidiary or Foreign Subsidiary Holding Company to secure the Obligations, any Stock or Stock Equivalents of any class of such Foreign Subsidiary or Foreign Subsidiary Holding Company in excess of 65% of the outstanding Voting Stock of such class (such percentage to be adjusted upon any Change in Law as may be required to avoid adverse U.S. federal income tax consequences to Parent, the Borrower or any Subsidiary of the Borrower), (iii) any Stock or Stock Equivalents to the extent the pledge thereof would violate any Applicable Law, (iv) in the case of any Stock or Stock Equivalents of any Subsidiary of the Borrower that is not Wholly Owned by the Borrower or any Subsidiary Guarantor at the time such Subsidiary becomes a Subsidiary, any Stock or Stock Equivalents of each such Subsidiary to the extent (A) that a pledge thereof to secure the Obligations is prohibited by any applicable Contractual Requirement (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other Applicable Law or any Organizational Document), (B) any Contractual Requirement prohibits such a pledge without the consent of any other party; provided that this clause (B) shall not apply if (x) such other party is a Credit Party or Wholly Owned Subsidiary or (y) consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary of the Borrower to obtain any such consent)) and for so long as such Contractual Requirement or replacement or renewal thereof is in effect, or (C) a pledge thereof to secure the Obligations would give any other party (other than a Credit Party or Wholly Owned Subsidiary) to any contract, agreement, instrument or indenture governing such Stock or Stock Equivalents the right to terminate its obligations thereunder (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable law), (v) the Stock or Stock Equivalents of any Subsidiary of a Foreign Subsidiary, (vi) any Stock or Stock Equivalents of any Subsidiary to the extent that (A) the pledge of such Stock or Stock Equivalents would result in adverse tax or accounting consequences to the Borrower or any Subsidiary as reasonably

determined by the Borrower, and (B) such Stock or Stock Equivalents have been identified in writing to the Collateral Agent by an Authorized Officer of the Borrower, and (vii) the Stock or Stock Equivalents of any Unrestricted Subsidiary or Immaterial Subsidiary. Notwithstanding the foregoing, the term "Excluded Stock and Stock Equivalents" shall not in any event include the Stock or Stock Equivalents issued by Oncor and held by any Credit Party.

"**Excluded Subsidiary**" shall mean (a) each Domestic Subsidiary listed on Schedule 1.1(a) hereto and each future Domestic Subsidiary, in each case, for so long as any such Subsidiary does not constitute a Material Subsidiary, (b) each Domestic Subsidiary that is not a Wholly Owned Subsidiary on any date such Subsidiary would otherwise be required to become a Subsidiary Guarantor pursuant to the requirements of Section 7.11 (for so long as such Subsidiary remains a non-Wholly Owned Restricted Subsidiary), (c) any Foreign Subsidiary Holding Company, (d) each Domestic Subsidiary that is prohibited by any applicable Contractual Requirement, Applicable Law or Organizational Document from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such restriction or any replacement or renewal thereof is in effect), (e) each Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary, (f) any other Domestic Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), the cost or other consequences (including any adverse tax or accounting consequences) of guaranteeing the Obligations shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (g) each Unrestricted Subsidiary, (h) any Foreign Subsidiary, and (i) any Subsidiary to the extent that (A) the guarantee of the Obligations by would result in adverse tax or accounting consequences and (B) such Subsidiaries have been identified in writing to the Collateral Agent by an Authorized Officer of the Borrower. For the avoidance of doubt, Oncor Subsidiaries shall be deemed Excluded Subsidiaries. Notwithstanding the foregoing, the term "Excluded Subsidiary" shall not in any event include any Subsidiary that is a debtor and debtor-in-possession in the Cases.

"**Excluded Swap Obligation**" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"**Excluded Taxes**" shall mean, with respect to any Agent or any Lender, (a) net income taxes and franchise and excise taxes (imposed in lieu of net income taxes) imposed on such Agent or Lender, (b) any Taxes imposed on any Agent or any Lender as a result of any current or former connection between such Agent or Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising from such Agent or Lender having executed, delivered or performed its obligations or received a payment under, or having been a party to or having enforced, this Agreement or any other Credit Document), (c) any U.S. federal withholding tax that is imposed on amounts payable to any Lender under the law in effect at the time such Lender becomes a party to this Agreement (or designates a new lending office other than a new lending office designated at request of the Borrower); provided that this subclause (c) shall not apply to the extent that (x) the indemnity payments or additional amounts any Lender would be entitled to receive (without regard to this subclause (c)) do not exceed the indemnity payment or additional amounts that the person making the assignment, participation or transfer to such

Lender  (or designation of a new lending office by such Lender) would have been entitled to receive in the absence of such assignment or (y) any Tax is imposed on a Lender in connection with an interest in any Loan or other obligation that such Lender was required to acquire pursuant to <u>Section 11.8(a)</u> or that such Lender acquired pursuant to <u>Section 11.7</u> (it being understood and agreed, for the avoidance of doubt, that any withholding tax imposed on a Lender as a result of a Change in Law occurring after the time such Lender became a party to this Agreement (or designates a new lending office) shall not be an Excluded Tax), (d) any Tax to the extent attributable to such Lender's failure to comply with <u>Sections 4.4(d)</u> and <u>(e)</u> (in the case of any Non-U.S. Lender) or <u>Section 4.4(h)</u> (in the case of a U.S. Lender), and (e) any Taxes imposed by FATCA.

"**Extension Conditions**" shall have the meaning provided in the definition of "Maturity Date".

"**Existing DIP Credit Agreement**" shall have the meaning set forth in the Recitals hereto.

"**Existing Primed Creditors**" shall mean the respective noteholders and other secured parties pursuant to and in connection with the Existing Primed Secured Facilities.

"**Existing Primed Secured Facilities**" shall mean the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future Treasury regulations or official administrative interpretations thereof.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the *per annum* rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published on the next succeeding Business Day by the Federal Reserve Bank of New York; <u>provided</u> that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"**Fee Letter**" shall mean the fee letter, dated  June [__], 2017, among the Borrower and the Agents.

"**Fees**" shall mean all amounts payable pursuant to, or referred to in, <u>Section 3.1</u>.

"**FEMA**" means the Federal Emergency Management Agency.

"**First Day Orders**" shall mean all orders entered by the Bankruptcy Court based on the motions identified on <u>Schedule 1.1(d)</u> hereto, in each case excluding orders, which, by their terms, specifically provide that they do not grant any relief in respect of, or purport to affect the rights, duties or obligations of, the Borrower or any of its Subsidiaries.

"**Fiscal Year**" shall have the meaning provided in <u>Section 7.10</u>.

"**Flood Compliance Event**" shall mean the occurrence of any of the following: (a) a Flood Redesignation with respect to any Mortgaged Property, (b) an extension of the scheduled Maturity Date pursuant to the definition thereof and (c) the addition of any Flood Hazard Property as Collateral, whether pursuant to Section 7.13 or otherwise.

"**Flood Hazard Determination**" shall mean a "Life-of-Loan" FEMA Standard Flood Hazard Determination obtained by the Administrative Agent.

"**Flood Hazard Property**" shall mean any Mortgaged Property that on the relevant date of determination includes a Building and, as shown on a Flood Hazard Determination, such Building is located in a Special Flood Hazard Area.

"**Flood Insurance**" shall means (a) federally-backed flood insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program or (b) to the extent permitted by the Flood Laws, a private flood insurance policy from a financially sound and reputable insurance company that is not an Affiliate of the Borrower.

"**Flood Insurance Documents**" shall mean (a) evidence as to whether each Mortgaged Property is a Flood Hazard Property pursuant to a Flood Hazard Determination, and (b) if such Mortgaged Property is a Flood Hazard Property, (i) evidence as to whether the community in which such Mortgaged Property is located is participating in the National Flood Insurance Program, (ii) the owner of such Mortgaged Property's written acknowledgment of receipt of written notification from the Administrative Agent as to the fact that such Mortgaged Property is a Flood Hazard Property and as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (iii) evidence reasonably satisfactory to the Collateral Agent and in compliance with Flood Laws that Flood Insurance has been issued, or such other evidence of Flood Insurance, in an amount equal to at least the amount required by the Flood Laws and naming the Collateral Agent as loss payee and mortgagee on behalf of the Secured Parties, and otherwise including terms satisfactory to the Collateral Agent.

"**Flood Laws**" means the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, and as the same may be further amended, modified or supplemented, and including the regulations issued thereunder.

"**Flood Redesignation**" means the designation of any Mortgaged Property as a Flood Hazard Property where such property was not a Flood Hazard Property previous to such designation.

"**Foreign Asset Sale**" shall have the meaning provided in Section 4.2(f).

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Borrower or any of its Subsidiaries with respect to employees employed outside the United States.

"**Foreign Recovery Event**" shall have the meaning provided in Section 4.2(f).

"**Foreign Subsidiary**" shall mean each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Foreign Subsidiary Holding Company**" shall mean any Subsidiary that owns no material assets other than equity interest (including, for this purpose, any debt or other instrument treated

as equity for U.S. federal income tax purposes) in one or more (a) Foreign Subsidiaries and/or (b) other Subsidiaries that own no material assets other than equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in one or more Foreign Subsidiaries.

"**Fund**" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" shall mean any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including a central bank, stock exchange, PUCT or ERCOT.

"**Granting Lender**" shall have the meaning provided in Section 11.6(g).

"**Guarantee**" shall mean the Guarantee made by each Guarantor in favor of the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit B.

"**Guarantee Obligations**" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; provided, however, that the term "**Guarantee Obligations**" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Guarantors**" shall mean (a) each Domestic Subsidiary that is a party to the Guarantee on the Closing Date, and (b) each Domestic Subsidiary that becomes a party to the Guarantee on or after the Closing Date pursuant to Section 7.11 or otherwise.

"**Hazardous Materials**" shall mean (a) any petroleum or petroleum products spilled or released into the environment, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, for which a release into the environment is prohibited, limited or regulated by any Environmental Law.

"**Hedge Bank**" shall mean any Person (other than the Borrower or any other Subsidiary of the Borrower) that, with respect to any Hedging Agreement either (x) at the time it enters into a Secured Hedging Agreement or (y) on the Closing Date, is a Lender or an Affiliate of a Lender, in its capacity as a party to a Secured Hedging Agreement.

"**Hedging Agreements**" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedging Obligations**" shall mean, with respect to any Person, the obligations of such Person under Hedging Agreements which are not entered into for speculative purposes (as determined by the Borrower in its reasonable discretion acting in good faith).

"**Holdings**" shall mean Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership, and its successors.

"**Immaterial Subsidiary**" shall mean each Subsidiary of the Borrower that is not a Material Subsidiary.

"**Indebtedness**" of any Person shall mean (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be included as a liability on the balance sheet of such Person, (d) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder, (e) all Indebtedness of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (f) the principal component of all Capitalized Lease Obligations of such Person, (g) net Hedging Obligations of such Person, (h) without duplication, all Guarantee Obligations of such Person, and (i) Disqualified Stock of

such Person; <u>provided</u> that Indebtedness shall not include (i) trade and other ordinary course payables and accrued expenses arising in the ordinary course of business, (ii) deferred or prepaid revenue, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) amounts payable by and between Parent, the Borrower and any other Subsidiary of Parent in connection with retail clawback or other regulatory transition issues, and (v) any Indebtedness defeased by such Person or by any Subsidiary of such Person. The amount of any net Hedging Obligations on any date shall be deemed to be the Swap Termination Value. The amount of Indebtedness of any Person for purposes of <u>clause (e)</u> shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**indemnified liabilities**" shall have the meaning provided in <u>Section 11.5</u>.

"**Indemnified Taxes**" shall mean all Taxes (including Other Taxes) other than (i) Excluded Taxes and (ii) any interest, penalties or expenses caused by an Agent's or Lender's gross negligence or willful misconduct.

"**Initial Budget**" shall have the meaning provided in the definition of the term "Budget".

"**Initial Term Loan Commitment**" shall mean the Term Loan Commitment as of the Closing Date.

"**Initial Term Loans**" shall have the meaning provided in <u>Section 2.1(a)</u>.

"**Interest Period**" shall mean, with respect to any Loan, the interest period applicable thereto, as determined pursuant to <u>Section 2.8</u>.

"**Investment**" shall mean, for any Person: (a) the acquisition (whether for cash, property, services or securities or otherwise) of Stock, Stock Equivalents, bonds, notes, debentures, partnership, limited liability company membership or other ownership interests or other securities of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale); (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person) (including any partnership or joint venture); (c) the entering into of any guarantee of, or other contingent obligation with respect to, Indebtedness; or (d) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; <u>provided</u> that, in the event that any Investment is made by the Borrower or any Restricted Subsidiary in any Person through substantially concurrent interim transfers of any amount through one or more other Restricted Subsidiaries, then such other substantially concurrent interim transfers shall be disregarded for purposes of <u>Section 8.5</u>.

"**Joint Lead Arrangers**" shall mean Citigroup Global Markets Inc., Morgan Stanley Senior Funding, Inc., RBC Capital Markets and Barclays Bank PLC as joint lead arrangers and joint bookrunners for the Lenders under this Agreement and the other Credit Documents.

"**JV Distribution Amount**" shall mean, at any time, the aggregate amount of cash dividends and other cash distributions received by the Borrower or any Restricted Subsidiary from any Minority Investments or any Unrestricted Subsidiary since the Closing Date and prior to such time and

only to the extent that neither the Borrower nor any Restricted Subsidiary is under any obligation to repay such amount to such Minority Investments or such Unrestricted Subsidiary.

"**Latest Maturity Date**" shall mean, at any date of determination, the latest maturity date applicable to any Term Loan Facility hereunder as of such date of determination, in each case as extended in accordance with this Agreement from time to time.

"**Lender**" shall have the meaning provided in the preamble to this Agreement.

"**Lender Default**" shall mean (a) the failure (which has not been cured) of a Lender to make available its portion of any Borrowing or (b) a Lender having notified the Administrative Agent and/or the Borrower that it does not intend to comply with the obligations under Section 2.1(a), or (c) a Lender having (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity.

"**LIBOR Loan**" shall mean any Loan bearing interest at a rate determined by reference to the LIBOR Rate.

"**LIBOR Rate**" shall mean, for any Interest Period with respect to a LIBOR Loan the rate per annum equal to the ICE Benchmark Administration (or any successor organization) LIBOR Rate ("**ICE LIBOR**"), as published by Reuters (or other commercially available source providing quotations of ICE LIBOR as designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for deposits in dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period.  If such rate is not available at such time for any reason, then the "LIBOR Rate" for such Interest Period, as applicable, shall be a rate per annum as may be agreed upon by the Borrower and the Administrative Agent to be a rate at which deposits in dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBOR Loan being made, continued or converted by the Administrative Agent and with a term equivalent to such Interest Period, would be offered by the Administrative Agent's London Branch to major banks in the applicable London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period.  Notwithstanding anything to the contrary contained herein, in no event shall the LIBOR Rate be less than 1.00% per annum.

"**Lien**" shall mean any mortgage, pledge, security interest, hypothecation, collateral assignment, lien (statutory or other) or similar encumbrance (including any conditional sale or other title retention agreement or any lease or license in the nature thereof); provided that in no event shall an operating lease be deemed to be a Lien.

"**Loan**" shall mean any Initial Term Loan and any Delayed Draw Term Loans, as the context requires, made by any Lender hereunder.

"**Management Investors**" shall mean the directors, management, officers and employees of Parent and its Subsidiaries who are or become investors (directly or indirectly) in Holdings, any of its direct or indirect parent entities or in Parent at any time prior to the first anniversary of Closing Date.

"**Majority Initial Lender**" means, at any time, a Lender (if any at such time) that both (a) holds or held a majority of the aggregate principal amount of the then-outstanding Term Loans and then-outstanding unfunded Delayed Draw Term Commitments on the Closing Date,

and (b) at any time of determination, holds such a majority. For purposes of this definition, a group of funds and accounts managed by the same or affiliated investment manager(s) and that hold Loans or commitments to purchase Loans at such time shall be deemed to be a single Lender. As of the Closing Date, the Majority Initial Lender was _____.

"**Master Agreement**" shall have the meaning provided in the definition of the term "**Hedging Agreement**."

"**Material Adverse Effect**" shall mean any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Borrower and its Subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the EFIH Debtors (taken as a whole) to perform their payment obligations under the Credit Documents to which they are a party, or the rights and remedies of the Administrative Agent and the Lenders under the Credit Documents other than, in each case, as a result of the events leading up to, and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not, individually or in the aggregate, constitute a Material Adverse Effect, and provided that nothing disclosed in any of the following filings by Parent and/or the Borrower: (1) the annual report on Form 10-K for the year ended December 31, 2015, (2), the annual audited financials of the Parent and/or the Borrower for the year ended December 31, 2016, (3) any filings on Form 8-K made through the date of the Engagement Letter and/or (4) any disclosure statement related to any plan of reorganization or liquidation of EFIH Debtors provided to the Joint Lead Arrangers on or prior to the date of the Engagement Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Effect.

"**Material Subsidiary**" shall mean, at any date of determination, each Restricted Subsidiary of the Borrower (a) whose total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of the most recent Test Period for which Section 7.1 Financials have been delivered were equal to or greater than 2.5% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (b) whose total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period were equal to or greater than 2.5% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; provided that if, at any time and from time to time after the Closing Date, Restricted Subsidiaries that are not Material Subsidiaries have, in the aggregate, (x) total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of such Test Period equal to or greater than 10.0% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (y) total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period equal to or greater than 10.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP, then the Borrower shall, on the date on which financial statements for such quarter are delivered pursuant to this Agreement, designate in writing to the Administrative Agent one or more of such Restricted Subsidiaries as "Material Subsidiaries" so that such condition no longer exists.

"**Maturity Date**" shall mean the earliest to occur of (a) June 30, 2018; provided, however, that the Maturity Date shall be subject to a single six-month extension as requested by the Borrower, if (1) as of the first day of such extension no Event of Default is continuing, (2) an Acceptable Reorganization Plan has been filed, (3) if not then confirmed, a hearing has been scheduled for the

confirmation of such Acceptable Reorganization Plan, (4) in not then confirmed, the EFIH Debtors are working in good faith to confirm such Acceptable Reorganization Plan, and (5) the Borrower pays an extension fee in the amount of 0.25% of the then outstanding Term Loan Commitment and Loans on the date of such payment to the Administrative Agent for distribution to the Lenders on a pro rata basis based on the respective Term Loan Commitment and Loans held by each Lender (subclauses (1) through (5), the "**Extension Conditions**"); (b) the effective date of any Reorganization Plan; (c) the consummation of a sale of all or substantially all of the EFIH Debtors' assets or stock under section 363 of the Bankruptcy Code; or (d) the acceleration of any Loans and the termination of any then outstanding Term Loan Commitment in accordance with the terms of this Agreement; provided, however, that the Maturity Date will occur in any event no later than December 30, 2018.

"**Minimum Borrowing Amount**" shall mean with respect to any Borrowing of Loans, $5,000,000 or multiples of $1,000,000 in excess thereof (or if less, the entire remaining Term Loan Commitment.

"**Minority Investment**" shall mean any Person (other than a Subsidiary) in which the Borrower or any Restricted Subsidiary owns Stock or Stock Equivalents, including any joint venture (regardless of form of legal entity).

"**Moody's**" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"**Mortgage**" shall mean a mortgage or a deed of trust, deed to secure debt, trust deed or other security document entered into by the owner of a Mortgaged Property and the Collateral Agent for the benefit of the Secured Parties in respect of that Mortgaged Property.

"**Mortgaged Property**" shall mean all Real Estate, if any, with respect to which a Lien for the benefit of the Collateral Agent and the other Secured Parties is granted and perfected pursuant to the terms and conditions of any Order.

"**Multiemployer Plan**" shall mean a plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA (i) to which any of the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate is then making or has an obligation to make contributions or (ii) with respect to which the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate could incur liability pursuant to Title IV of ERISA.

"**Narrative Report**" shall mean, with respect to the financial statements for which such narrative report is required, a management's discussion and analysis of the financial condition and results of operations of the Borrower and its consolidated Subsidiaries for the applicable period to which such financial statements relate.

"**National Flood Insurance Program**" means the program created pursuant to the Flood Laws.

"**Net Cash Proceeds**" shall mean, with respect to any Prepayment Event, (a) the gross cash proceeds and cash equivalents (including payments from time to time in respect of installment obligations, if applicable) received by or on behalf of the Borrower or any Restricted Subsidiary in respect of such Prepayment Event, as the case may be, less (b) the sum of:

(i)       the amount, if any, of all taxes paid or estimated by the Borrower in good faith to be payable by the Borrower or any Restricted Subsidiary in connection with such Prepayment Event,

(ii)      the amount of any reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) associated with the assets that are the subject of such Prepayment Event and (y) retained by the Borrower or any Restricted Subsidiary (including any pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction); provided that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such Prepayment Event occurring on the date of such reduction,

(iii)     the amount of any Indebtedness (other than Indebtedness hereunder) secured by a Lien on the assets that are the subject of such Prepayment Event to the extent that the instrument creating or evidencing such Indebtedness requires that such Indebtedness be repaid upon consummation of such Prepayment Event,

(iv)     in the case of any Asset Sale Prepayment Event (other than any Asset Sale Prepayment Event pursuant to Section 8.4(b) and excluding in any event any Disposition by the Borrower or any of its Restricted Subsidiaries of the Stock or Stock Equivalents issued by any Oncor Subsidiary) or Recovery Prepayment Event, the amount of any proceeds of such Prepayment Event that the Borrower or any Restricted Subsidiary has reinvested (or intends to reinvest within the Reinvestment Period, has entered into an Acceptable Reinvestment Commitment prior to the last day of the Reinvestment Period to reinvest or, with respect to any Recovery Prepayment Event, provided an Acceptable Reinvestment Commitment or a Restoration Certification prior to the last day of the Reinvestment Period) in the business of the Borrower or any Restricted Subsidiary (subject to Section 7.14), including for the repair, restoration or replacement of an asset or assets subject to a Recovery Prepayment Event; provided that any portion of such proceeds that has not been so reinvested within such Reinvestment Period (with respect to such Prepayment Event, the "Deferred Net Cash Proceeds") shall, unless the Borrower or any Restricted Subsidiary has entered into an Acceptable Reinvestment Commitment or provided a Restoration Certification prior to the last day of such Reinvestment Period to reinvest such proceeds, (x) be deemed to be Net Cash Proceeds of an Asset Sale Prepayment Event or Recovery Prepayment Event occurring on the last day of such Reinvestment Period or, if later, 180 days after the date the Borrower or such Restricted Subsidiary has entered into such Acceptable Reinvestment Commitment or provided such Restoration Certification, as applicable (such last day or 180th day, as applicable, the "Deferred Net Cash Proceeds Payment Date"), and (y) be applied to the repayment of Loans in accordance with Section 4.2(a),

(v)      in the case of any Asset Sale Prepayment Event or Recovery Prepayment Event by a non-Wholly Owned Restricted Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (vi)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a Wholly Owned Restricted Subsidiary as a result thereof, and

(vi)     reasonable and customary fees, commissions, expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums and recording charges, transfer taxes, deed or mortgage recording taxes and other customary expenses and brokerage, consultant and other customary fees), issuance costs, discounts and other costs paid by the Borrower or any Restricted Subsidiary, as applicable, in connection with such Prepayment Event,

in each case only to the extent not already deducted in arriving at the amount referred to in clause (a) above.

"**Netting Agreement**" shall mean, in respect of Hedging Obligations, a netting agreement, master netting agreement or other similar document having the same effect as a netting agreement or master netting agreement and, as applicable, any collateral annex, security agreement or other similar document related to any master netting agreement.

"**Non-Consenting Lender**" shall have the meaning provided in Section 11.7(b).

"**Non-Defaulting Lender**" shall mean and include each Lender other than a Defaulting Lender.

"**Non-U.S. Lender**" shall mean any Agent or Lender that is not, for United States federal income tax purposes, (a) an individual who is a citizen or resident of the United States, (b) a corporation, partnership or entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (c) an estate whose income is subject to U.S. federal income taxation regardless of its source or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust or a trust that has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person.

"**Notice of Borrowing**" shall mean a request of the Borrower in accordance with the terms of Section 2.3 and substantially in the form of Exhibit A or such other form as shall be approved by the Administrative Agent (acting reasonably).

"**Notice of Conversion or Continuation**" shall have the meaning provided in Section 2.6.

"**Obligations**" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any Loan or under any Secured Cash Management Agreement or Secured Hedging Agreement, in each case, entered into with the Borrower or any Restricted Subsidiary, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party of any proceeding under the Cases or any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, in each case other than Excluded Swap Obligations. Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Credit Documents) (i) include the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document and (ii) exclude, notwithstanding any term or condition in this Agreement or any other Credit Documents, any Excluded Swap Obligations.

"**Oncor**" shall mean Oncor Electric Delivery Holdings Company LLC, a Delaware limited liability company.

"**Oncor Credit Facility**" shall mean the amended and restated revolving credit agreement, dated as of October 11, 2011, among Oncor Electric, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent for the lenders, JPMorgan Chase Bank, N.A., as swingline lender, and JPMorgan Chase Bank, N.A., Barclays Bank PLC, The Royal Bank of

26

Scotland plc, Bank of America, N.A. and Citibank, N.A., as fronting banks for lenders of credit issued thereunder., as amended, supplemented or otherwise modified from time to time.

"**Oncor Electric**" shall mean Oncor Electric Delivery Company LLC, a Delaware limited liability company.

"**Oncor Subsidiaries**" shall mean Oncor and its Subsidiaries.

"**Organizational Documents**" shall mean, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement, and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and, if applicable, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" shall mean any and all present or future stamp, registration, documentary or any other excise, property or similar taxes (including interest, fines, penalties, additions to tax and related expenses with regard thereto) arising from any payment made or required to be made under this Agreement or any other Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Credit Document.

"**Overnight Rate**" shall mean, for any day, the greater of (a) the Federal Funds Effective Rate and (b) an overnight rate determined by the Administrative Agent, in accordance with banking industry rules on interbank compensation.

"**Parent**" shall mean Energy Future Holdings Corp., a Texas corporation.

"**Participant**" shall have the meaning provided in Section 11.6(c)(i).

"**Participant Register**" shall have the meaning provided in Section 11.6(c)(iii).

"**Patriot Act**" shall have the meaning provided in Section 11.18.

"**Payment Default**" shall mean any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default under Section 9.1.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Pension Act**" shall mean the Pension Protection Act of 2006, as it presently exists or as it may be amended from time to time.

"**Permitted Acquisition**" shall mean the acquisition, by merger or otherwise, by the Borrower or any Restricted Subsidiary of assets (including assets constituting a business unit, line of business or division) or Stock or Stock Equivalents, so long as (a) such acquisition and all transactions related thereto shall be consummated in accordance with Applicable Law, (b) if such acquisition involves any Stock or Stock Equivalents, such acquisition shall result in the issuer of such Stock or Stock

Equivalents and its Subsidiaries becoming a Restricted Subsidiary and a Subsidiary Guarantor, to the extent required by Section 7.11, (c) such acquisition shall result in the Collateral Agent, for the benefit of the applicable Secured Parties, being granted a security interest in any Stock, Stock Equivalent or any assets so acquired, to the extent required by Sections 7.11, 7.12 and/or 7.13, (d) after giving effect to such acquisition, the Borrower and the Restricted Subsidiaries shall be in compliance with Section 7.14, (e) both before and after giving effect to such acquisition, no Default or Event of Default shall have occurred and be continuing and (f) the Borrower shall be in compliance, on a Pro Forma Basis, after giving effect to such acquisition (including any Indebtedness assumed or permitted to exist or incurred pursuant to Section 8.1), with the covenant set forth in Section 8.9.

"**Permitted Holders**" shall mean (a) the Sponsors and (b) the Management Investors.

"**Permitted Investments**" shall mean:

(a)    United States dollars;

(b)    euros or any national currency of any participating member state of the economic and monetary union as contemplated in the Treaty on European Union or such local currencies held by Borrower and its Restricted Subsidiaries from time to time in the ordinary course of business;

(c)    securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government (or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of the U.S. government) with maturities, unless such securities are deposited to defease Indebtedness, of 24 months or less from the date of acquisition;

(d)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(e)    repurchase obligations for underlying securities of the types described in clauses (c) and (d) entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)    commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof;

(g)    marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof;

(h)    investment funds investing 95% of their assets in securities of the types described in clauses (a) through (g) above;

(i)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an

Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

   (j) Indebtedness or preferred stock issued by Persons with a rating of A or higher from S&P or A2 or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

   (k) Investments with average maturities of 24 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

   Notwithstanding the foregoing, Permitted Investments shall include amounts denominated in currencies other than those set forth in clauses (a) and (b) above; provided that such amounts are converted into any currency listed in clauses (a) and (b) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

   "**Permitted Liens**" shall mean:

   (a) Liens for taxes, assessments or governmental charges or claims (i) not yet delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP or (ii) not otherwise required to be paid pursuant to <u>Section 6.10</u>;

   (b) Liens in respect of property or assets of the Borrower or any Subsidiary of the Borrower imposed by Applicable Law, such as carriers', warehousemen's and mechanics' Liens and other similar Liens, arising in the ordinary course of business or in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity, in each case so long as such Liens arise in the ordinary course of business and do not individually or in the aggregate have a Material Adverse Effect;

   (c) Liens arising from judgments or decrees in circumstances not constituting an Event of Default under <u>Section 9.7</u>;

   (d) Liens incurred or deposits made in connection with workers' compensation, unemployment insurance and other types of social security or similar legislation, or to secure the performance of tenders, statutory obligations, trade contracts (other than for payment of money), leases, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations, in each case incurred in the ordinary course of business (including in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity) or otherwise constituting Investments permitted by <u>Section 8.5</u>;

   (e) ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Borrower or any of the Subsidiaries of the Borrower are located;

   (f) easements, rights-of-way, licenses, reservations, servitudes, permits, conditions, covenants, rights of others, restrictions (including zoning restrictions), oil, gas and other mineral interests, royalty interests and leases, minor defects, exceptions or irregularities in title or survey, encroachments, protrusions and other similar charges or encumbrances (including those to secure

health, safety and environmental obligations), which do not interfere in any material respect with the business of the Borrower and the Subsidiaries of the Borrower, taken as a whole;

(g)    any exception on the title policies issued in connection with any Mortgaged Property;

(h)    any interest or title of a lessor, sublessor, licensor, sublicensor or grantor of an easement or secured by a lessor's, sublessor's, licensor's, sublicensor's interest or grantor of an easement under any lease, sublease, license, sublicense or easement to be entered into by the Borrower or any Restricted Subsidiary of the Borrower as lessee, sublessee, licensee, grantee or sublicensee to the extent permitted by this Agreement;

(i)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)    Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit or banker's acceptance issued or created for the account of the Borrower or any Subsidiary of the Borrower; provided that such Lien secures only the obligations of the Borrower or such Subsidiary in respect of such letter of credit or banker's acceptance to the extent permitted under Section 8.1;

(k)    leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Borrower and the Subsidiaries of the Borrower, taken as a whole;

(l)    Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Borrower or any Subsidiary of the Borrower;

(m)    Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of the Borrower and the Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(n)    Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(o)    any zoning, land use, environmental or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and the Subsidiaries of the Borrower, taken as a whole;

(p)    any Lien arising by reason of deposits with or giving of any form of security to any Governmental Authority for any purpose at any time as required by Applicable Law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Borrower or any Subsidiary to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(q)    rights reserved to or vested in any Governmental Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of Applicable Law, to

30

terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

   (r) Liens arising under any obligations or duties affecting any of the property, the Borrower or any Restricted Subsidiary to any Governmental Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

   (s) rights reserved to or vested in any Governmental Authority to use, control or regulate any property of such person, which do not materially impair the use of such property for the purposes for which it is held;

   (t) any obligations or duties, affecting the property of the Borrower or any Restricted Subsidiary, to any Governmental Authority with respect to any franchise, grant, license or permit; and

   (u) a set-off or netting rights granted by the Borrower or any Subsidiary of the Borrower pursuant to any Hedging Agreements or Netting Agreements solely in respect of amounts owing under such agreements.

Notwithstanding anything to the contrary, Permitted Liens shall not include Liens securing any of the Existing Primed Secured Facilities.

   "**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, replaced, restructured, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred in connection with such modification, replacement, restructuring, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder (which shall include, in the case of refinanced unutilized commitments, the same restrictions on utilization as contained in the refinanced indebtedness), (b) such modification, replacement, restructuring, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, replaced, restructured, refinanced, refunded, renewed or extended, (c) such modification, replacement, restructuring, refinancing, refunding, renewal or extension shall not require any scheduled principal payments due prior to the Maturity Date in excess of, or prior to, the scheduled principal payments due prior to the Maturity Date for the Indebtedness being modified, replaced, restructured, refinanced, refunded, renewed or extended, (d) if the Indebtedness being modified, replaced, restructured, refinanced, refunded, renewed or extended is subordinated in right of payment and/or junior in right of security to the Obligations, such modification, replacement, restructuring, refinancing, refunding, renewal or extension is subordinated in right of payment and/or junior in right of security, as applicable, to the Obligations on subordination and/or lien priority terms at least as favorable (in all material respects) to the Lenders as those contained in the documentation governing the Indebtedness being modified, replaced, restructured, refinanced, refunded, renewed or extended, taken as a whole (as reasonably determined in good faith by the Borrower), or subject to an intercreditor agreement (x) on the same form as the intercreditor agreement with respect to the Indebtedness being modified, replaced, restructured, refinanced, refunded, renewed or extended, or (y) reasonably acceptable to the Administrative Agent (such approval not to be unreasonably withheld, delayed, denied or conditioned) and that is on materially the same terms as the intercreditor agreement with respect to such Indebtedness,

(e) if secured, such modification, replacement, restructuring, refinancing, refunding, renewal or extension is secured on the same basis and by the same collateral as the Indebtedness being modified, replaced, restructured, refinanced, refunded, renewed or extended, and (f) such modification, replacement, restructuring, refinancing, refunding, renewal or extension is incurred only by the Person or Persons who are the obligors on the Indebtedness being modified, replaced, restructured, refinanced, refunded, renewed or extended.

"**Permitted Sale Leaseback**" shall mean any Sale Leaseback that does not involve any Stock or Stock Equivalents of any Oncor Subsidiary and that is existing on the Closing Date or consummated by the Borrower or any Restricted Subsidiary after the Closing Date; provided that any such Sale Leaseback consummated after the Closing Date not between (a) a Credit Party and another Credit Party or (b) a Restricted Subsidiary that is not a Credit Party and another Restricted Subsidiary that is not a Credit Party is consummated for fair value as determined at the time of consummation in good faith by (i) the Borrower or such Restricted Subsidiary and (ii) in the case of any Sale Leaseback (or series of related Sales Leasebacks) the aggregate proceeds of which exceed $50,000,000, the board of directors of the Borrower or such Restricted Subsidiary (which such determination may take into account any retained interest or other Investment of the Borrower or such Restricted Subsidiary in connection with, and any other material economic terms of, such Sale Leaseback).

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"**Petition Date**" shall have the meaning set forth in the Recitals hereto.

"**PIK Notes**" shall mean each of (i) the 9.75% unsecured notes due October 15, 2019, issued by the EFIH Debtors pursuant to that certain Indenture, as amended or supplemented from time to time, dated November 16, 2009, by and among the Borrowers, as issuers, and UMB Bank, N.A., as successor trustee to The Bank of New York Mellon, as trustee, (ii) the 11.25%/12.25% senior unsecured notes due December 1, 2018, issued by the EFIH Debtors pursuant to that certain Indenture, as amended or supplemented from time to time, dated December 5, 2012, by and among the Borrowers, as issuers, and UMB Bank, N.A., as successor trustee to The Bank of New York Mellon, as trustee, (iii) the 10.875% senior notes due November 1, 2017, issued by EFH Corp. pursuant to that certain Indenture, as amended or supplemented from time to time, dated October 31, 2007, by and among Energy Future Holdings Corp., as issuer, Energy Future Competitive Holdings Company LLC and EFIH as guarantors, and American Stock Transfer & Trust Company, LLC, as successor trustee to The Bank of New York Mellon (the "**EFH LBO Note Indenture**"), and (iv) the 11.25%/12.00% toggle notes due November 1, 2017, issued by Energy Future Holdings Corp. pursuant to the EFH LBO Note Indenture.

"**Plan**" shall mean an employee pension benefit plan (other than a Multiemployer Plan), which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by the Borrower, any Subsidiary or ERISA Affiliate or with respect to which the Borrower or any Subsidiary could incur liability pursuant to Title IV of ERISA.

"**Plan Effective Date**" shall mean the date of the effectiveness of an Acceptable Reorganization Plan that has been confirmed pursuant to a final order of the Bankruptcy Court.

"**Platform**" shall have the meaning provided in Section 11.17(c).

"**Pledge Agreement**" shall mean (a) the Pledge Agreement, entered into by the Credit Parties party thereto and the Collateral Agent for the benefit of the Secured Parties, substantially in the

form of <u>Exhibit C</u>, and (b) any other Pledge Agreement with respect to any or all of the Obligations delivered pursuant to <u>Section 7.12</u>.

"**Post-Acquisition Period**" shall mean, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the sixth full consecutive fiscal quarter immediately following the date on which such Specified Transaction is consummated.

"**Preferred Stock**" shall mean any Stock or Stock Equivalents with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"**Prepayment Event**" shall mean any Asset Sale Prepayment Event or Recovery Prepayment Event.

"**Prepetition**" shall mean, when used with respect to any agreement or instrument or any claim or proceeding or any other matter with respect of any Credit Party, an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred or, by operation of law, is deemed to have occurred, prior to the Petition Date.

"**Prepetition Debt**" shall mean collectively all Prepetition First Lien Obligations and Prepetition Second Lien Obligations.

"**Prepetition First Lien 2017 Notes Indenture**" shall mean that certain indenture, dated as of August 14, 2012, among the Borrower and the Prepetition First Lien Trustee, as trustee, as amended, restated, supplemented or modified from time to time.

"**Prepetition First Lien 2020 Notes Indenture**" shall mean that certain indenture, dated as of August 17, 2010, among the Borrower and the Prepetition First Lien Trustee, as trustee, as amended, restated, supplemented or modified from time to time.

"**Prepetition First Lien Indentures**" shall mean, collectively, (i) the Prepetition First Lien 2017 Notes Indenture and (ii) the Prepetition First Lien 2020 Notes Indenture.

"**Prepetition First Lien Obligations**" shall mean the "Note Obligations" (as defined in the Prepetition First Lien Indentures).

"**Prepetition First Lien Trustee**" shall mean CSC Trust Company of Delaware, in its capacity as Trustee under each Prepetition First Lien Indenture, and its successors and assigns.

"**Prepetition Obligations**" shall mean, collectively, the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations.

"**Prepetition Primed Trustees**" shall mean the Prepetition First Lien Trustee together with the Prepetition Second Lien Trustee.

"**Prepetition Second Lien Indenture**" shall mean that certain indenture, dated as of April 25, 2011, among the Borrower and the Prepetition Second Lien Trustee, as trustee, as amended, restated, supplemented or modified from time to time.

"**Prepetition Second Lien Obligations**" shall mean the "Note Obligations" (as defined in the Prepetition Second Lien Indenture).

"**Prepetition Second Lien Trustee**" shall mean, collectively, Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in its capacity as Trustee under the Prepetition Second Lien Indenture, and its successors and assigns.

"**Pro Forma Basis**", and "**Pro Forma Effect**" shall mean, with respect to compliance with any test or covenant hereunder, that all Specified Transactions and the following transactions in connection therewith shall be deemed to have occurred as of the first day of the applicable period of measurement in such test or covenant: (a) income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction (i) in the case of a Disposition of all or substantially all Stock in any Subsidiary of the Borrower or any division, product line, or facility used for operations of the Borrower or any Subsidiary of the Borrower, shall be excluded, and (ii) in the case of a Permitted Acquisition or Investment described in the definition of "Specified Transaction," shall be included; (b) any retirement or repayment of Indebtedness; and (c) any incurrence or assumption of Indebtedness by the Borrower or any Restricted Subsidiary in connection therewith (it being agreed that if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness as at the relevant date of determination).

"**PUCT**" shall mean the Public Utility Commission of Texas or any successor.

"**Qualified ECP Guarantor**" shall mean, in respect of any Swap Obligation, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Real Estate**" shall have the meaning provided in Section 7.1(f).

"**Real Estate Improvement**" shall mean any Building, in each case together with the contents thereof.

"**Recovery Event**" shall mean (a) any damage to, destruction of or other casualty or loss involving any property or asset or (b) any seizure, condemnation, confiscation or taking (or transfer under threat of condemnation) under the power of eminent domain of, or any requisition of title or use of or relating to, or any similar event in respect of, any property or asset.

"**Recovery Prepayment Event**" shall mean the receipt of cash proceeds with respect to any settlement or payment in connection with any Recovery Event in respect of any property or asset of the Borrower or any Restricted Subsidiary; provided that the term "Recovery Prepayment Event" shall not include any Asset Sale Prepayment Event.

"**Refreshed Ratings**" shall mean the refreshed "point-in-time" public ratings (but no specific ratings) in respect of the Term Loans from each of Moody's and S&P.

"**Register**" shall have the meaning provided in Section 11.6(b)(iv).

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Reinvestment Period**" shall mean 15 months following the date of receipt of Net Cash Proceeds of an Asset Sale Prepayment Event or Recovery Prepayment Event.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees and advisors of such Person and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"**Reorganization Plan**" shall mean a plan of reorganization of the EFIH Debtors in the Cases.

"**Reportable Event**" shall mean an event described in Section 4043 of ERISA and the regulations thereunder, other than any event as to which the thirty day notice period has been waived.

"**Required Lenders**" shall mean, at any date, Non-Defaulting Lenders having or holding a majority of the total outstanding amount of the sum of (a) the outstanding amount of the Loans as of such date plus (b) the unfunded Total Delayed Draw Term Loan Commitment as of such date.

"**Repricing Transaction**" shall mean (i) any prepayment or repayment of initial Loans with the proceeds of, or any conversion of initial Loans into, any substantially concurrent issuance of new or replacement tranche of broadly syndicated senior secured first lien term loans under credit facilities the primary purpose of which is to reduce the Yield applicable to the initial Loans and (ii) any amendment to the initial Term Loan Facility (or any exercise of any "yank-a-bank" rights in connection therewith) the primary purpose of which is to reduce the Yield applicable to the initial Loans; provided that a Repricing Transaction shall not include any such prepayment, repayment or amendment in connection with (w) a Change of Control or other "change of control" transaction, (x) an initial public offering or other offering of the equity interests of the Borrower or any parent thereof, (y) a Permitted Acquisition or other Investment by the Borrower or any Restricted Subsidiary that is either (I) not permitted by the terms of this Agreement immediately prior to the consummation of such Permitted Acquisition or other Investment or (II) if permitted by the terms of this Agreement immediately prior to the consummation of such Permitted Acquisition or other Investment, would not provide the Borrower and its Restricted Subsidiaries with adequate flexibility under this Agreement for the continuation and/or expansion of their combined operations following such consummation, as determined by the Borrower acting in good faith, or (z) a Bona Fide DIP Refinancing.

"**Restoration Certification**" shall mean, with respect to any Recovery Prepayment Event, a certification made by an Authorized Officer of the Borrower or any Restricted Subsidiary, as applicable, to the Administrative Agent prior to the end of the Reinvestment Period certifying (a) that the Borrower or such Restricted Subsidiary intends to use the proceeds received in connection with such Recovery Prepayment Event to repair, restore or replace the property or assets in respect of which such Recovery Prepayment Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of

(i) 15 months after the date on which cash proceeds with respect to such Recovery Prepayment Event were received and (ii) 180 days after delivery of such Restoration Certification.

"**Restricted Foreign Subsidiary**" shall mean a Foreign Subsidiary that is a Restricted Subsidiary.

"**Restricted Subsidiary**" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"**S&P**" shall mean Standard & Poor's Ratings Services or any successor by merger or consolidation to its business.

"**Sale Leaseback**" shall mean any transaction or series of related transactions pursuant to which the Borrower or any Restricted Subsidiary (a) sells, transfers or otherwise disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property and intends to use such property for substantially the same purpose or purposes.

"**Scheduled Dispositions**" shall have the meaning provided in Section 8.4(i).

"**SEC**" shall mean the Securities and Exchange Commission or any successor thereto.

"**Second Lien DIP Facility**" shall have the meaning provided in Section 2.13(a).

"**Second Lien DIP Limit**" shall have the meaning provided in Section 2.13(b).

"**Section 7.1 Financials**" shall mean the financial statements delivered, or required to be delivered, pursuant to Section 7.1(a) or (b) together with the accompanying officer's certificate delivered, or required to be delivered, pursuant to Section 7.1(c).

"**Secured Cash Management Agreement**" shall mean any agreement relating to Cash Management Services that is entered into by and between the Borrower or any Restricted Subsidiary and any Cash Management Bank.

"**Secured Hedging Agreement**" shall mean any Hedging Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank in accordance with the terms of this Agreement.

"**Secured Parties**" shall mean the Administrative Agent, the Collateral Agent, each Lender, each Hedge Bank that is party to any Secured Hedging Agreement, each Cash Management Bank that is a party to a Secured Cash Management Agreement and each sub-agent pursuant to Section 10 appointed by the Administrative Agent with respect to matters relating to the Term Loan Facility or by the Collateral Agent with respect to matters relating to any Security Document.

"**Securitization**" shall mean a public or private offering by a Lender or any of its Affiliates or their respective successors and assigns of securities or notes which represent an interest in, or which are collateralized, in whole or in part, by the Loans and the Lender's rights under the Credit Documents.

"**Security Agreement**" shall mean the Security Agreement entered into by the Borrower, the other grantors party thereto and the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit D.

"**Security Documents**" shall mean, collectively, (a) the Security Agreement, (b) the Pledge Agreement, (c) the DIP Order, (d) Section 12 of this Agreement, and (e) each other security agreement or other instrument or document executed and delivered pursuant to Section 7.11, 7.12 or 7.13 or pursuant to any other such Security Documents to secure or perfect the security interest in any or all of the Obligations. The Security Documents (other than the DIP Order) shall supplement, and shall not limit, the grant of a Lien on and security interest in the Collateral pursuant to the DIP Order.

"**Special Flood Hazard Area**" means an area that FEMA has designated as an area subject to the special flood or mud slide hazards.

"**Specified Default**" shall mean any Event of Default under Section 9.1.

"**Specified Transaction**" shall mean, with respect to any period, any Investment, any Disposition of assets, Permitted Sale Leaseback, incurrence or repayment of Indebtedness, dividend, Subsidiary designation or other event that by the terms of this Agreement requires "Pro Forma Compliance" with a test or covenant hereunder or requires such test or covenant to be calculated on a "Pro Forma Basis".

"**Spin-Off**" shall have the meaning given to such term in that certain Eighth Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al, pursuant to Chapter 11 of the Bankruptcy Code, confirmed on February 17, 2017.

"**Sponsors**" shall mean any of Kohlberg Kravis Roberts & Co., L.P., KKR Associates, L.P., TPG Capital, L.P. and Goldman, Sachs & Co., and each of their respective Affiliates, but excluding portfolio companies of any of the foregoing.

"**SPV**" shall have the meaning provided in Section 11.6(g).

"**Stated Maturity**" shall mean, with respect to any installment of interest or principal on any series of Indebtedness, the date on which such payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for payment thereof.

"**Stock**" shall mean shares of capital stock or shares in the capital, as the case may be (whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting.

"**Stock Equivalents**" shall mean all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable.

"**Subsidiary**" of any Person shall mean and include (a) any corporation more than 50% of whose Stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Stock of any class

or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time or is a controlling general partner. Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

"**Subsidiary Guarantor**" shall mean each Guarantor that is a Subsidiary of the Borrower.

"**Superpriority Claim**" shall mean superpriority administrative expense claim with priority over any and all other obligations, liabilities and indebtedness, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject only to and effective upon entry of the DIP Order), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code.

"**Swap Obligation**" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"**Tax Order**" shall mean that certain Order Authorizing the Debtors To Pay Certain Prepetition Taxes and Fees, in form and substance reasonably satisfactory to the Administrative Agent on a motion by the EFIH Debtors that is in form and substance reasonably satisfactory to the Administrative Agent, as such order or orders may be extended, amended, supplemented or modified in a manner reasonably satisfactory to the Administrative Agent.

"**Tax Sharing Agreements**" shall mean (i) the Amended and Restated Tax Sharing Agreement, dated November 5, 2008, among Energy Future Holdings Corp., Oncor, Oncor Electric, Texas Transmission Investment LLC and Oncor Management Investment LLC and (ii) any other tax sharing agreement reasonably acceptable to the Administrative Agent, each as amended, supplemented or otherwise modified from time to time in a manner that is not, in the Borrower's reasonable judgment, adverse, taken as a whole, to the Lenders in any material respect.

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"**Term Loan Commitment**" shall mean, (a) on the date hereof, the amount set forth opposite such Lender's name on Schedule 1.1(a) as such Lender's "Term Loan Commitment" and (b) in the case of any Lender that becomes a Lender after the date hereof, the amount specified as such Lender's

"Term Loan Commitment" in the Assignment and Acceptance pursuant to which such Lender assumed a portion of the Total Term Loan Commitment, in each case as the same may be changed from time to time pursuant to the terms hereof. The aggregate amount of Term Loan Commitments outstanding as of the Closing Date is $5,475,000,000.

"**Term Loans**" shall have the meaning provided in Section 2.1(a).

"**Term Loan Facility**" shall mean the facility providing for the Term Loans.

"**Test Period**" shall mean, for any determination under this Agreement, the four consecutive fiscal quarters of the Borrower then last ended and for which Section 7.1 Financials have been or were required to have been delivered.

"**Total Commitment**" shall mean the sum of the Total Term Loan Commitment and the Total Delayed Draw Term Loan Commitment.

"**Total Credit Exposure**" shall mean, at any date, the sum, without duplication, of (a) the Total Commitments (if any) outstanding and unfunded at such date and (b) the aggregate outstanding principal amount of all Loans (if any) at such date.

"**Total Delayed Draw Term Loan Commitment**" shall mean the sum of the Delayed Draw Term Loan Commitments. On the Closing Date, the Total Delayed Draw Term Loan Commitments shall be $825,000,000 as set forth on Schedule 1.1(a), as such amount may be reduced after the Closing Date pursuant to Section 2.1(b).

"**Total Initial Term Loan Commitment**" shall mean the sum of the Initial Term Loan Commitments. On the Closing Date, prior to the making of any of the Initial Term Loans, the Initial Term Loan Commitments shall be $5,475,000,000 as set forth on Schedule 1.1(a).

"**Total Term Loan Commitment**" shall mean the sum of the Term Loan Commitments of all the Lenders.

"**Transaction Expenses**" shall mean any fees, costs, liabilities or expenses incurred or paid by the Borrower or any of their respective Subsidiaries in connection with any Incremental Facility, any Second Lien DIP Facility, the Transactions, this Agreement and the other Credit Documents and the transactions contemplated hereby and thereby including in respect of the commitments, negotiation, syndication, documentation and closing (and post-closing actions in connection with the Collateral) of the Term Loan Facility.

"**Transactions**" shall mean, collectively, the transactions contemplated by this Agreement to occur on or around the Closing Date (including the entering into and funding hereunder and the preparation and filing of the Cases), the payment of fees, costs, liabilities and expenses in connection with each of the foregoing, and the consummation of any other transaction connected with the foregoing.

"**Transition Services Agreement**" shall mean that certain Transition Services Agreement, dated October 3, 2016, by and between Energy Future Holdings Corp. and TEX Operations Company, LLC.

"**Transferee**" shall have the meaning provided in Section 11.6(e).

"**Trust Indenture Act**" shall have the meaning provided in Section 10.11.

"**Type**" shall mean, as to any Loan, its nature as an ABR Loan or a LIBOR Loan.

"**UCC**" shall mean the Uniform Commercial Code of the State of New York or the State of Texas, as applicable, or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**Unfunded Current Liability**" of any Plan shall mean the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 ("**SFAS 87**")) under the Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the fair market value of the assets allocable thereto.

"**Unrestricted Cash**" shall mean, without duplication, all cash and cash equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by Section 8.2(k) and Liens permitted by Sections 8.2(a), 8.2(j), 8.2(t) and 8.2(u) and clauses (i) and (ii) of Section 8.2(n)) included in the cash and cash equivalents accounts listed on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries as such date.

"**Unrestricted Subsidiary**" shall mean (a) each of the Oncor Subsidiaries; (b) any Subsidiaries set forth on Schedule 1.1(c) hereto; (c) any Subsidiary of the Borrower that is formed or acquired after the Closing Date; provided that at such time (or promptly thereafter) the Borrower designates such Subsidiary an Unrestricted Subsidiary in a written notice to the Administrative Agent, (d) any Restricted Subsidiary subsequently designated as an Unrestricted Subsidiary by the Borrower in a written notice to the Administrative Agent; provided that in the case of (c) and (d), (i) such designation shall be deemed to be an Investment (or reduction in an outstanding Investment, in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary) on the date of such designation in an amount equal to the net book value of the investment therein and such designation shall be permitted only to the extent permitted under Section 8.5 on the date of such designation and (ii) no Default or Event of Default would result from such designation after giving Pro Forma Effect thereto, and (e) each Subsidiary of an Unrestricted Subsidiary. The Borrower may, by written notice to the Administrative Agent, re-designate any Unrestricted Subsidiary as a Restricted Subsidiary, and thereafter, such Subsidiary shall no longer constitute an Unrestricted Subsidiary, but only if (i) to the extent such Subsidiary has outstanding Indebtedness on the date of such designation, immediately after giving effect to such designation, the Borrower shall be in compliance, on a Pro Forma Basis, after giving effect to the incurrence of such Indebtedness, with the covenant set forth in Section 8.9 and (ii) no Default or Event of Default would result from such re-designation. On or promptly after the date of its formation, acquisition, designation or re-designation, as applicable, each Unrestricted Subsidiary (other than an Unrestricted Subsidiary that is a Foreign Subsidiary) shall have entered into a tax sharing agreement containing terms that, in the reasonable judgment of the Administrative Agent, provide for an appropriate allocation of tax liabilities and benefits; provided that the tax sharing agreements described in clauses (i) and (ii) of the definition of "Tax Sharing Agreements" as in effect on the date hereof shall be deemed to satisfy such standard.

"**U.S. Lender**" shall have the meaning provided in Section 4.4(h).

"**Voting Stock**" shall mean, with respect to any Person, such Person's Stock or Stock Equivalents having the right to vote for the election of directors or other governing body of such Person under ordinary circumstances.

"**Wages Order**" shall mean the "Final Order (a) Authorizing the Debtors to (i) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (ii) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (iii) Continue Employee and Retiree Benefit Programs, and (b) Modifying the Automatic Stay" as in effect from time to time.

"**Weighted Average Life to Maturity**" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then-outstanding principal amount of such Indebtedness; provided that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being modified, replaced, restructured, refinanced, refunded, renewed or extended (the "**Applicable Indebtedness**"), the effects of any prepayments (other than voluntary prepayments) or amortization made on such Applicable Indebtedness prior to the date of the applicable modification, replacement, restructuring, refinancing, refunding, renewal or extension shall be disregarded.

"**Wholly Owned**" shall mean, with respect to the ownership by a Person of a Subsidiary, that all of the Stock of such Subsidiary (other than directors' qualifying shares or nominee or other similar shares required pursuant to Applicable Law) are owned by such Person or another Wholly Owned Subsidiary of such Person.

"**Yield**" shall mean, with respect to any Term Loan Commitment and/or Loans, on any date of determination, the yield to maturity, in each case, based on the interest rate applicable to such Term Loan Commitment and/or Loans on such date and giving effect to interest rate floors and any original issue discount or upfront fees, but excluding any customary arrangement, administrative, advisory, origination or similar fees in connection therewith that are not paid to all of the Lenders providing such Term Loan Commitment and/or Loans).

1.2.         Other Interpretive Provisions.  With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)         The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)         The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c)         Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d)         The term "including" is by way of example and not limitation.

(e)         The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)         The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(g)         All references to "knowledge" or "awareness" of any Credit Party or a Restricted Subsidiary thereof means the actual knowledge of an Authorized Officer of a Credit Party or such Restricted Subsidiary.

(h)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(i)      Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(j)      For purposes of determining compliance with any one of Sections 8.1, 8.2, 8.4, 8.5, 8.6, and 8.7, in the event that any Lien, Investment, Indebtedness, Disposition, dividend, affiliate transaction, contractual obligation or prepayment of Indebtedness meets the criteria of more than one of the categories of transactions permitted pursuant to any clause of such Section, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower (and the Borrower shall be entitled to redesignate use of any such clauses from time to time) in its sole discretion at such time.

(k)      The Co-Borrowers are jointly and severally liable for any and all of the Borrower's obligations under each Credit Document.

1.3.      Accounting Terms.

(a)      All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP.

(b)      Notwithstanding anything to the contrary herein, for purposes of determining compliance with any test or covenant contained in this Agreement with respect to any period during which any Specified Transaction occurs, Unrestricted Cash shall each be calculated with respect to such period and such Specified Transaction on a Pro Forma Basis.

1.4.      Rounding. Any financial ratios (if any) required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.5.      References to Agreements, Laws, Etc. Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document; and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

1.6.      Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.7. <u>Timing of Payment of Performance</u>. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

1.8. <u>Currency Equivalents Generally</u>. For purposes of determining compliance under <u>Sections 8.4</u>, <u>8.5</u> and <u>8.6</u> with respect to any amount denominated in any currency other than Dollars (other than with respect to (a) any amount derived from the financial statements of the Borrower and the Subsidiaries of the Borrower or (b) any Indebtedness denominated in a currency other than Dollars), such amount shall be deemed to equal the Dollar equivalent thereof based on the average Exchange Rate for such other currency for the most recent twelve-month period immediately prior to the date of determination. For purposes of determining compliance with <u>Sections 8.1</u>, <u>8.2</u> and <u>8.5</u>, with respect to any amount of Indebtedness in a currency other than Dollars, compliance will be determined at the time of incurrence or advancing thereof using the Dollar equivalent thereof at the Exchange Rate in effect at the time of such incurrence or advancement.

1.9. <u>Classification of Loans and Borrowings</u>. For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "**LIBOR Loan**"). Borrowings also may be classified and referred to by Type (e.g., a "**LIBOR Borrowing**").

1.10. <u>Hedging Agreements</u>. For the avoidance of doubt, it is understood that the following Hedging Agreements shall not be deemed to be speculative or entered into for speculative purposes for any purpose of this Agreement and all other Credit Documents: (a) any Hedging Agreement intended, at inception or execution, (i) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of the Borrower or the Restricted Subsidiaries, (ii) for foreign exchange or currency exchange management, (iii) to manage commodity portfolio exposure associated with changes in interest rates or (iv) to hedge any exposure that the Borrower or the Restricted Subsidiaries may have to counterparties under other Hedging Agreements such that the combination of such Hedging Agreements is not speculative taken as a whole and (b) any Hedging Agreement entered into by the Borrower or any Restricted Subsidiary (in each case, entered into in the ordinary course of business or consistent with past practice) that was intended, at inception or execution, as applicable, thereof, to unwind or offset any Hedging Agreement described in clauses (a) and (b) of this <u>Section 1.10</u>.

SECTION 2.        <u>Amount and Terms of Credit</u>.

2.1.        <u>Commitments</u>.

(a)        Subject to and upon the terms and conditions set forth in this Agreement, each Lender having a Term Loan Commitment on the Closing Date, severally, but not jointly, agrees to make an initial term loan (each such initial term loan, an "**Initial Term Loan**", and collectively, all such term loans made on the Closing Date, the "**Initial Term Loans**", and together with any Delayed Draw Term Loan made after the Closing Date, a "**Term Loan**" and, collectively, the "**Term Loans**") in Dollars on the Closing Date to the Borrower, which Initial Term Loans shall equal the amount requested by the Borrower, not to exceed (i) for any such Lender the Initial Term Loan Commitment of such Lender and (ii) in the aggregate, the Total Initial Term Loan Commitment. For the avoidance of doubt, the Borrower shall not be required to borrow the full amount of the Total Initial Term Loan Commitment.

(i)        The Initial Term Loans may, at the option of the Borrower, be incurred, maintained as, and/or converted into, ABR Loans or LIBOR Loans in accordance with <u>Section 2.6</u>; <u>provided</u> that all such Initial Term Loans made by each of the Lenders pursuant to

43

the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Term Loans of the same Type. The Initial Term Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

(b)        Subject to the terms and conditions herein set forth, each Lender having a Delayed Draw Term Loan Commitment severally agrees to make a delayed draw loan or delayed draw loans (each such delayed draw term loan made after the Closing Date are referred to individually as a "**Delayed Draw Term Loan**" and collectively as the "**Delayed Draw Term Loans**") on or before the Delayed Draw Term Loan Commitment Termination Date, in the amount set forth opposite such Lender's name in Schedule 1.1(a) under the heading "Delayed Draw Term Loan Commitment" or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder. The principal amount of any Delayed Draw Term Loan to be made by any Lender shall not exceed such Lender's remaining Delayed Draw Term Loan Commitment. Amounts borrowed as the Delayed Draw Term Loan which are repaid or prepaid may not be reborrowed. The Total Delayed Draw Term Loan Commitment shall automatically reduce immediately upon and in the principal amount of each Delayed Draw Term Loan made hereunder, and any remaining Delayed Draw Term Loan Commitments of the Lenders shall terminate on the Delayed Draw Term Loan Commitment Termination Date. Upon receipt by the Administrative Agent of written notice from the Borrower, the Total Delayed Draw Term Loan Commitment may be permanently reduced, in whole or in part (which such notice shall be provided at least three (3) Business Days prior to the date of such reduction), as directed by the Borrower so long as each such reduction is in a minimum amount of $10,000,000.  The Delayed Draw Term Loan may be funded in up to two (2) draws occurring on or prior to the Delayed Draw Term Loan Commitment Termination Date, in each case in a minimum amount of $200,000,000.

(i)        The Delayed Draw Term Loans may, at the option of the Borrower, be incurred, maintained as, and/or converted into, ABR Loans or LIBOR Loans in accordance with Section 2.6; provided that all such Delayed Draw Term Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Delayed Draw Term Loans of the same Type. The Delayed Draw Term Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

(c)        Each Lender may at its option make any LIBOR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that (A) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (B) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.9 shall apply).

2.2.        Maximum Number of Borrowings. More than one Borrowing may be incurred on any date; provided that at no time shall there be outstanding more than eleven (11) Borrowings of LIBOR Loans under this Agreement.

2.3.        Notice of Borrowing.

(a)        When the Borrower desires to incur Initial Term Loans on the Closing Date, the Borrower shall deliver to the Administrative Agent at the Administrative Agent's Office a Notice of Borrowing (or telephonic notice promptly confirmed by delivery of a Notice of Borrowing) (i) prior to 1:00 p.m. (New York City time) at least three Business Days' prior to the date of the proposed Borrowing

44

of Loans if all or any of such Loans are to be initially LIBOR Loans, and (ii) prior to 10:00 a.m. (New York City time) on the date of the proposed Borrowing of Term Loans if all or any of such Loans are to be ABR Loans. Such notice (together with any such notice of a Borrowing of Delayed Draw Term Loans pursuant to Section 2.3(b), a "**Notice of Borrowing**") shall specify (i) the aggregate principal amount of Loans to be made, (ii) the date of the Borrowing and (iii) whether such Loans shall consist of ABR Loans and/or LIBOR Loans and, if the Loans are to include LIBOR Loans, the Interest Period to be initially applicable thereto. The Administrative Agent shall promptly give each applicable Lender written notice (or telephonic notice promptly confirmed in writing) of the proposed Borrowing of Loans, of such Lender's proportionate share thereof and of the other matters covered by the related Notice of Borrowing.

(b)        Whenever the Borrowers desire to incur Delayed Draw Term Loans hereunder, the Administrative Borrower shall give the Administrative Agent a Notice of Borrowing prior to 1:00 p.m. (New York time) at least three (3) Business Days' prior to each Borrowing of LIBOR Loans or ABR Loans. Each such Notice of Borrowing shall specify (A) the aggregate principal amount of the Delayed Draw Term Loans to be made pursuant to such Borrowing, (B) the date of Borrowing (which shall be a Business Day), and (C) whether the respective Borrowing shall consist of ABR Loans or LIBOR Loans and, if LIBOR Loans, the Interest Period to be initially applicable thereto. The Administrative Agent shall promptly give each applicable Lender holding any Delayed Draw Term Loan Commitment written notice (or telephonic notice promptly confirmed in writing) of each proposed Borrowing of Delayed Draw Term Loans, of such Lender's proportionate share thereof and of the other matters covered by the related Notice of Borrowing. No Delayed Draw Term Loans shall be borrowed on the Closing Date.

(c)        Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower.

2.4.        <u>Disbursement of Funds</u>.

(a)        No later than 2:00 p.m. (New York City time) on the date specified in each Notice of Borrowing, each Lender will make available its *pro rata* portion, if any, of each Borrowing requested to be made on such date in the manner provided below.

(b)        Each Lender shall make available all amounts required in cash under any Borrowing for its applicable Term Loan Commitment in immediately available funds to the Administrative Agent at the Administrative Agent's Office in Dollars, and the Administrative Agent will make available to the Borrower, by depositing to an account designated by the Borrower to the Administrative Agent the aggregate of the amounts so made available in Dollars. Unless the Administrative Agent shall have been notified by any Lender prior to the date of any such Borrowing that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made in cash on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent has made available such amount to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent in Dollars. The Administrative Agent shall also be entitled to recover from such

Lender or the Borrower interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent, at a rate *per annum* equal to (i) if paid by such Lender, the Overnight Rate or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with Section 2.7.

(c)        Nothing in this Section 2.4 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

2.5.        Repayment of Loans; Evidence of Debt.

(a)        The Borrower shall repay to the Administrative Agent, for the benefit of the applicable Lenders, on the Maturity Date, the then outstanding Loans.

(b)        Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office of such Lender from time to time, including the amounts of principal and interest payable and paid to such lending office of such Lender from time to time under this Agreement.

(c)        The Administrative Agent shall maintain the Register pursuant to Section 11.6(b)(iv), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder, the Type of each Loan made and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)        The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (c) and (d) of this Section 2.5 shall, to the extent permitted by Applicable Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.6.        Conversions and Continuations.

(a)        Subject to the penultimate sentence of this clause (a), (x) the Borrower shall have the option on any Business Day to convert all or a portion equal to at least the Minimum Borrowing Amount of the outstanding principal amount of Loans of one Type into a Borrowing or Borrowings of another Type and (y) the Borrower shall have the option on any Business Day to continue the outstanding principal amount of any LIBOR Loans as LIBOR Loans for an additional Interest Period; provided that (i) no partial conversion of LIBOR Loans shall reduce the outstanding principal amount of LIBOR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount, (ii) ABR Loans may not be converted into LIBOR Loans if a Payment Default or an Event of Default is in existence on the date of the conversion and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such conversion, (iii) LIBOR Loans may not be continued as LIBOR Loans for an additional Interest Period if a Default or Event of Default is in existence on the date of the

46

proposed continuation and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such continuation and (iv) Borrowings resulting from conversions pursuant to this Section 2.6 shall be limited in number as provided in Section 2.2. Each such conversion or continuation shall be effected by the Borrower by giving the Administrative Agent at the Administrative Agent's Office prior to 1:00 p.m. (New York City time) at least (i) three Business Days', in the case of a continuation of, or conversion to, LIBOR Loans or (ii) one Business Day's in the case of a conversion into ABR Loans, prior written notice (or telephonic notice promptly confirmed in writing) (each, a "**Notice of Conversion or Continuation**") specifying the Loans to be so converted or continued, the Type of Loans to be converted into or continued and, if such Loans are to be converted into, or continued as, LIBOR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration). The Administrative Agent shall give each applicable Lender notice as promptly as practicable of any such proposed conversion or continuation affecting any of its Loans.

(b)      If any Payment Default or Event of Default is in existence at the time of any proposed continuation of any LIBOR Loans and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such continuation, such LIBOR Loans shall be automatically converted on the last day of the current Interest Period into ABR Loans. If upon the expiration of any Interest Period in respect of LIBOR Loans, the Borrower has failed to elect a new Interest Period to be applicable thereto as provided in clause (a) above, the Borrower shall be deemed to have elected to convert such Borrowing of LIBOR Loans into a Borrowing of ABR Loans, effective as of the expiration date of such current Interest Period.

(c)      Notwithstanding anything to the contrary herein, the Borrower may deliver a Notice of Conversion or Continuation pursuant to which the Borrower elects to irrevocably continue the outstanding principal amount of any Loans subject to an interest rate Hedging Agreement as LIBOR Loans for each Interest Period until the expiration of the term of such applicable Hedging Agreement.

2.7.      Interest.

(a)      The unpaid principal amount of each ABR Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable ABR Margin plus the ABR, in each case, in effect from time to time.

(b)      The unpaid principal amount of each LIBOR Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable LIBOR Margin plus the relevant LIBOR Rate, in each case in effect from time to time.

(c)      If all or a portion of (i) the principal amount of any Loan or (ii) any interest payable thereon or any other amount hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), and an Event of Default shall exist as a result of such failure to pay, then upon the giving of written notice by the Administrative Agent to the Borrower, such overdue amount shall bear interest at a rate *per annum* (the "**Default Rate**") that is (x) in the case of overdue principal, the rate that would otherwise be applicable thereto plus 2% or (y) in the case of any overdue interest or other amounts due hereunder, to the extent permitted by Applicable Law, the rate described in Section 2.7(a) plus 2% from the date of such non-payment to the date on which such amount is paid in full (after as well as before judgment).

(d)        Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; provided that any Loan that is repaid on the same date on which it is made shall bear interest for one day. Except as provided below, interest shall be payable (i) in respect of each ABR Loan, monthly in arrears on the third Business Day of each calendar month, (ii) in respect of each LIBOR Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three-month intervals after the first day of such Interest Period, and (iii) in respect of each Loan, (A) on any prepayment; provided that interest on ABR Loans shall only become due pursuant to this subclause (A) if the aggregate principal amount of the ABR Loans then-outstanding is repaid in full, (B) at maturity (whether by acceleration or otherwise), and (C) after such maturity, on demand.

(e)        All computations of interest hereunder shall be made in accordance with Section 4.5.

(f)        The Administrative Agent, upon determining the interest rate for any Borrowing of LIBOR Loans, shall promptly notify the Borrower and the relevant Lenders thereof. Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.

2.8.        Interest Periods. At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of LIBOR Loans in accordance with Section 2.6(a), the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of the Interest Period applicable to such Borrowing, which Interest Period shall, at the option of the Borrower be a one week or a one, two, three or six or (if available to all relevant Lenders participating in the relevant Term Loan Facility) a twelve month period or a period of less than one month; provided that, notwithstanding the foregoing, the initial Interest Period beginning on the Closing Date may be for a period of less than one month or such other period agreed by the Borrower and the Administrative Agent.

Notwithstanding anything to the contrary contained above:

(a)        the initial Interest Period for any Borrowing of LIBOR Loans shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b)        if any Interest Period relating to a Borrowing of LIBOR Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)        if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that if any Interest Period in respect of a LIBOR Loan would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(d)        the Borrower shall not be entitled to elect any Interest Period in respect of any LIBOR Loan if such Interest Period would extend beyond the applicable Maturity Date of such Loan.

2.9.    Increased Costs, Illegality, Etc.

(a)    In the event that (x) in the case of clause (i) below, the Administrative Agent or (y) in the case of clauses (ii) and (iii) below, any Lender shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto):

(i)    on any date for determining the LIBOR Rate for any Interest Period that (x) deposits in the principal amounts and currencies of the Loans comprising such LIBOR Borrowing, are not generally available in the relevant market or (y) by reason of any changes arising on or after the Closing Date affecting the interbank LIBOR market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR Rate; or

(ii)    at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any LIBOR Loans (other than any increase or reduction attributable to (i) Taxes indemnifiable under Section 4.4, (ii) net income taxes and franchise and excise taxes (imposed in lieu of net income taxes) imposed on any Agent or Lender or (iii) Taxes included under clauses (c) and (d) of the definition of "Excluded Taxes") because of (x) any change since the Closing Date in any Applicable Law (or in the interpretation or administration thereof and including the introduction of any new Applicable Law), such as, for example, without limitation, a change in official reserve requirements, and/or (y) other circumstances affecting the interbank LIBOR market or the position of such Lender in such market; or

(iii)    at any time, that the making or continuance of any LIBOR Loan has become unlawful as a result of compliance by such Lender in good faith with any Applicable Law (or would conflict with any such Applicable Law not having the force of law even though the failure to comply therewith would not be unlawful), or has become impracticable as a result of a contingency occurring after the Closing Date that materially and adversely affects the interbank LIBOR market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall within a reasonable time thereafter give notice (if by telephone, confirmed in writing) to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, LIBOR Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing or Notice of Conversion or Continuation given by the Borrower with respect to LIBOR Loans, that have not yet been incurred shall be deemed rescinded by the Borrower, as applicable, (y) in the case of clause (ii) above, the Borrower shall pay to such Lender, promptly after receipt of written demand therefor such additional amounts (in the form of an increased rate of or a different method of calculating, interest or otherwise, as such Lender in its reasonable discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) and (z) in the case of subclause (iii) above, the Borrower shall take one of the actions specified in Section 2.9(b) as promptly as possible and, in any event, within the time period required by Applicable Law.

49

(b)    At any time that any LIBOR Loan is affected by the circumstances described in Section 2.9(a)(ii) or (iii), the Borrower may (and in the case of a LIBOR Loan affected pursuant to Section 2.9(a)(iii) shall) either (x) if the affected LIBOR Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to Section 2.9(a)(ii) or (iii) or (y) if the affected LIBOR Loan is then-outstanding, upon at least three Business Days' notice to the Administrative Agent require the affected Lender to convert each such LIBOR Loan into an ABR Loan; provided that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.9(b).

(c)    If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's or its Affiliate's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent or its Affiliate could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy), then from time to time, promptly after demand by such Lender (with a copy to the Administrative Agent, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any Applicable Law as in effect on the Closing Date. Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.9(c), will give prompt written notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.12, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.9(c) upon receipt of such notice.

2.10.    Compensation. If (i) any payment of principal of any LIBOR Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such LIBOR Loan as a result of a payment or conversion pursuant to Section 2.5, 2.6, 2.9, 4.1, 4.2 or 11.7, as a result of acceleration of the maturity of the Loans pursuant to Section 9 or for any other reason, (ii) any Borrowing of LIBOR Loans is not made as a result of a withdrawn Notice of Borrowing, (iii) any ABR Loan is not converted into a LIBOR Loan as a result of a withdrawn Notice of Conversion or Continuation, (iv) any LIBOR Loan is not continued as a LIBOR Loan, as the case may be, as a result of a withdrawn Notice of Conversion or Continuation or (v) any prepayment of principal of any LIBOR Loan is not made as a result of a withdrawn notice of prepayment pursuant to Section 4.1 or 4.2, the Borrower shall, after receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such LIBOR Loan.

2.11.    Change of Lending Office. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.9(a)(ii), 2.9(a)(iii), 2.9(b) or 4.4 with respect to such Lender, it will, if requested by the Borrower use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event

giving rise to the operation of any such Section. Nothing in this <u>Section 2.11</u> shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in <u>Section 2.9</u> or <u>4.4</u>.

2.12.    <u>Notice of Certain Costs</u>. Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by <u>Section 2.9</u>, <u>2.10</u> or <u>4.4</u> is given by any Lender more than 180 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under <u>Section 2.9</u>, <u>2.10</u> or <u>4.4</u>, as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower.

2.13.    <u>Second Lien DIP Facility</u>.

(a)    The Borrower may, on or after the Closing Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request one or more tranches of new Indebtedness (either in the form of second lien subordinated term loans or second lien subordinated notes) in one or more separate facilities from the outstanding Loans (the "**Second Lien DIP Facility**"), provided that (i) at (and immediately after giving effect to) the effectiveness and funding of the Second Lien DIP Facility, no Event of Default shall exist.

(b)    The aggregate principal amount of all Indebtedness under the Second Lien DIP Facility shall not exceed $6,000,000,000 (the "**Second Lien DIP Limit**").

(c)    Indebtedness under the Second Lien DIP Facility (i) shall rank junior in right of payment and security with all Loans (including a "1.5 Lien" structure), (ii) shall not mature earlier than the Maturity Date (after giving effect to the extension provided for in the proviso in the definition of "Maturity Date" and a corresponding extension of the Second Lien DIP Facility in the event the Maturity Date is so extended) and shall require no scheduled amortization, (iii) shall have interest rates, interest margins, rate floors, fees, funding discounts and premiums determined by the Borrower and the lenders thereof, and (iv) with respect to all other terms and conditions, shall (A) reflect market terms and conditions (taken as a whole) at the time of incurrence or issuance (as determined in good faith by the Borrower) or (B) be on terms and conditions reasonably satisfactory to the Administrative Agent (such consent not to be unreasonably withheld, delayed, denied or conditioned).

(d)    The principal amount of the Second Lien DIP Facility (including any principal amount arising in connection with "pay-in-kind" fees or interest) shall not be required to be repaid in cash (except in the case of an acceleration of the obligations thereunder); and, subject to the proviso to this clause (d), at the final maturity of the Second Lien DIP Facility, the principal amount (including any principal amount arising in connection with "pay-in-kind" fees or interest) of the Indebtedness under the Second Lien DIP Facility shall be converted into equity in accordance with an Acceptable Reorganization Plan; provided that nothing herein shall prevent a refinancing and/or repayment of the Second Lien DIP Facility in cash if (I)(x) such refinancing and/or repayment occurs after the Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Cash Management Obligations under the Secured Cash Management Agreements or Contingent Obligations) have been repaid in full in cash and (y) if consummated at emergence, the Acceptable Reorganization Plan permits the Borrower to make such repayment and/or incur Indebtedness to refinance the Second Lien DIP Facility or (II) with proceeds of a Permitted Refinancing.

(e)    The proceeds of the Second Lien DIP Facility shall be used solely (i) to repay a portion of the Loans, (ii) to pay, repay, exchange, satisfy, redeem or otherwise retire all or a portion of the EFIH First Lien Makewhole Claims, the Prepetition Second Lien Obligations and EFIH Second Lien

51

Makewhole Claims, (iii) to repay exchange, satisfy, redeem or otherwise retire all or a portion of the PIK Notes, (iv) to pay all or a portion of the interest, premium, fees, and expenses, in each case incurred in connection with (x) any such payment or repayment or (y) the incurrence of the Second Lien DIP Facility and (v) for any other purpose contemplated by an Acceptable Reorganization Plan. Notwithstanding anything to the contrary in this Section 2.13(e), the proceeds of the Second Lien DIP Facility shall be applied *first* to satisfy the obligations listed under clauses (ii) and (iv) (to the extent attributable to (ii)) above until such obligations are paid in full, *second*, to repay the Loans so that the Total Credit Exposure does not exceed $4,300,000,000, and *third*, toward any of the other purposes listed above.

(f)     The notice from the Borrower pursuant to this Section 2.13 shall set forth the requested amount and proposed terms of the Second Lien DIP Facility. The Second Lien DIP Facility may be provided by any existing Lender (it being understood that (i) no existing Lender will have an obligation to make a portion of the Second Lien DIP Facility and (ii) the Borrower shall have no obligation to offer any existing Lender the opportunity to provide the Second Lien DIP Facility).

(g)     The effectiveness and borrowing of any Second Lien DIP Facility shall be subject to the satisfaction on the date thereof of the conditions as the parties thereto shall agree, including the execution of an intercreditor agreement reasonably acceptable to the Administrative Agent, the Lenders and the Borrower under the Second Lien DIP Facility, which intercreditor agreement shall provide that until the Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Cash Management Obligations under the Secured Cash Management Agreements or Contingent Obligations) are paid in full, the Administrative Agent will control at all times all remedies and other actions related to the Collateral, and that the secured parties under the Second Lien DIP Facility will not be entitled to take any action with respect to the Collateral (other than limited actions to preserve and protect the liens securing the Second Lien DIP Facility that do not impair the liens securing the Obligations and other customary actions to be agreed).

(h)     Notwithstanding any other provision in this Agreement or any other Credit Document to the contrary, this Section 2.13 shall govern with respect to the incurrence of any Second Lien DIP Facility.

2.14.    [Reserved].

2.15.    Defaulting Lenders.  If the Borrower and the Administrative Agent agree in writing (in their discretion) that a Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender; provided that, except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

SECTION 3.    Fees.

3.1.    Fees.

(a)     The Borrower agrees to pay directly to the Administrative Agent for its own account the administrative agent fees as set forth in the Fee Letter.

(b)     In the event that, on or prior to the six month anniversary of the Closing Date, the Borrower (x) makes any prepayment or repayment of Initial Term Loans or Delayed Draw Term Loans in

connection with any Repricing Transaction or (y) effects any amendment of this Agreement resulting in a Repricing Transaction, the Borrower shall pay to the Administrative Agent, for the ratable account of each of the applicable Lenders holding Initial Term Loans or Delayed Draw Term Loans, as the case may be, (I) a prepayment premium of 1.00% of the principal amount of the Initial Term Loans or Delayed Draw Term Loans, as the case may be, being prepaid or repaid in connection with such Repricing Transaction and (II) in the case of clause (y), an amount equal to 1.00% of the aggregate amount of the applicable Initial Term Loans or Delayed Draw Term Loans, as the case may be, of non-consenting Lenders outstanding immediately prior to such amendment that are subject to an effective pricing reduction pursuant to such amendment.

SECTION 4.  Payments.

4.1.  Voluntary Prepayments. The Borrower shall have the right to prepay Loans, without premium or penalty, in whole or in part, from time to time on the following terms and conditions: (a) the Borrower shall give the Administrative Agent at the Administrative Agent's Office written notice (or telephonic notice promptly confirmed in writing) of its intent to make such prepayment, the amount of such prepayment and, in the case of LIBOR Loans, the specific Borrowing(s) pursuant to which made, which notice shall be given by the Borrower no later than 1:00 p.m. (New York City time) (x) one Business Day prior to (in the case of ABR Loans) or (y) three Business Days prior to (in the case of LIBOR Loans), the date of such prepayment and shall promptly be transmitted by the Administrative Agent to each of the relevant Lenders, (b) each partial prepayment of any Borrowing of Loans shall be in a multiple of $1,000,000 and in an aggregate principal amount of at least $5,000,000; provided that no partial prepayment of LIBOR Loans made pursuant to a single Borrowing shall reduce the outstanding LIBOR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount for LIBOR Loans, and (c) any prepayment of LIBOR Loans pursuant to this Section 4.1 on any day other than the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of Section 2.10. All prepayments under this Section 4.1 shall also be subject to the provisions of Section 4.2(c) or (e), as applicable. At the Borrower's election in connection with any prepayment pursuant to this Section 4.1, such prepayment shall not be applied to any Loan of a Defaulting Lender.

4.2.  Mandatory Prepayments.

(a)  Loan Prepayments. On each occasion that a Prepayment Event occurs, the Borrower shall, within three Business Days after the occurrence of such Prepayment Event (or, in the case of Deferred Net Cash Proceeds, within three Business Days after the Deferred Net Cash Proceeds Payment Date), prepay (subject to Section 9.14 when applicable), in accordance with clauses (c) and (d) below, Loans in a principal amount equal to 100% of the Net Cash Proceeds from such Prepayment Event.

(b)  Application to Repayments. Subject to Section 9.14 when applicable, each prepayment of Loans required by Section 4.2(a) shall be allocated to the Loans until paid in full.

(c)  Application to Loans. With respect to each prepayment of Loans elected to be made by the Borrower pursuant to Section 4.1 or required by Section 4.2(a), subject to Section 9.14 when applicable, the Borrower may designate the Types of Loans that are to be prepaid and the specific Borrowing(s) pursuant to which made; provided that the Borrower pays any amounts, if any, required to be paid pursuant to Section 2.10 with respect to prepayments of LIBOR Loans made on any date other than the last day of the applicable Interest Period. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such