82

# EXHIBIT 2

**Engagement Letter**

EXECUTION VERSION

**CITIGROUP GLOBAL MARKETS INC.**
**390 GREENWICH STREET**
**NEW YORK, NEW YORK 10013**

**MORGAN STANLEY SENIOR FUNDING, INC.**
**1585 BROADWAY**
**NEW YORK, NY 10036**

**ROYAL BANK OF CANADA**
**200 VESEY STREET**
**NEW YORK, NEW YORK 10281**

**BARCLAYS**
**745 SEVENTH AVENUE**
**NEW YORK, NY 10019**

<u>CONFIDENTIAL</u>

June 22, 2017

Energy Future Intermediate Holding Company LLC
1601 Bryan St.
Dallas, Texas 75201

Attn:   Anthony R. Horton
        Executive Vice President, Chief Financial Officer and Treasurer

<u>**Second Amended and Restated Engagement Letter**</u>

Ladies and Gentlemen:

You have advised Citi (as defined below), Morgan Stanley Senior Funding, Inc. ("**Morgan Stanley**"), RBC Capital Markets[1] ("**RBCCM**"), Royal Bank of Canada (together with RBCCM, "**RBC**"), and Barclays Bank PLC ("**Barclays**" and, together with Citi, Morgan Stanley and RBC, collectively, "**we**" or "**us**") that Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("**you**" or the "**Company**") is seeking to refinance (the "**Refinancing**") its existing Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of June 19, 2014, by and among the Company, the lenders from time to time parties thereto and Deutsche Bank AG New York Branch, as administrative agent and collateral agent (as amended, restated, extended, supplemented or otherwise modified from time to time prior to the date hereof, the "**Existing Credit Agreement**") with the proceeds from a senior secured superpriority debtor-in-possession term loan facility consisting of (i) up to an aggregate principal amount of $5,475,000,000 of term loans to be funded under the initial term loan facility on the Closing Date (as defined below) (the "**Initial DIP Term Loan Facility**"), and (ii) up to an aggregate principal amount of $825,000,000 of additional term loans to be funded under a delayed draw term loan facility in up to two drawings within ninety (90) days from the date on which the final Court Order (as defined below) is issued (the "**Delayed Draw DIP Term Loan Facility**" and, together with the Initial DIP Term Loan Facility, the "**DIP Term Loan Facility**"), which DIP Term Loan Facility shall (i) extend the final scheduled maturity to June 30, 2018 (the "**Extension**"), (ii) include the ability to further extend the final scheduled maturity from June 30, 2018 to December 30, 2018, subject to conditions to be mutually agreed (the "**Additional Extension**"), (iii) include a liquidity covenant set at $100,000,000 at any time ("**Liquidity Covenant Adjustment**"), (iv) adjust the applicable interest rates to

---

[1] RBC Capital Markets is a marketing name for the capital markets activities of Royal Bank of Canada and its affiliates.

a rate to be agreed (the "**Interest Rate Adjustment**"), (v) permit the incurrence of an uncommitted second lien DIP facility of up to $6,000,000,000 (the "**Second Lien**"), the proceeds of which shall be used to repay a portion of the loans under the DIP Term Loan Facility and/or the existing second lien claims or other prepetition claims, and pay related interest, fees, premiums and expenses, and (vi) include other modifications to the Existing Credit Agreement to be mutually agreed (the "**Other Amendments**" and collectively with the Delayed Draw DIP Term Loan Facility, the Extension, the Additional Extension, the Liquidity Covenant Adjustment, the Interest Rate Adjustment and the Second Lien, the "**DIP Adjustments**"). The definitive documentation in respect of the DIP Term Loan Facility will be the same as the Existing Credit Agreement and the Credit Documents, including the Final Order (each as defined in the Existing Credit Agreement), amended to reflect the DIP Adjustments. This second amended and restated engagement letter (this "**Engagement Letter**"), amends, restates and supersedes in its entirety that certain amended and restated engagement letter, dated June 21, 2017 (the "**Original Engagement Letter**") among Citi, Morgan Stanley and you, and the Original Engagement Letter shall be of no further force or effect.

For purposes of this Engagement Letter, "**Citi**" shall mean Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. or any of their affiliates as Citi shall determine to be appropriate to provide the services contemplated herein; and "**Transactions**" shall mean, collectively, the negotiation and entering into the documentation evidencing the DIP Term Loan Facility, the arrangement and incurrence of the Refinancing, and all other related transactions, including the payment of reasonable and documented fees and expenses in connection therewith. The date on which the effectiveness of the Refinancing occurs is referred to as the "**Closing Date**".

We are pleased to confirm the arrangements under which Citi, Morgan Stanley, RBCCM and Barclays are exclusively authorized by the Company to act as the joint lead arrangers and joint lead bookrunners for the DIP Term Loan Facility, on the terms and subject to the conditions set forth in this Engagement Letter.

1. <u>Titles and Roles</u>

You hereby appoint (a) Citi, Morgan Stanley, RBCCM and Barclays to act, and Citi, Morgan Stanley, Barclays and RBCCM hereby agree to act, as joint lead arrangers and joint lead bookrunners for the DIP Term Loan Facility (in such capacities, the "**Lead Arrangers**" and each a "**Lead Arranger**"), and (b) Citi to act as the administrative agent and collateral agent for the DIP Term Loan Facility (in such capacities, the "**Agent**"). It is further agreed that Citi shall have "left lead" placement in any and all marketing materials or other documentation used in connection with the DIP Term Loan Facility, and Morgan Stanley shall appear to the immediate right of Citi in such materials. Except as provided in this paragraph, no other arrangers, bookrunners or agents will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by this Engagement Letter and the Fee Letter referred to below) will be paid to any person to obtain such person's commitment to become a Lender under the DIP Term Loan Facility unless you and us shall so agree. The Lead Arrangers agree to use commercially reasonable efforts to (i) arrange and syndicate the DIP Term Loan Facility to a group of banks, financial institutions and other lenders selected by the Lead Arrangers and acceptable to you (the "**Lenders**"); *provided*, that the Lead Arrangers shall not syndicate the DIP Term Loan Facility to any Disqualified Institution (as defined in the Existing Credit Agreement). The Company acknowledges and agrees that this Engagement Letter is not a commitment by us or any of our affiliates to provide any financing or provide or purchase any loans in connection with the DIP Term Loan Facility, nor does this Engagement Letter constitute an express or implied guarantee with respect to the outcome of the DIP Term Loan Facility and no assurance can be given that the DIP Term Loan Facility will be successful.

NYDOCS02/1122720

2. <u>Syndication</u>

The Lead Arrangers intend to approach potential Lenders acceptable to you regarding the DIP Term Loan Facility promptly upon the execution of this Engagement Letter. You agree, following the date hereof, to use your commercially reasonable efforts to assist the Lead Arrangers in arranging the DIP Term Loan Facility. Such commercially reasonable efforts to assist shall include (A) your using your commercially reasonable efforts to cause direct contact between your senior management and advisors and the Lenders at mutually agreed times, (B) your preparing and providing to the Lead Arrangers all customary information with respect to you and such of your subsidiaries as are subject to proceedings under Title 11 of the United States Code (the "**Bankruptcy Code**") (such subsidiaries, together with you, the "**Debtors**"), including all financial information and Projections (as defined below), as the Lead Arranger may reasonably request in connection with the arrangement of the DIP Term Loan Facility and your assistance in the preparation of customary marketing materials to be used in connection with the arrangement of the DIP Term Loan Facility (all such information and materials, "**Information Materials**") and (C) the hosting, with the Lead Arrangers, of one or more meetings (which may be telephonic) of Lenders at reasonable times and locations to be mutually agreed. For the avoidance of doubt, you will not be required to provide any information to the extent that the provision thereof would violate any attorney-client or other privilege (or otherwise constitutes attorney work product) or violate or contravene any law, rule or regulation, or any obligation of confidentiality (not created in contemplation hereof) binding on you, the other Debtors or your or their respective affiliates (provided that if you do not provide information on the foregoing exclusions, you shall use your commercially reasonable efforts to promptly notify the Lead Arrangers that such information is being withheld).

Subject to the foregoing, the Lead Arrangers will manage, with your consent, all aspects of the arrangement and syndication of the DIP Term Loan Facility, including decisions as to when the Lenders will be approached, selection of institutions acceptable to you (including lenders under the Existing Credit Agreement) that will issue commitments to provide financing under the DIP Term Loan Facility, when commitments from such institutions will be accepted and the allocation of the commitments among such additional (or increasing) financial institutions. You hereby acknowledge and agree that the Lead Arrangers will not be subject to any fiduciary or other implied duties.

At the reasonable request of any Lead Arranger, you agree to use commercially reasonable efforts to assist in the preparation of a public version of each Information Material (a "**Public Version**") consisting exclusively of information with respect to you and your affiliates that is either publicly available or does not contain material non-public information (within the meaning of United States federal securities laws) with respect to you and your subsidiaries, or any of your or their respective securities for purposes of United States federal and state securities laws (such information, "**Non-MNPI**", and any information that is not Non-MNPI is referred to as "**MNPI**"). Such Public Versions, together with any other information prepared by you or your subsidiaries or your representatives and conspicuously marked "**Public**" (collectively, the "**Public Information**"), which at a minimum means that the word "**Public**" will appear prominently on the first page of any such information, may be distributed by us to Lenders and prospective Lenders who have advised us that they wish to receive only Non-MNPI ("**Public Side Lenders**"), and you shall be deemed to have authorized the Public Side Lenders to treat such Public Versions and such marked information as containing Non-MNPI. You agree that, unless expressly identified as Public Information, each document to be disseminated by us to any Lender in connection with the Transactions will be deemed to contain MNPI. Notwithstanding the foregoing, you acknowledge and agree that, in addition to Public Information and unless you promptly notify us otherwise after being provided a reasonable amount of time to review such documentation provided by us, (a) the final definitive documentation with respect to the DIP Term Loan Facility, (b) administrative materials prepared by the Lead Arrangers for Lenders and prospective Lenders (such as a lender meeting invitation, allocation and funding and closing memoranda), (c) the court order approving

3

the DIP Term Loan Facility and the other Transactions (the "**Court Order**") and (d) notifications of changes in the terms of the DIP Term Loan Facility be distributed to Public Side Lenders. For the avoidance of doubt, the draw, amount, and use of the Delayed Draw DIP Term Loan Facility shall be subject to the conditions set forth in the Court Order.

In connection with our distribution to Lenders and prospective Lenders of any Information Material, you will execute and deliver to us a customary authorization letter authorizing such distribution and, in the case of any Public Version thereof, representing that it contains only Non-MNPI. Each Information Material will be accompanied by a disclaimer exculpating you and us (in each case, including our respective affiliates) with respect to any use thereof and any use of the related Information Materials by the recipients thereof.

3. Information

You hereby represent and warrant that (a) all written information concerning you or any of your subsidiaries or the Transactions (including all Information Materials), other than the Projections, estimates, forward looking information and information of a general economic or industry specific nature (the "**Information**"), that has been or will be made available to us by you or any of your representatives in connection with the Transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto) and (b) the financial projections (the "**Projections**") in the marketing materials distributed to potential Lenders at the request of you have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time delivered (it being recognized by the Lead Arrangers that such Projections are as to future events and are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurances are given that any particular Projections will be realized, that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and that such differences may be material). You agree that if, at any time prior to the Closing Date, you become aware that any of the representations in the preceding sentence is incorrect in any material respect then you will promptly supplement the Information and the Projections so that such representations and warranties, as supplemented, are correct in all material respects under those circumstances. You understand that in providing our services pursuant to this Engagement Letter we may use and rely on the Information and Projections without independent verification thereof. Notwithstanding anything to the contrary in this Engagement Letter, except to the extent reasonably requested by the Lead Arrangers, you will not be obligated to supplement such Information or the Projections to reflect changes in commodity prices, market heat rates, interest rates, regulatory issues of general applicability, general market conditions or similar assumptions relating to, or impacting, the Debtors' businesses.

4. Fees

In consideration for our execution and delivery of this Engagement Letter, and in consideration for providing the services described herein, you hereby agree to pay (or cause to be paid) the fees described in that certain amended and restated fee letter, dated as of the date hereof (the "**Fee Letter**"), by and among you and the Lead Arrangers, on the terms and subject to the conditions set forth therein.

4

5. Indemnification and Expenses

You agree (a) to indemnify and hold harmless the Lead Arrangers, its affiliates and controlling persons and its and their respective directors, officers, employees, partners, advisors, agents and other representatives (each, an "**indemnified person**") from and against any and all losses incurred, claims, damages, liabilities and expenses (in each case, other than any anticipated and unrealized profits) to which any such indemnified person may become subject arising out of, resulting from or in connection with this Engagement Letter, the Fee Letter, the DIP Term Loan Facility, the use of the proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "**Proceeding**") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person promptly following written demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses (i) to the extent they are found by a final non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of such indemnified person or its affiliates, directors, officers, employees, advisors, agents or other representatives (collectively, the "**Related Parties**"), (ii) to the extent arising from any dispute solely among indemnified persons other than any claims against a Lead Arranger in its capacity or in fulfilling its role as Agent (as applicable) or Lead Arranger or any similar role under the DIP Term Loan Facility and other than any claims arising out of any act or omission on your part or on the part of the other Debtors, and (iii) to the extent they are found by a final non-appealable judgment of a court of competent jurisdiction to arise from any material breach of this Engagement Letter by such indemnified person (or its Related Parties) and (b) to the extent the Closing Date occurs, to reimburse within 30 days of written demand (together with reasonably detailed supporting documentation) (or, if earlier, on the Closing Date to the extent invoiced prior thereto) the Lead Arrangers and its affiliates for all reasonable and documented out-of-pocket expenses that have been invoiced prior to such time or following termination or expiration of the commitments hereunder (including reasonable and documented out-of-pocket due diligence expenses, syndication expenses, travel expenses, reasonable fees and reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel, and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)) incurred in connection with the DIP Term Loan Facility, this Engagement Letter, the Fee Letter, or the administration, amendment, modification or waiver thereof. It is further agreed that the Lead Arrangers shall only have liability to you (as opposed to any other person) arising out of the Transactions. No indemnified person or party hereto shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of such person (or any of its Related Parties); provided that nothing in this sentence shall limit your indemnification and reimbursement obligations set forth herein to the extent any such damages are incurred or paid by an indemnified person to a third party unaffiliated with the Lead Arrangers with respect to which the applicable indemnified person is entitled to indemnification or reimbursement pursuant to this Section. None of the indemnified persons, you, your affiliates and the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Engagement Letter, the DIP Term Loan Facility or the Transactions; provided that nothing in this sentence shall limit your indemnification and reimbursement obligations set forth herein to the extent any such indirect, special, punitive or consequential damages are included in any third party claim with respect to which the applicable indemnified person is entitled to indemnification or reimbursement pursuant to this Section.

5

6. <u>Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities</u>

You acknowledge that each Lead Arranger (or an affiliate thereof) is a full service securities firm and such person may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, or your affiliates (subject, in each case, to the terms and conditions of any other applicable agreements in effect between you and us (or our affiliates) applicable to the Transactions, which other applicable agreements remain in full force and effect in accordance with their terms).

You also acknowledge that the Lead Arrangers and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Lead Arrangers or any of their respective affiliates is intended to be or has been created in respect of any of the transactions contemplated by this Engagement Letter, irrespective of whether the Lead Arrangers has advised or is advising you on other matters, (b) the Lead Arrangers, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Lead Arrangers, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Engagement Letter, (d) you have been advised that the Lead Arrangers are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Lead Arrangers have no obligation to disclose such interests and transactions to you (provided, however, that we will be subject to the provisions applicable to us set forth in the preceding paragraph), (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) the Lead Arrangers have been, is and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity, and (g) the Lead Arrangers have no obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by the Lead Arrangers and you or any such affiliate.

In addition, please note that none of the Lead Arrangers provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, the Company (and each employee, representative or other agent of the Company) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the DIP Term Loan Facility and all materials of any kind (including opinions or other tax analyses) that are provided to the Company relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure will remain subject to the confidentiality provisions hereof (and the foregoing sentence will not apply) to the extent reasonably necessary to enable the parties hereto, their respective affiliates, and their respective affiliates' directors and employees to comply with applicable securities laws. For this purpose, "tax treatment" means U.S. federal or state income tax treatment, and "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the transactions contemplated by this Engagement Letter, but does not include information relating to the identity of the parties hereto or any of their respective affiliates.

7. <u>Confidentiality</u>

The Lead Arrangers shall use all confidential information received by it in connection with the Transactions and the related transactions solely for the purposes of providing the services that are the subject of this Engagement Letter and shall treat confidentially all such information; *provided, however,*

6

that nothing herein shall prevent the Lead Arrangers from disclosing any such information (a) to rating agencies (provided that as to rating agencies, we will disclose information acting only through you and with your prior agreement), (b) to any Lenders or participants or prospective Lenders or participants that agree in writing, for the benefit of the Company, to keep such information confidential on terms reasonably acceptable to the Company or substantially similar to the terms set forth herein (including pursuant to customary "click through" or similar electronic agreements), (c) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case the Lead Arrangers shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over the Lead Arrangers or any of its affiliates, (e) to the Lead Arrangers' affiliates and the Lead Arrangers' and their affiliates' respective employees, officers, directors, legal counsel, independent auditors, professionals and other experts or agents (collectively, "**Representatives**") on a "need to know" basis (provided that any such Representative or affiliate, is advised of its obligation to retain such information as confidential, and the Lead Arrangers shall be responsible for their Representatives' and affiliates' compliance with this paragraph), in each such case solely in connection with the Transactions, (f) to the extent any such information becomes publicly available other than by reason of disclosure by the Lead Arranger's affiliates or Representatives in breach of this Engagement Letter or any other confidentiality or fiduciary obligations owed to you or your affiliates, and (g) to the extent such information is independently developed by the Lead Arrangers, their respective affiliates or their Representatives so long as not based on information obtained in a manner that would otherwise violate this provision; *provided* that the disclosure of any such information to any Lender or prospective Lender or participant or prospective participant referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of the Lead Arrangers or customary market standards for dissemination of such type of information. Notwithstanding anything to the contrary in this Engagement Letter, under no circumstance will we or our affiliates disclose any confidential information to a Disqualified Institution (as defined in the Existing Credit Agreement) (except pursuant to clause (c) above (to the extent required pursuant to such legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations)). The obligations of the Lead Arrangers under this paragraph shall remain in effect until the earlier of (i) two years from the date hereof and (ii) the Closing Date, at which point any confidentiality undertaking in the definitive documentation of the DIP Term Loan Facility (the "**Loan Documents**") shall supersede the provisions of this paragraph.

8. Miscellaneous

This Engagement Letter shall not be assignable by you without the prior written consent of the Lead Arrangers (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein. Each of the Lead Arrangers reserves the right to employ the services of its affiliates (other than certain units of affiliates (such units, "**Trading Affiliates**") providing any commodities, hedge or derivatives trading or brokerage activities conducted, advised, agented or brokered by us or our respective affiliates) in providing services contemplated hereby and to allocate, in whole or in part, to its affiliates (other than Trading Affiliates) certain fees payable to the Lead Arranger in such manner as the Lead Arranger and its affiliates (other than Trading Affiliates) may agree in its sole discretion. This Engagement Letter may not be amended or waived except by an instrument in writing signed by you and the Lead Arrangers. The Lead Arrangers' engagement hereunder may be terminated by the Company in writing at any time.

This Engagement Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Engagement Letter by facsimile or electronic transmission (e.g., "**pdf**" or "**tif**") shall be effective as delivery of an original executed counterpart hereof. This Engagement Letter is the only agreement that has been entered into among us and you with respect to the Transactions and sets forth the entire understanding of the parties with respect thereto.

This Engagement Letter shall be governed by, and construed and interpreted in accordance with, the law of the State of New York. Each of the parties hereto agrees that as of the date hereof, this Engagement Letter is the only agreement that has been entered into among you and us with respect to the Transactions and sets forth the entire understanding of the parties with respect thereto.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court and, to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Engagement Letter or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive (to the extent permitted by applicable law) any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive (to the extent permitted by applicable law) trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Engagement Letter or the performance of services hereunder or thereunder.

The Lead Arrangers hereby notify you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**PATRIOT Act**"), it and each Lender may be required to obtain, verify and record information that identifies each Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow the Lead Arrangers or such Lender to identify each Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Lead Arrangers and each Lender.

The indemnification, jurisdiction, waiver of jury trial, service of process, venue, governing law, sharing of information, no agency or fiduciary duty and your confidentiality provisions contained herein shall remain in full force and effect regardless of whether definitive documentation for the DIP Term Loan Facility shall be executed and delivered and notwithstanding the termination of this Engagement Letter or the commitments hereunder; *provided* that your obligations under this Engagement Letter (other than your obligations with respect to (a) Sections 3 and 4 hereof and (b) confidentiality of this Engagement Letter and the contents hereof and thereof subject to Section 7 hereof) shall automatically terminate and be superseded by the provisions of the Loan Documents upon the Closing Date, and you shall automatically be released from all liability in connection therewith at such time, in each case to the extent the Loan Documents have comparable provisions with comparable coverage.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Engagement Letter by returning to us executed counterparts of this Engagement Letter on or before 11:59 p.m. (New York City time) on June 22, 2017. If not signed and returned as described in the preceding sentence by such date, this offer will terminate on such date. In the event that (a) the Company shall not have filed a motion with the Bankruptcy Court in form and substance reasonably satisfactory to

8

the Lead Arrangers, for the entry of the Court Order on or prior to June 5, 2017, (b) the Bankruptcy Court shall not have entered the Court Order (in form and substance reasonably satisfactory to the Lead Arrangers), on or prior to June 26, 2017 (or June 30, 2017 if the Bankruptcy Court has not entered the Court Order by June 26, 2017 after use of commercially reasonable efforts by the Company to obtain such Court Order by June 26, 2017), (c) the Court Order shall have been amended, supplemented, waived or otherwise modified in a manner that is, in the aggregate, materially adverse to the interests of the Lead Arrangers unless the Lead Arrangers consent in writing, (d) after the date hereof but prior to the entry of the Court Order, the Company shall have knowingly and actively solicited commitments for an alternative financing that would be provided in lieu of the Transaction, (e) the bankruptcy case with respect to the Company is converted to a proceeding under Chapter 7 of the Bankruptcy Code or (f) a trustee or examiner with enlarged powers (having powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) is appointed with respect to the Company and substantially all of its respective properties, then this Engagement Letter shall automatically terminate upon the occurrence of such event unless we shall, in our sole discretion, agree to an extension.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

We are pleased to have been given the opportunity to assist you in connection with this matter.

Very truly yours,

**CITIGROUP GLOBAL MARKETS INC.**


By: _____
Name:
Title:

**MORGAN STANLEY SENIOR FUNDING, INC.**

By: _____
Name:
Title:

*Signature Page to 2nd A&R Engagement Letter*
*(Energy Future Intermediate Holding Company LLC)*

**BARCLAYS BANK PLC**

By: _____
Name:
Title:

*Signature Page to 2nd A&R Engagement Letter*
*(Energy Future Intermediate Holding Company LLC)*

**ROYAL BANK OF CANADA**

By: _____
    Name:
    Title:

Accepted and agreed to as of the date first written above:

**ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC**


By: _____
    Name:
    Title:

*Signature Page to 2nd A&R Engagement Letter
(Energy Future Intermediate Holding Company LLC)*