## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline:  July 24, 2017 at 4:00 p.m.** |
| | **Hearing: August 10, 2017 at 10:00 a.m.** |

## MOTION OF THE EFH/EFIH DEBTORS FOR ORDER AUTHORIZING
## ENTRY INTO MERGER AGREEMENT AND APPROVING TERMINATION FEE

Energy Future Holdings Corp. ("<u>EFH Corp.</u>"), certain of its direct and indirect subsidiaries (together with EFH Corp., the "<u>EFH Debtors</u>"),[2] Energy Future Intermediate Holding Company LLC ("<u>EFIH</u>"), and EFIH Finance, Inc. (together with EFIH, the "<u>EFIH Debtors</u>," and together with the EFH Debtors, the "<u>E-Side Debtors</u>") file this motion (this "<u>Motion</u>") seeking entry of an order, substantially in the form attached as **Exhibit A** (the "<u>Approval Order</u>"):  (a) authorizing the E-Side Debtors to enter into the Agreement and Plan of

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the Debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]    The other EFH Debtors are Ebasco Services of Canada Limited, EEC Holdings, Inc., EECI, Inc., EFH Australia (No. 2) Holdings Company, EFH Finance (No. 2) Holdings Company, EFH FS Holdings Company, EFH Renewables Company LLC, Generation Development Company LLC, LSGT Gas Company LLC, LSGT SACROC, Inc., NCA Development Company LLC, and TXU Receivables Company.

Capitalized terms used but not defined herein shall have the meanings ascribed in the *Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>BHE Plan</u>") filed contemporaneously herewith.

Merger, attached as **Exhibit 1** to **Exhibit A** (the "Merger Agreement"), with Berkshire Hathaway Energy Company ("BHE") and (b) approving the payment of a termination fee to BHE (the "Termination Fee") as an allowed administrative expense claim payable if and when due without further order of the Court.

In support of this Motion, the E-Side Debtors file (a) the *Declaration of Paul Keglevic in Support of the Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* and (b) the *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee*, both filed contemporaneously herewith.  In further support of this Motion, the E-Side Debtors respectfully state as follows.

### Preliminary Statement

1.      The Merger Agreement is the basis for a value-maximizing transaction that brings billions of dollars into the estates and provides the greatest amount of certainty regarding the E-Side Debtors' emergence from chapter 11.  Specifically, BHE will acquire EFH Corp. via a three-tier merger with an expected all-cash infusion of approximately $9 billion into the estates (the "Transaction").[3]  As a result, the E-Side Debtors project that, assuming an emergence date of December 31, 2017, outstanding EFIH secured debt and administrative expense claims will be

---

[3]    BHE and the E-Side Debtors believe the proposed transactions will be consummated entirely with cash on hand at EFH and EFIH and a cash infusion from BHE.  However, the Merger Agreement contains provisions that contemplate adjustments to the form of consideration if the IRS indicates that adjustments are necessary to obtain the supplemental tax rulings that are contemplated by the Merger Agreement.

repaid in full, EFIH unsecured claims will receive a recovery, and creditors of EFH Corp. will receive the value of EFH Corp. cash on hand as of the effective date of the proposed BHE Plan.[4]

2.      The E-Side Debtors entered into the Transaction based on their multi-year experience of marketing their economic interest in Oncor Electric Delivery Company LLC ("Oncor")—both informally and via a multi-stage, Court-supervised process.  Since 2014, virtually every alternative has been considered and attempted, including a standalone equitization (in connection with the original restructuring support agreement), a REIT restructuring (in connection with the Hunt-led plan), and, most recently, a merger with a leading utility company, NextEra Energy, Inc. ("NextEra").

3.      The E-Side Debtors determined it was in the best interests of their estates to terminate the merger agreement with NextEra (the "NEE Merger Agreement") after (a) the Public Utility Commission of Texas ("PUCT") denied approval of the deal and two motions for rehearing and (b) months of evaluating potential alternatives (consistent with the NEE Merger Agreement).

4.      The E-Side Debtors also determined that the Transaction represents the highest and best proposal to restructure their balance sheets, maximize creditor recoveries, and exit from bankruptcy.  Critically, Oncor, BHE, PUCT staff, and certain interveners have reached agreement on a set of regulatory commitments, which are generally consistent with the current Oncor ring-fence and should facilitate a more consensual PUCT approval process.

---

[4]   Recoveries will depend on, among other things, whether the termination fee under the NEE Merger Agreement is due and, if so, its allocation between the EFH and EFIH estates, as well as on any other allocations or agreements between EFH and EFIH.

The E-Side Debtors paid down outstanding EFIH first lien debt from the proceeds of the refinanced EFIH first lien DIP facility approved by the Court on June 26, 2017 [D.I. 11388].

5.     The Transaction has no financing contingency and collectively provides billions of dollars in cash backed by the commitment of BHE, one of America's most prominent and well-regarded utility holdings companies.  BHE is well-suited to acquire the economic interest in Oncor:  BHE reported more than $4.2 billion in operating income in 2016, nearly 90 percent from its investment-grade, rate-regulated businesses.

6.     The Transaction is also designed to honor the prior commitments of the E-Side Debtors in connection with the tax-efficient separation of the T-Side Debtors (other than TCEH and EFCH), as required under the terms of Tax Matters Agreement.[5]  Furthermore, the Transaction contemplates similar treatment for certain EFH creditor constituencies as in the NextEra deal, including a complete preservation of the EFH/EFIH Committee Settlement (including the reinstatement of asbestos claims and preserving the turnover of a portion of proceeds from the TCEH Settlement Claim to certain other classes of claims against the EFH Debtors) [D.I. 7143].[6]

7.     Under the Merger Agreement, the E-Side Debtors would be liable for a Termination Fee, in the amount of $270 million, if certain termination events occurred thereunder.  The Termination Fee, however, would not be payable under certain circumstances summarized more fully in paragraph 39, including if the PUCT issued a final, non-appealable order permanently restraining, enjoining, rendering illegal or otherwise prohibiting, directly or indirectly, the Transactions.

---

[5]    The "T-Side Debtors" refers to Energy Future Competitive Holdings Company LLC, Texas Competitive Electric Holdings Company LLC ("TCEH"), and TCEH's direct and indirect debtor subsidiaries.

[6]    Although no creditor constituency has announced its affirmative support for the Transaction, the E-Side Debtors will work to develop consensus wherever possible as they have throughout these cases.

8.      Given the value of the consideration provided, the firmness of the financial commitment from BHE, and the progress already made with the PUCT staff and certain interveners, the Transaction is the clear choice for the E-Side Debtors to pursue at this time. Thus, the E-Side Debtors respectfully submit that entry into the Merger Agreement is a sound exercise of their business judgment and request that the Court approve the Motion.

### Jurisdiction, Venue, and Procedural Background

9.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

10.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the E-Side Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The bases for the relief requested in this Motion are sections 105, 363(b), and 503(b), 507(a)(2), and 1125 of title 11 of the United States Code (the "Bankruptcy Code") and rule 9006 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

13.     On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to

5

sections 1107(a) and 1108 of the Bankruptcy Code.  Further information regarding the Debtors'

business operations and capital structure is set forth in the declaration of Paul Keglevic in

support of the Debtors' first day motions [D.I. 98].

**Relief Requested**

14.     By this Motion, the E-Side Debtors respectfully request that the Court enter the

Approval Order, substantially in the form attached as **Exhibit A**, authorizing entry into the

Merger Agreement and approving the Termination Fee as an allowed administrative expense

claim payable if and when due without further order of the Court.

**Background**

15.     The E-Side Debtors' indirect economic interest in Oncor has undergone an

extensive formal and informal marketing process for more than three years.

**I.      Formal Two-Stage Marketing of the E-Side Debtors' Interest in Oncor.**

16.     In January 2015, the Court approved bidding procedures governing a formal, two-

stage marketing process for Oncor.  Over the next six months, the Debtors aggressively marketed

that interest to a wide range of potential bidders through the Court-approved process.

Throughout, the Debtors consulted with the conflicts matters advisors and the advisors to the E-

Side and T-Side creditors' committees, including on twice-weekly standing update calls.

17.     After entry of the bidding procedures order, the Debtors and their advisors

circulated a process letter to 50-plus potential strategic and financial bidders.  The process letter

explained the opportunity to bid and invited potential bidders to participate.  Twenty-eight

potential bidders requested and received nondisclosure agreements, and 17 signed them, gaining

access to an extensive electronic data room maintained by the Debtors.  Over the following

6

weeks, potential bidders held diligence calls and meetings with the Debtors' advisors, and a number of the most interested bidders met with Oncor management.

18.     The Debtors received two first round bids and two second round bids from third-party bidders (i.e., non-creditors).  The Debtors negotiated value and key terms with these bidders over several months.  After receiving second round bids, the Debtors simultaneously negotiated definitive documentation for two third-party bids while continuing to advance plan discussions with creditor constituencies.  Ultimately, both remaining third-party acquisition proposals dissipated.  Toward the end of June 2015, the Debtors determined that the Oncor bidding process had not yielded a sufficiently high offer to justify selecting a stalking horse. Accordingly, the Debtors declined to do so and instead shifted their focus to the ongoing plan negotiations.

## II.     The Hunt Plan.

19.     One of the third-party bids received through the Court-approved marketing process was submitted by Hunt Consolidated, Inc. and certain co-investors (collectively, the "Hunt Group").  After the formal Oncor marketing process terminated, ad hoc groups of TCEH creditors submitted a compromise proposal that contemplated a Hunt Group-sponsored merger with reorganized EFH Corp. (the "Hunt Merger"), in which EFH Corp. would convert to a real estate investment trust.  The proposal from the TCEH creditors also contemplated a global settlement of ongoing disputes, lien challenges, and legacy litigation.

20.     In August 2015, the Debtors, the Hunt Group, and various TCEH creditor parties entered into a plan support agreement contemplating the Hunt Merger (the "Hunt PSA").  The Hunt PSA includes provisions governing an alternative restructuring that remain in effect even after the primary plan support obligations terminate (the "Alternative Restructuring").  The Court

7

approved the Debtors' entry into the Hunt PSA on September 18, 2015, and confirmed the plan

of reorganization authorizing the Hunt Merger (the "Original Confirmed Plan") on December 9,

2015 [D.I. 6097, 7285].

21.     Under the Hunt PSA, the parties' obligations to support the Original Confirmed

Plan could terminate under certain circumstances on April 30, 2016 unless regulatory approvals

from the PUCT were obtained.  On March 24, 2016, the PUCT entered an order that contained

certain commitments for Oncor that the Hunt Group deemed unacceptable.  Accordingly, on

April 30, 2016, certain members of the Hunt Group as parties to the Hunt PSA indicated that

they would not elect to extend the date for regulatory approvals.  As a result, on May 1, 2016, the

ad hoc group of TCEH first lien creditors delivered a plan support termination notice to the

parties to the Hunt PSA, which caused the Original Confirmed Plan to be null and void.  Shortly

thereafter, the Debtors terminated the merger agreement related to the Hunt Merger.

22.     Importantly, while this termination event terminated the parties' obligations to

support the Original Confirmed Plan, it did not terminate the Hunt PSA.  The Alternative

Restructuring provisions of the Hunt PSA, which generally restrict certain TCEH junior creditors

from objecting to an alternative plan that meets certain requirements, remain in effect.

III.    The NextEra Plan.

23.     After the termination of the Original Confirmed Plan, the Debtors immediately

began implementing their contingency plans.  On the T-Side, the core framework for a

restructuring had been established and largely agreed upon by key stakeholders via the

Alternative Restructuring provisions of the Hunt PSA.  Accordingly, last summer, the

confirmation processes for the T-Side Debtors and E-Side Debtors diverged.  On August 29,

2016, the Court confirmed a plan in which TCEH was spun-off in a largely tax-free manner to

8

the TCEH first lien creditors with a $550 million cash recovery to TCEH junior creditors, as contemplated by the Alternative Restructuring provisions under the Hunt PSA.  On October 3, 2016, the Plan went effective as to the T-Side Debtors.

24.     Last spring, the E-Side Debtors restarted negotiations with creditors regarding a potential standalone plan in which reorganized EFH Corp. equity would be allocated among existing creditors.  To that end, the E-Side Debtors submitted a standalone plan proposal to the advisors of various creditors at the end of April 2016.  After years of such negotiations, however, the E-Side Debtors were aware of the distinct challenges associated with causing EFH Corp. and EFIH creditors to agree to allocations of reorganized EFH Corp. equity.  Among other challenges, it may not be possible to compel the E-Side Debtors' prepetition secured lenders to accept equity on account of their secured claims.

25.     Informed by that experience, the E-Side Debtors also refreshed the Oncor marketing process.  The E-Side Debtors contacted 18 potential strategic and financial bidders, most of whom were parties that previously showed interest in the asset, and sent process letters to 15 of them.  Of those parties, eight parties signed nondisclosure agreements and obtained access to an updated electronic data room.

26.     At the time, NextEra, which had a longstanding interest in acquiring the Debtors' economic interest in Oncor, was the most engaged.  NextEra and two other bidders engaged in negotiations with the E-Side Debtors.  Negotiations progressed to documentation with NextEra and one other party—BHE.  Throughout the negotiations, the E-Side Debtors sought to use the multiple-bidder dynamic to obtain the highest and otherwise best terms and conditions, particularly on the overall value of the bids.

9

27.     On July 28, 2016, after three months of intensive, multiparty negotiations, the boards of directors and managers of EFH Corp. and EFIH approved the execution of the NEE Merger Agreement and a plan support agreement with NextEra (the "NEE PSA").  The Debtors filed an amended plan of reorganization contemplating the NextEra deal (the "NEE Plan"), which the Court confirmed on February 17, 2017 [D.I. 10859].

28.     A condition precedent to consummation of the NEE Plan (and the transactions contemplated thereby) included PUCT approval of Oncor's and NextEra's joint application regarding the NEE Merger Agreement.  On April 13, 2017, the PUCT issued an order denying the joint application of Oncor and NextEra for the change of control of Oncor.  On May 8, 2017, NextEra filed a motion for rehearing with the PUCT, and the E-Side Debtors submitted an amicus brief in support of that motion.  On June 7, 2017, the PUCT issued a revised order that contained primarily technical updates to its April 13 order, but still denied the joint application. NextEra filed a second motion for rehearing with the PUCT on June 27, 2017, and the E-Side Debtors filed a second amicus brief in support.  The PUCT denied NextEra's second motion for rehearing on June 29, 2017.

## IV.     Recent Developments and the BHE Plan.

29.     Following the April 13, 2017 order from the PUCT—and consistent with the terms of the NEE Merger Agreement and NEE PSA—the E-Side Debtors engaged in discussions with a variety of parties regarding a potential "backup" to the NEE Plan.

30.     After signing a confidentiality agreement on May 17, 2017, the E-Side Debtors had discussions with Elliott Management Corporation as advisor to certain funds (together, "Elliott"), the largest EFIH creditor regarding a potential equitization plan.  Despite the parties'

10

best efforts, there remain significant open issues in Elliott's latest proposal, and the discussions have not yielded an actionable proposal.

31.     The E-Side Debtors also received a proposal from BHE on June 23, 2017 that largely preserved the structure of the NEE Plan.  BHE owns a portfolio of locally managed businesses that share a vision for a secure energy future, make sustainable investments to achieve that vision, and had $85 billion of assets as of December 31, 2016.  These businesses deliver affordable, safe, and reliable service each day to more than 11.6 million electric and gas customers and end-users around the world and consistently rank high among energy companies in customer satisfaction.  BHE is headquartered in Des Moines, Iowa. Additional company information is available at www.berkshirehathawayenergyco.com.

32.     On July 6, 2017, following intensive negotiations, the boards of directors and managers of EFH Corp. and EFIH determined that it was in the best interests of their stakeholders to (a) terminate the NEE Merger Agreement and (b) approve the execution of the Merger Agreement with BHE.  Contemporaneously herewith, the E-Side Debtors filed the BHE Plan, which reflects the transactions contemplated by the Merger Agreement.

33.     The E-Side Debtors are hopeful that the Transaction will facilitate the development of consensus with Elliott and the other creditor constituencies, with whom the E-Side Debtors have provided periodic updates regarding the back-up plan discussions (subject to applicable confidentiality agreements).

11

V.      **Summary of the Merger Agreement.**[7]

34.     The Merger Agreement contemplates a transaction in which reorganized EFH Corp. would survive as a wholly-owned subsidiary of BHE, and the successor by merger to reorganized EFIH (which would be merged into a subsidiary of reorganized EFH Corp.) would survive as an indirect subsidiary of BHE.  Based on BHE's contribution of approximately $9 billion—which is expected to be all cash—the deal reflects an approximate $18.1 billion implied total enterprise value for the 80% of Oncor owned by EFIH.

35.     Under the BHE Plan, the cash portion of the contribution will be distributed first to pay EFIH administrative claims and outstanding secured indebtedness and then to EFIH unsecured creditors together with remaining cash on hand at EFIH.  As a result, the E-Side Debtors project that—assuming, among other things, a December 31, 2017 emergence—(a) EFIH secured debt and administrative expense claims will be repaid in full (consistent with the makewhole-related settlements and pay-off of the outstanding EFIH debtor-in-possession facilities), (b) EFIH unsecured claims will receive a recovery, and (c) creditors of EFH Corp. will receive a recovery based, in part, on the adjusted estimated cash on hand at EFH Corp. Recoveries will depend on, among other things, whether the termination fee under the NEE Merger Agreement is due and, if so, its allocation between the EFH and EFIH estates, as well as on any other allocations or agreements between EFH and EFIH.

A.      **Terms and Conditions of Merger Agreement.**

---

[7]   Capitalized terms that are not defined in the table below shall have the meanings ascribed to them in the Merger Agreement. The descriptions of the Merger Agreement in this Motion are intended only as a summary of certain provisions thereof and are qualified in their entirety by the Merger Agreement attached as **Exhibit 1** to **Exhibit A**.

36.    The following table highlights certain material provisions of the Merger Agreement.

| Provision | Summary of Provision |
|---|---|
| **Representations and Warranties of the Debtor Parties** | The Merger Agreement contains customary representations and warranties of EFH Corp. and EFIH. (Merger Agmt., § 5.1) |
| **Representations and Warranties of BHE** | The Merger Agreement contains customary representations and warranties of BHE. (Merger Agmt., § 5.2) |
| **Covenants of the Debtor Parties** | The E-Side Debtors covenant, subject to certain exceptions, to perform the following acts, among others:<br>• refrain from soliciting, negotiating, or entering into any Alternative Proposal, except with respect to certain pre-existing bidders or in the case of an unsolicited, written proposal which would reasonably be expected to lead to a Superior Proposal (as defined in Merger Agreement § 6.2); and<br>• pursue and cooperate with BHE in pursuing all necessary regulatory and IRS approvals. (Merger Agmt., Art. 6) |
| **Covenants of BHE** | BHE covenants, subject to certain exceptions, to perform the following acts, among others:<br>• pursue and cooperate with the Debtors in pursuing all necessary regulatory and IRS approvals; and<br>• if the transactions close, reorganized EFH Corp. shall indemnify each present and former director, manager, member, and officer of the Debtors. (Merger Agmt., Art. 6) |
| **Mutual Conditions** | The E-Side Debtors' and BHE's obligations to effect the Closing are subject to the following conditions, among others:<br>• the Court shall have entered final orders approving the Merger Agreement, including the Termination Fee, and the BHE Plan;<br>• no court or other Governmental Entity shall have enacted, issued, promulgated, enforced or entered any Law or order (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins, renders illegal or otherwise prohibits consummation of the Closing Date Transactions;<br>• the tax opinion of Kirkland & Ellis LLP obtained by EFH Corp. on October 3, 2016 to the effect that the Reorganized TCEH Contributions, Reorganized TCEH Conversion and Reorganized TCEH Spin-Off meet the requirements of Sections 368(a)(1)(G), 355 and 356 of the Internal Revenue Code shall not have been revoked, rescinded, or modified in any respect (except as consented to in writing by BHE);<br>• assuming the Closing Date Transactions are consummated, neither EFH Corp. nor any of its Subsidiaries (other than the Oncor Entities) will have any indebtedness for borrowed money immediately following the Effective Time and all Claims except Legacy Claims and certain property tax Claims will no longer be obligations of the Debtors;<br>• the Initial Private Letter Ruling shall remain in full force and effect and shall not have been revoked, withdrawn, or amended and the Supplemental Rulings shall have been obtained by the Company from the IRS in a form reasonably satisfactory to BHE; and<br>• the shares of Parent stock that may be issuable pursuant to Section 1.8 of the |

13

| Provision | Summary of Provision |
|---|---|
| | Merger Agreement shall be freely saleable and not subject to any resale restrictions except to the extent such restrictions are due to the status of the holder thereof, and shall be issuable either pursuant to (i) the exemption from the registration requirements of the Securities Act and from applicable state securities laws provided by Section 1145 of the Bankruptcy Code or (ii) a Form S-4, or other registration statement, as applicable, that shall have become and continue to be effective under the Securities Act and shall not be the subject of any stop order or proceedings seeking a stop order, and Parent shall have received the state securities or "blue sky" authorizations necessary for the issuance of the shares of Parent stock. (Merger Agmt., § 7.1) |
| **Conditions to BHE's Obligations** | BHE's obligations to effect the Closing are subject to the following conditions, among others: <ul><li>the representations and warranties of the Debtors shall be true and correct (subject to certain customary materiality thresholds);</li><li>the representations and warranties of Oncor and Oncor Holdings in the Oncor Letter Agreement shall be true and correct;</li><li>the Debtors shall have performed in all material respects all obligations required to be performed by it under the Merger Agreement at or prior to the Closing;</li><li>Oncor and Oncor Holdings shall have performed in all material respects all obligations required to be performed by it under the Oncor Letter Agreement at or prior to the Closing;</li><li>the FERC Approval, the FCC Approval, the PUCT Approval and the Vermont Insurance Approval shall have been obtained and shall remain in full force and effect and the applicable waiting period under the HSR Act shall have expired or been terminated, and no such consent or approval shall, individually or in the aggregate, impose a Burdensome Condition;</li><li>the Debtors shall have received the tax opinion specified in section 7.3(c) of the Merger Agreement;</li><li>BHE shall have received an opinion of Gibson, Dunn & Crutcher LLP, dated as of the Closing Date, wherein the party providing the opinion opines to the Fundamental Opinions listed in Exhibit I to the Merger Agreement;</li><li>the TTI Minority Interest Acquisition shall have occurred or the Bankruptcy Court shall have entered an order to the effect that the Drag-Along Rights are valid and enforceable with respect to TTI in connection with the transactions contemplated by the Merger Agreement and that EFH is entitled to enforce the Drag-Along Rights if the total payments TTI receives in connection with the proposal to buy TTI's Minority Interest satisfy the IRR Hurdle; *provided, however*, that nothing in this condition requires that the Bankruptcy Court issue an order finding that the total payments TTI receives in connection with the transactions contemplated hereby in fact satisfy the IRR Hurdle;</li><li>the Bankruptcy Court shall have confirmed the Plan and made findings that (i) the Plan and Merger Agreement satisfy, among other things, section 1129(a)(4) and section 1129(a)(5) of the Bankruptcy Code; (ii) BHE is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protections afforded to good faith purchasers to the fullest extent permitted under the Bankruptcy Code; and (iii) the purchase price was not controlled by any agreement between BHE and any potential bidders and was not reduced or suppressed in any manner by any agreement or arrangement involving Parent and any creditor;</li><li>any third party consents and approvals necessary in connection with the</li></ul> |

14

| Provision | Summary of Provision |
|---|---|
| | consummation of the transactions contemplated by the Merger Agreement shall have been obtained and shall remain in full force and effect; <br>• except as agreed by BHE, EFH Corp. and its subsidiaries shall have no employees other than employees of the Oncor entities, and shall not be responsible for any liabilities or obligations owed to any pre-transaction employee of EFH Corp. or its subsidiaries (other than the Oncor entities); <br>• EFH Corp.'s ownership structure with respect to its subsidiaries shall be as disclosed in Section 7.2(j) of the Company Disclosure Letter; <br>• the facts presented and the representations made in the IRS Submissions are true, correct, and completed in all material respects; <br>• except as contemplated by the BHE Plan, no Debtor shall have taken any action that results in an ownership change of EFH Corp. within the meaning of Section 382(g) of the Internal Revenue Code and Texas Energy Future Holdings Limited Partnership shall not have taken any action that results in an ownership change of EFH Corp. within the meaning of Section 382(g) of the Internal Revenue Code or knowingly permitted any person (other than Texas Energy Future Holdings Limited Partnership) to own 50% or more of the equity interests in EFH Corp. during the three-year period prior to Closing or changed EFH Corp.'s taxable year to be other than the calendar year; <br>• except for matters set forth in the Company Disclosure Letter, no Company Material Adverse Effect shall have occurred and be continuing as of the Closing Date; <br>• the Split Participant Agreement shall be in full force and effect and shall not have been amended, modified or supplemented without the consent of BHE; <br>• the Transition Services Agreement shall be in full force and effect and shall not have been amended, modified or supplemented without the consent of Parent; <br>• the Separation Agreement shall be in full force and effect and shall not have been amended, modified or supplemented without the consent of BHE; and <br>• the Tax Matters Agreement shall be in full force and effect and shall not have been amended, modified or supplemented without the consent of BHE. (Merger Agmt., § 7.2) |
| **Conditions to the Debtor Parties' Obligations** | The E-Side Debtors' obligations to effect the Closing are subject to the following conditions, among others: <br>• the representations and warranties of BHE shall be true and correct (subject to certain customary materiality thresholds); <br>• BHE shall have performed in all material respects all obligations required to be performed by it under the Merger Agreement at or prior to the Closing; <br>• unless waived by BHE, EFH Corp. shall have received an opinion of Kirkland & Ellis LLP or, under certain circumstances, Cravath Swaine & Moore LLP, on the basis of the representations and warranties set forth or referred to in such opinion, dated as of the Closing Date, wherein the party providing the opinion opines to the Fundamental Opinions listed in Exhibit I to the Merger Agreement; and <br>• any and all governmental consents and approvals shall have been obtained and shall remain in full force and effect and the applicable waiting period under the HSR Act shall have expired or been terminated. (Merger Agmt., § 7.3) |
| **Mutual Termination** | The E-Side Debtors and BHE may mutually agree in writing to terminate the Merger Agreement any time before the Closing.  (Merger Agmt., § 8.1) |

15

| Provision | Summary of Provision |
|---|---|
| | Either the E-Side Debtors or BHE may terminate the Merger Agreement any time before the Closing if:<br>(i) the Closing has not been consummated within two hundred forty (240) days of the date of the Merger Agreement, *provided* that such date shall be extended for ninety (90) days if as of such date any of the FERC Approval, the PUCT Approval or the Supplemental Rulings (if applicable) shall not have been obtained (and such approval or Supplemental Rulings are still capable of being obtained within ninety (90) days); or<br>(ii) if any order of any court or other Governmental Entity permanently restraining, enjoining, rendering illegal or otherwise prohibiting, directly or indirectly, consummation of the Closing Date Transactions shall have become final and non-appealable. (Merger Agmt., § 8.2) |
| **Termination by the Debtor Parties** | The E-Side Debtors may terminate the Merger Agreement at any time before Closing if:<br>• BHE breaches any representation, warranty, covenant, or agreement in the Merger Agreement such that a certain condition to the Debtors' obligation to consummate the Closing would fail, and the breach cannot be or is not cured within thirty (30) days;<br>• BHE fails to consummate the Closing in breach of the Merger Agreement;<br>• the Bankruptcy Court confirms a plan of reorganization that is not proposed or supported by the Debtors;<br>• the Debtors' chapter 11 cases are dismissed or converted to chapter 7 and the dismissal or conversion does not contemplate the Closing Date Transactions; or<br>• prior to confirmation of the Plan, the board of EFH Corp. or EFIH determines in its sole discretion, after consultation with independent financial advisors and outside legal counsel and based on advice of such counsel, that the failure to terminate the Merger Agreement is inconsistent with its fiduciary duties, *provided* that a material breach of EFH Corp.'s or EFIH's obligations under Section 6.2 of the Merger Agreement has not provided the basis for such determination. (Merger Agmt., § 8.3) |
| **Termination by BHE** | BHE may terminate the Merger Agreement at any time before Closing if:<br>• the Debtors breach any representation, warranty, covenant, or agreement in the Merger Agreement such that a certain condition to the Debtors' obligation to consummate the Closing would fail, and the breach cannot be or is not cured within thirty (30) days;<br>• Oncor or Oncor Holdings breaches any representation, warranty, covenant, or agreement in the Oncor Letter Agreement such that a certain condition to the Oncor's or Oncor Holdings' obligation to consummate the Closing would fail, and the breach cannot be or is not cured within thirty (30) days;<br>• the Debtors fail to consummate the Closing in breach of the Merger Agreement;<br>• the Debtors file or expressly support a plan of reorganization that is inconsistent with the Merger Agreement and the Amended Plan and such inconsistency cannot be cured within thirty (30) business days after the Debtors' receipt of written notice from BHE;<br>• the Bankruptcy Court enters an order, or the Debtors file a motion seeking an order, approving any sale or other disposition of (i) any material portion of the assets of the Debtors or their Subsidiaries or (ii) any equity interests in EFIH or any of its Subsidiaries (including the Oncor Entities), to anyone |

16

| Provision | Summary of Provision |
|---|---|
|  | other than BHE; |
|  | • a trustee is appointed pursuant to section 1104 of the Bankruptcy Code; |
|  | • the Debtors' chapter 11 cases, other than cases relating to (i) LSGT Gas Company LLC, (ii) EECI, Inc., (iii) EEC Holdings, Inc., and (iv) LSGT SACROC, Inc., are dismissed or converted to chapter 7 and the dismissal or conversion does not contemplate the Closing Date Transactions and the transactions contemplated by the Merger Agreement; |
|  | • the Plan of Reorganization or the motion for entry of the Approval Order is not filed with the Bankruptcy Court by July 11, 2017; |
|  | • the Bankruptcy Court does not enter the Approval Order within forty-five (45) days of the date of the Merger Agreement; provided that entry of such order shall be deemed to occur upon an oral indication by the Bankruptcy Court that it is approving or will approve the E-Side Debtors' entry into and performance and agreement under the Merger Agreement, including but not limited to payment and satisfaction of the Termination Fee pursuant to the terms hereof; |
|  | • the Bankruptcy Court does not enter the Disclosure Statement Order by September 5, 2017; provided, that, entry of such order shall be deemed to occur upon an oral indication by the Bankruptcy Court that it is approving or will approve the Disclosure Statement and solicitation materials as containing "adequate information" as required by section 1125 of the Bankruptcy Code; or |
|  | • the Bankruptcy Court does not enter the EFH Confirmation Order by December 15, 2017; provided, that, entry of such order shall be deemed to occur upon an oral indication by the Bankruptcy Court that it is approving or will approve confirmation of the Plan of Reorganization. (Merger Agmt., § 8.4) |

## B.    Specific Performance and Fiduciary Out.

37.    So long as the Merger Agreement has not been validly terminated, the E-Side Debtors are entitled to specific performance against BHE to compel closing of the transactions contemplated by the Merger Agreement. *See* Merger Agreement § 9.10. The Merger Agreement is terminable by EFH Corp. or EFIH up to confirmation of the BHE Plan upon a determination by their respective boards that the failure to terminate the Merger Agreement is inconsistent with their fiduciary duties. *See id.* § 8.3(e)-(f). This fiduciary out is available in all circumstances, until confirmation of the BHE plan, so long as a material breach by EFH Corp. and EFIH of the Merger Agreement's provisions governing solicitation and negotiation of competing proposals has not provided a basis for such termination.

17

C.      **Termination Fee and Go Shop Provisions.**

38.     Upon Court approval of the Merger Agreement, EFH Corp. and EFIH would be liable for the Termination Fee, in the amount of $270 million, as an allowed administrative expense claim, in the event of certain termination events in accordance with the Merger Agreement. *See id.* § 8.5(b).

39.     The Termination Fee, however, will not be payable if the Merger Agreement is terminated because, among other reasons:

- a final non-appealable order has been issued by the PUCT, permanently restraining, enjoining, rendering illegal or otherwise prohibiting, directly or indirectly, closing of the Transactions, *see id.* § *8.5(b)(ii)*;

- the closing of the Transactions has not occurred by the Termination Date (as defined in Section 8.2(a) of the Merger Agreement) and either:

  - approval from the PUCT is the only condition to closing which has not been satisfied or waived—other than (A) those conditions to be satisfied at closing and (B) the private letter ruling(s) from the IRS (which have not been obtained), and the IRS has indicated that the private letter ruling(s) would require the issuance of BHE stock, and BHE has not agreed to issue the required amount or type of stock in order to obtain such rulings (for reference, all conditions to closing are set forth in Article VII of the Merger Agreement), *see id.* § *8.5(b)(iii)*;[8] OR

  - the only closing condition not satisfied at closing (other than those conditions that can only be satisfied at closing) is the closing condition requiring either that BHE consummated the acquisition of Oncor's equity interests in Texas Transmission Investment LLC or that the Court entered an order to the effect that the drag-along rights held by EFH Corp. are valid and enforceable in connection with the Transactions and that EFH Corp. is entitled to enforce such drag-along rights (subject to the satisfaction of certain minimum investment rate hurdles), *see id.* § *8.5(b)(iv)*; OR

---

8   Additionally, if the PUCT approval approves the contemplated transactions with a Burdensome Condition (as defined in the Merger Agreement), then BHE would not be obligated to close on the proposed transaction. Under those circumstances, the Termination Fee would be payable in some, but not all, circumstances. Additional details regarding the circumstances in which the Termination Fee could become due and payable in connection with a Burdensome Condition are set forth in Section 8.2 and Section 8.5 of the Merger Agreement.

- the IRS has indicated that the private letter ruling(s) would require the issuance of BHE stock, and BHE has not agreed to issue the required amount or type of stock in order to obtain such rulings (or the related tax opinions), and all other conditions to closing have been satisfied or waived—other than (A) those conditions to be satisfied at closing and (B) receipt of PUCT approval, *see id.* § *8.5(b)(v).*

40.     The Merger Agreement includes provisions that allow for higher or otherwise better bids to emerge.  From the execution of the Merger Agreement until entry of the Approval Order, the E-Side Debtors may solicit, initiate, and facilitate higher or otherwise better offers without paying the Termination Fee.  During the period between entry of the Approval Order and confirmation of the BHE Plan, the E-Side Debtors may continue discussions or negotiations with any party that has executed a confidentiality agreement and satisfied certain other requirements set forth in the Merger Agreement.  Following entry of the Approval Order, if the E-Side Debtors terminate the Merger Agreement to accept another proposal and the transaction contemplated by such other proposal is consummated, the Termination Fee would be payable.

## Basis for Relief

**I.     The Court Should Grant the Motion Because Entry Into the Merger Agreement Is a Sound Exercise of the E-Side Debtors' Business Judgment.**

41.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Additionally, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

42.     In the Third Circuit, courts have authorized a debtor's use of property of the estate outside the ordinary course of business when such use has a "sound business purpose" and is proposed in good faith.  *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward*

19

*Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991). Courts authorize a debtor to use property of the estate outside the ordinary course if the debtor shows (a) a sound business reason or emergency justifies the proposed use; (b) adequate and reasonable notice was provided to all interested parties; (c) the proposed use was requested in good faith; and (d) fair and reasonable consideration is provided in exchange for the use of estate assets. *See In re Exaeris, Inc.*, 380 B.R. 741 (Bankr. D. Del. 2008); *In re Decora Indus., Inc.*, No. 00–4459 (JJF), 2002 WL 32332749, at *7 (D. Del. May 20, 2002); *In re Del. & Hudson*, 124 B.R. at 176.

43.     The E-Side Debtors submit that entering into the Merger Agreement is a sound exercise of their business judgment and is justified under the circumstances. Their economic interest in Oncor has been heavily-marketed for years. The universe of parties with the means and motivation to acquire the asset are fully aware of the investment opportunity and have been afforded ample opportunities to participate in the process and come forward with a proposal.

44.     Against that backdrop, the Merger Agreement represents the highest and most actionable transaction for the E-Side Debtors to pursue at this time. The Transaction infuses billions of dollars of cash into the estates from one of the America's most prominent and well-regarded utility holding companies. Critically, Oncor, BHE, PUCT staff, and certain interveners have reached agreement on a set of regulatory commitments, which are generally consistent with the current Oncor ring-fence and should facilitate a more consensual PUCT approval process.

45.     Under the BHE Plan, the cash contribution will be used to pay off EFIH administrative expense claims and remaining EFIH secured indebtedness before being distributed—together with remaining cash on hand at EFIH—to EFIH unsecured creditors. As a result, the E-Side Debtors project that, assuming, among other things, a December 31, 2017

20

emergence, EFIH secured debt will be repaid in full (consistent with the makewhole settlements and pay-off of the outstanding EFIH debtor-in-possession facilities), EFIH unsecured claims will receive a recovery, and creditors of EFH Corp. will receive a recovery based on the adjusted estimated cash on hand at EFH Corp.

46.    The funding that underlies those creditor recoveries is supported by the commitment of a highly credit-worthy acquirer with a long-standing strategic interest in acquiring the E-Side Debtors' interest in Oncor.  This commitment is backed by a specific performance right of EFH Corp. and EFIH against BHE and is subject to customary terms and conditions.  In light of the terminations of the Hunt and NextEra plans, BHE's firm financial commitment and the progress already made with the PUCT staff and certain interveners were significant factors in the E-Side Debtors' decision to enter into the Merger Agreement.  It also largely preserves several of the key agreements reached in connection with the NEE Plan, including a complete preservation of the EFH/EFIH Committee Settlement (including the reinstatement of asbestos claims and preserving the turnover of a portion of proceeds from the TCEH Settlement Claim to certain other classes of claims against the EFH Debtors).

47.    Despite what has been a long and difficult process defined by regulatory hurdles, the BHE deal sets the E-Side Debtors and their stakeholders on a path toward an excellent outcome under the circumstances.  As the Court knows, the E-Side Debtors have pursued all available avenues to restructure their balance sheets.  The Merger Agreement is well within the range of the other transactions that the Court has approved, and it is necessary to achieve a value-maximizing outcome.

21

48.     Therefore, the E-Side Debtors submit that entry into the Merger Agreement is a sound decision reflecting the reasonable business judgment of the E-Side Debtors and should be approved.

## II.     The Termination Fee Satisfies the *O'Brien* Standard.

49.     While termination fees are analyzed under the administrative expense framework of section 503 of the Bankruptcy Code, *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010), "considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination," *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999).

50.     A termination fee must "provide **some** benefit to the debtor's estate."  *In re O'Brien*, 181 F.3d at 536 (emphasis added); *see also Reliant Energy*, 594 F.3d at 207-08 ("A break-up fee certainly provides a benefit to an estate if a bidder remains committed to a purchase."). "There is no suggestion that the . . . benefit to the estate [has] to be substantial, as required by section 503(b)(3)(D)."  *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) (noting court approved termination fee of 2.8% of assets).

51.     Proper application of *O'Brien* requires review of "the record evidence" to determine whether the record supports a termination fee.  *See O'Brien*, 181 F.3d at 536.  In that holistic examination, courts in the Third Circuit have evaluated whether the fee (a) promotes a competitive bidding process, including by inducing a bid that otherwise would not have been made, and without which bidding would have been limited; (b) induces the bidder to "remain committed to a purchase"; and (c) is not being used by the debtors to favor one bidder over another.  *Id.* at 537; *see also In re Reliant Energy*, 594 F.3d at 207 ("We recognize that the first bidder in a bankruptcy sale necessarily takes a risk at least to the extent of investing the time,

money and energy needed to produce its bid."); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC),
2007 WL 7728109, at *91 (Bankr. D. Del. Aug. 15, 2007) (approving break fee where, *inter alia*,
"bidding protections were not used by the Debtors to favor one bidder over another" and
"bidding protections played a material role in inducing the Purchaser to enter into the binding
APA, thereby, in addition to setting a minimum price for the Sale Assets, providing a baseline
asset purchase agreement upon which other bidders can rely").

52.     Here, the Termination Fee is part of a large, complex, and heavily negotiated
transaction in which BHE has provided material concessions.  Although the E-Side Debtors
vigorously negotiated the Termination Fee, it was ultimately necessary to induce BHE to enter
into the Merger Agreement and commit to infuse approximately $9 billion into the estates, all of
which is expected to be cash.

53.     In short, the Transaction provides significant value to the E-Side Debtors'
creditors and minimizes the level of conditionality necessary to set the E-Side Debtors on a path
to emergence—including by facilitating what should be a more consensual PUCT approval
process because Oncor, BHE, PUCT staff, and certain interveners have reached agreement on a
set of regulatory commitments.  In light of the consideration provided by the Merger Agreement,
the firm financial commitment from a highly credit-worthy acquirer, and the progress already
made with the PUCT staff and certain interveners, the Termination Fee is reasonable under the
circumstances and in the best interest of the estates.

54.     The Termination Fee—equal to approximately 1.5% of the Transaction's total
enterprise value ("TEV") for the 80% of Oncor owned by EFIH and 3.0% of consideration made
available to EFIH ("EV")—is also consistent with market practice for similar commitment fees
on a percentage basis.  Its size is a product of (a) the E-Side Debtors' negotiating posture in light

23

of the historical context of these chapter 11 cases and (b) BHE's reasonable demand that they receive some comfort that the E-Side Debtors pursue the Merger in the absence of documented creditor support. This Court and other courts have approved similar fees and premiums as a reasonable use of assets in other recent chapter 11 cases. *See, e.g.*, *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. Sept. 19, 2016) [D.I. 9584] (approving $275 million termination fee, equal to approximately 1.5% of transaction's total enterprise value); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. May 10, 2013) (approving termination fee of 1.2% of purchase price); *In re Pilgrim's Pride*, No. 08-45664 (DML) (Bankr. N.D. Tex. 2011) (approving termination fee of 1.6% of purchase price); *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. Mar. 11, 2014) (approving termination fee of 2.1% of purchase price).

55.    The table below summarizes the results from the comparable transactions described in the subsequent pages.

| | BHE Transaction | Public Utility Transactions | Similarly Sized Transactions |
|---|---|---|---|
| Fee as a % of TEV | 1.5% | 2.0% | 2.7% - 2.8% |
| Fee as a % of EV | 3.0% | 3.0% - 3.1% | 3.3% |

56.    The Termination Fee is comparable to fees payable by target companies in transactions of publicly traded utility companies since 2012 with equity values of $1 billion or greater, as depicted in the following tables:

24

## Termination Fee of Target as % of TEV for Publicly Traded Utility Transactions

| Date Announced | Acquirer | Target | TEV $ (in millions) | Break Fee of Target | |
|---|---|---|---|---|---|
| | | | | $ (in millions) | % of TEV |
| 01/25/17 | AtlasGas | WGL Holdings | 6,299 | 136 | 2.2% |
| 07/29/16 | NextEra Energy | EFH Corp.[9] | 18,706 | 275 | 1.5% |
| 05/31/16 | Great Plains | Westar | 12,157 | 280 | 2.3% |
| 02/09/16 | Algonquin | Empire District | 2,364 | 53 | 2.2% |
| 02/09/16 | Fortis | ITC Holdings | 11,435 | 245 | 2.1% |
| 02/01/16 | Dominion | Questar | 5,979 | 99 | 1.7% |
| 10/26/15 | Duke Energy | Piedmont Natural Gas | 6,579 | 125 | 1.9% |
| 09/04/15 | Emera Inc. | TECO Energy | 10,389 | 213 | 2.0% |
| 08/24/15 | Southern Company | AGL Resources | 11,996 | 201 | 1.7%. |
| 02/25/15 | Iberdrola USA | UIL Holdings | 4,483 | 75 | 1.7%. |
| 12/03/14 | NextEra Energy | Hawaiian Electric Industries | 4,336 | 90 | 2.1% |
| 10/20/14 | Macquarie Group | Cleco Corporation | 4,720 | 120 | 2.5% |
| 06/23/14 | Wisconsin Energy Corp. | Integrys Energy Group | 9,137 | 175 | 1.9% |
| 04/30/14 | Exelon Corp. | Pepco Holdings | 11,928 | 293 | 2.5% |
| 12/11/13 | Fortis Inc. | UNS Energy | 4,276 | 64 | 1.5% |
| 05/29/13 | MidAm. Energy Holdings Company | NV Energy | 10,400 | 170 | 1.6% |
| | | | | **Mean** | **2.0%** |
| | | | | **Median** | **2.0%** |

---

[9] EFH Corp. is not a publicly-traded utility.

25

### Termination Fee of Target as % of EV for Publicly Traded Utility Transactions

| Date Announced | Acquirer | Target | EV $ (in millions) | Break Fee of Target $ (in millions) | % of EV |
|---|---|---|---|---|---|
| 01/25/17 | AtlasGas | WGL Holdings | 4,519 | 136 | 3.0% |
| 07/29/16 | NextEra Energy | EFH Corp.[10] | 9,796 | 275 | 2.8% |
| 05/31/16 | Great Plains | Westar | 8,537 | 280 | 3.3% |
| 02/09/16 | Algonquin | Empire District | 1,491 | 53 | 3.6% |
| 02/09/16 | Fortis | ITC Holdings | 7,055 | 245 | 3.5% |
| 02/01/16 | Dominion | Questar | 4,390 | 99 | 2.3% |
| 10/26/15 | Duke Energy | Piedmont Natural Gas | 4,795 | 125 | 2.6% |
| 09/04/15 | Emera Inc. | TECO Energy | 6,508 | 213 | 3.3% |
| 08/24/15 | Southern Company | AGL Resources | 7,944 | 201 | 2.5% |
| 02/25/15 | Iberdrola USA | UIL Holdings | 2,999 | 75 | 2.5% |
| 12/03/14 | NextEra Energy | Hawaiian Electric Industries | 2,636 | 90 | 3.4% |
| 10/20/14 | Macquarie Group | Cleco Corporation | 3,357 | 120 | 3.6% |
| 06/23/14 | Wisconsin Energy Corp. | Integrys Energy Group | 5,804 | 175 | 3.0% |
| 04/30/14 | Exelon Corp. | Pepco Holdings | 6,872 | 293 | 4.3% |
| 12/11/13 | Fortis Inc. | UNS Energy | 2,508 | 64 | 2.5% |
| 05/29/13 | MidAm. Energy Holdings Company | NV Energy | 5,629 | 170 | 3.0% |
| | | | | Mean | 3.1% |
| | | | | Median | 3.0% |

---

[10]  EFH Corp. is not a publicly-traded utility.

57.     The Termination Fee is also comparable as a percentage of TEV and EV to fees payable by target companies in recent, similarly-sized transactions across industries:

## Termination Fee of Target as % of TEV Across Industries

| Date Announced | Acquirer | Target | TEV $ (in millions) | Break Fee of Target | |
|---|---|---|---|---|---|
| | | | | $ (in millions) | % of TEV |
| 07/07/16 | Danone SA | The WhiteWave Foods Co. | 12,494 | 310 | 2.5% |
| 03/20/16 | Sherwin-Williams Co. | Valspar Corp. | 11,292 | 300 | 2.7% |
| 11/17/15 | Air Liquide SA | Airgas Inc. | 13,346 | 400 | 3.0% |
| 10/21/15 | Lam Research Corp. | KLA-Tencor Corp. | 11,333 | 290 | 2.6% |
| 05/21/15 | CVS Health Corp. | Omnicare Inc. | 12,596 | 350 | 2.8% |
| 03/30/15 | UnitedHealth Group Inc. | Catamaran Corp. | 13,333 | 450 | 3.4% |
| 01/26/15 | Energy Transfer Partners LP | Regency Energy Partners LP | 18,024 | 450 | 2.5% |
| 10/05/14 | Becton Dickinson & Co. | CareFusion Corp. | 12,309 | 367 | 3.0% |
| | | | | **Mean** | **2.8%** |
| | | | | **Median** | **2.7%** |

**Termination Fee of Target as % of EV Across Industries**

| Date Announced | Acquirer | Target | EV $ (in millions) | Break Fee of Target | |
|---|---|---|---|---|---|
| | | | | $ (in millions) | % of EV |
| 07/07/16 | Danone SA | The WhiteWave Foods Co. | 10,345 | 310 | 3.0% |
| 03/20/16 | Sherwin-Williams Co. | Valspar Corp. | 9,350 | 300 | 3.2% |
| 11/17/15 | Air Liquide SA | Airgas Inc. | 10,641 | 400 | 3.8% |
| 10/21/15 | Lam Research Corp. | KLA-Tencor Corp. | 10,451 | 290 | 2.8% |
| 05/21/15 | CVS Health Corp. | Omnicare Inc. | 10,604 | 350 | 3.3% |
| 03/30/15 | UnitedHealth Group Inc. | Catamaran Corp. | 12,911 | 450 | 3.5% |
| 01/26/15 | Energy Transfer Partners LP | Regency Energy Partners LP | 11,287 | 450 | 4.0% |
| 10/05/14 | Becton Dickinson & Co. | CareFusion Corp. | 12,168 | 367 | 3.0% |
| | | | | **Mean** | **3.3%** |
| | | | | **Median** | **3.3%** |

58.     Accordingly, the E-Side Debtors respectfully submit that the agreement to pay the Termination Fee, if triggered, is a sound decision reflecting the reasonable business judgment of the E-Side Debtors and should be approved.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

59.     To implement the foregoing successfully, the E-Side Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

28

**Notice**

60.     The E-Side Debtors shall provide notice of this Motion on the date hereof via first class mail to: (a) the U.S. Trustee; (b) counsel to the EFH Creditors' Committee; (c) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (d) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (e) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (f) Delaware Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020; (g) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (f); (h) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (i) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (j) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (k) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (l) Oncor Electric Delivery Company LLC and counsel thereto; (m) the Securities and Exchange Commission; (n) the Internal Revenue Service; (o) the Office of the United States Attorney for the District of Delaware; (p) the Office of the Texas Attorney General

29

on behalf of the Public Utility Commission of Texas; (q) counsel to the Electric Reliability Council of Texas; and (r) those parties that have requested notice pursuant to Bankruptcy Rule 2002. The E-Side Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## Conclusion

61.     Based on the foregoing, the E-Side Debtors respectfully request that the Court enter the Approval Order.

*[Remainder of page intentionally left blank.]*

Dated:  July 7, 2017
      Wilmington, Delaware

*/s/ Christopher M. De Lillo*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
Christopher M. De Lillo (No. 6355)
920 North King Street
Wilmington, Delaware 19801
Telephone:        (302) 651-7700
Facsimile:        (302) 651-7701
Email:              collins@rlf.com
                        defranceschi@rlf.com
                        madron@rlf.com
                        delillo@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:              edward.sassower@kirkland.com
                        stephen.hessler@kirkland.com
                        brian.schartz@kirkland.com
                        aparna.yenamandra@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:              james.sprayregen@kirkland.com
                        marc.kieselstein@kirkland.com
                        chad.husnick@kirkland.com
                        steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession

RLF1 17803048v.1