**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
|  | **Re: D.I. 11430** |

**DECLARATION OF PAUL KEGLEVIC IN SUPPORT OF THE
MOTION OF THE EFH/EFIH DEBTORS FOR ORDER AUTHORIZING
ENTRY INTO MERGER AGREEMENT AND APPROVING TERMINATION FEE**

I, Paul Keglevic, declare as follows:

1. I am the Chief Executive Officer, Chief Restructuring Officer ("CRO"), and Chief Accounting Officer of Energy Future Holdings Corp. ("EFH Corp.") and Energy Future Intermediate Holding Company LLC ("EFIH" together with EFH Corp. and their respective direct and indirect subsidiaries, the "E-Side Debtors"). I submit this declaration (this "Declaration") in support of the *Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* (the "Motion").[2]

2. I have worked for the Debtors since July 2008. Before the TCEH Debtors and Shared Services Debtors emerged from bankruptcy on October 3, 2016, I was the Executive Vice President, Chief Financial Officer, and co-CRO of EFH, its direct subsidiary Energy Future Competitive Holdings Company LLC, EFCH's direct subsidiary Texas Competitive Electric Holdings Company LLC, and EFIH.

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

3. Through those roles, I am generally familiar with the Debtors' businesses, day-to-day operations, financial matters, results of operations, cash flows, and underlying books and records. Except as otherwise indicated below, all facts set forth are based upon my personal knowledge of the Debtors' businesses, operations, and related financial information gathered from my review of their books and records, relevant documents, including documents filed in this bankruptcy proceeding, and information supplied to me by members of the Debtors' management team and advisors.

4. Further information regarding the Motion is set forth in the *Declaration of David Ying in Support of the Motion of the EFH/EFIH Debtors for Order Authorizing Entry into Merger Agreement and Approving Termination Fee* (the "Ying Declaration"), filed contemporaneously herewith.

**I.    Entry into the BHE Transaction.**

5. On April 13, 2017, the Public Utility Commission of Texas (the "PUCT") entered an order denying approval of the transactions contemplated by the Agreement and Plan of Merger, dated as of July 29, 2016, between NextEra Energy, Inc. ("NextEra") and the E-Side Debtors (as amended, the "NEE Merger Agreement"). Following that order—and consistent with the terms of the NEE Merger Agreement and related plan support agreement—the E-Side Debtors engaged in discussions with a variety of parties regarding a potential "backup" to the NextEra deal.

6. After signing a confidentiality agreement on May 17, 2017, the E-Side Debtors had discussions with Elliott Management Corporation as advisor to certain funds (together, "Elliott"), the largest EFIH creditor regarding a potential equitization plan. Despite the parties'

2

best efforts, there remain significant open issues in Elliott's latest proposal, and the discussions have not yielded an actionable proposal.

7.      The E-Side Debtors also received a proposal from Berkshire Hathaway Energy Company ("BHE") on June 23, 2017 that largely preserved the structure of the NextEra deal. BHE owns a portfolio of locally managed businesses that share a vision for a secure energy future, make sustainable investments to achieve that vision, and had $85 billion of assets as of December 31, 2016. These businesses deliver affordable, safe, and reliable service each day to more than 11.6 million electric and gas customers and end-users around the world and consistently rank high among energy companies in customer satisfaction. BHE is headquartered in Des Moines, Iowa. Additional company information is available at www.berkshirehathawayenergyco.com.

8.      After the PUCT denied NextEra's Second Motion for Rehearing, and following intensive negotiations with BHE that allowed the parties to get to closure quickly, the boards of directors and managers of EFH Corp. and EFIH determined on July 6, 2017 that it was in the best interests of their stakeholders to (a) terminate the NEE Merger Agreement and (b) approve the execution of a merger with BHE (the "Transaction" and the agreement, the "Merger Agreement"). Contemporaneously herewith, the E-Side Debtors filed an amended plan of reorganization that reflects the transactions contemplated by the Merger Agreement (the "BHE Plan").

9.      The E-Side Debtors are hopeful that the proposed merger with BHE will facilitate the development of consensus with Elliott and the other creditor constituencies, with whom the E-Side Debtors have provided periodic updates regarding the back-up plan discussions (subject to applicable confidentiality agreements).

## II.     Summary of the BHE Transaction.[3]

10.    The Merger Agreement contemplates a transaction in which reorganized EFH Corp. would survive as a wholly-owned subsidiary of BHE, and the successor by merger to reorganized EFIH (which would be merged into a subsidiary of reorganized EFH Corp.) would survive as an indirect subsidiary of BHE.  Based on BHE's contribution of approximately $9 billion—which is expected to be all cash—the deal reflects an approximate $18.1 billion implied total enterprise value for the 80% of Oncor Electric Delivery Company LLC ("Oncor") owned by EFIH.

9.     Under the BHE Plan, the cash portion of the contribution will be distributed first to pay EFIH administrative claims and outstanding secured indebtedness and then to EFIH unsecured creditors together with remaining cash on hand at EFIH.  As a result, the E-Side Debtors project that—assuming, among other things, a December 31, 2017 emergence—(a) EFIH secured debt and administrative expense claims will be repaid in full (consistent with the makewhole-related settlements and pay-off of the outstanding EFIH debtor-in-possession facilities), (b) EFIH unsecured claims will receive a recovery, and (c) creditors of EFH Corp. will receive a recovery based, in part, on the adjusted estimated cash on hand at EFH Corp.  Recoveries will depend on, among other things, whether the termination fee under the NEE Merger Agreement is due and, if so, its allocation between the EFH and EFIH estates, as well as on any other allocations or agreements between EFH and EFIH.

---

[3]    The descriptions of the Merger Agreement in this Declaration are intended only as a summary of certain provisions thereof and are qualified in their entirety by the Merger Agreement attached as **Exhibit 1** to **Exhibit A** to the Motion.

### III. Specific Performance and Fiduciary Out.

10. So long as the Merger Agreement has not been validly terminated, the E-Side Debtors are entitled to specific performance against BHE to compel closing of the transactions contemplated by the Merger Agreement. The Merger Agreement is terminable by EFH Corp. or EFIH up to confirmation of the BHE Plan upon a determination by their respective boards that the failure to terminate the Merger Agreement is inconsistent with their fiduciary duties. This fiduciary out is available in all circumstances, until confirmation of the BHE Plan, so long as a material breach by EFH Corp. and EFIH of the Merger Agreement's provisions governing solicitation and negotiation of competing proposals has not provided a basis for such termination.

### IV. Termination Fee and Go Shop Provisions.

11. Upon Court approval of the Merger Agreement, EFH Corp. and EFIH would be liable for the Termination Fee, in the amount of $270 million, as an allowed administrative expense claim, in the event of certain termination events in accordance with the Merger Agreement.

12. The Termination Fee, however, will not be payable if the Merger Agreement is terminated because, among other reasons:

- a final non-appealable order has been issued by the PUCT, permanently restraining, enjoining, rendering illegal or otherwise prohibiting, directly or indirectly, closing of the Transactions, see id. § *8.5(b)(ii)*;

- the closing of the Transactions has not occurred by the Termination Date (as defined in Section 8.2(a) of the Merger Agreement) and either:

    - approval from the PUCT is the only condition to closing which has not been satisfied or waived—other than (A) those conditions to be satisfied at closing and (B) the private letter ruling(s) from the IRS (which have not been obtained), and the IRS has indicated that the private letter ruling(s) would require the issuance of BHE stock, and BHE has not agreed to issue the required amount or type of stock

in order to obtain such rulings (for reference, all conditions to closing are set forth in Article VII of the Merger Agreement), *see id. § 8.5(b)(iii)*;[4] OR

- the only closing condition not satisfied at closing (other than those conditions that can only be satisfied at closing) is the closing condition requiring either that BHE consummated the acquisition of Oncor's equity interests in Texas Transmission Investment LLC or that the Court entered an order to the effect that the drag-along rights held by EFH Corp. are valid and enforceable in connection with the Transactions and that EFH Corp. is entitled to enforce such drag-along rights (subject to the satisfaction of certain minimum investment rate hurdles), *see id. § 8.5(b)(iv)*; OR

- the IRS has indicated that the private letter ruling(s) would require the issuance of BHE stock, and BHE has not agreed to issue the required amount or type of stock in order to obtain such rulings (or the related tax opinions), and all other conditions to closing have been satisfied or waived—other than (A) those conditions to be satisfied at closing and (B) receipt of PUCT approval, *see id. § 8.5(b)(v)*.

13.     The Merger Agreement includes provisions that allow for higher or otherwise better bids to emerge. From the execution of the Merger Agreement until entry of the Approval Order, the E-Side Debtors may solicit, initiate, and facilitate higher or otherwise better offers without paying the Termination Fee. During the period between entry of the Approval Order and confirmation of the BHE Plan, the E-Side Debtors may continue discussions or negotiations with any party that has executed a confidentiality agreement and satisfied certain other requirements set forth in the Merger Agreement. Following entry of the Approval Order, if the E-Side Debtors terminate the Merger Agreement to accept another proposal and the transaction contemplated by such other proposal is consummated, the Termination Fee would be payable.

---

[4] Additionally, if the PUCT approval approves the contemplated transactions with a Burdensome Condition (as defined in the Merger Agreement), then BHE would not be obligated to close on the proposed transaction. Under those circumstances, the Termination Fee would be payable in some, but not all, circumstances. Additional details regarding the circumstances in which the Termination Fee could become due and payable in connection with a Burdensome Condition are set forth in Section 8.2 and Section 8.5 of the Merger Agreement.

RLF1 17803047v.1

**V.     Conclusion**

14. Based on my experience as the CEO and CRO of EFH Corp. and EFIH—and as a CRO of the Debtors' estates throughout the chapter 11 cases—I believe that entering into the Merger Agreement is a sound decision reflecting the reasonable business judgment of the E-Side Debtors and is justified under the circumstances.

15. *First*, as described in more detail in the Ying Declaration, the Debtors' economic interest in Oncor has been heavily-marketed for more than three years. The universe of parties with the means and motivation to acquire the asset are fully aware of the investment opportunity and have been afforded ample opportunities to participate in the process and come forward with a proposal.

16. *Second*, the Transaction infuses billions of dollars of cash into the estates in a transaction with one of the America's most prominent and well-regarded utility holding companies. Moreover, there is no financing contingency, and the funding is supported by the commitment of a highly credit-worthy acquirer. In turn, that commitment is backed by a specific performance right of EFH Corp. and EFIH against BHE.

17. *Third*, BHE is well-suited to acquire the economic interest in Oncor: BHE reported more than $4.2 billion in operating income in 2016, nearly 90 percent from its investment-grade, rate-regulated businesses.

18. *Fourth*, Oncor, BHE, PUCT staff, and certain interveners have reached agreement on a set of regulatory commitments, which are generally consistent with the current Oncor ring-fence, and should facilitate a more consensual PUCT approval process.

19. *Fifth*, the Transaction largely preserves the structure of the NextEra deal, including a complete preservation of the EFH/EFIH Committee Settlement (including the

7

reinstatement of asbestos claims and preserving the turnover of a portion of proceeds from the TCEH Settlement Claim to certain other classes of claims against the EFH Debtors).

20.     Given the value of the consideration provided, the firmness of the financial commitment, and a pre-negotiated regulatory construct with the key players in the PUCT process, the Transaction is the clear choice for the E-Side Debtors to pursue at this time.  For those reasons, I believe the Merger Agreement represents the highest and most actionable deal, and I submit that entry into the Merger Agreement is a sound decision reflecting the reasonable business judgment of the E-Side Debtors.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I hereby declare that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 7th day of July, 2017.

*/s/ Paul Keglevic*
Paul Keglevic
Chief Executive Officer
Chief Restructuring Officer
Chief Accounting Officer
EFH Corp.
