Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4   In re:                          :

5   ENERGY FUTURE HOLDINGS          :    Chapter 11

6   CORP., et al.,                  :    Case No. 14-10979

7           Debtors.                :    (Jointly Administered)

8   _____:

9   ELLIOT ASSOCIATES,              :

10  L.P. et al.,                    :

11          Plaintiffs,             :

12     v.                           :    Adv. Proc. No. 17-50479

13  ENERGY FUTURE INTERMEDIATE      :

14  HOLDING COMPANY LLC, et al.,  :

15          Defendants.             :

16  _____:

17                                  United States Bankruptcy Court

18                                  824 North Market Street

19                                  Wilmington, Delaware

20                                  July 12, 2017

21                                  10:01 a.m. - 10:51 a.m.

22  B E F O R E :

23  HON CHRISTOPHER S. SONTCHI

24  U.S. BANKRUPTCY JUDGE

25  ECRO OPERATOR:  LESLIE MURIN

1    HEARING re Debtors' Thirty-Seventh Omnibus (Substantive)

2    Objection to Certain Improperly Asserted Claims Pursuant to

3    Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

4    3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

5    7814; filed February 9, 2016]

6

7    HEARING re Debtors' Forty-Fifth Omnibus (Substantive)

8    Duplicate and No Liability Claims Pursuant to Section 502(b)

9    of the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and

10   3007 and Local Bankruptcy Rule 3007-1 [D.I. 10917; February

11   24, 2017]

12

13   HEARING re Motion of Energy Future Holdings Corp., et al.,

14   for Entry of an Order Further Enlarging the Period Within

15   Which the Debtors May Remove Certain Actions [D.I. 11369;

16   filed June 19, 2017]

17

18   HEARING re Verified Complaint for Declaratory and Injunction

19   Relief [Adv. D.I. 1; filed May 11, 2017]

20

21   HEARING re Interim Fee Applications

22

23   HEARING re Interim Fee Applications

24

25   HEARING re Interim/Final Fee Application

Page 3

1   HEARING re Joint Plan of Reorganization of Energy Future

2   Holdings Corp., Energy Future Intermediate Holding Company

3   LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the

4   Bankruptcy Code [D.I. 11426; filed July 7, 2017] (the "New

5   E-Side Plan")

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Sonya Ledanski Hyde

1  A P P E A R A N C E S :

2

3  KRAMER LEVIN NAFTALIS & FRANKLIN LLP

4       Attorneys for Second Lien Indenture Trustee

5

6  BY:  JENNIFER SHARRET

7

8  PACHULSKI STANG ZIEHL & JONES LLP

9       Attorneys for

10

11  COLIN R. ROBINSON

12

13  NIXON PEABODY LLP

14       Attorneys for American Stock Transfer

15

16  BY:  MORGAN NIGHAN

17

18  VENABLE LLP

19       Attorneys for PIMCO

20

21  BY:  JEFFREY S. SABIN

22

23

24

25

1   MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP

2        Attorneys for E-Side Official Creditors Committee

3

4   BY:  NATALIE RAMSEY

5

6   SULLIVAN & CROMWELL LLP

7        Attorneys for E-Side Official Creditors Committee

8

9   BY:  ALEXA KRANSKY

10

11  ROPES & GRAY LLP

12       Attorneys for Elliott Fund

13

14  BY:  GREGG M. GALARDI

15

16  STEVENS & LEE

17       Attorneys for EFIH Special Conflicts

18

19  BY:  JOSEPH H. HUSTON, JR.

20

21  LANDIS RATH & COBB

22       Attorneys for NextEra

23

24  BY:  JOSEPH WRIGHT

25

1   NORTON ROSE FULBRIGHT

2        Attorneys for NextEra

3

4   BY:  ERIC DAUCHER

5

6   KIRKLAND & ELLIS LLP

7        Attorneys for the Debtors

8

9   BY:  CHAD HUSNICK

10

11  RICHARDS, LAYTON & FINGER, P.A.

12       Attorneys for the Debtors

13

14  BY:  DANIEL J. DEFRANCESCHI

15       JASON M. MADRON

16

17  BAYARD, P.A.

18       Attorneys for Elliot Funds

19

20  BY:  SCOTT D. COUSINS

21

22  HOGAN MCDANIEL

23       Attorneys for Fenicle, Fahy, Jones & Heinzmann

24

25  BY:  DANIEL M. HOGAN

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3

4    BY:  RICHARD L. SCHEPACARTER

5

6    BIELLI & KLAUDER, LLC

7         Attorneys for EFH Corp.

8

9    BY:  DAVID KLAUDER

10

11   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

12        Attorneys for Fidelity Management & Research Company

13

14   BY:  GARY L. KAPLAN

15

16   O'KELLY ERNST & JOYCE, LLC

17        Attorneys for Fidelity Management & Research Company

18

19   BY:  MICHAEL J. JOYCE

20

21   KLEHR HARRISON HARVEY BRANZBURG LLP

22        Attorneys for UMB Bank, N.A.

23

24   BY:  SALLY VEGHTE

25

1    ALSO PRESENT TELEPHONICALLY:

2

3    JACOB A. ADLERSTEIN

4    ALYSA AIN

5    SCOTT L. ALBERINO

6    ARLENE R. ALVES

7    SAM N. ASHURAEY

8    ROBIN D. BALL

9    ASHLEY F. BARTRAM

10   JULIE BELL

11   LAUREN BITZIN

12   JOSH W. BRANT

13   PEG A. BRICKLEY

14   JOSHUA BRODY

15   CHRISTOPHER L. CARTER

16   MARK A. CODY

17   ANDREW COHEN

18   DANIEL B. DENNY

19   BARRY FELDER

20   MARK A. FINK

21   JOSEPH A. FLORCZAK

22   GREGG GALARDI

23   RICHARD GITLIN

24   BRIAN GLUECKSTEIN

25   TODD M. GOREN

1    TAYLOR B. HARRISON

2    MARK F. HEBBELN

3    EMILY L. KATZ

4    JEFFREY C. KRAUSE

5    THOMAS KRELLER

6    VINCENT LAZAR

7    PATRICK C. MAXCY

8    GEOFFREY M. MILLER

9    PAMELA S. MORIN

10   HAL F. MORRIS

11   MICHAEL S. NEUMEISTER

12   RICHARD PEDRONE

13   JON PRUCHANSKY

14   ELIZABETH RASSKAZOVA

15   ERIK SCHNEIDER

16   NED S. SCHODEK

17   NOAH M. SCHOTTENSTEIN

18   CHARLES E. SIEVING

19   BRAD SWEENEY

20   ANGELO THALASSINOS

21   ANDREW M. THAU

22   MARK K. THOMAS

23   AMER TIWANA

24   CARL TULLSON

25   PATRICK VENTER

1    MICHAEL J. WALSH

2    MEGAN WASSON

3    ERIN A. WEST

4    BRADY C. WILLIAMSON

5    PETER YOUNG

6    DANIEL S. SHAMAH

7    MATTHEW C. BROWN

8    ALLISTER CHAN

9    GRENVILLE DAY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. HUSNICK:  Good morning, Your Honor.  Chad

5    Husnick with Kirkland & Ellis, appearing on behalf of the

6    Debtors.

7              Your Honor, I believe the only item on today's

8    agenda, because Your Honor entered the Order approving the

9    fee applications, is a status report regarding the state of

10   negotiations and the process for exit from these cases.

11             THE COURT:  Yes.

12             MR. HUSNICK:  Your Honor, as we updated the Court

13   on June 26th in the wake of the PUCT's rulings, the NextEra

14   deal -- that the NextEra deal was not in the public

15   interest.  The Debtors have been engaged in discussions with

16   various parties, including Elliott Capital Management, a

17   significant holder of the EFIH second lien notes and the

18   EFIH PIK notes, and other parties regarding various

19   potential backup plans.  This process, as we have told the

20   Court several times, was expressly permitted by the next

21   Tera merger agreement.

22             What I didn't mention, Your Honor, at the last

23   status hearing, because we're not in a position to safely

24   disclose this update, was that one of the parties that we

25   were talking to was Berkshire Hathaway Energy Company.  That

1    party had very recently reemerged in the Debtor's exit

2    process of restructuring discussions, and we had begun, as

3    of the last hearing, discussions with them as well, subject

4    to an NDA.

5              Ultimately, Your Honor, as you've no doubt

6    gathered from the record and the many filings between --

7    over the last week or so, the Debtors have progressed their

8    discussions with Berkshire Hathaway, and we have filed a new

9    plan, a new disclosure statement, and various other filings

10   that I'll get to in a minute, that outline a deal with

11   Berkshire.

12             Before I turn to exactly what that deal looks

13   like, I'd just like to begin with a little bit of background

14   on how we got to where we are.  And trust me, Your Honor,

15   I'm not going to start with four years ago.

16             THE COURT:  I was going to say, we could be here a

17   while.

18             MR. HUSNICK:  Your Honor, it's important to

19   remember that Berkshire was a potential bidder last year.

20   We disclosed when we had our last confirmation hearing with

21   NextEra that there were two other parties who had expressed

22   a significant amount of interest in potentially acquiring

23   the Debtor's indirect economics interests in Oncor.

24   Unfortunately, for obvious confidentiality reasons, we are

25   unable to disclose the identifies of those bidders.  But now

1    I can tell you, Your Honor, that one of those bidders was

2    Berkshire.

3            The Debtors ultimately ended up pursuing the

4    NextEra transaction.  But it's important to note that

5    Berkshire was very familiar with the Debtor's assets and had

6    an opportunity to do significant due diligence back in the

7    original process, as did other parties.

8            As Your Honor is aware, on February 17th, the

9    Debtor -- or the Court confirmed the NextEra plan, and we

10   quickly turned to trying to get PUCT approval.  And as we've

11   reported to the Court at the March 30th open meeting, the

12   PUCT signaled that it was likely to find that the NextEra

13   transaction was not in the public interest, largely focusing

14   around certain what NextEra characterized as deal killers to

15   aspects of the ring fence that the PUCT had insisted upon in

16   the proceedings.

17           On April 13th, the PUCT formally rejected the

18   NextEra transaction and found that it was not in the public

19   interest.  There was a motion for rehearing, filed by

20   NextEra, and the Debtors filed an amicus brief shortly

21   thereafter on May 11th.  On June 7th, the PUCT reaffirmed

22   its prior finding that the NextEra transaction was not in

23   the best interest -- or not in public interest.

24           On June 27th, a second motion for rehearing was

25   filed by NextEra, and the Debtors again filed a short amicus

1    brief in support of that motion for rehearing.  On June

2    29th, at the last open meeting, this occurred after our last

3    update, the PUCT reaffirmed its prior ruling and entered an

4    Order denying the motion for rehearing.  That was

5    approximately two weeks ago.

6          The Debtors pursued the NextEra agreement and

7    their efforts to try and turn the PUCT process around on a

8    parallel path with their negotiations with creditors and

9    other parties regarding potential backup plans, and that is

10   consistent with what we reported to Your Honor on several

11   occasions.  In particular, we entered into confidentiality

12   agreements with several parties interested in developing

13   backup plans, and we spent significant times over the past -

14   - significant time over the past couple of months engaging

15   on the principal-to-principal advisor who advised their

16   discussions with these parties, including Elliott.

17          In particular, the discussions with Elliott

18   yielded drafts of restructuring term sheets in early June

19   and -- I'm sorry -- in June and into early July.  Those term

20   sheets have now been made public as part of a cleansing

21   process under the nondisclosure agreement.

22          Berkshire, at the same time, made a proposal

23   similar to the NextEra proposal in the middle of the

24   discussions with the creditor constituencies.  This proposal

25   was an inbound proposal from Berkshire, and we'll cover that

1    in a great level of detail.  In particular, the deal

2    contemplated the $9 billion of consideration for their

3    acquisition of the indirect interests in Oncor.  That

4    implies a valuation of approximately $11.25 billion that's a

5    -- for the equity value in Oncor, and that would be 100

6    percent of Oncor.  That's the applied equity valuation.

7            That deal does provide significant recoveries to

8    both the EFIH and EFH that states, in particular at EFIH,

9    the first line and second liens would be paid in full in

10   cash, including the settled make whole amounts.  The PIK

11   notes for their perspective would receive a recovery, and

12   I'll defer to the disclosure statement on exactly the range

13   of recoveries and the assumptions around those.

14           Finally, the deal does largely leave intact where

15   we were with NextEra on recoveries for EFH creditors,

16   insofar as those recoveries will be driven in large part by

17   the amount of cash that's available at the conclusion of the

18   cases.

19           Your Honor, Berkshire previewed its offer with the

20   PUCT staff and certain other interveners.  This was done

21   through Oncor at the request of Berkshire.  And Oncor

22   reached out to the PUCT staff and certain of the interveners

23   who played a significant role in the NextEra and Hunt

24   approval processes in front of the PUCT to solicit those

25   interveners' views as to what the regulatory landscape would

1    likely need to look like in order to obtain approval of a

2    Berkshire transaction.

3           The result of that, and as based on the feedback

4    received from the interveners, is that Berkshire, Oncor, the

5    PUCT staff, and three of the key interveners agreed upon the

6    regulatory commitments that will be required in any 14101

7    application filed by Berkshire and Oncor in connection with

8    the Berkshire transaction.

9           The three key interveners, just for the record,

10   are the Office of the Public Utility Council, the Texas

11   Industrial Energy Consumers, and the steering committee of

12   cities served by Oncor.  We attached that agreement, that

13   written agreement, of commitments to the disclosure

14   statement as Exhibit H so that it's part of the public

15   record and everyone can look at what was being committed to.

16          While the written agreement of interveners is by

17   no means a guarantee of success, as the commission is an

18   independent body from the interveners, including the PUCT

19   staff, it does represent unparalleled consensus.  A level of

20   consensus that is heretofore eluded the Debtors and their

21   stakeholders and prior movants before the PUCT, including

22   Hunt consortium and NextEra.

23          THE COURT:  What's the position of the Oncor

24   board?

25          MR. HUSNICK:  The Oncor board has -- and I know

1    Oncor's counsel is in the Courtroom -- has signed an Oncor

2    side letter substantially simultaneously with the execution

3    of the Berkshire agreement.  That side letter is very

4    consistent with previous side letters and will obligate

5    Oncor to move forward with the transaction.  Oncor has, of

6    course, signed off on the regulatory commitments.  They are

7    signatory to the document.

8              THE COURT:  Okay.

9              MR. HUSNICK:  In form, the one step I believe that

10   has not been taken by the Oncor board is formally

11   authorizing the filing of a change of control application.

12   I think Ms. Ball will correct me if I got any of that wrong.

13             THE COURT:  No, she's not going to.

14             MR. HUSNICK:  Your Honor, ultimately, the Debtor's

15   evaluated the Berkshire deal against the current state of

16   play, and elected to continue discussions with Berkshire at

17   the same time as continuing discussions with the creditor

18   constituencies, including Elliott.

19             Your Honor, it was a busy holiday weekend.  And on

20   what's indicative of the level of work that we were doing

21   over the July 4th holiday is all of the filings that

22   happened on July 6th and July 7th.  Importantly, Your Honor,

23   on July 6th, the Debtors took steps to terminate the NextEra

24   merger agreement and the NextEra and fidelity plan support

25   agreement.

1          On July 7th, the Debtors executed a new merger

2     agreement with Berkshire and with affiliates of Berkshire,

3     and we filed very shortly thereafter a notice of filing

4     regarding the termination of the NextEra merger agreement,

5     as well as the NextEra plan support agreement.  We filed a

6     new Chapter 11 plan.  We filed a disclosure statement, a

7     motion to approve the disclosure statement, solicitation

8     procedures, and related disclosures and mailings, and a

9     scheduling motion, Your Honor, that will be heard on July

10    26th.  And finally, we filed a motion requesting approval of

11    the merger agreement and the related termination fee with

12    Berkshire.  All of those documents were filed and served on

13    July 7th.

14          On July 10th, Your Honor, the Debtors also agreed

15    with Elliott to terminate the PIK plan support agreement.

16    That was the subject of the preliminary injunction motion

17    and adversary proceeding commenced by Elliott earlier this

18    year.  Shortly thereafter, Elliott filed, pursuant to that

19    agreement, a voluntary dismissal of the preliminary

20    injunction litigation, so that issue is now off the table.

21          Finally, Your Honor, just yesterday, the Debtors

22    filed a notice that identified the provisions of the plan

23    and the confirmation Order that rendered confirmation and

24    the plan null and void pursuant to its terms.  And we put

25    that on the docket at Docket #11446 yesterday.  As a result,

1    Your Honor, we are prepared to move forward in these Chapter

2    11 cases with the Berkshire transaction.

3          I just want to take a moment -- I already

4    discussed the economics -- but to identify just a couple of

5    the reasons why the Debtors elected to move forward with the

6    Berkshire transaction.  First of all, and perhaps most

7    importantly, there are no financing contingencies associated

8    with the Berkshire transaction.  The Berkshire deal is an

9    all-cash deal.  While there is a contemplated to be a

10   potential issuance of stock, that is largely driven by the

11   regulatory process, as I'll mention in just a moment.

12         But the second issue is that it's substantially

13   similar to the NextEra transaction in its construct and how

14   it works.  That's important to the Debtors because a lot of

15   the feedback that we were able to get from both the PUCT

16   proceeding, as well as the PLR or the private letter ruling

17   process with the Internal Revenue Service, is helpful in

18   informing the Debtors as to how to structure the

19   transaction.

20         And I can submit to Your Honor that it will become

21   evident in the evidence that this was structured to satisfy

22   concerns that were raised by the various parties.  For

23   example, the Berkshire merger agreement, as I just

24   mentioned, and the Chapter 11 plan that embodies that merger

25   agreement, while it's structured as an all-cash deal

1    contemplates the ability to toggle to issuing some amount of

2    stock within certain parameters -- it's preferred stock --

3    in the event that stock is necessary to satisfy the Internal

4    Revenue Service's requirements.  This framework is based

5    upon the insights that we received in discussions with the

6    Internal Revenue Service in previous applications.

7            Next, as I mentioned earlier, the Berkshire deal

8    has regulatory commitments in hand.  The agreement with the

9    PUCT staff and three key interveners provides the Debtors

10   with an expectation of a swift PUCT process.  And while the

11   timing of the PUCT approval process is completely within the

12   control of the PUCT Commissioners themselves, the Debtors

13   understand that with this level of consensus, it is possible

14   that the PUCT approval process could proceed on an expedited

15   basis, perhaps as short as 60 to 90 days for approval.

16           It is with that in mind, Your Honor, that the

17   Debtors intend to obtain regulatory approval prior to the

18   state of the confirmation hearing in front of Your Honor.

19   This is a change from previous attempts to confirm and

20   consummate plans.  This time, we will go to the PUCT first,

21   hopefully obtain approval, and then come to Your Honor and

22   ask for confirmation of the plan.  This should provide

23   additional certainty regarding feasibility of the plan as it

24   goes forward.

25           Finally, I just note that the Berkshire

1    transaction is silent as to conditionality regarding the

2    outcome of potential litigation or allocation of liability

3    on the breakup fee in connection with NextEra.  In contrast,

4    Your Honor --

5              THE COURT:  I'm sorry to interrupt.  What are --

6    what is the status of the TTI issues with regard to the

7    drag?  My memory is that there was a settlement between TTI

8    and NextEra in the last deal.  Is there a settlement yet or

9    are there discussions or do we know whether that'll be

10   litigation?

11             MR. HUSNICK:  Your Honor, at this point in time,

12   there is still an agreement between TTI and NextEra

13   regarding the transfer of ownership over that roughly 20

14   percent interest.  It is a condition to the consummation of

15   the Berkshire agreement that Berkshire be able to acquire

16   the 20 percent.  That is something that still needs to be

17   worked out.

18             In effect, there's really two ways that that could

19   go down: one, there could be an agreed settlement similar to

20   what NextEra was able to negotiate with TTI; or two, it

21   could go down the path similar to what was done with the

22   Hunt, where there was an adversary proceeding and an action

23   to exercise the drag right.

24             I would say, Your Honor, at this point in time,

25   it's probably preliminary for me to comment on exactly which

1    path I see it going down.  I don't think I could accurately

2    predict that.  However, I would note that while it is a

3    condition of the Berkshire agreement -- and this is

4    something we'll probably discuss in more detail on August

5    10th -- it is not a situation where that failure of that

6    condition, if it were as a result of either inability to

7    reach an agreement with TTI or if the Court were to not find

8    that the drag was enforceable, that would not be a trigger

9    event for the --

10              THE COURT:  Breakup fee.

11              MR. HUSNICK:  -- Berkshire breakup fee.  But we'll

12   get into more detail on that in the future, but I think it's

13   important to mention.

14              THE COURT:  Yes, thank you.

15              MR. HUSNICK:  Your Honor, in contrast to where we

16   were with Berkshire at the time that the Debtors made the

17   decision, there were still open issues in their negotiations

18   with creditor constituents, including Elliott.  While I

19   don't think this morning is the appropriate time for me to

20   discuss exactly what those issues were and I'll stay away

21   from that, suffice to say the Debtors have been discussing

22   those issues with Elliott and will continue to discuss those

23   issues with Elliott.  And we will be prepared at future

24   hearings, to the extent that those issues remain extant, to

25   address them in detail.

1          THE COURT:  Keep writing each other letters.

2          MR. HUSNICK:  We're going to stop, Your Honor.

3     The Berkshire plan did not have those same issues and,

4     therefore, the Debtors elected to proceed with the Berkshire

5     plan and we filed that plan.  What's important is the Debtor

6     -- and the Debtors highlighted this in their motion and I'll

7     reiterate from the podium this morning -- is that it's not

8     the end of discussions with creditor constituencies.  We

9     believe it was an important step to lock in the transaction

10    and to take steps to move forward in these Chapter 11 cases.

11          But there are some very specific rights that have

12    been agreed to in the merger agreement.  First, and probably

13    most importantly, the Debtors are able to solicit between

14    the signing of the document and a hearing on approval of the

15    document on August 10th, we're able to do anything in all

16    negotiations with parties without any overhang from the

17    break fee.  Second, Your Honor, even after the break fee is

18    approved and the merger agreement is approved, the Debtors

19    are able to continue discussions that had started prior to

20    the signing -- or the approval of the merger agreement.

21    This is very similar to the way the NextEra merger agreement

22    worked, where we were authorized to continue discussions

23    after the break fee had been approved.

24          Your Honor, I think that that is an especially

25    important point as it doesn't cut discussions off yet again;

1    it will run through confirmation.  And like Berkshire -- or

2    like the NextEra deal, the Berkshire deal does -- the

3    fiduciary does expire at confirmation; however, the Debtors

4    are able to continue to discuss backup plans in the event

5    that that transaction is not approved.  However, that last

6    piece is probably not going to be that significant here

7    because we would anticipate, as I said earlier, having

8    regulatory approval before we come to Your Honor for

9    confirmation.

10          The sum total of all those rights is that the

11    Debtors have significant flexibility and intend to use that

12    flexibility to continue to engage with the creditor

13    constituencies to maximize value.  We are committed to

14    obtaining as much consensus as we possibly can towards a

15    value maximizing plan forward, and we will continue to post

16    Your Honor as circumstances develop regarding this

17    transaction.

18          Just to highlight a few dates before I cede the

19    podium.  We do have a hearing scheduled on July 26th in

20    front of Your Honor to consider the Debtor's proposed

21    schedule.  We have not heard a lot of feedback on the

22    schedule.  I expect we will as the time rolls on between now

23    and July 26th, and the Debtors are happy to discuss the

24    schedule with parties in an attempt to try and resolve any

25    objections to that schedule.

1          I would say that we expect to know more about the

2     PUCT process and the schedule for the PUCT process in

3     advance of that hearing, so we'll keep Your Honor posted as

4     developments warrant there, and perhaps will have to update

5     the schedule one way or the other in advance of that

6     hearing.

7          Next, we have -- and this is all ultimately set

8     forth in the scheduling motion.  We propose a hearing to

9     consider approval -- we filed a motion actually on this one

10    -- for August 10th to consider approval of the merger

11    agreement and the related termination fee.

12         On August 11th, we've set the hearing to approve

13    the disclosure statement and to consider the other relief

14    requested in the disclosure statement motion.  We propose in

15    our scheduling motion to set the voting deadline and the

16    deadline to object to the plan at October 11th and a hearing

17    for October 24th.

18         I only highlight this to put it on the record what

19    the proposed dates are, Your Honor.  I realize that a lot of

20    that is subject to the scheduling motion, which I'm sure

21    parties in the room will have some views on, and I'm not

22    looking to advocate one way or the other on that.  And I do

23    think that it bears repeating one more time that that

24    schedule is contingent upon obtaining some certainty on the

25    timeline from the PUCT.

1      Unless Your Honor has any questions, that is the

2   Debtor's status report for today.

3      THE COURT:  Thank you.  I don't have any

4   questions, other than the ones I've already asked.  I'm --

5   well, I'll defer comment on anything else, and open it up

6   now to whoever would like to speak.  Mr. Galardi is the

7   first to jump up, so I'll hear from Elliott.  Good morning.

8      MR. GALARDI:  Good morning, Your Honor.  How are

9   you?

10     THE COURT:  Very well.

11     MR. GALARDI:  For the record, Gregg Galardi on

12  behalf of Elliott.

13     Your Honor, I just want to -- I understand that

14  today is just a status conference, so I wanted to say we

15  start by agreeing that today is not the day to argue a

16  number of issues.  First, the proposed scheduled, although I

17  think as Mr. Husnick knows and as Your Honor has commented

18  about the letters, we will be arguing about the schedule and

19  the time frame for the reasons that I'll say in a few

20  minutes.

21     It's also not the day to argue about the approval

22  of the Berkshire transaction, which Mr. Husnick said on a

23  number of occasions is substantially similar to the

24  transaction with NextEra.  What he left out and what I think

25  everybody in the Court knows is that there is a significant

1    monetary difference between the NextEra deal and the

2    Berkshire deal.  And what I think Mr. Husnick said was the

3    EFH creditors will get substantially the same recovery,

4    which already implies that the burden of the Berkshire

5    transaction, leaving aside the NextEra termination fee, is

6    falling on EFIH creditors.  But that'll be another day as

7    well.

8            Your Honor, they also proposed a schedule for the

9    disclosure statement.  I think it's 33 days from the day

10   they filed it, with an underlying plan on October 24th.

11   Again, it's a scheduling issue, but that raises other

12   issues.  Leaving aside the scheduling, we think and Your

13   Honor knows, that with respect to EFIH, Elliott is by far

14   the largest creditor, has blocking positions in the second

15   lien, which they now change from impaired to unimpaired.  It

16   has a controlling share of the PIK notes, and we believe

17   that the plan will not be confirmable.

18           So, Your Honor, though you heard a lot about PUCT

19   approval and preapproval and commitments, Your Honor has

20   gone through it the other way.  Your Honor has approved with

21   creditor support to have the PUCT deny.  We have serious

22   concerns and believe that the plan on file through the

23   Berkshire transaction will not be a confirmable plan at

24   EFIH.  But, again, that's a different issue.

25           We also disagree, as Your Honor commented about,

1    the letters, and we don't think it's worth getting into the

2    open issue.  Mr. Husnick and I have gone back with letters,

3    and I agree with him, we should not continue to go back and

4    forth on the letters.  There will be pleadings that will

5    address those issues.

6             But I do want to talk a little bit about the

7    schedule and put into context.  Mr. Husnick started the

8    conversation that Berkshire was in the -- in play when the

9    NextEra deal transaction was ultimately decided to go

10   forward last year.  The fact of the matter is, no one should

11   be under the illusion that the clock, with respect to this

12   transaction, the approval of this transaction, did not begin

13   -- that only began, we think, on July 7th, just a few days

14   ago.

15            So while he lays out the date, I think we have to

16   take some indisputable facts and Your Honor has to be aware

17   of them.  One is that, as I said, Elliott has more than a

18   third of the second liens, more than 70 percent of the PIK

19   notes.

20            Your Honor is familiar that we dismissed the

21   litigation, but the Debtors sought to enforce the PSA PIK

22   against Elliott, both in the litigation and throughout the

23   proceedings and until July 10th.  Which Mr. Husnick said

24   today, on the grounds that one, the NextEra deal had not

25   been terminated because they didn't do it until probably

1    about 11:00 on July 6th, only to then sign and announce the

2    Berkshire deal I think a little bit after midnight, midnight

3    being the first hour of July 7th.

4           They didn't -- they wouldn't let out Elliott from

5    the PIK PSA, even though we said we were never bound.  And

6    consistent with what has been said to this Court from May --

7    from the day we filed the Complaint, the other argument

8    being that even if the NextEra deal was rejected by the PSA,

9    they could still pursue an 80-cent plan.  But there is

10   simply no evidence, nothing at all, that suggests that they

11   actually pursued that, had any intention of pursuing that,

12   and, in fact, abandoned that on -- I think as they took up

13   the Berkshire deal.

14          Your Honor, also, though, we agreed to negotiate

15   and did negotiate in good faith with the Debtors as was said

16   in the emails forwarded to the Court.  There was only a

17   limited waiver, and what the limited waiver did was

18   expressed.  It did not allow Elliott to file or prosecute

19   any financing or restructuring proposal not supported by the

20   Debtors.  So despite 16 months ago, the exclusivity had

21   lapsed, the Debtors continue to insist that all

22   negotiations, all financing discussions had to be with their

23   approval.

24          Your Honor, I know that Mr. Husnick and Kirkland &

25   Ellis had a very busy July 4th weekend, as did we.  But

1    another undisputed fact is on June 21st, we forwarded that

2    for the purposes of securing the financing; we have never

3    received comments back.  On July 1st, we forwarded the term

4    sheet; we did not during the July 4th weekend receive any

5    comments back.  We received, quote, a courtesy call on July

6    6th telling us at 10:30 p.m., well, the deal is done,

7    despite the fact that we asked to be parties to the

8    negotiations, despite the fact that we were told we all know

9    Berkshire's MO, that they will not negotiate a deal once

10   they execute it.  The creditors, the most significant

11   creditor at EFIH was not permitted to negotiate or have a

12   say in the Berkshire transaction, and we understand that

13   this was not the position of Oncor and it was not the

14   position of Berkshire.

15          So, Your Honor, we found ourselves on basically

16   July 10th now free to go forward with a transaction or an

17   alternative transaction to seek financing.  And while the

18   Debtors say they're willing to cooperate with that

19   financing, we have to see it in their action -- not in their

20   words.  And also, they're seeking to have the transaction

21   approved on August 10th and settle the estate with another

22   termination fee.  So they say, okay, we can get out of this

23   transaction, a termination fee of 270, which Berkshire

24   Hathaway -- Berkshire Energy has said we don't need to

25   allocate it.  We also don't worry about it, NextEra hasn't

1    said we didn't allocate it.  But that's over $540 million of

2    breakup fees that has not been allocated and that we believe

3    the Debtors will try to saddle the EFIH estate with at least

4    the NextEra should it be a valid fee.

5              So, Your Honor, it's important for us to note here

6    and when we go into the next scheduling that we believe the

7    clock has started on July 10th.  We are encouraged that

8    since the announcements and with all the blowout of the

9    materials that many financing sources have contacted

10   Elliott.  We believe we will be able to raise financing, but

11   we may need the Debtors and Oncor's full cooperation.  Not

12   simply the words in court, but actual proved cooperation and

13   help with management presentations, just as they would with

14   a competitive bidder.  And we would need more because they

15   don't have -- they never had an auction process.  Indeed,

16   the Debtors seek to impose their fiduciary obligation on

17   Elliott.

18             As Your Honor knows, whenever you go for a sale,

19   you have to explore independent financing.  There's been

20   nothing that suggests that they explored independent

21   financing on their own, but rather tried to shoulder that

22   fiduciary burden on Elliott using that as a basis to go with

23   Berkshire.

24             Now, finally, I just want to bring to the Court's

25   attention that there's been a certain jumping of the gun

1    already with respect to the PUCT.  Your Honor, last night at

2    about 9:00, I believe, Berkshire and Oncor asked the Court

3    to put on the docket -- get a docket number for the

4    application, joint application to approve the joint control.

5    They said in that statement that they expected the

6    application to be ready to be put on the docket on July

7    17th.

8            I think as Mr. Husnick mentioned, the board at

9    Oncor had not yet approved going forward with that

10   application.  But I wanted Your Honor to understand that's

11   unprecedented even for these unusual cases.  For example,

12   NextEra was approved in September.  I think it was a month

13   later that the application went on file, after Your Honor

14   approved the NextEra merger agreement.  In the Hunt

15   transaction, the Hunt transaction put an application on

16   after the Court approved the PSA.

17           Now, everyone wants the PUCT approval.  I'm sure

18   Your Honor has reviewed the filings.  We want the PUCT

19   approval prior to Bankruptcy Court approval.  We believe an

20   equitization plan can get that approval.  But, Your Honor,

21   once an application is filed, it has to be withdrawn.

22   Unlike Hart-Scott, you can't have two applications pending.

23   So that will hamper us.  That will also hamper the filing --

24   the financing efforts.

25           So, Your Honor, I wanted to bring that to your

1    attention because what we firmly believe is there has not

2    been a level playing field, even at this stage.  We will

3    insist on the Debtor's cooperation and come to Your Honor

4    with respect to the Debtor's cooperation with respect to

5    financing efforts and the discharge of its fiduciary

6    obligations.

7           We do believe that, with respect to this plan, to

8    say that the EFH creditors will not be affected is to ignore

9    that the EFIH creditors are significantly affected from an

10   80-cent plan to a 24-cent plan.  And that we will be

11   opposing both the schedule, as well as seeking to come up

12   with an alternative as fast as possible.

13          And in that context, Your Honor, we were the ones

14   that said a fast process is necessary when we filed our

15   Complaint because there was the ticking of interest.  We are

16   the ones that suffer if the case goes longer, so we are the

17   most motivated to bring value into this estate as fast as

18   possible.  But a fair opportunity to do so is not to have

19   the hearing on August 10th, not to have the hearing on

20   August 11th.  But, Your Honor, we think the October-November

21   timeframe if the Debtors, in fact, cooperate is a very

22   doable timeframe.

23          We also would like to avoid a prolonged

24   confirmation hearing and have exactly the opposite results

25   that have happened in this case: you get a confirmation, but

1    you don't get PUCT approval.  We think the equitization plan

2    can do both.  And so, Your Honor, I just wanted to provide

3    our view of what the schedules will be and what the next

4    couple of weeks will be.

5            THE COURT:  Okay.  Thank you, Mr. Galardi.

6            MR. GALARDI:  Thank you.

7            THE COURT:  Mr. Qureshi.

8            MR. QURESHI:  Thank you, Your Honor.  Good

9    morning.  For the record, Abid Qureshi, Akin Gump Stress

10   Hauer & Feld, on behalf of UMB Bank as indentured Trustee

11   for the EFIH PIK notes.

12           Two very brief points, Your Honor.  First, we

13   share Elliott's concerns regarding the confirmability of the

14   Berkshire plan; that's obviously not an issue for today, but

15   I wanted Your Honor to be aware of that.  Secondly, I just

16   want to emphasize the point that the NextEra deal falling

17   apart really is harming EFIH creditors.  And, therefore, it

18   should come as no surprise, Your Honor, that we, as

19   indentured Trustee, are fully supportive of a process going

20   forward that allows for the possibility of an alternative

21   transaction that increases EFIH recoveries over and above

22   what is presently proposed by Berkshire.  So when we come

23   back at the scheduling hearing, we expect to be fully

24   supportive of that type of a process.

25           As Your Honor heard from Mr. Galardi, if the end

1    dates that the Debtor has in mind with respect to the

2    Berkshire deal can be kept in place, which it sounds like

3    Elliott believes that they can, then we hope and expect that

4    the Debtor will be doing absolutely everything that it can

5    in accordance with its duties to creditors to ensure that an

6    Elliott transaction has the possibility of coming together

7    and increasing recoveries for EFIH creditors.  Thank you,

8    Your Honor.

9           THE COURT:  Thank you, Mr. Qureshi.

10          MR. DAUCHER:  Good morning, Your Honor.  Eric

11   Daucher of Norton Rose Fulbright on behalf of NextEra

12   Energy, Inc.

13          I rise today just to briefly address the Debtor's

14   termination of the NextEra merger agreement and certain

15   related agreements which collectively formed the basis of

16   the NextEra sponsored plan.

17          Obviously, this is a disappointing development for

18   NextEra, particularly in light of the enormous effort

19   NextEra has invested alongside the Debtors in attempting to

20   close this transaction.  But this is the juncture at which

21   we find ourselves, and NextEra acknowledges that the cases

22   will now have to move in a different direction.

23          With that said, I just wanted to call your

24   attention -- the Court's attention to one issue with respect

25   to the termination itself.  As Mr. Husnick explained and as

1    reflected at Docket #11424, on July 6th, the letter -- the

2    Debtors delivered a letter to NextEra purporting to

3    terminate the merger agreement pursuant to Section 8.2(a)

4    and Section 8.3.  Now, Section 8.2(a) deals with the

5    Debtor's voluntary termination of the merger agreement upon

6    the occurrence of the drop-dead date.  Section 8.3 has a

7    variety of other termination provisions.

8            The Debtors also suggested that they may have had

9    other bases on which they could have terminated the merger

10   agreement.  The following day, as reflected at Docket

11   #11441, NextEra delivered a reply letter to the Debtors,

12   acknowledging termination of the merger agreement pursuant

13   to Section 8.2(a).  NextEra also acknowledges that the

14   related agreements, such as the NextEra debtor fidelity plan

15   support agreement, have likewise been terminated.  That's

16   not going to be in dispute.

17           NextEra does not agree, however, that the Debtor's

18   letter reflected an effective or valid termination of the

19   merger agreement pursuant to Section 8.3, or that the

20   Debtors had any other valid basis upon which to terminate

21   the merger agreement.

22           In short, we have agreement that the merger

23   agreement has been terminated, insofar as the Debtors have

24   invoked Section 8.2(a) and accept, with respect to that

25   acknowledged termination, NextEra reserves its rights in all

1   respects.  Thank you, Your Honor.

2          THE COURT:  Thank you.  Anyone else?  Mr. Husnick,

3   any comment?

4          MR. HUSNICK:  I didn't want to do this, Your

5   Honor, but I have to.  There's a couple of things that were

6   said that were unfortunately just plain wrong.

7          Let me start by saying the Debtors are well aware

8   that Elliott acquired large positions in two of the Debtor's

9   tranches of debt, perhaps three -- the first liens, as well.

10  And they did so fully aware of the existence of the PIK PSA,

11  and that will come to light through evidence and testimony

12  and I won't have to speak or testify from the podium.  But

13  they also know that there are other tranches of debt and

14  there are other classes of creditors.  So while we can

15  litigate confirmability, the Debtors are very comfortable

16  that this plan is confirmable and will be confirmable.

17          As to the unilateral waiver, Your Honor, it is

18  interesting that Mr. Galardi testifies from the podium that

19  they were not free to talk to other parties.  Your Honor, as

20  you know, Elliott commenced the action because of that

21  concern.  We negotiated the unilateral waiver.  And Elliott

22  went on its way adjourning by agreement the PIK PSA

23  preliminary injunction hearing while they went out and had

24  discussions with the financing parties.

25          The Debtors negotiated the NDA.  We, in fact, sent

1    the only joinder signature that I've received from Elliott

2    over the last three months, unless we -- or two months,

3    unless I got one this morning, is from a party that the

4    Debtors introduced to Elliott.

5            It's just shocking to hear complaints about the

6    PIK PSA.  As we all know, the PIK PSA is gone now.  And did

7    the Debtors feel that there was no chance at an 80-cent plan

8    here?  Absolutely not and we could talk about that later.

9    But suffice to say, we figured that it was a worthwhile

10   exercise to just not have to continue to fight with Elliott

11   over the existence of the PIK PSA.

12           The truly most shocking comment that I heard,

13   though, was comments on the investor deck.  And I just

14   looked it up while I was sitting here, Your Honor.  Two

15   separate emails, one on June 20 at 2:07 p.m., containing the

16   Debtor's comments to that investor deck.  We absolutely

17   engaged on that.  It's just patently false.  Maybe it was a

18   mistake, but it's false.  June 22nd at 2:46 p.m., we sent

19   additional comments to the investor deck.  While the

20   investor deck that was ultimately disclosed by Elliott did

21   not contain all of those comments, it did contain some of

22   them.  It didn't reflect all of them because a lot of them

23   were ignored.

24           Your Honor, we will continue to cooperate with

25   Elliott.  But let me be clear that the Debtors do not bear a

1    fiduciary obligation or otherwise to negotiate the financing

2    for an Elliott-led transaction.  That's just not how it

3    works.  We will cooperate with them and assist them in

4    getting them the information they need; obviously, subject

5    to confidentiality agreements that must be agreeable between

6    Oncor.

7            One issue they asked for is just let us in the

8    data room.  We want to see everything.  Well, every party

9    that has gotten into the data room in this process has

10   signed an NDA.  That's at the request of Oncor.  We don't

11   control Oncor.  And Oncor is going to negotiate its own NDA

12   and it's going to agree to blow out what it agrees to blow

13   out in a cleansing process.  The Debtors simply can't

14   control that.  We can help them get in contact with Oncor,

15   and Oncor's counsel is sitting in the room here today, to

16   have that discussion.

17           It's important to note that nothing stopped

18   Elliott from having conversations with Berkshire.  Berkshire

19   was subject to an NDA.  Elliott was subject to an NDA.  They

20   were free to pick up the phone.  Whether Berkshire would

21   take the call or not, I don't know, but they were free to do

22   that, and I understand they have had some discussions.

23           Your Honor, I do need to clarify one of my own

24   misstatements, which is Oncor being a signatory to the

25   regulatory commitment letter.  I was mistaken on that.

1    Oncor is actually not a signatory to that regulatory

2    agreement.  That is just between the interveners and

3    Berkshire, so I wanted to clarify the record on that.

4            In terms of what was filed this morning, Your

5    Honor, it was a simple procedural request to open a docket

6    number in the PUCT process.  But let me be clear that it is

7    entirely our intention to -- and we have no ability to

8    control it or otherwise because we are not an applicant in

9    that process.  But it is entirely our desire to facilitate

10   as quick of a regulatory process as we possibly can, largely

11   to facilitate having a confirmation hearing where we know

12   what the result of that process is.  And as we know under

13   the law, there's 180-day period.

14           I think what you did hear from both Mr. Qureshi

15   and Mr. Galardi is there is a shared interest in moving

16   these cases forward, and we're going to talk a lot about

17   that at scheduling.  But $25 to $35 million a month of

18   interest leaves the door at a direct detriment to creditors

19   at the EFIH box.  So there is a unified interest in moving

20   these cases forward.

21           And I did hear and I'm not sure -- and this will

22   be my last point -- I'm not sure if what I heard from Mr.

23   Galardi was an ask for another auction.  But I'm just

24   shocked.  Your Honor, this is the most marketed asset in

25   Chapter 11 history.  I've said that before and I truly

1   believe it.  We ran a marketing process at the very

2   beginning.  We reran the marketing process, and we reran it

3   again.  There is no need to remarket this asset.  Everybody

4   who's out there knows that this asset is being sold.

5           There's been two very public PUCT proceedings.

6   There's been three very public confirmation proceedings.

7   And Your Honor, we don't need to remarket the asset for

8   people to know that it's available.  And as I said, all the

9   provisions in the merger agreement give us the flexibility

10   to consider whether there is a higher or otherwise better

11   offer.

12           So the argument that this somehow needs to slow

13   down and market the asset, my response to that is, show me

14   the money.  Show me the money and we'll talk about it.

15   Right now, there is zero committed financing for any

16   alternative proposal.  So until that time, Your Honor, we

17   respectfully submit that the schedule is appropriate and we

18   need to move forward.

19           THE COURT:  All right.

20           MR. HUSNICK:  Thank you.

21           THE COURT:  Thank you.  Of course, I'll hear

22   argument on the schedule when it's in front of me, and

23   everyone will have a full and fair opportunity to be heard

24   in connection with that schedule.  As Mr. Galardi

25   acknowledged, this is a status conference and has been very

1   helpful to bring an update on a quickly moving situation.

2   And also to get an update on the creditor's response to

3   what's being proposed by the Debtors, or at least certain

4   creditor's response to what's being proposed by the Debtors.

5          So it's been very helpful to hear from Mr.

6   Husnick.  It's been very helpful to hear from Mr. Galardi,

7   as well as NextEra, although I had read the letter with

8   regard to that.  So I was aware of that issue already since

9   it was publicly filed on the docket, so very helpful.

10          I'm hoping end of the year, right?  I'm very

11   hopeful one way or the other, we get this thing -- we get

12   this asset taken care of and we get this case reorganized.

13   I will comment that I think it's very helpful.  And I agree

14   with the parties that obtaining PUCT approval prior to going

15   through the exercise of another confirmation process,

16   whatever -- whether that be a Berkshire deal or an Elliott

17   deal, is highly preferable to going for the third time back

18   to what's proved to be a twice unsuccessful approach to

19   getting the case out of Chapter 11, so I full support that.

20   I think that makes a lot of sense.

21          And, of course, the PUCT will do what is

22   appropriate for them to do in the context of their duties,

23   and I will do what I feel is appropriate in the context of

24   my duties.  And, hopefully, whether it's an Elliott deal or

25   a Berkshire deal or not, hopefully, we'll actually agree

1   this time and be able to move this forward.  But we'll have

2   to await developments; we'll see how it plays out.

3           So the only other thing I would comment on is the

4   TTI litigation, and I certainly am not asking for any kind

5   of commitment as to how that's going to proceed.  However,

6   that might -- that will take some time if it's litigated or

7   is going to be litigated.  So I don't -- I think if it's

8   going to be a litigation track, that needs to start

9   relatively soon in order not to imperil a confirmation

10  hearing set for October.

11          Although I'm not trying to pressure the parties

12  into litigating before they've had an opportunity to settle,

13  but I'm just sort of learning that I can only turn that

14  litigation so quickly.  We went down this path, of course,

15  back in 2015 and 2016 and it took some time, so I'm somewhat

16  educated to the issues obviously from the briefing at that

17  point.

18          It goes without saying, but I'll say it anyway

19  that Courts, including myself, always prefer settlement to

20  litigation.  And that, of course, would be a much better way

21  to resolve the issue.  But if it requires litigation, I will

22  do my best to hear it and decide it in a timeframe that is

23  consistent with an October exit, which it sounds like

24  everybody's in favor of.  It's just a question of how do we

25  get from here to late October and whose deal is the deal

1   that's in front of the Court in October and that'll have to

2   await developments.

3              Mr. Galardi, you look like you want to say

4   something.

5              MR. GALARDI:  Your Honor, just one point.

6              THE COURT:  Wait, can you come to the microphone

7   first?  Otherwise, people on the phone can't hear you.

8              MR. GALARDI:  You mentioned that TTI transaction,

9   and I just -- and Mr. Husnick said the same thing -- they

10  are still bound.  And I think Your Honor's familiar with the

11  document, but I do want to give Your Honor one more date.

12  My understanding is they are bound to that document, I think

13  it is, until August 1st, so no one can even really speak to

14  your (indiscernible).

15             THE COURT:  Okay.  I did not know that.

16             MR. GALARDI:  I just wanted to add that date to

17  your -- I think that's correct, but I wanted to put that in

18  your mind as well.  And that is a 20 percent owner, and we

19  are thinking of that in the context, again, of the August

20  10th date and the other issues Your Honor will have to deal

21  with.

22             THE COURT:  Thank you.  I was not aware of that

23  deadline -- or not deadline, that date.  So thank you for

24  that information.  Okay, very good, very helpful.  I hope

25  everyone has a pleasant rest of the day, and we are

1    adjourned and I'll see you on July 26th.

2                              * * * * *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya
    Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o,
ou, email=digital1@veritext.com,
c=US
Date: 2017.07.13 15:25:55 -04'00'

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  July 13, 2017