## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>ENERGY FUTURE<br>HOLDINGS CORP., *et al.*,<br><br>          *Debtors.* | Chapter 11<br><br>Case No. 14-10979 (CSS)<br>(Jointly Administered)<br><br><u>**Hearing Date:**</u>  July 26, 2017 at 10:00 a.m.*<br><u>**Objection Deadline:**</u>  July 24, 2017 at 4:00 p.m.*<br>*\* subject to motion to shorten notice* |

## THE ELLIOTT FUNDS' MOTION TO ADJOURN HEARING ON THE MOTION OF THE EFH/EFIH DEBTORS FOR ORDER AUTHORIZING ENTRY INTO MERGER AGREEMENT AND APPROVING TERMINATION FEE

Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership (collectively, "Elliott" or the "Elliott Funds") respectfully move this Court to adjourn (the "Motion to Adjourn") the hearing on the *Motion of the EFH/EFIH Debtors for Order Authorizing Entry Into Merger Agreement and Approving Termination Fee* [D.I. 11430] (the "Berkshire Merger Agreement Motion") currently scheduled for August 10, 2017.  In support of the Motion to Adjourn, the Elliott Funds respectfully state as follows:

## PRELIMINARY STATEMENT

1.       Elliott is the Debtors' largest unsecured creditor, holding, among other claims, over 74% of Energy Future Intermediate Holding Company LLC's ("EFIH") unsecured bonds (the "PIK Notes").  Despite this, neither the Debtors, nor the disinterested director for EFIH, sought Elliott's input prior to executing the merger agreement (the "Berkshire Merger Agreement") with Berkshire Hathaway Energy Company ("Berkshire").  Although Elliott and the Debtors were in the midst of negotiations regarding a transaction that would provide the Debtors' estates hundreds of

millions of dollars of additional value, the Debtors (with concurrence of the EFIH Independent Director) chose to execute the Berkshire Merger Agreement instead. If approved, that agreement will saddle these estates with a ***$270 million*** termination fee (the "Termination Fee"). But the Termination Fee did not and does not position these estates to get a higher and better deal arising from the presence of a "floor" created by Berkshire—because the Berkshire Termination Fee, if approved, effectively cancels out the additional consideration already on the table in a creditor-led equitization; because Berkshire is well known for not engaging in competitive bidding; and finally, because the fiduciaries chose to instantly pursue a deal weighted with a termination fee, rather than pursuing a superior creditor-led deal, or merely pausing briefly to consider both transactions.

2.    The relevant fiduciaries went forward, without pausing between terminating the NextEra transaction and signing the new Berkshire Merger Agreement, knowing that:

(i)  Elliott had requested to be involved in negotiations with Berkshire prior to entry into the Berkshire Merger Agreement;

(ii)  Berkshire was unlikely to negotiate its price ***after*** it executed a merger agreement;

(iii)  Elliott had proposed an equitization transaction that (a) was for substantially higher value, (b) did not require the acquisition of the minority interests in Oncor Electric Delivery Company LLC ("Oncor") held by Texas Transmission Investment LLC ("TTI"), (c) envisioned funding no later than August 31, and (d) contemplated consummation of a consensual plan of reorganization by no later than year end; and

(iv)  the transactions with Berkshire (the "Berkshire Transactions") have significant conditions, including acquisition of the 20% minority interest in Oncor from TTI.

> This minority interest (a) is not property of the Debtors' estates, (b) is still subject to an exclusive agreement with NextEra that would terminate, at the earliest, on August 1, 2017, which agreement precluded TTI from negotiating with third parties regarding the acquisition of its minority interest, and (c) will, in all likelihood, require the Debtors to seek to exercise a "drag" right on the 20% interest, which right TTI has already contested.

3.      Given these facts and circumstances and those set forth below, Elliott requests a relatively short adjournment of 35 to 40 days for the hearing on the Berkshire Merger Agreement and the Termination Fee.  Absent such an adjournment, this Court will grant a costly *de facto* extension of exclusivity, to which the Debtors are not entitled. More important, failure to pause briefly now will irrevocably sacrifice the chance to maximize value for all creditors, and most particularly, the interests of the EFIH unsecured creditors.

### JURISDICTION AND VENUE

4.       This Court has jurisdiction over the Motion to Adjourn pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2014.

5.      The Motion to Adjourn is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Pursuant to Local Rule 9013-1(f), Elliott consents to entry of a final order with respect to the Motion to Adjourn to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue with respect to the Motion to Adjourn in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The bases for the relief requested in the Motion to Adjourn are Bankruptcy Code Section 105(a), Rule 9013 of the Federal Rules of Bankruptcy Procedure, and Local Rules 9006-1 and 9013-1.

## RELIEF REQUESTED

8.     Elliott respectfully moves that this Court adjourn the hearing on the approval of the Berkshire Merger Agreement and Termination Fee currently scheduled for August 10, 2017 for 35 to 40 days, or as soon thereafter as the Court determines is appropriate.

## BACKGROUND

9.     The Debtors have attempted to sell Oncor for nearly three years.

10.     First, in September 2014, the Debtors pursued a formal process through a bidding procedures motion. At that time, the Court delayed approval of the bidding procedures until January 2015, first requiring that independent advisors be retained for the three principal estates (EFH, EFIH, and TCEH) because of inherent conflicts of interest.  More than five months later, in June 2015, the Debtors abandoned the formal sale process after it yielded, in the Debtors' determination, no adequate offer.

11.     Subsequently, in August 2015, after several months of negotiations with creditors, the Debtors determined to pursue a REIT reorganization transaction with Hunt Consolidated, Inc. ("Hunt"), and in December of the same year confirmed a reorganization plan contingent upon consummating the Hunt transaction.  The Hunt transaction, however, failed when the PUCT refused to approve the REIT transaction, and the Hunt plan support agreement and merger agreement were terminated in May 2016.

12.     Starting again, the Debtors then explored additional sale transactions.  In July 2016, after spending months of negotiations with three interested parties (including Berkshire), the Debtors entered into a merger agreement (the "NextEra Merger Agreement") with NextEra Energy, Inc. ("NextEra").  In September 2016, the NextEra Merger Agreement was approved.  The NextEra Merger Agreement included an extraordinary "break fee" provision purporting to entitle NextEra to a $275 million even in the event that the PUCT said no to NextEra as acquirer of Oncor.  Clearly this was unusual, since denial by the PUCT would leave the estates with a $275 million liability, but with no alternative "higher and better" transaction for the creditors from which to pay such a fee.

13.     In February 2017, the Court confirmed the reorganization plan based upon the transactions contemplated by the NextEra Merger Agreement.  The PUCT denied approval of the NextEra transaction on April 27, 2017, finding that the NextEra transaction was not in the public interest.  Following further tactical procedural delay by NextEra (the delay was "tactical" because NextEra publicly admitted it was never going to accede to the substantive hurdles made clear by the PUCT), the PUCT again denied approval of the NextEra transaction on June 29, 2017.  Seven days later, the Debtors' boards of directors authorized the **simultaneous** termination of the NextEra transaction and entry into the Berkshire Merger Agreement (including a new $270 million break fee). As a consequence, late on the evening of July 6, Debtors' counsel advised Elliott that the Berkshire transaction was a *fait accompli*, and shortly after midnight on July 7, 2017 made the public announcement.

I.    **ELLIOTT'S EFFORTS TO FORMULATE AND FUND A SUPERIOR CREDITOR-LED EQUITIZATION PLAN**

14.    In March and April 2017, Elliott contemplated pursuit of an alternative restructuring plan.  Following the PUCT's first denial of the NextEra transaction in April 2017, Elliott contacted the Debtors regarding such an alternative.  The Debtors flatly refused to permit Elliott to negotiate financing and restructuring alternatives with third parties.

15.    The Debtors insisted that the January 2017 Plan Support Agreement (the "PIK PSA") precluded Elliott, the largest EFIH unsecured creditor, from undertaking such a course without them, even though Elliott was never a party to that agreement.  And the Debtors contended that the PIK PSA would block Elliott's efforts even if the NextEra transaction was not approved—the theory was that the Debtors hypothetically could still pursue a transaction that would provide Elliott and other holders of PIK Notes the value of the "PIK Settlement," (*i.e.,* 80 cents on the dollar) and thereby satisfy the PIK PSA.  As a result, Elliott was compelled to bring an adversary proceeding seeking a declaration, among others, that it was not bound by the PIK PSA.  *Elliott Assocs., L.P., et al. v. Energy Future Intermediate Holding Co. LLC*, Adv. Pro. No. 17-50479 (Bankr. D. Del.).

A.    **The Negotiation of Term Sheets for an Equitization Plan**

16.    Notwithstanding these roadblocks, Elliott determined that instead of pursuing a month or more of costly litigation, it would attempt to work cooperatively with the Debtors to negotiate a term sheet for a fully consensual "Backup Plan."  In short, Elliott was comfortable that the ultimate PUCT rejection would come and render the PIK PSA litigation moot.  Thus, on May 17, Elliott entered into a confidentiality agreement

with the Debtors that only permitted Elliott to have plan negotiations with the Debtors. Although not ideal, it permitted Elliott to share information with third parties that signed joinders, but both Elliott and those third parties were only permitted to pursue transactions that the Debtors supported.  Over the next month, Elliott focused on negotiating a term sheet for an equitization plan that the Debtors would support, seeking to shape the form of financing the Debtors and Elliott would use to consummate an equitization plan.

17.     These negotiations resulted in the exchange of term sheets between the Debtors and Elliott, including a term sheet from the Debtors on June 23, *see* Exhibit A hereto, and a counterproposal from Elliott on July 1, *see* Exhibit B hereto (redline against the Debtors' June 23 proposal).  These term sheets make clear that Elliott's equitization plan would provide creditors with a transaction at a valuation that is hundreds of millions of dollars above the Berkshire transaction.

18.     To help ensure regulatory approval for an equitization plan, Elliott has committed to accept the existing "ring fence" conditions, as well as certain other requests that were made by the PUCT but rejected by NextEra.  Both before and after the July 7 announcement of the Berkshire transaction, Elliott has been working with Oncor and its advisers regarding PUCT approval and Elliott's financing efforts.

**B.      Raising Capital for a Higher-Value Equitization Transaction**

19.     Prior to the announcement of the Berkshire transaction, Elliott worked with the Debtors and Oncor to obtain sufficient information for a capital raise to reduce the principal amount outstanding on the recently approved debtor in possession financing through a "New EFIH 1.5L DIP Facility" and the interest accrual on the outstanding second lien debt through a "New Second Lien DIP Financing" (together, the "Proposed

New DIP Financings"). Under the draft term sheets, Elliott was committed to complete the capital raise for the New Proposed DIP Financings by August 31. The Debtors had proposed in their June 23 term sheet (the same day they received the Berkshire proposal) that Elliott need only commit to have the Proposed New DIP Financings close in mid-September. *See* Exhibit B at 7 (Elliott proposing an August 31 deadline, and Debtors proposing September 15 deadline). To obtain the Proposed New DIP Financings, Elliott had been working with the Debtors and Oncor on preparing a presentation for potential financing partners, and a draft of the presentation that included the Debtors' initial comments was provided to the Debtors on June 21. After providing some minor comments by email on June 22, the Debtors ignored Elliott's interest, apparently choosing instead to proceed exclusively with Berkshire.

20.     Despite the announcement of the Berkshire transaction and the Debtors' abrupt refusal to engage with Elliott, Elliott is still committed to the equitization plan. As Elliott has advised the Debtors, it remains committed to providing a substantial amount of its own capital and to convert much of its debt into equity of the Reorganized EFH. Partly as a result of the termination (albeit tardy) of the NextEra Merger Agreement, Elliott has already received considerable in-bound unsolicited interest in participating in the capital raise. ***In fact, Elliott has also received in-bound expressions of interest from multiple strategic bidders following the announcement of the Berkshire transaction.*** These indications of interest have proven to be serious, and Elliott is in the process of finalizing confidentiality agreements with numerous potential investors.

21.     Furthermore, Elliott has taken upon itself to retain Moelis & Company LLC ("Moelis") as its investment banker to assist with, among other things, the capital

raise. As will be demonstrated at the hearing on this Motion to Adjourn, Elliott is confident that it will be able to have committed financing for the equitization plan by early September, if the hearing on the Berkshire Merger Agreement and the Debtors' proposed disclosure statement with respect to the Berkshire plan are adjourned, despite the Debtors' failing to help with the investor presentation and its abrupt change of heart regarding the Proposed New DIP Financings.

## II.    THE CURRENTLY PROPOSED AUGUST 10, 2017 HEARING TO APPROVE ANOTHER $270 MILLION BREAK FEE

22.    The Debtors have sought approval of the Berkshire Merger Agreement and its $270 million Termination Fee at an August 10 hearing. Approval of the Berkshire Merger Agreement, including the $270 million Termination Fee, on August 10 and the consequent filing of a change of control application with the PUCT by Oncor will materially undermine Elliott's capital raise efforts and prevent an equitization plan yielding the unsecured creditors of EFIH hundreds of millions of dollars more in value. Imposing a $270 million termination fee creates an overbid requirement that will effectively wipe out the increased value inherent in Elliott's equitization plan and, together with the filing of a change of control application by Oncor (which requires the Debtors' consent), will provide the Debtors' with a *de facto* extension of exclusivity.

23.    Accordingly, by letters dated July 11 and 15, Elliott requested that the Debtors agree to a modest adjournment of the hearings on the Berkshire Merger Agreement, the disclosure statement for the Berkshire plan, and certain other deadlines. In that regard, Elliott requested that the hearings be adjourned 35 to 40 days, which would extend the hearing on the Berkshire Merger Agreement only four weeks beyond the August 21 deadline for approval set forth in the Berkshire Merger Agreement. *See*

Berkshire Merger Agreement § 8.4(h)(ii). Elliott did <u>not</u> request that the Debtors adjourn the October 24, 2017 hearing on confirmation of the Berkshire plan; but even if that hearing were adjourned, it could easily be held well before November 22, 2017, the date by which the Debtors must make "commercially reasonable" efforts to obtain a confirmation order. *See id.* § 8.4(h)(ii). Although counsel to the Debtors and Elliott have conferred regarding Elliott's request, the Debtors have refused Elliott's request for a modest adjournment. Consequently, Elliott has filed this Motion to Adjourn.

## **BASIS FOR RELIEF REQUESTED**

24.     Under the Berkshire deal and accompanying proposed Berkshire plan, the Debtors project that EFIH's unsecured creditors will receive only an 18% recovery, *see* Proposed Disclosure Statement [D.I. 11427] at 28, as compared with the approximately 80% recovery that such creditors were to receive under the terminated NextEra transaction. And even that 18% recovery projection assumes the $275 million NextEra termination fee is not payable by EFIH. Full candor in considering the Berkshire Termination Fee requires these Debtors to show the marginal recovery to EFIH unsecured creditors if the prior NextEra break fee falls upon them. The Berkshire transaction provides creditors with far less value than the NextEra transaction, less than Elliott's proposed equitization transaction, and less than even Berkshire's own proposal from over a year ago. It also requires the Debtors to proceed on a truncated timeline for approval, which approval includes burdening the Debtors' estates with an additional $270 million termination fee that would eliminate most of the value that Elliott's equitization proposal could bring to the EFIH unsecured creditors.

25.      Instead of encouraging the development of value-maximizing alternatives, the currently proposed schedule destroys value.    Accordingly, more than adequate grounds exist for this Court to grant Elliott's request to adjourn the hearings on the Berkshire Merger Agreement and disclosure statement for 35 to 40 days and permit Elliott to "show [the Court] the money" (as Debtors' counsel stated at the last status conference) before ***another*** $270 million termination fee permanently closes the door to a consensual, value-maximizing transaction.

## I.      CONSIDERATION OF THE BERKSHIRE TRANSACTION ON AUGUST 10 IS PREMATURE

26.      This is not the first time the Debtors have attempted to sell EFIH's interest in Oncor without creditor support and without fully exploring value-maximizing alternatives.    At the beginning of these cases in 2014, the Debtors sought to establish bidding procedures for the sale of Oncor and received backlash from its creditors across both the E-side and T-side.    As this Court noted then:

> Creditor and Court oversight of the debtors' action outside the ordinary course of business, including asset marketing and sales, is not only appropriate, but is required by the law.

Transcript of Nov. 3, 2014 Bench Ruling at 21:15-18.

27.      The Debtors simply do not have the unfettered right to commit their estates to a sale transaction at deflated values, nor to saddle their estates and creditors with massive break fees.    Instead, the Debtors' judgment in pursuing a sales transaction must be independently assessed by the Court for reasonableness:

> The business judgment test here differs from the general corporate law business judgment rule which protects corporate directors [from] liability when they have exercised due care and are not self-interested in the transaction.    Here by contrast the Bankruptcy Court reviews the debtors' business judgment to determine

> independently whether the judgment is a reasonable one.
> The Court should not substitute its judgment for the debtors;
> however, but should determine only whether the debtors'
> judgment was reasonable and whether a sound business
> justification exists supporting the transaction and its terms.

*Id.* at 17:1-12.

28.    It is not at all reasonable to jump from one transaction to the next while doling out hundreds of millions of dollars of break fees, particularly when their largest and most-affected unsecured creditor both opposes the transaction and remains committed to pursuing a value-maximizing alternative.

29.    Proceeding on a truncated timeline that precludes the full and fair development of a creditor-led proposal and an associated capital raise process, or other potential transactions, should not be permitted.  Moreover, the Berkshire transaction contains major contingencies, requiring, among other things, Berkshire to succeed in a "drag right" that has already been contested, receipt of a private letter ruling from the Internal Revenue Service, and this Court's approval of not only the Berkshire Merger Agreement, but also the Berkshire plan, which will be contested by Elliott and perhaps by other unsecured creditors at EFIH.

### A.    The Berkshire Transaction Is Contingent On Obtaining The 20% Minority Interest From TTI

30.    Unlike the prior Hunt transaction, which was *not* conditioned on the acquisition of the 20% minority Oncor interest, and the NextEra transaction, which had a prior agreement with TTI for the acquisition of the minority interest, consummation of the Berkshire transaction is dependent upon the *future* negotiation of the minority interest acquisition, or a litigated outcome that permits Berkshire to exercise certain drag rights. An additional obstacle on the Berkshire transaction is imposed by NextEra's current

agreement with TTI for the acquisition of the minority interest which terminates, at the earliest, on August 1, 2017.[1] That agreement precludes TTI from even negotiating with Berkshire (or Elliott) until its agreement with NextEra is terminated. In all likelihood, and in light of the higher value offered by the equitization plan, the drag rights will need to again be litigated, further delaying a determination of when and if this condition to the Berkshire Merger Agreement would be satisfied.[2]

31.    Nor may any comfort be taken in the fact that the Termination Fee is not payable if the Berkshire Merger Agreement is terminated as a result of Berkshire's inability to acquire the 20% minority Oncor interest from TTI. If the $270 million Termination Fee is approved at this early juncture, having to overcome this hurdle will preclude the interim development of Elliott's equitization plan (which is not conditioned on the minority interest acquisition). Moreover, it will enable Berkshire and Oncor to file a joint change of control application with the PUCT, precluding other applications from being filed, and thereby grant the Debtors and Berkshire a *de facto* exclusive period to pursue the Berkshire plan. Consequently, if Berkshire's minority interest condition is not satisfied, the Debtors will be back to square one to negotiate Elliott's equitization plan, having wasted several months on yet another failed transaction. This, however, could be avoided by providing Elliott with a sufficient opportunity to raise committed financing

---

[1] NextEra Energy, Inc. Form 8-k (Oct. 31, 2016), Ex. 2 at 36 (Agreement and Plan of Merger dated Oct. 30, 2016 among, *inter al*ia, Texas Transmission Holdings Corporation and NextEra Energy Inc.).

[2] This issue further complicates the PUCT process. Specifically, because Berkshire is seeking approval of a transaction in which it acquires 100% of the economic interests in Oncor, the change of control application filed with the PUCT must seek approval of that 100% control transaction. Until it is clear that Berkshire is able to obtain the minority interests held by TTI, the filing of such application would appear to be premature. Indeed, any approval by the PUCT would arguably be advisory in nature given that it is far from certain that Berkshire will be able to acquire the minority interest. In contrast, Hunt proceeded with regulatory approval for a transaction that was not conditioned on obtaining the minority Oncor interest, and NextEra requested approval of both its acquisition of EFIH's 80% interest in Oncor and its acquisition of the 20% interest held by TTI (for which NextEra already had an agreement with TTI).

for the equitization plan.  In short, the minority interest condition renders any consideration of the Berkshire Merger Agreement and Termination Fee at this stage premature.

**B.** **The Berkshire Merger Agreement Has A December Outside Date For Confirmation Of The Berkshire Plan**

32.    An August 10 hearing on the Termination Fee is also not necessary in light of the December outside date for confirmation of the plan under the Berkshire Merger Agreement.  *See* Berkshire Merger Agreement § 6.3(g)(v) (requiring the Debtors use "commercially reasonable efforts" to obtain a confirmation order by November 22— a month after the currently requested October 24 confirmation hearing); *id.* § 8.4(h)(iv) (providing Berkshire a termination right if a confirmation order is not entered by December 15).

33.    The Debtors and Elliott have been unable to agree upon Elliott's request for a modest adjournment of the hearing on the Berkshire Merger Agreement Motion because of the Debtors' agreement to provide Berkshire the right to terminate the Berkshire Merger Agreement if it and the Termination Fee are not approved by August 21.  Any suggestion that Berkshire will walk away due to a 25-30 day delay from the August 21 milestone is simply not credible.  Berkshire has been interested in Oncor for years, having previously conducted diligence and engaged in months of negotiations with the Debtors.  There is no basis to suggest that Berkshire will walk if a modest delay were granted, particularly since its current bid is hundreds of millions of dollars less than its prior bid, despite the relevant indicators of value suggesting that the Oncor asset is worth more today than at the time of Berkshire's prior (higher) bid.

34.      Moreover, as the Debtors' largest unsecured creditor with the greatest economic risk, Elliott is simply willing to take the risk—however small it may be—that Berkshire will walk if its dictated deadline for approval of the Termination Fee is not met. A $270 million termination fee provides no benefit to Elliott or other unsecured creditors who will bear the brunt of the fee and the resulting barrier to a superior transaction. Elliott, with its recovery on the line, should be afforded the opportunity to put forth an alternate transaction for the benefit of all creditors before a $270 million termination fee is approved.  In sum, the proposed August 10 approval of the Transaction Fee is intended to "advantage a favored purchaser over other bidders by increasing the cost of the acquisition to the other bidders (an impermissible purpose)." *Calpine Corp. v. O'Brien Env't Energy, Inc.* (*In re O'Brien Env't Energy, Inc.*), 181 F.3d 527, 535, 537 (3d Cir. 1999) (noting that bidding might be "even more heated" if a break fee is not approved in light of "uneconomical" overbid requirements).

### C.      The Berkshire Merger Agreement Has No Creditor Consensus Or Support

35.      This Court has previously noted the importance of the Debtors' involvement of creditors in the selection of sale transaction:

> [T]he Court finds that the bidding procedures are not transparent and are inappropriate in a bankruptcy case.  The procedures must allow for the substantive involvement of some creditors on a real-time basis with the ability for those creditors to communicate directly with potential bidders.

Transcript of Nov. 3, 2014 Bench Ruling at 19:17-22.   Notwithstanding this prior admonishment, the Debtors precluded Elliott—the largest remaining affected stakeholder—from directly discussing possible transactions with third parties, including Berkshire.  The Debtors used the pretense of the PIK PSA—even though Elliott was

never a party to the agreement—to preclude Elliott from directly negotiating a transaction even though all parties knew that the NextEra transaction was long dead and no transaction preserving the PIK settlement would be available.  The Debtors continued to refuse to permit Elliott to engage in discussions with Berkshire even after the Debtors knew of Berkshire's continued interest from receiving Berkshire's June 23 term sheet. Instead, the Debtors only informed Elliott of the *fait accompli* of the Berkshire transaction hours before its public announcement.

36.     The Debtors' determination to pursue the Berkshire sale transaction while its largest unsecured creditor was and remains committed to pursuing an equitization plan does not make sense.  In fact, the Debtors do not have the support of *any* creditor constituency.  Elliott, as the controlling holder of the PIK Notes (which represent over 96% of the impaired unsecured claims at EFIH that will be required to vote on the plan) opposes the transaction.  Absent creditor support—particularly by Elliott—the Berkshire transaction has significant obstacles to confirmation, at best.  Proceeding with a hearing on the Termination Fee under these circumstances is a high-risk wager with only downside for the Debtors' estates.

## II.     ELLIOTT SHOULD HAVE A FAIR OPPORTUNITY TO FORMULATE A COMPETING PROPOSAL

37.     "It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.  *Off. Comm. Of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 659 (S.D.N.Y. 1992); *se also In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996) ("[Under the Code a trustee . . . has the duty to maximize the value of the estate, and in so doing is 'bound to be vigilant and attentive in advancing

[the estate's] interests.'  In sum, 'it is the trustee's duty to both the debtor and the creditor to realize all that is possible for distribution among the creditors.") (citations omitted).

38.    The Debtors' refrain that the Oncor asset has been the most marketed asset in the history of chapter 11 means nothing for value-maximization when its largest unsecured creditor is denied the meaningful opportunity to develop a superior equitization plan.

**A.    Elliott Remains Committed To Pursuing An Equitization Plan With Committed Financing**

39.    Notwithstanding the obstacles imposed by the Debtors, Elliott remains committed to pursuing an equitization plan with committed financing.  Raising $9.3 billion in capital, however, cannot happen on 30-days notice as the Debtors now demand through their proposed schedule.  A modest adjournment of the hearing on the Berkshire Merger Agreement and the Termination Fee will provide Elliott and its investment banker, Moelis, the necessary time to complete raising capital.

40.    The Debtors' refusal to pursue an equitization plan with Elliott based on the absence of committed financing is disingenuous.  The Debtors had indicated agreement to the process related to the Proposed New DIP Financings, but after receiving interest from Berkshire never requested Elliott to change the timeline in the term sheets. To the contrary, in the term sheet negotiations, it was the *Debtors* that pushed to *extend* the deadlines to raise the Proposed New DIP Financings.  *See* Exhibit B at 7 (Elliott proposing an August 31 deadline, and Debtors proposing September 15 deadline).  Thus, the suggestion that Elliott was to have raised $9.3 billion in financing in the middle of negotiations of a term sheet upon which there was still no agreement, and before Elliott had sufficient financial information for Oncor to use in the capital raise, defies all logic.

It has only been after the July 11 termination of the PIK PSA that Elliott has been truly free of the Debtors' artificial restrictions and been able to work directly with Oncor and third parties to raise financing for an equitization plan (which will not, as before, be through Proposed New DIP Financings).

### B.    The "Fiduciary Out" Is Illusory

41.    This Court should not accept the Debtors' position that the proposed Berkshire Merger Agreement and Berkshire plan are the starting point in the process of maximizing creditor recoveries and that they should take comfort in the Debtors' "fiduciary out." The Debtors knew full well that Berkshire was unlikely to negotiate its price after it executed a merger agreement. Nor is there any comfort in the "fiduciary out." The Debtors simultaneously terminated the NextEra transaction and entered into the Berkshire Merger Agreement, in the middle of negotiations with Elliott, and without providing opportunity for other interested parties to appear following announcement of the termination of the NextEra transaction. Nor did the Debtors resolicit interest from other potential interested parties after terminating the NextEra transaction. In fact, Elliott has received in-bound expressions of interest from multiple strategic bidders following the announcement of the Berkshire transaction. Once the Berkshire Termination Fee is approved, imposing an overbid requirement roughly equal to the increased value of Elliott's proposal, an equitization plan will be stopped dead in its tracks, and the ability of other parties to propose transactions will be significantly chilled. The "fiduciary out" thus becomes illusory if the Termination Fee is approved. If the Debtors' assertions were genuine that the Berkshire transaction is the start and not the end, Elliott must be afforded sufficient time to obtain commitments to fund its equitization plan before imposing a new

$270 million overbid requirement.  As the Court held in 2014 in extending the sales process then:

> [I]n order for the debtors' statement that they are open to any transaction to be anything more than lip service more time must be provided to allow any such transaction to be formulated.

Transcript of Nov. 3, 2014 Bench Ruling at 22:6-9.  The same is even more true today.

### C.    The Requested Adjournment Will Not Impair Exit By Year-End

42.    Importantly, Elliott's requested modest adjournment will not delay the ultimate resolution of these cases. Elliott does **not** presently seek to adjourn the confirmation hearing currently proposed to commence October 24, 2017, and even if that were required, this case would still be able to be resolved within the timeframes contemplated by the Berkshire Merger Agreement.  The Berkshire Merger Agreement only requires that the Debtors use "commercially reasonable efforts" to obtain a confirmation order by November 22—a month after the currently requested October 24 confirmation hearing—and Berkshire's termination right provides a December 15 outside date for confirmation.

43.    Affording Elliott the opportunity to put forth an alternative plan with the necessary capital is what the Debtors should have done and is what this Court should now provide through a short adjournment of the Berkshire Merger Agreement Motion.

### CONCLUSION

44.    While the Debtors have attempted to shut the door on a value-maximizing alternative, this Court should not.  A modest amount of additional time is needed to permit Elliott to complete its capital raise for its equitization plan before this Court is asked to approve a $270 million hurdle to a value-maximizing transaction.  Accordingly,

Elliott requests that the Court provide a short adjournment of the hearing on the approval of the Berkshire Merger Agreement and Termination Fee to permit Elliott to obtain capital commitments for its superior, value-maximizing equitization plan.

WHEREFORE, Elliott respectfully requests that the Court adjourn the hearing on the approval of the Berkshire Merger Agreement and termination fee currently scheduled for August 10, 2017 for 35 to 40 days, or as soon thereafter as the Court determines appropriate.

Dated:  July 19, 2017
      Wilmington, Delaware

BAYARD, P.A.

*/s/ Evan T. Miller*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Evan T. Miller (No. 5364)
222 Delaware Avenue, Suite 900
Wilmington, Delaware  19801
Phone: (302) 655-5000
Facsimile: (302) 658-6395
Email: scousins@bayardlaw.com
     efay@bayardlaw.com
     emiller@bayardlaw.com

-and-

ROPES & GRAY LLP
Andrew G. Devore
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Email: Andrew.Devore@ropesgray.com

ROPES & GRAY LLP
Keith H. Wofford
Gregg M. Galardi
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: Keith.Wofford@ropesgray.com
     Gregg.Galardi@ropesgray.com

*Counsel to the Elliott Funds*