## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 11425, 11505** |

### EFH/EFIH DEBTORS' REPLY IN SUPPORT OF THE MOTION OF THE EFH/EFIH DEBTORS FOR ENTRY OF AN ORDER SCHEDULING CERTAIN HEARING DATES AND DEADLINES AND ESTABLISHING CERTAIN PROTOCOLS IN CONNECTION WITH CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF ENERGY FUTURE HOLDINGS CORP., ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, AND THE EFH/EFIH DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Energy Future Holdings Corp. ("EFH Corp."), certain of its direct and indirect

subsidiaries (together with EFH Corp., the "EFH Debtors"),[2] Energy Future Intermediate

Holding Company LLC ("EFIH"), and EFIH Finance, Inc. (together with EFIH, the "EFIH

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the Debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of Debtors in these chapter 11 cases, which are being jointly administered, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] The other EFH Debtors are Ebasco Services of Canada Limited, EEC Holdings, Inc., EECI, Inc., EFH Australia (No. 2) Holdings Company, EFH Finance (No. 2) Holdings Company, EFH FS Holdings Company, EFH Renewables Company LLC, Generation Development Company LLC, LSGT Gas Company LLC, LSGT SACROC, Inc., NCA Development Company LLC, and TXU Receivables Company.

Capitalized terms used but not defined herein shall have the meanings ascribed in the *Motion of the EFH/EFIH Debtors for Entry of an Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols in Connection with Confirmation of the Joint Plan of Reorganization of Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC, and the EFH/EFIH Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 11425] (the "Scheduling Motion").

<u>Debtors</u>," and together with the EFH Debtors, the "<u>Debtors</u>")  file this reply (this "<u>Reply</u>") in support of the Scheduling Motion and in response to the Elliott Funds' objection to the Scheduling Motion [D.I. 11505] (the "<u>Elliott Objection</u>"), the Sunrise Partners Limited Partnership objection to the Scheduling Motion [D.I. 11509] (the "<u>Sunrise Objection</u>" and the Sunrise Objection, the Elliott Objection, and the joinder to the Elliott Objection filed by UMB Bank, N.A., collectively the "<u>Objections</u>").  The Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.     The Court should overrule the Objections and grant the relief requested in the Scheduling Motion.  Today marks the 1,179th day in which the Debtors have been in chapter 11. In the last three years, two months, and 22 days, the Debtors have turned over every proverbial rock to explore all potential, executable options for restructuring the Debtors.  This has included formal and informal marketing processes, ultimately resulting in two merger agreements that would have comprehensively reorganized these Debtors, two confirmation trials for these Debtors, millions of pages of documents produced, a dozen expert reports, and exhaustive negotiations with no less than eight separate, highly sophisticated, differently-incentivized, and organized creditor constituencies.  These efforts have been in pursuit of a single goal: a path to exit that maximizes value for all of the Debtors' stakeholders.  Following the PUCT's ruling with respect to the NextEra transaction in particular, it became clear that any path to exit would require developing as much consensus as possible (and as early as possible) on regulatory commitments with the PUCT staff and key intervenors.  In the absence of regulatory support, it does not matter whether the Debtors (or any other party) are able to obtain financing in the amount of $9.00 or $9,000,000,000.00.

RLF1 17861272v.1

2.      Three years, two months, and 22 days later, the Debtors finally have an all-cash deal with a financially stable and well-operated utility holding company that has the general consensus of eight key intervenors on regulatory commitments.  Exit from chapter 11 is, at long last, on the horizon.  And with it, the cessation of interest rate accruals (over $50 million per month on account of the EFIH DIP facility and the EFIH second lien notes) and professional fee accruals, each of which erode unsecured creditor recoveries.

3.      The Objecting Parties are functionally asking (a) the Court to jeopardize the proposed Berkshire transaction (effectively rendering the Merger Agreement terminable) or (b) Berkshire to offer Elliott the continuation of a free option for an additional 30-45 days, for a total period of approximately 74 days between the signing of the Merger Agreement and the hearing to consider approval of the Merger Agreement.

4.      In exchange for such significant asks, Elliott is offering nothing except its word that it will ultimately raise $9.3 billion in committed financing and achieve the same or better general consensus regarding regulatory commitments, as compared to the Berkshire transaction. Elliott has offered no proof of committed financing and cannot offer any reasonable assurance of obtaining committed financing.[3]  Indeed, Elliott has asserted that it is the Debtors' obligation to raise capital for Elliott, whether or not the Debtors have another actionable proposal in hand. Elliott has shown no credible evidence of any regulatory support.  Elliott has no support from any EFH creditors.    What it *has* offered are a slew of misrepresentations and mischaracterizations regarding its discussions with the Debtors, key intervenors, and the PUCT staff—the latter of which required the PUCT Staff to send a letter clarifying the record and

---

[3] To date, Elliott has not even provided a draft form of commitment letter to the Debtors despite repeated requests.

stating that "any future communications between the PUCT Staff and Elliott outside of [] face-to-face meetings shall take place only in writing."  Stephany Decl., Ex. 1, Letter from Brian Lloyd dated July 17, 2017.

5.       To the extent the clouds part, the letter writing campaign stops, the self-aggrandizing pronouncements become supported by actual financing commitments from a credit worthy counterparty <u>and</u> robust regulatory support, the public misstatements and mischaracterizations of negotiations cease, and Elliott ultimately pulls together a higher or otherwise better offer than what is contemplated by the Merger Agreement, the Debtors are free to pursue (and would eagerly pursue) such an offer.  Elliott asserts that the Debtors' fiduciary out under the Merger Agreement is illusory after entry of the order approving the Merger Agreement because any offer after such date will likely need to account for the termination fee under the Merger Agreement.  That does not render the Debtors' fiduciary out illusory; that is quite simply the product of "gives and gets" negotiations that are informed by three years, two months, and 22 days in chapter 11.

6.       In any event, the hearing on the Scheduling Motion is not the proper forum to evaluate the merits of the Merger Agreement or Elliott's proposed transaction (if any).  To the extent Elliott ultimately produces an actionable proposal, it will have had at least 85 days to make good on its promise (*i.e.*, the period between signing the Elliott NDA (May 17, 2017) and the proposed date of the Merger Agreement approval hearing (August 10, 2017)) without having to address the termination fee under the Merger Agreement.  It is hard to imagine a credible financing effort would take longer.  The Court can evaluate whether the Elliott proposal warrants denying approval of the Merger Agreement at the approval hearing.  To adjourn the proposed schedule by 30-45 days at this juncture would make the Merger Agreement terminable by

Berkshire.  This is an unacceptable risk for the Debtors and their stakeholders to bear in the hopes that the Elliott transaction will coalesce in 30-45 days with both the necessary funding to satisfy, at minimum, all secured debt obligations at EFIH (approximately $8.8 billion) and at least the same level of general consensus on regulatory commitments.

## ARGUMENT

I.    **THE DEBTORS OWE FIDUCIARY DUTIES TO MAXIMIZE ESTATE VALUE FOR ALL OF THEIR RESPECTIVE STAKEHOLDERS AND SHOULD NOT BE FORCED TO JEOPARDIZE STAKEHOLDER RECOVERIES TO SUPPORT ELLIOTT'S DESPERATE SEARCH FOR FINANCING.**

7.    The Debtors' Proposed Scheduling Order lays the tracks for an efficient and speedy confirmation that maximizes estate value for all stakeholders.  The Elliott Objection and *The Elliott Funds' Motion to Adjourn Hearing on the Motion of the EFH/EFIH Debtors for Order Authorizing Entry Into Merger Agreement and Approving Termination Fee* [D.I. 11506] (the "Motion to Adjourn") are attempts to derail this path forward to either extract concessions from Berkshire or, if the Debtors, all other stakeholders, the PUCT, key Texas intervenors, and the Court take Elliott at its word, afford Elliott more time to remedy its current failure to secure financing, regulatory consensus, and EFH creditor support.[4]  Elliott claims the requests in its objection are "necessary to permit time for Elliott to raise $9.3 billion in capital . . . ."  Elliott Objection at ¶ 4.  Elliott has had two months to secure committed financing, and has thus far raised not a cent to the best of the Debtors' knowledge.  The Debtors have no obligation to delay approval of the Merger Agreement, endanger unsecured creditor recoveries, and ultimately bear the risk of Elliott's efforts so that Elliott has more time to try to develop an actionable alternative plan.  Rather, the Debtors owe a fiduciary duty to maximize the value of the estate for the benefit

---

[4] Nothing herein prejudices the rights of the Debtor to file an objection in response to the Motion to Adjourn in accordance with the deadline set by the Court.

of *all stakeholders*.  The Proposed Scheduling Order accomplishes just that by setting dates and deadlines that conform to the Merger Agreement milestones and establishing a discovery protocol that avoid excessive expenses and impose sensible limits on scope and conduct.

8.     Should Elliott succeed in obtaining committed financing from credit worthy entities and consensus from the key stakeholders regarding regulatory commitments, the Debtors are not restricted from considering its proposal further.   Indeed, the Debtors would actively consider (and eagerly engage on) any such offer that is higher or otherwise better than the transactions contemplated by the Merger Agreement.   The Merger Agreement contains a "fiduciary out" provision that allows the Debtors to terminate the Berkshire deal if it becomes inconsistent with their fiduciary duties.  *First*, prior to Court approval of the Merger Agreement, the Debtors are free to terminate the Merger Agreement for a superior proposal without paying any termination fee (*i.e.*, no earlier than August 10—a full 12 weeks after the Elliott NDA was signed, five weeks after the Merger Agreement was announced, and more than two weeks after this hearing).  Merger Agreement, ¶ 6.2(a)(i).  *Second*, although the Merger Agreement includes a standard "no shop" provision, it permits the Debtors to engage with any party who made a proposal prior to entry of the Merger Agreement Order—*i.e.*, Elliott.   Merger Agreement, ¶ 6.2(a)(ii).  *Third*, section 8.3(e) and section 8.3(f) of the Merger Agreement provide that EFH and/or EFIH may terminate the Merger Agreement at any time prior to confirmation if concurrently with such a termination, the Board "determines in its sole discretion after consultation with its independent financial advisors and outside legal counsel, and based on the advice of such counsel, that the failure to terminate this Agreement is inconsistent with its fiduciary duties . . . ."  Merger Agreement, ¶¶ 8.3(e), 8.3(f).  While the Debtors are confident that the Merger Agreement is currently the right path forward to maximize value for all stakeholders,

should that change in the future in the face of a higher or otherwise better offer, the Debtors would obviously consider other alternative proposals.

9.    Elliott characterizes the Debtors' fiduciary out as "illusory" because any offer that comes in after approval of the Merger Agreement will likely have to address satisfaction of the termination fee under the Merger Agreement.    Motion to Adjourn, ¶ 41.    The fact that the standard for measuring whether an alternative proposal is truly a higher or otherwise better offer shifts as circumstances change does not render a debtor's fiduciary out "illusory."    The facts facing the Debtors are unambiguous.    Interest rate accruals and professional fee burn are draining unsecured creditor recoveries.    Two prior confirmed plans as to the Debtors have failed to go effective.    The Debtors have exhaustively searched the market for a financially strong buyer willing to accept the regulatory limitations that are necessary for EFH and EFIH to emerge from chapter 11.    In exchange for agreeing to, among other key deal points, preserve the ring-fence (including agreeing to dividend restrictions, board control limitations, and capex commitments) and forego any financing conditions, Berkshire required the three-tiered fiduciary out construct detailed above and in the Merger Agreement.    The Debtors evaluated this request against, among other factors, the likelihood of finding another willing, financially stable buyer willing to invest in the Debtors and, equally importantly, willing to accept the regulatory commitments likely to be imposed by the PUCT.

10.    Finally, Elliott has already had over two months to secure financing, obtain regulatory support, and propose an actionable plan.    Elliott will have at least another three weeks to continue its efforts, without the imposition of a termination fee.    As described below, Elliott is not barred from continuing its efforts, and the Debtors are not barred from continuing to support Elliott's efforts.    Indeed, as discussed below, the Debtors have been actively working with Elliott

7

and its advisors for over nine weeks.  Delaying the proceedings, however, will harm the Debtors'

other stakeholders as the Debtors languish in chapter 11 and interest rate accruals and

professional fees continue to rapidly drain unsecured creditor recoveries.

II.     **THE   PROPOSED   ELLIOTT-SPONSORED   TRANSACTION   IS   NOT
        ACTIONABLE AT THIS TIME AND THE PROPOSED ADJOURNMENTS
        JEOPARDIZE CREDITOR RECOVERIES.**

        A.      **The Elliott Transaction: No Financing, No Regulatory Support, No EFH
                Creditor Support.**

        11.     To say the Elliott-sponsored transaction in its current form is rife with execution

risk would be an understatement.  Most significantly, neither the Debtors nor their advisors have

seen a single document indicating that Elliott has made any progress on obtaining committed

financing.   As discussed in greater detail below, the asserted obstacles to the committed

financing (*i.e.*, the overhang of the PIK PSA litigation (as defined in the Elliott Objection) and

the Debtors' alleged efforts to stifle Elliott's capital raise) are a gross misrepresentation of the

reality of the last two months.  The Debtors' funded debt obligations are significant and in the

restructuring world, cash is king.  With $8.8 billion in secured debt obligations alone—which

either must be paid in full, in cash or must receive an alternative, negotiated treatment to avoid

the EFIH Debtors spiraling into a chapter 7 liquidation—the Debtors and their stakeholders

simply cannot bear the risks associated with indulging a transaction proposal that currently has

zero dollars in committed financing and no regulatory consensus.  Finally, the Debtors are not

aware of any objective support from any EFH creditor constituencies for the Elliott-sponsored

transaction.   This is not surprising, given Elliott's failure to commit to preserving the EFH

Committee Settlement and the value of EFH Cash on hand for the benefit of EFH creditors.

        12.     Even if the Court set aside the absence of any committed financing or EFH

creditor support, the Court should consider closely that the proposed Elliott-sponsored

transaction has no regulatory support.  In its earlier (and now public letter), Elliott noted that "the

PUCT staff advised Elliott that it would accept the proposed equitization plan, subject to setting

the terms out in a formal agreement" and that Berkshire was "slightly further along in the

regulatory process."  Stephany Decl., Ex 2, Letter from Gregg Galardi dated July 11, 2017[5].  In

correspondence from Brian H. Lloyd, Executive Director for the Public Utility Commission of

Texas to counsel for Elliott, the PUCT Staff stated the following:

> Your July 11 letter represented that, based on upon the June 28, 2017 meeting attended by representatives of the Public Utility Commission of Texas (PUCT) Staff (including myself), the Office of the Attorney General of Texas, Oncor, and Elliott (including you and Jeff Rosenbaum), that ". . . the PUC Staff advised Elliott that it would accept the proposed equitization plan, subject to setting out the terms in a formal agreement." **No such advisement occurred at this meeting, as the attendees from the Office of the Attorney General of Texas and Oncor can attest**." (emphasis added).

Stephany Decl., Ex. 1, Letter from Brian Lloyd dated July 17, 2017.

13.     Mr. Lloyd went on to list ten key pieces of information that the PUCT Staff would

require, at a minimum, to evaluate the Elliott's proposed transaction:

- the composition of the new proposed ownership group;
- how the potential transaction will be financed;
- the continued debt levels at Oncor and Oncor Holdings;
- the continued debt levels at Energy Future Holdings (EFH) and Energy Future Intermediate Holdings (EFIH);
- whether there are potential code of conduct issues with any of the potential ownership group with respect to their interests in other Texas electricity market participants;
- the governance and levels of independence of the Oncor, Oncor Holdings, EFH, and EFIH boards;
- the composition and independence of the management of Oncor;
- how certain liabilities or potential liabilities related to asbestos litigation, certain income tax issues and other issues will be treated;
- analyses or discussions with rating agencies about the impacts of the above items on the credit ratings of Oncor, Oncor Holdings, EFH, and EFIH; and

---

[5] This letter was published on July 11, 2017.  *See* http://elliottdocs.com/energy-future.php (last accessed July 21, 2017).

- any assurances that will be made to ensure that the new owners will not slash capital expenditures, operating expenses, vegetation management, cyber-security investments or otherwise unduly restrict the ability of Oncor to fulfill its statutory obligation to reliably serve customers at just and reasonable rates.

*Id*.

14.    In short, the PUCT Staff does not have enough information to evaluate the Elliott-sponsored transaction and has disavowed any suggestion that it has "accepted" Elliott's proposed transaction structure.  The absence of any regulatory consensus is particularly concerning given that the Elliott-sponsored transaction contemplates incurring new, senior debt (via the new one-and-a-half lien and second-lien DIP facilities), which debt would have to be paid in full whether or not the Elliott-sponsored transaction ever received regulatory approval.  In other words, the Debtors could be faced with additional secured debt obligations (on top of the $8.8 billion in current secured debt obligations) and no available chapter 11 options in the event the Elliott-sponsored transaction does not close.[6]  Stephany Decl., Ex 3, Email (with attachments) from Gregg Galardi, dated July 1, 2017.

15.    The Elliott-sponsored transaction in its current form fails several requirements set forth in sections 1123 and 1129 of the Bankruptcy Code.  Given no committed financing, the transaction has no adequate means for implementation (failure to satisfy 1123(a)), no guarantee that the transaction will pass the best interests test (failure to satisfy 1129(a)(7)), no indication of support from any EFH creditor class or a plan to obtain such support (failure to satisfy 1129(a)(10)), and no ability to evaluate feasibility (failure to satisfy 1129(a)(11)).  If the Elliott-sponsored transaction truly coalesces into a higher or otherwise better offer than the transactions

---

[6] The Elliott proposal also contemplates approximately $4 billion in exit debt (*i.e.*, post-emergence debt that would remain at reorganized EFH and/or reorganized EFIH. The Merger Agreement does not contemplate any post-emergence debt at the reorganized entities.

proposed under the Merger Agreement, the Debtors, in an exercise of their fiduciary duty obligations, would actively pursue such an offer.

**B.    The Berkshire Transaction: All-Cash Deal With General Regulatory Consensus.**

16.    Accommodating Elliott's requested adjournments risks jeopardizing the entire proposed Berkshire transaction.  Section 8.4(h)(iii) of the Merger Agreement allows Berkshire to terminate if approval of the Disclosure Statement is not obtained by September 5, 2017.  Merger Agreement, ¶ 8.4(h)(iii).    Elliott proposes to adjourn the Disclosure Statement Hearing to approximately September 19, 2017.  Elliott Objection, ¶ 1.  This would necessarily result in the Debtors failing to meet a Merger Agreement milestone and give Berkshire the ability to terminate the Merger Agreement.  Compounding the issue, Elliott has also filed a motion to adjourn the hearing on the Merger Agreement to approximately September 19, 2017.  *Id.* Section 8.4(h)(ii) of the Merger Agreement provides that the Merger Agreement may be terminated at any point prior to closing if "the Bankruptcy Court does not enter the Approval Order within forty-five (45) days of the date of this Agreement."    Merger Agreement, ¶ 8.4(h)(ii).  As the parties executed the Merger Agreement on July 7, 2017, the milestone for Bankruptcy Court approval of the Merger Agreement is August 21, 2017.  Moving the date of either hearing unnecessarily puts the Berkshire deal at risk by making it impossible for the Debtors to satisfy the milestones in the Merger Agreement.  This is an unacceptable risk to bear without a corresponding benefit.

17.    The Merger Agreement reflects the Debtors' best option for maximizing value for all stakeholders.  The proposed transactions under the Berkshire Merger Agreement do not contain any financing conditions and reflect the general consensus of Oncor, the PUCT Staff, and, as of the date hereof, seven other key intervenors (the Cities Served by Oncor, the Texas

11

Industrial Energy Consumers group, the Office of Public Utility Counsel, TXU Energy, NRG Energy, the Texas Energy Association for Marketers, and the Alliance of Retail Markets) for the regulatory commitments to be included in Berkshire's and Oncor's change of control application with the PUCT, laying the groundwork for a more consensual PUCT regulatory approval process than has been achieved in these chapter 11 cases.    Stephany Decl., Ex 4, REPs' Agreed Regulatory Commitments - Addendum No. 1.  The Debtors have spent three years exploring all viable restructuring proposals for EFH and EFIH in a shifting regulatory landscape.  With every passing month, the EFIH Debtors burn over $50 million in interest expense on account of the EFIH DIP facility and the EFIH second lien notes, (to the detriment of the very stakeholders that are now asking the Debtors to further delay their path to emergence in the hopes that previously unattainable financing and regulatory support will suddenly coalesce and potentially those more senior to them). This is an unacceptable risk to bear without a corresponding benefit.

18.    Thus, in connection with the relief requested in the Motion, the Court is being asked to weigh the risk of endangering a comprehensive transaction with a well-established utility holding company, reflecting general regulatory consensus (eliminating the most significant source of uncertainty that has previously plagued the Debtors' emergence efforts) against the benefits of providing Elliott with another 35-40 days (in addition to the three months Elliott has already had, as discussed below) to obtain financing and comparable regulatory consensus.  The 85 days it has had between the signing of the Elliott NDA and the proposed Merger Agreement approval hearing is more than enough time for Elliott to achieve that goal. And if Elliott cannot achieve its goal in the three months of time it has been afforded (and with the Debtors' good faith efforts to facilitate its goal, as described below), that failure should not be borne by the Debtors' other stakeholders.

III. **THE RECORD SHOWS THE DEBTORS HAVE BEEN, AND REMAIN COMMITTED TO, SUPPORTING ELLIOTT'S EFFORTS TO DEVELOP AN ACTIONABLE, SUPERIOR PROPOSAL.**

19.    Elliott's failure to obtain, at a minimum, financing and regulatory support for its proposed transaction renders the Elliott proposal materially inferior to the proposed Merger Agreement.  None of the Debtors, their advisors, the Court, or any other significant stakeholder in this case has any indication of who Elliott's proposed financing sources may be, let alone whether such sources are guaranteed to actually provide such financing.  In fact, Elliott itself has not provided a draft commitment letter to the Debtors, let alone draft commitment letters from other allegedly credit-worthy financing sources.  Elliott has placed the blame for its failed efforts to date with the Debtors.  As discussed below, the Debtors have been, and remain committed to, supporting Elliott's efforts to develop an actionable, superior proposal.  Importantly, however, the Debtors cannot reasonably justify putting the recoveries of all other stakeholders at risk to allow Elliott to continue its uncertain efforts to obtain financing and regulatory consensus.

A.    **Correcting the Record: The PIK PSA Litigation.**

20.    On April 19, 2017, counsel for Elliott sent counsel for the Debtors a proposed outline on key points to be included in an amendment of the PIK PSA.  Stephany Decl., Ex. 5, E-mail from Gregg Galardi dated April 19, 2017.  Among other new requests, the proposal included:  (a) a termination date less than two months later; (b) the Debtors' agreement that Elliott could file a competing plan on 48 hours' notice; and (c) hair trigger termination events tied to the NextEra merger agreement (*i.e.*, the ability to terminate the PIK PSA if the NextEra merger agreement is terminated, NextEra does not file a motion for rehearing, or the PUCT denies a rehearing request).  *Id.*  During preliminary discussions on the proposal (which the Debtors responded to within 24 hours), the Debtors made clear that while they would be willing to support an Elliott-sponsored equitization plan, they could not consent to the filing of an

13

alternative, competing plan on as little as 48-hours' notice—the equivalent of consenting to allowing the Debtors' cases to descend into chaos. Stephany Decl., Ex. 6, E-mail from Aparna Yenamandra dated April 21, 2017. Three days later, counsel for Elliott submitted a revised turn of the proposed term sheet, reinstating the very changes the Debtors already said they could not accept. Stephany Decl., Ex. 7, E-mail from Gregg Galardi dated April 24, 2017.

21.    When it became clear that the PIK PSA amendment discussions had stalled, on April 28, 2017, the Debtors proactively offered Elliott a unilateral waiver under the PIK PSA, pursuant to which the Debtors would agree not to enforce the restrictions under the PIK PSA on Elliott's ability to have discussions with any parties regarding potential back-up proposals, provided such parties were subject to an NDA with the Debtors. Stephany Decl., Ex. 8, E-mail from Rebecca Chaikin dated April 28, 2017. Instead of engaging, on April 28, 2017, counsel for Elliott submitted a letter to the Debtors asserting (without any case authority) that the PIK PSA was not enforceable against Elliott. Stephany Decl., Ex. 9, Letter from Keith Wofford dated April 28, 2017. The Debtors had no choice but to withdraw their unilateral waiver request one day later. Stephany Decl., Ex. 10, Email from Chad Husnick dated April 29, 2017.

22.    Three days later, on May 1, 2017, counsel for Elliott asked the Debtors to "confirm that no claims exist or could be asserted in connection with" Elliott providing the Debtors with a proposal for a DIP financing facility. Stephany Decl., Ex. 11, E-mail from Gregg Galardi dated May 1, 2017. On May 2, 2017, counsel for the Debtors offered Elliott a waiver under the PIK PSA "to the extent necessary to permit Elliott to make a proposal to EFIH for debtor in possession financing." Stephany Decl., Ex. 12, E-mail from Chad Husnick dated May 2, 2017. Echoing its sentiments from a week earlier, counsel for Elliott responded with additional assertions regarding the enforceability of the PIK PSA. Stephany Decl., Ex.13, E-mail

from Chad Husnick dated May 3, 2017.  Yet again, in an effort to drive discussions forward, the Debtors offered an even broader unilateral waiver, allowing Elliott to engage in discussions and negotiations with any parties regarding a backup plan proposal (subject to an NDA) or financing proposal. Stephany Decl., Ex. 14, E-mail from Paul Keglevic dated May 4, 2017.  In response, Elliott noted that the Debtors were "still imposing restrictions that go beyond the PSA." *Id.*, Email from Jeff Rosenbaum, dated May 4, 2017.  **Thus, over a sixteen-day period, the Debtors offered Elliott a waiver from the PIK PSA (without requiring Elliott to ever concede it was bound by the PIK PSA) to freely engage in discussions regarding a backup plan and financing proposals.  Each of these offers was met with silence, a letter-writing campaign, or unproductive conclusory remarks regarding the enforceability of the PIK PSA.**[7]

23.    Finally, what is particularly surprising about Elliott's allegations that the Debtors' position on the enforceability of the PIK PSA precluded Elliott from obtaining financing commitments is the fact that Elliott itself agreed to adjourn the PIK PSA litigation schedule *two times during the 51-day period between the signing of the Elliott NDA and the termination of the Elliott NDA*:

- In particular, on May 16, 2017, the Court entered an order scheduling a preliminary injunction hearing on the PIK PSA litigation for June 12, 2017. Scheduling Order Regarding The Elliott Funds' Motion for Preliminary Injunction.  [Adv. No. 17-50479, D.I. 4].

- The Elliott NDA was signed on May 17, 2017.  Stephany Decl., Ex. 15, Confidentiality Agreement, dated May 17, 2017 between Elliott Management Corporation, Energy Future Holding Corp., and Energy Future Intermediate Holding Company LLC.

---

[7] It should be noted that Elliott commenced the PIK PSA litigation against the Debtors but the Elliott NDA ultimately referenced the very unilateral waiver the Debtors had offered Elliott several times, beginning on April 28, 2017.  Stephany Decl., Ex. 15, Confidentiality Agreement, dated May 17, 2017 between Elliott Management Corporation, Energy Future Holding Corp., and Energy Future Intermediate Holding Company LLC.

- On June 7th, Elliott and the Debtors mutually agreed to continue the preliminary injunction hearing to July 21st.  Stephany Decl., Ex. 20, Email from Gregg Galardi, dated June 6, 2017.

- On June 12th, Elliott and the Debtors mutually agreed to continue the preliminary injunction hearing to August 10th.  Notice of Agreement to Amend Certain of the Deadlines in the "Scheduling Order Regarding the Elliott Funds' Motion for Preliminary Injunction [D.I. 4]."  [Adv. No. 17-50479, D.I. 43].

- On July 10th, Elliott voluntary dismissed the PIK PSA litigation (following the termination of the PIK PSA).  Notice of Voluntary Dismissal Filed by Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership.  [Adv. No. 17-50479, D.I. 46].

24.     In other words, it is disingenuous for Elliott to assert at this time that the existence of the PIK PSA litigation prevented it from securing committed financing when Elliott itself voluntarily agreed to adjourn the PIK PSA litigation schedule (that was approved by the Court one day before Elliott signed the Elliott NDA) not once, but two times.  Either the PIK PSA litigation disincentivized potential financing sources (in which case, it is baffling that Elliott would agree to multiple adjournments of the PIK PSA litigation schedule) or the PIK PSA litigation did not independently disincentivize potential financing sources (in which case, Elliott's assertions to the contrary should be added to the existing compendium of Elliott misstatements).

**B.     Correcting the Record: NDA Discussions and Investor Materials**.

25.     On May 17, 2017, the Debtors and Elliott entered into an NDA (the "Elliott NDA").  By its terms, the Elliott NDA required the Debtors to "cleanse" "all of the Confidential Information provided to [Elliott] by the [Debtors] or the [Debtors'] Representatives." Stephany Decl., Ex. 15, Confidentiality Agreement, dated May 17, 2017 between Elliott Management Corporation, Energy Future Holding Corp., and Energy Future Intermediate Holding Company LLC.  This was an unusual request that no other party has ever made in these chapter 11 cases.

16

Nevertheless, the Debtors agreed to such terms, with the understanding that the Debtors would be necessarily limited in the confidential information they could provide Elliott, since any confidential information provided would be made public (regardless of whether such information was material).   Following execution of the Elliott NDA, the Debtors provided Elliott with confidential information that was published to the open market upon termination of the Elliott NDA. *See* http://elliottdocs.com/energy-future.php (last accessed July 21, 2017).

26.     The Elliott NDA also included a provision that permitted Elliott to discuss confidential matters with third parties that sign a joinder to the Elliott NDA.  Stephany Decl., Ex. 15, Confidentiality Agreement, dated May 17, 2017 between Elliott Management Corporation, Energy Future Holding Corp., and Energy Future Intermediate Holding Company LLC.  In the 51 days between signing the Elliott NDA (May 17, 2017) and termination of the Elliott NDA (July 7, 2017), exactly one party signed a joinder. Thus, to the best of the Debtors' knowledge, and assuming Elliott adhered to the terms of the Elliott NDA, over the course of 51 days, Elliott could only generate interest beyond high-level discussions from one party.  Importantly, because the Elliott NDA was signed after the Debtors' final unilateral waiver offer, Elliott could have mitigated the alleged risk of the PIK PSA litigation disincentivizing potential financing sources by simply accepting the unilateral waiver offer.  Instead, Elliott did as Elliott often does and took the litigation path.[8]  Now, 51 days later, Elliott suddenly argues that the PIK PSA somehow

---

[8] *See Verified Complaint for Declaratory and Injunctive Relief [Adv. No. 17-50479, D.I. 11223] and The Elliott Funds' Motion for Preliminary Injunction* [Adv. No. 17-50479, D.I. 4].

[9] *See, e.g., James Burton, Vulture Hedge Fund Elliott Management Seeking to Strip Hundreds of Millions From Carcass of Lehman Brothers in Legal Battle Over Debts,* THE DAILY MAIL, *May 18, 2017; Michael de la Merced, Samsung in Cross Hairs of American Hedge Fund,* THE NEW YORK TIMES, *Oct. 5, 2016; Paul Singer's Elliot Vulture Fund at Center of South Korean Impeachment,* LAROUCHE PAC, *Jan. 6, 2017; Natalie Sherman, Elliott Management: The Hedge Fund Not Afraid of a Fight,* BBC NEWS, *April 23, 2017.*

impeded their financing efforts, notwithstanding Elliott's willingness to delay the PIK PSA litigation two times.

27.     In connection with the Elliott NDA, on June 13, Elliott provided the Debtors with proposed materials to be shared with potential investors. Stephany Decl., Ex. 16, E-mail from Jeremy Grant dated June 13, 2017. On June 20, the Debtors submitted comments to such materials. Stephany Decl., Ex. 17, Email from Rebecca Chaikin dated June 20, 2017. The next day, Elliott submitted a revised turn of the materials, which did not reflect a number of the Debtors' comments.[10] Stephany Decl., Ex. 18, Email from Rebecca Chaikin dated June 22, 2017. On June 22, the Debtors identified these comments to Elliott and provided additional materials supporting the calculations in the Debtors' comments. *Id.* Elliott acknowledged receipt of such comments. Stephany Decl., Ex. 19, Email from Rebecca Chaikin dated June 23, 2017. Thus, any allegations that the Debtors did not cooperatively work with Elliott with respect to potential investor materials are baseless and disproved by Elliott's own correspondence.

28.     Finally, as stated above, Elliott has also "misrepresented the nature of the [PUCT Staff] meeting and [the PUCT Staff's] commitment" for Elliott's proposed transaction. Stephany Decl., Ex. 1, Letter from Brian Lloyd dated July 17, 2017.

---

[10] Importantly, Elliott's proposed materials contemplated an additional column of financial projections that adjusted Oncor capex downwards by over $300 million. In one of the Debtors' comments on June 22nd (which comment was not accepted by Elliott), the Debtors noted that "there can be no assurances as to whether adjusted capex will be accepted by the PUCT." Stephany Decl., Ex. 17, E-mail from Rebecca Chaikin dated June 20, 2017.

In the PUCT's letter to Elliott, the PUCT specifically referenced this construct and noted that "this discussion reflects precisely the types of concerns that the PUCT Staff and other parties have analyzed in great detail during the prior transactions." Stephany Decl., Ex. 1, Letter from Brian Lloyd dated July 17, 2017.

29.     After unpacking the slew of misstatements and mischaracterizations in Elliott's communications with the Debtors, the PUCT Staff, and the Court, two facts become clear: Elliott does not have the committed financing or regulatory support necessary to render its proposal actionable and Elliott did not take advantage of repeated opportunities to drive its own proposal forward.

## IV.    THE DATES AND PROTOCOL REVISIONS PROPOSED IN THE ELLIOTT OBJECTION ARE UNWORKABLE.

30.     All parties involved stand to benefit from an expedited resolution of these bankruptcy proceedings to ensure that creditor recoveries are maximized.  Indeed, Elliott agrees with the Debtors' request for a confirmation hearing in October.  Elliott Objection at ¶ 5.  But Elliott requests five changes to the Scheduling Order that would make an October confirmation hearing virtually impossible.  *First*, Elliott requests an adjournment of the Disclosure Statement Hearing 35 to 40 days.  *Second*, Elliott requests a one-week extension of the deadline to serve written discovery requests.  *Third*, Elliott demands that the Court require the Debtors to produce documents on a rolling basis.  *Fourth*, Elliott requests the removal of a protocol limiting requests that overlap with prior discovery.  *Fifth*, Elliott requests the inclusion of interrogatories and requests for admission. The Court should deny each of these requests and enter the Proposed Scheduling Order because the dates, deadlines, and protocol therein maximize estate value and ensure a speedy confirmation that preserves judicial resources and value for stakeholder recoveries.

### A.     Adjourning the Disclosure Statement Hearing 35 to 40 Days is Unworkable Due To the Triggering of Merger Agreement Termination Rights.

31.     The Debtors have proposed an August 10, 2017 hearing date for the Merger Agreement Motion and an August 11, 2017 hearing date for the Disclosure Statement.  These dates were not chosen arbitrarily.  Elliott requests an adjournment of the Disclosure Statement

Hearing 35 to 40 days in order to be heard "on the same day as, or a day following" the requested adjourned hearing on the Merger Agreement Motion. Elliott Objection at ¶ 2. But such a delay would prevent the Debtors from meeting Merger Agreement milestones, trigger Berkshire's termination rights, and jeopardize the Debtors' only currently actionable path to exit.

32.    Section 8.4(h)(iii) of the Merger Agreement allows Berkshire to terminate if approval of the Disclosure Statement is not obtained by September 5, 2017, and Section 6.3(g)(iv) requires the Debtors to use commercially reasonable efforts to obtain approval of the Disclosure Statement by August 28, 2017. Merger Agreement, ¶¶ 6.3(g)(iv), 8.4(h)(iii). Elliott's proposal would necessarily result in the Debtors failing to meet a Merger Agreement milestone and give Berkshire the ability to terminate the Merger Agreement. Compounding the issue, Elliott has also filed a motion to adjourn the hearing on the Merger Agreement to approximately September 19th. Section 8.4(h)(ii) of the Merger Agreement provides that the Merger Agreement may be terminated at any point prior to closing if "the Bankruptcy Court does not enter the Approval Order within forty-five (45) days of the date of this Agreement." Merger Agreement, ¶ 8.4(h)(ii). As the parties executed the Merger Agreement on July 7, 2017, the milestone for Bankruptcy Court approval of the Merger Agreement is August 21, 2017. Moving the date of either hearing unnecessarily puts this deal at risk by making it impossible for the Debtors to satisfy the milestones in the Merger Agreement. Elliott's efforts to delay the Disclosure Statement hearing in concert with the Motion to Adjourn put the Plan in jeopardy, and should be rejected.

33.    Additionally, the dates set forth in the Proposed Scheduling Order comply with all Bankruptcy Rules and Local Bankruptcy Rules. These rules require the deadline for parties to object to the Disclosure Statement to be set at least 28 days after the Disclosure Statement is

served and the hearing regarding approval of the Disclosure Statement to take place at least 35 days after the Disclosure Statement is served.  Fed. R. Bankr. P. 2002(b); Fed. R. Bankr. P. 3017(a); Bankr. D. Del. R. 3017-1(a).  The Proposed Schedule complies with the Bankruptcy Rules and the Local Bankruptcy Rules, affording twenty-eight days to object to the Disclosure Statement and thirty-five days to prepare for the Disclosure Statement hearing.  This is a practical timeline that permits all parties to conduct discovery and prepare any objections.

**B.      It is Virtually Impossible to Accommodate Elliott's Requested Adjournments and Maintain a Fall Confirmation Hearing Date**.

34.      Adjourning the Disclosure Statement Hearing by 35-40 days to approximately September 19, 2017 effectively eliminates the ability to commence Confirmation Proceedings by October 25, 2017.  Based on experience in these chapter 11 cases and the number of impaired classes that will likely be entitled to vote on the Plan, the Debtors' noticing agent will need at least 10 business days to complete service of the Plan, including by mailing the Solicitation Packages to Holders in all ten Voting Classes.  As a result, with Elliott's proposed adjournments, the resulting solicitation deadline would be October 5, 2017, and the Plan objection deadline would be November 2, 2017—28 days following completion of service of the Plan, in accordance with Local Rule 2002(b).  After factoring in the Debtors' Plan reply deadline, the deadline to file any *motions in limine*, the deadline for submission of final witness and exhibit lists, the deadline to file oppositions to *motions in limine*, and the final pre-trial conference, the Confirmation Hearing could not begin until well into November.

**C.      The Deadline for Written Discovery Should Be Set for July 27, 2017.**

35.      Elliott requests that the deadline for written discovery requests be extended by one week, from July 27 to August 3, 2017.  Elliott Objection at ¶¶ 8-14.  The purported basis for the requested extension is because Elliott needs additional time to retain and prepare experts who

will be asked to provide input on Elliott's discovery requests.  Even if this were a valid basis to delay the deadline for written discovery, and it is not, Elliott has known about the Merger Agreement and the Plan of Reorganization since July 7, 2017 and thus has had more than sufficient time to retain any experts needed to aide in formulating discovery requests.  The Court should not reward Elliott's dilatory tactics by extending the deadline for all parties to serve written discovery requests.[11]

> ### D.     The Court Should Require that All Parties Produce Documents on a Rolling Basis.

36.    Elliott requests that the parties agree to a rolling production of documents, with at least two prior rounds of production for the stated reason of avoiding a "document dump" two weeks before depositions begin.  Elliott Objection at ¶ 11.  Throughout these chapter 11 cases, the Debtors have regularly made rolling productions and will do the same in connection with the current confirmation discovery process, as they communicated to Elliott.  Any formal requirement obligating productions on a rolling basis should be reciprocal.  The Debtors propose that the following language be inserted into the Proposed Scheduling Order: "All Participating Parties shall make commercially reasonable efforts to produce documents on a rolling basis before the production deadline."

---

[11] Elliott's complaint about the imbalance of time for the Debtors to produce documents (41 days) and propounding parties time to review produced documents prior to depositions (12 days) is misleading. First, as explained below, the Debtors will make rolling productions, and Elliott will have more than 12 total days to review produced documents. Second, during that 41 days period, the parties must draft written responses and objections to discovery, devise search terms, meet and confer, and seek Court intervention if agreement cannot be reached, on top of reviewing and producing documents.  It is more than reasonable to allocate more time to the period before the final production deadline than after.

E.     **The Proposed Protocol Limiting Participating Parties From Serving Discovery Requests That Were Previously Sought and Preserves Estates and Judicial Resources.**

37.     The Proposed Scheduling Order seeks to preserve estate and judicial resources by preventing discovery overlap with prior document productions.  Proposed Scheduling Order, ¶ 20.  Elliott requests that this governing protocol be modified or eliminated, and that parties be permitted to serve discovery requests on all relevant matters.

38.     Elliott mischaracterizes the purpose of this provision when it argues that it would require Elliott to "locate all prior document requests that any party has ever served . . ., independently determine whether productions of such documents were actually made . . ., and then locate the relevant documents among the 6 million pages of documents the Debtors have produced in a repository."  Elliott Obj. ¶ 13.  Rather, this provision, which has been present in each scheduling order the Debtors have proposed in these chapter 11 cases, simply means the Debtors need not re-produce materials that have already been produced.[12]

39.     At Elliott's request, the Debtors facilitated Elliott's request to access to the discovery repository before Elliott even served any discovery.  Recognizing that Elliott was not a Participating Party in previous rounds of discovery, the Debtors are willing to assist Elliott in identifying reasonably targeted requests to identify previously-produced documents, but the

---

[12] *See Order Scheduling Certain Hearing Dates and Deadlines and Establishing Certain Protocols in Connection With the Confirmation of Debtors' Joint Plan of Reorganization and the Approval of Debtors' Disclosure Statement* [D.I. 8514] ("Participating Parties shall not serve discovery seeking the same documents from the same time period already produced by that Participating Party in response to other requests in these chapter 11 cases . . . ."); *Order (A) Scheduling Certain Hearing Dates and Deadlines, (B) Establishing Certain Protocols in Connection With the Confirmation of Debtors' Plan of Reorganization, and (C) Revising Certain Dates in the Disclosure Statement Scheduling Order* [D.I. 4916] ("Participating Parties shall not serve discovery seeking the same documents from the same time period already produced by that Participating Party in response to other requests in these chapter 11 cases . . . .").

Debtors should not have an obligation to scour prior productions so Elliott, the propounding party, need not make an effort to do so itself.

40.     This protocol has proven to encourage efficiency and preserve judicial and estate resources throughout these chapter 11 cases, and should not be abandoned now.   Moreover, the protocol only restricts service of discovery seeking "the same documents from the same time period already produced" by the Debtors.   The issues to be litigated in this proceeding are comparatively narrow, and relevant facts will in large part rely on documents created since the last time discovery was served in these chapter 11 cases.   To the extent Elliott serves discovery seeking materials that were produced in prior proceedings, the proposed schedule provides ample time for Elliott to review the documents already produced to the extent they are responsive to its own document requests.

**F.      The Participating Parties Should Be Prohibited From Serving Any Interrogatories Or Requests For Admission Aside From Those Authorized By The Proposed Order.**

41.     The Proposed Scheduling Order also seeks to preserve estate and judicial resources by prohibiting the use of interrogatories or requests for admission, except for those seeking names of witnesses with knowledge of discoverable information.   Proposed Scheduling Order, ¶¶ 17-18.   Elliott requests that this governing protocol be eliminated.   The Debtors have gone through three confirmation trials, and at every step of the way the Participating Parties have agreed to eliminate the use of these burdensome discovery tools.   Participating Parties can obtain similar information through more efficient means, such as depositions.   And if there are topics Elliott feels are inadequately addressed via depositions and requests for production, they can, upon a showing of good cause, request a Court order allowing a particular interrogatory or request for admission.   But allowing the parties to serve 20 interrogatories and 20 requests for admission is burdensome and unnecessary.

24

Dated: July 21, 2017
    Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
    defranceschi@rlf.com
    madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
    stephen.hessler@kirkland.com
    brian.schartz@kirkland.com
    aparna.yenamandra@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    marc.kieselstein@kirkland.com
    chad.husnick@kirkland.com
    steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession

RLF1 17861272v.1